# AGREEMENT OF LEASE

Between

## WEST GROUP, LLC

LANDLORD,

AND

## BED BATH & BEYOND INC.,

TENANT

DATED: November __, 1998

PREMISES LOCATED

IN

LITTLE ROCK, ARKANSAS

EXHIBIT

A

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed the date and year first above written.

WEST GROUP, LLC

By: _____
Name: _____
Title: _____

By: _____
Name: _____
Title: _____

By: _____
Name: _____
Title: _____

BED BATH & BEYOND INC.

By: _____
Name: Warren Eisenberg
Title:   Co-Chief Executive Officer

EXHIBIT I

DELIVERY DATE NOTICE

[Letterhead of Landlord]

_____, 199__

VIA CERTIFIED MAIL,
RETURN RECEIPT REQUESTED
BED BATH & BEYOND INC.
650 Liberty Avenue
Union, NJ 07083
Attn: Warren Eisenberg

Re:    Agreement of Lease, dated _____,
199__ (the "Lease"), between WEST
GROUP, LLC, as landlord ("Landlord"),
and BED BATH & BEYOND INC., as
tenant ("Tenant"), with respect to certain
retail premises (the "Premises") located in
the Chenal Place in  Little Rock, Arkansas

Gentlemen:

In accordance with the provisions of Section 5(b) of the Lease, Landlord hereby informs
Tenant that the Delivery Date shall take place on _____, 199__.  This notice shall
constitute the Delivery Date Notice referred to in Section 5(b) of the Lease.

WEST GROUP, LLC

By:_____
              , (Vice) President

cc:    Edward M. Schotz, Esq.
       Allan N. Rauch, Esq.

7.    Modifications to Landlord's Work    Tenant has to date made changes to Landlord's Work which have resulted in a net savings to Landlord of $27,652.00 (the "Net Savings"). Such changes are set forth on Schedule 1 attached hereto and made a part hereof (the "Change Orders"). Tenant hereby waives its right to reimbursement of the New Savings, and Landlord hereby waives its right to seek additional payments for the Change Orders.

8.    Exhibit F-2.    Exhibit F-2 attached to the Lease is hereby deleted and there is substituted in lieu thereof the Exhibit F-3 attached hereto and made a part hereof.

9.    Authority.    Landlord and Tenant each represent and warrant to the other that it has full right, power and authority to enter into this Amendment, and has obtained all necessary consents and resolutions from its members required under the documents governing its affairs in order to consummate this transaction, and the persons executing this Amendment have been duly authorized to do so.

10.    Ratification.    Except as modified hereby, all of the terms and conditions of the Lease shall remain in full force and effect.

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the day and year first above written.

LANDLORD:

WEST GROUP LLC

By: _____
Name: _____BEK Krisen_____
Title: _____member_____

By: _____
Name: _____E.J. Cooper_____
Title: _____member_____

By: _____
Name: _____Witney's Smith_____
Title: _____member_____

TENANT:

BED BATH & BEYOND INC.

By: _____
Name: _____Seth Geldzahler_____
Title: _____Real Estate Director_____



# LEGEND

- REVISED STAGING AREAS ••••
- CRITICAL FIXTURING COMMON AREA ━ ━ ━
- CRITICAL COMMON AREA ////

The parking and drive portions of the Critical Fixturing Common Area shall have a surface adequate to permit automobile parking and truck parking and delivery (including, without limitation, adequate surface flush to dock ramp for truck access thereto). A stoned fine graded surface or better shall be deemed adequate provided it permits the aforesaid parking and delivery.

# EXHIBIT B-1

Developer: WEST GROUP, L.L.C.
c/o C.J. Cropper
650 S. Shackleford Suite 320
Little Rock, AR 72212

# CHENAL PLACE SHOPPING CENTER
## LITTLE ROCK, ARKANSAS

<u>Rent Commencement and Expiration Date Agreement</u>

THIS AGREEMENT, made as of this 13th day of August 1999, by and between WEST GROUP, LLC (hereinafter called "Landlord") and BED BATH & BEYOND INC. (hereinafter called "Tenant").

## W I T N E S S E T H :

WHEREAS, Landlord is the owner of a certain shopping center known as Chenal Place (the Shopping Center), situated in Little Rock, Arkansas;

WHEREAS, by that certain lease dated November 18, 1999 (herein called the "Lease"), Landlord leased a portion (the "Premises") of the Shopping Center to Tenant;

WHEREAS, Tenant is in possession of the Premises and the Term of the Lease has commenced; and

WHEREAS, under Section 1(j) of the Lease, Landlord and Tenant agreed to enter into an agreement setting forth certain information in respect of the Premises and the Lease.

NOW, THEREFORE, Landlord and Tenant agree as follows:

1.     The Rent Commencement Date was July 30, 1999.

2.     The Term of the Lease shall expire on January 31, 2010, unless Tenant exercises any option to extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

3.     The date of commencement of the first Renewal Period shall be February 1, 2010, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 2015, unless Tenant exercises any option to further extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

4.     The date of commencement of the second Renewal Period shall be February 1, 2015, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 2020, unless Tenant exercises any option to further extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

5.     The date of commencement of the third Renewal Period shall be February 1, 2020, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 2025, unless Tenant exercises any option to further extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

6.     The date of commencement of the fourth Renewal Period shall be February 1, 2025, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 2030, unless the Lease terminates earlier as provided in the Lease.

7.     Capitalized terms not defined herein shall have the same meaning as set forth in the Lease.



## EXHIBIT F-3

MONUMENT SIGN



EXHIBIT F-5

BED BATH & BEYOND

STAPLES

REVISED DESIGN.

TENANT

## TABLE OF CONTENTS

Page

SECTION 1.  DEFINITIONS AND BASIC TERMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
SECTION 2.  LEASE OF PREMISES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
SECTION 3.  LEASE TERM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
SECTION 4.  PAYMENT OF FIXED RENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
SECTION 5.  IMPROVEMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
SECTION 6.  REAL ESTATE AND OTHER TAXES . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
SECTION 7.  PERMITTED AND PROHIBITED USES . . . . . . . . . . . . . . . . . . . . . . . . . 27
SECTION 8.  UTILITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
SECTION 9.  MUTUAL RELEASE, WAIVER OF SUBROGATION AND MUTUAL
            INDEMNIFICATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
SECTION 10. SIGNS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
SECTION 11. ALTERATIONS AND IMPROVEMENTS . . . . . . . . . . . . . . . . . . . . . . . . 34
SECTION 12. ACCESS TO SHOPPING CENTER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
SECTION 13. COMMON AREAS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
SECTION 14. PARKING AREAS AND OTHER COMMON AREAS . . . . . . . . . . . . . . . 40
SECTION 15. TENANT'S INSURANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
SECTION 16. LANDLORD'S INSURANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
SECTION 17. REPAIRS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
SECTION 18. TENANT DEFAULT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
SECTION 19. LANDLORD DEFAULT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
SECTION 20. LANDLORD'S ENTRY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
SECTION 21. FIRE AND OTHER CASUALTY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
SECTION 22. EMINENT DOMAIN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
SECTION 23. EXCLUSIVES IN CENTER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53
SECTION 24. RIGHT TO MORTGAGE AND NON-DISTURBANCE . . . . . . . . . . . . . . 55
SECTION 25. TENANT ASSIGNMENT AND SUBLETTING . . . . . . . . . . . . . . . . . . . . 55
SECTION 26. NOTICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57
SECTION 27. SHORT FORM LEASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57
SECTION 28. ENTIRE AGREEMENT AND MODIFICATION . . . . . . . . . . . . . . . . . . . 58
SECTION 29. SEVERABILITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58
SECTION 30. GRAMMATICAL USAGES AND CONSTRUCTION . . . . . . . . . . . . . . . 58
SECTION 31. TABLE OF CONTENTS, LINE NUMBERING AND PARAGRAPH
            HEADINGS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58
SECTION 32. NO JOINT VENTURE OR PARTNERSHIP CREATED BY LEASE . . . . . . 58
SECTION 33. BROKER'S COMMISSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58
SECTION 34. RIGHTS CUMULATIVE; DEFINITION OF LANDLORD . . . . . . . . . . . 59
SECTION 35. NON-WAIVER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59
SECTION 36. LIMITATION OF LANDLORD'S LIABILITY . . . . . . . . . . . . . . . . . . . . . 59
SECTION 37. SURRENDER OF PREMISES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60
SECTION 38. SUCCESSORS AND ASSIGNS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60
SECTION 39. FORCE MAJEURE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60
SECTION 40. HOLD OVER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60
SECTION 41. CONSENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60
SECTION 42. DECLARATION OF CONTRACTUAL LIABILITY . . . . . . . . . . . . . . . . 61
SECTION 43. QUIET ENJOYMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61
SECTION 44. ESTOPPEL CERTIFICATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61
SECTION 45. COSTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61
SECTION 46. OPTIONS TO EXTEND TERM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61
SECTION 47. GOVERNING LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62
SECTION 48. ATTORNEYS' FEES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62
SECTION 49. PAYMENT UNDER PROTEST . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63
SECTION 50. WORK PERFORMED UNDER PROTEST . . . . . . . . . . . . . . . . . . . . . . . 63
SECTION 51. CONDUCT OF BUSINESS OPERATIONS . . . . . . . . . . . . . . . . . . . . . . 63
SECTION 52. ABATEMENT OF RENT CHARGES . . . . . . . . . . . . . . . . . . . . . . . . . . . 64
SECTION 53. WARRANTIES AND REPRESENTATIONS . . . . . . . . . . . . . . . . . . . . . . 64
SECTION 54. ARBITRATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65
SECTION 55. LIENS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65
SECTION 56. DEFINITION OF HEREUNDER, HEREIN, ETC. . . . . . . . . . . . . . . . . . . 66
SECTION 57. TENANT'S PROPERTY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

SECTION 58. TENANT'S RIGHT OF FIRST OFFER ............................. 66
SECTION 59. LIMITATION OF TENANT'S LIABILITY ......................... 67
SECTION 60. TENANT'S RIGHT OF TERMINATION ........................... 67
SECTION 61. SURVIVAL OF OBLIGATIONS .................................. 68
SECTION 62. ENVIRONMENTAL MATTERS ................................... 68
SECTION 63. EXECUTION OF THIS LEASE .................................. 71
SECTION 64. REA ....................................................... 71

EXHIBIT A -    Legal Description of Shopping Center
EXHIBIT B -    Site Plan of Development (including the Shopping Center)
EXHIBIT C -    Rent Commencement and Expiration Date Agreement
EXHIBIT D -    Specifications for Landlord's Work
EXHIBIT D-1 -  Front Elevation of Premises [including building signage] and of Shopping Center
EXHIBIT E -    Permitted Encumbrances
EXHIBIT F-1 -  Coming Soon Sign
EXHIBIT F-2 -  Pylon and Monument Signs
EXHIBIT G -    Subordination, Non-Disturbance and Attornment Agreement
EXHIBIT H -    Recognition Agreement
EXHIBIT I -    Delivery Date Notice
EXHIBIT J -    Delivery Date Certification
EXHIBIT K-1 -  [Intentionally Omitted]
EXHIBIT K-2 -  [Intentionally Omitted]
EXHIBIT L -    Restrictions

## LEASE AGREEMENT

**THIS LEASE AGREEMENT** ("Lease") is entered into as of November ___, 1998 by and between WEST GROUP, LLC, an Arkansas limited liability company, having an office c/o K & L Realty, #5 Innwood Circle, Suite 105, Little Rock, Arkansas 92211 ("Landlord"), and BED BATH & BEYOND INC., a New York corporation, having an office at 650 Liberty Avenue, Union, New Jersey 07083 ("Tenant").

### W I T N E S S E T H:

**SECTION 1.  DEFINITIONS AND BASIC TERMS.** The following terms shall have the meanings set forth in this Section 1 except as otherwise expressly provided herein:

Additional Rent: Any monies which Tenant is required to pay to Landlord under the terms and conditions of this Lease, other than Fixed Rent.

Adjusted Break Point: As defined in Section 4(c) of this Lease.

Adjusted Percentage Multiple: As defined in Section 4(c) of this Lease.

Broker: The C. J. Cropper Co.  [see Section 33 of this Lease]

Column Layout: As defined in Section 5(a) of this Lease.

Commencement Date: The date hereof.

Common Areas:  All areas which are, from time to time, available for the joint use and benefit of Tenant and other tenants and occupants of the Shopping Center, and their respective employees, agents, subtenants, concessionaires, licensees, customers and other invitees, including but not limited to any and all parking areas, parking spaces, driveways, truck serviceways, passageways, sidewalks, entrances, exits, lighting facilities, courts, landscaped areas, retention or detention areas, and common utility lines.

Common Areas Charges: As defined in Section 13(c) of this Lease.

Compliance Costs: As defined in Section 62(a) of this Lease.

Delivery Date: As defined in Section 5(b) of this Lease.

Development: Lots 1, 2, 3 and 4 as shown on Exhibit B.

educational uses: As defined in Section 7(b) of this Lease.

End Months: As defined in Section 4(c) of this Lease.

Environmental Laws: As defined in Section 62(a) of this Lease.

Environmental Notice: As defined in Section 62(a) of this Lease.

Event of Default: As defined in Section 18(a) of this Lease.

Exclusive Items: As defined in Section 23(a) of this Lease.

Excused Periods: Such periods of time during which Tenant's failure or refusal to conduct the operations of its business or any other business (w) resulted from alterations or renovations being performed in and to the Premises, (x) was caused by damage or destruction, eminent domain proceedings or actions, or Force Majeure, (y) occurred during the course of diligent good-faith efforts by Tenant to assign Tenant's interest in this Lease or to sublease all or any portion of the Premises, or (z) was caused by any act or omission of Landlord.

Exhibits. The following Exhibits are annexed hereto and made a part hereof:

EXHIBIT A - Legal Description of Shopping Center

EXHIBIT B - Site Plan of Development (including the Shopping Center)

EXHIBIT C - Rent Commencement and Expiration Date Agreement

EXHIBIT D - Specifications for Landlord's Work

EXHIBIT D-1 Front Elevation of Premises [including building signage] and of Shopping Center

EXHIBIT E - Permitted Encumbrances

EXHIBIT F-1 - Coming Soon Sign

EXHIBIT F-2 - Pylon and Monument Signs

EXHIBIT G - Subordination, Non-Disturbance and Attornment Agreement

EXHIBIT H - Recognition Agreement

EXHIBIT I - Delivery Date Notice

EXHIBIT J - Delivery Date Certification

EXHIBIT K-1 - [Intentionally Omitted]

EXHIBIT K-2 - [Intentionally Omitted]

EXHIBIT L - Restrictions

Expiration Date: The date on which the Term of this Lease expires.

Extended Date: As defined in Section 5(a) of this Lease.

Fee: As defined in Section 4(c) of this Lease.

Final Plans and Specifications: As defined in Section 5(a) of this Lease.

Fixed Rent: The following amounts for the periods indicated:

(i) For the period commencing on the Rent Commencement Date and ending on the last day of the original Term, at the rate of Four Hundred Twenty-Five Thousand Six

37,813.59 ?        35,292.13 per Mo

Hundred Eighty-Nine and 60/100 ($425,689.60) Dollars per year [based on Eleven and 20/100

($11.20) Dollars per square foot of Floor Area];

       (ii)    In the event Tenant exercises the first Renewal Option,  for the first

five (5) year Renewal Period, at the rate of Four Hundred Fifty-Four Thousand One Hundred

Ninety-Five and 60/100 ($454,195.60) Dollars per year [based on Eleven and 95/100 ($11.95)

Dollars per square foot of Floor Area];    8/1/04  37,655.45 per Mo

       (iii)    In the event Tenant exercises the second Renewal Option, for the

second five (5) year Renewal Period, at the rate of Four Hundred Seventy-Three Thousand One

Hundred Ninety-Nine and 60/100 ($473,199.60) Dollars per year [based on Twelve and 45/100

($12.45) Dollars per square foot of Floor Area];    8/1/09  39,230.99 per Mo.

       (iv)    In the event Tenant exercises the third Renewal Option, for the third

five (5) year Renewal Period, at the rate of Four Hundred Ninety-Two Thousand Two Hundred

Three and 60/100 ($492,203.60) Dollars per year [based on Twelve and 95/100 ($12.95) Dollars per

square foot of Floor Area]; and    8/1/14  40,806.53 per Mo

       (v)    In the event Tenant exercises the fourth Renewal Option, for the fourth

five (5) year Renewal Period, at the rate of Five Hundred Eleven Thousand Two Hundred Seven and

60/100 ($511,207.60) Dollars per year [based on Thirteen and 45/100 ($13.45) Dollars per square

foot of Floor Area].    8/1/19  42,382.07

    Floor Area:  The actual number of square feet of space contained on all floors within any

building area in the Shopping Center (including the Premises) and, with respect to exterior areas,

including all exterior areas leased to or exclusively used by one or more tenants (other than exterior

loading dock areas).  All measurements pursuant to this paragraph shall be from the exterior of

outside walls or store front and/or to the centerline of any common walls, but in no event shall Floor

Area within either the Premises or the remainder of the Shopping Center include any non-selling or

storage space areas within any mezzanine, second floor or, except as set forth above, any exterior

areas.

    Force Majeure:  A delay, hindrance in, or prevention from, the performance of any act

required hereunder (except for the payment of a monetary sum to be paid by either party to the other

party) which is caused by strikes, inability to procure materials, failure of power, restrictive

governmental laws or regulations, riots, insurrection, war or other reasons of a like nature which are

not the fault of the party delayed in performing work or doing acts required under the terms of this

Lease.

Gross Sales: As defined in Section 4(c) of this Lease.

Hazardous Substances: As defined in Section 62(a) of this Lease.

Inducement Date: As defined in Section 4(b) of this Lease.

Inducement Opening Period: As defined in Section 4(b) of this Lease.

Inducement Tenants: As defined in Section 5(b) of this Lease.

Institutional Lender:   A state or federally regulated bank, savings and loan association, insurance company, pension fund, credit union, REIT, a state or federally regulated lender or any other recognized lender.

Insurance Rebate: As defined in Section 16(b) of this Lease.

Landlord: As defined in the introductory paragraph and Section 34 of this Lease (or, as applicable, its successors and assigns pursuant to the further provisions of this Lease).

Landlord's Mailing Address: c/o K & L Realty, #5 Innwood Circle, Suite, 105, Little Rock, Arkansas 92211, or such other place and/or to the attention of such other person as Landlord may notify Tenant in writing from time to time.

Landlord's Work: As defined in Section 5(a) of this Lease.

Lease: As defined in the introductory paragraph of this Lease.

Lease Interest Rate:   The then effective prime rate as announced from time to time by the Wall Street Journal plus two (2%) percent.

Licensees: As defined in Section 4(c) of this Lease.

Major Assignee: As defined in Section 25(c) of this Lease.

Major Guarantor: As defined in Section 25(c) of this Lease.

obnoxious or a nuisance: As defined in Section 7(b) of this Lease.

Offered Space: As defined in Section 58 of this Lease.

Offering Notice: As defined in Section 58 of this Lease.

Original Tenant: Bed Bath & Beyond Inc., a New York corporation

Partial Last Year: As defined in Section 4(c) of this Lease.

Paying Agent: BBBY Management Corporation, a New York corporation.

Percentage Multiple: Three (3%) percent.

Percentage Rent: As defined in Section 4(c) of this Lease.

Permitted Encumbrances: As defined in Section 5(b)(iv) of this Lease.

Permitted Items: As defined within the definition of "Permitted Use" in this Section 1.

Permitted Use: The sale at retail of a variety of linens and domestics (including but not limited to sheets, bedspreads, comforters, duvets, pillows, pillow covers, chair pads, placemats, tablecloths, dish towels, oven mittens and aprons); bathroom items (including but not limited to towels, shower curtains, bathroom rugs, toilet seats, health and beauty aids, personal care products and other bathroom accessories); personal care devices (including but not limited to electric razors, shavers, toothbrushes and hair dryers); home furnishings; area rugs; housewares (including but not limited to utensils, kitchen utensils, appliances and "gadgets," cleaning appliances and supplies, cookware, bakeware, dishes and china, glassware, kitchen and bathroom appliances, garbage pails, ironing boards and other laundry items, mops and brooms, ready-to-assemble furniture and artificial flowers); wall and floor coverings; furniture; window treatments; decorative accessories; frames and wall art; photo albums; photo storage boxes; closet, shelving and storage items; luggage; books; party supplies; cards and stationery; seasonal items; juvenile merchandise (including but not limited to toys, car seats and safety-proofing items); specialty food items; food and non-alcoholic beverage services; any and all other items sold or services provided from time to time in any store owned or operated by Tenant or any entity affiliated with Tenant (all of the aforementioned items are hereinafter collectively called the "Permitted Items"); and for any other lawful retail use not specifically prohibited by the provisions of Section 7(c) of this Lease. In addition, Tenant shall be permitted to use portions of the Premises for storage and office uses incidental to the Permitted Use. Tenant's assignees, sublessees, licensees and concessionaires shall be permitted to use the Premises (or the applicable portion thereof) for the uses permitted in Section 25 hereof.

pornographic use: As defined in Section 7(b) of this Lease.

Premises: Being the area cross-hatched on Exhibit B, containing approximately thirty-eight thousand and eight (38,008) square feet of Floor Area and approximately one thousand two hundred (1,200) square feet of non-selling space on the mezzanine level for non-selling office purposes. In no event shall such non-selling space result in any charge to Tenant by way of Fixed Rent or any Additional Rent, nor shall such non-selling space be included in the determination of Tenant's Pro Rata Share. At least ninety (90) days prior to the Delivery Date, exact measurements of the Floor Area of the Premises, the square footage of the non-selling space of the Premises and the Floor Area of the Shopping Center shall be made and certified to Tenant by Landlord's licensed architect, surveyor or engineer. The measurements of Landlord's licensed architect, surveyor or engineer shall be subject to confirmation by Tenant's licensed architect, surveyor or engineer. In the event Landlord has failed to deliver such certification to Tenant as set forth above, Tenant shall have the right to

have either or both of such measurements made and certified to Landlord by Tenant's licensed architect, surveyor or engineer, and the cost of such measurement(s), in an amount not to exceed Twenty-Five Hundred ($2,500.00) Dollars, shall be credited to Tenant against the first payment of Fixed Rent due hereunder. In the event the measurement of the Premises shall indicate a Floor Area less than the Floor Area of the Premises set forth above, the parties hereto shall promptly execute an amendment to this Lease reducing, as applicable, the Fixed Rent and any other applicable provision of this Lease (including, without limitation, the Sales Break Point) to conform to the exact measurement. Notwithstanding the provisions of the immediately preceding sentence, the parties hereto agree that (x) with respect to any non-selling office space on the mezzanine level, in the event the measurement of either such space indicates a square footage which is more than fifty (50) square feet less than the size of such space set forth above, then, for each square foot of such space deficiency in excess of fifty (50) square feet, the Floor Area of the Premises shall be deemed to have been reduced by one square foot, and the reduction in the Fixed Rent and any other applicable provision of this Lease (including, without limitation, a proportionate reduction in Tenant's Pro Rata Share, but excluding any reduction in the Sales Break Point) shall apply; (y) if the Floor Area of the Premises is determined or deemed to be less than the Floor Area of the Premises set forth above, Tenant shall receive a proportional refund of any Rent previously paid to Landlord pursuant to the terms of this Lease, and (z) if (i) the Floor Area of the Premises is determined to be less than thirty-seven thousand five hundred (37,500) square feet, or (ii) if the non-selling office space on the office mezzanine is determined to be less than one thousand one hundred (1,100) square feet, then, in any such event, Tenant shall have the right to terminate this Lease upon notice to Landlord given within fifteen (15) days after Tenant's receipt of the final measurement determination and to receive a refund from Landlord of all sums (a) paid to Landlord pursuant to the terms of this Lease, and (b) incurred by Tenant in connection with Tenant's Work. In the event the measurement of the Premises shall indicate a Floor Area more than the Floor Area of the Premises set forth above (i.e. thirty-eight thousand and eight (38,008) square feet), the Fixed Rent shall not be increased by reason thereof, nor shall such excess Floor Area be utilized in the determination of Tenant's Pro Rata Share under this Lease. In addition to the measurements of the Floor Area described above, the Floor Area of the Premises and of the Shopping Center shall be increased or decreased, as the case may be, and in accordance with the provisions contained within the definition of "Floor Area" in this Section 1, as walls which previously constituted outside walls become common walls, and as walls which previously constituted common walls become outside walls. Any dispute between the parties with

respect to the Floor Area of the Premises, the square footage of said non-selling space or the Floor Area of the Shopping Center shall be resolved by arbitration in accordance with the provisions of Section 54 below.

Prohibited Uses: As defined in Section 7(b) of this Lease.

punch list items: Such minor items of fit and finish which, when considered as a whole, do not materially adversely affect either (i) the performance of Tenant's Work, or (ii) Tenant's ability to conduct its normal business operations in the Premises.

Recission Notice: As defined in Sections 11(e) and 51 of this Lease.

Related Company: A corporation, partnership, person or other entity which is controlling, controlled by, or under common control with, Landlord or Tenant (as applicable).

Related Land: As defined in Section 7(b) of this Lease.

Release: As defined in Section 62(a) of this Lease.

Renewal Option: As defined in Section 46(a) of this Lease.

Renewal Period(s): As defined in Section 46(a) of this Lease.

Rent: As defined in Section 4(a) of this Lease

Rent Commencement Date: The first to occur of the following two (2) dates: (i) the date which Tenant shall establish in its published advertisement as its grand opening [but not later than ten (10) days after the date upon which Tenant shall open the Premises to the general public for business]; or (ii) the date that is fifty (50) days after the Delivery Date; except, however, if for any reason whatsoever [including, without limitation, Force Majeure], the date established pursuant to (ii) occurs between October 1 and the following March 31 (the "Slack Period"), Tenant shall have the right to delay the Rent Commencement Date without payment of Rent or penalty until the end of the Slack Period (and also, at its election, delay its acceptance of physical possession of the Premises up to the date which is thirty (30) days prior to the end of the Slack Period). Notwithstanding the foregoing, in the event that the date established pursuant to (ii) above occurs during the Slack Period, or in the event the Delivery Date occurs during the Slack Period, and Tenant, nevertheless, elects to open the Premises to the general public for business prior to the next following April 1, then, the Rent Commencement Date shall be the date determined in accordance with (i) above but, commencing on such Rent Commencement Date and continuing until the next following April 1, Tenant shall be entitled to a full abatement of Fixed Rent and Tenant shall be liable only for the payment of (A) Tenant's Pro Rata Share of Taxes and Common Areas Charges, and (B) Percentage Rent, except that for purposes of this paragraph, (1) the Sales Break Point shall

be deemed to be One ($1.00) Dollar, and (2) in no event shall the aggregate Percentage Rent payable during such period exceed one-half (½) of the amount which the Fixed Rent would otherwise have been payable with respect to such period. Landlord and Tenant agree that any abatement of Fixed Rent which inures to the benefit of Tenant in accordance with the provisions of this paragraph shall constitute a reimbursement to Tenant for certain pre-opening expenses incurred by Tenant in connection with this Lease. Within ten (10) days after the Rent Commencement Date has been determined, Landlord and Tenant shall execute and deliver to each other a Rent Commencement and Expiration Date Agreement in the form provided in Exhibit C setting forth the Rent Commencement Date, the expiration date of the original Term and the dates of commencement of the Renewal Periods.

Sales Break Point: As defined in Section 4(c) of this Lease.

Shopping Center: The shopping center commonly known as Chenal Place, containing approximately ninety-two thousand four hundred fifty-seven (92,457) square feet of Floor Area, located on the property between Chenal Parkway and Atkins Road in Little Rock, Arkansas, shown as Lots 3 and 4 on Exhibit B and more fully described in Exhibit A. Landlord represents that there exist no strips or gores between said Lots 3 and 4 which are not owned by Landlord. Landlord shall not change the name of the Shopping Center without at least ninety (90) days prior notice to Tenant, and Landlord covenants and agrees not to include the name of any tenant (other than Tenant) in the name of the Shopping Center.

Slack Period: As defined within the definition of "Rent Commencement Date" in this Section 1.

Special Delivery Conditions: As defined in Section 5(b) of this Lease.

Substantially Completed or Substantial Completion: The completion of specified work at the Shopping Center (including without limitation, as applicable, Landlord's Work) to the extent that only so-called "punch list" items of such work (as hereinabove defined) shall not be completed.

Taxes: As defined in Section 6(a) of this Lease.

Tenant: As defined in the introductory paragraph of this Lease (or, as applicable, its successors and assigns pursuant to the further provisions of this Lease).

Tenant's Administrative Costs: As defined in Section 5(b) of this Lease.

Tenant's Mailing Address: 650 Liberty Avenue, Union, New Jersey 07083, Attn: Mr. Warren Eisenberg, or such other place and/or to the attention of such other person as Tenant may notify Landlord from time to time.

Tenant's Plans: As defined in Section 5(a) of this Lease.

Tenant's Pro Rata Share: A fraction whose numerator is the Floor Area of the Premises [as determined pursuant to the provisions of the definition of "Floor Area" in this Section 1] and whose denominator is the annual average Floor Area of the Shopping Center [as determined pursuant to the provisions of the definition of "Premises" in this Section 1]. Tenant's Pro Rata Share shall be redetermined any time buildings (and/or Floor Area) are added to or removed from the Shopping Center, but in no event shall Tenant's Pro Rata Share be greater than fifty (50%) percent. A building shall be deemed added to or removed from the Shopping Center on the earlier of (i) the date upon which the building is opened to the public for business, or (ii) at such time as an assessment for Taxes is made or removed, as the case may be, with respect to such building. Within ten (10) days following written request from Tenant, Landlord shall certify to Tenant in writing as to the then Floor Area of the Shopping Center (as determined pursuant to the provisions contained within the definition of "Premises" in this Section 1.

Tenant's Property: All of Tenant's personal property, including, without limitation, phone and alarm systems, satellite antennae, shelving, computers, furniture, cash registers and customer service counters, specialty lighting, track lighting, millage, conveyor systems, storage racks and signage and any and all other personal property of Tenant which is capable of being removed from the Premises without material damage thereto, but which shall not include electrical systems, HVAC and other mechanical systems, flooring, carpet, elevators, standard lighting and wiring installed within the walls of the Premises.

Tenant Related Parties: As defined in Section 62(a) of this Lease.

Tenant Releases: As defined in Section 62(a) of this Lease.

Tenant's Specified Costs: As defined in Section 5(b) of this Lease.

Tenant's Work: As defined in Section 5(a) of this Lease.

Term: An original period of approximately ten (10) years beginning on the Rent Commencement Date and ending at midnight on the last day of January following the tenth (10th) anniversary of the Rent Commencement Date. As used herein, "Term" shall refer to the original Term and any Renewal Period exercised pursuant to Section 46 below, as the context shall require.

SECTION 2. LEASE OF PREMISES. As of the Commencement Date, Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the Premises together with any and all rights, benefits, privileges and easements, now or hereafter appurtenant thereto, arising out of any public or private grant or authority, including without limitation the non-exclusive right and

easement to use the Common Areas in common with other tenants and occupants of the Shopping

Center.

SECTION 3. **LEASE TERM.** Subject to the terms of this Lease, Tenant shall have and

hold the Premises for the Term, unless sooner terminated as herein provided.

SECTION 4. **PAYMENT OF FIXED RENT.**

(a)     Commencing on the Rent Commencement Date and continuing throughout

the balance of the Term, Tenant shall pay to Landlord the Fixed Rent, payable in equal successive

monthly installments, in advance, on the first day of each and every calendar month throughout the

Term, except that Fixed Rent for any partial calendar month during the Term shall be prorated.

Fixed Rent shall be paid without deduction or set-off (except as may be otherwise expressly provided

herein). Landlord shall have the same remedies with respect to the non-payment of Additional Rent

as it has for the nonpayment of Fixed Rent pursuant to the terms of this Lease. The term "Rent" as

used herein shall mean Fixed Rent and/or Additional Rent. All Rent shall be mailed or otherwise

delivered to Landlord's Mailing Address above or to such other address as Landlord may from time

to time designate by notice to Tenant. All Rent shall be paid in lawful money of the United States

which shall be legal tender for the payment of all debts and dues, public and private, at the time of

payment.   Landlord acknowledges and agrees that for administrative purposes, Tenant has

designated the Paying Agent to make all Rent payments due to Landlord under this Lease.  Said

designation (which may be revoked by Tenant at any time) is not intended as, and shall not

constitute, an assignment of any rights of Tenant to Paying Agent. Landlord shall not have any right

to bring any actions against Paying Agent, and Paying Agent shall have no liability to Landlord for

any obligation whatsoever (including, without limitation, the obligation to pay Rent). All payments

of Rent received by Landlord from Paying Agent shall be credited to Tenant as if such payments of

Rent had been made by Tenant directly to Landlord.

(b)     If any or all of the Inducement Tenants are not "ready to open" (as such phrase

is hereinafter defined) on or before the date on which Tenant is ready to open the Premises to the

general public for business, then Tenant shall have the right, at its sole option, to:

(i)     elect not to open the Premises to the general public for business, in

which event the Rent Commencement Date, notwithstanding any other provision of this Lease

except for the conditions precedent to the occurrence of the Delivery Date, shall be the date that is

ninety (90) days after the date (the "Inducement Date") upon which all of the Inducement Tenants

are ready to open and Landlord has notified Tenant that all of the Inducement Tenants are ready to

open (except, however, if the date which is ninety (90) days after the Inducement Date occurs during the Slack Period, Tenant shall have the right to delay the Rent Commencement Date without payment of Rent or penalty until the end of the Slack Period), or

         (ii)    to open the Premises to the general public for business, despite the failure of all of the Inducement Tenants to have been ready to open, or the fact that the date which is ninety (90) days after the Inducement Date shall occur during the Slack Period, in either of which event set forth in this subsection (ii), notwithstanding any other provision of this Lease except for the conditions precedent to the occurrence of the Delivery Date, the Rent Commencement Date shall be deemed to be the date which Tenant shall establish as its grand opening in its published advertisement [but not later than ten (10) days after the date upon which Tenant shall have opened the Premises to the general public for business] and during the period (the "Inducement Opening Period") commencing on the Rent Commencement Date and ending on the later to occur of (x) the end of the Slack Period, or (y) the date which is ninety (90) days after the Inducement Date, Tenant shall be entitled to a full abatement of Fixed Rent and Tenant shall only be liable for the payment of (A) Tenant's Pro Rata Share of Taxes and Common Areas Charges, and (B) Percentage Rent, except that for purposes of this Section 4(b), (1) the Sales Break Point shall be deemed to be One ($1.00) Dollar, and (2) in no event shall the aggregate Percentage Rent payable during the Inducement Opening Period exceed one-half (½) of the amount which the Fixed Rent would otherwise have been payable with respect to the Inducement Opening Period. Landlord and Tenant agree that any abatement of Fixed Rent which inures to the benefit of Tenant in accordance with the provisions of this Section 4(b) shall constitute a reimbursement to Tenant for certain pre-opening expenses incurred by Tenant in connection with this Lease.

