# Exhibit A

# LEASE AGREEMENT

**Between**

## ROCKWALL CROSSING, LTD.,

**a Texas limited partnership,**

**Landlord**

**and**

## BED BATH & BEYOND INC.,

**a New York corporation,**

**Tenant**

**ROCKWALL MARKETPLACE**

**ROCKWALL, TX**

Dated: ~~August~~ September 3 , 2004

## TABLE OF CONTENTS

ARTICLE 1 BASIC TERMS AND DEFINITIONS .................................................. 2
    Section 1.1    Basic Terms and Definitions................................................. 2
ARTICLE 2 ............................................................................................................... 6
    Section 2.1    Lease of Premises. ................................................................ 6
    Section 2.2    Term. .................................................................................... 6
    Section 2.3    Delivery Date. ...................................................................... 7
    Section 2.4    Unseasonable Delivery: Slack Period. .................................. 9
    Section 2.5    Initial Co-Tenancy Condition. ............................................. 9
ARTICLE 3 IMPROVEMENTS ............................................................................ 10
    Section 3.1    Landlord's Work and Tenant's Work. ................................ 10
    Section 3.2    Plan Approvals. .................................................................. 10
    Section 3.3    Performance of Work. ........................................................ 13
    Section 3.4    Measurement; Adjustment of Rent. .................................... 15
ARTICLE 4 FIXED RENT, TAXES & PERCENTAGE RENT: ............................. 16
    Section 4.1    Fixed Rent. ......................................................................... 16
    Section 4.2    Payment of Rent. ............................................................... 16
    Section 4.3    Real Estate and Other Taxes. ............................................. 16
    Section 4.4    Percentage Rent. ................................................................ 19
ARTICLE 5 COMMON AREAS, THEIR USE AND CHARGES ........................... 20
    Section 5.1    Common Areas: .................................................................. 20
    Section 5.2    Common Areas: Restrictions. ............................................. 24
ARTICLE 6 UTILITIES ........................................................................................ 27
    Section 6.1    Utility Service. ................................................................... 27
    Section 6.2    Interruption. ....................................................................... 27
ARTICLE 7 SIGNS ............................................................................................... 28
    Section 7.1    Tenant's Building Signage. ................................................. 28
    Section 7.2    Pylon/Monument Signage. ................................................. 28
    Section 7.3    Signage: Alteration/Removal/Allocation. ........................... 28
    Section 7.4    Cooperation. ....................................................................... 29
    Section 7.5    Signage Restrictions and Criteria....................................... 29
ARTICLE 8 ALTERATIONS AND IMPROVEMENTS ........................................ 29
    Section 8.1    Alterations and Improvements. .......................................... 29
ARTICLE 9 REPAIRS .......................................................................................... 31
    Section 9.1    Tenant's Repairs. ............................................................... 31
    Section 9.2    Landlord's Repairs. ............................................................ 31
    Section 9.3    Legal Compliance Work. .................................................... 32
ARTICLE 10 INDEMNIFICATION, INSURANCE AND WAIVER OF SUBROGATION .... 33
    Section 10.1    Mutual Release, Waiver of Subrogation and Mutual Indemnification. ........ 33
    Section 10.2    Tenant's Insurance. ............................................................ 33
    Section 10.3    Landlord's Insurance. ......................................................... 34
    Section 10.4    General Insurance Requirements. ....................................... 35
ARTICLE 11 FIRE AND OTHER CASUALTY; EMINENT DOMAIN .................. 35
    Section 11.1    Fire and Other Casualty. .................................................... 35
    Section 11.2    Eminent Domain. ............................................................... 39
    Section 11.3    Abatement of Rent Charges. ............................................... 40
ARTICLE 12 COVENANTS, REPRESENTATIONS AND WARRANTIES .......... 40
    Section 12.1    Quiet Enjoyment. ............................................................... 40
    Section 12.2    Authority. ........................................................................... 40
    Section 12.3    Landlord's Covenants, Warranties and Representations. ............. 41
    Section 12.4    Environmental Matters....................................................... 42
    Section 12.5    OEA. .................................................................................. 44
ARTICLE 13 USES AND RESTRICTIONS .......................................................... 45
    Section 13.1    Permitted and Prohibited Uses. .......................................... 45
    Section 13.2    Tenant's Exclusive in Center. ............................................ 46
    Section 13.3    Exclusives Which Tenant Must Honor. .............................. 48
ARTICLE 14 CONDUCT OF BUSINESS OPERATIONS ...................................... 48
ARTICLE 15 TENANT ASSIGNMENT AND SUBLETTING................................ 49
    Section 15.1    Assignment and Subletting. ............................................... 49
    Section 15.2    Liability of Tenant. ............................................................ 50
    Section 15.3    Collateral Assignment........................................................ 50

-i-

Section 15.4     Cure Rights of Original Tenant............................................................... 51
Section 15.5     Recognition Agreement. ....................................................................... 51
ARTICLE 16 DEFAULT AND DISPUTE RESOLUTION ........................................... 51
Section 16.1     Tenant Default. ..................................................................................... 51
Section 16.2     Arbitration............................................................................................ 54
ARTICLE 17 RIGHT TO MORTGAGE AND NON-DISTURBANCE; ESTOPPEL
CERTIFICATE ............................................................................................................ 54
Section 17.1     Right to Mortgage and Non-Disturbance............................................ 54
Section 17.2     Estoppel Certificate.............................................................................. 55
Section 17.3     Existing Mortgages. ............................................................................. 55
ARTICLE 18 NOTICE ................................................................................................ 55
ARTICLE 19 TENANT'S PROPERTY ....................................................................... 56
ARTICLE 20 END OF TERM ..................................................................................... 56
Section 20.1     Surrender of Premises. ......................................................................... 56
Section 20.2     Hold Over.............................................................................................. 56
ARTICLE 21 TENANT'S RIGHT OF FIRST OFFER ............................................... 56
ARTICLE 22 ONGOING CO-TENANCY ................................................................. 57
ARTICLE 23 MISCELLANEOUS .............................................................................. 58
Section 23.1     Loading Facilities.................................................................................. 58
Section 23.2     Liens...................................................................................................... 58
Section 23.3     Broker's Commission. .......................................................................... 58
Section 23.4     Force Majeure. ...................................................................................... 58
Section 23.5     Consents. ............................................................................................... 58
Section 23.6     Costs...................................................................................................... 59
Section 23.7     Attorneys' Fees. .................................................................................... 59
Section 23.8     Survival of Obligations. ....................................................................... 59
Section 23.9     Non-Waiver........................................................................................... 59
Section 23.10    Rights Cumulative. ............................................................................... 59
Section 23.11    Definition of Landlord. ........................................................................ 59
Section 23.12    Successors and Assigns......................................................................... 59
Section 23.13    Limitation of Landlord's Liability........................................................ 59
Section 23.14    Limitation of Tenant's Liability............................................................ 60
Section 23.15    Joint and Several Liability. ................................................................... 60
Section 23.16    Severability. .......................................................................................... 60
Section 23.17    Grammatical Usages and Construction................................................. 60
Section 23.18    Table of Contents, Line Numbering and Paragraph Headings. ........... 60
Section 23.19    Definition of Hereunder, Herein, etc.. ................................................. 60
Section 23.20    Short Form Lease. ................................................................................. 60
Section 23.21    Entire Agreement and Modification. .................................................... 60
Section 23.22    No Joint Venture or Partnership Created by Lease................................ 60
Section 23.23    Tenant's Tradename............................................................................... 61
Section 23.24    Counterparts.......................................................................................... 61
Section 23.25    Waiver of Trial by Jury......................................................................... 61
Section 23.26    Governing Law. ..................................................................................... 61

# EXHIBITS

| Exhibit A | Legal Description of Shopping Center |
| Exhibit B | Site Plan |
| Exhibit C | Form of Rent Commencement and Expiration Date Agreement |
| Exhibit D | Specifications for Landlord's Work |
| Exhibit D-1 | Exterior Elevations of the Premises, and Sidewalk Plan |
| Exhibit D-2 | Exterior Elevations of the Shopping Center |
| Exhibit E | Permitted Encumbrances |
| Exhibit F | Tenant's Signage |
| Exhibit G | Form of Subordination, Non-Disturbance and Attornment Agreement |
| Exhibit H | Form of Subtenant Recognition Agreement |
| Exhibit I | Form of Delivery Date Notice |
| Exhibit J | Form of Delivery Date Certification |
| Exhibit K-1 | Existing Exclusives |
| Exhibit K-2 | Existing Leases |
| Exhibit L | [Intentionally Omitted] |
| Exhibit M | Prohibited Uses |

1                               LEASE AGREEMENT

2           THIS LEASE AGREEMENT (*"Lease"*) is entered into as of ~~August~~ *September* 3, 2004 by
3    and between ROCKWALL CROSSING, LTD., a Texas limited partnership, having an
4    office at 2100 W. 7th Street, Fort Worth, Texas 76107-2306 (*"Landlord"*), and BED
5    BATH & BEYOND INC., a New York corporation, having an office at 650 Liberty
6    Avenue, Union, New Jersey 07083 (*"Tenant"*).

7                               W I T N E S S E T H:
8
9                                   ARTICLE 1
10                      BASIC TERMS AND DEFINITIONS
11
12          Section 1.1      Basic Terms and Definitions. The following terms shall have
13   the meanings set forth in this Section 1.1 except as otherwise expressly provided herein.

14                  1.1.1     Additional Rent: Any monies which Tenant is required to pay to
15   Landlord under the terms and conditions of this Lease, other than Fixed Rent.
16                  1.1.2     Affiliate: A corporation, partnership, person or other entity
17   which is controlling, controlled by, or under common control with, Landlord or Tenant,
18   as the case may be. As used herein, "control" shall mean the possession, direct or
19   indirect, of the power to direct or cause the direction of the management and policies of a
20   person or entity, whether through the ownership of voting securities or rights, by contract,
21   or otherwise.

22                  1.1.3     Alternate Rent: Payment of Percentage Rent (except that for
23   purposes of this paragraph, the Percentage Multiple shall be deemed to be three percent
24   (3%), the Sales Break Point shall be deemed to be One ($1.00) Dollar and the Sales
25   Break Limit shall not apply), not to exceed fifty percent (50%) of the amount of Fixed
26   Rent which otherwise would have been payable during such period (the *"Cap"*).
27   Alternate Rent shall be payable, without prior notice or demand except as otherwise set
28   forth herein, within thirty (30) days after the end of the calendar month to which it
29   pertains. Alternate Rent payments shall be accompanied by a statement prepared by an
30   officer of Tenant setting forth the amount of "Gross Sales" (hereinafter defined in
31   Subsection 4.4.2) achieved during, and the amount of Alternate Rent payable for, such
32   month.

33                  1.1.4     Common Areas: All areas in the Shopping Center which are,
34   from time to time, available for the joint use and benefit of Tenant and other tenants and
35   occupants of the Shopping Center, and their respective employees, agents, subtenants,
36   concessionaires, licensees, customers and other invitees, including, but not limited to, any
37   and all parking areas, parking spaces, driveways, truck serviceways, passageways,
38   sidewalks, entrances, exits, lighting facilities, courts, landscaped areas, retention or
39   detention areas, and common utility lines.

40                  1.1.5     Common Areas Charges: As defined in Section 5.1 hereof.

41                  1.1.6     Delivery Date: As defined in Section 2.3 hereof.

42                  1.1.7     Effective Date: The date hereof.

43                  1.1.8     Event of Default: As defined in Section 16.1 hereof.

44                  1.1.9     Excused Periods: Periods during which Tenant's failure to
45   conduct the operations of its business or any other business: (x) resulted from alterations
46   or renovations being performed in and to the Premises provided Tenant proceeded to
47   complete the same with reasonable diligence and in good faith, (y) was caused by
48   damage or destruction, eminent domain proceedings or actions, or *Force Majeure*,
49   provided that to the extent Tenant had an obligation hereunder to take any action as a
50   consequence of any such event that Tenant proceeded to take such action in accordance

                                          2

1  herewith, or (z) was caused by any act or omission of Landlord, or its employees, agents,
2  or contractors.

3          1.1.10    Exhibits.  The exhibits listed in the Table of Contents annexed to
4  this Lease have been agreed to by the parties and attached hereto, it being the intention of
5  the parties that they shall become a binding part of this Lease as if fully set forth herein.

6          1.1.11    Fixed Rent:  The following amounts for the periods indicated (subject
7  to adjustment pursuant to Section 3.4 hereof):

8                  (a)    For the period commencing on the Rent Commencement Date
9  and ending on the last day of the "Initial Term" (defined in Subsection 1.1.43 below), at
10  the rate of Two Hundred Seven Thousand and 00/100 ($207,000.00) Dollars per year
11  [based on nine and 00/100 ($9.00) Dollars per square foot of Floor Area in the Premises];

12                  (b)    In the event Tenant exercises the first Renewal Option, for the
13  first five (5) year Renewal Period, at the rate of Two Hundred Eighteen Thousand Five
14  Hundred and 00/100 ($218,500.00) Dollars per year [based on Nine and 50/100 ($9.50)
15  Dollars per square foot of Floor Area in the Premises];

16                  (c)    In the event Tenant exercises the second Renewal Option, for
17  the second five (5) year Renewal Period, at the rate of Two Hundred Thirty Thousand
18  and 00/100 ($230,000.00) Dollars per year [based on Ten and 00/100 ($10.00) Dollars
19  per square foot of Floor Area in the Premises];

20                  (d)    In the event Tenant exercises the third Renewal Option, for
21  the third five (5) year Renewal Period, at the rate of Two Hundred Forty-One Thousand
22  Five Hundred and 00/100 ($241,500.00) Dollars per year [based on Ten and 50/100
23  ($10.50) Dollars per square foot of Floor Area in the Premises]; and

24                  (e)    In the event Tenant exercises the fourth Renewal Option, for
25  the fourth five (5) year Renewal Period, at the rate of Two Hundred Fifty-Three
26  Thousand and 00/100 ($253,000) Dollars per year [based on Eleven and 00/100 ($11.00)
27  Dollars per square foot of Floor Area in the Premises].

28  It is the intent of Landlord and Tenant that Fixed Rent shall be a so-called "gross rent"
29  inclusive of Taxes and Common Areas Charges (including, without limitation,
30  insurance), except that Tenant shall be responsible for Tenant's Pro Rata Share of the
31  increases in Taxes and Common Areas Charges (including, without limitation, insurance)
32  pursuant to Subsections 4.3.2(a) and 5.1.2(b), respectively.

33          1.1.12    Floor Area:  The actual number of square feet of space contained
34  on all floors within any particular building area(s) in the Shopping Center (including the
35  Premises) and, with respect to exterior areas, including all exterior areas leased to or
36  exclusively used by one or more tenants ("*Exterior Tenant Areas*") other than exterior
37  loading dock areas, trash compactor areas, and trash container areas and other than up to
38  an aggregate of 1,000 square feet of outdoor selling areas.  All measurements pursuant to
39  this Subsection shall be from the exterior of outside walls or store front and/or to the
40  centerline of any common walls, but in no event shall Floor Area within either the
41  Premises or the remainder of the Shopping Center include any non-selling or storage
42  space areas within any mezzanine, lower floor, second floor or, except as set forth above,
43  any exterior areas.

44          1.1.13    *Force Majeure*:  As defined in Section 23.4 hereof.

45          1.1.14    Ground Lessor:  The landlord under any existing or future ground
46  or underlying leases encumbering or affecting all or any part of the Shopping Center.

47          1.1.15    [Intentionally Omitted]

3

1                1.1.16    <u>Hazardous Substances</u>:  As defined in Subsection 12.4.1 hereof.

2                1.1.17    <u>Inducement Tenants</u>:  As defined in Subsection 2.3.1 hereof.

3                1.1.18    <u>Landlord</u>:  As defined in the preamble and Section 23.11 hereof.

4                1.1.19    <u>Landlord's Mailing Address</u>:  c/o The Woodmont Company,
5 2100 W. 7th Street, Fort Worth, Texas 76107-2306, or such other place and/or to the
6 attention of such other person as Landlord may notify Tenant from time to time by notice
7 given in accordance with the provisions of Article 18 hereof.

8                1.1.20    <u>Landlord's Work</u>:  As defined in Section 3.1 hereof.

9                1.1.21    <u>Lease Interest Rate</u>: The then effective prime rate as published
10 from time to time in the "Money Rates" section of *The Wall Street Journal* (or any
11 successor publication thereto) plus two (2%) percent.

12            1.1.22    <u>Legal Requirements</u>: All laws, statutes, codes, acts, ordinances,
13 judgments, decrees, authorizations, directions and requirements of, and agreements with,
14 all governmental departments, commissions, boards, courts, authorities, agencies,
15 officials and officers, which now or at any time hereafter may be applicable to the
16 Premises, the Shopping Center, or any part(s) thereof.

17            1.1.23    <u>Mortgagee</u>:  Any state or federally regulated: bank, savings and
18 loan association, insurance company, pension fund, credit union, real estate investment
19 trust, or other institutional lender, which is not an Affiliate of Landlord, and which holds
20 a mortgage on the Shopping Center or is the beneficiary under a deed of trust
21 encumbering the Shopping Center.

22                1.1.24    [Intentionally Omitted]

23                1.1.25    <u>Percentage Multiple</u>:  Four (4%) percent.

24                1.1.26    <u>Percentage Rent</u>:  As defined in Section 4.4 hereof.

25            1.1.27    <u>Permitted Use</u>:  The sale at retail of a variety of linens and
26 domestics (including, but not limited to, sheets, bedspreads, comforters, duvets, pillows,
27 pillow covers, chair pads, placemats, tablecloths, dish towels, oven mittens and aprons);
28 bathroom items (including, but not limited to, towels, shower curtains, bathroom rugs,
29 toilet seats, health and beauty care items and cosmetics, personal care devices and other
30 bathroom appliances and accessories); housewares (including, but not limited to, kitchen
31 utensils, kitchen appliances and kitchen "gadgets," cleaning appliances and supplies,
32 cookware, bakeware, dishes and china, glassware, garbage pails, ironing boards and other
33 laundry items, mops and brooms, candles and candle holders, ready-to-assemble furniture
34 and artificial flowers); frames and wall art; window treatments; closet, shelving and
35 storage items; home furnishings; area rugs; wall and floor coverings; furniture (including,
36 without limitation, mattresses, box springs, bed frames, and bedroom furniture);
37 decorative accessories; photo albums; photo storage boxes; luggage; books; party
38 supplies; cards and stationery; seasonal items; juvenile merchandise (including, but not
39 limited to, toys, car seats and safety-proofing items); specialty food items; food and non-
40 alcoholic beverage services; any and all other items sold or services provided from time
41 to time in any store owned or operated by Tenant or its Affiliate(s) (the aforementioned
42 items are hereinafter collectively referred to as the ***"Permitted Items"***); and for any other
43 lawful retail use not specifically prohibited by the provisions of Section 13.1.1 below.  In
44 addition, Tenant shall be permitted to use portions of the Premises for storage and office
45 ʻuses incidental to the Permitted Use.

46            1.1.28    <u>Premises</u>:  Being the area cross hatched on <u>Exhibit B</u> hereto,
47 having dimensions as shown on <u>Exhibit B</u> and containing approximately: (i) twenty-three
48 thousand (23,000) square feet of Floor Area, and (ii) one thousand (1,000) square feet of

mezzanine level space for non-selling office purposes, subject to adjustment in accordance with the provisions of Section 3.4 below. In no event shall such non-selling space (or any space used for fire pump facilities) result in any charge to Tenant by way of Fixed Rent or any Additional Rent, nor shall such space be included in the determination of Tenant's Pro Rata Share.

1.1.29   Renewal Option: As defined in Section 2.2.2 hereof.

1.1.30   Renewal Period(s): Four (4) successive periods of five (5) years each, as provided in Section 2.2.2 hereof.

1.1.31   Rent: Fixed Rent, Percentage Rent (if applicable) and/or Additional Rent.

1.1.32   Rent Commencement Date: As defined in Section 2.2 hereof.

1.1.33   Sales Break Point: As defined in Section 4.4.1 hereof.

1.1.33A Sales Break Limit: As defined in Section 4.4.1 hereof.

1.1.34   Shopping Center: The shopping center currently in development and to be known as Rockwall Marketplace, which, when completed as presently designed, will contain approximately two hundred twenty-four thousand (224,000) square feet of Floor Area, on the property located between Ralph Hall Parkway and the I-30 Eastbound Frontage Road, east of Mims Road, in the City of Rockwall, Rockwall County, Texas 75032, and more particularly described in Exhibit A hereto. Landlord shall not change the name of the Shopping Center without giving at least ninety (90) days prior notice to Tenant, and Landlord shall not include the name of any tenant (other than Tenant) in the name of the Shopping Center. Landlord represents that the Shopping Center will consist of a minimum of one hundred seventy-six thousand seven hundred fifty-two (176,752) square feet of Floor Area.

1.1.35   Substantially Completed or Substantial Completion: The completion of specified work at the Shopping Center (including, without limitation, as applicable, Landlord's Work) to the extent that only "Punch List Items" of such work (defined in Subsection 3.3.3 below) shall not be completed.

1.1.36   Taxes: As defined in Section 4.3.3 hereof.

1.1.37   Tenant: As defined in the preamble hereof.

1.1.38   Tenant's Mailing Address:  650 Liberty Avenue, Union, New Jersey 07083, Attn: Mr. Warren Eisenberg, or such other place and/or to the attention of such other person as Tenant may notify Landlord from time to time by notice given in accordance with the provisions of Article 18 hereof.

1.1.39   Tenant's Permits: As defined in Section 2.3.1(b) hereof.

1.1.40   Tenant's Property: All of Tenant's personal property, including, without limitation, phone and alarm systems, satellite antennae, shelving, computers, furniture, cash registers and customer service counters, specialty lighting, track lighting, millwork, conveyor systems, storage racks and signage and any and all other personal property of Tenant which is capable of being removed from the Premises without material damage thereto, but which shall not include electrical systems, heating, ventilation and air conditioning systems, and other mechanical systems, flooring, carpet, elevators, standard lighting and wiring installed within the walls of the Premises. Tenant shall be responsible for paying all taxes levied on any of Tenant's Property before the same shall become delinquent unless the same is contested by Tenant in good faith.

5

1      1.1.41    Tenant's Pro Rata Share: A fraction whose numerator is the
2  Floor Area of the Premises and whose denominator is the Floor Area of the Shopping
3  Center as may be re-determined any time a building (and/or Floor Area) is added to or
4  removed from the Shopping Center, but in no event shall Tenant's Pro Rata Share be
5  greater than thirteen (13%) percent. Floor Area shall be deemed added to or removed
6  from the Shopping Center on the earlier of (i) the date upon which such Floor Area is
7  Substantially Completed, or (ii) at such time as an assessment for Taxes is made or
8  removed, as the case may be, with respect to such Floor Area. Within thirty (30) days
9  following written request from Tenant, Landlord shall certify to Tenant in writing as to
10  the then Floor Area of the Shopping Center.

11      1.1.42    Tenant's Work: As defined in Section 3.1 hereof.

12      1.1.43    Term: A period (the *"Initial Term"*) of approximately ten (10)
13  years beginning on the Rent Commencement Date and expiring at midnight on the last
14  day of January following the tenth (10th) anniversary of the Rent Commencement Date,
15  unless the Rent Commencement Date is February 1, in which event the Expiration Date
16  shall be the day before the tenth (10th) anniversary of the Rent Commencement Date. As
17  used herein: (i) *"Term"* shall refer to the Initial Term, as the same may be extended by
18  any Renewal Period exercised pursuant to Section 2.2.2 below; and (ii) *"Expiration
19  Date"* shall mean the date on which the Term expires.

20                          ARTICLE 2
21            LEASE OF PREMISES; LEASE TERM; DELIVERY DATE

22      Section 2.1    Lease of Premises. Landlord hereby leases to Tenant, and
23  Tenant hereby leases from Landlord, the Premises together with any and all rights,
24  benefits, privileges and easements, now or hereafter appurtenant to either or both of the
25  Premises and the Shopping Center, arising out of any public or private grant or authority,
26  including, without limitation, the non exclusive right and easement to use the Common
27  Areas in common with other tenants and occupants of the Shopping Center.

28      Section 2.2    Term.

29      2.2.1    Initial Term. Subject to the provisions of this Article 2, the Term
30  shall begin on the sixtieth (60th) day following the Delivery Date (the *"Rent
31  Commencement Date"*). The Term shall expire on the Expiration Date, unless earlier
32  terminated as herein provided. When the Rent Commencement Date has been
33  determined, as provided in this Section, Landlord and Tenant shall execute, acknowledge
34  and deliver, each to the other, a written statement in the form attached hereto as Exhibit C
35  specifying the Rent Commencement Date.

36      2.2.2    Renewal Options. Provided an Event of Default (as defined
37  herein) has not occurred and is not continuing, Tenant shall have the right and option
38  (hereinafter a *"Renewal Option"*) to extend the Initial Term from the date on which it
39  would otherwise expire for four (4) successive renewal periods of five (5) years each
40  (individually, a *"Renewal Period"*, and collectively, the *"Renewal Periods"*) upon the
41  same terms and conditions as are herein set forth. Each Renewal Option shall be
42  exercisable by notice given to Landlord at least one hundred eighty (180) days prior to
43  the commencement of the applicable Renewal Period(s). In order to prevent the
44  inadvertent failure of Tenant to exercise any of the Renewal Options within the time
45  specified above, the Term of this Lease shall not expire unless and until Tenant fails to
46  exercise a Renewal Option within fifteen (15) days after receiving notice from Landlord
47  (a *"Reminder Notice"*) that the Renewal Option in question has not been exercised
48  (Landlord's notice shall not be given prior to the 180th day prior to the Expiration Date),
49  or Tenant gives notice to Landlord that it will not be exercising any remaining Renewal
50  Options. If Landlord fails to give Tenant such a Reminder Notice prior to the Expiration
51  Date, and Tenant occupies the Premises after the Expiration Date, then Tenant shall
52  remain in possession subject to the provisions of this Lease but without the application of

6

1  Article 20 hereof.  If Landlord then gives Tenant such a Reminder Notice and Tenant
2  exercises its Renewal Option, then the effective date of such exercise shall be retroactive
3  to such Expiration Date.  In the event Tenant shall fail to exercise its Renewal Option
4  within fifteen (15) days after Tenant's receipt of a Reminder Notice given in accordance
5  herewith then Tenant shall be deemed to have waived Tenant's right to exercise the
6  Renewal Option and the Term shall end on the later to occur of the Expiration Date or
7  such fifteenth (15th) day.

8          Section 2.3      Delivery Date.

9          2.3.1      Definition.  Subject to Landlord's delivery to Tenant of the
10  Delivery Date Notice in accordance with the provisions of Subsection 2.3.2 below and
11  Landlord's timely compliance therewith, Landlord shall be deemed to have delivered
12  possession of the Premises to Tenant at 8:00 a.m. on the date (the *"Delivery Date"*)
13  following the day on which all of the following conditions (the *"Delivery Date*
14  *Conditions"*) shall have occurred and Tenant shall have received from Landlord the
15  Delivery Date Certification in accordance with the provisions of Section 2.3.3 below,
16  which shall constitute Landlord's written certification that all of the following shall have
17  occurred:

18              (a)     Actual possession of the Premises shall have been delivered
19  to Tenant water-tight, free of Hazardous Substances, in a good, structurally sound
20  condition, with all of Landlord's Work Substantially Completed, which Substantial
21  Completion shall be evidenced by a written certification by Landlord's architect to
22  Tenant;

23              (b)     Landlord shall have obtained (and delivered copies thereof to
24  Tenant, upon request) all permits and approvals required from all applicable
25  governmental authorities to enable Tenant to occupy and use the Premises for the conduct
26  of its business in the Premises (exclusive of any business licenses or permits which
27  Tenant may be required to obtain in order to install Tenant's fixtures, perform Tenant's
28  Work and open and operate its specific business and not a general retail business
29  (collectively, *"Tenant's Permits"*)), which permits and approvals shall include, without
30  limitation, zoning and building code approvals, environmental requirements, and a
31  permanent certificate of occupancy for the Premises (unless a permanent certificate of
32  occupancy for the Premises cannot be obtained solely as a result of the failure to
33  complete Tenant's Work in the manner required hereunder, in which event: (1) the
34  delivery of a permanent certificate of occupancy for the Premises shall not be a condition
35  to the occurrence of the Delivery Date, (2) the obtaining of a temporary certificate of
36  occupancy shall be a condition to the occurrence of the Delivery Date, and  (3) Landlord
37  shall obtain the permanent certificate of occupancy promptly following the correction or
38  completion of Tenant's Work);

39              (c)     The Common Areas, and all of the improvements thereto
40  within the area shown on Exhibit B hereto as "Bed Bath & Beyond Critical Area" (the
41  *"Critical Area"*) shall have been Substantially Completed and operational, and all off-site
42  improvements (including, without limitation, street, storm drainage, and traffic
43  signalization improvements) required for the Shopping Center to open for business and
44  for Tenant to receive a permanent certificate of occupancy shall have been Substantially
45  Completed; Landlord, at its sole cost and expense, shall have obtained (and delivered
46  copies thereof to Tenant, upon request) all permits and approvals required from
47  applicable governmental authorities to enable the Common Areas to be developed,
48  operated, and used for the purposes herein contemplated, which permits and approvals
49  shall include, without limitation, zoning, building code, environmental requirements, curb
50  cut and site plan approvals, all permits pertaining to pylon and/or monument signage (and
51  Tenant's panel(s) thereon), construction, and development and use permits;

7

1             (d)    The representations and warranties of Landlord set forth in
2 subparagraphs (a) through (i) of Section 12.3 below shall then be true and in effect;

3             (e)    Leases or other occupancy agreements shall have been
4 entered into with the following tenants or occupants (hereinafter collectively referred to
5 as the *"Inducement Tenants"*) on the following terms, for occupancy of the premises
6 designated for them on Exhibit B; such leases shall not be cancelable by any of the
7 Inducement Tenants, except for failure of Landlord to complete the Shopping Center, for
8 injury to or loss of the premises thereby demised because of fire or other casualty, or for a
9 taking or for other reasons similar to those for which this Lease is cancelable by Tenant:

| Inducement Tenants | Minimum Square-foot Gross Floor Area | Minimum Term |
|---|---|---|
| TJ Maxx | As shown on Exhibit B | 10 Years |
| Circuit City | As shown on Exhibit B | 10 Years |
| Recognized Tenants (as defined in Article 22 below) | 37,000 total square feet (exclusive of the Premises and the TJ Maxx and Circuit City premises referred to above) | 10 Years |
| Recognized Tenants | 13,000 total square feet (exclusive of the Premises and the TJ Maxx premises, Circuit City premises and 37,000 square feet referred to above) | 5 Years |

10
11             (f)    Landlord shall have delivered to Tenant, in recordable form:
12 (i) a subordination, non-disturbance and attornment agreement substantially in the form
13 attached hereto as Exhibit G, or such other form as is reasonably acceptable to Tenant as
14 provided in Section 17.3 herein, executed by each holder of any mortgage or deed of trust
15 encumbering or affecting the Shopping Center or any portion thereof (it being understood
16 and agreed that this Subsection 2.3.1 (f) is not intended to extend the date by which
17 Landlord is to deliver to Tenant any document(s) required pursuant to Section 17.3
18 hereof), and (ii) a fee owner recognition agreement in the form and content described in
19 clause (b) of Section 17.1 hereof executed by any existing Ground Lessor.

20          2.3.2    Delivery Date.

21             (a)    Landlord shall give Tenant at least one hundred twenty (120)
22 days prior notice of the Delivery Date, using the form of Delivery Date Notice attached
23 hereto as Exhibit I. Landlord's delivery of the Delivery Date Notice shall be a condition
24 precedent to the Delivery Date. Notwithstanding any provision of this Lease to the
25 contrary, in no event shall the Delivery Date be deemed to occur prior to the Delivery
26 Date established in the Delivery Date Notice.

27             (b)    Landlord acknowledges that if it shall fail to satisfy all of the
28 Delivery Date Conditions by the Delivery Date as established in the Delivery Date
29 Notice, Tenant will sustain substantial, additional costs and expenses, including, without
30 limitation, storage costs for fixtures, equipment, and inventory, employee costs during the
31 waiting period, and additional advertising and promotional costs, the exact amount of
32 which would be impracticable or extremely difficult to ascertain. Subject to *Force*
33 *Majeure* and to the extent of any delays caused by Tenant, its agents, employees and/or

1    contractors (**"Tenant Delay"**), either of which have occurred after the Delivery Date
2    Notice has been delivered to Tenant, if the Delivery Date does not occur by the date
3    established therefor in the Delivery Date Notice, then, in addition to any other remedies
4    available to Tenant under this Lease, Landlord agrees to allow to Tenant a credit against
5    the initial installment(s) of Rent hereunder equal to, as liquidated reimbursement to
6    Tenant (and not as a penalty) for all of the aforesaid costs incurred by Tenant, the sum of:
7    (i) One Hundred Fifty Thousand Dollars ($150,000), plus (ii) Five Thousand Dollars
8    ($5,000) for each day that the Delivery Date established in the Delivery Date Notice is
9    delayed.  The foregoing liquidated reimbursements represent the parties' good faith
10   agreement as to an agreed upon amount which shall have been incurred by Tenant and
11   which shall otherwise not be susceptible of exact ascertainment.  Notwithstanding
12   anything to the contrary contained in this subsection 2.3.2(b), if the Delivery Date does
13   not occur by the date established therefor in the Delivery Date Notice due solely to
14   Landlord's having failed to satisfy the Initial Co-Tenancy Condition, then, so long as
15   Tenant accepts delivery of physical possession of the Premises, Landlord shall not be
16   obligated to credit Tenant for such liquidated reimbursement.

17         2.3.3     Delivery Date Certification.  Upon the satisfaction of all of the
18   Delivery Date Conditions, Landlord shall so certify to Tenant, using the form of Delivery
19   Date Certification attached hereto as Exhibit J.

20         2.3.4     No Waiver.  Neither Tenant's acceptance of physical possession
21   of the Premises nor Tenant's opening of the Premises for business to the public prior to
22   the Delivery Date shall: (i) be deemed a waiver by Tenant of any of the Delivery Date
23   Conditions, or (ii) relieve Landlord of any obligation under this Lease, unless such
24   condition or obligation is expressly waived in writing by Tenant.

25        Section 2.4     Unseasonable Delivery: Slack Period.  If, for any reason
26   (including, without limitation, Force Majeure, but subject to any Tenant Delay), the
27   Delivery Date occurs during the period commencing on October 1 and ending on the
28   March 31 next following (the **"Slack Period"**), then Tenant shall have, in addition to any
29   other remedies, the right to:

30             (a)     accept delivery of physical possession of the Premises; or

31             (b)     defer its acceptance of delivery of physical possession of the
32   Premises to a later date within the Slack Period, whereupon the Delivery Date shall be
33   deemed to have occurred on the date that Tenant actually accepts physical possession of
34   the Premises (subject to the other provisions of this Article 2 and the continuing
35   satisfaction of the Delivery Date Conditions), except that Tenant shall not be entitled to
36   the per diem liquidated reimbursement provided in clause (ii) of Section 2.3.2(b) for any
37   portion of the Slack Period occurring after the date on which all of the Delivery Date
38   Conditions shall have been satisfied; and

39   in either event, if the Rent Commencement Date occurs before the April 1 next following
40   the Slack Period, Tenant shall be entitled to pay Alternate Rent in lieu of Fixed Rent and
41   Percentage Rent for the period commencing on the Rent Commencement Date and
42   ending on the March 31 next following; any benefit which Tenant may realize thereby
43   shall constitute a reimbursement to Tenant for certain pre-opening expenses incurred by
44   Tenant in connection with this Lease.

45        Section 2.5     Initial Co-Tenancy Condition.

46         2.5.1     As used herein, the **"Initial Co-Tenancy Condition"** shall mean
47   that each and every Inducement Tenant shall have accepted possession of its entire
48   premises, such premises shall have been substantially completed, and each Inducement
49   Tenant shall, if not already open for business, then be actively and continuously engaged
50   in the fixturing and merchandising therein.

1         2.5.2   If, on the Delivery Date, the Initial Co-Tenancy Condition has
2   not been satisfied, Tenant shall have the right, at its sole option, to:

3         (a)   accept delivery of physical possession of the Premises; or

4         (b)   defer its acceptance of delivery of physical possession of the
5   Premises to a later date (but not later than the date on which the Initial Co-Tenancy
6   Condition is satisfied and Tenant receives notice from Landlord thereof), whereupon the
7   Delivery Date shall be deemed to have occurred on the date that Tenant actually accepts
8   physical possession of the Premises (subject to the other provisions of this Article 2 and
9   the continuing satisfaction of the Delivery Date Conditions), provided in no event shall
10  Tenant be entitled to the liquidated damages set forth in Section 2.3.2(b) in the event the
11  Delivery Date is solely delayed pursuant to this Section 2.5.2(b);

12  and in either event, if the Rent Commencement Date occurs before the satisfaction of the
13  Initial Co-Tenancy Condition, Tenant shall be entitled to pay Alternate Rent in lieu of
14  Fixed Rent and Percentage Rent until the Initial Co-Tenancy Condition is satisfied and
15  the Landlord gives Tenant notice thereof, subject to any other applicable provisions of
16  this Article 2.

17        2.5.3   In addition to the provisions of Section 2.5.2 above, if the Initial
18  Co-Tenancy Condition has not been satisfied by the first (1st) anniversary of the Delivery
19  Date established pursuant to Section 2.3.2(a) above, then Landlord and Tenant shall each
20  have the right, at any time prior to the satisfaction of the Initial Co-Tenancy Condition,
21  upon giving to the other party at least sixty (60) days' prior notice, to terminate this Lease
22  as of the date specified in said notice.  Landlord may negate any such termination notice
23  by Tenant by causing the Initial Co-Tenancy Condition to be satisfied within thirty (30)
24  days after the date on which said termination notice is given, provided that notice of such
25  satisfaction is given by Landlord to Tenant on or before such thirtieth (30th) day.  Tenant
26  may negate any such termination notice by Landlord by Tenant's giving Landlord notice,
27  within thirty (30) days after the date on which Landlord's termination notice is given, that
28  Tenant, upon the expiration of the thirty (30) day period will commence paying full Fixed
29  Rent regardless of the continuation thereafter of the failure to satisfy the Initial
30  Co-Tenancy Condition; provided, however, that Tenant shall nevertheless retain its rights
31  under Article 22 below, in the event that once the Initial Co-Tenancy Condition is
32  satisfied, subsequent events cause an Excess Vacancy to exist.  If this Lease is terminated
33  hereunder, neither party shall have any further liability under this Lease, except: (i) for
34  those obligations which survive the expiration or other termination of this Lease pursuant
35  to the express terms of this Lease, and (ii) Landlord shall promptly reimburse Tenant for
36  all of its reasonable third-party costs and expenses incurred in connection with this Lease,
37  including, without limitation, costs associated with the preparation and review of plans
38  and specifications, and the performance of Tenant's Work, not to exceed Fifty Thousand
39  Dollars ($50,000) in the aggregate.

40        ARTICLE 3
41        IMPROVEMENTS

42        Section 3.1   Landlord's Work and Tenant's Work.  Landlord shall, at its
43  sole cost and expense, perform the work and obligations described on Exhibit D, Exhibit
44  D-1, and Exhibit F hereto, and the "Final Plans and Specifications" (hereinafter defined
45  in Section 3.2) (collectively, *"Landlord's Work"*), and shall deliver possession of the
46  Premises to Tenant in the condition described therein.  Except for Landlord's Work,
47  Tenant shall, at its own cost and expense, do any and all work (hereinafter referred to as
48  *"Tenant's Work"*) which Tenant desires to adapt the Premises to Tenant's use, subject to
49  Article 8 herein.

50        Section 3.2   Plan Approvals.

51        3.2.1   Preparation of Plans and Specifications.

1        (a)    Within <u>thirty (30)</u> days after the Effective Date, Landlord
2    shall deliver to Tenant drawings showing the proposed footprint, column layout, and
3    interior clear dimensions of the Premises (the *"Preliminary LOD"*) [Limits of Demised],
4    which shall be subject to any reasonable modifications indicated by Tenant as provided
5    below. The Preliminary LOD shall be substantially consistent with <u>Exhibits B</u>, <u>D</u>, and <u>D-</u>
6    <u>1</u> hereto.  Tenant hereby acknowledges receipt of the Preliminary LOD.

7        (b)    Within <u>thirty (30)</u> days after Tenant's receipt of the Preliminary
8    LOD, Tenant shall deliver to Landlord its revisions thereto (the *"Revised LOD"*), showing the
9    location of the interior structural grid (column layout), storefront opening, and mezzanine and/or
10   office core, the location and arrangement of the loading facilities, trash compactor pad, and trash
11   container pad(s), and any reasonable revisions to the interior clear dimensions.  Landlord
12   hereby acknowledges receipt of the Revised LOD.

13        (c)    Within <u>fifteen (15)</u> days after Landlord's receipt of the
14   Revised LOD, Landlord shall deliver to Tenant a final LOD (the *"Certified LOD"*),
15   certified by Landlord, which shall incorporate all of the elements of the Revised LOD.
16   Within fifteen (15) days after its receipt of the Certified LOD, Tenant shall notify
17   Landlord of Tenant's approval thereof or the reasons why such approval cannot be
18   granted, and Landlord shall, within fifteen (15) days after receiving such notice, make
19   any revisions necessary to correct such matters and obtain Tenant's approval.  In the
20   event Tenant shall fail to respond to the Certified LOD within the 15-day period
21   following Tenant's receipt thereof, and thereafter Tenant continues to fail to respond
22   within fifteen (15) days following Tenant's receipt of notice from Landlord of such
23   failure, which notice expressly states (in capitalized letters): "TENANT HAS FAILED
24   TO RESPOND TO LANDLORD'S DELIVERY OF THE CERTIFIED LOD AND IF
25   TENANT CONTINUES TO FAIL TO RESPOND THERETO BY THE DATE WHICH
26   IS FIFTEEN (15) DAYS FOLLOWING TENANT'S RECEIPT OF THIS NOTICE,
27   TENANT WILL BE DEEMED TO HAVE APPROVED SAME PURSUANT TO
28   SUBSECTION 3.2.1(C) OF THE LEASE", then Tenant shall be deemed to have
29   approved the Certified LOD submitted by Landlord.  Upon Tenant's approval of the
30   Certified LOD, any further changes thereto shall be subject to Tenant's prior written
31   approval (which may be withheld in its sole discretion), provided that, as to changes
32   required to conform to Legal Requirements, Tenant shall have reasonable approval rights
33   within the confines of said Legal Requirements.  After Tenant approves the Certified
34   LOD, Landlord shall be responsible for any and all reasonable costs incurred and delays
35   experienced by Tenant in connection with any further changes to the Certified LOD
36   required by Landlord.  In the event of a disagreement between Landlord and Tenant
37   relating to the Certified LOD, Landlord and Tenant agree to negotiate in good faith to
38   resolve any such dispute.  Landlord and Tenant hereby acknowledge that the Certified
39   LOD has been received and approved by Tenant.

40        (d)    Within <u>thirty (30)</u> days after the Effective Date, Tenant shall
41   deliver to Landlord its Fixture Plan (F1); Floor Finish Plans Notes and Details  (F2);
42   Power/Specialty Lighting Plan and Notes (F3); and Lighting Plans and Notes (F4)
43   (collectively, *"Tenant's Plans"*), all of which shall be substantially consistent with the
44   Certified LOD (as same may be reasonably modified by Tenant, as noted above).

45        (e)    Within <u>thirty (30)</u> days after receipt of Tenant's Plans,
46   Landlord shall prepare and submit to Tenant, in a single submission, Landlord's
47   preliminary plans and specifications (the *"Preliminary Plans"*) for Landlord's Work
48   (which shall include, without limitation, mechanical, electrical, plumbing, fire protection
49   and high-pile storage, structural, architectural and site plans [including, without
50   limitation, a site lighting plan with photometrics]), and each of the plans which
51   collectively constitute the Preliminary Plans shall be at least 85% complete, in Tenant's
52   reasonable judgment.  The Preliminary Plans shall be substantially consistent with
53   Tenant's Plans, the Certified LOD, and <u>Exhibits B, D, D-1, D-2, and F</u> hereto.

11

1         (f)    Within <u>thirty (30)</u> days after its receipt of the Preliminary
2 Plans, Tenant shall give Landlord notice of the respects, if any, in which said Preliminary
3 Plans fail to meet Tenant's reasonable approval and/or fail to conform to the Certified
4 LOD, Tenant's Plans, and/or <u>Exhibits B</u>, <u>D</u>, <u>D-1, D-2</u>, and <u>F</u> hereto, and Landlord shall
5 promptly make any revisions necessary to correct such matters and obtain Tenant's
6 approval. In the event Tenant shall fail to respond to the Preliminary Plans within the 30-
7 day period following Tenant's receipt thereof, and thereafter Tenant continues to fail to
8 respond within fifteen (15) days following Tenant's receipt of notice from Landlord of
9 such failure, which notice expressly states (in capitalized letters): "TENANT HAS
10 FAILED TO RESPOND TO LANDLORD'S DELIVERY OF THE PRELIMINARY
11 PLANS AND IF TENANT CONTINUES TO FAIL TO RESPOND THERETO BY THE
12 DATE WHICH IS FIFTEEN (15) DAYS FOLLOWING TENANT'S RECEIPT OF
13 THIS NOTICE, TENANT WILL BE DEEMED TO HAVE APPROVED SAME
14 PURSUANT TO SUBSECTION 3.2.1(F) OF THE LEASE", then Tenant shall be
15 deemed to have approved the Preliminary Plans submitted by Landlord. In the event of a
16 disagreement between Landlord and Tenant relating to the Preliminary Plans, Landlord
17 and Tenant agree to negotiate in good faith to resolve any such dispute.

18         (g)    Within <u>thirty (30)</u> days after the date on which Landlord
19 receives notice of Tenant's approval of the Preliminary Plans, Landlord shall prepare and
20 deliver to Tenant, in a single submission, final plans and specifications (the ***"Final Plans***
21 ***and Specifications"***), which shall be substantially consistent with the Preliminary Plans,
22 as approved by Tenant.

23         (h)    Within <u>fifteen (15)</u> days after its receipt of the Final Plans and
24 Specifications, Tenant shall notify Landlord of Tenant's approval thereof or the reasons
25 why such approval cannot be granted, and Landlord shall, within fifteen (15) days after
26 receiving such notice, make any revisions necessary to correct such matters and obtain
27 Tenant's approval. Upon Tenant's approval of the Final Plans and Specifications, any
28 further changes thereto shall be subject to Tenant's prior written approval. In the event
29 Tenant shall fail to respond to the Final Plans and Specifications within the 15-day period
30 following Tenant's receipt thereof, and thereafter, Tenant continues to fail to respond
31 within fifteen (15) days following Tenant's receipt of notice from Landlord of such
32 failure, which notice expressly states (in capitalized letters): "TENANT HAS FAILED
33 TO RESPOND TO LANDLORD'S DELIVERY OF THE FINAL PLANS AND
34 SPECIFICATIONS AND IF TENANT CONTINUES TO FAIL TO RESPOND
35 THERETO BY THE DATE WHICH IS FIFTEEN (15) DAYS FOLLOWING
36 TENANT'S RECEIPT OF THIS NOTICE, TENANT WILL BE DEEMED TO HAVE
37 APPROVED SAME PURSUANT TO SUBSECTION 3.2.1(H) OF THE LEASE", then
38 Tenant shall be deemed to have approved the Final Plans and Specifications submitted by
39 Landlord. Unless specifically noted on a separate summary sheet attached to the Final
40 Plans and Specifications, to the extent of a conflict between the terms and provisions of
41 Tenant's Plans, <u>Exhibit B</u>, <u>Exhibit D</u>, <u>Exhibit D-1</u>, <u>Exhibit D-2</u>, and/or <u>Exhibit F</u> hereto,
42 and the terms and provisions of the Final Plans and Specifications, then the terms and
43 provisions of Tenant's Plans, <u>Exhibit B</u>, <u>Exhibit D</u>, <u>Exhibit D-1</u>, <u>Exhibit D-2</u>, and <u>Exhibit</u>
44 <u>F</u> shall govern and prevail.

45         (i)    All submissions by the parties of the Preliminary LOD, the
46 Revised LOD, the Certified LOD, the Tenant's Plans, the Preliminary Plans, and the
47 Final Plans and Specifications shall be made (or accompanied) by the computer files
48 thereof formatted in any version of *"Autocad"*, up to *"Autocad 2002"*.

49         3.2.2    <u>Plan Changes</u>.

50         (a)    Tenant shall have the right to make changes from the
51 standards and specifications set forth in "Tenant's Prototype Drawings and
52 Specifications" and/or the "Project Manual", referred to in <u>Exhibit D</u> hereto, and/or to
53 require Landlord to subsequently make changes to either or both of the Preliminary Plans

1   and Specifications and/or the Final Plans and Specifications in accordance therewith (the
2   **"Changes"**). Any Changes must be evidenced in writing by an authorized representative
3   of Tenant as a condition precedent to Landlord's obligation to make such Changes.
4   Within ten (10) business days after receiving Tenant's request for any Change, Landlord
5   shall give Tenant notice of the cost or savings, and any delay, that may be occasioned by
6   such Change. If Tenant fails to authorize such Change within five (5) business days after
7   receiving Landlord's notice, Tenant shall be deemed to have disapproved such Change.

8           (b)     Tenant shall pay to Landlord the net reasonable additional
9   third-party costs of Landlord's Work resulting directly and solely from the aggregate
10  Changes (exclusive of any charges for overhead and profit, other than sums not
11  exceeding 5% subcontractor profit and 5% general contractor profit thereon), taking into
12  consideration any and all actual costs and savings resulting from all Changes, in the
13  aggregate (including, without limitation, reasonable costs approved by Tenant in advance
14  associated with any acceleration of the work schedule which Tenant, at its sole option,
15  may require). Such payment shall be due and payable within thirty (30) days after
16  Tenant's receipt of backup information reasonably supporting all such costs, including,
17  without limitation, invoices, receipts and lien waivers of subcontractors and materialmen.

18          (c)     Landlord shall pay to Tenant one-half (1/2) of the net
19  reasonable cost savings resulting from the aggregate Changes, taking into consideration
20  all reasonable additional third-party costs of Landlord's Work directly and solely
21  resulting from the Changes (exclusive of any charges for overhead and profit, other than
22  sums not exceeding 5% subcontractor profit and 5% general contractor profit thereon).
23  At Tenant's request, Landlord shall deliver to Tenant backup information reasonably
24  supporting all such additional costs, including, without limitation, invoices, receipts, and
25  lien waivers of subcontractors and materialmen. Such payment shall be due and payable
26  within thirty (30) days after the Delivery Date.

27          (d)     If the Changes occur during the preparation of any of the
28  plans described in Section 3.2.1 above, then the deadlines for preparation and delivery of
29  the plans then being prepared shall be extended as reasonably necessary to incorporate
30  such Changes. If, despite Landlord's diligent efforts in performing Landlord's Work, the
31  Changes cause a net delay in the Substantial Completion of Landlord's Work (taking into
32  consideration any time reductions resulting from such changes), then: (i) the Rent
33  Commencement Date shall be determined as if such delay had not occurred, (ii) the
34  commencement of the Slack Period, and the dates set forth in clauses (a) and (b) of
35  Section 3.3.2 below, shall be extended by the number of days of such net delay; and (iii)
36  with respect to Changes requested after the Delivery Date Notice is given, for purposes of
37  calculating liquidated damages under Subsection 2.3.2(b) above, the Delivery Date shall
38  be extended by the number of days of such net delay.

39          Section 3.3      Performance of Work.

40          3.3.1      Both Landlord's Work and Tenant's Work shall be performed in
41  a good and workmanlike manner, in compliance with all applicable Legal Requirements,
42  utilizing only new, first-class materials, and in accordance with all insurance company
43  requirements. Landlord shall perform Landlord's Work in a manner such that Tenant
44  will be able to obtain Tenant's Permits. Landlord shall pay all impact fees and related
45  governmental charges in connection with Landlord's Work and all other work performed
46  by or on behalf of Landlord in connection with the Shopping Center. If Tenant's Permits
47  cannot be obtained because Landlord's Work has not been completed or has been
48  performed improperly or by reason of any then existing condition of the Shopping
49  Center, Landlord shall remedy the situation so as to enable Tenant to obtain Tenant's
50  Permits, and the Delivery Date shall be deemed delayed, for Tenant's benefit only, on a
51  day-for-day basis for each day of delay occasioned thereby.

1            **3.3.2**      If: (a) Landlord's Work has not been commenced (*i.e.*, if
2   Landlord has not yet poured foundation footings for the Premises) by January 15, 2005,
3   or (b) the Delivery Date shall not have occurred by September 1, 2005 (subject to *Force*
4   *Majeure*, not to exceed thirty (30) days in the aggregate, and provided that Landlord shall
5   have given Tenant notice of such event of *Force Majeure* promptly after its occurrence),
6   Tenant may thereafter, during such time as Landlord's Work has not been commenced or
7   the Delivery Date has not occurred, as the case may be, consider Landlord to be in default
8   hereunder and, at Tenant's option in its sole discretion, elect to:

9                    (i)     terminate this Lease, if Landlord shall fail to fully cure
10     such default within thirty (30) days after receiving Tenant's notice thereof, in
11     which event neither party shall have any further liability hereunder, except: (i) for
12     those obligations which survive the expiration or other termination of this Lease
13     pursuant to the express terms of this Lease, and (ii) Landlord shall be obligated to
14     promptly reimburse Tenant, as Tenant's sole monetary remedy by reason thereof,
15     for all its reasonable third-party costs and expenses incurred in connection with
16     this Lease (including, without limitation, costs associated with the preparation and
17     review of plans and specifications, attorney's fees and the performance of
18     Tenant's Work), not to exceed Fifty Thousand Dollars ($50,000), in the aggregate,
19     and/or

20                    (ii)    avail itself of the remedies set forth in Section 16.2
21     below (provided, however, that the cure period set forth therein shall not be
22     applicable); and/or

23                   (iii)   extend one or more times the dates set forth in clauses
24     (a) and/or (b) of this Subsection 3.3.2 to such future dates designated by Tenant in
25     notice given to Landlord.

26   The election by Tenant of any one or more of the foregoing remedies shall not preclude
27   the subsequent election of any alternative remedy provided in this Section, this Lease, at
28   law, or in equity.

29             **3.3.3**      Landlord's Work Performed After Delivery of Possession. On or
30   before the Delivery Date, Landlord's and Tenant's representatives together shall conduct
31   a walk-through of the Premises to compile a punch list of the "Punch List Items"
32   (hereinafter defined). Tenant shall deliver to Landlord a copy of said punch list within
33   five (5) days after the walk-through. Landlord shall complete any Punch List Items
34   within ten (10) days after it receives a copy of said punch list, or such extended period of
35   time (not to exceed an additional fifteen (15) days) as may reasonably be necessary
36   provided Landlord is diligently pursuing completion of such Punch List Items. If
37   Landlord fails to complete any item on said punch list within said 10-day period (subject
38   to the extension set forth above), Tenant shall have the right to complete such item(s)
39   using its own contractors and receive reimbursement from Landlord for the reasonable
40   costs and expenses thereof upon demand. If reasonably required by Tenant, any portion
41   of Landlord's Work which is performed after Tenant accepts physical possession of the
42   Premises shall occur only "after hours", when neither Tenant nor any of its agents,
43   contractors, employees and servants are working within the Premises, and Landlord shall
44   reimburse Tenant for the reasonable costs and expenses incurred by Tenant by reason of
45   such "after hours" performance of Landlord's Work. As used herein, the term ***"Punch***
46   ***List Items"*** shall mean such minor items of a cosmetic nature which, when considered as
47   a whole, do not adversely affect either the performance of Tenant's Work or Tenant's
48   ability to conduct its normal business operations in the Premises, including, but not
49   limited to, landscaping within the Common Areas.

50             **3.3.4**      Tenant's Right of Entry. Prior to the Delivery Date, Tenant may
51   enter upon the Premises for the purposes of inspecting the work, taking measurements,
52   making plans, erecting temporary or permanent signs and doing such other work as may

1   be appropriate or desirable without being deemed thereby to have taken possession or
2   obligated itself to pay Rent, provided, however, that Tenant shall not, during the course
3   of such work, materially interfere with the performance of Landlord's Work and shall
4   indemnify and hold Landlord harmless from and against any and all claims or losses
5   arising from Tenant's entry upon the Premises, except to the extent caused by Landlord,
6   its agents, employees, or contractors.

7           3.3.5     [Intentionally Omitted]

8           3.3.6     Work Requirements After Delivery Date. Following the
9   Delivery Date, any construction by Landlord or other tenants or occupants of the
10   Shopping Center materially affecting any portion of the Shopping Center shall be subject
11   to the following terms and conditions:

12                 (a)    staging and storage of materials and parking of construction
13   vehicles shall occur only within the portions of the Shopping Center designated outside
14   the Critical Area;

15                 (b)    Landlord shall diligently ensure that, from and after Tenant's
16   opening for business to the public, no ingress, egress or passage of any construction,
17   delivery and related vehicles engaged in the performance of such work or other
18   construction activities shall take place except through the entrance/exit drive designated
19   as the "Post Delivery Construction Drive" on Exhibit B hereto; and

20                 (c)    Landlord shall maintain, or cause to be maintained, the
21   Shopping Center in a clean, safe, and sightly condition, and shall use reasonable efforts to
22   ensure that such construction shall not materially adversely interfere with the normal
23   conduct of any business operations in the Premises.

24           3.3.7     Tenant's Trailer. Landlord shall install a trailer for Tenant's
25   exclusive use in conducting employee interviews and recruiting, in accordance with
26   Exhibit D hereto, in the location shown on Exhibit B hereto. Said trailer shall be installed
27   and operational at least forty-five (45) days prior to the Delivery Date, and shall be
28   removed within twenty (20) days (but not sooner than ten days) after the Delivery Date.

29         Section 3.4     Measurement; Adjustment of Rent.

30           3.4.1     Measurement of Premises and Shopping Center. Within five (5)
31   days after the completion of the first course of masonry for the exterior walls of the
32   Premises and demising walls of the Premises (and at least sixty (60) days prior to the
33   Delivery Date), Landlord shall deliver to Tenant a certification to Tenant by Landlord's
34   licensed architect, surveyor or engineer of the interior clear dimensions and the Floor
35   Area of the Premises, and Floor Area of the Shopping Center (to the extent of completion
36   of the first course of masonry for the exterior level walls of the Shopping Center, with
37   supplemental certifications for additional completed exterior walls of the Shopping
38   Center to be thereafter provided from Landlord from time to time), the measurements of
39   which shall be subject to confirmation by Tenant's licensed architect, surveyor or
40   engineer within six (6) months after Substantial Completion of any areas so certified,
41   failure of which shall be deemed a waiver by Tenant to challenge such certification. If
42   Landlord shall fail so to deliver such certification to Tenant, Tenant shall have the right to
43   have any of such measurements made and certified to Landlord by Tenant's licensed
44   architect, surveyor or engineer. If the interior clear dimensions and/or the Floor Area of
45   the Premises vary from those shown on the Certified LOD (as may be modified by any
46   applicable Changes), then Landlord shall correct such work to conform to the Certified
47   .LOD (as may be modified by any applicable Changes).

48           3.4.2     Measurement of Storage Area/Mezzanine. Within five (5) days
49   after the completion of the floor system for the non-selling office mezzanine and the
50   installation of the floor tracks for the walls enclosing it, Landlord shall deliver to Tenant

a certification to Tenant by Landlord's licensed architect, surveyor or engineer of the Floor Area of said non-selling office mezzanine space, the measurements of which shall be subject to confirmation by Tenant's licensed architect, surveyor or engineer within six (6) months after Substantial Completion of any areas so certified, failure of which shall be deemed a waiver by Tenant to challenge such certification. If the square footage of the non-selling office mezzanine varies by more than 1% from that shown on the Final Plans and Specifications (as may be modified by any applicable Changes), then, at Tenant's request, Landlord shall correct such work to conform to the Final Plans and Specifications.

**3.4.3   Adjustment of Fixed Rent and Tenant's Pro Rata Share**. Subject to the foregoing provisions of this Section 3.4, if the measurement of the Premises shall indicate a Floor Area of less than ninety-nine percent (99%)of the Floor Area of the Premises set forth in Subsection 1.1.28 above, then the Fixed Rent and any other applicable provision of this Lease (including, without limitation, Tenant's Pro Rata Share) shall be reduced to conform to the actual measurement, and Tenant shall receive a proportional refund of any Rent theretofore paid to Landlord. If the measurement of the Premises indicates that the actual Floor Area of the Premises exceeds the Floor Area of the Premises set forth in Section 1.1.28 hereof (as same may be increased due to Changes under Section 3.2 above), neither Fixed Rent nor Tenant's Pro Rata Share shall be increased by reason thereof. Landlord and Tenant shall each promptly execute and deliver to the other an amendment memorializing any change to the Fixed Rent, Tenant's Pro Rata Share, or any other applicable provisions of this Lease, made pursuant to this Section 3.4. Any dispute between the parties with respect to the Floor Area of the Premises, the square footage of said non-selling space or the Floor Area of the Shopping Center shall be resolved by arbitration in accordance with the provisions of Section 16.2 below.

<h1 style="text-align:center">ARTICLE 4</h1>
FIXED RENT, TAXES & PERCENTAGE RENT: DETERMINATION AND PAYMENT

**Section 4.1   Fixed Rent**. Commencing on the Rent Commencement Date and continuing throughout the Term, Tenant shall pay to Landlord the Fixed Rent, in equal successive monthly installments, in advance, on the first day of each and every calendar month throughout the Term, except that Fixed Rent payable for any partial calendar month during the Term shall be prorated based on a 365-day year. Fixed Rent shall be paid without prior notice, demand, deduction or set off, except to the extent otherwise expressly provided herein.

**Section 4.2   Payment of Rent**. All Rent shall be mailed or otherwise delivered to Landlord's Mailing Address above or, upon at least thirty (30) days' prior notice to Tenant, to such other address as Landlord may from time to time designate. Landlord acknowledges and agrees that for administrative purposes, Tenant has designated BBBY Management Corporation, a New York corporation (the ***"Paying Agent"***), to make all Rent payments due to Landlord under this Lease. Said designation (which may be revoked by Tenant at any time) is not intended as, and shall not constitute, an assignment of any rights or obligations of Tenant to the Paying Agent, and Tenant shall remain primarily liable for payment of Rent under this Lease. All payments of Rent received by Landlord from the Paying Agent shall be credited to Tenant as if such payments of Rent had been made by Tenant directly to Landlord.

**Section 4.3   Real Estate and Other Taxes**.

**4.3.1**   Landlord shall pay on or before the due dates thereof all "Taxes" (defined in Subsection 4.3.3 below) other than personal property taxes levied against tenants. Throughout the Term, Landlord shall cause the Shopping Center to be

16

1  maintained entirely within tax parcels and lots that exclude any property not a part of the
2  Shopping Center.

3        4.3.2      (a) Tenant shall pay to Landlord Tenant's Pro Rata Share of the
4  Taxes which accrue during the Term, subject to the provisions of this Section 4.3. Any
5  Taxes for a real estate fiscal tax year (*"Tax Year"*), only a part of which is included
6  within the Term, shall be adjusted between Landlord and Tenant on the basis of a 365-
7  day year as of the Rent Commencement Date or the date on which the Term expires or
8  earlier terminates, as the case may be, for the purpose of computing Tenant's Pro Rata
9  Share of Taxes. If, by law, any Taxes may, at the option of the taxpayer, be paid in
10  installments (whether or not interest shall accrue on the unpaid balance thereof),
11  Landlord shall exercise such option so as to maximize the number of installments, and
12  Landlord shall pay the same as they come due and before any fine, penalty, interest or
13  cost may be added thereto for nonpayment thereof. Tenant shall pay Landlord for a
14  portion of Taxes as follows:

15                (i)      For the period commencing on the Rent
16        Commencement Date and ending on the last day of the first full fiscal Tax Year
17        thereafter (the *"Base Tax Year"*), Tenant shall have no liability for Taxes, the
18        same being deemed to be included in Fixed Rent for such period;

19                (ii)      For each fiscal Tax Year after the Base Tax Year, an
20        amount equal to Tenant's Pro Rata Share of the increase, if any, in Taxes for such
21        fiscal Tax Year over the Taxes for the Base Tax Year.

22             (b)      Notwithstanding the foregoing provisions of Subsection
23  4.3.2(a), to the extent that the Shopping Center shall not be fully assessed by the
24  applicable governmental authority to reflect at least 176,000 square feet of Floor Area for
25  the Base Tax Year, then any increase in Taxes following the Base Tax Year which shall
26  be attributable to the completion of construction of buildings and improvements to the
27  Shopping Center to reflect such minimum Floor Area shall be added to the Taxes for the
28  Base Tax Year for the purposes of determining Tenant's Pro Rata Share of increases in
29  Taxes pursuant to Subsection 4.3.2(a) hereof. If Tenant shall have paid any increases in
30  Taxes prior to the determination of any such addition, Tenant shall be entitled to an
31  appropriate credit against Tenant's Pro Rata Share of the increase in Taxes for the Tax
32  Year(s) next accruing hereunder.

33             (c)      Landlord shall submit to Tenant a copy of the bill for Taxes
34  issued by the applicable taxing authority, a computation of Tenant's Pro Rata Share of
35  such Taxes, as well as copies of all notices concerning assessments, tax rates, and
36  changes thereto. Tenant shall pay Landlord in the amount required by this Subsection
37  4.3.2 within thirty (30) days after receipt of such bill (but in no event earlier than the
38  fifteenth (15th) day prior to the date on which such Taxes would become delinquent).

39        4.3.3      (a) As used herein, *"Taxes"* shall mean all general, *ad valorem*
40  real estate taxes, and assessments for betterments and improvements that are levied or
41  assessed by any lawful authority on the Shopping Center (general or special), including
42  any substitution therefor, in whole or in part, due to a future change in the method of
43  taxation. Taxes shall be reduced by any deferral, abatement, or other tax-lowering
44  adjustment received by Landlord from the taxing authorities. For purposes of computing
45  Tenant's Pro Rata Share of Taxes, Taxes shall not include any: (1) income, excise,
46  profits, estate, inheritance, succession, gift, transfer, franchise, capital, or other tax or
47  assessment upon Landlord; (2) taxes on rents (other than to the extent that such taxes are
48  customarily paid by retail tenants in the state in which the Shopping Center is located),
49  gross receipts or revenues of Landlord from the Premises; (3) fine, penalty, cost or
50  interest for any tax or assessment, or part thereof, which Landlord or its lender failed to
51  timely pay (except if same are caused by an Event of Default); (4) assessment for a public
52  improvement arising from the initial construction or expansion of the Shopping Center or

1   the Premises (it being agreed that all assessments imposed during the Term which are
2   permitted to be included within Taxes hereunder shall, for the purposes of computing
3   Tenant's Pro Rata Share thereof, be deemed to have been paid in the maximum number
4   of installments permitted by the applicable taxing authority); (5) Taxes resulting directly
5   from an increase in the assessment caused by a sale or ground lease of all or any portion
6   of the Shopping Center to an Affiliate of Landlord or more than once every five (5) years;
7   or (6) fees imposed upon Landlord in connection with Landlord's development of the
8   Shopping Center (including, without limitation, trip generation fees). All Taxes payable
9   by Tenant pursuant to this Section 4.3 shall be determined as if the Shopping Center was
10   the only property owned by Landlord. Landlord represents to Tenant that, as of the
11   Effective Date and, to the best of Landlord's knowledge, as of the anticipated Delivery
12   Date, no portion of the Shopping Center is or will be (i) subject to or the beneficiary of an
13   phase-in (of the full amount of the assessment), abatement and/or exemption of Taxes,
14   (ii) subject to any special assessments or similar charges, or (iii) are included in any
15   special improvement district(s) which would result in higher sales taxes or other similar
16   impositions than would exist in the absence of such district(s).

17         (b)    Notwithstanding the provisions of Subsection 4.3.3(a) to the
18   contrary, for so long as the tax lot of which the Premises are a part shall at any time
19   consist of less than the entire Shopping Center (such tax lot being hereinafter referred to
20   as the "*Tax Lot*"), then the following shall apply: (i) the term "Taxes" shall mean all
21   Taxes with respect to the Tax Lot only (and subject to the other provisions hereof
22   affecting the calculation of Taxes) ; (ii) "Tenant's Pro Rata Share" shall be determined
23   with respect to only such Floor Area as is contained in the Tax Lot, but in no event shall
24   Tenant's Pro Rata Share exceed the Tenant's Pro Rata Share that would be calculated
25   under this clause (ii) had all of the Floor Area located and/or to be located within the Tax
26   Lot been Substantially Completed; and (iii) in the event that the square footage allocation
27   of the Common Areas located within the Tax Lot (as compared to the total Floor Area of
28   the buildings located within the Tax Lot) is materially greater than the allocation of
29   Common Areas for the remainder of the Shopping Center, then Tenant's Pro Rata Share
30   thereof shall be equitably reduced accordingly.

31         4.3.4    Upon Tenant's good faith determination that a contest of the
32   amount or validity of any assessed valuation of Taxes may be successful, at Tenant's
33   request, Landlord shall contest the amount or validity of any assessed valuation or Taxes,
34   failing which, Tenant shall have the right to contest the assessed valuation or Taxes by
35   appropriate proceedings conducted in good faith, whereupon Landlord shall cooperate
36   with Tenant, execute any and all documents required in connection therewith and, if
37   required by any governmental authority having jurisdiction, join with Tenant in the
38   prosecution thereof. If, as a result of any contest or otherwise, any rebate or refund of
39   Taxes (a "*Tax Refund*") is received, Tenant shall be entitled to Tenant's Pro Rata Share
40   thereof (after reasonable and customary expenses incurred by Landlord and/or Tenant in
41   connection with such contest ("*Contest Costs*") are paid to the party which incurred such
42   expense out of the Tax Refund promptly upon Landlord's receipt thereof).
43   Notwithstanding the foregoing provisions of this Section 4.3.4, if Tenant requests that
44   Landlord contest Taxes hereunder and Landlord, within five (5) days following its receipt
45   of Tenant's request, notifies Tenant that Landlord refuses to do so because of Landlord's
46   good faith determination that any such contest will result in an increased assessed
47   valuation or Taxes, then, if Tenant nevertheless proceeds to contest the Taxes hereunder,
48   the following shall apply: (A) should such proceeding directly result in an increased
49   assessed valuation of Taxes, then Tenant shall be responsible for the entire resulting
50   increase in Taxes during the then remainder of the Term only, as the same become due
51   and payable to the applicable taxing authority, and (B) should such proceeding directly
52   result in a decreased assessed valuation of Taxes, then to the extent the Tax Refund is
53   insufficient to reimburse Tenant for all of its Contest Costs Tenant shall receive from
54   Landlord any such remaining Contest Costs as an offset against Tenant's Pro Rata Share
55   of Taxes (it being agreed that to the extent such remaining Contest Costs exceeds the then
56   remaining installments of Tenant's Pro Rata Share of Taxes during the Term, Tenant

1    shall receive the amount of such excess as a further offset against the then remaining
2    installments of Fixed Rent hereunder).

3             Section 4.4       Percentage Rent.

4             4.4.1     Payment. During and for each full calendar year during the
5    Term, Tenant shall pay annual percentage rent (*"Percentage Rent"*) equal to four (4%)
6    percent (the *"Percentage Multiple"*) of all "Gross Sales" (hereinafter defined in
7    Subsection 4.4.2) resulting from business conducted in, on or from the Premises during
8    such calendar year in excess of Five Million Dollars ($5,000,000) (the *"Sales Break*
9    *Point"*) and up to (but not exceeding) Six Million Dollars ($6,000,000) (the *"Sales Break*
10   *Limit"*); it being understood and acknowledged that Tenant shall have no obligation to
11   pay Percentage Rent on any Gross Sales during a particular calendar year of less than the
12   Sales Break Point or in excess of the Sales Break Limit. Within sixty (60) days after the
13   close of each calendar year, Tenant shall furnish to Landlord a compilation prepared by
14   an officer of Tenant setting forth the amount of Gross Sales during the preceding calendar
15   year and showing the amount of Percentage Rent, if any, required to be paid by Tenant
16   for such calendar year, provided, however, that Tenant shall not be required to provide
17   such compilation if the amount of Gross Sales for such calendar year is less than ninety
18   percent (90%) of the Sales Break Point or more than ten percent (10%) of the Sales Break
19   Limit. The full amount of any Percentage Rent due shall be paid to Landlord
20   simultaneously with the furnishing of said compilation. Notwithstanding the foregoing,
21   no Percentage Rent shall be payable with respect to the period commencing on the Rent
22   Commencement Date and ending on the December 31 next following the Rent
23   Commencement Date.

24           4.4.2     Definition of Gross Sales. As used herein, the term *"Gross*
25   *Sales"* shall mean the total amount of all sales of merchandise or services completed at
26   the Premises by Tenant or any sublessee, licensee or concessionaire of Tenant and any
27   other person or entity operating in the Premises (for purposes of this Subsection 4.4.2
28   only, collectively, *"Tenant"*), whether for cash, credit or otherwise, including redemption
29   of gift certificates and gift cards. Tenant shall record, at the time of each Gross Sale, all
30   receipts from such sale, whether for cash, credit or otherwise, in a cash register or cash
31   registers, or in such electronic or computer device which records sales in a manner which
32   is generally acceptable by industry standards. The term *"Gross Sales"* shall exclude: **(1)**
33   proceeds from any sales tax, gross receipts tax or similar tax, by whatever name called,
34   which are separately stated and are in addition to the sales price, **(2)** *bona fide* transfers or
35   exchanges of merchandise from the Premises to any other stores or warehouses of Tenant
36   or any Affiliates of Tenant, and returns to shippers and manufacturers for credit, **(3)**
37   refunds or credits given to customers for merchandise returned or exchanged at the
38   Premises (regardless of where or how purchased) and which were originated at the
39   Premises and previously included in Gross Sales, **(4)** sales of Tenant's fixtures and
40   equipment not in the ordinary course of Tenant's business, **(5)** to the extent of prior
41   inclusion in Gross Sales, bad debts when written off the books of Tenant, provided that
42   any collections made on account of such bad debts shall be included in Gross Sales when
43   received, not to exceed two percent (2%) of Gross Sales per calendar year or pro rata
44   portion thereof, **(6)** receipts from vending machines installed solely for the use of
45   Tenant's employees and receipts from pay telephones, **(7)** sales to employees of Tenant at
46   discount (which, for the purposes of determining Percentage Rent hereunder, shall not
47   exceed two percent (2%) of Gross Sales per calendar year or pro rata portion thereof, as
48   applicable), **(8)** fees paid to independent third party credit card, charge card, and debit
49   card companies in connection with sales charged to or debited from customers' credit
50   cards, charge cards, or debit cards, as applicable, **(9)** proceeds from delivery, gift-
51   wrapping and check cashing charges (which, for the purposes of determining Percentage
52   Rent hereunder, shall not exceed two percent (2%) of Gross Sales per calendar year or
53   pro rata portion thereof, as applicable), **(10)** sums and credits received in settlement of
54   claims for loss or damage to merchandise, **(11)** separately stated service, finance and
55   interest charges, **(12)** the dollar value of coupons utilized by customers in the purchase of

19

1    merchandise from the Premises, **(13)** close-out or bulk sales of inventory to jobbers or
2    wholesalers, **(14)** sales of gift certificates and/or gift cards (provided that redemptions of
3    gift certificates and/or gift cards shall be included in Gross Sales at the time so
4    redeemed), and **(15)** forfeited deposits.

5              4.4.3      Books and Records.  Tenant shall maintain at the Premises or at
6    its principal office, complete books and records reflecting all elements of Gross Sales.
7    Tenant shall be allowed to maintain its books and records in a computerized form;
8    provided, however, that (i) such computerized books and records provide the same level
9    of information as the books and records described above, are retained for the full record
10   retention period provided for herein, and (ii)  promptly upon request, printed copies of
11   any such books and records are made available at Tenant's principal office for inspection
12   by Landlord's representatives who are engaged in inspecting and/or auditing Tenant's
13   books and records as provided herein.  Such books and records shall be kept in
14   accordance with generally accepted accounting principles and practices consistently
15   applied and shall be retained by Tenant for at least two (2) years following the end of the
16   calendar year to which they refer.

17             4.4.4      Landlord's Right to Audit.  Landlord and/or Landlord's auditor
18   shall have the right, within three (3) years following the end of any particular calendar
19   year and upon at least ten (10) days prior notice to Tenant (but not more than once per
20   annum), to inspect and/or audit the records of Tenant relating to Gross Sales for such
21   calendar year.  If any such audit discloses a deficiency in the Gross Sales reported by
22   Tenant, Tenant shall pay any deficiency in Percentage Rent (or Alternate Rent) owing to
23   Landlord on account of such deficiency, with interest at the Lease Interest Rate from the
24   date such amount was due and payable to Landlord.  If such deficiency is in excess of
25   three (3%) percent of the Gross Sales reported by Tenant and Percentage Rent (or
26   Alternate Rent) is then payable, Tenant shall also pay Landlord's reasonable costs of the
27   inspection and audit.  Tenant has not and does not make any representation or warranty as
28   to the amount of Gross Sales which are anticipated from the Premises.

29             4.4.5      Confidentiality.  Landlord shall not disclose to any third party
30   Tenant's Gross Sales or the amount of Percentage Rent paid or payable by Tenant,
31   provided, however, that (i) such information was not previously disclosed by Tenant to
32   such third party or to the public generally, and (ii) nothing contained herein shall restrict
33   Landlord from disclosing such information as may be required by applicable Legal
34   Requirements or to its accountants, attorneys, *bona fide* prospective purchasers, or
35   current or prospective Mortgagees or underlying lessors of all or any portion of
36   Landlord's interest in the Shopping Center (provided that each of such recipients shall be
37   bound to the same non disclosure provisions as are imposed upon Landlord).

38             4.4.6      Disputes.  Any dispute between the parties relative to the
39   provisions of this Section 4.4, including, without limitation, the amount of Percentage
40   Rent or Alternate Rent payable by Tenant, shall be submitted to arbitration in accordance
41   with the provisions of Section 16.2 of this Lease.

42                                    ARTICLE 5
43                      COMMON AREAS, THEIR USE AND CHARGES

44          Section 5.1      Common Areas:  Maintenance.

45             5.1.1      Maintenance of Common Areas.  Landlord shall operate,
46   maintain, repair and replace, or cause to be operated, maintained, repaired and replaced,
47   the Common Areas as required by this Lease and otherwise to the standard by which
48   Common Areas of first-class shopping centers in the state in which the Shopping Center
49   is located are operated, maintained, repaired and replaced, including, without limitation,
50   snow, ice, rubbish and debris removal (including installation and maintenance of
51   sidewalk refuse containers), landscaping (including, without limitation, the trimming and
52   pruning of trees to avoid interference with the use or visibility of canopies or signs on the

20

1     exterior of the Premises), adequate lighting, insurance, supervision, use, parking lot
2     paving and striping, drainage, security (as reasonably required), and control of all
3     Common Areas, and Landlord shall comply with all applicable Legal Requirements.

4             5.1.2    <u>Tenant's Pro Rata Share of Common Areas Charges</u>.

5             (a)     During the Term, Tenant shall pay to Landlord a contribution
6     towards the reasonable costs (hereinafter referred to as the ***"Common Areas Charges"***)
7     paid by Landlord to operate, maintain, insure and repair, subject to the exclusions set
8     forth in Section 5.1.3 below, the Common Areas including, without limitation, costs
9     related to lighting facilities; curbs, walkways, parking lot patching and repaving; security;
10    trash collection; snow and ice removal; gardening and landscaping; striping of parking
11    areas; reasonable depreciation or amortization of, or rents for, the equipment used in the
12    operation of Common Areas; annual premiums for insurance required to be maintained
13    by Landlord hereunder pursuant to Subsection 10.3.3 below; wages, worker's
14    compensation, unemployment taxes and Social Security taxes of employees, in each case
15    below the level of management, directly and actually performing the above described
16    services (provided however, if such persons perform services for more than one shopping
17    center, such wages, workmen's compensation, unemployment taxes and Social Security
18    taxes shall be allocated between the Shopping Center and such other shopping centers,
19    and Tenant shall be obligated to contribute only to the portion allocated to the Shopping
20    Center); retention pond and storm water lines; and tools consumed in the operation,
21    maintenance, repair and replacement of the Common Areas. Tenant's Pro Rata Share of
22    Common Areas Charges shall be paid in equal monthly installments on the first day of
23    each calendar month, in advance, during each calendar year based on Landlord's
24    reasonable budget (with respect to which budget the amount thereof shall not exceed one
25    hundred five (105%) percent of the Increase (as hereinafter defined) for the most recent
26    calendar year for which such information is available (exclusive of snow removal, utility
27    rate increases and insurance rate increases during such prior calendar year). The
28    Common Areas Charges shall also include an administrative fee equal to five percent
29    (5%) of the total Common Areas Charges for the calendar year in question, excluding
30    therefrom the cost of any replacement or improvement of a capital nature (to the extent
31    otherwise a permissible Common Area Charge), costs relating to insurance and costs of
32    utilities (the ***"Administrative Fee"***).

33             (b)     For the purposes hereof (x) the phrase ***"Base CAM Year"***
34    shall mean the first full calendar year after the Rent Commencement Date occurs; (y) the
35    phrase ***"Premises Base Year CAM"*** shall mean the Common Areas Charges for the Base
36    CAM Year multiplied by Tenant's Pro Rata Share [provided that this definition (y) is
37    solely for the purposes of calculating the cap on Tenant's Pro Rata Share of increases in
38    the Common Areas Charges over those for the Base CAM Year as hereinafter provided
39    and is not for the purposes of calculating any liability to Tenant for Common Areas
40    Charges for the Base CAM Year], and (z) the phrase ***"Increase"*** shall mean the increase,
41    if any, in Tenant's Pro Rata Share of Common Areas Charges for a particular calendar
42    year after the Base CAM Year over the Premises Base Year CAM. On and after the Rent
43    Commencement Date, Tenant shall pay as Tenant's Pro Rata Share of Common Areas
44    Charges the following:

45             (i)     For the period commencing on the Rent
46    Commencement Date and ending on the last day of the Base CAM Year thereafter,
47    Tenant shall have no liability for Common Areas Charges, the same being deemed
48    to be included in Fixed Rent for such period;

49             (ii)     For each calendar year, or part thereof, during the
50    Term, after the Base CAM Year, the Increase for such year.

51     Notwithstanding the foregoing, except with respect to snow and ice removal, utility rate
52     increases and insurance rate increases, which Tenant shall be obligated to pay Tenant's

1   Pro Rata Share of as otherwise provided herein, the Increase payable by Tenant for the
2   first calendar year after the Base CAM Year shall not exceed one hundred five percent
3   (105%) of the Premises Base Year CAM and the Increase payable by Tenant each
4   subsequent calendar year shall not exceed one hundred five percent (105%) of the
5   Increase for the immediately prior calendar year.

6                    (c)     Within one hundred twenty (120) days after the end of each
7   calendar year, Landlord shall provide to Tenant a statement, in reasonable detail, of
8   Common Areas Charges for such year, which statement shall be prepared in accordance
9   with generally accepted accounting principles consistently applied (the *"CAC*
10  *Reconciliation Statement"*). The CAC Reconciliation Statement shall be certified by
11  Landlord as being accurate and shall be accompanied by a calculation of Tenant's Pro
12  Rata Share of Common Areas Charges, and payment to Tenant in the amount of any
13  overpayment made by Tenant during the preceding calendar year. If Tenant's Pro Rata
14  Share of the actual Common Areas Charges for a calendar year shall exceed the
15  aggregate monthly installments paid by Tenant during said calendar year, Tenant shall
16  pay to Landlord the deficiency within thirty (30) days after receipt of such notice. Upon
17  Tenant's request, Landlord shall promptly deliver to Tenant copies of relevant backup
18  materials (including, but not limited to, contracts, correspondence and paid invoices)
19  reasonably required by Tenant. If Landlord fails to timely remit to Tenant the amount of
20  any overpayment hereunder, Tenant shall have the right (in addition to any rights and
21  remedies to which it may be entitled under this Lease, at law, or in equity) to offset such
22  amount from payments of Rent next becoming due hereunder, together with interest
23  thereon at the Lease Interest Rate from the date such remittance is due until
24  reimbursement or full satisfaction by credit.

25              5.1.3    Exclusions from Common Areas Charges.

26                   (a)     Common Areas Charges shall not include: **(1)** the capital cost
27  of any additions to the Common Areas pursuant to an expansion of the Shopping Center;
28  **(2)** the cost of any replacements or capital improvements to the Common Areas, except
29  that the cost of repaving the parking areas of the Shopping Center may be included within
30  Common Areas Charges so long as such cost is amortized on a straight-line basis over the
31  useful life thereof under generally accepted accounting principles, and is not incurred (A)
32  prior to the expiration of the fifth (5th) full calendar year of the Term, or (B) more than
33  once during each five (5) full calendar years of the Term; **(3)** the cost of investigating,
34  monitoring or remedying any environmental condition or "Hazardous Substances" or any
35  other "Compliance Costs" (both as hereinafter defined in Subsection 12.4.1); **(4)** any debt
36  service (including principal and interest) or payments of any judgments or other liens
37  against Landlord; **(5)** the cost of maintaining, repairing or providing security for interior
38  portions of buildings; **(6)** Taxes or other taxes levied or assessed against Landlord or the
39  Shopping Center; **(7)** the cost of compliance with Legal Requirements (including, without
40  limitation, the cost of curing violations or contesting such Legal Requirements or
41  violations), except that Common Areas Charges shall include the cost of compliance with
42  Legal Requirements affecting only the Common Areas provided that same shall (A)
43  apply only to Legal Requirements enacted after the Rent Commencement Date, (B) not
44  be necessitated by the acts or omissions of Landlord or any other tenant or any of their
45  respective agents, subtenants, occupants, contractors or employees, (C) benefit all tenants
46  of the Shopping Center, (D) be amortized on a straight-line basis over the useful life
47  thereof under generally accepted accounting practices, and (E) be similarly imposed on
48  all other tenants of the Shopping Center; **(8)** any costs resulting from insurance
49  deductibles or any payments made under any self-insurance policy maintained by
50  Landlord to the extent that Tenant's aggregate Pro Rata Share thereof during the lifetime
51  of the Lease shall exceed a total of $5,000 for each full calendar year that shall have
52  elapsed during the Term other than the Base CAM Year; **(9)** any costs which would have
53  been reimbursed or paid for by insurance proceeds had Landlord maintained the
54  insurance required under Section 10.3 hereof and the amount of any judgment or other
55  charge entered or costs assessed against Landlord in excess of the policy limits of the

insurance maintained by Landlord under Section 10.3 hereof); **(10)** those portions of Landlord's insurance premiums which are reimbursed to Landlord by any other tenant in the Shopping Center other than through the payment of such tenant's proportionate share of insurance premiums otherwise includable as part of Common Areas Charges; **(11)** sums paid or owed by Landlord to any tenant in the Shopping Center; **(12)** costs incurred in connection with the negotiation of leases with, or construction of improvements for, any tenant in the Shopping Center (including, without limitation, brokerage commissions and legal fees); **(13)** costs incurred in connection with lawsuits or other legal actions (including, without limitation, arbitrations and mediations) instituted or defended by Landlord; **(14)** sums incurred as late payment fees, penalties or interest; **(15)** ground rent; **(16)** depreciation [except as expressly permitted pursuant to item 23 below]; **(17)** costs that Tenant demonstrates are disproportionately incurred by or on behalf of any one or more of the tenants in the Shopping Center (including, without limitation, all costs relating to the operation of any food court in the Shopping Center); **(18)** electricity costs for lighting Common Areas later than the "Normal Hours" [hereinafter defined in Section 5.2], other than low-level security lighting; **(19)** Landlord's advertising, entertainment and promotional costs for the Shopping Center (including, without limitation, holiday decorations); **(20)** costs of acquiring, leasing, restoring, insuring or displaying sculptures, paintings and other objects of art located within or outside the Shopping Center; **(21)** costs and expenses payable to Landlord or its Affiliate, to the extent that such costs and expenses exceed competitive costs and expenses for materials and services by unrelated persons or entities of similar skill and experience; **(22)** repairs resulting from defects in the original construction of the Shopping Center arising within one (1) year after the Rent Commencement Date; **(23)** the cost of mechanized equipment for the maintenance of the Common Areas (but not the straight-line depreciation thereof over its useful life, as determined in accordance with generally accepted accounting principles); **(24)** reserves for anticipated future expenses; **(25)** other than the Administrative Fee, any cost or expense relating to the administration and management of the Common Areas (whether on-site or off-site) including, but not limited to, overhead, management fees, office salaries and benefits, office rental, office supplies, dues and subscriptions, office utility charges, telephone charges and automobile expenses; **(26)** costs incurred in connection with the monitoring, maintenance, inspection, or testing of fire alarm systems; **(27)** costs and expenses payable to Landlord, or its Affiliate or designee, for the provision of utility service(s) to the Common Areas, to the extent that such costs and expenses exceed competitive market rates; **(28)** costs relating to any Exterior Tenant Areas; or **(29)** costs of repairs and replacements required of Landlord under Section 9.2 below except as otherwise expressly provided thereunder.

        **(b)**    In addition, if any tenant or other occupant of the Shopping Center (i) maintains the Common Areas in whole or in part, or any facilities therein, (ii) provides any services the cost of which would otherwise be includable in Common Areas Charges, and/or (iii) pays directly for costs which would otherwise be included in the Common Areas Charges, then the costs associated with or attributable to any of the foregoing shall be excluded from Common Areas Charges, and the denominator used to determine Tenant's Pro Rata Share of such costs (and only such costs) shall be reduced by the Floor Area occupied by such tenant or other occupant.

        **(c)**    Common Areas Charges for any period during the Term which constitutes less than a full calendar year shall be equitably prorated.

        5.1.4    <u>Tenant's Right to Audit</u>. Provided an Event of Default (as defined herein) has not occurred and is not continuing, Tenant shall have the right, within three (3) years after receiving any CAC Reconciliation Statement (and not more than once annually) to audit Landlord's books and records to verify Landlord's calculation of Common Areas Charges as reflected therein and Tenant's Pro Rata Share thereof. Upon Tenant's request, Landlord shall promptly deliver to Tenant copies of relevant backup materials (including, but not limited to, contracts, correspondence and paid invoices) reasonably required by Tenant. In the event of an error in Landlord's favor, Landlord

23

1   shall refund the overcharge to Tenant (with interest at the Lease Interest Rate from the
2   date of Landlord's delivery of the CAC Reconciliation Statement for the audited year
3   through the date the overcharge is paid) within thirty (30) days after Tenant's demand
4   therefor, and if the overcharge exceeds three (3%) percent of Tenant's Pro Rata Share of
5   Common Areas Charges, Landlord shall pay to Tenant the reasonable expenses of the
6   audit within thirty (30) days after Tenant's demand therefor, failing which, Tenant shall
7   have the right (in addition to any rights and remedies to which it may be entitled under
8   this Lease, at law, or in equity) to offset such amount from payments of Rent next
9   becoming due hereunder, together with interest thereon at the Lease Interest Rate from
10  the date such remittance is due until reimbursement or full satisfaction by credit.
11  Landlord shall maintain all books and records pertaining to a calendar year for at least
12  three (3) years after it delivers to Tenant a CAC Reconciliation Statement for such
13  calendar year.  Tenant shall keep the results of any such audit confidential, provided that
14  nothing contained herein shall restrict Tenant from disclosing such information as may be
15  required by applicable Legal Requirements, or to its accountants, attorneys or *bona fide*
16  prospective assignees or subtenants (provided that each of such recipients shall be bound
17  by the same non-disclosure provisions as are imposed upon Tenant).  Any dispute by
18  Landlord with respect to an audit by Tenant shall be submitted to arbitration in
19  accordance with the provisions of Section 16.2 below.

20       5.1.5   In no event shall Tenant be required to join, participate in or
21  contribute to any promotional fund, marketing fund or merchants' association.

22       Section 5.2   Common Areas: Restrictions.

23       5.2.1   Continuous Access.  Except with respect to events covered by
24  Article 11, no entrances, exits, approaches and means of ingress and egress to, from,
25  and/or within the Critical Area or the Premises as shown on Exhibit B hereto shall be
26  interrupted or disturbed by any act or omission of Landlord during the Term, except: (i)
27  in the event of an emergency or as may be otherwise required by applicable Legal
28  Requirements, in which event Landlord shall use reasonable efforts to give Tenant
29  advance notice of same and to minimize interference to Tenant's normal business
30  operations in the Premises as a result thereof; (ii) perform normal maintenance and repair
31  obligations; or (iii) in the event that Landlord is required to temporarily close the
32  Common Areas, for the minimum time legally necessary to prevent a dedication thereof
33  or an accrual of any rights in any person or the public generally therein; provided that
34  such closure shall not occur during August, November or December of any calendar year,
35  and Landlord shall give Tenant at least thirty (30) days' prior notice thereof.

36       5.2.2   No Alterations.  Except with respect to events covered by Article
37  11, Landlord shall not, without obtaining Tenant's prior written consent in each instance,
38  which consent may be withheld in its sole discretion: (i) alter the area of the Shopping
39  Center within the Critical Area or the location, availability, or size of any Common Area
40  improvement within the Critical Area from that shown on Exhibit B hereto; (ii) construct
41  or permit to be constructed any structures in the Common Areas of the Shopping Center
42  within the Critical Area (including, without limitation, any buildings, kiosks, booths,
43  signs or similar structures in the Common Areas), other than as shown on Exhibit B
44  hereto; (iii) materially change the entrances or exits to and from the Shopping Center, or
45  the curb cuts, roadways, drive aisles, sidewalks or other elements of the Common Areas,
46  or the number, location or layout of parking spaces within the Critical Area from those
47  shown on Exhibit B hereto.  Landlord shall neither perform nor permit to be performed,
48  any construction, repairs, replacements or maintenance to any portion of the Shopping
49  Center, including the Premises (other than emergency repairs to utilities and Common
50  Areas or as required by Legal Requirements) during the months of August, November
51  and December of any year, without the prior consent of Tenant, which consent may be
52  withheld in Tenant's sole discretion.

24

1          5.2.3      Outparcels; Omni Parcels. In addition to the provisions of
2  Subsection 5.2.2 above, during the Term, the following restrictions shall encumber and
3  bind the outparcels (collectively, the *"Outparcels"* and each, individually, an
4  *"Outparcel"*) designated on Exhibit B hereto as Pad "A", Pad "B" and Pad "C" as well as
5  those portions of the shopping center designated on Exhibit B hereto as Omni "A" and
6  Omni "B" (collectively, the *"Omni Parcels"* and each, individually, an *"Omni Parcel"*):
7  (a) no more than one building shall be constructed on any Outparcel or Omni Parcel; (b)
8  no building shall exceed one story in height; (c) no building shall exceed a maximum
9  height of twenty-two feet (22') as measured from the finished floor level to the top of the
10 roof level (exclusive of the height of all types of architectural projections, treatments or
11 embellishments beyond such roof level, such as, without limitation, parapets, mansards
12 and signs, as well as all non-architectural elements such as HVAC equipment, satellite
13 dishes and antennae), provided that such building shall in no event exceed a maximum
14 height of twenty-four feet three inches (24' 3") as measured from the finished floor level
15 to the highest point on such building or structure (inclusive of the height of all types of
16 architectural projections, treatments or embellishments thereon, such as, without
17 limitation, parapets, mansards and signs, as well as all non-architectural elements such as
18 HVAC equipment, satellite dishes, and antennae); (d) the Floor Area of any building
19 constructed on an Omni Parcel shall not exceed the Floor Area established therefor on
20 Exhibit B hereto and the Floor Area of any building constructed on an Outparcel shall not
21 exceed 11,000 square feet on Pad "A" referred to above or 7,000 square feet on each of
22 Pad "B" or Pad "C" referred to above; and (e) all Legal Requirements relative to parking
23 requirements for each Outparcel operation shall be complied with by providing the
24 requisite number of parking spaces solely within the boundaries of such Outparcel,
25 without reduction in such number by virtue of the granting of a variance or special
26 exception. For purposes of this Subsection 5.2.3, the Floor Area of any building
27 constructed on an Outparcel or Omni Parcel shall also be deemed to include outdoor
28 balconies, patios or other outdoor areas utilized for retail sales or food or beverage
29 service (exclusive of drive through or walk-up take-out food or beverage service).

30         5.2.4      Parking Area. During the Term, Landlord shall maintain in the
31 Shopping Center, at a minimum, the greater of (i) the number of parking spaces required
32 by applicable Legal Requirements, without variance, or (ii) 4.50 ground-level parking
33 spaces for every one thousand (1,000) square feet of Floor Area in the Shopping Center,
34 with each such space being at least nine (9) feet in width and eighteen (18) feet in length.
35 Parking spaces shall at all times be clearly marked by painting, striping or otherwise.
36 Landlord shall not designate specific parking spaces for use by other tenants or occupants
37 of the Shopping Center within the Critical Area (other than the Outparcels) and except for
38 the six (6) designated spaces for Circuit City in the rear of its building as shown on
39 Exhibit B as "Circuit City Car Stereo Parking", nor shall Landlord permit any person or
40 entity to use the parking areas other than Tenant, the other tenants and occupants of the
41 Shopping Center, and their respective employees, agents, subtenants, concessionaires,
42 licensees, customers, and invitees. There shall be no charge whatsoever levied for the
43 use of any parking areas within the Shopping Center. Landlord shall not permit
44 overnight parking in the Shopping Center, other than delivery vehicles or temporary
45 trailers used by other Occupants of the Shopping Center, but in no event located within
46 the Critical Area or the triangular piece of land between the Premises and the TJ Maxx
47 premises and described as "Open Area" on Exhibit B attached hereto.

48         5.2.5      Lighting. Throughout the Term, Landlord shall keep the
49 Common Areas fully lighted and open to the customers of the Shopping Center seven (7)
50 days a week from dusk until 11:00 p.m. Monday through Saturday and until 9:00 p.m. on
51 Sunday (*"Normal Hours"*). Upon request of Tenant, Landlord shall keep the Common
52 Areas lighted for as long after Normal Hours as Tenant shall request, provided Tenant
53 shall pay for a share of the reasonable cost of said requested lighting, which share shall
54 be equal to the product of (x) such cost, and (y) a fraction, the numerator of which shall
55 be the number of square feet of Floor Area within the Premises and the denominator of
56 which shall be the aggregate number of square feet of Floor Area of all premises within

the Shopping Center (including the Premises) open later than Normal Hours (excluding, however, those tenants and occupants who separately control and pay for their own Common Area lighting). In addition to the foregoing, Landlord shall provide for low level security lighting from one (1) hour after the close of business in the Premises until dawn.

5.2.6    Repairs. During the Term, any construction or repair by Landlord permitted or required under this Lease and undertaken in the Common Areas or in any other portion of the Shopping Center shall:

(a)    not be performed during the months of August, November, or December of any year, except in the event of an emergency or as may be otherwise required by applicable Legal Requirements;

(b)    with respect to the Critical Area only, be commenced only upon at least five (5) days' prior notice to Tenant (except in an emergency, in which event Landlord shall only be required to give such notice as is reasonable under the circumstances); and

(c)    be performed in accordance with the requirements of Section 3.3.6 above and in such a manner so as not to materially interfere with the normal conduct of any business operations in the Premises.

5.2.7    Rules and Regulations. Tenant shall comply with the rules and regulations of the Shopping Center as established from time to time by Landlord, within sixty (60) days after Landlord notifies Tenant thereof, provided they: (i) are reasonable, (ii) do not adversely affect the normal conduct of any business operations in the Premises, (iii) do not adversely affect any of Tenant's rights under this Lease, and (iv) are uniformly enforced against all tenants of the Shopping Center and without prejudice against Tenant. In the event of any conflict between the provisions of this Lease and any rules or regulations, the provisions of this Lease shall prevail and govern.

5.2.8    Miscellaneous.

(a)    No Promotional Use. Landlord shall not use or permit the use of all or any portion of the Common Areas within the Critical Area for retail sales or for promotional purposes. Notwithstanding the foregoing provision, tenants of the Shopping Center (including Tenant) within the Critical Area shall be permitted to conduct sidewalk sales in front of their respective stores only, provided that such sales shall: (A) be conducted in a manner consistent with sidewalk sales in first-class shopping centers in the state in which the Shopping Center is located, (B) not materially interfere with normal pedestrian access over the sidewalks, and (C) not materially interfere with the normal business operations of Tenant in the Premises or materially impair the visibility of Tenant's signage. Further notwithstanding the foregoing provision, the tenant under the Circuit City lease (as identified in Exhibit K-2) may use the parking areas shown on Exhibit B as "Circuit City Demonstration Area" for temporary sales, promotions and product demonstration activities customary to its business operations, provided that (aa) such activities shall occur on not more than four (4) occasions per year, each such occasion not to exceed seven (7) consecutive days' duration, (bb) such areas shall be maintained in a clean, safe and sightly manner, (cc) such activities shall be conducted in a manner consistent with so-called parking lot tent sales in first-class shopping centers in the state in which the Shopping Center is located, (dd) such activities shall not materially interfere with normal vehicular or pedestrian access in the parking areas, (ee) such activities shall not materially interfere with the normal business operations of Tenant in the Premises or materially impair the visibility of Tenant's signage, and (ff) such activities shall be conducted totally within the parking areas shown on Exhibit B as "Circuit City Demonstration Area." Landlord shall not permit any solicitation, distribution of handbills, picketing, or other public demonstration in the Common Areas, except as otherwise may be mandated by applicable Legal Requirements.

1              (b)    Trash Compactor & Containers. Tenant shall be permitted to
2  maintain and operate, at no extra charge: (i) a trash compactor in the portion of the
3  Common Areas designated on Exhibit B hereto as "Trash Compactor Pad"; and (ii) a
4  trash container(s) in the portion(s) of the Common Areas designated on Exhibit B hereto
5  as "Trash Container Pad". Tenant, at its sole cost and expense, shall keep the trash
6  compactor and containers neat and clean and repair any damage caused by use and
7  storage of such compactor and containers.

8              (c)    Shopping Carts. Tenant shall be permitted to store its
9  shopping carts in not more than two (2) exterior cart corrals as may be reflected on
10  Exhibits B and D-1 hereto except to the extent the same is not permitted by Legal
11  Requirements. With respect to shopping carts provided by Tenant for the use of its
12  customers, Tenant will use reasonable efforts to periodically remove same from the
13  Common Areas.

14            (d)    Cellular Towers. No transmission and/or reception towers for
15  wireless telephone or internet communications shall be permitted within the Shopping
16  Center. The preceding sentence shall not prohibit Tenant from maintaining rooftop
17  antennae and satellite dishes as set forth in Section 8.1.4 below; nor shall the preceding
18  sentence prohibit other tenants of the Shopping Center from maintaining rooftop
19  antennae and satellite dishes in conjunction with and incidental to their respective retail
20  businesses conducted within the Shopping Center, in each case of the type customarily
21  utilized by tenants in first-class shopping centers.

22                                  ARTICLE 6
23                                  UTILITIES

24        Section 6.1    Utility Service. From and after the Delivery Date and
25  continuing thereafter through the end of the Term, Tenant shall be solely responsible for
26  and shall pay the cost of utilities services (including, without limitation, electricity, gas,
27  water, sanitary sewer, alarm and telecommunications) consumed in the Premises by
28  Tenant. Tenant shall not be obligated to purchase utility service(s) directly from
29  Landlord, or from any utility provider designated by Landlord. Landlord shall provide
30  separate utility meters exclusively serving the Premises, at its sole cost and expense
31  (including, without limitation, all connection, tap-in and hook-up fees). Subject to
32  Landlord's obligations set forth in the immediately preceding sentence, Tenant shall be
33  responsible for all deposits and charges required by any utility companies in connection
34  with opening an account with such utility services, and in the event Tenant selects a
35  utility provider not otherwise providing or anticipated to provide service to any area of
36  the Shopping Center, for increased costs incurred by Landlord due to the installation of
37  utility lines and equipment required by such utility company(ies) solely by reason of
38  providing such service to Tenant (but excluding, in any event, costs incurred by Landlord
39  in connection with completing Landlord's Work and/or complying with its obligations
40  under this Section 6.1). Tenant's entry upon the Premises prior to the Delivery Date shall
41  not constitute a waiver by Tenant of Landlord's obligation to pay the costs of all utility
42  charges incurred in the Premises prior to the Delivery Date. Landlord shall not permit the
43  capacity of utility lines available for use at the Premises to be reduced or overloaded by
44  any other persons or entities. Landlord shall permit Tenant and its telecommunications
45  provider full and free access to, and use of, available telecommunications conduits in the
46  Shopping Center for the provision of telecommunications service to the Premises, subject
47  to such reasonable requirements as Landlord may impose.

48        Section 6.2    Interruption. Notwithstanding any provision of this Lease to
49  the contrary, in the event utilities serving the Premises are disrupted due to the acts or
50  omissions of Landlord, its agents, contractors, servants or employees, Landlord shall
51  promptly restore the affected utilities at Landlord's sole cost and expense. If the
52  disrupted utilities are not restored within forty-eight (48) hours after the Landlord has
53  knowledge of the disruption, and Tenant is unable to conduct its normal business in the

1     Premises as a result thereof, Rent shall be equitably abated during the period of
2     disruption.

3                      ARTICLE 7
4                      SIGNS

5          Section 7.1     Tenant's Building Signage. Landlord, at its own cost and
6     expense, shall supply and install signage (and obtain all permits and approvals therefor)
7     as part of Landlord's Work in accordance with Exhibits D, D-1, and F hereto, and with
8     the additional provisions of this Lease. Thereafter, Tenant shall have the exclusive right
9     during the Term, at its sole cost and expense, to erect, maintain, and replace (subject to
10    the limitations set forth herein) on the Allowed Signage Area (as defined herein) signs
11    (including, without limitation, under-canopy or blade signs), banners (including
12    temporary banners placed on the storefront of the Premises), awnings, and flags of such
13    size, design and color as Tenant, from time to time, may desire, subject to compliance
14    with applicable Legal Requirements. The foregoing notwithstanding, all such banners
15    shall be professionally prepared and no such banners may be displayed (i) on more than
16    four (4) occasions per calendar year (or such greater number of times per calendar year as
17    any other tenant or occupant in the Shopping Center may be allowed to display similar
18    such banners), nor (ii) for periods of more than thirty (30) consecutive days year (or such
19    greater number of consecutive days as any other tenant or occupant in the Shopping
20    Center may be allowed to display similar such banners). As used herein *"Allowed*
21    *Signage Area"* shall mean the storefront of the Premises and, to the extent any other
22    tenants in the Shopping Center are allowed with respect to their respective premises, any
23    exposed exterior walls of the Premises and the side walls of any entrance design
24    elements. Tenant may erect and maintain in the interior of the Premises any signs it may
25    desire, provided that same are professionally prepared.

26         Section 7.2     Pylon/Monument Signage. Landlord shall provide pylons at
27    the locations shown on Exhibit B hereto during the entire Term, and obtain all permits
28    and approvals therefor. Landlord, as part of Landlord's Work, shall obtain all
29    governmental approvals and permits for, and shall procure and install, Tenant's sign
30    panel(s) on all sides of such pylons, in accordance with the provisions of Article 3 and
31    Exhibits D and F hereto. The dimensions of Tenant's pylon sign panel(s) shall be at least
32    as large as those of other occupants of the Shopping Center, and shall be located in the
33    position designated on Exhibits D and F hereto. In addition, if Landlord constructs or
34    makes available to any other tenant or tenants in the Shopping Center any other signage
35    located in the Common Areas (other than pylon or monument signs located on Outparcels
36    or Omni Parcels that are used exclusively by the tenants of such Outparcels or Omni
37    Parcels, respectively, provided that no such pylons or monuments located on Outparcels
38    or Omni Parcels shall exceed the height of any shopping center pylon that contains or
39    may be required to contain Tenant's signs), such signage shall also include Tenant's
40    identification sign, as shown on Exhibit F hereto, which shall be at least as high (in
41    relation to other sign panels thereon) as Tenant's signs are on the pylons described in
42    Exhibits D and F and at least as large as the largest sign made available to such other
43    tenant or tenants. Landlord shall maintain all pylons in good order and repair, and allow
44    Tenant access to replace its signs thereon, at Tenant's cost and expense. Tenant shall be
45    responsible for maintaining and repairing Tenant's panels thereon. Landlord shall not
46    change or alter the location, structure, height or general appearance of the pylons
47    containing Tenant's panels without obtaining Tenant's prior consent. The cost of
48    maintaining all pylons bearing Tenant's sign panel(s) [but not the cost of individual
49    tenants' signs thereon or the cost of the construction of the pylons] and the cost of any
50    electricity used to illuminate them, shall be includable in Common Areas Charges.

51         Section 7.3     Signage: Alteration/Removal/Allocation. Tenant shall have
52    the right, from time to time, without Landlord's approval, to change its signs on the
53    storefront and exterior of the Premises, as well as on any pylon, in each case consistent
54    with signage customarily found in first class shopping centers, provided that the area of

the new sign is no larger than the area of the sign which it replaces and that the method of construction and attachment is substantially the same and Tenant shall repair any damage caused by any such modifications. Upon the expiration or earlier termination of the Lease, Tenant shall remove its signs from the fascia or other exterior walls of the Premises and from any pylon, and shall repair any damage occasioned thereby. The signage rights granted to Tenant pursuant to this Article 7 shall, at Tenant's option, be allocated to or between Tenant and/or any subtenant(s) of all or any portion of the Premises. All signage installed by Landlord and Tenant hereunder shall comply with applicable Legal Requirements.

Section 7.4    Cooperation. Landlord, upon request, shall execute any consents or applications which may be required by applicable Legal Requirements to permit the placement, installation, and/or replacement by Tenant of any signs on any part of the Premises or on any pylon, to which Tenant may be entitled under this Lease, provided same does not subject Landlord to any liability, cost or obligation.

Section 7.5    Signage Restrictions and Criteria.

7.5.1    During the Term, no exterior identification signs attached to any building of the Shopping Center shall be of the following type: (i) flashing, moving or audible signs; (ii) signs employing exposed raceways (other than individual raceway signs that do not exceed a total of thirty-six (36) square feet in area and that are conforming in color and design with the buildings to which they are affixed), exposed neon tubes, exposed ballast boxes, or exposed transformers, provided that Tenant shall have the right to employ any methods necessary for the installation of internally illuminated self-contained channel letters; or (iii) paper or cardboard signs other than professionally prepared interior window signs advertising special sales within the subject premises, temporary signs (exclusive of contractor signs), stickers or decals, provided, however, the foregoing shall not prohibit the placement at the entrance of each such premises of (A) small stickers or decals which indicate hours of business, emergency telephone numbers, credit cards accepted, and other similar information, and/or (B) a sticker or decal which contains the phrase "no solicitation" or words of like import. No billboard signs shall be permitted within the Shopping Center.

7.5.2    Landlord shall not permit any obstructions (including, without limitation, any trees, bushes or other landscaping, scaffolding or architectural details) to obscure Tenant's storefront, storefront signs or other exterior wall signs (where permitted hereunder) or any pylons, monuments or other freestanding signs containing Tenant's sign. No other tenant's premises in the Shopping Center containing less Floor Area than the Floor Area of the Premises shall have: (i) building signage possessing more total square footage than the total square footage available for use by Tenant, or a maximum height greater than the maximum height of Tenant's building signage, as measured from the finished floor level to the highest point on such signage, or (ii) a building and entrance design element higher or wider than the height or width of the building and entrance design element of the Premises; provided that the foregoing shall not require the alteration of any other tenant's then existing signage or building merely as a consequence of alterations thereafter made to Tenant's signage or building.

# ARTICLE 8
## ALTERATIONS AND IMPROVEMENTS

Section 8.1    Alterations and Improvements.

8.1.1    Tenant shall not perform any structural or exterior alterations or improvements to the Premises (except to the extent same pertain to Tenant's Work) without the prior approval of Landlord, provided, however, that Tenant's alterations of the exterior of the Premises that conform to Tenant's then-current prototypical storefront elevation and that are architecturally harmonious with the Shopping Center shall not require Landlord's consent. All work performed by Tenant in connection with structural

29

and non-structural alterations or improvements, whether exterior or interior, shall be done at Tenant's sole cost and expense, in a good and workmanlike manner and in compliance with all applicable Legal Requirements. The provisions of this Section 8.1 shall not apply to Tenant's building signage, which shall be governed by the applicable provisions of Article 7 above.

8.1.2    Tenant may, from time to time, at its sole cost and expense, without the prior approval of Landlord, make non structural alterations and non-structural improvements to the interior of the Premises as Tenant deems necessary or desirable, including, but not limited to, electrical systems, heating, ventilation and air conditioning and other mechanical systems, installation of fixtures and equipment, painting, and wall and floor coverings. All such interior non-structural alterations and interior non-structural improvements to the Premises shall be done at Tenant's sole cost and expense, in a good and workmanlike manner and in compliance with all applicable Legal Requirements.

8.1.3    Tenant shall have the right to subdivide the Premises into not more than two (2) separate spaces, each of which may have its own front entrance and access to the loading docks in the rear of the Premises, as well as separately sub-metered utilities; *provided, however*, that each such subdivided space shall contain approximately the same consistent depth as that applicable to the Premises as a whole, subject, however, to reasonable deviations to accommodate loading, storage, ingress/egress and corridor requirements.

8.1.4    Tenant shall have the right to erect and maintain an antenna and a satellite dish on the roof of the Premises, provided that Tenant: (i) obtains Landlord's prior approval of its plans for the installation of such equipment, (ii) uses a contractor designated or approved by Landlord for all roof penetrations so as not to violate or invalidate any roof warranties maintained by Landlord, (iii) maintains the area where roof penetrations are made while Tenant's equipment is present, (iv) removes any such equipment at the conclusion of the Term, (v) repairs any damage to the roof caused by the making of the roof penetrations, including, but not limited to, the repair of the roof penetrations upon the removal of any equipment installed thereon, and (vi) erects and maintains such equipment in accordance with applicable Legal Requirements. Any satellite dish or antenna installed by Tenant shall be properly screened from the view of the remainder of the Shopping Center.

8.1.5    Landlord shall execute and return to Tenant all appropriately completed building department or equivalent applications within ten (10) days after Tenant's request therefor, and will reasonably cooperate with Tenant in the permitting process.

8.1.6    If any violation of any applicable Legal Requirement which is noted against the Shopping Center or the Premises (other than a violation caused by Tenant) prevents Tenant from obtaining a building permit for any alterations or a certificate of occupancy, then, upon request by Tenant, Landlord shall promptly and diligently cause such violation to be removed of record to the extent required to permit Tenant to obtain its building permit or certificate of occupancy, as the case may be.

8.1.7    Landlord shall not make any alterations to the Premises (including, without limitation, changing the design, color or materials of the exterior of the Premises) nor shall Landlord construct an additional floor or floors above the Premises. Landlord shall neither make nor permit to be made any alterations to the exterior architectural theme of the remainder of the Shopping Center (as shown on Exhibit D-2 hereto) which would be inconsistent with a first-class shopping center in the state in which the Shopping Center is located (exclusive of other tenants' entrance features) without the prior consent of Tenant.

1                                 ARTICLE 9
2                                  REPAIRS

3          Section 9.1    Tenant's Repairs.  Subject to the provisions of Articles 10 and
4    11 hereof, and except as otherwise provided in Section 9.2 below, Tenant shall maintain
5    in good condition and repair, at its sole cost and expense: (i) the non-structural, interior
6    elements of the Premises (including plate glass and doors and the electrical, plumbing,
7    mechanical, and/or alarm systems located in, or serving, exclusively the Premises); (ii)
8    the heating, ventilation and air conditioning ("*HVAC*") units exclusively serving the
9    Premises (iii) any damage to the portions of the Premises to be maintained by Landlord to
10   the extent occasioned by (A) the act or negligence of Tenant, its employees, agents or
11   contractors (other than ordinary wear and tear) or (B) an Event of Default by Tenant; and
12   (iv) any of Tenant's signs.  With respect to Tenant's maintenance obligations to the
13   HVAC units, Tenant shall procure a routine maintenance service contract providing for
14   the periodic maintenance of the HVAC units.  All repairs and replacements on Tenant's
15   part to be performed hereunder shall be at Tenant's sole cost and expense, and performed
16   in a good and workmanlike manner in accordance with all applicable Legal
17   Requirements.

18         Section 9.2    Landlord's Repairs.  Subject to the provisions of Articles 10
19   and 11 hereof, Landlord shall perform, or cause to be performed, as the same shall from
20   time to time be necessary, all repairs and replacements to the following:

21                  (a)    the buildings of the Shopping Center as necessary to maintain
22   same in good condition and repair (including, without limitation, repainting the exterior
23   walls of the buildings of the Shopping Center (including, without limitation, the
24   Premises)) as same may be reasonably required from time to time during the Term;

25                  (b)    the structural elements of the Premises, which shall be
26   deemed to include, without limitation, the roof joists, columns, footings, foundation,
27   exterior walls (including, without limitation, repainting, but excluding plate glass,
28   storefront windows, doors, door closure devices, window and door frames, molding,
29   locks and hardware, and painting or other treatment of interior walls), floor (but not the
30   floor covering, unless the same is damaged as a result of a floor defect or settling), and
31   the structural elements of any building of which the Premises may be a part;

32                  (c)    the roof, gutters, flashings, downspouts and scuppers;

33                  (d)    the electric, gas, water, sanitary sewer, and other public utility
34   lines serving the Premises, to the point of connection to the Premises;

35                  (e)    all electric, gas, water, sanitary sewer, and other public utility
36   lines and ducts in or passing through the Premises which do not exclusively serve the
37   Premises; and

38                  (f)    the non-structural elements of the Premises (including,
39   without limitation, the HVAC units (other than routine maintenance as required pursuant
40   to the maintenance contract required to be maintained by Tenant as set forth in Section
41   9.1), the doors and the electrical, plumbing, mechanical, and/or fire alarm systems
42   located in or serving the Premises) until the first (1st) anniversary of the Delivery Date,
43   and thereafter for such period of time and to the extent any such non-structural elements
44   are covered by any contractors', manufacturers', vendors', or insurers' warranties or
45   guarantees; and

46                  (g)    any damage to the Premises or the Shopping Center which is
47   occasioned by (A) the act or omission of Landlord, its employees, agents or contractors,
48   or (B) any breach by Landlord of any provision of this Lease.

31

1      All repairs and replacements on Landlord's part to be performed hereunder shall
2 be at Landlord's sole cost and expense (and not includable in Common Areas Charges,
3 except that (x) one hundred percent (100%) of the cost of item (d) set forth above that
4 exclusively serves the Premises, (y) Tenant's Pro Rata Share of the cost of common trunk
5 lines serving all tenants of the Shopping Center, and (z) Tenant's Pro Rata Share of the
6 cost of item (e) set forth above that serves the Premises and two or more other tenants of
7 the Shopping Center, shall be includable, subject to all of the provisions of Subsection
8 5.1.3 above and provided further that such repairs are not required as a result of defects in
9 the original construction or installation of such utility lines and ducts and such costs are
10 amortized (to the extent allowable) on a straight-line basis over the useful life thereof
11 under generally accepted accounting principles), performed in a good and workmanlike
12 manner in accordance with all applicable Legal Requirements, and without material
13 interference with or disruption to the normal conduct of any business operations in the
14 Premises. Landlord shall give Tenant at least five (5) days' prior notice of any repairs or
15 replacements to, or which would otherwise materially and adversely affect the normal
16 conduct of any business operations in, the Premises (except in the case of an emergency
17 posing imminent risk of material harm to persons or property, in which event Landlord
18 shall only be required to give such notice as is reasonable under the circumstances). If, in
19 Tenant's reasonable judgment, Landlord's repairs would materially interfere with or
20 disrupt the normal conduct of any business operations in the Premises, except in the case
21 of an emergency posing imminent risk of material harm to persons or property, Landlord
22 shall perform such repairs only after the regular hours of operation of Tenant and any
23 other occupant of the Premises (or any portion thereof), and Landlord shall reimburse
24 Tenant for the reasonable costs and expenses incurred by Tenant in connection with such
25 "after hours" repairs, including, without limitation, utilities charges and security
26 expenses. In the event Landlord does not reimburse Tenant for any amounts payable to
27 Tenant hereunder within twenty (20) days after Tenant's demand therefor, Tenant shall
28 have the right (in addition to any rights and remedies to which it may be entitled under
29 this Lease, at law, or in equity) to offset such amounts against fifty percent (50%) of the
30 Fixed Rent, together with interest thereon at the Lease Interest Rate from the date of
31 outlay until reimbursement or full satisfaction by credit, it being agreed that (x) Tenant
32 shall, as applicable, be entitled to offset against larger percentages of each successive
33 installment of Fixed Rent if the aforesaid fifty percent (50%) percent offset is insufficient
34 to reimburse Tenant in full, taking in to account the then remaining number of
35 installments of Fixed Rent due and payable by Tenant hereunder, and (y) the reference in
36 this subsection to "fifty percent (50%) percent" shall be increased to "one hundred
37 (100%) percent" with respect to offsets pertaining to Tenant's performance of Landlord's
38 Work or repairs and restoration work under Section 11.1 hereof.

39      Section 9.3    <u>Legal Compliance Work</u>. Except as hereinafter expressly
40 provided, Landlord shall be responsible, at its sole cost and expense (and not includable
41 in Common Areas Charges, unless specifically allowed under Article 5 above), for
42 performing all "Legal Compliance Work" (hereinafter defined). Notwithstanding the
43 foregoing, Tenant shall be responsible, at its sole cost and expense, for the performance
44 of Legal Compliance Work: (a) pertaining to the interior elements of the Premises which
45 are neither structural nor comprise the major building systems serving the Premises,
46 unless Tenant is obligated to maintain such portions of the Premises as specifically set
47 forth herein; (b) required solely as a result of Tenant's specific manner of use of the
48 Premises (i.e., are not of general applicability to tenants and occupants of the Shopping
49 Center); or (c) required solely as a result of any alterations or modifications to the
50 Premises performed by Tenant pursuant to Article 8, <u>provided</u>, <u>however</u>, that the
51 foregoing shall not relieve Landlord of its obligations to perform: (x) Landlord's Work in
52 accordance with all Legal Requirements, and (y) the repairs required in this Lease. As
53 used herein, ***"Legal Compliance Work"*** shall mean any obligation, addition, alteration,
54 improvement, or rebuilding, structural or otherwise, to or of the Premises, the Shopping
55 Center, or any part thereof, as applicable, which may be required by reason of any Legal
56 Requirement.

1                                    ARTICLE 10
2              INDEMNIFICATION, INSURANCE AND WAIVER OF SUBROGATION

3              Section 10.1       Mutual Release, Waiver of Subrogation and Mutual
4      Indemnification.

5                      10.1.1     Mutual Waiver of Claims. Landlord and Tenant, on their own
6      behalf and on behalf of anyone claiming under or through either one by way of
7      subrogation, hereby release and waive all rights of recovery and causes of action against
8      each other from any and all liability for any loss or damage to property or resulting from
9      damage to such property (and, in either case, any resulting loss of business or rental
10     income), whether caused by the negligence or fault of the other party, which is normally
11     insured under Special Form property insurance (formerly known as "All-Risk") and time
12     element insurance required to be maintained hereunder.  In the event either Landlord or
13     Tenant is a self-insurer or maintains a deductible (as either may be permitted hereunder),
14     then the self-insuring party or the party maintaining the deductible hereby releases the
15     other party from any liability arising from any event which would have been covered had
16     the required insurance been obtained and/or the deductible not been maintained.

17                     10.1.2     Waiver of Subrogation. Landlord and Tenant shall cause each
18     property insurance policy carried by either of them insuring the Premises, the contents
19     thereof, or the Shopping Center, to provide that the insurer waives all rights of recovery
20     by way of subrogation or otherwise against the other party hereto in connection with any
21     loss or damage which is covered by such policy or that such policy shall otherwise
22     permit, and shall not be voided by the releases provided above.

23                     10.1.3     Mutual Indemnification.

24                     (a)        Except as otherwise provided in Subsections 10.1.1 and
25     10.1.2 above, Tenant covenants to defend and indemnify Landlord and hold Landlord
26     harmless from and against any and all claims, actions, damages, liability and expense,
27     including reasonable attorneys' fees, (x) in connection with loss of life, personal injury
28     and/or damage to property arising from or out of any occurrence in or upon the Premises,
29     or any part thereof, or (y) occasioned wholly or in part by any act or omission of Tenant,
30     its agents, contractors, employees, servants, or licensees, except to the extent such claims,
31     actions, damages, liability and expense are caused by the acts or omissions of Landlord,
32     its agents, contractors, licensees, employees, or other tenants and occupants, or for which
33     any of said parties may be statutorily liable.

34                     (b)        Except as otherwise provided in Subsections 10.1.1 and
35     10.1.2 above, Landlord covenants to defend and indemnify Tenant and hold Tenant
36     harmless from and against any and all claims, actions, damages, liability and expense,
37     including reasonable attorneys' fees, (x) in connection with loss of life, personal injury
38     and/or damage to property arising from or out of any occurrence in or upon any
39     portion(s) of the Shopping Center (excluding the Premises and any portion of the
40     Common Areas used by Tenant at the time of the applicable incident for outside sales as
41     provided herein), or (y) occasioned wholly or in part by any act or omission of Landlord,
42     its agents, contractors, employees, servants, tenants (other than Tenant), occupants or
43     licensees, except to the extent such claims, actions, damages, liability and expense are
44     caused by the acts or omissions of Tenant, its agents, contractors, licensees or employees,
45     or for which any of said parties may be statutorily liable.

46             Section 10.2       Tenant's Insurance.

47                     10.2.1     Tenant's Insurance. Tenant, at its own cost and expense, shall
48     maintain in full force and effect from and after the Delivery Date and throughout the
49     Term: (i) commercial general liability insurance protecting and insuring Tenant, naming
50     Landlord and any Mortgagee designated in writing by Landlord as "additional insured-
51     lessor" for claims arising out of the use or occupancy of the Premises by Tenant and the

33

1  obligations assumed by Tenant under this Lease, and having a combined single limit of
2  liability of not less than Ten Million Dollars ($10,000,000) for bodily injury, death and
3  property damage liability; (ii) Special Form (formerly known as "All-Risk") property
4  insurance, on a replacement cost basis, in an amount adequate to cover the full insurable
5  replacement value of all of Tenant's Property; and (iii) workers compensation insurance
6  at all times and to the extent required by Legal Requirements.  Tenant may carry any of
7  its insurance under "blanket policies" covering the Premises and other locations it or any
8  Affiliate of Tenant owns or leases, provided that: (A) the amount of the total insurance
9  available shall be at least the protection equivalent to separate policies in the amounts
10  herein required, and (B) in all other respects, any such policy or policies shall comply
11  with the applicable provisions of this Article 10.

12          10.2.2   Self-Insurance.  All insurance required to be maintained under
13  this Section 10.2 may be provided under: **(i)** an individual policy covering this location;
14  **(ii)** a blanket policy or policies which includes other liabilities, properties and locations of
15  Tenant or its Affiliates; **(iii)** a plan of self-insurance, provided that Tenant or any
16  guarantor of Tenant's obligations under this Lease maintains, during the period of such
17  self-insurance, a net worth of at least One Hundred Million Dollars ($100,000,000)
18  determined in accordance with generally accepted accounting principles consistently
19  applied (*"GAAP"*); or **(iv)** a combination of any of the foregoing insurance programs.  To
20  the extent any deductible is permitted or allowed as a part of any insurance policy carried
21  by Tenant in compliance with this Section 10.2, then Tenant shall be deemed to be
22  covering the amount thereof under an informal plan of self-insurance; provided, however,
23  that in no event shall any deductible exceed Two Hundred Fifty Thousand Dollars
24  ($250,000) unless Tenant complies with the requirements regarding self-insurance
25  pursuant to clause (iii) above.

26          Section 10.3   Landlord's Insurance.

27          10.3.1   Liability Insurance.  Landlord shall maintain in full force and
28  effect on and after the Delivery Date and throughout the Term commercial general
29  liability insurance with regard to the Common Areas protecting and insuring Landlord,
30  naming Tenant as "additional insured-lessee", and having a combined single limit of
31  liability of not less than Ten Million Dollars ($10,000,000) for bodily injury, death and
32  property damage liability.  Landlord shall have the right to carry its insurance under
33  "blanket policies" covering the Shopping Center and other properties provided that: (i)
34  the amount of the total insurance available shall be at least the protection equivalent to
35  separate policies in the amounts herein required, and (ii) in all other respects, any such
36  policy or policies shall comply with the applicable provisions of this Article 10.

37          10.3.2   Special Form Property Insurance.  Landlord shall procure and
38  maintain in full force and effect on and after the Effective Date and throughout the Term,
39  Special Form (formerly known as "All-Risk") property insurance (including loss of rents
40  for a minimum period of one (1) year) and endorsements for coverages for flood,
41  earthquake (but only if endorsements for earthquake are customarily maintained by
42  landlords in other first-class shopping centers in the Dallas/Fort Worth, Texas
43  metropolitan area), windstorm, earth movement [sinkholes] (but only if endorsements for
44  earth movement are customarily maintained by landlords in other first-class shopping
45  centers in the Dallas/Fort Worth, Texas metropolitan area), demolition, increased cost of
46  construction and contingent operation of building laws coverages,  on a replacement cost
47  basis, in an amount adequate to cover the full insurable replacement value of all of the
48  buildings (including the Premises) and other insurable improvements in the Shopping
49  Center; provided, however, in no event shall such insurance cover Tenant's Property.  All
50  policies required to be maintained by Landlord pursuant to this Subsection 10.3.2 shall
51  provide that any proceeds thereof shall be deposited with Landlord's Mortgagee (to the
52  extent Landlord's Mortgagee so requires), or if there is no Mortgagee or if there is a
53  Mortgagee but the Mortgagee does not so require, to Landlord, in either event to be held
54  in trust by such party and disbursed only in accordance with the provisions of, and for the

34

1     purposes set forth in, Section 11.1 hereof.  The property insurance required to be
2     maintained by Landlord pursuant to this Section shall not have deductibles exceeding
3     One Hundred Thousand Dollars ($100,000) without Tenant's prior consent.

4             10.3.3    <u>Tenant's Pro Rata Share of Insurance Premiums</u>.  Commencing
5     on the second (2nd) full calendar year of the Term, Tenant shall reimburse Landlord for
6     Tenant's Pro Rata Share of the reasonable Increase in insurance premiums attributable to
7     the policies required to be maintained by Landlord pursuant to this Section 10.3 as part of
8     Common Areas Charges.  If the rates for any insurance Landlord is required to carry
9     hereunder are increased as a result of the use or other activity of any other occupant of
10    the Shopping Center, the amount of such increase shall be excluded from Common Areas
11    Charges.  In the event Tenant's particular use of the Premises, other than as a retail store
12    generally or other than as a typical "Bed Bath & Beyond" store as contemplated herein,
13    shall cause an increase in the amount of insurance Landlord is required to carry
14    hereunder, Tenant shall be responsible for the entire amount of such additional costs.  To
15    the extent that Landlord receives a dividend, credit, rebate or other return of a premium
16    which had previously been included in Common Areas Charges, Landlord shall promptly
17    refund Tenant's Pro Rata Share of such dividend, credit, rebate, or return to Tenant.
18    Tenant's Pro Rata Share of any insurance premium for any period during the Term which
19    constitutes less than a full calendar year shall be equitably prorated.  The provisions of
20    this Subsection 10.3.3 shall survive the expiration or earlier termination of this Lease.

21         Section 10.4     <u>General Insurance Requirements</u>.

22             10.4.1     All insurance required to be maintained by the parties under this
23    Lease shall be maintained with insurance companies qualified to do business in the state
24    in which the Shopping Center is located, and rated at least A-/VIII by the most current
25    Best's Key Rating Guide (or its equivalent, if such Guide ceases to be published).  Each
26    party shall use its diligent efforts to have its insurers provide thirty (30) days [ten (10)
27    days in the event of non-payment of premium] prior notice to the other party of
28    cancellation or non-renewal of any policy required hereunder.  Each party shall provide
29    to the other duly executed certificates evidencing the insurance coverage described in
30    Sections 10.2.1 and 10.3 above.

31             10.4.2     The liability insurance requirements under Sections 10.2 and
32    10.3 above shall be reviewed by Landlord and Tenant every five (5) years for the purpose
33    of mutually increasing (in consultation with their respective insurance advisors) the
34    minimum limits of such insurance to limits which shall be reasonable and customary for
35    similar facilities of like size and operation in accordance with generally accepted
36    insurance industry standards.  The replacement value of the buildings and other insurable
37    improvements constituting the Shopping Center shall be re-evaluated from time to time at
38    the request of either Landlord or Tenant.

39                           ARTICLE 11
40            FIRE AND OTHER CASUALTY; EMINENT DOMAIN

41         Section 11.1     <u>Fire and Other Casualty</u>.

42             11.1.1

43             (a)     Except as otherwise provided in this Section 11.1, if all or a
44    portion of the Premises, the Common Areas (including all improvements thereto) or other
45    buildings in the Shopping Center shall be damaged by fire or other casualty, then so long
46    as no Event of Default has occurred and is continuing Landlord shall promptly (i) rebuild
47    and restore the Premises to the condition existing immediately prior to such fire or other
48    casualty (which restoration shall include all Tenant's Work and all other leasehold
49    improvements performed by Tenant), but shall not include any of Tenant's Property, (ii)
50    rebuild and restore buildings comprising at least 75% of the total non-Premises Floor
51    Area located within that portion of the Shopping Center shown as "75% Restoration

35

Area" on <u>Exhibit B</u> hereto and at least 50% of the total Floor Area located within that portion of the Shopping Center shown as "50% Restoration Area" on <u>Exhibit B</u> hereto to substantially the condition in which the same existed immediately prior to such fire or other casualty so that same shall be occupied or ready for occupancy following reconstruction; and (iii) rebuild and restore the Common Areas to substantially the condition as existed immediately prior to such fire or other casualty, or in such other manner (complying with all Legal Requirements and any other applicable requirements of this Lease) as shall be commercially reasonable under the circumstances, provided that in any event the rebuilt and restored Common Areas shall include without limitation (A) pylon signage suitable to Tenant, (B) unimpeded vehicular access to and from each of Ralph Hall Parkway and I-30 Eastbound Frontage Road and (C) not less than 4.5 parking spaces for each 1,000 square feet of Floor Area within each of the 75% Restoration Area and the 50% Restoration Area plus each additional area of the Shopping Center Landlord elects to reconstruct (all of the foregoing work is hereinafter referred to as the *"Primary Restoration"*). With respect to buildings or improvements within the Shopping Center which are damaged by fire or other casualty but which are not required to be restored by Landlord as part of the Primary Restoration, Landlord shall promptly either (1) rebuild and restore all or portions of the same to substantially the condition in which they existed immediately prior to such fire or other casualty, or (2) raze the remaining portions of such buildings or improvements not rebuilt, remove all debris resulting therefrom, and pave such areas for parking or landscape such areas in a sightly manner (all of the foregoing work is hereinafter referred to as the *"Secondary Restoration"*). The proceeds of the policies required to be obtained and maintained by Landlord pursuant to Section 10.3.2 hereof shall, to the extent necessary, be used for the performance of the Primary Restoration and the Secondary Restoration. In the event such insurance proceeds are insufficient to complete such work, Landlord shall provide the balance of the amount necessary to rebuild or restore the Shopping Center in the manner provided in this Section 11.1.

(b)     Notwithstanding the foregoing, if any portion of the Premises are so damaged or destroyed, Tenant shall have the right to require Landlord to make changes to the Premises in the course of, and as part of, such rebuilding or restoration work to the extent that Tenant would have been permitted to make such changes under Article 8 and otherwise to the extent such changes are reasonably acceptable to Landlord. If the net cost and expense of such rebuilding or restoration work is increased solely as a result of such changes (taking into consideration any and all actual reduced and additional costs resulting from such changes and/or other cost savings arising therefrom), then Tenant shall pay to Landlord, as Additional Rent, the amount of such net increase, which amount shall be due and payable within thirty (30) days after Landlord has delivered to Tenant backup information evidencing such increase (including, without limitation, receipted invoices) as may be reasonably required by Tenant (but in no event earlier than the occurrence of the date on which possession of the restored areas of the Premises are delivered to Tenant). To the extent that Landlord's substantial completion of such rebuilding or restoration work is delayed solely as a result of such changes (taking into consideration any and all reasonable time savings to Landlord resulting from such changes), then the applicable period(s) specified in Section 11.1.2 below shall be appropriately adjusted to the extent of such net delay.

(c)     If, in Tenant's reasonable judgment, any damage to the Premises renders all or any portion of the Premises unusable for the conduct of Tenant's business or, in the case of damage to the Shopping Center, materially interferes with the normal conduct of any business operations in the Premises, the Rent shall be equitably reduced or totally abated based upon the extent to which the remaining portion of the Premises may, in Tenant's reasonable judgment, be utilized for its normal conduct of business.

(d)     In the event of a fire or other casualty which shall damage or destroy all or a portion of the Premises, the buildings in the Shopping Center and/or the

1    Common Areas, which fire or other casualty is not insurable under the casualty insurance
2    coverage required to be carried by Landlord pursuant to Article 10 hereof (as opposed to
3    a casualty which is (i) intended to be covered by the policies described in Subsection
4    10.3.2 hereof but which, in fact, are not covered by the policies actually obtained by
5    Landlord; or (ii) covered by such policies, but with respect to which the insurer refuses to
6    pay the proceeds thereof), then Landlord's responsibility for the repair and restoration of
7    such damage or destruction shall be limited to an expenditure of Two Hundred Thousand
8    ($200,000.00) Dollars, in addition to any insurance proceeds which may have been paid
9    to or on behalf of Landlord (collectively, the *"Uninsured Obligation"*). If the Uninsured
10   Obligation is not sufficient to rebuild and restore the Premises, the other buildings and/or
11   the other portions of the Common Areas, as the case may be, then Landlord shall have no
12   obligation to rebuild and restore the same (but may, in any event, elect to do so),
13   provided that Landlord shall give Tenant notice thereof within forty-five (45) days
14   following such fire or other casualty, which notice shall include an independent
15   architect's certification as to the estimated cost of the repair and restoration work to the
16   Premises and Common Areas (the *"Restoration Cost"*). Tenant shall have the right, but
17   not the obligation, exercisable within thirty (30) days after receipt of Landlord's notice,
18   to give Landlord notice of its intention to provide the funds (the *"Remaining Funds"*) for
19   the repair and restoration of the Premises and/or the Common Areas, which Remaining
20   Funds shall not exceed the difference between the Restoration Cost and the Uninsured
21   Obligation. If Tenant shall elect to provide the Remaining Funds, then Landlord shall
22   promptly commence and diligently complete such rebuilding and restoration as otherwise
23   provided and subject to the provisions of this Article, and the Remaining Funds shall be
24   paid to Landlord within the same period of time as specified in Section 11.1.1 (b) for the
25   payment of net costs and expenses resulting from Tenant changes. If Tenant shall decline
26   to provide the Remaining Funds for such rebuilding and restoration, then Tenant shall
27   have the right to terminate this Lease as of the end of such thirty (30) day period, in
28   which event neither party shall have any liability to the other hereunder (except as
29   expressly provided for herein).

30          (e)    If this Lease is not terminated pursuant to this Section 11.1,
31   then Tenant shall reopen for business within the Premises for at least (but not more than)
32   one (1) day within one hundred twenty (120) days after completion of the Primary
33   Restoration and Secondary Restoration as required hereunder (but in all events subject to
34   Excused Periods).

35          (f)    Notwithstanding the foregoing, if (A) this Lease shall be
36   terminated pursuant to this Section 11.1.1 and (B) Landlord or any of Landlord's
37   affiliates shall commence to reconstruct the Shopping Center (or a shopping center of a
38   substantially similar type to the Shopping Center on the same site) on or before the date
39   that is five (5) years after the date of such casualty, Landlord shall be obligated to offer to
40   Tenant, at the time of the commencement of such construction, the option to lease a
41   portion of the Shopping Center (or a portion of such shopping center) equal in size to the
42   Floor Area of the Premises at the time of the termination of this Lease, or within 10%
43   thereof, on all the same terms and conditions of this Lease, including, without limitation,
44   the amount of Fixed Rent per square foot of Floor Area which is not greater than (but
45   which may be less than) the then applicable Fixed Rent per square foot set forth herein
46   for the remaining Term of the Lease (and any unexercised Renewal Options). If Tenant
47   shall elect, within thirty (30) days after such offer, to exercise such option, Landlord and
48   Tenant shall promptly execute a lease on substantially the same terms and provisions of
49   this Lease, except that all dates set forth in this Lease shall be tolled day for day for the
50   period of time between the date that this Lease was terminated and the effective date of
51   the new lease. If Tenant shall fail to elect, within such thirty (30)-day period, to exercise
52   such option, Landlord shall be free to lease such premises to any other person, on any
53   terms and provisions acceptable to Landlord. The provisions of this Section shall survive
54   the expiration or earlier termination of this Lease and run with and bind the land
55   comprising the Shopping Center.

1        11.1.2    In the event that:

2            (a)    Landlord does not commence the repair and restoration work
3    to the Premises, the Common Areas, or other buildings in the Shopping Center as
4    required pursuant to this Section 11.1 within ninety (90) days after the date of such
5    destruction (subject to extension for such additional period, not to exceed thirty (30) days
6    in the aggregate, as may be reasonably necessary for the adjustment of insurance
7    proceeds and the receipt of sufficient building permits) or thereafter fails to diligently
8    pursue the completion of such repair and restoration work; or

9            (b)    the required repairs and restorations to the Premises, the
10   Common Areas, or other buildings in the Shopping Center are not Substantially
11   Completed by Landlord in accordance with the provisions of this Section 11.1 within one
12   (1) year after the date of destruction subject to extension for an event of *Force Majeure*
13   and subject to extension for such additional period as may be reasonably necessary for
14   the adjustment of insurance proceeds and the receipt of sufficient building permits, the
15   foregoing extensions not to exceed thirty (30) days in the aggregate,

16   then, in either of such events, Tenant shall have the right, at its sole discretion and option,
17   to:

18            (i)    after giving thirty (30) days' prior notice to Landlord
19       (and Landlord's continued failure to commence and diligently pursue such repairs
20       and restoration work to completion), perform or complete, as the case may be, said
21       work (or any portion thereof) on Landlord's behalf and at the sole cost of
22       Landlord, which cost Landlord shall pay to Tenant during the course of such
23       repairs within ten (10) days after Tenant's delivery to Landlord of an invoice
24       therefor and, in default of any such payment, Tenant shall have the right to offset
25       the amount thereof, together with interest at the Lease Interest Rate, against the
26       Rent next accruing hereunder (it being agreed, without limiting the foregoing
27       provisions of this Subsection 11.1.2, that at Tenant's election all insurance
28       proceeds paid or payable to Landlord or Landlord's Mortgagee pursuant to
29       Subsection 10.3 hereof shall be paid (or, as applicable, in turn delivered) directly
30       to Tenant, to be applied to such work by Tenant as same is being performed); or

31            (ii)    seek to obtain specific performance of Landlord's
32       repair and restoration obligations pursuant to the laws of the state in which the
33       Shopping Center is located; or

34            (iii)    terminate this Lease by thirty (30) days' notice to
35       Landlord.

36   In addition to the foregoing, if, in the opinion of an independent licensed architect
37   designated by Tenant (and reasonably acceptable to Landlord), the required repairs and
38   restorations to the Premises, the Common Areas or other buildings in the Shopping
39   Center cannot be completed by Landlord in accordance with the provisions of this
40   Section 11.1 within one (1) year after the date of destruction, Tenant shall have the right,
41   at its sole discretion and option, to terminate this Lease by giving Landlord at least thirty
42   (30) days' notice thereof.

43        11.1.3    If the Premises are substantially destroyed by fire or other
44   casualty during the last two (2) years of the Term to the extent of more than one third
45   (1/3) of the Floor Area thereof, Landlord or Tenant shall each have the right to terminate
46   this Lease as of the date of such damage or destruction by giving notice within thirty (30)
47   days following such damage or destruction, but Tenant may negate any termination by
48   Landlord by agreeing to extend the Term for an additional five (5) year period by
49   exercising an option pursuant to Subsection 2.2.2 hereof, if available, within ten (10)
50   days after receipt of the termination notice from Landlord.

38

1          Section 11.2    Eminent Domain.

2          11.2.1    As used in this Section 11.2, *"Taking"* or *"Taken"* shall mean a
3    taking for any public or quasi-public use by any lawful power or authority by exercise of
4    the right of condemnation or eminent domain or by agreement between Landlord and
5    those having the authority to exercise such right.

6          11.2.2    If all of the Premises shall be Taken, this Lease shall terminate as
7    of the date of vesting of title or transfer of possession, whichever is earlier, without
8    further liability on the part of either Landlord or Tenant, except for an adjustment
9    between the parties for the Rent payable by Tenant hereunder.

10          11.2.3    In the event that:

11                    (a)    any portion of the Premises shall be Taken so that it is
12    commercially unreasonable or unfeasible for Tenant, in its reasonable judgment, to
13    conduct its normal business in the Premises;

14                    (b)    as a consequence of any Taking: (i) portions of the Shopping
15    Center shall be divided or separated in any manner that it materially interferes with
16    parking, visibility, or access to the Premises from other portions of the Shopping Center,
17    or (ii) the Shopping Center no longer has all of the entrances from both Ralph Hall
18    Parkway and the I-30 Eastbound Frontage Road, and as a result, it is not commercially
19    reasonable or feasible for Tenant, in its reasonable judgment, to conduct its normal
20    business in the Premises;

21                    (c)    there occurs, in Tenant's reasonable judgment, a denial of
22    adequate access to the Shopping Center at the grade of any street adjoining the Shopping
23    Center or to any easement granted under this Lease, whether or not a Taking shall have
24    occurred;

25                    (d)    any portion of the Shopping Center shall be Taken which
26    materially interferes with parking, visibility or access to the Premises, and as a result of
27    such taking it is commercially unreasonable or unfeasible for Tenant, in its reasonable
28    judgment, to conduct its normal business in the Premises;

29                    (e)    more than twenty five (25%) percent of the total Floor Area
30    of all of the buildings in the Shopping Center (other than the Premises) are Taken; or

31                    (f)    five (5%) percent or more of the parking spaces located in the
32    Shopping Center are Taken, or if so many of the parking spaces in the Shopping Center
33    are Taken such that there are fewer than (i) 4.25 parking spaces for every one thousand
34    (1,000) square feet of Floor Area in the Shopping Center, or (ii) the number of parking
35    spaces required by applicable Legal Requirements;

36    then, in any of such events, Tenant shall have the right to terminate this Lease by giving
37    at least sixty (60) days' prior notice to Landlord within sixty (60) days of any such event,
38    in which event this Lease shall terminate without any further liability on the part of either
39    Landlord or Tenant, except for an adjustment between the parties for the Rent payable by
40    Tenant hereunder and for payment to Tenant for its share of the award for the taking
41    pursuant to Subsection 11.2.5 below.  Upon any partial Taking of the Premises, the Rent
42    shall be equitably reduced or totally abated based upon the extent to which the remaining
43    portion of the Premises may, in Tenant's reasonable judgment, be utilized for its normal
44    conduct of business.

45          11.2.4    If this Lease is not terminated pursuant to this Section 11.2 then
46    so long as no Event of Default has occurred and is continuing, Landlord, at its sole cost
47    and expense (which cost may be offset against the proceeds from the condemning
48    authority), within a reasonable period of time after such Taking, shall repair and restore

the area not so Taken (the ***"Damaged Area"***) to tenantable condition, similar in physical
appearance to the condition of the area immediately prior to the Taking (to the extent
practicable), pursuant to plans and specifications approved by Tenant (which repair and
restoration shall, as applicable, include all Tenant's Work and all other leasehold
improvements performed by Tenant; provided, however, that Landlord shall not be
obligated to repair or restore Tenant's Property), and any and all amounts awarded to
Landlord for any Taking shall be made available to and used by Landlord for any
rebuilding or restoration which it is required to perform hereunder.  During the period of
such repairs and restoration, all Rent shall abate to the extent that the Premises may not,
in Tenant's reasonable judgment, be used by Tenant for the normal conduct of its
business.  Such abatement shall terminate in accordance with the terms of Section 11.3
below.

   11.2.5 In connection with any Taking or partial Taking of the Premises,
Tenant shall be entitled to claim an award for loss of business, leasehold improvements,
fixtures and equipment and removal and reinstallation costs; provided, however, that no
award shall be payable to Tenant which reduces the award payable to Landlord for its fee
interest in the Premises.

   11.2.6 Any dispute between the parties with respect to this Section 11.2
shall be resolved by arbitration in accordance with the provisions of Section 16.2 below.

   11.2.7 If any Taking or partial Taking of the Premises shall occur during
the last two (2) Lease Years of the Term of this Lease, Landlord may, if Landlord shall so
elect, terminate the Lease by giving Tenant written notice of the exercise of such election
within thirty (30) days after receipt by Landlord of the notice of any such Taking or
partial taking, but Tenant may negate any termination by Landlord by agreeing to extend
the Term for an additional five (5) year period by exercising an option pursuant to
Subsection 2.2.2 hereof, if available, within ten (10) days after receipt of the termination
notice from Landlord.

   11.2.8 If this Lease is not terminated pursuant to this Section 11.2, then
Tenant shall reopen for business within the Premises for at least (but not more than) one
(1) day within one hundred twenty (120) days after completion of Landlord's repair and
restoration of the Damaged Area as required hereunder.

   Section 11.3 Abatement of Rent Charges.  Notwithstanding any other
provisions of this Lease, if the Fixed Rent, Percentage Rent and Additional Rent payable
by Tenant hereunder shall be abated pursuant to Sections 11.1 or 11.2 above, such
abatement shall terminate upon the first to occur of: (a) the date on which Tenant shall
reopen the Premises to the general public for business; or (b) the expiration of the period
which is sixty (60) days after Landlord shall have Substantially Completed such repairs
and restoration work as Landlord is obligated to perform hereunder and the interference
with the operation of business in the Premises has ceased.

ARTICLE 12
COVENANTS, REPRESENTATIONS AND WARRANTIES

   Section 12.1 Quiet Enjoyment.  Tenant shall peaceably and quietly have,
hold, occupy and enjoy the Premises for the Term, without hindrance from Landlord or
any party claiming by, through, or under Landlord.

   Section 12.2 Authority.  Tenant and Landlord each warrant and represent
that the person(s) signing this Lease on their behalf has authority to enter into this Lease
and to bind Tenant and Landlord, respectively, to the terms, covenants and conditions
contained herein.  The submission of this Lease to each party hereto shall be for
examination and negotiation purposes only, and does not and shall not constitute a
reservation of or an obligation of Tenant to lease, or otherwise create any interest of

40

1   Tenant in, the Premises or any other premises situated in the Shopping Center unless and
2   until the Lease is fully executed and delivered by Tenant and Landlord.

3          Section 12.3    Landlord's Covenants, Warranties and Representations.  To
4   induce Tenant to execute this Lease, and in consideration thereof, Landlord covenants,
5   warrants and represents to Tenant as follows:

6                  (a)    As of the Effective Date, Landlord has, and as of the Delivery
7   Date Landlord shall have, good and marketable fee simple title to the entire Shopping
8   Center, free and clear of all easements, restrictions, liens, encumbrances, leases and the
9   like, except for the encumbrances described on Exhibit E hereto;

10                 (b)    In the event the legal description of the Shopping Center
11  described in Exhibit A hereto indicates that the Shopping Center is composed of more
12  than one parcel or lot, Landlord represents that there exist no strips or gores between such
13  parcels or lots which are not owned by Landlord;

14                 (c)    No third party consents or approvals are required in order for
15  Landlord to enter into this Lease, or for the performance of Landlord's Work and
16  Tenant's Work (excluding, as of the Effective Date, governmental permits and
17  approvals);

18                 (d)    Except as set forth on Exhibits M and K-1 hereto, Tenant's
19  use of the Premises for sale of "Permitted Items" (defined in Section 1.1.27 above) will
20  not violate any exclusive provision or prohibited use restriction granted to any other
21  tenant or occupant in the Shopping Center;

22                 (e)    The Shopping Center will have, on the Delivery Date, access
23  to and from Ralph Hall Parkway and the I-30 Eastbound Frontage Road, as shown on
24  Exhibit B hereto, for the passage of vehicular traffic;

25                 (f)    This Lease does not violate the provisions of any instrument
26  heretofore executed and/or binding on Landlord, or affecting or encumbering the
27  Shopping Center, or the Premises, and no rights granted by Landlord to Tenant under the
28  terms of this Lease conflict with any rights granted by Landlord to any other tenant or
29  occupant in the Shopping Center;

30                 (g)    There shall be no restrictions or other legal impediments
31  imposed by any public or private instrument which would prevent: (i) the use of the
32  Premises for the Permitted Use, other than Exhibits M and K-1 hereto; (ii) the use of the
33  parking facilities, access roads, and other Common Areas in the manner contemplated by
34  this Lease; or (iii) the performance of Tenant's Work;

35                 (h)    As of the Effective Date, there are no sign ordinances,
36  restrictive covenants, uniform sign plans or other signage restrictions which would
37  prevent the Premises from having the signage (including, without limitation, the square
38  foot area and size of letters) as depicted on Exhibit D-1 and Exhibit F hereof.

39                 (i)    As of the Effective Date there is no "Related Land" (defined
40  in 13.1.2 below) in existence and as of the Delivery Date there will not be any Related
41  Land in existence (or, if there shall be Related Land in existence, Landlord shall promptly
42  notify Tenant thereof and promptly execute any recordable instrument reasonably
43  requested by Tenant which memorializes the provisions of this Lease pertaining to or
44  otherwise affecting Related Land);

45                 (j)    Attached hereto as Exhibit K-2 is a complete list of all fully
46  executed and delivered leases in effect on the Effective Date with respect to the Shopping
47  Center (the *"Existing Leases"*); and

1        (k)     Landlord shall promptly forward to Tenant any notice or
2    other communication received by Landlord from any owner of property adjoining or
3    adjacent to the Shopping Center or from any municipal or other governmental authority,
4    in connection with any hearing or other administrative proceeding relating to any
5    proposed zoning, building code, signage, or related variance affecting the Shopping
6    Center or any adjoining or adjacent property, which, if granted, could adversely affect
7    Tenant's use or occupancy of the Premises, the conduct of Tenant's business therein, or
8    Tenant's rights and benefits under this Lease. Landlord, at its sole cost and expense,
9    shall appear in such proceeding and shall contest such proposed variance. If Landlord
10   fails so to appear and contest such proposed variance after receiving five (5) days' notice
11   from Tenant (or such shorter notice as may be practicable under the circumstances), then
12   Tenant shall be entitled (but shall not be obligated to), in its own name and/or in the name
13   of Landlord, to appear in such proceeding, in which event Landlord shall fully cooperate
14   with Tenant, provide such information, and execute any documents or other instruments
15   as Tenant may reasonably request in connection with any such proceeding.

16        Section 12.4      Environmental Matters.

17            12.4.1    Definitions.

18            (a)     As used herein, the term *"Environmental Laws"* shall mean
19   any and all Legal Requirements concerning the protection of the environment, human
20   health or safety.

21            (b)     As used herein, the term *"Hazardous Substances"* shall mean
22   each and every element, compound, material, mixture, substance, waste, hazardous
23   substance, hazardous waste, hazardous material, toxic substance, pollutant or
24   contaminant either as those terms are defined in any of the Environmental Laws or the
25   presence of which may cause liability at common law, including, without limitation,
26   asbestos and/or asbestos-containing products, whether or not currently friable.

27            (c)     As used herein, the term *"Environmental Notice"* shall mean
28   a summons, citation, directive, order, claim, notice, litigation, investigation, judgment,
29   legal pleading, letter or other communication, written or oral, actual or threatened, from
30   the United States Environmental Protection Agency or other federal, state or local
31   governmental agency or authority, or any other private individual or entity concerning (i)
32   any Hazardous Substances at, on, in, under or emanating from the Premises, the
33   Shopping Center or any contiguous property; (ii) any violation or potential violation of
34   Environmental Laws at the Premises, the Shopping Center or any contiguous property; or
35   (iii) any underground storage tanks on the Premises or the Shopping Center.

36            (d)     As used herein, the term *"Releasing"* or *"Release"* shall
37   mean releasing, spilling, leaking, discharging, disposing or dumping or otherwise
38   introducing any substance into the environment or into any building or other
39   improvements in violation of Environmental Laws.

40            (e)     As used herein, the term *"Compliance Costs"* shall mean any
41   and all costs incurred by a party in complying with applicable Environmental Laws,
42   including, without limitation, consultant's and engineer's fees; laboratory costs;
43   contractor's and subcontractor's fees; application and filing fees; costs of investigation,
44   monitoring or cleanup of soil or other substrate, surface water, groundwater, or buildings
45   or other improvements; equipment costs; disposal fees; costs of operation and
46   maintenance of equipment; legal fees; other governmental fees or costs; interest at the
47   Lease Interest Rate from the date of expenditure until paid in full; and other similar or
48   ·related costs.

49            (f)     As used herein, the term *"Tenant Related Parties"* shall
50   mean Tenant's agents, servants, employees, contractors or licensees.

42

12.4.2    Compliance with Environmental Laws.  Tenant shall comply with all applicable requirements of Environmental Laws governing its use of, and operations at, the Shopping Center and the Premises.  Landlord shall comply with all applicable requirements of Environmental Laws relating to the Shopping Center and the Premises, except to the extent such requirements arise from Tenant's operations thereon.

12.4.3    Responsibility for Releases of Hazardous Substances. Notwithstanding any other provision of this Lease, Tenant shall only be liable for any Release of Hazardous Substances at, on, in, under or emanating from the Premises or Shopping Center which were caused by Tenant or Tenant Related Parties (hereinafter *"Tenant Releases"*), including, without limitation, any Compliance Costs required to address Tenant Releases.  Landlord shall be liable for any Hazardous Substances at, on, in, under or emanating from the Premises or Shopping Center, including, without limitation, any Compliance Costs attributable to such Hazardous Substances, unless the Hazardous Substances are caused by Tenant Releases.  Except in the event of an emergency or if compelled by applicable governmental authority, any work performed by Landlord relating to Hazardous Substances shall be performed by Landlord at any time other than during the months of August, November and December, and shall be undertaken in such a manner so as to (i) not adversely affect ingress to or egress from the Shopping Center, (ii) have no adverse effect on the visibility of the Premises or any signs which contain Tenant's name, and (iii) not otherwise materially interfere with the normal conduct of any business operations in the Premises.

12.4.4    Standards.  Except as expressly provided herein, the parties agree that any investigation or remediation of Hazardous Substances, or cure of a violation of Environmental Laws, required to be conducted at the Premises or Shopping Center shall be no more stringent than necessary to meet the minimum standards of Environmental Laws applicable to properties used in the manner the Shopping Center is being used.

12.4.5    Landlord's Representations and Warranties.  Landlord represents and warrants that except as set forth in that certain Phase I Environmental Site Assessment for Rockwall Crossing by AZTEC Environmental Services dated April 2004: (i) Landlord has received no Environmental Notices concerning the Shopping Center, the Premises or any contiguous properties; (ii) Landlord has no knowledge of, and has received no notice of, any violation, or potential or alleged violation, of any Legal Requirement, including, without limitation, Environmental Laws, affecting the Shopping Center, the Premises or any contiguous properties, regardless of whether same has been cured; and (iii) to the best of Landlord's knowledge: (A) no Hazardous Substances are located at, on, in, under or emanating from the Shopping Center, the Premises or any contiguous properties; and (B) no underground storage tank exists at the Shopping Center or the Premises.

12.4.6    Documents.  Each party shall immediately notify the other party of the notifying party's receipt of an Environmental Notice.

12.4.7    Indemnity.  Each party to this Lease shall indemnify, defend and hold the other party, and its agents, servants, shareholders, directors, officers, partners, members and employees harmless from any and all claims, losses, expenses, costs, lawsuits, actions, administrative proceedings, damage, orders, judgments, penalties and liabilities of any nature whatsoever, including, without limitation, reasonable attorneys' fees (incurred to enforce this indemnity or for any other purpose) and Compliance Costs, arising from (i) the indemnifying party's breach of any of its representations, warranties, covenants or other obligations under this Section 12.4; (ii) Hazardous Substances for which the indemnifying party is liable under this Section 12.4; or (iii) violations of Environmental Laws for which the indemnifying party is liable under this Section 12.4.

12.4.8    Survival.  The obligations of the parties under this Section 12.4 shall survive the renewal, expiration, breach or earlier termination of this Lease.

43

1           12.4.9    Conflict.  In the event of any conflict between the provisions of
2  this Section 12.4 and any other provision of this Lease, the provisions of this Section 12.4
3  shall control.

4           Section 12.5    OEA.

5           12.5.1    Landlord and Tenant acknowledge that Landlord shall have the
6  right, but not the obligation, to subject the Shopping Center to the terms and conditions of
7  one or more Declarations of Reciprocal Easements, Covenants, Conditions and
8  Restrictions encumbering one or more of the Outparcels and the remainder of the
9  Shopping Center (each, an *"OEA"*), which may be recorded after the date of execution of
10 this Lease.  Notwithstanding the later recordation of the OEA, this Lease shall be
11 subordinate to the OEA, subject to Tenant's consent as provided herein; provided,
12 however, in the event of a conflict between the OEA and this Lease, as between Landlord
13 and Tenant, the terms of the Lease shall control.  Within thirty (30) days after Tenant's
14 receipt of a proposed OEA or modifications to an OEA from Landlord, Tenant shall
15 deliver to Landlord Tenant's written notice of approval or disapproval of the OEA or
16 proposed modifications to the OEA, which approval shall not be unreasonably withheld,
17 conditioned or delayed so long as there is no material adverse effect on the visibility of
18 the Premises and Tenant's signage, access to the Premises, Tenant's use or occupancy of
19 the Premises and the operation of Tenant's business therein.  If Landlord does not receive
20 such written notice of disapproval within such thirty (30) day period, then Tenant shall be
21 deemed to have approved the proposed OEA or modifications to the OEA.  If Tenant
22 shall deliver its written notice of disapproval to Landlord as provided herein, then
23 Landlord and Tenant shall negotiate in good faith to resolve all objections of Tenant to
24 the OEA or proposed modifications to the OEA.  Under no circumstances shall Tenant be
25 obligated to approve, or shall this Lease be subordinated to, any OEA or modifications to
26 an OEA that would increase Tenant's obligations under this Lease, diminish Tenant's
27 rights under this Lease, contradict any of the terms and conditions of this Lease, or
28 otherwise adversely affect Tenant's use or occupancy of the Premises or the conduct of
29 Tenant's business therein.

30           12.5.2    Landlord shall, during the Term: (i) perform and observe all of
31 the terms, covenants, provisions and conditions of any OEA on Landlord's part to be
32 performed and observed; (ii) defend, indemnify and hold harmless Tenant from and
33 against any and all claims, demands, causes of action, suits, damages, liabilities, and
34 expenses of any nature arising out of or in connection with the enforcement of, or a
35 claimed breach by, Landlord of any covenant, term, condition, or provision of the OEA;
36 and (iii) diligently enforce, at its sole expense, the covenants, agreements, and obligations
37 of the OEA.

38           12.5.3    Whenever, pursuant to an OEA, the consent or approval of
39 Landlord shall be required by or requested, and such consent or approval could diminish
40 the rights or increase the obligations of Tenant thereunder or under this Lease, or could
41 adversely affect Tenant's use or occupancy of the Premises, or the conduct of Tenant's
42 business therein, such consent or approval shall not be granted without the prior consent
43 of Tenant, which consent may be withheld in its sole and absolute discretion.

44           12.5.4    Landlord shall, immediately upon receipt, forward to Tenant and
45 Tenant's leasehold mortgagee, if any, a copy of any and all notices and/or demands
46 received by Landlord under or pursuant to an OEA, which relate to, or could adversely
47 affect, Tenant's use or occupancy of the Premises, the conduct of Tenant's business
48 therein, or Tenant's rights pursuant to this Lease.

49           12.5.5    Landlord shall not amend, or modify the OEA if such
50 amendment or modification could materially and adversely diminish the rights or
51 increase the obligations of Tenant thereunder or under this Lease, or could materially and
52 adversely affect Tenant's use or occupancy of the Premises, the conduct of Tenant's

1   business therein, the visibility of the Premises and Tenant's signage and access to the
2   Premises.

3           12.5.6    Once entered into, Landlord shall not terminate an OEA if such
4   termination would increase Tenant's obligations under this Lease, diminish Tenant's
5   rights under this Lease, contradict any of the terms and conditions of this Lease, or
6   otherwise adversely affect Tenant's use or occupancy of the Premises or the conduct of
7   Tenant's business therein.

8           12.5.7    In the event Landlord defaults in the performance of any of its
9   obligations under an OEA or fails to enforce the obligations of any other obligee under an
10  OEA, and such default or failure to enforce could adversely affect Tenant's rights
11  thereunder or under this Lease, Tenant's Work, Tenant's use or occupancy of the
12  Premises or the conduct of Tenant's business therein, Tenant may, but shall not be
13  obligated to, after thirty (30) days written notice (except in the event of emergency, in
14  which case no notice shall be required) cure any default by Landlord under the OEA
15  and/or enforce, in its own name, at Landlord's expense, the obligations of any other
16  obligee under the OEA.  Landlord shall, upon demand, reimburse Tenant for the costs
17  incurred by Tenant in performing any of Landlord's obligations under the OEA  or
18  enforcing the obligations of any obligee under the OEA, together with interest thereon at
19  the Lease Interest Rate, and failing such reimbursement, Tenant shall have the right (in
20  addition to any rights and remedies to which it may be entitled under this Lease, at law,
21  or in equity), upon ten (10) days' prior notice to Landlord, to offset such costs from the
22  next succeeding payment or payments of any Rent due hereunder, together with interest
23  thereon at the Lease Interest Rate from the date of outlay until reimbursement or full
24  satisfaction by credit.

25          12.5.8    As between Landlord and Tenant, in the event of any conflict
26  between an OEA and this Lease, this Lease shall in all respects control.

27                          ARTICLE 13
28                      USES AND RESTRICTIONS

29          Section 13.1    Permitted and Prohibited Uses.

30          13.1.1    Tenant's Permitted Use.  The Premises may be used and
31  occupied for the Permitted Use (defined in Subsection 1.1.27 above).  Notwithstanding
32  the foregoing, Tenant shall not use the Premises for any of the *"Prohibited Uses"*
33  (defined in Exhibit M hereto annexed) or the *"Existing Exclusives"* (defined in
34  Subsection 13.3.1), to the extent then applicable.

35          13.1.2    Prohibited Uses.  Landlord shall construct, lease, operate,
36  maintain and manage the Shopping Center as a first-class shopping center comparable to
37  other first-class shopping centers in the state in which the Shopping Center is located.
38  Landlord shall not lease, rent or occupy or permit any portion of the Shopping Center or
39  any land (the *"Related Land"*) contiguous or adjacent to the Shopping Center (including,
40  without limitation, any land that would be contiguous or adjacent to the Shopping Center
41  but for any intervening road, street, alley or highway) now or hereafter owned or
42  controlled by Landlord or its Affiliate(s), to be occupied (except to the extent otherwise
43  permitted under any lease for space in the Shopping Center or the Related Land existing
44  as of the Effective Date) for any of the "Prohibited Uses" (defined in Exhibit M hereto
45  annexed), provided, however, that the foregoing provisions of this Subsection 13.1.2 shall
46  not apply to any business existing on any Related Land owned or controlled by a person
47  or entity which: (i) was previously, but is no longer, the Landlord hereunder, or (ii) at the
48  time it became Landlord hereunder, already owned or controlled such Related Land
49  (excluding, however, the Landlord originally named herein and its Affiliates).

1         Section 13.2    <u>Tenant's Exclusive in Center</u>. To induce Tenant to execute
2   this Lease, and subject to all of the terms and provisions of this Section 13.2, Landlord
3   covenants and agrees as follows.

4         13.2.1    Landlord shall not lease, rent or occupy or permit any other
5   premises in the Shopping Center or on any Related Land to be occupied, whether by a
6   tenant (including, without limitation, a tenant under an Existing Lease), sublessee,
7   assignee, licensee or other occupant or itself, for the sale, rental or distribution, either
8   singly or in any combination, of items contained in any of the following respective
9   categories of merchandise: (a) linens and domestics; (b) bathroom items (excluding
10   plumbing hardware); (c) housewares (excluding furniture, and major appliances or "white
11   goods"); (d) frames and wall art (provided that a fine art gallery shall not be precluded);
12   (e) window treatments; and/or (f) closet, shelving and storage items (each of the aforesaid
13   categories (a) through (f) are herein referred to as an ***"Exclusive Category"*** and all of the
14   Exclusive Categories, including any and all items included within any Exclusive
15   Categories, either singly or in any combination, are herein referred to as the ***"Exclusive***
16   ***Items"***). Notwithstanding the foregoing, any tenant or subtenant in the Shopping Center
17   or the Related Land shall have the right to utilize its respective premises for the sale,
18   rental and/or distribution of Exclusive Items within an aggregate area (which shall
19   include an allocable portion of the aisle space adjacent to such sales, rental and/or
20   distribution area) not to exceed the lesser of (x) five percent (5%) of the Floor Area of
21   such tenant's or subtenant's premises, or (y) two thousand (2,000) square feet of Floor
22   Area within such tenant's or subtenant's premises. [For example only, a tenant occupying
23   premises containing a total of five thousand (5,000) square feet of Floor Area could sell
24   Exclusive Items (either singly or in any combination) so long as the aggregate area within
25   its entire demised premises in which any and all Exclusive Items are sold shall not exceed
26   two hundred fifty (250) square feet.] Existing tenants of the Shopping Center and any
27   Related Land (and current or future assignees or sublessees of such tenants) shall
28   nevertheless be subject to the restrictions contained in this Section 13.2 in the event that:
29   (i) the lease between Landlord (or Landlord's Affiliate) and any such tenant requires the
30   consent of Landlord (or its Affiliate) to any assignment or subletting or to a change in the
31   use of the applicable premises to permit the sale, rental or distribution of the Exclusive
32   Items; or (ii) Landlord or its Affiliate permits or agrees to an expansion of the applicable
33   premises for the sale, rental, or distribution of the Exclusive Items. The restrictions set
34   forth in this Section 13.2 shall terminate with respect to any particular Exclusive
35   Category in the event Tenant, after the initial opening of the Premises to the public for
36   business (or, if earlier, the date which is one (1) year after the date upon which the
37   Premises was required to be so open under this Lease), has ceased to sell, rent or
38   distribute such Exclusive Category at the Premises for a continuous period of one (1) year
39   (other than during Excused Periods); *provided*, *however*, that such restrictions with
40   respect to such Exclusive Category shall not be null and void unless (x) Landlord has
41   notified Tenant that Landlord intends to terminate such restrictions by notice delivered to
42   Tenant at any time after the end of such latter one (1) year period (which notice shall set
43   forth which particular Exclusive Category such restrictions are intended by Landlord to
44   be terminated with respect to), and (y) Tenant fails to sell, rent or distribute such
45   Exclusive Category within one hundred eighty (180) days following the delivery of such
46   notice to Tenant. Landlord represents that the Existing Leases contain provisions
47   subjecting the tenants thereunder to the foregoing provisions of this Section 13.2.1.

48         13.2.2    The restrictions set forth in Subsection 13.2.1 above shall not
49   apply to (i) a full-line national or regional department store [for example, Wal-Mart, J.C.
50   Penny, Macy's, or Target], discount club [for example, Costco, BJ's Wholesale Club, or
51   Sam's Club], or home improvement center [for example, Home Depot or Lowe's], each
52   of the type commonly located in first-class shopping centers in the state in which the
53   Shopping Center is located and each occupying at least 80,000 square feet of Floor Area
54   within the Shopping Center (or such lesser square footage as these retailers may then be
55   operating on a national or regional basis so long as such retailers are not then primarily
56   selling home furnishings or any of the Exclusive Categories), (ii) a Kohl's store

occupying at least 60,000 square feet of Floor Area or a Belks store occupying at least 50,000 square feet of Floor Area, so long as each such store is not then primarily selling home furnishings or any of the Exclusive Items, (iii) Bombay Furniture/Bombay Kids, so long as at the time Bombay Furniture/Bombay Kids' is primarily a furniture store selling so-called "private label" products, is occupying less than 10,000 square feet of Floor Area and has entered into a Coexistence Agreement (as defined herein) with Tenant, (iv) Bath & Body Works, so long as at the time Bath & Body Works is primarily a personal care products store selling so-called "private label" products, is occupying less than 5,000 square feet of Floor Area and has entered into a Coexistence Agreement with Tenant, (v) Hobby Lobby, so long as such retailer is not then primarily selling home furnishings or any of the Exclusive Items and has entered into a Coexistence Agreement with Tenant, (vi) Dollar Tree, so long as such retailer is not then primarily selling home furnishings or any of the Exclusive Items, is operated substantially as it is on the Effective Date and has entered into a Coexistence Agreement with Tenant, and (vii) a full-line furniture store so long as at the time such store is operated primarily for the sale of so-called "hard-line" furniture and so long as such store is not then primarily selling any of the Exclusive Items.  In addition, the restrictions set forth in Subsection 13.2.1 above shall not apply to any of the following retailers if Landlord enters into a lease with any such retailer within eighteen (18) months after the Effective Date and so long as such retailer has entered into a Coexistence Agreement with Tenant:  (i) Jo-Ann Fabrics or Michaels Arts and Crafts, (ii) Ross Dress for Less, (iii) Pier I Imports, (iv) Cost Plus/Cost Plus World Market, (v) T.J. Maxx or Marshalls (provided the store occupied by T.J. Maxx or Marshalls does not exceed 33,000 square feet of Floor Area and provided such store is not a Mega Marshalls, T.J. Maxx 'n More or Home Goods store), (vi) Circuit City or Best Buy, and (vii) Steinmart.  As used herein *"Coexistence Agreement"* shall mean a separate agreement between Tenant and a third party retailer in which Tenant and/or the third party retailer (in such context, the *"Restricting Party")* agrees to allow the other party (in such context, the *"Restricted Party"*) to sell, rent or distribute certain items within the Shopping Center notwithstanding any lease exclusives or restrictive covenants the Restricting Party may have the benefit of enforcing at the Shopping Center; *provided* that under no circumstances shall Tenant have any obligation to enter into any Coexistence Agreement with any party except in a form substantially similar to that which Tenant is then entering into with retailers of the same type.

13.2.3   The exclusive rights granted to Tenant in this Section 13.2 shall inure to the benefit of any assignee of Tenant's interest in this Lease and to any sublessee of at least fifty percent (50%) of the Floor Area of the Premises.

13.2.4

(a)   Upon breach of the aforesaid covenant and agreement by Landlord (which breach shall not include a situation in which the lease between Landlord and any tenant in the Shopping Center or in the Related Land prohibits the tenant therein from violating the exclusive rights granted to Tenant in this Section 13.2 and despite such prohibition, such tenant violates such exclusive rights, unless Landlord fails to comply with any of the provisions of subparagraph (b) below), the Fixed Rent payable hereunder shall be reduced by fifty percent (50%) for so long as such violation shall continue, and Tenant shall have all remedies given to it at law and in equity, including, without limitation, the right to obtain injunctive relief, and/or to terminate this Lease, and/or to commence and prosecute an action against Landlord or any other violator for damages.

(b)   If any person or entity other than Landlord shall violate any of the exclusive provisions herein set forth, or shall indicate in writing to Landlord that it intends to violate any of said provisions, Landlord shall promptly commence appropriate legal proceedings, and vigorously prosecute the same, to enjoin and prohibit any such violation.  If Landlord fails to promptly commence such proceedings, or shall fail thereafter to vigorously prosecute the same, then Tenant shall have the right (a) to conduct and prosecute such legal proceedings (including, without limitation, an action for

47

1  injunctive relief) in its own name, at Landlord's expense, or (b) in the event the right set
2  forth in (a) above is not permitted to be exercised under applicable Legal Requirements,
3  to conduct and prosecute such legal proceedings in the name of Landlord, at Landlord's
4  expense, and Landlord shall cooperate with Tenant with respect to such prosecution
5  (including, without limitation, by executing any documentation or authorization
6  reasonably required by Tenant in connection with such prosecution and by appearing at
7  any hearing or trial with respect to such prosecution).

8         Section 13.3  <u>Exclusives Which Tenant Must Honor</u>.

9         13.3.1   Tenant shall honor certain exclusives and use restrictions
10  (hereinafter, collectively, ***"Existing Exclusives"***) granted by Landlord to certain other
11  tenants in the Shopping Center pursuant to the terms of certain Existing Leases, or in the
12  case of the TJ Maxx provisions set forth in <u>Exhibit K-1</u> pursuant to a lease which shall
13  have been executed within one (1) year following the Effective Date so long as Landlord
14  was engaging in good faith negotiations therefor at the time of the Effective Date and so
15  long as the tenant thereunder shall have entered into a Coexistence Agreement with
16  Tenant, a true and complete listing and description of such Existing Exclusives being
17  attached hereto as <u>Exhibit K-1</u>, and shall not sublease, occupy or use all or any portion of
18  the Premises, or permit all or any portion of the Premises to be occupied or used in
19  violation of any such Existing Exclusive (except as may be specifically set forth on
20  <u>Exhibit K-1</u>). Landlord represents and warrants that no Existing Exclusive(s) exist other
21  than those listed on <u>Exhibit K-1</u> hereto and that <u>Exhibit K-1</u> is true accurate and
22  complete, and covenants to indemnify, defend and hold Tenant harmless from and against
23  all loss, cost, liability or expense (including, without limitation, reasonable legal fees)
24  incurred by Tenant by reason of the enforcement by any person or entity of such unlisted
25  Existing Exclusive. Landlord shall not have the right to enforce the terms of the
26  preceding provisions of this Section 13.3.1 with respect to any third party retailer with
27  whom Tenant has executed a Coexistence Agreement. Tenant shall indemnify, defend
28  and hold Landlord harmless from all loss, cost and/or expense incurred by Landlord as a
29  result of any alleged breach by Tenant of any Coexistence Agreement.

30         13.3.2   [Intentionally Omitted]

31         13.3.3   Except as expressly set forth in this Section 13.3, Tenant shall
32  not be obligated to honor any exclusive granted by Landlord to any tenant in the
33  Shopping Center.

34                             ARTICLE 14
35            CONDUCT OF BUSINESS OPERATIONS

36         Subject to the other provisions of this Lease (including, without limitation,
37  Articles 2 & 3 hereof) Tenant shall initially open its store for business to the public in the
38  Premises for at least one (1) day as a typical "Bed Bath & Beyond", not later than the
39  ninetieth (90th) day after the Rent Commencement Date (which date shall, as applicable,
40  be extended by reason of (A) damage or destruction, eminent domain proceedings or
41  actions, or *Force Majeure*, or (B) the acts or omissions of Landlord). Other than as
42  expressly set forth in the preceding sentence, Tenant shall have no obligation to open or
43  operate any business in the Premises, and shall have the right, at any time, to cease to
44  conduct any business operations in the Premises, and Tenant shall incur no liability to
45  Landlord or its Mortgagee by reason thereof (it being understood and agreed that all of
46  Tenant's obligations under this Lease shall continue unless this Lease is terminated
47  pursuant, *inter alia*, to the further provisions of this Article 14 or any other provision of
48  this Lease [other than by reason of an Event of Default]). In the event that Tenant does
49  not operate or cause to be operated any retail business in the Premises (other than prior to
50  the Delivery Date or during Excused Periods) for more than three hundred sixty-five
51  (365) consecutive days (a ***"Non-operating Condition"***), then so long thereafter as such
52  Non-operating Condition is continuing uninterruptedly Landlord may notify Tenant of its

intention to terminate this Lease. Within fifteen (15) days of Tenant's receipt of Landlord's termination intention notice, Tenant shall deliver to Landlord a statement certified by Tenant of the amount of Tenant's costs and expenses incurred in connection the preparation of plans and specifications for, and the then unamortized costs (amortized on a straight-line basis over the Initial Term) of, Tenant's Work and any alterations performed by Tenant to the Premises (collectively, *"Recapture Costs"*). Within fifteen (15) days after Landlord's receipt of such statement, Landlord may then elect by notice to Tenant to terminate this Lease provided that such notice shall contain payment in full of the Recapture Costs identified in Tenant's statement, whereupon this Lease shall terminate upon the thirtieth (30th) day (the *"Recapture Date"*) after the date on which Tenant receives Landlord's termination notice, as if the Recapture Date was originally set forth herein as the expiration date of the Term. Upon such termination, Landlord and Tenant shall each be released from any and all liabilities thereafter accruing hereunder, except for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease. All Rent payable by Tenant hereunder shall be apportioned as of the Recapture Date and Tenant shall promptly pay to Landlord any amounts so determined to be due and owing by Tenant to Landlord, and conversely Landlord shall promptly reimburse Tenant for any amounts prepaid by Tenant for periods subsequent to the Recapture Date. Notwithstanding anything to the contrary contained herein, in the event Tenant, after initially opening as provided herein, shall cease operating for business in the Premises for a period of thirty (30) consecutive days (other than during Excused Periods) and a business does not reopen in the Premises within ten (10) days after written notice from Landlord to Tenant stating in ALL CAPITAL LETTERS or **bold type** that failure of a business to reopen in the Premises will result in the applicability of this sentence of Article 14), then during the period commencing on the expiration of the aforesaid 10-day period and ending on the Recapture Date that would have applied had Landlord exercised its termination rights under this Article 14 at the earliest juncture allowed hereunder (the *"Applicable Period"*) the Fixed Rent set forth herein shall be deemed increased to include the Percentage Rent, if any, as had been payable by Tenant for the immediately preceding three hundred sixty-five (365) day period, pro rated on a per diem basis for the Applicable Period. Notwithstanding the foregoing, Landlord shall not be obligated to provide written notice of Tenant's failure to operate in the Premises for such 30-day period (plus Excused Periods) more than one time each calendar year, and, in such event, the Applicable Period shall commence on the thirty-first (31st) day after a business ceases to be open in the Premises.

ARTICLE 15

TENANT ASSIGNMENT AND SUBLETTING

Section 15.1    Assignment and Subletting.

15.1.1    Provided any Event of Default has not occurred and is continuing, Tenant shall have the right from time to time, without the consent of Landlord, to assign Tenant's interest in this Lease and/or to sublet, concession or license all or any portion of the Premises, subject to (a) all of the terms and conditions of this Lease (including, without limitation, Article 13 hereof), (b) the Existing Exclusives, and (c) the Permitted Encumbrances set forth on Exhibit E hereto. Tenant agrees to provide Landlord with written notice of any such assignment or subletting within thirty (30) days following the effective date of same, subject to the provisions of Subsection 15.1.2 below.

15.1.2    Except with respect to any transaction covered under Subsection 15.1.3 or Section 15.3 below, in the event Tenant proposes to assign this Lease or sublet, in a single transaction, the whole of the Premises, it shall first give notice thereof (the *"Assignment/Subletting Notice"*) to Landlord, which notice shall specify the name and address of the proposed assignee or sublessee, along with such financial information as Landlord may reasonably require and the proposed use of the Premises to be made by such assignee or sublessee, together with a statement certified by Tenant of the amount of

the then Recapture Costs applicable thereto.  Thereafter, Landlord shall have the option to terminate this Lease, which option shall be exercisable by:

(a)    giving notice to Tenant (the *"Termination Notice"*) thereof within fifteen (15) business days after receipt of an Assignment/Subletting Notice from Tenant, and

(b)    paying to Tenant, within thirty (30) days after such notice is given, all of the Recapture Costs identified in Tenant's statement,

in which event this Lease shall automatically terminate on the ninetieth (90th) day (the *"Termination Date"*) after the date on which Tenant receives Landlord's Termination Notice, with the same force and effect as if the Termination Date had been designated as the expiration date of this Lease.  Upon the Termination Date, Landlord and Tenant shall each be released from any and all liabilities thereafter accruing hereunder, except for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease.  All Rent payable by Tenant hereunder shall be apportioned as of the Termination Date and Tenant shall promptly pay to Landlord any amounts so determined to be due and owing by Tenant to Landlord, and conversely Landlord shall promptly reimburse Tenant for any amounts prepaid by Tenant for periods subsequent to the Termination Date.  Notwithstanding the foregoing, Tenant shall have the right to avoid Landlord's termination by giving notice to Landlord (the *"Rescission Notice"*), within ten (10) days after receiving the Termination Notice, of its rescission of the Assignment/Subletting Notice, whereupon Landlord's Termination Notice shall be rendered null and void, and Tenant shall not assign this Lease or sublet the whole of the Premises as proposed in its Assignment/Subletting Notice.  If Landlord does not give the Termination Notice within the aforesaid 15 business day period, Landlord shall conclusively be deemed to have waived its termination rights hereunder with respect to such proposed assignment or subletting transaction, and Tenant may assign this Lease or sublet the entire Premises in accordance with its Assignment/Subletting Notice.

15.1.3    In addition to, and not in limitation of, Tenant's other rights set forth in this Section 15.1, Tenant shall have the right from time to time, without the consent of Landlord, to assign Tenant's interest in this Lease and/or to sublet or license all or any portion of the Premises:  (a) to an Affiliate of Tenant;  (b) to any entity which purchases all or substantially all of the assets of Tenant or any of its Affiliates; (c) to any entity which purchases Tenant's interest in the majority of stores owned or operated by Tenant or its Affiliate(s) in the Dallas/Fort Worth, Texas metropolitan area; (d) in conjunction with any merger, acquisition, consolidation or public offering of stock or other interests involving Tenant or its Affiliate(s); and/or (e) as may be required by any Legal Requirement.

Section 15.2    Liability of Tenant.  Unless otherwise agreed to in writing by Landlord, no assignment, subletting, licensing or concessioning by Tenant shall reduce, diminish, or otherwise affect the liability of Tenant hereunder.

Section 15.3    Collateral Assignment.  In addition to Tenant's other rights set forth in this Article 15, a mortgage, deed of trust or collateral assignment of Tenant's interest in this Lease by Tenant to one or more "Lenders" (hereinafter defined), as collateral security for an indebtedness or other obligation of Tenant or its Affiliates shall be permitted and Landlord shall execute all documentation reasonably requested by Tenant or any such Lender in connection therewith.  In addition, Tenant shall have the right, without Landlord's consent, to grant to an Affiliate of Tenant a license to operate all of Tenant's business operations at the Premises, without such Affiliate having assumed any liability for the performance of Tenant's obligations under this Lease.  As used herein, *"Lender"* shall mean a state or federally regulated: bank, savings and loan association, insurance company, pension fund, credit union, real estate investment trust, or other institutional lender.

Section 15.4    <u>Cure Rights of Original Tenant.</u>

15.4.1    If Tenant assigns Tenant's interest in this Lease, then Landlord, when giving notice to said assignee or any future assignee in respect of any default, shall also give a copy of such notice to the Tenant originally named in this Lease (the ***"Original Tenant"***), and no notice of default shall be effective until a copy thereof is so given to Original Tenant. Original Tenant shall have the same period after receipt of such notice to cure such default as is given to Tenant therefor under this Lease.

15.4.2    If this Lease is terminated because of: (a) an Event of Default of such assignee, or (b) the rejection, disaffirmation, or other termination of this Lease by or on behalf of the assignee pursuant to any proceeding in bankruptcy under any Legal Requirement of any State or of the United States, or any other Legal Requirements affecting creditors' rights, <u>then</u> Landlord shall promptly give to Original Tenant notice thereof, and Original Tenant shall have the right, exercisable by notice given to Landlord within fifteen (15) days after receipt by Original Tenant of Landlord's notice, to enter into a new lease of the Premises with Landlord (***"New Lease"***), <u>provided</u> that the Original Tenant shall have remedied all Events of Default of the assignee hereunder, unless such Events of Default are not reasonably susceptible of cure by the Original Tenant, in which event the Original Tenant shall not be obligated to cure such Events of Default as a condition to the exercise of its rights under this Subsection 15.4.2 but shall be thereafter obligated to remedy the same to the extent required under the terms of the New Lease. Upon the Original Tenant's curing of any such Event of Default of the assignee as aforesaid, Landlord shall assign to the Original Tenant all of Landlord's rights against such assignee (whether arising as a result of bankruptcy court proceedings or otherwise). The term of said New Lease shall begin on the date of termination of this Lease and shall continue for the remainder of the Term (including any Renewal Periods). Such New Lease shall otherwise contain the same terms and conditions as those set forth herein, except for requirements which are no longer applicable or have already been performed. It is the intention of the parties hereto that such New Lease shall have the same priority relative to other rights or interests in or to the Premises as this Lease. The provisions of this Subsection 15.4.2 shall survive the termination of this Lease and shall continue in full force and effect thereafter to the same extent as if this Subsection 15.4.2 were a separate and independent contract between Landlord and the Original Tenant. From the date on which the Original Tenant shall serve Landlord with the aforesaid notice of the exercise of its right to a New Lease, the Original Tenant shall have quiet and undisturbed use and enjoyment of the Premises and all appurtenances thereto, as contemplated in this Lease.

Section 15.5    <u>Recognition Agreement</u>. In the event Tenant subleases at least fifty percent (50%) of the Floor Area of the Premises for a term of at least five (5) years (or such lesser time as may then remain in the then current Term hereof) to any Recognized Tenant having a then net worth of at least fifteen million ($15,000,000) dollars determined in accordance with GAAP, then, notwithstanding any other provisions of this Lease, and so long as (x) such sublet premises contain approximately the same consistent depth as that applicable to the Premises generally, subject, however, to such subtenant's reasonable loading, storage, ingress/egress and corridor requirements, (y) the then balance of the Premises (i.e. the space not being so subleased) is not rendered unmarketable by reason of such sublease, utilizing commercially reasonable standards, and (z) the term of such sublease (as the same may be renewed) does not extend beyond the duration of the Term (including the Renewal Periods), Landlord shall, upon Tenant's request, execute and deliver an agreement among Landlord, Tenant and such subtenant substantially in the form of <u>Exhibit H</u> hereto, in recordable form.

## ARTICLE 16
## DEFAULT AND DISPUTE RESOLUTION

Section 16.1    <u>Tenant Default.</u>

51

1          16.1.1   If Tenant shall fail to: (i) pay any Rent when due, within ten (10)
2   days after its receipt of notice thereof from Landlord specifying the amount and details of
3   the unpaid Rent, or (ii) perform or observe any of the other covenants of this Lease on
4   Tenant's part to be performed or observed within thirty (30) days after its receipt of
5   notice thereof from Landlord specifying the nature of such default (or, if such default
6   shall be of a nature that same cannot reasonably be cured within thirty (30) days and
7   Tenant does not commence to cure such default on or before such thirtieth (30th) day and
8   thereafter diligently prosecute said cure to completion), such circumstance shall
9   constitute an *"Event of Default"*.

10          16.1.2   Upon an Event of Default, Landlord shall have all remedies
11   given to it at law or in equity (except that Landlord hereby expressly waives any rights to
12   accelerate any element of the Rent, and any right of distraint, which may be granted to it
13   by law), including the following:

14          (a)   to bring suit for the collection of such unpaid Rent or for the
15   performance of such other covenant of this Lease on Tenant's part to be performed;
16   and/or

17          (b)   without waiving any non-monetary default, may (but shall not
18   be obligated to) perform any covenant which is capable of being remedied by the
19   performance of affirmative acts for the account and at the reasonable expense of Tenant
20   (it being agreed that should Landlord require access to the Premises in order to perform
21   such covenant as aforesaid, Landlord shall comply with the applicable provisions of
22   Sections 9.2 hereof), in which event, Tenant shall pay to Landlord on demand, as
23   Additional Rent, the reasonable cost or amount thereof, together with interest thereon at
24   the Lease Interest Rate from the date of outlay of expense until payment; and/or

25          (c)   upon at least five (5) days' notice to Tenant, to terminate this
26   Lease, whereupon Landlord shall have and retain full right to sue for and collect all
27   unpaid Rent which shall have accrued up to the date of termination and any damages to
28   Landlord by reason of any such breach, and Tenant shall surrender and deliver the
29   Premises to Landlord, failing which, Landlord shall have the right to initiate summary
30   proceedings to recover possession; and/or

31          (d)   upon at least five (5) days' notice to Tenant to terminate
32   Tenant's right of possession, re-enter the Premises and take possession thereof by lawful
33   means.  If Landlord shall so elect to repossess the Premises without terminating the
34   Lease, then Tenant shall be liable for and shall pay to Landlord all Rent payable to
35   Landlord pursuant to the terms of this Lease which shall have accrued up to the date of
36   repossession, as well as all Rent as and when same shall become due and payable
37   pursuant to the terms of this Lease during the remainder of the Term, diminished by any
38   net sums thereafter received by Landlord through reletting the Premises during said
39   period (after deducting reasonable costs and expenses incurred by Landlord in connection
40   with such reletting).  In no event shall Tenant be entitled to any excess of any rent
41   obtained by such reletting over and above the Rent herein reserved.  Landlord may bring
42   actions to collect amounts due by Tenant under this Lease, from time to time, prior to the
43   expiration of the Term.

44          16.1.3   Upon an Event of Default, Tenant shall be liable for and shall
45   pay to Landlord, in addition to any sum provided to be paid above, brokers' fees incurred
46   by Landlord in connection with reletting the whole or any part of the Premises for the
47   remainder of the then unexpired Term (excluding any then unexercised Renewal
48   Periods), the costs of removing and storing Tenant's or other occupant's property; the
49   cost of repairs; and all other commercially reasonable expenses incurred by Landlord in
50   enforcing or defending Landlord's rights and/or remedies, including reasonable
51   attorneys' fees.

1        16.1.4    Upon an Event of Default, any amounts paid by Landlord to cure
2  said Event of Default and any Rent payments not paid after notice thereof is given shall
3  bear interest at the Lease Interest Rate from and after the expiration of any applicable
4  grace period until paid.

5        16.1.5    Landlord shall use all reasonable efforts to relet the Premises or
6  any portion thereof to mitigate Landlord's damages to which Landlord would otherwise
7  be entitled to as a result of an Event of Default, provided, however, Landlord shall not be
8  obligated to attempt to relet the Premises prior to leasing other available and comparable
9  space in the Shopping Center.  In no event shall Tenant be liable to Landlord for any
10  consequential damages suffered by Landlord as a result of an Event of Default by, or any
11  other act of, Tenant.

12        16.1.6    <u>Landlord Default</u>.  If Landlord shall: (i) fail to perform or
13  observe any of the covenants of this Lease on Landlord's part to be performed or
14  observed within thirty (30) days after receiving notice from Tenant thereof (or, if same
15  cannot reasonably be cured within thirty (30) days, if Landlord shall fail to promptly
16  commence and diligently prosecute said cure to completion), <u>or</u> (ii) materially breach any
17  warranty or representation under this Lease (either of (i) or (ii) above being hereinafter
18  referred to as a *"Landlord's Default"*), then Tenant, in addition to such other rights and
19  remedies as may be available under this Lease, or at law or in equity, may, in its sole
20  discretion:

21        (a)    as applicable, perform such obligation(s) of Landlord in
22  accordance with the provisions of this Lease on behalf of, and at the expense of Landlord
23  if such default by Landlord shall materially and adversely affect Tenant's use and
24  operation of the Premises or the Common Areas as set forth herein; and/or

25        (b)    bring suit for the collection of any amounts for which
26  Landlord is in default, seek injunctive relief, or seek specific performance for any other
27  covenant or agreement of Landlord, without terminating this Lease; and/or

28        (c)    offset up to fifty percent (50%) of each successive installment
29  of Fixed Rent payable by Tenant hereunder for amounts owed by Landlord to Tenant
30  and/or for the amounts reasonably expended by Tenant performing Landlord's
31  obligations hereunder, including costs and reasonable attorneys' fees, together with
32  interest thereon at the Lease Interest Rate from the date of the outlay until paid (it being
33  agreed that (x) Tenant shall, as applicable, be entitled to offset against larger percentages
34  of each successive installment of Fixed Rent if the aforesaid fifty (50%) percent offset is
35  insufficient to reimburse Tenant in full, taking into account the then remaining number of
36  installments of Fixed Rent due and payable by Tenant hereunder, and (y) the reference in
37  this subsection (c) to fifty (50%) percent shall be increased to one hundred (100%)
38  percent with respect to offsets pertaining to Tenant's performance of Landlord's Work,
39  Tenant's performance of the Primary Restoration and/or the Secondary Restoration
40  pursuant to Section 11.1 hereof (subject, as applicable, to Tenant's actual receipt of
41  insurance proceeds which would otherwise be payable to Landlord or Landlord's
42  Mortgagee, in the manner described in said Section 11.1), and Tenant's performance of
43  restoration work pursuant to Section 11.1 hereof); and/or

44        (d)    may terminate this Lease, without waiving its rights to
45  damages for Landlord's Default, <u>provided</u> that:  (1) Landlord's Default materially
46  interferes with the normal conduct of any business operations in the Premises,  (2)
47  Landlord's Default is not reasonably capable of being cured by Tenant, and (3) Tenant
48  gives notice of Landlord's Default to any Mortgagee of whom Landlord shall have
49  previously given Tenant notice (including its address), and such Mortgagee shall not have
50  cured Landlord's Default within thirty (30) days after such notice is given (or, if such
51  default cannot reasonably be cured within thirty (30) days, such Mortgagee fails to
52  promptly commence and diligently prosecute said cure to completion).

1    Notwithstanding the foregoing, if, in Tenant's reasonable judgment, a condition
2    posing imminent risk of liability or material harm to persons or property or material
3    disruption to the normal conduct of any business operations in the Premises shall exist,
4    Tenant may, at its election, and without prior notice to Landlord, exercise any or all of
5    the remedies set forth in (a), (b) and (c) above.  In no event shall Landlord be liable to
6    Tenant for any consequential damages suffered by Tenant as a result of a default by, or
7    any other act of, Landlord.

8    Section 16.2   Arbitration.  In any case where this Lease expressly provides
9    for submission of a dispute or matter to arbitration (but not otherwise), the same shall be
10   settled by arbitration in Dallas, Texas, before one arbitrator in accordance with the
11   procedural rules then obtaining of the American Arbitration Association or any successor
12   thereto.  The decision of the arbitrator shall be final, conclusive and binding on the
13   parties, but the powers of the arbitrator are hereby expressly limited to the determination
14   of factual issues, and the arbitrator shall have no power to reform, supplement or modify
15   this Lease.  The arbitrator shall make only required findings of fact incident to an
16   arbitrable dispute, which findings shall be set forth in reasonable detail in a written
17   decision by the arbitrator.  Landlord and Tenant shall share equally in the cost and
18   expenses of such arbitration, and each shall separately pay its own attorneys' fees and
19   expenses, unless the arbitrator finds that one of the parties did not act in good faith in
20   connection with the dispute or the conduct of the arbitration proceeding, in which case
21   the arbitrator may award all or part of said costs, expenses and fees to the other party.

22                    ARTICLE 17
23   RIGHT TO MORTGAGE AND NON-DISTURBANCE; ESTOPPEL CERTIFICATE

24   Section 17.1   Right to Mortgage and Non-Disturbance.  Landlord reserves
25   the right to subject and subordinate this Lease at all times to any first mortgage or deed of
26   trust for the benefit of any Mortgagee hereafter encumbering or affecting all or any
27   portion of the Shopping Center, as well as to any future ground or underlying leases
28   encumbering or affecting all or any part of the Shopping Center; provided, however, that
29   (a) each Mortgagee shall first execute and deliver to Tenant a subordination, non-
30   disturbance and attornment agreement in substantially the form attached as Exhibit G
31   hereto (or in another form acceptable to Tenant, acting reasonably and in good faith, so
32   long as such agreement shall include the following provisions: (i) no default by Landlord
33   under its mortgage or deed of trust shall affect Tenant's rights under this Lease so long as
34   no Event of Default has occurred and is continuing; (ii) Tenant will not be named a party
35   in any foreclosure or other proceedings with respect to such mortgage or deed of trust,
36   unless required by applicable Legal Requirements; and (iii) such Mortgagee agrees that
37   the insurance proceeds resulting from any fire or other casualty and the proceeds payable
38   from any Taking will be made available for restoration of the Premises and the Shopping
39   Center to the extent required in Article 11 of this Lease), in recordable form, and (b) any
40   Ground Lessor shall execute (and shall obtain the written consent of any holder of any
41   mortgage, deed of trust or any other existing lien encumbering or affecting the Shopping
42   Center or any portion thereof, as applicable) and deliver to Tenant a fee owner
43   recognition agreement in a form reasonably satisfactory to Tenant, which shall include
44   the following provisions: (i) the Ground Lessor will not, in the exercise of any of the
45   rights arising or which may arise out of such lease, disturb or deprive Tenant in or of its
46   possession or its rights to possession of the Premises or of any right or privilege granted
47   to or inuring to the benefit of Tenant under this Lease; (ii) in the event of the termination
48   of the ground or underlying lease, Tenant will not be made a party in any removal or
49   eviction action or proceeding, nor shall Tenant be evicted or removed of its possession or
50   its right of possession of the Premises, and this Lease shall continue in full force and
51   effect as a direct lease between the Ground Lessor and Tenant for the remainder of the
52   Term and on the same terms and conditions as contained herein, without the necessity of
53   executing a new lease; and (iii) Landlord and Tenant shall have the right to execute any
54   amendment to this Lease which is specifically required hereunder and the Ground Lessor
55   shall recognize and be bound thereto.

54

1    Section 17.2    Estoppel Certificate.  Upon written request of Landlord or
2  Tenant, the other party, within twenty (20) days of the date of such request, shall execute
3  and deliver to and only for the benefit of the requesting party or any Mortgagee, *bona*
4  *fide* prospective purchaser, assignee, or sublessee of the requesting party, without charge,
5  a written statement:  (1) ratifying this Lease; (2) certifying, to such party's actual
6  knowledge, that this Lease is in full force and effect, if such is the case, and has not been
7  modified, assigned, supplemented or amended, except by such writings as shall be stated;
8  (3) specifying the dates to which Fixed Rent and Additional Rent have been paid; (4)
9  stating whether or not, to such party's actual knowledge, the party requesting the estoppel
10  is in default and, if so, stating the nature of such default, (5) stating the Rent
11  Commencement Date, (6) stating which options to extend the Lease Term have been
12  exercised, if any, and (7) stating any other factual matter reasonably requested hereunder.

13    Section 17.3    Existing Mortgages.  If a mortgage, deed of trust, or other
14  security instrument encumbers the Shopping Center or any part thereof on the Effective
15  Date, then within thirty (30) days after the Effective Date, Landlord shall deliver to
16  Tenant, in recordable form: (x) a subordination, non-disturbance and attornment
17  agreement substantially in the form attached hereto as Exhibit G, (or in another form
18  acceptable to Tenant, acting reasonably and in good faith, so long as such agreement shall
19  include the following provisions: (i) no default by Landlord under its mortgage or deed of
20  trust shall affect Tenant's rights under this Lease so long as no Event of Default has
21  occurred and is continuing; (ii) Tenant will not be named a party in any foreclosure or
22  other proceedings with respect to such mortgage or deed of trust, unless required by
23  applicable Legal Requirements; and (iii) such Mortgagee agrees that the insurance
24  proceeds resulting from any fire or other casualty and the proceeds payable from any
25  Taking will be made available for restoration of the Premises and the Shopping Center to
26  the extent required in Article 11 of this Lease), in recordable form, executed by each and
27  every holder of any mortgage, deed of trust or any other existing lien encumbering or
28  affecting the Shopping Center or any portion thereof, and (y) a fee owner recognition
29  agreement in the form and content described in clause (b) of Section 17.1 hereof, in
30  recordable form, executed by any Ground Lessor (and, as may be required, consented to
31  by the holder of any mortgage, deed of trust or other existing lien as aforesaid).  Should
32  Landlord fail to so deliver such instrument(s) within said 30-day period, Tenant shall
33  have the right by notice given to Landlord at any time prior to the date on which such
34  instrument(s) are delivered, to terminate this Lease, in which event, neither party shall
35  have any further liability hereunder, except: (i) for those obligations which survive the
36  expiration or other termination of this Lease pursuant to the express terms of this Lease,
37  and (ii) Landlord shall be obligated to promptly reimburse Tenant for all its reasonable,
38  third-party costs and expenses incurred in connection with this Lease, including, without
39  limitation, the preparation and review of plans and specifications, and the performance of
40  Tenant's Work, provided, however, that such reimbursement by Landlord shall not
41  exceed the aggregate sum of Fifty Thousand Dollars ($50,000), in the aggregate.

42                          ARTICLE 18
43                            NOTICE

44    Subject to the further provisions of this Article 18, whenever it is provided herein
45  that any notice, demand, request, consent, approval or other communication (*"Notice"*)
46  shall or may be given to either of the parties by the other, it shall be in writing and, any
47  Legal Requirement to the contrary notwithstanding, shall not be effective for any purpose
48  unless same shall be given by registered or certified mail, postage prepaid, return receipt
49  requested, or by any recognized overnight mail carrier, with proof of delivery slip,
50  addressed to Landlord at Landlord's Mailing Address or to Tenant at Tenant's Mailing
51  Address, with copies of notices to Tenant also given to: (i) Allan N. Rauch, Esq., c/o Bed
52  Bath & Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, and (ii) Thomas J.
53  Phillips, Esq., c/o Brown Rudnick Berlack Israels LLP, One Financial Center, Boston,
54  Massachusetts 02111, or to such other person or other address as may, from time to time,
55  be specified by either party in a written notice to the other party.  All notices given in

1   accordance with the provisions of this Section shall be effective upon receipt (or refusal
2   of receipt) at the address of the addressee. Notwithstanding the foregoing, Landlord shall
3   instead send the following items to Tenant (Attention: Lease Administration) at Tenant's
4   Mailing Address: (A) all bills, notices (but not notices of default) and related information
5   pertaining to Tenant's Pro Rata Share of Taxes as described in Section 4.3 of this Lease,
6   and (B) all budgetary information, notices (but not notices of default), statements, bills
7   and related information pertaining to Tenant's Pro Rata Share of Common Areas Charges
8   as described in Section 5.1 of this Lease.

9                               ARTICLE 19
10                         TENANT'S PROPERTY

11          All of Tenant's Property which may be installed or placed in or upon the Premises
12  by Tenant shall remain the property of Tenant.  Tenant may assign, hypothecate,
13  encumber, mortgage or create a security interest in or upon Tenant's Property in the
14  Premises without the consent of Landlord and may remove Tenant's Property at any time
15  during the Term.  Landlord waives any right it may have in Tenant's Property.  To the
16  extent Landlord may have a lien on or security interest in the Tenant's Property pursuant
17  to this Lease, by law or otherwise, Landlord hereby waives, and agrees not to assert, such
18  lien or security interest.  Landlord shall provide to Tenant, within ten (10) days after
19  Tenant's request therefor, a written waiver in form reasonably satisfactory to Landlord
20  and Tenant evidencing Landlord's waiver of any rights it has or may have in Tenant's
21  Property.

22                               ARTICLE 20
23                            END OF TERM

24          Section 20.1    Surrender of Premises.  At the expiration of the Term, Tenant
25  will quit and surrender the Premises in good condition and repair, excepting, however,
26  reasonable wear and tear, damage by fire or other casualty, damage by eminent domain,
27  and repairs and replacements to be made by Landlord hereunder.

28          Section 20.2    Hold Over.  If Tenant fails to deliver possession of the
29  Premises to Landlord at the end of the Term, and unless Landlord and Tenant are, at such
30  time, engaged in good faith negotiations to extend the Term, Tenant shall be a tenant at
31  sufferance and shall be liable for Fixed Rent on a monthly basis (or, if applicable, on a
32  prorated daily basis) in an amount equal to one hundred fifty (150%) percent of the
33  amount thereof payable by Tenant for the month immediately preceding the last day of
34  the Term as well as for all Additional Rent payable by Tenant hereunder.

35                               ARTICLE 21
36                  TENANT'S RIGHT OF FIRST OFFER

37          Provided an uncured Event of Default does not then exist under this Lease and
38  further provided there is not then a continuing Non-operating Condition, Tenant shall
39  have continuing rights of first offer to lease additional space in the Shopping Center
40  which is contiguous to the Premises and which may become available on and after the
41  date of this Lease.  Notwithstanding the foregoing, the terms and conditions of this
42  Article 21 shall not be applicable to the initial leasing of any space in the Shopping
43  Center.  At such time that Landlord has knowledge that such space (*"Offered Space"*) is
44  or will become available, Landlord will give Tenant notice (the *"Offering Notice"*) of the
45  terms and conditions Landlord would be willing to accept with respect to the Offered
46  Space (including, without limitation, the proposed rent, additional rent, scope of
47  Landlord's proposed tenant improvements, location and Floor Area), and Tenant shall
48  have thirty (30) days within which to respond to Landlord's offer.  In the event Tenant
49  elects to accept Landlord's offer, then Tenant shall notify Landlord of such election by
50  giving notice to Landlord during such thirty (30) day period and Landlord and Tenant
51  shall thereupon enter into an amendment to this Lease for the leasing of the Offered
52  Space, which amendment shall (a) contain the terms and conditions set forth in the

1   Offering Notice, (b) provide that the term thereunder shall expire or sooner terminate
2   contemporaneously with the expiration or sooner termination of the Term hereof (subject
3   to extension in accordance with Section 2.2.2 above), and (c) contain such other terms
4   and provisions as either Landlord or Tenant may reasonably require in order to effectuate
5   the incorporation of the Offered Space into the Premises and to otherwise effectuate the
6   intent of this Article 21.  Should Tenant decline Landlord's offer or fail to respond
7   thereto, then, and in such event, Tenant shall have been deemed to have waived any
8   prospective rights of first offer to the Offered Space (but Tenant shall not lose any
9   prospective rights of first offer with respect to any space (including, without limitation,
10  the Offered Space) which may in the future become vacant and available), and Landlord
11  may lease the Offered Space to any other party upon substantially the same terms and
12  conditions as that offered to Tenant, provided that such lease is executed within six (6)
13  months after Tenant has declined (or has been deemed to have waived) Landlord's offer
14  with respect to the Offered Space.  As used herein, the phrase *"substantially the same*
15  *terms and conditions as that offered to Tenant"* shall mean terms not materially
16  different and/or a rent of not more than five (5%) percent below the rent requested by
17  Landlord of Tenant.  Any dispute between the parties with respect to this Article 21
18  (including, without limitation, any dispute as to the provisions of the amendment
19  described in this Article 21) shall be resolved by arbitration in accordance with the
20  provisions of Section 16.2 above.

21                      ARTICLE 22
22                  ONGOING CO-TENANCY

23          If, at any time during the Term, (a) TJ Maxx (or a Replacement Tenant, as herein
24  defined, thereof), (b) Circuit City (or a Replacement Tenant thereof) or (c) Recognized
25  Tenants (as herein defined) occupying in the aggregate at least 50,000 square feet of
26  Floor Area (excluding the Premises and the TJ Maxx and Circuit City premises referred
27  to in Subsection 2.3.1(e) above) cease to be open for business to the public in their entire
28  respective premises for a period of one hundred eighty (180) consecutive days (such
29  condition being hereinafter referred to as an *"Excess Vacancy"*) (excepting therefrom,
30  such periods that the Excess Vacancy exists by reason of the repairing and/or restoring of
31  any portion of such building necessitated by fire or other casualty or condemnation, so
32  long as Landlord is completing [or causing to be completed] with due diligence such
33  repair and/or restoration necessary to cause such building(s) to be in the condition
34  required to open same for business), then in such event, Tenant shall have the right to: (i)
35  pay Alternate Rent in lieu of Fixed Rent and Percentage Rent during the period of such
36  Excess Vacancy, and/or (ii) if the Excess Vacancy continues for a period in excess of
37  three hundred sixty-five (365) continuous days, to terminate this Lease, exercisable by
38  giving Landlord, within one hundred twenty (120) days after the expiration of such 365-
39  day period, not more than sixty (60) days' prior notice, in which event this Lease shall
40  terminate on the date set forth in Tenant's notice of termination without further liability
41  on the part of either Landlord or Tenant, except: (A) for those obligations which survive
42  the expiration or other termination of this Lease pursuant to the express terms of this
43  Lease, and (B) Landlord, promptly after receiving a statement from Tenant showing the
44  costs and expenses of any alterations made by Tenant, shall reimburse Tenant for the
45  unamortized portion of such costs and expenses based upon the unexpired portion of the
46  Term.  If Tenant does not terminate this Lease pursuant to this Article 22, then
47  commencing on the expiration of the aforesaid 120-day period, Tenant shall resume
48  paying full Rent, provided, however, that Tenant shall retain all of its original rights
49  under this Article 22 with respect to any future condition(s) of Excess Vacancy.  For the
50  purposes of this Section 22, (I) the term *"Replacement Tenant"* shall mean one (1) or
51  more national or regional retailer(s) of the type typically found in the first-class shopping
52  centers located in the Dallas/Fort Worth, Texas metropolitan area which occupies, in the
53  aggregate, at least ninety percent (90%) of the TJ Maxx or Circuit City, as the case may
54  be, premises referred to in Subsection 2.3.1(e) above, respectively, and (II) the term
55  *"Recognized Tenants"* shall mean nationally or regionally recognized tenants of the type

1 typically found in first-class regional shopping centers located in the Dallas/Fort Worth,
2 Texas metropolitan area.

3 ARTICLE 23
4 MISCELLANEOUS

5 Section 23.1   Loading Facilities. Tenant shall have the exclusive right to
6 utilize the loading facilities serving the Premises (shown on Exhibit B) on a "24 hour a
7 day", "365 days a year" basis, subject to Legal Requirements.

8 Section 23.2   Liens. Within thirty (30) days after notice of the filing
9 thereof, Tenant shall discharge (either by payment or by filing of the necessary bond, or
10 otherwise) any lien against the Premises and/or Landlord's interest therein, which may
11 arise out of any payment due for, or purported to be due for, any labor, services,
12 materials, supplies or equipment alleged to have been furnished to or for Tenant in, upon
13 or about the Premises. Similarly, within thirty (30) days after notice of the filing thereof,
14 Landlord shall discharge (either by payment or by filing of the necessary bond, or
15 otherwise) any lien against the Premises and/or Landlord's interest therein, which may
16 arise out of any payment due for, or purported to be due for, any labor, services,
17 materials, supplies or equipment alleged to have been furnished to or for Landlord in,
18 upon or about the Premises.

19 Section 23.3   Broker's Commission. Landlord and Tenant each warrant
20 and represent to the other that they did not deal with any real estate broker in connection
21 with the negotiation, execution and delivery of this Lease, except for The Retail
22 Connection and The Woodmont Company (collectively the *"Broker"*). Landlord shall
23 pay the Broker a commission pursuant to a separate agreement. Each party agrees to
24 indemnify, defend, and save the other harmless from and against any and all liabilities,
25 costs, causes of action, damages and expenses, including, without limitation, attorneys'
26 fees, with respect to or arising out of any claims made by any real estate broker (other
27 than the Broker), agent or finder with respect to this Lease in breach of the foregoing
28 representation. The provisions of this Section shall survive the expiration or earlier
29 termination of this Lease.

30 Section 23.4   *Force Majeure*. Except as otherwise expressly set forth
31 herein, in the event either party hereto shall be delayed or hindered in, or prevented from,
32 the performance of any act required hereunder by reason of strikes, failure of power,
33 riots, insurrection, war, earthquake, hurricane or tornado (or comparable weather
34 conditions of unusual severity), or other reasons of an extraordinary nature which are
35 beyond the reasonable control of the party and which could not have been avoided
36 through the exercise of due diligence by a party (collectively referred to herein as *"Force
37 Majeure"*), then the performance of any such act shall be excused for a period equal to
38 the period of the delay. Notwithstanding the foregoing provisions, the following shall not
39 constitute Force Majeure: (i) the financial inability of a party to perform its obligations
40 under this Lease; or (ii) delays occurring in the course of complying with applicable
41 Legal Requirements that could have been avoided through the exercise of due diligence
42 by a party hereto. A party wishing to invoke this Section shall give the other party notice
43 of that intention within ten (10) days of the commencement of any event of Force
44 Majeure and shall, at that time, specify the reasons therefor, the specific provision of this
45 Lease which will be delayed as a result, and the period of such extension, if known, or if
46 not known, a reasonable estimate thereof.

47 Section 23.5   Consents. Except as may be otherwise expressly set forth in
48 this Lease, whenever under this Lease provision is made for either party's securing the
49 consent or approval of the other party, (i) such consent or approval shall be in writing and
50 shall not be unreasonably withheld, delayed or conditioned, and (ii) in all matters
51 contained herein, both parties shall have an implied obligation of reasonableness.

1           Section 23.6     Costs. Whenever this Lease requires the performance of an
2   act by a party, such party shall perform the act at its own cost and expense, unless
3   expressly provided to the contrary.

4           Section 23.7     Attorneys' Fees. In any action or proceeding hereunder
5   (whether to enforce the terms and provisions of an indemnity or otherwise), the
6   prevailing party shall be entitled to recover from the other party the prevailing party's
7   reasonable costs and expenses in such action or proceeding, including reasonable
8   attorneys' fees, costs and expenses. Except as otherwise set forth herein, if either party is
9   sued by a third party as a result of a violation of a covenant or warranty herein contained
10   by the other party hereto, then the party who has violated the covenant or warranty shall
11   be responsible for the reasonable costs and expenses in such action or proceeding against
12   the non violating party, including reasonable attorneys' fees, costs and expenses.

13          Section 23.8     Survival of Obligations. The obligation to pay any sums due
14   to either party from the other that by the terms herein would not be payable, or are
15   incapable of calculation, until after the expiration or sooner termination of this Lease
16   shall survive and remain a continuing obligation until paid. All indemnity obligations
17   under this Lease shall survive the expiration or earlier termination of this Lease.

18          Section 23.9     Non-Waiver. The failure of Landlord or Tenant to insist upon
19   the strict performance of, or to enforce, any provision, covenant or condition herein shall
20   not be deemed to be a waiver thereof, nor void or affect the right of the aggrieved party to
21   enforce the same covenant or condition on the occasion of any subsequent breach or
22   default; nor shall the failure of either party to exercise any option in this Lease upon any
23   occasion arising therefor be deemed or construed to be a waiver of the right to exercise
24   that same kind of option upon any subsequent occasion.

25          Section 23.10    Rights Cumulative. Unless expressly provided to the contrary
26   in this Lease, each and every one of the rights, remedies and benefits provided by this
27   Lease shall be cumulative and shall not be exclusive of any other such rights, remedies
28   and benefits allowed by applicable Legal Requirements.

29          Section 23.11    Definition of Landlord. The term *"Landlord"* shall mean
30   only the person or entity which, from time to time, shall then own the Shopping Center,
31   and in the event of the transfer by such owner of its interest in the Shopping Center, as
32   the same may be encumbered, such owner shall (except to the extent of (1) claims made
33   by Tenant against Landlord which arose prior to the effective date of the transfer of such
34   ownership interest, and/or (2) judgments obtained by Tenant against Landlord, on or prior
35   to the effective date of the transfer of such ownership interest) thereupon be released and
36   discharged from all covenants and obligations of Landlord thereafter accruing, but such
37   covenants and obligations shall be binding during the Term upon each new owner for the
38   duration of such owner's ownership.

39          Section 23.12    Successors and Assigns. The provisions of this Lease shall be
40   binding upon and shall inure to the benefit of the parties hereto and their respective heirs,
41   executors, administrators, successors and assigns.

42          Section 23.13    Limitation of Landlord's Liability. Except with respect to
43   insurance proceeds or condemnation awards received by Landlord which are required by
44   the terms of this Lease to be applied to the repair or restoration of the Premises or the
45   Shopping Center, Tenant shall, on and after the Delivery Date, look only to Landlord's
46   estate and property in the Shopping Center (or the proceeds from the sale of all or any
47   portion thereof) and net income derived from the Shopping Center, as the same may then
48   be encumbered as expressly permitted hereunder, for the satisfaction of Tenant's
49   remedies for the collection of a judgment (or other judicial process) requiring the
50   payment of money by Landlord hereunder and no other property or assets of Landlord, its
51   officers, directors, stockholders, members or partners shall be subject to levy, execution
52   or other enforcement procedure for the satisfaction of Tenant's remedies under or with

1 respect to this Lease. Except with respect to the limitation on personal liability
2 hereinabove set forth, the provisions of this Section 23.13 shall not be deemed or
3 construed to limit Tenant's rights and remedies pursuant to this Lease or which may be
4 available at law or in equity.

5        Section 23.14    Limitation of Tenant's Liability.  Landlord, its successors and
6 assigns, shall look solely to the assets, if any, of Tenant and its successors and assigns,
7 for the satisfaction of any claim arising from or under this Lease and shall not seek to
8 impose personal liability on any shareholder, officer, director, member or employee of
9 Tenant or any of its Affiliates.

10        Section 23.15    Joint and Several Liability.  If either party consists of more
11 than one person, then the persons constituting such party shall be jointly and severally
12 liable hereunder.

13        Section 23.16    Severability.  If any term, covenant, condition or provision of
14 this Lease is held by a court of competent jurisdiction to be invalid, void or
15 unenforceable, the remainder of the provisions hereof shall remain in full force and effect
16 and shall in no way be affected, impaired, or invalidated thereby.

17        Section 23.17    Grammatical Usages and Construction.  In construing this
18 Lease, feminine or neuter pronouns shall be substituted for those masculine in form and
19 vice versa, and plural terms shall be substituted for singular and singular for plural in any
20 place in which the context so requires.  This Lease shall be construed without regard to
21 (i) the identity of the party who drafted the various provisions hereof or (ii) the addition
22 or deletion of text made during the negotiation of this Lease.  Moreover, each and every
23 provision of this Lease shall be construed as though all parties hereto participated equally
24 in the drafting thereof.  As a result of the foregoing, any rule or construction that a
25 document is to be construed against the drafting party shall not be applicable hereto.

26        Section 23.18    Table of Contents, Line Numbering and Paragraph Headings.
27 The table of contents and line numbering, if any, and section headings are inserted only
28 for convenience and in no way define, limit or describe the scope or intent of this Lease,
29 nor in any way affect this Lease.

30        Section 23.19    Definition of Hereunder, Herein, etc..  Unless the context
31 clearly indicates to the contrary, the words "herein," "hereof," "hereunder," "hereafter,"
32 and words of similar import refer to this Lease and all the Exhibits attached hereto as a
33 whole and not to any particular section, subsection, or paragraph hereof.

34        Section 23.20    Short Form Lease.  Upon the request of either party
35 following the execution and delivery of this Lease, Landlord and Tenant shall execute a
36 short form lease or memorandum for recording, which shall be in form and substance as
37 either party shall reasonably request.  In no event shall the amount of Fixed Rent reserved
38 hereunder be included in any such short form lease or memorandum.  The party
39 requesting the execution and delivery of any such short form lease or memorandum shall
40 be responsible for arranging for the recording thereof (including any recording charges
41 therefor).

42        Section 23.21    Entire Agreement and Modification.  This Lease constitutes
43 the entire agreement of the parties hereto, and all prior agreements between the parties,
44 whether written or oral, are merged herein and, except as may be specifically set forth
45 herein, shall be of no force and effect.  This Lease cannot be changed, modified or
46 discharged orally, but only by an agreement in writing, signed by the party against whom
47 enforcement of the change, modification or discharge is sought.

48        Section 23.22    No Joint Venture or Partnership Created by Lease.  Nothing
49 contained herein shall be deemed or construed as creating the relationship of principal
50 and agent or of partnership or of joint venture between the parties hereto.

1         Section 23.23    <u>Tenant's Tradename</u>.  Landlord shall not make use of
2 Tenant's tradename [*i.e., "Bed Bath & Beyond"*®] in any advertising or marketing
3 material, including, without limitation, on any internet website, without obtaining
4 Tenant's prior written approval, which may be withheld in Tenant's sole and absolute
5 discretion.

6         Section 23.24    <u>Counterparts</u>.  This instrument may be executed in several
7 counterparts, each of which shall be deemed an original.  The signatures to this instrument may
8 be executed and notarized on separate pages, and when attached to this instrument, shall
9 constitute one complete document.

10         Section 23.25    <u>Waiver of Trial by Jury</u>.  Landlord and Tenant hereby mutually
11 waive any and all rights which either may have to request a jury trial in any proceeding between
12 them at law or in equity.

13         Section 23.26    <u>Governing Law</u>.  This Lease shall be governed by, construed,
14 and enforced in accordance with the laws of the State in which the Premises are located.

15                   [Signature page follows]

1
2       IN WITNESS WHEREOF, the parties have executed this instrument under seal
3  the day and year first-above written.
4

**LANDLORD:**

WITNESS:               **ROCKWALL CROSSING, LTD.,** a
Texas limited partnership

By:  **WOODMONT ROCKWALL
GP, L.L.C.,** a Texas limited
liability company, its General
Partner

By: _____
Name: Stephen Coslik
[SEAL]                       Title: Managing Member

**TENANT:**

ATTEST:             **BED BATH & BEYOND INC.,** a New
York corporation

_____    By: _____
Name: Alan M Freeman     Name:  Warren Eisenberg
Title:  (Assistant) Secretary    Title:    Co-Chairman of the Board of
                                    Directors

[SEAL]

1

2    IN WITNESS WHEREOF, the parties have executed this instrument under seal

3    the day and year first-above written.

4

<strong>LANDLORD:</strong>

WITNESS:                              **ROCKWALL CROSSING, LTD.,** a
                                      Texas limited partnership

                                      By:   **WOODMONT ROCKWALL
                                            GP, L.L.C.**, a Texas limited
                                            liability company, its General
                                            Partner

                                            By:   _Stephen Coslik_
_____          _____
                                            Name: Stephen Coslik
[SEAL]                                      Title: Managing Member


<strong>TENANT:</strong>

ATTEST:                               **BED BATH & BEYOND INC.**, a New
                                      York corporation


_____    By:_____
Name:_____     Name:  Warren Eisenberg
Title:  (Assistant) Secretary          Title:   Co-Chairman of the Board of
                                               Directors
[SEAL]

5

## INDEX OF EXHIBITS

| | |
|---|---|
| Exhibit A | Legal Description of Shopping Center |
| Exhibit B | Site Plan |
| Exhibit C | Form of Rent Commencement and Expiration Date Agreement |
| Exhibit D | Specifications for Landlord's Work |
| Exhibit D-1 | Exterior Elevations of the Premises, and Sidewalk Plan |
| Exhibit D-2 | Exterior Elevations of the Shopping Center |
| Exhibit E | Permitted Encumbrances |
| Exhibit F | Tenant's Signage |
| Exhibit G | Form of Subordination, Non-Disturbance and Attornment Agreement |
| Exhibit H | Form of Subtenant Recognition Agreement |
| Exhibit I | Form of Delivery Date Notice |
| Exhibit J | Form of Delivery Date Certification |
| Exhibit K-1 | Existing Exclusives |
| Exhibit K-2 | Existing Leases |
| Exhibit L | [Intentionally Omitted] |
| Exhibit M | Prohibited Uses |

1           Exhibit A
2
3           Legal Description of Shopping Center
4
5      BEING a tract of land situated in the J.D. McFarland Survey, Abstract No. 145, City of
6      Rockwall, Rockwall County, Texas, and being all of that called 8.44 acre tract as
7      conveyed to L&B Land & Cattle Co. as recorded in Volume 1406, Page 120 and also
8      being a part of that called 94.126 acre tract as conveyed to PRS Realty II, L.P., as
9      recorded in Volume 961, Page 55 of the Deed Records of Rockwall County, Texas, said
10     tract being more particularly described by metes and bounds as follows:

11             BEGINNING at a concrete right of way post found at the point of intersection of
12     the existing right of way of Mims Road with the existing right of way of Interstate
13     Highway No. 30, said point also be the most westerly corner of said 8.44 acre tract;

14             THENCE along the existing right of way of Interstate Highway No. 30 and a
15     curve to the left having a central angle of 14 degrees 51 minutes 09 seconds, a radius of
16     3970.90 feet, a chord distance of 1026.47 feet that bears North 42 degrees 49 minutes 01
17     seconds East, around said curve an arc distance of 1029.35 feet to a concrete right of way
18     post found for corner;

19             THENCE North 35 degrees 12 minutes 58 seconds East, continuing along the
20     existing right of way of Interstate Highway No. 30, a distance of 436.20 feet to a ½" iron
21     rod set at the most northerly corner of said 94.126 acre tract and also being the most
22     westerly corner of Lot 1, Block C of Rockwall Business Park East, Phase Three, an
23     addition to the City of Rockwall as recorded in Slide B, Page 291 of the Plat Records of
24     Rockwall County, Texas;

25             THENCE South 45 degrees 50 minutes, 36 seconds East, leaving the existing right
26     of way of Interstate Highway No. 30, a distance of 1211.07 feet to a ½" iron rod set for
27     corner on the existing right of way of Ralph Hall Parkway;

28             THENCE along the existing right of way of Ralph Hall Parkway, the following:

29             South 62 degrees, 30 minutes, 30 seconds West, a distance of 786.50 feet to a ½"
30             iron rod set for corner;

31             North 45 degrees 54 minutes 44 seconds West, a distance of 109.06 feet to a ½"
32             iron rod found for corner;

33             South 42 degrees 53 minutes 27 seconds West, a distance of 445.10 feet to a ½"
34             iron rod set for corner at the most easterly corner of a tract as conveyed to Texas
35             Department of Transportation ("TxDot") as recorded in Volume 65, Page 591 of
36             said Deed Records;

37             THENCE, North 46 degrees 19 minutes 47 seconds West, leaving the existing
38     right of way of Ralph Hall Parkway and along the northeast line of said TxDot tract, a
39     distance of 650.45 feet to a ½" iron rod set for corner;

40             THENCE, South 43 degrees 31 minutes 18 seconds West, a distance of 304.49
41     feet to a concrete right of way post found on the existing right of way of Mims Road;

42             THENCE, North 26 degrees 17 minutes 25 seconds West, along the existing right
43     of way of Mims Road, a distance of 133.05 feet to the POINT OF BEGINNING and
44     containing 26.0915 acres of land, more or less.

45
46

1

2

3

4

<u>Exhibit B</u>

<u>Site Plan</u>

B-1



FLOOR PLAN
1/16" = 1'-0"
THE ABOVE FLOOR PLAN
REPRESENTS TENANT'S
CRITICAL DIMENSIONS

NOTES:

CONSTRUCTION STAGING AREA FOR LANDLORD AND OTHER
CO-TENANTS SHALL NOT BE WITHIN TENANT'S CRITICAL AREA,
DIRECTLY IN FRONT OF TENANT'S PREMISES, OR BLOCK
ACCESS TO TENANT'S LOADING DOCK.

TENANT SHALL HAVE THE RIGHT TO RELOCATE CART CORRALS
IN THE PARKING FIELD.

EXIT DOOR LOCATIONS TO BE COORDINATED WITH TENANT'S PLANS

SITE PLAN LAYOUT TO ADEQUATELY ACCOMMODATE TURNING
RADIUS FOR A 55'-0" TRAILER, FROM POINT OF ENTRY TO
TENANT'S LOADING DOCK, AND THEN EXIT.

PROPOSED HIRING TRAILER LOCATION, SUBJECT TO REASONABLE
RELOCATION BY LANDLORD IF APPLICABLE.

SITE PLAN LEGEND

BED BATH & BEYOND
PREMISES AREA.

BED BATH & BEYOND
CRITICAL AREA.

SITE DATA:

BUILDING AREA:  176,752 SQ. FT.

PARKING:  835 PARKING SPACES

SITE PLAN
1" = 60'

INTERSTATE HWY 30

RALPH HALL PARKWAY

EXHIBIT B (1 OF 2)

ROCKWALL CROSSING
ROCKWALL, TEXAS
DATE: 8-9-04

INTERSTATE HWY 30

POINT OF BEGINNING

LOT 7
0.722 AC.
SUBJECT TO FUTURE
SITE PLAN APPROVAL

LOT 6
1.14 AC.

PAD "A"

LOT 5
1.90 AC.

OMNI "A"
17,500 SF

LOT 4
2.10 AC.

OMNI "B"
17,500 SF

LOT 3
1.41 AC.

PAD "B"

SUBJECT TO FUTURE
SITE PLAN APPROVAL

LOT 2
1.42 AC.

SUBJECT TO FUTURE
SITE PLAN APPROVAL

PAD "C"

25' ACCESS & DRAINAGE ESM'T

ROCKWALL BUSINESS PARK
EAST PHASE THREE
LOT 1 BLK. C

PBA

PBA

TXDOT
VOL. 65, PG. 591
D.R.R.C.T.

50%
RESTORATION
AREA

PETSMART
20,087 SF

DOLLAR
TREE
17,250 SF

RETAIL

RETAIL

CIRCUIT
CITY
30,000 SF

BED, BATH
&
BEYOND
29,000 SF

TJ MAXX
30,100 SF

RETAIL
14,000 SF

PBA

BARBED WIRE FENCE

DETENTION POND
16,000 S.F.

4,500 S.F.
DETENTION POND

WATER
FEATURE

75%
RESTORATION
AREA

POST
DELIVERY
CONSTRUCTION
DRIVE

PROPOSED
DETENTION POND
35,000 S.F.

SITE PLAN
NOT TO SCALE

NORTH

RALPH HALL PARKWAY

85' R.O.W.

EXHIBIT B ( 2 OF 2 )

ROCKWALL CROSSING
ROCKWALL, TEXAS
DATE: 8-9-04

<u>Exhibit C</u>

<u>Rent Commencement and Expiration Date Agreement</u>

THIS RENT COMMENCEMENT AND EXPIRATION DATE AGREEMENT, made as of the _____ day of _____, 200___, by and between _____ ("Landlord") and BED BATH & BEYOND INC. ("Tenant").

## W I T N E S S E T H :

WHEREAS, Landlord is the owner of a certain shopping center known as Rockwall Marketplace (the *"Shopping Center"*), situated in Rockwall, Texas;

WHEREAS, by that certain lease dated August __, 2004 (the *"Lease"*), Landlord leased a portion (the *"Premises"*) of the Shopping Center to Tenant;

WHEREAS, Tenant is in possession of the Premises and the Term of the Lease has commenced; and

WHEREAS, under Section 2.2 of the Lease, Landlord and Tenant agreed to enter into an agreement setting forth certain information in respect of the Premises and the Lease.

NOW, THEREFORE, Landlord and Tenant agree as follows:

1.      The Rent Commencement Date occurred on _____, 200__.

2.      The **Initial Term** of the Lease shall expire on January 31, 20___, unless Tenant exercises any option to extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

3.      The date of commencement of the **first Renewal Period** shall be February 1, 20___, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 20___, unless Tenant exercises any option to further extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

4.      The date of commencement of the **second Renewal Period** shall be February 1, 20___, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 20___, unless Tenant exercises any option to further extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

5.      The date of commencement of the **third Renewal Period** shall be February 1, 20___, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 20___, unless the Lease terminates earlier as provided in the Lease.

6.      The date of commencement of the **fourth Renewal Period** shall be February 1, 20___, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 20___, unless the Lease terminates earlier as provided in the Lease.

7.      Capitalized terms used, but not defined, herein shall have the meanings ascribed to them in the Lease.

IN WITNESS WHEREOF, the parties hereto have caused this Rent Commencement and Expiration Date Agreement to be executed the date and year first above written.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19

**LANDLORD:**

_____

By:_____
Name:_____
Title:_____

**TENANT:**

BED BATH & BEYOND INC., a New York
corporation

By:_____
Name:  Warren Eisenberg
Title:   Co-Chairman of the Board of Directors

C-2

1
2                                          <u>Exhibit D</u>
3
4                              <u>Specifications for Landlord's Work</u>
5

D-1

## *Rockwall, Texas*

### Exhibit D - Standard Landlord's Work

08/09/04

[All capitalized terms used, but not otherwise defined herein shall have the meanings ascribed to them in the Lease.  The terms of the Lease regarding Landlord's Work shall be deemed to supplement the provisions of the Exhibit D, to the extent not inconsistent with the terms of this Exhibit D.  It is specifically understood and agreed that all materials and supplies shall be installed in strict accordance with all manufacturers' specifications.]

### Landlord's Final Plans and Specifications

Landlord shall provide one (1) complete full size set, one (1) complete ½ size set and one (1) copy of electronic file of the Final Plans and Specifications as well as each subsequent revision to Landlord's Plans for Tenant's use. Landlord shall develop project-specific Final Plans and Specifications in accordance with following documents:

A.  Tenant's Plans consist of the following: FIXTURE PLAN (F1); FLOOR FINISH PLANS, NOTES AND DETAILS (F2); POWER/SPECIALTY LIGHTING PLANS AND NOTES (F3); LIGHTING PLANS AND NOTES (F4); and HIGH PILE STORAGE PLAN (F5).  Tenant's Plans are project-specific design-development documents.  In the event of a conflict between Tenant's Plans and "Tenant's Prototype Drawings and Specifications"(defined below), then Tenant's Plans shall govern and prevail.  Tenant's Plans shall be delivered to Landlord in accordance with Article 3 of the Lease.

B.  Tenant's Prototype Drawings and Specifications entitled "Bed Bath & Beyond Prototype Drawings and Specifications – version 1.2004, dated 3-29-04 developed by Casco Architects, comprise the following drawings and specifications:

At the time the Preliminary Plans are 85% complete, LL shall be obligated to issue Preliminary Plans to "BBBY Consultant" for review against "Quality Control Checklist".  The cost to LL for this review is $2500.00 plus reimbursable associated with printing and shipping.  If Preliminary Plans are "rejected" or noted "revise and resubmit" by the BBBY consultant then LL shall be obligated for all expenses related to these subsequent reviews until Preliminary Plans are deemed approved.  Project specific BBBY consultants to be determined by BBBY post lease execution.  If LL fails to pay consultant, then Tenant shall have the right to receive a credit against "Changes" under the lease or deduct amount from Rent in order to satisfy outstanding invoice.

All site specific plans and specifications developed by Landlord and submitted to Tenant for review and approval must be in the same Format as Tenant's Prototypical Plans and Specifications as outlined within Item C. below of this Exhibit unless otherwise authorized in writing by Tenant.

Tenant shall not be obligated to review nor approve improperly formatted Landlord's Plans and/or specifications, nor shall said submission be deemed to be in compliance with Section 3.2 "Plan Approvals" of the Lease, unless said Format is complied with.

Tenant reserves the right to immediately disapprove and return improperly formatted plans to the Landlord and the Landlord shall be solely responsible for all costs and/or delays relating to revising/correcting and resubmitting the plans and/or specifications to Tenant for re-review and approval.

C.

| SHEET # | DRAWING TITLE | CURRENT ISSUE | DRAWING DATE |
|---|---|---|---|
| A0.1 | Code Data, Project Data and Responsibility Schedule | Prototype Version 1.2004 | 03/29/04 |
| A0.2 | Generic Site Requirements Plan | Prototype Version 1.2004 | 03/29/04 |
| A1.1 | Site Details | Prototype Version 1.2004 | 03/29/04 |
| A1.2 | Demolition Plan | Prototype Version 1.2004 | 03/29/04 |
| A2.1 | Store Fixture/Egress Path  Plan & Notes | Prototype Version 1.2004 | 03/29/04 |
| A2.2 | Floor Plan | Prototype Version 1.2004 | 03/29/04 |
| A2.3 | Floor Finish Plan | Prototype Version 1.2004 | 03/29/04 |
| A2.4 | Reflected Ceiling Plans & Notes | Prototype Version 1.2004 | 03/29/04 |
| A2.5 | Roof Plan Details & Notes | Prototype Version 1.2004 | 03/29/04 |
| A3.1 | Finish Schedule, Part Types, Storefront Types & Vestibule Elevations | Prototype Version 1.2004 | 03/29/04 |
| A3.2 | Door Hardware, Door Schedule & Door Types | Prototype Version 1.2004 | 03/29/04 |
| A3.3 | BBB National Account Vendors & Specified Manufactures w/Distribution Schedule | Prototype Version 1.2004 | 03/29/04 |
| A4.1 | Exterior Elevations | Prototype Version 1.2004 | 03/29/04 |



1

| A5.1 | Building Sections, Interior Wall Sections | Prototype Version 1.2004 | 03/29/04 |
| A5.2 | Exterior Wall Sections | Prototype Version 1.2004 | 03/29/04 |
| A5.3 | Exterior Wall Sections | Prototype Version 1.2004 | 03/29/04 |
| A5.4 | Exterior Wall Sections | Prototype Version 1.2004 | 03/29/04 |
| A5.5 | Interior Wall Sections | Prototype Version 1.2004 | 03/29/04 |
| A5.6 | *Alternate* Scissor Lift Plan, Section, Specification & Notes | Prototype Version 1.2004 | 03/29/04 |
| A6.1 | Exterior Details | Prototype Version 1.2004 | 03/29/04 |
| A6.2 | Interior & Exterior Details | Prototype Version 1.2004 | 03/29/04 |
| A6.3 | Slatwall Details at Storefront | Prototype Version 1.2004 | 03/29/04 |
| A7.1 | Large Scale Plans | Prototype Version 1.2004 | 03/29/04 |
| A7.2 | Large Scale Plans | Prototype Version 1.2004 | 03/29/04 |
| A7.2a | *Alternate* Large Scale Plans (38k SF Building) | Prototype Version 1.2004 | 03/29/04 |
| A8.1 | Interior Details | Prototype Version 1.2004 | 03/29/04 |
| A8.2 | Interior Details | Prototype Version 1.2004 | 03/29/04 |
| A8.3 | Customer Service Desk | Prototype Version 1.2004 | 03/29/04 |
| A8.4 | Register Bays | Prototype Version 1.2004 | 03/29/04 |
| A8.5 | Remote Service Desks | Prototype Version 1.2004 | 03/29/04 |
| A9.1 | Interior Elevations | Prototype Version 1.2004 | 03/29/04 |
| A9.1a | *Alternate* Interior Elevations (38K SF Building) | Prototype Version 1.2004 | 03/29/04 |
| A9.2 | *Alternate* Elevations & Details | Prototype Version 1.2004 | 03/29/04 |
| A9.3 | *Alternate* Plans, Elevations & Details | Prototype Version 1.2004 | 03/29/04 |
| A9.4 | Fine China Store Fixture Plan & Vendor Responsibility Schedule | Prototype Version 1.2004 | 03/29/04 |
| A9.4a | *Alternate* Fine China Store Fixture Plan & Vendor Responsibility Schedule (Corner) | Prototype Version 1.2004 | 03/29/04 |
| A9.4b | *Alternate* Fine China Store Fixture Plan & Vendor Responsibility Schedule (Freestanding w/o Bulkhead) | Prototype Version 1.2004 | 03/29/04 |
| A9.5 | Fine China Plans, Wall Sections & Details | Prototype Version 1.2004 | 03/29/04 |
| A9.5a | *Alternate* Fine China Plans, Wall Sections & Details (Corner) | Prototype Version 1.2004 | 03/29/04 |
| HP1.1 | High Pile Storage Plan & Fixture-Shelf Details | Prototype Version 1.2004 | 03/29/04 |
| S1.1 | Structural General Information & Typical Details | Prototype Version 1.2004 | 03/29/04 |
| S2.1 | Foundation Plan | Prototype Version 1.2004 | 03/29/04 |
| S2.2 | Roof Framing Plan | Prototype Version 1.2004 | 03/29/04 |
| S3.1 | Foundation Details | Prototype Version 1.2004 | 03/29/04 |
| S3.2 | Roof Framing Details | Prototype Version 1.2004 | 03/29/04 |
| P1.1 | Plumbing Riser Diagrams and Fixture Schedule | Prototype Version 1.2004 | 03/29/04 |
| P2.1 | Plumbing Floor Plan | Prototype Version 1.2004 | 03/29/04 |
| P3.1 | Plumbing Enlarged Plans & Details | Prototype Version 1.2004 | 03/29/04 |
| FP1.0 | Fire Sprinkler Plans, Notes & Details | Prototype Version 1.2004 | 03/29/04 |
| FA1.0a | Base System Fire Alarm Plans, Notes & Details | Prototype Version 1.2004 | 03/29/04 |
| FA1.1a | Base System Misc. Notes & Details | Prototype Version 1.2004 | 03/29/04 |
| FA1.2a | Base System Fire Alarm Matrix & Calcs | Prototype Version 1.2004 | 03/29/04 |
| FA1.0b | *Alternate* Fire Alarm Plans w/Occupant Notification Alarm | Prototype Version 1.2004 | 03/29/04 |
| FA1.1b | *Alternate* Fire Plans w/Occupant Notification Notes & Details | Prototype Version 1.2004 | 03/29/04 |
| FA1.2b | *Alternate* Fire Alarm Plans w/Occupant Notification Matrix & Calcs | Prototype Version 1.2004 | 03/29/04 |
| FA1.0c | *Alternate* Fire Alarm Plans w/Smoke Detection | Prototype Version 1.2004 | 03/29/04 |
| FA1.1c | *Alternate* Fire Alarm Plans w/Smoke Detection Notes & Details | Prototype Version 1.2004 | 03/29/04 |
| FA1.2c | *Alternate* Fire Alarm Plans w/Smoke Detection Matrix & Calcs | Prototype Version 1.2004 | 03/29/04 |
| M1.1 | Mechanical General Information | Prototype Version 1.2004 | 03/29/04 |

| M2.1 | Mechanical Floor Plan | Prototype Version 1.2004 | 03/29/04 |
|------|----------------------|--------------------------|----------|
| M3.1 | Mechanical Large Scale Plans & Details | Prototype Version 1.2004 | 03/29/04 |
| M4.1 | Mechanical Schedules & Details | Prototype Version 1.2004 | 03/29/04 |
| E1.1 | Electrical General Information & Schedules | Prototype Version 1.2004 | 03/29/04 |
| E2.1 | Power Plan | Prototype Version 1.2004 | 03/29/04 |
| E2.2 | Lighting Layout Plan | Prototype Version 1.2004 | 03/29/04 |
| E2.3 | Lighting Circuiting Plan | Prototype Version 1.2004 | 03/29/04 |
| E2.4 | Specialty Lighting Plans & Diagrams | Prototype Version 1.2004 | 03/29/04 |
| E3.1 | Electrical Large Scale Plans & Details | Prototype Version 1.2004 | 03/29/04 |
| E3.2 | Lighting Sequencing | Prototype Version 1.2004 | 03/29/04 |
| E3.3 | Electrical Details | Prototype Version 1.2004 | 03/29/04 |
| E4.1 | Electrical Schedules | Prototype Version 1.2004 | 03/29/04 |
| E4.2 | Electrical Diagrams | Prototype Version 1.2004 | 03/29/04 |
| E4.3 | Electrical Schedules | Prototype Version 1.2004 | 03/29/04 |
| E4.4 | Novar Wiring Details | Prototype Version 1.2004 | 03/29/04 |
| E4.4a | *Alternate* Novar Wiring Details for RTU's Other Than Lennox | Prototype Version 1.2004 | 03/29/04 |
| E4.5 | ETM Details for Lennox RTU's | Prototype Version 1.2004 | 03/29/04 |
| E4.5a | *Alternate* ETM Wiring Details For Non-Lennox RTU's | Prototype Version 1.2004 | 03/29/04 |
| E5.1 | Fine China Power, Lighting & Specialty Lighting | Prototype Version 1.2004 | 03/29/04 |
| E5.1a | *Alternate* Fine China Power, Lighting Specialty Lighting (Corner) | Prototype Version 1.2004 | 03/29/04 |
| E5.1b | *Alternate* Fine China Power, Lighting, Specialty Lighting (Freestanding w/o Bulkhead) | Prototype Version 1.2004 | 03/29/04 |
| E6.1 | *Bid Alternate:* Modular Wiring (Fastlane) Plans | Prototype Version 1.2004 | 03/29/04 |
| E6.2 | *Bid Alternate:* Modular Wiring (Fastlane) Details | Prototype Version 1.2004 | 03/29/04 |

Project Manual for Bed Bath & Beyond, dated March 29, 2004.

D.   Neither Tenant's Plans nor Tenant's Prototype Drawings and Specifications reflect regional or governmental requirements. Such regional/governmental requirements may include but not limited to the following: Stockroom/Sales Area partition between sales area and stockroom may be required including all openings through the partition be properly protected; Disability access to mezzanine level such as an ADA lift, limited use/limited application elevator, or elevator may be required including installation of phone lines to cab; The number of restroom fixtures, number of exit stairs, smoke purge and pressurization system, smoke/heat vents, draft curtains, fire rated walls, ceiling or floors required to meet high pile storage requirements, etc. may need to be modified to comply with all applicable Legal Requirements.

In addition, Landlord shall include the following items as part of the Final Plans and Specifications:

1.   All architectural elevations and construction details for all pylon, monument and directional signs located throughout the Shopping Center.

2.   All architectural elevations and partial sidewalk plans of all other tenants and occupants of the Shopping Center.

3.   Complete civil engineering documents that describe planned improvements to the Shopping Center, including geo-technical and stormwater design reports.

## Site Specifications

A.   Landlord represents that all site development and civil work shall be completed in accordance with the Geotechnical Engineering Investigation Report (dated 04-20-2004) prepared by Reed Engineering Group and also in accordance with the civil engineering drawings (sheet # 1 to 20 of 21 see index of drawings attached to this Exhibit D as addendum A) prepared by Douphrate & Associates, Inc. (see index for datesAdditional City required changes may be necessary before final approval. Landlord shall furnish any revisions to Tenant.

B.   The minimum lighting level throughout the Shopping Center (parking areas, traffic drives, service drives, etc.) shall be at least two (2) foot-candles, measured 30" above grade. Landlord shall include a photometric plan, which shall confirm that the proposed lighting meets these requirements as part of the Final Plans and Specifications. Landlord shall not include illumination from building-mounted wall packs when

3

calculating the required foot-candle level.  Landlord shall provide low level security lighting min. (1) foot-candle throughout center that shall remain illuminated from dusk to dawn seven days a week.

## Building Requirements

The following describes project-specific elements of Landlord's Work in addition to the scope detailed in Tenant's Prototype Drawings and Specifications:

A.   Clear Height - Building systems (mechanical, plumbing, electrical) shall be designed to allow Tenant to stock merchandise up to at least 16'-6" a.f.f.  All mechanical, plumbing and electrical elements shall be located at least 16'-6" a.f.f., except for Tenant's light fixtures.  Fire protection sprinkler piping shall be located at least 16'-6" a.f.f., sprinkler heads shall be located at least 18'-0" a.f.f.  Bottom of all structural elements shall be located at least 18'-0" a.f.f.

B.   Fire Alarm System - Landlord shall furnish and install a fire alarm system in accordance with the minimum base standards set forth in Tenant's Prototypical Plans and Specifications, or more stringent requirements as may be required by law.  Landlord shall be responsible for monitoring the fire alarm system for a min. (30) thirty days following the Delivery Date.

LL shall issue complete fire alarm system submittal consisting of site specific drawings and equipment cut sheets to CCI for their review and approval no later than (12) weeks prior to projected delivery date.  The fixed cost to LL for this initial review is $550.00 plus reimbursables associated with printing and shipping.  If subsequent reviews are required by CCI due to initial rejection, then fixed cost to LL for subsequent reviews shall be on a time and material basis.  The hourly rate for these subsequent reviews shall be $125.00/hour plus reimbursables associated with printing and shipping.

Mr. Will Smith
Code Consultants, INC.
Work:          (314) 991-2633
Fax:            (314) 991-4614
1804 Borman Circle Drive
St. Louis, Missouri 63146-4136

C.   1st Level Structure (sales/non-sales level) - Landlord shall provide a minimum 4000 psi concrete floor slab having a minimum thickness of 4".  Structural system shall be rated to accept 125 lb. per square foot of live load.  If rebar or pretensioned or post-tensioned steel is required, it shall not be placed within the top 2 ½" of the concrete slab.

D.   Sprinkler System - The sprinkler system shall be designed to allow fixturing and storage to be within 18" of heads.  System shall comply with NFPA 231-C and or NFPA13, (high-rack storage) for class IV commodity solid shelves, minimum 4 foot aisles. Typically, .486 GPM over 2000 sf will be required.

E.   Landlord shall provide sprinkler system sufficient to meet the requirements specified within Tenant's Prototype Drawings and Specifications without utilizing a fire pump if existing water pressure allows.  If water pressure is inadequate and system cannot be designed to properly function without incorporating a fire pump, then Landlord shall locate Fire Pump outside of Premises.  Landlord shall maintain Fire Pump for the full term of the Lease without any cost to Tenant. Landlord shall, without any cost to Tenant and for the full term of the Lease, routinely inspect, test, and maintain the Fire Pump in accordance with NFPA 25, Standard for the Inspection, Testing, and Maintenance of Water-based Fire Protection Systems (Chapter 5 of 1998 Edition).

F.   LL shall issue complete fire protection submittal consisting of site specific head locations, hydraulic calculations and equipment cut sheets to CCI for their review and approval no later than (12) weeks prior to projected delivery date.  The fixed cost to LL for this initial review is $550.00 plus reimbursables associated with printing and shipping.  If subsequent reviews are required by CCI due to initial rejection, then fixed cost to LL for subsequent reviews shall be on a time and material basis.  The hourly rate for these subsequent reviews shall be $125.00/hour plus reimbursables associated with printing and shipping.

If BBBY national fire protection consultants are needed to assist LL with approvals from governmental authorities such as completing technical discussions with governmental authorities to explain/clarify design parameters, calculations, high pile storage commodity classifications, fire pump design, etc., then LL shall directly pay consultant for all time and materials. If LL fails to pay consultant, then Tenant shall have the right to receive a credit against "Changes" under the lease or deduct amount from Rent in order to satisfy outstanding invoice.

Mr. Will Smith
Code Consultants, INC.
Work:          (314) 991-2633
Fax:            (314) 991-4614
1804 Borman Circle Drive
St. Louis, Missouri 63146-4136

4

G.    If fire-proofing of structural elements is required, then Landlord shall use intumescent fire resistive coating. All edges of application shall be neat, clean and straight. All edges of material to be parallel to structural element being treated.

## Construction Coordination Requirements

A.    Landlord shall provide Tenant with a critical path schedule prior to commencement of Landlord's Work, and shall provide to Tenant's construction project manager an updated critical path schedule every two weeks thereafter until Landlord's Work is completed

B.    Throughout the period during which Landlord's Work is being performed, Landlord shall provide to Tenant's construction project manager, on a weekly basis, then-current photographs of the interior and exterior of the Premises, and the Shopping Center site, showing the progression of Landlord's Work. All photographs shall be in a digital format, and transmitted to Tenant at e-mail address at **BBB.2000photos@bedbath.com**

## Building and Site Signs

A.    Building Signs -- Landlord shall furnish and install all building signs shown on Exhibits D-1 and F utilizing Tenant's specified vendor only. Landlord is responsible to verify actual number of circuits required with Tenant's specified vendor. Conduit to be installed continuously from Tenant's panel in Premises to sign location(s). Landlord required to execute purchase order with Tenant's specified vendor within 10 weeks prior to Delivery Date. If Landlord fails to execute purchase order within this time frame, then at Tenant's option, Tenant may execute purchase order with Tenant's specified vendor and deduct all costs from rent, (or , at Tenant's option , receive a credit against "Changes" under the lease). If Tenant does not provide written notice to Landlord regarding Tenant's decision to execute purchase order with Tenant's specified vendor, then Landlord shall remain responsible to execute purchase order. Signage and size of signs shall be subject to the Sign Ordinance and approval of the City of Rockwall.

C.    Pylon/Monument/Directional Signs -- Landlord shall furnish and install all pylon /monument /directional signs (s) shown on Exhibit F to this Lease, complete (including, without limitation, sign structure, any required electrical service, sign panels, and Tenant's specified graphics).

D.    Temporary Signs -- commencing on the commencement of construction, and continuing thereafter until (30) thirty days following delivery, Landlord shall install and maintain in accordance with Tenant's Prototype Drawings and Specifications [and Exhibit F to this Lease, as applicable]: (i) a temporary banner bearing the phrase "Coming Soon" on the storefront of the Premises, and (ii) a temporary sign  on  the site of the **[future]** Shopping Center, bearing the phrase "Bed Bath & Beyond Coming Soon". At Tenant's request, Landlord shall relocate Tenant's temporary signage, in the event the visibility thereof becomes obstructed.

E.    Landlord shall provide complete shop drawings of all Landlord-furnished signs to Tenant for Tenant's approval at least (12) weeks prior to delivery date.

## Permits and Approvals

A.    <u>Landlord to secure permits required to allow Tenant to fixture, merchandise (including without limitation permits for  it's prepackaged foods), and open for business to the public in the Premises.</u> This to include Health Permit based on no on-site consumption or preparation of food or beverage as outlined in Tenant furnished plans. Landlord is not required to obtain any business permits or license which may be required for the Tenant.

If Seismic calculations, plans and details are required, then Landlord shall be obligated to contract with "Seizmic Inc." no later than (12) weeks prior to delivery. Seizmic Inc. shall provide the necessary services to assist Landlord in securing the fixture permit. These services include completion of all required submittal documents, required applications, responses to inquiries from the authority having jurisdiction and monitoring status of permit. Actual submission of the required documents to the AHJ shall be made only by Seizmic, Inc., or other vendor selected at Tenant's discretion.

        Seizmic Inc.
        Contact: Sal Fateen or Genie Fateen
        161 Atlantic Street, Pomona, CA 91768
        Ph. # 909 869 0989

Landlord shall be obligated to take possession of Fixture permit and transfer permit to Tenant's fixture Installer. If fixture permit is required, then Landlord shall secure fixture permit no later than (2) weeks prior to delivery date.

5

B.    Sprinkler system design shall allow Landlord to obtain and secure "high pile storage" permit.

## Construction Closeout

A.    Landlord shall be obligated to forward (1) hard copy of all required documents outlined with Section 01700 – Contract Closeouts, of Tenant's Prototype Specifications / Project Manual to **Digital Reliance Incorporated (DRI)**, **386 Charmel Place, Columbus, OH 43235, (614) 430-5950, jg@digital-reliance.com**, for purpose of scanning to disk for Tenant's future use. All documents shall be delivered to DRI within forty-five (45) days after the "Substantial Completion Date. The cost associated with this service is $500.00. All costs associated with this service shall be Landlord's responsibility.

Prior to scanning, DRI will confirm submittal from Landlord meets base minimum requirements and shall inform Landlord directly if certain documents are missing. DRI will not review items for content. The content will be reviewed once electronic file has been recieved by Tenant's Construction Project Manager. Any need for resubmittal due to incorrect content, etc. will be communicated to Landlord from Tenant's Construction Project Manager. Landlord to resubmit amended document to DRI for scanning and incorporation into file until approved by Tenant's Construction Project Manager.

Once Electronic file has been completed, It shall be forwarded directly to Tenant's Construction Project Manager with transmittal copy to Landlord within sixty (60) days after the "Substantial Completion Date".

B.    Landlord shall cause its contractor(s) to instruct Tenant's Construction Project Manager in the operation of any equipment installed pursuant to these specifications. All of Landlord's Work shall be performed in a manner which will not void, impair or diminish any manufacturers', installers', or contractors' warranties which otherwise would have been provided by such manufacturer, installer, or contractor to either Landlord or Tenant. Two (2) months prior to the end of the warranty period, Landlord must forward a written report to Tenant on the condition of all warranty items.

C.    If Landlord fails to deliver any of the instruments and items (collectively, the "Close-out Documents") described in the immediately preceding paragraph A within the prescribed thirty (60) day period, then Tenant may provide Landlord with notice of such failure. If Landlord has not remedied such failure within fifteen (15) days after Tenant's delivery of such notice, then Tenant shall be entitled to an abatement in Rent in the amount of One Hundred ($100.00) dollars for each day that Landlord has not so delivered all of the Close-out Documents.

D.    Landlord shall be obligated to provide to Tenant within 30 days of Tenants request, copies of manufactures invoice(s), manufactures cut sheets, subcontractor invoices, etc. for items described within Exhibit D - Standard Landlord's Work as required for Tenant to satisfy submittal for any possible utility rebates, if any.

6

Addendum A.

Index of Civil Engineering drawings prepared by Douphrate & Associates, Inc.

| Title | Sheet No | Rev/Date |
|---|---|---|
| Cover Sheet | 0 of 21 | 7/6/04 |
| 16" Water profile | 1 of 21 | 7/6/04 |
| File Plat | 2 of 21 | 7/6/04 |
| File plat | 3 of 21 | 7/6/04 |
| Drainage area map | 4 of 21 | 7/6/04 |
| Detention pond calculations | 5 of 21 | 7/6/04 |
| Grading plan | 6 of 21 | 8/4/04 |
| Storm sewer Plan | 7 of 21 | 7/4/04 |
| Storm sewer details | 8 of 21 | 7/6/04 |
| Storm sewer profile – Line A-D | 9 of 21 | 7/6/04 |
| Storm sewer profile – line E | 9A of 21 | 7/6/04 |
| Storm Calculations | 10 of 21 | 7/6/04 |
| Storm Calculations | 10A of 21 | 7/6/04 |
| Dimensional Control Plan | 11 of 21 | 7/4/04 |
| Site/Paving Plan | 12 of 21 | 7/6/04 |
| Water Main Plan | 14 of 21 | 7/4/04 |
| Sanitary Sewer plan | 16 of 21 | 7/4/04 |
| Sanitary Sewer Profile | 17 of 21 | 7/6/04 |
| Erosion Control Plan | 18 of 21 | 7/6/04 |
| Erosion Control Details | 19 of 21 | 7/6/04 |
| Tree Preservation Plan | 20 of 21 | 7/6/04 |

7

1
2                                    <u>Exhibit D-1</u>
3
4                        <u>Exterior Elevations of Premises and Sidewalk Plan</u>
5

SIGNAGE ALLOWANCE:
MAX HEIGHT - 6 FEET
MAX SQ. FOOTAGE - 10%
OF FRONT FACE AREA OF BUILDING.

BBB FRONT FACE - 3641 SQ. FT.
10% MAX SIZE OR 364 SQ. FT.

## EXTERIOR MATERIAL SCHEDULE

| Code | Description | | Code | Description |
|---|---|---|---|---|
| AL-CO-1 | ALUM. COPING, PREFINISHED COLOR ATAS #06 "SANDSTONE" | | TILE-1 | NERO PORCELAIN / POLISHED, 8"x8" SIZE |
| BLK-1 | 8" x 8" x 16" SPLITFACE CONC. MASONRY UNITS, COLOR 1. | | TILE-2 | NERO PORCELAIN / POLISHED, 12"x12" SIZE |
| BLK-2 | 8" x 8" x 16" SPLITFACE CONC. MASONRY UNITS, COLOR 2. | | EIFS-1 | DRYVIT #444 "BUCKSKIN" SANDBLAST FINISH |
| CUL-ST | CULTURED STONE VENEER OVER 8" MASONRY. | | EIFS-2 | DRYVIT #III "PRAIRIE CLAY" SANDBLAST FINISH |

MATERIALS AND
COLORS
TO BE MUTUALLY
DISCUSSED BETWEEN
LANDLORD AND TENANT

NOTE:
TENANT HAS RIGHT TO PURSUE VARIANCE
FOR TALLER SIGN. LANDLORD TO
UPDATE 12"X12" BLACK CERAMIC TILE
PATTERN AND ELECTRICAL CIRCUITS
ACCORDINGLY, DEPENDANT ON
VARIANCE OUTCOME.

STANDARD "BED BATH & BEYOND" SIGNAGE:
-INDIVIDUALLY ILLUMINATED
 CHANNEL LETTERS
-WHITE FACE, WHITE RETURNS ON SIDE
- 6' X 24' SIZE.

## FRONT ELEVATION
NOT TO SCALE

## PARTIAL SIDEWALK PLAN
NOT TO SCALE

EGRESS DOOR

EXIT DOOR LOCATION
TO BE COORDINATED
WITH TENANT'S PLANS

CART CORRAL

PRECAST CONC. TRASH CAN

HANDICAPP CURB RAMP

EXHIBIT D-1

ROCKWALL CROSSING
ROCKWALL, TEXAS
DATE: 8-9-04

1

<u>Exhibit D-2</u>

2

3

<u>Exterior Elevations of the Shopping Center</u>

4



## REAR ELEVATION WITH ADJACENT TENANTS
NOT TO SCALE

## FRONT ELEVATION WITH ADJACENT TENANTS
NOT TO SCALE

## REAR ELEVATION
NOT TO SCALE

**EXHIBIT D-2**
ROCKWALL CROSSING
ROCKWALL, TEXAS
DATE: 8-9-04

1
2                                    <u>Exhibit E</u>
3
4                            <u>Permitted Encumbrances</u>

5      1.  EASEMENT executed by Mims Williamson to RCH Water Supply Corp. dated
6          September 26, 1961, recorded in Volume 64, page 316, DRRCT.
7
8      2.  EASEMENT executed by W.C. rant to RCH Water Supply Corp. dated October
9          27, 1961, recorded in Volume 64, page 290, DRRCT, and as shown on survey by
10         Douphrate & Associates, Inc., Job #0242BDY, dated 3/19/04.
11
12     3.  DRAINAGE EASEMENT executed by H.L. McIntire to the State of Texas dated
13         April 7, 1950, recorded in Volume 46, page 251, DRRCT, andas shown on survey
14         by Douphrate & Associates, Inc., Job #0242BDY, dated 3/19/04.
15
16
17     4.  EASEMENT AND ROW executed by Henry S. Miller Company, Trustee for
18         Rockwall I-30 JV to TP & L Co., filed January 10, 1980, recorded in Volume 147,
19         page 127, DRRCT, and as shown on survey by Douphrate & Associates, Inc., Job
20         #0242BDY, dated 3/19/04.
21
22     5.  EASEMENT granted to Texas Power & Light Company by instrument dated May
23         3, 1979, executed by Henry S. Miller Company, Trustee for Interstate 30 South-
24         Rockwall Joint Venture, recorded in Volume 147, Page 127, Deed Records,
25         Rockwall County, Texas.
26
27         Landlord represents and warrants that (i) none of the foregoing will interfere with
28 or prevent Tenant from operating its Premises in accordance with the terms of this Lease,
29 (ii) conflict with any right granted Tenant under this Lease, (iii) impose on Tenant any
30 obligation(s) in excess of those set forth in this Lease, and (iv) none of the foregoing
31 easements or rights of way (a) are located beneath the Premises, or (b) will interfere with
32 Tenant's use and enjoyment of the Premises.
33
34

1
## Exhibit F

3
## Tenant's Signage

MATERIALS AND COLORS
(EXCLUDING TENANT PANELS)
TO BE MUTUALLY DISCUSSED BETWEEN
LANDLORD AND TENANT

2" PERIMETER
ACCENT BORDER
(COLOR WHITE)

VINYL LETTERING
ON PLEXIGLAS PANEL

16'-10"

4'-4"

BED BATH &
BEYOND

11'-6"

7'-8"

circuit city

PETSMART

DOLLAR
TREE

T·J·maxx

PYLON PANEL WITH WHITE
BED BATH & BEYOND LOGO
WITH BLACK BACKGROUND

30'-0"

19'-6"

3'-10"

1'-0"   3'-0"   11'-6"   3'-0"   1'-0"

19'-6"

**PYLON SIGN**
NOT TO SCALE

PYLON SIGN "A"
(STATE HIGHWAY 30)

EXHIBIT F ( 1 OF 5)

ROCKWALL CROSSING
ROCKWALL, TEXAS
DATE: 8-9-04

MATERIALS AND COLORS
(EXCLUDING TENANT PANELS)
TO BE MUTUALLY DISCUSSED
BETWEEN LANDLORD AND
TENANT

PYLON PANEL WITH
WHITE BED BATH
& BEYOND LOGO
WITH BLACK BACKGROUND

2" PERIMETER
ACCENT BORDER
(COLOR WHITE)

15'-4"

2'-11"

BED BATH &
BEYOND

5'-2"

11'-6"

VINYL LETTERING
ON PLEXIGLAS PANEL

dress
city

PETsMART

DOLLAR
TREE

T·J·maxx

20'-0"

12'-4"

2'-6"

11'-6"        2'-0"    8"

16'-10"



PYLON SIGN
NOT TO SCALE

PYLON SIGN "B"
(RALPH HALL PKWY)

EXHIBIT F ( 2 OF 5)

ROCKWALL CROSSING
ROCKWALL, TEXAS
DATE: 8-9-04



THE INFORMATION CONTAINED IN THIS DRAWING IS THE SOLE PROPERTY OF COLLINS SIGNS. ANY REPRODUCTION IN PART OR WHOLE WITHOUT THE WRITTEN PERMISSION OF COLLINS SIGNS IS PROHIBITED.

BED BATH & BEYOND
ROCKWALL, TEXAS
FRONT ELEVATION
EXHIBIT F — SIGNAGE
(SHEET 3 OF 5)

24'-0"

2'-10 15/16"
6'-0"
2'-3 5/8"

NOTE:
TENANT HAS RIGHT TO PURSUE VARIANCE FOR TALLER SIGN. LANDLORD TO UPDATE 12"X12" BLACK CERAMIC TILE PATTERN AND ELECTRICAL CIRCUITS ACCORDINGLY, DEPENDANT ON VARIANCE OUTCOME.

TUBESUPPORT W/PAD ON Z-BRACKET
.090 ALUM. BACK(s)-STAPLED
CONDUIT, CONN. AND STRAIN RELIEF
DISCONNECT SWITCH
STD. TRANSFORMER (60MA IN COLD WEATHER) (SEE ELECTRICAL SPECS)
.063 ALUM. RETURNS (SEE COLORS)
1" JEWELITE (SEE COLORS)
LEXAN FACE(s) (SEE COLORS)
15MM NEON 3" O.C. — TURNBACK W/ELECTRO-BITS BOOTS (SEE COLORS)
EQUIPMENT GROUND REQ'D
3/8" THREADED ROD OR LAG BOLT-AS REQ'D
SILICONE BEAD AROUND INTERIOR SEAM
1/4"Ø WEEP HOLES

WHIPS 12 FT.

TYPICAL SELF-CONTAINED DETAIL
SCALE: NTS

COLORS:
FACES:
(FACE COLOR TO BE DETERMINED BY LOCATION)
3/16" 7328 WHITE PCB
RETURNS:
OUTSIDE:
WHITE
INSIDE:
PAINT WHITE
RETAINER:
1" TRIMCAP (COLOR TO MATCH RETURNS)

ELECTRICAL SPECS:

WHITE NEON / 30mA TRANSFORMER(S)
AMPS: 31.1
# OF 20 AMP CIRCUITS (RECOMMENDED): 3
VOLTS: 120

NOTES:
MINIMUM #8 SHEET METAL SCREWS ARE TO BE USED FOR SECURING THE TRIM AND FACE TO THE SIGN BODY. THE MAXIMUM SPACING SHALL NOT EXCEED 1'-6" AND NO FEWER THAN (4) FOUR SCREWS ARE TO BE USED PER FACE. SHELLAC IS TO BE APPLIED TO EACH COPPER WIRE TIE TO PREVENT LOOSENING OF THE WIRE TIE.
ALL SIGNAGE WILL BE U.L. LISTED AND CARRY U.L. LABELS.
**EQUIPMENT GROUND REQUIRED.
ACTUAL # OF CIRCUITS TO BE DETERMINED BY A LICENSED ELECTRICAL CONTRATOR.

NOTES:

ROCKWALL, TEXAS

| | | |
|---|---|---|
| CUSTOMER | BED BATH & BEYOND | |
| CODE | PAGE LAYOUT PRESENTATION | |
| ITEM DESCRIPTION | | |
| DRAWING APPROVED BY | 6'-0" X 24'-0" STACKED LAYOUT SELF-CONT. CHLL | |
| PROGRAM APPROVED BY | LOCATION VARIOUS | DRAWN BY CUPPLES |
| PROTOTYPE BY | SCALE 1:32 | ENGINEER JOHNSON | ACCOUNT REPRESENTATIVE MURAKAMI |
| 1st RUN BY | SHEET | BOXED SQ FT 144 | ITEM NUMBER |
| PRODUCTION BY | WIND LOAD (MPH) | EST WEIGHT (LBS) | BED12201 | REV — |

ITEM NUMBER BED12201

ECR    REV    REVISIONS    DATE    BY



THE INFORMATION CONTAINED IN THIS DRAWING IS THE SOLE PROPERTY
OF COLLINS SIGNS. ANY REPRODUCTION IN PART OR WHOLE WITHOUT
THE WRITTEN PERMISSION OF COLLINS SIGNS IS PROHIBITED.

| ECR | REV | REVISIONS | DATE | BY |
|-----|-----|-----------|------|-----|
| | | | | |

BED BATH & BEYOND
ROCKWALL, TEXAS
REAR ELEVATION
EXHIBIT F — SIGNAGE
(SHEET 4 OF 5)

24'-0"

2'-10 15/16"

6'-0"

2'-3 5/8"

TUBESUPPORT W/PAD ON Z-BRACKET
.090 ALUM. BACK(s)-STAPLED
CONDUIT, CONN. AND STRAIN RELIEF
DISCONNECT SWITCH
STD. TRANSFORMER (60MA IN COLD WEATHER) (SEE ELECTRICAL SPECS)
.063 ALUM. RETURNS (SEE COLORS)
1" JEWELITE (SEE COLORS)
LEXAN FACE(s) (SEE COLORS)
15MM NEON 3" O.C. — TURNBACK W/ELECTRO-BITS BOOTS (SEE COLORS)
EQUIPMENT GROUND REQ'D
3/8" THREADED ROD OR LAG BOLT-AS REQ'D.
SILICONE BEAD AROUND INTERIOR SEAM
1/4"ø WEEP HOLES

WHIPS 12 FT.

TYPICAL SELF-CONTAINED DETAIL
SCALE: NTS

COLORS:
  FACES:
  (FACE COLOR TO BE DETERMINED BY LOCATION)
  ■ 3/16" 7328 WHITE PCB
  RETURNS:
    OUTSIDE:
    ■ WHITE
    INSIDE:
    ■ PAINT WHITE
  RETAINER:
  1" TRIMCAP (COLOR TO MATCH RETURNS)

NOTE:
TENANT HAS RIGHT TO PURSUE
VARIANCE FOR TALLER SIGN. LANDLORD
TO UPDATE 12"X12" BLACK CERAMIC
TILE PATTERN AND ELECTRICAL CIRCUITS
ACCORDINGLY, DEPENDANT ON
VARIANCE OUTCOME.

ELECTRICAL SPECS:

■ WHITE NEON / 30mA TRANSFORMER(S)
AMPS: 31.1
# OF 20 AMP CIRCUITS (RECOMMENDED): 3
VOLTS: 120

NOTES:
MINIMUM #8 SHEET METAL SCREWS ARE TO BE USED FOR
SECURING THE TRIM AND FACE TO THE SIGN BODY. THE
MAXIMUM SPACING SHALL NOT EXCEED 1'-6" AND NO
FEWER THAN (4) FOUR SCREWS ARE TO BE USED PER
FACE. SHELLAC IS TO BE APPLIED TO EACH COPPER WIRE
TIE TO PREVENT LOOSENING OF THE WIRE TIE.
ALL SIGNAGE WILL BE U.L. LISTED AND CARRY U.L. LABELS.
**EQUIPMENT GROUND REQUIRED.
ACTUAL # OF CIRCUITS TO BE DETERMINED BY A LICENSED
ELECTRICAL CONTRATOR.

NOTES:

ROCKWALL, TEXAS

| | | |
|---|---|---|
| CUSTOMER | | ITEM NUMBER |
| BED BATH & BEYOND | | BED 12201 |
| CODE | PAGE LAYOUT | |
| | PRESENTATION | |
| ITEM DESCRIPTION | | |
| DRAWING APPROVED | BY | 6'-0" X 24'-0" STACKED LAYOUT SELF-CONT. CHLL |
| | | LOCATION | DRAWN BY |
| PROGRAM APPROVED | BY | VARIOUS | CUPPLES |
| | | SCALE | ENGINEER | ACCOUNT REPRESENTATIVE |
| PROTOTYPE | BY | 1:32 | JOHNSON | MURAKAMI |
| | | SHEET | BOXED SQ FT | ITEM NUMBER | REV |
| 1st RUN | BY | 1 | 144 | | |
| PRODUCTION | BY | WIND LOAD (MPH) | EST WEIGHT (LBS) | BED12201 | - |



**GRAND OPENING**

(SIDE 1)

4' x 20' (VERSION 1)

**BED BATH & BEYOND**
**HIRING HOTLINE 1-877-JOBS-BBB**
**COMING SOON!**

(SIDE 2)

4'-0"

**why wait? shop online @**
**www.bedbathandbeyond.com**

20'-0"

5'-0"

5' x 20'    TEMPORARY BUILDING SIGN
(REFER TO EXHIBIT D-1 FOR LOCATION ON BUILDING)

**NOW HIRING**

(SIDE 1)

20'-0"

4' x 20' (VERSION 2)

**NOW OPEN**

(SIDE 2)

**BED BATH &**
**BEYOND**
**NOW OPEN**

4'-8"

**BED BATH &**
**BEYOND**
**COMING SOON!**
**FOR HIRING INFORMATION CALL**
**877 - JOBS BBB**

8'-8"

TEMPORARY SIGN (BUILDING OR BBB HIRING TRAILER)

TEMPORARY SITE SIGNAGE

4' x 8' - TYVEK
(2 banners of a single
version per box)
TEMPORARY SITE SIGNAGE

**GRAND OPENING**

(SIDE 1)

6'-0"

6' x 30'

30'-0"

**BED BATH & BEYOND**
**HIRING HOTLINE 1-877-JOBS-BBB**
**COMING SOON!**

(SIDE 2)

TEMPORARY BUILDING SIGN    (REFER TO EXHIBIT D-1 FOR LOCATION ON BUILDING)

VINYL COLORS

PMS 187 RED
BLACK

BED BATH & BEYOND
EXHIBIT F ( 5 OF 5 )

ROCKWALL CROSSING
ROCKWALL, TEXAS
DATE: 8-9-04

Exhibit G

Subordination, Non-Disturbance and Attornment Agreement

THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT
AGREEMENT, made as of the _____ day of _____, 200__, by and between
_____, a _____ [corporation] [limited] [general]
[partnership] [national banking association], having an office at
_____ (the *"Mortgagee"*) and Bed Bath &
Beyond Inc., a New York corporation, having an office at 650 Liberty Avenue, Union,
New Jersey 07083 (the *"Tenant"*).

## W I T N E S S E T H :

WHEREAS, Mortgagee is the holder of a mortgage (the *"Mortgage"*) covering a
parcel of land owned by _____, a _____ [corporation],
[limited] [general] [partnership] (the *"Landlord"*) together with the improvements [to
be] erected thereon (said parcel of land and improvements thereon being hereinafter
referred to as the **"Shopping Center"** and being more particularly described on Exhibit
A attached hereto and made a part hereof); and

WHEREAS, by a certain lease heretofore entered into between Landlord and
Tenant dated as of August ____, 2004 (the *"Lease"*), Landlord leased to Tenant a portion
of the Shopping Center, as more particularly described in the Lease (the *"Premises"*);
and

WHEREAS, a copy of the Lease has been delivered to Mortgagee, the receipt of
which is hereby acknowledged; and

**[For mortgages existing as of the date Lease is executed:** WHEREAS, as an
inducement to Tenant to enter into the Lease, **[Section 2.3.1/Section 17.3]** thereof
provides that the Lease is conditioned upon Landlord obtaining this Agreement from
Mortgagee; and

WHEREAS, the parties desire to satisfy the foregoing condition and to provide for
the non-disturbance of Tenant by the holder of the Mortgage; and]

**[For mortgages occurring after the Lease is executed:** WHEREAS, Section
17.1 of the Lease provides that the Lease shall become subject and subordinate to a
mortgage encumbering the fee interest of Landlord in and to the Shopping Center if and
when a non-disturbance agreement is entered into with respect to such mortgage; and

WHEREAS, the parties hereto desire to effect the subordination of the Lease to
the Mortgage and to provide for the non-disturbance of Tenant by Mortgagee.]

NOW, THEREFORE, in consideration of the premises and of the mutual
covenants and agreements herein contained, the parties hereto, intending to be legally
bound hereby, agree as follows:

1.      Mortgagee hereby consents to and approves the Lease and the term thereof,
including the options to extend the term as set forth in the Lease, and covenants and
agrees that the exercise by Tenant of any of the rights, remedies and options therein
contained shall not constitute a default under the Mortgage.

2.      Tenant covenants and agrees with Mortgagee that the Lease hereby is made
and shall continue hereafter to be subject and subordinate to the lien of the Mortgage, and
to all modifications and extensions thereof (and such subordination shall not lessen or

G-1

1  diminish Tenant's rights under the Lease), subject, however, to the provisions of this
2  Agreement.

3        3.    Mortgagee agrees that so long as the Lease shall be in full force and effect,
4  and so long as Tenant shall not be in default under the Lease beyond any applicable
5  notice and grace period:

6              (a)    Tenant shall not be named or joined as a party or otherwise in any
7  suit, action or proceeding for the foreclosure of the Mortgage or to enforce any rights
8  under the Mortgage or the bond or note or other obligation secured thereby;

9              (b)    The possession by Tenant of the Premises and Tenant's rights
10 thereto shall not be disturbed, affected or impaired by, nor will the Lease or the term
11 thereof be terminated or otherwise affected by (i) any suit, action or proceeding brought
12 upon the Mortgage or the bond or note or other obligation secured thereby, or for the
13 foreclosure of the Mortgage or the enforcement of any rights under the Mortgage, or by
14 any judicial sale or execution or other sale of the Premises or the Shopping Center, or any
15 deed given in lieu of foreclosure, or by the exercise of any other rights given to any
16 holder of the Mortgage or other documents as a matter of law, or (ii) any default under
17 the Mortgage or the bond or note or other obligation secured thereby; and

18             (c)    All condemnation awards and insurance proceeds paid or payable
19 with respect to the Premises or any other part of the Shopping Center shall be applied and
20 paid in the manner set forth in the Lease.

21       4.    If Mortgagee or any future holder of the Mortgage shall become the owner
22 of the Shopping Center by reason of foreclosure of the Mortgage or otherwise, or if the
23 Shopping Center shall be sold as a result of any action or proceeding to foreclose the
24 Mortgage, or transfer of ownership by deed given in lieu of foreclosure, the Lease shall
25 continue in full force and effect, without necessity for executing any new lease, as a
26 direct lease between Tenant and the then owner of the Shopping Center, as "landlord",
27 upon all of the same terms, covenants and provisions contained in the Lease, and in such
28 event:

29             (a)    Tenant shall be bound to such new owner under all of the terms,
30 covenants and provisions of the Lease for the remainder of the term thereof (including the
31 Renewal Periods, if Tenant elects or has elected to exercise its options to extend the term)
32 and Tenant hereby agrees to attorn to such new owner and to recognize such new owner
33 as "landlord" under the Lease; and

34             (b)    Such new owner shall be bound to Tenant under all of the terms,
35 covenants and provisions of the Lease for the remainder of the term thereof (including the
36 Renewal Periods, if Tenant elects or has elected to exercise its options to extend the term)
37 which such new owner hereby agrees to assume and perform and Tenant shall, from and
38 after the date such new owner succeeds to the interest of "landlord" under the Lease, have
39 the same remedies against such new owner for the breach of any covenant contained in
40 the Lease that Tenant might have had under the Lease against Landlord if such new
41 owner had not succeeded to the interest of "landlord"; provided, however, that such new
42 owner shall not be:

43                   (i)    liable for any act or omission of any prior landlord (including
44 Landlord) unless such act or omission continues from and after the date upon which the
45 new owner succeeds to the interest of such prior landlord;

46                   (ii)   subject to any defenses which Tenant may have against any
47 prior landlord (including Landlord) unless resulting from any default or breach by such
48 prior landlord which continues from and after the date upon which the new owner
49 succeeds to the interest of such prior landlord;

G-2

1               (iii)     subject to any offsets which Tenant may have against any
2 prior landlord, except to the extent such offsets are expressly provided under the Lease
3 and Mortgagee has received notice thereof and the opportunity to cure within the
4 applicable time periods set forth in the Lease (it being further agreed that offsets under
5 the Lease that were deducted by Tenant prior to the date upon which the new owner
6 succeeds to the interest of such prior landlord shall not be subject to challenge);

7               (iv)     bound by any fixed rent or additional rent which Tenant
8 might have paid for more than one month in advance of its due date under the Lease to
9 any prior landlord (including Landlord), unless such additional rent is paid in accordance
10 with the applicable provisions of the Lease; or

11               (v)     bound by any amendment or modification of the Lease made
12 without its consent; notwithstanding the foregoing, Mortgagee acknowledges that the
13 Lease specifically provides for amendments thereof upon the occurrence of certain events
14 described in the Lease (such as, for example, an amendment to the Lease confirming the
15 measurement of the Premises), and, by its execution below, Mortgagee agrees to
16 recognize such amendments as part of the Lease, and Mortgagee further agrees that such
17 new owner shall also be bound by such amendment(s) to the Lease, without any consent
18 on the part of Mortgagee or such new owner.

19            (c)     Tenant's obligations hereunder shall be effective only so long as
20 Mortgagee is bound to Mortgagee's obligations hereunder.

21       5.     Tenant will notify Mortgagee of any default by Landlord under the Lease
22 which would entitle Tenant to terminate the Lease or abate the rent payable thereunder
23 and agrees that notwithstanding any provision of the Lease, no notice of termination
24 thereof nor any abatement shall be effective unless Mortgagee has received the aforesaid
25 notice and has failed to cure the subject default within the same time period allowed
26 Landlord under the Lease.  It is understood that the abatement provisions of this Section
27 relate to abatements by reason of Landlord's default and do not apply to provisions of the
28 Lease whereby Tenant has the automatic right to abate rentals such as, for example,
29 abatement upon casualty or condemnation.

30       6.     Neither the Mortgage nor any other security instrument executed in
31 connection therewith shall encumber or be construed as subjecting in any manner to the
32 lien thereof, any trade fixtures, signs or other personal property at any time furnished or
33 installed by or for Tenant or its subtenants or licensees on the aforementioned property
34 regardless of the manner or mode of attachment thereof.

35       7.     Any notices of communications given under this Agreement shall be in
36 writing and shall be given by registered or certified mail, return receipt requested, or by
37 any recognized overnight mail carrier, with proof of delivery slip, postage prepaid, (a) if
38 to Mortgagee, at the address of Mortgagee as hereinabove set forth or at such other
39 address or persons as Mortgagee may designate by notice in the manner herein set forth,
40 or (b) if to Tenant, at the address of Tenant as hereinabove set forth, with duplicate copies
41 to  Allan N. Rauch, Esq., c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New
42 Jersey 07083, and Thomas J. Phillips, Esq., c/o Brown Rudnick Berlack Israels LLP, One
43 Financial Center, Boston, Massachusetts 02111, or such other address or persons as
44 Tenant may designate by notice in the manner herein set forth.  All notices given in
45 accordance with the provisions of this Section shall be effective upon receipt (or refusal
46 of receipt) at the address of the addressee.

47       8.     This Agreement shall bind and inure to the benefit of and be binding upon
48 'and enforceable by the parties hereto and their respective successors, assigns, and
49 sublessees.

50       9.     This Agreement contains the entire agreement between the parties and
51 cannot be changed, modified, waived or canceled except by an agreement in writing

1  executed by the party against whom enforcement of such modification, change, waiver or
2  cancellation is sought.

3      10.    This Agreement and the covenants herein contained are intended to run
4  with and bind all lands affected thereby.

5      NOTE: THIS AGREEMENT BY TENANT SHALL NOT BE EFFECTIVE
6  UNLESS AND UNTIL ANY PRIOR MORTGAGES ON THIS PROPERTY HAVE
7  BEEN SATISFIED SO THAT TENANT'S PRIOR AGREEMENTS TO ATTORN TO
8  SAID MORTGAGES AND/OR TO SUBORDINATE ITS LEASE TO SAID
9  MORTGAGES SHALL HAVE BEEN EXTINGUISHED.

10     IN WITNESS WHEREOF, the parties hereto have duly executed this
11 Subordination, Non-Disturbance and Attornment Agreement as of the day and year first
12 above written.

13

**MORTGAGEE:**

ATTEST:                            _____

By:_____        By:_____
Name:_____        Name:_____
Title:  (Assistant) Secretary     Title:  (Vice) President

[SEAL]

                                  **TENANT:**

ATTEST:                           BED BATH & BEYOND INC., a New
                                  York corporation

_____       By:_____
Name:_____        Name:  Warren Eisenberg
Title:  (Assistant) Secretary     Title:   Co-Chairman of the Board of
                                           Directors
[SEAL]
14

G-4

**[INSERT APPROPRIATE JURAT FOR MORTGAGEE]**

_____

STATE OF NEW JERSEY    )
                       ) : ss.
COUNTY OF UNION       )

     On this ___ day of _____, 200__, before me personally came Warren Eisenberg to me known, who being by me duly sworn, did depose and say that he is the Co-Chairman of the Board of Directors of Bed Bath & Beyond Inc., the corporation described in and which executed the above instrument and that he signed his name thereto by order of the Board of Directors of said corporation.

                                    _____
                                    Notary Public

My Commission Expires:

_____

1
2                                    Exhibit H
3
4                              Recognition Agreement

5     THIS RECOGNITION AGREEMENT, made as of the _____ day of _____,
6     200__, by and between _____, a [_____] **[corporation]**
7     **[limited] [general] [partnership]**, having an address at
8     _____ (*"Landlord"*); Bed Bath & Beyond Inc.,
9     a New York corporation, having an address at 650 Liberty Avenue, Union, New Jersey
10    07083 (*"Tenant"*); and _____, a [_____]
11    **[corporation] [limited] [general] [partnership]**, having an address at
12    _____ (*"Subtenant"*).

13                               R E C I T A L S:

14    A.      Landlord and Tenant have entered into a certain lease (the *"Lease"*) dated as of
15    August ___, 2004, a short form of which has been recorded in the Rockwall, Texas
16    County Recorder's Office, which demises certain premises (the *"Premises"*) located in
17    the Rockwall Marketplace Shopping Center, Rockwall, Texas, which Shopping Center is
18    more particularly described on Exhibit A annexed hereto and made a part hereof.

19           B.      Section 15.5 of the Lease provides that in the event Tenant subleases all or
20    a portion of the Premises for a term of at least five (5) years, Landlord shall, upon
21    Tenant's request, execute and deliver a Recognition Agreement among Landlord, Tenant
22    and each such subtenant in the form attached to the Lease, in recordable form.

23           C.      Pursuant to a Sublease dated as of _____ (the *"Sublease"*),
24    Tenant has subleased **[a portion of]** the Premises to Subtenant (the *"Subleased
25    Premises"*).

26           D.      The parties hereto desire to effectuate the provisions of Section 15.5 of the
27    Lease with respect to the Sublease and the Subleased Premises.

28           NOW, THEREFORE, in consideration of the mutual covenants and agreements
29    herein contained, the parties hereto, intending to be legally bound hereby, agree as
30    follows:

31           1.      Landlord warrants and represents as follows:

32                   (a)     that it is the fee owner of the Premises,

33                   (b)     that the Lease is unmodified (except as may be otherwise set forth in
34    Exhibit B annexed hereto, if any) and is in full force and effect,

35                   (c)     that the term of the Lease expires on _____, but is subject
36    to four renewal periods of five years each and

37                   (d)     that Tenant is not in default under the Lease nor has any event
38    occurred which would after notice to Tenant and the passage of time become a default of
39    Tenant under the Lease.

40           2.      Landlord hereby acknowledges receipt of a copy of, and consents to and
41    approves, the Sublease and all of the terms, covenants and provisions thereof, and agrees
42    that the exercise by Subtenant of any of its rights, remedies and options contained therein
43    . shall not constitute a default under the Lease.

44           3.      Landlord agrees that whenever it has an obligation with respect to the
45    Premises, or its consent or approval is required for any action of Tenant under the Lease,
46    then, to the extent such obligation, consent or approval relates to the Subleased Premises

                                         H-1

1   or Subtenant's use and occupation thereof, it will perform such obligation in accordance
2   with the terms and conditions of the Lease, and, subject to the applicable terms of the
3   Lease, will not unreasonably withhold or unduly delay such consent or approval.

4       4.      Landlord shall not, in the exercise of any of the rights arising or which may
5   arise out of the Lease or of any instrument modifying or amending the same or entered
6   into in substitution or replacement thereof (whether as a result of Tenant's default or
7   otherwise), disturb or deprive Subtenant in or of its possession or its rights to possession
8   of the Subleased Premises or of any right or privilege granted to or inuring to the benefit
9   of Subtenant under the Sublease, provided that Subtenant is not in default under the
10  Sublease beyond the expiration of any applicable notice and cure period.

11      5.      In the event of the termination of the Lease by reentry, notice, conditional
12  limitation, surrender, summary proceeding or other action or proceeding, or otherwise, or,
13  if the Lease shall terminate or expire for any reason before any of the dates provided in
14  the Sublease for the termination of the initial or renewal terms of the Sublease and if
15  immediately prior to such surrender, termination or expiration the Sublease shall be in
16  full force and effect, Subtenant shall not be made a party in any removal or eviction
17  action or proceeding nor shall Subtenant be evicted or removed of its possession or its
18  right of possession of the Subleased Premises be disturbed or in any way interfered with,
19  and the Sublease shall continue in full force and effect as a direct lease between Landlord
20  and Subtenant (provided, that in such event, Subtenant shall, for the then remainder of the
21  term of the Sublease, pay fixed rent and additional rent in an amount equal to the greater
22  of (x) the Fixed Rent and additional rent then payable under the Lease, prorated on the
23  basis of the ratio which the Floor Area of the Subleased Premises bears to the Floor Area
24  of the Premises, or (y) the fixed rent and additional rent then payable under the Sublease).

25      6.      Landlord hereby waives and relinquishes any and all rights or remedies
26  against Subtenant, pursuant to any lien, statutory or otherwise, that it may have against
27  the property, goods or chattels of Subtenant in or on the Subleased Premises.

28      7.      Any notices, consents, approvals, submissions, demands or other
29  communications (hereinafter collectively referred to as *"Notice"*) given under this
30  Agreement shall be in writing.  Unless otherwise required by law or governmental
31  regulation, Notices shall be deemed given if sent by registered or certified mail, return
32  receipt requested, or by any recognized overnight mail carrier, with proof of delivery slip,
33  postage prepaid (a) to Landlord, at the address of Landlord as hereinabove set forth or
34  such other address or persons as Landlord may designate by Notice to the other parties
35  hereto, (b) to Tenant, at the address of Tenant as hereinabove set forth, with duplicate
36  copies to  Allan N. Rauch, Esq., c/o Bed Bath & Beyond Inc., 650 Liberty Avenue,
37  Union, New Jersey 07083, and Thomas J. Phillips, Esq., c/o Brown Rudnick Berlack
38  Israels LLP, One Financial Center, Boston, Massachusetts 02111, or such other address or
39  persons as Tenant may designate by Notice to the other parties hereto, and (c) to
40  Subtenant, at the address of Subtenant as hereinabove set forth or such other address or
41  persons as Subtenant may designate by Notice to the other parties hereto.  During the
42  period of any postal strike or other interference with the mails, personal delivery shall be
43  substitute for registered or certified mail.  All Notices shall become effective only on the
44  receipt or rejection of same by the proper parties.

45      8.      No modification, amendment, waiver or release of any provision of this
46  Agreement or of any right, obligation, claim or cause of action arising hereunder shall be
47  valid or binding for any purpose whatsoever unless in writing and duly executed by the
48  party against whom the same is sought to be asserted.

49                          [Signature Page Follows]

50

H-2

Case 23-13359-VFP   Doc 1290   Filed 07/11/23   Entered 07/11/23 10:53:34   Desc Main
Document      Page 101 of 126

9.    This Agreement shall be binding on and shall inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors, assigns and sublessees.

IN WITNESS WHEREOF, the parties have caused this Recognition Agreement to be executed under seal the date first above written.

**LANDLORD:**

_____

By:_____
Name:_____
Title:_____

**TENANT:**

BED BATH & BEYOND INC., a New York corporation

By:_____
Name: Warren Eisenberg
Title:  Co-Chairman of the Board of Directors

**SUBTENANT:**

_____

By:_____
Name:_____
Title:_____

**[INSERT APPROPRIATE JURATS FOR <u>LANDLORD</u> AND <u>SUBTENANT</u>]**

_____

STATE OF NEW JERSEY        )
                           ) : ss.
COUNTY OF UNION            )

     On this ___ day of _____, 200__, before me personally came Warren Eisenberg to me known, who being by me duly sworn, did depose and say that he is the Co-Chairman of the Board of Directors of Bed Bath & Beyond Inc., the corporation described in and which executed the above instrument and that he signed his name thereto by order of the Board of Directors of said corporation.

                              _____
                              Notary Public

My Commission Expires:


_____

Exhibit I

<u>DELIVERY DATE NOTICE</u>

[Letterhead of Landlord]

_____, 200__

[via Federal Express or other
recognized overnight delivery
service per Article 18 of the foregoing
lease]

Bed Bath & Beyond Inc.
650 Liberty Avenue
Union, NJ 07083
Attn: Warren Eisenberg

Re:    Agreement of Lease, dated August ___, 2004 (the *"Lease"*), between [name of
Landlord], as landlord (*"Landlord"*), and Bed Bath & Beyond Inc., as tenant
(*"Tenant"*), with respect to certain retail premises (the *"Premises"*) located in the
Rockwall Marketplace, Rockwall, Texas

Gentlemen:

      In accordance with the provisions of Subsection 2.3.2 of the Lease, the Landlord
hereby informs the Tenant that the Delivery Date shall take place at 8:00 A.M. on
_____, 200__.  This notice shall constitute the Delivery Date Notice referred to
in Subsection 2.3.2 of the Lease.

[NAME OF LANDLORD]

By:_____
_____, (Vice) President

cc:    Thomas J. Phillips, Esq.
Allan N. Rauch, Esq.

I-1

Exhibit J

DELIVERY DATE CERTIFICATION

[Letterhead of Landlord]

_____, 200__

[via Federal Express or other
recognized overnight delivery
service per Article 18 of the foregoing
lease]

Bed Bath & Beyond Inc.
650 Liberty Avenue
Union, NJ 07083
Attn: Warren Eisenberg

Re:   Agreement of Lease, dated August ___, 2004 (the "Lease"), between [name of
      Landlord], as landlord ("Landlord"), and Bed Bath & Beyond Inc., as tenant
      ("Tenant"), with respect to certain retail premises (the "Premises") located in the
      Rockwall Marketplace, Rockwall, Texas

Gentlemen:

        In accordance with the provisions of Subsection 2.3.3 of the Lease, Landlord
hereby certifies to Tenant that, as of the date of this certification, all of the Delivery Date
Conditions (as defined in the Lease) have been satisfied, and that, as a result, the Delivery
Date (as such term is defined in the Lease) will be deemed to be _____, 200__ .
This notice shall constitute the Delivery Date Certification referred to in Subsection 2.3.3
of the Lease.

                                    [NAME OF LANDLORD]


                                    By:_____
                                         _____, (Vice) President

cc:   Thomas J. Phillips, Esq.
      Allan N. Rauch, Esq.

J-1

<u>Exhibit K-1</u>

<u>Existing Exclusives</u>

[Note:  The defined terms and references to sections and paragraphs set forth in this <u>Exhibit K-1</u> (except for the language in italics) shall have the meanings ascribed to same in each applicable lease.]

1.  **Dollar Tree**

<u>Exclusive; Restricted Uses.</u>  As a material inducement for Tenant to enter into this Lease, Landlord hereby agrees as follows:

> a.  Tenant shall have an exclusive for a single price point variety retail store ("Exclusive" or "Exclusive Use").  A single price point variety retail store is hereby defined as a store that offers all of its merchandise for sale at a single price point.
>
> b.  In addition, Landlord will not permit any other occupant in the Shopping Center to operate the following without Tenant's prior written consent and such consent shall be in Tenant's sole and absolute discretion:
>
>> (1) a close-out store including stores operating under the tradename Big Lots, excluding stores operating under the tradename Christmas Tree Shops;
>>
>> (2) a retail store whose "principal business" (hereinafter defined) is:
>>
>>> a.  selling variety retail merchandise at a single price point; or
>>>
>>> b.  selling artificial flowers and picture frames (individually or collectively), excluding Bed, Bath & Beyond Inc.;
>>
>> (3) variety retail operations with the word "Dollar" in their trade name; or
>>
>> (4) a Hallmark Gold Crown store, without the prior written consent of Tenant.
>
> For the purpose of this Section, "principal business" shall be defined as selling such merchandise in twenty-five percent (25%) or more of the sales floor area (including one-half (1/2) of the adjacent aisle space).

Notwithstanding the foregoing, the provisions contained in this Section A.15 shall not apply to (1) any tenant or occupant selling single price point apparel as its principal business, or (2) any current occupant or tenant of the Shopping Center who is operating under their current use clause as of the date of this Lease; provided, however, in the event Landlord's consent is required for a change in permitted use, Landlord shall not consent to a change of any tenant's use which would violate subsections A.15.a or A.15.b hereinabove.

1
2  **2. PetsMart**
3  Tenant's Exclusive Rights. As used in the Lease, the term "Tenant's Primary Business"
4  shall mean the retail sale of (i) pets (including but not limited to fish, birds, reptiles, dogs,
5  cats and other small animals), (ii) food, accessories and other products relating to pets
6  and animals, including equestrian products and apparel related thereto, (iii) incidental
7  services related to pets and animals, such as grooming, boarding and veterinary services,
8  and (iv) educational products and services related to any of the foregoing, and office and
9  storage uses incidental to the foregoing.  Notwithstanding the foregoing, any veterinary,
10 raising or boarding services provided in connection with Tenant's use shall be subject to
11 the following restrictions: (i) such uses shall be incidental to Tenant's use; (ii) all
12 kennels, runs and pens shall be located inside the Premises; and (iii) the combined
13 incidental veterinary, raising and/or boarding facilities shall not occupy more than twenty
14 percent (20%) of the floor area of the Premises. Any veterinary, raising and/or boarding
15 facilities must have an entrance from within the Premises, although one additional,
16 separate exterior entrance shall also be permitted. During the Term of the Lease, so long
17 as Tenant has ceased operation at the Premises for a period of at least nine (9) months for
18 Tenant's Primary Business, Tenant shall have the exclusive right in the Shopping Center
19 to conduct any portion of Tenant's Primary Business described in clauses (i), (ii) and (iii)
20 of this Paragraph 2. All other tenants or other occupants of any portion of the Shopping
21 Center, shall be prohibited from engaging in any portion of such Primary Business
22 described in clauses (i), (ii) and (iii) of this Paragraph 2, except on a basis which is
23 incidental to an otherwise permitted use. For purposes of this Paragraph 2, the term
24 "incidental" shall mean that the use occupies the lesser of (a) 1,000 square feet of Gross
25 Floor area, or (b) five percent (5%) of the sales area in the subject premises.  In addition
26 to the foregoing, Tenant's exclusive use set forth above shall not be applicable to: (i) any
27 supermarket or grocery store occupying in excess of twenty-five thousand (25,000)
28 square feet of Gross Floor Area; and (ii) a full-line department store such as Target, Wal-
29 Mart or Kohl's. (Exhibit G).
30
31 Prohibited Uses. The following uses (collectively referred to as "Prohibited Uses" and
32 individually as a "Prohibited Use") are prohibited during the Term of the Lease in any
33 portion of the Shopping Center: nuisance; any use causing loud noises or offensive odors
34 (including any business using exterior loud speakers); manufacturing facility; dry cleaner
35 (except facilities for drop off and pick up of clothing cleaned at another location); any
36 facility for the sale, lease or rental of automobiles, trucks, motorcycles, recreational
37 vehicles, boats or other vehicles; automobile repair shop or service station (other than a
38 typical National Tire Warehouse or other national or regional type tenant located on an
39 Outparcel), or any facility storing or selling gasoline or diesel fuel in or from tanks; used
40 clothing or thrift store or liquidation outlet (but expressly not prohibiting the operation of
41 no more than two (2) upscale consignment shops, such as, by way of example, a store
42 specializing in branded ladies apparel, or a bookstore), not to exceed fifteen thousand
43 (15,000) square feet of Gross Floor Area; massage parlor; adult book shop or adult movie
44 house; mortuary or funeral parlor; coin operated laundry; cocktail lounge, bar or tavern or
45 sale of alcoholic beverages, whether or not packaged, except in conjunction with a
46 restaurant permitted hereunder; night club; cinema or theater; place of recreation
47 (including but not limited to bowling alley, skating rink, carnival, game arcade or health
48 spa (provided, however, a health spa of less than two thousand five hundred (2,500)
49 square feet of Gross Floor Area may be located in the Shopping Center); or any
50 other use inconsistent with the operation of a high quality retail shopping center. In
51 addition, the following uses must first be reasonably approved in writing by Tenant
52 within thirty (30) days of receiving written notice of request thereof from Landlord:
53 drive-throughs; children's recreational, educational or day-care facility; restaurants
54 occupying more than three thousand (3,000) square feet of Gross Floor Area located
55 within two hundred fifty (250) feet of the Premises, not to exceed six thousand (6,000)
56 square feet of Gross Floor Area in the aggregate within such two hundred fifty (250) feet
57 radius; offices (except incidental to a retail use or as otherwise provided herein);

K-2-1

1   professional uses, provided, however, the following shall not preclude any hair salon,
2   beauty salon, dental offices, eye care offices any similar uses typically found in first-class
3   regional shopping centers, provided (i) no such uses shall be within two hundred fifty
4   (250) feet of the Premises, and (ii) the aggregate Gross Floor Area of such uses shall not
5   exceed fifteen thousand (15,000) square feet; and schools of any nature except in
6   conjunction with animal training or obedience training classes associated with Tenant's
7   Primary Business. As used herein, "school" includes, but is not limited to, a beauty
8   school, barber college, reading room, place of instruction or any other operation serving
9   primarily students or trainees rather than retail customers. It is the intent of this Section
10  that the Shopping Center shall be devoted to high quality retail uses and that the parking
11  and the other common facilities shall not be burdened by either excessive or protracted
12  use.
13
14  3. **Circuit City**
15  So long as the Premises are used for the initial uses as set forth hereinbelow and this lease
16  is in full force and effect, no other tenant or occupant of the Shopping Center shall be
17  entitled to sell or rent (or rent to own) any of the Products, subject only to (i) rights
18  granted to Bed, Bath & Beyond pursuant to a separate written agreement executed by and
19  between Tenant and Bed, Bath & Beyond and (ii) exclusive rights of tenants or occupants
20  of the Shopping Center under leases or occupancy agreements in existence prior to this
21  Lease, as set forth in Exhibit "F"; provided, however, this provision shall not be deemed
22  to prohibit sales of the Products by any nationally recognized department stores such as
23  Kohl's, J.C. Penney, Nordstrom, Hechts, Dillard's or Foley's, so long as any such
24  department store is open and operating such department store on a full-line basis within
25  the Shopping Center. Incidental Sale (as hereinafter defined) of the Products in
26  connection with the overall business of another occupant or tenant shall not be deemed a
27  violation of the preceding sentence. As used herein, "Incidental Sale: shall mean the
28  lesser of (i) two hundred (200) square feet, or (ii) ten percent (10%) of such occupant's or
29  tenant's display area.
30
31  Use. Tenant shall initially use and operate the Premises as a "Circuit City" retail store for
32  (i) the sale of consumer, office and automotive electronics products (which include, but
33  shall not be limited to, televisions, stereos, speakers, video and audio recorders and
34  players and cameras), computer hardware and software and related software services,
35  including internet access services, entertainment software and entertainment media
36  (which include, but shall not be limited to, records, game cartridges, video tapes,
37  cassettes, compact discs, DVD's and DVD equipment), cellular and wireless telephones
38  and telecommunication devices, and related goods and the sale and installation of motor
39  vehicle audio, stereo and telephone systems and technological evolutions of the foregoing
40  (all of such items are collectively referred to as the "Products"), and (ii) renting,
41  servicing, repairing and warehousing of the Products.
42
43            ***The foregoing restriction regarding Circuit City is subject to that certain letter***
44            ***agreement dated March 31, 2004 between Circuit City Stores, Inc. and Bed Bath***
45            ***& Beyond Inc., a copy of which is attached hereto.***
46
47  Prohibited Activities. During the Term of this Lease, Landlord shall not operate or lease
48  (or permit to be operated or leased) any building or tenant space in the Shopping Center
49  and Tenant shall not operate in the Premises for use as:
50            (A)    a bar, pub, nightclub, music hall or disco in which less than fifty
51                   percent (50%) of its space or revenue is devoted to and derived from
52                   food service;
53            (B)    a bowling alley;
54            (C)    a billiard or bingo parlor;
55            (D)    a flea market;
56            (E)    a massage parlor;
57            (F)    a funeral home;

K-3-1

1      (G)    a facility for the sale of paraphernalia for use with illicit drugs;
2      (H)    a facility for the sale or display of pornographic material (as
3               determined by community standards for the area in which the
4               Shopping Center is located), excluding such uses as are typical of a
5               first-class bookstore such as Barnes & Noble or Borders;
6      (I)     an off-track betting parlor;
7      (J)     a carnival, amusement park or circus;
8      (K)    a gas station, car wash or auto repair or body shop (the parties
9               specifically acknowledging that Tenant's car stereo installation
10             facility is not included in this prohibition;
11     (L)    a facility for the sale of new or used motor vehicles, trailers or
12             mobile homes;
13     (M)   a facility for any use which is illegal or dangerous, constitutes a
14             nuisance or is inconsistent with an integrated, community-oriented
15             retail and commercial shopping center;
16     (N)    a skating rink;
17     (O)    an arcade, pinball or computer game room (provided that retail
18             facilities in the Shopping Center may operate no more than four (4)
19             such electronic games incidentally to their primary operations);
20     (P)    service-oriented offices (such as, by way of example, medical or
21             employment offices, travel agencies, real estate agencies or dry
22             cleaning establishments) or other non-retail uses, except for (i)
23             offices and storage facilities incidental to a primary retail operation,
24             and (ii) service-oriented offices in more than an aggregate of 20,000
25             square feet of gross leasable area within the Shopping Center;
26     (Q)    a banquet hall, auditorium or other place of public assembly;
27     (R)    a training or educational facility (including, without limitation, a
28             beauty school, barber college, reading room, school or other facility
29             catering primarily to students or trainees rather than customers);
30     (S)    a theater of any kind;
31     (T)    a facility for the sale or rental of used goods (including thrift shops,
32             secondhand or consignment stores) or any facility selling new or
33             used merchandise as a wholesale operation, a liquidation operation,
34             odd lots, lot sales, factory close-outs or imperfect goods; or
35     (U)    a gymnasium, sport or health club or spa, excluding a "day spa"
36             (such as, by way of example, "Curves") not to exceed 4,000 square
37             feet of gross leasable area within the Shopping Center.
38
39 In addition to the foregoing, Landlord shall not operate, lease or permit to be operated or
40 leased (a) any restaurant or (b) any bookstore larger than 20,000 square feet of gross
41 leasable area, within any building which abuts the Building. In addition, no auction, fire
42 or going-out-of-business sale shall be conducted in the Shopping Center, unless pursuant
43 to a court order.
44
45 4.  **TJ Maxx**
46 Landlord agrees that, from the date hereof until expiration of the term of this lease, no
47 other premises in the Shopping Center shall at any time contain more than  fifteen
48 thousand (15,000) square feet of floor area therein used or occupied for, or devoted to,
49 the sale or display of apparel and related accessories (the foregoing hereinafter referred to
50 as a "Competing Use" and the merchandise referred to therein as the "Protected
51 Merchandise"). The computation of such floor area shall include one half (1/2) of all
52 floor area in any aisles, corridors or similar spaces adjacent to or abutting any racks,
53 gondolas, shelves, cabinets, counters or other fixtures or equipment containing or used
54 for the sale or display of the Protected Merchandise.
55
56 Landlord agrees that as long as any retail sales activity shall be conducted in the Demised
57 Premises the Shopping Center shall not be used (a) for any non-retail purposes (repairs,

K-4-1

1  alterations and offices incidental to retailing, and banks and small loan offices, not being
2  deemed non-retail), or (b) for any entertainment purposes such as a bowling alley, skating
3  rink, cinema, bar, nightclub, discotheque, amusement gallery, poolroom, health club,
4  massage parlor, sporting event, sports or game facility, off-track betting club (c) or for
5  any establishment which sells or displays pornographic materials (provided, however, the
6  sale of materials which persons may consider to be pornographic shall be permitted
7  incident to a general bookstore operating such as Borders Books*Music*Café, provided;
8  however, that nothing herein shall alter the obligation of every occupant to conduct its
9  business in a manner consistent with the operation of a first class retail shopping center)
10 or (d) for any establishment which sells or displays used merchandise or second hand
11 goods.  For purposes of this Section, the sale of pornographic materials shall be
12 considered incidental to such business' primary use for so long as not more than two
13 percent (2%) of its gross sales are attributable to the sale of such items.  No restaurants or
14 establishments selling food prepared on premises for consumption on or off premises
15 shall be located in the Shopping Center outside of the area labeled "Permitted Restaurant
16 Area" (OUTPARCELS) on the Lease Plan may have a cafe containing up to two
17 thousand five hundred (2,500) feet of ground floor area within their premises, provided
18 that any such cafe is ancillary to a primary retail purpose.
19
20     ***The foregoing restriction regarding TJ Maxx is subject to the provisions of***
21     ***Section 13.3.1 of this Lease, including any Coexistence Agreement entered into***
22     ***as contemplated by said Section 13.3.1.***
23
24
25

Circuit City Stores, Inc.
9950 Mayland Drive
Richmond, VA 23233-1464

March 31, 2004

Katherine Sloss, Esq.
Bed Bath & Beyond Inc.
650 Liberty Avenue
Union, New Jersey 07083

Re:   Agreement Regarding Exclusive Uses between Circuit City Stores, Inc., a
Virginia corporation ("CC") and Bed Bath & Beyond Inc., a New York
corporation ("BBB") - Rockwall Marketplace, Rockwall, TX (the "Shopping
Center")

Ladies and Gentlemen:

In order to facilitate the operation of retail stores by each of CC and BBB in the Shopping
Center, this letter sets forth the agreement of CC and BBB with respect to the exclusive uses
established in their respective leases in the Shopping Center (hereafter referred to as the "CC
Lease" and the "BBB Lease", respectively).

## DEFINITIONS

A.   **BBB Store:**  The store demised to BBB under the BBB Lease, containing a retail
sales area of at least 10,000 square feet, which is operated primarily for the sale of home
products and furnishings by (i) BBB, or (ii) any Successor.

B.   **BBB Exclusive Use:**  The retail sale of any of the following goods (such items
are collectively referred to as the "BBB Exclusive Products"): (i) linens and domestics (including
but not limited to sheets, bedspreads, comforters, duvets, pillows, pillow covers, placements,
tablecloths, dish towels, oven mittens and aprons); (ii) bathroom items (including but not limited
to towels, shower curtains, bathroom rugs, toilet seats and other bathroom accessories);
(iii) housewares (including but not limited to utensils, kitchen utensils, countertop kitchen and
bathroom appliances, kitchen and bathroom "gadgets," small cleaning appliances [including but
not limited to irons and hand held cleaning machines] and supplies, cookware, bakeware, dishes
and china); (iv) frames and wall art; (v) window treatments; and/or (vi) closet, shelving and
storage items.

C.   **CC Store:**  The store demised to CC under the CC Lease, containing a retail sales
area of at least 10,000 square feet, which is operated primarily for the sale of consumer, office
and/or automotive electronics by (i) CC, or (ii) any Successor.

378351 v1 (00050 00001.000)

March 31, 2004
Page 2

     D.    CC Exclusive Use:  The retail sale of any of the following goods and services (i) consumer, office and automotive electronics products (which include, but shall not be limited to, televisions, stereos, speakers, video and audio recorders and players and cameras), computer hardware and software and related software services. including internet access services, entertainment software. and entertainment media (which include. but shall not be limited to, records, game cartridges, video tapes, cassettes, compact discs, DVD's and DVD equipment), cellular and wireless telephones and telecommunication devices, and related goods and the sale and installation of motor vehicle audio, stereo and telephone systems and technological evolutions of the foregoing (all of such items are collectively referred to as the "CC Exclusive Products"), and (ii) renting, servicing. repairing and warehousing of the CC Exclusive Products.

     E.    Successor(s):  Any entity which is controlling, controlled by or under common control with CC or BBB, as applicable, or any assignees. sublessees, licensees, concessionaires, tenants, purchasers or other successor(s) in interest.

     F.    Excused Periods:  Periods during which: (a) material alterations or renovations are being performed in and to a party's Store for a period not in excess of 365 days, (b) a party's Store is being restored with reasonable efforts following damage, destruction, or taking in eminent domain, or (c) an event of *force majeure* prevents the operation of business within a Party's Store.

## AGREEMENT

     For and in consideration of the mutual covenants set forth herein. CC and BBB agree as follows:

     1.    Notwithstanding any provision(s) to the contrary in the BBB Lease or the CC Lease. BBB agrees to recognize and not violate the CC Exclusive Use in the Shopping Center, provided, however, that (i) the following categories of goods shall not be deemed to be CC Exclusive Products: (a) consumer electronic products involving personal care (such as hair dryers); (b) small electronic kitchen appliances and devices (such as microwave ovens. toasters, coffee makers); (c) electronic bedroom appliances and devices (such as alarm or clock radios); (d) electronic home maintenance devices (such as vacuum cleaners): and (e) electronic entertainment software and media that is specifically related to cooking, home decorating. home repairs, and/or home building; and (ii) BBB and its Successors shall be permitted to use up to (but not more than) 400 square feet of floor area in the BBB Store for the sale of any of the CC Exclusive Products except cellular telephones, provided, however, that in the event that BBB subsequently sells cellular telephones in at least seventy-five percent (75%) of its stores in the United States, then BBB shall be permitted to use up to (but not more than) fifty (50) square feet of the square footage that it occupies within the BBB Store for the sale of cellular telephones. The exclusive rights with respect to any particular category listed in the CC Exclusive Use shall terminate as to such category in the event that the CC Store ceases to be used for the sale, rental or distribution of items contained in such category for in excess of twelve (12) consecutive months (except for Excused Periods).  Notwithstanding the foregoing, the CC Exclusive Use shall lapse in its entirety with respect to a non-affiliated assignee of the CC Lease or a non-affiliated sublessee of all or a portion of the CC Store, if that assignee or sublessee fails to use at

March 31, 2004
Page 3

least fifty percent (50%) of the square footage that it occupies within the CC Store for the sale, rental or distribution of the CC Exclusive Products, singly or in any combination, for in excess of twelve (12) consecutive months, except for Excused Periods.

2.    Notwithstanding any provision(s) to the contrary in the BBB Lease or the CC Lease, CC agrees to recognize and not violate the BBB Exclusive Use in the Shopping Center, provided, however, that (i) CC and its Successors shall be permitted to use up to (but not more than) 450 square feet of floor area in the CC Store for the sale of the BBB Exclusive Products. The exclusive rights with respect to any particular category listed in the BBB Exclusive Use shall terminate as to such category in the event that the BBB Store ceases to be used for the sale, rental or distribution of items contained in such category for in excess of twelve (12) consecutive months (except for Excused Periods). Notwithstanding the foregoing, the BBB Exclusive Use shall lapse in its entirety with respect to a non-affiliated assignee of the BBB Lease or a non-affiliated sublessee of all or a portion of the BBB Store, if that assignee or sublessee fails to use at least fifty percent (50%) of the square footage that it occupies within the BBB Store for the sale, rental or distribution of the BBB Exclusive Products, singly or in any combination, for in excess of twelve (12) consecutive months, except for Excused Periods.

3.    Subject to each party's compliance with the terms of this letter agreement, CC and BBB each agree not to object to the development, proposed development, operation or proposed operation of a BBB Store, or a CC Store, as applicable, in the Shopping Center.

4.    Although not required as a condition to the enforceability of the terms and provisions of this letter agreement, CC and BBB shall, upon the request of the other, execute any document reasonably required by the other to evidence the existence or applicability of the terms and provisions of this letter agreement.

5.    The foregoing constitutes the final agreement between CC and BBB with respect to the Shopping Center, and supersedes all prior understandings, writings and agreements between the parties with respect to the BBB Exclusive Use and the CC Exclusive Use in the Shopping Center. The provisions of this letter agreement shall be binding on any and all Successors of CC and BBB. The Landlord in the CC Lease and the BBB Lease shall be entitled to rely on the terms and conditions set forth in this agreement only as between CC and BBB (and their respective Successors), and not with respect to other tenants or occupants of the Shopping Center (as to which the "exclusive use" provisions contained in the CC Lease and the BBB Lease shall apply in accordance with the terms of said Leases).

If the foregoing accurately reflects your understanding, please sign below indicating your agreement, and return the executed counterpart to my attention at the above address. It shall be a condition precedent to the agreements herein set forth that BBB and CC shall each have entered into a lease or occupancy agreement for its premises in the Shopping Center within one year after the date hereof.

March 31, 2004
Page 4

Very truly yours,

By: _____

Thomas C. Nolan
Vice-President Real Estate

MM/kj

Approved as
to form

ACCEPTED AND AGREED TO
THIS 6+ DAY OF Ap'n'l ____, 2004:

BED BATH & BEYOND, INC.

_____

Name: Steven H. Temares
Title:   President – Chief Executive Officer

1
2                                    Exhibit K-2

3                                   Existing Leases

4
5
6     Tenant                         Date of Lease
7
8     Circuit City                   June 11, 2004
9     Dollar Tree                    June 25, 2004
10    PETsMART                       June 25, 2004
11    Sports Clips                   January 21, 2004
12

1                                    <u>Exhibit L</u>

2                                <u>Intentionally Omitted</u>

1          <u>Exhibit M</u>

2          <u>Prohibited Uses</u>

3      As used in this Lease, the term ***"Prohibited Uses"*** shall mean any of the following uses:

4      A.      As to the <u>Shopping Center and to any Related Land located inside of the area</u>
5      <u>formed by the intersections of Mims Road, the I-30 Eastbound Frontage Road and Ralph</u>
6      <u>Hall Parkway</u>, any of the following uses:

7          1.      Any use which emits or results in strong, unusual or offensive odors,
8      fumes, dust or vapors, is a public or private nuisance, emits noise or sounds which are
9      objectionable due to intermittence, beat, frequency, shrillness or loudness, creates a
10     hazardous condition, or is used, in whole or in part, as or for warehousing or the dumping
11     or disposing of garbage or refuse.

12         2.      Any operation primarily used as a storage facility and any assembling,
13     manufacturing, distilling, refining, smelting, agricultural, or mining operation;

14         3.      Any "second hand" store or "surplus" store, excluding (a) a nationally or
15     regionally recognized used sporting goods store of the type found in first class shopping
16     centers (such as Play it Again Sports) and containing not more than 10,000 square feet of
17     Floor Area, (b) a Half Price Books store containing not more than 12,000 square feet of
18     Floor Area, and (c) nationally or regionally recognized used maternity clothing stores of
19     the type found in first class shopping centers and containing not more than 2,500 square
20     feet of Floor Area for any and all such maternity stores in the aggregate;

21         4.      Any mobile home park, trailer court, labor camp, junkyard, or stockyard
22     (except that this provision shall not prohibit the temporary use of construction trailers
23     during periods of construction, reconstruction, or maintenance);

24         5.      Any dumping, disposing, incineration, or reduction of garbage (exclusive of
25     trash compactors or trash containers located near the rear of any building);

26         6.      Any fire sale, bankruptcy sale (unless pursuant to a court order), auction
27     house operation, fictitious going-out-of-business sale, lost-our-lease sale or similarly
28     advertised event;

29         7.      Any central laundry, dry cleaning plant, or laundromat (except that a dry
30     cleaner that performs all dry cleaning outside the Shopping Center shall be permitted, so
31     long as its on-site premises are located more than 150 feet away from the Premises);

32         8.      Any automobile, truck, trailer, boat, or recreational vehicle sales, leasing,
33     display or body shop repair operation, excluding Boaters World so long as the same is
34     located on an Outparcel and does not display any boats outdoors;

35         9.      Any bowling alley or skating rink;

36         10.     Any live performance theater, auditorium, meeting hall, sporting event, or
37     other entertainment use;

38         11.     Any living quarters, sleeping apartments, or lodging rooms;

39         12.     Any veterinary hospital or animal raising or boarding facilities (except to
40     the extent permitted below);

41     .   13.     Any mortuary or funeral home;

42         14.     Any "Pornographic Use", which shall include, without limitation: (x) a
43     store displaying for sale or exhibition books, magazines or other publications containing
44     any combination of photographs, drawings or sketches of a sexual nature, which are not

M-1

1  primarily scientific or educational [provided, however, that the sale of books, magazines
2  and other publications by a national bookstore of the type normally located in first-class
3  shopping centers in the State in which the Shopping Center is located (such as, for
4  example, Borders and Barnes & Noble, as said stores currently operate) shall not be
5  deemed a "pornographic use" hereunder]; or (y) a store offering for exhibition, sale or
6  rental video cassettes or other medium capable of projecting, transmitting or reproducing,
7  independently or in conjunction with another device, machine or equipment, an image or
8  series of images, the content of which has been rated or advertised generally as NC-17 or
9  "X" or unrated by the Motion Picture Rating Association, or any successor thereto
10 [provided, however, that the sale or rental of such videos by a national video store of the
11 type normally located in first-class shopping centers in the State in which the Shopping
12 Center is located (such as, for example, Blockbuster or West Coast Video, as said stores
13 currently operate) shall not be deemed a "pornographic use" hereunder]; or massage
14 parlor [except for therapeutic massages given in connection with the operation of a day
15 spa or health club which may otherwise be permitted under this Exhibit M];

16       15.     Any so-called "head shop", or other establishment primarily selling or
17 exhibiting drug-related paraphernalia;

18       16.     Any bar, tavern, or other establishment selling alcoholic beverages for on-
19 or off-premises consumption, excluding one (1) "liquor store" selling alcoholic beverages
20 for off-premises consumption, of the type found in first class shopping centers, occupying
21 not more than 1,500 square feet of Floor Area and located at least 200 feet from the
22 Premises, and provided that the foregoing shall not restrict the on-premises consumption
23 of alcoholic beverages as incidental to a restaurant use specifically permitted pursuant to
24 clause 35(b) below;

25       17.     Any catering or banquet hall;

26       18.     Any flea market, amusement or video arcade, pool or billiard hall, night
27 club, discotheque, or dance hall;

28       19.     Any training or education facility, including but not limited to:  beauty
29 schools, barber colleges, reading rooms, places of instruction or other operations catering
30 primarily to students or trainees rather than to customers; provided, however, this
31 prohibition shall not be applicable to on-site employee training by an Occupant incidental
32 to the conduct of its business at the Shopping Center;

33       20.     Any gambling facility or operation, including but not limited to:  off-track
34 or sports betting parlor; table games such as black-jack or poker; slot machines; video
35 poker/black-jack/keno machines or similar devices; or bingo hall.  Notwithstanding the
36 foregoing, this prohibition shall not apply to governmental sponsored gambling activities,
37 or charitable gambling activities, so long as such governmental and/or charitable
38 activities are incidental to the business operation being conducted by the Occupant;

39       21.     Any unlawful use;

40       22.     Any pawn shop, gun shop, or tattoo parlor, except that incidental sales of
41 guns may occur at a full-line sporting goods store that is also a Recognized Tenant [such
42 as an Academy Sports or Gart as such stores are presently operated];

43       23.     Any church or other place of religious worship;

44       24.     Any car wash, automobile repair shop, or any business servicing motor
45 vehicles in any respect, including, without limitation, any quick lube oil change service,
46 tire center or gasoline or service station or facility

47       25.     Any carnival, amusement park or circus;

26.     Any medical clinics or medical offices, except that optician/optometrist offices and dental offices, of not more than 5,000 square feet of Floor Area each and 10,000 square feet of Floor Area in the aggregate, may be located not closer than 250 feet from the Premises;

27.     Any supermarket, except that an upscale, boutique-type food store of the type normally operated in the Dallas/Fort Worth, Texas metropolitan area (such as, by way of example, Zagara's, Whole Foods, Fresh Fields, or Wild Oats), provided, that such store shall not occupy more than 27,000 square feet of Floor Area, and shall be located at least 200 feet away from the Premises (except that an upscale, boutique-type food store shall be permitted to be located within the Premises) and except that a supermarket may be allowed in any expanded area of the Shopping Center located to the east of its present configuration;

28.     Any office use, other than: (a) office space used in connection with and ancillary to a permitted retail use hereunder, (b) offices specifically allowed under clause 26 above, (c) a bank not exceeding 6,000 square feet of Floor Area located on an Outparcel; and (d) retail offices providing services commonly found in similar first-class shopping centers in the Dallas/Fort Worth, Texas metropolitan area (for example, financial services, real estate brokerage, insurance agency, banking, travel agency), provided that such uses under this clause (d) are located at least 150 feet away from the Premises, and not more than 7,500 square feet of Floor Area in the Shopping Center, in the aggregate, shall be devoted to such uses;

29.     hotel/motel;

30.     daycare center;

31.     veterinary office, except (i) a typical "PETsMART" as shown on Exhibit B and (ii) as may be incidental to a full-line pet and pet supply store operating in at least 15,000 square feet of Floor Area and located at least 200 feet away from the Premises (except that a full-line pet and pet supply store shall be permitted to be located within the Premises), subject to the provisions of Section 13.3 of this Lease with respect to Existing Exclusives; such occupant shall use reasonable efforts to prevent its customers from allowing their pets to urinate or defecate in the Common Areas and will promptly remove any "dog dirt" from the Common Areas;

32.     children's entertainment or activity facility (such as "Discovery Zone", or "Chuck E. Cheese's"), unless located on an Outparcel;

33.     karate center;

34.     movie theater;

35.     restaurant serving meals for on- or off-premises consumption, except for (a) not more than two (2) so-called "take out" or "fast food" establishments, occupying not more than a total of 10,000 square feet of Floor Area and each located at least 150 feet from the Premises and (b) a nationally or regionally recognized family-oriented, sit-down restaurant typically operating in a first class shopping center [such as TGI Fridays, Red Lobster, Olive Garden and Bennigans, as such restaurants are presently operated (it being acknowledged that the foregoing are included as examples (and not limitations) of nationally or regionally recognized family-oriented, sit-down restaurants typically operating in a first class shopping center )], provided that all such restaurants shall be located at least 150 feet from the Premises;

36.     beauty parlor or nail salon within 200 feet of the Premises; or

M-3

37.     health spa, exercise facility or similar type business, excluding a typical "day spa" occupying not more than 8,000 square feet of Floor Area located at least 150 feet from the Premises.

B.     As to any <u>Related Land</u> not covered by the preceding Section A of this <u>Exhibit M</u>, any of the uses listed in Items 1, 2, 4, 5, 14, 15, 21, 22, and 25 above.

#1266408 v\7 - phillitj - r56007!.doc - 23945/2

M-4

## AMENDMENT TO LEASE

THIS AMENDMENT TO LEASE AGREEMENT ("AGREEMENT"), made this 6 day of August, 2009, between **ROCKWALL CROSSING, LTD.**, a Texas limited partnership ("Landlord") and **BED BATH & BEYOND INC.**, a New York corporation ("Tenant"),

### WITNESSETH:

WHEREAS, Landlord and Tenant are parties to a lease agreement dated September 3rd, 2004, as amended by that certain letter agreement dated March 30th, 2005 (collectively hereinafter referred to as the "Lease"), for a retail premises (the "Leased Premises") located within Rockwall Crossing (the "Shopping Center"), formerly referred to as Rockwall Marketplace;

WHEREAS, the Lease has various limitations associated with restaurants in the Shopping Center;

WHEREAS, in addition to the restaurants allowed by the Lease, Tenant has approved the operation of a "Chipotle" restaurant and "La Madeleine" restaurant (collectively referred to as the "Tenant Approved Restaurants") at the Shopping Center;

WHEREAS, the parties hereto desire to amend the Lease to modify the restrictions on restaurant types and allow additional restaurants at the Shopping Center in addition to the Tenant Approved Restaurants.

NOW, THEREFORE, in consideration of the mutual covenants exchanged herein and other good and valuable consideration, the adequacy of which is hereby acknowledged, Landlord and Tenant agree to amend the Lease as follows. This Agreement shall be upon the same terms and conditions provided in the Lease, except as the same are hereby modified and supplemented. Wherever there is any conflict between this Agreement and the Lease, the provisions of this Agreement are paramount and the Lease shall be construed accordingly.

1.  The text in Line 24 of Page 2 of <u>Exhibit M</u> of the Lease is hereby deleted and the following inserted therein: "clause 35 below;"

2.  The text in Lines 37 and 38 of Page 3 of <u>Exhibit M</u> of the Lease is hereby deleted and the following inserted therein: "not more than three (3) restaurants occupying not more than a total of 13,000 square feet of Floor Area and each located at least 150 feet".

3.  Landlord and Tenant each acknowledge and understand that the Tenant Approved Restaurants are in addition to the restaurants that are permitted at the Shopping Center by the Lease and the amendments thereto as set forth in Section 1 and 2 of this Agreement.

4.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

5.  This Agreement may be executed in any number of counterparts, each of which will for all purposes be deemed to be an original, and all of which are identical.

EXCEPT AS HEREIN extended, modified, supplemented or amended, all of the terms, covenants and conditions of the Lease shall remain in full force and effect as heretofore written, and the Lease as extended, modified, supplemented or amended by this Agreement is hereby ratified and confirmed in every respect.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed on the date stated hereinabove.

LANDLORD:

**ROCKWALL    CROSSING,    LTD.,** a  Texas  limited partnership

By: WOODMONT ROCKWALL GP, L.L.C.,
a Texas limited liability company, its General Partner

By: _Stephen Coslik_____
Stephen Coslik, Managing Member

TENANT:

**BED BATH & BEYOND INC.,** a New York corporation

By: _____

Name: _Seth Geldzahler_____

Title: _Vice President - Real Estate_____

## LEASE MODIFICATION

THIS LEASE MODIFICATION (*"Modification"*), dated as of the _3/s⁺_ day of _July_ , 2020 (*"Modification Date"*) by and between ROCKWALL CROSSING, LTD. (*"Landlord"*), having an office at 2100 W. 7ᵗʰ Street, Fort Worth, Texas 76107-2306 and BED BATH & BEYOND INC., a New York corporation (*"Tenant"*), having an office at 650 Liberty Avenue, Union, New Jersey 07083.

### W I T N E S S E T H :

WHEREAS, Landlord and Tenant are parties to that certain Lease Agreement dated as of September 3, 2004 (as amended and/or modified thereafter, the *"Lease"*), with respect to premises (*"Premises"*) located at the Rockwall Marketplace in Rockwall, Texas (*"Shopping Center"*); and

WHEREAS, Landlord and Tenant desire to modify the Lease on the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual covenants and promises set forth in this Modification and other valuable consideration, receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.      The recitals hereinabove set forth are incorporated into this Modification by this reference. Capitalized terms used, but not defined herein, shall have the meanings ascribed them in the Lease.

2.      Notwithstanding anything contained in the Lease to the contrary, Landlord and Tenant hereby agree that the modifications to the Term, Renewal Periods and/or Rent that are outlined in underline Schedule A hereto shall govern and control from and after the Modification Date.

3.      INTENTIONALLY DELETED.

4.      It is the policy of Tenant and its subsidiaries and affiliates (collectively, *"the Company"*) to conduct all its business transactions in accordance with the highest ethical standards and all applicable laws (including but not limited to the U.S. Foreign Corrupt Practices Act). No individual who is employed by or who represents the Company, and no individual or entity that contracts with the Company or otherwise performs services on behalf of the Company, is permitted to solicit, accept, offer, promise or pay any bribe, kickback or any other improper payment of money, products or services. This includes, but is not limited to, any improper payment in exchange for (i) the Company's execution of this Modification, (ii) any action taken by such individual on behalf of the Company, or (iii) any action taken by a third party. If any such improper actions are observed, contact our Legal Department (Attention: General Counsel) at Tenant's notification address and/or by telephone at 908-688-0888, so that the incident may be fully investigated.

5.      Landlord and Tenant each warrant and represent to the other that they did not deal with any real estate broker in connection with the negotiation, execution and delivery of this

Modification, except for Retail Consulting Services (*"Tenant's Broker"*).  Tenant shall pay any commission due to Tenant's Broker in connection with this Modification pursuant to a separate written agreement between Tenant and Tenant's Broker.  Each party agrees to indemnify, defend, and save the other harmless from and against any and all liabilities, costs, causes of action, damages and expenses, including, without limitation, attorneys' fees, with respect to or arising out of any claims made by any real estate broker, agent or finder (other than Tenant's Broker) with respect to this Modification in breach of the foregoing representation or claiming to have worked with the indemnifying party in connection with the Lease.  The provisions of this Section shall survive the expiration or earlier termination of the Lease.

6.      Landlord represents and warrants to Tenant that, as of the date hereof, no third-party consents or approvals (including, without limitation, with respect to easement agreements and/or any lender or beneficiary of a deed of trust) are required in order for the terms and provisions of this Modification to be in full force and effect or, if any such consent is required, Landlord has obtained same prior to its execution hereof.  The parties represent and warrant to each other that the person signing on behalf of either Landlord or Tenant, as the case may be, has the authority to do so and for this Modification to be deemed in full force and effect.

7.      Upon the request of either party following the execution and delivery of this Modification, Landlord and Tenant shall execute an amended/restated short form lease or memorandum for recording, which shall be in form and substance as reasonably acceptable to both parties.  In no event shall the amount of Rent or any other monetary terms hereof be included in any such short form lease or memorandum.  Further, after the expiration or earlier termination of the Lease, Tenant agrees, upon Landlord's request, to execute and deliver a termination of such short form lease or memorandum in recordable form and this obligation shall survive expiration or termination of the Lease.  Tenant shall record any such short form lease or memorandum at Tenant's expense.

8.      The terms and conditions of this Modification shall be binding upon, and inure to the benefit of Landlord and Tenant and their respective heirs, executors, administrators, successors and assigns.  Except as specifically amended hereby, the Lease is unmodified, is hereby ratified by the parties hereto and remains in full force and effect.  In the event of any conflict or inconsistency between the terms and provisions of the Lease and this Modification, the terms and provisions of this Modification shall govern and control.

9.      This Modification may be executed in one or more counterparts, each of which shall be an original for all purposes, but all of which taken together shall constitute only one Modification to Lease.  The execution and transmission of an image of any signed document or .pdf document or signed by DocuSign (or a similar application) will have the same binding effect as an original bearing an original signature.  No party may raise the use of an image transmission device or method or the fact that any signature was transmitted as an image as a defense to the enforcement of such document.

10.      All late fees/interest charges/attorney fees as a result of COVID-related Lease issues occurring prior to the date of this Modification are waived and Landlord hereby acknowledges that there is no monetary default by Tenant under the Lease as of the date of this

DocuSign Envelope ID: 13BCE0AE-10E2-4D6B-9D5E-EDDE6CDB88C0

Modification.  Tenant hereby represents that as of July 29, 2020: (i) to Tenant's actual knowledge without inquiry, the Lease is free from default by Landlord, and (ii) to Tenant's knowledge, Tenant has no current right of offset against Rent.

[Signature Page to Follow]

IN WITNESS WHEREOF, the parties hereto have executed this Modification to Lease as of the day and year first above written.

**LANDLORD:**

ROCKWALL CROSSING, LTD.,
a Texas limited partnership

By: Woodmont Rockwall GP, L.L.C., its general partner

By: _____
Name: Stephen Coslik, Managing Member

**TENANT:**

BED BATH & BEYOND INC.,
a New York corporation

By: _____
Name:    John Hartmann
Title:    EVP, Chief Operating Officer

DocuSign Envelope ID: 13BCE0AE-10E2-4D6B-9D5E-E08C12FB63B3

## SCHEDULE A

The Lease is hereby amended to reflect that:

(a) The Term is hereby extended for the period commencing on February 1, 2021 and ending on January 31, 2026 (the *"Extension Term"*);

(b) Tenant shall pay Fixed Rent during the Extension Term at the rate of $218,500 per year; and

(c) Tenant shall continue to have the right to extend the Term (beyond the Extension Term) for the three (3) remaining Renewal Options of five (5) years each, subject to the terms and conditions contained in the Lease, including, without limitation, Section 2.2.2 of the Lease. Fixed Rent payable during each remaining Renewal Period shall be as specified for such Renewal Period in Section 1.1.11 (c), (d) and (e) of the Lease.