# **Exhibit A**

**LEASE AGREEMENT**

**between**

**TELEGRAPH MARKETPLACE PARTNERS, L.L.C.,**
**a Utah limited liability company,**

**Landlord**

**and**

**BED BATH & BEYOND INC.,**
**a New York corporation,**

**Tenant**

**TELEGRAPH MARKETPLACE**
**I-15 and Green Springs Drive**
**Washington, Utah**

**Dated: September _____, 2003**

* * * * * *

The mailing, delivery or negotiation of this Lease shall not be deemed an offer to enter into any transaction or to enter into any relationship, whether on the terms contained herein or on any other terms.  This Lease shall not be binding nor shall either party have any obligations or liabilities or any rights with respect thereto, or with respect to the premises, unless and until both parties have executed and delivered this Lease.  Until such execution and delivery of this Lease, either party may terminate all negotiation and discussion of the subject matter hereof, without causes and for any reason, without recourse or liability.

* * * * * *

**TABLE OF CONTENTS**

Page

ARTICLE 1 BASIC TERMS AND DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -1-
    Section 1.1   Basic Terms and Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -1-

ARTICLE 2 LEASE OF PREMISES; LEASE TERM; DELIVERY DATE . . . . . . . . . . . . . . . -4-
    Section 2.1   Lease of Premises . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -4-
    Section 2.2   Term . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -4-
    Section 2.3   Delivery Date . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -4-
    Section 2.4   Unseasonable Delivery: Slack Period . . . . . . . . . . . . . . . . . . . . . . . . . -6-
    Section 2.5   Initial Co-Tenancy Condition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -7-

ARTICLE 3 IMPROVEMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -8-
    Section 3.1   Landlord's Work and Tenant's Work . . . . . . . . . . . . . . . . . . . . . . . . . -8-
    Section 3.2   Plan Approvals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -8-
    Section 3.3   Performance of Work . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -9-
    Section 3.4   Measurement; Adjustment of Rent . . . . . . . . . . . . . . . . . . . . . . . . . . -11-

ARTICLE 4 FIXED RENT, TAXES: DETERMINATION AND PAYMENT . . . . . . . . . . . . . . -12-
    Section 4.1   Fixed Rent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -12-
    Section 4.2   Payment of Rent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -12-
    Section 4.3   Real Estate and Other Taxes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -12-

ARTICLE 5 COMMON AREAS, THEIR USE AND CHARGES . . . . . . . . . . . . . . . . . . . . . -13-
    Section 5.1   Common Areas: Maintenance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -13-
    Section 5.2   Common Areas: Restrictions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -15-

ARTICLE 6 UTILITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -17-
    Section 6.1   Utility Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -17-
    Section 6.2   Interruption . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -17-

ARTICLE 7 SIGNS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -17-
    Section 7.1   Tenant's Building Signage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -17-
    Section 7.2   Pylon/Monument Signage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -18-
    Section 7.3   Signage: Alteration/Removal/Allocation . . . . . . . . . . . . . . . . . . . . . . -18-
    Section 7.4   Cooperation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -18-
    Section 7.5   Signage Restrictions and Criteria . . . . . . . . . . . . . . . . . . . . . . . . . . -18-

ARTICLE 8 ALTERATIONS AND IMPROVEMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . -19-
    Section 8.1   Alterations and Improvements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -19-

ARTICLE 9 REPAIRS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -20-
    Section 9.1   Tenant's Repairs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -20-
    Section 9.2   Landlord's Repairs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -20-
    Section 9.3   Legal Compliance Work . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -21-

ARTICLE 10 INDEMNIFICATION, INSURANCE AND WAIVER OF SUBROGATION . . . . -21-
    Section 10.1   Mutual Release, Waiver of Subrogation and Mutual Indemnification -21-
    Section 10.2   Tenant's Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -21-
    Section 10.3   Landlord's Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -22-
    Section 10.4   General Insurance Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . -23-

ARTICLE 11 FIRE AND OTHER CASUALTY; EMINENT DOMAIN . . . . . . . . . . . . . . . . . -23-
    Section 11.1   Fire and Other Casualty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -23-
    Section 11.2   Eminent Domain . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -24-
    Section 11.3   Abatement of Rent Charges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -25-

ARTICLE 12 COVENANTS, REPRESENTATIONS AND WARRANTIES . . . . . . . . . . . . . -26-
    Section 12.1   Quiet Enjoyment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -26-
    Section 12.2   Authority. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -26-
    Section 12.3   Landlord's Covenants, Warranties and Representations. . . . . . . . . -26-
    Section 12.4   Environmental Matters. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -27-
    Section 12.5   Project Agreements. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -29-

Section 12.6    Purchase and Sale Contract. . . . . . . . . . . . . . . . . . . . . . . . . . . . -30-

ARTICLE 13 USES AND RESTRICTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -31-
    Section 13.1    Permitted and Prohibited Uses . . . . . . . . . . . . . . . . . . . . . . . . . . . -31-
    Section 13.2    Tenant's Exclusive in Center . . . . . . . . . . . . . . . . . . . . . . . . . . . . -31-
    Section 13.3    Exclusives Which Tenant Must Honor. . . . . . . . . . . . . . . . . . . . . . -32-

ARTICLE 14 CONDUCT OF BUSINESS OPERATIONS . . . . . . . . . . . . . . . . . . . . . . . . -32-

ARTICLE 15 TENANT ASSIGNMENT AND SUBLETTING . . . . . . . . . . . . . . . . . . . . . . -33-
    Section 15.1    Assignment and Subletting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -33-
    Section 15.2    Liability of Tenant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -34-
    Section 15.3    Collateral Assignment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -34-
    Section 15.4    Cure Rights of Original Tenant . . . . . . . . . . . . . . . . . . . . . . . . . . -34-
    Section 15.5    Recognition Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -34-

ARTICLE 16 DEFAULT AND DISPUTE RESOLUTION . . . . . . . . . . . . . . . . . . . . . . . . . -34-
    Section 16.1    Tenant Default . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -34-
    Section 16.2    Landlord Default . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -35-
    Section 16.3    Arbitration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -36-

ARTICLE 17 RIGHT TO MORTGAGE AND NON-DISTURBANCE;
        ESTOPPEL CERTIFICATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -36-
    Section 17.1    Right to Mortgage and Non-Disturbance . . . . . . . . . . . . . . . . . . . -36-
    Section 17.2    Estoppel Certificate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -37-
    Section 17.3    Existing Mortgages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -37-

ARTICLE 18 NOTICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -37-

ARTICLE 19 TENANT'S PROPERTY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -38-

ARTICLE 20 END OF TERM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -38-
    Section 20.1    Surrender of Premises. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -38-
    Section 20.2    Hold Over. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -38-

ARTICLE 21 TENANT'S RIGHT OF FIRST OFFER . . . . . . . . . . . . . . . . . . . . . . . . . . . -38-

ARTICLE 22 ONGOING CO-TENANCY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -39-

ARTICLE 23 MISCELLANEOUS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -39-
    Section 23.1    Loading Facilities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -39-
    Section 23.2    Liens. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -39-
    Section 23.3    Broker's Commission. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -39-
    Section 23.4    Force Majeure. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -39-
    Section 23.5    Consents. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -40-
    Section 23.6    Costs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -40-
    Section 23.7    Attorneys' Fees. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -40-
    Section 23.8    Survival of Obligations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -40-
    Section 23.9    Non-Waiver. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -40-
    Section 23.10   Rights Cumulative. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -40-
    Section 23.11   Definition of Landlord. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -40-
    Section 23.12   Successors and Assigns. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -40-
    Section 23.13   Limitation of Landlord's Liability. . . . . . . . . . . . . . . . . . . . . . . . . -40-
    Section 23.14   Limitation of Tenant's Liability. . . . . . . . . . . . . . . . . . . . . . . . . . -40-
    Section 23.15   Joint and Several Liability. . . . . . . . . . . . . . . . . . . . . . . . . . . . . -41-
    Section 23.16   Severability. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -41-
    Section 23.17   Grammatical Usages and Construction . . . . . . . . . . . . . . . . . . . . -41-
    Section 23.18   Table of Contents, Line Numbering and Paragraph Headings. . . . . -41-
    Section 23.19   Definition of Hereunder, Herein, etc.. . . . . . . . . . . . . . . . . . . . . -41-
    Section 23.20   Short Form Lease. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -41-
    Section 23.21   Entire Agreement and Modification. . . . . . . . . . . . . . . . . . . . . . . -41-
    Section 23.22   No Joint Venture or Partnership Created by Lease. . . . . . . . . . . . -41-
    Section 23.23   Tenant's Tradename. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -41-
    Section 23.24   Counterparts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -42-
    Section 23.25   Waiver of Jury Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -42-
    Section 23.26   Governing Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -42-

## **EXHIBITS**

| | |
|---|---|
| Exhibit A | Legal Description of Shopping Center |
| Exhibit B | Site Plan and Sidewalk Plan |
| Exhibit C | Rent Commencement and Expiration Date Agreement |
| Exhibit D | Specifications for Landlord's Work |
| Exhibit D-1 | Exterior Elevations of the Premises |
| Exhibit D-2 | Intentionally Omitted |
| Exhibit E | Permitted Encumbrances |
| Exhibit F | Signage |
| Exhibit G | Subordination, Non-Disturbance and Attornment Agreement |
| Exhibit H | Subtenant Recognition Agreement |
| Exhibit I | Delivery Date Notice |
| Exhibit J | Delivery Date Certification |
| Exhibit K-1 | Existing Exclusives |
| Exhibit K-2 | Existing Leases |
| Exhibit L | Alternate Rent |
| Exhibit M | Prohibited Uses |
| Exhibit N | CC&Rs |
| Exhibit O | REA |
| Exhibit P | Declaration |

**LEASE AGREEMENT**

THIS LEASE AGREEMENT (**"Lease"**) is entered into as of September ___, 2003 by and between TELEGRAPH MARKETPLACE PARTNERS, L.L.C., a Utah limited liability company, having an office at 9 Exchange Place, Suite 900, Salt Lake City, Utah 84111 (**"Landlord"**), and BED BATH & BEYOND INC., a  New York corporation, having an office at 650 Liberty Avenue, Union, New Jersey 07083 (**"Tenant"**).

**W I T N E S S E T H:**

ARTICLE 1
BASIC TERMS AND DEFINITIONS

Section 1.1    <u>Basic Terms and Definitions</u>.  The following terms shall have the meanings set forth in this Section 1.1 except as otherwise expressly provided herein.

1.1.1    <u>Additional Rent</u>:  Any monies which Tenant is required to pay to Landlord under the terms and conditions of this Lease, other than Fixed Rent.

1.1.2    <u>Affiliate</u>:  A corporation, partnership, person or other entity which is controlling, controlled by, or under common control with, Landlord or Tenant, as the case may be.  As used herein, **"control"** shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person or entity, whether through the ownership of voting securities or rights, by contract, or otherwise.

1.1.3    <u>Alternate Rent</u>:  As defined in <u>Exhibit L</u> attached hereto.

1.1.4    <u>Common Areas</u>:  All areas in the Shopping Center which are, from time to time, available for the joint use and benefit of Tenant and other tenants and occupants of the Shopping Center, and their respective employees, agents, subtenants, concessionaires, licensees, customers and other invitees, including, but not limited to, any and all parking areas, parking spaces, driveways, truck serviceways, passageways, sidewalks, entrances, exits, lighting facilities, courts, landscaped areas, retention or detention areas, and common utility lines.

1.1.5    <u>Common Areas Charges</u>:  As defined in Section 5.1 hereof.

1.1.6    <u>Delivery Date</u>: As defined in Section 2.3 hereof.

1.1.7    <u>Effective Date</u>: The date hereof.

1.1.8    <u>Event of Default</u>:  As defined in Section 16.1 hereof.

1.1.9    <u>Excused Periods</u>:  Periods during which Tenant's failure to conduct the operations of its business or any other business: (x) resulted from alterations or renovations being performed in and to the Premises, (y) was caused by damage or destruction, eminent domain proceedings or actions, or *Force Majeure*, or (z) was caused by any act or omission of Landlord, or its employees, agents, or contractors.

1.1.10    <u>Exhibits</u>.  The exhibits listed in the Table of Contents annexed to this Lease have been agreed to by the parties and attached hereto, it being the intention of the parties that they shall become a binding part of this Lease as if fully set forth herein.

1.1.11    <u>Fixed Rent</u>:  The following amounts for the periods indicated (subject to adjustment pursuant to Section 3.4 hereof):

(a)    For the period commencing on the Rent Commencement Date and ending on the last day of the "Initial Term" (defined in Subsection 1.1.43 below), at the rate of Two Hundred Thirty-Seven Thousand Eighty and 50/100 ($237,080.50) Dollars per year [based on Ten and 75/100 ($10.75) Dollars per square foot of Floor Area];

(b)    In the event Tenant exercises the first Renewal Option,  for the first    five (5) year Renewal Period, at the rate of Two Hundred Sixty Thousand Six Hundred Seventy-Eight and 28/100 ($260,678.28) Dollars per year [based on Eleven and 82/100 ($11.82) Dollars per square foot of Floor Area];

(c)    In the event Tenant exercises the second Renewal Option, for the second five (5) year Renewal Period, at the rate of Two Hundred Seventy-Three Thousand Nine Hundred Ten and 68/100 ($273,910.68) Dollars per year [based on Twelve and 42/100 ($12.42) Dollars per square foot of Floor Area]; and

(d)    In the event Tenant exercises the third Renewal Option, for the third five (5) year Renewal Period, at the rate of Two Hundred Eighty-Seven Thousand Five Hundred Eighty-Four and 16/100 ($287,584.16) Dollars per year [based on Thirteen and 04/100 ($13.04) Dollars per square foot of Floor Area].

1.1.12  _Floor Area_:  The actual number of square feet of space contained on all floors within any building area in the Shopping Center (including the Premises) and, with respect to exterior areas, including all exterior areas leased to or exclusively used by one or more tenants (other than loading dock areas, trash compactor areas, and trash container areas).  All measurements pursuant to this Subsection shall be from the exterior of outside walls or store front and/or to the centerline of any common walls, but in no event shall Floor Area within either the Premises or the remainder of the Shopping Center include any non-selling or storage space areas within any mezzanine, lower floor, second floor or, except as set forth above, any exterior areas.

1.1.13  _Force Majeure_:  As defined in Section 23.4 hereof.

1.1.14  _Ground Lessor_: The landlord under any existing or future ground or underlying leases encumbering or affecting all or any part of the Shopping Center.

1.1.15  _Intentionally Omitted._

1.1.16  _Hazardous Substances_:  As defined in Subsection 12.4.1 hereof.

1.1.17  _Inducement Tenant_:  As defined in Subsection 2.3.1 hereof.

1.1.18  _Landlord_:  As defined in the preamble and Section 23.11 hereof.

1.1.19  _Landlord's Mailing Address_:  9 Exchange Place, Suite 900, Salt Lake City, Utah 84111, or such other place and/or to the attention of such other person as Landlord may notify Tenant from time to time by notice given in accordance with the provisions of Article 18 hereof.

1.1.20  _Landlord's Work_:  As defined in Section 3.1 hereof.

1.1.21  _Lease Interest Rate_: The then effective prime rate as published from time to time in the "Money Rates" section of _The Wall Street Journal_ (or any successor publication thereto) plus two (2%) percent.

1.1.22  _Legal Requirements_: All laws, statutes, codes, acts, ordinances, judgements, decrees, authorizations, directions and requirements of, and agreements with, all governmental departments, commissions, boards, courts, authorities, agencies, officials and officers, which now or at any time hereafter may be applicable to the Premises, the Shopping Center, or any part(s) thereof.

1.1.23  _Mortgagee_:  Any state or federally regulated: bank, savings and loan association, insurance company, pension fund, credit union, real estate investment trust, or other institutional lender, which is not an Affiliate of Landlord, and which holds a mortgage on the Shopping Center or is the beneficiary under a deed of trust encumbering the Shopping Center.

1.1.24  _Intentionally Omitted._

1.1.25  _Intentionally Omitted._

1.1.26  _Intentionally Omitted._

1.1.27  _Permitted Use_:  The sale at retail of a variety of linens and domestics (including, but not limited to, sheets, bedspreads, comforters, duvets, pillows, pillow covers, chair pads, placemats, tablecloths, dish towels, oven mittens and aprons); bathroom items (including, but not limited to, towels, shower curtains, bathroom rugs, toilet seats, health and beauty care items and cosmetics, personal care devices and other bathroom appliances and accessories); housewares (including, but not limited to, kitchen utensils, kitchen appliances and kitchen "gadgets," cleaning appliances and supplies, cookware, bakeware, dishes and china,

glassware, garbage pails, ironing boards and other laundry items, mops and brooms, candles and candle holders, ready-to-assemble furniture and artificial flowers); frames and wall art; window treatments; closet, shelving and storage items; home furnishings; area rugs; wall and floor coverings; furniture (including, without limitation, mattresses, box springs, bed frames, and bedroom furniture); decorative accessories; photo albums; photo storage boxes; luggage; books; party supplies; cards and stationery; seasonal items; juvenile merchandise (including, but not limited to, toys, car seats and safety-proofing items); specialty food items; food and non-alcoholic beverage services; any and all other items sold or services provided from time to time in any store owned or operated by Tenant or its Affiliate(s) (the aforementioned items are hereinafter collectively referred to as the **"Permitted Items"**); and for any other lawful retail use not specifically prohibited by the provisions of Section 13.1.1 below.  In addition, Tenant shall be permitted to use portions of the Premises for storage and office uses incidental to the Permitted Use.

1.1.28  Premises: Being the area cross-hatched on Exhibit B hereto, having dimensions as shown on Exhibit B and containing approximately: (i) twenty-two thousand fifty-four (22,054) square feet of Floor Area, and (ii) one thousand (1,000) square feet of mezzanine level space for office purposes, subject to adjustment in accordance with the provisions of Section 3.4 below.  In no event shall such non-selling space (or any space used for fire pump facilities or vertical transportation) result in any charge to Tenant by way of Fixed Rent or any Additional Rent, nor shall such space be included in the determination of Tenant's Pro Rata Share.

1.1.29  Renewal Option:  As defined in Section 2.2.2 hereof.

1.1.30  Renewal Period(s): Three (3) successive periods of five (5) years each, as provided in Section 2.2.2 hereof.

1.1.31  Rent:  Fixed Rent and/or Additional Rent.

1.1.32  Rent Commencement Date: As defined in Section 2.2 hereof.

1.1.33  Intentionally Omitted.

1.1.34  Shopping Center:  The shopping center commonly known as Telegraph Marketplace, containing approximately seventy thousand (70,000) square feet of Floor Area plus the Floor Area of any Outparcels not sold or otherwise transferred by Landlord, on the property located at the intersection of Interstate 15 and Green Springs Drive in Washington City, Washington County, Utah, and more particularly described in Exhibit A hereto.  Landlord shall not change the name of the Shopping Center without giving at least ninety (90) days prior notice to Tenant, and Landlord shall not include the name of any tenant (other than Tenant) in the name of the Shopping Center.

1.1.35  Substantially Completed or Substantial Completion:  The completion of specified work at the Shopping Center (including, without limitation, as applicable,  Landlord's Work) to the extent that only "Punch List Items" of such work (defined in Subsection 3.3.3 below) shall not be completed.

1.1.36  Taxes:  As defined in Section 4.3.3 hereof.

1.1.37  Tenant:  As defined in the preamble hereof.

1.1.38  Tenant's Mailing Address:  650 Liberty Avenue, Union, New Jersey 07083, Attn: Mr. Warren Eisenberg, or such other place and/or to the attention of such other person as Tenant may notify Landlord from time to time by notice given in accordance with the provisions of Article 18 hereof.

1.1.39  Tenant's Permits:  As defined in Section 2.3.1(b) hereof.

1.1.40  Tenant's Property:  All of Tenant's personal property, including, without limitation, phone and alarm systems, satellite antennae, shelving, computers, furniture, cash registers and customer service counters, specialty lighting, track lighting, millwork, conveyor systems, storage racks and signage and any and all other personal property of Tenant which is capable of being removed from the Premises without material damage thereto, but which shall not include electrical systems, heating, ventilation and air conditioning systems, and other mechanical systems, flooring, carpet, elevators, standard lighting and wiring installed within the walls of the Premises.

1.1.41 Tenant's Pro Rata Share:  A fraction whose numerator is the Floor Area of the Premises and whose denominator is the Floor Area of the Shopping Center as may be re-determined any time a building (and/or Floor Area) is added to or removed from the Shopping Center, but in no event shall Tenant's Pro Rata Share be greater than thirty-one and fifty-one hundredths (31.51%) percent.  Floor Area shall be deemed added to or removed from the Shopping Center on the earlier of (i) the date upon which such Floor Area is Substantially Completed, or (ii) at such time as an assessment for Taxes is made or removed, as the case may be, with respect to such Floor Area.  Within thirty (30) days following written request from Tenant, Landlord shall certify to Tenant in writing as to the then Floor Area of the Shopping Center.

1.1.42 Tenant's Work:  As defined in Section 3.1 hereof.

1.1.43 Term:  A period  (the *"Initial Term"*) of approximately ten (10) years beginning on the Rent Commencement Date and expiring at midnight on the last day of January following the tenth (10th) anniversary of the Rent Commencement Date, unless the Rent Commencement Date is February 1, in which event the Expiration Date shall be the day before the tenth (10th) anniversary of the Rent Commencement Date.  As used herein:  (i) *"Term"* shall refer to the Initial Term, as the same may be extended by any Renewal Period exercised pursuant to Section 2.2.2 below; and  (ii) *"Expiration Date"* shall mean the date on which the Term expires.

ARTICLE 2
LEASE OF PREMISES; LEASE TERM; DELIVERY DATE

Section 2.1    Lease of Premises.  Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the Premises together with any and all rights, benefits, privileges and easements, now or hereafter appurtenant to either or both of the Premises and the Shopping Center, arising out of any public or private grant or authority, including, without limitation, the non-exclusive right and easement to use the Common Areas in common with other tenants and occupants of the Shopping Center.

Section 2.2    Term.

2.2.1    Initial Term.  Subject to the provisions of this Article 2, the Term of this Lease shall begin on the earlier to occur of (such earlier date being referred to herein as the *"Rent Commencement Date"*): (a) ten (10) days after Tenant shall initially open the Premises to the general public for business, or (b) the sixtieth (60th) day following the Delivery Date.  The Term shall expire on the Expiration Date, unless earlier terminated as herein provided.  When the Rent Commencement Date has been determined, as provided in this Section, Landlord and Tenant shall execute, acknowledge and deliver, each to the other, a written statement in the form attached hereto as Exhibit C specifying the Rent Commencement Date.

2.2.2    Renewal Options.  Tenant shall have the right and option (hereinafter a *"Renewal Option"*) to extend the Initial Term from the date on which it would otherwise expire for three (3) successive renewal periods of five (5) years each (individually, a *"Renewal Period"*, and collectively, the *"Renewal Periods"*) upon the same terms and conditions as are herein set forth.  Each Renewal Option shall be exercisable by notice given to Landlord at least one hundred eighty (180) days prior to the commencement of the applicable Renewal Period(s).  In order to prevent the inadvertent failure of Tenant to exercise any of the Renewal Options within the time specified above, the Term of this Lease shall not expire unless and until Tenant fails to exercise a Renewal Option within fifteen (15) days after receiving notice from Landlord that the Renewal Option in question has not been exercised (Landlord's notice shall not be given prior to the 180th day prior to the Expiration Date), or unless and until Tenant gives notice to Landlord that it will not be exercising any remaining Renewal Options.  If Landlord fails to give Tenant such notice prior to the Expiration Date, and Tenant occupies the Premises after the Expiration Date, then Tenant shall remain in possession subject to the provisions of this Lease but without the application of Article 20 hereof.  If Landlord then gives Tenant such notice and Tenant exercises its Renewal Option, then the effective date of such exercise shall be retroactive to the Expiration Date.

Section 2.3    Delivery Date.

2.3.1    Definition.  Subject to Landlord's delivery to Tenant of the Delivery Date Notice in accordance with the provisions of Subsection 2.3.2 below and Landlord's timely compliance therewith, Landlord shall be deemed to have delivered possession of the Premises

to Tenant at 8:00 a.m. on the date (the *"Delivery Date"*) following the day on which all of the following conditions (the *"Delivery Date Conditions"*) shall have occurred <u>and</u> Tenant shall have received from Landlord the Delivery Date Certification in accordance with the provisions of Section 2.3.3 below, which shall constitute Landlord's written certification that all of the following shall have occurred:

        (a)    Actual possession of the Premises shall have been delivered to Tenant water-tight, free of Hazardous Substances, in a good, structurally sound condition, with all of Landlord's Work Substantially Completed, which Substantial Completion shall be evidenced by a written certification by Landlord's architect to Tenant;

        (b)    Landlord shall have obtained (and delivered copies thereof to Tenant, upon request) all permits and approvals required from all applicable governmental authorities to enable Tenant to occupy and use the Premises for the conduct of its business in the Premises (<u>exclusive</u> of any business licenses which Tenant may be required to obtain in order to open and operate its specific business and not a general retail business (collectively, *"Tenant's Permits"*)), which permits and approvals shall include, without limitation, zoning and building code approvals, environmental requirements, fixturing permits and/or approvals, and a permanent certificate of occupancy for the Premises (<u>unless</u> a permanent certificate of occupancy for the Premises cannot be obtained solely as a result of the failure to complete Tenant's Work in the manner required hereunder, in which event: (1) the delivery of a permanent certificate of occupancy for the Premises shall not be a condition to the occurrence of the Delivery Date,  (2) the obtaining of a temporary certificate of occupancy shall be a condition to the occurrence of the Delivery Date, and  (3) Landlord shall obtain the permanent certificate of occupancy promptly following the correction or completion of Tenant's Work); and

        (c)    The Common Areas, and all of the improvements thereto shown on <u>Exhibit B</u> hereto shall have been Substantially Completed and operational, and all off-site improvements (including, without limitation, street, storm drainage, and traffic signalization improvements [including, without limitation, the traffic signal shown on <u>Exhibit B</u> hereto]) required for the Shopping Center to open for business and for Tenant to receive a permanent certificate of occupancy shall have been Substantially Completed; Landlord, at its sole cost and expense, shall have obtained (and delivered copies thereof to Tenant, upon request) all permits and approvals required from applicable governmental authorities to enable the Common Areas to be developed, operated, and used for the purposes herein contemplated, which permits and approvals shall include, without limitation, zoning, building code, environmental requirements, curb cut and site plan approvals, all permits pertaining to pylon and/or monument signage (and Tenant's panel(s) thereon), construction, and development and use permits;

        (d)    The representations and warranties of Landlord set forth in subparagraphs (a) through (m) of Section 12.3 below shall then be true and in effect;

        (e)    A lease or other occupancy agreement shall have been entered into with the following tenant or occupant (hereinafter referred to as the *"Inducement Tenant"*) on the following terms, for occupancy of the premises designated for it on <u>Exhibit B</u>; such lease shall not be cancelable by the Inducement Tenant, except for failure of Landlord to complete the Shopping Center, for injury to or loss of the premises thereby demised because of fire or other casualty, or for a taking or for other reasons similar to those for which this Lease is cancelable by Tenant:

| Inducement Tenant | Minimum Square-foot Gross Floor Area | Minimum Term |
|---|---|---|
| Best Buy | 20,500 | 10 years |

        (f)    Landlord shall have delivered to Tenant, in recordable form: (i) a subordination, non-disturbance and attornment agreement substantially in the form attached hereto as <u>Exhibit G</u> executed by each holder of any mortgage or deed of trust encumbering or affecting the Shopping Center or

any portion thereof (it being understood and agreed that this Subsection 2.3.1(f) is not intended to extend the date by which Landlord is to deliver to Tenant any document(s) required pursuant to Section 17.3 hereof), and (ii) a fee owner recognition agreement in the form and content described in clause (b) of Section 17.1 hereof executed by any existing Ground Lessor;

(g)     The CC&Rs (hereinafter defined in Section 12.5) is (x) fully executed and delivered and recorded in Clerk's Office of the Washington County, Utah, and (y) superior to all mortgages, deeds of trust and other liens affecting the Shopping Center; any third-party approvals required under the CC&Rs for the performance of Landlord's Work (including, without limitation, Tenant's elevations and signage, as shown on Exhibit D-1 and Exhibit F hereto) and Tenant's Work shall have been obtained;

(h)     The REA (hereinafter defined in Section 12.5) is (x) fully executed and delivered and recorded in Clerk's Office of the Washington County, Utah, and (y) superior to all mortgages, deeds of trust and other liens affecting the Shopping Center and the Redlands Property; and

(i)     The Declaration (hereinafter defined in Section 12.5) is (x) fully executed and delivered and recorded in Clerk's Office of the Washington County, Utah, and (y) superior to all mortgages, deeds of trust and other liens affecting the Shopping Center.

2.3.2   Delivery Date.

(a)     Landlord shall give Tenant at least one hundred twenty (120) days prior notice of the Delivery Date, using the form of Delivery Date Notice attached hereto as Exhibit I.  Landlord's delivery of the Delivery Date Notice shall be a condition precedent to the Rent Commencement Date.  Notwithstanding any provision of this Lease to the contrary, in no event shall the Delivery Date be deemed to occur prior to the Delivery Date established in the Delivery Date Notice.

(b)     Landlord acknowledges that if it shall fail to satisfy all of the Delivery Date Conditions by the Delivery Date as established in the Delivery Date Notice, Tenant will sustain substantial, additional costs and expenses, including, without limitation, storage costs for fixtures, equipment, and inventory, employee costs during waiting period, and additional advertising and promotional costs, the exact amount of which would be impracticable or extremely difficult to ascertain.  If the Delivery Date does not occur by the date established therefor in the Delivery Date Notice, then, in addition to any other remedies available to Tenant under this Lease, Landlord agrees to allow to Tenant a credit against the initial installment(s) of Rent hereunder equal to, as liquidated reimbursement to Tenant (and not as a penalty) for all of the aforesaid costs incurred by Tenant, the sum of: (i) Twenty-Five Thousand Dollars ($25,000), plus (ii) Five Thousand Dollars ($5,000) for each day that the Delivery Date established in the Delivery Date Notice is delayed.  The foregoing liquidated reimbursements represent the parties' good faith agreement as to an agreed upon amount which shall have been incurred by Tenant and which shall otherwise not be susceptible of exact ascertainment.

