# EXHIBIT A

# LEASE AGREEMENT

**Between**

## DC USA OPERATING CO., LLC,
a New York limited liability company

**Landlord**

**and**

## BED BATH & BEYOND INC.,
a New York corporation,

**Tenant**

## DC USA SHOPPING CENTER
14TH STREET AND IRVING
WASHINGTON, D.C.

**Dated: January __, 2006**

\* \* \* \* \*

# TABLE OF CONTENTS

Page

ARTICLE 1      BASIC TERMS AND DEFINITIONS ........................................ 1
   Section 1.1      Basic Terms and Definitions ............................................ 1

ARTICLE 2      LEASE OF PREMISES; LEASE TERM; DELIVERY DATE .......... 5
   Section 2.1      Lease of Premises ............................................................ 5
   Section 2.2      Term ................................................................................ 5
   Section 2.3      Delivery Date .................................................................. 6
   Section 2.4      Unseasonable Delivery: Slack Period ............................ 9
   Section 2.5      Initial Co-Tenancy Condition ........................................ 9
   Section 2.6      Permits for Signage ...................................................... 10

ARTICLE 3      IMPROVEMENTS ................................................................ 11
   Section 3.1      Landlord's Work and Tenant's Work .............................. 11
   Section 3.2      Plan Approvals .............................................................. 11
   Section 3.3      Performance of Work ...................................................... 15
   Section 3.4      Measurement; Adjustment of Rent ................................ 18

ARTICLE 4      FIXED RENT, TAXES & PERCENTAGE RENT:
               DETERMINATION AND PAYMENT .................................... 19
   Section 4.1      Fixed Rent ...................................................................... 19
   Section 4.2      Payment of Rent ............................................................ 19
   Section 4.3      Real Estate and Other Taxes .......................................... 19
   Section 4.4      Percentage Rent ............................................................ 21

ARTICLE 5      COMMON AREAS, THEIR USE AND CHARGES ...................... 23
   Section 5.1      Common Areas: Maintenance.......................................... 23
   Section 5.2      Common Areas: Restrictions .......................................... 26

ARTICLE 6      UTILITIES .......................................................................... 29
   Section 6.1      Utility Service ................................................................ 29
   Section 6.2      Interruption.................................................................... 29

ARTICLE 7      SIGNS .................................................................................. 29
   Section 7.1      Tenant's Building Signage.............................................. 29
   Section 7.2      Pylon/Monument Signage.............................................. 30
   Section 7.3      Signage: Alteration/Removal/Allocation ........................ 30
   Section 7.4      Cooperation .................................................................... 31
   Section 7.5      Signage Restrictions and Criteria.................................. 31

ARTICLE 8      ALTERATIONS AND IMPROVEMENTS ................................ 31
   Section 8.1      Alterations and Improvements ........................................ 31

ARTICLE 9      REPAIRS .............................................................................. 33
   Section 9.1      Tenant's Repairs.............................................................. 33
   Section 9.2      Landlord's Repairs ........................................................ 33
   Section 9.3      Legal Compliance Work .................................................. 34
   Section 9.4      Miscellaneous Construction Provisions .......................... 34

ARTICLE 10     INDEMNIFICATION, INSURANCE AND WAIVER OF
               SUBROGATION .................................................................. 35
   Section 10.1     Mutual Release, Waiver of Subrogation and Mutual Indemnification 35
   Section 10.2     Tenant's Insurance .......................................................... 36
   Section 10.3     Landlord's Insurance...................................................... 36
   Section 10.4     General Insurance Requirements .................................... 37

ARTICLE 11     FIRE AND OTHER CASUALTY; EMINENT DOMAIN .............. 37
   Section 11.1     Fire and Other Casualty .................................................. 37

| | Section 11.2 | Eminent Domain | 40 |
| | Section 11.3 | Abatement of Rent Charges | 41 |
| | ARTICLE 12 | COVENANTS, REPRESENTATIONS AND WARRANTIES | 41 |
| | Section 12.1 | Quiet Enjoyment | 41 |
| | Section 12.2 | Authority | 41 |
| | Section 12.3 | Landlord's Covenants, Warranties and Representations | 42 |
| | Section 12.4 | Environmental Matters | 43 |
| | Section 12.5 | Condominium Documents | 45 |
| | Section 12.6 | Land Development Agreement | 46 |
| | ARTICLE 13 | USES AND RESTRICTIONS | 47 |
| | Section 13.1 | Permitted and Prohibited Uses | 48 |
| | Section 13.2 | Tenant's Exclusive in Center | 48 |
| | Section 13.3 | Exclusives Which Tenant Must Honor | 34 |
| | ARTICLE 14 | CONDUCT OF BUSINESS OPERATIONS | 51 |
| | ARTICLE 15 | TENANT ASSIGNMENT AND SUBLETTING | 51 |
| | Section 15.1 | Assignment and Subletting | 51 |
| | Section 15.2 | Liability of Tenant | 53 |
| | Section 15.3 | Collateral Assignment | 53 |
| | Section 15.4 | Cure Rights of Original Tenant | 53 |
| | Section 15.5 | Recognition Agreement | 54 |
| | ARTICLE 16 | DEFAULT AND DISPUTE RESOLUTION | 54 |
| | Section 16.1 | Tenant Default | 54 |
| | Section 16.2 | Landlord Default | 55 |
| | Section 16.3 | Arbitration | 56 |
| | ARTICLE 17 | RIGHT TO MORTGAGE AND NON-DISTURBANCE; ESTOPPEL CERTIFICATE | 56 |
| | Section 17.1 | Right to Mortgage and Non-Disturbance | 56 |
| | Section 17.2 | Estoppel Certificate | 57 |
| | Section 17.3 | Existing Mortgages | 57 |
| | ARTICLE 18 | NOTICE | 57 |
| | ARTICLE 19 | TENANT'S PROPERTY | 58 |
| | ARTICLE 20 | END OF TERM | 58 |
| | Section 20.1 | Surrender of Premises | 58 |
| | Section 20.2 | Hold Over | 58 |
| | ARTICLE 21 | TENANT'S RIGHT OF FIRST OFFER | 58 |
| | ARTICLE 22 | ONGOING CO-TENANCY | 59 |
| | ARTICLE 23 | MISCELLANEOUS | 59 |
| | Section 23.1 | Loading Facilities | 59 |
| | Section 23.2 | Liens | 59 |
| | Section 23.3 | Broker's Commission | 60 |
| | Section 23.4 | *Force Majeure* | 60 |
| | Section 23.5 | Consents | 60 |
| | Section 23.6 | Costs | 60 |
| | Section 23.7 | Attorneys' Fees | 60 |
| | Section 23.8 | Survival of Obligations | 60 |
| | Section 23.9 | Non-Waiver | 60 |

| | | | |
|---|---|---|---|
| 1 | Section 23.10 | Rights Cumulative | 61 |
| 2 | Section 23.11 | Definition of Landlord | 61 |
| 3 | Section 23.12 | Successors and Assigns | 61 |
| 4 | Section 23.13 | Limitation of Landlord's Liability | 61 |
| 5 | Section 23.14 | Limitation of Tenant's Liability | 61 |
| 6 | Section 23.15 | Joint and Several Liability | 62 |
| 7 | Section 23.16 | Severability | 62 |
| 8 | Section 23.17 | Grammatical Usages and Construction | 62 |
| 9 | Section 23.18 | Table of Contents, Line Numbering and Paragraph Headings | 62 |
| 10 | Section 23.19 | Definition of Hereunder, Herein, etc. | 62 |
| 11 | Section 23.20 | Short Form Lease | 62 |
| 12 | Section 23.21 | Entire Agreement and Modification | 62 |
| 13 | Section 23.22 | No Joint Venture or Partnership Created by Lease | 62 |
| 14 | Section 23.23 | Tenant's Tradename; DC USA | 62 |
| 15 | Section 23.24 | Counterparts | 62 |
| 16 | Section 23.25 | Waiver of Trial by Jury | 63 |
| 17 | Section 23.26 | Incentives | 63 |
| 18 | Section 23.27 | Hiring | 64 |
| 19 | Section 23.28 | Governing Law | 34 |

20

## **EXHIBITS**

| | | |
|---|---|---|
| 22 | Exhibit A-1 | Legal Description of Land |
| 23 | Exhibit A-2 | Legal Description of Shopping Center Unit |
| 24 | Exhibit A-3 | Legal Description of Target Unit |
| 25 | Exhibit A-4 | Legal Description of Parking Unit |
| 26 | Exhibit B | Site Plan |
| 27 | Exhibit C | Rent Commencement and Expiration Date Agreement |
| 28 | Exhibit D | Specifications for Landlord's Work |
| 29 | Exhibit D-1 | Exterior Elevations of the Premises, and Sidewalk Plan |
| 30 | Exhibit D-2 | Exterior Elevations of the Building |
| 31 | Exhibit E | Permitted Encumbrances |
| 32 | Exhibit F | Signage |
| 33 | Exhibit F-1 | Permitted Signage Areas |
| 34 | Exhibit G | Subordination, Non-Disturbance and Attornment Agreement |
| 35 | Exhibit H | Subtenant Recognition Agreement |
| 36 | Exhibit I | Delivery Date Notice |
| 37 | Exhibit J | Delivery Date Certification |
| 38 | Exhibit K-1 | Existing Exclusives |
| 39 | Exhibit K-2 | Existing Leases |
| 40 | Exhibit L | Form of Condominium Documents |
| 41 | Exhibit M | Prohibited Uses |
| 42 | Exhibit N | Rules and Regulations |
| 43 | Exhibit O | Intentionally Omitted |
| 44 | Exhibit P | Description of Tax abatements and similar items, if any |
| 45 | Exhibit Q | Landlord's Sign Criteria |

1                              **LEASE AGREEMENT**

2            THIS LEASE AGREEMENT (***"Lease"***) is entered into as of January ___, 2006
3      by and between DC USA OPERATING CO., LLC, a New York limited liability
4      company, having an office c/o Grid Properties, Inc., 2309 Frederick Douglass Boulevard
5      New York, New York 10027 (***"Landlord"***), and BED BATH & BEYOND INC., a New
6      York corporation, having an office at 650 Liberty Avenue, Union, New Jersey 07083
7      (***"Tenant"***).

8                              **W I T N E S S E T H:**

9                              ARTICLE 1
10                        BASIC TERMS AND DEFINITIONS

11           Section 1.1    Basic Terms and Definitions. The following terms shall have the
12     meanings set forth in this Section 1.1 except as otherwise expressly provided herein.

13                  1.1.1   Additional Rent: Any monies which Tenant is required to pay to
14     Landlord under the terms and conditions of this Lease, other than Fixed Rent.

15                  1.1.2   Affiliate: A corporation, partnership, person or other entity which is
16     controlling, controlled by, or under common control with, Landlord or Tenant, as the case
17     may be. As used herein, "***control***" shall mean the possession, direct or indirect, of the
18     power to direct or cause the direction of the management and policies of a person or
19     entity, whether through the ownership of voting securities or rights, by contract, or
20     otherwise.

21                  1.1.3   Alternate Rent: Fifty (50%) of the Fixed Rent then applicable.

22                  1.1.4   Common Areas: The Common Elements together with all areas
23     within the Shopping Center that are not Common Elements which are, from time to time,
24     available for the joint use and benefit of Tenant and other tenants and occupants of the
25     Shopping Center, and, as appropriate in light of the nature of the Common Areas, their
26     respective employees, agents, subtenants, concessionaires, licensees, customers and other
27     invitees, including, but not limited to, passageways, sidewalks, entrances, exits, lighting
28     facilities, courts, landscaped areas, retention or detention areas, elevators, escalators and
29     common utility lines.

30                  1.1.4A Common Elements. The "General Common Elements", "Limited
31     Common Elements" and "Reserved Common Elements", each as defined in the
32     Condominium Documents. Each of ***"General Common Elements"***, ***"Limited Common***
33     ***Elements"*** and ***"Reserved Common Elements"*** as used herein shall have the meaning set
34     forth in the Condominium Documents.

35                  1.1.5   Condominium. That certain condominium created by the
36     Condominium Documents. The Condominium is on the property located at 14th Street
37     and Irving Street in Washington, D.C., and more particularly described in Exhibit A-1
38     hereto. It consists of three units: Unit No. 1, which is further defined as the "Shopping
39     Center" below and is further described on Exhibit A-2, Unit No. 2, which is referred to
40     herein as the Target Unit (the ***Target Unit"***) and is further described on Exhibit A-3 and
41     Unit No. 3, which is referred to herein as the Parking Unit (the ***"Parking Unit"***) and is
42     further described on Exhibit A-4. The Shopping Center, the Target Unit and the Parking
43     Unit are sometimes collectively referred to herein as the ***"Units"***. Each Unit includes all
44     interests included within the definition of "Condominium Unit" and "Unit" in the
45     Condominium Documents, including, without limitation, its interest in the "Common
46     Elements", "General Common Elements", "Limited Common Elements" and "Reserved
47     Common Elements", all as defined in the Condominium Documents.

48                  1.1.5A Condominium Documents. The documents attached hereto as
49     Exhibit L, which include the following: Declaration for DC USA Condominium,

1    including all exhibits thereto, By-Laws for DC USA Condominium and the Declaration
2    of Parking Operations.

3            1.1.6  Delivery Date: As defined in Section 2.3 hereof.

4            1.1.7  Effective Date: The date hereof.

5            1.1.8  Event of Default: As defined in Section 16.1 hereof.

6            1.1.9  Excused Periods: Periods during which Tenant's (or another tenant
7    or occupant's, as the context requires) failure to conduct the operations of its business or
8    any other business: (x) resulted from alterations or renovations being performed in and to
9    the Premises (or such other tenant's or occupant's premises) to the extent that such period
10   does not exceed ninety (90) days and does not occur more than once in a five (5) year
11   period, (y) was caused by damage or destruction, eminent domain proceedings or actions,
12   or Force Majeure, or (z) was caused by any act or omission of Landlord, or its
13   employees, agents, or contractors.

14          1.1.10 Exhibits. The exhibits listed in the Table of Contents annexed to this
15   Lease have been agreed to by the parties and attached hereto, it being the intention of the
16   parties that they shall become a binding part of this Lease as if fully set forth herein.

17          1.1.11 Fixed Rent: The following amounts for the periods indicated
18   (subject to adjustment pursuant to Section 3.4 hereof):

19            (a)  For the period commencing on the Rent Commencement Date
20   and ending on the last day of the "Initial Term" (defined in Subsection 1.1.43 below), at
21   the rate of Five Hundred Sixty Thousand and 00/100 ($560,000.00) Dollars per year
22   [based on Seventeen and 50/100 ($17.50) Dollars per square foot of Floor Area];

23            (b)  In the event Tenant exercises the first Renewal Option, for the
24   first five (5) year Renewal Period, at the rate of Six Hundred Seventy Two Thousand and
25   00/100 ($672,000.00) Dollars per year [based on Twenty One and 00/100 ($21.00)
26   Dollars per square foot of Floor Area];

27            (c)  In the event Tenant exercises the second Renewal Option, for
28   the second five (5) year Renewal Period, at the rate of Seven Hundred Fifty Two
29   Thousand and 00/100 ($752,000.00) Dollars per year [based on Twenty Three and 50/100
30   ($23.50) Dollars per square foot of Floor Area]; and

31            (d)  In the event Tenant exercises the third Renewal Option, for
32   the third five (5) year Renewal Period, at the rate of Eight Hundred Eighty Thousand and
33   00/100 ($880,000.00) Dollars per year [based on Twenty Seven and 50/100 ($27.50)
34   Dollars per square foot of Floor Area].

35          1.1.12 Floor Area: The actual number of square feet of space contained on
36   all floors within any building area in the Shopping Center (including the Premises) except
37   for areas used for such items as fire pump facilities, heating and ventilation facilities and
38   telephone and electric rooms not exclusively serving the Premises or any other premises,
39   adjacent corridors, stairwells, common ducts, common shafts, elevators, escalators and
40   similar common facilities, and, with respect to exterior areas, including all exterior areas
41   (other than outdoor seating areas located on public sidewalks that are available for
42   seating for patrons of adjacent restaurants located in the Shopping Center) leased to or
43   exclusively used by one or more tenants (other than [exterior] loading dock areas, trash
44   compactor areas, and trash container areas or areas that are not included in the assessment
45   for Taxes). All measurements pursuant to this Subsection shall be from the exterior of
46   outside walls or store front and/or to the centerline of any common walls, but in no event
47   shall Floor Area within either the Premises or the remainder of the Shopping Center

2

include any non-selling or storage space areas within any mezzanine, or, except as set forth above, any exterior areas. Notwithstanding the foregoing, the *"Health Club Patio Seating Area"* as designated on Exhibit B, shall not be considered Floor Area so long as Landlord receives no rent or other income therefrom and it is available solely to patrons of the health club in conjunction with their use of the health club.

   1.1.13 *Force Majeure*:  As defined in Section 23.4 hereof.

   1.1.14 Ground Lessor: The landlord under any existing or future ground or underlying leases encumbering or affecting all or any part of the Shopping Center owned by Landlord.

   1.1.15 Intentionally Omitted

   1.1.16 Hazardous Substances:  As defined in Subsection 12.4.1 hereof.

   1.1.17 Inducement Tenants:  As defined in Subsection 2.3.1 hereof.

   1.1.18 Landlord:  As defined in the preamble and Section 23.11 hereof.

   1.1.19 Landlord's Mailing Address:  c/o Grid Properties, Inc., 2309 Frederick Douglass Boulevard, New York, New York 10027, or such other place and/or to the attention of such other person as Landlord may notify Tenant from time to time by notice given in accordance with the provisions of Article 18 hereof.

   1.1.20 Landlord's Work:  As defined in Section 3.1 hereof.

   1.1.21 Lease Interest Rate: The then effective prime rate as published from time to time in the "Money Rates" section of *The Wall Street Journal* (or any successor publication thereto) plus two (2%) percent.

   1.1.22 Legal Requirements: All laws, statutes, codes, acts, ordinances, judgments, decrees, authorizations, directions and requirements of, and agreements with, all governmental departments, commissions, boards, courts, authorities, agencies, officials and officers, which now or at any time hereafter may be applicable to the Premises, the Shopping Center, or any part(s) thereof.

   1.1.23 Mortgagee:  Any state or federally regulated: bank, savings and loan association, insurance company, pension fund, credit union, real estate investment trust, or other institutional lender, which is not an Affiliate of Landlord, and which holds a mortgage on the Shopping Center or is the beneficiary under a deed of trust encumbering the Shopping Center.

   1.1.24 Intentionally Omitted

   1.1.25 Percentage Multiple:  As defined in Section 4.4 hereof.

   1.1.26 Percentage Rent:  As defined in Section 4.4 hereof.

   1.1.27 Permitted Use:  The sale at retail of a variety of linens and domestics (including, but not limited to, sheets, bedspreads, comforters, duvets, pillows, pillow covers, chair pads, placemats, tablecloths, dish towels, oven mittens and aprons); bathroom items (including, but not limited to, towels, shower curtains, bathroom rugs, toilet seats, health and beauty care items and cosmetics, personal care devices and other bathroom appliances and accessories); housewares (including, but not limited to, kitchen utensils, kitchen appliances and kitchen "gadgets," cleaning appliances and supplies, cookware, bakeware, dishes and china, glassware, garbage pails, ironing boards and other laundry items, mops and brooms, candles and candle holders, ready-to-assemble furniture and artificial flowers); frames and wall art; window treatments; closet, shelving and

3

storage items; home furnishings; area rugs; wall and floor coverings; furniture (including, without limitation, mattresses, box springs, bed frames, and bedroom furniture); decorative accessories; photo albums; photo storage boxes; luggage; books; party supplies; cards and stationery; seasonal items; juvenile merchandise (including, but not limited to, toys, car seats and safety-proofing items); specialty food items; food and non-alcoholic beverage services; any and all other items sold or services provided from time to time in any store owned or operated by Tenant or its Affiliate(s) (the aforementioned items are hereinafter collectively referred to as the *"Permitted Items"*); and for any other lawful retail use. In addition, Tenant shall be permitted to use portions of the Premises for storage and office uses incidental to the Permitted Use. Nothing in this definition shall permit Tenant to use the Premises in violation of any Prohibited Use or any Existing Exclusive then applicable, as is provided in Sections 2.1.4 and 13.1.1 below.

1.1.28 <u>Premises</u>: Being the area cross-hatched on <u>Exhibit B</u> hereto, having dimensions as shown on <u>Exhibit B</u> and containing approximately: (i) Thirty Two Thousand (32,000) square feet of Floor Area, and (ii) one thousand (1,000) square feet of mezzanine level space for office purposes, subject to adjustment in accordance with the provisions of Section 3.4 below. In no event shall such mezzanine non-selling space (or any space used for fire pump facilities) result in any charge to Tenant by way of Fixed Rent or any Additional Rent, nor shall such space be included in either the numerator or denominator in the determination of Tenant's Pro Rata Share. Nothing herein contained shall be construed as a letting by Landlord to Tenant of (i) the roof or exterior walls of the building of which the Premises forms a part and in which each of the Units are constructed (the *"Building"*), (ii) the space below the underside of the slab of the Premises, or (iii) the land below, or air rights above, the Premises.

1.1.29 <u>Renewal Option</u>:  As defined in Section 2.2.2 hereof.

1.1.30 <u>Renewal Period(s)</u>: Three (3) successive periods of five (5) years each, as provided in Section 2.2.2 hereof.

1.1.31 <u>Rent</u>:  Fixed Rent and all Additional Rent.

1.1.32 <u>Rent Commencement Date</u>: As defined in Section 2.2 hereof.

1.1.33 <u>Sales Break Point</u>:   As defined in Section 4.4.1 hereof; and as subject to adjustment as set forth in Section 3.4 hereof.

1.1.34 <u>Shopping Center</u>: Unit No. 1 of the Condominium, together with the interests of such Unit in the General Common Elements, Limited Common Elements and Reserved Common Elements and other rights and privileges relating to the Condominium, all in accordance the Condominium Documents The Shopping Center contains approximately Two Hundred Sixty Seven Thousand (267,000) square feet of Floor Area and is located on the block formed by 14th Street, Irving Street, Hiatt Place and Park Road in Washington, D.C.  Landlord shall not change or permit others to change the name of the Condominium without giving at least ninety (90) days prior notice to Tenant, and Landlord shall not include or permit the inclusion of the name of any tenant or "sponsor" or other entity or person in the name of the Shopping Center or the Condominium.

1.1.35 <u>Substantially Completed or Substantial Completion</u>: The completion of specified work at the Condominium (including, without limitation, as applicable, Landlord's Work) to the extent that only "Punch List Items" of such work (defined in Subsection 3.3.3 below) shall not be completed.

1.1.36 <u>Taxes</u>: As defined in Section 4.3.3 hereof.

1.1.37 <u>Tenant</u>:  As defined in the preamble hereof.

4

1.1.38 <u>Tenant's Mailing Address</u>:  650 Liberty Avenue, Union, New Jersey 07083, Attn: Mr. Warren Eisenberg, or such other place and/or to the attention of such other person as Tenant may notify Landlord from time to time by notice given in accordance with the provisions of Article 18 hereof.

1.1.39 <u>Tenant's Permits</u>:  As defined in Section 2.3.1(b) hereof.

1.1.40 <u>Tenant's Property</u>:  All of Tenant's personal property, including, without limitation, phone and alarm systems, satellite antennae, shelving, computers, furniture, vaults and safes, cash registers and customer service counters, specialty lighting, track lighting, millwork, conveyor systems, storage racks and signage and any and all other personal property of Tenant which is capable of being removed from the Premises without material damage thereto, but which shall not include electrical systems, heating, ventilation and air conditioning systems, and other mechanical systems, flooring, carpet, elevators, standard lighting and wiring installed within the walls of the Premises.

1.1.41 <u>Tenant's Pro Rata Share</u>:  A fraction whose numerator is the Floor Area of the Premises and whose denominator is the Floor Area of the Shopping Center as may be re-determined any time Floor Area is added to or removed from the Shopping Center, but in no event shall Tenant's Pro Rata Share be greater than thirteen (13%) percent.  Floor Area shall be deemed added to or removed from the Shopping Center on the earlier of (i) the date upon which such Floor Area is Substantially Completed, or (ii) at such time as an assessment for Taxes is made or removed, as the case may be, with respect to such Floor Area.  In addition, Floor Area shall be adjusted in accordance with Section 5.2.8(a) as applicable.  Within thirty (30) days following written request from Tenant, Landlord shall certify to Tenant in writing as to the then Floor Area of the Shopping Center.  Notwithstanding the foregoing provisions of this definition of "Tenant's Pro Rata Share" if the Shopping Center is divided into individual condominium units (including their allocable rights in the Common Areas) that are separately assessed and the Premises is such a separate unit, Tenant's Pro Rata Share of Taxes shall be 100% of the assessment against the Premises and Tenant shall not be responsible to contribute to any other Taxes relating to the Shopping Center.

1.1.42 <u>Tenant's Work</u>:  As defined in Section 3.1 hereof.

1.1.43 <u>Term</u>:  A period  (the *"Initial Term"*) of approximately ten (10) years beginning on the Rent Commencement Date and expiring at midnight on the last day of January following the tenth (10th) anniversary of the Rent Commencement Date, unless the Rent Commencement Date is February 1, in which event the Expiration Date shall be the day before the tenth (10th) anniversary of the Rent Commencement Date.  As used herein: (i) *"Term"* shall refer to the Initial Term, as the same may be extended by any Renewal Period exercised pursuant to Section 2.2.2 below; and (ii) *"Expiration Date"* shall mean the date on which the Term expires.

1.1.44 <u>Unit Owners Association</u> shall mean the Unit Owners Association established under the Condominium Documents.

# ARTICLE 2
## LEASE OF PREMISES; LEASE TERM; DELIVERY DATE

Section 2.1    <u>Lease of Premises</u>.

2.1.1  Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the Premises together with any and all rights, benefits, privileges and the right to use easements on a non-exclusive basis, now or hereafter appurtenant to either or both of the Premises and the Shopping Center, arising out of any public or private grant or

authority, including, without limitation, the non-exclusive right to use those Common Areas within the Shopping Center (which are not Common Elements) or are available to the Shopping Center (which are Common Elements) in common with other tenants and occupants of the Shopping Center and to exercise the rights relating to the use of General Common Elements, Limited Common Elements and Reserved Common Elements that are available to the Shopping Center in connection with the Condominium Documents (subject to allocation of certain rights relating to loading docks and trash container and compactor areas to Tenant and to certain other tenants, all as expressly provided in this Lease).

2.1.2  Tenant's use of the Premises shall be subject to the Rules and Regulations attached hereto as Exhibit N.  Future changes to the Rules and Regulations shall be governed by Section 5.2.7 hereof.

2.1.3  Subject to the terms of Section 9.3 hereof, Tenant shall at all times operate in compliance with Legal Requirements, including, without limitation, the terms of any certificate of occupancy issued and any required business licenses or similar governmental requirements.  The term *"certificate of occupancy"* whenever same is used in this Lease, shall include, without limitation, any jurisdictional equivalent of a certificate of occupancy, regardless of its actual name or designation.

2.1.4  As further set forth in Article 13 hereof, Tenant shall not use the Premises for any Prohibited Use or in violation of any Existing Exclusive.

2.1.5  Landlord shall have the right to install pipes, duct work, conduits, utility lines and wires in the Premises in accordance with the following terms and conditions:

(a)  Such installation shall be limited to instances in which no practical alternative exists to such installation that is commercially reasonable;

(b)  Landlord shall make such installation in accordance with Tenant's reasonable direction as to location and configuration and in full accordance with the other requirements of this Section 2.1.5;

(c)  No work on such installation shall be conducted while Tenant is open for business;

(d)  Landlord shall pay to Tenant the reasonable cost of Tenant providing security and the reasonable cost of other personnel within its Premises while Landlord conducts such work;

(e)  Any such installations shall be installed only above the lights of the Premises and shall not use any space below such lights, nor shall any such installation interfere in any way with Tenant's stacking space or graphics or MEP system whether above or below the lights;

(f)  Any such installations shall not adversely affect the use or operation of the Premises or reduce in any manner the usable area of the Premises (except the area above the lights that is not used for stacking or graphics);

(g)  Tenant shall not be required to make any changes in its operations or use of its space as a result of any such installation; and

(h)  Landlord shall paint or otherwise finish the installation as directed by Tenant so that it is compatible with Tenant's design criteria for the area in which it is located.

6

1   The above requirements shall apply to the installation of pipes, duct work, conduits,
2   utility lines and wires in the Premises that are not located wholly within conduits shown
3   on the Final Plans and Specifications and in place on the Delivery Date. Items, including,
4   without limitation, pipes and wires, may be installed in such conduits as same exist on the
5   Delivery Date without satisfying the above criteria provided that no physical entry into
6   the Premises is required (or if it is, it is performed after operating hours in the same
7   manner as repairs by Landlord within the Premises) and the installation does not interfere
8   with the operation of the Premises or the provision or services or utilities thereto (for
9   example, a wire or pipe may not be added to an existing conduit if to do so would
10  displace wires or pipes serving the Premises and deprive Tenant of the level of service it
11  previously enjoyed, but a wire or pipe may be added if Tenant's level of service is
12  unaffected).

13          2.1.6  Landlord represents and warrants that that, prior to the Delivery
14  Date, the Condominium shall have been created in accordance with all Legal
15  Requirements and the Condominium Documents shall be in full force and effect, with all
16  Condominium Documents having been accepted for recording by the appropriate
17  recording office, with all charges and taxes relating to such recording having been paid.
18  Landlord further represents and warrants that, on the Delivery Date, the Premises shall
19  constitute a part of Unit No. 1 as defined in the Condominium Documents and that
20  Tenant shall have all rights of a tenant of such Unit in accordance with the Condominium
21  Documents

22          Section 2.2    Term.

23          2.2.1  Initial Term.  Subject to the provisions of this Article 2, the Term of
24  this Lease shall begin on the earlier of (such earlier date being referred to herein as the
25  *"Rent Commencement Date"*): (a) the date (the *"Grand Opening Date"*) which Tenant
26  shall establish in its published advertisement as its grand opening [but not later than the
27  tenth (10th) day after the date upon which Tenant shall initially open the Premises to the
28  general public for business], or (b) the sixtieth (60th) day following the Delivery Date.
29  The Term shall expire on the Expiration Date, unless earlier terminated as herein
30  provided.  When the Rent Commencement Date has been determined, as provided in this
31  Section, Landlord and Tenant shall execute, acknowledge and deliver, each to the other, a
32  written statement in the form attached hereto as Exhibit C specifying the Rent
33  Commencement Date.

34          2.2.2  Renewal Options.  Tenant shall have the right and option
35  (hereinafter a *"Renewal Option"*) to extend the Initial Term from the date on which it
36  would otherwise expire for three (3) successive renewal periods of five (5) years each
37  (individually, a *"Renewal Period"*, and collectively, the *"Renewal Periods"*) upon the
38  same terms and conditions as are herein set forth.  Each Renewal Option shall be
39  exercisable by notice given to Landlord at least two hundred ten (210) days prior to the
40  commencement of the applicable Renewal Period(s).  In order to prevent the inadvertent
41  failure of Tenant to exercise any of the Renewal Options within the time specified above,
42  the Term of this Lease shall not expire unless and until Tenant fails to exercise a Renewal
43  Option within fifteen (15) days after receiving notice from Landlord that the Renewal
44  Option in question has not been exercised (Landlord's notice shall not be given prior to
45  the 210th day prior to the Expiration Date), or unless and until Tenant gives notice to
46  Landlord that it will not be exercising any remaining Renewal Options.  If Landlord fails
47  to give Tenant such notice prior to the Expiration Date, and Tenant occupies the Premises
48  after the Expiration Date, then Tenant shall remain in possession subject to the provisions
49  of this Lease but without the application of Article 20 hereof.  If Landlord then gives
50  Tenant such notice and Tenant exercises its Renewal Option, then the effective date of
51  such exercise shall be retroactive to the Expiration Date.

2.2.3 <u>Tenant's Right Of Termination</u>. Notwithstanding anything to the contrary contained in this Lease, in the event that Tenant's Gross Sales for each of the first five (5) full calendar years of the Term do not exceed Seven Million One Hundred Thirty Six Thousand Dollars ($7,136,000.00), Tenant may, at its option, provided no monetary Event of Default by Tenant then exists and has not been cured, elect to terminate this Lease by delivering to Landlord written notice of such cancellation (the *"Cancellation Notice"*) within ninety (90) days following the end of the fifth (5th) full calendar year of the Term, such time period being of the essence, in which event this Lease shall terminate on the date set forth in Tenant's notice of Cancellation Notice (which date shall be at least ninety (90) days and not more than one hundred eighty (180) days after the date of the Cancellation Notice) without further liability on the part of either Landlord or Tenant, <u>except</u>: (A) for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease, and (B) Tenant, within ninety (90) days after the date of the Cancellation Notice (and before the actual termination of the Lease), shall pay to Landlord the unamortized portion of the reasonable costs incurred by Landlord for Landlord's Work (amortized on a straight line basis over the Initial Term), which reasonable costs shall be set forth in the written statement in the form attached hereto as <u>Exhibit C</u> specifying the Rent Commencement Date and, among other things, such reasonable costs. If Tenant fails to exercise this termination right in the time and manner set forth in this Section 2.2.3, then Tenant shall have no further right to exercise the termination right contained in this Section 2.2.3 and the right set forth in this Section 2.2.3 shall expire and be of no further force or effect. In determining Tenant's Gross Sales for any applicable calendar year, the following shall apply (a) no adjustment to actual Gross Sales shall be made for Permitted Closures (as hereinafter defined); and (b) for closures other than Permitted Closures, (i) if such other closures are for less than sixty (60) days during any calendar year, the Gross Sales for the days of such closure for the previous calendar year (in the case of the 2nd through 5th calendar years) or the next calendar year (in the case of the first calendar year) shall, solely for purposes of determining Gross Sales under this Section 2.2.3 (and not for Percentage Rent purposes), be added to the actual Gross Sales for such calendar year, and (ii) for closures other than Permitted Closures exceeding sixty (60) days in any calendar year, such calendar year shall, solely for purposes of this Section 2.2.3 (and not for Percentage Rent purposes) be deemed to be the greater of actual Gross Sales for such calendar year or $7,136,001. *"Permitted Closures"* as used herein shall mean any failure to operate a business in the Premises as a result of Force Majeure, damage to or destruction of the Premises, any Legal Requirements that result in an inability to legally operate in the Premises in a commercially reasonable manner or any closure related to a condemnation at the Shopping Center. In addition, if at any time during the first five (5) calendar years of the Term, the Premises is operated under a trade name other than Bed Bath & Beyond or any successor trade name thereto, for each calendar year after such operation begins shall, for purposes of this Section 2.2.3 (and not for Percentage Rent purposes) be deemed to have Gross Sales of the greater of the actual Gross Sales for such calendar year or $7,136,001.

Section 2.3    <u>Delivery Date</u>.

2.3.1 <u>Definition</u>. Subject to Landlord's delivery to Tenant of the Delivery Date Notice in accordance with the provisions of Subsection 2.3.2 below and Landlord's timely compliance therewith, Landlord shall be deemed to have delivered possession of the Premises to Tenant at 8:00 a.m. on the date (the *"Delivery Date"*) following the day on which all of the following conditions (the *"Delivery Date Conditions"*) shall have occurred <u>and</u> Tenant shall have received from Landlord the Delivery Date Certification in accordance with the provisions of Section 2.3.3 below, which shall constitute Landlord's written certification that all of the following shall have occurred:

(a)    Actual possession of the Premises shall have been delivered to Tenant water-tight, free of Hazardous Substances, in a good, structurally sound

8

1    condition, with all of Landlord's Work Substantially Completed, which Substantial
2    Completion shall be evidenced by a written certification by Landlord's architect to
3    Tenant;

4          (b)   Landlord shall have obtained (and delivered copies thereof to
5    Tenant, upon request) all permits and approvals required from all applicable
6    governmental authorities to enable Tenant to occupy and use the Premises for the conduct
7    of its business in the Premises (exclusive of any business licenses which Tenant may be
8    required to obtain in order to open and operate its specific business and not a general
9    retail business (collectively, *"Tenant's Permits"*)), which permits and approvals shall
10   include, without limitation, zoning and building code approvals, environmental
11   requirements, and a temporary or permanent certificate of occupancy for the Premises
12   (unless a certificate of occupancy for the Premises cannot be obtained solely as a result of
13   the failure to complete Tenant's Work in the manner required hereunder, in which event:
14   (1) the delivery of a certificate of occupancy for the Premises shall not be a condition to
15   the occurrence of the Delivery Date, and (2) Landlord shall obtain the certificate of
16   occupancy promptly following the correction or completion of Tenant's Work). 
17   Landlord has represented to Tenant that, to the best of Landlord's knowledge, a
18   permanent certificate of occupancy might only be obtainable when all work within the
19   Shopping Center is completed.  Landlord shall continue to use reasonable efforts to
20   obtain an permanent certificate of occupancy for the Premises until it is obtained and
21   until such time as sufficient work in the Shopping Center is completed for a permanent
22   certificate of occupancy for the Premises to be issued, Landlord shall maintain a valid
23   temporary certificate of occupancy for Tenant and Landlord shall keep same in full force
24   and effect at all times; and

25         (c)   The Common Areas within the Shopping Center that are not
26   Common Elements and all General Common Elements, together with those Limited
27   Common Elements and Reserved Common Elements which the Shopping Center has a
28   right to use (except those portions exclusively allocated to tenants other than Tenant in
29   accordance with this Lease), and the Parking Unit shall have been Substantially
30   Completed and operational, and all off-site improvements (including, without limitation,
31   street, storm drainage, and traffic signalization improvements) required for the Shopping
32   Center to open for business and for Tenant to receive a temporary or permanent
33   certificate of occupancy (and if same is a temporary, Landlord covenants, represents and
34   warrants that it shall complete the items necessary to obtain a permanent certificate of
35   occupancy prior to the expiration of the temporary certificate of occupancy so that Tenant
36   is continuously legally able to operate in accordance with a validly issued temporary or
37   permanent certificate of occupancy) shall have been Substantially Completed; Landlord,
38   at its sole cost and expense, shall have obtained (and delivered copies thereof to Tenant,
39   upon request) all permits and approvals required from applicable governmental
40   authorities to enable the Common Areas to be developed, operated, and used for the
41   purposes herein contemplated, which permits and approvals shall include, without
42   limitation, zoning, building code, environmental requirements, curb cut and site plan
43   approvals, all permits pertaining to pylon and/or monument signage, if any (but not the
44   signage for which Tenant is obtaining permits in accordance with Article 7 hereof),
45   construction, and development and use permits;

46         (d)   The representations and warranties of Landlord set forth in
47   subparagraphs (a) through (i) of Section 12.3 below shall then be true and in effect;

48         (e)   The following tenants or occupants shall have entered into
49   leases or other occupancy agreements or, such persons shall have acquired Units of the
50   Condominium (such tenants or occupants are collectively referred to as the *"Inducement*
51   *Tenants"*) on the following terms, for occupancy, in the case of Target, of the Target
52   Unit and, in the case of other Inducement Tenants, of premises in the Shopping Center;
53   such leases, occupancy agreements or sales of units of the Condominium shall not be

cancelable by any of the Inducement Tenants, except for failure of Landlord to complete the Shopping Center, for injury to or loss of the premises thereby demised because of fire or other casualty, or for a taking or for other reasons similar to those for which this Lease is cancelable by Tenant:

| Inducement Tenants | Minimum Square-foot Gross Floor Area | Minimum Term |
|---|---|---|
| Target | Target Unit Floor Area | Fee Owner |
| Two other national or regional retailers such as, for example, Best Buy, Circuit City, Whole Foods, Staples, TJ Maxx, Marshall's (but not TJ Maxx & More or Mega-Marshalls), Ross, Modell's, Sports Authority, Borders and/or Barnes and Noble | At least 15,000 square feet of Floor Area each in the Shopping Center | 10 Years each |

(f)    Landlord shall have delivered to Tenant, in recordable form: (i) a subordination, non-disturbance and attornment agreement substantially in the form attached hereto as Exhibit G executed by each holder of any mortgage or deed of trust encumbering or affecting the Shopping Center (it being understood and agreed that this Subsection 2.3.1 (f) is not intended to extend the date by which Landlord is to deliver to Tenant any document(s) required pursuant to Section 17.3 hereof), and (ii) a fee owner recognition agreement in the form and content described in clause (b) of Section 17.1 hereof executed by any existing Ground Lessor; and

(g)    The Condominium Documents are (x) fully executed and delivered and recorded in Land Records of the District of Columbia, and (y) superior to all mortgages, deeds of trust and other liens affecting the Condominium, the Shopping Center and any other Unit of the Condominium; any third-party approvals required under Section 4.12 of the Declaration for DC USA Condominium and any other sections of the of the Condominium Documents for the performance of Landlord's Work and Tenant's Work shall have been obtained (including, without limitation, Tenant's elevations and signage, as shown on Exhibit D-1 and Exhibit F hereto) and the Unit Owners' Association has received notice of this Lease as required by Section 6.1(c) of the Declaration of DC USA Condominium.

2.3.2  Delivery Date.

(a)    Landlord shall give Tenant at least one hundred twenty (120) days prior notice of the Delivery Date, using the form of Delivery Date Notice attached hereto as Exhibit I. Landlord's delivery of the Delivery Date Notice shall be a condition precedent to the Rent Commencement Date. Notwithstanding any provision of this Lease to the contrary, in no event shall the Delivery Date be deemed to occur prior to the Delivery Date established in the Delivery Date Notice.

(b)    Landlord acknowledges that if it shall fail to satisfy all of the Delivery Date Conditions by the Delivery Date as established in the Delivery Date Notice, Tenant will sustain substantial, additional costs and expenses, including, without limitation, storage costs for fixtures, equipment, and inventory, employee costs during waiting period, and additional advertising and promotional costs, the exact amount of which would be impracticable or extremely difficult to ascertain. If the Delivery Date

10

does not occur by the date established therefor in the Delivery Date Notice (subject to the terms of Section 3.2.2(c) relating to delays caused by Tenant and subject to Force Majeure delays that first occurred after the Delivery Date Notice was delivered by Landlord to the extent written notice thereof was given to Tenant within five (5) days after such Force Majeure first occurred), then, in addition to any other remedies available to Tenant under this Lease, Landlord agrees to allow to Tenant a credit against the initial installment(s) of Rent hereunder equal to, as liquidated reimbursement to Tenant (and not as a penalty) for all of the aforesaid costs incurred by Tenant, the sum of: (i) Fifty Thousand Dollars ($50,000), plus (ii) Three Thousand Dollars ($3,000) for each day that the Delivery Date established in the Delivery Date Notice is delayed. The foregoing liquidated reimbursements represent the parties' good faith agreement as to an agreed upon amount which shall have been incurred by Tenant and which shall otherwise not be susceptible of exact ascertainment. In the event Tenant elects to defer the Delivery Date pursuant to either Section 2.4 or 2.5 hereof, the aforesaid liquidated damages shall not be applicable from and after the date on which the Delivery Date Conditions have been satisfied, Landlord shall have delivered the Delivery Date Certification and the Delivery Date would have occurred but for such deferral by Tenant.

2.3.3 Delivery Date Certification. Upon the satisfaction of all of the Delivery Date Conditions, Landlord shall so certify to Tenant, using the form of Delivery Date Certification attached hereto as Exhibit J.

2.3.4 No Waiver. Neither Tenant's acceptance of physical possession of the Premises nor Tenant's opening of the Premises for business to the public prior to the Delivery Date shall: (i) be deemed a waiver by Tenant of any of the Delivery Date Conditions, or (ii) relieve Landlord of any obligation under this Lease, unless such condition or obligation is expressly waived in writing by Tenant. Notwithstanding the foregoing, the liquidated damages payable pursuant to Section 2.3.2(b) shall not be applicable from and after the date Tenant accepts actual physical possession of the Premises unless the unsatisfied Delivery Date Conditions interfere with Tenant's ability to perform Tenant's Work or operate its business in the Premises, in which event such liquidated damages shall apply until such interference ends.

Section 2.4    Unseasonable Delivery: Slack Period. If, for any reason (including, without limitation, Force Majeure, but excepting Tenant caused delays as set forth in Section 3.2.2(c) hereof), the Delivery Date occurs during the period commencing on September 15 and ending on the January 15 next following (the *"Slack Period"*), then Tenant shall have, in addition to any other remedies, the right to:

(a)    accept delivery of physical possession of the Premises; or

(b)    defer its acceptance of delivery of physical possession of the Premises to a later date within the Slack Period, whereupon the Delivery Date shall be deemed to have occurred on the date that Tenant actually accepts physical possession of the Premises (subject to the other provisions of this Article 2 and the continuing satisfaction of the Delivery Date Conditions), except that Tenant shall not be entitled to the per diem liquidated reimbursement provided in Section 2.3.2(b) for any portion of the Slack Period occurring after the date on which all of the Delivery Date Conditions shall have been satisfied; and

in either event, if the Rent Commencement Date occurs during the Slack Period, Tenant shall be entitled to pay Alternate Rent in lieu of Fixed Rent for the period commencing on the Rent Commencement Date and ending on the expiration of the Slack Period; any benefit which Tenant may realize thereby shall constitute a reimbursement to Tenant for certain pre-opening expenses incurred by Tenant in connection with this Lease. In the event Tenant defers the acceptance of physical possession of the Premises as set forth in this Section 2.4, the per diem liquidated reimbursement of $3,000 payable by Landlord to

11

1    Tenant under Section 2.3.2(b) shall cease to accrue as of the date the Delivery Date
2    would have occurred had Tenant not elected to defer acceptance, but shall recommence
3    on the date later in the Slack Period which Tenant designates for delivery of the Premises
4    if Landlord fails to deliver the Premises with all Delivery Date Conditions satisfied on
5    such date.

6        Section 2.5    Initial Co-Tenancy Condition.

7    As used herein, the *"Initial Co-Tenancy Condition"* shall mean that each and every
8    Inducement Tenant shall have accepted possession of its entire premises, Landlord's
9    work in such premises shall have been substantially completed, and each Inducement
10    Tenant shall, if not already open for business, then be actively and continuously engaged
11    in the fixturing and merchandising therein or performing interior tenant work.

12        2.5.1    If, on the Delivery Date, the Initial Co-Tenancy Condition has not
13    been satisfied, Tenant shall have the right, at its sole option, to:

14            (a)    accept delivery of physical possession of the Premises, in
15        which case the Delivery Date shall be deemed to have occurred (subject to the
16        satisfaction of all other applicable provisions of Article 2), but Tenant shall be
17        entitled to pay Alternate Rent and, if the Initial Co-Tenancy Condition is not
18        satisfied for one (1) year thereafter, to terminate this Lease all in accordance with
19        Section 2.5.2 below; or

20            (b)    defer its acceptance of delivery of physical possession of the
21        Premises to a later date (but not later than the date on which the Initial Co-
22        Tenancy Condition is satisfied and Tenant receives notice from Landlord thereof),
23        whereupon the Delivery Date shall be deemed to have occurred on the date that
24        Tenant actually accepts physical possession of the Premises (subject to the other
25        provisions of this Article 2 and the continuing satisfaction of the Delivery Date
26        Conditions); and

27    in either event, if the Rent Commencement Date occurs before the satisfaction of the
28    Initial Co-Tenancy Condition, Tenant shall be entitled to pay Alternate Rent in lieu of
29    Fixed Rent until the Initial Co-Tenancy Condition is satisfied and the Landlord gives
30    Tenant notice thereof, subject to any other applicable provisions of this Article 2.

31        2.5.2    In addition to the provisions of Section 2.5.1 above, if the Initial Co-
32    Tenancy Condition has not been satisfied by the first (1st) anniversary of the Delivery
33    Date established pursuant to Section 2.3.2(a) above, then Tenant shall have the right, at
34    any time prior to the satisfaction of the Initial Co-Tenancy Condition, upon giving
35    Landlord at least sixty (60) days' prior notice, to terminate this Lease as of the date
36    specified in said notice. Landlord may negate such termination by causing the Initial Co-
37    Tenancy Condition to be satisfied within thirty (30) days after the date on which said
38    termination notice is given. If this Lease is terminated hereunder, neither party shall have
39    any further liability under this Lease, except: (i) for those obligations which survive the
40    expiration or other termination of this Lease pursuant to the express terms of this Lease,
41    and (ii) Landlord shall promptly reimburse Tenant for all of its reasonable third-party
42    costs and expenses incurred in connection with this Lease, including, without limitation,
43    costs associated with the preparation and review of plans and specifications, attorney's
44    fees, and the performance of Tenant's Work, not to exceed Fifty Thousand Dollars
45    ($50,000). If Tenant has the right to terminate hereunder and has accepted physical
46    possession of the Premises and the Delivery Date has occurred, if Tenant fails to
47    terminate this Lease in accordance with this Section 2.5.2 by the eighteen (18) month
48    anniversary of the Delivery Date, Tenant shall be deemed to have waived the Initial Co-
49    Tenancy Condition and Alternate Rent shall cease and regular Fixed Rent shall begin
50    (retroactively) on the first (1st) anniversary of the Delivery Date (with the retroactive
51    payment of any difference between Alternate Rent and regular Fixed Rent for such 6

month period to be paid by Tenant within sixty (60) days after receipt of an invoice therefor from Landlord) and Tenant shall have no further right to terminate this Lease in accordance with this Section 2.5.2. If the Delivery Date has not previously occurred, Landlord shall deliver an updated Delivery Date Certification to Tenant and tender actual physical possession of the Premises to Tenant promptly following the satisfaction of the Initial Co-Tenancy Condition.

Section 2.6    Permits for Signage.

2.6.1    Tenant shall use diligent efforts to obtain those of Tenant's Permits relating to Tenant's storefront and exterior signs on or before the Delivery Date designated by Landlord in its Delivery Date Notice. Landlord represents and warrants to Tenant that the concept for Tenant's signs, as set forth in the Exhibits to this Lease, has been reviewed by the applicable governmental authorities without negative comment (but without approval of same either). Landlord agrees to update Tenant from time to time on Tenant's request as to the status of all of Landlord's permits and approvals that may relate to Tenant's signage permits and to provide reasonable assistance and information to Tenant so that Tenant can obtain such signage permits. Provided Landlord complies with its obligations under this Section 2.6.1 and its representations contained herein are true on the Effective Date, this Lease shall not be conditioned on Tenant actually receiving Tenant's Permits relating to Tenant's storefront and exterior signs and neither party shall have any right to terminate this Lease if they are not obtained.

ARTICLE 3
IMPROVEMENTS

Section 3.1    Landlord's Work and Tenant's Work. Landlord shall, at its sole cost and expense, perform the work and obligations described on Exhibit D and Exhibit D-1 hereto, and the "Final Plans and Specifications" (hereinafter defined in Section 3.2) (collectively, "*Landlord's Work*"), and shall deliver possession of the Premises to Tenant in the condition described therein. Except for Landlord's Work, Tenant shall, at its own cost and expense, do any and all work (hereinafter referred to as "*Tenant's Work*") which Tenant desires to initially adapt the Premises to Tenant's use.

Section 3.2    Plan Approvals.

3.2.1    Preparation of Plans and Specifications.

(a)    Prior to the Effective Date, Landlord has delivered to Tenant drawings showing the proposed footprint, column layout, and interior clear dimensions of the Premises (the "*Preliminary LOD*") [Limits of Demised], which shall be subject to any reasonable modifications indicated by Tenant as provided below. The Preliminary LOD shall be substantially consistent with Exhibits B, D, and D-1 hereto.

(b)    Within thirty (30) days after Tenant's receipt of the Preliminary LOD, Tenant shall deliver to Landlord its revisions thereto (the "*Revised LOD*"), showing the location of the interior structural grid (column layout), storefront opening, and mezzanine and/or office core, the location and arrangement of the loading facilities, trash compactor pad, and trash container pad(s), and any reasonable revisions to the interior clear dimensions.

(c)    Within fifteen (15) days after Landlord's receipt of the Revised LOD, Landlord shall deliver to Tenant a final LOD (the "*Certified LOD*"), certified by Landlord, which shall incorporate all of the elements of the Revised LOD. Within fifteen (15) days after its receipt of the Certified LOD, Tenant shall notify Landlord of Tenant's approval thereof or the reasons why such approval cannot be granted, and Landlord shall, within fifteen (15) days after receiving such notice, make any revisions necessary to correct such matters and obtain Tenant's approval. Upon

13

Tenant's approval of the Certified LOD, any further changes thereto shall be subject to Tenant's prior written approval (which may be withheld in its sole discretion), provided that, as to changes required to conform to Legal Requirements, Tenant shall have reasonable approval rights within the confines of said Legal Requirements. After Tenant approves the Certified LOD, each party shall be responsible for any and all reasonable costs incurred and delays experienced by the other party in connection with any further changes to the Certified LOD required by the party causing such change.

(d)     Within thirty (30) days after Tenant's receipt of the Certified LOD, Tenant shall deliver to Landlord its Fixture Plan (F1); Floor Finish Plans Notes and Details (F2); Power/Specialty Lighting Plan and Notes (F3); and Lighting Plans and Notes (F4) and High Pile Storage Plan (F-5) (collectively, *"Tenant's Plans"*), all of which shall be substantially consistent with the Certified LOD (as same may be reasonably modified by Tenant, as noted above).

(e)     Within thirty (30) days after receipt of Tenant's Plans, Landlord shall prepare and submit to Tenant, in a single submission, Landlord's preliminary plans and specifications (the *"Preliminary Plans"*) for Landlord's Work (which shall include, without limitation, mechanical, electrical, plumbing, fire protection and high-pile storage, structural, architectural and site plans [including, without limitation, a site lighting plan with photometrics]), and each of the plans which collectively constitute the Preliminary Plans shall be at least 85% complete, in Tenant's reasonable judgment. The Preliminary Plans shall be substantially consistent with Tenant's Plans, the Certified LOD, and Exhibits B, D, D-1, and F hereto.

(f)     Within thirty (30) days after its receipt of the Preliminary Plans, Tenant shall give Landlord notice of the respects, if any, in which said Preliminary Plans fail to meet Tenant's reasonable approval and/or fail to conform to the Certified LOD, Tenant's Plans, and/or Exhibits B, D, D-1, and F hereto, and Landlord shall promptly make any revisions necessary to correct such matters and obtain Tenant's approval.

(g)     Within thirty (30) days after the date on which Landlord receives notice of Tenant's approval of the Preliminary Plans, Landlord shall prepare and deliver to Tenant, in a single submission, final plans and specifications (the *"Final Plans and Specifications"*), which shall be substantially consistent with the Preliminary Plans, as approved by Tenant.

(h)     Within fifteen (15) days after its receipt of the Final Plans and Specifications, Tenant shall notify Landlord of Tenant's approval thereof or the reasons why such approval cannot be granted, and Landlord shall, within fifteen (15) days after receiving such notice, make any revisions necessary to correct such matters and obtain Tenant's approval. Upon Tenant's approval of the Final Plans and Specifications, any further changes thereto shall be subject to Tenant's prior written approval. Unless specifically noted on a separate summary sheet attached to the Final Plans and Specifications, to the extent of a conflict between the terms and provisions of Tenant's Plans, Exhibit B, Exhibit D, Exhibit D-1, and/or Exhibit F hereto, and the terms and provisions of the Final Plans and Specifications, then the terms and provisions of Tenant's Plans, Exhibit B, Exhibit D, Exhibit D-1, and Exhibit F shall govern and prevail.

(i)     All submissions by the parties of the Preliminary LOD, the Revised LOD, the Certified LOD, the Tenant's Plans, the Preliminary Plans and the Final Plans and Specifications shall be made (or accompanied) by the computer files thereof formatted in any version of "Auotocad", up to "Autocad" 2002.

14

3.2.2  Plan Changes.

(a)  Tenant shall have the right to make changes from the standards and specifications set forth in "Tenant's Prototype Drawings and Specifications" and/or the "Project Manual", referred to in Exhibit D hereto, and/or to require Landlord to subsequently make changes to either or both of the Preliminary Plans and Specifications and/or the Final Plans and Specifications in accordance therewith (the "*Changes*"). Within ten (10) business days after receiving Tenant's request for any Change, Landlord shall give Tenant notice of the cost or savings, and any delay, that may be occasioned by such Change. If Tenant fails to authorize such Change within five (5) business days after receiving Landlord's notice, Tenant shall be deemed to have disapproved such Change. Notwithstanding the foregoing, if a Change proposed by Tenant would have the effect of causing a net delay in the construction of the Building, as opposed to the construction of the Premises, Landlord shall not be required to accept such Change, but any delay in the construction of the Premises shall be permitted (and shall be charged to Tenant as hereinafter provided).

(b)  Tenant shall pay to Landlord the net reasonable additional third-party costs of Landlord's Work resulting directly and solely from the aggregate Changes (exclusive of any charges for overhead and profit, other than sums not exceeding 5% subcontractor profit and 5% subcontractor overhead in a case where the construction schedule has no net extension as a result of the Changes, and such 5% and 5% payments to the subcontractor together with 5% general contractor profit and 5% general contractor overhead thereon in a case where the construction schedule has a net extension as a result of the Changes), taking into consideration any and all actual costs and savings resulting from all Changes, in the aggregate (including, without limitation, reasonable costs approved by Tenant in advance associated with any acceleration of the work schedule which Tenant, at its sole option, may require). Such payment shall be due and payable within thirty (30) days after Tenant's receipt of backup information reasonably supporting all such costs, including, without limitation, invoices, receipts and lien waivers of subcontractors and materialmen.

(c)  If the Changes occur during the preparation of any of the plans described in Section 3.2.1 above, then the deadlines for preparation and delivery of the plans then being prepared shall be extended as reasonably necessary to incorporate such Changes. If, despite Landlord's diligent efforts in performing Landlord's Work, the Changes cause a net delay in the Substantial Completion of Landlord's Work (taking into consideration any time reductions resulting from such changes), then: (i) the Rent Commencement Date shall be determined as if such delay had not occurred, (ii) the commencement of the Slack Period (but not the end), and the dates set forth in clauses (a) and (b) of Section 3.3.2 below, shall be extended by the number of days of such net delay; and (iii) with respect to Changes requested after the Delivery Date Notice is given, for purposes of calculating liquidated damages under Subsection 2.3.2(b) above, the Delivery Date shall be extended by the number of days of such net delay.

Section 3.3    Performance of Work.

3.3.1  Both Landlord's Work and Tenant's Work shall be performed in a good and workmanlike manner, in compliance with all applicable Legal Requirements, utilizing only new, first-class materials and in accordance with all insurance company requirements. Landlord shall perform Landlord's Work in a manner such will not prevent or interfere with Tenant's ability to obtain Tenant's Permits. Landlord shall pay all impact fees and related governmental charges in connection with Landlord's Work and all other work performed by or on behalf of Landlord in connection with the Shopping Center. If Tenant's Permits cannot be obtained because Landlord's Work has not been completed or has been performed improperly or by reason of any then existing condition of the Shopping Center, Landlord shall remedy the situation so as to enable

15

Tenant to obtain Tenant's Permits, and the Delivery Date shall be deemed delayed, for Tenant's benefit only, on a day-for-day basis for each day of delay occasioned thereby.

3.3.2  If: (a) Landlord's Work has not been commenced (*i.e.*, if Landlord has not yet commenced excavation for the Shopping Center) by May 1, 2006, or (b) the Delivery Date shall not have occurred by December 31, 2008 (subject to *Force Majeure*, not to exceed sixty (60) days in the aggregate, and provided that Landlord shall have given Tenant notice of such event of *Force Majeure* promptly after its occurrence and subject to Tenant caused delays as set forth in Section 3.2.2(c) or caused by Tenant's unreasonable interference with the performance of Landlord's Work being performed before the Delivery Date), Tenant may thereafter, during such time as Landlord's Work has not been commenced or the Delivery Date has not occurred, as the case may be, consider Landlord to be in default hereunder and, at Tenant's option in its sole discretion, elect to:

(i)  terminate this Lease, if Landlord shall fail to fully cure such default within thirty (30) days after receiving Tenant's notice thereof, in which event neither party shall have any further liability hereunder, except: (i) for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease, and (ii) Landlord shall be obligated to promptly reimburse Tenant, as Tenant's sole monetary remedy by reason thereof, for all its reasonable third-party costs and expenses incurred in connection with this Lease (including, without limitation, costs associated with the preparation and review of plans and specifications, attorney's fees, and the performance of Tenant's Work), not to exceed Fifty Thousand Dollars ($50,000) and/or

(ii)  avail itself of the remedies set forth in Section 16.2 below (provided, however, that the cure period set forth therein shall not be applicable and provided further Tenant shall have no right to seek monetary damages); and/or

(iii)  extend one or more times the dates set forth in clauses (a) and/or (b) of this Subsection 3.3.2 to such future dates designated by Tenant in notice given to Landlord.

The election by Tenant of any one or more of the foregoing remedies shall not preclude the subsequent election of any alternative remedy provided in this Section, this Lease, at law, or in equity.

3.3.3  Landlord's Work Performed After Delivery of Possession.  On or before the Delivery Date, Landlord's and Tenant's representatives together shall conduct a walk-through of the Premises to compile a punch list of the "Punch List Items" (hereinafter defined). Tenant shall deliver to Landlord a copy of said punch list within five (5) days after the walk-through. Landlord shall complete any Punch List Items within thirty (30) days after it receives a copy of said punch list. If Landlord fails to complete any item on said punch list within said 30-day period, Tenant shall have the right to complete such item(s) using its own contractors and receive reimbursement from Landlord for the reasonable costs and expenses thereof upon demand. If reasonably required by Tenant (which requirement shall be deemed reasonable if performing the work during regular hours will interfere in more than a de minimus manner with Tenant's Work, Tenant's preparation for opening or Tenant's business operations), any portion of Landlord's Work which is performed after Tenant accepts physical possession of the Premises shall occur only "after hours", when neither Tenant nor any of its agents, contractors, employees and servants are working within the Premises. As used herein, the term *"Punch List Items"* shall mean such minor items of a cosmetic nature which, when considered as a whole, do not adversely affect either the performance of Tenant's Work or Tenant's ability to conduct its normal business operations in the Premises.

16

1         3.3.4    <u>Tenant's Right of Entry</u>. Prior to the Delivery Date, Tenant may
2    enter upon the Premises for the purposes of inspecting the work, taking measurements,
3    making plans, erecting temporary or permanent signs and doing such other work as may
4    be appropriate or desirable without being deemed thereby to have taken possession or
5    obligated itself to pay Rent, <u>provided, however,</u> that Tenant shall not, during the course
6    of such work, interfere in more than a de minimus manner with the performance of
7    Landlord's Work and shall indemnify, defend and hold Landlord harmless from and
8    against any and all claims or losses arising from Tenant's entry upon the Premises, except
9    to the extent caused by Landlord, its agents, employees, or contractors.

10         3.3.5    <u>Intentionally Omitted</u>

11         3.3.6    <u>Work Requirements After Delivery Date</u>. Following the Delivery
12    Date, any construction by Landlord, any other Unit Owner (as defined in the
13    Condominium Documents a *"Unit Owner"*) or other tenants or occupants of the
14    Shopping Center (including Tenant) or Condominium or affecting any portion of the
15    Shopping Center or the Common Areas other than the interior of another tenant's or
16    occupant's space or a Limited Common Element or Reserved Common Element in which
17    Tenant has no rights, shall be subject to the following terms and conditions:

18         (a)    staging and storage of materials and parking of construction
19    vehicles shall not occur within the portions of the Shopping Center and Common Areas
20    designated as "No Staging" on <u>Exhibit B</u> hereto, provided, however that the additional
21    staging area designated as "Temporary Staging" on <u>Exhibit B</u> may be used for staging
22    only between the Delivery Date and the day that is ten (10) days after the Delivery Date
23    and Tenant may use the area designated as "Tenant's Temporary Staging" after the
24    Delivery Date;

25         (b)    Landlord shall diligently enforce the Declaration of Parking
26    Operations to ensure that, from and after Tenant's opening for business to the public, no
27    construction vehicles shall utilize the Parking Unit other than to the extent they are
28    working on such Parking Unit and cannot perform such work from another location.  In
29    no event shall parking of construction vehicles in the Parking Unit be permitted
30    (provided, however, that nothing shall prevent any construction vehicle from paying the
31    appropriate fees and parking in the Parking Unit in the same manner and subject to the
32    same limits and regulations as any other member of the public); and

33         (c)    Landlord shall maintain the Shopping Center and cause the
34    other Unit Owners to maintain their Units and cause the Common Elements to be
35    maintained in a clean, safe, and sightly condition, and shall use reasonable efforts to
36    ensure that such construction shall not materially adversely interfere with the normal
37    conduct of any business operations in the Premises.

38         3.3.7    <u>Tenant's Hiring Trailer</u>. Landlord shall consider in good faith the
39    temporary establishment of an employment center for the joint use of various tenants and
40    occupants of the Condominium in conducting employee interviews and recruiting (the
41    *"Recruiting Center"*).  If Landlord elects to establish the Recruiting Center, Landlord
42    shall provide Tenant with space in same at no charge to Tenant except as provided below
43    in this Section 3.3.7 and Landlord shall provide Tenant with a desk and work area in such
44    Recruiting Center that is the same size and approximate configuration as is provided to
45    other tenants and occupants of the Condominium sharing the Recruiting Center.  The
46    Recruiting Center shall have a bathroom for the common use of the occupants. Tenant
47    shall be responsible for its own telephone charges and shall pay its equitable share of the
48    electric charge for the Recruiting Center (based on the number of users and their relative
49    space and electrical needs).  The Recruiting Center (if Landlord elects to have a
50    Recruiting Center) shall be installed and operational at least forty-five (45) days prior to
51    the Delivery Date, and shall not be removed until at least ten (10) days after the Delivery

17

1    Date unless Legal Requirements provide otherwise. After Tenant vacates its space in the
2    Recruiting Center, it shall have no obligation to contribute to the electrical costs of such
3    trailer.

4    3.3.8  Temporary Certificate of Occupancy. Landlord has represented to
5    Tenant that in the District of Columbia it might not be practicable to obtain a permanent
6    certificate of occupancy for premises such as the Premises as a result of the requirement
7    of the local officials that all work in the entire Shopping Center be completed before one
8    can be issued and the frequent alterations that are made by tenants and occupants of the
9    Shopping Center in the normal course of their business. In reliance on such
10   representation, Tenant has agreed to take possession with only a temporary certificate of
11   occupancy where it would normally require a permanent certificate of occupancy. In
12   consideration of and as a material inducement to Tenant agreeing to accept such
13   temporary certificate of occupancy, Landlord shall at all times continue to try to obtain a
14   permanent certificate of occupancy and until same is obtained shall keep any temporary
15   certificate of occupancy issued to Tenant or relating to the Premises in full force and
16   effect and shall complete or cause to be completed any work necessary to keep same in
17   effect (except work that is Tenant's obligation hereunder). Landlord covenants to defend
18   and indemnify Tenant and hold Tenant harmless from and against any and all claims,
19   actions, damages, liability and expense, including reasonable attorneys' fees, arising
20   from, relating to or in connection with any suspension of the legal ability of Tenant to use
21   and occupy the Premises for its business purposes pursuant to a valid certificate of
22   occupancy except to the extent the suspension is caused by work required to be
23   completed by Tenant hereunder.

24   Section 3.4    Measurement; Adjustment of Rent.

25   3.4.1  Measurement of Premises and Shopping Center. Within five (5)
26   days after the beginning of construction of the interior walls of the Premises demising it
27   from the adjacent store and from the adjacent interior Common Areas, (and at least one
28   hundred twenty (120) days prior to the Delivery Date), Landlord shall deliver to Tenant a
29   certification to Tenant by Landlord's licensed architect, surveyor or engineer of the
30   interior clear dimensions and the Floor Area of the Premises, and Floor Area of the
31   Shopping Center, the measurements of which shall be subject to confirmation by
32   Tenant's licensed architect, surveyor or engineer. If Landlord shall fail so to deliver such
33   certification to Tenant, Tenant shall have the right to have any of such measurements
34   made and certified to Landlord by Tenant's licensed architect, surveyor or engineer. If
35   the interior clear dimensions of the Premises vary from those shown on the Certified
36   LOD (as may be modified by any applicable Changes) by more than two inches (2") and
37   correction is possible given the location of the problem (i.e., the parties recognize that the
38   exterior walls cannot be changed, but the interior wall demising it from the adjacent store
39   and the adjacent interior Common Areas can be changed), then Landlord shall correct
40   such work to conform to the Certified LOD to within such two inch permitted variance
41   (as may be modified by any applicable Changes). In no event shall the location of any
42   wall, whether or not same can be adjusted, vary by more than the tolerances permitted by
43   Landlord's construction contract with its general contractor, which Landlord represents
44   are industry standard tolerances.

45   3.4.2  Measurement of Storage Area/Mezzanine. Within five (5) days after
46   the completion of the walls enclosing the non-selling space on the office mezzanine,
47   Landlord shall deliver to Tenant a certification to Tenant by Landlord's licensed
48   architect, surveyor or engineer of the Floor Area of each of said non-selling space(s), the
49   measurements of which shall be subject to confirmation by Tenant's licensed architect,
50   surveyor or engineer. If the square footage of the non-selling space on the office
51   mezzanine, varies from that shown on the Final Plans and Specifications by more than
52   three percent (3%), then, at Tenant's request, Landlord shall correct such work to
53   conform to the Final Plans and Specifications.

18

3.4.3  <u>Adjustment of Fixed Rent and Tenant's Pro Rata Share</u>.  Subject to the foregoing provisions of this Section 3.4, if the measurement of the Premises shall indicate a Floor Area less than the Floor Area of the Premises set forth in Subsection 1.1.28 above, the Fixed Rent and any other applicable provision of this Lease (including, without limitation, Tenant's Pro Rata Share) shall be reduced to conform to the actual measurement, and Tenant shall receive a proportional refund of any Rent theretofore paid to Landlord.  If the measurement of the Premises indicates that the actual Floor Area of the Premises exceeds 32,000 (except if increased due to Changes under Section 3.2 above), neither Fixed Rent nor Tenant's Pro Rata Share shall be increased by reason thereof.  Landlord and Tenant shall each promptly execute and deliver to the other an amendment memorializing any change to the Fixed Rent, Tenant's Pro Rata Share, or any other applicable provisions of this Lease, made pursuant to this Section 3.4.  Any dispute between the parties with respect to the Floor Area of the Premises, the square footage of said non-selling space or the Floor Area of the Shopping Center shall be resolved by arbitration in accordance with the provisions of Section 16.3 below.

ARTICLE 4

FIXED RENT, TAXES & PERCENTAGE RENT: DETERMINATION AND PAYMENT

Section 4.1    <u>Fixed Rent</u>.  Commencing on the Rent Commencement Date and continuing throughout the Term, Tenant shall pay to Landlord the Fixed Rent, in equal successive monthly installments, in advance, on the first day of each and every calendar month throughout the Term, except that Fixed Rent payable for any partial calendar month during the Term shall be prorated based on a 365-day year.  Fixed Rent shall be paid without deduction or set-off, except to the extent otherwise expressly provided herein.

Section 4.2    <u>Payment of Rent</u>.  All Rent shall be mailed or otherwise delivered to Landlord's Mailing Address above or, upon at least thirty (30) days' prior notice to Tenant, to such other address as Landlord may from time to time designate.  Landlord acknowledges and agrees that for administrative purposes, Tenant has designated BBBY Management Corporation, a New York corporation (the "***Paying Agent***"), as its agent to make all Rent payments due to Landlord under this Lease.  Said designation (which may be revoked by Tenant at any time) is not intended as, and shall not constitute, an assignment of any rights or obligations of Tenant to the Paying Agent, and Tenant shall remain primarily liable for payment of Rent under this Lease.  All payments of Rent received by Landlord from the Paying Agent shall be credited to Tenant as if such payments of Rent had been made by Tenant directly to Landlord. Fixed Rent and Additional Rent shall be paid in lawful money of the United States by good and sufficient check (subject to collection) drawn to Landlord's order or as Landlord may direct in writing on a bank which is a member of a United States clearinghouse.  Said checks shall be sent to Landlord at Landlord's address or such other rent payment address as Landlord shall provide to Tenant in accordance with the notice provisions of this Lease.  Any change in the address to which Rent is to be sent shall not take effect for 60 days after notice thereof is given to allow time for Tenant's computer system to be set for such new address.  Only one Rent payment address may be effective at any one time.

Section 4.3    <u>Real Estate and Other Taxes</u>.

4.3.1  Landlord shall pay or cause to be paid on or before the due dates thereof all "Taxes" (defined in Subsection 4.3.3 below) other than personal property taxes levied against tenants.  Throughout the Term, Landlord shall cause the Shopping Center to be maintained entirely within tax parcels and lots that exclude any property not a part of the Shopping Center.  If the Premises becomes a separate Condominium Unit and is

19

1  separately assessed, then the Premises shall be maintained entirely with the applicable tax
2  parcel and lot and shall exclude any property not a part of the Premises. Landlord and
3  Tenant acknowledge that both the Shopping Center and, if it becomes a Condominium
4  Unit, the Premises, include an allocable share of the Common Elements, which inclusion
5  does not violate the requirement that the Shopping Center or the Premises, as the case
6  may be, be maintained entirely with the tax parcel as such allocable share is part of the
7  Shopping Center or Premises, as the case may be.

8     4.3.2

9         (a)   Tenant shall pay to Landlord Tenant's Pro Rata Share of the
10  Taxes which accrue during the Term, subject to the provisions of this Section 4.3 and
11  Section 5.2.8(a) below. Any Taxes for a real estate fiscal tax year, only a part of which is
12  included within the Term, shall be adjusted between Landlord and Tenant on the basis of
13  a 365-day year as of the Rent Commencement Date or the date on which the Term
14  expires or earlier terminates, as the case may be, for the purpose of computing Tenant's
15  Pro Rata Share of Taxes. If, by law, any Taxes may, at the option of the taxpayer, be
16  paid in installments (whether or not interest shall accrue on the unpaid balance thereof),
17  Landlord shall either exercise such option so as to maximize the number of installments,
18  or, notwithstanding that Landlord does not exercise such option, for all purposes of this
19  Lease both Landlord and Tenant shall be treated as if Landlord had exercised such option
20  and Tenant's Pro Rata Share of Taxes accruing during the Term shall be calculated as if
21  such option were exercised (including any interest that would have been imposed had
22  such option been exercised) and, in either event, Landlord shall pay all Taxes as they
23  come due and before any fine, penalty, interest or cost may be added thereto for
24  nonpayment thereof.

25         (b)   Landlord shall submit to Tenant a copy of the bill for Taxes
26  issued by the applicable taxing authority, a computation of Tenant's Pro Rata Share of
27  such Taxes and proof of the payment of Taxes for the previous payment period, as well
28  as copies of all notices concerning assessments, tax rates, and changes thereto. Tenant
29  shall pay Landlord the amount required by this Subsection 4.3.2 within thirty (30) days
30  after receipt of such bill (but in no event earlier than the fifteenth (15th) day prior to the
31  date on which such Taxes would become delinquent).

32         4.3.3   As used herein, *"Taxes"* shall mean all general, *ad valorem* real
33  estate taxes, and assessments for betterments and improvements that are levied or
34  assessed by any lawful authority on the Shopping Center (or, if the Premises is a separate
35  Condominium Unit, the Premises) (general or special), including any substitution
36  therefor, in whole or in part, due to a future change in the method of taxation. Taxes
37  shall be reduced by any deferral, abatement, or other tax-lowering adjustment received by
38  Landlord from the taxing authorities. For purposes of computing Tenant's Pro Rata
39  Share of Taxes, Taxes shall not include any: (1) income, excise, profits, estate,
40  inheritance, succession, gift, transfer, franchise, capital, or other tax or assessment upon
41  Landlord or upon the rentals payable under this Lease; (2) taxes on rents (other than to
42  the extent that such taxes are customarily paid by retail tenants in the state or jurisdiction
43  in which the Shopping Center is located), gross receipts or revenues of Landlord from the
44  Premises; (3) fine, penalty, cost or interest for any tax or assessment, or part thereof,
45  which Landlord or its lender failed to timely pay (except if same are caused by an Event
46  of Default); (4) assessment for a public improvement arising from the expansion of the
47  Shopping Center after the Rent Commencement Date (it being agreed that all assessments
48  imposed during the Term which are permitted to be included within Taxes hereunder
49  shall, for the purposes of computing Tenant's Pro Rata Share thereof, be deemed to have
50  been paid in the maximum number of installments permitted by the applicable taxing
51  authority); (5) Taxes resulting directly from an increase in the assessment caused by a
52  sale or ground lease of all or any portion of the Shopping Center to an Affiliate of
53  Landlord; or (6) fees imposed upon Landlord in connection with Landlord's development

of the Shopping Center (including, without limitation, trip generation fees). All Taxes payable by Tenant pursuant to this Section 4.3 shall be determined as if the Shopping Center was the only property owned by Landlord. Landlord represents to Tenant that, as of the Effective Date and, to the best of Landlord's knowledge, as of the anticipated Delivery Date, except as described on Exhibit P attached to this Lease, no portion of the Shopping Center is or will be (i) subject to or the beneficiary of an abatement of Taxes, (ii) subject to any special assessments or similar charges, or (iii) included in any special improvement district(s) which would result in higher sales taxes or other similar impositions than would exist in the absence of such district(s), provided, however, that Landlord shall not be responsible for any change in such facts after the Effective Date if Landlord had no knowledge on the Effective Date, after diligent inquiry, that a change in such facts was contemplated. Landlord and Tenant agree that if a "business improvement district" or similar designation for the area including the Condominium is proposed by the District of Columbia to provide services that are generally included in the services provided to taxpayers and included in Taxes (but may be provided to a greater extent if a business improvement district or equivalent is established), Landlord shall oppose same and shall not voluntarily agree that the Condominium shall be included in same. If, notwithstanding such opposition by Landlord, the Condominium is included in the business improvement district and all tenants of the Shopping Center and the owner of the Target Unit (or its tenants), without exception, are required to pay their pro rata share of the annual cost allocable to the Condominium of such business improvement district, then during any Renewal Term of this Lease (but not during the Initial Term), Tenant shall pay its Pro Rata Share of such cost as a part of Tenant's payment of Taxes.

4.3.4   If the Premises is a separate tax parcel, at Tenant's request, and if the Premises is part of a tax parcel including the rest of the Shopping Center, at the request of Tenant and other tenants or occupants of the Shopping Center who collectively (including Tenant) lease or have the right to occupy at least 50% of the Shopping Center (or, if tax parcel is more than the Premises and less than the Shopping Center, at the request of Tenant and if the Premises is less than 50% of the tax parcel, other tenants or occupants of the tax parcel who together with Tenant lease or have the right to occupy at least 50% of the tax parcel), Landlord shall contest the amount or validity of any assessed valuation or Taxes, failing which, Tenant shall have the right to contest the assessed valuation or Taxes by appropriate proceedings conducted in good faith, whereupon Landlord shall cooperate with Tenant, execute any and all documents required in connection therewith and, if required by any governmental authority having jurisdiction, join with Tenant in the prosecution thereof. If, as a result of any contest or otherwise, any rebate or refund of Taxes is received, Tenant shall be entitled to Tenant's Pro Rata Share thereof (after reasonable and customary expenses incurred by Landlord and/or Tenant in connection with such contest are paid to the party which incurred such expense).

Section 4.4    Percentage Rent.

4.4.1   Payment. During and for each full calendar year during the Term, Tenant shall pay annual percentage rent (*"Percentage Rent"*) equal to Six (6%) percent of all "Gross Sales" (hereinafter defined in Subsection 4.4.2) resulting from business conducted in, on or from the Premises during such calendar year in excess of the Natural Sales Break Point and less than Eleven Million and 00/100 Dollars ($11,000,000.00) and Four (4%) percent of all Gross Sales resulting from business conducted in, on or from the Premises during such calendar year equal to or in excess of Eleven Million and 00/100 Dollars ($11,000,000.00) (each a *"Percentage Multiple"* and collectively the *Percentage Multiples"*). As used herein, the term *"Natural Sales Break Point"* shall mean the amount arrived at by dividing the annual Fixed Rent for the calendar year for which Percentage Rent is being determined by the six percent (6%) Percentage Multiple, the term *"Fixed Sales Break Point"* shall mean $11,000,000.00 and *"Sales Break Point"* shall mean the Natural Sales Break Point and/or the Fixed Sales Break Point as the context requires. Within sixty (60) days after the close of each calendar year, Tenant

21

shall furnish to Landlord a compilation prepared by an officer of Tenant setting forth the amount of Gross Sales during the preceding calendar year and showing the amount of Percentage Rent, if any, required to be paid by Tenant for such calendar year. The full amount of any Percentage Rent due shall be paid to Landlord simultaneously with the furnishing of said compilation. Notwithstanding the foregoing, with respect to any partial calendar year during the Term after the Rent Commencement Date, the Gross Sales occurring in the month(s) subsequent to the end of such short calendar year shall be added to the Gross Sales derived from the Premises during the short calendar year so that the total number of months shall equal twelve (12), and if any Percentage Rent would be owing for such period, then Tenant shall pay to Landlord, within sixty (60) days after the end of such 12-month period, the Percentage Rent owing, if any, for the 12-month period multiplied by a fraction, the numerator of which is the number of days in the short calendar year and the denominator of which shall be 365. Examples of the calculation of Percentage Rent are as follows: Assuming that the annual Fixed Rent is $560,000 during the Initial Term, the Natural Sales Break Point would be $9,333,333. Assume that during the fifth (5th) calendar year of the Term, Gross Sales equal $13,000,000. In such case, Percentage Rent will be 6% of $1,666,667 (the difference between the Fixed Sales Break Point of $11,000,000 and the Natural Sales Break Point of $9,333,333, such difference being the Gross Sales to which the 6% Percentage Multiple applies) or $100,000.02, plus 4% of the excess Gross Sales over the Fixed Sales Break Point of $11,000,000, being 4% of $13,000,000 less $11,000,000, or $80,000, for a total Percentage Rent due in such example for such fifth calendar year of $100,000.02 plus $80,000, or $180,000.02. Assume further that during the second calendar year of the First Renewal Term, Gross Sales are $13,000,000. Assume that annual Fixed Rent during such First Renewal Term is $672,000. In that case the Natural Sales Break Point would be $11,200,000. Thus the 6% Percentage Multiple would not apply, but the 4% Percentage Multiple would apply to the portion of Gross Sales that exceeded the Fixed Sales Break Point of $11,000,000, so the Percentage Rent for such year would be 4% $13,000,000 less $11,000,000, or $80,000.

4.4.2  Definition of Gross Sales. As used herein, the term *"Gross Sales"* shall mean the total amount of all sales of merchandise or services completed at the Premises by Tenant or any sublessee, licensee or concessionaire of Tenant (subject, however, to Section 4.4.6) and any other person or entity operating in the Premises (for purposes of this Subsection 4.4.2 only, collectively, *"Tenant"*), whether for cash, credit or otherwise, including redemption of gift certificates and gift cards. Tenant shall record, at the time of each Gross Sale, all receipts from such sale, whether for cash, credit or otherwise, in a cash register or cash registers, or in such electronic or computer device which records sales in a manner which is generally acceptable by industry standards. The term *"Gross Sales"* shall exclude: (1) proceeds from any sales tax, gross receipts tax or similar tax, by whatever name called, which are separately stated and are in addition to the sales price, (2) *bona fide* transfers or exchanges of merchandise from the Premises to any other stores or warehouses of Tenant or any Affiliates of Tenant, and returns to shippers and manufacturers for credit, (3) refunds or credits given to customers for merchandise returned or exchanged at the Premises (regardless of where or how purchased), (4) sales of Tenant's fixtures and equipment not in the ordinary course of Tenant's business, (5) to the extent of prior inclusion in Gross Sales, bad debts when written off the books of Tenant, provided that any collections made on account of such bad debts shall be included in Gross Sales when received, (6) receipts from vending machines installed solely for the use of Tenant's employees and receipts from pay telephones, (7) sales to employees of Tenant at discount (which, for the purposes of determining Percentage Rent hereunder, shall not exceed two percent (2%) of Gross Sales per calendar year or pro rata portion thereof, as applicable), (8) fees paid to independent third party credit card, charge card, and debit card companies in connection with sales charged to or debited from customers' credit cards, charge cards, or debit cards, as applicable, (9) proceeds from delivery, gift-wrapping and check cashing charges

22

(which, for the purposes of determining Percentage Rent hereunder, shall not exceed two percent (2%) of Gross Sales per calendar year or pro rata portion thereof, as applicable), **(10)** sums and credits received in settlement of claims for loss or damage to merchandise, **(11)** separately stated service, finance and interest charges, **(12)** the dollar value of coupons utilized by customers in the purchase of merchandise from the Premises, **(13)** close-out or bulk sales of inventory to jobbers or wholesalers, **(14)** sales of gift certificates and/or gift cards, and **(15)** forfeited deposits.

4.4.3  <u>Books and Records</u>. Tenant shall maintain at the Premises or at its principal office, complete books and records reflecting all elements of Gross Sales. Tenant shall be allowed to maintain its books and records in a computerized form; <u>provided, however</u>, that (i) such computerized books and records provide the same level of information as the books and records described above, are retained for the full record retention period provided for herein, and (ii) promptly upon request, printed copies of any such books and records are made available at Tenant's principal office for inspection by Landlord's representatives who are engaged in inspecting and/or auditing Tenant's books and records as provided herein. Such books and records shall be kept in accordance with generally accepted accounting principles and practices consistently applied and shall be retained by Tenant for at least two (2) years following the end of the calendar year to which they refer.

4.4.4  <u>Landlord's Right to Audit</u>. Landlord and/or Landlord's auditor shall have the right, upon at least ten (10) days prior notice to Tenant (but not more than once per annum), to inspect and/or audit the records of Tenant relating to Gross Sales. If any such audit discloses a deficiency in the Gross Sales reported by Tenant, Tenant shall pay any deficiency in Percentage Rent owing to Landlord on account of such deficiency. If such deficiency is in excess of three (3%) percent of the Gross Sales reported by Tenant and Percentage Rent is then payable, Tenant shall also pay Landlord's reasonable costs of the inspection and audit. Tenant has not and does not make any representation or warranty as to the amount of Gross Sales which are anticipated from the Premises.

4.4.5  <u>Confidentiality</u>. Landlord shall not disclose to any third party Tenant's Gross Sales or the amount of Percentage Rent paid or payable by Tenant, <u>provided, however</u>, that (i) such information was not previously disclosed by Tenant to such third party or to the public generally, and (ii) nothing contained herein shall restrict Landlord from disclosing such information as may be required by applicable Legal Requirements or to its accountants, attorneys, *bona fide* prospective purchasers, or current or prospective Mortgagees or underlying lessors of all or any portion of Landlord's interest in the Shopping Center (provided that each of such recipients shall be bound to the same non-disclosure provisions as are imposed upon Landlord).

4.4.6  <u>Licensees</u>. If Tenant enters into any agreement(s) with any non-Affiliate person or entity (hereinafter, the *"Licensees"*) permitting the Licensees to operate businesses or concessions within the Premises, then, in lieu of including the Gross Sales actually achieved by such Licensee(s) from such licensed portion of the Premises, Tenant may elect to include in Gross Sales an amount equal to the product obtained by multiplying (i) the Floor Area of such licensed space, by (ii) the average Gross Sales per square foot of Floor Area for the remainder (*i.e.*, the unlicensed portion) of the Premises. The provisions of this Subsection 4.4.6 shall not apply to more than 4,000 square feet of Floor Area, in the aggregate, in the Premises at any one time. If more than 4,000 square feet of the Floor Area of the Premises is licensed to Licensees at any one time, then Tenant shall have the right to designate, from time to time, those portions of the Premises which will be entitled to the benefit of this Subsection 4.4.6.

4.4.7  <u>Adjustment for Assignees and Sublessees</u>. In the event an assignee of this Lease or any sublessee of all or any portion of the Floor Area of the Premises does not use the Premises (or, as applicable, the subleased portion thereof) as a store

23

specializing primarily in the sale of linens and domestics, bathroom items, housewares, frames and wall art, window treatments and/or closet, shelving and storage items, then the Percentage Multiples [and the Sales Break Points] shall be amended, with respect to the Premises (or, as applicable, the subleased portion thereof), to such other percentage (the *"Adjusted Percentage Multiple"*) [and such other break points (the *"Adjusted Break Points"*)] as shall, as of the effective date of such assignment or sublease, be then generally applicable to such use of the Premises (or, as applicable, the subleased portion thereof) by normal and accepted business standards applicable to such use, taking into consideration (i) the location of the Shopping Center, and (ii) the nature of the Shopping Center (*e.g.*, strip center, mall, power center, etc.) [it being agreed that with respect to any sublease covering less than all of the Floor Area of the Premises, the following shall apply: (1) the Sales Break Points relating to any portion of the Premises so subleased shall be the quotient of (aa) the annual base subrent payable by each sublessee under the terms of its sublease on account of the calendar year for which Percentage Rent is being determined, divided by (bb) the Adjusted Percentage Multiples applicable to such sublessee, and (2) the Sales Break Points relating to the non-subleased portions of the Premises shall be determined by dividing the product of (x) the Fixed Rent for the calendar year for which Percentage Rent is being determined per square foot of the Premises, and (y) the Floor Area of such retained portion of the Premises, by the Percentage Multiples]. Notwithstanding anything to the contrary contained in this Section 4.4.7, in any event where an adjustment is made pursuant to this Section 4.4.7, Percentage Rent for any calendar year during which such adjustment is made shall in no event be less than seventy-five percent (75%) of the average of the actual annual Percentage Rent, if any, during the two calendar years immediately before the assignment or subleasing [it being agreed that with respect to any sublease covering less than all of the Floor Area of the Premises, the minimum Percentage Rent established by this sentence shall be an amount equal to the total average annual Percentage Rent for the Premises for the two calendar years immediately preceding the subleasing in question, divided by the Floor Area of the Premises, multiplied by the Floor Area subject to the sublease in question and there shall be no minimum Percentage Rent for the portion of the Premises not so subleased]. If this Lease has been in effect for less than two full calendar years at the time of the assignment or subletting in question, then the minimum Percentage Rent established in accordance with the preceding sentence shall be based upon seventy-five percent (75%) of the actual Percentage Rent, if any, for the immediately preceding calendar year. If no full calendar year has occurred during the Term, then there shall be no minimum Percentage Rent. For example, if during the fifth calendar year of the Term Percentage Rent is $300,000 and during the sixth calendar year of the Term Percentage Rent is $330,000, and on the first day of the seventh calendar year of the Term the Premises is assigned or subleased in full and adjustments are made in accordance with this Section 4.4.7, the Percentage Rent for the Premises for the period of such adjustment (being the term of the assignment or subletting) shall not be less than seventy-five percent of $315,000 or $236,250 for any calendar year. Equitable adjustments shall be made for partial calendar years. Any dispute between the parties relative to the provisions of this Section 4.4, including, without limitation, the amount of Percentage Rent payable by Tenant, shall be submitted to arbitration in accordance with the provisions of Section 16.3 of this Lease.

ARTICLE 5
COMMON AREAS, THEIR USE AND CHARGES

Section 5.1    Common Areas: Maintenance.

5.1.1   Maintenance of Common Elements. Landlord shall operate, manage, maintain, maintain, repair and replace or cause to be operated, managed, maintained, repaired and replaced, the Shopping Center and the Common Elements, together with the public sidewalks adjacent to the Condominium, as required by this Lease and otherwise to the standard set forth in the Condominium Documents. Landlord shall cause the other

24

Unit Owners to manage, maintain, repair and replace their Condominium Units in accordance with the standards set forth in the Condominium Documents. Landlord shall comply or cause compliance with all applicable Legal Requirements relating to the Shopping Center, the Common Elements and the Condominium.

5.1.2  Common Areas Charges. During the Term, Tenant shall pay to Landlord a fixed charge per square foot of Floor Area (hereinafter referred to as the *"Fixed Common Areas Charges"*) for Landlord to operate, maintain and repair the Common Areas. In addition, Tenant shall pay to Landlord Tenant's Pro Rata Share of any Insurance Surcharge (as hereinafter defined in Section 10.3.3) for Landlord to insure the Shopping Center in accordance with this Lease (Fixed Common Areas Charges and Tenant's Pro Rata Share of Insurance Charges are collectively referred to herein as *"Common Areas Charges"*). Tenant is also responsible for the payment of Tenant's Pro Rata Share of Taxes as provided in Section 4.3.2, but such payment is not part of Common Areas Charges. The fixed charge per square foot of Floor Area for Fixed Common Areas Charges shall be: (a) Three and 50/100 Dollars ($3.50) per square foot of Floor Area per annum from the Rent Commencement Date through the end of the fifth (5th) full calendar year of the Term; (b) Four Dollars ($4.00) per square foot of Floor Area per annum from the first day of the sixth (6th) full calendar year of the Term through the last day of the Initial Term; (c) Four and 80/100 Dollars ($4.80) during the first Renewal Period; (d) Five and 32/100 Dollars ($5.32) during the second Renewal Period; and (e) Six and 28/100 Dollars ($6.28) during the third Renewal Period. Fixed Common Areas Charges shall be paid by Tenant in equal monthly installments on the first day of each calendar month, in advance, during each calendar year. Tenant's Pro Rata Share of any Insurance Surcharge shall be paid within sixty (60) days after Tenant receives reasonable proof of the existence and the amount of any such Insurance Surcharge and the actual payment thereof by Landlord. Tenant shall have the right to audit any Insurance Surcharge. Common Areas Charges for any period during the Term which constitutes less than a full calendar year shall be equitably prorated.

5.1.3  Merchants' Association In no event shall Tenant be required to join, participate in or contribute to any promotional fund, marketing fund or merchants' association.

Section 5.2    Common Areas: Restrictions.

5.2.1  Continuous Access. No entrances, exits, approaches and means of ingress and egress to, from, and/or within the Shopping Center or the Premises as shown on Exhibit B hereto or any Common Elements that are for the purpose of accessing the Shopping Center or the Premises shall be interrupted or disturbed by any act or omission of Landlord, or, except to the extent expressly permitted by the Condominium Documents for the Common Elements (and in strict compliance therewith) any other Unit Owner or the Unit Owners Association, the Managing Agent (as defined in the Condominium Documents (*"the Managing Agent"*) or any employee, agent or contractor or any of the foregoing during the Term, except: (i) in the event of an emergency or as may be otherwise required by applicable Legal Requirements, in which event Landlord (or the acting party) shall use reasonable efforts to give Tenant advance notice of same and to minimize interference to Tenant's normal business operations in the Premises as a result thereof; or (ii) in the event that Landlord (or any other Unit Owner or the Unit Owners Association or the Managing Agent) is required to temporarily close the Common Elements or any portion thereof as permitted by the Condominium Documents, for the minimum time legally necessary to prevent a dedication thereof or an accrual of any rights in any person or the public generally therein; provided that Landlord shall not elect to or vote in favor of or otherwise support any such closure occurring during August, November or December of any calendar year and shall vigorously oppose the efforts of any party to schedule such a closure during such months, and Landlord shall give Tenant at least thirty (30) days' prior notice thereof. Nothing in this Section 5.2.1

25

1    shall prohibit Landlord or the Unit Owners Association or the Managing Agent from
2    making repairs to such entrances and exits, approaches and means of ingress and egress
3    in a commercially reasonable manner otherwise permitted by this Lease and the
4    Condominium Documents and designed to minimize interference with access to the
5    Premises.

6              5.2.2    No Alterations.  Landlord shall not, without obtaining Tenant's prior
7    written consent in each instance, which consent may be withheld in its sole discretion
8    with respect to clause (ii), but shall not be unreasonably withheld with respect to clauses
9    (i) and (iii): (i) alter or permit the alteration of the size (size, as used herein shall include,
10   without limitation, area, height, width and depth) of the Shopping Center or the location,
11   availability, or size of any Common Area improvement, from that shown on Exhibit B
12   hereto (which designates areas where changes are permitted, including the areas in which
13   the expansion of the Shopping Center and the construction of additional floors is
14   permitted, and the parameters of those permitted changes) or support or consent to any
15   changes to the location, availability, size of any Common Element from that shown on
16   Exhibit B; (ii) construct or permit to be constructed any structures in the Common Areas
17   of the Shopping Center or the Common Elements (including, without limitation, any
18   buildings, kiosks, booths, signs or similar structures in the Common Areas), other than as
19   shown on Exhibit B hereto as permitted building areas; (iii) materially change or permit
20   to be materially changed:  the entrances or exits to and from or within the Shopping
21   Center or the Condominium (except that entrances to individual stores may change, but
22   not those entrances from areas outside of the Condominium to the Common Areas or
23   from the Parking Unit to the Common Areas), or the curb cuts, roadways, drive aisles,
24   elevators, escalators, stairways, sidewalks or other elements of the Common Areas, or the
25   number, location or layout of parking spaces in the Parking Unit (except as expressly
26   permitted by the Condominium Documents with respect to changes in the parking), from
27   those shown on Exhibit B hereto.  Landlord shall neither perform nor permit to be
28   performed, any construction, repairs, replacements or maintenance to any portion of the
29   Shopping Center, including the Premises (other than emergency repairs to utilities and
30   Common Areas and work that is legally required to be performed and cannot legally be
31   delayed or if such repair does not in any way interfere with the use of the Common
32   Areas, access to the Premises or the availability of all parking spaces in the Parking Unit
33   or is wholly conducted (without ongoing interference thereafter) within the period
34   beginning one hour after Tenant closes for business on a day and ending no later than one
35   hour before Tenant opens for business the next day) or the Common Elements or the
36   Parking Unit during the months of August, November and December of any year, without
37   the prior consent of Tenant, which consent may be withheld in Tenant's sole discretion.
38   In addition, all alterations and other work permitted hereunder shall be performed in full
39   compliance with the Condominium Documents.

40             5.2.3    Intentionally Omitted

41             5.2.4    Parking Area.  During the Term, Landlord shall diligently and
42   vigorously enforce the obligations of the owner and/or operator of the Parking Unit to
43   comply with the terms of the Condominium Documents relating to the Parking Unit and
44   the parking therein and shall not consent to or support any amendment to such terms
45   without the consent of Tenant, which may be granted or denied by Tenant in accordance
46   with the standards set forth in Section 12.5.1 for changes before the recording of the
47   Condominium Documents.  Landlord shall not designate specific parking spaces for use
48   by other tenants or occupants of the Shopping Center or any other person, nor shall
49   Landlord permit any person or entity to designate specific parking spaces for use by other
50   tenants or occupants of the Condominium or any other person, although directional signs
51   directing drivers to the nearest parking to various tenants and occupants may be used so
52   long as any car may be parked in any vacant parking space.  Charges for the spaces in the
53   Parking Unit shall be permitted as provided in the Condominium Documents.  In
54   addition, signage in the Parking Unit that is not retail directional signage governed by

26

Section 13(B) of the Declaration of Parking Operations shall be limited to those areas designated on Exhibit B as *"Permitted Advertising Areas"* and the advertisements located in the Permitted Advertising Areas shall be limited to advertisements by Qualified Advertisers. Qualified Advertisers shall mean reputable companies that are not engaged in or advertising any business that (i) is a retail business (except that retail businesses actually located in the Condominium shall be Qualified Advertisers) or (ii) if not a retail business, that the Condominium Documents do not allow to be conducted within the Condominium, the intent being to limit Qualified Advertisers to retail occupants of the Shopping Center and reputable non-retail companies conducting non-retail businesses that are not prohibited by the Condominium Documents (such prohibitions being a method of defining those non-retail businesses whose uses are not compatible with the Shopping Center and therefore should not be advertised within the Condominium). The company being advertised shall be considered the company placing the advertisement for purposes of determining whether such company is reputable and whether it is engaged in a retail business and any agency or other company renting the ad on such other company's account shall be disregarded. Notwithstanding the foregoing, notices and communications directly related to the operation of the parking business being conducted in the Parking Unit (such as prices, directional signs, rules and regulations, hours and similar items) shall not be considered advertisements and shall not be restricted as to placement within the Parking Unit.

5.2.5 Lighting. Throughout the Term, Landlord shall keep the public areas of the Shopping Center and cause the public areas of the Common Elements to be lighted 24 hours a day, every day and cause the Common Areas to be open to the customers of the Shopping Center in accordance with the terms of the Condominium Documents. Tenant agrees to provide low level lighting for all portions of the Premises visible from outside of the Building (the public streets and surrounding areas) to the extent that all other tenants and occupants having second floor space do so.

5.2.6 Repairs. During the Term, any construction or repair by Landlord or any other Unit Owner or the Unit Owners Association permitted or required under this Lease and undertaken in the Common Areas or in any other portion of the Shopping Center (except wholly within the interior of another tenant's premises), or, to the extent such repairs are permitted under the Condominium Documents, in the Parking Unit, shall:

(a)    not be performed during the months of August, November, or December of any year, except in the event of an emergency or as may be otherwise required by applicable Legal Requirements or if such repair does not in any way interfere with the use of the Common Areas, access to the Premises or the availability of all parking spaces in the Parking Unit or is wholly conducted (without ongoing interference thereafter) within the period beginning one hour after Tenant closes for business on a day and ending no later than one hour before Tenant opens for business the next day;

(b)    be commenced only upon at least five (5) days' prior notice to Tenant (except in an emergency, in which event Landlord shall only be required to give such notice as is reasonable under the circumstances); and

(c)    be performed in accordance with the requirements of Section 3.3.6 above and in such a manner so as not to materially interfere with the normal conduct of any business operations in the Premises.

5.2.7 Rules and Regulations. Tenant shall comply with the rules and regulations of the Shopping Center and Condominium attached hereto as Exhibit N, if any. Tenant shall also comply with future rules and regulations of the Shopping Center as established from time to time by Landlord and the Condominium, as established in accordance with the applicable Condominium Documents, within sixty (60) days after Landlord notifies Tenant thereof, provided they: (i) are reasonable, (ii) do not adversely

27

affect the normal conduct of any business operations in the Premises, (iii) do not adversely affect any of Tenant's rights under this Lease, and (iv) are uniformly enforced against all tenants of the Shopping Center and/or Condominium, as the case may be and without prejudice against Tenant. In the event of any conflict between the provisions of this Lease and any rules or regulations, the provisions of this Lease shall prevail and govern.

### 5.2.8 Miscellaneous.

(a) No Promotional Use. Landlord shall not use or permit the use of all or any portion of the Common Areas for retail sales or for promotional purposes other than those areas of the Common Areas shown on Exhibit B as "Permitted Promotional Areas". If Landlord shall use or permit the use of any Permitted Promotional Area, Landlord shall include the Floor Area of such Permitted Promotional Area within the denominator used to calculate Tenant's Pro Rata Share of Taxes and Tenant's Pro Rata Share of any Insurance Surcharge (the parties agree that as the posting of signage permitted by this Lease on the walls of the Permitted Promotional Areas does not utilize Floor Area, it shall not result in any adjustment to the denominator hereunder). This principle shall be equitably applied if the use of the Common Elements of the Condominium by Landlord for the sales purposes (such as kiosks and similar sales areas) is taken into account in calculating the Taxes for the Shopping Center (including taking into account the time period for which such area was used) or increases the insurance premiums that would be payable by Landlord if such use did not occur. Tenant's Pro Rata Share of Taxes shall then be reduced to Tenant's Pro Rata Share of the Taxes as so calculated and Tenant's Pro Rata Share of any Insurance Surcharge shall then be reduced to Tenant's Pro Rata Share of any Insurance Surcharge as so calculated. Landlord shall be entitled to retain any rental or other consideration paid for the use of such Permitted Promotional Area without crediting same against Taxes so long as the Floor Area of the Permitted Promotional Area being used for retail sales or promotional purposes is included in the denominator used to calculate Tenant's Pro Rata Share of Taxes. Any activities occurring within the Permitted Promotional Areas shall be subject to the Rules and Regulations applicable to the Shopping Center and the Condominium, all Legal Requirements and the terms of this Lease, including, without limitation, Article 13 hereof. Landlord shall not permit any solicitation, distribution of handbills, picketing, or other public demonstration in the Common Areas, except as otherwise may be mandated by applicable Legal Requirements, except that advertising may take place within the Permitted Promotional Areas. This restriction shall not apply to the public sidewalk surrounding the Building, so long as Landlord does not allow the areas near the entrances to the building leading to Common Areas (but not to any specific tenant's premises) to be used for this purpose to the greatest extent permitted by Legal Requirements, the intent being that customers can pass easily to the entrances to the Common Areas without hindrance and without being discouraged from entering as a result of having to encounter numerous parties advertising their businesses by the distribution of handbills or similar items or otherwise engaging in any solicitation, distribution of handbills, picketing, or other public demonstration.

(b) Trash Compactor & Containers. Tenant shall be permitted to maintain and operate, at no extra charge: (i) the use of the its exclusive trash compactor in the portion of the Common Areas designated on Exhibit B hereto as "Tenant's Trash Compactor Pad"; and (ii) the use of its exclusive trash container located in the portion of the Common Areas designated on Exhibit B hereto as "Tenant's Trash Container Pad". Tenant shall remove its debris from outside of the trash areas and shall not damage the containers or compactors. Tenant shall arrange for the removal of its trash from Tenant's exclusive trash compactor and trash container at Tenant's sole cost and expense.

(c) Shopping Carts. Tenant shall be permitted to store its shopping carts in the common cart corrals located in the Parking Unit as designated on

1    Exhibits B and D-1 hereto. Tenant shall use carts with site specific sensors provided that
2    Landlord (i) delivers to Tenant the specifications for such sensors and for the shopping
3    cart size and dimensions to be used by Target no more than 30 days after Landlord
4    delivers to Tenant the Delivery Date Notice, and (ii) installs, at no cost to Tenant, the
5    sensors reasonably needed in the Parking Unit, sidewalk and Common Areas of the
6    Condominium in order to make the sensors to be installed by Tenant on its carts effective.
7    Landlord represents and warrants to that Target has agreed to install compatible sensors
8    and to use carts having the specifications to be delivered to Tenant and Landlord agrees
9    that Landlord shall require all other tenants and occupants of the Shopping Center using
10    shopping carts to install compatible sensors and to use carts that are compatible with the
11    cart size to be used by Target so that all occupants of the Condominium sharing the cart
12    corrals can do so effectively. With respect to shopping carts provided by Tenant for the
13    use of its customers, Tenant shall periodically remove same from the common cart
14    corrals and return same to Tenant's store and shall clear its carts from the corrals each
15    night after closing to the extent that Target and all other cart corral users also do so.

16            (d)    Cellular Towers. No transmission and/or reception towers for
17    wireless telephone or internet communications shall be permitted within the Shopping
18    Center except that such devices may be located on the roof of the Shopping Center. This
19    Section 5.2.8(d) does not limit Tenant or any other Shopping Center tenant's ability to
20    place an antenna or satellite dish on the roof for use in its business (and not for use by
21    third parties) as permitted by the applicable lease. Any placement of any transmission or
22    reception device by a person that is not a tenant in the Shopping Center shall be limited to
23    those devices that do not interfere with the devices used by tenants of the Shopping
24    Center (including Tenant).

25                               ARTICLE 6
26                               UTILITIES

27        Section 6.1    Utility Service. From and after the Delivery Date and continuing
28    thereafter through the end of the Term, Tenant shall be solely responsible for and shall
29    pay the cost of utilities services (including, without limitation, electricity, gas, water,
30    sanitary sewer, alarm and telecommunications) consumed in the Premises by Tenant and
31    any required deposits for such service (but not including connection fees or hook-up fees,
32    which shall be paid by Landlord). Tenant shall not be obligated to purchase utility
33    service(s) directly from Landlord or the Condominium or Unit Owners Association, or
34    from any utility provider designated by Landlord, the Condominium, Unit Owners
35    Association or Managing Agent and Landlord shall not provide any utilities to Tenant,
36    but instead shall allow Tenant to contract directly with the utility providing the service.
37    Landlord shall provide separate utility meters exclusively serving the Premises, at its sole
38    cost and expense (including, without limitation, all connection and hook-up fees) as set
39    forth in Exhibit D, except for water and sewer, which will be provided by the applicable
40    utility to the Shopping Center with Tenant's portion of such charges charged to Tenant
41    based on the readings from a meter shall be installed by Landlord in accordance with
42    Exhibit D to meter Tenant's actual use and Tenant shall pay on the basis of its actual use
43    and the actual cost of Tenant's usage. Landlord shall provide Tenant with the actual
44    sewer and water bills and the basis of Landlord's calculation of Tenant's cost with each
45    bill rendered to Tenant by Landlord. Tenant's entry upon the Premises prior to the
46    Delivery Date shall not constitute a waiver by Tenant of Landlord's obligation to pay the
47    costs of all utility charges incurred in the Premises prior to the Delivery Date. Landlord
48    shall not permit the capacity of utility lines available for use at the Premises to be reduced
49    or overloaded by any other persons or entities. Tenant shall not overload the utility lines
50    by using utilities in excess of the capacities set forth on Exhibit D for each utility.
51    Landlord shall permit Tenant and its telecommunications provider full and free access to,
52    and use of, available telecommunications conduits in the Shopping Center for the
53    provision of telecommunications service to the Premises, subject to such reasonable
54    requirements as Landlord may impose.

1       Section 6.2   Interruption. Notwithstanding any provision of this Lease to the
2 contrary, in the event utilities serving the Premises are disrupted due to the willful or
3 negligent acts or omissions of Landlord, its agents, contractors, servants or employees, or
4 by the actions of the Unit Owners Association or the Managing Agent or either of their
5 agents, contractors, servants or employees, Landlord shall promptly restore or cause to be
6 restored the affected utilities at no cost or expense to Tenant. If the utilities so willfully
7 or negligently disrupted are not restored within twenty-four (24) hours after the Landlord
8 has knowledge of the disruption, and Tenant is unable to conduct its normal business in
9 the Premises as a result thereof, Rent shall be equitably abated during the period of
10 disruption.

11                                  ARTICLE 7
12                                  SIGNS

13       Section 7.1   Tenant's Building Signage.   Subject to compliance with
14 applicable Legal Requirements and Landlord Sign Criteria, attached hereto as Exhibit Q
15 (*"Landlord's Sign Criteria"*), Tenant shall have the exclusive right, in connection with
16 Tenant's Work, and thereafter during the Term, at its sole cost and expense, to erect,
17 maintain, and replace on the storefront and exterior walls of the Premises (including,
18 without limitation, those "exterior" walls of the Premises that face interior public areas of
19 the Common Areas) in the locations designated on Exhibit F-1 and with dimensions
20 substantially the same as those designated on Exhibit F-1, and on the side walls of any
21 entrance design element, if any, signs (including, without limitation, under-canopy (*e.g.*,
22 blade) signs), banners (including temporary banners placed on the construction wall or
23 fence relating to the construction of the Condominium announcing "Sneak Preview,"
24 "Grand Opening" and/or "Now Hiring"), awnings, and flags of such size, design and
25 color as Tenant, from time to time, may desire. Tenant shall be entitled, at Tenant's sole
26 cost and expense, to: (i) install and maintain on the storefront of the Premises a
27 temporary banner announcing "Coming Soon" at such time, and for such duration prior to
28 the Rent Commencement Date, as Tenant shall desire, and (ii) install and maintain,
29 during the period commencing on the Effective Date and ending on the day prior to the
30 Rent Commencement Date, a temporary sign near the site of the future main entrance to
31 the Shopping Center which states "Bed Bath & Beyond Coming Soon" (which sign is
32 more particularly shown in Exhibit F hereto). Tenant may erect and maintain in the
33 interior of the Premises any signs it may desire, provided same are professionally
34 prepared.

35       Section 7.2   Pylon/Monument Signage. Landlord represents that the
36 Condominium does not have any pylon or monument signs, but that the Condominium
37 Documents contemplate the possible construction of monument signage. If, at any time,
38 the Condominium or the Unit Owners Association or the Managing Agent or Landlord
39 constructs or makes available to any other tenant or tenants or other occupants in the
40 Shopping Center having equal or lesser Floor Area than Tenant, any pylon or monument
41 signage, such signage shall also include Tenant's identification sign, as shown on Exhibit
42 F hereto, which shall be higher than and at least as large as the largest sign made
43 available to any other tenant or tenants having equal or lesser Floor Area than Tenant. If
44 any pylons or monuments shall be erected, Landlord (or the Unit Owners Association or
45 Managing Agent, as the case may be) shall maintain same, and Tenant shall maintain
46 Tenant's signs thereon, each in good order and repair. Landlord shall allow (or shall
47 cause the Unit Owners Association or the Managing Agent to allow) Tenant access to
48 replace its signs thereon, at Tenant's cost and expense. After the erection of any pylon or
49 monument on which Tenant has signage, Landlord shall not change or alter or consent or
50 support the changing or alteration of the location, structure, height or general appearance
51 of such pylon or monument without obtaining Tenant's prior consent, except that
52 Landlord or the Unit Owners Association or the Managing Agent may add lower panels
53 for tenants that are smaller than Tenant, provided the pylon or monument is not otherwise
54 changed and the actual signage on each panel may be changed to reflect the tenant

1    thereon provided such signage is consistent with Landlord's Sign Criteria and all Legal
2    Requirements. Except for the cost and maintenance of Tenant's sign panels, which shall
3    be paid by Tenant directly, no costs or expenses relating to maintenance or operation of
4    the signs or the illumination thereof shall be charged to Tenant, as all of such costs are
5    included in the Fixed Common Areas Charges payable by Tenant hereunder.

6    Section 7.3    Signage: Alteration/Removal/Allocation. Tenant shall have the
7    right, from time to time, without Landlord's approval, but in compliance with Legal
8    Requirements and Landlord's Sign Criteria, to change its signs located upon or outside of
9    the Premises (both facing the outside and facing the public Common Areas, as well as on
10   any pylon or monument, provided that the area of the new sign is no larger than the area
11   of the sign which it replaces and that the method of construction and attachment is
12   substantially the same. Upon the expiration or earlier termination of the Lease, Tenant
13   shall remove its signs from the fascia or other "exterior" walls of the Premises and from
14   any pylon or monument, and shall repair any damage occasioned thereby. The signage
15   rights granted to Tenant pursuant to this Article 7 shall, at Tenant's option, be allocated
16   to or between Tenant and/or any subtenant(s) of all or any portion of the Premises,
17   provided such allocation is not among more than three (3) parties. All signage installed
18   by Landlord and Tenant hereunder shall comply with applicable Legal Requirements and
19   Landlord's Sign Criteria.

20   Section 7.4    Cooperation. Landlord, upon request, shall execute or cause the
21   Unit Owners Association or Managing Agent, as appropriate, to execute any consents or
22   applications which may be required by applicable Legal Requirements to permit the
23   placement, installation, and/or replacement by Tenant of any signs on any part of the
24   Premises or the exterior walls thereof (which are actually Common Elements, but are
25   referred to in this Article 7 as exterior walls of the Premises) or on any pylon or
26   monument, to which Tenant may be entitled under this Lease.

27   Section 7.5    Signage Restrictions and Criteria.

28   7.5.1  During the Term, (a) all identification signs or signs visible from the
29   Common Areas or the outside and attached to the Building shall comply with Legal
30   Requirements and Landlord's Sign Criteria, (b) all such signs attached to the Building
31   shall comply with Legal Requirements and any applicable Condominium Document
32   provisions and (c) signage within the Parking Unit (other than directional signs and signs
33   directly related to the conduct of the parking business and not advertising any other
34   business or group) shall comply with the requirements of Section 5.2.4 above.

35   7.5.2  Landlord shall not permit any obstructions (including, without
36   limitation, any trees, bushes or other landscaping (except to the extent same can not be
37   removed, pruned or trimmed as a result of Legal Requirements), scaffolding or
38   architectural details) to obscure Tenant's storefront, storefront signs or other "exterior"
39   (to the outside or to public areas of the Common Areas) wall signs or any pylons,
40   monuments or other freestanding signs, except that temporary scaffolding necessary to
41   the repair of the Condominium shall be permitted if same is designed to minimize the
42   obstruction and to be in place the minimum reasonable time. If any such temporary
43   scaffolding is necessary, Landlord will use diligent efforts to provide Tenant with
44   unobstructed temporary signage if Tenant's signage is obstructed in any way. Exhibit F-
45   1 contains all permitted signage areas on the "exterior" of the Shopping Center (both
46   facing the outside and facing the public portions of the Common Areas) and within the
47   Common Areas (or facing the public portion of the Common Areas from the "exterior"
48   wall of another Unit) and the maximum areas for the elevation of each premises,
49   including the Premises and the other Units. Landlord shall not permit any tenant or other
50   person to install any signage outside of such permitted signage areas or to have an
51   elevation exceeding that shown, nor to seek a variance to do so without Tenant's consent,
52   which can be withheld in Tenant's sole discretion and may be conditioned on Tenant also

31

obtaining expanded signage space.  In no event shall any temporary scaffolding interfere with ingress or egress to or from the Parking Unit, the Shopping Center or the Premises (including, without limitation, the loading docks and trash container and trash compactor areas relating thereto).  Tenant acknowledges that variances have been obtained for Target's blade sign and Landlord's sign containing the name of the Shopping Center (but not any tenant or occupant thereof) and that such variances shall not require Tenant's consent or give rise to any right of Tenant to seek additional signage.

ARTICLE 8

ALTERATIONS AND IMPROVEMENTS

Section 8.1      <u>Alterations and Improvements</u>.

8.1.1    Tenant shall not perform any structural alterations or structural improvements to the Premises or any exterior alteration (except to the extent same pertain to Tenant's Work) without the prior approval of Landlord, provided, however, that Tenant's alteration of the storefront of the Premises facing the interior Common Areas to conform to Tenant's then-current prototypical elevation shall not require Landlord's consent if Tenant is then a national or regional retailer provided same is contained within the signage and elevation areas shown on <u>Exhibit D-1</u> and <u>Exhibit F-1</u> for the Premises. All work performed by Tenant in connection with structural and non-structural alterations or improvements shall be done at Tenant's sole cost and expense, in a good and workmanlike manner and in compliance with all applicable Legal Requirements.  The provisions of this Section 8.1 shall not apply to Tenant's building signage, which shall be governed by the applicable provisions of Article 7 above and Landlord's Sign Criteria.

8.1.2    Tenant may, from time to time, at its sole cost and expense, without the prior approval of Landlord, make interior non-structural alterations and non-structural improvements to the Premises as Tenant deems necessary or desirable, including, but not limited to, electrical systems, heating, ventilation and air conditioning and other mechanical systems, installation of fixtures and equipment, painting, and wall and floor coverings, provided, however that changes to the electrical, heating, ventilation, air conditioning or mechanical systems shall not adversely affect the Shopping Center systems.  Tenant shall provide Landlord with plans relating to such alterations and improvements for Landlord's files.

8.1.3    Tenant, at Tenant's sole cost and expense, shall have the right to subdivide the Premises into three (3) separate stores, each of which may have its own front entrance and access to the loading docks in the rear of the Premises, as well as separately sub-metered utilities.

8.1.4    Tenant shall have the right to erect and maintain an antenna and a satellite dish on the roof of the Shopping Center, together with such cabling connecting the antenna to the interior of the Premises as is reasonably necessary, and install same in the manner set forth in <u>Exhibit D</u> and <u>Exhibit D-1</u>, provided that Tenant: (i) obtains Landlord's prior approval of its plans for the installation of such equipment, (ii) uses a contractor designated or approved by Landlord for all roof penetrations so as not to violate or invalidate any roof warranties maintained by Landlord, (iii) maintains the area where roof penetrations are made while Tenant's equipment is present, (iv) repairs any damage to the roof caused by the making of the roof penetrations, including, but not limited to, the repair of the roof penetrations upon the removal of any equipment installed thereon, and (v) erects and maintains such equipment in accordance with applicable Legal Requirements.

8.1.5    Landlord shall execute (or cause the Unit Owners Association or Managing Agent to execute) and return to Tenant all appropriately completed building department or equivalent applications within ten (10) Business Days after Tenant's request therefor, and will reasonably cooperate (or cause the Unit Owners Association

32

and Managing Agent to reasonably cooperate) with Tenant in the permitting process. If Tenant proposes structural changes to the Premises, Landlord and the Unit Owners Association and, if applicable, the Managing Agent, shall have such additional time (but not more than twenty (20) additional days) as may be necessary to review the structural aspects of such request and Tenant shall reimburse Landlord and the Unit Owners Association/Managing Agent for its reasonable out-of-pocket costs of review of such structural elements by an outside structural engineer selected by Landlord and/or the Unit Owners Association within sixty (60) days after Landlord/Unit Owners Association/Managing Agent submits reasonable proof of such costs to Tenant.

8.1.6  If any violation of any applicable Legal Requirement which is noted against the Shopping Center or the Premises (other than a violation caused by Tenant, which Tenant shall correct) prevents Tenant from obtaining a building permit for any alterations or a certificate of occupancy, then, upon request by Tenant , Landlord shall promptly and diligently cause such violation to be removed of record to the extent required to permit Tenant to obtain its building permit or certificate of occupancy, as the case may be. If any violation of any applicable Legal Requirement which is noted against the Condominium or the Common Elements (other than a violation caused by Tenant, which Tenant shall correct) prevents Tenant from obtaining a building permit for any alterations or a certificate of occupancy, then, upon request by Tenant , Landlord shall cause the Unit Owners Association or the Managing Agent to promptly and diligently cause such violation to be removed of record to the extent required to permit Tenant to obtain its building permit or certificate of occupancy, as the case may be.

8.1.7  Landlord shall not make or permit to be made any alterations to the Premises (including, without limitation, changing the design, color or materials of the "exterior" walls of the Premises visible from public areas of the Common Areas, but not including those portions of the exterior walls of the Premises that are outside walls and are not interior to the Condominium and are not within Tenant's permitted signage and elevation area or, unless the same change is made to all exterior areas having windows like the Premises, the windows) nor shall Landlord construct an additional floor or floors above the Premises except for the permitted expansion area set forth on Exhibit B. Landlord shall neither make nor permit to be made any alterations to the exterior architectural theme of the remainder of the Shopping Center (as shown on Exhibit D-2 hereto) which would be inconsistent with a high quality shopping center of the same type as the Shopping Center in urban areas similar to the location of the Shopping Center (exclusive of other tenants' entrance features) without the prior consent of Tenant. No consent shall be required to make changes to the exterior architectural theme of the remainder of the Shopping Center that are fully consistent with a high quality shopping center. Any alterations made by Landlord shall not adversely affect the visibility of the Premises or Tenant's signage.

ARTICLE 9

REPAIRS

Section 9.1    Tenant's Repairs. Subject to the provisions of Articles 10 and 11 hereof, and except as otherwise provided in Section 9.2 below, Tenant shall maintain in good condition and repair, at its sole cost and expense: (i) the non-structural, interior elements of the Premises (including plate glass, and the electrical, plumbing, mechanical, and/or alarm systems located in, or serving, exclusively the Premises); and (ii) the heating, ventilation and air conditioning ("*HVAC*") units and elevators exclusively serving the Premises. All repairs and replacements on Tenant's part to be performed hereunder shall be at Tenant's sole cost and expense, and performed in a good and workmanlike manner in accordance with all applicable Legal Requirements. Subject to Section 10.1 hereof, Tenant shall also be responsible for all repairs necessitated by Tenant's acts.

33

Section 9.2    <u>Landlord's Repairs</u>. Subject to the provisions of Articles 10 and 11 hereof, Landlord shall perform or cause to be performed, as the same shall from time to time be reasonably necessary, all repairs and replacements to the following:

(a)    the Building as reasonably necessary to maintain same in good condition and repair (including, without limitation, repainting and otherwise maintaining the exterior walls of the Building (including, without limitation, the Premises, but not including Tenant's or any other tenant's or occupant's storefront)) as same may be reasonably required from time to time during the Term;

(b)    the structural elements of the Premises, which shall be deemed to include, without limitation, the roof joists, columns, footings, foundation, exterior walls (<u>including</u>, without limitation, repainting and otherwise maintaining such exterior elements, but <u>excluding</u> plate glass, storefront windows, doors, door closure devices, window and door frames, molding, locks and hardware, and painting or other treatment of interior walls), floor (but not the floor covering, unless the same is damaged as a result of a floor defect or settling), and the structural elements of the Building;

(c)    the roof, gutters, flashings, downspouts and scuppers;

(d)    the electric, gas, water, sanitary sewer, and other public utility lines serving the Premises, to the point of connection to the Premises;

(e)    all electric, gas, water, sanitary sewer, and other public utility lines and ducts in or passing through the Premises which do not exclusively serve the Premises; and

(f)    the non-structural elements of the Premises (including, without limitation, the HVAC units and the electrical, plumbing, mechanical, and/or fire alarm systems located in or serving the Premises) until the first (1st) anniversary of the Delivery Date, and thereafter for such period of time and to the extent any such non-structural elements are covered by any contractors', manufacturers', vendors', or insurers' warranties or guarantees unless Landlord shall then assign such warranties or guarantees to Tenant in a manner that provides to Tenant a viable right to enforce same, in which event, from and after the later of such first (1st) anniversary or such assignment, Tenant shall be responsible for such warranted or guaranteed non-structural repairs; and

(g)    any damage to the Shopping Center (including, without limitation, the Premises) or the Building which is occasioned by (A) the act or omission of Landlord, its employees, agents or contractors, or (B) any breach by Landlord of any provision of this Lease.

All repairs and replacements on Landlord's part to be performed or caused to be performed hereunder shall be without cost to Tenant, performed in a good and workmanlike manner in accordance with all applicable Legal Requirements, and without material interference with or disruption to the normal conduct of any business operations in the Premises. Landlord shall give Tenant at least five (5) days' prior notice of any repairs or replacements to, or which would otherwise affect the normal conduct of any business operations in, the Premises (except in the case of an emergency posing imminent risk of material harm to persons or property, in which event Landlord shall only be required to give such notice as is reasonable under the circumstances). If, in Tenant's reasonable judgment, the repairs that Landlord makes or causes to be made would materially interfere with or disrupt the normal conduct of any business operations in the Premises, such repairs shall be performed only after the regular hours of operation of Tenant and any other occupant of the Premises (or any portion thereof), and Landlord shall reimburse Tenant for the reasonable costs and expenses incurred by Tenant in connection with such "after hours" repairs, including, without limitation, utilities charges and security expenses. In the event Landlord does not reimburse Tenant for any amounts

34

1    payable to Tenant hereunder within ten (10) days after Tenant's demand therefor, Tenant
2    shall have the right (in addition to any rights and remedies to which it may be entitled
3    under this Lease, at law, or in equity) to offset such amounts against Rent, together with
4    interest thereon at the Lease Interest Rate from the date of outlay until reimbursement or
5    full satisfaction by credit.  Landlord shall also diligently and vigorously enforce the
6    maintenance and repair obligations of the other tenants and occupants of the Shopping
7    Center and the other Unit Owners and of the Unit Owners Association and Managing
8    Agent in accordance with the terms of the Condominium Documents.  Landlord
9    represents and warrants to Tenant that Landlord has reserved the right to enter the health
10    club located above to immediately repair any condition posing imminent risk of material
11    harm to persons or property and that it will promptly utilize such right to if a water leak
12    or other condition posing an imminent risk of material harm to persons or property within
13    the Premises exists so as to minimize the damage caused by such condition.

14          Section 9.3    Legal Compliance Work.  Except as hereinafter expressly
15    provided, Landlord shall be responsible, at its sole cost and expense, for performing or
16    causing to be performed all "Legal Compliance Work" (hereinafter defined).
17    Notwithstanding the foregoing, Tenant shall be responsible, at its sole cost and expense,
18    for the performance of Legal Compliance Work: (a) pertaining to the interior elements of
19    the Premises which are neither structural nor comprise the major building systems
20    serving the Premises; or (b) required solely as a result of Tenant's specific manner of use
21    of the Premises (i.e., are not of general applicability to tenants and occupants of the
22    Shopping Center), or (c) relate solely to Tenant's signage, Tenant's Work and other
23    alterations to the Premises made by Tenant; provided, however, that the foregoing shall
24    not relieve Landlord of its obligations to perform or cause to be performed: (x)
25    Landlord's Work in accordance with all Legal Requirements, and (y) the repairs required
26    in this Lease.  Moreover, Landlord shall be solely responsible for any fire-rated ceiling.
27    Columns and/or walls required in connection with the Premises (whether located within
28    the Premises, the Shopping Center or the Common Elements) and any Legal Compliance
29    Work relating thereto as the third floor of the Shopping Center is to be located above the
30    Premises.  As used herein, "*Legal Compliance Work*" shall mean any obligation,
31    addition, alteration, improvement, or rebuilding, structural or otherwise, to or of the
32    Premises, the Shopping Center, the Common Elements or any part thereof, as applicable,
33    which may be required by reason of any Legal Requirement.

34          Section 9.4    Miscellaneous Construction Provisions.

35            9.4.1    Landlord, its architects, engineers, agents and employees may enter
36    upon and inspect the Premises at commercially reasonable times and in a commercially
37    reasonable manner during the performance of Tenant's Work or any Alterations for the
38    purpose of ensuring that Tenant Work or Alterations conforms with the requirements
39    herein contained, provided that neither Landlord nor its architects, engineers, agents or
40    employees shall interfere with or delay such work and Landlord shall indemnify Tenant
41    and hold Tenant harmless from and against any losses, costs or expenses incurred by
42    Tenant and arising from any interference or delay caused by Landlord or such architects,
43    engineers, agents or employees.  If during such work Landlord, its architects or
44    engineers shall determine that the work is not proceeding substantially in accordance with
45    the applicable plans and Legal Requirements, Landlord shall give written notice to
46    Tenant specifying the particular deficiency or omission.  However, Landlord will be
47    under no obligation to inspect the Tenant's work for compliance to Legal Requirements
48    or sound construction practices.

49            9.4.2    Tenant agrees that all work with outside contractors contracted for
50    by Tenant relating to construction work within the Premises being completed before the
51    Premises is open for business to the public will be with outside contractors compatible
52    with Landlord's contractors, a list of which shall be given to Tenant upon Tenant's

35

1 request. Tenant shall not be responsible for any incompatibility if resulting from a
2 contractor of Landlord's not on the list provided to Tenant.

3          9.4.3     As soon as reasonably feasible following the completion of
4 Tenant's Work or Alterations undertaken by Tenant, Tenant shall obtain and furnish to
5 Landlord (i) any required certifications from governmental authorities having jurisdiction
6 to the effect that Tenant's Work or Alterations undertaken by Tenant have been
7 performed and completed substantially in accordance with the applicable plans and in
8 accordance with all Legal Requirements (but nothing herein contained shall affect
9 Landlord's obligations to perform Landlord's Work or require Tenant to correct any work
10 that was not performed by it or finish any work that it did not undertake if any
11 governmental authority requires that same be corrected or finished in order to issue the
12 required certifications to Tenant and the party that was responsible for such work shall
13 promptly correct or complete same so that Tenant shall be able to obtain such
14 certification), and (ii) as-built plans for such Tenant's Work or Alterations, as the case
15 may be.

16          9.4.4     Tenant shall not undertake Tenant's Work until it has procured and
17 paid for any of Tenant's Permits required therefor. Tenant shall not undertake any
18 Alterations until Tenant shall have procured and paid for, so far as the same may be
19 required from time to time, any governmental permits and authorizations required for the
20 performance of same. Upon Landlord's written request, Tenant shall furnish copies of
21 same to Landlord. Nothing herein contained shall affect Landlord's obligations to
22 perform Landlord's Work or require Tenant to obtain any permits or authorization for
23 any work that was not performed by Tenant and the party responsible for such work shall
24 promptly obtain any required permit or authorization.

25

26                              ARTICLE 10
27    INDEMNIFICATION, INSURANCE AND WAIVER OF SUBROGATION

28          Section 10.1    Mutual Release, Waiver of Subrogation and Mutual
29                        Indemnification.

30          10.1.1 Mutual Waiver of Claims. Landlord and Tenant, on their own behalf
31 and on behalf of anyone claiming under or through either one by way of subrogation,
32 hereby release and waive all rights of recovery and causes of action against each other
33 from any and all liability for any loss or damage to property or resulting from damage to
34 such property (and, in either case, any resulting loss of business or rental income),
35 whether caused by the negligence or fault of the other party, which is normally insured
36 under Special Form property insurance (formerly known as "All-Risk") and time element
37 insurance required to be maintained hereunder. In the event either Landlord or Tenant is
38 a self-insurer or maintains a deductible (as either may be permitted hereunder), then the
39 self-insuring party or the party maintaining the deductible hereby releases the other party
40 from any liability arising from any event which would have been covered had the
41 required insurance been obtained and/or the deductible not been maintained.

42          10.1.2 Waiver of Subrogation. Landlord and Tenant shall cause each
43 property insurance policy carried by either of them insuring the Premises, the contents
44 thereof, or the Shopping Center, to provide that the insurer waives all rights of recovery
45 by way of subrogation or otherwise against the other party hereto in connection with any
46 loss or damage which is covered by such policy or that such policy shall otherwise
47 permit, and shall not be voided by the releases provided above. Each party shall also
48 obtain a waiver of subrogation in favor of the Unit Owners Association, Managing Agent
49 and the Unit Owners provided that each party benefiting from such waiver also obtains a
50 waiver of subrogation in favor of the insured party.

1        10.1.3 <u>Mutual Indemnification</u>.

2        (a)   Except as otherwise provided in Subsections 10.1.1 and
3   10.1.2 above, Tenant covenants to defend and indemnify Landlord and hold Landlord
4   harmless from and against any and all claims, actions, damages, liability and expense,
5   including reasonable attorneys' fees, (x) in connection with loss of life, personal injury
6   and/or damage to property arising from or out of any occurrence in or upon the Premises,
7   or any part thereof, or (y) occasioned wholly or in part by any act or omission of Tenant,
8   its agents, contractors, employees, servants, or licensees, <u>except</u> to the extent such claims,
9   actions, damages, liability and expense are caused by the acts or omissions of Landlord,
10  its agents, contractors, licensees, employees, or other tenants and occupants, or for which
11  any of said parties may be statutorily liable.

12       (b)   Except as otherwise provided in Subsections 10.1.1 and
13  10.1.2 above, Landlord covenants to defend and indemnify Tenant and hold Tenant
14  harmless from and against any and all claims, actions, damages, liability and expense,
15  including reasonable attorneys' fees, (x) in connection with loss of life, personal injury
16  and/or damage to property arising from or out of any occurrence in or upon any
17  portion(s) of the Condominium (excluding the Premises), or (y) occasioned wholly or in
18  part by any act or omission of Landlord, the Unit Owners Association, the Managing
19  Agent or any other Unit Owner or any of their respective agents, contractors, employees,
20  servants, tenants (other than Tenant), occupants or licensees, <u>except</u> to the extent such
21  claims, actions, damages, liability and expense are caused by the acts or omissions of
22  Tenant, its agents, contractors, licensees or employees, or for which any of said parties
23  may be statutorily liable.

24       Section 10.2   <u>Tenant's Insurance</u>.

25       10.2.1 <u>Tenant's Insurance</u>.  Tenant, at its own cost and expense, shall
26  maintain in full force and effect from and after the Delivery Date and throughout the
27  Term: (i) commercial general liability insurance protecting and insuring Tenant, naming
28  Landlord, Landlord's Mortgagee, any Ground Lessor and, to the extent that Tenant is
29  named as an additional insured under their liability polices, the Unit Owners Association,
30  the Managing Agent and the other Unit Owners, as their interests may appear for claims
31  arising out of the use or occupancy of the Premises by Tenant and the obligations
32  assumed by Tenant under this Lease, and having a combined single limit of liability of
33  not less than Ten Million Dollars ($10,000,000) for bodily injury, death and property
34  damage liability; and (ii) Special Form (formerly known as "All-Risk") property
35  insurance, on a replacement cost basis, in an amount adequate to cover the full insurable
36  replacement value of all of Tenant's Property, provided, however, that Tenant shall only
37  be required to name any party as an additional insured hereunder to the extent that such
38  party's name and address has been provided to Tenant.  Tenant may carry any of its
39  insurance under "blanket policies" covering the Premises and other locations it or any
40  Affiliate of Tenant owns or leases, <u>provided</u> that: (i) the amount of the total insurance
41  available shall be at least the protection equivalent to separate policies in the amounts
42  herein required, and (ii) in all other respects, any such policy or policies shall comply
43  with the applicable provisions of this Article 10.

44       10.2.2 <u>Self-Insurance</u>.  All insurance required to be maintained under this
45  Section 10.2 may be provided under: **(i)** an individual policy covering this location; **(ii)** a
46  blanket policy or policies which includes other liabilities, properties and locations of
47  Tenant or its Affiliates; **(iii)** a plan of self-insurance, provided that Tenant or any
48  guarantor of Tenant's obligations under this Lease maintains, during the period of such
49  self-insurance, a tangible net worth of at least One Hundred Million Dollars
50  ($100,000,000); or **(iv)** a combination of any of the foregoing insurance programs.  To
51  the extent any deductible is permitted or allowed as a part of any insurance policy carried
52  by Tenant in compliance with this Section 10.2, then Tenant shall be deemed to be

covering the amount thereof under an informal plan of self-insurance; provided, however, that in no event shall any deductible exceed Two Hundred Fifty Thousand Dollars ($250,000) unless Tenant complies with the requirements regarding self-insurance pursuant to clause (iii) above.

Section 10.3   Landlord's Insurance.

10.3.1 Liability Insurance. Landlord shall maintain or cause to be maintained in full force and effect on and after the Effective Date and throughout the Term commercial general liability insurance with regard to the Common Areas protecting and insuring Landlord, naming Tenant as "additional insured-lessee", and having a combined single limit of liability of not less than Ten Million Dollars ($10,000,000) for bodily injury, death and property damage liability. Landlord shall have the right to carry its insurance under "blanket policies" covering the Shopping Center and other properties provided that: (i) the amount of the total insurance available shall be at least the protection equivalent to separate policies in the amounts herein required, and (ii) in all other respects, any such policy or policies shall comply with the applicable provisions of this Article 10. The insurance required by Section 6.3 of the By Laws that form part of the Condominium Documents shall satisfy this requirement as to the Common Elements (but not the Common Areas of the Shopping Center that are not Common Elements), provided that Tenant is named as an additional insured-lessee and limit of liability is at least equal to the amount required hereunder.

10.3.2 Special Form Property Insurance. Landlord shall procure and maintain or cause to be procured and maintained in full force and effect on and after the Effective Date and throughout the Term, Special Form (formerly known as "All-Risk") property insurance (including loss of rents for a minimum period of one (1) year) and endorsements for coverages for flood, earthquake, windstorm, earth movement [sinkholes], demolition, increased cost of construction and contingent operation of building laws coverages, on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of the Building (including the Premises) and other insurable improvements in the Condominium; provided, however, in no event shall such insurance cover Tenant's Property. All policies required to be maintained by Landlord pursuant to this Subsection 10.3.2 shall provide that any proceeds thereof shall be deposited with Landlord's Mortgagee or disbursed in accordance with the Condominium Documents, in either event to be held in trust by such party and disbursed only in accordance with the provisions of, and for the purposes set forth in, Section 11.1 hereof. The property insurance required to be maintained by or on behalf of Landlord pursuant to this Section shall not have deductibles exceeding One Hundred Thousand Dollars ($100,000) without Tenant's prior consent which consent shall not be unreasonably withheld. The insurance required by Section 6.2 of the By Laws that form part of the Condominium Documents shall satisfy this requirement as to the portions of the Condominium insured thereby (but not as to other portions required to be insured by this Section 10.3.2), provided that Tenant is provided with a waiver of claims and waiver of subrogation in accordance with Section 10.1 and provided that the insurance coverage is at least equal to the amount required hereunder.

10.3.3 Landlord's Insurance Premiums. The Fixed Common Areas Charges payable hereunder includes Landlord's insurance premiums (including all premiums paid directly and all in accordance with the Condominium Documents) and Tenant shall not be required to pay any other amounts with respect to such insurance premiums. Notwithstanding the foregoing, (a) if the rates for any insurance Landlord is required to carry hereunder are increased as a result of the use or other activity of Tenant and Tenant has been provided with at least thirty (30) days to dispute the increase or correct the condition causing same, such increase (but no part of the rest of such premium) shall be billed directly to Tenant as Additional Rent and shall be payable sixty (60) days after Tenant receives an invoice therefore with reasonable proof of the increase, the cause

38

1    thereof and the basis for assessing same, and (b) if the rates for insurance that Landlord is
2    required to carry hereunder increase at a rate exceeding a cumulative, compound increase
3    of three percent (3%) for each year of the Term, then Tenant shall pay to Landlord, as
4    Additional Rent, Tenant's Pro Rata Share (subject to Section 5.2.8(a)) of the excess of
5    such 3% cumulative, compound increase, if any (the *"Insurance Surcharge"*), which
6    amount shall be payable sixty (60) days after Tenant receives an invoice therefor with
7    reasonable proof of the increase and the correct calculation of the Insurance Surcharge.
8    To the extent that Landlord receives a dividend, credit, rebate or other return of a
9    premium which had previously been paid by Tenant in accordance with this Section
10    10.3.3, Landlord shall promptly refund such dividend, credit, rebate, or return to Tenant.
11    Any increase payable by Tenant for any period during the Term which constitutes less
12    than a full calendar year shall be equitably prorated.  The provisions of this Subsection
13    10.3.3 shall survive the expiration or earlier termination of this Lease.

14        Section 10.4    General Insurance Requirements.

15            10.4.1 All insurance required to be maintained by the parties under this
16    Lease shall be maintained with insurance companies qualified to do business in the state
17    or jurisdiction in which the Shopping Center is located, and rated at least A-/VIII by the
18    most current Best's Key Rating Guide (or its equivalent, if such Guide ceases to be
19    published).  Each party shall use its diligent efforts to have its insurers provide thirty (30)
20    days [ten (10) days in the event of non-payment of premium] prior notice to the other
21    party of cancellation or non-renewal of any policy required hereunder.  Each party shall
22    provide to the other duly executed certificates evidencing the insurance coverage
23    described in Sections 10.2.1 and 10.3 above.  Notwithstanding the foregoing, if different
24    requirements apply to insurance carried by the Unit Owners Association in accordance
25    with the Condominium Documents, such requirements shall apply to such insurance and
26    Tenant shall receive reasonable proof of such compliance.

27            10.4.2 The liability insurance requirements under Sections 10.2 and 10.3
28    above shall be reviewed by Landlord and Tenant every five (5) years for the purpose of
29    mutually increasing (in consultation with their respective insurance advisors) the
30    minimum limits of such insurance to limits which shall be reasonable and customary for
31    similar facilities of like size and operation in accordance with generally accepted
32    insurance industry standards.  The replacement value of the Building and other insurable
33    improvements constituting the Condominium shall be re-evaluated from time to time at
34    the request of either Landlord or Tenant, but no more often than every three (3) years.

35                          ARTICLE 11
36              FIRE AND OTHER CASUALTY; EMINENT DOMAIN

37        Section 11.1    Fire and Other Casualty.

38            11.1.1

39                (a)    Except as otherwise provided in this Section 11.1, if all or a
40    portion of the Premises, the Common Areas (including all improvements thereto) or the
41    Building (except the interior finish work in the Target Unit) shall be damaged by fire or
42    other casualty, Landlord shall promptly rebuild and restore same and/or cause the Unit
43    Owners Association to rebuild and restore same, as the case may be (the parties
44    acknowledging that certain improvements are required to be rebuilt by the Unit Owners
45    Association in accordance with the Condominium Documents and certain improvements
46    are not included in that rebuilding obligation, but are required to be rebuilt by Landlord
47    hereunder) to the same to the condition existing immediately prior to such fire or other
48    casualty, (but not including the restoration of Tenant's Work or Tenant's Property or
49    other alterations made by Tenant).  The proceeds of the policies required to be obtained
50    and maintained by Landlord pursuant to Subsection 10.3.2 hereof shall, to the extent
51    necessary, be used for the performance of such rebuilding and restoration work.  In the

39

1    event such insurance proceeds are insufficient to complete such work, Landlord shall
2    provide the balance of the amount necessary to rebuild or restore the improvements to be
3    restored in the manner provided in this Section 11.1 with respect to those improvements
4    not being restored by the Unit Owners Association and the balance of the amount shall be
5    provided as required by the Condominium Documents with respect to those
6    improvements being restored by the Unit Owners Association.

7            (b)    Notwithstanding the foregoing, if any portion of the Premises
8    are so damaged or destroyed, Tenant shall have the right to request Landlord to make
9    reasonable changes to the Premises in the course of, and as part of, such rebuilding or
10   restoration work and, to the extent such changes are reasonable and do not delay the
11   rebuilding or restoration work of portions of the Condominium that would affect the use
12   of any portion of the Condominium other than the Premises, Landlord agrees to consent
13   to same.  If the net cost and expense of such rebuilding or restoration work is increased
14   solely as a result of such changes (taking into consideration any and all actual reduced
15   and additional costs resulting from such changes and/or other cost savings arising
16   therefrom), then Tenant shall pay to Landlord, as Additional Rent, the amount of such net
17   increase, which amount shall be due and payable within thirty (30) days after Landlord
18   has delivered to Tenant backup information evidencing such increase (including, without
19   limitation, receipted invoices) as may be reasonably required by Tenant (but in no event
20   earlier than the occurrence of the date on which possession of the restored areas of the
21   Premises are delivered to Tenant).  To the extent that Landlord's (or the Unit Owners
22   Association's) substantial completion of the rebuilding or restoration work to the
23   Condominium is delayed solely as a result of such changes (taking into consideration any
24   and all reasonable time savings to Landlord resulting from such changes), then the
25   applicable period(s) specified in Section 11.1.2 below shall be appropriately adjusted to
26   the extent of such net delay.

27           (c)    If, in Tenant's reasonable judgment, any damage to the
28   Premises renders all or any portion of the Premises unusable for the conduct of Tenant's
29   business or, in the case of damage to the Condominium, materially interferes with the
30   normal conduct of any business operations in the Premises, the Rent shall be equitably
31   reduced or totally abated based upon the extent to which the remaining portion of the
32   Premises may, in Tenant's reasonable judgment, be utilized for its normal conduct of
33   business.

34           (d)    To the extent that any obligation in this Lease, including
35   without limitation, this Article 11, is an obligation of the Unit Owners Association or
36   another Unit Owner under the Condominium Documents, Landlord shall use diligent and
37   vigorous efforts to enforce such obligations.

38           11.1.2 In the event that:

39           (a)    Landlord and/or the Unit Owners Association, as the case
40   may be, does not commence the repair and restoration work to the Premises and
41   the rest of the Condominium as required pursuant to this Section 11.1 within
42   twelve (12) months after the date of such destruction, or thereafter fails to
43   diligently pursue the completion of such repair and restoration work (which period
44   may be extended by reason of an event of *Force Majeure*, not to exceed sixty (60)
45   days in the aggregate, provided that Landlord shall have given Tenant notice
46   thereof promptly after its occurrence); or

47           (b)    the required repairs and restorations to the Premises and the
48   rest of the Condominium as required pursuant to this Section 11.1 are not
49   Substantially Completed by Landlord and/or the Unit Owners Association in
50   accordance with the provisions of this Section 11.1 within eighteen (18) months
51   after the date of destruction (which period may be extended by reason of an event

40

1       of *Force Majeure*, not to exceed sixty (60) days in the aggregate, provided that
2       Landlord shall have given Tenant notice thereof promptly after its occurrence),

3  then, in either of such events, Tenant shall have the right, at its sole discretion and option,
4  to:

5          (i)    after giving thirty (30) days' prior notice to Landlord
6       (and Landlord's and/or the Unit Owners Association's continued failure to
7       commence and diligently pursue such repairs and restoration work to completion),
8       perform or complete, as the case may be, said work (or any portion thereof) that is
9       located within the Premises or, to the extent Landlord has the right to perform such
10      work under the Condominium Documents, in the rest of the Condominium, on
11      Landlord's behalf and at the sole cost of Landlord, which cost Landlord shall pay
12      to Tenant during the course of such repairs within ten (10) days after Tenant's
13      delivery to Landlord of an invoice therefor and, in default of any such payment,
14      Tenant shall have the right to offset the amount thereof, together with interest at
15      the Lease Interest Rate, against the Rent next accruing hereunder; or

16          (ii)   seek to obtain specific performance of Landlord's,
17      and/or on Landlord's behalf and, if necessary, in Landlord's name, seek to obtain
18      specific performance of the Unit Owners Association's repair and restoration
19      obligations pursuant to the laws of the District of Columbia; or

20          (iii)  terminate this Lease by thirty (30) days' notice to
21      Landlord.

22  In addition to the foregoing, if, in the opinion of an independent licensed architect
23  designated by Tenant (and reasonably acceptable to Landlord), the required repairs and
24  restorations to the Condominium cannot be completed by Landlord and/or the Unit
25  Owners Association in accordance with the provisions of this Section 11.1 within one (1)
26  year after the date of destruction, Tenant shall have the right, at its sole discretion and
27  option, to terminate this Lease by giving Landlord at least thirty (30) days' notice thereof.

28       11.1.3 If the Premises are substantially destroyed by fire or other casualty
29  during the last three (3) years of the Term to the extent of more than one-third (1/3) of the
30  Floor Area thereof, Landlord or Tenant shall each have the right to terminate this Lease
31  as of the date of such damage or destruction by giving notice within thirty (30) days
32  following such damage or destruction, but Tenant may negate any termination by
33  Landlord by agreeing to extend the Term for an additional five (5) year period by
34  exercising an option pursuant to Subsection 2.2.2 hereof, if available, within ten (10)
35  days after receipt of the termination notice from Landlord.

36       Section 11.2   <u>Eminent Domain</u>.

37       11.2.1 As used in this Section 11.2, "***Taking***" or "***Taken***" shall mean a
38  taking for any public or quasi-public use by any lawful power or authority by exercise of
39  the right of condemnation or eminent domain or by agreement between Landlord and
40  those having the authority to exercise such right.

41       11.2.2 If all of the Premises shall be Taken, this Lease shall terminate as of
42  the date of vesting of title or transfer of possession, whichever is earlier, without further
43  liability on the part of either Landlord or Tenant, except for an adjustment between the
44  parties for the Rent payable by Tenant hereunder.

11.2.3 In the event that:

(a)   any portion of the Premises shall be Taken so that it is commercially unreasonable or unfeasible for Tenant, in its reasonable judgment, to conduct its normal business in the Premises;

(b)   as a consequence of any Taking: (i) portions of the Condominium shall be divided or separated in any manner that it materially interferes with parking, visibility, or access to the Premises from other portions of the Condominium, or (ii) the Condominium no longer has all of the entrances from both 14th Street and Irving Street and as a result, it is not commercially reasonable or feasible for Tenant, in its reasonable judgment, to conduct its normal business in the Premises;

(c)   there occurs, in Tenant's reasonable judgment, a denial of adequate access to the Condominium at the grade of any street adjoining the Condominium or to any easement granted under this Lease, whether or not a Taking shall have occurred;

(d)   any portion of the Condominium shall be Taken which materially interferes with parking, visibility or access to the Premises, and as a result of such taking it is commercially unreasonable or unfeasible for Tenant, in its reasonable judgment, to conduct its normal business in the Premises;

(e)   more than twenty-five (25%) percent of the total Floor Area of the Building (other than the Premises) are Taken; or

(f)   seven and one half (7.5%) percent or more of the parking spaces located in the Parking Unit are Taken, or if so many of the parking spaces in the Parking Unit are Taken such that there are fewer parking spaces for every one thousand (1,000) square feet of Floor Area in the Shopping Center and the Target Unit than exist on the Delivery Date, or (ii) the number of parking spaces required by applicable Legal Requirements;

then, in any of such events, Tenant shall have the right to terminate this Lease by giving at least sixty (60) days' prior notice to Landlord within sixty (60) days of any such event, in which event this Lease shall terminate without any further liability on the part of either Landlord or Tenant, except for an adjustment between the parties for the Rent payable by Tenant hereunder and for payment to Tenant for its share of the award for the taking pursuant to Subsection 11.2.5 below.  Upon any partial Taking of the Premises, the Rent shall be equitably reduced in whole or in part based upon the extent, if any, to which the remaining portion of the Premises may, in Tenant's reasonable judgment, be utilized for its normal conduct of business.

11.2.4 If this Lease is not terminated pursuant to this Section 11.2, Landlord and/or the Unit Owners Association, at no cost to Tenant, within a reasonable period of time after such Taking, shall repair and restore the area not so Taken to tenantable condition, similar in physical appearance to the condition of the area immediately prior to the Taking, pursuant to plans and specifications approved by Tenant (which repair and restoration shall, as applicable, include all Tenant's Work and all other leasehold improvements performed by Tenant that have become Landlord's property (or part of the Common Elements) hereunder or under applicable law or the taking of which was included in Landlord's or the Unit Owners Association's award for the Taking; provided, however, that neither Landlord nor the Unit Owners Association shall be obligated to repair or restore Tenant's Property or any Tenant's Work or other leasehold improvements performed by Tenant that did not become Landlord property or a part of the Common Elements under this Lease or applicable law and were not included in Landlord's or the Unit Owners Association's award for the Taking), and any and all

42

1    amounts awarded to Landlord or the Unit Owners Association for any Taking shall be
2    made available to and used by Landlord or the Unit Owners Association, as the case may
3    be, for any rebuilding or restoration which it is required to perform hereunder. During
4    the period of such repairs and restoration, all Rent shall abate to the extent that the
5    Premises may not, in Tenant's reasonable judgment, be used by Tenant for the normal
6    conduct of its business. Such abatement shall terminate in accordance with the terms of
7    Section 11.3 below.

8         11.2.5 In connection with any Taking or partial Taking of the Premises,
9    Tenant shall be entitled to claim an award for loss of business, leasehold improvements,
10   fixtures and equipment and removal and reinstallation costs; provided, however, that no
11   award shall be payable to Tenant which reduces the award payable to Landlord for its fee
12   or leasehold interest in the Premises.

13        11.2.6 Any dispute between the parties with respect to this Section 11.2
14   shall be resolved by arbitration in accordance with the provisions of Section 16.3 below.

15        Section 11.3    Abatement of Rent Charges. Notwithstanding any other provisions
16   of this Lease, if the Fixed Rent and Additional Rent payable by Tenant hereunder shall be
17   abated pursuant to Sections 11.1 or 11.2 above, such abatement shall terminate upon the
18   first to occur of: (a) the date on which Tenant shall reopen the Premises to the general
19   public for business; or (b) the expiration of the period which is sixty (60) days after
20   Landlord and the Unit Owners Association shall have Substantially Completed such
21   repairs and restoration work as Landlord and the Unit Owners Association is obligated to
22   perform hereunder and the interference with the operation of business in the Premises has
23   ceased or the date on which all Punch List Items are completed, if later.

24                          ARTICLE 12
25              COVENANTS, REPRESENTATIONS AND WARRANTIES

26        Section 12.1    Quiet Enjoyment. Subject to the provisions of this Lease, Tenant
27   shall peaceably and quietly have, hold, occupy and enjoy the Premises and the rights
28   appurtenant thereto relating to the Common Elements for the Term, without hindrance
29   from Landlord or any party claiming by, through, or under Landlord.

30        Section 12.2    Authority. Tenant and Landlord each warrant and represent that
31   the person(s) signing this Lease on their behalf has authority to enter into this Lease and
32   to bind Tenant and Landlord, respectively, to the terms, covenants and conditions
33   contained herein. The submission of this Lease to each party hereto shall be for
34   examination and negotiation purposes only, and does not and shall not constitute a
35   reservation of or an obligation of Landlord or Tenant to lease, or otherwise create any
36   interest of Tenant in, the Premises or any other premises situated in the Shopping Center
37   unless and until the Lease is fully executed and delivered by Tenant and Landlord.

38        Section 12.3    Landlord's Covenants, Warranties and Representations. To induce
39   Tenant to execute this Lease, and in consideration thereof, Landlord covenants, warrants
40   and represents to Tenant as follows:

41                          (a)    As of the Effective Date, to the best of Landlord's
42   knowledge, the Contract Vendor (as defined in Section 12.6 hereof) has, and as of the
43   Delivery Date Landlord shall have, good and marketable fee simple title to the entire land
44   on which the Condominium will be built, free and clear of all easements, restrictions,
45   liens, encumbrances, leases and the like, except for the encumbrances described on
46   Exhibit E hereto;

47                          (b)    Landlord represents that, on or before the Delivery Date, it
48   shall obtain a title insurance policy that insures that there exist no strips or gores between

43

1    the parcels or lots making up the Condominium which will not be part of the
2    Condominium on the Delivery Date;

3            (c)    All third party consents or approvals that are required in order
4    for Landlord to enter into this Lease, or for the performance of Landlord's Work and
5    Tenant's Work (excluding governmental permits and approvals and any consents for
6    Tenant's Work that relate solely to Tenant and its authority to conduct same) have been
7    obtained;

8            (d)    Tenant's use of the Premises for sale of the specifically
9    enumerated "Permitted Items" (defined in Section 1.1.27 above) will not violate any
10    exclusive provision or prohibited use restriction granted to any other tenant or occupant
11    in the Condominium except to the extent expressly set forth in the Existing Exclusives set
12    forth in Exhibit K-1;

13            (e)    The Condominium, on the Delivery Date, shall have, access
14    to and from 14th Street, Irving Street, Park Road and Hiatt Place, as shown on Exhibit B
15    hereto, for the passage of vehicular traffic;

16            (f)    This Lease does not violate the provisions of any instrument
17    heretofore executed and/or binding on Landlord, or affecting or encumbering the
18    Condominium, or the Premises, and no rights granted by Landlord to Tenant under the
19    terms of this Lease conflict with any rights granted by Landlord to any other tenant or
20    occupant in the Shopping Center (including, without limitation, any rights of first offer or
21    first refusal or the like);

22            (g)    There shall be no restrictions or other legal impediments
23    imposed by any public or private instrument which would prevent: (i) the use of the
24    Premises for the Permitted Use; (ii) the use of the parking facilities, access roads, and
25    other Common Areas in the manner contemplated by this Lease; or (iii) the performance
26    of Tenant's Work; provided in each case Legal Requirements are complied with;

27            (h)    As of the Effective Date, to the best of Landlord's
28    knowledge, there are no sign ordinances, restrictive covenants, uniform sign plans or
29    other signage restrictions which would prevent the Premises from having the signage
30    (including, without limitation, the square foot area and size of letters) as depicted on
31    Exhibit D-1 and Exhibit F hereof.

32            (i)    As of the Effective Date there is no "Related Land" (defined
33    in 13.1.2 below) in existence and as of the Delivery Date there will not be any Related
34    Land in existence (or, if there shall be Related Land in existence, Landlord shall promptly
35    notify Tenant thereof and promptly execute any recordable instrument reasonably
36    requested by Tenant which memorializes the provisions of this Lease pertaining to or
37    otherwise affecting Related Land);

38            (j)    Attached hereto as Exhibit K-2 is a complete list of all fully
39    executed and delivered leases in effect on the Effective Date with respect to the Shopping
40    Center (the "*Existing Leases*"); and

41            (k)    Landlord shall make good faith efforts to promptly forward to
42    Tenant any notice or other communication received by Landlord from any owner of
43    property adjoining or adjacent to the Condominium or from any municipal or other
44    governmental authority, in connection with any hearing or other administrative
45    proceeding relating to any proposed zoning, building code, signage, or related variance
46    affecting the Condominium or any adjoining or adjacent property, which, if granted,
47    could adversely affect Tenant's use or occupancy of the Premises, the conduct of
48    Tenant's business therein, or Tenant's rights and benefits under this Lease (including,
49    without limitation, the rights to the parking in the Parking Unit).  The parties

1  acknowledge that the notices to be forwarded are limited, as stated above, to notices
2  "from any owner of property adjoining or adjacent to the Condominium or from any
3  municipal or other governmental authority in connection with any hearing or other
4  administrative proceeding relating to any proposed zoning, building code, signage or
5  related variance affecting the Condominium or any adjoining or adjacent property" if the
6  granting of the requested zoning, building code, signage or related variance could
7  adversely affect Tenant's use or occupancy of the Premises, the conduct of Tenant's
8  business therein or Tenant's rights and benefits under this Lease and does not include,
9  among many other things, foreclosure notices relating to adjoining or adjacent properties
10  as same are not zoning, building code, signage or other variance proceedings.   Landlord,
11  at its sole cost and expense, shall appear in such proceeding and shall contest such
12  proposed variance.  If Landlord fails so to appear and contest such proposed variance
13  after receiving five (5) days' notice from Tenant (or such shorter notice as may be
14  practicable under the circumstances), then Tenant shall be entitled (but shall not be
15  obligated to), in its own name and/or in the name of Landlord, to appear in such
16  proceeding, in which event Landlord shall fully cooperate with Tenant, provide such
17  information, and execute any documents or other instruments as Tenant may reasonably
18  request in connection with any such proceeding.

19         Section 12.4   Environmental Matters.

20               12.4.1 Definitions.

21               (a)   As used herein, the term *"Environmental Laws"* shall mean
22  any and all Legal Requirements concerning the protection of the environment, human
23  health or safety.

24               (b)   As used herein, the term *"Hazardous Substances"* shall mean
25  each and every element, compound, material, mixture, substance, waste, hazardous
26  substance, hazardous waste, hazardous material, toxic substance, pollutant or
27  contaminant either as those terms are defined in any of the Environmental Laws or the
28  presence of which may cause liability at common law, including, without limitation,
29  asbestos and/or asbestos-containing products, whether or not currently friable.

30               (c)   As used herein, the term *"Environmental Notice"* shall mean
31  a summons, citation, directive, order, claim, notice, litigation, investigation, judgment,
32  legal pleading, letter or other communication, written or oral, actual or threatened, from
33  the United States Environmental Protection Agency or other federal, state or local
34  governmental agency or authority, or any other private individual or entity concerning (i)
35  any Hazardous Substances at, on, in, under or emanating from the Premises, the
36  Shopping Center or any contiguous property; (ii) any violation or potential violation of
37  Environmental Laws at the Premises, the Condominium or any contiguous property; or
38  (iii) any underground storage tanks on the Premises or the Condominium.

39               (d)   As used herein, the term *"Releasing"* or *"Release"* shall
40  mean releasing, spilling, leaking, discharging, disposing or dumping or otherwise
41  introducing any substance into the environment or into any building or other
42  improvements in violation of Environmental Laws.

43               (e)   As used herein, the term *"Compliance Costs"* shall mean any
44  and all costs incurred by a party in complying with applicable Environmental Laws,
45  including, without limitation, consultant's and engineer's fees; laboratory costs;
46  contractor's and subcontractor's fees; application and filing fees; costs of investigation,
47  monitoring or cleanup of soil or other substrate, surface water, groundwater, or buildings
48  or other improvements; equipment costs; disposal fees; costs of operation and
49  maintenance of equipment; legal fees; other governmental fees or costs; interest at the
50  Lease Interest Rate from the date of expenditure until paid in full; and other similar or
51  related costs.

45

1           (f)   As used herein, the term *"Tenant Related Parties"* shall
2 mean Tenant's agents, servants, employees, contractors or licensees.

3           12.4.2 <u>Compliance with Environmental Laws</u>. Tenant shall comply with all
4 applicable requirements of Environmental Laws governing its use of, and operations at,
5 the Condominium and the Premises. Landlord shall comply with or cause to be complied
6 with all applicable requirements of Environmental Laws relating to the Condominium
7 and the Premises, except to the extent such requirements arise from Tenant's operations
8 or the operation of any Tenant Related Parties thereon.

9           12.4.3 <u>Responsibility for Releases of Hazardous Substances</u>.
10 Notwithstanding any other provision of this Lease, Tenant shall only be liable for any
11 Release of Hazardous Substances at, on, in, under or emanating from the Premises or
12 Condominium which were caused by Tenant or Tenant Related Parties (hereinafter
13 *"Tenant Releases"*), including, without limitation, any Compliance Costs required to
14 address Tenant Releases. Landlord shall be liable for any Hazardous Substances at, on,
15 in, under or emanating from the Premises or Condominium, including, without limitation,
16 any Compliance Costs attributable to such Hazardous Substances, unless the Hazardous
17 Substances are caused by Tenant Releases and Landlord shall have any rights provided
18 by the Condominium Documents with respect to the liability of the Unit Owners
19 Association or any other Unit Owner. Except in the event of an emergency or if
20 compelled by applicable governmental authority, any work performed by Landlord
21 relating to Hazardous Substances shall be performed by Landlord at any time other than
22 during the months of August, November and December, and shall be undertaken in such
23 a manner so as to (i) not adversely affect ingress to or egress from the Condominium or
24 the Premises, (ii) have no adverse effect on the visibility of the Premises or any signs
25 which contain Tenant's name, and (iii) not otherwise materially interfere with the normal
26 conduct of any business operations in the Premises. To the extent that any such work is
27 being done by the Unit Owners Association, Landlord shall use all reasonable efforts to
28 cause the Unit Owners Association to perform such work at any time other than during
29 the months of August, November and December, and such work shall be undertaken in
30 such a manner so as to (i) not adversely affect ingress to or egress from the Condominium
31 or the Premises, (ii) have no adverse effect on the visibility of the Premises or any signs
32 which contain Tenant's name, and (iii) not otherwise materially interfere with the normal
33 conduct of any business operations in the Premises and shall not consent to or support
34 any actions that would violate the above requirements.

35           12.4.4 <u>Standards</u>. Except as expressly provided herein, the parties agree
36 that any investigation or remediation of Hazardous Substances, or cure of a violation of
37 Environmental Laws, required to be conducted at the Premises or Condominium shall be
38 no more stringent than necessary to meet the minimum standards of Environmental Laws
39 applicable to properties used in the manner the Condominium is being used.

40           12.4.5 <u>Landlord's Representations and Warranties</u>. Landlord represents
41 and warrants that: (i) Landlord has received no Environmental Notices concerning the
42 Land, or any contiguous properties or any improvements thereon, and, once existing, the
43 Condominium or the Premises; (ii) Landlord has no knowledge of, and has received no
44 notice of, any violation, or potential or alleged violation, of any Legal Requirement,
45 including, without limitation, Environmental Laws, affecting the Condominium, the
46 Premises or any contiguous properties, regardless of whether same has been cured; and
47 (iii) to the best of Landlord's knowledge: (A) no Hazardous Substances are located at, on,
48 in, under or emanating from the Condominium, the Premises or any contiguous
49 properties; and (B) no underground storage tank exists at the Condominium or the
50 Premises. The above representations are expressly limited by the matters set forth in the
51 following environmental reports that have been provided to Tenant:

1.    Phase I Environmental Site Assessment, Columbia Heights Redevelopment Property, Irving and 14th Streets, N.W., Washington, D.C., dated March 5, 2001, prepared for Grid Properties, Inc. by GeoConcepts Engineering, Inc. as their project number 201146.

2.    Environmental Sampling and Testing letter report, dated October 21, 2003, prepared by Professional Consulting Corporation for DC USA Operating CL., LLC, c/o Grid Properties, PCC No. 031002.

3.    Phase I Environmental Site Assessment Update, "Parcel 27" – Columbia Heights Redevelopment Project, Irving and 14th Streets, N.W., Washington D.C., dated November 21, 2005, prepared for Grid Properties, Inc. by GeoConcepts Engineering, Inc.

Landlord agrees that it shall comply with the recommendations of said reports in carrying out or causing the carrying out of the construction of the Condominium and that all of such activities shall comply with Environmental Laws and other Legal Requirements. Landlord represents and warrants that (i) the copies of said reports provided to Tenant are complete and accurate copies of the actual reports delivered to Landlord, and (ii) that Landlord shall promptly deliver to Tenant complete and accurate copies of any further environmental report(s) relating to the Land or the existing improvements thereon, or the demolition thereof, or the construction of the Shopping Center, that are obtained by or on behalf of Landlord or any lender to Landlord before the Delivery Date.

12.4.6 Documents.  Each party shall immediately notify the other party of the notifying party's receipt of an Environmental Notice.

12.4.7 Indemnity.  Each party to this Lease shall indemnify, defend and hold the other party, and its agents, servants, shareholders, officers, partners, members and employees harmless from any and all claims, losses, expenses, costs, lawsuits, actions, administrative proceedings, damage, orders, judgments, penalties and liabilities of any nature whatsoever, including, without limitation, reasonable attorneys' fees (incurred to enforce this indemnity or for any other purpose) and Compliance Costs, arising from (i) the indemnifying party's breach of any of its representations, warranties, covenants or other obligations under this Section 12.4; (ii) Hazardous Substances for which the indemnifying party is liable under this Section 12.4; or (iii) violations of Environmental Laws for which the indemnifying party is liable under this Section 12.4.

12.4.8 Survival.  The obligations of the parties under this Section 12.4 shall survive the renewal, expiration, breach or earlier termination of this Lease.

12.4.9 Conflict.  In the event of any conflict between the provisions of this Section 12.4 and any other provision of this Lease, the provisions of this Section 12.4 shall control.

Section 12.5    Condominium Documents.

12.5.1 The form of Condominium Documents are attached hereto as Exhibit L.  No changes to the form of Condominium Documents shall be made before filing or recording without Tenant's written consent which (i) may be granted or withheld in Tenant's sole discretion if Tenant reasonably concludes that the proposed change is likely to adversely affect the visibility, access to or from (for customers, employees or for purposes of delivery of goods), use, operation or commercial utility of the Premises or Tenant's cost to operate same, and (ii) shall not be unreasonably withheld if Tenant reasonably concludes that the proposed change is not likely to adversely affect the visibility, access to or from (for customers, employees or for purposes of delivery of goods), use, operation or commercial utility of the Premises or Tenant's cost to operate

47

same. All requests for Tenant's consent hereunder shall be sent in accordance with Article 18 of this Lease. Any and all requests for Tenant's consent shall contain on the first page thereof, in 14-point (or greater) boldface capital font, the following words *"IN ACCORDANCE WITH SECTION 12.5.1 OF YOUR LEASE, FAILURE TO RESPOND WITHIN FIVE (5) BUSINESS DAYS MAY RESULT IN YOUR DEEMED CONSENT TO THE CHANGES TO THE CONDOMINIUM DOCUMENTS CONTAINED HEREIN".* All such requests shall also contain the full text of the requested changes, with all such changes noted with "redlining" or "bubbling", or strikeouts, as applicable. If Tenant fails to respond within five (5) Business Days after Tenant's receipt of such request, Landlord shall have the right to serve a second notice upon Tenant in the same manner as the first, which second notice shall contain on the first page thereof, in 14-point (or greater) boldface capital font, the following words *"IN ACCORDANCE WITH SECTION 12.5.1 OF YOUR LEASE, FAILURE TO RESPOND WITHIN THREE (3) BUSINESS DAYS WILL RESULT IN YOUR DEEMED CONSENT TO THE CHANGES TO THE CONDOMINIUM DOCUMENTS CONTAINED HEREIN".* Such request shall also contain a full text of the requested changes, with all such changes noted with "redlining" or "bubbling", or strikeouts, as applicable. If Tenant fails to respond within three (3) Business Days after receiving such second notice, Tenant shall be deemed to have consented to the changes contained in such notices. Upon the filing and/or recording of the Condominium Documents, Landlord shall provide a fully recorded copy containing all exhibits and recording information to Tenant as soon as possible thereafter. Landlord and Tenant agree that the blanks in Section 7(C) of the Declaration of Parking Operations shall be filled in (without such additions being considered changes) consistent with the second sentence of the subsection of Section 7 entitled "Changes to Hours of Operation". In addition, the insertion of dollar amounts into the "Amount Charged" column in the chart of initial parking rates set forth in Section 8(B) shall permitted and not considered changes if Target has approved same and same are uniformly applicable to Target and Tenant.

12.5.2  Landlord covenants, represents and warrants to Tenant that: (i) the Condominium Documents will not be modified, amended or terminated from the form attached hereto as Exhibit L except as expressly permitted by Section 12.5.1; (ii) the Condominium Documents will be in full force and effect on the Delivery Date; (iii) on the Delivery Date, Landlord will not be in default under the Condominium Documents beyond any applicable notice and cure period; and (iv) the Condominium Documents shall be, and shall remain, superior in lien to all mortgages and related liens affecting the property that constitutes the Condominium and all other land which is encumbered by the Condominium Documents. Landlord and Tenant each acknowledge that this Lease is made and shall continue to be subject and subordinate to the Condominium Documents, subject to the provisions of this Section 12.5. Tenant shall comply with the terms and conditions of the Condominium Documents to the extent same affects the Premises (it being agreed that Tenant shall not be obligated to expend any sums in connection with such compliance).

12.5.3  Landlord shall, during the Term: (i) perform and observe all of the terms, covenants, provisions and conditions of the Condominium Documents on Landlord's part to be performed and observed; (ii) defend, indemnify and hold harmless Tenant from and against any and all claims, demands, causes of action, suits, damages, liabilities, and expenses of any nature arising out of or in connection with the enforcement of, or a claimed breach by, Landlord of any covenant, term, condition, or provision of the Condominium Documents; and (iii) diligently enforce, at its sole expense, the covenants, agreements, and obligations of the Condominium Documents.

12.5.4  Whenever, pursuant to the Condominium Documents, the consent or approval of Landlord shall be required by or requested, and such consent or approval could diminish the rights or increase the obligations of Tenant thereunder or under this Lease, or could adversely affect Tenant's use or occupancy of the Premises, or the

48

conduct of Tenant's business therein, such consent or approval shall not be granted without the prior consent of Tenant, which consent may be withheld in its sole and absolute discretion.

12.5.5 Landlord shall, immediately upon receipt, forward to Tenant and Tenant's leasehold mortgagee, if any, a copy of any and all notices and/or demands received by Landlord under or pursuant to the Condominium Documents, which relate to, or could adversely affect, Tenant's use or occupancy of the Premises, the conduct of Tenant's business therein, or Tenant's rights pursuant to this Lease.

12.5.6 Landlord shall not vote for, consent to or support any amendment or modification of the Condominium Documents if such amendment or modification could diminish the rights or increase the obligations of Tenant thereunder or under this Lease, or could adversely affect Tenant's use or occupancy of the Premises or the conduct of Tenant's business therein, nor shall Landlord terminate the Condominium Documents.

12.5.7 In the event Landlord defaults in the performance of any of its obligations under the Condominium Documents or fails to enforce the obligations of any other obligee under the Condominium Documents, and such default or failure to enforce could adversely affect Tenant's rights thereunder or under this Lease, Tenant's Work, Tenant's use or occupancy of the Premises or the conduct of Tenant's business therein, Tenant may, but shall not be obligated to, after thirty (30) days written notice (except in the event of emergency, in which case no notice shall be required) cure any default by Landlord under the Condominium Documents and/or enforce, in its own name, at Landlord's expense, the obligations of any other obligee under the Condominium Documents. Landlord shall, upon demand, reimburse Tenant for the costs incurred by Tenant in performing any of Landlord's obligations under the Condominium Documents or enforcing the obligations of any obligee under the Condominium Documents, together with interest thereon at the Lease Interest Rate, and failing such reimbursement, Tenant shall have the right (in addition to any rights and remedies to which it may be entitled under this Lease, at law, or in equity), upon ten (10) days' prior notice to Landlord, to offset such costs from the next succeeding payment or payments of any Rent due hereunder, together with interest thereon at the Lease Interest Rate from the date of outlay until reimbursement or full satisfaction by credit.

12.5.8 As between Landlord and Tenant, in the event of any conflict between the Condominium Documents and this Lease, this Lease shall in all respects control.

12.5.9 Landlord shall obtain any third-party approvals required under Section 5.6 and Section 5.7 of the By Laws of the Condominium Documents for the performance of Landlord's Work (including, without limitation, Tenant's elevations and signage, as shown on Exhibit D-1 and Exhibit F hereto), Tenant's Work, and the operation of Tenant's business in the Premises.

Section 12.6    Land Disposition and Development Agreement.

12.6.1 Landlord represents and warrants to Tenant that, as of the Effective Date: (a) it is the vendee under that certain Land Disposition and Development Agreement dated January 17, 2003, as amended October 31, 2005 by and between RLA Revitalization Corporation, successor by statute to District of Columbia Redevelopment Land Agency, as seller (the *"Contract Vendor"*), and Landlord, as purchaser, with respect to the land (the *"Land"*) on which the Condominium will be constructed (the *"Contract"*); (b) the Contract is in full force and effect; (c) it has not delivered or received any notice of default, and has no knowledge of any condition or circumstance which with notice or the lapse of time, or both, could become a default, under the Contract; and (d) the Land consists of approximately five (5) acres, and, together with any improvements located on the Land on the Effective Date, currently constitutes all of

49

the property to be purchased under the Contract. Landlord shall proceed diligently and in good faith to acquire fee or leasehold title to the Land under the Contract.

12.6.2 In the event that Landlord and Tenant have executed a short form or memorandum of this Lease for recording pursuant to Section 23.20 below prior to Landlord's closing of title to the Land, Landlord shall cause such short form or memorandum to be duly recorded immediately after the documents listed on Exhibit E and expressly noted thereon as "to be recorded before Tenant's memorandum of lease", at Landlord's expense. Within ten (10) days after the closing of title to the Land pursuant to the Contract, Landlord shall give Tenant notice thereof.

12.6.3   (a)   In the event that Landlord has not acquired fee title to the entire Land in full accordance with the terms and conditions of this Lease by July 1, 2006, then Tenant may, at its election, upon notice to Landlord given at any time after said date (and in any event, prior to Landlord's acquisition of fee title as aforesaid), elect to terminate this Lease. Should Tenant so terminate this Lease, Landlord shall be obligated to promptly reimburse Tenant for all reasonable, third party costs and expenses incurred by Tenant in connection with this Lease, including, without limitation, the preparation of plans and specifications, and the performance of Tenant's Work, it being agreed that so long as Landlord's failure to acquire such fee title is not attributable to Landlord's default or breach under the Contract, such reimbursement by Landlord shall not exceed the aggregate sum of Fifty Thousand Dollars ($50,000), and the provisions of Section 23.13 hereof shall not apply.

(b)   In the event that after acquiring fee title to the entire Land as provided in Section 12.6.3, Landlord has not created the Condominium, retaining title to the Shopping Center in full accordance with the terms and conditions of this Lease by December 31, 2008, then Tenant may, at its election, upon notice to Landlord given at any time after said date (and in any event, prior to Landlord's creation of the Condominium as aforesaid), elect to terminate this Lease. Should Tenant so terminate this Lease, Landlord shall be obligated to promptly reimburse Tenant for all reasonable, third party costs and expenses incurred by Tenant in connection with this Lease, including, without limitation, the preparation of plans and specifications, and the performance of Tenant's Work, it being agreed that so long as Landlord's failure to acquire such fee title is not attributable to Landlord's default or breach under its agreements to construct the Condominium, such reimbursement by Landlord shall not exceed the aggregate sum of Fifty Thousand Dollars ($50,000), and the provisions of Section 23.13 hereof shall not apply.

12.6.4 In the event that Landlord has not acquired fee title to the entire Land in full accordance with the terms and conditions of this Lease by July 1, 2007, which failure by Landlord is not attributable to Landlord's default or breach under the Contract, then Landlord may at its election, upon notice to Tenant, given at any time after said date (and in any event prior to Landlord's acquisition of fee title as aforesaid), elect to terminate this Lease. Should Landlord so terminate this Lease, Landlord shall be obligated to promptly reimburse Tenant for all reasonable, third party costs and expenses incurred by Tenant in connection with this Lease, including, without limitation, the preparation of plans and specifications, and the performance of Tenant's Work, it being agreed that so long as Landlord's failure to acquire such fee title is not attributable to Landlord's default or breach under the Contract, such reimbursement by Landlord shall not exceed the aggregate sum of Fifty Thousand Dollars ($50,000), and the provisions of Section 23.13 hereof shall not apply.

12.6.5 If this Lease is terminated pursuant to Subsection 12.6.3 above, and Landlord or its Affiliate acquires title to the Land or the Shopping Center (or another interest that results in Landlord or its Affiliate having control over a retail development on the Land or any part thereof within two (2) years after the date on which the Lease

50

1  termination becomes effective hereunder, then Landlord shall offer to Tenant, at the time
2  of Landlord's (or its Affiliate's) acquisition of title to the Land, the Shopping Center or
3  such similar interest, the option to lease the Premises upon the terms and conditions of
4  this Lease; provided, however, that all dates set forth in this Lease shall be appropriately
5  extended.  In the event Tenant elects, within thirty (30) days after its receipt of such offer,
6  to exercise such option, Landlord and Tenant shall promptly execute a lease upon
7  substantially the same terms and provisions of this Lease. In the event Tenant does not
8  elect, within thirty (30) days after its receipt of such offer, to exercise such option,
9  Landlord shall be free to lease the Premises to any other person or entity, upon economic
10 terms which are not materially more favorable to the tenant than those contained in this
11 Lease. The provisions of this Subsection 12.6.5 shall survive the termination of this
12 Lease.

13                                  ARTICLE 13
14                           USES AND RESTRICTIONS

15          Section 13.1    Permitted and Prohibited Uses.

16                  13.1.1 Tenant's Permitted Use.  The Premises may be used and occupied
17 for the Permitted Use (defined in Subsection 1.1.27 above).  Tenant shall not use the
18 Premises for any of the "Prohibited Uses" (defined in Exhibit M hereto annexed), in
19 violation of any Existing Exclusives to the extent then applicable or otherwise in a
20 manner prohibited by the terms of this Lease.

21                  13.1.2 Prohibited Uses.  Landlord shall construct, lease, operate, maintain
22 and manage the Shopping Center as a high quality shopping center comparable to other
23 high quality shopping centers in the state or jurisdiction in which the Shopping Center is
24 located and shall cause the Unit Owners Association to manage the Condominium in the
25 manner contemplated by the Condominium Documents.  Landlord shall not lease, rent or
26 occupy or permit any portion of the Shopping Center or any other Condominium Unit or
27 land now or hereafter owned or controlled by Landlord or its Affiliate(s) that is part of
28 the Condominium or contiguous or adjacent to the Condominium (including, without
29 limitation, any land that would be contiguous or adjacent to the Shopping Center but for
30 any intervening road, street, alley or highway) (any such Condominium Unit or land, the
31 "*Related Land*") to be occupied (except to the extent otherwise permitted under any
32 lease for space in the Shopping Center or the Related Land existing as of the Effective
33 Date) for any of the "Prohibited Uses" (defined in Exhibit M hereto annexed), provided,
34 however, that the foregoing provisions of this Subsection 13.1.2 shall not apply to any
35 business existing on any Related Land owned or controlled by a person or entity which:
36 (i) was previously, but is no longer, the Landlord hereunder, or (ii) at the time it became
37 Landlord hereunder, already owned or controlled such Related Land (excluding,
38 however, the Landlord originally named herein and its Affiliates).  Landlord shall not
39 permit any Condominium Units to be used for any purpose prohibited by the
40 Condominium Documents.  The parties acknowledge that the Target Unit is not Related
41 Land unless (i) it is not transferred to Target as contemplated and is used for retail
42 purposes while owned or controlled by Landlord or an Affiliate of Landlord, or (ii) after
43 transferring the Target Unit to Target, Landlord or an Affiliate of Landlord later obtains
44 ownership or control of same.

45          Section 13.2    Tenant's Exclusive in Center.  To induce Tenant to execute this
46 Lease, and subject to all of the terms and provisions of this Section 13.2, Landlord
47 covenants and agrees as follows.

48                  13.2.1 Landlord shall not lease, rent or occupy or permit any other
49 premises in the Shopping Center to be occupied, whether by a tenant, sublessee, assignee,
50 licensee or other occupant or itself, for the sale, rental or distribution, either singly or in
51 any combination, of items contained in any of the following respective categories of

                                        51

1    merchandise: (a) linens and domestics; (b) bathroom items (excluding plumbing
2    hardware); (c) housewares (excluding furniture, and major appliances or "white goods");
3    (d) frames and wall art (provided that a fine art gallery shall not be precluded); (e)
4    window treatments; and/or (f) closet, shelving and storage items (which items, either
5    singly or in any combination, are hereinafter referred to as the *Exclusive Items*") nor
6    shall Landlord lease, rent, occupy or permit any premises on any Related Land to be
7    occupied whether by a tenant; sublessee, assignee, licensee or other occupant or itself, for
8    a business directly competing with Tenant (such as Linens n Things, Home Goods, TJ
9    Maxx and More, MegaMarshalls or any store engaged in a similar business).
10   Notwithstanding the foregoing, any tenant or subtenant in the Shopping Center shall have
11   the right to utilize its respective premises for the sale, rental and/or distribution of any
12   one category (as set forth in (a) through (f) above) of the Exclusive Items within an
13   aggregate area (which shall include an allocable portion of the aisle space adjacent to
14   such sales, rental and/or distribution area) not to exceed two thousand five hundred
15   (2,500) square feet of Floor Area, with the total aggregate area (which shall include an
16   allocable portion of the aisle space adjacent to such sales, rental and/or distribution area)
17   for the sale, rental and/or distribution of all Exclusive Items not exceeding an aggregate
18   of ten thousand (10,000) square feet of Floor Area. [For example only, a tenant selling
19   only one category of the Exclusive Items could only do so in an aggregate area of 2,500
20   square feet, while a tenant selling all six categories of the Exclusive Items could only use
21   an aggregate of 10,000 square feet of Floor Area for same, with no one category using an
22   aggregate area in excess of 2,500 square feet.

23          13.2.2 The restrictions set forth in Subsection 13.2.1 above shall not apply
24   (a) to a full-line national or regional: (i) department store [for example, Wal-Mart,
25   Macy's, or Target], (ii) discount club [for example, Costco, BJ's Wholesale Club, or
26   Sam's Club], or (iii) home improvement center [for example, Home Depot or Lowe's],
27   commonly located in first-class shopping centers in the state or jurisdiction in which the
28   Shopping Center is located, each occupying at least 80,000 square feet of Floor Area
29   within the Shopping Center, as such stores are currently operated (as of the Effective
30   Date).  In addition, Landlord represents and warrants that neither Tenant nor any party
31   occupying all or part of the Premises and claiming through Tenant is subject to any
32   exclusive or restricted use in favor of or imposed by Whole Foods or Best Buy and, in
33   reliance on such representation, Tenant agrees that neither Whole Foods nor Best Buy nor
34   any party occupying all or part of either of their premises and claiming through either of
35   them shall be subject to the exclusive rights granted to Tenant in this Section 13.2 so long
36   as their leases remain in full force and effect.

37          13.2.3   The exclusive rights granted to Tenant with respect to any
38   respective category listed in Subsection 13.2.1 above shall be conditioned upon Tenant
39   using portions of the Premises for the sale, rental or distribution of items contained in
40   such category (other than during Excused Periods and for periods of time not exceeding
41   six (6) consecutive months).  The exclusive rights granted to Tenant in this Section 13.2
42   shall inure to the benefit of any assignee of Tenant's interest in this Lease and to any
43   sublessee of at least fifty percent (50%) of the Floor Area of the Premises.

44          13.2.4

45          (a)   Upon breach of the aforesaid covenant and agreement by
46   Landlord (which breach shall not include a situation in which the lease between Landlord
47   and any tenant in the Shopping Center or in the Related Land prohibits the tenant therein
48   from violating the exclusive rights granted to Tenant in this Section 13.2 and despite such
49   prohibition, such tenant violates such exclusive rights, unless Landlord fails to comply
50   with any of the provisions of subparagraph (b) below), the Rent payable hereunder shall
51   be reduced by fifty percent (50%) for so long as such violation shall continue, and Tenant
52   shall have all remedies given to it at law and in equity, including, without limitation, the

52

1  right to obtain injunctive relief, and/or to terminate this Lease, and/or to commence and
2  prosecute an action against Landlord or any other violator for damages.

3              (b)  If any person or entity other than Landlord shall violate any
4  of the exclusive provisions herein set forth, or shall indicate in writing to Landlord that it
5  intends to violate any of said provisions, Landlord shall promptly commence appropriate
6  legal proceedings, and vigorously prosecute the same, to enjoin and prohibit any such
7  violation. If Landlord fails to promptly commence such proceedings, or shall fail
8  thereafter to vigorously prosecute the same, then Tenant shall have the right (a) to
9  conduct and prosecute such legal proceedings (including, without limitation, an action for
10  injunctive relief) in its own name, at Landlord's expense, or (b) in the event the right set
11  forth in (a) above is not permitted to be exercised under applicable Legal Requirements,
12  to conduct and prosecute such legal proceedings in the name of Landlord, at Landlord's
13  expense, and Landlord shall cooperate with Tenant with respect to such prosecution
14  (including, without limitation, by executing any documentation or authorization
15  reasonably required by Tenant in connection with such prosecution and by appearing at
16  any hearing or trial with respect to such prosecution).

17       Section 13.3    Exclusives Which Tenant Must Honor.

18  Tenant shall honor certain exclusives granted by Landlord to certain other tenants in the
19  Shopping Center (other than Whole Foods and Best Buy) pursuant to the terms of leases
20  which have been executed prior to the Effective Date or that Landlord reasonably
21  anticipates will be executed within six (6) months after the Effective Date (hereinafter,
22  *"Existing Exclusives"*) [a true and complete listing and description of such Existing
23  Exclusives being attached hereto as Exhibit K-1], and shall not sublease, occupy or use
24  all or any portion of the Premises, or permit all or any portion of the Premises to be
25  occupied or used in violation of any such Existing Exclusive (except as may be
26  specifically set forth on Exhibit K-1, or, with respect to those Existing Exclusives where
27  the lease to which they relate has not been executed on the Effective Date, provided the
28  tenant named in such Existing Exclusive actually executes its lease within six (6) months
29  after the Effective Date and Tenant is provided with written notice thereof reasonably
30  promptly thereafter and in no event later than the seventh (7th) month after the Effective
31  Date). Landlord represents and warrants that no Existing Exclusive(s) exist other than
32  those listed on Exhibit K-1 hereto and that Exhibit K-1 is true accurate and complete, and
33  covenants to indemnify, defend and hold Tenant harmless from and against all loss, cost,
34  liability or expense (including, without limitation, reasonable legal fees) incurred by
35  Tenant by reason of the enforcement by any person or entity of such unlisted Existing
36  Exclusive. Notwithstanding the foregoing, Tenant shall be entitled to enter into a
37  separate agreement with any tenant or other occupant for whose benefit the existing
38  Exclusive is granted which nullifies or modifies the corresponding Existing Exclusive
39  with regard to the Premises. Except as expressly set forth in this Section 13.3, Tenant
40  shall not be obligated to honor any exclusive granted by Landlord to any tenant in the
41  Shopping Center.

42

43                    ARTICLE 14
44             CONDUCT OF BUSINESS OPERATIONS

45       Subject to the other provisions of this Lease (including, without limitation,
46  Articles 2 & 3 hereof) Tenant shall initially open its store for business to the public in the
47  Premises for at least one (1) day, not later than the one hundred eightieth (180th) day
48  after the Rent Commencement Date (which date shall, as applicable, be extended by
49  reason of (A) damage or destruction, eminent domain proceedings or actions, or *Force*
50  *Majeure*, or (B) the acts or omissions of Landlord). Other than as expressly set forth in
51  the preceding sentence, Tenant shall have no obligation to open or operate any business

53

1   in the Premises, and shall have the right, at any time, to cease to conduct any business
2   operations in the Premises, and Tenant shall incur no liability to Landlord or its
3   Mortgagee by reason thereof (it being understood and agreed that all of Tenant's
4   obligations under this Lease shall continue unless this Lease is terminated pursuant, *inter*
5   *alia*, to the further provisions of this Article 14 or any other provision of this Lease [other
6   than by reason of an Event of Default]).  Notwithstanding the foregoing, in the event that
7   Tenant intends to cease operating in the Premises (other than for Excused Periods or as a
8   result of Force Majeure or casualty), Tenant shall notify Landlord no less than sixty (60)
9   days before Tenant will cease operations and, in such notice, shall specify the date upon
10  which Tenant will cease operations.  Within sixty (60) days after Tenant's notice to
11  Landlord of Tenant's intent to cease operations Landlord shall have the option to
12  terminate this Lease, which option shall be exercisable by giving notice thereof to Tenant
13  by not later than the sixtieth (60th) day after Tenant's notice to Landlord whereupon this
14  Lease shall terminate upon the tenth (10th) after that set in Tenant's notice for its
15  cessation of operations (the *"Recapture Date"*) as if the Recapture Date was originally
16  set forth herein as the expiration date of the Term (for example, if Tenant' notice
17  specifies that Tenant intends to cease operations on January 31, and Landlord elects to
18  recapture, the Recapture Date would be February 10).  Upon such termination, Landlord
19  and Tenant shall each be released from any and all liabilities thereafter accruing
20  hereunder, except for those obligations which survive the expiration or other termination
21  of this Lease pursuant to the express terms of this Lease.  All Rent payable by Tenant
22  hereunder shall be apportioned as of the Recapture Date and Tenant shall promptly pay to
23  Landlord any amounts so determined to be due and owing by Tenant to Landlord, and
24  conversely Landlord shall promptly reimburse Tenant for any amounts prepaid by Tenant
25  for periods subsequent to the Recapture Date.

26                                        ARTICLE 15
27                         TENANT ASSIGNMENT AND SUBLETTING

28         Section 15.1   Assignment and Subletting.

29                 15.1.1 Tenant shall have the right from time to time, without the consent of
30  Landlord, to assign Tenant's interest in this Lease and/or to sublet, concession or license
31  all or any portion of the Premises, subject to all of the terms and conditions of this Lease.

32                 15.1.2

33                         (a)   Except with respect to any transaction covered under
34  Subsection 15.1.3 or Section 15.3 below, in the event Tenant proposes to assign this
35  Lease or sublet, in a single transaction, the whole of the Premises, it shall first give notice
36  thereof (the *"Assignment/Subletting Notice"*) to Landlord, which notice shall specify the
37  name and address of the proposed assignee or sublessee and the proposed use of the
38  Premises to be made by such assignee or sublessee, the proposed economic terms of the
39  sublease or assignment, together with a statement certified by Tenant of the amount of
40  the then unamortized costs (amortized on a straight-line basis over the Initial Term) of
41  any alterations performed by Tenant to the Premises.  Thereafter, Landlord shall have the
42  option to terminate this Lease, which option shall be exercisable by:

43                                 (i)   giving notice to Tenant (the *"Termination Notice"*)
44  thereof within fifteen (15) days after receipt of an Assignment/Subletting Notice from
45  Tenant, and

46                                 (ii)   paying to Tenant, within thirty (30) days after such
47  notice is given, all of Tenant's costs and expenses incurred in connection the preparation
48  of plans and specifications for, and the then unamortized costs (amortized on a straight-
49  line basis over the Initial Term) of, Tenant's Work and any alterations performed by
50  Tenant to the Premises,

                                            54

1 in which event this Lease shall automatically terminate on the ninetieth (90th) day (the
2 "*Termination Date*") after the date on which Tenant receives Landlord's Termination
3 Notice, with the same force and effect as if the Termination Date had been designated as
4 the expiration date of this Lease. Upon the Termination Date, Landlord and Tenant shall
5 each be released from any and all liabilities thereafter accruing hereunder, except for
6 those obligations which survive the expiration or other termination of this Lease pursuant
7 to the express terms of this Lease. All Rent payable by Tenant hereunder shall be
8 apportioned as of the Termination Date and Tenant shall promptly pay to Landlord any
9 amounts so determined to be due and owing by Tenant to Landlord, and conversely
10 Landlord shall promptly reimburse Tenant for any amounts prepaid by Tenant for periods
11 subsequent to the Termination Date. Notwithstanding the foregoing, Tenant shall have
12 the right to avoid Landlord's termination by giving notice to Landlord (the "*Rescission*
13 *Notice*"), within ten (10) days after receiving the Termination Notice, of its rescission of
14 the Assignment/Subletting Notice, whereupon Landlord's Termination Notice shall be
15 rendered null and void, and Tenant shall not assign this Lease or sublet the whole of the
16 Premises as proposed in its Assignment/Subletting Notice. If Landlord does not give the
17 Termination Notice within the aforesaid 15-day period, Landlord shall conclusively be
18 deemed to have waived its termination rights hereunder with respect to such proposed
19 assignment or subletting transaction, and Tenant may assign this Lease or sublet the
20 entire Premises in accordance with its Assignment/Subletting Notice.

21 (b) Except with respect to any transaction covered under
22 Subsection 15.1.3 or Section 15.3 below, if Landlord does not elect to terminate this
23 Lease in accordance with subsection (a) of this Section 15.1.2, upon any assignment of
24 the Lease or subletting of all or any portion of the Premises by Tenant in accordance with
25 its Assignment/Subletting Notice, Tenant shall promptly pay to Landlord fifty percent
26 (50%) of all of the rent and other consideration received for such assignment or sublease,
27 as and when received, in excess of the rent and other consideration required to be paid by
28 Tenant for the Premises in the event of an assignment or for the area sublet, in the cases
29 of a sublease, less (i) actual out-of-pocket expenses (including, but not limited to
30 brokerage fees, attorneys' fees and tenant fit-up costs) incurred by Tenant in effecting
31 such assignment or sublease, and (ii) the unamortized costs of Tenant's Work and other
32 tenant improvements made by Tenant to the Premises (or the portion thereof sublet in the
33 case of a partial subletting). The parties intend that the actual net profit to Tenant, after
34 full recovery by Tenant of the items set forth in (i) and (ii) above, shall be split between
35 Landlord and Tenant as set forth above, but that in no event shall Tenant be required to
36 pay to Landlord any amount until such time as an actual net profit is received by Tenant.

37 (c) Except with respect to any transaction covered under
38 Subsection 15.1.3 or Section 15.3 below, if, at the time of any assignment or subletting,
39 Tenant achieved the Sales Break Point and was required to pay Percentage Rent either of
40 the two immediately preceding calendar year, then, commencing upon the effective date
41 of such assignment or subletting, Percentage Rent for any calendar years thereafter shall
42 in no event be less than seventy-five (75%) percent of the actual annual
43 Percentage Rent, if any, during the two calendar years immediately before the assignment
44 or subleasing [it being agreed that with respect to any sublease covering less than all of
45 the Floor Area of the Premises, the minimum Percentage Rent established by this
46 sentence shall be an amount equal to the total average annual Percentage Rent for the
47 Premises for the two calendar years immediately preceding the subleasing in question,
48 divided by the Floor Area of the Premises, multiplied by the Floor Area subject to the
49 sublease in question and there shall be no minimum Percentage Rent for the portion of
50 the Premises not so subleased]. If this Lease has been in effect for less than two full
51 calendar years at the time of the assignment or subletting in question, then the minimum
52 Percentage Rent established in accordance with the preceding sentence shall be based
53 upon 75% of the actual Percentage Rent, if any, for the immediately preceding calendar
54 year. If no full calendar year has occurred during the Term, then there shall be no
55 minimum Percentage Rent. For example, if during the fifth calendar year of the Term

55

1   Percentage Rent is $300,000 and during the sixth calendar year of the Term Percentage
2   Rent is $330,000, and on the first day of the seventh calendar year of the Term the
3   Premises is assigned or subleased in full and adjustments are made in accordance with
4   this Section 15.1.2(c), the Percentage Rent for the Premises for the period of such
5   adjustment (being the term of the assignment or subletting) shall not be less than seventy
6   five (75%) percent of $315,000, or $236,250, for any calendar year. Equitable
7   adjustments shall be made for partial calendar years.

8        15.1.3  In addition to, and not in limitation of, Tenant's other rights set
9   forth in this Section 15.1, Tenant shall have the right from time to time, without the
10  consent of Landlord, to assign Tenant's interest in this Lease and/or to sublet or license
11  all or any portion of the Premises: (a) to an Affiliate of Tenant; (b) to any entity which
12  purchases all or substantially all of the assets of Tenant or any of its Affiliates; (c) to any
13  entity which purchases Tenant's interest in the majority of stores owned or operated by
14  Tenant or its Affiliate(s) in the Washington D.C. metropolitan area; (d) in conjunction
15  with any merger, acquisition, consolidation or public offering of stock or other interests
16  involving Tenant or its Affiliate(s); and/or (e) as may be required by any Legal
17  Requirement.

18       Section 15.2   Liability of Tenant.  Unless otherwise agreed to in writing by
19  Landlord, no assignment, subletting, licensing or concessioning by Tenant shall reduce,
20  diminish, or otherwise affect the liability of Tenant hereunder.

21       Section 15.3   Collateral Assignment.  In addition to Tenant's other rights set
22  forth in this Article 15, a collateral assignment of Tenant's interest in this Lease by
23  Tenant to one or more "Lenders" (hereinafter defined), as collateral security for an
24  indebtedness or other obligation of Tenant or its Affiliates shall be permitted and
25  Landlord shall execute all documentation reasonably requested by Tenant or any such
26  Lender in connection therewith.  In addition, Tenant shall have the right, without
27  Landlord's consent, to grant to an Affiliate of Tenant a license to operate all of Tenant's
28  business operations at the Premises, without such Affiliate having assumed any liability
29  for the performance of Tenant's obligations under this Lease.  As used herein, *"Lender"*
30  shall mean a state or federally regulated: bank, savings and loan association, insurance
31  company, pension fund, credit union, real estate investment trust, or other institutional
32  lender.

33       Section 15.4   Cure Rights of Original Tenant.

34       15.4.1 If Tenant assigns Tenant's interest in this Lease, then Landlord,
35  when giving notice to said assignee or any future assignee in respect of any default, shall
36  also give a copy of such notice to the Original Tenant, and no notice of default shall be
37  effective until a copy thereof is so given to Original Tenant.  Original Tenant shall have
38  the same period after receipt of such notice to cure such default as is given to Tenant
39  therefor under this Lease.

40       15.4.2 If this Lease is terminated because of: (a) an Event of Default of
41  such assignee, or (b) the rejection, disaffirmation, or other termination of this Lease by or
42  on behalf of the assignee pursuant to any proceeding in bankruptcy under any Legal
43  Requirement of any State or of the United States, or any other Legal Requirements
44  affecting creditors' rights, <u>then</u> Landlord shall promptly give to Original Tenant notice
45  thereof, and Original Tenant shall have the right, exercisable by notice given to Landlord
46  within fifteen (15) days after receipt by Original Tenant of Landlord's notice, to enter
47  into a new lease of the Premises with Landlord (*"New Lease"*), <u>provided</u> that the
48  Original Tenant shall have remedied all Events of Default of the assignee hereunder,
49  unless such Events of Default are not reasonably susceptible of cure by the Original
50  Tenant, in which event the Original Tenant shall not be obligated to cure such Events of
51  Default as a condition to the exercise of its rights under this Subsection 15.4.2.  Upon the

1   Original Tenant's curing of any such Event of Default of the assignee as aforesaid,
2   Landlord shall assign to the Original Tenant all of Landlord's rights against such assignee
3   (whether arising as a result of bankruptcy court proceedings or otherwise). The term of
4   said New Lease shall begin on the date of termination of this Lease and shall continue for
5   the remainder of the Term (including any Renewal Periods). Such New Lease shall
6   otherwise contain the same terms and conditions as those set forth herein, except for
7   requirements which are no longer applicable or have already been performed. It is the
8   intention of the parties hereto that such New Lease shall have the same priority relative to
9   other rights or interests in or to the Premises as this Lease. The provisions of this
10  Subsection 15.4.2 shall survive the termination of this Lease and shall continue in full
11  force and effect thereafter to the same extent as if this Subsection 15.4.2 were a separate
12  and independent contract between Landlord and the Original Tenant. From the date on
13  which the Original Tenant shall serve Landlord with the aforesaid notice of the exercise
14  of its right to a New Lease, the Original Tenant shall have quiet and undisturbed use and
15  enjoyment of the Premises and all appurtenances thereto, as contemplated in this Lease.

16          Section 15.5    Recognition Agreement. In the event Tenant subleases all or any
17  portion of the Premises for a term of at least five (5) years, then, notwithstanding any
18  other provisions of this Lease, but provided that such sublease is subject to the terms and
19  conditions of this Lease as required by Section 15.1.1, Landlord shall, upon Tenant's
20  request, execute and deliver an agreement among Landlord, Tenant and each such
21  subtenant in the form of Exhibit H hereto, in recordable form, which form states, among
22  other things, that upon such sublease becoming a direct lease between Landlord and such
23  subtenant, such subtenant shall be obligated to pay the higher of the Rent per square foot
24  of Floor Area of the subleased premises set forth in the sublease or in this Lease.

25                                  ARTICLE 16
26                          DEFAULT AND DISPUTE RESOLUTION

27          Section 16.1    Tenant Default.

28          16.1.1 If Tenant shall fail to: (i) pay any Rent when due, within ten (10)
29  days after its receipt of notice thereof from Landlord specifying the amount and details of
30  the unpaid Rent, or (ii) perform or observe any of the other covenants of this Lease on
31  Tenant's part to be performed or observed within thirty (30) days after its receipt of
32  notice thereof from Landlord specifying the nature of such default (or, if such default
33  shall be of a nature that same cannot reasonably be cured within thirty (30) days and
34  Tenant does not commence to cure such default on or before such thirtieth (30th) day and
35  thereafter diligently prosecute said cure to completion), such circumstance shall
36  constitute an *"Event of Default"*.

37          16.1.2 Upon an Event of Default, Landlord shall have all remedies given to
38  it at law or in equity (except that Landlord hereby expressly waives any rights to
39  accelerate any element of the Rent, and any right of distraint, which may be granted to it
40  by law), including but not limited to the following:

41                  (a)    to bring suit for the collection of such unpaid Rent or for the
42  performance of such other covenant of this Lease on Tenant's part to be performed;
43  and/or

44                  (b)    without waiving any non-monetary default, may (but shall not
45  be obligated to) perform any covenant which is capable of being remedied by the
46  performance of affirmative acts for the account and at the reasonable expense of Tenant
47  (it being agreed that should Landlord require access to the Premises in order to perform
48  such covenant as aforesaid, Landlord shall comply with the applicable provisions of
49  Sections 9.2 hereof), in which event, Tenant shall pay to Landlord on demand, as
50  Additional Rent, the reasonable cost or amount thereof, together with interest thereon at
51  the Lease Interest Rate from the date of outlay of expense until payment; and/or

        (c)   upon at least five (5) days' notice to Tenant, to terminate this Lease, whereupon Landlord shall have and retain full right to sue for and collect all unpaid Rent which shall have accrued up to the date of termination and any damages to Landlord by reason of any such breach, including, but not limited to commercially reasonable reletting expenses actually incurred by Landlord as a result of the Event of Default, and Tenant shall surrender and deliver the Premises to Landlord, failing which, Landlord shall have the right to initiate summary or other proceedings to recover possession; and/or

        (d)   upon at least five (5) days' notice to Tenant to terminate Tenant's right of possession, re-enter the Premises and take possession thereof by lawful means.  If Landlord shall so elect to repossess the Premises without terminating the Lease, then Tenant shall be liable for and shall pay to Landlord all Rent payable to Landlord pursuant to the terms of this Lease which shall have accrued up to the date of repossession, as well as all Rent as and when same shall become due and payable pursuant to the terms of this Lease during the remainder of the Term, diminished by any net sums thereafter received by Landlord through reletting the Premises during said period (after deducting reasonable expenses incurred by Landlord in connection with such reletting).  In no event shall Tenant be entitled to any excess of any rent obtained by such reletting over and above the Rent herein reserved.  Landlord may bring actions to collect amounts due by Tenant under this Lease, from time to time, prior to the expiration of the Term.

        16.1.3 Upon an Event of Default, Tenant shall be liable for and shall pay to Landlord, in addition to any sum provided to be paid above, brokers' fees and other commercially reasonable reletting expenses incurred by Landlord in connection with reletting the whole or any part of the Premises for the remainder of the then unexpired Term (excluding any then unexercised Renewal Periods), the costs of removing and storing Tenant's or other occupant's property; the cost of repairs; and all other commercially reasonable expenses incurred by Landlord in enforcing or defending Landlord's rights and/or remedies, including reasonable attorneys' fees.

        16.1.4 Upon an Event of Default, any amounts paid by Landlord to cure said Event of Default and any Rent payments not paid after notice thereof is given shall bear interest at the Lease Interest Rate from and after the expiration of any applicable grace period until paid.

        16.1.5 Landlord shall use commercially reasonable efforts to relet the Premises or any portion thereof to mitigate Landlord's damages to which Landlord would otherwise be entitled to as a result of an Event of Default.  In no event shall Tenant be liable to Landlord for any consequential damages suffered by Landlord as a result of an Event of Default by, or any other act of, Tenant.

        Section 16.2    Landlord Default.  If Landlord shall: (i) fail to perform or observe any of the covenants of this Lease on Landlord's part to be performed or observed within thirty (30) days after receiving notice from Tenant thereof (or, if same cannot reasonably be cured within thirty (30) days, if Landlord shall fail to promptly commence and diligently prosecute said cure to completion), or (ii) materially breach any warranty or representation under this Lease (either of (i) or (ii) above being hereinafter referred to as a "*Landlord's Default*"), then Tenant, in addition to such other rights and remedies as may be available under this Lease, or at law or in equity, may, in its sole discretion:

        (a)   as applicable, perform such obligation(s) of Landlord in accordance with the provisions of this Lease on behalf of, and at the expense of Landlord; provided that Tenant's right to perform the obligation of Landlord to make repairs and perform maintenance shall be limited to the right to perform the repair and maintenance

1  obligations of Landlord in the Premises and the Common Areas that are reasonably
2  necessary for access to and use and operation of the Premises; and/or

3            (b)  bring suit for the collection of any amounts for which
4  Landlord is in default, seek injunctive relief, or seek specific performance for any other
5  covenant or agreement of Landlord, without terminating this Lease; and/or

6            (c)  offset against the Rent payable by Tenant hereunder for
7  amounts owed by Landlord to Tenant and/or for the amounts reasonably expended by
8  Tenant performing Landlord's obligations hereunder, including costs and reasonable
9  attorneys' fees, together with interest thereon at the Lease Interest Rate from the date of
10  the outlay until paid; and/or

11            (d)  terminate this Lease, without waiving its rights to damages
12  for Landlord's Default, provided that:  (1) Landlord's Default materially interferes with
13  the normal conduct of any business operations in the Premises,  (2) Landlord's Default is
14  not reasonably capable of being cured by Tenant, and  (3) Tenant gives notice of
15  Landlord's Default to any Mortgagee of whom Landlord shall have previously given
16  Tenant notice (including its address), and such Mortgagee shall not have cured
17  Landlord's Default within thirty (30) days after such notice is given (or, if such default
18  cannot reasonably be cured within thirty (30) days, such Mortgagee fails to promptly
19  commence and diligently prosecute said cure to completion).

20       Notwithstanding the foregoing, if, in Tenant's reasonable judgment, a condition
21  posing imminent risk of liability or material harm to persons or property or material
22  disruption to the normal conduct of any business operations in the Premises shall exist,
23  Tenant may, at its election, and without prior notice to Landlord, exercise any or all of
24  the remedies set forth in (a), (b) and (c) above.  In no event shall Landlord be liable to
25  Tenant for any consequential damages suffered by Tenant as a result of a default by, or
26  any other act of, Landlord.

27       Section 16.3    Arbitration.  In any case where this Lease expressly provides for
28  submission of a dispute or matter to arbitration (but not otherwise), the same shall be
29  settled by arbitration in Washington, D.C., before one arbitrator in accordance with the
30  procedural rules then obtaining of the American Arbitration Association or any successor
31  thereto for expedited arbitration.  The decision of the arbitrator shall be final, conclusive
32  and binding on the parties, but the powers of the arbitrator are hereby expressly limited to
33  the determination of factual issues, and the arbitrator shall have no power to reform,
34  supplement or modify this Lease.  The arbitrator shall make only required findings of fact
35  incident to an arbitrable dispute, which findings shall be set forth in reasonable detail in a
36  written decision by the arbitrator.  Landlord and Tenant shall share equally in the cost and
37  expenses of such arbitration, and each shall separately pay its own attorneys' fees and
38  expenses, unless the arbitrator finds that one of the parties did not act in good faith in
39  connection with the dispute or the conduct of the arbitration proceeding, in which case
40  the arbitrator may award all or part of said costs, expenses and fees to the other party.

41                      ARTICLE 17
42  RIGHT TO MORTGAGE AND NON-DISTURBANCE; ESTOPPEL CERTIFICATE

43       Section 17.1    Right to Mortgage and Non-Disturbance.  Landlord reserves the
44  right to subject and subordinate this Lease at all times to the lien of any first mortgage or
45  deed of trust for the benefit of any Mortgagee hereafter encumbering or affecting all or
46  any portion of the Shopping Center, and the lien of any second mortgage or deed of trust
47  held by a Mortgagee, as well as to any future ground or underlying leases encumbering or
48  affecting all or any part of the Shopping Center; provided, however, that (a) each
49  Mortgagee shall first execute and deliver to Tenant a subordination, non-disturbance and
50  attornment agreement in substantially the form attached as Exhibit G hereto, in
51  recordable form, and (b) any Ground Lessor shall execute (and shall obtain the written

1  consent of any holder of any mortgage, deed of trust or any other existing lien
2  encumbering or affecting the Shopping Center or any portion thereof, as applicable) and
3  deliver to Tenant a fee owner recognition agreement in a form reasonably satisfactory to
4  Tenant, which shall include the following provisions: (i) the Ground Lessor will not, in
5  the exercise of any of the rights arising or which may arise out of such lease, disturb or
6  deprive Tenant  in or of its possession or its rights to possession of the Premises or of any
7  right or privilege granted to or inuring to the benefit of Tenant under this Lease; (ii) in the
8  event of the termination of the ground or underlying lease, Tenant will not be made a
9  party in any removal or eviction action or proceeding, nor shall Tenant be evicted or
10  removed of its possession or its right of possession of the Premises, and this Lease shall
11  continue in full force and effect as a direct lease between the Ground Lessor and Tenant
12  for the remainder of the Term and on the same terms and conditions as contained herein,
13  without the necessity of executing a new lease; and (iii) Landlord and Tenant shall have
14  the right to execute any amendment to this Lease which is specifically required hereunder
15  and the Ground Lessor shall recognize and be bound thereto.

16      Section 17.2    Estoppel Certificate.  Upon written request of Landlord or Tenant,
17  the other party, within thirty (30) days of the date of such request, shall execute and
18  deliver to and only for the benefit of the requesting party or any Mortgagee, *bona fide*
19  prospective purchaser, assignee, or sublessee of the requesting party, without charge, a
20  written statement: (1) ratifying this Lease; (2) certifying, to such party's actual
21  knowledge, that this Lease is in full force and effect, if such is the case, and has not been
22  modified, assigned, supplemented or amended, except by such writings as shall be stated;
23  (3) specifying the dates to which Fixed Rent and Additional Rent have been paid; (4)
24  stating whether or not, to such party's actual knowledge, the party requesting the estoppel
25  is in default and, if so, stating the nature of such default, (5) stating the Rent
26  Commencement Date, and (6) stating which options to extend the Lease Term have been
27  exercised, if any.  Each request after the first 2 requests for a written statement pursuant
28  to this Section 17.2 made within twelve (12) months of an earlier request for such a
29  written statement shall be accompanied by a payment, from the requesting party to the
30  other party, in the amount of One Thousand ($1000) Dollars (increased by Two Hundred
31  ($200 Dollars on each date that the Fixed Rent increases pursuant to Section 1.1.11
32  hereof).

33      Section 17.3    Existing Mortgages.  If a mortgage, deed of trust, or other security
34  instrument encumbers the Shopping Center or any part thereof on the Effective Date, then
35  simultaneously with the delivery of this Lease to Tenant after Landlord's execution
36  thereof, Landlord shall deliver to Tenant, in recordable form: (x) a subordination, non-
37  disturbance and attornment agreement substantially in the form attached hereto as Exhibit
38  G, in recordable form, executed by each and every holder of any mortgage, deed of trust
39  or any other existing lien encumbering or affecting the Shopping Center or any portion
40  thereof, and (y) a fee owner recognition agreement in the form and content described in
41  clause (b) of Section 17.1 hereof, in recordable form, executed by any Ground Lessor
42  (and, as may be required, consented to by the holder of any mortgage, deed of trust or
43  other existing lien as aforesaid).  Should Landlord fail to so deliver such instrument(s)
44  simultaneously as above provided, Tenant shall have the right by notice given to
45  Landlord at any time prior to the date on which such instrument(s) are delivered, to
46  terminate this Lease, in which event, neither party shall have any further liability
47  hereunder, except for those obligations which survive the expiration or other termination
48  of this Lease pursuant to the express terms of this Lease.

49                              ARTICLE 18
50                               NOTICE

51      Subject to the further provisions of this Article 18, whenever it is provided herein
52  that any notice, demand, request, consent, approval or other communication (*"Notice"*)
53  shall or may be given to either of the parties by the other, it shall be in writing and, any

1   Legal Requirement to the contrary notwithstanding, shall not be effective for any purpose
2   unless same shall be given by registered or certified mail, postage prepaid, return receipt
3   requested, or by any recognized overnight mail carrier, with proof of delivery slip,
4   addressed to Landlord at Landlord's Mailing Address or to Tenant at Tenant's Mailing
5   Address, with copies of notices to Tenant also given to: (i) Allan N. Rauch, Esq., c/o Bed
6   Bath & Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, and (ii) Victoria A.
7   Morrison, Esq., Riker, Danzig, Scherer, Hyland & Perretti, LLP, Headquarters Plaza, One
8   Speedwell Avenue, P.O. Box 1981, Morristown, New Jersey 07862-1981, or to such
9   other person or other address as may, from time to time, be specified by either party in a
10  written notice to the other party. All notices given in accordance with the provisions of
11  this Section shall be effective upon receipt (or refusal of receipt) at the address of the
12  addressee. Notwithstanding the foregoing, Landlord shall instead send the following
13  items to Tenant (Attention: Lease Administration) at Tenant's Mailing Address: (A) all
14  bills, notices (but not notices of default) and related information pertaining to Tenant's
15  Pro Rata Share of Taxes as described in Section 4.3 of this Lease, and (B) all budgetary
16  information, notices (but not notices of default), statements, bills and related information
17  pertaining to Tenant's Pro Rata Share of Common Areas Charges as described in Section
18  5.1 of this Lease.

19                              ARTICLE 19
20                          TENANT'S PROPERTY

21          All of Tenant's Property which may be installed or placed in or upon the Premises
22  by Tenant shall remain the property of Tenant. Tenant may assign, hypothecate,
23  encumber, mortgage or create a security interest in or upon Tenant's Property in the
24  Premises without the consent of Landlord and may remove Tenant's Property at any time
25  during the Term. Landlord waives any right it may have in Tenant's Property. To the
26  extent Landlord may have a lien on or security interest in the Tenant's Property pursuant
27  to this Lease, by law or otherwise, Landlord hereby waives, and agrees not to assert, such
28  lien or security interest. Landlord shall provide to Tenant, within ten (10) days after
29  Tenant's request therefor, a written waiver in form reasonably satisfactory to Tenant
30  evidencing Landlord's waiver of any rights it has or may have in Tenant's Property.

31                              ARTICLE 20
32                              END OF TERM

33          Section 20.1   Surrender of Premises. At the expiration of the Term, Tenant will
34  quit and surrender the Premises in good condition and repair, excepting, however,
35  reasonable wear and tear, damage by fire or other casualty, damage by eminent domain,
36  and repairs and replacements to be made by Landlord hereunder.

37          Section 20.2   Hold Over. If Tenant fails to deliver possession of the Premises to
38  Landlord at the end of the Term, and unless Landlord and Tenant are, at such time,
39  engaged in good faith negotiations to extend the Term, Tenant shall be a tenant at
40  sufferance and shall be liable for Fixed Rent on a monthly basis (or, if applicable, on a
41  prorated daily basis) in an amount equal to one hundred fifty (150%) percent of the
42  amount thereof payable by Tenant for the month immediately preceding the last day of
43  the Term as well as for all Additional Rent payable by Tenant hereunder, provided,
44  however, after four (4) months of paying such 150% Fixed Rent, if such holdover
45  persists, the Fixed Rent shall be increased to two hundred percent (200%) of the amount
46  thereof payable by Tenant for the month immediately preceding the last day of the Term..

47                              ARTICLE 21
48                      TENANT'S RIGHT OF FIRST OFFER

49          Provided an uncured Event of Default does not then exist under this Lease, Tenant
50  shall have continuing rights of first offer to lease additional space in the Shopping Center
51  which is immediately contiguous to the Premises on the second floor of the Shopping

1   Center and which may become available on and after the date of this Lease. At such time
2   that Landlord has knowledge that such space (*"Offered Space"*) is or will become
3   available, Landlord will give Tenant notice (the *"Offering Notice"*) of the terms and
4   conditions Landlord would be willing to accept with respect to the Offered Space
5   (including, without limitation, the proposed rent, additional rent, scope of Landlord's
6   proposed tenant improvements, location and Floor Area), and Tenant shall have fifteen
7   (15) days within which to respond to Landlord's offer. In the event Tenant elects to
8   accept Landlord's offer (which may only be accepted for the entire Offered Space unless
9   the Offering Notice contained other options), then Tenant shall notify Landlord of such
10  election by giving notice to Landlord during such fifteen (15) day period and Landlord
11  and Tenant shall thereupon enter into an amendment to this Lease for the leasing of the
12  Offered Space, which amendment shall contain (a) the terms and conditions set forth in
13  the Offering Notice, (b) provide that the term thereunder shall expire or sooner terminate
14  contemporaneously with the expiration or sooner termination of the Term hereof (subject
15  to extension in accordance with Section 2.2.2 above), and (c) contain such other terms
16  and provisions as either Landlord or Tenant may reasonably require in order to effectuate
17  the incorporation of the Offered Space into the Premises and to otherwise effectuate the
18  intent of this Article 21. Should Tenant decline Landlord's offer or fail to respond
19  thereto, then, and in such event, Tenant shall have been deemed to have waived any
20  prospective rights of first offer to the Offered Space (but Tenant shall not lose any
21  prospective rights of first offer with respect to any space (including, without limitation,
22  the Offered Space) which may in the future become vacant and available), and Landlord
23  may lease the Offered Space to any other party upon substantially the same terms and
24  conditions as that offered to Tenant (or on conditions more favorable to Landlord),
25  provided that such lease is executed within six (6) months after Tenant has declined (or
26  has been deemed to have waived) Landlord's offer with respect to the Offered Space. As
27  used herein, the phrase *"substantially the same terms and conditions as that offered to
28  Tenant"* shall mean terms not materially different and/or a rent of not more than ten
29  (10%) percent below the rent requested by Landlord of Tenant. Any dispute between the
30  parties with respect to this Article 21 (including, without limitation, any dispute as to the
31  provisions of the amendment described in this Article 21) shall be resolved by arbitration
32  in accordance with the provisions of Section 16.3 above.

33                                ARTICLE 22
34                           ONGOING CO-TENANCY

35          If, at any time after the first twelve (12) months of the Term, Target (or the then-
36  occupant of the Target Unit) and at least one other national tenant occupying at least
37  15,000 square feet of Floor Area in the Shopping Center are not actively using their
38  premises for the operation of retail business other than during Excused Periods (such
39  condition being hereinafter referred to as an *"Excess Vacancy"*), then in such event,
40  Tenant shall have the right to: (i) pay Alternate Rent in lieu of Fixed Rent during the
41  period of such Excess Vacancy, and/or (ii) if the Excess Vacancy (which the parties agree
42  cannot, in accordance with its definition, ever include any period within the first 12
43  months of the Term) continues for a period in excess of three hundred sixty-five (365)
44  continuous days, to terminate this Lease, exercisable by giving Landlord, within one
45  hundred twenty (120) days after the expiration of such 365-day period, at least ninety
46  (90) days' prior notice, in which event this Lease shall terminate on the date set forth in
47  Tenant's notice of termination without further liability on the part of either Landlord or
48  Tenant, except: (A) for those obligations which survive the expiration or other
49  termination of this Lease pursuant to the express terms of this Lease, and (B) Landlord,
50  promptly after receiving a statement from Tenant showing the costs and expenses of any
51  alterations made by Tenant, shall reimburse Tenant for the unamortized portion of such
52  costs and expenses based upon the unexpired portion of the Term. If Tenant does not
53  terminate this Lease pursuant to this Article 22, then commencing on the expiration of the
54  aforesaid 120-day period, Tenant shall resume paying full Rent, provided, however, that
55  Tenant shall: (x) again be entitled to exercise its rights under this Article 22 each time the

1   then existing condition of Excess Vacancy worsens by more than five percent (5%); and
2   (y) retain all of its original rights under this Article 22 with respect to any future
3   condition(s) of Excess Vacancy.

4                                   ARTICLE 23
5                                   MISCELLANEOUS

6           Section 23.1   Loading Facilities. Tenant shall have the right to utilize the
7   loading facilities serving the Premises (shown on Exhibit B) on a "24 hour a day", "365
8   days a year" basis provided such use is in accordance with all Legal Requirements and
9   the Rules and Regulations. Only the tenants or occupants of the spaces at the Shopping
10  Center designated on Exhibit B as sharing such loading facilities shall share such loading
11  facilities and no other person shall have the right to use same.

12          Section 23.2   Liens. Within thirty (30) days after notice of the filing thereof,
13  Tenant shall discharge (either by payment or by filing of the necessary bond, or
14  otherwise) any lien against the Premises and/or Landlord's interest therein, which may
15  arise out of any payment due for, or purported to be due for, any labor, services,
16  materials, supplies or equipment alleged to have been furnished to or for Tenant in, upon
17  or about the Premises. Similarly, within thirty (30) days after notice of the filing thereof,
18  Landlord shall discharge (either by payment or by filing of the necessary bond, or
19  otherwise) any lien against the Premises and/or Landlord's interest therein, which may
20  arise out of any payment due for, or purported to be due for, any labor, services,
21  materials, supplies or equipment alleged to have been furnished to or for Landlord in,
22  upon or about the Premises.

23          Section 23.3   Broker's Commission. Landlord and Tenant each warrant and
24  represent to the other that they did not deal with any real estate broker in connection with
25  the negotiation, execution and delivery of this Lease, except for Newmark New Spectrum
26  Retail, LLC (the "Broker"). Landlord shall pay the Broker a commission pursuant to a
27  separate agreement. Each party agrees to indemnify, defend, and save the other harmless
28  from and against any and all liabilities, costs, causes of action, damages and expenses,
29  including, without limitation, attorneys' fees, with respect to or arising out of any claims
30  made by any real estate broker (other than the Broker), agent or finder with respect to this
31  Lease in breach of the foregoing representation. The provisions of this Section shall
32  survive the expiration or earlier termination of this Lease.

33          Section 23.4   Force Majeure. Except as otherwise expressly set forth herein, in
34  the event either party hereto shall be delayed or hindered in, or prevented from, the
35  performance of any act required hereunder by reason of strikes, failure of power, acts of
36  terrorism riots, insurrection, war, earthquake, hurricane or tornado (or comparable
37  weather conditions of unusual severity), or other reasons of an extraordinary nature
38  which are beyond the reasonable control of the party and which could not have been
39  avoided through the exercise of due diligence by a party (collectively referred to herein as
40  "Force Majeure"), then the performance of any such act shall be excused for a period
41  equal to the period of the delay. Notwithstanding the foregoing provisions, the following
42  shall not constitute Force Majeure: (i) the financial inability of a party to perform its
43  obligations under this Lease; or (ii) delays occurring in the course of complying with
44  applicable Legal Requirements that could have been avoided through the exercise of due
45  diligence by a party hereto. A party wishing to invoke this Section shall give the other
46  party notice of that intention within ten (10) days (or, as applicable, such other period
47  expressly provided for notification elsewhere in this Lease) after the commencement of
48  any event of Force Majeure and shall, at that time, specify the reasons therefor, the
49  specific provision of this Lease that will be delayed as a result and the period of such
50  extension, if known, or if not known, a reasonable estimate thereof.

1       Section 23.5   <u>Consents</u>. Except as may be otherwise expressly set forth in this
2   Lease, whenever under this Lease provision is made for either party's securing the
3   consent or approval of the other party, (i) such consent or approval shall be in writing and
4   shall not be unreasonably withheld, delayed or conditioned, and (ii) in all matters
5   contained herein, both parties shall have an implied obligation of reasonableness.

6       Section 23.6   <u>Costs</u>. Whenever this Lease requires the performance of an act by
7   a party, such party shall perform the act at its own cost and expense, unless expressly
8   provided to the contrary.

9       Section 23.7   <u>Attorneys' Fees</u>. In any action or proceeding hereunder (whether
10  to enforce the terms and provisions of an indemnity or otherwise), the prevailing party
11  shall be entitled to recover from the other party the prevailing party's reasonable costs
12  and expenses in such action or proceeding, including reasonable attorneys' fees, costs and
13  expenses. Except as otherwise set forth herein, if either party is sued by a third party as a
14  result of a violation of a covenant or warranty herein contained by the other party hereto,
15  then the party who has violated the covenant or warranty shall be responsible for the
16  reasonable costs and expenses in such action or proceeding against the non-violating
17  party, including reasonable attorneys' fees, costs and expenses.

18      Section 23.8   <u>Survival of Obligations</u>. The obligation to pay any sums due to
19  either party from the other that by the terms herein would not be payable, or are incapable
20  of calculation, until after the expiration or sooner termination of this Lease shall survive
21  and remain a continuing obligation until paid. All indemnity obligations under this Lease
22  shall survive the expiration or earlier termination of this Lease.

23      Section 23.9   <u>Non-Waiver</u>. The failure of Landlord or Tenant to insist upon the
24  strict performance of, or to enforce, any provision, covenant or condition herein shall not
25  be deemed to be a waiver thereof, nor void or affect the right of the aggrieved party to
26  enforce the same covenant or condition on the occasion of any subsequent breach or
27  default; nor shall the failure of either party to exercise any option in this Lease upon any
28  occasion arising therefor be deemed or construed to be a waiver of the right to exercise
29  that same kind of option upon any subsequent occasion.

30      Section 23.10  <u>Rights Cumulative</u>. Unless expressly provided to the contrary in
31  this Lease, each and every one of the rights, remedies and benefits provided by this Lease
32  shall be cumulative and shall not be exclusive of any other such rights, remedies and
33  benefits allowed by applicable Legal Requirements.

34      Section 23.11  <u>Definition of Landlord</u>. The term *"Landlord"* shall mean only the
35  person or entity which, from time to time, shall then own the Shopping Center, and in the
36  event of the transfer by such owner of its interest in the Shopping Center, such owner
37  shall (<u>except</u> to the extent of (1) claims made by Tenant against Landlord which arose
38  prior to the effective date of the transfer of such ownership interest, and/or (2) judgments
39  obtained by Tenant against Landlord, on or prior to the effective date of the transfer of
40  such ownership interest) thereupon be released and discharged from all covenants and
41  obligations of Landlord thereafter accruing, but such covenants and obligations shall be
42  binding during the Term upon each new owner for the duration of such owner's
43  ownership.

44      Section 23.12  <u>Successors and Assigns</u>. The provisions of this Lease shall be
45  binding upon and shall inure to the benefit of the parties hereto and their respective heirs,
46  executors, administrators, successors and assigns.

47      Section 23.13  <u>Limitation of Landlord's Liability</u>. Except with respect to
48  insurance proceeds or condemnation awards received by Landlord which are required by
49  the terms of this Lease to be applied to the repair or restoration of the Premises or the
50  Shopping Center, Tenant shall, on and after the Delivery Date, look only to Landlord's

64

1   estate and property in the Shopping Center (or the proceeds from the sale of all or any
2   portion thereof) and net income derived from the Shopping Center for the satisfaction of
3   Tenant's remedies for the collection of a judgment (or other judicial process) requiring
4   the payment of money by Landlord hereunder and no other property or assets of
5   Landlord, its officers, directors, stockholders, members or partners shall be subject to
6   levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies
7   under or with respect to this Lease. Except with respect to the limitation on personal
8   liability hereinabove set forth, the provisions of this Section 23.13 shall not be deemed or
9   construed to limit Tenant's rights and remedies pursuant to this Lease or which may be
10  available at law or in equity.

11          Section 23.14  <u>Limitation of Tenant's Liability</u>.

12          Landlord, its successors and assigns, shall look solely to the assets, if any, of
13  Tenant and its successors and assigns, for the satisfaction of any claim arising from or
14  under this Lease and shall not seek to impose personal liability on any shareholder,
15  officer, director, member or employee of Tenant or any of its Affiliates.

16          Section 23.15  <u>Joint and Several Liability</u>.  If either party consists of more than
17  one person, then the persons constituting such party shall be jointly and severally liable
18  hereunder.

19          Section 23.16  <u>Severability</u>.  If any term, covenant, condition or provision of this
20  Lease is held by a court of competent jurisdiction to be invalid, void or unenforceable,
21  the remainder of the provisions hereof shall remain in full force and effect and shall in no
22  way be affected, impaired, or invalidated thereby.

23          Section 23.17  <u>Grammatical Usages and Construction</u>.  In construing this Lease,
24  feminine or neuter pronouns shall be substituted for those masculine in form and vice
25  versa, and plural terms shall be substituted for singular and singular for plural in any
26  place in which the context so requires.  This Lease shall be construed without regard to
27  the identity of the party who drafted the various provisions hereof.  Moreover, each and
28  every provision of this Lease shall be construed as though all parties hereto participated
29  equally in the drafting thereof.  As a result of the foregoing, any rule or construction that
30  a document is to be construed against the drafting party shall not be applicable hereto.

31          Section 23.18  <u>Table of Contents, Line Numbering and Paragraph Headings</u>.  The
32  table of contents and line numbering, if any, and section headings are inserted only for
33  convenience and in no way define, limit or describe the scope or intent of this Lease, nor
34  in any way affect this Lease.

35          Section 23.19  <u>Definition of Hereunder, Herein, etc.</u>.  Unless the context clearly
36  indicates to the contrary, the words "herein," "hereof," "hereunder," "hereafter," and
37  words of similar import refer to this Lease and all the Exhibits attached hereto as a whole
38  and not to any particular section, subsection, or paragraph hereof.

39          Section 23.20  <u>Short Form Lease</u>.  Upon the request of either party following the
40  execution and delivery of this Lease, Landlord and Tenant shall execute a short form
41  lease or memorandum for recording, which shall be in form and substance as either party
42  shall reasonably request.  In no event shall the amount of Fixed Rent reserved hereunder
43  be included in any such short form lease or memorandum.  Such short form or
44  memorandum of lease shall not be recorded until Landlord acquires its interest in the
45  Shopping Center.

46          Section 23.21  <u>Entire Agreement and Modification</u>.  This Lease constitutes the
47  entire agreement of the parties hereto, and all prior agreements between the parties,
48  whether written or oral, are merged herein and, except as may be specifically set forth
49  herein, shall be of no force and effect.  This Lease cannot be changed, modified or

discharged orally, but only by an agreement in writing, signed by the party against whom enforcement of the change, modification or discharge is sought.

Section 23.22  No Joint Venture or Partnership Created by Lease.  Nothing contained herein shall be deemed or construed as creating the relationship of principal and agent or of partnership or of joint venture between the parties hereto.

Section 23.23  Tenant's Tradename; DC USA.  Landlord shall not make use of Tenant's tradename [*i.e.*, *"Bed Bath & Beyond"*®] in any advertising or marketing material, including, without limitation, on any internet website, without obtaining Tenant's prior written approval, which may be withheld in Tenant's sole and absolute discretion.  Tenant shall have a license only to use but shall not be obligated to use, the name "DC USA" only for purposes of advertising its general business at the Premises and for no other purpose; in connection with such use, the name shall be used only in a first class manner and not in any manner that could reasonably be expected to disparage or harm the value of the name.  Neither Tenant nor its Affiliates shall have the right of any kind to use the name DC USA on any product or services promoted or sold by Tenant or its Affiliates unless Tenant and Landlord have first entered into a written license agreement. Landlord shall not have the right to require Tenant to use names of any project sponsors when DC USA is being used by the Tenant in connection with any form of advertising or marketing as the permitted use of the words DC USA is solely to identify the location of Tenant's Premises in a manner equivalent to an address and the identification of a project sponsor would be inappropriate and unduly burdensome on Tenant's ability to inform the public that Tenant has a premises at the Shopping Center. Tenant shall have the unrestricted right to use the name of the Shopping Center in its address and for any other purpose relating to its location and the ability of people to locate its store even if the Shopping Center name contains the words "DC USA" as Tenant's ability to identify its location to its customers is an essential component of this Lease without which Tenant would be unable to conduct business in the Premises.

Section 23.24  Counterparts. This instrument may be executed in several counterparts, each of which shall be deemed an original. The signatures to this instrument may be executed and notarized on separate pages, and when attached to this instrument, shall constitute one complete document.

Section 23.25  Waiver of Trial by Jury.  Landlord and Tenant hereby mutually waive any and all rights which either may have to request a jury trial in any proceeding between them at law or in equity.

Section 23.26  Incentives.  Landlord has informed Tenant that there are or may be various incentives pertaining to Enterprise Zones and other incentives that are designed to encourage tenants to locate in the Shopping Center. Landlord agrees to use reasonable efforts to inform Tenant of any such incentive programs that may exist or come into existence for which Tenant may be eligible and to promptly respond to inquiries by Tenant regarding same and to cooperate with Tenant so that Tenant may qualify for all appropriate programs. Landlord makes no assurances or representations that any incentives or other programs will be obtained or granted.

Section 23.27  Hiring.  Tenant acknowledges that the Center was developed as a part of a redevelopment plan. In connection therewith, Tenant agrees to use commercially reasonable efforts to make qualified District of Columbia residents aware of its employment opportunities at the Premises and shall use commercially reasonable efforts to hire those applicants who are District residents and apply for an available position for which they are qualified. In furtherance of the aforementioned goals, Tenant agrees to provide Landlord periodically, and in any event within thirty (30) days of Landlord's written request, with a written report identifying the number of employees that have been hired by Tenant at the Premises and the percentage of such employees that

66

1    have provided Tenant with residence addresses within the District of Columbia.  Tenant
2    further agrees to cooperate with the District of Columbia and to provide it with such
3    reasonable information as may be requested by the City concerning Tenant's hiring of
4    local residents.

5          Section 23.28  Enforcement of Obligations of Others.  To the extent that any
6    obligation in this Lease is an obligation of the Unit Owners Association or another Unit
7    Owner under the Condominium Documents, Landlord shall use diligent and vigorous
8    efforts to enforce such obligations.

9                        [signature page follows]

Section 23.29  Governing Law.  This Lease shall be governed by, construed, and enforced in accordance with the laws of the State in which the Premises are located.

IN WITNESS WHEREOF, the parties have executed this instrument under seal the day and year first-above written.

**LANDLORD:**

DC USA OPERATING CO., LLC

By: _____

Name: _Dan Eisenberg_

Title: _4th Vp_

**TENANT:**

BED BATH & BEYOND INC., a New York corporation

By: _____

Name:  Warren Eisenberg

Title:  Co-Chairman of the Board of Directors

WITNESS:

_____

[SEAL]

ATTEST:

_____

Name: _Alan M. Freeman_

Title: (Assistant) Secretary

[SEAL]

1    Section 23.28 <u>Governing Law</u>. This Lease shall be governed by, construed, and
2    enforced in accordance with the laws of the State in which the Premises are located.

3    IN WITNESS WHEREOF, the parties have executed this instrument under seal
4    the day and year first-above written.

**LANDLORD:**

WITNESS:                                     D.C. USA OPERATING CO., LLC

*Catherine McCloskey*                        By: _____
                                             Name: _Joel F Picket_
[SEAL]                                       Title: _____

**TENANT:**

ATTEST:                                      BED BATH & BEYOND INC., a New
                                             York corporation

_____             By: _____
Name: _____               Name: Warren Eisenberg
Title:  (Assistant) Secretary                Title:   Co-Chairman of the Board of
                                             Directors
[SEAL]

1                                    **INDEX OF EXHIBITS**

2        Exhibit A-1        Legal Description of Land
3        Exhibit A-2        Legal Description of Shopping Center Unit
4        Exhibit A-3        Legal Description of Target Unit
5        Exhibit A-4        Legal Description of Parking Unit
6        Exhibit B          Site Plan
7        Exhibit C          Rent Commencement and Expiration Date Agreement
8        Exhibit D          Specifications for Landlord's Work
9        Exhibit D-1        Exterior Elevations of the Premises, and Sidewalk Plan
10       Exhibit D-2        Exterior Elevations of the Building
11       Exhibit E          Permitted Encumbrances
12       Exhibit F          Signage
13       Exhibit F-1        Permitted Signage Areas
14       Exhibit G          Subordination, Non-Disturbance and Attornment Agreement
15       Exhibit H          Subtenant Recognition Agreement
16       Exhibit I          Delivery Date Notice
17       Exhibit J          Delivery Date Certification
18       Exhibit K-1        Existing Exclusives
19       Exhibit K-2        Existing Leases
20       Exhibit L          Form of Condominium Documents
21       Exhibit M          Prohibited Uses
22       Exhibit N          Rules and Regulations
23       Exhibit O          Intentionally Omitted
24       Exhibit P          Description of Tax abatements and similar items, if any
25       Exhibit Q          Landlord's Sign Criteria
26
27

A-1

1   Exhibit A-1

2   Legal Description of the Land

3   **Lots 719, 720, 812, 832, 863, 866, 869, 870, 871, 872**
4   **And Public Alleys (Closed)**
5   # Square 2674
6   **14th Street, Park Road, Irving Street and Hiatt Place, N.W.**
7   **Ward 1 – ANC 1A**
8   **District of Columbia.**
9
10   All those certain lots or parcels of land situate and lying in the District of Columbia, and more
11   particularly described as follows:
12
13   PARCEL I:
14
15   Lot Seven Hundred Nineteen (719) in the subdivision made by George C. Calder and
16   Frances B. Calder in Square 2674 as per plat recorded in Subdivision Book 154 at page 127 in
17   the Office of the Surveyor of the District of Columbia.
18
19   PARCEL II:
20
21   Lot Seven Hundred Twenty (720) in Square 2674 in the subdivision made by Westminster
22   Investing Corporation as per plat recorded in Liber 155 at folio 76 in the Office of the Surveyor
23   of the District of Columbia.
24
25   PARCEL III:
26
27   Part of Lot numbered Twenty-nine (29) in John Sherman's subdivision of part of a tract of
28   land known as "Pleasant Plains" as per plats recorded respectively in Liber E.C.E. 27, folio 160,
29   among the Land Records of the District of Columbia, and Liber Levy Court Carbery, Folio 2-1/2
30   among the Records of the Office of the Surveyor of the District of Columbia, beginning the same
31   on Park Road and on the north side of said lot and distant 85.15 feet from the northeast corner
32   of said lot, and running thence Southeastwardly along the north line of said lot, 26.85 feet,
33   thence Southwestwardly and at right angle to said north line 53.30 feet; thence
34   Southwestwardly 14.32 feet to the north line of Lot 339 and distant 6.05 feet from the northwest
35   corner of said Lot 339; thence Westwardly along the north line of Lot 339, 6.05 feet to the
36   northwest corner of Lot 339; thence Northwardly, 74.72 to the place of beginning.
37
38   NOTE:  At the date hereof the above described property is designated on the Records of the
39   Assessor for the District of Columbia for assessment and taxation purposes as Lot 812 in
40   Square 2674.
41
42   PARCEL IV:
43
44   All of Lot Five Hundred Twenty-five (525) in Harry K. Bliss' subdivision of part of Lot 29 in
45   John Sherman's subdivision of part of "Mount Pleasant" as per plat of said Bliss' subdivision
46   recorded in Liber County 17 at folio 14 in the Office of the Surveyor of the District of Columbia,
47   AND all of the land lying between the eastern boundary of Lot 525 and the western boundary of
48   Lot 812 in Square 2674.
49
50   NOTE:  At the date hereof the above described property is designated on the Records of the
51   Assessor for the District of Columbia for assessment and taxation purposes as Lot 832 in
52   Square 2674.
53
54   PARCEL V:
55
56   Part of Lot Three Hundred Thirty-two (332) in James F. Barbour's subdivision of part of Lot 25
57   in John Sherman's subdivision of parts of "Mount Pleasant" and "Pleasant Plains", per plat
58   recorded in Liber County 12, folio 140, also part of Lot 406 in Fred Warther's subdivision of part
59   of Lot 25 in John Sherman's subdivision of "Mt. Pleasant", and "Pleasant Plains", per plat
60   recorded in Liber County 14, folio 104, also part of Lot Seven Hundred Six (706) in the
61   combination made by New Arcade Company of lots in John Sherman's subdivision of "Pleasant
62   Plains", per plat recorded in Book 62, page 131, all of said property being described in one
63   parcel as follows:

A-2

BEGINNING on the west line of 14th Street, at the southeast corner of said Lot 332, and thence North along said line of said street, 54.30 feet; thence West and parallel with the north line of said Lot 406 and a prolongation thereof, 193.02 feet; thence South and parallel with said west line of 14th Street, 29.30 feet to the north line of said Lot 332; thence West along said north line of said lot, 6.98 feet; thence South and parallel with said west line of 14th Street, 20 feet to the north line of a public alley; thence East along said line of said alley, 55 feet to an angle therein; thence Southeasterly still along said line of said alley, 20.615 feet to another angle therein; thence East still along said line of said alley, 125 feet to beginning; as shown on plat of survey recorded in Survey Book 155, page 65, as amended January 18, 1950.

NOTE: At the date hereof the above described property is designated on the Records of the Assessor for the District of Columbia for assessment and taxation purposes as Lot 863 in Square 2674.

PARCEL VI:

Part of Lot Twenty-nine (29) in John Sherman's subdivision of part of "Pleasant Plains", per plat recorded in Liber E.C.E. 27, folio 160 among the Land Records of the District of Columbia; BEGINNING at the northeasterly corner of said lot formed by the intersection of the west line of 14th Street with southerly line of Park Road and running thence Northwesterly along the northerly line of said Lot 29 and the southerly line of Park Road, a distance of 58.30 feet; thence Southwesterly and at right angles to the northerly line of said Lot 29 and the easterly line of that part of said Lot 29 conveyed to Cassassa by Deed recorded in Liber 3134 at folio 481, a distance of 53.30 feet; thence Southerly 14.43 (sic) feet to the north line of Lot 339 in Cassassa's subdivision of part of Lot 29 of Sherman's subdivision of Mt. Pleasant, per plat recorded in Liber County 13, folio 21; to a point distant 6.08 feet from the northwest corner of said Lot 339; thence East along the north line of said Lot 339 79.68 feet to the west line of 14th Street at a point distant 30 feet south of the point of beginning; thence North 30 feet to the point of beginning; also Lot 339 in Cassassa's subdivision of part of Lot 29 in Sherman's subdivision of Mt. Pleasant, per plat recorded in Liber County 13, folio 21.

NOTE: At the date hereof the above described property is designated on the Records of the Assessor for the District of Columbia for assessment and taxation purposes as Lot 866 in Square 2674.

PARCEL VII:

Lots One Hundred Ninety (190), One Hundred Ninety-one (191) and One Hundred Ninety-two (192) in Norment's subdivision of parts of Lots 24 and 25 in Sherman's subdivision of part of "Pleasant Plains", per plat recorded in Liber County 11, folio 106.

NOTE: At the date hereof the above described property is designated on the Records of the Assessor for the District of Columbia for assessment and taxation purposes as Lot 869 in Square 2674.

PARCEL VIII:

Part of Lot numbered Twenty-four (24) in John Sherman's subdivision of part of "Pleasant Plains", as shown on plat recorded in Liber E.C.E. 27, folio 160, among the Land Records of the District of Columbia; also part of Lot numbered Six Hundred and Forty (640) in a plat of subdivision by John O. Gheen of certain lots in Sherman's subdivision of "Mount Pleasant" and "Pleasant Plains" recorded in the Office of the Surveyor for the District of Columbia in Liber 40 at folio 14, all being in Square No. 2674 and part of an alley closed being more particularly described as follows: BEGINNING at a point on the north line of Irving Street at the southwest corner of Lot Six Hundred Forty (640) as shown on the aforesaid plat and from the beginning point thus established thence North along the west line of Lot Six Hundred Forty (640) a distance of 125 feet to a point in said line being the southwest corner of Lot One Hundred Ninety-nine (199); thence East with the south line of Lot One Hundred Ninety-nine (199), a distance of 156.36 feet to a point in the west line of an alley; thence with the lines of the alley, South a distance of 21 feet, Southwest a distance of 7.07 feet, West a distance of 66.72 feet and South a distance of 99 feet to a point in the north line of Irving Street; thence with the North line of Irving Street, West a distance of 85 feet to the point of beginning.

AND

A-3

Lots numbered One Hundred Ninety-nine (199), Two Hundred (200) and Two Hundred One (201) and the West 10 feet by a depth of 40 feet (abutting said Lot 201) of Lot numbered Two Hundred Two (202) in Clarence F. Norment's subdivision of parts of "Mount Pleasant" and "Pleasant Plains", as per plat recorded in Liber County 11 at folio 112 of the Records  of the Office of the Surveyor for the District of Columbia.  LESS AND EXCEPT that portion of Lot 202 which was condemned and taken as an alley in District Civil Case #1553 (74-189).

NOTE:  At the date hereof all of the above parcels are described property is designated on the Records of the Assessor for the District of Columbia for assessment and taxation purposes as Lot 870 in Square 2674.

PARCEL IX:

Lots 707, 708 and 709 in Townsend's subdivision of lots in Sherman's subdivision of part of Pleasant Plains, per plat recorded in Book 62, page 184, in Square 2674.

AND

Parts of Lots 17 and 18 and all of Lot 19 in Sherman's subdivision of part of "Pleasant Plains", per plat recorded in Liber E.C.E. 27, folio 160, recorded among the Land Records of the District of Columbia, described as follows:  BEGINNING at the southeast corner of said Lot 19 and running thence West along the north line of Irving Street, 51.50 feet; thence North and parallel with the west line of Lot 19, 98.24 feet; thence North 45 degrees West 10.60 feet; thence West parallel with said north line of Irving Street, 71 feet, thence South parallel with the east line of said lot, 17, 105.74 feet to the north line of said Irving Street; thence West along the north line of said Irving Street 10 feet; thence North and parallel with said east line of said Lot 17, 232 feet; thence Southeasterly on the north lines of said lots 17, 18 and 19, 142.52 feet to the northeast corner of said Lot 19; thence South along the east line of said Lot 19, 205.22 feet to the beginning; being improved by a two story concrete garage building and ramp; TOGETHER WITH the right of way for driveway purposes appurtenant to said garage building, over the following described part of said Lot 17, being a strip 10 feet wide adjoining the ramp of said garage on the east; BEGINNING at a point on the north line of said Irving Street, distant 20 feet from the southeast corner of said Lot 17, and running West along said north line of said Irving Street 10 feet; thence North and parallel with the east line of said Lot 17 and along the east side of said ramp, 105.74 feet to the south wall of said garage on said Lot 17; thence East along said south wall of said garage 10 feet; thence South parallel with said east line of said Lot 17, 105.74 feet to the beginning.

AND

Parts of Lots Seventeen (17) and Eighteen (18) in Sherman's subdivision of part of "Pleasant Plains", per plat recorded in Liber E.C.E. 27, folio 160, recorded among the Land Records of the District of Columbia, described as follows:  BEGINNING at a point on the south line of said Lot 18, 1.50 feet west of the east line of said Lot 18, and running thence West and parallel with the north line of Irving Street, along the south lines of said Lots 17 and 18, 78.50 feet; thence North and parallel with the east line of said Lot 17, 105.74 feet; thence East and parallel with the north line of Irving Street, 71 feet; South 45 degrees East 10.60 feet; thence South and parallel with the east line of Lot 18, 98.24 feet to the beginning.  SUBJECT TO right of way over the west 10 feet of said property for driveway purposes.

NOTE:  At the date hereof all of the above parcels are designated on the Records of the Assessor for the District of Columbia for assessment and taxation purposes as Lot 871 in Square 2674.

PARCEL X:

Lots numbered Six Hundred Forty-one (641) to Six Hundred Forty-six (646), both inclusive, in Hank Schlosberg's subdivision of part of Lot Twenty-four (24) in John Sherman's subdivision of part of the tract of land called "Pleasant Plains", as per plat of said Schlosberg's subdivision recorded in Liber No. 46, folio 148, of the Records of the Office of the Surveyor of the District of Columbia.

AND

Lots numbered Six Hundred Forty-seven (647) and Six Hundred Forty-eight (648) in the subdivision made by Jordan and Company, Incorporated, of part of Lot numbered Twenty-four (24) in John Sherman's subdivision of part of Pleasant Plains", as per plat of said first

A-4

mentioned subdivision recorded in Book 47, page 91 of the Records of the Office of the Surveyor of the District of Columbia.

AND

Lots numbered One Hundred Ninety-six (196) and One Hundred Ninety-seven (197) of Clarence F. Norment's subdivision of parts of Lots numbered Twenty-four (24) and Twenty-five (25) of John Sherman's subdivision of part of "Pleasant Plains", as per plat of said Norment's subdivision recorded in the Office of the Surveyor for the District of Columbia in Liber County 11 at folio 106.

NOTE:  At the date hereof all of the above parcels are designated on the Records of the Assessor for the District of Columbia for assessment and taxation purposes as Lot 872 in Square 2674.

PARCEL XI:

Alleys Closed on plat of "Public Alley Closed Square 2674" recorded April 27, 2005 in Subdivision Book 199 at Page 88 among the Records of the Office of the Surveyor of the District of Columbia and designated as reverting to the owner(s) of Lots 719, 720, 863, 869, 870 and 872.

*      *      *      *      *      *      *      *      *      *      *      *

All of the abovesaid land being more particularly described, as a single consolidated perimeter outline in the meridian of the Office of the Surveyor of the District of Columbia, as follows:

BEGINNING at the southeast corner of Square 2674, being the intersection of the west line of 14th Street, N.W. (80 ft. wide) and the north line of Irving Street, N.W. (50 ft. wide); thence departing 14th Street, N.W. and running with the north line of Irving Street, N.W. and the outline of Square 2674

1)   **SOUTH 85° 28' WEST, 501.72 feet** (per Record) to the southwest corner of Square 2674, being the intersection of the north line of Irving Street, N.W. and the east line of Hiatt Place, N.W. (50 ft. wide); thence departing Irving Street, N.W. and running with said east line of Hiatt Place, N.W., still following the outline of Square 2674

2)   **NORTH 04° 32' WEST, 243.48 feet** (per Record) to the southwest corner of Lot 853 (Bell Multicultural School) in said Square; thence departing Hiatt Place, N.W. and running with the outline of said Lot 853 in Square 2674

3)   **SOUTH 83° 44' 10" EAST, 204.20 feet** (per Record) to the southeast corner of Lot 853; thence running still with said Lot outline

4)   **NORTH 04° 22' WEST, 34.78 feet** (per Record) to the south line of a Public Alley (Closed) in said Square, as set forth in **Subdivision Book 199 at page 88** among the aforesaid Records; thence running with the south line of said Alley (Closed)

5)   **SOUTH 85° 28' WEST, 3.00 feet** (per Record) to the centerline of a second Public Alley (Closed) in said Square, pursuant to the abovesaid plat; thence running with said centerline

6)   **NORTH 04° 22' WEST, 308.97 feet** (per Record) to the south line of a 20 ft. wide Public Alley remaining open in said Square; thence with the south line of said Public Alley

7)   **NORTH 85° 28' EAST, 8.00 feet** (per Record); thence with the east (end) line of said 20 ft. wide Public Alley

8)   **NORTH 04° 22' WEST, 20.00 feet** (per Record) to the northeast corner of said Alley; thence departing said Public Alley and running

9)   **NORTH 85° 38' EAST, 73.19 feet** (per Record) to the southeast corner of Lot 717 in said Square, as shown among the abovesaid Records; thence running with the easterly line of said Lot

10)  **NORTH 26° 19' EAST, 54.75 feet** (per Record) to the southerly line of Park Road, N.W. (width varies), being also the northerly line of Square 2674; thence departing Lot 717

A-5

and running with said southerly line of Park Road, N.W. and with the outline of said Square

11)   **SOUTH 63° 41' EAST, 225.75 feet** (per Record) to the northeast corner of Square 2674, being the intersection of said southerly line of Park Road, N.W. and the previously-mentioned west line of 14th Street, N.W.; thence departing Park Road, N.W. and running with said west line of 14th Street, N.W. and with the east line of Square 2674

12)   **SOUTH 04° 32' EAST, 500.00 feet** (per Record) to the Place of Beginning, containing a **total area of 215,471 Square Feet or 4.94653 Acres** of land (per Record) and **total area of 215,865.66 Square Feet or 4.95559 Acres** of land (per Survey).

1

## Exhibit A-2

2

## Legal Description of Shopping Center Unit

3  This legal description will be set forth in the Condominium Documents when executed
4  and recorded and will be the same, in all material respects, as described in this Lease and
5  shown on Exhibit B.  Upon the finalization of this description and the recording of the
6  Condominium Documents, the description from the Condominium Documents shall be
7  incorporated herein by reference.

1                                           Exhibit A-3

2                                  Legal Description of Target Unit

3        This legal description will be set forth in the Condominium Documents when executed
4        and recorded and will be the same, in all material respects, as described in this Lease and
5        shown on Exhibit B.  Upon the finalization of this description and the recording of the
6        Condominium Documents, the description from the Condominium Documents shall be
7        incorporated herein by reference.

1

## Exhibit A-4

2

## Legal Description of Parking Unit

3     This legal description will be set forth in the Condominium Documents when executed
4 and recorded and will be the same, in all material respects, as described in this Lease and
5 shown on <u>Exhibit B</u>.  Upon the finalization of this description and the recording of the
6 Condominium Documents, the description from the Condominium Documents shall be
7 incorporated herein by reference.

8

9

10
11
12
13

Exhibit B

Site Plan

1   2   3   4

B-1

EXHIBIT B

Sheet 1



* NOTE: Location of Tenant's interior entry and storefront shown is diagrammatic only and is subject to Tenant's final plans.

D.C. USA - Bed Bath & Beyond - Demised Premises Plan



EXHIBIT B
Sheet 2

**Mezzanine Level Plan**

\* NOTE: All measurements shall be made from the midpoint of all demising walls and to the outer face of exterior walls. All ducts, shaft columns, escalators, elevators, egress and convenience stairs located in the Demised Premises shall be included.

# D.C. USA - Bed Bath & Beyond - Demised Premises Plan

EXHIBIT B
Sheet 3



(1) Ground Floor Plan

(3) Detailed Plan

(2) Detailed Plan

SPACE 110

Loading Facilities

* NOTE: All measurements shall be made from the midpoint of all demising walls and to the outer face of exterior walls. All ducts, shaft columns, escalators, elevators, egress and convenience stairs located in the Demised Premises shall be included.

BED BATH & BEYOND EXCLUSIVE FREIGHT ELEVATOR AREA

SHARED LOADING BERTH SHARED WITH SPACE 110 (PER SECTION 23.1 OF LEASE)

TENANT'S TRASH COMPACTOR/COMPACTOR PAD

# D.C. USA - Bed Bath & Beyond - Demised Premises Plan

EXHIBIT B

Sheet 4



TENANT'S EXCLUSIVE
FREIGHT ELEVATOR

170 SQUARE FEET

(2) Detailed Plan

(1) Parking Level P-1

* NOTE: All measurements shall be made from the midpoint of all demising walls and to the outer face of exterior walls. All ducts, shaft columns, escalators, elevation, egress and convenience stairs located in the Demised Premises shall be included.

**D.C. USA - Bed Bath & Beyond - Demised Premises Plan**



TENANT'S EXCLUSIVE
FREIGHT ELEVATOR

170 SQUARE FEET

(2) Detailed Plan

(1) Parking Level P2

* NOTE: All measurements shall be made from the midpoint
of all demising walls and to the outer face of exterior walls.
All ducts, shaft columns, escalators, elevators, egress and
convenience stairs located in the Demised Premises shall
be included.

D.C. USA - Bed Bath & Beyond - Demised Premises Plan



EXHIBIT B
Sheet 6

* NOTE: All measurements shall be made from the midpoint of all demising walls and to the outer face of exterior walls. All ducts, shaft columns, escalators, elevators, egress stairs exclusively serving Tenant and convenience stairs located in the Demised Premises shall be included.

**D.C. USA - Bed Bath & Beyond - 2nd Floor Demised Premises Dimension Plan**



**Ground Floor Plan**

EXHIBIT B

Sheet 8



SECOND FLOOR CONSTRUCTION STAGING AREAS

No construction staging areas

201

204

203

205

202

**Second Floor Plan**

0 5'10'    30'    60'





SECOND FLOOR KIOSK/PROMOTIONAL AREA PLAN

Non-Kiosk Area, Permitted Promotional Area

Kiosks may be located in any area not specifically excluded.

No promotional activity shall restrict access to or visibility of the Bed Bath & Beyond premises.

**Second Floor Plan**

0  5'10'   30'        60'



THIRD FLOOR KIOSK/PROMOTIONAL AREA PLAN

Non-Kiosk Area, Permitted Promotional Area

Kiosks may be located in any area not specifically excluded.

Permitted Promotional Area

301

303

302

SECOND FLOOR ROOF

**Third Floor Plan**

0 5'10'   30'   60'



**Third Floor Plan**



NOTE: LAYOUT, ORIENTATION OF SPACES,
LOCATION OF PARKING EQUIPMENT, & CART
CORRAL NUMBER AND LOCATIONS ARE SUBJECT
TO FINAL COORDINATION. TENANT ACKNOWLEDGES
THAT PLANS ARE PRELIMINARY AND LANDLORD
RESERVES THE RIGHT TO MAKE CHANGES AS
LONG AS THE GARAGE CONTAINS A
TOTAL OF 1,000 PARKING SPACES.

PERMITTED ADVERTISING AREAS:

ALL AREAS INDICATED IN GREEN AND OTHER
AREAS WHERE SUCH ADVERTISING WOULD BE
CUSTOMARILY FOUND IN HIGH-QUALITY
RETAIL PARKING FACILITIES IN THE DISTRICT.

CART CORRALS: CC

**Parking Level P1**



NOTE: LAYOUT, ORIENTATION OF SPACES,
LOCATION OF PARKING EQUIPMENT, & CART
CORRAL NUMBER AND LOCATIONS ARE SUBJECT
TO FINAL COORDINATION.  TENANT ACKNOWLEDGES
THAT PLANS ARE PRELIMINARY AND LANDLORD
RESERVES THE RIGHT TO MAKE CHANGES AS
LONG AS THE GARAGE CONTAINS A
TOTAL OF 1,000 PARKING SPACES.

PERMITTED ADVERTISING AREAS:

ALL AREAS INDICATED IN GREEN AND OTHER
AREAS WHERE SUCH ADVERTISING WOULD BE
CUSTOMARILY FOUND IN HIGH-QUALITY
RETAIL PARKING FACILITIES IN THE DISTRICT.

CART CORRALS: CC

**Parking Level P2**

# EXHIBIT B
## Sheet 15



D.C. USA - Bed Bath & Beyond - Site Plan



**Second Floor Plan**

Sheet 17



THIRD FLOOR PLAN

Health club patio seating area

301

303

302

SECOND FLOOR ROOF

**Third Floor Plan**

0 5'10'   30'   60'

EXHIBIT B
SHEET 18



ROOF PLAN



EXHIBIT B
Sheet 19

202

W30

W30

W30

W30

W33   W40   W40   W40

W40   W40   W40

W30

W33

W30

\* NOTE: Floor-to-floor height is 21'-0".  Beams noted encroach
below 18'0" from finished floor.



0  5'10'    30'         60'

**D.C. USA - Bed Bath & Beyond - 2nd Floor Demised Premises Beam Depth Plan**

<u>Exhibit C</u>

<u>Rent Commencement and Expiration Date Agreement</u>

THIS RENT COMMENCEMENT AND EXPIRATION DATE AGREEMENT, made as of the ____ day of _____, 200___, by and between _____ (*"Landlord"*) and BED BATH & BEYOND INC. (*"Tenant"*).

## W I T N E S S E T H :

WHEREAS, Landlord is the owner of a certain shopping center known as DC USA Shopping Center (the *"Shopping Center"*), situated in Washington, D.C.;

WHEREAS, by that certain lease dated _____, 2003 (the *"Lease"*), Landlord leased a portion (the *"Premises"*) of the Shopping Center to Tenant;

WHEREAS, Tenant is in possession of the Premises and the Term of the Lease has commenced; and

WHEREAS, under Section 2.2 of the Lease, Landlord and Tenant agreed to enter into an agreement setting forth certain information in respect of the Premises and the Lease.

NOW, THEREFORE, Landlord and Tenant agree as follows:

1.    The Rent Commencement Date occurred on _____, 200___.

2.    The **Initial Term** of the Lease shall expire on January 31, 20___, unless Tenant exercises any option to extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

3.    The date of commencement of the **first Renewal Period** shall be February 1, 20___, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 20___, unless Tenant exercises any option to further extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

4.    The date of commencement of the **second Renewal Period** shall be February 1, 20___, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 20___, unless Tenant exercises any option to further extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

5.    The date of commencement of the **third Renewal Period** shall be February 1, 20___, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 20___, unless the Lease terminates earlier as provided in the Lease.

6.    Landlord represents and warrants to Tenant that the reasonable costs incurred by Landlord for Landlord's Work is _____ Dollars ($_____) and Landlord has attached hereto as <u>Exhibit A</u> proof reasonably acceptable to Tenant of such cost.

7.    Capitalized terms used, but not defined, herein shall have the meanings ascribed to them in the Lease.

C-1

1       IN WITNESS WHEREOF, the parties hereto have caused this Rent
2  Commencement and Expiration Date Agreement to be executed the date and year first
3  above written.

**LANDLORD:**

DC USA OPERATING CO., LLC

By:_____
Name:_____
Title:_____

**TENANT:**

BED BATH & BEYOND INC., a New
York corporation

By:_____
Name:  Warren Eisenberg
Title:   Co-Chairman of the Board of
Directors

Exhibit D

Specifications for Landlord's Work

1

2

3
4
5
6

D-1

***DC USA***
***Washington, DC***

**Exhibit D - Standard Landlord's Work**

December 22, 2005

**[All capitalized terms used, but not otherwise defined herein shall have the meanings ascribed to them in the Lease. The terms of the Lease regarding Landlord's Work shall be deemed to supplement the provisions of the Exhibit D, to the extent not inconsistent with the terms of this Exhibit D. It is specifically understood and agreed that all materials and supplies shall be installed in strict accordance with all manufacturers' specifications.]**

<u>**Landlord's Final Plans and Specifications**</u>

Landlord shall provide one (1) complete full size set, one (1) complete ½ size set and one (1) copy of electronic file of the Final Plans and Specifications as well as each subsequent revision to Landlord's Plans for Tenant's use. Landlord shall develop project-specific Final Plans and Specifications in accordance with following documents:

A.    Tenant's Plans consist of the following: FIXTURE PLAN (F1); FLOOR FINISH PLANS, NOTES AND DETAILS (F2); POWER/SPECIALTY LIGHTING PLANS AND NOTES (F3); LIGHTING PLANS AND NOTES (F4); and HIGH PILE STORAGE PLAN (F5).  Tenant's Plans are project-specific design-development documents.  In the event of a conflict between Tenant's Plans and "Tenant's Prototype Drawings and Specifications"(defined below), then Tenant's Plans shall govern and prevail.  Tenant's Plans shall be delivered to Landlord in accordance with Article 3 of the Lease.

B.    <u>Tenant's Prototype Drawings and Specifications</u> entitled "Bed Bath & Beyond Prototype Drawings and Specifications – version 1.2005, dated 03-01-05 developed by Casco Architects, comprise the following drawings and specifications:

At the time the Preliminary Plans are 85% complete, LL shall be obligated to issue Preliminary Plans to Tenant for their review and approval.  If the drawings are not approved or approved "as noted" by Tenant acting reasonably, Landlord shall then revise the drawings and submit them to "BBBY Consultant" for review against "Quality Control Checklist".  The cost to LL for this review is $2500.00 plus reimbursable associated *with printing and shipping.  If Preliminary Plans are "rejected" or noted "revise and resubmit" by the BBBY* consultant then LL shall be obligated for all expenses related to these subsequent reviews until Preliminary Plans are deemed approved.  Project specific BBBY consultants to be determined by BBBY post lease execution.  If LL fails to pay consultant, then Tenant shall have the right to receive a credit against "Changes" under the lease or deduct amount from Rent in order to satisfy outstanding invoice.

All site specific plans and specifications developed by Landlord and submitted to Tenant for review and approval must be in the same Format as Tenant's Prototypical Plans and Specifications as outlined within Item C. below of this Exhibit unless otherwise authorized in writing by Tenant.

Tenant shall not be obligated to review nor approve improperly formatted Landlord's Plans and/or specifications, nor shall said submission be deemed to be in compliance with Section 3.2 "Plan Approvals" of the Lease, unless said Format is complied with.

Tenant reserves the right to immediately disapprove and return improperly formatted plans to the Landlord and the Landlord shall be solely responsible for all costs and/or delays relating to revising/correcting and resubmitting the plans and/or specifications to Tenant for re-review and approval.

C.

| SHEET # | DRAWING TITLE | CURRENT ISSUE | DRAWING DATE |
|---|---|---|---|
| A0.1 | Code Data, Project Data and Responsibility Schedule | Prototype Version 1.2005 | 03/01/05 |
| A2.1 | Store Fixture/Egress Path  Plan & Notes | Prototype Version 1.2005 | 03/01/05 |
| A2.2 | Floor Plan | Prototype Version 1.2005 | 03/01/05 |
| A2.3 | Floor Finish Plan . | Prototype Version 1.2005 | 03/01/05 |
| A2.4 | Reflected Ceiling Plans & Notes | Prototype Version 1.2005 | 03/01/05 |
| A2.5 | Roof Plan Details & Notes | Prototype Version 1.2005 | 03/01/05 |
| A3.1 | Finish Schedule, Storefront Types & Vestibule Elevations | Prototype Version 1.2005 | 03/01/05 |
| A3.2 | Door Hardware, Door Schedule & Door Types | Prototype Version 1.2005 | 03/01/05 |
| A3.3 | BBB National Account Vendors & Specified Manufactures w/Distribution Schedule | Prototype Version 1.2005 | 03/01/05 |
| A5.1 | Building Sections, Interior Wall Sections | Prototype Version 1.2005 | 03/01/05 |
| A5.5 | Interior Wall Sections | Prototype Version 1.2005 | 03/01/05 |
| A5.6 | *Alternate* Scissor Lift Plan, Section, Specification & Notes | Prototype Version 1.2005 | 03/01/05 |
| A6.2 | Interior & Exterior Details | Prototype Version 1.2005 | 03/01/05 |
| A6.3 | Slatwall Details at Storefront | Prototype Version 1.2005 | 03/01/05 |
| A7.1 | Large Scale Plans & Partition Types | Prototype Version 1.2005 | 03/01/05 |
| A7.2 | Large Scale Plans & Partition Types | Prototype Version 1.2005 | 03/01/05 |
| A7.2a | *Alternate* Large Scale Plans & Partition Types (38k SF Building) | Prototype Version 1.2005 | 03/01/05 |



1

| | | | |
|---|---|---|---|
| A8.1 | Interior Details | Prototype Version 1.2005 | 03/01/05 |
| A8.2 | Interior Details | Prototype Version 1.2005 | 03/01/05 |
| A8.3 | Customer Service Desk | Prototype Version 1.2005 | 03/01/05 |
| A8.4 | Register Bays | Prototype Version 1.2005 | 03/01/05 |
| A8.5 | Remote Service Desks | Prototype Version 1.2005 | 03/01/05 |
| A9.1 | Interior Elevations | Prototype Version 1.2005 | 03/01/05 |
| A9.1a | *Alternate* Interior Elevations (38K SF Building) | Prototype Version 1.2005 | 03/01/05 |
| A9.2 | *Alternate* Elevations & Details | Prototype Version 1.2005 | 03/01/05 |
| A9.3 | *Alternate* Plans, Elevations & Details | Prototype Version 1.2005 | 03/01/05 |
| A9.4 | FTG Fixture Plan & Vendor Responsibility Schedule | Prototype Version 1.2005 | 03/01/05 |
| A9.4a | *Alternate* FTG Fixture Plan & Vendor Responsibility Schedule (Corner) | Prototype Version 1.2005 | 03/01/05 |
| A9.4b | *Alternate* FTG Fixture Plan & Vendor Responsibility Schedule (Freestanding w/o Bulkhead) | Prototype Version 1.2005 | 03/01/05 |
| A9.5 | FTG Plans, Wall Sections & Details | Prototype Version 1.2005 | 03/01/05 |
| A9.5a | *Alternate* FTG Plans, Wall Sections & Details (Corner) | Prototype Version 1.2005 | 03/01/05 |
| HP1.1 | High Pile Storage Plan & Fixture-Shelf Details | Prototype Version 1.2005 | 03/01/05 |
| P1.1 | Plumbing Riser Diagrams and Fixture Schedule | Prototype Version 1.2005 | 03/01/05 |
| P2.1 | Plumbing Floor Plan | Prototype Version 1.2005 | 03/01/05 |
| P3.1 | Plumbing Enlarged Plans & Details | Prototype Version 1.2005 | 03/01/05 |
| FP1.0 | Fire Sprinkler Plans, Notes & Details | Prototype Version 1.2005 | 03/01/05 |
| FA1.0a | Base System Fire Alarm Plans, Notes & Details | Prototype Version 1.2005 | 03/01/05 |
| FA1.1a | Base System Misc. Notes & Details | Prototype Version 1.2005 | 03/01/05 |
| FA1.2a | Base System Fire Alarm Matrix & Calcs | Prototype Version 1.2005 | 03/01/05 |
| FA1.0b | *Alternate* Fire Alarm Plans w/Occupant Notification Alarm | Prototype Version 1.2005 | 03/01/05 |
| FA1.1b | *Alternate* Fire Plans w/Occupant Notification Notes & Details | Prototype Version 1.2005 | 03/01/05 |
| FA1.2b | *Alternate* Fire Alarm Plans w/Occupant Notification Matrix & Calcs | Prototype Version 1.2005 | 03/01/05 |
| FA1.0c | *Alternate* Fire Alarm Plans w/Smoke Detection | Prototype Version 1.2005 | 03/01/05 |
| FA1.1c | *Alternate* Fire Alarm Plans w/Smoke Detection Notes & Details | Prototype Version 1.2005 | 03/01/05 |
| FA1.2c | *Alternate* Fire Alarm Plans w/Smoke Detection Matrix & Calcs | Prototype Version 1.2005 | 03/01/05 |
| M1.1 | Mechanical General Information | Prototype Version 1.2005 | 03/01/05 |
| M2.1 | Mechanical Floor Plan | Prototype Version 1.2005 | 03/01/05 |
| M3.1 | Mechanical Large Scale Plans & Details | Prototype Version 1.2005 | 03/01/05 |
| M4.1 | Mechanical Schedules & Details | Prototype Version 1.2005 | 03/01/05 |
| E1.1 | Electrical General Information & Schedules | Prototype Version 1.2005 | 03/01/05 |
| E2.1 | Power Plan | Prototype Version 1.2005 | 03/01/05 |
| E2.2 | Lighting Layout Plan | Prototype Version 1.2005 | 03/01/05 |
| E2.3 | Lighting Circuiting Plan | Prototype Version 1.2005 | 03/01/05 |
| E2.4 | Specialty Lighting Plans & Diagrams | Prototype Version 1.2005 | 03/01/05 |
| E3.1 | Electrical Large Scale Plans & Details | Prototype Version 1.2005 | 03/01/05 |
| E3.2 | Lighting Sequencing | Prototype Version 1.2005 | 03/01/05 |
| E3.3 | Electrical Details | Prototype Version 1.2005 | 03/01/05 |
| E4.1 | Electrical Schedules | Prototype Version 1.2005 | 03/01/05 |
| E4.2 | Electrical Diagrams | Prototype Version 1.2005 | 03/01/05 |
| E4.3 | Electrical Schedules | Prototype Version 1.2005 | 03/01/05 |
| E4.4 | Novar Wiring Details | Prototype Version 1.2005 | 03/01/05 |
| E4.4a | *Alternate* Novar Wiring Details for RTU's Other Than Lennox | Prototype Version 1.2005 | 03/01/05 |
| E4.5 | ETM Details for Lennox RTU's | Prototype Version 1.2005 | 03/01/05 |
| E4.5a | *Alternate* ETM Wiring Details For Non-Lennox RTU's | Prototype Version 1.2005 | 03/01/05 |
| E5.1 | FTG Power, Lighting & Specialty Lighting | Prototype Version 1.2005 | 03/01/05 |
| E5.1a | *Alternate* FTG Power, Lighting Specialty Lighting (Corner) | Prototype Version 1.2005 | 03/01/05 |
| E5.1b | *Alternate* FTG Power, Lighting, Specialty Lighting (Freestanding w/o Bulkhead) | Prototype Version 1.2005 | 03/01/05 |
| E6.1 | *Bid Alternate*: Modular Wiring (Data Only) Plans & Details | Prototype Version 1.2005 | 03/01/05 |

The following  drawings are not applicable:

2

| A1.1 | Site Details | Prototype Version 1.2005 | 03/01/05 |
| A0.2 | Generic Site Requirements Plan | Prototype Version 1.2005 | 03/01/05 |
| A1.2 | Demolition Plan | Prototype Version 1.2005 | 03/01/05 |
| A4.1 | Exterior Elevations | Prototype Version 1.2005 | 03/01/05 |
| A5.3 | Exterior Wall Sections | Prototype Version 1.2005 | 03/01/05 |
| A5.4 | Exterior Wall Sections | Prototype Version 1.2005 | 03/01/05 |
| A5.2 | Exterior Wall Sections | Prototype Version 1.2005 | 03/01/05 |
| A6.1 | Exterior Details | Prototype Version 1.2005 | 03/01/05 |
| A.9.6 | *Alternate* Awning Details | Prototype Version 1.2005 | 03/01/05 |
| A9.7 | *Alternate* Awning Details | Prototype Version 1.2005 | 03/01/05 |
| A9.8 | *Alternate* Wall Sections at Awning | Prototype Version 1.2005 | 03/01/05 |
| S2.1 | Foundation Plan | Prototype Version 1.2005 | 03/01/05 |
| S2.2 | Roof Framing Plan | Prototype Version 1.2005 | 03/01/05 |
| S3.1 | Foundation Details | Prototype Version 1.2005 | 03/01/05 |
| S3.2 | Roof Framing Details | Prototype Version 1.2005 | 03/01/05 |
| S1.1 | Structural General Information & Typical Details | Prototype Version 1.2005 | 03/01/05 |

Project Manual for Bed Bath & Beyond, dated March 01, 2005, as adjusted per the Bed Bath & Beyond Prototype Specification chart, dated November 22, 2005 which is attached as part of this exhibit

D.       Neither Tenant's Plans nor Tenant's Prototype Drawings and Specifications reflect regional or governmental requirements. Such regional/governmental requirements may include but not limited to the following: Stockroom/Sales Area partition between sales area and stockroom may be required including all openings through the partition be properly protected; Disability access to mezzanine level such as an ADA lift, limited use/limited application elevator, or elevator may be required including installation of phone lines to cab; The number of restroom fixtures, number of exit stairs, smoke purge and pressurization system, smoke/heat vents, draft curtains, fire rated walls, ceiling or floors required to meet high pile storage requirements, etc. may need to be modified to comply with all applicable Legal Requirements.

In addition, Landlord shall include the following items as part of the Final Plans and Specifications or has provided them as part of the this exhibit:

1.   All architectural elevations and construction details and directional signage located throughout the Shopping Center.

2.   Complete civil engineering documents that describe planned improvements to the Shopping Center, including geo-technical and stormwater design reports.

3.   The Landlord's Base Building Work will be in substantial conformance with the drawings prepared by Bower Lewis Thrower Architects and their consultants (drawing list attached as part of this exhibit). The Landlord's Base Building Work's components and its workmanship will be in conformance with District of Columbia construction industry standard practices for similar type buildings.

### Site Specifications

A.       All parking areas and traffic drives in the Shopping Center shall be as per base building standard and DC Department of Transportation regulations.

B.       All truck access drives in the Shopping Center shall be as per base building standard and DC Department of Transportation regulations.

C.       All truck ramps and dumpster pads shall be as per base building standard and DC Department of Transportation regulations.

If Landlord's geo-technical report for the Shopping Center recommends more stringent requirements, then the geo-technical report recommendations shall supersede the criteria stated in items A, B, and C above.

D.       The minimum lighting level throughout the Shopping Center (parking areas, traffic drives, service drives, etc.) shall be at least three (3) foot-candles, measured 30" above parking surface. Landlord shall include a photometric plan, which shall confirm that the proposed lighting meets these requirements as part of the Final Plans and Specifications. Landlord shall not include illumination from building-mounted wall packs when calculating the required foot-candle level. Landlord shall provide low level security lighting min. (1) foot-candle throughout interior common areas of the center that shall remain illuminated from dusk to dawn seven days a week.

### Building Requirements

The following describes project-specific elements of Landlord's Work in addition to the scope detailed in Tenant's Prototype Drawings and Specifications:

A.       Clear Height - Building systems (plumbing & electrical) shall be designed to allow Tenant to stock merchandise up to at least 16'-6" a.f.f. All plumbing and electrical elements shall be located at least 16'-6'' a.f.f., except for Tenant's light fixtures. Mechanical shall be designed at a minimum of 17'-6" a.f.f. to bottom

3

of duct. Fire protection sprinkler piping (main and branch lines) shall be located at least 16'-6" a.f.f., sprinkler heads shall be located within 1" minimum and 6" maximum from the roof/floor deck.

B.    Fire Alarm System - Landlord shall furnish and install a fire alarm system in accordance with the minimum base standards set forth in Tenant's Prototypical Plans and Specifications, or more stringent requirements as may be required by law.   The system will be a subsystem to the Base Building fire alarm system if allowed by the District of Columbia.  Landlord shall be responsible for monitoring the fire alarm system up to 90 days after the Delivery Date.

If Landlord does not retain CCI to design the fire alarm system, Landlord shall issue complete fire alarm system submittal consisting of site specific drawings and equipment cut sheets to CCI for their review and approval no later than (12) weeks prior to projected delivery date.  The fixed cost to LL for this initial review is $550.00 plus reimbursables associated with printing and shipping.  If subsequent reviews are required by CCI due to initial rejection, then fixed cost to LL for subsequent reviews shall be on a time and material basis.  The hourly rate for these subsequent reviews shall be $125.00/hour plus reimbursables associated with printing and shipping.

Mr. Will Smith
Code Consultants, INC.
Work:          (314) 991-2633
Fax:           (314) 991-4614
1804 Borman Circle Drive
St. Louis, Missouri 63146-4136

C.    1st Level Structure (sales/non-sales level) - Landlord shall provide a minimum 4000 psi concrete floor slab having a minimum thickness of 4".  Structural system shall be rated to accept 125 lb. per square foot of live load. If rebar or pretensioned or post-tensioned steel is required, it shall not be placed within the top 2 ½" of the concrete slab.

D.    Sprinkler System - The sprinkler system shall be designed to allow fixturing and storage to be within 18" of heads.  System shall comply with NFPA 231-C and or NFPA13, (high-rack storage) for class IV commodity solid shelves, minimum 4 foot aisles.  Typically, .486 GPM over 2000 sf will be required.

E.    Landlord shall provide sprinkler system sufficient to meet the requirements specified within Tenant's Prototype Drawings and Specifications without utilizing a fire pump if existing water pressure allows.  If water pressure is inadequate and system cannot be designed to properly function without incorporating a fire pump, then Landlord shall locate Fire Pump outside of Premises.  Landlord shall maintain Fire Pump for the full term of the Lease without any cost to Tenant. Landlord shall, without any cost to Tenant and for the full term of the Lease, routinely inspect, test, and maintain the Fire Pump in accordance with NFPA 25, Standard for the Inspection, Testing, and Maintenance of Water-based Fire Protection Systems (Chapter 5 of 1998 Edition).

F.    If Landlord does not retain CCI to design the fire protection system,  Landlord shall issue complete fire protection submittal consisting of site specific head locations, hydraulic calculations and equipment cut sheets to CCI for their review and approval no later than (12) weeks prior to projected delivery date. The fixed cost to LL for this initial review is $550.00 plus reimbursables associated with printing and shipping.  If subsequent reviews are required by CCI due to initial rejection, then fixed cost to LL for subsequent reviews shall be on a time and material basis.  The hourly rate for these subsequent reviews shall be $125.00/hour plus reimbursables associated with printing and shipping.

If BBBY national fire protection consultants are needed to assist LL with approvals from governmental authorities such as completing technical discussions with governmental authorities to explain/clarify design parameters, calculations, high pile storage commodity classifications, fire pump design, etc., then LL shall directly pay consultant for all time and materials. If LL fails to pay consultant, then Tenant shall have the right to receive a credit against "Changes" under the lease or deduct amount from Rent in order to satisfy outstanding invoice.

Mr. Will Smith
Code Consultants, INC.
Work:          (314) 991-2633
Fax:           (314) 991-4614
1804 Borman Circle Drive
St. Louis, Missouri 63146-4136

G.    Building standard spray-on fireproofing will be provided.  All edges of application shall be neat, clean and straight.  All edges of material to be parallel to structural element being treated.

H.    If applicable, Landlord shall complete and make operational all vertical transportation equipment (passenger and freight elevators and common escalators (as shown on Exhibit B)) a minimum of (2) two weeks in advance of Delivery.  Landlord shall continuously operate such equipment in accordance with manufacturers recommendations during this (2) week period in order to allow equipment to properly "Burn-In". "Burn-In" required in order to identify and repair any potential mechanical deficiencies that may exist with the equipment prior to Delivery.

I.    Common Lobby Entry -  The Landlord will construct a common lobby entry ("Lobby") that will be used as an entrance by Best Buy; Bed, Bath & Beyond; Washington Sports Clubs; Target and other tenants. The systems, finishes and material used in the Lobby shall be determined by the Landlord at its sole discretion except for the wall separating the Demised Premises from the Lobby.  On that wall, Tenant shall have right to locate their entry door and provide signage and/or theming, subject to the Landlord's reasonable approval that the Tenant's proposed design is consistent with a high-quality retail facility and conforms to the level and scope of work provided in this Exhibit and in compliance with applicable codes and regulations.   The Landlord will provide four pairs of building standard entrance doors at the Ground Floor Lobby. The Landlord will provide two fully operational, code and ADA compliant escalators in the Lobby that will run from the

4

Ground to Second Floor (one up/one down). The escalators will come with standard finishes selected by the Landlord at its sole discretion. The Landlord will provide four fully operational and code and ADA compliant elevators in the Lobby. The elevators will connect the two parking levels with the three retail levels. The Landlord will provide one set of stairs in the Lobby connecting the Second and Third floors.

J. Utility Metering – The Tenant will be directly metered with the appropriate utility for electricity and gas service. Meter locations will be per utility requirements. The Landlord will install a water meter to measure Tenant's water consumption. The cost of furnishing and installing the water meter will be split 50/50 between the Tenant and Landlord.

K. Access to Tenant's loading dock on Ground Floor (as shown on Exhibit B) -Landlord shall provide a 6,000 lb. capacity freight elevator for Tenant's exclusive use extending from the lower parking level P-2 to the Second Floor. in accordance with applicable Legal Requirements. The elevator will be based on the Schindler Elevator Corporation prototype provided in the Bed Bath prototype Version 1.2004. Alternative manufacturers may be used as long as they are in substantial conformance with the above referenced Schindler prototype. The elevator platform shall be a minimum of 10'-4" X 12'-0". The elevator door shall be a minimum of 8'w. X 8'h. and shall be electronically operated. The elevator will be equipped with key controls to limit accessibility to Tenant. In the event this elevator is required to be ADA compliant, the elevator shall be a Schindler (or similar elevator by another manufacturer) 6,000 lb. freight/service elevator. If the modified plan varies significantly from Tenant's Plans, then Landlord shall review such modified plan with Tenant prior to formally submitting Preliminary Plans to Tenant.  If the freight elevator is not inspected and signed off for public use at the time of Delivery Date then, Landlord shall provide freight elevator services throughout the fixture installation and merchandising periods at no cost to tenant associated with but not limited to maintenance and operators as deemed necessary to provide uninterrupted service.

L. Second Level Structure (Office Mezzanine or Second-Level Structure)- Landlord shall provide a minimum 3000 psi concrete floor slab having a minimum thickness of 4".  If rebar or pretensioned or post-tensioned steel is required, it shall not be placed within the top 2 ½" of the concrete slab.

M. Landlord shall install security panic door hardware in all service and/or egress stairs serving the Shopping Center which connect to Tenant's Demised Premises. Such hardware shall prevent other tenants from having access to the Demised Premises from any of these stairs. Final hardware details to be approved by Tenant.

### Construction Coordination Requirements

A. Landlord shall provide Tenant with a critical path schedule prior to commencement of Landlord's Work, and shall provide to Tenant's construction project manager an updated critical path schedule every two weeks thereafter until Landlord's Work is completed

B. Throughout the period during which Landlord's Work is being performed, Landlord shall provide to Tenant's construction project manager, on a weekly basis, then-current photographs of the interior and exterior of the Premises, and the Shopping Center site, showing the progression of Landlord's Work. All photographs shall be in a digital format, and transmitted to Tenant at e-mail address at **BBB.2000photos@bedbath.com**

C. The Tenant will not be allowed to store outside of the Demised Premises any item including material, *equipment, rubbish, dumpsters, trailers, shanties or other items needed to construct the Tenant's work* unless approved in advance by Landlord. Landlord will provide an area to stage 2-3 open top containers during fixturing and merchandising.

D. Tenant must use Tenant's shared loading dock and freight elevator to make all deliveries to the Demised Premises. The Lobby will not be able to used for Tenant deliveries.

E. There will be no on-site parking of cars and trucks during construction except during the actual loading or unloading of trucks. There will be no Tenant contractor identification signs allowed on site without the Landlord's prior approval.

### Building and Site Signs

A. Tenant shall provide signage as per Article 7 and Exhibit F of the Lease. Landlord to provide electric to Tenant signs and make final electrical sign connections. Landlord is responsible to verify actual number of circuits required with Tenant's specified vendor. Conduit to be installed continuously from Tenant's panel in Premises to sign location (s).

### Permits and Approvals

A. If Tenant provides information to Landlord for inclusion on Landlord's drawings that are submitted for a building permit, Landlord will file and obtain permits required to allow Tenant to fixture, merchandise (including without limitation permits for it's for prepackaged foods), and open for business to the public in the Premises. Landlord will advise Tenant if any information is required other than what is shown on Tenant's plans. Tenant will provide information required for permit submissions in a timely manner.

If Seismic calculations, plans and details are required, then Landlord shall be obligated to contract with "Seizmic Inc." no later than (12) weeks prior to delivery. Seizmic Inc. shall provide the necessary services to assist Landlord in securing the fixture permit. These services include completion of all required submittal documents, required applications, responses to inquiries from the authority having jurisdiction and monitoring status of permit. Actual submission of the required documents to the AHJ shall be made only by Seizmic, Inc., or other vendor selected at Tenant's discretion.

5

Seizmic Inc.
Contact: Sal Fateen or Genie Fateen
161 Atlantic Street, Pomona, CA 91768
Ph. # 909 869 0989

Landlord shall be obligated to take possession of Fixture permit and transfer permit to Tenant's fixture Installer. If fixture permit is required, then Landlord shall secure fixture permit no later than (2) weeks prior to delivery date.

B.     Sprinkler system design shall allow Landlord to obtain and secure "high pile storage" permit.

### Construction Closeout

A.     Landlord shall be obligated to forward (1) hard copy of all required documents outlined with Section 01700 – Contract Closeouts, of Tenant's Prototype Specifications / Project Manual to **Digital Reliance Incorporated (DRI), 386 Charmel Place, Columbus, OH 43235, (614) 430-5950, jg@digital-reliance.com,** for purpose of scanning to disk for Tenant's future use. All documents shall be delivered to DRI within thirty (30) days after the "Substantial Completion Date. The cost associated with this service is $500.00. All costs associated with this service shall be Landlord's responsibility.

Prior to scanning, DRI will confirm submittal from Landlord meets base minimum requirements and shall inform Landlord directly if certain documents are missing. DRI will not review items for content. The content will be reviewed once electronic file has been received by Tenant's Construction Project Manager. Any need for resubmittal due to incorrect content, etc. will be communicated to Landlord from Tenant's Construction Project Manager. Landlord to resubmit amended document to DRI for scanning and incorporation into file until approved by Tenant's Construction Project Manager.

Once Electronic file has been completed, It shall be forwarded directly to Tenant's Construction Project Manager with transmittal copy to Landlord within sixty (60) days after the "Substantial Completion Date".

B.     Landlord shall cause its contractor(s) to instruct Tenant's Construction Project Manager in the operation of any equipment installed pursuant to these specifications. All of Landlord's Work shall be performed in a manner which will not void, impair or diminish any manufacturers', installers', or contractors' warranties which otherwise would have been provided by such manufacturer, installer, or contractor to either Landlord or Tenant. Two (2) months prior to the end of the warranty period, Landlord must forward a written report to Tenant on the condition of all warranty items.

C.     If Landlord fails to deliver any of the instruments and items (collectively, the "Close-out Documents") described in the immediately preceding paragraph A within the prescribed thirty (60) day period, then Tenant may provide Landlord with notice of such failure. If Landlord has not remedied such failure within fifteen (15) days after Tenant's delivery of such notice, then Tenant shall be entitled to an abatement in Rent in the amount of One Hundred ($100.00) dollars for each day that Landlord has not so delivered all of the Close-out Documents.

**DC USA**
**Bed Bath & Beyond Prototype Specifications Clarifications**
December 14, 2005

The Landlord's Tenant work will be in substantial conformance with the Bed Bath & Beyond's Prototype drawings and specifications as listed in this Exhibit. The prototype drawings will be modified to reflect the unique layout of the Demised Premises and Bed Bath & Beyond's interior location on the second floor. The modifications to the specifications include the following:

| Spec. Section | Description | Comments |
|---|---|---|
| 2060 | Demolition Work | Not Applicable |
| 2200 | Earthwork | Base Building Standard |
| 2220 | Trenching | Base Building Standard |
| 2510 | Asphalt Paving | Base Building Standard/DC DOT Standards |
| 2515 | Asphalt Paving Repairs & Seal Coat | Base Building Standard/DC DOT Standards |
| 2520 | Concrete Paving | Base Building Standard |
| 2710 | Foundation Dampproofing | Base Building Standard |
| 2715 | Foundation Waterproofing | Base Building Standard |
| 2810 | Irrigation System | Base Building Standard |
| 2950 | Landscaping | Base Building Standard |
| 2990 | Miscellaneous Sitework Specialties | Base Building Standard |
| 3300 | Cast-in-Place Concrete | Base Building Standard |
| 4250 | Mechanically Support Brick Veneer | Base Building Standard |
| 4420 | Concrete Masonry Units | Base Building Standard |
| 5120 | Structural Steel | Base Building Standard |
| 5200 | Metal Joists | Base Building Standard |
| 5300 | Metal Decking | Base Building Standard |
| 5400 | Cold Formed Metal Framing | Base Building Standard |
| 5500 | Metal Fabrications | Base Building Standard for Base Building Items/Prototype For Other |
| 7210 | Exterior Building Insulation | Base Building Standard |
| 7220 | Pressure-Injected Masonry Insulation | Not Applicable |
| 7240 | Water Managed EISF | Not Applicable |
| 7510 | Single-Ply Membrane Roofing System | Base Building Standard |
| 7600 | Metal Wall/Soffit Panels | Not Applicable |
| 7720 | Roof Accessories | Base Building Standard |
| 7920 | Sealants & Caulking | Base Building Standard |
| 8100 | Metal Doors & Frames | Base Building Standard for Egress Doors/Prototype for Other |
| 8300 | Sectional Overhead Doors at Receiving | Base Building Standard. Sized to Allow 55' Vehicles per DC Code |
| 8300 | Surface Mounted Access Door at Ext. Soffit | Not Applicable |
| 8410 | Aluminum Storefront | Base Building Standard for Exterior Façade |
| 9310 | Exterior Wall Tile | Not Applicable |
| 9860 | Exterior Masonry Coatings | Not Applicable |
| 10300 | Dock Bumpers & Truck Approach | Bed Bath Prototype or Approved Equal |
| 10300 | Dock Hoods & Hoods | Bed Bath Prototype or Approved Equal |
| 10300 | Dock Leveler | Bed Bath Prototype or Approved Equal |
| 10300 | Dock Light | Bed Bath Prototype or Approved Equal |
| 10300 | Dock Seal | Bed Bath Prototype or Approved Equal |
| 10400 | Pylon Signage | Not Applicable |
| 15255 | Seismic Restraints | Base Building Standard/Washington DC Code |
| | | |

Based on Bed, Bath, & Beyond Prototype Drawings, Version 1.2005

Exhibit D-1

Exterior Elevations of Premises and Sidewalk Plan

1

2

3
4
5
6
7
8

D-1-1





EXHIBIT D-1
Sheet 2



137'-1 1/2"

Bed Bath & Beyond Premises

Exterior wall behind which the Bed Bath & Beyond premises sits

No alteration of this wall shall be permitted without Landlord's approval which can be withheld in its sole and absolute discretion.

See Exhibit F-1 for permitted signage on this portion of the exterior wall and Exhibit F for tenant signage.

EXTERIOR ELEVATION OF THE PREMISES - 14TH STREET

EXHIBIT D-1
Sheet 3



258'-8 1/8"

Bed Bath & Beyond Premises

Exterior wall behind which the Bed Bath & Beyond premises sits

No alteration of this wall shall be permitted without Landlord's approval which can be withheld in its sole and absolute discretion.

See Exhibit F-1 for permitted signage on this portion of the exterior wall and Exhibit F for tenant signage.

EXTERIOR ELEVATION OF THE PREMISES - IRVING STREET

EXHIBIT D-1
Sheet 4



Exhibit D-2
Exterior Elevations



14th Street

J.B.
1-23-06

Exhibit D-2
Exterior Elevations



Park Road



Irving Street

Exhibit E

Permitted Encumbrances

1.      Right of way for alley purposes created in Agreement dated February 29, 1924 and recorded March 10, 1924 in Liber 5178 at folio 114, and referenced in Deed recorded April 5, 1963 as Instrument No. 10420. [already recorded]

2.      The rights, if any, of the owner of Lot 717 in Square 2674 in and to the land lying between the common property lines between Lots 717 and 720 and the fence lying to the east and south of said common lines.

3.      The rights, if any, of the public in and to that portion of the land lying between the west boundary line of former Lot 720 in Square 2674 where it adjoins a 20.0' public alley and the chain-link fence lying inside said west line.

4.      The matters set forth in the Deed of the Land from RLA Revitalization Corporation to Landlord [to be recorded prior to Tenant's memorandum of Lease].

5.      Deed of Trust and Indemnity Deed of Trust to be granted to Citicorp USA, Inc. or its affiliates in connection with the acquisition of the Land and construction of the Condominium, together with all ancillary documents further securing or relating to the loans secured by the Deeds of Trust, including but not limited to a Mortgagee Non-Disturbance Agreement executed by National Capital Revitalization Corporation and Citicorp USA, Inc. or its affiliates, and a Mortgagee Agreement or similar document executed by and between RLA Revitalization Corporation and Citicorp USA, Inc. or its affiliates [to be recorded prior to Tenant's memorandum of lease].

The interests in this item 5 shall be subject to Section 17.3 of this Lease.

6.      Easements, covenants and similar items granted in connection with the construction and operation of the Condominium to utilities to provide service to the Condominium or to the District of Columbia or its instrumentalities in connection with stormwater management and similar items.

7.      Those encroachments and other matters disclosed by that certain ALTA/ACSM Land Title Survey dated November 15, 2005 and made by A. Morton Thomas and Associates, Inc., Consulting Engineers, Sheet C-1, A.M.T File No. 93-079.07, including but not limited to: (A) buried H beams 2 feet to 5 feet on the Property appearing to be sheeting and shoring from Metro construction, (B) overhead utility wires, (C) drains, (D) encroachment of electric box appurtenant to Lot 717 in Square 2674 into the Property, (E) gas test vent, (F) steel hatch, (G) Metro monument, and (H) utility lines; (viii) unrecorded easements for utilities and/or pipelines in public alley closes per plat recorded in Book 199 at page 88 among the records of the Office of the Surveyor of the District of Columbia, e.g. PEPCO vaults, electric manholes, electric lines, 10 foot sewer line and sanitary manhole.

8.      Land Disposition and Development Agreement dated January 17, 2003, as amended October 31, 2005 by and between RLA Revitalization Corporation, successor by statute to District of Columbia Redevelopment Land Agency, as seller [to be recorded prior to Tenant's memorandum of lease].

E-1

9.     Memorandum of Unit Purchase Agreement with National Capital Revitalization Corporation relating to the Parking Unit [to be recorded prior to Tenant's memorandum of lease].

The inclusion of the foregoing memorandum of unit purchase agreement within these "Permitted Encumbrances" is for informational purposes only, and shall not be deemed to diminish any of Tenant's rights, or increase any of Tenant's obligations, under this Lease.

10.     Memorandum of Target Purchase Agreement [to be recorded prior to Tenant's memorandum of lease].

The inclusion of the foregoing memorandum of Target Purchase Agreement within these "Permitted Encumbrances" is for informational purposes only, and shall not be deemed to diminish any of Tenant's rights, or increase any of Tenant's obligations, under this Lease.

11.     Certain subordination, non-disturbance and attornment agreements executed between Citicorp USA, Inc. or its affiliates, Landlord and other tenants.

The inclusion of the foregoing subordination, non-disturbance and attornment agreements within these "Permitted Encumbrances" is for informational purposes only, and shall not be deemed to diminish any of Tenant's rights, or increase any of Tenant's obligations, under this Lease.

12.     Certain memorandums of leases executed between Landlord and other tenants affecting premises other than the Premises.

The inclusion of the foregoing memorandum of leases within these "Permitted Encumbrances" is for informational purposes only, and shall not be deemed to diminish any of Tenant's rights, or increase any of Tenant's obligations, under this Lease.

13.     The Subordination, Non-Disturbance and Attornment Agreement executed between Citicorp USA, Inc. or its affiliates, Landlord and Tenant.

14.     The Condominium Documents (including the Declaration, By-Laws and Declaration of Parking Operations) [subject to the provisions of Section 12.5 of this Lease].

Landlord represents and warrants that none of the foregoing (i) will interfere with or prevent Tenant from operating its Premises in accordance with the terms of this Lease, (ii) conflict with any right granted Tenant under this Lease, or (iii) impose on Tenant any obligation(s) in excess of those set forth in this Lease.

Exhibit F

Tenant's Signage

F-1

For Use Only As
Seasonal Banners
To Promote DC USA



14TH STREET

CANOPY SIGNS

IRVING STREET

EXHIBIT F-1
PERMITTED SIGNAGE
Sheet 1



PARK ROAD

PARKING SIGNS

HIATT PLACE

PARKING SIGNS

KEY: 
- BUS GRAPHICS BEHIND GLASS ZONE
- GROUND FLOOR SIGNAGE ZONE AWNINGS ALSO PERMITTED AT GROUND FLOOR
- PINNED ON SIGNS
- BLADE SIGNS (SMALL BLADE SIGNS ALSO PERMITTED SUBJECT TO CODE AND LANDLORD'S APPROVAL)
- SEASONAL ADVERTISING BANNER ZONE

EXTERIOR ELEVATIONS – PERMITTED SIGNAGE

JB
1-20-06

EXHIBIT F
TENANT SIGNAGE
SHEET 1



EXTERIOR ELEVATIONS KEY



EXHIBIT F
TENANT SIGNAGE
Sheet 2

EXTERIOR WALL SIGNAGE TO BE FURNISHED AND INSTALLED AT SOLE COST OF TENANT PURSUANT TO SECTION 7.1 OF THE LEASE. TENANT TO OBTAIN ALL PERMITS PURSUANT TO SECTION 2.6.1.

CANOPY SIGNAGE TO BE FURNISHED BY LANDLORD AT TENANT'S COST.

SIGNAGE AFFIXED TO RECESSED BRICK PANEL

TARGET
BED BATH & BEYOND
BEST BUY
WASHINGTON SPORTS CLUB
MARSHALLS

CHANNEL LETTERS SIGN

BED BATH & BEYOND
MARSHALLS
TARGET
BEST BUY
WASHINGTON SPORTS CLUB

Signage Zones

POTENTIAL SIGNAGE LOCATIONS – 14TH STREET ATRIUM ENTRANCE

EXHIBIT F
TENANT SIGNAGE
Sheet 3



TOTAL SIZE OF SIGN LIMITED TO 96 SQUARE FEET
CURRENTLY SHOWN AS APPROXIMATELY 17'-4" x 5'-6"

EXTERIOR WALL SIGNAGE TO BE FURNISHED
AND INSTALLED AT SOLE COST OF TENANT
PURSUANT TO SECTION 7.1 OF THE LEASE.
TENANT TO OBTAIN ALL PERMITS PURSUANT
TO SECTION 2.6.1.

TENANT'S
Signage Zone

POTENTIAL SIGNAGE LOCATION – ABOVE RETAINED FACADE ON IRVING STREET



EXHIBIT F
TENANT SIGNAGE
Sheet 4

Signage Zone

POTENTIAL SIGNAGE LOCATION — IRVING STREET (AT 14TH STREET)

**A**

SIGNAGE
AFFIXED TO
RECESSED
BRICK PANEL

TARGET

BED BATH & BEYOND

SPACE #____

5'-0"

5'-0"

STAPLES

BEST BUY

MARSHALLS

WASHINGTON SPORTS CLUB

GENERAL NOTE: OTHER TENANTS INDICATED
ON ALL SIGNS MAY BE CHANGED AT
LANDLORD'S REASONABLE DISCRETION
EXCEPT THAT TENANT'S LOCATION IS
FIXED AND CANNOT BE CHANGED
WITHOUT TENANT'S PERMISSION.

EXTERIOR WALL SIGNAGE TO BE FURNISHED
AND INSTALLED AT SOLE COST OF TENANT
PURSUANT TO SECTION 7.1 OF THE LEASE.
TENANT TO OBTAIN ALL PERMITS PURSUANT
TO SECTION 2.6.1.

EXHIBIT F
TENANT SIGNAGE
Sheet 5

Signage Zone

POTENTIAL SIGNAGE LOCATION — PARK ROAD

EXHIBIT F
TENANT SIGNAGE
Sheet 6



TENANT MAY PLACE BUS GRAPHICS ON THE INSIDE FACE OF THE
GLASS IN THE LOCATIONS INDICATED TO THE EXTENT THESE
GRAPHICS ARE NOT CONSIDERED SIGNAGE BY THE DISTRICT OF
COLUMBIA AND ARE OTHERWISE IN COMPLIANCE WITH APPLICABLE
LAWS AND LANDLORD'S SIGNAGE REQUIREMENTS.

POTENTIAL GLASS GRAPHICS LOCATIONS — 14TH STREET

TENANTS
Graphics Zones



TENANT MAY PLACE BUS GRAPHICS ON THE INSIDE FACE OF THE
GLASS IN THE LOCATIONS INDICATED TO THE EXTENT THESE
GRAPHICS ARE NOT CONSIDERED SIGNAGE BY THE DISTRICT OF
COLUMBIA AND ARE OTHERWISE IN COMPLIANCE WITH APPLICABLE
LAWS AND LANDLORD'S SIGNAGE REQUIREMENTS.

 TENANT'S
Graphics Zones

POTENTIAL GLASS GRAPHICS LOCATIONS — IRVING STREET

EXHIBIT F
TENANT SIGNAGE
Sheet 7



202

— Extent of Bed Bath & Beyond exterior of premises facing 2nd floor of atrium



23'-1"

4'-4 1/2"

90'9 9/16"

Bed Both & Beyond Premises

TENANT'S
Signage Zone

Area to be used, at Tenant's discretion, for possible window, signage or decorative elements

Tenant Exterior Wall Zone to be designed by Tenant subject to Landlord's reasonable approval.
The design and materials shall be compatible with building standard finishes for the atrium lobby.

SECOND FLOOR INTERIOR STOREFRONT ELEVATION — POTENTIAL SIGNAGE LOCATION





POTENTIAL SIGNAGE LOCATION — ATRIUM INTERIOR

Signage Zones

**(A)**



**(B)**

Size of sign is approximately 20 square feet. Currently shown as approximately 2'-5 7/8" x 7'-9 1/4".

Actual design to be determined by Tenant subject to Landlord's reasonable approval.

EXHIBIT F
TENANT SIGNAGE
Sheet 9



**4' x 20'** (VERSION 1)

(SIDE 1) GRAND OPENING

(SIDE 2) BED BATH & BEYOND
HIRING HOTLINE 1-877-JOBS-BBB
COMING SOON!
— 20'-0" —    4'-0"

**4' x 20'** (VERSION 2)

(SIDE 1) NOW HIRING

(SIDE 2) NOW OPEN

TEMPORARY SIGN
(BUILDING OR BBBY
HIRING TRAILER)

**6' x 30'**

(SIDE 1) GRAND OPENING    6'-0"

(SIDE 2) BED BATH & BEYOND
HIRING HOTLINE 1-877-JOBS-BBB
COMING SOON!
— 30'-0" —

TEMPORARY BUILDING SIGN    (REFER TO EXHIBIT D-1 FOR LOCATION ON BUILDING)

— 20'-0" —    5'-0"
why wait? shop online @
www.bedbathandbeyond.com

**5' x 20'**    TEMPORARY BUILDING SIGN
(REFER TO EXHIBIT D-1 FOR LOCATION ON BUILDING)

(VERSION 1)
BED BATH &
BEYOND
NOW OPEN    4'-8"
— 8'-8" —

(VERSION 2)
BED BATH &
BEYOND
COMING SOON!
FOR HIRING INFORMATION CALL
877 - JOBS BBB

**4' x 8' - TYVEK**
(2 banners of a single
version per box)
TEMPORARY SITE SIGNAGE

VINYL COLORS

☐ PMS 187 RED
■ BLACK

BED BATH & BEYOND
EXHIBIT F
SHEET 10

\* NOTE: TEMPORARY SIGNS ARE TO BE PLACED ON CONSTRUCTION
FENCE/BARRICADE AND/OR ON BUILDING IN A
PROMINENT & VISABLE AREA.

1              <u>Exhibit G</u>

2              <u>Subordination, Non-Disturbance and Attornment Agreement</u>

3              THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT
4      AGREEMENT, made as of the _____ day of _____, 200__, by and between
5      _____, a _____ [corporation] [limited] [general]
6      [partnership] [national banking association], having an office at
7      _____ (the *"Mortgagee"*) and Bed Bath &
8      Beyond [of _____] Inc., a _____ corporation, having an office
9      at 650 Liberty Avenue, Union, New Jersey 07083 (the *"Tenant"*).

10             W I T N E S S E T H :

11             WHEREAS, Mortgagee is the holder of a mortgage (the *"Mortgage"*) covering a
12     parcel of land owned by DC USA Operating Co., LLC, a _____ limited
13     liability company (the *"Landlord"*) together with the improvements [to be] erected
14     thereon (said parcel of land and improvements thereon being hereinafter referred to as the
15     *"Shopping Center"* and being more particularly described on <u>Exhibit A</u> attached hereto
16     and made a part hereof); and

17             WHEREAS, by a certain lease heretofore entered into between Landlord and
18     Tenant dated as of _____ (the *"Lease"*), Landlord leased to Tenant a portion
19     of the Shopping Center, as more particularly described in the Lease (the *"Premises"*); and

20             WHEREAS, a copy of the Lease has been delivered to Mortgagee, the receipt of
21     which is hereby acknowledged; and

22             **[For mortgages existing as of the date Lease is executed:** WHEREAS, as an
23     inducement to Tenant to enter into the Lease, [Section 2.3.1 and Section 17.3] thereof
24     provides that the Lease is conditioned upon Landlord obtaining this Agreement from
25     Mortgagee; and

26             WHEREAS, the parties desire to satisfy the foregoing condition and to provide for
27     the non-disturbance of Tenant by the holder of the Mortgage; and]

28             **[For mortgages occurring after the Lease is executed:** WHEREAS, Section
29     17.1 of the Lease provides that the Lease shall become subject and subordinate to a
30     mortgage encumbering the fee interest of Landlord in and to the Shopping Center if and
31     when a non-disturbance agreement is entered into with respect to such mortgage; and

32             WHEREAS, the parties hereto desire to effect the subordination of the Lease to
33     the Mortgage and to provide for the non-disturbance of Tenant by Mortgagee.]

34             NOW, THEREFORE, in consideration of the premises and of the mutual
35     covenants and agreements herein contained, the parties hereto, intending to be legally
36     bound hereby, agree as follows:

37             1.      Mortgagee hereby consents to and approves the Lease and the term thereof,
38     including the options to extend the term as set forth in the Lease, and covenants and
39     agrees that the exercise by Tenant of any of the rights, remedies and options therein
40     contained shall not constitute a default under the Mortgage.

41             2.      Tenant covenants and agrees with Mortgagee that the Lease hereby is made
42     and shall continue hereafter to be subject and subordinate to the lien of the Mortgage, and
43     to all modifications and extensions thereof (and such subordination shall not lessen or
44     diminish Tenant's rights under the Lease), subject, however, to the provisions of this
45     Agreement.

3.    Mortgagee agrees that so long as the Lease shall be in full force and effect, and so long as Tenant shall not be in default under the Lease beyond any applicable notice and grace period:

(a)    Tenant shall not be named or joined as a party or otherwise in any suit, action or proceeding for the foreclosure of the Mortgage or to enforce any rights under the Mortgage or the bond or note or other obligation secured thereby;

(b)    The possession by Tenant of the Premises and Tenant's rights thereto shall not be disturbed, affected or impaired by, nor will the Lease or the term thereof be terminated or otherwise affected by (i) any suit, action or proceeding brought upon the Mortgage or the bond or note or other obligation secured thereby, or for the foreclosure of the Mortgage or the enforcement of any rights under the Mortgage, or by any judicial sale or execution or other sale of the Premises or the Shopping Center, or any deed given in lieu of foreclosure, or by the exercise of any other rights given to any holder of the Mortgage or other documents as a matter of law, or (ii) any default under the Mortgage or the bond or note or other obligation secured thereby; and

(c)    All condemnation awards and insurance proceeds paid or payable with respect to the Premises or any other part of the Shopping Center shall be applied and paid in the manner set forth in the Lease.

4.    If Mortgagee or any future holder of the Mortgage shall become the owner of the Shopping Center by reason of foreclosure of the Mortgage or otherwise, or if the Shopping Center shall be sold as a result of any action or proceeding to foreclose the Mortgage, or transfer of ownership by deed given in lieu of foreclosure, the Lease shall continue in full force and effect, without necessity for executing any new lease, as a direct lease between Tenant and the then owner of the Shopping Center, as "landlord", upon all of the same terms, covenants and provisions contained in the Lease, and in such event:

(a)    Tenant shall be bound to such new owner under all of the terms, covenants and provisions of the Lease for the remainder of the term thereof (including the Renewal Periods, if Tenant elects or has elected to exercise its options to extend the term) and Tenant hereby agrees to attorn to such new owner and to recognize such new owner as "landlord" under the Lease; and

(b)    Such new owner shall be bound to Tenant under all of the terms, covenants and provisions of the Lease for the remainder of the term thereof (including the Renewal Periods, if Tenant elects or has elected to exercise its options to extend the term) which such new owner hereby agrees to assume and perform and Tenant shall, from and after the date such new owner succeeds to the interest of "landlord" under the Lease, have the same remedies against such new owner for the breach of any covenant contained in the Lease that Tenant might have had under the Lease against Landlord if such new owner had not succeeded to the interest of "landlord"; provided, however, that such new owner shall not be:

(i)    liable for any act or omission of any prior landlord (including Landlord) unless such act or omission continues from and after the date upon which the new owner succeeds to the interest of such prior landlord;

(ii)    subject to any defenses which Tenant may have against any prior landlord (including Landlord) unless resulting from any default or breach by such prior landlord which continues from and after the date upon which the new owner succeeds to the interest of such prior landlord;

(iii)    subject to any offsets which Tenant may have against any prior landlord, except to the extent such offsets are expressly provided under the Lease and Mortgagee has received notice thereof and the opportunity to cure within the

1    applicable time periods set forth in the Lease (it being further agreed that offsets under
2    the Lease that were deducted by Tenant prior to the date upon which the new owner
3    succeeds to the interest of such prior landlord shall not be subject to challenge);

4                        (iv)    bound by any fixed rent or additional rent which Tenant
5    might have paid for more than one month in advance of its due date under the Lease to
6    any prior landlord (including Landlord), unless such additional rent is paid in accordance
7    with the applicable provisions of the Lease; or

8                        (v)    bound by any amendment or modification of the Lease made
9    without its consent; notwithstanding the foregoing, Mortgagee acknowledges that the
10    Lease specifically provides for amendments thereof upon the occurrence of certain events
11    described in the Lease (such as, for example, an amendment to the Lease confirming the
12    measurement of the Premises), and, by its execution below, Mortgagee agrees to
13    recognize such amendments as part of the Lease, and Mortgagee further agrees that such
14    new owner shall also be bound by such amendment(s) to the Lease, without any consent
15    on the part of Mortgagee or such new owner.

16            (c)    Tenant's obligations hereunder shall be effective only so long as
17    Mortgagee is bound to Mortgagee's obligations hereunder.

18        5.    Tenant will notify Mortgagee of any default by Landlord under the Lease
19    which would entitle Tenant to terminate the Lease or abate the rent payable thereunder
20    and agrees that notwithstanding any provision of the Lease, no notice of termination
21    thereof nor any abatement shall be effective unless Mortgagee has received the aforesaid
22    notice and has failed to cure the subject default within the same time period allowed
23    Landlord under the Lease. It is understood that the abatement provisions of this Section
24    relate to abatements by reason of Landlord's default and do not apply to provisions of the
25    Lease whereby Tenant has the automatic right to abate rentals such as, for example,
26    abatement upon casualty or condemnation.

27        6.    Neither the Mortgage nor any other security instrument executed in
28    connection therewith shall encumber or be construed as subjecting in any manner to the
29    lien thereof, any trade fixtures, signs or other personal property at any time furnished or
30    installed by or for Tenant or its subtenants or licensees on the aforementioned property
31    regardless of the manner or mode of attachment thereof.

32        7.    Any notices of communications given under this Agreement shall be in
33    writing and shall be given by registered or certified mail, return receipt requested, or by
34    any recognized overnight mail carrier, with proof of delivery slip, postage prepaid, (a) if
35    to Mortgagee, at the address of Mortgagee as hereinabove set forth or at such other
36    address or persons as Mortgagee may designate by notice in the manner herein set forth,
37    or (b) if to Tenant, at the address of Tenant as hereinabove set forth, with duplicate copies
38    to  Allan N. Rauch, Esq., c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New
39    Jersey 07083, and Victoria A. Morrison, Esq., Riker, Danzig, Scherer, Hyland & Perretti,
40    LLP, Headquarters Plaza, One Speedwell Avenue, P.O. Box 1981, Morristown, New
41    Jersey 07862-1981, or such other address or persons as Tenant may designate by notice
42    in the manner herein set forth. All notices given in accordance with the provisions of this
43    Section shall be effective upon receipt (or refusal of receipt) at the address of the
44    addressee.

45        8.    This Agreement shall bind and inure to the benefit of and be binding upon
46    and enforceable by the parties hereto and their respective successors, assigns, and
47    sublessees.

48        9.    This Agreement contains the entire agreement between the parties and
49    cannot be changed, modified, waived or canceled except by an agreement in writing
50    executed by the party against whom enforcement of such modification, change, waiver or
51    cancellation is sought.

1    10.   This Agreement and the covenants herein contained are intended to run
2   with and bind all lands affected thereby.

3       **[to add if our memorandum of lease has been recorded prior to the subject**
4   **mortgage]** NOTE: THIS AGREEMENT BY TENANT SHALL NOT BE EFFECTIVE
5   UNLESS AND UNTIL ANY PRIOR MORTGAGES ON THIS PROPERTY HAVE
6   BEEN SATISFIED SO THAT TENANT'S PRIOR AGREEMENTS TO ATTORN TO
7   SAID MORTGAGES AND/OR TO SUBORDINATE ITS LEASE TO SAID
8   MORTGAGES SHALL HAVE BEEN EXTINGUISHED.

9       IN WITNESS WHEREOF, the parties hereto have duly executed this
10   Subordination, Non-Disturbance and Attornment Agreement as of the day and year first
11   above written.

<b><u>MORTGAGEE:</u></b>

ATTEST:                                     _____

By:_____        By:_____
Name:_____        Name:_____
Title: (Assistant) Secretary             Title:   (Vice) President

[SEAL]


<b><u>TENANT:</u></b>

ATTEST:                          BED BATH & BEYOND INC., a New
                                 York corporation


By:_____        By:_____
Name:_____        Name:  Warren Eisenberg
Title: (Assistant) Secretary             Title:   Co-Chairman of the Board of
                                         Directors

[SEAL]

1        **[INSERT APPROPRIATE JURAT FOR MORTGAGEE]**

2        _____

3

4    STATE OF NEW JERSEY        )
5                              ) : ss.
6    COUNTY OF UNION            )

7        On this ___ day of _____, 200__, before me personally came Warren
8    Eisenberg to me known, who being by me duly sworn, did depose and say that he is the
9    Co-Chairman of the Board of Directors of Bed Bath & Beyond Inc., the corporation
10   described in and which executed the above instrument and that he signed his name
11   thereto by order of the Board of Directors of said corporation.

12                                      _____
13                                      Notary Public
14   My Commission Expires:
15
16
17   _____

18

1  <u>Exhibit H</u>

2  <u>Recognition Agreement</u>

3      THIS RECOGNITION AGREEMENT, made as of the _____ day of _____,
4  200__, by and between DC USA Operating Co., LLC, a _____ limited liability
5  company, having an address c/o Grid Properties, Inc., 2309 Frederick Douglass
6  Boulevard, New York, New York 10027 (*"Landlord"*); Bed Bath & Beyond Inc., a New
7  York corporation, having an address at 650 Liberty Avenue, Union, New Jersey 07083
8  (*"Tenant"*); and _____, a [_____]
9  **[corporation] [limited] [general] [partnership]**, having an address at
10 _____ (*"Subtenant"*).

11      R E C I T A L S:

12      A.     Landlord and Tenant have entered into a certain lease (the *"Lease"*) dated
13 as of _____, 2003, a short form of which has been recorded in
14 _____, which demises certain premises (the *"Premises"*) located in the
15 DC USA Shopping Center, Washington , D.C., which Shopping Center is more
16 particularly described on <u>Exhibit A</u> annexed hereto and made a part hereof.

17      B.     Section 15.5 of the Lease provides that in the event Tenant subleases all or
18 a portion of the Premises for a term of at least five (5) years, Landlord shall, upon
19 Tenant's request, execute and deliver a Recognition Agreement among Landlord, Tenant
20 and each such subtenant in the form attached to the Lease, in recordable form.

21      C.     Pursuant to a Sublease dated as of _____ (the *"Sublease"*),
22 Tenant has subleased **[a portion of]** the Premises to Subtenant (the *"Subleased*
23 *Premises"*).

24      D.     The parties hereto desire to effectuate the provisions of Section 15.5 of the
25 Lease with respect to the Sublease and the Subleased Premises.

26      NOW, THEREFORE, in consideration of the mutual covenants and agreements
27 herein contained, the parties hereto, intending to be legally bound hereby, agree as
28 follows:

29      1.     Landlord warrants and represents as follows:

30          (a)     that it is the fee owner of the Premises,

31          (b)     that the Lease is unmodified (except as may be otherwise set forth in
32 <u>Exhibit B</u> annexed hereto, if any) and is in full force and effect,

33          (c)     that the term of the Lease expires on _____, but is subject
34 to _____ renewal periods of five years each and

35          (d)     that Tenant is not in default under the Lease nor has any event
36 occurred which would after notice to Tenant and the passage of time become a default of
37 Tenant under the Lease **[, other than as set forth in the schedule attached hereto]**.

38      2.     Landlord hereby acknowledges receipt of a copy of, and consents to and
39 approves, the Sublease and all of the terms, covenants and provisions thereof, and agrees
40 that the exercise by Subtenant of any of its rights, remedies and options contained therein
41 shall not constitute a default under the Lease.

42      3.     Landlord agrees that whenever it has an obligation with respect to the
43 Premises, or its consent or approval is required for any action of Tenant under the Lease,
44 then, to the extent such obligation, consent or approval relates to the Subleased Premises
45 or Subtenant's use and occupation thereof, it will perform such obligation in accordance

H-1

1  with the terms and conditions of the Lease, and, subject to the applicable terms of the
2  Lease, will not unreasonably withhold or unduly delay such consent or approval.

3      4.    Landlord shall not, in the exercise of any of the rights arising or which may
4  arise out of the Lease or of any instrument modifying or amending the same or entered
5  into in substitution or replacement thereof (whether as a result of Tenant's default or
6  otherwise), disturb or deprive Subtenant in or of its possession or its rights to possession
7  of the Subleased Premises or of any right or privilege granted to or inuring to the benefit
8  of Subtenant under the Sublease, provided that Subtenant is not in default under the
9  Sublease beyond the expiration of any applicable notice and cure period.

10      5.    In the event of the termination of the Lease by reentry, notice, conditional
11  limitation, surrender, summary proceeding or other action or proceeding, or otherwise, or,
12  if the Lease shall terminate or expire for any reason before any of the dates provided in
13  the Sublease for the termination of the initial or renewal terms of the Sublease and if
14  immediately prior to such surrender, termination or expiration the Sublease shall be in
15  full force and effect, Subtenant shall not be made a party in any removal or eviction
16  action or proceeding nor shall Subtenant be evicted or removed of its possession or its
17  right of possession of the Subleased Premises be disturbed or in any way interfered with,
18  and the Sublease shall continue in full force and effect as a direct lease between Landlord
19  and Subtenant (provided, that in such event, Subtenant shall, for the then remainder of the
20  term of the Sublease, pay fixed rent and additional rent in an amount equal to the greater
21  of (x) the Fixed Rent and additional rent then payable under the Lease, prorated on the
22  basis of the ratio which the Floor Area of the Subleased Premises bears to the Floor Area
23  of the Premises, or (y) the fixed rent and additional rent then payable under the Sublease).

24      6.    Landlord hereby waives and relinquishes any and all rights or remedies
25  against Subtenant, pursuant to any lien, statutory or otherwise, that it may have against
26  the property, goods or chattels of Subtenant in or on the Subleased Premises.

27      7.    Any notices, consents, approvals, submissions, demands or other
28  communications (hereinafter collectively referred to as "*Notice*") given under this
29  Agreement shall be in writing. Unless otherwise required by law or governmental
30  regulation, Notices shall be deemed given if sent by registered or certified mail, return
31  receipt requested, or by any recognized overnight mail carrier, with proof of delivery slip,
32  postage prepaid (a) to Landlord, at the address of Landlord as hereinabove set forth or
33  such other address or persons as Landlord may designate by Notice to the other parties
34  hereto, (b) to Tenant, at the address of Tenant as hereinabove set forth, with duplicate
35  copies to Allan N. Rauch, Esq., c/o Bed Bath & Beyond Inc., 650 Liberty Avenue,
36  Union, New Jersey 07083, Victoria A. Morrison, Esq., Riker, Danzig, Scherer, Hyland &
37  Perretti, LLP, Headquarters Plaza, One Speedwell Avenue, P.O. Box 1981, Morristown,
38  New Jersey 07862-1981, or such other address or persons as Tenant may designate by
39  Notice to the other parties hereto, and (c) to Subtenant, at the address of Subtenant as
40  hereinabove set forth or such other address or persons as Subtenant may designate by
41  Notice to the other parties hereto. During the period of any postal strike or other
42  interference with the mails, personal delivery shall be substitute for registered or certified
43  mail. All Notices shall become effective only on the receipt or rejection of same by the
44  proper parties.

45      8.    No modification, amendment, waiver or release of any provision of this
46  Agreement or of any right, obligation, claim or cause of action arising hereunder shall be
47  valid or binding for any purpose whatsoever unless in writing and duly executed by the
48  party against whom the same is sought to be asserted.

49                         [Signature Page Follows]

1        9.    This Agreement shall be binding on and shall inure to the benefit of the
2    parties hereto and their respective heirs, legal representatives, successors, assigns and
3    sublessees.

4        IN WITNESS WHEREOF, the parties have caused this Recognition Agreement to
5    be executed under seal the date first above written.

**LANDLORD:**

DC USA OPERATING CO., LLC

By:_____
Name:_____
Title:_____

**TENANT:**

BED BATH & BEYOND INC., a New
York corporation

By:_____
Name:  Warren Eisenberg
Title:  Co-Chairman of the Board of
Directors

**SUBTENANT:**

_____

By:_____
Name:_____
Title:_____

H-3

1     **[INSERT APPROPRIATE JURATS FOR <u>LANDLORD</u> AND <u>SUBTENANT</u>]**

2

3     STATE OF NEW JERSEY          )
4                                  ) : ss.
5     COUNTY OF UNION              )

6          On this ___ day of _____, 200__, before me personally came Warren
7     Eisenberg to me known, who being by me duly sworn, did depose and say that he is the
8     Co-Chairman of the Board of Directors of Bed Bath & Beyond Inc., the corporation
9     described in and which executed the above instrument and that he signed his name
10    thereto by order of the Board of Directors of said corporation.

11                                      _____
12                                      Notary Public
13    My Commission Expires:
14
15
16    _____

17

H-4

<u>Exhibit I</u>

<u>DELIVERY DATE NOTICE</u>

[Letterhead of Landlord]

_____, 200__

[via Federal Express or other
recognized overnight delivery
service per Article 18 of the foregoing
lease]

Bed Bath & Beyond Inc.
650 Liberty Avenue
Union, NJ 07083
Attn: Warren Eisenberg

Re:     Agreement of Lease, dated _____, 2003 (the "*Lease*"), between DC USA
         Operating Co., Inc., as landlord ("*Landlord*"), and Bed Bath & Beyond Inc., as
         tenant ("*Tenant*"), with respect to certain retail premises (the "*Premises*") located
         in the DC USA Shopping Center, Washington, D.C..

Gentlemen:

        In accordance with the provisions of Subsection 2.3.2 of the Lease, the Landlord
hereby informs the Tenant that the Delivery Date shall take place at 8:00 A.M. on
_____, 200__.  This notice shall constitute the Delivery Date Notice referred to
in Subsection 2.3.2 of the Lease.

                                          DC USA Operating Co., Inc.


                                          By:_____
                                             _____, (Vice) President

cc:     Victoria A. Morrison, Esq.
         Allan N. Rauch, Esq.

I-1

1                               <u>Exhibit J</u>

2                    <u>DELIVERY DATE CERTIFICATION</u>

3                      [Letterhead of Landlord]

4                            _____, 200__

5 [via Federal Express or other
6 recognized overnight delivery
7 service per Article 18 of the foregoing
8 lease]

9 Bed Bath & Beyond Inc.
10 650 Liberty Avenue
11 Union, NJ 07083
12 Attn: Warren Eisenberg

13 Re:     Agreement of Lease, dated _____, 2003 (the "***Lease***"), between DC USA
14          Operating Co., Inc., as landlord ("***Landlord***"), and Bed Bath & Beyond Inc., as
15          tenant ("***Tenant***"), with respect to certain retail premises (the "***Premises***") located
16          in the DC USA Shopping Center, Washington, D.C.

17 Gentlemen:

18         In accordance with the provisions of Subsection 2.3.3 of the Lease, Landlord
19 hereby certifies to Tenant that, as of the date of this certification, all of the Delivery Date
20 Conditions (as defined in the Lease) have been satisfied, and that, as a result, the Delivery
21 Date (as such term is defined in the Lease) will be deemed to be _____, 200__ .
22 This notice shall constitute the Delivery Date Certification referred to in Subsection 2.3.3
23 of the Lease.

24                              DC USA Operating Co., Inc.
25
26
27                              By:_____
28                                    _____, (Vice) President
29 cc:    Victoria A. Morrison, Esq.
30         Allan N. Rauch, Esq.

Exhibit K-1

Existing Exclusives

- The use as a drug store or pharmacy and/or the sale or offering for sale of pharmaceutical products requiring the services of a licensed pharmacist. [Target]

- Pet food, pet supplies, live animals, pet grooming, pet training and/or veterinary services except for Incidental Sales. "Incidental Sales" shall mean the sale or display for sale of such items or services which is not the primary use of the competing tenant and taking up no more than five hundred (500) square feet of floor area. [Petco]

- The sale, rental, service and/or warehouse (and, if applicable, install in motor vehicles) of the following product categories (regardless of whether new, used or refurbished): electronic equipment and appliances (including, without limitation, televisions, stereos, radios and DVD and video machines); major household appliances (including, without limitation, refrigerators, freezers, stoves, microwave ovens, dishwashers, washers and dryers); personal computers and peripherals, computer software; digital, downloadable and streamable entertainment; car radios, stereos, tape decks and phones; entertainment software (including compact discs, music videos, DVDs and prerecorded tapes); accessories and connectors for products sold by the protected tenant (including, without limitation, cable connectors, surge protectors, cables, and wires); telephones, telecopy, facsimile and photocopy machines; photographic cameras and equipment; office equipment, or supplies; any substitutes for or items which are a technological evolution of the foregoing items. This exclusive shall not be deemed applicable to: a department store or discount department store in the operation of a full-line department store such as Target; Bed, Bath & Beyond (or a similar housewares or home furnishing store); a store which is primarily a housewares or home furnishing store such as Crate & Barrel or Pottery Barn; a store which is primarily an office supply store such as Staples; a Radio Shack which is not in excess of 3,500 square feet; or a bookstore such as a Barnes & Noble. In addition, any tenant, sublessee, assignee, licensee or occupant shall have the right to utilize its respective premises for the sale, rental service, and/or warehouse of the foregoing restricted categories herein only on an incidental basis. [Best Buy]

- Office, home office or school supplies, furniture, machines and other office, home office or school related equipment, computers, computer hardware, software and related equipment; cellular telephones and telecommunications equipment and related devices (including personal digital assistance ["PDA"] and the like), or the provision of business or office services (including copying, printing, telecommunications, packing, shipping and business equipment repair services). Other tenants shall be permitted to sell such items up to the lesser of 5% of the tenant's floor area or 1,000 sq. ft. of floor area in the aggregate. [Staples]

- The sale of gourmet coffee, gourmet coffee drinks, gourmet tea, gourmet tea drinks, gourmet coffee products (grinders, filters, etc.), whole bean coffee and/or coffee ground on site (collectively, the "Protected Items"). No other tenants, other than the tenant protected by this exclusive, shall sell as their primary use (i.e. more than 15% if its gross sales is for the sale of any of the Protected Items, when considering all of the Protected Items in the aggregate) Protected Items. This exclusive shall not apply to any full service restaurant selling Protected Items primarily for on-premises consumption or to any single tenant occupying in excess of 10,000 square feet within a single premises. [Caribou Coffee]

- The sale of submarine style and/or delicatessen style sandwiches. No other tenants, other than the tenant protected by this exclusive, shall sell as their primary use (i.e. more than 40% of the tenant's gross sales is for the sale of said restricted items) submarine style and/or delicatessen style sandwiches. [Quizno's Franchise]

- The business of a full service health club or to provide or operate a regulation high school basketball court, a swimming pool, aerobic exercise and/or weight training instruction (i.e. personal training), yoga or Pilates. The aforesaid restriction shall not apply to sport specific

K-1-1

1    training programs such as martial art programs or baseball skills training (i.e. Frozen Ropes).
2    [Washington Sports Club]
3

4  • Vitamins, mineral supplements, nutrition products or herbs. However, tenants shall be
5    permitted to sell such items in up to ten percent (10%) of the aggregate sales floor area of
6    such tenant's premises (but not in excess of five hundred (500) square feet of sales floor area
7    within such tenant's premises). [The Vitamin Shoppe]
8

9  • The sale or display of apparel and related accessories in more than fifteen thousand (15,000)
10   square feet of floor area and/or the sale or display of shoes, footwear and related accessories
11   in more than seven thousand five hundred (7,500) square feet of floor area. [Marshall's]
12

13 • The sale of large size (14 and up, or its equivalent) women's clothing and apparel. This
14   exclusive shall not apply to: (1) any tenant occupying in excess of 12,000 leasable square feet of
15   contiguous space and operating under a single-trade name, (2) the Incidental (as hereinafter
16   defined) sale of large size clothing and/or apparel (for purposes hereof, "Incidental" shall mean
17   the sale of such merchandise in not more than the lesser of (a) two hundred fifty (250) square
18   feet or (b) ten percent (10%) of the sales area of such tenant's store; included in the computation
19   of such two hundred fifty (250) square feet or such ten percent (10%) shall be the area that is
20   one-half (1/2) of all floor areas in any aisles, corridors or similar spaces adjacent to or abutting
21   any racks, gondolas, shelves, cabinets, counters or other trade fixtures or equipment containing
22   or used for the sale or display of such large women's clothing and/or apparel), and (3) other
23   specific tenants agreed to between the Landlord and the protected tenant. [Lane Bryant]
24

25 • The use as a restaurant which sells "Asian food," uses a wok or is generally recognized as
26   Chinese food or is soy sauce based or is served in a steam table format (hot buffet). The term
27   "Asian food" shall mean Chinese, Japanese (including Sushi), Vietnamese, Thai, Hawaiian,
28   Mongolian, and Korean foods. These restrictions do not apply to any space larger than
29   12,000 square feet. [Panda Express]
30

31 • The sale of sporting goods, athletic wear and/or athletic footwear. No other tenants, other
32   than the tenant protected by this exclusive, shall sell as their primary use sporting goods,
33   athletic wear and/or athletic footwear. [Modell's Sporting Goods]
34

35 • Grocery products, produce, meats, poultry and seafood, bakery goods, beer and wine and
36   vitamins (other than those that are incidental to a health club operation). This shall not apply
37   to Bed Bath & Beyond. [Whole Foods]
38

39 • Fast food and/or quick service restaurant primarily selling hamburgers or any other type of
40   beef products served in sandwich form. [McDonald's]
41

42 • The sale and/or display of mattresses, box springs, daybeds and/or futons ("Exclusive
43   Items"). No other tenants, other than the tenant protected by this exclusive, shall sell as their
44   primary use (i.e. more than 50% of the tenant's demised area is used for such Exclusive
45   Items) Exclusive Items. [Mattress Discounters]
46
47

48

1                                    Exhibit K-2

2                                    Existing Leases

3
4
5    A.    Lease between DC USA Operating Co., LLC (Landlord) and Best Buy Stores, L.P.
6          (Tenant) dated January 30th, 2006.
7
8    B.    Lease between DC USA Operating Co., LLC (Landlord) and TSI Columbia Heights, Inc.
9          (Tenant) dated November 28th, 2005.
10
11   C.    Lease Agreement between DC USA Operating Co., LLC (Landlord) and MARSHALLS
12         OF MA, INC. (Tenant) dated January 31st, 2006 [and delivered 2/2/06].
13
14   D.    Lease between DC USA Operating Co., LLC (Landlord) and Staples The Office
15         Superstore East, Inc. (Tenant) dated January 28th, 2006.
16
17   E.    Lease between DC USA Operating Co., LLC (Landlord) and Vitamin Shoppe Industries
18         Inc. (Tenant) dated January 24th, 2006.
19
20   F.    Lease between DC USA Operating Co., LLC (Landlord) and RadioShack Corporation
21         (Tenant) dated December 30th, 2005.
22
23   G.    Lease between DC USA Operating Co., LLC (Landlord) and Caribou Coffee Company,
24         Inc. (Tenant) dated January 26th, 2006.
25
26   H.    Lease between DC USA Operating Co., LLC (Landlord) and Panda Express, Inc.
27         (Tenant) dated January 25th, 2006.
28
29   I.    Lease Agreement between DC USA Operating Co., LLC (Landlord) and Lane Bryant
30         #4505, LLC (Tenant) dated January 10th, 2006.
31
32   J.    Lease between DC USA Operating Co., LLC (Landlord) and Mattress Discounters
33         Corporation (Tenant) dated December 31st, 2005 [and delivered 2/2/06].
34
35   K.    Lease between DC USA Operating Co., LLC (Landlord) and Tamecia Bradshaw
36         (Tenant) dated November 30th, 2005.
37

Exhibit L

Form of Condominium Documents

L-1

1

2

3

4
5
6
7
8
9

[Holland & Knight Draft, January 23, 2006]

DECLARATION

FOR

DC USA CONDOMINIUM

Date: _____, 200___

DECLARATION
FOR DC USA CONDOMINIUM

ARTICLE I
CREATION; DEFINED TERMS

Section 1.1. <u>Creation of the Condominium</u>. Pursuant to the provisions of
Chapter 19 of Title 42 of the District of Columbia Code (2001 edition, as amended)
(the "Condominium Act"), DC USA Operating Co., LLC, a New York limited liability
company (the "Declarant"), hereby submits to the Condominium Act the land
described in <u>Exhibit A</u> hereto, located within the District of Columbia (the "Land"),
together with the building thereon, having a street address of 3100 14th Street,
N.W., Washington, D.C. containing approximately 490,000 square feet of retail and
commercial area and together with two (2) levels of below grade parking facilities
(the "Building"), all other improvements thereon, all easements, rights and
appurtenances thereunto appertaining (including rights to and licenses for
adjoining public rights of way), all of Declarant's rights in and to personal property
and fixtures installed in or located within the Building directly related to the
general operations of the Building and its common areas, all of Declarant's rights in
contracts, warranties and other agreements related to the general operations of the
Building and its common areas, and all licenses, permits, and certificates issued by
any applicable governmental authority related to the general operations of the
Building, the Land and their respective appurtenant areas (including, but not
limited to, elevator permits, public space vault rental agreements, etc.) (the Land,
the Building and all other such improvements, easements, rights and
appurtenances being collectively referred to as the "Property"). The Land and the
Building are shown on the Condominium Plat and Condominium Plans filed among
the Condominium Records of the Office of the District of Columbia Surveyor in
Condominium Book ___, at Page ___.

Section 1.2. <u>Defined Terms</u>. Except as otherwise defined in this Declaration
or in the Bylaws, all terms used in the Condominium Instruments shall have the
meanings specified in Section 42-1901.02 of the Condominium Act. Each of the
following terms as used in this Declaration and in the Bylaws recorded
contemporaneously herewith shall have the associated meaning:

(a)    "<u>Affiliate</u>" means (i) any Person that controls, is
controlled by or is under common control with such Person, (ii) any
managing member, general partner or Person authorized to act on
behalf of such Person, or (iii) any Person that controls, is controlled by or
is under common control with any Person described in the preceding
clause (ii).

(b)    "Atrium Lobby" means that area of the Building
providing access to the Building to and from 14th Street, NW depicted

and marked on the Plat and Plan as the lobby of the Building to which all Unit Owners and the general public have general access.

(c) "Bond Documents" means the Indenture of Trust, the Non-Arbitrage Certificate, the Bonds, the Bond Purchase Agreement and any other agreements or instruments relating to the issuance of and security for the Bonds issued in conjunction with and related to the development and construction of Unit No. 3. [Awaiting updated information from Bond Counsel]

(d) "Bonds" means the tax-exempt Variable Rate Revenue Bonds (DC-USA Parking Garage Project) Series 2005, issued by the National Capital Revitalization Corporation ("NCRC") to finance a portion of the costs of developing and constructing Unit No. 3 referred to in this Declaration and the Bylaws as being located within Unit No. 3.

(e) "Bylaws" means the Bylaws recorded contemporaneously with this Declaration and as amended from time to time, which provides for the self-governance of the Condominium.

(f) "Business Day" means a calendar day that is any day, Monday through Friday, and is not a declared federal or District of Columbia legal holiday.

(g) "Common Elements" means all parts of the Condominium and rights attributable thereto, tangible and intangible, other than the Units, as more fully set forth in Article III of this Declaration captioned "Common Elements," and includes both "General Common Elements" and "Limited Common Elements."

(h) "Common Element Interest" means the undivided percentage interest of each Unit in the Common Elements as set forth in Exhibit B attached to and made a part of this Declaration, as amended from time to time in accordance with the provisions of the Condominium Act and this Declaration, which establishes each Unit's undivided percentage interest (i) in the General Common Elements, (ii) in the votes in the Unit Owners Association, and (iii) the allocation of responsibility for payment of General Expenses, unless a different allocation is provided for in this Declaration or in Schedule A to the Bylaws.

(i) "Common Expenses" means and includes all sums incurred by the Unit Owners Association, and duly assessable to and against the Unit Owners by the Unit Owners Association, including without limitation (i) expenses of administration and operation, maintenance, repair or replacement of, and additions to, the Common

2

Elements, including, but not limited to contributions to reserves for working capital and future expenditures as may be established from time to time by the Unit Owners Association and deposits, allowances or other amounts set aside by the Unit Owners Association for obligations of the Unit Owners Association, (ii) expenses of service delivery related to the Common Elements, such as but not limited to cleaning services, electrical services, water/sewer services, and heating, ventilation and air conditioning services, (iii) expenses declared Common Expenses pursuant to the Condominium Act, the provisions of this Declaration, or the Bylaws, (iv) expenses of administration and operation of the Condominium and the Unit Owners Association as an entity, (v) any and all vault rentals arising from the licensing or leasing of subterranean public space from the District of Columbia, (vi) sums due under any easement, covenant, or other document which encumbers the Common Elements, (vii) expenses of providing the services set forth in Section 5.5(a) of the Bylaws, (viii) insurance premiums and deductibles under the insurance set forth in Article 6 of the Bylaws or otherwise obtained from time to time by the Unit Owners Association, (ix) fees and expenses payable by the Unit Owners Association to the Managing Agent pursuant to the Management Agreement, (x) costs and expenses of environmental remediation related to the Land and the Building necessitated due to environmental contamination occurring after the recordation of this Declaration, and (xi) such other expenses as may be incurred by the Unit Owners Association on behalf of one or more of the Unit Owners in accordance with the provisions of this Declaration or the Bylaws including Schedule A. The term "Common Expenses" shall mean collectively General Expenses, Limited Common Element Expenses and Special Expenses. The term "Common Expenses" shall be deemed to exclude any costs and expenses associated with the operation, maintenance, repair or replacement of a Unit or any portion thereof, which costs and expenses shall be the sole responsibility of the Unit Owner of such Unit.  Any costs and expenses not incurred by the Unit Owners Association for Common Elements, but instead paid for directly by one or more Unit Owners shall not be deemed a Common Expense, those costs and expenses not having been incurred by the Unit Owners Association. To the extent the Unit Owners Association does incur an expense due to the failure of one or more Unit Owners to pay any cost or expense that is the responsibility of such Unit Owner(s), then the same shall become Common Expenses, but then allocable as Limited Common Element Expenses or Special Expenses as applicable to the Unit Owner(s) in question.

(j)      "Condominium" means the condominium regime created pursuant to this Declaration and the Plat and Plans.

(k)    "Condominium Instruments" means this
Declaration, the Bylaws and the Plat and Plans, as the same may be
amended from time to time.

(l)    "Condominium Unit" means a Unit together with
the Limited Common Elements appurtenant thereto, if any, and an
undivided interest in the General Common Elements appertaining to
that Unit.

(m)    "Declaration of Parking Operations" means that
certain Declaration of Parking Operations by and among the Unit
Owners of Unit No. 1, Unit No. 2 and Unit No. 3, dated as of the date of
this Declaration, a memorandum of which is recorded immediately
hereafter, as may be subsequently amended, related to the operation
and maintenance of the parking garage located or to be located in and
occupying Unit No. 3. In the event of a conflict between the Declaration
of Parking Operations and this Declaration, this Declaration shall
control.

(n)    "DC USA Deed" means that certain special
warranty deed of conveyance given by the RLA Revitalization
Corporation to Declarant, dated _____, 200_, and recorded as
Instrument Number _____ among the land records of the Office of
the Recorder of Deeds of the District of Columbia, granted in accordance
with the LDA.

(o)    "Declarant" means D.C. USA Operating Co., LLC, a
New York limited liability company and shall also mean and refer to any
Person who reserves or succeeds to any Special Declarant Right.

(p)    "Declaration" means this instrument imposing a
condominium regime on the Land and Building as the same may be
amended and recorded from time to time.

(q)    "Default Share" means generally the share of a
Unit Owner for Common Expenses if not otherwise allocated pursuant to
Schedule A to the  Bylaws or by Agreement of the Unit Owners, and
specifically means, (i) as to General Expenses, the General Expenses
Share of a Unit Owner, unless Schedule A provides otherwise, and (ii) as
to Special Expenses and Limited Common Element Expenses, where
more than one, but less than all Unit Owners bear responsibility for the
cost and expense thereof, and either Schedule A does not indicate a
share arrangement for that Common Expense to each benefited Unit
Owner for such item, or the benefited Unit Owners cannot agree upon
the sharing of that Common Expense within 10 days after the date that

4

notice is given to the benefited Unit Owners of the cost or expense for such item, the share determined by dividing such Unit Owner's General Expenses Share by the cumulative total of the General Expenses Shares of all benefited Unit Owners.

(r)    "Effective Date" means the date that this Declaration is recorded among the land records of the Office of the Recorder of Deeds of the District of Columbia.

(s)    "Facilities Access Conditions" means those conditions specified in Section 4.3 of this Declaration related to right of the Unit Owners Association or a Unit Owner to have access to Unit No. 1 or Unit No. 2, or any assigned Limited Common Elements thereto, as applicable, to undertake maintenance, repairs and replacement of Unit Facilities, repairs, replacements, and relocation of existing Service Facilities and to undertake the installation of new Service Facilities.

(t)    "General Common Elements" means all Common Elements of the Condominium other than Limited Common Elements.

(u)    "General Expense/General Expenses" means a Common Expense, but for those classified by the provisions of this Declaration or the Bylaws as a Limited Common Element Expense or Special Expense.

(v)    "General Expenses Share" means the share of General Expenses that the Unit Owner of each particular Unit shall be responsible for based upon the Common Element Interest percentage attributable to that Unit pursuant to Exhibit B to this Declaration, except where Schedule A to the Bylaws provides an alternate sharing arrangement for such General Expenses, and then the provisions of Schedule A shall govern and control the allocation of those General Expenses.

(w)    "Identification Monuments" means signs and other monuments, posters and the like as more fully described in Section 4.12 of this Declaration.

(x)    "Limited Common Elements" means those portions of the Common Elements, more fully described in Section 3.3 of this Declaration, that are reserved for the exclusive use of at least one, but fewer than all, of the Units, including, without limitation, those Common Elements specifically identified as "Limited Common Elements" on the Condominium Plat or the Condominium Plans, as

5

amended from time to time, and for which the Unit Owner or Unit Owners shall have the sole rights and benefits.

(y)     "Limited Common Element Expense/Limited Common Element Expenses" means a Common Expense incurred by the Unit Owners Association related to and arising from the use or control of, and entitlement to, a Limited Common Element; each benefited Unit Owner shall be responsible for its Limited Common Element Expenses Share of such Limited Common Element Expenses, for (i) all necessary or required repairs, maintenance and replacement of each Limited Common Element assigned to its Unit, (ii) obtaining all services, facilities, equipment and the like related to the use and/or occupancy with regard to each Limited Common Element for which it is/they are the beneficiary and (iii) costs and expenses of environmental remediation related to a Limited Common Element necessitated due to environmental contamination occurring after the recordation of this Declaration and caused by the action of the Unit Owner or Unit Owners of the Unit or Units to which the Limited Common Element is assigned, or caused by any tenant, contractor or agent thereof.  Where there is only one such Unit Owner, then such Unit Owner shall be solely responsible, on behalf of the Unit Owners Association, for such Limited Common Element and the related Limited Common Element Expense; where there is more than one Unit Owner benefited, but fewer than all Unit Owners are benefited, then, unless the Unit Owners Association is otherwise charged with responsibility for such Limited Common Element, all such benefited Unit Owners shall share responsibility for the Limited Common Element, and each Unit Owner shall be responsible for its Limited Common Element Expense Share of the Limited Common Element Expense therefore.  Where expenses and costs related to or arising from the use of any Limited Common Elements are paid for directly by the Unit Owner of the Unit or Unit Owners of Units to which those Limited Common Elements are assigned, and not by the Unit Owners Association, then such costs and expenses shall not be deemed Limited Common Element Expenses, nor Common Expenses generally of the Unit Owners Association.

(z)     "Limited Common Element Expenses Share" means, where there is more than one Unit Owner, but less than all Unit Owners benefited, a Unit Owner's share of a Limited Common Element Expense, determined by (i) first by Schedule A to the Bylaws, (ii) second by allocation by and between the benefited Unit Owners in proportion to their respective utilization and benefit of such Limited Common Elements as determined by those benefited Unit Owners, where not addressed by Schedule A to the Bylaws, and (iii) third where Schedule A

6

to the Bylaws does not address an allocation of such item and the benefited Unit Owners fail to come to agreement within 10 days after the date that notice is given to the benefited Unit Owners of the cost or expense for such Common Expense, then the Default Share of each such Unit Owner.

(aa)    "Managing Agent" means any duly qualified managing agent duly selected and employed by the Unit Owners Association to perform (i) property management duties and services for the General Common Elements and, if applicable, the Limited Common Elements, and (ii) duties and services related to the management and operation of the Condominium, as a condominium regime, and the Unit Owners Association, as a community association entity, all in accordance with the provisions of the Condominium Act, this Declaration or the Bylaws, as applicable.

(bb)    "Management Agreement" means any management agreement between the Unit Owners Association and the Managing Agent related to the operation and administration of the Condominium.

(cc)    "Mortgage" means any recorded deed of trust or mortgage for the benefit of a Mortgagee, which deed of trust or mortgage encumbers the legal title of a Condominium Unit.

(dd)    "Mortgagee" means the lender or bondholder under the Bonds secured under a Mortgage, where such lender, bondholder or trustee, pursuant to the terms of Article 8 of the Bylaws, has notified the Unit Owners Association of its status as the beneficiary under any Mortgage and has requested all rights under the Condominium Instruments and the Condominium Act, as applicable, provided that where there are multiple bondholders under the Bonds then the term "Mortgagee" shall mean the party that has the fiduciary responsibility for administering the Bonds.

(ee)    "Par Value" means the number of points assigned to each Unit by this Declaration as set forth on Exhibit B attached to and made a part of this Declaration.

(ff)    "Permitted Uses" means those uses of the Building provided and permitted by Section 1.4 of this Declaration.

(gg)    "Person" means any individual, corporation, association, foundation, trust, limited liability company, partnership or other legal entity, including an association of unit owners, or any

7

combination thereof, that may individually or collectively be the owner or owners of a Condominium Unit.

(hh)  "Plans" or "Condominium Plans" consist of the plans of the Building showing the location and boundaries of each Unit and of the Common Elements located in and about the Building and the Land, and related matters that are subjected to the regime of the Condominium, and any amendments thereto, made in accordance with the provisions of this Declaration, certified by a registered architect and/or registered engineer, licensed in the District of Columbia, and filed among the Condominium Records of the Office of the District of Columbia Surveyor.

(ii)  "Plat" or "Condominium Plat" means the plat of survey of the Land and related matters that are subjected to the regime of the Condominium, and any amendments thereto, made in accordance with the provisions of this Declaration, certified by a registered surveyor and/or registered engineer, licensed in the District of Columbia and recorded among the Condominium Records of the Office of the District of Columbia Surveyor.

(jj)  "Plat and Plans" means collectively the Plat and the Plans.

(kk)  "Required Vote" shall mean a Standard Majority Vote, except that (i) in those cases where the Condominium Instruments require a Special Majority Vote, and then a Required Vote shall mean a Special Majority Vote, (ii) in those cases where the Condominium Instruments require the approval of all the Unit Owners, and then a Required Vote shall mean a Unanimous Vote, and (iii) in the approval of a line item in a proposed budget for Limited Common Element Expenses where the line item relates to a Limited Common Element assigned to Unit No. 3, then a Required Vote must include a vote of approval from Unit No. 3 Owner.

(ll)  "Reserved Common Element" means a portion of the General Common Elements not required for the functioning of the Condominium in the interests of all Unit Owners and with respect to which the Unit Owners Association, pursuant to this Declaration or by the Bylaws, has granted or may in its discretion grant a license to one or more (but not all) Unit Owners for exclusive use by those Unit Owner(s).

(mm)  "Right of Access Conditions" means those conditions specified in Section 4.1 of this Declaration related to the exercise of right of entry to a Unit or the Limited Common Elements

8

assigned to that Unit by the Unit Owners Association, the Managing Agent, any other person authorized by the Unit Owners Association, the Managing Agent or a Unit Owner.

(nn)    "Rules and Regulations" means the rules and regulations adopted from time to time by the Unit Owners Association in accordance with the Bylaws.

(oo)    "Schedule A" means the Schedule A to the Bylaws, which allocates the principal responsibilities for operation, maintenance, repair and replacement of the Common Elements.

(pp)    "Service Facilities" means those facilities identified in Section 4.3 of this Declaration.

(qq)    "Standard Majority Vote" shall mean the vote or written approval of an action of the Unit Owners by Unit No. 1 Owner and any other Unit Owner, whether actually cast in person or by proxy at a duly held meeting of the Unit Owners Association at which a quorum is present, or alternatively reflected in a written consent or communication from the participating Unit Owners where no meeting is held as is permitted by the Bylaws.

(rr)    "Special Declarant Rights" shall mean those rights reserved for the benefit of the Declarant as provided for in the Condominium Act and the Condominium Instruments, and shall include, without limitation, the following rights: (a) to complete improvements indicated on the Plats and Plans filed with this Declaration; (b) to maintain models, sales offices, leasing offices, management offices, customer service offices, and signs advertising the Units; and (c) to use easements through the Common Elements and the Units for the purpose of making improvements or performing repairs within the Condominium.

(ss)    "Special Expense/Special Expenses" means a Common Expense, other than Limited Common Element Expense, incurred by the Unit Owners Association with regard to, and which are allocable and assessable to, one or more, but fewer than all of the Unit Owners which Common Expense as allocable and assessed in accordance with and as specifically described in this Declaration or the Bylaws (including Schedule A), including but not limited to any costs and expenses incurred by the Unit Owners Association arising from (i) any residual environmental clean up obligations of environmental conditions identified prior to the  Effective Date, which obligations shall be the responsibility of and shared prorata by Unit No.1 Owner and Unit No. 2

9

Owner in accordance with the area of their respective Units, (ii) any environmental hazard or condition occurring within in a Unit that a Unit Owner fails to accept responsibility for and pay, and (iii) any environmental hazard or condition occurring in or about the General Common Elements caused by or the result of an action or failure to act of one or more but less than all Unit Owners, or by any the tenants, contractors or agents of such Unit Owner or Unit Owners.

(tt)    "Special Majority Vote" means a vote of the Unit Owners Association in which Unit Owner No. 1 and Unit Owner No. 2 are in agreement to take an action, or as applicable not to take an action.

(uu)    "Title Documents" shall mean any documents imposing (i) easements, and (ii) those covenants, conditions and restrictions related to the physical development and operation of the Building or a component part thereof, whether affecting or benefiting the Property, in whole or in part, created or existing outside of this Declaration, whether now existing or hereafter executed, and shall include, without limitation, the following documents, if and to the extent the following remain in effect as an encumbrance upon legal title to the Property or any portion thereof after the Effective Date: [(A)] Land Disposition and Development Agreement, dated as of January 17, 2003 by and between RLA Revitalization Corporation, an independent instrumentality of the District of Columbia, and Declarant, as amended to the date of this Declaration (the "LDA");[ and (B) such additional matters as may arise or be in the chain of legal title prior to the Effective Date and which relate to the physical development and operation of the Property.] The term "Title Documents" shall specifically not be deemed to mean the DC USA Deed, including any of the performance obligations thereunder, and any deed of conveyance to any Unit in the Condominium and any of the performance obligations thereunder.

(vv)    "Unanimous Vote" means a vote requiring the agreement of all Unit Owners as to the action proposed.

(ww)    "Unit" means a unit as defined by the Condominium Act, as separately described in Article II of this Declaration and as depicted on the Plat and Plans, and in any amendment to the Declaration and/or the Plat and Plans. Furthermore, where in this Declaration, in the Bylaws or on the Plans, a Unit is referred to by a specific Unit number as the same appears in the Common Element Interests Table set forth as Exhibit B attached to this Declaration and on the Plans, then the provisions of this Declaration

10

and the Bylaws shall apply and be deemed to mean that identified Unit only (e.g. "Unit No. 1").

(xx) "Unit Facilities" means any equipment, facilities and supporting equipment serving a Unit that are located (i) within the boundaries of that Unit, but which may be accessed only through Common Elements not assigned to that Unit or through another Unit, and (ii) within Common Elements, but which may be accessed only through another Unit or Limited Common Elements assigned to another Unit.

(yy) "Unit Owner" or "Owner" means any Person capable of holding title to real property that owns fee simple title to a Condominium Unit, but does not include a Mortgagee, as such, unless and until such Mortgagee takes title to a Unit by foreclosure or process in lieu thereof. Furthermore, where in this Declaration and the Bylaws a Unit Owner is referred to as the Unit Owner of a specific Unit, then the provisions of this Declaration and the Bylaws shall apply and be deemed to give specific reference to that identified Unit Owner only (e.g. "Unit No. 1 Owner").

(zz) "Unit Owners Association" means collectively all of the Unit Owners acting as a group in accordance with the provisions of the Condominium Act, this Declaration and the Bylaws. The Unit Owners Association shall be incorporated as a District of Columbia non-profit corporation.

Section 1.3. Name and Address of Condominium. The name of the Condominium is the "DC USA Condominium." The address of the Condominium is 3100 14th Street, N.W., Washington, D.C. 20010.

Section 1.4. Permitted Uses.

(a) Unit No. 1 may be used for retail/commercial uses that would be found in a similar high quality, mixed use retail/commercial project, including without limitation retail, entertainment, recreational, service and restaurant uses, consistent with high quality urban development projects, but in any case only for those uses as are permitted by applicable law, including without limitation the District of Columbia Zoning Regulations, as the same may exist from time to time (the "Zoning Regulations"), the DC USA Deed and the Title Documents. The use of Unit No. 1 for such retail/commercial uses may only be undertaken, operated and maintained in accordance with and subject to the terms and conditions set forth in this Declaration, the Bylaws, or both and then only in

11

accordance with applicable law, the DC USA Deed and the Title Documents, as applicable.

(b)    Unit No. 2 may be used only for a high quality, "big box" retail uses, and any retail/commercial uses that would be found in a similar high quality, mixed use retail/commercial project, including without limitation retail, entertainment, recreational, service and restaurant uses, consistent with high quality urban development projects, but in any case only those retail and accessory uses as are permitted by applicable law, including without limitation the Zoning Regulations, the DC USA Deed and the Title Documents. The use of Unit No. 2 for such "big box" retail uses may only be undertaken, operated and maintained in accordance with and subject to the terms and conditions set forth in this Declaration, the Bylaws, or both and then only in accordance with applicable law, the DC USA Deed and the Title Documents, as applicable.

(c)    Unit No. 3 may be used only for off-street vehicular parking purposes providing for and serving primarily the off-street vehicular and bicycle parking needs arising from the various Permitted Uses of each of Unit No.1 and Unit No. 2 as identified in Sections 1.4 (a) and (b) above, open to the public, unless a change in use is approved by a Unanimous Vote, which approval may be only granted by the Unit Owners Association where such a change in use would not cause the Building to violate applicable laws, including the Zoning Regulations, the DC USA Deed, the Title Documents, and the Declaration of Parking Operations. The use of Unit No. 3 for off-street vehicular parking may only be undertaken, operated and maintained in accordance with and subject to the terms and conditions set forth in this Declaration, the Bylaws, the DC USA Deed, the Title Documents, the Declaration of Parking Operations, or any or all of them, and then only in accordance with applicable law.

Section 1.5. Warranty as to the Common Elements and Any Unit; Transfer of Non-Real Estate Assets. (a)    No warranty against structural defects in the Common Elements or in any Unit is given or made by the Declarant to any Unit Owner or to the Unit Owners Association; any warranty against structural defects otherwise available pursuant to the Condominium Act from Declarant is deemed specifically waived by the Unit Owners and the Unit Owners Association. By acceptance of a deed to a Unit from the Declarant, a Unit Owner will be deemed conclusively to have accepted such Unit without any statutory warranty as to structural defects.

12

(b)    Notwithstanding that no warranty is given or made by the Declarant pursuant to this Declaration by the Declarant, Declarant does hereby assign and transfer over (1) to the Unit Owners Association as to the General Common Elements (A) any warranties or performance guarantees made and given by third parties to Declarant as the developer or owner of the Property, B) all personal property located upon the Land or within the Building owned by Declarant and used in connection with the General Common Elements, if any, and (C) all licenses and permits issued to or owned by Declarant relating to the General Common Elements, and (2) to each Unit Owner as to its Unit and any Limited Common Elements appurtenant thereto (A) any warranties or performance guarantees made and given by third parties to Declarant as the developer or owner of the Property, (B) all personal property located within the Unit owned by Declarant and used in connection with such Owner's Unit or the assigned Limited Common Elements, if any, and (C) all licenses and permits issued to or owned by Declarant relating to such Owner's Unit or the assigned Limited Common Elements, if any.

ARTICLE II
BUILDING ON THE LAND; UNIT BOUNDARIES

Section 2.1. Location and Dimensions of the Building. The location and dimensions of the Building on the Land are shown on the Condominium Plat.

Section 2.2. Units. The location of the Units within the Building and their dimensions are shown on the Condominium Plans. The Common Element Interests Table, attached as Exhibit B hereto, is a serial list of all the Units in the Condominium, each Unit's identifying designation and the Common Element Interest appurtenant to each Unit determined on the basis of Par Value.

Section 2.3. Unit Boundaries. The boundaries of each Unit are as follows:

(a)    Upper and Lower (horizontal) Boundaries of a Unit: The upper and lower boundaries of each Unit shown on the Plans are the following boundaries extended to intersections with the vertical (perimetric) boundaries:

(1)    Upper Boundaries: The horizontal planes of the bottom surface of the structural slab of the ceiling of the uppermost floor of a Unit at various levels in the Building; provided, however, that with respect to any portion of a Unit where the ceiling does not exist, then the upper boundary of such Unit shall be deemed to be bounded by the lower boundary of any Unit immediately above such portion of a Unit, extended in a direct line across said opening, all as more fully depicted on the Plans.

13

(2)    Lower Boundaries: The horizontal planes of the top surface of the undecorated structural floor slab of the lowest floor of a Unit at various levels in the Building, provided, however, that with respect to any portion of a Unit where a floor slab does not exist, then the lower boundary of that Unit shall be the upper boundary of the Unit immediately below such portion of a Unit extended in a direct line across said opening, all as more fully depicted on the Plans.

(b)    Vertical (perimetric) Boundaries: The vertical boundaries of each Unit are, as applicable, (1) as to any bounding walls, or portions thereof, that are exterior walls of the Building, the vertical planes of the interior surface of all exterior walls of the Building, including of any parking ramp, whether above or below grade, (any drywall or other type of finishing covering the interior surface of any exterior wall being deemed part of and within the Unit), provided that the exterior surface of doors, and window and window systems located from time to time at the ground floor level of the Building in the vertical walls that at exterior walls of the Building bounding the Unit shall be deemed part of the Unit, (2) as to any bounding walls, or portions thereof, that are not exterior walls of the Building, the vertical planes of the back surface of the wall board of any interior wall bounding a Unit, provided that if the bounding wall, or portion, thereof is a wall directly confronting the Atrium Lobby, then the bounding wall, or the portion thereof that confronts that Atrium Lobby shall be deemed part of the Unit, and the boundary of the Unit of those bounding walls or the applicable portion thereof shall be the exterior face of that exterior wall or the portion thereof that confronts the Atrium Lobby, and (3) as to any doors, and window and window systems located in any other interior vertical walls bounding the Unit, the vertical planes of the exterior surface of those doors, and window and window systems, in all cases (1), (2) and (3) above, as those vertical planes are extended to intersections with each other and with the upper and lower boundaries of the Unit, provided that , in any case where there is no vertical wall bounding such Unit, the vertical boundary in such area will be the vertical boundary line separating such Unit from another Unit or from any Common Elements as such boundary line is determined by extending, in a direct line, that boundary line across said opening in a straight or level plane, all as more fully depicted on the Plans.

(c)    Included as part of each Unit are: (1) all equipment related to the exclusive use and operation of a Unit, including but not limited to air-conditioning and heating components serving only that Unit, whether located inside or outside of the designated boundaries of the Unit; (2) any power source exclusively servicing a Unit, and the energy source exclusively therefor (including any fuel

14

storage tank), whether located inside or outside of the designated boundaries of a Unit; (3) any elevators, escalators, and convenience staircases, whether located inside or outside of the designated boundaries of a Unit and serving only that Unit, and all equipment serving and supporting such elevator, escalator or convenience staircase serving that Unit, whether located inside or outside of the designated boundaries of a Unit; (4) any equipment, fixtures and ancillary movable items, such as but not limited to shopping carts and cart corals, related to the use and operation of a Unit, located or positioned outside of the designated boundaries of a Unit; (5) Identification Monuments pertinent to the Unit, wherever located, in the Common Elements and (6) subject to the following sentence, all space, interior partitions and other fixtures and improvements, including but not limited to Identification Monuments within the designated boundaries of a Unit. Subject to Section 2.3(d), if any chute, flue, duct, pipe, conduit, chase, wire, bearing wall or column, or any other apparatus serving the Unit, lies partially inside and partially outside of the designated boundaries of that Unit, then any portions thereof serving only that Unit and located outside the designated boundaries of that Unit, shall be deemed a part of that Unit; any portions thereof wherever located serving more than one Unit shall be deemed Common Elements.

(d) For the purposes of this Section, the term "Unit" shall be deemed to include the floor slabs, rampways and other horizontal surfaces located within the designated boundaries of a Unit, but shall not be deemed to include any slab, or any portion thereof, that serves as demarcation of an upper or lower horizontal boundary of a Unit, including the structural slab of the Building serving as the roof of the Building, the structural slab of the Building that is the lowest foundation slab of the Building, a slab at any level between Unit No. 1 and Unit No. 3, and the portion of slab at any level that separates Unit No. 1 and Unit No. 2, all of which Unit boundary slabs shall be deemed General Common Elements, subject however to the provisions of Schedule A with regard to the responsibilities of individual Unit Owners therefore as provided in that Schedule A. For the purposes of this Section, as to all Units, the term "Unit" shall not be deemed to include (i) any vertical supports of the Building, including columns, whether part of any bounding walls of a Unit, or not; or (ii) the space between the back surfaces of any bounding walls separating adjoining Units, or (iii) any building systems of any kind and nature serving more than one Unit, notwithstanding that same maybe located within the designated boundaries of a Unit. The designation of any slab or portion thereof as a boundary slab to a Unit and thus a General Common Element is not

15

intended to modify the allocation of responsibility and costs/expenses thereof of a Unit Owner as specified in Schedule A to the Bylaws.

(e)    Where this is a conflict between the location of a boundary of a Unit as would be fixed pursuant to the provisions of this Section 2.3 of the Declaration and the depiction of that Unit on the Plat and Plans, the location of a Unit as depicted on the Plat and Plans shall control.

Section 2.4.  Operation, Maintenance, Repair and Replacement Responsibilities of a Unit.  Notwithstanding the description of the boundaries of each Unit, the provisions of the Bylaws, including Schedule A thereto, shall govern the division of operation, maintenance, repair and replacement responsibilities of Units and Common Elements among Unit Owners and between each Unit Owner and the Unit Owners Association, as well as the consequent sharing of General Expenses or Limited Common Element Expenses.  Generally however, and, except as provided by Schedule A to the Bylaws, (i) a Unit Owner shall be solely liable for undertaking construction, operation, maintenance, repair and replacement of the furnishings, fixtures, equipment and interior improvements and betterments of a Unit, including the cost and expenses thereof, and (ii) the Unit Owner of a Unit or Unit Owners of Units to which Limited Common Elements are assigned thereto shall be solely liable for undertaking construction, operation, maintenance, repair and replacement of the furnishings, fixtures, equipment and interior improvements and betterments of those Limited Common Elements, including the cost and expense thereof, unless the same are specifically identified as the responsibility of the Unit Owners Association, or another Unit Owner pursuant to this Declaration or the Bylaws, including Schedule A.  Each Unit Owner shall operate, maintain and repair its Unit, and each Unit Owner or group of Unit Owners shall operate, maintain and repair the Limited Common Elements assigned thereto, in a high quality condition, comparable to what would be found from time to time in comparable high quality retail/commercial developments in the Washington, D.C. metropolitan area.  Each Unit Owner shall periodically refurbish its Unit and see to the refurbishment of the Limited Common Elements assigned thereto, or as applicable replace operating equipment for its Unit and see to the applicable replacement of operating equipment related to such Limited Common Elements so as to maintain such standard as to both the Unit and those Limited Common Elements.

Section 2.5.  Relocation of Boundaries Between Units and Subdivision of Units.

(a)    Each of Unit No. 1 and Unit No. 2 may be legally subdivided by its applicable Unit Owner subject to obtaining the approval of any affected Mortgagee of the Unit, and upon giving prior notice to the other Units and Unit Owners Association of the intent to undertake the same.  Unit No. 3 may not

16

be subdivided by its Unit Owner without the prior approval in writing from all Unit Owners and each Mortgagee of a Unit.

        (b)      The unit boundaries between or among any of Unit No. 1, Unit No. 2 and Unit No. 3 may not be relocated without the prior approval in writing from all affected Unit Owners, each affected Mortgagee of the Unit(s) involved and the Unit Owners Association by Standard Majority Vote.

        (c)      Where a subdivision or boundary relocation is permitted, an amendment to this Declaration shall be entered into by the affected Unit Owners and the Unit Owners Association to effect any Unit subdivision or boundary relocation and thereafter such amendment shall be recorded by the Unit Owners Association as provided in Section 42-1902.25 or Section 42-1902.26 of the Condominium Act, among the land records of the Office of the Recorder of Deeds of the District of Columbia, and, if appropriate, an amendment to the Plans which shall be similarly prepared and filed with the Office of the Surveyor of the District of Columbia, all at no expense to the Unit Owners Association.

Section 2.6.  Establishment of a Subordinate Condominium Regime within a Unit.

        (a)      Subject to the Title Documents, and the Declaration of Parking Operations where applicable, each of Unit No. 1 Owner and Unit No. 2 Owner may establish a subordinate condominium regime within its Unit, provided that the same does not cause the Building to become in violation of any applicable provisions of the Zoning Regulations, and undertaking the establishment of a subordinate condominium regime within its Unit shall not require the prior approval of the Unit Owners Association so long as undertaking the same would not impose additional material and substantive obligations on the Unit Owners Association or alter the Common Element Interest appurtenant to any Unit. If it can reasonably be demonstrated and determined that additional material and substantive obligations would be imposed upon the Unit Owners Association as a result of the establishment of the subordinate condominium regime or there would be an alteration of the Common Element Interest allocation to any Unit, then the prior approval of the Unit Owners Association shall be required by a Unanimous Vote.

        (b)      Subject to the Title Documents and the Declaration of Parking Operations, Unit No. 3 Owner may establish a condominium regime within Unit No. 3, provided that (i) the same does not cause the Building to become in violation of any applicable provisions of the Zoning Regulations, and (ii) the approval of the Unit Owners Association is obtained by the Unanimous Vote prior to the establishment of a subordinate condominium regime within Unit No. 3.

17

(c)      Where a Unit Owner has satisfied the conditions to establishment of a subordinate condominium regime within its Unit as described in subparagraphs (a) or (b) of this Section as applicable, and thereafter proceeds to so establish a condominium regime within its Unit, that Unit Owner shall provide notice thereof to the Unit Owners Association at such time as such a regime is duly established in accordance with the Condominium Act. Any Unit in which a subordinate condominium regime is established shall remain for all purposes a single Unit of the Condominium, with the Common Element Interest specified herein. That is, the vote of such Unit shall thereafter be exercised by the unit owners association for the condominium regime established within such Unit and not by the individual unit owners of units in any condominium established within that Unit. Further, any and all Common Expenses and other expenses payable by such Unit shall be an obligation of the unit owners' association in such subordinate condominium regime. The Unit Owners Association shall incur no costs related to either the establishment or the continuation thereafter of a condominium regime within any of Unit No. 1, Unit No. 2, or Unit No. 3, all of the same being borne by the Unit Owner, or its successors or transferees thereof, that has undertaken to establish a condominium regime within its Unit. Upon the establishment of a subordinate condominium regime within a Unit, the Unit Owners' Association shall be a "master association" as defined in Section 42-1903.18 of Condominium Act.

Section 2.7    Development Rights/Expansion of Building.

(a)      Entitlement to Excess Development Rights. Any gross floor area attributable to Land  pursuant to the Zoning Regulations from time to time (as the term "gross floor area" is defined in the Zoning Regulations) not consumed by and incorporated in the Building as of the date of this Declaration shall be deemed excess gross floor area attributable to the Land ("Excess Development Rights"). All Excess Development Rights shall be deemed to be outside the regime of the Condominium, and shall be deemed reserved in the Declarant and its successors and assigns. If Declarant or its successors and assigns elects to use the Excess Development Rights within the portion of the air space above the Building located directly above Unit No. 1, and then Declarant or its successors and assigns may do so, but only subject to review and approval as provided in Section 2.7 (b) of this Declaration.

(b)      Development Above The Building. If Declarant or its successors or assigns desires to develop any or all of the Excess Development Rights outside the boundaries of the Land within the portion of the air space above the Unit No. 1, Declarant shall review the concept and plans for the same with the Unit Owners Association. Approval by all Unit Owners shall be required, provided that so long as the proposal for development of the Excess Development Rights (i) would not be expected  to materially and adversely impact the structural integrity of the Building, (ii) would not be expected to impose any material or significant burden on

18

the Building's operating systems, (iii) would be for uses that are permitted as a matter of right by the applicable provisions of the Zoning Regulations and not incompatible with the Permitted Uses and the DC USA Deed, (iv) would not cause a violation of the provisions of any of the Title Documents, (v) would not put Unit No. 3 in non-compliance with or in violation of the Zoning Regulations with regard to providing parking accommodations for any uses of the additional development using the Excess Development Rights, (vi) would not cause Unit No. 3 to incur costs and expenses that would not be compensated with regard to the operation of the parking facilities located within Unit No. 3, and (vii) is architecturally compatible with the Building, then no Unit Owner may unreasonably withhold its consent to or condition its approval of the proposed development sought by Unit No. 1 Owner .

## ARTICLE III
## COMMON ELEMENTS

Section 3.1.  <u>General Common Elements</u>.  The locations of the General Common Elements are shown on the Plat and the Plans and consist of the entire Condominium, other than the Units and Limited Common Elements.  The General Common Elements include, without limitation, the following:

(a)     The Land;

(b)     All foundations, foundation walls, columns, girders, beams, floor slabs and supports of the Building whether the same are located within or outside of a Unit, except those horizontal structural elements identified in Section 2.3 as part of a Unit;

(c)     All exterior walls and facings of the Building and any other exterior surfaces and fixtures attached to such walls, facings and surfaces (including without limitation the structural grid wall) and all partitions separating Units, except to the extent the portion thereof is included as part of a Unit or identified as Limited Common Elements;

(d)     The mechanical, electrical, telephone/telecommunications, maintenance, trash and other rooms located in the Building to the extent not included as part of a Unit or identified as Limited Common Elements;

(e)     All mechanical, electrical, telephone/telecommunications and plumbing equipment and related facilities, including but not limited to all pumps, pipes, wires, cables, conduits and other apparatus relating to the water distribution, power, light, telephone, gas, sewer, heating, air conditioning and plumbing systems located in and/or serving the Building and not included as part of a Unit or identified as Limited Common Elements;

19

(f)     The roof and roof structures of the Building to the extent not included as part of a Unit or identified as Limited Common Elements;

(g)     The entrances, vestibules, lobbies, reception spaces, common seating areas, elevator lobbies and all other hallways and areas located in or about the Condominium to the extent not identified as either part of a Unit or identified as Limited Common Elements;

(h)     All furniture, fixtures and equipment (i) purchased, and installed or located in General Common Element areas of the Condominium by the Declarant as of the Effective Date and not identified as a Limited Common Element or part of a Unit, or as the personal property of any Unit Owner, and (ii) purchased or otherwise acquired as of and after the Effective Date by the Unit Owners Association for installation in the General Common Element areas of the Condominium, but in any case specifically excluding as General Common Elements (A) property of Declarant, including but not limited to signage, acquired as and related to its ownership of any Unit located within or attached to the General Common Elements, (B) property of any of tenant of any Unit, including but not limited to signage, acquired as and related to its leasing of any space in any Unit, which may be located within or attached to the General Common Elements, (C) furniture, materials and equipment belonging to any contractor of the Declarant, any Unit Owner or any tenant of any Unit Owner that is located within or attached to the General Common Element areas of Condominium,  and (D) any merchandising kiosk, cart or similar feature of any Unit Owner, or a tenant thereof that is permitted to be located in, on or about General Common Element areas pursuant to the Rules and Regulations, such property, furniture, materials and equipment being deemed part of any Unit, identified as a Limited Common Element appurtenant to the Unit to which it is associated, or the personal property of a Unit Owner or its tenant/occupant of such Unit.

(i)     The elevators and elevator shafts, escalators and escalator machinery areas, and in each case related equipment thereto located within or that serve the General Common Elements or all Units, excluding, however (i) elevators and elevator shafts, and escalators and escalators machinery areas identified on the Plan as within Limited Common Elements, and (ii) elevators and escalators that are located within the boundaries of any Unit;

(j)     The stairwells and stairs of the Building, including fire egress stairs, but excluding stairwells and stairs identified as

Limited Common Elements and convenience or other stairs situated within the boundaries of a Unit;

(k) All exterior entrance doors and windows located in and about the Building, except those identified as Limited Common Elements or included as part of a Unit;

(l) Storage spaces in the Building not otherwise identified as Limited Common Elements or located within the boundaries of a Unit;

(m) Off-street loading facilities serving the Building, as well as rights to other off-street loading facilities, except those located within the boundaries of a Unit or those identified as Limited Common Elements;

(n) Rights to subterranean vaults located within public rights of way, or portions thereof, adjacent to the Land, if any;

(o) Landscaping features located in the General Common Elements of the Condominium including but not limited to walkways, planters, gardens, furniture and lighting, and any landscaping features within areas of the Building and the Land marked as the General Common Elements of the Condominium, whether interior or exterior to the Building;

(p) All rights and entitlements in and to adjacent public rights of way that accrue to the Land;

(q) Easements, covenants, restrictions and similar agreements benefiting or burdening the Property, except to the extent identified as Limited Common Elements or as part of a Unit;

(r) Except as may be otherwise set forth herein, all apparatus and installations now located upon or hereinafter constructed or installed in the Building or on the Land for common use, or necessary or convenient to the existence, the common maintenance or safety of the Building or the Land;

(s) All permits, licenses, approvals, and similar governmental actions related to the use and operation of the Building (e.g., elevator licenses, etc.), but specifically excluding those related to the use and occupancy of a specific Unit or portion thereof;

(t) Such other areas or elements of the Property identified as General Common Elements on Schedule A.

21

(u)     [Such other items as may become evident with a review of the draft Plat and Plans of the proposed Condominium being prepared.]

Section 3.2. <u>Reserved Common Elements</u>.

The Unit Owners Association shall have the power in its discretion from time to time to grant revocable licenses in designated portions of the General Common Elements to a Unit Owner as Reserved Common Elements. A Standard Majority Vote of the Unit Owners Association shall be required before such designation and granting of a license may be made, provided that where such designation (a) would reasonably be expected to materially and adversely deprive any Unit Owner, which is not the intended licensee of the Reserved Common Elements, of any material benefit that all Unit Owners then enjoy with regard to the portions of the General Common Elements proposed to be designated as Reserved Common Elements, and/or (b) would reasonably be expected to impose a greater financial obligation for General Expenses or other burdens upon any Unit Owner that is not the beneficiary of the license for Reserved Common Elements than would have been the case if such designation had not occurred, then a Unanimous Vote shall be required to designate and then license Reserved Common Elements to one or more, but less than all Unit Owners. Any Unit Owner that is granted rights to Reserved Common Elements shall indemnify and hold harmless the Unit Owners Association from any claims, losses, expenses and costs related to the use of the same. The Unit Owners Association may establish a reasonable charge to the Unit Owner of the Unit to which the Reserved Common Elements are licensed for the use and maintenance thereof. The designation by the Unit Owners Association of any General Common Elements as Reserved Common Elements shall not be construed as a sale or disposition of the General Common Elements. Any Common Expenses directly attributable to the operation of General Common Elements that are designated as Reserved Common Elements shall be deemed Special Expenses and shall be borne solely by the benefited Unit Owner or if there is more than one benefited Unit Owner then by each Unit Owner at its Default Share, unless there is agreement among those Unit Owners otherwise. Any income generated by the Unit Owner through the use of Reserved Common Elements licensed to it shall belong solely to that Unit Owner or those Unit Owners, as applicable.

Section 3.3. <u>Limited Common Elements</u>. Limited Common Elements are those Common Elements that are identified on the Plat and the Plans, or are otherwise described in this Section 3.3 as Limited Common Elements for the benefit

22

of one or more, but less than all Unit Owners, and shall include but are not limited to the following:

    (a)    Roof structures and areas of any roof of the Building identified on the Plat and Plans as Limited Common Elements;

    (b)    The mechanical, electrical, telephone/telecommunications and maintenance rooms and other areas located in, on or about the Building to the extent not included as part of a Unit, and identified as Limited Common Elements on the Plat and Plans;

    (c)    Any mechanical, electrical, HVAC, telephone/telecommunications, antennae and related equipment, and plumbing equipment and related facilities, including but not limited to all pumps, pipes, wires, cables, conduits and other apparatus relating to the water distribution, power, light, telephone, gas, sewer, heating, air conditioning and plumbing systems located in and/or serving fewer than all Units and not included as parts of a Unit, and areas related thereto identified as Limited Common Elements on the Plat and Plans;

    (d)    Areas of the Common Elements identified on the Plat and Plans for the benefit of one or more, but not all Units, all in accordance with the provisions of Section 4.7 of this Declaration, where Identification Monuments (as defined in Section 4.10 of this Declaration) may be installed and maintained by a Unit Owner (or a tenant/occupant of such Unit Owner's Unit), including on vertical or horizontal surfaces of the Common Elements, both interior to and exterior of the Building, and the areas in, on or about the Property, including but not limited to exterior walls of the Building, interior walls of the Common Element corridors, the walls and ceiling of the Atrium Lobby, and Common Element staircases and elevator cabs;

    (e)    Off-street loading facilities wherever located, including but not limited to roll down doors and other facilities and equipment marked on the Plat and Plans as Limited Common Elements;

    (f)    Elevators and elevator shafts, escalators and escalator machinery areas, and in each case related equipment that serve more than one Unit but less than all Units of the Condominium as identified on the Plat and Plans as Limited Common Elements.

    (g)    The exterior surface of any such elevator door and the exterior surface of the framework of the elevator door of any elevator

23

that opens directly into a Unit, which shall be deemed Limited Common Elements of that Unit.

(h)      Areas within the Common Elements identified on the Plat and Plans, where merchandising kiosks, carts or similar features and vending opportunities, and supporting facilities and equipment, may be located by a Unit Owner or a tenant thereof to whom such Limited Common Elements have been assigned.

(i)      All furniture, fixtures and equipment (i) purchased, and installed or located in Limited Common Element areas of the Condominium by the Declarant as of the Effective Date, and not identified as part of a Unit or as the personal property of any Unit Owner, and (ii) purchased or otherwise acquired as of and after the Effective Date by the Unit Owners Association for installation in the Limited Common Element areas of the Condominium, but in any case specifically excluding as Limited Common Elements (A) property of Declarant, including but not limited to signage and artwork, acquired as and related to its ownership and use of any Unit, located within or attached to the Limited Common Elements, (B) property of any tenant of any Unit, including but not limited to signage, acquired as and related to its leasing of any space in any Unit, which may be located within or attached to the Limited Common Elements, (C) furniture, materials and equipment belonging to any contractor of the Declarant, any Unit Owner or any tenant of any Unit Owner that is located within or attached to the Limited Common Element areas of Condominium, and (D) any merchandising kiosk, cart or similar feature of any Unit Owner, or a tenant thereof that is permitted to be located in, on or about Limited Common Element areas, such property, furniture, materials and equipment being deemed part of any Unit or the personal property of a Unit Owner or its tenant/occupant of such Unit.

(j)      The area of any cartilator and related equipment related to and serving a Unit and located in whole or in part outside of the Unit;

(k)      To the extent not part of a Unit, all entrance doors, and window and window assemblies located in and about vertical boundaries of that Unit, whether fronting on the exterior of the Building or on interior General Common Element areas, but specifically not including any entrance door and window/window assemblies located on or about the exterior face of the Building fronting on, or providing ingress to or egress from the exterior of the Building to, the interior General Common Element areas of the Building, such as the Atrium Lobby;

24

(l)      Landscaping features of any Limited Common Elements, including but not limited to walkways, planters, furniture and lighting;

(m)      Such other areas or elements of the Property identified as Limited Common Elements on Schedule A to the Bylaws.

(n)      [Such other items as may become evident with a review of the draft Plat and Plans of the proposed Condominium being prepared.]

Section 3.4.  <u>Allocation of Parking Rights</u>.  Each of Unit No. 1 Owner and Unit No. 2 Owner, and the permittees, licensees and invitees of each, shall be entitled to use on a non-exclusive basis with the Unit No. 3 Owner and its permittees, licensees and invitees, the parking accommodations in the public parking garage facility located within Unit No. 3, all in accordance with and subject to the provisions of the Declaration of Parking Operations.  As a public parking garage facility, Unit Owner No. 3 shall make available to each of Unit No. 1 Owner and Unit No. 2 Owner no less than the amount of off street parking spaces required by the Zoning Regulations for the Permitted Uses in Unit No. 1 and Unit No. 2.

ARTICLE IV
EASEMENTS, COVENANTS AND RESTRICTIONS

In addition to the easements created by Sections 42-1902.16 of the Condominium Act and by the Title Documents, the Condominium shall be subject to the following easements, covenants, conditions, limitations and restrictions:

Section 4.1.  <u>Easement for Access</u>.

At no expense to the benefited Person:

(a)      The Unit Owners Association, any of its officers, the Managing Agent and any other person authorized by the Unit Owners Association, any of its officers or the Managing Agent shall have the right of access at any time to any Limited Common Element or any Unit as provided in Section 42-1903.07 of the Condominium Act and Section 5.8 of the Bylaws, subject to compliance with the Right of Access Conditions.  The term "Right of Access Conditions" shall mean that access is gained and used in a manner that (i) does not materially and substantively interfere with the normal business operations of a Unit Owner, or its tenants or occupants, except in the case of an emergency or where applicable law imposes restrictions or conditions, and (ii), except with regard to activities conducted pursuant to the exercise of rights

25

provided for in Section 4.3(f) of this Declaration, is had only during normal operating hours of the Unit, or of any tenant or occupant thereof.

(b)     Each of Unit No. 1 Owner and Unit No. 2 Owner shall have a right of access at any time in, to and through Unit No. 3 to gain access to any portion of its Unit and any Limited Common Elements assigned to its Unit and to any easement area granted to such Unit Owner, in each case which are located within, or to which access may be gained only through, Unit No. 3, subject as appropriate to the giving of reasonable prior notice to Unit No. 3 Owner where access to such portion of a Unit or any Limited Common Element assign to such Unit can only be obtained through an area of Unit No. 3 under restricted access or control, such as a management office of any operator of the parking garage facility located in Unit No. 3.

(c)     Unit No. 3 Owner, its agents and contractors shall have a right of access to and through each of Unit No. 1 and Unit No. 2 to gain access to any Limited Common Elements assigned to Unit No. 3, which are located within, or may only be reasonably accessed through Unit No. 1 or Unit No. 2, as applicable, subject to satisfaction of the Right of Access Conditions with regard to the affected Unit.

(d)     Unit No. 1 Owner, it agents and contractors shall have a right of access to and through Unit No. 2 to gain access to any Limited Common Elements assigned to Unit No. 1 and located within, or may only be reasonably accessed through Unit No. 2, subject to satisfaction of the Right of Access Conditions with regard to the affected Unit.

(e)     Unit No. 2 Owner, it agents and contractors shall have a right of access to and through Unit No. 1 to gain access to any Limited Common Elements assigned to Unit No. 2 and located within, or may only be reasonably accessed through Unit No. 1, subject to satisfaction of the Right of Access Conditions with regard to the affected Unit.

(f)     The right of access afforded to a Unit Owner under (b), (c), (d) and (e) above of this Section 4.1 does not grant to such Unit Owner a right to physically occupy any portion of the Unit of another Unit Owner, but is intended to afford a Unit Owner only a right of passage to and from the portion of its Unit of the Limited Common Elements assigned to such Unit for which access may only be reasonably obtained through the Unit of another.

26

Section 4.2. Unit Owners Association's Right to Act under and Grant, Modify, Amend and Terminate Easements, Restrictions and Covenants. (a) The Unit Owners Association shall have the exclusive right on behalf of all Unit Owners, subject to obtaining the Required Vote hereunder, (i) to grant, modify, amend and terminate, subject to and in accordance with the applicable provisions of the Bylaws, (A) easements, restrictions, covenants and similar agreements affecting the Property, or any portion thereof, including, without limitation to those that may also affect or pertain to any other property in Square 2674 in the District of Columbia, to which the Unit Owner Association is a party and not any one or more of the Unit Owners individually ,and (B) the Title Documents, provided that any amendment to the LDA may additionally require actions in accordance with the terms thereof by the parties thereto, (ii) to cast all votes or take other actions under any of the agreements referred to in item (a) above of this Section on behalf of the Unit Owners that the Unit Owners Association reasonably believes are not inconsistent with the best interest of the Condominium and the Unit Owners collectively, subject as applicable to obtaining a Required Vote, and (iii) to apply for or voluntarily agree to accept, subject to and in accordance with the applicable provisions of the Bylaws, any governmental relief, benefit or burden under (A) the Zoning Regulations, and (B) the Construction Codes of the District of Columbia (Title 12, DCMR) as amended (collectively the "Governmental Requirements"), where such relief or benefit, if granted, would not reasonably be expected to impose obligations or burdens upon the Unit Owners Association with regard to the Common Elements  that would be greater or more burdensome than were those imposed upon the Unit Owners Association as of the Effective Date.

(b)    Where a proposed grant, modification, amendment, exercise of termination, application, or acceptance would reasonably be expected to materially and adversely deprive a Unit Owner of any benefit to the Common Elements it otherwise then enjoys, or would impose a materially greater financial burden upon a Unit Owner for Common Expenses than would have been the case in either circumstance if the grant, modification, amendment, termination, application or acceptance did not occur, then the consent of all Unit Owners shall be required. In no event shall the Unit Owners Association have the authority to act on behalf of any Unit Owner in altering, modifying, terminating or otherwise changing any easement, restriction, covenant or similar agreement as to any individual Unit that may arise under any Title Document (including, without limitation, the LDA) or the DC USA Deed.

27

(c)      Where a proposed grant, modification, amendment, exercise of termination, application, or acceptance would not reasonably be expected to materially and adversely deprive any Unit Owner of any benefit to any Common Element that such Unit Owner otherwise then enjoys, or would not impose a greater financial burden upon any Unit Owner for Common Expenses than would have been the case if the grant, modification, amendment, termination, application, or acceptance did not occur, and the provisions of each of Section 3.2 (a) and Section 3.2 (b) of the Bylaws do not apply, then only a Standard Majority Vote shall be required to approve the proposed grant, modification, amendment, exercise or termination, application or acceptance.

(d)      If a proposed grant, modification, amendment, exercise of termination, application, or acceptance would require the consent of all Unit Owners in support of the action (whether pursuant to this Section or pursuant to the provisions of Section 3.2 (a) or Section 3.2 (b) of the Bylaws as applicable, and the Required Vote is not achieved, then if the President-Treasurer believes in his or her reasoned opinion, after consultation with all Unit Owners, that the failure to take the action will (i) materially and detrimentally harm the Land or the Building, or the interests of the Unit Owners as a whole under such agreements, (ii) result in the failure to obtain or maintain utilities necessary for the operation of the Condominium, or (iii) result in the non-compliance of the Condominium, the Land or the Building with any applicable law or governmental requirement, then the President-Treasurer, notwithstanding the inability of the Unit Owners Association to achieve the consent of all Unit Owners in support of such action, may act in his or her reasonable discretion, to execute such agreements, cast such votes or take such actions as he or she deems necessary to the extent necessary to protect the interests of the Condominium and all of its Units Owners, provided that the President-Treasurer shall make a good faith effort to identify and implement the alternative that in his/her reasoned opinion would be expected to be the least burdensome upon the Unit Owners collectively.

(e)      Provided the President-Treasurer duly undertakes his/her duties and proceeds as provided for in Section 4.2(d) above, then the Unit Owners shall accept such decision of the President-Treasurer as a due action by the Unit Owners Association.  No action may be taken by the Unit Owners Association or the President-Treasurer however that would (i) interfere in any material and significant manner with the conduct of business in a Unit, (ii) increase the cost of conducting business within a Unit, without the consent of the affected Unit Owner, (iii) cause a default under any financing instruments securing or

documenting any Mortgage, (iv) violate any Title Document, (v) cause any Unit Owner to violate any covenant, restriction or condition that may have been imposed upon that Unit Owner or the Unit of that Unit Owner by and through, directly or indirectly, the DC USA Deed, or (vi) cause a default under the Bond Documents or adversely affect the exemption from taxation of interest on the Bonds.

Section 4.3.  <u>Pipes, Ducts, Cables, Wires, Conduits, Public Utility Lines and Other Utility Distribution Systems/Unit Related Operating Equipment and Systems</u>.

(a)    Each Unit Owner shall have an easement, in common with the Unit Owners, of access and use, for the purposes of installation, maintenance, repair and replacement, of all pipes, wires, ducts, cables, conduits, public utility lines and all other utility distribution systems (individually a "Service Facility" and collectively "Service Facilities"), whether or not the same are Common Elements, and whether or not located in any of the other Units or in any Common Elements of the Property, to the extent that (i) any such Service Facility serves the Unit or assigned Limited Common  Element thereto of that Unit Owner or is necessary for service delivery to the Unit of that Unit Owner, and (ii) the use of and access to the same by the Unit Owner would not be materially and adversely detrimental to the Common Elements or to another Unit.

(b)    Additionally Unit Owner No. 1 shall have an easement of access and use to install, locate, maintain, repair and replace Unit Facilities serving Unit No. 1 in and about Unit No. 3, provided the same would not and does not materially and adversely (i) impact the structure of the Building and the physical improvements located in Unit No. 3 belonging to Unit No. 3 Owner (or its agents or contractors), or (ii) interfere with the use and normal business operations of the parking garage located within Unit No. 3, unless in either case the same is required to comply with a government directive. Unit Owner No. 1 shall also have the right under this grant in an emergency to have access and take such actions as might on a temporary basis be deemed to have a material or adverse impact on the improvements in Unit No. 3 or in the operations within Unit No. 3 in order to stabilize and address the identified emergency condition. Penetration of any slab to locate pipes, chases, conduits and ductwork in the ordinary course may not be deemed work that materially and adversely impacts the structure of the Building, provided the same is done in accordance with applicable codes of the District of Columbia.

(c)      Additionally Unit Owner No. 2 shall have an easement of access and use in and about Unit No. 3 to install, locate, maintain, repair and replace Unit Facilities serving Unit No. 2 and any Limited Common Element assigned thereto located in and about Unit No. 3, provided the same would not and does not materially and adversely (i) impact the structure of the Building and the physical improvements located in Unit No. 3 belonging to Unit No. 3 Owner (or its agents or contractors), or (ii) interfere with the use and normal business operations of the parking garage located within Unit No. 3, unless in either case the same is required to comply with a government directive. Unit Owner No. 2 shall also have the right under this grant in an emergency to have access and take such actions as might on a temporary basis be deemed to have a material or adverse impact on the improvements in Unit No. 3 or in the operations within Unit No. 3 in order to stabilize and address the identified emergency condition. Penetration of any slab to locate pipes, chases, conduits and ductwork in the ordinary course may not be deemed work that materially and adversely impacts the structure of the Building, provided the same is done in accordance with applicable codes of the District of Columbia.

(d)      Additionally Unit Owner No. 1 shall have an easement of access and use in and about Unit No. 2 to install, locate, maintain, repair and replace Unit Facilities serving Unit No. 1 and any Limited Common Element assigned thereto located in and about Unit No. 2, provided, except in an emergency or where required to comply with a government directive, the same would not and does not materially and adversely (i) impact the structure of Building and the physical improvements located in Unit No. 2 belonging to Unit No. 2 Owner (or its agents or contractors), or (ii) interfere with the use and normal business operations of the commercial or retail business located within Unit No. 2. Penetration of any slab to locate pipes, chases, conduits and ductwork in the ordinary course may not be deemed work that materially and adversely impacts the structure of the Building, provided the same is done in accordance with applicable codes of the District of Columbia.

(e)      Additionally Unit Owner No. 2 shall have an easement of access and use in and about Unit No. 1 to install, locate, maintain, repair and replace Unit Facilities serving Unit No. 2 and any Limited Common Elements assigned thereto located in and about Unit No. 1, provided, except in an emergency or where required to comply with a government directive, the same does not materially and adversely (i) impact the structure of the Building and the physical improvements located in Unit No. 1 belonging to Unit No.1 Owners (or it tenants,

30

agents, contractors or licensees), or (ii) interfere with the use and normal business operations of the commercial or retail business located within Unit No 1. Penetration of any slab to locate pipes, chases, conduits and ductwork in the ordinary course may not be deemed work that materially and adversely impacts the structure of the Building, provided the same is done in accordance with applicable codes of the District of Columbia.

(f)    Notwithstanding any provision to the contrary in this Section 4.3, except in an emergency or where required to satisfy a government directive, the right of access to each of Unit No. 1 and to Unit No. 2 by the Unit Owners Association or by another Unit Owner, or by any agent, contractor or representative of that other Unit Owner, with regard to matters covered by this Section 4.3, shall be further conditioned and restricted by the following (the "Facilities Access Conditions"):

(i)    As to Unit Facilities and Service Facilities, the repair, replacement, or relocation of existing Unit Facilities and Service Facilities and the installation of new Service Facilities within either Unit No. 1 or Unit No. 2, and the Limited Common Elements in either case assigned thereto, may be undertaken by the Unit Owners Association or by another Unit Owner only in those instances in which no practical alternative exists that is commercially reasonable;

(ii)    As to Unit Facilities and Service Facilities, the repair, replacement, or relocation of existing Unit Facilities and Service Facilities and the installation of new Service Facilities within in either of Unit No. 1 or Unit No. 2, and the Limited Common Elements in either case assigned thereto, may be undertaken by the Unit Owners Association or any other Unit Owner only subject to the reasonable direction of Unit No. 1 Owner or Unit No. 2 Owner, as applicable, as to the site of any re-location or new location and the configuration of such installation.

(iii)    As to Unit Facilities and Service Facilities, the repair, replacement, or relocation of existing Unit Facilities and Service Facilities and the installation of new Service Facilities within in either Unit No. 1 or Unit No. 2,  and the Limited Common  Elements in either case assigned thereto,  may only be undertaken by the Unit Owners Association or any other Unit Owner in the affected portion of the Unit or Limited Common

31

Element in question when the tenant or occupant of that portion of the Unit or Limited Common Element is open for business.

(iv)    The Unit Owners Association or Unit Owner seeking to repair, replace, or relocate existing Unit Facilities or Service Facilities, as applicable, and install new Service Facilities shall pay the affected Unit Owner the reasonable costs incurred by the affected Unit Owner (or its tenant or occupant of the affected portion of the Unit in question) for providing security within the portions of the Unit or Limited Common Elements in question impacted by the repair, replacement, relocation or installation activity.

(v)    Any relocation of existing Service Facilities or installation of new Service Facilities within Unit No. 1, and any Limited Common Elements assigned thereto, and within Unit No. 2, and any Limited Common Elements assigned thereto, may only be installed above any drop ceiling within the affected portion of the Unit in question, or if no drop ceiling is installed then above the level of any lighting fixtures installed in the affected portion of the Unit in question, nor where there is no drop ceiling  may any relocation or installation of Service Facilities interfere with any graphics or stacking space whether located or installed above or below the level at which lighting fixtures have been set.

(vi)    Any relocation of existing Unit Facilities or Service Facilities or installation of new Service Facilities may not adversely affect the use or operation of a Unit, the assigned Limited Common Elements, or the impacted portion thereof in either case, or in any manner reduce the useable area below the level of any lighting fixtures installed in a Unit, the assigned Limited Common Elements, or the impacted portion thereof.

(vii)    No relocation of existing Unit Facilities and Service Facilities or installation of new Service Facilities may require a Unit Owner (or any tenant or occupant thereof) to make changes in the manner or nature of the use and normal business operations of its Unit or in the use or operation of any constituent part thereof.

(viii)    Except in an emergency or where satisfaction of a legal order is required, no repair, replacement of existing Unit Facilities and Service Facilities, or relocation of existing Service

32

Facilities, or installation of new Service Facilities shall occur (i) during the business hours of the Unit or of any tenant or occupant of any portion of the Unit to be impacted, (ii) during the calendar months reasonably acceptable to Unit No.1 Owner and Unit No. 2 Owner, and (iii) without the first giving of no less than forty eight (48) hours prior notice in writing to the impacted Unit Owner.

(g)    The Unit Owners Association or a Unit Owner seeking to repair, replace, relocate or install Unit Facilities or Service Facilities, as applicable, shall paint or otherwise finish the repair, replacement, relocation or installation so as to be compatible with the then existing design criteria in place of the affected Unit Owner or its tenant or occupant.

(h)    Before a Unit Owner may exercise any rights afforded to in by this Section 4.3, it shall review the plans related to Unit Facilities and Service Facilities with the Unit Owner whose Unit will be affected, and with the Unit Owners Association or its designee. The Unit Owner shall give due consideration to comments received from the affected Unit Owner(s) and from the Unit Owners Association concerning the proposed plans and shall use its best efforts to find reasonable accommodation of the concerns expressed in the location, installation and subsequent operation and use of the equipment, facilities and supporting equipment located within a Unit or the Common Elements. The Unit Owner in the exercise of such right shall use commercially reasonable efforts to minimize disruption of the use of other Units and the Common Elements by the applicable Unit Owner(s) thereof, during the installation and then subsequent use and operation. Each Unit Owner exercising this right agrees to indemnify and hold harmless the affected Unit Owner and the Unit Owners Association against all damages, liability, claims and expenses, including reasonable attorneys fees and litigation costs, incurred by the affected Unit Owner, the Unit Owners Association or both as a direct result of the exercise of the rights afforded to it by this Section 4.3.

(i)    Subject to obtaining the prior approval from the Unit Owners Association in accordance with Section 5.7(b) of the Bylaws, if and when required, and in accordance with this Section 4.3, each Unit Owner may, in connection with the performance of alterations or additions within its Unit and assigned Limited Common Elements, connect any electrical, mechanical, plumbing, telephone, telecommunications, fire/security alarm and other systems to the

33

General Common Element building systems of the Building through such Service Facilities.

(j)    The Unit Owners Association shall have an easement for access to and to use all pipes, wires, ducts, cables, conduits, public utility lines and all other utility distribution systems located within the boundaries of a Unit and assigned Limited Common Elements thereto to the extent any such pipe, duct, cable, wire, conduit, public utility line or other utility distribution system serves the Common Elements or is necessary for service to the Common Elements and such use does not unreasonably burden the affected Unit. Before the Unit Owners Association may exercise this right, it shall review the same with the affected Unit Owner and cooperate with the affected Unit Owner to reduce any impact of such access on the affected Unit Owner.

Section 4.4. <u>Support</u>. Every portion of a Unit, which contributes to the structural support of the Building, a Unit or the Common Elements, shall be burdened with an easement of lateral and subjacent structural support and necessity for the benefit of all other Units and the Common Elements.

Section 4.5. <u>Utilities</u>. The Unit Owners Association reserves the right on behalf of the Unit Owners to grant with respect to the Condominium public and private utility easements and to lay water, sanitary and storm sewer, electricity, telephone and cable television lines through, on, over or under any portion of the Building and the Land, which right shall be exercised by the Unit Owners Association in compliance with the provisions of Section 4.2. Before the Unit Owners Association may exercise this right, it shall review the same with the affected Unit Owner and cooperate with the affected Unit Owner to reduce any impact of such access on the affected Unit in accordance with the Facilities of Access Conditions.

Section 4.6. <u>Encroachments</u>. In the event and to the extent that any portion of any Unit or Common Elements, as actually constructed, encroaches, as of the Effective Date of this Declaration, upon any other Unit or any Common Elements, a perpetual easement shall exist for the use, maintenance, repair and replacement of such encroachment by the Unit Owner of the encroaching Unit (or by the Unit Owners Association in the case of any encroaching Common Elements).

Section 4.7. <u>Antenna and Satellite Dish Easement</u>.

(a)    An irrevocable easement is hereby granted to Unit Owner No. 3 to install and locate on the roof level of the Building at a location reasonable designated by the Unit Owners Association from time to time, not more than two (2) satellite dishes or antennae and other equipment ancillary thereto related to the operation of the parking

34

facilities located in Unit No. 3 for purposes accessory to the operation of Unit No. 3 as a public, off street parking facility, and not for other commercial purposes. The easement granted shall include an easement for access to maintain, repair, replace and remove such satellite dishes or antennae (including the right to run such cabling, wiring or ancillary equipment in and through Unit No. 1 or Unit No. 2, as applicable, as reasonably maybe required to operate the applicable satellite dishes or antennae); provided that (i) Unit Owner No. 3 shall pay any and all costs in connection with the installation, maintenance, repair, replacement and removal of any satellite dish or antenna and related equipment, whether arising directly, as a Special Expense to the Unit Owners Association or an reimbursement to the Unit Owner through whose Unit access to the roof of the Building is required, including for the cost and expenses of any repair any damage caused to the roof of the Building and to the affected Unit, and (ii) the installation, operation and maintenance of any such equipment by Unit Owner No. 3 shall be in accordance with the applicable provisions of the Zoning Regulations and other applicable codes, regulations and ordinances. Should the Unit Owners Association by Standard Majority Vote desire to relocate the satellite dishes or antennae appurtenant to Unit No. 3, and the equipment related thereto, then it may do so, so long as it is at no cost to Unit No. 3 Owner, shall be without material interruption of service to Unit No. 3, and shall provide a comparable location for such equipment on the roof of the Building.

(b)    An irrevocable easement is hereby granted to Unit Owner No. 1 and the tenants and other occupants of said Unit to install, maintain, repair, replace and remove one (1) or more satellite dishes and/or antennae and other equipment ancillary in the limited common element portion of the roof of the Building located above Unit No. 1; provided that (i) Unit Owner No. 1 shall pay any and all costs in connection with the installation, maintenance, repair, replacement and removal any satellite dish or antenna and related equipment, whether arising directly, as a Special Expense to the Unit Owners Association, including for the cost and expenses of any repair any damage caused to the roof of the Building, (ii) the installation, operation and maintenance of any such equipment by Unit Owner No. 1 shall be in accordance with the applicable provisions of the Zoning Regulations and other applicable codes, regulations and ordinances, and (iii) the installation does not interfere with the location of similar equipment of Unit No. 2 Owner as permitted in Section 4.7(c) below of this Declaration.

(c)    An irrevocable easement is hereby granted to the Unit Owner No. 2 and the tenants and other occupants of said Unit to

35

install, maintain, repair, replace and remove one (1) or more satellite dishes and/or antennae and other equipment ancillary on the portion of the roof of the Building located above Unit No. 2; provided that (i) Unit Owner No. 2 shall pay any and all costs in connection with the installation, maintenance, repair, replacement and removal any satellite dish or antenna and related equipment, whether arising directly, as a Special Expense to the Unit Owners Association, including for the cost and expenses of any repair any damage caused to the roof of the Building, and (ii) the installation, operation and maintenance of any such equipment by Unit Owner No. 2 shall be in accordance with the applicable provisions of the Zoning Regulations and other applicable codes, regulations and ordinances.

(d)       Each Unit Owner shall indemnify and hold harmless the Unit Owners Association with regard to any claims, damages or losses suffered as a result of or arising from the use of the roof of the Building for these purposes.

Section 4.8.  Shopping Cart Corrals. Each of Unit Owner No. 1 and Unit Owner No. 2 shall have easements to those portions of Unit No. 3 to establish shopping cart corrals, and install equipment related thereto, serving the needs of the customers of the retail operations being conducted in Unit No. 1 and Unit No. 2 as applicable, provided that no less than one thousand (1,000) legal parking spaces and access thereto, satisfying the requirements of the Zoning Regulations, are preserved in Unit No.3. The location and operation of each shopping cart corral from time to time shall be determined after consultation by each Unit Owner with Unit Owner No. 3 in accordance with the applicable provisions of the Declaration of Parking Operations, and shall be undertaken by a Unit Owner in manner to ensure that no shopping cart corral will unreasonably or materially interfere with the operations of the parking garage operations within Unit No. 3.

Section 4.9.  Units Subject to the Condominium Instruments.  All present and future Unit Owners, tenants and occupants of Units shall be subject to and shall comply with the provisions of the Condominium Instruments, as well as the Rules and Regulations, as any of the same may be amended from time to time in accordance with this Declaration or as applicable under the Bylaws.  The acceptance of a deed of conveyance or the entering into of a lease or the entering into occupancy of any Unit or portion thereof shall constitute an agreement that the provisions of Condominium Instruments, as well as the Rules and Regulations, as they may be duly amended from time to time, are accepted and ratified by such Unit Owner, tenant or occupant, and all of such provisions shall be deemed and taken to be enforceable equitable servitudes and covenants running with the land and shall bind any person at any time having any interest or estate in such Unit as

36

though such provisions were recited and stipulated at length in each and every such deed of conveyance or lease.

Section 4.10. <u>Public Space Covenants</u>.  Other than as to Title Documents, where Unit No. 1 Owner (or any party deriving its interest in that Unit or part thereof, including by lease or license) seeks and obtains an entitlement to use any public space, being space located in any of the public rights of way abutting the Building, then Unit No. 1 Owner and not the Unit Owners Association shall be responsible for compliance with the provisions of the applicable public space covenant entered into in conjunction with obtaining that entitlement.  Unit No. 1 Owner shall however apprise the Unit Owners Association of such Unit Owner's application for rights to use public space, and the Unit Owners Association agrees to fully cooperate with Unit No. 1 Owner in the Unit Owner's application to the relevant government authorities for permission to use public space, including executing any consents or authorizations that may be required of the Unit Owners Association, provide the same does not cause the Unit Owners Association to incur any additional costs or expenses.  Any use of public space by Unit No. 1 Owner (or any party deriving its interest in that Unit or part thereof, including by lease or license) shall be at the sole expense of Unit No. 1 Owner; to the extent any cost or expense is incurred by the Unit Owners Association the same shall become a Special Expense chargeable to the Unit Owner.

37

Section 4.11.  Assumption of Rights and Obligations under Title Documents. The Unit Owners Association on behalf of each Unit Owner shall be deemed the successor and assignee of the Declarant as to any rights and obligations of the Declarant arising under any of the Title Documents as the same relate to the Property and the operation of the Condominium generally.  Notwithstanding the foregoing, in no event shall the Unit Owners Association be deemed to be the successor to the Declarant under the LDA, which LDA remains a private contract between the parties thereto, and thus the Unit Owners Association shall have no liability or responsibility with regard to performance thereunder and the Declarant shall hold the Unit Owners Association harmless for any liability that may arise thereunder.  To the extent that satisfaction of any obligation of the LDA involves the modification of the physical structure of the Building or any of the Common Elements, then, provided that approval has been first obtained in accordance with the provisions of the LDA for the undertaking of such modification, only approval by a Standard Majority Vote of the Unit Owners Association shall be required before such modification may be undertaken.

Section 4.12.  Rights Related to Installation and Maintenance of Signage and Other Identification Monuments.

(a)  In Common Elements.  Except for such signs, awnings, pylons and other identification monuments as may be posted or installed by the Unit Owners Association (i) to comply with applicable governmental requirements, or (ii) to provide appropriate and customary directional and identification signage for service areas and facilities of the General Common Elements (including but not limited to a building directory, parking garage signage, etc.) of a quality customarily found in and about a high quality retail/commercial project, no identification monuments, such as but not limited to signs of any kind, awnings and pylons, (collectively "Identification Monuments") shall be erected, posted or displayed upon, in, from or about the General Common Elements without the prior written approval of the Unit Owners Association as provided in subsection (d) below of this Section 4.12.

(b)  Within or Related to Unit No. 3.  The Unit No. 3 Owner shall be required to post and thereafter maintain, at such Owner's sole cost and expense, clear and user-friendly Identification Monuments within Unit No. 3 in conjunction with its parking facilities operation to ensure that patrons of the parking garage located within Unit No. 1 are properly guided to (i) pedestrian exits, staircases, elevators and escalators, (ii) vehicular exits to and from the parking facilities, and (iii) specific retail uses situated in Unit No. 1 and Unit No. 2, subject to review and approval pursuant to and in accordance with the Declaration of Parking Operations.

38

(c)    Within or Related to Unit No. 1 and Unit No. 2.
Each of Unit No. 1 Owner and Unit No. 2 Owner shall be required to
post and thereafter maintain, at its sole cost and expense, clear and
user-friendly Identification Monuments within its Unit to ensure that
patrons of such Units can be properly guided to (i) pedestrian exits,
staircases, elevators and escalators, and (ii) the parking facilities
situated within Unit No. 3.

(d)    Approval by the Unit Owners Association.

(i)    Any Identification Monument proposed to be installed or
modified  by a Unit Owner for its own benefit, or on behalf of or for the benefit of
any tenant or occupant of a Unit in or about the General Common Elements shall
be subject to the review and approval of the Unit Owners Association, as to the
design, size, location, specifications for installation and manner of attachment as
well as for the specifications for the maintenance and upkeep subsequent to
installation by the Unit Owner (or its designee).

(ii)    The power to act on behalf of the Unit Owners Association
to approve Identification Monuments proposed to be installed or modified by a Unit
Owner in or about the General Common Elements may be delegated to the
President-Treasurer of the Unit Owners Association upon a Unanimous Vote.  The
President-Treasurer shall thereafter have the authority to approve any proposed
Identification Monument including design, size, location, specifications for
installation and manner of attachment, as well as the specifications for
maintenance and upkeep, after consultation with the Managing Agent.  The Unit
Owners Association acting directly, or through the President-Treasurer shall have
no more than ten (10) days following the receipt of a written request from a Unit
Owner to grant approval, or to withhold the grant of approval (with comment), to
any request for approval of an Identification Monument.  Failure of the Unit
Owners Association, acting directly, or through the President-Treasurer, to respond
to a request for approval of an Identification Monument by a Unit Owner within
such ten (10) day period shall be deemed the approval of the Unit Owners
Association of such proposed Identification Monument.

(iii)    If approval to a proposed Identification Monument is
denied, then the Unit Owner may propose an alternate design or specifications to
respond to the objections giving rise to the disapproval.

(iv)    Any Identification Monument installed as part of the
initial construction of the Condominium, as depicted on Exhibit C to this
Declaration, shall be deemed approved, and the Unit Owner benefited by such sign
shall have the right to repair, replace and maintain such sign without the consent of
the Unit Owners Association.

39

(v)    Notwithstanding anything herein to the contrary, any signage proposed to be installed on the exterior of the Building that could reasonably be expected by the Unit Owners Association or President-Treasurer to affect the sight lines for the ingress from or egress to Unit No. 3 from an adjacent public right of way must be approved in advance by the Unit No. 3 Owner.

(vi)    Where permission is granted for the installation of an Identification Monument about the General Common Elements, the Unit Owner receiving such permission shall be deemed to have received a license from the Unit Owners Association to install and maintain the same. Any Identification Monument installed by a Unit Owner in and about the General Common Elements on behalf of itself or its tenants or occupants of its Unit shall be undertaken at the sole cost and expense of that Unit Owner. Additionally any Unit Owner benefited by an Identification Monument in the General Common Elements shall be responsible at its sole cost and expense for the operation, maintenance, repair, replacement or removal. Each Unit Owner, by accepting a license from the Unit Owners Association related to installation of an Identification Monument, agrees to indemnify and hold harmless the Unit Owners Association with regard to any claims, damages or losses suffered. To the extent the Unit Owners Association incurs any costs or expenses related to any Identification Monument installed by a Unit Owner, whether as to the initial installation, or any subsequent operation, maintenance, repair, replacement or removal of the same, then any costs and expenses incurred shall be deemed a Special Expense of the Unit Owner.

(e)    Benefit and Burden. Any Unit Owner (or tenant/occupant thereof) that duly installs an Identification Monument in, on or about the Common Elements shall be solely entitled to the benefits attributable to that Identification Monument, but shall be similarly liable to the Unit Owners Association or another Unit Owner, as applicable, for the burdens arising from the installation, maintenance, repair and operation of any Identification Monument, all at no expense to the Unit Owners Association or the other Unit Owner. Any failure of a Unit Owner to satisfy its obligations which in any way causes the Unit Owners Association to incur expenses shall permit the Unit Owners Association to assess against such Unit Owner such reasonable and actual expenses as Special Expenses of that Unit Owner; provided, however, that the Unit Owners Association shall not have the right to cure the default of an Owner under this Article 4 unless and until the Unit Owner shall have been provided with no less than ten (10) business days to cure and/or correct its default after receipt of written notice to do so from the Unit Owners Association.

Section 4.13. Compliance with Laws. Each Unit Owner agrees to promptly and fully comply at its sole cost and expense with all applicable laws, regulations

40

and ordinances related to the use and occupancy of its Unit and agrees that it shall take no action or fail to take any action that would cause the Condominium or any other Unit therein to be cited for infraction of any law, ordinance or regulation related to the use or occupancy of its Unit, including any laws, regulations and ordinances applicable to the use, storage and disposal of hazardous materials and substances. Each Unit Owner agrees to indemnify and hold harmless the Unit Owners Association and the other Unit Owners for any matters of noncompliance by the Unit Owner, including but not limited to damages arising therefrom and reasonable attorneys' fees. Furthermore, any failure of a Unit Owner to satisfy its obligations which in any way causes the Unit Owners Association to incur expenses shall permit the Unit Owners Association to assess against such Unit Owner such reasonable and actual expenses of cure or correction as Special Expenses of that Unit Owner, provided that such Unit Owner shall have been given no less than ten (10) business days to cure and/or correct its default after receipt of written notice to do so from the Unit Owners Association.

Section 4.14. Bond Documents. Bonds will be used to finance the costs of the development and construction of Unit No. 3 and the parking garage facility located therein. Each of the Declarant, Unit Owner No. 1, Unit Owner No. 2 and the Unit Owners Association agrees that it may take no action or fail to take any action that would (a) cause the loss of tax exemption status on the Bonds or (b) prevent Unit No. 3 Owner from complying with the material terms of the Bond Documents. Unit No. 3 Owner shall supply to each of the Declarant, the other Unit Owners and the Unit Owners Association a copy of the Bond Documents.

## ARTICLE V
## AMENDMENT TO CONDOMINIUM INSTRUMENTS;
## TERMINATION OF CONDOMINIUM;
## REQUIRED CONSENT

Section 5.1. Amendment to Condominium Instruments. Except as permitted by and provided for in Section 2.6 and 2.7 of this Declaration, this Declaration and the other Condominium Instruments may not be amended except with the written consent of all Unit Owners in favor of such amendment, and then only provided that thereafter such amendment is approved in writing by each of the Mortgagees and the bondholder of the Bonds if and to the extent that the provisions of the applicable Mortgage or the Bond Documents require such consent.

Section 5.2. Termination of Condominium Regime The regime of the Condominium may be terminated pursuant to Section 42-1902.28 of the Condominium Act only with the written consent of all Unit Owners and the written consent of all Mortgagees.

41

## ARTICLE VI
## RIGHT TO LEASE OR SELL UNITS

Section 6.1. <u>Right to Lease</u>.

(a) Each of Unit No. 1 Owner and Unit No. 2 Owner shall have the right to enter into leases with any person or entity for the leasing and occupancy of the Unit or a portion thereof owned by that Unit Owner for the Permitted Uses, subject to any provisions of any of (i) the Title Documents, (ii) the DC USA Deed, (iii) the applicable laws and regulations including the Zoning Regulations, and (iv) the Rules and Regulations that are applicable to that Unit.

(b) Unit No. 3 Owner may not lease or license all or any portion of Unit No. 3 to any Person, except in accordance with and pursuant to the Declaration of Parking Operations, and then only for the Permitted Use specified in Section 1.4 (c) of this Declaration, and in any case only in a manner that does not cause a violation of applicable laws including the Zoning Regulations.

(c) Any Unit Owner that leases or licenses the occupancy of all or any portion of its Unit to any Person shall notify the Unit Owners Association, and supply such information to the Unit Owners Association as the Association may reasonably request, including contact information of responsible Persons in case of an emergency. This requirement to notify and provide information to the Unit Owners Association shall not apply to the Unit No. 3 Owner with regard to the issuance of parking contracts to Persons for use of the parking garage facility located within Unit No. 3, if the same are for hourly or daily parking in the parking garage facility, but shall apply where longer term arrangements are involved, or where there is a lease for the entirety of Unit No. 3. or a significant portion thereof where permitted by this Declaration to a Person. The requirement to notify and supply information shall also apply to any operator or manager of the parking facilities in Unit No. 3 on behalf of Unit Owner No. 3 and any contractual obligations of Unit No. 3 Owner with regard to the operator or manager.

Section 6.2. <u>Right to Mortgage</u>. Each Unit Owner shall have the right, subject to the regime of the Condominium and the Condominium Instruments, to place financing, secured by the Unit or Units owned by such Unit Owner or any part thereof. A Unit Owner shall provide the Unit Owners Association, or its designee with written notice of the placement of any financing secured by the Unit, with information concerning the name and address of such Mortgagee.

42

Section 6.3. <u>Right to Sell</u>. Each Unit Owner retains the right to sell its Unit and convey legal title to its Unit in conjunction with such sale, whether in response to an unsolicited offer or by formal offer of sale. A Unit may only be sold where there will be a continuation of the Permitted Uses for that Unit, and then only subject to any applicable provisions of the Title Documents.

Section 6.4. <u>Right of First Offer</u>. Notwithstanding the provisions of Section 6.3, if at any time Unit No. 3 Owner desires to sell or otherwise transfer, whether directly or indirectly, all or part of Unit No. 3 (the "Offered Property"), and neither the National Capital Revitalization Corporation Act of 1998 (the "NCRC Act") nor any other law prohibits Unit No. 3 Owner from disposing of the Offered Property by a negotiated sale, Unit No. 3 Owner shall first offer to sell the Offered Property to Unit No. 1 Owner, and thereafter to Unit No. 2 Owner if Unit No. 1 Owner does not previously elect to purchase the Offered Property. Any offering to Unit No. 1 Owner and Unit No. 2 Owner pursuant to this Section 6.4 shall be in writing advising such Unit Owner of the opportunity to purchase the Offered Property upon terms fixed by Unit No. 3 Owner, it its sole reasonable discretion, in the written offering (the "Offering"). The Offering shall specify the basic terms of the sale and the purchase price for the offered Property; <u>provided</u>, however, that the purchase price contained in the Offering shall be an amount that is no greater than the fair market value of the Offered Property as determined solely by Unit No. 3 Owner in good faith as of the date of the Offering (the "Purchase Price"). The Offering shall constitute an offer by Unit No. 3 Owner to sell all of its interests in the Offered Property to Unit No.1 Owner or Unit No. 2 Owner, as applicable, at the Purchase Price and on the terms and conditions set forth in the Offering. The following provisions shall apply with regard to this process of providing the Offering to first the Unit No. 1 Owner and thereafter to Unit No. 2 Owner, if applicable.

(a)     Unit No. 3 Owner shall first provide to Unit No. 1 Owner the Offering. Unit No. 1 Owner shall have thirty (30) days after the date of receipt of the Offering (the "First Acceptance Period") within which to notify Unit No. 3 Owner in writing if Unit No. 1 Owner has elected to purchase the Offered Property based upon the Offering (an "Acceptance Notice"). If Unit No. 1 Owner elects to purchase the Offered Property by timely delivery of an Acceptance Notice to Unit No. 3 Owner, then Unit No. 3 Owner and Unit No. 1 Owner shall enter into a binding agreement (which in all events shall be conditioned upon receipt of any required approvals from any public entities) to purchase the Offered Property pursuant to the terms and conditions of the Offering (the "Contract") within thirty (30) business days after the date of the delivery of the Acceptance Notice by Unit No. 1 Owner to Unit No. 3 Owner. The parties shall proceed to closing under the Contract by a date no later than ninety (90) days after the execution of the Contract by the parties.

43

(b)     If Unit No. 1 Owner (i) elects not to acquire the Offered Property, or (ii) fails to deliver an Acceptance Notice to Unit No. 3 Owner during the First Acceptance Period, or (iii) fails to enter into a Contract within the required 30 business day period, or (iv) fails to settle on its acquisition of the Offered Property under the Contract within the required 90 day period, then Unit No. 1 Owner's right to acquire the Offered Property pursuant to Section 6.4(a) above shall be deemed terminated and Unit No. 3 Owner shall then provide a comparable Offering to Unit No. 2 Owner.

(c)     After delivery of an Offering to purchase the Offered Property to Unit No. 2 Owner due to the actions (or omissions) by Unit No. 1 Owner, then Unit No. 2 Owner shall have thirty (30) days after date of receipt by it of the Offering from Unit No. 3 Owner (the "Second Acceptance Period") to deliver to Unit No. 3 Owner an Acceptance Notice based upon the Offering.  If Unit No. 2 Owner elects to purchase the Offered Property by timely delivery of the Acceptance Notice, then Unit No. 3 Owner and Unit No. 2 Owner shall enter into a Contract within thirty (30) business days after the date of the delivery of the Acceptance Notice by Unit No. 2 Owner to Unit No. 3 Owner.  The parties shall thereafter proceed to closing under the Contract by a date no later than ninety (90) days after the execution of the Contract by the parties.

(d)     If Unit No. 2 Owner (i) elects not to acquire the Offered Property, or (ii) fails to timely give the Acceptance Notice to Unit No. 3 Owner during the Second Acceptance Period, or (iii) fails to enter into a Contract within the required 30 business day period, or (iv) fails to settle on its acquisition of the Offered Property within the required 90 day period, then Unit No. 2 Owner's right to acquire the Offered Property pursuant to Section 6.4(c) above shall be deemed terminated and Unit No. 3 Owner shall have the right to sell the Offered Property to any party pursuant to such terms, conditions and Purchase Price as is determined by Unit No. 3 Owner in its sole discretion, subject to the provisions of Section 6.4 (e) and (f) below.

(e)     If, after Unit No. 3 Owner's obligations to offer to sell the Offered Property to Unit No. 1 Owner and then to Unit No. 2 Owner pursuant to the foregoing Sections 6.4(a)-(d) are satisfied, terminated or otherwise waived and Unit No. 3 Owner thereafter has the right to sell the Offered Property to any third party, Unit No. 3 Owner may choose to offer to sell the Offered Property by either a competitive bid process, by offer to any third party or by any other method determined by Unit No. 3 Owner in its sole discretion, subject to the provisions of Section 6.4 (g) below of this Declaration.

44

(f)    In the event Unit No. 3 Owner shall desire to sell or otherwise transfer the Offered Property pursuant to a competitive bidding process, either by sealed bid, auction or request for proposals, ("Competitive Process"), then in such event neither Unit No. 1 Owner nor Unit No. 2 Owner shall be precluded from submitting a bid or otherwise participating in such Competitive Process as a bidder.  Unit No. 3 Owner shall have no obligation to accept any bid from either Unit No. 1 Owner or Unit No. 2 Owner as the winning bid under any Competitive Process, provided that Unit No.3 Owner may not discriminate against Unit No. 1 Owner or Unit No. 2 Owner due to the fact that neither failed to acquire the Offered Property pursuant to the procedures set forth in Section 6.4 (a) through (d) above of this Declaration.  Furthermore Unit No. 3 Owner also may not discriminate against Unit No. 1 Owner or Unit No. 2 Owner in the selection of the bidder with the winning bid for the Offered Property in a Competitive Process, where either submits a bid that is the highest dollar value bid of bids submitted for the Offered Property, so long as the bid of Unit No. 1 Owner or of Unit No. 2 Owner otherwise satisfies all of the requirements and specifications set forth in the Competitive Process for evaluation of a winning bid.

(g)    Notwithstanding anything to the contrary contained in this Section 6.4, Unit No. 1 Owner and thereafter Unit No. 2 Owner shall be entitled to receive a new Offering with regard to the sale or other transfer of all or the offered portion of the Offered Property pursuant to the provisions of Sections 6.4 (a) through (d), under the following circumstances:

(i)    Unit No. 3 Owner shall have failed to enter into a contract for the sale of the Offered Property to any third party ("Third Party Sales Contract") within one year following the last day of the Second Acceptance Period, and Unit No. 3 Owner thereafter still desires to sell the Offered Property;

(ii)    Unit No. 3 Owner shall have entered into a Third Party Sales Contract, but such Third Party Sales Contract was terminated without closing and Unit No. 3 Owner thereafter still desires to sell the Offered Property;

(iii)    Unit No. 3 Owner shall have entered into a Third Party Sales Contract and such Third Party Sales Contract has not closed pursuant to the terms therein within a period of one hundred eighty (180) days after the effective date of the Third Party Sales Contract.

45

(h)    Notwithstanding anything to the contrary in this Section 6.4, Unit No. 3 Owner may not agree to sell the Offered Property to a Person through a Third Party Sales Contract, whether through the Competitive Process or a negotiated sale, for a purchase price and/or other monetary terms which in the aggregate would result in a sale of the Offered Property for less than ninety percent (90%) of the fair market value of the Offered Property, as determined in the sole good faith and reasonable discretion of Unit No. 3 Owner, as of the date of the Offering given to Unit No. 1 Owner pursuant to Section 6.4 (a).

Section 6.5.  Sale or Assignment of Limited Common Elements.  A Unit Owner shall not have the right to sell, convey, assign or transfer any Limited Common Elements assigned to its Unit separate and apart from the conveyance of the Unit to which such Limited Common Elements pertain.

Section 6.6.  Estoppel Certificates.  Solely in conjunction with the rights and restrictions imposed on each Unit Owner by the Title Documents, the DC USA Deed, this Declaration and the Bylaws, the Unit Owners Association and each Unit Owner (the "Responding Unit Owner") shall execute, acknowledge and deliver to any Unit Owner that makes a request in conjunction with a sale of its Unit, a refinancing of any indebtedness secured by a lien on its Unit or a refinancing of the Bonds (the "Requesting Party") an estoppel certificate in recordable form for the benefit of the Requesting Party, or any prospective purchaser from, lender to or bond holder of the Requesting Unit Owner, stating whether the Requesting Party has complied with rights and restrictions imposed by the Title Documents, this Declaration and the Bylaws as applicable.  The Responding Unit Owner shall deliver the same to the Requesting Party upon no less than twenty (20) days' prior written notice by the Requesting Unit Owner to the Responding Party.

ARTICLE VII
SPECIAL DECLARANT RIGHTS

Section 7.1.  Generally.  Special Declarant Rights are those rights reserved for the benefit of the Declarant as provided for in the Condominium Act and the Condominium Instruments, and shall include, without limitation, the following rights: (a) to complete improvements indicated on the Plats and Plans filed with this Declaration; (b) to maintain models, sales offices, leasing offices, management offices, customer service offices, and signs advertising the Units; and (c) to use easements through the Common Elements and the Units for the purpose of making improvements or performing repairs within the Condominium.

Section 7.2.  Transfer of Special Declarant Rights.

(a)    The Declarant may, but shall not be obligated to, transfer Special Declarant Rights created or reserved under

46

the Condominium Act or provided for in the Condominium Instruments. Any transfer by Declarant of Special Declarant Rights hereunder may solely be made to a Unit Owner or a Mortgagee. In no event shall any transfer of Special Declarant Rights hereunder remove, transfer or waive any rights or obligations of Declarant under the Title Documents or the DC USA Deed. Any such transfer shall be by an instrument evidencing the transfer recorded in the Land Records of Office of the Recorder of Deeds of the District of Columbia. The instrument is not effective unless executed by the transferor and transferee.

(b)    Upon transfer of any Special Declarant Right, the liability of a transferor declarant is as follows:

(1)    A transferor is not relieved of any obligation or liability arising before the transfer and remains liable for any warranty obligations imposed upon the transferor declarant by the Condominium Act. Lack of privity does not deprive any Unit owner of standing to bring an action to enforce any obligation of the transferor.

(2)    If the successor to any Special Declarant Right is an "affiliate of a declarant" (hereinafter defined), the transferor is jointly and severally liable with the successor for any obligation or liability of the successor which relates to the Condominium. For purposes of this subsection, the phrase "affiliate of a declarant" shall mean the same as set forth in Section 42-1901.02 of the Condominium Act.

(3)    If a transferor retains any Special Declarant Rights, and transfers other Special Declarant Rights to a successor who is not an affiliate of the transferor, the transferor is liable for any obligations or liabilities imposed on a declarant by the Condominium Act or by the Condominium Instruments that relate to the retained Special Declarant Rights and that arise after the transfer.

(4)    A transferor has no liability for any act or omission, or any breach of a contractual or warranty obligation arising from the exercise of a Special Declarant Right by a successor declarant who is not an affiliate of the transferor.

(c)    Unless otherwise provided in a Mortgage, in case of foreclosure of any Mortgage (or deed in lieu of foreclosure), tax sale, judicial sale, sale by a trustee under a deed of trust, or sale under the Bankruptcy Code or receivership proceedings, of any Units owned by Declarant in the Condominium or real estate in a condominium subject to "development rights" (hereinafter defined), a person acquiring title to all the real estate being foreclosed or sold, but only upon its request,

47

succeeds to any or all Special Declarant Rights related to the real estate held by the Declarant, or to any rights reserved in the Condominium Instruments to maintain models, sales offices, management offices, customer service offices and advertising signs. The judgment or instrument conveying title shall provide for transfer of only the Special Declarant Rights requested. For purposes of this subsection, the term "development rights" means any rights or combination of rights to expand an expandable condominium, contract a contractible condominium, convert convertible land, or convert convertible space.

(d)    Upon foreclosure (or deed in lieu of foreclosure), tax sale, judicial sale, sale by a trustee under a Mortgage, or sale under the Bankruptcy Code or receivership proceedings, of all Units in a Condominium owned by Declarant and other real estate in a condominium owned by Declarant: (i) Declarant shall cease to have any Special Declarant Rights, and (ii) the period of Declarant control, if any, as provided in the Condominium Act, shall terminate unless the judgment or instrument conveying title provides for transfer of all Special Declarant Rights held by the Declarant to a successor declarant.

(e)    The liabilities or obligations of persons who succeed to Special Declarant Rights are as follows:

(1)    A successor to any Special Declarant Right who is an affiliate of Declarant is subject to any obligations or liabilities imposed on the transferor by the Condominium Act or by the Condominium Instruments.

(2)    A successor to any Special Declarant Right, other than a successor described in paragraphs (3) or (4) of this subsection, who is not an affiliate of the Declarant, is subject to any obligations or liabilities imposed by the Condominium Act or the Condominium Instruments: (A) on a declarant which relates to such declarant's exercise or non-exercise of special declarant rights; or (B) on the transferor, other than: (1) misrepresentations by any previous declarant; (2) warranty obligations on improvements made by any previous declarant, or made before the Condominium was created; (3) breach of a fiduciary obligation by any previous declarant; or (4) any liability or obligation imposed on the transferor as a result of the transferor's acts or omissions after the transfer.

(3)    A successor who is not an affiliate of Declarant and whose sole right is a reservation to maintain models, sales offices, management offices, customer service offices and advertising signs, may not exercise any other Special Declarant Right, and is not subject to any liability or obligation as a declarant, except the obligation to provide a public offering statement and any liability arising as a result thereof.

48

(4)    A successor to all Special Declarant Rights held by the transferor who is not an affiliate of the Declarant and who succeeded to those rights pursuant to a deed in lieu of foreclosure or a judgment or instrument conveying title to Units under this Section 7.2 may declare the intention in a recorded instrument to hold those rights solely for transfer to another person. Thereafter, until transferring all Special Declarant Rights to any person acquiring title to any Unit owned by the successor, or until recording an instrument permitting exercise of all those rights, that successor may not exercise any of those rights. So long as a successor declarant may not exercise Special Declarant Rights under this subsection, such successor declarant is not subject to any liability or obligation as a declarant.

(f)    Nothing in this Article shall subject any successor to a Special Declarant Right to any claims against or other obligations of a transferor declarant, other than claims or obligations arising under the Condominium Act or the Condominium Instruments.

## ARTICLE VIII
## MISCELLANEOUS PROVISIONS

Section 8.1.  Waiver.  No provision contained in this Declaration shall be deemed to have been abrogated or waived by reason of any failure to enforce the same, irrespective of the number of violations or breaches which may occur.

Section 8.2.  Severability/Conflicts.  The invalidity or unenforceability of any provision of this Declaration shall not be deemed to impair or affect in any manner the validity, enforceability or effect of the remainder of this Declaration, and in such event, all of the other provisions of this Declaration shall continue in full force and effect as if such invalid or unenforceable provision had never been included herein. Any conflict between (1) the Condominium Instruments and (2) the Rules and Regulations shall be governed by the Condominium Instruments.

Section 8.3.  No Revocation or Partition.  The Common Elements shall remain undivided legally as to ownership thereof, and no Unit Owner or any other person shall bring or have the right to bring any action for partition or division thereof, nor shall the Common Elements be abandoned by act or omission, unless the condominium regime is waived and terminated by agreement of all the Unit Owners and all Mortgagees.

Section 8.4.  Applicable Law.  This Declaration and any interpretation thereof shall by governed by the law of the District of Columbia.

IN WITNESS WHEREOF, _____, a _____
limited liability company, sole member of _____, a
_____, itself managing member of Declarant hereunder, has
caused these presents to be signed in its name by _____, ____
President, and does hereby appoint said _____ as its attorney-in-
fact for purposes of executing, acknowledging and delivering this Declaration, as the
act and deed of said corporation, limited partnership and limited liability
companies, all as of the day and year hereinbefore written.

D.C. USA OPERATING CO., LLC, a
New York Limited Liability Company


By: _____
    a _____
    Its Managing Member


By: _____
    Name: _____
    Title: _____

COUNTY OF _____
STATE OF NEW YORK, to wit:


    I, _____, a Notary Public in and for the jurisdiction
aforesaid, do hereby certify that _____, ___ _____ of
_____, the managing member of Declarant, a party to the
foregoing and annexed Declaration, personally appeared before me in said District
and, being personally well known to me, acknowledged said instrument to be the act
and deed of said corporation, limited partnership and limited liability companies
and delivered the same as such.


    GIVEN under my hand and seal this ____ day of _____, 200_.


                           _____
                              Notary Public

My commission expires: _____

50

## EXHIBIT A

### to

### DECLARATION
### FOR DC USA CONDOMINIUM

### LEGAL DESCRIPTION

All that certain lot or parcel of land situated and lying in the District of Columbia, and more particularly described as follows:

[Portion of Lot of Record __ being one or more air rights parcel identified for assessment and taxation purposes of the District of Columbia as _____, in Square _____, which may be held in fee simple by Declarant, or may be held as a leasehold interest in perpetuity by Declarant.]

**Less and except** (i) any excess gross floor area attributable to the Lot of Record under the applicable provisions of the Zoning Regulations not otherwise consumed by the Building, (ii) any transferable development rights (TDRs) appurtenant to the above described property as of the Effective Date, all such rights being retained by the Declarant, (iii) any rights to any benefits, proceeds or other consideration arising from any sale and transfer of those TDRs, all of such rights to be deemed vested and retained by Declarant or its assignees, (iv) any beneficial or other consideration to be paid, posted or given by or on behalf of the Declarant prior to the Effective Date in conjunction with and arising out of any combined lot development arrangements under the Zoning Regulations, (v) any refund of all or a portion of any governmental imposition paid by or on behalf of the Declarant, including but not limited real property taxes, franchise taxes, business improvement district taxes, public space rentals and similar impositions, imposed upon the Declarant for the period prior to the Effective Date and for which the Declarant has applied for a refund or appealed the imposition of prior to the Effective Date, or for which Declarant has been assessed and charged with regard to any period prior to the Effective Date, (vi) any return, release, or refund of any deposits, bonds, or escrow of funds posted by or on behalf of the Declarant prior to the Effective Date in conjunction with the development of the Building, including but not limited to utilities bonds, and (vii) any investment tax credits arising under the United States Internal Revenue Code arising or related the development of the Building.

The Land shall not be deemed to include any airspace attributable to Lot of Record __ other than as initially described above.

A·2

EXHIBIT B

to

DECLARATION
FOR DC USA CONDOMINIUM

Common Element Interests Table

| Unit Designation | Par Value | Percentage of Undivided Interest |
|---|---|---|
| Unit No. 1 (Retail Unit) | 40 | 40.0% |
| Unit No. 2 (Target Unit) | 30 | 30.0% |
| Unit No. 3 (Parking Unit) | 30 | 30.0% |
| Totals | 100 | 100.0% |

B-1

EXHIBIT C

to

DECLARATION
FOR DC USA CONDOMINIUM

Approved Identification Monument Locations

[See attached depictions.]

C-1

## BYLAWS
## FOR DC USA CONDOMINIUM

### ARTICLE 1
### General Provisions

Section 1.1    Name.  These Bylaws provide for the governance of the
Condominium by the Unit Owners Association pursuant to the requirements of
Subchapter III of the Condominium Act.  The name of the Unit Owners Association
shall be the "Unit Owners Association of DC USA Condominium, Inc."

Section 1.2    Office.  The office of the Condominium and the Unit Owners
Association shall be located at 3100 14th Street, N.W., Washington, D.C. 20010 or
at such other place in Washington, D.C. as may be designated from time to time by
the Unit Owners Association.

Section 1.3    Definitions.  Terms used herein without definition shall have
the meanings specified for such terms in the Declaration, or if not defined therein,
the meanings specified for such terms in Section 42-1901.02 of the Condominium
Act.

### ARTICLE 2
### Unit Owners Association

Section 2.1    Composition.  The Unit Owners Association shall consist of all of
the Unit Owners.  The Unit Owners Association shall have the responsibility of
administering the Condominium, establishing the means and methods of collecting
Common Expense assessments and other assessments and charges, arranging for
the management of the Condominium and performing all of the other acts that may
be required or permitted to be performed by the Unit Owners Association pursuant
to the Condominium Act, the Declaration, these Bylaws and the Rules and
Regulations.

Section 2.2    Annual Meetings/Notice of Annual Meetings.  The annual
meetings of the Unit Owners Association shall be held on October 1st of each year
(or if such day is a Saturday, Sunday or governmentally fixed legal holiday, on the
next Business Day, or on such other day as may be approved by the Standard
Majority Vote of the Unit Owners.  The Secretary shall send notice of each annual
meeting at least twenty-one (21) days in advance of each annual meeting.  The
giving of a notice of an annual meeting in the manner provided in this Section and
Section 10.1 of these Bylaws shall be considered service of notice.  The notice of the
annual meeting issued to the Unit Owners must include a clear, concise and
accurate statement of the matters to be considered at the annual meeting that will
require the formal action and vote of the Unit Owners at the meeting.

C-1

Section 2.3    Place of Meetings. Meetings of the Unit Owners Association shall be held at the principal office of the Unit Owners Association or at such other place in Washington, D.C. that is approved by the Standard Majority Vote of the Unit Owners.

Section 2.4    Special Meetings. Any Unit Owner may request a special meeting of the Unit Owners Association. The President-Treasurer shall send notice of any special meeting to all Unit Owners which shall state the time, place and purpose thereof.

Section 2.5    Notice of Special Meetings. Notice of a special meeting shall be transmitted at least seven (7), but not more than thirty (30) days prior to such meeting, stating the time, place and purpose thereof. The giving of a notice of a special meeting in the manner provided in this Section and Section 10.1 of these Bylaws shall be considered service of notice. The notice of a special meeting issued to the Unit Owners must include a clear, concise and accurate statement of the matters to be considered at the special meeting called by the notice that will require the formal action and vote of the Unit Owners at the meeting.

Section 2.6    Quorum at Meetings. Provided the required notice is given, the presence in person or by proxy of two (2) out of the three (3) of the Unit Owners shall constitute and be necessary for a quorum at all meetings of the Unit Owners Association; provided, however, that (i) in the case of any matter requiring a decision by a Special Majority Vote, then, notwithstanding the presence of a quorum, no action may be taken by the Unit Owners Association on such matter except by a Special Majority Vote in accordance with the processes set forth in these Bylaws, except as specified in Section 2.7(d), and (ii) in the case of any matter requiring the approval of all the Unit Owners, then, notwithstanding the presence of a quorum, no action may be taken by the Unit Owners Association on such matter except by the Unanimous Vote in accordance with the processes set forth in these Bylaws.

Section 2.7    Voting.

(a)    Voting at all meetings of the Unit Owners Association shall be on a percentage basis and the percentage of the vote to which each Unit Owner is entitled shall be the Common Element Interests assigned to such Unit Owner's Unit in the Declaration as the same appears in the Common Element Interests Table appended to the Declaration.

(b)    Where the ownership of a Unit is in more than one Person, the Person who shall be entitled to cast the vote of such Unit shall be the Person named in a certificate executed by all of the owners of such Unit and filed with the President-Treasurer (if such a certificate is on file) or, in the absence of such named person from the meeting, the Person who shall be entitled to cast the vote of such

Unit shall be the Person owning such Unit who is present. If more than one person owning such Unit is present, then such vote shall be cast only in accordance with their unanimous agreement pursuant to Section 42-1903.05(c) of the Condominium Act. If a Unit Owner is not a natural Person, the vote for such Unit may be cast by any natural person having authority to act on behalf of such Unit Owner. Subject to the requirements of the Condominium Act, wherever the approval or disapproval of a Unit Owner is required by the Condominium Act or the Condominium Instruments, such approval or disapproval shall be made only by the Person who would be entitled to cast the vote of such Unit at any meeting of the Unit Owners Association. There shall be no cumulative voting.

(c)  Except where a greater number is required by the Declaration or these Bylaws, a Standard Majority Vote is required to adopt decisions at any meeting of the Unit Owners Association.

(d)  Where due notice has been given to and received by a Unit Owner of the call of a meeting of the Unit Owners Association to consider and take action on a specific matter noted in the notice of meeting, and either (1) a quorum cannot established at the time and place specified in the meeting notice, or (ii) no action is taken by the Unit Owners by Required Vote to approve or to disapprove the action, or no action is taken by Standard Majority Vote to extend consideration to a date certain in the future on the specific matter for which notice was given in the meeting notice, then the requested action on the specific matter proposed in the meeting notice shall be deemed to have been approved by the Unit Owners Association, a Required Vote of approval as to that specific matter having been obtained.

Section 2.8  Proxies. A vote may be cast by a Unit Owner in person or by proxy. A proxy may be instructed (directing the proxy how to vote) or uninstructed (leaving how to vote to the proxy's discretion). Proxies may be granted by any Unit Owner in favor of (a) any Mortgagee duly registered with the Unit Owners Association pursuant to Section 8.1 of these Bylaws as having an interest in such Unit Owner's Unit, but only if that Mortgagee shall be entitled to the same in accordance with the deed of trust or mortgage under which the Mortgagee holds its interest in the Unit, or (b) another Unit Owner. Proxies shall be duly executed in writing, shall be duly acknowledged (notarized), shall be dated, shall be signed by a natural person having authority at the time of the execution thereof to execute deeds on behalf of that Unit Owner, and shall be filed with the Secretary. Such proxy shall be deemed revoked only upon actual receipt by the natural person presiding over the meeting of notice of revocation from any of the persons owning such Unit. Any proxy shall terminate automatically upon the adjournment of the first meeting held on or after the date of that proxy. The Unit Owners Association shall be entitled to fully rely upon any proxy submitted on behalf of a Unit Owner

C-1

without the need for inquiry, if a proxy on behalf of a Unit Owner is submitted in accordance with the provisions of this Section.

Section 2.9  Conduct of Meeting.  The minutes of all meetings shall be held in a Minute Book maintained for the Unit Owners' Association by the President-Treasurer.  The then current Robert's Rules of Order or any other rules of procedure acceptable to a majority of the votes of Unit Owners shall govern the conduct of all meetings of the Unit Owners' Association when not in conflict with these Bylaws, the Declaration or the Condominium Act.  All votes shall be tallied by a person or persons appointed by the presiding officer of the meeting, or if action is taken without a meeting pursuant to Section 2.10, then by the President-Treasurer.

Section 2.10 Action Without a Meeting.  Any decision required or permitted to be made at an annual or special meeting of the Unit Owners Association may be taken by written consent without a meeting of the Unit Owners Association provided that (a) consent to waive the holding of a meeting is obtained from all Unit Owners, (b) if applicable, consent to waive the receipt of advanced notice of such is obtained from all Unit Owners and (c) the Required Vote for such decision is obtained.

ARTICLE 3
Powers and Duties of the Unit Owners Association;
Delegation of Authority

Section 3.1  Powers and Duties.  There shall be no executive or governing board of the Unit Owners Association.  In addition to any responsibilities, duties or obligations imposed by the Condominium Act or the Declaration, the Unit Owners Association shall have the following powers and duties, subject to action first being taken by the Required Vote of the Unit Owners where a Required Vote is provided for in each case:

(a)    Prepare and adopt an annual budget for the expected General Expenses for the forthcoming fiscal year and the proposed assessments of each Unit Owner for the General Expenses arising thereunder in accordance with these Bylaws.

(b)    Fix the amount of assessments against each Unit Owner, based upon the approved budget, to defray the General Common Expenses of the Condominium, and establish the means and methods of collecting such assessments from each Unit Owner.

(c)    Provide for the operation, care, upkeep and maintenance of and general access to and through, the General Common Elements and for delivery of services related thereto by the Unit Owners Association, including by and through the Service Facilities for which the Unit Owners Association is responsible.

(d)    Provide services chargeable as Special Expenses to one or more Unit Owners, where a Unit Owner fails in the performance of its obligations under the Declaration or these Bylaws, provided that such Unit Owner shall have been given no less than ten (10) business days to cure and/or correct its default after receipt of written notice to do so from the Unit Owners Association.

(e)    Undertake alterations, repairs, replacements, additions and improvements to the General Common Elements, subject to compliance with the Facilities Access Conditions as applicable, provided that if any alterations, repairs, replacements and improvements would require the temporary closure of any entry to or from the Building through public corridors and staircases, or the Atrium Lobby, then such alterations, repairs, replacements and improvements may not be undertaken, except in an emergency or where applicable law requires otherwise, during the calendar months reasonably acceptable to Unit No.1 Owner and Unit No. 2 Owner, and additionally only during those hours that the tenants and occupants of Unit No.1 and Unit No. 2 are not open for business. Any such alterations, repairs, replacements, additions and improvements to the General Common Elements by or on behalf of the Unit Owners Association shall be accomplished in the minimum time reasonably necessary to complete the undertaking, and shall be conducted in a manner that is intended to minimize interference with the activities and normal business operations of any Unit Owner (or its tenants or occupants) .

(f)    Subject to compliance with the Facilities Access Conditions as applicable, undertake alterations, additions and improvements to a Unit or any Limited Common Elements assigned to that Unit to the extent necessary where it can be reasonably established by the Unit Owners Association that a condition or situation in a Unit or any Limited Common Elements assigned to that Unit materially and adversely impacts the General Common Elements, any Limited Common Elements of any other Unit, or any other Unit, that the same needs to be corrected or cured to protect the General Common Elements, any other Limited Common Elements or another Unit, and that the same has not been duly undertaken by a Unit Owner or Unit Owners, as applicable, provided that such Unit Owner shall have been given no less than ten (10) business days to cure and/or correct its failure to cure or correct after receipt of written notice to do so from the Unit Owners Association.

(g)    Designate, hire and dismiss the personnel and/or companies necessary for the maintenance, operation, repair and replacement of the General Common Elements and provide services for the General Common Elements and, where appropriate, provide for the compensation of such personnel and for the purchase of equipment, supplies and material to be used by such personnel in the performance of their duties, which supplies and equipment shall be deemed part of the General Common Elements.

C-1

(h)     Hire a Managing Agent as provided for by Section 3.4 of these Bylaws.

(i)     Collect, when due and owing, the assessments for Common Expenses, and special assessments, and Special Expenses to those Unit Owners for which Common Expenses were incurred, deposit the proceeds thereof in bank depositories designated by the Unit Owners Association and use the proceeds to carry out the administration of the Property.

(j)     Open bank accounts on behalf of the Unit Owners Association with the signatories thereon designated by the Unit Owners Association.

(k)     Make, or contract for the making of, (i) repairs, additions and improvements to or alterations of the General Common Elements, and as appropriate Limited Common Elements, where in each case a Unit Owner has failed to perform its obligations with regard to the same for the benefit of the Condominium, provided that such Unit Owner shall have been given no less than ten (10) business days to cure and/or correct its default after receipt of written notice to do so from the Unit Owners Association, and (ii) repairs to and restoration of the Property, in accordance with these Bylaws, after damage or destruction by fire or other casualty, or as a result of condemnation or eminent domain proceedings, provided that in the case of each of (i) and (ii) above to any work undertaken would be subject to compliance with the Facilities Access Conditions as applicable.

(l)     Exercise such approval rights as provided to the Unit Owners Association by the Declaration or these Bylaws and enforce by legal means the provisions of the Declaration and these Bylaws;

(m)     Act on behalf of all Unit Owners to take all actions to preserve and protect the Condominium with respect to all matters arising out of any eminent domain proceeding, and notify all Unit Owners of any litigation against the Unit Owners Association as a result thereof.

(n)     Obtain and carry insurance against casualties and liabilities, as provided in Article 6 of these Bylaws, pay the premiums therefor and adjust and settle any claims thereunder.

(o)     Pay the cost of all authorized services rendered to the Unit Owners Association.

(p)     In accordance with Section 42-1903.14 of the Condominium Act, keep books with detailed accounts in chronological order of the receipts and expenditures by the Unit Owners Association affecting the Condominium, and the administration of the Condominium, specifying the expenses of maintenance and

C-1

repair of the Common Elements and any other expenses duly incurred. Such books and vouchers accrediting the entries therein shall be made available for examination by each Unit Owner, its attorneys, accountants, Mortgagees and authorized agents during general business hours on Business Days at the times and in the manner set and announced by the Unit Owners Association.

(q)  Borrow money on behalf of the Unit Owners Association and the Condominium when required in connection with any one instance relating to the operation, care, upkeep and maintenance of the Common Elements.

(r)  From time to time to designate certain General Common Elements as Reserved Common Elements and impose such restrictions and conditions on the use thereof as the Unit Owners Association deems appropriate.

(s)  Furnish the statement required by Section 42-1904.11 of the Condominium Act within ten (10) days after the receipt of a written request therefor from any Unit Owner.

(t)  Establish reasonable reserves for repairs, capital replacements or other capital expenditures or purposes as may be provided for in any budget for the Unit Owners Association adopted in accordance with Section 5.1(b) of these Bylaws.

(u)  Act in connection with the execution of any documents arising out of or related to covenants, easements, restrictions or similar documents that may encumber the Land or to which the Condominium (as distinct from any individual Unit Owner and excluding specifically the DC USA Deed) is or becomes liable or responsible, (including any Title Documents, but not the LDA) and any amendments to or termination of any of the foregoing, provided that before any grant, modification, amendment or exercise of termination of any easement, restriction, covenant or similar agreement, is executed, then a Required Vote has been obtained in accordance with these Bylaws as would be applicable to such grant, modification, amendment or termination.

(v)  Act in connection with the application for or appeal of or under, any of the Governmental Requirements applicable to the Condominium or the Land, or the acceptance of benefits, burdens and relief thereunder.

(w)  Amend any or all of the Condominium Instruments, including Schedule A to these Bylaws, in any manner which (1) is not inconsistent with the DC USA Deed, (2) would not require modification of the Declaration of Parking Operations, and/or (3) not would violate the Bond Documents, so long as any of the same are in full force and effect.

(x)    Amend the Rules and Regulations from time to time as may be deemed reasonably necessary to insure the due and proper operation of the Condominium and the continuation of the Building as a high quality retail/commercial facility, comparable to other high quality retail/commercial buildings in the Washington, D.C. metropolitan area  by a Standard Majority Vote, provided that such Rules and Regulations do not discriminate between different Unit Owners and are not inconsistent with any of the provisions of the Condominium Instruments, DC USA Deed or Declaration of Parking Operations.

(y)    Identify on the portion of the roof of the Building the areas and locations that are appropriate for the installation and maintenance of antennas and other transmitting/receiving equipment, and related support equipment therefor, by Unit No. 1 Owner, Unit No. 2 Owner, and Unit No. 3 as contemplated by Section 4.7 of the Declaration.

(z)    Take no actions or fail to take an action that would restrict or prevent  general access to and through the General Common Element public corridors, public staircases, and the Atrium Lobby, except (i) in the case of an emergency or as may be required by applicable law; (ii) in the case of a scheduled repair, replacement, installation, alteration, or similar action to the General Common Elements, or portions thereof, approved by the Unit Owners Association by a Required Vote; and (iii) in the case where a concern for the security of person or property arises as reasonably determined by the Managing Agent that necessitates restriction on or control of access to and from the Building.

(aa)    Do such other things and acts not inconsistent with the Condominium Act or the Condominium Instruments which the Unit Owners Association may be authorized to do by a resolution of the Unit Owners Association.

Section 3.2    Actions by Unit Owners Association Requiring a Standard Majority Vote; Actions by Unit Owners Association Requiring a Special Majority Vote or a Unanimous Vote of All Unit Owners.

(a)    Actions Requiring a Standard Majority Vote.  The Unit Owners Association may exercise all of the powers and duties specified in Section 3.1 above of these Bylaws by Standard Majority Vote action, except as otherwise specifically provided for in Section 3.2(b) and Section 3.2(c) below.

(b)    Actions Requiring a Special Majority Vote.  The following actions shall require a Special Majority in Interest Vote:

(1)    Approval of any budget related to the Limited Common Element Expenses, provided that if a line item of any budget related to the Limited Common Element Expenses involves budgeting for a line item related to a limited Common Element assigned to Unit No. 3 then the vote of Unit Owner No. 3 shall be

required to approve such line item, but not for the entire budget for Limited Common Element Expenses as provided in Section 5.1(c).

(2) Termination of any license to Unit Owner No. 1 for use of areas of General Common Elements designated as Reserved Common Elements pursuant the Declaration.

(3) Appointment of a Person as Managing Agent.

(4) Subject to Section 3.2(b)(6) below of these Bylaws, approval of additions, alteration or improvements by the Unit Owners Association or by a Unit Owner in or to Limited Common Elements assigned to more than one Unit.

(5) Election of a Person as an officer of the Association where there is a vacancy in the officer due to death, resignation or removal of the incumbent as provided for in Section 3.7 of these Bylaws to serve until an annual election is held as provided for in Section 3.6 of these Bylaws.

(6) Approval of a physical modification to any of the Common Elements required to satisfy any obligation of the LDA, where approval has first been obtained in accordance with the provisions of the LDA for such proposed modification.

(7) Approval of any budget related to General Expenses where the increase in the amount of General Expenses proposed in the budget for General Expenses for the forthcoming fiscal year does not exceed ten percent (10%) of the amount of the General Expenses in the approved budget for the current fiscal year, provided that where that proposed budget for General Expenses contains any line item reflecting an increase of more than ten percent (10%) in the amount of any line item for which Unit No. 3 Owner would be responsible for twenty percent (20%) or more of the costs and expenses thereof above the amount of that line item in the approved budget for General Expenses for the current fiscal year, then approval of that budget less and except that line item or items, unless Unit No. 3 Owner votes to approve such line item(s).

(8) Approval of additions, alterations or improvements to General Common Elements by the Unit Owners Association or by a Unit Owner where Unit No. 3 would not be required to share in the cost and expense of the addition, alteration or improvement to the General Common Elements.

(9) Taking any other action requiring a Special Majority Vote as specified in and pursuant to any provision of the Declaration or these Bylaws.

(c) <u>Actions Requiring the Unanimous Vote of All Unit Owners.</u>

C-1

The following actions shall require Unanimous Vote:

(1) Termination of the regime of the Condominium.

(2) Amendment of the Declaration or any exhibits thereto or the Plat and Plans, except for any amendment to the Declaration or any exhibits thereto, or to the Plans undertaken in each case pursuant to Section 2.5 of the Declaration where no Required Vote is necessary.

(3) Amendment of these Bylaws or any exhibits thereto, including amendment or modification of Schedule A to these Bylaws.

(4) Approval of any budget or budget line items related to the General Expenses where the increase in the amount of General Expenses proposed in the budget for General Expenses of the Unit Owners Association for the forthcoming fiscal year exceeds ten percent (10%) of the amount of the General Expenses in the approved budget for the current fiscal year, or where there is proposed in the budget for the forthcoming fiscal year an increase of more than ten percent (10%) in the amount of any line item for which Unit No. 3 Owner would be responsible for twenty percent (20%) or more of the costs and expenses of that line item thereof above the amount of that line item in the approved budget for General Expenses for the current fiscal year.

(5) Establishment of reasonable reserves for repairs, capital replacements or other capital expenditures or purposes as may be provided for in any budget for the Unit Owners Association adopted in accordance with Section 5.1(b) of these Bylaws.

(6) Election of officers of the Association annually as provided by these Bylaws.

(7) Borrowing of money in excess of 10% of the annual budget for General Expenses.

(8) Leasing or licensing of areas within Unit No. 3, except as otherwise permitted by Section 6.1 of the Declaration (including, as provided in that Section leasing and licensing in accordance with the Declaration of Parking Operations).

(9) Approving, authorizing or consenting to any change in the Permitted Uses of a Unit.

(10) Establishment of a subtier condominium regime within Unit No. 3.

C-1

(11)   Establishment of a subtier condominium regime within any Unit, other than Unit No. 3, where it can reasonably demonstrated and determined that additional material and substantive obligations would be imposed upon the Unit Owners Association as a result of the establishment of the subordinate condominium regime within that Unit, or there would be an alteration of the Common Element Interest allocation to any Unit.

(12)   Subdivision of Unit No. 3.

(13)   Approval of any development proposal for use of Excess Development Rights above the Building as provided for in and subject to Section 2.7 (b) of the Declaration.

(14)   Approval of any additions, alterations or improvements to General Common Elements by the Unit Owners Association or by a Unit Owner where Unit No. 3 would be required to share in the cost and expense of the addition, alteration or improvement to the General Common Elements and the same is not part of the approved budget for General Expenses of the Unit Owners Assocation, unless (a) such additions, alterations or improvements to General Common Elements are otherwise permitted or provided for by the Declaration or these Bylaws without a Unanimous Vote, or (b) approval of a physical modification to the General Common Elements was required to satisfy an obligation of the LDA and approval of such proposed modification was first obtained in accordance with the provisions of the LDA.

(15)   Approval of Alterations to a Unit as and when required under Section 5.7(b) of these Bylaws.

(16)   Delegation of authority under Section 3.3 of these Bylaws to a Unit Owner, to the President-Treasurer, the Secretary, any Vice President or to the Managing Agent.

(17)   Taking of any other action requiring a Unanimous Vote as specified in and pursuant to any provision of the Declaration or these Bylaws.

(d)   Arbitration of Disputes Concerning Unit Owner Decisions on Actions or Matters.

(1)   Except as hereinafter specified, where an action or matter is brought before the Unit Owners Association at a duly called meeting, and that action or matter requires a Special Majority Vote or a Unanimous Vote, then if the Unit Owners fail to agree upon an action or matter requiring such Special Majority Vote or a Unanimous Vote, then any Unit Owner or group of Unit Owners disputing the act or failure to act by the Unit Owners Association shall have as its sole remedy the right to submit the same to binding arbitration in accordance with the

provisions of this Section 3.2(d). Notwithstanding the foregoing, this process of resolution of disputes among Unit Owners by binding arbitration shall not apply, to any action that seeks (i) to terminate the regime of the condominium, (ii) to amend in any material respect the Declaration and its Exhibits, or (iii) to amend in any material respect these Bylaws (other than an action seeking to amend Schedule A to these Bylaws, which dispute related to Schedule "A" shall be resolved by binding arbitration in accordance with the provisions of this Section 3.2(d)).

(2)    If the qualified Unit Owners fail to agree by Required Vote upon the action or matter in question at a meeting of the Unit Owners duly called for the purposes of considering such action or matter in accordance with these Bylaws, then any of Unit Owner or group of Unit Owners qualified to vote on the action or matter in question may, with ten (10) calendar days after the date of the meeting called to consider the action or matter, notify the other qualified Unit Owner or Unit Owners in writing that it intends to request that a decision or determination on the action or matter be submitted to an arbitrator for consideration and determination or decision. If the qualified Unit Owners do not reach agreement or consensus on the action or matter within ten (10) days after the issuance and receipt of notice of intent to request a decision or determination on an action or matter by an arbitrator, then, except where these Bylaws provide for the appointment of a Designated Property Manger to make a decision or determination under Section 5.1 of these Bylaws, the qualified Unit Owner or Unit Owners shall select an independent Person to review the action or matter proposed to the Unit Owners as an arbitrator, such Person to be duly qualified either by professional credentials or demonstrated experience to be a Person qualified to evaluate, consider, review and determine the matter or matters upon which there is a lack of agreement by Required Vote. The arbitrator shall be authorized and directed to make the decision or the determination on the action or matter upon which the Unit Owners have not been able to agree by Required Vote. A Person to be duly considered to the arbitrator shall have established professional credentials in or evidence of five (5) years of demonstrated experience in the subject matter that is the basis of the dispute or upon which there is a lack of agreement among the Unit Owners. Additionally where a person is to be considered based upon his or her experience in the subject matter in dispute or upon which there is not agreement, then he or she must have no less than five (5) years of such demonstrated experience in the Washington, D.C. metropolitan area. Only a person who has professional credentials or demonstrated experience with regard to the subject matter of the action or matter may be designated as an arbitrator. If the qualified Unit Owners cannot agree on such person within twenty (20) days after the issuance and receipt of the notice of intent to request a decision or determination on an the action or matter by an arbitrator, then any of the qualified Unit Owners may apply to the American Arbitration Association or any successor thereto having jurisdiction to designate an independent, credentialed and appropriately trained person to be the arbitrator of the action or matter in dispute. If no qualified Unit

Owner makes such application within the twenty (20) day period, then the action by the qualified Unit Owners on the action or matter at the meeting of the Unit Owners Association shall be deemed to stand.

(3)     The arbitrator may conduct such hearings or investigations as he or she may deem appropriate, including requesting presentations from each qualified Unit Owner. The arbitrator shall render his or her decision or determination as to the action or matter in dispute within twenty (20) days after his or her designation or twenty (20) days following a hearing called to discuss the matter in dispute.

(4)     In making his or her decision or determination, the arbitrator, whether as selected by the qualified Unit Owners or the American Arbitration Association, may only consider the alternative actions that were presented to the qualified Unit Owners for consideration at the meeting of the Unit Owners Association. The arbitrator may not select or choose an alternate course from what was presented to the qualified Unit Owners for consideration at that meeting.

(5)     Where an action or matter is duly submitted to an arbitrator, the determination or decision of the arbitrator shall be binding upon the Unit Owners Association.

(6)     Each party shall pay its own consultant's fees, such as those of its legal counsel, and shall otherwise share the expenses of the arbitration, including any fees incurred to employ the arbitrator at the Default Share of each Unit Owner. Neither the fees of a party, nor the expenses of the arbitration shall be General Expenses of the Unit Owners Association. If the Unit Owners Association incurs any expenses in connection with such arbitration, the same shall be deemed Special Expenses chargeable to the Unit Owner or prorata to the Unit Owners involved.

(7)     A qualified Unit Owner shall mean as to a specific action or matter, where the Required Vote is a Special Majority Vote, Unit No. 1 Owner and Unit No. 2 Owner, and where the Required Vote is a Unanimous Vote, then all Unit Owners.

(8)     In the event that, before or after a decision or determination of an arbitrator selected pursuant to the provisions of the Section 3.2 (d) is rendered, the qualified Unit Owners reach agreement on the action or matter in dispute, and so notify the arbitrator in writing of the same, then the agreement of the qualified Unit Owners shall be deemed controlling, notwithstanding any decision or determination that may have been previously or may be rendered by the arbitrator. With the notification to the arbitrator of such agreement by the

qualified Unit Owners prior to the time, a decision or determination is rendered, the arbitrator shall be deemed discharged of his or her obligations to so render a decision or a determination. Any such termination of the arbitrator and his or her services shall not discharge the qualified Unit Owners of their responsibility for the expenses of arbitration.

(9)    Until either an agreement is reached by the qualified Unit Owners on a action or matter presented for consideration or a decision or determination of the arbitrator is rendered, the status quo with regard to the operation of the Condominium on the action or matter in dispute shall be controlling and in full force and effect.

(10)    Notwithstanding anything in this Section 3.2 to the contrary, where the failure to reach agreement relates to approval of a budget of General Expenses or approval of a budget for Limited Common Element Expenses, then the applicable provisions of the Section 5.1 of these Bylaws shall apply as to the lack of agreement by the Unit Owners by Required Vote.

Section 3.3    <u>Delegation of Responsibilities for Performance of Powers and Duties of the Unit Owners Association</u>. In the performance of the powers and duties of the Unit Owners Association identified in Section 3.1 above, the Unit Owners Association may delegate any or all of the same, by Required Vote, to one of the Unit Owners, to the President-Treasurer, the Secretary or any Vice President, or to the Managing Agent, affording that Person the authority to act on behalf of the Unit Owners Association on such matters which may arise, provided however that no such Person shall have authority to take any action for which these Bylaws provide that a Special Majority Vote, or a vote of all of the Unit Owners is required, without in each instance obtaining such Required Vote.

Section 3.4    <u>Managing Agent</u>.

(a)    Employment of a Managing Agent. The Unit Owners Association shall hire a Person to serve as "managing agent" for the Condominium (the "Managing Agent"). The Unit Owners Association shall select the Person to be the Managing Agent from time to time by a Required Vote, subject to the Person hired meeting or exceeding the requirements set forth in subsection (b) and (c) below of this Section.

(b)    Management Agreement. The Person proposed to be hired as Managing Agent shall be hired only under an agreement for services (the "Management Agreement"), upon prevailing market terms for similar projects then in place in similar locations in Washington, D.C. for management and operation of high quality retail/commercial projects. Any Management Agreement entered into

C-1

by the Unit Owners Association with a Person selected as Managing Agent may have a term of no more than three (3) years. At the expiration of the term of any Management Agreement with an incumbent Managing Agent, the Unit Owners Association may elect (i) to extend the term of the Management Agreement with the incumbent Managing Agent or in lieu thereof enter into a new Management Agreement, or (ii) to select another Person as the Managing Agent. Any compensation due and owing the Managing Agent under any Management Agreement with the Unit Owners Association may not be based upon profits that could be deemed to be either (y) generated by the Unit Owners Association through the operation of the Condominium or (z) generated by the Unit Owners through the operation of their respective Units.

(c)     Qualifications of Person for Position of Managing Agent. The Person to be designated as Managing Agent shall be a bona fide and duly licensed business enterprise, with substantial, and strong credentials. Experience in the management of condominium associations, property owners associations, cooperative associations and similar types of entities shall also be a factor to be considered, but not a requirement, in evaluating a Person's capability to serve as the Managing Agent. The Person to be considered for hiring must be able to show that its employees possess a high level of competence in the technical skills necessary to proper management of the Condominium as a high quality retail/commercial project. The Managing Agent must be qualified to advise the Unit Owners Association and the Officers regarding the administrative operation of the Condominium and shall employ personnel knowledgeable in pertinent subject matter areas. The Unit Owners Association shall solicit bids from Persons satisfying the qualifications set forth above in this section; no Person shall be disqualified from consideration due to the fact that the Person may be an Affiliate of a Unit Owner.

(d)     Duties. The Managing Agent shall perform such duties and services as the Unit Owners Association or the President-Treasurer shall direct, subject to undertaking those responsibilities within the frame work of the approved budget adopted by the Unit Owners Association in accordance with Section 5.1 of these Bylaws. As provided for in Section 3.3 above of these Bylaws, the Unit Owners Association may delegate to the Managing Agent all of the powers granted to the Unit Owners Association by these Bylaws, subject to the requirements of the Condominium Act and the provisions of Section 3.3 of these Bylaws with regard to obtaining the Required Vote. The Managing Agent shall perform the assigned and delegated obligations, duties and services in compliance with the provisions of the Declaration or of these Bylaws, other than the powers set forth in subsection 3.1(b), with regard to the fixing of the amount of any assessment and in subsection 3.1(p), with regard to the borrowing of monies on behalf of the Condominium.

(e)    Standards.  The Management Agreement shall set forth appropriate standards of performance upon the Managing Agent consistent with its responsibilities for the management and operation of the Property as a high quality retail/commercial facility.

(f)    Role and Duties of the Managing Agent.  The Managing Agent shall:

(1)    Provide at least the following services and functions, as well as such other services as the Unit Owners Association may designate:

(A)    Employ both cash and an accrual method of accounting to determine General Expenses, Limited Common Element Expenses, and Special Expenses, in accordance with generally accepted accounting principles, consistently applied, subject however to the provisions of the Declaration or these Bylaws, as applicable; Special Expenses shall be accounted for separately from other Common Expenses.

(B)    Provide two or more persons to be responsible for handling cash to maintain adequate financial control procedures.

(C)    Prepare a budget for each fiscal year of the Unit Owners Association for General Expenses and Limited Common Element Expenses in accordance with the provisions of these Bylaws and as directed by the President-Treasurer for review and approval by the Unit Owners Association in accordance with the provisions of these Bylaws, which budget shall be submitted to the Unit Owners Association for its consideration no later than October 1 of each calendar year, all as more fully described in Section 5.1(b) of these Bylaws.

(D)    Determine and assess Special Expenses to various Unit Owners.

(E)    Prepare and issue assessment notices of Common Expenses  based upon the then approved budget of the Unit Owners Association for General Expenses and Limited Common Element Expenses, prepare and issue notice of Special Expenses, and in any case undertake collection activities thereon which assessments are not duly and timely paid.

(F)    Prepare a monthly, consolidated financial report for the Unit Owners Association and distribute such report to all Unit Owners, which report shall contain, among other reports and recommendations for the Unit Owners, the following:

C-1

(i) an "income statement" reflecting all income activity for the General Common Elements and all expense activity for the Common Elements for the preceding month on an accrual basis;

(ii) an "account activity statement" reflecting all receipt and disbursement activity for the preceding month on a cash basis;

(iii) an "account status report" reflecting the status of all accounts in an "actual" versus "projected" (budget) format;

(iv) a "balance sheet" reflecting the financial condition of the Unit Owners Association on an unaudited basis;

(v) a "budget variance report" reflecting any actual or pending obligations which are at variance to budgeted amounts;

(vi) a "delinquency report" listing all Unit Owners who are delinquent in paying condominium assessments and describing the status of any actions to collect such assessments; and

(vii) "bank reconciliation report" noting all savings and investment accounts of the Unit Owners Association.

(G) Prepare an annual, consolidated financial report promptly after the expiration of the fiscal year of the Unit Owners Association and shall distribute the same to the President-Treasurer and all Unit Owners, which report shall contain, among other reports and recommendations for the Unit Owners Association, the following:

(i) an "income statement" reflecting all income activity for the General Common Elements and expense activity of the Condominium for the preceding fiscal year on an accrual basis;

(ii) an "account status report" reflecting the status of all accounts in an "actual" versus "projected" (budget) format;

(iii) a "balance sheet" reflecting the financial condition of the Unit Owners Association on an unaudited basis;

(iv) a "budget variance report" reflecting any actual or pending obligations which are at variance with budgeted amounts;

(v) a "delinquency report" listing all Unit Owners who are delinquent in paying condominium assessments and describing the status of any actions to collect such assessments; and

(vi)    a "bank reconciliation report" noting all savings and investment accounts of the Unit Owners Association.

(H)    Undertake such other roles and responsibilities and provide such other services for the Unit Owners Association as designated by the Unit Owners Association.

(2)    In performing its responsibilities and duties, the Managing Agent may not:

(A)    Commingle cash accounts of the Unit Owners Association with any other accounts managed by the Managing Agent.

(B)    Accept remuneration from vendors, independent contractors or others providing goods or services to the Unit Owners Association whether in the form of commissions, finders fees, service fees or otherwise; any discounts and rebates received shall benefit the Unit Owners Association.

(C)    Have any financial or other interest in any firm providing goods or services to the Unit Owners Association, unless the same shall be disclosed promptly to the President-Treasurer and to all Unit Owners, and any goods or services to be provided by such firm shall be offered to the Unit Owners Association at prevailing and competitive rates.

(h)    Property Management Services With Regard to Units.  The Managing Agent's duties under the Management Agreement shall not provide for the performance by the Managing Agent of property management duties for the benefit of a Unit Owner that are unique to any Unit and shall not include leasing duties related to the Unit of an individual Unit Owner, including leasing administration duties such as but not limited to the collection of revenues related to the leasing of any Unit or for such Unit's Limited Common Elements.  The foregoing shall not be construed to prevent the Managing Agent from entering into a separate agreement with any Unit Owner for the performance of property management and leasing duties with regard to the Unit owned by that Unit Owner upon terms and provisions mutually agreeable to the Unit Owner and the Managing Agent; the Unit Owners Association shall have no liability for the same.

Section 3.5   Officers/Designation and Duties.  The officers of the Unit Owners Association shall be the President-Treasurer and a Secretary, and if desired by the Unit Owners Association, one or more Vice Presidents (one of whom may be serve concurrently as Secretary).  The President-Treasurer, the Secretary and each Vice President shall (i) perform such duties as are normally associated with such office in parliamentary organizations, except to the extent such duties are inconsistent with the Condominium Act or the Condominium Instruments; (ii) perform such duties required to be performed by an officer pursuant to the

provisions of the Condominium Act, the Declaration and these Bylaws; and (iii) perform such other duties as may be assigned to such officer by a Required Vote of the Unit Owners.

Section 3.6    Election of Officers.  The President-Treasurer, the Secretary and each Vice President of the Unit Owners Association shall be elected annually by the Unit Owners Association by a Unanimous Vote and shall hold office at the pleasure of the Unit Owners Association.  Except for death, resignation or removal, the President-Treasurer, Secretary and any Vice President shall hold office until his or her successor shall have been elected by the Unit Owners Association, as provided for above in this Section.

Section 3.7    Death, Resignation or Removal of Officer.  In the event of the death or resignation of a person holding the office of President-Treasurer, Secretary or any Vice President, a successor shall be elected by Required Vote, and duly elected person in such role shall hold such office until the next election provided for under Section 3.6.  Such person shall retain such office under a successor is so duly elected.  With regard to the removal of any officer, the President-Treasurer, the Secretary and each Vice President may be removed, either with or without cause, by a Unanimous Vote.

## ARTICLE 4
### Amendments to Bylaws

Section 4.1    Amendments.  Subject to the provisions of Section 4.2 below, these Bylaws may not be modified or amended except by a Unanimous Vote.  All amendments to these Bylaws duly adopted shall be recorded among the land records of the Office of the Recorder of Deeds of the District of Columbia by the President-Treasurer.

Section 4.2    Approval of Mortgagees.  Article 8 of these Bylaws contains provisions concerning various rights, priorities, remedies and interests of Mortgagees.  Such provisions in these Bylaws are to be construed as covenants for the protection of such Mortgagees on which they may rely in making loans secured by Mortgages.  Accordingly, no amendment or modification of Article 8 of these Bylaws impairing or affecting such rights, priorities, remedies or interests of a Mortgagee shall be adopted without the prior written consent of each Mortgagee existing as of the date of recordation of such amendment or modification, if and to the extent that the provisions of the Mortgage with the Mortgagee require such applicable consent.

ARTICLE 5
Operation of the Building

Section 5.1    Budgeting For and Determination of General Expenses and
Limited Common Element Expenses; Determination of Assessments to the Unit
Owners for Common Expenses.

(a)    Fiscal Year.  The fiscal year of the Unit Owners Association
shall be the calendar year unless otherwise determined by the Unit Owners
Association.

(b)    Preparation and Approval of Budget for General Expenses.

(1)    Prior to the first conveyance of legal title to the first Unit
in the Condominium, Declarant shall determine a budget for the operation of the
General Common Elements of the Condominium, which budget shall be in effect for
the fiscal year in which this first conveyance of legal title to a Unit occurs; provided
that if the first conveyance of legal title to a Unit occurs after September 30th of a
calendar year, then Declarant shall also determine a budget for the operation of the
General Common Elements of the Condominium for the next successive fiscal year
of the Condominium.

(2)    Annually after the first fiscal year of the Condominium
the Unit Owners Association shall cause the Managing Agent to prepare a budget
for the General Common Elements for consideration of the Unit Owners.  Prior to
such consideration and adoption by the Unit Owners, the Managing Agent shall
distribute a copy of the proposed budget to each Unit Owner no later than October 1
prior to the beginning of the fiscal year of the Association and during the period
from the date of distribution of such proposed budget to the date of adoption thereof,
each Unit Owner shall have the right to obtain information from the Managing
Agent with respect to such proposed budget, to discuss the same with the Managing
Agent and to express to the Unit Owners Association and the Managing Agent its
views concerning the proposed budget.

(3)    Following the delivery of a proposed budget for the
General Common Elements as provided in subsection (b)(2) above of this Section,
but no later than forty-five (45) days prior to the beginning of each fiscal year after
the fiscal year in which the first conveyance of legal title to a Unit in the
Condominium, the Unit Owners Association shall adopt a budget of the Unit
Owners Association for the General Common Elements for the coming fiscal year by
Required Vote.  The budget shall  be an estimate of the total amount considered
necessary to (a)  pay the cost of maintenance, management, operation, repair and
replacement of the General Common Elements, including as may be identified on
Schedule A to these Bylaws and the cost of wages, materials, insurance premiums,
services, supplies and other expenses of the Condominium that may be declared to

C-1

be General Expenses by the Condominium Act, the Declaration or these Bylaws, or other action by the Unit Owners Association and which will be required during the ensuing fiscal year for the administration, operation, maintenance and repair of the Property, and (b) pay for the administration and operation of the Condominium and the Unit Owners Association as an entity. The proposed budget shall also estimate the assessment proposed for each Unit that would be due and payable by each Unit Owner for General Expenses for the coming fiscal year.

(4)    Such budget shall also include such reasonable amounts as the Unit Owners Association reasonably considers necessary to provide working capital, a general operating reserve and reserves for contingencies and replacements. Prior to the beginning of each fiscal year, the Unit Owners Association shall send to each Unit Owner a copy of the budget in a reasonably itemized form which sets forth the amount of the General Expenses payable by each Unit Owner. Such budget shall constitute the basis for determining each Unit Owner's assessment for the General Expenses of the Condominium.

(5)    A budget for General Expenses for each fiscal year shall be adopted by Required Vote of the Unit Owners. Where the Unit Owners cannot reach agreement on the budget for General Expenses for the fiscal year, or specific line items thereof, within thirty (30) days after the commencement of the fiscal year, the President-Treasurer shall initiate the processes provided for in Section 3.2 (d) of these Bylaws, looking to having appointed an independent qualified property manager unaffiliated with any Unit Owner or the Managing Agent, (the "Designated Property Manager") to review, as applicable, the proposed budget for General Expenses being considered by the Unit Owners, or such line items thereof upon which the Unit Owners cannot reach agreement. A Person to be considered as a Designated Property Manager shall be licensed in the District of Columbia as a property manager and shall have at least ten (10) years of professional experience with budgeting for the operations of complex commercial real estate comparable to the Building in the Washington, D.C. metropolitan area. Based upon the review and analysis by the Designated Property Manager, the Designated Property Manager shall submit to the Unit Owners Association, as applicable, a budget for General Expenses for the then current fiscal year, or a decision on such line items upon which agreement cannot be reached. The budget or decision on such line items as submitted by the Designated Property Manager shall become the budget, or part of the otherwise approved budget, as applicable, for General Expenses of the Unit Owners Association for that fiscal year. No further action by the Unit Owners shall be required. The Unit Owners Association shall be obligated to pay the fee of the Designated Property Manager, such fee to be incorporated into the budget for General Expenses as submitted. Each Unit Owner shall have the opportunity to present to the Designated Property Manager its concerns with regard to the proposed budget for General Expenses or, as applicable, the line items upon which agreement has not been reached. The Designated Property Manager shall complete

C-1

its review of the proposed budget or the line items in question, and the related analysis of the operations of the Condominium, and then submit its budget for the General Expenses, or decision on specific line items, for the fiscal year in question within forty-five (45) days after being designated as the Designated Property Manager. The fees and costs of the Designated Property Manager shall be shared by the Unit Owners at the Default Share of each Unit Owner.

(6)     Where the Unit Owners Association fails to duly and timely adopt in whole a budget for General Expenses of the Unit Owners Association, or cannot reach agreement on specific line items thereof, then, until such time as (i) a budget for the applicable fiscal year is adopted, where the budget in its entirety cannot be agreed upon, or (ii) a decision on specific line items thereof cannot be agreed upon, the Unit Owners Association, or as applicable the authorized Unit Owner(s), shall be authorized to continue to operate the General Common Elements during the forthcoming fiscal year pursuant to and under, as applicable, (i) the budget for the then current fiscal year during the forthcoming fiscal year with the amount of that budget increased by five percent (5%), or (ii) the portion of the proposed budget for the forthcoming fiscal year upon which agreement was reached, other than the line items upon which agreement could not be reached. With regard to those line items upon which there is not agreement, if there was a comparable line item in the then current fiscal year, then the amounts in the comparable line item of the budget for the then current fiscal year shall apply, increased by five percent (5%) of the then budgeted amount for that line item. The then the augmented current fiscal year budget, or if applicable the proposed budget, adjusted for those line items upon which agreement could not be reached as provided above, shall be the budget for the Unit Owners Association in the forthcoming fiscal year until a complete budget is finalized pursuant to subclause (5) above. The Unit Owners shall be assessed, and shall be obligated to pay assessments levied by the Unit Owners Association based upon that continuing budget for the General Expenses, as modified, until the completed budget for the forthcoming fiscal year has been agreed upon or determined, in which case the Unit Owners Association shall adjust the assessments to be levied to reflect that budget, including any reconciliation thereof with the prior continuing budget.

(c)     Preparation and Approval of Budget for Limited Common Element Expenses.

(1)     Prior to the first conveyance of legal title to the first Unit in the Condominium, Declarant shall determine a budget for the operation of the Limited Common Elements of the Condominium, which budget shall be in effect for the fiscal year in which this first conveyance of legal title to a Unit occurs; provided that if the first conveyance of legal title to a Unit occurs after September 30th of a calendar year, then Declarant shall also determine a budget for the operation of the

Limited Common Elements of the Condominium for the next successive fiscal year of the Condominium.

(2)    Annually after the first fiscal year of the Condominium the Unit Owners Association shall cause the Managing Agent to prepare a budget for the Limited Common Elements for consideration of the Unit Owners. Prior to such consideration and adoption by the Unit Owners, the Managing Agent shall distribute a copy of the proposed budget to each Unit Owner no later than October 1 prior to the beginning of the fiscal year of the Association and during the period from the date of distribution of such proposed budget to the date of adoption thereof, each Unit Owner shall have the right to obtain information from the Managing Agent with respect to such proposed budget for the Limited Common Elements, to discuss the same with the Managing Agent and to express to the Unit Owners Association and the Managing Agent its views concerning the proposed budget for the Limited Common Elements.

(3)    Following the delivery of a proposed budget as provided in subsection (c)(2) above of this Section, but no later than forty-five (45) days prior to the beginning of each fiscal year after the fiscal year in which the first conveyance of legal title to a Unit in the Condominium, the Unit Owners Association shall adopt a budget of the Unit Owners Association for the Limited Common Elements for the coming fiscal year. The budget shall be an estimate of the total amount considered necessary to pay the cost of maintenance, management, operation, repair and replacement of the Limited Common Elements for the ensuing fiscal year, including as identified on Schedule A to these Bylaws and the cost of wages, materials, insurance premiums, services, supplies and other expenses of the Condominium that may be declared to be Limited Common Element Expenses by the Condominium Act, the Declaration or these Bylaws. The proposed budget shall also estimate the assessment proposed for each Unit that would be due and payable by each Unit Owner for the various Limited Common Element Expenses for the coming fiscal year.

(4)    Such budget shall also include such reasonable amounts as the Unit Owners Association reasonably considers necessary to provide working capital, an operating reserve and reserves for contingencies and replacements for Limited Common Elements. Prior to the beginning of each fiscal year, the Unit Owners Association shall send to each Unit Owner a copy of the budget in a reasonably itemized form which sets forth the amount of the Limited Common Element Expenses. Such budget shall constitute the basis for determining each Unit Owner's assessment for the Limited Common Element Expenses of the Condominium, due and payable by each Unit Owner, as applicable.

(5)    A budget for Limited Common Element Expenses for each fiscal year shall be adopted by Unit Owners by Required Vote. Where a line item in a proposed budget for Limited Common Element Expenses includes a line item for a

C-1

Limited Common Element assigned to Unit No.3, then Required Vote as to that line item shall be deemed to include the need to obtain a vote of approval by Unit Owner No. 3 with regard that line item, but not as to the rest of any proposed budget for Limited Common Element Expenses. Where a Required Vote cannot be achieved to approve the budget for Limited Common Element Expenses for the fiscal year, or on one or more specific line items thereof, within thirty (30) days after the commencement of the fiscal year, the President·Treasurer shall initiate the processes provided for in Section 3.2 (d) of these Bylaws, looking to having appointed a the Designated Property Manager to review, as applicable, the proposed budget for Limited Common Element Expenses being considered by the Unit Owners, or such line items thereof upon which the Unit Owners cannot obtain a Required Vote. Based upon the review and analysis by the Designated Property Manager, the Designated Property Manager shall submit to the Unit Owners Association, as applicable, a budget for Limited Common Element Expenses for the then current fiscal year, or a decision on such line items upon which a Required Vote to approve could not be achieved. The budget, or the decision on such line items, as submitted shall become the budget, or part of the otherwise approved budget, for Limited Common Element Expenses of the Unit Owners Association for that fiscal year. No further action by the Unit Owners shall be required. The Unit Owners Association shall be obligated to pay the fee of the Designated Property Manager, such fee to be incorporated into the budget for Limited Common Element Expenses as submitted. Each Unit Owner shall have the opportunity to present to the Designated Property Manager its concerns with regard to the proposed budget for Limited Common Element Expenses, or as applicable, the line items upon which the Required Vote could not be obtained. The Designated Property Manager shall complete its review of the proposed budget, or as applicable such line items upon which a Required Vote could not be achieved, and related analysis of the operations of the Condominium, and then submit its budget for the Limited Common Element Expenses, or the line items in question, for the fiscal year in question within forty·five (45) days after being designated as the Designated Property Manager.

(6)    Where the Unit Owners Association fails to duly and timely adopt in whole a budget for Limited Common Element Expenses, or cannot reach agreement on specific line items thereof, then, until such time as (i) a budget for the applicable fiscal year is adopted, where the budget in its entirety cannot be agreed upon, or (ii) a decision on specific line items thereof cannot be agreed upon, the Unit Owners Association, or the impacted Unit Owners, as applicable, shall be authorized to continue to operate the Limited Common Elements during the forthcoming fiscal year pursuant to and under, as applicable, (i) the budget for the then current fiscal year during the forthcoming fiscal year, or (ii) the portion of the proposed budget for the forthcoming fiscal year upon which agreement was reached, other than the line items upon which agreement could not be reached. With regard to those line items on which there is not agreement, if there was a comparable line item in the then current fiscal year, then the amounts in the comparable line item

of the budget for the then current fiscal year shall apply. The then current fiscal year budget, or if applicable the proposed budget, adjusted for those line items upon which agreement could not be reached as provided above, shall be the budget for Limited Common Elements in the forthcoming fiscal year until a complete budget is finalized pursuant to subclause (5) above. The Unit Owners shall be assessed, and shall be obligated to pay assessments levied by the Unit Owners Association based upon that continuing budget for the Limited Common Element Expenses, as modified, until the completed budget for the forthcoming fiscal year has been agreed upon or determined, in which case the Unit Owners Association shall adjust the assessments to be levied to reflect that budget, including any reconciliation thereof with the prior continuing budget.

(d)     Determination and Assessment of General Expenses.  Based upon the budget for General Expenses adopted pursuant to Section 5.1(b), the Unit Owners Association shall determine each Unit Owner's assessment for General Expenses (to the extent the same can be reasonably identified) and any contributions to any reserves for General Expenses established by the Unit Owners Association from time to time, based upon the Common Element Interests Table attached as Exhibit B to the Declaration; each Unit Owner shall then be assessed that amount toward its obligation for General Expenses for the coming fiscal year of the Unit Owners Association subject to audit and reconciliation as provided for in subsection (i) of this Section.

(e)     Determination and Assessment of Limited Common Element Expenses.  Based upon the budget for Limited Common Element Expenses adopted pursuant to Section 5.1(c), the Unit Owners Association shall determine each Unit Owner's assessment for Limited Common Element Expenses, based upon the Schedule A or the applicable provisions the Declaration; each Unit Owner shall then be assessed that amount toward its obligation for Limited Common Element Expenses for the coming fiscal year of the Unit Owners Association subject to audit and reconciliation as provided for in subsection (i) of this Section.

(f)     Determination and Assessment of Special Expenses.  As and to the extent incurred from time to time, the Unit Owners Association shall also determine a Unit Owner's assessment for Special Expenses in accordance with the provisions of the Declaration or these Bylaws, as applicable.

(g)     Payment of Assessments.

(i)     With regard to assessments for General Expenses and Limited Common Element Expenses, on or before the first day of each fiscal year, and the first day of each of the succeeding eleven months in such fiscal year, each Unit Owner shall be obligated to pay to the Unit Owners Association or, as designated by the Unit Owners Association, the Managing Agent, in advance, one-

twelfth of the each Unit Owner's assessments for General Expenses and for Limited Common Element Expenses based upon the applicable budget for that fiscal year.

(ii)     With regard to Special Expenses, on or before the tenth (10th) day following the receipt by a Unit Owner of a written notice from the Unit Owners Association or, as designated by the Unit Owners Association, the Managing Agent, of an assessment by the Unit Owners Association for Special Expenses accompanied by documentation reasonably sufficient to justify and support the assessment of the Special Expenses, the Unit Owner shall pay to the Unit Owners Association the billed assessment for Special Expenses.

(h)     <u>Assessment as a Lien</u>.  Any  assessment for Common Expenses, including for Special Expenses, made by the Unit Owners Association shall be a lien against each Unit Owner's Unit as provided in Section 9.2 of these Bylaws.

(i)     <u>Audit and Annual Reconciliation</u>.  Within ninety (90) days after the end of each fiscal year, the Unit Owners Association shall retain the services of an reputable and recognized accounting or certified public accountant unaffiliated with any Unit Owner or the Property manager and retained on a non-contingent fee basis, as may be agreed upon by the Unit Owners Association by Standard Majority Vote to audit the financial books and records of the Unit Owners Association with regard to the operation of the Building and the Association.  Upon completion of the audit, the Unit Owners Association shall supply a copy of the completed audit to each Unit Owner.  Thereafter the Unit Owners Association shall prepare, based upon the audit, a reconciliation report for each Unit Owner and deliver the same to each Unit Owner, noting the total Common Expenses accrued by the Unit Owners Association for the prior fiscal year, the Unit Owner's share of General Expenses and the Unit Owner's share of Limited Common Element Expenses, the application of the Unit Owner's assessment payments made during that fiscal year for its share of General Expenses and its share of Limited Common Element Expenses, and a statement of the net amount over or short of such Unit Owner's liability for General Expenses and for Limited Common Element Expenses for that year.  Any amount accumulated in excess of the amounts required to pay the Unit Owner's share of General Expenses and Limited Common Element Expenses shall be distributed to the Unit Owner, less any amounts of any kind or nature assessed under the Declaration or these Bylaws then currently due and owing to the Unit Owners Association by that Unit Owner.  Unless the Unit Owners Association directs otherwise, any net shortage in the amount actually due by a Unit Owner and unpaid for that fiscal year shall be assessed promptly against the Unit Owner.  The Unit Owner shall pay such shortage in full to the Unit Owners Association with payment to the Unit Owners Association of the next periodic assessment for Common Expenses that is due more than ten (10) days after delivery of the reconciliation report and the notice of such further assessment.

(j)    <u>Unit Owner Audit</u>.  Following receipt of the reconciliation report and notice of further assessment as provided in subsection (i) of this Section, each Unit Owner shall have the option, on behalf of itself or on behalf of any tenant or other occupant of its Unit, to audit at its sole expense the Unit Owner Association's books and records for the just completed fiscal year as the same relate to the determination of Common Expenses, including Special Expenses, for the fiscal year, subject however to the provisions of this Section 5.1(j).  A Unit Owner that desires to conduct an audit must give notice of its intent to conduct an audit no later than one hundred fifty (150) days after the date of its receipt of the reconciliation report.  A filing of a request to audit with the Unit Owners Association does not relieve the Unit Owner from its obligation to pay any shortage assessment issued to the Unit Owner with the delivery of the reconciliation report.  The audit may be conducted either directly by the Unit Owner or by an independent certified public accounting firm offering a full range of accounting services retained on a non-contingent fee basis, at no expense to the Unit Owners Association.  Any such audit shall be conducted at reasonable times, upon reasonable notice, to the Unit Owners Association and to the Managing Agent.  If a request to audit is timely received by the Unit Owners Association or the Managing Agent from a Unit Owner, then the Unit Owners Association's books and records as to Common Expenses shall be made available for up to one hundred twenty (120) days after the date of receipt by the Unit Owners Association of the Unit Owner's request to audit the books and records of the Unit Owners Association.  A Unit Owner may only audit the most recent fiscal year for which it received the Unit Owners Association's audit and reconciliation report and may not audit any fiscal year more than once; provided that if a Unit Owner's audit determines that (i) the Unit Owners Association overstated a particular line item and (ii) (a) such overstatement arose from an error in the methodology of calculating General Expenses, Limited Common Element Expenses or both (as opposed to a one-time overstatement) or (b) such overstatement was by more than five percent (5%), then, by written notice to the Unit Owner, delivered to the Unit Owners Association within one hundred eighty (180) days after the receipt of the Unit Owners Association's reconciliation report, the Unit Owner may audit such line item with respect to the previous two (2) years (it being agreed, however, that the discovery of errors in such two (2) prior years shall not, in turn, permit the audit of any additional years).

(k)    <u>Adjustments</u>.  Where an audit reveals an error and General Expenses had been inappropriately assessed among the Unit Owners or to a Unit Owner, then the President-Treasurer shall as appropriate make special assessments against Unit Owner(s) where there is a noted deficiency in payment of its/their obligations for General Expenses, and credit overpayments by a Unit Owner(s) for General Expenses to assessments next due and payable until such time as the overpayment is cleared.  Where an audit reveals an error and Limited Common Element Expenses had been inappropriately assessed among the appropriate Unit Owners or to a Unit Owner, then the President-Treasurer shall as

C-1

appropriate make special assessments against other responsible Unit Owner(s) for the Limited Common Element Expenses where there is a noted deficiency in payment of its/their obligations for Limited Common Element Expenses, and credit overpayments by a Unit Owner(s) for Limited Common Element Expenses to assessments next due and payable until such time as the overpayment is cleared. Where an audit reveals an error in the assessment of Special Expenses, then the President·Treasurer shall, as appropriate make a special assessment for Special Expenses to the Unit Owner in question, or credit any overpayment by a Unit Owner for any overcharge of Special Expenses to the next assessment of Special Expenses of that Unit Owner until such time as the overpayment is cleared.

(l)     Confidentiality. To the extent permitted by law, a Unit Owner shall (and shall cause its employees, agents and consultants to) use commercially reasonable efforts to keep the results of any such audit or audited statements strictly confidential, provided however a Unit Owner may disclose the same to (i) any tenant or other occupant of its Unit, where such tenant or other occupant will be responsible for Common Expenses pursuant to a business arrangement between that Unit Owner and such tenant or other occupant, (ii) current Mortgagee or bondholder of the Bonds (in the case of Unit No. 3), where provided for by the applicable Mortgage or Bonds, or (iii) a proposed purchaser under a executed contract for purchase and sale of a Unit, a prospective Mortgagee under an executed loan commitment letter to provide financing to a Unit Owner, where such financing is to be secured by a Unit, or in the case of Unit No. 3 to a prospective bondholder in conjunction with any refinancing of the Bonds, provided that in each case under this item (ii) either a confidentiality agreement in form reasonably acceptable to the Unit Owners Association is entered into by the prospective purchaser, prospective Mortgagee, or prospective bondholder, provided that in the case of a prospective Mortgagee or bondholder, where, after the Unit Owner's diligent, good faith efforts, the prospective Mortgagee or bondholder refuses to execute such agreement the audit or audited statements are delivered to the prospective Mortgagee or bondholder by the Unit Owner under a covering transmittal letter imposing a confidentiality obligation upon the prospective Mortgagee or bondholder by acceptance of the same. As and to the extent disclosure is required at law to a governmental agency or by order of a court of competent jurisdiction, then the restrictions of this section shall be deemed waived, but solely and only to the extent to permit compliance with such law or order.

(m)     Accrual Basis of Accounting. The Unit Owners Association shall compute the Common Expenses in any audit and the reconciliation report on an accrual basis in accordance with generally accepted accounting principles, consistently applied.

(n)     Accounts. All sums collected by the Unit Owners Association from Unit Owners with respect to assessments for Common Expenses or from any

other source received by the Unit Owners Association may be commingled into a single fund.

Section 5.2  Payment of Common Expenses.  Each Unit Owner shall pay the Common Expenses assessed by the Unit Owners Association against that Unit Owner pursuant to the provisions of Section 5.1 hereof.  No Unit Owner may be exempted from liability for the assessment for General Expenses, nor relieved from liability for Limited Common Element Expenses or Special Expenses, by reason of waiver of the use or enjoyment of any of the General Common Elements or any Limited Common Elements, or by abandonment of the Unit.  No Unit Owner shall be liable for the payment of any part of the Common Expenses accruing against the Unit subsequent to the date of recordation of a conveyance by such Unit Owner in fee of such Unit, but such assessment for accrued and unpaid Common Expenses shall become the liability and obligation of the transferee of such Unit.  Prior to or at the time of any such conveyance of a legal title in a Unit, all liens, unpaid charges and assessments shall be paid in full and discharged.

Section 5.3  Collection of Assessments.  The Unit Owners Association may take such action as it deems necessary or appropriate to collect any assessments for Common Expenses due to the Unit Owners Association from any Unit Owner which remain unpaid for more than ten (10) days from the due date for payment thereof. Any assessment, or installment thereof, not paid within ten (10) days after due shall accrue a late charge of five percent (5%) of the amount of the delinquent assessment or such other amount as may be established from time to time by the Unit Owners Association with the approval of a Standard Majority Vote. Notwithstanding the foregoing, in the event that the Unit Owners are not advised of the amount of any assessment at least thirty (30) days prior to the due date thereof, no enforcement action may be taken against such Unit Owner, and no late charge shall be payable by such Unit, unless such assessment remains unpaid after the later of (i) the expiration of ten (10) days after the due date or (ii) the expiration of thirty (30) days after the date such Unit Owner has received written notice of the amount of such assessment.

Section 5.4  Statement of Common Expenses.  The Unit Owners Association shall promptly provide any Unit Owner, contract purchaser or Mortgagee so requesting the same in writing, a written statement of all unpaid assessments for Common Expenses due to the Unit Owners Association by such Unit Owner.  The Unit Owners Association may impose a reasonable charge for the preparation of such statement to cover the cost of preparation.

Section 5.5  Operation, Maintenance, Repair, and Replacement of Common Elements.

(a)  By the Unit Owners Association.

C-1

(1)                                                    Except as otherwise
specifically provided for in these Bylaws, the Unit Owners Association shall be
responsible for the operation, maintenance, repair and replacement of all of the
General Common Elements  as defined in the Declaration, and including such areas
or elements of the Property identified as General Common Elements on Schedule A
to these Bylaws, whether located inside or outside of the Units, as well as a base
level of services in the Common Elements and each Unit as more specifically
identified in this Subsection (a).  Except as otherwise shown on Schedule A, the
General Expenses for the operation, maintenance, and repair shall be allocated to
each Unit Owner based upon the Common Element Interest assigned to its Unit.
With regard to the operation and maintenance of the Common Elements and
delivery of the baseline services in the Common Elements and the Units, the Unit
Owners Association shall provide at a minimum the following services to the Unit
Owners, all in a manner commensurate with the manner in which such services are
provided in high quality retail/commercial buildings of an age comparable to the
Building located in the Washington, D.C. metropolitan area, and for the purposes of
this Section 5.5(a) the age of the Building shall be determined without regard to the
historic facades and other pre-existing structural elements of the Building:

(A)     Facilities for delivery and provision of hot and cold
water in and to Units and Common Element areas if the Buildings, it being
understood and agreed that delivery of water shall be furnished by Unit Owners
Association only to and at those points of supply provided for general use of those
Unit Owners, including wet stacks located in the General Common Elements.

(B)     Automatically operated elevator service for
elevators in General Common Element areas at all times.

(C)     Cleaning services of interior General Common
Element areas, and provision of supplies for the operation of such areas, such as but
not limited to lavatory supplies for General Common Element bathrooms.

(D)     Landscaping services and cleaning services for
exterior General Common Elements.

(E)     Heat and air-conditioning in season for interior
General Common Element areas of the Building during the period one hour prior
and one hour after the normal business hours of Unit No. 1 and Unit No. 2..

(F)     Maintenance, painting and electric lighting service
for General Common Element areas of the Building.

(G)     Security for General Common Element areas of the
Building (but not the Units or any business operations therein) comparable to other
high quality retail/commercial buildings in the Washington, D.C. metropolitan area.

C-1

(H)    Electricity and proper electrical facilities to furnish sufficient electricity for the General Common Elements and, as applicable, to support the operation of the Unit Owner's equipment in its Unit, as well as for the operation of equipment of such Unit Owner's tenants and other occupants of its Unit if separate service cannot be obtained directly from the electricity provider; provided that a Unit Owner shall then be liable to the Unit Owners Association for the cost of electricity and for the cost of necessary facilities required to supply same, with those costs being Special Expenses of the Unit Owner, and not as General Expenses. Where the Unit Owners Association supplies such electricity to a Unit, the Unit Owners Association shall install a separate meter for the Unit or a portion thereof, and the Unit Owner shall pay, or cause payment of, the cost of electricity it consumes as recorded by such meter either to the Unit Owners Association as Special Expenses, or directly to the electricity provider, if the same is feasible.

(2)    The cost of the operation, maintenance, repair and replacement of General Common Elements including, but not limited to, the delivery or provision of the services in the Units referred to above shall be charged to all Unit Owners as a General Common Expenses, unless the Declaration or these Bylaws (including Schedule A attached hereto) specifically provides that one or more, but less than all Unit Owners are to be charged for the same as Limited Common Element Expenses, or Special Expenses, as applicable.

(3)    Each Unit Owner shall promptly report to the Unit Owners Association or to the Managing Agent any defect or need for repairs or replacements for which the Unit Owners Association is responsible.

(4)    Notwithstanding the foregoing, where a Unit Owner has made changes to Common Elements or added special features, equipment or facilities as or to Common Elements that require by their nature a higher level of maintenance or repair than other aspects of the Common Elements, or when a replacement is required that would necessitate replacement by non-standard or special order items, then maintenance, repair and replacement of such shall be the responsibility of the Unit Owner, and the cost thereof shall not be a General Common Expense, but shall be charged to that Unit Owner as Special Expenses if the maintenance, repair, or replacement is undertaken by the Unit Owners Association.

(b)    By the Unit Owner. Each Unit Owner shall keep its Unit and its furnishings, fixtures, equipment, appliances and appurtenances and the Limited Common Elements assigned to such Unit in good order, safe, condition and repair and in a clean, safe and sanitary condition comparable to the conditions identified from time to time in high quality retail/commercial developments in the Washington, D.C. metropolitan area. Each Unit Owner will perform this responsibility in such manner so as not to unreasonably disturb or interfere with

C-1

any other Unit Owner or with the activities of the Unit Owners Association and of the Managing Agent.  Each Unit Owner shall provide to the Unit Owners Association a report annually of current and proposed capital activities with regard to its Unit, in any case not later than October of each calendar year for review and comment by the Unit Owners Association.

(c)     Manner of Repair and Replacement.  All repairs and replacements of Common Elements shall be substantially similar to the original construction and installation, unless permitted otherwise pursuant to Section 5.6 below, but may be done with contemporary building materials and equipment.

Section 5.6   Additions, Alterations or Improvements to Common Elements.

(a)     By the Unit Owners Association to General Common Elements. If the General Common Elements require additions, alterations or improvements or if the Unit Owners Association desires to make any additions, alterations or improvements to the General Common Elements, then the Unit Owners Association may make those additions, alterations or improvements, after obtaining a Required Vote approving those additions, alterations or improvements, where those additions, alterations or improvements (1) are items that (A) fall within the scope of additions, alterations and improvements then being made to other high quality retail/commercial buildings in the Washington, D.C. metropolitan area of comparable age to the Building, (B) are deemed reasonably appropriate, applying good business practices, to be undertaken to maintain the quality of the Building as high quality retail/commercial buildings in the Washington, D.C. metropolitan area and (C) were approved by the Unit Owners Association as a capital expenditure in conjunction with the annual budget approved by the Unit Owners Association, (2) are required to be undertaken to comply with any applicable law or governmental requirement, or (3) are to be undertaken pursuant to commitments made or approvals obtained under any Title Documents, and are not inconsistent with and would not violate the Title Documents, the DC USA Deed or any Governmental Requirements.  Any other proposed addition, alteration or improvement of the Common Elements may be undertaken by the Unit Owners Association only after obtaining a Unanimous Vote to approve such addition, alteration, or improvement.  The costs and expenses of approved additions, alterations and improvements approved by the Unit Owners Association shall be assessed to the Unit Owners as General Expenses.  Any work undertaken by the Unit Owners Association shall be accomplished in accordance with Facilities Access Conditions.

(b)     By a Unit Owner to General Common Elements.  If a Unit Owner desires to make any additions, alterations or improvements to or within the General Common Elements that benefit only the Unit Owner requesting such, then either the Unit Owners Association or, with the permission of the Unit Owners Association, the Unit Owner may make those additions, alterations or

C-1

improvements provided a Required Vote of the Unit Owners is obtained approving those additions, alterations or improvements has been obtained, except that if such additions, alterations or improvements are (1) otherwise permitted by the Declaration or these Bylaws, including, but not limited to installation of Identification Monuments (as contemplated by Section 4.12 of the Declaration), (2) are in the nature of openings for and installation of (A) doors and windows, (B) customer service facilities, such as walk up service facilities (including but not limited to bank teller windows, money machines and night depositary drop offs) for ground floor retail and commercial service activities, or (C) required by any applicable governmental requirement, then only a Standard Majority Vote shall be required. Where the Unit Owners Association undertakes such additions, alterations, or improvements on behalf of and solely for the benefit of a Unit Owner, then the Unit Owners Association shall assess that Unit Owner directly for the cost thereof; the cost thereof shall not be deemed General Expenses, but shall be deemed as Special Expenses to that Unit Owner(s). Where such additions, alterations, or improvements to the General Common Elements are undertaken by a Unit Owner, then that Unit Owner shall be responsible for the cost thereof. In either case, the Unit Owner shall be responsible for any continuing costs and expenses related to such additions, alterations, or improvements, including those costs and expenses that might otherwise be duly assessed to the Unit Owners Association by the Declaration or these Bylaws. Any work undertaken by the Unit Owner shall be accomplished in accordance with Facilities Access Conditions.

(c)     <u>By the Unit Owners Association to Limited Common Elements</u>. If the Limited Common Elements require additions, alterations or improvements to comply with any applicable law or governmental requirement, or to maintain the integrity of the General Common Elements, or if the conditions of the Limited Common Elements are such as to materially detract from the appearance or functionality of the General Common Elements, then the Unit Owners Association upon a Unanimous Vote may make those additions, alterations or improvements as reasonably deemed necessary to correct the condition of the Limited Common Elements in question, provided however the Unit Owners Association shall first have provided written notice to the Unit Owners that have the benefit of those Limited Common Elements, advising the Unit Owners of the offending condition, and affording the affected Unit Owner(s) to promptly correct or cure the same. If there is a failure to timely act to correct to noted condition, then the Unit Owners Association may proceed to undertake such addition, alteration or improvement. The cost incurred by the Unit Owners Association shall be deemed a Special Expense chargeable to the affected Unit Owners. Additionally if the Unit Owners Association upon a Standard Majority Vote desires to make any other additions, alterations or improvements to the Limited Common Elements on behalf of the benefited Unit Owner(s) thereof, then the Unit Owners Association shall first notify the affected Unit Owners, but thereafter may make those additions, alterations or improvements, only after obtaining the consent of the affected Unit Owners. The

cost of any such additions, alterations or improvements incurred by the Unit Owners Association shall be deemed a Special Expense of the affected Unit Owners. Any work undertaken by the Unit Owners Association shall be accomplished in accordance with Facilities Access Conditions.

(d)    By a Unit Owner to Limited Common Elements.  If a Unit Owner desires to make any additions, alterations or improvements to or within the Limited Common Elements appurtenant to such Unit Owner's Unit, then either the Unit Owners Association or, with the permission of the Unit Owners Association, the Unit Owner may make those additions, alterations or improvements provided a Required Vote approving those additions, alterations or improvements has been obtained, except that if such additions, alterations or improvements are (1) otherwise permitted by the Declaration or these Bylaws, including, but not limited to installation of Identification Monuments (as contemplated by Section 4.12 of the Declaration), (2) are in the nature of openings for and  installation of (A) doors and windows, (B) customer service facilities, such as walk up service facilities (including but not limited to bank teller windows, money machines and night depositary drop offs) for ground floor retail and commercial service activities, or (C) required by any applicable governmental requirement, then such additions, alterations or improvements may be made without the need for a Required Vote of any kind. Where a Unit Owner is permitted to undertake such approved additions, alterations, or improvements to the Limited Common Elements, then the Unit Owner(s) making such additions, alterations or improvements shall be solely responsible for the cost thereof.  If the same are undertaken by the Unit Owners Association they shall be assessed to the appropriate Unit Owner(s) as a Special Expense.  Where such approved additions, alterations, or improvements to Limited Common Elements are made by or on behalf of a Unit Owner, then that Unit Owner shall be also responsible for any continuing costs and expenses related thereto, including those that might otherwise be duly assessed to the Unit Owners Association pursuant to the Declaration or these Bylaws.  Any work undertaken shall be accomplished in accordance with Facilities Access Conditions.

(e)    The provisions of Sections 5.7(d), (e) and (f) of these Bylaws shall apply in the event a Unit Owner seeks to make and thereafter undertakes any improvements, changes or additions to the Common Elements pursuant to this Section 5.6.

Section 5.7    Additions, Alterations or Improvements of a Unit.

(a)    Other than Immaterial Alterations (as hereinafter defined), no Unit Owner, nor tenant or other occupant of a Unit Owner's Unit may make any alterations, changes, installations, additions or improvements in or to the Unit or portion thereof (collectively "Alterations") without first having the Unit Owner review the same with the Unit Owners Association and obtaining the prior written approval of the Unit Owners Association by a Required Vote as provided for in

Subsection 5.7(b) below. An "Immaterial Alteration" shall mean any proposed alteration, installation, additions or improvements (i) to a Unit (such as installation of tenant layout improvements for spaces within a Unit) that would not negatively affect the structure of the Building or any of the General Common Element building systems, (ii) to a Unit (such as installation of tenant layout improvements for spaces within a Unit) that would not impose upon any of the base building operating systems (including but not limited to those systems and the facilities related thereto that provide electrical, mechanical, plumbing and fire and life safety services to the Common Elements and all Units) special or unique demands which materially adversely impact the level of services being provided to the Common Elements or any Unit, (iii) to Unit No. 1 or Unit No. 2, that would be an alteration of the non-structural components of any exterior wall of that Unit, and does not materially alter the architectural character of the General Common Elements, (iv) to Unit No. 1 or Unit No. 2, to any Identification Monuments, including signage, erected on the exterior of the Building or in the Common Element areas related to either or both of such Units, whether by the Unit Owner thereof or any a tenant or occupant of thereof, as applicable, in accordance with applicable law, the Declaration and the Rules and Regulations, (v) to Unit No. 3, the installation of diversion gutters suspended from the ceiling within the various levels of Unit No. 3 to control leaks in the parking garage facility, provided the same do not obstruct Identification Monuments related to the use of the facility by the public or the facilities effective operation as a parking garage or installed by or on behalf of an tenants or occupants of Unit No.1 or Unit No.2 pursuant to the Declaration of Parking Operations, and (vi) to Unit No. 3, undertaking concrete repairs to floor slabs within Unit No. 3, re-striping of the parking facilities, fixing of leaks in pipes and conduits, and similar types of non-structural maintenance and repair activities in about Unit No. 3 and the parking facilities located therein.

(b)     Where the approval of the Unit Owner's Association to Alterations is required by Section 5.7(a) above, then only a Standard Majority Vote by the Unit Owners Association shall be required, unless the same could be expected to (i) impair (A) the structural integrity of the Buildings, (B) any of the mechanical, electrical or plumbing systems of the Buildings, or (C) any interior partitions contributing to the support of the Unit or the Buildings, (ii) have a material adverse effect on (A) the use, functioning or the costs of operation of the Buildings, or (B) the rights of Unit Owners or the Unit Owners Association attendant to any Common Elements, and (iii) substantially alter the appearance of the Common Elements. If the Alterations proposed by a Unit Owner could reasonably be expected to adversely or negatively impact the Building or the Common Elements as described in Subsection 5.7(b) (i) through (iii) above, then a Unit Owner must obtain a Unanimous Vote to approve the Alteration.

(c)     A Unit Owner shall give notice to the Unit Owners Association or to the Managing Agent of any Immaterial Alterations proposed to be made to the

Unit so as to be able to coordinate contractor access through the General Common Elements.

(d)     The Unit Owner, at its sole cost and expense, shall provide, or have provided, to the Unit Owners Association a copy of the plans for the floor or floors, or the portions thereof, on which the proposed Alterations to its Unit are to be made, revised to show the Unit Owner's proposed Alterations to its Unit.

(e)     All proposed Alterations to a Unit by a Unit Owner (or any tenant or other occupant thereof) shall be made (i) at no expense to the Unit Owners Association, (ii) at such times and in such manner as to not unreasonably interfere with the operation of the Permitted Uses in the Buildings, (iii) in a good, workmanlike, high quality, and prompt and timely manner, (iv) in a fashion that minimizes impact on other Units and the Condominium in general, (v) in accordance with all applicable legal requirements and the requirements of any insurance company insuring the Buildings, including obtaining all necessary governmental permits, (vi) by a contractor or mechanic that (A) is duly and properly licensed in the District of Columbia, (B) is duly and properly insured, and (C) possesses requisite experience, personnel, financial strength and other resources necessary to perform and complete the proposed alterations, installations, additions or improvements, (vii) in lien free condition during and upon completion of any construction or installation, (viii) only after the Unit Owner supplies to the Unit Owners Association evidence that all risk coverage insurance (or comparable insurance coverage) is in place naming the Unit Owners Association as an additional named insured, and providing coverage against damages or claims thereof that could arise from undertaking the Alterations, and (ix) in accordance with such reasonable and non-discriminatory construction rules that the Unit Owners Association may adopt from time to time as part of the Rules and Regulations. Where the Unit Owners Association incurs any direct costs and expenses related to Alterations made (or to be made) to a Unit, those costs and expenses shall be deemed Special Expenses assessable to that Unit Owner. The Unit Owner shall also be responsible for any continuing costs and expenses related to such Alterations at no cost to the Unit Owners Association.

(f)     If any Alterations to a Unit (other than Immaterial Alterations) are made without the prior written consent of the Unit Owners Association, the Unit Owners Association may correct or remove the same, and the Unit Owner of such Unit shall be liable to the Unit Owners Association for any and all reasonable expenses incurred by the Unit Owners Association in the performance of the work. Additionally if any application to any governmental authority for a permit to make an addition, alteration or improvement requires execution by the Unit Owners Association and, provided consent of the Unit Owners Association has been obtained where required, then the application, may be executed on behalf of the Unit Owners Association by the President-Treasurer or the Managing Agent.

C-1

Neither the approval by the Unit Owners Association of any request of a Unit Owner to make Alterations to its Unit nor the execution of any application for government permission or approval related thereto by the Unit Owners Association shall be deemed to have committed the Unit Owners Association to undertake such work, or become liable (1) to the issuing government agency, (2) to any contractor, subcontractor or materialman hired to perform such work on behalf of the Unit Owner (or any tenant or other occupant of that Unit Owner's Unit), or (3) to any person having any claim for injury to person or damage to property, as a result of such work or arising from the undertaking of such work.

Section 5.8   Right of Access. By acceptance of the deed of conveyance, each Unit Owner thereby grants a right of access to the Unit and the Limited Common Elements appurtenant thereto, as provided by subsection 42-1903.07(a) of the Condominium Act, to the Unit Owners Association, or any other person authorized by the Unit Owners Association, including the Managing Agent and any other Unit Owner, for the purpose of enabling the exercise and discharge of their respective powers and responsibilities, including without limitation making inspections, correcting any condition originating in the Unit or in the Common Elements to which access is obtained through the Unit and threatening another Unit or the Common Elements, or performing installations, alterations or repairs to the mechanical, heating ventilating and air conditioning, plumbing or electrical systems of the General Common Elements located in the Unit or in the Limited Common Elements appurtenant thereto. All such actions as and when proposed to be undertaken shall be subject to performance in compliance with the Facilities Access Conditions.

Section 5.9   Utility Charges. The cost of utilities services provided to the Condominium and not individually metered or submetered to a specific Unit or not benefiting solely a specific Unit or Units (and not all Units equally) shall be treated as General Expenses, and unless specifically allocated to one or more, but less than all Unit Owners by Schedule A, shall be allocated based upon Common Element Interest.

## ARTICLE 6
### Insurance

Section 6.1   Authority to Purchase; Notice.

(a)   Except as otherwise provided in Section 6.5 hereof, all insurance policies relating to the Property including as to each Unit shall be purchased by the Unit Owners Association. The cost thereof shall be a General Expense. The Unit Owners Association, to the extent practicable and available at commercially reasonable rates, shall purchase one policy for the coverage of the Property. Neither the Unit Owners Association, the President-Treasurer (or any other officer) nor the Managing Agent shall be liable for failure to obtain any coverages required

by this Article 6 nor for any loss or damage resulting from such failure if such failure is due to the unavailability of such coverages from reputable insurance companies. The Unit Owners Association shall promptly furnish to each Unit Owner written notice of the procurement of, subsequent changes in, or termination of, insurance coverages obtained on behalf of the Unit Owners Association, in compliance with Section 42-1903.10 of the Condominium Act.

(b)     Each such policy shall provide that:

(1)     The insurer waives any right to claim by way of subrogation against the Unit Owners Association, the President-Treasurer (or any other officer) the Managing Agent or the Unit Owners, and their respective guests, invitees, tenants, agents and employees;

(2)     Such policy may not be cancelled or substantially modified (including cancellation for nonpayment of premium) without at least thirty (30) days prior written notice to the Unit Owners Association, all Unit Owners and all Mortgagees.

(c)     All policies of insurance shall be written by reputable companies licensed or qualified to do business in the District of Columbia.

(d)     The amount of the deductible, if any, on any insurance policy purchased by the Unit Owners Association shall be a General Expense.

Section 6.2   Physical Damage Insurance.

(a)     The Unit Owners Association shall obtain and maintain a blanket, "all-risk" form policy of fire and casualty insurance with extended coverage, vandalism, malicious mischief and sprinkler leakage, or comparable coverage then available from time to time, insuring the Common Elements and any personal property owned by the Unit Owners Association together with all air-conditioning and heating equipment and other service machinery that are General Common Elements contained therein and covering the interests of the Unit Owners Association (subject, however, to the loss payment and adjustment provisions in favor of the Insurance Trustee), in an amount equal to one hundred percent (100%) of the then current replacement cost of the Property (exclusive of the Land, excavations and foundations), without deduction for depreciation; provided that the Unit Owners Association shall not be required in such blanket, "all-risk" form policy of fire and casualty insurance to cover betterments and improvements supplied or installed by any Unit Owner in its Unit or the personal property of any Unit Owner.

(b)     Such policy shall also provide such other available coverages as the Unit Owners Association may from time to time determine. Such policy shall also include an endorsement or provision, to the extent obtainable at commercially

C-1

reasonable rates, that any "no other insurance" clause expressly exclude individual Unit Owner's policies from its operation so that the physical damage policy purchased by the Unit Owners Association shall be deemed primary coverage and any individual Unit Owner's policies shall be deemed excess coverage, and in no event shall the insurance coverage obtained and maintained by the Unit Owners Association hereunder provide for or be brought into contribution with insurance purchased by individual Unit Owners or their Mortgagees, unless otherwise required by law.

Section 6.3    Liability Insurance.  The Unit Owners Association shall obtain and maintain commercial general liability and property damage liability insurance in such limits as the Unit Owners Association may from time to time determine, by a Simple Majority in Interest, insuring the President-Treasurer (or any other officer) the Managing Agent, each Unit Owner and the employees of the Unit Owners Association against any liability to the public or to the Unit Owners (and their guests, invitees, tenants, agents and employees) arising out of, or incident to the ownership or use of the Common Elements.  The extent, nature and degree of such coverage from time to time shall be no less than that maintained in real estate developments comparable to the Building with its mix of Permitted Uses. Such insurance shall be issued on a comprehensive liability basis and shall contain: (i) a cross liability endorsement under which the rights of a named insured under the policy shall not be prejudiced with respect to an action against another named insured; and (ii) a "severability of interest" endorsement which shall preclude the insurer from denying liability coverage to a Unit Owner because of negligent acts of the Unit Owners Association or of another Unit Owner

Section 6.4    Other Insurance.  The Unit Owners Association shall also obtain and maintain such other insurance as the Unit Owners Association may determine or as may be requested from time to time by a Simple Majority in Interest.

Section 6.5    Separate Insurance.

(a)    Each Unit Owner shall obtain insurance for such Unit Owner's benefit, at such Unit Owner's sole expense, covering the Unit Owner's nonstructural components of a Unit, and any furniture, furnishings, fixtures, equipment, and personal property, as well as any improvements made to the Unit by such Unit Owner, or any tenant or occupant of such Owner's Unit (including coverage normally called "improvements and betterments coverage"); provided, however, that no Unit Owner shall be entitled to exercise this right to acquire or maintain such insurance coverage so as to decrease the amount which the Unit Owners Association, on behalf of all Unit Owners, may realize under any insurance policy maintained by the Unit Owners Association for the Common Elements or to cause any insurance coverage maintained by the Unit Owners Association to be brought into contribution with insurance coverage obtained by a Unit Owner.

C-1

(b)    In addition to the foregoing insurance requirements, each Unit Owner shall maintain a policy of commercial general liability insurance, naming as additional insureds the other Unit Owners and the Unit Owners Association at limits as reasonably fixed by the Unit Owners Association by a Standard Majority Vote.

(c)    Due to the nature of the operations in Unit No. 3, the Unit No. 3 Owner shall also maintain such additional insurance coverages as would be appropriate from time to time and typical in the industry for Persons owning and operating a off-street publicly accessible parking garage, including but not limited garage liability, garage keepers legal liability and crime insurance coverages (or comparable insurance programs).

(d)    No Unit Owner shall obtain separate insurance policies on the Condominium whole however.

Section 6.6    Insurance Trustee.

(a)    All physical damage insurance policies purchased by the Unit Owners Association shall be for the benefit of the Unit Owners Association, the Unit Owners and their Mortgagees, as their interests may appear, and shall provide that all proceeds of such policies shall be paid in trust to an "Insurance Trustee" to be applied pursuant to the terms of Article 7.

(b)    The sole duty of the Insurance Trustee shall be to receive such proceeds as are paid to it and to hold the same in trust for the purposes elsewhere stated in these Bylaws, for the benefit of the insureds and their beneficiaries thereunder.

(c)    The Insurance Trustee shall be appointed by, and may be removed and replaced by, a Standard Majority Vote of the Unit Owners.

ARTICLE 7
Repair and Reconstruction After Fire or Other Casualty

Section 7.1    When Repair and Reconstruction are Required.  Except as otherwise provided in Section 7.4, if all or any part of the Property is damaged or destroyed as a result of fire or other casualty, the Unit Owners Association shall arrange for and supervise the prompt repair and restoration thereof (but not including any non-structural fit out of a Unit, and any furniture, furnishings, fixtures, equipment or other personal property supplied or installed by any Unit Owner in its Unit unless then covered by insurance obtained by the Unit Owners Association).

Section 7.2    Procedure for Reconstruction and Repair.

(a)    Cost Estimates.  Immediately after a fire or other casualty causing damage to any portion of the Property, the Unit Owners Association shall obtain estimates of the cost of repairing and restoring the damaged portion of the Property (but not including any non-structural fit out of a Unit and any furniture, furnishings, fixtures, personal property or equipment installed by a Unit Owner in its Unit unless then covered by insurance obtained by the Unit Owners Association) to a condition as good as that existing before such casualty.  Such costs may also include professional fees and premiums for such bonds as the Insurance Trustee determines to be necessary.

(b)    Assessments.  If the proceeds of insurance are not sufficient to defray such estimated costs of reconstruction and repair for which the Unit Owners Association is responsible (including any deductible), or if upon completion of reconstruction and repair the funds for the payment of the costs thereof are insufficient, the amount necessary to permit the Unit Owners Association to complete such reconstruction and repair shall be deemed a Common Expense and a special assessment therefor shall be levied against all Unit Owners in proportion to their respective Common Element Interests.

(c)    Plans and Specifications.  Any such reconstruction or repair of the Property shall be substantially in accordance with the construction of the Property at the time of the casualty, subject to any modifications required by changes in applicable governmental regulations, and using contemporary building materials and technology to the extent feasible; provided, however, that other action may be taken if approved by all Unit Owners and all Mortgagees.

Section 7.3  Disbursements of Construction Funds.

(a)    Construction Fund and Disbursement.  The proceeds of insurance collected on account of casualty, and the sums received by the Insurance Trustee from collections of assessments against the Unit Owners on account of such casualty, shall constitute a construction fund which shall be disbursed in payment of the costs of reconstruction and repair in the following manner:

(1)    If the estimated cost of reconstruction and repair to the Property, or portion thereof for which the Unit Owners Association is responsible is less than _____ *Million and 00/100ths Dollars ($_,000,000.00)*, then the construction fund shall be disbursed in payment of such costs upon order of the Unit Owners Association.

(2)

(3)    If the estimated cost of reconstruction and repair to the Property for which the Unit Owners Association is responsible equals or exceeds _____ *Million and 00/100ths Dollars ($_,000,000.00)*, then the

C-1

construction fund shall be disbursed in payment of such costs upon approval of an architect qualified to practice in the District of Columbia and employed by the Insurance Trustee to supervise such work, payment to be made from time to time as the work progresses. The architect shall be required to furnish a certificate giving a brief description of the services and materials furnished by various contractors, subcontractors, materialmen, the architect and other persons who have rendered services or furnished materials in connection with the work stating that: (i) the sums requested by them in payment are justly due and owing and that such sums do not exceed the value of the services and materials furnished; (ii) there is no other outstanding indebtedness known to such architect for the services and materials described; and (iii) the cost as estimated by such architect for the work remaining to be done subsequent to the date of such certificate does not exceed the amount of the construction fund remaining after payment of the sum so requested. Each contractor or subcontractor submitting a request for payment for such repair or restoration work shall be required to submit a lien waiver executed by such contractor or subcontractor with respect to all amounts previously paid to such contractor or subcontractor.

(b)     Surplus.  The first monies disbursed in payment of the cost of reconstruction and repair of the Property for which the Unit Owners Association is responsible shall be from insurance proceeds and, if there is a balance in the construction fund after the payment of all of the costs of the reconstruction and repair for which the fund is established, such balance shall be divided among the Unit Owners in proportion to their respective Common Element Interests and shall be distributed in accordance with the priority of interests at law or in equity in each Unit.

Section 7.4   When Reconstruction Is Not Required.  If the Unit Owners Association elects, pursuant to the unanimous agreement of all Unit Owners and all Mortgagees, not to repair insubstantial damage to the Common Elements, the Unit Owners Association shall remove all remains of the damaged improvements and restore the site thereof to an acceptable condition compatible with the remainder of the Condominium and the balance of any insurance proceeds received on account of such damage shall be distributed or credited, as the Unit Owners Association may decide, to all Unit Owners in proportion to their respective Common Element Interests. If the Condominium is terminated pursuant to the written consent of all Unit Owners and all Mortgagees, then the net assets of the Condominium together with the net proceeds of insurance policies, if any, shall be divided by the Insurance Trustee among all Unit Owners in proportion to their respective Common Element Interests, after first paying out of the share of each Unit Owner, to the extent sufficient therefor, the amount of any unpaid liens on the Unit in the order of priority of such liens.

## ARTICLE 8
## Mortgages

Section 8.1    Notice to Unit Owners Association.  A Unit Owner who executes
a Mortgage secured by its Unit shall notify the Unit Owners Association of the
name and address of the Mortgagee and, upon request, shall file a conformed copy
of the note and Mortgage with the Unit Owners Association.

Section 8.2    Notice of Default, Casualty or Condemnation.  The Unit Owners
Association when giving notice to any Unit Owner of a default in paying an
assessment for General Expenses, Limited Common Element Expenses or Special
Expenses (which remains uncured for sixty (60) days) or any other default, shall
simultaneously send a copy of such notice to the Mortgagee of such Unit.  Each
Mortgagee shall also be promptly notified of any casualty, of all actions taken under
Article 7 of these Bylaws and of any taking in condemnation or by eminent domain
pursuant to Section 42-1901.06 of the Condominium Act and actions of the Unit
Owners Association with respect thereto.

Section 8.3    Notice of Amendment of Condominium Instruments.  The Unit
Owners Association shall give notice to all Mortgagees at least twenty (20) days
prior to the date on which the Unit Owners, in accordance with the provisions of
these Bylaws, will take action to materially amend the Condominium Instruments.

Section 8.4    Approvals.  In addition to a Required Vote of the Unit Owners
pursuant to the Declaration and these Bylaws, unless all Mortgagees have given
their prior written approval, the Unit Owners Association shall not: (a) change any
Unit's Common Element Interest except as provided in Section 42-1901.06 of the
Condominium Act; (b) partition, subdivide, abandon, encumber, sell or transfer the
Common Elements of the Condominium (other than the granting, modifying,
amending or terminating easements, leases, licenses or concessions pursuant to and
in accordance with the provisions of the Declaration or these Bylaws); (c) by act or
omission withdraw the submission of the Property to the Condominium Act; (d)
modify the method of determining assessments or allocating distributions of
casualty insurance proceeds or condemnation awards; (e) use hazard insurance
proceeds for losses to the Property for any purpose other than repair, replacement
or restoration except as provided in Sections 7.3 and 7.4 hereof; or (f) add or amend
any material provisions of the Condominium Instruments which establish, provide
for, govern or regulate voting or assessment liens.

## ARTICLE 9
## Compliance and Default

Section 9.1    Relief.  Each Unit Owner and the Unit Owners Association shall
be governed by, and shall comply with, all of the terms of the Condominium Act, the
Condominium Instruments and the applicable Title Documents, as applicable, as

any of the same may be amended from time to time. In addition to the remedies provided in Section 42-1902.09 of the Condominium Act, a default by a Unit Owner shall entitle the Unit Owners Association, acting through itself or through the Managing Agent, to the following relief:

(a)    Legal Proceedings. Failure to comply with any of the terms of the Condominium Instruments shall be grounds for relief, including without limitation, an action to recover any sums due for money damages, injunctive relief, specific performance, foreclosure of the lien for payment of all assessments, any other relief provided for in these Bylaws or any combination thereof and any other relief afforded by a court of competent jurisdiction, all of which relief may be sought by the Unit Owners Association or, if appropriate, by any aggrieved Unit Owner, and shall not constitute an election of remedies.

(b)    Costs and Attorneys' Fees. In any proceedings arising out of any alleged default by a Unit Owner, the prevailing party on the merits of the claim upon which the proceedings were filed shall be entitled to recover the costs of such proceeding and such reasonable attorneys' fees as may be determined. The same shall be deemed Special Expenses due and owing by that Unit Owner.

(c)    No Waiver of Rights. The failure of the Unit Owners Association, or of a Unit Owner to enforce any right, provision, covenant or condition which may be granted by the Condominium Instruments or the Condominium Act shall not constitute a waiver of the right of the Unit Owners Association, or the Unit Owner to enforce such right, provision, covenant or condition in the future. All rights, remedies and privileges granted to the Unit Owners Association, or any Unit Owner pursuant to any term, provision, covenant or condition of the Condominium Instruments or the Condominium Act shall be deemed to be cumulative and the exercise of any one or more thereof shall not be deemed to constitute an election of remedies, nor shall it preclude the party exercising the same from exercising such other privileges as may be granted to such party by the Condominium Instruments or the Condominium Act or at law or in equity.

Section 9.2    Lien for Assessments.

(a)    Lien. The assessment of each Unit Owner for General Expenses, Special Expenses and any special assessment, or any other sum duly levied made pursuant to these Bylaws, is hereby declared to be a lien levied against the Unit of such Unit Owner as provided in Section 42-1903.13 of the Condominium Act, which lien shall be effective, with respect to annual assessments, on the first day of each fiscal year of the Condominium and, as to special assessments and other sums duly levied, on the first day of the next month which begins more than thirty (30) days after delivery to the Unit Owner of notice of default of payment of such special assessment or levy. The Unit Owners Association may file or record such

C-1

other or further notice of any such lien, or such other or further document, as may be required to confirm the establishment and priority of such lien.

(b) Enforcement. The lien for assessments may be enforced and foreclosed in any manner permitted by the laws of the District of Columbia, by power of sale (pursuant to Section 42-1903.13 of the Condominium Act) or action in the name of the Unit Owners Association. The plaintiff in such proceeding shall have the right to the appointment of a receiver, if available under the laws of the District of Columbia. Notwithstanding the provisions of Section 42-1903.13 of the Condominium Act, the lien for assessments shall have priority over, and shall not be subordinate to, the lien of any Mortgage.

(c) Remedies Cumulative. A suit to recover a money judgment for unpaid assessments may be maintained without foreclosing or waiving the lien securing the same, and a foreclosure may be maintained notwithstanding the pendency of any suit to recover a money judgment.

(d) Nondisturbance of Tenants. Should the Unit Owners Association successfully foreclose on legal title to the Unit of a Unit Owner in satisfaction of any lien or claim of the Unit Owners Association against a Unit Owner, the foreclosure and transfer of legal title to the Unit shall not serve to entitle the Unit Owners Association, or any assignee or transferee thereof to displace any tenant or occupant of the Unit (or portion thereof) or terminate any lease or other occupancy arrangement with such tenant or occupant previously entered into by such tenant or occupant with the prior Unit Owner, except as provided for under such lease or other occupancy arrangement. The Unit Owners Association, and any assignee or transferee thereof shall continue to recognize such tenant or occupant as having a recognized interest in the Unit (or portion thereof) as provided for in the lease or other occupancy arrangement, and shall afford full non-disturbance protection to such tenant or occupant provided such tenant or occupant continues to comply with the provisions of, and fulfills its obligations under, the applicable lease or other occupancy arrangement.

Section 9.3 Nonliability After Conveyance of Title. A Unit Owner that conveys title to its Condominium Unit (other than execution of a deed of trust, mortgage or other conveyance as security for an obligation) shall not have any liability or obligation under the Declaration or these Bylaws for any default or breach of the obligations imposed upon or arising with respect to the Unit conveyed by such Unit Owner other than with respect to any obligations of such Unit Owner that accrued prior to the date such Unit Owner conveyed title to its Condominium Unit, and in such cases the transferee of such Unit shall be liable for the obligations imposed upon or accruing with respect to such Unit after the date of such transfer.

ARTICLE 10
Miscellaneous

Section 10.1 Notices.

(a)    All notices, demands, bills, statements or other communications under these Bylaws shall be in writing and shall be deemed to have been duly given if delivered personally or within 2 days of deposit if sent by United States mail, return receipt requested, postage prepaid, or the next day after deposit if sent by reputable overnight courier, (i) if to a Unit Owner, at the address which the Unit Owner shall designate in writing and file with the President-Treasurer or, if no such address is designated, at the address of the Unit of such Unit Owner, or (ii) if to the Unit Owners Association or at such address as shall be designated by notice in writing to all of the Unit Owners pursuant to this Section, or if no address is designated, to 3100 14th Street, N.W., Washington, D.C.

(b)    If a Unit is owned by more than one person, each such person who so designates an address in writing to the President-Treasurer shall be entitled to receive all notices hereunder.

Section 10.2 Captions.  The captions herein are inserted only as a matter of convenience and for reference, and in no way define, limit or describe the scope of these Bylaws or the intent of any provision thereof.

Section 10.3 Gender.  The use of the masculine gender in these Bylaws shall be deemed to include the feminine and neuter genders and the use of the singular shall be deemed to include the plural, and vice versa, whenever the context so requires.

Section 10.4 Applicable Law/Construction.  These Bylaws shall be governed by the law of the District of Columbia.  Additionally these Bylaws are intended to comply with all of the applicable provisions of the Condominium Act and shall be so interpreted and applied.  The failure to comply strictly with the time periods required by these Bylaws, unless also required by the Condominium Act, shall not invalidate any action of the Unit Owners Association in the absence of a written objection by a Unit Owner or a Mortgagee within ten (10) days after the failure to comply.

C-1

IN WITNESS WHEREOF, _____, a _____ limited liability company, sole member of _____, a _____, itself managing member of Declarant hereunder, has caused these presents to be signed in its name by _____, ____ President, and does hereby appoint said _____ as its attorney-in-fact for purposes of executing, acknowledging and delivering these Bylaws, as the act and deed of said corporation, limited partnership and limited liability companies, all as of the day and year hereinbefore written.

D.C. USA OPERATING CO., LLC, a
New York Limited Liability Company

By: _____

a _____
Its Managing Member

By: _____

Name: _____

Title: _____

COUNTY OF _____
STATE OF NEW YORK, to wit:

I, _____, a Notary Public in and for the jurisdiction aforesaid, do hereby certify that _____, ____ _____ of _____, the managing member of Declarant, a party to the foregoing and annexed Bylaws, personally appeared before me in said County and, being personally well known to me, acknowledged said instrument to be the act and deed of said corporation, limited partnership and limited liability companies and delivered the same as such.

GIVEN under my hand and seal this ____ day of _____, 200_.

_____
Notary Public

My commission expires: _____

C-1

# SCHEDULE A

## to

# BYLAWS
## OF
## DC USA CONDOMINIUM

## CONDOMINIUM RESPONSIBILITY MATRIX

[To be reviewed and revised by the parties with the addition of alternate sharing %s as applicable from the % sharing for General Common Elements specified in the Declaration/Bylaws.]

## [AGREED/OPEN]

i

# TABLE OF CONTENTS

to

## DECLARATION

## FOR DC USA CONDOMINIUM

[To be generated.]

# 2279300_v23

1          <u>Exhibit M</u>

2          <u>Prohibited Uses</u>

3    As used in this Lease, the term *"Prohibited Uses"* shall mean any of the following uses:

4    A.        As to the <u>Shopping Center</u>, any of the following uses:

5          (1)        Any use which emits or results in strong, unusual or offensive odors,
6    fumes, dust or vapors, is a public or private nuisance, emits noise or sounds which are
7    objectionable due to intermittence, beat, frequency, shrillness or loudness, creates a
8    hazardous condition, or is used, in whole or in part, as or for warehousing or the dumping
9    or disposing of garbage or refuse.

10          (2)        Any operation primarily used as a storage facility and any assembling,
11    manufacturing, distilling, refining, smelting, agricultural, or mining operation;

12          (3)        Any "second hand" store or "surplus" store;

13          (4)        Any mobile home park, trailer court, labor camp, junkyard, or stockyard
14    (except that this provision shall not prohibit the temporary use of construction trailers
15    during periods of construction, reconstruction, or maintenance);

16          (5)        Any dumping, disposing, incineration, or reduction of garbage (exclusive of
17    trash compactors or trash containers located near the rear of any building);

18          (6)        Any fire sale, bankruptcy sale (unless pursuant to a court order), auction
19    house operation, fictitious going-out-of-business sale, lost-our-lease sale or similarly
20    advertised event;

21          (7)        Any central laundry or dry cleaning plant, or laundromat (except that a dry
22    cleaner that performs all dry cleaning outside the Shopping Center shall be permitted if
23    Landlord consents thereto, which consent may be granted or withheld in Landlord's sole
24    and absolute discretion, so long as its on-site premises are not located on the same floor
25    of the Shopping Center as the Premises);

26          (8)        Any automobile, truck, trailer, boat, or recreational vehicle sales, leasing,
27    display or body shop repair operation;

28          (9)        Any bowling alley or skating rink;

29          (10)    Any live performance theater, auditorium, meeting hall, sporting event, or
30    other entertainment use;

31          (11)    Any living quarters, sleeping apartments, or lodging rooms, except that a
32    first class hotel may be located in the Expansion Space;

33          (12)    Any veterinary hospital or animal raising or boarding facilities (except to
34    the extent permitted below);

35          (13)    Any mortuary or funeral home;

36          (14)    Any "Pornographic Use", which shall include, without limitation: (x) a
37    store displaying for sale or exhibition books, magazines or other publications containing
38    any combination of photographs, drawings or sketches of a sexual nature, which are not
39    primarily scientific or educational [provided, however, that the sale of books, magazines
40    and other publications of the type commonly sold by first class bookstore of the type
41    normally located in first-class shopping centers in the State in which the Shopping Center
42    is located (such as, for example, Borders and Barnes & Noble, as said stores currently
43    operate) shall not be deemed a "pornographic use" hereunder]; or (y) a store offering for

M-1

1    exhibition, sale or rental video cassettes or other medium capable of projecting,
2    transmitting or reproducing, independently or in conjunction with another device,
3    machine or equipment, an image or series of images, the content of which has been rated
4    or advertised generally as NC-17 or "X" or unrated by the Motion Picture Rating
5    Association, or any successor thereto [provided, however, that the sale or rental of
6    videos of the type commonly sold or rented by a national video store of the type normally
7    located in first-class shopping centers in the State in which the Shopping Center is
8    located (such as, for example, Blockbuster or West Coast Video, as said stores currently
9    operate) or of the type commonly sold by a first class electronics store such as Best Buy
10   as said stores currently operate shall not be deemed a "pornographic use" hereunder]; or
11   massage parlor [except for therapeutic massages given in connection with the operation
12   of a day spa or health club which may otherwise be permitted under this Exhibit M];

13        (15)   Any so-called "head shop", or other establishment primarily selling or
14   exhibiting drug-related paraphernalia;

15        (16)   Any bar, tavern, or other establishment selling alcoholic beverages for on-
16   or off-premises consumption, except for sales incidental to the operation of a restaurant
17   permitted in accordance with (35) below;

18        (17)   Any catering or banquet hall;

19        (18)   Any flea market, amusement or video arcade, pool or billiard hall, night
20   club, discotheque, or dance hall, except that video games and family oriented billiards
21   may be operated as a part of a use permitted in (32) and video games may be an
22   incidental part of a use permitted in (35);

23        (19)   Any training or education facility, including but not limited to: beauty
24   schools, barber colleges, reading rooms, places of instruction or other operations catering
25   primarily to students or trainees rather than to customers; provided, however, this
26   prohibition shall not be applicable to on-site employee training by an occupant incidental
27   to the conduct of its business at the Shopping Center, except that children's educations
28   centers such as Score, Kuman or Kaplan that are customarily found in first class retail
29   shopping centers may be located on the first and third floors of the Shopping Center;

30        (20)   Any gambling facility or operation, including but not limited to: off-track
31   or sports betting parlor; table games such as black-jack or poker; slot machines; video
32   poker/black-jack/keno machines or similar devices; or bingo hall.

33        (21)   Any unlawful use;

34        (22)   Any pawn shop, gun shop, or tattoo parlor, provided, however that gun
35   sales shall be permitted as a part of the operation of a full-line sporting goods store;

36        (23)   Any church or other place of religious worship;

37        (24)   Any car wash, automobile repair shop, or any business servicing motor
38   vehicles in any respect, including, without limitation, any quick lube oil change service,
39   tire center or gasoline or service station or facility, provided, however that a business
40   installing, as a part of the sale thereof to a customer, car stereos, cell phone equipment
41   and similar devices into cars shall be permitted.

42        (25)   Any carnival, amusement park or circus;

43        (26)   Any medical clinics or medical offices, except that first class medical
44   offices (but not clinics), of the type commonly found in first class shopping centers may
45   be located on the first or third floor of the Shopping Center, provided that such use shall
46   be treated as "office use" and shall be subject to the limitations set forth in (28);

1  (27)  Any supermarket, except one upscale, boutique-type food store of the type
2  normally operated in the Washington D.C. metropolitan area (such as, by way of
3  example, Zagara's, Whole Foods, Fresh Fields, or Wild Oats);

4  (28)  Any office use, other than: (x) office space used in connection with and
5  ancillary to a permitted retail use hereunder; and (y) retail offices providing services
6  commonly found in similar first-class shopping centers in the Washington D.C.
7  metropolitan area (for example, financial services, real estate brokerage, insurance
8  agency, banking, travel agency), provided that such uses are located on the first or third
9  floors of the Shopping Center, and not more than ten thousand (10,000) square feet of
10  Floor Area in the Shopping Center, in the aggregate (including therein first class medical
11  offices permitted under (26)), shall be devoted to such uses.

12  (29)  hotel/motel, except that one first class hotel may be constructed and
13  operated in the Expansion Area if all parking requirements set forth in the Condominium
14  Documents are satisfied without amendments thereto;

15  (30)  daycare center;

16  (31)  pet store or veterinary office, except that a full line pet and pet supply store
17  with or without a veterinary office that is incidental to such full-line pet and pet supply
18  may operate in at least 10,000 square feet of Floor Area provided that it is located on the
19  first or third floors of the Shopping Center; such occupant shall use reasonable efforts to
20  prevent its customers from allowing their pets to urinate or defecate in the Common
21  Areas and will promptly remove any "dog dirt" from the Common Areas;

22  (32)  children's entertainment or activity facility (such as "Discovery Zone", or
23  "Chuck E. Cheese's"), except that such facilities may be located on the first and third
24  floors of the Shopping Center;

25  (33)  karate center, except that such facilities may be located on the first and
26  third floors of the Shopping Center;

27  (34)  movie theater;

28  (35)  restaurant serving meals for on- or off-premises consumption except that
29  such facilities may be located on the first and third floors of the Shopping Center and any
30  eating facilities that are part of a permitted supermarket shall be permitted within such
31  supermarket wherever located and incidental uses of a retail store such as Barnes and
32  Noble or Borders, as such stores currently operate, for a first class coffee/snack bar shall
33  be permitted as a part of such tenants uses.  Best Buy shall also be permitted to have a
34  first class coffee/snack bar similar to those currently operated by Barnes & Noble and
35  Borders as an incidental part of its use;

36  (36)  beauty parlor or nail salon except that such facilities may be located on the
37  first and third floors of the Shopping Center; or

38  (37)  health spa, exercise facility or similar type business except that one such
39  facility may be located on the third floor of the Shopping Center.

40  (38)  tanning facilities (unless operated incidental to a use permitted under (37);

41  (39)  any facility related to the occult sciences, such as palm readers, astrologers,
42  fortune tellers, tea leaf readers or prophets;

43  (40)  a frozen food locker or sales facility;

44  (41)  a milk distribution center;

45  (42)  a nursing home or old age center;

M-3

1           (43)    any use prohibited by the Condominium Documents.

2    B.    As to <u>Related Land,</u> any of the uses listed in Items 1, 2, 4, 5, 14, 15, 21, 22, and 25
3           above.

1                                          <u>Exhibit N</u>

2                                     <u>Rules and Regulations</u>

3        a.     All loading and unloading of goods shall be done only at such times, in the areas
4 and through the entrances reasonably designated for such purpose by Landlord and only during
5 the time periods designated by Landlord. Trailers and trucks shall deliver merchandise to the
6 Tenant's premises only through the access road or roads designated for such purposes and such
7 motor vehicles shall not be permitted to park in or drive through such areas, and said vehicles
8 will be expeditiously loaded and unloaded and not permitted to park in the Project at the
9 designated places for periods longer than are reasonably necessary for loading and/or unloading.
10 Tenant shall be responsible for removing its refuse and/or packaging materials from the loading
11 area and maintaining such area in a neat and orderly manner.
12

13        b.     All garbage and refuse shall be kept in the type and size of container specified by
14 Landlord, shall be stored in the Tenant's premises and prepared for collection in the manner and
15 at the time and places specified by Landlord, subject to the provisions of Section 5.2.8(b) and
16 Exhibit D of this Lease. Tenant at its sole cost and expense shall be solely responsible for the
17 removal and carting of all garbage and refuse generated at the Tenant's premises. In the event
18 Tenant is permitted to use a shared trash compactor(s), if any, Tenant shall maintain the area in a
19 clean and orderly manner and shall be responsible for cleaning any garbage, refuse, trash, spills
20 or other items caused by Tenant.
21

22        c.     Except as otherwise provided in the Lease, no radio or television or other similar
23 device shall be installed, and no aerial shall be erected on the roof, on exterior walls of the
24 Tenant's premises or the Project, or on the grounds, without in each instance having obtained
25 Landlord's written consent, subject, however, to the provisions of Section 8.1.4 of this Lease.
26 Any such device or aerial so installed without such prior written consent shall be subject to
27 removal without notice at any time.
28

29        d.     Except as otherwise provided in the Lease, no loudspeakers, television sets,
30 phonographs, radios or other devices shall be used in a manner so as to be heard or seen outside
31 of the Tenant's premises without the prior written consent of Landlord.
32

33        e.     Sales using the auction method of selling, fire sales, shall not be conducted on or
34 about the Tenant's premises without the prior written consent of Landlord.
35

36        f.     Tenant shall keep Tenant's display windows illuminated and signs and lights on
37 the storefront lighted each and every day of the Term hereof as required under the Lease.
38

39        g.     Tenant shall keep its premises at a temperature sufficiently high to prevent
40 freezing of water in pipes and fixtures.
41

42        h.     Tenant shall not leave merchandise or other items in the common service
43 corridors, sidewalks, entrances, passages, courts, corridors or stairways.
44

45        i.     Tenant shall exterminate its premises as frequently as is necessary to prevent any
46 infestation.
47

48        j.     Tenant will cooperate and participate in all security programs affecting the
49 Project; Tenant shall be solely responsible for all security with respect to its premises; and all
50 gates and window guards (roll down or otherwise) shall be located on the interior of the
51 premises, shall be semi-transparent, and shall be subject to Landlord's reasonable approval.
52

53        k.     Tenant shall not make or permit any noise, vibration, fume or odor which
54 Landlord reasonably deems objectionable to emanate from the Tenant's premises, no cooking
55 shall be done in the Tenant's premises (unless specifically permitted pursuant to the Lease), and
56 no person shall use the Tenant's premises or any part thereof as a sleeping quarter, sleeping
57 apartment or lodging room. Notwithstanding the foregoing, Landlord agrees that Tenant shall be
58 permitted to engage in cooking demonstrations incidental to its sale of kitchenware.

N-1

l.      Except for those exclusively for use by employees of Tenant which are not visible from the sales area of Tenant's premises or the exterior of the premises, Tenant shall not operate any coin or token operated vending machines or similar device for the sale of any goods, wares, merchandise, food, beverages or services including, but not limited to, pay telephones, pay lockers, pay toilets, scales, amusement devices and machines for the sale of beverages, food, candy, cigarettes or other commodities, without the prior written consent of Landlord.

m.      Tenant shall not place or maintain any temporary fixture for the display of merchandise in front of any entrance to the Tenant's premises, except such as shall have first received the written approval of Landlord as to size, color, location, nature and display qualities.

n.      Tenant shall not make noises, cause disturbances or vibrations or use or operate any mechanical equipment, machinery or electrical or electronic devices or other devices or create odors, any of which may be a nuisance to other tenants and occupants of the Project.

o.      The plumbing facilities in the Tenant's premises shall not be used for any purpose other than that for which they are constructed, and no foreign substance of any kind shall be thrown therein, and the expenses of any breakage, stoppage or damage resulting from a violation of this provision shall be borne by Tenant, who shall, or whose employees, agents or invitees shall, have caused it.

p.      Any outside areas which constitute a part of the Tenant's premises shall be kept clean and free from dirt and rubbish by Tenant to the satisfaction of the Landlord, and Tenant shall not place or permit any obstructions or merchandise in such areas.

q.      No live animals shall be kept on or about the Tenant's premises (unless otherwise specifically permitted by the Lease).

Landlord may amend, modify, and delete the Rules and Regulations or add new and additional reasonable rules and regulations for the use and care of the Tenant's premises and the Retail Unit.  Tenant understands and agrees that such rules and regulations are necessary in order to maintain a high quality retail project although they may affect Tenant's method of operation and merchandising its store at the Tenant's premises and Tenant agrees to comply with all such rules and regulations upon notice to Tenant from Landlord.  Landlord shall not discriminate in the enforcement of the applicable rules and regulations pertaining to each tenant in the Retail Unit.

Exhibit O

Intentionally Omitted

N-3

1

2

Exhibit P

Descriptions of Tax abatements and similar items, if any

None

1
2
3
4

N-4

**Exhibit Q**
**Landlord Signage Criteria**
Rev 1-20-06

1. Tenant shall be permitted to place a sign or signs at its cost and expense only in the locations and of the size provided on Exhibit F and in no other location without the Landlord's prior approval which shall be in the Landlord's sole discretion. The sign may be backlit if permitted by applicable laws and regulations. Exterior signs and interior signs visible from the exterior shall be kept illuminated at all times.

2. The square footage of the exterior signage for the ground floor tenants with street frontage may not exceed two feet (2') multiplied by the street frontage of the tenant's premises. The sign may be placed anywhere within the designated boundaries indicated for the Tenant or within their show window. Permitted sign locations for other tenants without direct street level access shall be as shown on Exhibit F-1 except that Landlord may seek approval by variance or otherwise for additional signs if required to provide identification for tenants for which no signage location currently exists.

3. All tenant signage shall only be to identify a tenant's location at the premises and shall not be used for advertising or for the generation of revenue from any third party.

4. The content and design of tenant signs shall conform to the standards used by said tenants in most of their other locations in either the Washington D.C. market or regionally or nationally, otherwise it shall require Landlord's approval in its reasonable discretion. The Tenant may change its sign from time to time as long as it otherwise complies with this Exhibit.

5. All signage must comply with applicable laws and regulations and the condominium documents. No variance shall be sought without the prior written consent of the Landlord which it may withhold in its sole discretion unless otherwise provided in the Lease or its exhibits.

6. There will be no freestanding signage pylon.

7. Signs advertising going out of business sales are prohibited.

8. The Landlord retains the exclusive right to place advertising, promotional signage or seasonal banners in the locations shown on Exhibit F-1.

9. Tenant shall not affix or maintain outside the Premises or the Tenant's designated sign area including the exterior of the glass panes and supports of the show windows, doors and the exterior walls of the Premises, any other signs, advertising placards, names, insignia, notices, trademarks, descriptive material or any other item or items except as otherwise provided herein or in the Lease, or in its exhibits or for which it shall have first received written approval of Landlord (which approval shall be in its sole discretion) as to size, type, color, location, copy, nature, and display qualities.



10. All Tenant or Landlord signs, whether located in the interior or exterior of the Premises or the Shopping Center, shall be in good taste so as not to detract from the general appearance of the Premises or the Project.

11. Ground floor tenants may provide awnings subject to the Landlords approval and subject to building standard criteria as to size, location, color and profile.

12. Signage will be provided in the elevator lobbies to direct patrons to retail areas. The Tenant shall be indicated on all such directories. Signage listing the major retailers will also be provided in the parking levels to direct all patrons to the elevator lobbies.

## AMENDMENT TO LEASE

THIS AMENDMENT TO LEASE ("*Amendment*"), dated as of the 18th day of November, 2013 (the "*Amendment Effective Date*") by and between DC USA OPERATING CO., LLC, a New York limited liability company ("*Landlord*"), having an office c/o Grid Properties, Inc., 2309 Frederick Douglass Boulevard New York, New York 10027, and BED BATH & BEYOND INC., a New York corporation ("*Tenant*"), having an office at 650 Liberty Avenue, Union, New Jersey 07083.

## WITNESSETH:

WHEREAS, Landlord and Tenant are parties to that certain Lease Agreement dated as of February 1, 2006, as amended by that certain Rent Commencement and Expiration Date Agreement dated as of June 11, 2009 (together, the "*Lease*"); and

WHEREAS, Landlord and Tenant desire to expand the Premises, by incorporating into the Premises certain adjacent space containing additional floor area of approximately 1,940 square feet, as depicted on the site plan attached as Exhibit 1 hereto and made a part hereof (the "*Expansion Space*"); and

WHEREAS, Landlord and Tenant desire to amend the Lease so to reflect such expansion, and to otherwise amend the Lease, all on the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual covenants and promises set forth in this Amendment and other valuable consideration, receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.      The recitals hereinabove set forth are incorporated into this Amendment by this reference. Capitalized terms used, but not defined herein, shall have the meanings ascribed them in the Lease.

2.      Demise. Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the Expansion Space, on all the same terms and conditions applicable to the Premises, except as otherwise expressly modified by this Amendment. From and after the "Delivery Date" (as hereinafter defined), the Premises shall be deemed to include the Expansion Space for all purposes of the Lease, and all references in the Lease to the "Premises" shall be deemed to include the Expansion Space.

3.      Term. Subject to the provisions of this Amendment, the Term of this Amendment shall begin on the Delivery Date and shall expire on the Expiration Date as originally established in the Lease.

4.      Delivery of Possession. Landlord shall deliver possession of the Expansion Space on the Amendment Effective Date (the "*Delivery Date*"). Landlord covenants, represents, and warrants that, as of the Delivery Date:

(a)      Landlord shall have good and marketable fee simple title to the entire Shopping Center, and Landlord shall deliver possession of the Expansion Space to Tenant free and clear of all tenancies and other rights of occupancy;

(b)      the Expansion Space shall be water-tight, free of Hazardous Substances, broom clean and free of any previous tenant's or occupant's furniture, fixtures, and equipment, in a good, structurally sound, and secure condition;

(c)      any presently existing mechanical systems, utilities and life safety systems serving the Expansion Space shall be in good, working order and the Expansion Space, as presently existing, shall be in compliance with all applicable Legal Requirements;

(d)      Landlord shall have obtained (and delivered copies thereof to Tenant, upon request) all permits and approvals required from all applicable governmental authorities to

enable Tenant to occupy and use the Expansion Space for the conduct of its business in the Expansion Space (exclusive of building permits which may be necessary for the performance of "Tenant's Expansion Work" (as hereinafter defined) and any business licenses which Tenant may be required to obtain in order to open and operate its specific business and not a general retail business (collectively *"Tenant's Permits"*)), which permits and approvals shall include, without limitation, zoning and building code approvals, environmental requirements, and a certificate of occupancy for the Expansion Space (unless a certificate of occupancy for the Expansion Space cannot be obtained solely as a result of Tenant's Expansion Work not having been commenced or completed, in which event the delivery of a certificate of occupancy for the Expansion Space shall not be a condition to the occurrence of the Delivery Date);

(e)    All third party consents or approvals that are required in order for Landlord to enter into this Amendment have been obtained; and

(f)    Tenant's use of the Expansion Space for sale of the specifically enumerated "Permitted Items" (defined in Section 1.1.27 of the Lease) will not violate any exclusive provision or prohibited use restriction granted to any other tenant or occupant in the Condominium except to the extent expressly set forth in the Existing Exclusives set forth in Exhibit K-1 of the Lease.

5.    Tenant's Expansion Work.

(a)    Tenant shall, at its own cost and expense, do any and all work (referred to herein as *"Tenant's Expansion Work"*) which Tenant desires to initially adapt the Expansion Space to Tenant's use, and integrating the Expansion Space into the Premises, except as set forth below. Tenant shall deliver to Landlord Tenant's plans (*"Tenant's Plans"*) depicting Tenant's Expansion Work within seventy five (75) days from the Amendment Effective Date. Landlord shall have fifteen (15) days from its receipt of Tenant's Plans (or revisions thereto, as applicable) to approve or disapprove Tenant's Expansion Work depicted thereon, which plans and work shall be approved so long as they: (i) comply with all Legal Requirements and Condominium Documents, (ii) comply with the terms of the Lease, as amended hereby, and (iii) do not materially reduce the structural soundness of the building containing the Expansion Space. If Landlord shall fail to disapprove Tenant's Plans with reasonable specificity within said 15-day period, Tenant's Plans shall be deemed approved. Tenant's Expansion Work shall be performed in a good and workmanlike manner, in compliance with all applicable Legal Requirements and Condominium Documents, utilizing only new, first-class materials. Landlord shall pay any and all impact fees and related governmental charges in connection with the Shopping Center and the Expansion Space. If Tenant's Permits cannot be obtained solely by reason of any then existing condition of the Shopping Center, Landlord shall undertake to remedy the condition (other than conditions which are the responsibility of (i) a tenant of the Shopping Center (including Tenant) or (ii) another party to any restrictive easement agreement to cure (collectively, *"Third-Party Conditions"*)) so as to enable Tenant to obtain Tenant's Permits (*"Landlord Cure Obligations"*). Landlord shall not be obligated to spend in excess of $10,000.00 in the aggregate to cure such Landlord Cure Obligations. If there are Third-Party Conditions which prevent Tenant from obtaining Tenant's Permits, or Landlord cannot cure the Landlord Cure Obligations or if Landlord reasonably estimates that the cost to cure the Landlord Cure Obligations will exceed $10,000.00 in the aggregate, then Landlord may, in Landlord's sole discretion, terminate this Amendment (the "**Expansion Termination**") by written notice (the "**Expansion Termination Notice**") to Tenant within thirty (30) days after receiving written notice from Tenant thereof. Notwithstanding the foregoing, in the event that Landlord sends the Expansion Termination Notice due to the estimated cost to cure the Landlord Cure Obligations exceeding $10,000.00 in the aggregate, then Tenant may nullify the Expansion Termination by undertaking in writing (the "**Nullification Notice**") to pay all sums in excess of $10,000.00 to cure the Landlord Cure Obligations. Tenant shall pay all sums in excess of $10,000.00 (the "**Cure Payment**") promptly when due. Such Cure Payment shall be included as part of Additional Rent and Landlord shall have all remedies available under the Lease for Tenant's failure to pay same. Tenant shall promptly send written notice to Landlord of any conditions that prevent the obtaining of Tenant's Permits (*"Tenant's Permit Notice"*) and notwithstanding anything herein to the contrary, if Tenant's Permits cannot be obtained by reason of any Third-Party Conditions or any Landlord Cure

2

Obligations, the cost to cure of which exceeds $10,000.00 in the aggregate and Tenant has not elected pay all sums in excess of $10,000.00, then Tenant shall have the right to terminate this Amendment by written notice given to Landlord at any time prior to the first to occur of (i) the date which is thirty (30) days after Landlord's receipt of Tenant's Permit Notice, or (ii) March 30, 2014. If Tenant does not terminate this Amendment prior to such date pursuant to the immediately preceding sentence, then Tenant shall be deemed to have waived such termination right and this Amendment shall continue in full force and effect. In the event Tenant's Permits cannot be obtained due to Landlord Cure Obligations which Landlord is required to cure hereunder, and provided that Tenant is not occupying the Expansion Space, then Tenant shall be entitled to an equitable abatement of Fixed Rent with respect to the Expansion Space for each day that Tenant's Expansion Work is delayed as a result thereof from the date of Landlord's receipt of Tenant's Permit Notice to the earlier of (i) the date such Landlord Cure Obligations are cured, or (ii) the date that Tenant occupies the Expansion Space.

(b)  In no event shall Tenant be permitted to (i) add additional exterior signage, or (ii) increase the number of windows or size of existing windows without (x) Landlord's consent, and (y) ensuring that such windows are in compliance with all applicable Legal Requirements and Condominium Documents, or (iii) increase the size or change the location of the store entrance, or (iv) otherwise alter the exterior of the Premises.

(c)  Tenant's Expansion Work and all other improvements erected by Tenant with respect to the Expansion Space, together with any replacements thereof, shall be and remain the property of Tenant throughout the Term, and Tenant alone shall be entitled to the benefits of ownership thereof, including, but not limited to, depreciation of same as an asset for tax purposes.

6.    Permits Contingency.

(a)  Tenant shall use diligent efforts to obtain all of Tenant's Permits (defined in Section 4(d) above) on or before the date which is one hundred twenty (120) days following the Amendment Effective Date (the *"Permit Contingency Date"*). If, despite Tenant's diligent efforts, all Tenant's Permits have not been obtained by the Permit Contingency Date, Tenant shall have the right, upon notice given to Landlord prior to the earlier of (i) unconditional grant of all of Tenant's Permits, and (ii) the 30th day after the Permit Contingency Date, to terminate this Amendment.

(b)  If all of Tenant's Permits have not been obtained on or before the Permit Contingency Date for any reason other than Landlord's failure to perform or observe any of its obligations under this Amendment, then Landlord shall have the option, upon notice given to Tenant prior to the earlier of (i) unconditional grant of all of Tenant's Permits, and (ii) the 30th day after the Permit Contingency Date, to terminate this Amendment, provided, however, that Tenant shall have the right to avoid Landlord's termination by giving notice to Landlord, within fifteen (15) days after receiving Landlord's termination notice, of Tenant's waiver of its rights under Section 6(a) above, whereupon Landlord's termination notice shall be rendered null and void.

(c)  In the event Tenant or Landlord elects to terminate this Amendment pursuant to this Section 6, this Amendment shall cease and be deemed canceled and terminated as of the date set forth in Tenant's or Landlord's notice of such termination and upon such termination, Tenant and Landlord shall be relieved of any and all further liability hereunder, except for those obligations which survive the expiration or other termination of this Amendment pursuant to the express terms of this Amendment.

7.    Fixed Rent.  Commencing on the date which is seventy five (75) days following the Delivery Date (the *"Expansion Rent Commencement Date"*) and continuing throughout the Term, Tenant shall pay to Landlord Fixed Rent with respect to the Expansion Space at the time and in the manner established for the payment of Fixed Rent in the Lease (such Fixed Rent with respect to the Expansion Space shall be deemed to be included as part of "Rent" for all purposes under the Lease). Fixed Rent with respect to the Expansion Space only, shall be as follows:

(a)  For the period commencing on the Expansion Rent Commencement Date and

ending on the last day of the Initial Term, at the rate of Thirty-Eight Thousand Three Hundred Fifteen and 00/100 ($38,315.00) Dollars per year [based on Nineteen and 75/100 ($19.75) Dollars per square foot of Floor Area in the Expansion Space];

(b)    In the event Tenant exercises the first Renewal Option, for the first [five (5)] year Renewal Period, at the rate of Forty-Five Thousand Nine Hundred Seventy-Eight and 00/100 ($45,978.00) Dollars per year [based on Twenty-Three and 70/100 ($23.70) Dollars per square foot of Floor Area in the Expansion Space];

(c)    In the event Tenant exercises the second Renewal Option, for the second [five (5)] year Renewal Period, at the rate of Fifty-One Thousand Four Hundred Eighty-Seven and 60/100 ($51,487.60) Dollars per year [based of Twenty-Six and 54/100 ($26.54) Dollars per square foot of Floor Area in the Expansion Space]; and

(d)    In the event Tenant exercises the third Renewal Option, for the third [five (5)] year Renewal Period, at the rate of Sixty Thousand Two Hundred Thirty-Seven and 00/100 ($60,237.00) Dollars per year [based on Thirty-One and 05/100 ($31.05) Dollars per square foot of Floor Area in the Expansion Space].

Notwithstanding the foregoing and for the avoidance of doubt, it is hereby understood that the Tenant shall not be able to exercise the Renewal Option with respect to the original Premises without also exercising the Renewal Option with respect to the Expansion Space. Likewise, Tenant shall not be able to exercise the Renewal Option with respect to the Expansion Space without also exercising the Renewal Option with respect to the original Premises.

8.    Percentage Rent. Supplementing Section 4.4 of the Lease, as used in the definition of "Natural Sales Break Point" only, the term Fixed Rent shall mean the Fixed Rent for the original Premises only (not including the Fixed Rent with respect to the Expansion Space).

9.    Additional Rent/Tenant's Pro Rata Share. The Floor Area of the Expansion Space shall be included in the Floor Area of the Premises for purposes of determining Additional Rent and Tenant's Pro Rata Share. The first sentence of Section 1.1.41 of the Lease shall be amended such that, as of the Expansion Rent Commencement Date, the words "thirteen (13%) percent" shall be deleted and the words "fourteen (14%) percent" shall be inserted in lieu thereof.

10.    It is the policy of Tenant and its parent company, subsidiaries and affiliates to conduct all its business transactions in accordance with the highest ethical standards: No individual who is employed by or who represents the company is permitted to solicit, accept or pay any bribe, kickback or any other improper payment of money, products or services in exchange for (i) the company's execution of this Amendment, (ii) any action taken by such individual on behalf of the company, or (iii) any action taken by a third party. If any such improper actions are observed, please contact our Legal Department (Attention: General Counsel) at 908-688-0888 so that the incident may be fully investigated and appropriate remedial action taken.

11.    Landlord and Tenant each warrant and represent to the other that they did not deal with any real estate broker in connection with the negotiation, execution and delivery of this Amendment. Each party agrees to indemnify, defend, and save the other harmless from and against any and all liabilities, costs, causes of action, damages and expenses, including, without limitation, attorneys' fees, with respect to or arising out of any claims made by any real estate broker, agent or finder with respect to this Amendment in breach of the foregoing representation or claiming to have worked with the indemnifying party in connection with the Lease. The provisions of this Section shall survive the expiration or earlier termination of the Lease.

12.    Landlord represents and warrants to Tenant that, as of the date hereof, no third-party consents or approvals (including, without limitation, with respect to the Condominium Documents or any lender or beneficiary of a deed of trust) are required in order for the terms and provisions of this Amendment to be in full force and effect, except for the consent of Citicorp North America, Inc., whose consent is appended hereto.

13.     Tenant represents and warrants to Landlord that, as of the date hereof, (i) the Lease is in full force and effect and has not been modified except pursuant to this Amendment; (ii) to Tenant's actual knowledge, there are no defaults by Tenant existing under the Lease; (iii) there exist no valid abatements, causes of action, counterclaims, disputes, defenses, offsets, credits, deductions, or claims against the enforcement of any of the terms and conditions of the Lease subject to Tenant's audit rights under the Lease; (iv) this Amendment has been duly authorized, executed and delivered by Tenant and constitutes the legal, valid and binding obligation of Tenant; and (v) to Tenant's actual knowledge, Landlord is not in default of any of its obligations or covenants under the Lease.

14.     Landlord represents and warrants to Tenant that, as of the date hereof, (i) the Lease is in full force and effect and has not been modified except pursuant to this Amendment; (ii) to Landlord's actual knowledge, there are no defaults by Tenant existing under the Lease; (iii) there exist no valid abatements, causes of action, counterclaims, disputes, defenses, offsets, credits, deductions, or claims against the enforcement of any of the terms and conditions of the Lease subject to Landlord's audit rights under the Lease; (iv) this Amendment has been duly authorized, executed and delivered by Landlord and constitutes the legal, valid and binding obligation of Landlord; and (v) to Landlord's actual knowledge, Tenant is not in default of any of its obligations or covenants under the Lease.

15.     The terms and conditions of this Amendment shall be binding upon, and inure to the benefit of Landlord and Tenant and their respective heirs, executors, administrators, successors and assigns. Except as specifically amended hereby, the Lease is unmodified, is hereby ratified by the parties hereto and remains in full force and effect. In the event of any conflict or inconsistency between the terms and provisions of the Lease and this Amendment, the terms and provisions of this Amendment shall govern and control.

16.     This Amendment shall be governed by the laws of the District of Columbia without giving effect to conflict of laws principles thereof.

17.     This Agreement may be executed in one or more counterparts, each of which shall be an original for all purposes, but all of which taken together shall constitute only one Amendment to Lease.

[Signature Page to Follow]

IN WITNESS WHEREOF, the parties hereto have executed this Amendment to Lease as of the day and year first above written.

**LANDLORD:**

DC USA OPERATING CO., LLC,
  a New York limited liability company

By: _____
Name: _____
Title: _____

By: _____
Name: _____
Title: _____

**TENANT:**

BED BATH & BEYOND INC.,
  a New York corporation

By: _____
Name: Steven H. Temares
Title: Chief Executive Officer

IN WITNESS WHEREOF, the parties hereto have executed this Amendment to Lease as of the day and year first above written.

**<u>LANDLORD</u>:**

DC USA OPERATING CO., LLC,
  a New York limited liability company

By: _____
Name: _____David L. Picket_____
Title: _____Authorized Representative____

**<u>TENANT</u>:**

BED BATH & BEYOND INC.,
  a New York corporation

By: _____
Name: _____
Title: _____

8

IN WITNESS WHEREOF, the parties hereto have executed this Amendment to Lease as of the day and year first above written.

**LANDLORD:**

DC USA OPERATING CO., LLC,
  a New York limited liability company

By: _____
Name: _____
Title: _____

**TENANT:**

BED BATH & BEYOND INC.,
  a New York corporation

By: _____
Name: _____
Title: _____

850960

8

EXHIBIT 1



**Second Floor Plan**

* NOTE: All measurements shall be made from the midpoint of all demising walls and to the outer face of exterior walls. All ducts, shaft columns, escalators, elevators, egress and convenience stairs located in the Demised Premises shall be included.

---- DC USA - Bed Bath & Beyond - Expansion Premises Plan ----

## CONSENT OF MORTGAGEE

The undersigned hereby confirms that it is the mortgagee or beneficiary of a mortgage or deed of trust encumbering Condominium Unit No.1 in the DC USA Condominium located at 3100 14th Street, N.W. in Washington, DC; and as such beneficiary, Citicorp USA, Inc., a Delaware corporation, hereby consents to the foregoing Amendment to Lease dated as of the _18th_ day of _November_ 2013 by and between DC USA Operating Company, LLC, and Bed Bath & Beyond Inc.

CITICORP USA, INC.,
   a Delaware corporation

Date: _November 6_ , 2013

By: _____

Name: _Ronald Lee Mignica_

Title: _Director Const Rife_

Address: _787 W 5th St, 29th Fl_
        _Los Angeles, CA 90071_

## SECOND AMENDMENT TO LEASE

THIS SECOND AMENDMENT TO LEASE (*"Amendment"*), dated as of the 30TH day of April, 2016 (the *"Amendment Effective Date"*) by and between DC USA OPERATING CO., LLC, a New York limited liability company (*"Landlord"*), having an office c/o Grid Properties, Inc., 2309 Frederick Douglass Boulevard New York, New York 10027, and BED BATH & BEYOND INC., a New York corporation (*"Tenant"*), having an office at 650 Liberty Avenue, Union, New Jersey 07083.

### WITNESSETH:

WHEREAS, Landlord and Tenant are parties to that certain Lease Agreement dated as of February 1, 2006, as amended by that certain Rent Commencement and Expiration Date Agreement dated as of June 11, 2009, and by that certain Amendment to Lease dated as of November 18, 2013 (together, the *"Lease"*), demising certain premises (the *"Premises"*) in the DC USA shopping center (the *"Shopping Center"*), located at 3100 14th Street, N.W., Washington, DC; and

WHEREAS, Tenant desires to extend the Initial Term of the Lease and to license certain space in the Shopping Center pursuant to the license agreement attached as Exhibit 1 hereto and made a part hereof (the *"License Agreement"*); and

WHEREAS, Landlord and Tenant desire to amend the Lease so to reflect such extension and license, and to otherwise amend the Lease, all on the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual covenants and promises set forth in this Amendment and other valuable consideration, receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.     The recitals hereinabove set forth are incorporated into this Amendment by this reference. Capitalized terms used, but not defined herein, shall have the meanings ascribed them in the Lease.

2.     Extension of the Term. As of the Amendment Effective Date, Tenant hereby exercises its option for the first Renewal Period under the Lease for a period of five (5) years, such first Renewal Period to commence on February 1, 2019, and the Term of the Lease to expire on January 31, 2024, unless Tenant exercises any option to further extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

3.     License Agreement. Simultaneously with the execution and delivery of this Amendment, Landlord and Tenant shall execute the License Agreement annexed hereto as Exhibit 1 (*"License Agreement"*), and both Landlord and Tenant shall be subject to the terms and conditions thereof. In addition, provided the Lease is in full force and effect, to the extent that space similar in size to the premises licensed to Tenant under the License Agreement is not leased or otherwise occupied and is available in the Shopping Center during the same period

covered in the License Agreement for years 2017 and 2018, Landlord shall provide such similar sized space to Tenant, with no license fee charged to Tenant therefor, for the same purpose as set forth in the License Agreement, and Landlord and Tenant shall enter into a new license agreement in the same form as the License Agreement set forth on Exhibit 1 evidencing the same.

4.      Landlord and Tenant each warrant and represent to the other that they did not deal with any real estate broker in connection with the negotiation, execution and delivery of this Amendment. Each party agrees to indemnify, defend, and save the other harmless from and against any and all liabilities, costs, causes of action, damages and expenses, including, without limitation, attorneys' fees, with respect to or arising out of any claims made by any real estate broker, agent or finder with respect to this Amendment in breach of the foregoing representation or claiming to have worked with the indemnifying party in connection with the Lease. The provisions of this Section shall survive the expiration or earlier termination of the Lease.

5.      Tenant represents and warrants to Landlord that, as of the date hereof, (i) the Lease is in full force and effect and has not been modified except pursuant to this Amendment; (ii) to Tenant's actual knowledge, there are no defaults by Tenant existing under the Lease; (iii) there exist no valid abatements, causes of action, counterclaims, disputes, defenses, offsets, credits, deductions, or claims against the enforcement of any of the terms and conditions of the Lease subject to Tenant's audit rights under the Lease; (iv) this Amendment has been duly authorized, executed and delivered by Tenant and constitutes the legal, valid and binding obligation of Tenant; and (v) to Tenant's actual knowledge, Landlord is not in default of any of its obligations or covenants under the Lease.

6.      Landlord represents and warrants to Tenant that, as of the date hereof, (i) the Lease is in full force and effect and has not been modified except pursuant to this Amendment; (ii) to Landlord's actual knowledge, there are no defaults by Tenant existing under the Lease; (iii) there exist no valid abatements, causes of action, counterclaims, disputes, defenses, offsets, credits, deductions, or claims against the enforcement of any of the terms and conditions of the Lease subject to Landlord's audit rights under the Lease; (iv) this Amendment has been duly authorized, executed and delivered by Landlord and constitutes the legal, valid and binding obligation of Landlord; and (v) to Landlord's actual knowledge, Tenant is not in default of any of its obligations or covenants under the Lease.

7.      The terms and conditions of this Amendment shall be binding upon, and inure to the benefit of Landlord and Tenant and their respective heirs, executors, administrators, successors and permitted assigns. Except as specifically amended hereby, the Lease is unmodified, is hereby ratified by the parties hereto and remains in full force and effect. In the event of any conflict or inconsistency between the terms and provisions of the Lease and this Amendment, the terms and provisions of this Amendment shall govern and control.

8.      This Amendment shall be governed by the laws of the District of Columbia without giving effect to conflict of laws principles thereof.

9.      This Agreement may be executed in one or more counterparts, each of which shall be an original for all purposes, but all of which taken together shall constitute only one Amendment to Lease.

[Signature Page to Follow]

IN WITNESS WHEREOF, the parties hereto have executed this Second Amendment to Lease as of the day and year first above written.

**LANDLORD:**

DC USA OPERATING CO., LLC,
a New York limited liability company

By:
Name: DREW GREENUP
Title: AUTH. Rep

By:
Name: DAVID L. PICKET
Title: Authorized Representative

**TENANT:**

BED BATH & BEYOND INC.,
a New York corporation

By:
Name: Seth Geldzahler
Title: Vice President - Real Estate

{Second Amendment to Lease / 01344385.DOCX /}

## EXHIBIT 1

### License Agreement

DC USA Operating Co., LLC

April __, 2016

**TO:**        **Bed Bath & Beyond, Inc.**

**FROM:**    **DC USA Operating Co. LLC**

**RE:**        **License Agreement for Space 116 - DC USA
Tenant:  Bed Bath & Beyond, Inc.**

**Occupancy:**  Subject to all terms and conditions of this Agreement, DC USA Operating Co., LLC ("DC USA") hereby licenses to Bed Bath & Beyond, Inc. ("Licensee") and Licensee hereby licenses from DC USA, the right to use Space 116 as indicated on the attached Exhibit A (the "Premises") for a fee of **zero ($0.00) dollars** paid upon execution of this License Agreement, for the period described below, solely for use as additional storage area for Licensee's store at DC USA, to be conducted in a professional manner compatible with the nature and quality of the building and subject to the reasonable approval of DC USA.

**License Term:**  June 3, 2016 – September 1, 2016.

**Manning of Space:**

The responsibility of manning the Premises is solely the responsibility of Licensee during the entire period of its use.

**Conditions of Premises:**
Licensee to accept the Premises in its "as is" condition. Licensee is solely liable for maintaining security, including the security of furnishings, equipment and other contents in the Premises.

**Repair and Maintenance Charges:**
Unless otherwise requested by DC USA in writing, Licensee will return the Premises to DC USA in same condition as delivered.  Licensee shall keep the Premises clean and maintain and repair the Premises. If Licensee fails to return the Premises in proper condition, DC USA may perform said repairs/maintenance and invoice Licensee for the cost. Licensee is also responsible for its daily trash removal.

**Insurance:**
Licensee shall be solely responsible for Worker's Compensation and other insurance on all workers employed by Licensee during the duration of the period in use, as well as all other

5

insurance required from Licensee pursuant to that certain lease agreement between Licensee and DC USA for Licensee's demised premises at the Shopping Center

**Liability:**
DC USA shall not be responsible for any damage, loss or theft of any furnishings, equipment, supplies or other contents; personal injury; property damage; or any other type of damage.

**Indemnification:**
Licensee agrees to indemnify DC USA from and against any claims, damage and expenses (inclusive of reasonable attorney's fees) arising out of or relating to the use, conduct and activities at or in the Premises by Licensee, its agents, employees, contractors, invitees, and anyone else.

**No Assignment:**
The license granted herein is personal to Licensee. Licensee shall not assign, sublease or transfer its rights under this License Agreement in any way whatsoever.

**Entire Agreement; Modifications:**
This License Agreement may not be modified or amended except by any instrument in writing signed by the parties hereto. This License Agreement represents the entire understanding of the parties. There are no representations, promises, warranties, covenants or undertakings other than those expressly set forth herein.

**Miscellaneous:**
In the event DC USA in its sole, but good faith discretion, determines that Licensee's occupancy of the Premises is detrimental to the building or the other occupants, or is identified as a prohibited use, DC USA reserves the right to immediately terminate this License Agreement. Upon such termination the only liability on the part of DC USA shall be to return the unaccrued portion of the rental fee paid by Licensee, if any.

Licensee shall be responsible for obtaining all permits necessary for its occupancy of the Premises and shall comply with all laws.

Licensee shall not place any advertising or other promotional materials in the windows of the Premises that are visible from the outside.

This License Agreement is in all respects subject and subordinate to any mortgage, lease or other matter which now or may hereafter encumber the building or the land.

This License Agreement does not and shall not be deemed to constitute a lease or a conveyance of the Premises by DC USA to Licensee or to confer upon Licensee any right, title, estate or interest in the Premises. Rather, this License Agreement grants to Licensee a personal privilege to use the Premises for the term hereof under the terms and conditions set forth herein.

{Second Amendment to Lease / 01344385.DOCX /}

This License shall be governed by and construed in accordance with the laws of the District of Columbia.

[Signatures appear on the following page]

7

Licensee agrees that the liability of DC USA under this License, shall be solely limited to the License fee hereunder and in no event shall Licensee make any claim against or seek to impose any personal liability upon any manager, member or general or limited partner of DC USA, or any principal of any firm, corporation or other entity that may hereafter be or become DC USA.

BED BATH & BEYOND, INC.

Date:_____        By: _____        _____

                               Name:
                               Title:

DC USA OPERATING CO., LLC

Date:_____        By: _____

                               Name:
                               Title:

Date:_____        By: _____

                               Name:
                               Title:

8

# EXHIBIT A

## PLAN OF PREMISES