# EXHIBIT A

# LEASE AGREEMENT

## Between

## MIDLAND RUSHMORE, LLC

### Landlord

### and

## BED BATH & BEYOND INC.,
## A NEW YORK CORPORATION,

### Tenant

## RUSHMORE CROSSING SHOPPING CENTER
## RAPID CITY, SOUTH DAKOTA

_____

Dated as of: ~~March~~ MAY 14, 2010

* * * * * *

* * * * * *

## TABLE OF CONTENTS

### Table of Contents

Page

ARTICLE 1
BASIC TERMS AND DEFINITIONS

Section 1.1          Basic Terms and Definitions ........................................................1

ARTICLE 2
LEASE OF PREMISES; LEASE TERM; DELIVERY DATE

Section 2.1          Lease of Premises........................................................................4
Section 2.2          Term...........................................................................................5
Section 2.3          Delivery Date. ............................................................................5
Section 2.4          Unseasonable Delivery: Slack Period .........................................7
Section 2.5          Initial Co-Tenancy Condition........................................................7

ARTICLE 3
IMPROVEMENTS

Section 3.1          Landlord's Work and Tenant's Work ............................................8
Section 3.2          Plan Approvals. ...........................................................................8
Section 3.3          Performance of Work..................................................................10
Section 3.4          Measurement; Adjustment of Rent.............................................12

ARTICLE 4
FIXED RENT AND TAXES: DETERMINATION AND PAYMENT

Section 4.1          Fixed Rent .................................................................................12
Section 4.2          Payment of Rent.........................................................................13
Section 4.3          Real Estate and Other Taxes......................................................13

ARTICLE 5
COMMON AREAS, THEIR USE AND CHARGES

Section 5.1          Common Areas: Maintenance.....................................................14
Section 5.2          Common Areas: Restrictions. .....................................................17

ARTICLE 6
UTILITIES

Section 6.1          Utility Service.............................................................................19
Section 6.2          Interruption ................................................................................19

ARTICLE 7
SIGNS

Section 7.1          Tenant's Building Signage ..........................................................20
Section 7.2          Pylon/Monument Signage...........................................................20
Section 7.3          Signage: Alteration/Removal/Allocation .....................................20
Section 7.4          Cooperation ...............................................................................20
Section 7.5          Signage and Building Restrictions and Criteria. ..........................21

ARTICLE 8
ALTERATIONS AND IMPROVEMENTS

Section 8.1          Alterations and Improvements. ...................................................21

i

ARTICLE 9
REPAIRS

| Section 9.1 | Tenant's Repairs | 22 |
| Section 9.2 | Landlord's Repairs | 23 |
| Section 9.3 | Legal Compliance Work | 24 |

ARTICLE 10
INDEMNIFICATION, INSURANCE AND WAIVER OF SUBROGATION

| Section 10.1 | Mutual Release, Waiver of Subrogation and Mutual Indemnification. | 24 |
| Section 10.2 | Tenant's Insurance. | 24 |
| Section 10.3 | Landlord's Insurance. | 25 |
| Section 10.4 | General Insurance Requirements. | 26 |

ARTICLE 11
FIRE AND OTHER CASUALTY; EMINENT DOMAIN

| Section 11.1 | Fire and Other Casualty. | 26 |
| Section 11.2 | Eminent Domain. | 27 |
| Section 11.3 | Abatement of Rent Charges | 29 |

ARTICLE 12
COVENANTS, REPRESENTATIONS AND WARRANTIES

| Section 12.1 | Quiet Enjoyment | 29 |
| Section 12.2 | Authority | 29 |
| Section 12.3 | Landlord's Covenants, Warranties and Representations | 29 |
| Section 12.4 | Environmental Matters. | 30 |
| Section 12.5 | OEA. | 32 |

ARTICLE 13
USES AND RESTRICTIONS

| Section 13.1 | Permitted and Prohibited Uses. | 33 |
| Section 13.2 | Tenant's Exclusive in Center | 33 |
| Section 13.3 | Exclusives Which Tenant Must Honor. | 35 |

ARTICLE 14
CONDUCT OF BUSINESS OPERATIONS

ARTICLE 15
TENANT ASSIGNMENT AND SUBLETTING

| Section 15.1 | Assignment and Subletting. | 36 |
| Section 15.2 | Liability of Tenant | 37 |
| Section 15.3 | Collateral Assignment | 37 |
| Section 15.4 | Cure Rights of Original Tenant. | 37 |
| Section 15.5 | Recognition Agreement | 38 |

ARTICLE 16
DEFAULT AND DISPUTE RESOLUTION

| Section 16.1 | Tenant Default. | 38 |
| Section 16.2 | Landlord Default | 39 |
| Section 16.3 | Arbitration | 39 |

ARTICLE 17
RIGHT TO MORTGAGE AND NON-DISTURBANCE; ESTOPPEL CERTIFICATE

| Section 17.1 | Right to Mortgage and Non-Disturbance | 40 |
| Section 17.2 | Estoppel Certificate | 40 |
| Section 17.3 | Existing Mortgages and Ground Leases | 40 |

ii

ARTICLE 18
NOTICE

ARTICLE 19
TENANT'S PROPERTY

ARTICLE 20
END OF TERM

| Section 20.1 | Surrender of Premises | 41 |
| Section 20.2 | Hold Over | 42 |

ARTICLE 21
TENANT'S RIGHT OF FIRST OFFER

ARTICLE 22
ONGOING CO-TENANCY

ARTICLE 23
MISCELLANEOUS

| Section 23.1 | Loading Facilities | 43 |
| Section 23.2 | Liens | 43 |
| Section 23.3 | Broker's Commission | 43 |
| Section 23.4 | *Force Majeure* | 43 |
| Section 23.5 | Consents | 43 |
| Section 23.6 | Costs | 43 |
| Section 23.7 | Attorneys' Fees | 43 |
| Section 23.8 | Survival of Obligations | 44 |
| Section 23.9 | Non-Waiver | 44 |
| Section 23.10 | Rights Cumulative | 44 |
| Section 23.11 | Definition of Landlord | 44 |
| Section 23.12 | Successors and Assigns | 44 |
| Section 23.13 | Limitation of Landlord's Liability | 44 |
| Section 23.14 | Limitation of Tenant's Liability | 44 |
| Section 23.15 | Joint and Several Liability | 44 |
| Section 23.16 | Severability | 44 |
| Section 23.17 | Grammatical Usages and Construction | 44 |
| Section 23.18 | Table of Contents, Line Numbering and Paragraph Headings | 45 |
| Section 23.19 | Definition of Hereunder, Herein, etc. | 45 |
| Section 23.20 | Short Form Lease | 45 |
| Section 23.21 | Entire Agreement and Modification | 45 |
| Section 23.22 | No Joint Venture or Partnership Created by Lease | 45 |
| Section 23.23 | Tenant's Tradename | 45 |
| Section 23.24 | Counterparts | 45 |
| Section 23.25 | Waiver of Trial by Jury | 45 |
| Section 23.26 | Governing Law | 45 |

## EXHIBITS

Exhibit A          Legal Description of Shopping Center
Exhibit B          Site Plan
Exhibit C          Form of Rent Commencement and Expiration Date Agreement
Exhibit D          Specifications for Landlord's Work
Exhibit D-1        Exterior Elevations of the Premises, and Sidewalk Plan
Exhibit D-2        Exterior Elevations of the Shopping Center
Exhibit E          Permitted Encumbrances
Exhibit F          Signage
Exhibit G          Form of Subordination, Non-Disturbance and Attornment Agreement
Exhibit H          Form of Subtenant Recognition Agreement
Exhibit I          Form of Delivery Date Notice
Exhibit J          Form of Delivery Date Certification
Exhibit K-1        Existing Exclusives
Exhibit K-2        Existing Leases
Exhibit L          Alternate Rent
Exhibit M          Prohibited Uses
Exhibit N          Form of Declaration of Restrictions Against Related Land
Exhibit O          Rules and Regulations
Exhibit P          Landscaping and Hardscaping Plans

DMEAST #10098913 v6

## **LEASE AGREEMENT**

THIS LEASE AGREEMENT (***"Lease"***) is entered into as of March ___, 2010 by and between MIDLAND RUSHMORE, LLC, an Ohio limited liability company, having an office at c/o Midland Atlantic Development Company, 8044 Montgomery Road, Suite 710, Cincinnati, Ohio 45236 (***"Landlord"***), and BED BATH & BEYOND INC., a New York corporation, having an office at 650 Liberty Avenue, Union, New Jersey 07083 (***"Tenant"***).

### W I T N E S S E T H :

### ARTICLE 1
### BASIC TERMS AND DEFINITIONS

Section 1.1    Basic Terms and Definitions.  The following terms shall have the meanings set forth in this Section 1.1 except as otherwise expressly provided herein.

1.1.1    Additional Rent:  Any monies which Tenant is required to pay to Landlord under the terms and conditions of this Lease, other than Fixed Rent.

1.1.2    Affiliate:  A corporation, partnership, limited liability company, person or other entity which is controlling, controlled by, or under common control with, Landlord or Tenant, as the case may be.  As used herein, "***control***" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person or entity, whether through the ownership of voting securities or rights, by contract, or otherwise.

1.1.3    Alternate Rent:  As defined in and payable in the manner set forth in Exhibit L attached hereto.

1.1.4    Common Areas:  All areas in the Shopping Center which are, from time to time, available for the joint use and benefit of Tenant and other tenants and occupants of the Shopping Center, and their respective employees, agents, subtenants, concessionaires, licensees, customers and other invitees, including, but not limited to, any and all parking areas, parking spaces, driveways, private roadways, truck serviceways, passageways, sidewalks, entrances, exits, lighting facilities, courts, landscaped areas (including, without limitation, perimeter landscaping), storm water management facilities, retention or detention ponds and areas, common utility lines, federally mandated wetlands mitigation and monitoring program areas for the Shopping Center, and all gateway/entry features of the Shopping Center (excluding signage) located thereon.

1.1.5    Common Areas Charges:  As defined in Section 5.1 hereof.

1.1.6    Delivery Date: As defined in Section 2.3 hereof.

1.1.7    Effective Date: The date hereof.

1.1.8    Event of Default:  As defined in Section 16.1 hereof.

1.1.9    Excused Periods:  Periods during which Tenant's failure to conduct the operations of its business or any other business: (x) resulted from alterations or renovations being performed in and to the Premises not to exceed one hundred eighty (180) days unless due to casualty or condemnation, (y) was caused by damage or destruction, eminent domain proceedings or actions, or *Force Majeure*, or (z) was caused by any act or omission of Landlord, or its employees, agents, or contractors.

1.1.10   Exhibits.  The exhibits listed in the Table of Contents annexed to this Lease have been agreed to by the parties and attached hereto, it being the intention of the parties that they shall become a binding part of this Lease as if fully set forth herein.

1.1.11   Fixed Rent:  The following amounts for the periods indicated (subject to adjustment pursuant to Section 3.4 hereof):

(a)    For the period commencing on the Rent Commencement Date and ending on the first January 31 occurring after the tenth (10th) anniversary of the Rent Commencement Date, at the rate of One Hundred Seventy-Seven Thousand Six Hundred Six and XX/100 ($177,606.00) Dollars per year [based on Seven and 59/100 ($7.59) Dollars per square foot of Floor Area in the Premises];

(b)    In the event Tenant exercises the first Renewal Option,  for the first five (5) year Renewal Period, at the rate of Two Hundred Four Thousand Two Hundred Eighty-Two and XX/100 ($204,282.00) Dollars per year [based on Eight and 73/100 ($8.73) Dollars per square foot of Floor Area in the Premises];

(c)    In the event Tenant exercises the second Renewal Option, for the second five (5) year Renewal Period, at the rate of Two Hundred Twenty-Seven Thousand Six Hundred Eighty-Two and XX/100 ($227,682.00) Dollars per year [based on Nine and 73/100 ($9.73) Dollars per square foot of Floor Area in the Premises];

(d)    In the event Tenant exercises the third Renewal Option, for the third five (5) year Renewal Period, at the rate of Two Hundred Fifty-One Thousand Eighty-Two and XX/100 ($251,082.00) Dollars per year [based on Ten and 73/100 ($10.73) Dollars per square foot of Floor Area in the Premises]; and

(e)    In the event Tenant exercises the fourth Renewal Option, for the fourth five (5) year Renewal Period, at the rate of Two Hundred Seventy-Four Thousand Four Hundred Eighty-Two and XX/100 ($274,482.00) Dollars per year [based on Eleven and 73/100 ($11.73) Dollars per square foot of Floor Area in the Premises];

1.1.12 Floor Area:  The actual number of square feet of space contained on all floors within any building area in the Shopping Center (including the Premises) and, with respect to exterior areas, all exterior areas leased to one or more tenants for outdoor seating for customers of restaurants and/or other food service businesses and space for outdoor sales of merchandise, but in no event shall Floor Area include exterior loading dock areas, trash compactor areas, and trash container areas.  All measurements pursuant to this Subsection shall be from the exterior of outside walls or store front and/or to the centerline of any common walls, but in no event shall Floor Area within either the Premises or the remainder of the Shopping Center include any non-selling or storage space areas within any mezzanine, lower floor (basement), second floor or, except as set forth above, any exterior areas.

1.1.13 Force Majeure:  As defined in Section 23.4 hereof.

1.1.14 Ground Lessor:  The landlord under any existing or future ground or underlying leases encumbering or affecting all or any part of the Shopping Center.

1.1.15 Intentionally Omitted.

1.1.16 Hazardous Substances:  As defined in Subsection 12.4.1 hereof.

1.1.17 Inducement Tenants:  As defined in Subsection 2.3.1 hereof.

1.1.18 Landlord:  As defined in the preamble and Section 23.11 hereof.

1.1.19 Landlord's Mailing Address:  c/o Midland Atlantic Development Company, LLC, 8044 Montgomery Road, Suite 710, Cincinnati, Ohio 45236, Attn.  Property Administration, or such other place and/or to the attention of such other person as Landlord may notify Tenant from time to time by notice given in accordance with the provisions of Article 18 hereof.  If the "Landlord" consists of more than one person, then notices given to the entity listed in Landlord's Mailing Address will be deemed to have been given automatically to all of the parties which constitute Landlord, and Tenant shall be entitled to rely exclusively on any notice sent by said entity.

1.1.20 Landlord's Work:  As defined in Section 3.1 hereof.

1.1.21 Lease Interest Rate:  The then effective prime rate as published from time to time in the "Money Rates" section of The Wall Street Journal (or any successor publication thereto) plus two (2%) percent.

1.1.22 Legal Requirements:  All laws, statutes, codes, acts, ordinances, judgments, decrees, authorizations, directions and requirements of, and agreements with, all governmental departments, commissions, boards, courts, authorities, agencies, officials and officers, which now or at any time hereafter may be applicable to the Premises, the Shopping Center, or any part(s) thereof.

1.1.23 Mortgagee:  Any state or federally regulated: bank, savings and loan association, insurance company, pension fund, credit union, real estate investment trust, or

2

other institutional lender, which is not an Affiliate of Landlord, and which holds a mortgage on the Shopping Center or is the beneficiary under a deed of trust encumbering the Shopping Center.

1.1.24 <u>Intentionally Omitted</u>.

1.1.25 <u>Intentionally Omitted</u>.

1.1.26 <u>Intentionally Omitted</u>.

1.1.27 <u>Permitted Use</u>:  Subject to Prohibited Uses, Existing Exclusives, the OEA, and Legal Requirements, the sale at retail of a variety of linens and domestics (including, but not limited to, sheets, bedspreads, comforters, duvets, pillows, pillow covers, chair pads, placemats, tablecloths, dish towels, oven mittens and aprons); bathroom items (including, but not limited to, towels, shower curtains, bathroom rugs, toilet seats, health and beauty care items, cosmetics, and non-prescription drug remedies, personal care devices and other bathroom appliances and accessories); housewares (including, but not limited to, kitchen utensils, kitchen appliances and kitchen "gadgets," cleaning appliances and supplies, cookware, bakeware, dishes and china, glassware, garbage pails, ironing boards and other laundry items, mops and brooms, candles and candle holders, ready-to-assemble furniture and artificial flowers); frames and wall art; window treatments; closet, shelving and storage items; home furnishings; area rugs; wall and floor coverings; furniture (including, without limitation, mattresses, box springs, bed frames, and bedroom furniture); decorative accessories; photo albums; photo storage boxes; luggage; books; party supplies; cards and stationery; seasonal items; juvenile merchandise (including, but not limited to, toys, car seats and safety-proofing items); specialty food items; food and non-alcoholic beverage services; any and all other items sold or services provided from time to time in other Bed Bath & Beyond stores (the aforementioned items are hereinafter collectively referred to as the *"Permitted Items"*); and for any other lawful retail use not specifically prohibited by the provisions of Section 13.1.1 below. In addition, Tenant shall be permitted to use portions of the Premises for storage and office uses incidental to the Permitted Use.

1.1.28 <u>Premises</u>: Being the area cross-hatched on <u>Exhibit B</u> attached hereto, having dimensions as shown on <u>Exhibit B</u> and containing approximately: (i) twenty three thousand four hundred (23,400) square feet of Floor Area and (ii) eight hundred (800) square feet of non-selling space on the first floor level for non-selling storage and service support purposes, subject to adjustment in accordance with the provisions of Section 3.4 below.  In no event shall such non-selling space (or any space used for fire pump facilities) result in any charge to Tenant by way of Fixed Rent or any Additional Rent, nor shall such space be included in the numerator in the determination of Tenant's Pro Rata Share.

1.1.29 <u>Renewal Option</u>:  As defined in Section 2.2.2 hereof.

1.1.30 <u>Renewal Period(s)</u>: Four (4) successive periods of five (5) years each, as provided in Section 2.2.2 hereof.

1.1.31 <u>Rent</u>:  Fixed Rent and/or Additional Rent.

1.1.32 <u>Rent Commencement Date</u>: As defined in Section 2.2 hereof.

1.1.33 <u>Intentionally Omitted</u>.

1.1.34 <u>Shopping Center</u>:  The shopping center commonly known as Rushmore Crossing Shopping Center, which, when completed, is estimated to contain approximately eight hundred thousand (800,000) square feet of Floor Area, on the property located along Interstate 90 between East North Street and Lacrosse Street in Rapid City, South Dakota, and more particularly described in <u>Exhibit A</u> hereto and shown on <u>Exhibit B</u>.  The Shopping Center is comprised of the "**Target District**" and the "**Sam's District**," as labeled on <u>Exhibit B</u>.  The Target District includes those Outparcels owned by Landlord (or an Affiliate of Landlord) and not ground leased to third parties ("**Landlord's Outparcels**").  The Target District shall exclude those Outparcels which are owned or ground leased by third parties ("**Third Party Outparcels**").  Landlord shall not change the name of the Shopping Center without giving at least ninety (90) days prior notice to Tenant, and Landlord shall not include the name of any tenant (other than Tenant) in the name of the Shopping Center.

1.1.35 <u>Substantially Completed or Substantial Completion</u>: The completion of specified work at the Shopping Center (including, without limitation, as applicable,  Landlord's

3

Work) to the extent that only "Punch List Items" of such work (defined in Subsection 3.3.3 below) shall not be completed.

    1.1.36 <u>Taxes</u>:  As defined in Section 4.3.3 hereof.

    1.1.37 <u>Tenant</u>:  As defined in the preamble hereof.

    1.1.38 <u>Tenant Delay</u>.  Those acts or omissions of Tenant or its agents, employees or contractors which materially and adversely interfere with Landlord's capacity to perform Landlord's Work and which are not within the scope of customary and usual delays in the construction process.

    1.1.39 <u>Tenant's Mailing Address</u>:  650 Liberty Avenue, Union, New Jersey 07083, Attn: Mr. Warren Eisenberg, or such other place and/or to the attention of such other person as Tenant may notify Landlord from time to time by notice given in accordance with the provisions of Article 18 hereof.

    1.1.40 <u>Tenant's Permits</u>:  As defined in Section 2.3.1(b) hereof.

    1.1.41 <u>Tenant's Property</u>:  All of Tenant's personal property, including, without limitation, phone and alarm systems, satellite antennae, shelving, computers, furniture, cash registers and customer service counters, specialty lighting, track lighting, millwork, conveyor systems, storage racks and signage and any and all other personal property of Tenant which is capable of being removed from the Premises without material damage thereto, but which shall not include electrical systems, heating, ventilation and air conditioning systems, and other mechanical systems, flooring, carpet, elevators, standard lighting and wiring installed within the walls of the Premises.

    1.1.42 <u>Tenant's Pro Rata Share</u>:  Subject to Subsection 5.1.3(b) below, a fraction, the numerator of which is the Floor Area of the Premises and whose denominator is the Floor Area of all buildings in the Target District, as may be redetermined any time a building (and/or Floor Area) is added to or removed from the Target District; but in no event shall Tenant's Pro Rata Share be greater than six percent (6%).  With respect to Taxes, Tenant's Pro Rata Share is a fraction whose numerator is the Floor Area of the Premises and whose denominator is the Floor Area of the buildings situated on the tax parcels which comprise the Target District, as shown on Exhibit B hereto, except for those tax parcels in the Target District for which Taxes are paid directly to the taxing authority by an unrelated third party.  Floor Area shall be deemed added to or removed from the Shopping Center on the earlier of (i) the date upon which such Floor Area is Substantially Completed, or (ii) at such time as an assessment for Taxes is made or removed, as the case may be, with respect to such Floor Area.  Within thirty (30) days following written request from Tenant, Landlord shall certify to Tenant in writing as to the then Floor Area of the Sam's District and the Target District.

    1.1.43 <u>Tenant's Work</u>:  As defined in Section 3.1 hereof.

    1.1.44 <u>Term</u>:  A period  (the "***Initial Term***") of approximately ten (10) years beginning on the Rent Commencement Date and expiring at midnight on the last day of January following the tenth (10th) anniversary of the Rent Commencement Date, unless the Rent Commencement Date is February 1, in which event the Expiration Date shall be the day before the tenth (10th) anniversary of the Rent Commencement Date.  As used herein: (i) "***Term***" shall refer to the Initial Term, as the same may be extended by any Renewal Period exercised pursuant to Section 2.2.2 below; and (ii) "***Expiration Date***" shall mean the date on which the Term expires.

## ARTICLE 2
## LEASE OF PREMISES; LEASE TERM; DELIVERY DATE

    Section 2.1    <u>Lease of Premises</u>.  Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the Premises together with any and all rights, benefits, privileges and easements, now or hereafter appurtenant to either or both of the Premises and the Shopping Center, arising out of any public or private grant or authority, including, without limitation, the non-exclusive right and easement to use the Common Areas in common with other tenants and occupants of the Shopping Center.

4

Section 2.2    <u>Term.</u>

2.2.1    <u>Initial Term</u>.  Subject to the provisions of this Article 2, the Term of this Lease shall begin on the sixtieth (60th) day following the Delivery Date (the "**Rent Commencement Date**").  The Term shall expire on the Expiration Date, unless earlier terminated as herein provided.  When the Rent Commencement Date has been determined, as provided in this Section, Landlord and Tenant shall execute, acknowledge and deliver, each to the other, a written statement in the form attached hereto as <u>Exhibit C</u> specifying the Rent Commencement Date.

2.2.2    <u>Renewal Options</u>.  Tenant shall have the right and option (hereinafter a "**Renewal Option**") to extend the Initial Term from the date on which it would otherwise expire for four (4) successive renewal periods of five (5) years each (individually, a "**Renewal Period**", and collectively, the "**Renewal Periods**") upon the same terms and conditions as are herein set forth.  Each Renewal Option shall be exercisable by notice given to Landlord at least one hundred eighty (180) days prior to the commencement of the applicable Renewal Period(s).  In order to prevent the inadvertent failure of Tenant to exercise any of the Renewal Options within the time specified above, the Term of this Lease shall not expire unless and until Tenant fails to exercise a Renewal Option within fifteen (15) days after receiving notice from Landlord that the Renewal Option in question has not been exercised (Landlord's notice shall not be given prior to the 180th day prior to the Expiration Date), or unless and until Tenant gives notice to Landlord that it will not be exercising any remaining Renewal Options.  If Landlord fails to give Tenant such notice prior to the Expiration Date, and Tenant occupies the Premises after the Expiration Date, then Tenant shall remain in possession subject to the provisions of this Lease but without the application of Article 20 hereof unless and until Landlord provides such notice and Tenant fails to exercise its Renewal Option, in which case Article 20 shall apply commencing on the sixteenth (16th) day after Tenant receives Landlord's notice.  If Landlord then gives Tenant such notice or Tenant exercises its Renewal Option, then the effective date of such exercise shall be retroactive to the Expiration Date.

Section 2.3    <u>Delivery Date.</u>

2.3.1    <u>Definition</u>.  Subject to Landlord's delivery to Tenant of the Delivery Date Notice in accordance with the provisions of Subsection 2.3.2 below and Landlord's timely compliance therewith, Landlord shall be deemed to have delivered possession of the Premises to Tenant at 8:00 a.m. on the date (the "**Delivery Date**") following the day on which all of the following conditions (the "**Delivery Date Conditions**") shall have occurred <u>and</u> Tenant shall have received from Landlord the Delivery Date Certification in accordance with the provisions of Section 2.3.3 below, which shall constitute Landlord's written certification that all of the following shall have occurred:

(a)    Actual possession of the Premises shall have been delivered to Tenant water-tight, free of Hazardous Substances in amounts which require corrective action under Environmental Laws, in a good, structurally sound condition, with all of Landlord's Work Substantially Completed, which Substantial Completion shall be evidenced by a written certification by Landlord's architect to Tenant;

(b)    Landlord shall have obtained (and delivered copies thereof to Tenant, upon request) all permits and approvals required from all applicable governmental authorities to enable Tenant to occupy and use the Premises for the conduct of its business in the Premises (exclusive of any business or operating licenses which Tenant may be required to obtain in order to open and operate its specific business and not a general retail business (collectively, "**Tenant's Permits**")), which permits and approvals shall include, without limitation, zoning and building code approvals, environmental requirements, and a permanent certificate of occupancy for the Premises (unless a permanent certificate of occupancy for the Premises cannot be obtained solely as a result of the failure to complete Tenant's Work in the manner required hereunder, in which event: (1) the delivery of a permanent certificate of occupancy for the Premises shall not be a condition to the occurrence of the Delivery Date, (2) the obtaining of a temporary certificate of occupancy shall be a condition to the occurrence of the Delivery Date, and (3) Landlord shall obtain the permanent certificate of occupancy promptly following the correction or completion of Tenant's Work);

(c)    The Common Areas of the Target District, and all of the improvements thereto shown on <u>Exhibit B</u> hereto shall have been Substantially Completed and operational, and all off-site improvements (including, without limitation, street, storm drainage, and traffic signalization improvements) required for the Shopping Center to open for business and for Tenant to receive a temporary or permanent certificate of occupancy shall have been

5

Substantially Completed; Landlord, at its sole cost and expense, shall have obtained (and delivered copies thereof to Tenant, upon request) all permits and approvals required from applicable governmental authorities to enable the Common Areas of the Target District to be developed, operated, and used for the purposes herein contemplated, which permits and approvals shall include, without limitation, zoning, building code, environmental requirements, curb cut and site plan approvals, all permits pertaining to pylon and/or monument signage (and Tenant's panel(s) thereon on which Tenant will have signage), construction, and development and use permits;

(d)    The representations and warranties of Landlord set forth in subparagraphs (a) through (i) of Section 12.3 below shall then be true and in effect;

(e)    Leases shall have been entered into or ownership shall have been transferred to at least two (2) of Sam's Club, Target and Scheel's, and with at least three (3) National or Regional Retailers (as hereinafter defined) (e.g., but not limited to, TJ Maxx, Petco, Barnes & Noble, Gordman's, Michael's and Old Navy) (hereinafter collectively referred to as the **"Inducement Tenants"**) on the following terms, for occupancy of the premises designated for them on Exhibit B; such leases shall not be cancelable by any of the Inducement Tenants, except for failure of Landlord to complete the Shopping Center, for injury to or loss of the premises thereby demised because of fire or other casualty, or for a taking or for other reasons similar to those for which this Lease is cancelable by Tenant:

| Inducement Tenants | Minimum Square-foot Gross Floor Area | Minimum Initial Term |
|---|---|---|
| Sam's Club | N/A | Owned |
| Target | N/A | Owned |
| Scheel's | N/A | 10 Years |
| Three (3) regional or national retailers | 20,000 (except that Old Navy or Petco may be 15,000 each) | 10 Years |

As used in this Lease, a "**National Retailer**" shall mean a national chain store operating, as of the Delivery Date, at least seventy-five (75) retail stores and a "**Regional Retailer**" shall mean a regional store operating, as of the Delivery Date, at least twenty (20) retail stores in the aggregate in the states of South Dakota, North Dakota, Colorado, Wyoming and Montana; provided that in each instance the stores are being operated under a single trade name in similar first class shopping centers.

(f)    Landlord shall have delivered to Tenant, in recordable form: (i) a subordination, non-disturbance and attornment agreement substantially in the form attached hereto as Exhibit G executed by each holder of any mortgage or deed of trust encumbering or affecting the Shopping Center or any portion thereof (it being understood and agreed that this Subsection 2.3.1 (f) is not intended to extend the date by which Landlord is to deliver to Tenant any document(s) required pursuant to Section 17.3 hereof), and (ii) a fee owner recognition agreement in the form and content described in clause (b) of Section 17.1 hereof executed by any existing Ground Lessor; and

(g)    The Declaration of Restrictions (hereinafter defined in Section 13.2.5) is (x) fully executed, delivered and recorded in Clerk's Office of Pennington County, South Dakota, and (y) Landlord shall have obtained the consent or made reasonable efforts to obtain the consent to the Declaration of Restrictions from the holders of all mortgages, deeds of trust and other liens affecting the Related Land.

2.3.2    Delivery Date.

(a)    Landlord shall give Tenant at least ninety (90) days prior notice of the Delivery Date, using the form of Delivery Date Notice attached hereto as Exhibit I (the **"Delivery Date Notice"**). Landlord's delivery of the Delivery Date Notice shall be a condition precedent to the Rent Commencement Date. Notwithstanding any provision of this Lease to the contrary, in no event shall the Delivery Date be deemed to occur prior to the Delivery Date established in the Delivery Date Notice. No event of Force Majeure occurring prior to the giving of the Delivery Date Notice shall serve to delay the Delivery Date thereby established.

(b)    Landlord acknowledges that if it shall fail to satisfy all of the Delivery Date Conditions by the Delivery Date as established in the Delivery Date Notice, Tenant will sustain substantial, additional costs and expenses, including, without limitation, storage costs for fixtures, equipment, and inventory, employee costs during the waiting period,

6

and additional advertising and promotional costs, the exact amount of which would be impracticable or extremely difficult to ascertain. If the Delivery Date does not occur by the date established therefor in the Delivery Date Notice, then, Tenant shall be entitled to a credit against the initial installment(s) of Rent hereunder , as liquidated reimbursement (and not as a penalty) for all of the aforesaid costs incurred by Tenant, an amount equal to the sum of: (i) Twenty Five Thousand Dollars ($25,000), plus (ii) Two Thousand Five Hundred Dollars ($2,500) for each day that the Delivery Date established therefor in the Delivery Date Notice is delayed. The foregoing liquidated reimbursement represent the parties' good faith agreement as to an agreed upon amount which shall have been incurred by Tenant and which shall otherwise not be susceptible of exact ascertainment. Notwithstanding anything to the contrary in this Lease, if the Delivery Date is delayed due to (i) a Tenant Delay occurring after the date the Delivery Date Notice is given and provided Landlord shall have given Tenant notice of such Tenant Delay promptly after its occurrence, or (ii) Force Majeure occurring after the date the Delivery Date Notice is given (not to exceed forty-five (45) days in the aggregate and provided that Landlord shall have given Tenant notice of such event of Force Majeure promptly after its occurrence) (subsections (i) and (ii) collectively, "Permitted Delays"), the Delivery Date as specified in the Delivery Date Notice, shall be extended one (1) day for each day of the Permitted Delays.

2.3.3   Delivery Date Certification.  Upon the satisfaction of all of the Delivery Date Conditions, Landlord shall so certify to Tenant, using the form of Delivery Date Certification attached hereto as Exhibit J.

2.3.4   No Waiver.  Other than the liquidated reimbursement reflected in Section 2.3.2(b) hereof, neither Tenant's acceptance of physical possession of the Premises nor Tenant's opening of the Premises for business to the public prior to the Delivery Date shall: (i) be deemed a waiver by Tenant of any of the Delivery Date Conditions, or (ii) relieve Landlord of any obligation under this Lease, unless such condition or obligation is expressly waived in writing by Tenant.

Section 2.4   Unseasonable Delivery: Slack Period.  If, for any reason (including, without limitation, Force Majeure), the Delivery Date occurs during the period commencing on September 1 and ending on the March 1 next following (the **"Slack Period"**), then Tenant shall have the right to:

(a)   accept delivery of physical possession of the Premises; or

(b)   defer its acceptance of delivery of physical possession of the Premises to a later date within the Slack Period, whereupon the Delivery Date shall be deemed to have occurred on the date that Tenant actually accepts physical possession of the Premises (subject to the other provisions of this Article 2 and the continuing satisfaction of the Delivery Date Conditions); and

in either event, if the Rent Commencement Date occurs during the Slack Period, Tenant shall be entitled to pay Alternate Rent in lieu of Fixed Rent for the period commencing on the Rent Commencement Date and ending on the expiration of the Slack Period; any benefit which Tenant may realize thereby shall constitute a reimbursement to Tenant for certain pre-opening expenses incurred by Tenant in connection with this Lease. In the event Tenant is entitled to the liquidated reimbursement provided for in Section 2.3.2(b) above, and Tenant defers the acceptance of physical possession of the Premises as set forth in this Section 2.4, the per diem liquidated reimbursement of $2,500.00 payable by Landlord to Tenant under Section 2.3.2(b) shall cease to accrue as of the date the Delivery Date would have occurred had Tenant not elected to defer acceptance, but shall recommence on the date later in the Slack Period which Tenant designates for delivery of the Premises if Landlord fails to deliver the Premises with all Delivery Date Conditions satisfied on such date.

Section 2.5   Initial Co-Tenancy Condition.

2.5.1   As used herein, the "**Initial Co-Tenancy Condition**" shall mean that each and every Inducement Tenant shall have accepted possession of its entire premises, such premises shall have been substantially completed, and each Inducement Tenant shall, if not already open for business, then be actively and continuously engaged in the fixturing and merchandising therein.

2.5.2   If, on the Delivery Date, the Initial Co-Tenancy Condition has not been satisfied, Tenant shall have the right, at its sole option, to:

(a)   accept delivery of physical possession of the Premises; or

7

(b)    defer its acceptance of delivery of physical possession of the Premises to a later date (but not later than the date on which the Initial Co-Tenancy Condition is satisfied and Tenant receives notice from Landlord thereof), whereupon the Delivery Date shall be deemed to have occurred on the date that Tenant actually accepts physical possession of the Premises (subject to the other provisions of this Article 2 and the continuing satisfaction of the Delivery Date Conditions); and

in either event, if the Rent Commencement Date occurs before the satisfaction of the Initial Co-Tenancy Condition, Tenant shall be entitled to pay Alternate Rent in lieu of Fixed Rent until the Initial Co-Tenancy Condition is satisfied and the Landlord gives Tenant notice thereof, subject to any other applicable provisions of this Article 2.

2.5.3   In addition to the provisions of Section 2.5.2 above, if the Initial Co-Tenancy Condition has not been satisfied by the first (1st) anniversary of the Delivery Date established pursuant to Section 2.3.2(a) above, then Tenant shall have the right, at any time prior to the satisfaction of the Initial Co-Tenancy Condition, upon giving Landlord at least sixty (60) days' prior notice, to terminate this Lease as of the date specified in said notice.  Landlord may negate such termination by causing the Initial Co-Tenancy Condition to be satisfied within thirty (30) days after the date on which said termination notice is given.  If this Lease is terminated hereunder, neither party shall have any further liability under this Lease, except: (i) for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease, and (ii) Landlord shall promptly reimburse Tenant for all of its actual and reasonable third-party costs and expenses incurred in connection with this Lease, including, without limitation, costs associated with the preparation and review of plans and specifications, attorney's fees, and the performance of Tenant's Work, such reimbursement not to exceed Twenty-Five Thousand Dollars ($25,000) in the aggregate.  If Tenant does not terminate this Lease pursuant to this Section 2.5.3 before the date that is eighteen (18) months following the Delivery Date, then Tenant shall commence paying Rent under this Lease effective as of the date that is eighteen (18) months following the Delivery Date.

ARTICLE 3
IMPROVEMENTS

Section 3.1    Landlord's Work and Tenant's Work.  Landlord shall, at its sole cost and expense, perform the work and obligations described on Exhibit D, Exhibit D-1, and Exhibit F hereto, and the "Final Landlord's Plans and Specifications" (hereinafter defined in Section 3.2) (collectively, "**Landlord's Work**"), and shall deliver possession of the Premises to Tenant in the condition described therein.  Except for Landlord's Work, Tenant shall, at its own cost and expense, do any and all work (hereinafter referred to as **"Tenant's Work"**) which Tenant desires to adapt the Premises to Tenant's use.

Section 3.2    Plan Approvals.

3.2.1   Preparation of Plans and Specifications.

(a)    Within thirty (30) days after the Effective Date, Landlord shall deliver to Tenant drawings showing the proposed footprint, column layout, and interior clear dimensions of the Premises (the "**Preliminary LOD**") [Limits of Demised], which shall be subject to any reasonable modifications indicated by Tenant as provided below. The Preliminary LOD shall be substantially consistent with Exhibits B, D, and D-1 hereto.  The parties acknowledge that the foregoing was performed prior to the Effective Date.

(b)    Within thirty (30) days after Tenant's receipt of the Preliminary LOD, Tenant shall deliver to Landlord its revisions thereto (the "**Revised LOD**"), showing the location of the interior structural grid (column layout), storefront opening, and mezzanine and/or office core, the location and arrangement of the loading facilities, trash compactor pad, and trash container pad(s), and any reasonable revisions to the interior clear dimensions.  The parties acknowledge that the foregoing was performed prior to the Effective Date.

(c)    Within fifteen (15) days after Landlord's receipt of the Revised LOD, Landlord shall deliver to Tenant a final LOD (the "**Certified LOD**"), certified by Landlord, which shall incorporate all of the elements of the Revised LOD.  Within fifteen (15) days after its receipt of the Certified LOD, Tenant shall notify Landlord of Tenant's approval thereof or the reasons why such approval cannot be granted, and Landlord shall, within fifteen (15) days after receiving such notice, make any revisions necessary to correct such matters and obtain Tenant's approval.  Upon Tenant's approval of the Certified LOD, any further changes thereto

8

shall be subject to Tenant's prior written approval (which may be withheld in its sole discretion), provided that, as to changes required to conform to Legal Requirements, Tenant shall have reasonable approval rights within the confines of said Legal Requirements.  After Tenant approves the Certified LOD, Landlord shall be responsible for any and all reasonable costs incurred and delays experienced by Tenant in connection with any further changes to the Certified LOD required by Landlord.  Landlord and Tenant shall work in good faith to resolve concerns of either party in an effort to provide the Certified LOD.  The parties acknowledge that the foregoing was performed prior to the Effective Date.

(d)     Within thirty (30) days after the Effective Date, Tenant shall deliver to Landlord its Fixture Plan (F1); Floor Finish Plans Notes and Details (F2); Power/Specialty Lighting Plan and Notes (F3); Lighting Plans and Notes (F4); and High-Pile Storage Plan (F5) (collectively, *"Tenant's Plans"*), all of which shall be substantially consistent with the Certified LOD (as same may be reasonably modified by Tenant, as noted above).

(e)     Within thirty (30) days after receipt of Tenant's Plans, Landlord shall prepare and deliver to Tenant, in a single submission, *"Landlord's Plans and Specifications"* (as defined in <u>Exhibit D</u> hereto), and each of the plans which collectively constitute Landlord's Plans and Specifications shall be at least 85% complete for turnkey delivery, in Tenant's reasonable judgment.  Landlord's Plans and Specifications shall be substantially consistent with Tenant's Plans, the Certified LOD, and <u>Exhibits B, D, D-1, and F</u> hereto.

(f)     Within thirty (30) days after its receipt of Landlord's Plans and Specifications, Tenant shall give Landlord notice of the respects, if any, in which said Plans fail to meet Tenant's reasonable approval and/or fail to conform to the Certified LOD, Tenant's Plans, and/or <u>Exhibits B, D, D-1, and F</u> hereto.

(g)     Within fifteen (15) days after the date on which Landlord receives Tenant's notice (described in the preceding paragraph), Landlord shall deliver to Tenant, in a single submission, revised Landlord's Plans and Specifications, which shall be 100% complete and shall address all of Tenant's comments.

(h)     Within fifteen (15) days after its receipt of the revised Landlord's Plans and Specifications, Tenant shall notify Landlord of Tenant's approval thereof or the reasons why such approval cannot be granted.

(i)     In the event that the Landlord's re-submittal of Landlord's Plans and Specifications is <u>not</u> approved by the Tenant, then Landlord shall further revise Landlord's Plans and Specifications to address all Tenant comments and re-submit them to Tenant for Tenant's review and approval.  The re-submittal described in the preceding sentence shall be delivered to Tenant by Landlord within fifteen (15) days of receipt of Tenant's notice that the previous submittal has not been approved.  The process described in this subparagraph (i) and subparagraph (h) above shall be repeated until Landlord has secured Tenant's approval of Landlord's Plans and Specifications.  Landlord's Plans and Specifications as finally approved by Tenant are referred to herein as the *"Final Landlord's Plans and Specifications"*.  Landlord and Tenant shall work in good faith to resolve concerns of either party in an effort to provide Final Landlord's Plans and Specifications.

(j)     Upon Tenant's approval of the Final Landlord's Plans and Specifications, any further changes thereto shall be subject to Tenant's prior written approval; provided, however, the Final Landlord's Plans and Specifications remain subject to Legal Requirements.  Unless specifically noted on a separate summary sheet attached to the Final Landlord's Plans and Specifications, to the extent of a conflict between the terms and provisions of Tenant's Plans, <u>Exhibit B</u>, <u>Exhibit D</u>, <u>Exhibit D-1</u>, and/or <u>Exhibit F</u> hereto, and the terms and provisions of the Final Landlord's Plans and Specifications, then the terms and provisions of Tenant's Plans, <u>Exhibit B</u>, <u>Exhibit D</u>, <u>Exhibit D-1</u>, and <u>Exhibit F</u> shall govern and prevail.

(k)     All submissions by the parties of the Preliminary LOD, the Revised LOD, the Certified LOD, the Tenant's Plans, the Landlord's Plans and Specifications, the Final Landlord's Plans and Specifications, and the measurements required under Section 3.4.1 and 3.4.2 below shall be made (or accompanied) by the computer files thereof formatted in any version of *"Autocad 2002"* up to *"Autocad 2007"*.

9

3.2.2  <u>Plan Changes</u>.

(a)  Tenant shall have the right to make changes from the standards and specifications set forth in "Tenant's Prototype Drawings and Specifications" and/or the "Project Manual", referred to in <u>Exhibit D</u> hereto (collectively, the **"Prototype Standards/Specifications"**), and/or to require Landlord to subsequently make changes to Landlord's Plans and Specifications and/or the Final Landlord's Plans and Specifications in accordance therewith (the **"Changes"**).  Within ten (10) business days after receiving Tenant's request for any Change, Landlord shall give Tenant notice of the cost or savings, and any delay, that may be occasioned by such Change, which notice shall be accompanied by all back-up supporting the cost increases or delays.  If Tenant fails to authorize such Change within five (5) business days after receiving Landlord's notice, Tenant shall be deemed to have disapproved such Change and Landlord shall not make such Change.

(b)  Tenant shall pay to Landlord the net reasonable additional third-party costs of Landlord's Work resulting directly and solely from the aggregate Changes (exclusive of any charges for overhead and profit, other than sums not exceeding 10% subcontractor profit and general contractor profit in the aggregate thereon), taking into consideration any and all actual costs and savings resulting from all Changes, in the aggregate (including, without limitation, reasonable costs approved by Tenant in advance associated with any acceleration of the work schedule which Tenant, at its sole option, may require).  Such payment shall be due and payable within thirty (30) days after Tenant's receipt of backup information reasonably supporting all such costs, including, without limitation, invoices, receipts and lien waivers of subcontractors and materialmen, but in no event earlier than the Delivery Date.

(c)  Landlord shall pay to Tenant the net reasonable cost savings resulting from the aggregate Changes, taking into consideration all reasonable additional third-party costs of Landlord's Work directly and solely resulting from the Changes (exclusive of any charges for overhead and profit, other than sums not exceeding 7½% subcontractor profit and 7½% general contractor profit thereon).  At Tenant's request, Landlord shall deliver to Tenant backup information reasonably supporting all such additional costs, including, without limitation, invoices, receipts, and lien waivers of subcontractors and materialmen.  Such payment shall be due and payable within thirty (30) days after the Delivery Date.

(d)  If the Changes occur during the preparation of any of the plans described in Section 3.2.1 above, then the deadlines for preparation and delivery of the plans then being prepared shall be extended as reasonably necessary to incorporate such Changes.  If, despite Landlord's diligent efforts in performing Landlord's Work, the Changes cause a net delay in the Substantial Completion of Landlord's Work (taking into consideration any time reductions resulting from such changes), then: (i) the Rent Commencement Date shall be determined as if such delay had not occurred, (ii) the commencement of the Slack Period, and the dates set forth in clauses (a) and (b) of Section 3.3.2 below, shall be extended by the number of days of such net delay; and (iii) with respect to Changes requested after the Delivery Date Notice is given, for purposes of calculating liquidated damages under Subsection 2.3.2(b) above, the Delivery Date shall be extended by the number of days of such net delay.

Section 3.3   <u>Performance of Work.</u>

3.3.1  Both Landlord's Work and Tenant's Work shall be performed in a good and workmanlike manner, in compliance with all applicable Legal Requirements, utilizing only new, first-class materials, and in accordance with all insurance company requirements.  Landlord shall perform Landlord's Work in a manner such that Tenant will be able to obtain Tenant's Permits.  Landlord shall pay any and all impact fees and related governmental charges in connection with the Shopping Center and the Premises, except for Tenant's business and/or operating licenses which shall be obtained and paid for by Tenant.  If Tenant's Permits cannot be obtained because Landlord's Work has not been completed or has been performed improperly or by reason of any then existing condition of the Shopping Center (unless such condition is solely the result of an act or omission of Tenant), Landlord shall remedy the situation so as to enable Tenant to obtain Tenant's Permits, and the Delivery Date shall be deemed delayed, for Tenant's benefit only, on a day-for-day basis for each day of delay occasioned thereby.

3.3.2  If: (a) Landlord's Work has not been commenced (*i.e.*, if Landlord has not yet poured foundation footings for the Premises) by September 1, 2010, or (b) the Delivery Date shall not have occurred by March 31, 2011 (subject to *Force Majeure*, not to exceed forty-five (45) days in the aggregate, and provided that Landlord shall have given Tenant notice of

10

such event of *Force Majeure* promptly after its occurrence, and subject to any Tenant Delays occurring after the date the Delivery Date Notice is given), Tenant may thereafter, during such time as Landlord's Work has not been commenced or the Delivery Date has not occurred, as the case may be, consider Landlord to be in default hereunder and, at Tenant's option in its sole discretion, elect to:

(i)    terminate this Lease, if Landlord shall fail to fully cure such default within thirty (30) days after receiving Tenant's notice thereof, in which event neither party shall have any further liability hereunder, except: (i) for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease, and (ii) Landlord shall be obligated to promptly reimburse Tenant, as Tenant's sole monetary remedy by reason thereof, for all its actual and reasonable third-party costs and expenses incurred in connection with this Lease (including, without limitation, costs associated with the preparation and review of plans and specifications, attorney's fees, and the performance of Tenant's Work), such reimbursement not to exceed Twenty Five Thousand Dollars ($25,000) in the aggregate and/or

(ii)    avail itself of the remedies set forth in Section 16.2 below (provided, however, that the cure period set forth therein shall not be applicable); and/or

(iii)    extend one or more times the dates set forth in clauses (a) and/or (b) of this Subsection 3.3.2 to such future dates designated by Tenant in notice given to Landlord, and as to any extension granted with respect to the clause 3.3.2(b) above, in addition to any other rights and remedies to which Tenant may be entitled, the Rent Commencement Date shall be postponed by one (1) day for each day of the extension granted as to clause 3.3.2(b) above until such time as the Delivery Date has occurred.

Except if Tenant elects to terminate the Lease pursuant to Subsection (i) above, the election by Tenant of any one or more of the foregoing remedies shall not preclude the subsequent election of any alternative remedy provided in this Section.

3.3.3    Landlord's Work Performed After Delivery of Possession.    On or before the Delivery Date, Landlord's and Tenant's representatives together shall conduct a walk-through of the Premises to compile a punch list of the "Punch List Items" (hereinafter defined). Tenant shall deliver to Landlord a copy of said punch list within five (5) days after the walk-through.  Landlord shall complete any Punch List Items within ten (10) days after it receives a copy of said punch list.  If Landlord fails to complete any item on said punch list within said 10-day period, Tenant shall have the right to complete such item(s) using its own contractors and receive reimbursement from Landlord for the actual and reasonable out-of-pocket costs and expenses thereof upon demand.  If reasonably required by Tenant, any portion of Landlord's Work which is performed after Tenant accepts physical possession of the Premises shall occur only "after hours", when neither Tenant nor any of its agents, contractors, employees and servants are working within the Premises.  As used herein, the term "**Punch List Items**" shall mean such minor items of a cosmetic or non-material nature which, when considered as a whole, do not adversely affect either the performance of Tenant's Work or Tenant's ability to conduct its normal business operations in the Premises.

3.3.4    Tenant's Right of Entry.  Prior to the Delivery Date, Tenant may enter upon the Premises for the purposes of inspecting the work, taking measurements, making plans, erecting temporary or permanent signs and doing such other work as may be appropriate or desirable without being deemed thereby to have taken possession or obligated itself to pay Rent, provided, however, that Tenant shall not, during the course of such work, materially interfere with the performance of Landlord's Work and shall indemnify and hold Landlord harmless from and against any and all claims or losses arising from Tenant's entry upon the Premises, except to the extent caused by Landlord, its agents, employees, or contractors. Any merchandise or other personal property of Tenant installed or stored on the Premises as provided herein shall be at the sole risk of Tenant, and Landlord shall have no responsibility for any damages thereto.

3.3.5    Intentionally Omitted.

3.3.6    Work Requirements After Delivery Date.  Unless otherwise provided or permitted under the OEA, following the Delivery Date, any construction by Landlord or other tenants or occupants of the Target District affecting any portion of the Target District shall be subject to the following terms and conditions:

11

(a)      staging and storage of materials and parking of construction vehicles shall not occur within the area designated as "Critical Area" on Exhibit B attached hereto (the "**Critical Area**");

(b)      Landlord shall diligently ensure that, from and after Tenant's opening for business to the public, no ingress, egress or passage of any construction, delivery and related vehicles engaged in the performance of such work or other construction activities shall take place except through the entrance/exit drive designated as the "Construction Drive" on Exhibit B hereto; and

(c)      Landlord shall maintain the Shopping Center in a clean, safe, and sightly condition, and shall use reasonable efforts to ensure that such construction shall not materially adversely interfere with the normal conduct of Tenant's business operations in the Premises for the Permitted Use.

3.3.7    Tenant's Trailer.  Landlord shall install a trailer or provide vacant space for Tenant's exclusive use in conducting employee interviews and recruiting, in accordance with Exhibit D hereto, in the location shown on Exhibit B hereto.  Said trailer or space shall be installed and operational at least forty-five (45) days prior to the Delivery Date, and, if a trailer is provided, shall be removed within twenty (20) days (but not sooner than ten days) after the Delivery Date.  Tenant shall provide commercial general liability insurance for any claims arising out of the use of the trailer or vacant space by Tenant and shall return the trailer or vacant space to Landlord in the same condition as when received, ordinary wear and tear excepted.

Section 3.4    Measurement; Adjustment of Rent.

3.4.1    Measurement of Premises and Shopping Center.  Within five (5) days after the completion of the first course of masonry for the exterior walls of the Premises and demising walls of the Premises (and at least sixty (60) days prior to the Delivery Date), Landlord shall deliver to Tenant a certification to Tenant by Landlord's licensed architect, surveyor or engineer of the interior clear dimensions and the Floor Area (with the dimensions on which it is based) of the Premises, and Floor Area of the Shopping Center, the measurements of which shall be subject to confirmation by Tenant's licensed architect, surveyor or engineer.  If Landlord shall fail so to deliver such certification to Tenant after ten (10) days notice from Tenant, Tenant shall have the right to have any of such measurements made and certified to Landlord by Tenant's licensed architect, surveyor or engineer.  If the interior clear dimensions and/or the Floor Area of the Premises vary from those shown on the Certified LOD by more than one percent (1%) in Floor Area or by more than twelve inches (12") from side wall to side wall (as may be modified by any applicable Changes), then Landlord shall correct such work to conform to the Certified LOD (as may be modified by any applicable Changes).

3.4.2    Intentionally Omitted.

3.4.3    Adjustment of Fixed Rent and Tenant's Pro Rata Share.  Subject to the foregoing provisions of this Section 3.4, if the measurement of the Premises shall indicate a Floor Area less than the Floor Area of the Premises set forth in Subsection 1.1.28 above (as the same may be decreased due to Changes under Section 3.2 above), the Fixed Rent and any other applicable provision of this Lease (including, without limitation, Tenant's Pro Rata Share) shall be reduced to conform to the actual measurement, and Tenant shall receive a proportional refund of any Rent theretofore paid to Landlord.  If the measurement of the Premises indicates that the actual Floor Area of the Premises exceeds the Floor Area of the Premises set forth in Section 1.1.28 hereof (as same may be increased due to Changes under Section 3.2 above), neither Fixed Rent nor Tenant's Pro Rata Share shall be increased by reason thereof.  Landlord and Tenant shall each promptly execute and deliver to the other an amendment memorializing any change to the Fixed Rent, Tenant's Pro Rata Share, or any other applicable provisions of this Lease, made pursuant to this Section 3.4.  Any dispute between the parties with respect to the Floor Area of the Premises, the square footage of said non-selling space or the Floor Area of the Shopping Center shall be resolved by arbitration in accordance with the provisions of Section 16.3 below.

# ARTICLE 4
## FIXED RENT AND TAXES: DETERMINATION AND PAYMENT

Section 4.1    Fixed Rent.  Commencing on the Rent Commencement Date and continuing throughout the Term, Tenant shall pay to Landlord the Fixed Rent, in equal successive monthly installments, in advance, on the first day of each and every calendar month

DMEAST #10098913 v6

throughout the Term, except that Fixed Rent payable for any partial calendar month during the Term shall be prorated based on a 365-day year. Fixed Rent shall be paid without notice, demand, deduction or set-off, except to the extent otherwise expressly provided herein.

Section 4.2    Payment of Rent.    All Rent shall be mailed or otherwise delivered to Landlord's Mailing Address above or, upon at least thirty (30) days' prior notice to Tenant, to such other address as Landlord may from time to time designate. Landlord acknowledges and agrees that for administrative purposes, Tenant has designated BBBY Management Corporation, a New York corporation (the "*Paying Agent*"), to make all Rent payments due to Landlord under this Lease. Said designation (which may be revoked by Tenant at any time) is not intended as, and shall not constitute, an assignment of any rights or obligations of Tenant to the Paying Agent, and Tenant shall remain primarily liable for payment of Rent under this Lease. All payments of Rent received by Landlord from the Paying Agent shall be deemed made by Tenant and credited to Tenant as if such payments of Rent had been made by Tenant directly to Landlord. If any payment of Rent is not delivered to Landlord within ten (10) days after its due date hereunder, such payment shall be subject to the imposition of a late charge of three percent (3%) of the late payment, provided, however, that the first two late payments in any calendar year shall not be subject to a late charge unless they continue unpaid ten (10) days after Tenant has received a notice from Landlord specifying the failure of Landlord to receive such payment when due.

Section 4.3    Real Estate and Other Taxes.

4.3.1    Landlord shall pay on or before the due dates thereof all "Taxes" (defined in Subsection 4.3.3 below) other than personal property taxes levied against tenants. Throughout the Term, Landlord shall cause the Shopping Center to be maintained entirely within tax parcels and lots that exclude any property not a part of the Shopping Center.

4.3.2    (a)    Tenant shall pay to Landlord Tenant's Pro Rata Share of the Taxes which accrue during the Term, subject to the provisions of this Section 4.3. Any Taxes for a real estate fiscal tax year, only a part of which is included within the Term, shall be adjusted between Landlord and Tenant on the basis of a 365-day year as of the Rent Commencement Date or the date on which the Term expires or earlier terminates, as the case may be, for the purpose of computing Tenant's Pro Rata Share of Taxes. If, by law, any Taxes may, at the option of the taxpayer, be paid in installments, Landlord shall exercise such option so as to maximize the number of installments, and Landlord shall pay the same as they come due and before any fine, penalty, interest or cost may be added thereto for nonpayment thereof.

(b)    Landlord shall submit to Tenant a copy of the bill for Taxes issued by the applicable taxing authority, a computation of Tenant's Pro Rata Share of such Taxes and proof of the payment of Taxes for the previous payment period, as well as copies of all notices concerning assessments, tax rates, and changes thereto. Tenant shall pay Landlord in the amount required by this Subsection 4.3.2 within thirty (30) days after receipt of such bill (but in no event earlier than the fifteenth (15th) day prior to the date on which such Taxes would become delinquent).

4.3.3    As used herein, "*Taxes*" shall mean all general, *ad valorem* real estate taxes, and assessments for betterments and improvements that are levied or assessed by any lawful authority on each tax parcel comprising the Target District and the two (2) parcels labeled as "Detention Pond 1" and "Detention Pond 2" on Exhibit B attached hereto (general or special), including any substitution therefor, in whole or in part, due to a future change in the method of taxation (except for any portion thereof for which the Taxes are paid directly by the tenant thereof to the taxing authority). Taxes shall be reduced by any deferral, abatement, or other tax-lowering adjustment received by Landlord from the taxing authorities. For purposes of computing Tenant's Pro Rata Share of Taxes, Taxes shall not include any: (1) income, excise, profits, estate, inheritance, succession, gift, transfer, franchise, capital, or other tax or assessment upon Landlord or upon the rentals payable under this Lease; (2) taxes on rents (other than to the extent that such taxes are customarily paid by retail tenants in the state in which the Shopping Center is located), gross receipts or revenues of Landlord from the Premises; (3) fine, penalty, cost or interest for any tax or assessment, or part thereof, which Landlord or its lender failed to timely pay (except if same are caused by an Event of Default); (4) assessment for a public improvement arising from the initial construction or expansion of the Shopping Center or the Premises (it being agreed that all assessments imposed during the Term which are permitted to be included within Taxes hereunder shall, for the purposes of computing Tenant's Pro Rata Share thereof, be deemed to have been paid in the maximum number of installments permitted by the applicable taxing authority); (5) Taxes resulting directly from an increase in the assessment caused by a sale or ground lease of all or any portion of the

13

Shopping Center to an Affiliate of Landlord or more than once every five (5) years; (6) fees imposed upon Landlord in connection with Landlord's development of the Shopping Center (including, without limitation, trip generation fees); or (7) Taxes on any tax parcel other than the tax parcels which comprise the Target District and Detention Pond 1 and Detention Pond 2. All Taxes payable by Tenant pursuant to this Section 4.3 shall be determined as if the Shopping Center was the only property owned by Landlord. Landlord represents to Tenant that, as of the Effective Date and, to the best of Landlord's knowledge, as of the anticipated Delivery Date, no portion of the Shopping Center is or will be (i) subject to or the beneficiary of an abatement, exemption and/or phase-in of Taxes, (ii) subject to any special assessments or similar charges that will be passed through to Tenant, or (iii) included in any special improvement district(s) which would result in higher sales taxes or other similar impositions than would exist in the absence of such district(s). Tenant acknowledges that Landlord is a party to a Contract for Private Development, Tax Increment District Number 56, with the City of Rapid City, South Dakota (the "*TIF Agreement*"). Under the TIF Agreement, the incremental real estate tax revenue generated by the construction of the Shopping Center improvements is to be deposited by the City into a special tax increment district fund (the "*Fund*"). The Fund will be used to pay the cost of public improvements related to the Shopping Center and completed by Landlord in accordance with the approved "Project Plan" (as referenced in the TIF Agreement). The term "Taxes" shall include all such incremental real estate taxes allocable to the Tax Increment District Number 56 (the "*TIF District*") collected by the City and deposited into the Fund; provided that the inclusion of the Shopping Center in the TIF District does not serve to increase the Taxes at the Shopping Center above what they would have been but for such inclusion in the TIF District, and notwithstanding anything to the contrary contained herein, in no event shall Tenant's obligations under this Lease be increased or the benefits to Tenant under this Lease decreased by reason of the TIF Agreement. Landlord estimates that the Tenant's Pro Rata Share of Taxes for the first full calendar year after the Shopping Center has been completed and fully-assessed will be approximately $2.00 per square foot of Floor Area in the Premises.

4.3.4    At Tenant's request, Landlord shall contest the amount or validity of any assessed valuation or Taxes, failing which, Tenant shall have the right to contest the assessed valuation or Taxes by appropriate proceedings conducted in good faith, whereupon Landlord shall cooperate with Tenant, execute any and all documents required in connection therewith and, if required by any governmental authority having jurisdiction, join with Tenant in the prosecution thereof. If, as a result of any contest or otherwise, any rebate or refund of Taxes is received, Tenant shall be entitled to Tenant's Pro Rata Share thereof (after reasonable and customary expenses incurred by Landlord and/or Tenant in connection with such contest are paid to the party which incurred such expense). Notwithstanding anything to the contrary contained in this Section 4.3.4, Tenant covenants that it will not commence or prosecute (or appeal a decision on) a Tax Contest (as hereinafter defined), as long as Taxes are not more than the Base Amount (as hereinafter defined) per annum. "Tax Contest" means an action to reduce ad valorem real estate taxes on the tax parcel or parcels of which the premises are a part (the "Applicable Parcel"). "Base Amount" means an amount equal to (i) the product of $1.85 multiplied by the square footage of the building improvements on the Applicable Parcel (as measured by the applicable taxing/assessing authority) plus (ii) ten percent (10%) of such product. Further, in any Tax Contest otherwise permitted hereunder, Tenant will not seek or consent to a determination or decision setting the annual taxes at an amount less than the Base Amount.

## ARTICLE 5
## COMMON AREAS, THEIR USE AND CHARGES

Section 5.1    Common Areas: Maintenance.

5.1.1    Maintenance of Common Areas. Landlord shall operate, maintain, repair and replace the Common Areas as required by this Lease and otherwise to the standard by which Common Areas of first-class shopping centers in the state in which the Shopping Center is located are operated, maintained, repaired and replaced, including, without limitation, snow, ice, rubbish and debris removal (including installation and maintenance of sidewalk refuse containers), landscaping (including, without limitation, perimeter landscaping and the trimming and pruning of trees to avoid interference with the use or visibility of canopies or signs on the exterior of the Premises), gateway/entry features (excluding signage), adequate lighting, insurance, supervision, use, parking lot paving and striping, drainage, security (as reasonably required), wetlands mitigation and monitoring, storm water management and maintenance of the retention/detention system, and control of all Common Areas, and Landlord shall comply with all applicable Legal Requirements.

14

5.1.2  Tenant's Pro Rata Share of Common Areas Charges.

(a)      During the Term, Tenant shall pay to Landlord Tenant's Pro Rata Share of the reasonable costs (hereinafter referred to as the **"Common Area Charges"**) paid by Landlord to operate, maintain, light, clean, repaint, restripe, insure and repair the Common Areas as provided in Section 5.1.1 above and in the OEA.  Landlord shall be permitted to include in Common Area Charges (in lieu of any cost(s) or expense(s) relating to the administration and management of the Common Areas) for each calendar year an administrative fee (the "**Administrative Fee**") equal to ten percent (10%) of the Common Areas Charges for the calendar year in question, but excluding from the computation of such Administrative Fee the cost of any replacement or improvement of a capital nature (if such capital item is a permissible Common Areas Charge hereunder), the cost of electricity and other utilities, and the cost of insurance which Landlord is required to maintain under this Lease.  Tenant's Pro Rata Share of Common Areas Charges shall be paid in equal monthly installments on the first day of each calendar month, in advance, during each calendar year based on Landlord's reasonable budget.

(b)      Within ninety (90) days after the end of each calendar year, Landlord shall provide to Tenant a statement, in detail reasonably satisfactory to Tenant, of Common Areas Charges for such year, which statement shall be prepared in accordance with generally accepted accounting principles consistently applied (the **"CAC Reconciliation Statement"**).  The CAC Reconciliation Statement shall be certified by Landlord as being accurate and shall be accompanied by a calculation of Tenant's Pro Rata Share of Common Areas Charges, and payment to Tenant in the amount of any overpayment made by Tenant during the preceding calendar year.  If Tenant's Pro Rata Share of the actual Common Areas Charges for a calendar year shall exceed the aggregate monthly installments paid by Tenant during said calendar year, Tenant shall pay to Landlord the deficiency within sixty (60) days after receipt of such notice.  Upon Tenant's request, Landlord shall promptly deliver to Tenant copies of relevant backup materials (including, but not limited to, contracts, correspondence and paid invoices) reasonably required by Tenant.  If Landlord fails to timely remit to Tenant the amount of any overpayment hereunder, Tenant shall have the right to offset such amount from payments of Rent next becoming due hereunder, together with interest thereon at the Lease Interest Rate from the date such remittance is due until reimbursement or full satisfaction by credit; provided, however, that if there is insufficient time left in the Term for Tenant to offset the full amount due Tenant or if the amount owed is greater than six (6) months of Fixed Rent, then Tenant shall also have any rights and remedies to which it may be entitled under this Lease, at law, or in equity.  Notwithstanding any provision hereof to the contrary, in no event shall the Tenant's Pro Rata Share of Common Areas Charges with respect to the first full calendar year of the Term exceed $2.00 per square foot of Floor Area, and with respect to any other calendar year thereafter (exclusive of the costs of snow removal, insurance rate increases, and utility rate increases, for the Common Areas during such calendar year) exceed one hundred five percent (105%) of the Tenant's Pro Rata Share of Common Areas Charges paid by Tenant for the immediately preceding calendar year (exclusive of the costs of snow removal, insurance rate increases, and utility rate increases, for the Common Areas during such calendar year).

5.1.3  Exclusions from Common Areas Charges.

(a)      Common Areas Charges shall not include: **(1)** the capital cost of any additions to the Common Areas pursuant to an expansion of the Shopping Center; **(2)** the cost of any replacements or capital improvements to the Common Areas, except that the cost of repaving the parking areas of the Shopping Center may be included within Common Areas Charges so long as such cost is amortized on a straight-line basis over the useful life thereof under generally accepted accounting principles, and is not incurred (A) prior to the expiration of the fifth (5th) full calendar year of the Term, or (B) more than once during each five (5) full calendar years of the Term; **(3)** the cost of investigating, monitoring or remedying any environmental condition or "Hazardous Substances" or any other "Compliance Costs" (both as hereinafter defined in Subsection 12.4.1); **(4)** any debt service (including principal and interest) or payments of any judgments or other liens against Landlord; **(5)** the cost of maintaining, repairing or providing security for interior portions of buildings; **(6)** Taxes or other taxes levied or assessed against Landlord or the Shopping Center; **(7)** the cost of compliance with applicable Legal Requirements other than typical maintenance items (including, without limitation, the cost of curing violations or contesting such Legal Requirements); **(8)** any costs resulting from insurance deductibles or any payments made under any self-insurance policy maintained by Landlord; **(9)** any costs which would have been reimbursed or paid for by insurance proceeds had Landlord maintained the insurance required under Section 10.3 hereof and the amount of any judgment or other charge entered or costs assessed against Landlord in excess of the policy limits of the insurance maintained by Landlord under Section 10.3 hereof); **(10)** those

15

portions of Landlord's insurance premiums which are reimbursed to Landlord by any other tenant in the Shopping Center other than through the payment of such tenant's proportionate share of insurance premiums otherwise includable as part of Common Areas Charges; **(11)** sums paid or owed by Landlord to any tenant in the Shopping Center; **(12)** costs incurred in connection with the negotiation of leases with, or construction of improvements for, any tenant in the Shopping Center (including, without limitation, brokerage commissions and legal fees); **(13)** costs incurred in connection with lawsuits or other legal actions (including, without limitation, arbitrations and mediations) instituted or defended by Landlord; **(14)** sums incurred as late payment fees, penalties or interest; **(15)** ground rent; **(16)** depreciation [except as expressly permitted pursuant to item 23 below]; **(17)** costs disproportionately incurred by or on behalf of any one or more of the tenants in the Shopping Center (including, without limitation, all costs relating to the operation of any food court or exterior dining area in the Shopping Center); **(18)** electricity costs for lighting Common Areas later than the "Normal Hours" [hereinafter defined in Section 5.2], other than low-level security lighting; **(19)** Landlord's advertising, entertainment and promotional costs for the Shopping Center (including, without limitation, holiday decorations); **(20)** costs of acquiring, leasing, restoring, insuring or displaying sculptures, paintings and other objects of art located within or outside the Shopping Center; **(21)** costs and expenses payable to Landlord or its Affiliate, to the extent that such costs and expenses exceed competitive costs and expenses for materials and services by unrelated persons or entities of similar skill and experience, it being agreed that Landlord can satisfy any question of the competitiveness of such costs and expenses by obtaining three (3) bids for such work, if the costs and expenses payable to Landlord or its Affiliate are equal to or lower than the lowest bid; **(22)** repairs resulting from defects in the original construction of the Shopping Center arising within one (1) year after the Rent Commencement Date; **(23)** the cost of mechanized equipment for the maintenance of the Common Areas (but not the straight-line depreciation thereof over its useful life, as determined in accordance with generally accepted accounting principles); **(24)** reserves for anticipated future expenses; **(25)** except for the Administrative Fee provided for in Subsection 5.1.2(a) above, any cost or expense relating to the administration and management of the Common Areas (whether on-site or off-site) including, but not limited to, overhead, management fees, office salaries and benefits, office rental, office supplies, dues and subscriptions, office utility charges, telephone charges and automobile expenses; **(26)** costs incurred in connection with the monitoring, maintenance, inspection, or testing of fire alarm systems; **(27)** costs and expenses payable to Landlord, or its Affiliate or designee, for the provision of utility service(s) to the Common Areas, to the extent that such costs and expenses exceed competitive market rates; or **(28)** except as specifically provided in Section 7.2 hereof, any costs relating to any pylon signs or other signage identifying tenants of the Shopping Center.

(b)    In addition, if any tenant or other occupant of the Shopping Center (i) maintains the Common Areas in whole or in part, or any facilities therein, (ii) provides any services the cost of which would otherwise be includable in Common Areas Charges, and/or (iii) pays directly for costs which would otherwise be included in the Common Areas Charges, then the costs associated with or attributable to any of the foregoing shall be excluded from Common Areas Charges, and the denominator used to determine Tenant's Pro Rata Share of such costs (and only such costs) shall be reduced by the Floor Area occupied by such tenant or other occupant. In applying the provisions hereof, Landlord shall act equitably, taking into account, for example, the relationship of the size of the Common Areas maintained by the other tenant or occupant to the size of its premises. In furtherance of the foregoing, Tenant acknowledges that (A) certain items of Common Area Charges will be prorated using the Floor Area of the Target District as the denominator, and (B) certain items of Common Area Charges will be prorated using the Floor Area of the entire Shopping Center (i.e., the Sam's District and the Target District in the aggregate) as the denominator, including but not limited to Common Area Charges associated with the federally mandated wetlands mitigation and monitoring program for the Shopping Center, the storm water management and retention/detention system for the Shopping Center (including but not limited to the retention/detention ponds serving the Shopping Center), the private roadways serving the Shopping Center, perimeter landscaping, all gateway/entry features of the Shopping Center (excluding signage), as such categories are more fully set forth in the OEA.

(c)    Common Areas Charges for any period during the Term which constitutes less than a full calendar year shall be equitably prorated.

5.1.4    <u>Tenant's Right to Audit</u>.  Tenant shall have the right, within three (3) years after receiving any CAC Reconciliation Statement (and not more than once annually nor more than once for any period) to audit Landlord's books and records at Landlord's reasonably designated location to verify Landlord's calculation of Common Areas Charges as reflected therein and Tenant's Pro Rata Share thereof.  Upon Tenant's request, Landlord shall make

16

available for review to Tenant copies of relevant backup materials (including, but not limited to, contracts, correspondence and paid invoices) reasonably required by Tenant. After conclusion of any audit by Tenant, Tenant shall promptly disclose in writing to Landlord the results of such audit. In the event of an error in Landlord's favor, Landlord shall refund the overcharge to Tenant within thirty (30) days after Tenant's demand therefor, and if the overcharge exceeds three (3%) percent of Tenant's Pro Rata Share of Common Areas Charges, Landlord shall pay to Tenant the actual and reasonable out-of-pocket expenses of the audit not to exceed $4,000 within thirty (30) days after Tenant's demand therefor, failing which, Tenant shall have the right to offset such amount from payments of Rent next becoming due hereunder, together with interest thereon at the Lease Interest Rate from the date such remittance is due until reimbursement or full satisfaction by credit; provided, however, that if there is insufficient time left in the Term for Tenant to offset the full amount due Tenant, then Tenant shall also have any rights and remedies to which it may be entitled under this Lease, at law, or in equity. In the event of an error in Tenant's favor, Tenant shall pay the amount of such underpayment to Landlord within thirty (30) days after Tenant's demand therefore. Landlord shall maintain all books and records pertaining to a calendar year for at least three (3) years after it delivers to Tenant a CAC Reconciliation Statement for such calendar year. Tenant shall keep the results of any such audit confidential, provided that nothing contained herein shall restrict Tenant from disclosing such information as may be required by applicable Legal Requirements, or to its accountants, attorneys or *bona fide* prospective assignees or subtenants (provided that each of such recipients shall be bound by the same non-disclosure provisions as are imposed upon Tenant). Any dispute by Landlord with respect to an audit by Tenant shall be submitted to arbitration in accordance with the provisions of Section 16.3 below.

5.1.5   In no event shall Tenant be required to join, participate in or contribute to any promotional fund, marketing fund or merchants' association.

Section 5.2    Common Areas: Restrictions.

5.2.1   Continuous Access. No entrances, exits, approaches and means of ingress and egress to, from, and/or within the Shopping Center or the Premises designated as Permanent Access Drive on Exhibit X to the OEA shall be interrupted or disturbed by any act or omission of Landlord during the Term, except: (i) in the event of an emergency or as may be otherwise required by applicable Legal Requirements, in which event Landlord shall use reasonable efforts to give Tenant advance notice of same and to minimize interference to Tenant's normal business operations in the Premises as a result thereof; (ii) in the event that Landlord is required to temporarily close the Common Areas, for the minimum time legally necessary to prevent a dedication thereof or an accrual of any rights in any person or the public generally therein; provided that such closure shall not occur during August, November or December of any calendar year, and Landlord shall give Tenant at least thirty (30) days' prior notice thereof; or (iii) temporary interruptions reasonably necessary to maintain, repair, and/or replace such areas, or any portion thereof, in which event Landlord shall give Tenant at least thirty (30) days prior notice thereof and shall minimize interference to Tenant's normal business operations in the Premises as a result thereof and provided that such interruptions shall not occur during November or December of any calendar year.

5.2.2   No Alterations. Landlord shall not, without obtaining Tenant's prior written consent in each instance, which consent may be withheld in its sole discretion: **(i)** materially alter the area of the Target District or alter the location, availability, or size of any Common Area improvement in the Critical Area from that shown on Exhibit B hereto; **(ii)** construct or permit to be constructed any structures in the Critical Area (including, without limitation, any buildings, kiosks, booths, signs or similar structures in the Critical Area), other than as shown on Exhibit B hereto; **(iii)** materially change the curb cuts, roadways, drive aisles, sidewalks or other elements of the Critical Area, or the number, location or layout of parking spaces in the Critical Area, from those shown on Exhibit B hereto; or **(iv)** alter the location of the Permanent Access Drive as shown on Exhibit X to the OEA. Landlord shall neither perform nor permit to be performed, any construction, repairs, replacements or maintenance to any portion of the Target District (except for the Permitted Places as defined in Exhibit M hereto), including the Premises (other than emergency repairs to utilities and Common Areas) during the months of August, November and December of any year, without the prior consent of Tenant, which consent may be withheld in Tenant's sole discretion.

5.2.3   Outparcels. In addition to the provisions of Subsection 5.2.2 above, during the Term, the following restrictions shall encumber and bind the outparcels (collectively, the "***Outparcels***" and individually, an "***Outparcel***") designated on Exhibit B hereto as "Outparcel 1," "Outparcel 2," "Outparcel 3," "Outparcel 4," "Outparcel 5," "Outparcel 6," "Outparcel 7," "Outparcel 8," and "Outparcel 9": (a) no more than one building shall be

17

constructed on any Outparcel; (b) no building shall exceed one story in height, except on Outparcel 7, Outparcel 8 and Outparcel 9, there may be multistoried buildings not to exceed thirty-six feet (36') in height measured perpendicular from the finished floor elevation to the top of the roof structure, including the height of all types of projections or architectural treatments or embellishments thereon, such as, but without limitation, HVAC equipment, parafits, mansards, signs, satellite dishes, and antennas; (c) except as set forth in Section 5.2.3(b), no building shall exceed a maximum height of twenty-four feet (24') as measured perpendicular from the finished floor elevation to the top of the roof structure, including any screening, parapet or other architectural element, penthouse, mechanical equipment or similar appurtenance located on the roof of such building; (d) the Floor Area of any building constructed on an Outparcel shall be constructed within the Primary Building Area as shown on Exhibit B hereto; and (e) all Legal Requirements relative to parking requirements for each Outparcel operation shall be complied with by providing the requisite number of parking spaces solely within the boundaries of such Outparcel, without reduction in such number below the minimum requirement of the OEA by virtue of the granting of a variance or special exception.

5.2.4    Parking Area.  During the Term, Landlord shall maintain in the Target District, at a minimum, the greater of (i) the number of parking spaces required by applicable Legal Requirements, without variance, or (ii) four and five-tenths (4.5) ground-level parking spaces for every one thousand (1,000) square feet of Floor Area in the Target District, with each such space being at least nine (9) feet in width and eighteen (18) feet in length.  Parking spaces shall at all times be clearly marked by painting, striping or otherwise.  Landlord shall not designate specific parking spaces for temporary use (other than in the Permitted Places) or for use by other tenants or occupants of the Target District, nor shall Landlord permit any person or entity to use the parking areas other than Tenant, the other tenants and occupants of the Shopping Center, and their respective employees, agents, subtenants, concessionaires, licensees, customers, and invitees.  There shall be no charge whatsoever levied for the use of any parking areas within the Shopping Center.  Landlord shall not permit overnight parking in the Shopping Center (except the Sam's District).

5.2.5    Lighting.  Throughout the Term, Landlord shall keep the Common Areas fully lighted and open to the customers of the Shopping Center seven (7) days a week from dusk until 11:00 p.m. (**"Normal Hours"**).  Upon request of Tenant, Landlord shall keep the Common Areas lighted for as long after Normal Hours as Tenant shall request, provided Tenant shall pay for a share of the reasonable cost of said requested lighting, which share shall be equal to the product of (x) such cost, and (y) a fraction, the numerator of which shall be the number of square feet of Floor Area within the Premises and the denominator of which shall be the aggregate number of square feet of Floor Area of all premises within the Shopping Center (including the Premises) open later than Normal Hours (excluding, however, those tenants and occupants who separately control and pay for their own Common Area lighting).  In addition to the foregoing, Landlord shall provide for low level security lighting from one (1) hour after the close of business in the Premises until dawn.  Nothing in this Section 5.2.5 shall require Landlord to keep the Common Areas of parcels separately controlled by a party other than Landlord or its Affiliates lighted beyond Normal Hours (unless required under the OEA); provided, however, upon Tenant's prior request, Landlord will use commercially reasonably efforts to cause such other party to light its respective Common Area.

5.2.6    Repairs.  During the Term, any material construction or repair by Landlord permitted or required under this Lease and undertaken in the Common Areas of the Target District or in any other portion of the Shopping Center shall:

(a)    not be performed during the months of August, November, or December of any year, except in the event of an emergency or as may be otherwise required by applicable Legal Requirements;

(b)    be commenced only upon at least five (5) days' prior notice to Tenant (except in an emergency, in which event Landlord shall only be required to give such notice as is reasonable under the circumstances); and

(c)    be performed in accordance with the requirements of Section 3.3.6 above and in such a manner so as not to materially interfere with the normal conduct of any business operations in the Premises.

5.2.7    Rules and Regulations.  Tenant shall comply with the rules and regulations of the Shopping Center as established from time to time by Landlord, within sixty (60) days after Landlord notifies Tenant thereof, provided they: (i) are reasonable, (ii) do not materially adversely affect the normal conduct of any business operations in the Premises for

18

the Permitted Use, (iii) do not materially adversely affect any of Tenant's rights under this Lease, and (iv) are uniformly enforced against all tenants of the Shopping Center and without prejudice against Tenant. In the event of any conflict between the provisions of this Lease and any rules or regulations, the provisions of this Lease shall prevail and govern. A copy of the current rules and regulations for the Shopping Center are attached hereto as Exhibit O.

### 5.2.8  Miscellaneous.

(a)  No Promotional Use. Landlord shall not use or permit the use of all or any portion of the Common Areas in the Target District for retail sales or for promotional purposes except the area labeled "Scheel's Demonstration Area" on Exhibit B. Notwithstanding the foregoing provision, subject to the OEA, tenants of the Shopping Center (including Tenant) shall be permitted to conduct sidewalk sales in front of their respective stores only, provided that such sales shall: (A) be conducted in a manner consistent with sidewalk sales in first-class shopping centers in the state in which the Shopping Center is located, (B) not materially interfere with normal pedestrian access over the sidewalks, and (C) not materially interfere with the normal business operations of Tenant in the Premises or materially impair the visibility of Tenant's signage. Landlord shall use commercially reasonable efforts to not permit any solicitation, distribution of handbills, picketing, or other public demonstration in the Common Areas, except as otherwise may be mandated by applicable Legal Requirements.

(b)  Trash Compactor and Containers. Tenant shall be permitted to maintain and operate, at no extra charge: (i) a trash compactor in the portion of the Common Areas designated on Exhibit B hereto as "Trash Compactor Pad"; and (ii) a trash container(s) in the portion(s) of the Common Areas designated on Exhibit B hereto as "Trash Container Pad". Tenant, at its sole cost and expense, shall keep the trash compactor and containers neat and clean and repair any damage caused by use and storage of such compactor and containers, and shall be solely responsible for its trash removal.

(c)  Shopping Carts. Tenant shall be permitted to store its shopping carts in such exterior cart corrals as may be reflected on Exhibits B and D-1 hereto. With respect to shopping carts provided by Tenant for the use of its customers, Tenant will use reasonable efforts to periodically remove same from the Common Areas.

(d)  Cellular Towers. No transmission and/or reception towers for wireless telephone or internet communications shall be permitted within the Shopping Center. The foregoing shall not prohibit tenants and occupants from utilizing space on the roofs of buildings for satellite dishes, antennas, and similar communications equipment, in accordance with the OEA.

(e)  Temporary Storage Containers. Tenant shall be permitted to maintain temporary storage containers or trailers in the locations designated on Exhibit B hereto during the Term, subject to applicable Legal Requirements and the OEA.

### ARTICLE 6
### UTILITIES

Section 6.1  Utility Service. From and after the Delivery Date and continuing thereafter through the end of the Term, Tenant shall be solely responsible for and shall pay the cost of utilities services (including, without limitation, electricity, gas, water, sanitary sewer, alarm and telecommunications) consumed in the Premises by Tenant. Tenant shall not be obligated to purchase utility service(s) directly from Landlord, or from any utility provider designated by Landlord. Landlord shall provide separate utility meters or submeters exclusively serving the Premises, at its sole cost and expense (including, without limitation, all connection and hook-up fees). Tenant's entry upon the Premises prior to the Delivery Date shall not constitute a waiver by Tenant of Landlord's obligation to pay the costs of all utility charges incurred in the Premises prior to the Delivery Date. Landlord shall not permit the capacity of utility lines available for use at the Premises to be reduced or overloaded by any other persons or entities. Landlord shall permit Tenant and its telecommunications provider full and free access to, and use of, available telecommunications conduits in the Shopping Center for the provision of telecommunications service to the Premises, subject to such reasonable requirements as Landlord may impose.

Section 6.2  Interruption. Notwithstanding any provision of this Lease to the contrary, in the event utilities serving the Premises are disrupted due to the acts or omissions of Landlord, its agents, contractors, servants or employees, Landlord shall promptly restore the affected

1 utilities at Landlord's sole cost and expense.  If the disrupted utilities are not restored within
2 twenty-four (24) hours after the Landlord has knowledge of the disruption, and Tenant is unable
3 to conduct its normal business in the Premises as a result thereof, Rent shall be equitably
4 abated during the period of disruption.

5                                                ARTICLE 7
6                                                 SIGNS

7        Section 7.1    Tenant's Building Signage.  Landlord shall supply and install signage
8 (and obtain all permits and approvals therefor) as part of Landlord's Work in accordance with
9 Exhibits D,  D-1, and F hereto, and with the additional provisions of this Lease; provided,
10 however, that Landlord shall not be required to expend more than $15,000.00 in connection with
11 the installation of such signage, and any costs in excess of $15,000.00 shall be the sole
12 responsibility of Tenant.  Thereafter, Tenant shall have the exclusive right during the Term, at its
13 sole cost and expense, to erect, maintain, and replace on the storefront and exterior walls of the
14 Premises, and on the side walls of any entrance design element of the Premises, if any, signs
15 (including, without limitation, under-canopy or blade signs), banners (including temporary
16 banners placed on the storefront of the Premises and such other walls of the Premises as
17 selected by Tenant), awnings, and flags of such size, design and color as Tenant, from time to
18 time, may desire, subject to compliance with applicable Legal Requirements, Exhibit F and the
19 OEA.  Subject to Legal Requirements and the OEA, Tenant may erect and maintain in the
20 interior of the Premises any signs it may desire, provided that same are professionally prepared.

21        Section 7.2    Pylon/Monument Signage.  Landlord shall provide a pylon sign at the
22 location shown and identified on Exhibit B hereto as Pylon Sign B (the "**Pylon Sign**") during the
23 entire Term, and obtain all permits and approvals therefor.  Subject to the $15,000.000 cap set
24 forth in Section 7.1 above, Landlord, as part of Landlord's Work, shall obtain all governmental
25 approvals and permits for, and shall procure and install, Tenant's sign panel(s) on all sides of
26 the Pylon Sign, in accordance with the provisions of Article 3 and Exhibits D and F hereto.  The
27 dimensions and location of Tenant's pylon sign panel(s) shall be as shown on Exhibit F hereto
28 and at least as large as those of other occupants of the Target District, whose Premises Floor
29 Area is less than or equal to the Floor Area of the Premises.  Landlord shall maintain all pylons
30 and monuments in good order and repair, and allow Tenant access to replace its sign panels
31 thereon, at Tenant's cost and expense.  Unless required by Legal Requirements, or as a result
32 of casualty or condemnation, Landlord shall not change or alter the location, structure, height or
33 general appearance (except tenant panels) of the Pylon Sign without obtaining Tenant's prior
34 consent.  Tenant's Proportionate Share (as calculated below) of the cost of insurance,
35 repainting, maintenance contracts, electrical service and other reasonable, actual and
36 noncapital costs of maintenance for the Pylon Sign (but not the cost of individual tenants' signs
37 thereon or the cost of the construction of the pylons and monuments) shall be includable in
38 Common Area Charges.  Tenant's Proportionate Share of the cost of maintaining the Pylon Sign
39 shall be calculated by multiplying the total cost of such maintenance of the Pylon Sign by a
40 fraction, the numerator of which is the square footage of Tenant's panel(s) on the Pylon Sign,
41 and the denominator of which is the total square footage of all of the panels on the Pylon Sign.
42 Tenant shall have no right to have signage on any pylon, monument, gateway, or other sign in
43 the Shopping Center other than the Pylon Sign and signage on the Premises.

44        Section 7.3    Signage: Alteration/Removal/Allocation.  Subject to Legal Requirements,
45 Exhibit F and the OEA, Tenant shall have the right, from time to time, without Landlord's
46 approval, to change its signs on the storefront and exterior of the Premises, as well as on the
47 Pylon Sign, provided that the area of the new sign is no larger than the area of the sign which it
48 replaces and that the method of construction and attachment is substantially the same, and
49 shall repair any damage occasioned thereby.  Upon the expiration or earlier termination of the
50 Lease, Tenant shall remove its signs from the fascia or other exterior walls of the Premises and
51 from any pylon or monument, and shall repair any damage occasioned thereby.  The signage
52 rights granted to Tenant pursuant to this Article 7 shall, at Tenant's option, be allocated to or
53 between Tenant and/or any subtenant(s) of all or any portion of the Premises, provided that
54 Landlord is not prohibited from doing so under any Existing Lease with respect to the Pylon
55 Sign.  All signage installed by Landlord and Tenant hereunder shall comply with applicable
56 Legal Requirements, Exhibit F and the OEA.

57        Section 7.4    Cooperation.  Subject to Exhibit F and the OEA, Landlord, upon request,
58 shall execute any consents or applications which may be required by applicable Legal
59 Requirements to permit the placement, installation, and/or replacement by Tenant of any signs
60 on any part of the Premises or on any pylon or monument, to which Tenant may be entitled
61 under this Lease.

20

Section 7.5    Signage and Building Restrictions and Criteria.

7.5.1    Subject to the OEA, during the Term, no exterior identification signs attached to any building of the Shopping Center shall be of the following type: **(i)** flashing, moving or audible signs; **(ii)** signs employing exposed raceways, exposed neon tubes, exposed ballast boxes, or exposed transformers, provided that Tenant shall have the right to employ any methods necessary for the installation of internally illuminated self-contained channel letters; or **(iii)** paper or cardboard signs other than professionally prepared interior window signs advertising special sales within the subject premises, temporary signs (exclusive of contractor signs), provided, however, the foregoing shall not prohibit the placement at the entrance of each such premises of (A) small stickers or decals which indicate hours of business, emergency telephone numbers, credit cards accepted, and other similar information, and/or (B) a sticker or decal which contains the phrase "no solicitation" or words of like import. No billboard signs shall be permitted within the Shopping Center, other than the one existing as of the Effective Date.

7.5.2    Subject to the OEA, Landlord shall not permit any obstructions (including, without limitation, any trees, bushes or other landscaping, scaffolding or architectural details) to obscure Tenant's storefront, storefront signs or other exterior wall signs or the Pylon Sign. Tenant hereby approves the landscaping and hardscaping plans attached hereto as Exhibit P, and agrees that such plans do not violate the preceding sentence. Except (i) as otherwise permitted under Existing Leases (hereinafter defined in Section 12.3(j)), (ii) for premises located on the corner of a building, and/or (iii) for premises with secondary signs (such as "Petco Grooming"), no premises in the Shopping Center containing less Floor Area than the Floor Area of the Premises shall have building signage possessing more total square footage than the total square footage available for use by Tenant.

ARTICLE 8
ALTERATIONS AND IMPROVEMENTS

Section 8.1    Alterations and Improvements.

8.1.1    Tenant shall not perform any exterior or structural alterations or exterior or structural improvements to the Premises (except to the extent same pertain to Tenant's Work) without the prior approval of Landlord; provided, however, that Tenant's alteration of the exterior of the Premises to conform to Tenant's then-current prototypical elevation shall not require Landlord's consent. All work performed by Tenant in connection with structural and non-structural alterations or improvements shall be done at Tenant's sole cost and expense, in a good and workmanlike manner using licensed contractors and construction professionals, lien free, and in compliance with all applicable Legal Requirements and the OEA. The provisions of this Section 8.1 shall not apply to Tenant's building signage, which shall be governed by the applicable provisions of Article 7 above.

8.1.2    Tenant may, from time to time, at its sole cost and expense, without the prior approval of Landlord, make interior non-structural alterations and interior non-structural improvements to the Premises as Tenant deems necessary or desirable, including, but not limited to, electrical systems, heating, ventilation and air conditioning and other mechanical systems, installation of fixtures and equipment, interior painting, and wall and floor coverings.

8.1.3    Subject to Legal Requirements and the OEA, Tenant shall have the right, at Tenant's sole cost and expense, to subdivide the Premises into two (2) or more separate stores, each of which may have its own front entrance and access to the loading docks in the rear of the Premises, as well as separately sub-metered utilities.

8.1.4    Tenant shall have the right to erect and maintain an antenna and a satellite dish on the roof of the Premises, provided that Tenant: (i) obtains Landlord's prior approval of its plans for the installation of such equipment, (ii) uses Landlord's roofing contractor or a contractor designated or approved by Landlord for all roof penetrations so as not to violate or invalidate any roof warranties maintained by Landlord, (iii) maintains the area where roof penetrations are made while Tenant's equipment is present, (iv) repairs any damage to the roof caused by the presence of such equipment, Tenant, or Tenant's contractors on the roof, or the making of the roof penetrations, including, but not limited to, the repair of the roof penetrations upon the removal of any equipment installed thereon, (v) erects and maintains such equipment in accordance with applicable Legal Requirements, and the OEA, and (vi) defends, indemnifies and holds Landlord harmless from and against any claims, costs or expenses incurred by Landlord as a result of Tenant's failure to comply with this Section 8.1.4.

21

8.1.5   Landlord shall execute and return to Tenant all appropriately completed building department or equivalent applications within ten (10) days after Tenant's request therefor, and will reasonably cooperate with Tenant in the permitting process as long as the same is at no cost to Landlord.

8.1.6   If any violation of any applicable Legal Requirement which is noted against the Shopping Center or the Premises (other than a violation caused by Tenant) prevents Tenant from obtaining a building permit for any alterations or a certificate of occupancy, then, upon request by Tenant, Landlord shall promptly and diligently cause such violation to be removed of record to the extent required to permit Tenant to obtain its building permit or certificate of occupancy, as the case may be.

8.1.7   Landlord shall not make any alterations to the Premises (including, without limitation, changing the design, color or materials of the exterior of the Premises) nor shall Landlord construct an additional floor or floors above the Premises.  Landlord shall neither make nor permit to be made any material alterations to the exterior architectural theme of the remainder of the Target District (as shown on Exhibit D-2 hereto) which would be inconsistent with a first-class shopping center in the state in which the Shopping Center is located (exclusive of other tenants' entrance features) without the prior consent of Tenant, which shall not be unreasonably withheld.

8.1.8   Tenant shall have the right to erect and maintain on the roof of the Premises, a passive solar array for the production of electricity (the **"System"**), provided that Tenant: (i) obtains Landlord's prior approval of its plans for the installation of the System, (ii) uses Landlord's roofing contractor or a contractor designated or approved by Landlord for all roof penetrations so as not to violate or invalidate any roof warranties maintained by Landlord, (iii) maintains the area where roof penetrations are made while the System is present, (iv) repairs any damage to the roof caused by the presence of such equipment, Tenant, or Tenant's contractors on the roof, or the making of the roof penetrations, including, but not limited to, the repair of the roof penetrations upon the removal of any component of the System, (v) erects and maintains the System in accordance with applicable Legal Requirements and the OEA, and (vi) defends, indemnifies and holds Landlord harmless from and against any claims, costs or expenses incurred by Landlord as a result of Tenant's failure to comply with this Section 8.1.8.  The System shall be deemed to be part of Tenant's Property  Landlord acknowledges and agrees that Tenant or its Affiliate or transferee shall be the exclusive owner and operator of the System and Landlord shall have no right, title or interest in such equipment or any component thereof, notwithstanding that any such equipment may be physically mounted or adhered to the Premises.  Landlord acknowledges and agrees that, notwithstanding the System's presence as a fixture on the Premises, Tenant or its Affiliate or transferee is the sole and exclusive owner of: (i) the electricity generated by the System, (ii) the environmental attributes of the System, and (iii) any and all credits (including tax credits), rebates, benefits, reductions, offsets, and allowances and entitlements of any kind, howsoever entitled, resulting from the environmental or related attributes of the System.  Without the express written consent of Tenant, Landlord shall not make or publish any public statement or notice regarding any environmental incentive relating to the System or any environmental attribute of the System or the energy output from the System unless required by Legal Requirements.  At the end of the Term, the System shall be removed and repairs shall be made accordingly or ownership of such System shall transfer to Landlord as determined by Landlord.

ARTICLE 9
REPAIRS

Section 9.1   Tenant's Repairs.  Subject to the provisions of Articles 10 and 11 hereof, and except as otherwise provided in this Section 9.1 and Section 9.2 below, Tenant shall maintain in good condition and repair, and replace, at its sole cost and expense: (i) the non-structural, interior elements of the Premises (including plate glass, vestibule, non-structural components of the storefront system, and the electrical, plumbing, mechanical, fire protection systems, emergency management systems, and/or alarm systems located in, and serving exclusively the Premises); (ii) the heating, ventilation and air conditioning ("**HVAC**") units exclusively serving the Premises; provided that until the first (1st) anniversary of the Delivery Date, Landlord shall be responsible for the maintenance, repair and replacement of such HVAC units; (iii) the loading dock area, including without limitation, the compactor pad and trash pad; and (iv) any damage to the Premises or the Shopping Center to the extent caused by the negligence of Tenant, its employees, agents or contractors, or any breach by Tenant of any provision of this Lease.  All repairs and replacements on Tenant's part to be performed hereunder shall be at Tenant's sole cost and expense, and performed in a good and

22

workmanlike manner using licensed contractors, lien free, and in accordance with all applicable Legal Requirements. All repairs and replacements on Tenant's part to be performed hereunder shall be at Tenant's sole cost and expense, performed in a good and workmanlike manner in accordance with all applicable Legal Requirements, and without material interference with or disruption to the normal conduct of any business operations in the Shopping Center. Landlord agrees to assign to Tenant all warranties and guaranties secured by Landlord relating solely to the Premises or Landlord's Work, to the extent the Tenant is responsible therefor pursuant to this Section 9.1 after the first anniversary of the Delivery Date.

Section 9.2    Landlord's Repairs.  Subject to the provisions of Articles 10 and 11 hereof, Landlord shall perform, as the same shall from time to time be necessary, all repairs and replacements to the following:

(a)    the buildings of the Shopping Center as necessary to maintain same in good condition and repair (including, without limitation, repainting the exterior walls of the buildings of the Shopping Center (including, without limitation, the Premises)) as same may be reasonably required from time to time during the Term;

(b)    the structural elements of the Premises, which shall be deemed to include, without limitation, the roof joists, columns, footings, foundation, exterior walls (excluding repainting (which shall be performed by Landlord but included in Common Area Charges), plate glass, storefront windows, doors, door closure devices, window and door frames, molding, locks and hardware, and painting or other treatment of interior walls which shall be the sole obligation of Tenant at Tenant's sole cost), floor (but not the floor covering, unless the same is damaged as a result of a floor defect or settling), and the structural elements of any building of which the Premises may be a part;

(c)    the roof, gutters, flashings, downspouts and scuppers;

(d)    the electric, gas, water, sanitary sewer, and other public utility lines serving the Premises, to the point of connection to the Premises;

(e)    all electric, gas, water, sanitary sewer, and other public utility lines and ducts in or passing through the Premises which do not exclusively serve the Premises; and

(f)    the non-structural elements of the Premises (including, without limitation, the maintenance, repair and replacement of the HVAC units and the electrical, plumbing, mechanical, and/or fire alarm systems located in or serving the Premises) until the first (1st) anniversary of the Delivery Date, and thereafter for such period of time and to the extent any such non-structural elements are covered by any contractors', manufacturers', vendors', or insurers' warranties or guarantees; and

(g)    any damage to the Premises or the Shopping Center which is occasioned by (A) the negligent act or omission of Landlord, its employees, agents or contractors, or (B) any breach by Landlord of any provision of this Lease.

All repairs and replacements on Landlord's part to be performed hereunder shall be at Landlord's sole cost and expense (and not includable in Common Areas Charges), performed in a good and workmanlike manner in accordance with all applicable Legal Requirements, and without material interference with or disruption to the normal conduct of any business operations in the Premises. Landlord shall give Tenant at least five (5) days' prior notice of any repairs or replacements to, or which would otherwise affect the normal conduct of any business operations in, the Premises (except in the case of an emergency posing imminent risk of material harm to persons or property, in which event Landlord shall only be required to give such notice as is reasonable under the circumstances). If, in Tenant's reasonable judgment, Landlord's repairs would materially interfere with or disrupt the normal conduct of any business operations in the Premises, Landlord shall perform such repairs only after the regular hours of operation of Tenant and any other occupant of the Premises (or any portion thereof). In the event Landlord does not reimburse Tenant for any amounts payable to Tenant hereunder within thirty (30) days after Tenant's demand therefor, Tenant shall have the right to offset such amounts against Rent, together with interest thereon at the Lease Interest Rate from the date of outlay until reimbursement or full satisfaction by credit; provided, however, that if there is insufficient time left in the Term for Tenant to offset the full amount due Tenant or if the amount owed is greater than six (6) months of Fixed Rent, then Tenant shall also have any rights and remedies to which it may be entitled under this Lease, at law, or in equity.

23

Section 9.3   <u>Legal Compliance Work</u>.  Except as hereinafter expressly provided, Landlord shall be responsible, at its sole cost and expense (and not includable in Common Areas Charges), for performing all "Legal Compliance Work" (hereinafter defined). Notwithstanding the foregoing, Tenant shall be responsible, at its sole cost and expense, for the performance of Legal Compliance Work: (a) pertaining to the interior elements of the Premises which are neither structural nor comprise the major building systems serving the Premises; or (b) required solely as a result of Tenant's specific manner of use of the Premises (*i.e.*, are not of general applicability to tenants and occupants of the Shopping Center); provided, however, that the foregoing shall not relieve Landlord of its obligations to perform: (x) Landlord's Work in accordance with all Legal Requirements, and (y) the repairs required of Landlord in this Lease. As used herein, "*Legal Compliance Work*" shall mean any obligation, addition, alteration, improvement, or rebuilding, structural or otherwise, to or of the Premises, the Shopping Center, or any part thereof, as applicable, which may be required by reason of any Legal Requirement.

ARTICLE 10
INDEMNIFICATION, INSURANCE AND WAIVER OF SUBROGATION

Section 10.1   <u>Mutual Release, Waiver of Subrogation and Mutual Indemnification.</u>

10.1.1 <u>Mutual Waiver of Claims</u>.  Landlord and Tenant, on their own behalf and on behalf of anyone claiming under or through either one by way of subrogation, hereby release and waive all rights of recovery and causes of action against each other from any and all liability for any loss or damage to property or resulting from damage to such property (and, in either case, any resulting loss of business or rental income), whether caused by the negligence or fault of the other party, which is normally insured under Special Form property insurance (formerly known as "All-Risk") and time element insurance required to be maintained hereunder. In the event either Landlord or Tenant is a self-insurer or maintains a deductible (as either may be permitted hereunder), then the self-insuring party or the party maintaining the deductible hereby releases the other party from any liability arising from any event which would have been covered had the required insurance been obtained and/or the deductible not been maintained.

10.1.2 <u>Waiver of Subrogation</u>.  Landlord and Tenant shall cause each property insurance policy carried by either of them insuring the Premises, the contents thereof, or the Shopping Center, to provide that the insurer waives all rights of recovery by way of subrogation or otherwise against the other party hereto in connection with any loss or damage which is covered by such policy or that such policy shall otherwise permit, and shall not be voided by the releases provided above.

10.1.3 <u>Mutual Indemnification</u>.

(a)     Except as otherwise provided in Subsections 10.1.1 and 10.1.2 above, Tenant covenants to defend and indemnify Landlord and hold Landlord harmless from and against any and all claims, actions, damages, liability and expense, including reasonable attorneys' fees, (x) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon the Premises, or any part thereof, or (y) occasioned wholly or in part by any act or omission of Tenant, its agents, contractors, employees, servants, occupants, or licensees, <u>except</u> to the extent such claims, actions, damages, liability and expense are caused by the acts or omissions of Landlord, its agents, contractors, licensees, employees, or other tenants and occupants, or for which any of said parties may be statutorily liable.

(b)     Except as otherwise provided in Subsections 10.1.1 and 10.1.2 above, Landlord covenants to defend and indemnify Tenant and hold Tenant harmless from and against any and all claims, actions, damages, liability and expense, including reasonable attorneys' fees, (x) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon any portion(s) of the Shopping Center (excluding the Premises), or (y) occasioned wholly or in part by any act or omission of Landlord, its agents, contractors, employees, servants, occupants, tenants (other than Tenant), occupants or licensees, <u>except</u> to the extent such claims, actions, damages, liability and expense are caused by the acts or omissions of Tenant, its agents, contractors, licensees or employees, or for which any of said parties may be statutorily liable.

Section 10.2   <u>Tenant's Insurance.</u>

10.2.1 <u>Tenant's Insurance</u>.  Tenant, at its own cost and expense, shall maintain in full force and effect from and after the Delivery Date and throughout the Term: (i) commercial

24

general liability insurance protecting and insuring Tenant, naming Landlord as "additional insured-lessor" for claims arising out of the use or occupancy of the Premises by Tenant and the obligations assumed by Tenant under this Lease, and having a combined single limit of liability of not less than Ten Million Dollars ($10,000,000) for bodily injury, death and property damage liability; and (ii) Special Form (formerly known as "All-Risk") property insurance, on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of all of Tenant's Property, including without limitation, the Expansion Area and Additional Floor, if applicable. Tenant may carry any of its insurance under "blanket policies" covering the Premises and other locations it or any Affiliate of Tenant owns or leases, provided that: (i) the amount of the total insurance available shall be at least the protection equivalent to separate policies in the amounts herein required, and (ii) in all other respects, any such policy or policies shall comply with the applicable provisions of this Article 10.

10.2.2 Self-Insurance. All insurance required to be maintained under this Section 10.2 may be provided under: (i) an individual policy covering this location; (ii) a blanket policy or policies which includes other liabilities, properties and locations of Tenant or its Affiliates; (iii) a plan of self-insurance, provided that Tenant or any guarantor of Tenant's obligations under this Lease maintains, during the period of such self-insurance, a net worth of at least One Hundred Million Dollars ($100,000,000); or (iv) a combination of any of the foregoing insurance programs. To the extent any deductible is permitted or allowed as a part of any insurance policy carried by Tenant in compliance with this Section 10.2, then Tenant shall be deemed to be covering the amount thereof under an informal plan of self-insurance; provided, however, that in no event shall any deductible exceed Two Hundred Fifty Thousand Dollars ($250,000) unless Tenant complies with the requirements regarding self-insurance pursuant to clause (iii) above.

Section 10.3   Landlord's Insurance.

10.3.1 Liability Insurance. Landlord shall maintain in full force and effect on and after the Effective Date and throughout the Term commercial general liability insurance with regard to the Common Areas protecting and insuring Landlord, naming Tenant as an "additional insured-lessee", and having a combined single limit of liability of not less than Six Million Dollars ($6,000,000) for each occurrence and Seven Million Dollars ($7,000,000) aggregate for bodily injury, death and property damage liability. Landlord shall have the right to carry its insurance under "blanket policies" covering the Shopping Center and other properties provided that: (i) the amount of the total insurance available shall be at least the protection equivalent to separate policies in the amounts herein required, and (ii) in all other respects, any such policy or policies shall comply with the applicable provisions of this Article 10.

10.3.2 Special Form Property Insurance. Landlord shall procure and maintain in full force and effect on and after the Effective Date and throughout the Term, Special Form (formerly known as "All-Risk") property insurance (including loss of rents for a minimum period of one (1) year) and endorsements for coverages for flood, earthquake, windstorm, earth movement [sinkholes], demolition, increased cost of construction and contingent operation of building laws coverages, on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of all of the buildings (including the Premises) and other insurable improvements in the Shopping Center to the extent such improvements are owned by Landlord or Landlord's Affiliate; provided, however, in no event shall such insurance cover Tenant's Property. The foregoing policy shall also have endorsements for coverages for earthquake in the amount of Five Million Dollars ($5,000,000), and demolition, increased cost of construction and contingent operation of building laws coverages in the amount of Two Million Dollars ($2,000,000). All policies required to be maintained by Landlord pursuant to this Subsection 10.3.2 shall provide that any proceeds thereof shall be deposited with Landlord's Mortgagee, or if none, to Landlord, in either event to be held in trust by such party and disbursed only in accordance with the provisions of, and for the purposes set forth in, Section 11.1 hereof. The property insurance required to be maintained by Landlord pursuant to this Section shall not have deductibles exceeding One Hundred Thousand Dollars ($100,000) without Tenant's prior consent.

10.3.3 Tenant's Pro Rata Share of Insurance Premiums. Tenant shall reimburse Landlord for Tenant's Pro Rata Share of the reasonable insurance premiums attributable to the policies required to be maintained by Landlord pursuant to this Section 10.3 as part of Common Areas Charges allocable to the Shopping Center. If the rates for any insurance Landlord is required to carry hereunder are increased as a result of the use or other activity of any other occupant of the Shopping Center, the amount of such increase shall be excluded from Common Areas Charges. To the extent that Landlord receives a dividend, credit, rebate or other return of a premium which had previously been included in Common Areas Charges, Landlord shall

25

promptly refund Tenant's Pro Rata Share of such dividend, credit, rebate, or return to Tenant. Tenant's Pro Rata Share of any insurance premium for any period during the Term which constitutes less than a full calendar year shall be equitably prorated. The provisions of this Subsection 10.3.3 shall survive the expiration or earlier termination of this Lease.

Section 10.4   Underline General Insurance Requirements.

10.4.1 All insurance required to be maintained by the parties under this Lease shall be maintained with insurance companies qualified to do business in the state in which the Shopping Center is located, and rated at least A-/VIII by the most current Best's Key Rating Guide (or its equivalent, if such Guide ceases to be published). Each party shall use its diligent efforts to have its insurers provide thirty (30) days [ten (10) days in the event of non-payment of premium] prior notice to the other party of cancellation or non-renewal of any policy required hereunder. Each party shall provide to the other duly executed certificates evidencing the insurance coverage described in Sections 10.2.1 and 10.3 above.

10.4.2 The liability insurance requirements under Sections 10.2 and 10.3 above shall be reviewed by Landlord and Tenant every five (5) years for the purpose of mutually increasing (in consultation with their respective insurance advisors) the minimum limits of such insurance to limits which shall be reasonable and customary for similar facilities of like size and operation in accordance with generally accepted insurance industry standards. The replacement value of the buildings and other insurable improvements constituting the Shopping Center shall be re-evaluated from time to time at the request of either Landlord or Tenant.

ARTICLE 11
FIRE AND OTHER CASUALTY; EMINENT DOMAIN

Section 11.1   Fire and Other Casualty.

11.1.1 (a)     Except as otherwise provided in this Section 11.1, if all or a portion of the Premises, the Common Areas (including all improvements thereto) of the Target District or other buildings in the Target District (except for the Target building and the Scheels building) shall be damaged by fire or other casualty, Landlord shall promptly rebuild and restore the same to the condition existing immediately prior to such fire or other casualty, which restoration shall include all Tenant's Work and all other leasehold improvements performed by Tenant, and shall not include any of Tenant's Property. The proceeds of the policies required to be obtained and maintained by Landlord pursuant to Subsection 10.3.2 hereof shall, to the extent necessary, be used for the performance of such rebuilding and restoration work. In the event such insurance proceeds are insufficient to complete such work, Landlord shall provide the balance of the amount necessary to rebuild or restore the Premises plus at least 150,000 square feet of contiguous Floor Area in the in-line portion of the Target District in the manner provided in this Section 11.1. Landlord shall give Tenant at least ninety (90) days' prior notice of the date on which the restoration work to the Premises will be Substantially Completed.

(b)     Notwithstanding the foregoing, if any portion of the Premises are so damaged or destroyed, Tenant shall have the right to require Landlord to make changes to the Premises in the course of, and as part of, such rebuilding or restoration work. If the net cost and expense of such rebuilding or restoration work is increased solely as a result of such changes (taking into consideration any and all actual reduced and additional costs resulting from such changes and/or other cost savings arising therefrom), then Tenant shall pay to Landlord, as Additional Rent, the amount of such net increase, which amount shall be due and payable within thirty (30) days after Landlord has delivered to Tenant backup information evidencing such increase (including, without limitation, receipted invoices) as may be reasonably required by Tenant (but in no event earlier than the occurrence of the date on which possession of the restored areas of the Premises are delivered to Tenant). To the extent that Landlord's substantial completion of such rebuilding or restoration work is delayed solely as a result of such changes (taking into consideration any and all reasonable time savings to Landlord resulting from such changes), then the applicable period(s) specified in Section 11.1.2 below shall be appropriately adjusted to the extent of such net delay.

(c)     If, in Tenant's reasonable judgment, any damage to the Premises renders all or any portion of the Premises unusable for the conduct of Tenant's business for the Permitted Use or, in the case of damage to the Target District, materially interferes with the normal conduct of any business operations in the Premises, the Rent shall be equitably reduced or totally abated based upon the extent to which the remaining portion of the Premises may, in

26

Tenant's reasonable judgment, be utilized for its normal conduct of business for the Permitted Use.

11.1.2 In the event that:

(a)  Landlord does not commence the repair and restoration work to the Premises, the Common Areas of the Target District, or other buildings in the Target District as required pursuant to this Section 11.1 within ninety (90) days after the date of such destruction, or thereafter fails to diligently pursue the completion of such repair and restoration work (subject to such period as may be reasonably necessary for the adjustment of insurance proceeds, not to exceed thirty (30) days in the aggregate); or

(b)  the required repairs and restorations to the Premises, the Common Areas of the Target District, or other buildings in the Target District are not Substantially Completed by Landlord in accordance with the provisions of this Section 11.1 within one (1) year after the date of destruction (which period may be extended by reason of an event of *Force Majeure*, not to exceed sixty (60) days in the aggregate, or any Tenant Delays, provided that, in either case, Landlord shall have given Tenant notice thereof promptly after its occurrence),

then, in either of such events, Tenant shall have the right, at its sole discretion and option, to:

(i)  after giving thirty (30) days' prior notice to Landlord (and Landlord's continued failure to commence and diligently pursue such repairs and restoration work to completion), perform or complete, as the case may be, said work (or any portion thereof) on Landlord's behalf and at the sole cost of Landlord, which cost Landlord shall pay to Tenant during the course of such repairs within ten (10) days after Tenant's delivery to Landlord of an invoice therefor and, in default of any such payment, Tenant shall have the right to offset the amount thereof, together with interest at the Lease Interest Rate, against the Rent next accruing hereunder (it being agreed, without limiting the foregoing provisions of this Subsection 11.1.2, that at Tenant's election all applicable insurance proceeds with respect to such work performed by Tenant that is paid or payable to Landlord or Landlord's Mortgagee pursuant to Subsection 10.3 hereof shall be paid (or, as applicable, in turn delivered) directly to Tenant, to be applied to such work by Tenant as same is being performed); or

(ii)  seek to obtain specific performance of Landlord's repair and restoration obligations pursuant to the laws of the state in which the Shopping Center is located; or

(iii)  terminate this Lease by thirty (30) days' notice to Landlord.

In addition to the foregoing, if, in the opinion of an independent licensed architect reasonably designated by Tenant (and reasonably acceptable to Landlord), which opinion must be presented to Landlord within sixty (60) days after the date of such damage or destruction, the required repairs and restorations to the Premises, the Common Areas of the Target District or other buildings in the Target District cannot be completed by Landlord in accordance with the provisions of this Section 11.1 within one (1) year after the date of destruction, Tenant shall have the right, at its sole discretion and option, to terminate this Lease by giving Landlord at least thirty (30) days' notice thereof, given within thirty (30) days after such architect's determination.

11.1.3 If the Premises are substantially destroyed by fire or other casualty during the last two (2) years of the Term to the extent of more than one-third (1/3) of the Floor Area thereof, Landlord or Tenant shall each have the right to terminate this Lease as of the date of such damage or destruction by giving notice within thirty (30) days following such damage or destruction, but Tenant may negate any termination by Landlord by agreeing to extend the Term for an additional five (5) year period by exercising an option pursuant to Subsection 2.2.2 hereof, if available, within ten (10) days after receipt of the termination notice from Landlord.

Section 11.2  <u>Eminent Domain.</u>

11.2.1 As used in this Section 11.2, "*Taking*" or "*Taken*" shall mean a taking for any public or quasi-public use by any lawful power or authority by exercise of the right of condemnation or eminent domain or by agreement between Landlord and those having the authority to exercise such right.

27

11.2.2 If all of the Premises shall be Taken, this Lease shall terminate as of the date of vesting of title or transfer of possession, whichever is earlier, without further liability on the part of either Landlord or Tenant, except for an adjustment between the parties for the Rent payable by Tenant hereunder.

11.2.3 In the event that:

(a)    any portion of the Premises shall be Taken so that it is commercially unreasonable or unfeasible for Tenant, in its reasonable judgment, to conduct its normal business in the Premises;

(b)    as a consequence of any Taking: (i) portions of the Target District shall be divided or separated in any manner that it materially interferes with parking, visibility, or access to the Premises from other portions of the Target District, or (ii) the Shopping Center no longer has an entrance from both East North Street and Lacrosse Street, and as a result, it is not commercially reasonable or feasible for Tenant, in its reasonable judgment, to conduct its normal business in the Premises;

(c)    there occurs, in Tenant's reasonable judgment, a denial of adequate access to the Target District at the grade of any street adjoining the Target District or to any easement granted under this Lease, whether or not a Taking shall have occurred;

(d)    any portion of the Target District shall be Taken which materially interferes with parking, visibility or access to the Premises, and as a result of such taking it is commercially unreasonable or unfeasible for Tenant, in its reasonable judgment, to conduct its normal business in the Premises;

(e)    more than twenty-five (25%) percent of the total Floor Area of all of the buildings in the Target District (other than the Premises) are Taken; or

(f)    five (5%) percent or more of the parking spaces located in the Shopping Center are Taken, or if so many of the parking spaces in the Shopping Center are Taken such that there are fewer than (i) four and one-half (4.5) parking spaces for every one thousand (1,000) square feet of Floor Area in the Target District, or (ii) the number of parking spaces required by applicable Legal Requirements;

then, in any of such events, Tenant shall have the right to terminate this Lease by giving at least sixty (60) days' prior notice to Landlord within sixty (60) days of any such event, in which event this Lease shall terminate without any further liability on the part of either Landlord or Tenant, except for an adjustment between the parties for the Rent payable by Tenant hereunder and for payment to Tenant for its share of the award for the taking pursuant to Subsection 11.2.5 below. Upon any partial Taking of the Premises, the Rent shall be equitably reduced or totally abated based upon the extent to which the remaining portion of the Premises may, in Tenant's reasonable judgment, be utilized for its normal conduct of business.

11.2.4 If this Lease is not terminated pursuant to this Section 11.2, Landlord, at its sole cost and expense, within a reasonable period of time after such Taking, shall repair and restore the area not so Taken to tenantable condition, similar in physical appearance to the condition of the area immediately prior to the Taking, pursuant to plans and specifications approved by Tenant (which repair and restoration shall, as applicable, include all Tenant's Work and all other leasehold improvements performed by Tenant; provided, however, that Landlord shall not be obligated to repair or restore Tenant's Property, including without limitation, the Expansion Area and the Additional Floor, if applicable), and any and all amounts awarded to Landlord for any Taking shall be made available to and used by Landlord for any rebuilding or restoration which it is required to perform hereunder. During the period of such repairs and restoration, all Rent shall abate to the extent that the Premises may not, in Tenant's reasonable judgment, be used by Tenant for the normal conduct of its business. Such abatement shall terminate in accordance with the terms of Section 11.3 below. Landlord shall give Tenant at least ninety (90) days' prior notice of the date on which the restoration work to the Premises will be Substantially Completed.

11.2.5 In connection with any Taking or partial Taking of the Premises, Tenant shall be entitled to claim an award for loss of business, fixtures and equipment and removal and reinstallation costs; provided, however, that no award shall be payable to Tenant which reduces the award payable to Landlord for its fee interest in the Premises and the Shopping Center.

28

11.2.6 Any dispute between the parties with respect to this Section 11.2 shall be resolved by arbitration in accordance with the provisions of Section 16.3 below.

Section 11.3  Abatement of Rent Charges.  Notwithstanding any other provisions of this Lease, if the Fixed Rent and Additional Rent payable by Tenant hereunder shall be abated pursuant to Sections 11.1 or 11.2 above, such abatement shall terminate upon the first to occur of: (a) the date on which Tenant shall reopen the Premises to the general public for business; or (b) the expiration of the period which is sixty (60) days after Landlord shall have completed such repairs and restoration work as Landlord is obligated to perform hereunder and the interference with the operation of business in the Premises has ceased.

ARTICLE 12
COVENANTS, REPRESENTATIONS AND WARRANTIES

Section 12.1  Quiet Enjoyment.  Tenant shall peaceably and quietly have, hold, occupy and enjoy the Premises for the Term, without hindrance from Landlord or any party claiming by, through, or under Landlord. Tenant acknowledges that this Section 12.1 shall not limit Landlord's rights and remedies if there shall be an Event of Default on the part of Tenant.

Section 12.2  Authority.  Tenant and Landlord each warrant and represent that the person(s) signing this Lease on their behalf has authority to enter into this Lease and to bind Tenant and Landlord, respectively, to the terms, covenants and conditions contained herein. The submission of this Lease to each party hereto shall be for examination and negotiation purposes only, and does not and shall not constitute a reservation of or an obligation of Tenant to lease, or otherwise create any interest of Tenant in, the Premises or any other premises situated in the Shopping Center unless and until the Lease is fully executed and delivered by Tenant and Landlord.

Section 12.3  Landlord's Covenants, Warranties and Representations.  To induce Tenant to execute this Lease, and in consideration thereof, Landlord covenants, warrants and represents to Tenant subject to the OEA as follows:

(a)  As of the Effective Date, Landlord has, and as of the Delivery Date Landlord shall have, good and marketable fee simple title to the entire Shopping Center (excluding the Target Parcel and the Sam's Parcel and Outparcel #13 as shown on Exhibit B), free and clear of all easements, restrictions, liens, encumbrances, leases and the like, except for the encumbrances described on Exhibit E hereto and the three (3) mechanics liens heretofore disclosed by Landlord to Tenant, which have been collateralized in an escrow account held by First American Title Company; provided, however, Landlord may encumber the Shopping Center with utility easements and other encumbrances in connection with Landlord's development of the Shopping Center so long as each such easement and encumbrance (x) is not in violation of any of the other terms of this Lease or the OEA, and (y) shall not materially interfere with or prevent Tenant from operating its business in accordance with the Lease or impose any obligations on Tenant in excess of those set forth in this lease;;

(b)  In the event the legal description of the Shopping Center described in Exhibit A hereto indicates that the Shopping Center is composed of more than one parcel or lot, Landlord represents to the best of its knowledge that there exist no strips or gores between such parcels or lots which are not owned by Landlord or otherwise subject to the OEA;

(c)  No third party consents or approvals are required in order for Landlord to enter into this Lease, or for the performance of Landlord's Work and Tenant's Work (excluding, as of the Effective Date, governmental permits and approvals);

(d)  Subject to Section 13.3, Tenant's use of the Premises for sale of "Permitted Items" (defined in Section 1.1.27 above) will not violate any exclusive provision or prohibited use restriction granted to any other tenant or occupant in the Shopping Center;

(e)  The Shopping Center now has, and, on the Delivery Date, shall have, access to and from East North Street and Lacrosse Street via Eglin Street, as shown on Exhibit B hereto, for the passage of vehicular traffic;

(f)  Subject to Tenant's compliance with the Prohibited Uses, Existing Exclusives, the OEA and Legal Requirements, this Lease does not violate the provisions of any instrument heretofore executed and/or binding on Landlord, or affecting or encumbering the Shopping Center, or the Premises, and no rights granted by Landlord to Tenant under the terms

29

1   of this Lease conflict with any rights granted by Landlord to any other tenant or occupant in the
2   Shopping Center (including, without limitation, any rights of first offer or first refusal or the like);

3          (g)    Subject to Legal Requirements, there shall be no restrictions or
4   other legal impediments imposed by any public or private instrument which would prevent: (i)
5   the use of the Premises for the Permitted Use; (ii) the use of the parking facilities, access roads,
6   and other Common Areas in the manner contemplated by this Lease; or (iii) the performance of
7   Tenant's Work;

8          (h)    As of the Effective Date, there are no sign ordinances, restrictive
9   covenants, uniform sign plans or other signage restrictions which would prevent the Premises
10   from having the signage (including, without limitation, the square foot area and size of letters) as
11   depicted on Exhibit D-1 and Exhibit F hereof;

12          (i)    Landlord shall promptly execute any recordable instrument
13   reasonably requested by Tenant which memorializes the provisions of this Lease pertaining to
14   or otherwise affecting Related Land;

15          (j)    Attached hereto as Exhibit K-2 is a complete list of all fully
16   executed and delivered leases in effect on the Effective Date with respect to the Shopping
17   Center (the "*Existing Leases*") and Landlord represents to Tenant that all leases executed on
18   or after the date hereof shall be bound by Tenant's exclusive use provision as set forth in
19   Section 13.2.1 below; and

20          (k)    Landlord shall endeavor to promptly forward to Tenant any notice
21   or other communication received by Landlord from any owner of property adjoining or adjacent
22   to the Shopping Center or from any municipal or other governmental authority, in connection
23   with any hearing or other administrative proceeding relating to any proposed zoning, building
24   code, signage, or related variance affecting the Shopping Center or any adjoining or adjacent
25   property, which, if granted, could materially adversely affect Tenant's use or occupancy of the
26   Premises, the conduct of Tenant's business therein, or Tenant's rights and benefits under this
27   Lease. Landlord, at its sole cost and expense, shall appear in such proceeding and shall
28   contest such proposed variance. If Landlord fails so to appear and contest such proposed
29   variance after receiving ten (10) days' notice from Tenant (or such shorter notice as may be
30   practicable under the circumstances), then Tenant shall be entitled (but shall not be obligated
31   to), in its own name and/or in the name of Landlord, to appear in such proceeding, in which
32   event Landlord shall fully cooperate with Tenant, provide such information, and execute any
33   documents or other instruments as Tenant may reasonably request in connection with any such
34   proceeding.

35          Section 12.4    Environmental Matters.

36              12.4.1 Definitions.

37          (a)    As used herein, the term "*Environmental Laws*" shall mean any
38   and all Legal Requirements concerning the protection of the environment, human health or
39   safety.

40          (b)    As used herein, the term "*Hazardous Substances*" shall mean
41   each and every element, compound, material, mixture, substance, waste, hazardous substance,
42   hazardous waste, hazardous material, toxic substance, pollutant or contaminant either as those
43   terms are defined in any of the Environmental Laws or the presence of which may cause liability
44   at common law, including, without limitation, asbestos and/or asbestos-containing products,
45   whether or not currently friable.

46          (c)    As used herein, the term "*Environmental Notice*" shall mean a
47   summons, citation, directive, order, claim, notice, litigation, investigation, judgment, legal
48   pleading, letter or other communication, written or oral, actual or threatened, from the United
49   States Environmental Protection Agency or other federal, state or local governmental agency or
50   authority, or any other private individual or entity concerning (i) any Hazardous Substances at,
51   on, in, under or emanating from the Premises, the Shopping Center or any contiguous property;
52   (ii) any violation or potential violation of Environmental Laws at the Premises, the Shopping
53   Center or any contiguous property; or (iii) any underground storage tanks on the Premises or
54   the Shopping Center.

55          (d)    As used herein, the term "*Releasing*" or "*Release*" shall mean
56   releasing, spilling, leaking, discharging, disposing or dumping or otherwise introducing any

30

substance into the environment or into any building or other improvements in violation of Environmental Laws.

(e)    As used herein, the term "**Compliance Costs**" shall mean any and all costs incurred by a party in complying with applicable Environmental Laws, including, without limitation, consultant's and engineer's fees; laboratory costs; contractor's and subcontractor's fees; application and filing fees; costs of investigation, monitoring or cleanup of soil or other substrate, surface water, groundwater, or buildings or other improvements; equipment costs; disposal fees; costs of operation and maintenance of equipment; legal fees; other governmental fees or costs; interest at the Lease Interest Rate from the date of expenditure until paid in full; and other similar or related costs.

(f)    As used herein, the term "**Tenant Related Parties**" shall mean Tenant's agents, servants, employees, contractors or licensees.

12.4.2 <u>Compliance with Environmental Laws</u>.  Tenant shall comply with all applicable requirements of Environmental Laws governing its use of, and operations at, the Shopping Center and the Premises.  Landlord shall comply or cause compliance with all applicable requirements of Environmental Laws relating to the portions of the Shopping Center owned or controlled by Landlord and/or its Affiliates and the Premises, except to the extent such requirements arise from Tenant's operations thereon.

12.4.3 <u>Responsibility for Releases of Hazardous Substances</u>.  Notwithstanding any other provision of this Lease, Tenant shall only be liable for any Release of Hazardous Substances at, on, in, under or emanating from the Premises or Shopping Center which were introduced by Tenant or Tenant Related Parties (hereinafter "**Tenant Releases**"), including, without limitation, any Compliance Costs required to address Tenant Releases.  Landlord shall be liable for any Hazardous Substances at, on, in, under or emanating from the Premises or Shopping Center, including, without limitation, any Compliance Costs attributable to such Hazardous Substances, unless the Hazardous Substances are caused by Tenant Releases.  Except in the event of an emergency or if compelled by applicable governmental authority, any work performed by Landlord relating to Hazardous Substances shall be performed by Landlord at any time other than during the months of November and December, and shall be undertaken in such a manner so as to (i) not adversely affect ingress to or egress from the Shopping Center, (ii) have no material adverse effect on the visibility of the Premises or any signs which contain Tenant's name, and (iii) not otherwise materially interfere with the normal conduct of any business operations in the Premises.  If the presence of Hazardous Substances, or Landlord's remediative work relative thereto, materially interferes with Tenant's normal business operations in the Premises, then Tenant shall be entitled to an equitable abatement of Rent for so long as such condition persists.

12.4.4 <u>Standards</u>.  Except as expressly provided herein, the parties agree that any investigation or remediation of Hazardous Substances, or cure of a violation of Environmental Laws, required to be conducted at the Premises or Shopping Center shall be no more stringent than necessary to meet the minimum standards of Environmental Laws applicable to properties used in the manner the Shopping Center is being used.

12.4.5 <u>Landlord's Representations and Warranties</u>.  Except as disclosed in the environmental report dated July 31, 2006 prepared by Environmental Data Resources, Inc. and the Update Phase I Environmental Site Assessment dated September 18, 2006 prepared by American Engineering Testing, Inc., Landlord represents and warrants that: (i) Landlord has received no Environmental Notices concerning the Shopping Center, the Premises or any contiguous properties; (ii) Landlord has no knowledge of, and has received no notice of, any violation, or potential or alleged violation, of any Legal Requirement, including, without limitation, Environmental Laws, affecting the Shopping Center, the Premises or any contiguous properties, regardless of whether same has been cured; and (iii) to the best of Landlord's knowledge: (A) no Hazardous Substances are located at, on, in, under or emanating from the Shopping Center, the Premises or any contiguous properties in amounts which require corrective action under any Environmental Laws; and (B) no underground storage tank exists at the Shopping Center or the Premises.  The foregoing representations and warranties shall in no way serve to vitiate Landlord's obligations under this Article 12.

12.4.6 <u>Documents</u>.  Each party shall immediately notify the other party of the notifying party's receipt of an Environmental Notice.

12.4.7 <u>Indemnity</u>.  Each party to this Lease shall indemnify, defend and hold the other party, and its agents, servants, shareholders, directors, officers, partners, members and

employees harmless from any and all claims, losses, expenses, costs, lawsuits, actions, administrative proceedings, damage, orders, judgments, penalties and liabilities of any nature whatsoever, including, without limitation, reasonable attorneys' fees (incurred to enforce this indemnity or for any other purpose) and Compliance Costs, arising from (i) the indemnifying party's breach of any of its representations, warranties, covenants or other obligations under this Section 12.4; (ii) Hazardous Substances for which the indemnifying party is liable under this Section 12.4; or (iii) violations of Environmental Laws for which the indemnifying party is liable under this Section 12.4.

12.4.8 <u>Survival</u>. The obligations of the parties under this Section 12.4 shall survive the renewal, expiration, breach or earlier termination of this Lease.

12.4.9 <u>Conflict</u>. In the event of any conflict between the provisions of this Section 12.4 and any other provision of this Lease, the provisions of this Section 12.4 shall control.

Section 12.5   <u>OEA.</u>

12.5.1 As used in this Lease, the term "***OEA***" shall mean that certain Operation and Easement Agreement between Target Corporation and Landlord, dated as of October 25, 2007 and recorded on October 25, 2007 in Book 174, Page 4290 in the Office of the Pennington County, South Dakota Register of Deeds (the "***Clerk's Office***") as amended by that certain First Amendment to Operation and Easement Agreement by and between Target Corporation and Landlord, dated as of December 21, 2009 and recorded on December 22, 2009 in Book 195, Page 7087 in the Clerk's Office.

12.5.2 Landlord covenants, represents and warrants to Tenant that: (i) the OEA has not been modified, amended or terminated; (ii) the OEA is currently in full force and effect; (iii) to its actual knowledge as of the date hereof, no default under the OEA exists thereunder beyond any applicable notice and cure period; and (iv) the OEA is, and shall remain, superior in lien to all mortgages and related assignments of rents and leases, and UCC financing statements affecting the Shopping Center and all other land which is encumbered by the OEA, if any.  Landlord and Tenant each acknowledge that this Lease is made and shall continue to be subject and subordinate to the OEA, subject to the provisions of this Section 12.5.  Tenant shall comply with the terms and conditions of the OEA to the extent same affects the Premises (it being agreed that Tenant shall not be obligated to expend any sums in connection with such compliance except as otherwise expressly set forth in this Lease).

12.5.3 Landlord shall, during the Term: (i) perform and observe all of the terms, covenants, provisions and conditions of the OEA on Landlord's part to be performed and observed; (ii) defend, indemnify and hold harmless Tenant from and against any and all claims, demands, causes of action, suits, damages, liabilities, and expenses of any nature arising out of or in connection with the enforcement of, or a claimed breach by, Landlord of any covenant, term, condition, or provision of the OEA unless same results from an act or omission of Tenant; and (iii) diligently enforce, at its sole expense, the covenants, agreements, and obligations of the OEA.

12.5.4 Whenever, pursuant to the OEA, the consent or approval of Landlord shall be required by or requested, and such consent or approval could materially diminish the rights or materially increase the obligations of Tenant thereunder or under this Lease, or could materially adversely affect Tenant's use or occupancy of the Premises, or the conduct of Tenant's business therein for the Permitted Use, such consent or approval shall not be granted without the prior consent of Tenant, which consent may be withheld in its sole and absolute discretion.

12.5.5 Landlord shall, promptly upon receipt, forward to Tenant and Tenant's leasehold mortgagee, if any, and if a notice address of such leasehold mortgagee is provided to Landlord, a copy of any and all notices and/or demands received by Landlord under or pursuant to the OEA, which could materially adversely affect, Tenant's use or occupancy of the Premises, the conduct of Tenant's business therein for the Permitted Use, or Tenant's rights pursuant to this Lease.

12.5.6 Landlord shall not amend, or modify the OEA if such amendment or modification could materially diminish the rights or materially increase the obligations of Tenant thereunder or under this Lease, or could materially adversely affect Tenant's use or occupancy of the Premises or the conduct of Tenant's business therein for the Permitted Use, nor shall Landlord terminate the OEA.

32

12.5.7  In the event Landlord defaults in the performance of any of its obligations under the OEA or fails to enforce the obligations of any other obligee under the OEA, and such default or failure to enforce could materially adversely affect Tenant's rights thereunder or under this Lease, Tenant's Work, Tenant's use or occupancy of the Premises or the conduct of Tenant's business therein for the Permitted Use, Tenant may, but shall not be obligated to, after thirty (30) days written notice (except in the event of emergency, in which case only notice as is reasonable under the circumstances shall be required) and the failure of Landlord to commence to cure such default within such thirty (30) day period and diligently pursue such remedy thereafter, cure any default by Landlord under the OEA and/or enforce, in its own name, at Landlord's expense, the obligations of any other obligee under the OEA.  Landlord shall, upon demand, reimburse Tenant for the actual and reasonable out-of-pocket costs incurred by Tenant in performing any of Landlord's obligations under the OEA or enforcing the obligations of any obligee under the OEA as permitted herein, together with interest thereon at the Lease Interest Rate, and failing such reimbursement, Tenant shall have the right, upon ten (10) days' prior notice to Landlord, to offset such costs from the next succeeding payment or payments of any Rent due hereunder, together with interest thereon at the Lease Interest Rate from the date of outlay until reimbursement or full satisfaction by credit; provided, however, that if there is insufficient time left in the Term for Tenant to offset the full amount due Tenant or if the amount owed is greater than six (6) months of Fixed Rent, then Tenant shall also have any rights and remedies to which it may be entitled under this Lease, at law, or in equity.

12.5.8  As between Landlord and Tenant, in the event of any conflict between the OEA and this Lease, this Lease shall in all respects control.  Without limiting the generality of the foregoing, if the Lease contains restrictions which are more burdensome on Landlord and Tenant than the OEA (such as by way of example only, if this Lease prohibits billiard parlors but the OEA does not), then Landlord and Tenant shall be bound by the more restrictive provisions of this Lease as same relates to the Shopping Center.  Further, if this Lease contains greater rights on the part of Tenant than are granted under the OEA (such as, by way of example only, if Tenant is permitted to make certain exterior alterations without Landlord's consent but the OEA require the consent of the Approving Parties), then, notwithstanding that Tenant may not be able to exercise such rights without obtaining an approval under the OEA, Landlord, by virtue of granting Tenant such right under this Lease, shall be deemed to have consented to same.

12.5.9  Landlord shall obtain any third-party approvals required under the OEA for the performance of Landlord's Work (including, without limitation, Tenant's elevations and signage, as shown on Exhibit D-1 and Exhibit F hereto), Tenant's Work, and the operation of Tenant's business in the Premises.

12.5.10    Landlord hereby warrants, covenants and represents to Tenant that Landlord shall not assign its rights as an "Approving Party" under the OEA separate and apart from its interest as Landlord under this Lease.  Landlord further warrants, covenants and represents to Tenant that any assignment of its rights as an Approving Party under the OEA shall be set forth in a written instrument.

ARTICLE 13
USES AND RESTRICTIONS

Section 13.1  Permitted and Prohibited Uses.

13.1.1  Tenant's Permitted Use.  The Premises may be used and occupied for the Permitted Use (defined in Subsection 1.1.27 above).  Tenant shall not use the Premises for any of the "Prohibited Uses" (defined in Exhibit M hereto annexed) or the "Existing Exclusives" (hereinafter defined in Subsection 13.3.1), to the extent then applicable.

13.1.2  Prohibited Uses.  Landlord shall construct, lease, operate, maintain and manage the Shopping Center as a first-class shopping center comparable to other first-class shopping centers in the state in which the Shopping Center is located.  Landlord shall not lease, rent or occupy or permit to be occupied any portion of the Shopping Center for any of the "Prohibited Uses" (as set forth in Exhibit M hereto annexed).

Section 13.2  Tenant's Exclusive in Center.  To induce Tenant to execute this Lease, and subject to all of the terms and provisions of this Section 13.2, Landlord covenants and agrees as follows.

13.2.1  Landlord shall not lease, rent or occupy or permit any other premises in the Shopping Center or on any Related Land (hereinafter defined) to be occupied, whether by a

33

tenant, sublessee, assignee, licensee or other occupant or itself, for the sale, rental or distribution, at retail or at wholesale, either singly or in any combination, of items contained in any of the following respective categories of merchandise: (a) linens and domestics, such as, but not limited to, towels and pillows; (b) bathroom items, such as, but not limited to, shower curtains and toilet bowl brushes (excluding plumbing hardware); (c) housewares, such as, but not limited to, kitchen utensils and dishware (excluding furniture and major appliances); (d) frames and wall art (provided that a fine art gallery shall not be precluded); (e) window treatments; and/or (f) closet, shelving and storage items (which items, either singly or in any combination, are hereinafter referred to as the *"Exclusive Items"*). Notwithstanding the foregoing, any tenant, subtenant, assignee, licensee or other occupant in the Shopping Center or the Related Land shall have the right to utilize its respective premises for the sale, rental and/or distribution of Exclusive Items within an aggregate area (which shall include an allocable portion of the aisle space adjacent to such sales, rental and/or distribution area) not to exceed the lesser of (x) fifteen percent (15%) of the Floor Area of such tenant's, subtenant's, assignee's, licensee's or other occupant's premises, or (y) three thousand five hundred (3,500) square feet of Floor Area within such tenant's, subtenant's, assignee's, licensee's or other occupant's premises. [For example, only, and not by way of limitation, a tenant occupying premises containing a total of five thousand (5,000) square feet of Floor Area could sell Exclusive Items (either singly or in any combination) so long as the <u>aggregate</u> area within its entire demised premises in which any and all Exclusive Items are sold shall not exceed seven hundred fifty (750) square feet.] As used in this Lease, the term *"Related Land"* shall mean any land contiguous or adjacent to the Shopping Center (including, without limitation, any land that would be contiguous or adjacent to the Shopping Center but for any intervening road, street, alley or highway) owned or controlled by Landlord or its Affiliate(s). As to any future Related Land, the foregoing restrictions shall not apply to the extent that any Exclusive Items are otherwise permitted under leases entered into prior to the date on which such land became Related Land.

13.2.2  The restrictions set forth in Subsection 13.2.1 above shall not apply to a: (i) department store [for example, only, and not by way of limitation, Wal-Mart, J.C. Penney, Macy's, Dillard's or Target], (ii) discount club [for example, only, and not by way of limitation, Costco, BJ's Wholesale Club, or Sam's Club], (iii) home improvement center [for example, only, and not by way of limitation, Home Depot or Lowe's], or (iv) supermarkets (as otherwise may be permitted under <u>Exhibit M</u>), commonly located in first-class shopping centers in the state in South Dakota, North Dakota, Wyoming, Montana or Colorado, as such stores are operated as of the Effective Date, each occupying at least 60,000 square feet of Floor Area within the Shopping Center.  The restrictions set forth in Subsection 13.2.1 above also shall not apply to: (i) Existing Leases, (ii) any tenant or occupant under an Existing Lease who, having the right to do so (without amending its lease or occupancy agreement or obtaining Landlord's consent), changes its current use and operates a competing use, (iii) the Target Parcel or the Sam's Parcel unless owned by Landlord or Affiliate of Landlord; (iv) specialty stores of less than 3,000 square feet, and (v)  furniture stores, such as Ethan Allen or Conlins.  In addition, Tenant agrees that if Landlord enters into a lease or other occupancy agreement within one (1) year after the Effective Date with any retailer with whom Tenant has a written agreement to modify the restrictions set forth in Subsection 13.2.1 above (such as, by way of example only, and not by way of limitation, Michaels, Pier One and Ross), then, upon Landlord's request, with respect to any such retailer, Tenant shall execute and deliver an agreement modifying the restrictions set forth in Subsection 13.2.1 above in the form used by Tenant with respect to such retailer.

13.2.3  The exclusive rights granted to Tenant in this Section 13.2 shall inure to the benefit of any assignee of Tenant's interest in this Lease and to any sublessee of at least fifty percent (50%) of the Floor Area of the Premises as long as such assignee or sublessee dedicates fifty percent (50%) or more of its Floor Area for the sale of one or more of the Exclusive Items.

13.2.4  (a)       Upon breach of the aforesaid covenant and agreement by Landlord (which breach shall not include a situation in which the lease or occupancy agreement between Landlord and any tenant or occupant in the Shopping Center or in the Related Land prohibits the tenant or occupant therein from violating the exclusive rights granted to Tenant in this Section 13.2 and despite such prohibition, such tenant or occupant violates such exclusive rights, unless Landlord fails to comply with any of the provisions of subparagraph (b) below), the Rent payable hereunder shall be reduced by fifty percent (50%) for so long as such violation shall continue, and Tenant shall have all remedies given to it at law and in equity, including, without limitation, the right to obtain injunctive relief, and/or to terminate this Lease, and/or to commence and prosecute an action against Landlord or any other violator for damages.

DMEAST #10098913 v6

(b)    If any person or entity other than Landlord shall violate any of the exclusive provisions herein set forth, or shall indicate in writing to Landlord that it intends to violate any of said provisions, Landlord shall promptly commence appropriate legal proceedings, and diligently prosecute the same, to enjoin and prohibit any such violation. If Landlord fails to promptly commence such proceedings, or shall fail thereafter to diligently prosecute the same, then Tenant shall have the right (a) to conduct and prosecute such legal proceedings (including, without limitation, an action for injunctive relief) in its own name, at Landlord's reasonable and actual third party expense, or (b) in the event the right set forth in (a) above is not permitted to be exercised under applicable Legal Requirements, to conduct and prosecute such legal proceedings in the name of Landlord, at Landlord's reasonable and actual third party expense, and Landlord shall cooperate with Tenant with respect to such prosecution (including, without limitation, by executing any documentation or authorization reasonably required by Tenant in connection with such prosecution and by appearing at any hearing or trial with respect to such prosecution).

13.2.5    Simultaneously with the execution and delivery of this Lease, Landlord shall execute and record, or cause to be executed and recorded, a Declaration of Restrictions substantially the form attached hereto as Exhibit O, against all Related Land existing as of the Effective Date and shall have obtained the consent or made reasonable efforts to obtain the consent to the Declaration of Restrictions from the holders of all mortgages, deeds of trust and other liens affecting the Related Land.

Section 13.3    Exclusives Which Tenant Must Honor.

13.3.1 Tenant shall honor certain exclusives granted by Landlord to certain other tenants or occupants in the Shopping Center pursuant to the terms of leases which have been executed prior to the Effective Date (hereinafter, **"Existing Exclusives"**) [a true and complete listing and description of such Existing Exclusives being attached hereto as Exhibit K-1], and shall not sublease, occupy or use all or any portion of the Premises, or permit all or any portion of the Premises to be occupied or used in violation of any such Existing Exclusive (except as may be specifically set forth on Exhibit K-1). Landlord represents and warrants that no Existing Exclusive(s) exist other than those listed on Exhibit K-1 hereto and that Exhibit K-1 is true accurate and complete, and covenants to indemnify, defend and hold Tenant harmless from and against all loss, cost, liability or expense (including, without limitation, reasonable legal fees) incurred by Tenant by reason of the enforcement by any person or entity of such unlisted Existing Exclusive. Notwithstanding the foregoing, Tenant shall be entitled to enter into a separate written agreement with any tenant or other occupant for whose benefit the Existing Exclusive is granted which nullifies or modifies the corresponding Existing Exclusive with regard to the Premises and Tenant shall provide Landlord with a true and correct copy of such agreement promptly after such agreement is reached.

13.3.2 Except as expressly set forth in this Section 13.3, Tenant shall not be obligated to honor any exclusive granted by Landlord to any tenant in the Shopping Center or in any other property owned by Landlord or Landlord's Affiliate.

ARTICLE 14
CONDUCT OF BUSINESS OPERATIONS

Subject to the other provisions of this Lease (including, without limitation, Articles 2 and 3 and Section 12.4.3 hereof) Tenant shall initially open a prototypical Bed Bath & Beyond store for business to the public in the Premises (fully fixtured, stocked, staffed and merchandised) for at least one (1) day, not later than the one hundred eightieth (180th) day after the Rent Commencement Date (which date shall, as applicable, be extended by reason of (A) damage or destruction, eminent domain proceedings or actions, or *Force Majeure*, or (B) the acts or omissions of Landlord). Other than as expressly set forth in the preceding sentence, Tenant shall have no obligation to open or operate any business in the Premises, and shall have the right, at any time, to cease to conduct any business operations in the Premises, and Tenant shall incur no liability to Landlord or its Mortgagee by reason thereof (it being understood and agreed that all of Tenant's obligations under this Lease shall continue unless this Lease is terminated pursuant, *inter alia*, to the further provisions of this Article 14 or any other provision of this Lease [other than by reason of an Event of Default]). In the event that Tenant does not operate or cause to be operated any retail business in the Premises (other than prior to the Rent Commencement Date or during Excused Periods) for more than one hundred eighty (180) consecutive days, Landlord shall have the option to terminate this Lease, which option shall be exercisable by giving notice thereof to Tenant by no later than the one hundred eightieth (180th) day after the date on which said 180-day period expires, and whereupon this Lease shall

35

terminate upon the sixtieth (60th) day (the "**Recapture Date**") after the date on which Tenant receives Landlord's termination notice, as if the Recapture Date was originally set forth herein as the expiration date of the Term.  Upon such termination, Landlord and Tenant shall each be released from any and all liabilities thereafter accruing hereunder, except for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease.  All Rent payable by Tenant hereunder shall be apportioned as of the Recapture Date and Tenant shall promptly pay to Landlord any amounts so determined to be due and owing by Tenant to Landlord, and conversely Landlord shall promptly reimburse Tenant for any amounts prepaid by Tenant for periods subsequent to the Recapture Date.

ARTICLE 15<br/>
TENANT ASSIGNMENT AND SUBLETTING

Section 15.1   <u>Assignment and Subletting.</u>

15.1.1 Tenant shall have the right from time to time, without the consent of Landlord, to assign Tenant's interest in this Lease and/or to sublet, concession or license all or any portion of the Premises, subject to all of the terms and conditions of this Lease.

15.1.2 Except with respect to any transaction covered under Subsection 15.1.3 or Section 15.3 below, in the event Tenant proposes to assign this Lease or sublet, in a single transaction, the whole of the Premises, it shall first give notice thereof (the "*Assignment/Subletting Notice*") to Landlord, which notice shall specify the name and address of the proposed assignee or sublessee. the proposed use of the Premises to be made by such assignee or sublessee, the proposed date of the assignment or sublease, and financial statements of the proposed assignee or sublessee, together with a statement certified by Tenant of the amount of the then unamortized costs (amortized on a straight-line basis over the Initial Term) of any alterations performed by Tenant to the Premises.  Thereafter, Landlord shall have the option to terminate this Lease, which option shall be exercisable by:

(a)   giving notice to Tenant (the "**Termination Notice**") thereof within thirty (30) days after receipt of an Assignment/Subletting Notice from Tenant, and

(b)   paying to Tenant, within thirty (30) days after such notice is given, all of Tenant's costs and expenses incurred in connection with the preparation of plans and specifications for, and the then unamortized costs (amortized on a straight-line basis over the Initial Term) of, Tenant's Work and any alterations performed by Tenant to the Premises, which shall not exceed $20,000.00,

in which event this Lease shall automatically terminate on the ninetieth (90th) day (the "**Termination Date**") after the date on which Tenant receives Landlord's Termination Notice, with the same force and effect as if the Termination Date had been designated as the expiration date of this Lease.  Upon the Termination Date, Landlord and Tenant shall each be released from any and all liabilities thereafter accruing hereunder, except for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease.  All Rent payable by Tenant hereunder shall be apportioned as of the Termination Date and Tenant shall promptly pay to Landlord any amounts so determined to be due and owing by Tenant to Landlord, and conversely Landlord shall promptly reimburse Tenant for any amounts prepaid by Tenant for periods subsequent to the Termination Date.  Notwithstanding the foregoing, Tenant shall have the right to avoid Landlord's termination by giving notice to Landlord (the "**Rescission Notice**"), within ten (10) days after receiving the Termination Notice, of its rescission of the Assignment/Subletting Notice, whereupon Landlord's Termination Notice shall be rendered null and void, and Tenant shall not assign this Lease or sublet the whole of the Premises as proposed in its Assignment/Subletting Notice.  If Landlord does not give the Termination Notice within the aforesaid 30-day period, Landlord shall conclusively be deemed to have waived its termination rights hereunder with respect to such proposed assignment or subletting transaction, and Tenant may assign this Lease or sublet the entire Premises in accordance with its Assignment/Subletting Notice.

15.1.3 In addition to, and not in limitation of, Tenant's other rights set forth in this Section 15.1, Tenant shall have the right from time to time, without the consent of Landlord, to assign Tenant's interest in this Lease and/or to sublet or license all or any portion of the Premises: (a) to an Affiliate of Tenant;  (b) to any entity which purchases all or substantially all of the assets of Tenant or any of its Affiliates;  (c) to any entity which purchases Tenant's interest in the majority of stores owned or operated by Tenant or its Affiliate(s) in the states of South Dakota, North Dakota, Wyoming and Montana; (d) in conjunction with any merger,

36

acquisition, consolidation or public offering of stock or other interests involving Tenant or its Affiliate(s); and/or (e) as may be required by any Legal Requirement. Tenant shall forward a copy of all relevant assignment documents to Landlord within thirty (30) days after completion of the assignment, sublease or license agreement. If any assignment, sublease or license shall be made of Tenant's interest in this Lease, each assignee, subtenant and licensee of this Lease will be required to deliver to Landlord within thirty (30) days after such transfer, an agreement, in recordable form, by the terms of which such assignee, subtenant or licensee agrees to perform and observe all agreements on the part of Tenant to be performed or observed hereunder from and after the date of said assignment, sublease or license.

Section 15.2    <u>Liability of Tenant</u>. Unless otherwise agreed to in writing by Landlord, no assignment, subletting, licensing or concessioning by Tenant shall reduce, diminish, or otherwise affect the liability of Tenant hereunder; provided, however, that in the event of an assignment by the Tenant originally named herein or its Affiliate (collectively, the "***Original Tenant***") of its interest in this Lease to a Major Assignee or to a tenant whose obligations under this Lease are guaranteed by a Major Guarantor, all liability of the Original Tenant under this Lease accruing from and after the effective date of such assignment, shall terminate. For purposes of this Section 15.2, the term ***"Major Assignee"*** or ***"Major Guarantor"***, as the case may be, shall mean a person or entity which has, as of the effective date of such assignment, a net worth of at least One Hundred Fifty Million ($150,000,000) Dollars.

Section 15.3    <u>Collateral Assignment</u>. In addition to Tenant's other rights set forth in this Article 15, a collateral assignment of Tenant's interest in this Lease by Tenant to one or more "Lenders" (hereinafter defined), as collateral security for an indebtedness or other obligation of Tenant or its Affiliates shall be permitted and Landlord shall execute all documentation reasonably requested by Tenant or any such Lender in connection therewith. In addition, Tenant shall have the right, without Landlord's consent, to grant to an Affiliate of Tenant a license to operate all of Tenant's business operations at the Premises, without such Affiliate having assumed any liability for the performance of Tenant's obligations under this Lease. As used herein, "***Lender***" shall mean a state or federally regulated: bank, savings and loan association, insurance company, pension fund, credit union, real estate investment trust, or other institutional lender.

Section 15.4    <u>Cure Rights of Original Tenant.</u>

15.4.1  If Tenant assigns Tenant's interest in this Lease unless to a Major Assignee or such assignee associated with a Major Guarantor, then Landlord, when giving notice to said assignee or any future assignee in respect of any default, shall also give a copy of such notice to the Original Tenant, and no notice of default shall be effective until a copy thereof is so given to Original Tenant. Original Tenant shall have the same period after receipt of such notice to cure such default as is given to Tenant therefor under this Lease.

15.4.2  Except if to a Major Assignee or such assignee associated with a Major Guarantor, if this Lease is terminated because of: (a) an Event of Default of such assignee, or (b) the rejection, disaffirmation, or other termination of this Lease by or on behalf of the assignee pursuant to any proceeding in bankruptcy under any Legal Requirement of any State or of the United States, or any other Legal Requirements affecting creditors' rights, <u>then</u> Landlord shall promptly give to Original Tenant notice thereof, and Original Tenant shall have the right, exercisable by notice given to Landlord within fifteen (15) days after receipt by Original Tenant of Landlord's notice, to enter into a new lease of the Premises with Landlord (***"New Lease"***), <u>provided</u> that the Original Tenant shall have remedied all Events of Default of the assignee hereunder, unless such Events of Default are personal to the assignee and/or not reasonably susceptible of cure by the Original Tenant, in which event the Original Tenant shall not be obligated to cure such Events of Default as a condition to the exercise of its rights under this Subsection 15.4.2. Upon the Original Tenant's curing of any such Event of Default of the assignee as aforesaid, Landlord shall assign to the Original Tenant all of Landlord's rights against such assignee (whether arising as a result of bankruptcy court proceedings or otherwise). The term of said New Lease shall begin on the date of termination of this Lease and shall continue for the remainder of the Term (including any applicable Renewal Periods). Such New Lease shall otherwise contain the same terms and conditions as those set forth herein, except for requirements which are no longer applicable or have already been performed. It is the intention of the parties hereto that such New Lease shall have the same priority relative to other rights or interests in or to the Premises as this Lease. The provisions of this Subsection 15.4.2 shall survive the termination of this Lease and shall continue in full force and effect thereafter to the same extent as if this Subsection 15.4.2 were a separate and independent contract between Landlord and the Original Tenant. From the date on which the Original Tenant shall serve Landlord with the aforesaid notice of the exercise of its right to a New Lease,

37

the Original Tenant shall have quiet and undisturbed use and enjoyment of the Premises and all appurtenances thereto, as contemplated by and subject to the terms of this Lease.

Section 15.5  Recognition Agreement.  In the event Tenant subleases all or any portion of the Premises for a term of at least five (5) years, then, notwithstanding any other provisions of this Lease, Landlord shall, upon Tenant's request, execute and deliver an agreement among Landlord, Tenant and each such subtenant in the form substantially and substantively consistent with Exhibit H hereto, in recordable form.

## ARTICLE 16
## DEFAULT AND DISPUTE RESOLUTION

Section 16.1  Tenant Default.

16.1.1 If Tenant shall fail to: (i) pay any Rent when due, within ten (10) days after its receipt of notice thereof from Landlord specifying the amount and details of the unpaid Rent, (ii) perform or observe any of the other covenants of this Lease on Tenant's part to be performed or observed within thirty (30) days after its receipt of notice thereof from Landlord specifying the nature of such default (or, if such default shall be of a nature that same cannot reasonably be cured within thirty (30) days and Tenant does not commence to cure such default on or before such thirtieth (30th) day and thereafter diligently prosecute said cure to completion), or (iii) become insolvent, make a transfer in fraud of creditors, make an assignment for the benefit of creditors, or file a petition under any section or chapter of the United States Bankruptcy Code, such circumstance shall constitute an **"Event of Default"**.

16.1.2 Upon an Event of Default, Landlord shall have all remedies given to it at law or in equity (except that Landlord hereby expressly waives any rights to accelerate any element of the Rent, and any right of distraint, which may be granted to it by law), including, without limitation, the following:

(a)    to bring suit for the collection of such unpaid Rent or for the performance of such other covenant of this Lease on Tenant's part to be performed; and/or

(b)    without waiving any non-monetary default, may (but shall not be obligated to) perform any covenant which is capable of being remedied by the performance of affirmative acts for the account and at the reasonable expense of Tenant (it being agreed that should Landlord require access to the Premises in order to perform such covenant as aforesaid, Landlord shall comply with the applicable provisions of Sections 9.2 hereof), in which event, Tenant shall pay to Landlord on demand, as Additional Rent, the reasonable cost or amount thereof, together with interest thereon at the Lease Interest Rate from the date of outlay of expense until payment; and/or

(c)    upon at least five (5) days' notice to Tenant, to terminate this Lease, whereupon Landlord shall have and retain full right to sue for and collect all unpaid Rent which shall have accrued up to the date of termination and any damages to Landlord by reason of any such breach as provided in Section 16.1.3 below, and Tenant shall surrender and deliver the Premises to Landlord, failing which, Landlord shall have the right to initiate summary proceedings to recover possession, seek injunctive relief, or seek specific performance for any covenant or agreement of Tenant; and/or

(d)    upon at least five (5) days' notice to Tenant to terminate Tenant's right of possession, re-enter the Premises and take possession thereof by lawful means. If Landlord shall so elect to repossess the Premises without terminating the Lease, then Tenant shall be liable for and shall pay to Landlord all Rent payable to Landlord pursuant to the terms of this Lease which shall have accrued up to the date of repossession, as well as all Rent as and when same shall become due and payable pursuant to the terms of this Lease during the remainder of the Term, diminished by any net sums thereafter received by Landlord through reletting the Premises during said period (after deducting reasonable expenses incurred by Landlord in connection with such reletting). In no event shall Tenant be entitled to any excess of any rent obtained by such reletting over and above the Rent herein reserved. Landlord may bring actions to collect amounts due by Tenant under this Lease, from time to time, prior to the expiration of the Term.

16.1.3 Upon an Event of Default, Tenant shall be liable for and shall pay to Landlord, in addition to any sum provided to be paid above, brokers' fees incurred by Landlord in connection with reletting the whole or any part of the Premises for the remainder of the then

38

unexpired Term (excluding any then unexercised Renewal Periods), the costs of removing and storing Tenant's or other occupant's property; the cost of repairs and deferred maintenance; and all other commercially reasonable expenses incurred by Landlord in enforcing or defending Landlord's rights and/or remedies, including reasonable attorneys' fees.

16.1.4  Upon an Event of Default, any amounts paid by Landlord to cure said Event of Default and any Rent payments not paid after notice thereof is given shall bear interest at the Lease Interest Rate from and after the expiration of any applicable grace period until paid.

16.1.5  Landlord shall use all commercially reasonable efforts to relet the Premises or any portion thereof to mitigate Landlord's damages to which Landlord would otherwise be entitled to as a result of an Event of Default.  In no event shall Tenant be liable to Landlord for any consequential damages suffered by Landlord as a result of an Event of Default by, or any other act of, Tenant.

Section 16.2  Landlord Default.  If Landlord shall: (i) fail to perform or observe any of the covenants of this Lease on Landlord's part to be performed or observed within thirty (30) days after receiving notice from Tenant thereof (or, if same cannot reasonably be cured within thirty (30) days, if Landlord shall fail to promptly commence and diligently prosecute said cure to completion), or (ii) materially breach any warranty or representation under this Lease and fail to cure same within thirty (30) days after receiving notice from Tenant thereof (either of (i) or (ii) above being hereinafter referred to as a **"Landlord's Default"**), then Tenant, in addition to such other rights and remedies as may be available under this Lease, or at law or in equity, may, in its sole discretion:

(a)  as applicable, perform such obligation(s) of Landlord in accordance with the provisions of this Lease on behalf of, and at the reasonable expense of Landlord; and/or

(b)  bring suit for the collection of any amounts for which Landlord is in default, seek injunctive relief, or seek specific performance for any other covenant or agreement of Landlord, without terminating this Lease; and/or

(c)  offset against the Rent payable by Tenant hereunder for amounts owed by Landlord to Tenant and/or for the amounts reasonably expended by Tenant performing Landlord's obligations hereunder, including costs and reasonable attorneys' fees, together with interest thereon at the Lease Interest Rate from the date of the outlay until paid; and/or

(d)  terminate this Lease, without waiving its rights to damages for Landlord's Default, provided that:  (1) Landlord's Default materially interferes with the normal conduct of any business operations in the Premises, (2) Landlord's Default is not reasonably capable of being cured by Tenant, and  (3) Tenant gives notice of Landlord's Default to any Mortgagee of whom Landlord shall have previously given Tenant notice (including its address), and such Mortgagee shall not have cured Landlord's Default within thirty (30) days after such notice is given (or, if such default cannot reasonably be cured within thirty (30) days, such Mortgagee fails to promptly commence and diligently prosecute said cure to completion).

Notwithstanding the foregoing, if, in Tenant's reasonable judgment, a condition posing imminent risk of liability or material harm to persons or property or material disruption to the normal conduct of any business operations in the Premises shall exist (it being agreed, without limitation, that any water infiltration into the Premises from within or without the Premises, or mold remediation in connection therewith, shall be deemed to be such a condition), Tenant may, at its election, and without prior notice to Landlord, exercise any or all of the remedies set forth in (a) and (c) above.  In no event shall Landlord be liable to Tenant for any consequential, punitive or special damages suffered by Tenant as a result of a default by, or any other act or omission of, Landlord.

Section 16.3  Arbitration.  In any case where this Lease expressly provides for submission of a dispute or matter to arbitration (but not otherwise), the same shall be settled by arbitration in Rapid City, South Dakota before one arbitrator in accordance with the procedural rules of the American Arbitration Association (or any successor thereto) then in effect.  The decision of the arbitrator shall be final, conclusive and binding on the parties, but the powers of the arbitrator are hereby expressly limited to the determination of factual issues, and the arbitrator shall have no power to reform, supplement or modify this Lease.  The arbitrator shall make only required findings of fact incident to an arbitrable dispute, which findings shall be set forth in reasonable detail in a written decision by the arbitrator.  Landlord and Tenant shall share equally in the cost and expenses of such arbitration, and each shall separately pay its own

DMEAST #10098913 v6

1  attorneys' fees and expenses, unless the arbitrator finds that one of the parties did not act in
2  good faith in connection with the dispute or the conduct of the arbitration proceeding, in which
3  case the arbitrator may award all or part of said costs, expenses and fees to the other party.

4                                   ARTICLE 17
5            RIGHT TO MORTGAGE AND NON-DISTURBANCE; ESTOPPEL CERTIFICATE

6         Section 17.1   Right to Mortgage and Non-Disturbance.  Landlord reserves the right to
7  subject and subordinate this Lease at all times to the lien of any first mortgage or deed of trust
8  for the benefit of any Mortgagee hereafter encumbering or affecting all or any portion of the
9  Shopping Center, as well as to any future ground or underlying leases encumbering or affecting
10  all or any part of the Shopping Center; provided, however, that (a) each Mortgagee shall first
11  execute and deliver to Tenant a subordination, non-disturbance and attornment agreement in
12  substantially the form attached as Exhibit G hereto, in recordable form, and (b) any Ground
13  Lessor shall execute (and shall obtain the written consent of any holder of any mortgage, deed
14  of trust or any other existing lien encumbering or affecting the Shopping Center or any portion
15  thereof, as applicable) and deliver to Tenant a fee owner recognition agreement in a form
16  reasonably satisfactory to Tenant, which shall include the following provisions: (i) as long as
17  there is no Event of Default which is continuing, the Ground Lessor will not, in the exercise of
18  any of the rights arising or which may arise out of such lease, disturb or deprive Tenant  in or of
19  its possession or its rights to possession of the Premises or of any right or privilege granted to
20  or inuring to the benefit of Tenant under this Lease; (ii) in the event of the termination of the
21  ground or underlying lease, Tenant will not be made a party in any removal or eviction action or
22  proceeding unless required by Legal Requirements, nor shall Tenant be evicted or removed of
23  its possession or its right of possession of the Premises, and this Lease shall continue in full
24  force and effect as a direct lease between the Ground Lessor and Tenant for the remainder of
25  the Term and on the same terms and conditions as contained herein, without the necessity of
26  executing a new lease; and (iii) Landlord and Tenant shall have the right to execute any
27  amendment to this Lease which is specifically required hereunder and the Ground Lessor shall
28  recognize and be bound thereto.

29         Section 17.2   Estoppel Certificate.  Upon written request of Landlord or Tenant, the
30  other party, within thirty (30) days after the date of receipt of such request, shall execute and
31  deliver to and only for the benefit of the requesting party or any Mortgagee, *bona fide*
32  prospective purchaser, assignee, or sublessee of the requesting party, without charge, a written
33  statement:  (1) ratifying this Lease; (2) certifying, to such party's actual knowledge, that this
34  Lease is in full force and effect, if such is the case, and has not been modified, assigned,
35  supplemented or amended, except by such writings as shall be stated; (3) specifying the dates
36  to which Fixed Rent and Additional Rent have been paid; (4) stating whether or not, to such
37  party's actual knowledge, the party requesting the estoppel is in default and, if so, stating the
38  nature of such default, (5) stating the Rent Commencement Date, and (6) stating which options
39  to extend the Lease Term have been exercised, if any.  Each request for a written statement
40  pursuant to this Section 17.2 made within twelve (12) months of an earlier request for such a
41  written statement shall be accompanied by a payment, from the requesting party to the other
42  party, in the amount of Five Hundred ($500) Dollars (increased by Two Hundred ($200 Dollars
43  on each date that the Fixed Rent increases pursuant to Section 1.1.11 hereof).

44         Section 17.3   Existing Mortgages and Ground Leases.  If a mortgage, deed of trust, or
45  other security instrument, or any ground or underlying lease, encumbers any property owned or
46  ground leased by Landlord which is within the Shopping Center on the Effective Date, then
47  within thirty (30) days after the Effective Date, Landlord shall deliver to Tenant, in recordable
48  form: (x) a subordination, non-disturbance and attornment agreement substantially in the form
49  attached hereto as Exhibit G, in recordable form, executed by each and every holder of any
50  mortgage, deed of trust or any other existing lien encumbering or affecting the Shopping Center
51  or any portion thereof, and (y) a fee owner recognition agreement in the form and content
52  described in clause (b) of Section 17.1 hereof, in recordable form, executed by any Ground
53  Lessor (and, as may be required, consented to by the holder of any mortgage, deed of trust or
54  other existing lien as aforesaid).  Should Landlord fail to so deliver such instrument(s) within
55  said 30-day period, Tenant shall have the right by notice given to Landlord at any time prior to
56  the date on which such instrument(s) are delivered, to terminate this Lease, in which event,
57  neither party shall have any further liability hereunder, except: (i) for those obligations which
58  survive the expiration or other termination of this Lease pursuant to the express terms of this
59  Lease, and (ii) Landlord shall be obligated to promptly reimburse Tenant for all its actual and
60  reasonable, third-party costs and expenses incurred in connection with this Lease, including,
61  without limitation, the preparation and review of plans and specifications, and the performance

40

of Tenant's Work, provided, however, that such reimbursement by Landlord shall not exceed the aggregate sum of Thirty Five Thousand Dollars ($35,000).

ARTICLE 18
NOTICE

Subject to the further provisions of this Article 18, whenever it is provided herein that any notice, demand, request, consent, approval or other communication (*"Notice"*) shall or may be given to either of the parties by the other, it shall be in writing and, any Legal Requirement to the contrary notwithstanding, shall not be effective for any purpose unless same shall be given by personal delivery, registered or certified mail, postage prepaid, return receipt requested, or by any recognized overnight mail carrier, with proof of delivery slip, addressed to Landlord at Landlord's Mailing Address with copies to Landlord also given to: John C. Krug, Esq., Frost Brown Todd LLC, 2200 PNC Center, 201 E. Fifth Street, Cincinnati, Ohio 45202, and for emergency notices only, (513) 651-6800 (telephone) and jkrug@fbtlaw.com, or to Tenant at Tenant's Mailing Address, with copies of notices to Tenant also given to: (i) Allan N. Rauch, Esq., c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, and (ii) Bart I. Mellits, Esq., Ballard Spahr LLP, 1735 Market Street, 51st Floor, Philadelphia, Pennsylvania 19103-7599, or to such other person or other address as may, from time to time, be specified by either party in a written notice to the other party. If Landlord or Tenant shall consist of more than one person or entity, notices delivered by either party to the other party's Mailing Address shall be deemed to be delivered to, and effective notice to, all such persons or entities comprising Landlord or Tenant, as the case may be. All notices given in accordance with the provisions of this Section shall be effective upon receipt (or refusal of receipt) at the address of the addressee. Notwithstanding the foregoing, Landlord shall instead send the following items to Tenant (Attention: Lease Administration) at Tenant's Mailing Address: (A) all bills, notices (but not notices of default) and related information pertaining to Tenant's Pro Rata Share of Taxes as described in Section 4.3 of this Lease, and (B) all budgetary information, notices (but not notices of default), statements, bills and related information pertaining to Tenant's Pro Rata Share of Common Areas Charges as described in Section 5.1 of this Lease.

ARTICLE 19
TENANT'S PROPERTY

All of Tenant's Property which may be installed or placed in or upon the Premises by Tenant shall remain the property of Tenant. Tenant may assign, hypothecate, encumber, mortgage or create a security interest in or upon Tenant's Property in the Premises without the consent of Landlord and may remove Tenant's Property at any time during the Term, provided that if removal of any of Tenant's Property damages any part of the Premises, Tenant shall promptly repair such damage. Landlord waives any right it may have in Tenant's Property. To the extent Landlord may have a lien on or security interest in the Tenant's Property pursuant to this Lease, by law or otherwise, Landlord hereby waives, and agrees not to assert, such lien or security interest. Landlord shall provide to Tenant, within fifteen (15) days after Tenant's request therefor, a written waiver in form reasonably satisfactory to Tenant and Landlord evidencing Landlord's waiver of any rights it has or may have in Tenant's Property. Tenant's Property shall be on the Premises at Tenant's sole risk, and in no event shall Landlord have any liability to Tenant for any damage or loss to Tenant's Property.

ARTICLE 20
END OF TERM

Section 20.1  Surrender of Premises. At the expiration of the Term, Tenant will quit and surrender the Premises broom clean, and in good condition and repair, excepting, however, reasonable wear and tear, damage by fire or other casualty, damage by eminent domain, and repairs and replacements to be made by Landlord hereunder. Upon notice from Landlord, Tenant shall remove all of its trade fixtures and personal property before surrendering the Premises and shall repair any structural or other material damage to the Premises caused thereby. Tenant's obligation to observe and perform this covenant shall survive the expiration or earlier termination of the Term. Any such items remaining in the Premises more than thirty (30) days after receipt of notice from Landlord shall be deemed abandoned for all purposes and shall, at Landlord's option exercised by notice to Tenant, become the property of Landlord and Landlord may dispose of the same at Tenant's reasonable expense without liability therefore of any type or nature.

41

Section 20.2  Hold Over.  If Tenant fails to deliver possession of the Premises to Landlord at the end of the Term, Tenant shall be a tenant at sufferance and shall be liable for Fixed Rent on a monthly basis (or, if applicable, on a prorated daily basis) in an amount equal to one hundred fifty (150%) percent of the amount thereof payable by Tenant for the month immediately preceding the last day of the Term as well as for all Additional Rent payable by Tenant hereunder.  Such tenancy may be terminated at the end of any month thereafter by either party by giving at least thirty (30) days notice thereof to the other party.

## ARTICLE 21
## TENANT'S RIGHT OF FIRST OFFER

Provided an uncured Event of Default does not then exist under this Lease, Tenant shall have continuing rights of first offer to lease additional space in the Shopping Center which is contiguous to the Premises and which may become available on and after the date of this Lease (but excluding the initial lease-up of such space).  At such time that Landlord has knowledge that such space (*"Offered Space"*) is or will become available, Landlord will give Tenant notice (the *"Offering Notice"*) of the terms and conditions Landlord would be willing to accept with respect to the Offered Space (including, without limitation, the proposed rent, additional rent, scope of Landlord's proposed tenant improvements, location and Floor Area), and Tenant shall have thirty (30) days within which to accept or reject Landlord's offer.  In the event Tenant elects to accept Landlord's offer, then Tenant shall notify Landlord of such election by giving notice to Landlord during such thirty (30) day period and Landlord and Tenant shall thereupon enter into an amendment to this Lease for the leasing of the Offered Space, which amendment shall (a) contain the terms and conditions set forth in the Offering Notice, (b) provide that the term thereunder shall expire or sooner terminate contemporaneously with the expiration or sooner termination of the Term hereof (subject to extension in accordance with Section 2.2.2 above), and (c) contain such other terms and provisions as either Landlord or Tenant may reasonably require in order to effectuate the incorporation of the Offered Space into the Premises and to otherwise effectuate the intent of this Article 21.  Should Tenant decline Landlord's offer or fail to respond thereto, then, and in such event, Tenant shall have been deemed to have waived any prospective rights of first offer to the Offered Space (but Tenant shall not lose any prospective rights of first offer with respect to any space (including, without limitation, the Offered Space) which may in the future become vacant and available), and Landlord may lease the Offered Space to any other party upon substantially the same terms and conditions as that offered to Tenant, provided that such lease is executed within six (6) months after Tenant has declined (or has been deemed to have waived) Landlord's offer with respect to the Offered Space.  As used herein, the phrase *"substantially the same terms and conditions as that offered to Tenant"* shall mean terms not materially different and/or a rent of not more than five (5%) percent below the rent requested by Landlord of Tenant.  Any dispute between the parties with respect to this Article 21 (including, without limitation, any dispute as to the provisions of the amendment described in this Article 21) shall be resolved by arbitration in accordance with the provisions of Section 16.3 above.

## ARTICLE 22
## ONGOING CO-TENANCY

If, at any time during the Term, more than forty percent (40%) of the total Floor Area of all buildings then constructed to a minimum of shell condition in the Target District of the Shopping Center (as identified on Exhibit B hereto) (excluding the Premises), ceases to be used for the operation of retail business (excepting temporary closures due to casualty, condemnation, remodeling, or assignment or sublease) (such condition being hereinafter referred to as an "*Excess Vacancy*"), then in such event, Tenant shall have the right to: (i) pay Alternate Rent in lieu of Fixed Rent during the period of such Excess Vacancy, and/or (ii) if the Excess Vacancy continues for a period in excess of eighteen (18) months, to terminate this Lease, exercisable by giving Landlord, at any time commencing within one hundred twenty (120) days after the expiration of such 18-month period, at least sixty (60) days' prior notice, in which event this Lease shall terminate on the date set forth in Tenant's notice of termination without further liability on the part of either Landlord or Tenant, except for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease.  If Tenant does not terminate this Lease pursuant to this Article 22, then commencing on the expiration of the aforesaid 120-day period, Tenant shall have forfeited its right to terminate this Lease based on such Excess Vacancy, and shall resume paying full Rent, provided, however, that Tenant shall: (x) again be entitled to exercise its rights under this Article 22 each time the then existing condition of Excess Vacancy worsens by more than ten percent (10%); and (y) retain all of its original rights under this Article 22 with respect to any future condition(s) of Excess Vacancy.

42

ARTICLE 23
MISCELLANEOUS

Section 23.1  Loading Facilities. Tenant shall have the exclusive right to utilize the loading facilities serving the Premises (shown on Exhibit B) on a "24 hour a day", "365 days a year" basis, subject to the OEA and Legal Requirements.

Section 23.2  Liens. Within thirty (30) days after notice of the filing thereof, Tenant shall discharge (either by payment or by filing of the necessary bond, or otherwise) any lien against the Premises and/or Landlord's interest therein, which may arise out of any payment due for, or purported to be due for, any labor, services, materials, supplies or equipment alleged to have been furnished to or for Tenant in, upon or about the Premises. Similarly, within thirty (30) days after notice of the filing thereof, Landlord shall discharge (either by payment or by filing of the necessary bond, or otherwise) any lien against the Premises and/or Landlord's interest therein, which may arise out of any payment due for, or purported to be due for, any labor, services, materials, supplies or equipment alleged to have been furnished to or for Landlord in, upon or about the Premises.

Section 23.3  Broker's Commission. Landlord and Tenant each warrant and represent to the other that they did not deal with any real estate broker in connection with the negotiation, execution and delivery of this Lease, except for Legend Retail Group on behalf of Tenant (the "**Broker**"). Landlord shall pay the Broker a commission pursuant to a separate agreement. Each party agrees to indemnify, defend, and save the other harmless from and against any and all liabilities, costs, causes of action, damages and expenses, including, without limitation, attorneys' fees, with respect to or arising out of any claims made by any real estate broker (other than the Broker), agent or finder with respect to this Lease in breach of the foregoing representation. The provisions of this Section shall survive the expiration or earlier termination of this Lease.

Section 23.4  *Force Majeure*. Except as otherwise expressly set forth herein, in the event either party hereto shall be delayed or hindered in, or prevented from, the performance of any act required hereunder by reason of strikes, failure of power, riots, insurrection, war, earthquake, hurricane, tornado or extraordinary rainfall or snowfall for the area (or comparable weather conditions of unusual severity), or other reasons of an extraordinary nature which are beyond the reasonable control of the party, and which could not have been avoided through the exercise of due diligence by a party (collectively referred to herein as "*Force Majeure*"), then the performance of any such act shall be excused for a period equal to the period of the delay. Notwithstanding the foregoing provisions, the following shall not constitute Force Majeure: (i) the financial inability of a party to perform its obligations under this Lease; or (ii) delays occurring in the course of complying with applicable Legal Requirements that could have been avoided through the exercise of due diligence by a party hereto. A party wishing to invoke this Section shall give the other party notice of that intention within ten (10) days of the commencement of any event of *Force Majeure* and shall, at that time, specify the reasons therefor, the specific provision of this Lease which will be delayed as a result, and the period of such extension, if known, or if not known, a reasonable estimate thereof.

Section 23.5  Consents. Except as may be otherwise expressly set forth in this Lease, whenever under this Lease provision is made for either party's securing the consent or approval of the other party, (i) such consent or approval, and the request therefor, shall be in writing and shall not be unreasonably withheld, delayed or conditioned, and (ii) in all matters contained herein, both parties shall have an implied obligation of reasonableness.

Section 23.6  Costs. Whenever this Lease requires the performance of an act by a party, such party shall perform the act at its own cost and expense, unless expressly provided to the contrary.

Section 23.7  Attorneys' Fees. In any action or proceeding hereunder (whether to enforce the terms and provisions of an indemnity or otherwise), the prevailing party shall be entitled to recover from the other party the prevailing party's reasonable costs and expenses in such action or proceeding, including reasonable attorneys' fees, costs and expenses. Except as otherwise set forth herein, if either party is sued by a third party as a result of a violation of a covenant or warranty herein contained by the other party hereto, then the party who has violated the covenant or warranty shall be responsible for the reasonable costs and expenses in such action or proceeding against the non-violating party, including reasonable attorneys' fees, costs and expenses.

43

Section 23.8  <u>Survival of Obligations</u>.  The obligation to pay any sums due to either party from the other that by the terms herein would not be payable, or are incapable of calculation, until after the expiration or sooner termination of this Lease shall survive and remain a continuing obligation until paid.  All indemnity obligations under this Lease shall survive the expiration or earlier termination of this Lease.

Section 23.9  <u>Non-Waiver</u>.  The failure of Landlord or Tenant to insist upon the strict performance of, or to enforce, any provision, covenant or condition herein shall not be deemed to be a waiver thereof, nor void or affect the right of the aggrieved party to enforce the same covenant or condition on the occasion of any subsequent breach or default; nor shall the failure of either party to exercise any option in this Lease upon any occasion arising therefor be deemed or construed to be a waiver of the right to exercise that same kind of option upon any subsequent occasion.

Section 23.10  <u>Rights Cumulative</u>.  Unless expressly provided to the contrary in this Lease, each and every one of the rights, remedies and benefits provided by this Lease shall be cumulative and shall not be exclusive of any other such rights, remedies and benefits allowed by applicable Legal Requirements.

Section 23.11  <u>Definition of Landlord</u>.  The term **"Landlord"** shall mean only the person or entity which, from time to time, shall then own the Shopping Center, and in the event of the transfer by such owner of its interest in the Shopping Center, such owner shall (except to the extent of (1) claims made by Tenant against Landlord which arose prior to the effective date of the transfer of such ownership interest, and/or (2) judgments obtained by Tenant against Landlord, on or prior to the effective date of the transfer of such ownership interest) thereupon be released and discharged from all covenants and obligations of Landlord thereafter accruing, but such covenants and obligations shall be binding during the Term upon each new owner for the duration of such owner's ownership.

Section 23.12  <u>Successors and Assigns</u>.  The provisions of this Lease shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns.

Section 23.13  <u>Limitation of Landlord's Liability</u>.  Except with respect to insurance proceeds or condemnation awards received by Landlord which are required by the terms of this Lease to be applied to the repair or restoration of the Premises or the Shopping Center, Tenant shall, on and after the Delivery Date, look only to Landlord's estate and property in the Shopping Center (or the proceeds from the sale of all or any portion thereof) and net income derived from the Shopping Center for the satisfaction of Tenant's remedies for the collection of a judgment (or other judicial process) requiring the payment of money by Landlord hereunder and no other property or assets of Landlord, its officers, directors, stockholders, members, principals, joint venturers, or partners shall be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies under or with respect to this Lease.  Without limiting the generality of the foregoing, in no event shall Landlord, its officers, directors, stockholders, members, principals, joint venturers or partners be subject to any personal liability whatsoever for any claim arising from or under this Lease.  Except with respect to the limitation on personal liability hereinabove set forth, or as may otherwise be limited in accordance with this Lease, the provisions of this Section 23.13 shall not be deemed or construed to limit Tenant's rights and remedies pursuant to this Lease or which may be available at law or in equity.

Section 23.14  <u>Limitation of Tenant's Liability</u>.  Landlord, its successors and assigns, shall look solely to the assets, if any, of Tenant and its successors and assigns, for the satisfaction of any claim arising from or under this Lease and shall not seek to impose personal liability on any shareholder, officer, director, member or employee of Tenant or any of its Affiliates.

Section 23.15  <u>Joint and Several Liability</u>.  If either party consists of more than one person, then the persons constituting such party shall be jointly and severally liable hereunder.

Section 23.16  <u>Severability</u>.  If any term, covenant, condition or provision of this Lease is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions hereof shall remain in full force and effect and shall in no way be affected, impaired, or invalidated thereby.

Section 23.17  <u>Grammatical Usages and Construction</u>.  In construing this Lease, feminine or neuter pronouns shall be substituted for those masculine in form and vice versa, and plural terms shall be substituted for singular and singular for plural in any place in which the

44

context so requires.  This Lease shall be construed without regard to: (i) the identity of the party who drafted the various provisions hereof, and (ii) the addition or deletion of text made during the negotiation of this Lease.  Moreover, each and every provision of this Lease shall be construed as though all parties hereto participated equally in the drafting thereof.  As a result of the foregoing, any rule or construction that a document is to be construed against the drafting party shall not be applicable hereto.

Section 23.18 <u>Table of Contents, Line Numbering and Paragraph Headings</u>.  The table of contents and line numbering, if any, and section headings are inserted only for convenience and in no way define, limit or describe the scope or intent of this Lease, nor in any way affect this Lease.

Section 23.19 <u>Definition of Hereunder, Herein, etc.</u>.  Unless the context clearly indicates to the contrary, the words "herein," "hereof," "hereunder," "hereafter," and words of similar import refer to this Lease and all the Exhibits attached hereto as a whole and not to any particular section, subsection, or paragraph hereof.

Section 23.20 <u>Short Form Lease</u>.  Upon the request of either party following the execution and delivery of this Lease, Landlord and Tenant shall execute a short form lease or memorandum for recording, which shall be in form and substance as either party shall reasonably request.  In no event shall the amount of Fixed Rent reserved hereunder be included in any such short form lease or memorandum.

Section 23.21 <u>Entire Agreement and Modification</u>.  This Lease constitutes the entire agreement of the parties hereto, and all prior agreements between the parties, whether written or oral, are merged herein and, except as may be specifically set forth herein, shall be of no force and effect.  This Lease cannot be changed, modified or discharged orally, but only by an agreement in writing, signed by the party against whom enforcement of the change, modification or discharge is sought.

Section 23.22 <u>No Joint Venture or Partnership Created by Lease</u>.  Nothing contained herein shall be deemed or construed as creating the relationship of principal and agent or of partnership or of joint venture between the parties hereto.

Section 23.23 <u>Tenant's Tradename</u>.  Landlord shall not make use of Tenant's tradename [*i.e.*, "*Bed Bath & Beyond*"®] in any advertising or marketing material, including, without limitation, on any internet website, without obtaining Tenant's prior written approval, which may be withheld in Tenant's sole and absolute discretion.  Notwithstanding anything to the contrary in this Section, Tenant acknowledges and approves the Landlord's use of the Tenant's tradename in leasing materials for the Shopping Center.

Section 23.24  <u>Counterparts</u>.  This instrument may be executed in several counterparts, each of which shall be deemed an original.  The signatures to this instrument may be executed and notarized on separate pages, and when attached to this instrument, shall constitute one complete document.

Section 23.25 <u>Waiver of Trial by Jury</u>.  Landlord and Tenant hereby mutually waive any and all rights which either may have to request a jury trial in any proceeding between them at law or in equity.

Section 23.26 <u>Governing Law</u>.  This Lease shall be governed by, construed, and enforced in accordance with the laws of the State in which the Premises are located.

[Signature page follows]

DMEAST #10098913 v6

IN WITNESS WHEREOF, the parties have executed this instrument under seal the day and year first-above written.

**LANDLORD:**

WITNESS:

MIDLAND RUSHMORE, LLC, an Ohio limited liability company

MICHAEL SMALL

[SEAL]

By:_____
Name: John I. Silverman
Title:   Executive Manager

**TENANT:**

ATTEST:

BED BATH & BEYOND INC., a New York corporation

By:_____
Name: Alan M. Freeman
Title:  Assistant Secretary

By:_____
Name:  Warren Eisenberg
Title:   Co-Chairman

[SEAL]

46

## INDEX OF EXHIBITS

| | | |
|---|---|---|
| 2 | Exhibit A - | Legal Description of Shopping Center |
| 3 | Exhibit B - | Site Plan |
| 4 | Exhibit C - | Form of Rent Commencement and Expiration Date Agreement |
| 5 | Exhibit D - | Specifications for Landlord's Work |
| 6 | Exhibit D-1 | Exterior Elevations of the Premises, and Sidewalk Plan |
| 7 | Exhibit D-2 | Exterior Elevations of the Shopping Center |
| 8 | Exhibit E - | Permitted Encumbrances |
| 9 | Exhibit F - | Signage |
| 10 | Exhibit G - | Form of Subordination, Non-Disturbance and Attornment Agreement |
| 11 | Exhibit H - | Form of Subtenant Recognition Agreement |
| 12 | Exhibit I - | Form of Delivery Date Notice |
| 13 | Exhibit J - | Form of Delivery Date Certification |
| 14 | Exhibit K-1 | Existing Exclusives |
| 15 | Exhibit K-2 | Existing Leases |
| 16 | Exhibit L | Alternate Rent |
| 17 | Exhibit M | Prohibited Uses |
| 18 | Exhibit N | Form of Declaration of Restrictions Against Related Land |
| 19 | Exhibit O | Rules and Regulations |
| 20 | Exhibit P | Landscaping and Hardscaping Plans |

Exhibit A

Legal Description of Shopping Center

Lot 2 in Block 1 of Rushmore Crossing in the City of Rapid City, Pennington County, South Dakota, as shown on the plat filed in Plat Book 34, Page 172

Lots 1, 2, 3, 4, and 5 of Block 2, Rushmore Crossing in the City of Rapid City, Pennington County, South Dakota, as shown on the plat filed in Plat Book 35, page 173.
Tracts C, D and E in Block 2 of Rushmore Crossing in the City of Rapid City, Pennington County, South Dakota, as shown on the plat filed in Plat Book 34, page 172.
Lots 1, 4, 5, 6, 7, 8, and 9 in Block 3 of Rushmore Crossing in the City of Rapid City, Pennington County, South Dakota, as shown on the plat filed in Plat Book 34, page 172.
Lots 2A, 2B and 2C in Block 3 of Rushmore Crossing in the City of Rapid City, Pennington County, South Dakota, as shown on the plat filed in Plat Book 35 page 71.

Lot K-4B of Marshall Heights Tract in the City of Rapid City, Pennington County, South Dakota, as shown on the plat filed in Plat Book 35, Page 108.

Easement for signage and streetscape purposes over Lot K-4 of Marshall Heights Tract in the City of Rapid City, Pennington County, South Dakota, as shown on the plat filed in Plat Book 8, Page 187; EXCEPTING therefrom Lot H-1 of said Lot K-4, as shown on the plat filed in Highway Plat Book 7, Page 54; ALSO EXCEPTING therefrom Lot H-2 of Lot K-4 of Marshall Heights Tract in the City of Rapid City, Pennington County, South Dakota, as shown on the plat filed in Highway Plat Book 11, Page 134, as set forth in Streetscape and Monument Sign Easement Agreement and Quitclaim recorded in Book 174, Page 4168.

A-1

1                                    <u>Exhibit B</u>

2                                    <u>Site Plan</u>

B-1



# RUSHMORE CROSSING
## Rapid City, SD

Date

1 MARCH 2010

# EXHIBIT B  1 of 2

### SITE PLAN LEGEND:

| | PREMISES |
| | CRITICAL AREA |

PREMISES BED
BATH & BEYOND

SCHEELS
DEMONSTRATION
AREA

GUEST ACCESS
AND PARKING

TENANTS
HIRING
TRAILER

CART
CORRAL

EXISTING
TRANSFORMER

P-4 INLINE
TENANT

P-5
BED BATH
& BEYOND

TRASH
CONTAINER
PAD

TRASH COMPACTOR
PAD

LOADING FACILITIES

TEMPORARY
STORAGE/CONTAINER
TRAILER

P-6
TARGET
131,148 SF

EDLIN STREET

GUEST ACCESS
AND PARKING

PYLON B
BED BATH
& BEYOND

PYLON A
NOT AVAILABLE

BBBY PREMISES

TRUCK ROUTE AND
CONSTRUCTION DRIVE

① FLOOR PLAN / LOD
1/32" = 1'-0"

② SITE PLAN

③ KEY PLAN- REFER TO EXHIBIT B 2 OF 2

3.2.10



**NOTE:**
1) CONSTRUCTION STAGING AREA FOR LANDLORD AND OTHER CO-TENANT'S SHALL NOT BE DIRECTLY IN FRONT OF TENANT'S PREMISES OR BLOCK ACCESS TO TENANT'S LOADING DOCK.
2) TENANT TO HAVE THE RIGHT TO RELOCATE CART CORRALS ON THE SIDEWALK IN FRONT OF PREMISES AND IN THE PARKING FIELD.
3) EXIT DOOR LOCATIONS TO BE COORDINATED WITH TENANT'S PLANS.
4) SITE PLAN LAYOUT TO ADEQUATELY ACCOMMODATE TURNING RADIUS FOR A 55' TRAILER, FROM POINT OF ENTRY TO TENANT'S LOADING DOCK AND THEN FOR EXITING SHOPPING CENTER.

## SITE PLAN LEGEND

| | |
|---|---|
| TARGET PARCEL | |
| TARGET DISTRICT | |
| SHOPPING CENTER | |
| CONSTRUCTION DRIVE | |
| SAM'S DISTRICT | |
| SAM'S CLUB PARCEL | |
| SCHEELS PARCEL | |
| RELATED LAND | |
| PRIMARY BUILDING AREA (AT OUTPARCELS) | |

PYLON SIGN 9.
REFER TO EXHIBIT F

TENANT'S PROTOTYPICAL "TEMPORARY SIGN"
LOCATION. REFER TO EXHIBITS F

**PRIMARY BUILDING AREA**

LANDLORDS OUTPARCEL

**SAM'S**

**SCHEELS DEMONSTRATION AREA**

**SCHEELS**

**RELATED LANDS**

OUTPARCEL
OUTPARCEL
OUTPARCEL
OUTPARCEL 5
OUTPARCEL 6
OUTPARCEL 7
OUTPARCEL 9

DETENTION POND

**TARGET**

**PREMISES
BED BATH & BEYOND**

**TJ MAXX**

**GORDMAN'S**

**MICHAEL'S**

**PETCO**

SITE PLAN
N.T.S.

## EXHIBIT B (2OF2)
### SITE PLAN
BED BATH & BEYOND
RUSHMORE CROSSING
RAPID CITY, SD
DATE: 03/01/2010

<u>Exhibit C</u>

<u>Rent Commencement and Expiration Date Agreement</u>

THIS RENT COMMENCEMENT AND EXPIRATION DATE AGREEMENT, made as of the _____ day of _____, 200___, by and between MIDLAND RUSHMORE, LLC (*"Landlord"*) and BED BATH & BEYOND INC. (*"Tenant"*).

**W I T N E S S E T H :**

WHEREAS, Landlord is the owner of a certain shopping center known as Rushmore Crossing Shopping Center (the *"Shopping Center"*), situated in Rapid City, South Dakota;

WHEREAS, by that certain Lease Agreement dated as of _____ __, 2008 (the *"Lease"*), Landlord leased a portion (the *"Premises"*) of the Shopping Center to Tenant;

WHEREAS, Tenant is in possession of the Premises and the Term of the Lease has commenced; and

WHEREAS, under Section 2.2 of the Lease, Landlord and Tenant agreed to enter into an agreement setting forth certain information in respect of the Premises and the Lease.

NOW, THEREFORE, Landlord and Tenant agree as follows:

1.      The Rent Commencement Date occurred on _____, 200___.

2.      The **Initial Term** of the Lease shall expire on January 31, 20___, unless Tenant exercises any option to extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

3.      The date of commencement of the **first Renewal Period** shall be February 1, 20___, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 20___, unless Tenant exercises any option to further extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

4.      The date of commencement of the **second Renewal Period** shall be February 1, 20___, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 20___, unless Tenant exercises any option to further extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

5.      The date of commencement of the **third Renewal Period** shall be February 1, 20___, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 20___, unless the Lease terminates earlier as provided in the Lease.

6.      The date of commencement of the **fourth Renewal Period** shall be February 1, 20___, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 20___, unless the Lease terminates earlier as provided in the Lease.

7.      Capitalized terms used, but not defined, herein shall have the meanings ascribed to them in the Lease.

DMEAST #10098913 v6

1        IN WITNESS WHEREOF, the parties hereto have caused this Rent Commencement
2  and Expiration Date Agreement to be executed the date and year first above written.

**LANDLORD:**

MIDLAND RUSHMORE, LLC, an Ohio limited
liability company

By:_____

Name:  John I. Silverman
Title:    Executive Manager

**TENANT:**

BED BATH & BEYOND INC., a New York
corporation

By:_____

Name:  Warren Eisenberg
Title:   Co-Chairman

C-2

1                                    <u>Exhibit D</u>

2                          <u>Specifications for Landlord's Work</u>

DMEAST #10098913 v6



*RAPID CITY, SD*

Exhibit D - Landlord's Work

1/29/2010

*[All capitalized terms used, but not otherwise defined herein shall have the meanings ascribed to them in the Lease. The terms of the Lease regarding Landlord's Work shall be deemed to supplement the provisions of this Exhibit D, to the extent not inconsistent with the terms of this Exhibit D. It is specifically understood and agreed that all materials and supplies shall be installed in strict accordance with all manufacturers' specifications.]*

## I. Landlord's Plans & Specifications

A.  Landlord shall generate a complete set of project-specific construction documents hereinafter collectively referred to as "Landlord's Plans & Specifications" which shall be in accordance with the following :

1.  Tenant's Plans : Site-specific design-development drawings prepared by Tenant which shall include :
    a)  F1 - FIXTURE PLAN
    b)  F2 - FLOOR FINISH PLANS, NOTES AND DETAILS
    c)  F3 - POWER/SPECIALTY LIGHTING PLANS AND NOTES
    d)  F4 - LIGHTING PLANS AND NOTES
    e)  F5 - HIGH PILE STORAGE PLAN
    f)  Additional F-drawings as may be required to address atypical site-specific conditions

2.  Tenant's Prototype Drawings & Specifications — [developed by Casco Corporation ,St. Louis, MO] which consist of :

    a)  **Bed Bath & Beyond – PROTOTYPE VERSION 1.2009 – Drawings (dated 07/15/09)**

| | | | |
|---|---|---|---|
| A0.1 | Code Data, Project Data and Responsibility Schedule | P1.1 | Plumbing Riser Diagrams and Fixture Schedule |
| A0.2 | Generic Site Requirements Plan | P2.1 | Plumbing Floor Plan |
| A1.1 | Site Details | P3.1 | Plumbing Enlarged Plans & Details |
| A1.2 | Demolition Plan | | |
| A2.1 | Cable Clip/Store Fixture/Egress Path Plan & Notes | FP1.0 | Fire Sprinkler Plans & Details |
| A2.2 | Floor Plan | FP1.1 | Fire Sprinkler Notes and Details |
| A2.3 | Floor Finish Plans | | |
| A2.4 | Reflected Ceiling Plans & Notes | FA1.0a | Fire Alarm Plans & Notes Base System |
| A2.5 | Roof Plan, Details & Notes | FA1.0b | (Alternate) Fire Alarm Plans & Notes – Occupant Notification |
| A3.1 | Finish Schedule, Storefront Types & Vestibule Elevations | FA1.0c | (Alternate) Fire Alarm Plans & Notes - Full Smoke Detection |
| A3.2 | Door Hardware, Door Schedules & Door Types | FA1.1a | Fire Alarm Details - Base System |
| A3.3 | BBB National Account Vendors & Specified Manufactures w/ Distribution Schedule | FA1.1b | (Alternate) Fire Alarm Details – Occupant Notification |
| A4.1 | Exterior Elevations | FA1.1c | (Alternate) Fire Alarm Details – Full Smoke Detection |
| A5.1 | Building Sections, Interior Wall Sections | FA1.2a | Fire Alarm Device Lists & Calcs - Base System |
| A5.2 | Exterior Wall Sections | FA1.2b | (Alternate) Fire Alarm Device Lists & Calcs - Occupant Notification |
| A5.3 | Exterior Wall Sections | FA1.2c | (Alternate) Fire Alarm Device Lists & Calcs - Full Smoke Detection |
| A5.4 | Exterior Wall Sections | | |
| A5.5 | Interior Wall Sections | M1.1 | Mechanical General Information |
| A5.6 | Alternate Scissor Lift Plan, Section, Specification & Notes | M2.1 | Mechanical Floor Plan |
| | | M2.1a | (Alternate) Mechanical Floor Plan |
| A6.1 | Exterior Details | M3.1 | Mechanical Enlarged Plans & Details |
| A6.2 | Interior and Exterior Details | M4.1 | Mechanical Schedules |
| A6.3 | Slatwall Details | | |
| A7.1 | Large Scale Plans | E1.1 | Electrical General Information & Schedules |
| A7.2 | Large Scale Plans & Partition Types | E2.1 | Power Plan |
| A8.1 | Interior Details | E2.2 | Lighting Layout Plan |
| A8.2 | Interior Details | E2.3 | Lighting Circuiting Plan |
| A8.3 | Customer Service Desk | E2.4 | Specialty Lighting Plans & Diagrams |
| A8.4 | Register Bays and Remote Service Desks | E2.5 | Specialty Lighting Elevations |
| A9.1 | Interior Elevations | E3.1 | Electrical Large Scale Plans & Details |
| A9.3 | Alternate Plans, Elevations & Details | E3.2 | Lighting Sequencing |
| A9.4 | FTG Fixture Plan & Vendor Responsibility Schedule | E3.3 | Electrical Details |
| A9.5a | (Alternate) – Vertical Core Sections | E4.1 | Electrical Schedules |
| A9.5b | (Alternate) – Vertical Core Plans Elevation & Details | E4.2 | Electrical Diagrams |
| A9.6a | (Alternate) – Awning Elevations & Details | E4.3 | Power Wall Details, Security Details, Sign Schedule |
| A9.6b | (Alternate) - Awning Details | E4.4 | Novar Wiring Details |
| A9.6c | (Alternate) - Awning Wall Sections | E4.4a | (Alternate) Novar Wiring Details for Non-Lennox RTU's |
| HP1.1 | High Pile Storage Plan & Fixture-Shelf Details | E4.5 | ETM Wiring Details for Lennox RTU's |
| | | E4.5a | (Alternate) ETM Wiring Dtls for Non-Lennox RTU's |
| S1.1 | Structural General Information & Typical Details | E5.1 | FTG Power, Lighting, Specialty Lighting |
| S2.1 | Foundation Plan | | |
| S2.2 | Roof Framing Plan | | |
| S3.1 | Foundation Details | | |
| S3.2 | Roof Framing Details | | |

    b)  **Bed Bath & Beyond – PROTOTYPE VERSION 1.2009 – Project Manual (dated 07/15/09)**

3.  Lease Exhibits : Landlord's Plans & Specifications shall conform to all provisions of Exhibits B, D, D-1, D-2 and F to this Lease.

---

B.   Landlord's Plans & Specifications shall also include the following items :

   1.   All architectural elevations and construction details for all pylon, monument and directional signs located throughout the Shopping Center.

   2.   All architectural elevations and partial sidewalk plans of all other tenants and occupants of the Shopping Center.

   3.   *Complete civil engineering documents that describe planned improvements to the Shopping Center.*

   4.   Geo-technical and Storm-water design reports.

C.   Landlord shall be responsible for ensuring that Landlord's Plans & Specifications are in full compliance with all applicable regional/governmental Requirements. Such regional/governmental Requirements may not be addressed in the "Tenant's Plans" or the "Tenant's Prototype Drawings & Specifications". Such Requirements may include (but shall not be limited to) the following: Fire-rated partitions separating Receiving/Pre-Sales Areas from Sales Areas [incl. protection of openings through fire-rated partitions]; Disability access to mezzanine level [i.e. - ADA lift; limited use/limited application elevator; passenger elevator]; Second egress stair from the mezzanine level; Quantity of restroom fixtures; Quantity & location of egress doors, Quantity & location of egress stairs; Smoke purge and pressurization system; Smoke/heat vents; Draft curtains; Fire rated assemblies, Etc.. Landlord shall be responsible for coordination of all regional/governmental requirements with Tenant and "Tenant's Plans".

D.   Hierarchy :

   1.   In the event of a conflict among the following documents, the following hierarchy ('a' representing the highest priority) shall be used to determine which documents govern :
      a.   Lease Exhibits B, D [excluding Tenant's Prototype], D-1, D-2 & F
      b.   Tenant's Plans
      c.   Tenant's Prototype Drawings and Specifications
      d.   Landlord's Plans and Specifications

   2.   To the extent any of the documents listed above conflict with applicable regional or governmental requirements, said documents shall be revised (prior to construction) to accommodate the regional or governmental requirements to the mutual satisfaction of both Landlord and Tenant.

E.   Quality Control Review :

   1.   At the time the Landlord's Plans & Specifications are 85% complete, Landlord shall submit to Tenant for Tenant's review one (1) complete full size set and one (1) complete ½ size set. Tenant may (at Tenant's option) employ a third party consultant to review the submittal, in which event, prior to the commencement thereof, Landlord shall reimburse Tenant for the fixed cost ($1500 - All payments must be made in US Dollars or the foreign equivalent thereof) related to such third party review. If the submittal is "rejected" or noted as "revise and resubmit" by Tenant then Landlord shall revise the Landlord's Plans & Specifications to address all Tenant comments.

   2.   Landlord shall provide to Tenant (for Tenant's review and approval) a separate and complete submittal for each subsequent iteration/revision to Landlord's Plans & Specifications. Tenant may (at Tenant's option) employ a third party consultant to review each subsequent submittal, in which event, prior to the commencement thereof, Landlord shall reimburse Tenant for the fixed cost (not to exceed $1,500 - All payments must be made in US Dollars or the foreign equivalent thereof) related to such third party review. If the submittal is "rejected" or noted as "revise and resubmit" by Tenant then Landlord shall revise the Landlord's Plans & Specifications to address all Tenant comments.

   3.   Landlord's Plans & Specifications submitted to Tenant for review and approval must be in the same Format as "Tenant's Prototype Plans & Specifications" unless otherwise authorized in writing by Tenant. Tenant shall not be obligated to review or approve improperly formatted submittals of Landlord's Plans & Specifications. Improperly formatted submittals shall not be deemed to be in compliance with Section 3.2 ("Plan Approvals") of the Lease. Tenant reserves the right to immediately disapprove and return improperly formatted submittals to the Landlord and the Landlord shall be solely responsible for all costs and/or delays relating to revising/correcting and resubmitting the Landlord's Plans & Specifications to Tenant for review and approval.

   4.   Construction Closeout (subsequently outlined in this Exhibit) shall not be deemed "complete" until Landlord has secured Tenant approval of Landlord's Plans and Specifications.

## II. Site Specifications

A.   All parking areas and traffic drives in the Shopping Center shall consist of a minimum 9" of compacted sub-base (95% compacted), 3" asphalt base, and 2" asphalt surface finish. Grading of these areas shall not exceed a slope of 2% unless specifically approved in writing by Tenant. Utilization of any portion of the parking field for above ground storm water retention/detention is prohibited. All parking areas and traffics drives are existing and were constructed based on the above specifications.

B.   All truck access drives in the Shopping Center shall consist of a minimum 12" of compacted sub-base (95% compacted), 3" asphalt base, and 3" asphalt surface finish. Grading of these areas are not to exceed a slope of 3% unless specifically approved in writing by Tenant. All truck access drives are existing and were constructed based on the above specifications.

C.   Tenant's truck ramp, Trash Compactor Pad and Trash Container Pad shall consist of 12" compacted sub-base (95% compacted), 4" compacted granular base and 6" Portland cement concrete surface finish. Tenant's truck ramp shall include #4 re-bars at 18" on center each direction. Tenant's recessed truck ramp shall not exceed slope of 6%.

D.   If Landlord's geo-technical report for the Shopping Center recommends more stringent requirements, then the geo-technical report recommendations shall supersede the criteria stated in items A, B, and C above.

E.   The minimum lighting level throughout the Shopping Center (parking areas, traffic drives, service drives, etc.) shall be two (2) foot-candles, measured 30" above grade. Landlord shall include a photometric plan, which shall confirm that the proposed lighting meets these requirements as part of Landlord's Plans & Specifications. Landlord shall not include illumination from building-mounted wall packs when calculating the required foot-candle level. Landlord shall also provide low level security

lighting min. (1) foot-candle on the buildings throughout center that shall remain illuminated from dusk to dawn seven days a week. **III. Building Requirements**

The following section both (a) highlights elements of Landlord's Work which are already specified in "Tenant's Prototype Drawings & Specifications" and (b) identifies project-specific elements of Landlord's Work which are <u>in addition to</u> the scope detailed in "Tenant's Prototype Drawings & Specifications" :

A.  <u>Clear Height</u> : All Building Systems shall be designed to allow Tenant to stock merchandise to 16'-6"a.f.f.  Various systems shall be designed to conform with the following criteria :
1.  18'-4" minimum clear height to underside of all structural system components.
2.  16'-0" minimum clear height to underside of all plumbing & electrical system components [excluding lighting]
3.  17'-6" minimum clear height to underside of all mechanical system components [i.e. - ductwork]
4.  19'-0" maximum clear height to underside of all mechanical supply and return ducts
5.  16'-6" minimum clear height to underside of all fire protection sprinkler piping (main and branch lines)
6.  1" minimum and 6" maximum from fire sprinkler heads to underside of roof/floor deck above
7.  22'-0" maximum clear height at the lowest point of the underside of roof/floor deck above (excluding elevator override)

B.  <u>Fire Protection</u> : Landlord shall furnish and install both a fire alarm system and a fire sprinkler system in accordance with the criteria established in "Tenant's Prototype Drawings & Specifications", or more stringent criteria as may be applicable.

1.  Landlord shall issue one complete submittal each for : (i) the fire alarm system and (ii) the fire sprinkler system (per Sections 01340, 15300 and 16720 of the "Tenant's Prototype Drawings & Specifications") to Tenant's National Fire Protection Consultant (listed below) for review and approval.  Each initial submittal must be received by Tenant's Consultant no later than (12) weeks prior to projected Delivery Date.  Upon receipt of an invoice from Tenant's Consultant, Landlord shall pay a fixed fee ($625 for Fire Alarm + $625 for Fire Sprinkler) directly to Tenant's Consultant.  If any submittal is "rejected" or noted as "amend and resubmit" by Tenant's Consultant then Landlord shall revise the submittal to address all Consultant comments and resubmit.  Upon receipt of an invoice from Tenant's Consultant, Landlord shall pay a fixed fee ($400 each) directly to Tenant's Consultant for review of any re-submittal.  All payments must be made in US Dollars or the foreign equivalent thereof.

2.  Landlord shall be responsible for monitoring the fire alarm system up to 90 days following the Delivery Date.

3.  The sprinkler system shall be designed to allow merchandise to be stored within 18" of the sprinkler heads.  The system shall comply with 2002 (or later) version of NFPA13, (high pile solid shelf storage) for class I-IV commodity solid shelves, minimum 4-foot aisles [typically, .486 GPM over 2000 sf will be required].

4.  The sprinkler system shall NOT utilize a fire pump.  If water pressure is inadequate and system cannot be designed to properly function without incorporating a fire pump, then Landlord shall locate any required Fire Pump outside of the Premises.  Landlord shall, at no cost to Tenant and for the full term of the Lease, routinely inspect, test, and maintain the Fire Pump in accordance with NFPA 25, Standard for the Inspection, Testing, and Maintenance of Water-based Fire Protection Systems (Chapter 5 of 1998 Edition), and shall otherwise maintain the fire pump.

5.  Consulting Services : If Tenant's National Fire Protection Consultant (listed below) is needed to assist Landlord with approvals from governmental authorities (i.e. - completing technical discussions with governmental authorities to explain/clarify design parameters, calculations, high pile storage commodity classifications, fire pump design, etc.), then Landlord shall directly pay Tenant's Consultant for all time and materials. If Landlord fails to pay Tenant's Consultant in a timely manner, then Tenant shall have the right to make said payment and, at Tenant's option, receive a credit against "Changes" under the lease or deduct the amount from Rent in order to satisfy outstanding invoice.

6.  Tenant's National Fire Protection Consultant :    Mr. Will Smith / Code Consultants, Inc.  (CCI)
1804 Borman Circle Drive
St. Louis, MO  63146-4136
(314) 991-2633 [ph]
(314) 991-4614 [fax]
wills@codeconsultants.com

C.  <u>Office Mezzanine Access</u> : Prior to the development of Tenant's Plans, Landlord shall coordinate with the Authority Having Jurisdiction and advise Tenant of all applicable requirements regarding vertical transportation at the office mezzanine.  In the event that vertical transportation equipment is required, Landlord shall provide and install the appropriate vertical transportation equipment in accordance with "Tenant's Prototype Drawings & Specifications".  Vertical transportation equipment installation by the Landlord shall be <u>complete</u>, fully code compliant and inspected and shall allow Tenant to fixture, merchandise and open for business to the public in the Premises.  All equipment shall be operational a minimum of (2) two weeks prior to the Delivery Date to allow for proper "burn-in" in accordance with Tenant's Prototype Specifications Sections 14205 and 14255.  Final locations of all equipment shall be in accordance with Tenant's Plans.

D.  <u>Floor System</u> : Landlord shall provide and install a concrete floor slab in accordance with "Tenant's Prototype Drawings & Specifications".  The floor system shall utilize 4,000 psi concrete and maintain a minimum thickness of 4 inches.  The floor system shall be designed to accept a minimum 125 lbs. per square foot of live load.  If rebar or pre-tensioned / post-tensioned steel is required, such reinforcement shall not be placed within the top 2 ½" of the concrete slab.

E.  <u>Utilities</u> : Landlord shall ensure that all utilities serving the Premises (including but not limited to electric, gas, water, fire protection water, sanitary sewer and phone services) are separately metered exclusive of all other tenants and occupants in the Shopping Center.  Tenant's utility services shall be provided directly by the Utility company (sub-metering is prohibited). Location of utility lines and equipment serving other Tenants in the Shopping Center shall be prohibited on, under, over, across or within the Premises.  Landlord shall ensure that all utilities serving the Premises are active or are made active on or before the Delivery Date.  Landlord shall assist Tenant in transferring all utility accounts to Tenant so that Tenant may assume responsibility for utility costs commencing on the Delivery Date.  If Landlord and Tenant are unable to complete transfer at time of Delivery, then Tenant shall reimburse Landlord for utility costs from Delivery Date until transfer has been completed.

F.  <u>Intumescent Paint</u> : In the event that fire-proofing of exposed structural elements is required, then Landlord shall use intumescent fire resistant coating to achieve the required fire rating.  Application shall be neat & clean and in accordance with manufacturer's recommendations.

G.  <u>Exit Signs</u> - Any existing Self Luminous Exit Signs containing Tritium Gas shall be removed from the Premises at the Landlord's cost (if applicable).

---

H.  Exterior Storefront to be Xtra dark Bronze per the architectural criteria. The interior to be clear annodized per BBBY specs. If any other tenant other than Target is allowed a storefront color other than Xtra Dark Bronze than BBBY will be allowed the prototype spec at landlord expense.

## IV. Construction Coordination Requirements

A.  Schedule : Landlord shall provide Tenant with a critical path construction schedule prior to commencement of Landlord's Work. Following the commencement of Landlord's Work, Landlord shall provide an updated critical path construction schedule to Tenant's Construction Project Manager every two weeks until Landlord's Work is complete.

B.  Photographs : Throughout the period during which Landlord's Work is being performed, Landlord shall provide to Tenant's Construction Project Manager, on a weekly basis, then-current photographs of the interior and exterior of the Premises, and the Shopping Center site, showing the progression of Landlord's Work. All photographs shall be in a digital format, and transmitted to Tenant at the following e-mail address : BBB.2000photos@bedbath.com

C.  Vendor Coordination : Landlord shall be responsible for contracting, coordinating and scheduling directly with Tenant's Specified National Account Vendors.

## V. Building and Site Signs

A.  Building Signs -- Landlord shall furnish and install all building signs shown on Exhibits D-1 and F of this Lease using Tenant's specified vendor only. Landlord shall verify actual number of circuits required for each sign with Tenant's specified vendor. Landlord shall install conduit continuously from Tenant's panel in Premises to all sign locations. Landlord shall execute a purchase order with Tenant's specified vendor no later than ten (10) weeks prior to Delivery Date. If Landlord fails to execute a purchase order prior to the established deadline, then Tenant (at its option) may execute a purchase order with Tenant's specified vendor and (at its option) deduct all costs from rent or receive a credit against "Changes" as defined in the Lease. If Tenant does not provide written notice to Landlord regarding Tenant's decision to execute a purchase order with Tenant's specified vendor, then Landlord shall remain responsible to execute the purchase order.

B.  Remote Building Sign(s) – [Building Sign(s) not located on Premises] Not Applicable.

C.  Pylon/Monument/Directional Signs -- Landlord shall furnish and install all pylon /monument /directional signs (s) shown on Exhibit F to this Lease, complete (including, without limitation, sign structure, any required electrical service, sign panels, and Tenant's specified graphics). Landlord to furnish, install and remove (at Tenant's request) temporary non stick vinyl graphics as detailed in exhibit F.

D.  Temporary Signs -- Commencing on the Effective Date, and continuing thereafter through the Rent Commencement Date, Landlord shall furnish, install and maintain (for such duration as Tenant may desire or as permitted by the Operating and Easement Agreement between Target Corporation and Midland Rushmore, LLC dated 10/27/07) all temporary signs as detailed in Exhibit F to the Lease and listed below. Temporary signage shall be in accordance with Tenant's Prototype Drawings & Specifications :
   1.  Two double sided temporary banners mounted to the Premises bearing the phrase :
       Banner #1 - "Coming Soon" (side a) and "Grand Opening" (side b).
       Banner #2 - "Why Wait ? Shop Online" (side a) and "Now Open" (side b).
   2.  Two double sided banners at the temporary site sign located per Exhibit B to the Lease, bearing the phrase:
       Banners #1 & #2 – "Coming Soon" (side a) and "Now Open" (side b).
   3.  One double sided banner sign mounted to Tenant's Hiring Trailer bearing the phrase :
       "Now Hiring" (side a) and "Now Open" (side b).
At Tenant's request, Landlord shall relocate Tenant's temporary signage should the signage visibility become obstructed.

Landlord shall secure banners through the following vendor:

> Sarah Dehebreard / Corporate Identification Solutions
> 5308 N. Northwest Highway
> Chicago, IL 60630
> (773) 763-9600 [ph]
> (773) 763-9606 [fax]
> sdehebreard@corporateidsolutions.com  -
> www.corporateidsolutions.com

E.  Shop Drawings : Landlord shall provide complete shop drawings of all Landlord-furnished signs to Tenant for Tenant's approval no later than twelve (12) weeks prior to the Delivery Date.

## VI. Permits and Approvals

A.  Landlord shall be obligated to secure all permits required to allow Tenant to fixture, merchandise and open for business to the public in the Premises. Such permits may include (but shall not be limited to) the following : Building Permit, Health Permit [for the sale of prepackaged foods], Fixture Permit, Seismic Permit, High Pile Storage Permit [for storage of merchandise above 12'-0-"] and Signage Permits.

If seismic calculations, plans and details are required, then Landlord shall be obligated to contract with "Seizmic Inc." no later than twelve (12) weeks prior to the Delivery Date. Seizmic Inc. shall provide all necessary services to assist Landlord in securing the Fixture Permit. These services include completion of all required submittal documents, required applications, responses to inquiries from the authority having jurisdiction and monitoring status of the permit application. Actual submission of the required documents to the Authority Having Jurisdiction shall be made only by Seizmic, Inc. (or other vendor selected at Tenant's discretion).

> Sal Fateen or Genie Fateen / Seizmic Inc.
> 161 Atlantic Street, Pomona, CA 91768
> (909) 869-0989 [ph]

Landlord shall be obligated to take possession of fixture permit and transfer the permit to Tenant's fixture Installer. If fixture permit is required, then Landlord shall secure fixture permit no later than (2) weeks prior to Delivery Date.

## VII. **Construction Closeout**

A. <u>Electronic Format</u> : Within thirty (30) days following the "Substantial Completion" date, Landlord shall be obligated to issue one (1) hard copy of ALL required Closeout Documents to :

Digital Reliance Incorporated (DRI)
386 Charmel Place
Columbus, OH 43235
(614) 430-5950 [ph]
jg@digital-reliance.com

Closeout Documents shall be in accordance with those requirements outlined in "Tenant's Prototype Drawings & Specifications" Project Manual Section 01700.  DRI shall scan all documents to disk for Tenant's future use.  Landlord shall be responsible to pay DRI directly for the $675 cost associated with this service.  Payment for this fixed fee must accompany the initial submittal to DRI.  All payments must be made in US Dollars or the foreign equivalent thereof.

Prior to scanning the documents, DRI will review the submittal for general conformance with the base minimum submittal requirements (per "Tenant's Prototype Drawings & Specifications").  DRI shall inform Landlord directly of any missing documents.  After <u>all</u> Closeout Documents have been received by DRI and scanned, a disk with electronic files will be issued to Tenant's Construction Project Manager.  DRI will <u>not</u> review items for content.  Content will be reviewed by Tenant's Construction Project Manager after receipt of electronic files from DRI.  If Tenant's Construction Project Manager notifies Landlord that a resubmittal is required due to incorrect content, Landlord shall resubmit amended documents to DRI for scanning and incorporation into file until approved by Tenant's Construction Project Manager.

B. <u>Warranties</u> : Landlord shall cause its contractor(s) to instruct Tenant's Construction Project Manager in the operation of any equipment installed as part of Landlord's Work.  All of Landlord's Work shall be performed in a manner which will not void, impair or diminish any manufacturers', installers', or contractors' warranties which otherwise would have been provided by such manufacturer, installer, or contractor to either Landlord or Tenant.  Two (2) months prior to the end of the warranty period, Landlord shall forward a written report to Tenant outlining the condition of all warranty items.

C. <u>Late Closeouts</u> : If Landlord fails to deliver any of the instruments and items (collectively, the "Close-out Documents") described in paragraph A above within the prescribed thirty (30) day period, then Tenant may provide Landlord with notice of such failure. If Landlord has not remedied such failure within fifteen (15) days after Tenant's delivery of such notice, then Tenant shall be entitled to an abatement in Rent in the amount of One Hundred ($100.00) dollars for each day that Landlord has not so delivered all of the Close-out Documents.

D. <u>Itemized Costs</u>: Landlord shall provide Tenant with its itemized "final cost" for all of Landlord's Work within thirty (30) days following the Substantial Completion Date.

E. <u>Energy Rebate Information</u> : Landlord shall be obligated to provide to Tenant (within 30 days of Tenants request) copies of manufacturer invoice(s), manufacturer cut sheets, subcontractor invoices, etc. for any item or items described within this Exhibit for Tenant's pursuit of energy rebate programs that are in force by the Authority Having Jurisdiction and/or the utility provider.

1                                        <u>Exhibit D-1</u>

2                           <u>Exterior Elevations of Premises and Sidewalk Plan</u>

3

D-1-1

DMEAST #10098913 v6



# RUSHMORE CROSSING
## Rapid City, SD

Date
1 MARCH 2010

# EXHIBIT D-1

## MATERIALS LIST:

| | |
|---|---|
| ST-2 | CULTURED STONE - BOULDER CREEK COLOR: PRAIRIE BLUFF NAVAJO |
| TILE 1 | NERO PORCELAIN 12" X 12" (BBD NATIONAL ACCOUNT) |
| TILE 2 | NERO PORCELAIN 8" X8" (BBD NATIONAL ACCOUNT) |
| BR-10 | ENDICOTT CLAY PRODUCTS COLOR: MEDIUM IRONSPOT 46 SIZE: UTILITY / TEXTURE: VELOUR |
| EIFS-1 | DRYVIT COLOR #13 AMARILLO WHITE TEXTURE: SANDBLAST TEXTURE (LIGHT) |
| EIFS-1 | STO COLOR #20848 TEXTURE: STO LIT 1.5 |
| EIFS-8 | STO COLOR #20411 TEXTURE: STO LIT 1.5 |
| MTL-3 | UNACLAD METAL FLASHING COLOR: ALMOND |

## KEYNOTES:

1. 10'-0" X 40'-0" BED BATH & BEYOND SIGN STACKED INDIVIDUALLY ILLUMINATED WHITE CHANNEL LETTERS W/ WHITE FACE AND WHITE RETURNS ON SIDE OVER 12" X 12" NERO PORCELAIN TILE

3·2·10

**RUSHMORE CROSSING**
Rapid City, SD

Date
_____
29 JANUARY 2010

## EXHIBIT D-2



TARGET
FF ELEV. = 3237.80'

BBB
FF ELEV. = 3237.13'

IN-LINE
FF ELEV. = 3236.47'

① EXTENDED ELEVATION

3·2·10



# RUSHMORE CROSSING
### Rapid City, SD

Date

1 MARCH 2010

# EXHIBIT D-1

**MATERIALS LIST:**

| | |
|---|---|
| ST-2 | CULTURED STONE-BOULDER CREEK COLOR: PRAIRIE BLUFF NAVAJO |
| TILE 1 | NERO PORCELAIN 12" X 12" (BBB NATIONAL ACCOUNT) |
| TILE 2 | NERO PORCELAIN 8" X8" (BBB NATIONAL ACCOUNT) |
| BR-10 | ENDICOTT CLAY PRODUCTS COLOR: MEDIUM IRONSPOT 46 SIZE: UTILITY / TEXTURE: VELOUR |
| EIFS-1 | DRYVIT COLOR #13 AMARILLO WHITE TEXTURE: SANDBLAST TEXTURE (LIGHT) |
| EIFS-1 | STO COLOR #0848 TEXTURE: STO LIT 1.5 |
| EIFS-8 | STO COLOR #0411 TEXTURE: STO LIT 1.5 |
| MTL-3 | UNACLAD-METAL FLASHING COLOR: ALMOND |

**KEYNOTES:**

1. 10'-0" X 40'-0" BED BATH & BEYOND SIGN STACKED INDIVIDUALLY ILLUMINATED WHITE CHANNEL LETTERS W/ WHITE FACE AND WHITE RETURNS ON SIDE OVER 12" X 12" NERO PORCELAIN TILE

3·2·10

# RUSHMORE CROSSING
## Rapid City, SD

Date

29 JANUARY 2010

## EXHIBIT D-2



1  EXTENDED ELEVATION

3·2·10

Exhibit E

Permitted Encumbrances

1.  Easement awarded to the United States of America to construct, operate and maintain an electric transmission line over and across the W1/2SW1/4 of Section 29, T2N, R8E and other property, together with rights, appurtenant thereto, as set forth in Judgment of Declaration of Taking recorded April 22, 1952, in Misc. Book 52, Page 338, and shown as an existing 75 foot powerline easement crossing Tract E in Block 2 and Lot 1 in Block 3 of Rushmore Crossing on the plat filed in Plat Book 34, Page 172 and as located on the Rushmore Crossing ALTA/ACSM Land Title Survey by Arleth & Associates dated March 20, 2007, Revised October 19, 2007, Job No. 02-0028.

2.  Controlled Access to Lot H3 of the SWl/4 of Section 29, T2N, R8E (Interstate 90 right-of-way) as shown on the plat filed in Highway Plat Book 3, Page 109, in accordance with Chapter 155 of the 1953 Session Laws of the State of South Dakota, as set forth in deed to the State of South Dakota recorded August 4, 1958, in Deed Book 119, Page 394. "No Access"; and

Controlled Access to Lot H1 of the SW1/4 of Section 29, T2N, R8E (Interstate 90 right-of-way) as shown on the plat filed in Highway Plat Book 3, Page 113, in accordance with Chapter 155 of the 1953 Session Laws of the State of South Dakota, as set forth in deed to the State of South Dakota recorded August 20, 1958, in Deed Book 119, Page 528. No Access"; and

Control of access to property located in the N1/2SE1/4 of Section 30 and the SW1/4 of Section 29, T2N, R8E (Interstate 90 right-of-way) which was condemned and taken by the United States of America, acting by and through the Department of Commerce, Bureau of Public Roads and conveyed to the South Dakota Department of Highways, as set forth in instrument recorded October 13, 1962, in Deed Book 138, Page 68.

Controlled Access to Lot H3 in the unplatted portion of the N1/2SE1/4 lying south of the Interstate 90 right of way of Section 30, T2N, R8E as shown on the plat filed in Highway Plat Book 10, Page 148, and to Lot H4 in the unplatted portion of the SW1/4 lying south of the Interstate 90 right of way and north of the railroad right of way and excepting therefrom Tract C in Section 29, T2N, R8E, as shown on the plat filed in Highway Plat Book 10, Page 150, in accordance with SDCL 31-7, and amendments thereto, as set forth in deed to South Dakota Department of Transportation recorded July 8, 2004, in Book 133, Page 9109. "No access will be permitted to or from Interstate 90".

3.  Easement awarded to the United States of America to construct, operate and maintain an electric transmission line through, over and across Lot 2 of the NW1/4SW1/4 of Section 29, T2N, R8E and the W1/2SW1/4 of Section 29 and Lots 1 and 2 of the NW1/4SW1/4 of said Section 29, T2N, R8E, and other property, together with rights appurtenant thereto, as set forth in Judgment of Declaration of Taking recorded February 6, 1962, in Misc. Book 78, Page 459, and shown as an existing 75 foot powerline easement crossing Lot 1 in Block 3 of Rushmore Crossing on the plat filed in Plat Book 34, Page 172, and as located on the Rushmore Crossing ALTA/ACSM Land Title Survey by Arleth & Associates dated March 20, 2007, Revised October 19, 2007, Job No. 02-0028.

4.  Statement on Warranty Deed recorded August 2, 1962 in Deed Book 137, Page 206 conveying to the State of South Dakota highway rights of way adjoining Tract C in the NE1/4NW1/4 and in the NWl/4NEl/4 of Section 32, T2N, R8E on the east, as follows: "In accordance with Chapter 155 of the 1953 Session Laws of the State of South Dakota, the grantor, his heirs or assigns to have no access to said abutting and adjacent Highway System." Located on the ALTA/ACSM Land Title Survey by Arleth & Associates dated February 22, 2007, Revised July 26, 2007, Job No. 02-0028.

5.  Right-of-Way and easement awarded to Black Hills Corporation to construct, operate and maintain an electric transmission system over, across and under the SW1/4 south of highway right-of-way (I-90) Lot H2, excepting Tracts C, D and the railroad right-of-way in Section 29, T2N, R8E, together with rights appurtenant thereto, as set forth and as shown in Judgment on Jury Verdict recorded October 16, 1996, in Book 64, Page 8891, and recorded February 3, 1997, in Book 66, Page 307, and shown as an existing 40 foot powerline easement crossing Lot 1 in Block 3 of Rushmore Crossing on the plat filed in Plat Book 34, Page 172, and as located on the Rushmore Crossing ALTA/ACSM Land Title Survey by Arleth & Associates dated March 20, 2007, Revised October 19, 2007, Job No. 02-0028.

6. Easement over Tract C in the NE1/4NW1/4 and the NW1/4NE1/4 of Section 32, T2N, R8E (now a portion of Tract E in Block 2 of Rushmore Crossing) for the purpose of the placement, construction, use, maintenance, repair, replacement, enlargement and/or removal of the existing outdoor advertising structures and advertising signs, together with terms and conditions contained therein, as set forth in Easement Agreement recorded April 9, 2003, in Book 113, Page 8358, and as located on the ALTA/ACSM Land Title Survey by Arleth & Associates dated March 20, 2007, Revised October 19, 2007, Job No. 02-0028.

7. Statement on Warranty Deed recorded October 21, 2004 in Book 137, Page 8290 conveying to South Dakota Department of Transportation control of access to and from Tract C in the NE1/4NW1/4 and NW1/4NE1/4 of Section 32, T2N, R8E (now a portion of Tract E in Block 2 of Rushmore Crossing), as follows: "The transfer of the CONTROL OF ACCESS is in accordance with the authority granted the South Dakota Transportation Commission to construct and maintain controlled access facilities pursuant to SDCL 31-7. No access will be permitted to and from interstate 90 ramp or US 16B, except a shared 36 foot wide approach within the 33 foot right of way of the section line, of Tract C in the NE1/4NW1/4 and NW1/4NE1/4 of Section 32, Township 2 North, Range 8 East of the B.H.M., Pennington County, South Dakota." Located on the Rushmore Crossing ALTA/ACSM Land Title Survey by Arleth & Associates dated March 20, 2007, Revised October 19, 2007, Job No. 02-0028.

8. Covenants, conditions, restrictions and reservations in Covenant of Dedication recorded January 24, 2007, in Book 165, Page 8898, and shown as "Drainage and/or Existing Wetland Easement Book 165, Page 8898" crossing Lot 2 in Block 1, Tract B in Block 2 and Lot 1 in Block 3 of Rushmore Crossing on the plat filed in Plat Book 34, Page 172, and listed as Existing Easement (A) and (E) located on Lot 5, Block 2, Rushmore Crossing plat file din Plat Book 35, page 173, and as located on the Rushmore Crossing ALTA/ACSM Land Title Survey by Arleth & Associates dated March 20, 2007, Revised October 19, 2007, Job No. 02-0028.

9. Covenants, conditions, restrictions and reservations in Covenant of Dedication recorded January 24, 2007, in Book 165, Page 8908, and shown as "Drainage and Existing Wetland Easement Book 165, Page 8908" crossing Tract B in Block 2 of Rushmore Crossing on the plat filed in Plat Book 34, Page 172, and listed as Existing Easement (A) and (E) located on Lot 5, Block 2, Rushmore Crossing plat file din Plat Book 35, page 173, and as located on the Rushmore Crossing ALTA/ACSM Land Title Survey by Arleth & Associates dated March 20, 2007, Revised October 19, 2007, Job No. 02-0028.

10. The limitations, covenants, conditions, restrictions, easements, reservations, exceptions, terms, liens or charges contained in the Agreement Waiving Right to Protest dated May 21, 2007, recorded May 29, 2007, in Book 169, Page 8082, and recorded June 26, 2007, in Book 170, Page 8766.

Indemnity Agreement relating to said Agreement executed by Midland Rushmore, LLC for the benefit of Sam's Real Estate Business Trust recorded December 22, 2009, in Book 195, Page 7125.

11. The limitations, covenants, conditions, restrictions, easements, reservations, exceptions, terms, liens or charges contained in the Covenant Agreement between the City of Rapid City and Midland Rushmore, LLC, Securing the Payment of Future Off-site Improvements to Serve Rushmore Crossing, dated June 18, 2007, recorded July 24, 2007, in Book 171, Page 7105, provided that no exception is taken for liability under Sections 2 and 3 of said Covenant Agreement.

Indemnity Agreement relating to said Covenant Agreement executed by Midland Rushmore, LLC for the benefit of Furniture Row USA, LLC, recorded October 25, 2007, in Book 174, Page 4256.

Indemnity Agreement relating to said Covenant Agreement executed by Midland Rushmore, LLC for the benefit of Rapid City Telco Federal Credit Union recorded May 8, 2009, in Book 189, page 2226.

Indemnity Agreement relating to said Agreement executed by Midland Rushmore, LLC for the benefit of Sam's Real Estate Business Trust recorded December 22, 2009, in Book 195, Page 7131.

12. Easement granted to the City of Rapid City to install, operate, maintain, repair, remove and replace a waterline under that portion of the SW1/4 of Section 29, T2N, R8E lying south of I-90 and lying north of the railroad right-of-way, excepting therefrom Lot A of the SE1/4SW1/4, and

DMEAST #10098913 v6

1  excepting therefrom Tract C of said SW1/4, and excepting therefrom Lot 1R, Lot BR of Lot 2
2  and Lot C of Lot 2 of the SE1/4SW1/4, and excepting therefrom the W1/2SW1/4SW1/4SW1/4
3  lying north of said Tract C, which is shown in Exhibit A as a waterline easement crossing Tracts
4  B, D and E in Block 2 of Rushmore Crossing, together with any limitations, covenants,
5  conditions, restrictions, easements, reservations, exceptions or terms therein, as set forth in the
6  Permanent Utility Easement dated October 9, 2007, recorded October 12, 2007, in Book 174,
7  Page 802.

8  13. Easement granted to the City of Rapid City to install, operate, maintain, repair, remove and
9  replace a waterline under that portion of the SW1/4 of Section 29, T2N, R8E lying south of I-90
10 and lying north of the railroad right-of-way, excepting therefrom Lot A of the SE1/4SW1/4, and
11 excepting therefrom Tract C of said SW1/4, and excepting therefrom Lot 1R, Lot BR of Lot 2
12 and Lot C of Lot 2 of the SE1/4SW1/4, and excepting therefrom the W1/2SW1/4SW1/4SW1/4
13 lying north of said Tract C, including Lot BR of Lot 2 and Lot C of Lot 2 of the SE1/4SW1/4,
14 which is shown in Exhibit B as a waterline easement crossing Tract E in Block 2 of Rushmore
15 Crossing, together with any limitations, covenants, conditions, restrictions, easements,
16 reservations, exceptions or terms therein, as set forth in the Permanent Utility Easement dated
17 October 9, 2007, recorded October 12, 2007, in Book 174, Page 809.

18 14. Easement granted to the City of Rapid City to install, operate, maintain, repair, remove and
19 replace a waterline under Lot 1R of Lots 1 and 2 and a portion of section line right-of-way
20 (Century Road) to be vacated, all in the SE1/4SW1/4 of Section 29, T2N, R8E, which is shown
21 in Exhibit C as a waterline easement crossing Tract E in Block 2 of Rushmore Crossing,
22 together with any limitations, covenants, conditions, restrictions, easements, reservations,
23 exceptions or terms therein, as set forth in the Permanent Utility Easement dated October 9,
24 2007, recorded October 12, 2007, in Book 174, Page 815.

25 15. The limitations, covenants, conditions, restrictions, easements, reservations, exceptions,
26 terms, liens or charges contained in the Storm Water Detention Easement Agreement between
27 Midland Rushmore, LLC, grantor, and Peter Hendricksen, and Betty J. Flack and Leigh H.
28 Tange, as Co-Trustees of the Ray T. Flack Family Trust, grantees, to use the storm water
29 detention facility located on Tract B in Block 2 of Rushmore Crossing for the collection and
30 detention of surface and storm water from adjacent properties owned by said grantees
31 described therein, recorded October 25, 2007, in Book 174, Page 4210, and listing as Existing
32 Easement (J) located on Lot 5, Block 2, Rushmore Crossing plat filed in Plat Book 35, Page
33 173.

34 16. The limitations, covenants, conditions, restrictions, easements, reservations, exceptions,
35 terms, liens or charges contained in the Easement Agreement with Covenants, Conditions and
36 Restrictions by and between Midland Rushmore, LLC and Furniture Row USA, LLC, recorded
37 October 25, 2007, in Book 174, Page 4225.

38 17. The limitations, covenants, conditions, restrictions, easements, reservations, exceptions,
39 terms, liens or charges contained in the Sign Easement Agreement (Project Sign #2) by and
40 between Midland Rushmore, LLC and Target Corporation for the construction, reconstruction,
41 replacement, operation, maintenance and repair of a pylon sign structure over, upon and across
42 Lot 2 of Block 1 of Rushmore Crossing for the benefit of Tract D in Block 2 of Rushmore
43 Crossing, recorded October 25, 2007, in Book 174, Page 4279.

44 18. The limitations, covenants, conditions, restrictions, easements, reservations, exceptions,
45 terms, liens or charges contained in the Operation and Easement Agreement between Target
46 Corporation and Midland Rushmore, LLC for Rushmore Crossing Shopping Center, dated
47 October 25, 2007, recorded October 25, 2007, in Book 174, Page 4290.

48 First Amendment to Operation and Easement Agreement by and between Target Corporation
49 and Midland Rushmore, LLC, dated as of December 21, 2009, recorded on December 22, 2009,
50 in Book 195, Page 7087.

51 19. Easement granted to the City of Rapid City to install, operate, maintain, repair, remove and
52 replace a waterline under the surface of a portion of Tract C, Block 2, Rushmore Crossing,
53 together with rights appurtenant thereto, as set forth in and as located in Exhibit D of the
54 Permanent Utility Easement recorded November 16, 2007, in Book 175, Page 757.

55 20. Easement granted to the City of Rapid City to install, operate, maintain, repair, remove and
56 replace a waterline 20 foot wide under the surface of a portion of Tract B, Block 2, Rushmore
57 Crossing, together with rights appurtenant thereto, as set forth in and as located in Exhibit E of
58 the Permanent Utility Easement recorded November 16, 2007, in Book 175, Page 762, and

E-3

listed as Existing Easement (B) located on Lot 5, Block 2, Rushmore Crossing plat filed in Plat Book 35, Page 173.

21. Easement granted to the City of Rapid City to install, operate, maintain, repair, remove and replace a waterline under the surface of a portion of Tract E, Block 2, Rushmore Crossing, together with rights appurtenant thereto, as set forth in and as located in Exhibit F of the Permanent Utility Easement recorded November 16, 2007, in Book 175, Page 767.

22. Easement granted to the City of Rapid City to install, operate, maintain, repair, remove and replace a waterline under the surface of a portion of Tract E, Block 2, Rushmore Crossing, together with rights appurtenant thereto, as set forth in and as located in Exhibit G of the Permanent Utility Easement recorded November 16, 2007, in Book 175, Page 772.

23. Easement granted to the City of Rapid City to install, operate, maintain, repair, remove and replace a waterline under the surface of a portion of Tract E, Block 2, Rushmore Crossing, together with rights appurtenant thereto, as set forth in and as located in Exhibit H of the Permanent Utility Easement recorded November 16, 2007, in Book 175, Page 777.

24. Right-Of-Way Permit granted to Black Hills Power, Inc. to construct, operate and maintain an electrical power system and an electrical power line upon, over and across Lots 1 and 2 of Block 1, Tracts A, B, C, D and E of Block 2, Lots 1 through 9 of Block 3 and Tracts G and J, all in Rushmore Crossing, together with the power to extend use to any communications company and other rights appurtenant thereto, as set forth in and as located in Exhibit A of the Right-Of-Way recorded October 26, 2007, in Book 175, Page 2665, and listed as Existing Easement (F) located on Lot 5, Block 2, Rushmore Crossing plat filed in Plat Book 35, Page 173.

25. Easement granted to the City of Rapid City for the right to install, operate, maintain, repair, remove and replace a sanitary sewer and waterline under the surface of Tracts B and C in Block 2 of Rushmore Crossing, together with rights appurtenant thereto, as set forth in instrument recorded September 24, 2008, in Book 183, Page 4164, and listed as Existing Easement (D) and (H) located on Lots 3 and 5, Block 2, Rushmore Crossing plat filed in Plat Book 35, Page 173.

26. The covenants and restrictions contained in the Warranty Deed and Restrictive Covenant Agreement dated November 12, 2008, recorded November 14, 2008, in Book 184, Page 5647. Restrictions, if any, based on race, color, religion, sex, handicap, familial status, or national origin, are deleted.  This pertains to Lots 1, 2A, 2B, 2C, 4, 5, 6, 7, 8 and 9 in Block 3.

27. The limitations, covenants, conditions, restrictions, easements, reservations, exceptions, terms, liens or charges contained in the Maintenance Agreement between South Dakota Department of Transportation and Midland Rushmore, LLC for Landscaping within Interstate 90 and East North Street at Exit 60 dated December 2, 2008, recorded December 18, 2008, in Book 185, Page 1849.

28. The limitations, covenants, conditions, restrictions, easements, reservations, exceptions, terms, liens or charges contained in the Streetscape Easement and Use Restrictions Agreement by and between Midland Rushmore, LLC and Viper, LLC, recorded March 26, 2009, in Book 387, Page 8155.

Indemnity Agreement relating to said Easement executed by Midland Rushmore, LLC for the benefit of Sam's Real Estate Business Trust recorded December 22, 2009 in Book 195, Page 7125.

29. The limitations, covenants, conditions, restrictions, easements, reservations, exceptions, terms, liens or charges contained in the Streetscape Easement by and between Midland Rushmore, LLC and Skyway Enterprises, Inc. recorded March 26, 2009, in Book 187, Page 8186.

Indemnity Agreement relating to said Easement executed by Midland Rushmore, LLC for the benefit of Sam's Real Estate Business Trust recorded December 22, 2009 in Book 195, Page 7131.

30. Easement for drainage within the north 20 feet of the un-platted portion of the E1/2NW1/4SE1/4 of Section 30, T2N, R8E, as shown on the plat of Rushmore Crossing filed in Plat Book 34, Page 172; together with the following note on said plat:

E-4

The 20' drainage easement shown hereon on the north boundary of Lot 1 of Block 1, Rushmore Crossing (See Page 4) also benefits the owner of the un-platted land to the west and southwest of such lot, which benefited land is bounded on the southwest by Spruce Street, on the west by the western boundary line of the un-platted area shown on Page 4 hereof, on the east by Lot 1 of Block 1, Rushmore Crossing and on the south and southeast by Eglin Street, for the purposes stated above.  Notwithstanding the foregoing, Lot 1 of Block 1, Rushmore Crossing is not subject to the above restrictions prohibiting fences, hedges, trees and shrubs and the owner thereof may install fences, hedges, trees, shrubs and landscaping within the drainage easement.  The party constructing, operating, maintaining, inspecting or repairing improvements and structures within the drainage easement shall (A) construct all such facilities underground, (B) limit the size of any drainage pipe to not more than 36 inches in diameter, (C) restore the property to its prior condition, including replacing damaged fences, hedges, trees, shrubs and landscaping. After exercising any such rights and (D) indemnify, defend and hold harmless the owner of Lot 1 of Block 1, Rushmore Crossing from and against all claims, liabilities, costs and expenses (including reasonable attorneys' fees) arising out of its (and its contractors', agents', employees' and invitees') negligent, intentional or willful acts or omissions with respect to this easement and the rights and obligations set forth in this paragraph.

31. Easement for utilities 25 foot wide crossing the un-platted portion of the E1/2NW1/4SE1/4 of Section 30, T2N, R8E, as shown on the plat Rushmore Crossing filed in Plat Book 34, Page 172.

32. Lot 2 in Block 1 and Lot 1 in Block 3 of Rushmore Crossing are designated as "(Drainage Lot)", as shown on the plat filed in Plat Book 34, Page 172.

33. Acreage shown on lots include easements, as set forth on the plat of Rushmore Crossing filed in Plat Book 34, Page 172.

34. Note on the plat of Rushmore Crossing filed in Plat Book 34, Page 172, as follows: Temporary easements of record are not shown hereon.

35. Non-access easement adjacent to LaCrosse Street and adjacent to Eglin Street, as shown on the plat of Lot K-4B of Marshall Heights Tract filed in Plat Book 35, Page 108.

36. Vehicular access to Lot K-4B of Marshall Heights Tract is permitted on a temporary basis for construction activities and vehicular access is also permitted for maintenance, as set forth on the plat filed in Plat Book 35, Page 108.

37. Easement for utilities and drainage hereby established 8 feet hereby on the interior sides of all lot lines except the southerly and easterly lot lines of Lot K4-B of Marshall Heights Tract where they adjoin Lot 1, Bedco Subdivision, as set forth on the plat filed in Plat Book 35, Page 108.

38. Easement for access and utilities crossing the un-platted portion of the E1/2NW1/4SE1/4 of Section 30, T2N, R8E and Tracts A, B, C and E in Block 2 of Rushmore Crossing, as shown on the plat filed in Plat Book 34, Page 162, and listed as Existing Easement (I) located on Lots 3 and 5, Block 2, Rushmore Crossing Plat filed in Plat Book 35, Page 173.

39. Easement for access crossing Tracts B and C in Block 2 of Rushmore Crossing, as shown on the plat filed in Plat Book 34, Page 162, and listed as Existing Easement (C) located on Lot 5, Block 2, Rushmore Crossing plat filed in Plat Book 35, Page 173.

40. Easement for drainage 40 foot wide crossing Tracts B and C in Block 2 of Rushmore Crossing, as shown on the plat filed in Plat Book 34, Page 172, and listed as Existing Easement (G) located on Lot 5, Block 2, Rushmore Crossing plat filed in Plat Book 35, Page 173.

41. Non-Access Easements pertaining to Lot 2 in Block 1, Tracts A, B and E in Block 2, Lots 1 through 9 in Block 3, Rushmore Crossing, as shown on the plat filed in Plat Book 34, Page 172; pertaining to Lots 2A and 2B in Block 3, Rushmore Crossing, as shown on the plat filed in Plat Book 35, Page 71; and listed as Existing Easement (K) on located on Lots 2, 4 and 5, Block 2, Rushmore Crossing plat filed in Plat Book 35, Page 173; together with the following note on Plat 34, Page 172:

"Non-Access Easements are hereby established along all corner lots and as indicated hereon."

E-5

42. Easement for public utilities and drainage within the vacated section line right-of-way and vacated dedicated right-of-way located on Lot 5, Block 2, Rushmore Crossing plat filed in Plat Book 35, Page 173.

43. Sign easement located on Lot 2A in Block 3 of Rushmore Crossing, as shown on the plat filed in Plat Book 34, Page 172, and as shown on the plat filed in Plat Book 35, Page 71.

44. Approach easement located on Lot 2A in Block 3 of Rushmore Crossing, as shown on the plat filed in Plat Book 34, Page 172, and as shown on the plat filed in Plat Book 35, Page 71.

45. Shared approach (40' x 40") between Lots 2C and 4 in Block 3 of Rushmore Crossing, as shown on the plats filed in Plat Book 34, Page 172, and in Plat Book 35, Page 71.

46. Shared approach (40.00' typ., 20.00' typ. within each lot) between Lots 4 and 5, between Lots 5 and 6, between Lots 6 and 7, between Lots 7 and 8 and Lots 8 and 9, all in Block 3 of Rushmore Crossing, as shown on the plat filed in Plat Book 34, Page 172.

47. Easements for minor drainage and utilities are hereby established 8 feet wide on the interior side of all lot lines and right-of-way (except where major drainage easements are located and on the interior side of all lots lines of Tracts A through E, Block 2), as set forth on the plat of Rushmore Crossing filed in Plat Book 34, Page 172.

48. Easements for utilities and minor drainage 8 feet wide on the interior sides of all lot lines and right-of-way (except where major drainage easements are located), as set forth on the plat of Lots 2A and 2B, Block 3, Rushmore Crossing, filed in Plat Book 35, Page 71, and as set forth on the plat of Lots 2, 3, 4 and 5, Block 2, Rushmore Crossing, filed in Plat Book 35, Page 173.

49. Requirements as set forth on the plats of Rushmore Crossing filed in Plat Book 34, Page 172, Plat Book 35, Page 71 and Plat Book 35, Page 173.

50. All builders shall maintain existing drainage facilities in accordance to approved construction plans, as set forth on the plats of Rushmore Crossing filed in Plat Book 34, Page 172, and Plat Book 35, Page 71.

51. Note on the plat of Lots 2, 3, 4 and 5, Block 2, Rushmore Crossing filed in Plat Book 35, Page 173, as follows: The sidelines of created easements are to be lengthened or shortened to conform to easement lines, right-of-way lines and/or property lines.

52. Access to Lot 2, Block 2, Rushmore Crossing is limited to an access easement across adjacent Lot 1, listed as Easements To Be Created (N) in Rushmore Crossing plat filed in Plat Book 35, Page 173 (a non-exclusive easement), and is not a fee interest. Such access is subject to any terms and conditions relating thereto.

53. Easement for storm sewer 20 foot wide, 10 feet on each side of centerline as shown, crossing Lots 3 and 4, Block 2, Rushmore Crossing, listed as Easements To Be Created (P) on the plat filed in Plat Book 35, Page 173.

54. Easement for access 60 foot wide, 30 feet on each side of the centerline between Lots 1 and 4 and extending into Lot 3, Block 2, Rushmore Crossing, listed as Easements To Be Created (Q) on the plat filed in Plat Book 35, Page 173.

55. Easement for sanitary sewer crossing Lots 1 and 3, Block 2, Rushmore Crossing, listed as Easements To Be Created (R) on the plat filed in Plat Book 35, Page 173.

56. Easement for storm sewer 20 foot wide, 10 feet on each side of centerline, crossing Lots 1 and 3, Block 2, Rushmore Crossing, listed as Easements To Be Created (S) on the plat filed in Plat Book 35, Page 173.

57. Easement for additional access and utilities crossing Lots 1 and 3, Block 2, Rushmore Crossing, listed as Easements To Be Created (T) on the plat filed in Plat Book 35, Page 173.

58. Easement for powerline 20 foot wide crossing Lot 1, Block 2, Rushmore Crossing, for the benefit of adjacent Lot 2, together with any terms and conditions relating thereto, listed as Easements To Be Created (U) in Rushmore Crossing plat filed in Plat Book 35, Page 173.

59. Wall off Lot M of the NW1/4SE1/4 of Section 30, T2N, R8E by 0.6 feet, more or less, as shown on the ALTA/ACSM Land Title Survey by Arleth & Associates dated January 3, 2006, Revised July 26, 2007, Job No. 02-0028.

E-6

60. The terms, covenants, conditions and provisions of an unrecorded Lease between Midland Rushmore, LLC, an Ohio limited liability company, Landlord, and The TJX Companies, Inc., a Delaware corporation, Tenant dated January 11, 2008, notice of which is given by a Memorandum of Lease dated January 11, 2008, recorded April 28, 2008, in Book 179, Page 4879, and the effect of any failure to comply with said terms, covenants, conditions and provisions. This pertains to Tracts B and E in Block 2 and Lots 1-9 in Block 3 of Rushmore Crossing.

Amendment to Memorandum of Lease by and between Midland Rushmore, LLC, and The TJX Companies, Inc., dated June 10, 2009, recorded December 22, 2009 , in Book 195, Page 7115. **The inclusion of the foregoing memorandum of lease and assignment within these "Permitted Encumbrances" is for informational purposes only, and shall not be deemed to diminish any of Tenant's rights, or increase any of Tenant's obligations, under this Lease.**

61. The limitations, covenants, conditions, restrictions, easements, reservations, exceptions, terms, liens or charges contained in the Development Agreement by and between Midland Rushmore, LLC and Sam's Real Estate Business Trust dated December 21, 2009, notice of which is given by Memorandum of Development Agreement dated December 21, 2009, recorded in Book 195, Page 7199.

62. Subject to the provisions of Section 17.3 of the Lease, Mortgage, Assignment of Rents and Security Agreement (Securing Variable Rate Mortgage Note) executed by Midland Rushmore, LLC, an Ohio limited liability company to National City Bank, a national banking association, securing the original amount of $57,800,000.00 and any other amounts which may become due and payable under the terms thereof, dated October 25, 2007, recorded October 25, 2007 in Book 174 page 4399. Said Mortgage was assigned to PNC Bank, National Association, a National Banking Association, as Administrative Agent for the Lenders, by Assignment of Mortgages, Assignment of Leases and Rents and Security Agreement and Other Loan Documents dated December 14, 2009 recorded December 22, 2009, in Book 195, Page 7138.

63. Subject to the provisions of Section 17.3 of the Lease, Mortgage, Assignment of Rents and Security Agreement (Securing Variable Rate Obligations under a Reimbursement and Security Agreement) executed by Midland Rushmore, LLC, an Ohio limited liability company to National City Bank, a national banking association, securing the original amount of $13,655,675.03 and any other amounts which may become due and payable under the terms thereof, dated October 25, 2007, recorded October 25, 2007 in Book 174 page 4425. Said Mortgage was assigned to PNC Bank, National Association, a National Banking Association, as Administrative Agent for the Lenders, by Assignment of Mortgages, Assignment of Leases and Rents and Security Agreement and Other Loan Documents dated December 14, 2009 recorded December 22, 2009, in Book 195, Page 7138.

Subject to the provisions of Section 17.3 of the Lease, as same are consolidated, amended and restated pursuant to that certain Consolidated, Amended and Restated Mortgage and Security Agreement executed by Midland Rushmore, LLC, an Ohio limited liability company to PNC Bank, National Association, a national banking association, individually and as agent for the lenders, securing the original amount of $61,173,400.00 and any other amounts which may become due and payable under the terms thereof, dated December 18, 2009 recorded December 22, 2009, in Book 195, Page 7142.

DMEAST #10098913 v6

**BED BATH &**
**BEYOND**

40'-0"

10'-0"

ELEVATION

**BED BATH &**
**BEYOND**

GELCORE LED LAYOUT

### MATERIALS

| | POWER WHITE | GEWHPTS2 | GECLPS5 | GECLPS6 | GECLSC2 | GECLSW1 | GECLEC1 | N/A | N/A |
|---|---|---|---|---|---|---|---|---|---|
| | WHITE | 2/FT | SELF-CONTAINED POWER SUPPLIES | | SPLICE CONNCTR | SUPPLY WIRE | END CAP | LT. GUIDE CONNCTR | LIGHT GUIDE |
| | 120° | Ft | In | Bank # | Bank # | Qty | Ft | Qty | Qty | Ft |
| FACE | B | 32 | 0 | #1B1-4 | #18R1 | 10 | 40 | 20 | | |
| | E | 30 | 0 | #2B1-4 | #19B1 | 10 | 40 | 20 | | |
| | D | 30 | 0 | #3B1-4 | #20B1 | 10 | 40 | 20 | | |
| | B | 32 | 0 | #4B1-4 | #21B1 | 10 | 40 | 20 | | |
| | A | 31 | 0 | #5B1-4 | #22B1 | 10 | 40 | 20 | | |
| | Y | 19 | 0 | #6B1-3 | | 6 | 24 | 12 | | |
| | H | 32 | 0 | #7B1-4 | #23B1 | 10 | 40 | 20 | | |
| | & | 37 | 0 | #9B1-4 | #24B1;#25B1 | 12 | 48 | 24 | | |
| | B | 35 | 0 | #9B1-4 | #26B1 | 10 | 40 | 20 | | |
| | E | 34 | 0 | #10B1-4 | #27B1 | 10 | 40 | 20 | | |
| | Y | 20 | 0 | #11B1-4 | #28B1 | 10 | 40 | 20 | | |
| | O | 28 | 0 | #12B1-4 | | 8 | 32 | 16 | | |
| | | 18 | 0 | #13B1-3 | | 6 | 24 | 12 | | |
| | N | 28 | 0 | #14B1-4 | | 8 | 32 | 16 | | |
| | | 22 | 0 | #15B1-4 | | 8 | 32 | 16 | | |
| | D | 28 | 0 | #16B1-4 | | 8 | 32 | 16 | | |
| | | 28 | 0 | #17B1-4 | | 8 | 32 | 16 | | |
| | | 9 | 0 | | #29B1 | 2 | 8 | 4 | | |

**NOTES:**
- TENANT SHALL HAVE APPROVAL RIGHTS FOR ALL DESIGN AND SHOP DRAWINGS FOR TENANT'S SIGNAGE PRIOR TO MANUFACTURE.
- ALL TENANT'S SIGNAGE SHALL BE COMPLETED USING TENANT'S STANDARD FONTS, LOGO AND COLORS AND WILL BE SUBJECT TO TENANT'S REVIEW AND APPROVAL PRIOR TO MANUFACTURE.
- TENANT RESERVES THE RIGHT TO CHANGE DESIGN, SIZE AND MATERIAL PRIOR TO MANUFACTURE.



.063 ALUM. RETURN
1" JEWELITE FACE
TOGGLE SWITCH
.090 ALUM. BACK STAPLED
POWER SUPPLY
½" CARFLEX CONDUIT x 15' CARFLEX WHIP
EQUIPMENT GROUND
LED. GELCORE 2/ft. TETRA, (WHITE)
GELCORE SPLICE CONNECTOR
⅜" NON-CORROSIVE LAG BOLTS OR THREADED ROD AS REQ'D.
1/4" WEEP HOLE w/LIGHT BAFFLE BEAD AROUND INTERIOR SEAM

CROSS SECTION MOUNTING DETAIL
SCALE: NTS

**GENERAL NOTE:**
MINIMUM #8 SHEET METAL SCREWS ARE TO BE USED FOR SECURING THE FACE TO THE LETTER RETURN.
THE MAXIMUM SPACING SHALL NOT EXCEED 18" AND NO FEWER THAN FOUR SCREWS ARE TO BE USED PER FACE.

**COLOR NOTES:**
RETURN: 6"x.063 WHITE
TRIM: TO MATCH RETURN
   LTRS UNDER 42" USE 1" WHITE JEWELITE
   LTRS 42" AND ABOVE USE L MOLD
   PAINTED WHITE
FACE: 2447 WHITE SG 410 LEXAN
LED: WHITE GELCORE TYPE–GEWHPTS2
INSIDE OF CAN TO BE PAINTED
   SEMI GLOSS WHITE

| IF NON-STANDARD PRODUCT CHECK APPROPRIATE BOX BELOW |
|---|
| ☐ – RED FACE |
| ☐ – BLACK RETURNS |
| ☐ – DARK BRONZE RETURNS |

**ELECTRICAL NOTE**—Actual # of circuits to be determined by a Licensed Electrical Contractor.
TOTAL AMPS– 22.5A
# OF CKTS– 3  20 AMP(RECOMMENDED)
VOLTS– 120
ALL SIGNAGE WILL BE (U.L.) LISTED, (U.L.) 2161 COMPLIANT AND CARRY (U.L.) LABELS.
OR CANADIAN EQUIVALENT



ON   OFF

**\*NOTE:**
INSTALL TOGGLE SWITCH TO OPERATE (ON/OFF) IN THE HORIZONTAL POSITION.

1 SWITCH PER LETTER

3.2.10

**EXHIBIT F (1 OF 3)**
FRONT EXTERIOR SIGN
RUSHMORE CROSSING
RAPID CITY, SD
DATE:01/26/10



MATERIAL
SIGN PANELS: ACRYLIC

NOTES:
BBBY SIGN PANELS LOCATED ON BOTH SIDES
OF PYLON SIGN

PLEX PYLON PANEL WITH RED
BED BATH & BEYOND LOGO
WITH WHITE BACKGROUND. SIGN
COMPANY TO STRETCH LOGO
FOR BEST FIT IN PANEL

1" INCH BORDER
ACCENT BORDER
(COLOR WHITE)

BED BATH & BEYOND PYLON PANEL
LOCATED ON PYLON SIGN B
SCALE: NTS



See Project Sign #1 for typical notes.

Internally illuminated signage.
(330.02 s² each side)

- PANEL BOTH SIDES OF PYLON
- FINAL VISIBLE OPENING TO BE CONFIRMED
AND LOGO ADJUSTED AS REQUIRED AND
APPROVED BY BBBY.
- IF ANY OTHER TENANT ON THE PYLON SIGN B
IS ALLOWED A DARK BACKGROUND (NOT
WHITE) THEN BBBY WILL BE ALLOWED AT
LANDLORD EXPENSE.

PYLON SIGN B
(REFER TO EXHIBIT B FOR LOCATION)
SCALE: NTS

SEE PANEL DETAIL
THIS SHEET



3.2.10

EXHIBIT F (2 OF 3)
BED BATH & BEYOND
RUSHMORE CROSSING
RAPID CITY, SD
DATE: 01/26/10





**TEMPORARY BUILDING BANNERS**
(REFER TO EXHIBIT D-1 FOR LOCATION ON BUILDING)



VINYL COLORS

PMS 187 RED
BLACK



**TEMPORARY BANNERS (BUILDING OR BBB HIRING TRAILER)**



LOCATION SHOWN ON EXHIBIT B.

**TEMPORARY SITE SIGNAGE**

4' x 8' - TYVEK

**TEMPORARY SITE BANNERS**



BANNER STYLE

CORNER STYLE

NOTE:
o VINYL TO BE RED (PMS 187 OR EQUIVALENT) BACKGROUND WITH WHITE LETTERS IN A SIMILIAR FONT AS SHOWN.
o TENANT'S SPECIFIED VENDOR TO PROVIDE, INSTALL AND REMOVE AS REQUIRED BY BBBY.
o TENANT TO APPROVE THE STYLE ( BANNER, CORNER, ETC) AND LANDLORD PROVIDED RENDERING FOR EACH
  PANEL LOCATED ON PYLON, MONUMENT OR OTHER SIGN PANEL STRUCTURE.
o TENANT TO DETERMINE PHRASE (COMING SOON, NOW OPEN, ETC) ON TEMPORARY VINYL.
o VINYL TO BE 3M NON STICK VINYL OR EQUIVALENT. NO LASTING RESIDUE OR MARKS AFTER THE VINYL IS
  REMOVED.

**TEMPORARY NON STICK VINYL GRAPHIC**



3.2.10

**EXHIBIT F (2OF 3)**
**BED BATH & BEYOND**
RUSHMORE CROSSING
RAPID CITY, SD
DATE: 01/26/10

1          <u>Exhibit G</u>

2          <u>Form of Subordination, Non-Disturbance and Attornment Agreement</u>

3          THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT,
4  made as of the _____ day of _____, 200__, by and between _____,
5  a _____ [corporation] [limited] [general] [partnership] [national
6  banking association], having an office at _____
7  (the "*Mortgagee*") and Bed Bath & Beyond Inc., a New York corporation, having an office at
8  650 Liberty Avenue, Union, New Jersey 07083 (the "*Tenant*").

9          W I T N E S S E T H :

10         WHEREAS, Mortgagee is the holder of a mortgage (the "*Mortgage*") covering a parcel
11  of land owned by _____, a _____ [corporation], [limited]
12  [general] [partnership] (the "*Landlord*") together with the improvements [to be] erected
13  thereon (said parcel of land and improvements thereon being hereinafter referred to as the
14  "*Shopping Center*" and being more particularly described on <u>Exhibit A</u> attached hereto and
15  made a part hereof); and

16         WHEREAS, by a certain Lease Agreement heretofore entered into between Landlord
17  and Tenant dated as of _____ (the "*Lease*"), Landlord leased to Tenant a portion of
18  the Shopping Center, as more particularly described in the Lease (the "*Premises*"); and

19         WHEREAS, a copy of the Lease has been delivered to Mortgagee, the receipt of which
20  is hereby acknowledged; and

21         **[For mortgages existing as of the date Lease is executed:** WHEREAS, as an
22  inducement to Tenant to enter into the Lease, **[Section 2.3.1/Section 17.3]** thereof provides
23  that the Lease is conditioned upon Landlord obtaining this Agreement from Mortgagee; and

24         WHEREAS, the parties desire to satisfy the foregoing condition and to provide for the
25  non-disturbance of Tenant by the holder of the Mortgage; and]

26         **[For mortgages occurring after the Lease is executed:** WHEREAS, Section 17.1 of
27  the Lease provides that the Lease shall become subject and subordinate to a mortgage
28  encumbering the fee interest of Landlord in and to the Shopping Center if and when a non-
29  disturbance agreement is entered into with respect to such mortgage; and

30         WHEREAS, the parties hereto desire to effect the subordination of the Lease to the
31  Mortgage and to provide for the non-disturbance of Tenant by Mortgagee.]

32         NOW, THEREFORE, in consideration of the premises and of the mutual covenants and
33  agreements herein contained, the parties hereto, intending to be legally bound hereby, agree as
34  follows:

35         1.      Mortgagee hereby consents to and approves the Lease and the term thereof,
36  including the options to extend the term as set forth in the Lease, and covenants and agrees
37  that the exercise by Tenant of any of the rights, remedies and options therein contained shall
38  not constitute a default under the Mortgage.

39         2.      Tenant covenants and agrees with Mortgagee that the Lease hereby is made
40  and shall continue hereafter to be subject and subordinate to the lien of the Mortgage, and to all
41  modifications and extensions thereof (and such subordination shall not lessen or diminish
42  Tenant's rights under the Lease), subject, however, to the provisions of this Agreement.

43         3.      Mortgagee agrees that so long as the Lease shall be in full force and effect, and
44  so long as Tenant shall not be in default under the Lease beyond any applicable notice and
45  grace period:

46                 (a)     Tenant shall not be named or joined as a party or otherwise in any suit,
47  action or proceeding for the foreclosure of the Mortgage or to enforce any rights under the
48  Mortgage or the bond or note or other obligation secured thereby;

49                 (b)     The possession by Tenant of the Premises and Tenant's rights thereto
50  shall not be disturbed, affected or impaired by, nor will the Lease or the term thereof be
51  terminated or otherwise affected by (i) any suit, action or proceeding brought upon the Mortgage
52  or the bond or note or other obligation secured thereby, or for the foreclosure of the Mortgage or

G-1

the enforcement of any rights under the Mortgage, or by any judicial sale or execution or other sale of the Premises or the Shopping Center, or any deed given in lieu of foreclosure, or by the exercise of any other rights given to any holder of the Mortgage or other documents as a matter of law, or (ii) any default under the Mortgage or the bond or note or other obligation secured thereby; and

(c)      All condemnation awards and insurance proceeds paid or payable with respect to the Premises or any other part of the Shopping Center shall be applied and paid in the manner set forth in the Lease.

4.      If Mortgagee or any future holder of the Mortgage shall become the owner of the Shopping Center by reason of foreclosure of the Mortgage or otherwise, or if the Shopping Center shall be sold as a result of any action or proceeding to foreclose the Mortgage, or transfer of ownership by deed given in lieu of foreclosure, the Lease shall continue in full force and effect, without necessity for executing any new lease, as a direct lease between Tenant and the then owner of the Shopping Center, as "landlord", upon all of the same terms, covenants and provisions contained in the Lease, and in such event:

(a)      Tenant shall be bound to such new owner under all of the terms, covenants and provisions of the Lease for the remainder of the term thereof (including the Renewal Periods, if Tenant elects or has elected to exercise its options to extend the term) and Tenant hereby agrees to attorn to such new owner and to recognize such new owner as "landlord" under the Lease; and

(b)      Such new owner shall be bound to Tenant under all of the terms, covenants and provisions of the Lease for the remainder of the term thereof (including the Renewal Periods, if Tenant elects or has elected to exercise its options to extend the term) which such new owner hereby agrees to assume and perform and Tenant shall, from and after the date such new owner succeeds to the interest of "landlord" under the Lease, have the same remedies against such new owner for the breach of any covenant contained in the Lease that Tenant might have had under the Lease against Landlord if such new owner had not succeeded to the interest of "landlord"; provided, however, that such new owner shall not be:

(i)      liable for any act or omission of any prior landlord (including Landlord) unless such act or omission continues from and after the date upon which the new owner succeeds to the interest of such prior landlord;

(ii)      subject to any defenses which Tenant may have against any prior landlord (including Landlord) unless resulting from any default or breach by such prior landlord which continues from and after the date upon which the new owner succeeds to the interest of such prior landlord;

(iii)      subject to any offsets which Tenant may have against any prior landlord, except to the extent such offsets are expressly provided under the Lease and Mortgagee has received notice thereof and the opportunity to cure within the applicable time periods set forth in the Lease (it being further agreed that offsets under the Lease that were deducted by Tenant prior to the date upon which the new owner succeeds to the interest of such prior landlord shall not be subject to challenge);

(iv)      bound by any fixed rent or additional rent which Tenant might have paid for more than one month in advance of its due date under the Lease to any prior landlord (including Landlord), unless such additional rent is paid in accordance with the applicable provisions of the Lease; or

(v)      bound by any amendment or modification of the Lease made without its consent; notwithstanding the foregoing, Mortgagee acknowledges that the Lease specifically provides for amendments thereof upon the occurrence of certain events described in the Lease (such as, for example, an amendment to the Lease confirming the measurement of the Premises), and, by its execution below, Mortgagee agrees to recognize such amendments as part of the Lease, and Mortgagee further agrees that such new owner shall also be bound by such amendment(s) to the Lease, without any consent on the part of Mortgagee or such new owner.

(c)      Tenant's obligations hereunder shall be effective only so long as Mortgagee is bound to Mortgagee's obligations hereunder.

G-2

5.     Tenant will notify Mortgagee of any default by Landlord under the Lease which would entitle Tenant to terminate the Lease or abate the rent payable thereunder and agrees that notwithstanding any provision of the Lease, no notice of termination thereof nor any abatement shall be effective unless Mortgagee has received the aforesaid notice and has failed to cure the subject default within the same time period allowed Landlord under the Lease.  It is understood that the abatement provisions of this Section relate to abatements by reason of Landlord's default and do not apply to provisions of the Lease whereby Tenant has the automatic right to abate rentals such as, for example, abatement upon casualty or condemnation.

6.     Neither the Mortgage nor any other security instrument executed in connection therewith shall encumber or be construed as subjecting in any manner to the lien thereof, any trade fixtures, signs or other personal property at any time furnished or installed by or for Tenant or its subtenants or licensees on the aforementioned property regardless of the manner or mode of attachment thereof.

7.     Any notices of communications given under this Agreement shall be in writing and shall be given by registered or certified mail, return receipt requested, or by any recognized overnight mail carrier, with proof of delivery slip, postage prepaid, (a) if to Mortgagee, at the address of Mortgagee as hereinabove set forth or at such other address or persons as Mortgagee may designate by notice in the manner herein set forth, or (b) if to Tenant, at the address of Tenant as hereinabove set forth, with duplicate copies to  Allan N. Rauch, Esq., c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, and Bart I. Mellits, Esq., Ballard Spahr LLP, 1735 Market Street, 51st Floor, Philadelphia, Pennsylvania, 19103-7599, or such other address or persons as Tenant may designate by notice in the manner herein set forth.  All notices given in accordance with the provisions of this Section shall be effective upon receipt (or refusal of receipt) at the address of the addressee.

8.     This Agreement shall bind and inure to the benefit of and be binding upon and enforceable by the parties hereto and their respective successors, assigns, and sublessees.

9.     This Agreement contains the entire agreement between the parties and cannot be changed, modified, waived or canceled except by an agreement in writing executed by the party against whom enforcement of such modification, change, waiver or cancellation is sought.

10.     This Agreement and the covenants herein contained are intended to run with and bind all lands affected thereby.

**[to add if our memorandum of lease has been recorded prior to the subject mortgage]** NOTE: THIS AGREEMENT BY TENANT SHALL NOT BE EFFECTIVE UNLESS AND UNTIL ANY PRIOR MORTGAGES ON THIS PROPERTY HAVE BEEN SATISFIED SO THAT TENANT'S PRIOR AGREEMENTS TO ATTORN TO SAID MORTGAGES AND/OR TO SUBORDINATE ITS LEASE TO SAID MORTGAGES SHALL HAVE BEEN EXTINGUISHED.

IN WITNESS WHEREOF, the parties hereto have duly executed this Subordination, Non-Disturbance and Attornment Agreement as of the day and year first above written.

**MORTGAGEE:**

ATTEST:

_____

By:_____

Name:_____          By:_____

Title:  (Assistant) Secretary                              Name:_____

                                                                      Title:   (Vice) President

[SEAL]

**TENANT:**

ATTEST:

                                                                      BED BATH & BEYOND INC., a New York
                                                                      corporation

By:_____

Name: Alan M. Freeman                                    By:_____

Title:  (Assistant) Secretary                              Name:  Warren Eisenberg

                                                                      Title:   Co-Chairman

[SEAL]

G-3

**[INSERT APPROPRIATE JURAT FOR MORTGAGEE]**

_____

**[JURAT FOR PARENT:]**

STATE OF NEW JERSEY            )
                              ) : ss.
COUNTY OF UNION        )

On this ___ day of _____, 200__, before me personally came Warren Eisenberg to me known, who being by me duly sworn, did depose and say that he is the Co-Chairman of Bed Bath & Beyond Inc., the corporation described in and which executed the above instrument and that he signed his name thereto by order of the Board of Directors of said corporation.

_____
Notary Public

My Commission Expires:

_____

G-4

1          Exhibit H

2          Form of Recognition Agreement

3          THIS RECOGNITION AGREEMENT, made as of the _____ day of _____, 200__,
4  by and between Midland Rushmore, LLC, an Ohio limited liability company, having an address
5  at c/o Midland Atlantic Development Company, 8044 Montgomery Road, Suite 710, Cincinnati,
6  Ohio 45236 ("*Landlord*"); Bed Bath & Beyond Inc., a New York corporation, having an address
7  at 650 Liberty Avenue, Union, New Jersey 07083 ("*Tenant*"); and
8  _____, a [_____] [corporation] [limited] [general]
9  [partnership], having an address at _____
10 ("*Subtenant*").

11              R E C I T A L S:

12         A.     Landlord and Tenant have entered into a certain Lease Agreement (the "*Lease*")
13 dated as of _____ __, 2008, a short form of which has been recorded in
14 _____, which demises certain premises (the "*Premises*") located in the
15 Rushmore Crossing Shopping Center, Rapid City, South Dakota, which Shopping Center is
16 more particularly described on Exhibit A annexed hereto and made a part hereof.

17         B.     Section 15.5 of the Lease provides that in the event Tenant subleases all or a
18 portion of the Premises for a term of at least five (5) years, Landlord shall, upon Tenant's
19 request, execute and deliver a Recognition Agreement among Landlord, Tenant and each such
20 subtenant in the form attached to the Lease, in recordable form.

21         C.     Pursuant to a Sublease dated as of _____ (the "*Sublease*"), Tenant
22 has subleased [a portion of] the Premises to Subtenant (the "*Subleased Premises*").

23         D.     The parties hereto desire to effectuate the provisions of Section 15.5 of the
24 Lease with respect to the Sublease and the Subleased Premises.

25         NOW, THEREFORE, in consideration of the mutual covenants and agreements herein
26 contained, the parties hereto, intending to be legally bound hereby, agree as follows:

27         1.     Landlord warrants and represents as follows:

28              (a)     that it is the fee owner of the Premises,

29              (b)     that the Lease is unmodified (except as may be otherwise set forth in
30 Exhibit B annexed hereto, if any) and is in full force and effect,

31              (c)     that the term of the Lease expires on _____, but is subject to
32 [three] renewal periods of [five] years each and

33              (d)     that Tenant is not in default under the Lease nor has any event occurred
34 which would after notice to Tenant and the passage of time become a default of Tenant under
35 the Lease.

36         2.     Landlord hereby acknowledges receipt of a copy of, and consents to and
37 approves, the Sublease and all of the terms, covenants and provisions thereof, and agrees that
38 the exercise by Subtenant of any of its rights, remedies and options contained therein shall not
39 constitute a default under the Lease.

40         3.     Landlord agrees that whenever it has an obligation with respect to the Premises,
41 or its consent or approval is required for any action of Tenant under the Lease, then, to the
42 extent such obligation, consent or approval relates to the Subleased Premises or Subtenant's
43 use and occupation thereof, it will perform such obligation in accordance with the terms and
44 conditions of the Lease, and, subject to the applicable terms of the Lease, will not unreasonably
45 withhold or unduly delay such consent or approval.

46         4.     Landlord shall not, in the exercise of any of the rights arising or which may arise
47 out of the Lease or of any instrument modifying or amending the same or entered into in
48 substitution or replacement thereof (whether as a result of Tenant's default or otherwise),
49 disturb or deprive Subtenant in or of its possession or its rights to possession of the Subleased
50 Premises or of any right or privilege granted to or inuring to the benefit of Subtenant under the
51 Sublease, provided that Subtenant is not in default under the Sublease beyond the expiration of
52 any applicable notice and cure period.

H-1

5.      In the event of the termination of the Lease by reentry, notice, conditional limitation, surrender, summary proceeding or other action or proceeding, or otherwise, or, if the Lease shall terminate or expire for any reason before any of the dates provided in the Sublease for the termination of the initial or renewal terms of the Sublease and if immediately prior to such surrender, termination or expiration the Sublease shall be in full force and effect, Subtenant shall not be made a party in any removal or eviction action or proceeding nor shall Subtenant be evicted or removed of its possession or its right of possession of the Subleased Premises be disturbed or in any way interfered with, and the Sublease shall continue in full force and effect as a direct lease between Landlord and Subtenant (provided, that in such event, Subtenant shall, for the then remainder of the term of the Sublease, pay fixed rent and additional rent in an amount equal to the greater of (x) the Fixed Rent and additional rent then payable under the Lease, prorated on the basis of the ratio which the Floor Area of the Subleased Premises bears to the Floor Area of the Premises, or (y) the fixed rent and additional rent then payable under the Sublease).

6.      Landlord hereby waives and relinquishes any and all rights or remedies against Subtenant, pursuant to any lien, statutory or otherwise, that it may have against the property, goods or chattels of Subtenant in or on the Subleased Premises.

7.      Any notices, consents, approvals, submissions, demands or other communications (hereinafter collectively referred to as "**Notice**") given under this Agreement shall be in writing.  Unless otherwise required by law or governmental regulation, Notices shall be deemed given if sent by registered or certified mail, return receipt requested, or by any recognized overnight mail carrier, with proof of delivery slip, postage prepaid (a) to Landlord, at the address of Landlord as hereinabove set forth or such other address or persons as Landlord may designate by Notice to the other parties hereto, (b) to Tenant, at the address of Tenant as hereinabove set forth, with duplicate copies to  Allan N. Rauch, Esq., c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, and Bart I. Mellits, Esq., Ballard Spahr LLP, 1735 Market Street, 51st Floor, Philadelphia, Pennsylvania, 19103-7599, or such other address or persons as Tenant may designate by Notice to the other parties hereto, and (c) to Subtenant, at the address of Subtenant as hereinabove set forth or such other address or persons as Subtenant may designate by Notice to the other parties hereto.  During the period of any postal strike or other interference with the mails, personal delivery shall be substitute for registered or certified mail.  All Notices shall become effective only on the receipt or rejection of same by the proper parties.

8.      No modification, amendment, waiver or release of any provision of this Agreement or of any right, obligation, claim or cause of action arising hereunder shall be valid or binding for any purpose whatsoever unless in writing and duly executed by the party against whom the same is sought to be asserted.

[Signature Page Follows]

H-2

9. This Agreement shall be binding on and shall inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors, assigns and sublessees.

IN WITNESS WHEREOF, the parties have caused this Recognition Agreement to be executed under seal the date first above written.

**LANDLORD:**

MIDLAND RUSHMORE, LLC, an Ohio limited liability company

By:_____
Name:  John I. Silverman
Title:   Executive Manager

**TENANT:**

BED BATH & BEYOND INC., a New York corporation

By:_____
Name:  Warren Eisenberg
Title:   Co-Chairman

**SUBTENANT:**

_____

By:_____
Name:_____
Title:_____

H-3

**[INSERT APPROPRIATE JURATS FOR <u>LANDLORD</u> AND <u>SUBTENANT]</u>**

_____

**[JURAT FOR PARENT:]**

STATE OF NEW JERSEY         )
                                 ) : ss.
COUNTY OF UNION        )

      On this ___ day of _____, 200__, before me personally came Warren Eisenberg to me known, who being by me duly sworn, did depose and say that he is the Co-Chairman of Bed Bath & Beyond Inc., the corporation described in and which executed the above instrument and that he signed his name thereto by order of the Board of Directors of said corporation.

_____
Notary Public

My Commission Expires:

_____

H-4

<u>Exhibit I</u>

<u>Form of Delivery Date Notice</u>

[Letterhead of Landlord]

_____, 200__

[via Federal Express or other
recognized overnight delivery
service per Article 18 of the foregoing
lease]

Bed Bath & Beyond [of _____] Inc.
650 Liberty Avenue
Union, NJ 07083
Attn: Warren Eisenberg

Re:    Lease Agreement dated as of _____, 2008 (the "**Lease**"), between
Midland Rushmore, LLC, as landlord ("**Landlord**"), and Bed Bath &
Beyond Inc., as tenant ("**Tenant**"), with respect to certain retail premises
(the "**Premises**") located in the Rushmore Crossing Shopping Center,
Rapid City, South Dakota

Gentlemen:

In accordance with the provisions of Subsection 2.3.2 of the Lease, the Landlord hereby
informs the Tenant that the Delivery Date shall take place at 8:00 A.M. on _____,
200__.  This notice shall constitute the Delivery Date Notice referred to in Subsection 2.3.2 of
the Lease.

MIDLAND RUSHMORE, LLC

By:_____
_____, (Vice) President

cc:    [_____, Esq.]
[Allan N. Rauch, Esq.]

I-1

## Exhibit J

## Form of Delivery Date Certification

[Letterhead of Landlord]

_____, 200__

[via Federal Express or other
recognized overnight delivery
service per Article 18 of the foregoing
lease]

Bed Bath & Beyond [of _____] Inc.
650 Liberty Avenue
Union, NJ 07083
Attn: Warren Eisenberg

Re:    Lease Agreement dated as of _____, 2008 (the "**Lease**"), between
       Midland Rushmore, LLC, as landlord ("**Landlord**"), and Bed Bath &
       Beyond Inc., as tenant ("**Tenant**"), with respect to certain retail premises
       (the "**Premises**") located in the Rushmore Crossing Shopping Center,
       Rapid City, South Dakota

Gentlemen:

        In accordance with the provisions of Subsection 2.3.3 of the Lease, Landlord hereby
certifies to Tenant that, as of the date of this certification, all of the Delivery Date Conditions (as
defined in the Lease) have been satisfied, and that, as a result, the Delivery Date (as such term
is defined in the Lease) will be deemed to be _____, 200__ .  This notice shall
constitute the Delivery Date Certification referred to in Subsection 2.3.3 of the Lease.

                                MIDLAND RUSHMORE, LLC


                                By:_____
                                    _____, (Vice) President
cc:    [_____, Esq.]
       [Allan N. Rauch, Esq.]

J-1

DMEAST #10098913 v6

1                          <u>Exhibit K-1</u>

2                       <u>Existing Exclusives</u>

3                          [See attached]

4
5
6

K-1-1

1.    **Parties; Effective Date**

This Lease is dated for reference purposes only as of _____Oct. 19_____, 2009, and is made by and between Midland Rushmore, LLC, an Ohio limited liability company ("Landlord") and The Men's Wearhouse, Inc., a Texas corporation ("Tenant").

2.    **Definitions**

Capitalized terms used in this Lease, unless the context clearly requires otherwise, have the following meanings:

"**Additional Rent**" means any amounts other than Base Rent that Tenant is or becomes obligated to pay Landlord under this Lease.

"**Adjacent Space**" means leasable space within the Shopping Center located immediately adjacent to the Premises.

"**Alterations**" means any alterations, modifications, additions or improvements made in, on, about, under or contiguous to the Premises after the Commencement Date, including, but not limited to, HVAC, pipes and conduits, and carpentry installations, but excluding (a) the initial Tenant Work, and (b) such things as partitions, draperies, shelves, cabinet work, floor and wall coverings or the installation or relocation of trade fixtures or equipment.

"**Anchor Stores**" means Target, Scheels, David's Bridal, TJ Maxx and Gordmans, and any successor or assignee of any such Anchor.

"**Applicable Laws**" means any federal and state and city statutes, laws, rules and regulations then in effect, as well as the laws, rules and regulations, building codes and ordinances then in effect and issued by governmental authorities with jurisdiction over the Premises, the Building or the Shopping Center.

"**Base Rent**" means the minimum monthly rent payable by Tenant, as set forth in **Paragraph 5.1**.

"**Building**" means the multi- tenant building in which the Premises are located.

"**Business Days**" means all weekdays that are not recognized state or Federal holidays.

"**Common Areas**" means those areas and facilities within the Shopping Center, exclusive of the Premises and other portions of the Shopping Center leased or sold (or to be leased or sold) exclusively to other occupants of the Shopping Center. The Common Area includes, but is not limited to, parking areas, interior access roads, retention/detention ponds, sidewalks, landscaped areas (including perimeter landscaping), gateway/entry features, enclosed courts and malls, service areas and similar areas and facilities.

"**Common Area Costs**" means Operating Expenses and Shopping Center Expenses.

"**Construction Allowance**" means an amount equal to Thirty-Five Dollars ($35.00) per gross leasable square foot of the Premises, and paid to Tenant pursuant to **Paragraph 4.7.1**.

"**Delivery Date**" means the date all of the conditions specified in **Paragraph 4.4** are satisfied.

"**Effective Date**" means the date this Lease is fully-executed, and a copy delivered to both parties.

"**Force Majeure**" means a labor strike, riot, war, act of terrorism (actual or threatened), fire or other casualty, Act of God or other event beyond a party's reasonable control. Inability by a party to fulfill its monetary obligations under this Lease shall not be a Force Majeure event.

"**Hazardous Materials**" has the meaning set forth in **Paragraph 12**.

"**Insured Loss**" means damage or destruction which was caused by an event required to be covered by the insurance described in **Paragraph 13**.

"**Interest Rate**" means the lesser of: (a) ten percent (10%); or (b) the maximum rate permitted by Applicable Laws.

"**Landlord's Work**" means the work to be done by Landlord and described in **Exhibit B**.

"**Lease Year**" has the meaning set forth in **Paragraph 4.9**.

1

*Men's Wearhouse*

*(2 pages)*

"Lifestyle District" means that portion of the Shopping Center shown on the Site Plan.

"Operating Expenses" means costs and expenses incurred by Landlord in maintaining common areas within the Outparcel District or within the Soft Power District.

"Outparcel District" means that portion of the Shopping Center shown on the Site Plan; provided, however, for purposes of this Lease, Outparcel 3 is not part of the Outparcel District.

"Outparcel 4" means that parcel within the Outparcel District upon which the Building will be located.

"Outparcel 4 Monument Sign" means the ground-mounted monument sign located on Outparcel 4.

"Premises" means the approximately 4,560 gross leasable square feet, with a frontage of approximately seventy two linear feet, located at 1612 Eglin Street, Rapid City, South Dakota, as shown on the Site Plan.

"Premises Partial Damage" means damage or destruction only to the Premises or Building to the extent that the cost of repair is less than fifty percent (50%) of the then replacement cost of the Premises or the Building.

"Premises Total Damage" means damage or destruction only to the Premises or Building to the extent that the cost of repair is fifty percent (50%) or more of the then replacement cost of the Premises or the Building.

"Real Property Tax" has the meaning set forth in Paragraph 7.1.

"Renewal Term" means any term resulting from Tenant's exercise of an option pursuant to Paragraph 4.2.

"Rent" means Base Rent and any Additional Rent.

"Rent Commencement Date" means the date the conditions specified in Paragraph 5.1 are satisfied, and Tenant is obligated to pay Base Rent and all Additional Rent, as applicable.

"Restricted Items" means men's suits, men's and boys' formalwear, sports coats and unfinished dress/business pants that require tailoring.

"Restrictive Covenants" means that certain Operation and Easement Agreement (the "OEA") between Target Corporation and Landlord dated October 25, 2007, and recorded in Book 174, Page 4290 in the Office of the Pennington County, South Dakota Register of Deeds (as it may be amended from time to time), such Restrictive Covenants are incorporated herein by reference as Exhibit A-2. This Lease shall be subject to the Restrictive Covenants, and Tenant agrees to abide by its terms.

"Shopping Center" means the real property and improvements located in Rapid City, Pennington County, South Dakota, and commonly known as Rushmore Crossing, as more particularly described in Exhibit A and outlined on the Site Plan. The Shopping Center consists of approximately 800,000 gross leasable square feet, and includes the Soft Power District, the Outparcel District and the Lifestyle District.

"Shopping Center Expenses" means those costs and expenses incurred by Landlord in managing and maintaining those portions of the Common Area outside of the Outparcel District or Soft Power District, that benefit the Shopping Center as a whole and are not allocable to any particular tenant or district within the Shopping Center. Shopping Center Expenses include, but are not limited to, costs associated with Federally-mandated wetlands mitigation and monitoring programs, costs associated with retention/detention ponds within the Shopping Center, landscaping costs and costs of maintaining private roads within the Shopping Center.

"Site Plan" means the site plan for the Shopping Center attached to this Lease as Exhibit A-1.

"SNDA" means a subordination and non-disturbance agreement in form reasonably satisfactory to Landlord's lender and Tenant.

"Soft Power District" means that portion of the Shopping Center shown on the Site Plan.

2

### 5.2. Additional Rent

From and after the Rent Commencement Date, Additional Rent, if any, will be due and payable to Landlord in lawful money of the United States, with Base Rent in advance of the first (1st) day of each calendar month without demand or offset, excepting as otherwise provided in the Lease, in lawful money of the United States, via electronic funds transfer or other method selected by Tenant, unless this Lease provides for another time for the payment of specific items of Additional Rent, in which case payment will be due at such specified time. Unless otherwise provided in this Lease, Additional Rent will be paid at the same place Base Rent is paid.

### 5.3. Security Deposit

Tenant is not required to pay a security deposit with respect to this Lease.

## 6. Use

### 6.1. Use and Tradename; Tenant's Exclusive Rights; Use Violations

The Premises may be used for the retail sale of: clothing, furnishings, accessories, shoes, and related items and services; tailoring services; the rental of men's and boys' formalwear and formalwear accessories, and shoes; and/or any reasonably comparable use that is consistent with Tenant's Use, under any tradename designated by Tenant from time to time subject to the rights of existing tenants with signed leases and exclusives then in place and/or use prohibitions and restrictions contained in **Section 20.24** herein and **Exhibit H**, attached hereto. Landlord represents and warrants that Tenant has the exclusive right within the Shopping Center (the "Exclusive Use Area") to: (a) rent or sell formalwear in the Exclusive Use Area; and (b) to sell Restricted Items in the Exclusive Use Area; provided, however, that this right does  not prohibit another tenant or occupant of the Shopping Center from selling the Restricted Items or renting formalwear in the Exclusive Use Area, in the aggregate, in any manner that does not constitute a Use Violation. For purposes of this Lease, a "Use Violation" means the use by any tenant or other occupant in the Exclusive Use Area, including a Temporary Store, of forty percent (40%) or more of its total floor area for the aggregate: (a) sale of formalwear or the Restricted Items, or (b) the rental of formalwear, related accessories, formalwear shoes and related items. This restriction does not apply to existing tenants, including the tenants or occupants of Outparcel 3 as labeled on **Exhibit A-1**, nor to any tenant or occupant greater than fifteen thousand (15,000) contiguous square feet operating under one tradename.

Landlord further represents and warrants that: (i) it has not granted, and will not grant to any other tenant of the Shopping Center, any right to sell men's suits, sport coats, unfinished dress/business pants that require tailoring, or men's and boys' formalwear, nor to rent men's and boys' formalwear, in each case as a primary use or as an exclusive use; (ii) no exclusive use or other covenant or agreement, entered into or granted by Landlord or to which Landlord is party or otherwise is in effect, restricts the use of the Premises by Tenant as contemplated by this Lease; and (iii) Landlord will not modify, nor approve a change of use (unless required by law) under, an existing lease to allow a use which would conflict with the exclusive use rights set forth in this **Paragraph 6.1**; and all future leases and extensions of existing leases (unless Landlord is contractually obligated to make such extensions of existing leases) by Landlord, will specifically prohibit such uses; and (iv) Landlord will not lease the immediately adjacent space on the west side of the Premises for a food use or for any other use that generates odors or smells detectable outside of such premises. Landlord also represents and warrants that the Premises are zoned for Tenant's permitted use seven (7) days per week.

### 6.2. Remedies for Use Violations

If (a) Landlord knowingly leases, assigns, sublets or otherwise permits any space within the Exclusive Use Area of the Shopping Center for a use that constitutes a Use Violation; or (b) a Use Violation occurs for any other reason, excepting as otherwise provided in the immediately following paragraph, then Tenant, in addition to all other rights and remedies available to Tenant, (i) may terminate this Lease by written notice to Landlord, which notice may be given any time following the Use Violation and prior to the cure of same, and (ii) if this Lease is not terminated, pay Substitute Rent in lieu of Base Rent. Substitute Rent will be due and payable in accordance with the Lease terms, together with any Additional Rent, then due and payable. Substitute Rent shall commence upon Tenant's delivery to Landlord of a notice of the Use Violation and shall continue until the earlier of (aa) the date the Use Violation no longer exists, as evidenced by written notice and other reasonable assurances delivered to Tenant by Landlord, or (bb) Tenant terminates the Lease. Following any termination of the Lease by Tenant, thereafter neither party shall have any continued liability to the other party, other than any unpaid or unresolved obligation of one party to the other.

Notwithstanding anything in the foregoing to the contrary, if (A) another tenant or occupant in the Exclusive Use Area violates a provision of its lease or license agreement regarding its premises, and such violation results in a Use Violation; and (B) Landlord, (i) upon receipt of written notice from Tenant, promptly takes reasonable and appropriate action to stop said violation, (ii) thereafter, if necessary, promptly commence appropriate proceedings to enjoin such activities, and (iii) in all events,

9

not be obstructed by landscaping or otherwise.

4. (A) Landlord agrees that as long as any retail sales activity shall be conducted in the Demised Premises, (i) the Outparcels shall be subject to the use restrictions contained in the REA except Outparcels #1, 2 and 3 may not be used for the following uses: hotel or motel (except Outparcels other than #1, 2 and 3 may be used for hotels or motels if permitted in the REA) and (ii) the Soft Power District shall not be used (a) for any non retail purpose except as provided in this Paragraph 4 (repairs, alterations, and offices incidental to retailing, banks and small loan offices, not being deemed non retail), or (b) for any entertainment or amusement purposes such as a bowling alley, skating rink, cinema, bar (except that a bar shall be allowed when located in conjunction with a restaurant), night club, discotheque, arcade, pool room, health club and/or day spa (except as provided below), massage parlor (but not prohibiting the incidental offering of massages in a health club or day spa permitted in other provisions hereof), sporting event, sports or game facility (but the foregoing shall not prohibit a sports memorabilia store or prohibit the operator of the big box sporting goods retail store located within the area labelled "Scheel's" on the Lease Plan from using the area labelled "Scheel's Demonstration Area" on the Lease Plan in accordance with the provisions of Section 5.1.4(K) of the REA), or off track betting club or (c) for any establishment which sells or displays pornographic materials (except for a traditional book store or video store) or (d) for any establishment which sells or displays used merchandise or second hand goods (except that "Play it Again Sports" and "EB Games" or "Game Stop" type of stores shall be allowed). Notwithstanding anything contained in this Paragraph 4(A) to the contrary, Landlord and Tenant agree as follows with respect to the Soft Power District:

(1)     there may be one health club and/or day spa not to exceed 7,000 square feet of floor area in the Soft Power District provided such is located at least 200 feet from the Demised Premises;

(2)     up to 20,000 square feet of floor area in the Soft Power District may be used for office uses and service type uses provided such space is located at least 200 feet from the Demised Premises but this restriction shall not apply to office space used by a retail or restaurant tenant ancillary to such tenant's retail or restaurant operations;

(3)     gambling machines, billiards, other gaming tables, and video games may be operated in connection with a restaurant or other retail use as long as operated in a first class manner substantially similar to other first class retail shopping centers in South Dakota and so long as such is located at least two hundred (200) feet away from the Demised Premises.

No restaurants selling food for consumption on or off premises shall be located within two hundred (200) feet from the Demised Premises (except (a) that the Inducement Store may contain a café which is an incidental part of a retail department store and (b) cafes of up to 3,000 square feet of floor area which are an incidental part of retail stores which occupy at least 15,000 square feet of floor area (such as Barnes & Noble or Target) are permitted within such two hundred (200) foot radius) and no more than an aggregate of fifteen thousand (15,000) square feet of floor area in the Soft Power District may be used for restaurant uses (in addition to the exclusion of the incidental cafes described above and Existing Leases in Subsection (C) below).

(B) Landlord agrees that, during the term of this lease except as expressly provided below in this Paragraph 4(B), no other premises in the Shopping Center shall at any time contain more than fifteen thousand (15,000) square feet of floor area therein used or occupied for, or devoted to the sale or display of apparel on an Off-Price Basis (the "Protected Merchandise") including in the computation of such floor area one half (1/2) of all floor area in any aisles, corridors or similar spaces adjacent to or abutting any racks, gondolas, shelves, cabinets, counters or other fixtures or equipment containing or used for the sale or display of the Protected Merchandise. For purposes of the foregoing, the term "Off-Price Basis" shall mean the sale or display of apparel on an every day basis at prices reduced from regular prices charged by department and specialty stores. Notwithstanding anything contained herein to the contrary, nothing in this lease shall be construed to prohibit (i) a general merchandiser with at least sixty thousand (60,000) square feet of retail floor space with operations similar to that of a Target or Wal-Mart, (ii) a full price department store with at least fifty thousand (50,000) square feet of retail floor space with operations similar to that of a J.C. Penney, Kohl's, Dillard's and/or Gordmans department store but such shall not include a store such as Burlington Coat Factory or Ross which does not sell merchandise at full price as a department store would, (iii) any store whose primary business is the sale of sporting goods (including but not limited to Scheels or Dick's Sporting Goods), or (iv) the operation of an Old Navy store or Gap store not to exceed nineteen thousand (19,000) square feet of floor area in the Shopping Center, or (v) the operation of a Dollar Tree Store, (vi) the operation of a typical "Michaels" store, as such stores typically

SCHEDULE B                                    B-3
G:\Legal\Beaumont\TJ MAXX\SD\Rapid City\Lease\Final Clean.doc

have been provided to Tenant prior to the date hereof, including without limitation, the OEA and the Exclusive Uses, which are in effect as of the execution of this Lease, and all agreements entered into by Tenant and Landlord with regard to the Leased Premises, including insurance policies. In addition, notwithstanding the foregoing, Landlord represents and covenants that nothing shall prevent Tenant from using the Leased Premises for the Permitted Use except that this representation and covenant shall not relieve Tenant of its obligation to not violate the Prohibited Uses (as defined below) and the Exclusive Uses (as defined below). Tenant shall be permitted to conduct periodic sidewalk sales in the area in front of the Leased Premises, so long as such sales comply with the terms of the OEA and all applicable governmental laws and regulations.

**5.2    Use.** Except for leases signed prior to the date of this Lease, Landlord agrees that it shall not, without Tenant's prior written consent (which Tenant may withhold in its sole and absolute discretion), lease, sell or permit any part of the Soft Power District subsequent to the date of this Lease to be used by any thrift or second-hand store (*e.g.* Salvation Army or Goodwill), any "dollar store" retailer, including without limitation Family Dollar, Dollar General, Big Lots and McCrory's, an auditorium; meeting hall; bingo hall or a place of public assembly; library; sale, rental or service of automobiles or other vehicles; automobile body shop; bar serving alcoholic beverages whose gross revenues from the sale of on-premises consumption exceeds 50% of the gross revenues for such business, except that this restriction shall in no way prohibit a Buffalo Wild Wings, Wings N' More, Buffalo Wings & Rings or other similar operation; funeral parlor or mortuary; discotheque; dance hall (or otherwise for musical/dance reviews or topless/nude shows); karate, gymnasium, skating rink; health spa, fitness center or workout facility unless such facility within the Soft Power District is located more than 500 linear feet from the nearest demising wall of the Leased Premises; race track; car wash; off-track betting establishment; tattoo parlor; game room (unless part of a national or regional restaurant chain), amusement arcade, amusement gallery or amusement store, pinball arcade or billiard parlor; so-called "flea market"; store selling primarily distressed or damaged merchandise; pool hall/room (except as provided below); bowling alley; so-called "head shop"; night club; school (excluding employee training programs and users of 5,000 square feet or less such as Sylvan Learning Center and Huntington Learning Center); any business or use which emits offensive odors, fumes, dust or vapors; is a public or private nuisance; emits loud noise or sounds which are objectionable; creates fire, explosive or other hazard; adult book store or store selling or exhibiting sexually explicit or obscene materials except as may be incidental to a book, record or video store, provided such sale of such materials is not the primary purpose of such store, and except further that this restriction shall in no way prohibit a Borders, Barnes & Noble or other general purpose bookstore, whether or not of same or similar size; storage warehouse; assembling, manufacturing, distilling, refining, smelting, agricultural or mining operation; mobile home park, motor inn, trailer court, labor camp, junkyard or stockyard; dumping, disposing, incineration or reduction of garbage (provided, however, that this prohibition shall not be applicable to garbage compactors located in the rear of any building, but only to the extent that the same is allowed under the terms of any lease or occupancy agreement and the terms of the OEA); fire sale, bankruptcy sale or auction house (unless pursuant to a court order); central laundry, dry cleaning plant or laundromat; amusement park, circus or carnival; movie theatre or live performance theatre; hotel, motel, short or long term residential use, including but not limited to single family townhouses, condominiums, other multi-family units, and other forms of living quarters, sleeping apartments or lodging rooms; any establishment that exhibits nude or partially clothed

- 9 -

OM-245209-15

Gordman's

(2 pages)

wait staff (provided, however, that this restriction shall not apply to Hooters or other similar family or sports-themed restaurants); any restaurant located within 200 linear feet of the nearest demising wall of the Leased Premises (provided, however, that this shall not prevent a café which is ancillary to an occupants' retail primary use, such as Target or Scheel's, so long as such café does not exceed 3,000 square feet in size) ; massage parlor or similar establishment (unless such services are offered at a salon or health club); gun range or gun shop; any establishment, department or operation of any size selling or offering for sale any pharmaceutical products or requiring the services of a licensed pharmacist; gas/service station or other facility that dispenses gasoline, diesel or other petroleum products; establishments that both sell and/or install any lubricants, tires, batteries, transmissions, brake shoes or other similar vehicle accessories; any liquor store offering for sale alcoholic beverages for off-premises consumption unless such articles are sold at a grocery store or supermarket; any free-standing convenience store; any abortion or drug rehabilitation clinic or counseling center; any psychic, tarot card reading or other similar services, any child care center, daycare or preschool; any teleconference or call center; any sporting event, live action sports or gaming facility (but expressly excluding a sports or game retailer such as a sporting goods store, sports memorabilia store or Game Stop); any Bailbondsman; any non-retail use, not including restaurants, but retail business offices are permitted as long as they are consistent with the OEA; any so called "gentlemen's" clubs; or any check cashing services located within 300 linear feet of the nearest demising wall of the Leased Premises. Notwithstanding the foregoing, in no way shall any of the restrictions set forth herein prohibit gambling machines, billiards or other gaming tables, or video games from being operated in connection with a restaurant or other retail use operated in a first-class manner and in compliance with all applicable laws, regulations and ordinances.  In addition, and notwithstanding anything to the contrary in this Section 5.2, Landlord shall be able to lease to or allow space at the Shopping Center to be used by Dollar Tree; provided, further, that Landlord agrees that Dollar Tree shall only be allowed to occupy space "P-22" on the site plan attached as Exhibit "B." Tenant specifically acknowledges that Landlord may lease to or allow space at the Shopping Center to be used by Barnes & Noble, Borders Books, Ross Dress for Less, Party City, Party America, TJ Maxx, Marshalls, Michael's, Petco or PetSmart (or other similar pet supply retailer), Dillard's, Target, J.C. Penney, Dress Barn, Scheel's All Sports, Linens-N-Things, Cost Plus World Market, Old Navy, Shoe Carnival, David's Bridal, Toys R Us, Babies R Us, Guitar Center, Deb Shops, Circuit City, Staples, Factory Card & Party, Ulta, Lane Bryant, and Rue 21. The restrictions set forth in this Section 5.2 shall not apply to the parcels owned or to be owned by Target, Dillard's or J.C. Penny, or the parcel ground leased by Scheels so long as such parcels are (x) not owned by Landlord or any party affiliated with Landlord (unless through a sale-leaseback or similar arrangement with Target, Dillard's, J.C. Penney, Scheels or their replacements), or (y) ground leased to a party other than a party affiliated with Landlord.

**5.3    Prohibited Uses.** Tenant covenants that the Leased Premises, or any part thereof, shall not be leased or used directly or indirectly for any of the uses set forth in Exhibit "C-1" attached hereto and made a part hereof (the "Prohibited Uses"). In addition, Tenant shall not violate the exclusive uses of tenants or occupants (the "Exclusive Use Retailers") listed on Exhibit "C-2" attached hereto and made a part hereof (the "Exclusive Uses"). Landlord acknowledges that the Exclusive Uses, the OEA and the Prohibited Uses are the sole use limitations in effect on the date hereof.

- 10 -

subject to any fees, penalties or fines therefor. Notwithstanding the foregoing, if after the Operating Period Tenant closes for business in the Premises for a period of one hundred eighty (180) consecutive days, other than for Permitted Closures, Landlord may terminate this Lease. In the event Landlord elects to terminate this Lease as provided in this paragraph, Landlord shall give Tenant at least sixty (60) days prior written notice of said intention; and Tenant, upon thirty (30) days notice to Landlord within such period, may avoid such cancellation by reopening for business during such sixty (60) day period. Upon the effective date of termination as herein above described, the Lease shall be deemed cancelled and of no further force or effect, as if the Lease had naturally expired by the terms thereof, except as to liabilities that may have accrued on or before the termination of this Lease.

Tenant shall, at its own cost and expense, secure and maintain all necessary licenses and permits required for the conduct of its business. Except as otherwise provided in this Lease, Tenant shall, at its sole cost and expense, comply with all laws of any board of fire underwriters (including all modifications and improvements required thereby) now in force or which may hereafter be in force relating to or affecting the condition, use or occupancy of the Premises.

For so long as Tenant is not in default hereunder beyond any applicable notice and cure period, and provided Tenant is operating the Premises as a "sporting goods store" (as defined below) Landlord shall not permit any person or entity (other than within the Premises) within the Exclusive Area (as defined below) to operate a "sporting goods store" (as defined below). For purposes of this Section 13, a "sporting goods store" shall mean a store (a "Competitor") which sells and/or rents (and may service and/or warehouse same in connection therewith) any of the following (individually and/or collectively, a "Competing Use"): (i) a wide variety of "sporting goods" (as defined below), such as, without limitation, Dick's Sporting Goods, Cabellas, the Sports Authority, Gander Mountain or REI or similar; and/or (ii) bicycles and/or related equipment and gear (the "Bike Use"); and/or (iii) hunting or fishing equipment or gear (the "Hunting Use"); and/or (iv) athletic footwear or clothing including, without limitation, stores such as The North Face, The Athletes Foot, Nike, Under Armour or Adidas, in any such case (i) through (iv) above, without Tenant's prior written consent which may be granted or withheld in Tenant's sole and absolute discretion. For purposes of this Section, "sporting goods" shall mean men's, women's and children's athletic sportswear and apparel; athletic footwear; bicycles; fitness equipment; golf and racquet equipment; camping equipment; marine equipment; fishing and hunting gear; water sports equipment; ski equipment; other equipment used for sports and/or exercise and general recreational merchandise that is athletic in nature.

For purposes of this Lease, the Exclusive Area shall be deemed to be the entire Center, including, without limitation, the Outparcels, Landlord Outparcels and Third Party Outparcels, but excluding the Target Parcel (as identified on the Site Plan), and the Dillards Parcel (as identified on the Site Plan); provided, however, (i) the Target Parcel shall be deemed part of the Exclusive Area if the Target Parcel remains or becomes within the ownership of Landlord or within the ownership of any affiliate or assignee of Landlord (and then at all times thereafter) and does not operate as a Target store or any affiliate, subsidiary or successor to a Target store, either by Target or an affiliate, subsidiary or successor of Target, within the Target Parcel, unless the Target Parcel is being operated for any Replacement Use (as defined below), and/or (ii) the Dillards Parcel shall be deemed part of the Exclusive Area if the Dillards Parcel remains or

24

A620000-14

Scheel's
( 2 pages)

becomes within the ownership of Landlord or within the ownership of any affiliate or assignee of Landlord (and then at all times thereafter) and does not operate as a Dillards store or any affiliate, subsidiary or successor to a Dillards store, either by Dillards or an affiliate, subsidiary or successor of Dillards, within the Dillards Parcel, unless the Dillards Parcel is being operated for any Replacement Use. For purposes of this Lease "Replacement Use" shall mean any of the following: (a) a typical home improvement store which is at least 100,000 leasable square feet, as such stores typically operate as of the Effective Date, such as (without limitation) a Home Depot or Lowe's, (b) a full line department store which is at least 60,000 leasable square feet, such as (without limitation) Dillards, J.C. Penney or Macy's, as such stores typically operate as of the Effective Date, (c) a typical discount department store which is at least 80,000 leasable square feet, such as (without limitation) Target, Wal-Mart or Kohls, as such stores typically operate as of the Effective Date, and (d) a typical warehouse club store which is at least 100,000 leasable square feet, such as (without limitation) Sam's or Costco, as such stores typically operate as of the Effective Date. The tenant or occupant operating any such Replacement Use as set forth in items (a) - (d) of the preceding sentence is referred to below as a "Replacement Tenant".

Subject to the following, none of the following shall be deemed a Competitor and Tenant shall not be entitled to exercise its remedies set forth herein with respect thereto: (i) any tenant or occupant operating a Competing Use pursuant to a fully-executed lease that is in full force and effect prior to the date of this Lease ("Existing Tenant") but limited to the Existing Tenants specified on Exhibit Q attached hereo, and their respective successors and assigns (and provided that Landlord may not modify any such existing lease so as to allow a Competing Use to any degree greater than currently allowed under such existing lease), or (ii) any tenant or occupant operating a Competing Use in violation of its Lease, but only so long as Landlord is promptly and diligently trying to cure such violation, or (iii) any tenant or occupant operating a primarily single-line sporting goods store, other than for the Bike Use or the Hunting Use, such as without limitation, (a) a store selling primarily snow skis, snowboards, snow shoes and related equipment, apparel and shoes, (b) a store selling primarily golf equipment, golf apparel and golf shoes, or (c) a store selling primarily exercise and/or fitness equipment and related apparel and shoes, (iv) any tenant or occupant operating a general men's, women's and/or children's apparel store, but not engaged primarily in the sale of sporting goods, or (v) any tenant or occupant operating a business limited to and customarily categorized as a family shoe store, such as without limitation, those operating as of the date hereof under the trade names of Shoe Carnival, Famous Footwear or Payless, or (vi) any tenant or occupant operating a second hand sporting goods store such as Play It Again Sports, or (vii) any tenant or occupant operating solely a sports memorabilia store, (viii) any tenant or occupant operating a store for which the aggregate sale of sporting goods is merely "incidental" to such tenant's or occupant's primary use, unless the total space which such tenant or occupant devotes to sporting goods exceeds the lesser of ten percent (10%) of the leasable square feet within such lessee's or occupant's premises or one thousand five hundred (1,500) leasable square feet (inclusive of allocable aisle space and linear shelf space), or (ix) any Replacement Tenant.

Notwithstanding anything contained herein to the contrary, Tenant acknowledges that the following prospective occupants in the Center shall not be deemed Competitors:  Linens N Things, T.J. Maxx, Marshalls, Gordmans and/or Ross Dress For Less, Michaels, Petco, Old

4620000.14

SECTION 7.01. <u>Utilities</u>. Landlord covenants and agrees that the Premises shall be properly serviced with gas, electric, telephone, water, sewer and other utilities sufficient to meet Tenant's requirements at the Acceptance Date. Landlord shall cause all such utilities (excluding water/sewer) to the Premises to be separately and directly metered at Landlord's sole cost and expense. Tenant shall pay all charges for utility services furnished to the Premises. Commencing with the period from and after the Acceptance Date, Tenant agrees to pay promptly, as the same become due and payable, all bills for gas, electricity and water for the Premises and sewer use charges for the Premises for any period during the Term. If at any time during the Term, for any reason, Landlord shall provide utility service to the Premises, Tenant's cost for such utility service shall not exceed Landlord's actual cost for such utility service provided that Landlord shall use commercially reasonable efforts to obtain the most economical rate possible based on market conditions. In addition, Tenant shall have the right to install a test meter to verify its utility usage.

In the event an interruption or cessation of services shall occur and as a result thereof Tenant shall be prevented from conducting its business in the Demised Premises or any part thereof, Landlord agrees to promptly commence to take whatever action is necessary to restore such service(s) and proceed with such restoration with due diligence. During the period that any utility service to the Premises is interrupted or not available, Tenant shall be entitled to an equitable abatement of Annual Minimum Rent and Additional Charges for such period.

## ARTICLE VIII

## USE OF PREMISES

SECTION 8.01. <u>Permitted Use</u>. When Tenant opens the Premises for business to the public, the Premises shall be initially used for the Permitted Use. However, thereafter Tenant may use the Premises for any lawful retail purpose, which does not violate any exclusive uses or other restrictive covenants to which Landlord is a party as set forth in Exhibit F and/or any prohibited uses as set forth in Exhibit G. Subject to the Opening Requirement, Tenant agrees to initially open the Premises for business to the public staffed, stocked and fixtured for the Permitted Use under the trade name "Dress Barn" for at least one (1) day within one hundred twenty (120) days of the Commencement Date (the "Opening Day").

SECTION 8.02. <u>Leasing Restrictions</u>. Landlord agrees not to use, lease, sell or otherwise permit any space in the District to be used, in whole or in part, for a billiard parlor (except in the limited circumstances described below), flea market, massage parlor (but this restriction shall not be read to prohibit a health spa, health club, fitness center or workout facility to the extent permitted by the Operating Agreements, which may offer massages as a part of its services), a so-called "off-track betting" operation; the sale, leasing or display of pornographic materials, provided that the foregoing restriction shall not preclude the sale or rental of adult books, magazines or videos as an incidental part of the business of a general purpose bookstore or video store (such as, by way of example, but not necessarily of same or similar size, Blockbuster, Hollywood Video, Borders, Barnes & Noble or Books a Million; a store specializing in the sale of drug paraphernalia. Notwithstanding the foregoing, in no way shall any

18

Dress Barn
(2 pages)

of the restrictions set forth herein prohibit gambling machines, billiards or other gaming tables, or video games from being operated in connection with a restaurant or other retail use operated in a first-class manner and in compliance with all applicable laws, regulations and ordinances. In addition, and notwithstanding anything to the contrary in this Article, Tenant specifically acknowledges that Landlord may lease to or allow space at the Shopping Center to be used by Dollar Tree, Barnes & Noble, Borders Books, Ross Dress for Less, Party City, Party America, TJ Maxx, Marshalls, Michael's, Petco, Dillard's, Target, J.C. Penney, Scheel's All Sports, Linens-N-Things, Cost Plus World Market, Old Navy, Shoe Carnival, David's Bridal, Toys R Us, Babies R Us, Guitar Center, Deb Shops, Circuit City, Staples, Factory Card & Party, Ulta, Lane Bryant, and Rue 21. The restrictions set forth in this Article shall not apply the parcels owned or to be owned by Target, Dillard's or J.C. Penney, or the parcel ground leased by Scheels. Landlord understands and agrees that to permit any of the prohibited uses described in this Section within the District would materially and adversely affect Tenant's business. In the event that Landlord violates the foregoing Section, Tenant, as its sole remedy, may elect to either (a) pay one-half of Annual Minimum Rent ("Other Alternative Rent") in lieu of Annual Minimum Rent until such time as the violation ceases (and Tenant shall in all cases continue to pay all Additional Rent and all other charges owing by Tenant to Landlord under this Lease) or (b) terminate this Lease; provided, however, that if Tenant has not elected to terminate the Lease within three hundred sixty five (365) days from the date of such violation, Tenant shall resume the payment of full Annual Minimum Rent, Percentage Rent and Additional Charges and Tenant's right to terminate the Lease for the violation of this Section 8.02 shall be null and void. Notwithstanding the foregoing, in the event that a tenant in the shopping center violates the above Section and such violation is not permitted pursuant to any sale or lease by Landlord (a "Rogue Tenant") and so long as Landlord is exercising diligent efforts to prevent or correct such Rogue Tenant's violations, including pursuing all legal and equitable remedies available, Tenant shall delay its remedy under this Section for so long as Landlord diligently pursues compliance, not to exceed one hundred twenty (120) days. Tenant's failure to terminate within the thirty (30) day period provided above shall be deemed an election to resume payment of full Rent (and Tenant shall in all cases continue to pay all Additional Charges and all other charges owing by Tenant to Landlord under this Lease). Tenant acknowledges that the lease restrictions set forth herein are not binding upon leases executed prior to the date hereof, and shall not apply to the parcel owned by Target, Dillard's or J.C. Penny, or the parcel ground leased by Scheels so long as such parcels are (x) not owned by Landlord or any party affiliated with Landlord (unless through a sale-leaseback or similar arrangement with Target, J.C. Penney, Scheels or their replacements), or (y) ground leased to a party other than a party affiliated with Landlord.

SECTION 8.03.  Co-Tenancy.  Landlord represents and warrants that it has entered into, or is negotiating to enter into leases and/or operating agreements with the Inducement Tenants (as defined in Section 1.01(m)) for initial terms expiring no sooner than the expiration of the Initial Lease Term.

(a) Notwithstanding anything set forth in this Lease to the contrary, Tenant will not be required to open for business or to pay Annual Minimum Rent, Percentage Rent and Additional Charges and any other charges to be paid by Tenant until such time as the Inducement Tenants are opened and operating in the Shopping Center and at least seventy-five percent (75%) of the

19

Section G.4 of this Lease; provided however, Landlord represents that Tenant's Proportionate Share of the actual Common Area Maintenance Charge for the Soft Power District CAM and the Shopping Center CAM during the first full calendar year of the Original Lease Term will not exceed $1.66 per square foot inclusive of the ten percent (10%) administrative fee. Thereafter, annual increases for the Common Area Maintenance Charge (including Tenant's Proportionate Share of Landlord's Liability Insurance) will not exceed five percent (5%) of the lesser of (i) Tenant's Proportionate Share of the actual Common Area Maintenance Charge or (ii) the amount paid by Tenant for the previous calendar year excluding utility costs attributable to per unit rate increases and not to increased usage. Annual increases shall be calculated in this manner on a non-cumulative basis for the entire Original Lease Term and any Renewal Term(s) thereof. In addition to the $1.66 stated above, Landlord estimates that Tenant's Proportionate Share of the actual cost for snow removal ("Snow Removal Cost") during the first full calendar year of the Original Lease Term will be $0.34 per square foot and will not be included as a capped expense or in establishing the annual increase for the Common Area Maintenance Charge. Thereafter, Tenant shall pay Tenant's Proportionate Share of Landlord's actual cost for snow and ice removal on a direct pass-through basis.

b.   Real Estate Taxes. Tenant shall pay Tenant's Proportionate Share of Landlord's actual Real Estate Taxes in accordance with Section F.2 of this Lease; provided, however, Landlord represents that Tenant's Proportionate Share of Landlord's actual Real Estate Taxes during the first full calendar year of the Original Lease Term will not exceed $1.70 per square foot.

c.   Property Insurance. Tenant shall pay Tenant's Proportionate Share of Landlord's actual Property Insurance premium in accordance with Section L.4.c of this Lease; provided, however, Landlord represents that Tenant's Proportionate Share of Landlord's actual Property Insurance premium during the first full calendar year of the Original Lease Term will not exceed $0.30 per square foot.

d.   Adjustment. Notwithstanding anything to the contrary in this Lease, in the event there are any additional sums due from Tenant to Landlord resulting from an error in calculation of any Additional Rent payable by Tenant under this Lease ("Adjustment"), Landlord shall notify Tenant of any such Adjustment within twelve (12) months after the end of the period used by Landlord in estimating Landlord's cost to which such Adjustment is applicable. If Landlord fails to notify Tenant of any such Adjustment within such twelve (12) month period, Landlord's claim to such Adjustment shall be deemed waived.

12.   Early Termination. Intentionally deleted.

13.   Exclusive Use and Restricted Uses. As a material inducement for Tenant to enter into this Lease, Landlord hereby agrees as follows:

a.   Landlord shall not lease, rent, occupy or permit any other premises in that portion of the Shopping Center and the Outparcels owned and/or controlled by Landlord and/or Landlord's affiliates to be occupied, whether by a tenant, sublessee, assignee, licensee or other occupant, for the operation of a single price point variety retail store ("Exclusive" or "Exclusive Use"). For the purposes of this Lease, a single price point variety retail store is defined as a store that offers all of its merchandise for sale at a single price point.

b.   Landlord will not permit any other occupant in that portion of the Shopping Center and the Outparcels owned and/or controlled by Landlord and/or Landlord's affiliates to operate the following uses (hereinafter, "Restricted Uses") without

Rushmore Crossing
Rapid City, SD
8-18-08

Dollar Tree
(2 pages)

Tenant's consent and such consent shall be in Tenant's sole and absolute discretion:

(1)    Variety retail operations with the word "Dollar" in their trade name, by way of example, including but not limited to Dollar General, Family Dollar, Always $.99, and like users who may or may not have a price point reference in their name;

(2)    A close-out store (such as, by way of example, Ocean State Job Lot, Building 19 or Odd Lots but not including off price stores such as T.J. Maxx or Marshalls) whose principal business is selling retail merchandise provided it is understood that a close-out store or outlet type store selling hard and/or soft goods, such as women's purses, apparel or jewelry, or men's shirts or belts would be deemed not to be in violation nor require any consent from Tenant; or

(3)    A retail store whose "principal business" (hereinafter defined) is selling variety retail merchandise at a single price point;

For the purpose of this Section, "principal business" shall be defined as selling such merchandise in twenty-five percent (25%) or more of the sales floor area (including one-half [1/2] of the adjacent aisle space).

For the purpose of this Lease, an "affiliate" of Landlord shall mean any person, firm or entity which controls, is controlled by, or is under common control with, Landlord, and the term "control" shall mean the ability to control the business, management and/or operational decision of the person, firm or entity in question.

Notwithstanding the foregoing, this Section A.13 shall not apply to (1) any current tenant or occupant selling single price-point apparel as its principal business; or (2) any tenant under lease, or occupant under binding agreement prior to the date this Lease was signed, (or any successor or assign thereof); provided, however, in the event Landlord's consent is required for a change in permitted use or trade name, Landlord shall not consent to a change of any tenant's use or trade name which would violate the Exclusive Use or Restricted Uses.

Notwithstanding the foregoing, the following shall also be excluded from those to which Tenant's Exclusive applies:

1.    Any occupant greater than 80,000 square feet;
2.    Target, Scheels, JC Penney and Dillard's parcels provided such parcels are not owned and/or controlled by Landlord and/or Landlord's affiliates.

Tenant specifically acknowledges that Landlord may lease to or allow space at the Shopping Center to be used by Barnes & Noble, Borders Books, Ross Dress for Less, Party City, Party America, T.J. Maxx, Marshalls, Michael's, Petco, Dillard's, Target, J.C. Penney, Dress Barn, Scheel's All Sports, Linens-N-Things, Gordmans, Cost Plus World Market, Old Navy, Shoe Carnival, David's Bridal, Toys R Us, Babies R Us, Guitar Center, Deb Shops, Circuit City, Staples, Factory Card & Party, Ulta, Lane Bryant, and Rue 21, provided such tenants', their successors' or assigns', principal use does not violate Tenant's Exclusive.

If any provision of this Section A.13 is violated and such violation continues for a period of thirty (30) days after written notice from Tenant, Tenant's rights and remedies shall include, but not be limited to the following:

24.   Recording.   Tenant will not record this Lease without the prior written consent of Landlord. The party requesting recordation of this Lease shall pay any and all fees associated with same.

25.   Quiet Enjoyment.   If Tenant performs its obligations under this Lease, Tenant will have the quiet enjoyment of the Shop so long as this Lease remains in force, without hindrance or disturbance from Landlord, subject to the specific provisions of this Lease and to easements and restrictions of record. Landlord shall not block access to and from the storefront entrance during Tenant's business hours. Landlord shall not materially and/or adversely affect Tenant's visibility and/or storefront. Upon written notice from Tenant to Landlord whenever Tenant is being prevented in whole or in part from the free, uninterrupted and unimpeded use, access and enjoyment of the Shop, or the Common Areas which continues for more than forty-eight (48) consecutive hours, as a result of (a) Landlord's failure to observe or perform any obligation on Landlord's part to be observed or performed under the Lease, (b) any negligent act or omission by Landlord, its agents, employees or contractors, (c) Landlord's making any repairs or alterations in or to the Shop or the Shopping Center, (d) the closing by Landlord of any portion of the Shopping Center and/or the Common Areas, or (e) Landlord's entry into the Shop, then and in each and all such cases, all Rent shall be equitably abated, or if rent payments have not commenced, the Commencement Date shall be extended on a day for day basis, retroactively to the first day of such written notice by Tenant and shall continue until full use of the Shop is restored to Tenant.

26.   Not an Offer.   The submission of this Lease to Tenant for examination does not constitute an offer to enter into a lease, and this Lease shall become effective only upon execution and delivery by Landlord and Tenant.

27.   No Presumption Against Drafter.   Both parties have freely negotiated this Lease. In any interpretation of this Lease, no presumption will be made against either party on the basis that it drafted the Lease or a particular portion of the Lease.

28.   Recapture.   Tenant must open for business to the public in the Shop as a typical GameStop fully stocked, staffed, fixtured and merchandised for at least one day within sixty (60) days of the Delivery Date and subject to punch list items and subject to the terms and conditions of the Commencement Date.   If Tenant fails to open for business fully stocked, staffed, fixtured and merchandised within such sixty (60) day period or ceases to operate its business in the Shop after its initial opening for business to the public (except in the case of fire, remodeling, casualty or condemnation, force majeure, compliance with laws, repairs, and renovations, each period not to exceed one hundred twenty (120) days in duration) and Tenant continues to meet all its obligations under the Lease except for any obligations that could only be met while operating the Shop and such cessation continues for more than sixty (60) days or if Tenant seeks to assign or sublet pursuant to the provisions of Paragraph 10 contained herein or Tenant assigns this Lease pursuant to the provisions of Paragraph 10 or and such assignee is not open and operating in the Shop for at least a continuous sixty (60) day period, then Landlord shall have the right, at Landlord's option, to recapture the Shop and terminate this Lease by providing no less than thirty (30) days written notice to Tenant. Upon such lease termination date, Tenant shall vacate and surrender the Shop in the condition required by this Lease and Landlord and Tenant shall be relieved of further obligations hereunder except for obligations theretofore accruing. Notwithstanding the foregoing, if Tenant fails to vacate and surrender the Shop by such termination date in the condition required by this Lease, Minimum Rent and all Other Charges under this Lease shall continue to accrue until such time as Tenant has vacated and surrendered the Shop in the condition required by this Lease. The foregoing remedies of Landlord shall be in addition to any other right or remedy available to Landlord at law or in equity.

29.   Tenant Improvement Allowance.   Landlord shall contribute a cash contribution in the amount of $7.00 per square foot of the Shop as a tenant improvement allowance. This allowance will be paid to Tenant within 30 days following the later of the following events: (a) upon Tenant's opening for business in the Shop to the public, (b) upon Tenant's payment of first months rent; (c) upon Landlord's receipt of fully executed lien waivers from Tenant's construction contractors providing goods or services in excess of $5,000.00, and (d) that Tenant is not in default under this Lease beyond any applicable cure period.  In the event that Landlord does not pay to Tenant the Improvement Allowance within the time period required by the Lease, Tenant shall have the right to offset the amount owed to Tenant for said Improvement Allowance against Rent as it comes due until the amount owed to Tenant is paid in full

30.   Exclusive Use.   So long as Tenant is open and operating and is not in default under the terms of this Lease beyond any applicable cure period and is continuously operating under the permitted use in Paragraph 1, Landlord will not enter into any lease for space within the Exclusive Area shown on Exhibit A to an individual or entity which intends to use such space as a competing use, defined for purposes of this section as a business that utilizes more than seventy-five (75) square feet of space as surface display area for the retail advertising or sale of said video games and/or video games systems. The foregoing exclusive clause will not apply to (a) Target Corporation or the parcel now owned by Target ("Target"), (b) leases or other agreements with tenants or occupants of the Shopping Center occupying 10,000 square feet or more; (c) any leases or agreements signed prior to the date of this Lease; (d) any tenant or occupant who, having the right to do so (without amending its lease or agreement or obtaining Landlord's consent), changes its current use and operates a competing use; or (e) a tenant or occupant operating a competing use in violation of its lease or agreement with Landlord (provided, however, that Landlord will diligently attempt to correct such violation).   In the event that Landlord breaches the

9

*T.I Allowance
$7.00/SF*

*Gamestop*

such award.  In the event that thirty-three percent (33%) or more of the rentable floor area of the Soft Power District or thirty-three percent (33%) or more of the Common Area located within the Soft Power District is taken by public authority under the power of eminent domain, then, at Landlord's option, by written notice to Tenant, mailed within 60 days from the date possession is taken by such public authority, Landlord may terminate this Lease effective upon a date specified in such notice, which termination date will be no more than 60 days after the giving of such notice.  Notwithstanding anything to the contrary, Landlord will not terminate this Lease pursuant to this Section 13.1 unless Landlord also terminates the leases of all other tenants in the Soft Power District affected by such condemnation where the Landlord has such right to terminate under the respective leases.

13.2   Award; Restoration.  Anything in this Section 13 to the contrary notwithstanding, Tenant will have the right to prove in any condemnation proceedings and to receive any separate award which may be made for damages to or condemnation of the Tenant's Work or any other alterations or improvements installed by Tenant, Tenant's movable trade fixtures and equipment and for moving expenses; provided, however, that any such award does not reduce the amount of the award to which Landlord or its mortgagee may be entitled and Tenant will in no event have any right to receive any award for its interest in this Lease or for loss of its leasehold.  In the event of a taking of any portion of the Premises, Minimum Rent and other charges will abate with respect to any period and with respect to any portion of the Premises which is rendered unusable as a result of such taking, and after the restoration of the Premises, if any, Minimum Rent and other charges will be reduced in the same proportion that the rentable floor area of the Premises after such taking will bear to such rentable floor area immediately before the taking.  Anything in this Section 13 to the contrary notwithstanding, in the event of a partial condemnation of the Soft Power District or the Premises where this Lease is not terminated, (i) Landlord will, at its sole cost and expense, restore the Premises (other than the Tenant's Work or any other alterations or improvements installed by Tenant) to a complete architectural unit (but Landlord's restoration obligations will be limited to restoration and repair of the initial Landlord's Work to a vanilla box condition and Landlord's restoration obligation will be limited to the extent of the condemnation award available to Landlord), and (ii) Tenant agrees that promptly after completion of such work by Landlord, it will proceed with reasonable diligence and at its sole cost and expense to rebuild, repair and restore its signs, fixtures, equipment and to construct and install leasehold improvements of a character and type substantially similar to Tenant's Work.  If Landlord is unable to rebuild and repair to the full extent of its obligations under this Section 13.2 due to insufficient condemnation award proceeds, then Landlord shall promptly send Tenant written notice of such event, and Tenant shall have the right to terminate this Lease upon written notice to Landlord to be exercised, if at all, within sixty (60) days following Tenant's receipt of such notice.  If Tenant does not terminate Lease within sixty (60) day termination period, Landlord shall rebuild and deliver Premises to fullest extent possible with actual condemnation award proceeds received.

Section 14.   Use and Key Tenants.

14.1.   Permitted Use.

14.1.1.   As an inducement for Tenant to  enter into this Lease, Landlord warrants to Tenant that Tenant will have the right to use the premises on a primary basis for the sale of apparel, footwear, and accessories; and to use the premises on an ancillary basis for the sale of video/computer games, electronics, and toys, jewelry, cosmetics and bath and body care products, candy and pre-packaged food items, lifestyle items, and such other items and services as may be sold from time to time, all of the foregoing being marketed to "Tweens" (ages of 6 - 14) provided that such ancillary items are then being sold in a majority of Tenant's other stores and are permitted under applicable Laws. Tenant shall further have the right to conduct special events in the Premises including birthday parties (which may include activities such as hair grooming, nail coloring, cosmetic make-overs, face painting, costume dressing, music, games, and similar activities of interest to Tweens), celebrity appearances, and

Tween Brands
(2 pages)

20

demonstrations of products sold in the Premises. The permitted use shall not be prohibited by any "exclusive" rights granted to any other tenant except as provided in Section 14.1.2 below. Tenant shall nonetheless have the right to use the Premises for any lawful retail business subject to the OEA and except as expressly prohibited by Section 14.1.2. Tenant acknowledges and agrees that nothing contained in this Lease is intended nor shall be construed as a grant to Tenant of any "exclusive" right to conduct the Permitted Use from any portion of the Soft Power District or the Shopping Center and that other tenants of the Shopping Center may engage in the Permitted Use, or some parts of the Permitted Use. Tenant may use the Premises only for the Permitted Use as set forth in this Section 14.1.1 and for no other use or purpose.

14.1.2. Landlord warrants and represents that Exhibit H attached hereto and the OEA, a true and accurate copy of which was provided to Tenant, represent a complete list of all use restrictions and exclusive use rights that affect the use of the Premises, and that except for the matters set forth in Exhibit H and the OEA, there are no other exclusives or use restrictions outstanding which would in any manner derogate from Tenant's right to use the Premises for the Permitted Use as set forth in Section 14.1.1. For such period of time as the restrictions or exclusives set forth in Exhibit H and the OEA shall be outstanding, Tenant agrees that its operations in the Premises shall not violate said restrictions or exclusives.

14.2. Intentionally omitted.

14.3. <u>Rules and Regulations</u>. Tenant shall comply with such non-discriminatory, uniform, and reasonable rules and regulations as set forth on Exhibit G or promulgated by Landlord for all of the tenants of the Shopping Center from time to time.

14.4. <u>Operation of Shopping Center</u>. Landlord shall at all times during the Term operate the Shopping Center in a first-class manner, and shall not permit any tenant or occupant in the Shopping Center to create or continue any nuisance, disturbance or other condition in the Shopping Center which may materially and adversely affect Tenant or its enjoyment of the Premises or the Common Areas.

14.5. <u>Continuous Operation</u>. Subject to Sections 3.1.3, 3.2, and 29.7, Tenant shall be obligated to open for business, fully stocked, staffed, fixtured and merchandised, as a typical Justice-type store for at least one (1) day within six (6) months after delivery of possession of the Premises to Tenant in the manner required under this Lease. Notwithstanding anything contained in this Lease to the contrary, it is specifically and expressly understood and agreed that Tenant shall be under no duty or obligation, either express or implied, to continuously conduct, its business in the Premises at any time or during any hours during the continuance of the Term of this Lease after its initial opening for business as set forth in the previous sentence or any renewals thereof. Further, Tenant's failure to thereafter continuously conduct its business in the Premises shall not in any way be deemed an event of default under this Lease nor shall such a failure otherwise entitle Landlord to commence or to maintain any action, suit, or proceeding, whether in law or in equity, relating in any way to its business in the Premises, provided that Tenant shall otherwise perform and obey the other covenants and agreements contained in this Lease on the part of Tenant to be performed, including the payment of rent and other charges due hereunder. In the event that Tenant is not open and operating in the Premises reasonably stocked, staffed, fixtured and merchandised as a typical Justice-type store for a period of ninety (90) consecutive days or more, except for reasons of casualty or condemnation, not to exceed one hundred eighty (180) days in any Lease Year, or renovation or remodeling not to exceed ninety (90) days in any Lease Year, or any Unavoidable Delay, then, Landlord may terminate this Lease upon thirty (30) days' prior written notice to Tenant, unless Tenant reopens for business in the Premises within such thirty (30) day period, without payment of any termination fee or compensation to Tenant.

14.6. <u>Trade Name</u>. Tenant intends to operate its business in the Premises under the Trade Name provided in Section 1.1.18. Tenant reserves the right

(a)     The Premises shall be occupied and used for the purpose of conducting therein the business of the retail sale and/or rental of bridal wear, bridal wear accessories, prom dresses, women's and men's formal attire. As used herein, the term "bridal wear" shall mean wedding gowns and wedding dresses, veils and headpieces, and bridesmaids dresses. In addition, and subject to the prohibited uses set forth on attached Exhibit H (the "Prohibited Uses"), the exclusives existing as of the date hereof set forth on attached Exhibit I (the "Existing Exclusives") and as defined herein below in Section 8.1 (c)(ix)(bb) (the "Additional Exclusives"), (the Additional Exclusives and the Existing Exclusives being collectively referred to herein as the "Exclusives"), (i) clothing, other accessories related to all of the foregoing items in the first sentence of this Section 2.5(a) above, and any other goods and services related to weddings and parties, or (ii) for any other lawful retail business or purpose typically found in first class shopping centers which Landlord may from time to time permit in writing (Landlords' written consent not to be unreasonably withheld, conditioned or delayed).

(b)     During the Lease Term, and for so long as Tenant is not in monetary or other material default hereunder beyond the expiration of any applicable notice and cure periods, Landlord shall not permit or lease any portion of the District and Landlord Outparcels, excluding the Target Parcel (as shown on the Plot Plan), the Dillard's Parcel (as shown on the Plot Plan), and the Scheels Parcel (as shown on the Plot Plan), and any additions thereto to another tenant which would use its premises for the retail sale or rental of women's bridal wear (the "Exclusive Use"). Landlord and Tenant mutually acknowledge and agree that the Exclusive Use granted to Tenant was a material inducement to Tenant to enter into this Lease, and that absent such inducement, Tenant would not have agreed to enter into the terms of this Lease. Landlord covenants to enforce Tenant's Exclusive Use as set forth herein. Should Tenant's Exclusive Use be violated by Landlord, and Landlord fails to cure same within thirty (30) days after written notice from Tenant, Tenant's sole remedies for such violation shall be as follows: Tenant's Minimum Rent shall be reduced by 50% until such time as the violation is cured; provided, however, in the event a violation of the Exclusive Use is still continuing for eighteen (18) calendar months, following the thirty (30) day notice from Tenant, Tenant must elect to either (i) terminate this Lease by delivering thirty (30) days prior written notice to Landlord within thirty (30) days after the expiration of said eighteen (18) month period, or (ii) resume paying full Monthly Minimum Rent as of the expiration of said 30-day period, with Tenant's failure to terminate this Lease within said 30 day period being deemed an election to resume paying full Minimum Rent as of the expiration of said 30-day period. Notwithstanding the forgoing, at all times Tenant shall still be obligated to pay its pro rata share of Common Area Costs, Insurance and Taxes and all other charges hereunder.

Notwithstanding anything contained herein to the contrary, none of the following shall be deemed a violation of the Exclusive Use and Tenant shall not be entitled to exercise its remedies set forth herein with respect thereto: (i) any tenant or occupant operating the Exclusive Use pursuant to a fully-executed lease that is in full force and effect prior to the date of this Lease ("Existing Tenant"), and their respective permitted successors and assigns, or (ii) any tenant or occupant operating the Exclusive Use in violation of its lease, but only so long as Landlord is promptly and diligently trying to cure such violation (including, but not limited to, the commencement of appropriate legal proceedings, if necessary), or (iii) any tenant or occupant occupying at least 19,000 square feet. Tenant acknowledges the following occupants of the Shopping Center and that such occupants shall not be deemed a violation of this Section 2.5 as long as such occupants operate in substantially the same manner as such occupants' stores operate as of the date of this Lease: Michaels, T.J. Maxx, Gordmans, Linens-N-Things, Petco, Scheels, Shoe Carnival and Cost Plus World Market.

2.6     Prohibited Uses:

Neither Tenant nor its sublessees, assignees, licensees, or concessionaires will use or lease (or permit the use, lease or sublease of) the Premises or any portion thereof during the Lease Term in violation of the Prohibited Uses or the Exclusives. Neither Landlord nor any entity controlled by Landlord will use or lease (or permit the use, lease or sublease of) or sell any space in or portion of the District during the Lease Term allowing for any of the following uses: an auditorium; meeting hall; bingo hall or a place of public assembly; library; sale, rental or service of automobiles or other vehicles; bar serving alcoholic beverages whose gross revenues from the sale of on-premises consumption exceeds 50% of the gross revenues for such business,

-4-

David's Bridal

Project: Rushmore Crossing

## LEASE

This Lease ("Lease") is entered into on _____, 2008 between Midland Rushmore, LLC, an Ohio limited liability company ("Landlord"), having as its address for notice purposes c/o Midland Atlantic Development Company, 8044 Montgomery Road, Suite 710, Cincinnati, Ohio 45236, Attn: Property Administration and Eyemart Express, Ltd., a Texas limited partnership ("Tenant"), having an address for notice purposes at 2110 Hutton Drive, Suite 100, Carrollton, Texas 75006, Attn: Jonathan Herskovitz, with a copy to Mark R. Vowell, Esq., Hunton & Williams, LLP, 1445 Ross Avenue, Suite 3700, Dallas, Texas 75202.

1.    Lease.   Landlord leases to Tenant and Tenant leases from Landlord a space of approximately 3,240 square feet of floor area located within the area indicated on the on the site plan (the "Site Plan") attached as Exhibit A (the "Shop") and located in the shopping center commonly known as Rushmore Crossing located in Rapid City, Pennington County, South Dakota (the "Shopping Center"). The Shopping Center is planned to be divided into various districts, including the "Soft Power District," the "Outparcels Outparcel District" and the "Lifestyle District," all as labeled on the Site Plan. As used in this Lease, the term "District" shall mean the Soft Power District or the Lifestyle District as applicable. The Shop will be used only for the operation of a full-service optical and eye care business including the manufacture, fabrication, dispensing and selling of prescription eyewear (frames and lenses), including, without limitation, contact lenses, eyeglass frames and eyeglass lenses, and the incidental sale of related eyewear and eye care products and accessories, including the performance of eye and contact examinations or similar ancillary services performed by an independent licensed optometrist, and other related purposes which Landlord shall consent to in writing, such consent not to be unreasonably withheld, conditioned or delayed, and for no other purpose. The business in the Shop will be conducted only under the following trade names: *Vision for Less, Dr. Barnes Eyemart Express, Dr. Barnes Eyewear Express or Dr. Barnes Visionmart Express* or any other trade name approved by Landlord which approval may not be unreasonably withheld, conditioned or delayed. The Shop will be delivered to Tenant in the condition specified in Exhibit B attached to this Lease and made a part of this Lease on or before the second anniversary of the date of this Lease. If Landlord fails to timely deliver the Shop pursuant to the preceding sentence, then as Tenant's sole remedy, Tenant may terminate this Lease. Upon reasonable notice Landlord will have the right to inspect the Shop at all reasonable times and to place "for rent" signs on the Shop during the last ninety (90) days of the Lease Term, and to show the Shop to lenders and prospective purchasers of the Shopping Center or any part thereof upon reasonable prior notice. Any alterations to the Shop and any signage for the Shop will be subject to prior approval by Landlord. Tenant will have the right to the non-exclusive use of those portions of the Shopping Center intended for the common use of all tenants of the Shopping Center and their patrons as they exist from time to time (the "Common Area"). Tenant is not permitted to store shopping carts or have cart corrals in the Common Area or the Shop. Landlord has the right to control use of the Common Area and may designate specific areas for employee parking provided that such parking area designations shall be reasonably approved by Tenant. The initial employee parking area is set forth on Exhibit A-1 attached hereto. Notwithstanding anything to the contrary contained herein, Landlord agrees not to make any modifications to the Soft Power District or the Common Area of the Soft Power District that will have a material adverse affect on access to or visibility of the Shop and agrees to use commercially reasonable efforts when making modifications to the Shopping Center and Common Area so as to minimize the interruption of Tenant's business activity. In the event that Landlord closes or modifies portions of the Soft Power District or Common Area of the Soft Power District and customer traffic to the Shop is materially adversely affected, then Tenant shall be entitled to a fair abatement of all rentals payable under the Lease until such customer traffic is not longer materially adversely affected.

Landlord reserves the right in, over and upon the Shop as may be reasonably necessary or advisable for the servicing of the Shop or of other portions of the Shopping Center, including, without limitation, the right to install, maintain, use, repair and replace pipes, duct work, conduits, utility lines and wires in the Shop provided that if any entry by Landlord materially interferes with Tenant's normal business operations Tenant shall receive an equitable abatement of Minimum Rent and other charges until such interference is eliminated. Landlord shall ensure that the Shop is furnished with water, gas, electricity, telephone, and sewer. In addition, if any such utility service is interrupted due to the negligence or intentional misconduct of Landlord, its contractors or agents, for more than two (2) business days after written notice to Landlord, and such interruption materially adversely affects Tenant's use of the Shop for the Permitted Use, Tenant shall receive an equitable abatement of Minimum Rent and other charges until such service is restored.

2.    Lease Term; Holdover.   The term of this Lease (the "Lease Term") will be five years and will begin on the earliest of the following dates: (a) the date which is 90 days after Landlord delivers possession of the Shop to Tenant in the condition required by this Lease (the "Delivery Date"); or (b) the date on which Tenant opens for business in the Shop (the earliest of (a) or (b), the "Commencement Date"). If the Commencement Date is not the first day of a month, then the first year of the Lease Term will end on the last day of the 12th full calendar month immediately following the Commencement Date. At or prior to expiration of the Lease Term, Tenant will return possession of the Shop to Landlord in broom clean condition, normal wear and tear and casualty excepted, with all of Tenant's furniture, fixtures, signage (with façade repaired) and inventory removed. Should Tenant not deliver possession of the Shop to Landlord at the end of the Lease Term, the Minimum Rent payable under this Lease and the end of the Lease Term will be one hundred fifty percent (150%) of the monthly Minimum Rent payable

1

Tenant's obtaining all such approvals as reflected herein, Tenant shall, with Landlord's prior written consent, install Tenant's storefront building sign within ninety (90) days following the Commencement Date.

24.    Recording.  Tenant will not record this Lease without the prior written consent of Landlord.

25.    Quiet Enjoyment.  If Tenant performs its obligations under this Lease, Tenant will have the quiet enjoyment of the Shop so long as this Lease remains in force, without hindrance or disturbance from Landlord, subject to the specific provisions of this Lease.

26.    Not an Offer.  The submission of this Lease to Tenant for examination does not constitute an offer to enter into a lease, and this Lease shall become effective only upon execution and delivery by Landlord and Tenant.

27.    No Presumption Against Drafter.  Both parties have freely negotiated this Lease.  In any interpretation of this Lease, no presumption will be made against either party on the basis that it drafted the Lease or a particular portion of the Lease.

28.    Construction Allowance.  Landlord will pay to Tenant in cash a contribution of $25.00 per square foot as a tenant improvement allowance.  This allowance will be paid to Tenant within thirty (30) days following the latter to occur of:  (a) Tenant opening the Shop for business to the public, fully staffed, fixtured and stocked; (b) Tenant's payment of the first month's Minimum Rent and other charges due hereunder; (c) Landlord's receipt of fully executed lien waivers from Tenant's general contractor and all material subcontractors and material suppliers (i.e., subcontractors and suppliers providing services in excess of $5,000) involved in Tenant's work, together with a master affidavit from the general contractor listing all such parties by name, trade and amount owed; (d) upon Tenant providing copies of plans reflecting Tenant's improvements to the Shop, permits and other information which may be reasonably required by Landlord, and (e) that Tenant is not in default under this Lease.

29.    Recapture.  Tenant must open for business in the Shop as a typical Eye-Mart fully stocked, staffed, fixtured and merchandised for at least one day within 90 days of the Commencement Date.  After initially opening for business, Tenant may thereafter cease business operations within the Shop.  During any periods that Tenant is operating within the Shop, Tenant may keep store hours which are consistent with Tenant's other chain store locations.  If Tenant ceases to operate its business in the Shop (except in the case of remodeling, casualty or condemnation), for one hundred eighty (180) days, Tenant shall not be in default by virtue of its cessation of operations, but Landlord shall have the right, at Landlord's option, to recapture the Shop and terminate this Lease by providing no less than 30 days written notice to Tenant unless Tenant re-opens within the Shop within such 30-day period.  In the event of recapture of the Shop by Landlord under this Article in this Lease, Tenant shall pay to Landlord an amount equal to the unamortized transaction costs incurred in connection with this Lease, including without limitation, brokerage or leasing commissions and tenant improvement allowances (the "Recapture Payment").  Upon such lease termination date, Tenant shall vacate and surrender the Shop and Landlord and Tenant shall be relieved of further obligations hereunder except for obligations theretofore accruing.  Notwithstanding the foregoing, if Tenant fails to vacate and surrender the Shop by such termination date, or if Tenant fails to pay Landlord the Recapture Payment, rent and all other charges under this Lease shall continue to accrue until such time as Tenant has vacated and surrendered the Shop and made the Recapture Payment to Landlord but no such accrual of rent and other charges shall operate to extend the term of this Lease or revive this Lease or the Tenant's right to possession hereunder.  The foregoing remedies of Landlord shall be in addition to any other right or remedy available to Landlord at law or in equity.

30.    Joint Liability.  If there is more than one Tenant (or more than one person constituting the Tenant) under this Lease, they shall be bound jointly and severally by all provisions herein contained.

31.    Tenant's Exclusive Rights.  So long as Tenant is not in default under the terms of this Lease beyond any applicable cure periods herein and is continuously operating under the permitted use in paragraph 1 (excepting temporary closures due to casualty, condemnation or remodeling, but in no event shall such temporary closures exceed 180 days), Landlord will not lease space in the ~~Lifestyle District~~ "Exclusive Area" as shown on Exhibit A to a full service optical and eyecare business.  The foregoing exclusive clause will not apply to (a) Target Corporation ("Target"), Scheels All Sports, Inc. ("Scheels"), or the owner(s), ground lessees or occupants of the parcels in the Shopping Center now owned or ground leased by Target and Scheels, respectively, (b) leases or other agreements with tenants or occupants of the Shopping Center occupying 10,000 square feet or more; (c) any leases or agreements signed prior to the date of this Lease and continue to be enforceable; provided, that if Landlord has the right to consent to any change of use under such leases or agreements, Landlord will not consent to any change to a full service optical and eyecare business (but without prejudice to the application of any other exclusion set forth herein); or (d) a tenant or occupant operating a competing use in violation of its lease or agreement with Landlord (provided, however, that Landlord will diligently attempt to correct such violation) and cure's the violation within ninety (90) days of written notice from Tenant; or (e) Pearle Vision.  In the event that Landlord breaches the foregoing covenant, then Tenant's sole remedies will be: (a) terminate this Lease upon not less than thirty (30) days prior notice to Landlord delivered to Landlord on or before the date the violation is ended, or (b) pay an amount equal to fifty (50%) of Minimum Rent, in lieu of Minimum Rent, plus all other charges, costs and fees hereunder, from the date the violation occurs until it is ended or Tenant terminates this Lease, whichever occurs first;

7



furnished such proof, to terminate this Lease by notifying Landlord of Tenant's election.  Upon the giving of notice of Tenant's election to Landlord, this Lease will terminate and Tenant will be released from all further obligations under this Lease.

16.3.  <u>Failure of Other Required Lessees to Operate</u>.  As used in this Section 16.3, the term "**On-Going Co-Tenancy Requirement**" shall mean that the entirety of the premises marked on <u>Exhibit B</u> as occupied by (i) two (2) of the Other Required Lessees listed in Paragraph 8(b) of the Basic Lease Provisions, and (ii) two (2) of the Other Required Lessees listed in any subparagraph of Paragraph 8 of the Basic Lease Provisions, shall be open and continuously operated by an Anchor Tenant (as defined below)(it being understood that a total of four [4] Anchor Tenants must be open and continuously operating), provided, however, the On-Going Co-Tenancy Requirement as set forth in this Section 16.3 shall only apply after the Initial Co-Tenancy Requirement has been met.  As used herein, the "**Anchor Premises**" means, individually, the entirety of the premises to be occupied by an Other Required Lessee (as shown on <u>Exhibit B</u>).  "**Anchor Tenant**" shall mean one of the Other Required Lessees or a tenant which (a) on a regional or national basis, operates under the same trade name at least ten (10) high quality retail stores comparably sized to the respective Anchor Premises, in a manner which is consistent with a first class promotional shopping center in the Rapid City, South Dakota metropolitan area, (b) operates in at lease eighty-five percent (85%) of the applicable Anchor Premises and (c) operates as one of the following: (I) full line department store or discount department store, (II) junior department store, (III) soft good store, (IV) supermarket, (V) sporting good store, (VI) home improvements store, (VII) catalog store, (VIII) drug store, (IX) toy superstore, (X) electronic equipment/appliance superstore, (XI) office supply store, or (XII) warehouse department store (e.g., Costco or Sams Club).  If at any time after the Rental Commencement Date the On-Going Co-Tenancy Requirement is not satisfied for a period of one hundred twenty (120) days ("**Initial Failure**"), all Minimum Rent shall be abated until such time as the On-Going Co-Tenancy Requirement is satisfied, and in lieu thereof, Tenant shall pay to Landlord on a monthly basis, thirty (30) days after the end of each calendar month, as "**Alternative Rent**," an amount equal to the product of (A) the entire amount of Gross Sales (as defined below) made upon the Premises during such month or the portion thereof for which Alternative Rent is payable, multiplied by (B) four percent (4%), (but in no event will such Alternative Rent exceed the Minimum Rent which would have been payable for such period in the absence of this provision), as well as such Common Area Charges, Real Estate Taxes, insurance charges or any other charges due from Tenant under this Lease.  In addition to the rights of Tenant to pay "Alternative Rent", if (aa) the non-satisfaction of the On-Going Co-Tenancy Requirement shall continue for a period of twelve (12) months beyond the Initial Failure to meet the On-Going Co-Tenancy Requirement and for so long as such non-satisfaction shall continue, or (bb) the Initial Co-Tenancy Requirement is not satisfied within nine (9) months after the date on which the Rental Commencement Date would otherwise have occurred but for the failure to satisfy the Initial Co-Tenancy Requirement, and for so long as such non-satisfaction shall continue, Tenant shall have the right to terminate this Lease by sixty (60) days' written notice delivered to Landlord.  Upon said termination, the parties shall have no liability under this Lease for obligations arising after that date.  Landlord shall likewise have a right to terminate this Lease at the end of the twelfth (12th) month following the Initial Failure at any time thereafter by giving sixty (60) days prior written notice to Tenant of the termination.  Landlord's termination notice shall be ineffective if within thirty (30) days after Tenant's receipt of such termination notice, Tenant notifies Landlord that it will discontinue the payment of Alternative Rent and recommence the payment of Minimum Rent, Common Area Charges, Real Estate Taxes and insurance charges despite the abatement provisions of this Section 16.3 for the circumstances which triggered the failure to meet the On-Going Co-Tenancy Requirement.  In the event Tenant so notifies Landlord of its discontinuance of the payment of Alternative Rent, Tenant shall discontinue the payment of Alternative Rent and re-commence the payment of Minimum Rent, Common Area Charges, Real Estate Taxes and insurance charges as of the first day of the second full calendar month following Tenant's receipt of Landlord's termination notice.  Tenant's rendering Landlords' termination notice ineffective as aforesaid and payment of full rent under this Lease shall not prevent Tenant from later claiming a breach of the On-Going Co-Tenancy Requirement when, if ever, additional co-tenants cease operation or when, if ever, the On-Going Co-Tenancy Requirement is again satisfied but is later not satisfied.

16.4.  <u>Exclusive Use</u>.

16.4.1  <u>Limitation on Use</u>.  Neither Landlord nor any entity controlled by Landlord will use, lease (or permit the use, leasing or subleasing of) or sell any space in or portion of the Shopping Center or the Outparcels owned or controlled now or at any time hereafter by Landlord or any affiliate of Landlord, to any "craft store", store selling arts and crafts, art supplies, craft supplies, picture frames or picture framing services, framed art, artificial flowers and/or plants, artificial floral and/or plant arrangements, wedding or party goods (except apparel), scrapbooking/memory book store, or a store selling scrapbooking/memory book supplies, accessories, and/or decorations or other papercrafting (e.g. making greeting cards, gift bags, tags, and other related or similar items) supplies, accessories and/or decorations associated with the foregoing, or providing classes on any of the foregoing or any combination of the foregoing categories, or any store substantially similar to Tenant in operation or merchandising.  This Section 16.4.1 shall not apply to any of the following:

(i)      the Target Tract, provided, however this Section 16.4.1 shall apply to the Target Tract if the Target Tract becomes within the ownership of Landlord or within the ownership of any affiliate

or assignee of Landlord and ceases to operate as a Target store or any affiliate, subsidiary or successor to Target store, either by Target Corporation or an affiliate, subsidiary or successor of Target Corporation, within the Target Tract provided further, however, in the event the Target Tract becomes within the ownership of Landlord or within the ownership of any affiliate or assignee of Landlord and ceases to operate as a Target store or any affiliate, subsidiary or successor to Target store, either by Target Corporation or an affiliate, subsidiary or successor of Target Corporation, as to such Target Tract;

(ii)     to any tenant occupying 80,000 or more Leasable Square Feet in the Shopping Center;

(iii)     any lessee whose lease was fully executed on the Effective Date hereof and is identified on Exhibit I as an "Existing Lease Not Subject to Tenant's Exclusive;" provided, however, that this exception shall not apply if (a) Landlord permits or agrees to an expansion of the premises for any such permitted use which violates Tenant's exclusive if Landlord has the right, by virtue of the provisions of the existing lease, to avoid granting such change in use, or (b) Landlord permits or agrees to the change of a permitted use by any such lessee or its successors or assigns if Landlord has the right, by virtue of the provisions of the existing lease, to avoid granting such change in use, or (c) Landlord permits or agrees to an assignment or sublease of such existing lease if Landlord has the right, by virtue of the provisions of the existing lease, to avoid granting such change in use, or (d) Landlord has the right, by virtue of the provisions of the existing lease, to cause said lessee to honor the exclusive granted to Tenant by giving said existing lessee notice of this exclusive or otherwise; or,

(iv)     any lessee or occupant for which the sale of a product or service covered by the exclusive granted to Tenant hereunder is merely incidental to such lessee's or occupant's primary use, unless the total space which such lessee or occupant devotes to the products or services which violate the exclusive contained in this Section 16.4.1 exceeds the lesser of ten percent (10%) of the Leasable Square Feet within such lessee's or occupant's premises or one thousand five hundred (1,500) Leasable Square Feet (inclusive of allocable aisle space and linear shelf space); and further provided, (a) in no event shall this exception for incidental use apply to picture framing services, it being the intention that no other lessee or occupant of the Shopping Center shall be permitted to offer custom framing services, unless such picture framing is incidental to the operation of high end art gallery (which is permitted so long as the picture framing by such high end gallery is limited to the art works sold by such art gallery), (b) that Gordman's, so long as it is open and operating as a typical Gordman's, shall be permitted to devote up to ten percent (10%) of the Leaseable Square Feet within its premises to the incidental sale of any product or service covered by the exclusive granted to Tenant hereunder but in no event shall this exception apply to custom framing and (c) HomeGoods shall be permitted to devote up to 4,000 Leasable Square Feet, in the aggregate (inclusive of allocable aisle space and linear shelf space) within its premises to the sale of the following items: prints and art object, home picture frames, mirrors, wicker baskets and decorative silk flowers and further provided that the sale of art supplies, and decoration or party goods, in the aggregate, shall not exceed 200 Leasable Square Feet (and shall be counted towards such 4,000 Leasable Square Feet) and finally, provided in no event shall HomeGoods permitted to perform any picture framing services within its premises; or

(v)     a scrapbooking store not exceeding one thousand five hundred (1,500) Leasable Square Feet so long as such store is located at least one hundred fifty (150) feet from the perimeter of the Premises.

Notwithstanding the foregoing, a floral shop selling fresh flowers and/or fresh floral arrangements shall not be deemed in violation of this Section 16.4.1. Tenant hereby acknowledges that a typical "card shop", such as a "Hallmark", shall not be deemed in violation of this Section 16.4.1 provided that such typical "card shop" operates in the same manner as a typical "card shop", such as a "Hallmark", operates as of the Effective Date of the Lease and further provided that such typical "card shop" shall not exceed 6,000 Leasable Square Feet. Further, Tenant hereby acknowledges that a typical "wedding wear" store, such as "David's Bridal", shall not be deemed in violation of this Section 16.4.1, provided such typical "wedding wear" store operates in the same manner as a typical "wedding wear" store operates as of the Effective Date of the Lease. Additionally, Tenant hereby acknowledges that a typical "on-site use pottery shop" (such as "All Fired Up") shall not be deemed in violation of this Section 16.4.1, provided such typical "on-site use pottery shop" operates in the same manner as a typical "on-site use pottery shop" operates as of the Effective Date of the Lease, such typical "on-site use pottery shop" shall only provide services, facilities and supplies for the consumer's on-site use in finishing or forming clay pottery items, and such typical "on-site use pottery shop" shall not exceed 3,000 Leasable Square Feet. Tenant hereby acknowledges that the operation in the Shopping Center of a typical "Pier 1 Imports" store as such stores typically operate from time to time shall not be a violation of this Section 16.4.1; provided, however, in no event shall such "pier 1 Imports" store provide picture framing services or devote more than the lesser of (I) 1,500 Leasable Square Feet, or (II) ten percent (10%) of its Leasable Square Feet, in the aggregate, to the sale of arts and crafts, frames, artificial flowers, artificial floral arrangements, wedding or party goods. At Landlord's request, Tenant agrees to execute or provide a standard letter agreement with "Bed Bath & Beyond" and/or "Cost Plus", as the case may be, regarding the application of such party's exclusive to Tenant and Tenant's exclusive to such party in this Shopping Center, provided there is, at the time of Landlord's request, a national agreement or understanding between Tenant and "Bed Bath & Beyond"

and/or "Cost Plus", as the case may be. Tenant hereby acknowledges that a typical "TJ Maxx" store and/or a typical "Marshalls" store, as such typical "TJ Maxx" store and/or "Marshalls" store operates as of the Effective Date of the Lease, shall not be deemed a violation of this Section 16.4.1, so long as any lease or occupancy agreement Landlord or any affiliate of Landlord executed with "TJ Maxx" and/or "Marshalls" (as applicable) with respect to this Shopping Center contains language stating that a typical "Michaels" store, as such store typically operates as of the date of the lease or occupancy agreement of "TJ Maxx" and/or "Marshalls" (as applicable), does not violate the exclusive, if any, granted to "TJ Maxx" and/or "Marshalls" therein. Finally, Tenant hereby acknowledges that the operation in the Shopping Center of the following potential occupants of the Shopping Center shall not be deemed to violate this Section 16.4.1: (A) a typical "Old Navy" store as such store operates as of the Effective Date of this Lease, (B) a typical "Circuit City" store as such store operates as of the Effective Date of this Lease or a typical "Best Buy" store as such store operates as of the Effective Date of this Lease, (C) a typical "Party America" store as such store operates as of the Effective Date of this Lease, (D) a typical "Petco" store as such store operates as of the Effective Date of this Lease, (E) a typical "Staples" store as such store operates as of the Effective Date of this Lease, (F) a typical "Scheels" store as such store operates as of the Effective Date of this Lease, (G) a typical "Shoe Carnival" store as such store operates as of the Effective Date of this Lease, (H) a typical "Dress Barn" store as such store operates as of the Effective Date of this Lease, (I) a typical "Dollar Tree" store as such store operates as of the Effective Date of this Lease, (J) a typical "Barnes & Noble" store as such store operates as of the Effective Date, (K) a typical "Toys 'R Us" or "Babies 'R Us" store as such stores operate as of the Effective Date of this Lease, (L) a typical "Ulta" store are such stores operate as of the Effective Date of this Lease and (M) a typical "Rue 21" store as such stores operate as of the Effective Date of this Lease".

If Landlord enters into a lease with Ross Stores ("**Ross**") for space in the Shopping Center prior to the date Michaels' store opens in the Shopping Center, then for so long as the lease with Michaels' is in effect and for so long as Michaels uses its premises as an "arts and crafts store" the Michaels' Exclusive shall not apply to Ross and its assignees and sublessees except that Ross and its assignees and sublessees shall not use its premises as an "arts and crafts store", and no portion of the Ross premises may be devoted to performing picture framing services. The term "arts and crafts store" means a store whose primary use is the sale of arts and crafts, art supplies, craft supplies, picture frames, framed art, artificial flowers and/or plants, artificial floral and/or plant arrangements, wedding or party goods (except apparel).

Tenant has entered into an agreement with Linens 'N Things (the "**Michaels/Linens 'N Things Agreement**") with respect to the application of each party's respective exclusive for the Shopping Center against the other party, and a true and complete copy of the Michaels/Linens 'N Things Agreement is attached hereto as Exhibit N. Tenant hereby represents and warrants to Landlord that, as of the date Tenant signs this Lease, Tenant has neither sent nor received a notice termination the Michaels/Linens 'N Things Agreement.

16.4.2  Remedy of Tenant. If any person or entity shall violate the exclusive granted to Tenant hereinabove, or if any person or entity indicates to Landlord that it will violate the exclusive granted to Tenant hereinabove, or if Tenant notifies Landlord that it believes, in good faith, that any other entity is violating or will in the future violate the exclusive granted to Tenant hereinabove, Landlord shall, at its sole cost and expense, promptly commence appropriate legal proceedings, and vigorously prosecute the same, to enjoin and prohibit such violation. In the event of any violation of the exclusive granted to Tenant hereinabove, Tenant may, at its option, pursue any available remedy, at law or in equity. In the event Tenant commences any legal proceedings with respect to any such violation, Landlord shall cooperate with Tenant with respect to such proceeding (including, without limitation, executing any documentation or authorization reasonably required by Tenant in connection with such proceeding and by appearing at any hearing or trial with respect to such proceeding). In addition, Tenant shall have the following remedies at any time during the existence of said violation, said remedies being separate, distinct and cumulative remedies, and the exercise of any one or more of which shall not be deemed to preclude Tenant's rights to exercise any other legal or equitable remedy available, including but not limited to, an action for injunctive relief:

(i)   reducing the Minimum Rent by twenty-five percent (25%) so long as such violation exists (or until the remedy as stated in (b) below takes effect), commencing sixty (60) days after Tenant has notified Landlord in writing of such violation; and

(ii)   reducing the Minimum Rent by fifty percent (50%) so long as such violation exists

# PETCO LEASE

THIS LEASE ("Lease") is made as of this 26ᵀᴴ day of November, 2007, by and between **MIDLAND RUSHMORE, LLC,** an Ohio limited liability company (hereinafter called "Landlord") and **PETCO ANIMAL SUPPLIES STORES, INC.,** a Delaware corporation, dba Petco Supplies & Fish or its Assignee (hereinafter called "Tenant").

## WITNESSETH:

In consideration of the mutual covenants and promises of the parties, it is hereby agreed as follows:

### 1.   PREMISES

Landlord does hereby lease to Tenant, and Tenant does hereby lease from Landlord, the premises and the improvements therein (the "Premises") which are located in that certain building (the "Building") identified as Building P15 on the Site Plan attached hereto as *Exhibit "A-2"* located in Rushmore Crossing ("Shopping Center"), in the City of Rapid City, County of Pennington, State of South Dakota upon the terms and conditions set forth in this Lease. The Shopping Center is planned to be divided into various districts, including the "Soft Power District" and the "Lifestyle District", all as labeled on the Site Plan. Landlord represents that the Premises will contain approximately Fifteen Thousand  Four Hundred Thirty (15,430) rentable net square feet and have dimensions of approximately 100 feet in frontage by 150 feet in depth (subject to readjustment upward or downward as a result of remeasurement).   Landlord further represents that the Legal Description of the real property whereon the Building and the Premises are situated is more particularly described in *Exhibit "A-1"*, attached hereto and made a part hereof.  The boundaries and location of the Premises are outlined in red or crosshatched on the Site Plan attached hereto as *Exhibit "A-2"* and made a part hereof. The rentable net square footage of the Premises shall be determined by measuring from the exterior surface of exterior walls and from the center line of demising walls. Landlord shall have its architect certify the rentable net square footage of the Premises to Tenant within ten (10) days after the Delivery Date.

TOGETHER with all the rights, alleys, ways, easements, contiguous parking, common areas, privileges, advantages and appurtenances thereto belonging or in any way pertaining to the Shopping Center.

Landlord reserves from the Premises the roof, the air space above the roof, the space below the floor, building service corridors, elevators and associated equipment rooms, lobby areas and the exterior walls of the building or buildings of which the Premises are a part (except that in no event shall Landlord be permitted to install signage upon the exterior walls of the Premises and/or the roof of the Premises without obtaining Tenant's prior written consent thereto), and further reserves the right over and upon the Premises as may be reasonably necessary or advisable to install, maintain, use, repair and replace pipes, duct work, conduits, utility lines and wires in the Premises so long in the exercise of such rights Landlord does not unreasonably interfere with Tenant's operation of its business in the Premises and shall access the Premises only in compliance with the terms and conditions of this Lease. In exercising the foregoing rights of entry, Landlord agrees to use commercially reasonably efforts to minimize interference with Tenant's use and enjoyment of the Premises and Tenant's access to the Premises.

1

1  rights of any party on the Scheels Parcel, Landlord covenants and agrees that, so long as Landlord has not

2  elected to terminate this Lease or terminate Tenant's right to possession of the Premises each following a

3  default by Tenant beyond applicable notice and cure periods as permitted Landlord in this Lease, during the

4  term of this Lease, and as long as Tenant is continuously operating in the Premises for the Prime Pet Use

5  (other than temporary disruptions for alterations [as to such alterations, not for more than a continuous

6  period of sixty (60) days], casualty, condemnation or any other reason beyond Tenant's reasonable control),

7  Tenant shall have the exclusive right to sell pet food, pet supplies, live animals, pet grooming, pet training,

8  and veterinary services in the Shopping Center except for incidental sales (the "Competing Use").

9  Incidental sales shall mean the sale or display for sale of such items or services not as the primary use of the

10  competing tenant and taking up no more than fifteen hundred (1,500) square feet of floor area.  This

11  covenant shall run with the land on which the Shopping Center is located so long as the Premises are used

12  and operating as a pet food and supply store (other than temporary cessations for alterations, casualty,

13  condemnation, force majeure or any other reason beyond Tenant's reasonable control) and this Lease

14  remains in full force and effect.  To the extent Landlord has any such rights, Landlord agrees not to sell to,

15  lease to, nor approve any sublease or assignment of lease, or change in use, unless prevented by the terms of

16  any lease then currently in force and effect, for any competing tenant, sub-tenant, assignee or user, however

17  this exclusive shall not apply to the Target Parcel, Dillards Parcel or Scheels Parcel (but as to the Dillards

18  Parcel and Scheels Parcel, subject to the terms set forth above), and any occupant operating in greater than

19  eighty thousand (80,000) square feet, a department store operating in at least fifty thousand (50,000) square

20  feet, or a grocery store operating in at least thirty thousand (30,000) square feet.  Landlord agrees at its sole

21  cost and expense to promptly and continuously enforce this non-competition covenant using all reasonable

22  legal means. Should Landlord violate the provisions of this covenant, in lieu of any other remedies available

23  at law or in equity other than any right to equitable relief (such as injunctive relief), Tenant shall have the

24  right to either: (i) ninety days after providing Landlord Notice of such violation, pay three percent (3%) of

25  Gross Sales in lieu of Base Rent (but shall nonetheless continue to pay additional rent) until the earlier of

26  the date the violation is cured or the end of the then current term; or (ii) should the violation continue for

27  fifteen (15) months after Tenant's Notice, terminate this Lease upon thirty (30) days advance Notice (which

28  termination right shall only be exercisable during the then current term) except in the event Tenant fails to

29  elect to so terminate this Lease within thirty (30) days following the expiration of such thirty (30) days

30  period, then Tenant shall be deemed to have waived its right to so terminate this Lease pursuant to such

31  particular violation of this *Paragraph 10(a)* and thereafter resume the payment of the full amount of Base

32  Rent then due and owing under this Lease.  Should another tenant in the Shopping Center violate this

33  covenant without the consent of Landlord, Landlord agrees at its sole cost and expense to promptly and

34  continuously enforce this non-competition covenant using all reasonable legal means. Tenant shall not have

35  the right to reduce the Base Rent or to terminate so long as Landlord is diligently enforcing this non-

36  competition covenant using all reasonable legal means, unless the violation continues for a period in excess

37  of eighteen (18) months, in which event Tenant may terminate this Lease within thirty (30) days after the

38  end of such 18-month period.

39

40        **(b)    CO-TENANCY**

41

42        A condition to the validity of this Lease is that Landlord shall have executed leases or purchase

43  agreements with the Named Tenants below.  Further, there shall be an Opening Co-Tenancy, such that until

44  such time as all Named Tenants and an additional one hundred thousand (100,000) square feet of premises

45  within the Shopping Center operated by Box Retail Stores, as such is defined below, have initially opened

46  for business (the "Opening Co-tenancy"), Tenant shall not be required to open and the Commencement Date

47  shall be the later of (i) sixty days after the Delivery Date or (ii) sixty days after this Opening Co-tenancy is

include asbestos and petroleum products. Use of hazardous materials in accordance with law in amounts appropriate to and necessary for the use of the Shop permitted by this Lease will be permitted. Accordingly, Tenant agrees to indemnify Landlord and hold it harmless for any costs and/or liabilities including reasonable attorneys' fees, arising from Tenant's release of any hazardous materials. Nothing in this Section shall be construed as granting Tenant a right to change the permitted use set forth in Section 1 of this Lease. "OEA" means that certain Operation and Easement Agreement between Target Corporation and Landlord dated October 25, 2007, and recorded in Book 174, Page 4290 in the Office of the Pennington County, South Dakota Register of Deeds (as it may be amended from time to time, the "OEA"). This Lease shall be subject to the OEA, and Tenant agrees to abide by its terms.

23.    Signage. All signs and window displays will require the prior written approval of Landlord and will comply with Landlord's sign criteria, applicable ordinances and other governmental restrictions. The determination of such requests and the prompt compliance will be the responsibility of Tenant. Tenant will be responsible for the cost of properly repairing all damage to the EIFS, brick, or other material caused by the installation and removal of signage. Subject to and following Tenant's obtaining all such approvals as reflected herein, Tenant shall, with Landlord's prior written consent, install Tenant's storefront building sign within thirty (30) days following the Commencement Date.

24.    Recording. Tenant will not record this Lease without the prior written consent of Landlord.

25.    Quiet Enjoyment. If Tenant performs its obligations under this Lease, Tenant will have the quiet enjoyment of the Shop so long as this Lease remains in force, without hindrance or disturbance from Landlord, subject to the specific provisions of this Lease and to easements and restrictions of record.

26.    Not an Offer. The submission of this Lease to Tenant for examination does not constitute an offer to enter into a lease, and this Lease shall become effective only upon execution and delivery by Landlord and Tenant.

27.    No Presumption Against Drafter. Both parties have freely negotiated this Lease. In any interpretation of this Lease, no presumption will be made against either party on the basis that it drafted the Lease or a particular portion of the Lease.

28.    Recapture. Tenant must open for business in the Shop as a typical Fantastic Nails, fully stocked, staffed, fixtured and merchandised for at least one day within 75 days of the Delivery Date. After initially opening for business, Tenant may thereafter cease business operations within the Shop. If Tenant fails to open for business fully stocked, staffed, fixtured and merchandised within 75 days of the Delivery Date or ceases to operate its business in the Shop (except in the case of remodeling, casualty or condemnation not to exceed one hundred eighty (180) days), Landlord shall have the right, at Landlord's option, to recapture the Shop and terminate this Lease by providing no less than 30 days written notice to Tenant. In the event of recapture of the Shop by Landlord under this Article in this Lease, Tenant shall pay to Landlord an amount equal to six (6) month's Minimum rent plus the unamortized transaction costs incurred in connection with this Lease, including without limitation, brokerage or leasing commissions and tenant improvement allowances, if any (the "Recapture Payment"). Upon such lease termination date, Tenant shall vacate and surrender the Shop and Landlord and Tenant shall be relieved of further obligations hereunder except for obligations theretofore accruing. Notwithstanding the foregoing, if Tenant fails to vacate and surrender the Shop by such termination date, or if Tenant fails to pay Landlord the Recapture Payment, rent and all other charges under this Lease shall continue to accrue until such time as Tenant has vacated and surrendered the Shop and made the Recapture Payment to Landlord but no such accrual of rent and other charges shall operate to extend the term of this Lease or revive this Lease or the Tenant's right to possession hereunder. The foregoing remedies of Landlord shall be in addition to any other right or remedy available to Landlord at law or in equity

29.    Exclusive Use. So long as Tenant is not in default under the terms of this Lease and is continuously operating under the permitted use in paragraph 1, Landlord will not enter into any lease for space within the multi-tenant building located on Outparcel 4 (as shown on Exhibit A) to an individual or entity which intends to use such space as a competing use, defined for purposes of this section as a business whose primary use is a nail salon. The foregoing exclusive clause will not apply to (a) Target Corporation ("Target"), Scheels All Sports, Inc. ("Scheels"), or the owner(s), ground lessees or occupants from time to time of the parcels in the Shopping Center now owned or ground leased by Target and Scheels, respectively, (b) Anchor Parcel B, as shown on Exhibit A, or the owner(s), ground lessees or occupants from time to time of Anchor Parcel B; (c) leases or other agreements with tenants or occupants of the Shopping Center occupying 10,000 square feet or more; (d) any leases or agreements signed prior to the date of this Lease; (e) any tenant or occupant who, having the right to do so (without amending its lease or agreement or obtaining Landlord's consent), changes its current use and operates a competing use; or (f) a tenant or occupant operating a competing use in violation of its lease or agreement with Landlord (provided, however, that Landlord will diligently attempt to correct such violation). In addition, Tenant specifically acknowledges that Landlord may lease to or allow space at the Shopping Center to be used by Barnes & Noble, Borders Books, Family Christian, Ross Dress for Less, Party City, Party America, T.J. Maxx, Marshalls, Michaels, Petco, Dillard's, Target, J.C. Penney, Dress Barn, Scheel's All Sports, Linens-N-Things, Bed Bath & Beyond, Cost Plus World Market, Old Navy, Gap, Shoe Carnival, David's Bridal, Dollar Tree, Toys R Us, Babies R Us, Guitar Center, Deb Shops, Circuit City, Staples,



6



Factory Card & Party, Ulta, Lane Bryant, Cost Cutters, EyeMart, Verizon, Regis, Sally Beauty, and Rue 21, and notwithstanding the foregoing no such lease or agreement will be deemed to violate Tenant's exclusive. In the event that Landlord breaches the foregoing covenant, then Tenant's sole remedies will be as follows, provided, however, that Tenant may not exercise such remedy until Tenant has given Landlord written notice of such violation and Landlord has failed to cure same within thirty (30) days after receipt of such written notice: (a) terminate this Lease upon not less than ninety (90) days prior notice to Landlord delivered to Landlord on or before the date the violation is ended, or (b) pay an amount equal to fifty (50%) of Minimum Rent, in lieu of Minimum Rent and Percentage Rent, plus all other charges, costs and fees hereunder, from the date the violation occurs until it is ended or Tenant terminates this Lease, whichever occurs first; provided, however, in the event the violation is still occurring 365 days after it first commenced and Tenant has failed to terminate this Lease as provided in this Section 29, this Lease shall remain in full force and effect, Tenant shall be deemed to have waived its right to terminate this Lease for that particular violation of this Section 29 and Tenant shall promptly resume paying full Minimum rent and Percentage Rent, plus all other charges, costs and fees hereunder effective at the end of the 365 day period.

30.    _Joint Liability_. If there is more than one Tenant (or more than one person constituting the Tenant) under this Lease, they shall be bound jointly and severally by all provisions herein contained.

IN WITNESS WHEREOF the parties and the Guarantors (if any) have executed this Lease as of the day and year first above set forth.

LANDLORD:

**MIDLAND RUSHMORE, LLC**
an Ohio limited liability company

By: _____
         John I. Silverman
         Executive Manager

TENANT:

_____
Ly Hoang

_____
Quang Chung

7

5. **CONSTRUCTION OF TENANT IMPROVEMENTS**

5.1     Upon Tenant's acceptance of the Premises in accordance with the provisions of Article 4 above, Tenant shall arrange for the construction and/or installation of all additional improvements, including building signage, to the Premises (collectively, the "Tenant Improvements") necessary for the operation of the business contemplated in Section 7.1 hereof.

5.2     Tenant shall have the right to select the architect, contractors or construction manager of its choosing, and to control the Tenant Improvement work. In the event Tenant is delayed in completing construction of the Tenant Improvements as result of any event or occurrence described in Article 33 hereof not to exceed thirty (30) days and for which Tenant has promptly notified Landlord upon such delay occurring, or in the event Tenant is delayed because of delays or completion of the Soft Power District and Common Areas of the Soft Power District, then the 60-day period set forth in clause (i) of the first sentence of Section 3.3 hereof to be utilized for establishing the Rent Commencement Date (absent Tenant's earlier opening for business at the Premises) shall be extended for the period of time corresponding to any such delay(s). Subject to applicable law, Tenant shall be allowed to complete the interior construction of the Premises in accordance with its national décor program.

6. **COVENANT OF TITLE AND QUIET ENJOYMENT**

Landlord represents and warrants to Tenant that Landlord, has full right and lawful authority to lease the Premises to Tenant pursuant to the terms hereof. Landlord covenants with Tenant to keep Tenant in quiet enjoyment and possession of the Premises during the term of this Lease, provided Tenant is not in default under this Lease beyond any applicable grace or cure period herein. Landlord further represents and warrants to Tenant that (i) as of the Effective Date, no zoning or similar ordinance, restrictive covenant, exclusivity provision in any Lease, or other encumbrance or restriction prevents the construction of the Improvements, or the use of or Tenant opening for business within the Premises for the specific purposes set forth in Section 7.1, or otherwise conflicts or is inconsistent with the terms of this Lease; (ii) as of the Effective Date, no joinder or approval of any other person or entity is required with respect to Landlord's right and authority to enter into this Lease, including any lender or mortgagee; and (iii) as of the Rent Commencement Date Landlord has good, marketable title to the Property, and will defend the title thereto.

7. **USE OF PREMISES**

7.1     Tenant may use and occupy the Premises for: (i) the furnishing of wireless and/or wireline communications services (including without limitation, voice, data, paging, text messaging, television, video, fiber optic cable and internet access), and the sale and servicing of wireless and/or wireline communications equipment and related accessories or the sale of any item which is a technological evolution of any of the foregoing; (ii) the incidental sale of wearable items containing Tenant's logo; and (iii) related general office and administrative uses, and for no other purpose without Landlord's consent, which consent shall not be unreasonably withheld, conditioned or delayed (the "Permitted Use"). The items identified in subparagraph 7.1(i) which may be sold, leased, installed, repaired or activated by Tenant shall be referred to as the "Exclusive Items". Notwithstanding the foregoing, television, video, and any related accessories to any item identified in subparagraph 7.1(i) shall not be considered "Exclusive Items." Tenant may change its use of the Premises to any other lawful retail use with Landlord's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed, provided that the new use shall not be in violation of any then existing exclusive use or other use restrictions binding against the Shopping Center. Landlord represents that the Permitted Use will not violate any agreement to which the Shopping Center or Landlord is bound, including exclusives granted to other tenants

*Exclusive only for outparcel's 1-9.*
*Section 7.5*

*Verizon*
*(2 pages)*

of the Shopping Center, and Landlord shall indemnify, defend and hold Tenant harmless from and against any loss or liability in the event this representation is not true, including without limitation, the defense of any claims raised by any other tenant who has an exclusive use right in conflict with the Permitted Use.

7.2     Nothing contained in this Lease shall be construed to impose a "continuous operation" or similar covenant or requirement upon Tenant provided, however, Tenant covenants and agrees to open for business to the public fully stocked and staffed as a typical Verizon Wireless store for at least one (1) day within 180 days of the Rent Commencement Date. Notwithstanding the foregoing, if Tenant shall have ceased its business operations at the Premises (excepting temporary store closings for casualty, condemnation, remodeling, alterations or restoration work) for a continuous period of ninety (90) days or more, Landlord may elect to terminate this Lease at any time after such three (3) month period by delivering written notice to Tenant indicating Landlord's election to so terminate the Lease. The Lease shall terminate ten (10) business days after Tenant's receipt of such notice unless Tenant resumes business operations from the Premises prior to expiration of the ten (10) business day period. In the event that Tenant does not resume business operations, the Lease shall terminate as if the term had expired by the passage of time. In the event of recapture of the Premises by Landlord under this Section 7.2, Tenant shall pay to Landlord an amount equal to the unamortized brokerage or leasing commissions and tenant improvement allowances on or before the termination of this Lease.

7.3     Landlord hereby represents and warrants that, upon Landlord's delivery of the Premises pursuant to Article 4 above, the Premises and Outparcel No. 4 and all parts thereof shall be in full compliance with all applicable laws, ordinances and regulations of all federal, state, county and municipal authorities (including, without limitation, zoning and building codes) ("Legal Requirements"), including Title III of the Americans With Disabilities Act of 1990, any regulations promulgated thereunder and any similar state or local laws or regulations. Landlord shall comply throughout the term of the Lease with all Legal Requirements, including any changes thereto, relating to the physical condition of all parts of the Premises and Outparcel No. 4, except to the extent any changes in Legal Requirements apply to Tenant's specific use of the Premises and not to real estate generally or to any alteration to the Premises made by Tenant. Tenant shall comply with the Legal Requirements which relate to its specific use of the Premises or to any alteration to the Premises made by Tenant.

7.4     Tenant shall not use the Premises in violation of the OEA, the prohibited uses set forth on Exhibit E or the exclusive uses applicable to the Shopping Center or any part thereof.

7.5     Landlord and its successors and assigns shall not operate or permit under any circumstances to be operated within Outparcels 1-9 any other store, kiosk, cart or stand selling, renting or displaying for sale or rental of the Exclusive Items described in Section 7.1 above provided the foregoing shall not prohibit "Incidental Sales" of the Exclusive Items. Incidental Sales shall mean no more than 3% of floor area is devoted to the sale of Exclusive Items but in no event shall Incidental Sales include wireless telephones or wireless services. Landlord shall not lease, consent to a sublease, or consent to an assignment of any lease for any space in Outparcels 1-9 to any tenant whose business includes the Exclusive Items excluding Incidental Sales. Notwithstanding anything to the contrary in this Lease, in the event that a tenant or occupant in the Shopping Center causes the breach the covenants contained in this Section 7.5 and such action by such tenant or occupant is not permitted pursuant to the terms of any lease or contract with Landlord (a "Rogue Tenant") and so long as Landlord is exercising diligent efforts to prevent or correct such Rogue Tenant's actions, including pursuing all legal and equitable remedies available, Tenant shall delay its remedy under this Section 7.5 for ninety (90) days after written notice to Landlord. In the event Landlord breaches the covenants contained in this Section 7.5, and such violation continues for a period exceeding thirty (30) days from the date Tenant delivers to Landlord written notice of such violation, Annual Fixed Rent shall, subsequent to said 30 day period, be automatically reduced to one-half (½) of stated

1                                    <u>Exhibit K-2</u>

2                                    <u>Existing Leases</u>

3       Target  (owns their parcel)
4       Sam's Club (owns their parcel)
5       Interstate Battery (owns their parcel)
6       Scheels dated October 1, 2007
7       EyeMart  dated September 3, 2008
8       T.J. Maxx dated January 11, 2008
9       Gordmans dated November 28, 2007
10      Shoe Carnival dated June 27, 2007
11      Justice dated July 20, 2009
12      David's Bridal dated December 27, 2007
13      Dress Barn dated April 28, 2008
14      Michaels dated May 16, 2008
15      Petco dated November 26, 2007
16      Dollar Tree dated December 8, 2008
17      Gamestop dated May 15, 2009
18      Verizon dated September 24, 2008
19      Men's Wearhouse dated October 19, 2009
20      Fantastic Nails dated November 3, 2008
21
22

K-2-1

<u>Exhibit L</u>

<u>Alternate Rent</u>

1.      During the applicable period(s) described within Sections 2.4 and/or 2.5 and/or Article 22 of the Lease, Tenant shall pay as "***Alternate Rent***" (i) an amount equal to three (3%) percent of all "Gross Sales" (hereinafter defined) resulting from business conducted in, on or from the Premises, not to exceed fifty percent (50%) of the amount of Fixed Rent which otherwise would have been payable during such period, and (ii) all Additional Rent for such period (the "***Cap***").

2.      As used herein, the term "***Gross Sales***" shall mean the total amount of all sales of merchandise or services completed at the Premises by Tenant or any sublessee, licensee or concessionaire of Tenant and any other person or entity operating in the Premises (for purposes of this Paragraph 2 only, collectively, "***Tenant***"), whether for cash, credit or otherwise, including redemption of gift certificates and gift cards (regardless of where or how such gift certificates and gift cards were purchased). Tenant shall record, at the time of each Gross Sale, all receipts from such sale, whether for cash, credit or otherwise, in a cash register or cash registers, or in such electronic or computer device which records sales in a manner which is generally acceptable by industry standards. The term "Gross Sales" shall <u>exclude</u>: **(1)** proceeds from any sales tax, gross receipts tax or similar tax, by whatever name called, which are separately stated and are in addition to the sales price, **(2)** *bona fide* transfers or exchanges of merchandise from the Premises to any other stores or warehouses of Tenant or any Affiliates of Tenant, and returns to shippers and manufacturers for credit, **(3)** refunds or credits given to customers for merchandise returned or exchanged at the Premises (regardless of where or how purchased), **(4)** sales of Tenant's fixtures and equipment not in the ordinary course of Tenant's business, **(5)** to the extent of prior inclusion in Gross Sales, bad debts when written off the books of Tenant, provided that any collections made on account of such bad debts shall be included in Gross Sales when received, **(6)** receipts from vending machines installed solely for the use of Tenant's employees and receipts from pay telephones, **(7)** sales to employees of Tenant at discount [which, for the purposes of determining Alternate Rent hereunder, shall not exceed two percent (2%) of Gross Sales per calendar year or pro rata portion thereof, as applicable], **(8)** fees paid to independent third party credit card, charge card, and debit card companies in connection with sales charged to or debited from customers' credit cards, charge cards, or debit cards, as applicable, **(9)** proceeds from delivery, gift-wrapping and check cashing charges [which, for the purposes of determining Alternate Rent hereunder, shall not exceed two percent (2%) of Gross Sales per calendar year or pro rata portion thereof, as applicable], **(10)** sums and credits received in settlement of claims for loss or damage to merchandise, **(11)** separately stated service, finance and interest charges, **(12)** the dollar value of coupons utilized by customers in the purchase of merchandise from the Premises, **(13)** close-out or bulk sales of inventory to jobbers or wholesalers, **(14)** sales of gift certificates or gift cards, and **(15)** forfeited deposits.

3.      Alternate Rent shall be payable within thirty (30) days after the end of the calendar month to which it pertains.  If the Alternate Rent for a calendar month does not exceed the Cap, such payment shall be accompanied by a statement prepared by an officer of Tenant setting forth the amount of Gross Sales achieved during, and the amount of Alternate Rent payable for, such month.

4.      Tenant shall maintain at the Premises or at its principal office, complete books and records reflecting all elements of Gross Sales.  Tenant shall be permitted to maintain its books and records in a computerized form; <u>provided</u>, <u>however</u>, that (A) such computerized books and records provide the same level of information as the books and records described above and are retained for the full record retention period provided for herein, and (B) promptly upon request, printed copies of any such books and records shall be made available at Tenant's principal office for inspection by Landlord's representatives who are engaged in inspecting and/or auditing Tenant's books and records as provided herein.  Such books and records shall be kept in accordance with generally accepted accounting principles and practices consistently applied and shall be retained by Tenant for not less than one (1) year following the end of the calendar year to which they refer.

5.      Provided that the Alternate Rent payable for a calendar month does not exceed the Cap, Landlord and/or its auditor shall have the right, upon at least thirty (30) days prior notice to Tenant, to inspect and/or audit Tenant's records relating solely to Gross Sales achieved in the Premises for such calendar month.

DMEAST #10098913 v6

6.      Landlord shall not disclose to any third party Tenant's Gross Sales or the amount of Alternate Rent paid or payable by Tenant, <u>provided</u>, <u>however</u>, that (A) such information was not previously disclosed by Tenant to such third party or to the public generally, and (B) nothing contained herein shall restrict Landlord from disclosing such information as may be required by law, or to its accountants, attorneys, *bona fide* prospective purchasers, or current or prospective Mortgagees or Ground Lessor(s) of all or any portion of Landlord's interest in the Shopping Center (provided that each of such recipients shall be bound to the same non-disclosure provisions as are imposed upon Landlord).

L-2

1        <u>Exhibit M</u>

2        <u>Prohibited Uses</u>

3    As used in this Lease, the term *"**Prohibited Uses"** shall mean any of the following uses:

4    As to the parcels within the Shopping Center owned or controlled by Landlord or an Affiliate as
5    of the Effective Date, any of the following uses:

6            (1)      Any use which emits or results in strong, unusual or offensive odors (other than
7    normal cooking odors emanating from restaurants), fumes, dust or vapors, is a public or private
8    nuisance, emits noise or sounds which are objectionable due to intermittence, beat, frequency,
9    shrillness or loudness, creates a hazardous condition, or is used, in whole or in part, as or for
10   warehousing or the dumping or disposing of garbage or refuse;

11           (2)      Any operation primarily used as a storage warehouse operation and any
12   assembling, manufacturing, distilling (other than the operation of a brew pub restaurant in
13   accordance with the OEA, refining, smelting, agricultural, or mining operation;

14           (3)      Any "second hand" store, "surplus" store, or pawn shop; provided, however, that
15   the foregoing shall not prevent the operation of a Play It Again Sports, Gamestop, E.B. Games
16   or similar first class national retailer in the same or similar business, nor shall the foregoing
17   prevent the operation of a dollar store (such as Dollar Tree or Dollar General);

18           (4)      Any mobile home park, trailer court, labor camp, junkyard, or stockyard (except
19   that this provision shall not prohibit the temporary use of construction trailers during periods of
20   construction, reconstruction, or maintenance);

21           (5)      Any dumping, disposing, incineration, or reduction of garbage (exclusive of trash
22   compactors or trash containers located near the rear of any building);

23           (6)      Any fire sale, bankruptcy sale (unless pursuant to a court order), or auction
24   house operation;

25           (7)      Any central laundry, dry cleaning plant, or laundromat (except that a dry cleaner
26   that performs all dry cleaning outside the Shopping Center and a laundromat shall be permitted,
27   so long as it is located more than 150 feet away from the Premises);

28           (8)      Any automobile, truck, trailer, boat, or recreational vehicle sales, leasing, display
29   or body shop repair operation; provided, however, that a tire, lube and battery operation is
30   permitted in the Sam's District and on any Outparcels;

31           (9)      Any bowling alley, skating rink, or race track, provided , however, that a bowling
32   alley is permitted in the Sam's District;

33           (10)     Any movie theater or live performance theater (except in the Sam's District),
34   auditorium, meeting hall, sporting event, bingo hall, library or other similar entertainment use;

35           (11)     Any hotel, motel, short or long term residential use, including but not limited to:
36   single family dwellings, townhouses, condominiums, other multifamily units, and other forms of
37   living quarters, sleeping apartments or lodging rooms; except that hotels and motels shall be
38   permitted on Outparcels 7, 8 and 9 as shown on Exhibit B to the extent they otherwise comply
39   with the OEA;

40           (12)     Any animal raising facility;

41           (13)     Any mortuary or funeral home;

42           (14)     Any "Pornographic Use", which shall include, without limitation: (x) a store
43   displaying for sale or exhibition books, magazines or other publications containing any
44   combination of photographs, drawings or sketches of a sexual nature, which are not primarily
45   scientific or educational [provided, however, that the sale of books, magazines and other
46   publications by a national bookstore of the type normally located in first-class shopping centers
47   in the State in which the Shopping Center is located (such as, but not limited to, Borders and
48   Barnes & Noble, as said stores currently operate) shall not be deemed a "pornographic use"
49   hereunder]; or (y) a store offering for exhibition, sale or rental video cassettes or other medium
50   capable of projecting, transmitting or reproducing, independently or in conjunction with another
51   device, machine or equipment, an image or series of images, the content of which has been

M-1

rated or advertised generally as NC-17 or "X" or unrated by the Motion Picture Rating Association, or any successor thereto [provided, however, that the sale or rental of such videos by a video store or full-line consumer electronics store of the type normally located in first-class shopping centers in the State in which the Shopping Center is located (such as, but not limited to, Blockbuster, West Coast Video, Best Buy or Fry's Electronics as said stores currently operate) shall not be deemed a "pornographic use" hereunder]; or massage parlor, provided the foregoing restriction shall not prohibit massage services offered on an incidental basis by an otherwise permitted health spa, health club, athletic club, fitness center, workout facility, beauty salon or barber shop, physician's office, chiropractor's office or physical therapist's office; nor shall the foregoing prohibit a commercially appropriate, accredited massage therapy facility that customarily operates in first class regional shopping center developments using accredited therapists, such as, but not limited to, Massage Envy;

(15)   Any so-called "head shop", or other establishment primarily selling or exhibiting drug-related paraphernalia or which exhibits either live or by any other means to any degree, nude or semi-nude dancers or waitstaff;

(16)   Any bar, tavern, restaurant or other establishment whose reasonably projected annual gross revenues from the sale of alcoholic beverages for on-premises consumption exceeds forty percent (40%) of the gross revenues of such business;

(17)   Any catering or banquet hall, provided, however, that a catering or banquet hall is permitted in the Sam's District;

(18)   Any flea market, amusement or video arcade, pool or billiard hall, night club, discotheque, or dance hall.  The foregoing prohibition shall not be applicable to video or amusement games, pinball machines or pool tables that are incidental to the operation of a permitted restaurant (such as, without limitation, a Chuck E. Cheese, Peter Piper Pizza or Red Robin), or a movie theater in accordance with the OEA;

(19)   Any training or education facility, including but not limited to:  beauty schools, barber colleges, reading rooms, places of instruction or other operations catering primarily to students or trainees rather than to customers; provided, however, this prohibition shall not be applicable to (i) on-site employee training by an Occupant incidental to the conduct of its business at the Shopping Center, and (ii) up to three (3) occupants of 5,000 square feet or less of Floor Area and located in the area east of the Target Tract (as defined in the OEA), any Outparcel and the Sam's District (collectively, the **"Permitted Places"**);

(20)   Any gambling facility or operation, including but not limited to:  off-track or sports betting parlor; table games such as black-jack or poker; slot machines; video poker/black-jack/keno machines or similar devices; or bingo hall.  Notwithstanding the foregoing, this prohibition shall not apply to governmental sponsored gambling activities, or charitable gambling activities (including the sale of lottery tickets and lottery games sponsored by a Governmental Authority), so long as such governmental and/or charitable activities are incidental to the business operation being conducted by the Occupant.  The foregoing prohibitions shall not be applicable to gambling machines, billiards or video games that are operated incidental to the operation of a restaurant in accordance with the OEA;

(21)   Any unlawful use;

(22)   Any tattoo parlor, gun shop or shooting range; provided this prohibition shall not be applicable to a gun shop or indoor gun range that (i) is incidental to the operation of a big-box sporting goods retail store (such as Scheel's) located within Building Area S as shown on Exhibit B, and (ii) otherwise complies with the provisions of the OEA;

(23)   Any church or other place of religious worship;

(24)   Except in the Sam's District or any Outparcel, any car wash, automobile repair shop, or any business servicing motor vehicles in any respect (except for those servicing automobile electronics, such as Best Buy), including, without limitation, any quick lube oil change service, tire center or gasoline or service station or facility

(25)   Any carnival, amusement park or circus;

(26)   Except in the Permitted Places, any medical clinics or medical offices;

(27)   Except in the Permitted Places, any grocery store, supermarket or drug store;

M-2

(28)    Any office use, other than: (x) office space used in connection with and ancillary to a permitted retail use hereunder; and (y) retail offices providing services commonly found in similar first-class shopping centers in the Rapid City, South Dakota metropolitan area (for example, financial services, real estate brokerage, insurance agency, banking, travel agency), provided that such uses are located in the Permitted Places and not more than eighty thousand (80,000) square feet of Floor Area in the Shopping Center, in the aggregate, shall be devoted to such uses;

(29)    Intentionally omitted.

(30)    Daycare center or child care center unless located in the Permitted Places; notwithstanding the foregoing, however, one (1) short term child care activity operation such as Gymboree or Little Gym shall also be permitted in the area not designated as Permitted Places;

(31)    Any veterinary hospital or boarding facility, provided, however, this prohibition shall not be applicable to pet shops and pet supply warehouse stores such as Petco or PetsMart. Notwithstanding the forgoing exception, any veterinary or boarding services provided in connection with the operation of a pet shop or pet supply warehouse store shall only be incidental to such operation and the boarding of pets as a separate customer service shall be prohibited; all kennels, runs and pens shall be located inside the building; and the combined incidental veterinary and boarding facilities shall occupy no more than fifteen percent (15%) of the Floor Area of the pet shop or pet supply warehouse store; such occupant shall use reasonable efforts to prevent its customers from allowing their pets to urinate or defecate in the Common Areas and will promptly remove any "dog dirt" from in front of the Premises;  no pet or pet supply store shall be located within 100 feet of the Premises;

(32)    Except in the Sam's District, children's entertainment or activity facility (such as "Discovery Zone", or "Chuck E. Cheese's");

(33)    Except in the Permitted Places, karate center;

(34)    Intentionally omitted;

(35)    Intentionally omitted;

(36)    Except in the Permitted Places, beauty parlor or nail salon;

(37)    Health spa, health club, athletic club, fitness center, exercise facility or similar type business unless located in the Permitted Places; notwithstanding the foregoing, however, one (1) exercise spa or club not exceeding 3,500 square feet of Floor Area and not located within two hundred fifty (250) feet of the Premises shall also be permitted in the area not designated as Permitted Places.

(38)    Any fire sale, bankruptcy sale (unless pursuant to a court order) or auction house operation.

M-3

<u>Exhibit N</u>

Form of Declaration of Restrictions Against Related Land

RECORDING REQUESTED BY AND WHEN RECORDED MAIL TO:

_____

(Space Above Line For Recorder's Use Only)

## DECLARATION OF RESTRICTIONS

This Declaration of Restrictions (*"Declaration"*) is made as of the _____ day of _____ 200__ by **[LANDLORD OR LANDLORD'S AFFILIATE, AS APPLICABLE]**, a _____, having an address c/o _____ (*"Declarant"*) for the benefit of BED BATH & BEYOND INC., a New York corporation, having an office at 650 Liberty Avenue, Union, New Jersey 07083 (*"Tenant"*).

WHEREAS, the Declarant is the owner of that certain real property located in the County of Pennington, State of South Dakota, as more particularly described on <u>Exhibit A</u> annexed hereto (the "*Related Land*").

WHEREAS, **[the Declarant// or Name of Landlord, as applicable]**, a _____, having an address c/o _____ (*"Landlord"*)] is **[also]** the owner of certain real property located in the County of Pennington, State of South Dakota, commonly referred to as the Rushmore Crossing Shopping Center as more particularly described on <u>Exhibit B</u> annexed hereto (the *"Shopping Center"*).

WHEREAS, **[Declarant or Landlord]** and Tenant, as of the date hereof, have entered into a lease (the *"Lease"*) demising a portion of the Shopping Center as more particularly described in the Lease (the *"Premises"*) to Tenant.

**[Add if Declarant is an Affiliate of Landlord: WHEREAS, Declarant controls, is controlled by, or is under common control with, Landlord, and therefore will derive a direct or indirect financial benefit from the Lease (as used herein, "*control*" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person or entity, whether through the ownership of voting securities or rights, by contract, or otherwise).]**

WHEREAS, Tenant is not willing to enter into the Lease unless the Related Land is restricted in accordance with this Declaration and the imposition of the terms of this Declaration on the Related Land is a material inducement to Tenant in connection with the Lease.

WHEREAS, the Declarant is willing to restrict the Related Land as set forth in this Declaration and by executing this Declaration does so restrict it for the benefit of Tenant and its successors and assigns.

DECLARATION

NOW, THEREFORE, in consideration of One Dollar and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties state as follows:

1.      All capitalized terms used, but not otherwise defined, herein shall have the meanings ascribed to them in the Lease.

2.      The Related Land shall be subject to the restrictions as set forth herein which are declared and agreed to be for the benefit of Tenant and its successors and assigns and which restrictions shall run with the Related Land and be binding upon the successors and

assigns of the Declarant, and subject to the terms of leases for premises on the Related Land existing on the date hereof, all tenants, licensees and other occupants and users of the Related Land, and any other party claiming by, through or under the Declarant.

3.    For so long as the Lease (as same may be amended, modified, extended or renewed from time to time) shall remain in effect, and subject to the terms of leases existing on the date hereof, the Declarant shall not lease, rent or occupy or permit any other premises in the Related Land to be occupied, whether by a tenant, sublessee, assignee, licensee or other occupant or itself, [INSERT TENANT'S EXCLUSIVE FROM THE LEASE].

4.    In the event of a breach of the restrictions set forth in this Declaration, Tenant and its successors and assigns may prosecute any appropriate proceedings at law or in equity. They may, in any such proceeding, obtain injunctive or other equitable relief to enforce this Declaration or restrain violations of this Declaration; recover damages on account of such violation; secure, by way of specific performance or otherwise, the performance of this Declaration; and/or obtain any other remedy provided for at law or in equity.

5.    The Declarant represents and warrants to Tenant that it is duly authorized to execute this Declaration and that this Declaration is superior to all mortgages, deeds of trust and other security instruments encumbering or otherwise affecting the Related Land, and no joinder by or consent or approval of any other party is necessary to fully bind the Declarant and the interests in the Related Land held by the Declarant to the terms of this Declaration.

IN WITNESS WHEREOF, the undersigned has executed this Declaration as of the date hereinabove provided.

**DECLARANT:**

Witness/Attest:                                    [ _____ ]

                                                    a _____


_____                          By:_____
                                                  Name: _____
                                                  Title:_____

N-2

## ACKNOWLEDGMENT

STATE OF _____

  ):  SS.

COUNTY OF _____)

On the _____ day of _____ in the year 200__ before me, the undersigned, a Notary Public in and for said State, personally appeared _____ personally known on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument, and that such individual made such appearance before the undersigned in the municipality of _____, _____ County, State of _____.


_____
Notary Public
My Commission Expires:


(SEAL)

N-3

Exhibit O

Rules and Regulations for the Shopping Center

In the event of any conflict between the provisions of the Lease as aforesaid and the following rules and regulations, the provisions of the Lease as aforesaid shall prevail and govern.

1.    Trash.  Tenant will contract for and shall pay the costs of removal of any of Tenant's refuse or rubbish.

2.    Employee Parking.  Tenant shall use reasonable efforts to cause Tenant and its employees to park their automobiles/motor vehicles in the areas designated as employee parking areas on Exhibit B-2.  Notwithstanding the foregoing, a breach of the employee parking rules by Tenant's employees shall not constitute a default of this Lease by Tenant.

3.    Temperature Maintenance.  Tenant shall keep the Leased Premises at a temperature sufficiently high to prevent freezing of water in pipes and fixtures.

4.    Inflammable Materials.  Tenant shall not use or keep in its Premises any kerosene, gasoline or other inflammable or combustible fluid or material other than such limited quantities of cleaning and similar substances reasonably necessary for the operation and maintenance of equipment and merchandise permitted to be kept in the Premises.

5.    Handbills, Canvassing.  Tenant will not display, paint or place or cause to displayed painted or placed any handbills, bumper stickers or other advertising or promotional materials or devices on any vehicles parked in the parking areas of the Shopping Center, whether belonging to Tenant or to Tenant's employees or agents or to any other person.  Canvassing, peddling, soliciting and distribution of handbills are prohibited in the Shopping Center, and each tenant will cooperate to prevent these activities.

DMEAST #10098913 v6

<u>Exhibit P</u>

Landscaping and Hardscaping Plans

P-1