# EXHIBIT A

**LEASE AGREEMENT**

**BETWEEN**

**U.S. 41 AND I-285 COMPANY,
LANDLORD**

**AND**

**BED BATH & BEYOND INC.,
TENANT**

**Akers Mill Square
Cobb Parkway and Akers Mill Road
Atlanta, Georgia**

Dated:  As of ~~September~~ October 3, 2005

\* \* \* \* \* \*

DMEAST #1997925 v7

**Table of Contents**

Page

ARTICLE 1 BASIC TERMS AND DEFINITIONS..................................................................1

      Section 1.1    Basic Terms and Definitions...........................................................1

ARTICLE 2 LEASE OF PREMISES; LEASE TERM; DELIVERY DATE .......................5

      Section 2.1    Lease of Premises ..........................................................................5
      Section 2.2    Term. ................................................................................................5
      Section 2.3    Delivery Date. .................................................................................5
      Section 2.4    Unseasonable Delivery; Slack Period...........................................6
      Section 2.5    Initial Co-Tenancy Condition. ........................................................7
      Section 2.6    Permits Contingency. .....................................................................7

ARTICLE 3 IMPROVEMENTS..............................................................................................8

      Section 3.1    Landlord's Work and Tenant's Work...............................................8
      Section 3.2    Plan Approvals.................................................................................8
      Section 3.3    Performance of Work.......................................................................8

ARTICLE 4 FIXED RENT, TAXES & PERCENTAGE RENT; DETERMINATION AND
      PAYMENT.................................................................................................11

      Section 4.1    Fixed Rent.......................................................................................11
      Section 4.2    Payment of Rent .............................................................................11
      Section 4.3    Real Estate and Other Taxes. ........................................................11
      Section 4.4    Percentage Rent. ............................................................................12

ARTICLE 5 COMMON AREAS, THEIR USE AND CHARGES ........................................14

      Section 5.1    Common Areas: Maintenance........................................................14
      Section 5.2    Common Areas: Restrictions..........................................................16

ARTICLE 6 UTILITIES ...........................................................................................................19

      Section 6.1    Utility Service ...................................................................................19
      Section 6.2    Interruption.......................................................................................20

ARTICLE 7 SIGNS ..................................................................................................................20

      Section 7.1    Tenant's Building Signage...............................................................20
      Section 7.2    Pylon Signage.................................................................................20
      Section 7.3    Signage: Alteration/Removal/Allocation.........................................21
      Section 7.4    Cooperation ......................................................................................21
      Section 7.5    Signage Restrictions and Criteria. ..................................................21

ARTICLE 8 ALTERATIONS AND IMPROVEMENTS ........................................................21

      Section 8.1    Alterations and Improvements.........................................................21

ARTICLE 9 REPAIRS ..............................................................................................................23

      Section 9.1    Tenant's Repairs .............................................................................23
      Section 9.2    Landlord's Repairs ..........................................................................23
      Section 9.3    Legal Compliance Work ..................................................................24

ARTICLE 10 INDEMNIFICATION, INSURANCE AND WAIVER OF SUBROGATION .............24

      Section 10.1   Mutual Release, Waiver of Subrogation and Mutual
                  Indemnification................................................................................24
      Section 10.2   Tenant's Insurance..........................................................................25
      Section 10.3   Landlord's Insurance.......................................................................25
      Section 10.4   General Insurance Requirements....................................................26

ARTICLE 11 FIRE AND OTHER CASUALTY; EMINENT DOMAIN ........................................26

    Section 11.1  Fire and Other Casualty. ...................................................................26
    Section 11.2  Eminent Domain...............................................................................28
    Section 11.3  Abatement of Rent Charges.............................................................30

ARTICLE 12 COVENANTS, REPRESENTATIONS AND WARRANTIES ................................30

    Section 12.1  Quiet Enjoyment..............................................................................30
    Section 12.2  Authority..........................................................................................30
    Section 12.3  Landlord's Covenants, Warranties and Representations.....................30
    Section 12.4  Environmental Matters....................................................................31
    Section 12.5  COREA. ...........................................................................................33

ARTICLE 13 USES AND RESTRICTIONS ...........................................................................34

    Section 13.1  Permitted and Prohibited Uses.........................................................34
    Section 13.2  Tenant's Exclusive in Center............................................................34
    Section 13.3  Exclusives Which Tenant Must Honor. ..............................................35

ARTICLE 14 CONDUCT OF BUSINESS OPERATIONS .......................................................36

ARTICLE 15 TENANT ASSIGNMENT AND SUBLETTING.....................................................36

    Section 15.1  Assignment and Subletting...............................................................36
    Section 15.2  Liability of Tenant............................................................................36
    Section 15.3  Collateral Assignment. ....................................................................37
    Section 15.4  Cure Rights of Original Tenant. ........................................................37
    Section 15.5  Recognition Agreement....................................................................37

ARTICLE 16 DEFAULT AND DISPUTE RESOLUTION ..........................................................37

    Section 16.1  Tenant Default. ...............................................................................37
    Section 16.2  Landlord Default...............................................................................39
    Section 16.3  Arbitration.......................................................................................39

ARTICLE 17 RIGHT TO MORTGAGE AND NON-DISTURBANCE; ESTOPPEL
    CERTIFICATE.....................................................................................................40

    Section 17.1  Right to Mortgage and Non-Disturbance ..........................................40
    Section 17.2  Estoppel Certificate .........................................................................40
    Section 17.3  Existing Mortgagee .........................................................................40

ARTICLE 18 NOTICE ........................................................................................................40

ARTICLE 19 TENANT'S PROPERTY ...................................................................................41

ARTICLE 20 END OF TERM ..............................................................................................41

    Section 20.1  Surrender of Premises ....................................................................41
    Section 20.2  Hold Over........................................................................................41

ARTICLE 21 [INTENTIONALLY OMITTED]...........................................................................41

ARTICLE 22 ONGOING CO-TENANCY ...............................................................................41

ARTICLE 23 MISCELLANEOUS .........................................................................................42

    Section 23.1  Loading Facilities ............................................................................42
    Section 23.2  Liens ..............................................................................................42
    Section 23.3  Broker's Commission .......................................................................42
    Section 23.4  Force Majeure .................................................................................42
    Section 23.5  Consents.........................................................................................42
    Section 23.6  Costs ..............................................................................................42
    Section 23.7  Attorneys' Fees ...............................................................................42
    Section 23.8  Survival of Obligations.....................................................................43
    Section 23.9  Non-Waiver......................................................................................43
    Section 23.10  Rights Cumulative ..........................................................................43
    Section 23.11  Definition of Landlord. ....................................................................43

Section 23.12  Successors and Assigns .................................................................43
Section 23.13  Limitation of Tenant's Liability .........................................................43
Section 23.14  Joint and Several Liability.................................................................43
Section 23.15  Severability ......................................................................................43
Section 23.16  Grammatical Usages and Construction ............................................43
Section 23.17  Table of Contents, Line Numbering and Paragraph Headings............43
Section 23.18  Definition of Hereunder, Herein, etc. ...............................................43
Section 23.19  Short Form Lease .............................................................................44
Section 23.20  Entire Agreement and Modification ..................................................44
Section 23.21  No Joint Venture or Partnership Created by Lease ................................44
Section 23.22  Tenant's Tradename ..........................................................................44
Section 23.23  Counterparts ....................................................................................44
Section 23.24  Governing Law .................................................................................44
Section 23.25  Landlord's Entry ..............................................................................44

ARTICLE 24 LIMITATION OF LANDLORD'S LIABILITY.........................................44

**EXHIBITS**

| Exhibit A | Legal Description of Shopping Center |
| Exhibit B | Site Plan |
| Exhibit C | Rent Commencement and Expiration Date Agreement |
| Exhibit D | Landlord's Work |
| Exhibit D-1 | Elevations |
| Exhibit E | Permitted Encumbrances |
| Exhibit F | Signage |
| Exhibit G | Form of Existing Mortgagee Subordination, Non-Disturbance and Attornment Agreement |
| Exhibit G-1 | (Bed Bath & Beyond) Form of Existing Mortgagee Subordination, Non-Disturbance and Atornment Agreement |
| Exhibit H | Form of Subtenant Recognition Agreement |
| Exhibit I | Form of Delivery Date Notice |
| Exhibit J | Form of Delivery Date Certification |
| Exhibit K-1 | Existing Exclusives |
| Exhibit K-2 | Existing Leases |
| Exhibit L | Intentionally Omitted |
| Exhibit M | Prohibited Uses |
| Exhibit N | Form of Mechanics' Lien Indemnification Agreement |

## LEASE AGREEMENT

THIS LEASE AGREEMENT (**"Lease"**) is entered into as of September ___, 2005 by and between US 41 AND I-285 COMPANY, a New York general partnership, whose address is c/o Mall Properties, Inc., 654 Madison Avenue, New York, New York 10021 (**"Landlord"**), and BED BATH & BEYOND INC., a New York corporation, having an office at 650 Liberty Avenue, Union, New Jersey 07083 (**"Tenant"**).

W I T N E S S E T H:

## ARTICLE 1
## BASIC TERMS AND DEFINITIONS

Section 1.1    <u>Basic Terms and Definitions</u>.  The following terms shall have the meanings set forth in this Section 1.1 except as otherwise expressly provided herein.

1.1.1    <u>Additional Rent</u>:  Any monies which Tenant is required to pay to Landlord under the terms and conditions of this Lease, other than Fixed Rent.

1.1.2    <u>Affiliate</u>:  A corporation, partnership, person or other entity which is controlling, controlled by, or under common control with, Landlord or Tenant, as the case may be.  As used herein, "**control**" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person or entity, whether through the ownership of voting securities or rights, by contract, or otherwise.

1.1.3    <u>Alternate Rent</u>:  An amount equal to three percent (3%) of Gross Sales. Alternate Rent shall be payable within thirty (30) days after the end of the calendar month to which it pertains, and shall be payable in lieu only of Fixed Rent and Percentage Rent normally payable under Article 4 below.

1.1.4    <u>Common Areas</u>:  All areas in the Shopping Center which are, from time to time, available for the joint use and benefit of Tenant and other tenants and occupants of the Shopping Center, and their respective employees, agents, subtenants, concessionaires, licensees, customers and other invitees, including, without limitation, the land and facilities utilized as parking areas, parking spaces, driveways, access and perimeter roads; truck serviceways, passageways, sidewalks, entrances, exits, lighting facilities, courts, landscaped areas, retention or detention areas, and common utility lines; directory equipment, underground storm and sanitary sewers, utility lines and the like installed at the cost of Landlord, wash rooms, comfort rooms, drinking fountains, toilets and other public facilities; and bus stations, taxi stands, and the like.

1.1.5    <u>Common Areas Charges</u>:  As defined in Section 5.1 hereof.

1.1.6    <u>COREA</u>:  That certain Construction, Operating and Reciprocal Easement Agreement by and between Morton L. Olshan and Akers Mill Associates, an Ohio limited partnership, dated February 11, 1976, filed for record February 19, 1976 and recorded in Deed Book 1666, Page 260, Cobb County, Georgia records; as amended by that certain First Amendment to Construction, Operating and Reciprocal Easement Agreement by and between Morton L. Olshan and Akers Mill Associates, an Ohio limited partnership, dated May 19, 1976, filed for record May 21, 1976 and recorded in Deed Book 1688, Page 436, aforesaid records; as further amended by that certain Second Amendment to Construction, Operating and Reciprocal Easement Agreement by and between Morton L. Olshan and Akers Mill Associates, an Ohio limited partnership, dated December 31, 1976, filed for record June 2, 1977 and recorded in Deed Book 1782, Page 837, aforesaid records; as amended by that certain Third Amendment to Construction, Operating and Reciprocal Easement Agreement by and between Morton L. Olshan and Akers Mill Associates, an Ohio limited partnership, dated May 3, 1979, filed for record June 1, 1979 and recorded in Deed Book 2017, Page 578, aforesaid records; as amended by that certain Third Amendment to Construction, Operating and Reciprocal Easement Agreement by and between Morton L. Olshan and Developers Diversified Associates No. 1, Ltd., an Ohio limited partnership, dated May 3, 1979, filed for record November 18, 1983 and recorded in Deed Book 2944, Page 161, aforesaid records; as amended by that certain Fourth Amendment to Construction, Operating and Reciprocal Easement Agreement by and between Morton L. Olshan and Hamilton Plaza Associates, a Tennessee limited partnership, dated March 25, 1985, filed for record May 14, 1985 and recorded in Deed Book 3499, Page 270, aforesaid records; as amended by that certain Fifth Amendment to Construction, Operating

and Reciprocal Easement by Morton L. Olshan and Hamilton Plaza Associates, a Tennessee limited partnership, dated October 1, 1986, filed for record October 1, 1986 and recorded in Deed Book 4140, Page 54, aforesaid records; as amended by that certain Fifth Amendment to Construction, Operating and Reciprocal Easement Agreement by and between Morton L. Olshan and Hamilton Plaza Associates, a Tennessee limited partnership, dated October 1, 1986, filed for record October 1, 1986 and recorded in Deed Book 4140, Page 59, aforesaid records; as amended by that certain Sixth Amendment to Construction, Operating and Reciprocal Easement Agreement by and between Morton L. Olshan and Hamilton Plaza Associates, a Tennessee limited partnership, dated November 17, 1987, filed for record January 28, 1988 and recorded in. Deed Book 4795, Page 93, aforesaid records; as amended by that certain Seventh Amendment to Construction, Operating and Reciprocal Easement Agreement by and between Morton L. Olshan and Hamilton Plaza Associates, a Tennessee limited partnership, dated August 17, 1992, filed for record August 18, 1992 and recorded in Deed Book 6798, Page 396, aforesaid records; as amended by that certain Eighth Amendment to Construction, Operating and Reciprocal Easement Agreement by and between Morton L. Olshan and The Sports Authority, Inc., a Delaware corporation, successor in interest to Hamilton Plaza Associates, dated October 27, 1992, filed for record October 30, 1992 and recorded in Deed Book 6948, Page 380, aforesaid records.

　　　1.1.7   Delivery Date:  As defined in Section 2.3 hereof.

　　　1.1.8   Effective Date:  The date hereof.

　　　1.1.9   Event of Default:  As defined in Section 16.1 hereof.

　　　1.1.10  Excused Periods:  Periods during which Tenant's failure to conduct the operations of its business or any other business:  (x) resulted from alterations or renovations being performed in and to the Premises for a period not to exceed ninety (90) days, (y) was caused by damage or destruction, eminent domain proceedings or actions, or Force Majeure, or (z) was caused by any act or omission of Landlord, or its employees, agents, or contractors.

　　　1.1.11  Exhibits.  The exhibits listed in the Table of Contents annexed to this Lease have been agreed to by the parties and attached hereto, it being the intention of the parties that they shall become a binding part of this Lease as if fully set forth herein.

　　　1.1.12  Fixed Rent:  The following amounts for the periods indicated (subject to adjustment pursuant to Section 3.4 hereof):

　　　　　(a)  For the period commencing on the Rent Commencement Date and ending on the last day of the Initial Term (defined in Subsection 1.1.47) at the rate of Three Hundred Seven Thousand Four Hundred Dollars ($307,400) per year (based on Ten and 60/100 Dollars ($10.60) per square foot of Floor Area in the Premises);

　　　　　(b)  In the event Tenant exercises the first Renewal Option, for the first five (5) year Renewal Period, at the rate of Three Hundred Forty-Eight Thousand Dollars ($348,000) per year (based on Twelve Dollars ($12.00) per square foot of Floor Area in the Premises);

　　　　　(c)  In the event Tenant exercises the second Renewal Option, for the second five (5) year Renewal Period, at the rate of Four Hundred Six Thousand Dollars ($406,000) per year (based on Fourteen Dollars ($14.00) per square foot of Floor Area in the Premises); and

　　　　　(d)  In the event Tenant exercises the third Renewal Option, for the third five (5) year Renewal Period, at the rate of Four Hundred Sixty-Four Thousand Dollars ($464,000) per year (based on Sixteen Dollars ($16.00) per square foot of Floor Area in the Premises).

　　　1.1.13  Floor Area:  The actual number of square feet of space contained on all floors within any building area in the Shopping Center (including the Premises) and, with respect to exterior areas, including all exterior areas leased to or exclusively used by one or more tenants (other than exterior loading dock areas, trash compactor areas, and trash container areas).  All measurements pursuant to this Subsection shall be from the exterior of outside walls or store front and/or to the centerline of any common walls, but in no event shall Floor Area within the Premises or the remainder of the Shopping Center include any non-selling or storage space areas within any mezzanine, lower floor, second floor or, except as set forth above, any exterior areas.  In addition, exterior areas exclusively used by Toys R Us, Circuit City or Sports Authority, respectively, as shown on Exhibit B hereto, shall not be included in Floor Area.

1.1.14 <u>Force Majeure</u>:  As defined in Section 23.4 hereof.

1.1.15 <u>Ground Lessor</u>:  The landlord under any existing or future ground or underlying leases encumbering or affecting all or any part of the Shopping Center.

1.1.16 <u>Intentionally Omitted</u>.

1.1.17 <u>Hazardous Substances</u>:  As defined in Subsection 12.4.1 hereof.

1.1.18 <u>Intentionally Omitted</u>:

1.1.19 <u>Landlord</u>:  As defined in the preamble and Section 23.11 hereof.

1.1.20 <u>Landlord's Mailing Address</u>:  c/o Mall Properties, 654 Madison Avenue, New York, New York 10021, or such other place and/or to the attention of such other person as Landlord may notify Tenant from time to time by notice given in accordance with the provisions of Article 18 hereof.

1.1.21 <u>Landlord's Work</u>:  As defined in Section 3.1 hereto.

1.1.22 <u>Lease Interest Rate</u>:  The then effective prime rate as published from time to time in the "Money Rates" section of *The Wall Street Journal* (or any successor publication thereto) plus two percent (2%).

1.1.23 <u>Legal Requirements</u>:  All laws, statutes, codes, acts, ordinances, judgments, decrees, authorizations, directions and requirements of, and agreements with, all governmental departments, commissions, boards, courts, authorities, agencies, officials and officers, and agents of the foregoing, which now or at any time hereafter may be applicable to the Premises, the Shopping Center, or any part(s) thereof.

1.1.24 <u>Mortgagee</u>:  Any state or federally regulated: bank, savings and loan association, insurance company, pension fund, credit union, real estate investment trust, or other institutional lender, which is not an Affiliate of Landlord, and which holds a mortgage on the Shopping Center or is the beneficiary under a deed of trust encumbering the Shopping Center.

1.1.25 <u>Percentage Multiple</u>:  Three percent (3%).

1.1.26 <u>Percentage Rent</u>:  As defined in Section 4.4 hereof.

1.1.27 <u>Intentionally Omitted</u>.

1.1.28 <u>Permitted Use</u>:  The sale at retail of a variety of linens and domestics (including, but not limited to, sheets, bedspreads, comforters, duvets, pillows, pillow covers, chair pads, placemats, tablecloths, dish towels, oven mittens and aprons); bathroom items (including, but not limited to, towels, shower curtains, bathroom rugs, toilet seats, health and beauty aids, personal care products and other bathroom accessories); personal care products (including, but not limited to electric razors, shavers, toothbrushes and hair dryers); housewares (including, but not limited to, kitchen utensils, kitchen appliances and kitchen "gadgets," cleaning appliances and supplies, cookware, bakeware, dishes and china, glassware, garbage pails, ironing boards and other laundry items, mops and brooms, candles and candle holders, ready-to-assemble furniture and artificial flowers); frames and wall art; window treatments; closet, shelving and storage items; home furnishings; area rugs; wall and floor coverings; furniture (including, without limitation, mattresses, box springs, bed frames, and bedroom furniture); decorative accessories; photo albums; photo storage boxes; luggage; books; party supplies; cards and stationery; seasonal items; juvenile merchandise including, but not limited to, toys, car seats and safety proofing items; specialty food items; food and non-alcoholic beverage services; any and all other items sold or services provided from time to time in any store owned or operated by Tenant or its Affiliate(s) (the aforementioned items are hereinafter collectively referred to as the "***Permitted Items***"); and for any other lawful retail use not specifically prohibited by the provisions of Subsection 13.1.1 below.  In addition, Tenant shall be permitted to use portions of the Premises for storage and office uses incidental to the Permitted Use.

1.1.29 <u>Intentionally Omitted</u>.

1.1.30 <u>Intentionally Omitted</u>

1.1.31  Outparcel or Outparcels:  The outparcels designated as Outparcel I, Outparcel II, Outparcel III, Outparcel IV, Outparcel V, Outparcel VI, and Outparcel VII on Exhibit B hereto.

1.1.32  Premises:  Being the area cross-hatched on Exhibit B hereto, having dimensions as shown on Exhibit B, and containing approximately: (i) Twenty-Nine Thousand (29,000) square feet of Floor Area and (ii) one thousand (1,000) square feet of mezzanine level space for office purposes.  In no event shall such non-selling office space (or any space used for fire pump facilities) result in any charge to Tenant by way of Fixed Rent or any Additional Rent, nor shall such space be included in the determination of Tenant's Pro Rata Share.

1.1.33  Renewal Option:  As defined in Subsection 2.2.2 hereof.

1.1.34  Renewal Period(s):  Three (3) successive periods of five (5) years each, as provided in Subsection 2.2.2 hereof.

1.1.35  Rent:  Fixed Rent, Percentage Rent and/or Additional Rent.

1.1.36  Rent Commencement Date:  As defined in Section 2.2 hereof.

1.1.37  Sales Break Point:  As defined in Subsection 4.4.1 hereof.

1.1.38  Shopping Center:  The shopping center common known as Akers Mill Square containing approximately Three Hundred Forty-Seven Thousand (347,000) square feet of Floor Area, on the property located at the southeast corner of Cobb Parkway (U.S. Highway 41) and Akers Mill Road, in Cobb County, Georgia, and more particularly described on Exhibit A hereto.  Landlord shall not change the name of the Shopping Center without giving at least ninety (90) days prior notice to Tenant, and Landlord shall not include the name of any tenant in the name of the Shopping Center unless any such tenant is an Existing Tenant (as hereinafter defined) and has such right in its respective Existing Lease to force such a change.

1.1.39  Substantially Completed or Substantial Completion:  The completion of specified work at the Shopping Center and upon the Premises (including, without limitation, as applicable,  Landlord's Work) to the extent that only minor items of a cosmetic nature which, when considered as a whole, do not adversely affect either the performance of Tenant's Work or Tenant's ability to conduct its normal business operations in the Premises shall not be completed.

1.1.40  Taxes:  As defined in Subsection 4.3.3 hereof.

1.1.41  Tenant:  As defined in the preamble hereof.

1.1.42  Tenant's Mailing Address:  650 Liberty Avenue, Union, New Jersey 07083, Attn: Mr. Warren Eisenberg, or such other place and/or to the attention of such other person as Tenant may notify Landlord from time to time by notice given in accordance with the provisions of Article 18 hereof.

1.1.43  Tenant's Permits:  As defined in Subsection 2.6.1 hereof.

1.1.44  Tenant's Property:  All of Tenant's personal property, including, without limitation, phone and alarm systems, satellite antennae, shelving, computers, furniture, cash registers and customer service counters, specialty lighting, track lighting, millwork, conveyor systems, storage racks and signage and any and all other personal property of Tenant which is capable of being removed from the Premises without material damage thereto, but which shall not include electrical systems, heating, ventilation and air conditioning systems, and other mechanical systems, flooring, carpet, elevators, standard lighting and wiring installed within the walls of the Premises.

1.1.45  Tenant's Pro Rata Share:  A fraction whose numerator is the Floor Area of the Premises and whose denominator is the Floor Area of the Shopping Center as may be re-determined any time a building (and/or Floor Area) is added to or removed from the Shopping Center, but in no event shall Tenant's Pro Rata Share be greater than ten percent (10%).  Floor Area shall be deemed added to or removed from the Shopping Center on the earlier of (i) the date upon which such Floor Area is Substantially Completed, or (ii) at such time as an assessment for Taxes is made or removed, as the case may be, with respect to such Floor Area.  Within thirty (30) days following written request from Tenant, Landlord shall certify to Tenant in writing as to the then Floor Area of the Shopping Center.

1.1.46  Tenant's Work:  As defined in Section 3.1 hereof.

1.1.47  Term:  A period (the "*Initial Term*") of approximately ten (10) years beginning on the Rent Commencement Date and ending at midnight on the last day of January following the tenth (10th) anniversary of the Rent Commencement Date, unless the Rent Commencement Date is February 1, in which event the Expiration Date shall be the day before the tenth (10th) anniversary of the Rent Commencement Date.  As used herein, "*Term*" shall refer to the Initial Term, as the same may be extended by any Renewal Period exercised pursuant to Subsection 2.2.2 below; and (ii) the "*Expiration Date*" shall mean the date on which the Term expires.

## ARTICLE 2
## LEASE OF PREMISES; LEASE TERM; DELIVERY DATE

Section 2.1    Lease of Premises.  Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the Premises together with any and all rights, benefits, privileges and easements, now or hereafter appurtenant to either or both of the Premises and the Shopping Center, arising out of any public or private grant or authority, including, without limitation, the non-exclusive right and easement to use the Common Areas in common with other tenants and occupants of the Shopping Center and all others entitled thereto.

Section 2.2    Term.

2.2.1    Initial Term.  Subject to the provisions of this Article 2, the Term of this Lease shall begin on the one hundred eightieth (180th) day following the later of: (such later date being referred to herein as the "*Rent Commencement Date*"):  (a) the Delivery Date, or (b) the "Permit Contingency Date" (hereinafter defined in Subsection 2.6.1).  The Term shall expire on the Expiration Date, unless earlier terminated as herein provided.  When the Rent Commencement Date has been determined, as provided in this Section, Landlord and Tenant shall execute, acknowledge and deliver, each to the other, a written statement in the form attached hereto as Exhibit C specifying the Rent Commencement Date.

2.2.2    Renewal Options.  Tenant shall have the right and option (hereinafter a "*Renewal Option*") to extend the Initial Term from the date on which it would otherwise expire for three (3) successive renewal periods of five (5) years each (individually, a "*Renewal Period*", and collectively, the "*Renewal Periods*") upon the same terms and conditions as are herein set forth, including the Fixed Rent set forth in Section 1.1.12 above.  Provided that a monetary Event of Default or Event of Default by Tenant arising under Section 13.1 has not occurred and is continuing, each Renewal Option shall be exercisable by notice given to Landlord at least two hundred seventy (270) days prior to the commencement of the applicable Renewal Period(s).

Section 2.3    Delivery Date.

2.3.1    Definition.  Subject to Landlord's delivery to Tenant of the Delivery Date Notice in accordance with the provisions of Subsection 2.3.2 below and Landlord's timely compliance therewith, Landlord shall be deemed to have delivered possession of the Premises to Tenant at 8:00 a.m. on the date (the "*Delivery Date*") following the day on which all of the following conditions (the "*Delivery Date Conditions*") shall have occurred and Tenant shall have received from Landlord the Delivery Date Certification in accordance with the provisions of Subsection 2.3.3 below, which shall constitute Landlord's written certification that all of the following shall have occurred:

(a)    Actual possession of the Premises shall have been delivered to Tenant broom-clean and free of furniture, fixtures and equipment, free of Hazardous Substances (including, without limitation, removal of all asbestos and asbestos containing material in accordance with all Legal Requirements and in accordance with Exhibit D attached hereto, but specifically excluding the asbestos which may be contained in the roof as described in that certain Report of Bulk Sample Analysis For Asbestos prepared by PSI dated November 2, 2004 previously delivered to Tenant (the "*Asbestos Report*")), free of all violations of any and all Legal Requirements, and in a good, structurally sound condition with all of Landlord's Work Substantially Completed, which Substantial Completion shall be evidenced by a written certification by Landlord's architect to Tenant;

(b)    As of the Delivery Date, there shall be no restrictions or other legal impediments imposed by any Legal Requirements or public or private instrument (not caused solely by Tenant) which would prevent:  (i) the use of the Premises for the Permitted Use; (ii) the use of the parking facilities, access roads, and other Common Areas in the manner

contemplated by this Lease; (iii) the lawful installation of the signage permitted pursuant to Article 7 below; or (iv) the performance of Tenant's Work;

(c)    The representations and warranties of Landlord set forth in subparagraphs (a) through (i) of Section 12.3 below shall then be true and in effect;

(d)    The Co-Tenancy Condition described in Section 2.5 below shall have been satisfied;

(e)    Landlord shall have delivered to Tenant, in recordable form:  (i) a subordination, non-disturbance and attornment agreement substantially in the form attached hereto as <u>Exhibit G</u> executed by each holder of any mortgage or deed of trust encumbering or affecting the Shopping Center or any portion thereof (it being understood and agreed that this Subsection 2.3.1(f) is not intended to extend the date by which Landlord is to deliver to Tenant any document(s) required pursuant to Section 17.3 hereof), and (ii) a fee owner recognition agreement in the form and content described in clause (b) of Section 17.1 hereof executed by any existing Ground Lessor.

2.3.2    <u>Delivery Date</u>.

(a)    Landlord shall give Tenant at least ten (10) days' prior notice of the Delivery Date (the "***Delivery Date Notice***"), using the form of Delivery Date Notice attached hereto as <u>Exhibit I</u>.  Landlord's delivery of the Delivery Date Notice shall be a condition precedent to the Rent Commencement Date.  Notwithstanding any provision of this Lease to the contrary, in no event shall the Delivery Date be deemed to occur prior to the Delivery Date established in the Delivery Date Notice.  No event of Force Majeure occurring prior to the giving of the Delivery Date Notice shall serve to delay the Delivery Date thereby established.

(b)    Landlord acknowledges that if it shall fail to satisfy all of the Delivery Date Conditions by the Delivery Date, subject to (i) Force Majeure (not to exceed thirty (30) days in the aggregate) and (ii) Tenant Delay, Tenant will sustain substantial, additional costs and expenses, including, without limitation, costs incurred in connection with contractors and subcontractors hired to perform Tenant's Work, storage costs for fixtures, equipment, inventory, and employee costs during waiting period, and additional advertising and promotional costs, the exact amount of which would be impracticable or extremely difficult to ascertain.  If the Delivery Date does not occur by the date established therefor in the Delivery Date Notice (excluding delays caused by Force Majeure and Tenant Delay as noted above), then, in addition to any other remedies available to Tenant under this Lease, Landlord agrees to allow to Tenant a credit against the initial installment(s) of Rent hereunder equal to, as liquidated reimbursement to Tenant (and not as a penalty) for all of the aforesaid costs incurred by Tenant, the sum of Five Thousand Dollars ($5,000) for each day that the Delivery Date established in the Delivery Date Notice is delayed.  The foregoing liquidated reimbursements represent the parties' good faith agreement as to an agreed upon amount which shall have been incurred by Tenant and which shall otherwise not be susceptible of exact ascertainment.  For purposes of this Lease, the term "***Tenant Delay***" shall mean those acts or omissions of Tenant or its agents, employees, or contractors which materially and adversely interfere with Landlord's capacity to satisfy the Delivery Date Conditions and which are not within the scope of customary and usual delays in the construction process.  Within ten (10) days after the occurrence of a Tenant Delay, Landlord shall notify Tenant, in reasonable detail, of the nature and existence of such Tenant Delay and the estimated delay in Landlord's satisfaction of the Delivery Date Conditions as a result of the Tenant Delay.  Landlord's failure to so notify Tenant of such Tenant Delay within the ten (10) day period shall be deemed a waiver of such Tenant Delay.

2.3.3    <u>Delivery Date Certification</u>.  Upon the satisfaction of all of the Delivery Date Conditions, Landlord shall so certify to Tenant, using the form of Delivery Date Certification attached hereto as <u>Exhibit J</u>.

2.3.4    <u>No Waiver</u>.  Neither Tenant's acceptance of physical possession of the Premises nor Tenant's opening of the Premises for business to the public prior to the Delivery Date shall: (i) be deemed a waiver by Tenant of any of the Delivery Date Conditions, or (ii) relieve Landlord of any obligation under this Lease, unless such condition or obligation is expressly waived in writing by Tenant.

Section 2.4    <u>Unseasonable Delivery; Slack Period</u>.  If, for any reason (including, without limitation, Force Majeure), the Rent Commencement Date occurs during the period commencing on October 15 and ending on March 1, next following, then Tenant shall have, in addition to any other remedies, the right to pay, in addition to Tenant's Pro Rata Share of Taxes, Tenant's Pro Rata Share of Insurance, and Tenant's Pro Rata Share of Common Areas

Charges, Alternate Rent in lieu of Fixed Rent for the period commencing on the Rent Commencement Date and ending on the March 31 next following; any benefit which Tenant may realize thereby shall constitute a reimbursement to Tenant for certain pre-opening expenses incurred by Tenant in connection with this Lease.  Notwithstanding the foregoing, if the Rent Commencement Date occurs during the Slack Period solely due to a Tenant Delay, of which Landlord had previously given Tenant notice within five (5) business days of the occurrence of such Tenant Delay, then Tenant shall not have the option to pay Alternate Rent, but shall be required to pay full Fixed Rent, Percentage Rent and all Additional Rent as of the Rent Commencement Date.

Section 2.5     Initial Co-Tenancy Condition.

2.5.1    As used herein, the "*Initial Co-Tenancy Condition"* shall mean that not less than sixty percent (60%) of the Floor Area of the Shopping Center (excluding the Premises and, if before the Delivery Date, Toys R Us ceases to be open for business as a typical Toys R Us, then excluding the square footage of the Floor Area occupied by Toys R Us) is leased to retail tenants who shall have accepted possession of their entire premises, such premises shall have been substantially completed, and each such tenant shall, if not already open for business, then be actively and continuously engaged in the fixturing and merchandising therein.

2.5.2    If, on the Delivery Date, the Initial Co-Tenancy Condition has not been satisfied, Tenant shall have the right, at its sole option, to:

(a)    accept delivery of physical possession of the Premises; or

(b)    defer its acceptance of delivery of physical possession of the Premises to a later date (but not later than the date on which the Initial Co-Tenancy Condition is satisfied and Tenant receives notice from Landlord thereof), whereupon the Delivery Date shall be deemed to have occurred on the date that the Initial Co-Tenancy Condition is met (subject to the other provisions of this Article 2 and the continuing satisfaction of the Delivery Date Conditions); and

in either event, if the Rent Commencement Date occurs before the satisfaction of the Initial Co-Tenancy Condition, Tenant shall be entitled to pay , in addition to Tenant's Pro Rata Share of Taxes, Tenant's Pro Rata Share of Insurance, and Tenant's Pro Rata Share of Common Areas Charges, Alternate Rent in lieu of Fixed Rent until the Initial Co-Tenancy Condition is satisfied and the Landlord gives Tenant notice thereof, subject to any other applicable provisions of this Article 2.

2.5.3    In addition to the provisions of Subsection 2.5.2 above, if the Initial Co-Tenancy Condition has not been satisfied by the first (1st) anniversary of the Delivery Date established pursuant to Subsection 2.3.2(a) above, then Tenant shall have the right, at any time prior to the satisfaction of the Initial Co-Tenancy Condition, upon giving Landlord at least one hundred twenty (120) days' prior notice, to terminate this Lease as of the date specified in said notice.  Landlord may negate such termination by causing the Initial Co-Tenancy Condition to be satisfied within thirty (30) days after the date on which said termination notice is given.  If this Lease is terminated hereunder, neither party shall have any further liability under this Lease, except:  (i) for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease, and (ii) Landlord shall promptly reimburse Tenant for all of its reasonable third-party costs and expenses incurred in connection with this Lease, including, without limitation, costs associated with the preparation and review of plans and specifications, attorney's fees, and the performance of Tenant's Work, not to exceed Seventy-Five Thousand Dollars ($75,000) in the aggregate for all such costs.

Section 2.6     Permits Contingency.

