**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

**PORZIO, BROMBERG & NEWMAN, P.C.**
100 Southgate Parkway
P.O. Box 1997
Morristown, New Jersey 07962
(973) 538-4006
(973) 538-5146 Facsimile
John S. Mairo, Esq.
jsmairo@pbnlaw.com
--and—
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
(214) 745-5400
(214) 745-5390 Facsimile
Phillip Lamberson
plamberson@winstead.com
Annmarie Chiarello
achiarello@winstead.com
Steffen R. Sowell
ssowell@winstead.com

*Counsel for DFW Lewisville Partners GP*

| | |
|---|---|
| In re: | Chapter 11 |
| BED BATH & BEYOND INC., *et al.*,[1] | Case No.:  23-13359 (VFP) |
| Debtor. | (Jointly Administered) |

## OBJECTION TO NOTICE OF ASSUMPTION OF CERTAIN UNEXPIRED LEASES

DFW Lewisville Partners GP (the "Landlord"), lease counter-party, creditor, and holder of

claims against Bed Bath & Beyond, Inc. (the "Tenant,"), together with its affiliates and debtors-

in-possession (collectively, the "Debtors") in the above-captioned, jointly administered bankruptcy

---

[1] The last four digits of Debtor Bed Bath & Beyond Inc.'s tax identification number are 0488. A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/bbby. The location of Debtor Bed Bath & Beyond Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 650 Liberty Avenue, Union, New Jersey 07083.

cases (the "Chapter 11 Cases"), files this *Objection* (the "Objection")[2] to the *Notice of Assumption*

*of Certain Unexpired Leases* [Docket No. 1157] (the "Assumption Notice"), and in support thereof

would respectfully demonstrate to this Court as follows:

## BACKGROUND

1.        On April 23, 2023 (the "Petition Date"), the Debtors each filed voluntary petitions

for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

2.        The Debtors remain in possession and management of their businesses as debtors-

in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

3.        No trustee or examiner has been appointed in these Chapter 11 Cases.

4.        The Landlord is a party-in-interest in these Chapter 11 Cases.

A.        **The Lease**

5.        Prior to the Petition Date, on January 4, 2016, the Landlord and the Tenant entered

into that certain Industrial Lease (the "Lease") whereby the Tenant agreed to lease the

nonresidential real property located at 2900 S. Valley Parkway, Lewisville, Texas 75067 (as

further described by the Lease, the "Premises").   The Premises encompass approximately

800,000 square feet and constitute one of the largest warehouse spaces available in the Dallas-Fort

Worth metroplex.   A true and correct copy of the Lease is attached hereto as **"Exhibit A"** and

incorporated herein for all purposes.

6.        Pursuant to the Lease, the Tenant is responsible for monthly Base Rent (as defined

by the Lease and is currently approximately $250,000 per month), Additional Rent (as defined by

the Lease) for Operating Expenses (as defined by the Lease and including, but not limited to, costs

---

[2] The Landlord filed the *Objection to Notice to Contract Counter Parties to Potentially Assumed Executory Contracts and Unexpired Leases* [Docket No. 998] related to the *Notice to Contract Counter Parties to Potentially Assumed Executory Contracts and Unexpired Leases* [Docket No. 714].

7404407

associated with real estate taxes, water, electricity, common area maintenance, building maintenance, insurance, averaging approximately $117,000.00 per month), and other amounts (including attorneys' fees) and other obligations due and owing under the Lease.  Thus, the yearly rent due under the Lease (without regard to other obligations) is about $4.5 million.

7.      There are over three years remaining during the initial term of the Lease and up to over 13 years remaining under the extended terms of the Lease.[3]

8.      The Tenant occupied the Premises prior to the Petition Date and has used the Premises as an e-commerce fulfillment center.  Since the Petition Date, the Tenant has continued to occupy the Premises and use the Premises to operate its business.

9.      As of the date of this filing, the Tenant is indebted to the Landlord in the amount of at least $69,540.00 related to amounts that are due and owing in connection with the Lease, including unpaid attorneys' fees (the "Cure Amount").

**B.      The Sales Procedures**

10.      On April 25, 2023, the Court entered the *Order (I)(A) Approving the Auction and Bidding Procedures, (B) Approving Stalking Horse Bid Protections, (C) Scheduling Bid Deadlines and an Auction, (D) Approving the Form and Manner of Notice Thereof, (E) Approving the Form APA, and (II)(A) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (B) Authorizing the Assumption and Assignment of Assumed Contracts, (C) Authorizing the Sale of Assets and (D) Granting Related Relief* [Docket No. 92] (the "Bidding Procedures Order").

---

[3] As addressed below, the extensions under the Lease are expressly personal to the Tenant, which is a provision the Court should respect in analyzing the proposed assignment of the Lease.

