# EXHIBIT A

INDUSTRIAL LEASE

DFW LEWISVILLE PARTNERS GP, a Texas general partnership,

as Landlord

BED BATH & BEYOND INC., a New York corporation,

as Tenant

Property:    2900 S. Valley Parkway
Lewisville, Texas 75067

Dated as of _January_ _4_, 201_6_

## Table of Contents

|     |                                              | Page |
|-----|----------------------------------------------|------|
| 1.  | Reference Data and Definitions               | 1    |
| 2.  | Demise of Premises                           | 6    |
| 3.  | Possession.                                  | 6    |
| 4.  | Term.                                        | 13   |
| 5.  | Base Rent.                                   | 16   |
| 6.  | Additional Rent for Operating Expenses.      | 16   |
| 7.  | Use; Compliance with Law.                    | 23   |
| 8.  | Alterations and Tenant's Property.           | 33   |
| 9.  | Repairs and Other Work.                      | 38   |
| 10. | Liens                                        | 41   |
| 11. | Subordination.                               | 41   |
| 12. | Inability to Perform                         | 42   |
| 13. | Destruction.                                 | 43   |
| 14. | Insurance.                                   | 45   |
| 15. | Eminent Domain.                              | 48   |
| 16. | Assignment; Subleasing.                      | 49   |
| 17. | Utilities and Services.                      | 53   |
| 18. | Default.                                     | 54   |
| 19. | Right of First Offer to Purchase.            | 59   |
| 20. | Indemnity.                                   | 61   |
| 21. | Access to Premises.                          | 63   |
| 22. | Notices                                      | 63   |
| 23. | No Waiver                                    | 64   |

24.    Estoppel Certificates ................................................................................64

25.    Rules and Regulations...............................................................................64

26.    Right of First Offer. ...................................................................................64

27.    Miscellaneous. ...........................................................................................66

28.    Economic Development Grants .................................................................76

ATTACHMENTS

Exhibit A         Site Plan

Exhibit B         Legal Description of the Land

Exhibit C         Landlord's Lien Subordination Agreement

Exhibit D         Form of SNDA

Exhibit E         Title Exceptions

Exhibit F         Certain of the Building Standard Improvements

Exhibit G         Contractor's Lien Waiver Forms

Exhibit H         Hazardous Substances

Exhibit I         List of Landlord's Plans

Exhibit J         Economic Development Agreement (Tenant and City of Lewisville)

Addendum 1        Solar Installation

THIS INDUSTRIAL LEASE (this "Lease") is made as of the __4th__ day of __January__ 2016, between **DFW LEWISVILLE PARTNERS GP,** a Texas general partnership ("Landlord"), and **BED BATH & BEYOND INC.,** a New York corporation ("Tenant").

Landlord and Tenant agree as follows:

1.    <u>Reference Data and Definitions</u>.  The following sets forth some of the basic lease information and definitions used in this Lease:

1.1    "Additional Rent" shall mean Tenant's Proportionate Share of Operating Expenses and all other sums (exclusive of Base Rent) payable by Tenant to Landlord under this Lease.

1.2    "Base Rent" shall mean the annual Base Rent for the Term of this Lease as set forth below:

| <u>Lease Months</u> | <u>Annual Base Rent/RSF</u> | <u>Monthly Base Amount</u> |
|---|---|---|
| 1-7 | $3.40 (Abated) | $226,513.67 (Abated)* |
| 8-67 | $3.40 | $226,513.67 |
| 68-127 | $3.74 | $249,165.03 |

*If an Event of Default (defined below) occurs which results in Landlord terminating this Lease and resuming possession of the Premises, at its option Landlord may, by written notice to Tenant, demand payment of all abated Base Rent, with interest at the Lease Interest Rate until paid in full.  This demand for payment of abated Base Rent is in addition to any other remedies to which Landlord may be entitled based on an Event of Default.

1.3    "Broker" shall mean, as applicable, Jones Lang LaSalle Brokerage, Inc. ("Tenant's Broker") and Majestic Realty Co. ("Landlord's Broker") (collectively, the "Brokers").

1.4    "Building" shall mean the building containing approximately 1,022,146 square foot and located at 2900 S. Valley Parkway, Lewisville, Texas 75067, as depicted on the attached Site Plan attached hereto as <u>Exhibit A</u>.

1.5    "Commencement Date" shall mean February 1, 2016, subject to the further terms and conditions of this Lease.

1.6    "Common Areas" shall mean all areas of the Property for the common use or benefit of the tenants of the Property and their employees, agents, and other invitees, including, without limitation pedestrian walkways, driveways, parking lot and access roads, entrances and exits, landscaped areas, and the drainage, storm filters and water detention/retention systems of the Land. Notwithstanding the foregoing, Landlord and Tenant

1

Outdoor Area (hereinafter defined) shall during the Term be for the exclusive use and enjoyment of Tenant and its employees, contractors, customers, invitees and other parties that Tenant may designate, at no additional cost or charge to Tenant (other than the costs or charges included within Tenant's Proportionate Share of Operating Expenses); the foregoing, however, shall not lessen or diminish any of Landlord's duties and obligations under this Lease relating to the Secure Tenant Outdoor Area, including without limitation Landlord's full compliance with Section 7.5 hereof, as such area is considered part of the Common Areas. Notwithstanding any language to the contrary in this Lease, Tenant's right to use the Common Areas, including the Secure Tenant Outdoor Area, shall automatically terminate upon termination of this Lease or upon termination of Tenant's right to possess the Premises.

1.7    "Delivery Date" shall have the meaning ascribed thereto in Section 3.1 hereto.

1.8    "Expiration Date" shall mean the last day of the calendar month which is one hundred twenty-seven (127) full calendar months after the Commencement Date, which is August 31, 2026 (such specific date being subject to extension in accordance with Section 3.2 and/or Section 4.3 of this Lease, each as may be applicable).

1.9    "Land" shall mean the land, without reference to any improvements thereon that constitutes the tax lot on which the Building is located, as described on Exhibit B.

1.10    "Landlord" shall mean the Landlord named on page 1 of this Lease or any subsequent owner of such Landlord's interest in the Property, subject to the terms of Section 18.5.

1.11    "Landlord's Address":

c/o Majestic Realty Co.
13191 Crossroads Parkway North
Sixth Floor
City of Industry, California 91746
Attention:  Property Management

With a copy of any notice to:

c/o Majestic Realty Co.
5400 LBJ Freeway, Suite 110
Dallas, Texas 75240
Attention:   Property Manager

The Northwestern Mutual Life Insurance Company
c/o Northwestern Mutual Investment Management Company
720 East Wisconsin Avenue
Milwaukee, Wisconsin  53202
Attention: Managing Director—Asset Management

DMWEST #12993214 v14

1.12    "Landlord Parties" shall mean Landlord's contractors, agents, servants, employees and invitees, but shall not include any tenants of the Property (including, without limitation, Tenant) or any of their respective contractors, agents, servants, employees or invitees.

1.13    "Lease Interest Rate" shall be equal to 500 basis points in excess of the Prime Rate in effect from time to time.

1.14    "Legal Compliance Work" shall mean any addition, alteration, improvement or rebuilding of the Premises, the Common Areas and the Building required pursuant to the terms of any law, ordinance, rule or regulation for reasons other than any negligence, misconduct or misuse of Tenant or any Tenant Parties (or any other tenant or any of their respective contractors, agents, servants, employees or invitees) or any breach, default or failure of performance by Tenant of any of its covenants or obligations hereunder.

1.15    "Lease Year" The "First Lease Year" shall be the period commencing on the Commencement Date and continuing to the last day of the calendar month in which the first anniversary of the Commencement Date occurs. Each "Lease Year" after the First Lease Year shall be a consecutive twelve (12) month period commencing on the first day immediately following the preceding Lease Year.

1.16    "Operating Expenses" shall have the meaning set forth in Section 6.1.

1.17    "Permitted Use" shall mean such warehousing, distribution and light assembly uses, and ancillary office and administrative uses, as may be permitted by any law, statute, ordinance, or governmental regulation or order, or other governmental requirement now in force or which may hereafter be enacted or promulgated (collectively, "Applicable Laws"); provided, however, that any such Permitted Use (i) does not create any atypical risk of Hazardous Substances contamination on the Property (Landlord hereby acknowledging that those Hazardous Substances described in clauses (b)(x) and (b)(y) of Section 7.4.2 of this Lease shall not be deemed atypical for the purposes of this Section 1.17); (ii) does not create obnoxious (as to a reasonable person) odors or noise; (iii) does not include storage of tires, chemicals (other than those permitted under Section 7.4 below) or explosives or other products made with like materials; and (iv) do not involve fabrication or manufacturing that would be inconsistent with the operation of an attractive, first-class and fully operative industrial/warehouse facility in the Dallas-Fort Worth Metropolitan Area (it being agreed that assembly of consumer products shall be permitted).

1.18    "Premises" shall mean the approximately 799,460 square foot portion of the Building as depicted on Exhibit A attached hereto.  No adjustment will be made to the Base Rent or any other amounts payable by Tenant under this Lease (or to any other provisions of this Lease) if the actual square footage, however measured, is more or less than the square footage recited.  Subject to Sections 8.3, 8.6 and 27.24 of this Lease, the Premises does not include any portion of, and Landlord reserves to itself the exterior walls and rooftop of the Building (the "Reserved Areas"), and all components of electrical, mechanical, plumbing, heating, and air conditioning systems and facilities located in the Premises that are used in common by tenants of

the Building (the "Common Systems"). Landlord's reservation includes the right to inspect, maintain, repair, alter and replace the Common Systems and to enter the Property in order to do so. Notwithstanding anything contained in this Lease, Landlord hereby agrees that it will not (a) allow any non-tenant third party to use any portion of the exterior walls or rooftop of the Building, (b) allow any other tenant or occupant of the Building to use any portion of the exterior walls of the Building except for purposes related to the installation and maintenance of equipment necessary or desirable for the conduct of such tenant's business at the Property and identifying exterior signage; each such use of the exterior walls shall be in a manner consistent with other attractive, first-class and fully operative industrial/warehouse facilities in the Dallas-Fort Worth Metropolitan Area, or (c) allow any other tenant or occupant of the Building to use any portion of the rooftop of the Building, except with respect to the Common Systems and for the installation and maintenance of solar panels and other equipment necessary or desirable for the conduct of such tenant's or occupant's business at the Property, each of the foregoing to be located above those portions of the Building that are not located directly above the Premises.

1.19    "Prime Rate" shall mean the rate of interest announced from time to time by Bank of America, N.A. or its successor as its prime rate or, if such rate is discontinued, such comparable rate as Landlord reasonably designates by notice to Tenant.

1.20    "Property" shall mean the Building and the Land.

1.21    "Real Estate Taxes" shall mean all real estate taxes, fees, levies, charges and assessments, general or special, ordinary or extraordinary, foreseen or unforeseen assessed or imposed upon the Property.   If, due to a future change in the method of taxation, any tax shall be levied or imposed in substitution, in whole or in part, for (or in lieu of) any tax which would otherwise be included within the definition of Real Estate Taxes, then such other tax shall be deemed to be included within Real Estate Taxes.  Real Estate Taxes shall not include estate taxes, corporate franchise taxes (unless such tax is in lieu of Real Estate Taxes), income taxes (unless such tax is in lieu of Real Estate Taxes), inheritance taxes, gift taxes, transfer taxes, excise taxes, unincorporated business taxes, capital stock taxes, mortgage taxes, late charges, interest and/or penalties, special assessments or extraordinary real estate taxes levied against another tenant or occupant of the Property due to extraordinary nature of such tenant's fitout or use, special assessments or charges in connection with the original development of all or any improvements shown on Exhibit A in accordance with the Plans attached hereto as Exhibit I; provided that the foregoing shall not exclude ordinary real estate taxes assessed on the assessed value of such improvements. "Real Estate Taxes" shall, notwithstanding the above, specifically include any excise, transaction, sales, margin or privilege tax (in each case imposed in substitution, in whole or in part, for, or in lieu of, any tax which would otherwise be included within the definition of Real Estate Taxes) now or hereafter levied or imposed upon Landlord by any government or governmental agency (including, without limitation, the so-called "margin tax" imposed as a result of Texas House Bill 3 enacted by the 79th  Texas Legislature, as the same now exists or may hereafter be amended or succeeded) on account of, attributed to or measured by or based upon (in whole or in part) Landlord's gross revenue (after any applicable deductions) or rent or other charges or prorations payable under this Lease.

1.22    "Rent" shall mean Additional Rent and Base Rent, collectively.

4

1.23    "Rent Commencement Date" shall mean the Commencement Date.

1.24    "Rentable Area of the Building" shall mean the 1,022,416 square foot Rentable Area of the Building.

1.25    "Rentable Area of the Premises" shall mean 799,460 square feet.

1.26    "Secure Tenant Outdoor Area" shall mean the area shown labeled as such on Exhibit A.

1.27    "Site Plan" shall mean the site plan depicting the Property annexed to this Lease as Exhibit A.

1.28    "Substantial Completion" and "Substantially Complete" shall each mean, when the construction of Tenant's Work is substantially completed as determined by Tenant's licensed architect of record (the "Architect of Record"), as evidenced by a written certification from the Architect of Record to Landlord and Tenant excepting only "punch list items" (as that term is commonly used in the construction industry) that will not materially interfere with Tenant's use of the Premises.

1.29    "Tenant" shall mean the Tenant named on page 1 of this Lease and such person's permitted successors and assigns, subject to the provisions of this Lease.

1.30    "Tenant's Mailing Address" shall mean 650 Liberty Avenue, Union, New Jersey 07083, Attn: Mr. Warren Eisenberg, or such other person or other address as may, from time to time, be specified by Tenant in a written notice to Landlord delivered pursuant to Section 22 hereof.

1.31    "Tenant Parties" shall mean Tenant's contractors, agents, servants, employees, invitees, permitted assignees, or permitted subtenants.

1.32    "Tenant's Permits" shall mean (a) all governmental approvals and permits which may be necessary for the performance of Tenant's Work, and (b) any business licenses which Tenant may be required to obtain in order to open and operate its specific business; provided, however, that for purposes of Section 3.3.2 and Section 5.1 of this Lease, "Tenant's Permits" shall only mean the items described in (a) above.

1.33    "Tenant's Work" shall mean any and all work to complete the Premises for Tenant's occupancy including, without limitation, any build out (including approximately 24,000 square feet of main office to be located within the Premises), fixturization and space preparation of any portion of the Premises, the construction of the fence system and access gates for the Secure Tenant Outdoor Area (and all other exterior fencing that Tenant may elect to install, as permitted by Landlord), and the completion of those items set forth on Exhibit F hereto.

1.34    "Tenant's Proportionate Share" shall be a percentage determined by dividing the Rentable Area of the Premises by the Rentable Area of the Building.  Subject to

5

Section 26 of this Lease, as applicable, Tenant's Proportionate Share of Operating Expenses shall be 799,460/1,022,146 or 78.21%. The parties agree that Landlord (a) may from time to time equitably increase Tenant's Proportionate Share for any item of expense or cost reimbursable by Tenant that relates to a repair, replacement, or service that benefits only the Premises and shall equitably decrease Tenant's Proportionate Share for any item of expense or cost reimbursable by Tenant that relates to a repair, replacement, or service that only benefits other premises of the Building, and (b) may from time-to-time to equitably increase (and shall from time-to-time equitably decrease) Tenant's Proportionate Share that is attributable to Real Estate Taxes, in order to reflect the proper respective allocations of leasehold improvements between or among Tenant and the other tenant(s) of the Building.

1.35    "Term" shall mean the period commencing on the Commencement Date and terminating on the Expiration Date, which Term shall be subject to extension as herein provided.

2.    Demise of Premises.  Subject to the terms of this Lease, Landlord leases to Tenant and Tenant leases from Landlord the Premises and grants to Tenant, so long as this Lease remains in effect, (i) subject to clause (ii) following, the non-exclusive right to use the Common Areas for their intended purposes in common with all others entitled to use them, and (ii) the exclusive right to use the Secure Tenant Outdoor Area (which area includes without limitation Tenant's dedicated loading area). Subject to the preceding clause (ii), Tenant shall be entitled to use the Common Areas in the same manner and fashion as other similarly-situated tenants of the Property on a non-discriminatory basis.

3.    Possession.

3.1    Subject to Section 3.2 below, Landlord shall be deemed to have delivered possession of the Premises to Tenant at 8:00 a.m. on the date (the "Delivery Date") following the day on which all of the following conditions (the "Delivery Date Conditions") have been satisfied:

(i)    actual possession of the Premises shall have been delivered to Tenant;

(ii)    Landlord shall have certified to Tenant in writing that the representations of Landlord set forth in Section 7.1.2 and 7.4.7 are then still true, correct in all material respects and not misleading in any material respect;

(iii)    Landlord shall have certified to Tenant in writing that (A) all Building Systems (hereafter defined), overhead doors and weather seals are in good working order, (B) all Building Systems and hardware have current inspection stickers (as applicable), (C) a fire pump test for the Building has been conducted within the past twelve months (Landlord to provide satisfactory evidence of same), and (D) the Premises are water tight, free of Hazardous

6

Substances in violation of Applicable Laws, and in a good structurally sound condition; and

(iv)     Landlord shall have delivered to Tenant, in recordable form: (i) a subordination, non-disturbance and attornment agreement substantially in the form attached hereto as <u>Exhibit D</u> executed by Landlord's present lender, The Northwestern Mutual Life Insurance Company (Landlord hereby representing that said company is the sole current mortgagee of the Property).

3.2     Tenant shall have the right to delay its acceptance of possession of the Premises (and the Delivery Date) until the earlier of (i) the Commencement Date or (ii) the date on which Tenant has obtained Tenant's Permits, subject to Landlord's satisfaction of the Delivery Date Conditions. Notwithstanding anything to the contrary contained in this Lease, in the event that the Delivery Date does not occur for any reason (other than by reason of Tenant's default under this Lease), within thirty (30) days following the earlier of the dates described in the preceding clauses (i) or (ii) (which dates shall not be extended for Force Majeure), Tenant may thereafter, until such date that the Delivery Date occurs, consider Landlord to be in default hereunder and, at Tenant's option in its sole discretion, elect to:

(a)     terminate this Lease, if Landlord shall fail to fully cure such default within thirty (30) days after receiving Tenant's notice thereof, in which event neither party shall have any further liability hereunder, except: for those obligations which expressly survive the expiration or other termination of this Lease pursuant to the express terms of this Lease; or

(b)     avail itself of any equitable remedies for Landlord's failure to deliver, including, without limitation, specific performance (it being agreed that the election by Tenant of any such equitable remedy shall not preclude the subsequent election by Tenant to elect to terminate this Lease as described in the preceding clause (a) of this subsection).

Notwithstanding anything contained in this Lease (but without limiting Tenant's right to terminate this Lease as described in the preceding clause (a)), any failure by Landlord to cause the Delivery Date to occur on or before the Commencement Date shall serve to postpone the Commencement Date to the actual date upon which the Delivery Date occurs.

3.3     <u>Tenant's Work, Tenant's Permits and Tenant Allowance</u>.

3.3.1     <u>Plans for Tenant's Work</u>.     Tenant shall retain Casco Corp ("Architect") and, if required by Tenant and/or Casco, engineering consultants ("Engineers") to prepare the plans and drawings for the Tenant's Work ("Tenant's Plans"). On behalf of Tenant, Architect shall prepare all plans and engineering working drawings relating to the structural, mechanical, electrical, plumbing, HVAC, life safety, and sprinkler work at the Premises that is

7

not part of the existing base building.  Tenant and Architect shall verify, in the field, the dimensions and conditions as shown on the relevant portions of the base building plans, and Tenant and Architect (and not Landlord) shall be solely responsible for such verification. Landlord's review or approval of Tenant's Plans, as set forth in this Section 3.3.1, shall be for its sole purpose and shall not be deemed or imply Landlord's review or approval of the same, or otherwise obligate Landlord to review or approve the same, for adequacy, fitness for a particular purpose, quality, design, building code compliance or other like matters.  Moreover, Landlord's review shall not make Landlord responsible for any construction means, methods, techniques, sequences, or procedures, or of any safety methods or precautions, all of which shall remain solely Tenant's responsibility.  Accordingly, notwithstanding that any of Tenant's Plans are reviewed and approved by Landlord or its architect, engineers and consultants, and notwithstanding any advice or assistance which may be rendered to Tenant by Landlord or Landlord's architect, engineers, and consultants, Landlord shall have no liability whatsoever in connection therewith and shall not be responsible for any omissions or errors contained in Tenant's Plans.  Nothing contained in this Paragraph shall lessen or diminish Landlord's duties and obligations otherwise applicable pursuant to Sections 7.3 and 9.3 of this Lease.

Tenant's Plans shall include Tenant's installation of a minimum of two (2) four inch (4") diameter conduits for fiber optic service from the Highway 121 right-of-way to the southeast corner of the Building.  One of these conduits will be for the use of the future tenant in the Expansion Space, and the other will be used as conduit for redundant fiber optic service to the Premises.  The locations of both conduits are subject to the prior written approval of Landlord, which approval will not be unreasonably withheld, conditioned or delayed.  In consideration of Tenant's installation of the two fiber optic conduits described above, Tenant shall have the exclusive use of the existing fiber optic conduit serving the Building.  Tenant shall be permitted during the Term to locate a portion of either or both of the Tenant-installed fiber optic conduits within the Expansion Premises and/or on the exterior walls and rooftop of the Building, at no additional charge to Tenant, subject to Landlord's prior approval of such location(s), as provided above in this paragraph.

Tenant's Plans shall include Tenant's installation of up to six (6) four inch (4") diameter E.M.T. conduits for electrical service to the Premises.  Tenant shall be permitted during the Term to locate portions of such Tenant-installed E.M.T. conduits within the Expansion Premises and/or on the exterior walls and rooftop of the Building, at no additional charge to Tenant; provided, however, that such locations shall be subject to the prior written approval of Landlord, which will not be unreasonably withheld, conditioned or delayed.

Tenant's Plans shall also include, if reasonably necessary, standard equipment for the protection of the exterior fencing from the risk of damage from tractor-trailers, and Landlord, if reasonably necessary, shall cause any other tenant in the Building to install similar equipment.

On or before January 5, 2016, Tenant shall deliver Tenant's Plans to Landlord.  Landlord shall have fifteen (15) days from its receipt of Tenant's Plans (or revisions thereto, as applicable) to approve or disapprove Tenant's Work depicted thereon, which plans and work shall be approved so long as they: (i) comply with all Applicable Laws, and (ii) are substantially consistent with Exhibits A and F attached hereto, (iii) do not materially reduce the structural

8

soundness of the Building or adversely affect the Building Systems, (iv) do not adversely affect safety of the Building, and (v) include no material changes to the exterior of the Building not approved by Landlord in its reasonable discretion (subject, as applicable, to Tenant's right to utilize certain portions of the roof of the Building as hereinafter described).  If Landlord shall fail to disapprove Tenant's Plans with reasonable specificity within said 15-day period, Tenant's Plans shall be deemed approved.  This Lease is subject to and conditioned upon Landlord's approval (or deemed approval) of Tenant's Plans.  Although the improvements generally described on the attached Exhibit F (and their like-kind replacements) need not be removed by Tenant at the expiration or earlier termination of this Lease, Landlord, in its sole discretion, may require Tenant to remove any other improvements constituting Tenant's Work (including the approximately 24,000 square feet of main office to be located within the Premises by Tenant) or any subsequent Alterations (defined below), unless such Alterations are like-kind replacements of the items listed on the attached Exhibit F.

### 3.3.2    Tenant's Permits.

(i)        After Landlord's written (or deemed) approval of the final Tenant's Plans (that is, those Tenant's Plans that are in a form sufficient for obtaining Tenant's Permits from the applicable governmental authority), Tenant shall use diligent efforts to obtain all of Tenant's Permits on or before April 1, 2016 (the "Outside Permit Date").  Tenant hereby agrees that neither Landlord nor Landlord's consultants shall be responsible for obtaining any building permit or certificate of occupancy for the Property (subject to Section 3.3.4 below) and that obtaining the same shall be Tenant's sole responsibility; provided, however, that Landlord shall cooperate with Tenant in executing permit applications and performing other ministerial acts reasonably necessary to enable Tenant to obtain any such permit or certificate of occupancy.  Notwithstanding the provisions of this Section 3.3.2 to the contrary, if, despite Tenant's diligent efforts, all Tenant's Permits have not been obtained by the Outside Permit Date and Tenant has not commenced Tenant's Work and has not received any portion of the Tenant Allowance (defined below) (or if Tenant has received any portion of the Tenant Allowance, such funds have been first returned to Landlord), Tenant shall have the right, upon notice given to Landlord prior to the unconditional grant of all of Tenant's Permits, to terminate this Lease by written notice to Landlord within ten (10) days following the Outside Permit Date.   Notwithstanding the foregoing, Tenant shall have no right to terminate this Lease under this Subsection 3.3.2(i) if Tenant's Permits are denied because one or more components of Tenant's Work are both (x) outside the scope of the work listed in Exhibit F hereof and the Tenant's Work comprising the approximately 24,000 square feet of the main office to be located within the Premises (and the improvements therein), and (y) not reasonably consistent with leasehold improvements commonly installed in other attractive, first-class and fully operative industrial/warehouse facilities in the Dallas-Fort Worth Metropolitan Area.

(ii)        In the event Tenant timely elects to terminate this Lease pursuant to this Section 3.3.2, this Lease shall cease and be deemed canceled and terminated as of the date set forth in Tenant's notice of such termination and upon such termination, Tenant and Landlord shall be relieved of any and all further liability hereunder, except for those

9

obligations which have accrued or expressly survive the expiration or earlier termination of this Lease pursuant to the express terms of this Lease, including Tenant's obligation to reimburse Landlord for all actual out-of-pocket costs incurred by Landlord in connection with this leasing transaction through the effective date of such termination ("Tenant's Reimbursement Obligation"). Tenant shall discharge Tenant's Reimbursement Obligation within thirty (30) days following Tenant's receipt of Landlord's invoice and reasonable supporting documentation. Notwithstanding anything contained in this Section 3.3.2, the Tenant's Reimbursement Obligation shall not exceed the sum of $100,000 in the aggregate.

       3.3.3   <u>Change Orders</u>. If Tenant desires any changes, revisions or substitutions to the improvements set forth in the final Tenant's Plans ("Change Orders"), Tenant shall, to the extent Landlord has a consent right under Section 3.3.1 above, submit to Landlord's representative the plans and specifications for such Change Orders. Landlord's representative will approve or disapprove (and, in case of disapproval, request revisions to the Change Order) a Change Order within three (3) business days following receipt of the required documentation. Landlord's disapproval and request for revisions to Tenant's proposed Change Order shall be based upon the same criteria as Landlord's initial consent standard under Section 3.3.1 above. Failure by Landlord's representative to approve or disapprove any submitted Change Order with reasonable specificity within said period of three (3) business days shall be deemed an approval thereof.

       3.3.4   <u>Performance of Tenant's Work</u>. Tenant hereby agrees that it shall engage Commerce Construction Co., L.P. ("Tenant's Contractor") for the performance of Tenant's Work by entering into a construction management agreement, between Tenant, as owner, and Tenant's Contractor, as construction manager, the general form of which has been previously negotiated by Tenant and Tenant's Contractor (the "CMA"). Tenant shall proceed diligently and in good faith to negotiate the final terms of and enter into the CMA, and Landlord shall use commercially reasonable efforts to induce Tenant's Contractor to proceed diligently and in good faith to negotiate the final terms of and enter into the CMA. Tenant's Work shall be performed in a good and workmanlike manner, in compliance with all Applicable Laws, utilizing only new, first-class materials. Landlord shall pay any and all impact fees and related governmental charges in connection with the Property and the Premises, other than those resulting from Tenant's particular use of, or leasehold improvements installed within the Premises by or on behalf of Tenant (it being acknowledged and agreed, however, that Landlord shall pay such impact fees and related governmental charges arising from (x) those leasehold improvements listed on <u>Exhibit F</u> of this Lease, and (y) Tenant's Work comprising the approximately 24,000 square feet of the main office to be located within the Premises and all improvements therein); provided, however, that Tenant is solely responsible for obtaining, at its cost, all building permits necessary for Tenant's Work. Tenant shall, at Tenant's sole cost, be obligated to obtain a permanent certificate of occupancy for the Premises. If a certificate of occupancy cannot be obtained solely as a result of Landlord's failure to perform the work shown in the plans listed on <u>Exhibit I</u> in accordance with Applicable Laws, Landlord shall cure or remedy such impediment as soon as reasonably practicable thereafter and, if Tenant is unable to legally occupy the Premises as a result thereof, Rent payable hereunder shall abate as from the date that Tenant is unable to legally occupy the Premises until such time as Landlord has cured or remedied such impediment. Tenant shall perform any Tenant's Work in the Premises in

10

accordance with, and subject to this Section 3.3. Prior to commencing any Tenant's Work, Tenant shall provide Landlord with certificates of insurance (for the insurance required of Tenant under this Lease) naming Landlord as additional insured/loss payee, as applicable. Tenant, Contractor, all subcontractors of any tier, laborers, materialmen, and suppliers used by Tenant (such subcontractors, laborers, materialmen, and suppliers, and Tenant's Contractor to be known collectively as "Tenant's Agents"), in the performance of Tenant's Work shall comply with the following:  (i) the Tenant's Work shall be constructed in substantial conformance with the final Tenant's Plans; and (ii) Tenant's Agents shall abide by all reasonable rules, which are not inconsistent with this Lease, made by Landlord's property manager with respect to the performance of Tenant's Work. To the fullest extent of the Applicable Law, Tenant's indemnity of Landlord as set forth in Section 20 of this Lease shall also apply with respect to any and all claims, costs, losses, damages, injuries and liabilities, including attorneys' fees, arising out of or relating in any way to Tenant's Work and attributable, in whole or in part, to any act or omission of Tenant or Tenant's Agents, or any architect, engineer, consultant, representative or agent of any of them, or anyone directly or indirectly employed by any of them, or in connection with Tenant's non-payment of any amount arising out of or relating to Tenant's Work and/or Tenant's disapproval of all or any portion of any request for payment.  Such indemnity by Tenant shall also apply with respect to any and all costs, losses, damages, injuries and liabilities related in any way to Landlord's performance of any ministerial acts reasonably necessary (i) to permit Tenant to complete Tenant's Work, and (ii) to enable Tenant to obtain any building permit or certificate of occupancy for the Property.

3.3.5    Governmental Compliance, Etc.  Tenant's Work shall comply in all respects with the following: (i) all Applicable Laws, (ii) applicable standards of the American Insurance Association (formerly, the National Board of Fire Underwriters), and (iii) the National Electrical Code.

3.3.6    Tenant's Representative.  Tenant has designated Jim Lambert as its sole representative with respect to the matters set forth in this Section 3.3, who shall have full authority and responsibility to act on behalf of Tenant as required in this Section. Tenant shall be entitled at any time to designate a substitute sole representative by prior written notice to Landlord.

3.3.7    Tenant Allowance.

(i)    Landlord shall pay Tenant the liquidated sums of (x) Three Million Nine Hundred Thousand and 00/100 Dollars ($3,900,000.00) in consideration for Tenant's construction of certain of Tenant's Work, and (y) Eight Hundred Thousand and 00/100 Dollars ($800,000.00) to offset Tenant's moving and other costs (such sums in (x) and (y) being, collectively, the "Tenant Allowance").  Landlord shall pay the Tenant Allowance to Tenant as follows:

(ii)    Two Million Three Hundred Fifty Thousand Dollars ($2,350,000) shall be paid to Tenant within twenty (20) days after Landlord's receipt or the occurrence, as the case may be, of all of the following:

11

(a) completion of at least fifty percent (50%) of the Building Standard Improvements (defined below), as certified by Tenant's Architect of Record;

(b) receipt of a copy of a fully-executed standard form of contractor's requisition indicating that at least fifty percent (50%) of the Building Standard Improvements has been completed; and

(c) an unconditional (if appropriate) or conditional lien waiver from each contractor providing work or materials in excess of $50,000 (in the form attached hereto as Exhibit G), pertaining to that portion of the Building Standard Improvements then completed, provided however, if a given lien waiver as herein described in not available because of a dispute with the applicable contractor then Landlord shall withhold an amount equal to one hundred twenty-five percent (125%) of the disputed sum but shall pay the balance of the portion of Tenant's Allowance otherwise due under this clause.

(iii) The balance of the Tenant Allowance shall be paid to Tenant within twenty (20) days after the later to occur of Substantial Completion of the Building Standard Improvements in accordance with Tenant's Plans, as certified by Tenant's Architect of Record, and Landlord's receipt of all of the following:

(a) a copy of a fully executed standard form of contractor's requisition indicating substantial completion of the Building Standard Improvements; and

(b) an unconditional (if appropriate) or conditional lien waiver from each contractor providing work or materials in excess of $50,000 (in the form attached hereto as Exhibit G); provided however, if a given lien waiver as herein described in not available because of a dispute with the applicable contractor then Landlord shall withhold an amount equal to one hundred twenty-five percent (125%) of the disputed sum but shall pay the balance of the portion of Tenant's Allowance other due under this clause.

If Landlord fails to provide Tenant with the Tenant Allowance or applicable portion thereof within twenty (20) days of Landlord's receipt of the applicable documentation or occurrence of

12

all of the events set forth above, then in addition to the rights and remedies under Section 18.2 of this Lease, Tenant shall have the right to a credit against one hundred percent (100%) of the Rent payable by Tenant hereunder, together with interest thereon at a rate equal to the then effective prime rate as published from time to time in the "Money Rates" section of The Wall Street Journal (or any successor publication thereto) plus five percent (5%).  The Tenant Allowance described in Section 3.3.7 (i) above is an offset (and not an inducement) for Tenant's construction, on behalf of Landlord, of certain of Tenant's Work, including without limitation the Building Standard Improvements, which Building Standard Improvements, together with any replacements thereof and such other portions of Tenant's Work towards which the Tenant Allowance is applied hereunder, when completed shall be the property of Landlord, subject to use by Tenant of same during the Term of, and in accordance with, this Lease.  Landlord alone shall be entitled to depreciate the Building Standard Improvements (and such other portions of Tenant's Work towards which the Tenant Allowance is applied) as an asset for tax purposes, and Tenant shall not recognize income with respect to the Tenant Allowance. Tenant shall be responsible for and herewith agrees to pay all costs of Tenant's Work in excess of the Tenant Allowance, and Tenant's Work (except for the Building Standard Improvements and such other portions of Tenant's Work towards which the Tenant Allowance is applied)), together with any replacements thereof, shall be and remain the property of Tenant throughout the Term, and Tenant alone shall be entitled to the benefits of ownership thereof, including, without limitation, depreciation of same as an asset for tax purposes.  As used in this Lease, the "Building Standard Improvements" are (a) those items generally described on Exhibit F to this Lease, and (b) the approximately 24,000 square feet of main office to be located within the Premises by Tenant as part of Tenant's Work.

3.4    Tenant's Access.  Landlord shall provide access to the Premises to Tenant on the date of this Lease for purposes of performing Tenant's Work, including, without limitation, the installation of Tenant's fixtures, communication infrastructure, cabling, racking and material handling equipment.  Notwithstanding the foregoing, Tenant shall not be entitled to occupy the Premises other than for the performance of Tenant's Work until issuance of a temporary or permanent certificate of occupancy to Tenant.   Tenant's access to the Premises as herein  provided shall be subject to all of the terms and conditions of this Lease (including, but not limited to, the insurance provisions below), with the exception of the payment of Base Rent and Additional Rent; provided, however, that during such period of early access, Tenant shall be responsible for payment of the cost of utilities attributable to Tenant's use of the Premises.

4.    Term.

4.1    Commencement Date.  The term of this Lease shall commence on the Commencement Date.

4.2    Rent Commencement.  Tenant's obligation to pay Additional Rent shall commence on the Rent Commencement Date.  From and after the Rent Commencement Date and throughout the initial Term, Tenant shall pay monthly Base Rent in the amounts required by Section 1.2. Before the Commencement Date, Landlord shall deliver to Tenant a completed and signed IRS Form W- 9.  Landlord acknowledges that the delivery of the Form W-9 shall be a condition precedent to Tenant's payment of Rent.

13

4.3 Extension.

 4.3.1 If Tenant is not in material default (beyond applicable periods for notice and cure) under this Lease at the time any of the options to renew described below (each, an "Extension Option") is exercised or at the commencement of the applicable Extension Period (as hereinafter defined), Tenant shall have the right to irrevocably extend the Term, for two (2), five (5) year periods (the "Extension Periods") commencing on the first day following the last day of the initial Term or the first Extension Period, as the case may be, upon the same terms and conditions as are contained in this Lease, except as hereinafter provided.  Base Rent for the first Extension Period shall be equal to the lesser of: (i) the Fair Market Rental Value, or (ii) the Base Rent for the final year of the initial term multiplied by 120%.  Base Rent for the second Extension Period shall be equal to the lesser of (i) the Fair Market Rental Value or (ii) the Base Rent for the final year of the first Extension Period multiplied by 120%.  Unless otherwise agreed in writing between Landlord and Tenant, Landlord shall have no obligation to make any build out, tenant improvements, or other comparable tenant inducements to or with respect to the Premises as a condition to Tenant's obligation to pay Rent for any Extension Period.  Each Extension Option shall be exercised by written notice to Landlord (an "Extension Notice") given no later than one hundred eighty (180) days prior to the expiration date of this Lease (as may be extended by the first Extension Period).  Notwithstanding any language to the contrary in this Section 4.3, in no event shall the Base Rent be reduced below the amount of Base Rent paid by Tenant under this Lease immediately prior to the first day of the applicable Extension Period. For the purposes of this Lease, the term "Fair Market Rental Value" shall mean the amount that a bona fide third party would pay to rent the Premises on the terms and conditions set forth in this Lease for the Extension Period as a result of an arms-length transaction.  Fair Market Rental Value shall be determined in the manner provided below:

 (i) Within ten (10) days after Tenant's exercise of the option to extend the Term for an Extension Period Landlord and Tenant shall meet to agree upon the Fair Market Rental Value.  If Landlord and Tenant shall so agree on the Fair Market Rental Value within twenty (20) days after Tenant's exercise of such option to extend the Term, Fair Market Rental Value shall be the agreed upon value.

 (ii) If Landlord and Tenant are unable to agree on Fair Market Rental Value within the time provided, Landlord and Tenant shall each appoint an appraiser within ten (10) days after the expiration of such time period and immediately notify the other party in writing of said appointment and of the name and address of the appraiser so appointed. If within ten (10) days after their appointment, the two appraisers are able to agree on the Fair Market Rental Value, then the same shall be binding upon Landlord and Tenant.

 (iii) If the two appraisers do not, within ten (10) days after their appointment, agree on the Fair Market Rental Value, the appraisers shall then appoint a third appraiser within ten (10) days thereafter.  Such third appraiser shall, within fifteen (15) days of such appointment, make a determination of whether the determination of Fair Market Rental Value made by the appraiser selected by Landlord or that made by the appraiser selected by Tenant most closely approximates the Fair Market Rental Value.  The determination made by the third appraiser shall be binding on Landlord and Tenant.  The charges for service of the appraiser

14

selected by Landlord shall be borne by Landlord.  The charges for services of the appraiser selected by Tenant shall be borne by Tenant. The charges for services of the third appraiser, if any, shall be borne by Landlord and Tenant in equal shares.

(iv)    The appraisers appointed pursuant to this Section must be appraisers specializing in industrial real estate with at least ten (10) years' continuous and active experience in the Dallas-Ft. Worth, Texas, metropolitan area.  No appraiser shall be employed by, or otherwise be engaged in business with or affiliated with Landlord or Tenant, except as an independent contractor.  In the event Landlord or Tenant fails to appoint an appraiser as provided above, and should such failure continue for a period of ten (10) days following written notice from the other requesting the appointment of their appraiser, the appraiser appointed by the other party shall determine Fair Market Rental Value and such determination shall be binding on the parties.

(v)    In making their determination of Fair Market Rental Value, the appraisers shall, among other relevant factors, take the following factors into consideration:

(a)    the duration of the Extension Period;

(b)    the absence of brokerage commissions;

(c)    the absence of free rent and other lease concessions; and

(d)    the "as-is" condition of the Premises (disregarding any state of disrepair which is a Tenant obligation) and the absence of any obligation on the part of Landlord to make improvements to the Premises.

4.3.2    The Extension Options are personal to the original Tenant named in this Lease or any Permitted Transferee (defined below).  If Tenant subleases more than fifty (50%) percent of the Floor Area of the Premises or assigns or otherwise transfers any interest under this Lease to an entity other than a Permitted Transferee prior to the exercise of an Extension Option (whether with or without Landlord's consent), then such Extension Option and any succeeding Extension Options shall lapse.  If Tenant subleases more than fifty (50%) percent of the Floor Area of the Premises or assigns or otherwise transfers any interest of Tenant under this Lease to an entity other than a Permitted Transferee after the exercise of an Extension Option but prior to the commencement of the respective Extension Period (whether with or without Landlord's consent), then such Extension Option and any succeeding Extension Options shall lapse and the Lease Term shall expire as if such Extension Option were not exercised.  If Tenant subleases more than fifty (50%) percent of the Floor Area of the Premises or assigns or otherwise transfers any interest of Tenant under this Lease to an entity other than a Permitted Transferee after the exercise of an Extension Option and after the commencement of the Extension Period related to such Extension Option, then the term of this Lease shall expire upon the expiration of the Extension Period during which such sublease or transfer occurred and only

the succeeding Extension Options shall lapse. Time is of the essence with respect to Tenant's exercise of the Extension Option(s) granted in this Section.

    5.    Base Rent.

    5.1    Payment. Base Rent shall be payable by Tenant in equal monthly installments on or before the first day of each calendar month, in advance. All payments of Base Rent and Additional Rent shall be made without prior demand and, except as otherwise expressly provided in this Lease, without offset, deduction, recoupment, or counterclaim of any kind, in lawful money of the United States of America. Such payments shall be made at Landlord's Address or at such other place as Landlord shall designate from time to time. Unless otherwise designated by Landlord in its sole discretion, all payments received by Landlord from Tenant shall be applied to the oldest payment obligation owed by Tenant to Landlord. No designation by Tenant, either in a separate writing or on a check or money order, shall modify this section or have any force or effect. Tenant shall pay the first month's Base Rent to Landlord within thirty (30) days after Tenant has obtained Tenant's Permits; provided, however, that such payment shall be returned to Tenant if this Lease is thereafter terminated (A) by Tenant in accordance with Section 3.2 or Section 13.2 of this Lease, or (B) by Landlord in accordance with Section 13.3. of this Lease, and such termination occurs while such payment by Tenant of Base Rent is still unearned (i.e., the first month's Base Rent is not then due and payable in accordance with the further provisions of this Lease).

    6.    Additional Rent for Operating Expenses.

    6.1    Definitions. Subject to any exclusion expressly provided herein, "Operating Expenses" shall mean the customary and reasonable (i.e., consistent, as to type and the typical amount of such expenses, with similar warehouse buildings in Lewisville, Texas) costs and expenses paid or incurred by Landlord in connection with the management, operation, administration, maintenance and repair (including replacement, as needed, subject to the further terms and conditions of this Section 6) of the Building and the Common Areas, including the Secure Tenant Outdoor Area, including, without limitation:

    (a)    the cost of electricity and water systems for the Common Areas;

    (b)    the cost of repairs, replacements, maintenance and cleaning, including, without limitation, the cost of trash removal with respect to the Common Areas and the cost of supplies, services, and equipment in connection with electricity, gas, water, sewer service and other systems and utilities covering the Common Areas;

    (c)    subject to Section 9.3 below, the cost of all repairs, replacements, and maintenance associated with the landscaped and paved areas of the Property (including periodic sweeping and cleaning of the parking areas) and, with respect to the Building, routine roof maintenance and exterior painting (but not the cost of repairs, replacements or maintenance of the structural elements of the

Building (including, but not limited to, structural elements of the roof [including the roof joists], columns, exterior or load-bearing walls, footings, and foundations);

(d)     the premiums for Landlord's Casualty Policy and Landlord's Liability Insurance (as defined in Section 14.6.2 and 14.6.3, respectively), provided, however, that Tenant's share of the cost of the premiums for Landlord's Casualty Policy as included hereunder shall be equitably reduced, as applicable, to the extent necessary to account for any above standard leasehold improvements to the Building that may be made outside of the Premises.

(e)     the cost of repaving the parking areas of the Property or replacing the roof of the Building so long as each such cost is amortized on a straight-line basis over the useful life thereof under generally accepted accounting principles (or successor accounting standards) and only the annual portion (including principal and interest) shall be included in Operating Expenses for each particular year;

(f)     the cost of (or rental fees for) supplies, materials and equipment used exclusively in the operation, maintenance and repair of the Common Areas;

(g)     costs for window washing, tax consulting services, snow and ice removal (at main office entrance only);

(h)     reasonable fees, costs and disbursements incurred in connection with proceedings to contest, determine or reduce Operating Expenses, to the extent of savings realized only;

(i)     a management fee up to, but not in excess of, two (2%) percent of the net rents of the Building;

(j)     costs of improvements made subsequent to the initial development of the Project to comply with the requirements of any law, ordinance, code, rule or regulation, relating to the Property that is first enacted after the date of this Lease; and if any such cost is a capital cost it shall be amortized on a straight-line basis over the useful life thereof under generally accepted accounting principles and only the annual portion (including principal and interest) shall be included in Operating Expenses for each particular year, and provided that such costs with respect to structural elements of the Building (including, but not limited to, structural elements of the roof (including the roof joists), columns, exterior or load-bearing

17

walls, footings, and foundations) shall not be included in Operating Expenses and shall be paid by Landlord;

(k)     costs of the operation, repair and replacement of the ESFR fire systems and pump (including testing, monitoring and servicing), fire alarm system and life safety system to meet all applicable requirements of the same;

(l)     costs of maintenance and repair (and replacement, as needed) of exterior fencing located (or to be located) at the Property, but not the initial installation costs thereof;

(m)     costs of ownership (including, without limitation, taxes), operation, repair and maintenance (including replacement, as needed) of off-site storm water detention facilities benefitting the Property (such costs to be equitably allocated by Landlord among all of the properties so benefitted); provided, however, that if any such replacement cost that is a capital item it shall be amortized on a straight-line basis over the useful life thereof under generally accepted accounting principles (or successor accounting standards) and only the annual portion (including principal and interest) shall be included in Operating Expenses for each particular year; and

(n)     Real Estate Taxes and reasonable costs to contest or reduce Real Estate Taxes to the extent of savings realized only.

"Operating Expenses" shall not include:

(1)     leasing commissions, accountants' or attorneys' fees, costs and disbursements and other expenses incurred in connection with proposals, negotiations or disputes with tenants or other occupants or prospective tenants or other occupants, or associated with the enforcement of any leases or the defense of Landlord's title to or interest in the Property or any part thereof;

(2)     any repairs or expenses for the premises of any other tenant in the Property, which would be chargeable to directly to such tenant and not as a portion of Operating Expenses;

(3)     except as provided in this Lease with regard to certain amortized capital improvement costs, any other expense that under generally accepted accounting principles and practices would not be considered a maintenance or operating expense;

(4)     interest on debt or amortization payments on any mortgages or deeds of trust or any other borrowings of Landlord;

(5)     salaries, benefits or other compensation paid to leasing agents, promotional directors, officers, directors and executives of Landlord above the

18

rank of property managers, or not involved in the day-to-day operations or management of the Property (except for out-of-pocket expenses of such persons to the extent related to the Property);

(6)     all contributions to any organizations, whether political or charitable;

(7)     interest or penalties for late payments;

(8)     costs reimbursed by insurance;

(9)     ground lease rental;

(10)    depreciation;

(11)    expenses in connection with services or other benefits of a type which are not provided to Tenant but are provided to another tenant or occupant;

(12)    Landlord's general overhead;

(13)    amounts paid to affiliates or subsidiaries of Landlord in excess of the fair market value of such services (but excluding any property management fee, which is already subject to a cap, paid to Landlord's affiliate);

(14)    costs incurred by Landlord to comply with its obligations under Section 7.4 (Hazardous Substances) or under its indemnity under Section 7.4;

(15)    any deductibles paid by Landlord in connection with Landlord's Casualty Insurance (as hereinafter defined) in excess of $25,000 in any calendar year (unless this Lease shall be terminated as a result of such casualty, in which case no deductible amount shall be includable in Operating Expenses) and the amount of any deductibles paid by Landlord with respect to Landlord's Liability Insurance;

(16)    costs incurred in correcting any defects in construction of the Building or in connection with new construction in the Building (i.e., adding or deleting buildings);

(17)    costs of initial construction of the existing storm water detention facilities serving the Property;

(18)    costs of repairs or rebuilding necessitated by fire or other casualty, or eminent domain or condemnation;

(19)    reserves for anticipated future expenses, including without limitation those for roof replacement and resurfacing and repaving of the parking lot, driveways, and other paved areas;

19

(20)    costs of refinancing any present or future mortgage;

(21)    transaction costs incurred in connection with the transfer of Landlord's interest (excluding any resulting Real Estate Tax increase which may result from an arms-length market transfer);

(22)    expenses resulting from the negligence or act or omission of Landlord or any other tenant or occupant in the Building, or their respective agents, servants, employees, contractors, licensees or invitees;

(23)    any bad debt loss, rent loss, or reserves for bad debts or rent loss;

(24)    excess insurance premiums covering the Common Areas and/or the Building occasioned directly by the use of extra hazardous materials of other tenants or occupants in the Building;

(25)    sewer or water "tap-in" or connection fees payable in connection with the initial occupancy of any tenant or occupant;

(26)    costs and expenses attributable to other buildings or property owned by Landlord outside of the Property;

(27)    principal and interest payments related to any financing completed by Landlord on the Property;

(28)    costs and expenses with regards to the specific Legal Compliance Work that is to be completed at Landlord's sole cost and expense as provided in Section 7.3;

(29)    costs and expenses in connection with achieving a so-called "green" building and/or LEED certification, to the extent such costs and expenses are in excess of that which would have been incurred in the absence thereof;

(30)    costs of improvements relating to the floor slab of the Building, whether to comply with the requirements of any law, ordinance, code, rule or regulation or otherwise; provided, however, that the foregoing shall not lessen or diminish Tenant's obligations under Sections 9.1.4 and 9.1.5 of this Lease; and

(31)    costs incurred in connection with third party lawsuits or other third party legal actions (including, without limitation, arbitrations and mediations) instituted or defended by Landlord, unless relating to a contest of Real Estate Taxes in accordance with Section 6.4 below or otherwise expressly payable by Tenant under the terms of this Lease.

6.2    <u>Payment of Operating Expenses.</u>

20

6.2.1    Commencing on the Commencement Date, Tenant shall pay to Landlord as additional rent, one twelfth (1/12th) of Tenant's Proportionate Share of Operating Expenses for each calendar year on or before the first day of each month during such year, in advance, in an amount reasonably estimated by Landlord in good faith and billed by Landlord to Tenant.  Tenant's Proportionate Share of Operating Expenses from the Rent Commencement Date through the end of the first full calendar year after the Commencement Date will be approximately $0.84 per square foot of Rentable Area in the Premises.  Tenant acknowledges that the amount stated in the preceding sentence is an estimate only, that such amount is subject to change, and that the actual Tenant's Proportionate Share of Operating Expenses for the first full calendar year after the Commencement Date may be more or less than this estimated amount.

6.2.2    <u>Cap on Controllable Operating Expenses</u>.  Notwithstanding anything in this Lease to the contrary, using Tenant's Proportionate Share of the Controllable Operating Expenses (hereinafter defined) for the first full calendar year as the base line, Landlord agrees that Tenant's Proportionate Share of the Controllable Operating Expenses shall not increase by more than seven percent (7%) per year on a cumulative, compounded basis over the initial Lease Term. As used herein, "Controllable Operating Expenses" shall mean all Operating Expenses except for Real Estate Taxes, insurance premiums, utility costs, paving repairs, roof repairs, and exterior painting.

6.2.3    <u>Landlord's Operating Expense Statement</u>.  Within one hundred twenty (120) days after the expiration of each calendar year, Landlord shall furnish Tenant with a statement ("Landlord's Operating Expense Statement"), setting forth in reasonable detail the actual amount of Operating Expenses for such year and Tenant's Proportionate Share of Operating Expenses.  If the actual amount of Operating Expenses due for such year payable by Tenant differs from the estimated amount of Operating Expenses paid by Tenant for such year, then, if Tenant owes any amounts to Landlord, such amounts shall be paid by Tenant (whether or not this Lease has terminated) within forty-five (45) days after receipt of Landlord's Operating Expense Statement, and if Landlord owes any amounts to Tenant, such amounts shall be credited against the next installments of Base Rent and Additional Rent due from Tenant (or if this Lease has terminated, paid to Tenant within sixty (60) days after delivery of Landlord's Operating Expense Statement provided Landlord may offset such amounts against damages actually owing from Tenant in connection with an Event of Default hereunder).

6.3    <u>Tenant's Inspection Rights</u>.  Landlord shall keep reasonably detailed records of all Operating Expenses for a period of at least three (3) years or as currently required by law.  Not more frequently than once in every 12-month period and after at least twenty (20) days' prior written notice to Landlord, Tenant shall be permitted to inspect the records of the Operating Expenses for the preceding three (3) consecutive years, including, without limitation, Real Estate Taxes, at Landlord's office during normal business hours ("Tenant's Review"). Subject to the foregoing, Tenant shall provide Landlord with notice that it intends to inspect records with respect to Operating Expenses for a given year or years and shall set the tentative date for such inspection (which tentative date shall be subject to reasonable adjournments by either party).  If Tenant exercises its inspection rights as provided above, Tenant shall conduct any Tenant's Review at a reasonable time and in a manner (not to exceed five (5) business days)

so as not to unduly disrupt the conduct of Landlord's business and shall not employ any third party contractor that is paid on a contingency fee basis. Any such inspection by Tenant shall be for the sole purpose of verifying the Operating Expenses (including, without limitation, Real Estate Taxes).    Tenant shall hold any information obtained during Tenant's Review in confidence, except that Tenant shall be permitted to disclose such information to its attorneys and advisors, provided Tenant informs such parties of the confidential nature of such information and uses good faith and diligent efforts to cause such parties to maintain such information as confidential.  Any shortfall or excess revealed and verified by Tenant's Review and undisputed by Landlord shall be paid to the applicable party within thirty (30) days after that party is notified of the shortfall or excess to the extent such overage or shortfall has not previously been adjusted pursuant to this Lease. If following Tenant's Review Tenant and Landlord continue to dispute in good faith the amounts shown on Landlord's Operating Expense Statement and Landlord and Tenant are unable to resolve such dispute, then either Landlord or Tenant  shall cause a final and determinative audit to be made by an independent certified public accountant (which accountant must be qualified and experienced and must be employed by a firm which derives its primary revenues from its accounting practice and is not performing its services on a contingency fee basis) of the proper amount of the disputed items and/or categories of the costs as shown on Landlord's Operating Expense Statement (the "Final Award"), provided that the identity of such accountant shall be reasonably approved by both Landlord and Tenant, and the cost of such accountant shall be shared equally by Landlord and Tenant.  The results of the Final Award shall be conclusive and binding upon both Landlord and Tenant.  If the resolution of the parties' dispute with regard to the costs as shown on Landlord's Operating Expense Statement, whether pursuant to Tenant's Review or the Final Award reveals an error in the calculation of Tenant's share of costs to be paid, the parties' sole remedy shall be for the parties to make appropriate payments or reimbursements, as the case may be, to each other as are determined to be owing.  Any such payments shall be made within thirty (30) days following the resolution of such dispute.  At Landlord's election, the parties shall treat any overpayments resulting from the resolution of such parties' dispute as a credit against Rent until such amounts are otherwise paid by Landlord.  Except as otherwise provided above with respect to the cost of the accountant determining the Final Award (which is to be shared equally by Landlord and Tenant), Tenant shall be responsible for all of its own costs and expenses associated with Tenant's Review and any Final Award; provided, however, if Landlord's Operating Expense Statement has overstated Tenant's Proportionate Share of the Operating Expenses by seven and one-half percent (7½%) or more (but expressly excluding any variance based on an increase in Real Estate Taxes), Landlord shall pay the cost of the final and determinative audit that resulted in the Final Award, in an amount not to exceed Three Thousand Dollars ($3,000.00).

6.4    Real Estate Tax Contest.  Landlord represents to Tenant that as of the date hereof the Property comprises a single tax lot (except for a small portion, consisting of 0.058 acres, that is described on the attached Exhibit B) and that no other land or improvements are included on the tax bill for the Property.  Landlord shall have the right, but in no event any obligation, to contest by appropriate legal proceedings the amount, validity, or application of any Real Estate Taxes or liens thereof.  If Landlord does not contest the Real Estate Taxes for any given tax year, Tenant shall have the right, with Landlord's prior written consent (not to be unreasonably withheld, conditioned or delayed), to contest same by appropriate proceedings conducted in good faith, whereupon (a) Landlord shall cooperate with Tenant, at no cost to

Landlord, in the institution and prosecution of any such proceedings of contesting taxes and will execute any documents reasonably required therefor, (b) Tenant shall indemnify and hold Landlord harmless with respect to all liability, penalties and reasonable costs (including reasonable attorneys' fees), tax obligations or liabilities (including any resulting increase in Real Estate Taxes), and reasonable expenses incurred by Landlord in connection therewith, (c) Tenant shall pay all costs and expenses of such contest out of pocket, and (d) instituting such contest shall not entitle Tenant to withhold or delay payment when due hereunder of Operating Expenses. If, as a result of any contest or otherwise, any rebate or refund of Real Estate Taxes is received, Tenant shall be entitled to a credit in such amount to be applied against its obligation to pay Tenant's Proportionate Share thereof to the extent Real Estate Taxes were previously included in Operating Expenses paid by Tenant (after reasonable and customary expenses incurred by Landlord and/or Tenant in connection with such contest are paid to the party which incurred such expense). Notwithstanding the foregoing, if Tenant's Proportionate Share of Real Estate Taxes is reduced or abated as part of an incentive program granted to Tenant, Tenant shall be entitled to the full benefit thereof.

6.5     <u>Use and Occupancy Taxes</u>.  Tenant shall also pay before any penalties or fines are assessed to the appropriate governmental authority any use and occupancy tax in connection with the Property which are in addition to, or in substitution for, Real Estate Taxes. In the event Landlord is required by law to collect such tax, Tenant shall pay such use and occupancy tax to Landlord as Additional Rent within ten (10) days of demand and Landlord shall remit any amounts so paid to Landlord to the appropriate governmental authority in a timely fashion.

6.6     <u>Rent Tax</u>.  In the event that any governmental authority imposes a tax, charge, assessment or other imposition upon tenants or landlords in general which is based upon the rents payable under this Lease, including any taxes based upon the receipt of rents including gross receipts, sales or value added tax, Tenant shall pay the same before any penalties or fines are assessed to such governmental authority or to Landlord if Landlord is responsible to collect the same, in which case Landlord shall remit the same in a timely manner and, upon request of Tenant, evidence to Tenant such remittance.

7.      <u>Use; Compliance with Law</u>.

7.1     <u>Permitted Use</u>.

7.1.1    The Premises shall be used only for the Permitted Use and for no other purpose. Subject to Applicable Laws, Tenant shall have access to the Premises and the Common Areas twenty-four hours per day, seven (7) days per week during the Term. Landlord hereby agrees that the balance of the Building shall at all times be used in a manner that will not detract from the Building as an attractive, first-class and fully operative industrial/warehouse facilities in the Dallas-Fort Worth Metropolitan Area, including without limitation for any use, in whole or in part, as a so-called "self-storage facility" or for any other use that would violate any of the conditions described in clauses (i) through (iv) of Section 1.17 above.

23

7.1.2    To Landlord's current actual knowledge, Landlord represents and warrants to Tenant that:

(i)    On the Commencement Date, except as noted herein and except for Tenant's Work, with respect to both the Premises delivered by Landlord to Tenant and the Common Areas, the Property shall be in material compliance with (a) all Applicable Laws, and (b) all easements, restrictions and covenants of record as of the Commencement Date of this Lease;

(ii)    On the date of this Lease and on the Commencement Date, the Premises are zoned "Light Industrial";

(iii)    On the date of this Lease, Landlord is the record owner of the Property, subject to all matters of record, including those described on Exhibit E hereto;

(iv)    As of the Commencement Date the Property has access to Ace Lane, State Highway 121 Frontage Road and Valley Parkway, each a dedicated and accepted public street;

(v)    No third party consents or approvals are required in order for Landlord to enter into this Lease, or for the performance of Tenant's Work (excluding, as of the date of this Lease, governmental permits and approvals);

(vi)    On the date of this Lease, the Property is not subject to any special assessments; and

(vii)    The Building and improvements on the Property as of the date of this Lease have been constructed in accordance with the plans listed on Exhibit I attached hereto.

For purposes of this Lease, "Landlord's current actual knowledge" shall mean and refer only to the current actual (as opposed to imputed, implied or constructive) knowledge of the officers of Landlord having direct operational responsibility for the Property, with the express limitations and qualifications that the knowledge of any contractor or consultant shall not be imputed to Landlord and none of such officers has made any special investigation or inquiry, and none of such officers has any duty or obligation of diligent investigations or inquiry, or any other duty or obligation, to acquire or to attempt to acquire information beyond or in addition to the current actual knowledge of such persons.

7.2    No Nuisance.  Tenant shall not allow, suffer or permit the Premises or any use thereof to constitute a nuisance.  Landlord shall not allow, suffer or permit the remainder of the Property, or any use thereof, to constitute a nuisance to Tenant.

24

7.3    <u>Compliance with Laws</u>.    Except as hereinafter provided, Tenant, at Tenant's expense, shall comply with and cause all of Tenant Parties to comply with all laws, ordinances, rules and regulations of governmental authorities applicable to the use or occupancy of the Premises by Tenant or the Tenant Parties.    Without limiting the generality of the foregoing, Tenant shall comply with the requirements of: (a) the Occupational Safety and Health Act (and all regulations promulgated thereunder); and (b) the Americans with Disabilities Act (and all regulations promulgated thereunder) ("ADA"), as the same may be amended from time to time, including Tenant's obligation to construct the Tenant's Work in accordance with all Applicable Laws.    The foregoing obligation of Tenant shall not, however, permit Tenant to make, without Landlord's prior written approval, any Alterations to the Premises which otherwise would require Landlord's approval under this Lease, and Tenant shall comply with all of the requirements of this Lease in making any such Alterations.    Except as hereinafter expressly provided, Landlord shall perform, at its sole cost and expense (and shall not include in Operating Expenses), all Legal Compliance Work pertaining to the Building Systems (defined below), exterior of the Building, the structural elements of the Building and the Common Areas, to the extent such Legal Compliance Work is required as a result of laws of general applicability and is (A) not required as a result of Tenant's specific manner of use of the Premises (e.g., is attributable to warehouse and distribution use generally or is required to be made by reason by an owner of an industrial building comparable to the Building irrespective of the use thereof by any particular occupant), or (B) not triggered by Tenant's Work or any Alterations to the Premises performed by or on behalf of Tenant. Subject to Section 13, in the event any Legal Compliance Work to the exterior of the Building, the structural elements of the Building or the Common Areas is required as a result of the negligence, misconduct or misuse of Tenant or any Tenant Parties or the failure by Tenant to perform any of its covenants or obligations hereunder, Tenant shall reimburse Landlord for the cost of any such Legal Compliance Work, as Additional Rent, within thirty (30) days after the presentation of invoices therefor by Landlord to Tenant.  Tenant shall not be responsible for contributing to the cost of any such Legal Compliance Work that is required as a result of the negligence, misconduct or misuse of any person other than Tenant or any Tenant Parties, the failure of Landlord to perform any of its covenants or obligations hereunder, or any other tenant of the Property to perform any of its covenants or obligations under its lease. If, as a result of laws of general applicability that are not in existence as of the date of this Lease but only become effective after such date, it is necessary from time to time during the Lease Term to perform Legal Compliance Work to which neither of the immediately preceding clauses (A) or (B) apply, then such Legal Compliance Work shall be performed by Landlord, and the cost of such work shall be included with the Operating Expenses for the Project, subject to the provisions of subsection 6.1(j) above.

7.4    <u>Hazardous Substances</u>.

7.4.1    <u>Definitions</u>.    "Hazardous Substance" shall mean any hazardous or toxic substance, material or waste, potentially dangerous substance, noxious substance, toxic substance, flammable substance, explosive substance, radioactive material, carcinogenic substances, or any other substances the removal of which is required, or the manufacture, preparation, production, generation, use, maintenance, treatment, storage, transfer, handling or ownership of which is restricted, prohibited, regulated or penalized by which is or becomes regulated by any local, state or federal governmental authority having jurisdiction.  The term

25

"Hazardous Substance" includes, without limitation, any material or substance which is: (i) designated as a "hazardous substance" pursuant to Section 311 of the Federal Water Pollution Control Act (33 U.S.C. Section 1317); (ii) defined as a "hazardous waste" pursuant to Section 1004 of the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901 et seq. (42 U.S.C. Section 6903); (iii) defined as a "hazardous substance" pursuant to Section 101 of the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Section 9601 et seq. (42 U.S.C. Section 9601); (iv) petroleum; (v) designated as a "hazardous substance" by the laws of the State of Texas.

7.4.2    Compliance with Law.    Tenant shall conduct, and cause to be conducted, all operations and activity at the Premises in compliance with, and shall in all other respects applicable to the Premises comply with, all applicable present and future federal, state, municipal and other governmental statutes, ordinances, regulations, orders, directives and other requirements, and all present and future requirements of common law, concerning the protection of public health, safety or the environment (collectively, "Environmental Statutes").    Tenant shall not cause or permit to occur:

(a)    Any violation of any federal, state, or local law, ordinance, or regulation now or hereafter enacted, related to environmental conditions on, under, or about the Premises arising from Tenant's manner of use or occupancy of the Premises, including, but not limited to, soil and ground water conditions; or

(b)    The use, generation, release, manufacture, refining, production, processing, storage, or disposal of any Hazardous Substance on, under, or about the Premises, or the transportation to or from the Premises of any Hazardous Substance, except (x) as specifically disclosed on the attached Exhibit H, and (y) for any combustible liquids, flammable liquids and aerosols, so long as the same are retail consumer products, packaged for retail sale and are stored in accordance with applicable State and Federal laws.

Landlord shall conduct, or cause to be conducted, all of its operations and activities at the Property in compliance with all Environmental Statutes.    Notwithstanding anything to the contrary in this Section 7.4.2, except as otherwise expressly provided in this Section 7.4, Tenant shall have no liability of any kind to Landlord as to Hazardous Substances existing on the Premises prior to Tenant's occupancy of the Premises or as to Hazardous Substances caused or permitted by: (i) Landlord or Landlord Parties; or (ii) any other tenants of the Property or their agents, employees, contractors, subtenants, assignees or invitees; or (iii) any other person or entity located outside of the Premises or the Property (including, without limitation, migration of Hazardous Substances caused by any person or entity, other than Tenant, its agents, employees, contractors, assignees, subtenants or invitees).    If Hazardous Substances are hereafter discovered on the Premises, and the presence of such Hazardous Substances is not the result of Tenant's use of the Premises or any act or omission of Tenant or its agents, employees, contractors, subtenants or invitees, and the presence of such Hazardous Substances results in any contamination, damages, or injury to the Premises that materially and adversely affects Tenant's occupancy or

26

use of the Premises or human health, Landlord shall promptly take all actions at its sole expense as are necessary to remediate such Hazardous Substances and as may be required by Applicable Law. Within thirty (30) days after notification from Tenant supported by reasonable documentation setting forth such presence or release of Hazardous Substances, and after Landlord has been given a reasonable period of time after such thirty (30) day period to conduct its own investigation to confirm such presence or release of Hazardous Substances, Landlord shall commence to remediate such Hazardous Substances within one hundred eighty (180) days after the completion of Landlord's investigation and thereafter diligently prosecute such remediation to completion. If Landlord commences remediation at the Property pursuant to this paragraph, as a result of a release of Hazardous Materials, the Base Rent and Operating Expenses shall be equitably adjusted if and to the extent and during the period the Premises are rendered untenantable. Notwithstanding anything herein to the contrary, if Landlord obtains a letter from the appropriate governmental authority that no further remediation is required, subject to Landlord's compliance with any ongoing requirements therein, Landlord's obligation to remediate as provided in this paragraph shall be satisfied.

       7.4.3 <u>Tenant's Remediation Obligation</u>. Tenant shall, upon approval and demand of Landlord, at its sole cost and expense and using contractors approved by Landlord, promptly take all actions to remediate the Premises and the Property which are required by any Governmental Agency (defined below), or which are reasonably necessary to mitigate Environmental Damages (defined below) or to allow full economic use of the Premises and the Property for its intended purpose as of the date hereof, which remediation is necessitated by the presence upon, about or beneath the Premises and the Property, at any time during or upon termination of this Lease (whether discovered during or following the Lease Term), of a Hazardous Substance introduced by any of the Tenant Parties. Such actions shall include, but not be limited to, the investigation of the environmental condition of the Premises and the Property, the preparation of any feasibility studies, reports or remedial plans, and the performance of any cleanup, remediation, containment, operation, maintenance, monitoring or restoration work, whether on or off the Premises, which shall be performed in a manner approved by Landlord. Tenant shall take all actions necessary to restore the Premises and the Property to substantially the condition existing prior to the introduction of Hazardous Material upon, about or beneath the Premises and the Property so as to allow use of the Property for the purpose intended on the date hereof. As used in this Section, "Governmental Agency" means all governmental agencies, departments, commissions, boards, bureaus or instrumentalities of the United States, states, counties, cities and political subdivisions thereof, and "Environmental Damages" means all claims, judgments, damages, losses, penalties, fines, liabilities (including strict liability), encumbrances, liens, costs, and expenses (including the expense of investigation and defense of any claim, whether or not such claim is ultimately defeated, or the amount of any good faith settlement or judgment arising from any such claim) of whatever kind or nature, contingent or otherwise, matured or unmatured, foreseeable or unforeseeable (including without limitation reasonable attorneys' fees and disbursements and consultants' fees) any of which are incurred at any time as a result of the existence of Hazardous Substances upon, about, or beneath the Premises or the Property which were introduced by a Tenant Party. Environmental Damages include, without limitation:

(i)     damages for personal injury, or injury to property occurring upon or off of the Premises (excluding lost profits and consequential damages), but including the cost of demolition and rebuilding of any improvements on real property, interest, penalties and damages arising from claims brought by or on behalf of employees of Tenant, and any diminution in the fair market value of the Property (such valuation to be based on the use of the Property for the purposes intended as of the date hereof);

(ii)    fees, costs or expenses incurred for the services of attorneys, consultants, contractors, experts, laboratories and all other costs incurred in connection with the investigation or remediation of such Hazardous Substances or violation of such Environmental Statutes, including, but not limited to, the preparation of any feasibility studies or reports or the performance of any cleanup, remediation, removal, response, abatement, containment, closure, restoration or monitoring work required by any Governmental Agency or reasonably necessary to make full economic use of the Premises and the Property or any other property in a manner consistent with its current use or otherwise expended in connection with such conditions, and including, without limitation, any attorneys' fees, costs and expenses incurred in enforcing the provisions of this Lease or collecting any sums due hereunder; and

(iii)   liability to any third person or Governmental Agency to indemnify such person or Governmental Agency for costs expended in connection with the items referenced in subsection (ii) above.

"Environmental Damages" shall not in any event include consequential or punitive damages, but shall include diminution in the fair market value of the Property (such valuation to be based on the use of the Property for the purposes intended as of the date hereof) including, without limitation, any reduction in fair market rental value based upon the intended use of the Property as of the date hereof or life expectancy of the Property or the improvements located thereon or the restriction on the use of or adverse impact on the marketing of the Property or any portion thereof based upon the intended use of the Property as of the date hereof.

7.4.4   <u>Permits</u>.  Each of Landlord and Tenant shall, in a timely manner, to the extent required due to such party's respective activities at the Property, obtain and maintain in full force and effect, all permits, licenses and approvals, and shall make and file all notifications and registrations as required by Environmental Statutes.  Each of Landlord and Tenant shall at all times comply with the terms and conditions of any such permits, licenses, approvals, notifications and registrations.

7.4.5   <u>Documents</u>.  Each party, as to the Premises or the Property only, shall make reasonable efforts to provide to the other, copies of the following, promptly after each shall have been submitted, prepared or received, and shall provide to the other promptly after

28

receiving a request from the other party therefor (which request may be general and request, for example, "all documents described in Section 7.4.5 for the last 6 months"): (A) all applications and associated materials submitted to any governmental agency relating to any Environmental Statute which would become available to the public upon request; (B) all notifications, registrations, reports and other documents, and supporting information, prepared, submitted or maintained in connection with any Environmental Statute or otherwise relating to environmental conditions which would become available to the public upon request; (C) all permits, licenses, approvals, and amendments or modifications thereof, obtained under any Environmental Statute which would become available to the public upon request; and (D) any correspondence, notice of violation, summons, order, complaint or other document received which pertains to compliance with or liability under any Environmental Statute which would become available to the public upon request.

7.4.6   Tanks.   Tenant shall not install or cause the installation of any underground storage tank at the Premises without Landlord's prior written consent, which may be withheld in its sole discretion.

7.4.7   Landlord's Representation.   Landlord represents to Tenant that to Landlord's current, actual knowledge that there are no Hazardous Substances in reportable quantities at the Property.  The phrase "current, actual knowledge of Landlord" shall mean and refer only to the current, actual knowledge of the officers of Landlord having direct, operational responsibility for the Property, with the express limitations and qualifications that the knowledge of any contractor or consultant shall not be imputed to Landlord, and none of such officers has made any special investigation or inquiry, and none of such officers has any duty or obligation of diligent investigation or inquiry, or any other duty or obligation, to acquire or to attempt to acquire information beyond or in addition to the current, actual knowledge of such persons.

7.4.8   Indemnification.   NOTWITHSTANDING   ANY   OTHER PROVISION IN THIS LEASE TO THE CONTRARY, TENANT HEREBY AGREES TO INDEMNIFY AND TO HOLD HARMLESS LANDLORD (INCLUDING ANY FUTURE TENANTS IN COMMON THEREOF) AND THE LANDLORD PARTIES AND THEIR RESPECTIVE OFFICERS, DIRECTORS, SHAREHOLDERS, MEMBERS, MANAGERS, PARTNERS AND PRINCIPALS (AND THEIR RESPECTIVE AFFILIATES) OF, FROM AND AGAINST ANY AND ALL EXPENSE, LOSS, COST, CLAIM, DAMAGE, PENALTY, FINE OR LIABILITY OF ANY KIND OR NATURE SUFFERED BY THE INDEMNIFIED PARTY BY REASON OF THE PRESENCE OR RELEASE OF HAZARDOUS SUBSTANCES AT OR FROM THE PREMISES OR THE PROPERTY AS A RESULT OF THE ACTS OR OMISSIONS OF TENANT OR TENANT PARTIES OR TENANT'S BREACH OF ANY OF THE PROVISIONS OF THIS SECTION 7, INCLUDING, WITHOUT LIMITATION:  (A) ANY AND ALL EXPENSES THAT LANDLORD MAY INCUR IN COMPLYING WITH ANY ENVIRONMENTAL STATUTES; (B) ANY AND ALL COSTS THAT LANDLORD MAY INCUR IN STUDYING, ASSESSING, CONTAINING, REMOVING, REMEDYING, MITIGATING OR OTHERWISE RESPONDING TO, THE PRESENCE OR RELEASE OF ANY HAZARDOUS SUBSTANCE AT OR FROM THE PREMISES OR THE PROPERTY IN ACCORDANCE WITH THIS SECTION 7.4; (C) ANY AND ALL COSTS FOR WHICH LANDLORD MAY BE LIABLE TO ANY

29

GOVERNMENTAL AGENCY FOR STUDYING, ASSESSING, CONTAINING, REMOVING, REMEDYING, MITIGATING, OR OTHERWISE RESPONDING TO, THE PRESENCE OR RELEASE OF ANY HAZARDOUS SUBSTANCE AT OR FROM THE PREMISES OR THE PROPERTY; (D) ANY AND ALL FINES OR PENALTIES ASSESSED, OR THREATENED TO BE ASSESSED, UPON THE INDEMNIFIED PARTY BY REASON OF A FAILURE OF TENANT TO COMPLY WITH ANY OBLIGATIONS, COVENANTS OR CONDITIONS SET FORTH IN THIS SECTION 7.4; AND (E) ANY AND ALL REASONABLE LEGAL FEES AND COSTS INCURRED BY LANDLORD IN CONNECTION WITH ANY OF THE FOREGOING.  NOTWITHSTANDING ANY OTHER PROVISION IN THIS LEASE TO THE CONTRARY, LANDLORD HEREBY AGREES TO INDEMNIFY AND TO HOLD HARMLESS TENANT (INCLUDING ANY FUTURE TENANTS IN COMMON THEREOF) AND THE TENANT PARTIES AND THEIR RESPECTIVE OFFICERS, DIRECTORS, SHAREHOLDERS, MEMBERS, MANAGERS, PARTNERS AND PRINCIPALS (AND THEIR RESPECTIVE AFFILIATES) FROM AND AGAINST ANY AND ALL EXPENSE, LOSS, COST, CLAIM, DAMAGE, PENALTY, FINE OR LIABILITY OF ANY KIND OR NATURE SUFFERED BY TENANT BY REASON OF: (A) THE PRESENCE OR RELEASE OF HAZARDOUS SUBSTANCES AT OR FROM THE PREMISES OR THE PROPERTY AS A RESULT OF THE ACTS OR OMISSIONS OF LANDLORD OR LANDLORD PARTIES; (B) THE PRESENCE OF ANY HAZARDOUS SUBSTANCES, IN, ON, UNDER OR ABOUT THE PREMISES OR THE PROPERTY PRIOR TO THE COMMENCEMENT DATE; OR (C) LANDLORD'S BREACH OF ITS OBLIGATIONS UNDER THIS SECTION 7.4 (COLLECTIVELY, "LANDLORD'S ENVIRONMENTAL LIABILITY"), INCLUDING WITHOUT LIMITATION: (A) ANY AND ALL EXPENSES THAT TENANT MAY INCUR IN COMPLYING WITH ANY ENVIRONMENTAL STATUTES TO THE EXTENT RELATING TO LANDLORD'S ENVIRONMENTAL LIABILITY; (B) ANY AND ALL COSTS THAT TENANT MAY INCUR IN STUDYING, ASSESSING, CONTAINING, REMOVING, REMEDYING, MITIGATING OR OTHERWISE RESPONDING TO, THE PRESENCE OR RELEASE OF ANY HAZARDOUS SUBSTANCE AT OR FROM THE PREMISES OR THE PROPERTY TO THE EXTENT RELATING TO LANDLORD'S ENVIRONMENTAL LIABILITY; (C) ANY AND ALL COSTS FOR WHICH TENANT MAY BE LIABLE TO ANY GOVERNMENTAL AGENCY FOR STUDYING, ASSESSING, CONTAINING, REMOVING, REMEDYING, MITIGATING, OR OTHERWISE RESPONDING TO, THE PRESENCE OR RELEASE OF ANY HAZARDOUS SUBSTANCE AT OR FROM THE PREMISES OR THE PROPERTY TO THE EXTENT RELATING TO LANDLORD'S ENVIRONMENTAL LIABILITY; (D) ANY AND ALL FINES OR PENALTIES ASSESSED, OR THREATENED TO BE ASSESSED, UPON TENANT BY REASON OF A FAILURE OF LANDLORD TO COMPLY WITH ANY OBLIGATIONS, COVENANTS OR CONDITIONS SET FORTH IN THIS SECTION 7; AND (E) ANY AND ALL REASONABLE LEGAL FEES AND COSTS INCURRED BY TENANT IN CONNECTION WITH ANY OF THE FOREGOING.  Tenant's and Landlord's obligations under this Section 7.4 shall survive the expiration or earlier termination of the Term of this Lease.  Notwithstanding anything to the contrary in this Section 7.4.8, Tenant shall have no liability to Landlord with respect to Hazardous Substances now or hereafter present at the Property due to the acts or omissions of any party other than Tenant and Tenant Parties, provided, however, that Tenant shall reimburse Landlord for reasonable remediation costs

incurred by Landlord by reason of the presence of Hazardous Substances during the Term (x) at the Premises, or (y) within that portion of the Common Areas constituting the Secure Tenant Outdoor Area, in either event resulting from the activities or negligence of a third party conducting business outside of the Premises and the Property (it being further agreed, however, that the foregoing reimbursement obligation of Tenant shall in no event apply to any such Hazardous Substances that (A) result from the activities or negligence of any other tenant or occupant of the Building or their respective agents, employees, contractors, visitors or invitees, or (B) are present at the Premises or within the Secure Tenant Outdoor Area and result from migration or other movement from any other real property). Tenant's and Landlord's obligations under this Section 7.4.8 shall survive the expiration or earlier termination of the Term of this Lease.

7.4.9  <u>Right to Inspect</u>.  Landlord shall have the right in its sole and absolute discretion, but not the duty, to enter and conduct an inspection of the Premises and the Secure Tenant Outdoor Area, including invasive tests if reasonably required, at any reasonable time and upon reasonable notice, to determine whether Tenant is complying with the terms of this Lease, including but not limited to the compliance of the Premises and the Secure Tenant Outdoor Area and the activities thereon with Environmental Statutes and the existence of Environmental Damages as a result of the condition of the Premises and the Tenant Secure Outdoor Area or surrounding properties and activities thereon. Landlord shall have the right, but not the duty, to retain any independent professional consultant (the "Consultant") to enter the Premises and the Secure Tenant Outdoor Area to conduct such an inspection or to review any report prepared by or for Tenant concerning such compliance.  The cost of the Consultant shall be paid by Landlord unless such investigation discloses a violation of any Environmental Statute by Tenant or the Tenant Parties or the existence of a Hazardous Substances on the Premises and the Secure Tenant Outdoor Area or any other property introduced by Tenant or the Tenant Parties (other than Hazardous Substances used in compliance with all Environmental Statutes), in which case Tenant shall pay the reasonable cost of the Consultant. Tenant hereby grants to Landlord, and the agents, employees, consultants and contractors of Landlord the right to enter the Premises and the Secure Tenant Outdoor Area to perform such tests on the Premises and the Secure Tenant Outdoor Area as are reasonably necessary to conduct such reviews and investigations. Landlord shall use commercially reasonable efforts to minimize interference with the business of Tenant when conducting any such inspections.

7.4.10 <u>Assignment and Subletting</u>.  In the event this Lease provides that Tenant may assign this Lease or sublet the Premises subject to Landlord's consent and/or certain other conditions, and if the proposed assignee's or subtenant's activities in or about the Premises involve the use, handling, storage or disposal of any Hazardous Substances other than those used or permitted to be used by Tenant and in quantities and processes similar to Tenant's uses in compliance with this Lease, (i) it shall be reasonable for Landlord to withhold its consent to such assignment or sublease in light of the risk of contamination posed by such activities and/or (ii) Landlord may, in its sole and absolute discretion, impose an additional condition to such assignment or sublease which requires Tenant to reasonably establish that such assignee's or subtenant's activities pose no materially greater risk of contamination to the Premises than do Tenant's permitted activities in view of:  (a) the quantities, toxicity and other properties of the Hazardous Substances to be used by such assignee or subtenant;  (b) the precautions against a

31

release of Hazardous Substances such assignee or subtenant agrees to implement; (c) such assignee's or subtenant's financial condition as it relates to its ability to fund a major clean-up; and (d) such assignee's or subtenant's policy and historical record respecting its willingness to respond to the clean-up of a release of Hazardous Substances.

7.5    Common Areas.

7.5.1    Tenant shall have the non-exclusive right to use the Common Areas in common with other persons approved by Landlord during the Term, subject to Section 1.6 hereof with respect to exclusive use and enjoyment of the Secure Tenant Outdoor Area and to reasonable rules and regulations uniformly established by Landlord from time to time and the provisions of this Lease. Tenant shall comply with the reasonable rules and regulations of the Property as established from time to time by Landlord upon at least 30 days' written notice to Tenant, provided they: (i) do not adversely affect the normal conduct of any business operations in the Premises (it being agreed by Landlord and Tenant that Tenant shall not be relieved of its duty to comply with any rules and regulations which adversely affect Tenant's business operations in any non-material or de minimis manner); (ii) do not adversely affect any of Tenant's rights under this Lease (it being agreed by Landlord and Tenant that Tenant shall not be relieved of its duty to comply with any rules and regulations which adversely affect Tenant's rights under this Lease in any non-material or de minimis manner); and (iii) are uniformly enforced against all tenants of the Property and without prejudice against Tenant. In the event of any conflict or inconsistency between the rules and regulations of the Property and this Lease, this Lease shall govern.

7.5.2    Throughout the Term, Landlord shall keep the Common Areas that reasonably require lighting in conformance with commercially reasonable management standards. During the Term, any construction or repair by Landlord permitted or required under this Lease and undertaken at the Building or in the Common Areas (including without limitation the Secure Tenant Outdoor Area) which shall be reasonably expected to materially affect Tenant's operations at the Premises, or egress or ingress to the Premises, then such construction or repair shall not commence until the date which five (5) days following Tenant's receipt of notice of such work to be completed (except in an emergency, in which event Landlord shall only be required to give such notice as is reasonable under the circumstances).

7.5.3    Neither (x) the main access drives from the public streets to the Premises, including, without limitation, the Secure Tenant Outdoor Area, nor (y) the Premises or the Common Areas, all of the foregoing as shown on Exhibit A hereto, shall be interrupted or disturbed by any act or omission of Landlord during the Term, except: (i) in the event of an emergency or as may be otherwise required by Applicable Laws, in which event Landlord shall use reasonable efforts to give Tenant advance notice of same and to minimize interference to Tenant's normal business operations in the Premises as a result thereof; or (ii) in the event that Landlord is required to temporarily close such areas, for the minimum time legally necessary to prevent a dedication thereof or an accrual of any rights in any person or the public generally therein; and Landlord shall give Tenant prior reasonable notice thereof, or (iii) in the event that Landlord is required to temporarily close such areas, for repair or maintenance; and Landlord shall give Tenant prior reasonable notice thereof. Landlord shall not, without obtaining Tenant's

prior written consent in each instance, which consent may be withheld in its sole discretion:  (i) construct or permit to be constructed any structures (which shall not include paved areas or landscaping) on the Land other than the Building as shown on <u>Exhibit A</u> hereto; or (ii) except in case of an emergency or if required by Applicable Law, court order, or the requirements of any governmental authority, materially change the entrances or exits to and from the Land or the Building or in the Secure Tenant Outdoor Area from those shown on <u>Exhibit A</u> hereto which would adversely impact Tenant's egress or ingress to the Premises or the Common Area, including, without limitation the Secure Tenant Outdoor Area.  Further, Landlord shall not, without obtaining Tenant's prior written consent in each instance, which consent may be withheld in its sole discretion, modify the Common Areas in a manner that will materially and adversely affect the normal operation of Tenant's business.

7.5.4    Landlord shall not use or permit the use of all or any portion of the Common Areas for retail sales or for promotional purposes.

7.6    <u>Parking</u>.  Tenant shall be entitled to use those spaces in the vehicle parking area located adjacent to the Premises, as shown on <u>Exhibit A</u> attached hereto, without paying any additional Rent, other than the usual Operating Expenses pursuant to the terms and conditions of this Lease. Except with respect to spaces located within the Secure Tenant Outdoor Area, Tenant's parking shall not be reserved and shall be limited to vehicles no larger than standard size automobiles or pickup utility vehicles. All trucks (delivery or otherwise) and trailers of Tenant shall only be parked in front of, adjacent and perpendicular to Tenant's dock high loading doors at the Premises, so as to be on the concrete apron adjacent to such doors or in the areas designated on <u>Exhibit A</u>. Handicapped spaces shall only be used by those legally permitted to use them. At such times during the Lease Term that the remainder of the Building (i.e., those tenantable areas outside of the Premises) is occupied by third party tenant(s), Tenant's employees and invitees shall only park in those areas labeled "Employee/Invitee Parking" on <u>Exhibit A</u>, and if Tenant's employees or invitees park in any other parking areas at the Property, Landlord shall have the right to have such vehicles towed at the vehicle owner's expense. If there are more than three (3) such violations in any calendar year, each of which result in Landlord's towing of the subject vehicle, then Tenant shall pay a daily charge (not to exceed $100) determined by Landlord for each such additional violating vehicle that is towed by Landlord during the balance of the calendar year.  Once any other tenant occupies a portion of the Building Landlord shall install reasonable signage within the Common Areas located outside of the "Employee/Invitee Parking" area, advising Tenant's employees and visitors as to the foregoing prohibition on parking, and the costs of such signage shall be treated as an Operating Expense.

8.    <u>Alterations and Tenant's Property</u>.

8.1    <u>Alterations Defined</u>.

8.1.1    Tenant shall not make or suffer or allow to be made any alterations, additions or improvements in or to the Premises (collectively, "Alterations") without first obtaining Landlord's written consent based on detailed plans and specifications submitted by Tenant ; provided, however, that Landlord's consent will not be required if: (a) the proposed

Alterations are less than $250,000 in cost, will not adversely affect the structure of the Building or the mechanical, electrical, HVAC, plumbing or life safety systems of the Building (collectively, "Building Systems"), do not include penetrations of the floor slab or roof membrane, and are not visible from the exterior of the Building.  In all other instances where Landlord's consent is so required, Landlord shall not unreasonably withhold, condition or delay its consent.  In all events, Tenant shall notify Landlord prior to commencing Alterations other than de minimis Alterations and shall provide plans for Landlord's records.  Landlord shall have the right, in its reasonable discretion, to determine the location of any Alterations (that may include the installation of equipment or other items) that are visible from outside the Building, either (x) at ground level from within the Property, or (y) at ground level from that portion of Valley Parkway extending from Ace Lane south to the Highway 121 frontage road, and Landlord and Tenant shall mutually agree as to whether screening of such items (or in the alternative, the painting of such items in the same color of the Building to minimize aesthetic differences in the appearance thereof) is reasonably required so as to prevent an unsightly appearance of such items from either of the locations described in the preceding clauses (x) or (y), which screening or painting shall be performed at the sole cost and expense of Tenant; provided, however, that screening will only be required to the extent necessary to conform the appearance of the Building to that of other comparable Class A industrial warehouse buildings in the Dallas-Fort Worth Metropolitan Area.  Landlord shall include similar terms and conditions (with respect to such screening or painting) in its lease with any other tenant of the Building; provided, however, that screening will only be required to the extent necessary to conform the appearance of the Building to that of other comparable Class A industrial warehouse buildings in the Dallas-Fort Worth Metropolitan Area.  Notwithstanding any language to the contrary in this Lease, Tenant shall have no obligation to paint or screen any rooftop equipment existing as of the date of this Lease.

8.1.2    Tenant agrees that all such work (regardless of whether Landlord's consent is required) shall be done at Tenant's sole cost and expense, in accordance with the plans and specifications provided to Landlord and in a good and workmanlike manner, that the structural integrity of the Building shall not be impaired, and that no liens shall attach to all or any part of the Premises or the Building by reason thereof.  Tenant shall obtain, at its sole expense, all permits required for such work. Landlord shall execute and return to Tenant all appropriately completed building department or equivalent applications within ten (10) days after Tenant's request therefor, and will reasonably cooperate with Tenant in the permitting process , provided that Landlord is not obligated to incur any out-of-pocket costs in doing so.  If any violation of any Applicable Law is noted against the Property or the Premises (other than a violation caused by Tenant) prevents Tenant from obtaining a building permit for any Alterations or a certificate of occupancy, then, upon request by Tenant, Landlord shall promptly and diligently cause such violation to be removed of record to the extent required to permit Tenant to obtain its building permit or certificate of occupancy, as the case may be.

8.1.3    Except for Legal Compliance Work, Landlord shall not make any Alterations to the Premises nor shall Landlord construct an additional floor or floors above the Premises.  Landlord shall neither make nor permit to be made any Alterations to the exterior architectural theme of the Property which would be inconsistent with a first-class industrial warehouse use in the Dallas-Fort Worth Metropolitan Area without the prior consent of Tenant.

34

8.1.4    Tenant shall pay when due all claims for labor and material furnished to the Premises or alleged to have been furnished to or for Tenant at or for use of the Premises.   Tenant shall give Landlord at least thirty (30) days' prior written notice of the commencement of any work on the Premises, regardless of whether Landlord's consent to such work is required. Landlord may elect to record and post notices of non-responsibility in, on or about the Premises, to the extent permitted under Applicable Law.

8.1.5    To the extent Landlord's prior consent is required by this Section 8, Landlord may condition its consent to any proposed Tenant's Alterations on (i) Tenant's submission to Landlord, for Landlord's prior written approval, of all plans and specifications relating to Tenant's Alterations, (ii) Landlord's prior written approval of the contractors and subcontractors performing Tenant's Alterations; (iii) Tenant's written notice of whether Tenant's Alterations include the use or handling of any Hazardous Substances; (iv) Tenant's obtaining all applicable permits from the governmental authorities and the furnishing of copies of such permits to Landlord before the commencement of work on the subject Tenant's Alterations; and (v) Tenant's agreement to reimburse Landlord for reasonable fees incurred for third party architects and engineers hired by Landlord to review Tenant's Alterations, including, but not limited to, costs incurred in reviewing the plans and specifications for, and the progress of, Tenant's Alterations, and as applicable the costs of for structural engineering and other review, all as may be reasonably required.

8.1.6    Within thirty (30) days following the imposition of any mechanics or other lien or stop notice filed with respect to the Premises or the Property, or any portion thereof, based upon any act of Tenant or of anyone claiming by, through or under Tenant, or based upon work performed or materials supplied allegedly for Tenant, (an "Imposition"), Tenant shall either (a) cause such Imposition to be released of record by payment, or (b) in case of a disputed Imposition, cause the posting of a proper bond (pursuant to Applicable Law under which a court issues an order that discharges the lien) or provide other security reasonably satisfactory to Landlord.   Provided that the Imposition is timely released or bonded over, Tenant shall have the right to contest the validity of the obligation underlying the Imposition. TENANT SHALL DILIGENTLY CONTEST SUCH IMPOSITION AND INDEMNIFY, DEFEND, AND HOLD LANDLORD HARMLESS FROM ANY AND ALL LOSS, COST, DAMAGE, LIABILITY AND EXPENSE (INCLUDING REASONABLE ATTORNEYS' FEES) ARISING FROM OR RELATED TO IT.   Landlord may require Tenant to pay Landlord's reasonable attorneys' fees and costs incurred while participating in such action if Landlord shall decide it is in its best interest to so participate.   If Tenant fails to take either action within such thirty (30)-day period, Landlord, at its election, may pay and satisfy the Imposition, in which case the sum so paid by Landlord, with interest at the Lease Interest Rate from the date of payment, shall be deemed Additional Rent due and payable by Tenant within ten (10) days after Tenant's receipt of Landlord's payment demand.   Nothing in this Lease shall be construed as consent on the part of Landlord to subject the interest and estate of Landlord to liability under any applicable lien law for any reason or purpose whatsoever, it being expressly understood that Landlord's interest and estate shall not be subject to such liability and that no person shall have any right to assert any such lien.

8.1.7    Notwithstanding any language to the contrary in this Section 8, if the proposed Tenant's Alterations involve or affect in any way one or more of the structural components of the Building, or relate in any way to life safety matters, including, but not limited to, the Building's fire suppression system (collectively, the "Structural and Safety Alterations"), Landlord's prior written consent will be required, regardless of the cost of the proposed Tenant's Alterations. Moreover, Tenant agrees to use contractors and subcontractors reasonably approved by Landlord for the construction of any and all permitted Structural and Safety Alterations, and for any work involving possible roof penetrations (so as to ensure that any such work is performed properly and does not render any applicable roof warranty void or voidable).

8.1.8    Tenant acknowledges and agrees that any Tenant's Alterations are wholly optional with Tenant and are not being required by Landlord, either as a condition to the effectiveness of this Lease or otherwise.

8.2    <u>Removal of Property</u>.  Upon the termination of this Lease, Tenant shall surrender the Premises to Landlord, broom clean and in the same condition as received (including, without limitation, the removal of all floor striping and the resealing of the floor, but only to the extent such resealing is necessitated by the removal of such floor striping), ordinary wear and tear excepted; provided, however, that (a) "ordinary wear and tear" shall not include any damage or deterioration that would or could have been prevented by good maintenance practice or by Tenant performing all of its obligations under this Lease, and (b) Tenant shall not be obligated to repair any damage which Landlord is required to repair under this Lease.  In addition, Landlord may require Tenant to remove any Tenant's Alterations (whether or not made with Landlord's consent) and Tenant's Work comprising the approximately 24,000 square feet of the main office to be located within the Premises (or any improvements therein) prior to the expiration of this Lease and to restore the Property to its prior condition, all at Tenant's expense; provided, however, the Tenant is under no obligation to remove any of the improvements generally described on the attached <u>Exhibit F</u> (and their like-kind replacements) from the Premises or Property.  All Alterations that are not required to be removed shall become the property of Landlord and shall be surrendered to Landlord upon the expiration or earlier termination of this Lease.  However (i) movable equipment, trade fixtures, personal property (including inventory in the Premises), furniture, or any other items that can be removed without material harm to the Building will remain Tenant's property; and (ii) the racks to be installed by Tenant (collectively, "Tenant Owned Property") shall not become the property of Landlord but shall be removed by Tenant upon the expiration or earlier termination of this Lease.  All Tenant Owned Property shall be removed from the Premises at Tenant's sole cost and expense at the expiration or sooner termination of this Lease.  Tenant shall repair, at its sole cost and expense, all damage caused to the Premises, the Building or the Property by removal of any Tenant Owned Property or any Alterations. Landlord may remove any Tenant Owned Property that Tenant is required but fails to remove at the expiration or earlier termination of this Lease and Tenant shall pay to Landlord the reasonable cost of removal.   If Tenant fails, by the expiration or earlier termination of the Lease Term, to restore the Property to the condition required under this Section 8.2, then Tenant shall pay Landlord on demand an amount equal to the cost of such restoration work, plus an administration fee equal to ten percent (10%) of such amount, in addition to any other remedy Landlord may have under this Lease or Applicable Law for such breach. If Tenant fails to surrender the Property to Landlord upon termination of this Lease in the

condition required by this Section, including, without limitation, the completion of any remediation work required under Section 7.4 above, such failure shall constitute a holdover for purposes of Section 27.7 below (provided, however, that such failure shall not by itself result in consequential damages being payable by Tenant pursuant to Section 27.7 below). Tenant's obligations under this Section 8.2 shall survive the expiration or earlier termination of this Lease.

Tenant may assign, hypothecate, encumber, mortgage or create a security interest in or upon Tenant Owned Property in the Premises without the consent of Landlord and may remove Tenant Owned Property at any time during the Term.  To the extent Landlord may have a lien on or security interest in the Tenant Owned Property pursuant to this Lease, by law or otherwise, Landlord agrees to subordinate any such lien to the perfected security interest in favor of Tenant's present or future lender, subject to terms and conditions reasonably acceptable to Landlord.  Landlord shall provide to Tenant or Tenant's lender, within thirty (30) days after Tenant's request therefor, a written Landlord's Lien Subordination Agreement, substantially in the form of that attached hereto as Exhibit C. Notwithstanding anything contained in this Lease, Landlord hereby expressly waives and agrees not to assert any lien or security interest upon any inventory or merchandise of Tenant, whether located within or without the Premises.

8.3    Solar Array.  Landlord hereby grants Tenant the right to install a solar system on the roof of the Building above the Premises initially demised under this Lease and, as applicable, above such additional portions of the Building as Tenant may hereafter lease in accordance with Addendum 1 to this Lease attached hereto and incorporated into this Lease by reference. Tenant agrees that it shall not permit any unrelated third party (other than its subtenant of the Premises, as applicable) to utilize the solar system installed by Tenant pursuant to this Lease.

8.4    Energy Rebates.  Landlord and Tenant agree that in the event that Tenant, at Tenant's expense, shall perform or cause to be performed any Alterations or improvements (including without limitation Tenant's Work) to, or within, the Premises which would cause an owner or occupant of the Premises to be entitled to an "Energy Rebate" (hereinafter defined), then Tenant shall be solely entitled to the benefit of such Energy Rebate. As used herein, an "Energy Rebate" shall be deemed to be any rebate, refund, voucher, credit, tax relief, abatement, or other monetary inducement (such as, for examples only, energy efficiency incentives, property tax abatements, sales tax refunds, tax credits, governmental grants, utility rebates or refunds) given by a governmental, non-governmental, private or public utility, or other entity as a result of efforts to conserve energy or other utilities or cause property or processes to be more environmentally friendly. If any such Energy Rebate is required to be paid or credited directly to Landlord, then: (i) Landlord shall elect to take the Energy Rebate in a lump sum, or if that is not permitted, then in the shortest number of installments possible, so as to permit Tenant to recoup the full amount of the Energy Rebate during the Term of this Lease, and (ii) within thirty (30) days after Landlord's receipt of the Energy Rebate, Landlord shall deliver a check to Tenant for such amount.

8.5    Signs.  Tenant shall not place any signs on the Premises, Building or Property except with the prior written consent of Landlord, including consent as to location and design, which consent shall not be unreasonably withheld, conditioned or delayed, provided that

37

Tenant may place exterior signs on the exterior of and in front of the Premises in locations mutually reasonably acceptable to Landlord and Tenant, provided that any and all such signs shall be installed and shall be maintained by Tenant, at its sole cost and expense, and shall be in compliance with all Applicable Laws.   Tenant shall be responsible to Landlord for the installation, use, or maintenance of said signs and any damage caused thereby.  Tenant agrees to remove all of its signs prior to termination of the Lease and upon such removal to repair all damage incident to such removal.  Any signs, notices, logos, pictures, names or advertisements which are installed and that have not been separately approved by in writing by Landlord, may be removed by Landlord if not removed by Tenant within twenty (20) days after notice to Tenant requiring such removal, at Tenant's sole cost and expense.

8.6    Roof Access.  Anything in this Lease to the contrary notwithstanding, Tenant shall provide Landlord with prior notice of any intent by Tenant or any of its employees, agents, contractors or invitees to enter on or in any way move about on the roof of the Building, for any purposes whatsoever, which notice shall include who will access the roof, when and for what purpose, and Tenant agrees that it shall use commercially reasonable efforts to coordinate with Landlord or its selected agents or contractors. Landlord shall in each instance cooperate to ensure Tenant's timely access to the roof of the Building as requested by Tenant.

8.7    Floor Load Limits.  Tenant shall not place a load upon any floor of the Premises exceeding the floor load per square foot area which it was designed to carry.

8.8    Floor Bolt Anchors.  Prior to anchoring any racking or equipment to the floor of the Premises, Tenant shall drill the holes for any anchor bolts to a depth that is one inch (1") deeper than normally required for such anchoring mechanism. Upon the expiration or earlier termination of this Lease, Tenant shall cut the top off the anchor bolts, pound the remaining bolt into the one inch (1") space described above, and pour epoxy filler into the existing hole so that the epoxy filler is flush with the floor, all at Tenant's sole cost and expense.

9.    Repairs and Other Work.

9.1    Tenant's Obligations.

9.1.1    Subject to Landlord's repair obligations set forth in this Lease, Tenant shall maintain in good, clean and sanitary order and condition (including repair and replacement, as needed), the Premises and every non-structural part thereof, including, without limiting, the generality of the foregoing, all plumbing, heating, air conditioning, ventilating, electrical, lighting facilities and equipment within and exclusively serving the Premises, fixtures, interior walls, ceilings, floors, windows, doors, and plate glass located within the Premises, and signs reflecting Tenant's presence in the Premises.

9.1.2    Tenant will not overload the electrical wiring serving the Premises or within the Premises, and will install at its expense, subject to the provisions of this Lease, any additional electrical wiring which may be required in connection with Tenant's apparatus.

9.1.3   Subject to the terms of Section 13, Tenant will repair, at its expense, any damage to the Premises, or to the Property, arising out of Tenant's use or occupancy thereof, including damage caused by bringing into the Premises any property for Tenant's use or by the installation or removal of such property, all regardless of fault, or by whom such damage shall be caused, unless caused by Landlord or Landlord Parties.

9.1.4   If any portion of the Premises or any system or equipment in the Premises that Tenant is obligated to repair pursuant to this Lease cannot be fully repaired or restored (in Landlord's reasonable judgment), Tenant shall promptly replace (subject to Landlord's right to undertake such responsibility) such portion of the Premises or system or equipment in the Premises.  The cost of such replacement shall be amortized (using a rate of interest reasonably determined by Landlord) over the useful life as reasonably determined by Landlord, and Tenant shall only be liable for that portion of the cost which is applicable to the remaining Lease Term (as it may be extended) (the "Useful Life Allocation"), and if the full replacement cost is initially borne by Tenant, Landlord shall reimburse Tenant or provide Tenant with a credit against future Rent obligations in an amount equal to Landlord's share of such total cost.  Tenant shall maintain a preventive maintenance service contract providing for the regular inspection and maintenance of the heating and air conditioning systems exclusively serving the Premises (the "HVAC Systems") by a licensed heating and air conditioning contractor, Notwithstanding any language to the contrary in this Section, Tenant shall pay the full cost of such repair or replacement of the HVAC Systems and is not entitled to the benefit of the Useful Life Allocation if Tenant has failed to obtain and maintain the preventive maintenance contracts for the HVAC Systems, as required above (and assuming Landlord has not elected to do so).  If any part of the Property is damaged by any act or omission of Tenant (such as damage to the floor slab caused by overloading), Tenant shall pay Landlord the cost of repairing or replacing such damaged property, whether or not Landlord would otherwise be obligated to pay the cost of maintaining or repairing such property and without the benefit of the Useful Life Allocation.  It is the intention of Landlord and Tenant that, at all times during the Lease Term, Tenant shall maintain the Premises in an attractive, first-class and fully operative condition.  Without limiting the generality of the provisions contained above in this Section, Tenant agrees to pay Landlord the reasonable cost of repairing any damage caused by the transportation and storage of its products in, on, or about the Property, including, but not limited to any damage to the Building's concrete floor slab, adjoining concrete ramps, adjoining concrete truck apron, and adjoining concrete or asphalt parking and access areas due to the use of forklifts or other equipment or vehicles hauling Tenant's products or otherwise.  Tenant's obligation described in the immediately preceding sentence shall include the cost of replacement of any damaged areas of the Property, if repair is impracticable, so as to restore such areas to the condition existing prior to such damage and in such event Tenant shall not be entitled to the benefit of the Useful Life Allocation. Tenant's duties and obligations pursuant to this Section 9.1 shall be subject to Article 13 of this Lease, as applicable.

9.1.5   Tenant, as part of Tenant's Work, will caulk the joints of that portion of the Building's concrete floor slab located at the Premises, and during the Lease Term Tenant shall maintain and repair (and replace, as needed) such caulking at its sole cost and expense.

39

9.2    <u>Conditions Applicable to Repairs and Other Work</u>.    All repairs, replacements and reconstruction (including, without limitation, all Alterations) made by or on behalf of Tenant shall be made and performed: (a) at Tenant's cost and expense; (b) by appropriately licensed contractors or mechanics reasonably approved by Landlord; (c) in a good workmanlike condition and in full compliance with Article 10 below and at least equal in quality of materials and workmanship to the original work or installation; (d) in accordance with all Applicable Laws and regulations of governmental authorities having jurisdiction over the Premises; and (e) Tenant shall provide Landlord with as built drawings of such Alterations (if applicable).

9.3    <u>Landlord's Obligations</u>.    Subject to the terms of Section 13, Landlord shall perform, as the same shall from time to time be necessary, all repair, maintenance and replacement of: (1) the exterior walls of the Building, including, without limitation, repainting the exterior walls of the Building (but excluding the hardware and painting or other treatment of interior walls); (2) the structural elements of the Building (including, but not limited to, roof, roof joists, columns, footings, and foundations); (3) exterior utility lines serving the Premises; (4) all utility lines and ducts passing through the Premises which do not exclusively serve the Premises; (5) gutters, flashing, downspouts and scuppers; (6) the Building's floor slab, subject to Tenant's responsibility for repair of any damage thereto attributable to Tenant (subject to Article 13 of this Lease, as applicable) and Tenant's responsibility for the initial caulking of the joints located at the Premises and repair of such caulking, as provided in Section 9.1.5; (7) all exterior fencing at the Property; and (8) the Premises or the Building to the extent of damage caused by the negligence or misconduct of Landlord or Landlord Parties (collectively, the "Landlord Repairs"). Landlord shall perform (or cause to be performed) Landlord Repairs at Landlord's sole cost and expense and such costs shall not be included in Operating Expenses (unless their inclusion is permitted in Section 6) in a good, workmanlike and lien-free fashion, and in accordance with all Applicable Laws. Landlord shall provide not less than forty-eight (48) hours prior notice of any Landlord Repairs that are reasonably expected to interfere with the normal operation of Tenant's business at the Premises (except in the event of an emergency posing imminent risk of harm to persons or property, in which case Landlord shall use good faith efforts to provide such notice to Tenant as is reasonable under the circumstances) and shall use reasonable efforts not to unreasonably interfere with Tenant's use of the Premises in performing the Landlord Repairs. Landlord shall perform Landlord Repairs in accordance with sound property management practices for an industrial/warehouse facility determined with reference to other attractive, first-class and fully operative industrial/warehouse facilities in the Dallas-Fort Worth Metropolitan Area. Notwithstanding the foregoing, if any Landlord Repairs or Common Area Repairs (defined below) are required as a result of any Alterations, any negligence or misconduct of Tenant or any Tenant Parties, or the misuse of the Premises or the Property by Tenant or any Tenant Parties, subject to the terms of Section 13, Tenant shall reimburse Landlord for all reasonable costs incurred by Landlord for such work within thirty (30) days after demand as Additional Rent. Landlord shall maintain, repair and replace the Common Areas (collectively, "Common Area Repairs") as required by this Lease, and otherwise to the standard by which common areas of comparable industrial/warehouse facilities in Lewisville, Texas are operated, maintained, repaired and replaced, <u>including</u>, <u>without limitation</u>, rubbish and debris removal and paving, landscaping (including, without limitation, the trimming and pruning of trees to avoid interference with the use or visibility of canopies or signs on the exterior of the

40

Premises) for the Common Areas, adequate lighting, and drainage, provided that the cost of such activities shall be reimbursable as Operating Expenses to the extent permitted in Section 6. Landlord shall not be liable for any injury to or interference with Tenant's business arising from any repairs, maintenance, alteration or improvement in or to any portion of the Property, including, without limitation, the Premises, or in or to the fixtures, appurtenances and equipment therein required pursuant to this Section 9.3, provided that the foregoing shall not be interpreted to limit Landlord's obligation to use reasonable efforts to not interfere with Tenant's operations at the Premises during such maintenance or repairs.

10.    Liens.  Within thirty (30) days after notice of the filing thereof, Tenant shall discharge (either by payment or by filing of the necessary bond, or otherwise) any lien against the Premises, the Property and/or Landlord's interest therein, which may arise out of any payment due for, or purported to be due for, any labor, services, materials, supplies or equipment alleged to have been furnished to or for Tenant in, upon or about the Premises or the Property. Similarly, within thirty (30) days after notice of the filing thereof, Landlord shall discharge (either by payment or by filing of the necessary bond, or otherwise) any lien against the Premises, the Property and/or Landlord's interest therein, which may arise out of any payment due for, or purported to be due for, any labor, services, materials, supplies or equipment alleged to have been furnished to or for Landlord in, upon or about the Premises or the Property.

11.    Subordination.

11.1    Provided Tenant is provided with a subordination, non-disturbance and attornment agreement ("SNDA"), in the form attached hereto as Exhibit D executed by the mortgagee or comparable party, this Lease shall be subject and subordinate at all times to: (a) the lien of the mortgage, deed of trust or other security instrument that exists in any amount for which the Property or any portion thereof, or Landlord's interest or estate therein, is specified as security; and (b) all modifications, renewals, supplements, consolidations and replacements thereof in accordance with such SNDA. Landlord reserves the right to subject and subordinate this Lease at all times to any future ground or underlying leases encumbering or affecting all or any part of the Property; provided, however, that any ground lessor shall execute and deliver to Tenant a fee owner recognition agreement, which shall include the following provisions:  (i) provided that there is then no Event of Default under this Lease, the ground lessor will not, in the exercise of any of the rights arising or which may arise out of such lease, disturb or deprive Tenant  in or of its possession or its rights to possession of the Premises or of any right or privilege granted to or inuring to the benefit of Tenant under this Lease; (ii) in the event of the termination of the ground or underlying lease, Tenant will not be made a party in any removal or eviction action or proceeding, nor shall Tenant be evicted or removed of its possession or its right of possession of the Premises, and this Lease shall continue in full force and effect as a direct lease between the ground lessor and Tenant for the remainder of the Term and on the same terms and conditions as contained herein, without the necessity of executing a new lease; and (iii) Landlord and Tenant shall have the right to execute any amendment to this Lease which is specifically required hereunder and the ground lessor shall recognize and be bound thereto. Landlord shall pay any reasonable legal fees incurred by Tenant in connection with its review and negotiation of said fee owner recognition agreement, within thirty (30) days after written

41

request by Tenant, provided, however, that Landlord's liability under this sentence shall not exceed the sum of $2,500.00.

11.2    Consistent with Section 11.1 above, concurrently with its execution and delivery of this Lease, Tenant agrees to execute a SNDA substantially in the form attached hereto as <u>Exhibit D</u> to effectuate the foregoing subordination.  In case of a request from a future mortgagee or prospective mortgagee to subordinate this Lease to the lien of its mortgage, deed of trust or other security instrument, Tenant covenants to consider, in good faith, and to promptly execute such other reasonable and customary SNDA or other subordination documents that also provide for non-disturbance of Tenant as herein required (or, as applicable, other documents designed to make this Lease prior to the lien of any such mortgage, deed of trust or other security instrument, as the case may be) submitted by Landlord to Tenant (with commercially reasonable modifications that Tenant may request), which documents may contain such other terms as such mortgagee or prospective mortgagee may reasonably require.  Notwithstanding the foregoing, any future SNDA or other instrument providing for the subordination of this Lease to a future mortgage, deed of trust or other security instrument as aforesaid shall include provisions to the effect that (i) no default by Landlord under any such  security instrument shall affect Tenant's rights under this Lease so long as Tenant is not in default of its obligations under this Lease beyond the applicable notice and grace periods provided herein; (ii) Tenant will not be named as a party in any foreclosure or other proceedings with respect to any such security instrument (except only if applicable law requires Tenant to be made a party thereto as a condition to proceeding against Landlord or protecting such rights, in which case the lien holder may so name or join Tenant as a party so long as the lien holder shall not seek any remedy against Tenant with respect thereto nor shall such naming or joining result in any cost or expense to Tenant); (iii) the lien holder agrees that the insurance proceeds resulting from any fire or other casualty and the proceeds payable from any taking by eminent domain will be made available for restoration of the Premises or any other part of the Property in the manner set forth in this Lease; and (iv) Landlord and Tenant shall have the right to execute any amendment to this Lease which is specifically required under this Lease and the lien holder shall recognize and be bound thereto).

12.    <u>Inability to Perform</u>.  If, by reason of acts of God, governmental restrictions, strikes, labor disturbances, shortages of materials or supplies or any other cause or event beyond Landlord's or Tenant's reasonable control (collectively, "Force Majeure Events"), Landlord or Tenant is unable to furnish or is delayed in furnishing any utility or service required to be furnished by either party under the provisions of this Lease, or either party hereto is unable to perform or make or is delayed in performing or making any installations, decorations, repairs, alterations, additions or improvements required to be performed or made under this Lease, no such inability or delay shall impose any liability upon such non-performing party or provide the other party with any right to offset, deduction or abatement of Rent by reason of inconvenience or annoyance to such other party, or otherwise.  The terms of this Section 12 shall not be applicable to or excuse any failing on the part of Tenant to satisfy Tenant's obligations to pay Rent or other required payments to Landlord.

DMWEST #12993214 v14

13.    <u>Destruction.</u>

13.1    <u>Repair.</u>  Subject to the provisions of Sections 13.2, 13.3, 13.4 and 13.5 below, if any portion of the Building, including without limitation the leasehold improvements located within the Premises, is damaged by fire or other casualty insured by the property insurance Landlord is required to maintain under this Lease, Landlord shall proceed immediately to make such repairs and replacements in accordance with Section 13.5.

13.2    <u>Tenant's Right to Terminate.</u>  If such damage causes all or any material portion of the Premises to be untenantable or inaccessible by Tenant for a period in excess of six (6) months, or in the reasonable opinion of a third party contractor approved by Landlord and Tenant in the exercise of their reasonable discretion, such damage cannot be repaired within twelve (12) months after the date of the event causing such damage (under a normal construction schedule not requiring the payment of overtime or premium) or, if commenced, such repairs are not completed within fourteen (14) months after the date of the event causing such damage, Tenant may terminate this Lease by delivery of written notice to Landlord within, as applicable: (i) thirty (30) days after the date on which such contractor's opinion is delivered to Tenant; or (ii) fourteen (14) months after the date of the event causing such damage if by such date the repairs are not substantially completed.  Upon termination, Rent shall be apportioned as of the date of the damage and, provided Tenant is not in default, all prepaid Rent shall be repaid to Tenant.

13.3    <u>Landlord's Right to Terminate.</u>  In the event of a fire or other casualty which shall damage or destroy all or a portion of the Premises and/or the Common Areas, all or any portion of which fire or other casualty is not insurable (which term shall not include or relate to a deductible) under the casualty insurance coverage required to be carried by Landlord pursuant to this Lease (as opposed to a casualty which is (i) intended to be covered by the policies described in this Lease but which, in fact, is not covered by the policies actually obtained by Landlord, or (ii) covered by such policies, but with respect to which the insurer refuses to pay the proceeds thereof), then Landlord's responsibility for the repair and restoration of such  damage or destruction shall be limited to an expenditure of Five Hundred Thousand ($500,000.00) Dollars ) (the "Uninsured Obligation"), in addition to the insurance proceeds (and deductibles) referred to in the foregoing clauses (i) and (ii) (all of the foregoing being referred to as the "Available Restoration Amount"). If the Available Restoration Amount is not sufficient to rebuild and restore the Premises and the Common Areas, then Landlord shall have no obligation to rebuild and restore the same (but may, in any event, elect to do so), provided that Landlord shall give Tenant notice thereof within forty-five (45) days following such fire or other casualty, which notice shall include an independent architect's certification as to the estimated cost of the repair and restoration work to the Premises and Common Areas (the "Restoration Cost"). Tenant shall have the right, but not the obligation, exercisable within thirty (30) days after receipt of Landlord's notice, to give Landlord notice of its intention to provide the funds (the "Remaining Funds") for the repair and restoration of the Premises and/or the Common Areas, which Remaining Funds shall not exceed the difference between the Restoration Cost and the Uninsured Obligation. If Tenant shall elect to provide the Remaining Funds, then Landlord shall promptly commence and diligently complete such repair and restoration work to the Premises as otherwise provided and subject to the provisions of this Section, and the Remaining Funds shall be paid to Landlord upon completion of such restoration.  If Tenant shall decline to provide the

Remaining Funds for such rebuilding and restoration, then Tenant shall have the right to terminate this Lease as of the end of such thirty (30)-day period, in which event neither party shall have any liability to the other hereunder (except as expressly provided for herein).

13.4    <u>Last Two Years</u>.  If the Premises are substantially destroyed by fire or other casualty during the last two (2) years of the Term to the extent of more than one-third (1/3) of the Floor Area thereof, Landlord or Tenant shall each have the right to terminate this Lease as of the date of such damage or destruction by giving notice within thirty (30) days following such damage or destruction, but Tenant may negate any termination by Landlord by agreeing to extend the Term for an additional five (5) year period by exercising an option pursuant to this Lease, if available, within ten (10) days after receipt of the termination notice from Landlord.

13.5    <u>Extent of Repair Obligations</u>.  If this Lease is not terminated, Landlord's repair and replacement obligations shall extend to the Common Areas, the structure of the Building and all improvements therein (except Tenant Owned Property) and otherwise in accordance with all laws, ordinances, rules or regulations then in effect, and Tenant shall repair all Tenant Owned Property. All such repairs and replacements shall be performed in a good and workmanlike manner, with due diligence, and shall restore the items repaired to substantially the same usefulness and construction as existed immediately before the damage.  All work by Tenant shall be performed in accordance with the requirements of Section 9.2 above.  In the event of any termination of this Lease, the proceeds from any of Landlord's insurance paid by reason of damage to or destruction of the Property or any portion thereof, or any other element, component or property insured by Landlord, shall belong to and be paid to Landlord or its lender. Notwithstanding any language to the contrary in this Lease, Landlord's obligation to repair and replace Tenant's Work and/or Tenant's Alterations hereunder shall apply only to the extent that such leasehold improvements are either (x) covered by any of the work listed in <u>Exhibit F</u> hereof (or future like-kind replacements thereof) and owned by Landlord, or (y) otherwise reasonably consistent with leasehold improvements commonly installed by tenants in other attractive, first-class and fully operative industrial/warehouse facilities in the Dallas-Fort Worth Metropolitan Area and owned by Landlord.

13.6    <u>Adjustment of Rent</u>.  If a casualty renders all or part of the Premises untenantable, Rent shall proportionately abate commencing on the date of the casualty and ending when the Premises are delivered to Tenant with Landlord's restoration obligation substantially complete.  The extent of the abatement shall be based upon the portion of the Premises rendered untenantable, inaccessible or unfit for use in a reasonable business manner for the purposes stated in this Lease. Except for such possible reduction in Rent, Tenant shall not be entitled to any compensation, reduction, or reimbursement from Landlord as a result of any damage, destruction, repair, or restoration of or to the Premises.

13.7    <u>Mutual Waiver of Subrogation</u>.  Notwithstanding anything to the contrary in this Lease, Landlord and Tenant mutually waive their respective rights of recovery against each other and each other's officers, directors, constituent partners, agents and employees and, Tenant waives such rights against each lender under any mortgage or deed of trust, any lessor under any ground lease, or other lien encumbering the Property or any portion thereof or interest therein, to the extent any loss is or would be covered by the property insurance policies required

DMWEST #12993214 v14

to be carried under this Lease or otherwise carried by the waiving party, and also waive the rights of the insurance carriers of such policy or policies to be subrogated to the rights of the insured under the applicable policy.  Each party shall cause its insurance policy to be endorsed to evidence compliance with such waiver of subrogation.

13.8    Waiver. TENANT WAIVES THE PROTECTION OF ANY STATUTE, CODE OR JUDICIAL DECISION WHICH MAY GRANT TO TENANT THE RIGHT TO TERMINATE A LEASE IN THE EVENT OF THE DESTRUCTION OF THE PREMISES. TENANT AGREES THAT THE PROVISIONS OF THIS SECTION 13 ABOVE SHALL GOVERN THE RIGHTS AND OBLIGATIONS OF LANDLORD AND TENANT IN THE EVENT OF ANY DESTRUCTION OF THE PREMISES.

14.    Insurance.

14.1    Insurance on Tenant's Property.  Tenant shall procure at its cost and expense and keep in effect during the Term (and any other period when Tenant is in possession of the Premises), insurance coverage for all risks of physical loss or damage insuring the full replacement value of Tenant Owned Property, other personal property of Tenant, and other business personal property in Tenant's custody and control ("Tenant's Property Coverage").

14.2    Tenant's Liability Insurance.  Tenant shall procure at its cost and expense and maintain throughout the Term (and any other period when Tenant is in possession of the Premises), commercial general liability insurance applicable to the Premises with a minimum combined single limit of liability of Ten Million Dollars ($10,000,000) per occurrence ("Tenant Liability Coverage"), statutory worker's compensation insurance, employer's liability insurance with a One Million Dollar ($1,000,000) minimum limit covering all of Tenant's employees, and commercial auto liability insurance with a limit of not less than Two Million Dollars ($2,000,000) aggregate limit for bodily injury and property damage, including owned, non-owned, and hired auto liability coverage for such vehicles driven on and around the Property (if Tenant does not own company vehicles, a letter to that effect from an officer or principal of Tenant, in addition to proof of non-owned and hired auto liability coverage is required).  Such liability insurance shall include, without limitation, products and completed operations liability insurance, fire and legal liability insurance, and such other coverage as Landlord may reasonably require from time to time.  From time to time, upon Landlord's request Tenant shall increase the amounts of such insurance coverage to amounts then generally required by other institutional owners of comparable industrial/warehouse properties in the greater Lewisville, Texas area.

14.3    Form of Policies.  Tenant's insurance shall be issued by companies with an A.M. Best rating of no less than A-/VIII.  Tenant shall have the right to provide insurance coverage pursuant to blanket policies obtained by Tenant if the blanket policies expressly afford coverage required by this Section 14.  All insurance policies required to be carried by Tenant under this Lease (except for worker's compensation insurance) shall: (i) name Landlord, and any other appropriate parties designated by Landlord as additional insureds (i.e. any mortgagee, etc.); (ii) as to liability coverages, be written on an "occurrence" basis; and (iii) if obtainable, provide that Landlord shall receive thirty (30) days' notice (or ten (10) days' notice in the case of non-payment of premium) from the insurer before any cancellation or change in coverage.  Each

such policy shall contain a provision that such policy and the coverage evidenced thereby shall be primary and non-contributing with respect to any policies carried by Landlord. Tenant shall deliver reasonably satisfactory evidence of such insurance to Landlord on or before the Commencement Date, and thereafter at least thirty (30) days before the expiration dates of expiring policies. Before Tenant's access to or occupancy of the Premises, Tenant shall deliver to Landlord copies of certificates of insurance evidencing such policies. Notwithstanding the foregoing, if at any time any such insurance expires without having been renewed by Tenant, Landlord shall have the option, in addition to Landlord's other remedies, to procure such insurance after ten (10) days' prior written notice to Tenant immediately and without notice to Tenant, and the cost thereof shall be paid to Landlord as Additional Rent within sixty (60) days after the presentation of invoices therefor. The limits of the insurance required under this Lease shall not limit the liability of Tenant.

14.4    Compliance with Insurance Requirements. Tenant shall not do anything, or suffer or permit anything to be done, in or about the Premises that shall invalidate or be in conflict with the provisions of any fire or other insurance policies covering the Building, provided that Tenant has received written notice of the same and the same are commercially reasonable.

14.5    Self-Insurance. Landlord hereby consents to a self-insurance program for Tenant as to Tenant's Liability Coverage and Tenant's Property Coverage provided that: (a) such self-insurance is permitted under all laws applicable to Tenant at the time in question; (b) Tenant and the Tenant Affiliates participating in such self-insurance plan or program maintain a tangible net worth determined in accordance with generally accepted accounting principles in excess of $500,000,000 according to its most recent audited financial statement and a shadow rating from Standards & Poor of BBB or better; and (c) said program contains reasonable procedures governing the investigation, litigation, processing, funding of reserves and payment of insurance claims (including claims brought by Landlord in its capacity as an additional insured under this Lease), which procedures shall be consistent with those of third-party insurers: (i) having a Best's rating of A- or better; and (ii) writing insurance policies providing coverages comparable to those being provided under Tenant's self-insurance program. At all times, Tenant's self-insurance program shall be subject to, and comply with, all of the requirements for Tenant's insurance policies as described in this Section 14.5 and Landlord's consent to Tenant's self-insurance program shall not diminish or abrogate any or all of said requirements in any way. Upon Landlord's request, Tenant shall deliver to Landlord certificates and written details, reasonably acceptable to Landlord and its lender, specifying the extent of self-insurance coverage and evidencing the compliance of its self-insurance program with the provisions of this Section 14.5. "Self-insure" shall mean that Tenant is itself acting as though it were the third-party insurer providing the insurance required under the provisions of this Lease, and Tenant shall pay any amounts due in lieu of insurance proceeds because of self-insurance, which amounts shall be treated as insurance proceeds for all purposes under this Lease. To the extent Tenant chooses to provide any insurance required by this Lease by "self-insurance," then Tenant shall have all of the obligations and liabilities of an insurer, and the protection afforded Landlord, Landlord's lender, and the Property shall be the same as if provided by a third-party insurer under the coverages required under this Lease, including coverage for additional insureds. In the event that Tenant elects to self-insure and an event or claim occurs for which a

46

defense and/or coverage would have been available from a third-party insurer, Tenant shall undertake the defense of any such claim, including a defense of Landlord, at Tenant's sole cost and expense, and use its own funds to pay any claim or replace any property or otherwise provide the funding which would have been available from insurance proceeds but for such election by Tenant to self-insure. Landlord's consent to Tenant's self-insurance program will automatically terminate upon the effective date of any assignment, transfer or assumption of this Lease by or to any third party (other than a Permitted Transferee), including transfers by operation of law, regardless of whether or not Landlord consents to such transfer; the foregoing shall not, however, apply with regard to a self-insurance program maintained by such third party that complies fully with the foregoing requirements for self-insurance as described in this Section 14.5. If at any time Tenant's tangible net worth is less than $500,000,000 or if this Lease shall be assigned (other to a Permitted Transferee), then Tenant must obtain, provide, and keep in full force and effect the above referenced insurance coverage and provide Landlord with evidence of the same. FOR SO LONG AS TENANT SELF-INSURES, TENANT, FOR ALL APPLICABLE PERIODS, SHALL AND DOES HEREBY INDEMNIFY AND HOLD HARMLESS LANDLORD (INCLUDING ANY FUTURE TENANTS IN COMMON), LANDLORD'S PARTNERS, AND      THEIR RESPECTIVE AFFILIATES, AND LANDLORD'S AGENTS AND EMPLOYEES FROM AND AGAINST ALL COSTS, DAMAGES OR EXPENSES (INCLUDING REASONABLE ATTORNEY FEES AT THE TRIAL AND APPELLATE LEVELS) INCURRED OR PAID BY LANDLORD AS A RESULT OF ANY CLAIM CUSTOMARILY COVERED BY COMMERCIAL GENERAL LIABILITY INSURANCE, INCLUDING A CONTRACTUAL LIABILITY ENDORSEMENT.

     14.6   <u>Landlord's Insurance</u>.

     14.6.1 <u>Landlord's Insurance</u>.   Landlord shall maintain the following insurance policies with insurance companies authorized to do business in the State of Texas:

     14.6.2 <u>Casualty Insurance</u>.   "All risk" (aka "Special Form") insurance with customary exclusions covering (a) the Building and Common Area improvements in an amount equal to the full replacement cost of the Building and the insurable improvements therein owned by Landlord (but expressly excluding Tenant Owned Property and any Tenant's Alterations that are not owned by Landlord) and the Common Area improvements, and flood insurance (but only if the Property is located within a FEMA-defined flood zone) ("Landlord's Casualty Policy"), together with rent insurance; and (b) any insurable improvements (such as detention basins and lighting facilities) located in the Common Areas.  Notwithstanding the foregoing provisions of this subsection 14.6.2, Landlord's Casualty Policy shall in any event cover (x) those leasehold improvements listed on <u>Exhibit F</u> of this Lease, and (y) Tenant's Work comprising the approximately 24,000 square feet of the main office to be located within the Premises and all improvements therein.

     14.6.3 <u>Liability Insurance</u>.   Landlord will purchase and maintain broad form commercial general liability insurance ("Landlord's Liability Insurance") with a minimum combined single limit of liability of at least Ten Million Dollars ($10,000,000).  Such liability insurance shall include, without limitation, products and completed operations liability insurance.  Landlord shall have the right to provide insurance coverage pursuant to blanket

47

policies obtained by Landlord if the blanket policies expressly afford coverage required by this Section 14.6. Landlord's Liability Insurance shall: (i) name Tenant as an additional insured for Landlord's negligent acts or omissions arising from the performance of its obligations under this Lease; (ii) as to liability coverages, be written on an "occurrence" basis; and (iii) contain a provision that no act or omission of Landlord shall affect or limit the obligation of the insurer to pay the amount of any loss sustained. Each such policy shall contain a provision that such policy and the coverage evidenced thereby shall be primary and non-contributing with respect to any policies carried by Tenant for claims based on Landlord's own negligence, to the extent of the same. Landlord shall deliver reasonably satisfactory evidence of such insurance to Tenant on or before the Commencement Date, and thereafter upon request by Tenant. The liability insurance requirements under this Section shall be reviewed by Landlord every five (5) years for the purpose of increasing (in consultation with Landlord's insurance advisor) the minimum limits of such insurance to limits which shall be reasonable and customary for similar facilities of like size and operation in accordance with generally accepted insurance industry standards.

14.6.4 Other Insurance. Landlord may, but is not obligated to, maintain such other insurance and additional coverages as it may deem necessary provided such insurance is reasonable for intuitional owners of similar projects in the market where the Premises is located.

14.6.5 Costs. All costs of insurance carried by Landlord and referred to in this Section 14.6 or otherwise will constitute Operating Expenses.

15.    Eminent Domain.

15.1    Effect of Taking. If all of the Premises is condemned or taken (or the access to the Premises or a material portion of the parking for the Premises are condemned, taken or reconfigured as to render the Premises unusable for the Permitted Use, as reasonably determined by Tenant) in any permanent manner (as defined in the last sentence of Section 15.4) before or during the Term for any public or quasi-public use, or any permanent transfer of the Premises (or the access to the Premises or a material portion of the parking for the Premises) is made in avoidance of an exercise of the power of eminent domain (each of which events shall be referred to as a "taking"), this Lease shall automatically terminate as of the date of the vesting of title as a result of such taking. If a part of the Premises is so taken, this Lease shall automatically terminate as to the portion of the Premises so taken as of the date of the vesting of title as a result of such taking. If such portion of the Building or Common Areas is taken as to render the balance of the Premises unusable by Tenant for the Permitted Use (including the loss of the access to the Premises or a material portion of the parking for the Premises that renders the Premises unusable for the Permitted Use, as reasonably determined by Tenant), this Lease may be terminated by Landlord or Tenant, as of the date of the vesting of title as a result of such taking, by written notice to the other party given within sixty (60) days following notice to Landlord of the date on which said vesting will occur. If this Lease is not terminated as a result of any taking, Landlord shall, at its sole cost and expense, restore the Building to an architecturally whole unit; provided, however, that Landlord's restoration obligation shall be limited to the extent of the award for such taking.

DMWEST #12993214 v14

15.2    Award.  Landlord shall be entitled to the entire award for any taking, including, without limitation, any award made for the value of the leasehold estate created by this Lease (Landlord hereby agreeing, as applicable, to proceed in good faith to obtain such award).  No award for any partial or entire taking shall be apportioned, and Tenant hereby assigns to Landlord any award that may be made in any taking, together with any and all rights of Tenant now or hereafter arising in or to such award or any part thereof; provided, however, that nothing contained herein shall be deemed to give Landlord any interest in or to require Tenant to assign to Landlord any separate award made to Tenant for its relocation expenses, the taking of personal property and fixtures belonging to Tenant, the unamortized value of improvements made or paid for by Tenant (other than the Building Standard Improvements and such other portions of Tenant's Work towards which the Tenant Allowance is applied) or the interruption of or damage to Tenant's business, provided that any such claim by Tenant does not diminish Landlord's award.

15.3    Adjustment of Rent.  In the event of a partial taking that does not result in a termination of this Lease as to the entire Premises, Base Rent and Additional Rent shall be equitably adjusted:  (i) temporarily as to the loss of use of the Premises during the pendency of the restoration in proportion to the portion of the Premises temporarily rendered unavailable; and (ii) permanently in relation to the portions of the Premises and the Building taken or rendered unusable by such taking.

15.4    Temporary Taking.  If all or any portion of the Premises is taken for a limited period of time during the Term, this Lease shall remain in full force and effect; provided, however, that Rent shall abate from the date of such taking until Landlord restores the Premises to the condition that existed immediately prior to such taking in proportion to the portion of the Premises taken by such taking.  Landlord shall be entitled to receive the entire award made in connection with any such temporary taking; provided, however, that nothing contained herein shall be deemed to give Landlord any interest in or to require Tenant to assign to Landlord any separate award made to Tenant for its relocation expenses, the taking of personal property and fixtures belonging to Tenant, the unamortized value of improvements made or paid for by Tenant (other than the Building Standard Improvements and such other portions of Tenant's Work towards which the Tenant Allowance is applied) or the interruption of or damage to Tenant's business, provided that any such claim does not diminish Landlord's award.  In the event that any portion of the Premises is damaged as a result of a temporary taking, Landlord shall, at its sole cost and expense, restore the Premises to the condition that existed immediately prior to such temporary taking; provided, however, that Landlord's restoration obligation shall be limited to the extent of the award for such temporary taking.  Any temporary taking of all of the Premises (or a portion of the Premises in accordance with Section 15.1) which continues for six (6) months (or which requires Landlord to make repairs to the Premises which are not completed within six (6) months after the date of the taking) shall be deemed a permanent taking.

16.    Assignment; Subleasing.

16.1    Consent Required.  Except as otherwise expressly provided herein, neither Tenant nor any sublessee or assignee of Tenant, directly or indirectly, voluntarily or by operation of law, shall sell, assign, encumber, pledge or otherwise transfer or hypothecate all or any part of

the Premises or Tenant's leasehold estate hereunder (each such act is referred to as an "Assignment"), or sublet the Premises or any portion thereof or permit the Premises to be occupied by anyone other than Tenant (each such act is referred to as a "Sublease"), without Landlord's prior written consent in each instance, which consent shall not be unreasonably withheld, conditioned or delayed.  Any Assignment or Sublease (collectively, a "Transfer") that is not in compliance with this Section 16 shall be void and, at the option of Landlord, shall constitute a material default by Tenant under this Lease.  The acceptance of Rent by Landlord from a proposed assignee, sublessee or occupant of the Premises (a "Transferee") shall not constitute consent to such Assignment or Sublease by Landlord.  Notwithstanding anything to the contrary contained herein, Landlord shall be deemed reasonable in withholding its consent if:

   16.1.1  The Transferee's business or use of the Subject Space (defined below) is not permitted under this Lease;

   16.1.2  The Transferee is not a party of reasonable financial worth and/or financial stability in light of the responsibilities involved under this Lease on the date consent is requested; or

   16.1.3  An Event of Default under this Lease is then pending.

In addition to those types of Transfers specified above in this Section 16.1, any reduction in the tangible net worth of Tenant below $500,000,000 resulting from a transaction or series of transactions (whether merger, sale, acquisition, financing, leverage buyout, spin-off, or otherwise), whether or not a formal assignment or hypothecation of this Lease or of Tenant's assets occurs, shall be deemed a Transfer requiring Landlord's consent.  As used in this Lease, "tangible net worth" means the sum of all of Tenant's assets, less liabilities and intangible assets, as determined by the use of generally accepted accounting principles.  The provisions of this paragraph shall not apply at any time the stock of Tenant is traded on a national exchange.

Notwithstanding any language to the contrary in this Section 16, Landlord may, in its sole discretion, withhold its consent to any proposed assignment of Tenant's leasehold interest in the Property to a lender as security, whether such proposed assignment is in the form of a leasehold deed of trust, leasehold mortgage, or otherwise.

   16.2 Notice.  Any request by Tenant for Landlord's consent to a specific Assignment or Sublease shall be provided at least thirty (30) days before the proposed Assignment or Sublease transaction and include: (a) the name of the proposed assignee, sublessee or occupant; (b) the nature of the proposed assignee's sublessee's or occupant's business to be carried on in the Premises; (c) in case of a Sublease, a description of the portion of the Premises to be transferred (the "Subject Space") (d) a copy of the proposed Assignment or Sublease; and (e) such financial information and such other information as Landlord may reasonably request concerning the proposed assignee, sublessee or occupant or its business. Landlord shall respond in writing, stating the reasons for any disapproval, within fifteen (15) business days after receipt of all information reasonably necessary to evaluate the proposed Assignment or Sublease.  Whether or not Landlord shall grant consent, Tenant shall pay Landlord's review and processing fees, as well as any reasonable legal fees incurred by Landlord

in connection with such review, within thirty (30) days after written request by Landlord, provided, however, that Tenant's liability under this sentence shall not exceed the sum of $2,500.00.

16.3    Transfer Profits. Except with respect to any Transfer involving a Permitted Transferee or other transferee described in Section 16.6 below, in the event that Tenant enters into an Assignment or Sublease, Tenant shall pay to Landlord fifty percent (50%) of the Profits (as hereinafter defined) obtained from such Assignment or Sublease, as the case may be, in accordance with the provisions of this Section 16.3. As used herein, "Profits" from an Assignment or Sublease shall be any and all consideration or subrents received from the subject assignee (the "Assignee") or subtenant (the "Subtenant"), but not including amounts attributable to goodwill, less: (x) the reasonable costs and expenses incurred by Tenant in connection with such Assignment or Sublease, including, without limitation, any advertising costs, legal fees, brokerage commissions, and the costs of any remodeling or alterations; (y) any bona fide amounts (not in excess of fair market value as reasonably determined by Tenant) paid by the Assignee or Subtenant for Tenant's trade fixtures, furniture, furnishings and equipment; and (z) in the event of a Sublease, all Base Rent and Additional Rent paid by Tenant to Landlord during the period of the Sublease multiplied by a fraction, the numerator of which is the number of square feet of floor area being subleased to such Subtenant and the denominator of which shall be the then entire Floor Area of the Premises. In the event of an Assignment hereunder, the fifty percent (50%) of the Profits shall be paid by Tenant to Landlord within thirty (30) days after the later to occur of (a) the receipt by Tenant of the payment of the full consideration from the Assignee on account of the Assignment, and (b) the lapsing of any contingencies to the effectiveness of the Assignment. In the event of a Sublease of the Premises or any portion of the Premises, the fifty percent (50%) of the Profits shall be paid by Tenant to Landlord within thirty (30) days after the receipt of the monthly subrent, as and to the extent received; provided, however, that the entire dollar amount of all costs and amounts described in subsections (x), (y) and (z) above shall be recouped by Tenant from the first subrents payable by the subtenant prior to such payment to Landlord. The provisions of this Section 16.3 shall not apply with respect to a Transfer to a Permitted Transferee or other transferee described in Section 16.6 below.

16.4    Landlord's Option as to the Premises or Subject Space. Notwithstanding anything to the contrary contained in this Section 16, Landlord shall have the option, by giving written notice to Tenant within thirty (30) days after receipt of any notice from Tenant pertaining to an assignment or subletting ("Transfer Notice"), to recapture the entirety of the Premises or the Subject Space. Such recapture notice shall cancel and terminate this Lease with respect to the entire Premises or the Subject Space, as applicable, as of the effective date of the proposed Transfer until the last day of the term of the Transfer as set forth in the Transfer Notice. In the event of a recapture by Landlord, if this Lease shall be canceled with respect to less than the entire Property, the Rent reserved herein shall be prorated on the basis of the number of rentable square feet retained by Tenant in proportion to the number of rentable square feet contained in the Property, and this Lease as so amended shall continue thereafter in full force and effect, and upon request of either party, the parties shall execute written confirmation of the same. In the event of a recapture, Landlord may, if it elects, enter into a new lease covering the entire Premises or the Subject Space, as applicable, with the intended Transferee on such terms as Landlord and such person or entity may agree or enter into a new lease covering the entire

51

Premises or the Subject Space with any other person or entity; in such event, Tenant shall not be entitled to any portion of the increased Rent, if any, which Landlord may realize on account of such termination and reletting.  The provisions of this Section 16.3 shall not apply with respect to a Transfer to a Permitted Transferee or other transferee described in Section 16.6 below.

      16.5    No Release.  No consent by Landlord to any Assignment or Sublease by Tenant, and no specification in this Lease of a right of Tenant's to make any Assignment or Sublease, shall relieve Tenant of any obligation to be performed by Tenant under this Lease, whether arising before or after: (a) the Assignment or Sublease; or (b) any extension of the Term (but only pursuant to exercise of an option granted in this Lease).  The consent by Landlord to any Assignment or Sublease shall not relieve Tenant or any successor of Tenant from the obligation to obtain Landlord's express written consent to any other Assignment or Sublease.

      16.6    Corporate or Partnership Transfers.  Any sale or other transfer, including, without limitation, by consolidation, merger or reorganization, of a majority of the voting stock of Tenant or any beneficial interest therein, if Tenant is a corporation, or any sale or other transfer of a majority of the general partnership or membership interests in Tenant or any beneficial interest therein, if Tenant is a partnership or limited liability company, shall be an Assignment for purposes of this Lease, but Landlord's consent is not required for such a transfer, if the Transferee is capable of satisfying Tenant's obligations hereunder, in Landlord's reasonable judgment. The provisions of this Section 16.6 shall not apply at any time the stock of Tenant is traded on a national exchange. Notwithstanding anything to the contrary in this Section 16, Tenant, without Landlord's consent (and without the application of Sections 16.3 and 16.4), but after reasonable prior notice, may assign this Lease or sublet all or any portion of the Premises: (i) to any entity or legal person which controls, is controlled by or is under common control with Tenant; (ii) to any entity or legal person resulting from a consolidation or merger with Tenant and whose tangible net worth is not less than $500,000,000; or (iii) to any entity or legal person acquiring all, or substantially all, of Tenant's assets or issued and outstanding stock and whose tangible net worth is not less than an amount equal to $500,000,000 (any of the foregoing, a "Permitted Transferee"); provided, however, that Tenant shall in no event be released from its obligations under this Lease. Any such Permitted Transferee shall execute and deliver to Landlord any and all documentation reasonably required by Landlord in order to evidence Permitted Transferee's assumption of all obligations of Tenant hereunder.

      16.7    Assumption of Obligations.  Each assignee or other transferee of Tenant's interest under this Lease, other than Landlord, shall assume all obligations of Tenant under this Lease and shall be and remain liable jointly and severally with Tenant for the payment of Base Rent and Additional Rent, and for the performance of all the terms, covenants, conditions and agreements contained in this Lease which are to be performed by Tenant.  Each sublessee of all or any portion of the Premises shall agree in writing for the benefit of Landlord: (a) not to violate any of the terms, covenants or conditions of this Lease, and (b) that such sublease (and all further subleases of any portion of the Premises) shall terminate upon any termination of this Lease, regardless of whether or not such termination is voluntary.  No Assignment or Sublease shall be valid or effective unless the assignee or sublessee of Tenant shall deliver to Landlord a fully-executed counterpart of the Assignment or Sublease and an instrument that contains a covenant of assumption by the assignee or agreement of the sublessee, reasonably satisfactory in substance

52

and form to Landlord, consistent with the requirements of this Section 16.7. The failure or refusal of the assignee to execute such instrument of assumption or of the sublessee to execute the agreement described above shall not release or discharge the assignee or sublessee from its obligations that would have been contained in such instrument or agreement, all of which obligations shall run automatically to such assignee or sublessee.

16.8    Termination Following an Assignment.    If this Lease is terminated because of: (a) an Event of Default of such assignee, or (b) the rejection, disaffirmation, or other termination of this Lease by or on behalf of the assignee pursuant to any proceeding in bankruptcy under any Applicable Law of any State or of the United States, or any other Applicable Law affecting creditors' rights, then Landlord shall promptly give to the original Tenant ("Original Tenant") notice thereof, and Original Tenant shall have the right, exercisable by notice given to Landlord within fifteen (15) days after receipt by Original Tenant of Landlord's notice, to enter into a new lease of the Premises with Landlord ("New Lease"), provided that the Original Tenant shall have remedied all Events of Default of the assignee hereunder, unless such Events of Default are personal to the assignee and/or not reasonably susceptible of cure by the Original Tenant, in which event the Original Tenant shall not be obligated to cure such Events of Default as a condition to the exercise of its rights under this Section 16.6. Upon the Original Tenant's curing of any such Event of Default of the assignee as aforesaid, Landlord shall assign to the Original Tenant all of Landlord's rights against such assignee (whether arising as a result of bankruptcy court proceedings or otherwise). The term of said New Lease shall begin on the date of termination of this Lease and shall continue for the remainder of the Term (including any Extension Periods). Such New Lease shall otherwise contain the same terms and conditions as those set forth herein, except for requirements which are no longer applicable or have already been performed. It is the intention of the parties hereto that such New Lease shall have the same priority relative to other rights or interests in or to the Premises as this Lease. The provisions of this Section 16.6 shall survive the termination of this Lease and shall continue in full force and effect thereafter to the same extent as if this Section 16.6 were a separate and independent contract between Landlord and the Original Tenant. From the date on which the Original Tenant shall serve Landlord with the aforesaid notice of the exercise of its right to a New Lease, the Original Tenant shall have quiet and undisturbed use and enjoyment of the Premises and all appurtenances thereto, as contemplated in this Lease.

17.    Utilities and Services.

17.1    Utilities.    From and after the Commencement Date, Tenant shall pay to Landlord, as Operating Expenses, Tenant's Proportionate Share of all electric, water and sewer utilities which serve solely the exterior areas of the Building and/or Property. Landlord shall cause electric, water, gas and sewer utilities serving the Premises to be separately metered and Tenant shall thereafter pay directly to the providing utility companies all charges therefor on the basis of readings of such meters. Notwithstanding the above, during any period of access to or use of the Premises for the performance of Tenant's Work, Tenant shall be responsible for payment of the cost of utilities attributable to the performance of Tenant's Work.

17.2    Certain Services.    Tenant shall contract separately for the provision, at Tenant's sole cost, of janitorial service and trash removal for the Premises (or, at its option,

engage its employees to perform such services) and Landlord will have no obligation to provide any such services to the Premises.    Subject to Applicable Laws, Landlord and Tenant acknowledge and agree that Tenant may, at Tenant's expense, install compactors within the Secure Tenant Outdoor Area as depicted on the Site Plan attached hereto as Exhibit A.  Unless due to the willful misconduct of Landlord, its employees or contractors, Landlord shall have no liability whatsoever in connection with such compactors, and TENANT SHALL INDEMNIFY LANDLORD FOR ANY AND ALL CLAIMS ARISING FROM THE PRESENCE AND MAINTENANCE OF SUCH COMPACTORS.

17.3    Involuntary Cessation of Services.  Landlord reserves the right, without any liability to Tenant and without affecting Tenant's covenants and obligations hereunder, to stop the services provided by any or all of the HVAC, electric, sanitary and other systems serving the Premises, or to stop any other services required by Landlord under this Lease, whenever and for so long as may be reasonably necessary by reason of accidents, emergencies, or the making of repairs or changes which Landlord, in good faith, deems reasonably necessary; provided, however, that all such work which is not required by reason of emergencies shall be coordinated with Tenant and otherwise performed in a manner which does not unreasonably interfere with Tenant's use of the Premises.  No such interruption of services shall be deemed an eviction or disturbance of Tenant's use and possession of the Premises or any part thereof, or render Landlord liable to Tenant for damages, or relieve Tenant from performance of Tenant's obligations under this Lease, including, but not limited to, the obligation to pay Rent. Notwithstanding the above, if any interruption of services resulting solely from the acts or omissions of Landlord or Landlord Parties persists for a period in excess of six (6) consecutive business days, Tenant shall be entitled to an abatement of Base Rent (in proportion to the extent, if any, of Tenant's actual loss of use of the Premises), with such abatement of Base Rent to begin on the seventh (7th ) business day following receipt of written notice from Tenant of such condition and continuing until the condition is corrected, as Tenant's sole and exclusive monetary remedy. Tenant acknowledges and agrees that except for such abatement of Base Rent Tenant shall not be entitled to any compensation or reimbursement from Landlord as a result of such failure or interruption.  If any interruption of services resulting solely from the acts or omissions of Landlord or Landlord Parties persists for a period in excess of ninety (90) consecutive days, Tenant shall have the right to terminate this Lease by written notice to Landlord.

18.    Default.

18.1    Tenant Default.

18.1.1 If Tenant shall fail to: (i) pay any Rent when due, within ten (10) days after its receipt of notice thereof from Landlord specifying the amount and details of the unpaid Rent, or (ii) perform or observe any of the other covenants of this Lease on Tenant's part to be performed or observed within thirty (30) days after its receipt of notice thereof from Landlord specifying the nature of such default (or, if such default shall be of a nature that same cannot reasonably be cured within thirty (30) days and Tenant does not commence to cure such default on or before such thirtieth (30th) day and thereafter diligently prosecute said cure to

DMWEST #12993214 v14

completion), such circumstance shall constitute an "Event of Default. " The above notices shall be in lieu of, and not in addition to, any notice required by law.

18.1.2  Upon an Event of Default, Landlord shall have all remedies given to it at law or in equity (except that Landlord hereby expressly waives (A) any rights to accelerate any element of the Rent, and any right of distraint which may be granted to it by law, except to the extent expressly permitted hereunder, and (B) any right to assert any lien or security interest upon any inventory or merchandise of Tenant, whether located within or without the Premises, provided that the foregoing shall not lessen or diminish Landlord's enforcement of its statutory lien rights, as applicable, against Tenant's leasehold improvements at the Premises and any Tenant Owned Property (but excluding Tenant's merchandise or inventory), including the following:

(i)      to bring suit for the collection of such unpaid Rent or for the performance of such other covenant of this Lease on Tenant's part to be performed; and/or

(ii)      without waiving any non-monetary default, may (but shall not be obligated to) perform any covenant which is capable of being remedied by the performance of affirmative acts for the account and at the reasonable expense of Tenant (it being agreed that should Landlord require access to the Premises in order to perform such covenant as aforesaid, Landlord shall comply with the applicable provisions of Sections 9.3 hereof), in which event, Tenant shall pay to Landlord on demand, as Additional Rent, the reasonable cost or amount thereof, together with interest thereon at the Lease Interest Rate from the date of outlay of expense until payment; and/or

(iii)      upon at least five (5) days' notice to Tenant, to terminate this Lease, whereupon Landlord shall have and retain full right to sue for and collect all unpaid Rent which shall have accrued up to the date of termination and any damages to Landlord by reason of any such breach, and Tenant shall surrender and deliver the Premises to Landlord, failing which, Landlord shall have the right to initiate summary proceedings to recover possession.  Upon termination, Landlord has the right to recover from Tenant all amounts permitted by law, including, without limitation:

(a)      The worth, at the time of the award, of the unpaid rent that had been earned at the time of termination of this Lease;

(b)      The worth, at the time of the award, of the amount by which the unpaid rent that would have been earned after the date of termination of this Lease until the time of award exceeds the amount of the loss of rent that Tenant proves could have been reasonably avoided;

(c)      The worth, at the time of the award, of the amount by which the unpaid rent for the balance of the

Term after the time of award exceeds the amount of the loss of rent that Tenant proves could have been reasonably avoided;

(d)    Any other amount necessary to compensate Landlord for all the detriment proximately caused by the Tenant's default.

The "worth at the time of award" as used in clause (i) and (ii) above shall be computed by allowing interest at the rate of ten percent (10%) per annum. The "worth at the time of award" as referred to in clause (iii) above shall be computed by discounting the amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of award, plus one percent (1%). The term "rent" as used in this Section shall include Base Rent and all Additional Rent and other charges required to be paid by Tenant pursuant to the provisions of this Lease.

(iv)    upon at least five (5) days' notice to Tenant to terminate Tenant's right of possession, re-enter the Premises and take possession thereof by lawful means. If Landlord shall so elect to repossess the Premises without terminating the Lease, then Tenant shall be liable for and shall pay to Landlord all Rent payable to Landlord pursuant to the terms of this Lease which shall have accrued up to the date of repossession, as well as all Rent as and when same shall become due and payable pursuant to the terms of this Lease during the remainder of the Term, diminished by any net sums thereafter received by Landlord through reletting the Premises during said period (after deducting reasonable expenses incurred by Landlord in connection with such reletting). In no event shall Tenant be entitled to any excess of any rent obtained by such reletting over and above the Rent herein reserved. Landlord may bring actions to collect amounts due by Tenant under this Lease, from time to time, prior to the expiration of the Term.

18.1.3  Upon an Event of Default, Tenant shall be liable for and shall pay to Landlord, in addition to any sum provided to be paid above, brokers' fees incurred by Landlord in connection with reletting the whole or any part of the Premises for the remainder of the then unexpired Term (excluding any then unexercised Extension Periods), the costs of removing and storing Tenant's or other occupant's property; the cost of repairs; and all other commercially reasonable expenses incurred by Landlord in enforcing or defending Landlord's rights and/or remedies, including reasonable attorneys' fees.

18.1.4  Upon an Event of Default, any amounts paid by Landlord to cure said Event of Default and any Rent payments not paid after notice thereof is given shall bear interest at the Lease Interest Rate from and after the expiration of any applicable grace period until paid.

18.1.5  Without in any way obligating Landlord to terminate this Lease in the Event of Default, Landlord shall act reasonably and make a good-faith effort to mitigate damages to which Landlord would otherwise be entitled to as a result of an Event of Default in reletting the Premises or any portion thereof. In no event shall Tenant be liable to Landlord for

56

any consequential damages suffered by Landlord as a result of an Event of Default by, or any other act of, Tenant.

18.1.6  Upon a default by Tenant, any amounts paid by Landlord to cure said default and any Rent payments not paid after notice shall bear interest at the Lease Interest Rate from and after the expiration of any applicable grace period.  In addition, with respect to any installment of Rent which becomes due and payable by Tenant hereunder but is not paid within ten (10) days after Tenant's receipt of a reminder notice from Landlord, Tenant shall pay to Landlord a late charge equal to five (5%) percent of such unpaid amount (provided, however, that such late charge shall not be payable with respect to the first two (2) such late payments during any calendar year during the Term).  The parties agree that this charge represents a fair and reasonable estimate of the costs that Landlord will incur by reason of such late payment or delivery of such check by Tenant.  Acceptance of any such charge shall not constitute a waiver of Tenant's default with respect to the overdue or unpaid amount, or prevent Landlord from exercising any of the other rights and remedies available to Landlord.

18.2    Landlord's Default.  If Landlord shall: (i) fail to perform or observe any of the covenants of this Lease on Landlord's part to be performed or observed within thirty (30) days after receiving notice from Tenant thereof (or, if same cannot reasonably be cured within thirty (30) days, if Landlord shall fail to promptly commence and diligently prosecute said cure to completion), or (ii) materially breach any warranty or representation under this Lease (either of (i) or (ii) above being hereinafter referred to as a "Landlord's Default"), then Tenant, in addition to such other rights and remedies as may be available under this Lease or at law or in equity (but subject to the limitations contained in the last paragraph of this Section 18.2), may, in its sole discretion:

(i)        to the extent expressly permitted in this Section 18.2, perform such obligation(s) of Landlord in accordance with the provisions of this Lease on behalf of, and at the expense of Landlord; and/or

(ii)        bring suit for the collection of any amounts for which Landlord is in default, seek injunctive relief, or seek specific performance for any other covenant or agreement of Landlord.

With respect to clause (i) above, if, in Tenant's reasonable judgment, a condition resulting from a Landlord Default that poses imminent risk of material harm to persons or property or material disruption to the normal conduct of any business operations in the Premises shall exist, and if (a) no Event of Default on the part of Tenant exists, (b) Tenant complies with the terms of this Section 18.2, and (c) such default has not been cured by Landlord within a reasonable time after receipt of written notice from Tenant pursuant to Section 18.2, Tenant may cure a default by Landlord, but only after giving a second written notice to Landlord of Tenant's intention to do so.  In the event of an emergency Tenant shall not be required to wait for the expiration of Landlord's cure period provided that Tenant gives Landlord such notice (including notice by telephone and e-mail) as is practical under all of the circumstances, containing the following: the nature of the emergency, a specific description of the location and type of the item needing repair, and a statement that Tenant intends to immediately undertake the repair.  If Tenant

57

completes the emergency repair in compliance with the provisions of this Section 18.2, then Landlord agrees to reimburse Tenant for Tenant's actual, reasonable, and documented out-of-pocket costs incurred, with such reimbursement to be made within thirty (30) days after Landlord's receipt of an itemized invoice (unless Landlord is contesting Tenant's right to make such repairs or contesting the reimbursement amount).  In no event shall Landlord be liable to Tenant for any consequential damages suffered by Tenant as a result of a default by, or any other act of, Landlord.

Tenant shall have no unilateral right to terminate this Lease based on an uncured default by Landlord in the performance of Landlord's obligations under this Lease; provided, however, that Tenant may, consistent with clause (ii) above, seek to recover from Landlord an amount representing appropriate actual, compensatory damages for breach of contract based on any such uncured default of Landlord. Although Tenant agrees that it has no unilateral right under this Lease to terminate this Lease based on an uncured default by Landlord, nothing in this Section 18.2 is intended to prevent Tenant from seeking an order or other decision from a court of competent jurisdiction terminating this Lease, to the extent such relief is available under Applicable Law.

18.3    Limitation of Landlord's Liability.    Except with respect to insurance proceeds or condemnation awards received by Landlord to the extent required by the terms of this Lease to be applied to the repair or restoration of the Premises or the Property, Tenant shall, on and after the Delivery Date, look only to Landlord's estate and property in the Property (or the proceeds from the sale of all or any portion thereof) as the same is then encumbered, together with net income derived from the Property for the satisfaction of Tenant's remedies for the collection of a judgment (or other judicial process) requiring the payment of money by Landlord hereunder and no other property or assets of Landlord, its members, officers, directors, stockholders or partners shall be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies under or with respect to this Lease. Except with respect to the limitation on personal liability hereinabove set forth, the provisions of this Section 18.3 shall not be deemed or construed to limit Tenant's rights and remedies pursuant to this Lease.

18.4    Transfer of Landlord's Interest.    Upon the sale or other conveyance or transfer of Landlord's interest in the Property, the transferor (except to the extent of (1) claims by Tenant against Landlord which arose prior to the effective date of the transfer of such ownership interest, but only to the extent liability therefore is not assumed by any transferee in writing, and/or (2) judgments obtained by Tenant against Landlord, on or prior to the effective date of the transfer of such ownership interest) shall be relieved of all covenants and obligations of Landlord arising under this Lease from and after the closing of such sale, conveyance or transfer, provided the transferee expressly assumes, in writing, the obligations of Landlord under this Lease, a copy of which assumption agreement shall be provided to Tenant.    Without limitation of the foregoing, the term "Landlord" shall mean only the person or entity which, from time to time, then owns the Property, and in the event of the transfer by such owner of its interest in the Property upon the express assumption by the transferee of all of Landlord's obligations hereunder and the delivery of such assumption agreement to Tenant, such owner shall (except to the extent of (1) claims by Tenant against Landlord which arose prior to the effective date of the transfer of such ownership interest, but only to the extent liability therefor is not assumed by any

58

transferee in writing, and/or (2) judgments obtained by Tenant against Landlord, on or prior to the effective date of the transfer of such ownership interest) thereupon, subject to the provisions of this Section  18.4, be released and discharged from all covenants and obligations of Landlord thereafter accruing, but such covenants and obligations shall be binding during the Term upon each new owner for the duration of such owner's ownership.

18.5    Tenant's Liability. Landlord, its successors and assigns, shall look solely to the assets, if any, of Tenant and its successors and assigns, for the satisfaction of any claim arising from or under this Lease and shall not seek to impose personal liability on any shareholder, officer, director, member or employee of Tenant or any of its affiliated companies.

19.    Right of First Offer to Purchase.

19.1.1  Provided that as of the date of the giving of Landlord's Sale Notice (as hereinafter defined), (x) Tenant (or a Permitted Transferee) is the Tenant originally named herein, (y) Tenant (or a Permitted Transferee) actually occupies all of the Premises originally demised under this Lease and any premises added to the Premises, and (z) no Event of Default by Tenant has occurred and is continuing beyond any applicable cure period, then subject to and in accordance with the terms of this Section 19, if at any time during the Term Landlord shall desire to sell the Property, then Landlord, before offering to sell the Property to anyone shall offer to Tenant the right to purchase the Property on the same terms and conditions upon which Landlord would be willing to sell the Property to any other party ("Landlord's Sale Notice"). Tenant shall exercise this Right of First Offer to Purchase by delivering written notice ("Purchase Notice") to Landlord no later than ten (10) business days after receipt of Landlord's Sale Notice.  Time is of the essence with respect to the giving of Tenant's Purchase Notice.  If Tenant does not timely provide its Purchase Notice in accordance with the terms of this Section 19, Tenant shall be deemed to have irrevocably waived all further rights under this Section 19, and Landlord shall be free to sell the Property to any other party(s), including on terms which may be less favorable to Landlord than those set forth in Landlord's Sale Notice (subject to Tenant's reoffer right as set forth below).  Notwithstanding the above to the contrary, Landlord shall not have the obligation to provide a notice of Landlord's intent to sell and Tenant shall not have the Right of First Offer to purchase the Property in any of the following transactions (each an "Excluded Transaction"):  (a) a sale of the Property to a related entity; (b) a sale of the Property in connection with a sale of all or substantially all of Landlord's assets or its shares; (c) encumbrances of the Property; (d) sales of the Property as a result of condemnation or sale in lieu of condemnation; (e) sales in connection with a lease back of the Property by Landlord as part of a bona fide financing transaction; (f) sale to a real estate investment fund in which Landlord owns an interest; (g) transfer of ownership as a result of a foreclosure or deed in lieu of foreclosure, and (h) sale of the Property as part of a portfolio transaction (i.e., a sale involving multiple properties) or in connection with the sale of any other real property.  Any rights granted Tenant under this Section 19 will end upon any Excluded Transaction, except for those described under (a), (c), (e) and (f) above in which case the right granted to Tenant under this Section 19 shall not apply to the Excluded Transaction but shall apply to any subsequent transaction in accordance with the terms hereof. Landlord hereby acknowledges that it shall not structure a transaction as an Excluded Transaction merely for the purposes of avoiding its obligations to Tenant under this Section.

19.1.2  The Purchase Price shall be set forth in Landlord's Sale Notice to Tenant and shall be payable in immediately available funds at closing.

19.1.3  The closing shall be conducted through an escrow established at a title company acceptable to both Landlord and Tenant.  All deliveries shall be deposited in escrow and all closing deliveries and disbursements shall be made through the escrow.  The closing shall occur no later than thirty (30) days following the end of the Inspection Period.

19.1.4  For a period of thirty (30) days after the date of Tenant's Purchase Notice to Landlord ("Inspection Period"), Tenant shall be entitled to inspect the Property, conduct title examination, and review leases, operating agreements and other materials relating to the Property, but no invasive testing shall be allowed ("Inspections").  TENANT SHALL INDEMNIFY AND DEFEND LANDLORD (INCLUDING ANY FUTURE TENANTS IN COMMON), LANDLORD'S PARTNERS, AND THEIR RESPECTIVE AFFILIATES, LANDLORD'S AGENTS AND EMPLOYEES FROM AND AGAINST ANY CLAIM, DAMAGE OR LIABILITY ARISING OUT OF TENANT'S AND ITS AGENT'S AND CONTRACTOR'S INSPECTION (provided that the foregoing shall not apply to the mere discovery of Hazardous Substances by Tenant during the course of its Inspections.  Tenant may revoke its election to exercise the Right of First Offer to Purchase by notice at the expiration of the Inspection Period if Tenant is not satisfied with any aspect of the Property, in which case this Lease shall continue in full force and effect.

19.1.5  Landlord shall convey to Tenant fee simple title to the Property by special warranty deed with covenants against grantors acts only, subject only to all matters of record and those matters which a correct survey would show but free and clear of any liens or any other exceptions created by, under or through Landlord.  Landlord shall remove any monetary liens created by, under or through Landlord.  Tenant shall have the absolute right to approve title to the Property, and if title is not satisfactory, Tenant may revoke its election to exercise the Right of First Offer to Purchase by giving notice to Landlord (x) within the Inspection Period in Section 19.1.3 above and, (y) with respect to any title exceptions of which Tenant is notified after such Inspection Period but before the closing, at any time before the closing.  Landlord shall assign to Tenant all its right, title and interest in and to all contracts, warranties, permits, approvals, and other intangible property related to the Property except for any trade name or other similar rights related to the Property, which Landlord shall retain.

19.1.6  Pursuant to this Lease, there should be no proration of taxes or other expenses.

19.1.7  This Lease shall be terminated as of the closing.  All rent and other payments due by Tenant to Landlord under this Lease shall be prorated to the date of closing and shall be deposited into the escrow and disbursed to Landlord at closing.

19.1.8  Risk of loss shall remain with Landlord, subject to Tenant's obligations under this Lease, until the Closing.  If any condemnation is instituted or threatened against the Property or the Property is damaged, either party may terminate the purchase transaction, and this Lease shall remain in full force and effect.

19.1.9 Either Landlord or Tenant may transfer the Property as part of a forward like-kind exchange pursuant to Section 1031 of the Internal Revenue Code of 1986 and the regulations promulgated thereunder, as amended, or as a reverse like-kind exchange under Revenue Procedure 2000-37 ("Exchange").  Accordingly, Landlord or Tenant may under such circumstances assign its rights to sell or purchase under this Section 19 to a third party ("Qualified Intermediary") and Landlord and Tenant hereby consent to such assignment; provided, however, that such assignment shall not (i) constitute an assumption by Qualified Intermediary of Landlord's or Tenant's obligations hereunder, (ii) release Landlord or Tenant of any of its obligations hereunder, (iii) diminish or affect the rights of Landlord or Tenant hereunder or impose any additional expense upon Landlord or Tenant, or (iv) delay the Closing. Landlord or Tenant shall execute such documents and take such other action as may reasonably be requested for the purpose of so qualifying the transaction contemplated by this Agreement as an Exchange.

Tenant's exercise of the Right of First Offer to Purchase is irrevocable except as provided herein. The Right of First Offer to Purchase is not assignable and shall terminate automatically upon any termination of this Lease other than as a result of default by Landlord.  Further, no such right is exercisable if as of the date of exercised of the right or the closing, this Lease has terminated, or there is then an Event of Default by Tenant.

20.    Indemnity.

20.1    TO THE EXTENT PERMITTED BY THE LEGAL REQUIREMENTS, BUT SUBJECT TO SECTION 13.7 (MUTUAL WAIVER OF SUBROGATION), AND EXCEPT TO THE EXTENT RESULTING FROM THE NEGLIGENCE OR WILLFUL MISCONDUCT OF A LANDLORD PARTY, OR A BREACH OF THIS LEASE BY LANDLORD, TENANT AGREES TO INDEMNIFY, DEFEND, PROTECT AND HOLD HARMLESS LANDLORD (INCLUDING ANY FUTURE TENANTS IN COMMON THEREOF) AND THE LANDLORD PARTIES AND THEIR RESPECTIVE OFFICERS, DIRECTORS, SHAREHOLDERS, MEMBERS, MANAGERS, PARTNERS AND PRINCIPALS (AND THEIR RESPECTIVE AFFILIATES) (COLLECTIVELY, INCLUDING LANDLORD, "LANDLORD INDEMNITEES") AGAINST AND FROM ANY AND ALL COSTS, CLAIMS, LOSS, DAMAGE, EXPENSE AND LIABILITY (INCLUDING WITHOUT LIMITATION COURT COSTS, LITIGATION EXPENSES, AND REASONABLE ATTORNEYS' FEES) INCURRED IN CONNECTION WITH OR ARISING FROM ACTUAL OR THREATENED THIRD PARTY CLAIMS REGARDING: (A) INJURIES TO ANY PERSON OR DAMAGE TO, OR THEFT OR LOSS OF, PROPERTY OCCURRING IN OR ABOUT THE PREMISES AND THE PROJECT TO THE EXTENT CAUSED OR ALLEGED TO BE CAUSED BY THE VIOLATION OF LAW, FRAUD, NEGLIGENCE OR WILLFUL MISCONDUCT OF TENANT OR OF ANY OF TENANT'S MEMBERS, MANAGERS, OFFICERS, DIRECTORS, PARTNERS, AND SHAREHOLDERS, AS APPLICABLE, AND THE AFFILIATES, EMPLOYEES, AGENTS, INVITEES, LICENSEES, SUBCONTRACTORS, AND CONTRACTORS OF TENANT AND ITS MEMBERS, MANAGERS, PARTNERS, AND SHAREHOLDERS, AS APPLICABLE, EACH, INCLUDING TENANT, BEING A "TENANT PARTY"; AND (B) ANY ACTUAL OR ALLEGED BREACH OR DEFAULT IN THE PERFORMANCE OF TENANT'S

61

OBLIGATIONS UNDER THIS LEASE.  IN CASE ANY ACTION OR PROCEEDING IS BROUGHT AGAINST ANY LANDLORD INDEMNITEE AND SUCH CLAIM IS A CLAIM FROM WHICH TENANT IS OBLIGATED TO INDEMNIFY LANDLORD INDEMNITEES PURSUANT TO THIS SECTION, TENANT, UPON NOTICE FROM LANDLORD, SHALL RESIST AND DEFEND SUCH ACTION OR PROCEEDING (BY COUNSEL REASONABLY SATISFACTORY TO LANDLORD) AT TENANT'S (OR ITS INSURER'S) EXPENSE.

20.2    TO THE EXTENT PERMITTED BY THE LEGAL REQUIREMENTS, BUT SUBJECT TO SECTION 13.7, AND EXCEPT TO THE EXTENT RESULTING FROM THE NEGLIGENCE OR WILLFUL MISCONDUCT OF A TENANT PARTY, OR A BREACH OF THIS LEASE BY TENANT, LANDLORD AGREES TO INDEMNIFY, DEFEND, PROTECT, AND HOLD HARMLESS TENANT (INCLUDING ANY FUTURE TENANTS IN COMMON) AND THE TENANT PARTIES AND THEIR RESPECTIVE OFFICERS, DIRECTORS, SHAREHOLDERS, MEMBERS, MANAGERS, PARTNERS AND PRINCIPALS (AND THEIR RESPECTIVE AFFILIATES) (COLLECTIVELY, INCLUDING TENANT, THE "TENANT INDEMNITEES") AGAINST AND FROM ANY AND ALL COSTS CLAIMS LOSS, DAMAGE, EXPENSE AND LIABILITY (INCLUDING WITHOUT LIMITATION, COURT COSTS, LITIGATION EXPENSES, AND REASONABLE ATTORNEYS' FEES) INCURRED IN CONNECTION WITH OR ARISING FROM ACTUAL OR THREATENED THIRD PARTY CLAIMS REGARDING:  (A) INJURIES TO ANY PERSON OR DAMAGE TO, OR THEFT OR LOSS OF, PROPERTY OCCURRING IN OR ABOUT THE PREMISES AND THE PROJECT TO THE EXTENT CAUSED OR ALLEGED TO BE CAUSED BY THE VIOLATION OF LAW, FRAUD, NEGLIGENCE OR WILLFUL MISCONDUCT OF LANDLORD OR ANY LANDLORD PARTY; AND (B) ANY ACTUAL OR ALLEGED BREACH OR DEFAULT IN THE PERFORMANCE OF LANDLORD'S OBLIGATIONS UNDER THIS LEASE. IN CASE ANY ACTION OR PROCEEDING IS BROUGHT AGAINST ANY TENANT INDEMNITEE AND SUCH CLAIM IS A CLAIM FROM WHICH LANDLORD IS OBLIGATED TO INDEMNIFY TENANT INDEMNITEES PURSUANT TO THIS SECTION, LANDLORD, UPON NOTICE FROM TENANT, SHALL RESIST AND DEFEND SUCH ACTION OR PROCEEDING (BY COUNSEL REASONABLY SATISFACTORY TO TENANT) AT LANDLORD'S (OR ITS INSURER'S) EXPENSE.

20.3    Tenant's agreement to indemnify Landlord and Landlord's agreement to indemnify Tenant pursuant to this Section 20 are not intended to and shall not relieve any insurance carrier of its obligations under policies required to be carried pursuant to the provisions of this Lease, to the extent such policies cover, or if carried, would have covered the matters subject to the parties' respective indemnification obligations; nor shall they supersede any inconsistent agreement of the parties set forth in any other provision of this Lease.  If either party breaches this Lease by its failure to carry the required insurance hereunder, such failure shall automatically be deemed to be a covenant and agreement by the failing party to self-insure such required coverage, with full waiver of subrogation in favor of the other party.  The provisions of this Section 20 shall survive the expiration or earlier termination of this Lease with respect to any claims or liability occurring prior to such expiration or earlier termination, and with respect to Tenant, shall constitute obligations that are independent and severable from Tenant's covenants and obligations to pay rent under this Lease.

21.    <u>Access to Premises</u>.  Landlord reserves for itself and its agents, employees and independent contractors the right to enter the Premises upon at least forty-eight (48) hours' notice (except in the event of an emergency) to (i) inspect the Premises, (ii) supply any service to be provided by Landlord to Tenant, (iii) show the Premises to prospective purchasers, mortgagees, beneficiaries or (no earlier than nine (9) months prior to the expiration of this Lease) tenants, (iv) post notices of non-responsibility, or (v) determine whether Tenant is complying with its obligations under this Lease.  Landlord's right to enter the Premises shall include the right to grant reasonable access to the Premises to governmental or utility employees.  Landlord may erect, use and maintain scaffolding, pipes, conduits and other necessary structures in and through the Premises where reasonably required by the character of the work to be performed in making repairs or improvements, provided that (i) the work is reasonably necessary to satisfy Landlord's obligations hereunder; (ii) the entrance to the Premises shall not be blocked thereby, and (iii) there is no unreasonable interference with the business of Tenant.  In the event of an emergency, Landlord shall have the right to enter the Premises at any time without notice.  Except to the extent caused by the willful misconduct of Landlord or Landlord Parties, Tenant waives any claim for damages for any injury or inconvenience to or interference with Tenant's business, any loss of occupancy or quiet enjoyment of the Premises, any right to abatement of Rent, or any other loss occasioned by Landlord's exercise of any of its rights under this Section 21.

22.    <u>Notices</u>.  Subject to the further provisions of this Section 22, whenever it is provided herein that any notice, demand, request, consent, approval or other communication ("Notice") shall or may be given to either of the parties by the other, it shall be in writing and, any laws, rules or ordinances to the contrary notwithstanding, shall not be effective for any purpose unless same shall be given by registered or certified mail, postage prepaid, return receipt requested, or by any recognized overnight mail carrier, with proof of delivery slip, addressed to Landlord at Landlord's Address or to Tenant at Tenant's Mailing Address, with copies of notices to Tenant also given to: (i) Allan N. Rauch, Esq., c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083; and (ii) W. John Park, Esq., Cole Schotz P.C., Court Plaza North, 25 Main Street, Hackensack, NJ 07601, or to such other person or other address as may, from time to time, be specified by either party in a written notice to the other party.  If Tenant is notified of the identity and address of Landlord's secured lender or ground or underlying lessor, Tenant shall give to such lender or ground or underlying lessor written notice of any default by Landlord under the terms of this Lease by registered or certified mail or by use of a nationally-recognized commercial overnight courier, and such lender or ground or underlying lessor shall be given the same opportunity to cure such default as is provided Landlord under this Lease (unless such cure period is extended pursuant to the terms of any agreement to which Tenant is a party, such as the SNDA, or to which Tenant consents) prior to Tenant's exercising any remedy available to Tenant.  Notices required hereunder may be given by either an agent or attorney acting on behalf of Landlord or Tenant.  All notices given in accordance with the provisions of this Section 22 shall be effective upon receipt (or refusal of receipt) at the address of the addressee.  Notwithstanding the foregoing, Landlord shall instead and only send the following items to Tenant (Attention: Lease Administration) at Tenant's Mailing Address: all bills, notices (but not notices of default) and related information pertaining to Tenant's Proportionate Share of Operating Expenses; and all budgetary information, notices (but not notices of default), statements, and bills.

DMWEST #12993214 v14

23.    No Waiver.  Neither this Lease nor any term or provision of this Lease may be waived, and no breach thereof shall be waived, except by a written instrument signed by the party against which the enforcement of the waiver is sought.  No failure by either party to insist upon the strict performance of any obligation of the other party under this Lease or to exercise any right, power or remedy consequent upon a breach thereof, no acceptance of full or partial payment for amounts due hereunder during the continuance of any such breach, no course of conduct between the parties, and no acceptance of the keys or to possession of the Premises before the termination of the Term by Landlord or any employee of Landlord, shall constitute a waiver of any such breach or a waiver or modification of any term, covenant or condition of this Lease or operate as a surrender of this Lease.  No waiver of any breach shall affect or alter this Lease, but each and every term, covenant and condition of this Lease shall continue in full force and effect with respect to any other then-existing or subsequent breach thereof.  No payment by the other party or receipt by the other party of a lesser amount than the aggregate of any amount then due under this Lease shall be deemed to be other than on account of the first items then accruing or becoming due, unless the party to which such amounts are owed elects otherwise.  No endorsement or statement on any check and no letter accompanying any check or other payment of any amounts due hereunder in any such lesser amount and no acceptance by any party of any such check or other payment shall constitute an accord and satisfaction.  Either party may accept such check or payment without prejudice to such party's right to recover the balance of such amount due hereunder or to pursue any other legal remedy.

24.    ==Estoppel Certificates==.  Either party, at any time and from time to time, within thirty (30) days after written request from the other, shall execute, acknowledge and deliver to the other party, addressed (at Landlord's request) to the other party and any prospective purchaser, ground or underlying lessor or mortgagee or beneficiary of any part of the Property, an estoppel certificate certifying:  (i) that this Lease is in full force and effect and not modified or amended except as disclosed; (ii) the relevant dates under this Lease; (iii) to the knowledge of the certifying party, whether any defaults exist under this Lease (and if a default exists, the nature of such default); (iii) Tenant has accepted the Premises and that all conditions to the effectiveness of this Lease have been satisfied, (iv), any tenant improvement allowance has been paid to Tenant, and (v) any other items reasonably requested provided the same are of a factual nature.  It is intended that any such certificate may be relied upon by the party receiving the same and any prospective purchaser, investor, ground or underlying lessor or mortgagee or beneficiary of all or any part of the Property.

25.    Rules and Regulations.  Tenant shall faithfully observe and comply with and cause all of its employees and invitees to observe and comply with all reasonable rules and regulations which may from time to time be put into effect by Landlord.  In the event of any conflict between any such rule or regulation and this Lease, this Lease shall govern.

26.    ==Right of First Offer.==

26.1    Subject to the terms and conditions of this Section 26, during the initial Lease Term Landlord hereby grants Tenant a one-time right of first offer on the warehouse space adjoining the Premises within the Building (consisting of approximately 222,686 rentable square feet), as shown on the attached Exhibit A (the "Expansion Space").  Tenant acknowledges the

64

Expansion Space is presently available for lease and further acknowledges that Landlord is actively engaged in the marketing of the Expansion Space to third parties. In the event Landlord leases the Expansion Space to a third party and, during the initial Lease Term, all of the Expansion Space thereafter becomes available for lease, Landlord shall provide written notice to Tenant of the same, which notice shall include the basic economic terms of Landlord's offer of the Expansion Space to Tenant ("Landlord's Notice"). Tenant shall have five (5) business days after receipt of Landlord's Notice in which to provide a written acceptance of Landlord's offer and agree to negotiate in good faith to enter into an amendment to this Lease that provides for the addition to the Property of the Expansion Space under the terms of the offer contained in Landlord's Notice and other terms and conditions mutually acceptable to Landlord and Tenant (the "Expansion Amendment"). If (a) Landlord and Tenant are unable to reach mutual agreement on all of the material terms and conditions of the Expansion Amendment within fifteen (15) business days after Tenant's receipt of Landlord's Notice, or (b) should Tenant provide Landlord with notice that Tenant does not intend to lease such Expansion Space, or (c) should Tenant fail to respond in writing to Landlord within the five (5) business days following receipt of Landlord's Notice, then Landlord shall thereafter be free to lease the Expansion Space to a third party.

26.2    The right granted to Tenant in Section 26.1 above (the "Right of First Offer") is personal to the original Tenant named in this Lease or any Permitted Transferee. If Tenant subleases any portion of the Premises or assigns or otherwise transfers any interest under the Lease to an entity other than a Permitted Transferee, then Landlord shall be under no obligation to honor the Right of First Offer. The Right of First Offer are only available to Tenant on the express conditions that (a) no Event of Default under this Lease is outstanding as of the date of such Offer, (b) that Tenant occupies the entirety of the Premises, and (c) Tenant has at least five (5) years of Lease Term remaining at the time it receives Landlord's Notice. Tenant shall, within five (5) business days following Landlord's written request (the "Confirmation Request"), confirm in writing whether the Right of First Offer was declined, waived, or not applicable, as appropriate. If Tenant does not deliver such statement to Landlord within such five (5) business-day period, Landlord, and any prospective purchaser or lender, may conclusively presume and rely upon the facts Landlord sought to confirm in the Confirmation Request. In such event, Tenant shall be estopped from denying the truth of such facts.

26.3    For purposes of this Section 26, the Expansion Space is considered "available for lease" if (i) the Expansion Space is due to become vacant because the subject lease has expired or will expire or be terminated, (ii) there is no renewal or extension right with respect thereto and no existing superior pre-emptive right to lease the Expansion Space, and (iii) no renewal or extension of the subject lease has been requested by the tenant or subtenant of the Expansion Space.

26.4    Upon Tenant's acceptance of possession of the Expansion Space (or such portion thereof), Tenant's Proportionate Share of Operating Expenses for the Building and the Park shall be modified such that the formulas provided in Section 1.38 shall reflect the new Rentable Area of the Premises. In the event Tenant's Proportionate Share of the Building is 100%, Tenant shall have the exclusive use of the Common Areas.

27.    Miscellaneous.

27.1    References. All personal pronouns used in this Lease, whether used in the masculine, feminine or neuter gender, shall include all other genders; the singular shall include the plural, and vice versa. The use herein of the word "including" or "include" when following any general statement, term or matter shall not be construed to limit such statement, term or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not non-limiting language (such as "without limitation", or "but not limited to," or words of similar import) is used with reference thereto. All references to "mortgage" and "mortgagee" shall include deeds of trust and beneficiaries under deeds of trust, respectively. All Exhibits and Addenda referenced and attached to this Lease are incorporated in this Lease by this reference. The captions preceding the Sections of this Lease have been inserted solely as a matter of convenience, and such captions in no way define or limit the scope or intent of any provision of this Lease.

27.2    Successors and Assigns. The terms, covenants and conditions contained in this Lease shall bind and inure to the benefit of Landlord and Tenant and, except as otherwise provided herein, their respective personal representatives and successors and assigns; provided, however, that upon the sale, assignment or transfer by Landlord (or by any subsequent Landlord) of its interest in the Building as owner or lessee, including, without limitation, any transfer upon or in lieu of foreclosure or by operation of law, Landlord (or subsequent Landlord) shall be relieved from all subsequent obligations or liabilities under this Lease if and to the extent provided in Section 18.4.

27.3    Severability. If any provision of this Lease or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such provision to persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby, and each provision of this Lease shall remain in effect and shall be enforceable to the full extent permitted by law.

27.4    Integration. The terms of this Lease (including, without limitation, the Exhibits to this Lease) are intended by the parties as a final expression of their agreement with respect to such terms as are included in this Lease and may not be contradicted by evidence of any prior or contemporaneous agreement, arrangement, understanding or negotiation (whether oral or written). The parties further intend that this Lease constitutes the complete and exclusive statement of its terms, and no extrinsic evidence whatsoever may be introduced in any judicial proceeding involving this Lease. The language in all parts of this Lease shall in all cases be construed as a whole and in accordance with its fair meaning and not construed for or against any party by reason of such party having drafted such language.

27.5    Surrender. Upon the expiration or sooner termination of the Term, Tenant will quietly and peacefully surrender to Landlord the Premises in the condition in materially the same condition as received (and with the improvements described on the attached Exhibit F) under this Lease in good order and condition, ordinary wear and tear, casualty and condemnation excepted; provided, however, that nothing herein shall require Tenant to return the Premises to Landlord in any better condition than Tenant received under this Lease or to complete repairs,

66

maintenance, or replacements which are not Tenant's obligations under this Lease.  Consistent with Sections 3.3 and 8.2 of this Lease, Tenant acknowledges that Landlord, in its sole discretion, may require Tenant, as part of Tenant's surrender obligations, to remove (a) the approximately 24,000 square feet of main office to be located with the Premises by Tenant as part of Tenant's Work, and (b) any subsequent Alterations (unless such Alterations are like-kind replacements of the items listed on the attached Exhibit F).

      27.6    Quiet Enjoyment.  Upon Tenant paying the Base Rent and Additional Rent and performing all of Tenant's obligations under this Lease, Tenant may peacefully and quietly enjoy the Premises during the Term as against all persons or entities claiming by or through Landlord, subject, however, to the provisions of this Lease.

      27.7    Holding Over.  If Tenant shall hold over after the expiration of the Term, Tenant shall pay monthly Base Rent equal to one hundred twenty-five percent (125%) of the Base Rent payable during the final full month of the applicable Lease Year (exclusive of abatements, if any), for the first three months of such hold over and one hundred fifty percent (150%) of the Base Rent payable during the final full month of the applicable Lease Year (exclusive of abatements, if any) thereafter, in which such termination occurs, together with an amount reasonably estimated by Landlord for the monthly Additional Rent payable under this Lease, and shall otherwise be on the terms and conditions herein specified so far as applicable (but expressly excluding all renewal or extension rights).  No holding over by Tenant after the Term shall operate to extend the Term.  Any holding over with Landlord's written consent shall be construed as a tenancy at sufferance or from month-to-month, at Landlord's option.  Any holding over without Landlord's written consent shall entitle Landlord to reenter the Premises as provided in Section 18, and to enforce all other rights and remedies provided by law or this Lease.  The provisions of this Section 27.7 shall not be deemed to limit or constitute a waiver of any other rights or remedies of Landlord provided herein or at law.  If Tenant fails to surrender the Premises upon the expiration or earlier termination of the Lease Term, in addition to any other liabilities to Landlord accruing therefrom, TENANT SHALL PROTECT, DEFEND, INDEMNIFY AND HOLD HARMLESS LANDLORD (AND LANDLORD'S MEMBERS, MANAGERS, PARTNERS, AND SHAREHOLDERS, AS APPLICABLE, AND THE AFFILIATES, EMPLOYEES, AGENTS, AND CONTRACTORS OF LANDLORD AND ITS MEMBERS, MANAGERS, PARTNERS, AND SHAREHOLDERS, AS APPLICABLE) FROM ALL LOSSES, LIABILITIES, DAMAGES, COSTS AND EXPENSES (INCLUDING REASONABLE ATTORNEYS' FEES) RESULTING FROM SUCH FAILURE, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, ANY CLAIMS MADE BY ANY SUCCEEDING TENANT FOUNDED UPON SUCH FAILURE TO SURRENDER, AND ANY LOST PROFITS TO LANDLORD RESULTING THEREFROM. Notwithstanding the terms and conditions of this Section 27.7, Tenant shall be liable to Landlord for consequential damages by reason of Tenant's holding over only as described in Section 27.18 below.

      27.8    Time of Essence.  Time is of the essence of each and every provision of this Lease.

27.9    Brokers' Commissions.  Each party represents and warrants to the other that it has not entered into any agreement or incurred or created any obligation which might require the other party to pay any broker's commission, finder's fee or other commission or fee relating to the leasing of the Premises, other than Brokers referenced herein.  Landlord shall pay any and all commissions owing to each broker in connection with this Lease pursuant to a separate agreement between Landlord and each broker.  EACH PARTY SHALL INDEMNIFY, DEFEND AND HOLD HARMLESS THE OTHER AND THE OTHER'S CONSTITUENT PARTNERS AND THEIR RESPECTIVE OFFICERS, DIRECTORS, SHAREHOLDERS, AGENTS AND EMPLOYEES FROM AND AGAINST ALL CLAIMS FOR ANY SUCH COMMISSIONS OR FEES MADE BY ANYONE CLAIMING BY OR THROUGH THE INDEMNIFYING PARTY OTHER THAN THE BROKERS.

27.10    No Merger.  The voluntary or other surrender or termination of this Lease by Tenant, or a mutual cancellation hereof shall not work a merger, but, at Landlord's sole option, shall either terminate all existing subleases or subtenancies or shall operate as an assignment to Landlord of all such subleases or subtenancies.

27.11    Survival.  All of Tenant's and Landlord's covenants and obligations contained in this Lease which by their nature might not be fully performed or capable of performance before the expiration or earlier termination of this Lease shall survive such expiration or earlier termination.  No provision of this Lease providing for termination in certain events shall be construed as a limitation or restriction of Landlord's or Tenant's rights and remedies at law or in equity available upon a breach by the other party of this Lease, unless such rights and remedies are expressly proscribed in this Lease.

27.12    Amendments.  No amendments or modifications of this Lease or any agreements in connection therewith shall be valid unless in writing duly executed by both Landlord and Tenant.  Except for an amendment to this Lease required by this Lease, no amendment to this Lease shall be binding on any mortgagee or beneficiary of Landlord (or purchaser at any foreclosure sale) unless such mortgagee or beneficiary shall have consented in writing to such amendment.

27.13    WAIVER OF JURY TRIAL; Venue. LANDLORD AND TENANT KNOWINGLY, INTENTIONALLY AND VOLUNTARILY WAIVE TRIAL BY JURY IN ANY ACTION OR PROCEEDING BROUGHT BY EITHER PARTY AGAINST THE OTHER IN ANY MATTER ARISING OUT OF THIS LEASE, THE RELATIONSHIP OF LANDLORD AND TENANT, TENANT'S USE OR OCCUPANCY OF THE PREMISES OR ANY CLAIM OF INJURY OR DAMAGE. Each party hereby knowingly, intentionally, and irrevocably agrees that the other party shall bring any action or claim to enforce or interpret the provisions of this Lease or otherwise arising out of or related to this Lease or to Tenant's use or occupancy of the Property, regardless of the theory of relief or recovery and regardless of whether third parties are involved, in the State and County where the Property is located, and each party irrevocably consents to personal jurisdiction in such State for the purposes of any such action or claim.

27.14    Consents.  Except as may be otherwise expressly set forth in this Lease, whenever under this Lease provision is made for either party's securing the consent or approval

of the other party, (i) such consent or approval shall be in writing and shall not be unreasonably withheld, delayed or conditioned, and (ii) in all matters contained herein, both parties shall have an implied obligation of reasonableness.

27.15  Ethical Conduct Policy.  It is the policy of Tenant and its subsidiaries and affiliates (collectively, "the Company") to conduct all its business transactions in accordance with the highest ethical standards and all Applicable Laws (including, but not limited to, the U.S. Foreign Corrupt Practices Act).  No individual employed by or representing the Company, and no individual or entity contracting with the Company or otherwise performing services on behalf of the Company, is permitted to solicit, accept, offer, promise or pay any bribe, kickback or any other improper payment of money, products or services.  This includes, but is not limited to, any improper payment in exchange for (i) the Company's execution of this Lease, (ii) any action taken by such individual on behalf of the Company, or (iii) any action taken by a third party. Any individual or entity having a business relationship with the Company shall require any subcontractor (of any level) to adhere to the same standards and are expected to appropriately monitor their subcontractors to ensure such adherence.    If any such improper actions are observed, please contact the Tenant's Legal Department (Attention: General Counsel) at 908-688-0888 so that the incident may be fully investigated and appropriate remedial action taken.

27.16  Waivers by Tenant.  Subject to the terms and conditions of this Lease, Tenant waives and surrenders, for itself and all persons or entities claiming by, through and under Tenant, including creditors of all kinds: (i) any right and privilege which Tenant or any of them has under any present or future constitution, statute or rule of law to have a continuance of this Lease for the Lease Term after termination of Tenant's right of occupancy by order or judgment of any court or by any legal process or writ, or under the terms of this Lease; (ii) the benefits of any present or future constitution, statute or rule of law that exempts property from liability for debt or for distress for rent; (iii) any provision of Applicable Laws relating to notice or delay in levy of execution in case of eviction of a tenant for non-payment of rent; (iv) ANY RIGHT WHICH TENANT MAY HAVE TO CLAIM ANY NATURE OF LIEN OR TO WITHHOLD, ABATE OR DEDUCT FROM OR OFFSET AGAINST RENT, INCLUDING WITHOUT LIMITATION ANY RIGHTS, PRIVILEGES AND LIENS SET OUT UNDER SECTION 91.004 OF THE TEXAS PROPERTY CODE; AND (V) ANY RIGHTS OR PRIVILEGES SET OUT UNDER SECTIONS 93.002 AND 93.003 OF THE TEXAS PROPERTY CODE (AS AMENDED), AND TENANT EXEMPTS LANDLORD FROM ANY LIABILITY OR DUTY THEREUNDER.  Subject to the terms and conditions of this Lease, Tenant further hereby acknowledges and agrees that Landlord shall have no duty to mitigate damages recoverable by Landlord by reason of any Event of Default hereunder, unless otherwise expressly required by Applicable Law, and Tenant hereby waives any such claims of any such obligation to mitigate to the extent permitted by Applicable Law.

27.17  Assessment of Charges.  Landlord and Tenant hereby each acknowledge and agree that they are knowledgeable and experienced in commercial transactions and further hereby acknowledge and agree that the provisions of this Lease for determining charges, amounts and additional rent payable by Tenant are commercially reasonable and valid even though such methods may not state precise mathematical formulae for determining such charges. ACCORDINGLY, WITH RESPECT TO ALL CHARGES PERMITTED TO BE ASSESSED

DMWEST #12993214 v14

BY LANDLORD AGAINST TENANT PURSUANT TO THIS LEASE, TENANT HEREBY VOLUNTARILY AND KNOWINGLY WAIVES ALL RIGHTS AND BENEFITS TO WHICH TENANT MAY BE ENTITLED UNDER SECTION 93.012 OF THE TEXAS PROPERTY CODE, AS SUCH SECTION NOW EXISTS OR AS SAME MAY BE HEREAFTER AMENDED.

27.18  <u>Punitive and Consequential Damages</u>. Notwithstanding anything to the contrary contained herein, in no event shall Landlord be liable to Tenant for any punitive, exemplary, or consequential damages suffered by Tenant as a result of an default by, or any other act of, Landlord, and in no event shall Tenant be liable to Landlord for any punitive, exemplary, or consequential damages suffered by Landlord as a result of an default by, or any other act of, Tenant, other than those actual consequential damages incurred by Landlord by reason of the holdover of the Premises by Tenant after the expiration or earlier termination of this Lease hereunder that extends ninety (90) or more days following such date of expiration or earlier termination of this Lease.

27.19  <u>Waiver of Certain Remedies and of Consumer Rights</u>. AS TO ANY CLAIMS OR CAUSES OF ACTION ARISING OR ALLEGED TO HAVE ARISEN OUT OF THIS LEASE OR THE SUBJECT MATTER HEREOF, TO THE FULLEST EXTENT ALLOWED BY LAW, TENANT HEREBY EXPRESSLY WAIVES ALL RIGHTS AND REMEDIES UNDER THE TEXAS DECEPTIVE TRADE PRACTICES-CONSUMER PROTECTION ACT, SECTION 17.41 <u>ET. SEQ.</u>, TEXAS BUSINESS AND COMMERCE CODE, AS SAME MAY BE AMENDED, A LAW THAT GIVES CONSUMERS SPECIAL RIGHTS AND PROTECTIONS.  AFTER CONSULTATION WITH AN ATTORNEY OF TENANT'S OWN SELECTION, TENANT VOLUNTARILY CONSENTS TO THIS WAIVER AND ACKNOWLEDGES THAT IT IS NOT IN A SIGNIFICANT DISPARATE BARGAINING POSITION AND THAT IT HAS KNOWLEDGE AND EXPERIENCE IN FINANCIAL BUSINESS MATTERS THAT ENABLE IT TO EVALUATE THE MERITS AND RISKS OF THE TRANSACTION CONTEMPLATED BY THIS LEASE.

27.20  <u>Existing Conditions</u>. Subject to the further terms and conditions of this Lease (and to all currently recorded matters, laws, ordinances, and governmental regulations and orders), Tenant shall accept the Premises in its "as-is" condition as of the earlier of Tenant's occupancy of the Premises or the Commencement Date. Except as expressly provided in this Lease, Tenant acknowledges that neither Landlord nor any agent of Landlord has made any representations or warranties, express or implied, whatsoever with respect to the condition of the Premises, the Building or any portion of the Property, or any buildings or other improvements on or comprising a part of either of same, nor with respect to the fitness or suitability thereof for any particular use or purpose, and Tenant hereby waives any and all such warranties, express or implied, including specifically but without limitation any warranty or representation of suitability.

27.21  <u>Exemption of Landlord from Liability</u>.  Subject to the further terms and conditions of this Lease, to the extent permitted by Applicable Law, Landlord shall not be liable for (and Tenant assumes the risk of ) any damage or injury to the person, business (or any loss of income therefrom), goods, wares, merchandise or other property of Tenant, Tenant's employees,

invitees, customers or any other person in or about the Property, whether such damage or injury is caused by or results from: (a) fire, steam, electricity, water, gas or rain; (b) the breakage, leakage, obstruction or other defects of pipes, sprinklers, wires, appliances, plumbing, air conditioning or lighting fixtures or any other cause; (c) conditions arising in or about the Property or upon other portions of the Project, or from other sources or places; (d) criminal acts or entry by unauthorized persons into the Property or the Building; or (e) any act or omission of any other tenant of Landlord.  Landlord shall not be liable for any such damage or injury even though the cause of or the means of repairing such damage or injury are not accessible to Tenant. The provisions of this Section shall not, however, exempt Landlord from liability to the extent of Landlord's negligence or willful misconduct.

27.22  Legal Proceedings.  If Tenant or Landlord shall be in breach or default under this Lease, such party (the "Defaulting Party") shall reimburse the other party (the "Non-defaulting Party") upon demand for any costs or expenses that the Non-defaulting Party incurs in connection with any breach or default of the Defaulting Party under this Lease, whether or not suit is commenced or judgment entered.  Such costs shall include legal fees and costs incurred for the negotiation of a settlement, enforcement of rights or otherwise.  Furthermore, if any action for breach of or to enforce the provisions of this Lease is commenced, the court in such action shall award to the party in whose favor a judgment is entered, a reasonable sum as attorneys' fees and costs.  The losing party in such action shall pay such attorneys' fees and costs. TO THE EXTENT PERMITTED BY APPLICABLE LAW, LANDLORD AND TENANT WAIVE THE PROTECTION OF ANY STATUTE, CODE OR JUDICIAL DECISION THAT MAY LIMIT THE AMOUNT OF ATTORNEYS' FEES OTHERWISE RECOVERABLE BY EITHER PARTY UNDER THE TERMS OF THIS LEASE.

27.23  Landlord's Consent.  Tenant shall pay Landlord's reasonable attorneys' fees incurred in connection with (a) Tenant's request for Landlord's consent under Section 16 (Assignment and Subletting) of this Lease, or in connection with any other act which Tenant proposes to do and which requires Landlord's consent, or (b) any other Landlord action requested by Tenant, provided, however that Tenant's liability hereunder with respect to any single application shall not exceed $2,500.00.

27.24  Communications Services.

27.24.1      Landlord's Communications Equipment.    Subject to Applicable Law, Landlord reserves to itself and its affiliates the exclusive right to (a) place antennae and related facilities and other equipment for the provision of communications services (the "Communications Equipment") on the rooftop of the Building, and (b) enter into license agreements, leases, or other agreements for the use of such areas by commercial and other providers of communications services (the "Communications Agreements").  Notwithstanding the foregoing, in no event shall such Communications Equipment interfere with the equipment placed on the roof by Tenant as part of its operations at the Premises.  As used in this Section, "Communications Services" shall mean the implementation, provision, facilitation and maintenance of voice, data, video or other communication services (or any combination of the foregoing) including, without limitation: (a) the provision and resale of point-to-point telephone communications (including dedicated long distance service), (b) video communications service,

71

(c) 800-number service, (d)¹ telephone credit or debit card service, (e) audio or video conferencing, paging, voice mail and message centers, (f) data transmission service, (g) access to computer "internet" or other networked computer-based communications, (h) satellite or cable television, (i) wideband digital networks, (j) security services, and (k) provision of telephone, video communication or other communication equipment to consumers of such services; whether now existing or subsequently developed and however provided, including, without limitation, wireless transmission and reception of communication signals. Landlord shall be entitled to any and all fees or other charges payable by any such provider of Communications Services on account of any Communications Agreements.

27.24.2    Tenant's Communications Equipment.    Notwithstanding any language to the contrary in this Lease, with Landlord's prior written consent and subject to all applicable provisions of this Lease and Applicable Law, Tenant may, at Tenant's sole cost and expense, install Communications Equipment on the rooftop or in other portions of the Premises, but only if such Communications Equipment is solely limited to Tenant's own use in the conduct of its business from the Premises ("Tenant's Communications Equipment"). Tenant's Communications Equipment shall remain the property of Tenant or its contractor. Tenant shall be solely responsible for all costs and expenses related to the use and maintenance of Tenant's Communications Equipment, and the removal of which upon the expiration or earlier termination of this Lease shall be governed by Section 8.2 of this Lease. Any damage caused by such installation or removal shall be repaired as required in Section 8.2 of this Lease. Subject to Section 8.6 above, Landlord agrees to permit Tenant and its contractors reasonable access to the rooftop of the Building and other areas of the Building required to facilitate the installation, use, maintenance, and removal of Tenant's Communications Equipment, so long as other users and occupants of the Building are not disturbed thereby and Tenant. TENANT SHALL DEFEND, INDEMNIFY AND HOLD HARMLESS LANDLORD (AND LANDLORD'S MEMBERS, MANAGERS, PARTNERS, AND SHAREHOLDERS, AS APPLICABLE, AND THE AFFILIATES, EMPLOYEES, AGENTS, AND CONTRACTORS OF LANDLORD AND ITS MEMBERS, MANAGERS, PARTNERS, AND SHAREHOLDERS, AS APPLICABLE) FROM ALL EXPENSES, COSTS, DAMAGES, LOSS, CLAIMS OR OTHER EXPENSES (INCLUDING REASONABLE ATTORNEYS' FEES) ARISING OUT OF TENANT'S INSTALLATION, USE, MAINTENANCE, AND REMOVAL OF TENANT'S COMMUNICATIONS EQUIPMENT. Tenant agrees that the use of Tenant's Communications Equipment shall in no way interfere with the operation and maintenance the Building, or any of the Building Systems. If such interference occurs, Tenant agrees to suspend use of Tenant's Communications Equipment until the interference has been corrected to the reasonable satisfaction of Landlord. All operations by Tenant pursuant to this Section shall be lawful and in compliance with all rules and regulations of the Federal Communications Commission. Consistent with the terms of Section 8.1.2 of this Lease, (a) Landlord shall have the right, in its reasonable discretion, to determine the location of any visible Tenant's Communications Equipment, (b) with respect to any visible Tenant's Communications Equipment described in the preceding clause (a), Landlord and Tenant shall mutually agree as to whether the screening or painting of same is reasonably required, in the manner more particularly described in the last sentence of Section 8.1.1 of this Lease, and (c) the installation the Tenant's Communications Equipment is subject to Landlord's prior approval of the final installation plans. Also, any rooftop installation of Tenant's Communications Equipment shall be only commenced and

72

completed using a Landlord-approved roofing contractor for any work involving possible roof penetrations, so as to preserve any applicable roof warranty. Regardless of any roof warranty or any repair obligations of Landlord in this Lease, Tenant shall be solely responsible for the (a) repair of any leaks or other damage to the roof membrane resulting from the installation of any Tenant's Communications Equipment, and (b) all expenses, costs, damages, losses, claims or other expenses and liabilities arising from the voiding of any applicable roof warranty resulting from the acts or omissions of Tenant or its agents, employees or contractors. The obligations of Tenant under this Section shall survive the expiration or earlier termination of this Lease.

27.25    No Recordation. Tenant shall not record this Lease or any assignment or security document pertaining to this Lease. Either Landlord or Tenant may require that a "Short Form" or memorandum of this Lease executed by both parties be recorded. The party requiring such recording shall pay all transfer taxes and recording fees.

27.26    Counterparts. This Lease may be executed in counterparts and, when all counterpart documents are executed, the counterparts shall constitute a single binding instrument. Receipt of facsimile signatures (regardless of the means of transmission, whether by PDF or other format) shall be as binding on the parties as an original signature.

27.27    Confidentiality. Each party hereto agrees that the terms of this Lease are confidential and constitute proprietary information, and that disclosure of the terms hereof could adversely affect the other party. Each party shall keep its partners, members, managers, officers, directors, employees, agents, real estate brokers and sales persons and attorneys, as applicable, from disclosing the terms of this Lease to any other person without the other party's prior written consent, except to any accountants of the first party in connection with the preparation of its financial statements or tax returns, to agents or consultants of the first party in connection with its performance of its obligations hereunder, to an assignee of this Lease or subtenant of the Premises (with respect to Tenant), or to a person to whom disclosure is required in connection with any action brought to enforce this Lease; provided, however, that each party shall inform such persons of the confidentiality of the terms of this Lease and shall obtain their agreement to abide by the confidentiality provisions of this Section prior to such disclosure. In the event either party is required to disclose this Lease or any terms thereof to governmental agencies pursuant to Applicable Law, such disclosing party shall, prior to making such disclosure, submit a written request to the applicable authorities that this Lease be exempt from such disclosure requirements and take other actions reasonably necessary to avoid such disclosure. The disclosing party shall provide the other party with a copy of such request and all related documents promptly following the submission thereof to the applicable authorities and shall keep the other party apprised of the status of such request and all responses thereto. Each party shall, in any event, provide the other party with not less than ten (10) days' notice prior to disclosing this Lease or any term thereof to any court or governmental agency. Notwithstanding any language to the contrary in this Section, The Northwestern Mutual Life Insurance Company, the sole current mortgagee of the Property whose wholly-owned affiliate is a partner of Landlord, shall also have the right to disclose the terms of this Lease to the National Association of Insurance Commissioners and to nationally recognized rating agencies.

27.28  Revenue and Expense Accounting.  Landlord and Tenant agree that for purposes of Section 467 of the Internal Revenue Code rental income will accrue to Landlord and rental expenses will accrue to Tenant in the amounts and as of the dates rent is payable under this Lease.

27.29  Tenant's Representations and Warranties.  Tenant warrants and represents to Landlord as follows, each of which is material and being relied upon by Landlord:

(i)  Tenant is not, and shall not become, a person or entity with whom Landlord is restricted from doing business under regulations of the Office of Foreign Assets Control ("OFAC") of the Department of the Treasury (including, but not limited to, those named on OFAC's Specially Designated Nationals and Blocked Persons list) or under any statute, executive order (including, but not limited to, the September 24, 2001 Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action; (y) are not, and shall not become, a person or entity with whom Landlord is restricted from doing business under the International Money Laundering Abatement and Financial Anti-Terrorism Act of 2001 or the regulations or orders thereunder; and (z) are not knowingly engaged in, and shall not knowingly engage in, any dealings or transaction or be otherwise associated with such persons or entities described in clauses (x) or (y), above.

(ii)  If Tenant is an entity, Tenant is duly organized, validly existing and in good standing under the laws of the State of its organization, and is qualified to do business in the State in which the Property is located, and the persons executing this Lease on behalf of Tenant have the full right and authority to bind Tenant without the consent or approval of any other person or entity. Tenant has full power, capacity, authority and legal right to execute and deliver this Lease and to perform all of its obligations hereunder.  This Lease is a legal, valid and binding obligation of Tenant, enforceable in accordance with its terms.

(iii)  Tenant has not (1) made a general assignment for the benefit of creditors, (2) filed any voluntary petition in bankruptcy or suffered the filing of an involuntary petition by any creditors, (3) suffered the appointment of a receiver to take possession of all or substantially all of its assets, (4) suffered the attachment or other judicial seizure of all or substantially all of its assets, (5) admitted in writing its inability to pay its debts as they come due, or (6) made an offer of settlement, extension or composition to its creditors generally.

74

27.30  <u>Tenant's Cooperation</u>.  Tenant acknowledges that the Building is or may be in the future certified/rated pursuant to the U.S. EPA's Energy Star® Portfolio Manager, the Green Building Initiative's Green Globes building rating system, or the U.S. Green Building Council's Leadership in Energy and Environmental Design (LEED®) building rating system, or operated to meet another standard for high performance buildings adopted by Landlord (collectively, the "Green Building Standard").  As and when requested by Landlord during the Lease Term, Tenant shall, at no third party, out-of-pocket cost to Tenant, provide Landlord (in the format requested by Landlord and reasonably necessary or desirable to comply with the requirements of the applicable Green Building Standard or any commissioning or re-commissioning of the Building's HVAC systems) with data concerning Tenant's energy consumption, water consumption, and the operation of the Building's HVAC systems. Such data may include, without limitation, the operating hours, the number of on-site personnel, the types of equipment used at the Building (including computer equipment, if applicable), and energy use and cost; Landlord shall ensure that the recipients of such information maintain same on a confidential basis..  Landlord shall have no liability to Tenant if, once obtained, any such Green Building Standard rating or certification lapses and is not reinstated by Landlord.

27.31  <u>Reservations</u>.  Landlord reserves to itself the right to grant, from time to time, without the consent or joinder of Tenant, such easements, rights and dedications that Landlord deems necessary, and to cause the recordation of parcel maps (or equivalent) and restrictions, so long as such easements, rights, dedications, maps and restrictions do not unreasonably interfere with the use of the Premises by Tenant or lessen or diminish Tenant's rights and benefits under this Lease.  Tenant agrees to sign any documents reasonably requested by Landlord to effectuate any such easements, rights, dedications, maps or restrictions.

27.32  <u>Independent Covenants</u>.  This Lease shall be construed as though the covenants herein between Landlord and Tenant are independent and not dependent and Tenant, to the extent permitted by Applicable Law, hereby expressly waives the benefit of any statute or other law to the contrary and agrees that if Landlord fails to perform its obligations set forth herein, Tenant shall not be entitled to make any repairs or perform any acts hereunder at Landlord's expense or to any setoff of the Rent or other amounts owing hereunder against Landlord.

27.33  <u>DELIVERY FOR EXAMINATION</u>.  DELIVERY OF THIS LEASE TO TENANT SHALL NOT BIND LANDLORD OR TENANT IN ANY MANNER, AND NO LEASE OR OBLIGATIONS OF LANDLORD OR TENANT SHALL ARISE UNTIL THIS INSTRUMENT IS SIGNED BY BOTH LANDLORD AND TENANT AND DELIVERY IS MADE TO EACH, WHETHER SUCH EXECUTION AND DELIVERY IS ACCOMPLISHED BY PHYSICAL DELIVERY OR DELIVERY BY FACSIMILE TRANSMISSION OR OTHER ELECTRONIC MEANS.  NEITHER PARTY SHALL HAVE ANY OBLIGATION TO CONTINUE DISCUSSIONS OR NEGOTIATIONS OF THIS LEASE.

27.34  <u>Texas Law</u>.  This Lease shall be governed by the laws of the State of Texas, without regard to its conflicts of law principles.

28.    <u>Economic Development Grants</u>. Reference is made to that certain Economic Development Agreement that is being entered into between the City of Lewisville and Tenant (and countersigned by Landlord) simultaneously with the full execution and delivery of this Lease, substantially in the form of <u>Exhibit J</u> hereto (the "Tenant EDA"), in accordance with Chapter 380 of the Texas Local Government Code, which Tenant EDA is designed among other matters to effect certain economic development grants to Tenant as more particularly described therein. Landlord, as owner of the Property, hereby agrees that during the Term it shall execute and deliver all consents and ancillary documents relating to the Tenant EDA, perform ministerial acts relating thereto and during the Lease Term otherwise cooperate fully and timely with Tenant and the City of Lewisville so as to enable Tenant to receive the respective benefits described in the Tenant EDA, all at no additional cost or charge to Landlord. Landlord hereby represents and warrants that Majestic Lewisville Partners L.P. is duly authorized to sign the EDA as the sole signatory on behalf of Landlord.

## NOTICE OF INDEMNIFICATION

THE PARTIES TO THIS LEASE AGREEMENT HEREBY ACKNOWLEDGE AND AGREE THAT THIS LEASE AGREEMENT CONTAINS CERTAIN INDEMNIFICATION PROVISIONS (INCLUDING, WITHOUT LIMITATION, PURSUANT TO SECTIONS 6.4, 7.4.8, 8.6.1, 14.5, 17.2, 19.1.4, 20.1, 20.2, 27.7, 27.9, and 27.24.2 OF THIS LEASE).

*[Intentionally left blank—signature page to follow]*

DMWEST #12993214 v14

IN WITNESS WHEREOF, Landlord and Tenant have each caused their duly authorized representatives to execute this Lease on their behalf as of the date first above written.

LANDLORD:

TENANT:

DFW LEWISVILLE PARTNERS, GP,
a Texas general partnership

BED BATH & BEYOND INC.,
a New York corporation

By:   MAJESTIC LEWISVILLE PARTNERS,
       L.P., a Delaware limited partnership,
       a partner

By:   **Signed In Counterpart**
Printed Name:  Steven H. Temares
Its: Chief Executive Officer

      By:   MAJESTIC DFW G.P., LLC, a Delaware
           limited liability company, its general partner

          By:   MAJESTIC REALTY CO.,
              a California corporation, Manager's
              Agent

              By:  _____
              Printed Name: EDWARD P. ROSKI, JR.
              Its:    President and Chairman of the Board

              By:  _____
              Printed Name:  _____
              Its:  _____

By:   NM DFW LEWISVILLE, LLC,
       a Delaware limited liability company, a partner

      By:   NM MAJESTIC HOLDINGS, LLC,
          a Delaware limited liability company,
          its sole member

          By:   NML REAL ESTATE HOLDINGS,
              LLC, a Wisconsin limited liability
              company, its sole member

              By:   THE NORTHWESTERN MUTUAL LIFE INSURANCE
                 COMPANY, a Wisconsin corporation, its
                 sole member

                 By:   NORTHWESTERN MUTUAL INVESTMENT
                    MANAGEMENT COMPANY, LLC,   a Delaware limited
                    liability company, its wholly-owned affiliate

                 By:  _Joseph L. Cochran_
                 Printed Name:  _Joseph L. Cochran_
                 Its:  _Director Asset Management_

77

IN WITNESS WHEREOF, Landlord and Tenant have each caused their duly authorized representatives to execute this Lease on their behalf as of the date first above written.

LANDLORD:                                                TENANT:

DFW LEWISVILLE PARTNERS, GP,                             BED BATH & BEYOND INC.,
a Texas general partnership                              a New York corporation

By:    MAJESTIC LEWISVILLE PARTNERS,                     By: _____
       L.P., a Delaware limited partnership,             Printed Name:  Steven H. Temares
       a partner                                         Its: Chief Executive Officer

       By:    MAJESTIC DFW G.P., LLC, a Delaware
              limited liability company, its general partner

              By:    MAJESTIC REALTY CO.,
                     a California corporation, Manager's
                     Agent
                            **Signed In Counterpart**
                     By: _____
                     Printed Name: _____
                     Its: _____

                     By: _____
                     Printed Name: _____
                     Its: _____

By:    NM DFW LEWISVILLE, LLC,
       a Delaware limited liability company, a partner

       By:    NM MAJESTIC HOLDINGS, LLC,
              a Delaware limited liability company,
              its sole member

              By:    NML REAL ESTATE HOLDINGS,
                     LLC, a Wisconsin limited liability
                     company, its sole member

                     By:    THE NORTHWESTERN MUTUAL LIFE INSURANCE
                            COMPANY, a Wisconsin corporation, its
                            sole member

                            By:    NORTHWESTERN MUTUAL INVESTMENT
                                   MANAGEMENT COMPANY, LLC,    a Delaware limited
                                   liability company, its wholly-owned affiliate

                            By: _____**Signed In Counterpart**_____
                            Printed Name: _____
                            Its: _____

**EXHIBIT A**

**SITE PLAN**

(Attached)

## EXHIBIT B

## LEGAL DESCRIPTION OF THE LAND

TRACT 1:

DESCRIPTION, of a 60.710 acre tract of land situated in the Peter Harmonson Survey, Abstract No. 530, Denton County, Texas, and the Peter Harmonson Survey, Abstract No. 1795, Dallas County, Texas; being all of Lot 1, Block B, Majestic Addition, an addition to the City of Lewisville according to the plat recorded in Cabinet 2012, Page 266, Official Records of Denton County, Texas and in Instrument 201300017112, Official Public Records of Dallas County, Texas; and being a part of that tract of land described in Special Warranty Deed to DFW Lewisville Partners, GP recorded in Instrument No. 2006-82125, Official Records of Denton County, Texas; and being a part of that tract of land described in Special Warranty Deed to DFW Lewisville Partners, GP recorded in Instrument No. 200600240418, Official Public Records of Dallas County, Texas; said 60.710 acre tract being more particularly described as follows:

BEGINNING, at a 1/2-inch iron rod found for the southeast corner of said DFW Lewisville Partners, GP tract; said point being the south corner of part of a tract of land described in Deed to Hawkeye Realty Schreiber, L.P. recorded in Document No. 2008-72708 of said Official Records of Denton County; said point being in the northwest right-of-way line of State Highway No. 121 (a variable width right-of-way);

THENCE, with the said northwest line of State Highway No. 121 and the south line of said Lot 1, the following five (5) calls:

South 50 degrees, 10 minutes, 34 seconds West, a distance of 0.26 feet to a 1/2-inch iron rod found for an angle point;

South 54 degrees, 09 minutes, 58 seconds West, a distance of 200.87 feet to a 1/2-inch iron rod with "PACHECO KOCH" cap found for corner;

South 58 degrees, 12 minutes, 05 seconds West, a distance of 453.43 feet to a Texas Department of Transportation highway disk found at the beginning of a non-tangent curve to the left;

In a southwesterly direction, along said curve to the left, having a central angle of 10 degrees, 12 minutes, 03 seconds, a radius of 1,457.40 feet, a chord bearing and distance of South 53 degrees, 04 minutes, 27 seconds West, 259.13 feet, an arc distance of 259.47 feet to a Texas Department of Transportation highway disk found at the end of said curve;

South 48 degrees, 00 minutes, 12 seconds West, a distance of 43.30 feet to a 1/2-inch iron rod found for corner;

THENCE, departing the said northwest line of State Highway No. 121 and continuing with the said south line of Lot 1, the following five (5) calls:

North 89 degrees, 26 minutes, 36 seconds West, a distance of 7.68 feet to a 5/8-inch iron rod found for corner;

North 00 degrees, 41 minutes, 52 seconds East, a distance of 131.22 feet to a point for corner;

North 75 degrees, 26 minutes, 57 seconds West, a distance of 125.47 feet to a point for corner;

North 64 degrees, 05 minutes, 25 seconds West, a distance of 628.58 feet to a point for corner;

North 68 degrees, 10 minutes, 24 seconds West, a distance of 122.74 feet to a point for the southwest corner of said Lot 1; said point being in the east right-of-way line of Ace Lane (a variable width right-of-way); from said point a 1/2-inch iron rod with "PACHECO KOCH" cap found bears North 68 degrees, 10 minutes West, a distance of 18.9 feet;

B-1

THENCE, with the west line of said Lot 1 and the east line of said Ace Lane, the following six (6) calls:

North 02 degrees, 19 minutes, 52 seconds East, a distance of 739.36 feet to a point for corner;

North 00 degrees, 42 minutes, 13 seconds East, a distance of 1,068.96 feet to a point for corner; said point being in the south right-of-way line of new Ace Lane (a 50-foot wide right-of-way, dedicated by Instrument No. 2008-50112 of said Official Records of Denton County); from said point a PK-nail with washer found bears North 89 degrees, 35 minutes West, a distance of 15.0 feet;

South 89 degrees, 34 minutes, 46 seconds East, departing the said east line of Ace Lane, a distance of 9.99 feet to a 1/2-inch iron rod with "PACHECO KOCH" cap found for corner;

North 00 degrees, 25 minutes, 14 seconds East, a distance of 50.00 feet to a point for corner at the beginning of a curve to the right;

In a northeasterly direction, along said curve to the right, having a central angle of 60 degrees, 07 minutes, 36 seconds, a radius of 175.00 feet, a chord bearing and distance of North 30 degrees, 29 minutes, 02 seconds East, 175.33 feet, an arc distance of 183.65 feet to a 1/2-inch iron rod with "PACHECO KOCH" cap found at the end of said curve;

North 60 degrees, 32 minutes, 50 seconds East, a distance of 51.50 feet to a "+" cut in concrete found for corner in the north end of a right-of-way corner clip at the intersection of the said south line of new Ace Lane and the south right-of-way line of Valley Parkway (a variable width right-of-way);

THENCE, South 74 degrees, 27 minutes, 10 seconds East, along the said corner clip, a distance of 25.79 feet to a 1/2-inch iron rod with "PACHECO KOCH" cap found for corner in the said south line of Valley Parkway; said point being the beginning of a non-tangent curve to the left;

THENCE, with the said south line of Valley Parkway and the northerly line of said Lot 1, the following ten (10) of calls:

In a southeasterly direction, along said curve to the left, having a central angle of 34 degrees, 58 minutes, 09 seconds, a radius of 1,600.00 feet, a chord bearing and distance of South 47 degrees, 08 minutes, 14 seconds East, 961.44 feet, an arc distance of 976.52 feet to a 1/2-inch iron rod with "PACHECO KOCH" cap found at the end of said curve;

South 64 degrees, 37 minutes, 19 seconds East, a distance of 434.67 feet to a 1/2-inch iron rod with "PACHECO KOCH" cap found at the beginning of a curve to the right;

In a southeasterly direction, along said curve to the right, having a central angle of 12 degrees, 34 minutes, 41 seconds, a radius of 237.50 feet, a chord bearing and distance of South 58 degrees, 19 minutes, 58 seconds East, 52.03 feet, an arc distance of 52.14 feet to a 1/2-inch iron rod with "PACHECO KOCH" cap found at the end of said curve; said point being the beginning of a reverse curve to the left;

In a southeasterly direction, along said curve to the left, having a central angle of 12 degrees, 34 minutes, 41 seconds, a radius of 262.50 feet, a chord bearing and distance of South 58 degrees, 19 minutes, 58 seconds East, 57.51 feet, an arc distance of 57.63 feet to a 1/2-inch iron rod with "PACHECO KOCH" cap found at the end of said curve;

South 64 degrees, 37 minutes, 19 seconds East, a distance of 100.00 feet to a 1/2-inch iron rod with "PACHECO KOCH" cap found for corner;

South 32 degrees, 37 minutes, 00 seconds East, a distance of 23.58 feet to a 1/2-inch iron rod with "PACHECO KOCH" cap found for corner;

South 64 degrees, 37 minutes, 19 seconds East, a distance of 46.00 feet to a 1/2-inch iron rod with "PACHECO KOCH" cap found for corner;

North 64 degrees, 37 minutes, 19 seconds East, a distance of 31.63 feet to a 1/2-inch iron rod with "PACHECO KOCH" cap found for corner;

South 64 degrees, 37 minutes, 19 seconds East, a distance of 18.52 feet to a point for corner at the beginning of a curve to the right;

In a southeasterly direction, along said curve to the right, having a central angle of 00 degrees, 27 minutes, 13 seconds, a radius of 1,000.00 feet, a chord bearing and distance of South 64 degrees, 23 minutes, 42 seconds East, 7.92 feet, an arc distance of 7.92 feet to a 1/2-inch iron rod with "PACHECO KOCH" cap found at the end of said curve;

THENCE, South 00 degrees, 18 minutes, 32 seconds West, departing the said south line of Valley Parkway, a distance of 990.80 feet to the POINT OF BEGINNING;

CONTAINING: 2,644,513 square feet or 60.710 acres of land, more or less.

TRACT

DESCRIPTION, of a 0.058 acre tract of land situated in the Peter Harmonson Survey, Abstract No. 530, Denton County, Texas; being all of Lot 1, Block C, Majestic Addition, an addition to the City of Lewisville according to the plat recorded in Cabinet 2012, Page 266, Official Records of Denton County, Texas and in Instrument 201300017112, Official Public Records of Dallas County, Texas; and being a part of that tract of land described in Special Warranty Deed to DFW Lewisville Partners, GP recorded in Instrument No. 2006-82125, Official Records of Denton County, Texas; and being a part of that tract of land described in Special Warranty Deed to DFW Lewisville Partners, GP recorded in Instrument No. 200600240418, Official Public Records of Dallas County, Texas; said 0.058 acre tract being more particularly described as follows:

BEGINNING, at point for corner at the intersection of the east right-of-way line of Ace Lane (a 50-foot wide right-of-way) with the northwest right-of-way line of new Ace Lane (a 50-foot wide right-of-way, dedicated by Instrument No. 2008-50112 of said Official Records of Denton County);

THENCE, North 00 degrees, 25 minutes, 14 seconds East, along the said east line of Ace Lane, a distance of 82.92 feet to a PK-nail w/shiner found for corner;

THENCE, South 89 degrees, 41 minutes, 27 seconds East, departing the said east line of Ace Lane, a distance of 73.61 feet to a 1/2-inch iron rod with "PACHECO KOCH" cap found for corner in the said northwest line of new Ace Lane; said point being the beginning of a non-tangent curve to the left;

THENCE, in a southwesterly direction, along the said northwest line of new Ace Lane and said curve to the left, having a central angle of 28 degrees, 33 minutes, 28 seconds, a radius of 225.00 feet, a chord bearing and distance of South 41 degrees, 57 minutes, 56 seconds West, 110.99 feet, an arc distance of 112.15 feet to the POINT OF BEGINNING;

CONTAINING: 2,536 square feet or 0.058 acres of land, more or less.

B-3

**EXHIBIT C**

**FORM OF LANDLORD'S LIEN SUBORDINATION AGREEMENT**

(Attached)

## LANDLORD'S LIEN SUBORDINATION AGREEMENT

THIS LANDLORD'S LIEN SUBORDINATION AGREEMENT (this "**Agreement**") is entered into as of the _____ day of _____, 20__, by and among _____, a _____
("**Landlord**"), _____, a _____
("**Tenant**"), and _____, a _____ ("**Lender**").

### RECITALS:

A.     Landlord is the landlord and Tenant is the tenant under that certain Lease, dated _____, 20__ (the "**Lease**"), covering a portion or all of the real property located at _____, _____ (the "**Property**").    The undefined capitalized terms used in this Agreement shall have the same meanings ascribed to such terms in the Lease.

B.     Lender has made or will make one or more loans to Tenant (the "**Loan**"), which is or will be secured, in whole or in part, by a security interest in certain tangible personal property, which is now or will be located on the Property (the "**Personal Property Collateral**").

NOW, THEREFORE, so long as the Lease exists on the Property, and the Loan secured by Lender's security interest in the Personal Property Collateral remains outstanding, and in consideration of the above recitals (which are hereby incorporated by reference into this Agreement) and the mutual covenants and agreements set forth below, Landlord, Tenant and Lender hereby covenant and agree as follows:

### AGREEMENT:

1.     Except as limited in this Agreement, Landlord subordinates any landlord's lien, rights of levy or distraint, claim, security interest or other interest Landlord may now or hereafter have in or with respect to any of the Personal Property Collateral to any and all liens and security interests Lender may now or hereafter acquire with respect to any of the Personal Property Collateral, and agrees that the Personal Property Collateral shall not become part of the Property regardless of the manner in which the Personal Property Collateral may be attached or affixed to the Property, provided that the Property is not materially damaged or altered thereby.  The above priority in favor of Lender shall be effective only to the extent of the indebtedness owed to the Lender pursuant to the Loan.  To the extent such indebtedness is less than the fair market value of the Personal Property Collateral, this Agreement shall be void and ineffective and Landlord's lien or other interest in or to the Personal Property Collateral shall control with respect to such excess.  Furthermore, full payment of the indebtedness of the Loan shall render this Agreement void and ineffective and not subject to renewal without a written agreement of the parties hereto.

2.     Upon written notification by Landlord of the expiration or earlier termination of the Lease or the exercise of its rights to possession of the Property because of such expiration or termination (or because of a material default of the Lease not yet resulting in termination of the

Lease) ("**Landlord's Notice**"), Landlord will allow Lender or its designee to enter the Property during ordinary business hours and upon at least three (3) days' prior written notice to Landlord to inspect or remove the Personal Property Collateral, provided that (a) Lender or its designee is accompanied by Landlord or an authorized agent of Landlord, and (b) Lender agrees to (i) promptly and fully repair any damage to the Property resulting from either the installation or removal of the Personal Property Collateral or Lender's acts or omissions, and (ii) during the time it occupies the Property, comply with the terms and conditions of this Section 2 and maintain a policy of commercial general liability insurance, naming Landlord and its managers, members, officers, directors, and partners, as applicable (and others as may be reasonably requested by Landlord), as additional insureds, and containing limits and coverage substantially identical to that required of Tenant under the Lease. Following receipt of Landlord's Notice, Lender agrees to cause the Personal Property Collateral to be removed from the Property and any resulting damage to the Property to be promptly repaired. As a precondition to Lender's removal of the Personal Property Collateral from the Property, Lender shall (a) first furnish Landlord with copies of then-current UCC-1 financing statements file-stamped by the appropriate filing office of the state under whose law Lender has perfected its security interest in the Personal Property Collateral, (b) accompany Landlord on a walk-through of the Property in order to identify for Lender the Personal Property Collateral, and (c) pre-pay Landlord the Base Rent due under the Lease during the period from the date of expiration or earlier termination of the Lease until the date the Personal Property Collateral is removed from the Property at the holdover rate set forth in the Lease, plus the Additional Rent due Landlord under the Lease for such period (all rent subject to per diem proration based on a 30-day month). Such Additional Rent includes Tenant's share of real property taxes, utilities, insurance premiums, and common area costs. Within ten (10) days following receipt of Landlord's Notice, Lender shall deliver written notice to Landlord advising Landlord of the date by which the Personal Property Collateral will be removed (not to exceed thirty (30) days from Lender's receipt of Landlord's Notice) and including the payment of the pre-paid rent described above. Within thirty (30) days after Lender's receipt of Landlord's Notice (the "**Disposition Period**"), if the Personal Property Collateral has not been removed, then the Personal Property Collateral shall be deemed abandoned and Landlord may remove and store and/or sell the same pursuant to applicable law and repair any resulting damage to the Property at Lender's expense (which shall be reimbursed by Tenant to Lender) wholly without any Landlord liability to Lender or Tenant. During the Disposition Period, Landlord shall have the right, at any time and without notice, to inspect the Property, show the Property to prospective tenants, and to construct improvements within the Property. Any notices provided by Landlord to Tenant and/or Lender pursuant to this Section 2 shall be in lieu of, and not in addition to, any notices required under applicable law. Lender shall not conduct public auctions or sales of the Personal Property Collateral at the Property; provided, however, that Lender may allow prospective purchasers or other parties to inspect the Personal Property Collateral at the Property, and Lender may conduct private sales at the Property and Lender may advertise such private sales elsewhere but shall not advertise them at the Property.

3. In no event shall Lender cause to be recorded any financing statements, or other Uniform Commercial Code filings or their equivalents in connection with this Agreement that affect or otherwise impair title to Landlord's fixtures located on the Property, Landlord's personal property, or the Property. Notwithstanding anything to the contrary in this Agreement, Lender acknowledges and agrees that the Personal Property Collateral does not include any real property, improvements or fixtures comprising the Property, owned by Landlord or paid for by

Landlord (including any paid for through a tenant allowance).  In addition, the Personal Property Collateral does not include any interest in the Lease (or any security deposit provided under the Lease).  By way of example and not limitation, trade fixtures such as equipment bolted to the floor of the Property may be Personal Property Collateral, but building fixtures and equipment, such as plumbing, lighting, and HVAC equipment, are not Personal Property Collateral.

4.  All requests, notices or service provided for or permitted to be given or made pursuant to this Agreement shall be deemed to have been properly given or made by (i) depositing the same in the United States Mail, postage prepaid and registered or certified return receipt requested, or (ii) delivery by a nationally-recognized commercial overnight courier, and addressed to the addresses set forth below, or to such other addresses as may from time to time be specified in writing by any party to the others:

If to Landlord:                                                        If to Lender:


_____        _____
c/o Majestic Realty Co.                              _____
13191 Crossroads Parkway North, 6th Fl.      _____
City of Industry, California  91746
Attention: _____          Attention:_____

If to Tenant:


_____
_____
_____
_____
Attention:_____

All notices provided pursuant to this Section 4 shall be effective upon receipt.

5.  Lender hereby agrees to indemnify, protect, defend (with counsel reasonably acceptable to Landlord) and hold harmless Landlord and its managers, members, officers, directors, and partners, as applicable, and their employees and agents, from and against any and all losses, costs, damages, expenses and liabilities (including, without limitation, litigation expenses, court costs and reasonable attorneys' fees) arising out of Lender's exercise of its rights under this Agreement, breach of its obligations (including, but not limited to, any failure by Lender to repair any damage to the Property) pursuant to this Agreement, and/or Lender's acts or omissions in its entry upon the Property and/or removal of the Personal Property Collateral therefrom.  **[[Note:  If "Agent" is used in place of "Lender" add the following and make conforming changes: "In any provision of this Agreement relating to the acts or omissions of Agent, the term "Agent" shall include the Lender(s) and the agents, employees, contractors, and invitees of such Agent and the Lender(s)."]]**

6.  This Agreement is binding upon and inures to the benefit of the heirs, successors and assigns of the parties hereto, as applicable, and shall become effective on the date it is fully-executed by Landlord, Tenant and Lender, and once Landlord has been provided with a fully

C-4

executed copy.

7.  This Agreement shall be governed by the laws of the State where the Property is located.  This Agreement shall not be recorded in the land or real estate records of the county in which the Property is located.

8.  Each of the parties represents and warrants that the individual signing this Agreement on its behalf has the requisite authority to bind such party.

9.  This Agreement may be executed in any number of original counterparts.  Any such counterpart, when executed, shall constitute an original of this Agreement, and all such counterparts together shall constitute one and the same agreement.  Any party may deliver its signature via facsimile or e-mail (in the form of a PDF or otherwise), and any signature so delivered shall be binding on the delivering party.

10. Landlord's execution of this Agreement is made as an accommodation to Lender and Tenant, and shall in no event subject Landlord to any liability whatsoever or impose any affirmative obligations upon Landlord other than the obligations expressly set forth in this Agreement.   Upon Tenant's execution and delivery of this Agreement, Tenant shall pay Landlord the sum of _____ Dollars ($_____.00), representing Landlord's reasonable attorneys' fees and costs incurred in connection with the preparation and execution of this Agreement.

*(Intentionally left blank – signature page to follow)*

EXECUTED effective as of the date first written above.

LENDER:

_____, a
_____

By:_____
Name:_____
Its:_____

LANDLORD:

_____, a
_____

By:_____
Name:_____
Its:_____

By: _____
Name:_____
Its: _____

TENANT:

_____, a
_____

By:_____
Name:_____
Its:_____

DMWEST #12993214 v14

## EXHIBIT D

## FORM OF SNDA

Loan No. 339418

RECORDING REQUESTED BY

Bed Bath & Beyond Inc.
650 Liberty Avenue
Union, NJ  07083
Attention:  Alan M. Freeman, Esquire

WHEN RECORDED MAIL TO

Bed Bath & Beyond Inc.
650 Liberty Avenue
Union, NJ  07083
Attention:  Alan M. Freeman, Esquire

_____SPACE ABOVE THIS LINE FOR RECORDER'S USE_____

## NON-DISTURBANCE AND ATTORNMENT AGREEMENT

THIS AGREEMENT is entered into as of _____, 2015, between BED BATH & BEYOND INC., a New York corporation ("Tenant") whose mailing address is 650 Liberty Avenue, Union, New Jersey 07083, DFW LEWISVILLE PARTNERS GP, a Texas general partnership ("Borrower"), whose mailing address is 5400 LBJ Freeway, Suite 110, Dallas, TX 75240, and THE NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY, a Wisconsin corporation ("Lender"), whose address for notices is 720 East Wisconsin Avenue, Milwaukee, WI 53202, Attention: Real Estate Investment Department, Reference Loan No. 339418.

## RECITALS

A.      Tenant is the lessee or successor to the lessee, and Borrower is the lessor or successor to the lessor under a certain lease dated _____, 2015 (the "Lease").

B.      Lender has made a mortgage loan secured by a Deed of Trust and Security Agreement from Borrower for the benefit of Lender (as it may be amended, restated or otherwise modified from time to time, the "Lien Instrument") encumbering the fee title to the land described in Exhibit A attached hereto and the improvements thereon (collectively, the "Property"), wherein the premises covered by the Lease (the "Demised Premises") are located.

C.      Borrower and Lender have executed an Absolute Assignment of Leases and Rents (the "Absolute Assignment"), pursuant to which (i) the Lease is assigned to Lender and (ii) Lender grants a license back to Borrower permitting Borrower to collect all rents, income and

D-1

other sums payable under the Lease until the revocation by Lender of such license, at which time all rents, income and other sums payable under the Lease are to be paid to Lender.

D.    Lender has required the execution of this Agreement by Borrower and Tenant as a condition to Lender making the requested mortgage loan or consenting to the Lease.

E.    Tenant acknowledges that, as its consideration for entering into this Agreement, Tenant will benefit by entering into an agreement with Lender concerning Tenant's relationship with any purchaser or transferee of the Property (including Lender) in the event of foreclosure of the Lien Instrument or a transfer of the Property by deed in lieu of foreclosure (any such purchaser or transferee and each of their respective successors or assigns is hereinafter referred to as "Successor Landlord").

<u>AGREEMENT</u>

NOW, THEREFORE, in consideration of the foregoing, the mutual covenants and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Tenant, Borrower and Lender agree as follows:

1.    Tenant and Borrower agree for the benefit of Lender that:

(a)    Tenant shall not pay, and Borrower shall not accept, any rent or additional rent more than one month in advance;

(b)    Except as specifically provided in the Lease, Tenant and Borrower will not enter into any agreement for the cancellation of the Lease or any agreement for the surrender of the Demised Premises without Lender's prior written consent;

(c)    Tenant and Borrower will not enter into any agreement amending or modifying the Lease without Lender's prior written consent, except for amendments or modifications specifically contemplated in the Lease for confirming the lease commencement date, the rent commencement date, the term, the square footage leased, the renewal or extension of the Lease, or the leasing of additional space at the Property;

(d)    Tenant will notify Lender of any default by Borrower under the Lease which would entitle Tenant to terminate the Lease or abate the rent payable thereunder and agrees that notwithstanding any provision of the Lease, no notice of termination thereof nor any abatement shall be effective unless Lender has received the aforesaid notice and has failed to cure the subject default within the same time period allowed Borrower under the Lease.  It is understood that the abatement provisions of this Section relate to abatements by reason of Borrower's default and do not apply to provisions of the Lease whereby Tenant has the automatic right to abate rentals such as, for example, abatement upon casualty or condemnation;

D-2

(e)     Tenant, upon receipt of notice from Lender that it has exercised its rights under the Absolute Assignment and revoked the license granted to Borrower to collect all rents, income and other sums payable under the Lease, shall pay to Lender all rent and other payments then or thereafter due under the Lease, and any such payments to Lender shall be credited against the rent or other obligations due under the Lease as if made to Borrower;

(f)     Tenant will not conduct any dry cleaning operations on the Demised Premises using chlorinated solvents nor will Tenant use any chlorinated solvents in the operation of their business on the Demised Premises; and

(g)     Tenant shall pay any and all termination fees due and payable under the Lease directly to Lender.

2.     The Lease is hereby subordinated in all respects to the Lien Instrument and to all renewals, modifications and extensions thereof, subject to the terms and conditions hereinafter set forth in this Agreement, but Tenant waives, to the fullest extent it may lawfully do so, the provisions of any statute or rule of law now or hereafter in effect that may give or purport to give it any right or election to terminate or otherwise adversely affect the Lease or the obligations of Tenant thereunder by reason of any foreclosure proceeding.

3.     Borrower, Tenant and Lender agree that, unless Lender shall otherwise consent in writing, the fee title to, or any leasehold interest in, the Property and the leasehold estate created by the Lease shall not merge but shall remain separate and distinct, notwithstanding the union of said estates either in Borrower or Tenant or any third party by purchase, assignment or otherwise.

4.     If the interests of Borrower in the Property are acquired by a Successor Landlord:

(a)     Tenant shall not be named or joined as a party or otherwise in any suit, action or proceeding for the foreclosure of the Lien Instrument or to enforce any rights under the Lien Instrument or the note secured by the Lien Instrument (the "Note") unless required by law in order to obtain a foreclosure of the Property;

(b)     If Tenant shall not then be in default in the payment of rent or other sums due under the Lease or be otherwise in material default under the Lease beyond any applicable notice and cure period, the possession by Tenant of the Demised Premises and Tenant's rights thereto shall not be disturbed, affected or impaired by, nor will the Lease or the term thereof be terminated or otherwise affected by (i) any suit, action or proceeding brought upon the Lien Instrument or the Note, or for the foreclosure of the Lien Instrument or the enforcement of any rights under the Lien Instrument, or by any judicial sale or execution or other sale of the Demised Premises or the Property, or any deed given in lieu of foreclosure, or by the exercise of any other rights given to any holder of the Lien Instrument or other documents as a matter of law, or (ii) any default under the Lien Instrument or the Note;

D-3

(c)     If Tenant shall not then be in default in the payment of rent or other sums due under the Lease or be otherwise in material default under the Lease beyond any applicable notice and cure period, the Lease shall not terminate or be terminated and the rights of Tenant thereunder shall continue in full force and effect except as provided in this Agreement;

(d)     All condemnation awards and insurance proceeds paid or payable with respect to the Demised Premises or any other part of the Property shall be applied and paid in the manner set forth in the Lease.

(e)     Tenant agrees to attorn to Successor Landlord as its lessor; Tenant shall be bound under all of the terms, covenants and conditions of the Lease for the balance of the term thereof, including any renewal options which are exercised in accordance with the terms of the Lease;

(f)     The interests so acquired shall not merge with any other interests of Successor Landlord in the Property if such merger would result in the termination of the Lease;

(g)     If, notwithstanding any other provisions of this Agreement, the acquisition by Successor Landlord of the interests of Borrower in the Property results, in whole or part, in the termination of the Lease, there shall be deemed to have been created a lease between Successor Landlord and Tenant on the same terms and conditions as the Lease, except as modified by this Agreement, for the remainder of the term of the Lease with renewal options, if any; and

(h)     Successor Landlord shall be bound to Tenant under all of the terms, covenants and conditions of the Lease, and Tenant shall, from and after Successor Landlord's acquisition of the interests of Borrower in the real estate, have the same remedies against Successor Landlord for the breach of the Lease that Tenant would have had under the Lease against Borrower if the Successor Landlord had not succeeded to the interests of Borrower; provided, however, that Successor Landlord shall not be:

(i)     Liable for the breach of any representations or warranties set forth in the Lease or for any act, omission or obligation of any landlord (including Borrower) or any other party occurring or accruing prior to the date of Successor Landlord's acquisition of the interests of Borrower in the Demised Premises, except for any repair, maintenance or other landlord obligations of a continuing nature as of the date of such acquisition;

(ii)    Subject to any offsets or defenses which Tenant might have against any landlord (including Borrower) prior to the date

D-4

of Successor Landlord's acquisition of the interests of
Borrower in the Demised Premises except to the extent
such offsets are expressly provided under the Lease and
Lender has received notice thereof and the opportunity to
cure within the applicable time periods set forth in the
Lease (it being further agreed that offsets under the Lease
that were deducted by Tenant prior to the date upon which
the new owner succeeds to the interest of such prior
landlord shall not be subject to challenge);

(iii)   Liable for the return of any security deposit under the Lease
unless such security deposit shall have been actually
deposited with Successor Landlord;

(iv)   Bound to Tenant subsequent to the date upon which
Successor Landlord transfers its interest in the Demised
Premises to any third party and such third party assumes
the obligations of landlord under the Lease;

(v)   Liable to Tenant under any indemnification provisions set
forth in the Lease with respect to the acts or omission of
any prior landlord; or

(vii)   Liable for any damages in excess of Successor Landlord's
equity in the Property.

The provisions of this paragraph shall be effective and self-operative immediately upon
Successor Landlord succeeding to the interests of Borrower without the execution of any other
instrument.

5.   Tenant represents and warrants that Tenant, all persons and entities owning (directly
or indirectly) more than a five percent (5%) ownership interest in Tenant, and all guarantors of all or
any portion of the Lease: (i) are not, and shall not become, a person or entity with whom Lender is
restricted from doing business under regulations of the Office of Foreign Assets Control
("OFAC") of the Department of the Treasury (including, but not limited to, those named on
OFAC's Specially Designated Nationals and Blocked Persons list) or under any statute, executive
order (including, but not limited to, the September 24, 2001 Executive Order Blocking Property
and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support
Terrorism), or other governmental action; (ii) are not, and shall not become, a person or entity
with whom Lender is restricted from doing business under the International Money Laundering
Abatement and Financial Anti-Terrorism Act of 2001 or the regulations or orders thereunder;
and (iii) are not knowingly engaged in, and shall not engage in, any dealings or transaction or be
otherwise associated with such persons or entities described in (i) and (ii) above.

6.   This Agreement may not be modified orally or in any other manner except by an
agreement in writing signed by the parties hereto or their respective successors in interest.  In the

event of any conflict between the terms of this Agreement and the terms of the Lease, the terms of this Agreement shall prevail.  This Agreement shall inure to the benefit of and be binding upon the parties hereto, their respective heirs, successors and assigns, and shall remain in full force and effect notwithstanding any renewal, extension, increase, or refinance of the indebtedness secured by the Lien Instrument, without further confirmation.  Upon recorded satisfaction of the Lien Instrument, this Agreement shall become null and void and be of no further effect.

7.    Lender hereby consents to and approves the Lease and the term thereof, including the options to extend the term as set forth in the Lease, and covenants and agrees that the exercise by Tenant of any of the rights, remedies and options therein contained shall not constitute a default under the Lien Instrument.

8.    Neither the Lien Instrument nor any other security instrument executed in connection therewith shall encumber or be construed as subjecting in any manner to the lien thereof, any trade fixtures, signs or other personal property at any time furnished or installed by or for Tenant or its subtenants or licensees on the aforementioned property regardless of the manner or mode of attachment thereof.

*[Intentionally left blank—signature page to follow]*

D-6

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

TENANT:                **BED BATH & BEYOND INC.**, a New York corporation

By:_____
Warren Eisenberg, Co-Chairman


Attest:_____
Alan Freeman, Assistant Secretary

STATE OF NEW JERSEY          )
                             ) : ss.
COUNTY OF UNION              )

On this ___ day of _____, 2015, before me personally came Warren Eisenberg to me known, who being by me duly sworn, did depose and say that he is the Co-Chairman of Bed Bath & Beyond Inc., the corporation described in and which executed the above instrument and that he signed his name thereto by order of the Board of Directors of said corporation.

_____
Notary Public

My Commission Expires:


_____

*(Signatures of Borrower and Lender continued on following pages)*

D-7

BORROWER:

DFW LEWISVILLE PARTNERS, GP,
a Texas general partnership

By:  MAJESTIC LEWISVILLE PARTNERS,
     L.P., a Delaware limited partnership,
     a partner

    By: MAJESTIC DFW G.P., LLC, a Delaware
       limited liability company, its general partner

       By:  MAJESTIC REALTY CO.,
          a California corporation, Manager's
          Agent

          By: _____
          Name: _____
          Its: _____

          By: _____
          Name: _____
          Its: _____

By:  NM DFW LEWISVILLE, LLC,
     a Delaware limited company, a partner

    By:  NM MAJESTIC HOLDINGS, LLC,
       a Delaware limited liability company,
       its sole member

       By: NML REAL ESTATE HOLDINGS,
          LLC, a Wisconsin limited liability
          company, its sole member

          By:  THE NORTHWESTERN MUTUAL LIFE INSURANCE
             COMPANY, a Wisconsin corporation, its
             sole member

             By:  NORTHWESTERN    MUTUAL    INVESTMENT    MANAGEMENT
                COMPANY, LLC,  a Delaware limited liability company, its wholly-owned
                affiliate

                By: _____
                Name: _____
                Its: _____

                Attest:

                _____
                Its Assistant Secretary        (corporate seal)

D-8

## CALIFORNIA ACKNOWLEDGMENT
## ALL-PURPOSE

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF _____ )
                                  )ss.
COUNTY OF _____ )

On _____, 2015, before me, _____, a Notary Public, personally appeared _____*(insert name(s) only)*, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature   _____

(Place Notary Seal Above)          Name (typed or printed)
                                   My Commission expires:

*(Remainder of page intentionally left blank;*
*Acknowledgments of Borrower continue on following page)*

D-9

STATE OF WISCONSIN          )
                                      ) ss.
COUNTY OF MILWAUKEE      )

      BEFORE ME, the undersigned authority, on this day personally appeared
_____ and _____, known to me to be the
persons whose names are subscribed to the foregoing instrument, and known to me to be the
_____ and Assistant Secretary, respectively, of Northwestern Mutual
Investment Management Company, LLC, a Delaware limited liability company, the wholly-owned
affiliate of The Northwestern Mutual Life Insurance Company, a Wisconsin corporation, the sole
member of NML Real Estate Holdings, LLC, a Wisconsin limited liability company, the sole
member of NM Majestic Holdings, LLC, a Delaware limited liability company, the sole member of
NM DFW Lewisville, LLC, a Delaware limited liability company, a partner of DFW LEWISVILLE
PARTNERS, GP, a Texas general partnership, and acknowledged to me that they executed said
instrument for the purposes and considerations therein expressed, and as the act of said general
partnership.

      GIVEN under my hand and official seal, this _____ day of _____, 2015.

                                _____

                                _____, Notary Public
My commission expires:

*(Signature of Lender continued on following pages)*

LENDER:    THE NORTHWESTERN MUTUAL LIFE
INSURANCE COMPANY, a Wisconsin
corporation

By:    Northwestern Mutual
Investment Management Company,
LLC, a Delaware limited liability
company, its wholly-owned affiliate

By:_____
Printed Name: _____
Title: _____

Attest:_____
_____
Its Assistant Secretary

(corporate seal)

STATE OF WISCONSIN          )
                            ) ss.
COUNTY OF MILWAUKEE          )

BEFORE ME, the undersigned authority, on this day personally appeared
_____ and _____, known to me to be the
persons whose names are subscribed to the foregoing instrument, and known to me to be the
_____ and Assistant Secretary, respectively, of Northwestern
Mutual Investment Management Company, LLC, a Delaware limited liability company, the
wholly-owned affiliate of THE NORTHWESTERN MUTUAL LIFE INSURANCE
COMPANY, a Wisconsin corporation, and acknowledged to me that they executed said
instrument for the purposes and considerations therein expressed, and as the act of said
corporation.

GIVEN under my hand and official seal, this _____ day of _____, 2015.

_____, Notary Public

My commission expires:

_____

D-11

EXHIBIT "A"

(Description of Property)

TRACT 1:

DESCRIPTION, of a 60.710 acre tract of land situated in the Peter Harmonson Survey, Abstract No. 530, Denton County, Texas, and the Peter Harmonson Survey, Abstract No. 1795, Dallas County, Texas; being all of Lot 1, Block B, Majestic Addition, an addition to the City of Lewisville according to the plat recorded in Cabinet 2012, Page 266, Official Records of Denton County, Texas and in Instrument 201300017112, Official Public Records of Dallas County, Texas; and being a part of that tract of land described in Special Warranty Deed to DFW Lewisville Partners, GP recorded in Instrument No. 2006-82125, Official Records of Denton County, Texas; and being a part of that tract of land described in Special Warranty Deed to DFW Lewisville Partners, GP recorded in Instrument No. 200600240418, Official Public Records of Dallas County, Texas; said 60.710 acre tract being more particularly described as follows:

BEGINNING, at a 1/2-inch iron rod found for the southeast corner of said DFW Lewisville Partners, GP tract; said point being the south corner of part of a tract of land described in Deed to Hawkeye Realty Schreiber, L.P. recorded in Document No. 2008-72708 of said Official Records of Denton County; said point being in the northwest right-of-way line of State Highway No. 121 (a variable width right-of-way);

THENCE, with the said northwest line of State Highway No. 121 and the south line of said Lot 1, the following five (5) calls:

South 50 degrees, 10 minutes, 34 seconds West, a distance of 0.26 feet to a 1/2-inch iron rod found for an angle point;

South 54 degrees, 09 minutes, 58 seconds West, a distance of 200.87 feet to a 1/2-inch iron rod with "PACHECO KOCH" cap found for corner;

South 58 degrees, 12 minutes, 05 seconds West, a distance of 453.43 feet to a Texas Department of Transportation highway disk found at the beginning of a non-tangent curve to the left;

In a southwesterly direction, along said curve to the left, having a central angle of 10 degrees, 12 minutes, 03 seconds, a radius of 1,457.40 feet, a chord bearing and distance of South 53 degrees, 04 minutes, 27 seconds West, 259.13 feet, an arc distance of 259.47 feet to a Texas Department of Transportation highway disk found at the end of said curve;

South 48 degrees, 00 minutes, 12 seconds West, a distance of 43.30 feet to a 1/2-inch iron rod found for corner;

THENCE, departing the said northwest line of State Highway No. 121 and continuing with the said south line of Lot 1, the following five (5) calls:

North 89 degrees, 26 minutes, 36 seconds West, a distance of 7.68 feet to a 5/8-inch iron rod found for corner;

North 00 degrees, 41 minutes, 52 seconds East, a distance of 131.22 feet to a point for corner;

North 75 degrees, 26 minutes, 57 seconds West, a distance of 125.47 feet to a point for corner;

North 64 degrees, 05 minutes, 25 seconds West, a distance of 628.58 feet to a point for corner;

North 68 degrees, 10 minutes, 24 seconds West, a distance of 122.74 feet to a point for the southwest corner of said Lot 1; said point being in the east right-of-way line of Ace Lane (a variable width right-of-way); from said point a 1/2-inch iron rod with "PACHECO KOCH" cap found bears North 68 degrees, 10 minutes West, a distance of 18.9 feet;

D-12

THENCE, with the west line of said Lot 1 and the east line of said Ace Lane, the following six (6) calls:

North 02 degrees, 19 minutes, 52 seconds East, a distance of 739.36 feet to a point for corner;

North 00 degrees, 42 minutes, 13 seconds East, a distance of 1,068.96 feet to a point for corner; said point being in the south right-of-way line of new Ace Lane (a 50-foot wide right-of-way, dedicated by Instrument No. 2008-50112 of said Official Records of Denton County); from said point a PK-nail with washer found bears North 89 degrees, 35 minutes West, a distance of 15.0 feet;

South 89 degrees, 34 minutes, 46 seconds East, departing the said east line of Ace Lane, a distance of 9.99 feet to a 1/2-inch iron rod with "PACHECO KOCH" cap found for corner;

North 00 degrees, 25 minutes, 14 seconds East, a distance of 50.00 feet to a point for corner at the beginning of a curve to the right;

In a northeasterly direction, along said curve to the right, having a central angle of 60 degrees, 07 minutes, 36 seconds, a radius of 175.00 feet, a chord bearing and distance of North 30 degrees, 29 minutes, 02 seconds East, 175.33 feet, an arc distance of 183.65 feet to a 1/2-inch iron rod with "PACHECO KOCH" cap found at the end of said curve;

North 60 degrees, 32 minutes, 50 seconds East, a distance of 51.50 feet to a "+" cut in concrete found for corner in the north end of a right-of-way corner clip at the intersection of the said south line of new Ace Lane and the south right-of-way line of Valley Parkway (a variable width right-of-way);

THENCE, South 74 degrees, 27 minutes, 10 seconds East, along the said corner clip, a distance of 25.79 feet to a 1/2-inch iron rod with "PACHECO KOCH" cap found for corner in the said south line of Valley Parkway; said point being the beginning of a non-tangent curve to the left;

THENCE, with the said south line of Valley Parkway and the northerly line of said Lot 1, the following ten (10) of calls:

In a southeasterly direction, along said curve to the left, having a central angle of 34 degrees, 58 minutes, 09 seconds, a radius of 1,600.00 feet, a chord bearing and distance of South 47 degrees, 08 minutes, 14 seconds East, 961.44 feet, an arc distance of 976.52 feet to a 1/2-inch iron rod with "PACHECO KOCH" cap found at the end of said curve;

South 64 degrees, 37 minutes, 19 seconds East, a distance of 434.67 feet to a 1/2-inch iron rod with "PACHECO KOCH" cap found at the beginning of a curve to the right;

In a southeasterly direction, along said curve to the right, having a central angle of 12 degrees, 34 minutes, 41 seconds, a radius of 237.50 feet, a chord bearing and distance of South 58 degrees, 19 minutes, 58 seconds East, 52.03 feet, an arc distance of 52.14 feet to a 1/2-inch iron rod with "PACHECO KOCH" cap found at the end of said curve; said point being the beginning of a reverse curve to the left;

In a southeasterly direction, along said curve to the left, having a central angle of 12 degrees, 34 minutes, 41 seconds, a radius of 262.50 feet, a chord bearing and distance of South 58 degrees, 19 minutes, 58 seconds East, 57.51 feet, an arc distance of 57.63 feet to a 1/2-inch iron rod with "PACHECO KOCH" cap found at the end of said curve;

South 64 degrees, 37 minutes, 19 seconds East, a distance of 100.00 feet to a 1/2-inch iron rod with "PACHECO KOCH" cap found for corner;

South 32 degrees, 37 minutes, 00 seconds East, a distance of 23.58 feet to a 1/2-inch iron rod with "PACHECO KOCH" cap found for corner;

South 64 degrees, 37 minutes, 19 seconds East, a distance of 46.00 feet to a 1/2-inch iron rod with "PACHECO KOCH" cap found for corner;

North 64 degrees, 37 minutes, 19 seconds East, a distance of 31.63 feet to a 1/2-inch iron rod with "PACHECO KOCH" cap found for corner;

South 64 degrees, 37 minutes, 19 seconds East, a distance of 18.52 feet to a point for corner at the beginning of a curve to the right;

In a southeasterly direction, along said curve to the right, having a central angle of 00 degrees, 27 minutes, 13 seconds, a radius of 1,000.00 feet, a chord bearing and distance of South 64 degrees, 23 minutes, 42 seconds East, 7.92 feet, an arc distance of 7.92 feet to a 1/2-inch iron rod with "PACHECO KOCH" cap found at the end of said curve;

THENCE, South 00 degrees, 18 minutes, 32 seconds West, departing the said south line of Valley Parkway, a distance of 990.80 feet to the POINT OF BEGINNING;

CONTAINING: 2,644,513 square feet or 60.710 acres of land, more or less.

TRACT 2:

DESCRIPTION, of a 0.058 acre tract of land situated in the Peter Harmonson Survey, Abstract No. 530, Denton County, Texas; being all of Lot 1, Block C, Majestic Addition, an addition to the City of Lewisville according to the plat recorded in Cabinet 2012, Page 266, Official Records of Denton County, Texas and in Instrument 201300017112, Official Public Records of Dallas County, Texas; and being a part of that tract of land described in Special Warranty Deed to DFW Lewisville Partners, GP recorded in Instrument No. 2006-82125, Official Records of Denton County, Texas; and being a part of that tract of land described in Special Warranty Deed to DFW Lewisville Partners, GP recorded in Instrument No. 200600240418, Official Public Records of Dallas County, Texas; said 0.058 acre tract being more particularly described as follows:

BEGINNING, at point for corner at the intersection of the east right-of-way line of Ace Lane (a 50-foot wide right-of-way) with the northwest right-of-way line of new Ace Lane (a 50-foot wide right-of-way, dedicated by Instrument No. 2008-50112 of said Official Records of Denton County);

THENCE, North 00 degrees, 25 minutes, 14 seconds East, along the said east line of Ace Lane, a distance of 82.92 feet to a PK-nail w/shiner found for corner;

THENCE, South 89 degrees, 41 minutes, 27 seconds East, departing the said east line of Ace Lane, a distance of 73.61 feet to a 1/2-inch iron rod with "PACHECO KOCH" cap found for corner in the said northwest line of new Ace Lane; said point being the beginning of a non-tangent curve to the left;

THENCE, in a southwesterly direction, along the said northwest line of new Ace Lane and said curve to the left, having a central angle of 28 degrees, 33 minutes, 28 seconds, a radius of 225.00 feet, a chord bearing and distance of South 41 degrees, 57 minutes, 56 seconds West, 110.99 feet, an arc distance of 112.15 feet to the POINT OF BEGINNING;

CONTAINING: 2,536 square feet or 0.058 acres of land, more or less.

DMWEST #12993214 v14

## EXHIBIT E

## TITLE EXCEPTIONS

Deed of Trust and Security Agreement dated October 15, 2013, executed by DFW Lewisville Partners, GP, a general partnership to Kevin L. Westra, Trustee, securing the payment of one note of even date therewith in the original principal sum of $43,278,768.00 and any other sums or obligations secured thereby, payable to the order of The Northwestern Mutual Life Insurance Company, a Wisconsin corporation, filed on October 15, 2013, under Clerk's File No. 2013-126401, Real Property Records, Denton County, Texas, and filed on October 15, 2013, under Clerk's File No. 201300323336, Official Public Records, Dallas County, Texas.

Absolute Assignment of Leases and Rents dated October 15, 2013, executed by DFW Lewisville Partners, GP, a general partnership in favor of The Northwestern Mutual Life Insurance Company, a Wisconsin corporation, filed on October 15, 2013, under Clerk's File No. 2013-126402, Real Property Records, Denton County, Texas, and filed on October 15 2013, under Clerk's File No. 201300323337, Official Public Records, Dallas County, Texas. Company insures the insured against loss, if any, sustained by the insured under the terms of the Policy if this item is not subordinate to the lien of the insured mortgage.

Security Interest granted to The Northwestern Mutual Life Insurance Company, Secured party, by DFW Lewisville Partners, GP, Debtor, as reflected by Financing Statement (UCC-1) filed on October 15, 2013, under Clerk's File No. 2013-126403, Real Property Records, Denton County, Texas, and filed on October 15, 2013, under Clerk's File No. 201300323338, Official Public Records, Dallas County, Texas. Company insures the insured against loss, if any, sustained by the insured under the terms of the Policy if this item is not subordinate to the lien of the insured mortgage.

Easement granted by L. H. Wood to General Telephone Company of the Southwest, dated December 10, 1970, filed for record on January 4, 1971 and recorded in volume 613, Page 390, Real Property Records, Denton County, Texas, and as shown on survey by Rene' Silvas, RPLS # 5921, of Pacheco Koch, dated 9/12/2013, last revised 10/15/2013.

Easement awarded to Brazos Electric Power Cooperative, Inc. by Agreed Judgment under Cause No. 92-50369-367 filed in the 367th Judicial District Court of Denton County, Texas, a copy filed for record on June 24, 1993 and recorded under Clerk's File No. 93-R0040763, Real Property Records, Denton County, Texas, and recorded in Volume 2005069, Page 205, Real Property Records, Dallas County, Texas, and as shown on survey by Rene' Silvas, RPLS # 5921, of Pacheco Koch, dated 9/12/2013, last revised 10/15/2013.

Easement awarded to Brazos Electric Power Cooperative, Inc. by Agreed Judgment under Cause No. 90-50372-367 filed in the 367th Judicial District Court of Denton County, Texas, a copy filed for record on June 24, 1993 and recorded under Clerk's File No. 93-R0040764, Real Property Records, Denton County, Texas, and recorded in Volume 2005069, Page 215, Real Property Records, Dallas County, Texas, and as shown on survey by Rene' Silvas, RPLS # 5921, of Pacheco Koch, dated 9/12/2013, last revised 10/15/2013.

Easement granted by H. S. Jackson Sand and Gravel, Inc. and Henry S. Jackson to the City of Lewisville, dated June 5, 2001, filed for record on June 13, 2001 and recorded in Volume 4857, Page 1197, Real Property Records, Denton County, Texas, and as shown on survey by Rene' Silvas, RPLS # 5921, of Pacheco Koch, dated 9/12/2013, last revised 10/15/2013.

Easement granted by H. S. Jackson Sand and Gravel, Inc. and Henry S. Jackson to the City of Lewisville, dated June 5, 2001, filed for record on June 13, 2001 and recorded in Volume 4857, Page 1201, Real Property Records, Denton County, Texas, and as shown on survey by Rene' Silvas, RPLS # 5921, of Pacheco Koch, dated 9/12/2013, last revised 10/15/2013.

Easement granted by H. S. Jackson Sand and Gravel, Inc. and Henry S. Jackson to the City of Lewisville, dated June 5, 2001, filed for record on June 13, 2001 and recorded in Volume 4857, Page 1205, Real Property Records, Denton County, Texas, and as shown on survey by Rene' Silvas, RPLS # 5921, of Pacheco Koch, dated 9/12/2013, last revised 10/15/2013.

Easement and/or Right of Way from DFW Lewisville Partners GP to Texas-New Mexico Power Company by instrument dated 10/2007, filed 11/5/2007, recorded in Clerk's File No. 2007-129825, Real Property Records, Denton County, Texas, and as shown on survey by Rene' Silvas, RPLS # 5921, of Pacheco Koch, dated 9/12/2013, last revised 10/15/2013.

Easement and/or Right of Way from DFW Lewisville Partners GP to Denton County Electric Cooperative, Inc., d/b/a Coserv Electric by instrument filed 11/5/2007, recorded in Clerk's File No. 2007-129826, Real Property Records, Denton County, Texas, and as shown on survey by Rene' Silvas, RPLS # 5921, of Pacheco Koch, dated 9/12/2013, last revised 10/15/2013.

Easement and/or Right of Way from DFW Lewisville Partners GP to the City of Lewisville, Texas by instrument dated 1/30/2009, filed 4/27/2009, recorded in Clerk's File No. 2009-49786, Real Property Records, Denton County, Texas, and as noted on survey by Rene' Silvas, RPLS # 5921, of Pacheco Koch, dated 9/12/2013, last revised 10/15/2013.

One-half of all the oil, gas and other minerals, the royalties, bonuses, rentals, and all other rights in connection with the same are excepted herefrom, as set forth in instrument recorded in Volume 354, Page 354, Real Property Records, Denton County, Texas.  The Company makes no representation as to the present ownership of this interest.

One-half of all the oil, gas and other minerals, the royalties, bonuses, rentals, and all other rights in connection with the same are excepted herefrom, as set forth in instrument recorded in Volume 432, Page 464, Real Property Records, Denton County, Texas. The Company makes no representation as to the present ownership of this interest.

One-half (1/2) of the oil, gas and other minerals, royalties, bonuses, rentals and all other rights in connection with same as set forth in instrument dated 5/23/50, filed 5/29/50, executed by Luna Mary Bulen to C.R. Adkins, recorded in Volume 361, Page 175, Real Property Records, Denton County, Texas. The Company makes no representation as to the present ownership of this interest.

One-half (1/2) of the oil, gas and other minerals, royalties, bonuses, rentals and all other rights in connection with same as set forth in instrument dated 8/1/58, filed 8/6/58, executed by C.R.

E-2

Adkins to John Wyatt et ux, recorded in Volume 439, Page 154, Real Property Records, Denton County, Texas. The Company makes no representation as to the present ownership of this interest.

Memorandum of an oil, gas and mineral lease dated 6/26/2008, filed 7/11/2008, executed by DFW Lewisville Partners GP, lessor, in favor of Williams Production-Gulf Coast Company, L.P., lessee, recorded in Clerk's File No. 2008-76385, Real Property Records, Denton County, Texas, and in recorded in Clerk's File No. 20080274930, Real Property Records, Dallas County, Texas. First Amendment filed 10/12/2010, recorded in Clerk's File No. 2010-101811, Real Property Records, Denton County, Texas. Affected by Declaration of Unit recorded in Clerk's File No. 2011-21623, Real Property Records, Denton County, Texas; First Amendment recorded in Clerk's File No. 2011-58798, Real Property Records, Denton County, Texas; and Second Amendment recorded in Clerk's File No. 2011-71287, Real Property Records, Denton County, Texas.

Terms, provisions and conditions contained in Permit To Appropriate State Water executed by and between Texas Water Rights Commission and H. S. Jackson Sand and Gravel, Inc., filed for record on December 28, 1972 and recorded in Volume 662, Page 374, Real Property Records, Denton County, Texas, and affected by instrument recorded in Volume 2, Page 30, Real Property Records, Denton County, Texas.

Terms, conditions, provisions and stipulations of Mutual Easement Agreement (Valley Parkway), dated June 12, 2006, by and between Payne-Johnston Management, Inc. et al and Majestic Lewisville Partners, L.P., filed June 14, 2006, recorded in Clerk's File No. 2006-71597 & Clerk's File No. 2006-71603, as amended in Clerk's File No. 2009-132226, Real Property Records, Denton County, Texas, and as shown on survey by Rene' Silvas, RPLS # 5921, of Pacheco Koch, dated 9/12/2013, last revised 10/15/2013.

Terms, conditions, provisions and stipulations of Storm Water Detention Easement Agreement, dated June 12, 2006, by and between Payne-Johnston Management, Inc. et al and Majestic Lewisville Partners, L.P., filed June 15, 2006, recorded in Clerk's File No. 2006-71609 & Clerk's File No. 2006-71614, Real Property Records, Denton County, Texas. Amended by instrument filed September 6, 2006, recorded in Clerk's File No.'s 2006-109713, 2006-109714, 2006-109715, 2006-109716, Real Property Records, Denton County, Texas, and as shown on survey by Rene' Silvas, RPLS # 5921, of Pacheco Koch, dated 9/12/2013, last revised 10/15/2013.

Terms, conditions, provisions and stipulations of Memorandum of Agreement, by and between Payne-Johnston Management, Inc., et al and Majestic Lewisville Partners, L.P., dated June 12, 2006, filed June 15, 2006, recorded in Clerk's File No. 2006-71610, Real Property Records, Denton County, Texas, and as shown on survey by Rene' Silvas, RPLS # 5921, of Pacheco Koch, dated 9/12/2013, last revised 10/15/2013.

Terms, conditions, provisions and stipulations of Voluntary Cleanup Program Conditional Certificate of Completion, by and between the Texas Commission on Environmental Quality and Majestic Realty Co., dated 1/3/06, filed 1/24/06, recorded in Clerk's File No. 2006-8981, Real

E-3

Property Records, Denton County, Texas, and as shown on survey by Rene' Silvas, RPLS # 5921, of Pacheco Koch, dated 9/12/2013, last revised 10/15/2013.

Restrictions, easements and other exceptions as set out and as shown on plats in/under Clerk's File No. 201300017112, Plat Records, Dallas County, Texas, and Clerk's File No. 2012-266, Plat Records, Denton County, Texas, and as shown on survey by Rene' Silvas, RPLS # 5921, of Pacheco Koch, dated 9/12/2013, last revised 10/15/2013.

E-4

12·22·15

## EXHIBIT F

## CERTAIN OF THE BUILDING STANDARD IMPROVEMENTS

1. Overhead Doors – Eighty (80) overhead dock doors on one wall (single side load configuration), 9x10 doors with 12" seals, 6" bumpers and dock lights.

2. Dock Levelers – Seventy-five (75) to eighty (80) 35,000 lb. mechanical levelers w/20" lip and brush seals for each leveler.

3. Warehouse Lighting – T8 lighting with motion sensors

4. Electrical Service – Main switch boards totaling 4000 AMPS and electrical switch gear (including breaker panels) not attached to Tenant FFE.

5. Demising Wall – Full-height demising wall (one half cost to be paid by Tenant, using the Tenant allowance and one-half cost by Landlord)

6. Office Area
   a. Approximately 3,000 sf dispatch office located on dock wall opposite main office (except FFE).
   b. All existing dock doors where office modules are proposed (approximately 200 LF) to be replaced with glass enclosures.

7. Floor Joints – Fill all slab joints with MM-80 only.

8. Interior bollards and guard rail to protect building infrastructure; provided, however, that the bollards protecting the main office will be removed if Landlord requires Tenant to remove the main office improvements upon vacation of the Premises.

9. Site Work – Including fence and gates, guardhouse, striping, landscaped islands, landscaping and irrigation added (if needed), upgraded site lighting, bollards and guard rail on site (outside building).

10. Roof insulation added by Tenant.

11. Any HVAC units added that are not attached to Tenant FFE.

DMWEST #12993214 v14

12. Any roof structure upgrades required to support Tenant roof-top HVAC equipment.

13. Fire extinguishers required to satisfy code and code officials.

14. Warehouse electrical receptacles and conduit not attached to Tenant FFE.

15. Hose bibs added in building.

16. Gas piping and electrical conduit on roof to feed new rooftop HVAC equipment for the Building's warehouse and office areas.

17. Modification to existing ESFR sprinkler system(s) to satisfy code.

DMWEST #12993214 v14

**EXHIBIT G**

**CONTRACTOR'S LIEN WAIVER FORMS**

(Attached)

**NOTICE:**

**This document waives rights unconditionally and states that you have been paid for giving up those rights. It is prohibited for a person to require you to sign this document if you have not been paid the payment amount set forth below. If you have not been paid, use a conditional release form.**

## UNCONDITIONAL WAIVER AND RELEASE ON PROGRESS PAYMENT

Project _____

Job No. _____

     The signer of this document has been paid and has received a progress payment in the sum of $ _____ for all labor, services, equipment, or materials furnished to the property or to _____ (person with whom signer contracted) on the property of _____ (owner) located at _____ (location) to the following extent: _____ (job description). The signer therefore waives and releases any mechanic's lien right, any right arising from a payment bond that complies with a state or federal statute, any common law payment bond right, any claim for payment, and any rights under any similar ordinance, rule, or statute related to claim or payment rights for persons in the signer's position that the signer has on the above referenced project to the following extent:

     This release covers a progress payment for all labor, services, equipment, or materials furnished to the property or to _____ (person with whom signer contracted) as indicated in the attached statement(s) or progress payment request(s), except for unpaid retention, pending modifications and changes, or other items furnished.

     The signer warrants that the signer has already paid or will use the funds received from this progress payment to promptly pay in full all of the signer's laborers, subcontractors, materialmen, and suppliers for all work, materials, equipment, or services provided for or to the above referenced project in regard to the attached statement(s) or progress payment request(s).

                             Signature: _____

                             Date: _____

                             Company Name: _____

                             Title: _____

STATE OF TEXAS         §
COUNTY OF _____ §

     This instrument was acknowledged before me on this _____ day of _____, 20___, by _____ (name), _____ (job title) of _____ (company name).

                             _____
                             NOTARY PUBLIC, STATE OF TEXAS

**NOTICE:**

**This document waives rights unconditionally and states that you have been paid for giving up those rights. It is prohibited for a person to require you to sign this document if you have not been paid the payment amount set forth below. If you have not been paid, use a conditional release form.**

**UNCONDITIONAL WAIVER AND RELEASE ON FINAL PAYMENT**

Project _____

Job No. _____

     The signer of this document has been paid in full for all labor, services, equipment, or materials furnished to the property or to _____ (person with whom signer contracted) on the property of _____ (owner) located at _____ (location) to the following extent: _____ (job description). The signer therefore waives and releases any mechanic's lien right, any right arising from a payment bond that complies with a state or federal statute, any common law payment bond right, any claim for payment, and any rights under any similar ordinance, rule, or statute related to claim or payment rights for persons in the signer's position.

     The signer warrants that the signer has already paid or will use the funds received from this final payment to promptly pay in full all of the signer's laborers, subcontractors, materialmen, and suppliers for all work, materials, equipment, or services provided for or to the above referenced project up to the date of this waiver and release.

Signature: _____
Date: _____
Company Name: _____
Title: _____

STATE OF TEXAS       §
COUNTY OF _____ §

     This instrument was acknowledged before me on this _____ day of _____, 20___, by _____ (name), _____ (job title) of _____ (company name).

_____
NOTARY PUBLIC, STATE OF TEXAS

G-3

**EXHIBIT H**

**HAZARDOUS SUBSTANCES**

Pursuant to Section 7.4.2 of this Lease, Landlord will allow Tenant to temporarily store at the Premises for eventual sale and distribution to its retail customers (a) those items listed in the "Hazardous Materials Inventory Statement for the Indoor Hazardous Materials (IHM) Rooms" dated January 12, 2015 and prepared for Tenant by Code Consultants, Inc. (CCI) for the Harmon Distribution Center in North Las Vegas, Nevada, a copy of which has been provided to Landlord, and (b) other substantially similar items not specifically listed.

All such items shall be sized and packaged for retail sale and distribution. No manufacturing shall take place at the Premises except as otherwise expressly allowed by the terms of this Lease.

Before Tenant stores any of the above items at the Premises, Tenant shall provide Landlord with High Pile Storage Plan and a Hazardous Materials Management Plan for the Premises (similar to those provided for the Harmon Distribution Center in North Las Vegas, Nevada, copies of which were provided to Landlord) in accordance with all Applicable Laws.

H-1

12·22·15

**EXHIBIT I**

**LIST OF LANDLORD'S PLANS**

(Attached)

### List of Record Drawings for
### Majestic Airport Center/DFW
### Building 5

| SHEET # | DESCRIPTION | REVISION DELTA # | REVISION DATE | ORIGINAL DATE |
|---|---|---|---|---|
| | **Landscaping and Irrigation** | | | |
| L0.01 | Tree Mitigation | | 9/19/13 | 4/2/12 |
| L0.02 | Tree Mitigation | | 9/19/13 | 4/2/12 |
| L0.03 | Tree Mitigation | | 9/19/13 | 4/2/12 |
| L0.04 | Tree Mitigation | | 9/19/13 | 4/2/12 |
| L1.00 | Landscape Plan Overall | 5 | 02/21/14 | 4/2/12 |
| L1.01 | Landscape Plan | 5 | 02/21/14 | 4/2/12 |
| L1.02 | Landscape Plan | 5 | 02/21/14 | 4/2/12 |
| L1.03 | Landscape Plan | 5 | 02/21/14 | 4/2/12 |
| L1.04 | Landscape Plan | 5 | 02/21/14 | 4/2/12 |
| L1.05 | Landscape Plan | 5 | 02/21/14 | 4/2/12 |
| L1.06 | Landscape Plan | 5 | 02/21/14 | 4/2/12 |
| L1.07 | Landscape Plan | 5 | 02/21/14 | 4/2/12 |
| L2.00 | Irrigation Plan Overall | 4 | 02/24/14 | 7/13/12 |
| L2.01 | Irrigation Plan | 4 | 02/24/14 | 7/13/12 |
| L2.02 | Irrigation Plan | 4 | 02/24/14 | 7/13/12 |
| L2.03 | Irrigation Plan | 3 | 02/24/14 | 7/13/12 |
| L2.04 | Irrigation Plan | 3 | 02/24/14 | 7/13/12 |
| L2.05 | Irrigation Plan | 4 | 02/24/14 | 7/13/12 |
| L2.06 | Irrigation Plan | 3 | 02/24/14 | 7/13/12 |
| L2.07 | Irrigation Plan | 4 | 02/24/14 | 7/13/12 |
| | | | | |
| | **Civil** | | | |
| C0.0 | Cover Sheet | | | 5/1/13 |
| FP-1, 2, 3 | Final Plat | | | 11/07/12 |
| C0.1 | General Notes | 1 | 11/26/13 | 10/17/14 |
| C1.0 | Overall Site Plan | | | 10/17/14 |
| C1.1 | Dimensional Control Plan | 2 | 01/23/14 | 10/17/14 |
| C1.2 | Dimensional Control Plan | 2 | 01/23/14 | 10/17/14 |
| C1.3 | Dimensional Control Plan | 2 | 01/23/14 | 10/17/14 |
| C1.4 | Dimensional Control Plan | | | 10/17/14 |
| C1.5 | Dimensional Control Plan | | | 10/17/14 |
| C1.6 | Dimensional Control Plan | | | 10/17/14 |
| C2.1 | Grading Plan | 3 | 02/12/14 | 10/17/14 |
| C2.2 | Grading Plan | 3 | 02/12/14 | 10/17/14 |
| C2.3 | Grading Plan | 3 | 02/12/14 | 10/17/14 |
| C2.4 | Grading Plan | 3 | 02/12/14 | 10/17/14 |
| C2.5 | Grading Plan | 3 | 02/12/14 | 10/17/14 |
| C2.6 | Grading Plan | 3 | 02/12/14 | 10/17/14 |
| C3.1 | Drainage Area Map | 2 | 01/23/14 | 10/17/14 |
| C4.1 | Storm Sewer Plan | 2 | 01/23/14 | 10/17/14 |
| C4.2 | Storm Sewer Plan | 2 | 01/23/14 | 10/17/14 |
| C4.3 | Storm Sewer Plan | | | 10/17/14 |
| C4.4 | Storm Sewer Plan | | | 10/17/14 |
| C4.5 | Storm Sewer Plan | 2 | 01/23/14 | 10/17/14 |

| | | | | |
|---|---|---|---|---|
| C4.6 | Storm Sewer Plan | 2 | 01/23/14 | 10/17/14 |
| C4.7 | Storm Sewer Profile | | | 10/17/14 |
| C4.8 | Storm Sewer Profile | 1 | 10/04/13 | 10/17/14 |
| C4.9 | Storm Sewer Profile | | | 10/17/14 |
| C4.10 | Storm Sewer Profile | | | 10/17/14 |
| C4.11 | Storm Sewer Profile | | | 10/17/14 |
| C4.12 | Storm Sewer Profile | | | 10/17/14 |
| C4.13 | Hydraulic Calculations | 1 | 10/04/13 | 10/17/14 |
| C4.14 | Hydraulic Calculations | | | 10/17/14 |
| C5.1 | Water and Sanitary Sewer Plan | 2 | 01/23/14 | 10/17/14 |
| C5.2 | Water and Sanitary Sewer Plan | | | 10/17/14 |
| C5.3 | Water and Sanitary Sewer Plan | 2 | 01/23/14 | 10/17/14 |
| C5.4 | Water and Sanitary Sewer Plan | | | 10/17/14 |
| C5.5 | Water and Sanitary Sewer Plan | | | 10/17/14 |
| C5.6 | Water and Sanitary Sewer Plan | 2 | 01/23/14 | 10/17/14 |
| C5.7 | Sanitary Sewer Profile | | | 10/17/14 |
| C6.1 | Paving Plan | 2 | 01/23/14 | 10/17/14 |
| C6.2 | Paving Details | 1 | 11/26/13 | 10/17/14 |
| C7.1 | Erosion Control Plans | | | 10/17/14 |
| C7.2 | Erosion Control Details | | | 10/17/14 |
| - | TXDOT Details FW-S | | | 4/29/13 |
| - | TXDOT Details CH-FW-0 | | | 4/29/13 |
| - | TXDOT Details TCP (1-5) - 12 | | | 4/29/13 |
| - | TXDOT Details PED-12 | | | 4/29/13 |
| - | TXDOT Details PED-12 | | | 4/29/13 |
| - | TXDOT Details PED-12 | | | 4/29/13 |
| - | TXDOT Details PED-12 | | | 4/29/13 |
| - | TXDOT Details CCCG-12 | | | 4/29/13 |
| - | TXDOT Details FDR (CP) -05 | | | 4/29/13 |
| - | TXDOT Details CPCD-94 | | | 4/29/13 |
| - | TXDOT Details PM (2) -12 | | | 4/29/13 |
| - | TXDOT Details BC (1) -07 | | | 4/29/13 |
| - | TXDOT Details BC (2) -07 | | | 4/29/13 |
| - | TXDOT Details BC (3) -07 | | | 4/29/13 |
| - | TXDOT Details BC (4) -07 | | | 4/29/13 |
| - | TXDOT Details BC (5) -07 | | | 4/29/13 |
| - | TXDOT Details BC (6) -07 | | | 4/29/13 |
| - | TXDOT Details BC (7) -07 | | | 4/29/13 |
| - | TXDOT Details BC (8) -07 | | | 4/29/13 |
| - | TXDOT Details BC (9) -07 | | | 4/29/13 |
| - | TXDOT Details BC (10) -07 | | | 4/29/13 |
| - | TXDOT Details BC (11) -07 | | | 4/29/13 |
| - | TXDOT Details BC (12) -07 | | | 4/29/13 |
| - | City of Lewisville 2.1, 2.2, 2.11 | | | 4/29/13 |
| - | City of Lewisville 4.1, 4.11, 8.11 | | | 4/29/13 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

October 15, 2015                                    Majestic Airport Center DFW Bldg. No. 5
Page 2 of 5

I-3

| | Architectural | | | |
|---|---|---|---|---|
| | Specifications | | | |
| T1.0 | Title Sheet | 4 | 12/03/12 | 9/21/12 |
| T1.1 | Sheet Index | 6 | 07/09/13 | 9/21/12 |
| T2 | Standard Details | 4 | 12/03/12 | 9/21/12 |
| A1.0 | Site Plan | 14 | 01/21/14 | 9/21/12 |
| A1.1 | Partial Site Plan | 14 | 01/21/14 | 9/21/12 |
| A1.2 | Partial Site Plan | 14 | 01/21/14 | 9/21/12 |
| A2.0 | Overall Floor Plan | 14 | 01/21/14 | 9/21/12 |
| A2.1 | Overall Storage Plan & Office Plan | 14 | 01/21/14 | 9/21/12 |
| A2.2 | Partial Floor Plan | 14 | 01/21/14 | 9/21/12 |
| A2.3 | Partial Floor Plan | 14 | 01/21/14 | 9/21/12 |
| A2.4 | Partial Floor Plan | | | 9/21/12 |
| A2.5 | Partial Floor Plan | | | 9/21/12 |
| A2.6 | Partial Floor Plan | | | 9/21/12 |
| A2.7 | Partial Floor Plan | | | 9/21/12 |
| A2.8 | Partial Floor Plan | 14 | 01/21/14 | 9/21/12 |
| A2.9 | Partial Floor Plan | 14 | 01/21/14 | 9/21/12 |
| A3.0 | Exterior Elevations | 15 | 02/04/14 | 9/21/12 |
| A3.1 | East & South Exterior Elevations | 11 | 12/17/13 | 9/21/12 |
| A3.2 | West & North Exterior Elevations | 15 | 02/04/14 | 9/21/12 |
| A4.0 | Exterior Paint Elevations | 15 | 02/04/14 | 9/21/12 |
| A4.1 | East & South Exterior Paint Elevations | 11 | 12/17/13 | 9/21/12 |
| A4.2 | West & North Exterior Paint Elevations | 15 | 02/04/14 | 9/21/12 |
| A5.0 | Enlarged Entry Soffit Plan | 14 | 01/21/14 | 9/21/12 |
| A5.1 | Enlarged Entry & Soffit Plan | 14 | 01/21/14 | 9/21/12 |
| A5.2 | Enlarged Entry & Soffit Plan | 14 | 01/21/14 | 9/21/12 |
| A5.3 | Enlarged Entry & Soffit Plan | 14 | 01/21/14 | 9/21/12 |
| A6.0 | Enlarged Exterior Elevations | 11 | 12/17/13 | 9/21/12 |
| A6.1 | Enlarged Exterior Elevations | 11 | 12/17/13 | 9/21/12 |
| A6.2 | Enlarged Exterior Elevations | 11 | 12/17/13 | 9/21/12 |
| A7.0 | Wall Sections | 8 | 09/24/13 | 9/21/12 |
| A7.1 | Wall Sections | 8 | 09/24/13 | 9/21/12 |
| A8.0 | Enlarged Ramp Plans | 11 | 12/17/13 | 9/21/12 |
| A8.1 | Enlarged Ramp Plans and Sections | 5 | 01/08/13 | 9/21/12 |
| A9.0 | Overall Roof Plan | 11 | 12/17/13 | 9/21/12 |
| A9.1 | Partial Roof  Plan | 11 | 12/17/13 | 9/21/12 |
| A9.2 | Partial Roof  Plan | 11 | 12/17/13 | 9/21/12 |
| A10.0 | Overall Reflected Ceiling Plan | 11 | 12/17/13 | 9/21/12 |
| A10.1 | Partial Reflected Ceiling Plan | 11 | 12/17/13 | 9/21/12 |
| A10.2 | Partial Reflected Ceiling Plan | 11 | 12/17/13 | 9/21/12 |
| A11.0 | Door Schedules and Door Types | 16 | 02/26/14 | 9/21/12 |
| A11.1 | Door Schedules, Door and Window Types | 16 | 02/26/14 | 9/21/12 |
| A12 | Pump House (Plans & Sections) | 8 | 09/24/13 | 9/21/12 |
| A13 | Roof Access Ladder | | | 9/21/12 |
| AD1 | Miscellaneous Details | | | 9/21/12 |
| AD2 | Miscellaneous Details | 9 | 11/13/13 | 9/21/12 |
| AD3 | Miscellaneous Details | 8 | 09/24/13 | 9/21/12 |
| AD4 | Miscellaneous Details | 11 | 12/17/13 | 9/21/12 |
| AD5 | Miscellaneous Details | | | 9/21/12 |
| AD6 | Monument Sign | | | 9/21/12 |
| | | | | |
| | | | | |

October 15, 2015                                          Majestic Airport Center DFW Bldg. No. 5
Page 3 of 5

I-4

| | **Structural** | | | |
|---|---|---|---|---|
| S1.1 | Overall Foundation Plan | | | 9/21/12 |
| S1.2 | Foundation Plan | | | 9/21/12 |
| S1.3 | Foundation Plan | | | 9/21/12 |
| S1.4 | Foundation Plan | | | 9/21/12 |
| S1.5 | Foundation Plan | | | 9/21/12 |
| S1.6 | Foundation Plan | | | 9/21/12 |
| S1.7 | Foundation Plan | | | 9/21/12 |
| S1.8 | Foundation Plan | | | 9/21/12 |
| S1.9 | Foundation Plan | | | 9/21/12 |
| S2.1 | Overall Roof Framing Plan | | | 9/21/12 |
| S2.2 | Framing Plan | | | 9/21/12 |
| S2.3 | Framing Plan | | | 9/21/12 |
| S2.4 | Framing Plan | | | 9/21/12 |
| S2.5 | Framing Plan | | | 9/21/12 |
| S2.6 | Framing Plan | | | 9/21/12 |
| S2.7 | Framing Plan | | | 9/21/12 |
| S2.8 | Framing Plan | | | 9/21/12 |
| S2.9 | Framing Plan | | | 9/21/12 |
| S3.0 | Roof Uplift Load & MWFRS Load | | | 9/21/12 |
| S4.1 | Enlarged Plans | | | 9/21/12 |
| S4.2 | Enlarged Plans | | | 9/21/12 |
| S4.3 | Enlarged Plans | | | 9/21/12 |
| S5.1 | Foundation Details | 1 | 09/25/13 | 9/21/12 |
| S5.2 | Foundation Details | | | 9/21/12 |
| S6.1 | Tilt-Wall Panels Details | | | 9/21/12 |
| S6.2 | Tilt-Wall Panels Details | | | 9/21/12 |
| S6.3 | Tilt-Wall Panels Details | | | 9/21/12 |
| S6.4 | Panel Reinforcing Details | | | 9/21/12 |
| S7.1 | Steel Details | | | 9/21/12 |
| S7.2 | Steel Details | | | 9/21/12 |
| S8.1 | Wall Reinforcing Profiles | | | 9/21/12 |
| S8.2 | Wall Reinforcing Profiles | | | 9/21/12 |
| S8.3 | Wall Reinforcing Profiles | | | 9/21/12 |
| S9.0 | Specifications | 1 | 09/25/13 | 9/21/12 |
| | | | | |
| | **HVAC** | | | |
| M0.00 | Mechanical Notes | | | 8/28/12 |
| M1.01 | Partial Floor Plan | | | 8/28/12 |
| M1.02 | Partial Floor Plan | | | 8/28/12 |
| M4.01 | Mechanical Schedules | | | 8/28/12 |
| MS1.02 | Partial HVAC Roof Framing Plan | | | 8/18/12 |
| | | | | |
| | **Plumbing** | | | |
| P1 | Overall Floor Plan - Plumbing | | | 9/11/12 |
| | | | | |
| | **Fire Alarm** | | | |
| FA-00 | Cover Sheet | | | 08/04/14 |
| FA-1A | Floor Plan | | | 08/04/14 |
| FA-1B | Floor Plan | | | 08/04/14 |
| | Data Sheets | | | 08/04/14 |
| | | | | |

October 15, 2015                                          Majestic Airport Center DFW Bldg. No. 5
Page 4 of 5

I-5

| | **Fire Sprinkler** | | | |
|---|---|---|---|---|
| FP-1 to FP-13 | Fire Sprinkler Plans | | | 12/30/14 |
| | | | | |
| | **Electrical** | | | |
| | Site Photometric Plan | 9 | 10/17/13 | |
| E-01 | Overall Floor Plan – Lighting | | | 9/6/12 |
| E-01A | Overall Floor Plan – Power | | | 9/6/12 |
| E-02 | Pump Room – Power and Lighting Plan | | | 9/6/12 |
| E-03 | Electrical Riser Diagrams | | | 9/6/12 |
| E-04 | Schedules | | | 9/6/12 |

**EXHIBIT J**

**ECONOMIC DEVELOPMENT AGREEMENT
(TENANT AND CITY OF LEWISVILLE)**

(Attached)

ECONOMIC DEVELOPMENT AGREEMENT

This Economic Development Agreement (the "Agreement") is entered into by and between the City of Lewisville, Texas, a home rule city and municipal corporation of Denton County, Texas, duly acting by and through its City Manager, (the "City"); and Bed Bath & Beyond Inc., a New York Corporation ("Company") (collectively the "Parties").  In addition, DFW Lewisville Partners GP, a Texas general partnership, is executing this Agreement for the limited purposes set forth immediately above its signature.

W I T N E S S E T H:

**WHEREAS,** pursuant to Chapter 380 of the Texas Local Government Code (the "Statute"), the City adopted a program for making economic development grants on June 19, 2006, as amended in 2010 ("the Policy Statement"); and

**WHEREAS,** the Policy Statement constitutes appropriate guidelines and criteria governing economic development agreements to be entered into by the City as contemplated by the Statute; and

**WHEREAS,** in order to maintain and/or enhance the commercial economic and employment base of the Lewisville area to the long-term interest and benefit of the City, in accordance with said Statute, the City desires to enter into this Agreement; and

**WHEREAS,** one or more Company Entities (hereinafter defined) intend to occupy the Leased Premises (hereinafter defined) for a term of up to twenty years, which space is located at the real property known as 2900 South Valley Parkway, Lewisville, Texas, which is more particularly described in "Attachment A" attached hereto (the "Premises"); and

**WHEREAS,** one or more Company Entities intend to lease such Leased Premises and make certain improvements; and

**WHEREAS,** one or more Company Entities intends to maintain Inventory (hereinafter defined) on such Leased Premises and conduct business that will involve Taxable Sales (hereinafter defined); and

**WHEREAS,** the contemplated use of the Leased Premises as set forth in this Agreement and the other terms hereof are consistent with encouraging economic development in the City in accordance with the purposes for its creation and are in compliance with the intent of the Statute

and the Policy Statement and similar guidelines and criteria adopted by the City and all applicable law; and

WHEREAS, the City Council finds that the improvements to the Leased Premises will be of benefit to the City after the expiration of this Agreement.

NOW THEREFORE, the City, in consideration of the mutual benefits and promises contained herein and for good and other valuable consideration, the adequacy and receipt of which is hereby acknowledged, including the attraction of major investment on the Leased Premises, which contributes to the economic development of the City and the enhancement of the tax base in the City, the Parties hereto do mutually agree as follows:

## ARTICLE I
## TERM

1.1     The term of this Agreement ("Term") shall commence on December [__], 2015 ("Effective Date") and (unless same expires or is terminated sooner as provided herein) shall continue in effect until December 31, 2036, provided that the City's payment obligations under this Agreement for grants then earned but not yet paid shall continue after the expiration of the Term.

## ARTICLE II
## DEFINITIONS

2.1     Wherever used in this Agreement, the following terms shall have the meanings ascribed to them:

"Affiliate" means, with respect to any Person, any other Person directly or indirectly Controlling, Controlled by, or under common Control with such Person.

"Agreement" has the meaning set forth in the introductory paragraph of this document.

"BBB Lewisville Sourced Sale" means any Taxable Sale by any Company Entity during the Term in which the City collects Local Sales Tax including, but not limited to, in a circumstance in which the item was shipped from the Leased Premises to a Texas customer, or in a circumstance in which the item was shipped from outside of Texas to a Texas customer.

"BBB Lewisville Sourced Sales Tax" means any Local Sales Tax received by or credited to the City on any BBB Lewisville Sourced Sale.

"Building" means any structure located on the Premises.

"**Business Personal Property**" means tangible personal property, equipment and fixtures, other than Inventory, owned or leased by any Company Entity that is first located on the Leased Premises subsequent to the execution of this Agreement.

"**Capital Investment**" means the sum of (i) the total capitalized cost (hard costs and soft costs) of the improvements made to the Leased Premises by any Company Entity, and (ii) the Company Entity's aggregate cost of acquisition and installation of Business Personal Property.

"**City**" has the meaning set forth in the introductory paragraph of this Agreement.

"**Clawback Event**" means Company failed to meet a material term or condition of Article IV or Section 5.1(c) or (d) of this Agreement after the expiration of any applicable Cure Period.  To the extent that a Clawback Event has occurred, a portion of any of the economic development grants described in Sections 3.1 through 3.5 of this Agreement and received by Company from the City shall be subject to repayment by Company pursuant to Article V of this Agreement.

"**Company**" has the meaning set forth in the introductory paragraph of this Agreement.

"**Company Entity**" means the Company and/or any Affiliate of the Company (references in this Agreement to "Company" shall refer to "Company Entity" as may be applicable).

"**Company RP Tax Share**" means, for a particular Grant Period, the portion of the ad valorem real property taxes owed and paid to the City on the Leased Premises.  The determination of the Company RP Tax Share for each Grant Period shall be determined as follows:

    a.   Company shall submit to City a written statement signed by Company, and certified to the City, that sets forth the dollar amount of City real property taxes allocable to the Premises that have been paid by Company (i.e. the City real property taxes allocable to the Leased Premises) to Landlord for such Grant Period pursuant to the existing lease between Landlord and Company for the Leased Premises. Said dollar amount shall not be equal to 100 percent of the City real property taxes owed and paid to the City for the Premises, unless Company leases 100 percent of the Premises.  Such certified statement for a particular Grant Period shall be delivered by Company to the City on or before February 15 of the immediately following calendar year.

b.    Such written certified statement by Company shall be accepted by the City and thus will establish the Company RP Tax Share for the Grant Period to which the written certified statement relates.

c.    If, at any time during the Term, the appraisal district(s) separately appraise for property tax purposes the Leased Premises, the Parties shall rely on the appraisal district(s)' determination of the City real property taxes on the Leased Premises.

"**Construction Items**" means a type of Taxable Item purchased by any Company Entity (or contractors or subcontractors of any Company Entity) directly related to the construction, finish-out, and furnishing of the Leased Premises (i.e. construction materials, services, equipment, furniture, fixtures, and/or equipment).

"**Control**" or any derivation thereof, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of securities, by contract or otherwise.

"**Electronic Commerce Retailing**" means the buying and selling of goods and services over an electronic network, primarily the internet.

"**Effective Date**" means that point in time established in Article I of this Agreement.

"**Event of Bankruptcy**" means the dissolution or termination of a party's existence as a going business, insolvency, appointment of receiver for any part of such party's property and such appointment is not terminated within ninety (90) days after such appointment is initially made, any general assignment for the benefit of creditors, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against such party and such proceeding is not dismissed within ninety (90) days after the filing thereof.

"**Force Majeure**" means any contingency or cause beyond the reasonable control of Company, including without limitation, acts of God or the public enemy, war, riot, terrorism, civil commotion, insurrection, governmental or de facto governmental action or inaction including, but not limited to, government actions pertaining to the determination of flood zones or FEMA actions, fire, earthquake, tornado, hurricane, explosions, floods, epidemics, strikes, slowdowns, work stoppages, unusually severe weather or adverse economic conditions.

"**Grant**" means each of a Capped Grant, RP Tax Grant, BPP Tax Grant, Inventory Tax Grant and Sales Tax Grant.

"**Grant Payment**" means the payment of any of the economic development incentives described in Article IV of this Agreement, including the Capped Grant, the RP Tax Grant, the Inventory Tax Grant, the BPP Tax Grant and the Sales Tax Grant.

"**Grant Period**" means a period, during the Term, beginning January 1 of the calendar year through and including the following December 31 of the calendar year. The first Grant Period shall begin on January 1, 2017, and the last Grant Period shall begin on January 1, 2036, for a total of 20 Grant Periods, subject to the further provisions of this Agreement.

"**Inventory**" means inventory, as defined by section 23.12 of TEX. TAX CODE, as amended, owned by Company, located at the Leased Premises and valued by the Denton Central Appraisal District.

"**Landlord**" means DFW Lewisville Partners GP, a Texas general partnership, and its successors and assigns.

"**Leased Premises**" means, at a particular time during the term of this Agreement, that portion of the Premises leased by a Company Entity. As of the Effective Date, the Leased Premises consists of approximately 799,460 square feet of space and is described in Attachment "C". However, it is agreed that the Leased Premises shall also include any improvements made to that portion of the Premises leased by a Company Entity and any other portion of the Premises that may be leased in the future by a Company Entity during the Term of this Agreement.

"**Local Sales Tax**" means the one percent (1%) sales and use tax imposed by the City for its general fund, pursuant to Chapter 321, TEX. TAX CODE, as amended, on the sale or use of Taxable Items by a Company Entity during the applicable Grant Period.

"**Minimum Capital Investment**" means the Company and/or the Company Entities making at least a $23,000,000.00 Capital Investment.

"**Person**" means any individual, corporation, partnership, trust, estate, unincorporated organization, association or other entity.

"**Premises**" has the meaning set forth in the recitals to this Agreement.

"**Required Use**" means Company's continuous (with short-term interruptions due to (a) Force Majeure or (b) other legitimate business reasons; provided, however, that the resulting interruptions of such other business reasons do not exceed 90 days per Grant

Period, which 90 day interruption may not occur in more than five (5) Grant Periods) operation of the Leased Premises as an Electronic Commerce Retailing facility.

"**Taxable Item**" means both "taxable items" and "taxable services" as those terms are defined by Chapter 151, TEX. TAX CODE, as amended.

"**Taxable Sale**" means any sale of a Taxable Item by a Company Entity that results in the imposition of Local Sales Tax.

"**Total Assessed Value**" means the assessed value for property tax purposes for a particular property tax year.

"**Vendor**" means a company, business or other legal entity from which Company purchased Construction Items.

## ARTICLE III
## ECONOMIC DEVELOPMENT INCENTIVES

3.1    Capped Grant.

    a.    Subject to Sections 3.1.b. and 3.1.c. below, the City agrees to provide to Company Entities an economic development grant equal to the sum of (i) any and all fees related to the completion of the improvements to the Leased Premises, including, but not limited to, building permit fees, electrical permit fees, business-related permit fees, construction fees, inspection fees, zoning fees and other applicable fees ("Fees"), which are imposed by the City and paid by Company from the Effective Date through December 31, 2018; (ii) 100% of the Local Sales Tax on all Construction Items collected or paid by any Company Entity from the Effective Date through December 31, 2018; and (iii) 100% of the BBB Lewisville Sourced Sales Tax with respect to sales occurring from the Effective Date through December 31, 2018 (the "Capped Grant").

    b.    Notwithstanding Section 3.1.a. above, the total amount of the Capped Grant shall not exceed seven hundred thousand dollars ($700,000) (the "Cap").

    c.    Company's receipt of the full amount of the Capped Grant is subject to the condition that it make the Minimum Capital Investment on or before December 31, 2016, subject to Force Majeure; provided, however, that if the total Capital Investment as of December 31, 2016 is at least eighteen million, four hundred thousand dollars ($18,400,000), then failure to make the Minimum Capital Investment by December 31, 2016 will not preclude Company from receiving the Capped Grant altogether, but said grant will be reduced according to the schedule set forth below:

| Percentage of Minimum Capital Investment | Percentage Capped Grant Available |
|---|---|
| 90-99% | 85% |
| 80-89% | 75% |

      d.      Notwithstanding any provision in this Agreement to the contrary, in no event will the Capped Grant decrease as a result of a decrease in the Total Assessed Value of the Capital Investment after December 31, 2016 (i.e. once the Company has met the Minimum Capital Investment, no decrease in the Total Assessed Value of the Capital Investment thereafter will preclude it from receiving the full amount of the Capped Grant).

      e.      In paying the Capped Grant, the City shall first apply against the Cap the total amount of Fees, then apply against the Cap the Local Sales Tax on the Construction Items, and lastly apply against the Cap the BBB Lewisville Sourced Sales Tax.  For illustration purposes, assume that between the Effective Date and December 31, 2018, Company pays $200,000 in Fees, pays $400,000 in Local Sales Tax on Construction Items, and generates on Taxable Sales $800,000 in BBB Lewisville Sourced Sales Tax. The City would apply the $200,000 in Fees and then the $400,000 of Local Sales Tax on Construction Items against the Cap. Finally, $100,000 of the BBB Lewisville Sourced Sales Tax would be applied to reach the Cap. To the extent any BBB Lewisville Sourced Sales Taxes are part of the Capped Grant, they shall not be eligible to be taken into account in determining the grant described in Section 3.5 below; however, the City and Company acknowledge and agree, however, that (x) once the Cap is reached, all then remaining BBB Lewisville Sourced Sales Tax with respect to sales occurring through December 31, 2018 shall be eligible for inclusion within the Sales Tax Grants as described in Section 3.5 of this Agreement, and (y) all BBB Lewisville Sourced Sales Taxes that are part of the Capped Grant shall be taken into account for the purpose of otherwise determining the applicable Minimum BBB Lewisville Sourced Sales (as defined in Section 3.5.b below) for a given Grant Period.

      f.      Company shall pay all applicable taxes and fees in accordance with the state and local regulations. Company will be paid the Capped Grant by the City in accordance with this Agreement on an annual basis subject to the timing referenced in Section 3.6. The Capped Grant shall be available subject to the terms and conditions of this Agreement during the Term, beginning as of the Effective Date.

      g.      Company shall provide a statement hereafter called the "Sales Tax Receipt

Statement" in a form reasonably acceptable to the City setting forth the City's receipts from the State of Texas from the collection of the Local Sales Tax for the sale to and purchase by Company and Company Entities of Construction Items which are to be used to determine the amount and eligibility of the Capped Grant, together with such supporting documentation, and as the City may reasonably request. The Sales Tax Receipt Statement and other supporting documentation are being used herein only as a temporary measurement for the Capped Grant, which will be paid out of the City's then current funds. Such grant payments may later have to be refunded or adjusted pursuant to Sections 3.1.h and 3.1.i of this Agreement.   The Sales Tax Receipt Statement shall be accompanied by the following:

(1)     A schedule detailing the amount of the Local Sales Tax paid to the State of Texas as a result of the purchase by Company Entity (or contractors or subcontractors of Company or Company Entity) of the Construction Items (Attachment D);

(2)     A copy of all receipts received from sales and use tax returns and reports, sales and use tax prepayment returns, direct payment permits and reports, including amended sales and use tax returns or reports, filed by a Vendor showing the Local Sales Tax collected (including sales and use tax paid directly to the State of Texas pursuant to a direct payment certificate) by the Vendor for the sale to and purchase by Company or any Company Entity (or contractors or subcontractors of Company or Company Entity) of the Construction Items; and

(3)     Information concerning any refund or credit received by Company of the Local Sales Tax paid by Company (including any sales and use tax paid directly to the State of Texas pursuant to a direct payment permit) which has previously been reported by Company as Local Sales Tax paid or collected from the Effective Date through December 31, 2018; and

(4)     A schedule of Local Sales Taxes paid by  contractors and subcontractors of Company and Company Entities for the purchase of Construction Items that are used in determining the amount of the Capped Grant.

h.     In the event the State of Texas determines that the City erroneously received

sales tax receipts, or that the amount of sales and use tax paid by the State of Texas to the City is less than the amount used to determine part of the Capped Grant, Company shall, within thirty (30) days after receipt of notification thereof from the City specifying the amount by which the Capped Grant exceeded the amount to which that Company was entitled pursuant to such State of Texas determination, pay such amount to the City.  As a condition precedent to payment of such refund, the City shall provide Company with a copy of such determination by the State of Texas.  The provisions of this Section 3.1.h shall survive termination of this Agreement.

i.    In the event a Vendor files an amended sales and use tax return, or report with the State of Texas, or if additional sales and use tax is due and owing, as determined or approved by the State of Texas, affecting the amount for the Capped Grant, the City shall pay to Company any underpayment of the Capped Grant, provided the City has received sales tax receipts attributed to such adjustment.  As a condition precedent to payment of such adjustment, Company shall provide the City with a copy of each Vendor amended sales and use tax report or return made available to Company, any relevant receipts, or any relevant direct payment and self-assessment returns.  The provisions of this Section 3.1.i shall survive termination of this Agreement.

j.    Under no circumstances shall the City be obligated to pay the portion of the Capped Grant dependent on the Local Sales Tax paid on Construction Items unless (1) there are available sales and use tax receipts from the Effective Date through December 31, 2018, attributed to the sale to and purchase by Company or Company Entity (or contractors or subcontractors of Company or any Company Entity) of Construction Items; and (2) the City has received the Sales Tax Receipt Statement.

3.2    Real Property Tax Grant.

a.    Subject to the terms and conditions of this Agreement, the City agrees to provide to Company Entities an economic development grant in an amount equal to a certain percentage of the Company RP Tax Share for each Grant Period according to the schedule set forth below (the "RP Tax Grant").  Company will be paid the RP Tax Grant by the City in accordance with this Agreement on an annual basis subject to the timing referenced in Section 3.6.  Said grant shall be available subject to the terms and conditions of this Agreement during the Term, beginning on January 1, 2017.

| Grant Periods | Percentage of the Company RP Tax Share |
|---------------|----------------------------------------|
| 1 – 5 | Ninety percent (90%) |
| 6 – 10 | Seventy-Five percent (75%) |

11 – 20                                    Fifty percent (50%)

b.        Company's receipt of the full amount of the RP Tax Grant is subject to the condition that it meet the Minimum Capital Investment; provided, however, that if the total Capital Investment is at least eighteen million, four hundred thousand dollars ($18,400,000) by December 31, 2016, then failure to meet the Minimum Capital Investment will not preclude Company from receiving the RP Tax Grant altogether, but said grant will be reduced according to the schedule set forth below.

| Percentage of Minimum Capital Investment | Percentage RP Tax Grant Available |
|---|---|
| 90-99% | 85% |
| 80-89% | 75% |

In addition, if the Minimum Capital Investment is not met on or before December 31, 2016, but the Company and/or Company Entities later increase their Capital Investment so that such Minimum Capital Investment is met (or such additional Capital Investment enables a higher percentage in the immediately preceding chart to apply), then the RP Tax Grant shall increase (or shall apply) for the year in which the additional Capital Investment is made (and for all later years) in accordance with the charts in this Section 3.2.a and b, above.  Notwithstanding any provision in this Agreement to the contrary, in no event will the RP Tax Grant decrease as a result of a decrease in the Total Assessed Value of the Capital Investment after December 31, 2016 (i.e. once the Company has met the Minimum Capital Investment, no decrease in the Total Assessed Value of the Capital Investment thereafter will preclude it from receiving the full amount of the RP Tax Grant).

c.        Company's RP Tax Grants as described in this Section 3.2 shall not be affected by and shall supersede any existing or future economic development agreement or other agreement between either (i) the City and Landlord, or (ii) the City and the other occupant(s) of the Premises. Specifically, the City and Landlord entered into an Economic Development Agreement, dated November 17, 2014 ("Landlord Agreement"), which provides for an ad valorem property tax grant to the Landlord and any of its tenants.  This Agreement therefore supersedes the Landlord Agreement and any other agreement described herein to the extent that the economic development incentives conflict or overlap.

3.3      Business Personal Property Tax Grant.

a.      Subject to the terms and conditions of this Agreement, the City agrees to provide to Company Entities an economic development grant in an amount equal to a certain percentage of the ad valorem property taxes owed and paid to the City by Company on the Business Personal Property located on the Leased Premises for each Grant Period according to the schedule set forth below (the "BPP Tax Grant") and otherwise in accordance with the terms of this Agreement and all applicable state and local regulations or valid waiver thereof.  Company shall pay all applicable taxes in accordance with the state and local regulations.  Company will be paid the BPP Tax Grant by the City in accordance with this Agreement on an annual basis subject to the timing referenced in Section 3.6.  The BPP Tax Grant shall be available subject to the terms and conditions of this Agreement during the Term, beginning on January 1, 2017.

| Grant Periods | Percentage of Personal Property Taxes |
|---|---|
| 1 – 5 | Ninety percent (90%) |
| 6 – 10 | Seventy-Five percent (75%) |
| 11 – 20 | Fifty percent (50%) |

b.      Company's receipt of the full amount of the BPP Tax Grant is subject to the condition that the Business Personal Property have a Total Assessed Value of at least nineteen million dollars ($19,000,000) (the "Minimum Total Assessed BPP Value") for the 2017 property tax year (i.e., assessed on or about January 1, 2017); provided, however, that if the Total Assessed BPP Value of the Business Personal Property is at least fifteen million, two hundred thousand dollars ($15,200,000) for the 2017 property tax year, then failure to meet the Minimum Total Assessed BPP Value standard will not preclude Company from receiving the BPP Tax Grant altogether, but said grant will be reduced according to the schedule set forth below.

| Percentage of Minimum Total Assessed BPP Value | Percentage BPP Tax Grant Available |
|---|---|
| 90-99% | 85% |
| 80-89% | 75% |

In addition, if the Minimum Total Assessed BPP Value is not met for the 2017 property tax year, but it is met for a later property tax year, then the BPP Tax Grant shall increase (or shall apply) for the year in which the Total Assessed Value increases (and for all later years) in accordance with the charts in this Section 3.3.a and b, above.  Notwithstanding any provision in this Agreement to the contrary, in no event will the BPP Tax Grant decrease as a result of a decrease in Total Assessed Value after the 2017 property tax year (i.e. once the Company has met the Minimum Total Assessed

BPP Value, no decrease in the Total Assessed Value thereafter will preclude it from receiving the full amount of the BPP Tax Grant). The failure of Company to meet the Minimum Total Assessed BPP Value for the 2017 property tax year shall not adversely affect Company's rights to any other Grants for any Grant Period; rather, the consequence to Company shall be the loss or reduction of the BPP Grant for such Grant Period.

**3.4**    **Inventory Tax Grant.**

a.    Subject to the terms and conditions of this Agreement, the City agrees to provide to Company Entities an economic development grant in an amount equal to a certain percentage of the ad valorem property taxes owed and paid to the City by each Company Entity on the Inventory for each Grant Period, according to the schedule set forth below (the "Inventory Tax Grant"). The Inventory Tax Grant shall be calculated with respect to the Inventory located on the Leased Premises on January 1 of each year in accordance with the terms of this Agreement and all applicable state and local regulations or valid waiver thereof. Company shall pay all applicable taxes in accordance with the state and local regulations. Company will be paid the Inventory Tax Grant by the City in accordance with this Agreement on an annual basis subject to the timing referenced in Section 3.6. The Inventory Tax Grant shall be available subject to the terms and conditions of this Agreement during the Term, beginning on January 1, 2017.

| Grant Periods | Percentage of Inventory Tax |
|---|---|
| 1 – 10 | Seventy-Five percent (75%) |
| 11 – 20 | Fifty percent (50%) |

b.    To be eligible for the Inventory Tax Grant under this Agreement for a given Grant Period, the Total Assessed Value of the Inventory must meet the schedule set forth below.

| Grant Periods | Inventory Minimum |
|---|---|
| 1 – 2 | Zero Dollars ($0.00) |
| 3 | Fifteen Million Dollars ($15,000,000) |
| 4 | Twenty-Five Million Dollars ($25,000,000) |

Beginning with the fourth (year 2020) Grant Period, if the Total Assessed Value of the Inventory for any Grant Period is at least twenty million dollars ($20,000,000), then failure to meet the Inventory Minimum will not preclude Company from receiving the Inventory Tax Grant altogether for such Grant Period, but said Grant Payment will be reduced according to the schedule

set forth below. Grant Payments made under the Inventory Tax Grant will be issued on a year-to-year basis, so that each Grant Payment will be based solely on the Total Assessed Value of the Inventory located on the Leased Premises on January 1 of the year in which the Grant Payment is issued. The failure of Company to meet the Inventory Minimum for any particular Grant Period shall not adversely affect Company's rights to Inventory Tax Grants for any other Grant Period (or any other Grants for any Grant Period); rather, the consequence to Company shall be the loss or reduction of the Inventory Grant for such Grant Period.

| Percentage of Inventory Minimum | Percentage Inventory Tax Grant Available |
|---|---|
| 90-99% | 85% |
| 80-89% | 75% |

3.5    Sales Tax Grant.

      a.     Subject to the terms and conditions of this Agreement, the City agrees to provide to Company Entities an economic development grant in an amount equal to a certain percentage of BBB Lewisville Sourced Sales Tax, according to the schedule set forth below (the "Sales Tax Grant") and otherwise in accordance with the terms of this Agreement and all applicable state and local regulations or valid waiver thereof.  A condition to the Sales Tax Grant is that Company Entities shall pay all applicable Texas state sales taxes in accordance with applicable law. Company Entities shall be paid the Sales Tax Grant by the City in accordance with this Agreement on a quarterly basis subject to the timing referenced in Section 3.6.  The Sales Tax Grant shall be available subject to the terms and conditions of this Agreement during the Term, beginning on January 1, 2017.

| Grant Periods | Percentage of Sales Tax |
|---|---|
| 1 – 5 | Seventy-Five percent (75%) |
| 6 – 15 | Fifty percent (50%) |
| 16 – 20 | Fifteen percent (15%) |

      b.     To be eligible for the Sales Tax Grant for a particular Grant Period, a minimum amount of BBB Lewisville Sourced Sales must be met each Grant Period according to the schedule set forth below (the "Minimum BBB Lewisville Sourced Sales").  The failure of Company to meet the Minimum BBB Lewisville Sourced Sales for any particular Grant Period shall not adversely affect Company's rights to Sales Tax Grants for any other Grant Period (or any other

Grants for any Grant Period); rather, the sole consequence to Company shall be the loss of the Sales Tax Grant for such Grant Period.

| Grant Periods | Minimum BBB Lewisville Sourced Sales |
|:---:|:---:|
| 1 - 3 | Thirty Million Dollars ($30,000,000) |
| 4 – 5 | Forty-five Million Dollars ($45,000,000) |
| 6 – 7 | Sixty Million Dollars ($60,000,000) |
| 8 – 10 | Seventy-five Million Dollars ($75,000,000) |
| 11 – 15 | One Hundred Million Dollars ($100,000,000) |
| 16 – 20 | One Hundred Twenty-Five Million Dollars ($125,000,000) |

c.      To the extent any BBB Lewisville Sourced Sales Taxes are part of the Capped Grant, they shall not be eligible to be taken into account in determining the Sales Tax Grant; however, such BBB Lewisville Sourced Sales Taxes shall be taken into account for the purpose of determining the applicable Minimum BBB Lewisville Sourced Sales for a given Grant Period.

d.      Company shall provide all the necessary information to prove the amount of the BBB Lewisville Sourced Sales Taxes, including but not limited to, the execution of a waiver required by the Texas Comptroller of Public Accounts which will allow the Comptroller's office to provide the City with the Local Sales Tax remittance for the Leased Premises.

e.      Any Local Sales Tax from an in-person purchase at a retail store shall not be considered for any purposes under this Agreement.

f.      With respect to taxable sales by contractors and subcontractors, only Company Entity(ies) shall submit to the City a request for payment of a Grant or the necessary information to support the payment of a Grant. In addition, no contractor or subcontractor is eligible for any Grant under this Agreement (i.e. only Company Entities will be eligible for the Grants).

3.6     Timing of Grants.  Company acknowledges that this Agreement makes an allowance for the Capped Grant, RP Tax Grant, BPP Tax Grant and Inventory Tax Grant to be paid on an annual basis. Each year during the Term, prior to payment of such grants, Company shall submit to the City, no later than February 15 for each year in which the grants are to be paid, all of the following: (1) proof of payment of its subject tax liability; (2) its Annual Compliance Report shown

on Attachment "B"; (3) a letter of request for payment; and (4) any other documentation or information required by this Agreement.  In addition to the above listed items, prior to payment of the RP Tax Grant, Company shall submit to City, no later than February 15 for each year in which the grant is to be paid, a written certified statement signed by Company regarding the Company RP Tax Share, as provided in Article II herein.  Subject to the satisfactory receipt of these items by February 15, the City agrees that the grants will be paid in full to Company prior to March 30 or within forty-five (45) days of satisfactory receipt of the above listed items.

Company further acknowledges that this Agreement makes an allowance for the Sales Tax Grant to be paid on a quarterly basis. Each quarter during the Term, prior to payment of such grant, Company shall submit to the City, no later than 45 days after the end of each quarter for which the grant is to be paid, proof of payment of its City sales tax paid to City during the quarter.  In order for Company to be eligible to receive Sales Tax Grant payments in any year during the term of this Agreement, Company must be in compliance of all material terms and conditions of this Agreement as of December 31 of the prior year.  Subject to the satisfactory receipt of these items by the City, the City agrees that the quarterly portion of the grant will be paid in full to Company within forty-five (45) days of satisfactory receipt of the above listed items.

3.7    Termination of Grants.  Notwithstanding anything to the contrary contained in this Agreement, the RP Tax Grant, Cap Grant, BPP Tax Grant, Inventory Tax Grant and Sales Tax Grant shall terminate and be null and void and of no further effect if (i) this Agreement is terminated as provided herein; (ii) the lease for the Leased Premises expires or is terminated for any reason; or (iii) Company suffers an Event of Bankruptcy; however, the foregoing shall not lessen or diminish any terms and conditions that survive expiration or earlier termination of this Agreement (including without limitation any payment obligations by City to Company for grants then earned but not yet paid).

## ARTICLE IV
## AGREEMENT GENERAL CONDITIONS

4.1    Company's eligibility to receive any of the economic incentives provided for in this Agreement is contingent upon its satisfaction of the following general conditions (i.e., conditions that apply to each Grant; these conditions are in addition to the specific condition or conditions that apply to particular Grants):

a.    Occupancy Condition.  As soon as practical after the Effective Date of this

Agreement, (1) Company shall commence with efforts to perform its improvements to the Leased Premises; and (2) Company shall occupy the Leased Premises and proceed diligently and in good faith to commence operations no later than December 31, 2016, subject to any event of Force Majeure.

b.      Minimum Use Condition.  During the Term of this Agreement, the Leased Premises shall not be used for any purpose other than the Required Use.

c.      Community Support.  Company shall support a community event or economic development activity with a minimum contribution of $15,000 per Grant Period to the City for the Term of this Agreement.

d.      Certification.  Company must certify annually to the governing body of the City through the City's Director of Economic Development as to its attainment of the stated performance measures described in Article III and this Article IV (subject to the terms and conditions thereof) by submitting an Annual Compliance Report (Attachment B) and appropriate support documentation, no later than February 15 of each year after the issuance of the certificate of occupancy and continuing until the expiration of the Term.  Failure to meet this condition for any particular Grant for any Grant Period shall not affect any other Grant (or such particular Grant for any other Grant Period).

4.2     Company may designate any Company Entity as a recipient of the Grants; provided, however, that Company must provide notice to the City at least thirty (30) days before payment of the Grants.  Solely for administrative ease, the City limits the designee of Grants to only one Company Entity per Grant Period.

## ARTICLE V
## TERMINATION

5.1     This Agreement may be terminated upon any one of the following:

(a)     by written agreement of the Parties;

(b)     expiration of the Term;

(c)     by the City if Company breaches any material terms or conditions of this Agreement and such breach is not cured within sixty (60) days after written notice thereof (the "Cure Period") or such breaching party does not commence curative action within such 60-day period and diligently pursue

such curative action to a satisfactory completion;

(d)     by the City on the date that Company or a Company Entity is not leasing any portion of the Premises or on the date that Company is not using the Leased Premises for the Required Use;

(e)     by Company upon sixty (60) days prior written notice to the City.

5.2     Refund of Grants.  In the event the Agreement is terminated by the City pursuant to Section 5.1(c) or (d), a Clawback Event shall have been deemed to occur, and Company shall, as the City's sole remedy, immediately pay the City, within sixty (60) days of notice from the City, an amount equal to a proportional amount of the affected grant received by Company for the applicable tax year when the Clawback Event occurs.

<h3 style="text-align:center">ARTICLE VI<br>MISCELLANEOUS</h3>

6.1     The terms and conditions of this Agreement are binding upon the successors and assigns of all Parties hereto.  This Agreement cannot be assigned by Company without the prior written consent of the City, which may not be unreasonably withheld, conditioned or delayed (it being understood that reasonable reasons for the City to deny such consent include, without limitation, the lack of financial viability of the assignee, the adverse business reputation of the assignee, the assignee's engaging in a type of business that would reflect poorly on the City, the assignee's lack of compliance with City ordinances and laws, etc.).  Notwithstanding the foregoing, Company may assign this agreement (in whole or in part), without the prior written consent of the City to any Company Entity (currently existing or later formed), provided that the Company shall have provided to the City written notice at least thirty (30) days before Company intends to make such assignment, and such assignee assumes the obligations and liabilities of the company in writing in a form reasonably approved by the City.

6.2     It is understood and agreed between the Parties that Company, in performing its obligations thereunder, is acting independently, and the City assumes no responsibility or liabilities in connection therewith to third parties.

6.3     Company further agrees that the City, its agents and employees, shall have reasonable rights of access to the Leased Premises as required by law to inspect the improvements and Leased Premises in order to ensure that the Leased Premises are maintained, operated, and occupied in accordance with all applicable agreements with the City, provided that with respect to

matters concerning this Agreement (i) the City must give Company reasonable prior written notice no less than two (2) days prior to any such inspection, and (ii) a representative of Company shall have the right to accompany the agent or employee of the City who is conducting such inspection.

6.4    The City represents and warrants that the Premises do not include any property that is owned by a member of the City Council having responsibility for the approval of this Agreement.

6.5    Notices required to be given to any party to this Agreement shall be given by certified mail, return receipt requested, postage prepaid, or overnight delivery by a nationally recognized courier, addressed to the party at its address as set forth below, and, if given by certified mail, shall be deemed delivered three (3) days after the date deposited in the United States' mail:

For City by notice to:

> City of Lewisville
> Attn: Economic Development Director
> 151 W. Church Street
> P.O. Box 299002
> Lewisville, Texas 75057

For Company by notice to:

> Bed Bath & Beyond Inc.
> Attn: Mr. Warren Eisenberg
> 650 Liberty Avenue
> Union, New Jersey 07083

With copy to:

> Bed Bath & Beyond Inc.
> Attn: Allan N. Rauch, Esq.
> 650 Liberty Avenue
> Union, New Jersey 07083

> Haynes and Boone, LLP
> Attn: Jeff Dorrill
> 2323 Victory Avenue, Suite 700
> Dallas, Texas 75219

Any party may change the address to which notices are to be sent by giving the other parties written notice in the manner provided in this paragraph.

6.7    This Agreement may be executed in multiple counterparts, each of which shall constitute an original, but all of which in the aggregate shall constitute one agreement.

6.8    In case any one or more of the provisions contained in this Agreement shall for any reason be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision thereof, and this Agreement shall be construed as if such invalid, illegal, or unenforceable provision had never been contained herein.

6.9    Whenever the context requires, all words herein shall be deemed to include the male, female, and neuter gender, singular words shall include the plural, and vice versa.

6.10    This Agreement was authorized by action of the City Council, authorizing the City Manager to execute the Agreement on behalf of the City.

6.11    No claim or right arising out of a breach of this Agreement can be discharged in whole or in part by a waiver or renunciation of the claim or right unless the waiver or renunciation is supported by consideration and is in writing signed by the aggrieved.

6.12    This Agreement may be modified or rescinded only by a writing signed by both of the Parties or their duly authorized agents.

6.13    Venue for any litigation arising from this Agreement shall lie in Denton County, Texas.

6.14    If this Agreement or any provision thereof is held to be invalid, illegal or unenforceable, then the City shall use its best efforts in working with Company to restructure this Agreement and the City's obligations described herein, or take such curative actions as may be necessary to (i) bring this Agreement into compliance with the applicable provisions of federal, state or local law to the extent possible, (ii) revise this Agreement with as similar terms as possible to the provision held to be illegal, invalid, or unenforceable, and (iii) to achieve the intended Grant Payments under this Agreement for Company.

6.15    COMPANY AGREES TO DEFEND, INDEMNIFY AND HOLD CITY, ITS OFFICERS, AGENTS AND EMPLOYEES, HARMLESS AGAINST ANY AND ALL CLAIMS, LAWSUITS, JUDGMENTS, COSTS AND EXPENSES FOR PERSONAL INJURY (INCLUDING DEATH), PROPERTY DAMAGE OR OTHER HARM (OTHER THAN CONSEQUENTIAL DAMAGES) FOR WHICH RECOVERY OF DAMAGES IS SOUGHT, SUFFERED BY ANY PERSON OR PERSONS, THAT MAY ARISE OUT OF OR BE OCCASIONED BY COMPANY'S BREACH OF THIS AGREEMENT OR BY ANY NEGLIGENT OR STRICTLY LIABLE ACT OR OMISSION OF COMPANY, ITS

OFFICERS, AGENTS, EMPLOYEES OR SUBCONTRACTORS, IN THE PERFORMANCE OF THIS AGREEMENT; EXCEPT THAT THE INDEMNITY PROVIDED FOR IN THIS PARAGRAPH SHALL NOT APPLY TO ANY LIABILITY TO THE EXTENT THAT IT RESULTS FROM THE NEGLIGENCE OR FAULT OF THE CITY, ITS OFFICERS, AGENTS, EMPLOYEES, OR SEPARATE CONTRACTORS, AND IN THE EVENT OF JOINT AND CONCURRENT NEGLIGENCE/BREACH OF BOTH COMPANY AND THE CITY, RESPONSIBILITY AND INDEMNITY , IF ANY, SHALL BE APPORTIONED IN ACCORDANCE WITH THE LAW OF THE STATE OF TEXAS, WITHOUT WAIVING ANY GOVERNMENTAL IMMUNITY AVAILABLE TO THE CITY UNDER TEXAS LAW AND WITHOUT WAIVING ANY DEFENSES OF THE PARTIES UNDER TEXAS LAW. THE PROVISIONS OF THIS PARAGRAPH ARE SOLELY FOR THE BENEFIT OF THE PARTIES HERETO AND NOT INTENDED TO CREATE OR GRANT ANY RIGHTS, CONTRACTUAL OR OTHERWISE, TO ANY OTHER PERSON OR ENTITY. THIS PARAGRAPH SHALL SURVIVE THE TERMINATION OF THIS AGREEMENT.

6.15   Nothing contained in this Agreement shall constitute a waiver of the City's governmental immunity.

6.16    This Agreement shall be considered drafted equally by both the City and Company.

DATED this the _____day of December, 2015.

(EXECUTION PAGE FOLLOWS)

CITY OF LEWISVILLE, TEXAS

_____

Donna Barron, City Manager

ATTEST:

_____

Julie Heinze, City Secretary

APPROVED AS TO FORM:

_____

Lizbeth Plaster, City Attorney

COMPANY:

BED BATH & BEYOND INC.,
a New York Corporation

By: _____
     Steven H. Temares
     Chief Executive Officer

DFW LEWISVILLE PARTNERS GP, a Texas general partnership, is executing this Agreement for this sole purpose of acknowledging the provisions of Section 2.1 and 3.2 of this Agreement "Company RP Tax Share" and specifically the supersession of the property tax grants in the Landlord Agreement.

DFW LEWISVILLE PARTNERS GP,
    a general partnership

By:  Majestic Lewisville Partners, L.P.,
      a Delaware limited liability company,

      By:  Majestic DFW G.P., LLC ,
          a Delaware limited liability company,
          General Partner

          By:  Majestic Realty Co.,
              a California corporation,
              Manager's Agent

              By:_____
              Name:_____
              Title:_____

By:  NM DFW LEWISVILLE, LLC,
      a Delaware limited liability company, a partner

By:  NM MAJESTIC HOLDINGS, LLC,
      a Delaware limited liability company,
      its sole member

      By:    NML REAL ESTATE HOLDINGS,
           LLC, a Wisconsin limited liability
           company, its sole member

          By:    THE NORTHWESTERN MUTUAL LIFE INSURANCE
              COMPANY, a Wisconsin corporation, its
              sole member

              By:    NORTHWESTERN MUTUAL INVESTMENT
                  MANAGEMENT COMPANY, LLC,    a Delaware limited
                  liability company, its wholly-owned affiliate

              By: _____
              Printed Name: _____
              Its: _____

Dated: December ____, 2015

DFW LEWISVILLE PARTNERS GP's address for notice purposes under this Agreement is as follows (unless DFW Lewisville Partners GP changes such address by delivering written notice to the other parties to this Agreement):

DFW LEWISVILLE PARTNERS GP
c/o Majestic Realty Co.
13191 Crossroads Parkway North
Sixth Floor
City of Industry, California 91746
Attention:  Property Management

ATTACHMENT A

<u>Premises</u>

**METES AND BOUNDS, LOCATION MAP, SITEPLAN**

TRACT 1:

DESCRIPTION, of a 60.710 acre tract of land situated in the Peter Harmonson Survey, Abstract No. 530, Denton County, Texas, and the Peter Harmonson Survey, Abstract No. 1795, Dallas County, Texas; being all of Lot 1, Block B, Majestic Addition, an addition to the City of Lewisville according to the plat recorded in Cabinet 2012, Page 266, Official Records of Denton County, Texas and in Instrument 201300017112, Official Public Records of Dallas County, Texas; and being a part of that tract of land described in Special Warranty Deed to DFW Lewisville Partners, GP recorded in Instrument No. 2006-82125, Official Records of Denton County, Texas; and being a part of that tract of land described in Special Warranty Deed to DFW Lewisville Partners, GP recorded in Instrument No. 200600240418, Official Public Records of Dallas County, Texas; said 60.710 acre tract being more particularly described as follows:

BEGINNING, at a 1/2-inch iron rod found for the southeast corner of said DFW Lewisville Partners, GP tract; said point being the south corner of part of a tract of land described in Deed to Hawkeye Realty Schreiber, L.P. recorded in Document No. 2008-72708 of said Official Records of Denton County; said point being in the northwest right-of-way line of State Highway No. 121 (a variable width right-of-way);

THENCE, with the said northwest line of State Highway No. 121 and the south line of said Lot 1, the following five (5) calls:

South 50 degrees, 10 minutes, 34 seconds West, a distance of 0.26 feet to a 1/2-inch iron rod found for an angle point;

South 54 degrees, 09 minutes, 58 seconds West, a distance of 200.87 feet to a 1/2-inch iron rod with "PACHECO KOCH" cap found for corner;

South 58 degrees, 12 minutes, 05 seconds West, a distance of 453.43 feet to a Texas Department of Transportation highway disk found at the beginning of a non-tangent curve to the left;

In a southwesterly direction, along said curve to the left, having a central angle of 10 degrees, 12 minutes, 03 seconds, a radius of 1,457.40 feet, a chord bearing and distance of South 53 degrees, 04 minutes, 27 seconds West, 259.13 feet, an arc distance of 259.47 feet to a Texas Department of Transportation highway disk found at the end of said curve;

South 48 degrees, 00 minutes, 12 seconds West, a distance of 43.30 feet to a 1/2-inch iron rod found for corner;

THENCE, departing the said northwest line of State Highway No. 121 and continuing with the said south line of Lot 1, the following five (5) calls:

North 89 degrees, 26 minutes, 36 seconds West, a distance of 7.68 feet to a 5/8-inch iron rod found for corner;

North 00 degrees, 41 minutes, 52 seconds East, a distance of 131.22 feet to a point for corner;

North 75 degrees, 26 minutes, 57 seconds West, a distance of 125.47 feet to a point for corner;

North 64 degrees, 05 minutes, 25 seconds West, a distance of 628.58 feet to a point for corner;

North 68 degrees, 10 minutes, 24 seconds West, a distance of 122.74 feet to a point for the southwest corner of said Lot 1; said point being in the east right-of-way line of Ace Lane (a variable width right-of-way); from said point a 1/2-inch iron rod with "PACHECO KOCH" cap found bears North 68 degrees, 10 minutes West, a distance of 18.9 feet;

THENCE, with the west line of said Lot 1 and the east line of said Ace Lane, the following six (6) calls:

North 02 degrees, 19 minutes, 52 seconds East, a distance of 739.36 feet to a point for corner;

North 00 degrees, 42 minutes, 13 seconds East, a distance of 1,068.96 feet to a point for corner; said point being in the south right-of-way line of new Ace Lane (a 50-foot wide right-of-way, dedicated by Instrument No. 2008-50112 of said Official Records of Denton County); from said point a PK-nail with washer found bears North 89 degrees, 35 minutes West, a distance of 15.0 feet;

South 89 degrees, 34 minutes, 46 seconds East, departing the said east line of Ace Lane, a distance of 9.99 feet to a 1/2-inch iron rod with "PACHECO KOCH" cap found for corner;

North 00 degrees, 25 minutes, 14 seconds East, a distance of 50.00 feet to a point for corner at the beginning of a curve to the right;

In a northeasterly direction, along said curve to the right, having a central angle of 60 degrees, 07 minutes, 36 seconds, a radius of 175.00 feet, a chord bearing and distance of North 30 degrees, 29 minutes, 02 seconds East, 175.33 feet, an arc distance of 183.65 feet to a 1/2-inch iron rod with "PACHECO KOCH" cap found at the end of said curve;

North 60 degrees, 32 minutes, 50 seconds East, a distance of 51.50 feet to a "+" cut in concrete found for corner in the north end of a right-of-way corner clip at the intersection of the said south line of new Ace Lane and the south right-of-way line of Valley Parkway (a variable width right-of-way);

THENCE, South 74 degrees, 27 minutes, 10 seconds East, along the said corner clip, a distance of 25.79 feet to a 1/2-inch iron rod with "PACHECO KOCH" cap found for corner in the said south line of Valley Parkway; said point being the beginning of a non-tangent curve to the left;

THENCE, with the said south line of Valley Parkway and the northerly line of said Lot 1, the following ten (10) of calls:

In a southeasterly direction, along said curve to the left, having a central angle of 34 degrees, 58 minutes, 09 seconds, a radius of 1,600.00 feet, a chord bearing and distance of South 47 degrees, 08 minutes, 14 seconds East, 961.44 feet, an arc distance of 976.52 feet to a 1/2-inch iron rod with "PACHECO KOCH" cap found at the end of said curve;

South 64 degrees, 37 minutes, 19 seconds East, a distance of 434.67 feet to a 1/2-inch iron rod with "PACHECO KOCH" cap found at the beginning of a curve to the right;

In a southeasterly direction, along said curve to the right, having a central angle of 12 degrees, 34 minutes, 41 seconds, a radius of 237.50 feet, a chord bearing and distance of South 58 degrees, 19 minutes, 58 seconds East, 52.03 feet, an arc distance of 52.14 feet to a 1/2-inch iron rod with "PACHECO KOCH" cap found at the end of said curve; said point being the beginning of a reverse curve to the left;

In a southeasterly direction, along said curve to the left, having a central angle of 12 degrees, 34 minutes, 41 seconds, a radius of 262.50 feet, a chord bearing and distance of South 58 degrees, 19 minutes, 58 seconds East, 57.51 feet, an arc distance of 57.63 feet to a 1/2-inch iron rod with "PACHECO KOCH" cap found at the end of said curve;

South 64 degrees, 37 minutes, 19 seconds East, a distance of 100.00 feet to a 1/2-inch iron rod with "PACHECO KOCH" cap found for corner;

South 32 degrees, 37 minutes, 00 seconds East, a distance of 23.58 feet to a 1/2-inch iron rod with "PACHECO KOCH" cap found for corner;

South 64 degrees, 37 minutes, 19 seconds East, a distance of 46.00 feet to a 1/2-inch iron rod with "PACHECO KOCH" cap found for corner;

North 64 degrees, 37 minutes, 19 seconds East, a distance of 31.63 feet to a 1/2-inch iron rod with "PACHECO KOCH" cap found for corner;

South 64 degrees, 37 minutes, 19 seconds East, a distance of 18.52 feet to a point for corner at the beginning of a curve to the right;

In a southeasterly direction, along said curve to the right, having a central angle of 00 degrees, 27 minutes, 13 seconds, a radius of 1,000.00 feet, a chord bearing and distance of South 64 degrees, 23 minutes, 42 seconds East, 7.92 feet, an arc distance of 7.92 feet to a 1/2-inch iron rod with "PACHECO KOCH" cap found at the end of said curve;

THENCE, South 00 degrees, 18 minutes, 32 seconds West, departing the said south line of Valley Parkway, a distance of 990.80 feet to the POINT OF BEGINNING;

CONTAINING: 2,644,513 square feet or 60.710 acres of land, more or less.

TRACT

DESCRIPTION, of a 0.058 acre tract of land situated in the Peter Harmonson Survey, Abstract No. 530, Denton County, Texas; being all of Lot 1, Block C, Majestic Addition, an addition to the City of Lewisville according to the plat recorded in Cabinet 2012, Page 266, Official Records of Denton County, Texas and in Instrument 201300017112, Official Public Records of Dallas County, Texas; and being a part of that tract of land described in Special Warranty Deed to DFW Lewisville Partners, GP recorded in Instrument No. 2006-82125, Official Records of Denton County, Texas; and being a part of that tract of land described in Special Warranty Deed to DFW Lewisville Partners, GP recorded in Instrument No. 200600240418, Official Public Records of Dallas County, Texas; said 0.058 acre tract being more particularly described as follows:

BEGINNING, at point for corner at the intersection of the east right-of-way line of Ace Lane (a 50-foot wide right-of-way) with the northwest right-of-way line of new Ace Lane (a 50-foot wide right-of-way, dedicated by Instrument No. 2008-50112 of said Official Records of Denton County);

THENCE, North 00 degrees, 25 minutes, 14 seconds East, along the said east line of Ace Lane, a distance of 82.92 feet to a PK-nail w/shiner found for corner;

THENCE, South 89 degrees, 41 minutes, 27 seconds East, departing the said east line of Ace Lane, a distance of 73.61 feet to a 1/2-inch iron rod with "PACHECO KOCH" cap found for corner in the said northwest line of new Ace Lane; said point being the beginning of a non-tangent curve to the left;

THENCE, in a southwesterly direction, along the said northwest line of new Ace Lane and said curve to the left, having a central angle of 28 degrees, 33 minutes, 28 seconds, a radius of 225.00 feet, a chord bearing and distance of South 41 degrees, 57 minutes, 56 seconds West, 110.99 feet, an arc distance of 112.15 feet to the POINT OF BEGINNING;

CONTAINING: 2,536 square feet or 0.058 acres of land, more or less.



# *VICINITY MAP*
## (CITY BASE MAP)
### 1" = 1,000'





ATTACHMENT B

Annual Compliance Report

**CITY OF LEWISVILLE**
ANNUAL COMPLIANCE REPORT
2900 South Valley Parkway
Lewisville, Texas

| Item | Purpose | Compliance Information | |
|------|---------|------------------------|---|
| 1 | Grant Period | | |
| | | | |
| 2 | Total BBB Lewisville Sourced Sales in Grant Period | $ | |
| | | | |
| 3 | Declared Capital Investment | $ | |
| | | | |
| 4. | Value of Inventory in Grant Period | $ | |
| | | | |
| 5 | Required Use | Yes | No |
| | | | |
| 6 | Community Support | Yes | No |

Certified By:

COMPANY:

Name: _____

Title: _____

Email: _____

Phone: _____

ATTACHMENT C

Leased Premises



# ADDENDUM 1

# SOLAR INSTALLATION

## ATTACHED TO AND MADE A PART OF

## THE INDUSTRIAL LEASE, DATED _____ ____, 201_

(a)      Landlord hereby grants Tenant a license, during the entire Term (as may be extended), to install, maintain, and operate a non-penetrating photovoltaic system (including the PV panels and all related equipment needed for its operation, the "Tenant Solar System") on up to eighty-five percent (85%) of that portion of the roof of the Building located above the Premises initially demised under this Lease (and thereafter, as applicable, over such additional premises within the Building that Tenant may occupy) (the "Reserved Tenant Roof") and on others portions of the Property approved in advance by Landlord for the installation of the non-rooftop components of the Tenant Solar System (the "Other Licensed Area"), subject to the following conditions (and other conditions set forth in this Addendum): (i) such installation, maintenance, and operation shall be undertaken in accordance with all laws, orders, judgments, ordinances, regulations, codes, directives, permits, licenses, covenants and restrictions now or hereafter applicable to the Property (collectively, "Legal Requirements"); (ii) the plans and specifications for the Tenant Solar System (including the location of the Tenant Solar System) shall be subject to Landlord's review and approval prior to any installation on the Reserved Tenant Roof and the Other Licensed Area (which approval by Landlord shall not shall not be unreasonably withheld, conditioned or delayed, it being agreed that the reasons for Landlord's refusal to approve Tenant's plans and specifications for the Tenant Solar System shall be limited to such plans and specifications (w) providing for penetrations of the roof membrane, except with respect to ordinary penetrations of the roof by conduits servicing the Tenant Solar System, which penetrations shall be shown on the Tenant's Schedule/Plan, as defined in subsection (e) below, and shall be subject to Landlord's approval in the manner described in subsection (e) below, (x) undermining the structural integrity of the Building or providing for the placement of any equipment related to the Tenant Solar System in locations that, in Landlord's reasonable judgment, adversely affect the safety, utility or aesthetics of the Property, (y) invalidating Landlord's then existing roof warranty for the Building, or (z) violating the terms and conditions of the Lease as hereby amended); (iii) subject to the preceding clause (ii)(w), in no event shall such installation of the Tenant Solar System consist of any other penetrations of the roof of the Building; (iv) such installation of the Tenant Solar System shall be completed in compliance with the conditions of any warranty of roof maintained by Landlord on the Building (it being agreed that Landlord and Tenant shall work together to obtain any consent required from Landlord's roofing contractor with respect to the Tenant's Solar System and that Tenant shall pay or reimburse Landlord for any reasonable out-of-pocket costs incurred to obtain any such required consent); (v) the Tenant Solar System shall not be visible at street level from that portion of Valley Parkway extending from Ace Lane south to the Highway 121 frontage road (and, as needed, Landlord and Tenant shall mutually agree as to whether the screening or painting of same is reasonably required, in the manner more particularly described in the last sentence of Section 8.1.1 of this Lease); (vi) the installer or provider of the Tenant Solar System shall be subject to Landlord's approval prior to any installation on the Reserved Tenant Roof  and

Addendum 1-1

the Other Licensed Area (which approval by Landlord shall not shall not be unreasonably withheld, conditioned or delayed) and any such party must be duly licensed and bonded, (vii) any agreement between Tenant and a third party with respect to the Tenant Solar System that has any effect on the rights of Tenant or Landlord under the Lease shall be subject to Landlord's approval prior to any installation on the Reserved Tenant Roof and Other Licensed Area (which approval by Landlord shall not shall not be unreasonably withheld, conditioned or delayed); and (viii) the Tenant Solar System shall be deemed an Alteration as defined in the Lease and shall, subject to the provisions of this Addendum, be installed in accordance with the terms and conditions as provided in Section 8 of the Lease.

(b)     (i)     Tenant, at Tenant's sole cost and expense, shall at all times maintain and carry "Causes of Loss—Special Form" (or comparable) property insurance covering the full replacement cost of the Tenant Solar System which shall include a waiver of subrogation by the insurer(s) and all rights based upon an assignment from its insured, against Landlord, its officers, directors, employees, partners, affiliates, managers, members, agents, invitees and contractors, in connection with any loss or damage thereby insured against. Landlord, its officers, directors, employees, partners, affiliates, managers, members, agents, invitees or contractors shall not be liable to Tenant for loss or damage caused by any risk coverable by such property insurance, and Tenant waives any claims against Landlord, and its officers, directors, employees, partners, affiliates, managers, members, agents, invitees and contractors for such loss or damage. The failure of Tenant to insure its property shall not void this waiver. Tenant, at Tenant's sole cost and expense, shall be solely responsible for the installation, operation, maintenance, repair, and replacement of the Tenant Solar System (except to the extent that any such repair or replacement is necessitated by Landlord's willful acts or negligence which is not subject to the waivers provided above), and Tenant shall insure the full payment of all contractors and subcontractors associated with the installation, operation, repair, and maintenance of the Tenant Solar System, so that such work shall be performed on a strictly "lien free" basis.

(ii)     In no event shall Tenant's right to install and operate the Tenant Solar System pursuant to this Addendum limit the rights of Landlord (or, as applicable, the Remaining Roof Tenant, hereinafter defined) to install, rooftop equipment of any kind on the Building and Tenant hereby agrees that Landlord (or, as applicable, the Remaining Roof Tenant) shall have such right to install rooftop equipment, including but not limited to other solar/photovoltaic systems, on the roof of the Building; provided, however, Landlord (or, as applicable, the Remaining Roof Tenant) shall not install any rooftop equipment within the Reserved Tenant Roof. Notwithstanding anything contained in the Lease (as modified by this Addendum) to the contrary, Tenant shall be responsible for 100% of any costs incurred by Landlord for the repair of any damage to any portion of the Property caused by Tenant's installation, maintenance, operation, and removal of the Tenant Solar System. The applicable provisions of the Lease, including without limitation, Section 7.4, Article 14 and Section 20, shall continue to apply with respect to the Reserved Tenant Roof and Other Licensed Area and the Tenant Solar System. As used in this Addendum, the "Remaining Roof Tenant" means any other tenant of the Building to whom Landlord grants a license to install equipment on the Building's roof (outside the Reserved Tenant Roof).

(c)     Tenant shall furnish to Landlord with the following pertaining to the installation of the Tenant Solar System: (i) a copy of all approved building permits from the applicable governmental authorities, all signed inspection forms from the applicable governmental

Addendum 1-2

authority, and, if required, signed inspection forms from the fire department prior to commencement of installation of the Tenant Solar System, (ii) final unconditional lien waivers from all contractors, and subcontractors upon completion of installation of the Tenant Solar System, and (iii) certificates of insurance as described below from each contractor, and subcontractor involved in the installation of the Tenant Solar System prior to commencement of the installation of the Tenant Solar System.

(d)      Prior to the commencement of the installation of the Tenant Solar System, Tenant shall deliver to Landlord insurance certificates (in form reasonably acceptable to Landlord) from each contractor and subcontractor that will access the Building in regards to the installation of the Tenant Solar System, satisfying the following minimum requirements on a "per project" basis:

(1)      Worker's Compensation Insurance, in minimum statutory limit amounts for the State of Texas;

(2)      Employer's Liability Insurance, in an amount not less than $1,000,000;

(3)      General Liability Insurance in the amount of not less than $5,000,000 combined single limit coverage per occurrence;

(4)      Automobile Liability Insurance (including owned and not-owned vehicles), in the minimum coverage amount of $2,000,000; and

(5)      Landlord shall be named as an "Additional Insured" on the above-described liability policies.

(e)      Tenant shall deliver to Landlord a detailed schedule and plan for the installation of the Tenant Solar System (the "Tenant's Schedule/Plan") for Landlord's approval prior to beginning the installation of the Tenant Solar System. The Tenant's Schedule/Plan shall be developed in a manner to minimize any interference with the operation of the Property and the operations of tenants of the Property. Within fifteen (15) business days following its receipt of the Tenant's Schedule/Plan (or, as applicable, Tenant's modification of same following Landlord's earlier disapproval thereof as herein described), together with any documentation reasonably requested by Landlord with respect to Tenant's Schedule/Plan, Landlord shall notify Tenant as to whether or not it approves of same (with any disapproval by Landlord accompanied by a reasonably detailed description as to the reason for such disapproval), it being agreed that Landlord's failure to timely notify Tenant as its disapproval in the foregoing manner shall be deemed an approval by Landlord of the Tenant's Schedule/Plan. Any approval requested of Landlord under this subsection shall be governed by the provisions of subsection (a) above. Concurrently with Tenant's delivery to Landlord of Tenant's Schedule/Plan, Tenant, at its sole cost and expense, obtain and deliver to Landlord (also for Landlord's approval) a test or calculations, signed and stamped by a licensed structural engineer (approved by Landlord), determining the sufficiency of the Building's existing roof structure to support the live and static loans of the Tenant Solar System.

Addendum 1-3

(f)      Tenant shall not cause any interference with other tenants in the Property (including any interference with the operation of any equipment installed or to be installed by Landlord or any other tenant at the Property) in the installation, operation, maintenance (including any repair or replacement) or removal of the Tenant Solar System and shall defend, indemnify, and hold harmless, Landlord (including any future tenants in common), and Landlord's agents, employees, partners, members, managers, affiliates, contractors, and any affiliates of Landlord's partners, from and against any and all losses, liabilities, damages, costs and expenses (including attorneys' fees) resulting from claims by third parties (including, but not limited to, other tenants in the Property) arising from the installation, maintenance (including any repair or replacement), operation, or removal of the Tenant Solar System, except to the extent that such losses, liabilities, damages, costs and expenses are the result of negligence or willful misconduct on the part of such indemnified parties.

(g)      Landlord has made no representation or warranty as to the suitability of the Building (including the Reserved Tenant Roof) for the purpose of installing the Tenant Solar System on the roof of the Building, and Tenant waives any implied warranty that the Building is suitable for Tenant's intended purposes.  Notwithstanding anything contained in the Lease (as modified by this Addendum) to the contrary, in the event any repairs to the Building (whether structural or non-structural in nature) are required as a result of the Tenant Solar System, such repairs shall be made by Landlord but, to the extent same are required as a result of the Tenant Solar System, Tenant shall reimburse Landlord for the reasonable cost thereof no later than thirty (30) days following Tenant's receipt of an invoice for such repairs.

(h)      In the event Landlord shall deem it necessary to (1) complete any maintenance, repairs, or replacement of the roof of the Building (including the roof membrane), or (2) install rooftop equipment necessary or desirable for the operation of the Building or for the conduct of business by another tenant in the Building, Landlord shall provide reasonable advance notice to Tenant (but in no case shall such notice be provided less than five (5) business days prior to the scheduled work of Landlord) of such repairs or installations to be completed and identify the panels of the Tenant Solar System that will be required to be removed to complete such maintenance, repair, or replacement or installations ("Roof Maintenance or Installation Notice"). Upon receipt of such Roof Maintenance or Installation Notice, Landlord and Tenant shall promptly work in good faith to create a plan for relocation of the applicable portion of the Tenant Solar System and Tenant shall complete such relocation of such portion of the Tenant Solar System at Tenant's sole cost and expense in accordance with such plan. In the event Tenant fails to timely remove the Tenant Solar System after receipt of the Roof Maintenance or Installation Notice or to cooperate in good faith as provided above, Landlord shall have the right, upon not less than five (5) business days' notice to Tenant, to remove, or relocate, such applicable portion of the Tenant Solar System, at Tenant's sole reasonable cost and expense payable no later than thirty (30) days following Tenant's receipt of an invoice for such costs; in the event Landlord is required to exercise its self-help remedies as provided above, Tenant hereby waives all liability of Landlord, its officers, directors, employees, partners, managers, members, agents, invitees or contractors for loss or damage caused by such removal or relocation unless such loss or damage is the result of the negligence or willful misconduct of Landlord or such other parties. Notwithstanding anything contained herein to the contrary, in the event of an Emergency (hereinafter defined), Landlord shall have the right to exercise the foregoing self-help remedies upon shorter notice to Tenant (or, if such shorter notice cannot be provided, then without prior

Addendum 1-4

notice to Tenant provided that Landlord shall thereafter notify Tenant as soon as is reasonably practicable). Tenant acknowledges and agrees that in the case of the installation of rooftop equipment necessary or desirable for the operation of the Building or for the conduct of business by another tenant in the Building, the relocation of the applicable portion of the Tenant Solar System may be permanent rather than temporary.

(i)    Following installation of the Tenant Solar System, Tenant's licensed and bonded contractors may, with at least five (5) business days' prior written notice to Landlord, have access to the Reserved Tenant Roof and Other Licensed Area as need for the proper maintenance and operation of the Tenant Solar System. Tenant shall pay or be responsible for (i) any increases in Landlord's insurance for the Property to the extent same results from the installation and operation of the Tenant Solar System, (ii) any taxes imposed by reason of the Tenant Solar System, and (iii) any utilities used or consumed in connection with the installation and operation of the Tenant Solar System.

(j)    In the event of an Emergency where it is reasonably necessary to remove all or a portion of the Tenant Solar System without the notice to Tenant as required above, Landlord may remove such portion of the Tenant Solar System as necessary in order to alleviate the Emergency at Tenant's sole cost and expense. After alleviation of the Emergency, Landlord shall promptly restore the affected portion of the Tenant Solar System at Tenant's sole reasonable cost and expense (unless Tenant elects in its sole discretion to perform its own restoration). An "Emergency" shall mean an event threatening immediate and material danger to people located in the Building or immediate, material damage to the Building, the Building's systems or structure, or the Tenant Solar System, or creates a realistic possibility of an immediate and material interference with, or immediate and material interruption of, a material aspect of a tenant's business operations in the Property.

(k)    The Tenant Solar System shall be the property of Tenant, and Tenant, at its sole cost and expense, shall be responsible for the operation, maintenance, repair and replacement of the Tenant Solar System and shall maintain it in a state of good repair and condition. No logo, business name or similar image or design, or trade name, or similar written feature (other than ordinary brand name imprints on the equipment) shall be visible on any surface of the Tenant Solar System. In connection with any replacement of all or any part of the Tenant Solar System with newer model or design facilities that have increased energy capture and efficiency (a "Replacement"), Tenant shall have the right to cause the Replacement so long as Tenant has submitted to Landlord for approval Tenant's Schedule/Plan for the Replacement and such Replacement is materially consistent with original installation of the Tenant Solar System, will not materially increase the downward force exerted on the Building's roof by the weight of the Replacement (or otherwise affect the structural integrity of the Building), will not void any roof warranty, materially alter the location of the Tenant Solar System, and will not require any penetrations to the Building's roof beyond those permitted as part of the original installation of the Tenant Solar System.

(l)    Under no circumstances will Tenant permit the installation or operation of the Tenant Solar System to interfere with or otherwise impede the conduct of business by any other tenant in the Building. Tenant will not use the Tenant Solar System for any purpose other than

Addendum 1-5

for the sole benefit of Tenant to provide energy for consumption in the ordinary course of Tenant's operations at the Premises.

(m)     Landlord and Tenant share a common desire to generate favorable publicity regarding the Tenant Solar System and their association with it. Landlord and Tenant agree that they may, from time-to-time, issue press releases regarding the Tenant Solar System and that they shall cooperate with each other in connection with the issuance of such releases including without limitation by completing review of press releases proposed to be issued by the other party within five (5) business days after submission by such other party. Notwithstanding the foregoing, Landlord and Tenant shall use good faith efforts to agree on the final text of at least one (1) press release from each party and/or a joint press release relating to the Tenant Solar System to be issued within five (5) business days following Tenant's installation of the Tenant Solar System. Landlord and Tenant each agrees that it shall not issue any press release regarding the Tenant Solar System without the prior consent of the other, and each party agrees not to unduly withhold or delay any such consent. Landlord shall have the right, following Tenant's installation of the Solar System, to publicize that it is serving as a "solar host" for the Tenant Solar System and to display photographs of the Tenant Solar System which are approved in advance by Tenant ("Approved Photographs") in its advertising and promotional materials, provided that any such materials identify Tenant as the owner of the Tenant Solar System. Tenant shall have the right to display Approved Photographs of the Tenant Solar System in its advertising and promotional materials and to use the Tenant Solar System data for promotional purposes without the prior consent of Landlord.

(n)     Before the expiration or earlier termination of the Lease, Tenant shall, at Tenant's sole cost and expense and in compliance with all Legal Requirements, remove the Tenant Solar System and repair any damage to the Property related to the installation, operation or removal of the Tenant Solar System and restore the Reserved Tenant Roof and Other Licensed Area to substantially the same condition as existed before installation of the Tenant Solar System, reasonable wear and tear and damage by casualty excepted. Landlord shall provide Tenant and its contractors and agents access at all reasonable times and upon at least five (5) business days' prior written notice for purposes of such removal and restoration. Without limiting the generality of the foregoing, such removal is subject to the following:

(1)     Tenant's removal of the Tenant Solar System shall not affect the integrity of the rooftop of the Building, which shall be as leak proof as it was prior to removal of the Tenant Solar System.

(2)     Prior to installation of the Tenant Solar System, representatives of Landlord and Tenant will jointly visit and inspect the Reserved Tenant Roof and Other Licensed Area to establish its condition. Findings from the inspection will be summarized in a written report complete with photographs as necessary to describe and specify the condition of the Reserved Tenant Roof and Other Licensed Area and signed by representatives of Tenant and Landlord.

(3)     Prior to removal and upon completion of Tenant's removal of the Tenant Solar System, qualified representatives from Landlord and Tenant will jointly visit and inspect the Reserved Tenant Roof and Other Licensed Area to establish its condition and the

Addendum 1-6

overall wear and tear of the Reserved Tenant Roof and Other Licensed Area.  Findings from the inspection will be summarized in a written report complete with photographs as necessary to describe and specify the condition of the Reserved Tenant Roof and Other Licensed Area and signed by representatives of Tenant and Landlord.

(4)     Upon completion of Tenant's removal of the Tenant Solar System in accordance with this subsection (n) and any necessary repairs resulting from the removal of the Tenant Solar System, representatives of Landlord and Tenant shall inspect the Reserved Tenant Roof and Other Licensed Area and compare the actual condition to the reports prepared prior to installation and removal to determine if the Reserved Tenant Roof and Other Licensed Area was left in a condition consistent to the condition prior to the removal of the Tenant Solar System.  Findings from the inspection will be summarized in a written report complete with photographs as necessary to describe and specify the condition of the Reserved Tenant Roof and Other Licensed Area and signed by representatives of Tenant and Landlord.

(5)     If the representatives reasonably determine that Tenant has not removed the Tenant Solar System or repaired damage in an adequate or timely manner, Tenant will proceed promptly to correct identified deficiencies.

DMWEST #12993214 v14