**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

Caption in Compliance with D.N.J. LBR 9004-1(b)

**RIKER DANZIG LLP**
Tara J. Schellhorn, Esq. (TS-8155)
Daniel A. Bloom, Esq. (DB-5288)
Headquarters Plaza
One Speedwell Avenue
Morristown, New Jersey 07962-1981
Telephone:  (973) 451-0800
Facsimile: (973) 538-1984
tschellhorn@riker.com

-and-

**CROWE & DUNLEVY**
Christina W. Stephenson
2525 McKinnon St., Ste. 425
Dallas, TX
(214) 420-2141
Crissie.stephenson@crowedunlevy.com

*Attorneys for TPP Bryant, LLC.*

| | |
|---|---|
| In re: | Chapter 11 |
| **BED BATH & BEYOND INC.,** *et al.*[1] | Case No.: 23-13359 (VFP) |
| Debtors. | (Jointly Administered) |

## LIMITED OBJECTION OF TPP BRYANT, LLC
## TO POTENTIAL ASSUMPTION AND ASSIGNMENT OF
## <u>UNEXPIRED LEASE AND RESERVATION OF RIGHTS</u>

TPP Bryant, LLC ("<u>Bryant</u>"), by and through its undersigned counsel, and in accordance

with the *Notice of Lease Auction and Potential Lease Sale Hearing* [Docket No. 456], dated May

---

[1] The last four digits of Debtor Bed Bath & Beyond Inc.'s tax identification number are 0488. A complete list of the Debtors in these Chapter 11 Cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/bbby. The location of Debtor Bed Bath & Beyond Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 650 Liberty Avenue, Union, New Jersey 07083.

25, 2023 ("May 23rd Notice"), the *Notice to Contract Parties to Potentially Assumed Executory Contracts and Unexpired Leases* [Docket No. 714], dated June 13, 2023 ("June 13th Notice"), the *Notice of Phase 1 Lease Auction, Qualified Bids, Lease Sale Hearing, and Related Lease Asset Information* [Docket No. 905], dated June 23, 2023 ("June 23rd Notice"), the *Notice of Successful and Backup Bidder with Respect to the Phase 1 Auction of Certain of the Debtors' Lease Assets and Assumption and Assignment of Certain Unexpired Leases* [Docket No. 1114], dated June 27, 2023 ("June 27th Notice"), and the *Order (I) Establishing Procedures to Sell Certain Leases, (II) Approving the Sale of Certain Leases, and (III) Granting Related Relief* [Docket No. 422], dated May 22, 2023 ("Lease Sale Procedures Order")[2] submits this limited objection ("Limited Objection") to assumption and assignment of the Bryant Lease (as hereinafter defined) and, in support hereof, states as follows:

**Background**

1.      On April 23, 2023 ("Petition Date"), each of the above-captioned debtors ("Debtors") filed voluntary petitions for relief under chapter 11 of Title 11 of the United States Code ("Bankruptcy Code").

2.      On June 13, 2023, the Debtors filed their June 13th Notice, which states that, "pursuant to the Bidding Procedures and the terms of any Successful Bid, the Debtors **may** assume and assign to the Successful Bidder the contract agreement listed on **Exhibit A** to which you are a counterparty, upon approval of the Sale Transaction." June 13th Notice, p. 2 (emphasis in original).

---

[2] The Lease Sale Procedures Order, among other things, approves additional sale procedures related to the Debtor's potential sale of leases, provides procedures for the potential assumption and assignment of unexpired leases, and permits landlords to submit bids in connection with their specific leases, including credit bids of their undisputed cure amounts.

3.      The Debtors had previously filed the May 25th Notice, which listed in Schedule 1 thereto, at item number 48, that certain Lease Agreement for Store number 544, at location 412 S. Bryant Avenue, Edmond, OK, 73034 (the "Premises"), but with the incorrect landlord listed, and the incorrect notice address.   In fact, Debtors listed a landlord that has not owned the Premises for 30 years, and did not properly notice the existing landlord, Bryant.

4.      The Debtors made the same error again in their June 23rd Notice.  Exhibit A thereto, at item number 15, listed the same incorrect landlord and notice party.

5.      A copy of the Lease, as amended, is attached hereto as **Composite Exhibit A** (the "Bryant Lease").

### Limited Objection

6.      Bryant asserts that the Debtors did not properly notice or notify it of the auction or the proposed assignment of the Bryant Lease.  Bryant did not receive information sufficient to establish adequate assurance of future performance by the proposed assignee.

7.      In addition, Bryant objects to any proposed assumption and assignment that does not require the assignee to comply with all of the terms of the Bryant Lease, including but not limited to all usage requirements and restrictions related to the premises as required under Section 365(b)(3) of the Bankruptcy Code.

8.      Bryant may be willing to waive its Limited Objection if the successful bidder (Burlington) closes the sale upon the agreed terms and Burlington otherwise complies with all of the terms of the Bryant Lease and the Bankruptcy Code.  However, Bryant otherwise reserves all rights with respect to any assignment of the Bryant Lease.

**Reservation of Rights**

9.      Bryant reserves the right to amend and/or supplement this Limited Objection.  This

Limited Objection should also be treated as an objection to any sale, assumption or assignment

proposed in connection the Lease Sale Procedures Order and all objections and reservations

asserted herein apply with equal force to any proposed sale, assumption or assignment under the

Lease Sale Procedures Order.

July 11, 2023
Morristown, New Jersey

**RIKER DANZIG LLP**

By:  */s/ Tara J. Schellhorn*
Tara J. Schellhorn, Esq. (TS-8155)
Daniel A. Bloom, Esq. (DB-5288)
Headquarters Plaza, One Speedwell Avenue
Morristown, New Jersey 07962-1981
Telephone: (973) 538-0800
Facsimile: (973) 538-1984
tschellhorn@riker.com
dbloom@riker.com

and

**CROWE & DUNLEVY**
Christina Stephenson, Esq.
2525 McKinnon Street, Suite 425
Dallas, Texas 75201
crissie.stephenson@crowedunlevy.com

*Attorneys for TPP Bryant, LLC*

# EXHIBIT A

# LEASE AGREEMENT

between

## WEINGARTEN NOSTAT, INC,
### a Texas corporation,

**Landlord**

and

## BED BATH & BEYOND INC.,
### a New York corporation,

**Tenant**

## BRYANT SQUARE SHOPPING CENTER
### Edmond, Oklahoma

Dated: _AUGUST 7,_ 2002

\* \* \* \* \* \*

The mailing, delivery or negotiation of this Lease shall not be deemed an offer to enter into any transaction or to enter into any relationship, whether on the terms contained herein or on any other terms. This Lease shall not be binding nor shall either party have any obligations or liabilities or any rights with respect thereto, or with respect to the premises, unless and until both parties have executed and delivered this Lease. Until such execution and delivery of this Lease, either party may terminate all negotiation and discussion of the subject matter hereof, without causes and for any reason, without recourse or liability.

\* \* \* \* \* \*

Lease 6 (clean) - Edmond, OK.wpd

# TABLE OF CONTENTS

Page

ARTICLE 1  BASIC TERMS AND DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    Section 1.1  Basic Terms and Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARTICLE 2  LEASE OF PREMISES; LEASE TERM; DELIVERY DATE . . . . . . . . . . . . . . . 4
    Section 2.1  Lease of Premises . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    Section 2.2  Term . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    Section 2.3  Delivery Date . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    Section 2.4  Unseasonable Delivery: Slack Period . . . . . . . . . . . . . . . . . . . . . . . . . 7
    Section 2.5  Initial Co-Tenancy Condition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

ARTICLE 3  IMPROVEMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    Section 3.1  Landlord's Work and Tenant's Work . . . . . . . . . . . . . . . . . . . . . . . . . 8
    Section 3.2  Plan Approvals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    Section 3.3  Performance of Work . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    Section 3.4  Measurement: Premises and Shopping Center . . . . . . . . . . . . . . . . . 11

ARTICLE 4  FIXED RENT, TAXES: DETERMINATION AND PAYMENT
    Section 4.1  Fixed Rent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    Section 4.2  Payment of Rent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    Section 4.3  Real Estate and Other Taxes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    Section 4.4  Intentionally Omitted. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

ARTICLE 5  COMMON AREAS, THEIR USE AND CHARGES . . . . . . . . . . . . . . . . . . . . 13
    Section 5.1  Common Areas: Maintenance . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    Section 5.2  Common Areas: Restrictions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

ARTICLE 6  UTILITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

ARTICLE 7  SIGNS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
    Section 7.1  Tenant's Building Signage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
    Section 7.2  Signage Restrictions and Criteria . . . . . . . . . . . . . . . . . . . . . . . . . . 20
    Section 7.3  Pylon/Monument Signage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
    Section 7.4  Signage: Alteration/Removal/Allocation . . . . . . . . . . . . . . . . . . . . . 21
    Section 7.5  Cooperation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

ARTICLE 8  ALTERATIONS AND IMPROVEMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . 22
    Section 8.1  Alterations and Improvements . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

ARTICLE 9  REPAIRS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
    Section 9.1  Tenant's Repairs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
    Section 9.2  Landlord's Repairs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
    Section 9.3  Legal Compliance Work . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

ARTICLE 10  INDEMNIFICATION, INSURANCE AND WAIVER OF SUBROGATION . . . . . 24
    Section 10.1  Mutual Release, Waiver of Subrogation and Mutual
                  Indemnification . . . . . . . . . . . . . . . . . . . . . . . . . 24
    Section 10.2  Tenant's Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
    Section 10.3  Landlord's Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
    Section 10.4  General Insurance Requirements . . . . . . . . . . . . . . . . . . . . . . . . . 26

ARTICLE 11  FIRE AND OTHER CASUALTY; EMINENT DOMAIN . . . . . . . . . . . . . . . . . 26
    Section 11.1  Fire and Other Casualty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
    Section 11.2  Eminent Domain . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
    Section 11.3  Abatement of Rent Charges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

ARTICLE 12  COVENANTS, REPRESENTATIONS AND WARRANTIES . . . . . . . . . . . . . 30
    Section 12.1  Quiet Enjoyment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
    Section 12.2  Authority. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
    Section 12.3  Landlord's Covenants, Warranties and Representations. . . . . . . . . . . 30
    Section 12.4  Environmental Matters. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
    Section 12.5  Intentionally Omitted. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
    Section 12.6  Intentionally Omitted . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

ARTICLE 13  USES AND RESTRICTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
    Section 13.1  Permitted and Prohibited Uses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
    Section 13.2  Tenant's Exclusive in Center . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
    Section 13.3  Exclusives Which Tenant Must Honor . . . . . . . . . . . . . . . . . . . . . . . 36

ARTICLE 14  CONDUCT OF BUSINESS OPERATIONS . . . . . . . . . . . . . . . . . . . . . . . . . 36

ARTICLE 15  TENANT ASSIGNMENT AND SUBLETTING . . . . . . . . . . . . . . . . . . . . . . 37
    Section 15.1  Assignment and Subletting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
    Section 15.2  Liability of Tenant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
    Section 15.3  Collateral Assignment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
    Section 15.4  Cure Rights of Original Tenant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
    Section 15.5  Recognition Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
    Section 15.6  Copies of Instruments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

ARTICLE 16  DEFAULT AND DISPUTE RESOLUTION . . . . . . . . . . . . . . . . . . . . . . . . . 40
    Section 16.1  Tenant Default . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
    Section 16.2  Landlord Default . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
    Section 16.3  Arbitration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

ARTICLE 17  RIGHT TO MORTGAGE AND NON-DISTURBANCE; ESTOPPEL CERTIFICATE
    Section 17.1  Right to Mortgage and Non-Disturbance . . . . . . . . . . . . . . . . . . . . . . 42
    Section 17.2  Estoppel Certificate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
    Section 17.3  Existing Mortgages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

ARTICLE 18  NOTICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

ARTICLE 19  TENANT'S PROPERTY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

ARTICLE 20  END OF TERM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
    Section 20.1  Surrender of Premises. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
    Section 20.2  Hold Over. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

ARTICLE 21  INTENTIONALLY OMITTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

ARTICLE 22  CONTINUING CO-TENANCY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
    Section 22.1  Excess Vacancy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
    Section 22.2  Special Excess Vacancy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
    Section 22.3  Replacement Inducement Tenant . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

ARTICLE 23  MISCELLANEOUS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
    Section 23.1  Loading Facilities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
    Section 23.2  Liens. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
    Section 23.3  Broker's Commission. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
    Section 23.4  Force Majeure. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
    Section 23.5  Consents. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
    Section 23.6  Costs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
    Section 23.7  Attorneys' Fees. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
    Section 23.8  Survival of Obligations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
    Section 23.9  Non-Waiver. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
    Section 23.10 Rights Cumulative . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
    Section 23.11 Definition of Landlord. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
    Section 23.12 Successors and Assigns. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
    Section 23.13 Limitation of Landlord's Liability. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
    Section 23.14 Limitation of Tenant's Liability. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
    Section 23.15 Joint and Several Liability. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
    Section 23.16 Severability. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
    Section 23.17 Grammatical Usages and Construction . . . . . . . . . . . . . . . . . . . . . . 47
    Section 23.18 Table of Contents, Line Numbering and Paragraph Headings. . . . . 47
    Section 23.19 Definition of Hereunder, Herein, etc. . . . . . . . . . . . . . . . . . . . . . . . . 47
    Section 23.20 Short Form Lease. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
    Section 23.21 Entire Agreement and Modification. . . . . . . . . . . . . . . . . . . . . . . . . . 47
    Section 23.22 No Joint Venture or Partnership Created by Lease. . . . . . . . . . . . . 48
    Section 23.23 Tenant's Tradename. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
    Section 23.24 Counterparts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Section  23.25  Waiver of the Right to Trial by Jury . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
Section 23.26  Governing Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

## EXHIBITS

| | |
|---|---|
| Exhibit "A" | Legal Description of Shopping Center |
| Exhibit "B" | Site Plan |
| Exhibit "C" | Rent Commencement and Expiration Date Agreement |
| Exhibit "D" | Specifications for Landlord's Work |
| Exhibit "D-1" | Exterior Elevations of the Premises and Shopping Center, and Sidewalk Plan |
| Exhibit "E" | Permitted Encumbrances |
| Exhibit "F" | Signage |
| Exhibit "F-1" | Rendering of Pylon Structure |
| Exhibit "G-1" | Subordination, Non-Disturbance and Attornment Agreement |
| Exhibit "H" | Subtenant Recognition Agreement |
| Exhibit "I" | Delivery Date Notice |
| Exhibit "J" | Delivery Date Certification |
| Exhibit "K-1" | Existing Exclusives |
| Exhibit "K-2" | Existing Leases |
| Exhibit "L" | Percentage Rent |
| Exhibit "M" | Prohibited Uses |

# LEASE AGREEMENT

THIS LEASE AGREEMENT (*"Lease"*) is entered into as of _AUGUST 7_ ___, 2002 by and between WEINGARTEN NOSTAT, INC., a Texas corporation, having an office at 2600 Citadel Plaza Drive, POB # 924133, Houston, Texas 77292-4133 (*"Landlord"*), and BED BATH & BEYOND INC., a New York corporation, having an office at 650 Liberty Avenue, Union, New Jersey 07083 (*"Tenant"*).

## W I T N E S S E T H:

### ARTICLE 1
### BASIC TERMS AND DEFINITIONS

Section 1.1     Basic Terms and Definitions.  The following terms shall have the meanings set forth in this Section 1.1 except as otherwise expressly provided herein.

1.1.1     Additional Rent:  Any monies which Tenant is required to pay to Landlord under the terms and conditions of this Lease, other than Fixed Rent.

1.1.2     Affiliate:  A corporation, partnership, person or other entity which is controlling, controlled by, or under common control with, Landlord or Tenant, as the case may be.  As used herein, *"control"* shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person or entity, whether through the ownership of voting securities or rights, by contract, or otherwise.

1.1.3     Alternate Rent:  Payment of Percentage Rent, as defined in and payable in the manner set forth in Exhibit L attached hereto, but in no event shall the aggregate Percentage Rent payable during the Alternate Rent period exceed fifty percent (50%) of the amount of Fixed Rent which otherwise would have been payable during such period.

1.1.4     Common Areas:  All areas in the Shopping Center which are, from time to time, available for the joint use and benefit of Tenant and other tenants and occupants of the Shopping Center, and their respective employees, agents, subtenants, concessionaires, licensees, customers and other invitees, including, but not limited to, any and all parking areas, parking spaces, driveways, truck serviceways, passageways, sidewalks, entrances, exits, lighting facilities, courts, landscaped areas, retention or detention areas and common utility lines.

1.1.5     Common Areas Charges:  As defined in Section 5.1 hereof.

1.1.6     Delivery Date: As defined in Section 2.3 hereof.

1.1.7     Effective Date: The date hereof.

1.1.8     Event of Default:  As defined in Section 16.1 hereof.

1.1.9     Excused Periods:  Such periods of time during which Tenant's (or, as the case may be, another tenant's) failure to conduct the operations of its business or any other business: (x) resulted from alterations or renovations being performed in and to the Premises, (y) was caused by damage or destruction, eminent domain proceedings or actions, or *Force Majeure*, or (z) was caused by any act or omission of Landlord, or its employees, agents, or contractors.

1.1.10     Exhibits.  The exhibits listed in the Table of Contents annexed to this Lease have been agreed to by the parties and attached hereto, it being the intention of the parties that they shall become a binding part of this Lease as if fully set forth herein.

1.1.11     Fixed Rent:  The following amounts for the periods indicated (subject to adjustment pursuant to Section 3.4 hereof):

(a)     For the period commencing on the Rent Commencement Date and ending on the last day of the "Initial Term" (defined in Subsection 1.1.44 below), at the rate

of One Hundred Seventy-Four Thousand Nine Hundred and xx/100 ($174,900.00) Dollars per year, based on Seven and 95/100 ($7.95) Dollars per square foot of Floor Area;

(b)    In the event Tenant exercises the first Renewal Option, for the first five (5) year Renewal Period, at the rate of One Hundred Ninety-One Thousand Four Hundred and xx/100 ($191,400.00) Dollars per year, based on Eight and 70/100 ($8.70) Dollars per square foot of Floor Area;

(c)    In the event Tenant exercises the second Renewal Option, for the second five (5) year Renewal Period, at the rate of Two Hundred Seven Thousand Nine Hundred and xx/100 ($207,900.00) Dollars per year, based on Nine and 45/100 ($9.45) Dollars per square foot of Floor Area;

(d)    In the event Tenant exercises the third Renewal Option, for the third five (5) year Renewal Period, at the rate of Two Hundred Twenty-Four Thousand Four Hundred and xx/100 ($224,400.00) Dollars per year, based on Ten and 20/100 ($10.20) Dollars per square foot of Floor Area; and

(e)    In the event Tenant exercises the fourth Renewal Option, for the fourth five (5) year Renewal Period, at the rate of Two Hundred Forty Thousand Nine Hundred and xx/100 ($240,900.00) Dollars per year, based on Ten and 95/100 ($10.95) Dollars per square foot of Floor Area.

1.1.12    Floor Area:  The actual number of square feet of space contained on all floors within any building area in the Shopping Center (including the Premises) and, with respect to exterior areas, including all exterior areas leased to or exclusively used by one or more tenants (other than exterior loading dock areas and trash compactor areas, sidewalks used on a periodic and infrequent basis for sidewalk sales in accordance with Subsection 5.2.8(a) below, and patio seating on the sidewalks abutting restaurants located on the "Outparcels", as defined in Subsection 5.2.3 below, provided that such restaurants are permitted under other applicable provisions of this Lease including, without limitation, Article 13 below).  All measurements pursuant to this Subsection shall be from the exterior of outside walls or store front and/or to the centerline of any common walls, but in no event shall Floor Area within either the Premises or the remainder of the Shopping Center include any non-selling or storage space areas within any mezzanine, lower floor, second floor or, except as set forth above, any exterior areas.

1.1.13    _Force Majeure_:  As defined in Section 23.4 hereof.

1.1.14    Ground Lessor: The landlord under any existing or future ground or underlying leases encumbering or affecting all or any part of the Shopping Center.

1.1.15    Intentionally Omitted.

1.1.16    Hazardous Substances:  As defined in Subsection 12.4.1 hereof.

1.1.17    Inducement Tenants:  As defined in Subsection 2.3.1 hereof.

1.1.18    Landlord:  As defined in the preamble and Section 23.11 hereof.

1.1.19    Landlord's Mailing Address: 2600 Citadel Plaza Drive, POB # 924133, Houston, Texas 77292-4133, Attn: General Counsel, or such other place and/or to the attention of such other person as Landlord may notify Tenant from time to time by notice given in accordance with the provisions of Article 18 hereof.  From and after the Effective Date until the Delivery Date, copies of any notices to Landlord pertaining to Landlord's Work shall also be given to the attention of **"Construction Manager"** at Landlord's Mailing Address.

1.1.20    Landlord's Work:  As defined in Section 3.1 hereof.

1.1.21    Lease Interest Rate: The then effective prime rate as published from time to time in the "Money Rates" section of _The Wall Street Journal_ (or any successor publication thereto) plus two (2%) percent.

1.1.22    Legal Requirements: All laws, statutes, codes, acts, ordinances, judgements, decrees, authorizations, lawful directions and requirements of, and agreements with, all governmental departments, commissions, boards, courts, authorities, agencies, officials

and officers, which now or at any time hereafter may be applicable to the Premises, the Shopping Center, or any part(s) thereof.

        1.1.23    Mortgagee: Any state or federally regulated: bank, savings and loan association, insurance company, pension fund, credit union, real estate investment trust, or other institutional lender, which is not an Affiliate of Landlord, and which holds a mortgage on the Shopping Center or is the beneficiary under a deed of trust encumbering the Shopping Center.

        1.1.24    Intentionally Omitted.

        1.1.25    Intentionally Omitted.

        1.1.26    Percentage Rent: As defined in Exhibit L hereto.

        1.1.27    Permitted Use: The sale at retail of a variety of linens and domestics (including, but not limited to, sheets, bedspreads, comforters, duvets, pillows, pillow covers, chair pads, placemats, tablecloths, dish towels, oven mittens and aprons); bathroom items (including, but not limited to, towels, shower curtains, bathroom rugs, toilet seats, personal care products and other bathroom appliances and accessories); housewares (including, but not limited to, utensils, kitchen utensils, appliances and "gadgets," cleaning appliances and supplies, cookware, bakeware, dishes and china, glassware, garbage pails, ironing boards and other laundry items, mops and brooms, candles and candle holders, ready-to-assemble furniture and artificial flowers); frames and wall art; window treatments; closet, shelving and storage items; home furnishings; area rugs; wall and floor coverings; furniture (including, without limitation, mattresses, box springs, bed frames, and bedroom furniture); decorative accessories; photo albums; photo storage boxes; luggage; books; party supplies; cards and stationery; seasonal items; juvenile merchandise (including, but not limited to, toys, car seats and safety-proofing items); health and beauty aids; specialty food items; food and non-alcoholic beverage services; any and all other items sold or services provided from time to time in any store owned or operated by Tenant or its Affiliate(s) (the aforementioned items are hereinafter collectively referred to as the *"Permitted Items"*); and for any other lawful retail use not specifically prohibited by the provisions of Subsection 13.1.1 below.  In addition, Tenant shall be permitted to use portions of the Premises for storage and office uses incidental to the Permitted Use.

        1.1.28    Premises: Being the area shown by hatching on Exhibit B hereto, having dimensions as shown on Exhibit B and containing approximately twenty-two thousand (22,000) square feet of Floor Area and approximately one hundred eighty (180) square feet of mezzanine level space for storage purposes, subject to adjustment in accordance with the provisions of Section 3.4 below.  Without limiting any other provision of this Lease (including, without limitation, Subsection 1.1.12 above), in no event shall such non-selling mezzanine space (not to exceed approximately one hundred eighty [180] square feet) result in any charge to Tenant by way of Fixed Rent or any Additional Rent, nor shall such non-selling space be included in the determination of Tenant's Pro Rata Share.

        1.1.29    Intentionally Omitted.

        1.1.30    Renewal Option: As defined in Subsection 2.2.2 hereof.

        1.1.31    Renewal Period(s): Four (4) successive periods of five (5) years each, as provided in Subsection 2.2.2 hereof.

        1.1.32    Rent: Fixed Rent and/or Additional Rent.

        1.1.33    Rent Commencement Date: As defined in Section 2.2 hereof.

        1.1.34    Intentionally Omitted.

        1.1.35    Shopping Center: The shopping center commonly known as Bryant Square Shopping Center, containing upon completion at least two hundred eighty-one thousand eight hundred seventy-eight (281,878) square feet of Floor Area, on the property located at the southeast corner of 2nd Street and Bryant Avenue in Edmond, Oklahoma, and more particularly described in Exhibit A hereto.  Landlord shall not change the name of the Shopping Center without giving at least ninety (90) days prior notice to Tenant, and Landlord shall not include the name of any tenant (other than Tenant) in the name of the Shopping Center.

1.1.36    <u>Substantially Completed or Substantial Completion</u>: The completion of specified work at the Shopping Center (including, without limitation, as applicable, Landlord's Work) to the extent that only "Punch List Items" of such work (defined in Subsection 3.3.3 below) shall not be completed.

1.1.37    <u>Intentionally Omitted</u>.

1.1.38    <u>Taxes</u>: As defined in Subsection 4.3.3 hereof.

1.1.39    <u>Tenant</u>: As defined in the preamble hereof.

1.1.40    <u>Tenant's Mailing Address</u>: 650 Liberty Avenue, Union, New Jersey 07083, Attn: Mr. Warren Eisenberg, or such other place and/or to the attention of such other person as Tenant may notify Landlord from time to time by notice given in accordance with the provisions of Article 18 hereof.

1.1.41    <u>Tenant's Property</u>: All of Tenant's personal property, including, without limitation, phone and alarm systems, satellite antennae, shelving, computers, furniture, cash registers and customer service counters, specialty lighting, track lighting, millwork, conveyor systems, storage racks and signage and any and all other personal property of Tenant which is capable of being removed from the Premises without material damage thereto, but which shall not include electrical systems, plumbing fixtures and systems, heating, ventilation and air conditioning systems, and other mechanical systems, flooring, carpet, elevators, standard lighting and wiring installed within the walls of the Premises.

1.1.42    <u>Tenant's Pro Rata Share</u>: A fraction whose numerator is the Floor Area of the Premises and whose denominator is the Floor Area of the Shopping Center as may be re-determined any time a building (and/or Floor Area) is added to or removed from the Shopping Center, but in no event shall Tenant's Pro Rata Share be greater than eight (8%) percent. Notwithstanding the foregoing, if certain costs are excluded from Common Areas Charges pursuant to Section 5.1.3(b) below, then the 8% ceiling on Tenant's Pro Rata Share shall be equitably increased in determining Tenant's Pro Rata Share of the corresponding Common Areas Charges. By way of illustration only, if an Outparcel tenant pays the cost of lighting the Common Areas on such Outparcel directly to the utility provider, then such lighting costs shall be excluded from Common Areas Charges, and, for the purpose of determining Tenant's Pro Rata Share of the lighting costs for the balance of the Shopping Center, such 8% ceiling shall be equitably increased in order to reflect that the Floor Area of such Outparcel tenant is not being included in the denominator for the purpose of determining Tenant's Pro Rata Share of such lighting costs. However, such 8% ceiling shall continue to apply to determining Tenant's Pro Rata Share of the remaining Common Areas Charges. Floor Area shall be deemed added to or removed from the Shopping Center on the earlier of (i) the date upon which such Floor Area is Substantially Completed, or (ii) at such time as an assessment for Taxes is made or removed, as the case may be, with respect to such Floor Area. Within thirty (30) days following written request from Tenant, Landlord shall certify to Tenant in writing as to the then Floor Area of the Shopping Center.

1.1.43    <u>Tenant's Work</u>: As defined in Section 3.1 hereof.

1.1.44    <u>Term</u>: A period (the ***"Initial Term"***) of approximately ten (10) years beginning on the Rent Commencement Date and ending at midnight on the last day of January following the tenth (10th) anniversary of the Rent Commencement Date (the ***"Expiration Date"***). As used herein, ***"Term"*** shall refer to the Initial Term, as the same may be extended by any Renewal Period exercised pursuant to Subsection 2.2.2 below.

ARTICLE 2
LEASE OF PREMISES; LEASE TERM; DELIVERY DATE

Section 2.1    <u>Lease of Premises</u>. Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the Premises together with any and all rights, benefits, privileges and easements, now or hereafter appurtenant to either or both of the Premises and the Shopping Center, arising out of any public or private grant or authority, including, without limitation, the non-exclusive right and easement to use the Common Areas in common with other tenants and occupants of the Shopping Center.

Section 2.2    Term.

2.2.1    Initial Term. Subject to the provisions of this Article 2, the Term of this Lease shall begin on the earlier of (such earlier date being referred to herein as the *"Rent Commencement Date"*): (a) the sixtieth (60th) day following the Delivery Date, or (b) the tenth (10th) day after the date which Tenant shall initially open the Premises to the general public for business. The Term shall expire on the Expiration Date, unless earlier terminated as herein provided. When the Rent Commencement Date has been determined, as provided in this Section, Landlord and Tenant shall execute, acknowledge and deliver, each to the other, a written statement in the form attached hereto as Exhibit C specifying the Rent Commencement Date.

2.2.2    Renewal Options. Tenant shall have the right and option (hereinafter a *"Renewal Option"*) to extend the Initial Term from the date on which it would otherwise expire for four (4) successive renewal periods of five (5) years each (individually, a *"Renewal Period"*, and collectively, the *"Renewal Periods"*) upon the same terms and conditions as are herein set forth. Each Renewal Option shall be exercisable by notice given to Landlord at least one hundred eighty (180) days prior to the commencement of the applicable Renewal Period(s).

Section 2.3    Delivery Date.

2.3.1    Definition. Subject to Landlord's delivery to Tenant of the Delivery Date Notice in accordance with the provisions of Subsection 2.3.2 below and Landlord's timely compliance therewith, Landlord shall be deemed to have delivered possession of the Premises to Tenant at 8:00 a.m. on the date (the *"Delivery Date"*) following the day on which all of the following conditions (the *"Delivery Date Conditions"*) shall have occurred and Tenant shall have received from Landlord the Delivery Date Certification in accordance with the provisions of Subsection 2.3.3 below, which shall constitute Landlord's written certification that all of the following shall have occurred:

(a)    Actual possession of the Premises shall have been delivered to Tenant water tight, free of asbestos and/or asbestos-containing products, whether or not currently friable and, with respect to any other Hazardous Substances, otherwise in compliance with this Lease (including, without limitation, Section 12.4 below), in a good, structurally sound condition, with all of Landlord's Work Substantially Completed, which Substantial Completion shall be evidenced by a written certification by Landlord's architect to Tenant, and Landlord, at its sole cost and expense, shall have obtained (and delivered copies thereof to Tenant, upon request) all permits and approvals required from all applicable governmental authorities to enable Tenant to occupy and use the Premises for the conduct of its business in the Premises (exclusive of any business licenses which Tenant may be required to obtain in order to open and operate its specific business [and not a general retail business]), which permits and approvals shall include, without limitation, zoning and building code approvals, environmental requirements, and a permanent certificate of occupancy for the Premises (unless a permanent certificate of occupancy for the Premises cannot be obtained solely as a result of the failure to complete Tenant's Work in the manner required hereunder, in which event: (1) the delivery of a permanent certificate of occupancy for the Premises shall not be a condition to the occurrence of the Delivery Date, (2) the obtaining of a temporary certificate of occupancy (or its local equivalent) shall be a condition to the occurrence of the Delivery Date, and (3) Landlord shall obtain the permanent certificate of occupancy promptly following the correction or completion of Tenant's Work); and

(b)    The Common Areas, and all of the improvements thereto shown on Exhibit B hereto shall have been Substantially Completed and operational, and all off-site improvements (including, without limitation, street, storm drainage, and traffic signalization improvements) required for the Shopping Center to open for business and for Tenant to receive a permanent certificate of occupancy shall have been Substantially Completed; Landlord, at its sole cost and expense, shall have obtained all permits and approvals required from applicable governmental authorities to enable the Common Areas to be developed, operated, and used for the purposes herein contemplated, which permits and approvals shall include, without limitation, zoning, building code, environmental requirements, curb cut and site plan approvals, all permits pertaining to pylon and/or monument signage (and Tenant's panel(s) thereon), construction, and development and use permits. Landlord shall send to Tenant copies of such permits and approvals within a reasonable time after Tenant's request therefor; however, Tenant's receipt of such copies shall not be deemed to be a Delivery Date Condition;

(c)    The representations and warranties of Landlord set forth in subparagraphs (a) through (i) of Section 12.3 below shall then be true and in effect; and

(d)    Leases or other occupancy agreements shall have been entered into with the following tenants or occupants (hereinafter collectively referred to as the *"Inducement Tenants"*) on the following terms, for occupancy of the premises designated for them on Exhibit B; such leases shall not be cancelable by any of the Inducement Tenants, except for failure of Landlord to complete the Shopping Center, for injury or loss of the premises thereby demised because of fire or other casualty, or for a taking or for other reasons similar to those for which this Lease is cancelable by Tenant, and in the case of Academy Sport Co., such lease provides that same may be cancelable by the tenant thereunder during the last (2) years of the term thereof in the event that compliance with a law requiring such tenant to perform work at the premises exceeds $25,000, and in the case of Stein Mart, such lease provides that same may be cancelable by the tenant thereunder in the year 2004 if the gross sales of such tenant do not meet a certain threshold:

| Inducement Tenant | Minimum Square-foot Gross Floor Area | Minimum Term |
|---|---|---|
| Academy Sport Co. | 41,200 | 10 Years |
| Stein Mart | 36,040 | 10 Years. |

    2.3.2    Delivery Date.

(a)    Landlord shall give Tenant at least eighty (80) days prior notice of the Delivery Date, using the form of Delivery Date Notice attached hereto as Exhibit I. Landlord's delivery of the Delivery Date Notice shall be a condition precedent to the Rent Commencement Date. Notwithstanding any provision of this Lease to the contrary, in no event shall the Delivery Date be deemed to occur prior to the Delivery Date established in the Delivery Date Notice. However, if, notwithstanding a defective Delivery Date Notice, Tenant elects to open for business to the public in the Premises, then Rent (or Alternate Rent, should the provisions of Sections 2.4 or 2.5 below be applicable) will commence as of the tenth (10th) day after the date which Tenant shall initially open the Premises to the general public for business as contemplated by Subsection 2.2.1 above.

(b)    Landlord acknowledges that if it shall fail to satisfy all of the Delivery Date Conditions by the Delivery Date as established in the Delivery Date Notice, Tenant will sustain substantial, additional costs and expenses, including, without limitation, storage costs for fixtures, equipment, and inventory; employee costs during waiting period; and additional advertising and promotional costs, the exact amount of which would be impracticable or extremely difficult to ascertain. If the Delivery Date does not occur by the date established therefor in the Delivery Date Notice (subject to Force Majeure), then, in addition to any other remedies available to Tenant under this Lease, Landlord agrees to allow to Tenant a credit against the initial installment(s) of Rent hereunder equal to, as liquidated reimbursement to Tenant (and not as a penalty) for all of the aforesaid costs incurred by Tenant, an amount equal to (i) Five Thousand Dollars ($5,000) for each day that the Delivery Date established in the Delivery Date Notice is delayed plus, (ii) if such delay continues for a period of fourteen (14) days, then an additional one-time payment of One Hundred Twenty-Five Thousand Dollars ($125,000) (which one-time payment shall be in addition to, and not in lieu of any continuing per diem payments). The foregoing liquidated reimbursements represent the parties' good faith agreement as to an agreed upon amount which shall have been incurred by Tenant and which shall otherwise not be susceptible of exact ascertainment. If Tenant elects to take the aforesaid credit for such liquidated reimbursements and does not elect to terminate this Lease pursuant to an applicable provision of this Lease, then Tenant shall not be entitled to make a claim against Landlord for any other monetary damages for late delivery, subject to Tenant's rights (and the protections afforded to Tenant) under Sections 2.4, 10.1.3, 16.2(a), (b) and (c), and 23.3 of this Lease.

    2.3.3    Delivery Date Certification. Upon the satisfaction of all of the Delivery Date Conditions, Landlord shall so certify to Tenant, using the form of Delivery Date Certification attached hereto as Exhibit J.

    2.3.4    No Waiver. Neither Tenant's acceptance of physical possession of the Premises nor Tenant's opening of the Premises for business to the public prior to the Delivery Date shall: (i) be deemed a waiver by Tenant of any of the Delivery Date Conditions, or (ii)

relieve Landlord of any obligation under this Lease, unless such condition or obligation is expressly waived in writing by Tenant.  Notwithstanding any term or provision to the contrary contained in this Section 2.3.4, if Tenant elects in its sole and absolute discretion to open for business in the Premises, then Fixed Rent (or Alternate Rent, should the provisions of Sections 2.4 or 2.5 be applicable) shall commence no later than the tenth (10th) day after the date which Tenant shall initially open the Premises to the general public for business.

Section 2.4   Unseasonable Delivery: Slack Period.  If, for any reason (including, without limitation, *Force Majeure*), the Delivery Date occurs during the period commencing on November 5 and ending on the March 31 next following (the *"Slack Period"*), then Tenant shall have, in addition to any other remedies, the right to:

(a)   accept physical possession of the Premises; or

(b)   delay its acceptance of physical possession of the Premises to a date not later than the end of the Slack Period, whereupon the Delivery Date shall be deemed to have occurred on the date that Tenant actually accepts physical possession of the Premises (subject to the other provisions of this Article 2 and the continuing satisfaction of the Delivery Date Conditions); and

in either event, if the Rent Commencement Date occurs before the April 1 next following the Slack Period, Tenant shall be entitled to pay Alternate Rent in lieu of Fixed Rent for the period commencing on the Rent Commencement Date and ending on the March 31 next following; any benefit which Tenant may realize thereby shall constitute a reimbursement to Tenant for certain pre-opening expenses incurred by Tenant in connection with this Lease.  Notwithstanding the foregoing, if Tenant's failure to perform any obligation under this Lease is the sole reason for Landlord's failure to achieve a Delivery Date not within the Slack Period, then the provisions of this Section 2.4 shall not apply.  By way of example only, Tenant's failure to accept possession of the Premises prior to the Slack Period notwithstanding Landlord's full compliance with the Delivery Date Conditions prior thereto shall render the provisions of this Section 2.4 inapplicable; however, any delay resulting from Tenant's exercise of its rights under this Lease (including, without limitation, approving, disapproving, and/or making comments to the plans and specifications as contemplated under Subsection 3.2.1 below within the time periods set forth therein) shall not render the provisions of this Section 2.4 inapplicable.

Section 2.5   Initial Co-Tenancy Condition.

2.5.1   As used herein, the *"Initial Co-Tenancy Condition"* shall mean that both of the Inducement Tenants either shall be open for business to the general public or then be actively engaged in the fixturing and merchandising therein.

