Robert L. LeHane, Esq.
Jennifer D. Raviele, Esq.
Connie Y. Choe, Esq.
**KELLEY DRYE & WARREN LLP**
3 World Trade Center
175 Greenwich Street
New York, NY 10007
Tel:  212-808-7800
Fax: 212-808-7897
Email:  rlehane@kelleydrye.com
        jraviele@kelleydrye.com
        cchoe@kelleydrye.com

-and-

One Jefferson Road
Parsippany, NJ 07054
Tel: 973-503-5900

*Counsel for Landlord, Kite Realty Group*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

---------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| BED BATH & BEYOND, INC., *et al.,* | : | Case No. 23-13359 (VFP) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |
| | : | **Hearing Date: July 18, 2023 at 2:30 p.m.** |

---------------------------------------------------------------x

**OBJECTION OF KITE REALTY GROUP TO DEBTORS' MOTION FOR ORDER
AUTHORIZING THE DEBTORS TO ASSUME AND ASSIGN NON-RESIDENTIAL
<u>REAL PROPERTY LEASES FOR STORE NOS. 591, 1405 AND 3131</u>**

Kite Realty Group (the "<u>Landlord</u>"), by and through its undersigned counsel,

Kelley Drye & Warren LLP, submits this objection (this "<u>Objection</u>") to the proposed assumption

and assignment (the "<u>Proposed Assignments</u>") of the unexpired leases of nonresidential real

property for (i) Store No. 591 located in Avondale, Arizona (the "<u>Avondale Lease</u>") to Burlington

Coat Factory Warehouse Corporation and/or one of its affiliates ("<u>Burlington</u>"), (ii) Store No. 1405

located in Holly Springs, North Carolina (the "Holly Springs Lease") to Burlington, and (iii) Store

No. 3131 located in Concord, North Carolina (the "Concord Lease") to Barnes & Nobles

Booksellers, Inc, ("Barnes & Nobles"), all leases being assumed (the "Leases") for the retail spaces

listed on **Exhibit A** (collectively, the "Leased Premises"), pursuant to the Notice of Assumption

of Certain Unexpired Leases [Docket No. 1157] (the "Assignment Notice") and respectfully

represents as follows:

### PRELIMINARY STATEMENT

1.      The proposed assignment of the Avondale Lease and the Holly Springs

Lease to Burlington would violate exclusive use clauses in leases with Marshalls, another tenant

operating in both shopping centers.  Landlord is not fundamentally opposed to the proposed

assignment of the Concord Lease to Barnes & Nobles, but there are several problems with the

assignment that must be resolved as of the filing of this Objection.

2.      First, the proposed cure amounts for the Leases are incorrect.  In addition,

the Debtors have not adequately provided for cure of existing defaults under the subject Leases

and compensation for pecuniary losses suffered by the Landlord, including reasonable attorneys'

fees.  The Debtors must also cure or provide adequate assurance that they will cure all non-

monetary defaults under the Leases.

3.      Second, the Debtors have failed to meet their burden of demonstrating

adequate assurance of future performance as required by Bankruptcy Code section 365(b)(3).

Among other issues, as part of adequate assurance of future performance, the Debtors must satisfy

any Adjustment Amounts (as defined below) which have not yet been billed or have not yet

become due under the terms of the Leases.  The Debtors must also (i) be required to comply with

all contractual obligations to indemnify and hold the Landlords harmless with regard to events

which occurred before assumption, but which were not known to the Landlords as of the date of

the assumption, and (ii) continue to timely pay all rent, additional rent, and percentage rent due under the Leases until the Leases are assumed and assigned pursuant to section 365(d)(3) of the Bankruptcy Code.

4.     The Debtors and the Proposed Assignees (defined below) have also failed to provide any evidence regarding the similarity between the financial condition and operating performance of the Proposed Assignees and Debtors at the time the Leases were executed as required by section 365(b)(3) of the Bankruptcy Code.  Moreover, the Proposed Assignments of the Avondale Lease and the Holly Springs Lease for use as a Burlington store may violate certain exclusive use provisions.

5.     The Landlord is willing to engage in discussions with the Proposed Assignees and the Debtors and would prefer to resolve these issues consensually, but is filing this Objection in case the parties are unable to reach agreement.  The Court should not approve the Proposed Assignments unless the several issues described below are remedied.

## BACKGROUND

### A.     General Background

6.     The Landlord is the owner or managing agent for the owners of numerous shopping centers located throughout the United States.  The Debtors lease retail space from the Landlord pursuant to the Leases for the retail spaces listed on **Exhibit A**, attached hereto.

