**EXHIBIT "A"**

AGREEMENT OF LEASE

Between

FOUNTAINS PROPERTIES LIMITED

LANDLORD,

AND

STAFFORD BED BATH & BEYOND INC.,

TENANT

DATED: April 17, 1996

PREMISES LOCATED

IN

STAFFORD, TEXAS

# TABLE OF CONTENTS

Page

| | | |
|---|---|---|
| SECTION 1. | DEFINITIONS AND BASIC TERMS | 1 |
| SECTION 2. | LEASE OF PREMISES | 8 |
| SECTION 3. | LEASE TERM | 8 |
| SECTION 4. | PAYMENT OF FIXED RENT | 8 |
| SECTION 5. | IMPROVEMENTS | 18 |
| SECTION 6. | REAL ESTATE AND OTHER TAXES | 26 |
| SECTION 7. | PERMITTED AND PROHIBITED USES | 28 |
| SECTION 8. | UTILITIES | 30 |
| SECTION 9. | MUTUAL RELEASE, WAIVER OF SUBROGATION AND MUTUAL INDEMNIFICATION | 31 |
| SECTION 10. | SIGNS | 32 |
| SECTION 11. | ALTERATIONS AND IMPROVEMENTS | 34 |
| SECTION 12. | ACCESS TO SHOPPING CENTER | 36 |
| SECTION 13. | COMMON AREAS | 36 |
| SECTION 14. | PARKING AREAS | 41 |
| SECTION 15. | TENANT'S INSURANCE | 43 |
| SECTION 16. | LANDLORD'S INSURANCE | 44 |
| SECTION 17. | REPAIRS | 46 |
| SECTION 18. | TENANT DEFAULT | 48 |
| SECTION 19. | LANDLORD DEFAULT | 50 |
| SECTION 20. | LANDLORD'S ENTRY | 51 |
| SECTION 21. | FIRE AND OTHER CASUALTY | 51 |
| SECTION 22. | EMINENT DOMAIN | 53 |
| SECTION 23. | EXCLUSIVE IN CENTER | 55 |
| SECTION 24. | RIGHT TO MORTGAGE AND NON-DISTURBANCE | 59 |
| SECTION 25. | TENANT ASSIGNMENT AND SUBLETTING | 59 |
| SECTION 26. | NOTICE | 64 |
| SECTION 27. | SHORT FORM LEASE | 65 |
| SECTION 28. | ENTIRE AGREEMENT AND MODIFICATION | 65 |
| SECTION 29. | SEVERABILITY | 65 |
| SECTION 30. | GRAMMATICAL USAGES AND CONSTRUCTION | 65 |
| SECTION 31. | TABLE OF CONTENTS, LINE NUMBERING AND PARAGRAPH HEADINGS | 65 |
| SECTION 32. | NO JOINT VENTURE OR PARTNERSHIP CREATED BY LEASE | 66 |
| SECTION 33. | BROKER'S COMMISSION | 66 |
| SECTION 34. | RIGHTS CUMULATIVE | 66 |

SECTION 35.    NON-WAIVER . . . . . . . . . . . . . . . . . . . . . 67

SECTION 36.    LIMITATION OF LANDLORD'S LIABILITY . . . . . . 67

SECTION 37.    SURRENDER OF PREMISES . . . . . . . . . . . . . 67

SECTION 38.    SUCCESSORS AND ASSIGNS . . . . . . . . . . . . 67

SECTION 39.    FORCE MAJEURE . . . . . . . . . . . . . . . . . 68

SECTION 40.    HOLD OVER . . . . . . . . . . . . . . . . . . . 68

SECTION 41.    CONSENTS . . . . . . . . . . . . . . . . . . . . 68

SECTION 42.    DECLARATION OF CONTRACTUAL LIABILITY . . . . . 68

SECTION 43.    QUIET ENJOYMENT . . . . . . . . . . . . . . . . 69

SECTION 44.    ESTOPPEL CERTIFICATE . . . . . . . . . . . . . 69

SECTION 45.    COSTS . . . . . . . . . . . . . . . . . . . . . 69

SECTION 46.    OPTIONS TO EXTEND TERM . . . . . . . . . . . . 69

SECTION 47.    GOVERNING LAW . . . . . . . . . . . . . . . . . 71

SECTION 48.    ATTORNEYS' FEES . . . . . . . . . . . . . . . . 71

SECTION 49.    PAYMENT UNDER PROTEST . . . . . . . . . . . . . 71

SECTION 50.    WORK PERFORMED UNDER PROTEST . . . . . . . . . 71

SECTION 51.    DISCONTINUANCE OF BUSINESS OPERATIONS . . . . 72

SECTION 52.    ABATEMENT OF RENT CHARGES . . . . . . . . . . 73

SECTION 53.    WARRANTIES AND REPRESENTATIONS . . . . . . . . 73

SECTION 54.    ARBITRATION . . . . . . . . . . . . . . . . . . 77

SECTION 55.    LIENS . . . . . . . . . . . . . . . . . . . . . 77

SECTION 56.    DEFINITION OF HEREUNDER, HEREIN, ETC. . . . . 78

SECTION 57.    TENANT'S FIXTURES . . . . . . . . . . . . . . . 78

SECTION 58.    TENANT'S RIGHT OF FIRST OFFER . . . . . . . . 79

SECTION 59.    LIMITATION OF TENANT'S LIABILITY . . . . . . . 80

SECTION 60.    TENANT'S RIGHT OF TERMINATION . . . . . . . . 81

SECTION 61.    SURVIVAL OF OBLIGATIONS . . . . . . . . . . . . 82

SECTION 62.    EXECUTION OF THIS LEASE . . . . . . . . . . . 82

SECTION 63.    NO SECURITY . . . . . . . . . . . . . . . . . . 82

SECTION 64.    COVENANT TO OPEN FOR BUSINESS. . . . . . . . . 82

EXHIBIT A -    Legal Description of Shopping Center
EXHIBIT B -    Site Plan
EXHIBIT C -    Rent Commencement and Expiration Date Agreement
EXHIBIT D -    Specifications for Landlord's Work
EXHIBIT D-1    Front Elevation
EXHIBIT E -    Permitted Encumbrances
EXHIBIT E-1    Existing Tenants
EXHIBIT F -    Building Sign and Signage Criteria
EXHIBIT F-1    Pylon Sign
EXHIBIT G      Existing Exclusives

## LEASE AGREEMENT

THIS LEASE AGREEMENT ("Lease") is entered into on April 10, 1996 by and between FOUNTAINS PROPERTIES LIMITED, a Texas limited partnership, having an office at 2401 Fountainview, Suite 350, Houston, Texas 77057 ("Landlord"), and STAFFORD BED BATH & BEYOND INC., a Texas corporation, having an office at 715 Morris Avenue, Springfield, New Jersey 07081 ("Tenant").

W I T N E S S E T H:

SECTION 1.    DEFINITIONS AND BASIC TERMS.  The following terms shall have the meanings set forth in this Section 1 except as otherwise expressly provided herein:

(a)  Commencement Date:  The date hereof.

(b)  Common Areas:  All areas which are, from time to time, available for the joint use and benefit of Tenant and other tenants of the Shopping Center (as hereinafter defined), and their respective employees, agents, subtenants, concessionaires, licensees, customers and other invitees, including but not limited to any and all parking areas, parking spaces, driveways, truck serviceways, passageways, sidewalks, entrances, exits, lighting facilities, courts, landscaped areas, retention or detention areas, and utility lines.

(c)  Exhibits.  The following Exhibits are annexed hereto and made a part hereof:

```
EXHIBIT A -     Legal Description of Shopping Center
EXHIBIT B -     Site Plan
EXHIBIT C -     Rent Commencement and Expiration Date
                Agreement
EXHIBIT D -     Specifications for Landlord's Work
EXHIBIT D-1     Front Elevation
EXHIBIT E -     Permitted Encumbrances
EXHIBIT E-1     Existing Tenants
EXHIBIT F -     Building Sign and Signage Criteria
EXHIBIT F-1     Pylon Sign
EXHIBIT G       Existing Exclusives
```

(d)  Fixed Rent:  The following amounts for the periods indicated:

(i)  For the period commencing on the Rent Commencement Date (as hereinafter defined) and ending on the last day of the month during which the fifth (5th) anniversary of the Rent Commencement Date occurs, at the rate of Two Hundred Eighty

*based on 35,000 Sf -*

Thousand and xx/100 ($280,000.00) Dollars per year [based on Eight and xx/100 ($8.00) Dollars per square foot of Floor Area (as hereinafter defined)];

(ii) For the year period commencing on the first day of the first month following the month during which the fifth (5th) anniversary of the Rent Commencement Date occurs and ending on the last day of the month during which the tenth (10th) anniversary of the Rent Commencement Date occurs, at the rate of Two Hundred Ninety-seven Thousand Five Hundred and xx/100 ($297,500.00) Dollars per year [based on Eight and 50/100 ($8.50) Dollars per square foot of Floor Area];

(iii)    For the period commencing on the first day of the first month following the month during which the tenth (10th) anniversary of the Rent Commencement Date occurs and ending on the last day of the original Term (as hereinafter defined), at the rate of Three Hundred Thirty-Two Thousand Five Hundred and xx/100 ($332,500.00) Dollars per year [based on Nine and 50/100 ($9.50) Dollars per square foot of Floor Area];

(iv) For the first five (5) year Renewal Period, at the rate of Three Hundred Sixty-Seven Thousand Five Hundred and xx/100 ($367,500.00) Dollars per year [based on Ten and 50/100 ($10.50) Dollars per square foot of Floor Area];

(v)    For the second five (5) year Renewal Period, at the rate of Four Hundred Two Thousand Five Hundred and xx/100 ($402,500.00) Dollars per year [based on Eleven and 50/100 ($11.50) Dollars per square foot of Floor Area]; and

(vi) For the third five (5) year Renewal Period, at the rate of Four Hundred Thirty-Seven Thousand Five Hundred and xx/100 ($437,500.00) Dollars per year [based on Twelve and 50/100 ($12.50) Dollars per square foot of Floor Area].

(e)    <u>Floor Area</u>:    The actual number of square feet of space contained within any building area in the Shopping Center, but with respect to (i) the Shopping Center, including all space on all floors within all the buildings [including the Premises (as hereinafter defined)] located therein and, with respect to exterior areas, including all exterior areas leased to or exclusively used

by one or more tenants [but excepting the so-called "Boardwalk" located between the restaurants (as shown on the Site Plan)], and (ii) the Premises, including all space within the Premises. All measurements pursuant to this Subsection 1.(e) shall be from the exterior of outside walls or store front and/or to the centerline of any common walls, but in no event shall Floor Area include any non-selling area within any mezzanine, any lower floor storage space or, except as set forth in 1.(e)(i) above, any exterior areas.

(f)  <u>Landlord's Mailing Address</u>:  2401 Fountainview, Suite 350, Houston, Texas 77057 or such other place and/or to the attention of such other person as Landlord may notify Tenant in writing from time to time.

(g)  <u>Lease Interest Rate</u>:  The then effective prime rate as announced from time to time by the <u>Wall Street Journal</u> plus four (4%) percent.

(h)  <u>No Build Area</u>:  The portion of the Shopping Center depicted on <u>Exhibit B</u> as "No Build Area".

(i)  <u>Permitted Use</u>:  The sale at retail of a variety of linens and domestics (including but not limited to sheets, bedspreads, comforters, pillows, pillow covers, placemats, tablecloths, dish towels, oven mittens and aprons); bathroom items (including but not limited to towels, shower curtains, toilet seats and other bathroom accessories); personal care items (including but not limited to electric razors, shavers, toothbrushes and hair dryers); home furnishings; housewares (including but not limited to utensils, kitchen utensils, appliances and "gadgets," cleaning appliances and supplies, cookware, bakeware, dishes and china, glassware, kitchen and bathroom appliances); wall and floor coverings; furniture; window treatments; decorative accessories; frames and wall art; photo albums; photo storage boxes; closet, shelving and storage items; luggage; books; party supplies; juvenile merchandise (including but not limited to toys, car seats and safety-proofing items); specialty food items; food and non-alcoholic beverage services; any and all other items sold or services provided from time to time in a majority of the Bed Bath

& Beyond stores in the State of Texas owned or operated by Tenant or any entity controlling, controlled by, or under common control with Tenant (all of the aforementioned items are hereinafter collectively called the "Permitted Items"); and for any other lawful retail use not specifically prohibited by the provisions of Sections 7.(c) and 23.(d) of this Lease. In addition, Tenant shall be permitted to use portions of the Premises for storage and office uses incidental to the Permitted Use. Tenant's assignees and sublessees shall be permitted to use the Premises (or the applicable portion thereof) for the uses permitted in Section 25 hereof.

(j)  Premises:  The premises leased by Tenant, being the area cross-hatched on Exhibit B, containing approximately thirty-five thousand (35,000) *renumbered 36,00)* square feet of Floor Area on the ground floor and approximately one thousand five hundred (1,500) square feet of non-selling space on the mezzanine level for non-selling office purposes. In no event shall such non-selling space result in any charge to Tenant by way of Fixed Rent or any Additional Rent (as hereinafter defined), nor shall such non-selling space be included in the determination of Tenant's Pro Rata Share (as hereinafter defined). At least thirty (30) days prior to the Delivery Date (as hereinafter defined), exact measurements of the Floor Area of the Premises and of the Shopping Center (or so much thereof as may then be completed) shall be made and certified to Tenant by Landlord's licensed architect, surveyor or engineer. In the event Landlord has failed to deliver such certification to Tenant as set forth above, Tenant shall have the right to have such measurement made and certified to Landlord by Tenant's architect, surveyor or engineer, and the cost of such measurement, in an amount not to exceed Two Thousand Five Hundred ($2,500.00) Dollars, shall be credited to Tenant against the first payment of Fixed Rent due hereunder. In the event the measurement of the Premises shall indicate a Floor Area different than the Floor Area of the Premises set forth above, the parties hereto shall promptly execute an amendment to this Lease modifying, as applicable, the Fixed Rent and any other applicable provision of this Lease (including,

without limitation, the Sales Break Point) to conform to the exact measurement; provided, however, that if (i) the Floor Area of the Premises is determined or deemed to be less than the Floor Area of the Premises set forth above, Tenant shall receive a proportional refund of any Rent (as hereinafter defined) previously paid to Landlord pursuant to the terms of this Lease, (ii) the Floor Area of the Premises is determined or deemed to be greater than one thousand (1,000) square feet of Floor Area in excess of the Floor Area of the Premises set forth above, the Premises shall be deemed to contain thirty-six thousand (36,000) square feet, and (iii) the Floor Area of the Premises is determined to be less than thirty-three thousand (33,000) square feet, then Tenant shall have the right, as its sole remedy, to terminate this Lease upon notice to Landlord given within fifteen (15) days after Tenant's receipt of the final measurement determination and to receive a refund from Landlord of all sums (a) paid to Landlord pursuant to the terms of this Lease, and (b) incurred by Tenant in connection with Tenant's Work. In addition to the measurements of the Floor Area described above, the Floor Area of the Premises and of the Shopping Center (or so much thereof as may then be completed) shall be increased or decreased, as the case may be, and in accordance with the provisions of subsection 1.(e) above, as walls which previously constituted outside walls become common walls, and as walls which previously constituted common walls become outside walls. Any dispute between the parties with respect to the Floor Area of the Premises or the Shopping Center shall be determined by arbitration in accordance with the provisions of Section 54 below.

(k)  Primary Building Area:   The portion of the Shopping Center known as Unrestricted Reserve "F" of The Fountains Section One, a subdivision of Stafford, Fort Bend County, Texas, according to the map or plat thereof recorded on February 14, 1996, in Film Code Numbers 1453B, 1454 A, 1455 A and B of the Map Records of Fort Bend County, Texas, being the same area as that portion of the Shopping Center north and west of Fountain Lake Circle and encompassed within the area bounded by the Southwest Freeway (U.S. 59), Fountain Lake Circle, Fountain Lake Drive, and the western

boundary of the land described on <u>Exhibit A</u>, as is depicted on <u>Exhibit B</u>.

(1)  <u>Rent Commencement Date</u>:  The first to occur of the following two (2) dates: (i) the date which Tenant shall establish as its grand opening [but not later than ten (10) days after the date upon which Tenant shall open the Premises to the general public for business]; or (ii) the date that is sixty (60) days after the Delivery Date; except, however, if, for any reason whatsoever [including, without limitation, Force Majeure (as hereinafter defined)] the date established pursuant to (ii) occurs between October 1 and the following March 31 (the "<u>Slack Period</u>") Tenant shall have the right to delay the Rent Commencement Date without payment of Rent or penalty until the end of the Slack Period. Notwithstanding the foregoing, in the event, however, that the date established pursuant to (ii) above occurs during the Slack Period, or in the event the Delivery Date occurs during the Slack Period, and Tenant, nevertheless, elects to open the Premises to the general public for business prior to the next following April 1, then, the Rent Commencement Date shall be the date determined in accordance with (i) above but, commencing on such Rent Commencement Date and continuing until the next following April 1, Tenant shall be entitled to a full abatement of Fixed Rent and Tenant shall be liable only for the payment of (A) Tenant's Pro Rata Share of Taxes and Common Areas Charges (as those terms are hereinafter defined), and (B) Percentage Rent (as hereinafter defined) [except that for purposes of this Section 1.(1), (1) the Sales Break Point (as hereinafter defined) shall be deemed to be One ($1.00) Dollar, and (2) in no event shall the aggregate Percentage Rent payable during such period (A) exceed the amount which the Fixed Rent would otherwise have been with respect to such period, if the Delivery Date occurs prior to October 1, 1996, or (B) exceed fifty (50%) percent of the amount which the Fixed Rent would otherwise have been with respect to such period, if the Delivery Date occurs on or after October 1, 1996]. Landlord and Tenant agree that any abatement of Fixed Rent which inures to the benefit of Tenant in accordance with the provisions of this Section 1.(1) shall

constitute a reimbursement to Tenant for certain pre-opening expenses incurred by Tenant in connection with this Lease. Within ten (10) days after the Rent Commencement Date has been determined, Landlord and Tenant shall execute and deliver to each other a Rent Commencement and Expiration Date Agreement in the form provided in Exhibit C setting forth the Rent Commencement Date, the Expiration Date (as hereinafter defined) and the dates of commencement of the Renewal Periods (as hereinafter defined).

(m)   Shopping Center: The shopping center commonly known as The Fountains on the Lake, containing at least four hundred thousand (400,000) square feet of Floor Area, located on the property at the corner of Southwest Freeway and Fountain Lake Drive, Stafford, Texas, and more fully described in Exhibit A. In the event the legal description of the Shopping Center described in Exhibit A indicates that the Shopping Center is composed of more than one parcel or lot, Landlord represents that there exist no strips or gores between such parcels or lots which are not owned by Landlord.  Landlord shall not change the name of the Shopping Center without at least ninety (90) days prior written notice to Tenant, and Landlord covenants and agrees not to include the name of any tenant (other than Tenant) in the name of the Shopping Center.

(n)   Tenant's Mailing Address:   715 Morris Avenue, Springfield, New Jersey 07081, Attn: Mr. Warren Eisenberg, or such other place and/or to the attention of such other person as Tenant may notify Landlord in writing from time to time.

(o)   Tenant's Pro Rata Share: A fraction whose numerator is the Floor Area of the Premises [as determined pursuant to subsection 1.(j)] and whose denominator is the annual average Floor Area of the Shopping Center [as determined pursuant to subsection 1.(j)].  Tenant's Pro Rata Share shall be redetermined any time buildings are added to or removed from the Shopping Center, but in no event shall Tenant's Pro Rata Share be greater than fifteen (15%) percent.  A building shall be deemed added to or removed from the Shopping Center on the earlier of (i) the date upon which the building is opened to the public for business, or (ii) at such time

as an assessment for Taxes (as hereinafter defined) is made or removed, as the case may be, with respect to such building.