        In the event any or all of the Inducement Tenants shall not have been ready to open within one hundred eighty (180) days after Tenant shall either have been ready to open or shall have opened the Premises to the general public for business, except if any delay in opening by an Inducement Tenant is solely caused by an act of God, then Tenant's right to terminate shall be six (6) months from the date of such act or six (6) months after Tenant has opened for business, whichever is later, then Tenant may at any time thereafter when any or all of the Inducement Tenants shall not have been ready to open (and whether or not Tenant shall have opened business), upon giving Landlord not less than sixty (60) days' notice, terminate this Lease as of the date specified in said notice, in which event neither party shall have any further liability hereunder except that Landlord shall be obligated to promptly reimburse Tenant for all its costs, damages and expenses

incurred in connection with this Lease, including, without limitation, the preparation of plans and specifications for and the costs of Tenant's Work. Landlord may negate such termination by causing the Inducement Date to occur on or before the thirtieth (30th) day following the date on which Tenant has given the foregoing notice of termination. For the purposes of this Section 4(b), the phrase "ready to open" shall mean that all construction and related work to be performed by or on behalf of Landlord, Tenant and each such Inducement Tenant shall be Substantially Completed and Tenant and each Inducement Tenant shall then be actively and continuously engaged in the fixturing of its entire premises.

(c)     Percentage Rent.

(i)   During and for each full calendar year commencing with the second Renewal Period, if Tenant exercises its option in respect thereof, and during the remainder of the Term, Tenant shall pay annual percentage rent ("Percentage Rent") equal to two and one-half (2.5%) percent (the "Percentage Multiple") of all Gross Sales resulting from business conducted in, on or from the Premises during such calendar year in excess of the Sales Break Point. "Sales Break Point" means the amount arrived at by dividing the annual Fixed Rent for the calendar year for which Percentage Rent is being determined by the Percentage Multiple]. "Gross Sales" means the total amount of the actual sales price of all sales of merchandise or services arising out of or payable on account of all the business conducted in, on or from the Premises by or on account of Tenant and any sublessee, licensee or concessionaire of Tenant and any other person or entity operating in the Premises, whether for cash, credit or otherwise, including all orders for merchandise taken from or filled at or from the Premises and all deposits not refunded to customers. A sale shall be deemed to have been consummated for purposes of this Lease, and the entire amount of the sales price shall be included in Gross Sales, at such time as (1) the transaction is initially reflected in the books or records of Tenant, or any sublessee, licensee or concessionaire of Tenant, or any other person or entity operating its business in the Premises, (2) Tenant or any other person or entity operating its business in the Premises receives all or any portion of the sales price, or (3) the applicable goods or services are delivered to the customer, whichever of (1), (2) or (3) first occurs, irrespective of whether payment is made in installments, the sale is for cash or credit or otherwise, or all or any portion of the sales price has actually been paid at the time of inclusion in Gross Sales or at any other time. Tenant and the other persons and entities operating their business in the Premises shall record, at the time of each sale, all receipts from such sale, whether for cash, credit or otherwise, in a cash register or cash registers, or in such electronic or computer device which records sales in a manner

which is generally acceptable by industry standards.  The term "Gross Sales" shall exclude (A) proceeds from any sales tax, gross receipts tax or similar tax, by whatever name called, which are separately stated and are in addition to the sales price, (B) bona fide transfers or exchanges of merchandise from the Premises to any other stores or warehouses of Tenant or any affiliates of Tenant, and returns to shippers and manufacturers for credit, (C) refunds or credits  given to customers for merchandise purchased at the Premises and returned or exchanged, (D) sales of Tenant's fixtures and equipment not in the ordinary course of Tenant's business, (E) to the extent of prior inclusion in Gross Sales, bad debts when written off the books of Tenant, provided that any collections made on account of such bad debts shall be included in Gross Sales when received, (F) receipts from vending machines installed solely for the use of Tenant's employees and receipts from pay telephones, (G) sales to employees of Tenant at discount, (H) fees paid to independent third party credit card companies in connection with sales charged to customers' credit cards, (I) proceeds from delivery, wrapping and check cashing charges, (J) sums and credits received in settlement of claims for loss or damage to merchandise, (K) separately stated service, finance and interest charges, (L) the dollar value of Tenant coupons utilized by customers in the purchase of merchandise from the Premises, and (M) close out or bulk sales of inventory to jobbers or wholesalers.

   (ii)  Tenant shall keep upon the Premises or at its principal office, complete books and records reflecting all elements of Gross Sales.  Tenant shall be allowed to maintain its books and records in a computerized form; provided, however, that (A) such computerized books and records provide the same level of information as the books and records described above, are retained for the full record retention period provided for herein, and (B) promptly upon request, printed copies of any such books and records are made available at Tenant's principal office for inspection by Landlord's representatives who are engaged in inspecting and/or auditing Tenant's books and records as provided herein.  Such books and records shall be kept in accordance with generally accepted accounting principles and practices and shall be retained by Tenant for a period of not less than two (2) years following the end of the calendar year to which they have reference. Within sixty (60) days after the close of each calendar year, Tenant shall furnish to Landlord a compilation prepared by an officer of Tenant setting forth the amount of Gross Sales during the preceding calendar year and showing the amount of Percentage Rent, if any, required to be paid by Tenant for such calendar year.  The full amount of any Percentage Rent due shall be paid to Landlord simultaneously with the furnishing of said compilation.  Landlord and/or Landlord's auditor shall have the right, upon at least ten (10) days prior notice to Tenant (but not more than once per annum),

to inspect and/or audit the records of Tenant and any and all other persons and entities operating in the Premises relating to Gross Sales. If any such audit discloses a deficiency in the Gross Sales reported by Tenant, Tenant shall pay any deficiency in Percentage Rent owing to Landlord on account of such deficiency, and if the deficiency is in excess of three (3%) percent of the Gross Sales reported by Tenant, and provided that, as a result of such audit, additional payments of Percentage Rent are due to Landlord, Tenant shall also pay Landlord's reasonable costs of the inspection and audit. Tenant has not and does not make any representation or warranty as to the amount of Gross Sales which are anticipated from the Premises.

(iii)   Landlord agrees that it shall not disclose to any third party Tenant's Gross Sales or the amount of Percentage Rent paid or payable by Tenant, provided, however, that (A) such information was not previously disclosed by Tenant to such third party or to the public generally, and (B) nothing contained herein shall restrict Landlord from disclosing such information as may be required by law or to its accountants, attorneys, bona-fide prospective purchasers, or current or prospective mortgagees or underlying lessors of all or any portion of Landlord's interest in the Shopping Center (provided that each of such recipients shall be bound to the same non-disclosure provisions as are imposed upon Landlord). Notwithstanding anything to the contrary contained in this Lease, Tenant shall have no obligation to report any Gross Sales for a calendar year to Landlord unless Gross Sales for such calendar year has exceeded ninety (90%) of the Sales Breakpoint for such calendar year and the same provision with respect to non-reporting of Gross Sales shall apply with respect to any periods referenced in item (iv) below.

(iv)   Notwithstanding any other provisions of this Section 4(c), (A) no Percentage Rent shall be payable with respect to the period commencing on the Rent Commencement Date and ending on the first December 31 following the Rent Commencement Date, (B) in the event this Lease expires in accordance with the terms hereof on the Expiration Date, then the amount of Percentage Rent, if any, payable (1) with respect to the three (3) months of the Term immediately preceding the Expiration Date [with such three (3) month period hereinafter referred to as the "End Months"], shall be determined by (a) calculating the Gross Sales for the twelve (12) month period prior to the End Months, and (b) multiplying the Percentage Rent which would have been paid for such twelve (12) month period by twenty-five (25%) percent, and (2) with respect to the ten (10) months of the Term immediately preceding the End Months, shall be determined by (a) calculating the Gross Sales for the twelve (12) month period prior to the End Months, and (b) multiplying the Percentage Rent which would have been paid for such twelve (12) month period by

eighty-three and 33/100 (83.33%) percent, and (C) in the event this Lease does not expire in

accordance with the terms hereof on the Expiration Date, but instead terminates for any reason on

a date other than January 31, then the amount of Percentage Rent, if any, payable with respect to the

partial calendar year commencing upon the final January 1 to occur during the Term and ending on

the termination date of this Lease (such partial calendar year hereinafter referred to as the "Partial

Last Year") shall be determined by (a) calculating the Gross Sales for the twelve (12) month period

prior to the termination date of this Lease, and (b) multiplying the Percentage Rent which would

have been paid for such twelve (12) month period by a fraction, the numerator of which is the

number of days in the Partial Last Year and the denominator of which is three hundred sixty-five

(365).

       (v)  In the event Tenant executes one or more license agreements with

unrelated persons or entities (hereinafter, the "Licensees") for the purpose of permitting the

Licensees to operate businesses or concessions within the Premises, then, at Tenant's option,

notwithstanding any other provision of this Section 4(c), any license fee or other compensation

(collectively, the "Fee") paid by the Licensee(s) to Tenant in consideration for the use of such

portion of the Premises, but not the Gross Sales achieved by such Licensee(s) from such portion of

the Premises, shall be included in Gross Sales for the purpose of calculating Percentage Rent.

Notwithstanding any other provision of this subsection (v), in no event shall the provisions of this

subsection (v) be applicable to portions of the Premises licensed to Licensees to the extent such

licensed portions of the Premises exceed, in the aggregate, a Floor Area of two thousand (2,000)

square feet at any one time (it being understood and agreed that in the event the total portion of the

Premises licensed to Licensees exceeds a Floor Area of two thousand (2,000) square feet at any one

time, then Tenant shall have the right to designate, from time to time, those portions of the Premises

which will be entitled to the benefit of this subsection (v)).

       (vi)  In the event an assignee of this Lease or any sublessee of all or any

portion of the Floor Area of the Premises does not use the Premises (or, as applicable, the subleased

portion thereof) as a store specializing primarily in the sale of linens and domestics, bathroom items,

housewares, frames and wall art, window treatments and closet, shelving and storage items, then the

Percentage Multiple and the Sales Break Point shall be amended, with respect to the Premises (or,

as applicable, the subleased portion thereof), to such other percentage (the "Adjusted Percentage

Multiple") and such other break point (the "Adjusted Break Point") as shall, as of the effective date

of such assignment or sublease, be then generally applicable to such use of the Premises (or, as

applicable, the subleased portion thereof) by normal and accepted business standards applicable to

such use, taking into consideration (A) the location of the Shopping Center, and (B) the nature of

the Shopping Center (i.e., strip center, mall, power center, etc.) [it being agreed that with respect to

any sublease covering less than all of the Floor Area of the Premises, the following shall apply: (1)

the Sales Break Point shall be the quotient of (aa) the annual base subrent payable by such sublessee

under the terms of its sublease on account of the calendar year for which Percentage Rent is being

determined, divided by (bb) the Adjusted Percentage Multiple, and (2) the Sales Break Point relating

to the retained portions of the Premises not so subleased shall be determined by dividing the product

of (x) the Fixed Rent for the calendar year for which Percentage Rent is being determined per square

foot of the Premises, and (y) the Floor Area of such retained portion of the Premises, by the

Percentage Multiple.

(vii) In the event Landlord and Tenant are unable to agree upon the Adjusted

Percentage Multiple [or upon any other matter referenced in subsections 4(c)(v) or 4(c)(vi)], then

the Adjusted Percentage Multiple [and any other applicable matter referenced in subsections 4(c)(v)

or 4(c)(vi)] shall be resolved by arbitration in accordance with the provisions of Section 54 of this

Lease [except that any arbitrator conducting such arbitration shall have at least ten (10) years

experience in shopping center retail leasing].

(viii) Any dispute between the parties relative to the provisions of this Section

4(c), other than as set forth in (viii) above, including, without limitation, the amount of Percentage

Rent payable by Tenant, shall be submitted to arbitration in accordance with the provisions of

Section 54 of this Lease.

**SECTION 5. <u>IMPROVEMENTS</u>.**

(a)(i)   On or before the date which is thirty (30) days after the Commencement Date,

Landlord shall prepare and provide Tenant with an accurate plan of the column layout (the "<u>Column

Layout</u>") of the Premises [which Column Layout, in the event the Premises is not an existing

building, shall be subject to Tenant's reasonable modifications, which modifications shall be

indicated by Tenant as part of Tenant's Plans] and within thirty (30) days thereafter, based upon the

Column Layout (and Tenant's reasonable modifications thereto, if any), Tenant shall prepare and

provide Landlord with its fixture plan, reflected ceiling plan and office plan (collectively, "<u>Tenant's

Plans</u>").  Within forty-five (45) days after receipt of Tenant's Plans, Landlord shall prepare and

submit to Tenant, Landlord's preliminary plans and specifications for the construction of the

Premises (which shall include, without limitation, mechanical, electrical, plumbing, architectural and site plans). Tenant shall approve such preliminary plans and specifications provided the same conform to the provisions of the Column Layout (as the same may have been modified by Tenant), Tenant's Plans, and Exhibits D and D-1 hereto (which provisions, as more fully depicted and described in the Final Plans and Specifications, are hereinafter collectively referred to as "Landlord's Work"). Tenant shall give notice of such approval (or the reasons why such approval cannot be granted) to Landlord within thirty (30) days after receipt of the preliminary plans and specifications (it being understood that Tenant's approval of the preliminary plans and specifications shall not constitute an opinion or agreement by Tenant that the Premises and the Common Areas are structurally sufficient or that the preliminary plans and specifications are in compliance with law). Immediately following receipt of such notice, Landlord shall promptly commence the preparation of final plans and specifications (the "Final Plans and Specifications") based upon Landlord's preliminary plans and specifications and any changes required by Tenant therein, and Landlord shall complete the Final Plans and Specifications and provide Tenant with copies thereof within thirty (30) days after receipt of Tenant's notice. The Final Plans and Specifications shall not be changed without Tenant's prior written approval. Unless specifically noted on the Final Plans and Specifications, to the extent of a conflict between the terms and provisions of Exhibit D and D-1 hereto, on one hand, and the terms and provisions of the Final Plans and Specifications, on the other hand, then the terms and provisions of Exhibits D and D-1 shall govern and prevail. Tenant shall have the right to make changes in Tenant's Plans and/or to require Landlord to make changes in the Final Plans and Specifications, in which event (x) Tenant shall pay to Landlord the net reasonable additional cost of Landlord's Work resulting from such changes, taking into consideration any and all actual reduced and added costs resulting from all such changes and/or other costs savings that Tenant may provide to Landlord; such payment by Tenant shall be due and payable upon the latter to occur of (1) thirty (30) days after the Delivery Date, or (2) fifteen (15) days after Landlord has delivered to Tenant backup information in support of such net reasonable additional cost (including without limitation receipted invoices) as reasonably required by Tenant, and (y) to the extent that such changes cause a net delay in the Substantial Completion of Landlord's Work, despite Landlord having proceeded diligently at all times in connection therewith, then the date to be determined pursuant to subsection (ii) contained within the definition of "Rent Commencement Date" in Section 1 above shall be determined as if such net delay had not occurred (provided, however, that Landlord shall, within five (5) days following its receipt of Tenant's notice describing such changes in Tenant's

Plans and/or the Final Plans and Specifications, have notified Tenant in reasonable detail as to the nature and extent of the such anticipated net delay in the Substantial Completion of Landlord's Work). Except for Landlord's Work, Tenant shall, at its own cost and expense, do any and all work (hereinafter called "Tenant's Work") which Tenant desires to adapt the Premises to Tenant's use. Landlord shall perform Landlord's Work in a manner required by applicable governmental regulations, ordinances and codes so that Landlord will be able to secure for Tenant, at Landlord's sole cost and expense, any and all required permits and approvals from applicable governmental authorities to enable Tenant to perform Tenant's Work and to open and conduct its business in the Premises; without limiting the foregoing, Landlord shall pay all impact fees and related governmental charges in connection with Landlord's Work, and all other work performed by or on behalf of Landlord in connection with the Shopping Center . If such permits and approvals cannot be obtained because Landlord's Work has not been completed or has been done improperly or by reason of any condition of the Shopping Center or the building containing the Premises, then it shall be Landlord's obligation to remedy the situation so as to enable Landlord to obtain such permits and approvals for Tenant's Work.

(ii)     Both Landlord's Work and Tenant's Work shall be performed in a good and workmanlike manner, in compliance with all applicable law, utilizing only new, first class materials, and in accordance with all insurance company requirements.  In the event that (i) Landlord's Work has not been commenced by January 5, 1999, (ii) Landlord's Work is not diligently and continuously pursued by Landlord after commencement thereof, (iii) Landlord's Work is not Substantially Completed either (x) on or before July 15, 1999 (which date is subject to extension only as a result of Force Majeure), or (y) on or before January 5, 2000 (which date is not subject to extension as a result of Force Majeure), or (iv) the Delivery Date shall not have occurred by January 5, 2000 (which date is not subject to extension as a result of Force Majeure), Tenant, in any such event, may thereafter, at any time when Landlord's Work has not been commenced, is not being diligently pursued or has not been Substantially Completed, or when the Delivery Date has not occurred, as the case may be, consider Landlord to be in default hereunder and, at Tenant's option, elect (I) upon the expiration of thirty (30) days notice to Landlord with Landlord having failed to cure fully such default, to terminate this Lease [in which event neither party shall have any further liability hereunder (other than as set forth in Section 33 below) except that Landlord shall be obligated to promptly reimburse Tenant for all its costs, damages and expenses incurred in connection with this Lease, including, without limitation, the preparation of plans and specifications

for and the costs of Tenant's Work], and/or (II) to avail itself of the remedies set forth in Section 19 below (provided, however, that the cure period set forth therein shall not be applicable), and/or (III) by notice to Landlord, to extend one or more times the dates set forth in subsections (i), (iii) and/or (iv) of this subsection 5(a)(ii) to such future dates designated by Tenant (with each such future date hereinafter referred to as the "Extended Date").  In the event Tenant exercises its right to extend the dates set forth in subsections (i), (iii) and/or (iv) of this subsection 5(a)(ii) to the Extended Date, and in the event Landlord's Work shall not have commenced, or in the event Landlord's Work is not diligently pursued by Landlord after commencement thereof, or in the event the Substantial Completion of Landlord's Work shall not have occurred, or in the event the Delivery Date shall not have occurred, on or prior to the applicable Extended Date, then Tenant, in such event, may thereafter, at any time when Landlord's Work has not been commenced, is not being diligently pursued or has not been Substantially Completed, or when the Delivery Date shall not have occurred, as the case may be, consider Landlord to be in default hereunder and, at Tenant's option, elect (A) without providing Landlord an opportunity to cure, to terminate this Lease (in which event neither party shall have any further liability hereunder [other than as set forth in Section 33 below] except that Landlord shall be obligated to promptly reimburse Tenant for all its costs, damages and expenses incurred in connection with this Lease, including, without limitation, the preparation of plans and specifications for and the costs of Tenant's Work), and/or (B) to avail itself of the remedies set forth in Section 19 below (provided, however, that the cure period set forth therein shall not be applicable).  Landlord covenants and agrees to fully complete any punch list items [which may be submitted to Landlord, from time to time, at any time prior to the date which is thirty (30) days after the Rent Commencement Date] not later than the date which is thirty (30) days after Landlord receives notification thereof, and in the event Landlord fails to so complete any punch list item within such time period, then Tenant shall have the right to complete the same utilizing its own contractors, in which event the reasonable costs of such completion shall be reimbursed to Tenant by Landlord upon demand, together with interest on the amount due at the Lease Interest Rate, which interest shall accrue on all such sums commencing five (5) days after Tenant shall have so notified Landlord of the amount due. In the event Landlord does not reimburse Tenant for all such costs and any interest accrued thereon within ten (10) days after the original demand by Tenant for payment of those costs, Tenant shall have a right of offset against the Rent payable by Tenant for all the costs and interest thereon. Within thirty (30) days following Substantial Completion of Landlord's Work,

Landlord shall deliver to Tenant a duplicate copy of the "as built" plans for the building containing the Premises.

(iii)  Landlord represents, warrants and covenants to Tenant, and Tenant has relied upon the foregoing as a material inducement for Tenant entering into this Lease, that (A) other than those which may be required by governmental authorities, no other consents or approvals are necessary or required to be obtained in order for Landlord to commence and complete Landlord's Work or other work required to be performed by Landlord hereunder, and (B) no third party consents are required in order for Landlord to enter into this Lease.

(b)     (i)     Landlord shall give Tenant at least forty-five (45) days prior notice of the Delivery Date, utilizing the Delivery Date Notice annexed hereto as Exhibit I.  Should Landlord fail to satisfy the conditions to the Delivery Date on any Delivery Date established by Landlord, except solely for delays caused by acts of God, then, in addition to any other remedies available to Tenant under this Lease, Landlord agrees to (A) reimburse Tenant for all reasonable costs incurred by Tenant (including, without limitation, all temporary storage costs and salary costs for employees with respect to the Premises as a result thereof (the "Tenant's Specified Costs"), and (B) pay to Tenant the additional liquidated sum of Five Thousand ($5,000.00) Dollars in reimbursement for costs and expenses incurred by Tenant by reason of additional work performed by Tenant's employees at its corporate offices as a result thereof (it being acknowledged and agreed by Landlord and Tenant that the liquidated sum referred to in this clause (B) represents the parties' good faith agreement as to an amount which shall have been incurred by Tenant and which shall otherwise not be susceptible of exact ascertainment) (the "Tenant's Administrative Costs").  Without limiting the foregoing, and in addition to any other remedies available to Tenant under this Lease, if Landlord fails to satisfy those conditions to the Delivery Date described in subsection (b)(iv)(C) of this Section 5 on any Delivery Date established by Landlord (the "Special Delivery Conditions"), but Tenant nevertheless elects to open the Premises for business to the public prior to the satisfaction of all such conditions, then, notwithstanding any subsequent revision by Landlord of the Delivery Date, Landlord shall pay to Tenant the liquidated sum of One Thousand ($1,000.00) Dollars for each day that the Premises remains open for business prior to the Special Delivery Conditions having been satisfied. In no event shall Tenant be obligated to accept as the Delivery Date any date which is prior to the date then established by Landlord as the Delivery Date.

(ii)     Landlord agrees that each time, if ever, that Landlord revises the Delivery Date from any date previously established by Landlord, then, in addition to any other

remedies available to Tenant under this Lease, Landlord shall pay to Tenant both Tenant's Specified Costs resulting therefrom and Tenant's Administrative Costs (except that Landlord shall not be obligated to pay Tenant's Specified Costs with respect to any revision by Landlord of the Delivery Date which takes place at least thirty (30) days prior to the last Delivery Date previously established by Landlord).

(iii)  In the event Landlord shall have failed to pay any monies due to Tenant in accordance with this subsection 5(b) within fifteen (15) days after Tenant has notified Landlord of the amount of such monies (and furnished Landlord with copies of all applicable bills relating thereto), then Tenant shall have the right to offset such amounts, together with interest thereon at the Lease Interest Rate accruing from and after such fifteenth (15th) day after Tenant's notification, against the installments of Rent next accruing under this Lease.

(iv)    Subject to Landlord's prior delivery to Tenant of the Delivery Date Notice in accordance with the preceding provisions of this subsection 5(b) and Landlord's timely compliance therewith, Landlord shall be deemed to have delivered possession of the Premises to Tenant at 8:00 a.m. on the date (with such date hereinafter called the "Delivery Date") following the day on which Tenant shall have received from Landlord the Delivery Date Certification annexed hereto as Exhibit J, which shall constitute Landlord's written certification that all of the following shall have occurred:

(A)    Actual possession of the Premises shall have been delivered to Tenant free of all leases (other than this Lease) and occupants, Landlord shall then be the owner of the fee simple estate in the Shopping Center free and clear of any liens and encumbrances (except the "Permitted Encumbrances" described on Exhibit E);

(B)    Any permits, certificates of occupancy (or its local equivalent if certificates of occupancy are not issued in the applicable jurisdiction), other certificates, "sign-offs" and approvals (copies of which shall have been delivered to Tenant) required from applicable governmental authorities to enable (A) Tenant to occupy the Premises and use the Premises for the conduct of its business, other than those required for Tenant to open and operate its specific business (and not a general retail business) on the Premises, and (B) the Common Areas to be used for their intended purposes, shall have been obtained, at Landlord's sole cost and expense (with copies thereof, upon Tenant's request, to be delivered to Tenant by Landlord), including, but not limited to, zoning, building code, environmental requirements, curb cut and site plan approvals, building signage permits, all permits pertaining to pylon and/or monument signage (and Tenant's panel(s)

thereon) permits, permanent certificates of occupancy (unless a permanent certificate of occupancy for the Premises cannot be obtained solely as a result of Tenant's acts or omissions in connection with the performance of Tenant's Work in the Premises, in which event (i) the delivery of a permanent certificate of occupancy for the Premises shall not be a condition to the occurrence of the Delivery Date, (2) the obtaining of a temporary certificate of occupancy shall be a condition to the occurrence of the Delivery Date, and  (3) Landlord shall obtain the permanent certificate of occupancy promptly following the correction or completion of Tenant's acts or omissions or Tenant's Work), and construction, development and use permits.

(C)    The Common Areas (including, but not limited to, all parking facilities and any pylon and monument signs required hereunder), all of the buildings and other improvements depicted on Exhibit B and all off-site improvements (including, but not limited to, all off-site improvements depicted on Exhibit B) shall have been completed and operational and Landlord's Work shall have been Substantially Completed (including, but not limited to, the connection of all utilities to and in the Premises), which Substantial Completion shall be evidenced by a written certification by Landlord's architect to Tenant. In addition, (x) the Premises shall have been delivered in broom clean, secured condition with the roof watertight (and all gutters and downspouts in good working order), all systems and equipment (including, without limitation, the heating, plumbing and electrical systems and the air conditioning and ventilation system) in good working order, and the structural components (including, without limitation, the foundation, exterior walls, structural supports and roof) in good order and repair, and (y) Landlord shall have complied fully with the provisions of Section 62 below.

(D)    The zoning of the Shopping Center and all other laws, orders and regulations shall then permit the occupancy of the Premises for the Permitted Use and shall then permit the parking of private automobiles in the Common Areas where parking is shown on Exhibit B;

(E)    There shall be no restrictions or other legal impediments either imposed by law (including applicable zoning and building ordinances) or by any instrument which would prevent: (1) the use of the Premises for the Permitted Use; (2) the use of the parking facilities, access roads, and other Common Areas in the manner contemplated by this Lease; (3) the lawful installation of the signage permitted pursuant to Section 10 below; or (4) the performance of Tenant's Work;

(F)     Landlord shall have delivered to Tenant the certification with respect to the measurement of the Premises and of the Shopping Center as provided in (and subject to) Section 1 above [see definition of "Premises"];

(G)     Leases have been entered into with the following tenants (herein collectively called the "Inducement Tenants") on the following terms, for occupancy of those building sites in the Shopping Center designated for such tenants on Exhibit B. Such leases shall not be cancelable by any of the Inducement Tenants, except for failure of Landlord to complete the Shopping Center, for injury to or loss of the premises thereby demised because of fire or other casualty, or for a taking or for other reasons similar to those for which this Lease is cancelable by Tenant.

| | Inducement Tenants | Minimum Square Foot Gross Floor Area | Minimum Term |
|---|---|---|---|
| 1 | Staples | 24,000 | Fifteen (15) years |
| 2 | First class recognized national and regional tenants | 6,000 | Five (5) years; |

(H)     The extent of construction then performed for each of the respective premises of all Inducement Tenants, whether by Landlord and/or such Inducement Tenant itself, shall not be materially less than that performed for the Premises;

(I)     Landlord shall have delivered to Tenant (x) an agreement in the form of Exhibit G hereto executed by each holder of any mortgage, deed of trust or any other existing lien encumbering or affecting the Shopping Center or any portion thereof and in form suitable for recording, and (y) an agreement in the form and content described in clause (b) of Section 24 hereof executed by the landlord under any ground or underlying lease encumbering or affecting all or any part of the Shopping Center (and, as may be required, consented to by the holder of any mortgage, deed of trust or other existing lien as aforesaid) and in form suitable for recording. The provisions of this subsection (I) shall be in addition to, and not in limitation of, Section 24 of this Lease; and

(J)     Landlord shall have delivered to Tenant a reciprocal easements agreement (the "REA") executed by Landlord and the owner(s) of Lots 1 and 2 as shown on Exhibit B hereto (the "Adjacent Property"), which REA shall either have been recorded (but only after Tenant's approval thereof as hereinafter provided) or be in recordable form. The REA shall be

subject to Tenant's reasonable approval but shall, in any event include, but not be limited to, the following:

(1)     Joint use of the common entrance, walkways and driveway into the Shopping Center from Chenal Parkway, and the sharing on a fair and reasonable basis of all costs and expenses relating thereto, including without limitation the operation, maintenance, repair and replacement of curbs, paving, landscaping, directional signage and lighting;

(2)     A limitation of twenty-five (25') feet for the height of any building or improvement on the Adjacent Property;

(3)     Prohibitions on the use of the parking areas of the Shopping Center by the Owners, their tenants and other occupants, and their respective employees, invitees, contractors, agents and representatives;

(4)     Prohibitions on the use of the parking areas of the Adjacent Property by the Landlord, its tenants and other occupants, and their respective employees, invitees, contractors, agents and representatives;

(5)     The building areas on the Adjacent Property will not exceed the amounts shown on Exhibit B hereto for each of the respective two (2) parcels; and

(6)     An acknowledgment of the existence of Tenant's exclusive as set forth in Section 23(a) hereof and its application to the Adjacent Property.

(c)     Neither Tenant's acceptance of physical possession of the Premises nor Tenant's opening of the Premises for business to the public prior to the Delivery Date shall relieve Landlord of any obligation under this Lease, unless such obligation is expressly waived in writing by Tenant.

(d)     Prior to the Delivery Date, Tenant may enter upon the Premises for the purposes of inspecting the work, taking measurements, making plans, erecting temporary or permanent signs and doing such other work as may be appropriate or desirable (including, without limitation, the installation of Tenant's shelving and fixtures) without being deemed thereby to have taken possession or obligated itself to pay Rent, but Tenant shall not, during the course of such work, cause any interference with Landlord's performance of Landlord's Work and shall indemnify and hold Landlord harmless from and against any and all claims or losses arising from such work and from Tenant's entry upon the Premises.

(e)     In the event construction of any roads, acceleration lanes, deceleration lanes, entrances, or other roadway improvements, or the widening or relocation of existing streets, is

dependent upon Landlord's dedicating any land to a governmental agency or body, Landlord agrees to make such dedication in time to permit construction work to commence without delay.

(f)    Landlord hereby agrees that following the Delivery Date, any construction by Landlord affecting any portion of the Shopping Center shall be subject to the following terms and conditions: (i) all staging and storage of materials and parking of construction vehicles shall at all times occur only within those respective portions of the Shopping Center designated as "Staging" on Exhibit B hereof); (ii) during the course of any such construction, Landlord shall at its cost and expense construct and at all times maintain (A) a 6-foot high chain link fence (with privacy slats or similar visual barrier) around all work areas, and (B) as necessary, a slit fence around all then "unstabilized areas" of any such work (i.e. those areas from which silt and sediment deposits could run to any portion of the Premises or any then developed portion of the Shopping Center); and (iii) Landlord shall at all times proceed diligently to ensure that from and after Tenant's opening for business to the public, no ingress, egress or passage of any construction, delivery and related vehicles engaged in the performance of such work or other construction activities shall take place except through the entrance/exit drive designated as "Permissible Access Area" on Exhibit B.

## SECTION 6.  REAL ESTATE AND OTHER TAXES.

(a)    Landlord shall pay on or before the due dates thereof all real estate taxes and assessments for betterments and improvements that are levied or assessed by any lawful authority on the Shopping Center (general or special), other than personal property taxes levied against tenants (hereinafter collectively called "Taxes"). On and after the Rent Commencement Date, Tenant shall be obligated each calendar year or partial calendar year for the payment of Tenant's Pro Rata Share of the Taxes which accrue during the Term. Taxes, as used herein, shall not include any: (1) income, excise, profits, estate, inheritance, succession, gift, transfer, franchise, capital, or other tax or assessment upon Landlord (except special assessment taxes assessed by the Chenal Parkway Improvement District) or upon the rentals payable under this Lease; (2) taxes on rents, gross receipts or revenues of Landlord from the Premises; (3) fine, penalty, cost or interest for any tax or assessment, or part thereof, which Landlord (or Landlord's lender) failed to timely pay (except if same are imposed by reason of an Event of Default; (4) assessment for a public improvement arising from the initial construction or expansion of the Shopping Center or the Premises (it being agreed that all assessments imposed during the Term which are permitted to be included within Taxes hereunder shall, for the purposes of computing Tenant's Pro Rata Share thereof, be deemed to have been paid in the maximum number of installments permitted by the applicable taxing authority); (5)

Taxes resulting directly from an increase in the assessment caused by a sale or ground lease of all or any portion of the Shopping Center; (6) Taxes resulting directly from any construction work performed by or on behalf of a third-party at the Shopping Center which materially exceeds the general construction standard of the Shopping Center; (7) Taxes on unimproved portions of the Shopping Center until the same are either improved by improvements or buildings which become an integral part of the Shopping Center or by incorporation of such portions into the Common Areas; or (8) fees imposed upon Landlord in connection with Landlord's development of the Shopping Center (including, without limitation, trip generation fees). Notwithstanding the foregoing, if at any time during the Term the present method of taxation shall be so changed that the whole or any part of the Taxes imposed on real estate and improvements thereon shall be discontinued and in whole or partial substitution therefor, taxes, assessments, levies, impositions, or charges shall be levied, assessed and/or imposed wholly or partially as a capital levy or otherwise on the rents, gross receipts, revenues, or profits received from real estate or the rents, gross receipts, revenues, or profits reserved herein or any part thereof, then such substitute taxes, assessments, levies, impositions, or charges, to the extent so levied, assessed, or imposed, shall be deemed to be Taxes for the purpose of this Lease. All Taxes payable by Tenant pursuant to this Section 6 shall be determined as if the Shopping Center was the only property owned by Landlord. Landlord represents to Tenant that, as of the date hereof and, to the best of Landlord's knowledge, as of the anticipated Delivery Date, no portion of the Shopping Center is or will be (i) subject to or the beneficiary of an abatement of Taxes, or (ii) subject to any special assessments or similar charges. .

(b)    For the year in which the Rent Commencement Date occurs and the year in which this Lease expires or sooner terminates, Tenant shall pay Tenant's Pro Rata Share of Taxes, which shall, however, be adjusted so that same is based on a ratio of the Term within the tax year to the full tax year.

(c)    Landlord shall submit to Tenant a copy of the bill for Taxes issued by the applicable taxing authority, a computation of Tenant's Pro Rata Share of such Taxes and all notices concerning assessments, changes of assessments, tax rates and changes thereto (as well as proof of the payment of Taxes for the previous payment period). Tenant shall reimburse Landlord in the amount required by this Section 6 within thirty (30) days after receipt of such bill. In no event shall Landlord request reimbursement for such Taxes paid earlier than the last day such Taxes could have been paid by Landlord without penalty. Within thirty (30) days after Tenant's request, Landlord

shall provide Tenant with copies of paid bills for Taxes paid by Landlord pursuant to this Section
6.