2.3.3   Delivery Date Certification.  Upon the satisfaction of all of the Delivery Date Conditions, Landlord shall so certify to Tenant, using the form of Delivery Date Certification attached hereto as Exhibit J.

2.3.4   No Waiver.  Neither Tenant's acceptance of physical possession of the Premises nor Tenant's opening of the Premises for business to the public prior to the Delivery Date shall: (i) be deemed a waiver by Tenant of any of the Delivery Date Conditions, or (ii) relieve Landlord of any obligation under this Lease, unless such condition or obligation is expressly waived in writing by Tenant.

Section 2.4   Unseasonable Delivery: Slack Period.  If, for any reason (including, without limitation, Force Majeure), the Delivery Date occurs during the period commencing on September 1 and ending on the March 1 next following (the "Slack Period"), then Tenant shall have, in addition to any other remedies, the right to:

(a)     accept delivery of physical possession of the Premises; or

(b)     defer its acceptance of delivery of physical possession of the Premises to a later date within the Slack Period, whereupon the Delivery Date shall be deemed to have occurred on the date that Tenant actually accepts physical possession of the

Premises (subject to the other provisions of this Article 2 and the continuing satisfaction of the Delivery Date Conditions), except that Tenant shall not be entitled to the *per diem* liquidated reimbursement provided in Section 2.3.2(b) for any portion of the Slack Period occurring after the date on which all of the Delivery Date Conditions shall have been satisfied; and

in either event, if the Rent Commencement Date occurs before the March 2 next following the Slack Period, Tenant shall be entitled to pay Alternate Rent in lieu of Fixed Rent for the period commencing on the Rent Commencement Date and ending on the March 1 next following; any benefit which Tenant may realize thereby shall constitute a reimbursement to Tenant for certain pre-opening expenses incurred by Tenant in connection with this Lease. Notwithstanding the foregoing, if the Delivery Date occurs during the Slack Period, there are no unsatisfied Delivery Date Conditions, and Tenant elects to open the Premises to the general public for business on or after January 1 and prior to the expiration of the Slack Period, then Tenant shall be required to pay Fixed Rent, not Alternate Rent, for such period.

Section 2.5    Initial Co-Tenancy Condition.

2.5.1    As used herein, the **"Initial Co-Tenancy Condition"** shall mean that the Inducement Tenant or a Comparable Inducement Tenant (defined below) shall have accepted possession of its entire premises, such premises shall have been substantially completed, and the Inducement Tenant shall, if not already open for business, then be actively and continuously engaged in the fixturing and merchandising therein.

2.5.2    If, on the Delivery Date, the Initial Co-Tenancy Condition has not been satisfied, Tenant shall have the right, at its sole option, to:

(a)    accept delivery of physical possession of the Premises; or

(b)    defer its acceptance of delivery of physical possession of the Premises to a later date (but not later than the date on which the Initial Co-Tenancy Condition is satisfied and Tenant receives notice from Landlord thereof), whereupon the Delivery Date shall be deemed to have occurred on the date that Tenant actually accepts physical possession of the Premises (subject to the other provisions of this Article 2 and the continuing satisfaction of the Delivery Date Conditions); and

in either event, if the Rent Commencement Date occurs before the satisfaction of the Initial Co-Tenancy Condition, Tenant shall be entitled to pay Alternate Rent in lieu of Fixed Rent until the Initial Co-Tenancy Condition is satisfied and the Landlord gives Tenant notice thereof, subject to any other applicable provisions of this Article 2. As used in this Section 2.5 and in Article 22 below, the term **"Comparable Inducement Tenant"** shall mean a national retailer of the type typically found in first-class regional shopping centers located in the St. George, Utah metropolitan area (i) conducting business in at least all of the Floor Area previously occupied (or slated to have been occupied) by the named Inducement Tenant it is replacing, (ii) having a minimum lease term of ten (10) years, which lease term is not cancelable by such tenant except for failure of Landlord to complete the Shopping Center, for injury to or loss of the premises thereby demised because of fire or other casualty, or for a taking or for other reasons similar to those for which this Lease is cancelable by Tenant, and (iii) operating at least one hundred (100) stores in the aggregate within the continental United States under the same tradename as that utilized in the Shopping Center, of which at least fifteen (15) such stores in the aggregate shall be located in the States of Utah, Arizona and Nevada, and at least five (5) such stores in the aggregate shall be located in the State of Utah.

2.5.3    In addition to the provisions of Section 2.5.2 above, if the Initial Co-Tenancy Condition has not been satisfied by the first (1st) anniversary of the Delivery Date established pursuant to Section 2.3.2(a) above, then Tenant shall have the right, at any time prior to the satisfaction of the Initial Co-Tenancy Condition, upon giving Landlord at least one hundred twenty (120) days' prior notice, to terminate this Lease as of the date specified in said notice.  Landlord may negate such termination by causing the Initial Co-Tenancy Condition to be satisfied within thirty (30) days after the date on which said termination notice is given.  If this Lease is terminated hereunder, neither party shall have any further liability under this Lease, except: (i) for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease, and (ii) Landlord shall promptly reimburse Tenant for all of its reasonable third-party costs and expenses incurred in connection with this Lease, including, without limitation, costs associated with the preparation and review of plans and specifications, and the performance of Tenant's Work, not to exceed Fifty Thousand Dollars ($50,000).

ARTICLE 3
IMPROVEMENTS

Section 3.1    Landlord's Work and Tenant's Work.  Landlord shall, at its sole cost and expense, perform the work and obligations described on Exhibit B, Exhibit D, Exhibit D-1, and Exhibit F hereto, and the "Final Plans and Specifications" (hereinafter defined in Section 3.2) (collectively, *"Landlord's Work"*), and shall deliver possession of the Premises to Tenant in the condition described therein.  Except for Landlord's Work, Tenant shall, at its own cost and expense, do any and all work (hereinafter referred to as *"Tenant's Work"*) which Tenant desires to adapt the Premises to Tenant's use.

Section 3.2    Plan Approvals.

3.2.1    Preparation of Plans and Specifications.

(a)    Within   thirty (30)   days after the Effective Date, Landlord shall deliver to Tenant drawings showing the proposed footprint, column layout, and interior clear dimensions of the Premises (the *"Preliminary LOD"*), Limits of Demised which shall be subject to any reasonable modifications indicated by Tenant as provided below. The Preliminary LOD shall be substantially consistent with Exhibits B, D, and D-1 hereto.

(b)    Within thirty (30) days after Tenant's receipt of the Preliminary LOD, Tenant shall deliver to Landlord its revisions thereto (the *"Revised LOD"*), showing the location of the interior structural grid (column layout), storefront opening, and mezzanine and/or office core, the location and arrangement of the loading facilities, trash compactor pad, and trash container pad(s), and any reasonable revisions to the interior clear dimensions.

(c)    Within fifteen (15) days after Landlord's receipt of the Revised LOD, Landlord shall deliver to Tenant a final LOD (the *"Certified LOD"*), certified by Landlord, which shall incorporate all of the elements of the Revised LOD.  Within fifteen (15) days after its receipt of the Certified LOD, Tenant shall notify Landlord of Tenant's approval thereof or the reasons why such approval cannot be granted, and Landlord shall, within fifteen (15) days after receiving such notice, make any revisions necessary to correct such matters and obtain Tenant's approval.  Upon Tenant's approval of the Certified LOD, any further changes thereto shall be subject to Tenant's prior written approval (which may be withheld in its sole discretion), provided that, as to changes required to conform to Legal Requirements, Tenant shall have reasonable approval rights within the confines of said Legal Requirements.  After Tenant approves the Certified LOD, Landlord shall be responsible for any and all reasonable costs incurred and delays experienced by Tenant in connection with any further changes to the Certified LOD required by Landlord.

(d)    Within thirty (30) days after Tenant's receipt of the Certified LOD, Tenant shall deliver to Landlord its Fixture Plan (F1); Floor Finish Plans Notes and Details  (F2); Power/Specialty Lighting Plan and Notes (F3); and Lighting Plans and Notes (F4)  (collectively, *"Tenant's Plans"*), all of which shall be substantially consistent with the Certified LOD (as same may be reasonably modified by Tenant, as noted above).

(e)    Within thirty (30) days after receipt of Tenant's Plans, Landlord shall prepare and submit to Tenant, in a single submission, Landlord's preliminary plans and specifications (the *"Preliminary Plans"*) for Landlord's Work (which shall include, without limitation, mechanical, electrical, plumbing, fire protection and high-pile storage, structural, architectural and site plans including, without limitation, a site lighting plan with photometrics), and each of the plans which collectively constitute the Preliminary Plans shall be at least 85% complete, in Tenant's reasonable judgment.  The Preliminary Plans shall be substantially consistent with Tenant's Plans, the Certified LOD, and Exhibits B, D, D-1, and F hereto.

(f)    Within thirty (30) days after its receipt of the Preliminary Plans, Tenant shall give Landlord notice of the respects, if any, in which said Preliminary Plans fail to meet Tenant's reasonable approval and/or fail to conform to the Certified LOD, Tenant's Plans, and/or Exhibits B, D, D-1, and F hereto, and Landlord shall promptly make any revisions necessary to correct such matters and obtain Tenant's approval.

(g)    Within fifteen (15) days after the date on which Landlord receives notice of Tenant's approval of the Preliminary Plans, Landlord shall prepare and deliver to Tenant, in a single submission, final plans and specifications (the *"Final Plans and Specifications"*), which shall be substantially consistent with the Preliminary Plans, as approved by Tenant.

(h) Within fifteen (15) days after its receipt of the Final Plans and Specifications, Tenant shall notify Landlord of Tenant's approval thereof or the reasons why such approval cannot be granted, and Landlord shall, within fifteen (15) days after receiving such notice, make any revisions necessary to correct such matters and obtain Tenant's approval. Upon Tenant's approval of the Final Plans and Specifications, any further changes thereto shall be subject to Tenant's prior written approval. Unless specifically noted on a separate summary sheet attached to the Final Plans and Specifications, to the extent of a conflict between the terms and provisions of Tenant's Plans, Exhibit B, Exhibit D, Exhibit D-1, and/or Exhibit F hereto, and the terms and provisions of the Final Plans and Specifications, then the terms and provisions of Tenant's Plans, Exhibit B, Exhibit D, Exhibit D-1, and Exhibit F shall govern and prevail.

(i) All submissions by the parties of the Preliminary LOD, the Revised LOD, the Certified LOD, the Tenant's Plans, the Preliminary Plans and the Final Plans and Specifications shall be made (or accompanied) by the computer files thereof formatted in any version of "Autocad", up to "Autocad 2002".

3.2.2  Plan Changes.

(a) Tenant shall have the right to make changes from the standards and specifications set forth in "Tenant's Prototype Drawings and Specifications" and/or the "Project Manual", referred to in Exhibit D hereto, and/or to require Landlord to subsequently make changes to either or both of the Preliminary Plans and Specifications and/or the Final Plans and Specifications in accordance therewith (the *"Changes"*). Within ten (10) business days after receiving Tenant's request for any Change, Landlord shall give Tenant notice of the cost or savings, and any delay, that may be occasioned by such Change. If Tenant fails to authorize such Change within five (5) business days after receiving Landlord's notice, Tenant shall be deemed to have disapproved such Change.

(b) Tenant shall pay to Landlord the net reasonable additional third-party costs of Landlord's Work resulting directly and solely from the aggregate Changes (exclusive of any charges for overhead and profit, other than sums not exceeding 5% subcontractor profit and 5% general contractor profit thereon), taking into consideration any and all actual costs and savings resulting from all Changes, in the aggregate (including, without limitation, reasonable costs approved by Tenant in advance associated with any acceleration of the work schedule which Tenant, at its sole option, may require as well as reasonable third-party architectural and engineering costs pertaining to any Changes of a structural nature). Such payment shall be due and payable within thirty (30) days after Tenant's receipt of backup information reasonably supporting all such costs, including, without limitation, invoices, receipts and lien waivers of subcontractors and materialmen.

(c) Landlord shall pay to Tenant the net reasonable cost savings resulting from the aggregate Changes up to a maximum amount equal to ten percent (10%) of the total cost of Landlord's Work, taking into consideration all reasonable additional third-party costs of Landlord's Work directly and solely resulting from the Changes (exclusive of any charges for overhead and profit, other than sums not exceeding 5% subcontractor profit and 5% general contractor profit thereon). At Tenant's request, Landlord shall deliver to Tenant backup information reasonably supporting all such additional costs, including, without limitation, invoices, receipts, and lien waivers of subcontractors and materialmen. Such payment shall be due and payable within thirty (30) days after the Delivery Date.

(d) If the Changes occur during the preparation of any of the plans described in Section 3.2.1 above, then the deadlines for preparation and delivery of the plans then being prepared shall be extended as reasonably necessary to incorporate such Changes. If, despite Landlord's diligent efforts in performing Landlord's Work, the Changes cause a net delay in the Substantial Completion of Landlord's Work (taking into consideration any time reductions resulting from such changes), then: (i) the Rent Commencement Date shall be determined as if such delay had not occurred, (ii) the commencement of the Slack Period, and the dates set forth in clauses (a) and (b) of Section 3.3.2 below, shall be extended by the number of days of such net delay; and (iii) with respect to Changes requested after the Delivery Date Notice is given, for purposes of calculating liquidated damages under Subsection 2.3.2(b) above, the Delivery Date shall be extended by the number of days of such net delay.

Section 3.3  Performance of Work.

3.3.1  Both Landlord's Work and Tenant's Work shall be performed in a good and workmanlike manner, in compliance with all applicable Legal Requirements, utilizing only new, first-class materials, and in accordance with all insurance company requirements. Landlord shall perform Landlord's Work in a manner such that Tenant will be able to obtain

Tenant's Permits.  Landlord shall pay all impact fees and related governmental charges in connection with Landlord's Work and all other work performed by or on behalf of Landlord in connection with the Shopping Center.  If Tenant's Permits cannot be obtained because Landlord's Work has not been completed or has been performed improperly or by reason of any then existing condition of the Shopping Center, Landlord shall remedy the situation so as to enable Tenant to obtain Tenant's Permits, and the Delivery Date shall be deemed delayed, for Tenant's benefit only, on a day-for-day basis for each day of delay occasioned thereby.

        3.3.2  If: (a)  Landlord's Work has not been commenced (*i.e.*, if Landlord has not yet poured foundation footings for the Premises) by November 1, 2003, or (b)  the Delivery Date shall not have occurred by April 30, 2004 (subject to *Force Majeure*, not to exceed thirty (30) days in the aggregate, and provided that Landlord shall have given Tenant notice of such event of *Force Majeure* promptly after its occurrence), Tenant may thereafter, during such time as Landlord's Work has not been commenced or the Delivery Date has not occurred, as the case may be, consider Landlord to be in default hereunder and, at Tenant's option in its sole discretion, elect to:

        (i)      terminate this Lease, if Landlord shall fail to fully cure such default within thirty (30) days after receiving Tenant's notice thereof, in which event neither party shall have any further liability hereunder, <u>except</u>:  (i) for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease, and (ii) Landlord shall be obligated to promptly reimburse Tenant, as Tenant's sole monetary remedy by reason thereof, for all its reasonable third-party costs and expenses incurred in connection with this Lease (including, without limitation, costs associated with the preparation and review of plans and specifications, and the performance of Tenant's Work), not to exceed Fifty Thousand Dollars ($50,000); and/or

        (ii)      avail itself of the remedies set forth in Section 16.2 below (<u>provided</u>, <u>however</u>, that the cure period set forth therein shall not be applicable); and/or

        (iii)      extend one or more times the dates set forth in clauses (a) and/or (b) of this Subsection 3.3.2 to such future dates designated by Tenant in notice given to Landlord.

The election by Tenant of any one or more of the foregoing remedies shall not preclude the subsequent election of any alternative remedy provided in this Section, this Lease, at law, or in equity.

        3.3.3  <u>Landlord's Work Performed After Delivery of Possession</u>.   On or before the Delivery Date, Landlord's and Tenant's representatives together shall conduct a walk-through of the Premises to compile a punch list of the "Punch List Items" (hereinafter defined).  Tenant shall deliver to Landlord a copy of said punch list within five (5) days after the walk-through.  Landlord shall complete any Punch List Items within ten (10) days after it receives a copy of said punch list.  If Landlord fails to complete any item on said punch list within said 10-day period, Tenant shall have the right to complete such item(s) using its own contractors and receive reimbursement from Landlord for the reasonable costs and expenses thereof upon demand.  If reasonably required by Tenant, any portion of Landlord's Work which is performed after Tenant accepts physical possession of the Premises shall occur only "after hours", when neither Tenant nor any of its agents, contractors, employees and servants are working within the Premises, and Landlord shall reimburse Tenant for the reasonable costs and expenses incurred by Tenant by reason of such "after hours" performance of Landlord's Work.  As used herein, the term ***"Punch List Items"*** shall mean such minor items of a cosmetic nature which, when considered as a whole, do not adversely affect either the performance of Tenant's Work or Tenant's ability to conduct its normal business operations in the Premises.

        3.3.4  <u>Tenant's Right of Entry</u>.  Prior to the Delivery Date, Tenant may enter upon the Premises for the purposes of inspecting the work, taking measurements, making plans, erecting temporary or permanent signs and doing such other work as may be appropriate or desirable without being deemed thereby to have taken possession or obligated itself to pay Rent, <u>provided</u>, <u>however</u>, that Tenant shall not, during the course of such work, materially interfere with the performance of Landlord's Work and shall indemnify and hold Landlord harmless from and against any and all claims or losses arising from Tenant's entry upon the Premises, except to the extent caused by Landlord, its agents, employees, or contractors.

        3.3.5  Intentionally Omitted.

3.3.6  <u>Work Requirements After Delivery Date</u>.  Following the Delivery Date, any construction by Landlord or other tenants or occupants of the Shopping Center affecting any portion of the Shopping Center shall be subject to the following terms and conditions:

(a)  staging and storage of materials and parking of construction vehicles shall occur only within the portions of the Shopping Center designated as "Staging" on <u>Exhibit B</u> hereto;

(b)  Landlord shall diligently ensure that, from and after Tenant's opening for business to the public, no ingress, egress or passage of any construction, delivery and related vehicles engaged in the performance of such work or other construction activities shall take place except through the entrance/exit drive designated as the "Construction Drive" on <u>Exhibit B</u> hereto; and

(c)  Landlord shall maintain the Shopping Center in a clean, safe, and sightly condition, and shall use reasonable efforts to ensure that such construction shall not materially adversely interfere with the normal conduct of any business operations in the Premises.

3.3.7  <u>Tenant's Trailer</u>.  Landlord shall install a trailer for Tenant's exclusive use in conducting employee interviews and recruiting, in accordance with <u>Exhibit D</u> hereto, in the location shown on <u>Exhibit B</u> hereto.  Said trailer shall be installed and operational at least forty-five (45) days prior to the Delivery Date, and shall be removed within twenty (20) days (but not sooner than ten days) after the Delivery Date.

Section 3.4    <u>Measurement; Adjustment of Rent</u>.

3.4.1  <u>Measurement of Premises and Shopping Center</u>.  Within five (5) days after the completion of the first course of masonry for the exterior walls of the Premises and demising walls of the Premises (and at least ninety (90) days prior to the Delivery Date), Landlord shall deliver to Tenant a certification to Tenant by Landlord's licensed architect, surveyor or engineer of the interior clear dimensions and the Floor Area of the Premises, and the Floor Area of the Shopping Center, the measurements of which shall be subject to confirmation by Tenant's licensed architect, surveyor or engineer.  If Landlord shall fail so to deliver such certification to Tenant, Tenant shall have the right to have any of such measurements made and certified to Landlord by Tenant's licensed architect, surveyor or engineer.  If the interior clear dimensions and/or the Floor Area of the Premises vary from those shown on the Certified LOD (as may be modified by any applicable Changes), then Landlord shall correct such work to conform to the Certified LOD (as may be modified by any applicable Changes).

3.4.2  <u>Measurement of Storage Area/Mezzanine</u>.  Within five (5) days after the completion of the floor system for the mezzanine and the installation of the floor tracks for the walls enclosing it (but in all events at least sixty (60) days prior to the Delivery Date), Landlord shall deliver to Tenant a certification to Tenant by Landlord's licensed architect, surveyor or engineer of the Floor Area of each of said non-selling space(s), the measurements of which shall be subject to confirmation by Tenant's licensed architect, surveyor or engineer.  If the square footage of the non-selling space on the office mezzanine, varies from that shown on the Final Plans and Specifications, then, at Tenant's request, Landlord shall correct such work to conform to the Final Plans and Specifications.

3.4.3  <u>Adjustment of Fixed Rent and Tenant's Pro Rata Share</u>.  Subject to the foregoing provisions of this Section 3.4, if the measurement of the Premises shall indicate a Floor Area less than the Floor Area of the Premises set forth in Subsection 1.1.28 above, the Fixed Rent and any other applicable provision of this Lease (including, without limitation, Tenant's Pro Rata Share) shall be reduced to conform to the actual measurement, and Tenant shall receive a proportional refund of any Rent theretofore paid to Landlord.  If the measurement of the Premises indicates that the actual Floor Area of the Premises exceeds the Floor Area of the Premises set forth in Section 1.1.28 hereof (as same may be increased due to Changes under Section 3.2 above), neither Fixed Rent nor Tenant's Pro Rata Share shall be increased by reason thereof.  Landlord and Tenant shall each promptly execute and deliver to the other an amendment memorializing any change to the Fixed Rent, Tenant's Pro Rata Share, or any other applicable provisions of this Lease, made pursuant to this Section 3.4.  Any dispute between the parties with respect to the Floor Area of the Premises, the square footage of said non-selling space or the Floor Area of the Shopping Center shall be resolved by arbitration in accordance with the provisions of Section 16.3 below.

ARTICLE 4
FIXED RENT, TAXES: DETERMINATION AND PAYMENT

Section 4.1   Fixed Rent.   Commencing on the Rent Commencement Date and continuing throughout the Term, Tenant shall pay to Landlord the Fixed Rent, in equal successive monthly installments, in advance, on the first day of each and every calendar month throughout the Term, except that Fixed Rent payable for any partial calendar month during the Term shall be prorated based on a 365-day year.  Fixed Rent shall be paid without deduction or set-off, except to the extent otherwise expressly provided herein.

Section 4.2   Payment of Rent.   All Rent shall be mailed or otherwise delivered to Landlord's Mailing Address above or, upon at least thirty (30) days' prior notice to Tenant, to such other address as Landlord may from time to time designate.  Landlord acknowledges and agrees that for administrative purposes, Tenant has designated BBBY Management Corporation, a New York corporation (the **"Paying Agent"**),  to make all Rent payments due to Landlord under this Lease.  Said designation (which may be revoked by Tenant at any time) is not intended as, and shall not constitute, an assignment of any rights or obligations of Tenant to the Paying Agent, and Tenant shall remain primarily liable for payment of Rent under this Lease.  All payments of Rent received by Landlord from the Paying Agent shall be credited to Tenant as if such payments of Rent had been made by Tenant directly to Landlord.

Section 4.3   Real Estate and Other Taxes.

4.3.1   Landlord shall pay on or before the due dates thereof all "Taxes" (defined in Subsection 4.3.3 below) other than personal property taxes levied against tenants.  Throughout the Term, Landlord shall cause the Shopping Center to be maintained entirely within tax parcels and lots that exclude any property not a part of the Shopping Center.

4.3.2   (a)   Tenant shall pay to Landlord Tenant's Pro Rata Share of the Taxes which accrue during the Term, subject to the provisions of this Section 4.3.  Any Taxes for a real estate fiscal tax year, only a part of which is included within the Term, shall be adjusted between Landlord and Tenant on the basis of a 365-day year as of the Rent Commencement Date or the date on which the Term expires or earlier terminates, as the case may be, for the purpose of computing Tenant's Pro Rata Share of Taxes.  If, by law, any Taxes may, at the option of the taxpayer, be paid in installments (whether or not interest shall accrue on the unpaid balance thereof), Landlord shall exercise (or shall be deemed to have exercised) such option so as to maximize (or be deemed to have maximized) the number of installments, and Landlord shall pay the same (or be deemed to have paid the same) as they come due and before any fine, penalty, interest or cost may be added thereto for nonpayment thereof.

(b)   Landlord shall submit to Tenant a copy of the bill for Taxes issued by the applicable taxing authority, a computation of Tenant's Pro Rata Share of such Taxes and proof of the payment of Taxes for the previous payment period, as well as copies of all notices concerning assessments, tax rates, and changes thereto.  Tenant shall pay Landlord in the amount required by this Subsection 4.3.2 within thirty (30) days after receipt of such bill (but in no event earlier than the  fifteenth (15th) day prior to the date on which such Taxes would become delinquent).

4.3.3   As used herein, **"Taxes"** shall mean all general, *ad valorem* real estate taxes, and assessments for betterments and improvements that are levied or assessed by any lawful authority on the Shopping Center (general or special), including any substitution therefor, in whole or in part, due to a future change in the method of taxation.  Taxes shall be reduced by any deferral, abatement, or other tax-lowering adjustment received by Landlord from the taxing authorities.  For purposes of computing Tenant's Pro Rata Share of Taxes, Taxes shall not include any: (1) income, excise, profits, estate, inheritance, succession, gift, transfer, franchise, capital, or other tax or assessment upon Landlord or upon the rentals payable under this Lease; (2) taxes on rents (other than to the extent that such taxes are customarily paid by retail tenants in the state in which the Shopping Center is located), gross receipts or revenues of Landlord from the Premises; (3) fine, penalty, cost or interest for any tax or assessment, or part thereof, which Landlord or its lender failed to timely pay (except if same are caused by an Event of Default); (4) assessment for a public improvement arising from the initial construction or expansion of the Shopping Center or the Premises (it being agreed that all assessments imposed during the Term which are permitted to be included within Taxes hereunder shall, for the purposes of computing Tenant's Pro Rata Share thereof, be deemed to have been paid in the maximum number of installments permitted by the applicable taxing authority); (5) Taxes resulting directly from an increase in the assessment caused by a sale or ground lease of all or any portion of the Shopping Center to an Affiliate of Landlord or more than once every five (5) years; or (6) fees imposed upon Landlord in connection with Landlord's development of the Shopping Center (including, without limitation, trip generation fees).  All

Taxes payable by Tenant pursuant to this Section 4.3 shall be determined as if the Shopping Center was the only property owned by Landlord.  Landlord represents to Tenant that, as of the Effective Date and, to the best of Landlord's knowledge, as of the anticipated Delivery Date, no portion of the Shopping Center is or will be (i) subject to or the beneficiary of an abatement of Taxes, (ii) subject to any special assessments or similar charges, or (iii) are included in any special improvement district(s) which would result in higher sales taxes or other similar impositions than would exist in the absence of such district(s).

4.3.4   At Tenant's request, Landlord shall contest the amount or validity of any assessed valuation or Taxes, failing which, Tenant shall have the right to contest the assessed valuation or Taxes, at its own cost and expense (subject to the immediately following sentence), by appropriate proceedings conducted in good faith, whereupon Landlord shall cooperate with Tenant, execute any and all documents required in connection therewith and, if required by any governmental authority having jurisdiction, join with Tenant in the prosecution thereof.  If, as a result of any contest or otherwise, any rebate or refund of Taxes is received, Tenant shall be entitled to Tenant's Pro Rata Share thereof (after reasonable and customary expenses incurred by Landlord and/or Tenant in connection with such contest are paid to the party which incurred such expense).

## ARTICLE 5
## COMMON AREAS, THEIR USE AND CHARGES

Section 5.1   Common Areas: Maintenance.

5.1.1   Maintenance of Common Areas.  Landlord shall operate, maintain, repair and replace the Common Areas as required by this Lease and otherwise to the standard by which Common Areas of first-class shopping centers in the state in which the Shopping Center is located are operated, maintained, repaired and replaced, including, without limitation, snow, ice, rubbish and debris removal (including installation and maintenance of sidewalk refuse containers), landscaping (including, without limitation, the trimming and pruning of trees to avoid interference with the use or visibility of canopies or signs on the exterior of the Premises), adequate lighting, insurance, supervision, use, parking lot paving and striping, drainage, security (as reasonably required), and control of all Common Areas, and Landlord shall comply with all applicable Legal Requirements.

5.1.2   Tenant's Pro Rata Share of Common Areas Charges.

(a)   During the Term, Tenant shall pay to Landlord Tenant's Pro Rata Share of the reasonable costs (hereinafter referred to as the *"Common Areas Charges"*) paid by Landlord to operate, maintain, insure and repair the Common Areas.  Landlord shall be permitted to include in Common Area Charges (in lieu of any cost(s) or expense(s) relating to the administration and management of the Common Areas) for each calendar year an administrative fee (the *"Administrative Fee"*) equal to five percent (5%) of the Common Areas Charges for the calendar year in question, but excluding from the computation of such Administrative Fee the cost of any replacement or improvement of a capital nature (if such capital item is a permissible Common Areas Charge hereunder), the cost of electricity and other utilities, and the cost of insurance which Landlord is required to maintain under this Lease.  Tenant's Pro Rata Share of Common Areas Charges shall be paid in equal monthly installments on the first day of each calendar month, in advance, during each calendar year based on Landlord's reasonable budget.