2.6.1    Tenant shall use commercially reasonable and diligent efforts to submit its applications to obtain all permits and approvals required from all applicable governmental authorities to enable Tenant to perform the Tenant's Work (including, without limitation, certifications, approvals and/or permits from the relevant plumbing, fire, electrical and building departments) from the applicable government authority (collectively, *"Tenant's Permits"*) within ninety (90) days after the Effective Date, and Tenant shall use commercially reasonable and diligent efforts to obtain Tenant's Permits on or before the date that is ninety (90) days after the date that Tenant makes application for such permits.  Notwithstanding the provisions of this Article 2 to the contrary, if despite Tenant's diligent efforts, all Tenant's Permits have not been obtained on or before the date that is one hundred eighty (180) days after the Effective Date, Tenant shall have the right, upon notice given to Landlord prior to the unconditional grant of all of Tenant's Permits to:  (a) delay its acceptance of physical possession of the Premises to the

date on which all of the Tenant's Permits have been obtained, whereupon the Delivery Date shall be deemed to have occurred on such date (subject to the other provisions of this Article 2 and the continuing satisfaction of the Delivery Date Conditions); or (b) terminate this Lease. Tenant's exercise of its rights under (a) above shall not preclude the subsequent exercise of its rights under (b) above.  The date on which all Tenant's Permits are unconditionally granted is referred to herein as the "*Permit Contingency Date*".  Tenant agrees to use diligent efforts to make application for the Tenant Permits within thirty (30) days after the Effective Date.  Tenant shall promptly notify Landlord when Tenant obtains the Tenant's Permits.

      2.6.2    If all of Tenant's Permits have not been obtained by April 1, 2006, for any reason other than Landlord's failure to perform or observe any of its obligations under this Lease, then Landlord shall have the option, upon notice given to Tenant prior to the unconditional grant of all Tenant's Permits, to terminate this Lease.

      2.6.3    In the event Tenant or Landlord elects to terminate this Lease pursuant to this Section 2.6, this Lease shall cease and be deemed canceled and terminated as of the date set forth in Tenant's or Landlord's notice of such termination and upon such termination, Tenant and Landlord shall be relieved of any and all further liability hereunder, except for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease.

**ARTICLE 3**
**IMPROVEMENTS**

      Section 3.1    <u>Landlord's Work and Tenant's Work</u>.  Landlord shall, at its sole cost and expense, perform the work and obligations described on <u>Exhibit D</u> (collectively, "*Landlord's Work*"), and shall deliver possession of the Premises to Tenant in the condition described therein.  Except for Landlord's Work, Tenant shall, at its own cost and expense, do any and all work (hereinafter referred to as *"Tenant's Work"*) in a diligent manner and subject to compliance with Legal Requirements and the terms of this Lease, which Tenant desires to adapt the Premises to Tenant's use.

      Section 3.2    <u>Plan Approvals</u>.

      3.2.1    <u>Intentionally Omitted</u>.

      3.2.2    <u>Preparation of Final Plans and Specifications</u>.  Tenant has prepared and submitted to Landlord, and Landlord has received, in a single submission, Tenant's plans and specifications for Tenant's Work (the "*Final Plans and Specifications*").  Landlord shall have until September 16, 2005 to approve or disapprove Tenant's Work depicted thereon, which plans and work shall be approved so long as they: (i) comply with all Legal Requirements, (ii) do not, other than in a de minimus manner, impact the structural soundness of the building containing the Premises, and (iii) comply with <u>Exhibit D-1</u> attached hereto.  If Landlord shall fail to approve or disapprove the Final Plans and Specifications with reasonable specificity within said 15-day period, the Final Plans and Specifications shall be deemed approved.

      Section 3.3    <u>Performance of Work.</u>

      3.3.1    Both Landlord's Work and Tenant's Work shall be performed in a good and workmanlike manner, in compliance with all applicable Legal Requirements, utilizing all new, first-class materials and subject to compliance with the terms of this Lease.  Landlord shall take no action that would prevent Tenant from obtaining Tenant's Permits.  If, after the Delivery Date, Tenant's Permits cannot be obtained because Landlord's Work has not been completed or has been performed improperly, or because of the acts or omissions by Landlord, or by reason of any then existing condition of the Shopping Center not caused by Tenant, Landlord shall remedy the situation so as to enable Tenant to obtain Tenant's Permits, and the Rent Commencement Date shall be deemed delayed, for Tenant's benefit only, on a day-for-day basis for each day of actual delay in Tenant's completion of Tenant's Work occasioned thereby.

      3.3.2    If the Delivery Date has not occurred by the later to occur of (i) March 1, 2006 or (ii) one hundred eighty (180) days following the Effective Date (which Delivery Date is subject to Tenant Delay, but is not subject to extension as a result of Force Majeure), then Tenant may thereafter, during such time the Delivery Date has not occurred, consider Landlord to be in default hereunder and, at Tenant's option in its sole discretion, elect to:

            (i)    terminate this Lease, if Landlord shall fail to fully cure such default within thirty (30) days after receiving Tenant's notice thereof, in

which event neither party shall have any further liability hereunder except for those obligations which survive the expiration or other termination of this Lease, except that Landlord shall be obligated to promptly reimburse Tenant, as Tenant's sole monetary remedy by reason thereof, for all its reasonable third-party costs and expenses incurred in connection with this Lease (including, without limitation, costs associated with the preparation and review of plans and specifications, and the performance of Tenant's Work), not to exceed Seventy-five Thousand Dollars ($75,000) and/or

(ii)    avail itself of the remedies set forth in Section 16.2 below (provided, however, that the cure period set forth therein shall not be applicable); and/or

(iii)    extend one or more times the March 1st date set forth above to such future date designated by Tenant in notice given to Landlord.

The election by Tenant of any one or more of the foregoing remedies shall not preclude the subsequent election of any alternative remedy provided in this Section, this Lease, at law, or in equity.  The remedies provided herein shall be in addition to the liquidated reimbursement to which Tenant shall be entitled under Subsection 2.3.2(b) above.

3.3.3    Intentionally omitted.

3.3.4    Tenant's Right of Entry.  Prior to the Delivery Date, Tenant may enter upon the Premises for the purposes of inspecting the work, taking measurements, making plans, erecting temporary or permanent signs and doing such other work as may be appropriate or desirable without being deemed thereby to have taken possession or obligated itself to pay Rent (except that Tenant shall be responsible to pay for any of its usage of temporary utilities); provided, however, that Tenant shall not, during the course of such work, materially interfere with the performance of Landlord's Work and shall indemnify and hold Landlord harmless from and against any and all claims or losses arising from Tenant's entry upon the Premises, except to the extent caused by Landlord, its agents, employees, or contractors.

3.3.5    Tenant's Leasehold Improvements.  Tenant's Work and all other improvements erected by Tenant with respect to the Premises, together with any replacements thereof, shall be and remain the property of Tenant throughout the Term, and Tenant alone shall be entitled to the benefits of ownership thereof, including, but not limited to, depreciation of same as an asset for tax purposes (except for the portion thereof that constitutes Landlord's Special Improvements pursuant to Subsection 3.3.8(c) below).

3.3.6    Work Requirements After Delivery Date.  Following the Delivery Date, any construction by Landlord or other tenants or occupants of the Shopping Center affecting any portion of Tenant's "Critical Area" (as defined in subsection 5.2.2 below) of the Shopping Center shall be subject to the following terms and conditions:

(a)    no staging and storage of materials and parking of construction vehicles shall occur within the Critical Area; and

(b)    Landlord shall use commercially reasonable efforts to ensure that from and after Tenant's opening for business to the public, no ingress, egress or passage of any construction, delivery and related vehicles engaged in the performance of such work or other construction activities shall take place except through the entrance/exit drive designated as the "Construction Drive" on Exhibit B hereto; and

(c)    Landlord shall maintain the Shopping Center in a clean, safe, and sightly condition, and shall use reasonable efforts to ensure that any construction by Landlord shall not otherwise adversely and materially interfere with the normal conduct of any business operations of Tenant in the Premises.

3.3.7    Tenant's Trailer.  Tenant shall have the right, subject to applicable Legal Requirements, to place a trailer on the Common Areas in an area immediately adjacent to the Premises, in the location shown on Exhibit B hereto, for the purpose of conducting employee interviews and recruiting, which trailer shall be removed at least ten (10) days prior to the Rent Commencement Date.  In the event that Landlord has vacant space available in Building B as such building is designated on Exhibit B, then Landlord agrees to make such space available to Tenant thirty (30) days prior to Tenant's proposed opening date.  Tenant shall reimburse Landlord for all utilities consumed by Tenant in said space, but shall otherwise use said space free of charge.  Tenant shall vacate such space upon the earlier to occur of:  (a) Tenant's

opening its store for business to the public, or (b) ten (10) days after Tenant receives written notice from Landlord advising Tenant of Landlord's need to use the space.  Tenant shall carry the insurance required under this Lease before occupying such space and shall return such space in a broom clean condition.

        3.3.8   Tenant Allowance.

        (a)   Landlord shall pay Tenant the sum equal to the product of Sixty Eight Dollars ($68.00) multiplied by the total Floor Area of the Premises as determined pursuant to Section 1.1.13 (and excluding the square footage of the non-selling office mezzanine) (the "*Tenant Allowance*"), to reimburse Tenant for certain out-of-pocket costs (hard costs and soft costs) incurred by Tenant in connection with Tenant's Work.  Landlord and Tenant hereby acknowledge and agree that the Tenant Allowance shall be in addition to Tenant's Work.  Upon (i) Substantial Completion of Tenant's Work by Tenant, (ii) Tenant's obtaining a certificate of occupancy (or local equivalent) (conditional or final) for the Premises, (provided, however, if such certificate of occupancy is not available for any reason other than Tenant's failure to perform Tenant's Work in compliance with all Legal Requirements, then such certificate shall not be a TIA Requirement) and (iii) Tenant's delivery to Landlord of (A) final unconditional lien waivers from Tenant's General Contractor and all major subcontractors, or (B) Tenant's indemnification in the form of Exhibit N attached hereto (such items (i) through (iii) above being collectively referred to herein as "*TIA Requirements*"), Landlord shall pay the Tenant Allowance to Tenant within twenty (20) days after satisfaction of the TIA Requirements.

        (b)   In the event Tenant replaces the roof of the Premises as part of Tenant's Work, then, Tenant shall remove all of the asbestos in the roof of the Premises.  All of the costs to remove the roof and asbestos (including, without limitation, the certification of such asbestos removal and disposal) shall be paid by Landlord.  Such removal and/or remediation shall be performed by Tenant in accordance with all Legal Requirements, and in addition to the Tenant Allowance, Landlord, within twenty (20) days after Landlord's receipt of an invoice therefor from Tenant accompanied by either (i) a final unconditional lien waiver from the roofing contractor or (ii) Tenant's indemnification in the form of Exhibit N attached hereto, shall reimburse Tenant for the actual out-of-pocket, third party costs incurred by Tenant in connection with such work (the "Roof Allowance").  Tenant shall solicit at least three (3) bids from contractors to perform the removal and remediation work and deliver such bids to Landlord. Landlord and Tenant shall have five (5) business days to consult with one another to decide which bid to accept.  If Landlord and Tenant cannot agree, then Tenant, in good faith and in the exercise of reasonable business judgment, shall have the right to select the bid, and shall deliver notice thereof to Landlord stating in reasonable detail Tenant's reason for such selection. The bid so selected by Tenant shall be deemed accepted by Landlord.  Except for increased costs and expenses caused by Landlord, the Roof Allowance shall not exceed the amount of the bid for such work accepted (or deemed accepted) by Tenant and Landlord.  If, within five (5) business days of its receipt, Landlord fails to approve or disapprove any bid submitted by Tenant to Landlord for Landlord's approval, then Tenant shall have the right to accept such bid and such bid shall be deemed accepted by Landlord.

        (c)   If Landlord fails to provide Tenant with the Tenant Allowance or applicable portion thereof or the Roof Allowance within twenty (20) days of Landlord's receipt of the applicable documentation or occurrence of all of the events set forth above, then in addition to the rights and remedies under Section 16.2 of this Lease, Tenant shall have the right to offset against one hundred percent (100%) of the Fixed Rent payable by Tenant hereunder, together with interest thereon at the Lease Interest Rate (as defined in subsection 1.1.22 above).  The Tenant Allowance and the Roof Allowance are an offset (and not an inducement) for Tenant's construction, on behalf of Landlord, of a portion of Tenant's Work (the "*Landlord's Special Improvements*") (which Landlord's Special Improvements, together with any replacements thereof, when completed shall be the property of Landlord, subject to use by Tenant of same during the Term of, and in accordance with, this Lease).  Landlord alone shall be entitled to depreciate the Landlord's Special Improvements as an asset for tax purposes, and Tenant shall not recognize income with respect to the Tenant Allowance or the Roof Allowance.  Tenant shall be responsible for and herewith agrees to pay all costs of Tenant's Work in excess of the Tenant's Allowance, and Tenant's Work (except for Landlord's Special Improvements), together with any replacements thereof, shall be and remain the property of Tenant throughout the Term, and Tenant alone shall be entitled to the benefits of ownership thereof, including, without limitation, depreciation of same as an asset for tax purposes.

        *(d)   The obligation of Landlord to pay Tenant the Tenant Allowance and Roof Allowance shall survive the expiration or earlier termination of this Lease so long as such work has been performed by Tenant prior to such expiration or termination.*

## ARTICLE 4
### FIXED RENT, TAXES & PERCENTAGE RENT; DETERMINATION AND PAYMENT

Section 4.1    <u>Fixed Rent</u>.  Commencing on the Rent Commencement Date and continuing throughout the Term, Tenant shall pay to Landlord the Fixed Rent, in equal successive monthly installments, in advance, on the first day of each and every calendar month throughout the Term, except that Fixed Rent payable for any partial calendar month during the Term shall be prorated based on a 365-day year.  Fixed Rent shall be paid without demand, deduction or set-off, except to the extent otherwise expressly provided herein.

Section 4.2    <u>Payment of Rent</u>.  All Rent shall be mailed or otherwise delivered to Landlord's Mailing Address above or, upon at least thirty (30) days' prior notice to Tenant, to such other address as Landlord may from time to time designate.  Landlord acknowledges and agrees that for administrative purposes, Tenant has designated BBBY Management Corporation, a New York corporation (the "***Paying Agent***"), to make all Rent payments due to Landlord under this Lease.  Said designation (which may be revoked by Tenant at any time) is not intended as, and shall not constitute, an assignment of any rights or obligations of Tenant to the Paying Agent, and Tenant shall remain primarily liable for payment of Rent under this Lease.  All payments of Rent received by Landlord from the Paying Agent shall be credited to Tenant as if such payments of Rent had been made by Tenant directly to Landlord.

Section 4.3    <u>Real Estate and Other Taxes.</u>

4.3.1    Landlord shall pay on or before the due dates thereof all "Taxes" (defined in Subsection 4.3.3 below) other than personal property taxes levied against tenants.  Throughout the Term, Landlord shall cause the Shopping Center to be maintained entirely within tax parcels and lots that exclude any property not a part of the Shopping Center.

4.3.2    (a)    Tenant shall pay to Landlord Tenant's Pro Rata Share of the Taxes which accrue during the Term, subject to the provisions of this Section 4.3.  Any Taxes for a real estate fiscal tax year, only a part of which is included within the Term, shall be adjusted between Landlord and Tenant on the basis of a 365-day year as of the Rent Commencement Date or the date on which the Term expires or earlier terminates, as the case may be, for the purpose of computing Tenant's Pro Rata Share of Taxes.  If, by law, any Taxes may, at the option of the taxpayer, be paid in installments (whether or not interest shall accrue on the unpaid balance thereof), Landlord shall exercise such option so as to maximize the number of installments, and Landlord shall pay the same as they come due and before any fine, penalty, interest or cost may be added thereto for nonpayment thereof.

(b)    Landlord shall submit to Tenant a copy of the bill for Taxes issued by the applicable taxing authority, a computation of Tenant's Pro Rata Share of such Taxes and proof of the payment of Taxes for the previous payment period, as well as copies of all notices concerning assessments, tax rates, and changes thereto.  Tenant shall pay Landlord in the amount required by this Subsection 4.3.2 within thirty (30) days after receipt of such bill (but in no event earlier than the fifteenth (15th) day prior to the date on which such Taxes would become delinquent).

(c)    In the event that Landlord's Mortgagee shall require Landlord to escrow monthly payments for Taxes, then, so long as such escrow shall be so required and all future tenants and occupants of the Shopping Center are similarly required to make monthly payments to Landlord with respect to Taxes, Tenant shall, in lieu of making payments pursuant to subparagraph (b) above, pay Landlord monthly with each installment of Fixed Rent an amount equal to one-twelfth (1/12) of Tenant's Pro Rata Share of Landlord's (or Landlord's Mortgagee's) good faith estimate of such Taxes for the then applicable fiscal tax year(s) only.  Such payments shall be held in trust to be applied towards payment of the Taxes when the same shall become due.  If Tenant's Pro Rata Share of Taxes are paid monthly as provided in this Subsection, then within thirty (30) days following the issuance by the taxing authority of the bill covering the applicable fiscal tax year, Landlord shall provide to Tenant a statement, in detail reasonably satisfactory to Tenant, of the Taxes and Tenant's Pro Rata Share thereof for such year (the ***"Tax Reconciliation Statement"***).  The Tax Reconciliation Statement shall be certified by Landlord as being accurate and shall be accompanied by (x) copies of the applicable tax bills, (y) a calculation of Tenant's Pro Rata Share of Taxes, and (z) payment to Tenant in the amount of any overpayment made by Tenant in respect of the applicable fiscal tax year.  If Tenant's Pro Rata Share of the actual Taxes for a fiscal tax year shall exceed the aggregate monthly installments paid by Tenant in respect of said fiscal tax year, Tenant shall pay to Landlord the deficiency within thirty (30) days after receipt of such notice.  If Landlord fails to timely remit to Tenant the amount of any overpayment, Tenant shall have the right (in addition to any rights and remedies to which it may be entitled under this Lease, at law, or in

equity) to offset such amount from payments of Fixed Rent next becoming due hereunder, together with interest thereon at the Lease Interest Rate from the date such remittance is due until reimbursement or full satisfaction by credit.

4.3.3    As used herein, "*Taxes*" shall mean all general, *ad valorem* real estate taxes, and assessments for betterments and improvements that are levied or assessed by any lawful authority on the Shopping Center (general or special), including any substitution therefor, in whole or in part, due to a future change in the method of taxation.  Taxes shall be reduced by any deferral, abatement, or other tax-lowering adjustment received by Landlord from the taxing authorities.  For purposes of computing Tenant's Pro Rata Share of Taxes, Taxes shall not include any: (1) income, excise, profits, estate, inheritance, succession, gift, transfer, franchise, capital, or other tax or assessment upon Landlord or upon the rentals payable under this Lease; (2) taxes on rents (other than to the extent that such taxes are customarily paid by retail tenants in the state in which the Shopping Center is located), gross receipts or revenues of Landlord from the Premises; (3) fine, penalty, cost or interest for any tax or assessment, or part thereof, which Landlord or its lender failed to timely pay (except if same are caused by an Event of Default); (4) assessment for a public improvement arising from the initial construction or expansion of the Shopping Center or the Premises, other than any assessment caused by Tenant's Work in the Premises (it being agreed that all assessments imposed during the Term which are permitted to be included within Taxes hereunder shall, for the purposes of computing Tenant's Pro Rata Share thereof, be deemed to have been paid in the maximum number of installments permitted by the applicable taxing authority); (5) Taxes resulting directly from an increase in the assessment caused by a sale or ground lease of all or any portion of the Shopping Center to an Affiliate of Landlord or more than once every five (5) years; or (6) fees imposed upon Landlord in connection with Landlord's development of the Shopping Center (including, without limitation, trip generation fees).  All Taxes payable by Tenant pursuant to this Section 4.3 shall be determined as if the Shopping Center was the only property owned by Landlord.  Landlord represents to Tenant that, as of the Effective Date and, to the best of Landlord's actual knowledge, as of the anticipated Delivery Date, no portion of the Shopping Center is or will be (i) subject to or the beneficiary of an abatement, exemption and/or phase-in of Taxes, (ii) subject to any special assessments or similar charges, or (iii) are included in any special improvement district(s) which would result in higher sales taxes or other similar impositions than would exist in the absence of such district(s).  Landlord estimates that the Tenant's Pro Rata Share of Taxes for the first full calendar year of the Term will be approximately One and 25/100 Dollars ($1.25) per square foot of Floor Area in the Premises.  Although Landlord has no knowledge of any change, Tenant acknowledges that it is aware that Taxes can increase through a change of assessment, a new rate, or new taxes in addition to or in lieu of the present Taxes.

4.3.4    At Tenant's request, Landlord shall contest the amount or validity of any assessed valuation or Taxes, failing which, Tenant shall have the right to contest the assessed valuation or Taxes by appropriate proceedings conducted in good faith, whereupon Landlord shall cooperate with Tenant, execute any and all documents required in connection therewith and, if required by any governmental authority having jurisdiction, join with Tenant in the prosecution thereof.  If, as a result of any contest or otherwise, any rebate or refund of Taxes is received, Tenant shall be entitled to Tenant's Pro Rata Share thereof (after reasonable and customary expenses incurred by Landlord and/or Tenant in connection with such contest are paid to the party which incurred such expense).

Section 4.4    Percentage Rent.

4.4.1    Payment.  For each full calendar year during the Term, Tenant shall pay annual percentage rent (*"Percentage Rent"*) equal to the Percentage Multiple of all "Gross Sales" (hereinafter defined in Subsection 4.4.2) resulting from business conducted in, on or from the Premises during such calendar year in excess of the following (each, a "*Sale Break Point*"):

| Time Period | Sales Break Point |
|---|---|
| Rent Commencement Date to the last day of the last month of the Initial Term. | $7,500,000 Sales Break Point per year. |
| During the First Renewal Period | $9,000,000 Sales Break Point per year. |
| During the Second Renewal Period | $10,000,000 Sales Break Point per year. |
| During the Third Renewal Period | $11,000,000 Sales Break Point per year. |

Within sixty (60) days after the close of each calendar year, Tenant shall furnish to Landlord a compilation prepared by an officer of Tenant setting forth the amount of Gross Sales during the preceding calendar year and showing the amount of Percentage Rent, if any, required to be paid by Tenant for such calendar year, provided, however, that Tenant shall not be required to provide such compilation if the amount of Gross Sales for such calendar year is less than ninety percent (90%) of the Sales Break Point.  The full amount of any Percentage Rent due shall be paid to Landlord simultaneously with the furnishing of said compilation.  Notwithstanding the foregoing, no Percentage Rent shall be payable with respect to the period commencing on the Rent Commencement Date and ending on the December 31 next following the Rent Commencement Date.

      4.4.2    Definition of Gross Sales.  As used herein, the term *"Gross Sales"* shall mean the total amount of all sales of merchandise or services completed at the Premises by Tenant or any sublessee, licensee or concessionaire of Tenant (subject, however, to Subsection 4.4.6) and any other person or entity operating in the Premises (for purposes of this Subsection 4.4.2 only, collectively, "*Tenant*"), whether for cash, credit or otherwise, including redemption of gift certificates and gift cards.  Tenant shall record, at the time of each Gross Sale, all receipts from such sale, whether for cash, credit or otherwise, in a cash register or cash registers, or in such electronic or computer device which records sales in a manner which is generally acceptable by industry standards.  The term *"Gross Sales"* shall exclude: (1) proceeds from any sales tax, gross receipts tax or similar tax, by whatever name called, which are separately stated and are in addition to the sales price, (2) bona fide transfers or exchanges of merchandise from the Premises to any other stores or warehouses of Tenant or any Affiliates of Tenant, and returns to shippers and manufacturers for credit, (3) refunds or credits given to customers for merchandise returned or exchanged at the Premises (regardless of where or how purchased), (4) sales of Tenant's fixtures and equipment not in the ordinary course of Tenant's business, (5) to the extent of prior inclusion in Gross Sales, bad debts when written off the books of Tenant, provided that any collections made on account of such bad debts shall be included in Gross Sales when received, (6) receipts from vending machines installed solely for the use of Tenant's employees and receipts from pay telephones, (7) sales to employees of Tenant at discount (which, for the purposes of determining Percentage Rent hereunder, shall not exceed two percent (2%) of Gross Sales per calendar year or pro rata portion thereof, as applicable), (8) fees paid to independent third party credit card, charge card, debit card, and check verification/guaranty companies in connection with sales charged to or debited from customers' credit cards, charge cards, or debit cards, or sales paid for by customers by checks, as applicable, (9) proceeds from delivery, gift-wrapping and check cashing charges (which, for the purposes of determining Percentage Rent hereunder, shall not exceed two percent (2%) of Gross Sales per calendar year or pro rata portion thereof, as applicable), (10) sums and credits received in settlement of claims for loss or damage to merchandise, (11) separately stated service, finance and interest charges, (12) the dollar value of coupons utilized by customers in the purchase of merchandise from the Premises, (13) close-out or bulk sales of inventory to jobbers or wholesalers, and (14) sales of gift certificates and/or gift cards, and (15) forfeited deposits.

      4.4.3    Books and Records.  Tenant shall maintain at the Premises or at its principal office, complete books and records reflecting all elements of Gross Sales.  Tenant shall be allowed to maintain its books and records in a computerized form; provided, however, that (i) such computerized books and records provide the same level of information as the books and records described above, are retained for the full record retention period provided for herein, and (ii) promptly upon request, printed copies of any such books and records are made available at Tenant's principal office for inspection by Landlord's representatives who are engaged in inspecting and/or auditing Tenant's books and records as provided herein.  Such books and records shall be kept in accordance with generally accepted accounting principles and practices consistently applied and shall be retained by Tenant for at least two (2) years following the end of the calendar year to which they refer.

      4.4.4    Landlord's Right to Audit.  Landlord and/or Landlord's auditor shall have the right, upon at least ten (10) days prior notice to Tenant (but not more than once per annum), to inspect and/or audit the records of Tenant relating to Gross Sales.  If any such audit discloses a deficiency in the Gross Sales reported by Tenant, Tenant shall pay any deficiency in Percentage Rent owing to Landlord on account of such deficiency.  If such deficiency is in excess of three percent (3%) of the Gross Sales reported by Tenant and Percentage Rent is then payable, Tenant shall also pay Landlord's reasonable costs of the inspection and audit.  Tenant has not and does not make any representation or warranty as to the amount of Gross Sales which are anticipated from the Premises.

      4.4.5    Confidentiality.  Landlord shall not disclose to any third party Tenant's Gross Sales or the amount of Percentage Rent paid or payable by Tenant, provided, however,

that (i) such information was not previously disclosed by Tenant to such third party or to the public generally, and (ii) nothing contained herein shall restrict Landlord from disclosing such information as may be required by applicable Legal Requirements or to its accountants, attorneys, bona fide prospective purchasers, or current or prospective Mortgagees or underlying lessors of all or any portion of Landlord's interest in the Shopping Center (provided that each of such recipients shall be bound to the same non-disclosure provisions as are imposed upon Landlord).

4.4.6   Licensees.  If Tenant enters into any agreement(s) with any non-Affiliate person or entity (hereinafter, the **"Licensees"**) permitting the Licensees to operate businesses or concessions within the Premises, then, in lieu of including the Gross Sales actually achieved by such Licensee(s) from such licensed portion of the Premises, Tenant may elect to include in Gross Sales an amount equal to the product obtained by multiplying (i) the Floor Area of such licensed space, by (ii) the average Gross Sales per square foot of Floor Area for the remainder (*i.e.*, the unlicensed portion) of the Premises.  The provisions of this Subsection 4.4.6 shall not apply to more than 4,000 square feet of Floor Area, in the aggregate, in the Premises at any one time.  If more than 4,000 square feet of the Floor Area of the Premises is licensed to Licensees at any one time, then Tenant shall have the right to designate, from time to time, those portions of the Premises which will be entitled to the benefit of this Subsection 4.4.6.

4.4.7   Adjustment for Assignees and Sublessees.  In the event an assignee of this Lease or any sublessee of all or any portion of the Floor Area of the Premises does not use the Premises (or, as applicable, the subleased portion thereof) as a store specializing primarily in the sale of linens and domestics, bathroom items, housewares, frames and wall art, window treatments and/or closet shelving and storage items, then the Percentage Multiple and the Sales Break Point shall be amended, with respect to the Premises (or, as applicable, the subleased portion thereof), to such other percentage (the **"Adjusted Percentage Multiple"**) and such other break point (the **"Adjusted Break Point"**) as shall, as of the effective date of such assignment or sublease, be then generally applicable to such use of the Premises (or, as applicable, the subleased portion thereof) by normal and accepted business standards applicable to such use, taking into consideration (i) the location of the Shopping Center, and (ii) the nature of the Shopping Center (*e.g.*, strip center, mall, power center, etc.), it being agreed that with respect to any sublease covering less than all of the Floor Area of the Premises, the following shall apply:  (1) the Sales Break Point relating to any portion of the Premises so subleased shall be the quotient of (aa) the annual base subrent payable by each sublessee under the terms of its sublease on account of the calendar year for which Percentage Rent is being determined, divided by (bb) the Adjusted Percentage Multiple applicable to such sublessee, and (2) the Sales Break Point relating to the non-subleased portions of the Premises shall be determined by dividing the product of (x) the Fixed Rent for the calendar year for which Percentage Rent is being determined per square foot of the Premises, and (y) the Floor Area of such retained portion of the Premises, by the Percentage Multiple.

4.4.8   Any dispute between the parties relative to the provisions of this Section 4.4, including, without limitation, the amount of Percentage Rent payable by Tenant, shall be submitted to arbitration in accordance with the provisions of Section 16.3 of this Lease.

# ARTICLE 5
## COMMON AREAS, THEIR USE AND CHARGES

Section 5.1   Common Areas: Maintenance.

5.1.1   Maintenance of Common Areas.  Landlord, at its sole cost and expense, shall operate, maintain, repair and replace the Common Areas as required by this Lease and the COREA and otherwise to the standard by which Common Areas of similar first-class shopping centers in the state in which the Shopping Center is located are operated, maintained, repaired and replaced, including, without limitation, snow, ice, rubbish and debris removal (including installation and maintenance of sidewalk refuse containers), landscaping (including, without limitation, the trimming and pruning of trees to avoid material and adverse interference with the use or visibility of canopies or signs on the exterior of the Premises), adequate lighting, insurance, supervision, use, parking lot paving and striping, drainage, security (as reasonably required), and control of all Common Areas, and Landlord shall comply with all applicable Legal Requirements and the COREA.

5.1.2   Tenant's Pro Rata Share of Common Areas.

(a)   During the Term, Tenant shall pay to Landlord Tenant's Pro Rata Share of the reasonable costs (hereinafter referred to as the **"Common Areas Charges"**) paid

by Landlord to operate, maintain, insure and repair the Common Areas as required by Section 5.1.1 above.  Tenant's Pro Rata Share of Common Areas Charges shall be paid in equal monthly installments on the first day of each calendar month during the Term, in advance, during each calendar year based on Landlord's reasonable budget for such costs.

(b)    Within ninety (90) days after the end of each calendar year, Landlord shall provide to Tenant a statement, in detail reasonably satisfactory to Tenant, of Common Areas Charges for such year, which statement shall be prepared in accordance with generally accepted accounting principles consistently applied (the **"CAC Reconciliation Statement"**).  The CAC Reconciliation Statement shall be certified by Landlord as being accurate and shall be accompanied by a calculation of Tenant's Pro Rata Share of Common Areas Charges, and payment to Tenant in the amount of any overpayment made by Tenant during the preceding calendar year.  If Tenant's Pro Rata Share of the actual Common Areas Charges for a calendar year shall exceed the aggregate monthly installments paid by Tenant during said calendar year, Tenant shall pay to Landlord the deficiency within sixty (60) days after receipt of such notice.  Upon Tenant's request, Landlord shall promptly deliver to Tenant copies of relevant backup materials (including, but not limited to, contracts, correspondence and paid invoices) reasonably required by Tenant.  If Landlord fails to timely remit to Tenant the amount of any overpayment hereunder, Tenant shall have the right (in addition to any rights and remedies to which it may be entitled under this Lease) to offset such amount from payments of Fixed Rent next becoming due hereunder, together with interest thereon at the Lease Interest Rate from the date such remittance is due until reimbursement or full satisfaction by credit.  Notwithstanding any provision hereof to the contrary, in no event shall the Tenant's Pro Rata Share of Common Areas Charges (exclusive of insurance costs under Section 10.3.1) with respect to the first full calendar year of the Term exceed One Dollar and 50/100 ($1.50) per square foot of Floor Area, and with respect to any other calendar year thereafter (exclusive of insurance rate increases and utility rate increases for the Common Areas during such calendar year) exceed one hundred five percent (105%) of the Tenant's Pro Rata Share of Common Areas Charges paid by Tenant for the immediately preceding calendar year.

5.1.3    <u>Exclusions from Common Areas Charges</u>.

(a)    Common Areas Charges shall not include:  (1) the capital cost of any additions to the Common Areas pursuant to an expansion of the Shopping Center; (2) the cost of any replacements or capital improvements to the Common Areas, except that the cost of repaving the parking areas of the Shopping Center may be included within Common Areas Charges so long as such cost is amortized on a straight-line basis over the useful life thereof under generally accepted accounting principles, and is not incurred (A) prior to the expiration of the fifth (5th) full calendar year of the Term, or (B) more than once during each five (5) full calendar years of the Term; (3) the cost of investigating, monitoring or remedying any environmental condition or "Hazardous Substances" or any other "Compliance Costs" (both as hereinafter defined in Subsection 12.4.1); (4) any debt service (including principal and interest) or payments of any judgments or other liens against Landlord; (5) the cost of maintaining, repairing or providing security for interior portions of buildings; (6) Taxes or other taxes levied or assessed against Landlord or the Shopping Center; (7) the cost of compliance with applicable Legal Requirements (including, without limitation, the cost of curing violations or contesting such Legal Requirements); (8) any costs resulting from insurance deductibles or any payments made under any self-insurance policy maintained by Landlord; (9) any costs which would have been reimbursed or paid for by insurance proceeds had Landlord maintained the insurance required under Section 10.3 hereof and the amount of any judgment or other charge entered or costs assessed against Landlord in excess of the policy limits of the insurance maintained by Landlord under Section 10.3 hereof); (10) those portions of Landlord's insurance premiums which are reimbursed to Landlord by any other tenant in the Shopping Center other than through the payment of such tenant's proportionate share of insurance premiums otherwise includable as part of Common Areas Charges; (11) sums paid or owed by Landlord to any tenant in the Shopping Center; (12) costs incurred in connection with the negotiation of leases with, or construction of improvements for, any tenant in the Shopping Center (including, without limitation, brokerage commissions and legal fees); (13) costs incurred in connection with lawsuits or other legal actions (including, without limitation, arbitrations and mediations) instituted or defended by Landlord; (14) sums incurred as late payment fees, penalties or interest; (15) ground rent; (16) depreciation [except as expressly permitted pursuant to item 23 below]; (17) costs disproportionately incurred by or on behalf of any one or more of the tenants in the Shopping Center (including, without limitation, all costs relating to the operation of any food court in the Shopping Center); (18) electricity costs for lighting Common Areas later than the "Normal Hours" [hereinafter defined in Section 5.2], other than low-level security lighting; (19) Landlord's advertising, entertainment and promotional costs for the Shopping Center (including, without limitation, holiday decorations); (20) costs of acquiring, leasing, restoring, insuring or displaying sculptures, paintings and other objects of art located within or outside the

Shopping Center; (21) costs and expenses payable to Landlord or its Affiliate, to the extent that such costs and expenses exceed competitive costs and expenses for materials and services by unrelated persons or entities of similar skill and experience; (22) repairs resulting from defects in the original construction of the Shopping Center arising within one (1) year after the Rent Commencement Date; (23) the cost of mechanized equipment for the maintenance of the Common Areas (but not the straight-line depreciation thereof over its useful life, as determined in accordance with generally accepted accounting principles); (24) reserves for anticipated future expenses; (25)  any cost or expense relating to the administration and management of the Common Areas (whether on-site or off-site) including, but not limited to, overhead, management fees, office salaries and benefits, office rental, office supplies, dues and subscriptions, office utility charges, telephone charges and automobile expenses; (26) costs incurred in connection with the monitoring, maintenance, inspection, or testing of fire alarm systems; (27) costs and expenses payable to Landlord, or its Affiliate or designee, for the provision of utility service(s) to the Common Areas, to the extent that such costs and expenses exceed competitive market rates; (28) except as specifically provided in Section 7.2 hereof, any costs relating to any pylon signs or other signage identifying tenants of the Shopping Center; or (29) any portion of the cost of insurance which Landlord is required to maintain under this Lease, which is attributable to any betterments or improvements contained within any other tenant's premises within the Shopping Center.