On June 13, 2023, the Debtors filed the *Notice to Contract Parties to Potentially Assumed Executory Contracts and Unexpired Leases* [Docket No. 714] (the "Cure Notice").  The Cure Notice expressly references the Lease as a lease that may be assumed and assigned as part of the Bidding Procedures Order.  Pursuant to the Cure Notice, the Debtors' proposed cure amount for the Lease is $0.00.

11.    On June 26, 2023, the Landlord timely filed its objection to the Cure Notice [Docket No. 998] (the "Cure Objection").

12.    On May 22, 2023, the Court entered the *Order (I) Establishing Procedures to Sell Certain Leases, (II) Approving the Sale of Certain Leases, and (III) Granting Related Relief* [Docket No. 422] (the "Lease Sales Procedures Order").  The Lease Sales Procedures Order provides two different paths for the marketing and sale of the Debtors' leases – Phase 1 and Phase 2.  The only difference between Phase 1 and Phase 2 is timing; the deadlines for Phase 2 are two to three weeks after similar deadlines for Phase 1.

13.    Upon reviewing the Lease Sales Procedures Order, which do not identify which leases are included in which phase, counsel for the Landlord immediately inquired as to which phase the Lease would be included.  On May 26, 2023, counsel for the Debtors advised that the Debtors did not anticipate auctioning the Lease, and instead intended to have a private sale of the Lease and, if no private sale was available, the Lease would be included in the Phase 2 auction.

14.    Consistent with anticipated Phase 2 treatment, on Friday, June 23, 2023, the Debtors filed the *Notice of Phase 1 Lease Auction, Qualified Bids, Lease Sale Hearing, and Related Lease Asset Information* [Docket No. 905], which did **not** include the Lease as a Phase 1 lease.  The next day, however, on Saturday, June 24, the Debtors filed their *Supplemental Notice of Phase 1 Lease Auction, Qualified Bids, Lease Sale Hearing, and Related Lease Asset*

*Information* [Docket No. 964], which included the Lease as a Phase 1 lease for the first time. This was **after** the Phase 1 bid deadline and less than a business day before the Phase 1 auction commenced the morning of Monday, June 26.

15.     On June 30, 2023, the Debtors filed the Assumption Notice. The Assumption Notice states that, pursuant to the Lease Sales Procedures Order, the Debtors are seeking to assume and assign the Lease to Flexport, Inc. ("Flexport"). Pursuant to the Assumption Notice, the Debtors' proposed cure amount for the Lease is $0.00.

## OBJECTIONS

### A.     Applicable Law

16.     The Landlord objects to the proposed assumption and/or assumption and assignment of the Lease because the Tenant has failed to comply with the Bankruptcy Code, particularly Sections 365(b), (c), (f)(2), (k) and (l).

17.     The Lease is an "unexpired lease" as that term is defined in Section 365(b)(1) of the Bankruptcy Code. Pursuant to Sections 365(b)(1) and (f)(2) of the Bankruptcy Code, the Tenant may not assume and assign the Lease unless it: (i) cures or provides adequate assurance that it will promptly cure any monetary default(s) under the Lease; (ii) compensates the Landlord for any actual pecuniary loss resulting from any default under the Lease; and (iii) provides adequate assurance of future performance under the Lease. 11 U.S.C. § 365(b) and (f); *see also Spyglass Media Grp., LLC v. Bruce Cohen Prods (In re Weinstein Co. Holdings, LLC)*, 997 F.3d 497, 501 (3d Cir. 2021). The Tenant must also assume and assign the Lease "cum onere", which means "[i]f he receives the benefits, he must also adopt the burdens. He cannot accept one and reject the other." *In re Italian Cooking Oil Corp.*, 190 F.2d 994, 997 (3d. Cir. 1951).

18.     Similarly, Section 365(l) of the Bankruptcy Code provides that if an unexpired lease is assigned, the lessor may require a deposit or other security for performance of the obligations

under the lease substantially similar to what would have been required upon the initial leasing to a similar tenant.  11 U.S.C. § 365(l).

19.     The Assumption Notice does not comply with Sections 365(b), (c) and (f)(2) of the Bankruptcy Code, as it does not:  (i) provide adequate assurance that the Debtors or Flexport will pay the Cure Amount; or (ii) provide adequate assurance of Flexport's future performance under the Lease.

20.     In order to assume the Lease, the Debtors must cure the Lease by paying the Cure Amount.

21.     The Debtors bear the burden of establishing adequate assurance of future performance.  *See Tex. Health Enters. v. Lytle Nursing Home (In re Tex. Health Enters.),* 72 F. App'x 122, 126 (5th Cir. 2003); *see also* 15 Collier on Bankruptcy § 13.21[2] (16th 2023).  The plain language of Section 365 clearly places the burden on the Debtors to provide the Landlord with adequate assurance.  11 U.S.C. § 365(f)(2)(B) (adequate assurance must be "provided").