2.5.2   If, on the date on which Tenant is ready to commence installing fixtures in, and merchandising the Premises for business to the general public, the Initial Co-Tenancy Condition has not been satisfied, Tenant shall have the right, at its sole option, to:

(a)   open the Premises for business to the general public, in which event, subject to any applicable provisions of this Article 2, the Rent Commencement Date shall occur on the tenth (10th) day thereafter, and thereafter, Tenant shall be entitled to pay Alternate Rent in lieu of Fixed Rent until the Initial Co-Tenancy Condition is satisfied (any benefit which Tenant may realize thereby shall constitute a reimbursement to Tenant for certain pre-opening expenses incurred by Tenant in connection with this Lease); or

(b)   delay opening the Premises for business to the general public, in which event, the Rent Commencement Date shall be delayed until the sixtieth (60th) day after the date on which the Initial Co-Tenancy Condition is satisfied (and Tenant receives notice from Landlord thereof), or, if such 60th day occurs during the period beginning on the commencement of the "Slack Period" (defined in Section 2.4 above) and ending on the March 31 next following, then the Rent Commencement Date shall be delayed until the April 1 next following said period, subject to any applicable provisions of this Article 2.  However, if Tenant elects to open the Premises for business to the public prior to the expiration of such sixty-day period or such April 1, as applicable, then Tenant shall be obligated to commence paying Alternate Rent or Fixed Rent, as applicable, as of the tenth (10th) day thereafter.

2.5.3   In addition to the provisions of Subsection 2.5.2 above, if the Initial Co-Tenancy Condition has not been satisfied within one (1) year after the Delivery Date established pursuant to Subsection 2.3.2(a) above, then Tenant shall have the right, at any time

prior to the satisfaction of the Initial Co-Tenancy Condition, to terminate this Lease, which right shall be exercised by Tenant, if at all, by giving Landlord notice within one hundred twenty (120) days after the expiration of such one-year period, in which event this Lease shall terminate as of the date specified in said notice, provided that in no event shall such termination date be later than sixty (60) days after the expiration of such 120-day period.  Landlord may negate such termination by causing the Initial Co-Tenancy Condition to be satisfied within thirty (30) days after the date on which said termination notice is given.  If this Lease is terminated hereunder, neither party shall have any further liability under this Lease, except as set forth in Section 23.3 below.  Notwithstanding the foregoing, Tenant shall resume paying Fixed Rent as of the expiration of such one-year period, until the expiration or sooner termination of this Lease.

ARTICLE  3

IMPROVEMENTS

Section  3.1     Landlord's Work and Tenant's Work.  Landlord shall, at its sole cost and expense, perform the work and obligations described on Exhibits D, D-1, and F hereto, and the "Final Plans and Specifications" (hereinafter defined in Section 3.2) (collectively, *"Landlord's Work"*), and shall deliver possession of the Premises to Tenant in the condition described therein.  Except for Landlord's Work, Tenant shall, at its own cost and expense, do any and all work (hereinafter referred to as *"Tenant's Work"*) which Tenant desires to adapt the Premises to Tenant's use.

Section  3.2     Plan Approvals.

3.2.1     Preparation of Plans and Specifications.

(a)     Within thirty (30) days after the Effective Date, Landlord shall deliver to Tenant drawings showing the proposed footprint, column layout, and interior clear dimensions of the Premises (the *"Preliminary LOD"*) [Limits of Demised], which shall be subject to any reasonable modifications indicated by Tenant as provided below. The Preliminary LOD shall be substantially consistent with Exhibits B, D, and D-1 hereto.  Landlord and Tenant acknowledge that Landlord has delivered the Preliminary LOD to Tenant, and Tenant has received same.

(b)     Within thirty (30) days after Tenant's receipt of the Preliminary LOD, Tenant shall deliver to Landlord its revisions thereto (the *"Revised LOD"*), showing the location of the interior structural grid (column layout), storefront opening, and mezzanine and/or office core, the location and arrangement of the loading facilities, trash compactor pad, and trash container pad(s), and any reasonable revisions to the interior clear dimensions. Landlord and Tenant acknowledge that Tenant has delivered the Revised LOD to Landlord, and Landlord has received same.

(c)     Within fifteen (15) days after Landlord's receipt of the Revised LOD, Landlord shall deliver to Tenant a final LOD (the *"Certified LOD"*), certified by Landlord, which shall incorporate all of the elements of the Revised LOD.  Within fifteen (15) days after its receipt of the Certified LOD, Tenant shall notify Landlord of Tenant's approval thereof or the reasons why such approval cannot be granted, and Landlord shall, within fifteen (15) days after receiving such notice, make any revisions necessary to correct such matters and obtain Tenant's approval.  Upon Tenant's approval of the Certified LOD, any further changes thereto shall be subject to Tenant's prior written approval (which may be withheld in its sole discretion), provided that, as to changes required to conform to Legal Requirements, Tenant shall have reasonable approval rights within the confines of said Legal Requirements.  After Tenant approves the Certified LOD, Landlord shall be responsible for any and all reasonable costs incurred and delays experienced by Tenant in connection with any further changes to the Certified LOD required by Landlord.  Landlord and Tenant acknowledge that Landlord has delivered the Certified LOD to Tenant, and Tenant has received same.

(d)     Within thirty (30) days after Tenant's receipt of the Certified LOD, Tenant shall deliver to Landlord its Fixture Plan (F1); Floor Finish Plans Notes and Details  (F2); Power/Specialty Lighting Plan and Notes (F3); and Lighting Plans and Notes (F4) (collectively, *"Tenant's Plans"*), all of which shall be substantially consistent with the Certified LOD (as same may be reasonably modified by Tenant, as noted above).  Landlord and Tenant acknowledge that Tenant has delivered the Tenant's Plans to Landlord, and Landlord has received same.

(e)   On or before July 5, 2002, Landlord shall prepare and submit to Tenant, in a single submission, Landlord's preliminary plans and specifications (the *"Preliminary Plans"*) for Landlord's Work (which shall include, without limitation, mechanical, electrical, plumbing, fire protection and high-pile storage, structural, and architectural plans, and each of the plans which collectively constitute the Preliminary Plans shall be at least 85% complete, in Tenant's reasonable judgment. The Preliminary Plans shall be substantially consistent with Tenant's Plans, the Certified LOD, and Exhibits B, D, D-1, and F hereto. Landlord and Tenant acknowledge that Landlord has delivered the Preliminary Plans to Tenant, and Tenant has received same.

(f)   On or before July 23, 2002, Tenant shall give Landlord notice of the respects, if any, in which said Preliminary Plans fail to meet Tenant's reasonable approval and/or fail to conform to the Certified LOD, Tenant's Plans, and/or Exhibits B, D, D-1, and F hereto, and Landlord shall promptly make any revisions necessary to correct such matters and obtain Tenant's approval. Landlord and Tenant acknowledge that Tenant has delivered notice to Landlord of the respects in which said Preliminary Plans fail to meet Tenant's reasonable approval and/or failure to conform to the Certified LOD, Tenant's Plans, and/or Exhibits B, D, D-1, and F hereto, and Landlord has received same.

(g)   Within ten (10) days after the date on which Landlord receives notice of Tenant's approval of the Preliminary Plans, Landlord shall prepare and deliver to Tenant, in a single submission, final plans and specifications (the *"Final Plans and Specifications"*), which shall be substantially consistent with the Preliminary Plans, as approved by Tenant.

(h)   Within thirteen (13) days after its receipt of the Final Plans and Specifications, Tenant shall notify Landlord of Tenant's approval thereof or the reasons why such approval cannot be granted, and Landlord shall, within ten (10) days after receiving such notice, make any revisions necessary to correct such matters and obtain Tenant's approval. Upon Tenant's approval of the Final Plans and Specifications, any further changes thereto shall be subject to Tenant's prior written approval. Notwithstanding anything to the contrary contained in this Lease (including, without limitation, any Exhibits hereto), to the extent of a conflict between the terms and provisions of Tenant's Plans, Exhibit B, Exhibit D, Exhibit D-1, and/or Exhibit F hereto, and the terms and provisions of the Final Plans and Specifications, the terms and provisions of the Final Plans and Specifications shall govern and prevail.

(i)   All submissions by the parties of the Preliminary LOD, the Revised LOD, the Certified LOD, the Tenant's Plans, the Preliminary Plans, and the Final Plans and Specifications shall be made (or accompanied) by the computer files thereof formatted in *"Autocad 14"* format.

3.2.2   Plan Changes.

(a)   After Tenant approves either or both of the Preliminary Plans and Specifications or the Final Plans and Specifications, it shall have the right to require Landlord to subsequently make changes to either or both thereof (the *"Changes"*).

(b)   Tenant shall pay to Landlord the net additional third party costs of Landlord's Work resulting directly and solely from the aggregate Changes (exclusive of any charges for overhead and profit, other than sums not exceeding 10% subcontractor profit or 10% general contractor profit thereon; however, if the services of both a general contractor and a subcontractor(s) are required in connection with such Changes, then the allowed profit shall be 7.5% for each the general contractor and the subcontractor(s)), net of any and all actual costs and savings resulting from all Changes, in the aggregate (including, without limitation, costs approved by Tenant in advance associated with any acceleration of the work schedule which Tenant, at its sole option, may require). Such payment shall be due and payable within thirty (30) days after Tenant's receipt of backup information reasonably supporting all such costs, including, without limitation, invoices, receipts and lien waivers of subcontractors and materialmen. All cost increases and cost savings shall be the actual cost thereof as determined by Landlord's general contractor, provided that such costs are reasonably competitive. By way of illustration only, if the aggregate Changes result in a cost increase of $11,000 and cost savings of $10,000, then Tenant shall pay to Landlord an amount equal to $1,000; however, if the cost savings equal $12,500, then neither Landlord nor Tenant would owe the other any money in connection with such Changes.

(c)   Intentionally omitted.

(d)   If, despite Landlord's diligent efforts in performing Landlord's Work, the Changes cause a net delay in the Substantial Completion of Landlord's Work (taking into consideration any time reductions resulting from such changes), then the Delivery Date established pursuant to Subsection 2.3.2 hereof shall be extended by the number of days of the delay; provided, however, that, within ten (10) days following its receipt of Tenant's notice describing the Changes, Landlord shall have notified Tenant in reasonable detail as to the nature and extent of such delay.

Section 3.3    Performance of Work.

3.3.1    Both Landlord's Work and Tenant's Work shall be performed in a good and workmanlike manner, in compliance with all applicable Legal Requirements, utilizing only new, first-class materials, and in accordance with all insurance company requirements. Landlord shall perform Landlord's Work in a manner such that Tenant will be able to obtain all required permits and approvals from applicable governmental and quasi-governmental authorities to enable Tenant to perform Tenant's Work and to open and conduct its business in the Premises.  Landlord shall pay all impact fees and related governmental charges in connection with Landlord's Work and all other work performed by or on behalf of Landlord in connection with the Shopping Center.  If such permits and approvals cannot be obtained because Landlord's Work has not been completed or has been performed improperly or by reason of any then existing condition of the Shopping Center, Landlord shall remedy the situation so as to enable Tenant to obtain such permits and approvals for Tenant's Work, and the Delivery Date shall be deemed delayed, for Tenant's benefit only, on a day-for-day basis for each day of delay occasioned thereby.

3.3.2    If: (a)  Landlord's Work has not been commenced (i.e., if Landlord has not yet poured foundation footings for the two thousand (2,000) square foot expansion which will become the rear of the Premises) by August 31, 2002, or (b) the Delivery Date shall not have occurred by February 15, 2003 (subject to Force Majeure, not to exceed thirty (30) days in the aggregate), Tenant may thereafter, during such time as Landlord's Work has not been commenced or the Delivery Date has not occurred, as the case may be, consider Landlord to be in default hereunder and, at Tenant's option in its sole discretion, elect to:

(i)    terminate this Lease, if Landlord shall fail to fully cure such default within thirty (30) days after receiving Tenant's notice thereof, in which event neither party shall have any further liability hereunder (other than as set forth in Section 23.3 below), except that Landlord shall be obligated to promptly reimburse Tenant for all its reasonable third party costs and expenses incurred in connection with this Lease (including, without limitation, costs associated with the preparation and review of plans and specifications, and the performance of Tenant's Work), not to exceed Fifty Thousand Dollars ($50,000); and/or

(ii)    avail itself of the remedies set forth in Section 16.2 below (provided, however, that the cure period set forth therein shall not be applicable and Tenant's claim against Landlord for monetary damages if Tenant terminates this Lease pursuant to Subsection 3.3.2(i) above shall be limited by Subsection 3.3.2(i), subject to Tenant's rights [and the protections afforded to Tenant] under Sections 10.1.3 and 23.3 of this Lease); and/or

(iii)    extend one or more times the dates set forth in clauses (a) and/or (b) of this Subsubsection 3.3.2 to such future dates designated by Tenant in notice given to Landlord.

Except as expressly and specifically provided in Subsection 3.3.2(a)(ii) above to the contrary notwithstanding, the election by Tenant of any one or more of the foregoing remedies shall not preclude the subsequent election of any alternative remedy provided in this Section, this Lease, at law, or in equity.

3.3.3    Landlord's Work Performed After Delivery of Possession.  On or before the Delivery Date, Landlord's and Tenant's representatives together shall conduct a walk-through of the Premises to compile a punch list of the "Punch List Items" (hereinafter defined). Tenant shall deliver to Landlord a copy of said punch list within five (5) days after the walk-through.  Landlord shall complete any Punch List Items within fifteen (15) days after it receives a copy of said punch list.  If Landlord fails to complete any item on said punch list within said 15-day period, Tenant shall have the right to complete such item(s) using its own contractors

Lease 6 (clean) - Edmond, OK.wpd                                   10

and receive reimbursement from Landlord for the reasonable costs and expenses thereof upon demand.  If reasonably required by Tenant, any portion of Landlord's Work which is performed after Tenant accepts physical possession of the Premises shall occur only "after hours", when neither Tenant nor any of its agents, contractors, employees and servants are working within the Premises, and Landlord shall reimburse Tenant for the reasonable costs and expenses incurred by Tenant by reason of such "after hours" performance of Landlord's Work.  Within thirty (30) days following Substantial Completion of Landlord's Work, Landlord shall deliver to Tenant a duplicate copy of the "marked" plans for the building containing the Premises.  As used herein, the term **"Punch List Items"** shall mean such minor items of a cosmetic nature which, when considered as a whole, do not adversely affect either the performance of Tenant's Work or Tenant's ability to conduct its normal business operations in the Premises.

3.3.4    Tenant's Right of Entry.  Prior to the Delivery Date, Tenant may enter upon the Premises for the purposes of inspecting the work, taking measurements, making plans, erecting temporary or permanent signs and doing such other work as may be appropriate or desirable without being deemed thereby to have taken possession or obligated itself to pay Rent, provided, however, that Tenant shall not, during the course of such work, materially interfere with the performance of Landlord's Work and shall indemnify and hold Landlord harmless from and against any and all claims or losses to the extent caused by Tenant's entry upon the Premises.

3.3.5    Tenant's Leasehold Improvements.  Tenant's Work and all other improvements erected by Tenant with respect to the Premises, together with any replacements thereof, shall be and remain the property of Tenant throughout the Term, and Tenant alone shall be entitled to the benefits of ownership thereof, including, but not limited to, depreciation of same as an asset for tax purposes.  Upon the expiration or earlier termination of this Lease, Landlord shall automatically be deemed to be owner of any and all leasehold improvements (but not Tenant's Property) erected by Tenant at the Premises.

3.3.6    Work Requirements After Delivery Date.  Following the Delivery Date, any construction by Landlord or other tenants or occupants of the Shopping Center affecting any portion of the Shopping Center shall be subject to the following terms and conditions:

(a)    all staging and storage of materials and parking of construction vehicles shall at all times occur only within the portions of the Shopping Center located outside of **"Tenant's Critical Area"** as shown on Exhibit B hereto, except that Tenant shall be permitted to stage and store materials and park construction vehicles in the area designated as **"Tenant's Construction Staging Area"** on Exhibit B hereto;

(b)    Landlord shall at all times proceed diligently to ensure that from and after Tenant's opening for business to the public, no ingress, egress or passage of any construction, delivery and related vehicles engaged in the performance of such work or other construction activities shall take place through the entrance/exit drive designated as the "Non-Construction Drive" on Exhibit B hereto; and

(c)    Landlord shall maintain the Shopping Center in a clean, safe, and sightly condition, and shall use reasonable efforts to ensure that such construction shall not otherwise materially adversely interfere with the normal conduct of any business operations in the Premises.

3.3.7    Intentionally Omitted.

3.3.8    Intentionally Omitted.

Section 3.4    Measurement:  Premises and Shopping Center.  At least sixty (60) days prior to the Delivery Date, Landlord shall deliver to Tenant a certification to Tenant by Landlord's licensed architect, surveyor or engineer of the Floor Area of the Premises and the Shopping Center, and the square footage of the non-selling space of the Premises, the measurements of which shall be subject to confirmation by Tenant's licensed architect, surveyor or engineer.  If Landlord shall fail so to deliver such certification to Tenant, Tenant shall have the right to have any of such measurements made and certified to Landlord by Tenant's licensed architect, surveyor or engineer.  If (i) the Floor Area of the Premises is determined to be less than twenty-one thousand seven hundred fifty (21,750) square feet, or (ii) the square footage of the non-selling space on the office mezzanine is determined to be less than ninety-five percent (95%) of the Floor Area shown therefor on the Final Plans and Specifications, then, in addition to Tenant's other rights and remedies (provided, however, that

Tenant's claim against Landlord for monetary damages if Tenant terminates this Lease
pursuant to this Section 3.4 shall be limited to $50,000 as set forth below, subject to Tenant's
rights [and the protections afforded to Tenant] under Sections 10.1.3 and 23.3 of this Lease)
Tenant shall have the right to terminate this Lease upon notice to Landlord given within fifteen
(15) days after Tenant's receipt of the final measurement determination and to receive a refund
from Landlord of all amounts theretofore paid to Landlord pursuant to the terms of this Lease
and all reasonable, third party costs and expenses incurred by Tenant in connection with
Tenant's Work (including, without limitation, plan preparation and review), not to exceed Fifty
Thousand Dollars ($50,000).  If the measurement of the Premises shall indicate a Floor Area
less than the Floor Area of the Premises set forth in Subsection 1.1.28 above, the Fixed Rent
and any other applicable provision of this Lease (including, without limitation, Tenant's Pro Rata
Share) shall be reduced to conform to the actual measurement, and Tenant shall receive a
proportional refund of any Rent theretofore paid to Landlord.  If the measurement of the
Premises indicates that the actual Floor Area of the Premises exceeds the Floor Area of the
Premises set forth in Subsection 1.1.28 hereof by more than five hundred (500) square feet,
neither Fixed Rent nor Tenant's Pro Rata Share shall be increased by reason thereof.  Landlord
and Tenant shall each promptly execute and deliver to the other an amendment memorializing
any change to the Fixed Rent, Tenant's Pro Rata Share, or any other applicable provisions of
this Lease, made pursuant to the provisions of this Section 3.4.  Any dispute between the
parties with respect to the Floor Area of the Premises, the square footage of said non-selling
space or the Floor Area of the Shopping Center shall be resolved by arbitration in accordance
with the provisions of Section 16.3 below.

ARTICLE 4
FIXED RENT, TAXES: DETERMINATION AND PAYMENT

Section 4.1    Fixed Rent.  Commencing on the Rent Commencement Date and
continuing throughout the Term, Tenant shall pay to Landlord the Fixed Rent, in equal
successive monthly installments, in advance, on the first day of each and every calendar month
throughout the Term, except that Fixed Rent payable for any partial calendar month during the
Term shall be prorated. Fixed Rent shall be paid without deduction or set-off, except to the
extent otherwise expressly provided herein.

Section 4.2    Payment of Rent.  All Rent shall be mailed or otherwise delivered to
Landlord's Mailing Address above or, upon at least thirty (30) days' prior notice to Tenant, to
such other address as Landlord may from time to time designate.  Landlord acknowledges and
agrees that for administrative purposes, Tenant has designated BBBY Management
Corporation, a New York corporation (the **"Paying Agent"**),  to make all Rent payments due to
Landlord under this Lease.  Said designation (which may be revoked by Tenant at any time) is
not intended as, and shall not constitute, an assignment of any rights of Tenant to the Paying
Agent, and Tenant shall remain primarily liable for payment of Rent under this Lease.  All
payments of Rent received by Landlord from the Paying Agent shall be credited to Tenant as if
such payments of Rent had been made by Tenant directly to Landlord.

Section 4.3    Real Estate and Other Taxes.

4.3.1    Landlord shall pay on or before the due dates thereof all "Taxes"
(defined in Subsection 4.3.3 below) other than personal property taxes levied against tenants.
Throughout the Term, Landlord shall cause the Shopping Center to be maintained entirely
within tax parcels and lots that exclude any property not a part of the Shopping Center.

4.3.2    (a)    Tenant shall pay to Landlord Tenant's Pro Rata Share of the
Taxes which accrue during the Term, subject to the provisions of this Section 4.3.  Any Taxes
for a real estate fiscal tax year, only a part of which is included within the Term, shall be
adjusted between Landlord and Tenant on the basis of a 365-day year as of the Rent
Commencement Date or the date on which the Term expires or earlier terminates, as the case
may be, for the purpose of computing Tenant's Pro Rata Share of Taxes.  If, by law, any Taxes
may, at the option of the taxpayer, be paid in installments (whether or not interest shall accrue
on the unpaid balance thereof), Landlord shall exercise such option so as to maximize the
number of installments, and Landlord shall pay the same as they come due and before any fine,
penalty, interest or cost may be added thereto for nonpayment thereof.

(b)    Landlord shall submit to Tenant a copy of the bill for Taxes issued
by the applicable taxing authority, a computation of Tenant's Pro Rata Share of such Taxes and
proof of the payment of Taxes for the previous payment period, as well as copies of all notices

concerning assessments, tax rates, and changes thereto.  Tenant shall pay Landlord in the amount required by this Subsection 4.3.2 within thirty (30) days after receipt of such bill (but in no event earlier than the fifteenth (15th) day prior to the date on which such Taxes would become delinquent).

4.3.3    As used herein, *"Taxes"* shall mean all general, *ad valorem* real estate taxes, and assessments for betterments and improvements that are levied or assessed by any lawful authority on the Shopping Center (general or special), including any substitution therefor, in whole or in part, due to a future change in the method of taxation.  For purposes of computing Tenant's Pro Rata Share of Taxes, Taxes shall not include any: (1) income, excise, profits, estate, inheritance, succession, gift, transfer, franchise, capital, or other tax or assessment upon Landlord or upon the rentals payable under this Lease; (2) taxes on rents (other than to the extent that such taxes are customarily paid by retail tenants in the state in which the Shopping Center is located), gross receipts or revenues of Landlord from the Premises; (3) fine, penalty, cost or interest for any tax or assessment, or part thereof, which Landlord or its lender failed to timely pay (except if same are caused by an Event of Default); (4) assessment for a public improvement arising from the initial construction or expansion of the Shopping Center or the Premises (it being agreed that all assessments imposed during the Term which are permitted to be included within Taxes hereunder shall, for the purposes of computing Tenant's Pro Rata Share thereof, be deemed to have been paid in the maximum number of installments permitted by the applicable taxing authority); (5) Taxes resulting directly from an increase in the assessment caused by a sale or ground lease of all or any portion of the Shopping Center to an Affiliate of Landlord or more than once every five (5) years; or (6) fees imposed upon Landlord in connection with Landlord's development of the Shopping Center (including, without limitation, trip generation fees).  All Taxes payable by Tenant pursuant to this Section 4.3 shall be determined as if the Shopping Center was the only property owned or leased by Landlord.  Landlord represents to Tenant that, as of the Effective Date and, to Landlord's actual knowledge, as of the anticipated Delivery Date, no portion of the Shopping Center is or will be (i) subject to or the beneficiary of an abatement of Taxes, or (ii) subject to any special assessments or similar charges.

4.3.4    Upon prior notice to Landlord, Tenant shall have the right to contest the assessed valuation or Taxes by appropriate proceedings conducted in good faith, whereupon Landlord shall cooperate with Tenant, execute any and all documents required in connection therewith and, if required by any governmental authority having jurisdiction, join with Tenant in the prosecution thereof.  If, as a result of any contest or otherwise, any rebate or refund of Taxes is received, Tenant shall be entitled to Tenant's Pro Rata Share thereof (after reasonable and customary expenses incurred by Landlord and/or Tenant in connection with such contest are paid to the party which incurred such expense).

Section 4.4    Intentionally Omitted.


ARTICLE 5
COMMON AREAS, THEIR USE AND CHARGES

Section 5.1    Common Areas: Maintenance.

5.1.1    Maintenance of Common Areas.  Landlord shall operate, maintain, repair and replace the Common Areas as required by this Lease and otherwise to the standard by which Common Areas of first-class shopping centers in the state in which the Shopping Center is located are operated, maintained, repaired and replaced, including, without limitation, snow, ice, rubbish and debris removal (including installation and maintenance of sidewalk refuse containers), landscaping (including, without limitation, the trimming and pruning of trees to avoid interference with the use or visibility of canopies or signs on the exterior of the Premises), adequate lighting, insurance, supervision, use, parking lot paving and striping, drainage, security (as reasonably required), and control of all Common Areas, and Landlord shall comply with all applicable Legal Requirements.

5.1.2    Tenant's Pro Rata Share of Common Areas Charges.

(a)    During the Term, Tenant shall pay to Landlord Tenant's Pro Rata Share of the reasonable costs (hereinafter referred to as the *"Common Areas Charges"*) incurred by Landlord to operate, maintain, insure and repair the Common Areas, including all costs reasonably and actually incurred by Landlord in connection with sweeping, cleaning, restriping and repairing paved portions of the Common Area; lighting (including replacement of

bulbs and ballasts, and painting, repairing and maintaining light standards); steam cleaning of the sidewalks; graffiti removal from the Common Areas; maintaining the detention pond, if any; and maintaining the traffic direction signs and Shopping Center identification signs (provided that no tenant or occupant has its name, logo or other advertisement on such signs). Landlord shall be permitted to include in Common Areas Charges for each calendar year an administrative fee (the **"Administrative Fee"**) equal to five percent (5%) of the Common Areas Charges for the calendar year in question, but excluding from the computation of such Administrative Fee the cost of any replacement or improvement of a capital nature (if such capital item is a permissible Common Areas Charge hereunder), the cost of electricity and other utilities and insurance premiums. Tenant's Pro Rata Share of Common Areas Charges shall be paid in equal monthly installments on the first day of each calendar month, in advance, during each calendar year based on Landlord's reasonable budget. Landlord's budget for the first full calendar year during the Term shall be in an amount equal to $0.85 per square foot of Floor Area. Thereafter, Landlord's budget for Common Areas Charges for any calendar year shall not increase, on a cumulative basis, by more than five percent (5%) per calendar year (exclusive of the cost of utility service for the Common Areas during such calendar year), but in no event shall Tenant's Pro Rata Share of the budgeted Common Areas Charges for any given calendar year exceed one hundred ten percent (110%) of Tenant's Pro Rata Share of the Common Areas Charges paid by Tenant for the immediately preceding year. Landlord shall provide Tenant, upon Tenant's request, with reasonable backup documentation and applicable evidence of prior bills and payments.

(b)    Within ninety (90) days after the end of each calendar year, Landlord shall provide to Tenant a statement, in detail reasonably satisfactory to Tenant, of Common Areas Charges for such year (the **"CAC Reconciliation Statement"**). The accounting practices on which each CAC Reconciliation Statement is based shall be in accordance with generally accepted accounting principles, and the format of each CAC Reconciliation Statements shall be consistent with that for industry practices for first-class shopping centers. The CAC Reconciliation Statement shall be certified by Landlord as being accurate and shall be accompanied by a calculation of Tenant's Pro Rata Share of Common Areas Charges, and payment to Tenant in the amount of any overpayment made by Tenant during the preceding calendar year. If Tenant's Pro Rata Share of the actual Common Areas Charges for a calendar year shall exceed the aggregate monthly installments paid by Tenant during said calendar year, Tenant shall pay to Landlord the deficiency within thirty (30) days after receipt of such notice. Upon Tenant's request, Landlord shall promptly (but not to exceed twenty-one [21] days of the Tenant's request) deliver to Tenant copies of relevant backup materials (including, but not limited to, contracts, correspondence and paid invoices) reasonably required by Tenant; provided, however, Landlord shall not be obligated under this sentence to deliver to Tenant back-up materials for more than ten (10) components of Common Areas Charges (such as, by way of example only, electricity, landscaping, and sweeping). If Landlord fails to timely remit to Tenant the amount of any overpayment hereunder, Tenant shall have the right to offset such amount from payments of Rent next becoming due hereunder, together with interest thereon at the Lease Interest Rate from the date such remittance is due until reimbursement or full satisfaction by credit. Notwithstanding any provision hereof to the contrary, in no event shall the Tenant's Pro Rata Share of the Common Areas Charges with respect to the first full calendar year of the Term exceed $0.85, nor thereafter increase by more than five percent (5%) per calendar year (exclusive of the cost of utility service for the Common Areas during such calendar year) on a cumulative basis, but in no event shall Tenant's Pro Rata Share of the Common Areas Charges in any given calendar year exceed one hundred ten percent (110%) of the Tenant's Pro Rata Share of the Common Areas Charges paid by Tenant for the immediately preceding calendar year (exclusive of the cost of utility service for the Common Areas during such calendar year).

5.1.3    Exclusions from Common Areas Charges.

(a)    Common Areas Charges shall not include: **(1)** the capital cost of any additions to the Common Areas pursuant to an expansion of the Shopping Center; **(2)** the cost of any replacements or capital improvements to the Common Areas (for example, the cost of repaving the parking areas as opposed to patching), except that the cost of replacements or capital improvements to the Common Areas may be included so long as same (x) are not made necessary by the negligent, tortious or unlawful acts or omissions of Landlord or any other tenant or any of their respective agents, subtenants, occupants, contractors or employees, and (y) shall be amortized on a straight-line basis over the useful life thereof under generally accepted accounting principles (it being further agreed that the cost of repaving the parking areas of the Shopping Center shall not be included within Common Areas Charges (i) if same is incurred prior to the fifth (5th) anniversary of the Rent Commencement Date, or (ii) more often

than once every five (5) years during the Term); in no event, however, shall Common Areas Charges include any costs (whether or not amortized) relating to the installation or replacement of, or capital improvement to, the detention pond (if any) or the traffic direction and Shopping Center identification signs referenced in Subsection 5.1.2(a) above; **(3)** the cost of investigating, monitoring or remedying any environmental condition or "Hazardous Substances" or any other "Compliance Costs" (both as hereinafter defined in Subsection 12.4.1); **(4)** any debt service (including principal and interest) or payments of any judgments or other liens against Landlord; **(5)** the cost of maintaining, repairing or providing security for interior portions of buildings; **(6)** Taxes or other taxes levied or assessed against Landlord or the Shopping Center; **(7)** the cost of compliance with applicable Legal Requirements (including, without limitation, the cost of curing violations or contesting such Legal Requirements); **(8)** any costs resulting from insurance deductibles or any payments made under any self-insurance policy maintained by Landlord; **(9)** any costs which would have been reimbursed or paid for by insurance proceeds had Landlord maintained the insurance required under Section 10.3 hereof and the amount of any judgment or other charge entered or costs assessed against Landlord in excess of the policy limits of the insurance maintained by Landlord under Section 10.3 hereof); **(10)** those portions of Landlord's insurance premiums which are reimbursed to Landlord by any other tenant in the Shopping Center other than through the payment of such tenant's proportionate share of insurance premiums otherwise includable as part of Common Areas Charges; **(11)** sums paid or owed by Landlord to any tenant in the Shopping Center; **(12)** costs incurred in connection with the negotiation of leases with, or construction of improvements for, any tenant in the Shopping Center (including, without limitation, brokerage commissions and legal fees); **(13)** costs incurred in connection with lawsuits or other legal actions (including, without limitation, arbitrations and mediations) instituted or defended by Landlord; **(14)** sums incurred as late payment fees, penalties or interest; **(15)** ground rent; **(16)** depreciation; **(17)** costs disproportionately incurred by or on behalf of any one or more of the tenants in the Shopping Center (including, without limitation, all costs relating to the operation of any food court in the Shopping Center); **(18)** electricity costs for lighting Common Areas later than the "Normal Hours" [hereinafter defined in Section 5.2], other than low-level security lighting; **(19)** Landlord's advertising, entertainment and promotional costs for the Shopping Center (including, without limitation, holiday decorations); **(20)** costs of acquiring, leasing, restoring, insuring or displaying sculptures, paintings and other objects of art located within or outside the Shopping Center; **(21)** costs and expenses payable to Landlord or to an Affiliate of Landlord to the extent that such costs and expenses exceed competitive costs and expenses for materials and services by unrelated persons or entities of similar skill and experience; **(22)** repairs resulting from defects in the original construction of the Shopping Center arising within one (1) year after the Rent Commencement Date; **(23)** the cost of mechanized equipment (but not the straight-line depreciation thereof over its useful life, as determined in accordance with generally accepted accounting principles); **(24)** reserves for anticipated future expenses; **(25)** except for the Administrative Fee provided for in Subsection 5.1.2(a) above, any cost or expense relating to the administration and management of the Common Areas (whether on-site or off-site) including, but not limited to, overhead, management fees, office salaries and benefits, office rental, office supplies, dues and subscriptions, office utility charges, telephone charges and automobile expenses; or **(26)** costs incurred in connection with the monitoring, maintenance, inspection, or testing of fire alarm systems.

(b)   In addition, if any tenant or other occupant of the Shopping Center (i) maintains the Common Areas in whole or in part, or any facilities therein, (ii) provides any services the cost of which would otherwise be includable in Common Areas Charges, and/or (iii) pays directly for costs which would otherwise be included in the Common Areas Charges, then the costs associated with or attributable to any of the foregoing shall be excluded from Common Areas Charges, and the denominator used to determine Tenant's Pro Rata Share of the corresponding costs shall be reduced by the Floor Area leased or owned by such tenant or other occupant.

(c)   Common Areas Charges for any period during the Term which constitutes less than a full calendar year shall be equitably prorated.

5.1.4   <u>Tenant's Right to Audit</u>.  Subject to the provisions of this Subsection 5.1.4, Tenant shall have the right (not more than once annually, but not during the months of January, February and March) to audit Landlord's books and records to verify Landlord's calculation of Common Areas Charges and Tenant's Pro Rata Share thereof.  Within fifteen (15) days after Tenant's request, Landlord shall promptly deliver to Tenant copies of relevant backup materials (including, but not limited to, contracts, correspondence and paid invoices) reasonably required by Tenant.  In the event of an error in Landlord's favor, Landlord shall immediately refund the overcharge to Tenant, and if the overcharge exceeds three (3%)

percent of Tenant's Pro Rata Share of Common Areas Charges, Landlord shall pay to Tenant the reasonable expenses of the audit within thirty (30) days after Tenant's demand therefor, failing which, Tenant shall have the right to offset such amount from payments of Tenant's Pro Rata Share of Common Areas Charges next becoming due hereunder, together with interest thereon at the Lease Interest Rate from the date such remittance is due until reimbursement or full satisfaction by credit; provided, however, if there is not sufficient Term (not including any unexercised Renewal Options) for Tenant to fully recoup the entire amount owed to Tenant by Landlord hereunder, then Tenant shall also be permitted to offset such amount from payments of Fixed Rent and other Additional Rent next becoming due hereunder. Tenant shall keep the results of any such audit confidential, provided that nothing contained herein shall restrict Tenant from disclosing such information as may be required by applicable Legal Requirements, or to its accountants, attorneys or *bona fide* prospective assignees or subtenants (provided that each of such recipients shall be bound by the same non-disclosure provisions as are imposed upon Tenant). Any dispute by Landlord with respect to an audit by Tenant shall be submitted to arbitration in accordance with the provisions of Section 16.3 below. Provided that Landlord timely provides to Tenant the applicable CAC Reconciliation Statement in accordance with Subsection 5.1.2(b) above, Tenant may not inspect Landlord's books and records for any year prior to the third (3rd) calendar year preceding the year during which the inspection occurs (e.g., if Tenant conducts an inspection during 2003, Tenant may inspect Landlord's books and records for 2003, 2002, 2001, and 2000, but not any prior years). All inspections shall be conducted at Landlord's main offices which shall at all times be located within the continental United States (presently located in Houston, Texas). In no event may Tenant engage the services of any person or firm whose compensation for Tenant's audit is based on any type of "contingent fee" arrangement (i.e., whose compensation is based, in whole or in part, on the value of the charges [if any] disallowed by the inspection).

5.1.5   In no event shall Tenant be required to join, participate in or contribute to any promotional fund, marketing fund or merchants' association. However, Tenant shall, on an annual basis, reimburse Landlord for any and all costs and expenses reasonably and actually incurred by Landlord in installing and removing (but not the cost of purchasing or leasing) seasonal holiday decorations (***"Holiday Decoration Charges"***), but in no event shall Tenant's Pro Rata Share of the Holiday Decoration Charges exceed $2,000.00 in any given year and in no event shall Landlord be entitled to an Administrative Fee in connection with the Holiday Decoration Charges. Within ninety (90) days after the end of each calendar year, Landlord shall provide to Tenant a statement, in detail reasonably satisfactory to Tenant, of the Holiday Decoration Charges for such year, which statement shall be prepared and certified in the same manner as the CAC Reconciliation Statement (***"Holiday Decoration Statement"***), and shall be accompanied by a calculation of Tenant's Pro Rata Share of the Holiday Decoration Charges. Tenant shall pay to Landlord Tenant's Pro Rata Share of the Holiday Decoration Charges, subject to the above referenced cap, within thirty (30) days after receipt of such notice. Upon Tenant's request, Landlord shall promptly deliver to Tenant copies of relevant backup materials (including, but not limited to, contracts, correspondence and paid invoices) reasonably required by Tenant. The provisions of Subsection 5.1.4 shall also apply with respect to Tenant's right to audit Landlord's books and records to verify Landlord's calculation of the Holiday Decoration Charges and Tenant's Pro Rata Share thereof.

Section 5.2   Common Areas: Restrictions.

5.2.1   Continuous Access. No entrances, exits, approaches and means of ingress and egress to and from the Shopping Center as shown on Exhibit B hereto shall be interrupted or disturbed by any act or omission of Landlord during the Term. Notwithstanding the foregoing, Landlord shall be permitted, upon at least thirty (30) days prior notice given to Tenant, to temporarily close the Common Areas for the minimum time legally necessary to prevent a dedication thereof or an accrual of any rights in any person or the public generally therein; provided that such closure shall not occur during August, November or December of any calendar year. The restrictions contained in this Subsection 5.2.1 shall only apply to entrances, exits, approaches and means of ingress and egress located in Tenant's Critical Area, unless the closure of remaining entrances, exits, approaches and means of ingress and egress materially and adversely affects Tenant's business operations in the Premises or occurs in August, November and December. Further, Landlord shall not be in default of this Subsection 5.2.1 if any such interruption or disturbance is necessitated as a result of emergency repairs, or if the applicable governmental authority mandates any non-material changes to the access points provided that such governmental mandate was not triggered by any act or omission of Landlord.