7.     Each of the Leased Premises is located in a "shopping center," as that term is used in section 365(b)(3) of the Bankruptcy Code.  *See*, *e.g.*, *In re Joshua Slocum, Ltd.*, 922 F.2d 1081 (3d Cir. 1990).

8.     The Debtors seek to assume and assign the Leases of Bed Bath & Beyond, Inc. ("Bed Bath & Beyond") and Buy Buy Baby, Inc. ("Buy Buy Baby"), each as tenants, for the

Leased Premises to the proposed assignees, Burlington and Barnes & Nobles (collectively, the "Proposed Assignees").

**B.      The Concord Lease**

9.       On or about February 7, 2020, RPAI King's Grant II Limited Partnership as landlord, and debtor Buy Buy Baby, as tenant, entered into a written lease agreement for approximately 18,000 square feet of retail premises commonly known as the Pavilion at King's Grant located in Concord, North Carolina.  The term of the Concord Lease is scheduled to expire on January 31, 2031, with options to extend the term in favor of Tenant.

10.      Although the Landlord reserves the right to make further objections as may be appropriate based upon any new information provided by the Debtors or the Proposed Assignees, the Landlord does not fundamentally object to the proposed assignment of the Concord Lease to Barnes & Nobles.  However, the Debtors or Barnes & Nobles must provide adequate assurance of future performance and cure all amounts due and owing in connection with the assumption and assignment of the Concord Lease.

**C.      The Avondale Lease**

11.      On or about December 24, 2002, Gateway Pavilions, L.L.C., ("Gateway") as landlord, and debtor Bed Bath & Beyond, as tenant, entered into the Avondale Lease for approximately 25,603 square feet of retail premises commonly known as the Gateway Pavilions located in Avondale, Arizona.  The Avondale Lease was subsequently amended by First Amendment to Lease, dated August 31, 2004, and by three exercised options to extend.  The term of the Avondale Lease is scheduled to expire on January 31, 2029, with options to extend the term in favor of Bed Bath & Beyond.

12.      Section 13.3.2 of the Avondale Lease provides that the "Tenant shall honor future exclusives granted by Gateway to certain other tenants in the Shopping Center pursuant to

the terms of leases which are executed from and after the Effective Date."  Accordingly, Tenant "shall not sublease, occupy or use the Premises to be leased, whether by Tenant or any assignee in violation of any such future exclusive."  Such future exclusives may restrict the tenant from operating primarily for the same use as that engaged in by the beneficiary of the future exclusive including with respect to "off-price" stores.  Section 15 of the Avondale Lease further provides that in the event Bed Bath & Beyond proposes to assign the Avondale Lease, Gateway has the right to terminate the Avondale Lease and recapture the premises if the proposed use by the assignee is unacceptable to the Landlord.  For example, if the proposed assignee uses the premises in violation of the exclusive use provisions in Article 13, Gateway has the right to terminate the Avondale Lease.

13.    On June 19, 2003, Gateway, as landlord, and Marshalls of MA, Inc. ("Marshalls"), as tenant, entered into a written lease agreement for approximately 28,000 square feet of retail premises located in Gateway Pavilions (the "Marshalls Avondale Lease").  The Marshalls Avondale Lease provides that Landlord agrees that, during the terms of the lease, "no other premises in the [shopping center] shall at any time contain more than fifteen thousand (15,000) square feet of floor area therein used or occupied for, or devoted to, the sale or display of brand-name off-price apparel."  *See* Marshalls Avondale Lease Schedule B § 4(B).

14.    The Marshalls Avondale Lease provides explicit tenant remedies in the event Gateway or other shopping center tenants violate Marshall's exclusivity provision:

> Section § 14.2. If after notice from Tenant of any failure by Landlord to comply with Landlord's obligations under this Lease, [including any exclusivity provision], Tenant shall have the option to deduct no more than fifty percent (50%) of any payment due hereunder, including the payment of rent.

> *See* Marshalls Avondale Lease, § 14.2.

15.     In accordance with the Marshalls Avondale Lease, any tenant of the leased premises shall be bound by the future exclusivity terms of the Avondale Lease, which includes Marshalls' existing exclusive use clause.

**D.     The Holly Springs Lease**

16.     On or about March 31, 2014, KRG New Hill Place, LLC ("New Hill"), as landlord, and debtor Bed Bath & Beyond, as tenant, entered into the Holly Springs Lease for approximately 23,400 square feet of retail premises commonly known as the Holly Springs Towne Center II located in Holly Springs, North Carolina.  The Holly Springs Lease was subsequently amended by First Amendment to the Holly Springs Lease, dated August 29, 2014.  The term of the Holly Springs Lease is scheduled to expire on January 31, 2026, with options to extend the term in favor of Tenant.