(p) Term: An original fifteen (15) year period beginning on the Rent Commencement Date and, if the Rent Commencement Date shall occur on the first day of February, ending at midnight on the day immediately preceding the fifteenth (15th) anniversary of the Rent Commencement Date, but if the Rent Commencement Date is not the first day of February, then the Term shall be deemed extended and shall end at midnight on the last day of January following the fifteenth (15th) anniversary of the Rent Commencement Date. As used herein, "Term" shall refer to the original Term and any Renewal Period exercised pursuant to Section 46 below, as the context shall require, and "Expiration Date" shall be the date on which the Term of this Lease expires pursuant to the foregoing. Notwithstanding any other provision of this Lease, at Tenant's election, the Term shall be extended (and all dates relating to the commencement and expiration of Renewal Periods shall be extended) by a period of time equal to such periods of time as the Premises is not open to the general public for business as a result of any of the events described in Section 21 and/or Section 22 below, provided that Tenant notifies Landlord of such election to extend the Term within ninety (90) days after Tenant has re-opened the Premises to the general public for business following the restoration of the Premises and/or the remainder of the Shopping Center.

SECTION 2.  LEASE OF PREMISES.  As of the Commencement Date, Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the Premises together with the non-exclusive right and easement to use the Common Areas in common with other tenants and occupants of the Shopping Center.

SECTION 3.  LEASE TERM.  Subject to the terms of this Lease, Tenant shall have and hold the Premises for the Term, unless sooner terminated as herein provided.

SECTION 4.  PAYMENT OF FIXED RENT.

(a) Commencing on the Rent Commencement Date and continuing throughout the balance of the Term, Tenant shall pay to

Landlord the Fixed Rent, payable in equal successive monthly installments, in advance, on the first day of each and every calendar month throughout the Term, except that Fixed Rent for any partial calendar month during the Term shall be prorated. Fixed Rent shall be paid without deduction or set-off (except as may be otherwise expressly provided herein). Whenever Tenant is required hereunder to pay any monies to Landlord, other than Fixed Rent, the same shall be deemed to be "<u>Additional Rent</u>". Landlord shall have the same remedies with respect to the non-payment of Additional Rent as it has for the nonpayment of Fixed Rent pursuant to the terms of this Lease. The term "<u>Rent</u>" as used herein shall mean Fixed Rent and/or Additional Rent. All Rent shall be mailed or otherwise delivered to Landlord's mailing address set forth in Section 1.(f) above or to such other address as Landlord may from time to time designate by written notice to Tenant. All Rent shall be paid in lawful money of the United States which shall be legal tender for the payment of all debts and dues, public and private, at the time of payment. Landlord acknowledges and agrees that for administrative purposes, Tenant has designated BBBY Management Corporation (hereinafter the "<u>Paying Agent</u>") to make all Rent payments due to Landlord under this Lease. Said designation (which may be revoked by Tenant at any time) is not intended as, and shall not constitute, an assignment of any rights of Tenant to Paying Agent. Landlord shall not have any right to bring any actions against Paying Agent, and Paying Agent shall have no liability to Landlord for any obligation whatsoever (including, without limitation, the obligation to pay Rent). All payments of Rent received by Landlord from Paying Agent shall be credited to Tenant as if such payments of Rent had been made by Tenant directly to Landlord.

(b)  If Inducement Tenants (as hereinafter defined) occupying at least one hundred fifty thousand (150,000) square feet of Floor Area shall not have opened their respective premises to the general public for business on or before the date on which Tenant is prepared to open the Premises to the general public for business, then Tenant shall have the right, at its sole option, to

elect (i) not to open the Premises to the general public for
business, in which event the Rent Commencement Date,
notwithstanding any other provision of this Lease, except for the
conditions precedent to the occurrence of the Delivery Date, shall
be the date that is ninety (90) days after the date (the
"Inducement Date") upon which Landlord has notified Tenant that all
of the Inducement Tenants have opened their respective premises to
the general public for business [except, however, if the date which
is ninety (90) days after the Inducement Date occurs during the
Slack Period, Tenant shall have the right to delay the Rent
Commencement Date without payment of Rent or penalty until the end
of the Slack Period], or (ii) to open the Premises to the general
public for business, despite the failure of all of the Inducement
Tenants to have opened their respective premises to the general
public for business [or the fact that the date which is ninety (90)
days after the Inducement Date shall occur during the Slack
Period], in either of which event, notwithstanding any other
provision of this Lease, except for the conditions precedent to the
occurrence of the Delivery Date, the Rent Commencement Date shall
be deemed to be the date which Tenant shall establish as its grand
opening [but not later than ten (10) days after the date upon which
Tenant shall have opened the Premises to the general public for
business] and during the period (the "Inducement Opening Period")
commencing on the Rent Commencement Date and ending on the later to
occur of (x) the end of the Slack Period, or (y) the date which is
ninety (90) days after the Inducement Date, Tenant shall be
entitled to a full abatement of Fixed Rent and Tenant shall only be
liable for the payment of (A) Tenant's Pro Rata Share of Taxes and
Common Areas Charges hereunder, and (B) the Percentage Rent
hereunder (except that for purposes of this Section 4.(b), (1) the
Sales Break Point shall be deemed to be One ($1.00) Dollar and (2)
in no event shall the aggregate Percentage Rent payable during the
Inducement Opening Period exceed one-half (½) of the amount which
the Fixed Rent would otherwise have been with respect to the
Inducement Opening Period). In the event Inducement Tenants
occupying at least One Hundred Fifty Thousand (150,000) square feet

of Floor Area shall not have opened their respective premises to the general public for business within six (6) months after Tenant shall either have been ready to open (which for purposes of this Subsection (b) only, shall mean the date which is sixty (60) days after the occurrence of the Delivery Date (assuming subsections 5(b)(viii) and (ix) were not applicable)) or shall have opened the Premises to the general public for business, then Tenant may at any time thereafter when any of the Inducement Tenants shall not have so opened their premises to the general public for business (and whether or not Tenant shall have opened for business), upon giving Landlord not less than ninety (90) days' notice, terminate this Lease as of the date specified in said notice, in which event neither party shall have any further liability hereunder except that Landlord shall be obligated to promptly reimburse Tenant for all its costs and expenses incurred in connection with this Lease, including, without limitation, the preparation of plans and specifications for and the costs of Tenant's Work. Landlord may negate such termination by causing all of the Inducement Tenants to open their respective premises to the general public for business not later than sixty (60) days after the date on which Tenant has given the foregoing notice of termination.

(c)   <u>Percentage Rent</u>.

(i)   During and for each full calendar year during the Term, Tenant shall pay annual percentage rent ("<u>Percentage Rent</u>") equal to two (2%) percent (the "<u>Percentage Multiple</u>") of all Gross Sales (as hereinafter defined) resulting from business conducted in, on or from the Premises during such calendar year in excess of the Sales Break Point. "<u>Sales Break Point</u>" means the amount arrived at by dividing the annual Fixed Rent for the calendar year for which Percentage Rent is being determined by the Percentage Multiple. "<u>Gross Sales</u>" means the total amount of the actual sales price of all sales of merchandise or services arising out of or payable on account of (and all other receipts or amounts receivable whatsoever with respect to) all the business conducted in, on or from the Premises by or on account of Tenant and any sublessee, licensee or concessionaire of Tenant and any other

person or entity operating in the Premises, whether for cash or otherwise, including all orders for merchandise taken from or filled at or from the Premises and all deposits not refunded to customers. A <u>sale</u> shall be deemed to have been consummated for purposes of this Lease, and the entire amount of the sales price shall be included in Gross Sales, at such time as (1) the transaction is initially reflected in the books or records of Tenant, or any sublessee, licensee or concessionaire of Tenant, or any other person or entity operating its business in the Premises, (2) Tenant or any other person or entity operating its business in the Premises receives all or any portion of the sales price, or (3) the applicable goods or services are delivered to the customer, whichever of (1), (2) or (3) first occurs, irrespective of whether payment is made in installments, the sale is for cash or credit or otherwise, or all or any portion of the sales price has actually been paid at the time of inclusion in Gross Sales or at any other time. Tenant and the other persons and entities operating their business in the Premises shall record, at the time of each sale or transaction, all receipts from such sale or other transaction, whether for cash, credit or otherwise, in a cash register or cash registers, or in such electronic or computer device which records sales in a manner which is generally acceptable by industry standards. There shall be no deduction allowed for direct or indirect discounts, rebates or other reductions on sales, unless generally offered to the public on a uniform basis. The term "<u>Gross Sales</u>" shall exclude (A) proceeds from any sales tax, gross receipts tax or similar tax, by whatever name called, which are separately stated and are in addition to the sales price, (B) bona fide transfers or exchanges of merchandise from the Premises to any other stores or warehouses of Tenant or any affiliates of Tenant, and returns to shippers and manufacturers for credit, (C) refunds given to customers for merchandise purchased at the Premises and returned, (D) sales of Tenant's fixtures and equipment not in the ordinary course of Tenant's business, (E) to the extent of prior inclusion in Gross Sales, bad debts when written off the books of Tenant, provided that any collections made on account of such bad

debts shall be included in Gross Sales when received, (F) receipts from vending machines installed solely for the use of Tenant's employees and receipts from pay telephones, (G) proceeds from delivery, wrapping and check cashing charges, (H) sums and credits received in settlement of claims for loss or damage to merchandise, and (I) separately stated service, finance and interest charges. In addition to the items excluded from the definition of Gross Sales described in this subsection, there shall also be excluded from Gross Sales, but not to exceed two (2%) percent of the amount of Gross Sales that would otherwise result if none of the following were excluded from Gross Sales, sales to employees of Tenant at discount and fees paid to independent third party credit card companies in connection with sales charged to customers' credit cards. The term "merchandise" as used in this Lease shall include food and beverages if Tenant is permitted to sell such items pursuant to the terms of this Lease.

(ii) Tenant shall keep upon the Premises or at its principal office, complete books and records reflecting all elements of Gross Sales. Tenant shall be allowed to maintain its books and records in a computerized form; provided, however, that (A) such computerized books and records provide the same level of information as the books and records described above, are retained for the full record retention period provided for herein, and (B) promptly upon request, printed copies of any such books and records are made available at Tenant's principal office for inspection by Landlord's representatives who are engaged in inspecting and/or auditing Tenant's books and records as provided herein. Such books and records shall be kept in accordance with generally accepted accounting principles and practices and shall be retained by Tenant for a period of not less than three (3) years following the end of the calendar year to which they have reference. Within sixty (60) days after the close of each calendar year, Tenant shall furnish to Landlord a compilation prepared and signed by an officer of Tenant setting forth the amount of Gross Sales during the preceding calendar year and showing the amount of Percentage Rent, if any, required to be paid by Tenant for such calendar year. The full

amount of any Percentage Rent due shall be paid to Landlord simultaneously with the furnishing of said compilation. Landlord and/or Landlord's auditor shall have the right, upon at least five (5) days prior notice to Tenant, to inspect and/or audit the records of Tenant and any and all other persons and entities operating in the Premises relating to Gross Sales. If any such audit discloses a deficiency in the Gross Sales reported by Tenant, Tenant shall pay any deficiency in Percentage Rent owing to Landlord, and if the deficiency is in excess of three (3%) percent of the Gross Sales reported by Tenant, Tenant shall also pay Landlord's reasonable costs of the inspection and audit.

(iii) Landlord agrees that it shall not disclose to any third party Tenant's Gross Sales or the amount of Percentage Rent paid or payable by Tenant, provided, however, that (A) such information was not previously disclosed by Tenant to such third party or to the public generally, and (B) nothing contained herein shall restrict Landlord from disclosing such information as may be required by law or to its accountants, attorneys, bona-fide prospective purchasers, or current or prospective mortgagees or underlying lessors of all or any portion of Landlord's interest in the Shopping Center (provided that each of such recipients shall be bound to the same non-disclosure provisions as are imposed upon Landlord).

(iv) Notwithstanding any other provision of this Section 4.(c), (A) the amount of Percentage Rent, if any, payable with respect to the first partial calendar year shall be determined by (1) calculating the Gross Sales for the first full twelve (12) month period after the Rent Commencement Date and (2) multiplying the Percentage Rent which would have been paid for such twelve (12) month period by a fraction, the numerator of which is the number of days in the first partial calendar year, and the denominator of which is three hundred sixty-five (365), (B) in the event this Lease expires in accordance with the terms hereof on the Expiration Date, then the amount of Percentage Rent, if any, payable (1) with respect to the three (3) months of the Term immediately preceding the Expiration Date [with such three (3) month period hereinafter

referred to as the "End Months"], shall be determined by (a) calculating the Gross Sales for the twelve (12) month period prior to the End Months, and (b) multiplying the Percentage Rent which would have been paid for such twelve (12) month period by twenty-five (25%) percent, and (2) with respect to the ten (10) months of the Term immediately preceding the End Months, shall be determined by (a) calculating the Gross Sales for the twelve (12) month period prior to the End Months, and (b) multiplying the Percentage Rent which would have been paid for such twelve (12) month period by eighty-three and 33/100 (83.33%) percent, and (C) in the event this Lease does not expire in accordance with the terms hereof on the Expiration Date, but instead terminates for any reason in the middle of a calendar year, then the amount of Percentage Rent, if any, payable with respect to the partial calendar year commencing upon the final January 1 to occur during the Term and ending on the termination date of this Lease (such partial calendar year hereinafter referred to as the "Partial Last Year") shall be determined by (3) calculating the Gross Sales for the twelve (12) month period prior to the termination date of this Lease, and (4) multiplying the Percentage Rent which would have been paid for such twelve (12) month period by a fraction, the numerator of which is the number of days in the Partial Last Year and the denominator of which is three hundred sixty-five (365). The provisions of this Section 4(c)(iv), shall not apply to any Percentage Rent payable to Landlord pursuant to Section 1(l) and Section 4(b) of this Lease.

      (v)   Notwithstanding any other provision of this Section 4.(c), if pursuant to the terms of this Lease Tenant executes one or more license agreements with unrelated persons or entities (hereinafter, the "Licensees") for the purpose of permitting the Licensees to operate businesses or concessions within the Premises in an area of the Premises which does not exceed, in the aggregate for all Licensees at any one time, fifty (50%) percent of the Floor Area of the Premises, then neither (A) any license fee or other compensation (collectively, the "Fee") paid by the Licensees to Tenant in consideration for the use of such portion of the Premises, nor (B) the Gross Sales achieved by

such Licensees from such portion of the Premises, shall be included in Gross Sales for the purpose of calculating Percentage Rent; provided, and on the express condition that, the annual Fee divided by the square foot area of the licensed area does not equal at least fifty-one (51%) percent of the annual Gross Sales for the Premises (which Gross Sales shall not include either the Fee or the Gross Sales achieved by such Licensees) divided by the square foot area of the Premises (which square foot area of the Premises shall be reduced, for the purpose of this calculation, by the square foot area of the licensed area). In the event the annual Fee divided by the square foot area of the licensed area equals at least fifty-one (51%) percent of such Gross Sales, then the Fee (and not the Gross Sales achieved by such Licensee) shall be included in Gross Sales for the purpose of calculating Percentage Rent.

(vi) In the event an assignee of this Lease or a sublessee of the entire Floor Area of the Premises does not use the Premises as a department store specializing primarily in the sale of linens and domestics, bathroom items, housewares, window treatments and closet, shelving and storage items, then the Percentage Multiple shall be amended to such other percentage (the "Adjusted Percentage Multiple") as shall, as of the effective date of such assignment or sublease, be then generally applicable to such use of the Premises by normal and accepted business standards applicable to such use, taking into consideration (A) the location of the Shopping Center, and (B) the nature of the Shopping Center (i.e., strip center, mall, power center, etc.). Notwithstanding the foregoing, Tenant shall have the option of declining to apply the provisions of the first sentence of this Section 4.(c)(vi), provided, and on the condition that, the Fixed Rent shall be deemed to be increased, from and after the effective date of such assignment or sublease, by the annual average Percentage Rent, if any, which was payable by Tenant to Landlord under the terms of this Section 4.(c) during the two (2) most recent full calendar years occurring prior to the effective date of such assignment or sublease.

(vii)     In the event a sublessee or sublessees of thirty-three and one-third (33.3%) percent or more of the Floor Area of the Premises (but not the entire Floor Area of the Premises) do or does not use the Premises as a department store specializing primarily in the sale of linens and domestics, bathroom items, housewares, window treatments and closet, shelving and storage items, then the Percentage Multiple shall be amended, with respect to each portion of the Premises which has been so subleased, to such Adjusted Percentage Multiple as may, as of the effective date of each such sublease, be then applicable to such sublessee's use, taking into consideration (1) the location of the Shopping Center, and (2) the nature of the Shopping Center (i.e., strip center, mall, power center, etc.)   The Sales Break Point relating to the retained portions of the Premises not so subleased shall be determined by dividing the product of (x) the Fixed Rent for the calendar year for which Percentage Rent is being determined per square foot of the Premises, and (y) the Floor Area of such retained portion of the Premises, by the Percentage Multiple. Notwithstanding the foregoing, Tenant shall have the option of declining to apply the provisions of the first two (2) sentences of this Section 4.(c)(vii), provided, and on the condition that, the Fixed Rent payable with respect to the portions of the Premises which have been subleased shall be deemed increased, from and after the effective date of such sublease, by the average Percentage Rent, if any, which was payable by Tenant to Landlord, with respect to the portions of the Premises which have been subleased, under the terms of this Section 4.(c) during the two (2) most recent full calendar years occurring prior to the effective date of such sublease.

(viii)     In the event Landlord and Tenant are unable to agree upon the Adjusted Percentage Multiple, then the Adjusted Percentage Multiple shall be determined by arbitration in accordance with the provisions of Section 54 of this Lease [except that any arbitrator conducting such arbitration shall have at least ten (10) years experience in shopping center retail leasing].

(ix) Wherever appropriate, the term "Tenant" as used in this Section 4.(c) shall include any subtenant of Tenant.

(x) Any dispute between the parties relative to the provisions of this Section 4.(c), other than as set forth in (viii) above, including, without limitation, the amount of Percentage Rent payable by Tenant, shall be submitted to arbitration in accordance with the provisions of Section 54 of this Lease.

SECTION 5.    IMPROVEMENTS.