(d)    If Tenant so requests, Landlord shall contest the amount or validity of any
assessed valuation or Taxes.  If Landlord shall fail or refuse, on request of Tenant, to take the
necessary steps to contest such Taxes, Tenant shall have the right to contest the Taxes by appropriate
proceedings conducted in good faith, in which event Landlord shall cooperate with Tenant, execute
any and all documents required in connection therewith and, if required by any governmental
authority having authority, join with Tenant in the prosecution thereof. If, as a result of any contest,
any rebate or refund of Taxes is received, Tenant shall be entitled to Tenant's Pro Rata Share thereof
(after reasonable and customary expenses incurred by Landlord and/or Tenant in connection with
such contest are paid to the party which incurred such expense).

(e)    Landlord agrees that Tenant's Pro Rata Share of Taxes and Common Areas
Charges [including insurance premiums for the insurance required to be maintained by Landlord
pursuant to Section 16(b) below] for the first full calendar year after the Rent Commencement Date
will not, in the aggregate, exceed Two and 50/100 ($2.50) Dollars per square foot of Floor Area in
the Premises.

## SECTION 7.  <u>PERMITTED AND PROHIBITED USES.</u>

(a)    The Premises may be used and occupied for the Permitted Use.

(b)    (i)    Landlord covenants and agrees that the Shopping Center shall be
constructed, leased, operated, maintained and managed as a first class shopping center and that no
premises (and no portion of any premises) in the Shopping Center or on any land (hereinafter the
"Related Land" which, for the purposes of this Section 7(b) and of Section 23(a) below shall be
deemed to include Lots 1 and 2 as shown on <u>Exhibit B</u>) contiguous or adjacent to the Shopping
Center (which shall include land that would be contiguous or adjacent to the Shopping Center but
for any intervening road, street, alley or highway) owned now or at any time in the future by
Landlord or any affiliated entity (referring to the actual Landlord from time to time, without regard
to land owned by any prior landlords, and excluding from the operation hereof any business existing
at the time any future landlord becomes Landlord hereunder) shall be used or occupied for any of
the following: unlawful use; pornographic use; "second-hand" or "surplus" store;  laundry or dry
cleaners; pawn shop; daycare center; veterinary office; living quarters; hotel/motel; manufacturing;
bowling alley; off-track betting parlor or other gambling establishment; bingo hall; funeral parlor;
skating rink; nightclub, discotheque or dance hall; so-called "head shop"; catering or banquet hall;

children's entertainment or activity facility; video rental or viewing, except for video rental (but not viewing) in Building E as shown on Exhibit B; meeting hall; auction hall; place of religious worship; sporting event; karate center; auditorium; warehouse; theater; automobile repair shop, or any business servicing motor vehicles in any respect, including without limitation any quick lube oil change service, tire center or gasoline or service station or facility; supermarket; restaurant serving meals for on or off premises consumption, except that (x) restaurants shall be permitted on any Related Land, (y) the sale of food and non-alcoholic beverages, on an incidental basis, from a so-called "coffee bar" or "café" shall be permitted in the Premises and in the premises of any other retail tenant in the Shopping Center provided that (A) such incidental use is limited to not more than one thousand (1,000) square feet of Floor Area in any such premises, (B) no cooking which requires outside venting will be permitted, (C) the use and availability of such facility will not be publicly advertised, (D) the products sold in such facility shall be intended for on-premises consumption, and (E) there shall be no direct exterior entrance to the facility, and (z) a store principally selling bagels be permitted on any Related Land; beauty parlor; nail salon, except as an incidental use in conjunction with a tenant's permitted retail use; billiard parlor or pool hall; sales office or showroom for automobiles or other vehicles; an establishment serving alcoholic beverages for on or off premises consumption, except on any Related Land; massage parlor, except for massage therapy as an incidental use in conjunction with a tenant's permitted use; office (excluding office space used in connection with and ancillary to a permitted retail use hereunder); health spa, exercise facility or similar type business, except that a health spa shall be permitted in Building E as shown on Exhibit B provided that it contains not more than four thousand five hundred (4,500) square feet of Floor Area and that the front entrance in Building E is oriented toward the parking lot to the north; car wash; a so-called "flea market"; carnival, amusement park or circus; video/pinball arcade or game room; customer viewing, entertainment or educational uses; any use generally deemed to be obnoxious or a nuisance; medical offices; or any other non-retail uses (herein collectively called the "Prohibited Uses").

      (ii)     As used herein (A) the term "pornographic use" shall include without limitation a store displaying for sale or exhibition books, magazines or other publications containing any combination of photographs, drawings or sketches of a sexual nature, which are not primarily scientific or educational, or a store offering for exhibition, sale or rental video cassettes or other medium capable of projecting, transmitting or reproducing, independently or in conjunction with another device, machine or equipment, an image or series of images, the content of which has been

rated or advertised generally as NC-17 or "X" or unrated by the Motion Picture Rating Association, or any successor thereto, (B) the term "educational uses" shall include without limitation a beauty school, barber school, reading room, place of instruction, or any other activity, facility, school or program catering primarily to students or trainees as opposed to shoppers, and (C) the term "obnoxious or a nuisance" shall include without limitation a use which emits or results in strong, unusual or offensive odors, fumes, dust or vapors, is a public or private nuisance, emits noise or sounds which are objectionable due to intermittence, beat, frequency, shrillness or loudness, creates a hazardous condition, or is used, in whole or in part, as or for warehousing or the dumping or disposing of garbage or refuse.

  (c) Tenant covenants and agrees not to use the Premises for any of the Prohibited Uses, the Restrictions set forth on Exhibit L or the Staples Exclusive to the extent then applicable.

**SECTION 8. UTILITIES.**

  (a) From the Delivery Date and continuing throughout the Term, Tenant shall be responsible for paying, and as necessary shall contract for, in its own name, directly with the utility company servicing the Premises, the cost and expense of all utility services rendered or furnished to the Premises, including heat, air conditioning, water, gas, electricity and telephone. Landlord, at its cost and expense, will provide separate utility meters for the Premises (and pay all connection and hook-up fees) and no space other than the Premises shall be connected thereto. Landlord and Tenant acknowledge and agree that Tenant's entry upon the Premises prior to the Delivery Date is not a waiver by Tenant of Landlord's obligation to pay the costs of all utility charges incurred in the Premises prior to the Delivery Date. Landlord shall not permit the capacity of utility lines available for use at the Premises to be reduced or overloaded by other tenants of the Shopping Center.

  (b) Notwithstanding anything to the contrary in this Lease, in the event utilities serving the Premises are disrupted due to the acts or omissions of Landlord, its agents, contractors, servants or employees, Landlord shall promptly restore the affected utilities at Landlord's sole cost and expense. If the disrupted utilities are not restored within twenty-four (24) hours after the Landlord has knowledge of the disruption, and Tenant is unable to conduct its normal business in the Premises due to the disruption of such utility service, Rent shall be abated during the period of disruption.

**SECTION 9.  MUTUAL RELEASE, WAIVER OF SUBROGATION AND MUTUAL INDEMNIFICATION.**

(a)      Landlord and Tenant, on their own behalf and on behalf of anyone claiming under or through either one by way of subrogation, hereby release and waive all rights of recovery and causes of action against each other and their respective Related Companies from any and all liability for any loss or damage to property or resulting from damage to such property (and, in either case, any resulting loss of business or rental income), whether caused by the negligence or fault of the other party, which is normally insured under "All-Risk" property and time element insurance required to be maintained hereunder or any other insurance policy now or hereafter issued covering the Premises or the contents thereof or the Shopping Center.

(b)      Landlord and Tenant shall cause each property insurance policy carried by either of them insuring the Premises or the contents thereof or the Shopping Center to provide that the insurer waives all rights of recovery by way of subrogation or otherwise against the other party hereto (and all of such other party's Related Companies) in connection with any loss or damage which is covered by such policy or that such policy shall otherwise permit, and shall not be voided by the releases provided for in this Section 9. If any additional charge or increase in premium is made by the insurer because of this waiver of subrogation, then the party in whose favor the waiver was obtained shall pay such additional charge or increase in premium upon receipt of written notice. Failure to pay the increase in premium will void the release and waiver benefitting such party but shall not affect the benefit of the corresponding release and waiver in favor of the other party.

(c)      In the event either Landlord or Tenant is a self-insurer or maintains a deductible (as either may be permitted hereunder), then the self-insuring party or the party maintaining the deductible hereby releases the other party from any liability arising from any event which would have been covered had (i) the required insurance been obtained and/or (ii) the deductible not been maintained.

(d)      (i)      Except as otherwise provided in the foregoing subsections (a) and (b) of this Section 9, Tenant covenants to defend and indemnify Landlord and hold Landlord harmless (except for loss or damage (x) resulting from the acts or omissions of Landlord, its agents, contractors, licensees, tenants [other than Tenant], occupants or employees, or (y) for which any of the respective parties listed in the foregoing clause (x) may be statutorily liable) from and against any and all claims, actions, damages, liability and expense, including reasonable attorneys' fees, (A) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon the Premises, or any part thereof, or (B) occasioned wholly or in part by any act or omission of Tenant, its agents, contractors, employees, servants, or licensees.

(ii)     Except as otherwise provided in the foregoing subsections (a) and (b) of this Section 9, Landlord covenants to defend and indemnify Tenant and hold Tenant harmless (except for loss or damage resulting from the acts or omissions of Tenant, its agents, contractors, licensees or employees) from and against any and all claims, actions, damages, liability and expense, including reasonable attorneys' fees, (x) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon those portions of the Shopping Center not included within the Premises, or any part thereof, or (y) occasioned wholly or in part by any act or omission of Landlord, its agents, contractors, employees, servants, tenants (other than Tenant), occupants or licensees.

**SECTION 10.     SIGNS.**

(a)     Tenant may erect and maintain in the interior of the Premises any signs it may desire. Tenant shall also, at its own cost and expense, have the exclusive right to erect and maintain, subject to compliance with applicable governmental regulations, on the storefront and exterior walls of the Premises (and, as applicable, on the side walls of any entrance design element) banners, awnings, flags and signs (including without limitation under-canopy (e.g. blade signs)) and replacement banners, awnings, flags and signs (including without limitation under-canopy signs) (including temporary banners placed on the storefront of the Premises announcing "Sneak Preview," "Grand Opening" and/or "Now Hiring") of such size, design and color as Tenant, from time to time, may desire, subject only to compliance with the applicable governmental requirements. Landlord covenants and agrees that: (i) no sign or logo utilized by any other tenant in the Shopping Center shall include the words "bed", "bedroom", "bath", "bathroom", "sheets", "towels" or "housewares", (ii) no obstructions (including, without limitation, any trees, bushes or other landscaping, scaffolding or architectural details) shall obscure Tenant's storefront, storefront signs or other exterior wall signs or any pylons, monuments or other freestanding signs, and (iii) in no event shall the height or width of any other tenant's building and entrance design element in the Shopping Center (including the height and width of any sign (or any sign letters) or logo which is utilized by such other tenant) exceed that of Tenant's building and Tenant's entrance design element. Tenant shall be entitled, at Tenant's sole cost and expense, to (A) install and maintain on the storefront of the Premises a temporary banner announcing "Coming Soon" at such time, and for such duration prior to the Rent Commencement Date, as Tenant shall request, and (B) install and maintain, during the period commencing on the Commencement Date and ending on the day prior to the Rent Commencement Date, a temporary sign as Tenant may provide near the site of the main entrance to the Shopping

Center which states "Bed Bath & Beyond Coming Soon" (which sign is more particularly shown in Exhibit F-1 annexed hereto). During the Term, no exterior identification signs attached to any building of the Shopping Center shall be of the following type: (i) flashing, moving or audible signs; (ii) signs employing exposed raceways, exposed neon tubes, exposed ballast boxes, or exposed transformers, provided that Tenant shall have the right to employ any methods necessary for the installation of internally illuminated self-contained channel letters; or (iii) paper or cardboard signs other than professionally prepared interior window signs advertising special sales within the subject premises, temporary signs (exclusive of contractor signs), stickers or decals, provided, however, the foregoing shall not prohibit the placement at the entrance of each such premises of (A) small stickers or decals which indicate hours of business, emergency telephone numbers, credit cards accepted, and other similar information, and/or (B) a sticker or decal which contains the phrase "no solicitation" or words of like import.

     (b)    Landlord shall during the entire Term, provide a pylon at the location shown on Exhibit B. Tenant shall have the right, at its sole cost and expense, to erect and maintain its identification sign, as shown on Exhibit F-2 (and having colors as selected by Tenant), on both sides of such pylon above the signs of all other tenants of the Shopping Center and no other signs thereon shall be larger than Tenant's. In addition, if Landlord constructs or makes available to any other tenant or tenants in the Shopping Center any other signage located in the Common Areas or on any Related Land or otherwise, such signage shall also include Tenant's identification sign, as shown on Exhibit F-2 (and having colors as selected by Tenant), which shall be higher and as large as the signs of such other tenant or tenants.

     (c)    Tenant shall have the right, from time to time, without Landlord's approval, to change its signs on the storefront and exterior of the Premises as well as on any pylon or monument provided that the area of the new sign is no larger than the area of the sign which it replaces and that the method of construction and attachment is substantially the same; Landlord, upon request, shall execute any consents or applications which may be required by law to permit the placement or installation of any signs by Tenant on any part of the Premises or on any pylon or monument. Upon Tenant's cessation of business in the Premises, it shall remove its signs and patch up any holes on the fascia or other exterior walls of the Premises or on any pylon or monument caused by the prior installation or the removal of such signs.

     (d)    Landlord shall (A) at all times maintain all pylons and any monuments in good order and repair (and at all times allow Tenant reasonable access to maintain, repair and replace

its signs thereon, at Tenant's cost and expense), and (B) not change or alter the location, structure, height or general appearance of the pylons or any monuments without obtaining Tenant's prior consent. The cost of maintenance of all pylons and any monuments (but not individual tenants' signs) and of the cost of any electricity used to illuminate them, shall be included in Common Areas Charges.

(e)    The signage rights granted to Tenant pursuant to this Section 10 shall, at Tenant's option, be allocated to or between Tenant and/or any subtenant(s) of all or any portion of the Premises.

### SECTION 11.    ALTERATIONS AND IMPROVEMENTS.

(a)    Tenant shall not make any structural alterations or structural improvements to the Premises without the prior approval of Landlord. All work done in connection with structural and non-structural alterations or improvements shall be done at Tenant's sole cost and expense, in a good and workmanlike manner and in compliance with all applicable governmental requirements.

(b)    Tenant may, from time to time, at its own cost and expense, without the prior approval of Landlord, make non-structural alterations and non-structural improvements to the interior of the Premises, as Tenant deems necessary or desirable, including but not limited to electrical systems, heating, ventilation and air conditioning and other mechanical systems, installation of fixtures and equipment, painting, and wall and floor coverings, provided that the structural integrity of the Premises shall not be adversely affected thereby.

(c)    Tenant shall have the right, subject to any required municipal approvals, to erect and maintain an antenna and a satellite dish on the roof of the Premises, provided (i) Tenant's plans for the installation of such equipment are previously approved by Landlord, (ii) Tenant utilizes a contractor designated or approved by Landlord for all roof penetrations, (iii) Tenant maintains the area where roof penetrations are made while Tenant's equipment is present, and (iv) Tenant repairs any damage to the roof caused by the making of the roof penetrations, including, but not limited to, the repair of the roof penetrations upon the removal of any equipment installed thereon.

(d)    Landlord shall not make any alterations to the Premises (including, without limitation, changing the design, color or materials of the exterior of the Premises) nor shall Landlord construct an additional floor or floors above the Premises. Landlord shall not refurbish, renovate and/or paint the exterior of other portions of the Shopping Center unless Landlord also refurbishes, renovates and/or paints the exterior of the Premises, which refurbishment, renovation and/or painting shall (i) be performed at Landlord's sole cost and expense, and (ii) with respect to the Premises, be

subject to Tenant's reasonable prior approval. Landlord shall not make nor permit to be made any alterations to the exterior "architectural theme" of the remainder of the Shopping Center (exclusive of tenants', other than Tenant's, storefronts) without the prior consent of Tenant.

(e)    Tenant shall have the right to subdivide the Premises into two (2) or more separate stores, each of which may have its own front entrance and access to the loading docks in the rear of the Premises, as well as separately sub-metered utilities; provided, however, that if, at the time of any proposed subdivision of the Premises, for other than Excused Periods, Tenant (i) is not operating its business in at least nineteen thousand (19,000) square feet of Floor Area, (ii) has ceased its business in the Premises, or (iii) has vacated the Premises, Tenant shall give Landlord at least forty-five (45) days' prior notice of its intention to subdivide the Premises and during such period Landlord may terminate this Lease upon notice thereof to Tenant. Notwithstanding the foregoing, Tenant shall have the right, to be exercised within ten (10) days after receipt of such termination notice from Landlord, to give Landlord notice (the "Recission Notice") of its intention not to subdivide the Premises as aforesaid, in which event the termination notice previously given by Landlord shall be deemed null and void. If, however, this Lease is terminated pursuant to this Section 11(e), then (A) this Lease shall so terminate upon the date which is sixty (60) days after the date on which Tenant receives Landlord's termination notice, as if such date was originally set forth herein as the expiration date of the Term, (B) Landlord and Tenant shall, except as otherwise set forth below in this Section 11(e), upon such termination be released from any and all liabilities thereafter accruing hereunder, and (C) Landlord shall not, for a period of five (5) years after the effective date of termination, lease, rent or occupy or permit the Premises to be occupied for the sale, rental or distribution of the Exclusive Items [as defined in Section 23(a)(i) below] by any large so-called "box retailer" in direct competition with Tenant, such as but not limited to, Linens 'n Things, Home Place, Home Express, Waccamaw Pottery, Linens and More, Stroud's Linens, 3 D Bed and Bath, Boston Bed 'n Bath, Reading China & More/Kitchen & Co., Burlington Coat Factory Luxury Linens, Fortunoff, Garden Ridge and Great Indoors, as well as any specialty "home store" concept developed by a department store as a separate operating entity, such as but not limited to J.C. Penney Home Store or Macy's Home Store.

(f)    Upon the request of Tenant, Landlord shall fully, promptly and diligently cooperate with Tenant and its architects and designers in obtaining any permits, approvals and certificates required to be obtained by Tenant in connection with any alteration or improvement described in this Section 11, and shall execute all applications, documents and other instruments

reasonably required for such purpose, provided that Landlord shall not be obligated to incur any costs or expenses, including, without limitation, attorneys' fees and disbursements, or suffer any liability in connection therewith. Landlord shall execute and return to Tenant all appropriately completed building department or equivalent applications within ten (10) days after Tenant's request therefor.

(g)    If any violation of any applicable legal requirement which is noted against the Shopping Center or the Premises (other than a violation caused by Tenant) prevents Tenant from obtaining a building permit for any alterations or a certificate of occupancy, then, upon request by Tenant, Landlord shall promptly and diligently cure the same and cause such violation to be removed of record to the extent required to permit Tenant to obtain its building permit or certificate of occupancy, as the case may be.

(h)    All alterations and improvements made by Tenant shall become the property of Landlord, and shall be surrendered to Landlord, upon the expiration or sooner termination of this Lease; provided, however, that this provision shall not apply to Tenant's Property, and Tenant shall have no obligation to remove alterations or improvements.

SECTION 12.    **ACCESS TO SHOPPING CENTER.**    All entrances, exits, approaches and means of ingress and egress to and from the Shopping Center as shown on Exhibit B shall not be interrupted or disturbed by any act or omission of Landlord during the Term. Tenant shall have the exclusive right to utilize the loading facilities at the Premises on a "24 hour a day", "365 days a year" basis.

SECTION 13.    **COMMON AREAS.**

(a)    Landlord hereby undertakes and assumes all duties and responsibilities in regard to maintenance (including, without limitation, snow, ice, rubbish and debris removal), repair, replacement, operation, landscaping (including without limitation the trimming and pruning of trees to avoid interference with the use or visibility of canopies or signs on the exterior of the Premises), adequate lighting, insurance, supervision, use, parking lot paving and striping, drainage, security and control of all Common Areas and shall comply with all laws, ordinances, orders, rules and regulations applicable thereto.

(b)    Tenant shall comply with the rules and regulations of the Shopping Center as established from time to time by Landlord, within sixty (60) days after Landlord notifies Tenant of the establishment of the same, provided the same (i) are reasonable, (ii) do not adversely affect the operations of Tenant's business on the Premises, and (iii) do not adversely affect any of Tenant's

rights under this Lease. All such rules and regulations established by Landlord shall be uniformly enforced against all tenants of the Shopping Center and without prejudice against Tenant. In the event of any conflict between the provisions of this Lease and any rules or regulations, the provisions of this Lease shall prevail and govern.

(c)    Subject to the provisions of Section 6(e) above, on and after the Rent Commencement Date, Tenant shall pay Tenant's Pro Rata Share of the reasonable costs (hereinafter called the "Common Areas Charges") paid by Landlord to operate, maintain, insure and repair the Common Areas only. Tenant's Pro Rata Share of Common Areas Charges shall be paid in monthly installments on the first day of each calendar month, in advance, during each calendar year based on Landlord's reasonable budget [with respect to which budget (i) the amount thereof shall not exceed 105% of the actual Common Areas Charges for the most recent calendar year for which such information is available (exclusive of extraordinary non-recurring expenses during such prior calendar year), and (ii) same shall, with respect to the first full calendar year after the Rent Commencement Date be subject to the provisions of Section 6(e) above, and (iii) Landlord agrees to supply Tenant, upon Tenant's request, with reasonable backup documentation and applicable evidence of prior bills and payments]. Within 60 days following the end of each calendar year, Landlord shall submit to Tenant a computation of Tenant's Pro Rata Share of Common Areas Charges for the prior calendar year (which computation shall, as applicable, be accompanied by an updated accurate site plan which shall show any change in the total Floor Area of the Shopping Center from that which previously existed), together with a reasonably detailed statement certified by Landlord and containing actual costs and the calculation of Tenant's Pro Rata Share of Common Areas Charges, and thereafter Landlord shall furnish Tenant with copies of such bills and other documentation as Tenant may request. If Tenant's Pro Rata Share of Common Areas Charges shall be more than the aggregate monthly installments paid by Tenant during the prior year, Tenant shall pay to Landlord the difference within sixty (60) days after receipt of such notice. If, however, the aggregate monthly installments paid by Tenant for the prior year exceeds the actual amount due from Tenant for such period, such excess shall be refunded by Landlord to Tenant simultaneously with submission of the detailed statement setting forth Tenant's Pro Rata Share of Common Areas Charges. Notwithstanding anything contained herein, Tenant's Pro Rata Share of Common Areas Charges for the first full calendar year after the Rent Commencement Date shall be subject to the provisions of Section 6(e) above, and in no event shall the actual Tenant's Pro Rata Share of Common Areas Charges with respect to any given calendar year thereafter exceed one hundred five

(105%) percent of Tenant's Pro Rata Share of Common Areas Charges payable by Tenant for the

then immediately preceding calendar year for which such information is available (exclusive of

extraordinary non-recurring expenses during such immediately preceding calendar year). Common

Areas Charges shall not include: (i) the capital cost of any additions to the Common Areas pursuant

to an expansion of the Shopping Center; (ii) the cost of any replacements or capital improvements

to the Common Areas (for example, the cost of repaving the parking areas as opposed to patching

and striping); (iii) the cost of investigating, monitoring or remedying any environmental condition

or hazardous substances or wastes; (iv) any debt service (including principal and interest) or

payments of any judgments or other liens against Landlord; (v) the cost of maintaining, repairing

or providing security for interior portions of buildings; (vi) Taxes or other taxes levied or assessed

against Landlord or the Shopping Center; (vii) the cost of compliance with laws (including, without

limitation, the cost of curing violations or contesting such laws or violations), except that capital

costs of compliance which are not necessitated by any acts or omissions of Landlord or any other

tenant in the Shopping Center shall be amortized over useful life in accordance with generally

accepted accounting principles and an annual amortized portion shall be includable in Common

Areas Charges hereunder but in no event shall Tenant's Pro Rata Share exceed, on an annual basis,

Five Thousand ($5,000.00) Dollars; (viii) any costs resulting from insurance deductibles or any

payments made under any self-insurance policy maintained by Landlord; (ix) any costs which would

have been reimbursed or paid for by insurance proceeds had Landlord maintained the insurance

required under Section 16 hereof and the amount of any judgment or other charge entered or costs

assessed against Landlord in excess of the policy limits of the insurance maintained by Landlord

under Section 16 hereof (including, without limitation, liability insurance); (x) those portions of

Landlord's insurance premiums which are reimbursed to Landlord by any other tenant in the

Shopping Center other than through the payment of such tenant's proportionate share of insurance

premiums otherwise included as part of Common Areas Charges; (xi) any costs of refinancing any

debt encumbering the Shopping Center; (xii) sums paid or owed by Landlord to any tenant in the

Shopping Center; (xiii) costs incurred in connection with the negotiation of leases with, or

construction of improvements for, any tenant in the Shopping Center (including, without limitation,

brokerage commissions and legal fees); (xiv) costs incurred in connection with a sale, ground leasing

or sale-leaseback of all or any part of the Shopping Center; (xv) costs incurred in connection with

lawsuits or other legal actions (including, without limitation, arbitrations and mediations) instituted

or defended by Landlord; (xvi) sums incurred as late payment fees, penalties or interest; (xvii)

ground rent; (xviii) depreciation; (xix) costs disproportionately incurred by or on behalf of any one or more of the tenants in the Shopping Center (including, without limitation, all costs relating to the operation of any food court in the Shopping Center); (xx) electricity costs for lighting Common Areas later than one (1) hour after the regular closing time of the Shopping Center (other than low level security lighting); (xxi) Landlord's advertising, entertainment and promotional costs for the Shopping Center; (xxii) costs of acquiring, leasing, restoring, insuring or displaying sculptures, paintings and other objects of art located within or outside the Shopping Center; (xxiii) costs and expenses payable to Landlord or to an affiliate of Landlord to the extent that such costs and expenses exceed competitive costs and expenses for materials and services by unrelated persons or entities of similar skill and experience; (xxiv) repairs resulting from defects in the original construction of the Shopping Center arising within three (3) years after the Rent Commencement Date; (xxv) the cost of mechanized equipment (but not the straight line depreciation thereof over its useful life, as determined in accordance with generally accepted accounting principles); or (xxvi) any cost or expense relating to the administration and management of the Common Areas (whether on-site or off-site) including but not limited to overhead, management fees, office salaries and benefits, office rental, office supplies, dues and subscriptions, office utility charges, telephone charges and automobile expenses in excess of five (5%) percent of Common Areas Charges excluding utilities, Taxes, insurance premiums and amortized capital expenses.  In addition, if any tenant or other occupant of the Shopping Center maintains the Common Areas in whole or in part, or any facilities therein, or furnishes any services which would otherwise be included in Common Areas Charges, or pays directly for costs which would otherwise be included in the Common Areas Charges, its costs thereof shall be excluded in determining Tenant's obligation hereunder to the extent of the maintenance or services furnished by or costs incurred by said tenant or other occupant. Common Areas Charges for any period during the Term which constitutes less than a full calendar year shall be equitably pro rated.

(d)    Tenant shall have the right to audit Landlord's books and records to verify Landlord's calculation of Common Areas Charges and Tenant's Pro Rata Share.  Upon Tenant's request, Landlord shall promptly deliver to Tenant copies of relevant backup materials (including, but not limited to, contracts, correspondence and paid invoices) reasonably required by Tenant. In the event of an error in Landlord's favor, Landlord shall immediately refund the overcharge to Tenant, and if the error exceeds three (3%) percent of Tenant's Pro Rata Share of Common Areas Charges, Tenant shall also have the right to immediate reimbursement from Landlord for the

reasonable expenses of the audit. Tenant shall keep the results of any such audit confidential, provided that nothing contained herein shall restrict Tenant from disclosing such information as may be required by law, or to its accountants, attorneys or bona-fide prospective assignees or subtenants (provided that each of such recipients shall be bound by the same non-disclosure provisions as are imposed upon Tenant). Any dispute by Landlord with respect to an audit by Tenant shall be submitted to arbitration in accordance with the provisions of Section 54 below.

(e)     In no event shall Tenant be required to join, participate in or contribute to any promotional fund, marketing fund or merchants' association.

(f)     With respect to shopping carts provided by Tenant for the use of its customers, Tenant will use reasonable efforts to periodically remove same from the Common Areas.

(g)     Landlord shall not use or permit the use of all or any portion of the Common Areas for retail sales or for promotional purposes. Notwithstanding the foregoing, provided the same is permitted by applicable law, Tenant shall have the right to place a trailer on the Common Areas in an area immediately adjacent to the Premises for the purpose of conducting employee interviews and recruiting, which trailer shall be removed not later than the date which is ten (10) days after the Delivery Date.

**SECTION 14.     PARKING AREAS AND OTHER COMMON AREAS.**

(a)     The locations and size of the Premises and other buildings in the Shopping Center, and the layout of the parking and service areas and access and service roads and other Common Areas are designated on Exhibit B. Except as may be required by changes to The Americans with Disabilities Act (the "ADA") after the Delivery Date, Landlord shall not: (i) alter the area of the Shopping Center or the location, availability or size of any building or improvement in the Shopping Center shown on Exhibit B; (ii) change the number, location, or layout of parking spaces in the Shopping Center shown on Exhibit B; (iii) construct additional structures or buildings in the Shopping Center (including without limitation any kiosks, booths, signs or similar structures in the Common Areas); or (iv) change the entrances or exits to and from the Shopping Center, or the curb cuts, roadways and sidewalks or other Common Areas; without obtaining Tenant's prior written consent in each instance, which consent may be withheld by Tenant in its sole discretion without the application of Section 41 below. In the event Tenant consents to any such work, it shall be performed by Landlord at any time other than during the months of August, November and December, and shall be undertaken in such a manner so as to (A) not adversely affect ingress to or egress from the Shopping Center, (B) have no adverse effect on the visibility of the Premises or any

signs which contain Tenant's name, and (C) not otherwise materially interfere with the normal conduct of Tenant's business in the Premises. Landlord shall not designate specific parking spaces for use by any tenant or other occupant of the Shopping Center. Landlord further warrants and represents that Lot 4 of the Shopping Center will, except as provided in Section 22(d) below and except for reductions caused by changes to the ADA after the Delivery Date, at all times during the Term, contain the greater of (I) the number of parking spaces required by law, or (II) at least four and six hundred seventy-nine thousandths (4.679) parking spaces for every one thousand (1,000) square feet of Floor Area of Lot 4 of the Shopping Center, with each such space not less than nine (9) feet wide and eighteen (18) feet deep, except for compact parking spaces specifically shown on Exhibit B.

(b)    Parking spaces shall at all times be clearly marked by painting, striping or otherwise.

(c)    The Common Areas shall be fully lighted by Landlord on each day that business shall be conducted by Tenant in the Shopping Center from dusk until one (1) hour after the close of business in the Premises and Landlord shall provide for low level security lighting from one (1) hour after the close of business in the Premises until dawn.

(d)    Tenant shall use reasonable efforts to have its employees park their motor vehicles in the area designated as "Employee Parking" on Exhibit B and Landlord shall take all reasonable measures to have other tenants and occupants of the Shopping Center do the same.

(e)    There shall be no charge whatsoever levied for the use of any parking areas within the Shopping Center (other than costs incurred in maintaining Common Areas, as provided in Section 13 above).

(f)    In the event any construction or repair which is permitted under the terms of this Lease is undertaken in  the Common Areas or in any other portion of the Shopping Center during such time as the Premises shall be open for business to the public, all such construction or repairs shall be commenced following not less than five (5) days notice to Tenant, and shall be conducted in a manner which will not materially interfere with the normal operation of Tenant's business in the Premises, including access to and visibility of the Premises from the parking lots, roads and highways abutting the Shopping Center.

### SECTION 15.    TENANT'S INSURANCE.

(a)    Tenant, at its own cost and expense, shall procure and maintain in full force and effect on and after the Delivery Date and throughout the Term: (i) commercial general liability

insurance protecting and insuring Tenant, naming Landlord as "additional insured-lessor" with regard to the Premises, and having a combined single limit of liability of not less than Five Million ($5,000,000.00) Dollars for bodily injury, death and property damage liability; and (ii) standard "All-Risk" insurance, on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of all fixtures, equipment and other items of personal property of Tenant located on or within the Premises. Tenant shall proceed diligently to have its insurers provide thirty (30) days [ten (10) days in the event of non-payment of premium] notice of cancellation.

(b)     Duly executed certificates evidencing the insurance coverage described in Section 15(a)(i) above shall be delivered to Landlord prior to the Delivery Date.

(c)     Tenant may carry any of its insurance under "blanket policies" covering the Premises and other locations it or any affiliate of Tenant owns or leases.

(d)     The property insurance required to be maintained by Tenant pursuant to this Section shall not have deductibles exceeding One Hundred Thousand ($100,000.00) Dollars without Landlord's prior consent.

(e)     All insurance required of Tenant under this Lease shall be maintained with insurance companies qualified to do business in the state in which the Shopping Center is located, and rated at least A-VIII by the most current Best's Key Rating Guide (or its equivalent, if such Guide ceases to be published).

(f)     Except with respect to the liability insurance described in (a)(i) above, Tenant shall be permitted to self-insure the risks which would otherwise have been covered under the other insurance policies required to be maintained by Tenant pursuant to the provisions of this Section 15 on the condition that either Tenant or any guarantor of Tenant's obligations under this Lease maintains, during the period of such self-insurance, a net worth of at least Fifty Million ($50,000,000.00) Dollars.

**SECTION 16.     LANDLORD'S INSURANCE.**

(a)     Landlord shall procure and maintain in full force and effect on and after the Commencement Date and throughout the Term commercial general liability insurance with regard to the Common Areas protecting and insuring Landlord, naming Tenant as "additional insured", and having a combined single limit of liability of not less than Ten Million ($10,000,000.00) Dollars for bodily injury, death and property damage liability. Landlord shall have the right to carry its insurance under "blanket policies" covering the Shopping Center and other properties provided that the amount of the total insurance available shall be at least the protection equivalent to separate

policies in the amounts herein required, and provided further that in all other respects, any such policy or policies shall comply with the provisions of this Section 16.

(b)    Landlord shall procure and maintain in full force and effect on and after the Commencement Date and throughout the Term standard "All-Risk" insurance (including loss of rents for a minimum period of one (1) year) and endorsements for coverages for flood, earthquake, windstorm, earth movement [sinkholes], demolition, increased cost of construction and contingent operation of building laws coverages, on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of all of the buildings (including the Premises) and other insurable improvements in the Shopping Center ; provided, however, in no event shall such insurance cover Tenant's Property. The replacement value of the buildings and other insurable improvements constituting the Shopping Center shall be re-evaluated from time to time at the request of either Landlord or Tenant. All policies required to be obtained and maintained by Landlord pursuant to this Section 16 shall provide that any loss shall be made payable to Landlord's institutional fee mortgagee, or if none, to Landlord; all proceeds of such policies shall be disbursed by such party in accordance with the provisions of, and for the purposes set forth in, Section 21 hereof. Tenant agrees to reimburse Landlord for Tenant's Pro Rata Share of the reasonable insurance premiums attributable to the policies required to be obtained and maintained by Landlord pursuant to this Section 16 as part of Common Areas Charges. If the rates for any insurance Landlord is required to carry hereunder are increased as a result of the use or other activity of any other occupant (other than Tenant, its assignees or sublessees) of the Shopping Center, to the extent such rates are included as part of Common Areas Charges, Tenant's Pro Rata Share of said reasonable insurance premiums attributable thereto shall be appropriately reduced so Tenant does not contribute to such additional costs. To the extent that Landlord may receive a dividend, credit, rebate or other return of a premium (collectively, "Insurance Rebate") for which Tenant has paid a share of the insurance premium, Tenant shall be entitled to receive Tenant's Pro Rata Share of the Insurance Rebate. For the calendar years in which this Lease commences and terminates, the provisions of this paragraph shall apply and Tenant's liability for Tenant's Pro Rata Share of any insurance premium for such year shall be subject to a pro rata adjustment based on the number of days of said years during which the Term is in effect. The provisions of this subsection 16(b) shall survive the expiration or sooner termination of this Lease.