(b)   Within sixty (60) days after the end of each calendar year, Landlord shall provide to Tenant a statement, in detail reasonably satisfactory to Tenant, of Common Areas Charges for such year, which statement shall be prepared in accordance with generally accepted accounting principles consistently applied (the *"CAC Reconciliation Statement"*).  The CAC Reconciliation Statement shall be certified by Landlord as being accurate and shall be accompanied by a calculation of Tenant's Pro Rata Share of Common Areas Charges, and payment to Tenant in the amount of any overpayment made by Tenant during the preceding calendar year.  If Tenant's Pro Rata Share of the actual Common Areas Charges for a calendar year shall exceed the aggregate monthly installments paid by Tenant during said calendar year, Tenant shall pay to Landlord the deficiency within sixty (60) days after receipt of such notice.  Upon Tenant's request, Landlord shall promptly deliver to Tenant copies of relevant backup materials (including, but not limited to, contracts, correspondence and paid invoices) reasonably required by Tenant.  If Landlord fails to timely remit to Tenant the amount of any overpayment hereunder, Tenant shall have the right (in addition to any rights and remedies to which it may be entitled under this Lease, at law, or in equity) to offset such amount from payments of Rent next becoming due hereunder, together with interest thereon at the Lease Interest Rate from the date such remittance is due until reimbursement or full

satisfaction by credit.  Notwithstanding any provision hereof to the contrary, in no event shall the Tenant's Pro Rata Share of Common Areas Charges with respect to the first full calendar year of the Term exceed $1.50 per square foot of Floor Area, and with respect to any other calendar year thereafter (exclusive of the costs of snow removal, insurance rate increases, and utility rate increases for the Common Areas during such calendar year) exceed one hundred five percent (105%) of the Tenant's Pro Rata Share of Common Areas Charges paid by Tenant for the immediately preceding calendar year (exclusive of the costs of snow removal, insurance rate increases, and utility rate increases, for the Common Areas during such calendar year).

5.1.3   Exclusions from Common Areas Charges.

(a)     Common Areas Charges shall not include: (1) the capital cost of any additions to the Common Areas pursuant to an expansion of the Shopping Center;  (2) the cost of any replacements or capital improvements to the Common Areas, except that the cost of repaving the parking areas of the Shopping Center may be included within Common Areas Charges so long as such cost is amortized on a straight-line basis over the useful life thereof under generally accepted accounting principles, and is not incurred (A) prior to the expiration of the fifth (5th) full calendar year of the Term, or (B) more than once during each five (5) full calendar years of the Term; (3) the cost of investigating, monitoring or remedying any environmental condition or "Hazardous Substances" or any other "Compliance Costs" (both as hereinafter defined in Subsection 12.4.1); (4) any debt service (including principal and interest) or payments of any judgments or other liens against Landlord; (5) the cost of maintaining, repairing or providing security for interior portions of buildings; (6) Taxes or other taxes levied or assessed against Landlord or the Shopping Center; (7) the cost of compliance with applicable Legal Requirements (including, without limitation, the cost of curing violations or contesting such Legal Requirements); (8) any costs resulting from insurance deductibles or any payments made under any self-insurance policy maintained by Landlord; (9) any costs which would have been reimbursed or paid for by insurance proceeds had Landlord maintained the insurance required under Section 10.3 hereof and the amount of any judgment or other charge entered or costs assessed against Landlord in excess of the policy limits of the insurance maintained by Landlord under Section 10.3 hereof); (10) those portions of Landlord's insurance premiums which are reimbursed to Landlord by any other tenant in the Shopping Center other than through the payment of such tenant's proportionate share of insurance premiums otherwise includable as part of Common Areas Charges; (11) sums paid or owed by Landlord to any tenant in the Shopping Center; (12) costs incurred in connection with the negotiation of leases with, or construction of improvements for, any tenant in the Shopping Center (including, without limitation, brokerage commissions and legal fees); (13) costs incurred in connection with lawsuits or other legal actions (including, without limitation, arbitrations and mediations) instituted or defended by Landlord; (14) sums incurred as late payment fees, penalties or interest; (15) ground rent; (16) depreciation except as expressly permitted pursuant to item 23 below; (17) costs disproportionately incurred by or on behalf of any one or more of the tenants in the Shopping Center (including, without limitation, all costs relating to the operation of any food court in the Shopping Center); (18) electricity costs for lighting Common Areas later than the "Normal Hours" hereinafter defined in Section 5.2, other than low-level security lighting; (19) Landlord's advertising, entertainment and promotional costs for the Shopping Center (including, without limitation, holiday decorations); (20) costs of acquiring, leasing, restoring, insuring or displaying sculptures, paintings and other objects of art located within or outside the Shopping Center; (21) costs and expenses payable to Landlord or its Affiliate, to the extent that such costs and expenses exceed competitive costs and expenses for materials and services by unrelated persons or entities of similar skill and experience; (22) repairs resulting from defects in the original construction of the Shopping Center arising within one (1) year after the Rent Commencement Date; (23) the cost of mechanized equipment for the maintenance of the Common Areas (but not the straight-line depreciation thereof over its useful life, as determined in accordance with generally accepted accounting principles); (24) reserves for anticipated future expenses; (25)  except for the Administrative Fee provided for in Subsection 5.1.2(a) above, any cost or expense relating to the administration and management of the Common Areas (whether on-site or off-site) including, but not limited to, overhead, management fees, office salaries and benefits, office rental, office supplies, dues and subscriptions, office utility charges, telephone charges and automobile expenses; (26) costs incurred in connection with the monitoring, maintenance, inspection, or testing of fire alarm systems; or (27) costs and expenses payable to Landlord, or its Affiliate or designee, for the provision of utility service(s) to the Common Areas, to the extent that such costs and expenses exceed competitive market rates.

(b)     In addition, if any tenant or other occupant of the Shopping Center (i) maintains the Common Areas in whole or in part, or any facilities therein, (ii) provides any services the cost of which would otherwise be includable in Common Areas Charges, and/or (iii) pays directly for costs which would otherwise be included in the Common Areas Charges, then the costs associated with or attributable to any of the foregoing shall be excluded from

Common Areas Charges, and the denominator used to determine Tenant's Pro Rata Share of such costs (and only such costs) shall be reduced by the Floor Area occupied by such tenant or other occupant.

(c) Common Areas Charges for any period during the Term which constitutes less than a full calendar year shall be equitably prorated.

5.1.4 <u>Tenant's Right to Audit</u>. Tenant shall have the right, within three (3) years after receiving any CAC Reconciliation Statement (and not more than once annually) to audit Landlord's books and records to verify Landlord's calculation of Common Areas Charges as reflected therein and Tenant's Pro Rata Share thereof. Upon Tenant's request, Landlord shall promptly deliver to Tenant copies of relevant backup materials (including, but not limited to, contracts, correspondence and paid invoices) reasonably required by Tenant. In the event of an error in Landlord's favor, Landlord shall refund the overcharge to Tenant within thirty (30) days after Tenant's demand therefor, and if the overcharge exceeds three (3%) percent of Tenant's Pro Rata Share of Common Areas Charges, Landlord shall pay to Tenant the reasonable expenses of the audit within thirty (30) days after Tenant's demand therefor, failing which, Tenant shall have the right (in addition to any rights and remedies to which it may be entitled under this Lease, at law, or in equity) to offset such amount from payments of Rent next becoming due hereunder, together with interest thereon at the Lease Interest Rate from the date such remittance is due until reimbursement or full satisfaction by credit. Landlord shall maintain all books and records pertaining to a calendar year for at least three (3) years after it delivers to Tenant a CAC Reconciliation Statement for such calendar year. Tenant shall keep the results of any such audit confidential, provided that nothing contained herein shall restrict Tenant from disclosing such information as may be required by applicable Legal Requirements, or to its accountants, attorneys or *bona fide* prospective assignees or subtenants (provided that each of such recipients shall be bound by the same non-disclosure provisions as are imposed upon Tenant). Any dispute by Landlord with respect to an audit by Tenant shall be submitted to arbitration in accordance with the provisions of Section 16.3 below.

5.1.5 In no event shall Tenant be required to join, participate in or contribute to any promotional fund, marketing fund or merchants' association.

Section 5.2 <u>Common Areas: Restrictions</u>.

5.2.1 <u>Continuous Access</u>. No entrances, exits, approaches and means of ingress and egress to, from, and/or within the Shopping Center or the Premises as shown on <u>Exhibit B</u> hereto shall be interrupted or disturbed by any act or omission of Landlord during the Term, except: (i) in the event of an emergency or as may be otherwise required by applicable Legal Requirements, in which event Landlord shall use reasonable efforts to give Tenant advance notice of same and to minimize interference to Tenant's normal business operations in the Premises as a result thereof; or (ii) in the event that Landlord is required to temporarily close the Common Areas, for the minimum time legally necessary, to prevent a dedication thereof or an accrual of any rights in any person or the public generally therein; <u>provided</u> that such closure shall not occur during August, November or December of any calendar year, and Landlord shall give Tenant at least thirty (30) days' prior notice thereof.

5.2.2 <u>No Alterations</u>. Landlord shall not, without obtaining Tenant's prior written consent in each instance, which consent may be withheld in its sole discretion: (i) alter the area of the Shopping Center or the location, availability, or size of any Common Area improvement from that shown on <u>Exhibit B</u> hereto; (ii) construct or permit to be constructed any structures in the Common Areas of the Shopping Center (including, without limitation, any buildings, kiosks, booths, signs or similar structures in the Common Areas, other than as shown on <u>Exhibit B</u> hereto; (iii) materially change the entrances or exits to and from the Shopping Center, or the curb cuts, roadways, drive aisles, sidewalks or other elements of the Common Areas, or the number, location or layout of parking spaces, from those shown on <u>Exhibit B</u> hereto. Landlord shall neither perform nor permit to be performed, any construction, repairs, replacements or maintenance to any portion of the Shopping Center, including the Premises (other than emergency repairs to utilities and Common Areas) during the months of August, November and December of any year, without the prior consent of Tenant, which consent may be withheld in Tenant's sole discretion.

5.2.3 <u>Outparcels</u>. In addition to the provisions of Subsection 5.2.2 above, during the Term, the following restrictions shall encumber and bind the outparcels (collectively, the *"Outparcels"* and individually, an *"Outparcel"*) designated on <u>Exhibit B</u> hereto as "Parcel 1," "Parcel 2," and "Parcel 3": (a) no more than one building shall be constructed on any Outparcel; (b) no building shall exceed one story in height; (c) no building shall exceed a maximum height of twenty-five feet (25') as measured from the finished floor level to the highest point on such building or structure (inclusive of the height of all types of projections or

architectural treatments or embellishments thereon, such as, but without limitation, HVAC equipment, parapets, mansards, signs, satellite dishes, and antennae); (d) the Floor Area of any building constructed on an Outparcel shall not exceed the Floor Area established therefor on Exhibit B hereto; and (e) all Legal Requirements relative to parking requirements for each Outparcel operation shall be complied with by providing the requisite number of parking spaces solely within the boundaries of such Outparcel, without reduction in such number by virtue of the granting of a variance or special exception.  For purposes of this Subsection 5.2.3, the Floor Area of any building constructed on an Outparcel shall also be deemed to include outdoor balconies, patios or other outdoor areas utilized for retail sales or food or beverage service (exclusive of drive through or walk-up take-out food or beverage service).  The provisions of Subsection 5.2.2 above and this Subsection 5.2.3 shall remain binding upon the Outparcels during the Term even in the event of a sale or other transfer of all or any of the Outparcels.

5.2.4   Parking Area.  During the Term, Landlord shall maintain in the Shopping Center, at a minimum, the greater of (i) the number of parking spaces required by applicable Legal Requirements, without variance, or (ii) five (5) ground-level parking spaces for every one thousand (1,000) square feet of Floor Area in the Shopping Center, with each such space being at least nine (9) feet in width and eighteen (18) feet in length.  Parking spaces shall at all times be clearly marked by painting, striping or otherwise.  Landlord shall not designate specific parking spaces for use by other tenants or occupants of the Shopping Center, nor shall Landlord permit any person or entity to use the parking areas other than Tenant, the other tenants and occupants of the Shopping Center, and their respective employees, agents, subtenants, concessionaires, licensees, customers, and invitees.  There shall be no charge whatsoever levied for the use of any parking areas within the Shopping Center.  Landlord shall not permit overnight parking in the Shopping Center.

5.2.5   Lighting.  Throughout the Term, Landlord shall keep the Common Areas fully lighted and open to the customers of the Shopping Center seven (7) days a week from dusk until 11:00 p.m. Monday through Saturday (or one hour after the last store in the Shopping Center has closed for the evening, if earlier) and until 7:00 p.m. on Sunday (or one hour after the last store in the Shopping Center has closed for the evening, if earlier) (**"Normal Hours"**).  Upon request of Tenant, Landlord shall keep the Common Areas lighted for as long after Normal Hours as Tenant shall request, provided Tenant shall pay for a share of the reasonable cost of said requested lighting, which share shall be equal to the product of (x) such cost, and (y) a fraction, the numerator of which shall be the number of square feet of Floor Area within the Premises and the denominator of which shall be the aggregate number of square feet of Floor Area of all premises within the Shopping Center (including the Premises) open later than Normal Hours (excluding, however, those tenants and occupants who separately control and pay for their own Common Area lighting).  In addition to the foregoing, Landlord shall provide for low level security lighting from one (1) hour after the close of business in the Premises until dawn.

5.2.6   Repairs.  During the Term, any construction or repair by Landlord permitted or required under this Lease and undertaken in the Common Areas or in any other portion of the Shopping Center shall:

(a)     not be performed during the months of August, November, or December of any year, except in the event of an emergency or as may be otherwise required by applicable Legal Requirements;

(b)     be commenced only upon at least five (5) days' prior notice to Tenant (except in an emergency, in which event Landlord shall only be required to give such notice as is reasonable under the circumstances); and

(c)     be performed in accordance with the requirements of Section 3.3.6 above and in such a manner so as not to materially interfere with the normal conduct of any business operations in the Premises.

5.2.7   Rules and Regulations.  Tenant shall comply with the rules and regulations of the Shopping Center as established from time to time by Landlord, within sixty (60) days after Landlord notifies Tenant thereof, provided they: (i) are reasonable, (ii) do not adversely affect the normal conduct of any business operations in the Premises, (iii) do not adversely affect any of Tenant's rights under this Lease, and (iv) are uniformly enforced against all tenants of the Shopping Center and without prejudice against Tenant.  In the event of any conflict between the provisions of this Lease and any rules or regulations, the provisions of this Lease shall prevail and govern.

5.2.8   Miscellaneous.

(a)   <u>No Promotional Use</u>.  Landlord shall not use or permit the use of all or any portion of the Common Areas for retail sales or for promotional purposes, except as and to the extent specifically permitted in the CC&Rs (defined in Section 12.5 below). Notwithstanding the foregoing provision, tenants of the Shopping Center (including Tenant) shall be permitted to conduct sidewalk sales in front of their respective stores only, provided that such sales shall: (A) be conducted in a manner consistent with sidewalk sales in first-class shopping centers in the state in which the Shopping Center is located, (B) not materially interfere with normal pedestrian access over the sidewalks, and (C) not materially interfere with the normal business operations of Tenant in the Premises or materially impair the visibility of Tenant's signage.  Landlord shall not permit any solicitation, distribution of handbills, picketing, or other public demonstration in the Common Areas, except as otherwise may be mandated by applicable Legal Requirements.

(b)   <u>Trash Compactor & Containers</u>.  Tenant shall be permitted to maintain and operate, at no extra charge: (i) a trash compactor in the portion of the Common Areas designated on <u>Exhibit B</u> hereto as "Trash Compactor Pad"; and (ii) a trash container(s) in the portion(s) of the Common Areas designated on <u>Exhibit B</u> hereto as "Trash Container Pad". Tenant, at its sole cost and expense, shall keep the trash compactor and containers neat and clean and repair any damage caused by use and storage of such compactor and containers.

(c)   <u>Shopping Carts</u>.  Tenant shall be permitted to store its shopping carts in such exterior cart corrals as may be reflected on <u>Exhibits B and D-1</u> hereto.  With respect to shopping carts provided by Tenant for the use of its customers, Tenant will use reasonable efforts to periodically remove same from the Common Areas.

(d)   <u>Cellular Towers</u>.  No transmission and/or reception towers for wireless telephonic or internet communications shall be permitted within the Shopping Center.

ARTICLE 6
UTILITIES

Section 6.1   <u>Utility Service</u>.  From and after the Delivery Date and continuing thereafter through the end of the Term, Tenant shall be solely responsible for and shall pay the cost of utilities services (including, without limitation, electricity, gas, water, sanitary sewer, alarm and telecommunications) consumed in the Premises by Tenant.  Tenant shall not be obligated to purchase utility service(s) directly from Landlord, or from any utility provider designated by Landlord.  Landlord shall provide separate utility meters exclusively serving the Premises, at its sole cost and expense (including, without limitation, all connection and hook-up fees).  Tenant's entry upon the Premises prior to the Delivery Date shall not constitute a waiver by Tenant of Landlord's obligation to pay the costs of all utility charges incurred in the Premises prior to the Delivery Date.  Landlord shall not permit the capacity of utility lines available for use at the Premises to be reduced or overloaded by any other persons or entities.  Landlord shall permit Tenant and its telecommunications provider full and free access to, and use of, available telecommunications conduits in the Shopping Center for the provision of telecommunications service to the Premises, subject to such reasonable requirements as Landlord may impose.

Section 6.2   <u>Interruption</u>.  Notwithstanding any provision of this Lease to the contrary, in the event utilities serving the Premises are disrupted due to the acts or omissions of Landlord, its agents, contractors, servants or employees, Landlord shall promptly restore the affected utilities at Landlord's sole cost and expense.  If the disrupted utilities are not restored within twenty-four (24) hours after the Landlord has knowledge of the disruption, and Tenant is unable to conduct its normal business in the Premises as a result thereof, Rent shall be equitably abated during the period of disruption.

ARTICLE 7
SIGNS

Section 7.1   <u>Tenant's Building Signage</u>.  Landlord shall supply and install signage (and obtain all permits and approvals therefor including any necessary sign variance) as part of Landlord's Work, but at Tenant's sole cost and expense, in accordance with <u>Exhibits D</u>, <u>D-1</u>, and <u>F</u> hereto, the CC&Rs and the additional provisions of this Lease.  Thereafter, Tenant shall have the exclusive right during the Term, at its sole cost and expense, to erect, maintain, and replace on the storefront and exterior walls of the Premises, and on the side walls of any entrance design element, if any, signs (including, without limitation, under-canopy or blade signs), banners (including temporary banners placed on the storefront of the Premises and such other walls of the Premises as selected by Tenant), awnings, and flags of such size, design and color as Tenant, from time to time, may desire, subject to compliance with

applicable Legal Requirements.  Tenant may erect and maintain in the interior of the Premises any signs it may desire, provided that same are professionally prepared.

Section 7.2    Pylon/Monument Signage.  Landlord shall provide pylons and monuments at the locations shown on Exhibit B hereto during the entire Term, and obtain all permits and approvals therefor.  Landlord, as part of Landlord's Work, shall obtain all governmental approvals and permits for, and shall procure, at Tenant's sole cost and expense, and install simultaneously with the installation of such pylons and monuments, Tenant's sign panel(s) on all sides of such pylons and monuments, in accordance with the provisions of Article 3 and Exhibits D and F hereto.  The dimensions of Tenant's pylon sign panel(s) shall be at least as large as those of other occupants of the Shopping Center, and shall be located in the second (2nd) position on the pylon, as shown on Exhibit F hereto.  In addition, if Landlord constructs or makes available to any other tenant or tenants in the Shopping Center any other signage located in the Common Areas, such signage shall also include Tenant's identification sign, as shown on Exhibit F hereto, which shall be at least as large as the largest sign made available to such other tenant or tenants and shall be in the second (2nd) position thereon. Landlord shall maintain all pylons and monuments, and Tenant's signs thereon, in good order and repair, and allow Tenant access to replace its signs thereon, at Tenant's cost and expense.  Landlord shall not change or alter the location, structure, height or general appearance of the pylons or monuments without obtaining Tenant's prior consent.  The cost of maintaining all pylons and monuments bearing Tenant's sign panel(s) [but not the cost of individual tenants' signs thereon or the cost of the construction of the pylons and monuments] and the cost of any electricity used to illuminate them, shall be includable in Common Areas Charges.  If the top position on the pylon sign, as shown on Exhibit F, is occupied by another tenant's sign panel, then upon the expiration or earlier termination of such other tenant's lease, Tenant shall have the right to relocate its pylon sign panel to the top position on the pylon sign, at Tenant's sole expense.

Section 7.3    Signage: Alteration/Removal/Allocation.  Tenant shall have the right, from time to time, without Landlord's approval, to change its signs on the storefront and exterior of the Premises, as well as on any pylon or monument, provided that the area of the new sign is no larger than the area of the sign which it replaces and that the method of construction and attachment is substantially the same, and provided further that Tenant shall, at its sole cost, repair any damage caused by any such change or removal of signage on the part of Tenant. Upon the expiration or earlier termination of the Lease, Tenant shall remove its signs from the fascia or other exterior walls of the Premises and from any pylon or monument, and shall repair any damage occasioned thereby.  The signage rights granted to Tenant pursuant to this Article 7 shall, at Tenant's option, be allocated to or between Tenant and/or any subtenant(s) of all or any portion of the Premises.  All signage installed by Landlord and Tenant hereunder shall comply with applicable Legal Requirements.

Section 7.4    Cooperation.  Landlord, upon request, shall execute any consents or applications which may be required by applicable Legal Requirements to permit the placement, installation, and/or replacement by Tenant of any signs on any part of the Premises or on any pylon or monument, to which Tenant may be entitled under this Lease.

Section 7.5    Signage Restrictions and Criteria.

7.5.1    During the Term, no exterior identification signs attached to any building of the Shopping Center shall be of the following type: (i) flashing, moving or audible signs; (ii) signs employing exposed raceways, exposed neon tubes, exposed ballast boxes, or exposed transformers, provided that Tenant shall have the right to employ any methods necessary for the installation of internally illuminated self-contained channel letters; or (iii) paper or cardboard signs other than professionally prepared interior window signs advertising special sales within the subject premises,  temporary signs (exclusive of contractor signs), stickers or decals, provided, however, the foregoing shall not prohibit the placement at the entrance of each such premises of (A) small stickers or decals which  indicate hours of business, emergency telephone numbers, credit cards accepted, and other similar information, and/or (B) a sticker or decal which contains the phrase "no solicitation" or words of like import. No billboard signs shall be permitted within the Shopping Center.

7.5.2    Landlord shall not permit any obstructions (including, without limitation, any trees, bushes or other landscaping, scaffolding or architectural details) to obscure Tenant's storefront, storefront signs or other exterior wall signs or any pylons, monuments or other freestanding signs.  No premises in the Shopping Center containing less Floor Area than the Floor Area of the Premises shall have: (i) building signage possessing more total square footage than the total square footage available for use by Tenant, or a maximum height greater than the maximum height of Tenant's building signage, as measured from the finished floor

level to the highest point on such signage, or (ii) a building and entrance design element higher or wider than the height or width of the building and entrance design element of the Premises.

ARTICLE 8
ALTERATIONS AND IMPROVEMENTS

Section 8.1    <u>Alterations and Improvements</u>.

8.1.1    Tenant shall not perform any structural or exterior alterations or structural or exterior improvements to the Premises (except to the extent same pertain to Tenant's Work) without the prior approval of Landlord, provided, however, that Tenant's alteration of the exterior of the Premises to conform to Tenant's then-current prototypical elevation shall not require Landlord's consent.  All work performed by Tenant in connection with structural and non-structural alterations or improvements shall be done at Tenant's sole cost and expense, in a good and workmanlike manner and in compliance with all applicable Legal Requirements.  The provisions of this Section 8.1 shall not apply to Tenant's building signage, which shall be governed by the applicable provisions of Article 7 above.

8.1.2    Tenant may, from time to time, at its sole cost and expense, without the prior approval of Landlord, make non-structural alterations and non-structural improvements to the interior of the Premises as Tenant deems necessary or desirable, including, but not limited to, electrical systems, heating, ventilation and air conditioning and other mechanical systems, installation of fixtures and equipment, painting, and wall and floor coverings.

8.1.3    Tenant shall have the right to subdivide the Premises into two (2) or more separate stores, each of which may have its own front entrance and access to the loading docks in the rear of the Premises, as well as separately sub-metered utilities.  Nothing in the foregoing sentence shall be deemed to waive Tenant's obligation to comply with Subsection 8.1.1above if any such subdivision involves any structural or exterior alterations or structural or exterior improvements to the Premises.  In addition, even if any such subdivision does not involve any structural or exterior alterations or structural or exterior improvements to the Premises, Tenant shall nevertheless furnish Landlord with a copy of any plans or drawings relating thereto for informational purposes only (and not for the purpose of affording Landlord any approval rights).

8.1.4    Tenant shall have the right to erect and maintain an antenna and a satellite dish on the roof of the Premises, provided that Tenant: (i) obtains Landlord's prior approval of its plans for the installation of such equipment, (ii) uses a contractor designated or approved by Landlord for all roof penetrations so as not to violate or invalidate any roof warranties maintained by Landlord, (iii) maintains the area where roof penetrations are made while Tenant's equipment is present, (iv) repairs any damage to the roof caused by the making of the roof penetrations, including, but not limited to, the repair of the roof penetrations upon the removal of any equipment installed thereon, and (v) erects and maintains such equipment in accordance with applicable Legal Requirements and any applicable provisions of the CC&Rs.  Landlord, as part of Landlord's Work, shall obtain all permits and approvals for Tenant's installation of the antenna specified in the Final Plans and Specifications.

8.1.5    Landlord shall execute and return to Tenant all appropriately completed building department or equivalent applications within ten (10) days after Tenant's request therefor, and will reasonably cooperate with Tenant in the permitting process.

8.1.6    If any violation of any applicable Legal Requirement which is noted against the Shopping Center or the Premises (other than a violation caused by Tenant) prevents Tenant from obtaining a building permit for any alterations or a certificate of occupancy, then, upon request by Tenant, Landlord shall promptly and diligently cause such violation to be removed of record to the extent required to permit Tenant to obtain its building permit or certificate of occupancy, as the case may be.

8.1.7    Landlord shall not make any alterations to the Premises (including, without limitation, changing the design, color or materials of the exterior of the Premises) nor shall Landlord construct an additional floor or floors above the Premises without the prior consent of Tenant in its sole discretion.  Landlord shall neither make nor permit to be made any alterations to the exterior architectural theme of the remainder of the Shopping Center which would be inconsistent with a first-class shopping center in the state in which the Shopping Center is located (exclusive of other tenants' entrance features) without the prior consent of Tenant.

ARTICLE 9
REPAIRS

Section 9.1    Tenant's Repairs.  Subject to the provisions of Articles 10 and 11 hereof, and except as otherwise provided in Section 9.2 below, Tenant shall maintain in good condition and repair, at its sole cost and expense: (i) the non-structural, interior elements of the Premises (including plate glass, and the electrical, plumbing, mechanical, and/or alarm systems located in, or serving, exclusively the Premises); and (ii) the heating, ventilation and air conditioning (*"HVAC"*) units exclusively serving the Premises.  All repairs and replacements on Tenant's part to be performed hereunder shall be at Tenant's sole cost and expense, and performed in a good and workmanlike manner in accordance with all applicable Legal Requirements.

Section 9.2    Landlord's Repairs.  Subject to the provisions of Article 10 and 11 hereof, Landlord shall perform, as the same shall from time to time be necessary, all repairs and replacements to the following:

(a)     the buildings of the Shopping Center as necessary to maintain same in good condition and repair (including, without limitation, repainting the exterior walls of the buildings of the Shopping Center (including, without limitation, the Premises)) as same may be reasonably required from time to time during the Term;

(b)     the structural elements of the Premises, which shall be deemed to include, without limitation, the roof joists, columns, footings, foundation, exterior walls (including, without limitation,  repainting, but excluding plate glass, storefront windows, doors, door closure devices, window and door frames, molding, locks and hardware, and painting or other treatment of interior walls), floor (but not the floor covering, unless the same is damaged as a result of a floor defect or settling), and the structural elements of any building of which the Premises may be a part;

(c)     the roof, gutters, flashings, downspouts and scuppers;

(d)     the electric, gas, water, sanitary sewer, and other public utility lines serving the Premises, to the point of connection to the Premises;

(e)     all electric, gas, water, sanitary sewer, and other public utility lines and ducts in or passing through the Premises which do not exclusively serve the Premises; and

(f)     the non-structural elements of the Premises (including, without limitation, the HVAC units and the electrical, plumbing, mechanical, and/or fire alarm systems located in or serving the Premises) until the first (1st) anniversary of the Delivery Date, and thereafter for such period of time and to the extent any such non-structural elements are covered by any contractors', manufacturers', vendors', or insurers' warranties or guarantees; and

(g)     any damage to the Premises or the Shopping Center which is occasioned by (A) the act or omission of Landlord, its employees, agents or contractors, or (B) any breach by Landlord of any provision of this Lease.

All repairs and replacements on Landlord's part to be performed hereunder shall be at Landlord's sole cost and expense (and not includable in Common Areas Charges), performed in a good and workmanlike manner in accordance with all applicable Legal Requirements, and without material interference with or disruption to the normal conduct of any business operations in the Premises.  Landlord shall give Tenant at least five (5) days' prior notice of any repairs or replacements to, or which would otherwise affect the normal conduct of any business operations in, the Premises (except in the case of an emergency posing imminent risk of material harm to persons or property, in which event Landlord shall only be required to give such notice as is reasonable under the circumstances).  If, in Tenant's reasonable judgment, Landlord's repairs would materially interfere with or disrupt the normal conduct of any business operations in the Premises, Landlord shall perform such repairs only after the regular hours of operation of Tenant and any other occupant of the Premises (or any portion thereof), and Landlord shall reimburse Tenant for the reasonable costs and expenses incurred by Tenant in connection with such "after hours" repairs, including, without limitation, utilities charges and security expenses.  In the event Landlord does not reimburse Tenant for any amounts payable to Tenant hereunder within ten (10) days after Tenant's demand therefor, Tenant shall have the right (in addition to any rights and remedies to which it may be entitled under this Lease, at law, or in equity) to offset such amounts against Rent, together with interest thereon at the Lease Interest Rate from the date of outlay until reimbursement or full satisfaction by credit.

Section 9.3    <u>Legal Compliance Work</u>.  Except as hereinafter expressly provided, Landlord shall be responsible, at its sole cost and expense (and not includable in Common Areas Charges), for performing all "Legal Compliance Work" (hereinafter defined). Notwithstanding the foregoing, Tenant shall be responsible, at its sole cost and expense, for the performance of Legal Compliance Work: (a) pertaining to the interior elements of the Premises which are neither structural nor comprise the major building systems serving the Premises; or (b) required solely as a result of Tenant's specific manner of use of the Premises (*i.e.*, are not of general applicability to tenants and occupants of the Shopping Center); <u>provided</u>, <u>however</u>, that the foregoing shall not relieve Landlord of its obligations to perform: (x) Landlord's Work in accordance with all Legal Requirements, and (y) the repairs required in this Lease.  As used herein, **"Legal Compliance Work"** shall mean any obligation, addition, alteration, improvement, or rebuilding, structural or otherwise, to or of the Premises, the Shopping Center, or any part thereof, as applicable, which may be required by reason of any Legal Requirement.