(b)     In addition, if any tenant or other occupant of the Shopping Center (i) maintains the Common Areas in whole or in part, or any facilities therein, (ii) provides any services the cost of which would otherwise be includable in Common Areas Charges, and/or (iii) pays directly for costs which would otherwise be included in the Common Areas Charges, then the costs associated with or attributable to any of the foregoing shall be excluded from Common Areas Charges, and the denominator used to determine Tenant's Pro Rata Share of such costs (and only such costs) shall be reduced by the Floor Area occupied by such tenant or other occupant.

(c)     Common Areas Charges for any period during the Term which constitutes less than a full calendar year shall be equitably prorated.

5.1.4   Tenant's Right to Audit.  Tenant shall have the right, within three (3) years after receiving any CAC Reconciliation Statement (and not more than once annually) to audit Landlord's books and records to verify Landlord's calculation of Common Areas Charges as reflected therein and Tenant's Pro Rata Share thereof at Landlord's home office and upon at least ten (10) days' prior written notice.  Upon Tenant's request, Landlord shall promptly deliver to Tenant copies of relevant backup materials (including, but not limited to, contracts, correspondence and paid invoices) reasonably required by Tenant.  In the event of an error in Landlord's favor, Landlord shall refund the overcharge to Tenant within thirty (30) days after Tenant's demand therefor, and if the overcharge exceeds three percent (3%) of Tenant's Pro Rata Share of Common Areas Charges, Landlord shall pay to Tenant the reasonable expenses of the audit within thirty (30) days after Tenant's demand therefor, failing which, Tenant shall have the right (in addition to any rights and remedies to which it may be entitled under this Lease, at law, or in equity) to offset such amount from payments of Rent next becoming due hereunder, together with interest thereon at the Lease Interest Rate from the date such remittance is due until reimbursement or full satisfaction by credit.  Landlord shall maintain all books and records pertaining to a calendar year for at least three (3) years after it delivers to Tenant a CAC Reconciliation Statement for such calendar year.  Tenant shall keep the results of any such audit confidential, provided that nothing contained herein shall restrict Tenant from disclosing such information as may be required by applicable Legal Requirements, or to its accountants, attorneys or *bona fide* prospective assignees or subtenants (provided that each of such recipients shall be bound by the same non-disclosure provisions as are imposed upon Tenant).  Any dispute by Landlord with respect to an audit by Tenant shall be submitted to arbitration in accordance with the provisions of Section 16.3 below.

5.1.5   In no event shall Tenant be required to join, participate in or contribute to any promotional fund, marketing fund or merchants' association.

Section 5.2    Common Areas: Restrictions.

5.2.1   Continuous Access.  No entrances, exits, approaches and means of ingress and egress to and from the Shopping Center or the Premises as shown on Exhibit B hereto shall be interrupted or disturbed by any act or omission of Landlord during the Term, except in the event of an emergency or as may be otherwise required by applicable Legal Requirements, in which event Landlord shall use reasonable efforts to give Tenant advance notice of same and to minimize interference to Tenant's normal business operations in the Premises as a result thereof.  Notwithstanding the foregoing, Landlord shall be permitted, upon

at least thirty (30) days prior notice given to Tenant, to temporarily close the Common Areas for the minimum time legally necessary to prevent a dedication thereof or an accrual of any rights in any person or the public generally therein; provided that such closure shall not occur during August, November or December of any calendar year.

5.2.2    No Alterations.  Landlord shall not, without obtaining Tenant's prior written consent in each instance, such consent not to be unreasonably withheld: (i) alter the location, availability, or size of any Common Area improvement located within the area designated as "Critical Area" on Exhibit B hereto (the **"Critical Area"**) from that shown on Exhibit B hereto; (ii) construct or permit to be constructed any structures in the Critical Area (including, without limitation, any buildings, kiosks, booths, signs or similar structures in the Critical Area), other than as shown on Exhibit B hereto; or (iii) materially change the entrances or exits to and from the Shopping Center, or the curb cuts, roadways, drive aisles, sidewalks or other elements of the Common Areas, or the number, location or layout of parking spaces, all located within the Critical Area from those shown on Exhibit B hereto.  Landlord shall neither perform nor permit to be performed, any construction, repairs, replacements or maintenance to any portion of the Shopping Center, including the Premises (other than emergency repairs to utilities and Common Areas) during the months of August, November and December of any year, without the prior consent of Tenant, which consent may be granted or denied in Tenant's sole and unfettered discretion, reasonably or unreasonably exercised.

5.2.3    Outparcels.  In addition to the provisions of Subsection 5.2.2 above, during the Term, no building located on the outparcel in the Shopping Center shown as Outparcel VII on Exhibit B hereto (**"Outparcel VII"**): (a) shall exceed one story, (b) shall exceed thirty-four (34) feet in height as measured from the finished floor level to the highest point on such building or structure (inclusive of the height of all types of projections or architectural treatments or embellishments thereon, such as, but without limitation, HVAC equipment, parapets, mansards, signs, satellite dishes, and antennae), and (c) shall exceed 5,000 square feet of Floor Area.

5.2.4    Parking Area.  During the Term, Landlord shall maintain in the Shopping Center, at a minimum, the greater of (i) the number of parking spaces required by applicable Legal Requirements, without variance, or (ii) five (5) ground-level parking spaces for every one thousand (1,000) square feet of Floor Area in the Shopping Center, with each such space being in conformance with Legal Requirements.  Parking spaces shall at all times be clearly marked by painting, striping or otherwise.  Except for any rights granted to other tenants or occupants of the Shopping Center existing as of the Effective Date and any rights granted in the COREA, Landlord shall not hereafter designate specific parking spaces for use by other tenants or occupants of the Shopping Center, nor shall Landlord permit any person or entity to use the parking areas other than Tenant, the other tenants and occupants of the Shopping Center, and their respective employees, agents, subtenants, concessionaires, licensees, customers, and invitees.  There shall be no charge whatsoever levied for the use of any parking areas within the Shopping Center.  Subject to the rights of Existing Tenants, Landlord shall not permit overnight parking in the Shopping Center.

5.2.5    Lighting.  Throughout the Term, Landlord shall keep the Common Areas adequately lighted and open to the customers of the Shopping Center seven (7) days a week from dusk until 11:00 p.m. Monday through Saturday and until 7:00 p.m. on Sunday (**"Normal Hours"**).  Upon request of Tenant, Landlord shall keep the Common Areas lighted for as long after Normal Hours as Tenant shall request, provided Tenant shall pay for a share of the reasonable cost of said requested lighting, which share shall be equal to the product of (x) such cost, and (y) a fraction, the numerator of which shall be the number of square feet of Floor Area within the Premises and the denominator of which shall be the aggregate number of square feet of Floor Area of all premises within the Shopping Center (including the Premises) open later than Normal Hours (excluding, however, those tenants and occupants who separately control and pay for their own Common Area lighting).  In addition to the foregoing, Landlord shall provide for low level security lighting from one (1) hour after the close of business in the Premises until dawn.

5.2.6    Repairs.  (a) During the Term, any construction or repair by Landlord permitted or required under this Lease and undertaken in the Critical Area (other than de minimis repairs that do not interfere with Tenant's and/or its invitees' use of the Premises or the Common Areas) shall:

(i)    not be performed during the months of August, November, or December of any year, except in the event of an emergency or as may be otherwise required by applicable Legal Requirements;

(ii)      be commenced only upon at least five (5) days' prior notice to Tenant (except in an emergency, in which event Landlord shall only be required to give such notice as is reasonable under the circumstances); and

(iii)     be performed in accordance with the requirements of Subsection 3.3.6 above and in such a manner so as not to materially interfere with the normal conduct of any business operations in the Premises, and shall be performed in compliance with the terms and provisions of the COREA.

(b)      Landlord has informed Tenant that Landlord desires to perform certain work in the Common Areas, including the Critical Area, consisting generally of widening the sidewalk in front of the Premises and Building B, and consequently shifting the north-south drive aisle abutting said sidewalk further to the east so as to better align the drive aisle with the entry drive from Cobb Parkway between Outparcel V and Outparcel VII, as well as possible upgrades of certain Common Area improvements in this area (the "**_Front Work_**").  If Landlord elects to perform any of such Front Work then the following terms and conditions shall apply:

(i)      The Front Work shall be performed in a good and workmanlike manner, in compliance with all applicable Legal Requirements, utilizing only new, first-class materials, and in accordance with plans and specifications reasonably approved by Tenant in advance.  Because the Front Work will necessarily affect the Critical Area, it shall be subject to Tenant's approval, in its reasonable discretion.  Landlord shall be responsible for obtaining all licenses, permits and other approvals and consents as may be required under applicable Legal Requirements and as may be required from any other tenants at the Shopping Center and any Mortgagee.

(ii)     Landlord shall not perform the Front Work during August, November or December of any year.  Landlord, upon commencing the Front Work, shall diligently and expeditiously pursue such work to completion.  Landlord shall take all measures reasonably necessary to ensure the continuous ingress and egress of Tenant's customers and employees to and from the Premises and the parking area in front of the Premises, and to ensure the safety of Tenant's customers, employees and Tenant's Property during the course of the Front Work, including, without limitation, the erection of protective walkways and barricades, as necessary.  Landlord shall work with Tenant to coordinate the Front Work so as to minimize any interference with the normal conduct of Tenant's business in the Premises.

(iii)    In no event shall Landlord's performance of the Front Work at anytime:  (A) materially interfere with the normal conduct of business operations at the Premises, (B) obstruct or obscure any of Tenant's signage, or (C) materially interfere with Tenant's use and access to its loading facilities.  If Tenant is unable to conduct its normal business in the Premises as a result of the Front Work, Rent shall be equitably abated during the period of disruption.

5.2.7   _Rules and Regulations_.  Tenant shall comply with the rules and regulations of the Shopping Center as established from time to time by Landlord, within sixty (60) days after Landlord notifies Tenant thereof, provided they:  (i) are reasonable, (ii) do not adversely affect the normal conduct of any business operations in the Premises, (iii) do not adversely affect any of Tenant's rights under this Lease, and (iv) are uniformly enforced against all tenants of the Shopping Center and without prejudice against Tenant.  In the event of any conflict between the provisions of this Lease and any rules or regulations, the provisions of this Lease shall prevail and govern.

5.2.8   _Miscellaneous_.

(a)      _No Promotional Use_.  Subject to the COREA and the rights of Existing Tenants, Landlord shall not use or permit the use of any portion of the Critical Area and any portion of the Common Areas as shown on _Exhibit B_ located between the Premises and the premises currently occupied by Circuit City for retail sales or for promotional purposes.  Notwithstanding the foregoing provision and subject to the COREA, tenants of the Shopping Center (including Tenant) shall be permitted to conduct sidewalk sales in front of their respective stores only, provided that such sales shall (A) be conducted in a manner consistent with sidewalk sales in similar first class shopping centers in the state in which the Shopping Center is located, (B) not materially interfere with normal pedestrian access over the sidewalks,

(C) not materially interfere with the normal business operations of Tenant in the Premises or materially impair the visibility of Tenant's signage, of if conducted by Tenant, not materially interfere with the normal business operations or signage of other tenants in the Shopping Center, and (D) not be longer than thirty (30) days, in the aggregate, in any single year.

(b)     Trash Compactor and Containers.  Tenant shall be permitted to maintain and operate, at no extra charge by Landlord:  (i) a trash compactor in the portion of the Common Areas designated on Exhibit B hereto as "Trash Compactor Pad"; and (ii) a trash container(s) in the portion(s) of the Common Areas designated on Exhibit B hereto as "Trash Container Pad".  Tenant, at its sole cost and expense, shall keep the trash compactor and containers neat and clean and repair any damage caused by use and storage of such compactor and containers.

(c)     Shopping Carts.  Subject to the terms of the COREA and all Legal Requirements, Tenant shall be permitted to store its shopping carts in such exterior cart corrals as may be reflected on Exhibits B and D-1 hereto.  With respect to shopping carts provided by Tenant for the use of its customers, Tenant will use reasonable efforts to periodically remove same from the Common Areas.

(d)     Cellular Towers.  Excluding telecommunicating equipment used by existing tenants for their business at the Shopping Center, no transmission and/or reception towers for wireless telephone or internet communications shall be permitted within the Shopping Center within three hundred (300) feet of the Premises.

(e)     Storage Trailer.  Tenant, for so long as Tenant is operating for the Permitted Use hereunder (but not any subtenant), shall be permitted to maintain a temporary storage container or trailer (not to exceed 48 feet in length and 9 feet in width) behind the Premises in the location designated for such use on Exhibit B during August, and again during November and December, each year in the Term, subject to applicable Legal Requirements, and provided that the location of such container/trailer shall not adversely affect the vehicular and/or pedestrian access of Landlord or any other tenants in the Shopping Center.  In addition, the following provisions shall apply as to Tenant's use of the storage trailer:

(i)     Tenant must maintain insurance as required under this Lease pertaining to the storage trailer;

(ii)     Tenant shall be responsible to maintain and repair the area on which the storage trailer is located in substantially the same condition that existed prior to the installation of such trailer;

(iii)     Tenant shall indemnify and hold Landlord harmless from or against any claims which may be made against Landlord which arise by reason of Tenant's use of the storage trailer (to the  extent not caused by Landlord);

(iv)     Tenant shall not hold Landlord responsible for any lost or stolen merchandise from the storage trailer unless due to the gross negligence or willful misconduct of Landlord; and

(v)     if governmental authority with jurisdiction over the Shopping Center requests that the storage trailer be removed, Tenant shall remove such trailer within the time frame specified by the governmental authority. In the event Tenant fails to so remove the trailer within the specified time period, then Landlord, upon ten (10) days' prior notice to Tenant, shall have the right, but not the obligation, to remove the same at Tenant's cost and expense.

### ARTICLE 6
### UTILITIES

Section 6.1     Utility Service.  From and after the Delivery Date and continuing thereafter through the end of the Term, Tenant shall be solely responsible for and shall pay the cost of utilities services (including, without limitation, electricity, gas (if available), water, sanitary sewer, alarm and telecommunications) consumed in the Premises by Tenant.  Tenant shall not be obligated to purchase utility service(s) directly from Landlord, or from any utility provider designated by Landlord.  Landlord shall provide separate utility meters exclusively serving the Premises, at its sole cost and expense.  Tenant's entry upon the Premises prior to the Delivery Date shall not constitute a waiver by Tenant of Landlord's obligation to pay the costs of all utility

charges incurred in the Premises prior to the Delivery Date.  Landlord shall not permit the capacity of utility lines available for use at the Premises to be reduced or overloaded by any other persons or entities.  Landlord shall permit Tenant and its telecommunications provider full and free access to, and use of, available telecommunications conduits in the Shopping Center for the provision of telecommunications service to the Premises, subject to such reasonable requirements as Landlord may impose.

        Section 6.2    Interruption.  Notwithstanding any provision of this Lease to the contrary, in the event utilities serving the Premises are disrupted due to the acts or omissions of Landlord, its agents, contractors, servants or employees, Landlord shall promptly restore the affected utilities at Landlord's sole cost and expense.  If the disrupted utilities are not restored within forty-eight (48) hours after the Landlord has knowledge of the disruption, and Tenant is unable to conduct its normal business in the Premises as a result thereof, Rent shall be equitably abated during the period of disruption.

**ARTICLE 7
SIGNS**

        Section 7.1    Tenant's Building Signage.  Subject to compliance with applicable Legal Requirements including the COREA, Tenant shall have the exclusive right, in connection with Tenant's Work, and thereafter during the Term, at its sole cost and expense, to erect, maintain, and replace on the storefront and exterior walls of the Premises and on the side walls of any entrance design element, if any, signs (including, without limitation, under-canopy (e.g., blade) signs), banners (including temporary banners placed on the storefront of the Premises and such other walls of the Premises as selected by Tenant announcing "Sneak Preview," "Grand Opening" and/or "Now Hiring"), awnings, and flags of such size, design and color as Tenant, from time to time, may desire, provided that the banners and temporary signs on the storefront and exterior walls shall be prototypical of the signs used by a majority of Tenant's stores.  If such sign is non-prototypical, then the same shall require Landlord's consent.  Tenant shall be entitled, at Tenant's sole cost and expense, to:  (i) install and maintain on the storefront of the Premises a temporary banner announcing "Coming Soon" at such time, and for such duration prior to the Rent Commencement Date, as Tenant shall desire, and (ii) install and maintain, during the period commencing on the Effective Date and ending on the day prior to the Rent Commencement Date, a temporary sign near the site of the main entrance to the Shopping Center which states "Bed Bath & Beyond Coming Soon" (which sign is more particularly shown in Exhibit F hereto); it being understood and agreed that the location of such sign shall be in accordance with Exhibit B hereto and shall be in accordance with all Legal Requirements and the COREA.  Tenant may erect and maintain in the interior of the Premises any signs it may desire, provided same are professionally prepared.

        Section 7.2    Pylon Signage.  Landlord shall provide one (1) pylon sign in the location shown on Exhibit B hereto during the entire Term.  Tenant, at its sole cost, shall obtain permits for and shall procure and install its own panel on the existing Shopping Center pylon (the "***Existing Pylon***").  Tenant shall have the right, at its sole cost and expense, to erect and maintain its identification sign, as shown on Exhibit F hereto, on both sides of such pylon at the locations shown on Exhibit F.  If Landlord constructs or makes available to any other tenant or tenants in the Shopping Center, but excluding the Outparcels and the Eastern Parcel, any other monument or pylon signs located in the Common Areas, such sign(s) shall also include Tenant's identification sign, as shown on Exhibit F hereto, the location and size of which sign panel in comparison to the sign panels of other tenants with panels on such pylon or with such other signage shall be proportionate to the Floor Area of the Premises relative to the Floor Area of such other tenants' premises.  Landlord shall maintain all pylon signs, and Tenant's signs thereon, in good order and repair, and allow Tenant access to replace its signs thereon, at Tenant's cost and expense.  Landlord shall not change or alter the location, structure, height or general appearance of the pylon sign without obtaining Tenant's prior consent.  The cost of maintaining the pylon sign bearing Tenant's sign panel(s) [but not the cost of individual tenants' signs thereon or the cost of the construction of the pylon sign] and the cost of any electricity used to illuminate them, shall be includable in Common Areas Charges.  If Landlord elects at any time to replace the Existing Pylon with a new pylon, then the following provisions shall apply:

                (i)      the design and location of the pylon shall be subject to Tenant's approval;

                (ii)      the cost of designing and constructing the new pylon (including, without limitation, all design professionals' and attorneys' fees

and permit costs), along with the cost of designing, fabricating and installing Tenant's sign panel, shall be the sole responsibility of Landlord; and

(iii)    Tenant, at its election, shall have the right to have its sign panel installed either in the fourth position on said pylon or in the bottom position of said pylon.

Section 7.3    Signage: Alteration/Removal/Allocation.  Tenant shall have the right, from time to time, without Landlord's approval, to change its signs on the storefront and exterior of the Premises, as well as on any pylon or monument, provided that the area of the new sign is no larger than the area of the sign which it replaces and that the method of construction and attachment is substantially the same, and the signs continue to be in accordance with all Legal Requirements and the COREA.  Upon the expiration or earlier termination of the Lease, Tenant shall remove its signs from the fascia or other exterior walls of the Premises and from any pylon or monument, and shall repair any damage occasioned thereby.  The signage granted to Tenant pursuant to this Article 7 shall, at Tenant's option, be allocated to or between Tenant and/or any subtenant(s) of all or any portion of the Premises.  All signage installed by Landlord and Tenant hereunder shall comply with applicable Legal Requirements and the COREA.

Section 7.4    Cooperation.  Landlord, upon request and at no out-of-pocket cost to Landlord, shall execute any consents or applications which may be required by applicable Legal Requirements to permit the placement, installation, and/or replacement by Tenant of any signs on any part of the Premises or on any pylon or monument, to which Tenant may be entitled under this Lease.

Section 7.5    Signage Restrictions and Criteria.

7.5.1    During the Term, subject to the terms and conditions of Legal Requirements and the COREA, no exterior identification signs attached to any building of the Shopping Center shall be of the following type:  (i) flashing, moving or audible signs; (ii) signs employing exposed raceways, exposed neon tubes, exposed ballast boxes, or exposed transformers, provided that any future tenant or occupant, including Tenant, shall have the right to employ any methods necessary for the installation of internally illuminated self-contained channel letters; or (iii) paper or cardboard signs other than professionally prepared interior window signs advertising special sales within the subject premises, temporary signs (exclusive of contractor signs, "Coming Soon" or "Grand Opening" signs or banners), stickers or decals, provided, however, the foregoing shall not prohibit the placement at the entrance of each such premises of (A) small stickers or decals which indicate hours of business, emergency telephone numbers, credit cards accepted, and other similar information, and/or (B) a sticker or decal which contains the phrase "no solicitation" or words of like import.  Notwithstanding anything to the contrary set forth above, the foregoing restrictions shall not apply to any existing tenants or occupants of the Shopping Center as of the Effective Date.

7.5.2    Except for buildings, improvements and landscaping existing as of the Effective Date (and any replacements thereof), Landlord shall not permit any obstructions (including, without limitation, any trees, bushes or other landscaping, scaffolding or architectural details) to obscure Tenant's storefront, storefront signs or other exterior wall signs or any pylons, monuments or other freestanding signs except if required by Legal Requirements or mandated under the COREA in which case Landlord shall use its commercially reasonable efforts (without having to bring suit against the municipality) to mitigate the obstructions caused by compliance with Legal Requirements.  Except for the rights of Existing Tenants as of the Effective Date, no premises in the Shopping Center containing less Floor Area than the Floor Area of the Premises shall have:  (i) building signage possessing more total square footage than the total square footage available for use by Tenant, or a maximum height greater than the maximum height of Tenant's building signage (as measured from the finished floor level to the highest point on such signage), or (ii) a building and entrance design element higher or wider than the height or width of the building and entrance design element of the Premises.

## ARTICLE 8
## ALTERATIONS AND IMPROVEMENTS

Section 8.1    Alterations and Improvements.

8.1.1    Tenant shall not perform any structural alterations or structural improvements to the Premises (except to the extent same pertain to Tenant's Work) without the prior approval of Landlord, provided, however, that Tenant's alteration of the exterior of the Premises to conform to Tenant's then-current prototypical elevation shall not require Landlord's

consent so long as such alteration complies with all Legal Requirements and the COREA. All work performed by Tenant in connection with structural and non-structural alterations or improvements to the Premises shall be done at Tenant's sole cost and expense, in a good and workmanlike manner and in compliance with all applicable Legal Requirements and the COREA, and without materially and adversely interfering with the operation of any other tenant or occupant in the Shopping Center. The provisions of this Section 8.1 shall not apply to Tenant's building signage, which shall be governed by the applicable provisions of Article 7 above.

8.1.2    Tenant may, from time to time, at its sole cost and expense, without the prior approval of Landlord, make non-structural alterations and non-structural improvements to the Premises as Tenant deems necessary or desirable, including, but not limited to, electrical systems, heating, ventilation and air conditioning and other mechanical systems, installation of fixtures and equipment, painting, and wall and floor coverings.

8.1.3    Tenant shall have the right, at Tenant's sole cost and expense, to subdivide the Premises into not more than two (2) separate stores, each of which may have its own front entrance and access to the loading docks, if any, in the rear of the Premises, as well as separately sub-metered utilities.

8.1.4    Tenant shall have the right to erect and maintain an antenna and a satellite dish on the roof of the Premises, provided that Tenant erects and maintains such equipment in accordance with applicable Legal Requirements and the COREA, maintains the equipment and the affected area of the roof in good condition, repairs any damage to the Premises, including without limitation the roof, caused thereby and does not violate the existing or (if the roof is replaced as contemplated by Section 3.3.8) the new roof warranty.

8.1.5    Upon the request of Tenant, and subject to the provisions of Section 8.1.1 above, Landlord, at no out-of-pocket cost to Landlord, shall fully, promptly and diligently cooperate with Tenant and Tenant's architects, contractors and designers, in obtaining any permits, approvals and certificates required to be obtained by Tenant in connection with any alteration or improvement to the Premises, and shall execute all applications, documents and other instruments required for such purpose. Landlord shall execute and return to Tenant all appropriately completed building department or equivalent applications within ten (10) days after Tenant's request therefor.

8.1.6    (a)    If any violation of any applicable Legal Requirement which is noted against the Shopping Center or the Premises (other than a violation caused by Tenant) prevents Tenant from obtaining a building permit for any alterations or a certificate of occupancy, then, upon request by Tenant, Landlord shall promptly and diligently cause such violation to be removed of record to the extent required to permit Tenant to obtain its building permit or certificate of occupancy, as the case may be.

(b)    If any violation of any applicable Legal Requirement caused by Tenant which is noted against the Premises (other than a violation caused by Landlord) prevents Landlord from obtaining a building permit for any alterations or a certificate of occupancy, then, upon request by Landlord, Tenant shall promptly and diligently cause such violation to be removed of record to the extent required to permit Landlord to obtain its building permit or certificate of occupancy, as the case may be

8.1.7    Landlord shall not make any alterations to the Premises. Landlord shall not make (nor shall Landlord permit to be made subject to the rights existing as of the Effective Date of any Existing Tenants) any alterations to the exterior architectural theme of the Shopping Center as to colors and/or materials which would be inconsistent with a similar first-class shopping center in the state in which the Shopping Center is located without the prior consent of Tenant; provided, however, such restriction shall not apply to a "signature" storefront of a national or regional retailer typically found in first class shopping centers in the state in which the Shopping Center is located.

8.1.8    All trade fixtures furnished or installed by Tenant or any subtenant, concessionaire or licensee, or its or their equipment lessors in the Premises, regardless of the manner or mode of attachments, shall be and remain the property of Tenant or its said equipment lessors, as the case may be, and may be removed at any time during the Term. It is understood and agreed that all of said trade fixtures furnished or installed by Tenant or any subtenant, concessionaire or licensee, or its or their equipment lessors in the Premises may, from time to time, become subject to a lien of leases, financing statements and security agreements under the Uniform Commercial Code and should any such lien be foreclosed, the foreclosing party may remove such property from the Premises provided that such party repairs

any damage caused thereby and otherwise in accordance with the subordination documents to be executed by Landlord and the foreclosing party.  Landlord agrees to promptly execute and deliver to Tenant, from time to time, in a form reasonably acceptable to Landlord, such lien subordination and consent documents on the part of Landlord as may be reasonably required by Tenant or any subtenant, concessionaire or licensee's equipment lessors to effectuate these provisions.

        8.1.9    Upon the expiration or earlier termination of the Term, Tenant shall not remove any then-existing structural alterations, additions or improvements upon the Premises which under operation of law would become the property of Landlord.  Tenant may remove all other alterations, decorations, additions and improvements made by it to the Premises without Landlord's prior consent, provided that Tenant repairs and restores any damage to the Premises caused by such removal.

**ARTICLE 9**
**REPAIRS**

        Section 9.1    <u>Tenant's Repairs</u>.  Subject to the provisions of Article 11 hereof, and except as otherwise provided in Section 9.2 below, Tenant shall maintain in good condition and repair, at its sole cost and expense:  (i) the non-structural, interior elements of the Premises (including plate glass, and the electrical, plumbing, mechanical, sprinkler and/or alarm systems located in, or serving, exclusively the Premises); (ii) the heating, ventilation and air conditioning ("*HVAC*") units exclusively serving the Premises, and (iii) any damage to the Premises or the Shopping Center which is occasioned by (A) the act or omission of Tenant, its employees, agents or contractors, or (B) any breach by Tenant of any provision of this Lease.  All repairs and replacements on Tenant's part to be performed hereunder shall be at Tenant's sole cost and expense, and performed in a good and workmanlike manner in accordance with all applicable Legal Requirements, including the COREA and without materially and adversely interfering with the business of other tenants in the Shopping Center.

        Section 9.2    <u>Landlord's Repairs</u>.  Subject to the provisions of Article 11 hereof, and except as otherwise provided in Section 9.1 above, Landlord shall perform or cause to be performed, as the same shall from time to time be necessary, all repairs and replacements to the following:

        (a)    the exterior of the buildings of the Shopping Center (including without limitation the Premises) (unless a tenant at the Shopping Center is required under its lease with Landlord to perform such work in which event Landlord shall use commercially reasonable efforts to enforce such tenant's lease obligations, and if such tenant fails to perform its obligations, Landlord shall perform such obligation on behalf of such tenant if Landlord is permitted to do so under such lease, by a court of competent jurisdiction, or pursuant to Legal Requirements) as necessary to maintain same in good condition and repair (including, without limitation, repainting the exterior walls of the buildings of the Shopping Center (including, without limitation, the Premises)) as same may be reasonably required from time to time during the Term;

        (b)    from and after the Rent Commencement Date, the structural elements of the Premises, which shall be deemed to include, without limitation, the roof joists, columns, footings, foundation, exterior walls (including, without limitation, repainting, but excluding plate glass, storefront windows, doors, door closure devices, window and door frames, molding, locks and hardware, and painting or other treatment of interior walls), and structural floor (but not the floor covering, unless the same is damaged as a result of a floor defect or settling);

        (c)    the roof, gutters, flashings, downspouts and scuppers of the Premises and the building in which the Premises is located;

        (d)    the electric, gas, water, sanitary sewer, and other public utility lines serving the Premises, to the point of entry into the Premises;

        (e)    all electric, gas, water, sanitary sewer, and other public utility lines and ducts in or passing through the Premises which do not exclusively serve the Premises; and

        (f)    any damage to the Premises or the Shopping Center which is occasioned by (A) the act or omission of Landlord, its employees, agents or contractors, or (B) any breach by Landlord of any provision of this Lease.

All repairs and replacements on Landlord's part to be performed hereunder shall be at Landlord's sole cost and expense (and not includable in Common Areas Charges), performed in a good and workmanlike manner in accordance with all applicable Legal Requirements, and without material interference with or disruption to the normal conduct of any business operations in the Premises.  Landlord shall give Tenant at least five (5) days' prior notice of any repairs or replacements to, or which would otherwise affect the normal conduct of any business operations in, the Premises (except in the case of an emergency posing imminent risk of material harm to persons or property, in which event Landlord shall only be required to give such notice as is reasonable under the circumstances).  If, in Tenant's reasonable judgment, Landlord's repairs would materially interfere with or disrupt the normal conduct of any business operations in the Premises, Landlord shall perform such repairs only after the regular hours of operation of Tenant and any other occupant of the Premises (or any portion thereof), and Landlord shall reimburse Tenant for the reasonable costs and expenses incurred by Tenant in connection with such "after hours" repairs, including, without limitation, utilities charges and security expenses. In the event Landlord does not reimburse Tenant for any amounts payable to Tenant hereunder within ten (10) days after Tenant's demand therefor, Tenant shall have the right (in addition to any rights and remedies to which it may be entitled under this Lease, at law, or in equity) to offset such amounts against Fixed Rent, together with interest thereon at the Lease Interest Rate from the date of outlay until reimbursement or full satisfaction by credit.

Section 9.3    Legal Compliance Work.  Except as hereinafter expressly provided, Landlord shall be responsible, at its sole cost and expense (and not includable in Common Areas Charges), for performing all "Legal Compliance Work" (hereinafter defined). Notwithstanding the foregoing, Tenant shall be responsible, at its sole cost and expense, for the performance of Legal Compliance Work:  (a) in the performance of Tenant's Work, (b) pertaining to the interior elements of the Premises which are neither structural nor comprise the major building systems serving the Premises; or (b) required solely as a result of Tenant's specific use or manner of use of the Premises (i.e., are not of general applicability to tenants and occupants of the Shopping Center); provided, however, that the foregoing shall not relieve Landlord of its obligations to perform:  (x) Landlord's Work in accordance with all Legal Requirements, and (y) the repairs required in Section 9.2 of this Lease.  As used herein, "**Legal Compliance Work**" shall mean any obligation, addition, alteration, improvement, or rebuilding, structural or otherwise, to or of the Premises, the Shopping Center, or any part thereof, as applicable, which may be required by reason of any Legal Requirement.

### ARTICLE 10
### INDEMNIFICATION, INSURANCE AND WAIVER OF SUBROGATION

Section 10.1    Mutual Release, Waiver of Subrogation and Mutual Indemnification.

10.1.1  Mutual Waiver of Claims.  Landlord and Tenant, on their own behalf and on behalf of anyone claiming under or through either one by way of subrogation, hereby release and waive all rights of recovery and causes of action against each other from any and all liability for any loss or damage to property or resulting from damage to such property (and, in either case, any resulting loss of business or rental income), whether caused by the negligence or fault of the other party, which is normally insured under Special Form property insurance (formerly known as "All-Risk") and time element insurance required to be maintained hereunder. In the event either Landlord or Tenant is a self-insurer or maintains a deductible (as either may be permitted hereunder), then the self-insuring party or the party maintaining the deductible hereby releases the other party from any liability arising from any event which would have been covered had the insurance required by this Lease been obtained and/or the deductible not been maintained.

10.1.2  Waiver of Subrogation.  Landlord and Tenant shall cause each property insurance policy carried by either of them insuring the Premises, the contents thereof, or the Shopping Center, to provide that the insurer waives all rights of recovery by way of subrogation or otherwise against the other party hereto in connection with any loss or damage which is covered by such policy or that such policy shall otherwise permit, and shall not be voided by the releases provided above.

10.1.3  Mutual Indemnification.

(a)    Except as otherwise provided in Subsections 10.1.1 and 10.1.2 above, Tenant covenants to defend and indemnify Landlord and hold Landlord harmless from and against any and all claims, actions, damages, liability and expense, including reasonable attorneys' fees, (x) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon the Premises, or any part thereof, or

(y) occasioned wholly or in part by any act or omission of Tenant, its agents, contractors, employees, servants, licensees or subtenants, except to the extent such claims, actions, damages, liability and expense are caused by the acts or omissions of Landlord, its agents, contractors, licensees, employees, or other tenants and occupants, or for which any of said parties may be statutorily liable.

(b)     Except as otherwise provided in Subsections 10.1.1 and 10.1.2 above, Landlord covenants to defend and indemnify Tenant and hold Tenant harmless from and against any and all claims, actions, damages, liability and expense, including reasonable attorneys' fees, (x) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon any portion(s) of the Shopping Center (excluding the Premises), or (y) occasioned wholly or in part by any act or omission of Landlord, its agents, contractors, employees, servants, tenants (other than Tenant), occupants or licensees, except to the extent such claims, actions, damages, liability and expense are caused by the acts or omissions of Tenant, its agents, contractors, licensees, subtenants or employees, or for which any of said parties may be statutorily liable.

Section 10.2   Tenant's Insurance.

10.2.1 Tenant's Insurance.  Tenant, at its own cost and expense, shall maintain in full force and effect from and after the Delivery Date and throughout the Term: (i) commercial general liability insurance protecting and insuring Tenant, naming Landlord and Landlord's mortgagee (provided Tenant has received notice from Landlord identifying Landlord's mortagee) as additional insureds for claims arising out of the use or occupancy of the Premises by Tenant and the obligations assumed by Tenant under this Lease, and having a combined single limit of liability of not less than Ten Million Dollars ($10,000,000) for bodily injury, death and property damage liability; and (ii) Special Form (formerly known as "All-Risk") property insurance, on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of all fixtures, equipment and other items of Tenant's Property located on or within the Premises. Tenant may carry any of its insurance under "blanket policies" covering the Premises and other locations it or any Affiliate of Tenant owns or leases, provided that:  (i) the amount of the total insurance available shall be at least the protection equivalent to separate policies in the amounts herein required, and (ii) in all other respects, any such policy or policies shall comply with the applicable provisions of this Article 10.