22.     "The statutory requirement of 'adequate assurance of future performance by the assignee' affords 'needed protection to the non-debtor party because the assignment relieves the trustee and the bankruptcy estate from liability for breaches arising after the assignment.'"  *In re Fleming Cos.*, 499 F.3d 300, 305 (3d Cir. 2007) (quoting *Cinicola v. Scharffenberger*, 248 F.3d 110, 120 (3d Cir. 2001) & 11 U.S.C. § 365(k)).  Further, "a bankruptcy court in authorizing assumptions and assignments of unexpired leases must be sensitive to the rights of the non-debtor contracting party … and the policy requiring that the non-debtor receive the full benefit of his or her bargain."  *In re Joshua Slocum, Ltd.*, 922 F.2d 1081, 1091 (3d Cir. 1990).

23.     "Adequate assurance" is not defined in the Bankruptcy Code.  The phrase is adopted from the Uniform Commercial Code and what constitutes "adequate assurance of future

performance" must be determined by consideration of the facts of the proposed assumption.  *See*

*Cinicola v. Scharffenberger*, 248 F.3d 110, 121, n.10 (3d Cir. 2001) (citing *Richmond Leasing*

*Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309-10 (5th Cir. 1985)).

24.     Adequate assurance of future performance should be measured against the financial

condition of the debtor when the lease was entered.  *See In re RS Legacy Corp.*, No. 15-10197

(BLS), 2015 Bankr. LEXIS 2206, at *2 (Bankr. D. Del. June 25, 2015) (rejecting a motion to

assign a Radio Shack lease, which at the time the lease was signed was a "a 90-year old-publicly

traded company with annual revenues in the billions, and that RadioShack (at that time) is simply

not comparable to [the potential assignee] as a potential tenant"); *see also Richmond Leasing Co.*

*v. Capital Bank, N.A.,* 762 F.2d 1303, 1310 (5th Cir. 1985)("Courts have consistently determined

whether a debtor offered adequate assurance of future performance by considering whether the

debtor's financial data indicated its ability to generate an income stream sufficient to meet its

obligations, the general economic outlook in the debtor's industry, and the presence of a

guarantee.").

**B.**     **Flexport Has Not Provided the Landlord With Adequate Assurance**

25.     When the Landlord was negotiating the Lease with the Tenant (including reviewing

the Tenant's audited financials), the Tenant was a 40-year-old investment grade, publicly traded

company and a household retail name.  In late 2015, the Tenant had the following credit ratings:

> *Moody's:  Baa1 (Investment Grade)*
>
> *S&P:  A- (Investment Grade)*
>
> *Egan Jones:  A+ (Investment Grade)*
>
> *Bloomberg:  IG5 (Investment Grade)*

26.     The Tenant's financials from that time frame support this as well.  For its fiscal year

2015, the Tenant boasted $6.75 billion in assets, including $875 million in cash and equivalents,

and the Tenant had $2.7 billion in shareholder equity backing it.  Likewise, for its fiscal year 2015,

the Tenant showed net sales of almost $12 billion, net earnings of almost $1 billion, and positive

cash flow of more than $500 million.  Clearly, the Tenant projected as a strong, investment-grade

tenant at the outset of 2016 when the Lease was executed.

27.    This is starkly contrasted with Flexport, which is a 10-year-old start-up company.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████  Unlike the Tenant in 2016, Flexport has no credit rating,

much less an investment grade rating.

28.    Further, Flexport recently laid-off twenty-percent of its workforce, which hardly

bodes well for its ability to perform under the Lease.[4]  Additionally, upon information and belief,

Flexport's presumed business purpose for the Premises is in connection with Flexport's new e-

commerce fulfillment and last mile-logistics business (which was acquired from Shopify in June

---

[4] Freight Forwarder Flexport Is Laying Off 20% of Its Workforce - WSJ

2023).[5]  The financials provided by Flexport obviously do not include income or expenses related

to this new business line, so the utility of such financials is necessarily limited.

29.     Additionally, Flexport must comply with all provisions under the Lease, including,

but not limited to the insurance required by Section 14 of the Lease and disclosures related to

Hazardous Substances  (as defined by the Lease) consistent with Sections 7 and 8 of the Lease.

Flexport will also need to provide appropriate notice information pursuant to Section 23 of the

Lease.  To date, Flexport has not provided the Landlord with these necessary items.