5.2.2    No Alterations. Landlord shall not, without obtaining Tenant's prior written consent in each instance:  (i) alter the area of the Shopping Center or the location or size of any building or improvement in the Shopping Center shown on Exhibit B hereto; (ii) change the number, location, or layout of parking spaces within Tenant's Critical Area, or materially and adversely change the number, location, or layout of parking spaces in those portions of the Shopping Center shown on Exhibit B hereto which are not located within Tenant's Critical Area; (iii) construct any structures or buildings in the Shopping Center (including, without limitation, any kiosks, booths, signs or similar structures in the Common Areas), other than in the locations designated as *"Maximum Possible Building Area"* on Exhibit B hereto; provided, however, monument signs may hereafter be constructed on the Outparcels, subject in all events to Section 7.3 below; or (iv) change the entrances or exits to and from the Shopping Center located within Tenant's Critical Area, or the curb cuts, roadways and sidewalks or other Common Areas located within Tenant's Critical Area, from those shown on Exhibit B hereto, or substantially and adversely change the entrances or exits to and from the Shopping Center located outside of Tenant's Critical Area, or the curb cuts, roadways and sidewalks or other Common Areas located outside of Tenant's Critical Area, from those shown on Exhibit B hereto, it being understood and agreed that Landlord shall not be deemed in violation of this clause (iv) relating to those entrances, exits and curb cuts located outside of Tenant's Critical Area as long as there are at least two (2) Shopping Center entrances/exits to and from Bryant Avenue in the locations designated on Exhibit B hereto as "Entrance #1" and "Entrance #2", and there are at least two (2) entrances/exits to and from 2nd Street in the locations designated on Exhibit B hereto one (1) of which must either be "Entrance #3" or "Entrance #4", and the other of which must be "Entrance #5".  The standard of Tenant's consent for (a) those matters described in clauses "(i)", "(ii)", and "(iv)" above shall be "Tenant's sole discretion" if the affected area is located within Tenant's Critical Area, (b) those matters described in clauses "(i)", "(ii)", and "(iv)" above shall be "Tenant's reasonable discretion" if the affected area is located outside of Tenant's Critical Area, and (c) those matters described in clause "(iii)" above shall be "Tenant's sole discretion".  Without limiting the generality of the foregoing, Tenant shall have no consent rights with respect to changes in any of the Common Areas located outside of Tenant's Critical Area unless such changes are either material and adverse (as to those changes to certain of the Common Areas located outside of Tenant's Critical Area that are described in clause "(ii)" above), or represent substantial changes from that shown on Exhibit B (as to those changes to certain of the Common Areas located outside of Tenant's Critical Area that are described in clause "(iv)" above), as more particularly provided in this Subsection 5.2.2 above.  In the event Tenant consents to any such work, it shall not be performed during August, November and December of any year, and shall be undertaken in such a manner so as not to materially interfere with the normal conduct of any business operations in the Premises or Tenant's rights under this Lease.

5.2.3    Outparcels. In addition to the provisions of Subsection 5.2.2 above, during the Term, the following restrictions shall encumber and bind the outparcels (collectively, the *"Outparcels"* and individually, an *"Outparcel"*) designated on Exhibit B hereto as "Outparcel 1," "Outparcel 2," and "Outparcel 3," "Outparcel 4," and "Outparcel 5":  (a) no more than one building shall be constructed on any Outparcel; (b) no building shall exceed one story in height; (c) no building shall exceed a maximum height of twenty-eight (28) feet as measured from the finished floor level to the highest point on such building or structure (exclusive of the height of all types of projections or architectural treatments or embellishments thereon, such as, but without limitation, HVAC equipment, parapets, mansards, signs and antennae; however, the height of such types of projections, treatments and embellishments shall not exceed four (4) feet); provided, however, the buildings located on the Outparcels as of the date of this Lease are hereby excepted from this restriction, provided the height of such buildings, and each portion thereof, shall not be increased; and (d) the Floor Area of any building constructed on an Outparcel shall not exceed the Floor Area established therefor on Exhibit B hereto.  For purposes of this Subsection 5.2.3 and Exhibit M, the Floor Area of any building constructed on an Outparcel shall also be deemed to include outdoor balconies, patios or other outdoor areas utilized for retail sales or food or beverage service (exclusive of drive through or walk-up take-out food or beverage service); provided, however, a first-class operator primarily selling coffee in a manner similar to "Starbucks" as of the Effective Date shall be permitted to have up to four (4) outdoor tables without the square footage of such outdoor area being deemed included within the Floor Area of such building.

5.2.4    Parking Area. During the Term, Landlord shall maintain in the Shopping Center, at a minimum, the greater of (i) the number of parking spaces required by applicable Legal Requirements, or (ii) five (5) ground-level parking spaces for every one thousand (1,000) square feet of Floor Area in the Shopping Center, with each such space being at least nine (9) feet in width and eighteen (18) feet in length.  Parking spaces shall at all times

be clearly marked by painting, striping or otherwise.  Landlord shall not designate specific parking spaces within Tenant's Critical Area for use by other tenants or occupants of the Shopping Center, nor shall Landlord permit any person or entity to use the parking areas within the entire Shopping Center other than Tenant, the other tenants and occupants of the Shopping Center, and their respective employees, agents, subtenants, concessionaires, licensees, customers, and invitees.  There shall be no charge whatsoever levied for the use of any parking areas within the Shopping Center.

    5.2.5 <u>Lighting</u>.  Throughout the Term, Landlord shall keep the Common Areas fully lighted and open to the customers of the Shopping Center seven (7) days a week at all times during normal retail shopping center hours, which shall include dusk until 12:00 a.m. Monday through Sunday (**"Normal Hours"**).  Upon request of Tenant, Landlord shall keep the Common Areas lighted for as long after Normal Hours as Tenant shall request, <u>provided</u> Tenant shall pay for a share of the reasonable cost of said requested lighting, which share shall be equal to the product of (x) such cost, and (y) a fraction, the numerator of which shall be the number of square feet of Floor Area within the Premises and the denominator of which shall be the aggregate number of square feet of Floor Area of all premises within the Shopping Center (including the Premises) open later than Normal Hours, equitably adjusted to take into account the number of hours that each such tenant or occupant was open after Normal Hours (excluding, however, those tenants and occupants who separately control and pay for their own Common Area lighting).  In addition to the foregoing, Landlord shall provide for low level security lighting from one (1) hour after the close of business in the Premises until dawn.

    5.2.6 <u>Repairs</u>.  During the Term, any construction or repair by Landlord permitted or required under this Lease and undertaken in the Common Areas or in any other portion of the Shopping Center shall:

      (a) not be performed during the months of August, November, or December of any year, except in the event of an emergency or as may be otherwise required by applicable Legal Requirements;

      (b) be commenced only upon at least five (5) days' prior notice to Tenant (except in an emergency, in which event Landlord shall only be required to give such notice as is reasonable under the circumstances); and

      (c) be performed in accordance with the requirements of Subsection 3.3.6 above and in such a manner so as not to materially interfere with the normal conduct of any business operations in the Premises.

The provisions of Subsections 5.2.6 (a) and (b) above shall only apply to construction or repair occurring within Tenant's Critical Area, except as otherwise expressly provided below.  Further, Landlord shall not be deemed to be in violation of the provisions of Subsection 5.2.6(c) above by virtue of Landlord overlaying the paved areas of the Shopping Center provided that (i) such overlay does not occur more than once every seven (7) years, (ii) such work is performed in a manner consistent with industry practices for first-class shopping centers, (iii) such work is not performed during the months of August, November and December; and (iv) Landlord provides Tenant with at least thirty (30) days' prior notice of the commencement of such work and Tenant shall have the right to reasonably approve the dates during which such work shall occur within Tenant's Critical Area.

    5.2.7 <u>Rules and Regulations</u>.  Tenant shall comply with the rules and regulations of the Shopping Center as established from time to time by Landlord, within sixty (60) days after Landlord notifies Tenant thereof, provided they: (i) are reasonable, (ii) do not adversely affect the normal conduct of any business operations in the Premises, (iii) do not adversely affect any of Tenant's rights under this Lease, and (iv) are uniformly enforced against all tenants of the Shopping Center and without prejudice against Tenant.  In the event of any conflict between the provisions of this Lease and any rules or regulations, the provisions of this Lease shall prevail and govern.

    5.2.8 <u>Miscellaneous</u>.

      (a) <u>No Promotional Use</u>.  Landlord shall not use or permit the use of all or any portion of the Common Areas for retail sales or for promotional purposes. Notwithstanding the foregoing provisions of this Subsection 5.2.8(a), Landlord may allow tenants or occupants of the Shopping Center to conduct sidewalk sales in the front of their respective stores only; <u>provided</u>, <u>however</u>, that (i) such sales shall be conducted at all times in a

manner consistent with first-class shopping centers in the Oklahoma City, Oklahoma metropolitan area, (ii) Landlord shall proceed with reasonable diligence to ensure that such sales do not materially interfere with or disrupt Tenant's normal business operations, normal pedestrian access, the visibility of the Premises or any signage thereon, or Tenant's use of the Common Areas, (iii) the sidewalk sales of each tenant shall not occur more than four (4) times per each calendar year (and each such sale shall not exceed ten (10) days in duration), and (iv) no sidewalk sales shall be permitted within 150 feet from the perimeter of the Premises (provided, however, Tenant shall be permitted to use the sidewalks abutting the Premises for sidewalk sales subject to clauses "(i)" through "(iii)" above).  The conditions set forth in clauses (iii) and (iv) above shall not be applicable to sidewalk sales conducted by a national bookstore on the sidewalks abutting its premises in the Shopping Center provided that (aa) such bookstore is in excess of 20,000 square, (bb) such bookstore is operated and merchandised similar to a Barnes & Noble or Borders bookstore as of the Effective Date, and  (cc) such sidewalk sales are conducted in a manner similar to the manner is which sidewalk sales are conducted by a Barnes & Noble or Borders bookstore as of the Effective Date.  Further, Landlord shall be permitted to erect a tent in certain portions of the parking lot of the Shopping Center for the purpose of providing gifts to the customers of the tenants and occupants of the Shopping Center provided that (1) such tent does not take up more than twenty (20) parking spaces, (2) such tent shall not be erected more than three (3) times per each calendar year, not to exceed two (2) days in duration each time such tent is erected, and (3) such tent is not erected within two hundred fifty (250) feet of any portion of the Premises, but in no event shall such tent be erected within any portion of Tenant's Critical Area.

    (b)   Trash Compactor & Containers.  Tenant shall be permitted to maintain and operate, at no extra charge: (i) a trash compactor in the portion of the Common Areas designated on Exhibit B hereto as "Trash Compactor Pad"; and (ii) a trash container(s) in the portion(s) of the Common Areas designated on Exhibit B hereto as "Trash Container Pad".  Tenant, at its sole cost and expense, shall keep the trash compactor and containers neat and clean and repair any damage caused by use and storage of such compactor and containers.

    (c)   Shopping Carts.  Tenant shall be permitted to store its shopping carts in such exterior cart corrals as may be reflected on Exhibits B and/or D-1 hereto.  With respect to shopping carts provided by Tenant for the use of its customers, Tenant will use reasonable efforts to periodically remove same from the Common Areas.

## ARTICLE 6
## UTILITIES

    Section 6.1    From and after the date that Tenant accepts possession and has exclusive control over the Premises and continuing thereafter through the end of the Term, Tenant shall be solely responsible for and shall pay the cost of utilities services (including, without limitation, electricity, gas, water, sanitary sewer, alarm and telecommunications) consumed in the Premises by Tenant.  Tenant shall not be obligated to purchase utility service(s) directly from Landlord, or from any utility provider designated by Landlord unless: (i) the quality of the service(s) provided is at least equal to the quality of the same service(s) provided by the public utility corporation or governmental authority providing such utilities in the area in which the Shopping Center is located; and (ii) the cost of such service(s) shall not exceed the lesser of: (x) the cost of the same service if Tenant had obtained such service directly from the applicable public utility company, or (y) the cost to Landlord for such service.  Landlord shall provide separate utility meters exclusively serving the Premises, at its sole cost and expense (including, without limitation, all connection and hook-up fees).  Tenant's entry upon the Premises prior to the Delivery Date shall not constitute a waiver by Tenant of Landlord's obligation to pay the costs of all utility charges incurred in the Premises prior to the date that Tenant accepts possession and has exclusive control over the Premises.  Landlord shall not permit the capacity of utility lines available for use at the Premises to be reduced or overloaded by any other persons or entities.  Landlord shall permit Tenant and its telecommunications provider full and free access to, and use of, available telecommunications conduits in the Shopping Center for the provision of telecommunications service to the Premises, subject to such reasonable requirements as Landlord may impose.

    Section 6.2    Notwithstanding any provision of this Lease to the contrary, in the event utilities serving the Premises are disrupted due to the acts or omissions of Landlord, its agents, contractors, servants or employees, Landlord shall promptly restore the affected utilities at Landlord's sole cost and expense.  If the disrupted utilities are not restored within twenty-four (24) hours after the Landlord has knowledge of such disruption, and Tenant is unable to

conduct its normal business in the Premises as a result thereof, Rent shall be equitably abated during the period of disruption.

Section  6.3      Intentionally Omitted.

ARTICLE  7
SIGNS

Section  7.1      Tenant's Building Signage.

Landlord shall supply and install signage (and obtain all permits and approvals therefor) as part of Landlord's Work in accordance with Exhibits D, D-1, and F hereto, and with the additional provisions of this Lease.  Subject to compliance with applicable Legal Requirements, Tenant shall have the exclusive right during the Term, at its sole cost and expense, to erect, maintain, and replace on the storefront and exterior walls of the Premises, and on the side walls of any entrance design element, if any, signs (including, without limitation, under-canopy (e.g., blade) signs), banners (including temporary banners placed on the storefront of the Premises and such other walls of the Premises as selected by Tenant announcing "Sneak Preview", "Coming Soon", "Grand Opening", "Now Hiring", and/or "Now Open"), awnings, and flags of such size, design and color as Tenant, from time to time, may desire.  Tenant may erect and maintain in the interior of the Premises any signs it may desire, provided that same are professionally prepared.

Section  7.2      Signage Restrictions and Criteria.

7.2.1      Subject only to the "Existing Leases" (defined in Section 12.3 below), as to which the provisions of this Subsection 7.2.1 shall not apply except as specifically stated herein, during the Term, no exterior identification signs attached to any building of the Shopping Center (including, without limitation, the Premises) shall be of the following type: (i) flashing, moving or audible signs; (ii) signs employing exposed raceways, exposed neon tubes, exposed ballast boxes, or exposed transformers, provided that Tenant shall have the right to employ any methods necessary for the installation of internally illuminated self-contained channel letters; (iii) paper or cardboard signs other than professionally prepared interior window signs advertising special sales within the subject premises, temporary signs (exclusive of contractor signs), stickers or decals, provided, however, the foregoing shall not prohibit the placement at the entrance of each such premises of (A) small stickers or decals which indicate hours of business, emergency telephone numbers, credit cards accepted, and other similar information, and/or (B) a sticker or decal which contains the phrase "no solicitation" or words of like import; or (iv) "reader board" type signs.  Notwithstanding the restrictions contained in this Subsection 7.2.1, fast food drive through ordering devices shall be permitted for fast food restaurants located on the Outparcels to the extent such restaurants are otherwise permitted under this Lease (including, without limitation, Article 13 below).  Notwithstanding the restrictions contained in this Subsection 7.2.1, neon signs shall be permitted provided that (a) the tenant or occupant using such neon sign is part of a national or regional chain of at least fifty (50) other stores, (b) such neon sign is a prototype sign of such tenant or occupant, and (c) such neon sign (including, without limitation, its size and design and the materials used in making such neon sign) is customarily found in other first-class shopping centers.  Notwithstanding the exception of Existing Leases from this Subsection 7.2.1, existing tenants of the Shopping Center (and current or future assignees or sublessees of such tenants) shall nevertheless be subject to the restrictions contained in this Subsection 7.2.1 in the event that the lease between Landlord and any such tenant either does not permit such types of exterior identification signs, or requires Landlord's consent to any such signage where the standard of consent is Landlord's sole discretion (or words to that effect).

7.2.2      Subject only to the Existing Leases, as to which the provisions of this Subsection 7.2.2 shall not apply except as specifically stated herein, Landlord shall not permit any obstructions (including, without limitation, any trees, bushes or other landscaping, scaffolding or architectural details) to obscure Tenant's storefront, storefront signs or other exterior wall signs or any pylons, monuments or other freestanding signs.  Landlord shall not be in violation of this Subsection 7.2.2 if Landlord installs the minimum landscaping required by governmental authorities provided that Landlord routinely trims and prunes such landscaping in such a manner so as to prevent (to the extent possible) such landscaping from obscuring Tenant's storefront, storefront signs or other exterior signs as aforesaid.  Landlord shall not permit any tenant or occupant in the Shopping Center whose premises contain less Floor Area than the Floor Area of the Premises, to erect or maintain building signage having: (a) greater

total square footage than the total square footage available for use by Tenant, or (b) a maximum height greater than the maximum height of Tenant's building signage, as measured from the finished floor level to the highest point on such signage, <u>nor</u> shall the height or width of the building and entrance design element of such tenant(s) or occupant(s) (including, without limitation, the height and width of any sign which is utilized by such other tenant or occupant) exceed that of Tenant's building and entrance design element.  Notwithstanding the exception of Existing Leases from this Subsection 7.2.2, existing tenants of the Shopping Center (and current or future assignees or sublessees of such tenants) shall nevertheless be subject to the restrictions contained in this Subsection 7.2.2 in the event that the lease between Landlord and any such tenant either does not permit such signage, or requires Landlord's consent to any such signage where the standard of consent is Landlord's sole discretion (or words to that effect).

Section 7.3   <u>Pylon/Monument Signage</u>.  Landlord shall during the entire Term, provide pylons at the locations shown on <u>Exhibit B</u> hereto as "Center Pylon 1" and "Center Pylon 2".  Notwithstanding the foregoing, Landlord shall not be in violation of Landlord's obligations relative to pylon signage, if Legal Requirements do not permit the pylon signage contemplated by this Lease as long as no other tenant or occupant has its identification panel, sign, name, logo or trademark thereon.  Landlord, as part of Landlord's Work, shall obtain all governmental approvals and permits for, and shall procure and install, Tenant's sign panel(s) on all sides of such pylons, in accordance with the provisions of Article 3 and <u>Exhibits D</u>, <u>F</u>, and <u>F-1</u> hereto.  The dimensions of Tenant's pylon sign panel(s) shall be at least as large as those of other occupants of the Shopping Center, and no other signs thereon shall be larger than Tenant's.  Tenant's pylon sign panel(s) shall be in the first position, as shown on <u>Exhibit F-1</u> hereto.  In addition, if Landlord constructs or makes available to any other tenant or occupant in the Shopping Center any other signage located in the Common Areas located on the Shopping Center or on any "Related Land" (defined in Subsection 13.1.2 below) or otherwise, such signage shall also include Tenant's identification sign, as shown on <u>Exhibits F</u> and <u>F-1</u> hereto, which shall be higher and at least as large as the largest sign made available to such other tenant or occupant; <u>provided</u>, <u>however</u>, Tenant shall not have the benefit of this sentence as it applies to signage on Related Land if the tenant or occupant of the Shopping Center having signage on the Related Land is also a tenant or occupant of the Related Land.  However, Tenant's rights relative to freestanding signage shall apply only to the Center Pylon 1 and Center Pylon 2 signs shown on <u>Exhibit B</u> hereto unless any other tenant or occupant of the Shopping Center has greater rights than Tenant.  Notwithstanding the foregoing provisions of this Section 7.3, if Landlord constructs or makes available to any tenant or occupant of any Related Land any signage located in the Common Areas, then Tenant shall have the right to include Tenant's identification sign on any signage located on the Related Land, with the size and position of Tenant's signage being based upon the relative Floor Area of the tenants or occupants having signs located on such pylon; <u>provided</u>, <u>however</u>, Tenant shall not have the benefit of this clause if the tenant or occupant of any Related Land is also a tenant or occupant of the Shopping Center.  Landlord shall maintain all pylons and monuments, and Tenant's signs thereon, in good order and repair, and allow Tenant access to replace its signs thereon at Tenant's cost and expense.  Landlord shall not change or alter the location, structure, or height of, or materially change the general appearance of, the Center Pylon 1 or Center Pylon 2 without obtaining Tenant's prior consent.  The cost of maintenance of all pylons (but <u>not</u> the cost of individual tenants' signs thereon or the cost of the construction of the pylons and monuments), and of the cost of any electricity used to illuminate them, shall be includable in Common Areas Charges.  Notwithstanding the foregoing, Tenant shall not have any signage rights to the pylon/monument signage located on an Outparcel and utilized solely for the identification of the occupant(s) of an Outparcel and any other occupant of the Shopping Center (i.e., "in-line" tenants and other occupants of the Shopping Center) provided that such other occupant does not have greater signage rights than Tenant.

Section 7.4   <u>Signage: Alteration/Removal/Allocation</u>.  Tenant shall have the right, from time to time, without Landlord's approval, to change its signs on the storefront and exterior of the Premises, as well as on any pylon or monument (to the extent Tenant is otherwise permitted to have a sign thereon), <u>provided</u> that (i) the area of the new sign is no larger than the area of the sign which it replaces and that the method of construction and attachment is substantially the same, and (ii) Tenant complies with Legal Requirements.  Upon the expiration or earlier termination of the Lease, Tenant shall remove its signs and patch up any holes on the fascia or other exterior walls of the Premises or on any pylon or monument caused by the prior installation or the removal of such signs.  The signage rights granted to Tenant pursuant to this Article 7 shall, at Tenant's option, be allocated to or between Tenant and/or any subtenant(s) of all or any portion of the Premises.  All signage installed by Landlord and Tenant hereunder shall comply with applicable Legal Requirements.

Section 7.5     Cooperation.  Landlord, upon request, shall execute any consents or applications which may be required by applicable Legal Requirements to permit the placement, installation, and/or replacement by Tenant of any signs on any part of the Premises or on any pylon or monument, to which Tenant may be entitled under this Lease.

ARTICLE 8
ALTERATIONS AND IMPROVEMENTS

Section 8.1     Alterations and Improvements.

8.1.1     (a)    Tenant shall not perform any structural or exterior alterations or structural or exterior improvements to the Premises without the prior approval of Landlord.  All work performed in connection with structural and non-structural alterations or improvements shall be done at Tenant's sole cost and expense, in a good and workmanlike manner and in compliance with all applicable governmental requirements.  Notwithstanding the foregoing provisions of this Subsection 8.1.1(a), Landlord shall have no right to approve any exterior alterations or improvements to the Premises which are necessary in order to conform the Premises to one of Tenant's or a subtenant's prototypical storefronts, provided that such alterations or improvements are architecturally compatible with the balance of the Shopping Center and performed in a first-class manner.  The provisions of this Section 8.1 shall not apply to Tenant's building signage, which shall be governed by the applicable provisions of Article 7 above.

(b)    intentionally omitted.

8.1.2     Tenant may, from time to time, at its sole cost and expense, without the prior approval of Landlord, make interior or exterior (to the extent permitted by Subsection 8.1.1(a) above without Landlord's approval) non-structural alterations and interior or exterior (to the extent permitted by Subsection 8.1.1(a) above without Landlord's approval) non-structural improvements to the Premises as Tenant deems necessary or desirable, including, but not limited to, electrical systems, heating, ventilation and air conditioning and other mechanical systems, installation of fixtures and equipment, painting, and wall and floor coverings.  All such work shall be performed in a good and workmanlike manner and in compliance with Legal Requirements.

8.1.3     Tenant shall have the right to subdivide the Premises into two (2) or more separate stores, each of which may have its own front entrance and access to the loading docks in the rear of the Premises, as well as separately sub-metered utilities provided that (i) each store shall be at least seven thousand (7,000) square feet of Floor Area, (ii) such subdivision shall be in connection with an assignment or sublease pursuant to Article 15 below, and (iii) Tenant complies with any applicable requirements of Subsection 8.1.1(a) above.

8.1.4     Tenant shall have the right to erect and maintain an antenna and a satellite dish on the roof of the Premises, provided that Tenant: (i) obtains Landlord's prior approval of its plans for the installation of such equipment, (ii) uses a contractor designated or approved by Landlord for all roof penetrations so as not to violate or invalidate any roof warranties maintained by Landlord, (iii) maintains the area where roof penetrations are made while Tenant's equipment is present, and (iv) repairs any damage to the roof caused by the making of the roof penetrations, including, but not limited to, the repair of the roof penetrations upon the removal of any equipment installed thereon.

8.1.5     Landlord shall execute and return to Tenant all appropriately completed building department or equivalent applications within ten (10) days after Tenant's request therefor, and will reasonably cooperate with Tenant in the permitting process.

8.1.6     If any violation of any applicable legal requirement which is noted against the Shopping Center or the Premises (other than a violation caused by Tenant) prevents Tenant from obtaining a building permit for any alterations or a certificate of occupancy, then, upon request by Tenant, Landlord shall promptly and diligently cause such violation to be removed of record to the extent required to permit Tenant to obtain its building permit or certificate of occupancy, as the case may be.

8.1.7     Landlord shall not make any alterations to the Premises (including, without limitation, changing the design, color or materials of the exterior of the Premises) nor

shall Landlord construct an additional floor or floors above the Premises.  Landlord shall neither make nor permit to be made any alterations to the exterior "architectural theme" of the remainder of the Shopping Center which would be inconsistent with a first-class shopping center in the state in which the Shopping Center is located (exclusive of other tenants' entrance features) without the prior consent of Tenant.


ARTICLE 9
REPAIRS

Section 9.1    Tenant's Repairs.  Subject to the provisions of Article 11 hereof, and except as otherwise provided in Section 9.2 below, Tenant shall maintain in good condition and repair, at its sole cost and expense: (i) the non-structural, interior elements of the Premises (including plate glass, and the electrical, plumbing, mechanical, and/or alarm systems located in, or serving, exclusively the Premises, and the electrical service box provided same is either located within the Premises or attached to an exterior wall of the Premises and exclusively serves the Premises); (ii) the heating, ventilation and air conditioning (*"HVAC"*) units exclusively serving the Premises; (iii) floor coverings (as opposed to the floor slab), doors, door locks, fasteners and similar hardware; (iv) security enclosures and sprinkler branches and heads (as opposed to sprinkler mains) located in and serving the Premises exclusively; and (v) subject to Sections 10.1.1 and 10.1.2 and Article 11, any damage to the Premises which would be Landlord's responsibility to repair but which was occasioned by the act or omission of Tenant, its employees, agents or contractors.  All repairs and replacements on Tenant's part to be performed hereunder shall be at Tenant's sole cost and expense, and performed in a good and workmanlike manner in accordance with all applicable legal requirements.

Section 9.2    Landlord's Repairs.  Subject to the provisions of Article 11 hereof, Landlord shall perform, as the same shall from time to time be necessary, all repairs and replacements to the following:

(a)    the buildings of the Shopping Center as necessary to maintain same in good condition and repair (including, without limitation, repainting the exterior walls of the buildings of the Shopping Center (including, without limitation, the Premises)) as same may be reasonably required from time to time during the Term.

(b)    the structural elements of the Premises, which shall be deemed to include, without limitation, the roof joists, columns, sprinkler main and any other elements of the sprinkler system that are located within, but which do not exclusively serve, the Premises, footings, foundation, exterior walls (including, without limitation, repainting, but excluding plate glass, storefront windows, doors, door closure devices, window and door frames, molding, locks and hardware, and painting or other treatment of interior walls), floor (but not the floor covering, unless the same is damaged as a result of a floor defect or settling), and the structural elements of any building of which the Premises may be a part;

(c)    the roof, gutters, flashings, downspouts and scuppers;

(d)    the electric, gas, water, sanitary sewer, and other public utility lines serving the Premises, to the point of connection to the Premises; however, with respect to electric, Landlord shall maintain electrical lines up to the electrical box serving the Premises provided that such electrical box is attached to the exterior wall of or located within the Premises and exclusively serves the Premises;

(e)    all electric, gas, water, sanitary sewer, and other public utility lines and ducts in or passing through the Premises which do not exclusively serve the Premises;

(f)    the non-structural elements of the Premises (including, without limitation, the HVAC units and the electrical, plumbing, mechanical, and/or fire alarm systems located in or serving the Premises) until the first (1st) anniversary of the Delivery Date; and

(g)    any damage to the Premises or the Shopping Center which is occasioned by (A) the act or omission of Landlord, its employees, agents or contractors, or (B) any breach by Landlord of any provision of this Lease.  Notwithstanding the foregoing provisions of this Section 9.2(g), Landlord shall not be required to repair any damage to portions of the Shopping Center not consisting of the Premises or Common Areas provided that such portions not being repaired (i) are left in a sightly and safe condition consistent with first-class shopping centers, (ii) are not an "attractive nuisance",  (iii) do not have an adverse impact

on the Premises or Tenant's business being conducted from the Premises, and (iv) do not expose Tenant to any liability or risk.

All repairs and replacements on Landlord's part to be performed hereunder shall be at Landlord's sole cost and expense (and not includable in Common Areas Charges), performed in a good and workmanlike manner in accordance with all applicable legal requirements, and without material interference with or disruption to the normal conduct of any business operations in the Premises. Landlord shall give Tenant at least five (5) days' prior notice of any repairs or replacements to, or which would otherwise affect the normal conduct of any business operations in, the Premises (except in the case of an emergency posing imminent material harm to persons or property, in which event Landlord shall only be required to give such notice as is reasonable under the circumstances). If, in Tenant's reasonable judgment, Landlord's repairs would materially interfere with or disrupt the normal conduct of any business operations in the Premises, Landlord shall perform such repairs only after the regular hours of operation of Tenant and any other occupant of the Premises (or any portion thereof). Landlord shall provide and assign to Tenant any and all contractors', manufacturers' and vendors' warranties relating to any and all work performed by Landlord (including, without limitation, Landlord's Work) which is Tenant's obligation to maintain under this Lease.

Section 9.3    Legal Compliance Work. Subject to Section 9.2 above, Tenant shall be responsible, at its sole cost and expense, for the performance of all "Legal Compliance Work" (hereinafter defined) required: (a) only to the extent due to Tenant's specific manner of use of the Premises (*i.e.*, is not of general applicability to tenants and occupants of the Shopping Center), or (b) with respect to interior elements of the Premises which are not structural, provided, however, that the foregoing shall not relieve Landlord of its obligations to perform Landlord's Work in accordance with all legal requirements and to perform the repairs, as required in this Lease. Landlord shall be responsible, at its sole cost and expense (and not includable in Common Areas Charges) for performing all other Legal Compliance Work. As used herein, *"Legal Compliance Work"* shall mean any obligation, addition, alteration, improvement, or rebuilding, structural or otherwise, to or of the Premises, the Shopping Center, or any part thereof, as applicable, which may be required by reason of any Legal Requirement. Notwithstanding the foregoing, Landlord shall not be in default under this Lease if Landlord fails to perform Legal Compliance Work in those portions of the Shopping Center not consisting of the Premises or Common Areas provided that (i) such portions of the Shopping Center are left in a sightly and safe condition consistent with first-class shopping centers and are not an "attractive nuisance", (ii) Landlord's non-compliance does not have an adverse impact on the Premises, Common Areas or Tenant's business being conducted from the Premises, and (iii) Landlord's non-compliance does not expose Tenant to any liability or risk.

ARTICLE 10
INDEMNIFICATION, INSURANCE AND WAIVER OF SUBROGATION

Section 10.1    Mutual Release, Waiver of Subrogation and Mutual Indemnification.

10.1.1    Mutual Waiver of Claims. Landlord and Tenant, on their own behalf and on behalf of anyone claiming under or through either one by way of subrogation, hereby release and waive all rights of recovery and causes of action against each other from any and all liability for any loss or damage to property or resulting from damage to such property (and, in either case, any resulting loss of business or rental income), whether caused by the negligence or fault of the other party, which is normally insured under Special Form property insurance (formerly known as "all-risk") and time element insurance required to be maintained hereunder. In the event either Landlord or Tenant is a self-insurer or maintains a deductible (as either may be permitted hereunder), then the self-insuring party or the party maintaining the deductible hereby releases the other party from any liability arising from any event which would have been covered had the required insurance been obtained and/or the deductible not been maintained.

10.1.2    Waiver of Subrogation. Landlord and Tenant shall cause each property insurance policy carried by either of them insuring the Premises, the contents thereof, or the Shopping Center, to provide that the insurer waives all rights of recovery by way of subrogation or otherwise against the other party hereto in connection with any loss or damage which is covered by such policy or that such policy shall otherwise permit, and shall not be voided by the releases provided above.

10.1.3    Mutual Indemnification.

(a)    Except as otherwise provided in Subsections 10.1.1 and 10.1.2 above, Tenant covenants to defend and indemnify Landlord and hold Landlord harmless from and against any and all claims, actions, damages, liability and expense, including reasonable attorneys' fees, (x) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon the Premises, or any part thereof, or (y) occasioned wholly or in part by any act or omission of Tenant, its agents, contractors, employees, servants, or licensees, except to the extent such claims, actions, damages, liability and expense are caused by the acts or omissions of Landlord, its agents, contractors, licensees, employees, or other tenants and occupants, or for which any of said parties may be statutorily liable.

(b)    Except as otherwise provided in Subsections 10.1.1 and 10.1.2 above, Landlord covenants to defend and indemnify Tenant and hold Tenant harmless from and against any and all claims, actions, damages, liability and expense, including reasonable attorneys' fees, (x) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon any portion(s) of the Shopping Center (excluding the Premises), or (y) occasioned wholly or in part by any act or omission of Landlord, its agents, contractors, employees, servants, tenants (other than Tenant), occupants or licensees, except to the extent such claims, actions, damages, liability and expense are caused by the acts or omissions of Tenant, its agents, contractors, licensees or employees, or for which any of said parties may be statutorily liable.

(c)    The provisions of this Section 10.1.3 shall survive the expiration or earlier termination of this Lease.

Section 10.2    Tenant's Insurance.

10.2.1    Tenant's Insurance.  Tenant, at its own cost and expense, shall maintain in full force and effect from and after the Delivery Date and throughout the Term: (i) commercial general liability insurance protecting and insuring Tenant, naming Landlord as "additional insured-lessor" for claims arising out of the use or occupancy of the Premises by Tenant and the obligations assumed by Tenant under this Lease, and having a combined single limit of liability of not less than Ten Million Dollars ($10,000,000) for bodily injury, death and property damage liability; and (ii) Special Form (formerly known as "All-Risk") property insurance, on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of all fixtures, equipment and other items of personal property of Tenant located on or within the Premises.  Tenant may carry any of its insurance under "blanket policies" covering the Premises and other locations it or any Affiliate of Tenant owns or leases, provided that: (i) the amount of the total insurance available shall be at least the protection equivalent to separate policies in the amounts herein required, and (ii) in all other respects, any such policy or policies shall comply with the applicable provisions of this Article 10.

10.2.2    Self-Insurance.  All insurance required to be maintained under this Section 10.2 may be provided under: (i) an individual policy covering this location; (ii) a blanket policy or policies which includes other liabilities, properties and locations of Tenant or its Affiliates; (iii) a plan of self-insurance, provided that Tenant or any guarantor of Tenant's obligations under this Lease maintains, during the period of such self-insurance, a net worth of at least One Hundred Million Dollars ($100,000,000), as determined in accordance with generally accepted accounting principles; or (iv) a combination of any of the foregoing insurance programs.  To the extent any deductible is permitted or allowed as a part of any insurance policy carried by Tenant in compliance with this Section 10.2, then Tenant shall be deemed to be covering the amount thereof under an informal plan of self-insurance; provided, however, that in no event shall any deductible exceed One Hundred Thousand Dollars ($100,000) unless Tenant complies with the requirements regarding self-insurance pursuant to clause (iii) above.

Section 10.3    Landlord's Insurance.

10.3.1    Liability Insurance.  Landlord shall maintain in full force and effect on and after the Effective Date and throughout the Term commercial general liability insurance with regard to the Common Areas protecting and insuring Landlord, naming Tenant as "additional insured-lessee", and having a combined single limit of liability of not less than Ten Million Dollars ($10,000,000) for bodily injury, death and property damage liability.  Landlord shall have the right to carry its insurance under "blanket policies" covering the Shopping Center and other

properties provided that: (i) the amount of the total insurance available shall be at least the protection equivalent to separate policies in the amounts herein required, and (ii) in all other respects, any such policy or policies shall comply with the applicable provisions of this Article 10.

        10.3.2    Special Form Property Insurance.  Landlord shall procure and maintain in full force and effect on and after the Effective Date and throughout the Term, Special Form (formerly known as "All-Risk") property insurance (including loss of rents for a minimum period of one (1) year) and endorsements for coverages for flood, earthquake, windstorm, earth movement [sinkholes], demolition, increased cost of construction and contingent operation of building laws coverages, on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of all of the buildings (including the Premises) and other insurable improvements in the Shopping Center; provided, however, in no event shall such insurance cover Tenant's Property.  All policies required to be maintained by Landlord pursuant to this Subsection 10.3.2 shall provide that any proceeds thereof shall be deposited with Landlord's Mortgagee, or if none, to Landlord, in either event to be held in trust by such party and disbursed only in accordance with the provisions of, and for the purposes set forth in, Section 11.1 hereof.  The property insurance required to be maintained by Landlord pursuant to this Section shall not have deductibles exceeding One Hundred Thousand Dollars ($100,000) without Tenant's prior consent.

        10.3.3    Tenant's Pro Rata Share of Insurance Premiums.  Tenant shall reimburse Landlord for Tenant's Pro Rata Share of the reasonable insurance premiums attributable to the policies required to be maintained by Landlord pursuant to this Section 10.3 as part of Common Areas Charges.  If the rates for any insurance Landlord is required to carry hereunder are increased as a result of the use or other activity of any other occupant of the Shopping Center, the amount of such increase shall be excluded from Common Areas Charges.  To the extent that Landlord receives a dividend, credit, rebate or other return of a premium which had previously been included in Common Areas Charges, Landlord shall promptly refund Tenant's Pro Rata Share of such dividend, credit, rebate, or return to Tenant.  Tenant's Pro Rata Share of any insurance premium for any period during the Term which constitutes less than a full calendar year shall be equitably prorated.  The provisions of this Subsection 10.3.3 shall survive the expiration or earlier termination of this Lease.

      Section  10.4    General Insurance Requirements.

        10.4.1    All insurance required to be maintained by the parties under this Lease shall be maintained with insurance companies qualified to do business in the state in which the Shopping Center is located, and rated at least A-/VIII by the most current Best's Key Rating Guide (or its equivalent, if such Guide ceases to be published).  Each party shall use its diligent efforts to have its insurers provide thirty (30) days [ten (10) days in the event of non-payment of premium] prior notice to the other party of cancellation or non-renewal of any policy required hereunder.  Each party shall provide to the other duly executed certificates evidencing the insurance coverage described in Sections 10.2.1(ii) and 10.3 above.

        10.4.2    The liability insurance requirements under Sections 10.2 and 10.3 above shall be reviewed by Landlord and Tenant every five (5) years for the purpose of mutually increasing (in consultation with their respective insurance advisors) the minimum limits of such insurance to limits which shall be reasonable and customary for similar facilities of like size and operation in accordance with generally accepted insurance industry standards.  The replacement value of the buildings and other insurable improvements constituting the Shopping Center shall be re-evaluated from time to time at the request of either Landlord or Tenant.

ARTICLE  11<br>FIRE AND OTHER CASUALTY; EMINENT DOMAIN

      Section  11.1    Fire and Other Casualty.