17.     Section 13.3.1 of the Holly Springs Lease provides that Bed Bath & Beyond shall be bound by certain exclusives granted by the landlord to certain other tenants in the shopping center which have been executed prior to the effective date of the lease, and are listed on Exhibit K, attached to the Holly Springs Lease.[1]  Specifically, the exclusivity provision in the Holly Springs Lease provides that the premises "shall not contain more than fifteen thousand (15,000) square feet of floor area therein use or occupied for the sale of off-price apparel and related accessories."  The Holly Springs Lease provides an exception to such exclusive use for T.J. Maxx, T.J. Maxx 'n More, Marshalls, Marshalls-Mega, Ross Stores, Bed Bath & Beyond, Inc., and Dick's Sporting Goods, but notably does not provide an exception for Burlington.  The Holly Springs Lease incorporates, by reference, the lease entered into between New Hill, as

---

[1]     Copies of the Leases may be provided upon request.

landlord, and Marshalls, as tenant, (the "<u>Holly Springs Marshalls Lease</u>") prior to commencement

of the Holly Springs Lease.

### E.    Procedural Background

18.    On April 23, 2023 (the "<u>Petition Date</u>"), the Debtors filed voluntary

petitions for relief under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>")

with this Court.  Since the Petition Date, the Debtors have continued to manage their businesses

as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

19.    On May 22, 2023, the Court entered the *Order (I) Establishing Procedures*

*to Sell Certain Leases, (II) Approving the Sale of Certain Leases, and (III) Granting Related Relief*

(the "<u>Lease Sale Procedures Order</u>").[2]  Pursuant to the Lease Sale Procedures Order, on June 26,

2023, the Debtors conducted its "Phase I" auction of certain of its real property leasehold interests

(the "<u>Phase I Auction</u>"), including the Leases.

20.    On June 27, 2023, the Debtors filed their *Notice of Successful and Backup*

*Bidder with Respect to the Phase 1 Auction of Certain of the Debtors' Lease Assets and Assumption*

*and Assignment of Certain Unexpired Leases* (the "<u>Phase I Auction Notice</u>"),[3] which identified

(i) Burlington as the successful bidder for the (a) Avondale Lease and (b) Holly Spring Lease; and

(ii) Barnes & Nobles as the successful bidder for the Concord Lease.

21.    On June 30, 2023, the Debtors filed the Assignment Notice, requesting that

certain unexpired leases be assumed and assigned to the respective successful bidder.  Exhibit B

to the Assignment Notice identifies the Leases as those Debtors seek to assume and assign,

---

[2]        Docket No. 422.

[3]        Docket No. 1114.

including the respective cure amounts.  A summary of the proposed assignments (the "Lease Assignments") is provided on **Exhibit A**, attached hereto.

**OBJECTION**

**I.    THE CURE AMOUNTS PROPOSED BY THE DEBTORS ARE INCORRECT**

22.    The Landlord disputes the cure amount proposed by the Debtors in the Assignment Notice in connection with the assumption and assignment of the Leases.  The correct cure amounts outstanding under the Leases, including an estimate of attorneys' fees incurred to date, are set forth on **Exhibit A**, attached hereto, in the "Landlord Cure Amount" column (the "Landlord Cure Amount").

23.    Bankruptcy Code section 365(b)(1)(A) provides that unless a lessee-debtor either (a) cures all existing defaults or (b) provides the lessor with adequate assurance that it will promptly cure those defaults, it cannot assume the lease.  As one court has noted, "[s]ection 365(b)(1) is intended to provide protection to the non-debtor lessor to insure that he receives the full benefit of his bargain in the event of assumption."  *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 793 (Bankr. N.D. Ill. 1985); *accord In re Valley View Shopping Ctr., L.P.,* 260 B.R. 10, 25 (Bankr. D. Kan. 2001).