(a) On or before the date which is thirty (30) days after the Commencement Date, Landlord shall prepare and provide Tenant with an accurate plan of the column layout (the "Column Layout") of the Premises [which Column Layout, in the event the Premises is not an existing building, shall be reasonably acceptable to Tenant] and within thirty (30) days thereafter, based upon the Column Layout, Tenant shall prepare and provide Landlord with its fixture plan, reflected ceiling plan and office plan (collectively, "Tenant's Plans"). Within thirty (30) days after receipt of Tenant's Plans, Landlord shall prepare and submit to Tenant, Landlord's preliminary plans and specifications for the construction of the Premises. Tenant shall approve such preliminary plans and specifications provided the same conform to the Column Layout (as the same may have been modified by Tenant), Tenant's Plans, and the provisions of Exhibits D and D-1 hereto (which provisions are hereinafter collectively referred to as "Landlord's Work"). Tenant shall give notice of such approval (or the reasons why such approval cannot be granted) to Landlord within thirty (30) days after receipt of the preliminary plans and specifications. Immediately following receipt of such notice, Landlord shall promptly commence the preparation of final plans and specifications (the "Final Plans and Specifications") based upon Landlord's preliminary plans and specifications and any changes required by Tenant therein, and Landlord shall complete the Final Plans and Specifications and provide Tenant with copies thereof within thirty (30) days after receipt of Tenant's notice. The Final Plans and Specifications shall not be changed without Tenant's prior written approval, which approval shall not be

unreasonably withheld or delayed and will be deemed approved if Tenant has not responded within ten (10) days after Tenant has received notice of such change.  Tenant shall have the right to make changes in Tenant's Plans and/or to require Landlord to make changes in the Final Plans and Specifications, in which event Tenant shall pay to Landlord, within thirty (30) days after the Delivery Date, the net reasonable additional cost of Landlord's Work resulting from such changes, taking into consideration any and all actual reduced and added costs resulting from all such changes and/or other costs savings that Tenant may provide to Landlord, which cost savings shall be subject to acceptance by Landlord, in its reasonable discretion, by a written acknowledgement thereof to Tenant, but in no event shall Landlord be required to pay or reimburse Tenant for any amount by which the total reduced costs exceed the total additional costs.  Except for Landlord's Work, Tenant shall, at its own cost and expense, do any and all work (hereinafter called "Tenant's Work") which Tenant desires to adapt the Premises to Tenant's use.  Both parties shall do their respective work in a manner required by applicable governmental regulations, ordinances and codes so that Landlord will be able to secure for Tenant, at Landlord's sole cost and expense, any and all required permits and approvals from applicable governmental authorities to enable Tenant to perform Tenant's Work and to open and conduct its business in the Premises.  If such permits and approvals cannot be obtained because Landlord's Work has not been completed or has been done improperly (and not because of the manner in which Tenant shall have done or failed to do its work), or by reason of any condition of the Shopping Center or the building containing the Premises, then it shall be Landlord's obligation to remedy the situation so as to enable Landlord to obtain such permits and approvals.  Both Landlord's Work and Tenant's Work shall be performed in a good and workmanlike manner, utilizing only new, first class materials, and in accordance with all applicable legal requirements.  In the event that Landlord's Work (i) has not been commenced by February 1, 1997, (ii) is not diligently pursued by Landlord after commencement thereof, or (iii)

is not Substantially Completed (as hereinafter defined) either (x) on or before May 1, 1997, (which date is subject to extension <u>only</u> as a result of Force Majeure), or (y) on or before July 1, 1997, (which date is <u>not</u> subject to extension as a result of Force Majeure), Tenant, in any such event, may thereafter, at any time when Landlord's Work has not been commenced, is not being diligently pursued or has not been Substantially Completed, as the case may be, consider Landlord to be in default hereunder and either terminate this Lease (in which event neither party shall have any further liability hereunder except that Landlord shall be obligated to promptly reimburse Tenant for all its costs and expenses incurred in connection with this Lease, including, without limitation, the preparation of plans and specifications for and the costs of Tenant's Work) or, at Tenant's option, by notice to Landlord, extend the dates set forth in subsections (i) and/or (iii) of this subsection 5.(a) to such future dates designated by Tenant (with each such future date hereinafter referred to as the "<u>Extended Construction Date</u>").  In the event Tenant exercises its right to extend the dates set forth in subsections (i) and/or (iii) of this subsection 5.(a) to the Extended Construction Date, and the Substantial Completion of Landlord's Work shall not have occurred on or prior to the Extended Construction Date, then Tenant, in such event, may thereafter, at any time when Landlord's Work has not been commenced or has not been Substantially Completed, as the case may be, consider Landlord to be in default hereunder and terminate this Lease (in which event neither party shall have any further liability hereunder except that Landlord shall be obligated to promptly reimburse Tenant for all its costs and expenses incurred in connection with this Lease, including, without limitation, the preparation of plans and specifications for and the costs of Tenant's Work).  The term "<u>Substantially Completed</u>" shall mean that only so-called "<u>punch list</u>" items of Landlord's Work [which shall be limited to such minor items of fit and finish which, when considered as a whole, do not materially adversely affect either (y) the performance of Tenant's Work, or (z) Tenant's ability to conduct its normal business operations in the Premises] shall not

be completed. Landlord covenants and agrees to fully complete any punch list items [which may be submitted to Landlord, from time to time, at any time prior to the date which is sixty (60) days after the Rent Commencement Date] not later than the date which is twenty (20) days after Landlord receives notification thereof [provided, however, that in the event it is not possible for Landlord, using all commercially reasonable efforts to complete such "punch list" items within such twenty (20) day period (with such "punch list" items hereinafter referred to as the "Long Term Punch List Items") Landlord agrees that it shall commence such completion within such twenty (20) day period and thereafter diligently work to complete the same], and in the event Landlord fails to so complete any punch list item within such time period (or fails to commence to complete or diligently work to complete the Long Term Punch List Items within the time periods set forth above), then Tenant shall have the right to complete the same utilizing its own contractors, in which event the reasonable costs of such completion shall be reimbursed to Tenant by Landlord upon demand, together with interest on the amount due at the Lease Interest Rate, which interest shall accrue on all such sums commencing five (5) days after Tenant shall have so notified Landlord of the amount due. If Tenant does not deliver Tenant's Plans when required above, and such failure adversely affects Landlord's ability to complete Landlord's Work when required, then the dates set forth in (i) and (iii) above may be extended for a period of time not to exceed the period of such delay, by Landlord giving Tenant notice thereof within ten (10) days of Tenant's failure to deliver such Tenant's Plans. In the event Landlord does not reimburse Tenant for all such costs and any interest accrued thereon within ten (10) days after the original demand by Tenant for payment of those costs, Tenant shall have a right of offset against the Rent payable by Tenant for all the costs and interest thereon [which offset shall not exceed fifty (50%) percent of any payment of Rent, as and when the same becomes due and payable, in any given month].

      (b)    Landlord shall give Tenant at least forty-five (45) days prior notice of the Delivery Date. In no event shall Tenant

be obligated to accept as the Delivery Date a date which is prior to the date established by Landlord as the Delivery Date. Landlord agrees that each time, if ever, that Landlord revises the Delivery Date from any date previously established by Landlord, such revision shall entitle Tenant, in addition to any other remedies available to Tenant under this Lease, to a payment from Landlord of the reasonable out-of-pocket costs incurred by Tenant as a result of such revision, which costs shall be approximately Five Thousand ($5,000.00) Dollars. In addition, in the event Landlord shall fail to notify Tenant of any revised Delivery Date at least thirty (30) days prior to the last Delivery Date previously established by Landlord, then, in addition to any other remedies available to Tenant under this Lease, Landlord agrees to reimburse Tenant for all reasonable costs incurred by Tenant (including, without limitation, all temporary storage costs and salary costs for employees hired to work at the Premises) as a result thereof. In the event Landlord shall have failed to pay any monies due to Tenant in accordance with this subsection 5.(b) within fifteen (15) days after Tenant has notified Landlord of the amount of such monies (and furnished Landlord with copies of all bills relating thereto), then Tenant shall have the right to offset such amounts against the Rent next accruing under this Lease [which offset shall not exceed fifty (50%) percent of any payment of Rent, as and when the same becomes due and payable, in any given month]. Landlord shall be deemed to have delivered possession of the Premises to Tenant at 8:00 a.m. on the date (with such date hereinbefore and hereinafter called the "Delivery Date") following the day on which Landlord shall have certified to Tenant, in writing, that all of the following shall have occurred:

(i)    Actual possession of the Premises shall have been delivered to Tenant free of all leases (other than this Lease) and occupants, and Landlord shall then be the owner of the fee simple estate in the Shopping Center free and clear of any liens and encumbrances, except the "Permitted Encumbrances" described on Exhibit E and except for the lien of any recorded deed of trust

provided that a non-disturbance agreement with respect thereto has been delivered to Tenant pursuant to (v) below;

(ii)    Any permits, certificates, "sign-offs" and approvals (copies of which shall have been delivered to Tenant) required from applicable governmental authorities to enable (A) Tenant to occupy the Premises and use the Premises for the conduct of its business, other than those required for Tenant to open and operate its specific business (and not a general retail business) in the Premises, (B) Landlord to construct any required off-site improvements, and (C) the Common Areas to be used for their intended purposes, shall have been obtained, at Landlord's sole cost and expense, including, but not limited to, (if applicable) zoning, building code, environmental requirements, curb cut and site plan approvals, sign permits, certificates of occupancy (unless a certificate of occupancy for the Premises cannot be obtained solely as a result of Tenant's acts or omissions in connection with the performance of Tenant's Work in the Premises, in which event the delivery of a certificate of occupancy for the Premises shall not be a condition to the occurrence of the Delivery Date), and construction, development and use permits;

(iii)    The Common Areas (including, but not limited to, all parking facilities and any pylon and monument signs required hereunder) located in the Primary Building Area and all entrances to the Shopping Center from adjoining roads (including all pylon signs) shall have been completed and operational and Landlord's Work shall have been Substantially Completed (including, but not limited to, the connection of all utilities to and in the Premises);

(iv)    The zoning of the Shopping Center and all other applicable laws, orders and regulations shall then permit the occupancy of the Premises for the Permitted Use and shall then permit the parking of private automobiles in the Common Areas where parking is shown on Exhibit B;

(v)    Landlord shall have delivered to Tenant non-disturbance agreements duly executed by any then holders of any mortgage, deed of trust and ground lease encumbering or affecting

the Shopping Center, and by any other party whose lien is superior to this Lease, which non-disturbance agreements shall be in the form and content described in Section 24 below;

(vi)    There are no restrictions or other legal impediments either imposed by law (including applicable zoning and building ordinances) or by any instrument which would prevent: (A) the use of the Premises for the Permitted Use; (B) the use of the parking facilities, access roads, and other Common Areas in the manner contemplated by this Lease; (C) the lawful installation of the signage permitted pursuant to Section 10 below; or (D) the performance of Tenant's Work in the Premises in the manner contemplated by this Lease;

(vii)    Landlord shall have delivered to Tenant the certification of Landlord's architect with respect to the measurement of the Premises and of the Shopping Center as provided in Section 1.(j) above;

(viii)    Leases have been entered into with the following tenants (herein collectively called the "Inducement Tenants") on the following terms, for occupancy of those building sites in the Shopping Center designated for such tenants on Exhibit B. Such leases shall not be cancelable by any of the Inducement Tenants, except for failure of Landlord to complete the Shopping Center, for injury to or loss of the premises thereby demised because of fire or other casualty, or for a taking or for other reasons similar to those for which this Lease is cancelable by Tenant. Except for a default by the tenant thereunder, Landlord covenants not to terminate any such lease without Tenant's consent:

| Inducement Tenants | Minimum Square Foot Gross Floor Area | Minimum Term |
|---|---|---|
| 1. Borders Books and Music | 20,000 | 10 Years |
| 2. Steinmart | 20,000 | 10 Years |
| 3. Office Max | 20,000 | 10 Years |
| 4. Lil Things | 20,000 | 10 Years |
| 5. Hobby Lobby | 20,000 | 10 Years |
| 6. Oshmans | 20,000 | 10 Years |
| 7. a nationally recognized theater operator acceptable to Tenant | 50,000 | 10 Years |

; and

(ix)    Construction of the premises for all the Inducement Tenants for which Landlord is responsible shall have

been completed and Landlord shall have tendered possession of their premises to such Inducement Tenants in accordance with the terms of their respective leases.

(c)   If the Delivery Date shall not have occurred for any reason on or before July 1, 1997 (which date is not subject to extension as a result of Force Majeure) Landlord shall be in default hereunder and Tenant may, at its option, by notice to Landlord either (i) extend the Delivery Date (the "Extended Delivery Date"), or (ii) terminate this Lease (in which event neither party shall have any further liability hereunder except that Landlord shall, subject to the terms of Sections 5.(a) and 5.(b), be obligated to promptly reimburse Tenant for all its costs and expenses incurred in connection with this Lease, including, without limitation, the preparation of plans and specifications for and the costs of Tenant's Work).   In the event Tenant exercises its right to extend the date set forth in this subsection 5.(c) to the Extended Delivery Date, and the Delivery Date shall not have occurred on or prior to the Extended Delivery Date, then Tenant, in such event, may thereafter, at any time when the Delivery Date shall not have occurred, as Tenant's sole remedy, terminate this Lease (in which event neither party shall have any further liability hereunder except that Landlord shall be obligated to promptly reimburse Tenant for all its costs and expenses incurred in connection with this Lease, including, without limitation, the preparation of plans and specifications for, and the costs of, Tenant's Work).

(d)   Neither Tenant's acceptance of physical possession of the Premises nor Tenant's opening of the Premises for business to the public prior to the Delivery Date shall relieve Landlord of any obligation under this Lease, unless such obligation is expressly waived in writing by Tenant.

(e)   Prior to the Delivery Date, Tenant may, at Tenant's risk, enter upon the Premises for the purposes of inspecting the work, taking measurements, making plans, erecting temporary or permanent signs and doing such other work as may be appropriate or desirable (including, without limitation, the installation of

Tenant's shelving and fixtures) without being deemed thereby to have taken possession or obligated itself to pay Rent, but Tenant shall not, during the course of such work, cause any interference with Landlord's performance of Landlord's Work and shall indemnify and hold Landlord harmless from and against any and all claims or losses arising from such work and from Tenant's entry upon the Premises. Tenant agrees that it will not materially interfere with Landlord's Work in connection with any such entry. Tenant and its contractors shall maintain insurance reasonably satisfactory to Landlord covering Tenant's construction activities in the Premises.

SECTION 6.    **REAL ESTATE AND OTHER TAXES**.

(a) Landlord shall pay on or before the due dates thereof all real estate taxes and assessments for betterments and improvements that are levied or assessed by any lawful authority on the Shopping Center (general or special) including any sales tax assessed against the Fixed Rent, other than personal property taxes levied against tenants (hereinafter collectively called "Taxes"). On and after the Rent Commencement Date, Tenant shall be obligated each calendar year or partial calendar year for the payment of Tenant's Pro Rata Share of the Taxes which accrue during the Term. Taxes, as used herein, shall not include any: (1) income, excise, profits, estate, inheritance, succession, gift, transfer, franchise, capital, or other tax or assessment upon Landlord or upon the rentals payable under this Lease; (2) taxes on rents, gross receipts or revenues of Landlord from the Premises, all of which shall be the obligation of Landlord; (3) fine, penalty, cost or interest for any tax or assessment, or part thereof, which Landlord failed to timely pay (except if same are imposed by reason of Tenant's default hereunder); (4) special assessment for a public improvement (whether or not arising from the initial construction or expansion of the Shopping Center or the Premises); (5) Taxes resulting from an increase in the assessment caused by a sale, net lease or financing of all or any portion of the Shopping Center after the first sale, net lease or financing of all or any portion of the Shopping Center, or resulting from the execution of this Lease or recording of a memorandum thereof; (6) Taxes on unimproved

portions of the Shopping Center until the same are either improved by improvements or buildings which become an integral part of the Shopping Center or by incorporation of such portions into the Common Areas; or (7) fees imposed upon Landlord in connection with Landlord's development of the Shopping Center (including, without limitation, trip generation fees). Notwithstanding the foregoing, if at any time during the Term the present method of taxation shall be so changed that the whole or any part of the Taxes imposed on real estate and improvements thereon shall be discontinued and in whole or partial substitution therefor, taxes, assessments, levies, impositions, or charges shall be levied, assessed and/or imposed wholly or partially as a capital levy or otherwise on the rents, gross receipts, revenues, or profits received from real estate or the rents, gross receipts, revenues, or profits reserved herein or any part thereof, then such substitute taxes, assessments, levies, impositions, or charges, to the extent so levied, assessed, or imposed, shall be deemed to be Taxes for the purpose of this Lease. All Taxes payable by Tenant pursuant to this Section 6 shall be determined as if the Shopping Center was the only property owned by Landlord.

(b)    For the year in which the Rent Commencement Date occurs and the year in which this Lease expires or sooner terminates, Tenant shall only pay a proportionate share of Taxes, based on a ratio of the Term within the tax year to the full tax year.

(c)    Landlord shall submit a bill for Taxes and a computation of Tenant's Pro Rata Share to Tenant, together with copies of all notices concerning assessments, changes of assessments, tax rates and changes, and tax bills. Tenant shall reimburse Landlord in the amount required by this Section 6 within thirty (30) days after receipt of such bill, but in no event earlier than thirty (30) days prior to the due date thereof. Within thirty (30) days after Tenant's request, Landlord shall provide Tenant with copies of paid bills for Taxes paid by Landlord pursuant to this Section 6.

(d)  In the event tenants at the Shopping Center occupying, in the aggregate, in excess of one-half (1/2) of the Floor Area of the Shopping Center have requested that Landlord contest the Taxes by appropriate proceedings conducted in good faith and in accordance with all applicable laws, then Landlord shall so contest the Taxes.  If, as a result of any contest, any rebate or refund of Taxes is received, Tenant shall be entitled to its Pro Rata Share thereof after deducting the reasonable costs of the contest.  If, despite such contest, the reasonable costs incurred by Landlord exceed any rebate or refund of Taxes received (if any), then Tenant shall pay to Landlord its Pro Rata Share of such reasonable costs.

SECTION 7.    **PERMITTED AND PROHIBITED USES**.

(a)  The Premises may be used and occupied for the Permitted Use.

(b)  Landlord covenants and agrees that the Shopping Center shall be constructed, leased, operated, maintained and managed as a first class shopping center and that no premises in the Shopping Center or on any land (hereinafter the "Related Land") contiguous or adjacent to the Shopping Center (which shall include land that would be contiguous or adjacent to the Shopping Center but for any intervening road, street, alley or highway) owned now or at any time in the future by Landlord or any affiliated company (referring to the actual Landlord from time to time, without regard to land owned by any prior landlords, and excluding from the operation hereof any business existing at the time any future landlord becomes Landlord hereunder) shall be used or occupied for any of the following:  pornographic use, "second-hand" or "surplus" store, laundry or dry cleaners, veterinary office, living quarters, manufacturing, bowling alley, off-track betting parlor or other gambling establishment, funeral parlor, skating rink, children's entertainment or activity facility [except as an incidental use to a theater and then only if located in the interior of the theater (as shown on Exhibit B)], meeting hall, place of religious worship, sporting event, auditorium, warehouse, theater (except if located in the building labelled "theater" on Exhibit B), automobile repair

shop, gasoline or service station, supermarket (except if located
in a building whose entrance is not within three hundred (300) feet
from the front entrance to the Premises), restaurant serving meals
for on or off premises consumption in the Primary Building Area
(except if located between the buildings labelled "A" and "B" on
Exhibit B and if located in building "C" (the "Adjacent
Restaurant") then only if (i) the entrance to such Adjacent
Restaurant is facing the theater as shown on Exhibit B, (ii) such
Adjacent Restaurant shall not exceed six thousand (6,000) square
feet of Floor Area, and (iii) the frontage of such Adjacent
Restaurant facing Southwest Freeway (U.S. 59) shall not exceed
fifty (50) feet), beauty parlor (except if located between the
buildings labelled "A" and "B" on Exhibit B), nail salon (except if
located between the buildings labelled "A" and "B" on Exhibit B),
billiard parlor, sales office or showroom for automobiles or other
vehicles, an establishment serving or selling alcoholic beverages
for on or off premises consumption in the Primary Building Area
(except in that part of the Shopping Center labelled "Restaurant"
on Exhibit B and then only if incidental to their main use of
serving food for on-premises consumption, which for the purposes
hereof shall mean that such restaurants realize a maximum of forty
(40%) percent of their gross sales from the sale of alcoholic
beverages, and except for a package liquor store located to the
Southwest of the premises labelled "Lil Things" on Exhibit B),
massage parlor, health spa or similar type business, car wash, a
so-called "flea market", video/pinball arcade [except as an
incidental use to a theater and then only if located in the
interior of the theater (as shown on Exhibit B)], any use generally
deemed to be obnoxious or a nuisance (including, without
limitation, a use which generates offensive odors or noise),
medical offices or any other non-retail uses in the Primary
Building Area (except medical offices and other non-retail uses
shall be permitted in portions of the Primary Building Area only if
(a) not located within one hundred sixty-five (165) feet from the
southwest exterior demising wall of the Premises, (b) not located
in the Adjacent Restaurant, (c) not exceeding twenty thousand
(20,000) square feet of Floor Area in the aggregate, (d)

not exceeding eight (8) separate spaces, (e) no single premises is greater than seven thousand (7,000) square feet of Floor Area, and (f) such uses are customarily found in first class shopping centers in the greater Houston area), (herein collectively called the "Prohibited Uses").