(c)     The property insurance required to be maintained by Landlord pursuant to this Section shall not have deductibles exceeding One Hundred Thousand ($100,000.00) Dollars without Tenant's prior consent.

(d)     All insurance required of Landlord under this Lease shall be maintained with insurance companies qualified to do business in the state in which the Shopping Center is located, and rated at least A-VIII by the most current Best's Key Rating Guide (or its equivalent, if such Guide ceases to be published).  Landlord shall proceed diligently to have its insurers provide thirty (30) days [ten (10) days in the event of non-payment of premium] notice of cancellation.  Landlord shall provide Tenant with duly executed certificates of all insurance described in this Section 16.

(e)     The liability insurance requirements under the foregoing Section 15 and this Section 16 shall be reviewed by Landlord and Tenant every five (5) years for the purpose of mutually increasing (in consultation with their respective insurance advisors) the minimum limits of such insurance to limits which shall be reasonable and customary for similar facilities of like size and operation in accordance with generally accepted insurance industry standards.  If the parties are unable to mutually agree upon such new limits within thirty (30) days of a written demand by one party upon the other, the determination of an independent insurance advisor selected by the parties' insurance advisors shall be binding upon the parties.

**SECTION 17.**     **REPAIRS.**

(a)     Except as set forth in subsection 17(b) below, Tenant shall keep the non-structural interior of the Premises, including the plate glass, in good condition and repair, except for ordinary wear and tear, damage by fire or other casualty or eminent domain and any work done by Landlord. With respect to HVAC units serving the Premises exclusively but located on the roof of the Premises, Tenant shall, except as set forth in subsection 17(b) below, be responsible for the repair of same, provided that Landlord shall at all times provide Tenant with access necessary in order for Tenant to perform such work in a commercially reasonable manner (including without limitation by granting or arranging such easements or licenses for the benefit of Tenant as may be necessary). Notwithstanding the foregoing, Tenant shall have no responsibility for the repair of the electrical, plumbing, mechanical and/or other utility systems serving the Premises but located outside thereof, nor for any portions of such systems running through, in, under or across the Premises but not exclusively serving the same.

(b)     In addition to Landlord's obligations with respect to punch list items described in Section 5(a)(i) above, Landlord shall perform, at its own cost and expense (and not includable in

Common Areas Charges), as the same shall from time to time be necessary, all repairs and replacements to (i) the HVAC units and the electrical, plumbing and/or mechanical systems serving the Premises but located outside thereof (provided that subject to the further provisions of this Section 17(b), the phrase "located outside thereof" shall, for the purposes of this clause (i), not include those portions of the HVAC units located on the roof of the Premises and serving the Premises exclusively), and any portions thereof running through, in, under or across the Premises but not exclusively serving the same; (ii) the non-structural elements of the Premises (including, without limitation, the HVAC units and the electrical, plumbing and/or mechanical systems located in or servicing the Premises) (A) to the extent, if any, of contractors', manufacturers', vendors', or insurers' warranties or guarantees, including without limitation such warranties described in Exhibit D hereof, (B) during the period terminating on the date which is one (1) year after the Delivery Date , (C) which are occasioned by the act or omission of Landlord, its employees, agents or contractors, or (D) which are occasioned by any breach by Landlord of any provision of this Lease; (iii) the structural elements of the Premises and the remainder of the Shopping Center, including without limitation the roof joists, foundation, exterior walls [including the repainting of the same, if applicable and as required] (except plate glass, storefront windows, doors, door closure devices, window and door frames, molding, locks and hardware, and painting or other treatment of interior walls), floor (but not the floor covering unless the same are damaged as a result of a floor defect or settling), and structural portions of any building of which the Premises may be a part; (iv) the roof, gutters, flashings, downspouts and scuppers; (v) the sewer, gas, wiring and public utility connections outside the Premises; and (vi) all utility lines and ducts in or passing through the Premises that serve other tenants and occupants in the Shopping Center or that are located outside the Premises but that serve the Premises.

(c)    Any addition, alteration, improvement, or rebuilding, structural or otherwise, to or of the Premises or any part thereof, which may be required by reason of any law, rule, regulation or order promulgated by competent governmental authority and in effect on the date of this Lease or which is hereafter enacted and is not required solely due to Tenant's specific use of the Premises shall be made by and at the cost and expense of Landlord, except that any such work which (i) is required solely due to Tenant's specific use and would not otherwise be required, or (ii) involves any non-structural interior alterations or changes to the Premises, shall be made by and at the cost and expense of Tenant. As used in this Lease, the term "Tenant's specific use" shall not refer to general retail use. If it is determined that the Landlord's Work, performed in accordance with all

presently existing laws and regulations and the present interpretations thereof, does not comply with

the ADA, Landlord shall bear all costs of effecting such compliance, whether or not the same is

required as a result of Tenant's specific use of the Premises.

(d)     All rebuilding, altering and repairing of structural portions of the Premises

required by this Section shall be made in accordance with plans and specifications approved by

Tenant and Landlord.

(e)     Landlord shall have access to the Premises during Tenant's business hours

upon at least five (5) days prior notice (or without such notice in case of emergency, i.e., posing

imminent material harm to persons or property) for inspection and to make any repairs or

replacements required of it to be made; provided, however, that Landlord's employees, agents and

contractors shall identify themselves to the store manager upon entering the Premises.  Landlord

shall reimburse Tenant promptly upon demand for the reasonable cost and expense of Tenant

incurred in connection with the moving of any merchandise and trade fixtures required to enable

Landlord to make such repairs or replacements.

(f)     Notwithstanding any obligation of Tenant pursuant to (a) above, the repair

and replacement (but not normal maintenance) of the HVAC units exclusively servicing the Premises

shall be Landlord's responsibility during the period terminating on the date which is one (1) year

after the Rent Commencement Date and thereafter, provided any such repair or replacement is not

required as a result of Landlord's negligence or intentional acts, shall be Tenant's sole responsibility

throughout the remainder of the Term subject to the guarantees to be provided by Landlord pursuant

to Exhibit D; provided, however, that in the event Tenant replaces the HVAC units exclusively

serving the Premises during the five (5) year period ending on the expiration or earlier termination

of this Lease, then Landlord shall pay to Tenant, upon Tenant's delivery of possession of the

Premises to Landlord, the then unamortized cost of such HVAC units (which unamortized cost shall

be determined utilizing the estimated useful life of the HVAC units as provided by the Internal

Revenue Code of the United States), provided Tenant replaces the HVAC units with comparable

systems.  The provisions of this Section 17(f) shall survive the expiration or earlier termination of

this Lease.

(g)     Any repairs or replacement performed by Landlord shall not materially

interfere with the normal conduct of Tenant's business in the Premises, and no materials or tools of

any kind used in connection with such repairs shall be stored in the Premises or in portions of the

parking areas except where reasonably designated by Tenant.  To the extent that any repairs or

replacements required of Landlord pursuant to this Section 17 may materially interfere with the normal conduct of Tenant's business in the Premises if performed during Tenant's regular business hours, Landlord shall perform the same solely during the times that Tenant is not open for business.

### SECTION 18.    TENANT DEFAULT.

(a)    If (i) Tenant shall default in the payment of any Rent provided for herein for a period of ten (10) days after its receipt of written notice thereof from Landlord specifying the amount and details of the unpaid Rent, or (ii) default should be made in any of the other covenants of this Lease on Tenant's part to be performed, and Tenant does not cure such default on or before the thirtieth (30th) day after its receipt of written notice thereof from Landlord specifying the nature of such default (or, if such default described in this subsection (ii) shall be of a nature that same cannot reasonably be cured on or before such thirtieth (30th) day and Tenant does not commence to cure such default on or before such thirtieth (30th) day and thereafter diligently prosecute said cure to completion), such circumstance shall constitute an "Event of Default".

(b)    Upon an Event of Default, Landlord shall have all remedies given to it at law or in equity, including the following:

(i)    to bring suit for the collection of such unpaid Rent or for the performance of such other covenant of this Lease on Tenant's part to be performed; and/or

(ii)    upon at least five (5) days' notice to Tenant (and Tenant's continued failure to cure such Event of Default), to terminate this Lease, or to terminate Tenant's right of possession, reenter the Premises and take possession thereof. If Landlord shall so elect to terminate this Lease, all rights and obligations of Landlord shall cease and terminate, except that Landlord shall have and retain full right to sue for and collect all such unpaid Rent and all damages to Landlord by reason of any such breach, and Tenant shall surrender and deliver the Premises to Landlord and upon any failure by Tenant in so doing, Landlord shall have the right to recover possession by summary proceedings.  If Landlord elects to repossess the Premises without terminating the Lease, then Tenant shall be liable for and shall pay to Landlord all Rent payable to Landlord pursuant to the terms of this Lease which have accrued to the date of repossession, as well as all Rent which becomes due and payable pursuant to the terms of this Lease when and as required to be paid by Tenant to Landlord during the remainder of the Term (with no acceleration), diminished by any net sums thereafter received by Landlord through reletting the Premises during said period (after deducting reasonable expenses incurred by Landlord).  In no event shall Tenant be entitled to any excess of any rent obtained by such reletting over and above the Rent herein

reserved. Actions to collect amounts due by Tenant to Landlord as provided herein may be brought from time to time, on one or more occasions, without the necessity of Landlord's waiting until the expiration of the Term.

      (c)    Upon an Event of Default, Tenant shall also be liable for and shall pay to Landlord, in addition to any sum provided to be paid above, brokers' fees incurred by Landlord in connection with reletting the whole or any part of the Premises, the costs of removing and storing Tenant's or other occupant's property; the cost of repairs; and all other reasonable expenses incurred by Landlord in enforcing or defending Landlord's rights and/or remedies, including reasonable attorneys' fees.

      (d)    Upon an Event of Default, any amounts paid by Landlord to cure said Event of Default and any Rent payments not paid after notice shall bear interest at the Lease Interest Rate from and after the expiration of any applicable grace period.

      (e)    Landlord agrees to use all reasonable efforts to relet the Premises or any portion thereof to mitigate Landlord's damages to which Landlord would otherwise be entitled to as a result of an Event of Default. In no event shall Tenant be liable to Landlord for any consequential damages suffered by Landlord as a result of an Event of Default by, or any other act of, Tenant.

      **SECTION 19.**      **LANDLORD DEFAULT.** If Landlord fails to make any repairs or do any work required of Landlord by the provisions of this Lease, or if Landlord shall at any time be in default in the observance or performance of any of the other covenants and agreements required to be performed and observed by Landlord hereunder, and any such failure or default continues for a period of thirty (30) days after notice thereof is given by Tenant to Landlord, or, if such failure or default requires more than thirty (30) days to cure in the exercise of due diligence, unless Landlord commences to cure same within said thirty (30) day period and thereafter diligently prosecutes the same to completion, then Tenant, in addition to such other rights and remedies as may be available under this Lease, or at law or in equity (a) may, if the failure or default materially interferes with the normal conduct of Tenant's business in the Premises, (i) terminate this Lease and/or (ii) abate all payments of Rent hereunder until the failure or default has been cured and Tenant is able to conduct its normal business in the Premises, but in either case without waiving its rights to damages for Landlord's failure to perform; and/or (b) may, but shall not be obligated to, make such repairs or perform such work in accordance with the provisions of this Lease all on behalf of and at the expense of Landlord; and/or (c) may bring suit for the collection of any amounts for which Landlord is in default, seek injunctive relief, or seek specific performance for any other covenant or agreement of

Landlord, without terminating this Lease; and/or (d) may offset against the Rent payable by Tenant hereunder for amounts owed by Landlord to Tenant and/or for the amounts reasonably expended by Tenant performing such repairs or work, including costs and attorneys' fees, together with interest thereon at the Lease Interest Rate. Notwithstanding the foregoing, if, in Tenant's reasonable judgment, an emergency (i.e., posing imminent material harm to persons or property or material disruption to the normal operation of Tenant's business) shall exist, Tenant may at its election and without prior notice to Landlord, exercise its rights in accordance with the foregoing subsections (b), (c) and (d) of this Section 19. In no event shall Landlord be liable to Tenant for any consequential damages suffered by Tenant as a result of a default by, or any other act of, Landlord.

**SECTION 20.**      **LANDLORD'S ENTRY.** Tenant shall permit Landlord to enter upon the Premises during Tenant's business hours, upon at least five (5) days prior notice to Tenant, to exhibit same to prospective bona-fide purchasers and mortgagees of the Shopping Center, and during the last six (6) months of the Term, to exhibit same to prospective bona-fide tenants; provided, however, that Landlord's employees, agents and contractors shall identify themselves to the store manager upon entering the Premises.

**SECTION 21.**      **FIRE AND OTHER CASUALTY.**

(a)      Except as otherwise provided in this Section 21, if all or a portion of the Premises, the Common Areas or other buildings, including all improvements thereto, in the Shopping Center shall be damaged by fire or other casualty, Landlord shall promptly rebuild and restore the same to the condition existing immediately prior to such fire or other casualty (which restoration shall  include all Tenant's Work and all other leasehold improvements performed by Tenant). The proceeds of the policies required to be obtained and maintained by Landlord pursuant to Section 16(b) hereof shall, to the extent necessary, be used for the performance of such rebuilding and restoration work; in the event such insurance proceeds are insufficient to complete such work, Landlord shall provide the balance of the amount necessary to rebuild or restore the Shopping Center in the manner provided in this Section 21. Notwithstanding the foregoing, Landlord agrees that (A) if any portion of the Premises are so damaged or destroyed, Tenant shall have the right to require Landlord to make changes to the Premises in the course of, and as part of, such rebuilding or restoration work (it being agreed that to the extent that the net cost and expense of such rebuilding or restoration work is increased solely as a result of such changes (taking into consideration any and all actual reduced and additional costs resulting from such changes and/or other cost savings arising therefrom), then Tenant shall pay to Landlord, as Additional Rent, the amount by which the net cost

and expense of such rebuilding or restoration work was thereby increased, which amount shall be due and payable within fifteen (15) days after Landlord has delivered to Tenant backup information in support of such increase in the net cost and expense of such rebuilding or restoration work (including without limitation receipted invoices) as reasonably required by Tenant, and (B) Landlord shall not be obligated to rebuild, restore or replace Tenant's Property. If, in Tenant's sole but reasonable judgment, any damage to the Premises renders all or any portion of the Premises unusable for the conduct of Tenant's business, or in the case of damage to the Shopping Center, materially interferes with the normal conduct of Tenant's business in the Premises, a just proportion of Rent payable hereunder shall be abated, and such abatement shall terminate in accordance with the terms of Section 52 below. In addition, if such fire or other casualty occurs during the period commencing on the Delivery Date and ending one day prior to the Rent Commencement Date, then, notwithstanding any other provision of this Lease (but subject to the Slack Period provisions set forth in the definition of "Rent Commencement Date" in Section 1 above), the Rent Commencement Date shall be deemed delayed one day for each day which elapses between the occurrence of such fire or other casualty and the date upon which the damaged or destroyed area(s) are fully rebuilt and restored.

(b)     If (i) Landlord does not commence the repair and restoration work to the Premises, the Common Areas or other buildings in the Shopping Center as required pursuant to this Section 21 within one hundred twenty (120) days after the date of such destruction or thereafter fails to diligently pursue the completion of such repair and restoration work, (ii) the required repairs and restorations to the Premises, the Common Areas or other buildings in the Shopping Center cannot, in the opinion of an independent licensed architect designated by Tenant, be completed by Landlord in accordance with all provisions of this Section 21 within a period of twelve (12) months after the date of destruction, or (iii) the required repairs and restorations to the Premises, the Common Areas or other buildings in the Shopping Center are not actually Substantially Completed by Landlord in accordance with all provisions of this Section 21 within a period of twelve (12) months after the date of destruction (which twelve-month period may be extended by up to 90 days by reason of Force Majeure), then, in any of such events, Tenant shall have the right, at its sole discretion and option, to:  (A) with respect to (i) or (iii) above, after giving thirty (30) days prior notice to Landlord, perform or complete, as the case may be, the required repairs and restoration work (or any portion thereof) on Landlord's behalf and at the sole cost of Landlord, which cost Landlord shall pay to Tenant during the course of such repairs within ten (10) days of Tenant's delivery to Landlord of an

invoice therefor and, in default of any such payment, Tenant shall have the right to offset the amount thereof, together with interest at the Lease Interest Rate, against the Rent next accruing hereunder (it being agreed, without limiting the foregoing provisions of this Section 21(b), that at Tenant's election all insurance proceeds payable (or, as applicable, paid) to Landlord or Landlord's mortgagee pursuant to Section 16(b) hereof shall be paid (or, applicable, in turn delivered) directly to Tenant, to be applied to such work by Tenant as same is being performed); or (B) with respect to (i) or (iii) above, seek to obtain specific performance of Landlord's repair and restoration obligations pursuant to the laws of the state in which the Shopping Center is located; or (C) with respect to (i), (ii) or (iii) above, terminate this Lease by thirty (30) days notice to Landlord. The exercise of the rights granted to Tenant herein shall be in furtherance of and not in limitation of any other rights Tenant may have pursuant to this Lease or in law or equity.

(c)     If the Premises are substantially destroyed by fire or other casualty during the last two (2) years of the Term to the extent of more than one-third (1/3) of the Floor Area thereof, either Landlord or Tenant shall have the right to terminate this Lease as of the date of such damage or destruction by giving notice within thirty (30) days following such damage or destruction, but Tenant may negate any termination by Landlord by agreeing to extend the Term for an additional five (5) year period by exercising an option pursuant to Section 46 below, if available, within ten (10) days after receipt of the termination notice from Landlord.

**SECTION 22.     EMINENT DOMAIN.**

(a)     If all of the Premises shall be taken under the power of eminent domain, this Lease shall terminate as of the effective date of such taking without further liability on the part of either Landlord or Tenant except for an adjustment between the parties for the Rent payable by Tenant hereunder. If: (i) any portion of the Premises shall be taken under the power of eminent domain so that it is commercially unreasonable or unfeasible for Tenant, in its sole but reasonable judgment, to conduct its normal business in the Premises; or (ii) whether or not a taking occurs, (A) portions of the Shopping Center shall be divided or separated in any manner that it materially interferes with parking, visibility, or access to the Premises from other portions of the Shopping Center, or (B) the Shopping Center no longer has entrances from both Chenal Parkway and Atkins Road, and as a result, in either case, it is not commercially reasonable or feasible for Tenant, in its sole but reasonable judgment, to conduct its normal business in the Premises; or (iii) any portion of the Shopping Center shall be so taken that materially interferes with parking, visibility or access to the Premises, and as a result of such taking it is commercially unreasonable or unfeasible for Tenant,

in its sole but reasonable judgment, to conduct its normal business in the Premises; or (iv) more than

twenty-five (25%) percent of the buildings in the Shopping Center (other than the Premises) are

taken; then, within sixty (60) days of any such event, Tenant shall have the right to terminate this

Lease by giving sixty (60) days notice to Landlord, in which event this Lease shall so terminate

without further liability on the part of either Landlord or Tenant, except for an adjustment between

the parties for the Rent payable by Tenant hereunder and for payment to Tenant for its share of the

award for the taking pursuant to (c) below.  Subsequent to any partial taking of the Premises, the

Rent shall be equitably reduced or totally abated based upon the extent to which the remaining

portion of the Premises may, in Tenant's sole but reasonable judgment, be utilized for its normal

conduct of business.

     (b)    If Tenant shall not have the right to cancel this Lease or, having such right,

elects not to exercise the same, Landlord, at its own cost and expense, shall within a reasonable

period of time, repair and restore the damaged area to tenantable condition, similar in physical

appearance to the condition of the area immediately prior to the taking, pursuant to plans and

specifications approved by Tenant (which repair and restoration to the Premises shall include all

Tenant's Work and all other leasehold improvements performed by Tenant; provided, however, that

Landlord shall not be obligated to repair or restore Tenant's Property).  During the period of said

repairs and restoration, all Rent shall abate to the extent that the Premises may not, in Tenant's sole

judgment, be used by Tenant for the normal conduct of its business.  Such abatement shall terminate

in accordance with the terms of Section 52 below.

     (c)    In connection with any taking or partial taking of the Premises, Tenant shall

be entitled to claim an award for loss of business, leasehold improvements, fixtures and equipment

and removal and reinstallation costs; provided, however, that no award shall be payable to Tenant

which reduces the award payable to Landlord for its fee interest in the Premises.

     (d)    Notwithstanding the foregoing, if seven (7%) percent or more of the parking

spaces shown on Exhibit B shall be taken under the power of eminent domain, or if so many of the

parking spaces within the Shopping Center are so taken such that there are less than either (i) the

number of parking spaces required by law, or (ii) four and forty-five hundredths (4.45) parking

spaces for every one thousand (1,000) square feet of Floor Area in the Shopping Center, then Tenant

shall have the right to terminate this Lease in the same manner and with the same effect as set forth

in subsection (a) above.

(e)     Any dispute between the parties with respect to this Section 22 shall be resolved by arbitration in accordance with the provisions of Section 54 below.

**SECTION 23.     EXCLUSIVES IN CENTER.**

(a)     TENANT'S EXCLUSIVE.     To induce Tenant to execute this Lease, and subject to all of the terms and provisions of this Section 23, Landlord covenants and agrees that:

(i)     Landlord will not lease, rent or occupy or permit any other premises in the Shopping Center or in any Related Land to be occupied, whether by a tenant, sublessee, assignee, licensee or other occupant or itself, for the sale, rental or distribution, either singly or in any combination, of items contained in any of the following respective categories of items: (a) linens and domestics; (b) bathroom items; (c) housewares; (d) frames and wall art; (e) window treatments; and/or (f) closet, shelving and storage items (which items, either singly or in any combination, are hereinafter referred to as the "Exclusive Items").  Notwithstanding the foregoing, any tenant or subtenant in the Shopping Center shall have the right to utilize its respective premises for the sale, rental and/or distribution of Exclusive Items within an aggregate area (which shall include an allocable portion of the aisle space adjacent to such sales, rental and/or distribution area) not to exceed the lesser of (x) five (5%) percent of the Floor Area of such tenant's or subtenant's premises, or (y) two thousand (2,000) square feet of Floor Area within such tenant's or subtenant's premises; Notwithstanding the foregoing reference to "fully executed and delivered leases in effect on the date hereof," Landlord hereby agrees that current tenants of the Shopping Center (and current or future assignees or sublessees of such current tenants) shall nevertheless be subject to the restrictions contained in this Section 23(a) in the event that the lease between Landlord and any such tenant requires Landlord's consent to any assignment or sublet or requires Landlord's consent in order to permit a change in the use of the applicable premises so as to allow for the sale, rental or distribution of the Exclusive Items.

(ii)     the exclusive rights granted to Tenant with respect to any respective category listed in the foregoing subsection (a)(i) of this Section 23 shall be conditioned upon Tenant using portions of the Premises for the sale, rental or distribution of items contained in such category (other than during Excused Periods and for periods of time not exceeding six (6) consecutive months).  The exclusive rights granted to Tenant in this Section 23 shall inure to the benefit of any assignee of Tenant's interest in this Lease and to any sublessee of a Floor Area of at least fifteen thousand (15,000) square feet of the Premises; and

(iii) (A) upon a breach of the aforesaid covenant and agreement by Landlord (which breach shall not include a situation in which Landlord has included in the lease between Landlord and any tenant in the Shopping Center [or in the Related Land] a provision which effectuates the exclusive rights granted to Tenant in this Section 23(a) and, despite such inclusion, such tenant has violated the exclusive rights granted to Tenant in this Section 23(a)), the Rent payable hereunder shall be reduced by fifty (50%) percent for so long as such violation shall be continuing and Tenant shall have all remedies given to it at law and in equity, including, without limitation, the right: to obtain injunctive relief, and/or to terminate this Lease, and/or to commence and prosecute an action against Landlord for damages, or

(B) If any person or entity other than Landlord shall violate any of the exclusive provisions herein set forth, or shall indicate in writing to Landlord that it intends to violate any of said provisions, Landlord shall promptly commence appropriate legal proceedings, and vigorously prosecute the same, to enjoin and prohibit any such violation. If Landlord fails to commence such proceedings, or shall fail thereafter to vigorously prosecute the same, Tenant shall have the right (a) to conduct and prosecute such legal proceedings (including, without limitation, an action for injunctive relief) in its own name, but at Landlord's expense, or (b) in the event the right set forth in (a) above is not permitted to be exercised under applicable law, to conduct and prosecute such legal proceedings in the name of Landlord, at Landlord's expense, and Landlord agrees to cooperate with Tenant with respect to such prosecution (including, without limitation, by executing any documentation or authorization reasonably required by Tenant in connection with such prosecution and by appearing at any hearing or trial with respect to such prosecution).

(b)    EXCLUSIVE WHICH TENANT MUST HONOR.

(i)    If Landlord enters into a lease with Staples, Inc. for the premises (the "Staples Premises") indicated on Exhibit B and grants an exclusive (the "Staples Exclusive") to that tenant for the sale and leasing of office supplies, office furniture and office equipment (including computers) and for office services (including copying and printing), Tenant agrees that it shall not lease, occupy or use the Premises (or, in the event of a sublease, any applicable portion of the Premises); or permit the Premises (or, in the event of a sublease, any applicable portion of the Premises) to be leased, occupied or used, whether by Tenant or any sublessee, assignee, licensee or other occupant, in violation of any such Staples Exclusive; provided, however, that Tenant shall have the right to utilize up to an aggregate of ten (10%) percent of the Floor Area of the Premises (or in the event of a sublease, the applicable retail portion of the Premises) for the sale, rental or

distribution of the items protected by the Staples Exclusive.  Tenant's honoring of the Staples Exclusive shall be conditioned upon Staples (or its assignees and sublessees) using portions of the applicable retail portions of the Staples Premises for the sale, rental or distribution of the item or items for which exclusive rights are granted under this subsection (i) (other than during Excused Periods and for periods of time not to exceed six (6) consecutive months).

(ii) Except as specifically set forth in this subsection (b), Tenant shall not be required to honor any exclusive granted by Landlord to any tenant in the Shopping Center.

**SECTION 24.** **RIGHT TO MORTGAGE AND NON-DISTURBANCE.** Landlord reserves the right to subject and subordinate this Lease at all times to the lien of any mortgage or deed of trust now or hereafter encumbering or affecting all or any portion of the Shopping Center, as well as to any future ground or underlying leases encumbering or affecting all or any part of the Shopping Center; provided, however, that (a) each holder of any such mortgage or deed of trust shall execute and deliver to Tenant an agreement in the form of Exhibit G hereto, in recordable form, and (b) any landlord under such ground or underlying lease shall execute and deliver to Tenant a fee owner recognition agreement in a form reasonably satisfactory to Tenant (and, as may be required, consented to by the holder of any mortgage, deed of trust or other existing lien), which shall include the following provisions: (i) the landlord under the ground or underlying lease will not, in the exercise of any of the rights arising or which may arise out of such lease, disturb or deprive Tenant in or of its possession or its rights to possession of the Premises or of any right or privilege granted to or inuring to the benefit of Tenant under this Lease, provided that an uncured Event of Default does not then exist under this Lease; (ii) in the event of the termination of the ground or underlying lease, Tenant will not be made a party in any removal or eviction action or proceeding, nor shall Tenant be evicted or removed of its possession or its right of possession of the Premises, and this Lease shall continue in full force and effect as a direct lease between such landlord and Tenant for the remainder of the Term and on the same terms and conditions as contained herein, without the necessity of executing a new lease; and (iii) Landlord and Tenant shall have the right to execute any amendment to this Lease which is specifically required hereunder and the landlord under such ground or underlying lease shall recognize and be bound thereto.

**SECTION 25.** **TENANT ASSIGNMENT AND SUBLETTING.**

(a)     Tenant shall have the right from time to time, without the consent of Landlord, to assign Tenant's interest in this Lease and/or to sublet, concession or license all or any portion of the Premises; provided, however, that Landlord shall have the right to approve any use by Tenant

or Tenant's sublessees or any sublease which provides for a change in the use of the Premises which violates (i) the Staples Exclusive to the extent then applicable, (ii) any use restrictions imposed upon the Shopping Center by law, (iii) the Restrictions as set forth on Exhibit L, or (iv) any Prohibited Use. Any sublease of a portion of the Premises shall be subject to the provisions of Section 11(e) above.

(b)     Unless otherwise agreed to in writing by Landlord, no assignment, subletting, licensing or concessioning by Tenant shall reduce, diminish, or otherwise affect the liability of Tenant hereunder; provided, however, that in the event of an assignment of Tenant's interest in this Lease to a Major Assignee or in the event of an assignment of Tenant's interest in this Lease to a tenant whose obligations under this Lease are guaranteed by a Major Guarantor, all liability of Tenant hereunder, from and after the effective date of such assignment, shall terminate . For purposes of this Section 25(c), the term "Major Assignee" or "Major Guarantor", as the case may be, shall mean a person or entity which has, as of the effective date of such assignment, a net worth of at least One Hundred Million ($100,000,000.00) Dollars.

(c)     All assignees, sublessees, licensees and concessionaires shall be permitted to use the Premises (or the applicable portion thereof) for any retail purpose not specifically prohibited by the provisions of Section 7(c) of this Lease. Landlord hereby acknowledges that any sublessee of all or any portion of the Premises shall, subject to Tenant's prior written approval, be entitled to all of the rights and benefits available to Tenant pursuant to the terms of this Lease.

(d)     In addition to Tenant's other rights set forth in this Section 25, a collateral assignment of Tenant's interest in this Lease by Tenant to one or more Institutional Lenders, as collateral security for an indebtedness or other obligation of Tenant or any affiliated entity shall be permitted and Landlord shall execute all documentation reasonably requested by Tenant or any such Institutional Lender in connection therewith..

(e)     If Tenant assigns Tenant's interest in this Lease, then Landlord, when giving notice to said assignee or any future assignee in respect of any default, shall also give a copy of such notice to the original Tenant named herein (hereinafter referred to as "Original Tenant") if Original Tenant remains liable under this Lease, and no notice of default shall be effective until a copy thereof is so given to Original Tenant. Original Tenant shall have the same period after receipt of such notice to cure such default as is given to Tenant therefor under this Lease. If this Lease terminates because of an Event of Default of such assignee, Landlord shall promptly give to Original Tenant notice thereof; and Original Tenant shall have the option, exercisable by the giving of notice by Original Tenant to Landlord within ten (10) days after receipt by Original Tenant of Landlord's

notice, to cure any such Event of Default (but only if such Event of Default is of a monetary nature

or is otherwise reasonably susceptible of cure by Original Tenant, and, if such is not the case,

Original Tenant shall not be obligated to cure such Event of Default as a condition to the exercise

by Original Tenant of Original Tenant's rights set forth in this subsection (f)) and become Tenant

under a new lease for the remainder of the Term of this Lease (including any Renewal Periods) upon

all of the terms and conditions as then remain under this Lease, and such new lease shall commence

on the date of termination of this Lease, except that if Landlord delivers to Original Tenant, together

with Landlord's notice, a release as to all future liability under this Lease, Original Tenant shall not

have the foregoing option.  In the event this Lease is terminated as a result of a bankruptcy filing by

said assignee or any future assignee which results in such assignee's rejection of tenant's leasehold

interest in this Lease, then, upon Tenant's curing of such assignee's Event of Default as set forth

above, Landlord shall assign to Tenant all of Landlord's rights against such assignee (whether arising

as a result of bankruptcy court proceedings or otherwise).

      (f)     In the event Tenant subleases all or a portion of the Premises for a term of at

least five (5) years, then, notwithstanding any other provisions of this Lease, Landlord shall, upon

Tenant's request, execute and deliver an agreement among Landlord, Tenant and each such subtenant

in the form of Exhibit H hereto, in recordable form.

      **SECTION 26.**    **NOTICE.**  Whenever a notice or request is required or permitted in

this Lease, it shall mean a written notice (i) sent by certified mail, return receipt requested, addressed

to Landlord at Landlord's Mailing Address or to Tenant at Tenant's Mailing Address with copies to

(A) Allan N. Rauch, Esq., c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New Jersey

07083, and (B) Edward M. Schotz, Esq., c/o Cole, Schotz, Meisel, Forman & Leonard, P.A., Court

Plaza North, 25 Main Street, P.O. Box 800, Hackensack, New Jersey 07602-0800, or to such other

person or other address as may, from time to time, be specified by either party in a written notice to

the other party; or (ii) a written notice delivered to the addresses stated above by Federal Express or

other recognized overnight delivery service with charges prepaid and which obtains a receipt for any

such delivery.  All notices given in accordance with the provisions of this Section shall be effective

upon receipt (or refusal of receipt) at the address of the addressee.

      **SECTION 27.**    **SHORT FORM LEASE.**  Upon the request of either party following

the execution and delivery of this Lease, Landlord and Tenant shall execute a short form lease or

memorandum for recording, which shall be in form and substance as either party shall reasonably

request and shall refer to such provisions of this Lease which may survive the expiration or sooner

termination hereof. In no event shall the amount of Fixed Rent reserved hereunder be included in any such short form lease or memorandum.

SECTION 28.      **ENTIRE AGREEMENT AND MODIFICATION.** This Lease constitutes the entire agreement of the parties hereto, and all prior agreements between the parties, whether written or oral, are merged herein and, except as may be specifically set forth herein, shall be of no force and effect. This Lease cannot be changed, modified or discharged orally, but only by an agreement in writing, signed by the party against whom enforcement of the change, modification or discharge is sought.

SECTION 29.      **SEVERABILITY.** If any term, covenant, condition or provision of this Lease is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions hereof shall remain in full force and effect and shall in no way be affected, impaired, or invalidated thereby.

SECTION 30.      **GRAMMATICAL USAGES AND CONSTRUCTION.** In construing this Lease, feminine or neuter pronouns shall be substituted for those masculine in form and vice versa, and plural terms shall be substituted for singular and singular for plural in any place in which the context so requires. This Lease shall be construed without regard to the identity of the party who drafted the various provisions hereof. Moreover, each and every provision of this Lease shall be construed as though all parties hereto participated equally in the drafting thereof. As a result of the foregoing, any rule or construction that a document is to be construed against the drafting party shall not be applicable hereto.