ARTICLE 10
INDEMNIFICATION, INSURANCE AND WAIVER OF SUBROGATION

Section 10.1    <u>Mutual Release, Waiver of Subrogation and Mutual Indemnification</u>.

10.1.1 <u>Mutual Waiver of Claims</u>.  Landlord and Tenant, on their own behalf and on behalf of anyone claiming under or through either one by way of subrogation, hereby release and waive all rights of recovery and causes of action against each other from any and all liability for any loss or damage to property or resulting from damage to such property (and, in either case, any resulting loss of business or rental income), whether caused by the negligence or fault of the other party, which is normally insured under Special Form property insurance (formerly known as "all-risk") and time element insurance required to be maintained hereunder. In the event either Landlord or Tenant is a self-insurer or maintains a deductible (as either may be permitted hereunder), then the self-insuring party or the party maintaining the deductible hereby releases the other party from any liability arising from any event which would have been covered had the required insurance been obtained and/or the deductible not been maintained.

10.1.2 <u>Waiver of Subrogation</u>.  Landlord and Tenant shall cause each property insurance policy carried by either of them insuring the Premises, the contents thereof, or the Shopping Center, to provide that the insurer waives all rights of recovery by way of subrogation or otherwise against the other party hereto in connection with any loss or damage which is covered by such policy or that such policy shall otherwise permit, and shall not be voided by the releases provided above.

10.1.3 <u>Mutual Indemnification</u>.

(a)    Except as otherwise provided in Subsections 10.1.1 and 10.1.2 above, Tenant covenants to defend and indemnify Landlord and hold Landlord harmless from and against any and all claims, actions, damages, liability and expense, including reasonable attorneys' fees, (x) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon the Premises, or any part thereof, or (y) occasioned wholly or in part by any act or omission of Tenant, its agents, contractors, employees, servants, or licensees, <u>except</u> to the extent such claims, actions, damages, liability and expense are caused by the acts or omissions of Landlord, its agents, contractors, licensees, employees, or other tenants and occupants, or for which any of said parties may be statutorily liable.

(b)    Except as otherwise provided in Subsections 10.1.1 and 10.1.2 above, Landlord covenants to defend and indemnify Tenant and hold Tenant harmless from and against any and all claims, actions, damages, liability and expense, including reasonable attorneys' fees, (x) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon any portion(s) of the Shopping Center (excluding the Premises), or (y) occasioned wholly or in part by any act or omission of Landlord, its agents, contractors, employees, servants, tenants (other than Tenant), occupants or licensees, <u>except</u> to the extent such claims, actions, damages, liability and expense are caused by the acts or omissions of Tenant, its agents, contractors, licensees or employees, or for which any of said parties may be statutorily liable.

Section 10.2    <u>Tenant's Insurance</u>.

10.2.1 <u>Tenant's Insurance</u>.  Tenant, at its own cost and expense, shall maintain in full force and effect from and after the Delivery Date and throughout the Term: (i) commercial general liability insurance protecting and insuring Tenant, naming Landlord as "additional insured-lessor" for claims arising out of the use or occupancy of the Premises by Tenant and the obligations assumed by Tenant under this Lease, and having a combined single limit of

liability of not less than Five Million Dollars ($5,000,000) for bodily injury, death and property damage liability; and (ii) Special Form (formerly known as "All-Risk") property insurance, on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of all of Tenant's Property.  Tenant may carry any of its insurance under "blanket policies" covering the Premises and other locations it or any Affiliate of Tenant owns or leases, provided that: (i) the amount of the total insurance available shall be at least the protection equivalent to separate policies in the amounts herein required, and (ii) in all other respects, any such policy or policies shall comply with the applicable provisions of this Article 10.

10.2.2  Self-Insurance.  All insurance required to be maintained under this Section 10.2 may be provided under: (i) an individual policy covering this location; (ii) a blanket policy or policies which includes other liabilities, properties and locations of Tenant or its Affiliates; (iii) a plan of self-insurance, provided that Tenant or any guarantor of Tenant's obligations under this Lease maintains, during the period of such self-insurance, a net worth of at least Fifty Million Dollars ($50,000,000); or (iv) a combination of any of the foregoing insurance programs.  To the extent any deductible is permitted or allowed as a part of any insurance policy carried by Tenant in compliance with this Section 10.2, then Tenant shall be deemed to be covering the amount thereof under an informal plan of self-insurance; provided, however, that in no event shall any deductible exceed Two Hundred Fifty Thousand Dollars ($250,000) unless Tenant complies with the requirements regarding self-insurance pursuant to clause (iii) above.

Section 10.3  Landlord's Insurance.

10.3.1  Liability Insurance.  Landlord shall maintain in full force and effect on and after the Effective Date and throughout the Term commercial general liability insurance with regard to the Common Areas protecting and insuring Landlord, naming Tenant as "additional insured-lessee", and having a combined single limit of liability of not less than Five Million Dollars ($5,000,000) for bodily injury, death and property damage liability.  Landlord shall have the right to carry its insurance under "blanket policies" covering the Shopping Center and other properties provided that: (i) the amount of the total insurance available shall be at least the protection equivalent to separate policies in the amounts herein required, and (ii) in all other respects, any such policy or policies shall comply with the applicable provisions of this Article 10.

10.3.2  Special Form Property Insurance.  Landlord shall procure and maintain in full force and effect on and after the Effective Date and throughout the Term, Special Form (formerly known as "All-Risk") property insurance (including loss of rents for a minimum period of one (1) year) and endorsements for coverages for flood, earthquake, windstorm, earth movement, sinkholes, demolition, increased cost of construction and contingent operation of building laws coverages,  on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of all of the buildings (including the Premises) and other insurable improvements in the Shopping Center; provided, however, in no event shall such insurance cover Tenant's Property, and provided further that Landlord shall not be required to maintain endorsements for coverage of flood or earthquake unless such endorsements shall then be reasonable and customary for similar facilities of like size and operation in accordance with generally accepted insurance industry standards.  All policies required to be maintained by Landlord pursuant to this Subsection 10.3.2 shall provide that any proceeds thereof shall be deposited with Landlord's Mortgagee, or if none, to Landlord, in either event to be held in trust by such party and disbursed only in accordance with the provisions of, and for the purposes set forth in, Section 11.1 hereof.  The property insurance required to be maintained by Landlord pursuant to this Section shall not have deductibles exceeding One Hundred Thousand Dollars ($100,000) without Tenant's prior consent.

10.3.3  Tenant's Pro Rata Share of Insurance Premiums. Tenant shall reimburse Landlord for Tenant's Pro Rata Share of the reasonable insurance premiums attributable to the policies required to be maintained by Landlord pursuant to this Section 10.3 as part of Common Areas Charges.  If the rates for any insurance Landlord is required to carry hereunder are increased as a result of the use or other activity of any other occupant of the Shopping Center, the amount of such increase shall be excluded from Common Areas Charges.  To the extent that Landlord receives a dividend, credit, rebate or other return of a premium which had previously been included in Common Areas Charges, Landlord shall promptly refund Tenant's Pro Rata Share of such dividend, credit, rebate, or return to Tenant.  Tenant's Pro Rata Share of any insurance premium for any period during the Term which constitutes less than a full calendar year shall be equitably prorated.  The provisions of this Subsection 10.3.3 shall survive the expiration or earlier termination of this Lease.

Section 10.4    General Insurance Requirements.

10.4.1 All insurance required to be maintained by the parties under this Lease shall be maintained with insurance companies qualified to do business in the state in which the Shopping Center is located, and rated at least A-/VIII by the most current Best's Key Rating Guide (or its equivalent, if such Guide ceases to be published). Each party shall use its diligent efforts to have its insurers provide thirty (30) days [ten (10) days in the event of non-payment of premium] prior notice to the other party of cancellation or non-renewal of any policy required hereunder. Each party shall provide to the other duly executed certificates evidencing the insurance coverage described in Sections 10.2.1 and 10.3 above.

10.4.2 The liability insurance requirements under Sections 10.2 and 10.3 above shall be reviewed by Landlord and Tenant every five (5) years for the purpose of mutually increasing (in consultation with their respective insurance advisors) the minimum limits of such insurance to any higher limits which shall then be reasonable and customary for similar facilities of like size and operation in accordance with generally accepted insurance industry standards. The replacement value of the buildings and other insurable improvements constituting the Shopping Center shall be re-evaluated from time to time at the request of either Landlord or Tenant.

ARTICLE 11
FIRE AND OTHER CASUALTY; EMINENT DOMAIN

Section 11.1    Fire and Other Casualty.

11.1.1 (a)    Except as otherwise provided in this Section 11.1, if all or a portion of the Premises, the Common Areas (including all improvements thereto) or other buildings in the Shopping Center shall be damaged by fire or other casualty, Landlord shall promptly rebuild and restore the same to the condition existing immediately prior to such fire or other casualty, which restoration shall include all Tenant's Work and all other leasehold improvements performed by Tenant, but shall not include any of Tenant's Property. The proceeds of the policies required to be obtained and maintained by Landlord pursuant to Subsection 10.3.2 hereof shall, to the extent necessary, be used for the performance of such rebuilding and restoration work. In the event such insurance proceeds are insufficient to complete such work, Landlord shall provide the balance of the amount necessary to rebuild or restore the Shopping Center in the manner provided in this Section 11.1.

(b)    Notwithstanding the foregoing, if any portion of the Premises are so damaged or destroyed, Tenant shall have the right to require Landlord to make changes to the Premises in the course of, and as part of, such rebuilding or restoration work. If the net cost and expense of such rebuilding or restoration work is increased solely as a result of such changes (taking into consideration any and all actual reduced and additional costs resulting from such changes and/or cost savings arising therefrom), then Tenant shall pay to Landlord, as Additional Rent, the amount of such net increase, which amount shall be due and payable within thirty (30) days after Landlord has delivered to Tenant backup information evidencing such increase (including, without limitation, receipted invoices) as may be reasonably required by Tenant (but in no event earlier than the occurrence of the date on which possession of the restored areas of the Premises are delivered to Tenant). To the extent that Landlord's substantial completion of such rebuilding or restoration work is delayed solely as a result of such changes (taking into consideration any and all reasonable time savings to Landlord resulting from such changes), then the applicable period(s) specified in Section 11.1.2 below shall be appropriately adjusted to the extent of such net delay.

(c)    If, in Tenant's reasonable judgment, any damage to the Premises renders all or any portion of the Premises unusable for the conduct of Tenant's business or, in the case of damage to the Shopping Center, materially interferes with the normal conduct of any business operations in the Premises, the Rent shall be equitably reduced or totally abated based upon the extent to which the remaining portion of the Premises may, in Tenant's reasonable judgment, be utilized for its normal conduct of business.

11.1.2 In the event that:

(a)    Landlord does not commence the repair and restoration work to the Premises, the Common Areas, or other buildings in the Shopping Center as required pursuant to this Section 11.1 within ninety (90) days after the date of such destruction, or thereafter fails to diligently pursue the completion of such repair and restoration work (subject to such period as may be reasonably

necessary for the adjustment of insurance proceeds, not to exceed thirty (30) days in the aggregate); or

(b)    the required repairs and restorations to the Premises, the Common Areas, or other buildings in the Shopping Center are not Substantially Completed by Landlord in accordance with the provisions of this Section 11.1 within one (1) year after the date of destruction (which period may be extended by reason of an event of *Force Majeure*, not to exceed sixty (60) days in the aggregate, provided that Landlord shall have given Tenant notice thereof promptly after its occurrence),

then, in either of such events, Tenant shall have the right, at its sole discretion and option, to:

(i)    after giving thirty (30) days' prior notice to Landlord (and Landlord's continued failure to commence and diligently pursue such repairs and restoration work to completion), perform or complete, as the case may be, said work (or any portion thereof) on Landlord's behalf and at the sole cost of Landlord, which cost Landlord shall pay to Tenant during the course of such repairs within ten (10) days after Tenant's delivery to Landlord of an invoice therefor and, in default of any such payment, Tenant shall have the right to offset the amount thereof, together with interest at the Lease Interest Rate, against the Rent next accruing hereunder (it being agreed, without limiting the foregoing provisions of this Subsection 11.1.2, that at Tenant's election all insurance proceeds paid or payable to Landlord or Landlord's Mortgagee pursuant to Subsection 10.3 hereof shall be paid (or, as applicable, in turn delivered) directly to Tenant, to be applied to such work by Tenant as same is being performed); or

(ii)    seek to obtain specific performance of Landlord's repair and restoration obligations pursuant to the laws of the state in which the Shopping Center is located; or

(iii)    terminate this Lease by thirty (30) days' notice to Landlord.

In addition to the foregoing, if, in the opinion of an independent licensed architect designated by Tenant (and reasonably acceptable to Landlord), the required repairs and restorations to the Premises, the Common Areas or other buildings in the Shopping Center cannot be completed by Landlord in accordance with the provisions of this Section 11.1 within one (1) year after the date of destruction, Tenant shall have the right, at its sole discretion and option, to terminate this Lease by giving Landlord at least thirty (30) days' notice thereof.

11.1.3 If the Premises are substantially destroyed by fire or other casualty during the last three (3) years of the Term to the extent of more than one-third (1/3) of the Floor Area thereof, Landlord or Tenant shall each have the right to terminate this Lease as of the date of such damage or destruction by giving notice within thirty (30) days following such damage or destruction, but Tenant may negate any termination by Landlord by agreeing to extend the Term for an additional five (5) year period by exercising an option pursuant to Subsection 2.2.2 hereof, if available, within ten (10) days after receipt of the termination notice from Landlord.

Section 11.2    Eminent Domain.

11.2.1 As used in this Section 11.2, **"Taking"** or **"Taken"** shall mean a taking for any public or quasi-public use by any lawful power or authority by exercise of the right of condemnation or eminent domain or by agreement between Landlord and those having the authority to exercise such right.

11.2.2 If all of the Premises shall be Taken, this Lease shall terminate as of the date of vesting of title or transfer of possession, whichever is earlier, without further liability on the part of either Landlord or Tenant, except for an adjustment between the parties for the Rent payable by Tenant hereunder.

11.2.3 In the event that:

(a)    any portion of the Premises shall be Taken so that it is commercially unreasonable or unfeasible for Tenant, in its reasonable judgment, to conduct its normal business in the Premises;

(b)    as a consequence of any Taking: (i) portions of the Shopping Center shall be divided or separated in any manner that it materially interferes with parking, visibility, or access to the Premises from other portions of the

Shopping Center, or (ii) the Shopping Center no longer has both of the entrances from Telegraph Street (Old Highway 91) and as a result, it is not commercially reasonable or feasible for Tenant, in its reasonable judgment, to conduct its normal business in the Premises;

(c)     there occurs, in Tenant's reasonable judgement, a denial of adequate access to the Shopping Center at the grade of any street adjoining the Shopping Center or to any easement granted under this Lease, whether or not a Taking shall have occurred;

(d)     any portion of the Shopping Center shall be Taken which materially interferes with parking, visibility or access to the Premises, and as a result of such taking it is commercially unreasonable or unfeasible for Tenant, in its reasonable judgment, to conduct its normal business in the Premises;

(e)     more than twenty-five (25%) percent of the total Floor Area of all of the buildings in the Shopping Center (other than the Premises) are Taken; or

(f)     five (5%) percent or more of the parking spaces located in the Shopping Center are Taken, or if so many of the parking spaces in the Shopping Center are Taken such that there are fewer than (i) four and one-half (4.5) parking spaces for every one thousand (1,000) square feet of Floor Area in the Shopping Center, or (ii) the number of parking spaces required by applicable Legal Requirements;

then, in any of such events, Tenant shall have the right to terminate this Lease by giving at least sixty (60) days' prior notice to Landlord within sixty (60) days of any such event, in which event this Lease shall terminate without any further liability on the part of either Landlord or Tenant, except for an adjustment between the parties for the Rent payable by Tenant hereunder and for payment to Tenant for its share of the award for the taking pursuant to Subsection 11.2.5 below.  Upon any partial Taking of the Premises, the Rent shall be equitably reduced or totally abated based upon the extent to which the remaining portion of the Premises may, in Tenant's reasonable judgment, be utilized for its normal conduct of business.

11.2.4  If this Lease is not terminated pursuant to this Section 11.2, Landlord, at its sole cost and expense, within a reasonable period of time after such Taking, shall repair and restore the area not so Taken to tenantable condition, similar in physical appearance to the condition of the area immediately prior to the Taking, pursuant to plans and specifications approved by Tenant (which repair and restoration shall, as applicable, include all Tenant's Work and all other leasehold improvements performed by Tenant; provided, however, that Landlord shall not be obligated to repair or restore Tenant's Property), and any and all amounts awarded to Landlord for any Taking shall be made available to and used by Landlord for any rebuilding or restoration which it is required to perform hereunder.  During the period of such repairs and restoration, all Rent shall abate to the extent that the Premises may not, in Tenant's reasonable judgment, be used by Tenant for the normal conduct of its business.  Such abatement shall terminate in accordance with the terms of Section 11.3 below.

11.2.5  In connection with any Taking or partial Taking of the Premises, Tenant shall be entitled to claim an award for loss of business, leasehold improvements, fixtures and equipment and removal and reinstallation costs; provided, however, that no award shall be payable to Tenant which reduces the award payable to Landlord for its fee interest in the Premises.

11.2.6  Any dispute between the parties with respect to this Section 11.2 shall be resolved by arbitration in accordance with the provisions of Section 16.3 below.

Section 11.3    Abatement of Rent Charges.  Notwithstanding any other provisions of this Lease, if the Fixed Rent and Additional Rent payable by Tenant hereunder shall be abated pursuant to Sections 11.1 or 11.2 above, such abatement shall terminate upon the first to occur of: (a) the date on which Tenant shall reopen the Premises to the general public for business; or (b) the expiration of the period which is : sixty (60) days after Landlord shall have completed such repairs and restoration work as Landlord is obligated to perform hereunder and the interference with the operation of business in the Premises has ceased.

ARTICLE 12
COVENANTS, REPRESENTATIONS AND WARRANTIES

Section 12.1    Quiet Enjoyment.  Tenant shall peaceably and quietly have, hold, occupy and enjoy the Premises for the Term, without hindrance from Landlord or any party claiming by, through, or under Landlord.

Section 12.2    Authority.  Tenant and Landlord each warrant and represent that the person(s) signing this Lease on their behalf has authority to enter into this Lease and to bind Tenant and Landlord, respectively, to the terms, covenants and conditions contained herein.  The submission of this Lease to each party hereto shall be for examination and negotiation purposes only, and does not and shall not constitute a reservation of or an obligation of Tenant to lease, or otherwise create any interest of Tenant in, the Premises or any other premises situated in the Shopping Center unless and until the Lease is fully executed and delivered by Tenant and Landlord.

Section 12.3    Landlord's Covenants, Warranties and Representations.  To induce Tenant to execute this Lease, and in consideration thereof, Landlord covenants, warrants and represents to Tenant as follows:

(a)    Subject to Section 12.6, as of the Delivery Date Landlord shall have, good and marketable fee simple title to the entire Shopping Center, free and clear of all easements, restrictions, liens, encumbrances, leases and the like, except for the encumbrances described on Exhibit E hereto;

(b)    In the event the legal description of the Shopping Center described in Exhibit A hereto indicates that the Shopping Center is composed of more than one parcel or lot, Landlord represents that there exist no strips or gores between such parcels or lots which are not owned by Landlord;

(c)    No third party consents or approvals are required in order for Landlord to enter into this Lease, or for the performance of Landlord's Work and Tenant's Work (excluding, as of the Effective Date, governmental permits and approvals);

(d)    Tenant's use of the Premises for sale of "Permitted Items" (defined in Section 1.1.27 above) will not violate any exclusive provision or prohibited use restriction granted to any other tenant or occupant in the Shopping Center;

(e)    The Shopping Center, on the Delivery Date, shall have, access to and from Telegraph Street (Old Highway 91), as shown on Exhibit B hereto, for the passage of vehicular traffic;

(f)    This Lease does not violate the provisions of any instrument heretofore executed and/or binding on Landlord, or affecting or encumbering the Shopping Center, or the Premises, and no rights granted by Landlord to Tenant under the terms of this Lease conflict with any rights granted by Landlord to any other tenant or occupant in the Shopping Center;

(g)    There shall be no restrictions or other legal impediments imposed by any public or private instrument which would prevent: (i) the use of the Premises for the Permitted Use; (ii) the use of the parking facilities, access roads, and other Common Areas in the manner contemplated by this Lease; (iii) the performance of Tenant's Work or (iv) the Premises from having the signage (including, without limitation, the square foot area and size of letters) as depicted on Exhibit D-1 and Exhibit F hereof;

(h)    As of the Effective Date, there are no sign ordinances, restrictive covenants, uniform sign plans or other signage restrictions which would prevent the Premises from having the signage (including, without limitation, the square foot area and size of letters) as depicted on Exhibit D-1 and Exhibit F hereof.  In amplification of the foregoing sentence, and without limitation thereof, nothing in the CC&Rs or any of the other Project Agreements (defined in Section 12.5 below) will prevent the Premises from having the signage (including, without limitation, the square foot area and size of letters) as depicted on Exhibit D-1 and Exhibit F hereof;

(i)    As of the Effective Date there is no "Related Land" (defined in 13.1.2 below) in existence and as of the Delivery Date there will not be any Related Land in existence (or, if there shall be Related Land in existence, Landlord shall promptly notify Tenant thereof and promptly execute any recordable instrument reasonably requested by Tenant which memorializes the provisions of this Lease pertaining to or otherwise affecting Related Land);

(j)	Attached hereto as Exhibit K-2 is a complete list of all fully executed and delivered leases in effect on the Effective Date with respect to the Shopping Center (the *"Existing Leases"*);

(k)	The Shopping Center has been properly subdivided and the subdivision map has been approved by applicable governmental authorities;

(l)	Subject to Section 12.6, as of the Delivery Date Landlord shall be appointed the "Declarant" under the CC&Rs (defined in Subsection 12.5.1 below) and thereafter throughout the Term hereof Landlord shall remain the Declarant under the CC&Rs; similarly, subject to Section 12.6, as of the Delivery Date Landlord (or a member or employee of Landlord) shall be appointed to the "Architectural Committee" under the CC&Rs (defined in Subsection 12.5.1 below) and thereafter throughout the Term hereof Landlord (or a member or employee of Landlord) shall remain one of the two persons on the said Architectural Committee;

(m)	As of the Effective Date, the Project Documents (defined in Subsection 12.5.1 below) have been fully executed by all parties thereto and original counterparts of all such documents, in recordable form, are being held in escrow by United Title Services pending Landlord's acquisition of the Shopping Center; and

(n)	Landlord shall promptly forward to Tenant any notice or other communication received by Landlord from any owner of property adjoining or adjacent to the Shopping Center or from any municipal or other governmental authority, in connection with any hearing or other administrative proceeding relating to any proposed zoning, building code, signage, or related variance affecting the Shopping Center or any adjoining or adjacent property, which, if granted, could adversely affect Tenant's use or occupancy of the Premises, the conduct of Tenant's business therein, or Tenant's rights and benefits under this Lease. Landlord, at its sole cost and expense, shall appear in such proceeding and shall contest such proposed variance.  If Landlord fails so to appear and contest such proposed variance after receiving five (5) days' notice from Tenant (or such shorter notice as may be practicable under the circumstances), then Tenant shall be entitled (but shall not be obligated to), in its own name and/or in the name of Landlord, to appear in such proceeding, in which event Landlord shall fully cooperate with Tenant, provide such information, and execute any documents or other instruments as Tenant may reasonably request in connection with any such proceeding.

Section 12.4	Environmental Matters.

12.4.1	Definitions.

(a)	As used herein, the term *"Environmental Laws"* shall mean any and all Legal Requirements concerning the protection of the environment, human health or safety.

(b)	As used herein, the term *"Hazardous Substances"* shall mean each and every element, compound, material, mixture, substance, waste, hazardous substance, hazardous waste, hazardous material, toxic substance, pollutant or contaminant either as those terms are defined in any of the Environmental Laws or the presence of which may cause liability at common law, including, without limitation, asbestos and/or asbestos-containing products, whether or not currently friable.

(c)	As used herein, the term *"Environmental Notice"* shall mean a summons, citation, directive, order, claim, notice, litigation, investigation, judgment, legal pleading, letter or other communication, written or oral, actual or threatened, from the United States Environmental Protection Agency or other federal, state or local governmental agency or authority, or any other private individual or entity concerning (i) any Hazardous Substances at, on, in, under or emanating from the Premises, the Shopping Center or any contiguous property; (ii) any violation or potential violation of Environmental Laws at the Premises, the Shopping Center or any contiguous property; or (iii) any underground storage tanks on the Premises or the Shopping Center.

(d)	As used herein, the term *"Releasing"* or *"Release"* shall mean releasing, spilling, leaking, discharging, disposing or dumping or otherwise introducing any substance into the environment or into any building or other improvements in violation of Environmental Laws.

(e)	As used herein, the term *"Compliance Costs"* shall mean any and all costs incurred by a party in complying with applicable Environmental Laws, including, without limitation, consultant's and engineer's fees; laboratory costs; contractor's and

subcontractor's fees; application and filing fees; costs of investigation, monitoring or cleanup of soil or other substrate, surface water, groundwater, or buildings or other improvements; equipment costs; disposal fees; costs of operation and maintenance of equipment; legal fees; other governmental fees or costs; interest at the Lease Interest Rate from the date of expenditure until paid in full; and other similar or related costs.

(f)    As used herein, the term **"Tenant Related Parties"** shall mean Tenant's agents, servants, employees, contractors or licensees.

12.4.2 <u>Compliance with Environmental Laws</u>.  Tenant shall comply with all applicable requirements of Environmental Laws governing its use of, and operations at, the Shopping Center and the Premises.  Landlord shall comply with all applicable requirements of Environmental Laws relating to the Shopping Center and the Premises, except to the extent such requirements arise from Tenant's operations thereon.

12.4.3 <u>Responsibility for Releases of Hazardous Substances</u>.  Notwithstanding any other provision of this Lease, Tenant shall only be liable for any Release of Hazardous Substances at, on, in, under or emanating from the Premises or Shopping Center which were caused by Tenant or Tenant Related Parties (hereinafter **"Tenant Releases"**), including, without limitation, any Compliance Costs required to address Tenant Releases.  Landlord shall be liable for any Hazardous Substances at, on, in, under or emanating from the Premises or Shopping Center, including, without limitation, any Compliance Costs attributable to such Hazardous Substances, unless the Hazardous Substances are caused by Tenant Releases. Except in the event of an emergency or if compelled by applicable governmental authority, any work performed by Landlord relating to Hazardous Substances shall be performed by Landlord at any time other than during the months of August, November and December, and shall be undertaken in such a manner so as to (i) not adversely affect ingress to or egress from the Shopping Center, (ii) have no adverse effect on the visibility of the Premises or any signs which contain Tenant's name, and (iii) not otherwise materially interfere with the normal conduct of any business operations in the Premises.

12.4.4 <u>Standards</u>.  Except as expressly provided herein, the parties agree that any investigation or remediation of Hazardous Substances, or cure of a violation of Environmental Laws, required to be conducted at the Premises or Shopping Center shall be no more stringent than necessary to meet the minimum standards of Environmental Laws applicable to properties used in the manner the Shopping Center is being used.

12.4.5 <u>Landlord's Representations and Warranties</u>.  Landlord represents and warrants that, except as may be disclosed in that certain Phase II Environmental Site Assessment prepared by Applied Geotechnical Engineering Consultants, Inc. dated September 21, 2001 and that certain "no further action" letter dated April 16, 2003 from Mr. Dennis Frederick of the Utah Department of Environmental Quality: (i) Landlord has received no Environmental Notices concerning the Shopping Center, the Premises or any contiguous properties; (ii) Landlord has no knowledge of, and has received no notice of, any violation, or potential or alleged violation, of any Legal Requirement, including, without limitation, Environmental Laws, affecting the Shopping Center, the Premises or any contiguous properties, regardless of whether same has been cured; and (iii) to the best of Landlord's knowledge: (A) no Hazardous Substances are located at, on, in, under or emanating from the Shopping Center, the Premises or any contiguous properties; and (B) no underground storage tank exists at the Shopping Center or the Premises.

12.4.6 <u>Documents</u>.  Each party shall immediately notify the other party of the notifying party's receipt of an Environmental Notice.

12.4.7 <u>Indemnity</u>.  Each party to this Lease shall indemnify, defend and hold the other party, and its agents, servants, shareholders, directors, officers, partners, members and employees harmless from any and all claims, losses, expenses, costs, lawsuits, actions, administrative proceedings, damage, orders, judgments, penalties and liabilities of any nature whatsoever, including, without limitation, reasonable attorneys' fees (incurred to enforce this indemnity or for any other purpose) and Compliance Costs, arising from (i) the indemnifying party's breach of any of its representations, warranties, covenants or other obligations under this Section 12.4; (ii) Hazardous Substances for which the indemnifying party is liable under this Section 12.4; or (iii) violations of Environmental Laws for which the indemnifying party is liable under this Section 12.4.

12.4.8 <u>Survival</u>.  The obligations of the parties under this Section 12.4 shall survive the renewal, expiration, breach or earlier termination of this Lease.

12.4.9 <u>Conflict</u>. In the event of any conflict between the provisions of this Section 12.4 and any other provision of this Lease, the provisions of this Section 12.4 shall control.

Section 12.5   <u>Project Agreements</u>.