10.2.2 Self-Insurance.  All insurance required to be maintained under this Section 10.2 may be provided under:  (i) an individual policy covering this location; (ii) a blanket policy or policies which includes other liabilities, properties and locations of Tenant or its Affiliates; (iii) a plan of self-insurance, provided that Tenant or any guarantor of Tenant's obligations under this Lease maintains, during the period of such self-insurance, a net worth of at least One Hundred Million Dollars ($100,000,000); or (iv) a combination of any of the foregoing insurance programs.  To the extent any deductible is permitted or allowed as a part of any insurance policy carried by Tenant in compliance with this Section 10.2, then Tenant shall be deemed to be covering the amount thereof under an informal plan of self-insurance; provided, however, that in no event shall any deductible exceed Two Hundred Fifty Thousand Dollars ($250,000) unless Tenant complies with the requirements regarding self-insurance pursuant to clause (iii) above.

Section 10.3   Landlord's Insurance.

10.3.1 Liability Insurance.  Landlord shall maintain in full force and effect on and after the Effective Date and throughout the Term commercial general liability insurance with regard to the Common Areas protecting and insuring Landlord, naming Tenant as "additional insured-lessee", and having a combined single limit of liability of not less than Ten Million Dollars ($10,000,000) for bodily injury, death and property damage liability.  Landlord shall have the right to carry its insurance under "blanket policies" covering the Shopping Center and other properties provided that:  (i) the amount of the total insurance available shall be at least the protection equivalent to separate policies in the amounts herein required, and (ii) in all other respects, any such policy or policies shall comply with the applicable provisions of this Article 10.

10.3.2 Special Form Property Insurance.  Landlord shall procure and maintain (or shall cause to be procured and maintained) in full force and effect on and after the Effective Date and throughout the Term, Special Form (formerly known as "All-Risk") property insurance (including loss of rents for a minimum period of one (1) year) and endorsements for coverages for flood, earthquake, windstorm, earth movement [sinkholes], demolition, increased cost of construction and contingent operation of building laws coverages,  on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of all of the buildings

(including the Premises) and other insurable improvements in the Shopping Center (including, without limitation, Tenant's Work) provided, however, in no event shall such insurance cover Tenant's Property.  All policies required to be maintained by Landlord pursuant to this Subsection 10.3.2 shall provide that any proceeds thereof shall be deposited with Landlord's Mortgagee, or if none, to Landlord, in either event to be held in trust by such party and disbursed only in accordance with the provisions of, and for the purposes set forth in, Section 11.1 hereof.  The property insurance required to be maintained by Landlord pursuant to this Section shall not have deductibles exceeding One Hundred Thousand Dollars ($100,000) without Tenant's prior consent.  Tenant shall reimburse to Landlord the amount of the increase, if any in Landlord's cost for the Special Form insurance to the extent such increase was caused by a change in use of the Premises by Tenant by selling items other than Permitted Items. Such payment shall be made within thirty (30) days of Tenant's receipt of written notice from Landlord accompanied by a detailed statement showing Landlord's reasonable calculation of such increase with appropriate supporting documentation.

        10.3.3  Tenant's Pro Rata Share of Insurance Premiums.  Tenant shall reimburse Landlord for Tenant's Pro Rata Share of the reasonable insurance premiums attributable to the policies required to be maintained by Landlord pursuant to this Section 10.3 as part of Common Areas Charges (the *"Insurance Charges"*) (it being agreed, however, that for the purposes of calculating Tenant's Pro Rata Share of such Insurance Charges, said "insurance premiums" shall not be deemed to include premiums to the extent same are attributable to any betterments or improvements contained within any other tenant's premises within the Shopping Center). Notwithstanding the foregoing, in no event shall the amount of Tenant's Pro Rata Share of Insurance Charges exceed Fifty-Five Cents ($.55) per square foot of Floor Area with respect to the first full calendar year of the Term.  If the rates for any insurance Landlord is required to carry hereunder are increased as a result of the use or other activity of any other occupant of the Shopping Center, the amount of such increase shall be excluded from Common Areas Charges.  To the extent that Landlord receives a dividend, credit, rebate or other return of a premium which had previously been included in Common Areas Charges, Landlord shall promptly refund Tenant's Pro Rata Share of such dividend, credit, rebate, or return to Tenant. Tenant's Pro Rata Share of any insurance premium for any period during the Term which constitutes less than a full calendar year shall be equitably prorated.  The provisions of this Subsection 10.3.3 shall survive the expiration or earlier termination of this Lease.

        Section 10.4   General Insurance Requirements.

        10.4.1  All insurance required to be maintained by the parties under this Lease shall be maintained with insurance companies qualified to do business in the state in which the Shopping Center is located, and rated at least A-/VIII by the most current Best's Key Rating Guide (or its equivalent, if such Guide ceases to be published).  Each party shall use its diligent efforts to have its insurers provide thirty (30) days [ten (10) days in the event of non-payment of premium] prior notice to the other party of cancellation or non-renewal of any policy required hereunder.  Each party shall provide to the other duly executed certificates evidencing the insurance coverage described in Subsection 10.2.1(ii) and Section 10.3 above upon the request of the other.

        10.4.2  The liability insurance requirements under Sections 10.2 and 10.3 above shall be reviewed by Landlord and Tenant every five (5) years for the purpose of mutually increasing (in consultation with their respective insurance advisors) the minimum limits of such insurance to limits which shall be reasonable and customary for similar facilities of like size and operation in accordance with generally accepted insurance industry standards.  The replacement value of the buildings and other insurable improvements constituting the Shopping Center shall be re-evaluated from time to time at the request of either Landlord or Tenant.

## ARTICLE 11
## FIRE AND OTHER CASUALTY; EMINENT DOMAIN

        Section 11.1   Fire and Other Casualty.

        11.1.1  (a)        Except as otherwise provided in this Subsection 11.1.1, if all or a portion of the Premises, the Common Areas or other buildings, including all improvements thereto, in the Shopping Center shall be damaged by fire or other casualty, Landlord shall promptly (x) rebuild and restore the Premises and the Common Areas to the condition existing immediately prior to such fire or other casualty (which restoration shall include all Tenant's Work and all other leasehold improvements performed by Tenant), and (y) rebuild and restore the other buildings in the Shopping Center located within the "Primary Restoration Area" designated on Exhibit B hereto, to substantially the condition in which same existed immediately prior to

such fire or other casualty so that same shall be occupied or ready for occupancy following reconstruction (all of the foregoing work is hereinafter referred to as the "Primary Restoration"). With respect to buildings or improvements within the Shopping Center which are damaged by fire or other casualty but which are not required to be restored by Landlord as part of the Primary Restoration, Landlord shall promptly either (aa) rebuild and restore all or portions of the same to substantially the condition in which they existed immediately prior to such fire or other casualty, or (bb) raze the remaining portions of such buildings or improvements not rebuilt, remove all debris resulting therefrom, and pave such areas for parking or landscape such areas in a sightly manner (all of the foregoing work is hereinafter referred to as the "Secondary Restoration").  The proceeds of the policies required to be obtained and maintained by Landlord pursuant to Section 10.3 hereof shall, to the extent necessary, be used for the performance of the Primary Restoration and the Secondary Restoration (it being agreed that subject to the provisions of this Lease, such proceeds delivered to Landlord's Mortgagee may be disbursed in accordance with such Mortgagee's commercially reasonable disbursement requirements).  In the event such insurance proceeds are insufficient to complete such work, Landlord shall provide the balance of the amount necessary to rebuild or restore the Shopping Center in the manner provided in this Subsection 11.1.1.

(b)        Notwithstanding the foregoing, if any portion of the Premises are so damaged or destroyed, Tenant shall have the right to require Landlord to make changes to the Premises in the course of, and as part of, such rebuilding or restoration work.  If the net cost and expense of such rebuilding or restoration work is more than what the cost and expense would be to rebuild the Premises as shown on the as-built drawings previously delivered to Landlord solely as a result of such changes (taking into consideration any and all actual reduced and additional costs resulting from such changes and/or other cost savings arising therefrom), then Tenant shall pay to Landlord, as Additional Rent, the amount of such net increase, which amount shall be due and payable within thirty (30) days after Landlord has delivered to Tenant backup information evidencing such increase (including, without limitation, receipted invoices) as may be reasonably required by Tenant.  To the extent that Landlord's substantial completion of such rebuilding or restoration work is delayed solely as a result of such changes (taking into consideration any and all reasonable time savings to Landlord resulting from such changes), then the applicable period(s) specified in Subsection 11.1.2 below shall be appropriately adjusted to the extent of such net delay.

(c)        If, in Tenant's reasonable judgment, any damage to the Premises renders all or any portion of the Premises unusable for the conduct of Tenant's business or, in the case of damage to the Critical Areas, materially and adversely interferes with the normal conduct of any business operations in the Premises, the Rent shall be equitably reduced or totally abated based upon the extent to which the remaining portion of the Premises may, in Tenant's reasonable judgment, be utilized for its normal conduct of business until the damaged improvements are restored.

11.1.2 In the event that:

(a)        Landlord does not commence the repair and restoration work to the Premises, the Common Areas, or other buildings in the Shopping Center as required pursuant to this Section 11.1 within ninety (90) days after the date of such destruction, or thereafter fails to diligently pursue the completion of such repair and restoration work (subject to such period as may be reasonably necessary for the adjustment of insurance proceeds, not to exceed forty-five (45) days in the aggregate); or

(b)        the required repairs and restorations to the Premises, the Common Areas, or other buildings in the Shopping Center are not Substantially Completed by Landlord in accordance with the provisions of this Section 11.1 within one (1) year after the date of destruction (which period may be extended by reason of an event of Force Majeure, for a period not to exceed ninety (90) days in the aggregate, or adjustment of insurance proceeds, not to exceed forty-five (45) days in the aggregate, provided that Landlord shall have given Tenant notice thereof promptly after its occurrence),

then, in either of such events, Tenant shall have the right, at its sole discretion and option, to:

(i)        after giving thirty (30) days' prior notice to Landlord (and Landlord's continued failure to commence and diligently pursue such repairs and restoration work to completion), perform or complete, as the case may be, said work (or any portion thereof) to the Premises and Critical Areas only on Landlord's behalf and at the sole cost of Landlord, which cost Landlord shall pay to Tenant during the course of such repairs within twenty (20) days after Tenant's delivery to Landlord of an invoice therefor and, in default of any such payment,

Tenant shall have the right to offset the amount thereof, together with interest at the Lease Interest Rate, against the Rent next accruing hereunder (it being agreed, without limiting the foregoing provisions of this Subsection 11.1.2,  that at Tenant's election all insurance proceeds paid or payable to Landlord or Landlord's Mortgagee pursuant to Section 10.3 hereof shall be paid (or, as applicable, in turn delivered) directly to Tenant, to be applied to such work by Tenant as same is being performed); or

(ii)    seek to obtain specific performance of Landlord's repair and restoration obligations pursuant to the laws of the state in which the Shopping Center is located; or

(iii)    terminate this Lease by thirty (30) days' notice to Landlord.

In addition to the foregoing, if, in the opinion of an independent licensed architect designated by Tenant (and reasonably acceptable to Landlord), the required repairs and restorations to the Premises and the Common Areas cannot be completed by Landlord in accordance with the provisions of this Section 11.1 within one (1) year after the date of destruction, Tenant shall have the right, at its sole discretion and option, to terminate this Lease by giving Landlord at least thirty (30) days' notice thereof.  If Landlord is required to and does rebuild the Premises in accordance with this Article 11, Tenant shall restore Tenant's Property.

11.1.3 If the Premises are substantially destroyed by fire or other casualty during the last three (3) years of the Term to the extent of more than one-third (1/3) of the Floor Area thereof, Landlord or Tenant shall each have the right to terminate this Lease as of the date of such damage or destruction by giving notice within thirty (30) days following such damage or destruction, but Tenant may negate any termination by Landlord by agreeing to extend the Term for an additional five (5) year period by exercising an option pursuant to Subsection 2.2.2 hereof, if available, within ten (10) days after receipt of the termination notice from Landlord.

Section 11.2  Eminent Domain.

11.2.1  As used in this Section 11.2, "*Taking*" or "*Taken*" shall mean a taking for any public or quasi-public use by any lawful power or authority by exercise of the right of condemnation or eminent domain or by agreement between Landlord and those having the authority to exercise such right and also shall include a change in the grade of any street adjoining the Shopping Center as described in Section 11.2.6 below.

11.2.2  If all of the Premises shall be Taken, this Lease shall terminate as of the date of vesting of title or transfer of possession, whichever is earlier, without further liability on the part of either Landlord or Tenant, except for an adjustment between the parties for the Rent payable by Tenant hereunder.

11.2.3  In the event that:

(a)    any portion of the Premises shall be Taken so that it is commercially unreasonable or unfeasible for Tenant, in its reasonable judgment, to conduct its normal business in the Premises;

(b)    as a consequence of any Taking:  (i) portions of the Shopping Center shall be divided or separated in any manner that it materially interferes with parking, visibility, or access to the Premises from other portions of the Shopping Center, or (ii) the Shopping Center no longer has at least one (1) entrance from both Cobb Parkway and Akers Mill Road directly into the Critical Area, and as a result, it is not commercially reasonable or feasible for Tenant, in its reasonable judgment, to conduct its normal business in the Premises and Landlord is unable to replace such access in a manner acceptable to Tenant in its sole discretion within thirty (30) days of such Taking;

(c)    Intentionally Omitted;

(d)    Intentionally Omitted;

(e)    Intentionally Omitted;

(f)    any parking spaces located in the Critical Areas are taken or if five percent (5%) or more of any parking spaces located on the Outparcels shown on Exhibit B are Taken, or if so many of the parking spaces in the Shopping Center are Taken such that there are fewer than (i) five (5) parking spaces for every one thousand (1,000) square feet of Floor

Area in the Shopping Center, or (ii) the number of parking spaces required by applicable Legal Requirements and Landlord is unable to replace such parking spaces in a manner acceptable to Tenant in its sole discretion within thirty (30) days of such Taking;

then, in any of such events, Tenant shall have the right to terminate this Lease by giving at least sixty (60) days' prior notice to Landlord within sixty (60) days of any such event, in which event this Lease shall terminate without any further liability on the part of either Landlord or Tenant, except for an adjustment between the parties for the Rent payable by Tenant hereunder and for payment to Tenant for its share of the award for the taking pursuant to Subsection 11.2.5 below. Upon any partial Taking of the Premises, the Rent shall be equitably reduced or totally abated based upon the extent to which the remaining portion of the Premises may, in Tenant's reasonable judgment, be utilized for its normal conduct of business.

11.2.4  If this Lease is not terminated pursuant to this Section 11.2, Landlord, at its sole cost and expense, within a reasonable period of time after such Taking, shall repair and restore the area not so Taken to tenantable condition, similar in physical appearance to the condition of the area immediately prior to the Taking, pursuant to plans and specifications approved by Tenant (which repair and restoration shall, as applicable, include all Tenant's Work and all other leasehold improvements performed by Tenant based on as-built plans, if available; provided, however, that Landlord shall not be obligated to repair or restore Tenant's Property), and any and all amounts awarded to Landlord for any Taking shall be made available to and used by Landlord for any rebuilding or restoration which it is required to perform hereunder. During the period of such repairs and restoration, all Rent shall abate to the extent that the Premises may not, in Tenant's reasonable judgment, be used by Tenant for the normal conduct of its business.  Such abatement shall terminate in accordance with the terms of Section 11.3 below.

11.2.5  In the event of a Taking resulting in a termination of this Lease under this Article 11.2, the parties hereto, and each of their respective mortgagees, agree to cooperate in applying for and in prosecuting any claim for such Taking and further agree that the aggregate net award, after deducting the reasonable expenses of Landlord, Tenant, and any fee or Leasehold Mortgagee, excluding attorneys' fees, incurred in connection therewith, shall be paid and distributed as follows, and in the following order of priority:

(a)    Landlord shall be entitled to an amount equal to the value, on the vesting date, of the land taken, as if vacant and unimproved and available for its best or most economic use and the value of the Landlord's interest in this Lease, subject to the existence of this Lease.

(b)    Tenant shall be entitled to an amount representing Tenant's book value of Tenant's Work, which amount shall be determined by calculating all of Tenant's costs and expenses of performing Tenant's Work and deducting therefrom the Roof Allowance and the Tenant Allowance to the extent paid to Tenant from Landlord.

(c)    Landlord shall be entitled to the balance of the award.

Notwithstanding anything to the contrary in this Article 11, (i) if the Tenant Allowance and/or Roof Allowance have not been fully paid to Tenant at the time of the Taking and so long as Tenant has performed such work in the first instance, then before any portion of the award is paid to Landlord, Tenant shall be entitled to an amount equal to the unpaid Tenant Allowance and Roof Allowance along with an amount equal to Tenant's book value of Tenant's Work and (ii) provided that the award to Landlord is not reduced, Tenant shall be entitled to maintain a separate claim for any loss to Tenant's business as a going-concern on the Premises, removal expenses, business dislocation damages and moving expenses and any award resulting from such claim shall be paid to Tenant.

11.2.6  In the event there occurs, in Tenant's reasonable business judgment, a denial of adequate access to the Shopping Center at the grade of any street adjoining the Shopping Center or to any easement granted under this Lease, whether or not a Taking shall have occurred, and Landlord is unable to replace such access in a manner acceptable to Tenant in its reasonable business discretion within ninety (90) days of the occurrence of such event, and as a result thereof there is a material decrease in Tenant's gross sales at the Premises, then Tenant shall have the right to terminate this Lease by giving at least sixty (60) days' prior notice to Landlord within sixty (60) days of any such event, in which event this Lease shall terminate without any further liability on the part of either Landlord or Tenant, except for an adjustment between the parties for the Rent payable by Tenant hereunder and for payment to Tenant for its share of the award, if any, for the taking pursuant to Subsection 11.2.5 above.  If Tenant fails to provide such notice to Landlord within such 60-day period, then Tenant shall be

deemed to have waived its termination right under this Subsection 11.2.6 on account of such occurrence.

      11.2.7  Any dispute between the parties with respect to this Section 11.2 shall be resolved by arbitration in accordance with the provisions of Section 16.3 below.

      Section 11.3  <u>Abatement of Rent Charges.</u>  Notwithstanding any other provisions of this Lease, if the Fixed Rent and Additional Rent payable by Tenant hereunder shall be abated pursuant to Sections 11.1 or 11.2 above, such abatement shall terminate upon the first to occur of:  (a) the date on which Tenant shall reopen the Premises to the general public for business; or (b) the expiration of the period which is one hundred eighty (180)  days after Landlord shall have completed such repairs and restoration work as Landlord is obligated to perform hereunder and the interference with the operation of business in the Premises has ceased.

### ARTICLE 12
### COVENANTS, REPRESENTATIONS AND WARRANTIES

      Section 12.1  <u>Quiet Enjoyment</u>.  Provided that an Event of Default does not then exist, Tenant shall peaceably and quietly have, hold, occupy and enjoy the Premises for the Term, without hindrance from Landlord or any party claiming by, through, or under Landlord.

      Section 12.2  <u>Authority</u>.  Tenant and Landlord each warrant and represent that the person(s) signing this Lease on their behalf has authority to enter into this Lease and to bind Tenant and Landlord, respectively, to the terms, covenants and conditions contained herein. The submission of this Lease to each party hereto shall be for examination and negotiation purposes only, and does not and shall not constitute a reservation of or an obligation of Tenant to lease, or otherwise create any interest of Tenant in, the Premises or any other premises situated in the Shopping Center unless and until the Lease is fully executed and delivered by Tenant and Landlord.

      Section 12.3  <u>Landlord's Covenants, Warranties and Representations.</u>  To induce Tenant to execute this Lease, and in consideration thereof, Landlord covenants, warrants and represents to Tenant as follows:

      (a)      As of the Effective Date, Landlord has, and as of the Delivery Date Landlord shall have, good and marketable fee simple title to the entire Shopping Center, free and clear of all easements, restrictions, liens, encumbrances, and the like, except for the encumbrances described on <u>Exhibit E</u> hereto and any other restrictions, easements or encumbrances that will not (i) interfere with or prevent Tenant from operating its Premises in accordance with the terms of this Lease or interfere with Tenant's use and enjoyment of the Premises, (ii) conflict with any right granted Tenant under this Lease, or (iii) impose on Tenant any obligation(s) in excess of those set forth in this Lease;

      (b)      In the event the legal description of the Shopping Center described in <u>Exhibit A</u> hereto indicates that the Shopping Center is composed of more than one parcel or lot, Landlord represents that there exist no strips or gores between such parcels or lots which are not owned by Landlord;

      (c)      No third party consents or approvals are required in order for Landlord to enter into this Lease, or for the performance of Landlord's Work and Tenant's Work (excluding, as of the Effective Date, governmental permits and approvals);

      (d)      Subject to <u>Exhibit K-1</u> attached hereto, Tenant's use of the Premises for sale of "Permitted Items" (defined in Subsection 1.1.28 above) will not violate any exclusive provision or prohibited use restriction granted to any other tenant or occupant in the Shopping Center;

      (e)      The Shopping Center, on the Delivery Date, shall have, access to Cobb Parkway and Akers Mill Road for the purpose of vehicular traffic;

      (f)      This Lease does not violate the provisions of any instrument heretofore executed and/or binding on Landlord, or affecting or encumbering the Shopping Center, or the Premises, and no rights granted by Landlord to Tenant under the terms of this Lease conflict with any rights granted by Landlord to any other tenant or occupant in the Shopping Center;

      (g)      Subject to the provisions of <u>Exhibit E</u> attached hereto, there shall be no restrictions or other legal impediments imposed by any public or private instrument which

would prevent:  (i) the use of the Premises for the Permitted Use; (ii) the use of the parking facilities, access roads, and other Common Areas in the manner contemplated by this Lease; or (iii) the performance of Tenant's Work (and any permit or other authorization to proceed with Tenant's Work shall have been obtained by Tenant), provided that Tenant has timely made all required submissions to the applicable governmental authorities.

(h)     As of the Effective Date, subject to Legal Requirements, there are no sign ordinances, restrictive covenants, uniform sign plans or other signage restrictions which would prevent the Premises from having the signage (including, without limitation, the square foot area and size of letters) as depicted on Exhibit D-1 and Exhibit F hereof;

(i)     As of the Effective Date there is no "Related Land" (defined in Subsection 13.1.2 below) in existence and as of the Delivery Date there will not be any Related Land in existence (or, if there shall be Related Land in existence, Landlord shall promptly notify Tenant thereof and promptly execute any recordable instrument reasonably requested by Tenant which memorializes the provisions of this Lease pertaining to or otherwise affecting Related Land);

(j)     Other than the Leases set forth on Exhibit K-2 hereto (the "*Existing Leases*" and tenants under the Existing Leases are hereinafter referred to as the "*Existing Tenants*"), there are no executed and delivered leases in effect on the Effective Date with respect to the Shopping Center; and

(k)     Landlord shall promptly forward to Tenant any notice or other communication received by Landlord from any owner of property adjoining or adjacent to the Shopping Center or from any municipal or other governmental authority, in connection with any hearing or other administrative proceeding relating to any proposed zoning, building code, signage, or related variance affecting the Shopping Center, which, if granted, could adversely affect Tenant's use or occupancy of the Premises, the conduct of Tenant's business therein, or Tenant's rights and benefits under this Lease.  Landlord, at its sole cost and expense, shall appear in such proceeding and shall contest such proposed variance.  If Landlord fails so to appear and contest such proposed variance after receiving five (5) days' notice from Tenant (or such shorter notice as may be practicable under the circumstances), then Tenant shall be entitled (but shall not be obligated to), in its own name and/or in the name of Landlord, appear in such proceeding, in which event Landlord shall fully cooperate with Tenant, provide such information, and execute any documents or other instruments as Tenant may reasonably request in connection with any such proceeding.

Section 12.4     Environmental Matters.

12.4.1  Definitions.

(a)     As used herein, the term "*Environmental Laws*" shall mean any and all Legal Requirements concerning the protection of the environment, human health or safety.

(b)     As used herein, the term "*Hazardous Substances*" shall mean each and every element, compound, material, mixture, substance, waste, hazardous substance, hazardous waste, hazardous material, toxic substance, pollutant or contaminant either as those terms are defined in any of the Environmental Laws or the presence of which may cause liability at common law, including, without limitation, asbestos and/or asbestos-containing products, whether or not currently friable.

(c)     As used herein, the term "*Environmental Notice*" shall mean a summons, citation, directive, order, claim, notice, litigation, investigation, judgment, legal pleading, letter or other communication, written or oral, actual or threatened, from the United States Environmental Protection Agency or other federal, state or local governmental agency or authority, or any other private individual or entity concerning (i) any Hazardous Substances at, on, in, under or emanating from the Premises, the Shopping Center or any contiguous property that affects the Shopping Center; (ii) any violation or potential violation of Environmental Laws at the Premises, the Shopping Center or any contiguous property; or (iii) any underground storage tanks on the Premises or the Shopping Center.

(d)     As used herein, the term "*Releasing*" or "*Release*" shall mean releasing, spilling, leaking, discharging, disposing or dumping or otherwise introducing any substance into the environment or into any building or other improvements in violation of Environmental Laws.

(e)    As used herein, the term "**Compliance Costs**" shall mean any and all costs incurred by a party in complying with applicable Environmental Laws, including, without limitation, consultant's and engineer's fees; laboratory costs; contractor's and subcontractor's fees; application and filing fees; costs of investigation, monitoring or cleanup of soil or other substrate, surface water, groundwater, or buildings or other improvements; equipment costs; disposal fees; costs of operation and maintenance of equipment; legal fees; other governmental fees or costs; interest at the Lease Interest Rate from the date of expenditure until paid in full; and other similar or related costs.

(f)    As used herein, the term "**Tenant Related Parties**" shall mean Tenant's agents, servants, employees, contractors or licensees.

(g)    As used herein, the term "**Environmental Reports**" shall mean the Asbestos Report and that certain Phase I Investigation dated November 10, 2003.

12.4.2  Compliance with Environmental Laws.  Tenant, its agents, employees, contractors or assigns shall comply with all applicable requirements of Environmental Laws governing its use of, and operations at, the Shopping Center and the Premises.  Landlord shall comply with all applicable requirements of Environmental Laws relating to the Shopping Center and the Premises, except to the extent such requirements arise from Tenant's Work, Tenant's operations thereon, or Tenant's, its agents' employees', contractors' or assigns', acts or omissions thereat; provided, however, Landlord shall be liable and responsible for any and all liability (including, without limitation, Compliance Costs) relating to or arising from any pre-existing Hazardous Substances or Releases present at the Shopping Center or the Premises before the Effective Date, but excluding the asbestos located in the roof which shall be handled in accordance with Section 3.3.8.

12.4.3  Responsibility for Releases of Hazardous Substances.  Notwithstanding any other provision of this Lease, Tenant shall only be liable for any Release of Hazardous Substances at, on, in, under or emanating from the Premises or Shopping Center which were caused by Tenant or Tenant Related Parties (hereinafter "**Tenant Releases**"), including, without limitation, any Compliance Costs required to address Tenant Releases.  Landlord shall be liable for any Hazardous Substances at, on, in, under or emanating from the Premises or Shopping Center from and after the Delivery Date, including, without limitation, any Compliance Costs attributable to such Hazardous Substances, unless the Hazardous Substances are caused by Tenant Releases. Notwithstanding anything to the contrary in this Lease, if any Hazardous Substances, other than the asbestos which Landlord and Tenant acknowledged are in the roof of the Premises, are found in, on or under the Premises or Common Areas which pre-date the Delivery Date, then, Landlord shall promptly remove the same in compliance with all applicable laws at Landlord's sole cost and expense, and, to the extent such work delays Tenant's Work, then the Rent Commencement Date shall be delayed on a day for day basis for each day of such delay.  Except in the event of an emergency or otherwise required by Legal Requirements, any work performed in the Critical Area by Landlord relating to Hazardous Substances shall be performed by Landlord at any time other than during the months of August, November and December, and shall be undertaken in such a manner so as to (i) not adversely affect ingress to or egress from the Shopping Center, (ii) have no adverse effect on the visibility of the Premises or any signs which contain Tenant's name, and (iii) not otherwise materially interfere with the normal conduct of any business operations in the Premises.  Any work performed by Tenant shall comply with clauses (i), (ii) and (iii) to the extent the same affect other tenants or occupants at the Shopping Center.

12.4.4  Standards.  Except as expressly provided herein, the parties agree that any investigation or remediation of Hazardous Substances, or cure of a violation of Environmental Laws, required to be conducted at the Premises or Shopping Center shall be no more stringent than necessary to meet the minimum standards of Environmental Laws applicable to properties used in the manner the Shopping Center is being used.

12.4.5  Landlord's Representations and Warranties.  Landlord represents and warrants that, subject to the matters disclosed in the Environmental Report:  (i) Landlord has received no Environmental Notices concerning the Shopping Center, or the Premises; (ii) Landlord has no knowledge of, and has received no notice of, any violation, or potential or alleged violation, of any Legal Requirement, including, without limitation, Environmental Laws, affecting the Shopping Center or the Premises, regardless of whether same has been cured; and (iii) to Landlord's actual knowledge:  (A) no Hazardous Substances are located at, on, in, under or emanating from the Shopping Center, the Premises or any contiguous properties, except for the asbestos currently located in the roof of the Premises; and (B) no underground storage tank exists at the Shopping Center or the Premises.

12.4.6  <u>Documents</u>.  Each party shall immediately notify the other party of the notifying party's receipt of an Environmental Notice.

12.4.7  <u>Indemnity</u>.  Each party to this Lease shall indemnify, defend and hold the other party, and its agents, servants, shareholders, directors, officers and employees harmless from any and all claims, losses, expenses, costs, lawsuits, actions, administrative proceedings, damage, orders, judgments, penalties and liabilities of any nature whatsoever, including, without limitation, reasonable attorneys' fees (incurred to enforce this indemnity or for any other purpose) and Compliance Costs, arising from (i) the indemnifying party's breach of any of its representations, warranties, covenants or other obligations under this Section 12.4; (ii) Hazardous Substances for which the indemnifying party is liable under this Section 12.4; or (iii) violations of Environmental Laws for which the indemnifying party is liable under this Section 12.4.

12.4.8  <u>Survival</u>.  The obligations of the parties under this Section 12.4 shall survive the renewal, expiration, breach or earlier termination of this Lease.

12.4.9  <u>Conflict</u>.  In the event of any conflict between the provisions of this Section 12.4 and any other provision of this Lease, the provisions of this Section 12.4 shall control.

Section 12.5  <u>COREA.</u>

12.5.1  Landlord covenants, represents and warrants to Tenant that:  (i) the COREA has not been modified, amended or terminated; (ii) the COREA is currently in full force and effect; (iii) to its actual knowledge as of the date hereof, no default under the COREA exists thereunder beyond any applicable notice and cure period; and (iv) the COREA is, and shall remain, superior in lien to all mortgages and related liens affecting the Shopping Center and all other land which is encumbered by the COREA.  Landlord and Tenant each acknowledge that this Lease is made and shall continue to be subject and subordinate to the COREA, subject to the provisions of this Section 12.5.  Tenant shall comply with the terms and conditions of the COREA to the extent same affects the Premises.

12.5.2  Landlord shall, during the Term:  (i) perform and observe all of the terms, covenants, provisions and conditions of the COREA on Landlord's part to be performed and observed; (ii) defend, indemnify and hold harmless Tenant from and against any and all claims, demands, causes of action, suits, damages, liabilities, and expenses of any nature arising out of or in connection with the enforcement of, or a claimed breach by, Landlord of any covenant, term, condition, or provision of the COREA, but excluding any such actions or claims arising out of the acts or omissions of Tenant or its agents, contractors, employees or subtenants, and (iii) diligently enforce, at its sole expense, the covenants, agreements, and obligations of the COREA.

12.5.3  Whenever, pursuant to the COREA, the consent or approval of Landlord shall be required by or requested, and such consent or approval could diminish the rights or increase the obligations of Tenant thereunder or under this Lease, or could materially adversely affect Tenant's use or occupancy of the Premises, or the conduct of Tenant's business therein, such consent or approval shall not be granted without the prior consent of Tenant, which consent may be withheld in its sole and absolute discretion.

12.5.4  Landlord shall, immediately upon receipt, forward to Tenant and Tenant's leasehold mortgagee, if any, a copy of any and all notices and/or demands received by Landlord under or pursuant to the COREA, which relate to, or could adversely affect, Tenant's use or occupancy of the Premises, the conduct of Tenant's business therein, or Tenant's rights pursuant to this Lease.

12.5.5  Landlord shall not amend, or modify the COREA if such amendment or modification could diminish the rights or increase the obligations of Tenant thereunder or under this Lease, or could adversely affect Tenant's use or occupancy of the Premises or the conduct of Tenant's business therein.

12.5.6  In the event Landlord defaults in the performance of any of its obligations under the COREA or fails to enforce the obligations of any other obligee under the COREA, and such default or failure to enforce could adversely affect Tenant's rights thereunder or under this Lease, Tenant's Work, Tenant's use or occupancy of the Premises or the conduct of Tenant's business therein, Tenant may, but shall not be obligated to, after thirty (30) days' written notice (except in the event of emergency, in which case only such notice as is reasonable under the circumstances shall be required) cure any default by Landlord under the COREA and/or

enforce, in its own name, at Landlord's expense, the obligations of any other obligee under the COREA.  Landlord shall, upon demand, reimburse Tenant for the actual, reasonable, documented, out-of-pocket costs incurred by Tenant in performing any of Landlord's obligations under the COREA  or enforcing the obligations of any obligee under the COREA, together with interest thereon at the Lease Interest Rate.  In the event Landlord fails to reimburse Tenant for such costs, then Tenant shall have the right (in addition to any rights and remedies to which it may be entitled under this Lease), upon ten (10) days' prior notice to Landlord, to offset such costs from the next succeeding payment or payments of Fixed Rent due hereunder, together with interest thereon at the Lease Interest Rate from the date of outlay until reimbursement or full satisfaction by credit.

12.5.7  As between Landlord and Tenant, in the event of any conflict between the COREA and this Lease, this Lease shall in all respects control.

12.5.8  Landlord shall obtain any third-party approvals required under the COREA for the performance of Landlord's Work (including, without limitation, Tenant's elevations and signage, as shown on Exhibit D-1 and Exhibit F hereto), Tenant's Work, and the operation of Tenant's business in the Premises.

**ARTICLE 13
USES AND RESTRICTIONS**

Section 13.1    Permitted and Prohibited Uses.

13.1.1  Tenant's Permitted Use.  The Premises may be used and occupied for the Permitted Use and for no other use (defined in Subsection 1.1.28 above).  Notwithstanding the foregoing and notwithstanding the terms of subsection 1.1.28 above, Tenant shall not use the Premises for any of the "*Prohibited Uses*" (defined in Exhibit M hereto annexed), in conflict with any of the use restrictions contained in the COREA, or for any of the "Existing Exclusives" as hereinafter defined in Section 13.3.

13.1.2  Prohibited Uses.  Landlord shall operate, maintain and manage the Shopping Center as a first-class shopping center comparable to other first-class shopping centers in the state in which the Shopping Center is located.  Landlord shall not lease, rent or occupy or permit any portion of the Shopping Center, or any portion of that parcel of land designated as the "Flack Parcel" on Exhibit B hereto if any when such parcel is hereafter owned or controlled by Landlord or its Affiliate(s) (the "Related Land"), to be occupied (except to the extent otherwise permitted under any lease for space in the Shopping Center or the Related Land existing as of the Effective Date) for any of the "Prohibited Uses" (defined in Exhibit M hereto annexed).