30.     Because of the Tenant's strong financial position, the Landlord included provisions

in the Lease it would have never provided to Flexport (or, frankly, most other potential tenants for

the Premises).  For example, section 4.3.2 of the Lease provides the Tenant with two consecutive

five-year extensions at the lower of fair market value or a percentage escalator.  These extensions

are expressly personal to the Tenant in the Lease.  Again, this was based on the Tenant's unique

financial position when the Lease was entered (including its investment grade rating) and its

apparent ability to perform under what could be a 20-year lease term.  Ignoring the personal nature

of these extensions in assigning the Lease to Flexport would not be taking the Lease "cum onere"

nor would it provide the Landlord the benefit of its bargain at the time it entered the Lease.  *See*

*Joshua Slocum,* 922 F.2d at 1091.

31.     Similarly, the Landlord did not require a deposit in connection with the Lease,

which requires a base payment of roughly $250,000 per month plus Operating Expenses (as

defined by the Lease) that run over $1.4 million per year.  The Landlord would absolutely require

---

[5] Flexport Adds Fulfillment, B2B Distribution and Last Mile Delivery to its End-to-End Supply Chain Capabilities with the Successful Acquisition of Shopify Logistics (prnewswire.com)

a substantial deposit or other security from Flexport if it entered the Lease today (assuming the Landlord would enter any lease for the Premises with Flexport).

**C.**    **The Debtors Did Not Comply With Their Own Procedures**

32.    Finally, the Debtors did not follow their own Court-approved procedures to sell the Lease.  As noted above, the Debtors were marketing the Lease as a Phase 2 lease with longer submission deadlines until literally a business day before the auction began, when they suddenly decided it was a Phase 1 lease.  It is unknown what other potential tenants/assignees may have been interested in the Lease (and been an acceptable assignee to the Landlord) if the process had been straightforward and transparent, and not a bait and switch at the last second.

## DEMAND FOR SECURITY DEPOSIT

33.    Pursuant to Section 365(l) of the Bankruptcy Code, the Landlord demands that Flexport post a letter of credit or, in the Landlord's sole discretion, a security deposit, equal to at least six (6) months' base rent and additional rental charges due under the Lease (at least $2.2 million dollars).

## RESERVATION OF RIGHTS

34.    The Landlord hereby reserves its rights to make such other and further objections as may be appropriate, including, but not limited to, additional objections regarding assignment or adequate assurance of future performance of the Lease pursuant to Section 365 of the Bankruptcy Code.  The Landlord further reserves its right to amend or supplement the Cure Amount, including to amend or supplement:  (a) any post-petition rent and other charges pursuant to the Lease; (b) certain amounts due and owing under the Lease but which may be unbilled as of the date hereof; or (c) any regular or periodic adjustment of charges under the Lease which were not or had not been determined as of the date hereof.

7404407

## **PRAYER**

The Landlord respectfully requests that this Court enter an order denying the assumption and assignment of the Lease and granting the Landlord such other and further relief to which it may justly and fairly be entitled, both at law and in equity.

Dated: July 11, 2023

**PORZIO BROMBERG & NEWMAN, P.C.**

By: */s/ John S. Mairo*

John S. Mairo, Esq.
100 Southgate Parkway
Morristown, NJ 07962-1997
(973) 538-4006
(973) 538-5146 Facsimile
jsmairo@pbnlaw.com

-and-

**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
(214) 745-5400
(214) 745-5390 Facsimile
Phillip Lamberson, Esq.
plamberson@winstead.com
Annmarie Chiarello, Esq.
achiarello@winstead.com
Steffen R. Sowell, Esq.
ssowell@winstead.com

*Counsel for DFW Lewisville Partners GP*

7404407

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 11, 2023, I caused a true and correct copy of the foregoing document to be served by electronic means through the CM/ECF system to all registered participants in this case and by e-mail on the parties identified on the Service List.


/s/      *John S. Mairo*
  John S. Mairo

7404407

**Counsel to the Debtors**

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY  10022
Attn:   Joshua A. Sussberg, P.C. Emily E. Geier P.C.,
        Derek I. Hunter and Ross J. Fiedler

**Co-Counsel to the Debtors**

Cole Schotz P.C.
Court Plaza North
25 Main Street
Hackensack, NJ  07601
Attn:   Michael D. Sirota, Warren A. Usatine and
        Felice R. Yudkin

**Counsel to the Committee**

Pachulski Stang Ziehl & Jones LLP
780 Third Avenue, 34th Floor
New York, NY 10017
Attn:   Robert J. Feinstein, Bradford J. Sandler
        Paul J. Labov, Colin R. Robinson

**Counsel to the DIP Agent**

Proskauer Rose LLP
Eleven Times Square
New York, NY  10036
Attn:   David M. Hillman and Megan R. Volin

**Office of the United States Trustee
For Region 3, District of New Jersey**

Office of the United States Trustee
Andrew R.Vara, U.S. Trustee, Regions 3 & 9
Attn: Fran B. Steele, Esq. and Alexandria Nikolinos

7404407