        11.1.1    (a)    Except as otherwise provided in this Section 11.1, if all or a portion of the Premises, the Common Areas (including all improvements thereto) or other buildings in the Shopping Center shall be damaged by fire or other casualty, Landlord shall promptly rebuild and restore the same to the condition existing immediately prior to such fire or other casualty, which restoration shall include all Tenant's Work and all other leasehold improvements performed by Tenant, but shall not include any of Tenant's Property.  The proceeds of the policies required to be obtained and maintained by Landlord pursuant to

Subsection 10.3.2 hereof shall, to the extent necessary, be used for the performance of such rebuilding and restoration work. In the event such insurance proceeds are insufficient to complete such work, Landlord shall provide the balance of the amount necessary to rebuild or restore the Shopping Center in the manner provided in this Section 11.1.

(b)     Notwithstanding the foregoing, if any portion of the Premises are so damaged or destroyed, Tenant shall have the right to require Landlord to make changes to the Premises in the course of, and as part of, such rebuilding or restoration work. If the net cost and expense of such rebuilding or restoration work is increased as a result of such changes (taking into consideration any and all actual reduced and additional costs resulting from such changes and/or other cost savings arising therefrom), then Tenant shall pay to Landlord, as Additional Rent, the amount of such net increase to the extent resulting from Tenant's changes, which amount shall be due and payable within thirty (30) days after Landlord has delivered to Tenant backup information evidencing such increase (including, without limitation, receipted invoices) as may be reasonably required by Tenant (but in no event earlier than the Delivery Date unless Landlord agrees in writing to reimburse Tenant for such payment if Tenant terminates this Lease pursuant to Subsection 11.1.2 below, and in all events subject to final adjustment). To the extent that Landlord's substantial completion of such rebuilding or restoration work is delayed solely as a result of such changes (taking into consideration any and all reasonable time savings to Landlord resulting from such changes), then the applicable period(s) specified in Subsection 11.1.2 below shall be appropriately adjusted to the extent of such net delay.

(c)     If, in Tenant's reasonable judgment, any damage to the Premises renders all or any portion of the Premises unusable for the conduct of Tenant's business or, in the case of damage to the Shopping Center, materially interferes with the normal conduct of any business operations in the Premises, the Rent shall be equitably reduced or totally abated based upon the extent to which the remaining portion of the Premises may, in Tenant's reasonable judgment, be utilized for its normal conduct of business.

(d)     Anything contained in this Lease to the contrary notwithstanding, Landlord's obligations under this Section 11.1 with respect to restoring the other buildings in the Shopping Center (i.e., all buildings other than the building in which the Premises are located)) shall be satisfied by Landlord rebuilding and restoring all of those buildings located within the Shopping Center (exclusive of those located within the Outparcels), such that there shall be a minimum of one hundred eighty-five thousand (185,000) square feet of Floor Area (not including the Premises and the Outparcels) within the Shopping Center. If Landlord elects not to restore the portion of the Shopping Center that Landlord is not obligated to restore pursuant to this Section 11.1.1(d), then Landlord shall, on or before the date that Landlord is required to complete its required restoration obligations under this Section 11.1, raze the damaged area, rough grade the affected land and restore the cleared area to either a hard surface condition or a landscaped condition until such time (if at all) a replacement improvement is constructed as otherwise permitted by this Lease.

11.1.2   In the event that:

(a)     Landlord does not commence the repair and restoration work to the Premises, the Common Areas, or other buildings in the Shopping Center as required pursuant to this Section 11.1 within ninety (90) days after the date of such destruction (which ninety-day period shall be extended by an additional thirty [30] days if Tenant notifies Landlord within thirty [30] days of such casualty that Tenant desires Landlord to make changes to the Premises in connection with Landlord's restoration work [which notice shall contain the particulars of such changes], in which event Tenant shall proceed with due diligence and good faith in submitting its plans setting forth such changes and cooperating with Landlord in order to obtain any required approvals of such changes), or thereafter fails to diligently pursue the completion of such repair and restoration work (subject to such period as may be reasonably necessary for the adjustment of insurance proceeds, not to exceed thirty (30) days in the aggregate); or

(b)     the required repairs and restorations to the Premises, the Common Areas, or other buildings in the Shopping Center are not Substantially Completed by Landlord in accordance with the provisions of this Subsection 11.1.2 within one (1) year after the date of destruction (which period may be extended by up to ninety (90) days by reason of *Force Majeure*, provided that Landlord gives Tenant notice of its claim of *Force Majeure* within five (5) days after the occurrence of the event of *Force Majeure*), then, in either of such events, Tenant shall have the right, at its sole discretion and option, to:

(i)    after giving thirty (30) days' prior notice to Landlord (and Landlord's continued failure to commence and diligently pursue such repairs and restoration work to completion), perform or complete, as the case may be, said work (or any portion thereof) as same relates to the Premises and Common Areas on Landlord's behalf and at the sole cost of Landlord, which cost Landlord shall pay to Tenant during the course of such repairs within ten (10) days after Tenant's delivery to Landlord of an invoice therefor and, in default of any such payment, Tenant shall have the right to offset the amount thereof, together with interest at the Lease Interest Rate, against the Rent next accruing hereunder (it being agreed, without limiting the foregoing provisions of this Subsection 11.1.2, that at Tenant's election all insurance proceeds paid or payable to Landlord or Landlord's Mortgagee pursuant to Subsection 10.3 hereof shall be paid (or, as applicable, in turn delivered) directly to Tenant, to be applied to such work by Tenant as same is being performed); or

(ii)    seek to obtain specific performance of Landlord's repair and restoration obligations pursuant to the laws of the state in which the Shopping Center is located; or

(iii)    terminate this Lease by thirty (30) days' notice to Landlord.

In addition to the foregoing, if, in the opinion of an independent licensed architect designated by Tenant (and reasonably acceptable to Landlord), the required repairs and restorations to the Premises, the Common Areas or other buildings in the Shopping Center cannot be completed by Landlord in accordance with the provisions of this Section 11.1 within one (1) year after the date of destruction, Tenant shall have the right, at its sole discretion and option, to terminate this Lease by giving Landlord at least thirty (30) days' notice thereof. For the purpose of triggering Tenant's remedies under this Subsection 11.1.2, the term "repair and restoration work" and words of similar import shall also mean the work (i.e., razing, rough grading, etc.) that Landlord is obligated to perform pursuant to Subsection 11.1.1(d) above if Landlord elects not to rebuild and restore those buildings within the Shopping Center that Landlord is not otherwise obligated to rebuild and restore pursuant to this Lease.

11.1.3    If the Premises are substantially destroyed by fire or other casualty during the last three (3) years of the Term to the extent of more than one-third (1/3) of the Floor Area thereof, Landlord or Tenant shall each have the right to terminate this Lease as of the date of such damage or destruction by giving notice within thirty (30) days following such damage or destruction, but Tenant may negate any termination by Landlord by agreeing to extend the Term for an additional five (5) year period by exercising an option pursuant to Subsection 2.2.2 hereof, if available, within ten (10) days after receipt of the termination notice from Landlord.

Section 11.2    Eminent Domain.

11.2.1    As used in this Section 11.2, *"Taking"* or *"Taken"* shall mean a taking for any public or quasi-public use by any lawful power or authority by exercise of the right of condemnation or eminent domain or by agreement between Landlord and those having the authority to exercise such right.

11.2.2    If all of the Premises shall be Taken, this Lease shall terminate as of the date of vesting of title or transfer of possession, whichever is earlier, without further liability on the part of either Landlord or Tenant, except for an adjustment between the parties for the Rent payable by Tenant hereunder.

11.2.3    In the event that:

(a)    any portion of the Premises shall be Taken so that it is commercially unreasonable or unfeasible for Tenant, in its reasonable judgment, to conduct its normal business in the Premises;

(b)    as a consequence of any Taking: (i) portions of the Shopping Center shall be divided or separated in any manner that it materially interferes with parking, visibility, or access to the Premises from other portions of the Shopping Center, or (ii) the Shopping Center no longer has at least two (2) entrances from 2nd Street and at least two (2) entrances from Bryant Avenue as shown on Exhibit B, and as a result, it is not commercially

reasonable or feasible for Tenant, in its reasonable judgment, to conduct its normal business in the Premises;

(c)     there occurs, in Tenant's reasonable judgement, a denial of adequate access to the Shopping Center at the grade of any street adjoining the Shopping Center or to any easement granted under this Lease, whether or not a Taking shall have occurred;

(d)     any portion of the Shopping Center shall be Taken which materially interferes with parking, visibility or access to the Premises, and as a result of such taking it is commercially unreasonable or unfeasible for Tenant, in its reasonable judgment, to conduct its normal business in the Premises;

(e)     more than twenty-five (25%) percent of the total Floor Area of all of the buildings in the Shopping Center (other than the Premises) are Taken; or

(f)     any one (1) or more of the parking spaces located within Tenant's Critical Area are Taken, or if so many of the parking spaces in the Shopping Center are Taken such that there are fewer than (i) four and five tenths (4.5) parking spaces for every one thousand (1,000) square feet of Floor Area in the Shopping Center, or (ii) the number of parking spaces required by applicable Legal Requirements ;

then, in any of such events, Tenant shall have the right to terminate this Lease by giving at least sixty (60) days' prior notice to Landlord within sixty (60) days of any such event, in which event this Lease shall terminate without any further liability on the part of either Landlord or Tenant, except for accrued, undischarged obligations as of the date of the Taking, an adjustment between the parties for the Rent payable by Tenant hereunder and for payment to Tenant for its share of the award for the taking pursuant to Subsection 11.2.5 below.  However, Tenant shall not have the right to terminate this Lease under Subsections 11.2.3(b), (c) or (d) above if (y) any portion of the Common Areas not within either Tenant's Critical Area or the **"Additional No Taking Area"** as designated on Exhibit B are Taken, or (z) a curb cut within any portion of Tenant's Critical Area is Taken in connection with a widening of either 2nd Street or Bryant Avenue provided that (aa) a new curb cut is constructed which, together with the remaining portion of 2nd Street or Bryant Avenue, as applicable, if any, provides for access into the main parking field and, with regard to 2nd Street, the truck service drive in approximately the same location as the curb cut shown on Exhibit B, (bb) such curb cut and the remaining portions of 2nd Street or Bryant Avenue, as applicable, if any, provides the same quality of access that existed immediately prior to such Taking (such as by way of example only, if such entrance/exit was signalized, then the new entrance/exit must also be signalized; and if such entrance/exit provided for entrances and exits in all directions, then so must the new entrance/exit), and (cc) Tenant has reasonable continuous access to and from 2nd Street and Bryant Avenue, as applicable.  Upon any partial Taking of the Premises, the Rent shall be equitably reduced or totally abated as is fair and reasonable under the circumstances.

11.2.4    If this Lease is not terminated pursuant to this Section 11.2, Landlord, at its sole cost and expense, within a reasonable period of time after such Taking, shall repair and restore the area not so Taken to tenantable condition, similar in physical appearance to the condition of the area immediately prior to the Taking, pursuant to plans and specifications approved by Tenant (which repair and restoration to the Premises shall include all Tenant's Work and all other leasehold improvements performed by Tenant; provided, however, that Landlord shall not be obligated to repair or restore Tenant's Property).  During the period of such repairs and restoration, all Rent shall abate to the extent that the Premises may not, in Tenant's reasonable judgment, be used by Tenant for the normal conduct of its business.  Such abatement shall terminate in accordance with the terms of Section 11.3 below.

11.2.5    In connection with any Taking or partial Taking of the Premises, Tenant shall be entitled to claim, to the extent permitted by applicable law, an award for loss of business, leasehold improvements (not paid for by Landlord), fixtures and equipment and removal and reinstallation costs; provided, however, that no award shall be payable to Tenant which reduces the award payable to Landlord for its fee interest in the Premises.

11.2.6    Any dispute between the parties with respect to this Section 11.2 shall be resolved by arbitration in accordance with the provisions of Section 16.3 below.

Section 11.3    Abatement of Rent Charges.  Notwithstanding any other provisions of this Lease, if the Fixed Rent and Additional Rent payable by Tenant hereunder shall be abated

pursuant to Sections 11.1 or 11.2 above, such abatement shall terminate upon the first to occur of: (a) the date on which Tenant shall reopen the Premises to the general public for business; or (b) the expiration of the period which is sixty (60) days after Landlord shall have completed such repairs and restoration work as Landlord is obligated to perform hereunder and the interference with the operation of business in the Premises has ceased.

## ARTICLE 12
### COVENANTS, REPRESENTATIONS AND WARRANTIES

Section 12.1   Quiet Enjoyment.  Tenant shall peaceably and quietly have, hold, occupy and enjoy the Premises for the Term, without hindrance from Landlord or any party claiming by, through, or under Landlord.

Section 12.2   Authority.  Tenant and Landlord each warrant and represent that the person(s) signing this Lease on their behalf has authority to enter into this Lease and to bind Tenant and Landlord, respectively, to the terms, covenants and conditions contained herein. The submission of this Lease to each party hereto shall be for examination and negotiation purposes only, and does not and shall not constitute a reservation of or an obligation of Tenant to lease, or otherwise create any interest of Tenant in, the Premises or any other premises situated in the Shopping Center unless and until the Lease is fully executed and delivered by Tenant and Landlord.

Section 12.3   Landlord's Covenants, Warranties and Representations.  To induce Tenant to execute this Lease, and in consideration thereof, Landlord covenants, warrants and represents to Tenant as follows:

(a)   As of the Effective Date, Landlord has, and as of the Delivery Date Landlord shall have, good and marketable fee simple title to Shopping Center, free and clear of all easements, restrictions, liens, encumbrances, leases and the like, except for the encumbrances described on Exhibit E hereto, the leases identified in Exhibit K-2 hereto, none of which leases is for the Premises,  and except for customary underground utility easements within the Common Areas;

(b)   In the event the legal description of the Shopping Center described in Exhibit A hereto indicates that the Shopping Center is composed of more than one parcel or lot, Landlord represents that there exist no strips or gores between such parcels or lots which are not owned or leased by Landlord;

(c)   No third party consents or approvals are required in order for Landlord to enter into this Lease, or for the performance of Landlord's Work and Tenant's Work (excluding, as of the Effective Date, governmental permits and approvals);

(d)   Tenant's use of the Premises for sale of "Permitted Items" (defined in Subsection 1.1.27 above) will not violate any exclusive provision or prohibited use restriction granted to any other tenant or occupant in the Shopping Center;

(e)   The Shopping Center, on the Delivery Date, shall have, access to 2nd Street and Bryant Avenue as shown on Exhibit B for the purpose of vehicular traffic;

(f)   This Lease does not violate the provisions of any instrument heretofore executed and/or binding on Landlord, or affecting or encumbering the Shopping Center, or the Premises, and no rights granted by Landlord to Tenant under the terms of this Lease conflict with any rights granted by Landlord to any other tenant or occupant in the Shopping Center;

(g)   To the best of Landlord's knowledge and subject to the issuance of a building permit for Landlord's Work and, to the extent required, Tenant's Work, there shall be no restrictions or other legal impediments imposed by any public or private instrument which would prevent: (i) the use of the Premises for the Permitted Use; (ii) the use of the parking facilities, access roads, and other Common Areas in the manner contemplated by this Lease; or (iii) the performance of Tenant's Work;

(h)   As of the Effective Date, there are no sign ordinances, restrictive covenants, uniform sign plans or other signage restrictions which would prevent the Premises

from having the signage (including, without limitation, the square foot area and size of letters) as depicted on Exhibits F and F-1 hereof;

(i)     Attached hereto as Exhibit K-2 is a complete list of all fully executed and delivered leases in effect on the Effective Date with respect to the Shopping Center (the *"Existing Leases"*);

(j)     Landlord shall promptly forward to Tenant any notice or other communication received by Landlord from any owner of property adjoining or adjacent to the Shopping Center or from any municipal or other governmental authority, in connection with any hearing or other administrative proceeding relating to any proposed zoning, building code, signage, or related variance affecting the Shopping Center or any adjoining or adjacent property, which, if granted, could adversely affect Tenant's use or occupancy of the Premises, the conduct of Tenant's business therein, or Tenant's rights and benefits under this Lease. Landlord, at its sole cost and expense, shall appear in such proceeding and shall contest such proposed variance. If Landlord fails so to appear and contest such proposed variance after receiving five (5) days' notice from Tenant (or such shorter notice as may be practicable under the circumstances), then Tenant shall be entitled (but shall not be obligated to), in its own name and/or in the name of Landlord, appear in such proceeding, in which event Landlord shall fully cooperate with Tenant, provide such information, and execute any documents or other instruments as Tenant may reasonably request in connection with any such proceeding; and

(k)     Intentionally omitted.

Section  12.4    Environmental Matters.

12.4.1    Definitions.

(a)     As used herein, the term *"Environmental Laws"* shall mean any and all Legal Requirements concerning the protection of the environment, human health or safety.

(b)     As used herein, the term *"Hazardous Substances"* shall mean each and every element, compound, material, mixture, substance, waste, hazardous substance, hazardous waste, hazardous material, toxic substance, pollutant or contaminant either as those terms are defined in any of the Environmental Laws or the presence of which may cause liability at common law.

(c)     As used herein, the term *"Environmental Notice"* shall mean a summons, citation, directive, order, claim, notice, litigation, investigation, judgment, legal pleading, letter or other communication, written or oral, actual or threatened, from the United States Environmental Protection Agency or other federal, state or local governmental agency or authority, or any other private individual or entity concerning (i) any Hazardous Substances at, on, in, under or emanating from the Premises, the Shopping Center or any contiguous property; (ii) any violation or potential violation of Environmental Laws at the Premises, the Shopping Center or any contiguous property; or (iii) any underground storage tanks on the Premises or the Shopping Center.

(d)     As used herein, the term *"Releasing"* or *"Release"* shall mean releasing, spilling, leaking, discharging, disposing or dumping or otherwise introducing any substance into the environment or into any building or other improvements in violation of Environmental Laws.

(e)     As used herein, the term *"Compliance Costs"* shall mean any and all costs incurred by a party in complying with applicable Environmental Laws, including, without limitation, consultant's and engineer's fees; laboratory costs; contractor's and subcontractor's fees; application and filing fees; costs of investigation, monitoring or cleanup of soil or other substrate, surface water, groundwater, or buildings or other improvements; equipment costs; disposal fees; costs of operation and maintenance of equipment; legal fees; other governmental fees or costs; interest at the Lease Interest Rate from the date of expenditure until paid in full; and other similar or related costs.

(f)     As used herein, the term *"Tenant Related Parties"* shall mean Tenant's agents, servants, employees, contractors or licensees.

**12.4.2    Compliance with Environmental Laws.**  Tenant shall comply with all applicable requirements of Environmental Laws governing its use of, and operations at, the Shopping Center and the Premises.  Landlord shall comply with all applicable requirements of Environmental Laws relating to the Shopping Center and the Premises (including, without limitation, any Environmental Law compliance attributable to any Hazardous Substances disclosed in the "Environmental Reports", as defined below), except to the extent such requirements arise from Tenant's operations thereon.

**12.4.3    Responsibility for Releases of Hazardous Substances.**  Notwithstanding any other provision of this Lease, as between Landlord and Tenant, Tenant shall only be liable for any Release of Hazardous Substances at, on, in, under or emanating from the Premises or Shopping Center which were caused by Tenant or Tenant Related Parties (hereinafter **"Tenant Releases"**), including, without limitation, any Compliance Costs required to address Tenant Releases.  As between Landlord and Tenant, Landlord shall be liable for any Hazardous Substances at, on, in, under or emanating from the Premises or Shopping Center, including, without limitation, any Compliance Costs attributable to such Hazardous Substances and any Compliance Costs attributable to any Hazardous Substances disclosed in the Environmental Reports, unless the Hazardous Substances are caused by Tenant Releases.  Except in the event of an emergency, any work performed by Landlord relating to Hazardous Substances shall be performed by Landlord at any time other than during the months of August, November and December, and shall be undertaken in such a manner so as to (i) not adversely affect ingress to or egress from the Shopping Center, (ii) have no adverse effect on the visibility of the Premises or any signs which contain Tenant's name, and (iii) not otherwise materially interfere with the normal conduct of any business operations in the Premises.

**12.4.4    Standards.**  Except as expressly provided herein, the parties agree that any investigation or remediation of Hazardous Substances, or cure of a violation of Environmental Laws, required to be conducted at the Premises or Shopping Center shall be no more stringent than necessary to meet the minimum standards of Environmental Laws applicable to properties used in the manner the Shopping Center is being used.

**12.4.5    Landlord's Representations and Warranties.**  Landlord represents and warrants that: (i) Landlord has received no Environmental Notices concerning the Shopping Center, the Premises or any contiguous properties; (ii) Landlord has no knowledge of, and has received no notice of, any violation, or potential or alleged violation, of any Legal Requirement, including, without limitation, Environmental Laws, affecting the Shopping Center, the Premises or any contiguous properties, regardless of whether same has been cured; and (iii) to the best of Landlord's knowledge (except as may be disclosed in the Environmental Reports): (A) no Hazardous Substances are located at, on, in, under or emanating from the Shopping Center, the Premises or any contiguous properties; and (B) no underground storage tank exists at the Shopping Center or the Premises.  The term **"Environmental Reports"** shall mean the following reports, true and complete copies of which have been delivered by Landlord to Tenant: (a) Preliminary Hazardous Waste and Petroleum Hydrocarbon Site Assessment, prepared by ENSR Consulting and Engineering, dated November 29, 1988; (b) Phase I Environmental Site Assessment, prepared by Jones and Neuse, Inc., dated April 18, 1991; (c) Phase II Environmental Site Assessment, prepared by Jones and Neuse, Inc., dated June 28, 1991; and (d) Limited Scope Asbestos Survey, prepared by Air and Earth, Inc., dated May 10, 2002.

**12.4.6    Documents.**  Each party shall use reasonable efforts to notify the other party of the notifying party's receipt of an Environmental Notice, and shall notify the other party in a timely manner from time to time as to the commencement and status of any cleanup or other remediation of a Release.

**12.4.7    Indemnity.**  Each party to this Lease shall indemnify, defend and hold the other party, and its agents, servants, shareholders, directors, officers, trust managers and employees harmless from any and all claims, losses, expenses, costs, lawsuits, actions, administrative proceedings, damage, orders, judgments, penalties and liabilities of any nature whatsoever, including, without limitation, reasonable attorneys' fees (incurred to enforce this indemnity or for any other purpose) and Compliance Costs, arising from (i) the indemnifying party's breach of any of its representations, warranties, covenants or other obligations under this Section 12.4; (ii) Hazardous Substances for which the indemnifying party is liable under this Section 12.4; or (iii) violations of Environmental Laws for which the indemnifying party is liable under this Section 12.4.  Notwithstanding the foregoing provisions of this Subsection 12.4.7, Landlord's agreement to indemnify, defend and hold Tenant harmless shall not apply with respect to Hazardous Substances which are introduced to the Shopping Center or the Premises

after the Delivery Date by any party other than Landlord or an Affiliate of Landlord or any contractor, employee, agent or representative of Landlord or an Affiliate of Landlord, subject to the following conditions: (a) Landlord shall otherwise comply with its duties and obligations under this Section 12.4, (b) upon request by Tenant, Landlord shall at its expense commence such actions or proceedings on Tenant's behalf against the party who shall have introduced (or be legally responsible for the introduction of) such Hazardous Substances to the Shopping Center or the Premises and thereafter diligently pursue same, and (c) should the introduction of such Hazardous Substances as aforesaid materially interfere with the normal conduct of Tenant's business in the Premises, its use and enjoyment of the Common Areas or its other rights, benefits and entitlements under this Lease, then Tenant shall be entitled to an equitable abatement of Rent, and if such material interference continues for a period of one hundred twenty (120) days after discovery of such Hazardous Substances and Landlord is unable to remediate (or cause the remediation of) such Hazardous Substances as required by Legal Requirements within such period of one hundred twenty (120) days, then Tenant shall be entitled to terminate this Lease at any time prior to the completion of such remediation upon thirty (30) days prior notice to Landlord.  However, if such interference shall continue for three hundred sixty-five (365) days after the date of discovery of same and Tenant has not already notified Landlord that Tenant has elected to terminate this Lease, then, provided that Landlord has complied with its obligations under this Section 12.4,  Landlord shall have the right to send a notice to Tenant which advises Tenant that Tenant must elect, by notice to Landlord within thirty (30) days after Tenant's receipt of Landlord's notice, to either terminate this Lease or resume paying full Rent.  If Tenant elects to resume paying full Rent, then Landlord shall continue to perform its obligations under this Section 12.4, and, provided that Landlord is performing such obligations, Tenant's right to terminate this Lease as a result of the aforesaid introduction of Hazardous Substances shall be null and void.

   12.4.8   Survival.  The obligations of the parties under this Section 12.4 shall survive the renewal, expiration, breach or earlier termination of this Lease.

   12.4.9   Conflict.  In the event of any conflict between the provisions of this Section 12.4 and any other provision of this Lease, the provisions of this Section 12.4 shall control.

   Section  12.5   Intentionally Omitted.

   Section  12.6   Intentionally Omitted.


ARTICLE  13
USES AND RESTRICTIONS

   Section  13.1   Permitted and Prohibited Uses.

   13.1.1   Tenant's Permitted Use.  The Premises may be used and occupied for the Permitted Use (defined in Subsection 1.1.27 above).  Tenant shall not use the Premises for any of the "Prohibited Uses" (defined in Exhibit M hereto annexed) or the "Existing Exclusives" (hereinafter defined in Subsection 13.3.1), to the extent then applicable.

   13.1.2   Prohibited Uses.  Landlord shall construct, lease, operate, maintain and manage the Shopping Center as a first-class shopping center comparable to other first-class shopping centers in the state in which the Shopping Center is located.  Subject only to the rights of tenants and current or future assignees or sublessees of such tenants under Existing Leases, Landlord shall not lease, rent or occupy or permit any portion of the Shopping Center or any land (the *"Related Land"*) contiguous or adjacent to the Shopping Center (including, without limitation, any land that would be contiguous or adjacent to the Shopping Center but for any intervening road, street, alley or highway) now or hereafter owned or leased by Landlord or its Affiliate(s), to be occupied (except to the extent otherwise permitted under any lease for space in the Shopping Center or the Related Land existing as of the Effective Date) for any of the "Prohibited Uses" (defined in Exhibit M hereto annexed), provided, however, that the foregoing provisions of this Subsection 13.1.2 shall not apply to any business existing on any Related Land (a) owned or leased by a person or entity which: (i) was previously, but is no longer, the Landlord hereunder, or (ii) at the time it became Landlord hereunder, already owned or leased such Related Land (excluding, however, the Landlord originally named herein and its Affiliates); or (b) at the time such Related Land was acquired by Landlord or its Affiliates where the tenant(s) occupying such Related Land was not prohibited from engaging in one (1) or more of the Prohibited Uses.  Existing tenants of the Shopping Center and any Related Land (and

current or future assignees or sublessees of such tenants) shall nevertheless be subject to the restrictions contained in this Subsection 13.1.2 in the event that: (i) the lease between Landlord and any such tenant does not permit (including, without limitation, any requirements of applicable law) any assignment or subletting or a change in the use of the applicable premises to permit the sale, rental or distribution of any item included within the Prohibited Uses, or requires Landlord's consent to any assignment or subletting or to a change in the use of the applicable premises to permit the sale, rental or distribution of any item included within the Prohibited Uses where the standard of consent is Landlord's sole discretion (or words to that effect); (ii) any "Special Existing Lease" (as defined below) does not permit an expansion of the applicable premises and Landlord permits an expansion of the applicable premises by the current tenant (i.e., the tenant as of the Effective Date) under the Special Existing Lease; provided, however, that, for as long as such current tenant remains the occupant of the applicable premises, the Prohibited Uses shall be limited only to the expanded portion of the applicable premises; or (iii) any Special Existing Lease does not permit an expansion of the applicable premises and Landlord permits an expansion of the applicable premises by any future assignee of the tenant's interest in and to the Special Existing Lease or sublessee of the applicable premises.  The term *"Special Existing Lease"* shall mean any of the following Existing Leases: (i) lease between Weingarten/Oklahoma, Inc. and Academy Sport Co., d/b/a Academy, dated March 14, 1994; (ii) lease between Bryant Square Shopping Center and 3 Beall Brother 3, Inc., d/b/a Stage, dated July 20, 1977; (iii) lease between Landlord and Steven B. Herrin, d/b/a Furniture Gallery, dated May 13, 1998; and (iv) lease between Landlord and Stein Mart Inc., d/b/a Stein Mart, dated April 29, 1998.

Section 13.2    Tenant's Exclusive in Center.  To induce Tenant to execute this Lease, and subject to all of the terms and provisions of this Section 13.2, Landlord covenants and agrees as follows.

13.2.1    (a)    Subject only to the rights of tenants and current or future assignees or sublessees of such tenants under Existing Leases, Landlord has not and shall not lease, rent or occupy or permit any other premises in the Shopping Center or on any Related Land (defined in Subsection 13.1.2 above) to be occupied, whether by a tenant, sublessee, assignee, licensee or other occupant or itself, for the sale, rental or distribution, either singly or in any combination, of items contained in any of the following respective categories of merchandise: (i) linens and domestics; (ii) bathroom items; (iii) housewares; (iv) frames and wall art; (v) window treatments; and/or (vi) closet, shelving and storage items (which items, either singly or in any combination, are hereinafter referred to as the *"Exclusive Items"*).  Notwithstanding the foregoing, any tenant or subtenant in the Shopping Center or the Related Land shall have the right to utilize its respective premises for the sale, rental and/or distribution of Exclusive Items within an aggregate area (which shall include an allocable portion of the aisle space adjacent to such sales, rental and/or distribution area) not to exceed, as to stores of less than five thousand (5,000) square feet of Floor Area, ten percent (10%) of the Floor Area of such tenant's or subtenant's premises and, as to stores of five thousand (5,000) square feet or more, the lesser of (x) five percent (5%) of the Floor Area of such tenant's or subtenant's premises, or (y) one thousand five hundred (1,500) square feet of Floor Area within such tenant's or subtenant's premises. [For example only, a tenant occupying premises containing a total of five thousand (5,000) square feet of Floor Area could sell Exclusive Items (either singly or in any combination) so long as the aggregate area within its entire demised premises in which any and all Exclusive Items are sold shall not exceed two hundred fifty (250) square feet.]

(b)    Intentionally omitted.

(c)    The foregoing restrictions contained in this Subsection 13.2.1 shall remain in effect only for the Term of this Lease; provided, however, Landlord shall have the right to declare such restrictions null and void by notice to Tenant  if (i) Tenant has ceased being open and operating in at least eleven thousand (11,000) square feet of Floor Area within the Premises for more than three hundred sixty-five (365) consecutive days (not including temporary closures, such as, by way of example only, closures due to fire or other casualty, condemnation, remodeling, assignment or subletting, or Force Majeure) and Tenant fails to notify Landlord, within ten (10) days after Tenant's receipt of Landlord's notice to Tenant seeking to declare these restrictions null and void, of Tenant's intention to open at least eleven thousand (11,000) square feet of Floor Area within the Premises for business operations within sixty (60) days after Tenant's notice to Landlord as aforesaid and Tenant, in fact, opens within such sixty-day period, (ii) there has occurred an Event of Default pursuant to which Tenant has been dispossessed of the Premises in accordance with this Lease and applicable Legal Requirements, or (iii) Tenant assigns this Lease to an assignee who (aa) does not sell, rent or distribute any one or more of the Exclusive Items, (bb) is not an Affiliate of Tenant, and (cc) is

"Major Assignee" (as defined in Section 15.2 below) or whose obligations are guaranteed by a "Major Guarantor" (as defined in Section 15.2 below) whereby the Original Tenant is relieved of liability under this Lease as contemplated by Section 15.2 below.

13.2.2    The restrictions set forth in Subsection 13.2.1 above shall not apply to a full-line national or regional department store commonly located in first-class shopping centers in the state in which the Shopping Center is located and occupying at least 80,000 square feet of Floor Area within the Shopping Center, such as, by way of example, Wal-Mart, Macy's, or Target, as such department stores are currently operated (as of the Effective Date).  In addition to the foregoing, the following retail operations shall be permitted and shall not be deemed a violation of the restrictions set forth in Subsection 13.2.1 above: (i) off-priced apparel stores having a Floor Area of at least 30,000 square feet which are part of a national or regional chain of more than twenty-five (25) stores and are merchandised and operated similar to a "T.J. Maxx" (as distinguished from "T.J. Maxx & More", which shall not be permitted), "Ross Stores", "Stein Mart", "Goody's" or "Old Navy" as of the Effective Date; provided, however, in no event shall more than twenty percent (20%) of the aggregate Floor Area of each such store be used for the sale, rental or distribution of the Exclusive Items (which Floor Area limitation shall include an allocable portion of the aisle space adjacent to such sales, rental and/or distribution area); (ii) craft stores merchandised and operated similar to a "Michaels" or "Hobby Lobby" as of the Effective Date; provided, however, the Floor Area of each such store shall be in excess of 22,000 square feet, and in no event shall the aggregate Floor Area of each store devoted to the sale, rental and/or distribution of the Exclusive Items (which shall include an allocable portion of the aisle space adjacent to such sales, rental and/or distribution area) exceed 3,000 square feet, except that the Floor Area devoted to exclusively to the sale of custom frames (together with any counter space devoted exclusively to the sale of custom frames) shall not be included in such 3,000 square foot Floor Area limitation provided that the sale of custom frames is an incidental part of the business being conducted by such craft store; (iii) one (1) gallery store selling fine and semi-fine art (which shall, in all events, be prohibited from selling mass-produced prints and posters) provided that the Floor Area of such store does not exceed 2,500 square feet; (iv) one (1) mini-blind store merchandised and operated similar to a "3-Day Blinds" as of the Effective Date (which shall, in all events, be prohibited from selling draperies and fabric valences in an area larger than five percent (5%) of its Floor Area) provided that the Floor Area of such store does not exceed 2,500 square feet; (v) one (1) custom frame shop (which shall, in all events, be prohibited from having more than ten percent [10%] of its gross sales be in pre-made frames) provided that the Floor Area of such store does not exceed 2,500 square feet; (vi) one (1) locally owned interior design studio where the retail sale of merchandise is an incidental use; and (vii) a bathroom fixture store selling such items as toilets, bathtubs and washbasins provided that the Floor Area of such store does not exceed 2,500 square feet. Existing tenants of the Shopping Center and any Related Land (and current or future assignees or sublessees of such tenants) shall nevertheless be subject to the restrictions contained in this Subsection 13.2 in the event that: (i) the lease between Landlord and any such tenant does not permit (including, without limitation, any requirements of applicable law) any assignment or subletting or a change in the use of applicable premises to permit the sale, rental or distribution of the Exclusive Items, or requires Landlord's consent to any assignment or subletting or to a change in the use of the applicable premises to permit the sale, rental or distribution of the Exclusive Items where the standard of consent is Landlord's sole discretion (or words to that effect); (ii) any Special Existing Lease does not permit an expansion of the applicable premises and Landlord permits an expansion of the applicable premises by the current tenant (i.e., the tenant as of the Effective Date) under the Special Existing Lease; provided, however, that, for as long as such current tenant remains the occupant of the applicable premises, the restrictions contained in this Section 13.2 shall only restrict such current tenant from using its premises (i.e., the original premises and the expanded premises) primarily for the sale, rental or distribution of any of the Exclusive Items; or (iii) any Special Existing Lease does not permit an expansion of the applicable premises and Landlord permits an expansion of the applicable premises by any future assignee of the tenant's interest in and to the Special Existing Lease or sublessee of the applicable premises.

13.2.3    The exclusive rights granted to Tenant in this Section 13.2 shall inure to the benefit of any assignee of Tenant's interest in this Lease and to any sublessee of a Floor Area of at least eleven thousand (11,000) square feet of the Premises.

13.2.4    (a)    Upon breach of the aforesaid covenant and agreement by Landlord (which breach shall not include a situation in which Landlord has included in the lease between Landlord and any tenant in the Shopping Center or in the Related Land a provision which effectuates the exclusive rights granted to Tenant in this Section 13.2 and, despite such inclusion, such tenant has violated said exclusive right unless Landlord fails to comply with any

of the provisions of subparagraph (b) below [such tenant being referred to herein as a *"Rogue Tenant"*]), the Rent payable hereunder shall be reduced by fifty percent (50%) for so long as such violation shall continue, and Tenant shall have all remedies given to it at law and in equity, including, without limitation, the right to obtain injunctive relief, and/or to terminate this Lease, and/or to commence and prosecute an action against Landlord or any other violator for damages.

(b)    If any person or entity other than Landlord shall violate any of the exclusive provisions herein set forth, or shall indicate in writing to Landlord that it intends to violate any of said provisions, Landlord shall promptly commence appropriate legal proceedings, and vigorously prosecute the same, to enjoin and prohibit any such violation.  If Landlord fails to promptly commence such proceedings, or shall fail thereafter to vigorously prosecute the same, then Tenant shall have the right (a) to conduct and prosecute such legal proceedings (including, without limitation, an action for injunctive relief) in its own name, at Landlord's expense, or (b) in the event the right set forth in (a) above is not permitted to be exercised under applicable Legal Requirements, to conduct and prosecute such legal proceedings in the name of Landlord, at Landlord's expense, and Landlord shall cooperate with Tenant with respect to such prosecution (including, without limitation, by executing any documentation or authorization reasonably required by Tenant in connection with such prosecution and by appearing at any hearing or trial with respect to such prosecution). Landlord's obligations under this Subsection 13.2.4(b) to promptly commence appropriate legal proceedings and vigorously prosecute same against a Rogue Tenant shall apply from and after the date that Landlord has knowledge of such Rogue Tenant's violation (or threatened violation) of the provisions of this Section 13.2 or the corresponding provisions of such Rogue Tenant's lease, as the case may be.

Section  13.3    Exclusives Which Tenant Must Honor.

13.3.1    Tenant shall honor certain exclusives granted by Landlord to certain other tenants in the Shopping Center pursuant to the terms of leases which have been executed prior to the Effective Date (hereinafter, *"Existing Exclusives"*) [a true and complete listing and description of such Existing Exclusives being attached hereto as Exhibit K-1], and shall not sublease, occupy or use all or any portion of the Premises, or permit all or any portion of the Premises to be occupied or used in violation of any such Existing Exclusive (except as may be specifically set forth on Exhibit K-1).  Landlord represents and warrants that no Existing Exclusive(s) exist other than those listed on Exhibit K-1 hereto and that Exhibit K-1 is true accurate and complete, and covenants to indemnify, defend and hold Tenant harmless from and against all loss, cost, liability or expense (including, without limitation, reasonable legal fees) incurred by Tenant by reason of the enforcement by any person or entity of such unlisted Existing Exclusive.  Notwithstanding the foregoing, Tenant shall be entitled to enter into a separate agreement with any tenant or other occupant for whose benefit the Existing Exclusive is granted which nullifies or modifies the corresponding Existing Exclusive with regard to the Premises; provided, however, that as a condition of such entitlement, Landlord must either (i) be expressly named as a third party beneficiary under any such agreement or (ii) receive a full and complete indemnity from Tenant for any and all causes of action, expenses, losses, damages, costs (including, without limitation, costs of investigation and defense) resulting from the enforcement by any person or entity of any such Existing Exclusive. Tenant shall have the sole discretion to determine which of the above items, either (i) or (ii), it delivers to Landlord in order to satisfy this requirement.

13.3.2    Except as expressly set forth in this Section 13.3, Tenant shall not be obligated to honor any exclusive granted by Landlord to any tenant in the Shopping Center.