24.    Pursuant to the Leases, the Debtors are obligated to pay regular installments of fixed monthly rent, percentage rent, and/or gross rent, as well as a share of common area maintenance ("CAM") costs and expenses, real estate taxes, and assessments.  In addition, in order for the Proposed Assignments to be approved, all outstanding defaults under the Leases must be cured, and the Landlord must be compensated for any actual pecuniary loss, including the payment of related attorneys' fees.  *See* 11 U.S.C. § 365(b)(1)(B).  Attorneys' fees due under the Leases are compensable.  *See LJC Corp. v. Boyle*, 768 F.2d 1489, 1494–96 (D.C. Cir. 1985); *see also In re Bullock*, 17 B.R. 438, 439 (B.A.P. 9th Cir. 1982); *In re Crown Books Corp.*, 269 B.R. 12, 14–15

(Bankr. D. Del. 2001); *In re BAB Enters., Inc.*, 100 B.R. 982, 984 (Bankr. W.D. Tenn. 1989); *In re Westview 74th St. Drug Corp.*, 59 B.R. 747, 757 (Bankr. S.D.N.Y. 1986); *In re Ribs of Greenwich Vill., Inc.*, 57 B.R. 319, 322 (Bankr. S.D.N.Y. 1986).

25.    To the extent that rent, attorneys' fees, interest, and/or other charges continue to accrue, and/or the Landlord suffers other pecuniary losses with respect to the Leases, the Landlord reserves its right to amend the Landlord Cure Amount to reflect such additional amounts or to account for year-end adjustments, including, without limitation, adjustments for 2022 and 2023, which have not yet been billed or have not yet become due under the terms of the Leases (the "Adjustment Amounts").  The Debtors must be responsible to satisfy all accrued but unbilled obligations under the Leases, including the Adjustment Amounts, if any, when due in accordance with the terms of the Leases, regardless of when such Adjustment Amounts were incurred.  The Landlord further reserves its right to amend all cure amounts to include additional amounts that continue to accrue, including non-monetary obligations, and any other obligations that arise and/or become known to the Landlord prior to assumption and assignment of the Leases.

## II.    DEBTORS MUST DEMONSTRATE ADEQUATE ASSURANCE OF FUTURE PERFORMANCE IN ORDER TO ASSUME AND ASSIGN THE LEASES

26.    In addition to the curing of any default, the Proposed Assignments are also conditioned upon providing the Landlord with adequate assurance of future performance.  11 U.S.C. § 365(b)(1)(C).  Section 365(f)(2)(B) of the Bankruptcy Code provides that a trustee or debtor-in-possession may assign an unexpired nonresidential lease only if "adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease."  *See In re Sun TV and Appliances, Inc.*, 234 B.R. 356, 370 (Bankr. D. Del. 1999).

27.     While adequate assurance of future performance is not defined in the Bankruptcy Code, several courts have looked to the legislative history for guidance and have concluded that "the term was intended to be given a practical, pragmatic construction" in light of the facts of each case. *In re DBSI, Inc.*, 405 B.R. 698, 708 (Bankr. D. Del. 2009). The emphasis is on protection of the lessor, and the intention "is to afford landlord with a measure of protection from having to be saddled with a debtor that may continue to default and return to bankruptcy." *In re Natco Industries, Inc.*, 54 B.R. 436, 441 (Bankr. S.D.N.Y. 1985). By implication, Bankruptcy Code section 365 operates to remove doubts entertained by a lessor concerning the status of his lease with the bankruptcy estate. *See In re Standard Furniture Co.*, 3 B.R. 527, 530 (Bankr. S.D. Cal. 1980).

28.     The initial burden of presentation as to adequate assurance falls upon Debtors. *Sea Harvest Corp. v. Riviera Land Co.*, 868 F.2d 1077, 1079 (9th Cir. 1989). The Sea Harvest court rejected the debtor's bald statement that it "recognizes the ongoing obligation to maintain such Leases and pay all obligations with regard thereto," stating that Sea Harvest's empty declaration does not provide the compensation and assurances required by section 365(b)(1)." *Sea Harvest*, 868 F.2d at 1080.

29.     It is well-established that "[t]he Bankruptcy Code imposes heightened restrictions on the assumption and assignment of leases of shopping centers." *In re Joshua Slocum, Ltd.*, 922 F.2d at 1086. Accordingly, section 365(b)(3) of the Bankruptcy Code provides, in pertinent part:

> [A]dequate assurance of future performance of a lease of real property in a shopping center includes adequate assurance —
>
>> (a)    of the source of rent and other consideration due under such lease, and in the case of an assignment, that the financial condition and operating performance of the proposed assignee and its guarantors, if any, shall be similar

to the financial condition and operating performance of the debtor and its guarantors, if any, as of the time the debtor became the lessee under the lease;

(b)      that any percentage rent due under such lease will not decline substantially;

(c)      that *assumption or assignment of such lease is subject to all the provisions thereof*, including (but not limited to) provisions such as a *radius, location, use, or exclusivity provision, and will not breach any such provision contained in any other lease, financing agreement, or master agreement relating to such shopping center*; and

(d)      that assumption or assignment of such lease will not disrupt any tenant mix or balance in such shopping center.