(c)  Tenant covenants and agrees the Premises shall not be used for any of the Prohibited Uses.

SECTION 8.    UTILITIES.

(a)  From the Delivery Date and continuing throughout the Term, Tenant shall be responsible for paying, and as necessary shall contract for, in its own name, directly with the utility company servicing the Premises, the cost and expense of all utility services rendered or furnished to the Premises, including heat, air conditioning, water, gas, electricity and telephone. Landlord, at its cost and expense, will provide separate utility meters for the Premises and no space other than the Premises shall be connected thereto. Landlord and Tenant acknowledge and agree that Tenant's entry upon the Premises prior to the Delivery Date is not a waiver by Tenant of Landlord's obligation to pay the costs of all utility charges incurred in the Premises prior to the Delivery Date.

(b)  Notwithstanding anything to the contrary in this Lease, in the event utilities serving the Premises are disrupted due to the acts or omissions of Landlord, its agents, contractors, servants or employees, Landlord shall promptly restore the affected utilities at Landlord's sole cost and expense. If the disrupted utilities are not restored within forty-eight (48) hours after Landlord has knowledge or receives notice, whichever first occurs, of the disruption, and Tenant is unable to conduct its normal business in the Premises due to the disruption of such utility service, Rent shall be abated during the period commencing on the expiration of the aforementioned forty-eight (48) hours and ending on the first to occur of (i) the date the disrupted utilities are restored or (ii) the date Tenant resumes business in the Premises. In addition, a disruption of utility services caused by the negligence or acts of Landlord, its agents, contractors, servants, or employees shall not entitle Tenant to terminate this Lease, nor

shall it constitute a constructive or actual eviction of Tenant provided Landlord acts reasonably under the circumstances to restore the affected utility service, it being agreed that the abatement of Rent hereinabove mentioned and the self-help remedies afforded Tenant under this Lease shall be Tenant's sole remedies arising from a disruption of utility service under this Subsection 8(b).

SECTION 9.    **MUTUAL RELEASE, WAIVER OF SUBROGATION AND MUTUAL INDEMNIFICATION.**

(a)  Landlord and Tenant, on their own behalf and on behalf of anyone claiming under or through either one by way of subrogation, hereby release and waive all rights of recovery and causes of action against each other from any and all liability for any loss or damage to property or resulting from damage to such property (and, in either case, any resulting loss of business or rental income), whether caused by the negligence or fault of the other party, which is normally insured under "All-Risk" property and time element insurance required to be maintained hereunder or any other insurance policy now or hereafter issued covering the Premises or the contents thereof or the Shopping Center.

(b) Landlord and Tenant, respectively, shall cause each property insurance policy carried by them insuring the Premises or the contents thereof or the Shopping Center to provide that the insurer waives all rights of recovery by way of subrogation or otherwise against the other party hereto in connection with any loss or damage which is covered by such policy or that such policy shall otherwise permit, and shall not be voided by the releases provided for in this Section 9.  If any additional charge or increase in premium is made by the insurer because of this waiver of subrogation, then the party in whose favor the waiver was obtained shall pay such additional charge or increase in premium. Failure to pay the increase in premium will void the release and waiver benefitting such party but shall not affect the benefit of the corresponding release and waiver in favor of the other party.

(c)  In the event either Landlord or Tenant is a self-insurer or maintains a deductible (as either may be permitted

hereunder), then the self-insuring party or the party maintaining the deductible hereby releases the other party from any liability arising from any event which would have been covered had (i) the required insurance been obtained and/or (ii) the deductible not been maintained.

(d)  With respect to any claims brought by third parties, Landlord and Tenant agree to indemnify, defend and hold each other harmless from and against any and all claims, damages or causes of action for damages brought on account of injury to any person or persons or property, or loss of life, arising, in the case of Landlord, out of the negligence of Landlord or its employees, agents or contractors in the Shopping Center (including the Common Areas but excluding the Premises) and, in the case of Tenant, the negligence of Tenant or its employees, agents or contractors in the Premises, respectively.

SECTION 10.    SIGNS.

(a)  Tenant may erect and maintain in the interior of the Premises any signs it may desire; provided, however, that all signs which (i) are located within eighteen (18) inches of the front window of the Premises, and (ii) have their printed sides facing out from the Premises toward the Common Areas, shall be subject to Landlord's periodic review and consent, which consent shall not be unreasonably withheld [and which consent, in any event, shall not be required provided such signage (A) does not contain or depict any pornographic or lewd words or images, and (B) is substantially similar to the signage utilized by Tenant in other stores operated by Tenant or any entity controlling, controlled by or under common control with Tenant anywhere within the State of Texas].  Tenant shall also, at its own cost and expense, have the exclusive right to erect and maintain on the storefront and exterior walls of the Premises (including, but not limited to, the northwesterly and northeasterly demising wall of the building in which the Premises is situate) signs and replacement signs of such size, design and color as Tenant, from time to time, may desire, subject only to compliance with (1) applicable laws, codes, regulations and ordinances and (2) the provisions of Exhibit F, (including

temporary banners placed on the storefront of the Premises announcing "Sneak Preview," "Grand Opening" and/or "Now Hiring"). Landlord covenants and agrees that (a) the signage rights of all other tenants in the Shopping Center are subject to compliance with the provisions of Exhibit F, and (b) in no event shall (1) the height of any other tenant's building in the Shopping Center above finished floor or (2) the entrance design element of any other tenant's building in the Shopping Center (including the height of any sign or logo which is utilized by such other tenant) exceed that of Tenant's building and Tenant's entrance design element (except for the buildings labelled "Oshman's", "Hobby Lobby" and "Theater" on Exhibit B). Tenant may, at Tenant's sole cost and expense, install and maintain on the storefront of the Premises a temporary banner announcing "Coming Soon" at such time, and for such duration prior to the Rent Commencement Date, as Tenant shall desire. Upon request of Tenant, Landlord shall, at Landlord's sole cost and expense, install and maintain, during the period commencing not later than sixty (60) days after the Commencement Date and ending on such date prior to the Rent Commencement Date as Tenant shall request, a temporary sign near the site of the future main entrance to the Shopping Center which indicates "Bed Bath & Beyond Coming Soon".

(b)    Landlord shall provide pylons at the locations shown on Exhibit B. Tenant shall have the right, at its sole cost and expense, to erect and maintain its identification sign on one such pylon, as shown on Exhibit F-1, on both sides of such pylon in the top position thereof for tenant signs and no other tenant signs thereon shall be larger than Tenant's. In addition, if Landlord constructs or makes available to any other tenant or tenants in the Primary Building Area any other signage located in the Common Areas or on any Related Land, such signage shall also include Tenant's identification sign, as shown on Exhibits F and F-1, at least as large as the largest sign made available to such other tenant or tenants.

(c)    Tenant shall have the right, from time to time, without Landlord's approval, to change its signs on the storefront

and exterior of the Premises as well as on any pylon or monument provided that the area of the new sign is no larger than the area of the sign which it replaces and that the method of construction and attachment is substantially the same and so long as such changed signs comply with Section 10.(a) above.    Upon Tenant's cessation of business in the Premises, it may remove its signs and shall not be liable for any repairs to the fascia or other exterior walls of the Premises or to any pylon or monument incurred by the prior installation or the removal of such signs.

(d)    Landlord shall at all times maintain all pylons and monuments in good order and repair.    The cost of maintenance of all pylons and monuments, and of the cost of any electricity used to illuminate them, shall be included in Common Areas Charges.

(e)    The pylon signage rights granted to Tenant pursuant to this Section 10 shall accrue to any assignee of this Lease and to any subtenant of the entire Premises.

SECTION 11.    **ALTERATIONS AND IMPROVEMENTS**.

(a)    Tenant shall not make any alterations or improvements of a structural nature to the Premises or any alteration of any nature to the exterior of the Premises other than permitted herein, without the prior approval of Landlord.    All work done in connection with structural and non-structural alterations or improvements shall be done at Tenant's sole cost and expense, in a good and workmanlike manner and in compliance with all applicable governmental requirements.

(b)    Tenant may, from time to time, at its own cost and expense, without the prior approval of Landlord, make non-structural alterations and improvements to the Premises, as Tenant deems necessary or desirable, including but not limited to electrical systems, heating, ventilation and air conditioning and other mechanical systems, installation of fixtures and equipment, painting, and wall and floor coverings, provided that the structural integrity of the Premises shall not be adversely affected thereby.

(c)    Tenant shall have the right to erect and maintain an antenna and a satellite dish on the roof of the Premises, provided

(i) Tenant's plans for the installation of such equipment are previously approved by Landlord which approval shall not be unreasonably withheld or delayed, (ii) Tenant utilizes a contractor designated or approved by Landlord for all roof penetrations, (iii) Tenant maintains the area where roof penetrations are made while Tenant's equipment is present, and (iv) Tenant repairs any damage to the roof caused by the making of the roof penetrations, including, but not limited to, the repair of the roof penetrations upon the removal of any equipment installed thereon.

(d)    Landlord shall not make any alterations to the Premises (including, without limitation, changing the design, color or materials of the exterior of the Premises) nor shall Landlord construct an additional floor or floors above the Premises.

(e)    If permitted by applicable laws, codes, ordinances and regulations (including any variance obtained therefrom) Tenant shall have the right to subdivide the Premises into two (2) separate stores, each having its own front entrance and access to the loading docks in the rear of the Premises, as well as separately sub-metered utilities, provided that each such store shall contain no less than ten thousand (10,000) square feet of Floor Area.

(f)    Upon the request of Tenant, Landlord shall fully, promptly and diligently cooperate with Tenant and its architects and designers in obtaining any permits, approvals and certificates required to be obtained by Tenant in connection with any alteration or improvement described in this Section 11, and shall execute all applications, documents and other instruments reasonably required for such purpose, provided that Landlord shall not be obligated to incur any costs or expenses, including, without limitation, attorneys' fees and disbursements, or suffer any liability in connection therewith.  Landlord shall execute and return to Tenant all appropriately completed building department or equivalent applications within fifteen (15) days after Tenant's request therefor.

(g)    If any violation of any applicable legal requirement which is noted against the Shopping Center or the Premises (other

than a violation caused by Tenant) prevents Tenant from obtaining a building permit for any alterations or a certificate of occupancy, then, upon request by Tenant, Landlord shall promptly and diligently cure the same and cause such violation to be removed of record to the extent required to permit Tenant to obtain its building permit or certificate of occupancy, as the case may be.

(h)  All alterations and improvements made by Tenant shall become the property of Landlord, and shall be surrendered to Landlord, upon the expiration or sooner termination of this Lease; provided, however, that this provision shall not apply to Tenant's Property (as hereinafter defined), and Tenant shall have no obligation to remove alterations or improvements.

SECTION 12.    ACCESS TO SHOPPING CENTER.   All entrances, exits, approaches and means of ingress and egress to and from the Shopping Center as shown on Exhibit B shall not be interrupted or disturbed by any act or omission of Landlord during the Term except on a temporary basis during periods of repairs to some (but not all) of the entrances, provided Landlord gives Tenant prior notice thereof, and provided, further, that Landlord shall use reasonable efforts to keep any interference with the operation of the Premises to a minimum.

SECTION 13.    COMMON AREAS.

(a)  Landlord hereby undertakes and assumes all duties and responsibilities in regard to maintenance (including, without limitation, rubbish and debris removal), repair, replacement, operation, landscaping (including the trimming and pruning of trees to avoid interference with the use or visibility of canopies or signs on the exterior of the Premises), adequate lighting, insurance, supervision, use, parking lot paving and striping, drainage, and control of all Common Areas and shall comply with all laws, ordinances, orders, rules and regulations applicable thereto.

(b)  Tenant shall comply with the rules and regulations of the Shopping Center as established from time to time by Landlord, provided the same (i) are reasonable, (ii) do not adversely affect the operations of Tenant's business on the Premises, and (iii) do not adversely affect any of Tenant's rights

under this Lease.  All such rules and regulations established by Landlord shall be uniformly enforced against all tenants of the Shopping Center and without prejudice against Tenant.  In the event of any conflict between the provisions of this Lease and any rules or regulations, the provisions of this Lease shall prevail and govern.

(c)  On and after the Rent Commencement Date, Tenant shall pay Tenant's Pro Rata Share of the reasonable costs (hereinafter called the "Common Areas Charges") paid or incurred by Landlord to operate, maintain and repair the Common Areas. Common Areas Charges shall include, but shall not be limited to, amounts incurred and paid by Landlord for (i) cleaning, sweeping, drainage and re-striping and resurfacing portions of the parking areas (but not the whole), streets, sidewalks, service drives and driveways; (ii) maintenance, repair and upkeep of planted or landscaped areas; (iii) maintenance, repair and replacement of bulbs and light standards with respect to the parking lot lighting, and the cost of lighting the parking lot and other Common Areas; (iv) repainting; (v) rental charges for machinery and equipment used in operation, maintenance and repair of the Common Areas; (vi) operating and maintaining Shopping Center identification signs, directional signs and other markers; (vii) maintenance of refuse receptacles; (viii) maintenance of car stops; (ix) personal property taxes for equipment used in maintaining the Shopping Center; (x) fees for required licenses and permits; (xi) supplies; and (xii) an allowance to Landlord for Landlord's supervision of the Common Areas in an amount equal to ten (10%) percent of all Common Areas Charges (exclusive of Taxes, utility charges and insurance premiums.)  Tenant's Pro Rata Share shall be paid in monthly installments on the first day of each calendar month, in advance, during each calendar year based on Landlord's reasonable budget. At the end of each calendar year, Landlord shall submit to Tenant a computation of Tenant's Pro Rata Share for the prior calendar year, together with a reasonably detailed statement certified by Landlord and containing actual costs and the calculation of Tenant's Pro Rata Share, and thereafter, Landlord shall furnish

Tenant with copies of such bills as Tenant may request. If Tenant's Pro Rata Share shall be more than the aggregate monthly installments paid by Tenant during the prior year, Tenant shall pay to Landlord the difference within thirty (30) days after receipt of such notice. If, however, the aggregate monthly installments paid by Tenant for the prior year exceeds the actual amount due from Tenant for such period, such excess shall be refunded by Landlord to Tenant simultaneously with submission of the detailed statement setting forth Tenant's Pro Rata Share. Common Areas Charges shall not include: (1) the capital cost of any additions to the Common Areas pursuant to an expansion of the Shopping Center; (2) the cost of any replacements to the Common Areas (for example, the cost of repaving the parking areas as opposed to patching) provided, however, that any permitted capital expenditure as set forth above shall be amortized over its useful life in accordance with generally accepted accounting principles at the time such costs are incurred and only such amortized costs shall be included in Common Areas Charges as provided above; (3) the cost of investigating, monitoring or remedying any environmental condition or hazardous substances or wastes; (4) any debt service (including principal and interest) or payments of any judgments or other liens against Landlord; (5) the cost of maintaining, repairing or providing security for interior portions of buildings; (6) Taxes or other taxes (excluding sales taxes) levied or assessed against Landlord or the Shopping Center; (7) the cost of compliance with laws (including, without limitation, the cost of curing violations or contesting such laws or violations); (8) any costs resulting from insurance deductibles or any payments made under any self-insurance policy maintained by Landlord; (9) any costs which would have been reimbursed or paid for by insurance proceeds had Landlord maintained the insurance required under Section 16 hereof and the amount of any judgment or other charge entered or costs assessed against Landlord in excess of the policy limits of the insurance maintained by Landlord under Section 16 hereof (including, without limitation, liability insurance); (10) those portions of Landlord's insurance premiums which are reimbursed to Landlord by any other

tenant in the Shopping Center other than through the payment of such tenant's proportionate share of insurance premiums otherwise included as part of Common Areas Charges; (11) any costs of refinancing any debt encumbering the Shopping Center; (12) sums paid or owed by Landlord to any tenant in the Shopping Center; (13) costs incurred in connection with the negotiation of leases with, or construction of improvements for, any tenant in the Shopping Center (including, without limitation, brokerage commissions and legal fees); (14) costs incurred in connection with a sale, ground leasing or sale-leaseback of all or any part of the Shopping Center; (15) costs incurred in connection with lawsuits or other legal actions (including, without limitation, arbitrations and mediations) instituted or defended by Landlord; (16) sums incurred as late payment fees, penalties or interest; (17) ground rent; (18) depreciation; (19) costs to the extent disproportionately incurred by or on behalf of any one or more of the tenants in the Shopping Center; (20) electricity costs for lighting Common Areas later than one (1) hour after the regular closing time of the Shopping Center except to the extent required in Landlord's reasonable judgment to provide security for the Shopping Center; (21) Landlord's advertising, entertainment and promotional costs for the Shopping Center; (22) costs of acquiring, leasing, restoring, insuring or displaying sculptures, paintings and other objects of art located within or outside the Shopping Center; (23) costs and expenses payable to Landlord or to an affiliate of Landlord to the extent that such costs and expenses exceed competitive costs and expenses for materials and services by unrelated persons or entities of similar skill and experience; (24) repairs or replacements resulting from defects in the original construction of the Shopping Center arising within three (3) years after the Rent Commencement Date; and (25) the cost of mechanized equipment (but not the straight line depreciation thereof over its useful life, as determined in accordance with generally accepted accounting principles) and (26) except for the administrative fee set forth above, any cost or expense relating to the administration and management of the Common Areas including but not limited to

overhead, office salaries and benefits, office rental, office supplies, dues and subscriptions, office utility charges, telephone charges and automobile expense. Common Areas Charges shall be reduced by the amount of any rent and the fair market value of any other consideration paid to Landlord by any person or entity which utilizes space in the Common Areas for the sale or rental of any products or services or for parking or easements.

(d) Tenant shall have the right to audit Landlord's books and records to verify Landlord's calculation of Common Areas Charges and Tenant's Pro Rata Share for a period of three (3) years after the delivery of Landlord's statement thereof. In the event of an error in Landlord's favor, Landlord shall immediately refund the overcharge to Tenant, and if the error exceeds three (3%) percent of Tenant's Pro Rata Share of Common Areas Charges, Tenant shall also have the right to immediate reimbursement from Landlord for the reasonable expenses of the audit. Tenant shall keep the results of any such audit confidential. Any dispute by Landlord with respect to an audit by Tenant shall be submitted to arbitration in accordance with the provisions of Section 54 below.

(e) In no event shall Tenant be required to join, participate in or contribute to any promotional fund, marketing fund or merchants' association.