SECTION 31.      **TABLE OF CONTENTS, LINE NUMBERING AND PARAGRAPH HEADINGS.** The table of contents and line numbering, if any, and section headings are inserted only for convenience and in no way define, limit or describe the scope or intent of this Lease, nor in any way affect this Lease.

SECTION 32.      **NO JOINT VENTURE OR PARTNERSHIP CREATED BY LEASE.** Nothing contained herein shall be deemed or construed as creating the relationship of principal and agent or of partnership or of joint venture between the parties hereto.

SECTION 33.      **BROKER'S COMMISSION.**

(a)      Landlord and Tenant each warrant and represent to the other that they did not deal with any real estate broker in connection with the negotiation, execution and delivery of this Lease, except for the Broker. Landlord agrees to pay Broker a commission pursuant to a separate agreement. Each party agrees to indemnify, defend, and save the other harmless from and against

any and all liabilities, costs, causes of action, damages and expenses, including, without limitation, attorneys' fees, with respect to or arising out of any claims made by any real estate broker, agent or finder with respect to this Lease in breach of the foregoing representation. The provisions of this Section 33 shall survive the expiration or earlier termination of this Lease.

(b)     Tenant recognizes that C.J. Cropper, Bernard E. Kaiser and Willis R. Smith are real estate brokers who own West Group, LLC (the Landlord named in this Lease). As real estate brokers, the said owners of West Group, LLC represent and are responsible to Landlord, and as such they have no responsibility to Tenant in their capacities as real estate brokers.

**SECTION 34.**     **RIGHTS CUMULATIVE; DEFINITION OF LANDLORD.**

Unless expressly provided to the contrary in this Lease, each and every one of the rights, remedies and benefits provided by this Lease shall be cumulative and shall not be exclusive of any other such rights, remedies and benefits allowed by law. The term "Landlord" shall mean only the owner, for the time being, of the Shopping Center, and in the event of the transfer by such owner of its interest in the Shopping Center, such owner shall (except to the extent of (a) claims made by Tenant against Landlord at any time with respect to periods of time which occurred prior to the effective date of the transfer of such ownership interest, and/or (b) judgments obtained by Tenant against Landlord, on or prior to the effective date of the transfer of such ownership interest) thereupon be released and discharged from all covenants and obligations of Landlord thereafter accruing, but such covenants and obligations shall be binding during the Term upon each new owner for the duration of such owner's ownership.

**SECTION 35.**     **NON-WAIVER.** The failure of Landlord or Tenant to enforce against the other any provision, covenant or condition herein, by reason of either of them committing any breach of or default under this Lease shall not be deemed a waiver thereof, nor void or affect the right of the aggrieved party to enforce the same covenant or condition on the occasion of any subsequent breach of default; nor shall the failure of either party to exercise any option in this Lease upon any occasion arising therefor be deemed or construed to be a waiver of the right to exercise that same kind of option upon any subsequent occasion.

**SECTION 36.**     **LIMITATION OF LANDLORD'S LIABILITY.** Except with respect to insurance proceeds or condemnation awards received by Landlord which are required, by the terms of this Lease, to be applied to the repair or restoration of the Premises or the Shopping Center, Tenant shall, on and after the Delivery Date, look only to Landlord's estate and property in the Shopping Center (or the proceeds thereof) and income derived from the Shopping Center for the

satisfaction of Tenant's remedies for the collection of a judgment (or other judicial process) requiring the payment of money by Landlord hereunder and no other property or assets of Landlord, its officers, directors, stockholders or partners shall be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies under or with respect to this Lease. Except with respect to the limitation on personal liability hereinabove set forth, the provisions of this Section 36 shall not be deemed or construed to limit Tenant's rights and remedies pursuant to this Lease or which may be available at law or in equity.

**SECTION 37.** **SURRENDER OF PREMISES.** At the expiration of the Term, Tenant will quit and surrender the Premises in as good a state and condition as received, reasonable wear and tear, damage by fire or other casualty, damage by eminent domain, and repairs and replacements to be made by Landlord hereunder excepted.

**SECTION 38.** **SUCCESSORS AND ASSIGNS.** The provisions of this Lease shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns.

**SECTION 39.** **FORCE MAJEURE.** Except as may be otherwise expressly set forth herein, in the event either party hereto shall be delayed or hindered in, or prevented from, the performance of any act required hereunder by reason of Force Majeure, then the performance of any such act shall be excused for the period of the delay and the period of the performance of any such act shall be extended for a period equivalent to the period of such delay.

**SECTION 40.** **HOLD OVER.** If Tenant fails to deliver possession of the Premises to Landlord at the end of the Term, and unless Landlord and Tenant are, at such time, engaged in good faith negotiations to extend the Term, Tenant shall be a tenant at sufferance and shall be liable for Fixed Rent on a monthly basis (or, if applicable, on a pro rated daily basis) in an amount equal to one hundred twenty-five (125%) percent of the amount thereof payable by Tenant for the month immediately preceding the last day of the Term as well as for all Additional Rent payable by Tenant hereunder.

**SECTION 41.** **CONSENTS.** Except as may be otherwise expressly set forth in this Lease, whenever under this Lease provision is made for either party's securing the consent or approval of the other party, such consent or approval shall be in writing and shall not be unreasonably withheld, delayed or conditioned, and in all matters contained herein, both parties shall have an implied obligation of reasonableness.

**SECTION 42.**        **DECLARATION OF CONTRACTUAL LIABILITY.**  If either party consists of more than one person, then the persons constituting such party shall be jointly and severally liable hereunder.

**SECTION 43.**        **QUIET ENJOYMENT.**  Provided an uncured Event of Default does not then exist under this Lease, Tenant shall peaceably and quietly have, hold, occupy and enjoy the Premises for the Term, without hindrance from Landlord or any party claiming by, through, or under Landlord.

**SECTION 44.**        **ESTOPPEL CERTIFICATE.**  Upon written request of Landlord or Tenant, the other party, within thirty (30) days of the date of such request, shall execute and deliver to and only for the benefit of the requesting party, without charge, a written statement:  (a) ratifying this Lease; (b) certifying, to the best of such party's knowledge, that this Lease is in full force and effect, if such is the case, and has not been modified, assigned, supplemented or amended, except by such writings as shall be stated; (c) certifying, to the best of such party's knowledge, that all conditions and agreements under this Lease to be satisfied and performed have been satisfied and performed, except as shall be stated; (d) reciting the amount of advance Rent, if any, paid by Tenant and the date to which Rent has been paid; and (e) certifying to such other matters as the requesting party may reasonably require.  Each request for a written statement pursuant to this Section 44 made within twelve (12) months of an earlier request for such a written statement shall be accompanied by a payment, from the requesting party to the other party, in the amount of Five Hundred ($500.00) Dollars (which sum shall be increased by One Hundred ($100.00) Dollars on each date that the Fixed Rent increases pursuant to the terms contained within the definition of "Fixed Rent" in Section 1 above).

**SECTION 45.**        **COSTS.**  Whenever this Lease requires the performance of an act by either party, such party shall perform the act at its own cost and expense, unless expressly provided to the contrary.

**SECTION 46.**        **OPTIONS TO EXTEND TERM.**

        (a)        Tenant shall have the right and option (hereinafter a "Renewal Option") to extend the original Term from the date upon which it would otherwise expire for four (4) separate renewal periods of five (5) years each (each such period being herein called a "Renewal Period" and collectively, "Renewal Periods") upon the same terms and conditions as are herein set forth, except that  the Fixed Rent during such Renewal Periods shall be as set forth in the definition of "Fixed Rent" in Section 1 above.  If Tenant elects to exercise one or more of said Renewal Options, it shall

do so by giving notice of such election to Landlord at any time during the Term (including any Renewal Period) on or before the date which is one hundred eighty (180) days before the beginning of the Renewal Period or Renewal Periods for which the Term hereof is to be extended by the exercise of such Renewal Option or Renewal Options.

(b)   In order to prevent the inadvertent failure of Tenant to exercise any of the Renewal Options within the time specified above, it is agreed that Landlord may not terminate this Lease, and the Term of this Lease shall not expire, until and unless Landlord notifies Tenant in writing and indicates that the Renewal Option to extend or to further extend, as the case may be, has not been exercised (which notification shall not be sent prior to the date which is one hundred eighty (180) days before the beginning of the Renewal Period to which it relates). Tenant's Renewal Option, in each instance, shall continue for a period of fifteen (15) days after receipt of such notice from Landlord; but if Tenant does not send written notice of the exercise of such Renewal Option to Landlord within said fifteen (15) day period, Tenant's Renewal Option shall thereafter terminate. If Landlord fails to give Tenant such notice prior to the expiration of the original Term or of any extended Term, as the case may be, and if Tenant shall remain in possession of the Premises after the expiration of the then current Term, then Tenant shall remain in possession as a tenant from month to month, subject to the provisions of this Lease insofar as the same may be made applicable to a tenant from month to month, but without the application of Section 40 above. If Landlord then gives Tenant such notice and Tenant exercises its Renewal Option, then the effective date of such exercise shall be retroactive to the expiration date of the original Term or of the previously extended Term, whichever is appropriate.

**SECTION 47.**     **GOVERNING LAW.** This Lease shall be governed by, construed, and enforced in accordance with the laws of the State in which the Premises are located.

**SECTION 48.**     **ATTORNEYS' FEES.** In any action or proceeding hereunder (whether to enforce the terms and provisions of an indemnity or otherwise), the prevailing party shall be entitled to recover from the other party the prevailing party's reasonable costs and expenses in such action or proceeding, including reasonable attorneys' fees, costs and expenses. Except as otherwise set forth herein, if either party is sued by a third party as a result of a violation of a covenant or warranty herein contained by the other party hereto, then the party who has violated the covenant or warranty shall be responsible for the reasonable costs and expenses in such action or proceeding against the non-violating party, including reasonable attorneys' fees, costs and expenses.

SECTION 49.    PAYMENT UNDER PROTEST. If at any time a dispute shall arise as to any amount or sum of money to be paid by one party to the other party under the provisions hereof, the party against whom the obligation to pay the money is asserted shall have the right to make payment "under protest", which payment shall not be regarded as voluntary payment, and there shall survive the right on the part of such party to institute suit for recovery of such sum. If it shall be adjudged that there was no legal obligation on the part of such party to pay such sum or any part thereof, such party shall be entitled to recovery from the other party such sum or so much thereof as it was not legally required to pay under the provisions of this Lease, together with interest thereon at the Lease Interest Rate.

SECTION 50.    **WORK PERFORMED UNDER PROTEST.**  If at any time a dispute shall arise between the parties hereto as to any work to be performed by either of them under the provisions hereof, the party against whom the obligation to perform the work is asserted may perform such work and pay the cost thereof "under protest", performance of such work in no event to be regarded as a voluntary performance, and there shall survive the right on the part of such party to institute suit for recovery of the cost of such work. If it shall be adjudged that there was no legal obligation on the part of such party to perform such work or any part thereof, such party shall be entitled to recover from the other party the cost of such work or the cost of so much thereof as such party was not legally required to perform under the provisions of this Lease, together with interest thereon at the Lease Interest Rate.

SECTION 51.    **CONDUCT OF BUSINESS OPERATIONS.** Tenant shall initially open for business in the Premises for at least one (1) day, provided, however, that thereafter, notwithstanding any other provisions of this Lease, Tenant shall have no obligation to continue to operate its business or any other business in the Premises and shall have the right, at any time, to fail or refuse to conduct the operations of its business or any other business in the Premises, and Tenant shall not thereby incur any liability to Landlord by reason thereof [it being understood and agreed that all of Tenant's obligations under this Lease shall continue unless this Lease is terminated pursuant, inter alia, to the further provisions of this Section 51 or any other Sections of this Lease (other than Section 18)]. In the event such failure or refusal to conduct business continues (other than prior to the Delivery Date or during Excused Periods), for a period of time in excess of one (1) year, Landlord shall have the option, to be exercised by notice to Tenant given at any time after such one (1) year period when business is not being conducted in the Premises, to cancel and terminate this Lease, in which event this Lease shall terminate upon the date which is sixty (60) days after the

date on which Tenant receives Landlord's termination notice, as if such date was originally set forth

herein as the expiration date of the Term and Landlord and Tenant shall upon such termination be

released from any and all liabilities thereafter accruing hereunder. Notwithstanding the foregoing,

Tenant shall have the right, to be exercised within ten (10) days after receipt of such termination

notice from Landlord, to give Landlord a Recission Notice expressing Tenant's intention to open the

Premises for the operations of its business or any other business within sixty (60) days after delivery

of the Recission Notice by Tenant to Landlord, in which event the termination notice previously

given by Landlord shall be deemed null and void.

**SECTION 52.**     <u>**ABATEMENT OF RENT CHARGES**</u>. Notwithstanding any other

provisions of this Lease, if the Fixed Rent and Additional Rent payable by Tenant hereunder shall

be abated pursuant to Sections 21 or 22 above, such abatement shall terminate upon the first to occur

of: (a) the date on which Tenant shall reopen the Premises to the public for business and shall be

able to engage in the normal conduct of such business; or (b) the expiration of the period which is

sixty ( 60) days after Landlord shall have completed such repairs and restoration work as Landlord

is obligated to perform hereunder and the interference with the operation of business in the Premises

has ceased.

**SECTION 53.**     <u>**WARRANTIES AND REPRESENTATIONS**</u>. To induce Tenant

to execute this Lease, and in consideration thereof, Landlord warrants and represents to Tenant as

follows:

      (a)     Prior to the commencement of construction by Landlord, Landlord will have

good and marketable fee simple title to the entire Shopping Center free and clear of all easements,

restrictions, liens, encumbrances, leases and the like, except the Permitted Encumbrances described

on <u>Exhibit E</u>;

      (b)     Tenant's use of the Premises for sale of Permitted Items will not violate any

exclusive provision or prohibited use restriction granted to any tenant or tenants in the Shopping

Center;

      (c)     The Shopping Center shall, on the Delivery Date, have access to Atkins Road

and Chenal Parkway for the purpose of vehicular traffic;

      (d)     Except as required by law, Landlord (i) shall not reveal to anyone the Term

of this Lease or the economic or other business terms of this Lease (including, without limitation,

the amount of Fixed Rent set forth herein) (except that the foregoing shall not apply only to the

extent such information is contained in the short form lease or memorandum for recording executed

by the parties in accordance with Section 27 hereof), and (ii) shall use all commercially reasonable efforts to cause any broker retained by Landlord involved with this Lease to abide by the confidentiality requirement described in (i) above; provided, however, that nothing contained herein shall restrict Landlord from disclosing such information to its accountants, attorneys, agents or other consultants, any bona-fide prospective purchasers of the Shopping Center or any current or prospective mortgagees or underlying lessors of all or any portion of Landlord's interest in the Shopping Center;

(e)    This Lease does not violate the provisions of any instrument heretofore executed and binding on Landlord and no rights granted by Landlord to Tenant under the terms of this Lease conflict with any rights granted by Landlord to any other tenant in the Shopping Center; and

(f)    There are no executed and delivered leases in effect on the date hereof with respect to the Shopping Center.

### SECTION 54.    ARBITRATION.

(a)    In any case where this Lease expressly provides for submission of a dispute or matter to arbitration (but not otherwise), the same shall be settled by arbitration in Little Rock, Arkansas, before one arbitrator in accordance with the procedural rules then obtaining of the American Arbitration Association or any successor thereto.  The decision of the arbitrator shall be final, conclusive and binding on the parties, but the powers of the arbitrator are hereby expressly limited to the determination of factual issues, and the arbitrator shall have no power to reform, supplement or modify this Lease. The arbitrator shall make only required findings of fact incident to an arbitrable dispute, which findings shall be set forth in reasonable detail in a written decision by the arbitrator.

(b)    Landlord and Tenant shall share equally in the cost and expenses of such arbitration, and each shall separately pay its own attorneys' fees and expenses, unless the arbitrator finds that one of the parties did not act in good faith in connection with the dispute or the conduct of the arbitration proceeding, in which case the arbitrator may award all or part of said costs, expenses and fees to the other party.

### SECTION 55.    LIENS.  Within thirty (30) days after notice of the filing thereof, Tenant shall discharge (either by payment or by filing of the necessary bond, or otherwise) any lien against the Premises and/or Landlord's interest therein, which may arise out of any payment due for, or purported to be due for, any labor, services, materials, supplies or equipment alleged to have been

furnished to or for Tenant in, upon or about the Premises. Similarly, within thirty (30) days after notice of the filing thereof, Landlord shall discharge (either by payment or by filing of the necessary bond, or otherwise) any lien against the Premises and/or Landlord's interest therein, which may arise out of any payment due for, or purported to be due for, any labor, services, materials, supplies or equipment alleged to have been furnished to or for Landlord in, upon or about the Premises.

SECTION 56.    **DEFINITION OF HEREUNDER, HEREIN, ETC.**   Unless the context clearly indicates to the contrary, the words "herein," "hereof," "hereunder," "hereafter," and words of similar import refer to this Lease and all the Exhibits attached hereto as a whole and not to any particular section or paragraph hereof.

SECTION 57.    **TENANT'S PROPERTY**.

(a)     All of Tenant's Property which may be installed or placed in or upon the Premises by Tenant shall remain the property of Tenant. Landlord waives any right it may have in Tenant's Property. Tenant may assign, lien, encumber, mortgage or create a security interest in or upon Tenant's Property in the Premises without the consent of Landlord and may remove Tenant's Property at any time during the Term. Upon the request of Tenant, Landlord agrees to provide Tenant, within ten (10) days of such request, a written waiver in form reasonably satisfactory to Tenant evidencing Landlord's waiver of any rights it has or may have in Tenant's Property.

(b)     To the extent Landlord may have a lien on or security interest in the Tenant's Property pursuant to this Lease, by law or otherwise, Landlord hereby waives and agrees not to assert such lien or security interest.

(c)     Upon the expiration or earlier termination of this Lease, Tenant shall have the right (but not the obligation, except as otherwise specifically provided herein) to remove from the Premises all or any part of Tenant's Property.

SECTION 58.    **TENANT'S RIGHT OF FIRST OFFER.**   Provided an uncured Event of Default does not then exist under this Lease, Tenant shall have continuing rights of first offer to lease additional space in the Shopping Center which is contiguous to the Premises and which may become available on and after the date of this Lease, except that if the then remaining Term under this Lease is less than three (3) years, Tenant must extend or renew this Lease for an additional period of five (5) years in order to be entitled to exercise its right of first offer as set forth in this Section 58. At such time that Landlord has knowledge that such space ("Offered Space") is or will become available, Landlord will give Tenant notice (the "Offering Notice") of the terms and conditions Landlord would be willing to accept with respect to the Offered Space (including, without

limitation, the proposed rent, additional rent, scope of Landlord's proposed tenant improvements, location and Floor Area), and Tenant shall have thirty (30) days within which to respond to Landlord's offer. In the event Tenant elects to accept Landlord's offer, then Tenant shall notify Landlord of such election by giving notice to Landlord during such thirty (30) day period and Landlord and Tenant shall thereupon enter into an amendment to this Lease for the leasing of the Offered Space, which amendment shall contain (i) the terms and conditions set forth in the Offering Notice, (ii) provide that the term thereunder shall expire or sooner terminate contemporaneously with the expiration or sooner termination of the Term hereof (subject to extension in accordance with Section 46), and (iii) contain such other terms and provisions as either Landlord or Tenant may reasonably require in order to effectuate the incorporation of the Offered Space into the Premises and to otherwise effectuate the intent of this Section 58. Should Tenant decline Landlord's offer or fail to respond thereto, then, and in such event, Tenant shall have been deemed to have waived any prospective rights of first offer to the Offered Space (but Tenant shall not lose any prospective rights of first offer with respect to any space (including, without limitation, the Offered Space) which may in the future become vacant and available), and Landlord may lease the Offered Space to any other party upon substantially the same terms and conditions as that offered to Tenant, provided that such lease is executed prior to the date which is six (6) months after Tenant has declined (or has been deemed to have waived) Landlord's offer with respect to the Offered Space. The term "substantially", as used herein, shall mean terms not materially different or a rent of not more than five (5%) percent below the rent requested by Landlord of Tenant. Any dispute between the parties with respect to this Section 58 (including, without limitation, any dispute as to the provisions of the amendment described in this Section 58) shall be resolved by arbitration in accordance with the provisions of Section 54 above.

SECTION 59.    **LIMITATION OF TENANT'S LIABILITY.** Landlord agrees that it and its successors and assigns shall look solely to the assets, if any, of Tenant and its successors and assigns, for the satisfaction of any claim arising from or under this Lease and shall not seek to impose personal liability on any shareholder, officer, director or employee of Tenant or any affiliate, subsidiary or related entity.

SECTION 60.    **TENANT'S RIGHT OF TERMINATION.** If, at any time during the Term of this Lease less than seventy-five (75%) percent of the total Floor Area of all buildings in the Shopping Center are not open and are not being operated for retail purposes for a period exceeding ninety (90) days (except for Excused Periods) by national or regional tenants of the type

typically found in first class regional shopping centers located within twenty (20) miles of the Shopping Center, then in such event Tenant shall have the right to avail itself of either of the following remedies, provided Tenant shall have given Landlord notice of Tenant's intention to exercise any such right and Landlord shall not have remedied the situation giving rise to Tenant's right within ninety (90) days following such notice:

(i)    To terminate this Lease, in which event this Lease shall terminate on the date set forth in Tenant's notice of termination without further liability on the part of either Landlord or Tenant except that Landlord, promptly after receiving a statement from Tenant showing the costs and expenses of Tenant's Work, shall reimburse Tenant for the unamortized portion of such costs and expenses based upon the unexpired portion of the Term; or

(ii)    To discontinue the payment of Fixed Rent and pay only Percentage Rent [except that for the purposes of this Section 60(ii), (x) the Sales Break Point shall be deemed to be One ($1.00) Dollar, and (y) in no event shall the aggregate Percentage Rent payable by Tenant until Landlord remedies the situation giving rise to Tenant's rights to discontinue the payment of Fixed Rent, exceed the amount which the Fixed Rent would otherwise have been with respect to such period] and Tenant's Pro Rata Share of Taxes and Common Areas Charges hereunder.

**SECTION 61.**    **SURVIVAL OF OBLIGATIONS.**    The obligation to pay any sums due to either party from the other that by the terms herein would not be payable, or are incapable of calculation, until after the expiration or sooner termination of this Lease shall survive and remain a continuing obligation until paid. All indemnity obligations under this Lease shall survive the expiration or sooner termination of this Lease.

**SECTION 62.**    **ENVIRONMENTAL MATTERS.**

(a)    Definitions.

(i)    "Environmental Laws" means any and all federal, state, county, municipal or other governmental statutes, laws, ordinances, rules, regulations and legally enforceable policies concerning the protection of the environment, human health or safety.

(ii)    "Hazardous Substances" means each and every element, compound, material, mixture, substance, waste, hazardous substance, hazardous waste, hazardous material, toxic substance, pollutant or contaminant either as those terms are defined in any of the Environmental Laws or the presence of which may cause liability at common law.

(iii)    "Environmental Notice" means a summons, citation, directive, order, claim, notice, litigation, investigation, judgment, legal pleading, letter or other communication,

written or oral, actual or threatened, from the United States Environmental Protection Agency or other federal, state or local governmental agency or authority, or any other private individual or entity concerning (A) any Hazardous Substances at, on, in, under or emanating from the Premises, the Shopping Center or any contiguous property; (B) any violation or potential violation of Environmental Laws at the Premises, the Shopping Center or any contiguous property; or (C) any underground storage tanks on the Premises or the Shopping Center.

      (iv)   "Releasing" or "Release" means releasing, spilling, leaking, discharging, disposing or dumping or otherwise introducing any substance into the environment or into any building or other improvements.

      (v)   "Compliance Costs" means consultant's and engineer's fees; laboratory costs; contractor's and subcontractor's fees; application and filing fees; costs of investigation, monitoring or cleanup of soil or other substrate, surface water, groundwater, or buildings or other improvements; equipment costs; disposal fees; costs of operation and maintenance of equipment; legal fees; other governmental fees or costs; interest at the Lease Interest Rate from the date of expenditure until paid in full; and other similar or related costs.

      (vi)   "Tenant Related Parties" means Tenant's agents, servants, employees, contractors or licensees.

      (b)   Compliance with Environmental Laws.  Tenant shall comply with all the requirements of Environmental Laws governing its use of, and operations at, the Shopping Center and the Premises. Landlord shall comply with all the requirements of Environmental Laws relating to the Shopping Center and the Premises, except to the extent such requirements arise from Tenant's operations thereon.

      (c)   Responsibility for Releases of Hazardous Substances.  Notwithstanding any other provision of this Lease, Tenant shall only be liable for any Release of Hazardous Substances at, on, in, under or emanating from the Premises or Shopping Center which were caused by Tenant or Tenant Related Parties (hereinafter "Tenant Releases"), including, without limitation, any Compliance Costs required to address Tenant Releases. Landlord shall be liable for any Hazardous Substances at, on, in, under or emanating from the Premises or Shopping Center, including, without limitation, any Compliance Costs attributable to such Hazardous Substances, unless the Hazardous Substances are caused by Tenant Releases.  Except in the event of an emergency, any work performed by Landlord relating to Hazardous Materials shall be performed by Landlord at any time other than during the months of August, November and December, and shall be undertaken in such

a manner so as to (A) not adversely affect ingress to or egress from the Shopping Center, (B) have no adverse effect on the visibility of the Premises or any signs which contain Tenant's name, and (C) not otherwise materially interfere with the normal conduct of Tenant's business in the Premises.

(d)    Standards. Except as expressly provided herein, the parties agree that any investigation or remediation of Hazardous Substances, or cure of a violation of Environmental Laws, required to be conducted at the Premises or Shopping Center shall be no more stringent than necessary to meet the minimum standards of Environmental Laws applicable to properties used in the manner the Shopping Center is being used.

(e)    Landlord's Representations and Warranties. Landlord represents and warrants that:

(i)    Landlord has received no Environmental Notices concerning the Shopping Center, the Premises or any contiguous properties;

(ii)    Landlord has no knowledge of, and has received no notice of, any violation, or potential or alleged violation, of any governmental law, rule, statute, ordinance or regulation, including without limitation Environmental Laws, affecting the Shopping Center, the Premises or any contiguous properties, regardless of whether same has been cured; and

(iii) To the best of Landlord's knowledge: (A) no Hazardous Substances are located at, on, in, under or emanating from the Shopping Center, the Premises or any contiguous properties; and (B) no underground storage tank exists at the Shopping Center or the Premises.

(f)    Documents. Each party shall immediately notify the other party of the notifying party's receipt of an Environmental Notice.

(g)    Indemnity. Each party to this Lease shall indemnify, defend and hold the other party, and its agents, servants, shareholders, directors, officers and employees harmless from any and all claims, losses, expenses, costs, lawsuits, actions, administrative proceedings, damage, orders, judgments, penalties and liabilities of any nature whatsoever, including, without limitation, reasonable attorneys' fees (incurred to enforce this indemnity or for any other purpose) and Environmental Costs, arising from (i) the indemnifying party's breach of any of its representations, warranties, covenants or other obligations under this Section 62; (ii) Hazardous Substances for which the indemnifying party is liable under this Section 62; or (iii) violations of Environmental Laws for which the indemnifying party is liable under this Section 62.

(h)    Survival. The obligations of the parties under this Section 62 shall survive the renewal, expiration, breach or earlier termination of this Lease.

<u>EXHIBIT C</u>

<u>Rent Commencement and Expiration Date Agreement</u>

THIS AGREEMENT, made as of this _____ day of _____ _____, 199__, by and between WEST GROUP, LLC (hereinafter called "Landlord") and BED BATH & BEYOND INC. (hereinafter called "Tenant").

## W I T N E S S E T H :

WHEREAS, Landlord is the owner of a certain shopping center known as Chenal Place (the "Shopping Center"), situated in Little Rock, Arkansas;

WHEREAS, by that certain lease dated _____, 199__ (herein called the "Lease"), Landlord leased a portion (the "Premises") of the Shopping Center to Tenant;

WHEREAS, Tenant is in possession of the Premises and the Term of the Lease has commenced; and

WHEREAS, under Section 1(j) of the Lease, Landlord and Tenant agreed to enter into an agreement setting forth certain information in respect of the Premises and the Lease.

NOW, THEREFORE, Landlord and Tenant agree as follows:

1.　　The Rent Commencement Date was _____, 199__.

2.　　The Term of the Lease shall expire on January 31, 20__, unless Tenant exercises any option to extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

3.　　The date of commencement of the first Renewal Period shall be February 1, 20__, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 20__, unless Tenant exercises any option to further extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

4.　　The date of commencement of the second Renewal Period shall be February 1, 20__, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 20__, unless Tenant exercises any option to further extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

5.　　The date of commencement of the third Renewal Period shall be February 1, 20__, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 20__, unless the Lease terminates earlier as provided in the Lease.

6.　　The date of commencement of the fourth Renewal Period shall be February 1, 20__, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 20__, unless the Lease terminates earlier as provided in the Lease.

7.　　Capitalized terms not defined herein shall have the same meaning as set forth in the Lease.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed the date and year first above written.

WEST GROUP, LLC

By:_____
Name:_____
Title:_____

By:_____
Name:_____
Title:_____

By:_____
Name:_____
Title:_____

BED BATH & BEYOND INC.

By:_____
Name:  Warren Eisenberg
Title: Co-Chief Executive
      Officer

# EXHIBIT D

## Specifications for Landlord's Work

# OLD BATH & ● BEYOND

Beyond any store of its kind.™

(AB)

11·16·98

**Corporate Office**
650 Liberty Avenue
Union, NJ 07083
908/688-0888

## EXHIBIT D

### LITTLE ROCK, AK
### STANDARD LANDLORD'S WORK
#### (revision 11/16/98)

[All terms not otherwise defined herein shall have the meaning ascribed thereto in the
Lease. To the extent not inconsistent with the terms of this Exhibit D, the terms of the
Lease regarding Landlord's Work shall be deemed to supplement the provisions of this
Exhibit D. It is specifically understood and agreed that (I) all materials and supplies shall
be installed in strict accordance with all manufacturers' specifications, and (II) more
detailed specifications regarding this Exhibit D are set forth in the specification package
previously delivered to Landlord.]

1. **Plans** - Landlord to provide the following drawings for the Tenant's use.
   - A. Three (3) complete sets of all required architectural and engineering drawings to complete the Landlord's Work, including tenants fixture plan on permit set of drawings.
   - B. Architectural elevations of all sides of tenant building to include permanent signage locations and temporary signage locations.
   - C. Architectural elevations of all pylon signs.
   - D. Architectural elevations of all other tenants.
   - E. 2 sets of as-built drawings with close out books and all warranty information. One set shall remain in the store, one set shall be sent to the construction project manager.

2. **Flooring** - Landlord shall grade, excavate and place structural fill on site in conformance with the recommendations of Landlord's geotechnical engineer to meet the floor slab requirements. Landlord to provide a concrete floor slab minimum 4" thick, with a minimum 3000 psi rating. Concrete finish to be clean and smooth , with a slope not more than 1/8" per every 10'-0" in any direction and shall be free of pocketing and spalling. The moisture content of the slab must not exceed 3 lbs. Per 1000 square foot over 24 hours using the RMA (Rubber Manufacturers Association) quantitive testing method. A minimum of two test shall be performed per each 1000 square feet of floor area. Landlord to provide test results to Tenant. Floor should be ready to accept Tenant's specified finish. Combination carpet and wood floor to cover all sales area, layout per Tenant's floorplan. Type of carpet and wood per spec below, substitution only with Tenant's approval.

a) "Snap-T" or like molding to be installed wherever carpet meets wood flooring. Color of molding to match carpet. Cove base in White-White to be installed on all exposed walls of selling floor and office.

b) Steps to mezzanine office to have rubber stair treads and risers.

c) Stockroom and Janitors closet floor to be sealed concrete (using clear concrete sealer).

d) Lunchroom floor to be vinyl composition tile, spec below. Size and location of lunchroom per Tenant's drawings.

e) Vestibule flooring (spec below).

f) Bathroom flooring, full ceramic tile floors and walls (spec. below).

## Specifications:

Carpet -**mfg.**: J& J Industries; **style**: 992-05007-1A-E.
Wood - **mfg.**: Hartco; **style**: Patterns Plus 5000 series; **color**: Honey or Natural Maple. (As dictated by Tenant); **size**: 36" lengths to be installed on a 45-degree angle as per tenant plans.
Adhesive- **mfg.**:Hartco #40.
Transition-**mfg.**:Mercer Products; **style**: #970 Track, #930 Snap down T; **color**: #204
Vinyl - **mfg.**: Armstrong; **style**: Imperial Texture; **color**: 51904 Sterling
Vestibule flooring- **nfg.**:Interface Walk Off tile; **color**: charcoal
Ceramic Tile- Walls mfg: Dal Tile 4 1/4 x 4 1/4; **color**: D-700 Mellow White
Floors -mfg- Dal Tile- 2 x 2; **colors**: DK-156 Brownstone Range
Bathroom Partitions- **mfg**: Bobrick #1042 Color: #891- Desert Sand
Bathroom Fixtures- **mfg**: American Standard. Color: Bone
Bathroom Counter laminate- **mfg**: Pionite. Color: ST 606 (Taupe)

**3.    Stockroom/Sales Area Partition** - If required by local code, provide code approved wall between sales area and stockroom. Provide high impact self closing double action swing doors with window to fit within 48" opening at all areas from stock room to sales floor, color: black, mfg: Chase-Durus style: ABS 5000, per Tenant's plan.

**4.    Insulation**- Provide an R-19 Factor insulation between exterior roof membrane and decking (or as required by code) Provide an R-11 Factor insulation on all exterior walls (or as required by code).

**5.    Ceiling**- Underside of roof shall be open and exposed, painted with two coats of white paint (see #7 below). All ceilings located within the upper and lower levels of the mezzanine to have drop ceilings.

**6.    Ceiling Clearance**- 18'·clearance between slab and all structure including sprinkler heads. Sprinkler system should be designed to allow fixturing and storage to be within 18" of heads, and comply with NFPA 231-C, (High rack storage), and class 4 commodity.

**7.    Painting**-
Paint specs for ceiling and including all pipes, ductwork, steel and decking - 1 coat Benjamin Moore acrylic metal primer and two coats Sweep Up Spray Latex Flat #M530-01 white.
Interior drywall walls and columns- Benjamin Moore: Prime-Regal First Coat Latex #216-white, Finish Coat- 2 coats Regal Aqua Pearl #310-01 white.
Interior Block Walls- Benjamin Moore: Moorcraft Block Filler #173 white, finish 2 coats - Regal Aqua Pearl #310-01- white.
Interior Concrete Walls- Benjamin Moore: Regal First Coat latex primer #216-white, finish 2 coats- Regal Aqua Pearl #310-01-white.
Bridal Room Walls - Benjamin Moore: White Coffee

**8.    Exposed Columns**- No. 1 Columns (carpeted areas) - to be "boxed out" as tight to steel as possible. No. 2 Columns (wood floor) - to be 26" outside dimension. Provide and install white low pressure laminate (melamine) 3" O.C. slatwall (with aluminum inserts) up to 14'A.F.F. Provide and install 1" x 1" mill finish aluminum corner guards to 14' A.F.F.
Slatwall- **Model**: #100418; Description: Slatwall- MDF/melamine, Frosty White, with aluminum inserts, 3" O.C. 4' x 8', 8' Grooves- One side white. 1" x 1" mill finish aluminum corner guards. Orders to: New Directions 4550 Mariott Drive, Charleston, SC 29406. Contact: Gary Diamond/Marty, phone: (800) 945-4637 Fax: (803) 566-9540. All columns to have a Convenience Duplex outlet facing rear of store mounted at 18" A.F.F.