12.5.1   As used in this Lease, the term **"Project Agreements"** shall mean, collectively: (i) that certain Declaration of Covenants, Conditions, Restrictions executed by Landlord (the **"CC&Rs"**), a form of which is attached hereto as <u>Exhibit N</u>, (ii) that certain Reciprocal Easement Agreement for Access by and between Redlands Park, Inc. and Nelson W. Clayton, as Trustee under the Nelson W. Clayton and Jean T. Clayton Trust Agreement dated February 28, 1981 together with that certain Assignment of Reciprocal Easement for Access by and between Nelson W. Clayton, as Trustee under the Nelson W. Clayton and Jean T. Clayton Trust Agreement dated February 28, 1981, as Assignor, and Landlord, as Assignee (collectively, the **"REA"**), a form of which is attached hereto as <u>Exhibit O</u>, and (iii) that certain Declaration and Reservation of Reciprocal Easement Rights executed by Landlord (the **"Declaration"**), a form of which is attached hereto as <u>Exhibit P</u> (any changes to any of the Project Documents shall be subject to Tenant's prior written consent, which consent may be withheld in its sole and absolute discretion).

12.5.2   Landlord and Tenant each acknowledge that this Lease is made and shall continue to be subject and subordinate to the Project Agreements, subject to the provisions of this Section 12.5.  Tenant shall comply with the terms and conditions of the Project Agreements to the extent same affects the Premises (it being agreed that Tenant shall not be obligated to expend any sums in connection with such compliance).

12.5.3   Landlord shall, during the Term: (i) perform and observe all of the terms, covenants, provisions and conditions of the Project Agreements on Landlord's part to be performed and observed; (ii) defend, indemnify and hold harmless Tenant from and against any and all claims, demands, causes of action, suits, damages, liabilities, and expenses of any nature arising out of or in connection with the enforcement of, or a claimed breach by, Landlord of any covenant, term, condition, or provision of any of the Project Agreements; and (iii) diligently enforce, at its sole expense, the covenants, agreements, and obligations of the Project Agreements.

12.5.4   Whenever, pursuant to any of the Project Agreements, the consent or approval of Landlord shall be required by or requested, and such consent or approval could diminish the rights or increase the obligations of Tenant thereunder or under this Lease, or could adversely affect Tenant's use or occupancy of the Premises, or the conduct of Tenant's business therein, such consent or approval shall not be granted without the prior consent of Tenant, which consent may be withheld in its sole and absolute discretion.

12.5.5   Landlord shall, immediately upon receipt, forward to Tenant and Tenant's leasehold mortgagee, if any, a copy of any and all notices and/or demands received by Landlord under or pursuant to the Project Agreements, which relate to, or could adversely affect, Tenant's use or occupancy of the Premises, the conduct of Tenant's business therein, or Tenant's rights pursuant to this Lease.

12.5.6   Landlord shall not amend, or modify the Project Agreements if such amendment or modification could diminish the rights or increase the obligations of Tenant thereunder or under this Lease, or could adversely affect Tenant's use or occupancy of the Premises or the conduct of Tenant's business therein, nor shall Landlord terminate the Project Agreements.

12.5.7   In the event Landlord defaults in the performance of any of its obligations under any of the Project Agreements or fails to enforce the obligations of any other obligee under any of the Project Agreements, and such default or failure to enforce could adversely affect Tenant's rights thereunder or under this Lease, Tenant's Work, Tenant's use or occupancy of the Premises or the conduct of Tenant's business therein, Tenant may, but shall not be obligated to, after thirty (30) days written notice (except in the event of emergency, in which case no notice shall be required) cure any default by Landlord under the Project Agreements and/or enforce, in its own name, at Landlord's expense, the obligations of any other obligee under the Project Agreements.  Landlord shall, upon demand, reimburse Tenant for the costs incurred by Tenant in performing any of Landlord's obligations under the Project Agreements  or enforcing the obligations of any obligee under the Project Agreements, together with interest thereon at the Lease Interest Rate, and failing such reimbursement, Tenant shall have the right (in addition to any rights and remedies to which it may be entitled under this Lease, at law, or in equity), upon ten (10) days' prior notice to Landlord, to offset such costs from the next succeeding payment or payments of any Rent due hereunder, together with

interest thereon at the Lease Interest Rate from the date of outlay until reimbursement or full satisfaction by credit.  It is agreed that Tenant qualifies as an "In-Line Tenant" for purposes of the CC&Rs.

12.5.8  As between Landlord and Tenant, in the event of any conflict between the Project Agreements and this Lease, this Lease shall in all respects control.

12.5.9  Landlord shall obtain any third-party approvals required under the Project Agreements for the performance of Landlord's Work (including, without limitation, Tenant's elevations and signage, as shown on Exhibit D-1 and Exhibit F hereto), Tenant's Work, and the operation of Tenant's business in the Premises.

Section 12.6    Purchase and Sale Contract.

12.6.1  Landlord represents and warrants to Tenant that, as of the Effective Date:  (a) it is the vendee under that certain Purchase Contract dated on or about January 22, 2002 by and between Nelson W. Clayton on behalf of the Nelson W. Clayton and Jean T. Clayton Trust, as seller, and J. Michael Martin Properties, LLC, as  purchaser, with respect to the Shopping Center, which agreement was amended by amendments dated March 15, 2003 and May 29, 2003, and which amended agreement was assigned to Landlord by way of an Assignment of Contract Rights dated June 24, 2003 by and between J. Michael Martin Properties, LLC, as assignor, and Landlord, as assignee (collectively, the **"Contract"**);  (b) the Contract is in full force and effect;  (c) Landlord has not delivered or received any notice of default, and has no knowledge of any condition or circumstance which with notice or the lapse of time, or both, could become a default, under the Contract; and (d) the Shopping Center consists of approximately 7.758 acres, and currently constitutes all of the property to be purchased under the Contract.  Landlord shall proceed diligently and in good faith to acquire fee title to the Shopping Center under the Contract.

12.6.2  In the event that Landlord and Tenant have executed a short form or memorandum of this Lease for recording pursuant to Section 23.20 below prior to Landlord's closing of title to the Shopping Center, Landlord shall cause such short form or memorandum to be duly recorded immediately after the deed of conveyance to Landlord, at Landlord's expense. Within five (5) days after the closing of title to the Shopping Center pursuant to the Contract, Landlord shall give Tenant notice thereof.

12.6.3  (a)    In the event that Landlord has not acquired fee title to the entire Shopping Center in full accordance with the terms and conditions of this Lease within sixty (60) days after the Effective Date, then Tenant may, at its election, upon notice to Landlord given at any time after said date (and in any event, prior to Landlord's acquisition of fee title as aforesaid), elect to terminate this Lease. Should Tenant so terminate this Lease, Landlord shall be obligated to promptly reimburse Tenant for all reasonable, third party costs and expenses incurred by Tenant in connection with this Lease, including, without limitation, the preparation of plans and specifications, and the performance of Tenant's Work, it being agreed that so long as Landlord's failure to acquire such fee title is not attributable to Landlord's default or breach under the Contract, such reimbursement by Landlord shall not exceed the aggregate sum of Fifty Thousand Dollars ($50,000), plus reasonable legal fees, and the provisions of Section 23.13 hereof shall not apply.

(b)    In the event that Landlord has not acquired fee title to the entire Shopping Center in full accordance with the terms and conditions of this Lease within two hundred seventy (270) days after the Effective Date, which failure by Landlord is not attributable to Landlord's default or breach under the Contract, then Landlord may at its election, upon notice to Tenant, given at any time after said date (and in any event prior to Landlord's acquisition of fee title as aforesaid), elect to terminate this Lease. Should Landlord terminate this Lease as aforesaid, Landlord shall be obligated to promptly reimburse Tenant for all reasonable, third-party costs and expenses incurred by Tenant in connection with this Lease, including, without limitation, the preparation and review of plans and specifications, and the performance of Tenant's Work, it being agreed that so long as Landlord's failure to acquire such fee title is not attributable to Landlord's default or breach under the Contract, such reimbursement by Landlord shall not exceed the aggregate sum of Fifty Thousand Dollars ($50,000), plus reasonable legal fees, and the provisions of Section 23.13 hereof shall not apply.

12.6.4  If this Lease is terminated pursuant to Subsection 12.6.3 above, and Landlord or its Affiliate acquires title to the Shopping Center within three (3) years after the date on which the Lease termination becomes effective hereunder, then Landlord shall offer to Tenant, at the time of Landlord's (or its Affiliate's) acquisition of title to the Shopping Center, the option to lease the Premises upon the terms and conditions of this Lease; provided, however,

that all dates set forth in this Lease shall be appropriately extended.  In the event Tenant elects, within thirty (30) days after its receipt of such offer, to exercise such option, Landlord and Tenant shall promptly execute a lease upon substantially the same terms and provisions of this Lease. In the event Tenant does not elect, within thirty (30) days after its receipt of such offer, to exercise such option, Landlord shall be free to lease the Premises to any other person or entity, upon economic terms which are not materially more favorable to the tenant than those contained in this Lease. The provisions of this Subsection 12.6.4 shall survive the termination of this Lease.

ARTICLE 13
USES AND RESTRICTIONS

Section 13.1    <u>Permitted and Prohibited Uses</u>.

13.1.1 <u>Tenant's Permitted Use</u>.  The Premises may be used and occupied for the Permitted Use (defined in Subsection 1.1.27 above).  Tenant shall not use the Premises for any of the "Prohibited Uses" (defined in <u>Exhibit M</u> hereto annexed)**.**

13.1.2 <u>Prohibited Uses</u>.  Landlord shall construct, lease, operate, maintain and manage the Shopping Center as a first-class shopping center comparable to other first-class shopping centers in the state in which the Shopping Center is located.  Landlord shall not lease, rent or occupy or permit any portion of the Shopping Center or any land (the **"Related Land"**) contiguous or adjacent to the Shopping Center (including, without limitation, any land that would be contiguous or adjacent to the Shopping Center but for any intervening road, street, alley or highway) now or hereafter owned or controlled by Landlord or its Affiliate(s), to be occupied (except to the extent otherwise permitted under any lease for space in the Shopping Center or the Related Land existing as of the Effective Date) for any of the "Prohibited Uses" (defined in <u>Exhibit M</u> hereto annexed), provided, however, that the foregoing provisions of this Subsection 13.1.2 shall not apply to any business existing on any Related Land owned or controlled by a person or entity which: (i) was previously, but is no longer, the Landlord hereunder, or (ii) at the time it became Landlord hereunder, already owned or controlled such Related Land (excluding, however, the Landlord originally named herein and its Affiliates).

Section 13.2    <u>Tenant's Exclusive in Center</u>.  To induce Tenant to execute this Lease, and subject to all of the terms and provisions of this Section 13.2, Landlord covenants and agrees as follows.

13.2.1 Landlord shall not lease, rent or occupy or permit any other premises in the Shopping Center or on any Related Land to be occupied, whether by a tenant, sublessee, assignee, licensee or other occupant or itself, for the sale, rental or distribution, either singly or in any combination, of items contained in any of the following respective categories of merchandise: (a) linens and domestics; (b) bathroom items (excluding plumbing hardware); (c) housewares (excluding furniture, and major appliances or "white goods"); (d) frames and wall art (provided that a fine art gallery shall not be precluded); (e) window treatments; and/or (f) closet, shelving and storage items (which items, either singly or in any combination, are hereinafter referred to as the **"Exclusive Items"**).  Notwithstanding the foregoing, any tenant or subtenant in the Shopping Center or the Related Land shall have the right to utilize its respective premises for the sale, rental and/or distribution of Exclusive Items within an aggregate area (which shall include an allocable portion of the aisle space adjacent to such sales, rental and/or distribution area) not to exceed the lesser of (x) five percent (5%) of the Floor Area of such tenant's or subtenant's premises, or (y) two thousand (2,000) square feet of Floor Area within such tenant's or subtenant's premises. [For example only, a tenant occupying premises containing a total of five thousand (5,000) square feet of Floor Area could sell Exclusive Items (either singly or in any combination) so long as the aggregate area within its entire demised premises in which any and all Exclusive Items are sold shall not exceed two hundred fifty (250) square feet.]

13.2.2 The restrictions set forth in Subsection 13.2.1 above shall not apply to a full-line national or regional: (i) department store [for example, Wal-Mart, Macy's or Target], (ii) discount club [for example, Costco, BJ's Wholesale Club or Sam's Club], or (iii) home improvement center [for example, Home Depot or Lowe's], commonly located in first-class shopping centers in the state in which the Shopping Center is located, each occupying at least 80,000 square feet of Floor Area within the Shopping Center, as such stores are currently operated (as of the Effective Date).

13.2.3 The exclusive rights granted to Tenant in this Section 13.2 shall inure to the benefit of any assignee of Tenant's interest in this Lease and to any sublessee of at least fifty percent (50%) of the Floor Area of the Premises.

13.2.4 (a)    Upon breach of the aforesaid covenant and agreement by Landlord (which breach shall not include a situation in which the lease between Landlord and any tenant in the Shopping Center or in the Related Land prohibits the tenant therein from violating the exclusive rights granted to Tenant in this Section 13.2 and despite such prohibition, such tenant violates such exclusive rights, unless Landlord fails to comply with any of the provisions of subparagraph (b) below), the Rent payable hereunder shall be reduced by fifty percent (50%) for so long as such violation shall continue, and Tenant shall have all remedies given to it at law and in equity, including, without limitation, the right to obtain injunctive relief, and/or to terminate this Lease, and/or to commence and prosecute an action against Landlord or any other violator for damages.

(b)    If any person or entity other than Landlord shall violate any of the exclusive provisions herein set forth, or shall indicate in writing to Landlord that it intends to violate any of said provisions, Landlord shall promptly commence appropriate legal proceedings, and vigorously prosecute the same, to enjoin and prohibit any such violation.  If Landlord fails to promptly commence such proceedings, or shall fail thereafter to vigorously prosecute the same, then Tenant shall have the right (a) to conduct and prosecute such legal proceedings (including, without limitation, an action for injunctive relief) in its own name, at Landlord's expense, or (b) in the event the right set forth in (a) above is not permitted to be exercised under applicable Legal Requirements, to conduct and prosecute such legal proceedings in the name of Landlord, at Landlord's expense, and Landlord shall cooperate with Tenant with respect to such prosecution (including, without limitation, by executing any documentation or authorization reasonably required by Tenant in connection with such prosecution and by appearing at any hearing or trial with respect to such prosecution).

Section 13.3  Exclusives Which Tenant Must Honor.

13.3.1 Tenant shall honor certain exclusives granted by Landlord to certain other tenants in the Shopping Center pursuant to the terms of leases which have been executed prior to the Effective Date (hereinafter, *"Existing Exclusives"*) [a true and complete listing and description of such Existing Exclusives being attached hereto as Exhibit K-1], and shall not sublease, occupy or use all or any portion of the Premises, or permit all or any portion of the Premises to be occupied or used in violation of any such Existing Exclusive (except as may be specifically set forth on Exhibit K-1).  Landlord represents and warrants that no Existing Exclusive(s) exist other than those listed on Exhibit K-1 hereto and that Exhibit K-1 is true accurate and complete, and covenants to indemnify, defend and hold Tenant harmless from and against all loss, cost, liability or expense (including, without limitation, reasonable legal fees) incurred by Tenant by reason of the enforcement by any person or entity of such unlisted Existing Exclusive.  Notwithstanding the foregoing, Tenant shall be entitled to enter into a separate agreement with any tenant or other occupant for whose benefit the existing Exclusive is granted which nullifies or modifies the corresponding Existing Exclusive with regard to the Premises (including, without limitation, the existing letter agreement between Tenant and Best Buy attached to Exhibit K-1 hereto.

13.3.2  Except as expressly set forth in this Section 13.3, Tenant shall not be obligated to honor any exclusive granted by Landlord to any tenant in the Shopping Center.

ARTICLE 14
CONDUCT OF BUSINESS OPERATIONS

Subject to the other provisions of this Lease (including, without limitation, Articles 2 & 3 hereof) Tenant shall initially open its store for business to the public in the Premises for at least one (1) day, not later than the one hundred eightieth (180th) day after the Rent Commencement Date (which date shall, as applicable, be extended by reason of (A) damage or destruction, eminent domain proceedings or actions, or *Force Majeure*, or (B) the acts or omissions of Landlord).  Other than as expressly set forth in the preceding sentence, Tenant shall have no obligation to open or operate business in the Premises, and shall have the right, at any time, to cease to conduct any business operations in the Premises, and Tenant shall incur no liability to Landlord or its Mortgagee by reason thereof (it being understood and agreed that all of Tenant's obligations under this Lease shall continue unless this Lease is terminated pursuant, *inter alia*, to the further provisions of this Article 14 or any other provision of this Lease [other than by reason of an Event of Default].  In the event that Tenant does not operate or cause to be operated any retail business in the Premises (other than prior to the Delivery Date or during Excused Periods) for more than three hundred sixty-five (365) consecutive days, Landlord shall have the option to terminate this Lease, which option shall be exercisable by giving notice thereof to Tenant by not later than the ninetieth (90th) day after the date on which said 365-day period expires, and whereupon this Lease shall terminate upon the sixtieth (60th) day (the *"Recapture Date"*) after the date on which Tenant receives Landlord's termination

notice, as if the Recapture Date was originally set forth herein as the expiration date of the Term.  Upon such termination, Landlord and Tenant shall each be released from any and all liabilities thereafter accruing hereunder, except for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease.  All Rent payable by Tenant hereunder shall be apportioned as of the Recapture Date and Tenant shall promptly pay to Landlord any amounts so determined to be due and owing by Tenant to Landlord, and conversely Landlord shall promptly reimburse Tenant for any amounts prepaid by Tenant for periods subsequent to the Recapture Date.

ARTICLE 15
TENANT ASSIGNMENT AND SUBLETTING

Section 15.1   <u>Assignment and Subletting</u>.

15.1.1 Tenant shall have the right from time to time, without the consent of Landlord, to assign Tenant's interest in this Lease and/or to sublet, concession or license all or any portion of the Premises, subject to all of the terms and conditions of this Lease.

15.1.2 Except with respect to any transaction covered under Subsection 15.1.3 or Section 15.3 below, in the event Tenant proposes to assign this Lease or sublet, in a single transaction, the whole of the Premises for all or substantially all of the remaining Term, it shall first give notice thereof (the "Assignment/Subletting Notice") to Landlord, which notice shall specify the name and address of the proposed assignee or sublessee and the proposed use of the Premises to be made by such assignee or sublessee, together with a statement certified by Tenant of the amount of the then unamortized costs (amortized on a straight-line basis over the Initial Term) of any alterations performed by Tenant to the Premises.  Thereafter, Landlord shall have the option to terminate this Lease, which option shall be exercisable by:

(a)  giving notice to Tenant (the **"Termination Notice"**) thereof within fifteen (15) days after receipt of an Assignment/Subletting Notice from Tenant, and

(b)  paying to Tenant, within thirty (30) days after such notice is given, all of Tenant's costs and expenses incurred in connection the preparation of plans and specifications for, and the then unamortized costs (amortized on a straight-line basis over the Initial Term) of, Tenant's Work and any alterations performed by Tenant to the Premises,

in which event this Lease shall automatically terminate on the ninetieth (90th) day (the **"Termination Date"**) after the date on which Tenant receives Landlord's Termination Notice, with the same force and effect as if the Termination Date had been designated as the expiration date of this Lease.  Upon the Termination Date, Landlord and Tenant shall each be released from any and all liabilities thereafter accruing hereunder, except for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease.  All Rent payable by Tenant hereunder shall be apportioned as of the Termination Date and Tenant shall promptly pay to Landlord any amounts so determined to be due and owing by Tenant to Landlord, and conversely Landlord shall promptly reimburse Tenant for any amounts prepaid by Tenant for periods subsequent to the Termination Date.  Notwithstanding the foregoing, Tenant shall have the right to avoid Landlord's termination by giving notice to Landlord (the **"Rescission Notice"**), within ten (10) days after receiving the Termination Notice, of its rescission of the Assignment/Subletting Notice, whereupon Landlord's Termination Notice shall be rendered null and void, and Tenant shall not assign this Lease or sublet the whole of the Premises as proposed in its Assignment/Subletting Notice.  If Landlord does not give the Termination Notice within the aforesaid 15-day period, Landlord shall conclusively be deemed to have waived its termination rights hereunder with respect to such proposed assignment or subletting transaction, and Tenant may assign this Lease or sublet the entire Premises in accordance with its Assignment/Subletting Notice.  If Landlord terminates the Lease hereunder, then, for a period of two (2) years after the Termination Date, provided that Tenant is then operating one or more stores within fifty (50) miles of the Shopping Center under the same tradename as Tenant was utilizing in the Premises at the time of its Assignment/Subletting Notice, Landlord shall not lease, rent or occupy or permit the Premises or any portion thereof to be occupied as a store which operates primarily as a home furnishings, linens and/or domestics store; the foregoing shall survive the termination of this Lease.

15.1.3 In addition to, and not in limitation of, Tenant's other rights set forth in this Section 15.1, Tenant shall have the right from time to time, without the consent of Landlord, to assign Tenant's interest in this Lease and/or to sublet or license all or any portion of the Premises:  (a) to an Affiliate of Tenant;  (b) to any entity which purchases all or substantially all of the assets of Tenant or any of its Affiliates;  (c) to any entity which purchases Tenant's interest in the majority of stores owned or operated by Tenant or its Affiliate(s) in the

St. George-Washington metropolitan area; (d) in conjunction with any merger, acquisition, consolidation or public offering of stock or other interests involving Tenant or its Affiliate(s); and/or (e) as may be required by any Legal Requirement.

Section 15.2  Liability of Tenant.  Unless otherwise agreed to in writing by Landlord, no assignment, subletting, licensing or concessioning by Tenant shall reduce, diminish, or otherwise affect the liability of Tenant hereunder; provided, however, that in the event of an assignment by the Tenant originally named herein or its Affiliate (collectively, the *"Original Tenant"*) of its interest in this Lease to a Major Assignee or to a tenant whose obligations under this Lease are guaranteed by a Major Guarantor, all liability of the Original Tenant under this Lease accruing from and after the effective date of such assignment, shall terminate.  For purposes of this Section 15.2, the term *"Major Assignee"* or *"Major Guarantor"*, as the case may be, shall mean a person or entity which has, as of the effective date of such assignment, a net worth of at least Fifty Million ($50,000,000) Dollars.

Section 15.3  Collateral Assignment.  In addition to Tenant's other rights set forth in this Article 15, a collateral assignment of Tenant's interest in this Lease by Tenant to one or more "Lenders" (hereinafter defined), as collateral security for an indebtedness or other obligation of Tenant or its Affiliates shall be permitted and Landlord shall execute all documentation reasonably requested by Tenant or any such Lender in connection therewith.  In addition, Tenant shall have the right, without Landlord's consent, to grant to an Affiliate of Tenant a license to operate all of Tenant's business operations at the Premises, without such Affiliate having assumed any liability for the performance of Tenant's obligations under this Lease.  As used herein, *"Lender"* shall mean a state or federally regulated: bank, savings and loan association, insurance company, pension fund, credit union, real estate investment trust, or other institutional lender.

Section 15.4  Cure Rights of Original Tenant.

15.4.1  If Tenant assigns Tenant's interest in this Lease, then Landlord, when giving notice to said assignee or any future assignee in respect of any default, shall also give a copy of such notice to the Original Tenant, and no notice of default shall be effective until a copy thereof is so given to Original Tenant.  Original Tenant shall have the same period after receipt of such notice to cure such default as is given to Tenant therefor under this Lease.

15.4.2  If this Lease is terminated because of: (a) an Event of Default of such assignee, or (b) the rejection, disaffirmation, or other termination of this Lease by or on behalf of the assignee pursuant to any proceeding in bankruptcy under any Legal Requirement of any State or of the United States, or any other Legal Requirements affecting creditors' rights, then Landlord shall promptly give to Original Tenant notice thereof, and Original Tenant shall have the right, exercisable by notice given to Landlord within fifteen (15) days after receipt by Original Tenant of Landlord's notice, to enter into a new lease of the Premises with Landlord (*"New Lease"*), provided that the Original Tenant shall have remedied all Events of Default of the assignee hereunder, unless such Events of Default are not reasonably susceptible of cure by the Original Tenant, in which event the Original Tenant shall not be obligated to cure such Events of Default as a condition to the exercise of its rights under this Subsection 15.4.2.  Upon the Original Tenant's curing of any such Event of Default of the assignee as aforesaid, Landlord shall assign to the Original Tenant all of Landlord's rights against such assignee (whether arising as a result of bankruptcy court proceedings or otherwise).  The term of said New Lease shall begin on the date of termination of this Lease and shall continue for the remainder of the Term (including any Renewal Periods).  Such New Lease shall otherwise contain the same terms and conditions as those set forth herein, except for requirements which are no longer applicable or have already been performed.  It is the intention of the parties hereto that such New Lease shall have the same priority relative to other rights or interests in or to the Premises as this Lease.  The provisions of this Subsection 15.4.2 shall survive the termination of this Lease and shall continue in full force and effect thereafter to the same extent as if this Subsection 15.4.2 were a separate and independent contract between Landlord and the Original Tenant.  From the date on which the Original Tenant shall serve Landlord with the aforesaid notice of the exercise of its right to a New Lease, the Original Tenant shall have quiet and undisturbed use and enjoyment of the Premises and all appurtenances thereto, as contemplated in this Lease.

Section 15.5  Recognition Agreement.  In the event Tenant subleases all or any portion of the Premises for a term of at least five (5) years, then, notwithstanding any other provisions of this Lease, Landlord shall, upon Tenant's request, execute and deliver an agreement among Landlord, Tenant and each such subtenant in the form of Exhibit H hereto, in recordable form.

# ARTICLE 16
## DEFAULT AND DISPUTE RESOLUTION

Section 16.1   <u>Tenant Default</u>.

16.1.1   If Tenant shall fail to: (i) pay any Rent when due, within ten (10) days after its receipt of notice thereof from Landlord specifying the amount and details of the unpaid Rent, or (ii) perform or observe any of the other covenants of this Lease on Tenant's part to be performed or observed within thirty (30) days after its receipt of notice thereof from Landlord specifying the nature of such default (or, if such default shall be of a nature that same cannot reasonably be cured within thirty (30) days and Tenant does not commence to cure such default on or before such thirtieth (30th) day and thereafter diligently prosecute said cure to completion), such circumstance shall constitute an *"Event of Default"*.

16.1.2   Upon an Event of Default, Landlord shall have all remedies given to it at law or in equity (except that Landlord hereby expressly waives any rights to accelerate any element of the Rent, and any right of distraint, which may be granted to it by law), including the following:

(a)   to bring suit for the collection of such unpaid Rent or for the performance of such other covenant of this Lease on Tenant's part to be performed; and/or

(b)   without waiving any non-monetary default, may (but shall not be obligated to) perform any covenant which is capable of being remedied by the performance of affirmative acts for the account and at the reasonable expense of Tenant (it being agreed that should Landlord require access to the Premises in order to perform such covenant as aforesaid, Landlord shall comply with the applicable provisions of Sections 9.2 hereof), in which event, Tenant shall pay to Landlord on demand, as Additional Rent, the reasonable cost or amount thereof, together with interest thereon at the Lease Interest Rate from the date of outlay of expense until payment; and/or

(c)   upon at least five (5) days' notice to Tenant, to terminate this Lease, whereupon Landlord shall have and retain full right to sue for and collect all unpaid Rent which shall have accrued up to the date of termination and any damages to Landlord by reason of any such breach, and Tenant shall surrender and deliver the Premises to Landlord, failing which, Landlord shall have the right to initiate summary proceedings to recover possession; and/or

(d)   upon at least five (5) days' notice to Tenant to terminate Tenant's right of possession, re-enter the Premises and take possession thereof by lawful means.  If Landlord shall so elect to repossess the Premises without terminating the Lease, then Tenant shall be liable for and shall pay to Landlord all Rent payable to Landlord pursuant to the terms of this Lease which shall have accrued up to the date of repossession, as well as all Rent as and when same shall become due and payable pursuant to the terms of this Lease during the remainder of the Term, diminished by any net sums thereafter received by Landlord through reletting the Premises during said period (after deducting reasonable expenses incurred by Landlord in connection with such reletting).  In no event shall Tenant be entitled to any excess of any rent obtained by such reletting over and above the Rent herein reserved.  Landlord may bring actions to collect amounts due by Tenant under this Lease, from time to time, prior to the expiration of the Term.

16.1.3   Upon an Event of Default, Tenant shall be liable for and shall pay to Landlord, in addition to any sum provided to be paid above, brokers' fees incurred by Landlord in connection with reletting the whole or any part of the Premises for the remainder of the then unexpired Term (excluding any then unexercised Renewal Periods), the costs of removing and storing Tenant's or other occupant's property; the cost of repairs; a proportionate share (determined by dividing the number of months remaining in the then unexpired Term [excluding any then unexercised Renewal Periods] by the number of months in the term of any new lease for the Premises) of the cost of preparing the Premises for any new tenant; and all other commercially reasonable expenses incurred by Landlord in enforcing or defending Landlord's rights and/or remedies, including reasonable attorneys' fees.

16.1.4   Upon an Event of Default, any amounts paid by Landlord to cure said Event of Default and any Rent payments not paid after notice thereof is given shall bear interest at the Lease Interest Rate from and after the expiration of any applicable grace period until paid.

16.1.5   Landlord shall use all reasonable efforts to relet the Premises or any portion thereof to mitigate Landlord's damages to which Landlord would otherwise be entitled to

as a result of an Event of Default.  In no event shall Tenant be liable to Landlord for any consequential damages suffered by Landlord as a result of an Event of Default by, or any other act of, Tenant.

Section 16.2  <u>Landlord Default</u>.  If Landlord shall: (i) fail to perform or observe any of the covenants of this Lease on Landlord's part to be performed or observed within thirty (30) days after receiving notice from Tenant thereof (or, if same cannot reasonably be cured within thirty (30) days, if Landlord shall fail to promptly commence and diligently prosecute said cure to completion), <u>or</u> (ii) materially breach any warranty or representation under this Lease (either of (i) or (ii) above being hereinafter referred to as a *"Landlord's Default"*), then Tenant, in addition to such other rights and remedies as may be available under this Lease, or at law or in equity, may, in its sole discretion:

(a)      as applicable, perform such obligation(s) of Landlord in accordance with the provisions of this Lease on behalf of, and at the expense of Landlord; and/or

(b)      bring suit for the collection of any amounts for which Landlord is in default, seek injunctive relief, or seek specific performance for any other covenant or agreement of Landlord, without terminating this Lease; and/or

(c)      offset against the Rent payable by Tenant hereunder for amounts owed by Landlord to Tenant and/or for the amounts reasonably expended by Tenant performing Landlord's obligations hereunder, including costs and reasonable attorneys' fees, together with interest thereon at the Lease Interest Rate from the date of the outlay until paid; and/or

(d)      may terminate this Lease, without waiving its rights to damages for Landlord's Default, <u>provided</u> that:  (1) Landlord's Default materially interferes with the normal conduct of any business operations in the Premises, (2) Landlord's Default is not reasonably capable of being cured by Tenant, and  (3) Tenant gives notice of Landlord's Default to any Mortgagee of whom Landlord shall have previously given Tenant notice (including its address), and such Mortgagee shall not have cured Landlord's Default within thirty (30) days after such notice is given (or, if such default cannot reasonably be cured within thirty (30) days, such Mortgagee fails to promptly commence and diligently prosecute said cure to completion).