Section 13.2    Tenant's Exclusive in Center.  To induce Tenant to execute this Lease, and subject to all of the terms and provisions of this Section 13.2, Landlord covenants and agrees as follows:

13.2.1  Landlord shall not lease, rent or occupy or permit any other premises in the Shopping Center or on any Related Land to be occupied, whether by a tenant, sublessee, assignee, licensee or other occupant or itself for the sale, rental or distribution, either singly or in any combination, of items contained in any of the following respective categories of merchandise:  (a) linens and domestics; (b) bathroom items (excluding plumbing hardware); (c) housewares (excluding furniture, and major appliances or "white goods"); (d) frames and wall art (provided that a fine art gallery shall not be precluded); (e) window treatments; and/or (f) closet, shelving and storage items (which items, either singly or in any combination, are hereinafter referred to as the "*Exclusive Items*").  Notwithstanding the foregoing, any tenant or subtenant in the Shopping Center or on any Related Land shall have the right to utilize its respective premises for the sale, rental and/or distribution of each foregoing category of Exclusive Items within an aggregate area (which shall include an allocable portion of the aisle space adjacent to such sales, rental and/or distribution area) not to exceed the lesser of (x) five percent (5%) of the Floor Area of such tenant's or subtenant's premises, or (y) two thousand (2,000) square feet of Floor Area within such tenant's or subtenant's premises.  [For example only, a tenant occupying premises containing a total of five thousand (5,000) square feet of Floor Area could sell Exclusive Items (either singly or in any combination) so long as the  area within its entire demised premises in which any and all Exclusive Items are sold shall not exceed two hundred fifty (250) square feet.]  Existing Tenants of the Shopping Center and on any Related Land (and current or future assignees or sublessees of such tenants) shall nevertheless be subject to the restrictions contained in this Section 13.2 in the event that:  (i) the lease between Landlord (or any Landlord's Affiliate) and any such tenant requires Landlord's (or

such Landlord's Affiliate's) consent to any assignment or subletting or to a change in the use of the applicable premises to permit the sale, rental or distribution of the Exclusive Items; or (ii) Landlord or its Affiliate permits or agrees to an expansion of the applicable premises for the sale, rental, or distribution of the Exclusive Items.  The exclusive rights granted to Tenant with respect to any respective category listed above in this Section shall be conditioned upon Tenant using portions of the Premises for the sale, rental or distribution of any item or items contained in such category (other than during Excused Periods and for periods of time not exceeding six (6) consecutive months).

13.2.2  The restrictions set forth in Subsection 13.2.1 above shall not apply to the Existing Tenants or to a full-line national or regional:  (i) department store [for example, Wal-Mart, Macy's, Target, Sears or JC Penney, but not discount department stores such as Marshall's, Ross Dress for Less or TJ Maxx], (ii) discount club [for example, Costco, BJ's Wholesale Club, or Sam's Club], or (iii) home improvement center [for example, Home Depot or Lowe's], commonly located in first-class shopping centers in the state in which the Shopping Center is located, each occupying at least sixty-five thousand (65,000) square feet of Floor Area within the Shopping Center, as such stores are currently operated (as of the Effective Date).

13.2.3  The exclusive rights granted to Tenant in this Section 13.2 shall inure to the benefit of any assignee of Tenant's interest in this Lease and to any sublessee of at least fifty percent (50%) of the Floor Area of the Premises provided that such assignee or sublessee uses portions of the Premises for the sale, rental or distribution of items for which exclusive rights are granted under this Article, and such exclusive rights, following notice from Landlord to such assignee or sublessee, shall terminate and be of no further force or effect with respect to any "category" of merchandise (i.e., any one of the categories listed respectively as (a)-(f) in the foregoing Subsection 13.2.1) within which no items are sold, rented or distributed within the Premises for more than twelve (12) consecutive months (other than during Excused Periods).

13.2.4  (a)    Upon breach of the aforesaid covenant and agreement by Landlord (which breach shall not include a situation in which the lease between Landlord/or Landlord's Affiliate and any tenant in the Shopping Center, or on any Related Land, prohibits the tenant therein from violating the exclusive rights granted to Tenant in this Section 13.2 and despite such prohibition, such tenant violates such exclusive rights, unless Landlord fails to comply with any of the provisions of subparagraph (b) below), the Rent payable hereunder shall be reduced by fifty percent (50%) for so long as such violation shall continue, and Tenant shall have all remedies given to it at law and in equity, including, without limitation, the right to obtain injunctive relief, and/or to terminate this Lease, and/or to commence and prosecute an action against Landlord (and/or Landlord's Affiliate) or any other violator for damages.

(b)    If any person or entity other than an Existing Tenant or Landlord shall violate any of the exclusive provisions herein set forth, or shall indicate in writing to Landlord that it intends to violate any of said provisions, Landlord shall promptly commence appropriate legal proceedings, and vigorously prosecute the same, to enjoin and prohibit any such violation.  If Landlord fails to promptly commence such proceedings, or shall fail thereafter to vigorously prosecute the same, then Tenant shall have the right (a) to conduct and prosecute such legal proceedings (including, without limitation, an action for injunctive relief) in its own name, at Landlord's expense, or (b) in the event the right set forth in (a) above is not permitted to be exercised under applicable Legal Requirements, to conduct and prosecute such legal proceedings in the name of Landlord, at Landlord's expense, and Landlord shall cooperate with Tenant with respect to such prosecution (including, without limitation, by executing any documentation or authorization reasonably required by Tenant in connection with such prosecution and by appearing at any hearing or trial with respect to such prosecution).

Section 13.3   Exclusives Which Tenant Must Honor.

13.3.1  Tenant shall honor those certain exclusives granted by Landlord to certain other tenants in the Shopping Center pursuant to the terms of leases which have been executed prior to the Effective Date (hereinafter, *"Existing Exclusives"*) [a true and complete listing and description of such Existing Exclusives being attached hereto as Exhibit K-1], and shall not sublease, occupy or use all or any portion of the Premises, or permit all or any portion of the Premises to be occupied or used in violation of any such Existing Exclusive (except as may be specifically set forth on Exhibit K-1).  Landlord represents and warrants that as of the date of this Lease, no Existing Exclusive(s) exist other than those listed on Exhibit K-1 hereto and that Exhibit K-1 is true accurate and complete, and covenants to indemnify, defend and hold Tenant harmless from and against all loss, cost, liability or expense (including, without limitation, reasonable legal fees) incurred by Tenant by reason of the enforcement by any person or entity of such unlisted Existing Exclusive.  Notwithstanding the foregoing, Tenant shall be entitled to enter into a separate agreement with any tenant or other occupant for whose

benefit the Existing Exclusive is granted which nullifies or modifies the corresponding Existing Exclusive with regard to the Premises.

13.3.2    Except as set forth in Subsection 13.3.1, Tenant shall not be obligated to honor any exclusive granted by Landlord to any tenant or occupant in the Shopping Center.

## ARTICLE 14
## CONDUCT OF BUSINESS OPERATIONS

Subject to the other provisions of this Lease (including, without limitation, Articles 2 and 3 hereof) Tenant shall initially open its store for business to the public in the Premises for at least one (1) day as a typical fully stocked and staffed "Bed Bath & Beyond," not later than the two hundred seventieth (270th) day after the Rent Commencement Date (which date shall, as applicable, be extended by reason of (A) damage or destruction, eminent domain proceedings or actions, or Force Majeure, or (B) the acts or omissions of Landlord).  Other than as expressly set forth in the preceding sentence, Tenant shall have no obligation to open or operate any business in the Premises, and shall have the right, at any time, to cease to conduct any business operations in the Premises, and Tenant shall incur no liability to Landlord or its Mortgagee by reason thereof (it being understood and agreed that all of Tenant's obligations under this Lease shall continue unless this Lease is terminated pursuant, inter alia, to the further provisions of this Article 14 or any other provision of this Lease [other than by reason of an Event of Default]).  In the event that Tenant does not operate or cause to be operated any retail business in the Premises in at least twelve thousand five hundred (12,500) square feet of Floor Area (other than prior to the Delivery Date or during Excused Periods) for more than three hundred sixty-five (365) consecutive days, Landlord shall have the option to terminate this Lease, which option shall be exercisable by:

(a)    giving notice thereof to Tenant by not later than the ninetieth (90th) day after the date on which said 365-day period expires, and

(b)    paying to Tenant, within thirty (30) days after such notice is given, all of Tenant's costs and expenses incurred in connection the preparation and review of plans and specifications for, and the then unamortized costs (amortized on a straight-line basis over the Initial Term) of any alterations or improvements made by Tenant and permitted under this Lease,

whereupon this Lease shall terminate upon the sixtieth (60th) day (the "*Recapture Date*") after the date on which Tenant receives Landlord's termination notice, as if the Recapture Date was originally set forth herein as the expiration date of the Term.  Upon such termination, Landlord and Tenant shall each be released from any and all liabilities thereafter accruing hereunder, except for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease.  All Rent payable by Tenant hereunder shall be apportioned as of the Recapture Date and Tenant shall promptly pay to Landlord any amounts so determined to be due and owing by Tenant to Landlord, and conversely Landlord shall promptly reimburse Tenant for any amounts prepaid by Tenant for periods subsequent to the Recapture Date.

## ARTICLE 15
## TENANT ASSIGNMENT AND SUBLETTING

Section 15.1    Assignment and Subletting.  Tenant shall have the right from time to time, without the consent of Landlord, to assign Tenant's interest in this Lease and/or to sublet, concession or license all or any portion of the Premises, subject to all of the terms and conditions of this Lease.

Section 15.2    Liability of Tenant.  Unless otherwise agreed to in writing by Landlord, no assignment, subletting, licensing or concessioning by Tenant shall reduce, diminish, or otherwise affect the liability of Tenant hereunder; provided, however, that in the event of an assignment by the Tenant originally named herein or its Affiliate (collectively, the "*Original Tenant*") of its interest in this Lease to a Major Assignee or to a tenant whose obligations under this Lease are guaranteed by a Major Guarantor, all liability of the Original Tenant under this Lease accruing from and after the effective date of such assignment, shall terminate and all liability of any guarantor of this Lease, accruing from and after the effective date of such assignment, shall terminate.  For purposes of this Section 15.2, the term "*Major Assignee*" or "*Major Guarantor*", as the case may be, shall mean a person or entity which has, as of the effective date of such assignment, a net worth of at least One Hundred Million Dollars

($100,000,000), and is acquiring at least ten (10) of Tenant's stores in the aggregate, in the state of Georgia or at such time is operating at least ten (10) stores in all or any portion of such area.

Section 15.3    Collateral Assignment.  In addition to Tenant's other rights and obligations set forth in this Article 15, a collateral assignment of Tenant's interest in this Lease by Tenant to one or more "Lenders" (hereinafter defined), as collateral security for an indebtedness or other obligation of Tenant or its Affiliates shall be permitted and Landlord shall execute all documentation reasonably requested by Tenant or any such Lender in connection therewith, so long as Tenant's obligations under this Lease are not diminished and Landlord's obligations under this Lease are not increased other than to a de minimis extent.  In addition, Tenant shall have the right, without Landlord's consent, to grant to an Affiliate of Tenant a license to operate all of Tenant's business operations at the Premises, without such Affiliate having assumed any liability for the performance of Tenant's obligations under this Lease and without this Lease having been assigned to such Affiliate.  As used herein, "*Lender*" shall mean a state or federally regulated: bank, savings and loan association, insurance company, pension fund, credit union, real estate investment trust, or other institutional lender.

Section 15.4    Cure Rights of Original Tenant.

15.4.1  If Tenant assigns Tenant's interest in this Lease, then Landlord, when giving notice to said assignee or any future assignee in respect of any default, shall also give a copy of such notice to the Original Tenant if the Original Tenant is still liable under this Lease, and, provided the Original Tenant is still liable under this Lease, no notice of default shall be effective until a copy thereof is so given to Original Tenant.  Original Tenant shall have the same period after receipt of such notice to cure such default as is given to Tenant therefor under this Lease.

15.4.2  If this Lease is terminated because of:  (a) an Event of Default of such assignee, or (b) the rejection, disaffirmation, or other termination of this Lease by or on behalf of the assignee pursuant to any proceeding in bankruptcy under any Legal Requirement of any State or of the United States, or any other Legal Requirements affecting creditors' rights, then Landlord shall promptly give to Original Tenant notice thereof if the Original Tenant is still liable under this Lease, and Original Tenant shall have the right, exercisable by notice given to Landlord within fifteen (15) days after receipt by Original Tenant of Landlord's notice, to enter into a new lease of the Premises with Landlord ("*New Lease*"), provided that the Original Tenant shall have remedied all Events of Default of the assignee hereunder, unless such Events of Default are not reasonably susceptible of cure by the Original Tenant, in which event the Original Tenant shall not be obligated to cure such Events of Default as a condition to the exercise of its rights under this Subsection 15.4.2.  Upon the Original Tenant's curing of any such Event of Default of the assignee as aforesaid, Landlord shall assign to the Original Tenant all of Landlord's rights against such assignee (whether arising as a result of bankruptcy court proceedings or otherwise).  The term of said New Lease shall begin on the date of termination of this Lease and shall continue for the remainder of the Term (including any Renewal Periods).  Such New Lease shall otherwise contain the same terms and conditions as those set forth herein, except for requirements which are no longer applicable or have already been performed.  It is the intention of the parties hereto that such New Lease shall have the same priority relative to other rights or interests in or to the Premises as this Lease.  The provisions of this Subsection 15.4.2 shall survive the termination of this Lease and shall continue in full force and effect thereafter to the same extent as if this Subsection 15.4.2 were a separate and independent contract between Landlord and the Original Tenant.  From the date on which the Original Tenant shall serve Landlord with the aforesaid notice of the exercise of its right to a New Lease, the Original Tenant shall have quiet and undisturbed use and enjoyment of the Premises and all appurtenances thereto, as contemplated in this Lease.

Section 15.5    Recognition Agreement.  In the event Tenant subleases the entire Premises for a term of at least five (5) years, then, notwithstanding any other provisions of this Lease, Landlord shall, upon Tenant's request, execute and deliver an agreement among Landlord, Tenant and each such subtenant in the form of Exhibit H hereto, in recordable form.

## ARTICLE 16
## DEFAULT AND DISPUTE RESOLUTION

Section 16.1    Tenant Default.

16.1.1  If Tenant shall fail to:  (i) pay any Rent when due, within ten (10) days after its receipt of notice thereof from Landlord specifying the amount and details of the unpaid

Rent, or (ii) perform or observe any of the other covenants of this Lease on Tenant's part to be performed or observed within thirty (30) days after its receipt of notice thereof from Landlord specifying the nature of such default (or, if such default shall be of a nature that same cannot reasonably be cured within thirty (30) days and Tenant does not commence to cure such default on or before such thirtieth (30th) day and thereafter diligently prosecute said cure to completion), such circumstance shall constitute an "*Event of Default*".  If Tenant becomes a debtor within the meaning of Chapter 11 of the United States Code, Section 101 et seq., as the same may from time to time be amended ("*Bankruptcy Code*") then notwithstanding any other provision of this Lease, this Lease and Landlord's and Tenant's rights are then made subject to such Bankruptcy Code.  It is covenanted and agreed that the failure of Tenant or its representative appointed in accordance with said Bankruptcy Code to furnish accurate information and adequate assurances as to the source of Rent and other consideration due under this Lease, shall in any case each be deemed a default under this Section and Landlord shall have all rights and remedies herein afforded to it in the event of any default by Tenant under this Lease.

16.1.2  Upon an Event of Default, Landlord shall have all remedies given to it at law or in equity (except that Landlord hereby expressly waives any rights to accelerate any element of the Rent, and any right of distraint, which may be granted to it by law), including the following:

(a)     to bring suit for the collection of such unpaid Rent or for the performance of such other covenant of this Lease on Tenant's part to be performed; and/or

(b)     without waiving any non-monetary default, may (but shall not be obligated to) perform any covenant which is capable of being remedied by the performance of affirmative acts for the account and at the reasonable expense of Tenant (it being agreed that should Landlord require access to the Premises in order to perform such covenant as aforesaid, Landlord shall comply with the applicable provisions of Sections 9.2 hereof), in which event, Tenant shall pay to Landlord on demand, as Additional Rent, the reasonable cost or amount thereof, together with interest thereon at the Lease Interest Rate from the date of outlay of expense until payment; and/or

(c)     upon at least five (5) days' notice to Tenant, to terminate this Lease, whereupon Landlord shall have and retain full right to sue for and collect all unpaid Rent which shall have accrued up to the date of termination and any damages to Landlord by reason of any such breach, and Tenant shall surrender and deliver the Premises to Landlord, failing which, Landlord shall have the right to initiate summary proceedings to recover possession; and/or

(d)     upon at least five (5) days' notice to Tenant to terminate Tenant's right of possession, re-enter the Premises and take possession thereof by lawful means.  If Landlord shall so elect to repossess the Premises without terminating the Lease, then Tenant shall be liable for and shall pay to Landlord all Rent payable to Landlord pursuant to the terms of this Lease which shall have accrued up to the date of repossession, as well as all Rent as and when same shall become due and payable pursuant to the terms of this Lease during the remainder of the Term, diminished by any net sums thereafter received by Landlord through reletting the Premises during said period (after deducting reasonable expenses incurred by Landlord in connection with such reletting).  In no event shall Tenant be entitled to any excess of any rent obtained by such reletting over and above the Rent herein reserved.  Landlord may bring actions to collect amounts due by Tenant under this Lease, from time to time, prior to the expiration of the Term.

16.1.3  Upon an Event of Default, Tenant shall be liable for and shall pay to Landlord, in addition to any sum provided to be paid above, brokers' fees incurred by Landlord in connection with reletting the whole or any part of the Premises for the remainder of the then unexpired Term (excluding any then unexercised Renewal Periods), the costs of removing and storing Tenant's or other occupant's property; the cost of repairs; and all other commercially reasonable expenses incurred by Landlord in enforcing or defending Landlord's rights and/or remedies, including reasonable attorneys' fees.

16.1.4  Upon an Event of Default, any amounts paid by Landlord to cure said Event of Default and any Rent payments not paid after notice thereof is given shall bear interest at the Lease Interest Rate from and after the expiration of any applicable grace period until paid.

16.1.5  Landlord shall use all reasonable efforts to relet the Premises or any portion thereof to mitigate Landlord's damages to which Landlord would otherwise be entitled to as a result of an Event of Default.  In no event shall Tenant be liable to Landlord for any

consequential damages suffered by Landlord as a result of an Event of Default by, or any other act of, Tenant.

Section 16.2   Landlord Default.  If Landlord shall:  (i) fail to perform or observe any of the covenants of this Lease on Landlord's part to be performed or observed within thirty (30) days after receiving notice from Tenant thereof (or, if same cannot reasonably be cured within thirty (30) days, if Landlord shall fail to promptly commence and diligently prosecute said cure to completion), or (ii) materially breach any warranty or representation under this Lease (either of (i) or (ii) above being hereinafter referred to as a "*Landlord's Default*"), then Tenant, in addition to such other rights and remedies as may be available under this Lease, or at law or in equity, may, in its sole discretion:

(a)      as applicable, perform such obligation(s) of Landlord in accordance with the provisions of this Lease on behalf of, and at the expense of Landlord; and/or

(b)      bring suit for the collection of any amounts for which Landlord is in default, seek injunctive relief, or seek specific performance for any other covenant or agreement of Landlord, without terminating this Lease; and/or

(c)      until Tenant is fully reimbursed, offset up to fifty percent (50%) against the Rent payable each month by Tenant hereunder for amounts owed by Landlord to Tenant and/or for the amounts reasonably expended by Tenant performing Landlord's obligations hereunder, including costs and reasonable attorneys' fees, together with interest thereon at the Lease Interest Rate from the date of the outlay until such amounts have been recovered by Tenant through such offset (it being agreed that Tenant shall be entitled to offset against larger percentages of installments of Rent if the aforesaid fifty percent (50%) is insufficient to pay Tenant in full, taking into account the then remaining number of installments of Rent due and payable by Tenant for the balance of the then current Term) and the reference in this subsection (c) to "fifty (50%) percent" shall be increased to "one hundred (100%) percent" with respect to offsets pertaining to Tenant's performance of Landlord's restoration work pursuant to Article 11 hereof and the failure of Landlord to reimburse to Tenant the Tenant Allowance or the Roof Allowance in accordance with the provisions of this Lease; and/or

(d)      may terminate this Lease, without waiving its rights to damages for Landlord's Default, provided that:  (1) Landlord's Default materially interferes with the normal conduct of any business operations in the Premises, (2) Landlord's Default is not reasonably capable of being cured by Tenant despite commercially reasonable efforts on the part of Tenant, and (3) Tenant gives notice of Landlord's Default to any Mortgagee of whom Landlord shall have previously given Tenant notice (including its address), and such Mortgagee shall not have cured Landlord's Default within thirty (30) days after such notice is given (or, if such default cannot reasonably be cured within thirty (30) days, such Mortgagee fails to promptly commence and diligently prosecute said cure to completion).

Notwithstanding the foregoing, if, in Tenant's reasonable judgment, a condition posing imminent risk of material harm to persons or property or material disruption to the normal conduct of any business operations in the Premises shall exist, Tenant may, at its election, and without prior notice to Landlord, exercise any or all of the remedies set forth in (a), (b) and (c) above.  In no event shall Landlord be liable to Tenant for any consequential damages suffered by Tenant as a result of a default by, or any other act of, Landlord.

Section 16.3   Arbitration.  In any case where this Lease expressly provides for submission of a dispute or matter to arbitration (but not otherwise), the same shall be settled by arbitration in Atlanta, Georgia, before one arbitrator in accordance with the procedural rules then obtaining of the American Arbitration Association or any successor thereto.  The decision of the arbitrator shall be final, conclusive and binding on the parties, but the powers of the arbitrator are hereby expressly limited to the determination of factual issues, and the arbitrator shall have no power to reform, supplement or modify this Lease.  The arbitrator shall make only required findings of fact incident to an arbitrable dispute, which findings shall be set forth in reasonable detail in a written decision by the arbitrator.  Landlord and Tenant shall share equally in the cost and expenses of such arbitration, and each shall separately pay its own attorneys' fees and expenses, unless the arbitrator finds that one of the parties did not act in good faith in connection with the dispute or the conduct of the arbitration proceeding, in which case the arbitrator may award all or part of said costs, expenses and fees to the other party.

## ARTICLE 17
### RIGHT TO MORTGAGE AND NON-DISTURBANCE; ESTOPPEL CERTIFICATE

Section 17.1    Right to Mortgage and Non-Disturbance.  Landlord reserves the right to subject and subordinate this Lease at all times to any first mortgage or deed of trust for the benefit of any Mortgagee hereafter encumbering or affecting all or any portion of the Shopping Center, as well as to any future ground or underlying leases encumbering or affecting all or any part of the Shopping Center; provided, however, that (a) each Mortgagee shall first execute and deliver to Tenant a subordination, non-disturbance and attornment agreement in substantially the form attached as Exhibit G-1 hereto, or such other form reasonably acceptable to Tenant, in recordable form, and (b) any Ground Lessor shall execute (and shall obtain the written consent of any holder of any mortgage, deed of trust or any other existing lien encumbering or affecting the Shopping Center or any portion thereof, as applicable) and deliver to Tenant a fee owner recognition agreement in a form reasonably satisfactory to Tenant, which shall include the following provisions:  (i) the Ground Lessor will not, in the exercise of any of the rights arising or which may arise out of such lease, disturb or deprive Tenant  in or of its possession or its rights to possession of the Premises or of any right or privilege granted to or inuring to the benefit of Tenant under this Lease; (ii) in the event of the termination of the ground or underlying lease, Tenant will not be made a party in any removal or eviction action or proceeding, nor shall Tenant be evicted or removed of its possession or its right of possession of the Premises, and this Lease shall continue in full force and effect as a direct lease between the Ground Lessor and Tenant for the remainder of the Term and on the same terms and conditions as contained herein, without the necessity of executing a new lease; and (iii) Landlord and Tenant shall have the right to execute any amendment to this Lease which is specifically required hereunder and the Ground Lessor shall recognize and be bound thereto.

Section 17.2    Estoppel Certificate.  Upon written request of Landlord or Tenant, the other party, within thirty (30) days of the date of such request, shall execute and deliver to and only for the benefit of the requesting party or any Mortgagee, bona fide prospective purchaser, assignee, or sublessee of the requesting party, without charge, a written statement:  (1) ratifying this Lease; (2) certifying, to such party's actual knowledge, that this Lease is in full force and effect, if such is the case, and has not been modified, assigned, supplemented or amended, except by such writings as shall be stated; (3) specifying the dates to which Fixed Rent and Additional Rent have been paid; (4) stating whether or not, to Tenant's actual, knowledge, Landlord is in default and, if so, stating the nature of such default, (5) stating the Rent Commencement Date, and (6) stating which options to extend the Lease Term have been exercised, if any.

Section 17.3    Existing Mortgagee.  If a mortgage, deed of trust, or other security instrument encumbers the Shopping Center or any part thereof on the Effective Date, then within thirty (30) days after the Effective Date, Landlord shall deliver to Tenant, in recordable form:  (x) a subordination, non-disturbance and attornment agreement substantially in the form attached hereto as Exhibit G, in recordable form, executed by each and every holder of any mortgage, deed of trust or any other existing lien encumbering or affecting the Shopping Center or any portion thereof, and (y) a fee owner recognition agreement in the form and content described in clause (b) of Section 17.1 hereof, in recordable form, executed by any Ground Lessor (and, as may be required, consented to by the holder of any mortgage, deed of trust or other existing lien as aforesaid).  Should Landlord fail to so deliver such instrument(s) within said 30-day period, Tenant shall have the right by notice given to Landlord at any time prior to the date on which such instrument(s) are delivered, to terminate this Lease, in which event, neither party shall have any further liability hereunder, except:  (i) for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease, and (ii) Landlord shall be obligated to promptly reimburse Tenant for all its reasonable, third-party costs and expenses incurred in connection with this Lease, including, without limitation, the preparation and review of plans and specifications, and the performance of Tenant's Work, provided, however, that such reimbursement by Landlord shall not exceed the aggregate sum of Seventy-five Thousand Dollars ($75,000).

## ARTICLE 18
### NOTICE

Subject to the further provisions of this Article 18, whenever it is provided herein that any notice, demand, request, consent, approval or other communication ("**Notice**") shall or may be given to either of the parties by the other, it shall be in writing and, any Legal Requirement to the contrary notwithstanding, shall not be effective for any purpose unless same shall be given by registered or certified mail, postage prepaid, return receipt requested, or by any recognized overnight mail carrier, with proof of delivery slip, addressed to Landlord at Landlord's Mailing

Address with copies of notices to Landlord also given to Robert D. Simons, Esquire, Hartman, Simons, Spielman and Wood, LLP, 6400 Powers Ferry Road, N.W., Suite 400, Atlanta, Georgia 30339, or to Tenant at Tenant's Mailing Address, with copies of notices to Tenant also given to: Allan N. Rauch, Esquire, c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, and Bart I. Mellits, Esquire, Ballard Spahr Andrews & Ingersoll, LLP, 1735 Market Street, 51st Floor, Philadelphia, Pennsylvania 19103-7599, or to such other person or other address as may, from time to time, be specified by either party in a written notice to the other party. All notices given in accordance with the provisions of this Section shall be effective upon receipt (or refusal of receipt) at the address of the addressee. Notwithstanding the foregoing, Landlord shall instead send the following items to Tenant (Attention: Lease Administration) at Tenant's Mailing Address: (A) all bills, notices (but not notices of default) and related information pertaining to Tenant's Pro Rata Share of Taxes as described in Section 4.3 of this Lease, and (B) all budgetary information, notices (but not notices of default), statements, bills and related information pertaining to Tenant's Pro Rata Share of Common Areas Charges as described in Section 5.1 of this Lease.

## ARTICLE 19
## TENANT'S PROPERTY

All of Tenant's Property which may be installed or placed in or upon the Premises by Tenant shall remain the property of Tenant. Tenant may assign, hypothecate, encumber, mortgage or create a security interest in or upon Tenant's Property in the Premises without the consent of Landlord and may remove Tenant's Property at any time during the Term. Landlord waives any right it may have in Tenant's Property. To the extent Landlord may have a lien on or security interest in the Tenant's Property pursuant to this Lease, by law or otherwise, Landlord hereby subordinates, and agrees not to assert, such lien or security interest. Landlord shall provide to Tenant, within thirty (30) days after Landlord's receipt of Tenant's request therefor, a written subordination in form reasonably satisfactory to Tenant and Landlord evidencing Landlord's subordination of any rights it has or may have in Tenant's Property.

## ARTICLE 20
## END OF TERM

Section 20.1    Surrender of Premises.   At the expiration or earlier termination of the Term, Tenant will quit and surrender the Premises in good condition and repair, broom-clean, excepting, however, reasonable wear and tear, damage by fire or other casualty, damage by eminent domain, and repairs and replacements to be made by Landlord hereunder.

Section 20.2    Hold Over.   If Tenant fails to deliver possession of the Premises to Landlord at the end of the Term, and unless Landlord and Tenant are, at such time, engaged in good faith negotiations to extend the Term, Tenant shall be a tenant at sufferance and shall be liable for Fixed Rent on a monthly basis (or, if applicable, on a prorated daily basis) in an amount equal to one hundred fifty percent (150%) of the amount thereof payable by Tenant for the month immediately preceding the last day of the Term as well as for all Additional Rent payable by Tenant hereunder.

## ARTICLE 21
## [INTENTIONALLY OMITTED]

## ARTICLE 22
## ONGOING CO-TENANCY

If, at any time during the Term, more than thirty percent (30%) of the total Floor Area of all buildings in the Shopping Center, as set forth in Subsection 1.1.38 above (excluding the Premises), ceases to be used for the operation of retail business by tenants of the type typically found in first-class regional shopping centers located in the Cobb County metropolitan area (such condition being hereinafter referred to as an "*Excess Vacancy"*), and if such Excess Vacancy condition exists for one hundred eighty (180) days after Landlord receives written notice of such condition from Tenant, then in such event, Tenant shall have the right to: (i) pay Alternate Rent in lieu of Fixed Rent during the period of such Excess Vacancy, and/or (ii) if the Excess Vacancy continues for a period in excess of three hundred sixty-five (365) continuous days, to terminate this Lease, exercisable by giving Landlord, within one hundred twenty (120) days after the expiration of such 365-day period, at least sixty (60) days' prior notice, in which event this Lease shall terminate on the date set forth in Tenant's notice of termination without

further liability on the part of either Landlord or Tenant, except for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease.  If Tenant does not terminate this Lease pursuant to this Article 22, then commencing on the expiration of the aforesaid 120-day period, Tenant shall resume paying full Rent, provided, however, that Tenant shall:  (x) again be entitled to exercise its rights under this Article 22 each time the then existing condition of Excess Vacancy worsens by more than ten percent (10%); and (y) retain all of its original rights under this Article 22 with respect to any future condition(s) of Excess Vacancy.

**ARTICLE 23**
**MISCELLANEOUS**

Section 23.1  <u>Loading Facilities</u>.  Subject to all Legal Requirements and the COREA, Tenant shall have the exclusive right to utilize the loading facilities, if any, serving the Premises (shown on <u>Exhibit B</u>) on a "24 hour a day", "365 days a year" basis.

Section 23.2  <u>Liens</u>.  Within thirty (30) days after notice of the filing thereof, Tenant shall discharge (either by payment or by filing of the necessary bond, or otherwise) any lien against the Premises and/or Landlord's interest therein, which may arise out of any payment due for, or purported to be due for, any labor, services, materials, supplies or equipment alleged to have been furnished to or for Tenant in, upon or about the Premises.  Similarly, within thirty (30) days after receipt of notice of the filing thereof, Landlord shall discharge (either by payment or by filing of the necessary bond, or otherwise) any lien against the Premises and/or Landlord's interest therein, which may arise out of any payment due for, or purported to be due for, any labor, services, materials, supplies or equipment alleged to have been furnished to or for Landlord in, upon or about the Premises.

Section 23.3  <u>Broker's Commission</u>.  Landlord and Tenant each warrant and represent to the other that they did not deal with any real estate broker in connection with the negotiation, execution and delivery of this Lease, except for The Shopping Center Group (the "***Broker***"). Landlord shall pay the Broker a commission  pursuant to a separate agreement.  Each party agrees to indemnify, defend, and save the other harmless from and against any and all liabilities, costs, causes of action, damages and expenses, including, without limitation, attorneys' fees, with respect to or arising out of any claims made by any real estate broker (other than the Broker), agent or finder with respect to this Lease in breach of the foregoing representation.  The provisions of this Section shall survive the expiration or earlier termination of this Lease.

Section 23.4  <u>Force Majeure</u>.  Except as otherwise expressly set forth herein, in the event either party hereto shall be delayed or hindered in, or prevented from, the performance of any act required hereunder by reason of strikes, failure of power, riots, insurrection, war, earthquake, hurricane or tornado (or comparable weather conditions of unusual severity), or other reasons of a like nature which are beyond the reasonable control of the party (collectively referred to herein as "***Force Majeure***"), then the performance of any such act shall be excused for the period of the delay and the period of the performance of any such act shall be extended for a period equivalent to the period of such delay.  Notwithstanding the foregoing provisions, the financial inability of a party to perform its obligations under this Lease shall not constitute an event of Force Majeure.

Section 23.5  <u>Consents</u>.  Except as may be otherwise expressly set forth in this Lease, whenever under this Lease provision is made for either party's securing the consent or approval of the other party, (i) such consent or approval shall be in writing and shall not be unreasonably withheld, delayed or conditioned, and (ii) in all matters contained herein, both parties shall have an implied obligation of reasonableness.

Section 23.6  <u>Costs</u>.  Whenever this Lease requires the performance of an act by a party, such party shall perform the act at its own cost and expense, unless expressly provided to the contrary.

Section 23.7  <u>Attorneys' Fees</u>.  In any adjudicated or arbitrated action or proceeding hereunder (whether to enforce the terms and provisions of an indemnity or otherwise), the prevailing party shall be entitled to recover from the other party the prevailing party's reasonable costs and expenses in such action or proceeding, including reasonable attorneys' fees, costs and expenses.  Except as otherwise set forth herein, if either party is sued by a third party as a result of a violation of a covenant or warranty herein contained by the other party hereto, then the party who has violated the covenant or warranty shall be responsible for the reasonable

costs and expenses in such action or proceeding against the non-violating party, including reasonable attorneys' fees, costs and expenses.

Section 23.8   Survival of Obligations.  The obligation to pay any sums due to either party from the other that by the terms herein would not be payable, or are incapable of calculation, until after the expiration or sooner termination of this Lease shall survive and remain a continuing obligation until paid.  All indemnity obligations under this Lease shall survive the expiration or earlier termination of this Lease.

Section 23.9   Non-Waiver.  The failure of Landlord or Tenant to insist upon the strict performance of, or to enforce, any provision, covenant or condition herein shall not be deemed to be a waiver thereof, nor void or affect the right of the aggrieved party to enforce the same covenant or condition on the occasion of any subsequent breach or default; nor shall the failure of either party to exercise any option in this Lease upon any occasion arising therefor be deemed or construed to be a waiver of the right to exercise that same kind of option upon any subsequent occasion.

Section 23.10  Rights Cumulative.  Unless expressly provided to the contrary in this Lease, each and every one of the rights, remedies and benefits provided by this Lease shall be cumulative and shall not be exclusive of any other such rights, remedies and benefits allowed by applicable Legal Requirements.

Section 23.11  Definition of Landlord.  The term "*Landlord*" shall mean only the person or entity which, from time to time, shall then own the Shopping Center, and in the event of the transfer by such owner of its interest in the Shopping Center, such owner shall (except to the extent of (1) claims made by Tenant against Landlord which arose prior to the effective date of the transfer of such ownership interest, and/or (2) judgments obtained by Tenant against Landlord, on or prior to the effective date of the transfer of such ownership interest) thereupon be released and discharged from all covenants and obligations of Landlord thereafter accruing, but such covenants and obligations shall be binding during the Term upon each new owner for the duration of such owner's ownership.

Section 23.12  Successors and Assigns.  The provisions of this Lease shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns.

Section 23.13  Limitation of Tenant's Liability.  Landlord, its successors and assigns, shall look solely to the assets, if any, of Tenant (and any prior assignor of Tenant if such assignor was not previously released by Landlord pursuant to Section 15.2 or otherwise) and its successors and assigns, for the satisfaction of any claim arising from or under this Lease and shall not seek to impose personal liability on any shareholder, officer, director or employee of Tenant or any of its Affiliates.