ARTICLE  14
CONDUCT OF BUSINESS OPERATIONS

Covenant to Open for One Day:  Subject to the other provisions of this Lease (including, without limitation, Articles 2 and 3 hereof) Tenant shall initially open its store for business to the public in substantially all of the Premises as a Bed Bath & Beyond store for at least one (1) day, not later than the one hundred eightieth (180th) day after the Rent Commencement Date (which date shall, as applicable, be extended by reason of (A) damage or destruction, eminent domain proceedings or actions, or *Force Majeure*, or (B) the acts or omissions of Landlord).  Other than as expressly set forth in the preceding sentence, Tenant shall have no obligation to open or operate any business in the Premises, and shall have the right, at any time, to cease to conduct any business operations in the Premises, and Tenant shall incur no liability to Landlord or its

Mortgagee by reason thereof (it being understood and agreed that all of Tenant's obligations under this Lease shall continue unless this Lease is terminated pursuant, *inter alia*, to the further provisions of this Article 14 or any other provision of this Lease [other than by reason of an Event of Default]).  In the event that Tenant does not open its store for business as and when required by the first (1st) sentence of this Article 14, or if Tenant, after so opening its store, does not operate or cause to be operated any retail business in at least 10,300 square feet of Floor Area in the Premises (other than prior to the Delivery Date or during Excused Periods) for more than three hundred sixty-five (365) consecutive days (not including temporary closures, such as, by way of example only, closures due to fire or other casualty, condemnation, remodeling [not to exceed thirty {30} days per remodel], assignment or subletting, or Force Majeure), Landlord shall have the option to terminate this Lease, which option shall be exercisable by giving notice thereof to Tenant by not later than the ninetieth (90th) day after the date on which Tenant is required by the first (1st) sentence of this Article 14 to open its store, or by not later than the ninetieth (90th) day after the date on which said 365-day period expires, as applicable, whereupon this Lease shall terminate upon the sixtieth (60th) day (the *"Recapture Date"*) after the date on which Tenant receives Landlord's termination notice, as if the Recapture Date was originally set forth herein as the expiration date of the Term.  Upon such termination, Landlord and Tenant shall each be released from any and all liabilities thereafter accruing hereunder, except as set forth in Sections 10.1.3 and 23.3 below.  All Rent payable by Tenant hereunder shall be apportioned as of the Recapture Date and Tenant shall promptly pay to Landlord any amounts so determined to be due and owing by Tenant to Landlord, and conversely Landlord shall promptly reimburse Tenant for any amounts prepaid by Tenant for periods subsequent to the Recapture Date.  Tenant's liability for Tenant's Pro Rata Share of Common Areas Charges and Taxes shall be pro rated to the Recapture Date.

ARTICLE 15
TENANT ASSIGNMENT AND SUBLETTING

Section 15.1    Assignment and Subletting.

15.1.1    Tenant shall have the right, from time to time, to assign Tenant's interest in this Lease and/or to sublet, concession or license all or any portion of the Premises subject to all of the terms and conditions of this Lease.

15.1.2    (a)

(i)    Except with respect to any transaction covered under Subsection 15.1.3 or Section 15.3 below, if Tenant proposes to assign this Lease or sublet, in a single transaction, all or substantially all of the Premises, then Tenant shall first give notice thereof (the *"Assignment/Subletting Notice"*) to Landlord, which notice shall specify the name and address of the proposed assignee or sublessee and the proposed use of the Premises to be made by such assignee or sublessee, together with a statement certified by Tenant of the amount of the then unamortized costs (amortized on a straight-line basis over the Initial Term) of any alterations performed by Tenant to the Premises.  Tenant shall also use reasonable efforts to obtain from such assignee or sublessee a list (by location) of any of its other stores, and, if publicly available, its financial statements.  If Tenant is able to obtain such additional information, then same shall also be included in the Assignment/Subletting Notice.  After Landlord's receipt of the Assignment/Subletting Notice, Landlord shall have the option either to (y) terminate this Lease, or (z) reasonably withhold its consent to the proposed assignment or subletting, which option shall be exercisable by giving notice to Tenant thereof within thirty (30) days after receipt of an Assignment/Subletting Notice from Tenant.  Anything contained in this Lease to the contrary notwithstanding, if the proposed assignee or sublessee is a national or regional tenant operating at least fifty (50) other stores and having a net worth of at least Fifty Million Dollars ($50,000,000) determined in accordance with generally accepted accounting principles (such assignee or sublessee is referred to herein as a *"Special Transferee"*), then Landlord shall only have the option to terminate this Lease and pay Tenant's unamortized costs, as provided in this Section 15.1.2(a), which option shall be exercisable by giving notice to Tenant thereof within thirty (30) days after receipt of the Assignment/Subletting Notice from Tenant, failing which Tenant shall have the free right to assign this Lease or sublet the Premises in accordance with the Assignment/Subletting Notice as provided in Subsection 15.1.2(a)(iii) below.

(ii)    If Landlord proceeds pursuant to clause (y) of Subsection 15.1.2(a)(i) above or exercises Landlord's option to terminate this Lease in connection with an Assignment/Subletting Notice involving a Special Transferee pursuant to Subsection 15.1.2(a)(i) above, then, within thirty (30) days after such notice is given (the *"Termination Notice"*), Landlord shall pay to Tenant all of Tenant's costs and expenses incurred in connection the preparation of plans and specifications for, and the then unamortized costs (amortized on a straight-line basis over the Initial Term) of, Tenant's Work and any alterations performed by Tenant to the Premises, and this Lease shall automatically terminate on the ninetieth (90th) day (the *"Termination Date"*) after the date on which Tenant receives Landlord's Termination Notice, with the same force and effect as if the Termination Date had been designated as the expiration date of this Lease.  Upon the Termination Date, Landlord and Tenant shall each be released from any and all liabilities thereafter accruing hereunder, except as set forth in Section 23.3 below.  All Rent payable by Tenant hereunder shall be apportioned as of the Termination Date and Tenant shall promptly pay to Landlord any amounts so determined to be due and owing by Tenant to Landlord, and conversely Landlord shall promptly reimburse Tenant for any amounts prepaid by Tenant for periods subsequent to the Termination Date.  Notwithstanding the foregoing, Tenant shall have the right to avoid Landlord's termination by giving notice to Landlord (the *"Rescission Notice"*), within ten (10) days after receiving the Termination Notice, of its rescission of the Assignment/Subletting Notice, whereupon Landlord's Termination Notice shall be rendered null and void, and Tenant shall not assign this Lease or sublet all or substantially all of the Premises as proposed in its Assignment/Subletting Notice.

(iii)    If (y) with respect to an Assignment/Subletting Notice not involving a Special Transferee, Landlord does not give the Termination Notice within the aforesaid 30-day period or does not notify Tenant that Landlord withholds Landlord's consent to the proposed assignment or subletting (which notice must be accompanied by the reasons, in reasonable detail, for holding such consent) within the aforesaid 30-day period, or (z) with respect to an Assignment/Subletting Notice involving a Special Transferee, Landlord does not give the Termination Notice within the aforesaid 30-day period, then Landlord shall conclusively be deemed to have waived its termination right and, with respect to an Assignment/Subletting Notice not involving a Special Transferee, waived its consent right with respect to such proposed assignment or subletting transaction, and Tenant may freely assign this Lease or sublet the Premises in accordance with its Assignment/Subletting Notice.

(b)    Except with respect to any transaction covered under Subsection 15.1.3 or Section 15.3 below, in the event Tenant proposes to sublease less than substantially all of the Premises, it shall first give notice thereof (the *"Partial Subletting Notice"*) to Landlord, which notice shall specify the name and address of the proposed sublessee, the proposed use of the Premises to be made by such sublessee and the number of square feet of Floor Area which is proposed to be subleased, and the approximate location within the Premises of the Floor Area proposed to be subleased.  Tenant shall also use reasonable efforts to obtain from such sublessee a list (by location) of any of its other stores, and, if Tenant is able to obtain such additional information, then same shall be included in Tenant's Partial Subletting Notice.  Thereafter, Landlord shall have the option to reasonably withhold its consent to the proposed subletting, which option shall be exercisable by giving notice to Tenant thereof within thirty (30) days after receipt of a Partial Subletting Notice from Tenant.  If Landlord does not notify Tenant that Landlord withholds Landlord's consent to the proposed subletting (which notice must be accompanied by the reasons, in reasonable detail, for holding such consent) within the aforesaid 30-day period, then Landlord shall conclusively be deemed to have waived its consent rights hereunder with respect to such proposed subletting transaction, and Tenant may sublet such portion of the Premises in accordance with its Partial Subletting Notice.

15.1.3    In addition to, and not in limitation of, Tenant's other rights set forth in this Section 15.1, but subject to the provisions of this Lease governing permitted uses, Tenant shall have the right from time to time, without the consent of Landlord and without triggering the termination right of Landlord set forth in Section 15.1.2(a) above, to assign Tenant's interest in this Lease and/or to sublet or license all or any portion of the Premises:  (a) to an Affiliate of Tenant; (b) to any entity which purchases all or substantially all of the assets of Tenant or any of its Affiliates provided that such transferee operates at least twenty (20) other stores under the same trade name as then being used at the Premises; (c) to any entity which purchases Tenant's interest in the majority of stores owned or operated by Tenant or its Affiliate(s) (but in no event less than ten [10] stores) in the "State(s) of Oklahoma, Arkansas, Missouri and Kansas"; (d) in conjunction with any merger, acquisition, consolidation or public offering of stock

or other interests involving Tenant or its Affiliate(s); and/or (e) as may be required by any Legal Requirement.  Notwithstanding any term or provision to the contrary contained herein, in no event may Tenant engage in a series of permitted transfers so as to isolate this Lease from Tenant's other Leases by "spinning off" this Lease in an attempt to deprive Landlord of Landlord's right under Section 15.1.2 above.  For example only and not by way of limitation, in no event may Tenant assign this Lease to an Affiliate, whose sole asset consists of this Lease and the rights granted herein, and then sell all of the stock of such Affiliate to a third party.  Any such series of transfers shall be subject to the other applicable provisions of this Section 15.1.  Further, Tenant shall have the right from time to time, without the consent of Landlord and without triggering the termination right of Landlord set forth in Section 15.1.2(a) above, to enter into concession or license agreements with respect to portions of the Premises.

Section 15.2   Liability of Tenant.  Unless otherwise agreed to in writing by Landlord, no assignment, subletting, licensing or concessioning by Tenant shall reduce, diminish, or otherwise affect the liability of Tenant hereunder; provided, however, that in the event of an assignment by the Tenant originally named herein or its Affiliate (collectively, the *"Original Tenant"*) of its interest in this Lease to a Major Assignee or to a tenant whose obligations under this Lease are guaranteed by a Major Guarantor who unconditionally guarantees in writing the obligations of Tenant under this Lease from and after the date of such assignment, or in the event of an assignment pursuant to Subsection 15.1.3(b) or (c) above, or in the event of an assignment to a Special Transferee pursuant to Subsection 15.1.2(a)(i) above where Landlord has not exercised its right thereunder to terminate this Lease, all liability of the Original Tenant under this Lease shall terminate as of the expiration of the Initial Term of the Lease, or, if the effective date of the transaction occurs during a Renewal Period, then at the expiration of such Renewal Period.  Nothing contained herein shall be construed to relieve Tenant of any accrued, undischarged obligations as of such termination date.  For purposes of Subsection 13.2.1(c) above and this Section 15.2, the term *"Major Assignee"* or *"Major Guarantor"*, as the case may be, shall mean a person or entity which has, as of the effective date of such assignment, a net worth of at least Fifty Million ($50,000,000) Dollars determined in accordance with generally accepted accounting principles.

Section 15.3   Collateral Assignment.  In addition to Tenant's other rights set forth in this Article 15, a collateral assignment of Tenant's interest in this Lease by Tenant to one or more "Lenders" (hereinafter defined), as collateral security for an indebtedness or other obligation of Tenant or its Affiliates shall be permitted and Landlord shall execute all documentation reasonably requested by Tenant or any such Lender in connection therewith.  In addition, Tenant shall have the right, without Landlord's consent, to grant to an Affiliate of Tenant a license to operate all of Tenant's business operations at the Premises, without such Affiliate having assumed any liability for the performance of Tenant's obligations under this Lease.  As used herein, *"Lender"* shall mean a state or federally regulated: bank, savings and loan association, insurance company, pension fund, credit union, real estate investment trust, or other institutional lender.

Section 15.4   Cure Rights of Original Tenant.

15.4.1   If Tenant assigns Tenant's interest in this Lease, then Landlord, when giving notice to said assignee or any future assignee in respect of any default, shall also give a copy of such notice to the Original Tenant, and no notice of default shall be effective until a copy thereof is so given to Original Tenant.  Original Tenant shall have the same period after receipt of such notice to cure such default as is given to Tenant therefor under this Lease.

15.4.2   If this Lease is terminated because of: (a) an Event of Default of such assignee, or (b) the rejection, disaffirmation, or other termination of this Lease by or on behalf of the assignee pursuant to any proceeding in bankruptcy under any Legal Requirement of any State or of the United States, or any other Legal Requirements affecting creditors' rights, then Landlord shall promptly give to Original Tenant notice thereof, and Original Tenant shall have the right, exercisable by notice given to Landlord within fifteen (15) days after receipt by Original Tenant of Landlord's notice, to enter into a new lease of the Premises with Landlord (*"New Lease"*), provided that the Original Tenant shall have remedied all Events of Default of the assignee hereunder, unless such Events of Default are not reasonably susceptible of cure by the Original Tenant, in which event the Original Tenant shall not be obligated to cure such Events of Default as a condition to the exercise of its rights under this Subsection 15.4.2.  Upon the Original Tenant's curing of any such Event of Default of the assignee as aforesaid, Landlord shall assign to Tenant all of Landlord's rights against such assignee (whether arising as a result of bankruptcy court proceedings or otherwise).  The term of said New Lease shall begin on the date of termination of this Lease and shall continue for the remainder of the Term (including any

Renewal Periods).  Such New Lease shall otherwise contain the same terms and conditions as those set forth herein, except for requirements which are no longer applicable or have already been performed.  It is the intention of the parties hereto that such New Lease shall have the same priority relative to other rights or interests in or to the Premises as this Lease.  The provisions of this Subsection 15.4.2 shall survive the termination of this Lease and shall continue in full force and effect thereafter to the same extent as if this Subsection 15.4.2 were a separate and independent contract between Landlord and the Original Tenant.  From the date on which the Original Tenant shall serve Landlord with the aforesaid notice of the exercise of its right to a New Lease, the Original Tenant shall have quiet and undisturbed use and enjoyment of the Premises and all appurtenances thereto, as contemplated in this Lease.

15.4.3  The provisions of this Section 15.4 shall apply only during such time as the Original Tenant remains liable under this Lease.

Section 15.5  <u>Recognition Agreement</u>.  In the event Tenant subleases all of the Premises for a term of at least five (5) years, then, notwithstanding any other provisions of this Lease, Landlord shall, upon Tenant's request, execute and deliver an agreement among Landlord, Tenant and each such subtenant in the form of <u>Exhibit H</u> hereto, in recordable form (*"Recognition Agreement"*).  Notwithstanding the foregoing, Landlord, if requested by Tenant, shall only be obligated to enter into a Recognition Agreement if the following conditions are satisfied: (i) the prospective subtenant is a national or regional retailer operating at least fifteen (15) stores (inclusive of the Premises), (ii) the net worth of the prospective subtenant (or any guarantor who unconditionally guarantees in writing the subtenant's obligations under the sublease) is at least $10,000,000, (iii) Landlord shall not be bound by any payment made by such subtenant to Tenant under its sublease more than thirty (30) days in advance, and (iv) Landlord is not liable for any security deposit paid by the subtenant which has not been received by Landlord by credit or otherwise.

Section 15.6  <u>Copies of Instruments</u>.  Within thirty (30) days following any sublease or assignment permitted or consented to by Landlord hereunder, Tenant agrees to furnish Landlord with a true, correct and complete copy of the instrument(s) used to effect the assignment or sublease.

# ARTICLE 16
## DEFAULT AND DISPUTE RESOLUTION

Section 16.1  <u>Tenant Default</u>.

16.1.1  If Tenant shall fail to: (i) pay any Rent when due, within ten (10) days after its receipt of notice thereof from Landlord specifying the amount and details of the unpaid Rent, (ii) correct a breach of this Lease related to permitted uses within ten (10) days after receipt of notice thereof from Landlord, or (iii) perform or observe any of the other covenants of this Lease on Tenant's part to be performed or observed within thirty (30) days after its receipt of notice thereof from Landlord specifying the nature of such default (or, if such default shall be of a nature that same cannot reasonably be cured within thirty (30) days and Tenant does not commence to cure such default on or before such thirtieth (30th) day and thereafter diligently prosecute said cure to completion), such circumstance shall constitute an *"Event of Default"*.

16.1.2  Upon an Event of Default, Landlord shall have all remedies given to it at law or in equity (except that Landlord hereby expressly waives any rights to accelerate any element of the Rent, and any right of distraint, which may be granted to it by law), including the following:

(a)  to bring suit for the collection of such unpaid Rent or for the performance of such other covenant of this Lease on Tenant's part to be performed; and/or

(b)  without waiving any non-monetary default, may (but shall not be obligated to) perform any covenant which is capable of being remedied by the performance of affirmative acts for the account and at the reasonable expense of Tenant (it being agreed that should Landlord require access to the Premises in order to perform such covenant as aforesaid, Landlord shall comply with the applicable provisions of Sections 9.2 hereof), in which event, Tenant shall pay to Landlord on demand, as Additional Rent, the reasonable cost or amount thereof, together with interest thereon at the Interest Rate from the date of outlay of expense until payment; and/or

(c)    upon at least five (5) days' notice to Tenant, to terminate this Lease, whereupon Landlord shall have and retain full right to sue for and collect all unpaid Rent which shall have accrued up to the date of termination and any damages to Landlord by reason of any such breach, and Tenant shall surrender and deliver the Premises to Landlord, failing which, Landlord shall have the right to initiate summary proceedings to recover possession; and/or

(d)    upon at least five (5) days' notice to Tenant to terminate Tenant's right of possession, re-enter the Premises and take possession thereof by lawful means.  If Landlord shall so elect to repossess the Premises without terminating the Lease, then Tenant shall be liable for and shall pay to Landlord all Rent payable to Landlord pursuant to the terms of this Lease which shall have accrued up to the date of repossession, as well as all Rent as and when same shall become due and payable pursuant to the terms of this Lease during the remainder of the Term, diminished by any net sums thereafter received by Landlord through reletting the Premises during said period (after deducting reasonable expenses incurred by Landlord in connection with such reletting).  In no event shall Tenant be entitled to any excess of any rent obtained by such reletting over and above the Rent herein reserved.  Landlord may bring actions to collect amounts due by Tenant under this Lease, from time to time, prior to the expiration of the Term.

(e)    If Landlord takes possession of the Premises following an Event of Default, then Landlord shall have the right to remove therefrom all or any portion of Tenant's Property and place same in storage in the county where the Premises are located, and Tenant shall be responsible for the commercially reasonable costs thereof provided that Landlord shall have given Tenant notice of Landlord intentions at least twenty (20) days prior to the date that Landlord intends to remove same from the Premises (which notice shall also contain the name and address of the storage facility) and Tenant fails to remove same within such twenty (20) day period.  Landlord shall not be liable to Tenant for any claims or losses in connection with due exercise of Landlord's rights set forth in this subparagraph (e), except for Landlord's gross negligence and wilful acts or omissions, or Landlord's failure to strictly comply with the provisions contained herein.  Anything contained in this Lease to the contrary notwithstanding, Landlord's rights under this subparagraph (e) shall be subject to any lender's rights as contemplated by Article 19 of this Lease.

16.1.3    Upon an Event of Default, Tenant shall be liable for and shall pay to Landlord, in addition to any sum provided to be paid above, brokers' fees incurred by Landlord in connection with reletting the whole or any part of the Premises for the remainder of the then unexpired Term (excluding any then unexercised Renewal Periods), the costs of removing and storing Tenant's or other occupant's property; the cost of repairs; and all other commercially reasonable expenses incurred by Landlord in enforcing or defending Landlord's rights and/or remedies, including reasonable attorneys' fees.

16.1.4    Upon an Event of Default, any amounts paid by Landlord to cure said Event of Default and any Rent payments not paid after notice thereof is given shall bear interest at the Lease Interest Rate from and after the expiration of any applicable grace period until paid.

16.1.5    Landlord shall use reasonable efforts to relet the Premises or any portion thereof to mitigate Landlord's damages to which Landlord would otherwise be entitled to as a result of an Event of Default.  In no event shall Tenant be liable to Landlord for any consequential damages suffered by Landlord as a result of an Event of Default by, or any other act of, Tenant.

16.1.6    If any installment of Fixed Rent becomes due and payable by Tenant hereunder and is not paid by Tenant within ten (10) days after Tenant's receipt of a reminder notice from Landlord, then Tenant shall pay to Landlord a late charge equal to three percent (3%) of such unpaid amount (it being agreed that Landlord shall not be required to notify Tenant more often than two (2) times during any twelve-month period during the Term as a condition to Landlord's being entitled to receive such late charge hereunder).

Section 16.2    Landlord Default.  If Landlord shall: (i) fail to perform or observe any of the covenants of this Lease on Landlord's part to be performed or observed within thirty (30) days after its receipt of notice thereof from Tenant specifying the nature of such default (or, if such default shall be of a nature that same cannot reasonably be cured within thirty (30) days and Landlord does not commence to cure such default on or before such thirtieth (30th) day and thereafter diligently prosecute said cure to completion), or (ii) materially breach any

warranty or representation under this Lease (either of (i) or (ii) above being hereinafter referred to as a *"Landlord's Default"*), then Tenant, in addition to such other rights and remedies as may be available under this Lease, or at law or in equity, may, in its sole discretion:

           (a)   as applicable, perform such obligation(s) of Landlord in accordance with the provisions of this Lease on behalf of, and at the expense of Landlord; and/or

           (b)   bring suit for the collection of any amounts for which Landlord is in default, seek injunctive relief, or seek specific performance for any other covenant or agreement of Landlord, without terminating this Lease; and/or

           (c)   offset against the Rent payable by Tenant hereunder for amounts owed by Landlord to Tenant and/or for the amounts reasonably expended by Tenant performing Landlord's obligations hereunder, including costs and reasonable attorneys' fees, together with interest thereon at the Lease Interest Rate from the date of the outlay until paid; provided, however, except if Tenant is exercising its rights under Subsection 11.1.2 of this Lease, such offset shall not exceed fifty percent (50%) of the installments of Rent then payable by Tenant hereunder provided that sufficient Term (not including any unexercised Renewal Options) remains to recoup the entire amount owed to Tenant by Landlord hereunder; and/or

           (d)   may terminate this Lease, without waiving its rights to damages for Landlord's Default, provided and on condition that (1) Landlord's Default materially and adversely interferes with the normal conduct of any business operations in the Premises, (2) Landlord's Default is not capable of being cured or being rendered irrelevant by any actions of Tenant despite commercially reasonable efforts on the part of Tenant, and (3) Tenant shall have delivered notice of Landlord's Default to any Mortgagee of Landlord (provided Landlord shall have previously notified Tenant of the name and address of such Mortgagee), and such Mortgagee has not cured Landlord's Default within thirty (30) days following its receipt of such notice (or, if Landlord's Default requires more than thirty (30) days to cure in the exercise of due diligence, such Mortgagee has not commenced to cure same within said thirty (30) day period and thereafter diligently prosecuted the same to completion).

Notwithstanding the foregoing, if, in Tenant's reasonable judgment, an emergency (*i.e.*, posing imminent material harm to persons or property or material disruption to the normal conduct of any business operations in the Premises) shall exist, Tenant may, at its election, and without prior notice to Landlord, exercise any or all of the remedies set forth in (a), (b) and (c) above.  In no event shall Landlord be liable to Tenant for any consequential damages suffered by Tenant as a result of a default by, or any other act of, Landlord.

      Section 16.3   Arbitration.  In any case where this Lease expressly provides for submission of a dispute or matter to arbitration (but not otherwise), the same shall be settled by arbitration in the Oklahoma City, Oklahoma metropolitan area, before one arbitrator in accordance with the procedural rules then obtaining of the American Arbitration Association pertaining to the real estate industry or any successor thereto.  The decision of the arbitrator shall be final, conclusive and binding on the parties, but the powers of the arbitrator are hereby expressly limited to the determination of factual issues, and the arbitrator shall have no power to reform, supplement or modify this Lease.  The arbitrator shall make only required findings of fact incident to an arbitrable dispute, which findings shall be set forth in reasonable detail in a written decision by the arbitrator.  Landlord and Tenant shall share equally in the cost and expenses of such arbitration, and each shall separately pay its own attorneys' fees and expenses, unless the arbitrator finds that one of the parties did not act in good faith in connection with the dispute or the conduct of the arbitration proceeding, in which case the arbitrator may award all or part of said costs, expenses and fees to the other party.

## ARTICLE 17
## RIGHT TO MORTGAGE AND NON-DISTURBANCE; ESTOPPEL CERTIFICATE

      Section 17.1   Right to Mortgage and Non-Disturbance.  Landlord reserves the right to subject and subordinate this Lease at all times to any first mortgage or deed of trust for the benefit of any Mortgagee hereafter encumbering or affecting all or any portion of the Shopping Center, as well as to any future ground or underlying leases encumbering or affecting all or any part of the Shopping Center; provided, however, that (a) each Mortgagee shall first execute and deliver to Tenant a subordination, non-disturbance and attornment agreement in substantially the form attached as Exhibit G-1 hereto, in recordable form, and (b) any Ground Lessor shall

execute (and shall obtain the written consent of any holder of any mortgage, deed of trust or any other existing lien encumbering or affecting the Shopping Center or any portion thereof, as applicable) and deliver to Tenant a fee owner recognition agreement in a form reasonably satisfactory to Tenant, which shall include the following provisions: (i) the Ground Lessor will not, in the exercise of any of the rights arising or which may arise out of such lease, disturb or deprive Tenant in or of its possession or its rights to possession of the Premises or of any right or privilege granted to or inuring to the benefit of Tenant under this Lease; (ii) in the event of the termination of the ground or underlying lease, Tenant will not be made a party in any removal or eviction action or proceeding, nor shall Tenant be evicted or removed of its possession or its right of possession of the Premises, and this Lease shall continue in full force and effect as a direct lease between the Ground Lessor and Tenant for the remainder of the Term and on the same terms and conditions as contained herein, without the necessity of executing a new lease; and (iii) Landlord and Tenant shall have the right to execute any amendment to this Lease which is specifically required hereunder and the Ground Lessor shall recognize and be bound thereto.

Section 17.2    Estoppel Certificate. Upon written request of Landlord or Tenant, the other party, within thirty (30) days of the date of such request, shall execute and deliver to and only for the benefit of the requesting party or any Mortgagee, *bona fide* prospective purchaser, assignee, or sublessee of the requesting party, without charge, a written statement: (1) ratifying this Lease; (2) certifying, to such party's actual knowledge, that this Lease is in full force and effect, if such is the case, and has not been modified, assigned, supplemented or amended, except by such writings as shall be stated; (3) specifying the dates to which Fixed Rent and Additional Rent have been paid; (4) stating whether or not, to Tenant's actual, knowledge, Landlord is in default and, if so, stating the nature of such default, (5) stating the Rent Commencement Date, and (6) stating which options to extend the Lease Term have been exercised, if any.

Section 17.3    Existing Mortgages. On or before the Effective Date, Landlord shall deliver to Tenant either (a) in recordable form, (x) a subordination, non-disturbance and attornment agreement substantially in the form attached hereto as Exhibit G-1, executed by each and every holder of any mortgage, deed of trust or any other existing lien encumbering or affecting the Shopping Center or any portion thereof, and (y) a fee owner recognition agreement in the form and content described in clause (b) of Section 17.1 hereof executed by any Ground Lessor (and, as may be required, consented to by the holder of any mortgage, deed of trust or other existing lien as aforesaid), or (b) (x) a certification from Landlord that there are no mortgages, deeds of trust or other such liens or ground or underlying leases affecting the Shopping Center (or any portion thereof) as of the Effective Date, together with an updated title report or policy supporting such certification, and (y) an agreement by Landlord not to enter into (or grant, as applicable) any such mortgages, deeds of trust or other such liens or ground or underlying leases prior to the earlier to occur of (i) the recording of the short form of lease or memorandum of lease contemplated by Section 23.20 below, or (ii) the date the Tenant enters into possession of and has exclusive control over the Premises, without first complying with the provisions of Section 17.1 above. Should Landlord fail to so deliver any of the instruments contemplated by this Section 17.3, Tenant shall have the right by notice given to Landlord at any time prior to the date on which such instrument(s) are delivered, to terminate this Lease, in which event, neither party shall have any further liability hereunder (other than as set forth in Section 23.3 below).

ARTICLE 18
NOTICE

Subject to the further provisions of this Article XVIII, whenever it is provided herein that any notice, demand, request, consent, approval or other communication (*"Notice"*) shall or may be given to either of the parties by the other, it shall be in writing and, any Legal Requirement to the contrary notwithstanding, shall not be effective for any purpose unless same shall be given by registered or certified mail, postage prepaid, return receipt requested, or by any recognized overnight mail carrier, with proof of delivery slip, addressed to Landlord (Attention: General Counsel) at Landlord's Mailing Address or to Tenant at Tenant's Mailing Address, with copies of notices to Tenant also given to: (i) Allan N. Rauch, Esq., c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, and (ii) Jeffrey H. Newman, Esq., c/o Sills Cummis Radin Tischman Epstein & Gross, P.A., One Riverfront Plaza, Newark, New Jersey 07102-5400, or to such other person or other address as may, from time to time, be specified by either party in a written notice to the other party. From and after the Effective Date until the Delivery Date, copies of any notices to Landlord pertaining to Landlord's Work shall

also be given to the attention of **"Construction Manager"** at Landlord's Mailing Address. All notices given in accordance with the provisions of this Section shall be effective upon receipt (or refusal of receipt) at the address of the addressee.  Notwithstanding the foregoing, Landlord shall instead send the following items to Tenant (Attention: Lease Administration) at Tenant's Mailing Address: (A) all bills, notices (but not notices of default) and related information pertaining to Tenant's Pro Rata Share of Taxes as described in Section 4.3 of this Lease, and (B) all budgetary information, notices (but not notices of default), statements, bills and related information pertaining to Tenant's Pro Rata Share of Common Areas Charges as described in Section 5.1 of this Lease.

## ARTICLE 19
### TENANT'S PROPERTY

All of Tenant's Property  which may be installed or placed in or upon the Premises by Tenant shall remain the property of Tenant.  Tenant may assign, hypothecate, encumber, mortgage or create a security interest in or upon Tenant's Property in the Premises without the consent of Landlord and may remove Tenant's Property at any time during the Term.  Landlord waives any right it may have in Tenant's Property.  To the extent Landlord may have a lien on or security interest in the Tenant's Property pursuant to this Lease, by law or otherwise, Landlord hereby waives, and agrees not to assert, such lien or security interest.  Landlord shall provide to Tenant, within ten (10) days after Tenant's request therefor, a written waiver in form reasonably satisfactory to Tenant evidencing Landlord's waiver of any rights it has or may have in Tenant's Property.  Any such "waiver" shall be conditioned upon the lender agreeing to remove its collateral from the Premises within twenty (20) days after notice by Landlord that an Event of Default has occurred (subject to extensions for bankruptcy and receivership) and to repair any damage to the Premises caused by such removal.

## ARTICLE 20
### END OF TERM

Section 20.1   <u>Surrender of Premises</u>.  At the expiration of the Term, Tenant will quit and surrender the Premises in good condition and repair, excepting, <u>however</u>, reasonable wear and tear, damage by fire or other casualty, damage by eminent domain, and repairs and replacements to be made by Landlord hereunder.

Section 20.2   <u>Hold Over</u>.  If Tenant fails to deliver possession of the Premises to Landlord at the end of the Term, Tenant shall be a tenant at sufferance on a month-to-month basis, and shall be liable for Fixed Rent on a monthly basis (or, if applicable, on a prorated daily basis) in an amount equal to one hundred fifty (150%) percent of the amount thereof payable by Tenant for the month immediately preceding the last day of the Term as well as for all Additional Rent payable by Tenant hereunder.

## ARTICLE 21
### INTENTIONALLY OMITTED

## ARTICLE 22
### CONTINUING CO-TENANCY

Section 22.1   <u>Excess Vacancy</u>.  If, at any time during the Term of this Lease, (a) more than thirty-five percent (35%) of the total Floor Area of all buildings in the Shopping Center (excluding the Premises) ceases to be used for the operation of retail business by tenants of the type typically found in first-class regional shopping centers located in the Oklahoma City, Oklahoma metropolitan area or (b) any one of the Inducement Tenants (or its respective "Replacement Inducement Tenant", as defined below), ceases to be open for business to the general public in the minimum square footage of gross Floor Area set forth in Subsection 2.3.1(d) above (or, with respect to a Replacement Inducement Tenant, in at least thirty thousand (30,000) square feet of the Floor Area) of their respective premises designated as "Stein Mart" and "Academy" on <u>Exhibit B</u> (either such condition described in clause "(a)" or "(b)" above being hereinafter referred to as an **"Excess Vacancy"**), then in any such event, Tenant shall have the right to: (i) pay Alternate Rent in lieu of Fixed Rent during the period of such Excess Vacancy, and/or (ii) if the Excess Vacancy continues for a period in excess of three hundred sixty-five (365) continuous days, to terminate this Lease, exercisable by giving

Landlord, within one hundred twenty (120) days after the expiration of such 365-day period, at least one hundred twenty (120) days' prior notice, in which event this Lease shall terminate on the date set forth in Tenant's notice of termination without further liability on the part of either Landlord or Tenant, except as set forth in Section 23.3 below. If Tenant does not terminate this Lease pursuant to this Article 22, then commencing on the expiration of the aforesaid 120-day period immediately following the expiration of the aforesaid three hundred sixty-five (365) continuous day period, Tenant shall resume paying full Rent without regard to the foregoing provisions of this Article 22, provided, however, that Tenant shall retain all of its rights under this Article 22 with respect to any future condition of Excess Vacancy thereafter occurring.

Section 22.2    Special Excess Vacancy.  Notwithstanding Section 22.1(i) above, if the only reason that an Excess Vacancy exists is because one (1) of the Inducement Tenants ceases to be open for business as provided in Section 22.1(b) above (such Excess Vacancy is referred to as a *"Special Excess Vacancy"*), then Tenant's right to pay Alternate Rent pursuant to Section 22.1(i) above shall only arise if the Special Excess Vacancy continues for two hundred seventy (270) continuous days; provided, however, if the Excess Vacancy continues for two hundred seventy (270) continuous days or more, then Tenant's right to pay Alternate Rent shall apply retroactively to the first (1st) day that the Special Excess Vacancy existed.  In such event, Landlord shall, within thirty (30) days after Tenant's demand, reimburse Tenant for the difference between the Fixed Rent paid by Tenant during such 270-day period and the Alternate Rent that now applies to such period, failing which Tenant shall be entitled to offset such amount from payments of Rent (including, without limitation, Alternate Rent) next becoming due hereunder, together with interest thereon at the Lease Interest Rate from the date such remittance is due until reimbursement or full satisfaction by credit.  The provisions of this Section 22.2 shall cease applying from and after the date that an Excess Vacancy arises under Section 22.1(a) above or because both of the Inducement Tenants (or both of their respective Replacement Inducement Tenants) cease to be open as provided in Section 22.1(b) above.  By way of illustration only, if a Special Excess Vacancy exists because Academy Sport Co. ceases to be open for business, and thirty (30) days thereafter Stein Mart ceases to be open for business and/or more than thirty-five percent (35%) of the total Floor Area of the Shopping Center (excluding the Premises) ceases to be used for the operation of a retail business, then Tenant shall be entitled to pay Alternate Rent pursuant to Section 22.1(i) above, which right shall be retroactive to the first (1st) day that the Special Excess Vacancy existed.

Section 22.3    Replacement Inducement Tenant.  For purposes of this Article 22, a *"Replacement Inducement Tenant"* shall mean a tenant that (a) occupies at least thirty thousand (30,000) square feet of the premises identified as "Stein Mart" or "Academy," as applicable, on Exhibit B; and (b) is a national or regional retail chain store operation which (w) is customarily found in first-class shopping centers, (x) operates a total of at least twenty-five (25) stores under the same trade name as will be utilized within the Shopping Center in the area which includes Oklahoma, Arkansas, Missouri, Texas and Kansas, (y) offers goods and services that are compatible with the then current uses of the Shopping Center and Tenant, and (z) is not a pet store or office supply store.

ARTICLE  23
MISCELLANEOUS

Section 23.1    Loading Facilities.  Tenant shall have the exclusive right to utilize the loading facilities serving the Premises (shown on Exhibit B) on a "24 hour a day", "365 days a year" basis.

Section 23.2    Liens.  Within thirty (30) days after notice of the filing thereof, Tenant shall discharge (either by payment or by filing of the necessary bond, or otherwise) any lien against the Premises and/or Landlord's interest therein, which may arise out of any payment due for, or purported to be due for, any labor, services, materials, supplies or equipment alleged to have been furnished to or for Tenant in, upon or about the Premises.  Similarly, within thirty (30) days after notice of the filing thereof, Landlord shall discharge (either by payment or by filing of the necessary bond, or otherwise) any lien against the Premises and/or Landlord's interest therein, which may arise out of any payment due for, or purported to be due for, any labor, services, materials, supplies or equipment alleged to have been furnished to or for Landlord in, upon or about the Premises.