30.      Adequate assurance requires a foundation that is nonspeculative and sufficiently substantive so as to assure that a landlord will receive the bargained-for performance. *In re World Skating Ctr., Inc.,* 100 B.R. 147, 148–149 (Bankr. D.Conn. 1989).  Indeed, courts have required a *specific factual showing* through competent evidence to determine whether adequate assurance of future performance has been provided.  *See, e.g.*, *Matter of Haute Cuisine, Inc.*, 58 B.R. 390, 393–394 (Bankr. M.D. Fla. 1986); *see also In the Matter of CM Sys., Inc.*, 64 B.R. 363, 364–65 (Bankr. M.D. Fla. 1986).

31.      As discussed below, the Debtors have not satisfied their burden with respect to many of the elements of adequate assurance of future performance set forth in section 365(b)(3).

A.      **The Leases are for Real Property in Shopping Centers**

32.      It cannot be seriously disputed that the Leases are for "real property in a shopping center" as that term is used in Section 365(b)(3).  *See In re Joshua Slocum, Ltd.,* 922 F.2d 1081, 1086-1087 (3d Cir. 1990); *In re Sun TV and Appliances, Inc.,* 234 B.R. 356, 360 (Bankr. D. Del. 1999).  As a result, the Landlords are entitled to the protections afforded shopping center landlords under Bankruptcy Code section 365(b)(3).  "Shopping center landlords, even more than

non-debtor parties to executory contracts and executory leases, receive 'extraordinary protection'

under the Code." *In re Rickel Home Centers, Inc.,* 209 F.3d 291, 298 (3d Cir. 2000).

**B.    Debtors Failed to Establish the Financial Condition and Operating Performance of Burlington and Barnes & Nobles are Similar to the Financial Condition and Operating Performance of the Debtors at the Time the Leases were Executed**

33.    The Debtors bear the burden of proving adequate assurance of future

performance in connection with the assumption of the Leases. *See In re F.W. Rest. Assoc., Inc.*,

190 B.R. 143 (Bankr. D. Conn. 1995); *see also In re Rachels Indus. Inc.*, 109 B.R. 797, 802 (Bankr.

W.D. Tenn. 1990); *In re Lafayette Radio Elecs. Corp.*, 12 B.R. 302, 312 (Bankr. E.D.N.Y. 1981).

34.    Here, however, the Debtors have failed to provide any financial information

as to the financial condition of Bed Bath & Beyond or Buy Buy Baby, the proposed tenants under

the respective leases, in order to provide a "benchmark" against which the proposed assignee's

financial condition and operating history can be measured. *See* 11 U.S.C. § 365(b)(3)(A).

Additionally, the Landlord has not been provided with sufficient financial information about the

Proposed Assignees that would allow the Landlord to compare to the financial condition and

operating performance of the Proposed Assignees with that of Bed Bath & Beyond or Buy Buy

Baby at the time Bed Bath & Beyond or Buy Buy Baby became the lessee under the respective

leases, as required by section 365(b)(3)(A) of the Bankruptcy Code.  Accordingly, unless and until

the Landlord is provided with such information, the Debtors may not assume and assign the Leases.

**C.    Burlington Must Comply With the Use and Exclusivity Provisions of the Avondale and Holly Springs Lease**

35.    It is well-established that the proposed assignee must take the lease

subject to its use provisions. *See* 11 U.S.C. § 365(b)(3)(C).  The proposed assignment of the leases

is premised on the Proposed Assignee's demonstration of adequate assurance of future

performance.  Importantly, the Proposed Assignee's use and occupancy of the Leased Premises is

also "subject to … exclusivity provisions … contained in any other lease … relating to the shopping center." *See* 11 U.S.C. §§ 365(b)(3)(C). Because a proper tenant mix is an essential ingredient of all shopping centers, this legislative purpose will be given effect even where the Debtor's own lease contains no effective exclusives or other use restrictions. *See Federated Dep't Stores*, 135 B.R. at 945.

36.    The Debtors have the burden of establishing that the proposed use by the Proposed Assignee does not breach such use and exclusivity provisions applicable to the Leased Premises, as required by section 365(b)(3)(C) of the Bankruptcy Code. The Debtors have failed to do so. Where the proposed assignment is contrary to restrictive use covenants, assumption and assignment of a shopping center lease is not permitted. *See, e.g.*, *In re Three A's Holdings, LLC*, 364 B.R. 550, 560 (Bankr. D. Del. 2007).