(f) It is acknowledged by Landlord that Tenant provides shopping carts for the use of its customers and that carts are often abandoned by such customers in the Common Areas. Tenant will use reasonable efforts to periodically remove its carts from the Common Areas, but notwithstanding the indemnification and hold harmless agreement on the part of Tenant set forth in Section 9 above, Tenant shall not be liable to Landlord for any claims, damages or causes of action for damages brought on account of injury to any person or persons or property, or loss of life, arising in any manner whatsoever from the use or abandonment of shopping carts in the Common Areas, it being the intention of the parties that the liability insurance to be procured and maintained by Landlord pursuant to Section 16.(a) below will protect both

Landlord and Tenant with respect to any such claims, damages or causes of action.

SECTION 14.    <u>PARKING AREAS</u>.

(a) The locations and size of the Premises and other buildings in the Shopping Center, and the layout of the parking and service areas and access and service roads are designated on <u>Exhibit B</u>. Landlord shall not: (i) alter the location or size of any building or improvement in the Primary Building Area shown on <u>Exhibit B</u>; (ii) change the number, location or layout of parking spaces in the Primary Building Area as shown on <u>Exhibit B</u> (except for the parking spaces located behind the Premises as shown on <u>Exhibit B</u>); (iii) reduce the number of parking spaces in the Primary Building Area to less than the greater of (A) that required by applicable law, and (B) four (4) parking spaces per one thousand (1,000) square feet of Floor Area in the Primary Building Area; or (iv) change the entrances or exits to and from the Primary Building Area, or the curb cuts, roadways and sidewalks (unless required to do so after initial construction of the Primary Building Area by any governmental authority); without obtaining Tenant's prior written consent in each instance, which consent may be withheld by Tenant in its sole discretion without the application of Section 41 below. In the event Tenant consents to any such work, it shall be performed by Landlord at any time other than during the months of August, November and December, and shall be undertaken in such a manner so as to (A) not materially and adversely affect ingress to or egress from the Shopping Center, (B) have no material and adverse effect on the visibility of the Premises or any signs which contain Tenant's name, and (C) not otherwise materially interfere with the normal conduct of Tenant's business in the Premises. Landlord shall not designate specific parking spaces for use by any tenant or other occupant of the Primary Building Area.

(b) Landlord further warrants and represents that the Shopping Center will, except as provided in Section 22.(d) below, at all times during the Term, contain the greater of (i) the number of parking spaces required by law, or (ii) at least four (4) parking spaces for every one thousand (1,000) square feet of Floor

Area in the Shopping Center, with each such space not less than nine (9) feet wide and eighteen (18) feet deep. If Landlord fails to maintain such minimum number of parking spaces, except in the case of a taking of parking spaces by eminent domain, as to which Section 22.(d) below shall apply, Tenant shall, in addition to remedies of specific performance and/or injunctive relief, have the right to terminate this Lease by giving notice to Landlord within sixty (60) days from the date of said failure. The notice shall include a date of termination which shall not be less than one hundred twenty (120) days, nor more than two hundred seventy (270) days from the date of the notice. Such termination shall not be effective if Landlord has cured such default within ninety (90) days after its receipt of the notice of the termination.

(c)    Parking spaces shall at all times be clearly marked by painting, striping or otherwise.

(d)    The Common Areas shall be lighted by Landlord on each day that business shall be conducted by Tenant in the Shopping Center from dusk until one (1) hour after the close of business in the Premises.

(e)    Tenant shall use reasonable efforts to have its employees park their motor vehicles in the area designated as "Employee Parking" on Exhibit B and Landlord shall take all reasonable measures to have other tenants and occupants of the Shopping Center do the same (which reasonable measures may include the inclusion in all leases of space at the Shopping Center, executed after the date hereof, of provisions stating that the tenants under those leases shall require the employees of such tenant to park in designated "Employee Parking" areas.) In the event, despite Landlord's having taken some or all of the measures described above, the employees of such other tenants park in areas of the Shopping Center other than "Employee Parking" areas, then such parking shall not constitute a Landlord default under this Lease but, upon request of Tenant, Landlord shall continue to use reasonable efforts to enforce designated "Employee Parking" by such tenants.

(f)    There shall be no charge whatsoever levied for the use of any parking areas within the Shopping Center (other than costs incurred in maintaining Common Areas, as provided in Section 13 above).    Provided the same is permitted by applicable law, Tenant shall have the right to place a trailer on the Common Areas in an area immediately adjacent to the Premises (or, if the Primary Building Area is open to the public for business, then such trailer shall be placed behind the building of which the Premises is a part) for the purpose of conducting employee interviews and recruiting. Such trailer shall be removed not later than the date which is ten (10) days after the Delivery Date.

(g)    In the event any construction which is permitted under the terms of this Lease is undertaken in  the Common Areas or in any other portion of the Shopping Center during such time as the Premises shall be open for business to the public, all such construction shall be conducted in a manner which will not materially interfere with the normal operation of Tenant's business in the Premises, including access to and visibility of the Premises from the roads and highways abutting the Shopping Center.

SECTION 15.    <u>TENANT'S INSURANCE</u>.

(a)    Tenant, at its own cost and expense, shall procure and maintain in full force and effect on and after the Delivery Date and throughout the Term: (i) commercial general liability insurance protecting and insuring Tenant, naming Landlord as "additional insured-lessor" with regard to the Premises, and having a combined single limit of liability of not less than Five Million ($5,000,000.00) Dollars for bodily injury, death and property damage liability; and (ii) standard "All-Risk" insurance, on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of all fixtures, equipment and other items of personal property of Tenant located on or within the Premises.    Tenant shall request that its insurers endeavor to provide thirty (30) days [ten (10) days in the event of non-payment of premium] notice of cancellation.

(b)    Duly executed certificates evidencing the insurance coverage described in 15.(a)(i) above shall be delivered to Landlord prior to the Delivery Date.

(c)    Tenant may carry any of its insurance under "blanket policies" covering the Premises and other locations it or any affiliate of Tenant owns or leases.

(d)    The property insurance required to be maintained by Tenant pursuant to this Section shall not have deductibles (excluding any deductibles relating to special risks such as flood and earthquake) exceeding One Hundred Thousand ($100,000.00) Dollars without Landlord's prior consent, but if the tangible net worth of Guarantor (as hereinafter defined) is less than Fifty Million ($50,000,000.00) Dollars, then Tenant's deductibles shall not exceed Twenty Thousand ($20,000.00) Dollars without Landlord's prior written consent which consent shall not be unreasonably withheld or delayed.

(e)    All insurance required of Tenant under this Lease shall be maintained with insurance companies qualified to do business in the state in which the Shopping Center is located, and rated at least A-VIII by the most current Best's Key Rating Guide (or its equivalent, if such Guide ceases to be published).

SECTION 16.    LANDLORD'S INSURANCE.

(a)    Landlord shall procure and maintain in full force and effect on and after the Commencement Date and throughout the Term commercial general liability insurance with regard to the Common Areas protecting and insuring Landlord, naming Tenant as "additional insured", and having a combined single limit of liability of not less than Five Million ($5,000,000.00) Dollars for bodily injury, death and property damage liability.  Landlord shall have the right to carry its insurance under "blanket policies" covering the Shopping Center and other properties.  Landlord shall provide Tenant with a certificate or other evidence of the insurance described in this Section 16.(a).

(b)    Landlord shall procure and maintain in full force and effect on and after the Commencement Date and throughout the Term standard "All-Risk" insurance (including loss of rents for a

minimum period of one (1) year and endorsements for coverages for flood, earthquake (to the extent that landlords of shopping centers similarly situated in the same vicinity as the Shopping Center maintain such coverage), windstorm, earth movement, sinkholes, demolition, increased cost of construction and contingent operation of building laws coverages), on a replacement cost basis in an amount adequate to cover the full insurable replacement value of all of the buildings (including the Premises) and other insurable improvements in the Shopping Center [whether the same originally constituted Landlord's Work or Tenant's Work; provided, however, in no event shall such insurance cover Tenant's Property (as hereinafter defined)].  Tenant agrees to reimburse Landlord for Tenant's Pro Rata Share of the insurance premiums attributable to the policies required to be obtained and maintained by Landlord pursuant to this Section 16 as part of Common Areas Charges.  To the extent that Landlord may receive a dividend, credit, rebate or other return of a premium (collectively, "Insurance Rebate") for which Tenant has paid a share of the insurance premium, Tenant shall be entitled to receive Tenant's Pro Rata Share of the Insurance Rebate.  For the calendar years in which this Lease commences and terminates, the provisions of this paragraph shall apply and Tenant's liability for Tenant's Pro Rata Share of any insurance premium for such year shall be subject to a pro rata adjustment based on the number of days of said years during which the Term is in effect.  The provisions of this subsection 16.(b) shall survive the expiration or sooner termination of this Lease. Landlord shall provide Tenant with duly executed certificates of the insurance described in this Section 16.(b).

(c)  The property insurance required to be maintained by Landlord pursuant to this Section shall not have deductibles exceeding One Hundred Thousand ($100,000.00) Dollars without Tenant's prior consent.

(d)  All insurance required of Landlord under this Lease shall be maintained with insurance companies qualified to do business in the state in which the Shopping Center is located, and

rated at least A-VIII by the most current Best's Key Rating Guide (or its equivalent, if such Guide ceases to be published).

SECTION 17.    REPAIRS.

(a)    Except as set forth in subsection 17.(b) below, Tenant shall keep the interior of the Premises, including the plate glass, doors, door frames, locks and hardware, in good condition and repair, except for ordinary wear and tear, damage by fire or other casualty or eminent domain and any work done by Landlord. Tenant shall have no responsibility for the repair of the HVAC units or electrical, plumbing and/or mechanical systems serving the Premises but located outside thereof, nor for any portions of such systems running through, in, under or across the Premises but not exclusively serving the same.

(b)    In addition to Landlord's obligations with respect to punch list items described in Section 5.(a) above, Landlord shall perform, at its own cost and expense (and not includable in Common Areas Charges), as the same shall from time to time be necessary, all repairs and replacements to (i) the electrical, plumbing and/or mechanical systems serving the Premises but located outside thereof, and any portions thereof running through, in, under or across the Premises but not exclusively serving the same; (ii) the Premises (including, without limitation, the HVAC units and the electrical, plumbing and/or mechanical systems located in or servicing the Premises) (A) to the extent, if any, covered by contractors', manufacturers', vendors', or insurers' warranties or guarantees in favor of Landlord, (B) during the period terminating on the date which is one (1) year after the Delivery Date, (C) which are occasioned by the act or omission of Landlord, its employees, agents or contractors, and (D) which are occasioned by any breach by Landlord of any provision of this Lease; (iii) the structural elements of the Premises, including but not limited to the roof joists, foundation, exterior walls (except plate glass, storefront windows, doors, door closure devices, window and door frames, molding, locks and hardware, signs, placards, decorations or advertising media of any type, and painting or other treatment of interior walls), floor slab (but not the floor covering unless

the same are damaged as a result of a floor slab defect or settling), and structural portions of any building of which the Premises may be a part; (iv) the roof, gutters, flashings, downspouts and scuppers; (v) the sewer, gas, wiring and public utility connections outside the Premises; and (vi) all utility lines and ducts in or passing through the Premises that serve other tenants and occupants in the Shopping Center or that are located outside the Premises but that serve the Premises.

(c) Any addition, alteration, improvement, or rebuilding, structural or otherwise, to or of the Premises or any part thereof, which may be required by reason of any law, rule, regulation or order promulgated by competent governmental authority and in effect on the date of this Lease or which is hereafter enacted and is not required due to Tenant's specific use of the Premises or due to Tenant alterations in the Premises shall be made by and at the cost and expense of Landlord, except that any such work which is required due to Tenant's specific use of the Premises or due to Tenant alterations in the Premises and would not otherwise be required, shall be made by and at the cost and expense of Tenant. If it is determined that Landlord's Work, performed in accordance with all presently existing laws and regulations and the present interpretations thereof, does not comply with The Americans with Disabilities Act, Landlord shall bear all costs of effecting such compliance, whether or not the same is required as a result of Tenant's specific use of the Premises.

(d) All rebuilding, altering and repairing of structural portions of the Premises required by this Section shall be made in accordance with plans and specifications approved by Tenant and Landlord.

(e) Landlord shall have access to the Premises during Tenant's business hours upon at least three (3) days prior notice (or without such notice in case of emergency) for inspection and to make any repairs or replacements required of it to be made; provided, however, that Landlord's employees, agents and contractors shall identify themselves to the store manager upon entering the Premises. Landlord shall reimburse Tenant promptly

upon demand for the reasonable cost and expense of Tenant incurred in connection with the moving of any merchandise and trade fixtures required to enable Landlord to make such repairs or replacements.

(f)    Notwithstanding any obligation of Tenant pursuant to (a) above, the repair and replacement (but not normal maintenance) of the HVAC units exclusively servicing the Premises and located therein shall be Landlord's responsibility during the period terminating on the date which is one (1) year after the Delivery Date and thereafter, provided any such repair or replacement is not required as a result of Landlord's negligence or intentional acts, shall be Tenant's sole responsibility throughout the remainder of the Term subject to the guarantees to be provided by Landlord pursuant to Exhibit D.

(g)    Any repairs or replacement performed by Landlord shall not materially interfere with the normal conduct of Tenant's business in the Premises, and no materials or tools of any kind used in connection with such repairs shall be stored in the Premises or in portions of the parking areas except where reasonably designated by Tenant. To the extent that any repairs or replacements required of Landlord pursuant to this Section 17 may materially interfere with the normal conduct of Tenant's business in the Premises if performed during Tenant's regular business hours, Landlord shall perform the same solely during the times that Tenant is not open for business.

SECTION 18.    TENANT DEFAULT.

(a)    Tenant shall not be in default in payment of Rent hereunder until the expiration of ten (10) days after notice from Landlord specifying the amount and details of the unpaid Rent.

(b)    A breach by Tenant of any of its covenants contained in this Lease, other than the payment of Rent, which shall continue for a period of over thirty (30) days after notice from Landlord of such breach shall constitute a default under this Lease, provided that any and all breaches of a covenant by Tenant which are capable of being remedied by the performance of affirmative acts shall be deemed cured if Tenant shall commence the performance of said

affirmative acts within thirty (30) days after said notice and shall thereafter diligently prosecute the same to completion.

(c) Upon default by Tenant, Landlord shall have all remedies given to it at law or in equity, including the following:

(i) to bring suit for the collection of the Rent for which Tenant may be in default or for the performance of any other covenant or agreement devolving upon Tenant;

(ii) upon at least five (5) days' notice to Tenant, to terminate this Lease, or to terminate Tenant's right of possession without terminating this Lease, reenter the Premises and take possession thereof. If Landlord shall so elect to terminate this Lease, all rights and obligations of Landlord shall cease and terminate, except that Landlord shall have and retain full right to sue for and collect all Rent, the payment of which Tenant shall then be in default and all damages to Landlord by reason of any such breach, and Tenant shall immediately surrender and deliver the Premises to Landlord and upon any default by Tenant in so doing, Landlord shall have the right to recover possession by summary proceedings. If Landlord elects to repossess the Premises without terminating the Lease, then Tenant shall be liable for and shall pay to Landlord at the address specified for notice to Landlord herein, all Rent payable to Landlord pursuant to the terms of this Lease which shall have accrued to the date of repossession, plus all Rent thereafter becoming due under this Lease, when and as required to be paid by Tenant to Landlord during the remainder of the Term, diminished by any net sums thereafter received by Landlord through reletting the Premises during said period (after deducting reasonable expenses incurred by Landlord). In no event shall Tenant be entitled to any excess of any rent obtained by such reletting over and above the Rent herein reserved. Actions to collect amounts due by Tenant to Landlord as provided herein may be brought from time to time, on one or more occasions, without the necessity of Landlord's waiting until the expiration of the Term.

(d) Upon a default by Tenant, Tenant shall also be liable for and shall pay to Landlord, in addition to any sum provided to be paid above, brokers' fees incurred by Landlord in

connection with reletting the whole or any part of the Premises, the costs of removing and storing Tenant's or other occupant's property; the cost of repairs; and all reasonable expenses incurred by Landlord in enforcing or defending Landlord's rights and/or remedies, including reasonable attorneys' fees.

(e)    Upon a default by Tenant, any amounts paid by Landlord to cure said default and any Rent payments not paid after notice shall bear interest at the Lease Interest Rate from and after the expiration of any applicable grace period.

(f)    Landlord agrees to use reasonable efforts to relet the Premises or any portion thereof to mitigate Landlord's damages to which Landlord would otherwise be entitled to as a result of Tenant's default; provided, however, Landlord shall not be required to lease the Premises prior to leasing other vacant premises in the Shopping Center.

SECTION 19.    **LANDLORD DEFAULT**.  If Landlord fails to make any repairs or do any work required of Landlord by the provisions of this Lease, or if Landlord shall at any time be in default in the observance or performance of any of the other covenants and agreements required to be performed and observed by Landlord hereunder, and any such failure or default continues for a period of thirty (30) days after notice specifying the nature of such default in detail is given by Tenant to Landlord, or, if such failure or default requires more than thirty (30) days to cure in the exercise of due diligence, unless Landlord commences to cure same within said thirty (30) day period and thereafter diligently prosecutes the same to completion, Tenant may (a) if the failure or default materially interferes with the normal conduct of Tenant's business, abate fifty (50%) percent of the Rent hereunder until the failure or default has been cured and Tenant is able to conduct its normal business in the Premises, but without waiving its rights to damages for Landlord's failure to perform; and/or (b) but shall not be obligated to, make such repairs or perform such work in accordance with the provisions of this Lease all on behalf of and at the expense of Landlord; and/or (c) bring suit for the collection of any amounts for which Landlord is in default, seek

injunctive relief, or seek specific performance for any other covenant or agreement of Landlord, without terminating this Lease; and/or (d) if the amount so expended by Tenant or otherwise due Tenant is not paid to Tenant within thirty (30) days after notice thereof, Tenant may offset against the Rent payable by Tenant hereunder [which offset shall not exceed fifty (50%) percent of the Rent then payable under the terms of this Lease] for the amounts reasonably expended by Tenant performing such repairs or work or otherwise due Tenant hereunder, including costs and attorneys' fees, together with interest thereon at the Lease Interest Rate (provided, however, that in the event Landlord disputes Tenant's right to offset all or any portion of such amounts, such dispute shall be resolved through arbitration as provided in Section 54 hereof, and in the event such arbitration results in a decision which holds that Tenant was not justified in offsetting all or any portion of such amounts, then such amounts, with interest thereon at the Lease Interest Rate accruing from the time of such offset, shall be promptly paid by Tenant to Landlord). Notwithstanding the foregoing, if Tenant shall be unable to recoup the amounts owing to Tenant by offsetting or withholding the foregoing fifty (50%) percent of Rent during the remainder of the Term, the fifty (50%) percent limitation shall be increased to an amount each month required to enable Tenant to recover such amount monthly, amortized over the remaining months of the Term.

SECTION 20.    LANDLORD'S ENTRY.  Tenant shall permit Landlord to enter upon the Premises during Tenant's business hours, upon at least three (3) days prior notice to Tenant, to exhibit same to prospective bona-fide purchasers and mortgagees of the Shopping Center, and during the last six (6) months of the Term, to exhibit same to prospective bona-fide tenants; provided, however, that Landlord's employees, agents and contractors shall identify themselves to the store manager upon entering the Premises.

SECTION 21.    FIRE AND OTHER CASUALTY.