**9.    Lighting**- Fixtures to be provided as a combination of the following, per Tenant's layout. All offices, cash room, conference rooms, bathrooms and lunchroom to have occupancy sensors to control lighting (see #22-25 below).

- 4' octron and 8' octron tandem light fixture, w/electronic ballast- T8 lamps, (F032/841), with reflector that has a 10% aperture option and pendant mounted at a height of 15'6" above finished floor to bottom of reflector. Fluorescent lighting to be mounted on unistrut pendant mounted to ceiling structure to enable Tenant to adjust spacing between rows of lighting as necessary. All lights to be controlled by switches located in customer service per tenants contactor schedule.

© Bed Bath & Beyond Inc. and its subsidiaries, 1998.          page 2

**Specifications-**
8' octron tandem 4 light fixture w/ electronic ballast- **mfg.**: Metalux; **style**: ;  BED-5;
(with emergency battery back-up, add to above- **style**:  EL4)
4' octron 2 light fixture w/electronic ballast- **mfg.**: Metalux; **style**: BED-6;
with emergency battery back-up, add to above- **style**:  EL4)
dual voltage emergency light; wall pack- **mfg.**: Sure-Lite; **style**: BED-11
 universal exit sign, emergency Led lamps- **mfg.**: Sure-Lite; **style**: BED-21
2' x 4' lay-in troffer 4' octron 3 light w/electronic ballast- **mfg.**: Metalux; **style**: BED-7
(with emergency battery back-up, add to above- **style**: EL4)

**Specialty Lighting-**   Up to 136 ft. Juno single circuit Trackmaster lighting track, mounted on
unistrut and pendant mounted to ceiling structure, 72 Juno style T397-WH ,and 8 Juno style
V689 track light fixtures with 75PAR30 lamps, (10)  BED-13;  with (1) FO25/41koctron lamp
TL7, (100) BED-14 with (2) F025/35k octron lamp TL7, 110 (BED-15, BED -16, BED - 17,
BED - 18) as needed, and up to 52 ft. of wire mold #2200 plug mold painted per section #7, to
be distributed throughout the store per Tenant's final layout.

> Landlord to provide and install above items per local code. Landlord to provide and
> install electric to tenants supplied showcase lighting and bedding displays per local code.

> Tenant reserves the right to install all or any part of specialty lighting package described
> above, and to be reimbursed for the reasonable costs thereof.

Electrical contractor  to furnish and install four white twin chamber power poles (from floor to
deck), up to 40 drops for speciality lighting requirements and up to 41 duplex receptacles hung at
16'-6" A.F.F. (the conceptual layout for which will be included in the construction documents for
bidding purposes).
**NOTE:** Landlord will provide. Tenant 2 weeks notice of rough-in date. The actual
installation locations of the drops, poles and quads will be done in accordance with Tenant's
finished layout which shall be specified by Tenant to Landlord at least 1 week prior to electrical
rough-in. Rough- in date shall be 6 weeks prior to turn over.
Contact Cooper National Account #NA20232, call Dave Best at (800) 682-1242 for
pricing.

**10.**     **Exit/Emergency Lights-** Per code as needed per Tenant's fixture layout.  Emergency
lights integrated into Tenant's fluorescent lighting plan. Exit lights to be pendant mounted so as
not to interfere with tenant fixture plan.

**11.**     **Outlets-** Standard duplex wall outlets provided per Tenant's plan. Outlets (unless I.G.)
and outlet covers to be white. Outlets on columns and stockrooms to be white, outlet covers to be
metal. Electrical covers in Bridal room to match "White Coffee" paint.

All register bays , and Customer Service area to include 2 quad receptacles (Hubbell 1G5362) or
equivalent.  Island-type service desks to have 1 quad receptacle.  For additional information see
"Addendum A," also see #12 below.

Sensor Matic- provide power as shown on Tenant's plans for Tenant provided Sensor Matic
security.

**12.**     **Phone/Electric Conduits-** To Cash Room (designated on floor plan) provide 2" conduit
with drawstring from local telephone company demarcation point.  To register bays provide
Walker duct complete with drawstrings.  To island-type service desks provide dual-chamber
power poles (white) isolating phone from electric service (Wiremold no. SP80N620-2-[size](20-
1012) T39923).  Power poles must be extended to underside of deck and provide drawstring
looped from top to bottom.  To Cash Room provide 3/4" conduit with drawstring from
"Employee Entrance" door (header), and door box location for control of electric door strike.
Provide 3/4" conduit with drawstring from pay phone location to cashroom (see #16 below).
From rear loading dock man door provide 3/4" conduit from exterior of building to bottom of
joist on interior of building with drawstring for Tenant supplied intercom unit.

© Bed Bath & Beyond Inc. and its subsidiaries, 1998.      page 3

**13.   P.O.S.-Computer Conduit-** Standard duplex wall outlets provided per Tenant's plan to "Cash Room" (designated on floor plan). Also see #12 above.

**14.   Fixtures-** Landlord is responsible to unload and install Tenant supplied Cashwraps and remote Service Desk(s) as per Tenants final fixture plan. Landlord must supply and install all Built-in Counters and Customer service desk as shown on Tenants site specific plans.

**15.   Sign(s)-** Landlord to provide and install up to 6 circuits per sign, and to verify actual number of circuits with sign manufacturer. Conduit to be installed from panel box to outdoor sign location(s). Also, include all necessary circuiting and wiring to location per tenant's plan, along with photocell(s) (for sign "on") and 24 hour time clock(s) (for sign "off"). Landlord to provide final connection to Sign.

**16.   Vestibule-** Interior or exterior vestibule to consist of glass in clear anodized metal frames, and automatic doors (see #18 below). Flooring in vestibule to be Tenant specified walk-off tiles (see #2 above). Stanley Sentrex Bumper molding to be provided on all walls including glass at Tenant specified height. Stanley Sentrex Bumper molding to consist of aluminum channel with rubber or vinyl insert. (color: black) Any Dry-wall surface to be paneled in marlite #5454: S2V Gun Metal.

**17.   Pay Phone-** Landlord to provide all conduit needed for Tenant supplied pay phone.

**18.   Automatic Doors-** All sets to be Stanley's Dura Glide 3000 complete package, in windload required areas landlord to provide and install a complete "high impact" door package in compliance with local code. (Shutters are not acceptable) - complete with full breakaway function of doors and sidelights. (1) each Bi-Part (16' pkg) with threshold, model no.BB3-1. (2) each-4' single slide (9' pkg) with threshold, model no. BB3-2, and BB3-S3. Doors should have Best cylinders to accept Best core (see # 23 below). Landlord to provide an electric carriage lock on one door, designated by Tenant as the "Employee Entrance" door. All doors to be installed a minimum of 10 days prior to Tenant occupancy.

**19.   Cart Corral-** Landlord to provide a cart corral for up to 100 shopping carts within and alongside the exterior storefront area. The pipe rail to be constructed of brushed aluminum, or in a finish consistent with the storefront design as per BBB approved drawings.

**20.   Loading Dock-** Landlord to provide a trenched loading dock 23' wide minimum and 4' high to store level that will accommodate one truck bay, bumpers, seals, canopy, and drains. Landlord to provide one dock seal, one electrically operated sectional dock door with slide locks and interlocks and one 7' x 8' dock leveler as shown on Tenants plans, and per Tenant's specifications. Doors, seals, bumpers, and levelers provided by Arbon Equipment Corporation.

**21.   Waste Removal-** Provide Marathon model # BBB-5 compactor, with controls and pressure gauge, suitable pad (11' wide for compactor and 5' walkway), exterior disconnect per code and opening with lockable door for chute. In addition, provide additional and/or special sprinkler protection in the area in front of the chute opening to satisfy local codes. For compactor pricing contact Phillip Crossley (800) 633-8974 or (205) 695-9105.

**22.   Receiving Area-** Office layout as per Tenant's plans (approximately  120 sq. ft.) to include painted walls and vinyl floor (see # 2 above) and two electrically operated 8' wide x 10' high sectional doors. Receiving office to have built in counters per Tenant's floorplan. Provide Reznor or similar type heater(s) for receiving area. Also, include heat curtain or similar heater at each door opening. Provide conduit with drawstring from the man door to bottom of joist for Tenant installed doorbell/intercom system.

**23.   Mezzanine Office-** Elevated mezzanine office to be built above customer service,

© Bed Bath & Beyond Inc. and its subsidiaries, 1998.          page 4

23.    **Mezzanine Office**- Elevated mezzanine office to be built above customer service, bridal/gift registry room and bathrooms. Furnish and install code-required limited use/limited application elevator or passenger elevator and stairs from main selling floor to mezzanine office.
  Minimum size of mezzanine office to be 1300 sq. ft. and to be constructed per Tenant's plans, and specifications. Slatwall (with aluminum inserts) to be installed from selling floor to 14' A.F.F. as indicated on Tenant's drawings. Included should be up to four private offices as well as a general work area (as indicated on Tenant's plans). All walls to be sound insulated. "Cash Room" door to have automatic closure, peep hole, and Storeroom function leverset. All offices must have Best Lock Corp. hardware purchased through Best Locking Systems of New York, 31 Field Lane, North Salem, New York 10560, contact: Jim Russell (914)277-4600.
General Office area, Asst. Office, Rec. Office, and Cash Room to have built-in counters per Tenant's floorplan. Mezzanine to be completed minimum 10 days prior to turn over to Tenant.

All handrails and pipe rails to be a brushed aluminum finish. Lighting in all private rooms must have RAB LOS1000 occupancy sensors (except as noted), RAB Electric Manufacturing, 170 Ludlow Ave., Northvale, NJ. 07847, 201/784-8600.

24.    **Bridal Gift Registry**- Layout as per Tenant's plan to include:
Paint- (Benjamin Moore - White Coffee, Aqua pearl)
Wood Floor- (Hartco Pattern Plus 5000, **color:** Natural or Honey Maple)
Wood base molding- Superior Molding (818-376-1415) **style:** Colonial Style #B18-32
Cornice molding-  Superior Molding (818-376-1415) **style:** Colonial Style #1022
Molding should be stained to match wood floor.
Electrical cover plates to match "White Coffee" paint.
Lights to be operated by salesfloor lighting contactor.

25.    **Lunch Room**- Layout as per Tenant's plan, to include painted walls, vinyl floor (see #2 above), cabinets, counters and sink. There should be 4 dedicated duplex outlets installed for: refrigerator, microwave oven and vending machine(s) located per Tenant's specifications. Lunch Room lighting to be operated by RAB LOS1000 occupancy sensor (see #23 above for address).

26.    **Locker Room**- Provide four (4) sets of box lockers, Republic model #753893, 18 lockers per set, 6 high x 3 wide, box size: 12" x 15", grey; with number plates, model #700405. Contact Ford & Ulrich, (Terry ford - 203-239-4451) for pricing.

27.    **Bathrooms**- As per code (proportioned to size of store) with power-Flush (tankless type) toilets. Each rest room to include a wall mounted infant changing table (JBJ Industries Koala Bear Care) and a C-fold towel dispenser with an in-wall mounted stainless steel trash receptacle, soap dispenser and Tenant's specified accessories. Bathroom entrance to have "Men" and "Women" graphic braille signs on door or at entrance and accessible route signs if required by law. Floor and walls to be full ceramic tile (see #2 for spec.). Bathroom lighting to be operated by RAB LOS2400 occupancy sensor (see #23 above for address).

28.    **Mechanical System**- See Addendum "B."

29.    **Refrigerated Water Fountain**- With filter located per Tenant's floorplan, as per BBB spec.

30.    **Fire Exits and Rear Man -Door**- All to be equipped with local audible alarm "Protex" locking panic device, door closer, and best cylinder. Protex model #250. Rear Man-Door to include peep hole, Protex model 250 panic device, Protex model 707 exterior door pull, with best cylinder, and closer. Equipment and doors mounted and operational a minimum of 10 days prior to turn over to Tenant.

31.    **Fire Extinguisher**- Landlord to provide and install all fire extinguishers as required per local code.

© Bed Bath & Beyond Inc. and its subsidiaries, 1998.         page 5

**32.**    **Fire Protection/Sprinkler**- Landlord shall provide a sprinkler and fire alarm system, which will provide the necessary sprinkler heads and fire alarm for the Premises, as required by local authorities.  In the event local authorities do not require a fire alarm system, the same shall be specified by Tenant (using commercially reasonable discretion).
Sprinkler system should be designed to allow for solid shelf storage of class 4 commodities, with limited plastics in accordance with NFPA 13 (standard for the installation of sprinkler systems), NFPA 231C (standard for high pile storage), all state and local code requirements relative to high pile storage, and Tenants fixture plan consisting of 12'-4' high wire fixtures with stacking up to 16'-6" and up to 8'-0" high laminate fixtures with 4'-0" minimum aisle spacing (typ).  Fixturing and storage to be within 18" of sprinkler heads, without the need for in-rack sprinklers.
Sprinklers to be located 18'-0" minimum A.F.F.  In addition, if required, provide a smoke purge and pressurization system or any other similar code required system.  Landlord is responsible for the monitoring of the system (includes securing phone lines).  Sprinkler plans and calculations are to be provided to Tenant, and Tenant's insurance carrier for approval prior to fabrication. Landlord to provide any fire-rated walls, ceiling or floor required by law (including, without limitation, any of the same which are required by law to be installed within the Premises [such as within or about the office mezzanine or any storage level]).  Fire Protection/ Sprinkler system to be completed 10 days prior to delivery.

**33.**    **Disability Access**- Provide limited use/limited application lift or elevator to mezzanine area if required per Federal guidelines. Provide mechanized handicap access through mezzanine area per all requirements of local, state, and federal law. Landlord is responsible for the securing and monitoring of phone lines as per local code requirements. Equipment to be installed 10 prior to delivery.

**34.**    **Utility Services**- See Addendum "C"

**35.**    **Itemized Budget**- At Tenant's request, Landlord shall provide its itemized budget for Landlord's Work.

**36.**    **Seismic**- Landlord is responsible for securing fixture permits as required by local code, to include seismic calculations and to provide seismic information to Tenant.

**37.**    **Unistrut**- Contractor to provide pendant mounted unistrut as manufactured by Versabar (painted white per spec), 16' O.C. and 16' wide at wood walkway around the store, and across the front of the store  per Tenant's Layout at 16'-6" A.F.F. Orders to Wesco Distribution, Dave Best (800) 682-1242.

**38.**    **Site**- All parking lots and traffic drives shall consist of a minimum 12" of compacted sub-grade (95% compacted) 3" asphalt base and 2" asphalt surface finish, grading of these areas not to exceed a slope of 2%.  All truck access and drives shall consist of 12" of compacted sub-grade (95% compacted) 6" asphalt base and 3" asphalt surface finish, to have no greater than a 3% grade change.  All truck ramps and dumpster pads to consist of 12" compacted sub-grade (95% compacted),  4" compacted granular base and 5" portland cement concrete surface finish. All truck ramps shall consist of #3 rebars, 18" o.c. each direction.  Storefront sidewalk to have a minimum of one ADA curb cut within 6' of each entrance door, and in compliance with ADA standard requirements.  If soil report reflects more stringent requirements, the report shall supersede the above criteria.

**39.**    **Site Lighting**- Provide "Wall Packs" on building in areas described by BBB. Minimum lighting level should be 2 footcandles, measured 30" above adjacent ground  including entire parking,  service and drive areas. "Wall Packs"should not be calculated to include the min. lighting level.

**40.**    **Roofing**- All roof work to accommodate Tenant's satellite installation.  To include a 1 1/4" I.D. conduit from point of entry to cashroom with a drawstring and a duplex outlet at tenant indicated location on roof.

**41.**    **Storefront**- Landlord to supply and install up to 80 ft. Wide "tempered" storefront glass or "high impact" storefront glass (if required to meet windload requirements) to 18' high above bulkhead or other approved base. Low emissivity glass must be used if there is no canopy or overhang.  LL to provide sample board for Tenant's approval showing examples of both color & materials proposed for use on storefront and other exterior elevations.  (See Addendum"D")

© Bed Bath & Beyond Inc. and its subsidiaries, 1998.

**42.** **[Intentionally Omitted]**

**43.** <u>Warranties</u>- Landlord shall provide a list of contractors' and subcontractors' contacts and addresses, and a guarantee, including parts and labor, for a period of at least one (1) year after the commencement date (see Addendum B regarding extended warranty on compressor parts and labor). Send all warranties of equipment, service manuals, and As-built drawings to Tenant's corporate office within thirty (30) days of Delivery Date. Landlord to cause contractor to instruct Tenant's representative in operation of any equipment installed pursuant to these specifications. All of Landlord's Work shall be performed in a manner which will not void or diminish any manufacturer's, installer's or contractor's warranties which would otherwise have been provided by such manufacturer, installer or contractor to either Landlord or Tenant. Two (2) months prior to the end of the warranty period the landlord must forward a written report to the tenant on the condition of all warranty items.

**[IN THE EVENT TENANT'S PREMISES INCLUDES A SECOND LEVEL OR BASEMENT STORAGE AREA, THEN THE FOLLOWING TWO PARAGRAPHS SHALL APPLY, AND PARAGRAPH #6 SET FORTH ABOVE SHALL BE DEEMED DELETED]**

**44.** <u>Ceiling Clearance</u>- 18' minimum clearance between any storage level floor and all structure (including sprinkler heads) above storage level floor. Any basement storage to include 18' minimum clearance between basement level floor and all structure (including sprinkler heads) above basement level floor. Retail and storage space located on main "selling floor" to maintain 18' clearance between floor slab and all structure including sprinkler heads. Any portion of main "selling floor" located under storage area to maintain such 18' clearance between floor slab and all structure and sprinkler heads. Sprinkler system should be designed to allow fixturing and storage to be within 18" of heads.

**45.** <u>Access to Other Level(s)</u>- Landlord will provide to either basement or second level storage facilities a 10,000 lb capacity freight elevator to include a 10' x 13' platform and 8' x 8' electrically operated door as well as 1 set of stairs. All means of access must conform to ADA and any other code requirement. Contact: Schindler Elevator Corporation, Linda Lewis at 973-397-6500.

**46.** <u>Mezzanine storage floor</u>- Landlord to provide minimum 3000 PSI concrete floor slab to a minimum of 4" thickness at mezzanine storage area. Floor should be rated to 125lbs per square foot. Seismic areas must provide a floor rated as per code and Tenants fixture anchoring requirements.

© Bed Bath & Beyond Inc. and its subsidiaries, 1998.      page 7

## ADDENDUM "A"

**Items Provided By General Contractor**

1.     Contractor to provide a 4' x 8' x 3/4" plywood backboard in the electric room for the local telephone company demarcation point (coordinate with local telephone company), and all other necessary structures and/or accesses (e.g. conduits) for local telephone company use to bring phone trunks to the Tenant's space, if not already provided. This requirement must be met at least one (1) month prior to Tenant occupancy and must be coordinated with the local telephone company.

2.     A second plywood backboard, supported by vertical unistrut, 8'H x 8'W x 3/4", in the Cash Room for a wiring wallfield, extending 3" above the finished ceiling. The plywood must be painted fire-retardant white prior to the installation of any Contractor or telephone company wiring equipment. This requirement must be met at least ten (10) days prior to Tenant occupancy.

      There should be approximately 3" of clearance between the plywood and the sheetrock wall. Provide up to 8 I.G. dedicated receptacles mounted flush with the front of the plywood.

3.     Cash room must be secured- finished walls, ceiling, lockable doors and all outlets working at least ten (10) days prior to Tenant occupancy.

4.     Four (4) shelves in Cash Room. Approximately 6' W x 15" D. Please refer to Cash Room drawing for the placement of the shelves, and slatwall.

**Items Provided By Electrical Contractor**

1.     AC CIRCUITS

All POS equipment must be on I.G. circuits dedicated to POS equipment only. Electrician must use 1 circuit for every 2 terminals so that if 1 circuit is lost the remainder of the system will function. POS equipment must be on a separate panel. It MUST NOT be on a panel that supplies power to electric motors, machines, or any inductively coupled load. All outlets must be surge suppressed by a main surge suppressor attached to the panel.

2.     AC RECEPTACLES

All POS terminals, peripherals, or equipment that communicate MUST be plugged into insulated/isolated ground outlets. Use Hubbell IG5362 Duplex receptacles beneath each POS terminal. Every bay with 2 POS terminals will have 2 duplex receptacles. In addition, each bay must have 2 duplex outlets on a separate circuit and panel for non-POS equipment power, including power poles.

3.     GROUNDING

All insulated/isolated ground wiring for Hubbel IG5362 outlets must be run in conduit and grounded to the panel. DO NOT ground to the electrical conduit.

4.     SWITCHGEAR

Switchgear components should be purchased through GE Electrical Distribution & Control. Contact: Kelly Kearney 203-949-7532.

Note: Electrical engineer should coordinate layout through Kelly Kearney, no other brands will be accepted without prior approval.

© Bed Bath & Beyond Inc. and its subsidiaries, 1998.          page 8

## ADDENDUM "B"

<u>MECHANICAL</u>

HEATING AND AIR CONDITIONING: BED BATH & BEYOND has a national account agreement with Lennox Industries. Contact national account administrator, David Carey (800) 367-6285 for all inquires. Units shall be manufactured by Lennox. No other manufacturer will be accepted. Tenant's entire demised space shall be provided with a new fully distributed, insulated, balance ducted and individually controlled refrigerated air conditioning and heating system sufficient to maintain an inside temperature of 74 degrees Fahrenheit @ 50% RH in the cooling mode and 68 degrees Fahrenheit for heating on a design day for the specific geographical area. These conditions shall be in accordance with design criteria established by ASHRAE for the local area for a dry goods retail space. HVAC ductwork, diffuses, plenums, or return locations are not to conflict with the site specific fixture plan. Units shall be electric cooling/gas heating per Tenant requirements, and have the capacity to handle space exterior skinload, outside air ventilation load, plus an internal heat load of 4.5 watts/sq.ft. Design shall be no less than one ton of conditioned air per 350 sq.ft. of gross usable area. Units 8 ton and above to be of the highest efficiency available and have an EER of no less than 11.0 and a IPLV of no less than 11.5. All accessories such as economizers, exhaust dampers, smoke detectors, disconnect switches, power exhaust, and 115V GFI outlets are to be factory installed and tested. A manufacturer's provided "Equipment Operational Check" (EOC) shall be performed on all units after start up. Thermostats shall consist of Honeywell T7300 programmable type with remote sensors. Thermostats are to be located in the cashroom for control, programmed and locked out prior to store opening; remote temperature sensors located as required for optimum efficiency and in an areas that do not interfere with Tenant's fixtures. Landlord shall submit mechanical drawings and unit specifications to Tenant for review and approval. Landlord to provide a filter change using pleated filters three (3) days prior to store opening. The entire system shall be balanced and Landlord shall have the air balance certified, with proof of certification provided to Tenant in writing. Landlord shall provide a ten (10) year extended warranty on compressor-parts and labor. Manufacturer will provide one year warranty on all parts, five years on all compressors, and 10 years on all heat exchangers, less labor.

Settings:
      Occupied Cooling: 74 degrees - 7:30am Mon. thru Sat., 8:00am Sun
      Unoccupied Cooling: 84 degrees - 10:00pm Mon. thru Sat., 6:00pm Sun
      Occupied Heating: 68 degrees - 7:30am Mon. thru Sat., 8:00am Sun
      Unoccupied Heating: 58 degrees - 10:00pm Mon. thru Sat., 6:00pm Sun

Provisions shall be made for exhaust systems to the outdoors as follows:

      1. Toilet exhaust
      2. Lunchroom exhaust
      3. Electrical Room exhaust
      4. Cashroom exhaust
      5. Machine Room exhaust
      6. Janitors Closet exhaust

© Bed Bath & Beyond Inc. and its subsidiaries, 1998.    

## ADDENDUM "C"

<u>PLUMBING</u>

Provide the following to premises in agreed location-

1. 2" valved and metered water service.

2. 6" plugged sanitary line with cleanouts. Sanitary line not to run under sales floor.

3. Hot water line.

4. 2", or as needed, valved metered natural gas service capable of providing a minimum of 3000 cfh at 8" gas pressure.

<u>ELECTRICAL</u>

Provide a minimum of 800 amp, 277/480V, 3 phase-4 wire electrical service with main disconnect, main service switch and separate utility metering sized to handle a 4.5 watts per square foot load for lighting and miscellaneous power and a 1750 watts per ton load for air conditioning to the premises in agreed location.

Provide 20% useable spare capacity above the Landlord's electrical engineers calculations, within each panel no more than 80% of breakers may be used.

All utility service metering to be set up for the best possible rate. Consult Tenant.

© Bed Bath & Beyond Inc. and its subsidiaries, 1998.   page 10

## EXHIBIT D-1

Front Elevation of Premises [including building signage] and of Shopping Center

## EXHIBIT L

### Restrictions

### DEED RESTRICTIONS PLACED ON THE SHOPPING CENTER PROPERTY AND LOTS 1 AND 2 BY THE CATHOLIC DIOCESE OF LITTLE ROCK

#### USES PROHIBITED

(a)    Adult book store or adult video store;

(b)    night club or a place of recreation or amusement;

(c)    car wash, except as an incidental use to another business;

(d)    any business serving alcoholic beverages except a restaurant as a part of its overall business.

### USE RESTRICTIONS PLACED ON THE SHOPPING CENTER AND LOTS 1 AND 2 BY THE CITY PLANNING COMMISSION:

#### USES PROHIBITED

(a)    adult book or video store;

(b)    ambulance service or post;

(c)    auto glass or muffler shop;

(d)    bar, lounge or tavern, except as part of a restaurant;

(e)    pawnshop;

(f)    plumbing, electrical, air conditioning or heating shop;

(g)    recycling facility, automated.

### RESTRICTIONS IMPOSED BY THE CITY PLANNING COMMISSION:

(a)    Dumpster Pick-up Hours: Dumpster pick-ups are restricted to the hours between 7:00 a.m. and 7:00 p.m.

(b)    Public Address Systems: No tenant in the Shopping Center shall be allowed to install any external speakers of any kind.  This restriction shall not apply to a drive-thru order speaker for a restaurant use on Lots 1 or 2.

(c)    Building Height: Maximum building height shall not exceed 35 feet, except for the entry features on buildings "A" and "B", which shall be a maximum of 45 feet in height.

The aforesaid Restrictions shall be deemed rules and regulations established by Landlord pursuant to Section 13(b) of the Lease to which this Exhibit L is attached and shall be governed and enforced pursuant thereto.

## EXHIBIT I

## DELIVERY DATE NOTICE

[Letterhead of Landlord]

_____, 199__

VIA CERTIFIED MAIL,
RETURN RECEIPT REQUESTED
BED BATH & BEYOND INC.
650 Liberty Avenue
Union, NJ 07083
Attn: Warren Eisenberg

Re:     Agreement of Lease, dated _____,
199__ (the "Lease"), between WEST
GROUP, LLC, as landlord ("Landlord"),
and BED BATH & BEYOND INC., as
tenant ("Tenant"), with respect to certain
retail premises (the "Premises") located in
the Chenal Place in Little Rock, Arkansas

Gentlemen:

In accordance with the provisions of Section 5(b) of the Lease, Landlord hereby informs Tenant that the Delivery Date shall take place on _____, 199__. This notice shall constitute the Delivery Date Notice referred to in Section 5(b) of the Lease.

WEST GROUP, LLC

By:_____
                     , (Vice) President

cc:    Edward M. Schotz, Esq.
      Allan N. Rauch, Esq.

(i)    Conflict. In the event of any conflict between the provisions of this Section 62 and any other provision of this Lease, the provisions of this Section 62 shall control.

**SECTION 63.      EXECUTION OF THIS LEASE.** Tenant and Landlord each warrant and represent that the parties signing this Lease on behalf of each has authority to enter into this Lease and to bind Tenant and Landlord, respectively, to the terms, covenants and conditions contained herein. The submission of this Lease to each of Landlord and Tenant shall be for examination and negotiation purposes only, and does not and shall not constitute a reservation of or an obligation of Tenant to lease, or otherwise create any interest of Tenant in, the Premises or any other premises situated in the Shopping Center unless and until the Lease is fully executed by Tenant and Landlord.

**SECTION 64.      REA.** Landlord covenants and agrees:

(a)    To carry out and perform all of the terms, covenants and conditions of the REA [as defined in Section 5(b)(iv)(J) above] on Landlord's part to be performed;

(b)    To defend and indemnify Tenant, and hold Tenant harmless, from and against any and all claims, demands, causes of action, suits, damages, liabilities and expenses of any nature whatsoever arising out of or in connection with a claimed breach of the REA by Landlord, or any covenant, term, condition or provision thereof, or in connection with the termination of the REA;

(c)    On notice from Tenant, to enforce any provision of the REA, the non-performance of which would materially and adversely affect Tenant's use and enjoyment of the Premises and/or access to and visibility thereof, against all parties and other persons that are subject thereto;

(d)    Whenever, pursuant to the REA, consent shall be required by or requested from Landlord, or an election made by Landlord as to any matter which would materially and adversely affect Tenant's use and enjoyment of the Premises and/or access to and visibility thereof, not to grant such consent or make such election without the prior consent of Tenant;

(e)    Not amend, modify or terminate the REA in any manner which would materially and adversely affect Tenant's use and enjoyment of the Premises and/or access to and visibility thereof without the prior consent of Tenant;

(f)    Provide Tenant with copies of all notices (including default notices) received by it or which are sent by it (concurrently with the sending thereof) in connection with any aspect of the REA which would materially and adversely affect Tenant's use and enjoyment of the Premises and/or access to and visibility thereof;

(g)     Not to permit any occupant to violate the REA (including without limitation any prohibited uses set forth therein) in a manner which would materially and adversely affect Tenant's use and enjoyment of the Premises; and

(h)     Upon execution thereof, the REA will be in full force and effect and a valid and binding, and a first and paramount property right and lien upon the Shopping Center.

**IN WITNESS WHEREOF,** the parties hereto have executed this Lease as of the day and year first above written.

WITNESS:

WEST GROUP, LLC
(Landlord)

By: _____
Name: C.J. Copper
Title: member

By: _____
Name: Wilford Smith
Title: officer

By: _____
Name: Bernard E. Fraser
Title: member

WITNESS:

BED BATH & BEYOND INC. (Tenant)

By: _____
Name: ~~Warren Eisenberg~~ Steven Temares
Title: ~~Co-Chief Executive Officer~~
Executive Vice President

## EXHIBIT A

Legal Description of Shopping Center

The premises are located in the County of Pulaski, State of Arkansas and described as follows:

Part of the SE 1/4 NE 1/4, Section 5, Township 1 North, Range 13 West, Pulaski County, Arkansas, more particularly described as: Starting at the Southeast corner of the SE 1/4 NE 1/4, said Section 5; thence North 87 degrees 11 minutes 00 seconds West, along the South line of said SE 1/4 NE 1/4, 92.92 feet to the point of beginning, said point also being on the West right-of-way line of Chenal Parkway and the North line of Timber Ridge an Addition to the City of Little Rock; thence North 87 degrees 11 minutes 00 seconds West and continuing along said South line and North Line 1,208.02 feet to a point on the East right-of-way line of Atkins Road; thence North 01 degrees 04 minutes 29 seconds West along said East line 576.48 feet to the Southwest corner of Lot 1 Chenal Business Addition; thence South 87 degrees 14 minutes 17 seconds East along the South line of said Lot 1 Chenal Business Addition 335.27 feet; thence North 47 degrees 50 minutes 12 seconds East along said South line 10.61 feet; thence South 87 degrees 09 minutes 44 seconds East and continuing along said South line 334.72 feet; thence North 57 degrees 31 minutes 03 seconds East along said South line 87.81 feet to a point on the West right-of-way line of Chenal Parkway; thence Southeasterly along said right-of-way line, being the arc of a 1,382.39 foot radius curve to the right having a chord bearing and distance of South 30 degrees 59 minutes 25 seconds East 80.57 feet; thence South 29 degrees 21 minutes 06 seconds East continuing along said West right-of-way line 282.55 feet; thence continuing Southeasterly along said West right-of-way line, being the arc of a 1,482.39 foot radius curve to the left having a chord bearing and distance of South 37 degrees 44 minutes 14 seconds East 432.39 feet to the point of beginning.

## EXHIBIT B-1

CRITICAL FIXTURING COMMON AREA
CRITICAL COMMON AREA, AND
REVISED STAGING AREA

## FIRST AMENDMENT TO LEASE

**THIS FIRST AMENDMENT TO LEASE** ("Amendment"), dated as of June 16, 1999 between WEST GROUP LLC, an Arkansas limited liability company, with an address at c/o K&L Realty, #5 Inwood Circle, Suite 105, Little Rock, Arkansas 92211 ("Landlord") and BED BATH & BEYOND INC., a New York corporation, with an address at 650 Liberty Avenue, Union, New Jersey 07083 ("Tenant").

## W I T N E S S E T H :

WHEREAS, Landlord and Tenant entered into that certain Lease dated as of November 18, 1998 for premises situated in the Chenal Place Shopping Center located in Little Rock, Arkansas (as such premises is more particularly described in the Lease, the "Premises"); and

WHEREAS, Landlord and Tenant desire to amend the Lease as hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual covenants and promises set forth in this Amendment and other valuable consideration, receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.    Definitions.    Capitalized terms used but not defined herein shall have the meaning ascribed them in the Lease.

2.    Inducement Tenants.    Section 4(b) of the Lease is hereby deleted and there is substituted therefor the following:

" (b) (i)        If the Inducement Tenant, Staples, is not "ready to open" (as such phrase is hereinafter defined) on or before September 1, 1999 (the "Staples Inducement Trigger Date"), then in such event, and notwithstanding any other provision of the Lease except for the conditions precedent to the occurrence of the Delivery Date, during the period (the "Staples Inducement Opening Period") commencing on the Staples Inducement Trigger Date and ending on the date which is thirty (30) days after the date upon which such Inducement Tenant is ready to open and Landlord has notified Tenant that the such Inducement Tenant is ready open (the "Staples Inducement Date"), Tenant shall be entitled to a full abatement of Fixed Rent and Tenant shall be liable for the payment of: (A) Tenant's Pro Rata Share of Taxes and Common Area Charges, and (B) Percentage Rent, except that for purposes of this Section 4(b), (1) the Sales Break Point shall be deemed to be One ($1.00) Dollar, and (2) in no event shall the aggregate Percentage Rent payable during the Staples Inducement Opening Period exceed one-half (1/2) of the amount which the Fixed Rent would otherwise have been payable with respect to the Staples Inducement Opening Period.