Notwithstanding the foregoing, if, in Tenant's reasonable judgment, a condition posing imminent risk of liability or material harm to persons or property or material disruption to the normal conduct of any business operations in the Premises shall exist, Tenant may, at its election, and without prior notice to Landlord, exercise any or all of the remedies set forth in (a), (b) and (c) above.  In no event shall Landlord be liable to Tenant for any consequential damages suffered by Tenant as a result of a default by, or any other act of, Landlord.

Section 16.3  <u>Arbitration</u>.  In any case where this Lease expressly provides for submission of a dispute or matter to arbitration (but not otherwise), the same shall be settled by arbitration in the greater St. George, Utah area, before one arbitrator in accordance with the procedural rules then obtaining of the American Arbitration Association or any successor thereto.  The decision of the arbitrator shall be final, conclusive and binding on the parties, but the powers of the arbitrator are hereby expressly limited to the determination of factual issues, and the arbitrator shall have no power to reform, supplement or modify this Lease.  The arbitrator shall make only required findings of fact incident to an arbitrable dispute, which findings shall be set forth in reasonable detail in a written decision by the arbitrator.  Landlord and Tenant shall share equally in the cost and expenses of such arbitration, and each shall separately pay its own attorneys' fees and expenses, unless the arbitrator finds that one of the parties did not act in good faith in connection with the dispute or the conduct of the arbitration proceeding, in which case the arbitrator may award all or part of said costs, expenses and fees to the other party.

## ARTICLE 17
RIGHT TO MORTGAGE AND NON-DISTURBANCE; ESTOPPEL CERTIFICATE

Section 17.1  <u>Right to Mortgage and Non-Disturbance</u>.  Landlord reserves the right to subject and subordinate this Lease at all times to any first and second mortgage or deed of trust for the benefit of any Mortgagee hereafter encumbering or affecting all or any portion of the Shopping Center, as well as to any future ground or underlying leases encumbering or affecting all or any part of the Shopping Center; <u>provided</u>, <u>however</u>, that (a) each Mortgagee shall first execute and deliver to Tenant a subordination, non-disturbance and attornment

agreement in substantially the form attached as Exhibit G hereto, in recordable form, and (b) any Ground Lessor shall execute (and shall obtain the written consent of any holder of any mortgage, deed of trust or any other existing lien encumbering or affecting the Shopping Center or any portion thereof, as applicable) and deliver to Tenant a fee owner recognition agreement in a form reasonably satisfactory to Tenant, which shall include the following provisions: (i) the Ground Lessor will not, in the exercise of any of the rights arising or which may arise out of such lease, disturb or deprive Tenant  in or of its possession or its rights to possession of the Premises or of any right or privilege granted to or inuring to the benefit of Tenant under this Lease; (ii) in the event of the termination of the ground or underlying lease, Tenant will not be made a party in any removal or eviction action or proceeding, nor shall Tenant be evicted or removed of its possession or its right of possession of the Premises, and this Lease shall continue in full force and effect as a direct lease between the Ground Lessor and Tenant for the remainder of the Term and on the same terms and conditions as contained herein, without the necessity of executing a new lease; and (iii) Landlord and Tenant shall have the right to execute any amendment to this Lease which is specifically required hereunder and the Ground Lessor shall recognize and be bound thereto.

　　　　　Section 17.2   Estoppel Certificate.  Upon written request of Landlord or Tenant, the other party, within thirty (30) days of the date of such request, shall execute and deliver to and only for the benefit of the requesting party or any Mortgagee, *bona fide* prospective purchaser, assignee, or sublessee of the requesting party, without charge, a written statement: (1) ratifying this Lease; (2) certifying, to such party's actual knowledge, that this Lease is in full force and effect, if such is the case, and has not been modified, assigned, supplemented or amended, except by such writings as shall be stated; (3) specifying the dates to which Fixed Rent and Additional Rent have been paid; (4) stating whether or not, to such party's actual knowledge, the party requesting the estoppel is in default and, if so, stating the nature of such default, (5) stating the Rent Commencement Date, and (6) stating which options to extend the Lease Term have been exercised, if any.  Each request for a written statement pursuant to this Section 17.2 made within twelve (12) months of an earlier request for such a written statement shall be accompanied by a payment, from the requesting party to the other party, in the amount of One Thousand ($1000) Dollars (increased by Two Hundred ($200) Dollars on each date that the Fixed Rent increases pursuant to Section 1.1.11 hereof).

　　　　　Section 17.3   Existing Mortgages.  If a mortgage, deed of trust, or other security instrument encumbers the Shopping Center or any part thereof on the Effective Date, then within thirty (30) days after the Effective Date, Landlord shall deliver to Tenant, in recordable form: (x) a subordination, non-disturbance and attornment agreement substantially in the form attached hereto as Exhibit G, in recordable form, executed by each and every holder of any mortgage, deed of trust or any other existing lien encumbering or affecting the Shopping Center or any portion thereof, and (y) a fee owner recognition agreement in the form and content described in clause (b) of Section 17.1 hereof, in recordable form, executed by any Ground Lessor (and, as may be required, consented to by the holder of any mortgage, deed of trust or other existing lien as aforesaid).  Should Landlord fail to so deliver such instrument(s) within said 30-day period, Tenant shall have the right by notice given to Landlord at any time prior to the date on which such instrument(s) are delivered, to terminate this Lease, in which event, neither party shall have any further liability hereunder, except: (i) for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease, and (ii) Landlord shall be obligated to promptly reimburse Tenant for all its reasonable, third-party costs and expenses incurred in connection with this Lease, including, without limitation, the preparation and review of plans and specifications, and the performance of Tenant's Work, provided, however, that such reimbursement by Landlord shall not exceed the aggregate sum of  Fifty Thousand Dollars ($50,000).

ARTICLE 18
NOTICE

　　　　　Subject to the further provisions of this Article 18, whenever it is provided herein that any notice, demand, request, consent, approval or other communication (**"Notice"**) shall or may be given to either of the parties by the other, it shall be in writing and, any Legal Requirement to the contrary notwithstanding, shall not be effective for any purpose unless same shall be given by registered or certified mail, postage prepaid, return receipt requested, or by any recognized overnight mail carrier, with proof of delivery slip, addressed to Landlord at Landlord's Mailing Address or to Tenant at Tenant's Mailing Address, with copies of notices to Tenant also given to: (i) Allan N. Rauch, Esq., c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, and (ii) Sills Cummis Radin Tischman Epstein & Gross, P.A., One Riverfront Plaza, Newark, New Jersey 07102, Attn: Jeffrey H. Newman, Esq., or to such other person or other address as may, from time to time, be specified by either party in a written notice to the other party.  All notices given in accordance with the provisions of this Section

shall be effective upon receipt (or refusal of receipt) at the address of the addressee. Notwithstanding the foregoing, Landlord shall instead send the following items to Tenant (Attention: Lease Administration) at Tenant's Mailing Address: (A) all bills, notices (but not notices of default) and related information pertaining to Tenant's Pro Rata Share of Taxes as described in Section 4.3 of this Lease, and (B) all budgetary information, notices (but not notices of default), statements, bills and related information pertaining to Tenant's Pro Rata Share of Common Areas Charges as described in Section 5.1 of this Lease.

## ARTICLE 19
## TENANT'S PROPERTY

All of Tenant's Property which may be installed or placed in or upon the Premises by Tenant shall remain the property of Tenant.  Tenant may assign, hypothecate, encumber, mortgage or create a security interest in or upon Tenant's Property in the Premises without the consent of Landlord and may remove Tenant's Property at any time during the term.  Landlord waives any right it may have in Tenant's Property.  To the extent Landlord may have a lien on or security interest in the Tenant's Property pursuant to this Lease, by law or otherwise, Landlord hereby waives, and agrees not to assert, such lien or security interest.  Landlord shall provide to Tenant, within ten (10) days after Tenant's request therefor, a written waiver in form reasonably satisfactory to Tenant evidencing Landlord's waiver of any rights it has or may have in Tenant's Property.

## ARTICLE 20
## END OF TERM

Section 20.1  <u>Surrender of Premises</u>.  At the expiration of the Term, Tenant will quit and surrender the Premises in good condition and repair, <u>excepting</u>, <u>however</u>, reasonable wear and tear, damage by fire or other casualty, damage by eminent domain, and repairs and replacements to be made by Landlord hereunder.

Section 20.2  <u>Hold Over</u>.  If Tenant fails to deliver possession of the Premises to Landlord at the end of the Term, and unless Landlord and Tenant are, at such time, engaged in good faith negotiations to extend the Term, Tenant shall be a tenant at sufferance and shall be liable for Fixed Rent on a monthly basis (or, if applicable, on a prorated daily basis) in an amount equal to one hundred fifty (150%) percent of the amount thereof payable by Tenant for the month immediately preceding the last day of the Term as well as for all Additional Rent payable by Tenant hereunder.

## ARTICLE 21
## TENANT'S RIGHT OF FIRST OFFER

Provided an uncured Event of Default does not then exist under this Lease, Tenant shall have continuing rights of first offer to lease additional space in the Shopping Center which is contiguous to the Premises and which may become available on and after the date of this Lease.  At such time that Landlord has knowledge that such space (*"Offered Space"*) is or will become available, Landlord will give Tenant notice (the *"Offering Notice"*) of the terms and conditions Landlord would be willing to accept with respect to the Offered Space (including, without limitation, the proposed rent, additional rent, scope of Landlord's proposed tenant improvements, location and Floor Area), and Tenant shall have thirty (30) days within which to respond to Landlord's offer.  In the event Tenant elects to accept Landlord's offer, then Tenant shall notify Landlord of such election by giving notice to Landlord during such thirty (30) day period and Landlord and Tenant shall thereupon enter into an amendment to this Lease for the leasing of the Offered Space, which amendment shall contain (a) the terms and conditions set forth in the Offering Notice, (b) provide that the term thereunder shall expire or sooner terminate contemporaneously with the expiration or sooner termination of the Term hereof (subject to extension in accordance with Section 2.2.2 above), and (c) contain such other terms and provisions as either Landlord or Tenant may reasonably require in order to effectuate the incorporation of the Offered Space into the Premises and to otherwise effectuate the intent of this Article 21.  Should Tenant decline Landlord's offer or fail to respond thereto, then, and in such event, Tenant shall have been deemed to have waived any prospective rights of first offer to the Offered Space (but Tenant shall not lose any prospective rights of first offer with respect to any space (including, without limitation, the Offered Space) which may in the future become vacant and available), and Landlord may lease the Offered Space to any other party upon substantially the same terms and conditions as that offered to Tenant, provided that such lease is executed within six (6) months after Tenant has declined (or has been deemed to have waived) Landlord's offer with respect to the Offered Space.  As used herein, the phrase

*"substantially the same terms and conditions as that offered to Tenant"* shall mean terms not materially different and/or a rent of not more than five (5%) percent below the rent requested by Landlord of Tenant.  Any dispute between the parties with respect to this Article 21 (including, without limitation, any dispute as to the provisions of the amendment described in this Article 21) shall be resolved by arbitration in accordance with the provisions of Section 16.3 above.

ARTICLE 22
ONGOING CO-TENANCY

If, at any time during the Term, the Inducement Tenant or any Comparable Inducement Tenant ceases the operation of its retail business in all or substantially all of its premises (such condition being hereinafter referred to as a **"Co-Tenancy Failure"**), then in such event, Tenant shall have the right to: (i) pay Alternate Rent in lieu of Fixed Rent during the period of such Co-Tenancy Failure, and/or (ii) (1) if the Co-Tenancy Failure continues for a period in excess of three hundred sixty-five (365) continuous days, and (2) Tenant has experienced a decrease in Gross Sales (as defined in Exhibit L) of ten (10%) percent or greater during such 365-day period when measured against Gross Sales for the immediately preceding 365-period, to terminate this Lease, exercisable by giving Landlord, within one hundred twenty (120) days after the expiration of such 365-day period, at least one hundred (120) days' prior notice, in which event this Lease shall terminate on the date set forth in Tenant's notice of termination without further liability on the part of either Landlord or Tenant, except: (A) for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease, and (B) Landlord, promptly after receiving a statement from Tenant showing the costs and expenses of any alterations made by Tenant, shall reimburse Tenant for the unamortized portion of such costs and expenses based upon the unexpired portion of the Term. If Tenant terminates this Lease pursuant to this Article 22, then Tenant shall furnish to Landlord, a statement setting forth the amount of Gross Sales achieved during such 365-day period as well as a statement setting forth the amount of Gross Sales achieved during such immediately preceding 365-day period.  If Tenant does not terminate this Lease pursuant to this Article 22, then commencing on the expiration of the aforesaid 120-day period, Tenant shall resume paying full Rent, provided, however, that Tenant shall retain all of its original rights under this Article 22 with respect to any future condition(s) of Co-Tenancy Failure.

ARTICLE 23
MISCELLANEOUS

Section 23.1    Loading Facilities.  Tenant shall have the exclusive right to utilize the loading facilities serving the Premises (shown on Exhibit B) on a "24 hour a day", "365 days a year" basis.

Section 23.2    Liens.  Within thirty (30) days after notice of the filing thereof, Tenant shall discharge (either by payment or by filing of the necessary bond, or otherwise) any lien against the Premises and/or Landlord's interest therein, which may arise out of any payment due for, or  purported to be due for, any labor, services, materials, supplies or equipment alleged to have been furnished to or for Tenant in, upon or about the Premises.  Similarly, within thirty (30) days after notice of the filing thereof, Landlord shall discharge (either by payment or by filing of the necessary bond, or otherwise) any lien against the Premises and/or Landlord's interest therein, which may arise out of any payment due for, or purported to be due for, any labor, services, materials, supplies or equipment alleged to have been furnished to or for Landlord in, upon or about the Premises.

Section 23.3    Broker's Commission.  Landlord and Tenant each warrant and represent to the other that they did not deal with any real estate broker in connection with the negotiation, execution and delivery of this Lease, except for Pentad Properties (the **"Broker"**) and Site Reach Commercial Tenant Services ("**Site Reach**").  Landlord shall pay the Broker a commission pursuant to a separate agreement.  Each party agrees to indemnify, defend, and save the other harmless from and against any and all liabilities, costs, causes of action, damages and expenses, including, without limitation, attorneys' fees, with respect to or arising out of any claims made by any real estate broker (other than the Broker), agent or finder with respect to this Lease in breach of the foregoing representation; provided that in the event of any claim made by Site Reach, Landlord shall indemnify Tenant and Tenant shall not indemnify Landlord.  The provisions of this Section shall survive the expiration or earlier termination of this Lease.

Section 23.4    *Force Majeure*.  Except as otherwise expressly set forth herein, in the event either party hereto shall be delayed or hindered in, or prevented from, the performance of any act required hereunder by reason of strikes, failure of power, riots, insurrection, war,

earthquake, hurricane or tornado (or comparable weather conditions of unusual severity), or other reasons of an extraordinary nature which are beyond the reasonable control of the party and which could not have been avoided through the exercise of due diligence by a party (collectively referred to herein as *"Force Majeure"*), then the performance of any such act shall be excused for a period equal to the period of the delay.  Notwithstanding the foregoing provisions, the following shall not constitute *Force Majeure*:  (i) the financial inability of a party to perform its obligations under this Lease; or  (ii) delays occurring in the course of complying with applicable Legal Requirements that could have been avoided through the exercise of due diligence by a party hereto.

Section 23.5   <u>Consents</u>.  Except as may be otherwise expressly set forth in this Lease, whenever under this Lease provision is made for either party's securing the consent or approval of the other party, (i) such consent or approval shall be in writing and shall not be unreasonably withheld, delayed or conditioned, and (ii) in all matters contained herein, both parties shall have an implied obligation of reasonableness.

Section 23.6   <u>Costs</u>.  Whenever this Lease requires the performance of an act by a party, such party shall perform the act at its own cost and expense, unless expressly provided to the contrary.

Section 23.7   <u>Attorneys' Fees</u>.  In any action or proceeding hereunder (whether to enforce the terms and provisions of an indemnity or otherwise), the prevailing party shall be entitled to recover from the other party the prevailing party's reasonable costs and expenses in such action or proceeding, including reasonable attorneys' fees, costs and expenses.  Except as otherwise set forth herein, if either party is sued by a third party as a result of a violation of a covenant or warranty herein contained by the other party hereto, then the party who has violated the covenant or warranty shall be responsible for the reasonable costs and expenses in such action or proceeding against the non-violating party, including reasonable attorneys' fees, costs and expenses.

Section 23.8   <u>Survival of Obligations</u>.  The obligation to pay any sums due to either party from the other that by the terms herein would not be payable, or are incapable of calculation, until after the expiration or sooner termination of this Lease shall survive and remain a continuing obligation until paid.  All indemnity obligations under this Lease shall survive the expiration or earlier termination of this Lease.

Section 23.9   <u>Non-Waiver</u>.  The failure of Landlord or Tenant to insist upon the strict performance of, or to enforce, any provision, covenant or condition herein shall not be deemed to be a waiver thereof, nor void or affect the right of the aggrieved party to enforce the same covenant or condition on the occasion of any subsequent breach or default; nor shall the failure of either party to exercise any option in this Lease upon any occasion arising therefor be deemed or construed to be a waiver of the right to exercise that same kind of option upon any subsequent occasion.

Section 23.10 <u>Rights Cumulative</u>.  Unless expressly provided to the contrary in this Lease, each and every one of the rights, remedies and benefits provided by this Lease shall be cumulative and shall not be exclusive of any other such rights, remedies and benefits allowed by applicable Legal Requirements.

Section 23.11 <u>Definition of Landlord</u>.  The term *"Landlord"* shall mean only the person or entity which, from time to time, shall then own the Shopping Center, and in the event of the transfer by such owner of its interest in the Shopping Center, such owner shall (<u>except</u> to the extent of (1) claims made by Tenant against Landlord which arose prior to the effective date of the transfer of such ownership interest, and/or (2) judgments obtained by Tenant against Landlord, on or prior to the effective date of the transfer of such ownership interest) thereupon be released and discharged from all covenants and obligations of Landlord thereafter accruing, but such covenants and obligations shall be binding during the Term upon each new owner for the duration of such owner's ownership.

Section 23.12 <u>Successors and Assigns</u>.  The provisions of this Lease shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns.

Section 23.13 <u>Limitation of Landlord's Liability</u>.  Except with respect to insurance proceeds or condemnation awards received by Landlord which are required by the terms of this Lease to be applied to the repair or restoration of the Premises or the Shopping Center, Tenant shall, on and after the Delivery Date, look only to Landlord's estate and property in the Shopping Center (or the proceeds from the sale of all or any portion thereof) and net income derived from the Shopping Center for the satisfaction of Tenant's remedies for the collection of

a judgment (or other judicial process) requiring the payment of money by Landlord hereunder and no other property or assets of Landlord, its officers, directors, stockholders, members or partners shall be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies under or with respect to this Lease.  Except with respect to the limitation on personal liability hereinabove set forth, the provisions of this Section 23.13 shall not be deemed or construed to limit Tenant's rights and remedies pursuant to this Lease or which may be available at law or in equity.

Section 23.14 Limitation of Tenant's Liability.

Landlord, its successors and assigns, shall look solely to the assets, if any, of Tenant and its successors and assigns, for the satisfaction of any claim arising from or under this Lease and shall not seek to impose personal liability on any shareholder, officer, director, member or employee of Tenant or any of its Affiliates.

Section 23.15 Joint and Several Liability.  If either party consists of more than one person, then the persons constituting such party shall be jointly and severally liable hereunder.

Section 23.16 Severability.  If any term, covenant, condition or provision of this Lease is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions hereof shall remain in full force and effect and shall in no way be affected, impaired, or invalidated thereby.

Section 23.17 Grammatical Usages and Construction.  In construing this Lease, feminine or neuter pronouns shall be substituted for those masculine in form and vice versa, and plural terms shall be substituted for singular and singular for plural in any place in which the context so requires.  This Lease shall be construed without regard to the identity of the party who drafted the various provisions hereof.  Moreover, each and every provision of this Lease shall be construed as though all parties hereto participated equally in the drafting thereof.  As a result of the foregoing, any rule or construction that a document is to be construed against the drafting party shall not be applicable hereto.

Section 23.18 Table of Contents, Line Numbering and Paragraph Headings.  The table of contents and line numbering, if any, and section headings are inserted only for convenience and in no way define, limit or describe the scope or intent of this Lease, nor in any way affect this Lease.

Section 23.19 Definition of Hereunder, Herein, etc..  Unless the context clearly indicates to the contrary, the words "herein," "hereof," "hereunder," "hereafter," and words of similar import refer to this Lease and all the Exhibits attached hereto as a whole and not to any particular section, subsection, or paragraph hereof.

Section 23.20 Short Form Lease.  Upon the request of either party following the execution and delivery of this Lease, Landlord and Tenant shall execute a short form lease or memorandum for recording, which shall be in form and substance as either party shall reasonably request.  In no event shall the amount of Fixed Rent reserved hereunder be included in any such short form lease or memorandum.

Section 23.21 Entire Agreement and Modification.  This Lease constitutes the entire agreement of the parties hereto, and all prior agreements between the parties, whether written or oral, are merged herein and, except as may be specifically set forth herein, shall be of no force and effect.  This Lease cannot be changed, modified or discharged orally, but only by an agreement in writing, signed by the party against whom enforcement of the change, modification or discharge is sought.

Section 23.22 No Joint Venture or Partnership Created by Lease.  Nothing contained herein shall be deemed or construed as creating the relationship of principal and agent or of partnership or of joint venture between the parties hereto.

Section 23.23 Tenant's Tradename.  Landlord shall not make use of Tenant's tradename [*i.e., "Bed Bath & Beyond"®*] in any advertising or marketing material, including, without limitation, on any internet website, without obtaining Tenant's prior written approval, which may be withheld in Tenant's sole and absolute discretion.

[Signature page follows]

Section 23.24 <u>Counterparts</u>. This instrument may be executed in several counterparts, each of which shall be deemed an original.  The signatures to this instrument may be executed and notarized on separate pages, and when attached to this instrument, shall constitute one complete document.

Section 23.25 <u>Waiver of Jury Trial</u>.  Landlord and Tenant hereby mutually waive any and all rights which either may have to request a jury trial in any proceeding between them at law or in equity.

Section 23.26 <u>Governing Law</u>.  This Lease shall be governed by, construed, and enforced in accordance with the laws of the State in which the Premises are located.

IN WITNESS WHEREOF, the parties have executed this instrument under seal the day and year first-above written.

**LANDLORD:**

WITNESS:                                            TELEGRAPH MARKET PLACE
                                                             PARTNERS, L.L.C.,
                                                              a Utah limited liability company


_____                 By:    _____
                                                             Name: _____
                                                             Title:   _____



**TENANT:**

WITNESS:                                            BED BATH & BEYOND INC., a New York
                                                             corporation



_____                 By:    _____
                                                                      Warren Eisenberg
                                                                      Co-Chairman of the Board of
                                                                      Directors

## INDEX OF EXHIBITS

| | |
|---|---|
| Exhibit A | Legal Description of Shopping Center |
| Exhibit B | Site Plan and Sidewalk Plan |
| Exhibit C | Rent Commencement and Expiration Date Agreement |
| Exhibit D | Specifications for Landlord's Work |
| Exhibit D-1 | Exterior Elevations of the Premises |
| Exhibit D-2 | Intentionally Omitted |
| Exhibit E | Permitted Encumbrances |
| Exhibit F | Signage |
| Exhibit G | Form of Subordination, Non-Disturbance and Attornment Agreement |
| Exhibit H | Form of Subtenant Recognition Agreement |
| Exhibit I | Form of Delivery Date Notice |
| Exhibit J | Form of Delivery Date Certification |
| Exhibit K-1 | Existing Exclusives |
| Exhibit K-2 | Existing Leases |
| Exhibit L | Alternate Rent |
| Exhibit M | Prohibited Uses |
| Exhibit N | CC&Rs |
| Exhibit O | REA |
| Exhibit P | Declaration |

Exhibit A

Legal Description of Shopping Center

BEGINNING AT A POINT N00∘59'05" E 1214.39 FEET ALONG THE CENTER SECTION LINE FROM THE SOUTH 1/4 CORNER OF SECTION 15, TOWNSHIP 42 SOUTH, RANGE 15 WEST, SALT LAKE BASE AND MERIDIAN AND RUNNING THENCE ALONG SAID CENTER SECTION LINE N00∘59'05" E 379.49 FEET TO A POINT ON THE SOUTHERLY RIGHT OF WAY LINE OF I-15 FREEWAY; THENCE ALONG SAID RIGHT OF WAY FOR THE FOLLOWING THREE COURSES: S 38∘34'05" W 199.39 FEET TO A POINT ON A 1482.40 FOOT RADIUS CURVE TO THE RIGHT (CENTER BEARS N51∘26'18" W); THENCE SOUTHWESTERLY ALONG THE ARC OF SAID CURVE 351.87 FEET THROUGH A CENTRAL ANGLE OF 13∘36'00" ; THENCE S 33∘48'48" W 136.22 FEET TO A POINT ON THE EASTERLY RIGHT OF WAY FOR GREEN SPRINGS DRIVE; THENCE S 34∘02'13" E 109.77 FEET; THENCE S 27∘46'14" E 55.00 FEET TO A POINT ON A 878.51 FOOT RADIUS CURVE TO THE RIGHT (CENTER BEARS S 59∘06'55" W); THENCE SOUTHEASTERLY ALONG THE ARC OF SAID CURVE 125.44 FEET THROUGH A CENTRAL ANGLE OF 8∘10'53" TO THE POINT OF TANGENCY; THENCE S 22∘42'12" E 88.51 FEET; THENCE S 68∘43'33" E 42.47 FEET TO A POINT ON THE NORTHERLY RIGHT OF WAY LINE OF THE EXPANDED RIGHT OF WAY OF OLD HIGHWAY 91 (TELEGRAPH STREET); THENCE ALONG SAID RIGHT OF WAY N 67∘03'03" E 187.37 FEET; THENCE 70∘51'53" E 130.45 FEET; THENCE N 67∘03'03" E 322.16 FEET; THENCE N 01∘33'35" E 234.51 FEET TO A POINT ON THE SOUTH LINE OF THE NORTH HALF OF LOTS 3 AND 4, BLOCK 15, A.R. WHITEHEAD ENTRY OF WASHINGTON CITY; THENCE ALONG SAID SOUTH LINE N 88∘36'55" W 372.86 FEET TO THE POINT OF BEGINNING.

TO BE HEREAFTER KNOWN AS "TELEGRAPH MARKETPLACE SUBDIVISION", A COMMERCIAL SUBDIVISION, EMBRACED WITHIN SECTION 15, TOWNSHIP 42 SOUTH, RANGE 15 WEST, SALT LAKE BASE AND MERIDIAN.

CONTAINING 7.758 ACRES

1          **Exhibit B**

2

3         **Site Plan and Sidewalk Plan**

Exhibit C

Rent Commencement and Expiration Date Agreement

THIS RENT COMMENCEMENT AND EXPIRATION DATE AGREEMENT, made as of the _____ day of _____, 2003, by and between TELEGRAPH MARKETPLACE PARTNERS, L.L.C. (*"Landlord"*) and BED BATH & BEYOND INC. (*"Tenant"*).

**W I T N E S S E T H :**

WHEREAS, Landlord is the owner of a certain shopping center known as Telegraph Marketplace  (the *"Shopping Center"*), situated in Washington, Utah;

WHEREAS, by that certain lease dated _____ __, 2003_ (the *"Lease"*), Landlord leased a portion (the *"Premises"*) of the Shopping Center to Tenant;

WHEREAS, Tenant is in possession of the Premises and the Term of the Lease has commenced; and

WHEREAS, under Section 2.2 of the Lease, Landlord and Tenant agreed to enter into an agreement setting forth certain information in respect of the Premises and the Lease.

NOW, THEREFORE, Landlord and Tenant agree as follows:

1.      The Rent Commencement Date occurred on _____, 2003.

2.      The **Initial Term** of the Lease shall expire on January 31, 20___, unless Tenant exercises any option to extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

3.      The date of commencement of the **first Renewal Period** shall be February 1, 20___, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 20___, unless Tenant exercises any option to further extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

4.      The date of commencement of the **second Renewal Period** shall be February 1, 20___, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 20___, unless Tenant exercises any option to further extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

5.      The date of commencement of the **third Renewal Period** shall be February 1, 20___, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 20___, unless the Lease terminates earlier as provided in the Lease.

6.    Capitalized terms used, but not defined, herein shall have the meanings ascribed to them in the Lease.

IN WITNESS WHEREOF, the parties hereto have caused this Rent Commencement and Expiration Date Agreement to be executed the date and year first above written.

**LANDLORD:**

TELEGRAPH MARKETPLACE
PARTNERS, L.L.C.

_____    By:    _____
                                     Name:  _____
                                     Title:  _____


**TENANT:**

BED BATH & BEYOND INC.


                                     By:    _____
                                            Warren Eisenberg
                                            Co-Chairman of the Board of
                                            Directors

1
2
3
4
5
6
7

Exhibit D

Specifications for Landlord's Work

Exhibit D-1

Exterior Elevations of Premises

**[Refer to cross-references in <u>Exhibit D</u>. Among other things, <u>Exhibit D-1</u> should show the locations and dimensions of the cart corrals and ADA curb; remote building signage.]**

1
2                                    Exhibit D-2
3
4                                Intentionally Omitted
5
6

Exhibit E

Permitted Encumbrances

1. Easement between Nelson W. Clayton, Trustee under the Nelson W. Clayton and Jean T. Clayton Trust Agreement of February 28, 1981, as Grantor, and the Utah Department of Transportation, as Grantee, dated August 28, 2001, recorded in the Washington County Recorder's Office on November 7, 2001 as document number 00741433, in book 1434 at page 2276.