Section 23.14  Joint and Several Liability.  If there is more than one Landlord, then each such Landlord shall be jointly and severally liable hereunder.

Section 23.15  Severability.  If any term, covenant, condition or provision of this Lease is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions hereof shall remain in full force and effect and shall in no way be affected, impaired, or invalidated thereby.

Section 23.16  Grammatical Usages and Construction.  In construing this Lease, feminine or neuter pronouns shall be substituted for those masculine in form and vice versa, and plural terms shall be substituted for singular and singular for plural in any place in which the context so requires.  This Lease shall be construed without regard to the identity of the party who drafted the various provisions hereof.  Moreover, each and every provision of this Lease shall be construed as though all parties hereto participated equally in the drafting thereof.  As a result of the foregoing, any rule or construction that a document is to be construed against the drafting party shall not be applicable hereto.

Section 23.17  Table of Contents, Line Numbering and Paragraph Headings.  The table of contents and line numbering, if any, and section headings are inserted only for convenience and in no way define, limit or describe the scope or intent of this Lease, nor in any way affect this Lease.

Section 23.18  Definition of Hereunder, Herein, etc.  Unless the context clearly indicates to the contrary, the words "*herein*," "*hereof*," "*hereunder*," "*hereafter*," and words of similar

import refer to this Lease and all the Exhibits attached hereto as a whole and not to any particular section, Section, or paragraph hereof.

Section 23.19 Short Form Lease.  Upon the execution and delivery of this Lease, Landlord and Tenant shall execute a short form lease or memorandum for recording, which shall be in the form and substance as either party shall reasonably request.  Landlord covenants and agrees to record the Memorandum of Lease no later than thirty (30) days after the Effective Date.  In no event shall the amount of Fixed Rent reserved hereunder be included in the memorandum.

Section 23.20 Entire Agreement and Modification.  This Lease constitutes the entire agreement of the parties hereto, and all prior agreements between the parties, whether written or oral, are merged herein and, except as may be specifically set forth herein, shall be of no force and effect.  This Lease cannot be changed, modified or discharged orally, but only by an agreement in writing, signed by the party against whom enforcement of the change, modification or discharge is sought.

Section 23.21 No Joint Venture or Partnership Created by Lease.  Nothing contained herein shall be deemed or construed as creating the relationship of principal and agent or of partnership or of joint venture between the parties hereto.

Section 23.22 Tenant's Tradename.  Landlord shall not make use of Tenant's tradename [i.e., "Bed Bath & Beyond"®] in any advertising or marketing material, including, without limitation, on any internet website, without obtaining Tenant's prior written approval, which may be withheld in Tenant's sole and absolute discretion.

Section 23.23 Counterparts.  This instrument may be executed in several counterparts, each of which shall be deemed an original.  The signatures to this instrument may be executed and notarized on separate pages, and when attached to this instrument, shall constitute one complete document.

Section 23.24 Governing Law.  This Lease shall be governed by, construed, and enforced in accordance with the laws of the State in which the Premises are located.

Section 23.25 Landlord's Entry.  Tenant shall  permit Landlord to enter upon the Premises during Tenant's business hours, upon at least five (5) days prior notice to Tenant, to exhibit same to prospective bona-fide purchasers and mortgagees of the Shopping Center, and during the last six (6) months of the Term, to exhibit same to prospective bona-fide tenants; provided, however, that Landlord's employees, agents and contractors shall identify themselves to the store manager upon entering the Premises, and shall not unreasonably interfere with conduct of business at the Premises.

## ARTICLE 24
## LIMITATION OF LANDLORD'S LIABILITY

**EXCEPT WITH RESPECT TO INSURANCE PROCEEDS OR CONDEMNATION AWARDS RECEIVED BY LANDLORD WHICH ARE REQUIRED BY THE TERMS OF THIS LEASE TO BE APPLIED TO THE REPAIR OR RESTORATION OF THE PREMISES OR THE SHOPPING CENTER TENANT SHALL LOOK ONLY TO LANDLORD'S ESTATE AND PROPERTY IN THE SHOPPING CENTER (OR THE PROCEEDS FROM THE SALE OF ALL OR ANY PORTION THEREOF) AND NET INCOME DERIVED FROM THE SHOPPING CENTER FOR THE SATISFACTION OF TENANT'S REMEDIES FOR THE COLLECTION OF A JUDGMENT (OR OTHER JUDICIAL PROCESS) REQUIRING THE PAYMENT OF MONEY BY LANDLORD HEREUNDER AND NO OTHER PROPERTY OR ASSETS OF LANDLORD, ITS OFFICERS, DIRECTORS, STOCKHOLDERS OR PARTNERS SHALL BE SUBJECT TO LEVY, EXECUTION OR OTHER ENFORCEMENT PROCEDURE FOR THE SATISFACTION OF TENANT'S REMEDIES UNDER OR WITH RESPECT TO THIS LEASE.  EXCEPT WITH RESPECT TO THE LIMITATION ON PERSONAL LIABILITY HEREINABOVE SET FORTH, THE PROVISIONS OF THIS ARTICLE 24 SHALL NOT BE DEEMED OR CONSTRUED TO LIMIT TENANT'S RIGHTS AND REMEDIES PURSUANT TO THIS LEASE OR WHICH MAY BE AVAILABLE AT LAW OR IN EQUITY.**

*{Remainder of page intentionally blank.}*

IN WITNESS WHEREOF, the parties have executed this instrument under seal the day and year first-above written.

**LANDLORD:**

WITNESS:

U.S. 41 AND I-285 COMPANY

By:

Name: Morton L. Olshan

Title: General Partner

[SEAL]

**TENANT:**

WITNESS:

BED BATH & BEYOND Inc.

By:

Warren Eisenberg
Co-Chairman

[SEAL]

45

**INDEX OF EXHIBITS**

| | |
|---|---|
| Exhibit A | Legal Description of Shopping Center |
| Exhibit B | Site Plan |
| Exhibit C | Rent Commencement and Expiration Date Agreement |
| Exhibit D | Landlord's Work |
| Exhibit D-1 | Elevations |
| Exhibit E | Permitted Encumbrances |
| Exhibit F | Signage |
| Exhibit G | Form of Existing Mortgagee Subordination, Non-Disturbance and Attornment Agreement |
| Exhibit G-1 | (Bed Bath & Beyond) Form of Subordination, Non-Disturbance and Attornment Agreement |
| Exhibit H | Form of Subtenant Recognition Agreement |
| Exhibit I | Form of Delivery Date Notice |
| Exhibit J | Form of Delivery Date Certification |
| Exhibit K-1 | Existing Exclusives |
| Exhibit K-2 | Existing Leases |
| Exhibit L | Intentionally Omitted |
| Exhibit M | Prohibited Uses |
| Exhibit N | Form of Mechanics' Lien Indemnification |

DMEAST #1997925 v7

**EXHIBIT A**

**LEGAL DESCRIPTION OF SHOPPING CENTER**

**DESCRIPTION OF PROPERTY**

All that tract or parcel of land lying and being in Land Lots 947, 948, 978, 979 and 980 of the 17th District and 2nd Section of Cobb County, Georgia and being more particularly described as follows:

To reach the **Point of Beginning** commence at a concrete monument found at the most southerly margin of a mitered intersection formed by the northeasterly right-of-way line of US Highway #41/Cobb Parkway (variable r/w) and the southeasterly right-of-way line of Akers Mill Road (variable r/w) and proceed thence North 30°57'41"West along said miter and the southeasterly right-of-way line of Akers Mill Road a distance of 59.09 feet to a point; thence continuing along the southeasterly right-of-way line of said Akers Mill Road (variable r/w) North 21°22'35" East a distance of 107.86 feet to the **Point of Beginning**; from the **Point of Beginning** thus established, continue along said right-of-way line of Akers Mill Road the following courses and distances: 1) North 21°22'35" East a distance of 105.36 feet to a point; 2) thence 26.46 feet along the arc of a curve to the right, said curve having a radius of 668.20 feet and being subtended by a chord of North 22°30'40" East, 26.46 feet to a concrete monument found; 3) thence South 66°21'01" East a distance of 5.00 feet to a point; 4) thence North 23°53'33" East a distance of 4.64 feet to a point; 5) thence North 66°02'28" West a distance of 5.00 feet to a point; 6) thence 292.54 feet along the arc of a curve to the right, said curve having a radius of 668.20 feet and being subtended by a chord of North 36°35'12" East, 290.21 feet to a point; 7) thence South 40°52'12" East a distance of 2.00 feet to a point; 8) thence North 49°07'48" East a distance of 336.45 feet to a point; 9) thence North 03°03'42" East a distance of 13.49 feet to a point; 10) thence North 48°41'14" East a distance of 149.11 feet to a point; 11) thence North 48°03'42" East a distance of 133.40 feet to a point; 12) thence North 48°48'12" East a distance of 83.96 feet to a point; 13) thence North 53°21'17" East a distance of 125.74 feet to a point; thence departing said right-of-way line of Akers Mill Road and run South 35°12'15" East a distance of 448.14 feet to a point on the land lot line common to Land Lots 979 and 980; thence South 89°56'36" East along the land lot line common to Land Lots 979 and 980 for a distance of 404.68 feet to a concrete monument found on the southwesterly right-of-way line of Cobb Galleria Parkway (variable r/w); thence departing said land lot line and run southeasterly along said right-of-way line of Cobb Galleria Parkway the following courses and distances:  1) South 89°29'33" East a distance of 104.30 feet to a concrete monument found; 2) thence South 57°27'55" East a distance of 58.64 feet to a concrete monument found; 3) thence 221.39 feet along the arc of a curve to the right, said curve having a radius of 432.46 feet and being subtended by a chord of South 42°49'39" East, 218.98 feet to a point on the land lot line common to Land Lots 979 and 1014; thence departing said right-of-way line of Cobb Galleria  Parkway and run South 01°20'27" West along the land lot line common to Land Lots 979 and 1014 for a distance of 677.67 feet to a point; thence departing said land lot line and run 94.68 feet along the arc of a curve to the left, said curve having a radius of 868.51 feet and being subtended by a chord of South 31°55'47" West, 94.63 feet to a point; thence South 28°48'25" West a distance of 168.47 feet to a point; thence North 61°11'35" West a distance of 180.00 feet to a point; thence South 28°48'25" West a distance of 300.00 feet to a point on the northeasterly right-of-way line of US Highway #41/Cobb Parkway (variable r/w); thence northwesterly along said right-of-way line of US Highway #41/Cobb Parkway the following courses and distances: 1) thence North 56°02'50" West a distance of 317.79 feet to a point; 2) thence North 54°08'45" East a distance of 10.65 feet to a point; 3) thence North 56°02'50" West a distance of 133.49 feet to a point; 4) thence 657.79 feet along the arc of a curve to the left, said curve having a radius of 1507.40 feet and being subtended by a chord of North 68°32'31" West, 652.58 feet to a point; 5) thence North 81°02'35" West a distance of 54.11 feet to a point; 6) thence North 04°06'52" East a distance of 19.18 feet to a point; 7) thence North 81°05'59" West a distance of 285.32 feet to a point; thence departing said right-of-way line of US Highway #41/Cobb Parkway and run North 33°44'43" East a distance of 147.80 feet to a point; thence North 14°17'58" East a distance of 13.98 feet to a point; thence North 80°06'28" West a

distance of 152.20 feet to a point on the southeasterly right-of-way line of Akers Mill Road and the **Point of Beginning**; said tract containing 39.28651 acres or 1,711,321 square feet.

**EXHIBIT B**

**SITE PLAN**

## EXHIBIT C

## RENT COMMENCEMENT AND EXPIRATION DATE AGREEMENT

THIS RENT COMMENCEMENT AND EXPIRATION DATE AGREEMENT, made as of the ____ day of _____, 2005, by and between U.S. 41 & I 285 COMPANY (*"Landlord"*) and BED BATH & BEYOND INC. (*"Tenant"*).

W I T N E S S E T H :

WHEREAS, Landlord is the owner of a certain shopping center known as Akers Mill Square (the *"Shopping Center"*), situated in _____, Georgia; and

WHEREAS, by that certain lease dated _____, 2005 (the *"Lease"*), Landlord leased a portion (the *"Premises"*) of the Shopping Center to Tenant; and

WHEREAS, Tenant is in possession of the Premises and the Term of the Lease has commenced; and

WHEREAS, under Section 2.2 of the Lease, Landlord and Tenant agreed to enter into an agreement setting forth certain information in respect of the Premises and the Lease.

NOW, THEREFORE, Landlord and Tenant agree as follows:

1.      The Rent Commencement Date occurred on _____, 200___.

2.      The Initial Term of the Lease shall expire on January 31, 20___, unless Tenant exercises any option to extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

3.      The date of commencement of the first Renewal Period shall be February 1, 20___, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 20___, unless Tenant exercises any option to further extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

4.      The date of commencement of the second Renewal Period shall be February 1, 20___, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 20___, unless Tenant exercises any option to further extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

5.      The date of commencement of the third Renewal Period shall be February 1, 20___, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 20___, unless the Lease terminates earlier as provided in the Lease.

6.      Capitalized terms used, but not defined, herein shall have the meanings ascribed to them in the Lease.

IN WITNESS WHEREOF, the parties hereto have caused this Rent Commencement and Expiration Date Agreement to be executed the date and year first above written.

**LANDLORD:**

U.S. 41 & I 285 COMPANY

By:    _____
Name:  _____
Title:   _____

**TENANT:**

BED BATH & BEYOND INC.

By:    _____
       Warren Eisenberg
       Co-Chairman

**EXHIBIT D**

**LANDLORD'S WORK**



*Akers Mills, Atlanta, GA*

**Exhibit D - Standard Landlord's Obligations (As-Is Delivery)**

2/18/04 (9/7/05)

[All capitalized terms used, but not otherwise defined, herein shall have the meanings ascribed to them in the Lease.  To the extent not inconsistent with the terms of this Exhibit D, the terms of the lease regarding Landlord's work shall be deemed to supplement the provisions of the Exhibit D.  It is specifically understood and agreed that all materials and supplies shall be installed in strict accordance with all manufacturer's' specifications.]

The below noted drawings and specifications shall be utilized by the Tenant, in conjunction with existing building and site conditions, to develop the site specific documents  and specifications for the construction of the Premises by the Tenant at above noted location.

A.    <u>Tenant's Prototype Drawings and Specifications</u> entitled "Bed Bath & Beyond Prototype Drawings and Specifications – version 1.2005, dated 03-01-05 developed by Casco Architects, comprise the following drawings and specifications:

| SHEET # | DRAWING TITLE | CURRENT ISSUE | DRAWING DATE |
|---|---|---|---|
| A0.1 | Code Data, Project Data and Responsibility Schedule | Prototype Version 1.2005 | 03/01/05 |
| A0.2 | Generic Site Requirements Plan | Prototype Version 1.2005 | 03/01/05 |
| A1.1 | Site Details | Prototype Version 1.2005 | 03/01/05 |
| A1.2 | Demolition Plan | Prototype Version 1.2005 | 03/01/05 |
| A2.1 | Store Fixture/Egress Path  Plan & Notes | Prototype Version 1.2005 | 03/01/05 |
| A2.2 | Floor Plan | Prototype Version 1.2005 | 03/01/05 |
| A2.3 | Floor Finish Plan | Prototype Version 1.2005 | 03/01/05 |
| A2.4 | Reflected Ceiling Plans & Notes | Prototype Version 1.2005 | 03/01/05 |
| A2.5 | Roof Plan Details & Notes | Prototype Version 1.2005 | 03/01/05 |
| A3.1 | Finish Schedule, Storefront Types & Vestibule Elevations | Prototype Version 1.2005 | 03/01/05 |
| A3.2 | Door Hardware, Door Schedule & Door Types | Prototype Version 1.2005 | 03/01/05 |
| A3.3 | BBB National Account Vendors & Specified Manufactures w/Distribution Schedule | Prototype Version 1.2005 | 03/01/05 |
| A4.1 | Exterior Elevations | Prototype Version 1.2005 | 03/01/05 |
| A5.1 | Building Sections, Interior Wall Sections | Prototype Version 1.2005 | 03/01/05 |
| A5.2 | Exterior Wall Sections | Prototype Version 1.2005 | 03/01/05 |
| A5.3 | Exterior Wall Sections | Prototype Version 1.2005 | 03/01/05 |
| A5.4 | Exterior Wall Sections | Prototype Version 1.2005 | 03/01/05 |
| A5.5 | Interior Wall Sections | Prototype Version 1.2005 | 03/01/05 |
| A5.6 | *Alternate* Scissor Lift Plan, Section, Specification & Notes | Prototype Version 1.2005 | 03/01/05 |
| A6.1 | Exterior Details | Prototype Version 1.2005 | 03/01/05 |
| A6.2 | Interior & Exterior Details | Prototype Version 1.2005 | 03/01/05 |
| A6.3 | Slatwall Details at Storefront | Prototype Version 1.2005 | 03/01/05 |
| A7.1 | Large Scale Plans & Partition Types | Prototype Version 1.2005 | 03/01/05 |
| A7.2 | Large Scale Plans & Partition Types | Prototype Version 1.2005 | 03/01/05 |
| A7.2a | *Alternate* Large Scale Plans & Partition Types (38k SF Building) | Prototype Version 1.2005 | 03/01/05 |
| A8.1 | Interior Details | Prototype Version 1.2005 | 03/01/05 |
| A8.2 | Interior Details | Prototype Version 1.2005 | 03/01/05 |
| A8.3 | Customer Service Desk | Prototype Version 1.2005 | 03/01/05 |
| A8.4 | Register Bays | Prototype Version 1.2005 | 03/01/05 |
| A8.5 | Remote Service Desks | Prototype Version 1.2005 | 03/01/05 |
| A9.1 | Interior Elevations | Prototype Version 1.2005 | 03/01/05 |

| | | | |
|---|---|---|---|
| A9.1a | *Alternate* Interior Elevations (38K SF Building) | Prototype Version 1.2005 | 03/01/05 |
| A9.2 | *Alternate* Elevations & Details | Prototype Version 1.2005 | 03/01/05 |
| A9.3 | *Alternate* Plans, Elevations & Details | Prototype Version 1.2005 | 03/01/05 |
| A9.4 | FTG Fixture Plan & Vendor Responsibility Schedule | Prototype Version 1.2005 | 03/01/05 |
| A9.4a | *Alternate* FTG Fixture Plan & Vendor Responsibility Schedule (Corner) | Prototype Version 1.2005 | 03/01/05 |
| A9.4b | *Alternate* FTG Fixture Plan & Vendor Responsibility Schedule (Freestanding w/o Bulkhead) | Prototype Version 1.2005 | 03/01/05 |
| A9.5 | FTG Plans, Wall Sections & Details | Prototype Version 1.2005 | 03/01/05 |
| A9.5a | *Alternate* FTG Plans, Wall Sections & Details (Corner) | Prototype Version 1.2005 | 03/01/05 |
| A.9.6 | *Alternate* Awning Details | Prototype Version 1.2005 | 03/01/05 |
| A9.7 | *Alternate* Awning Details | Prototype Version 1.2005 | 03/01/05 |
| A9.8 | *Alternate* Wall Sections at Awning | Prototype Version 1.2005 | 03/01/05 |
| HP1.1 | High Pile Storage Plan & Fixture-Shelf Details | Prototype Version 1.2005 | 03/01/05 |
| S1.1 | Structural General Information & Typical Details | Prototype Version 1.2005 | 03/01/05 |
| S2.1 | Foundation Plan | Prototype Version 1.2005 | 03/01/05 |
| S2.2 | Roof Framing Plan | Prototype Version 1.2005 | 03/01/05 |
| S3.1 | Foundation Details | Prototype Version 1.2005 | 03/01/05 |
| S3.2 | Roof Framing Details | Prototype Version 1.2005 | 03/01/05 |
| P1.1 | Plumbing Riser Diagrams and Fixture Schedule | Prototype Version 1.2005 | 03/01/05 |
| P2.1 | Plumbing Floor Plan | Prototype Version 1.2005 | 03/01/05 |
| P3.1 | Plumbing Enlarged Plans & Details | Prototype Version 1.2005 | 03/01/05 |
| FP1.0 | Fire Sprinkler Plans, Notes & Details | Prototype Version 1.2005 | 03/01/05 |
| FA1.0a | Base System Fire Alarm Plans, Notes & Details | Prototype Version 1.2005 | 03/01/05 |
| FA1.1a | Base System Misc. Notes & Details | Prototype Version 1.2005 | 03/01/05 |
| FA1.2a | Base System Fire Alarm Matrix & Calcs | Prototype Version 1.2005 | 03/01/05 |
| FA1.0b | *Alternate* Fire Alarm Plans w/Occupant Notification Alarm | Prototype Version 1.2005 | 03/01/05 |
| FA1.1b | *Alternate* Fire Plans w/Occupant Notification Notes & Details | Prototype Version 1.2005 | 03/01/05 |
| FA1.2b | *Alternate* Fire Alarm Plans w/Occupant Notification Matrix & Calcs | Prototype Version 1.2005 | 03/01/05 |
| FA1.0c | *Alternate* Fire Alarm Plans w/Smoke Detection | Prototype Version 1.2005 | 03/01/05 |
| FA1.1c | *Alternate* Fire Alarm Plans w/Smoke Detection Notes & Details | Prototype Version 1.2005 | 03/01/05 |
| FA1.2c | *Alternate* Fire Alarm Plans w/Smoke Detection Matrix & Calcs | Prototype Version 1.2005 | 03/01/05 |
| M1.1 | Mechanical General Information | Prototype Version 1.2005 | 03/01/05 |
| M2.1 | Mechanical Floor Plan | Prototype Version 1.2005 | 03/01/05 |
| M3.1 | Mechanical Large Scale Plans & Details | Prototype Version 1.2005 | 03/01/05 |
| M4.1 | Mechanical Schedules & Details | Prototype Version 1.2005 | 03/01/05 |
| E1.1 | Electrical General Information & Schedules | Prototype Version 1.2005 | 03/01/05 |
| E2.1 | Power Plan | Prototype Version 1.2005 | 03/01/05 |
| E2.2 | Lighting Layout Plan | Prototype Version 1.2005 | 03/01/05 |
| E2.3 | Lighting Circuiting Plan | Prototype Version 1.2005 | 03/01/05 |
| E2.4 | Specialty Lighting Plans & Diagrams | Prototype Version 1.2005 | 03/01/05 |
| E3.1 | Electrical Large Scale Plans & Details | Prototype Version 1.2005 | 03/01/05 |
| E3.2 | Lighting Sequencing | Prototype Version 1.2005 | 03/01/05 |
| E3.3 | Electrical Details | Prototype Version 1.2005 | 03/01/05 |
| E4.1 | Electrical Schedules | Prototype Version 1.2005 | 03/01/05 |
| E4.2 | Electrical Diagrams | Prototype Version 1.2005 | 03/01/05 |
| E4.3 | Electrical Schedules | Prototype Version 1.2005 | 03/01/05 |
| E4.4 | Novar Wiring Details | Prototype Version 1.2005 | 03/01/05 |
| E4.4a | *Alternate* Novar Wiring Details for RTU's Other Than Lennox | Prototype Version 1.2005 | 03/01/05 |
| E4.5 | ETM Details for Lennox RTU's | Prototype Version 1.2005 | 03/01/05 |
| E4.5a | *Alternate* ETM Wiring Details For Non-Lennox RTU's | Prototype Version 1.2005 | 03/01/05 |
| E5.1 | FTG Power, Lighting & Specialty Lighting | Prototype Version 1.2005 | 03/01/05 |

| E5.1a | *Alternate* FTG Power, Lighting Specialty Lighting (Corner) | Prototype Version 1.2005 | 03/01/05 |
|-------|------------------------------------------------------------|--------------------------|----------|
| E5.1b | *Alternate* FTG Power, Lighting, Specialty Lighting (Freestanding w/o Bulkhead) | Prototype Version 1.2005 | 03/01/05 |
| E6.1 | *Bid Alternate:* Modular Wiring (Data Only) Plans & Details | Prototype Version 1.2005 | 03/01/05 |

Project Manual for Bed Bath & Beyond, dated March 01, 2005.

Landlord's work:

1.  Landlord agrees to perform, at its sole cost and to the extent such work has not been performed at this time,  the following condition (*"Landlord's Work* ) necessary to deliver possession of the Premises to the Tenant.

2.  Landlord has delivered to Tenant, (1) hard copy set of drawings EX-A-1.0,EX-E-1.0 and EX-M-1.0, which to the best of the Landlord's knowledge, describes the existing condition of the subject Premises at this time.
    Landlord makes no representation that the information shown on the drawings is complete or incorporates all the existing conditions, it being understood that it shall be Tenant's sole responsibility to determine the true conditions of the Premises.

3.  Landlord shall allow tenant to modify the existing sprinkler system, at the Tenant's sole cost,  in order to accommodate Tenant's specific  requirements.

4.  The Premises shall be delivered to Tenant by Landlord in an "as is" condition, free of all tenants and occupants, and free of all store fixtures and equipment and the like of prior occupants, with any damage to the Premises caused by the removal of the fixtures of the prior occupant having been repaired (at Landlord's cost) to Tenant's reasonable satisfaction.

5.  The Premises shall be delivered to Tenant by Landlord in broom clean with the structural components, including, without limitation, the foundation, exterior walls, other than the Trash Room enclosure walls and structural supports in good order and repair.

6.  The existing rear Trash enclosure is in an unstable condition and will need to be removed. Such specified work will be defined in the Tenant's bid documents and the back-up documentation cost for the demolition and removal will be provided to the Landlord prior to performing the work and the cost will be a direct reimbursable expense to the Tenant.

7.  NA – intentionally deleted

8.  All existing electric, gas, water (fire and domestic), sanitary and phone shall delivered in "as is "condition. Landlord shall reimburse Tenant any fees, excluding deposit costs, imposed by the utility company to replace the gas meter previously removed.

9.  Landlord shall allow tenant to re-use and/or remove and dispose of existing RTU's (at Tenant's Cost & discretion) solely serving the premises and associated ductwork, grilles, diffusers, accessories, related controls, etc. within the Premises.

10. The Premises shall be free from Asbestos material and other Hazardous Substances. If, during the Tenant's investigation of the subject premises and as established and defined in the PSI Engineering roof material testing report , dated 11/12/2004, Asbestos or other hazardous materials are determined to exist, Tenant shall notify the Landlord, and following approval by the Landlord, remediate such materials. Such specified work will be defined in the Tenant's bid documents and the back-up documentation cost for the remediation will be provided to the Landlord and will be a direct reimbursable expense to the Tenant.

11. All work performed in the Premises, whether performed by Landlord or Tenant, shall be done in a good and first class workmanlike manner; in accordance with all applicable laws, ordinances, codes and insurance requirements.  Landlord agrees to cooperate with Tenant and to assist  in obtaining all required building permits for Tenant's Work, and in obtaining an unconditional permanent certificate of occupancy, or the local equivalent thereof.

12. Tenant shall have the right to come onto the Premises in order to take measurements and in order to commence Tenant's Work.  Should Tenant elect to commence the Tenant Work in the Premises prior to Delivery of the Premises by Landlord to Tenant, then Tenant shall be responsible for payment of all utility services consumed in the Premises

13.     Except as otherwise provided in **the** Lease and the exhibits thereto, Landlord shall deliver the Premises to Tenant in its present "As Is" physical condition.  The foregoing reference to the Premises being delivered in "As Is" condition shall not relieve Landlord of any maintenance or repair obligations with respect to the Premises otherwise specifically set forth in **the** Lease **and this Exhibit D as being the** responsibility of Landlord.

14.     **Tenant shall construct Tenant's canopy feature and loading dock as shown in Exhibit B & D-1.**
**This includes all blocking and conduit for signage, removal of existing doors and storefront.**
**Tenant shall, at its sole cost, remove the glass windows and frames from the south façade of the**
**Premises and fill in the openings with materials similar to the existing adjacent material. Upon**
**completion, both the south and west (rear wall) walls shall be painted in color compatible with the**
**other colors of Tenant's new façade.**

15.     **In the event that additional on-site and/or off-site development work is required by governmental**
**authorities in order for Tenant to obtain its building permits or use and occupancy rights,**
**Landlord shall perform such work at its sole cost and expense.**

Site Specifications (delete if site to remain as-is)

16.     **Tenant shall remove existing sidewalk and install new sidewalk in conjunction with the Tenant's**
**new canopy design and  associated exterior columns and entry curb ramp as depicted in Exhibit**
**D-1 and  in the Tenant's Construction drawings.**

17.     **Landlord to repair and/or replace any defective parking lot light standards and fixtures in the**
**Tenant's critical parking and access areas as noted on Exhibit B.  Landlord will relamp any**
**existing  fixtures where lamps are not functioning.**

18.     **Warranties –Tenant   shall provided a list of contractors' and subcontractors', employed by**
**Tenant in the performance of Tenant's Work , including name of  contacts, phone numbers  and**
**addresses, and a guarantee, including parts and labor, for a period of at least one (1) year after**
**the commencement date.  All  warranties of equipment, service manuals and record drawings**
**shall be sent to Landlord's construction project manager within sixty ( 60) days of completion of**
**all of Tenant's work.**

19.     **Second Level Mezzanine Structure – Tenant shall provide floor system for the office mezzanine in**
**compliance with Tenant's Prototype design and in accordance with governing agencies having**
**jurisdiction.**

Building and Site Signs

20.     **Existing Pylon –Tenant shall furnish and install Tenant's pylon panel shown on Exhibit F.**
**Landlord is responsible for the existing pylon structure and all electrical service in order for**
**Tenant's panel to be fully illuminated.**

21.     **NA**

Bed Bath & Beyond Inc. and its subsidiaries, 1998.      page 4

**EXHIBIT D-1**

**ELEVATIONS**

**EXHIBIT E**

**PERMITTED ENCUMBRANCES**

1.      Easement from Mrs. J. B. Burton to Georgia Power Company, dated March 6, 1939, filed for record March 29, 1939 and recorded in Deed Book 132, Page 379, Cobb County, Georgia records.

2.      Easement from C.A. Jones, A.P. Jones and W.L. Jones to Georgia Power Company, dated January 22, 1946, filed for record February 7, 1946 and recorded in Deed Book 171, Page 261, aforesaid records.

3.      Easement from Crawford F. Barnett to Georgia Power Company, dated December 11, 1945, filed for record February 7, 1946 and recorded in Deed Book 171, Page 269, aforesaid records.

4.      Easement from C.A. Jones, A.P. Jones and W.L. Jones to Georgia Power Company, dated November 26, 1951, filed for record December 28, 1951 and recorded in Deed Book 239, Page 318, aforesaid records.

5.      Easement from C.A. Jones and A.P. Jones to Georgia Power Company, dated March 30, 1956, filed for record April 14, 1956 and recorded in Deed Book 354, Page 149, aforesaid records.

6.      Easement from C.A. Jones, A.P. Jones and W.L. Jones to Georgia Power Company, dated February 2, 1956, filed for record April 24, 1956 and recorded in Deed Book 356, Page 44, aforesaid records.

7.      Easement from C.A. Jones, A.P. Jones and W.L. Jones to Georgia Power Company, dated July 23, 1958, filed for record August 12, 1958 and recorded in Deed Book 455, Page 519, aforesaid records.

8.      Easement from Ferguson-Poole, Inc. to Georgia Power Company, dated June 6, 1962, filed for record June 27, 1962 and recorded in Deed Book 651, Page 296, aforesaid records.

9.      Easement from C.A. Jones, A.P. Jones and W.L. Jones to Georgia Power Company, dated June 5, 1962, filed for record June 27, 1962 and recorded in Deed Book 651, Page 297, aforesaid records.

10.     Right-of-Way Easement from C.A. Jones and A.P. Jones to Georgia Power Company, dated December 28, 1963, filed for record February 19, 1964 and recorded in Deed Book 752, Page 44, aforesaid records.

11.     Permit for Anchors, Guy Poles and Wires from C.A. Jones, individually and on behalf of the Estate of Walter L. Jones, deceased and Mrs. Augustus P. Jones, to Georgia Power Company, dated October 5, 1966, filed for record January 20, 1967 and recorded in Deed Book 954, Page 466, aforesaid records.

12.     Easement from A.D. Kennedy and A.T. Kennedy to Georgia Power Company, dated October 13, 1966, filed for record January 20, 1967 and recorded in Deed Book 954, Page 479, aforesaid records.

13.     Conditions and Reservations contained in that certain Cobb County Right of Way Deed from A.D. Kennedy to State Highway Department of Georgia, dated August 6, 1968, filed for record August 9, 1968 and recorded in Deed Book 1051, Page 889, aforesaid records.

14.     Easement conveyed in that certain Warranty Deed from Morton L. Olshan and Charles L. Vaughn to Standard Oil Company, a Division of Chevron Oil Company, a California Corporation, dated July 16, 1971, filed for record July 19, 1971 and recorded in Deed Book 1239, Page 368, aforesaid records.

15.    Easement from Alfred D. Kennedy, Jr. to Cobb County, a political subdivision of the State of Georgia, dated February 6, 1976, filed for record February 10, 1976 and recorded in Deed Book 1664, Page 130, aforesaid records.

16.    Easement from Alfred D. Kennedy, Jr. and Albert Thornton Kennedy to Cobb County, a political subdivision of the State of Georgia, dated February 16, 1976, filed for record February 19, 1976 and recorded in Deed Book 1666, Page 254, aforesaid records.

17.    Reservation of Easements contained in that certain Warranty Deed from Morton L. Olshan to Akers Mill Associates, an Ohio limited partnership, dated February XX, 1976, filed for record February 19, 1976 and recorded in Deed Book 1666, Page 256, aforesaid records.

18.    Construction, Operating and Reciprocal Easement Agreement by and between Morton L. Olshan and Akers Mill Associates, an Ohio limited partnership, dated February 11, 1976, filed for record February 19, 1976 and recorded in Deed Book 1666, Page 260, Cobb County, Georgia records; as amended by that certain First Amendment to Construction, Operating and Reciprocal Easement Agreement by and between Morton L. Olshan and Akers Mill Associates, an Ohio limited partnership, dated May 19, 1976, filed for record May 21, 1976 and recorded in Deed Book 1688, Page 436, aforesaid records; as further amended by that certain Second Amendment to Construction, Operating and Reciprocal Easement Agreement by and between Morton L. Olshan and Akers Mill Associates, an Ohio limited partnership, dated December 31, 1976, filed for record June 2, 1977 and recorded in Deed Book 1782, Page 837, aforesaid records; as amended by that certain Third Amendment to Construction, Operating and Reciprocal Easement Agreement by and between Morton L. Olshan and Akers Mill Associates, an Ohio limited partnership, dated May 3, 1979, filed for record June 1, 1979 and recorded in Deed Book 2017, Page 578, aforesaid records; as amended by that certain Third Amendment to Construction, Operating and Reciprocal Easement Agreement by and between Morton L. Olshan and Developers Diversified Associates No. 1, Ltd., an Ohio limited partnership, dated May 3, 1979, filed for record November 18, 1983 and recorded in Deed Book 2944, Page 161, aforesaid records; as amended by that certain Fourth Amendment to Construction, Operating and Reciprocal Easement Agreement by and between Morton L. Olshan and Hamilton Plaza Associates, a Tennessee limited partnership, dated March 25, 1985, filed for record May 14,1985 and recorded in Deed Book 3499, Page 270, aforesaid records; as amended by that certain Fifth Amendment to Construction, Operating and Reciprocal Easement Agreement by and between Morton L. Olshan and Hamilton Plaza Associates, a Tennessee limited partnership, dated October 1, 1986, filed for record October 1, 1986 and recorded in Deed Book 4140, Page 54, aforesaid records; as amended by that certain Fifth Amendment to Construction, Operating and Reciprocal Easement Agreement by and between Morton L. Olshan and Hamilton Plaza Associates, a Tennessee limited partnership, dated October 1, 1986, filed for record October 1, 1986 and recorded in Deed Book 4140, Page 59, aforesaid records; as amended by that certain Sixth Amendment to Construction, Operating and Reciprocal Easement Agreement by and between Morton L. Olshan and Hamilton Plaza Associates, a Tennessee limited partnership, dated November 17, 1987, filed for record January 28, 1988 and recorded in Deed Book 4795, Page 93, aforesaid records; as amended by that certain Seventh Amendment to Construction, Operating and Reciprocal Easement Agreement by and between Morton L. Olshan and Hamilton Plaza Associates, a Tennessee limited partnership, dated August 17, 1992, filed for record August 18, 1992 and recorded in Deed Book 6798, Page 396, aforesaid records; as amended by that certain Eighth Amendment to Construction, Operating and Reciprocal Easement Agreement by and between Morton L. Olshan and The Sports Authority, Inc., a Delaware corporation, successor in interest to Hamilton Plaza Associates, dated October 27, 1992, filed for record October 30, 1992 and recorded in Deed Book 6948, Page 380, aforesaid records.