Section 23.3    Broker's Commission.  Landlord and Tenant each warrant and represent to the other that they did not deal with any real estate broker in connection with the negotiation, execution and delivery of this Lease, except for The Weitzman Group (the

1   *"Broker"*). Landlord shall pay the Broker a commission pursuant to a separate agreement.
2   Each party agrees to indemnify, defend, and save the other harmless from and against any and
3   all liabilities, costs, causes of action, damages and expenses, including, without limitation,
4   attorneys' fees, with respect to or arising out of any claims made by any real estate broker
5   (other than the Broker), agent or finder with respect to this Lease in breach of the foregoing
6   representation. The provisions of this Section shall survive the expiration or earlier termination
7   of this Lease.
8
9   Section 23.4   *Force Majeure*. Except as otherwise expressly set forth herein, in the
10   event either party hereto shall be delayed or hindered in, or prevented from, the performance of
11   any act required hereunder by reason of strikes, inability to procure materials, failure of power,
12   restrictive Legal Requirements, riots, insurrection, war, earthquake, hurricane or tornado (or
13   comparable weather conditions of unusual severity), or other reasons of a like nature which are
14   beyond the reasonable control of the party (collectively referred to herein as *"Force Majeure"*),
15   then the performance of any such act shall be excused for the period of the delay and the
16   period of the performance of any such act shall be extended for a period equivalent to the
17   period of such delay. Notwithstanding the foregoing provisions, the financial inability of a party
18   to perform its obligations under this Lease shall not constitute an event of *Force Majeure*.
19
20   Section 23.5   Consents. Except as may be otherwise expressly set forth in this
21   Lease, whenever under this Lease provision is made for either party's securing the consent or
22   approval of the other party, (i) such consent or approval shall be in writing and shall not be
23   unreasonably withheld, delayed or conditioned, and (ii) in all matters contained herein, both
24   parties shall have an implied obligation of reasonableness.
25
26   Section 23.6   Costs. Whenever this Lease requires the performance of an act by a
27   party, such party shall perform the act at its own cost and expense, unless expressly provided
28   to the contrary.
29
30   Section 23.7   Attorneys' Fees. In any action or proceeding hereunder (whether to
31   enforce the terms and provisions of an indemnity or otherwise), the prevailing party shall be
32   entitled to recover from the other party the prevailing party's reasonable costs and expenses in
33   such action or proceeding, including reasonable attorneys' fees, costs and expenses. Except
34   as otherwise set forth herein, if either party is sued by a third party as a result of a violation of a
35   covenant or warranty herein contained by the other party hereto, then the party who has
36   violated the covenant or warranty shall be responsible for the reasonable costs and expenses in
37   such action or proceeding against the non-violating party, including reasonable attorneys' fees,
38   costs and expenses.
39
40   Section 23.8   Survival of Obligations. The obligation to pay any sums due to either
41   party from the other that by the terms herein would not be payable, or are incapable of
42   calculation, until after the expiration or sooner termination of this Lease shall survive and
43   remain a continuing obligation until paid. All indemnity obligations under this Lease shall
44   survive the expiration or earlier termination of this Lease.
45
46   Section 23.9   Non-Waiver. The failure of Landlord or Tenant to insist upon the strict
47   performance of, or to enforce, any provision, covenant or condition herein shall not be deemed
48   to be a waiver thereof, nor void or affect the right of the aggrieved party to enforce the same
49   covenant or condition on the occasion of any subsequent breach or default; nor shall the failure
50   of either party to exercise any option in this Lease upon any occasion arising therefor be
51   deemed or construed to be a waiver of the right to exercise that same kind of option upon any
52   subsequent occasion.
53
54   Section 23.10   Rights Cumulative. Unless expressly provided to the contrary in this
55   Lease, each and every one of the rights, remedies and benefits provided by this Lease shall be
56   cumulative and shall not be exclusive of any other such rights, remedies and benefits allowed
57   by applicable Legal Requirements.
58
59   Section 23.11   Definition of Landlord. The term *"Landlord"* shall mean only the
60   person or entity which, from time to time, shall then own the Shopping Center, and in the event
61   of the transfer by such owner of its interest in the Shopping Center, such owner shall (except to
62   the extent of (1) claims made by Tenant against Landlord which arose prior to the effective date
63   of the transfer of such ownership interest, and/or (2) judgments obtained by Tenant against
64   Landlord, on or prior to the effective date of the transfer of such ownership interest) thereupon
65   be released and discharged from all covenants and obligations of Landlord thereafter accruing,

but such covenants and obligations shall be binding during the Term upon each new owner for the duration of such owner's ownership.

Section 23.12    Successors and Assigns.  The provisions of this Lease shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns.

Section 23.13    Limitation of Landlord's Liability.  Except with respect to insurance proceeds or condemnation awards received by Landlord which are required by the terms of this Lease to be applied to the repair or restoration of the Premises or the Shopping Center, Tenant shall, on and after the Delivery Date, look only to Landlord's estate and property in the Shopping Center (or the proceeds from the sale of all or any portion thereof) and net income derived from the Shopping Center for the satisfaction of Tenant's remedies for the collection of a judgment (or other judicial process) requiring the payment of money by Landlord hereunder and no other property or assets of Landlord, its trust managers, officers, directors, stockholders or partners shall be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies under or with respect to this Lease.  Except with respect to the limitation on personal liability hereinabove set forth, the provisions of this Section 23.13 shall not be deemed or construed to limit Tenant's rights and remedies pursuant to this Lease or which may be available at law or in equity.

Section 23.14    Limitation of Tenant's Liability.  Landlord, its successors and assigns, shall look solely to the assets, if any, of Tenant and its successors and assigns, for the satisfaction of any claim arising from or under this Lease and shall not seek to impose personal liability on any shareholder, officer, director or employee of Tenant or any of its Affiliates.

Section 23.15    Joint and Several Liability.  If either party consists of more than one person, then the persons constituting such party shall be jointly and severally liable hereunder.

Section 23.16    Severability.  If any term, covenant, condition or provision of this Lease is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions hereof shall remain in full force and effect and shall in no way be affected, impaired, or invalidated thereby.

Section 23.17    Grammatical Usages and Construction.  In construing this Lease, feminine or neuter pronouns shall be substituted for those masculine in form and vice versa, and plural terms shall be substituted for singular and singular for plural in any place in which the context so requires.  This Lease shall be construed without regard to the identity of the party who drafted the various provisions hereof.  Moreover, each and every provision of this Lease shall be construed as though all parties hereto participated equally in the drafting thereof.  As a result of the foregoing, any rule or construction that a document is to be construed against the drafting party shall not be applicable hereto.

Section 23.18    Table of Contents, Line Numbering and Paragraph Headings.  The table of contents and line numbering, if any, and section headings are inserted only for convenience and in no way define, limit or describe the scope or intent of this Lease, nor in any way affect this Lease.

Section 23.19    Definition of Hereunder, Herein, etc.  Unless the context clearly indicates to the contrary, the words "herein," "hereof," "hereunder," "hereafter," and words of similar import refer to this Lease and all the Exhibits attached hereto as a whole and not to any particular section, subsection, or paragraph hereof.

Section 23.20    Short Form Lease.  Upon the request of either party following the execution and delivery of this Lease, Landlord and Tenant shall execute a short form lease or memorandum for recording, which shall be in form and substance as either party shall reasonably request and shall refer to such provisions of this Lease which may survive the expiration or sooner termination hereof.  In no event shall the amount of Fixed Rent reserved hereunder be included in any such short form lease or memorandum.

Section 23.21    Entire Agreement and Modification.  This Lease constitutes the entire agreement of the parties hereto, and all prior agreements between the parties, whether written or oral, are merged herein and, except as may be specifically set forth herein, shall be of no force and effect.  This Lease cannot be changed, modified or discharged orally, but only by an agreement in writing, signed by the party against whom enforcement of the change, modification or discharge is sought.

Section 23.22   <u>No Joint Venture or Partnership Created by Lease</u>.   Nothing contained herein shall be deemed or construed as creating the relationship of principal and agent or of partnership or of joint venture between the parties hereto.

Section 23.23   <u>Tenant's Tradename</u>.  Landlord shall not make use of Tenant's tradename [*i.e., "Bed Bath & Beyond"®*] in any advertising or marketing material, including, without limitation, on any internet website, without obtaining Tenant's prior written approval, which may be withheld in Tenant's sole and absolute discretion.

Section 23.24   <u>Counterparts</u>. This instrument may be executed in several counterparts, each of which shall be deemed an original.  The signatures to this instrument may be executed and notarized on separate pages, and when attached to this instrument, shall constitute one complete document.

Section 23.25   <u>Waiver of the Right to Trial by Jury</u>.   Landlord and Tenant hereby mutually waive any and all rights which either may have to request a jury trial in any proceeding between them at law or in equity.

Section 23.26   <u>Governing Law</u>.  This Lease shall be governed by, construed, and enforced in accordance with the laws of the State in which the Premises are located.

[Signature page follows]



IN WITNESS WHEREOF, the parties have executed this instrument under seal the day and year first-above written.

**LANDLORD:**

WITNESS:

WEINGARTEN NOSTAT, INC.,
a Texas corporation

By: _____
Name: _MARTIN DEBROUNER_
Title: _VICE CHAIRMAN_

[SEAL]

**TENANT:**

WITNESS:

BED BATH & BEYOND INC., a New York corporation

By: _____
    Warren Eisenberg
    Co-Chief Executive Officer

[SEAL]

## INDEX OF EXHIBITS

Exhibit A -     Legal Description of Shopping Center

Exhibit B -     Site Plan

Exhibit C -     Rent Commencement and Expiration Date Agreement

Exhibit D -     Specifications for Landlord's Work

Exhibit D-1    Exterior Elevations of the Premises and Shopping Center, and
Sidewalk Plan

Exhibit E -     Permitted Encumbrances

Exhibit F -     Signage

Exhibit F-1 -   Rendering of Pylon Structure

Exhibit G-1 -   Form of Subordination, Non-Disturbance and Attornment
Agreement

Exhibit H -     Form of Subtenant Recognition Agreement

Exhibit I -     Form of Delivery Date Notice

Exhibit J -     Form of Delivery Date Certification

Exhibit K-1    Existing Exclusives

Exhibit K-2    Existing Leases

Exhibit L      Percentage Rent

Exhibit M      Prohibited Uses

## Exhibit A

## Legal Description of Shopping Center

A tract of land lying in Government Lot One (1) of Section Thirty-One (31), Township Fourteen (14) North, Range Two (2) West of the Indian Meridian, Oklahoma County, Oklahoma, being more particularly described as follows:

Beginning at the Northwest corner of said Section 31; Thence South 89°53' 19" East along the North Line of said Section 31 a distance of 1023.35 feet; Thence South 00°19' 43" West a distance of 1317.21 feet to the South line of said Government Lot 1; Thence North 89°55' 42" West along said South line a distance of 1018.52 feet to the Southwest Corner of said Government Lot 1; Thence North 00°07' 07" East along the West line of said Government Lot 1 a distance of 685.91 feet; Thence South 89°52' 53" East a distance of 251.00 feet; Thence North 00°07' 07" East Parallel with the West line of said Government Lot 1 a distance of 342.00 feet; thence North 89°52' 53" West a distance of 251.00 feet to the West line of said Government Lot 1; Thence North 00°07' 07" East along said West line a distance of 290.00 feet to the Point of Beginning.

1
2
3

## Exhibit B

## Site Plan

<u>Exhibit C</u>

<u>Rent Commencement and Expiration Date Agreement</u>

THIS RENT COMMENCEMENT AND EXPIRATION DATE AGREEMENT, made as of the ____ day of _____, 200_, by and between WEINGARTEN NOSTAT, INC. (*"Landlord"*) and BED BATH & BEYOND INC. (*"Tenant"*).

# W I T N E S S E T H :

WHEREAS, Landlord is the owner of a certain shopping center known as Bryant Square Shopping Center (the *"Shopping Center"*), situated in Edmond, Oklahoma;

WHEREAS, by that certain lease dated _____ _, 2002 (the *"Lease"*), Landlord leased a portion (the *"Premises"*) of the Shopping Center to Tenant;

WHEREAS, Tenant is in possession of the Premises and the Term of the Lease has commenced; and

WHEREAS, under Section 2.2 of the Lease, Landlord and Tenant agreed to enter into an agreement setting forth certain information in respect of the Premises and the Lease.

NOW, THEREFORE, Landlord and Tenant agree as follows:

1.      The Rent Commencement Date occurred on _____, 200_.

2.      The **Initial Term** of the Lease shall expire on January 31, 20___, unless Tenant exercises any option to extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

3.      The date of commencement of the **first Renewal Period** shall be February 1, 20___, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 20___, unless Tenant exercises any option to further extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

4.      The date of commencement of the **second Renewal Period** shall be February 1, 20___, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 20___, unless Tenant exercises any option to further extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

5.      The date of commencement of the **third Renewal Period** shall be February 1, 20___, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 20___, unless the Lease terminates earlier as provided in the Lease.

6.      The date of commencement of the **fourth Renewal Period** shall be February 1, 20___, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 20___, unless the Lease terminates earlier as provided in the Lease.

7.      Capitalized terms used, but not defined, herein shall have the meanings ascribed to them in the Lease.

IN WITNESS WHEREOF, the parties hereto have caused this Rent Commencement and Expiration Date Agreement to be executed the date and year first above written.

**LANDLORD:**

WEINGARTEN NOSTAT, INC.

By: _____
Name: _____
Title: _____

**TENANT:**

BED BATH & BEYOND INC.

By: _____
                    Warren Eisenberg
                    Co-Chief Executive Officer

**Bryant Square Shopping Center**
**Edmond, Oklahoma**

**Exhibit D - Standard Landlord's Work**

*Edmond, OK*

## Exhibit D - Standard Landlord's Work
07/25/02

[All capitalized terms used, but not otherwise defined herein shall have the meanings ascribed to them in the Lease. The terms of the Lease regarding Landlord's Work shall be deemed to supplement the provisions of this <u>Exhibit D</u>, to the extent not inconsistent with the terms of this <u>Exhibit D</u>; provided, however, that to the extent of a conflict between the terms and provisions of Tenant's Plans, Exhibit B, Exhibit D and/or Exhibit F hereto and the terms and provisions of the Final Plans and Specifications, then the term and provisions of Final Plans and Specifications shall govern and prevail. It is specifically understood and agreed that all materials and supplies shall be installed in strict accordance with all manufacturers' specifications.]

### Landlord's Final Plans and Specifications

Landlord shall provide three (3) complete full size sets, three (3) complete ½ size sets and one (1) copy of electronic file of the Final Plans and Specifications as well as each subsequent revision to Landlord's Plans for Tenant's use. Landlord shall develop project-specific Final Plans and Specifications in accordance with following documents:

A.  Tenant's Plans consist of the following: FIXTURE PLAN (F1); FLOOR FINISH PLANS, NOTES AND DETAILS (F2); POWER/SPECIALTY LIGHTING PLANS AND NOTES (F3); LIGHTING PLANS AND NOTES (F4); and HIGH PILE STORAGE PLAN (F5). Tenant's Plans are project-specific design-development documents. In the event of a conflict between Tenant's Plans and "Tenant's Prototype Drawings and Specifications"(defined below), then Tenant's Plans shall govern and prevail. Tenant's Plans shall be delivered to Landlord in accordance with Article 3 of the Lease.

B.  <u>Tenant's Prototype Drawings and Specifications</u> entitled "Bed Bath & Beyond Prototype Drawings and Specifications – version 1.2002, dated 4-01-02 developed by Ignarri-Lummis Architects, comprise the following drawings and specifications:

At the time the Preliminary Plans are 85% complete, LL shall be obligated to issue Preliminary Plans to "BBBY Consultant" for review against "Quality Control Checklist". The cost to LL for this review is $2000.00 plus reimbursable associated with printing and shipping. If Preliminary Plans are "rejected" or noted "revise and resubmit" by the BBBY consultant then LL shall be obligated for all expenses related to these subsequent reviews until Preliminary Plans are deemed approved. Project specific BBBY consultants to be determined by BBBY post lease execution. If LL fails to pay consultant, then Tenant shall have the right to receive a credit against "Changes" under the lease or deduct amount from Rent in order to satisfy outstanding invoice.

C.

| SHEET # | DRAWING TITLE | CURRENT ISSUE | DRAWING DATE |
|---------|---------------|---------------|--------------|
| A0.1 | Code Data, Project Data, Responsibility Schedule | Prototype Version 1.2002 | 04/01/02 |
| A0.2 | Generic Site Requirements Plan | Prototype Version 1.2002 | 04/01/02 |
| A1.1 | Site Details | Prototype Version 1.2002 | 04/01/02 |
| A1.2 | Demolition Plan | Prototype Version 1.2002 | 04/01/02 |
| A2.1 | Store Fixture Plan & Notes | Prototype Version 1.2002 | 04/01/02 |
| A2.2 | Floor Plan & Partition Types | Prototype Version 1.2002 | 04/01/02 |
| A2.3 | Floor Finish Plan, Transition Strip Details & Interior Finishes Legend | Prototype Version 1.2002 | 04/01/02 |
| A2.4 | Reflected Ceiling Plans & Notes | Prototype Version 1.2002 | 04/01/02 |
| A2.5 | Roof Plan & Notes | Prototype Version 1.2002 | 04/01/02 |
| A3.1 | Door & Finish Schedules, Door & Storefront Types, Vestibule Elevations | Prototype Version 1.2002 | 04/01/02 |
| A3.2 | Finish Hardware Schedule | Prototype Version 1.2002 | 04/01/02 |
| A3.3 | BBB National Account Vendors & Distribution Schedule | Prototype Version 1.2002 | 04/01/02 |
| A3.4 | BBB Specified Manufacturers & Distribution Schedule | Prototype Version 1.2002 | 04/01/02 |
| A4.1 | Exterior Elevations | Prototype Version 1.2002 | 04/01/02 |
| A5.1 | Building Sections, Interior Wall Sections | Prototype Version 1.2002 | 04/01/02 |
| A5.2 | Exterior Wall Sections | Prototype Version 1.2002 | 04/01/02 |
| A5.3 | Exterior Wall Sections | Prototype Version 1.2002 | 04/01/02 |
| A5.4 | Exterior Wall Sections | Prototype Version 1.2002 | 04/01/02 |
| A6.1 | Exterior Details | Prototype Version 1.2002 | 04/01/02 |
| A7.1 | Large Scale Plans | Prototype Version 1.2002 | 04/01/02 |
| A7.2 | Large Scale Plans | Prototype Version 1.2002 | 04/01/02 |
| A8.1 | Interior Details | Prototype Version 1.2002 | 04/01/02 |



1

| | | | |
|---|---|---|---|
| A8.2 | Interior Details | Prototype Version 1.2002 | 04/01/02 |
| A8.3 | Customer Service Desk *(1 of 4 optional sheets)* | Prototype Version 1.2002 | 04/01/02 |
| A8.4 | Register Bays *(1 of 2 optional sheets)* | Prototype Version 1.2002 | 04/01/02 |
| A8.5 | Remote Service Desks | Prototype Version 1.2002 | 04/01/02 |
| A9.1 | Interior Elevations | Prototype Version 1.2002 | 04/01/02 |
| A9.2 | *Alternate* Elevations & Details | Prototype Version 1.2002 | 04/01/02 |
| A9.3 | *Alternate* Plans, Elevations & Details | Prototype Version 1.2002 | 04/01/02 |
| HP1.1 | High Pile Storage Plan & Fixture-Shelf Details | Prototype Version 1.2002 | 04/01/02 |
| CH-1 | Fine China – Floor / Framing / Ceiling Plans & Schedules | Prototype Version 1.2002 | 04/01/02 |
| CH-2 | Fine China – Wall Sections & Details | Prototype Version 1.2002 | 04/01/02 |
| CH-3 | Fine China – Electrical Plans, Details & Notes | Prototype Version 1.2002 | 04/01/02 |
| S1.1 | Structural General Information & Schedules | Prototype Version 1.2002 | 04/01/02 |
| S2.1 | Foundation Plan | Prototype Version 1.2002 | 04/01/02 |
| S2.2 | Roof Framing Plan | Prototype Version 1.2002 | 04/01/02 |
| S3.1 | Structural Wall Sections | Prototype Version 1.2002 | 04/01/02 |
| S3.2 | Typical Structural Details | Prototype Version 1.2002 | 04/01/02 |
| PME1.1 | Plumbing, Mechanical & Electrical General Information | Prototype Version 1.2002 | 04/01/02 |
| P1.1 | Plumbing General Information & Schedules | Prototype Version 1.2002 | 04/01/02 |
| P1.2 | Plumbing Riser Diagrams | Prototype Version 1.2002 | 04/01/02 |
| P2.1 | Plumbing Floor Plan | Prototype Version 1.2002 | 04/01/02 |
| P3.1 | Plumbing Enlarged Plans & Details | Prototype Version 1.2002 | 04/01/02 |
| FP1.0 | Fire Sprinkler Plans, Notes & Details | Prototype Version 1.2002 | 04/01/02 |
| M1.1 | Mechanical General Information | Prototype Version 1.2002 | 04/01/02 |
| M2.1 | Mechanical Floor Plan | Prototype Version 1.2002 | 04/01/02 |
| M3.1 | Mechanical Large Scale Plans & Details | Prototype Version 1.2002 | 04/01/02 |
| M4.1 | Mechanical Schedules & Details | Prototype Version 1.2002 | 04/01/02 |
| M4.2 | ETM Wiring Details for Lennox RTU's | Prototype Version 1.2002 | 04/01/02 |
| M4.2a | *Alternate* ETM Wiring Details for non-Lennox RTU's | Prototype Version 1.2002 | 04/01/02 |
| E1.1 | Electrical General Information & Schedules | Prototype Version 1.2002 | 04/01/02 |
| E2.1 | Power Plan | Prototype Version 1.2002 | 04/01/02 |
| E2.2 | Lighting Plan | Prototype Version 1.2002 | 04/01/02 |
| E2.3 | Specialty Lighting Plan | Prototype Version 1.2002 | 04/01/02 |
| E3.1 | Electrical Large Scale Plans & Details | Prototype Version 1.2002 | 04/01/02 |
| E3.2 | Lighting Sequencing | Prototype Version 1.2002 | 04/01/02 |
| E3.3 | Specialty Lighting Power Diagrams | Prototype Version 1.2002 | 04/01/02 |
| E3.4 | Electrical Details | Prototype Version 1.2002 | 04/01/02 |
| E4.1 | Electrical Schedules | Prototype Version 1.2002 | 04/01/02 |
| E4.2 | Electrical Riser Diagrams | Prototype Version 1.2002 | 04/01/02 |
| E4.3 | Electrical Schedules | Prototype Version 1.2002 | 04/01/02 |
| E4.4 | Novar Wiring Details | Prototype Version 1.2002 | 04/01/02 |
| E4.4a | *Alternate* Novar Wiring Details for non-Lennox RTU's | Prototype Version 1.2002 | 04/01/02 |

Project Manual for Bed Bath & Beyond, dated April 1, 2002.

D.   Neither Tenant's Plans nor Tenant's Prototype Drawings and Specifications reflect regional or governmental requirements. Such regional/governmental requirements may include but not limited to the following: Stockroom/Sales Area partition between sales area and stockroom may be required including all openings through the partition be properly protected; The number of restroom fixtures, number of exit stairs, smoke purge and pressurization system, smoke/heat vents, draft curtains, fire rated walls, ceiling or floors required to meet high pile storage requirements, etc. may need to be modified to comply with all applicable Legal Requirements.

**Site Specifications**

A.   All parking areas and traffic drives in the Shopping Center are existing.

B.   All truck access drives in the Shopping Center are existing.

2

C.    All truck ramps and dumpster pads shall consist of 12" compacted sub-base (95% compacted), 4" compacted granular base and 5" Portland cement concrete surface finish. All truck ramps shall consist of #4 re-bars, 18" o/c. each direction. Recessed truck ramps shall not exceed slope of 5%.

If Landlord's geo-technical report for the Shopping Center recommends more stringent requirements, then the geo-technical report recommendations shall supersede the criteria stated in items A, B, and C above.

D.    The average lighting level throughout the Shopping Center (parking areas, traffic drives, service drives, etc.) shall be at least two (2) foot-candles, measured 30" above grade. Landlord shall provide Tenant a photometric plan prepared by Landlord's lighting contractor, which shall confirm that the proposed lighting meets these requirements and such photometric plan shall be deemed part of the Final Plans and Specifications. Landlord shall provide low level security lighting min. (1) foot-candle throughout center that shall remain illuminated from dusk to dawn seven days a week. Landlord shall upgrade site lighting to meet these standards within critical area if existing conditions do not meet these standards.

## Building Requirements

The following describes project-specific elements of Landlord's Work in addition to the scope detailed in Tenant's Prototype Drawings and Specifications:

A.    Clear Height – For the new addition building systems (mechanical, plumbing, electrical) shall be designed to allow Tenant to stock merchandise up to at least 16'-6" a.f.f. All mechanical, plumbing and electrical elements shall be located at least 16'-6" a.f.f., except for Tenant's light fixtures. Fire protection sprinkler piping shall be located at least 16'-6" a.f.f., sprinkler heads shall be located at least 18'-0" a.f.f. Bottom of all structural elements shall be located at least 18'-0" a.f.f.

For the Existing structure, systems (mechanical, plumbing, electrical) shall be designed to allow Tenant to stock merchandise up to at least 15'-0" a.f.f, where possible due to the existing structure. All mechanical, plumbing, fire protection and electrical elements shall be located as high as possible, and within the existing structure whenever possible. Existing utility lines that are located within tenant's space below the level of the structure must be relocated in such a manner as to provide tenant with maximum clearance. Sprinkler heads should be located within 1" of the roof deck.

B.    Fire Alarm System - Landlord shall furnish and install a fire alarm system in accordance with the minimum base standards set forth in Tenant's Prototypical Plans and Specifications, or more stringent requirements as may be required by law. Landlord shall be responsible for monitoring the fire alarm system up to (and including) the Delivery Date. Landlord shall be obligated to contract directly with "ADT" to provide required FA system.

C.    1st Level Structure (sales/non-sales level) - Landlord shall provide a minimum 4000 psi concrete floor slab having a minimum thickness of 4". Structural system shall be rated to accept 125 lb. per square foot of live load. If rebar or pretensioned or post-tensioned steel is required, it shall not be placed within the top 2 ½" of the concrete slab. At the existing structure, the concrete slab is existing. Structural system shall accept 125 lb.

D.    Sprinkler System - The sprinkler system shall be designed to allow fixturing and storage to be within 18" of heads. System shall comply with NFPA 231-C and or NFPA13, (high-rack storage) for class IV commodity solid shelves, minimum 4 foot aisles. Typically, .486 GPM over 2000 sf will be required.

E.    Landlord shall provide sprinkler system sufficient to meet the requirements specified within Tenant's Prototype Drawings and Specifications without utilizing a fire pump if existing water pressure allows. If water pressure is inadequate and system cannot be designed to properly function without incorporating a fire pump, then Landlord shall locate Fire Pump outside of Premises. Landlord shall maintain Fire Pump for the full term of the Lease without any cost to Tenant. Landlord shall, without any cost to Tenant and for the full term of the Lease, routinely inspect, test, and maintain the Fire Pump in accordance with NFPA 25, Standard for the Inspection, Testing, and Maintenance of Water-based Fire Protection Systems (Chapter 5 of 1998 Edition).

F.    LL shall issue complete fire protection submittal consisting of site specific head locations, hydraulic calculations and equipment cut sheets to CCI/TVA for their review and approval no later than (16) weeks prior to projected delivery date. The fixed cost to LL for this initial review is $550.00 plus reimbursables associated with printing and shipping. If subsequent reviews are required by CCI/TVA due to initial rejection, then fixed cost to LL for subsequent reviews shall be on a time and material basis. The hourly rate for these subsequent reviews shall be $125.00/hour plus reimbursables associated with printing and shipping.

If BBBY national fire protection consultants are needed to assist LL with approvals from governmental authorities such as completing technical discussions with governmental authorities to explain/clarify design parameters, calculations, high pile storage commodity classifications, fire pump design, etc., then LL shall directly pay consultant for all time and materials. If LL fails to pay consultant, then Tenant shall have the right to receive a credit against "Changes" under the lease or deduct amount from Rent in order to satisfy outstanding invoice.

3

| Mr. Will Smith | Gerald Lingenfelter |
| Code Consultants, INC. | TVA Fire and Life Safety |
| Work:          (314) 991-2633 | Work:      973-398-1445x 4525 |
| Fax:            (314) 991-4614 | Fax:        973-398-1442 |
| 1804 Borman Circle Drive | 200 Valley Road Suite 306 |
| St. Louis, Missouri 63146-4136 | Mt. Arlington, NJ 07856 |

G.  If fire-proofing of structural elements is required, then Landlord shall use intumescent fire resistive coating. All edges of application shall be neat, clean and straight. All edges of material to be parallel to structural element being treated.

H.  Landlord shall provide a complete HVAC system as per requirements set forth within Tenant's prototype drawings and specifications; provided, however, Landlord shall be allowed to utilize two (2) existing 10-ton Lennox units, (all other existing RTU's to be removed), all existing ductwork, controls, etc. shall be removed and replaced with ductwork, controls, etc., which are consistent with Tenant's Prototype Drawings and Specifications. For the existing units Landlord shall provide (2) year warranty on all parts and labor, and an additional extended five (5) year warranty on replacement of compressor and heat exchangers parts including labor. Scope of work for renovation of existing units shall include all necessary repairs or replacement using new parts to bring the units up to good working condition. Renovation of units shall include: Cleaning of all coils; Combing of coils; Replacement of coils that show fin or tube deterioration; Cleaning and reconditioning of drip pans; Replacement of all filter/dryers; Replacement of any worn contractors; Repair of any wiring showing signs of deterioration; Installation of Tri Dek filters; Replacement of any compressors that are failing; Replacement of all belts; Replacement of any worn pulleys or sheaves; Cleaning of all blower fan blades; Replacement of any conditioning or evaporator fan motors or blades that are failed or marginal; Cleaning of the burner compartment; Repair of all condensate drain lines; Cleaning of ducts if needed; Adjustment or repair of damper and exhaust fan systems.

## Construction Coordination Requirements

A.  Landlord shall provide Tenant with a critical path schedule prior to commencement of Landlord's Work, and shall provide to Tenant's construction project manager an updated critical path schedule every two weeks thereafter until Landlord's Work is completed .

B.  Throughout the period during which Landlord's Work is being performed, Landlord shall provide to Tenant's construction project manager, on a weekly basis, then-current photographs of the interior and exterior of the Premises, and the Shopping Center site, showing the progression of Landlord's Work. All photographs shall be in a digital format, and transmitted to Tenant at e-mail address at BBB.2000photos@bedbath.com

## Building and Site Signs

A.  Building Signs -- Landlord shall furnish and install all building signs shown on Exhibits D-1 and F utilizing Tenant's specified vendor only. Landlord is responsible to verify actual number of circuits required with Tenant's specified vendor. Conduit to be installed continuously from Tenant's panel in Premises to sign location(s). Landlord required to execute purchase order with Tenant's specified vendor within 10 weeks prior to Delivery Date. If Landlord fails to execute purchase order within this time frame, then at Tenant's option, Tenant may execute purchase order with Tenant's specified vendor and deduct all costs from rent, (or , at Tenant's option , receive a credit against "Changes" under the lease). If Tenant does not provide written notice to Landlord regarding Tenant's decision to execute purchase order with Tenant's specified vendor, then Landlord shall remain responsible to execute purchase order.

B.  Pylon/Monument/Directional Signs -- Landlord shall furnish and install all pylon /monument /directional signs (s) shown on Exhibit F to this Lease, complete (including, without limitation, sign structure, any required electrical service, sign panels, and Tenant's specified graphics).

C.  Temporary Signs -- commencing on the Effective Date, and continuing thereafter through the Rent Commencement Date, Landlord shall install and maintain, for such duration as Tenant may desire, and in accordance with Tenant's Prototype Drawings and Specifications [and Exhibit F to this Lease, as applicable]: (i) a temporary banner bearing the phrase "Coming Soon" on the storefront of the Premises, and (ii) a temporary sign near the site of the main entrance to the Shopping Center, bearing the phrase "Bed Bath & Beyond Coming Soon" if allowed by the city, and subject to removal at opening. At Tenant's request, Landlord shall relocate Tenant's temporary signage, in the event the visibility thereof becomes obstructed.

D.  Landlord shall provide complete shop drawings of all Landlord-furnished signs to Tenant for Tenant's approval at least (12) weeks prior to delivery date.

4

## Permits and Approvals

A.  Landlord to secure all permits required allowing Tenant to fixture, merchandise (including without limitation permits for it's for prepackaged foods), and open for business to the public in the Premises.

B.  Sprinkler system design shall allow Landlord to obtain and secure "high pile storage" permit.

## Construction Closeout

A.  Landlord shall deliver to Tenant's Construction Project Manager two (2) hard-copy sets of as-built drawings of the Premises, one (1) electronic copy CD-ROM (*"Auto Cad" Rel. 14* Format) of As-built along with all close-out books and warranty information, as specified within Tenant's Prototype Drawings and Specifications (refer to Section 01700 for complete list of closeout documents) within thirty (30) days after the "Substantial Completion Date".

B.  Warranties - Landlord shall provide Tenant with a list of contractors' and subcontractors' contacts and addresses, and a guarantee, including parts and labor, for a period of at least one (1) year after the Rent Commencement Date. Landlord shall deliver all warranties of equipment, service manuals, and as-built drawings to Tenant's construction project manager within thirty (30) days after the "Substantial Completion Date". Landlord shall cause its contractor(s) to instruct Tenant's Construction Project Manager in the operation of any equipment installed pursuant to these specifications. All of Landlord's Work shall be performed in a manner which will not void, impair or diminish any manufacturers', installers', or contractors' warranties which otherwise would have been provided by such manufacturer, installer, or contractor to either Landlord or Tenant. Two (2) months prior to the end of the warranty period, Landlord must forward a written report to Tenant on the condition of all warranty items.

C.  If Landlord fails to deliver any of the instruments and items (collectively, the "Close-out Documents") described in the immediately preceding paragraphs A and B within the prescribed thirty (30) day period, then Tenant may provide Landlord with notice of such failure. If Landlord has not remedied such failure within fifteen (15) days after Tenant's delivery of such notice, then Tenant shall be entitled to an abatement in Rent in the amount of One Hundred ($100.00) dollars for each day that Landlord has not so delivered all of the Close-out Documents.

1
2
3
4
5
6
7

<u>Exhibit D-1</u>

<u>Exterior Elevations of Premises and Shopping Center,
and Sidewalk Plan</u>

## Exhibit E

## Permitted Encumbrances

1.    Taxes or special assessments which are not yet due and payable.

2.    Title to the minerals within and underlying the subject premises; oil and gas leases and mineral grants affecting the subject premises; all rights, interest and privileges appurtenant thereto.

3.    Statutory Section Line Road Easements in favor of the State of Oklahoma, where applicable.

4.    Right of Way Agreement in favor of Oklahoma Natural Gas Company recorded in Book 28, Page 632, and limited Partial Release recorded in Book 3790, Page 281.

5.    Easement in favor of the City of Edmond, recorded in Book 3247, Page 640.

6.    Easement in favor of the City of Edmond, recorded in Book 3247, Page 641; Correction easement recorded in Book 4338, Page 1602; Correction easement recorded in Book 4617, Page 569; Partial Vacation of easement recorded in Book 4600, Page 777.

7.    Highway easement in favor of the State of Oklahoma, recorded in Book 3334, Page 625.

8.    Easement in favor of Oklahoma Natural Gas Company, recorded in Book 4130, Page 481.

9.    Easement in favor of the City of Edmond, recorded in Book 4186, Page 83.

10.   Right of Way in favor of Oklahoma Natural Gas Company filed December 11, 1978 at Book 4524, Page 368.

11.   Agreement for utility easement by and between Bryant Square Shopping Center to C.A. Henderson, filed October 1, 1982 in Book 4920, Page 1056.

12.   Easement in favor of C.A. Henderson from Bryant Square Shopping Center for the purpose of ingress and egress and roadway purposes filed October 1, 1982 at Book 4920, Page 1060.

13.   Temporary permit to take and use ground water, dated October 11, 1977 and filed November 8, 1977 in Book 4414, Page 1101.

14.   Easement in favor of the City of Edmond, recorded in Book 5780, Page 578.

15.   Short Form Lease by and between Weingarten/Oklahoma, Inc. and Eckerd Corporation, recorded at Book 6683, Page 489. The inclusion of the foregoing short form lease within these "Permitted Encumbrances" is for informational purposes only, and shall not be deemed to diminish any of Tenant's rights, or increase any of Tenant's obligations, under this Lease.

16.   Easement in favor of The City of Edmond, recorded in Book 6022, page 1132.

17.   Easement in favor of The City of Edmond, recorded in Book 6574, page 1515.

18.   Temporary Easement in favor of The City of Edmond, recorded in Book 7029, page 1207.

19.   Easement in favor of The City of Edmond, recorded in Book 7411, page 1809.

20.   Street Easement in favor of The City of Edmond, recorded in Book 8100, page 1537.

21.   Mortgage made by Weingarten/Oklahoma, Inc. to Weingarten Realty Investors, dated July 22, 1991, filed July 23, 1991 and recorded in Book 6192, page 1426, in the principal amount of $3,127,014.95 and Mortgage Modification Agreement recorded June 24, 1996 in Book 6912, page 31, subject to the provisions of Section 17.3 of the Lease.

Lease 6 (clean) - Edmond, OK.wpd

22.    Memorandum of Lease evidencing a Lease by and between Weingarten Nostat, Inc., and Stein Mart, Inc., recorded August 18, 1998 in Book 7381, page 1915. The inclusion of the foregoing memorandum of lease within these "Permitted Encumbrances" is for informational purposes only, and shall not be deemed to diminish any of Tenant's rights, or increase any of Tenant's obligations, under this Lease.

23.    Evidence of Lease by and between C.A. Henderson and the Capitol Steel and Iron Company and Firestone Tire and Rubber Company, filed April 20, 1976 in Book 4285, page 1093; Assignment to Sheppard Mall State Bank, recorded in Book 4287, page 231. The inclusion of the foregoing evidence of lease within these "Permitted Encumbrances" is for informational purposes only, and shall not be deemed to diminish any of Tenant's rights, or increase any of Tenant's obligations, under this Lease.

Landlord represents and warrants that (i) none of the foregoing will interfere with or prevent Tenant from operating its Premises in accordance with the terms of this Lease, (ii) conflict with any right granted Tenant under this Lease, (iii) impose on Tenant any obligation(s) in excess of those set forth in this Lease, (iv) none of the foregoing easements or rights of way (a) are located beneath the Premises, or (b) will interfere with Tenant's use and enjoyment of the Premises or, as permitted under and subject to the terms of the Lease, the Common Areas.

1
2
3
4
5
6
7

<u>Exhibit F</u>

<u>Tenant's Signage</u>

<u>Exhibit G-1</u>

<u>Subordination, Non-Disturbance and Attornment Agreement</u>

THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT, made as of the _____ day of _____, 200_, by and between _____ _____, a _____ [corporation] [limited] [general] [partnership] [national banking association], having an office at _____ _____ (the *"Mortgagee"*) and Bed Bath & Beyond Inc., a New York corporation, having an office at 650 Liberty Avenue, Union, New Jersey 07083 (the *"Tenant"*).

W I T N E S S E T H :

WHEREAS, Mortgagee is the holder of a mortgage (the *"Mortgage"*) covering a parcel of land owned by WEINGARTEN NOSTAT, INC., a Texas corporation (the *"Landlord"*) together with the improvements [to be] erected thereon (said parcel of land and improvements thereon being hereinafter referred to as the *"Shopping Center"* and being more particularly described on <u>Exhibit A</u> attached hereto and made a part hereof); and

WHEREAS, by a certain lease heretofore entered into between Landlord and Tenant dated as of _____ (the *"Lease"*), Landlord leased to Tenant a portion of the Shopping Center, as more particularly described in the Lease (the *"Premises"*); and

WHEREAS, a copy of the Lease has been delivered to Mortgagee, the receipt of which is hereby acknowledged; and

_____

**[For mortgages existing as of the date Lease is executed:** WHEREAS, as an inducement to Tenant to enter into the Lease, Section 17.3 thereof provides that the Lease is conditioned upon Landlord obtaining this Agreement from Mortgagee; and

WHEREAS, the parties desire to satisfy the foregoing condition and to provide for the non-disturbance of Tenant by the holder of the Mortgage; and]

_____

**[For mortgages occurring after the Lease is executed:** WHEREAS, Section 17.1 of the Lease provides that the Lease shall become subject and subordinate to a mortgage encumbering the fee interest of Landlord in and to the Shopping Center if and when a non-disturbance agreement is entered into with respect to such mortgage; and

WHEREAS, the parties hereto desire to effect the subordination of the Lease to the Mortgage and to provide for the non-disturbance of Tenant by Mortgagee.]

_____

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements herein contained, the parties hereto, intending to be legally bound hereby, agree as follows:

1.      Mortgagee hereby consents to and approves the Lease and the term thereof, including the options to extend the term as set forth in the Lease, and covenants and agrees that the exercise by Tenant of any of the rights, remedies and options therein contained shall not constitute a default under the Mortgage.