37.    As described above in paragraphs eleven through seventeen, the Avondale Lease and Holly Springs Lease both contain restrictive use provisions that generally prohibit the tenant from duplicating certain identified uses of other tenants in the shopping center for which an exclusive use has been granted. Given the nature of Burlington's business, the post-assignment use would conflict with the exclusive use previously granted to Marshalls at both locations.

## A.    *The Avondale Lease Exclusivity Provision*

38.    Here, an assignment of the Avondale Lease to Burlington would breach the Marshalls Avondale Lease, which provides that no other tenant in Gateway Pavilions may be permitted to operate as an "off-price" store or contain more than fifteen thousand (15,000) square feet of floor area therein used or occupied for, or devoted to, the sale or display of brand-name off-price apparel." *See* Marshalls Avondale Lease Schedule B § 4(B). Further, Section 13.3.2 of the Avondale Lease provides that the tenant shall be bound by any future exclusives granted by the

Landlord to certain other tenants in the shopping center and prevents any tenant or assignee from occupying the premises in violation of any such future exclusive.  *See* Avondale Lease § 13.3.2. Burlington is an "off-price" retailer and an assignment of the Lease to Burlington selling off-price apparel would breach the exclusivity provision in the Avondale Lease in violation of section 365(b)(3)(C) of the Bankruptcy Code.

39.    More importantly, in the event that the applicable exclusivity provision is breached, Marshalls may exercise remedies under the Marshalls Avondale Lease that will cause the Landlord significant harm.  Specifically, Marshalls would have the option to withhold 50% of the rent to compensate Marshalls for its damages in the event of breach of the Landlord's obligations under the lease.  *See* Marshalls Avondale Lease, § 14.2.  Thus, the Landlord is at risk of significant harm in the event that the Court approves the assignment of the Avondale Lease to Burlington.

### B.    *The Holly Springs Lease Exclusivity Provision*

40.    Similarly, an assignment of the Lease to Burlington would breach section 13.3.1 of the Holly Springs Lease (and by operation, the Holly Springs Marshall's Lease), which provides that no other tenant in the Holly Towne Center II shall contain more than fifteen thousand (15,000) square feet of floor area therein use or occupied for the sale of off-price apparel and related accessories."  Thus, the operation of a Burlington store at Holly Towne Center II would breach the exclusivity provision in the Holly Springs Marshalls Lease in violation of section 365(b)(3)(C) of the Bankruptcy Code.

41.    More importantly, in the event that the applicable exclusivity provision is breached, Marshall's may exercise remedies under the Holly Springs Marshalls Lease that will cause Landlord significant harm.  Specifically, Marshalls may reduce the rent payable by 50% to

compensate Marshalls for its damages in association with the landlord's breach of any exclusive

rights contained in Section 14.2.  *See* Holly Springs Lease § 13.2.4(a).  Thus, the Landlord is at

risk of significant harm in the event that the Court approves the assignment of the Holly Springs

Lease to Burlington.

### D.    The Proposed Assignment Will Disrupt Tenant Mix and Balance

42.    Section 365(b)(3)(D) of the Bankruptcy Code states that a shopping center

lease cannot be assigned if such assignment would "disrupt any tenant mix or balance in such

shopping center."[4]  11 U.S.C. § 365(b)(3)(D); s*ee also In re TSW Stores of Nanuet, Inc*., 34 B.R.

299, 307 (Bankr.  S.D.N.Y, 1983) (applying section 365(b)(3)(D) to reject the proposed

assignment because it would cause substantial disruption to tenant mix and balance); *In re

Federated Dept. Stores, Inc.,* 135 B.R. 941, 943 (Bankr. S.D. Ohio 1991) (rejecting assignment of

the lease because of disruption of tenant mix and balance).  By enacting section 365(b)(3)(D) of

the Bankruptcy Code, Congress intended for the courts to be especially solicitous in the shopping

center context in ensuring that tenant mix and balance are not disrupted by any potential lease

assignments, and to protect landlords and other shopping mall tenants from the damage caused by

bankrupt tenants.  *In re Federated Dep't Stores, Inc.*, 135 B.R. 941, 945 (Bankr. S.D. Ohio 1991);

*see also Rockland Center Assocs. v. TSW Stores of Nanuet, Inc. (In re TSW Stores of Nanuet, Inc.),*

34 B.R. 299, 303 (Bankr. S.D.N.Y. 1983) ("a good tenant mix in a shopping center benefits the

landlord and the tenants as well").