(a)  Except as otherwise provided in this Section 21, if all or a portion of the Premises, the Common Areas or other buildings, including all improvements thereto, in the Shopping

Center shall be damaged by fire or other casualty, Landlord shall promptly rebuild and restore the same to the condition existing immediately prior to such fire or other casualty (which restoration shall include all Tenant's Work and all other leasehold improvements performed by Tenant, provided, however, that Landlord shall not be obligated to rebuild, restore or replace Tenant's Property). To the extent that all or any portion of the proceeds from Landlord's insurance policies may be paid directly to Landlord, such proceeds shall be retained by Landlord in trust and applied to the costs of restoration. If, in Tenant's sole but reasonable judgment, any damage to the Premises renders all or any portion of the Premises unusable for the conduct of Tenant's business, or in the case of damage to the Shopping Center, materially interferes with the normal conduct of Tenant's business in the Premises, a just proportion of Rent payable hereunder shall be abated until the damaged or destroyed area(s) are fully rebuilt and restored. In addition, if such fire or other casualty occurs during the period commencing on the Delivery Date and ending one day prior to the Rent Commencement Date, then, notwithstanding any other provision of this Lease, the Rent Commencement Date shall be deemed delayed one day for each day which elapses between the occurrence of such fire or other casualty and the date upon which the damaged or destroyed area(s) are fully rebuilt and restored.

(b)    If (i) Landlord does not commence the repair and restoration work to the Premises, the Common Areas or other buildings in the Shopping Center as required pursuant to this Section within ninety (90) days after the date of such destruction or thereafter fails to diligently pursue the completion of such repair and restoration work, (ii) the required repairs and restorations to the Premises, the Common Areas or other buildings in the Shopping Center cannot, in the opinion of an independent licensed architect designated by Tenant, be completed by Landlord in accordance with all provisions of this Section 21 within a period of twelve (12) months after the date of destruction, or (iii) the required repairs and restorations to the Premises, the Common Areas or other buildings in the Shopping Center are not

actually Substantially Completed by Landlord in accordance with all provisions of this Section within a period of twelve (12) months after the date of destruction, then, in any of such events, Tenant shall have the right, at its sole discretion and option, to: (A) with respect to (i) or (iii) above, after giving thirty (30) days prior notice to Landlord, perform or complete, as the case may be, the required repairs and restoration work at the sole cost of Landlord, which cost Landlord shall pay to Tenant during the course of such repairs within ten (10) days of Tenant's delivery to Landlord of an invoice therefor and, in default of any such payment, Tenant shall have the right to offset the amount thereof, together with interest at the Lease Interest Rate, against the Rent next accruing hereunder (which offset shall not exceed fifty (50%) percent of the Rent then payable under the terms of this Lease); or (B) with respect to (i) or (iii) above, seek to obtain specific performance of Landlord's repair and restoration obligations pursuant to the laws of the state in which the Shopping Center is located; or (C) with respect to (i), (ii) or (iii) above, terminate this Lease by thirty (30) days notice to Landlord. The exercise of the rights granted to Tenant herein shall be Tenant's sole remedy arising from any default by Landlord under this Section 21.

(c)   If the Premises are substantially destroyed by fire or other casualty during the last two (2) years of the Term to the extent of more than one-third (1/3) of the Floor Area thereof, either Landlord or Tenant shall have the right to terminate this Lease as of the date of such damage or destruction by giving written notice within thirty (30) days following such damage or destruction, but Tenant may negate any termination by Landlord by agreeing to extend the Term for an additional five (5) year period by exercising an option pursuant to Section 46 below, if available, within ten (10) days after receipt of the termination notice from Landlord.

SECTION 22.    **EMINENT DOMAIN**.

(a)   If all of the Premises shall be taken under the power of eminent domain, this Lease shall terminate as of the effective date of such taking without further liability on the part

of either Landlord or Tenant except for an adjustment between the parties for the Rent payable by Tenant hereunder.  If:  (i) any portion of the Premises shall be taken under the power of eminent domain so that it is commercially unreasonable or unfeasible for Tenant, in its sole but reasonable judgment, to conduct its normal business in the Premises; or (ii) as a consequence of any taking under the power of eminent domain, (A) portions of the Shopping Center shall be divided or separated in any manner that it materially interferes with parking, visibility, or access to the Premises from other portions of the Shopping Center, or (B) the Shopping Center no longer has entrances from either Southwest Freeway or Fountain Lake Drive, and as a result, in either case, it is not commercially reasonable or feasible for Tenant, in its sole but reasonable judgment, to conduct its normal business in the Premises; or (iii) any portion of the Shopping Center shall be so taken that materially interferes with parking, visibility or access to the Premises, and as a result of such taking it is commercially unreasonable or unfeasible for Tenant, in its sole but reasonable judgment, to conduct its normal business in the Premises; or (iv) more than twenty-five (25%) percent of the buildings in the Shopping Center (other than the Premises) are taken; then, within sixty (60) days of any such event, Tenant shall have the right to terminate this Lease by giving sixty (60) days written notice to Landlord, in which event this Lease shall so terminate without further liability on the part of either Landlord or Tenant, except for an adjustment between the parties for the Rent payable by Tenant hereunder and for payment to Tenant for its share of the award for the taking pursuant to (c) below.  Subsequent to any partial taking of the Premises, the Rent shall be equitably reduced or totally abated based upon the extent to which the remaining portion of the Premises may, in Tenant's sole but reasonable judgment, be utilized for its normal conduct of business.

(b)  If Tenant shall not have the right to cancel this Lease or, having such right, elects not to exercise the same, Landlord, at its own cost and expense, shall within a reasonable period of time, repair and restore the damaged area to tenantable

condition, similar in physical appearance to the condition of the area immediately prior to the taking, pursuant to plans and specifications approved by Tenant (which repair and restoration to the Premises shall include all Tenant's Work and all other leasehold improvements performed by Tenant; provided, however, that Landlord shall not be obligated to repair or restore Tenant's Property). During the period of said repairs and restoration, all Rent shall abate to the extent that the Premises may not, in Tenant's reasonable judgment, be used by Tenant for the normal conduct of its business.

(c) In connection with any taking or partial taking of the Premises, Tenant shall be entitled to claim an award for loss of business, leasehold improvements, fixtures and equipment and removal and reinstallation costs; provided, however, that no award shall be payable to Tenant which reduces the award payable to Landlord for its fee interest in the Premises.

(d) Notwithstanding the foregoing, if five (5%) percent or more of the parking spaces shown on Exhibit B shall be taken under the power of eminent domain, or if so many of the parking spaces within the Shopping Center are so taken such that there are less than either (i) the number of parking spaces required by law, or (ii) three and three quarters (3.75) parking spaces for every one thousand (1,000) square feet of Floor Area in the Shopping Center, then Tenant shall have the right to terminate this Lease in the same manner and with the same effect as set forth in subsection (a) above.

(e) Any dispute between the parties with respect to this Section 22 shall be determined by arbitration in accordance with the provisions of Section 54 below.

(f) Notwithstanding anything contained herein to the contrary, Landlord's liability for the repair and restoration of the Premises shall be limited to the actual amount of condemnation proceeds received by Landlord or Landlord's mortgagee.

SECTION 23.   EXCLUSIVE IN CENTER.

(a) To induce Tenant to execute this Lease, Landlord covenants and agrees that Landlord will not lease, rent or occupy

or permit any other premises in the Shopping Center or any Related Land (as such term is defined in Section 7 hereof) to be occupied, whether by a tenant, sublessee, assignee, licensee or other occupant, for the sale, rental or distribution, in any manner whatsoever, of linens and domestics, bathroom items, housewares, frames and wall art, window treatments and/or closet, shelving and storage items (which items, either together or separately, are hereinafter referred to as the "Exclusive Items"); except on an Incidental Basis (as hereinafter defined). For purposes of this Section 23(a), the term "Incidental Basis" shall mean the sale of such Exclusive Items but only to the extent that the total selling space (including allocable portion of the aisle space adjacent to such selling space) in any one store (other than the Premises) in the Shopping Center utilized for the sale of such Exclusive Items at any one time shall not exceed the lesser of five (5%) percent of the total selling space (including an allocable portion of the aisle space adjacent to such selling space) in such store, or a Floor Area of two thousand five hundred (2,500) square feet of the selling space (including an allocable portion of the aisle space adjacent to such selling space) in such store.

(b)    Landlord has advised Tenant that the leases for the tenants listed on Exhibit E-1 do not require such tenants to be subject to the exclusive granted to Tenant under this Lease (such tenants being hereinafter called the "Existing Tenants"). The exclusive granted to Tenant under this Lease shall not be binding on the Existing Tenants pursuant to their current written leases provided, however, the Existing Tenants and current and future assignees or sublessees of such Existing Tenants shall be subject to such exclusive (and Landlord shall not permit the same to be used in violation of Tenant's exclusive rights set forth in this Section 23) in the event (i) the lease between Landlord and such Existing Tenants requires Landlord's consent in order to permit a change in the use of the applicable premises so as to allow for the sale, rental or distribution of the Exclusive Items or such lease terminates; and (ii) Landlord has the legal right to withhold such consent without incurring any liability to any such Existing Tenant

or triggering a right of the Existing Tenant to terminate such lease.

(c)    Original Tenant (as such term is hereinafter defined) shall honor certain exclusives granted by Landlord to certain other tenants in the Shopping Center pursuant to the terms of leases which have been executed prior to the date hereof (hereinafter, "Existing Exclusives") [a true and complete listing and description of such Existing Exclusives being annexed hereto as Exhibit G] and shall not lease, occupy or use the Premises (or, in the event of a sublease, any applicable portion of the Premises) or permit the Premises (or, in the event of a sublease, any applicable portion of the Premises) to be leased, occupied or used, whether by Original Tenant or any sublessee, assignee, licensee or other occupant, in violation of any such Existing Exclusive (except as may be specifically set forth on Exhibit G). For purposes of this Section 23(c), the term "Original Tenant" shall mean Tenant named in this Lease and any successor-in-interest to Tenant named herein pursuant to the provisions of subsection (c) of Section 25.

(d)    Tenant agrees, that in the event Tenant assigns this Lease or subleases any part of the Premises, other than an assignment or sublease referred to in Section 25(c) hereof, Tenant shall not, in the case of an assignment of this Lease, permit the Premises, or in the case of a sublease permit the sublet premises, to be used for any use or purpose which would violate any exclusive granted by Landlord to other tenants in the Shopping Center pursuant to the terms of a lease which is executed from and after the date hereof (hereinafter, "Future Exclusive(s)") provided, and on the condition that:

(i)    If Tenant requests, Landlord shall notify Tenant of the existence of such Future Exclusive within fifteen (15) days after request;

(ii)    the premises occupied by the tenant (or, in the event of a sublease, the portion of such premises subleased by the subtenant) benefitting from such Future Exclusive contains a retail Floor Area of at least twenty thousand (20,000) square feet;

(iii)    such Future Exclusive shall not relate to the sale, rental or distribution of apparel or apparel accessories;

(iv) notwithstanding the granting of such Future Exclusive, any subtenant or assignee of Tenant shall have the right to utilize up to five (5%) percent of the Floor Area of the Premises (or, in the event of a sublease, the applicable portion of the Premises) for the sale, rental or distribution of the items protected by such Future Exclusive; and

(v) Notwithstanding the granting of such Future Exclusive, if all or any portion of the Premises is then being used for the sale, rental or distribution of the items protected by such Future Exclusive, then the tenant or occupant of the Premises or portion thereof may continue to operate in such Premises or a portion thereof a store selling the items set forth in the Future Exclusive.

In the event of any violation of this Section 23.(d) by Tenant, in addition to its rights and remedies under this Lease, Landlord shall have all remedies given to it at law and in equity, including the right to injunctive relief and/or damages. If any subtenant (other than a subtenant pursuant to Section 25(c)) shall violate any of the provisions set forth in this Section 23(d), or shall indicate that it intends to violate any of said provisions, Tenant shall promptly commence legal proceedings and vigorously prosecute the same to enjoin and prohibit any such violation. If Tenant fails to commence such proceedings, or shall fail thereafter to vigorously prosecute the same, Landlord shall have the right to conduct and prosecute such legal proceedings in its own name, and at the expense of Tenant (if the court determines there was a breach).

(e) Upon a breach of the covenant and agreement set forth in Section 23(a) by Landlord, Tenant shall have all remedies given to it at law and in equity, including the right to injunctive relief and/or damages. If any person or entity other than Landlord shall violate any of the provisions herein set forth, or shall indicate that it intends to violate any of said provisions, Landlord shall promptly commence legal proceedings and vigorously prosecute the same, to enjoin and prohibit any such violation. If Landlord fails to commence such proceedings, or shall fail thereafter to vigorously prosecute the same, Tenant shall have the right to conduct and prosecute such legal proceedings in its own

name, and at the expense of Landlord (if the court determines there was a breach).

SECTION 24.    **RIGHT    TO    MORTGAGE    AND    NON-DISTURBANCE.**
Landlord reserves the right to subject and subordinate this Lease at all times to the lien of any vendor's lien, mortgage or deed of trust now or hereafter affecting Landlord's interest in the Premises, as well as to any present or future ground or underlying leases (each of which lease, together with the said vendor's lien, mortgage or deed of trust is hereinafter referred to as a "lien") involving all or any part of the Shopping Center; provided, however:  (i) no default by Landlord under any such lien shall affect Tenant's rights under this Lease so long as Tenant is not in default of such obligations beyond the applicable notice and grace periods provided herein; (ii) Tenant will not be named as a party in any foreclosure or other proceedings with respect to any such lien; (iii) the holder of any such lien agrees that the insurance proceeds resulting from any fire or other casualty and the proceeds payable from any taking by eminent domain will be made available for restoration of the Premises and the Shopping Center to the extent provided in this Lease; (iv) Landlord and Tenant shall have the right to execute any amendment to this Lease which is specifically required hereunder and the holder of any such lien shall recognize and be bound thereto; and (v) the holder of any such lien will execute a non-disturbance agreement in a form reasonably satisfactory to Tenant which includes, _inter alia_, the provisions described in (i), (ii), (iii) and (iv) of this Section 24.

SECTION 25.    **TENANT ASSIGNMENT AND SUBLETTING.**

(a)    Tenant shall have the right from time to time (i) without the consent of Landlord, to concession or license a portion or portions of the Premises, but not the whole of the Premises, provided and on the condition that, such licensing or concessioning shall not include the physical demising of separate space within the Premises to such licensee or concessionaire, it being understood and agreed that the portion of the Premises so licensed or concessioned shall appear to be an integrated part of the

business being conducted in the Premises, (ii) without the consent
of Landlord, to sublet a portion or portions of the Premises,
provided that the sublet premises is not greater than approximately
ten thousand (10,000) square feet of Floor Area, and (iii) with the
consent of Landlord [which consent, provided Tenant has complied
with the provisions of Section 11.(e) with respect thereto, shall
not be unreasonably withheld] to sublet more than ten thousand
(10,000) square feet of the Premises, but not the whole of the
Premises.  No such subletting, licensing or concessioning shall
release Tenant from any of its obligations hereunder and all
provisions of this Lease [including, without limitation, the
provisions of Section 7.(a) above] shall remain in full force and
effect.

          (b)  Except as set forth in subsections 25.(a) and
25.(c), in the event Tenant proposes to assign this Lease or sublet
the whole of the Premises, it shall first give notice thereof
(hereinafter called the "Assignment/Subletting Notice") to
Landlord, which notice shall specify the name and address of the
proposed assignee or sublessee and the entire terms of the
assignment or subletting.  Within thirty (30) days after receipt of
an Assignment/Subletting Notice from Tenant, Landlord may elect by
notice (hereinafter called the "Termination Notice") in writing to
Tenant to terminate this Lease and recapture the Premises in which
event this Lease shall automatically terminate on the ninetieth
(90th) day (hereinafter called the "Termination Date") following
Tenant's receipt of the Termination Notice with the same force and
effect as if said Termination Date had been designated as the
Expiration Date of this Lease and Landlord and Tenant shall upon
such Termination Date be released from any and all liabilities
thereafter accruing hereunder.  All Fixed Rent and Additional Rent
payable by Tenant hereunder shall be apportioned as of the
Termination Date and Tenant shall promptly pay to Landlord any
amounts so determined to be due and owing by Tenant to Landlord,
and conversely Landlord shall promptly reimburse Tenant for any
amounts prepaid by Tenant for periods subsequent to the Termination
Date.  Notwithstanding any Termination Notice given to Tenant by

Landlord within the aforesaid thirty (30) day period, Tenant shall have the right, within ten (10) days thereafter, to give Landlord notice (hereinafter called the "Recision Notice") of its recision of the Assignment/Subletting Notice and upon the receipt of the Recision Notice the Termination Notice previously given by Landlord shall be deemed null and void and Tenant shall not assign this Lease or sublet the whole of the Premises as proposed in its Assignment/Subletting Notice.  If Landlord does not exercise its right of termination within the aforesaid thirty (30) day period, Landlord shall conclusively be deemed to have consented to the proposed assignment or subletting, as the case may be, and Tenant may assign this Lease or sublet the whole of the Premises pursuant to the Assignment/Subletting Notice.

(c)  Notwithstanding the provisions of subsections 25.(a) and 25.(b) above, Tenant shall have the unrestricted right, from time to time without the consent of Landlord, to (i) assign and/or sublet the whole of the Premises to any entity controlling, controlled by, or under common control with Tenant; (ii) assign this Lease to any company which purchases all or substantially all of the assets of Tenant's parent company; (iii) assign this Lease to any company which purchases Tenant's interest in the Premises (provided that such company has also purchased the interest of all tenants in all other Bed Bath & Beyond stores located in the greater Houston area substantially simultaneously with a purchase of Tenant's interest in the Premises); and (iv) assign this Lease in conjunction with any merger, consolidation or public offering of stock involving Tenant or any entity controlling, controlled by, or under common control with Tenant.

(d)  Unless otherwise agreed to in writing by Landlord, no assignment, subletting, licensing or concessioning by Tenant shall reduce, diminish, or otherwise affect the liability of Tenant hereunder.

(e)  All assignees and sublessees shall be permitted to use the Premises (or the applicable portion thereof) for any retail purpose not specifically prohibited by the provisions of Sections 7.(c) or 23.(d) of this Lease.  Landlord hereby acknowledges that

any sublessee of all or any portion of the Premises shall, subject to Tenant's prior written approval, be entitled to all of the rights and benefits available to Tenant pursuant to the terms of this Section 25.

(f)   In addition to Tenant's other rights set forth in this Section 25, a collateral assignment of Tenant's interest in this Lease by Tenant to one or more Institutional Lenders (as hereinafter defined), as collateral security for an indebtedness or other obligation of Tenant, the Parent Corporation or any affiliated company, shall be permitted and Landlord shall execute all documentation reasonably requested by Tenant or any such Institutional Lender (which shall be in form and content reasonably acceptable to Landlord) in connection therewith.   As used herein, "Institutional Lender" shall mean a state or federally regulated bank, savings and loan association, insurance company, pension fund, credit union, REIT, a state or federally regulated lender or any other nationally or regionally recognized lender.

(g)   Notwithstanding anything contained herein to the contrary, Tenant shall have the right, without Landlord's consent, to grant to Bed Bath & Beyond Inc. (herein called the "Parent Corporation") or to any entity controlling, controlled by or under common control with Tenant or the Parent Corporation a license to operate all of Tenant's business operations at the Premises, without the Parent Corporation having assumed any liability for the performance of Tenant's obligations under this Lease.