(ii)        If the Inducement Tenant, Men's Wearhouse, is not "ready to open" on or before October 1, 1999 (the "MW Inducement Trigger Date"), then in such event, and notwithstanding any other provision of the Lease except for the conditions precedent to the occurrence of the Delivery Date, during the period (the "MW Inducement Opening Period") commencing on the MW Inducement Trigger Date, and ending on the date which is thirty (30) days after the date upon which such Inducement Tenant is ready to open and Landlord has notified Tenant that such Inducement Tenant is ready open (the "MW Inducement Date"), Tenant shall be entitled to a full abatement of Fixed Rent and Tenant shall be liable for the payment of: (A) Tenant's Pro Rata Share of Taxes and Common Area Charges, and (B) Percentage Rent, except that for purposes of this Section 4(b), (1) the Sales Break Point shall be deemed to be One ($1.00) Dollar, and (2) in no event shall the aggregate Percentage Rent payable during the MW Inducement Opening Period exceed one-half (1/2) of the amount which the Fixed Rent would otherwise have been payable with respect to the MW Inducement Opening Period.

(iii)        Landlord and Tenant agree that any abatement of Fixed Rent which inures to the benefit of Tenant in accordance with the provisions of this Section 4(b) shall constitute a reimbursement to Tenant for certain pre-opening expenses incurred by Tenant in connection with the Lease.

(iv)    In the event any or all of the Inducement Tenants shall not have been ready to open within one hundred eighty (180) days after the Staples Inducement Trigger Date (except if any delay in opening by any Inducement Tenant is solely caused by act of God, then Tenant's right to terminate shall be six (6) months from the date of such act), then Tenant may at any time thereafter when any or all of the Inducement Tenants shall not have been ready to open, upon giving Landlord not less than sixty (60) days notice, terminate this Lease as of the date specified in said notice, in which event neither party shall have any further liability hereunder except that Landlord shall be obligated to promptly reimburse Tenant for all its costs, damages and expenses incurred in connection with this Lease, including without limitation, the preparation of plans and specifications for and the costs of Tenant's Work.  Landlord may negate such termination by causing the Staples and/or MW Inducement Date (as applicable) to occur on or before the thirtieth (30th) day following the date on which Tenant has given the foregoing notice of termination.  For the purposes of this Section 4(b), the phrase "ready to open" shall mean that all construction and related work to be performed by or on behalf of Landlord and each Inducement Tenant shall be Substantially Completed and Tenant and each Inducement Tenant shall have its premises fully fixtured and merchandised."

3.    Delivery Date.        (a)    Notwithstanding Landlord's delivery of that certain Delivery Date Notice, dated May 28, 1999, establishing a Delivery Date of July 15, 1999,  Landlord and Tenant hereby agree that the  Delivery Date shall be July 5, 1999.

(b)    Sections 5(b)(i) and (ii) of the Lease are deleted, and the following is substituted in lieu thereof:

"(i)    Landlord hereby designates the Delivery Date as July 5, 1999.  Should Landlord fail to satisfy the conditions to the Delivery Date on or before July 5, 1999, then, subject to delays solely caused by acts of God, Landlord shall pay Tenant the liquidated sum of Twenty-Five Thousand Dollars ($25,000.00) (it being acknowledged and agreed by Landlord and Tenant that this liquidated sum represents the parties' good faith agreement as to an amount which shall have been incurred by Tenant as a result of such delay and which shall not otherwise be susceptible of exact ascertainment).

(ii)    Without limiting the foregoing, if  Landlord fails to satisfy the conditions to the Delivery Date set forth below before July 15, 1999 then, subject to acts of god, from and after July 15, 1999,  in addition to any other remedies available to Tenant under this Lease and the payments required under subsection (i) above,  Landlord agrees to allow to Tenant a full credit against the initial installment(s) of Rent hereunder equal to Five Thousand ($5,000) dollars for each day that the Delivery Date is delayed beyond July 15, 1999 (which credit shall be deemed as reimbursement to Tenant for all reasonable costs incurred by Tenant for such additional delays)."

(c)    Section 5(b)(iv)(B) of the Lease is hereby deleted and the following is substituted in lieu thereof:

"(B)    any permits, certificates of occupancy (or its local equivalent if certificates of occupancy are not issued in the applicable jurisdiction), other certificates, "sign-offs" and approvals (copies of which shall have been delivered to Tenant) required from applicable governmental authorities to enable Tenant to (x) occupy, fixture and stock the Premises, (but not those required to open and conduct its business), and (y) install Tenant's sign panel on the monument sign as shown on Exhibit F-3.  The foregoing shall include any certificates, permits and "sign-offs" relating to the Common Areas if same are necessary for Tenant's occupancy, fixturing and stocking."

(d)    The first sentence of Section 5(b)(iv)(C) of the Lease is hereby deleted and there is substituted in lieu thereof:

"The Common Areas (including , but not limited to, the parking facilities and any pylon and monument signs required hereunder), all buildings and other improvements located within the "Critical Fixturing Common Area" shown on Exhibit B-1 attached hereto and made a part hereof, and all off-site improvements (but excluding landscaping)

shall have been completed and operational and Landlord's Work shall have been Substantially Completed (including but not limited to the connection of all utilities to and in the Premises), which Substantial Completion shall be evidenced by a written certification by Landlord's architect to Tenant."

(e)     Section 5(b)(iv)(G) of the Lease is hereby amended to substitute "Men's Wearhouse, having a minimum gross Floor Area of 6,000 square feet and a minimum lease term of five (5) years " in lieu of "First class recognized national and regional tenants."

(f)     Section 5(b)(iv)(H) of the Lease is hereby deleted.

4.     <u>Critical Common Areas</u>.     (a) Landlord covenants and agrees that on or prior to July 15, 1999, Landlord shall:

(1)     obtain, at Landlord's sole cost and expense, all permits, permanent certificates of occupancy (or its local equivalent if certificates of occupancy are not issued in the applicable jurisdiction), other certificates, "sign-offs" and approvals (copies of which shall have been delivered to Tenant) required from applicable governmental authorities to (A) enable Tenant to occupy and open the Premises to the general public for the conduct of its business, and (B) the Common Areas to be used for their intended purposes including, without limitation, zoning, building code, environmental requirements, curb cut and site plan approvals, building signage permits, all permits pertaining to pylon and/or monument signage (and Tenant's panel(s) thereon), and construction, development and use permits (collectively, the "<u>Shopping Center Approvals</u>"); and

(2)     Substantially complete and have operational the Critical Common Areas shown and identified on <u>Exhibit B-1</u> attached hereto, including without limitation the parking facilities and any pylon an monument signs required hereunder, and all buildings and other improvements depicted on Exhibit B-1 and all off-site improvements

(b)     If on or before July 15, 1999 Landlord fails to (i) obtain and deliver to Tenant the Shopping Center Approvals, or (ii)  substantially complete the Critical Common Areas and improvements as aforesaid, then neither the Rent Commencement Date nor the Delivery Date shall be deemed  to have occurred and, in addition to any other remedies available to Tenant under this Lease except the payments by Landlord under Section 5(b)(ii) to the extent them same would thereafter be made,  Landlord agrees (x) to allow to Tenant a full credit against the initial installment(s) of Rent hereunder equal to Five Thousand ($5,000) dollars for each day that the conditions of Section 4(a) remain unsatisfied  beyond July 15, 1999 (which credit shall be deemed as reimbursement to Tenant for all additional reasonable costs incurred by Tenant), and (y) to permit Tenant to exercise its self-help remedies under Sections 19(b)and (d) following three (3) days prior notice (in lieu of 30 days notice) to Landlord.

5.     <u>Completion of Shopping Center</u>.     On or prior to September 15, 1999, Landlord covenants and agrees to Substantially Complete the entire Shopping Center, as shown on Exhibit B to this Lease, including without limitation all Common Areas, buildings (but excluding Building C which shall be substantially complete no later than October 15, 1999) and other improvements shown thereon. If Landlord fails to Substantially Complete the entire Shopping Center on or prior to September 15, 1999 (or October 15, 1999 with respect to Building C), then in addition to any other remedies available to Tenant under this Lease except for the payments by Landlord permitted under Section 5(b)(ii) and Paragraph 4 to the extent either would thereafter be made,  Landlord agrees to allow to Tenant a full credit against the initial installment(s) of Rent hereunder equal to Five Thousand ($5,000) dollars for each day after September 15, 1999 (or October 15, 1999 with respect to Building C)  that the Shopping Center is not Substantially Complete  (which credit shall be deemed as reimbursement to Tenant for all additional reasonable costs incurred by Tenant).

6.     <u>Staging</u>.     In lieu of the "Staging" areas shown on Exhibit B to the Lease, Landlord shall be permitted the "<u>Revised Staging Areas</u>" shown on Exhibit B-1 hereto, subject to the terms and conditions of Section 5(f) of the Lease (as hereafter amended). Notwithstanding anything to the contrary in Section 5(f)(A) of the Lease, Landlord may utilize standard construction fencing with a height of not less than four feet in lieu of the 6-foot high chain link fence described in such subsection.

## BED BATH & BEYOND

STORE # 228
12309 CHENAL PARKWAY

MANAGER:  GREG
PHONE:       224-6400

| | |
|---|---|
| SQUARE FOOTAGE: | 37,813' |
| % OF TOTAL CENTER SQ FT: | 41% |

| | |
|---|---|
| MONTHLY RENT | $35,292.13 |
| ANNUAL RENT | $423,505.60 |

COMMENCEMENT DATE:                    JULY 30TH, 1999

ADDRESS:        COPORATE OFFICES
                        650 LIBERTY AVE.
                        UNION, NJ  07083

PHONE:          908-688-0888
FAX:              908-688-8385

CONTACT:        JEFF COHEN    4124
                        REAL ESTATE ACCT.

CAM CHARGES:    5% ON PARKING LOT & LANDSCAPING ONLY
BY BUDGET

*Leigh Moore 4611 Facil*
*908 844 0295*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed the date and year first above written.

WEST GROUP, LLC.

By: _____
Name: _____
Title: _____

By: _____
Name: _____
Title: _____

By: _____
Name: _____
Title: _____

BED BATH & BEYOND INC.

By: _____
Name: Warren Eisenberg
Title:    Co-Chief Executive Officer

EXHIBIT I

DELIVERY DATE NOTICE

[Letterhead of Landlord]

_____, 199__

VIA CERTIFIED MAIL,
RETURN RECEIPT REQUESTED
BED BATH & BEYOND INC.
650 Liberty Avenue
Union, NJ 07083
Attn: Warren Eisenberg

Re:     Agreement of Lease, dated _____,
199__ (the "Lease"), between WEST
GROUP, LLC, as landlord ("Landlord"),
and BED BATH & BEYOND INC., as
tenant ("Tenant"), with respect to certain
retail premises (the "Premises") located in
the Chenal Place in  Little Rock, Arkansas

Gentlemen:

In accordance with the provisions of Section 5(b) of the Lease, Landlord hereby informs
Tenant that the Delivery Date shall take place on _____, 199__.  This notice shall
constitute the Delivery Date Notice referred to in Section 5(b) of the Lease.

WEST GROUP, LLC

By:_____
                   , (Vice) President

cc:     Edward M. Schotz, Esq.
         Allan N. Rauch, Esq.

7.    <u>Modifications to Landlord's Work</u>    Tenant has to date made changes to Landlord's Work which have resulted in a net savings to Landlord of $27,652.00 (the "<u>Net Savings</u>").  Such changes are set forth on Schedule 1 attached hereto and made a part hereof (the "<u>Change Orders</u>").  Tenant hereby waives its right to reimbursement of the New Savings, and Landlord hereby waives its right to seek additional payments  for the Change Orders.

8.    <u>Exhibit F-2</u>.    Exhibit F-2 attached to the Lease is hereby deleted and there is substituted in lieu thereof the Exhibit F-3 attached hereto and made a part hereof.

9.    <u>Authority</u>.    Landlord and Tenant each represent and warrant to the other that it has full right, power and authority to enter into this Amendment, and has obtained all necessary consents and resolutions from its members required under the documents governing its affairs in order to consummate this transaction, and the persons executing this Amendment have been duly authorized to do so.

10.    <u>Ratification</u>.    Except as modified hereby, all of the terms and conditions of the Lease shall remain in full force and effect.

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the day and year first above written.

LANDLORD:

WEST GROUP LLC

By: _____
Name: _____
Title: _____

By: _____
Name: _____
Title: _____

By: _____
Name: _____
Title: _____

TENANT:

BED BATH & BEYOND INC.

By: _____
Name: __Seth Geldzahler_____
Title: __Real Estate Director____

# LEGEND

- REVISED STAGING AREAS ● ● ● ●
- CRITICAL FIXTURING COMMON AREA ▬ ▬ ▬
- CRITICAL COMMON AREA ////

The parking and drive portions of the Critical Fixturing Common Area shall have a surface adequate to permit automobile parking and truck parking and delivery (including, without limitation, adequate surface flush to dock ramp for truck access thereto). A stoned fine graded surface or better shall be deemed adequate provided it permits the aforesaid parking and delivery.

## EXHIBIT B-1

**CHENAL PLACE SHOPPING CENTER**
LITTLE ROCK, ARKANSAS

Developer: WEST GROUP, L.L.C.
c/o C.J. Crappser
650 S. Shackleford Suite 320
Little Rock, AR 72212

TENANT

<u>Rent Commencement and Expiration Date Agreement</u>

THIS AGREEMENT, made as of this 13th day of August 1999, by and between WEST GROUP, LLC (hereinafter called "Landlord") and BED BATH & BEYOND INC. (hereinafter called "Tenant").

## WITNESSETH:

WHEREAS, Landlord is the owner of a certain shopping center known as Chenal Place (the Shopping Center), situated in Little Rock, Arkansas;

WHEREAS, by that certain lease dated November 18, 1999 (herein called the "Lease"), Landlord leased a portion (the "Premises") of the Shopping Center to Tenant;

WHEREAS, Tenant is in possession of the Premises and the Term of the Lease has commenced; and

WHEREAS, under Section 1(j) of the Lease, Landlord and Tenant agreed to enter into an agreement setting forth certain information in respect of the Premises and the Lease.

NOW, THEREFORE, Landlord and Tenant agree as follows:

1.    The Rent Commencement Date was July 30, 1999.

2.    The Term of the Lease shall expire on January 31, 2010, unless Tenant exercises any option to extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

3.    The date of commencement of the first Renewal Period shall be February 1, 2010, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 2015, unless Tenant exercises any option to further extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

4.    The date of commencement of the second Renewal Period shall be February 1, 2015, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 2020, unless Tenant exercises any option to further extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

5.    The date of commencement of the third Renewal Period shall be February 1, 2020, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 2025, unless Tenant exercises any option to further extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

6.    The date of commencement of the fourth Renewal Period shall be February 1, 2025, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 2030, unless the Lease terminates earlier as provided in the Lease.

7.    Capitalized terms not defined herein shall have the same meaning as set forth in the Lease.

*Mailed to them*
*10/6/99*

## EXHIBIT F-3

MONUMENT SIGN



EXHIBIT F-3

REVISED DESIGN

BED BATH & BEYOND

STAPLES

## SECOND AMENDMENT TO LEASE AGREEMENT

THIS SECOND AMENDMENT TO LEASE AGREEMENT ("*Second Amendment*"), dated as of August 1, 2009, by and between **CHENAL PLACE PROPERTIES, L.L.C.,** an Arkansas limited liability company and successor in interest to West Group, L.L.C. ("*Landlord*") and BED BATH & BEYOND INC. ("*Tenant*").

WITNESSETH:

WHEREAS, Landlord and Tenant entered into that certain Lease, dated November 18, 1998, amended by First Amendment to Lease dated June 16, 1999, and as further amended by various letter agreements (collectively, the "*Lease*") for certain retail premises in the shopping center known as Chenal Place Shopping Center located in Little Rock, Pulaski County, Arkansas (the "*Shopping Center*");

WHEREAS, the parties hereto desire, among other things, to amend the Lease to reflect the parties agreement with respect to certain changes in the Lease, as hereinafter set forth;

NOW, THEREFORE, for and in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant hereby agree as follows:

1.      Capitalized terms used, but not otherwise defined herein, shall have the meaning(s) ascribed to them in the Lease.

2.      The current Term of the Lease is hereby extending for an additional ten (10) years, commencing February 1, 2010 and ending January 31, 2020 (the "*Extended Term*").

3.      During the Extended Term, the Fixed Rent shall be the following:

(a) For the period commencing February 1, 2010 and ending on January 31, 2015, at the rate of Three Hundred Eight-Five Thousand Six Hundred Ninety-Three and 00/100 Dollars ($385,693) per year [based on Ten and 20/100 Dollars ($10.20) per square foot];

(b) For the period commencing February 1, 2015 and ending on January 31, 2020, at the rate of Four Hundred Four Thousand Five Hundred Ninety-Nine and 00/100 Dollars ($404,599.00) per year [based on Ten and 70/100 Dollars ($10.70) per square foot];

4.      Landlord and Tenant agree that, except as expressly modified by the terms of this Second Amendment, the Lease is hereby ratified and affirmed in full force and effect, including Tenant's rights under Section 46 of the Lease (Options to Extend Term).

5.      This Second Amendment shall be binding upon and inure to the benefit of Landlord and Tenant, and their respective successors and assigns.

6.      Landlord hereby represents that there is no mortgagee of the Shopping Center other than Capmark Finance, Inc., Master Servicer for LaSalle Bank, N.S., Trustee for GMAC Commercial Mortgage.

7.      Landlord and Tenant each warrant and represent to the other that they did not deal with any real estate broker in connection with the negotiation, execution and delivery of this Second Amendment.  Each party agrees to indemnify, defend, and save the other harmless from and against any and all liabilities, costs, causes of action, damages and expenses, including, without limitation, attorneys' fees, with respect to or arising out of any claims made by any real estate broker, agent or finder with respect to this Second Amendment in breach of the foregoing representation.  The provisions of this Section shall survive the expiration or earlier termination of the Lease.

8.      This Second Amendment may be executed in multiple counterparts, each of which shall constitute an original.

[Signature page follows]

2

IN WITNESS WHEREOF, the parties hereto have executed this Second Amendment to Lease Agreement as of the day and year first above written.

**LANDLORD:**

CHENAL PLACE PROPERTIES, L.L.C.
By:  West Group Bowman & Chenal Two, Inc.,
Its Managing Member

By: _____
Name:  C.J. Cropper
Title:  President

By: _____
Name:  Bek Kaiser
Title:  Vice President

By: _____
Name:  Willis Smith
Title:  Secretary Treasurer

**TENANT:**

BED BATH & BEYOND INC.,
a New York corporation

By: _____
Warren Eisenberg
Co-Chairman

3

## <u>CONSENT OF MORTGAGEE</u>

The Undersigned hereby consents to the terms and conditions of this Second Amendment to Lease.

CAPMARK FINANCE, INC.,
Master Servicer for LaSalle Bank, N.A., Trustee for
GMAC Commercial Mortgage

*See letter of approval attached.*

By: _____

Name: _____

Title: _____

August ___, 2009

4

August 14, 2009

**CAPMARK.**

Chenal Place Properties LLC
5507 Ranch Drive, Suite #201,
Little Rock, AR 72223

Re:    Capmark Loan No. 991089887
        Chenal Place Properties LLC

Dear Borrower:

You have requested that Capmark Finance Inc. ("Capmark"), in its role as the servicer of the
Loan, consent to a lease amendment (the "Lease") between Chenal Place Properties LLC
("Borrower") and Bed Bath & Beyond, Inc. ("Tenant") for 37,813 square feet of space at Chenal
Place Shopping Center (the "Property") in accordance with the provisions of the Deed of Trust
and Security Agreement ("Security Instrument") encumbering the Property.

This letter is to inform you that Capmark hereby consents to the execution of the Lease and that
the obligations of the Borrower to obtain lender's consent prior to entering into a lease on the
Property are deemed satisfied.

However, please note that this consent shall not be construed to be a modification or waiver of
any of the terms or conditions of any of the documents executed in connection with the Loan or a
subordination of the lender's lien on the Property to the rights of the Tenant under the Lease, and
shall not create any rights or obligations between the lender and the Tenant.

Please provide the Tenant with the address of Capmark as set forth below (or such different
address if later provided by Capmark) for the purpose of any notices the Tenant shall be required
to give lender under the terms of the Lease.

Capmark Finance Inc.
116 Welsh Road
Horsham, PA  19044
Attn:  Executive Vice President – Servicing Administration

Sincerely,

*Russel Brown*

Russel Brown
Client Relations Manager
Phone: (801) 233-2324
Fax:     (801) 233-2329
Email:  russel.brown@capmark.com

### THIRD LEASE AMENDMENT

THIS THIRD LEASE AMENDMENT ("*Modification*"), dated as of the _10th_ day of _July_, 2019 ("*Modification Date*") by and between CHENAL PLACE PROPERTIES, L.L.C., an Arkansas limited liability company ("*Landlord*"), having an office at 5507 Ranch Drive, Suite 201, Little Rock, Arkansas 72223 and BED BATH & BEYOND INC., a New York corporation ("*Tenant*"), having an office at 650 Liberty Avenue, Union, New Jersey 07083.

## W I T N E S S E T H :

WHEREAS, Landlord, as successor-in-interest to West Group, LLC, and Tenant are parties to that certain Lease Agreement dated as of November 18, 1998 (as amended by a Rent Commencement and Expiration Date Agreement dated August 13, 1999, a First Amendment to Lease dated as of June 16, 1999, a Second Amendment to Lease Agreement dated as of August 1, 2009, letter agreements dated August 2, 1999 and August 27, 2001, and letters dated May 21, 2001, October 15, 2001, June 16, 2003, June 27, 2007, and July 5, 2007, collectively, the "*Lease*"), with respect to premises ("*Premises*") located at Chenal Place in Little Rock, Arkansas ("*Shopping Center*"); and

WHEREAS, Landlord and Tenant desire to modify the Lease on the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual covenants and promises set forth in this Modification and other valuable consideration, receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.      The recitals hereinabove set forth are incorporated into this Modification by this reference.  Capitalized terms used, but not defined herein, shall have the meanings ascribed them in the Lease.

2.      Notwithstanding anything contained in the Lease to the contrary, Landlord and Tenant hereby agree that the modifications to the Term, Renewal Periods and/or Rent that are outlined in <u>Schedule A</u> hereto shall govern and control from and after the Modification Date.

3.      Notwithstanding anything contained in the Lease to the contrary, Landlord and Tenant hereby agree that the modifications to certain other terms and provisions of the Lease to the extent outlined in <u>Schedule B</u> hereto shall govern and control from and after the Modification Date.

4.      It is the policy of Tenant and its subsidiaries and affiliates (collectively, "*the Company*") to conduct all its business transactions in accordance with the highest ethical standards and all applicable laws (including but not limited to the U.S. Foreign Corrupt Practices Act).  No individual who is employed by or who represents the Company, and no individual or entity that contracts with the Company or otherwise performs services on behalf of the Company, is permitted to solicit, accept, offer, promise or pay any bribe, kickback or any other improper payment of money, products or services.  This includes, but is not limited to, any improper payment in exchange for (i) the Company's execution of this Modification, (ii) any action taken by such individual on behalf of the Company, or (iii) any action taken by a third party.  If any such improper actions are observed, contact our Legal Department (Attention: General Counsel) at Tenant's notification address and/or by telephone at 908-688-0888, so that the incident may be fully investigated.

5.      Landlord and Tenant each warrant and represent to the other that they did not deal with any real estate broker in connection with the negotiation, execution and delivery of this Modification, except for Retail Consulting Services ("*Tenant's Broker*") and West Group Real Estate LLC ("*Landlord's Broker*").  Tenant shall pay any commission due to Tenant's Broker in connection with this Modification pursuant to a separate written agreement between Tenant and Tenant's Broker.  Landlord shall pay any commission due to Landlord's Broker in connection with this Modification pursuant to a separate written agreement between Landlord and Landlord's Broker. Each party agrees to indemnify, defend, and save the other harmless from and against any and all liabilities, costs, causes of action, damages and expenses, including, without limitation, attorneys' fees, with respect to or arising out of any claims made by any real

estate broker, agent or finder (other than Tenant's Broker and Landlord's Broker) with respect to this Modification in breach of the foregoing representation or claiming to have worked with the indemnifying party in connection with the Lease. The provisions of this Section shall survive the expiration or earlier termination of the Lease.

6.     Landlord represents and warrants to Tenant that, as of the date hereof, no third-party consents or approvals (including, without limitation, with respect to easement agreements and/or any lender or beneficiary of a deed of trust) are required in order for the terms and provisions of this Modification to be in full force and effect or, if any such consent is required, Landlord has obtained same prior to its execution hereof. The parties represent and warrant to each other that the person signing on behalf of either Landlord or Tenant, as the case may be, has the authority to do so and for this Modification to be deemed in full force and effect.

7.     The terms and conditions of this Modification shall be binding upon, and inure to the benefit of Landlord and Tenant and their respective heirs, executors, administrators, successors and assigns. Except as specifically amended hereby, the Lease is unmodified, is hereby ratified by the parties hereto and remains in full force and effect. In the event of any conflict or inconsistency between the terms and provisions of the Lease and this Modification, the terms and provisions of this Modification shall govern and control.

8.     This Modification may be executed in one or more counterparts, each of which shall be an original for all purposes, but all of which taken together shall constitute only one Modification to Lease. The transmission of an image of any signed original document will have the same binding effect as an original bearing an original signature. No party may raise the use of an image transmission device or method or the fact that any signature was transmitted as an image as a defense to the enforcement of such document.

[Signature Page to Follow]

IN WITNESS WHEREOF, the parties hereto have executed this Third Lease Amendment as of the day and year first above written.

**LANDLORD:**

CHENAL PLACE PROPERTIES, L.L.C.,
an Arkansas limited liability company

By: CPPWG Inc., its managing member

By: _____
    Bernard E. Kaiser III, President, by his attorney in fact
Jill R. Bryant

**TENANT:**

BED BATH & BEYOND INC.,
a New York corporation

By: _____
Name:   Eugene A. Castagna
Title:    President and Chief Operating Officer

## SCHEDULE A

The Lease is hereby amended to reflect that:

1.    Tenant hereby exercises its first (1st) Renewal Option to extend the Term of the Lease, such that the Term is hereby extended from February 1, 2020 through January 31, 2025 (unless Tenant exercises any further Renewal Options permitted under the Lease), in accordance with the provisions of Section 46 (Options to Extend the Term) of the Lease and the further terms and provisions of this Modification.

2.    During the first Renewal Period (i.e. February 1, 2020 through January 31, 2025), Fixed Rent shall be paid at the rate of Ten and 70/100 Dollars ($10.70) per square foot of Floor Area or Four Hundred Four Thousand Five Hundred Ninety-Nine and 10/100 Dollars ($404,599.10) per annum.

## SCHEDULE B

The Lease is hereby amended to reflect the following:

      1.      Landlord shall pay Tenant the sum of One Hundred Thousand and 00/100 Dollars ($100,000.00) (the **"*Landlord Payment*"**), which Landlord Payment shall be unconditional. Landlord shall pay the Landlord Payment in five (5) installments of Twenty Thousand and 00/100 Dollars ($20,000) each, which installments shall be due on or before January 1, 2020, January 1, 2021, January 1, 2022, January 1, 2023, and January 1, 2024. Tenant hereby agrees that it shall use the Landlord Payment for costs and expenses of construction, refixturing and/or renovation of the Premises (including, without limitation hard and soft costs and expenses, signage, third party and reasonable in-house labor costs incurred in conjunction with the applicable work, and technology expenses and equipment [e.g., large display monitors, wifi connectivity, etc.]). In the event Landlord does not pay Tenant the applicable installment when due (as described above), Tenant shall have the right to immediately offset the amount of such installment against Rent payable by Tenant under the Lease until reimbursement or full satisfaction by credit.

      2.      Landlord hereby makes the following disclosures solely for the purpose of complying with Sections 10.11 and 10.20 of the Arkansas Real Estate Commission, Real Estate Regulations, Time-Share Regulations and Federal Fair Housing Summary (January 2018) (**"*Real Estate Regulations*"**): (i) Landlord's property manager is West Group Real Estate LLC, which manager has an office at 5507 Ranch Drive, Suite 201, Little Rock, Arkansas 72223, Jill Bryant (**"*Bryant*"**) is the contact person for such property manager and can be reached at 501-868-9790; and (ii) CJ Cropper (**"*Cropper*"**) of Crest Realty Advisors is a member of Landlord and Cropper holds an active real estate broker license but is representing only himself and acting for his own benefit in this transaction. The foregoing disclosure is included herein solely for the purpose of complying with Sections 10.11 and 10.20 of the Real Estate Regulations and shall not in any manner affect the parties' respective obligations, rights, and remedies under the Lease (including, without limitation Section 26 of the Lease).

      3.      Bryant is hereby executing this Modification, as attorney in fact for Bernard E. Kaiser III, President of CPPWG Inc., as managing member of Landlord. Bryant, on behalf of herself and Landlord, hereby represents and warrants to Tenant that: (i) she has the full right, power, legal capacity and authority to execute, deliver and perform this Modification on behalf of Landlord; (ii) all consents required as a condition to the executing party's authority (on behalf of Landlord) to execute, deliver and perform this Modification have been obtained, and (iii) this Modification and all documents to be executed pursuant hereto by Bryant are and shall be binding upon and enforceable against Landlord in accordance with their respective terms.

DocuSign Envelope ID: FE295508-8B88-44D8-91CL-1BD5BD405746

0228 (Little Rock, AR)

## FOURTH AMENDMENT TO LEASE AGREEMENT

THIS FOURTH AMENDMENT TO LEASE ("*Fourth Amendment*"), dated as of the **17th** day of **November** 2022 ("*Effective Date*") by and between CHENAL PLACE PROPERTIES, LLC, an Arkansas limited liability company ("*Landlord*"), having an office at 5507 Ranch Drive, Suite 201, Little Rock, Arkansas 72223 and BED BATH & BEYOND INC., a New York corporation ("*Tenant*"), having an office at 650 Liberty Avenue, Union, New Jersey 07083.

## W I T N E S S E T H :

WHEREAS, Landlord, as successor-in-interest to West Group, LLC, and Tenant are parties to that certain Lease Agreement dated as of November 18, 1998 (as amended by a Rent Commencement and Expiration Date Agreement dated August 13, 1999, a First Amendment to Lease dated as of June 16, 1999, a Second Amendment to Lease dated as of August 1, 2009, a Third Amendment to Lease dated as of July 10, 2019, and as further amended by various letter agreements, collectively, the "*Lease*"), with respect to premises ("*Premises*") located at Chenal Place in Little Rock, Arkansas ("*Shopping Center*"); and

WHEREAS, Landlord and Tenant desire to modify the Lease on the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual covenants and promises set forth in this Amendment and other valuable consideration, receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.      The recitals hereinabove set forth are incorporated into this Amendment by this reference.  Capitalized terms used, but not defined herein, shall have the meanings ascribed them in the Lease.

2.      Notwithstanding anything contained in the Lease to the contrary, Landlord and Tenant hereby agree that the Lease shall be amended as follows:

3.      Landlord and Tenant acknowledge that the current Term of the Lease will expire on January 31, 2025. The Term of the Lease is hereby extended for a period of two (2) years, commencing on February 1, 2025, and expiring on January 31, 2027 (the "*Extended Term*").

4.      Landlord and Tenant agree that all three (3) of the remaining Renewal Options set forth in Section 46 of the Lease, as modified by the Third Amendment to Lease dated July 10, 2019 (collectively, the "*Renewal Options*") of the Lease shall remain in full force and effect and subject to the Fixed Rent set forth in the Lease, except that the Renewal Options, if exercised, shall run from February 1, 2027 through and including January 31, 2032 for the first Renewal Period, from February 1, 2032 through and including January 31, 2037 for the second Renewal Period, and from February 1, 2037 through and including January 31, 2042. All of the provisions relating to the exercise of the Renewal Options in Section 46 shall remain in full force and effect.

5.      Notwithstanding any provision of the Lease to the contrary, for the period commencing on November 1, 2022 and ending on January 31, 2027, Tenant shall pay Rent at the rate of Three Hundred Ninety-Three Thousand Two Hundred Fifty-Five and 20/100 ($393,255.20) Dollars per year, payable in monthly installments of Thirty-Two Thousand Seven Hundred Seventy-One and 26/100 ($32,771.26) Dollars [based on Ten and 40/100 ($10.40) Dollars per square foot of Floor Area in the Premises]. Landlord shall provide a credit to Tenant for any overpayment of Rent paid by Tenant, to the extent paid at a higher rate.

6.      Notwithstanding the prohibitions set forth in Section 7(b) of the Lease prohibiting "medical offices and/or clinics", Tenant hereby consents to Landlord leasing no more than ten thousand (10,000) square feet of Floor Area in the aggregate within the Shopping Center, provided such business is located at least two hundred (200) feet from the Premises measured from the farthest eastern edge of the main Premises entry doors as located on the date of this Agreement to the farthest edge of the location of the main entry doors of any such business, and provided such business is not located directly adjacent to the Premises, operated in a manner consistent with first-

DocuSign Envelope ID: FE29550B-8B88-44D8-91CC-15DF8D406746

class shopping centers in the State of Arkansas, and in compliance with other provisions of the Lease. **Tenant's consent hereunder does not constitute an approval or waiver of any other provision under the Lease and Landlord shall be obligated to obtain Tenant's consent in all other instances required under the Lease.**

7.     Landlord hereby represents and warrants that as of the date hereof, there is no existing monetary default by Tenant, including all late fees, interest charges, attorneys' fees or other charges associated with or resulting from any such monetary default.

8.     It is the policy of Tenant (together with its subsidiaries and affiliates, collectively, the **"Company"**) to conduct all its business transactions in accordance with the highest ethical standards and all applicable laws (including but not limited to the U.S. Foreign Corrupt Practices Act). Landlord shall not, directly or indirectly, solicit or accept from, nor offer, promise or pay any individual or entity (including, but not limited, to any government official) any bribe, kickback or any other improper payment of money or anything else of value. This includes, but is not limited to, any improper payment in exchange for the Company's execution of this Amendment. Landlord will also require any subcontractor (of any level) to adhere to the same standards, and will appropriately monitor its subcontractors to ensure such adherence. In addition, any individual who is employed by or who represents the Company is prohibited from soliciting, accepting, offering, promising or paying any bribe, kickback or any other improper payment of money or anything else of value. If any such improper actions are observed, Landlord shall inform the Company's Legal Department (Attention: General Counsel) by (i) notice to the address set forth in the Lease, as amended hereby or (ii) by telephoning 908-688-0888.

9.     Landlord and Tenant each warrant and represent to the other that they did not deal with any real estate broker in connection with the negotiation, execution and delivery of this Amendment. Each party agrees to indemnify, defend, and save the other harmless from and against any and all liabilities, costs, causes of action, damages and expenses, including, without limitation, attorneys' fees, with respect to or arising out of any claims made by any real estate broker, agent or finder with respect to this Amendment in breach of the foregoing representation or claiming to have worked with the indemnifying party in connection with the Lease. The provisions of this Section shall survive the expiration or earlier termination of the Lease.

10.     Each party represents and warrants to the other that, as of the date hereof, no third-party consents or approvals are required in order for the terms and provisions of this Amendment to be in full force and effect, except for the consent of Starwood Mortgage, via its servicer Wells Fargo Commercial Mortgage, which consent is appended hereto.