2. Easement between Nelson W. Clayton, Trustee under the Nelson W. Clayton and Jean T. Clayton Trust Agreement of February 28, 1981, as Grantor, and Washington City, as Grantee, dated August 28, 2001, recorded in the Washington County Recorder's Office on November 7, 2001 as document number 00741434, in book 1434 at page 2279.

3. CC&Rs in the form set forth on <u>Exhibit N</u> hereto.

4. REA in the form set forth on <u>Exhibit O</u> hereto.

5. Declaration in the form set forth on <u>Exhibit P</u> hereto.

**Landlord represents and warrants that (i) none of the foregoing will interfere with or prevent Tenant from operating its Premises in accordance with the terms of this Lease, (ii) conflict with any right granted Tenant under this Lease, (iii) impose on Tenant any obligation(s) in excess of those set forth in this Lease, and (iv) none of the foregoing easements or rights of way (a) are located beneath the Premises, or (b) will interfere with Tenant's use and enjoyment of the Premises.**

E-1

1
2
3
4
5
6
7
8
9
10

Exhibit F

Tenant's Signage

[see attached]

Exhibit G

Subordination, Non-Disturbance and Attornment Agreement

THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT, made as of the _____ day of _____, 200__, by and between _____, a _____ **[corporation] [limited] [general] [partnership] [national banking association]**, having an office at _____ __ (the *"Mortgagee")* and Bed Bath & Beyond Inc., a New York corporation, having an office at 650 Liberty Avenue, Union, New Jersey 07083 (the *"Tenant")*.

W I T N E S S E T H:

WHEREAS, Mortgagee is the holder of a mortgage (the *"Mortgage")* covering a parcel of land owned by _____, a _____ **[corporation], [limited] [general] [partnership]** (the *"Landlord")* together with the improvements **[to be]** erected thereon (said parcel of land and improvements thereon being hereinafter referred to as the *"Shopping Center"* and being more particularly described on Exhibit A attached hereto and made a part hereof); and

WHEREAS, by a certain lease heretofore entered into between Landlord and Tenant dated as of _____ (the *"Lease")*, Landlord leased to Tenant a portion of the Shopping Center, as more particularly described in the Lease (the *"Premises")*; and

WHEREAS, a copy of the Lease has been delivered to Mortgagee, the receipt of which is hereby acknowledged; and

_____

**[For mortgages existing as of the date Lease is executed:** WHEREAS, as an inducement to Tenant to enter into the Lease, **[Section 2.3.1/Section 17.3]** thereof provides that the Lease is conditioned upon Landlord obtaining this Agreement from Mortgagee; and

WHEREAS, the parties desire to satisfy the foregoing condition and to provide for the non-disturbance of Tenant by the holder of the Mortgage; and**]**

_____

**[For mortgages occurring after the Lease is executed:** WHEREAS, Section 17.1 of the Lease provides that the Lease shall become subject and subordinate to a mortgage encumbering the fee interest of Landlord in and to the Shopping Center if and when a non-disturbance agreement is entered into with respect to such mortgage; and

WHEREAS, the parties hereto desire to effect the subordination of the Lease to the Mortgage and to provide for the non-disturbance of Tenant by Mortgagee.**]**

_____

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements herein contained, the parties hereto, intending to be legally bound hereby, agree as follows:

1.      Mortgagee hereby consents to and approves the Lease and the term thereof, including the options to extend the term as set forth in the Lease, and covenants and agrees that the exercise by Tenant of any of the rights, remedies and options therein contained shall not constitute a default under the Mortgage.

2.      Tenant covenants and agrees with Mortgagee that the Lease hereby is made and shall continue hereafter to be subject and subordinate to the lien of the Mortgage, and to all modifications and extensions thereof (and such subordination shall not lessen or diminish Tenant's rights under the Lease), subject, however, to the provisions of this Agreement.

3.      Mortgagee agrees that so long as the Lease shall be in full force and effect, and so long as Tenant shall not be in default under the Lease beyond any applicable notice and grace period:

(a)    Tenant shall not be named or joined as a party or otherwise in any suit, action or proceeding for the foreclosure of the Mortgage or to enforce any rights under the Mortgage or the bond or note or other obligation secured thereby;

(b)    The possession by Tenant of the Premises and Tenant's rights thereto shall not be disturbed, affected or impaired by, nor will the Lease or the term thereof be terminated or otherwise affected by (i) any suit, action or proceeding brought upon the Mortgage or the bond or note or other obligation secured thereby, or for the foreclosure of the Mortgage or the enforcement of any rights under the Mortgage, or by any judicial sale or execution or other sale of the Premises or the Shopping Center, or any deed given in lieu of foreclosure, or by the exercise of any other rights given to any holder of the Mortgage or other documents as a matter of law, or (ii) any default under the Mortgage or the bond or note or other obligation secured thereby; and

(c)    All condemnation awards and insurance proceeds paid or payable with respect to the Premises or any other part of the Shopping Center shall be applied and paid in the manner set forth in the Lease.

4.    If Mortgagee or any future holder of the Mortgage shall become the owner of the Shopping Center by reason of foreclosure of the Mortgage or otherwise, or if the Shopping Center shall be sold as a result of any action or proceeding to foreclose the Mortgage, or transfer of ownership by deed given in lieu of foreclosure, the Lease shall continue in full force and effect, without necessity for executing any new lease, as a direct lease between Tenant and the then owner of the Shopping Center, as "landlord", upon all of the same terms, covenants and provisions contained in the Lease, and in such event:

(a)    Tenant shall be bound to such new owner under all of the terms, covenants and provisions of the Lease for the remainder of the term thereof (including the Renewal Periods, if Tenant elects or has elected to exercise its options to extend the term) and Tenant hereby agrees to attorn to such new owner and to recognize such new owner as "landlord" under the Lease; and

(b)    Such new owner shall be bound to Tenant under all of the terms, covenants and provisions of the Lease for the remainder of the term thereof (including the Renewal Periods, if Tenant elects or has elected to exercise its options to extend the term) which such new owner hereby agrees to assume and perform and Tenant shall, from and after the date such new owner succeeds to the interest of "landlord" under the Lease, have the same remedies against such new owner for the breach of any covenant contained in the Lease that Tenant might have had under the Lease against Landlord if such new owner had not succeeded to the interest of "landlord"; provided, however, that such new owner shall not be:

(i)    liable for any act or omission of any prior landlord (including Landlord) unless such act or omission continues from and after the date upon which the new owner succeeds to the interest of such prior landlord;

(ii)    subject to any defenses which Tenant may have against any prior landlord (including Landlord) unless resulting from any default or breach by such prior landlord which continues from and after the date upon which the new owner succeeds to the interest of such prior landlord;

(iii)    subject to any offsets which Tenant may have against any prior landlord, except to the extent such offsets are expressly provided under the Lease and Mortgagee has received notice thereof and the opportunity to cure within the applicable time periods set forth in the Lease (it being further agreed that offsets under the Lease that were deducted by Tenant prior to the date upon which the new owner succeeds to the interest of such prior landlord shall not be subject to challenge);

(iv)    bound by any fixed rent or additional rent which Tenant might have paid for more than one month in advance of its due date under the Lease to any prior landlord (including Landlord), unless such additional rent is paid in accordance with the applicable provisions of the Lease; or

(v)    bound by any amendment or modification of the Lease made without its consent; notwithstanding the foregoing, Mortgagee acknowledges that the Lease specifically provides for amendments thereof upon the occurrence of certain events described in the Lease (such as, for example, an amendment to the Lease confirming the measurement of the Premises), and, by its execution

below, Mortgagee agrees to recognize such amendments as part of the Lease, and Mortgagee further agrees that such new owner shall also be bound by such amendment(s) to the Lease, without any consent on the part of Mortgagee or such new owner.

(c)    Tenant's obligations hereunder shall be effective only so long as Mortgagee is bound to Mortgagee's obligations hereunder.

5.    Tenant will notify Mortgagee of any default by Landlord under the Lease which would entitle Tenant to terminate the Lease or abate the rent payable thereunder and agrees that notwithstanding any provision of the Lease, no notice of termination thereof nor any abatement shall be effective unless Mortgagee has received the aforesaid notice and has failed to cure the subject default within the same time period allowed Landlord under the Lease.  It is understood that the abatement provisions of this Section relate to abatements by reason of Landlord's default and do not apply to provisions of the Lease whereby Tenant has the automatic right to abate rentals such as, for example, abatement upon casualty or condemnation.

6.    Neither the Mortgage nor any other security instrument executed in connection therewith shall encumber or be construed as subjecting in any manner to the lien thereof, any trade fixtures, signs or other personal property at any time furnished or installed by or for Tenant or its subtenants or licensees on the aforementioned property regardless of the manner or mode of attachment thereof.

7.    Any notices of communications given under this Agreement shall be in writing and shall be given by registered or certified mail, return receipt requested, or by any recognized overnight mail carrier, with proof of delivery slip, postage prepaid, (a) if to Mortgagee, at the address of Mortgagee as hereinabove set forth or at such other address or persons as Mortgagee may designate by notice in the manner herein set forth, or (b) if to Tenant, at the address of Tenant as hereinabove set forth, with duplicate copies to  Allan N. Rauch, Esq., c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, and Sills Cummis Radin Tischman Epstein & Gross, P.A., One Riverfront Plaza, Newark, New Jersey 07102, Attention: Jeffrey H. Newman, Esq., or such other address or persons as Tenant may designate by notice in the manner herein set forth.  All notices given in accordance with the provisions of this Section shall be effective upon receipt (or refusal of receipt) at the address of the addressee.

8.    This Agreement shall bind and inure to the benefit of and be binding upon and enforceable by the parties hereto and their respective successors, assigns, and sublessees.

9.    This Agreement contains the entire agreement between the parties and cannot be changed, modified, waived or canceled except by an agreement in writing executed by the party against whom enforcement of such modification, change, waiver or cancellation is sought.

10.     This Agreement and the covenants herein contained are intended to run with and bind all lands affected thereby.

**[to add if our memorandum of lease has been recorded prior to the subject mortgage]** NOTE: THIS AGREEMENT BY TENANT SHALL NOT BE EFFECTIVE UNLESS AND UNTIL ANY PRIOR MORTGAGES ON THIS PROPERTY HAVE BEEN SATISFIED SO THAT TENANT'S PRIOR AGREEMENTS TO ATTORN TO SAID MORTGAGES AND/OR TO SUBORDINATE ITS LEASE TO SAID MORTGAGES SHALL HAVE BEEN EXTINGUISHED.

IN WITNESS WHEREOF, the parties hereto have duly executed this Subordination, Non-Disturbance and Attornment Agreement as of the day and year first above written.

**MORTGAGEE:**

ATTEST:

_____

[Corporate Seal]

_____    By:   _____
(Assistant) Secretary                Name: _____
                                     Title: _____

**TENANT:**

ATTEST:                              BED BATH & BEYOND INC.

[Corporate Seal]

_____    By:   _____
(Assistant) Secretary                       Warren Eisenberg
                                            Co-Chairman of the Board of
                                            Directors

**[INSERT APPROPRIATE JURAT FOR MORTGAGEE]**

STATE OF NEW JERSEY    )
                       ) : ss.
COUNTY OF UNION        )

      On this ___ day of _____, 200__, before me personally came Warren Eisenberg to me known, who being by me duly sworn, did depose and say that he is the Co-Chairman of the Board of Directors of Bed Bath & Beyond Inc., the corporation described in and which executed the above instrument and that he signed his name thereto by order of the Board of Directors of said corporation.

_____                                     _____
                                                     Notary Public
My Commission Expires:

_____

Exhibit H

Recognition Agreement

THIS RECOGNITION AGREEMENT, made as of the _____ day of _____, 2003 , by and between _____, a [_____] **[corporation] [limited] [general] [partnership]**, having an address at _____ (**"Landlord"**); Bed Bath & Beyond Inc., a New York corporation, having an address at 650 Liberty Avenue, Union, New Jersey 07083 (**"Tenant"**); and _____, a [_____] **[corporation] [limited] [general] [partnership]**, having an address at _____ _____ (**"Subtenant"**).

_____ R E C I T A L S:

A.    Landlord and Tenant have entered into a certain lease (the **"Lease"**) dated as of _____ ____, 200__, a short form of which has been recorded in _____, which demises certain premises (the **"Premises"**) located in the _____ Shopping Center, **[City], [State]**, which Shopping Center is more particularly described on Exhibit A annexed hereto and made a part hereof.

B.    Section 15.5 of the Lease provides that in the event Tenant subleases all or a portion of the Premises for a term of at least five (5) years, Landlord shall, upon Tenant's request, execute and deliver a Recognition Agreement among Landlord, Tenant and each such subtenant in the form attached to the Lease, in recordable form.

C.    Pursuant to a Sublease dated as of _____ (the **"Sublease"**), Tenant has subleased **[a portion of]** the Premises to Subtenant (the **"Subleased Premises"**).

D.    The parties hereto desire to effectuate the provisions of Section 15.5 of the Lease with respect to the Sublease and the Subleased Premises.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereto, intending to be legally bound hereby, agree as follows:

1.    Landlord warrants and represents as follows:

(i)    that it is the fee owner of the Premises,

(ii)    that the Lease is unmodified (except as may be otherwise set forth in Exhibit B annexed hereto, if any) and is in full force and effect,

(iii)    that the term of the Lease expires on _____, but is subject to [three] renewal periods of [five] years each and

(iv)    that Tenant is not in default under the Lease nor has any event occurred which would after notice to Tenant and the passage of time become a default of Tenant under the Lease.

2.    Landlord hereby acknowledges receipt of a copy of, and consents to and approves, the Sublease and all of the terms, covenants and provisions thereof, and agrees that the exercise by Subtenant of any of its rights, remedies and options contained therein shall not constitute a default under the Lease.

3.    Landlord agrees that whenever it has an obligation with respect to the Premises, or its consent or approval is required for any action of Tenant under the Lease, then, to the extent such obligation, consent or approval relates to the Subleased Premises or Subtenant's use and occupation thereof, it will perform such obligation in accordance with the terms and conditions of the Lease, and, subject to the applicable terms of the Lease, will not unreasonably withhold or unduly delay such consent or approval.

4.    Landlord shall not, in the exercise of any of the rights arising or which may arise out of the Lease or of any instrument modifying or amending the same or entered into in substitution or replacement thereof (whether as a result of Tenant's default or otherwise), disturb or deprive Subtenant in or of its possession or its rights to possession of the Subleased Premises or of any right or privilege granted to or inuring to the benefit of Subtenant under the Sublease,

provided that Subtenant is not in default under the Sublease beyond the expiration of any applicable notice and cure period.

5.      In the event of the termination of the Lease by reentry, notice, conditional limitation, surrender, summary proceeding or other action or proceeding, or otherwise, or, if the Lease shall terminate or expire for any reason before any of the dates provided in the Sublease for the termination of the initial or renewal terms of the Sublease and if immediately prior to such surrender, termination or expiration the Sublease shall be in full force and effect, Subtenant shall not be made a party in any removal or eviction action or proceeding nor shall Subtenant be evicted or removed of its possession or its right of possession of the Subleased Premises be disturbed or in any way interfered with, and the Sublease shall continue in full force and effect as a direct lease between Landlord and Subtenant (provided, that in such event, Subtenant shall, for the then remainder of the term of the Sublease, pay fixed rent and additional rent in an amount equal to the greater of (x) the Fixed Rent and additional rent then payable under the Lease, prorated on the basis of the ratio which the Floor Area of the Subleased Premises bears to the Floor Area of the Premises, or (y) the fixed rent and additional rent then payable under the Sublease).

6.      Landlord hereby waives and relinquishes any and all rights or remedies against Subtenant, pursuant to any lien, statutory or otherwise, that it may have against the property, goods or chattels of Subtenant in or on the Subleased Premises.

7.      Any notices, consents, approvals, submissions, demands or other communications (hereinafter collectively referred to as "Notice") given under this Agreement shall be in writing.  Unless otherwise required by law or governmental regulation, Notices shall be deemed given if sent by registered or certified mail, return receipt requested, or by any recognized overnight mail carrier, with proof of delivery slip, postage prepaid (a) to Landlord, at the address of Landlord as hereinabove set forth or such other address or persons as Landlord may designate by Notice to the other parties hereto, (b) to Tenant, at the address of Tenant as hereinabove set forth, with duplicate copies to  Allan N. Rauch, Esq., c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, and Sills Cummis Radin Tischman Epstein & Gross, One Riverfront Plaza, Newark, New Jersey 07102, Attention: Jeffrey H. Newman, Esq.  or such other address or persons as Tenant may designate by Notice to the other parties hereto, and (c) to Subtenant, at the address of Subtenant as hereinabove set forth or such other address or persons as Subtenant may designate by Notice to the other parties hereto.  During the period of any postal strike or other interference with the mails, personal delivery shall be substitute for registered or certified mail.  All Notices shall become effective only on the receipt or rejection of same by the proper parties.

8.      No modification, amendment, waiver or release of any provision of this Agreement or of any right, obligation, claim or cause of action arising hereunder shall be valid or binding for any purpose whatsoever unless in writing and duly executed by the party against whom the same is sought to be asserted.

[Signature Page Follows]

9.      This Agreement shall be binding on and shall inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors, assigns and sublessees.

IN WITNESS WHEREOF, the parties have caused this Recognition Agreement to be executed under seal the date first above written.

**LANDLORD:**

_____

By:     _____

Name: _____

Title:  _____

**TENANT:**

BED BATH & BEYOND INC.

By:     _____
         Warren Eisenberg
         Co-Chairman of the Board of Directors

**SUBTENANT:**

_____

By:     _____

Name: _____

Title:  _____

**[INSERT APPROPRIATE JURATS FOR <u>LANDLORD</u> AND <u>SUBTENANT</u>]**

STATE OF NEW JERSEY    )
                       ) : ss.
COUNTY OF UNION        )

      On this ____ day of _____, 200__, before me personally came Warren Eisenberg to me known, who being by me duly sworn, did depose and say that he is the Co-Chairman of the Board of Directors of Bed Bath & Beyond Inc., the corporation described in and which executed the above instrument and that he signed his name thereto by order of the Board of Directors of said corporation.

_____
Notary Public

My Commission Expires:

_____

<u>Exhibit I</u>

<u>DELIVERY DATE NOTICE</u>

[Letterhead of Landlord]

_____, 200__

[via Federal Express or other
recognized overnight delivery
service per Article 18 of the foregoing
lease]

Bed Bath & Beyond Inc.
650 Liberty Avenue
Union, NJ 07083
Attn: Warren Eisenberg

Re:   Agreement of Lease, dated _____, 2003 (the "Lease"), between Telegraph
       Marketplace Partners, L.L.C., as landlord ("Landlord"), and Bed Bath & Beyond Inc., as
       tenant ("Tenant"), with respect to certain retail premises (the "Premises") located in the
       Telegraph Marketplace, Washington, Utah

Gentlemen:

       In accordance with the provisions of Subsection 2.3.2 of the Lease, the Landlord hereby
informs the Tenant that the Delivery Date shall take place at 8:00 A.M. on _____, 200__.
This notice shall constitute the Delivery Date Notice referred to in Subsection 2.3.2 of the Lease.

                         TELEGRAPH MARKETPLACE
                         PARTNERS, L.L.C.


                         By:_____

       , (Vice) President


cc:   Allan N. Rauch, Esq.
      Jeffrey H. Newman, Esq.

<u>Exhibit J</u>

<u>DELIVERY DATE CERTIFICATION</u>

[Letterhead of Landlord]

_____, 2003

[via Federal Express or other
recognized overnight delivery
service per Article 18 of the foregoing
lease]

Bed Bath & Beyond Inc.
650 Liberty Avenue
Union, NJ 07083
Attn: Warren Eisenberg

Re:   Agreement of Lease, dated _____, 2003 (the "Lease"), between Telegraph
Marketplace Partners, L.L.C., as landlord ("Landlord"), and Bed Bath & Beyond Inc., as
tenant ("Tenant"), with respect to certain retail premises (the "Premises") located in the
_____ Telegraph Marketplace, Washington, Utah

Gentlemen:

In accordance with the provisions of Subsection 2.3.3 of the Lease, Landlord hereby
certifies to Tenant that, as of the date of this certification, all of the Delivery Date Conditions (as
defined in the Lease) have been satisfied, and that, as a result, the Delivery Date (as such term
is defined in the Lease) will be deemed to be _____, 200__.  This notice shall constitute
the Delivery Date Certification referred to in Subsection 2.3.3 of the Lease.

TELEGRAPH MARKETPLACE
PARTNERS, L.L.C.

By:_____
, (Vice) President

cc:   Allan N. Rauch, Esq.
Jeffrey H. Newman, Esq.

Exhibit K-1

Existing Exclusives

1. **BEST BUY**:

*"Landlord shall not permit any person or entity other than Tenant in space leased directly or indirectly from Landlord within a radius of one (1) mile of the Shopping Center, to sell, rent, service and/or warehouse (and, if applicable, install in motor vehicles) the following product categories: electronic equipment or appliances (including, without limitation, televisions, stereos, and video recorders); major household appliances (including, without limitation, refrigerators, freezers, stoves, microwave ovens, dishwashers, washers and dryers); personal computers and peripherals, computer software; car radios; stereos, tape decks or phones; entertainment software, including compact discs, music videos and prerecorded tapes; telephones, telecopy, facsimile and photocopy machines; photographic cameras or equipment; office equipment, supplies or furniture; books and magazines; sporting equipment and related items; toys; any substitutes for or items which are a technological evolution of the foregoing items; or any other related items carried in a majority of Tenant's stores, without Tenant's prior written consent, which may be granted or withheld in Tenant's sole and absolute discretion."*

[THE FOREGOING EXCLUSIVE IS SUBJECT TO THE ATTACHED LETTER AGREEMENT BETWEEN BED BATH & BEYOND INC. AND BEST BUY.]

2. **IN 'N OUT**:

*"...Seller covenants on behalf of Seller and the successors, assigns and legal representatives of Seller not to lease or sell any portion of the Shopping Center to a third party for a fast food hamburger type business with or without a drive-thru, which competes with Buyer, including, but not limited to Burger King, Wendy's, Jack-in-the-Box, McDonald's or Carl's Jr., or to any other fast food hamburger-type use that derives more than ten percent (10%) of its gross revenues from the sale of hamburgers.  Notwithstanding the foregoing, Buyer agrees the restrictive covenant of Seller set forth in this Section 12(a) shall terminate in the event the Property is not used for a fast food hamburger type business for a continuous period of one (1) year, which shall not include any periods of time that Buyer is unable to use the Property due to damage, destruction, condemnation or as a result of a Permitted Delay."*

3. **DEL TACO**:

Prohibition of another fast food Mexican restaurant in the Shopping Center.

NOTE: Each of the exclusives set forth in paragraphs 2 and 3 above shall only be effective if the Outparcel to which same applies is acquired by the prospective buyer at any time after the Delivery Date (it being understood and agreed that on the Delivery Date Landlord shall own fee simple title to the entire Shopping Center and no Outparcel shall be sold or otherwise transferred on or prior to the Delivery Date).

<u>Exhibit K-2</u>

Existing Leases

1.  Lease between Telegraph Marketplace Partners, L.L.C., as Landlord, and Best Buy Stores, L.P., as Tenant, dated May 28, 2003.

<u>Exhibit L</u>

<u>Alternate Rent</u>

1.      During the applicable period(s) described within Sections 2.4 and/or 2.5 and/or Article 22 of the Lease, Tenant shall pay as **"Alternate Rent"** an amount equal to three (3%) percent of all "Gross Sales" (hereinafter defined) resulting from business conducted in, on or from the Premises, not to exceed fifty percent (50%) of the amount of Fixed Rent which otherwise would have been payable during such period (the **"Cap"**).

2.      As used herein, the term **"Gross Sales"** shall mean the total amount of all sales of merchandise or services completed at the Premises by Tenant or any sublessee, licensee or concessionaire of Tenant and any other person or entity operating in the Premises (for purposes of this Paragraph 2 only, collectively, **"Tenant"**), whether for cash, credit or otherwise, including redemption of gift certificates and gift cards (regardless of where or how such gift certificates and gift cards were purchased).  Tenant shall record, at the time of each Gross Sale, all receipts from such sale, whether for cash, credit or otherwise, in a cash register or cash registers, or in such electronic or computer device which records sales in a manner which is generally acceptable by industry standards.  The term *"Gross Sales"* shall <u>exclude</u>: (1) proceeds from any sales tax, gross receipts tax or similar tax, by whatever name called, which are separately stated and are in addition to the sales price, (2) *bona fide* transfers or exchanges of merchandise from the Premises to any other stores or warehouses of Tenant or any Affiliates of Tenant, and returns to shippers and manufacturers for credit, (3) refunds or credits given to customers for merchandise returned or exchanged at the Premises (regardless of where or how purchased), (4) sales of Tenant's fixtures and equipment not in the ordinary course of Tenant's business, (5) to the extent of prior inclusion in Gross Sales, bad debts when written off the books of Tenant, provided that any collections made on account of such bad debts shall be included in Gross Sales when received, (6) receipts from vending machines installed solely for the use of Tenant's employees and receipts from pay telephones, (7) sales to employees of Tenant at discount [which, for the purposes of determining Alternate Rent hereunder, shall not exceed two percent (2%) of Gross Sales per calendar year or pro rata portion thereof, as applicable], (8) fees paid to independent third party credit card, charge card, and debit card companies in connection with sales charged to or debited from customers' credit cards, charge cards, or debit cards, as applicable, (9) proceeds from delivery, gift-wrapping and check cashing charges [which, for the purposes of determining Alternate Rent hereunder, shall not exceed two percent (2%) of Gross Sales per calendar year or pro rata portion thereof, as applicable], (10) sums and credits received in settlement of claims for loss or damage to merchandise, (11)  separately stated service, finance and interest charges, (12) the dollar value of coupons utilized by customers in the purchase of merchandise from the Premises, (13) close-out or bulk sales of inventory to jobbers or wholesalers, (14) sales of gift certificates or gift cards, and (15) forfeited deposits.

3.      Alternate Rent shall be payable within thirty (30) days after the end of the calendar month to which it pertains.  If the Alternate Rent for a calendar month does not exceed the Cap, such payment shall be accompanied by a statement setting forth the amount of Gross Sales achieved during, and the amount of Alternate Rent payable for, such month.

4.      Tenant shall maintain at the Premises or at its principal office, complete books and records reflecting all elements of Gross Sales.  Tenant shall be permitted to maintain its books and records in a computerized form; <u>provided</u>, <u>however</u>, that (A) such computerized books and records provide the same level of information as the books and records described above and are retained for the full record retention period provided for herein, and (B) promptly upon request, printed copies of any such books and records shall be made available at Tenant's principal office for inspection by Landlord's representatives who are engaged in inspecting and/or auditing Tenant's books and records as provided herein.  Such books and records shall be kept in accordance with generally accepted accounting principles and practices consistently applied and shall be retained by Tenant for not less than one (1) year following the end of the calendar year to which they refer.

5.      Provided that the Alternate Rent payable for a calendar month does not exceed the Cap, Landlord and/or its auditor shall have the right, upon at least ten (10) days prior notice to Tenant, to inspect and/or audit Tenant's records relating solely to Gross Sales achieved in the Premises for such calendar month.

6.      Landlord shall not disclose to any third party Tenant's Gross Sales or the amount of Alternate Rent paid or payable by Tenant, <u>provided</u>, <u>however</u>, that (A) such information was not previously disclosed by Tenant to such third party or to the public generally, and (B) nothing contained herein shall restrict Landlord from disclosing such information as may be required by law,

or to its accountants, attorneys, *bona fide* prospective purchasers, or current or prospective Mortgagees or Ground Lessor(s) of all or any portion of Landlord's interest in the Shopping Center (provided that each of such recipients shall be bound to the same non-disclosure provisions as are imposed upon Landlord).

<u>Exhibit M</u>
<u>Prohibited Uses</u>

As used in this Lease, the term ***"Prohibited Uses"*** shall mean any of the following uses:

(1)     Any use which emits or results in strong, unusual or offensive odors, fumes, dust or vapors, is a public or private nuisance, emits noise or sounds which are objectionable due to intermittence, beat, frequency, shrillness or loudness, creates a hazardous condition, or is used, in whole or in part, as or for warehousing or the dumping or disposing of garbage or refuse.