19.    Easements from Albert Thornton Kennedy and Alfred D. Kennedy, Jr. to Cobb County, a political subdivision of the State of Georgia, dated October 8, 1976, filed for record October 25, 1976 and recorded in Deed Book 1727, Page 583, aforesaid records.

20.     Easement from Morton L. Olshan to John W. Hooker, dated March 15, 1979, filed for record May 15, 197 and recorded in Deed Book 2009, Page 375, aforesaid records.

21.     Declaration of Easements and Restrictive Covenants by and between Morton L. Olshan and James C. Flack dated March 15, 1979, filed for record May 15, 1979 and recorded in Deed Book 2009, Page 378, aforesaid records; as re-filed on February 14, 1980 and re-recorded in Deed Book 2147, Page 28, aforesaid records.

22.     Utilities Agreement by and among Morton L. Olshan, James C. Flack, John W. Hooker, and Carriage House Inc., dated March 15, 1979, filed for record May 15, 1979 and recorded in Deed Book 2009, Page 382 aforesaid records

23.     Declaration of Ingress and Egress Easements by Morton Olshan, dated May 31, 1979, filed for record June 1, 1979 and recorded in Deed Book 2018, Page 36, aforesaid records.

24.     Easement from Morton L. Olshan to Georgia Power Company, dated June 9, 1982, filed for record June 29, 1983 and recorded in Deed Book 2082, Page 96, aforesaid records.

25.     Septic Tank and Leaching Field Easement by and among Morton L. Olshan and John W. Hooker, dated April 7, 1980, filed for record April 25, 1980 and recorded in Deed Book 2176, Page 436, aforesaid records.

26.     Department of Transportation State of Georgia Conveyance of Access Rights by and between the Department of Transportation, State of Georgia and Morton L. Olshan, dated September 29, 1983, filed record October 3, 1983 and recorded in Deed Book 2898, Page 300, Cobb County, Georgia records.

27.     Easement from Morton L. Olshan to Georgia Power Company, dated July 13, 1983, filed for record December 30, 1983 and recorded in Deed Book 2980, Page 503, aforesaid records.

28.     Easement from Morton L. Olshan to Georgia Power Company, dated April 2, 1985, filed for record July 10 1985 and recorded in Deed Book 3562, Page 102, aforesaid records.

29.     Right-of-Way Easement from Morton L. Olshan to Southern Bell Telephone and Telegraph Company, dated March 11, 1985, filed for record August 1, 1985 and recorded in Deed Book 3589, Page 40, aforesaid records.

30.     Declaration of Easement by Morton L. Olshan, dated September XX, 1985, filed for record September 25, 1985 and recorded in Deed Book 3659, Page 244 aforesaid records.

31.     Easement from Morton L. Olshan to Georgia Power Company, dated September 23, 1986, filed for record November 11, 1986 and recorded in Deed Book 4202, Page 475, aforesaid records.

32.     Easement Agreement by and between Embassy Suites, Inc., a Delaware corporation; George H. Johnson and Charles C. Barton, together d/b/a Embassy Akers Venture, a Georgia joint venture (as "Grantor") and Morton L. Olshan (as "Grantee"), dated March 24, 1986, filed for record February 8, 1988 and recorded in Deed Book 4804, Page 291, aforesaid records.

33.     Easement Agreement by and between Morton L. Olshan a Georgia corporation and KK Galleria Associates, a joint venture, dated August 22, 1988, filed for record September 16, 1988 and recorded in Deed Book 5076, Page 75, aforesaid records.

34.     Cobb County Permanent Drainage Easement from U.S. 41 & I-285 Company to Cobb County, Georgia, dated September 6, 1995, filed for record October 17, 1995 and recorded in Deed Book 9183, Page 445, aforesaid records.

35.     Cobb County Permanent Subterranean Wall Easement from U.S. 41 & I-285 Company to Cobb Count; Georgia, dated September 6, 1995, filed for record October 17, 1995 and recorded in Deed Book 9183, Page 447, aforesaid records.

36.     Terms and conditions of that certain Georgia Department of Transportation Right of Way Deed from U.S. 41 & I-285 Company, a New York General Partnership to Department of Transportation, dated August 21, 1997 filed for record September 17, 1997 and recorded in Deed Book 10652, Page 370, aforesaid records.

37.     Terms and conditions of that certain Georgia Department of Transportation Right of Way Deed from U.S. 41 & I-285 Company, a New York General Partnership to Department of Transportation, dated August 21, 1997 filed for record September 17, 1997 and recorded in Deed Book 10652, Page 373, aforesaid records.

38.     Terms and conditions of that certain Georgia Department of Transportation Right of Way Deed from U.S. 41 & I-285 Company, a New York General Partnership to Department of Transportation, dated August 21, 1997 filed for record September 17, 1997 and recorded in Deed Book 10652, Page 376, aforesaid records.

39.     Terms and conditions of that certain Georgia Department of Transportation Right of Way Deed from U.S. 41 & I-285 Company, a New York General Partnership to Department of Transportation, dated August 21, 1997 filed for record September 17, 1997 and recorded in Deed Book 10652, Page 380, aforesaid records.

40.     Terms and conditions of that certain Georgia Department of Transportation Right of Way Deed from U.S. 41 & I-285 Company, a New York General Partnership to Department of Transportation, dated September 12 1997, filed for record October 9, 1997 and recorded in Deed Book 10708, Page 207, aforesaid records.

41.     Distribution line Permit from Mall Properties to Marietta Power, Board of Water and Lights, dated November 21, 1997, filed for record January 28, 1998 and recorded in Deed Book 10968, Page 216, aforesaid records.

42.     Easement from U.S. 41 & I-285 Company, a New York general partnership to Georgia Power Company, dated December 9, 1997, filed for record May 1, 1998 and recorded in Deed Book 11244, Page 478 aforesaid records.

43.     Easement from U.S. 41 & I-285 Company, a New York general partnership to Georgia Power Company, dated December 9, 1997, filed for record May 1, 1998 and recorded in Deed Book 11244, Page 479 aforesaid records and re-recorded in Deed Book 11244, Page 480, aforesaid records.

44.     Easement from U.S. 41 & I-285 Company, a New York general partnership to Georgia Power Company, dated December 9, 1997, filed for record May 1, 1998 and recorded in Deed Book 11244, Page 481, Cobb County, Georgia records.

45.     Easement from US 41 & I-285 Company to Bellsouth Telecommunications, Inc., a Georgia corporation, dated January 8, 1998, filed for record May 5, 1998 and recorded in Deed Book 11252, Page 140, aforesaid records.

46.     Lease evidenced by that certain Memorandum of Lease by and between Developers Diversified, Ltd., an Ohio Limited Partnership (as "Landlord") and S. S. Kresge Company, a Michigan corporation (as "Tenant"), dated December 17, 1975, filed for record December 21, 1977 and recorded in Deed Book 1848, Page 197, aforesaid records; as affected by that certain Memorandum of Assignment of Lease by and between K Mart Corporation, a Michigan corporation (as "Assignor") and Mervyn's, a California corporation (as "Assignee") dated October 1, 1986, filed for record October 1, 1986 and recorded in Deed Book 4140, Page 46, aforesaid records; as further affected by that certain Assignment of Lease by and between K Mart Corporation, a Michigan corporation (as "Assignor") and Mervyn's, a California corporation (as "Assignee"), dated October 1986, filed for record November 6, 1986 and recorded in Deed Book 4196, Page 389, aforesaid records; as affected by that certain Memorandum of Assignment of Lease by and between Mervyn's, a California corporation (as "Assignor") and The Sports Authority, Inc., a Delaware corporation (as "Assignee"), dated August

17, 1992, filed for record August 18, 1992 and recorded in Deed Book 6798, Page 389, aforesaid records; as affected by that certain Short Form by and between Morton L. Olshan (as "Landlord") and The Sports Authority, Inc., a Delaware corporation (as "Tenant"), dated October 27, 1992, filed for record October 30, 1992 and recorded in Deed Book 6948, Page 372, aforesaid records.  The inclusion of the foregoing memorandum of lease within these "Permitted Encumbrances" is for informational purposes only, and shall not be deemed to diminish any of Tenant's rights, or increase any of Tenant's obligations, under this Lease.

47.    Lease evidenced by that certain Short Form Lease by and between Morton L. Olshan (as "Landlord") and TOYS "R" US, INC., a Delaware corporation, dated May 27, 1983, filed for record August 23, 1983 and recorded in Deed Book 2857, Page 71, aforesaid records.  The inclusion of the foregoing memorandum of lease within these "Permitted Encumbrances" is for informational purposes only, and shall not be deemed to diminish any of Tenant's rights, or increase any of Tenant's obligations, under this Lease.

48.    Lease evidenced by that certain Short Form of Lease by and between Morton L. Olshan (as "Landlord") and Chic-Fil-A, Inc., a Georgia corporation (as "Tenant"), dated August 19, 1994, filed for record August 25, 1999 and recorded in Deed Book 8444, Page 38, aforesaid records; as amended by that certain First Amendment to Ground Lease and Short Form of lease by and between Morton L. Olshan (as "Landlord") and Chick-Fil-A, Inc., a Georgia corporation (as "Tenant"), dated August 9, 1994, filed for record August 25, 1994 a recorded in Deed Book 8444, Page 44, aforesaid records. The inclusion of the foregoing memorandum of lease within these "Permitted Encumbrances" is for informational purposes only, and shall not be deemed to diminish any of Tenant's rights, or increase any of Tenant's obligations, under this Lease.

49.    Lease dated January 5, 2004, as evidenced by that certain Memorandum of Lease by and between U.S. 41 & I-285 Company, a New York general partnership (as "Landlord") and LA Fitness International, LLC, a California limited liability company (as "Tenant"), filed for record March 12, 2004 and recorded in Deed Book 13943, Page 454, Cobb County, Georgia records.  The inclusion of the foregoing memorandum of lease within these "Permitted Encumbrances" is for informational purposes only, and shall not be deemed to diminish any of Tenant's rights, or increase any of Tenant's obligations, under this Lease.

50.    Deed to Secure Debt and Security Agreement from U.S. 41 & I 285 Company, a New York general partnership to HSBC Realty Credit Corporation (USA), as Administrative Agent, dated November 25, 2003, filed for record December 12, 2003 and recorded in Deed Book 13901 page 5588, Cobb County, Georgia records, securing the original amount of $15,500,000.00. Subject to the provisions of Section 17.3 of the Lease.

Landlord represents and warrants that (i) none of the foregoing will interfere with or prevent Tenant from operating its Premises in accordance with the terms of this Lease, (ii) conflict with any right granted Tenant under this Lease, (iii) impose on Tenant any obligation(s) in excess of those set forth in this Lease, and (iv) none of the foregoing easements or rights of way (a) are located beneath the Premises, or (b) will interfere with Tenant's use and enjoyment of the Premises.

**EXHIBIT F**

**TENANT'S SIGNAGE**

**EXHIBIT G**
**FORM OF EXISTING MORTGAGEE SUBORDINATION,**
**NON-DISTURBANCE AND ATTORNMENT AGREEMENT**

After recording return to:
Hartman, Simons, Spielman & Wood, LLP
6400 Powers Ferry Road, Suite 400
Atlanta, Georgia 30339
Attn: Robert D. Simons, Esq.

**SUBORDINATION, NON-DISTURBANCE, ATTORNMENT AGREEMENT AND ESTOPPEL**

THIS AGREEMENT, made and entered into as of the __ day of _____ 2005, by and between _____ having an address at _____, a _____ ("**Tenant**"), US 41 & I-285 Company, a New York general partnership having an office at 654 Madison Avenue, New York, New York 10021 ("**Landlord**"), and HSBC Realty Credit Corporation (USA), as administrative agent, a corporation organized under the laws of the State of Delaware, having an office at 452 Fifth Avenue, New York, New York 10018 ("**Lender**").

WITNESSETH:

WHEREAS, Lender has made a mortgage loan (the "**Loan**") to the Landlord in the amount of Fifteen Million Five Hundred Thousand and No/100 Dollars ($15,500,000.00) secured by a mortgage on the Landlord's fee estate in, and on all of the property and improvements located on, the real property legally described in Exhibit "A" attached hereto and commonly known as Akers Mill Square Shopping Center (the "**Premises**").  The term "**Mortgage**" when used herein shall mean that certain Deed to Secure Debt, Assignment of Leases and Rents and Security Agreement (the "Security Deed") dated as of November 25, 2003, as the same may be modified, consolidated, renewed, increased or supplemented and any additional mortgages or security deeds on the Premises granted by Landlord to Lender, as the same may be modified consolidated, renewed, increased or supplemented.; and

WHEREAS, Tenant is the present lessee under a lease dated _____, made by Landlord, as landlord, demising a portion of the Premises and other property (the "**Demised Premises**") (said lease and all amendments thereto being referred to as the "**Lease**"); and

WHEREAS, the Loan terms require that Tenant subordinate the Lease and its interest in the Premises in all respects to the lien of the Mortgage and that Tenant attorn to Lender; and

WHEREAS, in return, Lender is agreeable to not disturbing Tenant's possession of the Demised Premises covered by the Lease, so long as Tenant is not in default under the Lease.

NOW, THEREFORE, the parties hereby agree as follows:

1.     Subordination of Lease.  Tenant covenants, stipulates and agrees that the Lease and all of Tenant's right, title and interest in and to the Premises thereunder is hereby, and shall at all times continue to be, subordinated and made secondary and inferior in each and every respect to the Mortgage and the lien thereof, to all of the terms, conditions and provisions thereof, and to all advances made or to be made thereunder so that at all times the Mortgage shall be and remain a lien on the Premises prior to and superior to the Lease for all purposes, subject to the provisions set forth herein.

2.     Non-Disturbance.  So long as Tenant is not in default in the payment of rent or in the performance of any of the other terms, covenants or conditions of the Lease on Tenant's

part to be performed, (a) Tenant's possession of the Demised Premises, shall not be diminished or interfered with by Lender, (b) Lender will not join Tenant as a party defendant in any action or proceeding foreclosing the Mortgage unless joinder is necessary to foreclose the Mortgage and then only for such purpose and not for the purpose of terminating the Lease, and (c) all condemnation awards and insurance proceeds paid or payable with respect to the Premises or any other part of the Shopping Center shall be applied and paid in the manner set forth in the Lease.

3.      Tenant to Attorn to Lender.  If Lender shall become the owner of the Premises or the Premises shall be sold by reason of foreclosure or other proceedings brought to enforce the Mortgage or the Premises shall be transferred by deed in lieu of foreclosure, the Lease (at the new owner's option, unless Tenant is entitled to the privileges of paragraph 2 hereof) shall continue in full force and effect as a direct Lease between the then owner of the Premises and Tenant, who shall succeed to the rights and duties of the Landlord and Tenant, provided, however, if the Tenant is in default in the performance of its obligations under the Lease, such continuation shall be at the option of the then owner of the Premises.  Tenant shall attorn to Lender or any other such owner as its Landlord, said attornment to be effective and self-operative without the execution of any further instruments.

4.      Authorization by Landlord.  Landlord authorizes and directs Tenant to honor any written demand or notice from Lender or such other owner instructing Tenant to pay rent or other sums to Lender or such other owner rather than Landlord (a "**Payment Demand**"), regardless of any other or contrary notice or instruction which Tenant may receive from Landlord before or after Tenant's receipt of such Payment Demand.  Tenant may rely upon any notice, instruction, payment demand, certificate, consent or other document from Lender or such other owner believed by Tenant to be genuine and signed by Lender or such other owner and shall have no duty to Landlord to investigate the same or the circumstances under which the same was given.  Any payment made by Tenant to Lender or such other owner in response to a Payment Demand shall be deemed proper payment by Tenant of such sum pursuant to the Lease.

5.      Limitation of Duties of Lender.  If Lender shall become the owner of the Premises or the Premises shall be sold by reason of foreclosure or other proceedings brought to enforce the Mortgage or if the Premises shall be transferred by deed in lieu of foreclosure, Tenant shall observe and perform: (i) each of the terms, covenants and conditions of the Lease that Lender or such other purchaser or transferee designates be observed and performed, and (ii) such other terms, covenants and conditions to which the parties may agree.  It is further agreed that Lender or such other purchaser or transferee shall not be:

(a)     obligated to perform any construction obligations of the Landlord or any prior landlord under the Lease; or

(b)     liable for any act or omission of any prior landlord (including Landlord) unless such act or omission continues from and after the date upon which the new owner succeeds to the interest of such prior landlord;

(c)     subject to any defenses which Tenant may have against any prior landlord (including Landlord) unless resulting from any default or breach by such prior landlord which continues from and after the date upon which the new owner succeeds to the interest of such prior landlord;

(d)     subject to any offsets which Tenant may have against any prior landlord, except to the extent such offsets are expressly provided under the Lease and Lender has received notice thereof and the opportunity to cure within the applicable time periods set forth in the Lease (it being further agreed that offsets under the Lease that were deducted by Tenant prior to the date upon which the new owner succeeds to the interest of such prior landlord shall not be subject to challenge);

(e)     bound by any payment of rent or additional rent by Tenant to Landlord or any prior landlord for more that one month in advance;

(f)     bound by any amendment or modification of the Lease made without the written consent of Lender or such other purchaser; or

(g)     liable or responsible for or with respect to the retention, application and/or return to Tenant of any security deposit paid to Landlord or any prior landlord, whether or not still held by Landlord or any prior landlord, unless and until Lender or such

other purchaser has actually received for its own account as landlord the full amount of such security deposit.

6.      Entire Agreement.  This Agreement sets forth the entire understanding between the parties concerning the subject matter of this Agreement and incorporates all prior negotiations and understandings.  There are no covenants, promises, agreements, conditions or understandings, either oral or written, between the parties relating to the subject matter of this Agreement other than those set forth herein.  No representation or warranty has been made by or on behalf of either party to this Agreement (or any officer, director, employee or agent thereof) to induce the other party to enter into this Agreement or to abide to or consummate any transactions contemplated by any terms of this Agreement, except representations and warranties, if any, expressly set forth herein.  No alteration, amendment, change or addition to this Agreement shall be binding upon either party unless in writing and signed by the party to be charged.

7.      Waiver.  No purported waiver by either party of any default by the other party of any term or provision contained herein shall be deemed to be a waiver of such term or provision unless the waiver is in writing and signed by the waiving party.  No such waiver shall in any event be deemed a waiver of any subsequent default under the same or any other term or provision contained herein.

8.      Successors and Assigns.  This Agreement and each and every covenant, agreement and other provision hereof shall be binding upon and shall inure to the benefit of the parties hereto and their representatives, successors and assigns.

9.      Notices.  Any consent, waiver, notice, demand, request or other instrument required or permitted to be given under this Agreement shall be in writing and be sent by certified or registered United States mail, return receipt requested, postage prepaid, addressed:

|  |  |
|---|---|
| If to Tenant: | Bed Bath & Beyond, Inc.<br>650 Liberty Avenue<br>Union, New Jersey  07083 |
| With copies to: | Allan N. Rauch, Esquire<br>c/o Bed Bath & Beyond Inc<br>650 Liberty Avenue<br>Union, New Jersey  07083 |
|  | Bart I. Mellits, Esquire<br>Ballard Spahr Andrews & Ingersoll, LLP<br>1735 Market Street<br>51st Floor<br>Philadelphia, Pennsylvania  19103-7599 |
| If to Landlord: | US 41 & I-285 Company<br>654 Madison Avenue<br>New York, New York  10021<br>Telephone: (212) 935-1330<br>Fax: (212) 832-5369<br>Attention:  Mr. Richard Steinberg |
| If to Lender: | HSBC Realty Credit Corporation (USA)<br>Fifth Avenue<br>New York, New York 10018<br>Attn.: Mortgage Servicing Department |

10.      Captions.  The captions and section numbers appearing in this Agreement are inserted only as a matter of convenience.  They do not define, limit, construe or describe the scope or intent of the provisions of this Agreement.

11.      Partial Invalidity.  If any term or provision of this Agreement or the application thereof to any person, firm or corporation, or circumstance, shall be invalid or unenforceable, the remainder of this Agreement, or the application of such term or provision to persons, firms or corporation, or circumstances, other than those as to which it is held invalid, shall both be unaffected thereby, and each term or provision of this Agreement shall be valid and be enforced to the fullest extent permitted by Law.

12.    <u>Governing Law</u>.    This Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to agreements to be performed in the State of New York.

13.    <u>Counterparts</u>.    This Agreement may be executed in counterparts, each of which when executed by the parties hereto shall be deemed an original and all of which together shall be deemed an original and all of which together shall be deemed the same Agreement.

[SIGNATURES ON FOLLOWING PAGE]

IN WITNESS WHEREOF, the parties hereto have each caused this Agreement to be executed as of the date first above written.

<u>Lender</u>

**HSBC REALTY CREDIT CORPORATION (USA)**


By:_____
Name:  Andrew Daly
Title:    Vice President


<u>Tenant</u>

**BED BATH & BEYOND INC.**
a New York corporation


By: _____
Name:  Warren Eisenberg
Title:  Co-Chairman

<u>Landlord</u>

**US 41 & I-285 COMPANY,**
a New York general partnership


By:_____
Name:
Title:

STATE OF NEW JERSEY    )

                             ) : ss.

COUNTY OF UNION        )

On this ___ day of _____, 200__, before me personally came Warren Eisenberg to me known, who being by me duly sworn, did depose and say that he is the Co-Chairman of BED BATH & BEYOND INC., the corporation described in and which executed the above instrument and that he signed his name thereto by order of the Board of Directors of said corporation.


_____
Notary Public

My Commission Expires:


_____

**EXHIBIT G-1
(BED, BATH & BEYOND FORM OF)
SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT**

THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT, made as of the _____ day of _____, 2005, by and between _____, a _____ **[corporation] [limited] [general] [partnership] [national banking association]**, having an office at _____(the **"Mortgagee"**) and Bed Bath & Beyond Inc., a New York corporation, having an office at 650 Liberty Avenue, Union, New Jersey 07083 (the **"Tenant"**).

W I T N E S S E T H :

WHEREAS, Mortgagee is the holder of a mortgage (the **"Mortgage"**) covering a parcel of land owned by U.S. 41 AND I-285 COMPANY, a New York general partnership (the **"Landlord"**), together with the improvements **[to be]** erected thereon (said parcel of land and improvements thereon being hereinafter referred to as the **"Shopping Center"** and being more particularly described on <u>Exhibit A</u> attached hereto and made a part hereof); and

WHEREAS, by a certain lease heretofore entered into between Landlord and Tenant dated as of _____(the **"Lease"**), Landlord leased to Tenant a portion of the Shopping Center, as more particularly described in the Lease (the **"Premises"**); and

WHEREAS, a copy of the Lease has been delivered to Mortgagee, the receipt of which is hereby acknowledged; and

_____

**[For mortgages existing as of the date Lease is executed:** WHEREAS, as an inducement to Tenant to enter into the Lease, **[Section 2.3.1/Section 17.3]** thereof provides that the Lease is conditioned upon Landlord obtaining this Agreement from Mortgagee; and

WHEREAS, the parties desire to satisfy the foregoing condition and to provide for the non-disturbance of Tenant by the holder of the Mortgage; and**]**

_____

**[For mortgages occurring after the Lease is executed:** WHEREAS, Section 17.1 of the Lease provides that the Lease shall become subject and subordinate to a mortgage encumbering the fee interest of Landlord in and to the Shopping Center if and when a non-disturbance agreement is entered into with respect to such mortgage; and

WHEREAS, the parties hereto desire to effect the subordination of the Lease to the Mortgage and to provide for the non-disturbance of Tenant by Mortgagee.**]**

_____

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements herein contained, the parties hereto, intending to be legally bound hereby, agree as follows:

1.      Mortgagee hereby consents to and approves the Lease and the term thereof, including the options to extend the term as set forth in the Lease, and covenants and agrees that the exercise by Tenant of any of the rights, remedies and options therein contained shall not constitute a default under the Mortgage.

2.      Tenant covenants and agrees with Mortgagee that the Lease hereby is made and shall continue hereafter to be subject and subordinate to the lien of the Mortgage, and to all modifications and extensions thereof (and such subordination shall not lessen or diminish Tenant's rights under the Lease), subject, however, to the provisions of this Agreement.

3.      Mortgagee agrees that so long as the Lease shall be in full force and effect, and so long as Tenant shall not be in default under the Lease beyond any applicable notice and grace period:

(a)      Tenant shall not be named or joined as a party or otherwise in any suit, action or proceeding for the foreclosure of the Mortgage or to enforce any rights under the Mortgage or the bond or note or other obligation secured thereby;

(b)      The possession by Tenant of the Premises and Tenant's rights thereto shall not be disturbed, affected or impaired by, nor will the Lease or the term thereof be terminated or otherwise affected by (i) any suit, action or proceeding brought upon the Mortgage or the bond or note or other obligation secured thereby, or for the foreclosure of the Mortgage or the enforcement of any rights under the Mortgage, or by any judicial sale or execution or other sale of the Premises or the Shopping Center, or any deed given in lieu of foreclosure, or by the exercise of any other rights given to any holder of the Mortgage or other documents as a matter of law, or (ii) any default under the Mortgage or the bond or note or other obligation secured thereby; and

(c)      All condemnation awards and insurance proceeds paid or payable with respect to the Premises or any other part of the Shopping Center shall be applied and paid in the manner set forth in the Lease.

4.      If Mortgagee or any future holder of the Mortgage shall become the owner of the Shopping Center by reason of foreclosure of the Mortgage or otherwise, or if the Shopping Center shall be sold as a result of any action or proceeding to foreclose the Mortgage, or transfer of ownership by deed given in lieu of foreclosure, the Lease shall continue in full force and effect, without necessity for executing any new lease, as a direct lease between Tenant and the then owner of the Shopping Center, as "landlord," upon all of the same terms, covenants and provisions contained in the Lease, and in such event:

(a)      Tenant shall be bound to such new owner under all of the terms, covenants and provisions of the Lease for the remainder of the term thereof (including the Renewal Periods, if Tenant elects or has elected to exercise its options to extend the term) and Tenant hereby agrees to attorn to such new owner and to recognize such new owner as "landlord" under the Lease; and

(b)      Such new owner shall be bound to Tenant under all of the terms, covenants and provisions of the Lease for the remainder of the term thereof (including the Renewal Periods, if Tenant elects or has elected to exercise its options to extend the term) which such new owner hereby agrees to assume and perform and Tenant shall, from and after the date such new owner succeeds to the interest of "landlord" under the Lease, have the same remedies against such new owner for the breach of any covenant contained in the Lease that Tenant might have had under the Lease against Landlord if such new owner had not succeeded to the interest of "landlord"; provided, however, that such new owner shall not be:

(i)      liable for any act or omission of any prior landlord (including Landlord) unless such act or omission continues from and after the date upon which the new owner succeeds to the interest of such prior landlord;

(ii)      subject to any defenses which Tenant may have against any prior landlord (including Landlord) unless resulting from any default or breach by such prior landlord which continues from and after the date upon which the new owner succeeds to the interest of such prior landlord;

(iii)      subject to any offsets which Tenant may have against any prior landlord, except to the extent such offsets are expressly provided under the Lease and Mortgagee has received notice thereof and the opportunity to cure within the applicable time periods set forth in the Lease (it being further agreed that offsets under the Lease that were deducted by Tenant prior to the date upon which the new owner succeeds to the interest of such prior landlord shall not be subject to challenge);

(iv)      bound by any fixed rent or additional rent which Tenant might have paid for more than one month in advance of its due date under the Lease to any prior landlord (including Landlord), unless such additional rent is paid in accordance with the applicable provisions of the Lease; or

(v)      bound by any amendment or modification of the Lease made without its consent; notwithstanding the foregoing, Mortgagee acknowledges that the Lease specifically provides for amendments thereof upon the occurrence of certain events described in the Lease (such as, for example, an amendment to the Lease confirming the measurement of the Premises), and, by its execution below, Mortgagee agrees to recognize such amendments as part of the Lease, and Mortgagee further agrees that such new owner shall also be bound by such amendment(s) to the Lease, without any consent on the part of Mortgagee or such new owner.

(c)      Tenant's obligations hereunder shall be effective only so long as Mortgagee is bound to Mortgagee's obligations hereunder.

5.      Tenant will notify Mortgagee of any default by Landlord under the Lease which would entitle Tenant to terminate the Lease or abate the rent payable thereunder and agrees that notwithstanding any provision of the Lease, no notice of termination thereof nor any abatement shall be effective unless Mortgagee has received the aforesaid notice and has failed to cure the subject default within the same time period allowed Landlord under the Lease.  It is understood that the abatement provisions of this Section relate to abatements by reason of Landlord's default and do not apply to provisions of the Lease whereby Tenant has the automatic right to abate rentals such as, for example, abatement upon casualty or condemnation.

6.      Neither the Mortgage nor any other security instrument executed in connection therewith shall encumber or be construed as subjecting in any manner to the lien thereof, any trade fixtures, signs or other personal property at any time furnished or installed by or for Tenant or its subtenants or licensees on the aforementioned property regardless of the manner or mode of attachment thereof.

7.      Any notices of communications given under this Agreement shall be in writing and shall be given by registered or certified mail, return receipt requested, or by any recognized overnight mail carrier, with proof of delivery slip, postage prepaid, (a) if to Mortgagee, at the address of Mortgagee as hereinabove set forth or at such other address or persons as Mortgagee may designate by notice in the manner herein set forth, or (b) if to Tenant, at the address of Tenant as hereinabove set forth, with duplicate copies to  Allan N. Rauch, Esquire, c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, and Bart I. Mellits, Esquire, Ballard Spahr Andrews & Ingersoll, LLP, 1735 Market Street, 51st Floor, Philadelphia, Pennsylvania 19103-7599, or such other address or persons as Tenant may designate by notice in the manner herein set forth.  All notices given in accordance with the provisions of this Section shall be effective upon receipt (or refusal of receipt) at the address of the addressee.

8.      This Agreement shall bind and inure to the benefit of and be binding upon and enforceable by the parties hereto and their respective successors, assigns, and sublessees.

9.      This Agreement contains the entire agreement between the parties and cannot be changed, modified, waived or canceled except by an agreement in writing executed by the party against whom enforcement of such modification, change, waiver or cancellation is sought.

10.      This Agreement and the covenants herein contained are intended to run with and bind all lands affected thereby.

**[to add if the memorandum of lease has been recorded prior to the subject mortgage]** NOTE: THIS AGREEMENT BY TENANT SHALL NOT BE EFFECTIVE UNLESS AND UNTIL ANY PRIOR MORTGAGES ON THIS PROPERTY HAVE BEEN SATISFIED SO THAT TENANT'S PRIOR AGREEMENTS TO ATTORN TO SAID MORTGAGES AND/OR TO SUBORDINATE ITS LEASE TO SAID MORTGAGES SHALL HAVE BEEN EXTINGUISHED.

IN WITNESS WHEREOF, the parties hereto have duly executed this Subordination, Non-Disturbance and Attornment Agreement as of the day and year first above written.

**MORTGAGEE:**

WITNESS:

_____

_____                    By:_____
                                                   Name:_____
                                                   Title:_____

[SEAL]

**TENANT:**

WITNESS:                                           BED BATH & BEYOND Inc., a New
                                                   York corporation

_____                    By:_____
                                                        Warren Eisenberg
                                                        Co-Chairman

[SEAL]

STATE OF NEW JERSEY    )

                                                 ) : ss.

COUNTY OF UNION        )

       On this ____ day of _____, 200__, before me personally came Warren Eisenberg to me known, who being by me duly sworn, did depose and say that he is the Co-Chairman of BED BATH & BEYOND INC., the corporation described in and which executed the above instrument and that he signed his name thereto by order of the Board of Directors of said corporation.

                                        _____
                                        Notary Public

My Commission Expires:


_____

**EXHIBIT H**

**RECOGNITION AGREEMENT**

THIS RECOGNITION AGREEMENT, made as of the _____day of _____, 200__, by and between U.S. 41 AND I-285 COMPANY, a New York general partnership, having an address at c/o Mall Properties, Inc., 654 Madison Avenue, New York, New York 10021 (*"Landlord"*); Bed Bath & Beyond Inc., a New York corporation, having an address at 650 Liberty Avenue, Union, New Jersey 07083 (*"Tenant"*); and _____, a [_____] **[corporation] [limited] [general] [partnership]**, having an address at _____(*"Subtenant"*).

R E C I T A L S:

A.      Landlord and Tenant have entered into a certain lease (the *"Lease"*) dated as of _____ __, 2005, a short form of which has been recorded in _____, which demises certain premises (the *"Premises"*) located in Akers Mill Square (the "Shopping Center"), _____, Georgia, which Shopping Center is more particularly described on Exhibit A annexed hereto and made a part hereof.

B.      Section 15.4 of the Lease provides that in the event Tenant subleases all or a portion of the Premises for a term of at least five (5) years, Landlord shall, upon Tenant's request, execute and deliver a Recognition Agreement among Landlord, Tenant and each such subtenant in the form attached to the Lease, in recordable form.

C.      Pursuant to a Sublease dated as of _____(the *"Sublease"*), Tenant has subleased the Premises to Subtenant (the *"Subleased Premises"*).

D.      The parties hereto desire to effectuate the provisions of Section 15.5 of the Lease with respect to the Sublease and the Subleased Premises.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereto, intending to be legally bound hereby, agree as follows:

1.      Landlord warrants and represents as follows:

(i)      that it is the fee owner of the Premises,

(ii)     that the Lease is unmodified (except as may be otherwise set forth in Exhibit B annexed hereto, if any) and is in full force and effect,

(iii)    that the term of the Lease expires on _____, but is subject to three renewal periods of five years each and

(iv)    that Tenant is not in default under the Lease nor has any event occurred which would after notice to Tenant and the passage of time become a default of Tenant under the Lease.

2.      Landlord hereby acknowledges receipt of a copy of, and consents to and approves, the Sublease and all of the terms, covenants and provisions thereof, and agrees that the exercise by Subtenant of any of its rights, remedies and options contained therein shall not constitute a default under the Lease.

3.      Landlord agrees that whenever it has an obligation with respect to the Premises, or its consent or approval is required for any action of Tenant under the Lease, then, to the extent such obligation, consent or approval relates to the Subleased Premises or Subtenant's use and occupation thereof, it will perform such obligation in accordance with the terms and conditions of the Lease, and, subject to the applicable terms of the Lease, will not unreasonably withhold or unduly delay such consent or approval.

4.      Landlord shall not, in the exercise of any of the rights arising or which may arise out of the Lease or of any instrument modifying or amending the same or entered into in substitution or replacement thereof (whether as a result of Tenant's default or otherwise), disturb or deprive Subtenant in or of its possession or its rights to possession of the Subleased Premises or of any right or privilege granted to or inuring to

the benefit of Subtenant under the Sublease, provided that Subtenant is not in default under the Sublease beyond the expiration of any applicable notice and cure period.