2.      Tenant covenants and agrees with Mortgagee that the Lease hereby is made and shall continue hereafter to be subject and subordinate to the lien of the Mortgage, and to all modifications and extensions thereof (and such subordination shall not lessen or diminish Tenant's rights under the Lease), subject, however, to the provisions of this Agreement.

3.      Mortgagee agrees that so long as the Lease shall be in full force and effect, and so long as Tenant shall not be in default under the Lease beyond any applicable notice and grace period:

(a)     Tenant shall not be named or joined as a party or otherwise in any suit, action or proceeding for the foreclosure of the Mortgage or to enforce any rights under the Mortgage or the bond or note or other obligation secured thereby;

(b)     The possession by Tenant of the Premises and Tenant's rights thereto shall not be disturbed, affected or impaired by, nor will the Lease or the term thereof be terminated or otherwise affected by (i) any suit, action or proceeding brought upon the Mortgage or the bond or note or other obligation secured thereby, or for the foreclosure of the Mortgage or the enforcement of any rights under the Mortgage, or by any judicial sale or execution or other sale of the Premises or the Shopping Center, or any deed given in lieu of foreclosure, or by the exercise of any other rights given to any holder of the Mortgage or other documents as a matter of law, or (ii) any default under the Mortgage or the bond or note or other obligation secured thereby; and

(c)     All condemnation awards and insurance proceeds paid or payable with respect to the Premises or any other part of the Shopping Center shall be applied and paid in the manner set forth in the Lease.

4.     If Mortgagee or any future holder of the Mortgage shall become the owner of the Shopping Center by reason of foreclosure of the Mortgage or otherwise, or if the Shopping Center shall be sold as a result of any action or proceeding to foreclose the Mortgage, or transfer of ownership by deed given in lieu of foreclosure, the Lease shall continue in full force and effect, without necessity for executing any new lease, as a direct lease between Tenant and the then owner of the Shopping Center, as "landlord", upon all of the same terms, covenants and provisions contained in the Lease, and in such event:

(a)     Tenant shall be bound to such new owner under all of the terms, covenants and provisions of the Lease for the remainder of the term thereof (including the Renewal Periods, if Tenant elects or has elected to exercise its options to extend the term) and Tenant hereby agrees to attorn to such new owner and to recognize such new owner as "landlord" under the Lease; and

(b)     Such new owner shall be bound to Tenant under all of the terms, covenants and provisions of the Lease for the remainder of the term thereof (including the Renewal Periods, if Tenant elects or has elected to exercise its options to extend the term) which such new owner hereby agrees to assume and perform and Tenant shall, from and after the date such new owner succeeds to the interest of "landlord" under the Lease, have the same remedies against such new owner for the breach of any covenant contained in the Lease that Tenant might have had under the Lease against Landlord if such new owner had not succeeded to the interest of "landlord"; provided, however, that such new owner shall not be:

(i)     liable for any act or omission of any prior landlord (including Landlord) unless such act or omission continues from and after the date upon which the new owner succeeds to the interest of such prior landlord;

(ii)    subject to any defenses which Tenant may have against any prior landlord (including Landlord) unless resulting from any default or breach by such prior landlord which continues from and after the date upon which the new owner succeeds to the interest of such prior landlord;

(iii)   subject to any offsets which Tenant may have against any prior landlord, except to the extent such offsets are expressly provided under the Lease and Mortgagee has received notice thereof and the opportunity to cure within the applicable time periods set forth in the Lease (it being further agreed that offsets under the Lease that were deducted by Tenant prior to the date upon which the new owner succeeds to the interest of such prior landlord shall not be subject to challenge);

(iv)    bound by any fixed rent which Tenant might have paid for more than one month in advance of its due date under the Lease to any prior landlord (including Landlord), unless such additional rent is paid in accordance with the applicable provisions of the Lease; or

(v)     bound by any amendment or modification of the Lease made without its consent; notwithstanding the foregoing, Mortgagee acknowledges that the Lease specifically provides for amendments thereof upon the occurrence of

certain events described in the Lease (such as, for example, an amendment to the Lease confirming the measurement of the Premises), and, by its execution below, Mortgagee agrees to recognize such amendments as part of the Lease, and Mortgagee further agrees that such new owner shall also be bound by such amendment(s) to the Lease, without any consent on the part of Mortgagee or such new owner.

   (c) Tenant's obligations hereunder shall be effective only so long as Mortgagee is bound to Mortgagee's obligations hereunder.

   5. Tenant will notify Mortgagee of any default by Landlord under the Lease which would entitle Tenant to terminate the Lease or abate the rent payable thereunder and agrees that notwithstanding any provision of the Lease, no notice of termination thereof nor any abatement shall be effective unless Mortgagee has received the aforesaid notice and has failed to cure the subject default within the same time period allowed Landlord under the Lease. It is understood that the abatement provisions of this Section relate to abatements by reason of Landlord's default and do not apply to provisions of the Lease whereby Tenant has the automatic right to abate rentals such as, for example, abatement upon casualty or condemnation.

   6. Neither the Mortgage nor any other security instrument executed in connection therewith shall encumber or be construed as subjecting in any manner to the lien thereof, any trade fixtures, signs or other personal property at any time furnished or installed by or for Tenant or its subtenants or licensees on the aforementioned property regardless of the manner or mode of attachment thereof.

   7. Any notices of communications given under this Agreement shall be in writing and shall be given by registered or certified mail, return receipt requested, postage prepaid, (a) if to Mortgagee, at the address of Mortgagee as hereinabove set forth or at such other address or persons as Mortgagee may designate by notice in the manner herein set forth, or (b) if to Tenant, at the address of Tenant as hereinabove set forth, with duplicate copies to Allan N. Rauch, Esq., c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, and Jeffrey H. Newman, Esq., c/o Sills Cummis Radin Tischman Epstein & Gross, P.A., One Riverfront Plaza, Newark, New Jersey 07102-5400, or such other address or persons as Tenant may designate by notice in the manner herein set forth.  All notices given in accordance with the provisions of this Section shall be effective upon receipt (or refusal of receipt) at the address of the addressee.

   8. This Agreement shall bind and inure to the benefit of and be binding upon and enforceable by the parties hereto and their respective successors, assigns, and sublessees.

   9. This Agreement contains the entire agreement between the parties and cannot be changed, modified, waived or canceled except by an agreement in writing executed by the party against whom enforcement of such modification, change, waiver or cancellation is sought.

   10. This Agreement and the covenants herein contained are intended to run with and bind all lands affected thereby.

IN WITNESS WHEREOF, the parties hereto have duly executed this Subordination, Non-Disturbance and Attornment Agreement as of the day and year first above written.

**MORTGAGEE:**

ATTEST:                                        _____

[Corporate Seal]

_____         By:_____
(Assistant) Secretary                   Name:_____
                                        Title:_____


**TENANT:**

ATTEST:                                 BED BATH & BEYOND INC.

[Corporate Seal]


_____         By:_____
(Assistant) Secretary                         Warren Eisenberg
                                              Co-Chief Executive Officer

**[INSERT APPROPRIATE JURAT FOR MORTGAGEE]**

_____

STATE OF NEW JERSEY          )
                             )ss.
COUNTY OF UNION              )


      Before me, a notary public, in and for said county and state, on this _____ day of _____, 2002, personally appeared Warren Eisenberg, to me known to be the identical person who subscribed the name of the maker thereof to the foregoing instrument as Co-Chief Executive Officer of Bed Bath & Beyond Inc., a New York corporation, and acknowledged to me that he executed the same as his free and voluntary act and deed, and as the free and voluntary act and deed of such corporation for the uses and purposes therein set forth.


_____
                Notary Public


(Seal)

<u>Exhibit H</u>

<u>Recognition Agreement</u>

THIS RECOGNITION AGREEMENT, made as of the _____ day of _____, 200_,
by and between WEINGARTEN NOSTAT, INC., a Texas corporation, having an address at
2600 Citadel Plaza Drive, POB # 924133, Houston, Texas 77292-4133 (*"Landlord"*); Bed Bath
& Beyond Inc., a New York corporation, having an address at 650 Liberty Avenue, Union, New
Jersey 07083 (*"Tenant"*); and _____, a [_____]
**[corporation] [limited] [general] [partnership]**, having an address at _____
_____ (*"Subtenant"*).

R E C I T A L S:

A.      Landlord and Tenant have entered into a certain lease (the *"Lease"*) dated as of
_____ ____, 200__, a short form of which has been recorded in _____,
which demises certain premises (the *"Premises"*) located in the Bryant Square Shopping
Center, Edmond, Oklahoma, which Shopping Center is more particularly described on <u>Exhibit A</u>
annexed hereto and made a part hereof.

B.      Section 15.4 of the Lease provides that in the event Tenant subleases all or a
portion of the Premises for a term of at least five (5) years, Landlord shall, upon Tenant's
request, execute and deliver a Recognition Agreement among Landlord, Tenant and each such
subtenant in the form attached to the Lease, in recordable form.

C.      Pursuant to a Sublease dated as of _____ (the *"Sublease"*), Tenant
has subleased **[a portion of]** the Premises to Subtenant (the *"Subleased Premises"*).

D.      The parties hereto desire to effectuate the provisions of Section 15.5 of the
Lease with respect to the Sublease and the Subleased Premises.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein
contained, the parties hereto, intending to be legally bound hereby, agree as follows:

1.      Landlord warrants and represents as follows:

(i)      that it is the fee owner of the Premises,

(ii)      that the Lease is unmodified (except as may be otherwise
set forth in <u>Exhibit B</u> annexed hereto, if any) and is in full force and effect,

(iii)      that the term of the Lease expires on _____, but
is subject to [three] renewal periods of [five] years each and

(iv) that, to Landlord's actual knowledge, Tenant is not in default
under the Lease nor has any event occurred which would after notice to Tenant
and the passage of time become a default of Tenant under the Lease.

2.      Landlord hereby acknowledges receipt of a copy of, and consents to and
approves, the Sublease and all of the terms, covenants and provisions thereof, and agrees that
the exercise by Subtenant of any of its rights, remedies and options contained therein shall not
constitute a default under the Lease.

3.      Landlord agrees that whenever it has an obligation with respect to the
Premises, or its consent or approval is required for any action of Tenant under the Lease, then,
to the extent such obligation, consent or approval relates to the Subleased Premises or
Subtenant's use and occupation thereof, it will perform such obligation in accordance with the
terms and conditions of the Lease, and, subject to the applicable terms of the Lease, will not
unreasonably withhold or unduly delay such consent or approval.

4.      Landlord shall not, in the exercise of any of the rights arising or which
may arise out of the Lease or of any instrument modifying or amending the same or entered
into in substitution or replacement thereof (whether as a result of Tenant's default or otherwise),
disturb or deprive Subtenant in or of its possession or its rights to possession of the Subleased
Premises or of any right or privilege granted to or inuring to the benefit of Subtenant under the

1   Sublease, provided that Subtenant is not in default under the Sublease beyond the expiration of
2   any applicable notice and cure period.
3
4          5.   In the event of the termination of the Lease by reentry, notice, conditional
5   limitation, surrender, summary proceeding or other action or proceeding, or otherwise, or, if the
6   Lease shall terminate or expire for any reason before any of the dates provided in the Sublease
7   for the termination of the initial or renewal terms of the Sublease and if immediately prior to
8   such surrender, termination or expiration the Sublease shall be in full force and effect,
9   Subtenant shall not be made a party in any removal or eviction action or proceeding nor shall
10  Subtenant be evicted or removed of its possession or its right of possession of the Subleased
11  Premises be disturbed or in any way interfered with.  Further, Landlord shall have the option to
12  either (A) have the Sublease continue in full force and effect as a direct lease between Landlord
13  and Subtenant, or (B) enter into a "new" lease with the Subtenant on the same terms and
14  conditions of the Lease.  Landlord shall exercise such option by notice to Tenant and
15  Subtenant, which notice shall be sent simultaneously with Landlord's notice to Tenant that
16  Landlord is electing to terminate the Lease following an "Event of Default" (as defined in the
17  Lease) by Tenant.  If Landlord fails to exercise such option as aforesaid, then Landlord shall be
18  deemed to have elected to proceed pursuant to clause (A) above.
19
20         6.   Landlord hereby waives and relinquishes any and all rights or remedies
21  against Subtenant, pursuant to any lien, statutory or otherwise, that it may have against the
22  property, goods or chattels of Subtenant in or on the Subleased Premises.
23
24         7.   Any notices, consents, approvals, submissions, demands or other
25  communications (hereinafter collectively referred to as "Notice") given under this Agreement
26  shall be in writing.  Unless otherwise required by law or governmental regulation, Notices shall
27  be deemed given if sent by registered or certified mail, return receipt requested, postage
28  prepaid (a) to Landlord, at the address of Landlord as hereinabove set forth or such other
29  address or persons as Landlord may designate by Notice to the other parties hereto, (b) to
30  Tenant, at the address of Tenant as hereinabove set forth, with duplicate copies to  Allan N.
31  Rauch, Esq., c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, and
32  Jeffrey H. Newman, Esq., c/o Sills Cummis Radin Tischman Epstein & Gross, P.A., One
33  Riverfront Plaza, Newark, New Jersey 07102-5400, or such other address or persons as
34  Tenant may designate by Notice to the other parties hereto, and (c) to Subtenant, at the
35  address of Subtenant as hereinabove set forth or such other address or persons as Subtenant
36  may designate by Notice to the other parties hereto.  During the period of any postal strike or
37  other interference with the mails, personal delivery shall be substitute for registered or certified
38  mail.  All Notices shall become effective only on the receipt or rejection of same by the proper
39  parties.
40
41         8.   No modification, amendment, waiver or release of any provision of this
42  Agreement or of any right, obligation, claim or cause of action arising hereunder shall be valid
43  or binding for any purpose whatsoever unless in writing and duly executed by the party against
44  whom the same is sought to be asserted.
45
46                  [Signature Page Follows]
47

9.     This Agreement shall be binding on and shall inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors, assigns and sublessees.

IN WITNESS WHEREOF, the parties have caused this Recognition Agreement to be executed under seal the date first above written.

**LANDLORD:**

WEINGARTEN NOSTAT, INC.

By: _____
Name: _____
Title: _____

**TENANT:**

BED BATH & BEYOND INC.

By: _____
        Warren Eisenberg
        Co-Chief Executive Officer

**SUBTENANT:**

_____

By: _____
Name: _____
Title: _____

<u>Exhibit I</u>

<u>DELIVERY DATE NOTICE</u>

[Letterhead of Landlord]

_____, 200___

[via Federal Express or other
recognized overnight delivery
service per Article 18 of the foregoing
lease]

Bed Bath & Beyond Inc.
650 Liberty Avenue
Union, NJ 07083
Attn: Warren Eisenberg

Re:     Agreement of Lease, dated _____, 2002 (the "Lease"), between Weingarten
Nostat, Inc., as landlord ("Landlord"), and Bed Bath & Beyond Inc., as tenant ("Tenant"),
with respect to certain retail premises (the "Premises") located in the Bryant Square
Shopping Center, Edmond, Oklahoma.

Gentlemen:

    In accordance with the provisions of Subsection 2.3.2 of the Lease, the Landlord hereby
informs the Tenant that the Delivery Date shall take place at 8:00 A.M. on _____ _   , 200_.
This notice shall constitute the Delivery Date Notice referred to in Subsection 2.3.2 of the
Lease.


                          WEINGARTEN NOSTAT, INC.


                          By:_____
                                        , (Vice) President


cc:     [Jeffrey H. Newman, Esq.]
        [Allan N. Rauch, Esq.]


Lease 6 (clean) - Edmond, OK.wpd

**[INSERT APPROPRIATE JURATS FOR <u>SUBTENANT</u>]**

STATE OF                              )
                                      )ss.
COUNTY OF                             )


     Before me, a notary public, in and for said county and state, on this _____ day of _____, 2002, personally appeared _____, to me known to be the identical person who subscribed the name of the maker thereof to the foregoing instrument as _____ of Weingarten Nostat, Inc., a Texas corporation, and acknowledged to me that he/she executed the same as his/her free and voluntary act and deed, and as the free and voluntary act and deed of such corporation for the uses and purposes therein set forth.


                                 _____
                                        Notary Public

(Seal)


STATE OF NEW JERSEY              )
                                )ss.
COUNTY OF UNION                  )


     Before me, a notary public, in and for said county and state, on this _____ day of _____, 2002, personally appeared Warren Eisenberg, to me known to be the identical person who subscribed the name of the maker thereof to the foregoing instrument as Co-Chief Executive Officer of Bed Bath & Beyond Inc., a New York corporation, and acknowledged to me that he executed the same as his free and voluntary act and deed, and as the free and voluntary act and deed of such corporation for the uses and purposes therein set forth.


                                 _____
                                        Notary Public

(Seal)

<u>Exhibit J</u>

<u>DELIVERY DATE CERTIFICATION</u>

[Letterhead of Landlord]

_____, 200__

[via Federal Express or other
recognized overnight delivery
service per Article 18 of the foregoing
lease]

Bed Bath & Beyond Inc.
650 Liberty Avenue
Union, NJ 07083
Attn: Warren Eisenberg

Re:    Agreement of Lease, dated _____, 2002 (the "Lease"), between Weingarten
       Nostat, Inc., as landlord ("Landlord"), and Bed Bath & Beyond Inc., as tenant ("Tenant"),
       with respect to certain retail premises (the "Premises") located in the Bryant Square
       Shopping Center, Edmond, Oklahoma.

Gentlemen:

       In accordance with the provisions of Subsection 2.3.3 of the Lease, Landlord hereby
certifies to Tenant that, as of the date of this certification, all of the Delivery Date Conditions (as
defined in the Lease) have been satisfied, and that, as a result, the Delivery Date (as such term
is defined in the Lease) will be deemed to be _____, 200__ [INSERT THE DATE
WHICH IS TWO DAYS AFTER THE DATE OF THIS LETTER].  This notice shall constitute the
Delivery Date Certification referred to in Subsection 2.3.3 of the Lease.

                                        WEINGARTEN NOSTAT, INC.


                                        By:_____
                                               , (Vice) President


cc:    [Jeffrey H. Newman, Esq.]
       [Allan N. Rauch, Esq.]

# EXHIBIT K-1

Tenant d/b/a:    Burger King

..,, Landlord agrees that it will not, after the date
hereof, lease space in the Shopping Center to any other tenant whose *primary*
business will be the operation of a "fast food" restaurant that specializes in
hamburgers (such as, for example only, a McDonald's, Wendy's or Whataburger
restaurant).
                                        5

Tenant d/b/a:    China City Buffet

to any other tenant whose business will be the operation of a restaurant primarily offering
Chinese/Asian food ("Competing Business").

Tenant d/b/a:    CiCi's Pizza

Landlord shall not, after the date hereof, lease space in the Shopping
Center to any other tenant whose primary business will be the sale of pizza for on
or off premises consumption (hereinafter a "Competing Business").

Tenant d/b/a:    Coyote Coffee

to any other
tenant whose primary business will be the operation of a gourmet coffee shop serving
coffee for on premises consumption and selling premium bulk coffee beans (herein-
after a "Competing Business"). T...

Tenant d/b/a:    Dance Unlimited

Shopping Center to any other tenant whose primary business will be the                        lease space in the
dance instruction.

Tenant d/b/a:    Dollar Tree

Landlord agrees that after the date of this Lease it will not lease other space in
the Shopping Center (or permit any other space in the Shopping Center) to be used
as a single price point variety retail store substantially similar to that operated
by Tenant.

Tenant d/b/a:    Eckerd's

Tenant shall have the exclusive right during the term of this Lease or
any extension or renewal hereof, to sell or dispense prescription drugs in the Shopping Center that no lease will be
entered into in the Shopping Center or any extensions thereof with any type store commonly
known as an army-navy store, surplus store, or non-categorized discount store or with any store
or business devoting more than one thousand (1,000) square feet of its retail floor area to the
sale of cosmetics, health and beauty aids and related items

PAGE 1 of 3

Tenant d/b/a:     Firestone

in the Shopping Center for sale of tires or automobile service, or to any tenant whose main and principal busi-
ness is automobile accessories..    This provision shall not apply to ...............

Tenant d/b/a:     J's Hallmark

...... ........, ... ...rm "Competing Business" shall be defined as
any of the following: any tenant occupying less than 8,000 square feet of space
whose business will include more than twenty (20) lineal feet of fixtures (or the
equivalent floor space, if no fixtures are used) devoted to the sale of cards, gift
wrap supplies and/or party supplies, or any tenant occupying less than 8,000 square
feet of space with an original lease term of less than nine (9) months in duration
which such tenant's business includes more than ten (10) lineal feet of fixtures (or
the equivalent floor space, if no fixtures are used) devoted to the sale of cards,
gift wrap supplies, party supplies and/or Christmas ornaments. For purposes of this
Section 6.04., a spinner rack of merchandise shall be deemed to constitute six (6)
lineal feet when determining whether a third party is conducting a Competing
Business. This limitation shall not apply to present tenants (or their assignees or
sublessees) whose leases as of the date of this Lease do not prohibit such use, nor
shall this limitation apply to "Major Tenants" (which are defined as any tenant
occupying more than 8,000 square feet of space).    ¯ ¯ ¯ ¯ .. ...... renant

Tenant d/b/a:     Leslie's Swimming Pool Supplies

               lease space in the Shopping Center to any
other tenant whose "primary" business ("primary" being defined as more than 10% of
such tenant's Gross Sales being derived from the sale of such items) shall be the
retail sale of swimming pools, spas and related supplies ...... ............. /.. their
"Competing Business").

Tenant d/b/a:     Moto Photo

           / lease space in the Shopping Center to any other tenant whose
business will include or be the operation of a one-hour photo processing store or
department ("Competing Business")

Tenant d/b/a:     Souper Salad

                                  -/ lease
space in the Shopping Center to any other tenant whose primary business will be the
operation of a self-service restaurant that receives more than fifty percent (50%) of
its revenues from the sale of soup and/or salads.

Tenant d/b/a:     Western Sizzlin Steak House

                              LESSOR will
not lease to any tenant within the shopping center of which the
Leased Premises is a part who advertises as a steak house
restaurant.

Tenant d/b/a:     Your Beauty Source

      lease space in the Shopping Center to any other tenant whose premises contain less
than 10,000 square feet and who derives fifty percent (50%) or more of its revenue from the
sale of beauty supplies (hereinafter a "Competing Business"). This limitation shall not
apply to: (i) present tenants (or their assignees or sublessees) whose leases may not
prohibit such use, or (ii) any tenant occupying 10,000 square feet or more; or (iii) any
tenant who derives less than fifty percent (50%) of its revenue from the sale of beauty
supplies. ̄

                                     PAGE 7 of 7

Exhibit K-2

Existing Leases

| Landlord | Tenant | Document | Date |
|---|---|---|---|
| Weingarten Nostat, Inc. | Richard A. Leturia, d/b/a Shaolin Kung Fu | Lease Contract | 12/10/96 |
| Bryant Square Shopping Center | Anita Haddock, d/b/a Merle Norman Cosmetics | Shopping Center Lease | 9/19/86 |
| Weingarten Nostat, Inc. | Your Beauty Source, Inc., d/b/a Your Beauty Source | Lease Contract | 2/21/01 |
| Weingarten Nostat, Inc. | Phillip Williams and Sharla Williams, d/b/a A.L.P. | Lease Contract | 12/10/97 |
| Weingarten/Oklahoma, Inc. | Wm. D. Griffin Company, Inc. | Lease Contract | 6/17/93 |
| Weingarten Nostat, Inc. | Tuesday Morning, Inc. | Lease | 12/4/95 |
| Weingarten Nostat, Inc. | K&K Foods, Inc., Burger King | Land Lease Contract | 11/30/95 |
| Weingarten Nostat, Inc. | Randolph, Inc., d/b/a The Sample Shop | Lease Contract | 5/17/96 |
| Henderson National Corporation | Tandy Corporation, d/b/a Radio Shack | Lease Agreement | 3/30/90 |
| Weingarten Nostat, Inc. | Ed Proffit and Gloria Proffit, d/b/a Hair & Nail Salon | Lease Contract | 7/16/01 |
| Weingarten Nostat, Inc. | Legend Enterprises, Inc., d/b/a Daylight Donuts of Edmond | Lease Contract | 3/13/96 |
| Weingarten Nostat, Inc. | John W. Hutchinson, d/b/a Pony Storage | Occupancy Agreement | 10/13/95 |
| Weingarten Nostat, Inc. | Dorothy Gean Duncan and Jay W. Duncan, d/b/a My Sisters' Closet | Lease Contract | 3/9/99 |
| Weingarten Nostat, Inc. | Brooke van Horn, d/b/a Discount Liquor | Lease Contract | 5/8/98 |
| Weingarten Nostat, Inc. | Jimmy Steiner and Christi Steiner, d/b/a Rocos | Lease Contract | 4/14/98 |
| Bryant Square Shopping Center | 3 Beall Brother 3, Inc., d/b/a Stage | Lease | 7/20/77 |
| Weingarten Nostat, Inc. | Leslie's Poolmart (Inc.), d/b/a Leslie's Swimming Pool Supplies | Lease Contract | 4/12/96 |
| Weingarten Nostat, Inc. | Amy Reynolds-Reed, d/b/a Dance Unlimited | Lease Contract | 5/18/01 |
| Weingarten Nostat, Inc. | Steven B. Herrin, d/b/a Furniture Gallery | Lease Contract | 5/13/98 |
| Bryant Square Shopping Center | Mr. Ping Chau, d/b/a Marbo Chinese Restaurant | Lease | 3/9/84 |
| Weingarten/Oklahoma, Inc. | John W. Hutchinson, Jr., d/b/a Pony Express | Lease Contract | 1/1/93 |
| Weingarten/Oklahoma, Inc. | Coyote Coffee Co., Inc., d/b/a Coyote Coffee | Lease Contract | 3/7/95 |
| First Westinghouse Equities Corporation | C&R Steaks, Inc., d/b/a Western Sizzlin Steak House | Lease | 9/18/90 |
| Weingarten/Oklahoma, Inc. | Eckerd Corporation | Lease | 10/12/94 |
| Weingarten Nostat, Inc. | G. Martini Enterprises, | Lease Contract | 8/27/01 |

| Landlord | Tenant | Document | Date |
|---|---|---|---|
| | LLC, d/b/a Daylight Donuts | | |
| Weingarten/Oklahoma, Inc. | First Phase, Inc., d/b/a Fantastic Sam's | Lease Contract | 9/9/92 |
| Weingarten/Oklahoma, Inc. | Academy Sport Co., d/b/a Academy | Lease Contract | 3/14/94 |
| Weingarten Nostat, Inc. | Stein Mart Inc., d/b/a Stein Mart | Lease | 4/29/98 |
| C. A. Henderson, Venturer and The Capital Steel and Iron Company, Venturer | The Firestone Tire & Rubber Company | Lease | 10/14/75 |
| Weingarten Nostat, Inc. | Diana L. Pate and Jack A. Pate, d/b/a Bead Attic | Lease Contract | 2/1/02 |
| Weingarten Nostat, Inc. | Souper Salad, Inc., d/b/a Souper Salad | Lease Contract | 3/11/98 |
| Weingarten Nostat, Inc. | Blue Haven Pools National, Inc., d/b/a Blue Haven Pools | Occupancy Agreement | 4/10/98 |
| Weingarten Nostat, Inc. | Christopher H. Bozarth, M.D. and Stacy A. Bozarth d/b/a Jazzercise | Lease Contract | 11/7/00 |
| Weingarten Nostat, Inc. | ACG, Inc., d/b/a Tan & Tone America | Lease Contract | 1/31/01 |
| Weingarten Nostat, Inc. | J&J Cards, Inc., d/b/a J's Hallmark | Lease Contract | 5/20/99 |
| Weingarten Nostat, Inc. | Robert Keely and Kelly Keely, d/b/a Confection Connection | Lease Contract | 11/16/01 |
| Weingarten Nostat, Inc. | R.C. Photo, Inc., d/b/a Moto Photo | Lease Contract | 8/7/95 |
| Weingarten Nostat, Inc. | Blue Haven Pools National, Inc., d/b/a Blue Haven Pools | Lease Contract | 3/23/98 |
| First Westinghouse Equities Corporation | Magic Dust Control and Towel Service, Inc., d/b/a Scott Cleaners & Laundry | Shopping Center Lease | 9/28/90 |
| Weingarten/Oklahoma, Inc. | Gene Ward, d/b/a House of Vacuum | Lease Contract | 8/18/94 |
| Weingarten Nostat, Inc. | Wan Zhang Lu d/b/a China City Buffet | Lease Contract | 2/15/02 |
| Weingarten Nostat, Inc. | Dollar Tree Stores, Inc. d/b/a Dollar Tree | Lease Contract | 12/27/00 |

Exhibit L

Percentage Rent

1.      During the applicable period described within Sections 2.4 and/or 2.5 and/or Article 22 of the Lease, Tenant shall pay percentage rent (*"Percentage Rent"*) equal to three (3%) percent of all Gross Sales (as hereinafter defined) resulting from business conducted in, on or from the Premises.  As used herein, the term *"Gross Sales"* shall mean the total amount of all sales of merchandise or services arising out of or payable on account of all the business conducted in, on or from the Premises by or on account of Tenant and any sublessee, licensee or concessionaire of Tenant and any other person or entity operating in the Premises, whether for cash, credit or otherwise, including redemption of gift certificates, orders for merchandise taken from or filled at or from the Premises and deposits not refunded to customers.  A sale shall be deemed to have been consummated for purposes of this Lease, and the entire amount of the sales price shall be included in Gross Sales, at such time as (A)  the transaction is initially reflected in the books or records of Tenant, or any sublessee, licensee or concessionaire of Tenant, or any other person or entity operating its business in the Premises, (B) Tenant or any other person or entity operating its business in the Premises receives all or any portion of the sales price, or (C) the applicable goods or services are delivered to the customer, whichever of (A), (B) or (C) first occurs, irrespective of whether payment is made in installments, the sale is for cash or credit or otherwise, or all or any portion of the sales price has actually been paid at the time of inclusion in Gross Sales or at any other time.  Tenant and the other persons and entities operating their business in the Premises shall record, at the time of each sale, all receipts from such sale, whether for cash, credit or otherwise, in a cash register or cash registers, or in such electronic or computer device which records sales in a manner which is generally acceptable by industry standards.  The term *"Gross Sales"* shall exclude (1) proceeds from any sales tax, gross receipts tax or similar tax, by whatever name called, which are separately stated and are in addition to the sales price, (2) *bona fide* transfers or exchanges of merchandise from the Premises to any other stores or warehouses of Tenant or any Affiliates of Tenant, and returns to shippers and manufacturers for credit, (3) refunds or credits  given to customers for merchandise purchased at the Premises and returned or exchanged, (4) sales of Tenant's fixtures and equipment not in the ordinary course of Tenant's business, (5) to the extent of prior inclusion in Gross Sales, bad debts when written off the books of Tenant, provided that any collections made on account of such bad debts shall be included in Gross Sales when received, (6)  receipts from vending machines installed solely for the use of Tenant's employees and receipts from pay telephones, (7) sales to employees of Tenant at discount [which, for the purposes of determining Percentage Rent hereunder, shall not exceed two percent (2%) of Gross Sales per calendar year or pro rata portion thereof, as applicable], (8) fees paid to independent third party credit card companies in connection with sales charged to customers' credit cards, (9) proceeds from delivery, wrapping and check cashing charges [which, for the purposes of determining Percentage Rent hereunder, shall not exceed two percent (2%) of Gross Sales per calendar year or pro rata portion thereof, as applicable], (10) sums and credits received in settlement of claims for loss or damage to merchandise, (11) separately stated service, finance and interest charges, (12) the dollar value of Tenant coupons utilized by customers in the purchase of merchandise from the Premises, (13) close-out or bulk sales of inventory to jobbers or wholesalers, and (14) sales of gift certificates.

2.      Tenant shall maintain at the Premises or at its principal office, complete books and records reflecting all elements of Gross Sales.  Tenant shall be permitted to maintain its books and records in a computerized form; provided, however, that (A) such computerized books and records provide the same level of information as the books and records described above and are retained for the full record retention period provided for herein, and (B) promptly upon request, printed copies of any such books and records shall be made available at Tenant's principal office for inspection by Landlord's representatives who are engaged in inspecting and/or auditing Tenant's books and records as provided herein.  Such books and records shall be kept in accordance with generally accepted accounting principles and practices consistently applied and shall be retained by Tenant for not less than one (1) year following the end of the calendar year to which they refer.  Within thirty (30) days after the close of each calendar month during which Percentage Rent is payable hereunder, Tenant shall deliver to Landlord a statement prepared by an officer of Tenant setting forth the amount of Gross Sales achieved during, and the amount of Percentage Rent payable for, the preceding calendar month, together with payment of such Percentage Rent.  Landlord and/or its auditor shall have the right, upon at least ten (10) days prior notice to Tenant, to inspect and/or audit Tenant's records relating solely to Gross Sales achieved in the Premises.

3.      Landlord shall not disclose to any third party Tenant's Gross Sales or the amount

1     of Percentage Rent paid or payable by Tenant, <u>provided</u>, <u>however</u>, that (A) such information
2     was not previously disclosed by Tenant to such third party or to the public generally, and (B)
3     nothing contained herein shall restrict Landlord from disclosing such information as may be
4     required by law, or to its accountants, attorneys, *bona-fide* prospective purchasers, or current or
5     prospective Mortgagees or Ground Lessor(s) of all or any portion of Landlord's interest in the
6     Shopping Center (provided that each of such recipients shall be bound to the same
7     non-disclosure provisions as are imposed upon Landlord).

Exhibit M

Prohibited Uses

As used in this Lease, the term *"Prohibited Uses"* shall mean any of the following uses:

**A.**     **As to the <u>Shopping Center</u>, any of the following uses:**

(1)     Any use which emits or results in strong, unusual or offensive odors, fumes, dust or vapors, is a public or private nuisance, emits noise or sounds which are objectionable due to intermittence, beat, frequency, shrillness or loudness, creates a hazardous condition, or is used, in whole or in part, as or for warehousing or the dumping or disposing of garbage or refuse; provided, <u>however</u>, the foregoing restriction shall not prohibit the operation of a tire center or "Restaurant" (defined below) as shown on <u>Exhibit B</u> attached hereto.

(2)     Any operation primarily used as a storage facility and any assembling, manufacturing, distilling, refining, smelting, agricultural, or mining operation;

(3)     Any "second hand" store or "surplus" store; provided, <u>however</u>, Landlord shall be permitted to replace the existing "Sample Shop", "Tuesday Morning" and "My Sister's Closet" with stores operated and merchandised in the same manner as the store that is being replaced is operated and merchandised as of the Effective Date as long as total Floor Areas of all such type of stores (inclusive of the aforesaid named stores to the extent same are still operating) do not exceed 15,000 square feet of Floor Area in the aggregate and no such replacement store is located within 250 feet of the Premises, except that the "Sample Shop" may be replaced in its location existent as of the Effective Date.  The foregoing restriction shall not prohibit the operation of any store operated based on a substantially similar concept as that of the "Dollar Store" currently located in the Shopping Center;

(4)     Any mobile home park, trailer court, labor camp, junkyard, or stockyard (except that this provision shall not prohibit the temporary use of construction trailers during periods of construction, reconstruction, or maintenance);

(5)     Any dumping, disposing, incineration, or reduction of garbage (exclusive of trash compactors or trash containers located near the rear of any building);

(6)     Any fire sale, bankruptcy sale (unless pursuant to a court order), auction house operation, fictitious going-out-of-business sale, lost-our-lease sale or similarly advertised event;

(7)     Any central laundry, dry cleaning plant, or laundromat (except that a dry cleaner that performs all dry cleaning outside the Shopping Center shall be permitted, so long as its on-site premises are located more than 150 feet away from the Premises);

(8)     Any automobile, truck, trailer, boat, or recreational vehicle sales, leasing, display or body shop repair operation;

(9)     Any bowling alley or skating rink;

(10)     Any live performance theater, auditorium, meeting hall, sporting event, or other entertainment use;

(11)     Any living quarters, sleeping apartments, or lodging rooms;

(12)     Any veterinary hospital or animal raising or boarding facilities (except to the extent permitted below);

(13)     Any mortuary or funeral home;

(14)     Any "Pornographic Use", which shall include, without limitation, a store displaying for sale or exhibition books, magazines or other publications containing any combination of photographs, drawings or sketches of a sexual nature, which are not primarily scientific or educational, or a store offering for exhibition, sale or rental video cassettes or other medium capable of projecting, transmitting or reproducing,

independently or in conjunction with another device, machine or equipment, an image or series of images, the content of which has been rated or advertised generally as NC-17 or "X" or unrated by the Motion Picture Rating Association, or any successor thereto. Notwithstanding the aforementioned prohibition against a use or occupancy for a "pornographic use", Landlord may, subject to applicable provisions of this paragraph, permit other premises in the Shopping Center to be used or occupied for the a store offering for sale or rental a full line of video cassettes, which shall be permitted to sell or rent adult videos, provided the number of such adult videos does not exceed in the aggregate, ten percent (10%) of the total number of all video cassettes offered for sale or rental at such store, said adult video shall be discretely displayed in a manner consistent with stores normally located in first class rental shopping centers in the Oklahoma City, Oklahoma area.  The parties hereto acknowledge and agree the sale of books, magazines and other publications by a national bookstore of the type normally located in first-class shopping centers in the State in which the Shopping Center is located (such as, for example, Borders and Barnes & Noble, as said stores currently operate) shall not be deemed a "pornographic use" hereunder;

       (15)    a massage parlor, except for therapeutic massages given in connection with the operation of a spa, health facility or tanning salon which is otherwise permitted under the Lease  (including, without limitation, this Exhibit M);

       (16)    Any so-called "head shop", or other establishment primarily selling or exhibiting drug-related paraphernalia;

       (17)    Any bar, tavern, or other establishment selling alcoholic beverages for on- or off-premises consumption (other than a Restaurant not otherwise prohibited hereunder serving alcohol as an incidental part of its operation);

       (18)    Any catering or banquet hall;

       (19)    Any flea market, amusement or video arcade (except incidental to the operation of a Restaurant), pool or billiard hall, night club, discotheque, or dance hall;

       (20)    Any training or education facility, including but not limited to:  beauty schools, barber colleges, reading rooms, places of instruction or other operations catering primarily to students or trainees rather than to customers; provided, however, this prohibition shall not be applicable to on-site employee training by an Occupant incidental to the conduct of its business at the Shopping Center;

       (21)    Any gambling facility or operation, including but not limited to:  off-track or sports betting parlor; table games such as black-jack or poker; slot machines; video poker/black-jack/keno machines or similar devices; or bingo hall.  Notwithstanding the foregoing, this prohibition shall not apply to governmental sponsored gambling activities, or charitable gambling activities, so long as such governmental and/or charitable activities are incidental to the business operation being conducted by the Occupant;

       (22)    Any unlawful use;

       (23)    Any pawn shop, gun shop, or tattoo parlor;

       (24)    Any church or other place of religious worship;

       (25)    Any car wash; provided, however, the foregoing restriction shall not prohibit the operation of a car wash in connection with and ancillary to a gasoline station located on Outparcel 2;

       (26)    Any automobile repair shop, or any business servicing motor vehicles in any respect, including, without limitation, any quick lube oil change service, tire center;

       (27)    Any gasoline or service station or facility; provided, however, the foregoing restriction shall not prohibit the operation of a gasoline station located on Outparcel 2;

       (28)    Any carnival, amusement park or circus;

(29)    intentionally omitted;

(30)    Any supermarket;

(31)    Any office use, other than: (x) office space used in connection with and ancillary to a permitted retail use hereunder; (y) retail offices providing services commonly found in similar first-class shopping centers in the Oklahoma City, Oklahoma metropolitan area (for example, financial services, real estate brokerage, insurance agency, banking, travel agency); and (z) medical offices (as opposed to medical clinics, which are prohibited), provided that such uses are located at least 300 feet away from the Premises (except that such uses shall be permitted in the areas designated as "Daylight Donuts Wing" on Exhibit B), and not more than ten thousand (10,000) square feet of Floor Area in the Shopping Center (including any such uses in the "Daylight Donuts Wing," but excluding any bank located on an Outparcel), in the aggregate, shall be devoted to such uses;

(32)    hotel/motel;

(33)    daycare center within 250 feet of the Premises;

(34)    veterinary office;

(35)    children's entertainment or activity facility; provided, however, the foregoing restriction will not prohibit the operation of a "Chuck E. Cheese's" or similar operation as long as same is located in the portion of the Shopping Center which is north of the store designated as "Tuesday Morning" on Exhibit B provided that in no event shall same be permitted on Outparcel #3;

(36)    karate center; provided that Landlord shall be permitted to replace the existing karate center identified as "Shaolin Kung Fu" on Exhibit B either within the same location as operated in as of the Effective Date or in a location which is not within 300 feet of the Premises and same is not larger than 1,650 square feet of Floor Area;

(37)    movie theater;

(38)    restaurant within 250 feet of the Premises; provided, however, this restriction shall not prohibit the operation of so-called "fast food" restaurants serving meals mainly for off-premises consumption only as long as same are located in the "Daylight Donuts Wing" and do not exceed 2,000 square feet of Floor Area in the aggregate. Further, Landlord shall be permitted to replace the existing Daylight Donuts store with another donut store as long such replacement store is located in, and not larger than, the premises designated as "Daylight Donut" on Exhibit B.