---

[4]     Tenant mix, as used in section 365(b)(3)(D) of the Bankruptcy Code, relates to "the inclusion or exclusion of a store in the array or mix of mall stores," whereas tenant balance relates to "the location and relationship of tenants in the mix of mall stores."  *See In re Federated Dept. Stores, Inc.,* 135 B.R. 941, 943 (Bankr. S.D. Ohio 1991).

43.     Section 365(b)(3)(D) of the Bankruptcy Code favors minimizing disruption to carefully planned tenant mixes in shopping centers. *See In re TSW Stores of Nanuet, Inc.*, 34 B.R. 299 (Bankr. S.D.N.Y. 1983). The Third Circuit, in *Joshua Slocum*, carefully noted that a bankruptcy court must be sensitive to the non-debtor party and the underlying tenet that requires that the non-debtor receive the full benefit of its bargain. 922 F.2d at 1089-90.

44.     The operation of a second retailer that sells primarily off-price apparel and related accessories, i.e., Burlington, at Gateway Pavilions or Holly Springs Towne Center II, rather than a store that does not conflict with the primary use of any existing tenants, disrupt the carefully planned tenant mix and balance currently in place at Gateway Pavilions or Holly Springs Towne Center II. Accordingly, the Court should not permit the Debtor to assign the Avondale Lease or Holly Springs Lease to Burlington.

## E.     Debtors Must Account for Accrued but not yet Billed Amounts

45.     Bankruptcy Code section 365(b)(3)(C) provides that the assumption and assignment of a shopping center lease "is subject to all the provisions thereof . . . ." 11 U.S.C. § 365(b)(3)(C). As the bankruptcy court noted in *In re Washington Capital Aviation & Leasing*:

> Adequate assurance of future performance by the assignee is important because 11 U.S.C. § 365(k) "relieves the . . . estate from any liability for any breach of such . . . lease occurring after such assignment." A party subject to a contractually created obligation ordinarily cannot divest itself of liability by substituting another in its place without the consent of the party owed the duty. While the assignee may be entitled to perform for the original obligor, the original obligor remains ultimately liable until discharged by performance or otherwise. Section 365(k) changes this common law rule and relieves the estate from all liability under the lease following assignment.

156 B.R. 167, 175 n.3 (Bankr. E.D. Va. 1993); *see also In re Rickel Home Ctrs., Inc.*, 209 F.3d 291, 299 (3d Cir. 2000) (stating that adequate assurance is "necessary to protect the rights of the

non-debtor party to the contract or lease, because assignment relieves the trustee and the estate

from liability arising from a post-assignment breach.").

46.    In order to satisfy the adequate assurance requirements of Bankruptcy Code

section 365(b)(1)(C), and ensure that the assumption of the Leases are "subject to all the provisions

thereof . . . ." 11 U.S.C. § 365(b)(3)(C), either the Debtors must make arrangement for such

payment by establishment of a segregated, reserve account for that purpose or the Proposed

Assignees must have responsibility for such as yet unbilled obligations (and, conversely, receive

the benefit of any credits).

47.    As a matter of law, however, a debtor is not entitled to the benefits and

protections of section 365(k) of the Bankruptcy Code where the debtor does not assume and assign

the lease *cum onere* — with all benefits and burdens.  *See, e.g.*, *Am. Flint Glass Workers Union v.

Anchor Resolution Corp.*, 197 F.3d 76 (3d Cir. 1999).  In particular, where an agreement between

a debtor and assignee attempts to limit the obligations assumed by the assignee only to obligations

arising after the closing, there has not been a complete assignment and the debtor is not entitled to

the protections of section 365(k).  *See id.* at 81.

48.    As with most modern shopping center leases, the Leases provide for the

monthly payment of "Tenant's Proportionate Share" of the CAM expenses, which are based on

budgeted amounts and subject to later reconciliation based on actual expenses incurred.  Here,

however, paragraph 3 of each of the Debtors' proposed Assignment and Assumption Agreements

seeks to bifurcate the tenant's future expense reimbursement obligations, purporting to limit the

assignee's assumption of the Leases to obligations "arising from and after the Closing."  *See*

Assumption Notice, pp. 63–71 (the "<u>Assignment Agreement</u>"), at ¶ 4.