(h)   If Tenant assigns Tenant's interest in this Lease and so notifies Landlord, then Landlord, when giving notice to said assignee or any future assignee in respect of any default, shall also give a copy of such notice to the original Tenant named herein (hereinafter referred to as "Original Tenant"), and no notice of default shall be effective until a copy thereof is so given to Original Tenant.   Original Tenant shall have the same period after receipt of such notice to cure such default as is given to Tenant therefor under this Lease.   If this Lease terminates because of a default of such assignee, Landlord shall promptly give to Original Tenant notice thereof; and Original Tenant shall have the option,

exercisable by the giving of notice by Original Tenant to Landlord within ten (10) days after receipt by Original Tenant of Landlord's notice, to cure any such default [but only if such default is of a monetary nature or is otherwise reasonably susceptible of cure by Original Tenant, and, if such is not the case, Original Tenant shall not be obligated to cure such default as a condition to the exercise by Original Tenant of Original Tenant's rights set forth in this subsection 25.(h)] and become Tenant under a new lease for the remainder of the Term of this Lease (including any Renewal Periods) upon all of the terms and conditions as then remain under this Lease, and such new lease shall commence on the date of termination of this Lease, except that if Landlord delivers to Original Tenant, together with Landlord's notice, a release as to all future liability under this Lease, Original Tenant shall not have the foregoing option.

(i)    In the event Tenant subleases the entire Premises for a term of at least five (5) years to a person or entity which has (or to a person or entity whose obligations under such sublease are guaranteed by a person or entity which has), as of the effective date of such sublease, a net worth of at least Five Million ($5,000,000.00) Dollars (with the instrument of sublease in such a case being hereinafter referred to as a "Qualified Sublease", and with the subtenant in such a case hereinafter referred to as the "Qualified Subtenant") then, notwithstanding any other provisions of this Lease:

(i)    Upon Tenant's request, Landlord agrees that it shall execute a Non-Disturbance Agreement (hereinafter, an "NDA") among Landlord, Tenant and Qualified Subtenant pursuant to which Landlord agrees (A) when giving notice to Tenant in respect of any default, to also give a copy of such notice to Qualified Subtenant, and no notice of default shall be effective until a copy thereof is so given to Qualified Subtenant, and (B) in the event this Lease is terminated because of such Tenant default, Qualified Subtenant shall have the option, exercisable by the giving of notice by Qualified Subtenant to Landlord within ten (10) days after receipt by Qualified Subtenant of notice from Landlord that the Lease has

been terminated, to cure any such default [but only if such default is of a monetary nature or is otherwise reasonably susceptible of cure by Qualified Subtenant, and, if such is not the case, Qualified Subtenant shall have no obligation to cure such default as a condition to the exercise by Qualified Subtenant of any of Qualified Subtenant's rights set forth in this Subsection 25.(i)], and become Tenant under a new lease for the remainder of the term of Qualified Sublease (including any Renewal Periods) upon all of the same terms and conditions as then remain under this Lease (and the Rent payable by Qualified Subtenant under the terms of such direct lease shall be the Rent payable by Tenant to Landlord under the terms of this Lease); and

(ii) From and after the effective date of the Qualified Sublease, all non-disturbance agreements obtained by Landlord in accordance with the provisions of Section 24 above shall afford Qualified Subtenant the same rights and protection as are afforded to Tenant thereunder.

SECTION 26.    NOTICE.    Whenever a notice is required or permitted in this Lease, it shall mean a written notice (i) sent by certified mail, return receipt requested, addressed to Landlord at Landlord's Mailing Address with a copy to Stephen M. Block, Esq., c/o Brown, Parker & Leahy, L.L.P.; 1200 Smith Street, Suite 3600; Houston, Texas 77002 or to Tenant at Tenant's Mailing Address with copies to (A) Allan N. Rauch, Esq., c/o Bed Bath & Beyond Inc., 715 Morris Avenue, Springfield, New Jersey 07081, and (B) Edward M. Schotz, Esq., c/o Cole, Schotz, Meisel, Forman & Leonard, P.A., Court Plaza North, 25 Main Street, P.O. Box 800, Hackensack, New Jersey 07602-0800, or to such other person or other address as may, from time to time, be specified by either party in a written notice to the other party; or (ii) a written notice delivered to the addresses stated above by Fedex or other recognized overnight delivery service with charges prepaid and which obtains a receipt for any such delivery.    All notices given in accordance with the provisions of this Section shall be effective upon receipt at the address of the addressee.

SECTION 27.    **SHORT FORM LEASE**.  Upon the request of either party following the execution and delivery of this Lease, Landlord and Tenant shall execute a short form lease or memorandum for recording, which shall be in form and substance as either party shall reasonably request and shall refer to such provisions of this Lease which may survive the expiration or sooner termination hereof.    In no event shall the amount of Fixed Rent reserved hereunder be included in any such short form lease or memorandum.

SECTION 28.    **ENTIRE AGREEMENT AND MODIFICATION**.  This Lease constitutes the entire agreement of the parties hereto, and all prior agreements between the parties, whether written or oral, are merged herein and, except as may be specifically set forth herein, shall be of no force and effect.    This Lease cannot be changed, modified or discharged orally, but only by an agreement in writing, signed by the party against whom enforcement of the change, modification or discharge is sought.

SECTION 29.    **SEVERABILITY**.  If any term, covenant, condition or provision of this Lease is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions hereof shall remain in full force and effect and shall in no way be affected, impaired, or invalidated thereby.

SECTION 30.    **GRAMMATICAL USAGES AND CONSTRUCTION**.    In construing this Lease, feminine or neuter pronouns shall be substituted for those masculine in form and vice versa, and plural terms shall be substituted for singular and singular for plural in any place in which the context so requires.    This Lease shall be construed without regard to the identity of the party who drafted the various provisions hereof.    Moreover, each and every provision of this Lease shall be construed as though all parties hereto participated equally in the drafting thereof.    As a result of the foregoing, any rule or construction that a document is to be construed against the drafting party shall not be applicable hereto.

SECTION 31.    **TABLE OF CONTENTS, LINE NUMBERING AND PARAGRAPH HEADINGS**.  The table of contents and line numbering, if any, and section headings are inserted only for convenience and in no way

SECTION 35.    **NON-WAIVER**.  The failure of Landlord or Tenant to enforce against the other any provision, covenant or condition herein, by reason of either of them committing any breach of or default under this Lease shall not be deemed a waiver thereof, nor void or affect the right of the aggrieved party to enforce the same covenant or condition on the occasion of any subsequent breach of default; nor shall the failure of either party to exercise any option in this Lease upon any occasion arising therefor be deemed or construed to be a waiver of the right to exercise that same kind of option upon any subsequent occasion.

SECTION 36.    **LIMITATION OF LANDLORD'S LIABILITY**.  On and after the Delivery Date, and except with respect to insurance proceeds or condemnation awards previously received by Landlord which are required, by the terms of this Lease, to be applied to the repair or restoration of the Premises or the Shopping Center, Tenant shall look only to Landlord's estate and property in the Shopping Center (or the proceeds thereof) and income derived from the Shopping Center for the satisfaction of Tenant's remedies for the collection of a judgment (or other judicial process) requiring the payment of money by Landlord hereunder and no other property or assets of Landlord, its officers, directors, stockholders or partners shall be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies under or with respect to this Lease.  Tenant agrees that it shall not attempt to impose personal liability for any claim arising under this Lease upon any officer, director, shareholder, employee, or partner of Landlord or any of its constituents.

SECTION 37.    **SURRENDER OF PREMISES**.  At the expiration of the Term, Tenant will quit and surrender the Premises in as good a state and condition as received, reasonable wear and tear, damage by fire or other casualty, damage by eminent domain, and repairs and replacements to be made by Landlord hereunder excepted.

SECTION 38.    **SUCCESSORS AND ASSIGNS**.  The provisions of this Lease shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors,

define, limit or describe the scope or intent of this Lease, nor in any way affect this Lease.

SECTION 32.    **NO JOINT VENTURE OR PARTNERSHIP CREATED BY LEASE.**    Nothing contained herein shall be deemed or construed as creating the relationship of principal and agent or of partnership or of joint venture between the parties hereto.

SECTION 33.    **BROKER'S COMMISSION.**    Landlord and Tenant each warrant and represent to the other that they did not deal with any real estate broker in connection with the negotiation, execution and delivery of this Lease, except for Robert Dozier/Lincoln Property Company (hereinafter called the "Broker").    Landlord agrees to pay Broker a commission   pursuant to a separate agreement.    Each party agrees to indemnify, defend, and save the other harmless from and against any and all liabilities, costs, causes of action, damages and expenses, including, without limitation, attorneys' fees, with respect to or arising out of any claims made by any real estate broker, agent or finder with respect to this Lease in breach of the foregoing representation.    The provisions of this Section 33 shall survive the expiration or earlier termination of this Lease.

SECTION 34.    **RIGHTS CUMULATIVE.**    Unless expressly provided to the contrary in this Lease, each and every one of the rights, remedies and benefits provided by this Lease shall be cumulative and shall not be exclusive of any other such rights, remedies and benefits allowed by law.    The term "Landlord" shall mean only the owner, for the time being, of the Shopping Center, and in the event of the transfer by such owner of its interest in the Shopping Center, such owner shall [except to the extent of (a) claims made by Tenant against Landlord at any time with respect to periods of time which occurred prior to the effective date of the transfer of such ownership interest, and/or (b) judgments obtained by Tenant against Landlord, on or prior to the effective date of the transfer of such ownership interest] thereupon be released and discharged from all covenants and obligations of Landlord thereafter accruing, but such covenants and obligations shall be binding during the Term upon each new owner for the duration of such owner's ownership.

administrators, successors and assigns, subject, however, to the restrictions on assignment hereinabove set forth.

SECTION 39.  **FORCE MAJEURE**.  Except as may be otherwise expressly set forth herein, in the event either party hereto shall be delayed or hindered in, or prevented from, the performance of any act required hereunder (except for the payment of a monetary sum to be paid by either party to the other party) by reason of strikes, inability to procure materials, failure of power, restrictive governmental laws or regulations, riots, insurrection, war or other reasons of a like nature not the fault of the party delayed in performing work or doing acts required under the terms of this Lease (all of such reasons or causes are herein collectively called "Force Majeure"), then the performance of any such act shall be excused for the period of the delay and the period of the performance of any such act shall be extended for a period equivalent to the period of such delay.  Any time either party is experiencing delay under this provision, such party will give notice to the other party detailing the nature of the delay and giving an estimate as to how long the delay is expected to be.

SECTION 40.  **HOLD OVER**.  If Tenant fails to deliver possession of the Premises to Landlord at the end of the Term, Tenant shall be a tenant at sufferance and shall be liable for Fixed Rent on a monthly basis (or, if applicable, on a pro rated daily basis) in an amount equal to one hundred twenty-five (125%) percent of the amount thereof payable by Tenant for the month immediately preceding the last day of the Term as well as for all Additional Rent payable by Tenant hereunder.

SECTION 41.  **CONSENTS**.  Except as may be otherwise expressly set forth in this Lease, whenever under this Lease provision is made for either party's securing the consent or approval of the other party, such consent or approval shall be in writing and shall not be unreasonably withheld, delayed or conditioned, and in all matters contained herein, both parties shall have an implied obligation of reasonableness.

SECTION 42.  **DECLARATION OF CONTRACTUAL LIABILITY**.  If either party consists of more than one person, then the persons

constituting such party shall be jointly and severally liable hereunder, subject, however, to the provisions of Section 36.

SECTION 43.    **QUIET ENJOYMENT**.    Provided Tenant is not in default of its obligations under this Lease beyond the expiration of any applicable notice and grace periods for the curing of such default, Tenant shall peaceably and quietly have, hold, occupy and enjoy the Premises for the Term, without hindrance from Landlord or any party claiming by, through, or under Landlord.

SECTION 44.    **ESTOPPEL CERTIFICATE**.    Upon written request of Landlord or Tenant, the other party, within thirty (30) days of the date of such request, shall execute and deliver to and only for the benefit of the requesting party, without charge, a written statement:    (a) ratifying this Lease; (b) certifying, to the best of such party's knowledge, that this Lease is in full force and effect, if such is the case, and has not been modified, assigned, supplemented or amended, except by such writings as shall be stated; (c) certifying, to the best of such party's knowledge, that all conditions and agreements under this Lease to be satisfied and performed have been satisfied and performed, except as shall be stated; (d) reciting the amount of advance Rent, if any, paid by Tenant and the date to which Rent has been paid; and (e) certifying to such other matters as the requesting party may reasonably require.    Each request for a written statement pursuant to this Section 44 made within twelve (12) months of an earlier request for such a written statement, shall be accompanied by a payment, from the requesting party to the other party, in the amount of Five Hundred ($500.00) Dollars [which sum shall be increased by One Hundred ($100.00) Dollars on each date that the Fixed Rent increases pursuant to the terms of Section 1.(d) above].

SECTION 45.    **COSTS**.    Whenever this Lease requires the performance of an act by either party, such party shall perform the act at its own cost and expense, unless expressly provided to the contrary.

SECTION 46.    **OPTIONS TO EXTEND TERM**.

(a)    Provided Tenant is not in default in the payment of any Rent beyond any applicable cure period after notice from

Landlord, Tenant shall have the right and option (hereinafter a "Renewal Option(s)") to extend the original Term from the date upon which it would otherwise expire for three (3) separate renewal periods of five (5) years each (each such period being herein called a "Renewal Period" and collectively, "Renewal Periods") upon the same terms and conditions as are herein set forth, except that the Fixed Rent during such Renewal Periods shall be as set forth in Section 1 hereof. If Tenant elects to exercise one or more of said Renewal Options, it shall do so by giving notice of such election to Landlord at any time during the Term (including any Renewal Period) on or before the date which is one hundred eighty (180) days before the beginning of the Renewal Period or Renewal Periods for which the Term hereof is to be extended by the exercise of such Renewal Option or Renewal Options.

(b)  In order to prevent the inadvertent failure of Tenant to exercise any of the Renewal Options within the time specified above, it is agreed that Landlord may not terminate this Lease, and the Term of this Lease shall not expire, until and unless Landlord notifies Tenant in writing and indicates that the Renewal Option to extend or to further extend, as the case may be, has not been exercised (which notification shall not be sent prior to the date which is one hundred eighty (180) days before the beginning of the Renewal Period to which it relates). Tenant's Renewal Option, in each instance, shall continue for a period of fifteen (15) days after receipt of such notice from Landlord; but if Tenant does not send written notice of the exercise of such Renewal Option to Landlord within said fifteen (15) day period, Tenant's Renewal Option shall thereafter terminate. If Landlord fails to give Tenant such notice prior to the expiration of the original Term or of any extended Term, as the case may be, and if Tenant shall remain in possession of the Premises after the expiration of the then current Term, then Tenant shall remain in possession as a tenant from month to month, subject to the provisions of this Lease insofar as the same may be made applicable to a tenant from month to month, but without the application of Section 40 above. If Landlord then gives Tenant such notice and

Tenant exercises its Renewal Option, then the effective date of such exercise shall be retroactive to the expiration date of the original Term or of the previously extended Term, whichever is appropriate.

SECTION 47.    <u>GOVERNING LAW</u>.    This Lease shall be governed by, construed, and enforced in accordance with the laws of the State in which the Premises are located.

SECTION 48.    <u>ATTORNEYS' FEES</u>.    In any action or proceeding hereunder, the prevailing party shall be entitled to recover from the other party, the prevailing party's reasonable costs and expenses in such action or proceeding, including reasonable attorneys' fees, costs and expenses.    If either party is sued by a third party as a result of a violation of a covenant or warranty herein contained by the other party hereto, then the party who has violated the covenant or warranty shall be responsible for the reasonable costs and expenses in such action or proceeding against the non-violating party, including reasonable attorneys' fees, costs and expenses.

SECTION 49.    <u>PAYMENT UNDER PROTEST</u>.    If at any time a dispute shall arise as to any amount or sum of money to be paid by one party to the other party under the provisions hereof, the party against whom the obligation to pay the money is asserted shall have the right to make payment "under protest", which payment shall not be regarded as voluntary payment, and there shall survive the right on the part of such party to institute suit for recovery of such sum.    If it shall be adjudged that there was no legal obligation on the part of such party to pay such sum or any part thereof, such party shall be entitled to recovery from the other party such sum or so much thereof as it was not legally required to pay under the provisions of this Lease.

SECTION 50.    <u>WORK PERFORMED UNDER PROTEST</u>.    If at any time a dispute shall arise between the parties hereto as to any work to be performed by either of them under the provisions hereof, the party against whom the obligation to perform the work is asserted may perform such work and pay the cost thereof "under protest", performance of such work in no event to be regarded as a voluntary

performance, and there shall survive the right on the part of such party to institute suit for recovery of the cost of such work. If it shall be adjudged that there was no legal obligation on the part of such party to perform such work or any part thereof, such party shall be entitled to recover from the other party the cost of such work or the cost of so much thereof as such party was not legally required to perform under the provisions of this Lease.

SECTION 51.    DISCONTINUANCE    OF    BUSINESS    OPERATIONS. Notwithstanding any other provisions of this Lease, Tenant shall have the right, at any time after the initial opening of the Premises to the public for business to discontinue the operations of its business in the Premises, and Tenant shall not thereby incur any additional liability to Landlord [it being understood and agreed that (i) all of Tenant's obligations under this Lease (except for any obligations of Tenant to operate its business in the Premises) shall continue unless this Lease is terminated pursuant, inter alia, to the provisions of this Section 51 or any other Sections of this Lease (other than Section 18), and (ii) such discontinuance of the operations of its business shall not include periods of time (hereinafter "Excused Periods") during which such discontinuance (w) resulted from alterations or renovations being performed in and to the Premises, (x) was caused by damage or destruction, eminent domain proceedings or actions, or Force Majeure, (y) occurred during the course of diligent good-faith efforts by Tenant to assign Tenant's interest in this Lease or to sublease all or any portion of the Premises [which period shall not exceed one hundred eighty (180) days], or (z) was caused by any act or omission of Landlord]. Should Tenant do so, however, it shall give Landlord notice in writing of such discontinuance at least sixty (60) days prior to the date on which Tenant proposes to discontinue its operations (hereinafter called the "Closing Date"). In such event Landlord shall have the option, to be exercised by written notice to Tenant given at any time after the date on which Landlord receives Tenant's notice, to cancel and terminate this Lease, in which event, this Lease shall terminate upon the date which is thirty (30) days after the last to occur of (a) the date

on which Tenant receives Landlord's termination notice; or (b) the Closing Date, as if such date was originally set forth herein as the expiration date of the Term and Landlord and Tenant shall upon such termination be released from any and all liabilities thereafter accruing hereunder. Notwithstanding any such notice of discontinuation given by Tenant to Landlord, if at the time Landlord may give Tenant a notice of termination, Tenant has not discontinued the operation of its business in the Premises, Tenant shall have the right within ten (10) days after receipt of the termination notice from Landlord to give Landlord notice (hereinafter called the "Cessation Recision Notice") of its recision of its notice of discontinuance and upon receipt of the Cessation Recision Notice by Landlord, the termination notice previously given by Landlord shall be deemed null and void and Tenant shall not have the right to discontinue the operations of its business in the Premises, but the giving of a Cessation Recision Notice by Tenant shall not prejudice its right to thereafter give Landlord another notice of discontinuance.

SECTION 52.    ABATEMENT OF RENT CHARGES. Notwithstanding any other provisions of this Lease, if the Fixed Rent and Additional Rent payable by Tenant hereunder shall be abated pursuant to Sections 21 or 22 above, such abatement shall terminate upon the first to occur of: (a) the date on which Tenant shall reopen the Premises to the public for business; or (b) the expiration of the period which is sixty (60) days after Landlord shall have completed such repairs and restoration work as Landlord is obligated to perform hereunder and the interference with the operation of business in the Premises has ceased; provided, however, that if said sixty (60) day period shall terminate during the period between October 1 and March 31 of any year, then termination of said sixty (60) day period shall be extended until the next April 1, unless Tenant reopens for business within said period.