11.     Landlord hereby makes the following disclosures solely for the purpose of complying with Sections 10.11 and 10.20 of the Arkansas Real Estate Commission, Real Estate Regulations, Time-Share Regulations and Federal Fair Housing Summary (January 2018) (**"Real Estate Regulations"**): (i) Landlord's property manager is West Group Real Estate LLC, which manager has an office at 5507 Ranch Drive, Suite 201, Little Rock, Arkansas 72223, Jill Bryant (**"Bryant"**) is the contact person for such property manager and can be reached at 501-868-9790; and (ii) CJ Cropper (**"Cropper"**) of Crest Realty Advisors is a member of Landlord and Cropper holds an active real estate broker license but is representing only himself and acting for his own benefit in this transaction. The foregoing disclosure is included herein solely for the purpose of complying with Sections 10.11 and 10.20 of the Real Estate Regulations and shall not in any manner affect the parties' respective obligations, rights, and remedies under the Lease (including, without limitation Section 26 of the Lease).

12.     Bryant is hereby executing this Amendment, as attorney in fact for Bernard E. Kaiser III, President of CPPWG Inc., as managing member of Landlord. Bryant, on behalf of herself and Landlord, hereby represents and warrants to Tenant that: (i) she has the full right, power, legal capacity and authority to execute, deliver and perform this Amendment on behalf of Landlord; (ii) all consents required as a condition to the executing party's authority (on behalf of Landlord) to execute, deliver and perform this Amendment have been obtained, and (iii) this Amendment and all documents to be executed pursuant hereto by Bryant are and shall be binding upon and enforceable against Landlord in accordance with their respective terms.

12.     This Amendment may be executed electronically and in one or more counterparts,

DocuSign Envelope ID: FE29550B-8B88-44D8-81C2-13DF2D406746

0228 (Little Rock, AR)

each of which shall be an original for all purposes, but all of which taken together shall constitute only one Amendment to Lease.  The execution and transmission of an image of any signed document or document signed by DocuSign (or a similar application) will have the same binding effect as an original bearing an original signature.  No party may raise the use of an image transmission device or method or the fact that any signature was transmitted as an image as a defense to the enforcement of such document.

[Signature Page to Follow]

IN WITNESS WHEREOF, the parties hereto have executed this Lease Amendment as of the day and year first above written.

**LANDLORD**:

CHENAL PLACE PROPERTIES, L.L.C.,
an Arkansas limited liability company

By: _____

Name: Bernard E. Kaiser by Jill R. Bryant as attorney
in fact

Title: President-CPPWG Inc. Managing Member of
Chenal Place Properties LLC

**TENANT**:

BED BATH & BEYOND INC.,
a New York corporation

By: _____

Name: Wade Haddad

Title: SVP. Real Estate & Store Development



VIA ELECTRONIC MAIL


12/28/2022                                                                              REVISED


BOWMAN STATION PROPERTIES, LLC. and CHENAL PLACE PROPERTIES, LLC.
5507 Ranch Drive, Suite 201
Little Rock, AR. 72223


Attention:    Jill Bryant


Re:    Loan ('Loan') made to BOWMAN STATION PROPERTIES, LLC. and CHENAL PLACE PROPERTIES, LLC.
('Borrower'), evidenced by a Note in the original principal amount of $21,675,000, dated 03/10/2015
('Note'), now held by Wilmington Trust, National Association, as Trustee for Morgan Stanley Bank of
America Merrill Lynch Trust 2015-C22, Commercial Mortgage Pass-Through Certificates, Series 2015-C22
('Lender') and serviced by LNR Partners, LLC. ('Special Servicer'), and secured by a Mortgage or Deed of
Trust ('Mortgage') of properties known as Bowman Station Shopping Center, located at 801 and 1001
South Bowman Road Little Rock, AR. 72211 and Chenal Place Shopping Center, located at 12305-12319
Chenal Parkway Little Rock, AR. 72211 ('Property'), and certain other documents (collectively, 'Loan
Documents') / Loan No.: M695100469 / Reference No.: NT56003 / Request for approval of proposed
Fourth  Amendment to Lease Agreement ('Lease') between Borrower and Bed Bath & Beyond, Inc.
('Tenant') (hereinafter referred to as the 'Request').


Dear Borrower:

Special Servicer, on behalf of Lender, has reviewed your above referenced Request. On behalf of the Lender, we hereby
consent to the Lease and the related terms and conditions thereof in the form and substance of the copy of said
agreement(s) attached hereto, subject to the conditions set forth below:


1) Borrower has represented that the costs for tenant improvements will be $0 and the leasing commission expense
will also be $0. Accordingly, no funds shall be released from Lender held Reserves in connection with this Request;

2) Borrower appears to have entered into this Lease without obtaining pre-approval of Lender, as required under the
Loan Documents. By retroactively approving this Request, Lender is not waiving any of Lender's rights to strictly enforce
all the terms of the Loan Documents;

3) Notwithstanding any other provision contained herein, Lender does not consent to any provision whatsoever in the
Lease allowing or providing for any right or option to Tenant, any affiliate of Tenant or any successor or assignee of
Tenant to purchase, in whole or in part, either the Property or the Loan and neither Lender nor any assignee of or
successor to Lender shall be bound in any way by any such right or option;

4) Notwithstanding approval of this Request, Lender is not waiving Borrower's obligations to meet all Loan requirements;

Neither such approval nor any discussions by Lender or Special Servicer with Borrower or its representatives constitutes (a) a waiver by Lender or Special Servicer of any default by Borrower under the Loan Documents, (b) a waiver, modification, relinquishment or forbearance by Lender or Special Servicer of any right or remedy under the Loan Documents or under law, all of which are reserved by Lender and Special Servicer, (c) a modification of any of the Loan Documents, or (d) an agreement by Lender or Special Servicer to grant further approvals, or to take other action in addition or similar to the action specified herein or to continue discussions with Borrower.

Should you have any questions, please feel free to contact Guillermo Patino at: (305) 695-5835.

Sincerely,

By:   _Tiffany Kobrin_

Name:      Tiffany Kobrin
Title:      Senior Associate

cc:      Wells Fargo Bank, N.A.
         LNR Partners, LLC / Document Library

**Chenal Place Properties LLC**
**Chenal Place Shopping Center**

5507 Ranch Dr Ste 201
Little Rock, AR 72223

501-868-9790

# Statement

| Billing Period | Statement Date |
|---|---|
| 10/01/22  -  04/23/23 | 04/23/23 |

| Property | Unit | Type | Acc # |
|---|---|---|---|
| CP | 12309-A | Retail | 3 |

**TO:**

Bed Bath & Beyond Store 228
Emily Ortiz
650 Liberty Ave Union NJ  07083

‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖

PLEASE RETURN TOP PORTION WITH YOUR REMITTANCE

-------------------------------------------------------------------

| Date | Reference | Description | | Amount | Running Bal. |
|---|---|---|---|---|---|
| | | Previous Balance | | 0.00 | 0.00 |
| 10/01/22 | 60742 | Payment Received | 10/22 payment | -38,993.82 | -38,993.82 |
| 10/01/22 | IV# 3 | Common Area Maint | Common Area Maintenance    CAM-Admin | 2,204.00 | -36,789.82 |
| 10/01/22 | IV# 3 | Property Insur. Reimb | Insurance Reimbursement    Insurance Rein | 1,125.00 | -35,664.82 |
| 10/01/22 | IV# 3 | Rent Charge | Rent Charge    10/22 | 33,716.59 | -1,948.23 |
| 11/01/22 | IV# 162 | Common Area Maint | Common Area Maintenance    CAM-Admin | 2,204.00 | 255.77 |
| 11/01/22 | IV# 162 | Property Insur. Reimb | Insurance Reimbursement    Insurance Rein | 1,125.00 | 1,380.77 |
| 11/01/22 | IV# 162 | Rent Charge | Rent Charge    Rent to 1/31/25 | 32,771.26 | 34,152.03 |
| 11/02/22 | ach1122 | Payment Received | 11/22 no email | -37,045.59 | -2,893.56 |
| 12/01/22 | 67529 | Payment Received | 12/22 payment | -37,045.59 | -39,939.15 |
| 12/01/22 | IV# 320 | Common Area Maint | Common Area Maintenance    CAM-Admin | 2,204.00 | -37,735.15 |
| 12/01/22 | IV# 320 | Property Insur. Reimb | Insurance Reimbursement    Insurance Rein | 1,125.00 | -36,610.15 |
| 12/01/22 | IV# 320 | Rent Charge | Rent Charge    Rent | 32,771.26 | -3,838.89 |
| 01/01/23 | IV# 466 | Common Area Maint | Common Area Maintenance    CAM-Admin | 2,293.00 | -1,545.89 |
| 01/01/23 | IV# 466 | Property Insur. Reimb | Insurance Reimbursement    Insurance Rein | 1,255.00 | -290.89 |
| 01/01/23 | IV# 466 | Rent Charge | Rent Charge    Rent | 32,771.26 | 32,480.37 |
| 01/01/23 | 71811 | Payment Received | 1/23 payment | -37,045.59 | -4,565.22 |
| 02/01/23 | IV# 608 | Common Area Maint | Common Area Maintenance    CAM-Admin | 2,293.00 | -2,272.22 |
| 02/01/23 | IV# 608 | Property Insur. Reimb | Insurance Reimbursement    Insurance Rein | 1,255.00 | -1,017.22 |
| 02/01/23 | IV# 608 | Rent Charge | Rent Charge    Rent | 32,771.26 | 31,754.04 |
| 02/08/23 | IV# 744 | Leasing Fee Reimb by Ten: | 2426-09651M Bed Bath & Beyond lean reviev | 357.50 | 32,111.54 |
| 02/09/23 | ach73424-111702 | Payment Received | 2/23 paid | -37,045.59 | -4,934.05 |
| 03/01/23 | IV# 758 | Common Area Maint | Common Area Maint    CAM-Admin Fee as | 2,293.00 | -2,641.05 |
| 03/01/23 | IV# 758 | Property Insur. Reimb | Property Insur. Reimb    Insurance Reimb a: | 1,255.00 | -1,386.05 |
| 03/01/23 | IV# 758 | Rent Charge | Rent Charge    Rent | 32,771.26 | 31,385.21 |
| 03/01/23 | Tax22 | RE Tax Reimb | Tax22 Reimb | 79,784.22 | 111,169.43 |
| 03/01/23 | CAM Rec 2022 | CAM - Reconciliation | CAM Rec 2022 | 3,613.61 | 114,783.04 |
| 03/09/23 | 75089 | Payment Received | 3/23 Payment | -37,045.59 | 77,737.45 |
| 03/15/23 | 75687 | Payment Received | 2022 tax reimb | -79,784.22 | -2,046.77 |
| 04/01/23 | IV# 926 | Common Area Maint | Common Area Maint    CAM-Admin Fee as | 2,293.00 | 246.23 |
| 04/01/23 | IV# 926 | Property Insur. Reimb | Property Insur. Reimb    Insurance Reimb as | 1,255.00 | 1,501.23 |
| 04/01/23 | IV# 926 | Rent Charge | Rent Charge    Rent | 32,771.26 | 34,272.49 |
| 04/19/23 | ach77103 | Payment Received | 4/23 rent paid | -37,045.59 | -2,773.10 |

EXHIBIT

**B**

## CHAMBERLAIN, HRDLICKA, WHITE, WILLIAMS & AUGHTRY, P.C.

### A PARTNERSHIP OF PROFESSIONAL CORPORATIONS
#### ATTORNEYS AT LAW

CHADD L. REYNOLDS
ASSOCIATE
DIRECT: 404.658.5454
CHADD.REYNOLDS@CHAMBERLAINLAW.COM

191 PEACHTREE STREET, N.E.
FORTY SIXTH FLOOR
ATLANTA, GEORGIA  30303
404.659.1410      800-800-0745
FAX: 404.659.1852

ATLANTA
HOUSTON
PHILADELPHIA
SAN ANTONIO

January 20, 2023

| **CERTIFIED MAIL** | **CERTIFIED MAIL** |
|---|---|
| **RETURN RECEIPT REQUESTED** | **RETURN RECEIPT REQUESTED** |
| 9314 8699 0430 0103 5274 77 | 9314 8699 0430 0103 5276 51 |
| Chenal Place Properties LLC | Bed Bath & Beyond, Inc. |
| c/o Jill R. Bryant | c/o C T Corporation System |
| 5507 Ranch Dr., Ste. 201 | 124 West Capitol Avenue, Ste. 1900 |
| Little Rock, AR 72223 | Little Rock, AR 72201 |

Re:    Place Services, Inc.'s Claim of Lien filed on 12309 Chenal Parkway, Suite A, Little
Rock, AR 72211, Pulaski County.

To Whomever:

Enclosed please find for your records a Claim of Lien, which has been filed with the Pulaski
County Clerk of Court in Arkansas.

Sincerely,

*/s/ Chadd L. Reynolds*
Chadd L. Reynolds

Enclosure

**EXHIBIT**

**C**

**2023003881**
**PULASKI CO. AR FEE $50.00**
**PRESENTED**
**1/19/2023 8:02:05 AM**
**RECORDED**
**01/19/2023 02:52:41 PM**
TERRI HOLLINGSWORTH
Circuit / County Clerk
BY: RUTHIE WATSON
DEPUTY RECORDER

Prepared by and after filing, please return to:
Chadd L. Reynolds, Esq.
Chamberlain, Hrdlicka, White, Williams & Aughtry
191 Peachtree Street, NE
46th Floor
Atlanta, GA 30303

## VERIFICATION OF ACCOUNT
## AND CLAIM OF LIEN

TO: Clerk of the Circuit Court of Pulaski County

FROM: Claimant: Place Services, Inc. 201 Gateway Drive, Canton Georgia 30115.

The undersigned, being duly sworn, states:

1.  The Claimant sold and delivered to Bed Bath & Beyond, Inc. the materials, or furnished the labor, listed and set forth in the statement of account which is attached hereto as Exhibit A and incorporated herein. The final delivery of such materials, or furnishing of said labor, occurred within the last 120 days.

2.  The attached statement of account is true and correct, and that there is now due and owing to Claimant, after allowing all credits, the sum of $44,202.21.

3.  The materials or labor were furnished for and used in the construction of the interior and exterior remodel of existing Bed Bath & Beyond which was constructed on the following-described property owned by Chenal Place Properties LLC as owner/lessor and Bed Bath & Beyond, Inc. as tenant/lessee in Pulaski County, Little Rock, Arkansas, more particularly described in Exhibit B which is incorporated herein.

4.  The Claimant claims a lien on the property described in paragraph 3, Exhibit B, to secure the sum of $44,202.21, plus attorney's fees and costs.

5.  An Affidavit of Notice reflecting that Claimant has complied with the applicable provisions of Ark. Code. Ann. §§ 18-44-144 through 18-44-116 by sending notices, copies of which are attached as Exhibit C and incorporated herein.

6.  That Todd Guthrie, the Chief Financial Officer of the Claimant, is authorized to release the lien.

This 18 day of January 2023.

**VERIFICATION**

I, Todd Guthrie, Chief Financial Officer of Place Services, Inc., a corporation, state under oath
that the information contained above and in the attached statement of account is true and correct
to the best of my knowledge and belief.

Place Services, Inc.

By: <u>Todd Guthrie</u>

Its: <u>Chief Financial Officer</u>

State of Georgia

County of Cherokee

Sworn to and subscribed before me this _18th_ day of January, 2023, by

Notary Public

My commission expires: _9/22/24_

<u>Exhibit "A"</u>

PAGE 1 OF 2

**TO OWNER:** Bed Bath and Beyond
650 Liberty Avenue
Union City, NJ 07083

**FROM CONTR** Place Services Incorporated
201 Gateway Drive
Canton, GA 30115

**PROJECT:**
Bed Bath & Beyond #228
12309 Chenal PKWY STE A
Little Rock, AR 72211

**APPLICATION #**
**PERIOD TO:** 12/22/22

**PROJECT NOS:** 0228000RT

Distribution to:

| | |
|---|---|
| x | OWNER |
| | CON MGR |
| X | CONTRACTOR |

2

### CONTRACTOR'S APPLICATION FOR PAYMENT
Application is made for payment, as shown below, in connection with the Contract.
Continuation Sheet, AIA Document G703, is attached.

| | | |
|---|---|---|
| 1. ORIGINAL CONTRACT SUM | $ | 162,222.00 |
| 2. Net change by Change Orders | $ | 27,980.01 |
| 3. CONTRACT SUM TO DATE (Line 1 ± 2) | $ | 190,202.01 |
| 4. TOTAL COMPLETED & STORED TO DATE (Column G on G703) | $ | 190,202.01 |
| 5. RETAINAGE: | | |
| a. 0% of Completed Work (Column D + E on G703) | $0.00 | |
| b. 0% of Stored Material (Column F on G703) | | |
| Total Retainage (Lines 5a + 5b or Total in Column I of G703) | $ | 0.00 |
| 6. TOTAL EARNED LESS RETAINAGE (Line 4 Less Line 5 Total) | $ | 190,202.01 |
| 7. LESS PREV PMNTS & CERT FOR PAYMENT | | 145,999.80 |
| 8. CURRENT TOTAL PAYMENT DUE | | 44,202.21 |
| 9. BALANCE TO FINISH, INCLUDING RETAINAGE (Line 3 less Line 6) | | 0.00 |

| CHANGE ORDER SUMMARY | ADDITIONS | DEDUCTIONS |
|---|---|---|
| Total changes approved in previous months by Owner | $ | $ - |
| Total approved this Month | 27,980.01 | $ - |
| TOTALS | $ 27,980.01 | $0.00 |
| NET CHANGES by Change Order | $ 27,980.01 | |

The undersigned Contractor certifies that to the best of the Contractor's knowledge, information and belief the Work covered by this Application for Payment has been completed in accordance with the Contract Documents, that all amounts have been paid by the Contractor for Work for which previous Certificates for Payment were issued and payments received from the Owner, and that current payment shown herein is now due.

By: _____ Date: 12/22/22

State of: GA County of: Cherokee

Subscribed and sworn to before me this 22 day of December, 2022.

Notary Public: _____

My Commission expires: May 20, 2023

### ARCHITECT'S CERTIFICATE FOR PAYMENT
In accordance with the Contract Documents, based on on-site observations and the data comprising the application, the Architect certifies to the Owner that to the best of the Architect's knowledge, information and belief the Work has progressed as indicated, that the quality of the Work is in accordance with the Contract Documents, and the Contractor is entitled to payment of the AMOUNT CERTIFIED.

AMOUNT CERTIFIED..........$ _____

(Attach explanation if amount certified differs from the amount applied. Initial all figures on this Application and on the Continuation Sheet that are changed to conform with the amount certified.)

ARCHITECT:

By: _____ Date: _____

This Certificate is not negotiable. The AMOUNT CERTIFIED is payable only to the Contractor named herein. Issuance, payment and acceptance of payment are without prejudice to any rights of the Owner or Contractor under this Contract.

# CONTINUATION SHEET

AIA DOCUMENT G703

AIA Document G702, APPLICATION AND CERTIFICATION FOR PAYMENT, containing
Contractor's signed certification is attached.
In tabulations below, amounts are stated to the nearest dollar.
Use Column I on Contracts where variable retainage for line items may apply.

PAGE 2 OF 2 PAGES

APPLICATION NO: 2
APPLICATION DATE:
PERIOD TO: 12/22/2022
PROJECT NO: 12/31/2022
0228000RT

| A ITEM NO. | B DESCRIPTION OF WORK | C SCHEDULED VALUE | D WORK COMPLETED FROM PREVIOUS APPLICATION (D + E) | E THIS PERIOD | F MATERIALS PRESENTLY STORED (NOT IN D OR E) | G TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G÷C) | H BALANCE TO FINISH (C - G) | I RETAINAGE (IF VARIABLE RATE) |
|---|---|---|---|---|---|---|---|---|---|
| | General Requirements | $31,919.00 | $31,919.00 | $0.00 | | $31,919.00 | 100.00% | $0.00 | $0.00 |
| | Sitework | $1,800.00 | $1,800.00 | $0.00 | | $1,800.00 | 100.00% | $0.00 | $0.00 |
| | Wood & Plastics | $4,525.00 | $4,525.00 | $0.00 | | $4,525.00 | 100.00% | $0.00 | $0.00 |
| | Doors & Windows | $3,073.00 | $3,073.00 | $0.00 | | $3,073.00 | 100.00% | $0.00 | $0.00 |
| | Finishes | $18,730.00 | $18,730.00 | $0.00 | | $18,730.00 | 100.00% | $0.00 | $0.00 |
| | Specialties | $9,000.00 | $9,000.00 | $0.00 | | $9,000.00 | 100.00% | $0.00 | $0.00 |
| | Electrical | $52,800.00 | $52,800.00 | $0.00 | | $52,800.00 | 100.00% | $0.00 | $0.00 |
| | Overhead & Profit | $17,058.00 | $17,058.00 | $0.00 | | $17,058.00 | 100.00% | $0.00 | $0.00 |
| | Alternate #1 | $14,781.00 | $14,781.00 | $0.00 | | $14,781.00 | 100.00% | $0.00 | $0.00 |
| | Alternate #2 | $8,556.00 | $8,556.00 | $0.00 | | $8,556.00 | 100.00% | $0.00 | $0.00 |
| | CO1 | $18,649.62 | | $18,649.62 | | $18,649.62 | | $0.00 | $0.00 |
| | CO2 | $9,330.39 | | $9,330.39 | | $9,330.39 | | $0.00 | $0.00 |
| | | | | | | | | $0.00 | $0.00 |
| | | | | | | | | $0.00 | $0.00 |
| | | | | | | | | $0.00 | $0.00 |
| | | | | | | | | $0.00 | $0.00 |
| | | | | | | | | $0.00 | $0.00 |
| | | | | | | | | $0.00 | $0.00 |
| | | | | | | | | $0.00 | $0.00 |
| | | | | | | | | $0.00 | $0.00 |
| | | | | | | | | $0.00 | $0.00 |
| | | | | | | | | $0.00 | $0.00 |
| | | | | | | | | $0.00 | $0.00 |
| | | | | | | | | $0.00 | $0.00 |
| | | | | | | | | $0.00 | $0.00 |
| | | | | | | | | $0.00 | $0.00 |
| | | | | | | | | $0.00 | $0.00 |
| | | | | | | | | $0.00 | $0.00 |
| | | | | | | | | $0.00 | $0.00 |
| | GRAND TOTALS | $190,202.01 | $162,222.00 | $27,980.01 | $0.00 | $190,202.01 | 100.00% | $0.00 | $0.00 |

Users may obtain validation of this document by requesting of the license a completed AIA Document D401 - Certification of Document's Authenticity

Exhibit "B"

DESCRIPTION OF REAL PROPERTY

PART OF THE SE 1/4 NE 1/4, SECTION 5, T-1-N, R-13-W, PULASKI COUNTY, ARKANSAS MORE PARTICULARLY DESCRIBED AS:
STARTING AT THE SOUTHWEST CORNER OF SAID SE 1/4 NE 1/4 ; THENCE S 87° 11'00" E, 30.00 FT. TO THE NORTHWEST CORNER OF LOT 1, TIMBER RIDGE, AN ADDITION TO THE CITY OF LITTLE ROCK, ARKANSAS AND THE POINT OF BEGINNING; THENCE N 01° 04' 29" E ALONG A LINE 30.00 FT. EAST OF AND PARALLEL WITH THE WEST LINE OF SAID SE 1/4 NE 1/4, 576.48 FT. TO A POINT ON THE SOUTH LINE OF LOT 1, CHENAL BUSINESS ADDITION TO THE CITY OF LITTLE ROCK, ARKANSAS; THENCE S 87° 14' 17" E ALONG SAID SOUTH LINE, 335.27 FT.; THENCE N 47° 50' 12" E AND CONTINUING ALONG SAID SOUTH LINE, 10.61 FT.; THENCE S 87° 09' 44" E AND CONTINUING ALONG SAID SOUTH LINE 306.21 FT.; THENCE S 02° 55' 15" W, 286.16 FT.; THENCE NORTHEASTERLY ALONG THE ARC OF A 261.48 FT. RADIUS CURVE TO THE LEFT, A CHORD BEARING AND DISTANCE OF N 70° 20' 20" E, 119.14 FT.; THENCE N 57° 10'21" E, 100.00 FT.; THENCE N 14° 13' 46" E, 72.04 FT. TO A POINT ON THE WEST RIGHT-OF-WAY LINE OF CHENAL PARKWAY; THENCE S 29° 21' 06" E ALONG SAID WEST RIGHT-OF-WAY LINE, 169.72 FT. THENCE SOUTHEASTERLY AND CONTINUING ALONG SAID WEST RIGHT-OF-WAY LINE, BEING THE ARC OF A 1482.39 FT. RADIUS CURVE TO THE LEFT, A CHORD BEARING AND DISTANCE OF S 29° 24' 15" E, 2.74 FT.; THENCE S 59° 33' 36" W, 21.89 FT.; THENCE N 30° 26' 24" W, 28.25 FT.; THENCE N 75°26' 24" W, 59.68 FT.; THENCE S 57° 10'21" W, 81.19 FT.; THENCE SOUTHWESTERLY ALONG THE ARC OF A 311.48 FT. RADIUS CURVE TO THE RIGHT, A CHORD BEARING AND DISTANCE OF S 61° 34' 05" W, 47.77 FT.; THENCE S 42° 33' 56" E, 106.62 FT.; THENCE S 02° 55' 15" W, 203.00 FT. TO A POINT ON THE NORTH LINE OF SAID TIMBER RIDGE; THENCE N 87° 11' 00" W ALONG SAID NORTH LINE 804.85 FT. TO THE POINT OF BEGINNING, CONTAINING 9.9373 ACRES MORE OR LESS.

## Exhibit C

### AFFIDAVIT OF NOTICE

The undersigned states on oath and affirms that he served the within Notices, in accordance with the applicable provisions of Ark. Code. Ann. §§ 18-44-144 through 18-44-116, on the following entities:

Via U.S. Certified Mail, Return Receipt Requested # 9314 8699 0430 0103 0738 51
Chenal Place Properties LLC
c/o Jill R. Bryant
5507 Ranch Dr., Ste. 201
Little Rock, AR 72223

Via U.S. Certified Mail, Return Receipt Requested # 9314 8699 0430 0103 0736 84
Bed Bath & Beyond, Inc.
c/o C T Corporation System
124 West Capitol Avenue, Ste. 1900
Little Rock, AR 72201

On January 9, 2023.

Chadd L. Reynolds
Chamberlain, Hrdlicka, White, Williams & Augtry, P.C.
191 Peachtree Street, N.E.
Forty-Sixth Floor
Atlanta, GA 30303
*Attorney-in-fact for Place Services, Inc.*

State of Georgia

County of Fulton

Sworn to and subscribed before me this 18th day of January, 2023, by

Marie-Annick Dyemma
Notary Public

My commission expires: January 4, 2026

Marie-Annick Dyemma
NOTARY PUBLIC
Cobb County, GEORGIA

## CHAMBERLAIN, HRDLICKA, WHITE, WILLIAMS & AUGHTRY, P.C.

### ATTORNEYS AT LAW

GINA M. VITIELLO
SHAREHOLDER
DIRECT: 404.588.3426
GINA.VITIELLO@CHAMBERLAINLAW.COM

191 PEACHTREE STREET, N.E.
FORTY SIXTH FLOOR
ATLANTA, GEORGIA 30303
404.659.1410
FAX: 404.659.1852

ATLANTA
HOUSTON
PHILADELPHIA
SAN ANTONIO

January 9, 2022

*Certified Article Number*

*SENDER'S RECORD*

**VIA Certified Mail, Return Receipt Requested No.**
Bed Bath & Beyond, Inc.
c/o C T Corporation System
124 West Capitol Avenue, Ste. 1900
Little Rock, AR 72201

*Certified Article Number*

*SENDER'S RECORD*

**VIA Certified Mail, Return Receipt Requested No.**
Chenal Place Properties LLC
c/o Jill R. Bryant
5507 Ranch Dr., Ste. 201
Little Rock, AR 72223

Re:   **NOTICE OF INTENT TO FILE A LIEN CLAIM (ARK. CODE ANN. § 18-44-114)**
12309 Chenal Parkway, Suite A, Little Rock, AR 72211 (the "Property")

To:   Owner/Lessor: Chenal Place Properties LLC

Owner/Lessee: Bed Bath & Beyond, Inc.

From:  Claimant:    Place Services, Inc.
201 Gateway Drive
Canton, GA 30115

This firm represents Place Services, Inc. ("Claimant") in connection with the above-referenced Property.

PLEASE TAKE NOTICE that Claimant holds a claim against the building or improvement located at 12309 Chenal Parkway, Suite A, Little Rock, AR 72211 in the amount of $190,202.01. This amount is owed by Bed Bath & Beyond, Inc. and was incurred in connection with Claimant's providing certain labor, services, equipment or materials for the building or improvements.

PLEASE ALSO TAKE NOTICE that if this claim is not paid within 10 days of the date of this notice, Claimant intends to file a lien against the Property. If this claim is not paid within 20 days of the date of this notice, and Claimant is required to sue for enforcement of the claim, Claimant will be entitled to a reasonable attorney's fee in addition to other relief.

Sincerely,

Gina M. Vitiello

cc:   Jeff Amason (via email)

**SENDER: COMPLETE THIS SECTION**

- ■ Complete items 1, 2, and 3.
- ■ Print your name and address on the reverse so that we can return the card to you.
- ■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Bed Bath +Beyond Inc
650 Liberty Ave.
Union, NJ 07083
Attn = David Kastin

9590 9402 7884 2234 2744 01

2. Article Number (Transfer from service label)

7021 2720 0001 7398 1789

PS Form 3811, July 2020 PSN 7530-02-000-9053

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _____    ☐ Agent
                    ☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery

D. Is delivery address different from Item 1?    ☐ Yes
   If YES, enter delivery address below:    ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery
(over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

Domestic Return Receipt

**EXHIBIT**

**D**

## Quattlebaum, Grooms & Tull PLLC
### A PROFESSIONAL LIMITED LIABILITY COMPANY
4100 Corporate Center Drive
Suite 310
Springdale, Arkansas 72762

Philip A. Elmore
pelmore@qgtlaw.com

(479) 444-5200
Writer's Direct Dial
(479) 444-5203
Writer's Direct Facsimile
(479) 444-5253

March 21, 2023

*__Via U.S. Certified Mail,__*
*__Return Receipt Requested__*

Bed Bath & Beyond Inc.
650 Liberty Avenue
Union, NJ 07083
Attn: David Kastin

Re:    Notice of Default and Demand for Cure under Lease Agreement dated November 18, 1998 (as amended, the "Lease") between Chenal Place Properties, LLC, successor-in-interest to West Group, LLC ("Landlord") and Bed Bath & Beyond Inc. ("Tenant") regarding Real Property Located at 12309 Chenal Parkway, Suite A, Little Rock, Arkansas 72211 ("Store 228").

Dear Mr. Kastin:

I am writing to you on behalf of my client Landlord concerning a materialmen's lien recorded on the above-referenced property by general contractor Place Services, Inc. ("PSI") as a result of being unpaid by Tenant in the amount of $44,202.21 for furnishing materials and/or providing labor used in the construction of the interior and exterior model of Store 228, an existing Bed Bath & Beyond store located on the property and leased to Tenant by Landlord pursuant to the Lease.

Landlord first received notice of PSI's recorded materialmen's lien on January 24, 2023, when PSI provided a copy to Landlord after the lien was recorded. Landlord immediately reached out to Tenant's corporate counsel Kathryn O'Connell and asked for an update on how Tenant planned on handling PSI's recorded lien and informed Ms. O'Connell that resolution of the lien dispute was critical. In response, Ms. O'Connell assured Landlord on January 26 that the $44,202.21 Tenant owed to PSI was "in process for payment." Landlord heard nothing further until January 30, when Tenant informed Landlord that a "missing invoice" had been uploaded to Tenant and that Tenant expected payment and a release of PSI's lien during the weekend of February 4-5, 2023.

Tenant never informed Landlord that the PSI lien had been discharged. On February 28, 2023, I emailed Ms. O'Connell directly and informed her that the lien remained recorded on the property and demanded Tenant have the PSI lien discharged by payment or bond by Tuesday, March 7. To date, PSI's lien has not been discharged.

Pursuant to Section 55 of the Lease, Tenant "**shall** discharge (either by payment or by filing of the necessary bond, or otherwise) **any** lien against the Premises and/or Landlord's interest therein, which may arise out of any payment due for, or purported to be due for, any labor, services, materials, supplies or equipment alleged to have been furnished to or for Tenant in, upon or about the Premises" within thirty (30) days after notice of the filing thereof. *See* Lease, at § 55 (emphasis added).

Landlord provided Tenant notice of PSI's lien in its email to Tenant's corporate counsel on January 24, 2023. Tenant failed to discharge the lien either through payment or bond within thirty days of its first receipt of notice from Landlord concerning PSI's lien. Pursuant to Section 18(a) of the Lease, an "Event of Default" by Tenant occurs when Tenant defaults on "any of the … covenants of this Lease on Tenant's part to be performed" and Tenant "does not cure such default on or before the thirtieth (30th) day after its receipt of written notice thereof from Landlord specifying the nature of such default." *See* Lease, at § 18(a). Upon an "Event of Default," Landlord shall have all remedies given to it at law or in equity, including (upon provision of at least five (5) days' notice to Tenant) termination of the Lease, termination of Tenant's right to possession, and re-entering the Premises and taking possession thereof. *See* Lease, at § 18(b)(ii). Landlord will also have the right to sue for and collect all damages to Landlord by reason of Tenant's default, including all costs Landlord incurs in removing and storing Tenant's or other occupant's property, the costs of repairs to the property, and all other reasonable expenses incurred by Landlord in enforcing or defending its rights and/or remedies under the Lease, including reasonable attorneys' fees. See Lease, at § 18(c).

This letter serves as Landlord's written notice that Tenant's failure to discharge the PSI lien by either payment or bond constitutes a default of Tenant's obligations under the Lease. Demand is hereby made that Landlord cure said default through discharge of the PSI lien within thirty (30) days from the date of Tenant's receipt of this written notice. If Tenant fails to discharge the PSI lien after its thirty (30) day cure period expires, Landlord will deem Tenant's failure to constitute an "Event of Default" under Section 18 of the Lease. Landlord will then exercise any and all remedies available to it under both the Lease and applicable law, including but not limited to terminating the Lease and instituting legal proceedings against Tenant to evict Tenant from the property and recover its damages incurred from Tenant's failure to discharge the PSI lien, which will include Landlord's costs and attorneys' fees.

Thank you for your prompt and immediate attention to this matter. I look forward to hearing from Tenant about how it plans to meet its contractual obligations and discharge the PSI lien.

Sincerely,

QUATTLEBAUM, GROOMS & TULL PLLC

Philip A. Elmore

PAE/ldh

2

cc:    Allan N. Rauch, Esq. (c/o Bed Bath & Beyond Inc., 650 Liberty Ave., Union, NJ 07083)
Edward M. Schotz, Esq. (c/o Cole Schotz, PC, P.O. Box 800, Hackensack, NJ 07602)
Kathryn O'Connell, Esq. (via email only)

3