(2)     Any operation primarily used as a storage facility and any assembling, manufacturing, distilling, refining, smelting, agricultural, or mining operation;

(3)     Any "second hand" store, "surplus" store;

(4)     Any mobile home park, trailer court, labor camp, junkyard, or stockyard (except that this provision shall not prohibit the temporary use of construction trailers during periods of construction, reconstruction, or maintenance);

(5)     Any dumping, disposing, incineration, or reduction of garbage (exclusive of trash compactors or trash containers located near the rear of any building);

(6)     Any fire sale, bankruptcy sale (unless pursuant to a court order), auction house operation, fictitious going-out-of-business sale, lost-our-lease sale or similarly advertised event;

(7)     Any central laundry, dry cleaning plant, or laundromat (except that a dry cleaner that performs all dry cleaning outside the Shopping Center shall be permitted, so long as its on-site premises are located more than 150 feet away from the Premises);

(8)     Any automobile, truck, trailer, boat, or recreational vehicle sales, leasing, display or body shop repair operation;

(9)     Any bowling alley or skating rink;

(10)     Any live performance theater, auditorium, meeting hall, sporting event, or other entertainment use;

(11)     Any living quarters, sleeping apartments, or lodging rooms;

(12)     Any veterinary hospital or animal raising or boarding facilities (except to the extent permitted below);

(13)     Any mortuary or funeral home;

(14)     Any "Pornographic Use", which shall include, without limitation: (x) a store displaying for sale or exhibition books, magazines or other publications containing any combination of photographs, drawings or sketches of a sexual nature, which are not primarily scientific or educational [provided, however, that the sale of books, magazines and other publications by a national bookstore of the type normally located in first-class shopping centers in the State in which the Shopping Center is located (such as, for example, Borders and Barnes & Noble, as said stores currently operate) shall not be deemed a "pornographic use" hereunder]; or (y) a store offering for exhibition, sale or rental video cassettes or other medium capable of projecting, transmitting or reproducing, independently or in conjunction with another device, machine or equipment, an image or series of images, the content of which has been rated or advertised generally as NC-17 or "X" or unrated by the Motion Picture Rating Association, or any successor thereto [provided, however, that the sale or rental of such videos by a national video store of the type normally located in first-class shopping centers in the State in which the Shopping Center is located (such as, for example, Blockbuster or West Coast Video, as said stores currently operate) shall not be deemed a "pornographic use" hereunder]; or massage parlor;

(15)     Any so-called "head shop", or other establishment primarily selling or exhibiting drug-related paraphernalia;

(16)    Any bar, tavern, or other establishment selling alcoholic beverages for on- or off-premises consumption;

(17)    Any catering or banquet hall;

(18)    Any flea market, amusement or video arcade, pool or billiard hall, night club, discotheque, or dance hall;

(19)    Any training or education facility, including but not limited to: beauty schools, barber colleges, reading rooms, places of instruction or other operations catering primarily to students or trainees rather than to customers; provided, however, this prohibition shall not be applicable to on-site employee training by an Occupant incidental to the conduct of its business at the Shopping Center;

(20)    Any gambling facility or operation, including but not limited to: off-track or sports betting parlor; table games such as black-jack or poker; slot machines; video poker/black-jack/keno machines or similar devices; or bingo hall.  Notwithstanding the foregoing, this prohibition shall not apply to governmental sponsored gambling activities, or charitable gambling activities, so long as such governmental and/or charitable activities are incidental to the business operation being conducted by the Occupant;

(21)    Any unlawful use;

(22)    Any pawn shop, gun shop, or tattoo parlor;

(23)    Any church or other place of religious worship;

(24)    Any car wash, automobile repair shop, or any business servicing motor vehicles in any respect, including, without limitation, any quick lube oil change service, tire center or gasoline or service station or facility

(25)    Any carnival, amusement park or circus;

(26)    Any medical clinics or medical offices;

(27)    Any supermarket;

(28)    Any office use, other than: (x) office space used in connection with and ancillary to a permitted retail use hereunder; and (y) retail offices providing services commonly found in similar first-class shopping centers in the St.- George-Washington metropolitan area (for example, financial services, real estate brokerage, insurance agency, banking, travel agency), provided that such uses are located either on an Outparcel or at least seventy-five (75') lineal feet away from the Premises, and not more than two thousand five hundred (2,500) square feet of Floor Area in the Shopping Center (excluding the Outparcels), in the aggregate, shall be devoted to such uses.

(29)    hotel/motel;

(30)    daycare center;

(31)    veterinary office (except that a full-line pet and pet supply store shall be permitted to be located within the Premises or on an Outparcel);

(32)    children's entertainment or activity facility (such as "Discovery Zone", or "Chuck E. Cheese's");

(33)    karate center;

(34)    movie theater;

(35)    restaurant or other food establishment serving meals for on- or off-premises consumption unless same is: (i) a primarily take-out food establishment, located at least seventy-five (75') lineal feet away from the Premises, and containing seating (e.g., chairs, booths or stools) for not more than four (4) customers, or (ii) a family-style restaurant or other family-style food establishment located on an Outparcel;

(36)    beauty parlor or nail salon unless same is located on an Outparcel; or

1          (37)     health spa, exercise facility or similar type business.

1

2

3

4

5

<u>Exhibit N</u>

<u>CC&Rs</u>

1
2
3
4

<u>Exhibit O</u>
<u>REA</u>

1
2
3
4
5
6
7
8

<u>Exhibit P</u>
<u>Declaration</u>

# **Exhibit B**



January 1, 2023

Bed Bath & Beyond, Inc.
650 Liberty Avenue
Union, NJ 07083

Re:    Telegraph Marketplace Shopping Center, Suite 2
         Store #777 – Washington, UT – CAM Reconciliation for 2022 - No Budget Change for 2023

Dear Bed Bath Specialist,

According to the Declaration of Covenants, Conditions and Restrictions that follow your land, Article IV, a written report about the Shared Maintenance Costs shall be provided to each owner by no later than sixty (60) days after the end of each calendar year. Your pro-rata share of the shopping center costs is 31.51% and the building share is 42.55%. You paid $18,000.00 in 2022 and the shortage is $5,205.97. An Invoice is included here with this letter (see spreadsheet attached ).

*Also, please note that the signage fee of $833.13 is included which is pro-rated at 20.34 that was brought to your attention for the cam report last year.* This is your advertising cost and it is charged by your square footage on the pylon and monument signage.  The fee is not a signage charge such as a No Overnight Parking Sign which is included elsewhere in the spreadsheet as is an expense this past year. Not all tenants have signage on the Pylon sign.   Not all pylon tenants are listed on the Monument Sign. However, both Best Buy (First line per CC&Rs) and Bed Bath & Beyond (Second Line per CC&RS) are on both signs. The Tenants are charged for this signage per their pro-rata share of the space on the signage since the operation of the shopping center in 2004. This is not considered a capped expense. I believe that you have been capping this expense and including it in Common Area Expenses and haven't been paying for your proper share.

Likewise, the Building Repairs for 2022 again is not shopping center expense that are capped.  There are two spaces the tenants share and they are the riser (pump room) and electrical room.  If there are repairs to these areas like lock changes; the tenants in that building share the expense on a pro-rate basis.  Your building share is 42.55%.  *Another point here is that the maintenance charges for the slurry coat and stripping are included here.*  **The amount is broken down into five equal yearly installments of $2313.40. This is year 5 charges.  It is not a capped expense and it is covered in Section 5.1.3 of the lease on a straight-line basis over 5 years.**

Attached is the flash drive with copies of the invoice included and also included is the spreadsheet breakdown of the charges and an invoice in the amount of $5,205.97.  I have also included a copy of the transaction detail by account of these payments.  The copies of the invoices are in many cases in two parts, January to July and August through December 2022.   *The budget will remain the same for 2022.*

We want to thank Bed Bath & Beyond for being our tenant and hope that your 2023 is prosperous.   The Landlord has been in contact with Bed Bath & Beyond and is currently working with Bed Bath & Beyond. Thank you in advance with any questions you may have regarding the cam report for 2022.

Sincerely,

Eileen T. Higgins
Mgr.,   North Star Real Estate Co., Inc.
On behalf of Telegraph Marketplace Shopping Center
803-732-3442 (land line) 803-361-6530 (cell)



**UNITED STATES POSTAL SERVICE**

STUART
801 SE JOHNSON AVE
STUART, FL 34994-9998
(800)275-8777

12/30/2022                          10:39 AM
------------------------------------------------
Product            Qty   Unit      Price
                         Price
------------------------------------------------
PM Express 1-Day     1             $27.90
Flat Rate Env
  Union, NJ 07083
  Flat Rate
  Signature Waiver
  Scheduled Delivery Date
    Sat 12/31/2022 06:00 PM
  Money Back Guarantee
  Tracking #:
    EI595903815US
  Insurance                         $0.00
  Up to $100.00 included
Total                              $27.90

------------------------------------------------
Grand Total:                       $27.90

------------------------------------------------
Credit Card Remit                  $27.90
  Card Name: AMEX
  Account #: XXXXXXXXXXX3015
  Approval #: 843440
  Transaction #: 767
  AID: A000000025010801     Chip
  AL: AMERICAN EXPRESS
  PIN: Not Required
------------------------------------------------

In a hurry? Self-service kiosks offer
  quick and easy check-out. Any Retail
    Associate can show you how.

    Save this receipt as evidence of
insurance. For information on filing an
    insurance claim go to
https://www.usps.com/help/claims.htm
      or call 1-800-222-1811

Text your tracking number to 28777 (2USPS)
to get the latest status. Standard Message
and Data rates may apply. You may also
visit www.usps.com USPS Tracking or call
        1-800-222-1811.

        Preview your Mail
        Track your Packages
        Sign up for FREE @
    https://informeddelivery.usps.com

All sales final on stamps and postage.
Refunds for guaranteed services only.
    Thank you for your business.

    Tell us about your experience.
Go to: https://postalexperience.com/Pos
or scan this code with your mobile device.



EI 595 903 815 US

Telegraph Marketplace Partners II, LLC
C/O Eileen Higgins
226 Bronlow Drive
Irmo, SC 29063
Phone: 803-732-3442
Fax: 803-781-3604

Date: 1.1.2023 to 3.31.2023

Physical Location
844 W. Telegraph Road, Washington, UT 84780

Prepared by:
Eileen T. Higgins, Manager, North Star Real Estate Co., Inc
Phone: 803-732-3442
Cell Phone: 803-381-6630
Email: eileen.t.higgins@gmail.com and ehigg@sc.rr.com

| Suite No. | Tenant | SF |
| --- | --- | --- |
| 1 | Best Buy Store #891 | 20,524 |
| 2 | Bed Bath Store #777 | 22,054 |
| 3 | American's Best Contacts & Eye Glasses / National Vision | 3,450 |
| 4 | Tan Republic | 2,337 |
| 5 | Rooms & More | 3,267 |
| Totals | | 51,632 |

Telegraph Marketplace Partners II, LLC
c/o Eileen Higgins
Irmo, SC 29063

Physical Location: 760 W. Telegraph Road, Washington, UT 84780

Prepared by: Eileen T. Higgins, Manager

NNN Leases

Date: 1-1-2023 to 3-31-2023

| Suite No. | Tenant | SF |
|---|---|---|
| | Rumbi Grill Corp. | 1800 |
| #2 | Vapor Works | 1400 |
| #4 | Jiren, Inc dba | 1400 |
| | Nail Salon | |
| #5 | Store Plaza | 3000 |
| | Totals | 6000 |

# TELEGRAPH MARKETPLACE PARTNERS 2022-2023 PREMIUM BREAKDOWN

**COMPANY:** Central Insurance Co.

**POLICY TERM:** 05/20/22 - 05/20/23

| COVERAGE TYPE | ANNUAL PREMIUM |
|---|---|
| Liability | $2,709 |
| 844 Telegraph Building | $3,275 |
| 740 Telegraph Building | $1,580 |
| Umbrella | $1,811 |
| **GRAND TOTAL** | **$9,375** |

**ACORD**

# CERTIFICATE OF LIABILITY INSURANCE

TELEMAR-01

JCLARK

DATE (MM/DD/YYYY)
5/4/2022

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | | |
|---|---|---|---|
| The Mahoney Group - Salt Lake<br>68 S. Main Street 8th Floor<br>Salt Lake City, UT 84101 | PHONE (A/C, No, Ext): (801) 521-2421 | | FAX (A/C, No): (801) 521-2424 |
| | E-MAIL ADDRESS: | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| INSURED | INSURER A: CENTRAL MUTUAL INSURANCE CO. | | 20230 |
| Telegraph Marketplace Partners II LLC<br>226 Bronlow Drive<br>Irmo, SC 29063 | INSURER B: | | |
| | INSURER C: | | |
| | INSURER D: | | |
| | INSURER E: | | |
| | INSURER F: | | |

## COVERAGES   CERTIFICATE NUMBER:   REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY<br>☐ CLAIMS-MADE  X OCCUR | | | CLP 8649781 | 5/20/2022 | 5/20/2023 | EACH OCCURRENCE | $ 1,000,000 |
| | | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 300,000 |
| | | | | | | | MED EXP (Any one person) | $ 5,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER:<br>X POLICY  ☐ PRO-JECT  ☐ LOC<br>OTHER: | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | | | | | | | CYBER | $ 50,000 |
| | AUTOMOBILE LIABILITY<br>☐ ANY AUTO<br>☐ OWNED AUTOS ONLY  ☐ SCHEDULED AUTOS<br>☐ HIRED AUTOS ONLY  ☐ NON-OWNED AUTOS ONLY | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| A | X UMBRELLA LIAB  X OCCUR<br>☐ EXCESS LIAB  ☐ CLAIMS-MADE | | | CXS 8649782 | 5/20/2022 | 5/20/2023 | EACH OCCURRENCE | $ 4,000,000 |
| | DED  X RETENTION $ 0 | | | | | | AGGREGATE | $ 4,000,000 |
| | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY<br>ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED?  Y/N<br>(Mandatory in NH)  N/A<br>If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | PER STATUTE    OTH-ER | |
| | | | | | | | E.L. EACH ACCIDENT | $ |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| A | Property | | | CLP 8649781 | 5/20/2021 | 5/20/2022 | E.L. DISEASE - POLICY LIMIT<br>Building | $<br>5,530,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
Loc. 844 W. Telegraph Road Ste 2 Washington UT 84780

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Bed Bath & Beyond #777<br>Corporate Offices<br>650 Liberty Ave<br>Union, NJ 07083 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| | AUTHORIZED REPRESENTATIVE<br>*Richard Q. Perris* |

ACORD 25 (2016/03)

© 1988-2015 ACORD CORPORATION. All rights reserved.
The ACORD name and logo are registered marks of ACORD

# **Exhibit C**

Telegraph Marketplace Partners II. LLC
C/O North Star Real Estate
226 Bronlow Drive
Irmo, SC 29063

February 2, 2023

Bed Bath & Beyond Inc.
650 Liberty Street
Union, NJ 07083

Re:  Lease Default per lease within 30 days if not remedied with Telegraph Marketplace and Bed Bath &
Beyond for Store #777, Suite 2, 844 Telegraph St., Washington, UT 84780

Dear Lease Administration Rep.,

Telegraph Marketplace Partners II, LLC has a lease with Bed Bath & Beyond Inc. dated 9/19/2003 and it
was Amended on October 31, 2013.  The lease is a 20 year lease ending on 1/31/2025.  On February 1,
2023 Telegraph did not receive Bed Bath & Beyond Inc. Store #777 Rent in the Amount of $22,175.63.
Additionally, it did not receive Additional Rent of $5,205.97 for a Cam Shortage in 2022.  The invoice was
dated 12/30/2022 and was overnighted to Bed Bath Corporate in New Jersey and received by your
company on 12/31/2022.  That invoice has not been paid and is due immediately as well.

According to Section 16.1 Tenant Default, the Landlord is looking for tenant to cure their default.
Landlord is not giving up any rights that it has with the lease and looks to Bed Bath & Beyond to cure this
default.  Copies of the statement and invoice are attached.

Sincerely,

Eileen T. Higgins
Mgr., North Star Real Estate Co Inc.
On behalf of Telegraph Marketplace Partners II, LLC
803-732-3442- landline
803-361-6530 - cell

Cc: J. Michael Martin – Telegraph Marketplace

Cc:  Gregory Cropper, Esq.
     Parsons Behle & Latimer
     1441 West Ute Blvd, Suite 330
     Park City, UT  84098

Cc: Sills Cummis Radin Tischman Epstein & Gross, P.A.

Cc: Attorney for Bed Bath & Beyond, 650 Liberty St., Union, NJ 07083

*File Copy*

Telegraph Marketplace Partners II. LLC
C/O North Star Real Estate
226 Bronlow Drive
Irmo, SC 29063
March 2, 2023

Bed Bath & Beyond Inc.
650 Liberty Street
Union, NJ 07083

Re:  Lease Default per lease within 10  days if not remedied with Telegraph Marketplace and Bed Bath &
Beyond for Store #777, Suite 2, 844 Telegraph St., Washington, UT 84780

Dear Lease Administration Rep.,

Telegraph Marketplace Partners II, LLC has a lease with Bed Bath & Beyond Inc. dated 9/19/2003 and it
was Amended on October 31, 2013.  The lease is a 20 year lease ending on 1/31/2025.  On March 1,
2023 Telegraph did not receive Bed Bath & Beyond Inc. Store #777 Rent in the Amount of $22,175.63.
Additionally, it did not receive Additional Rent of $5,205.97 for a Cam Shortage in 2022.  The invoice was
dated 12/30/2022 and was overnighted to Bed Bath Corporate in New Jersey and received by your
company on 12/31/2022.  That invoice has not been paid and is due immediately as well.  The invoice
for the 2022 cams was sent with a flash drive and backup.

According to Section 16.1 Tenant Default, the Landlord is looking for tenant to cure their default.
Landlord is not giving up any rights that it has with the lease and looks to Bed Bath & Beyond to cure this
default.  Copies of the statement and invoice are attached.

Sincerely,

Eileen T. Higgins
Mgr., North Star Real Estate Co Inc.
On behalf of Telegraph Marketplace Partners II, LLC
803-732-3442- landline
803-361-6530 - cell

Cc:  J. Michael Martin – Telegraph Marketplace

Cc:  Gregory Cropper, Esq.
     Parsons Behle & Latimer
     1441 West Ute Blvd, Suite 330
     Park City, UT  84098

Cc:  Sills Cummis Radin Tischman Epstein & Gross, P.A., Attn:  Jeffrey H. Newman, Esq.
Cc:  Allan N. Rauch, Esq., Bed Bath & Beyond, 650 Liberty St., Union, NJ 07083


**UNITED STATES POSTAL SERVICE.**

```
                    STUART
               801 SE JOHNSON AVE
              STUART, FL 34994-9998
                 (800)275-8777
03/02/2023                        10:41 AM
-------------------------------------------
Product          Qty   Unit     Price
                       Price
-------------------------------------------
PM Express 1-Day    1            $28.75
Flat Rate Env
    Union, NJ 07083
    Flat Rate
    Signature Requested
    Scheduled Delivery Date
       Fri 03/03/2023 06:00 PM
    Money Back Guarantee
    Tracking #:
       EI617752819US
    Insurance                    $0.00
       Up to $100.00 Included
    Return Receipt               $3.35
       Tracking #:
          9590 9402 7852 2234 4352 85
Total                            $32.10

PM Express 1-Day    1            $28.75
Flat Rate Env
    Newark, NJ 07102
    Flat Rate
    Signature Requested
    Scheduled Delivery Date
       Fri 03/03/2023 06:00 PM
    Money Back Guarantee
    Tracking #:
       EI383770152US
    Insurance                    $0.00
       Up to $100.00 Included
    Return Receipt               $3.35
       Tracking #:
          9590 9402 7852 2234 4374 56
Total                            $32.10
-------------------------------------------
Grand Total:                     $64.20
-------------------------------------------
Credit Card Remit                $64.20
    Card Name: AMEX
    Account #: XXXXXXXXXXX3015
    Approval #: 802710
    Transaction #: 183
    AID: A000000025010801         Chip
    AL: AMERICAN EXPRESS
```



**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Bed Bath & Beyond
650 Liberty Street
Union NJ 07083
Lease Admin

9590 9402 7852 2234 4352 85

2. Article Number (Transfer from service label)

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____ ☐ Agent
☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☒ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053    Domestic Return Receipt



USPS TRACKING #

9590 9402 7852 2234 4352 85

**United States Postal Service**

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

• Sender: Please print your name, address, and ZIP+4® in this box•

Telegraph Marketplace Partners II
c/o Eileen Higgins
226 Bronlow Dr
Irmo, SC 29063

829126

EI 383 770 152 US

Law Firm Sills, etc

EI 617 752 819 US

Bed Bath

for Lease Admin

& Allan Pauck

Telegraph Marketplace Partners II, LLC

C/O Eileen Higgins
226 Bronlow Drive
Irmo, SC 29063

|  |
|---|
| 3/2/2023 |

| Bill To |
|---|
| Bed Bath & Beyond #777
650 Liberty Street
Union, NJ 07083 |

| Amount Due |
|---|
| $27,381.60 |

| Date | Description | Amount | Balance |
|---|---|---|---|
| 12/31/2022 | Balance forward | | 5,205.97 |
| 01/01/2023 | Bed Bath Rent | 20,675.63 | 25,881.60 |
| | --- Bed Bath Rent $20,675.63 | | |
| 01/01/2023 | Bed Bath Cams as of 1/1/2022 | 1,500.00 | 27,381.60 |
| | --- Bed Bath cams $1,500.00 | | |
| 01/03/2023 | PMT | -22,175.63 | 5,205.97 |
| 02/01/2023 | Bed Bath Rent | 20,675.63 | 25,881.60 |
| | --- Bed Bath Rent $20,675.63 | | |
| 02/01/2023 | Bed Bath Cams as of 1/1/2023 | 1,500.00 | 27,381.60 |
| | --- Bed Bath cams $1,500.00 | | |
| 02/10/2023 | PMT | -22,175.63 | 5,205.97 |
| 03/01/2023 | Bed Bath Rent | 20,675.63 | 25,881.60 |
| | --- Bed Bath Rent $20,675.63 | | |
| 03/01/2023 | Bed Bath Cams as of 1/1/2023 | 1,500.00 | 27,381.60 |
| | --- Bed Bath cams $1,500.00 | | |

| Air Conditioning Units should be serviced quarterly. |
|---|

| Current | 1-30 Days Past Due | 31-60 Days Past Due | 61-90 Days Past Due | Over 90 Days Past Due | Amount Due |
|---|---|---|---|---|---|
| 22,175.63 | 0.00 | 5,205.97 | 0.00 | 0.00 | $27,381.60 |

| Phone # | E-mail |
|---|---|
| 803-732-3442 | eileen.t.higgins@gmail.com |

**Telegraph Marketplace Partners II, LLC**

Invoice

C/O Eileen Higgins
226 Bronlow Drive
Irmo, SC 29063

Phone #    803-732-3442        eileen.t.higgins@gmail.com
Fax #      803-781-3604

| Date | Invoice # |
|------|-----------|
| 12/30/2022 | 157 |

| Bill To |
|---------|
| Bed Bath & Beyond #777 |
| 650 Liberty Street |
| Union, NJ 07083 |

| P.O. No. | Terms | Project |
|----------|-------|---------|
|  | Net 30 |  |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
|  | 2022 Cam Shortage including  Final Coat on Slurry, Crack Repair for Parking Lot, Parking Lot  Signage additions, and Parking Lot Light Repairs | 5,205.97 | 5,205.97 |

| | Total | $5,205.97 |

# **Exhibit D**

TELEGRAPH MARKETPLACE PARTNERS II, LLC

March 31, 2023

Bed Bath & Beyond, Inc.
650 Liberty Street
Union, NJ 07083

Re:    NOTICE OF TERMINATION OF LEASE pursuant to Lease Agreement between Telegraph
Marketplace Partners, LLC, a Utah limited liability company, as "Landlord", and Bed Bath &
Beyond, Inc., a New York corporation, as "Tenant", dated September 19, 2003, pertaining to
Certain Premises located in Telegraph Marketplace, 844 Telegraph Street, Suite 2, Washington,
Utah; Bed Bath & Beyond Store #777 (as amended, the "Lease")

To Whom it May Concern,

This shall serve as notice from Landlord to Tenant pursuant to the Lease of Landlord's termination of the
Lease pursuant to Section 5.1.2 (b) and Section 16.1.2 (c) thereof, effective April 6, 2023.

Section 5.1.2 (b) of the Lease requires that Tenant resolve any and all questions, request any additional
information and pay a reconciliation of its share of Common Area Charges for the immediately
preceding calendar year within sixty (60) days following receipt from Landlord of the applicable "CAC
Reconciliation Statement" documenting the same. Landlord delivered a CAC Reconciliation Statement
for calendar year 2022 on January 3, 2023; therefore, the deadline for Tenant to resolve all questions
and pay its reconciliation share of Common area Charges was March 4, 2023. However, Tenant failed
resolve any questions and pay its reconciliation share on or before such deadline. Landlord then
delivered to Tenant a notice of default in connection with such failure, which notice of default was
delivered to Tenant on March 6, 2023. A copy of such notice of default, together with the related
delivery receipt, is enclosed for reference. Tenant then had had ten (10) days, until March 16, 2023, to
cure such default by paying Tenant's reconciliation share.

Tenant failed to cure such default on or before March 16, 2023, which failure constituted an "Event of
Default" under Section 16.1.1 of the Lease. Section 16.1.1 (c) of the Lease provides Landlord the right to
terminate the Lease upon an Event of Default by Tenant upon five (5) days prior written notice thereof
to Tenant. This notice shall serve as notice from Landlord to Tenant of such termination of the Lease by
Landlord due to the above-referenced Event of Default, effective as of April 6, 2023 (the "Termination
Date").

Section 20.1 of the Lease requires that Tenant "quit and surrender the Premises in good condition and
repair" as of the Termination Date, and Landlord hereby demands such surrender of the Premises in
such condition on or before April 6, 2023. Landlord hereby reserves all rights and remedies available to
Landlord under the Lease, at law and in equity, including, without limitation, the right to sue Tenant for
unpaid Rent, Common Area Charges and other amounts due and payable under the Lease through the
Termination Date, the right to institute summary judicial proceedings to recover possession of the
Premises and statutory damages, and the right to recover all costs and expenses incurred by Landlord in
connection with the foregoing, including attorneys' fees and costs pursuant to Section 23.7 of the Lease.

4892-0166-0250.v1

Sincerely,

TELEGRAPH MARKET PLACE PARTNERS II, LLC,
a Utah limited liability company

By _J. Michael Martin_

_By Eileen Higgins under Power of Attorney_
_dated the 26th day of September, 2007_

Cc: J. Michael Martin – Telegraph Marketplace
Cc: Gregory Cropper, Esq.
Cc: Sills Cummis Radin Tischman Epstein & Gross, P.A., Attn: Jeffrey H. Newman, Esq.
Cc: Allan N. Rauch, Esq., Bed Bath & Beyond, 650 Liberty St., Union, NJ 07083

4892-0166-0250.v1

# **Exhibit E**

TELEGRAPH MARKETPLACE PARTNERS II, LLC


April 12, 2023


Bed Bath & Beyond, Inc.
650 Liberty Street
Union, NJ 07083

Re:     **FIVE DAY NOTICE TO VACATE PREMISES** or, in the alternative, **FIFTEEN DAY NOTICE TO VACATE
PREMISES** previously leased pursuant to that certain Lease Agreement by and between
Telegraph Marketplace Partners, LLC, a Utah limited liability company, as "Landlord", and Bed
Bath & Beyond, Inc., a New York corporation, as "Tenant", dated September 19, 2003 (as
amended, the "Lease"), pertaining to certain premises located in Telegraph Marketplace, 844
Telegraph Street, Suite 2, Washington, Utah; Bed Bath & Beyond Store #777 (the "Premises")

To Whom it May Concern,

Landlord delivered to Tenant a Notice of Termination of Lease dated March 31, 2023, in connection with
the termination of the Lease by Landlord; such termination was effective as of April 6, 2023. Tenant
remains in unlawful possession of the Premises despite such termination of the Lease, which unlawful
occupancy by Tenant is now a tenancy at will (or tenancy at sufferance) pursuant to Utah Code
Annotated § 78B-6-802(1)(b)(ii). The purpose of this Notice to Vacate Premises is to demand that, in
accordance with Utah Code Ann. § 78B-6-802(1)(b)(ii), Tenant vacate the Premises and relinquish actual
and exclusive possession of the Premises to Landlord on or before within five (5) calendar days following
Landlord's delivery of this Notice to Vacate Premises, which is April 18, 2023.

In the alternative, if Tenant is found *not* to be a tenant at will under Utah Code Ann. § 78-B-6-
802(1)(b)(ii), Tenant shall be deemed to be occupying the Premises as a tenant at sufferance pursuant to
Section 20.2 of the Lease; and should Tenant be determined to be occupying the Premises as a month-
to-month tenant in connection therewith, then in accordance with Utah Code Ann. § 78-B-6-802(1)(b)(i),
Tenant shall vacate the Premises and relinquish actual and exclusive possession of the Premises to
Landlord on or before April 30, 2023.

In either event, Tenant shall be liable for the payment of all past, current and future Fixed Rent and
Additional Rent amounts payable by Tenant under the Lease or under law through the date on which
Tenant relinquishes possession of the Premises as required herein and under the Lease; and in the event
Tenant is determined to be a tenant at sufferance under Section 20.2 of the Lease, Tenant shall be liable
for One Hundred Fifty Percent (150%) of the Fixed Rent in effect as of the termination of the Lease,
together with all Additional Rent payable through such termination. Again, in either event, Tenant will
be liable to Landlord for all costs incurred in connection with obtaining possession of the Premises in the
condition required under the Lease, including attorney's fees and any available statutory damages.

Landlord received an electronic transfer of funds from Tenant *after* delivering the Notice of Termination
of Lease to Tenant. Be advised that Landlord will maintain all such funds for Tenant's account until
Tenant relinquishes possession of the Premises to Landlord as required, and will then conduct a full

4892-0166-0250.v1

accounting of such funds. In the event Landlord is required to institute legal action against Tenant to obtain such possession, Landlord will pay such funds into court in connection with such action for disposition by the court in accordance with Utah law and the terms of the Lease.

If Tenant fails to comply with this notice, Tenant will be served with a summons and complaint for unlawful detainer. Unlawful detainer is when a tenant remains in possession of rental property after the owner serves you with a lawful notice to vacate, such as this notice. If Tenant is found by the court to be in unlawful detainer, Tenant will be evicted by the court and Tenant will be liable for, in addition to the amounts set forth above: (a) damages caused by Tenant's unlawful detainer of the Premises; and (b) damages for any waste to the Premises caused by Tenant. Tenant will also be liable for three times those damages allowed to be trebled under Utah Code Ann. § 78B-6-811, which specifically may include trebling all of those damages mentioned above except attorney's fees and court costs. Damages under (a) above are the reasonable rental value or reasonable value of the use and occupation of the Premises for each day Tenant remains after the expiration of this notice. In most cases trebling damages under (a) means the court will multiply the amount Tenant has been paying for Fixed Rent and Additional Rent by three for every day Tenant remains on the Premises after the last day you were given to vacate under this notice.

Sincerely,

TELEGRAPH MARKET PLACE PARTNERS II, LLC,
a Utah limited liability company

By _____

By Eileen Higgins under Power of Attorney dated
   the 26th day of September, 2007

Cc: J. Michael Martin – Telegraph Marketplace
Cc: Gregory Cropper, Esq.
Cc: Sills Cummis Radin Tischman Epstein & Gross, P.A., Attn: Jeffrey H. Newman, Esq.
Cc: Allan N. Rauch, Esq., Bed Bath & Beyond, 650 Liberty St., Union, NJ 07083

4892-0166-0250.v1