       5.       In the event of the termination of the Lease by reentry, notice, conditional limitation, surrender, summary proceeding or other action or proceeding, or otherwise, or, if the Lease shall terminate or expire for any reason before any of the dates provided in the Sublease for the termination of the initial or renewal terms of the Sublease and if immediately prior to such surrender, termination or expiration the Sublease shall be in full force and effect, Subtenant shall not be made a party in any removal or eviction action or proceeding nor shall Subtenant be evicted or removed of its possession or its right of possession of the Subleased Premises be disturbed or in any way interfered with, and the Sublease shall continue in full force and effect as a direct lease between Landlord and Subtenant (provided, that in such event, Subtenant shall, for the then remainder of the term of the Sublease, pay fixed rent and additional rent in an amount equal to the greater of (x) the Fixed Rent and additional rent then payable under the Lease, prorated on the basis of the ratio which the Floor Area of the Subleased Premises bears to the Floor Area of the Premises, or (y) the fixed rent and additional rent then payable under the Sublease).

       6.       Provided that Subtenant is not in default under the Sublease beyond the expiration of any applicable notice and cure period, Landlord hereby waives and relinquishes any and all rights or remedies against Subtenant, pursuant to any lien, statutory or otherwise, that it may have against the property, goods or chattels of Subtenant in or on the Subleased Premises.

       7.       Any notices, consents, approvals, submissions, demands or other communications (hereinafter collectively referred to as "*Notice*") given under this Agreement shall be in writing.  Unless otherwise required by law or governmental regulation, Notices shall be deemed given if sent by registered or certified mail, return receipt requested, or by any recognized overnight mail carrier, with proof of delivery slip, postage prepaid (a) to Landlord, at the address of Landlord as hereinabove set forth or such other address or persons as Landlord may designate by Notice to the other parties hereto, (b) to Tenant, at the address of Tenant as hereinabove set forth, with duplicate copies to  Allan N. Rauch, Esquire, c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, and Bart I. Mellits, Esquire, Ballard Spahr Andrews & Ingersoll, LLP, 1735 Market Street, 51st Floor, Philadelphia, Pennsylvania 19103-7599, or such other address or persons as Tenant may designate by Notice to the other parties hereto, and (c) to Subtenant, at the address of Subtenant as hereinabove set forth or such other address or persons as Subtenant may designate by Notice to the other parties hereto. During the period of any postal strike or other interference with the mails, personal delivery shall be substitute for registered or certified mail.  All Notices shall become effective only on the receipt or rejection of same by the proper parties.

       8.       No modification, amendment, waiver or release of any provision of this Agreement or of any right, obligation, claim or cause of action arising hereunder shall be valid or binding for any purpose whatsoever unless in writing and duly executed by the party against whom the same is sought to be asserted.

[Signature Page Follows]

9.      This Agreement shall be binding on and shall inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors, assigns and sublessees.

IN WITNESS WHEREOF, the parties have caused this Recognition Agreement to be executed under seal the date first above written.

**LANDLORD**:

U.S. 41 AND I-285 COMPANY

By:      _____
Name:  _____
Title:   _____

**TENANT**:

BED BATH & BEYOND INC.

By:      _____
           Warren Eisenberg
           Co-Chairman

**SUBTENANT**:

_____

By:      _____
Name:  _____
Title:   _____

STATE OF NEW JERSEY    )

                                                    ) : ss.

COUNTY OF UNION        )

        On this ____ day of _____, 200__, before me personally came Warren Eisenberg to me known, who being by me duly sworn, did depose and say that he is the Co-Chairman of BED BATH & BEYOND INC., the corporation described in and which executed the above instrument and that he signed his name thereto by order of the Board of Directors of said corporation.


                                            _____
                                            Notary Public

My Commission Expires:


_____

EXHIBIT I

FORM OF DELIVERY DATE NOTICE

[Letterhead of Landlord]

_____, 200__

[via Federal Express or other
recognized overnight delivery
service per Article 18 of the foregoing
lease]

Bed Bath & Beyond Inc.
650 Liberty Avenue
Union, NJ 07083
Attn: Warren Eisenberg

Re:    Agreement of Lease, dated _____, 2005 (the "*Lease*"), between U.S. 41 AND I-285
COMPANY, as landlord ("*Landlord*"), and Bed Bath & Beyond Inc., as tenant
("*Tenant*"), with respect to certain retail premises (the "*Premises*") located in the Akers
Mill Square, _____, Georgia

Gentlemen:

        In accordance with the provisions of Subsection 2.3.2 of the Lease, the Landlord hereby
informs the Tenant that the Delivery Date shall take place at 8:00 A.M. on _____,
200__.  This notice shall constitute the Delivery Date Notice referred to in Subsection 2.3.2 of
the Lease.

                    Very truly yours,

                    U.S. 41 AND I-285 COMPANY

                    By:_____
                         , (Vice) President

cc:    Bart I. Mellits, Esquire
       Allan N. Rauch, Esquire

**EXHIBIT J**

**DELIVERY DATE CERTIFICATION**

[Letterhead of Landlord]

_____, 200__

[via Federal Express or other
recognized overnight delivery
service per Article 18 of the foregoing
lease]

Bed Bath & Beyond Inc.
650 Liberty Avenue
Union, NJ  07083
Attn:  Warren Eisenberg

Re:    Agreement of Lease, dated _____, 2005 (the "*Lease*"), between U.S. 41 AND I-285
       COMPANY, as landlord ("*Landlord*"), and Bed Bath & Beyond Inc., as tenant
       ("*Tenant*"), with respect to certain retail premises (the "*Premises*") located in the Akers
       Mill Square,_____, Georgia

Gentlemen:

       In accordance with the provisions of Subsection 2.3.3 of the Lease, Landlord hereby
certifies to Tenant that, as of the date of this certification, all of the Delivery Date Conditions (as
defined in the Lease) have been satisfied, and that, as a result, the Delivery Date (as such term
is defined in the Lease) will be deemed to be _____, 200__ [INSERT THE DATE
WHICH IS TWO DAYS AFTER THE DATE OF THIS LETTER].  This notice shall constitute the
Delivery Date Certification referred to in Subsection 2.3.3 of the Lease.

                       Yours very truly,

                       U.S. 41 AND I-285 COMPANY

                       By:_____
                              , (Vice) President

cc:    Allan N. Rauch, Esquire
       Bart I. Mellits, Esquire

**EXHIBIT K-1**

**EXISTING EXCLUSIVES**

1. <u>L.A. Fitness</u>

The "Initial Uses" of the Premises shall be for the operation of a health club and fitness facility which may include, without limitation, weight and aerobic training, racquetball, basketball, personal training, swimming pool, sauna and whirlpool facilities.  As part of the health club and fitness facility operated on the Premises, Tenant may use portions of the Premises for uses ancillary to a health club and fitness facility, including, but not limited to, a pro shop, physical therapy center, sports medicine (subject to municipal approvals), weight loss and nutritional counseling (excluding a full service weight-loss clinic), advising and related programs, therapeutic massage, chiropractic care, swim lessons, racquetball lessons, tanning salon, juice bar, vitamin and nutritional supplement sales, ATM machines located within the Premises, vending machines located within the Premises, child care facility for members only, and incidental food and beverage service (excluding a full service restaurant). So long as Tenant (or its successor or assigns) is operating the Premises as a health club and fitness facility, Tenant (or its successor or assigns) shall have the right throughout the Term and all Option Terms to operate the Premises for uses permitted under this Lease.  Except for Retail Center leases already in place, and all renewals, replacements, amendments (but exclusive of a use amendment requiring Landlord's consent that would violate this Section 1.9) and extensions thereof, Landlord will not enter into any Retail Center contracts permitting fitness related operations (including health club, aerobics, spinning, sports medicine, personal training, weight loss, basketball, karate, boxing, cardiovascular or jazzercise operations) to operate in the Retail Center.

2. Circuit City

<u>Use</u>. (a)    Tenant may initially use and operate the Premises as a retail store for (i) the sale of consumer, office and automotive electronics products (which include, but shall not be limited to, televisions, stereos, speakers, video and audio recorders and players and cameras), computer hardware and software and related software services, including internet access services, entertainment software and entertainment media (which include, but shall not be limited to, records, game cartridges, video tapes, cassettes, compact discs, DVD's and DVD equipment), cellular and wireless telephones and telecommunication devices, and related goods and the sale and installation of motor vehicle audio, stereo and telephone systems and technological evolutions of the foregoing (all of such items are collectively referred to as the "Products"), and (ii) renting, servicing, repairing and warehousing of the Products as ancillary to Tenant's primary business purpose.

<u>Tenant's Exclusive Use</u>.  So long as the Premises are used for the initial uses set forth in paragraph 18, no other tenant or occupant of the Shopping Center shall be entitled to sell or rent (or rent to own) any of the Products, subject only to rights granted any such tenants under leases in existence as of the date of this Lease and described on <u>Exhibit "F"</u>. Incidental Sale (as hereinafter defined) of the Products in connection with the overall business of another occupant or tenant shall not be deemed a violation of the preceding sentence.  As used herein, "Incidental Sale" shall mean the lesser of (i) five hundred (500) square feet, or (ii) five percent (5%) of such occupant's or tenant's display area.

**The foregoing provisions are subject to the terms of that certain agreement dated July 18, 2005 between Circuit City Stores, Inc. and Bed Bath & Beyond Inc., a copy of which is attached hereto.**

3. Chipotle Mexican Grill

Landlord agrees that as long as this Lease is in full force and effect, Tenant is not in default hereunder and Tenant is then operating the Premises as a typical Chipotle Mexican Grill restaurant located in the metropolitan Atlanta, Georgia area, Landlord will not lease anew any

premises in the Shopping Center for the operation of a restaurant whose primary use is selling burritos or tacos (the "Restricted Items")

4.  Wrap & Roll    Landlord agrees that as long as this Lease is in full force and effect, Tenant is not in default hereunder and Tenant is then operating the Premises as a Wrap & Roll restaurant located in the metropolitan Atlanta, Georgia area, Landlord will not lease anew any premises in the Shopping Center for a tenant to conduct the exclusive use (defined below as its primary use.  For the purposes of this Lease, Exclusive Use shall be defined as the sale of "Wrap" sandwiches comprising twenty percent (20%) or more of a tenant's or occupant's business in the Shopping Center.

5.  Sprint    Section 7.4.  Landlord covenants that, during the Lease Term, it shall not lease any other premises in the Shopping Center to another store whose primary use is the retail sale of wireless and wire line communication devices, equipment and related accessories.

6.  Toys 'R' Us    (c)    Landlord shall not operate or lease or permit to be used any store (other than the Store) located on the Entire Premises or any other property (other than the Adjacent Center) owned by it which is contiguous or adjacent to the Entire Premises, or which would be contiguous or adjacent except for an intervening road or waterway, for the use or purpose of the sale of toys, games, juvenile furniture or wheel goods.  For purposes hereof, the incidental sale of such items shall not be deemed a violation hereof.  Nevertheless, to the extent any store is leased to a party who utilizes more than either 2,000 square feet of retail floor space or 20% of its sales area in the aggregate, for the sale of any or all of such items, such leasing and such use shall be deemed a violation of this provision and subject to injunctive as well as any other relief legally available to Tenant for a breach of this covenant.

**The foregoing provisions are subject to the terms of that certain agreement dated July 29, 2005 between Toys "R" Us – Delaware, Inc. and Bed Bath & Beyond Inc., a copy of which is attached hereto.**

# BED BATH &
# BEYOND
### Beyond any store of its kind.®

**Corporate Office**
650 Liberty Avenue
Union, NJ 07083
908/688-0888

July 18, 2005

Circuit City Stores, Inc.
Real Estate Department
Deep Run I
9950 Mayland Drive
Richmond, VA 23233

> Re:    Agreement Regarding Exclusive Uses between Circuit City Stores, Inc., a
> Virginia corporation ("CC") and Bed Bath & Beyond Inc., a New York
> corporation ("BBB") - Akers Mill Square, Atlanta (Smyrna), Georgia (the
> "Shopping Center")

Ladies and Gentlemen:

In order to facilitate the operation of retail stores by each of CC and BBB in the Shopping
Center, this letter sets forth the agreement of CC and BBB with respect to the exclusive uses
established in their respective leases, and/or other recorded instruments, in the Shopping Center
(hereafter referred to as the "CC Lease" and the BBB Lease", respectively).

## DEFINITIONS

A.    BBB Store:   The store demised to BBB under the BBB Lease, containing a retail
sales area of at least 10,000 square feet, which is operated primarily for the sale of home
products and furnishings by (i) BBB, or (ii) any Successor.

B.    BBB Exclusive Use:   The retail sale of any of the following goods (such items
are collectively referred to as the "BBB Exclusive Products"): (i) linens and domestics (including
but not limited to sheets, bedspreads, comforters, duvets, pillows, pillow covers, placements,
tablecloths, dish towels, oven mittens and aprons); (ii) bathroom items (including but not limited
to towels, shower curtains, bathroom rugs, toilet seats and other bathroom accessories);
(iii) housewares (including but not limited to utensils, kitchen utensils, countertop kitchen and
bathroom appliances, kitchen and bathroom "gadgets," small cleaning appliances [including but
not limited to irons and hand held cleaning machines] and supplies, cookware, bakeware, dishes
and china); (iv) frames and wall art; (v) window treatments; and/or (vi) closet, shelving and
storage items.

C.    CC Store:   The store demised to CC under the CC Lease, containing a retail sales
area of at least 10,000 square feet, which is operated primarily for the sale of consumer, office
and/or automotive electronics by (i) CC, or (ii) any Successor.

J:\FORMS\EXCLUSVE\Circuit City\Smyrna, GA.doc

Circuit City Stores, Inc.
Atlanta (Smyrna), Georgia
July 18, 2005
Page 2

     D.    <u>CC Exclusive Use</u>:  The retail sale of any of the following goods and services (i) consumer, office and automotive electronics products (which include, but shall not be limited to, televisions, stereos, speakers, video and audio recorders and players and cameras), computer hardware and software and related software services, including internet access services, entertainment software and entertainment media (which include, but shall not be limited to, records, game cartridges, video tapes, cassettes, compact discs, DVD's and DVD equipment), cellular and wireless telephones and telecommunication devices, and related goods and the sale and installation of motor vehicle audio, stereo and telephone systems and technological evolutions of the foregoing (all of such items are collectively referred to as the "CC Exclusive Products"), and (ii) renting, servicing, repairing and warehousing of the CC Exclusive Products.

     E.    <u>Successor(s)</u>:  Any entity which is controlling, controlled by or under common control with CC or BBB, as applicable, or any assignees, sublessees, licensees, concessionaires, tenants, purchasers or other successor(s) in interest.

     F.    <u>Excused Periods</u>:  Periods during which: (a) material alterations or renovations are being performed in and to a party's Store for a period not in excess of 365 days, (b) a party's Store is being restored with reasonable efforts following damage, destruction, or taking in eminent domain, or (c) an event of *force majeure* prevents the operation of business within a Party's Store.

### AGREEMENT

     For and in consideration of the mutual covenants set forth herein, CC and BBB agree as follows:

     1.    Notwithstanding any provision(s) to the contrary in the BBB Lease or the CC Lease, and/or other recorded instruments affecting the Shopping Center, BBB agrees to recognize and not violate the CC Exclusive Use in the Shopping Center, provided, however, that **(i)** the following categories of goods shall not be deemed to be CC Exclusive Products: (a) consumer electronic products involving personal care (such as hair dryers); (b) small electronic kitchen appliances and devices (such as microwave ovens, toasters, coffee makers); (c) electronic bedroom appliances and devices (such as alarm or clock radios); (d) electronic home maintenance devices (such as vacuum cleaners); and (e) electronic entertainment software and media that is specifically related to cooking, home decorating, home repairs, and/or home building; and **(ii)** BBB and its Successors shall be permitted to use up to (but not more than) 400 square feet of floor area in the BBB Store for the sale of any of the CC Exclusive Products except cellular telephones, provided, however, that in the event that BBB subsequently sells cellular telephones in at least seventy-five percent (75%) of its stores in the United States, then BBB shall be permitted to use up to (but not more than) fifty (50) square feet of the square footage that it occupies within the BBB Store for the sale of cellular telephones. The exclusive rights with respect to any particular category listed in the CC Exclusive Use shall terminate as to such category in the event that the CC Store ceases to be used for the sale, rental or distribution of items contained in such category for in excess of twelve (12) consecutive months (except for Excused Periods). Notwithstanding the foregoing, the CC Exclusive Use shall lapse in its

J:\FORMS\EXCLUSVE\Circuit City\Smyrna, GA.doc

Circuit City Stores, Inc.
Atlanta (Smyrna), Georgia
July 18, 2005
Page 3

entirety with respect to a non-affiliated assignee of the CC Lease or a non-affiliated sublessee of all or a portion of the CC Store, if that assignee or sublessee fails to use at least fifty percent (50%) of the square footage that it occupies within the CC Store for the sale, rental or distribution of the CC Exclusive Products, singly or in any combination, for in excess of twelve (12) consecutive months, except for Excused Periods.

2.      Notwithstanding any provision(s) to the contrary in the BBB Lease or the CC Lease, BBB agrees that CC shall not be subject to the BBB Exclusive Use, because the Circuit City lease at the Shopping Center was executed on ~~June 30, 2003~~ and pre-exists the BBB lease.
July 1, 2004



3.      Subject to each party's compliance with the terms of this letter agreement, CC and BBB each agree not to object to the development, proposed development, operation or proposed operation of a BBB Store, or a CC Store, as applicable, in the Shopping Center.

4.      Although not required as a condition to the enforceability of the terms and provisions of this letter agreement, CC and BBB shall, upon the request of the other, execute any document reasonably required by the other to evidence the existence or applicability of the terms and provisions of this letter agreement.

5.      The foregoing constitutes the final agreement between CC and BBB with respect to the Shopping Center, and supersedes all prior understandings, writings and agreements between the parties with respect to the BBB Exclusive Use and the CC Exclusive Use in the Shopping Center. The provisions of this letter agreement shall be binding on any and all Successors of CC and BBB. The landlord(s) in the CC Lease and the BBB Lease shall be entitled to rely on the terms and conditions set forth in this agreement only as between CC and BBB (and their respective Successors), and <u>not</u> with respect to other tenants or occupants of the Shopping Center (as to which the "exclusive use" provisions contained in the CC Lease and the BBB Lease shall apply in accordance with the terms of said Leases).

If the foregoing accurately reflects your understanding, please sign below indicating your agreement, and return the executed counterpart to my attention at the above address. It shall be a

J:\FORMS\EXCLUSVE\Circuit City\Smyrna, GA.doc

Circuit City Stores, Inc.
Atlanta (Smyrna), Georgia
July 18, 2005
Page 4

condition precedent to the agreements herein set forth that BBB and CC shall each have entered into a lease or occupancy agreement for its premises in the Shopping Center within one year after the date hereof.

Very truly yours,

BED BATH & BEYOND INC.

By: _____

Seth Geldzahler
Vice President - Real Estate

ACCEPTED AND AGREED TO
THIS ____ DAY OF JULY, 2005:

CIRCUIT CITY STORES, INC.

By: _____
Name:  Steven E. Jackson
Title:  Vice-President  Real Estate

J:\FORMS\EXCLUSVE\Circuit City\Smyrna, GA.doc

# BED BATH &
## BEYOND®
### Beyond any store of its kind.®

**Corporate Office**
650 Liberty Avenue
Union, NJ 07083                                              July 29, 2005
908/688-0888

Toys "R" Us - Delaware, Inc.
1 Geoffrey Way
Wayne, New Jersey 07470-2030

Re:    Modifications of Exclusive Use Provisions as to Toys "R" Us - Delaware, Inc., a
       Delaware corporation (**"TRU"**) and Bed Bath & Beyond Inc., a New York
       corporation (**"BBB"**): Akers Mill Square, Atlanta, Georgia (the **"Shopping
       Center"**)

Ladies and Gentlemen:

       This letter, when executed by both parties, will confirm the agreement between TRU and
BBB regarding the parties' exclusive use provisions and prohibited sales activities
(**"Exclusives"**) contained in the parties' respective leases at the Shopping Center.  BBB and
TRU agree as follows:

       1.      In lieu of the Exclusive contained in the existing TRU lease at the Shopping
Center, the parties agree that BBB (and its successors, assigns, and sublessees), during the
term of its lease and any renewals, extensions or replacements of its lease at the Shopping
Center, will neither operate, nor permit to be operated, its premises at the Shopping Center
primarily for the sale, rental, or distribution of toys and/or newborns', infants' and/or children's
specialty items, services, goods or merchandise, individually, in any combination, or in the
aggregate.  TRU's exclusive rights hereunder shall be conditioned upon TRU using its then
existing premises in the Shopping Center primarily for the sale, rental, or distribution of toys
and/or newborns', infants' and/or children's specialty items, services, goods or merchandise
(other than during "Temporary Closings" [as defined below] and other than for periods of time
not exceeding twelve (12) consecutive months).

       2.      Following the execution of the BBB lease for its premises in the Shopping
Center, TRU (and its successors, assigns, and sublessees), during the term of its lease and
any renewals, extensions or replacements of its lease at the Shopping Center, will neither
operate, nor permit to be operated, its premises at the Shopping Center primarily for the sale,
rental, or distribution of linens and domestics, bathroom items, and/or housewares, individually,
in any combination, or in the aggregate.  BBB's exclusive rights hereunder shall be conditioned
upon BBB using its then existing premises in the Shopping Center primarily for the sale, rental,
or distribution of linens and domestics, bathroom items, and/or housewares (other than during
"Temporary Closings" [as defined below] and other than for periods of time not exceeding
twelve (12) consecutive months).

J:\FORMS\EXCLUSVE\ToysRUs\Akers Mill (Atlanta), GA (1094).wpd

Toys "R" Us - Delaware, Inc.
Akers Mill (Atlanta), Georgia
July 29, 2005
Page 2

      3.     The term *"Temporary Closing"* shall mean the discontinuance of the operation of business in such store for whose benefit a restriction has been granted in favor of:  (i) for any reasonable period during which such store is being altered, renovated or remodeled, (ii) for any reasonable period after damage or destruction or a condemnation, prior to full repair or restoration, including, without limitation, the actual passage of time in connection with settlements of claims or settlement negotiations between the applicable party and its insurance carriers and the applicable party and governmental authorities, (iii) for any period during which the use of the store for which a restriction has been granted in favor of is affected by any so-called event or condition of *"Force Majeure"*, (iv) for any reasonable period during the taking of inventory, (v) by reason of operation of law, governmental regulation or orders, (vi) as a result of or in connection with any labor dispute, (vii) as a result of the unavailability of adequate merchandise or supplies, (viii) as a result of the bona fide exercise by the holder of a mortgage of its foreclosure rights under such mortgage, or by deed or assignment in lieu thereof, or (ix) for any reason beyond the reasonable control of the applicable party, excluding lack of funds or inability to obtain financing.  The parties hereto acknowledge that the Temporary Closing periods are in addition to the aforesaid twelve (12) consecutive month periods and are not in derogation or in lieu thereof.

      4.     Please sign both of the enclosed counterparts of this letter agreement and return to the undersigned one fully executed counterpart of this letter agreement to confirm your acceptance of and agreement to the foregoing.  It shall be a condition precedent to the agreements herein set forth that the parties hereto shall have entered into leases or occupancy agreements for their premises in the Shopping Center by not later than the first anniversary hereof.  Thank you for your time and cooperation.

                     Very truly yours,

                     BED BATH & BEYOND INC.

By: _____

                     Seth Geldzahler
                     Vice President - Real Estate

AGREED TO AND ACCEPTED THIS
As of the _15th_ day of _August_ , 2005

TOYS "R" US - DELAWARE, INC.

By: _____
Name: ~~DAVID P. PICOT~~
Title: ~~VICE PRESIDENT - REAL ESTATE~~
       DESIGN & CONSTRUCTION
J:\FORMS\EXCLUSVE\ToysRUs\Akers Mill (Atlanta), GA (1094).wpd

**<u>EXHIBIT K-2</u>**

**EXISTING LEASES**

The Sports Authority
Office Max
LA Fitness
Jenny Craig
Souper Salad
Sprint PCS
Subway
My Friend's Place
Nail Salon (L Nails)
Wrap N' Roll
Circuit City
Toys 'R Us
Mays Chinese Restaurant
U.S. Post Office
Halloween Store
Riverside Commercial Bank
Buffalo's Café
Rare Hospitality International (Longhorn Steakhouse)
Chipotle
Chick-Fil-A
Hooters of Cumberland
Honey Baked Hams
IEM Rubbish

DMEAST #1997925 v7

**EXHIBIT L**

**INTENTIONALLY OMITTED**

**EXHIBIT M**

**PROHIBITED USES**

As used in this Lease, the term "Prohibited Uses" shall mean any of the following uses provided that the following uses shall not apply to Existing Tenants under Existing Leases:

A.      As to the Shopping Center, any of the following uses:

(1)      Any use which emits or results in strong, unusual or offensive odors, fumes, dust or vapors, is a public or private nuisance, emits noise or sounds which are objectionable due to intermittence, beat, frequency, shrillness, volume or loudness, creates a hazardous condition, or is used, in whole or in part, as or for warehousing or the dumping or disposing of garbage or refuse;

(2)      Any operation primarily used as a storage facility and any assembling, manufacturing, distilling, refining, smelting, agricultural, or mining operation;

(3)      Any "second hand" store, surplus store;

(4)      Any mobile home park, trailer court, labor camp, junkyard, or stockyard (except that this provision shall not prohibit the temporary use of construction trailers during periods of construction, reconstruction, or maintenance);

(5)      Any dumping, disposing, incineration, or reduction of garbage (exclusive of trash compactors or trash containers located near the rear of any building);

(6)      Any fire sale, bankruptcy sale (unless pursuant to a court order), auction house operation, fictitious going-out-of-business sale, lost-our-lease sale or similarly advertised event;

(7)      Any central laundry, dry cleaning plant or laundromat (except that (a) a dry cleaner that performs all dry cleaning outside the Shopping Center shall be permitted, so long as its on-site premises are located more than 150 feet away from the Premises and (b) a laundromat that is not located in-line with the Premises shall be permitted);

(8)      Any automobile, truck, trailer, boat, or recreational vehicle sales, leasing, display or body shop repair operation (except that any such uses shall be permitted so long as they are located in the area of the Shopping Center east of Expansion Area C, Circuit City and Honey Baked Hams as shown on Exhibit B of this Lease (the *"Eastern Parcel"*);

(9)      Any bowling alley, except if located in the Eastern Parcel;

(10)      Any live performance theater, auditorium, meeting hall, sporting event, or other entertainment use (except that said live performance theater, auditorium, meeting hall, sporting event or other entertainment use shall be permitted so long as its on-site premises are located more than 200 feet away from the Premises);

(11)      Any living quarters, sleeping apartments, or lodging rooms;

(12)      Any veterinary hospital or animal raising or boarding facilities (except to the extent permitted below);

(13)      Any mortuary or funeral home;

(14)      Any "Pornographic Use", which shall include, without limitation:  (x) a store displaying for sale or exhibition books, magazines or other publications containing any combination of photographs, drawings or sketches of a sexual nature, which are not primarily scientific or educational [provided, however, that the sale of books, magazines and other publications by a national bookstore of the type normally located in first-class shopping centers in the State in which the Shopping Center is located (such as, for example, Borders and Barnes & Noble, as said stores currently operate) shall not be deemed a "pornographic use" hereunder]; or (y) a store offering for exhibition, sale or rental video cassettes or other medium capable of projecting, transmitting or reproducing, independently or in conjunction with another device, machine or equipment, an image or series of images, the content of which has been rated or advertised generally as NC-17 or "X" or unrated by the Motion Picture Rating Association, or any successor thereto [provided, however, that the sale or rental of such videos by a national video store of the type normally located in first-class shopping centers in the State in which the

Shopping Center is located (such as, for example, Blockbuster or West Coast Video, as said stores currently operate) shall not be deemed a "pornographic use" hereunder]; or massage parlor except for therapeutic massages given in connection with the operation of a day spa or health club which may otherwise be permitted under this Exhibit M;

(15)    Any so-called "head shop", or other establishment primarily selling or exhibiting drug-related paraphernalia;

(16)    Any bar, tavern, or other establishment selling alcoholic beverages for on or off-premises consumption, except that (a) a first class wine and spirit shop typically found in first class shopping centers in the Atlanta metropolitan area shall be permitted, (b) incidental sale of alcoholic beverages for on-premises consumption in restaurants of the type described in Paragraph 38 of the Exhibit M below shall be permitted, and (c) a bar, tavern or other establishment selling alcoholic beverages for on or off-premises consumption shall be permitted in the Eastern Parcel and in the spaces labeled as J1, K1 or the 17,804 square foot space located between J1 and K1, all as shown on the Exhibit B;

(17)    Any catering or banquet hall;

(18)    Any flea market;

(19)    Any amusement or video arcade, pool or billiard hall, night club, discotheque, or dance hall (provided that an amusement or video arcade, pool or billiard hall, night club, discotheque, or dance hall shall be permitted so long as it is located in the Eastern Parcel);

(20)    Any training or education facility, including but not limited to:  beauty schools, barber colleges, reading rooms, places of instruction or other operations catering primarily to students or trainees rather than to customers; provided, however, this prohibition shall not be applicable to on-site employee training by an Occupant incidental to the conduct of its business at the Shopping Center;

(21)    Any gambling facility or operation, including but not limited to:  off-track or sports betting parlor; table games such as black-jack or poker; slot machines; video poker/black-jack/keno machines or similar devices; or bingo hall; provided, however, this prohibition shall not apply to such uses located in the Eastern Parcel or to the sale of lottery tickets, governmental sponsored gambling activities, or charitable gambling activities, so long as such governmental and/or charitable activities are incidental to the business operation being conducted by the occupant;

(22)    Any use in violation of Legal Requirements;

(23)    Any pawn shop, gun shop, or tattoo parlor;

(24)    Any church or other place of religious worship;

(25)    Any car wash, automobile repair shop, or any business servicing motor vehicles in any respect, including, without limitation, any quick lube oil change service, tire center or gasoline or service station or facility unless located on an Outparcel within the Eastern Parcel;

(26)    Any carnival, amusement park or circus;

(27)    Any medical clinics;

(28)    Any medical offices, except that medical offices shall be permitted if located at least 200 feet away from the Premises, and there may not be more than 5,000 square feet of Floor Area, in the aggregate, for medical office use located in Building C as shown on Exhibit B;

(29)    Any supermarket occupying more than 15,000 square feet of Floor Area and located in Building B as shown on Exhibit B;

(30)    Any office use, other than:  (x) office space used in connection with and ancillary to a permitted retail use hereunder; (y) retail offices providing services commonly found in similar first-class shopping centers in the Cobb County metropolitan area (for example, financial services, real estate brokerage, insurance agency, banking, travel agency), provided that such uses are located at least two hundred (200) feet away from the Premises, and not more than Fifteen Thousand (15,000) square feet of Floor Area in the Shopping Center, in the aggregate, shall be devoted to such uses; and (z) an office building located in the Eastern Parcel provided that (i) all parking for such use shall be located in the Eastern Parcel, and (ii) all Common Areas Charges, Insurance Charges and Taxes associated with such office building and such use shall

be separately accounted for and shall be excluded from all of such charges and Taxes billed to Tenant;

(31)    Any motel;

(32)    Any hotel use, other than a single hotel located in the Eastern Parcel or in the any of the spaces shown as J1, K1, or the 17,804 square foot space located between J1 and K1 as shown on Exhibit B provided that: (x) all of the parking for such hotel shall be located outside of the Shopping Center in the parking field adjacent to Cobb Galleria Parkway, and (y) all Common Areas Charges, Insurance Charges and Taxes associated with such hotel building and hotel use shall be separately accounted for and shall be excluded from all of such charges and Taxes billed to Tenant

(33)    Daycare center, unless located in the Eastern Parcel;

(34)    Veterinary office, except as may be incidental to a full-line pet and pet supply store, which may include boarding of pets, operating in at least Nine Thousand (9,000) square feet of Floor Area and located at least One Hundred (100) feet away from the Premises; such occupant shall use reasonable efforts to prevent its customers from allowing their pets to urinate or defecate in the Common Areas and will promptly remove any "dog dirt" from in front of the Premises;

(35)    Children's entertainment or activity facility (such as "Discovery Zone", or "Chuck E. Cheese's" located within 200 feet of the Premises;

(36)    Karate center located in the tenant space adjacent to the Premises and labeled as B1 on Exhibit B;

(37)    Movie theater, unless located in the Eastern Parcel;

(38)    Restaurant serving meals for on- or off-premises consumption, except that (x) sit-down restaurants shall be permitted anywhere in the Shopping Center other than Building B, and (y) take-out restaurants shall be permitted so long as they are located at least one hundred feet (100') from the Premises, and provided that in all cases not more than Ten Thousand (10,000) square feet of Floor Area in the Shopping Center, in the aggregate, shall be devoted to all restaurant uses (including Existing Tenants).  If an Existing Tenant under an Existing Lease is a restaurant use that violates either clause (x) or (y) above, and such Existing Lease expires or is terminated, Landlord may replace such tenant with another restaurant user and Landlord will not be deemed to be in violation of clause (x) or (y), but Landlord shall be subject to the 10,000 square feet of Floor Area limitation set forth above;

(39)    Beauty parlor or nail salon located in the tenant space adjacent to the Premises and labeled as B1 on Exhibit B ;

(40)    Health spa, exercise facility or similar type business may not occupy the space labeled as B1 on Exhibit B, and if located in Building A or Building B, may not occupy more than 4,000 square feet of Floor Area;

(41)    A store primarily selling merchandised which is classed as "odd lot," "close out," "clearance," "discontinued," "cancellation," "second," "factory reject," "sample," "floor model," "demonstrator," "obsolescent," "over stock," "distressed," "bankruptcy," "fire sale" or "damaged," such as, for example, "Grossman's Bargain Outlet", "Contractor's Warehouse", "Big Lots", "Liquidation World", or "Odd Job"; the retailer commonly known as "Christmas Tree Shops" shall be deemed not to violate the foregoing restriction, and a store selling Halloween costumes shall not be deemed to violate the foregoing restriction.

B.    As to Related Land, any of the uses listed in Items 1, 2, 4, 5, 14, 15, 22, 23 and 26 above.

**EXHIBIT N**

**MECHANICS' LIEN INDEMNIFICATION AGREEMENT**

THIS MECHANICS' LIEN INDEMNIFICATION is made this _____ day of
_____, 200__, by BED BATH & BEYOND INC., a New York corporation (hereinafter
referred to as *"Tenant"*), for the benefit of U.S. 41 AND I-285 COMPANY, a New York general
partnership ("Landlord").

**WITNESSETH**

Landlord and Tenant have entered into a Lease (the *"Lease"*) dated _____,
2005, whereby Landlord has leased to Tenant a portion of the real property located in Akers Mill
Square, _____, Georgia (the *"Shopping Center"*) and Tenant has constructed on
such real property a store premises (the *"Premises"*).

NOW, THEREFORE, in consideration of the payment of the Tenant Improvement
Allowance as defined in the Lease and other good and valuable consideration, the receipt of
which is hereby acknowledged, the Tenant agrees as follows:

1.        Tenant hereby indemnifies and agrees to hold Landlord harmless from any loss,
payment, claim or expense as the result of mechanics and materialmen filing liens or otherwise
making claims against Landlord's interest in the Premises and the Shopping Center based upon
materials or services provided under contract with Tenant.  In the event that any mechanic,
materialman or other claimant makes claim against the Premises or Shopping Center based
upon materials or services provided under contract with Tenant, Tenant shall hold harmless and
protect Landlord from any loss, payment, claim or expense related thereto.

2.        Tenant reserves the right to contest in good faith the amount of any claim or lien
assessed against the Premises or the Shopping Center by any of such claimants; provided,
however, should the holder or holders of such claim or lien attempt to enforce their lien by
foreclosure by any other means, Tenant shall bond around, pay or remove such lien by any
manner reasonably necessary to protect Landlord's interest in the Premises and the Shopping
Center.  This indemnity and hold harmless shall not apply to any liens or claims caused by
Landlord or Landlord's agents.

EXECUTED this _____ day of _____, 200__.

WITNESS:                                          TENANT:

                                                  BED BATH & BEYOND INC., a New York
                                                  corporation

_____        By:_____
                                                  Warren Eisenberg
                                                  Co-Chairman

[SEAL]