(39)    beauty parlor or nail salon within 250 feet of the Premises; or

(40)    health spa, exercise facility or similar type business, provided that Landlord shall be permitted to replace the existing "Jazzercise" and "Dance Unlimited" with another health spa, exercise facility or similar type of business provided that such replacement is located in the same location as the, and not larger than, the business being replaced, and Landlord shall also be permitted to replace the existing "Tan & Tone America" with another health spa, exercise facility or similar type of business as long as same is not larger than 8,532 square feet of Floor Area and same is located to the north of the store designated as "Dollar Tree" on Exhibit B .

HP/RDS/MP
4/28/04

P0142 LBED0BB01

## FIRST AMENDMENT TO LEASE

This FIRST AMENDMENT TO LEASE made and entered into this *4th* day of *May*,

2004, by and between WEINGARTEN NOSTAT, INC., hereinafter called "Landlord," and BED BATH & BEYOND

INC., hereinafter called "Tenant."

## W I T N E S S E T H:

WHEREAS, Landlord and Tenant entered into a Lease Contract dated August 7, 2002, ("Lease") for

certain premises consisting of approximately 22,000 square feet of space located in Landlord's Bryant Square

Shopping Center, and known by street address as 412 South Bryant, Edmond, Oklahoma ("Leased Premises");

and

WHEREAS, Landlord desires to reconfigure signage on "Center Pylon 1" (as defined in Section 7.3 of the

Lease and shown on Page 2 of Exhibit "F" to the Lease), and the parties have agreed to amend the Lease as

hereinafter set forth;

NOW, THEREFORE, in consideration of the premises and the mutual covenants and conditions

contained herein, the parties hereby agree as follows:

1.      Within ninety (90) days after the date on which Landlord enters into a lease with Ross Stores, Inc.

or its Affiliates for operation of a Ross Dress for Less store in other premises in the Shopping Center ("Ross

Lease"), Landlord shall remove Tenant's existing 3' X 20' sign faces on Center Pylon 1 and install in their place

new 4'6" X 20' sign faces as shown on Schedule 1 attached hereto and made a part hereof.  Landlord shall give

Tenant notice promptly after entering into the Ross Lease.  The colors and graphics of such replacement signs

shall be subject to Tenant's prior approval and applicable Legal Requirements, and Landlord shall coordinate the

foregoing sign work with Tenant.  All work shall be performed by Landlord, at Landlord's sole cost and expense,

and Tenant shall not be responsible for any costs in connection with such work.

2.      Upon completion of the work described in Section 1 above, Schedule 1 shall replace and

supersede Page 2 of Exhibit "F" to the Lease.

3.      EXCEPT as specifically provided to the contrary herein, all of the rest and remaining terms and

conditions of the Lease shall remain in full force and effect.  All defined terms used herein shall have the same

meaning as when used in the Lease unless another meaning is clearly indicated.



THE SUBMISSION OF THIS DOCUMENT FOR EXAMINATION AND/OR EXECUTION HEREOF SHALL

BECOME EFFECTIVE ONLY UPON EXECUTION BY ALL PARTIES HERETO AND DELIVERY OF A FULLY

EXECUTED COUNTERPART BY LANDLORD TO TENANT.

EXECUTED in multiple counterparts, each of which shall have the force and effect of an original on the

day and year first written above.

WEINGARTEN NOSTAT, INC.

_____
Secretary

By: _____
Name: _____Jeffrey A. Tucker_____
Title: _____Sr. Vice President/General Counsel_____

LANDLORD

ATTEST:

BED BATH & BEYOND, INC.

_____
Secretary

By: _____
Name: _____Steven H. Temares_____
Title: _____President - Chief Executive Officer_____

TENANT

SCHEDULE 1





CONSENT OF MORTGAGEE

The undersigned hereby consents to and approves the First Amendment to Lease by and between

WEINGARTEN NOSTAT, INC. and BED BATH & BEYOND INC., to which this Consent is appended.

MORTGAGEE:

WITNESS/ATTEST:

WEINGARTEN REALTY INVESTORS,
a Texas real estate investment trust

By:
Name:
Title:        Jeffrey A. Tucker
          Sr. Vice President/General Counsel

Dated: May _____ , 2004.

## SECOND AMENDMENT TO LEASE AGREEMENT

**THIS SECOND AMENDMENT TO LEASE AGREEMENT** (this "Amendment") is made and entered into as of July 31, 2012 by and between SCI BRYANT SQUARE FUND, LLC, a Delaware limited liability company, its successors and assigns, together with the SCI ENTITIES identified on Exhibit A attached hereto, having an address at c/o Price Edwards & Company, 210 Park Avenue, Suite 1000, Oklahoma City, OK 73102 (collectively, "Landlord"), and BED BATH AND BEYOND INC., a New York corporation, having an address at 650 Liberty Avenue, Union, New Jersey 07083 ("Tenant").

### RECITALS

A.    Landlord's predecessor in interest, Weingarten Nostat, Inc., and Tenant previously executed that certain Lease Agreement, dated August 7, 2002, and a First Amendment to Lease dated May 6, 2004 (collectively, the "Lease") for certain Premises more particularly described therein.

B.    Landlord and Tenant wish to modify the Lease, subject to and in accordance with the further terms, covenants and provisions of this Amendment.

NOW, THEREFORE, in consideration of the Lease, the foregoing Recitals, the mutual agreements, covenants and promises contained in this Amendment and other good and valuable considerations, the receipt, sufficiency and validity of which is hereby acknowledged, Landlord and Tenant agree as follows:

1.    Definitions. Capitalized terms in this Amendment without definition shall have the meanings assigned to such terms in the Lease, unless the context expressly requires otherwise.

2.    Option to Extend Term.  Tenant hereby elects to exercise the first Renewal Option to extend the Lease Term for five (5) years, commencing February 1, 2013 and expiring January 31, 2018, in accordance with the provisions of Section 2.2.2 and Subsection 1.1.11(b) of the Lease.  The execution of this Amendment by Landlord and Tenant shall serve as confirmation by Landlord of Tenant's timely delivery of any required option notice and the extension of the Lease Term for five (5) years.

3.    Renewal Options.  Landlord hereby grants to Tenant another renewal option for one (1) additional five (5) year Renewal Period, so that as of the effective date of this Amendment, Tenant shall have the right and option to extend the Term of the Lease from the date upon which it would otherwise expire, for four (4) Renewal Periods of five (5) years each, upon the terms and conditions as are set forth in Section 1.1.11 (as supplemented by Paragraph 4 below), and as set forth in Section 2.2.2 of the Lease.

4.    A new Subsection 1.1.11(f) is hereby added to the Lease as follows:

"(f)    In the event Tenant exercises the fifth Renewal Option, for the fifth Renewal Period, at the rate of Two Hundred Fifty-Seven Thousand Four Hundred and 00/100 ($257,400.00) Dollars per year, based on Eleven and 70/100 ($11.70) Dollars per square foot of Floor Area."

5.    New subsections 8.1.8 and 8.1.9 are hereby added to the lease as follows:

1

"8.1.8    Tenant shall have the exclusive right to erect and maintain on the roof of the Premises, in a location to be mutually agreed to by Landlord and Tenant, a passive solar array for the production of electricity (the "*System*"), provided that Tenant: (i) obtains Landlord's prior approval of its plans for the installation of the System, (ii) uses a contractor designated or approved by Landlord for all roof penetrations so as not to violate or invalidate any roof warranties maintained by Landlord, (iii) maintains, at Tenant's expense, the area where roof penetrations are made while the System is present, (iv) repairs, at Tenant's expense, any damage to the roof caused by the making of the roof penetrations, including, but not limited to, the repair of the roof penetrations upon the removal of any component of the System, and (v) erects and maintains the System in accordance with applicable Legal Requirements.  The System shall be deemed to be part of Tenant's Property.  All costs relating to the System shall be borne solely by Tenant, including, without limitation, all costs related to:  (i) the installation of the System, including all required permits and approvals therefor; (ii) the operation, maintenance, repair and/or replacement of the System throughout the Term; (iii) compliance with all applicable Legal Requirements of governmental authorities; and (iv) taxes levied on the System, if any. Tenant shall reimburse Landlord, within thirty (30) days after receipt of an invoice therefor, for any third-party costs incurred by Landlord in connection with the review of Tenant's plans for the System, and for the inspection of the System after the same has been installed on (i) the building of which the Premises is a part (the "*Building*") or the operation thereof; (ii) the equipment of Landlord and any tenants, licensees or occupants which are in existence prior to the date of Tenant's installation of the System; or (iii) any of the Building systems, including without limitation, any electrical or mechanical systems serving he Building.  Landlord acknowledges and agrees that Tenant or its Affiliate or transferee shall be the exclusive owner and operator of the System and Landlord shall have no right, title or interest in such equipment or any component thereof, notwithstanding that any such equipment may be physically mounted or adhered to the Premises. Landlord acknowledges and agrees that, notwithstanding the System's presence as a fixture on the Premises, Tenant or its Affiliate or transferee is the sole and exclusive owner of: (i) the electricity generated by the System, (ii) the environmental attributes of the System, and (iii) any and all credits (including tax credits), rebates, benefits, reductions, offsets, and allowances and entitlements of any kind, howsoever entitled, resulting from the environmental or related attributes of the System.  Without the express written consent of Tenant, Landlord shall not make or publish any public statement or notice regarding any environmental incentive relating to the System or any environmental attribute of the System or the energy output from the System.  At Landlord's request, upon the expiration or earlier termination of the Lease, Tenant shall remove the System and repair all damage occasioned thereby, which obligation shall survive the expiration or earlier termination of the Lease.

8.1.9  Landlord and Tenant agree that in the event that Tenant shall perform or cause to be performed any alterations or improvements (including without limitation Tenant's Work) to, or within, the Premises which

2

would cause an owner or occupant of the Premises to be entitled to an "Energy Rebate" (hereinafter defined), then Tenant shall be solely entitled to the benefit of such Energy Rebate. As used herein, an "**Energy Rebate**" shall be deemed to be any rebate, refund, voucher, credit, tax relief, abatement, or other monetary inducement (such as, for examples only, energy efficiency incentives, property tax abatements, sales tax refunds, tax credits, governmental grants, utility rebates or refunds) given by a governmental, non-governmental, private or public utility, or other entity as a result of efforts to conserve energy or other utilities or cause property or processes to be more environmentally friendly. If any such Energy Rebate is required to be paid or credited directly to Landlord, then: (i) Landlord shall elect to take the Energy Rebate in a lump sum, or if that is not permitted, then in the shortest number of installments possible, so as to permit Tenant to recoup the full amount of the Energy Rebate during the Term of this Lease, and (ii) within thirty (30) days after Landlord's receipt of the Energy Rebate, Landlord shall deliver a check to Tenant for such amount, or in the alternative, Tenant shall be entitled to offset the full amount of such Energy Rebate against the next succeeding installment(s) of Rent then payable under the Lease."

6.   <u>Broker</u>. Landlord and Tenant each warrant and represent to the other that they did not deal with any real estate broker in connection with the negotiation, execution and delivery of this Amendment, other than Price Edwards Company and The Retail Connection (the "**Brokers**"). Any commission due to Price Edwards Company shall be paid by Landlord pursuant to separate agreement. Any commission due to The Retail Connection shall be paid by Tenant pursuant to separate agreement. Each party agrees to indemnify, defend, and save the other armless from and against any and all liabilities, costs, causes of action, damages and expenses, including, without limitation, attorneys' fees, with respect to or arising out of any claims made by any real estate broker, agent or finder (other than Brokers) with respect to this Amendment in breach of the foregoing representation or claiming to have worked with the indemnifying party in connection with the Lease. The provisions of this Section shall survive the expiration or earlier termination of the Lease.

7.   <u>Consents</u>. Landlord represents and warrants to Tenant that, as of the date hereof, the Shopping Center is not encumbered by any mortgage or deed of trust except for a certain mortgage held by Wachovia Bank, National Association, its successor and/or assigns ("<u>Lender</u>"). Landlord further represents and warrants to Tenant that, as of the date hereof, no third-party consents or approvals are required for this Amendment to be valid and remain full force and effect, other than the consent of the Lender.

8.   <u>Binding Effect</u>. The terms and conditions of this Amendment shall be binding upon, and inure to the benefit of Landlord and Tenant and their respective heirs, executors, administrators, successors and assigns.

9.   <u>Full Force and Effect</u>. Except as expressly modified by this Amendment, the Lease shall remain unmodified and in full force and effect. All references in the Lease to "<u>this Lease</u>" shall be deemed references to the Lease as modified by this Amendment.

10.  <u>Counterparts; Facsimile Signatures</u>. This Amendment may be executed in counterparts and the signature pages combined to constitute one document. Facsimile signatures shall be deemed to have the same force and effect as original signatures.

3

IN WITNESS WHEREOF, Landlord and Tenant have executed this Amendment as of the date and year first above written.

**LANDLORD:**

**SCI BRYANT SQUARE FUND, LLC, a Delaware limited liability company, and the SCI Entities**

By:_____
Name:_____
Title: _____

**TENANT:**

**BED BATH AND BEYOND INC.,**
a New York corporation

By: _____
Name: Steven H. Temares
Its: Chief Executive Officer

4

**EXHIBIT A**

LIST OF SCI ENTITIES

SCI Bryant Square Fund, LLC, a Delaware limited liability company

1.    Whiting Trust dated November 21, 1994, Robert R. Whiting and Roberta J. Whiting, Trustees, as sole member of SCI Bryant Square Fund 1, LLC, a Delaware limited liability company

2.    James Smith Trust Estate, Timothy J. Smith, Successor Trustee, as sole member of SCI Bryant Square Fund 2, LLC, a Delaware limited liability company

3.    TERSTIEGE, Gerard and Krista J., husband and wife as community property, as sole member of SCI Bryant Square Fund 3, LLC, a Delaware limited liability company

4.    Amendment and Restatement of Bloss Living Trust, Hartmut Bloss and Ursula L. Bloss, Trustees, as sole member of SCI Bryant Square Fund 4, LLC, a Delaware limited liability company

5.    ROBB, Paul, a married man as his sole and separate property, as sole member of SCI Bryant Square Fund 5, LLC, a Delaware limited liability company

6.    Damong Lee and Young Won Lee, husband and wife as community property, as sole member of SCI Bryant Square Fund 6, LLC, a Delaware limited liability company

7.    CARR, Michael L., a single man, as sole member of SCI Bryant Square Fund 7, LLC, a Delaware limited liability company

8.    P. Steven Perls and Pamela R. Perls, husband and wife as community property, as sole member of SCI Bryant Square Fund 8, LLC, a Delaware limited liability company

9.    Agerter Judd Revocable Trust, Richard A. Judd and Linda L. Agerter, Trustees, as sole member of SCI Bryant Square Fund 9, LLC, a Delaware limited liability company

10.    L.M. and J.F. Savage Family Trust dated January 28, 2003, Lewis M. Savage, Trustee, as sole member of SCI Bryant Square Fund 10, LLC, a Delaware limited liability company

11.    The Wilson 1986 Revocable Living Trust, David T. Wilson and Ann M. Wilson, Trustees, as sole member of SCI Bryant Square Fund 11, LLC, a Delaware limited liability company

12.    The Ronald L. Pomerleau Revocable Trust of 2003, Ronald L. Pomerleau, Trustee, as sole member of SCI Bryant Square Fund 12, LLC, a Delaware limited liability company

13.    GOLDTIBS, INC., a California corporation, Dalip Tibb, President, as sole member of SCI Bryant Square Fund 13, LLC, a Delaware limited liability company

14.    153 Washington Street Realty Trust, Joshua T. Eisen and Kathy-Ann Eisen, Trustees, as sole member of SCI Bryant Square Fund 14, LLC, a Delaware limited liability company

5

15.   The Scullin Revocable Family Trust dated March 4, 1988, Robert F. Scullin and Cathy B. Scullin, Trustees, as sole member of SCI Bryant Square Fund 15, LLC, a Delaware limited liability company

16.   SCI Bryant Square - Bundy, LLC, a Delaware limited liability company

17.   PUCCI, Richard P., as sole member of SCI Bryant Square Fund 18, LLC, a Delaware limited liability company

18.   PUCCI, Maureen A., as sole member of SCI Bryant Square Fund 19, LLC, a Delaware limited liability company

19.   The Dutton Family Trust, Daniel F. Dutton, Jr. and Joyce F. Dutton, Trustees, sole member of SCI Bryant Square Fund 20, LLC, a Delaware limited liability company

20.   NASH, Eunice Elizabeth,, a widow, as sole member of SCI Bryant Square Fund 21, LLC, a Delaware limited liability company

21.   The Irvin and Marilyn Sobel Revocable Trust dated June 26, 1991, Irvin Q. Sobel and Marilyn G. Sobel, Co-Trustees, as sole member of sole member of SCI Bryant Square Fund 22, LLC, a Delaware limited liability company

22.   Jaber Family Living Trust dated July 12, 1991, Jimmie S. Jaber and Rose Jaber, Trustees, as sole member of SCI Bryant Square Fund 23, LLC, a Delaware limited liability company

23.   William S. Lee, sole member of SCI Bryant Square Fund 24, LLC, a Delaware limited liability company

24.   Omran Family Living Trust dated September 17, 1997, George D. Omran and Jeanette G. Omran, Trustees, as sole member of SCI Bryant Square Fund 25, LLC, a Delaware limited liability company

25.   Adler Revocable Trust, Glenn Jay Adler and Debra Lynne Adler, Trustees, as sole member of SCI Bryant Square Fund 26, LLC, a Delaware limited liability company

26.   Michael Commins, a married man as his sole and separate property, as sole member of SCI Bryant Square Fund 27, LLC, a Delaware limited liability company

27.   Zouari Family Trust, John Bunton and Vanina M. Bunton, Trustees, sole member of SCI Bryant Square Fund 28, LLC, a Delaware limited liability company

28.   The Moldanado Family Trust, Alexander Moldanado and Swarnalatha Moldanado, trustees, as sole member of SCI Bryant Square Fund 29, LLC, a Delaware limited liability company

29.   HowardAK, LLC - Carmel Valley Division Two, a Division of a Delaware limited liability company, Howard Kurshenbaum, Member, as sole member of SCI Bryant Square Fund 30, LLC, a Delaware limited liability company

30.    TAYLOR, George C., as sole member of SCI Bryant Square Fund  31, LLC, a Delaware limited liability company

31.    The Sapien Family Trust of 1995, Michael T. Sapien and Debora M. Sapien Trustees, as sole member of SCI Bryant Square Fund 32, LLC, a Delaware limited liability company

32.    William H. and Janet C. Kuni Family Trust,  William H. Kuni and Janet C. Kuni, Trustees, as sole member of SCI Bryant Square Fund 33, LLC, a Delaware limited liability company

33.    The Ching C. Poon and Jenny Poon 1998 Family Trust, Ching C. Poon & Jenny Poon, Co-Trustees, as sole member of SCI Bryant Square Fund  34, LLC, a Delaware limited liability company

34.    Pacific Light Investments, LLC, a California limited liability company, Douglas Steakley, Member, as sole member of SCI Bryant Square Fund 35, LLC, a Delaware limited liability company

## CONSENT OF MORTGAGEE

The undersigned hereby consents to the Second Amendment to Lease Agreement between SCI BRYANT SQUARE FUND, LLC, as Landlord, and Bed Bath & Beyond Inc., as Tenant, to which this Consent is annexed.

**WACHOVIA BANK, NATIONAL ASSOCIATION**

By: _____
Name:
Title:

Dated: _____, 2012

[or see separate consent attached]

8

## THIRD AMENDMENT TO LEASE

THIS THIRD AMENDMENT TO LEASE (*"Amendment"*), dated as of the 7ᵗʰ day of SEPT. , 2017 by and between IA EDMOND BRYANT, L.L.C., a Delaware limited liability company (*"Landlord"*), having an office at c/o InvenTrust Property Management, LLC, 3025 Highland Parkway, Suite 350, Downers Grove, IL 60515 and BED BATH & BEYOND INC., a New York corporation (*"Tenant"*), having an office at 650 Liberty Avenue, Union, New Jersey 07083.

## W I T N E S S E T H :

WHEREAS, Landlord, as successor-in-interest to Weingarten Nostat, Inc., and Tenant are parties to that certain Lease Agreement dated as of August 7, 2002 (*"Original Lease"*), with respect to premises (*"Premises"*) located at the Bryant Square Shopping Center in Edmond, Oklahoma (*"Shopping Center"*); and

WHEREAS, the Original Lease was amended or supplemented by a Rent Commencement and Expiration Date Agreement dated as of December 12, 2005 (*"RCEDA"*), a First Amendment to Lease dated as of May 6, 2004, a Second Amendment to Lease Agreement dated as of July 31, 2012, and letters dated December 18, 2003, March 19, 2004, May 12, 2004, and September 27, 2010 (collectively, as amended, the *"Lease"*); and

WHEREAS, the Term of the Lease is currently scheduled to expire on January 31, 2018; and

WHEREAS, Landlord and Tenant intend by this Third Amendment to Lease, to extend the Term of the Lease beyond January 31, 2018 for a period of seven (7) years (the *"Extension Term"*) and to modify the existing Lease provisions, so as to cause the four (4) remaining Renewal Options to remain in effect for the time frames and at the rents specified below, and otherwise subject to the terms of the Lease; and

WHEREAS, Landlord and Tenant desire to further amend the Lease on the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual covenants and promises set forth in this Amendment and other valuable consideration, receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.      The recitals hereinabove set forth are incorporated into this Amendment by this reference. Capitalized terms used, but not defined herein, shall have the meanings ascribed them in the Lease.

2.      Lease Term. Notwithstanding that the current Term is scheduled to naturally expire on January 31, 2018, the Term is now extended through the Extension Term, which is the period commencing on February 1, 2018 and continuing through (and including) January 31, 2025. The Lease is hereby modified to reflect that the "Expiration Date" shall be deemed to be January 31, 2025.

Tenant shall also continue to have the option to extend the Term for the four (4) remaining Renewal Periods described in the Lease (such remaining Renewal Periods are the *"Second Renewal Period"*, the *"Third Renewal Period"*, the *"Fourth Renewal Period"*, and *"Fifth Renewal Period"*, respectively), exercisable at the times and in the manner provided in Section 2.2.2 of the Lease; except that the Second Renewal Period, if exercised, will commence on February 1, 2025; and the Third Renewal Period, if exercised, will commence on February 1, 2030; the Fourth Renewal Period, if exercised, will commence on February 1, 2035; and the Fifth Renewal Period, if exercised, will commence on February 1, 2040. The Fixed Rent for the period commencing February 1, 2018 and continuing until January 31, 2025, and then continuing thereafter for the Renewal Periods, if exercised, will all be as set forth below. To the extent such rents differ from those called for in the Lease for the period commencing and following February 1, 2018 through January 31, 2025 and for the Renewal Periods, the Lease is amended accordingly.

| Period | Annual Fixed Rent PSF, $'s | Fixed Rent per annum, $'s |
|---|---|---|
| Extension Term February 1, 2018 through January 31, 2025 | $8.00 | $176,000.00 |
| Second Renewal Period February 1, 2025 through January 31, 2030 | $9.45 | $207,900.00 |
| Third Renewal Period February 1, 2030 through January 31, 2035 | $10.20 | $224,400.00 |
| Fourth Renewal Period February 1, 2035 through January 31, 2040 | $10.95 | $240,900.00 |
| Fifth Renewal Period February 1, 2040 through January 31, 2045 | $11.70 | $257,400.00 |

3.      Landlord and Tenant agree that the dates by which the options for the Second Renewal Period, the Third Renewal Period, the Fourth Renewal Period, and Fifth Renewal Period must be exercised are August 4, 2024, August 4, 2029, August 4, 2034, and August 4, 2039 respectively.

4.      The parties agree that Sections 4 – 6 of the RCEDA are no longer applicable and the expiration date of the Term of the Lease and the dates of each of the four (4) remaining Renewal Periods shall be as set forth in accordance with the dates set forth in Section 2 above.

5.      Section 1.1.27 (Permitted Use) of the Lease shall be modified to provide that the "Permitted Items" shall include the sale of alcoholic beverages for on- and/or off-premises consumption (including, without limitation, conducting on-premises sampling and tastings); and the operation of "Demonstration Areas" (hereinafter defined).  As used herein, *"Demonstration Areas"* shall mean an area or areas located within the Premises, for the purpose of demonstrating to Tenant's customers and invitees various products (including, without limitation, food and cooking products), which Demonstration Areas shall be at all times be operated in full compliance with all Legal Requirements.

6.      Within thirty (30) days of the date hereof, Landlord shall pay to Tenant the sum of Two Million Eight Hundred Thousand and 00/100 Dollars ($2,800,000.00).   In the event Landlord does not pay Tenant the aforesaid amount within such thirty (30) day period, Tenant shall have the right to offset such unpaid amount against Rent payable by Tenant under the Lease, together with interest at the Lease Interest Rate from the date such remittance is due until reimbursement or full satisfaction by credit.    Tenant hereby acknowledges that it shall use a portion of the aforesaid funds to pay for the Exterior Alterations (defined hereafter).

7.      Reference is made to the site plan attached to this Amendment as Exhibit 1 (*"New Site Plan"*).  Tenant hereby consents to the changes to the Shopping Center depicted on the New Site Plan. From and after the date Landlord commences performing the changes to the Shopping Center depicted on the New Site Plan (*"New Site Plan Commencement Date"*), Exhibit B attached to the Lease shall be deemed deleted in its entirety and replaced with the New Site Plan. From and after the New Site Plan Commencement Date, all references in the Lease to Exhibit B shall be deemed to be references to the New Site Plan. Landlord shall provide Tenant with notice of the New Site Plan Commencement Date within five (5) days after the occurrence of such date.  All alterations to the Shopping Center as depicted on the New Site Plan shall comply with all requirements under the Lease, including, but not limited to, Section 5.2.2. Notwithstanding anything herein or in the Lease to the contrary, Landlord shall provide Tenant with at least thirty (30) days' prior notice of the commencement of any changes to the Shopping Center contemplated by this Paragraph 7 (including, but not limited to, the restriping of the Shopping Center parking areas and the construction of any improvements in the Common

Areas) and Tenant shall have the right to reasonably approve the dates during which such work shall occur within Tenant's Critical Area. Upon Landlord commencing any alterations to the Common Areas, Landlord shall diligently and in good faith proceed with and complete such work. Nothing herein shall be deemed a waiver of any restrictions, terms or conditions governing any construction at or alterations to the Shopping Center.

8.      The Lease is hereby amended to reflect that on the New Site Plan Commencement Date, all references in the Lease to "Outparcel 3" shall be deemed deleted in their entirety (it being understood that effective as of such date, there shall be no "Outparcel 3").

9.      Section 5.2.3(a) of the Lease is hereby amended to reflect that effective on the New Site Plan Commencement Date, two (2) buildings may be constructed on Outparcel 2 (subject to the further terms of the Lease and this Amendment).

10.     Tenant shall alter the exterior of the Premises, which alteration shall be substantially similar to the proposed exterior depicted on Exhibit 2 (*"Exterior Alterations"*). Landlord hereby consents to Tenant performing the Exterior Alterations and making any non-material changes thereto. Tenant shall complete the Exterior Alterations within twelve (12) months of the date hereof, subject to (i) Force Majeure and (ii) Tenant's receipt of any and all permits and approvals required by all applicable governmental authorities to perform the Exterior Alterations.

11.     The parties hereto acknowledge that Ross Dress for Less and Petco (occupying the premises designated for such tenants on the New Site Plan) occupy the former Academy premises.

12.     Exhibit L of the Lease shall be modified to add as additional exclusions from the definition of "Gross Sales" thereunder the following: (A) sales of merchandise fulfilled from the Premises but where payment is not made at the Premises (e.g., online or at another store); and (B) sales of merchandise where payment is made at the Premises but not fulfilled from the Premises.

13.     Anything contained in Exhibit M to the contrary notwithstanding and provided such use is in compliance with applicable Legal Requirements, Tenant and any Affiliate of Tenant shall have the right to:

(a) engage in the incidental sale of alcoholic beverages for off-premises consumption and on-premises tastings only within the Premises;
(b) conduct events within the Premises for its customers, which shall include without limitation product demonstrations, instruction sessions and promotional events; and
(c) operate a café within the Premises.

14.     Exhibit M, item (40) is hereby deleted in its entirety and replaced with the following:

"(40)  health spa, exercise facility or similar type business, provided that Landlord shall be permitted to lease premises in the Shopping Center for a health spa, exercise facility or similar type business so long as: (i) any such business is of the type commonly found in first class shopping centers in Oklahoma; (ii) such uses are located to the north of the store designated as "Dollar Tree" on Exhibit B or on an Outparcel; and (iii) any individual premises shall occupy no more than 8,532 square feet of Floor Area and no more than 10,000 square feet of Floor Area in the aggregate, shall be devoted to such uses."

15.     The parties hereto acknowledge and agree that Landlord has granted Cost Plus, Inc. (an Affiliate of Tenant) a right of first offer for certain space in the Shopping Center pursuant to the terms and conditions contained in that certain Right of First Offer Agreement between Landlord and Cost Plus, Inc. dated as of the date hereof (the *"Cost Plus Agreement"*). In the event Landlord defaults under the Cost Plus Agreement, and such default is not cured within thirty (30) days after Landlord's receipt of written notice of same, then such default shall

be deemed a Landlord's Default under the Lease and Tenant shall have all rights and remedies under the Lease with respect to such Landlord's Default.  Notwithstanding anything herein or in the Lease to the contrary, the parties hereto acknowledge that in the event of such Landlord's Default, Tenant shall have the right to terminate the Lease by providing written notice of such election to Landlord.  In the event of such termination, Tenant shall not be deemed to have waived its rights to any damages for such default.

16.     It is the policy of Tenant and its subsidiaries and affiliates (collectively, *"the Company"*) to conduct all its business transactions in accordance with the highest ethical standards and all applicable laws (including but not limited to the U.S. Foreign Corrupt Practices Act).  No individual who is employed by or who represents the Company, and no individual or entity that contracts with the Company or otherwise performs services on behalf of the Company, is permitted to solicit, accept, offer, promise or pay any bribe, kickback or any other improper payment of money, products or services.  This includes, but is not limited to, any improper payment in exchange for (i) the Company's execution of this Amendment, (ii) any action taken by such individual on behalf of the Company, or (iii) any action taken by a third party.  If any such improper actions are observed, contact our Legal Department (Attention: General Counsel) at Tenant's notification address and/or by telephone at 908-688-0888, so that the incident may be fully investigated. In addition, you will require any subcontractor (of any level) to adhere to the same standards, and will appropriately monitor your subcontractors to ensure such adherence.

17.     Upon the request of either party following the execution and delivery of this Amendment, Landlord and Tenant shall execute a short form lease or memorandum for recording, which shall be in form and substance as reasonably acceptable to both parties.  In no event shall the amount of Rent or any other monetary terms hereof be included in any such short form lease or memorandum.  Further, after the expiration or earlier termination of the Lease, Tenant agrees, upon Landlord's request, to execute and deliver a termination of such short form lease or memorandum in recordable form and this obligation shall survive expiration or termination of the Lease.  Tenant shall record any such short form lease or memorandum at Tenant's expense.

18.     Landlord and Tenant each warrant and represent to the other that they did not deal with any real estate broker in connection with the negotiation, execution and delivery of this Amendment, except for The Retail Connection, LP (*"Broker"*).  Landlord shall pay any commission due to the Broker in connection with this Amendment pursuant to a separate written agreement between Landlord and Broker.  Each party agrees to indemnify, defend, and save the other harmless from and against any and all liabilities, costs, causes of action, damages and expenses, including, without limitation, attorneys' fees, with respect to or arising out of any claims made by any real estate broker, agent or finder (other than Broker) with respect to this Amendment in breach of the foregoing representation or claiming to have worked with the indemnifying party in connection with the Lease.  The provisions of this Section shall survive the expiration or earlier termination of the Lease.

19.     Landlord represents and warrants to Tenant that, as of the date hereof: (i) there is no mortgage or deed of trust encumbering the Shopping Center; and (ii) no third-party consents or approvals (including, without limitation, with respect to the OEA or any lender or beneficiary of a deed of trust) are required in order for the terms and provisions of this Amendment to be in full force and effect.

20.     The terms and conditions of this Amendment shall be binding upon, and inure to the benefit of Landlord and Tenant and their respective heirs, executors, administrators, successors and assigns.  Except as specifically amended hereby, the Lease is unmodified, is hereby ratified by the parties hereto and remains in full force and effect.  In the event of any conflict or inconsistency between the terms and provisions of the Lease and this Amendment, the terms and provisions of this Amendment shall govern and control.

21.     This Amendment may be executed in one or more counterparts, each of which shall be an original for all purposes, but all of which taken together shall constitute only one Third Amendment to Lease.

IN WITNESS WHEREOF, the parties hereto have executed this Third Amendment to Lease as of the day and year first above written.

**LANDLORD:**

IA EDMOND BRYANT, L.L.C.,
a Delaware limited liability company

By: _____
Name: DAVID F. COLLINS
Title: EXECUTIVE VICE PRESIDENT

**TENANT:**

BED BATH & BEYOND INC.,
a New York corporation

By: _____
Name: Steven H. Temares
Title: Chief Executive Officer

<u>Exhibit 1</u>

<u>New Site Plan</u>



EXHIBIT B NOTES

1. THE "PREMISES" AS SHOWN HEREIN IS FOR BED BATH AND BEYOND, INC.

2. THERE SHALL BE NO CONSTRUCTION STAGING AREA LOCATED IN THE PORTION OF TENANT'S CRITICAL AREA IMMEDIATELY BEHIND THE PREMISES OR IN THE FRONT OF THE PREMISES.

NOTE REFERENCES
FROM EXHIBIT "M"

1. FORMER "DAYLIGHT DONUTS WING"
2. FORMER "SAMPLE SHOP" - 3,250 SQ.FT.
3. FORMER "SHAOLIN KUNG FU" - 1,650 SQ.FT.
4. NORTH WALL OF "DOLLAR TREE"
5. "JAZZERCISE" - 5,321 SQ.FT.
6. FORMER "DANCE UNLIMITED" - 4,895 SQ.FT.
7. ALSO REFERRED TO IN LEASE AS "DOLLAR STORE"

EXHIBIT 'B'
SITE PLAN
BRYANT SQUARE
CENTER
EDMOND, OK

SITE PLAN LEGEND

Exhibit 2

Premises Elevation



⊕ 35'-0"
T.O.R.

⊕ 30'-6"
T.O.R.

NEW BBB SIGN STACKED WHITE
LETTERS (MAXIMUM SIZE AS ALLOWED
BY CODE)

BED BATH &
BEYOND

EIFS SYSTEM AS
SELECTED BY TENANT

NEW AUTO SLIDER DOOR

TENANT'S
PROTOTYPICAL STORE
FRONT ON 6" CURB

METAL PANEL SYSTEM
AS SELECTED BY
TENANT

EIFS SYSTEM AS
SELECTED BY TENANT

## FRONT ELEVATION

3·28·17

TRASH
RECEPTACLE

CART CORRAL

32'-0"
DEPRESSED CURB

BOLLARDS SPACED
@ MAX. 7' APART

GENERAL NOTES:
1. TRASH RECEPTACLE'S FINAL LOCATION TO BE
MUTUALLY AGREED TO AT A LATER DATE.
2. STOREFRONT MATERIALS SHALL BE CONSISTENT
WITH TENANT'S CURRENT PROTOTYPICAL
REQUIREMENTS.

# EXHIBIT D-1

EXTERIOR
ELEVATIONS OF THE
PREMISES, AND SIDE
WALK PLAN

BRYANT SQUARE
CENTER

EDMOND, OK

## PARTIAL SIDEWALK PLAN



   

**Corporate Office 650 Liberty Avenue, Union, NJ 07083**

March 31, 2020

Dear Landlord:

COVID-19 has created an unparalleled impact on our society, economy and business.  The priority of Bed Bath & Beyond, and all of its subsidiaries, throughout this challenging time is to help safeguard the welfare of our people, our customers and our communities.

We continue to base our decisions on the latest public health and regulatory guidance and have recently announced the temporary closure of the vast majority of our stores, to do what we can to help slow the spread of the virus. It is too early to judge when it will be appropriate and safe to re-open our stores.  Our customers continue to need us during this time, and we will continue, as long as we can, to make available essential infant, personal and health care products to customers who need items urgently, in our stand-alone buybuy BABY and Harmon/Face Values stores.

We remain financially stable and during this time of business disruption and uncertainty, we are taking decisive action across the board to carefully manage our expenses, working capital, capital expenditures and balance sheet.  To support this approach, we are seeking to limit the impact on our landlords, partners and vendors, where possible.

Given the impact on our business, we are asking our store landlords to partner with us through these difficult times.  To support the essential operating costs that you have during this time, we are paying landlords 20% of what would have been regularly paid for Rent for April and we are requesting that all late fees and interest be waived.

These decisions are not taken lightly but will support our efforts to retain financial stability and our long-term partnership. Our partnership is extremely important, and we welcome your support now more than ever. If you have questions regarding this notice, please direct them to 2020RentInquiry@bedbath.com so that we can review them.

We will endure together and I thank you in advance for your patience and cooperation.

Sincerely,

Seth Geldzahler
VP Real Estate