49.     Since year-end expense adjustments for 2023 will not be billed until later on in the year, there is no pending default with respect to such obligations.  Nevertheless, since the Assignment Agreement purports to exclude the Proposed Assignees' liability for such obligations, the Landlord is not receiving adequate assurance that those obligations will be paid when billed in the future.  In order to satisfy the adequate assurance requirements of section 365(b)(1)(C), either (i) the Debtors must provide for the payment of these expenses by the establishment of a segregated reserve account for that purpose or (ii) the Proposed Assignees must assume responsibility for such as yet unbilled obligations (and, conversely, receive the benefit of any credits), even though future billings may include expenses that accrue prior to the Closing Date under the Assignment Agreement.

50.     For these reasons, in order to provide adequate assurance of future performance, either the Proposed Assignees or the Debtors must be responsible for all accrued but not yet billed amounts under the Leases, including amounts for real estate taxes, common area maintenance, and insurance.

**F.       Debtors Must Provide Adequate Assurance of Indemnification Obligations**

51.     In addition to the monetary obligations that either Debtors or any proposed assignee must satisfy under section 365 of the Bankruptcy Code, the Leases provide that the Debtors must indemnify and hold Landlord harmless against all loss, liability, penalties, claims or demands of whatsoever nature arising from, among other things, Tenant's use of the Leased Premises or breach of any provision of the Leases.  There is no exclusion or limitation on such indemnification with regard to events or incidents that may have occurred prior to any assignment, but which are not made known to the Landlord, the Debtors or any assignees until after the Proposed Assignments.

52.     Accordingly, in order to cure possible pre-assignment non-monetary defaults and provide adequate assurance of future performance with respect to the indemnification obligations under the Leases, either (a) the Proposed Assignees must be required to assume all responsibility for any and all such claims, notwithstanding anything to the contrary contained in the assignment agreement, or (b) the Debtors must be required to demonstrate or obtain adequate insurance (by purchase of "tail" coverage or otherwise) in order to satisfy potential indemnification obligations based on events or occurrences prior to the effective date of an assignment.  Such claims for indemnity could include claims for personal injury occurring at the Leased Premises where the Landlord is joined as a party to a lawsuit or for damage and destruction of property by the Debtors or their agents or employees.

## RESERVATION OF RIGHTS

53.     Landlord reserves the right to make such other and further objections as may be appropriate based upon any new information provided by the Debtors or the Proposed Assignees, or as may be developed through formal or informal discovery.

## CONCLUSION

**WHEREFORE,** the Landlord respectfully requests that the Court enter an order (i) denying the proposed assignment of the Avondale and Holly Springs Lease to the extent Burlington's use result in violations of the exclusive use provisions in the Leases, or (ii) alternatively, if the Court decides to approve assignment of the Avondale and Holly Springs Lease, that the applicable order prevent any other tenant in the shopping centers from asserting that the lease assignments to Burlington is a basis to declare a default, reduce the rent or otherwise modify the terms or terminate any other lease in the shopping centers, (iii) conditioning approval of the Proposed Assignments on (a) the Debtors and/or the Proposed Assignees satisfying the Landlord's cure amounts; and (b) the Debtors and/or the Proposed Assignees providing the

requisite adequate assurance of future performance under the Leases; and (iv) such other and further relief and may be appropriate under the circumstances.

Dated:  July 12, 2023                    Respectfully submitted,

**KELLEY DRYE & WARREN LLP**

By:  */s/ Robert L. LeHane*

Robert L. LeHane
Jennifer D. Raviele (admitted *pro hac vice*)
Connie Y. Choe
3 World Trade Center
175 Greenwich Street
New York, NY 10007
Telephone: (212) 808-7800
Email: rlehane@kelleydrye.com
          jraviele@kelleydrye.com
          cchoe@kelleydrye.com

*Attorneys for Kite Realty Group*

**EXHIBIT A**

| Store No. | Tenant | Mall Name | Location | Debtor Cure Amount | Landlord Cure Amount |
|-----------|--------|-----------|----------|--------------------|----------------------|
| 591 | Bed Bath & Beyond, Inc. | Gateway Pavilions | Avondale, AZ | $77,172.28 | $120,658.28 |
| 1405 | Bed Bath & Beyond, Inc. | Holly Springs Towne Center II | Holly Springs, NC | $0.00 | $48,523.11 |
| 3131 | Buy Buy Baby, Inc. | Pavilion at Kings Grant | Concord, NC | $0.00 | $66,376.22 |

## <u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this July 12, 2023, a copy of the foregoing Objection was served via CM/ECF on all parties registered to receive such notice in the above-captioned cases.

_/s/ Robert L. LeHane_
Robert L. LeHane