SECTION 53.    WARRANTIES AND REPRESENTATIONS.

(a)    To induce Tenant to execute this Lease, and in consideration thereof, Landlord warrants and represents to Tenant as follows:

(i) As of the date hereof, Landlord has good and indefeasible fee simple title to the entire Shopping Center free and clear of all easements, restrictions, liens and encumbrances, except the Permitted Encumbrances described on <u>Exhibit E</u>;

(ii) Tenant's use of the Premises for sale of Permitted Items will not violate any exclusive provision granted to any other tenant or tenants in the Shopping Center;

(iii) On the Delivery Date, the Shopping Center shall have access to Southwest Freeway and Fountain Lake Drive and Fountain Lake Circle for the purpose of vehicular traffic;

(iv) To the best of Landlord's knowledge and belief, no portion of the Shopping Center (including, without limitation, the Premises) contains any hazardous substances or wastes (including, without limitation, asbestos) in violation of applicable law. Landlord shall, at its sole cost and expense, cause the Shopping Center to comply with all environmental laws and regulations applicable to the Shopping Center and the uses made thereof, including, without limitation, laws and regulations relating to hazardous substances and wastes; provided, however, that the provisions of this subsection 53.(a)(iv) shall not apply to any environmental laws and regulations applicable to Tenant's specific use of the Premises (as opposed to general retail use of the Premises), to the manner in which Tenant conducts its business in the Premises, or to any acts or omission of Tenant, all of which shall be remedied by Tenant at its sole cost and expense. At Tenant's request, Landlord shall provide Tenant with a copy of any environmental report prepared for the Shopping Center;

(v) Except as required by law, Landlord (A) shall not reveal to anyone the Term of this Lease or the economic or other business terms of this Lease (including, without limitation, the amount of Fixed Rent set forth herein), and (B) shall use all commercially reasonable efforts to cause any broker retained by Landlord involved with this Lease to abide by the confidentiality requirement described in (A) above; <u>provided, however</u>, that nothing contained herein shall restrict Landlord from disclosing such information to its accountants, attorneys, agents or other



consultants, any bona-fide prospective purchasers of the Shopping Center or any current or prospective mortgagees or underlying lessors of all or any portion of Landlord's interest in the Shopping Center;

(vi) This Lease does not violate the provisions of any instrument heretofore executed and binding on Landlord; and

(vii)          Landlord shall not cause or permit any hazardous material to be generated, produced, brought upon, used, stored, treated, discharged, released, spilled or disposed of in violation of applicable law on, in, under or about the Premises or other portions of the Shopping Center.   The term "hazardous material" shall have the same meaning as is set forth in Section 53.(b) below.   Without limiting the generality of any other provisions of this Lease, Landlord shall indemnify, defend and hold Tenant harmless from and against any and all actions (including, without limitation, remedial or enforcement actions of any kind, administrative or judicial proceedings, and orders or judgments arising out of or resulting therefrom), costs, claims, damages (including, without limitation, fines, penalties and punitive damages), expenses (including, without limitation, attorneys', consultants' and experts' fees, court costs and settlement payments), fines, forfeitures or other civil, administrative or criminal penalties, injunctive or other relief, liabilities or losses arising from a breach of this prohibition by Landlord, its affiliates, agents, employees or contractors.   Upon receipt of any relevant information, Landlord immediately shall notify Tenant of (A) any spill, release, discharge or disposal of any hazardous material in, on or under the Premises or the Shopping Center, (B) any enforcement, clean-up, removal or other governmental or regulatory action instituted, contemplated or threatened in connection with any hazardous materials relating to the Premises or the Shopping Center, (C) any claim made or threatened against Landlord, the Premises or the Shopping Center relating to hazardous materials, and (D) any reports made to any governmental agency or entity arising out of or in connection with any hazardous materials in, on, under or about, or removed from, the Premises or the

Shopping Center. The obligations and liabilities of Landlord under this subsection 53.(a)(vii) shall survive the expiration or earlier termination of this Lease.

(b)   To induce Landlord to execute this Lease, and in consideration thereof, Tenant warrants and represents to Landlord that Tenant shall not cause or permit any hazardous material to be generated, produced, brought upon, used, stored, treated, discharged, released, spilled or disposed of in violation of applicable law on, in, under or about the Premises or other portions of the Shopping Center. The term "hazardous material" means any flammable items, explosives, radioactive materials, hazardous or toxic substances, materials or wastes or related materials, including any substances defined as or included in the definition of "hazardous substances", "hazardous wastes", "infectious wastes", "hazardous materials" or "toxic substances" now or subsequently regulated under any federal, state or local laws, regulations or ordinances including, without limitation, oil, petroleum-based products, paints, solvents, lead, printing inks, or any products or materials which now have, or subsequently are found to have, adverse effects on the environment or the health and safety of persons. Without limiting the generality of any other provisions of this Lease, Tenant shall indemnify, defend and hold Landlord harmless from and against any and all actions (including, without limitation, remedial or enforcement actions of any kind, administrative or judicial proceedings, and orders or judgments arising out of or resulting therefrom), costs, claims, damages (including, without limitation, fines, penalties and punitive damages), expenses (including, without limitation, attorneys', consultants' and experts' fees, court costs and settlement payments), fines, forfeitures or other civil, administrative or criminal penalties, injunctive or other relief, liabilities or losses arising from a breach of this prohibition by Tenant, its affiliates, agents, employees or contractors. Upon receipt of any relevant information, Tenant immediately shall notify Landlord of (i) any spill, release, discharge or disposal of any hazardous material in, on or under the Premises or the Shopping Center, (ii)

any enforcement, clean-up, removal or other governmental or regulatory action instituted, contemplated or threatened in connection with any hazardous materials relating to the Premises or the Shopping Center, (iii) any claim made or threatened against Tenant, the Premises or the Shopping Center relating to hazardous materials, and (iv) any reports made to any governmental agency or entity arising out of or in connection with any hazardous materials in, on, under or about, or removed from, the Premises or the Shopping Center. The obligations and liabilities of Tenant under this Section 53.(b) shall survive the expiration or earlier termination of this Lease.

SECTION 54.    ARBITRATION.

(a)    In any case where this Lease expressly provides for submission of a dispute or matter to arbitration (but not otherwise), the same shall be settled by arbitration in Houston, Texas, before one arbitrator in accordance with the procedural rules then obtaining of the American Arbitration Association or any successor thereto. The decision of the arbitrator shall be final, conclusive and binding on the parties, but the powers of the arbitrator are hereby expressly limited to the determination of factual issues, and the arbitrator shall have no power to reform, supplement or modify this Lease. The arbitrator shall make only required findings of fact incident to an arbitrable dispute, which findings shall be set forth in reasonable detail in a written decision by the arbitrator.

(b)    Landlord and Tenant shall share equally in the cost and expenses of such arbitration, and each shall separately pay its own attorneys' fees and expenses, unless the arbitrator finds that one of the parties did not act in good faith in connection with the dispute or the conduct of the arbitration proceeding, in which case the arbitrator may award all or part of said costs, expenses and fees to the other party.

SECTION 55.    LIENS. Within thirty (30) days after notice of the filing thereof, Tenant shall discharge (either by payment or by filing of the necessary bond, or otherwise) any lien against the Premises and/or Landlord's interest therein, which may arise out of

any payment due for, or purported to be due for, any labor, services, materials, supplies or equipment alleged to have been furnished to or for Tenant in, upon or about the Premises. Nothing herein shall constitute Landlord's consent to the grant or perfection of any lien against the Premises by Tenant.

SECTION 56.   **DEFINITION OF HEREUNDER, HEREIN, ETC.**   Unless the context clearly indicates to the contrary, the words "herein," "hereof," "hereunder," "hereafter," and words of similar import refer to this Lease and all the Exhibits attached hereto as a whole and not to any particular section or paragraph hereof.

SECTION 57.   **TENANT'S FIXTURES**.

(a)   All of "Tenant's Property" (which is defined as all of Tenant's personal property, including, without limitation, phone and alarm systems, satellite antennae, shelving, cash registers, computers, furniture, cash registers and customer service counters, specialty lighting, conveyor systems, storage racks and signage and any and all other personal property of Tenant which is capable of being removed from the Premises without substantial damage thereto, but which shall not include electrical systems, HVAC and other mechanical systems, flooring, carpet, elevators, standard lighting and wiring installed within the walls of the Premises), which may be installed or placed in or upon the Premises by Tenant shall remain the property of Tenant.   Landlord waives any right it may have in Tenant's Property.   Tenant may assign, lien, encumber, mortgage or create a security interest in or upon Tenant's Property in the Premises without the consent of Landlord and may remove Tenant's Property at any time during the Term.   Upon the request of Tenant, Landlord agrees to provide Tenant, within ten (10) days of such request, a written waiver in form reasonably satisfactory to Tenant evidencing Landlord's waiver of any rights it has or may have in Tenant's Property.

(b)   To the extent Landlord may have a lien on or security interest in the Tenant's Property pursuant to this Lease, by law or otherwise, Landlord hereby waives and agrees not to assert such lien or security interest.

(c)  Upon the expiration or earlier termination of this
Lease, Tenant shall have the right (but not the obligation, except
as otherwise specifically provided herein) to remove from the
Premises all or any part of Tenant's Property.  Tenant shall repair
any substantial damage to the Premises caused by its removal of any
Tenant's Property in accordance with this Section 57.

SECTION 58.  **TENANT'S RIGHT OF FIRST OFFER**. Provided Tenant
is not in default pursuant to any of the terms and conditions of
this Lease (beyond any applicable notice and grace periods), Tenant
shall have continuing rights of first offer to lease additional
space in the Shopping Center which is contiguous to the Premises
and which may become available on and after the date which is one
(1) year from the Rent Commencement Date.  At such time that
Landlord has knowledge that such space ("Offered Space") is or will
become available, Landlord shall use reasonable efforts to give
Tenant notice (the "Offering Notice") of the terms and conditions
Landlord would be willing to accept with respect to the Offered
Space (including, without limitation, the proposed rent, additional
rent, scope of Landlord's proposed tenant improvements, location
and Floor Area), and Tenant shall have thirty (30) days within
which to respond to Landlord's offer.  In the event Tenant elects
to accept Landlord's offer, then Tenant shall notify Landlord of
such election by giving notice to Landlord during such thirty (30)
day period and Landlord and Tenant shall thereupon enter into an
amendment to this Lease for the leasing of the Offered Space, which
amendment shall contain (i) the terms and conditions set forth in
the Offering Notice, (ii) provide that the term thereunder shall
expire or sooner terminate contemporaneously with the expiration or
sooner termination of the Term hereof (subject to extension in
accordance with Section 46), and (iii) contain such other terms and
provisions as either Landlord or Tenant may reasonably require in
order to effectuate the incorporation of the Offered Space into the
Premises and to otherwise effectuate the intent of this Section 58.
Should Tenant decline Landlord's offer or fail to respond thereto,
then, and in such event, Tenant shall have been deemed to have
waived any prospective rights of first offer to the Offered Space

[but Tenant shall not lose any prospective rights of first offer with respect to any space (including, without limitation, the Offered Space) which may in the future become vacant and available], and Landlord may lease the Offered Space to any other party upon substantially the same terms and conditions as that offered to Tenant, provided that such lease is executed prior to the date which is six (6) months after Tenant has declined (or has been deemed to have waived) Landlord's offer with respect to the Offered Space. The term "substantially", as used herein, shall mean terms not materially different or a rent of not more than five (5%) percent below the rent requested by Landlord of Tenant. Any dispute between the parties with respect to this Section 58 (including, without limitation, any dispute as to the provisions of the amendment described in this Section 58) shall be determined by arbitration in accordance with the provisions of Section 54 above.

SECTION 59.   **LIMITATION OF TENANT'S LIABILITY**.   Landlord acknowledges that Tenant is now and shall remain a so-called "shell corporation" and has not now and will not at any time in the future have any assets or retain any earnings, and that the operations of Tenant's business may be conducted by the Parent Corporation or any entity controlling, controlled by or under common control with Parent Corporation in accordance with the provisions of Section 25.(g) above, which may also own all or a part of the fixtures, equipment and inventory in the Premises. The obligations of Tenant under this Lease have been guaranteed by Parent Corporation pursuant to a certain Guaranty executed by Parent Corporation contemporaneously herewith. In no event shall Landlord seek to pierce the corporate veil of Tenant in an attempt to hold the Parent Corporation liable for Tenant's obligations under this Lease, and Landlord agrees that it and its successors and assigns shall look solely to the assets, if any, of Tenant and its successors and assigns and the assets of Parent Corporation under the terms of the Guaranty, for the satisfaction of any claim arising from or under this Lease and shall not seek to impose personal liability on any shareholder, officer, director or employee of Tenant, the Parent Corporation or any of their

respective affiliates, subsidiaries or, related companies, or of their respective successors and assigns.

SECTION 60.    TENANT'S RIGHT OF TERMINATION. If, at any time during the Term of this Lease less than fifty (50%) percent of the total Floor Area of all buildings in the Shopping Center (excluding the Premises) is open and being operated for retail purposes for a period of one hundred eighty (180) days or more, then in such event Tenant shall, upon giving Landlord thirty (30) days prior notice, have the right to discontinue the payment of Fixed Rent hereunder and, in lieu thereof, pay only Percentage Rent [except that for the purposes of this Section 60, (i) the Sales Break Point shall be deemed to be One ($1.00) Dollar, and (ii) in no event shall the aggregate Percentage Rent payable to Landlord pursuant to this Section 60 exceed the amount which the Fixed Rent would otherwise have been payable] and Tenant's Pro Rata Share of Taxes and Common Areas Charges hereunder, until the earlier of (A) one (1) year from the date Tenant exercised its rights under this Section 60, and (B) the date Landlord has remedied the situation. For purposes of the immediately preceding sentence, Landlord shall be deemed to have remedied the situation by replacing tenants in the Shopping Center with Substitute Tenants (as hereinafter defined) who open their premises to the public for business so that more than fifty (50%) percent of the total Floor Area of all buildings in the Shopping Center is open and being operated for retail purposes. "Substitute Tenants" as used herein, shall mean tenants of reasonable reputation and retail experience occupying space in the Shopping Center pursuant to a written lease with a term of not less than five (5) years. A Substitute Tenant may not be a so-called "seasonal tenant." If, after such one (1) year period, the situation giving rise to Tenant's rights hereunder is not remedied, then Tenant shall have the right, to be exercised within ninety (90) days after the expiration of such one (1) year period, to terminate this Lease. If this Lease is not terminated as aforesaid, then Tenant shall resume paying Fixed Rent in accordance with the terms of this Lease.

SECTION 61.   **SURVIVAL OF OBLIGATIONS**.  The obligation to pay any sums due to either party from the other that by the terms herein would not be payable, or are incapable of calculation, until after the expiration or sooner termination of this Lease shall survive and remain a continuing obligation until paid.

SECTION 62.   **EXECUTION OF THIS LEASE**.  Tenant and Landlord each warrant and represent that the parties signing this Lease on behalf of each has authority to enter into this Lease and to bind Tenant and Landlord, respectively, to the terms, covenants and conditions contained herein.

SECTION 63.   **NO SECURITY**.  Tenant agrees that Tenant shall be responsible for security of the interior of the Premises, and for security of Tenant's agents, employees, contractors, invitees, customers, visitors and all other persons in the Premises. Landlord will not be obligated to provide security personnel or any other security for the interior of the Premises or for the Shopping Center.  If Landlord, in its reasonable discretion, elects to provide security for the Shopping Center, although Landlord is under no obligation to do so, the costs associated with same shall be Common Areas Charges to the extent all tenant's are benefitted by such security.

SECTION 64.   **COVENANT TO OPEN FOR BUSINESS.**  Notwithstanding any other provision of this Lease (except Force Majeure), Tenant agrees to initially open for business in the Premises on or before the date which is one hundred eighty (180) days after the Delivery Date; provided, however, if the Delivery Date occurs on or before September 30, 1996, then Tenant agrees to initially open for business in the Premises on or before December 1, 1996.

**IN WITNESS WHEREOF**, the parties hereto have executed this Lease as of the day and year first above written.

ATTEST:

FOUNTAINS PROPERTIES LIMITED
By: Fountains Properties GP,
Inc., a Texas corporation, its
sole general partner (Landlord)

By: _____
Name: Thomas J. Gordon
Title: Vice President

ATTEST:

STAFFORD BED BATH & BEYOND INC.
(Tenant)

By: _____,
Name: Leonard Feinstein
Title: Vice President and
       Secretary

## PROPERTY DESCRIPTION
## THE FOUNTAINS SHOPPING CENTER

All of Unrestricted Reserves "F", "I" and "J" of The Fountains
Section One, a subdivision of Stafford, Fort Bend County, Texas,
according to the map or plat thereof recorded on February 14, 1996,
in Film Code Number 1453B, 1454 A, 1455 A & B of the Map Records of
Fort Bend County, Texas.

**EXHIBIT B**

**Site Plan**

## EXHIBIT C

## RENT COMMENCEMENT AND EXPIRATION DATE AGREEMENT

THIS AGREEMENT, made as of this ___ day of _____ 199_, by and between FOUNTAINS PROPERTIES LIMITED, a Texas limited partnership, having an address of 2401 Fountainview, Suite 350, Houston, Texas 77057, (hereinafter called "Landlord"), and STAFFORD BED BATH & BEYOND INC., a Texas corporation, having an address at 715 Morris Avenue, Springfield, New Jersey 07081 (hereinafter called "Tenant").

## W I T N E S S E T H:

WHEREAS, Landlord is the owner of a Shopping Center situated in Houston, Texas, commonly known as The Fountains On The Lake; and

WHEREAS, by that certain lease dated _____, 1996 (herein called the "Lease"), Landlord leased a portion (the "Premises") of the Shopping Center to Tenant; and

WHEREAS, Tenant is in possession of the Premises and the term of the Lease has commenced; and

WHEREAS, under Section 1(l) of the Lease, Landlord and Tenant agreed to enter into an agreement setting forth certain information in respect of the Premises and the Lease;

NOW, THEREFORE, Landlord and Tenant agree as follows:

1. The Rent Commencement Date (as such term is defined in the Lease) was _____, 199_.

2. The term of the Lease shall expire on January 31, 20__, unless Tenant exercises any option to extend the term of the Lease or unless the Lease terminates earlier as provided in the Lease.

3. The date of commencement of the first Renewal Period (as such term is defined in the Lease shall be February 1, 20__, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the term of the Lease shall expire on January 31, 20__, unless Tenant exercises any option to further extend the term of the Lease or the Lease terminates earlier as provided in the Lease.

4. The date of commencement of the second Renewal Period (as such term is defined in the Lease) shall be February 1, 20__, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the term of the Lease shall expire on January 31 20__, unless Tenant exercises any option to further extend the term of the Lease or the Lease terminates earlier as provided in the Lease.

5. The date of commencement of the third Renewal Period (as such term is defined in the Lease) shall be February 1, 20__, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the term of the Lease shall expire on January 31 20__, unless the Lease terminates earlier as provided in the Lease.

6. Capitalized terms not defined herein shall have the meaning set forth in the Lease.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed the date and year first above written.

FOUNTAINS PROPERTIES LIMITED (Landlord)
By: Fountains Properties GP Inc.,
    general partner

By: _____
Name: _____
Title: _____

STAFFORD BED BATH & BEYOND INC.

By: _____
Name:    Warren Eisenberg
Title:   President