**EXHIBIT "B"**

# LEASE

## ROSS DRESS FOR LESS, INC.

## FOUNTAINS ON THE LAKE
## STAFFORD, TEXAS

### TABLE OF CONTENTS

1. **SALIENT LEASE TERMS** .................................................................................... 1
   1.1.    Effective Date. ............................................................................................ 1
   1.2.    Parties/Addresses. ..................................................................................... 1
   1.3.    Location Information. ............................................................................... 2
   1.4.    Critical Dates. ........................................................................................... 2
   1.5.    Lease Term. ............................................................................................... 3
   1.6.    Minimum Rent. ......................................................................................... 3
   1.7.    Required Co-Tenancy. ............................................................................. 4
   1.8.    Common Area Charge Administrative Fee. ........................................... 4
   1.9.    Title Report. .............................................................................................. 5
   1.10.   Contents of Lease. .................................................................................... 5

2. **DEFINITIONS OF GENERAL APPLICATION** .............................................. 6

3. **GRANTS OF LEASE, COMMON AREA USE, EASEMENTS AND ACCESS** ....... 14
   3.1.    Lease. ....................................................................................................... 14
   3.2.    Nature of the Shopping Center. ............................................................. 14
   3.3.    Grant of Common Area Use. .................................................................. 16
   3.4.    Grant of Utility Easements. .................................................................... 17
   3.5.    Utility Rooms. ......................................................................................... 17
   3.6.    Site Plan or Shopping Center Alterations. ........................................... 17
   3.7.    Dimensions. ............................................................................................. 18
   3.8.    Effect of REA. ......................................................................................... 19

4. **LEASE TERM** ..................................................................................................... 20
   4.1.    Term. ........................................................................................................ 20
   4.2.    Commencement Date. ............................................................................. 20
   4.3.    Acknowledgment of Commencement. .................................................. 20
   4.4.    Option Periods. ....................................................................................... 20

5. **CONSTRUCTION AND ACCEPTANCE** ......................................................... 21
   5.1.    Landlord's Construction Obligations. ................................................... 21
   5.2.    Construction Commencement. ............................................................... 22
   5.3.    Completion of Construction. .................................................................. 22
   5.4.    Construction Completion Notice. .......................................................... 22
   5.5.    Rollover. ................................................................................................... 24
   5.6.    Remedies Cumulative. ............................................................................ 24

Store No. 1610, "Stafford"
Fountains on the Lake
Stafford, TX
9320.1610.4

- i -

11/01/12
FINAL

| | 5.7. | Construction Completion Cancel Date. | 24 |
|---|---|---|---|
| | 5.8. | Automatic Termination. | 24 |
| | 5.9. | Entry Prior to Delivery Date. | 24 |
| | 5.10. | Walk-Through Inspection and Punchlist. | 25 |
| | 5.11. | Intentionally Deleted. | 25 |
| | 5.12. | Additional Delivery Requirements. | 25 |
| **6.** | **RENT** | | **26** |
| | 6.1. | Minimum Rent. | 26 |
| | 6.2. | Reimbursements. | 29 |
| | 6.3. | Other Payment Provisions. | 29 |
| | 6.4. | Gross Sales Statement for Purposes of Calculating Substitute Rent. | 30 |
| **7.** | **COMMON AREA MAINTENANCE** | | **30** |
| | 7.1. | Landlord's Obligation to Maintain Common Areas. | 30 |
| | 7.2. | Tenant's Pro Rata Share. | 31 |
| | 7.3. | Definition of Common Area Charges. | 31 |
| | 7.4. | Payment of Tenant's Pro Rata Share. | 34 |
| **8.** | **REAL ESTATE TAXES AND ASSESSMENTS** | | **38** |
| | 8.1. | Obligation to Pay. | 38 |
| | 8.2. | Tenant's Pro Rata Share. | 38 |
| | 8.3. | Exclusions. | 40 |
| | 8.4. | Rebates. | 40 |
| | 8.5. | Contest. | 41 |
| | 8.6. | Separate Assessment. | 41 |
| **9.** | **INSURANCE** | | **41** |
| | 9.1. | Property Insurance. | 41 |
| | 9.2. | Liability Insurance. | 43 |
| | 9.3. | Evidence of Insurance. | 43 |
| | 9.4. | Waiver of Subrogation. | 44 |
| | 9.5. | Tenant's Right to Self-Insure. | 44 |
| **10.** | **UTILITIES SERVICES** | | **45** |
| **11.** | **MAINTENANCE/REPAIR/ENVIRONMENTAL COMPLIANCE** | | **46** |
| | 11.1. | Maintenance and Repair by Tenant. | 46 |
| | 11.2. | Maintenance and Repair by Landlord. | 46 |
| | 11.3. | Repairs Required by Governmental Authorities. | 48 |
| | 11.4. | Hazardous Material. | 48 |
| **12.** | **ALTERATIONS** | | **51** |
| | 12.1. | Permitted Alterations. | 51 |
| | 12.2. | Communication Equipment. | 52 |

**13. NON-DISTURBANCE AND SUBORDINATION/ ESTOPPEL CERTIFICATES52**
13.1. Non-Disturbance and Subordination. ................................................................. 52
13.2. Estoppel Certificates. ........................................................................................ 53
13.3. Processing Fees for Non-Disturbance Agreements and Estoppel Certificates. ......... 53

**14. INDEMNIFICATION** ................................................................................................ **53**
14.1. Tenant Indemnity. ............................................................................................. 53
14.2. Landlord Indemnity. .......................................................................................... 54

**15. USE** ........................................................................................................................... **54**
15.1. Tenant's Business. ............................................................................................. 54
15.2. Operation. ......................................................................................................... 54
15.3. Protection. ........................................................................................................ 54
15.4. Exclusive Uses. ................................................................................................. 56
15.5. Other Exclusives Not Binding on Tenant. .......................................................... 56

**16. SURRENDER** ......................................................................................................... **56**
16.1. Condition of Premises. ...................................................................................... 56
16.2. Continuance of Possession. ............................................................................... 56

**17. LANDLORD'S COVENANTS** ................................................................................ **57**
17.1. Landlord's Warranty. ......................................................................................... 57
17.2. Landlord's Title. ................................................................................................ 57
17.3. Remedies. .......................................................................................................... 57

**18. QUIET ENJOYMENT** ............................................................................................ **58**

**19. ASSIGNMENT/SUBLETTING** .............................................................................. **58**
19.1. General. ............................................................................................................ 58
19.2. Related Entity. ................................................................................................... 58
19.3. Stock. ................................................................................................................ 58
19.4. Release of Liability. ........................................................................................... 58
19.5. Landlord Notice to Assignee. ............................................................................. 59
19.6. Restriction on Landlord's Right to Assign. .......................................................... 59

**20. DEFAULTS/DISPUTE RESOLUTION/ATTORNEYS' FEES** ............................. **59**
20.1. Defaults. ........................................................................................................... 59
20.2. Alternative Dispute Resolution Process. ............................................................. 61
20.3. Unlawful Detainer. ............................................................................................ 62
20.4. Attorneys' Fees. ................................................................................................ 62

**21. CASUALTY** ............................................................................................................. **63**
21.1. Definitions. ....................................................................................................... 63
21.2. Insured Casualty. ............................................................................................... 63
21.3. Uninsured Casualty. ........................................................................................... 64
21.4. End of Term Casualty. ........................................................................................ 64
21.5. Shopping Center Casualty. ................................................................................. 65

1    21.6.    Insurance Proceeds. ....................................................................................... 65
2    21.7.    Tenant Repair. ............................................................................................... 65
3    21.8.    Waiver of Statute. .......................................................................................... 66
4    21.9.    Laws. ............................................................................................................. 66
5    21.10.  Tolling of Term. ............................................................................................ 66
6    21.11.  Effect of Termination. ................................................................................... 67
7    21.12.  Tenant's Right of First Offer. ........................................................................ 67

8    **22. CONDEMNATION** ...................................................................................... **67**
9    22.1.    Taking. .......................................................................................................... 67
10   22.2.    Right to Terminate. ....................................................................................... 68
11   22.3.    Claims. ........................................................................................................... 68
12   22.4.    Waiver. ........................................................................................................... 68

13   **23. MECHANIC'S LIENS.** ................................................................................. **69**

14   **24. SIGNS.** ............................................................................................................ **69**
15   24.1.    Governmental Approval and Compliance. ..................................................... 69
16   24.2.    Building Signs. ............................................................................................... 69
17   24.3.    Pylon or Monument or Directional Signs. ..................................................... 70
18   24.4.    Temporary Signs. ........................................................................................... 70
19   24.5.    Visibility of Tenant's Store and Signs. ......................................................... 70

20   **25. NOTICE** ......................................................................................................... **70**

21   **26. GENERAL CONDITIONS** ........................................................................... **71**
22   26.1.    Partial Invalidity. ........................................................................................... 71
23   26.2.    Relationship of Parties. .................................................................................. 71
24   26.3.    Time. .............................................................................................................. 71
25   26.4.    Waiver. ........................................................................................................... 71
26   26.5.    Partial Months. ............................................................................................... 72
27   26.6.    Consent. .......................................................................................................... 72
28   26.7.    Intentionally Deleted. ..................................................................................... 72
29   26.8.    Governing Law. .............................................................................................. 72
30   26.9.    Due Authority. ............................................................................................... 72
31   26.10.  No Prior Agreements. ..................................................................................... 72
32   26.11.  Entry by Landlord. ......................................................................................... 72
33   26.12.  Neutral Interpretation. ................................................................................... 73
34   26.13.  Force Majeure. ............................................................................................... 73
35   26.14.  Successors in Interest. .................................................................................... 73
36   26.15.  Memorandum of Lease. .................................................................................. 73
37   26.16.  Real Estate Brokers. ....................................................................................... 73
38   26.17.  Confidentiality Agreement. ............................................................................ 74
39

1   **THIS LEASE** (the "Lease") is made as of the Effective Date by and between Landlord and
2   Tenant who are designated in Section 1.2 hereof.  Landlord and Tenant hereby agree as follows:

3                                **1.  SALIENT LEASE TERMS**

4   **1.1.    Effective Date.**

5   *December 5*_____, 2012.

6   **1.2.    Parties/Addresses.**

| 7 | **1.2.1.** | Landlord: | **FOUNTAINS DUNHILL, LLC** |
| 8 | | | a Delaware limited liability company |
| 9 | | | |
| 10 | | Address: | 3100 Monticello Avenue, Suite 300 |
| 11 | | | Dallas, TX  75205 |
| 12 | | | |
| 13 | | Facsimile #: | (214) 373-7535 |
| 14 | | Phone #: | (214) 373-7500 |

15                    Initial Contact Name:      Andy Crosland or Tim Denker

16                    Landlord's Taxpayer I.D. #: 06-1831644

17   **1.2.2.    Tenant:  ROSS DRESS FOR LESS, INC.,**
18                              a Virginia corporation

19   (a)    **Address for all invoices for Rent and Reimbursements due under this**
20          **Lease, and change of Landlord or Payee, or change of Landlord's or**
21          **Payee's address:**

| 22 | | Address: | 4440 Rosewood Drive |
| 23 | | | Mail Stop PL4 4E 3 |
| 24 | | City/State/Zip: | Pleasanton, CA  94588-3050 |
| 25 | | Attention: | **Property Management Department** |
| 26 | | Facsimile #: | (925) 965-4865 |
| 27 | | Phone #: | (925) 965-4400 |

28   (b)    **Address for all notices (other than invoices), including notices of**
29          **default and notices pertaining to disputed invoices:**

| 30 | | Address: | 4440 Rosewood Drive |
| 31 | | | Mail Stop PL4 4E 2 |
| 32 | | City/State/Zip: | Pleasanton, CA  94588-3050 |
| 33 | | Attention: | **Real Estate Law Department** |
| 34 | | Facsimile #: | (925) 965-4174 |
| 35 | | Phone #: | (925) 965-4400 |

1            (c)     Initial Contact Name: Jac Gee

2            (d)     Tenant's Taxpayer I.D. #: 20-0594333

3 **1.3.  Location Information.**

4     **1.3.1.**    Shopping Center Name:    Fountains on the Lake

5                 Location:    Southwest corner of US Highway 59 and Fountain Lake Drive
6                                  Stafford, Fort Bend County, Texas
7

8     **1.3.2.**    Minimum Leasable Floor Area for Pro Rata Share Denominator and
9 Co-Tenancy Denominator:

10            (a)     Common Area Charges:    589,201 square feet.
11                                                      (Section 7.2.1)

12            (b)     Taxes:    589,201 square feet.
13                                                        (Section 8.2.3)

14            (c)     Property Insurance:    589,201 square feet.
15                                                        (Section 9.1.4)

16            (d)     Co-Tenancy:    564,170 square feet.
17                                                        (Section 6.1.3)

18     The amount of square feet of Leasable Floor Area in Section 1.3.2(d) above reflects the
19 exclusion of the Store Agreed Size and the Leasable Floor Area of the buildings located on the
20 Outparcels designated on **Exhibit B** as required by Section 6.1.3(a) below.

21     **1.3.3.**    Store Agreed Size:  The Store Agreed Size is Twenty Five Thousand Thirty One
22 (25,031) square feet of Leasable Floor Area, including a minimum of One Hundred Fifty Nine (159)
23 feet of frontage on that portion of the Common Areas that contain the principal parking area for
24 Tenant's customers, subject to adjustment of the Leasable Floor Area pursuant to the provisions of
25 Section 3.7.  Tenant's Store frontage shall be linear, shall not include any indentations, and shall not
26 be set back from the storefront of adjacent tenants.  The Store Agreed Size includes the Building
27 only unless the loading dock is both enclosed and exclusive to Tenant.  The Store Agreed Size does
28 not include the pad area for Tenant's trash compactor or Tenant's trash bin enclosure area.

29 **1.4.  Critical Dates.**

30     **1.4.1.**    Tenant's obligation for Minimum Rent and Reimbursements shall commence
31 One Hundred Twenty (120) days after the Delivery Date (the "Commencement Date").
32                                                           (Section 4.2)

33     **1.4.2.**    Intended Delivery Date:  June 17, 2013.
34                                                         (Article 2)

Store No. 1610, "Stafford"                        - 2 -                        11/01/12
Fountains on the Lake                                                         FINAL
Stafford, TX
9320.1610.4

**1.4.3.**    Date of Tenant's Right to Cancel for Landlord's failure to commence construction ("Construction Commencement Cancel Date"):    January 1, 2014.

(Section 5.2)

**1.4.4.**    Date of Tenant's Right to Cancel for Landlord's failure to complete construction ("Construction Completion Cancel Date"):    August 31, 2014.

(Section 5.7)

**1.4.5.**    Automatic Termination Date:    August 31, 2015.

(Section 5.8)

**1.5.    Lease Term.**

**1.5.1.**    <u>Initial Term</u>:  From the Commencement Date through the January 31 next following the expiration of one hundred twenty (120) months after the Commencement Date.  As a hypothetical example and for illustration purposes only, if the Commencement Date is September 15, 2013, then the expiration of the Initial Term shall be January 31, 2024.

**1.5.2.**    <u>Option Periods</u>:  Total number of five (5) year Option Periods:  Four (4).

(Section 4.4)

**1.6.    Minimum Rent.**

| | | Per Sq. Ft. <u>Per Year</u> | <u>Monthly</u> | <u>Annually</u> |
|---|---|---|---|---|
| (a) | Initial Term Commencement Date through 10th Full Lease Year | $10.50 | $21,902.13 | $262,825.50 |
| (b) | Option Periods | | | |
| | First: | $11.25 | $23,466.56 | $281,598.75 |
| | Second: | $11.75 | $24,509.52 | $294,114.25 |
| | Third: | $12.25 | $25,552.48 | $306,629.75 |
| | Fourth: | $12.75 | $26,595.44 | $319,145.25 |

The Minimum Rent amounts listed above may be adjusted to reflect the actual Leasable Floor Area of the Store calculated in accordance with the provisions of Section 3.7.

Store No. 1610, "Stafford"
Fountains on the Lake
Stafford, TX
9320.1610.4

- 3 -

11/01/12
FINAL

1    **1.7.    Required Co-Tenancy.**

2        **1.7.1.**        On the Commencement Date and continuing throughout the entire Term of this
3    Lease, not less than three (3) of the following four (4) Co-Tenants ("Required Co-Tenants") shall
4    operate in no less than the Required Leasable Floor Area, in the location for such Required
5    Co-Tenant designated on **Exhibit B**, indicated as follows:

| Co-Tenant's Name | Required Leasable Floor Area (minimum sq. ft.) |
|---|---|
| Sports Authority | 55,000 |
| Bed Bath & Beyond | 30,000 |
| Hobby Lobby | 55,000 |
| SteinMart | 30,000 |

6                                                                                    (Section 6.1.3)

7        Provided that the Required Co-Tenancy set forth in Sections 1.7.1 and 1.7.2 is satisfied on
8    the Commencement Date, during the remainder of the Term, any of the Required Co-Tenants may
9    each be replaced by one (1) nationally or regionally recognized Anchor Tenant (as herein defined)
10   reasonably acceptable to Tenant, operating in no less than the Required Leasable Floor Area of the
11   Required Co-Tenant being replaced, in the same location as the Required Co-Tenant being replaced,
12   under a bona fide lease of a minimum of three (3) years' duration.  Notwithstanding the foregoing,
13   Landlord does not have the right to replace a Required Co-Tenant with an Anchor Tenant if that
14   Anchor Tenant is already operating in the Shopping Center.  An "Anchor Tenant" is a national
15   retailer with at least one hundred (100) stores or a regional retailer with at least seventy-five (75)
16   stores.  For purposes of this Section 1.7 and Section 6.1.3, a retailer and/or a retail tenant shall mean
17   a business open to the public whose principal use of its premises is the retail sale of merchandise to
18   customers within its premises, provided that a retailer or retail tenant shall specifically exclude a
19   restaurant use, a "retail service office use" (i.e., a business whose principal use of its premises is to
20   provide services to the public, such as a bank, title company, or insurance office), a use by a "High
21   Intensity Parking User," and any use which constitutes a Ross Prohibited Use or a Landlord's
22   Prohibited Use, as those terms are hereinafter defined in this Lease.

23       **1.7.2.**        Required percentage of Leasable Floor Area of the Shopping Center to be
24   occupied by operating retailers (as defined in Section 1.7.1):  Seventy percent (70%), excluding the
25   Leasable Floor Area of the Store and the Leasable Floor Area of the buildings located on the
26   Outparcels designated on **Exhibit B** from the numerator and denominator of such calculation.

27                                                                                    (Section 6.1.3)

28   **1.8.    Common Area Charge Administrative Fee.**

29       Five percent (5%).

30                                                                                    (Section 7.3)

1   **1.9.    Title Report.**

2       That certain Owner's Policy of Title Insurance dated as of January 4, 2008 issued by Chicago
3   Title Insurance Company as Policy No. 175-1025307, as updated by that certain
4   Abstractors/Nothing Further Report dated as of October 23, 2012 issued by Chicago Title
5   Insurance Company as File no. 2711001490 covering the period of January 4, 2008 through October
6   23, 2012, evidencing the state of Landlord's title to Landlord's Parcel or the Store (collectively, the
7   "Title Report").

8                                                                      (Section 17.2)

9   **1.10.    Contents of Lease.**

10      **1.10.1.**    Pages:  1 - 76

11      **1.10.2.**    Sections:  1.1 - 26.17

12      **1.10.3.**    Exhibits:

13                **A**        Legal Description of the Shopping Center

14                **B**        Site Plan

15                **C**        Construction Obligations of Landlord

16                **D**        Landlord's Prohibited Uses

17                **E**        Acknowledgment of Commencement

18                **F**        Non-Disturbance Agreement

19                **F-1**      Sublease Non-Disturbance Agreement

20                **G**        Construction Completion Notice

21                **H**        Exclusive Uses

22                **H-1**      Waiver Letter of The Sports Authority

23                **H-2**      Waiver Letter of Bed Bath & Beyond

24                **H-3**      Waiver Letter of Chair King

25                **I**        Permitted Title Exceptions

26                **J**        Tenant's Signs

27                **K**        Existing Leases

28

29

30

31

32

33

## 2. DEFINITIONS OF GENERAL APPLICATION

**Abatement Work.** See Section 11.4.3.

**Annual Statement.** See Section 7.4.5.

**Building.** The structure in which the Store is located.

**Building Envelope.** Those certain areas designated on **Exhibit B** within the boundaries of which buildings may be constructed.

**Business Days.** Business Days shall mean Mondays through Fridays excluding the following holidays: New Year's Day, Martin Luther King, Jr. Day, President's Day, Memorial Day, July 4th, Labor Day, Thanksgiving Day, the Friday following Thanksgiving Day, and Christmas. If any of the foregoing holidays falls on a Saturday, then the Friday before shall constitute the holiday and if any of the foregoing holidays falls on a Sunday, then the Monday following shall constitute the holiday.

**CAM Audit.** See Section 7.4.7.

**Casualty.** See Section 21.1.1.

**Commencement Date.** See Sections 1.4.1 and 4.2.

**Common Area(s).** Those portions of, and facilities within the Shopping Center which are intended solely for the common use of the occupants, their customers, agents, employees and suppliers, such as the parking areas, driveways, walkways, loading zones and loading areas (whether or not such loading zones or loading areas are available for common use), and landscaping, but specifically excluding the whole or any portion of any building located within the Shopping Center (however, Tenant acknowledges that the buildings in the Shopping Center shall be subject to the Rules and Regulations as set forth in Section 3.2.3). Enclosed malls are not includable for purposes of Common Area Charges hereof unless the Store has a direct customer door opening onto such mall intended for access of customers rather than emergency egress and Landlord keeps the mall open to customer access during all of Tenant's operating hours. Any area which is not enclosed by demising walls, but which is substantially used for the benefit of one tenant or group of tenants such as, for example, those areas sometimes referred to in the shopping center industry as "food courts," shall not be considered Common Areas. A "food court" is an open area of the Shopping Center which accommodates a common seating, serving or service area for the patrons of two or more retailers of prepared food whose premises are proximate to such seating, serving or service area.

**Common Area Charges.** See Section 7.3.

**Communication Equipment.** See Section 12.2.1.

**Control Area.** The area so designated on **Exhibit B** which may not be altered except as expressly set forth in this Lease. If no Control Area is indicated on **Exhibit B**, the Control Area shall be the same as the Common Areas.

Store No. 1610, "Stafford"
Fountains on the Lake
Stafford, TX
9320.1610.4

- 6 -

11/01/12
FINAL

1       **Co-Tenancy Report.** See Section 6.1.3(f).

2       **Co-Tenants.** See Sections 1.7.1 and 6.1.3.

3       **Delivery Date.** The Delivery Date is the first Permitted Delivery Day after the last of the
4  following conditions is satisfied (hereinafter "deliver" or "delivery"). Each of the conditions set
5  forth in clauses (a) through (l) below are conditions of delivery and in the aggregate are the
6  "Delivery Conditions." All documents and other written evidence required below to be submitted
7  to satisfy the Delivery Conditions (the "Delivery Evidence") shall be delivered to Tenant at the
8  address specified in Section 1.2.2(b).

9               (a)     Landlord has completed the Store in compliance with the terms of this
10  Lease, except for the Punchlist as specified in Section 5.10; however, the Punchlist items must be
11  completed and/or corrected to the extent required in Section 5.10;

12              (b)     All of the Common Areas and Off-Site Improvements and the buildings
13  depicted on **Exhibit B** (excluding Outparcel buildings) consisting of at least Five Hundred Eighty
14  Nine Thousand Two Hundred and One (589,201) square feet of Leasable Floor Area (the
15  "Minimum Building LFA") are existing, and Landlord has fulfilled all construction obligations
16  imposed by this Lease (including **Exhibit C**) and applicable governmental authorities, including
17  obtaining any requisite governmental authorizations and approvals to permit Tenant to open for
18  business, subject to Tenant's completion of Tenant's Work;

19              (c)     Receipt by Tenant of written evidence that Landlord's Construction
20  Obligations have passed final inspection by the authority by whom the building permit for
21  Landlord's Construction Obligations was issued and Tenant receives a temporary or permanent
22  certificate of occupancy (or equivalent), which permits Tenant to occupy and fixture the Store and,
23  subject to completion of Tenant's Work, open for business;

24              (d)     Landlord's delivery to Tenant of Landlord's most recent environmental
25  report and a current asbestos report as prepared by licensed environmental consultants stating that
26  such consultants conducted a comprehensive survey of the Store, and that the Store, including,
27  without limitation, the walls, ceilings, structural steel, flooring, pipes and boilers, and roof and roof
28  coverings are free of Hazardous Materials and free of asbestos-containing materials
29  ("Environmental Report");

30              (e)     Landlord's delivery to Tenant of a roof inspection report, prepared by First
31  Services Network, Inc., or another roof inspection (not construction) company ("Roof Inspection
32  Company") satisfactory to Tenant (the "Roof Inspection Report"). The Roof Inspection Report
33  shall be dated no more than one hundred twenty (120) days prior to the Delivery Date specified in
34  the Landlord's Construction Completion Notice and shall be delivered to Tenant concurrently with
35  the Construction Completion Notice pursuant to Section 5.4. If the Roof Inspection Report
36  indicates that the roof has a life expectancy of less than five (5) years from the date of the Roof
37  Inspection Report, Landlord shall, at its sole cost and expense, replace the roof with an R-factor of
38  not less than R-38 and deliver written evidence thereof to Tenant (which evidence shall be
39  satisfactory to Tenant). Landlord's replacement of the roof and delivery to Tenant of written
40  evidence thereof shall constitute a part of Landlord's Construction Obligations and shall be a

condition to delivery of the Store.  For purposes hereof, life expectancy of less than five (5) years means that the roof is likely to require more than one (1) repair in any twelve (12) month period.  If the Roof Inspection Report indicates that the roof has a life expectancy of five (5) years or more from the date of the report but that roof repairs are recommended, then Landlord shall, at its sole cost and expense, complete all recommended repairs to the roof and deliver written evidence thereof to Tenant (which evidence shall be satisfactory to Tenant).  Landlord's repair of the roof and delivery of written evidence thereof to Tenant shall constitute a part of Landlord's Construction Obligations and shall be a condition to delivery of the Store.  If Landlord is required to replace or repair the roof in accordance with this clause (e), then in addition to the foregoing, Landlord shall deliver to Tenant a copy of the roofing contractor's warranty with respect to said roof work;

(f)    Receipt by Tenant of at least one (1) fully executed original of this Lease, and a Memorandum of Lease signed by Landlord and Tenant and notarized so that such Memorandum of Lease may be recorded;

(g)    Delivery to Tenant of exclusive possession of the Store with Landlord's and its contractors' agents and employees' tools, equipment and materials removed from the Store;

(h)    Receipt of approval by governmental authorities of all of Tenant's Store signs and Tenant's signage on the pylon and monument and directional sign structures as depicted on **Exhibit J** (other than the permits for installation of Tenant's sign panels on such sign structures), and Landlord shall have constructed the pylon and monument and directional sign structures in the Shopping Center as shown on **Exhibit B** so that Tenant may at any time install, at its sole cost and expense, its sign panels thereon as depicted on **Exhibit J**;

(i)    Landlord has installed permanent power to the Store;

(j)    The Store has been secured by Landlord from unauthorized entry by persons without a key (an adjacent premises without a store front or store rear or which has any unlocked opening in its exterior walls shall be deemed to render the Store insecure);

(k)    Landlord has delivered to Tenant all certificates of insurance required to be maintained by Landlord pursuant to this Lease; and

(l)    If not previously delivered in accordance with the provisions of Section 13.1.1, Landlord has delivered the Non-Disturbance Agreement and/or the Sublease Non-Disturbance Agreement required pursuant to Section 13.1.1.

Notwithstanding anything to the contrary contained in this Lease, and notwithstanding any delays in completion of Landlord's Construction Obligations due to Force Majeure, unless Tenant in its sole discretion elects to take delivery on a day other than  a Permitted Delivery Day, the Delivery Date will not be on a day other than a Permitted Delivery Day.  If a Force Majeure event occurs and Landlord complies with the notice provisions of Section 26.13, the Delivery Date will be, at Tenant's option, either (a) the date Landlord tenders delivery of the Store to Tenant with all Delivery Conditions satisfied, or (b) the next Permitted Delivery Day which occurs after the date Landlord tenders delivery of the Store to Tenant with all Delivery Conditions satisfied, and the Commencement Date shall be determined in accordance with Section 1.4.1.

1       **Environmental Regulations.** See Section 11.4.1.

2       **Exempted Discontinuances.** See Section 6.1.3(e).

3       **Final Plans.** See **Exhibit C**.

4       **Force Majeure.** See Section 26.13.

5       **Gross Sales.** This definition applies to the calculation of Substitute Rent only. Gross Sales
6 are revenue received by Tenant from the selling price of all merchandise or services contracted to be
7 sold in or from the Store by Tenant, its subtenants, licensees and concessionaires, whether for cash
8 or for credit, excluding, however, the following: (a) the sales price of all merchandise returned and
9 accepted for full credit or the amount of the cash refund or allowance made thereon; (b) the sums
10 and credits received in settlement of claims for loss or damage to merchandise; (c) the consideration
11 received in connection with a sale of inventory which occurs other than in the ordinary course of
12 Tenant's business, including, but not limited to, a sale in bulk or to a jobber, liquidator or assignee;
13 (d) sales taxes, so-called luxury taxes, excise taxes, gross receipt taxes, and other taxes now or
14 hereafter imposed upon the sale or value of merchandise or services, whether added separately to
15 the selling price of the merchandise or services and collected from customers or included in the
16 retail selling price; (e) receipts from public telephones, vending machines, sales of money orders, and
17 the collection of public Utility bills; (f) bank card discounts or fees (e.g., Visa, MasterCard, etc.),
18 interest, carrying charges, or other finance charges in respect of sales made on credit; (g) sales of
19 fixtures, trade fixtures, or personal property that are not merchandise held for sale at retail; (h) sales
20 to employees and senior citizens at discount, in the aggregate not to exceed four percent (4%) of
21 Gross Sales; (i) revenue received from mailing, alterations, delivery or other services performed on a
22 non-profit basis for the benefit of customers; (j) Tenant's accounts receivable, not to exceed two
23 percent (2%) of Gross Sales, which have been determined to be uncollectible for federal income tax
24 purposes during the Lease Year; provided, however, that if such accounts are actually collected in a
25 later Lease Year, the amount shall be included in the Gross Sales for such later Lease Year; (k) rents,
26 subrents or other consideration received in connection with an assignment, sublease, license,
27 concession or other transfer of any portion of the Store; (l) amounts received for merchandise
28 transferred to any other place of business of Tenant (or its subtenants, concessionaires and/or
29 licensees) or to any business organization affiliated with Tenant wherever located; provided such
30 merchandise is not used to complete a sale originated in the Store; and (m) any Internet or other sale
31 contracted on a telecommunications network whether or not the sale item is delivered to the
32 customer at the Store.

33       **Hazardous Materials.** See Section 11.4.1.

34       **HVAC.** See Section 11.1.

35       **Inline Building.** The Building in Landlord's Parcel in which the Store is situated and any
36 other building in the Shopping Center that is not located on an "Outparcel."

37       **Insurance Bill.** See Section 9.1.4.

38       **Intended Delivery Date.** The date specified in Section 1.4.2.

Store No. 1610, "Stafford"                    - 9 -                    11/01/12
Fountains on the Lake                                                FINAL
Stafford, TX
9320.1610.4

1      **Invitee(s).** An Invitee shall mean any agent, employee, customer or other entity or
2 individual who comes upon the Shopping Center property for business or retail consumption
3 purposes, or to perform services for the occupants of the Shopping Center, by the invitation of any
4 party who is entitled to grant access to the Shopping Center such as Landlord, Tenant or any other
5 occupant of the Shopping Center.

6      **Landlord's Construction Obligations.** The construction obligations imposed on
7 Landlord by Section 5.1 and described in **Exhibit C** and any roof replacement or roof repairs
8 required by clause (e) of the Article 2 - Delivery Date definition, also referred to herein as
9 "Landlord's Work."

10      **Landlord's Parcel.** Those certain parcels of land described in **Exhibit A**, together with all
11 appurtenances thereunto belonging. For purposes of this Lease, Landlord's Parcel shall have the
12 same meaning as the Shopping Center.

13      **Leasable Floor Area.** All areas available, or held for the exclusive use and occupancy of
14 occupants or future occupants of Landlord's Parcel, measured from the exterior surface of exterior
15 walls and from the center of interior demising partitions excepting that:

16      (a)     Any mezzanines not intended to be used for distribution, sale or display of
17 merchandise to retail customers shall be excluded in the computation of Leasable Floor Area.

18      (b)     Any areas ("Outdoor Areas") which are located wholly or partially outside of
19 a building, or which, although located substantially inside of a building, are not bounded on all sides
20 by exterior walls or a roof, such as outdoor sales, seating, garden or storage areas, or enclosed truck
21 docks, shall be included in Leasable Floor Area if and to the extent that such Outdoor Areas are
22 available or held for the exclusive use and occupancy of occupants or future occupants of
23 Landlord's Parcel, whether or not such Outdoor Areas are clearly delineated and whether or not any
24 rental or other charges are paid by tenants with respect to such Outdoor Areas. Outdoor Areas
25 shall, to the extent that they are bounded by walls, be measured in the same manner as provided
26 above; otherwise, they shall be measured along lines which reasonably delineate the boundaries of
27 such Outdoor Areas.

28      (c)     Kiosks shall be includable in Leasable Floor Area. A "kiosk" is a structure of
29 no more than one hundred (100) square feet, set within the Common Areas and completely
30 surrounded by pedestrian walkways or driveways.

31      **Lease Year.** The first Lease Year shall extend from the Commencement Date to the first
32 January 31 thereafter. Each subsequent Lease Year shall consist of twelve (12) complete calendar
33 months commencing on February 1 and terminating on the ensuing January 31 and may be referred
34 to herein as a "Full Lease Year."

35      **Legal Rate.** In the event any rental or other payment due from one party to the other is
36 not paid when due, or in the event interest is required to be paid under the terms of this Lease, such
37 rental or payment amount shall bear interest at the rate of the lesser of (a) ten percent (10%) per
38 annum, or (b) the prime rate per annum quoted by Bank of America (or its successor) for short
39 term, unsecured commercial loans to its most creditworthy corporate borrowers, plus one percent

Store No. 1610, "Stafford"           - 10 -           11/01/12
Fountains on the Lake           FINAL
Stafford, TX
9320.1610.4

1  (1%) per annum, but not in any event exceeding the highest rate permissible by law which is not
2  usurious.

3  **LFA Minimums.**  Solely for purposes of calculating Co-Tenancy and Tenant's Pro Rata
4  Share of Reimbursements, the minimum amount of Leasable Floor Area in the Shopping Center or
5  Landlord's Parcel, as the case may require, agreed by the parties and set forth in Section 1.3.2.

6  **Minimum Rent.**  See Section 6.1.

7  **Off-Site Improvements.**  Public improvements not located within the Shopping Center,
8  without which the Shopping Center could not reasonably be used for its intended purpose, such as,
9  without limitation, roadways, offramps, Utility lines and turning lanes.

10  **Option.**  See Section 4.4.

11  **Option Periods.**  See Section 4.4.

12  **Outparcel.**  Any parcel of land upon which a building is or may be constructed which is
13  between the Store and any street bordering the Shopping Center.

14  **Permitted Delivery Day(s).**  Permitted Delivery Days are the second Monday of February,
15  the third Monday of June, and the last Monday of August only, which next follows the actual date
16  Landlord tenders possession of the Store to Tenant with all Delivery Conditions satisfied, provided
17  that it is no earlier than the Intended Delivery Date.

18  **Prohibited Uses.**  See Section 3.2.2.

19  **Property Insurance.**  See Section 9.1.1.

20  **Punchlist.**  See Section 5.10.

21  **REA.**  That certain Declaration of Covenants, Conditions and Restrictions and Grant of
22  Easements made as of April 10, 1986 and recorded as Instrument No. 9622662 in the Official
23  Records of Fort Bend County, Texas; and that certain Amended and Restated Declaration
24  Covenants, Conditions and Restrictions and Grant of Easements, recorded on January 3, 2008 as
25  Instrument No. 2008000883 (collectively, for purposes of this Lease, the "REA").

26  **Recommencement Date.**  See Section 21.2.

27  **Redelivery Date.**  The last of the following to occur after a Casualty or Taking:  (a) the date
28  on which Landlord's architect, or contractor having charge of the Restoration, certifies by written
29  notice to the parties that the Restoration has been completed; and (b) Tenant receives from all
30  applicable governmental agencies all necessary written approvals to reopen the Store for business.

31  **Reduced Occupancy Period.**  See Section 6.1.3.

32  **Reimbursements.**  Tenant's obligation to reimburse Landlord for Tenant's Pro Rata Share
33  under the provisions of Sections 7.4.1, 8.2.1 and 9.1.4.

**Rent**. The terms "Rent" or "Rental" shall mean all Minimum Rent and Reimbursements which may be due from Tenant to Landlord pursuant to this Lease.

**Requirements**. See Section 11.3.2.

**Restoration**. See Section 21.1.4.

**Restricted Area**. The Restricted Area shall be as shown on **Exhibit B**: See Section 3.2.

**Roof Repairs**. See Section 12.2.2.

**Section Numbers.** In this Lease, all references to "Section" shall mean the section numbers of this Lease, unless otherwise indicated.

**Shopping Center**. That certain real property development with all appurtenances generally described in Section 1.3 above, which is constructed or is to be constructed on the property described in **Exhibit A**. For purposes of this Lease, Landlord's Parcel shall have the same meaning as the Shopping Center.

**Site Plan**. The Site Plan is the plan attached hereto as **Exhibit B**. Landlord represents and warrants that the Site Plan depicts Landlord's Parcel described on **Exhibit A** and that the boundaries thereof are delineated thereon with substantial accuracy. The Inline Buildings depicted thereon contain or shall contain no more than one (1) story (but mezzanines having Leasable Floor Area not in excess of one-third (1/3) of the occupant's ground floor Leasable Floor Area, when not used for selling purposes, shall be permitted). Further, the height (including any architectural features and rooftop equipment) of any portion of the Inline Buildings and the buildings located on the Outparcels shall not exceed, without Tenant's prior written consent, the existing heights of such buildings as of the Effective Date.

**Special Form Policy**. See Section 9.1.1.

**Store**. The Store is that portion of Landlord's Parcel designated on **Exhibit B**, having the dimensions and containing the Leasable Floor Area specified in Section 1.3, including the use of the roof as specified in Section 12.2.

**Substitute Rent**. Substitute Rent shall mean the lesser of (a) Minimum Rent, or (b) two percent (2%) of Tenant's Gross Sales during the preceding month. Substitute Rent, where applicable in this Lease, shall be paid in lieu of Minimum Rent _and_ Reimbursements.

**Support Systems**. See Section 11.4.2.

**Taking**. See Section 22.1.

**Tax or Taxes**. See Section 8.1.

**Tax Bill**. See Section 8.1.

1     **Tax Year.** The twelve (12) month period used by the taxing authority as the period to
2 which the Tax Bill applies.

3     **Tenant Delay.** A delay in the performance by Landlord of any obligation it is to perform
4 under **Exhibit C** to this Lease as a result of: (a) Tenant's failure to approve, consent, comment
5 upon or otherwise respond to a request for plan approval within the express time provisions of
6 **Exhibit C**; or (b) Tenant's request for a change order to Landlord's Construction Obligations which
7 directly results in a delay in Landlord's ability to perform its obligations under this Lease; or (c) the
8 interference by Tenant or Tenant's contractors in the performance by Landlord or Landlord's
9 contractors of Landlord's Construction Obligations; provided, however, in order for there to be a
10 valid "Tenant Delay" Landlord must first have given Tenant written notice within ten (10) Business
11 Days of the event forming the basis for the claim of the Tenant Delay and provided Tenant with at
12 least five (5) Business Days to rectify the problem causing the delay.

13     **Tenant's Pro Rata Share.** Tenant's share of Reimbursements calculated as set forth in
14 Section 7.2 (Common Area Charges), Section 8.2 (Tax Bill) and Section 9.1.4 (Special Form Policy
15 premium).

16     **Tenant's Work.** The work to the Store by Tenant necessary for Tenant to open the Store
17 for business to the general public; or performed at any time during the Term for the purpose of
18 improving the Store.

19     **Term.** References to the Term of this Lease shall include the initial term described in
20 Section 1.5.1 ("Initial Term") and any extension of such Term ("Option Period").

21     **Termination Notice.** A notice provided by Tenant to Landlord in which Tenant notifies
22 Landlord of its election to terminate this Lease if permitted to do so under any provision of this
23 Lease.

24     **Third Party Audit.** See Section 7.4.8.

25     **Unamortized Cost.** The remaining balance of any amount expended by Tenant for
26 leasehold improvements to the Store (not including any allowance paid by Landlord to Tenant for
27 Tenant's leasehold improvements as specified in **Exhibit C**), as amortized according to Generally
28 Accepted Accounting Principles in the books and records of Tenant for public reporting purposes,
29 with an interest rate of ten percent (10%) per annum.

30     **Utilities.** Utilities are electricity, gas, power, steam, sanitary sewer, storm sewer,
31 telecommunications (audio, video or data bit streams, whether terrestrial, over the air or satellite),
32 and water supplied by public or private entities.

33     **Utility Room.** See Section 3.5.

34

35

Store No. 1610, "Stafford"
Fountains on the Lake
Stafford, TX
9320.1610.4

- 13 -

11/01/12
FINAL

1    **3. GRANTS OF LEASE, COMMON AREA USE, EASEMENTS AND ACCESS**

2    **3.1.    Lease.**

3    Landlord hereby leases to Tenant and Tenant hereby leases from Landlord the Store
4    depicted on the Site Plan, together with all easements, rights and privileges appurtenant thereto, on
5    the terms and conditions set forth herein.

6    **3.2.    Nature of the Shopping Center.**

7    **3.2.1.**    <u>Retail Use</u>.

8    (a)    <u>Prohibited Uses in Shopping Center, Restricted Area</u>. Tenant has entered
9    into this Lease in reliance upon representations by Landlord that Landlord's Parcel is and shall remain
10    retail in character, and, further, no part of Landlord's Parcel shall be used for the following uses:
11    residential uses, dance hall, billiard or pool hall, massage parlor (except as provided in Section
12    3.2.1(b)(ii) below, video game arcade (excepting arcades located within a family entertainment facility
13    or restaurant, such as Main Event or Chuck E. Cheese or a movie theater to the extent permitted
14    hereunder, that is located not less than 500 feet from the front and side perimeter walls of the Store),
15    skating rink, car wash, facility for the sale, display, leasing or repair of motor vehicles, night club,
16    on-premises consumption of alcoholic beverages except as incidental to a primarily restaurant use or
17    permitted family entertainment facility, any facility offering gambling to the public (including any so-
18    called Internet café that offers gambling to the public), the sale of adult products (excepting items
19    typically sold in drug stores or pharmacies) or adult bookstores or adult audio/video products stores
20    (which are defined as stores in which at least ten percent (10%) of the inventory is not available for sale
21    or rental to children under the age of majority in the state in which the Store is located because such
22    inventory explicitly deals with or depicts human sexuality). No tenant or occupant of the Shopping
23    Center shall be permitted to use its premises for the sale of whole bean and/or ground coffee other
24    than Tenant, a supermarket, grocery store, local bakery, or by Dunkin' Donuts, Caribou Coffee, Peets,
25    Indigo, or other national, regional or local coffee shops or coffee retailers with up to (but not more
26    than) 500 retail stores. Landlord shall not lease space nor allow space to be occupied in the Shopping
27    Center by any occupant other than Tenant, whose use of the space shall be (a) for a store primarily
28    selling merchandise at one price or set prices such as 99 Cents store, as they are operated as of the
29    Effective Date, or (b) for a discount department store under twenty thousand (20,000) square feet of
30    Leasable Floor Area, such as, Family Dollar store, as they are  operated as of the Effective Date, and
31    other such types of operations. Further, except as may be permitted under Section 3.2.1(b) below, the
32    following uses shall not be permitted within the "Restricted Area" delineated on **Exhibit B**: Office
33    uses (except as permitted under Section 3.2.1(b)(vi) below), as a theater (excepting the existing theater
34    listed on **Exhibit K** in the location shown on **Exhibit B**), auditorium, meeting hall, health club (except
35    as permitted under Section 3.2.1(b)(iii) below), school, church or other place of public assembly, "flea
36    market," mortuary, gymnasium (except as permitted under Section 3.2.1(b)(vii) below), veterinary
37    services or pet vaccination clinic or overnight stay pet facilities (except as an incidental use in
38    conjunction with the operation of a national or regional pet store retailer, provided such pet store
39    retailer is not located within one hundred fifty (150) feet of the front and side perimeter walls of the
40    Store), or bowling alley. Further, no restaurant or other "High Intensity Parking User" (as hereinafter
41    defined) shall be permitted in Landlord's Parcel within the Restricted Area.

1   A "High Intensity Parking User" is a tenant or occupant whose use requires more than five (5) parking
2   spaces per one thousand (1,000) square feet of Leasable Floor Area in accordance with either
3   customary shopping center practices or governmental regulations, whichever has a higher parking
4   requirement. The foregoing use restrictions are referred to herein as the Ross Prohibited Uses.

5              (b)      Notwithstanding the prohibitions specified in Section 3.2.1(a) above, the
6   following exceptions shall apply:

7                        (i)      Existing Leases.    The Ross Prohibited Uses set forth in
8   Section 3.2.1(a) shall not apply to those tenants or occupants operating in Landlord's Parcel and listed
9   on **Exhibit K** who, in accordance with the terms of existing leases or occupancy agreements in effect
10  on the Effective Date (the "Existing Leases"), cannot be prohibited from so operating, but only for the
11  balance of the term(s) of such existing lease(s) or occupancy agreement(s).  Landlord covenants and
12  agrees that if Landlord has the right to consent to a change in use of the premises occupied by any
13  such Existing Leases, Landlord shall not consent to a change in use which violates the Ross Prohibited
14  Uses set forth in Section 3.2.1(a);

15                       (ii)     Therapeutic Massage Services.    Facilities offering therapeutic
16  massage services to the public, such as a day spa or health club, or a retail provider of therapeutic
17  massage services, such as Massage Envy and Massage Heights, shall be permitted in Landlord's Parcel
18  provided that such use is not located within one hundred fifty (150) feet of the front the front and side
19  perimeter walls of the Store;

20                       (iii)    Health Club.  A health club is permitted in the Shopping Center
21  only to the north of the Hobby Lobby building as shown on **Exhibit B**;

22                       (iv)     Bowling Alley.  A bowling alley is permitted in the Shopping
23  Center only in the space identified as "Main Event" as shown on **Exhibit B**;

24                       (v)      Schools.  One (1) tutoring or other educational facility, such as
25  Kumon or Sylvan Learning Center, is permitted in the Shopping Center provided that such facility
26  does not exceed Two Thousand (2,000) square feet of Leasable Floor Area and is located not less than
27  One Hundred (100) feet from the front and side perimeter walls of the Store.  In addition, subject to
28  the provisions of Section 3.2.1(c) below, Ogle Beauty School shall also be permitted in the Shopping
29  Center provided that such use does not exceed Eleven Thousand Four Hundred Sixty-Eight (11,468)
30  square feet of Leasable Floor Area and is located in the space located adjacent to the Guitar Center
31  identified as "Ogle Beauty School" on **Exhibit B**;

32                       (vi)     Retail Service Offices.    "Retail Service Offices" are permitted,
33  which are defined as offices that are typically found in shopping centers that provide services directly
34  to the public such as banks and other financial institutions, real estate agencies, title companies,
35  professional and medical offices, insurance brokers, tax preparers, or travel agencies, provided that: (A)
36  such uses are not located within one hundred (100) feet of the front and side perimeter walls of the
37  Store, and (B) no single office exceeds two thousand five hundred (2,500) square feet of Leasable Floor
38  Area, and (C) the total amount of Retail Service Offices shall not exceed an aggregate of Twenty
39  Thousand (20,000) square feet of Leasable Floor Area;

1      (vii) <u>Gymnasium</u>. A gymnasium not exceeding Three Thousand (3,000)
2 square feet of Leasable Floor Area and located not less than Three Hundred (300) feet from the front
3 and side perimeter walls of the Store is permitted in the Shopping Center; and

4      (viii) <u>Family Entertainment Facility</u>. A family entertainment facility,
5 such as Chuck E. Cheese or Main Event, shall be permitted in the Shopping Center provided that such
6 use is located not less than Five Hundred (500) feet from the front and side perimeter walls of the
7 Store.

8     (c) <u>Parking Requirements Applicable to Ogle Beauty School</u>. Landlord shall,
9 at its sole cost and expense (and not as a Common Area Charge), employ commercially reasonable
10 efforts to prevent the tenant and employees, students and invitees of the Ogle Beauty School (the
11 "Beauty School Users") from parking in Tenant's Control Area delineated on **Exhibit B**. In the event
12 that automobiles belonging to the Beauty School Users are parked in Tenant's Control Area, Tenant
13 shall notify Landlord and Landlord shall install signs and mark the pavement throughout the Control
14 Area stating, "NO STUDENT PARKING – VIOLATORS WILL BE TOWED" within fifteen (15)
15 days of Landlord's receipt of such notice, and order the towing of cars parked in violation of such
16 posted warnings (the "Parking Restrictions"). If parking in the Control Area by the Beauty School
17 Users continues following Landlord's installation of such signage, Tenant shall notify Landlord and
18 Landlord shall employ an attendant (at Landlord's own cost and expense and not as a Common Area
19 Charge) to monitor and enforce the Parking Restrictions during Tenant's business hours, which
20 parking attendant shall issue warnings to violators and have the cars of violators towed (at the expense
21 of such owner), as appropriate under the circumstances. In the event Landlord fails to install the
22 above-described signage, or fails to employ an attendant or otherwise enforce the Parking Restrictions,
23 Tenant shall have the right to install the signage described above and to enforce the Parking
24 Restrictions on Landlord's behalf and deduct the costs thereof from Rent coming due under the Lease.

25  **3.2.2.** <u>Further Prohibited Uses</u>. Landlord agrees that the Ross Prohibited Uses set
26 forth in Section 3.2.1 and the "Landlord's Prohibited Uses" which are listed in **Exhibit D**
27 (collectively, the "Prohibited Uses") shall not be permitted in the Shopping Center. Tenant agrees
28 that it will not violate the Prohibited Uses.

29  **3.2.3.** <u>Shopping Center Rules and Regulations</u>. Tenant acknowledges that Landlord
30 has or may establish a list of Rules and Regulations for the operation of the Shopping Center (the
31 "Rules and Regulations"). Tenant agrees to: (a) comply with the Rules and Regulations to the extent
32 that such Rules and Regulations do not conflict with the provisions of this Lease, decrease Tenant's
33 rights, or increase Tenant's obligations under this Lease, and, (b) use commercially reasonable
34 efforts to cause its concessionaires, agents, contractors and employees to comply therewith.
35 Landlord covenants to enforce the Rules and Regulations in a uniform manner and not to
36 discriminate in the enforcement of any of the Rules and Regulations against Tenant. In the event of
37 any conflict or inconsistency between the Rules and Regulations and the terms of this Lease, this
38 Lease shall govern and control.

39 **3.3.** **Grant of Common Area Use.**

40  Tenant, as well as its agents, employees, customers and invitees, shall have and is granted
41 nonexclusive and undisturbed access to, and use of all Common Areas (hereinafter "easement"),

Store No. 1610, "Stafford"      - 16 -      11/01/12
Fountains on the Lake                   FINAL
Stafford, TX
9320.1610.4

which easement shall be appurtenant to the Store until the expiration or earlier termination of this Lease.  Landlord shall use commercially reasonable efforts to prevent (a) Common Area use by other than the Shopping Center's occupants and their Invitees, and (b) other Shopping Center's occupants and their employees and officers from parking within two hundred fifty (250) feet of the Store's front doors.  In no event shall Tenant or Tenant's Invitees' use of Common Areas be conditioned upon payment of parking or other charges by Tenant.

### 3.4.    Grant of Utility Easements.

(a)    Subject to the reasonable approval of Landlord as to location, Landlord hereby grants to Tenant and its employees, agents, contractors and vendors, the nonexclusive right by easement to install, replace, maintain and use Utilities of Tenant's choice serving the Store within Landlord's Parcel, and in connection therewith, to use existing Utility conduits and to tie into existing Utility lines.

(b)    Upon prior notice to Landlord and subject to Landlord's approval as to location, which approval shall not be unreasonably withheld, delayed, or conditioned, Tenant, at Tenant's election, shall have the right to install, at Tenant's expense: (i) a cart retention system within the parking lot, utilizing wires or other embedded objects as a means of perimeter control, provided that Tenant shall repair any damage caused by such installation; and (ii) bollards in front of the Store.

### 3.5.    Utility Rooms.

In the event any meters, controls or conduits for any Utility system serving the Store are at any time situated outside the Store (the "Utility Room"), Tenant shall at all times have access to the Utility Room and to controls and other conduits therein in common with Landlord and other tenants affected by such Utility systems.  No other parties (other than Landlord and the other tenants affected by such Utility systems) shall have access to the Utility Room at any time without the consent of Tenant.  Landlord shall provide adequate heat and security for the Utility Room and shall cause the Utility Room to be kept locked at all times.  Access to the Utility Room shall be restricted to an exterior entrance situated in the rear wall of the building in which it is located.

### 3.6.    Site Plan or Shopping Center Alterations.

**3.6.1.**    Control Area and Inline Buildings.  The Site Plan is a material consideration for Tenant entering into this Lease.  No change, alteration, deletion, or addition (including, but not limited to, landscaping, benches, seating, trash cans, light poles, directional signage or other structures or obstructions), except as may be required by any governmental authority, that materially and adversely affect parking or visibility of the Store or Tenant's Signs (collectively, "Obstructions") shall be made to the Control Area on the Site Plan nor shall any change in the location of a front wall of any premises in any Inline Building be made without the prior written consent of Tenant, which consent may be granted or denied in Tenant's sole and absolute discretion.  Landlord agrees to implement and enforce the Parking Restrictions applicable to the Control Area pursuant to the provisions of Section 3.2.1(c) of this Lease.

**3.6.2.**    Common Areas.  No change or alteration or addition (including, but not limited to, the addition of any Obstructions) shall be made in the Common Areas of the Shopping Center

Store No. 1610, "Stafford"
Fountains on the Lake
Stafford, TX
9320.1610.4

- 17 -

11/01/12
FINAL

outside of the Control Area (to the extent Landlord has the legal ability to control such changes or alterations) which materially and adversely affects any one or more of the following, without the prior written consent of Tenant (which consent shall not be unreasonably withheld, conditioned or delayed by Tenant if the change is not materially adverse to Tenant): (a) the configuration of the Common Areas; (b) methods of ingress and egress, direction of traffic, lighting, parking, or curbing in the Common Areas; or (c) visibility of the Store or of any of Tenant's Signs.

**3.6.3.**    Building Envelopes.    No construction of any building or remodeling or expansion of any building in within Tenant's Control Area may occur except within the Building Envelopes and shall be limited in size to the Leasable Floor Area as designated on **Exhibit B**.

**3.6.4.**    Store Exterior; Building Exteriors.    The use of the exterior walls of the Store shall be subject to the exclusive control of Tenant.  Further, Landlord may not alter the exterior of the Store, including, but not limited to, the color of the exterior of the Store, without the prior written consent of Tenant, which consent may be granted or denied in Tenant's sole and absolute discretion.  In no event shall Landlord install an ATM or similar machine on the exterior of the Store.  No alteration or change in the color or design of any exterior wall of any building located adjacent to the Store may be made without the prior written consent of Tenant, which consent shall not be unreasonably withheld, delayed or conditioned.

**3.6.5.**    Outparcels.    Any Outparcel(s) which is (are) not developed as of the date that Tenant opens in the Store for business ("Undeveloped Outparcels") shall be continuously maintained (or caused to be maintained) by Landlord, in a neat and sightly condition until such Outparcel(s) is (are) developed, at no cost or expense to Tenant (e.g., not as a Common Area Charge or otherwise) in the following condition.  Each Undeveloped Outparcel shall either be completely paved or shall be completely landscaped with low level shrubs or grass (such grass to be mowed regularly to a height not to exceed eight inches (8")).

**3.7.    Dimensions.**

Immediately following the completion of Landlord's Construction Obligations, Landlord shall cause the Store to be measured and shall deliver to Tenant an architect's certificate stating the Leasable Floor Area thereof.  In the event that the Leasable Floor Area of the Store is less than the size specified in Section 1.3.3 (the "Agreed Size"), Minimum Rent and all other charges shall be proportionately reduced and the parties shall set forth the actual Leasable Floor Area of the Store, the adjusted Minimum Rent and other corrections necessitated by the adjustment in Store size in the Acknowledgment of Commencement in **Exhibit E** hereto.  In the event that the Leasable Floor Area of the Store is more than the Agreed Size, Minimum Rent and all other charges shall be based upon the Agreed Size.  Nothing herein shall be construed as permitting a material variance in dimensions or area.  For purposes of this Section 3.7, a material variance is any decrease in the amount of Store frontage set forth in Section 1.3.3 or any decrease in the Agreed Size by more than one-half (½) of one percent (1%) of the amount of square feet of Leasable Floor Area.  Landlord shall simultaneously provide to Tenant a certificate from the project architect as to the total Leasable Floor Area in Landlord's Parcel depicted on **Exhibit B**.  Tenant shall have the right to dispute through its own licensed architect the amounts so represented and, if so, any unresolved dispute shall be resolved as provided in Section 20.2.  Until the amounts of Leasable Floor Area in the Store and in Landlord's Parcel have been finally determined, Tenant may defer payment of Minimum Rent

Store No. 1610, "Stafford"
Fountains on the Lake
Stafford, TX
9320.1610.4

- 18 -

11/01/12
FINAL

1  (to the extent of the disputed amount) and the disputed portion of Tenant's Pro Rata Share of any
2  charges which require the use of Leasable Floor Area for computational purposes under the terms
3  of this Lease (e.g., Taxes, insurance and Common Area Charges).

4  **3.8.    Effect of REA.**

5  (a)    Landlord agrees that the use of all portions of the Shopping Center, and restrictions
6  upon such use, are material to this Lease and absent rights of usage (and restrictions upon usage),
7  Tenant would not have entered into this Lease.  Therefore, Landlord grants to Tenant non-exclusive
8  easements, rights, licenses, privileges and servitudes reserved in, or granted by, the REA for the
9  benefit of Landlord's Parcel, including, but not limited to:

10  (i)    Ingress/egress, cross traffic, pedestrian and vehicular traffic, and parking in
11  the Common Areas of the Shopping Center;

12  (ii)    Use of Utility lines, drainage, and sanitary sewer system in the Shopping
13  Center;

14  (iii)    Use of the building and pylon signs granted under the REA for the benefit of
15  Landlord's Parcel;

16  (iv)    Maintenance and repair; and

17  (v)    Use restrictions.

18  (b)    Landlord agrees that Landlord shall not, as owner of Landlord's Parcel, execute any
19  documents terminating or materially modifying the REA without the prior written consent of
20  Tenant.

21  (c)    Provided Tenant obtains Landlord's prior written consent, which consent shall not
22  be unreasonably withheld, Tenant may from time to time contact the "Co-parties," as herein
23  defined, (i) to obtain consent in instances in which the REA provides that Landlord may perform an
24  act (or refrain from performing an act) which Tenant may perform under the terms of this Lease
25  with the consent of the Co-parties, and (ii) with respect to obtaining modifications and amendments
26  to the REA.  Landlord shall not unreasonably withhold its consent to any proposed modifications or
27  amendments agreed to by the Co-parties and Tenant.  "Co-parties" is defined as signatories to the
28  REA other than Landlord.

29  (d)    Landlord agrees that performance by the Co-parties, in accordance with the terms of
30  the REA, is material to this Lease; therefore Landlord agrees to use best efforts to cause the
31  Co-parties to so perform, or alternatively, to perform on behalf of the Co-parties.  If following
32  notice from Tenant, Landlord does not commence such effort in time sufficient so that prosecution
33  of such efforts is not prejudiced by delay (and in any event, commence prosecution thereof within
34  thirty (30) days of notice from Tenant), Tenant may prosecute such efforts in its own name or
35  Landlord's, but in either event, with Landlord's full cooperation, and Landlord shall reimburse
36  Tenant for all reasonable costs in good faith incurred.  Nothing herein shall preclude Tenant from
37  exercising any rights or remedies available at law or in equity or under this Lease in the event of a
38  breach of the REA.

1    (e)    Although the Store and the rights of Tenant under this Lease are necessarily subject
2    to the REA the parties agree that, as between the parties hereto, all provisions of this Lease shall be
3    superior and paramount to the REA.  In the event of any inconsistency between the REA and this
4    Lease (i) as between the parties hereto, the provisions of this Lease shall prevail, and (ii) if any
5    right(s) of Tenant under this Lease are disturbed and/or interfered with by any person claiming
6    through or under the REA, the same shall be deemed a default by Landlord under this Lease,
7    including, without limitation, Article 18 hereof, and Tenant shall have all rights and remedies with
8    respect thereto as Tenant would have with respect to any other default by Landlord under this
9    Lease.

10    (f)    Tenant agrees that it shall not violate the terms, covenants, conditions and
11    agreements set forth in the REA which are of a prohibitory nature; the obligations imposed by the
12    REA which are of an affirmative nature in respect of the Store shall be performed by Landlord
13    unless Tenant is obligated to perform such under a provision of this Lease.

14    (g)    In the event Landlord grants approval to Tenant under any of the terms of this
15    Lease, it shall be deemed that Landlord has obtained all necessary approvals under the REA.

16                                    **4.  LEASE TERM**

17    **4.1.    Term.**

18    The Term of this Lease shall commence on the Commencement Date and shall expire as
19    specified in Section 1.5.

20    **4.2.    Commencement Date.**

21    The Commencement Date shall be the date as set forth in Section 1.4.1.

22    **4.3.    Acknowledgment of Commencement.**

23    Within ninety (90) days after the Commencement Date, Landlord and Tenant shall execute a
24    written acknowledgment in the form attached hereto as **Exhibit E**, and by this reference it is hereby
25    incorporated herein.

26    **4.4.    Option Periods.**

27    Tenant shall have the right to extend the Term of this Lease (an "Option") for the number
28    of separate, consecutive additional periods ("Option Periods") which are specified in Section 1.5.2,
29    on the terms and conditions set forth herein, except that the number of Option Periods remaining
30    to be exercised shall, in each case, be reduced by one.  If Tenant elects to exercise an Option,
31    Tenant shall notify Landlord in writing at least one hundred eighty (180) days prior to the expiration
32    of the Term, or the then current Option Period, as the case may be.  If Tenant neglects to timely
33    exercise any Option, Tenant's right to exercise shall not expire or lapse unless Tenant fails to
34    exercise such Option within fifteen (15) days after notice from Landlord of Tenant's failure to timely
35    exercise the Option.  If Landlord does so notify Tenant, Tenant shall have the right at any time
36    within fifteen (15) days after such notice to notify Landlord in writing of either Tenant's unqualified

and irrevocable exercise of its Option, or Tenant's unqualified and irrevocable waiver of its Option. If Tenant fails to respond within such fifteen (15) day period, Tenant shall conclusively be deemed to have waived its Option and this Lease shall terminate on the then expiration date of the Term.

## 5. CONSTRUCTION AND ACCEPTANCE

**5.1.   Landlord's Construction Obligations.**

**5.1.1.**   Current.

(a)    Landlord shall provide to Tenant, for Tenant's review, the exterior elevations of all buildings in the Shopping Center in order for Tenant to prepare and/or review and approve the exterior elevations for the Store.  If, prior to the Delivery Date, such elevations are modified, Landlord shall promptly notify Tenant and shall provide Tenant with the modified elevations.  If Tenant reasonably determines that the modified elevations require a modification to the exterior Store elevations, Tenant shall notify Landlord of Tenant's requested modifications to the exterior Store elevations and Landlord shall make such modifications to the exterior Store elevations, at Landlord's sole cost and expense.

(b)    Landlord, at its own cost and expense, shall (i) construct the Store in accordance with the terms and conditions of **Exhibit C**, and including, without limitation, installation of permanent power to the Store and installation of a floor slab sealed with Creteseal 2000 sealant in accordance with the manufacturer's specifications and Tenant's prototype plans and specifications and which maintains moisture vapor emissions at or below five (5) pounds per one thousand (1,000) square feet per twenty-four (24) hours using the calcium chloride method, (ii) the buildings and Common Areas of the Shopping Center conform with the Site Plan and the elevations approved by Tenant and the Minimum Building LFA, and (iii) complete any roof replacement work or roof repair work required by clause (e) of the Article 2 - Delivery Date definition.  Landlord shall indemnify, defend, protect and hold Tenant harmless from all claims, demands and liabilities, including attorneys' fees and expenses, arising out of such construction, remodeling, alteration or other work completed by Landlord and its contractors, including, but not limited to, claims for defective work.  The obligations of this Section 5.1 are a material consideration to Tenant without which Tenant would not have entered into this Lease.

(c)    If the Store is part of a larger premises existing as of the date of execution hereof, Landlord shall be responsible, at its sole cost and expense, for any requirement (whether governmental, insurance or otherwise), for construction of fire access, including corridors or fire doors. Landlord shall perform, at Landlord's sole cost and expense, any work required by Requirements as well as any work imposed by any local governmental authority as part of the governmental approval process with respect to Landlord's Work or Tenant's Work, to the extent such work involves the Common Areas of the Shopping Center or any Outparcels owned by Landlord or any part of the Shopping Center buildings other than the Store.

**5.1.2.**   Future.  If Landlord undertakes the upgrading of the exterior of buildings in Landlord's Parcel other than the Store, then Landlord shall be obligated to similarly upgrade the exterior of the Building so that Landlord's Parcel presents a uniform appearance of quality, design and age.  Landlord's failure to perform its obligations under this Section 5.1.2 within ninety (90) days following the completion of the general upgrading of other buildings in Landlord's Parcel shall

Store No. 1610, "Stafford"
Fountains on the Lake
Stafford, TX
9320.1610.4

- 21 -

11/01/12
FINAL

1  constitute a material default under the provisions of this Lease entitling Tenant to all remedies at
2  law, in equity and/or under the terms hereof.

3  **5.2.    Construction Commencement.**

4  If Landlord fails to commence to perform Landlord's Construction Obligations, including
5  the construction of the Store prior to the Construction Commencement Cancel Date specified in
6  Section 1.4.3 of this Lease, then at any time thereafter, but prior to Landlord's commencement of
7  construction of the Store, Tenant shall have the right to terminate this Lease by notifying Landlord
8  in writing.  If the Store is a new Building to be constructed, "Commencement of Construction"
9  means to commence pouring the foundation for the Store.  However, if the Store is to be
10  constructed in an existing Building, Commencement of Construction means the day that the
11  contractor's workers commence the Work in the Store for the interior improvements to the Store
12  specifically for use by Tenant and other elements of Landlord's Work as described in **Exhibit C**.

13  **5.3.    Completion of Construction.**

14  Landlord shall use its best efforts to complete Landlord's Construction Obligations and
15  deliver possession of the Store to Tenant on the Intended Delivery Date.  In the event that Landlord
16  has previously delivered to Tenant a Construction Completion Notice and is thereafter delayed by
17  Force Majeure or Tenant Delay in delivering the Store, or for any other reason is unable to deliver
18  the Store by the Delivery Date as specified in the Construction Completion Notice, Landlord shall
19  continue to diligently complete and deliver Landlord's Work in compliance with this Lease.

20  **5.4.    Construction Completion Notice.**

21  (a)    The parties acknowledge the necessity for Landlord to provide Tenant with the
22  Construction Completion Notice specified in this Section 5.4 in order that Tenant shall have adequate
23  time to, among other things, order fixtures and equipment, order and stock in season merchandise,
24  move and hire employees and arrange for advertising, computer and distribution support, perform
25  Tenant's improvements and fixturization of the Store and enter into other commitments required to
26  timely occupy and conduct business within the Store.  Not less than one hundred twenty (120)
27  calendar days prior to the Delivery Date, Landlord must notify Tenant in writing as to when the
28  Delivery Date will occur (the "Construction Completion Notice") in the form set forth in **Exhibit G**
29  (a Delivery Date must be on a Permitted Delivery Day).  Landlord shall undertake all due diligence and
30  necessary efforts to complete Landlord's Construction Obligations, and satisfy the Delivery
31  Conditions, and deliver the Store on the Delivery Date specified in the Construction Completion
32  Notice. In the event Landlord does not timely satisfy all the Delivery Conditions by the Delivery Date
33  stated in the Construction Completion Notice (subject to delays caused by events of Force Majeure or
34  Tenant Delay), Tenant will suffer damages arising from Tenant's need for adequate and proper
35  advance notice of delivery.  It would be impractical or extremely difficult to fix actual damages in the
36  event of Landlord's breach under this Section 5.4.  Therefore, in the event of a breach by Landlord of
37  its obligations under this Section 5.4, the parties acknowledge that the damages to be suffered by
38  Tenant in such event are difficult to ascertain.  Landlord acknowledges that such damages include, but
39  are not limited to, the loss of, or need to, relocate employees hired for the Store, costs to reallocate
40  and/or to discount seasonal merchandise ordered for the Store, and costs to reschedule Tenant's
41  improvements and fixturization of the Store.  However, after negotiation the parties have made their

best reasonable estimate of such damage and have agreed that Landlord shall pay to Tenant, as liquidated damages (the "Liquidated Damages"), the sum of One Hundred Fifty Thousand Dollars ($150,000) which sum shall be paid to Tenant in a lump sum by Landlord to Tenant upon demand at any time following a breach by Landlord of its obligations under this Section 5.4. Nothing herein shall prohibit Tenant, in addition to claiming the Liquidated Damages, from postponing occupancy and the commencement of payment of Rent as specified in Section 5.5 hereof or from enforcing its remedies pursuant to Section 5.4(b). In the event Landlord fails to pay to Tenant the Liquidated Damages as required by this Section 5.4(a), Tenant may, at its option, deduct the full amount of the Liquidated Damages from the Rent or other charges coming due until Tenant has fully recovered the full amount of Liquidated Damages. In addition to Landlord's obligation to pay the Liquidated Damages, Landlord shall remain obligated to diligently complete Landlord's Construction Obligations and to satisfy the Delivery Conditions. If Landlord fails to deliver the Store on the date stated in the Construction Completion Notice due to a delay caused by an event of Force Majeure, Landlord's obligation to pay the Liquidated Damages shall be excused for the period of the Force Majeure delay (subject to the provisions of Section 26.13), provided Landlord gives Tenant the notice required by Section 26.13, and provided Landlord uses diligent efforts to complete Landlord's Construction Obligations and satisfy the Delivery Conditions. If Landlord fails to deliver the Store on the date stated in the Construction Completion Notice due to a Tenant Delay, Landlord shall have no obligation to pay Liquidated Damages for the period of the Tenant Delay. If Landlord does not deliver a Construction Completion Notice, there shall be no Liquidated Damages, but Tenant shall have the remedies specified in Sections 5.5 and 5.6.

(b)    On or before the Delivery Date specified in the Construction Completion Notice, Tenant shall have the right, but not the obligation, to notify Landlord of the earliest date (the "Opening Date") that Tenant may commence to operate in the Store for retail business to the general public (the "Opening Date Notice"). For purposes of the remedies set forth in this Section 5.4(b), such Opening Date shall not be earlier than eight (8) days after the Delivery Date specified in the Construction Completion Notice; however, notwithstanding anything contained herein to the contrary, Tenant may open the Store for business prior to the Opening Date. In addition to the provisions of Section 5.4(a) above, if Tenant delivers an Opening Date Notice to Landlord, and thereafter, Landlord fails to timely deliver the Store at least eight (8) days before the Opening Date, in addition to all of Tenant's other rights and remedies due to a missed Delivery Date, Tenant shall also have the right to occupy and conduct business in the Store without any obligation to pay Landlord Rent on and after the Commencement Date (notwithstanding the provisions of Section 6.1.1 of this Lease) for a period equal to the number of days between the missed Delivery Date as specified in the Construction Completion Notice and the one hundred twentieth (120th) day following the next Permitted Delivery Day which occurs after Landlord satisfies all Delivery Conditions. Landlord shall remain obligated to diligently complete Landlord's Construction Obligations and to satisfy the Delivery Conditions.

(c)    If Landlord tenders possession of the Store to Tenant prior to Landlord's satisfaction of the Delivery Conditions, Tenant may take possession of the Store and Tenant may occupy and conduct business in the Store. In such event, the parties' respective insurance obligations set forth in Article 9 shall commence on the date Tenant occupies the Store pursuant to this Section 5.4(c). Tenant's occupancy and use of the Store shall not constitute delivery of the Store or waive Landlord's obligations to satisfy the Delivery Conditions nor shall it constitute acceptance of Landlord's Work or relieve Landlord of responsibility for any warranty or maintenance obligations of Landlord under this Lease. Tenant's obligation to pay Minimum Rent and Reimbursements shall not commence until

Store No. 1610, "Stafford"
Fountains on the Lake
Stafford, TX
9320.1610.4

- 23 -

11/01/12
FINAL

Landlord satisfies all Delivery Conditions and the Commencement Date occurs, as determined in accordance with Section 1.4.1, subject to the other express provisions of this Lease.

### 5.5.  Rollover.

Notwithstanding any other provisions of this Lease, Tenant shall not be obligated to accept delivery of the Store at any time other than on a Permitted Delivery Day. If (a) Landlord offers to deliver the Store to Tenant on a date other than a Permitted Delivery Day, or (b) Landlord fails to deliver a timely Construction Completion Notice to Tenant, then, in either event, the Delivery Date shall, at Tenant's option, be deferred until the next Permitted Delivery Day which occurs after the one hundred twentieth (120th) day following the actual date Landlord satisfies all Delivery Conditions and tenders possession of the Store to Tenant. If Landlord delivers a Construction Completion Notice to Tenant and thereafter Landlord fails to timely deliver the Store to Tenant on the date specified in the Construction Completion Notice, then, unless Tenant agrees in writing to accept Delivery of the Store on an earlier date, the Delivery Date shall be deferred until the next Permitted Delivery Day which occurs after the actual date Landlord satisfies all Delivery Conditions and tenders possession of the Store to Tenant. Tenant's rights to defer the Delivery Date pursuant to this Section 5.5 are referred to herein as the "Rollover" remedy and are in addition to Tenant's rights to recover Liquidated Damages pursuant to Section 5.4 above, if applicable.

### 5.6.  Remedies Cumulative.

The Rollover remedy described in Section 5.5 above shall apply in addition to all other remedies at law, or in equity, or under the terms of this Lease.

### 5.7.  Construction Completion Cancel Date.

If for any reason, other than Tenant Delay, Landlord has not completed Landlord's Construction Obligations, or the Store is not delivered to Tenant prior to the Construction Completion Cancel Date specified in Section 1.4.4 of this Lease, Tenant may, at its sole option, cancel this Lease by written notice to Landlord within thirty (30) days of the Construction Completion Cancel Date, and if Tenant fails to exercise its right to terminate the Lease on or by the Construction Completion Cancel Date, Tenant shall have waived such termination right under this Section 5.7.

### 5.8.  Automatic Termination.

This Lease shall be automatically terminated if the Delivery Date does not occur on or before the Automatic Termination Date specified in Section 1.4.5 of this Lease notwithstanding any Force Majeure events. Notwithstanding the foregoing, this Lease shall not terminate if Tenant is occupying the Store as of the Automatic Termination Date.

### 5.9.  Entry Prior to Delivery Date.

Tenant shall have the right, without any obligation to pay Rent, to enter the Store to perform work of preparation, but not operation of its business prior to the Delivery Date; however, such exception regarding operation shall not apply subsequent to the Delivery Date specified in any Construction Completion Notice. Tenant agrees that it shall diligently seek to avoid impeding the

Store No. 1610, "Stafford"
Fountains on the Lake
Stafford, TX
9320.1610.4

- 24 -

11/01/12
FINAL

progress of Landlord's Work by such entry and shall indemnify Landlord from any damage or liability caused by Tenant's entry.  No such entry by Tenant shall be deemed an acceptance of delivery of the Store, nor shall it constitute acceptance of Landlord's Work.  Tenant may use such Utilities as are available during the course of such period at no charge or cost to Tenant.

**5.10.    Walk-Through Inspection and Punchlist.**

Within fifteen (15) Business Days after Landlord notifies Tenant of the completion of Landlord's Construction Obligations, Landlord's construction representative and Tenant's construction representative shall meet at and do a complete walk through inspection ("Walk-Through Inspection") of the Store to (a) identify any uncompleted Landlord's Work as required herein, and (b) identify any incomplete or noncomplying items of Landlord's Work.  Within five (5) Business Days after the Walk-Through Inspection, Tenant may deliver to Landlord a list ("Punchlist") containing all items described in clauses (a) and (b) above which were identified during the Walk-Through Inspection as not having been completed (i) to the extent necessary to permit Tenant to commence and complete Tenant's Work without delay or interference from the incomplete nature of Landlord's Work and/or from Landlord's contractor performing Landlord's Work, and (ii) to sufficiently allow Tenant's retail operations to commence in the Store without impediment to the conduct thereof by the incomplete nature of Landlord's Work, and (iii) including completion of the Common Areas to the extent required in this Lease.  If Tenant does submit such a list, and the items set forth on the list are, in fact, part of Landlord's Work under this Lease, Landlord shall promptly and diligently complete or correct such items within thirty (30) days thereafter.  In any event, the Delivery Date shall not be deemed to have occurred until the listed items are completed and/or corrected to the extent necessary to (x) permit Tenant to commence and complete Tenant's Work without delay or interference from Landlord's contractor performing Landlord's Work and/or caused by the incomplete nature of Landlord's Work, and (y) to permit Tenant's retail operations to commence in the Store without impediment to the conduct thereof.  A sum equal to the amount of Minimum Rent for one-half (1/2) of one (1) month may be withheld by Tenant pending completion by Landlord of the Punchlist, which amount shall be promptly remitted to Landlord following Landlord's completion of the Punchlist work.

**5.11.    Intentionally Deleted.**

**5.12.    Additional Delivery Requirements.**

**5.12.1.**    On the Delivery Date.  Tenant's occupancy of the Store on or after the Delivery Date shall not constitute an acceptance of Landlord's Work, or relieve Landlord of responsibility for any warranty or maintenance obligations under this Lease.

**5.12.2.**    Thirty Days After the Delivery Date.  Within thirty (30) days after the Delivery Date, Landlord shall deliver all of the following to Tenant:

(a)    All fully executed and dated warranties and guarantees applying to the Store from the date of completion of Landlord's Construction Obligations.  If such warranties or guarantees are given after the date of completion, they shall be dated as of the actual date that the equipment and/or item was placed in service, but in no event shall execution of any warranty and guaranty occur prior to the date of completion unless authorized in writing by Tenant;

1                (b)     A list of all contractors, subcontractors and suppliers, each of which
2 provided labor, services or materials in excess of Ten Thousand Dollars ($10,000) ("Major
3 Contractors") for the construction of the Store. Said list shall contain the following information about
4 each contractor, subcontractor or supplier: name, business address, phone number (including area
5 code), facsimile number and e-mail address, contact person for the project, and state license number if
6 required for the execution of work on the Store;

7                (c)     Equipment operation manuals, catalogue data sheets and material safety
8 data sheets on all major equipment and/or fixtures used in the Store;

9                (d)     For maintenance use, one percent (1%) of the floor and wall covering
10 material installed of each color and pattern required for the Store; a one (1) gallon container of paint
11 for each color and surface texture used; and each container, box or roll shall be labeled with color,
12 texture and room location in addition to manufacturer's label;

13              · (e)     Completed Punchlist properly signed and dated by Landlord or its general
14 contractor indicating that all items have been completed;

15                (f)     Intentionally deleted;

16                (g)     One (1) copy of final project record documents for the Store including,
17 without limitation, record specifications noted to indicate actual as-built conditions and as-built
18 Autocad record drawings developed from red-lined project stick sets indicating actual as-built
19 conditions; and

20                (h)     Copies of unconditional lien waivers and releases from all Major
21 Contractors.

22     **5.12.3.**    Until the foregoing items specified in Section 5.12.2 have been furnished to
23 Tenant, Tenant may defer payment of all Minimum Rent due under this Lease, provided that any
24 amounts of Minimum Rent so deferred by Tenant shall be due and payable to Landlord immediately
25 upon Tenant's receipt of the foregoing items.

26                                     **6.  RENT**

27 **6.1.  Minimum Rent.**

28     **6.1.1.**    <u>Payment and Amount</u>. Commencing on the Commencement Date and
29 continuing through the Term of this Lease (except as otherwise expressly set forth in this Lease),
30 without demand or set off except as otherwise specified in this Lease, Tenant shall pay Minimum
31 Rent to Landlord in equal monthly installments at the rates specified in Section 1.6 (the "Minimum
32 Rent"). Minimum Rent shall be payable in advance on or before the first (1st) day of each calendar
33 month. If this Lease commences other than on the first day of a calendar month, the first month's
34 Minimum Rent shall be prorated accordingly and paid with the Minimum Rent for the first full
35 month.

Store No. 1610, "Stafford"            - 26 -           11/01/12
Fountains on the Lake                                FINAL
Stafford, TX
9320.1610.4

**6.1.2.**    Place of Payment. All Minimum Rent and other payments to be made by Tenant to Landlord shall be sent to the place to which Landlord's notices are required to be sent, unless otherwise directed by Landlord in writing.

**6.1.3.**    Required Co-Tenancy.

(a)    Co-Tenancy Requirements. A "Reduced Occupancy Period" shall occur unless all of the following requirements are satisfied on the Commencement Date and thereafter throughout the Term: (i) the Required Co-Tenants specified in Section 1.7.1, shall be open in the Shopping Center every day for retail business during the normal and customary hours of operation for each such Required Co-Tenant, except public holidays; (ii) the Required Co-Tenants are operating in at least the Required Leasable Floor Area for each Required Co-Tenant specified in Section 1.7.1 under bona fide leases of a minimum of three (3) years' duration; and (iii) retail tenants (as defined in Section 1.7.1) of the Shopping Center, including the Required Co-Tenants, are open and operating under bona fide leases of a minimum of three (3) years' duration in at least the percentage of the Leasable Floor Area of the Shopping Center indicated in Section 1.7.2 (which percentage shall be calculated as set forth in Section 1.7.2). Landlord shall promptly notify Tenant of any Reduced Occupancy Period. For purposes of calculating the percentages in this paragraph, the denominator of the fraction may not be less than the LFA Minimum described in Section 1.3.2(d).

(b)    Commencement Date Reduced Occupancy Period. If a Reduced Occupancy Period exists on the Commencement Date ("Commencement Date Reduced Occupancy Period"), Tenant shall not be required to open the Store for business (notwithstanding any contrary provision in this Lease), and, further if a Commencement Date Reduced Occupancy Period exists and Tenant does not open for business in the Store, no Rent shall be due or payable whatsoever until and unless the Commencement Date Reduced Occupancy Period is cured (or Tenant terminates this Lease as provided below in this Section 6.1.3(b). However, if a Commencement Date Reduced Occupancy Period exists and Tenant, in its sole discretion, elects to open for business in the Store, then Tenant's obligation for Rent shall be replaced by the obligation for Substitute Rent until such time the Commencement Date Reduced Occupancy Period ceases to exist (or Tenant terminates this Lease as provided below in this Section 6.1.3(b). If the Commencement Date Reduced Occupancy Period continues for a period of twelve (12) consecutive calendar months, then in addition to Tenant's right to pay no Rent or Substitute Rent, as applicable, during the Commencement Date Reduced Occupancy Period, Tenant shall have the ongoing right to terminate this Lease upon thirty (30) days' notice to Landlord (the "Reduced Occupancy Termination Notice"), provided the Reduced Occupancy Termination Notice is given prior to the expiration of the Commencement Date Reduced Occupancy Period.

(c)    Secondary Reduced Occupancy Period. If a Reduced Occupancy Period occurs at any time after the Commencement Date and after the satisfaction of the Required Co-Tenancy set forth in Section 1.7.1 and Section 1.7.2, and such Reduced Occupancy Period is not the result of an Exempted Discontinuance as hereinafter defined ("Secondary Reduced Occupancy Period"), Tenant's total obligation for Rent shall be replaced by Substitute Rent which shall be payable within fifteen (15) days after the close of each calendar month during the Secondary Reduced Occupancy Period and continuing until the expiration of the Secondary Reduced Occupancy Period (or earlier if Tenant terminates this Lease as hereinafter provided in this Section 6.1.3(c)). If the Secondary Reduced Occupancy Period continues for a period of twelve (12) consecutive calendar

1    months (except in the event of an Exempted Discontinuance), then in addition to Tenant's right to
2    pay Substitute Rent during the Secondary Reduced Occupancy Period, Tenant shall have the ongoing
3    right to terminate this Lease upon giving Landlord Tenant's Reduced Occupancy Termination Notice,
4    provided the Reduced Occupancy Termination Notice is given prior to the expiration of the Secondary
5    Reduced Occupancy Period.  If the Secondary Reduced Occupancy Period continues for a period of
6    twenty four (24) consecutive calendar months, Landlord shall also have the right to terminate this
7    Lease upon ninety (90) days' notice to Tenant (the "Landlord's Reduced Occupancy Termination
8    Notice"), provided the Reduced Occupancy Termination Notice is given prior to the expiration of the
9    Secondary Reduced Occupancy Period.  Notwithstanding the foregoing, in the event Landlord elects
10   to terminate this Lease as provided in this Section 6.1.3(c), Tenant may notify Landlord at any time
11   within thirty (30) days after receiving Landlord's Reduced Occupancy Termination Notice, that Tenant
12   (commencing with the next full calendar month) will resume payment of the regular scheduled Rent
13   pursuant to this Lease (the "Withdrawal Notice").  If Tenant so notifies Landlord, then Landlord's
14   Reduced Occupancy Termination Notice shall automatically be void and have no force or effect.  The
15   provisions of this Section 6.1.3(c) shall apply to any subsequent Secondary Reduced Occupancy
16   Period.

17                    (d)      Unamortized Cost of Leasehold Improvements.  In the event Tenant or
18   Landlord terminates this Lease pursuant to Sections 6.1.3(b) or (c) above, Landlord shall pay to Tenant
19   an amount equal to the Unamortized Cost of Tenant's leasehold improvements, which sum shall be
20   due and payable to Tenant within thirty (30) Business Days following the date of the Reduced
21   Occupancy Termination Notice.  If the Unamortized Cost of Tenant's leasehold improvements is not
22   timely paid, Tenant may deduct the amount due from any payments due to Landlord, if any hereunder,
23   in addition to and cumulative with any other remedies available to Tenant at law, in equity, or under
24   the terms of this Lease.

25                    (e)      Exempted Discontinuance.  An Exempted Discontinuance shall mean the
26   closure of a retail tenant's store because of Casualty, condemnation, repairs or remodeling for a period
27   not to exceed one hundred twenty (120) days.  Notwithstanding the preceding sentence, an Exempted
28   Discontinuance shall not include repairs or remodeling or construction of leasehold improvements
29   performed by or on behalf of (i) an Anchor Tenant replacing a Required Co-Tenant (if and to the
30   extent permitted by Section 1.7.1) prior to the date said replacement Anchor Tenant initially opens for
31   business in the premises previously occupied by the Required Co-Tenant being replaced, or (ii) any
32   retail tenant replacing another retail tenant for purposes of satisfying the required percentage of the
33   Shopping Center to be occupied by operating retailers as required by Section 1.7.2, prior to the date
34   said replacement retail tenant initially opens for business.  A retail tenant's store which is closed due to
35   an Exempted Discontinuance shall not be considered closed for purposes of determining whether a
36   Secondary Reduced Occupancy Period is in effect (and the Leasable Floor Area of such retail tenant's
37   store shall not be calculated in the numerator or the denominator of the fraction specified in
38   Section 1.7.2) from the commencement of the Exempted Discontinuance until the earlier of:  (i) the
39   expiration of such ninety (90) day period; or (ii) the expiration of the Exempted Discontinuance.

40                    (f)      Landlord Reporting Requirements.  Within ten (10) Business Days
41   following the Commencement Date, Landlord shall deliver to Tenant, at Tenant's notice address as set
42   forth in Section 1.2.2(a), (i) Landlord's certification to Tenant certifying either (A) that the Co-Tenancy
43   Requirements applicable as of the Commencement Date are satisfied or (B) that a Reduced Occupancy
44   Period is in effect and specifying the nature of the Reduced Occupancy Period ("Landlord's

Co-Tenancy Certification"), and (ii) a Shopping Center tenant roster and occupancy/vacancy report for the entire Shopping Center which shall include the Leasable Floor Area occupied by each tenant and the percentage of Leasable Floor Area of the Shopping Center occupied by all operating retailers in the Shopping Center ("Co-Tenancy Report"). Landlord acknowledges that Tenant requires Landlord's Co-Tenancy Certification and the Co-Tenancy Report as required by the preceding sentence in order to determine the satisfaction of the Required Co-Tenancy under this Lease and to commence the payment of Rent under this Lease (and Tenant may defer all such payments of Rent until Landlord has delivered such items to Tenant). In addition, within sixty (60) days following the close of each calendar year, Landlord, as an addendum to the Annual Statement required pursuant to Section 7.4.5, shall provide Tenant a Co-Tenancy Report certified as current as of the date of the report plus a Landlord's Co-Tenancy Certification certified as current as of the date of the certificate. In the event Landlord fails to provide the Landlord's Co-Tenancy Certification and/or the Co-Tenancy Report within the time period specified above, Tenant may defer any payments relating to Rent until such time as the Landlord's Co-Tenancy Certification and/or Co-Tenancy Report is received by Tenant. If Tenant defers any payments relating to Rent pursuant to this Section 6.1.3(f), Tenant shall pay the amount due within thirty (30) days following Tenant's receipt of the Co-Tenancy Report and the Landlord's Co-Tenancy Certification, subject to the other terms of this Lease, including Section 6.1.3. Tenant shall have the right to audit Landlord's records pertaining to the Co-Tenancy Requirements, including, but not limited to, Landlord's records pertaining to Landlord's Co-Tenancy Certification and the Co-Tenancy Report, in accordance with the provisions of Section 7.4.7. In addition to the foregoing, in the event of a bona fide dispute as to the occurrence, existence or continuation of a Reduced Occupancy Period ("Co-Tenancy Dispute"), Tenant's non-payment of Rent, or Tenant's payment of Substitute Rent, or Tenant's withholding or offsetting of Rent which was overpaid by Tenant during the occurrence of a Reduced Occupancy Period, shall not be deemed a default by Tenant under the terms of this Lease. Upon resolution of the Co-Tenancy Dispute, the obligated party shall pay to the other the remaining sum liquidated as due (if any) with interest thereupon at the Legal Rate. Tenant agrees to maintain the Co-Tenancy Report on a confidential basis and not to disclose to third parties the contents thereof.

**6.2.    Reimbursements.**

In addition to the Minimum Rent described in Section 6.1, Tenant shall be responsible to pay Tenant's Pro Rata Share of Common Area Charges as described in Section 7.4.1, the Tax Bill as described in Section 8.2.1, and the Special Form Policy premium as described in Section 9.1.4.

**6.3.    Other Payment Provisions.**

**6.3.1.**    Late Payment. Any sum including Rent accruing to Landlord or Tenant under the provisions of this Lease which is not paid within ten (10) Business Days following written notice that such sum is past due ("Payment Notice Period"), shall bear interest at the Legal Rate from the expiration of the Payment Notice Period to the date paid unless the past due sum is disputed pursuant to Section 6.3.3.

**6.3.2.**    Timely Billing of Charges. All charges due from Tenant to Landlord for which Tenant must be billed by Landlord shall be billed within six (6) months after the close of the calendar year in which the charge is incurred by Landlord, or Landlord will have waived its right to reimbursement as otherwise provided in this Lease.

Store No. 1610, "Stafford"
Fountains on the Lake
Stafford, TX
9320.1610.4

- 29 -

11/01/12
FINAL

**6.3.3.**    Disputed Sums.    In the event that at any time during the Term a bona fide dispute arises with respect to the amount due for any Reimbursements or other charges claimed by a party to be due, or with respect to Tenant's payment of Substitute Rent or Tenant's non-payment of Rent pursuant to Tenant's right to pay Substitute Rent or to defer, withhold, deduct or offset Rent in accordance with this Lease, including, but not limited to, pursuant to Section 6.1.3(f), Section 11.2 and Section 20.1.2(b), the party claiming a dispute shall notify the other party in writing of the basis for the dispute.  Pending the resolution of the dispute between the parties by litigation or otherwise, any undisputed portion of any Reimbursements or other charges, Substitute Rent, or Rent, as applicable, shall be paid by Tenant or Landlord, as the case may be, and the disputed portion of any Reimbursements or other charges, Substitute Rent, or Rent, as the case may be, may be withheld pending resolution of the dispute.  Tenant's withholding of the disputed amount, or offsetting of an amount previously paid in the event of a bona fide dispute shall not be deemed a default by Tenant under the terms of this Lease.  Upon resolution of any dispute, the obligated party shall pay to the other the remaining sum liquidated as due (if any) with interest thereupon at the Legal Rate.

**6.4.    Gross Sales Statement for Purposes of Calculating Substitute Rent.**

**6.4.1.**    Gross Sales Statement.    In the event Tenant pays Substitute Rent pursuant to clause (b) of the Substitute Rent definition in Article 2, within fifteen (15) days after the close of each calendar month, Tenant shall submit to Landlord a statement indicating the amount of its Gross Sales for the previous month.  Landlord covenants to keep such information confidential.

**6.4.2.**    Maintenance of Records.    In the event Tenant pays Substitute Rent during any Lease Year, Tenant shall maintain adequate records for a period of one (1) year after the close of each such Lease Year for the purpose of allowing Landlord to verify the reported Gross Sales for such Lease Year.  At any time within said one (1) year period, Landlord or its agents may inspect such records at Tenant's main office specified in Section 1.2.2 hereinabove during Tenant's normal business hours.

**6.4.3.**    No Representation.    Landlord acknowledges that Tenant has made no representation as to the Gross Sales which may be generated from the Store.

# 7.  COMMON AREA MAINTENANCE

**7.1.    Landlord's Obligation to Maintain Common Areas.**

**7.1.1.**    Maintain Common Areas.    Landlord shall maintain (and to the extent it has the legal ability to effect same under the REA, to cause to be maintained) all Common Areas in first class condition, repair and cleanliness, including ice and snow removal, and sidewalk steam cleaning and shall keep the Common Areas free of any impediments and open for easy and safe movement within the Common Areas.  Landlord shall keep the Common Areas well lighted until 11:00 p.m. each night and thereafter shall maintain security lighting in the Common Areas as required by applicable Requirements or, if there are no applicable Requirements, then in accordance with customary shopping center management practices for comparable shopping centers in the vicinity of the Shopping Center, and Landlord shall otherwise keep such Common Areas safe and secure.  Landlord represents, and Tenant acknowledges, that lighting in the Common Areas is continuous after dark for security purposes, but not at the request of one or more tenants or occupants of the

Shopping Center, and the cost of such lighting is included in Common Area Charges. No construction or construction-related activity shall be permitted in the Common Areas, except for emergency repairs diligently pursued, during the period from October 1 of any year to January 2 of the ensuing year, without the prior written consent of Tenant, which consent may include conditions designed to eliminate interference with the operation of the Shopping Center or the effect of such activity upon Tenant's business.

**7.1.2.**   Common Area Metering. The Common Areas shall be served by meters which do not serve any other areas of the Shopping Center. Landlord shall cause all Utilities for the Common Areas to be separately metered from those of Tenant and/or the Store. Landlord shall obtain from the local Utility companies and shall provide to Tenant, upon Tenant's request therefor from time to time, written verification (a) that such meters service only the Common Areas, and (b) that no sewer service charges are included in the Common Area water billings.

## 7.2.   Tenant's Pro Rata Share.

**7.2.1.**   Landlord's Parcel. Subject to the provisions of Section 7.2.2, Tenant's Pro Rata Share of Common Area Charges is defined as that fraction of Common Area Charges the numerator of which is the Leasable Floor Area in the Store and the denominator of which is the Leasable Floor Area in Landlord's Parcel; provided, however, in no event shall the denominator of such fraction be less than the Minimum Leasable Floor Area set forth in Section 1.3.2(a).

**7.2.2.**   Shopping Center. Notwithstanding the provisions of Section 7.2.1 above, in no event shall Tenant's Pro Rata Share of Common Area Charges exceed the amount Tenant would have incurred had its Pro Rata Share been a fraction, the numerator of which is the Leasable Floor Area in the Store, and the denominator of which is the Leasable Floor Area in the Shopping Center, which fraction shall be applied to the Common Area Charges for the Shopping Center.

## 7.3.   Definition of Common Area Charges.

**7.3.1.**   Included Charges. The following costs reasonably incurred during the Term for maintenance and repair of the exterior Common Areas shall be included as Common Area Charges: maintaining and repairing the parking area of the Common Areas (including slurry-sealing, restriping parking spaces and filling potholes), sidewalks and loading zones (whether or not such sidewalks and loading zones are Common Areas); Shopping Center security; cleaning, sweeping and other janitorial services; sanitation; maintenance of Common Area refuse receptacles; maintenance of existing landscaping; maintenance of directional signs and other markers; electricity to light the Common Areas during the hours required under, and as provided in, Section 7.1; maintenance and repair of and electricity to light pylon and monument signs identifying the Shopping Center on which Tenant's signage appears (but not other pylon or monument signs on which Tenant's signage does not appear) as well as Tenant's signs on such pylon or monument signs; repair and maintenance of lighting fixtures; replacement of lighting elements; any maintenance of other Utility systems to serve the Common Areas; premiums of Landlord's liability insurance for the Common Areas; trash removal for the Common Areas of Landlord's Parcel (Landlord shall arrange for separate, segregated dumpsters for Common Area trash, the allocated cost of which shall be includable in Common Area Charges); and the administrative fee described in Section 1.8 which may be included only to the extent assessed against the remainder of Common Area Charges after excluding

Store No. 1610, "Stafford"
Fountains on the Lake
Stafford, TX
9320.1610.4

- 31 -

11/01/12
FINAL

therefrom liability insurance premiums, Utility costs, security costs, management fees paid to third parties and capital expenditures, if any are expressly authorized by this Section 7.3.1. Taxes as defined in Article 8, and Property Insurance pursuant to Section 9.1 are not included as Common Area Charges, and, accordingly, are not included in the computation of the administrative fee specified in Section 1.8.

**7.3.2.**    <u>Excluded Charges</u>. In no event shall Common Area Charges include any of the following: (1) costs of original construction (as distinguished from maintenance and repair) of the Shopping Center or any expansion, remodeling or renovation thereof; (2) principal and/or interest payments on any financing for the Shopping Center or any portion thereof or rental under any ground lease or other underlying lease; (3) capital expenditures (i.e., expenditures which, in the customary course of maintenance practice for shopping centers similar in type and location to that of the Shopping Center, do not recur annually) including, but not limited to, repaving, petromatting or resurfacing of the parking area of the Common Areas; (4) the costs of correcting defects in the design or construction of the Shopping Center, or repair and/or replacement of any materials or equipment required as a result of such defects; (5) any expense resulting from deferred maintenance or the negligence of Landlord, its agents, servants or employees, or any additional expense incurred as a direct result of Landlord's failure to use competitive bidding to minimize expenses to the extent possible without detracting from the standards of a first class shopping center; (6) the cost of any repair to remedy damage caused by or resulting from the negligence of any other tenant(s) in the Shopping Center, including their agents, servants or employees; (7) reserves for anticipated future expenses; (8) legal and other fees, leasing commissions, advertising expenses and other costs incurred in connection with development, leasing or operation of the Shopping Center, or in connection with negotiations or disputes with tenants, occupants or prospective tenants or occupants, or legal fees incurred in connection with this Lease; (9) cost of repairs or other work occasioned by fire, Casualty or other insurable risk or the exercise of the right of eminent domain; (10) expenses incurred in the build out, renovation, maintenance, repair, alteration, improvement, decoration, painting or redecoration of any portion of any building in the Shopping Center (except for graffiti removal and associated spot repainting); (11) any items for which Landlord is entitled to be reimbursed or compensated, including, without limitation, contractors' warranty or right of reimbursement from any tenant or occupant of the Shopping Center, including reimbursement for charges incurred solely for such tenant or occupant (i.e., tenant specific charges); (12) any bad debt loss, rent loss or reserves for bad debts or rent loss (including debt consisting of unpaid contributions to Common Area Charges due from another tenant or occupant of the Shopping Center); (13) cleaning, sweeping, and removal of debris within the primary parking area and adjacent walkways and seating area (if any) of any restaurant only to the extent the costs to clean, sweep and remove debris from such areas exceeds the costs to clean, sweep and remove debris in the remainder of the Common Areas; (14) expenses in connection with services or other benefits of a type which are not provided Tenant but which are provided only to or for another tenant or occupant of the Shopping Center; (15) any interest, late charges, or penalties incurred as a result of Landlord's failure to pay any bill as the same shall become due; (16) any and all other costs associated with the operation of the business of Landlord, intending by this exclusion to distinguish the same from the costs of maintenance of the Common Areas (excluded items shall specifically include, but shall not be limited to, formation of the Landlord entity, internal accounting and legal matters, including, but not limited to, preparation of tax returns and financial statements and gathering of data therefor, costs of selling, syndication, financing, mortgaging or hypothecating any of Landlord's interest in the Shopping Center, and costs of any disputes between Landlord and its

Store No. 1610, "Stafford"
Fountains on the Lake
Stafford, TX
9320.1610.4

- 32 -

11/01/12
FINAL

1    employees); (17) salaries and bonuses of officers and executives of Landlord and compensation paid
2    to clerks, attendants or other persons in commercial concessions operated by Landlord;
3    (18) advertising and promotional expenditures or customer services or music services such as Muzak
4    or misting services; (19) costs, fines, or fees incurred by Landlord due to violations of any federal,
5    state or local law, statute or ordinance, or any rule, regulation, judgment or decree of any
6    governmental rule or authority; (20) any costs or expenses associated with the investigation,
7    monitoring, removal, cleanup or remediation of any Hazardous Materials (as hereinafter defined)
8    from the Shopping Center, any restoration in connection therewith or compliance with any
9    Environmental Regulations (as hereinafter defined); (21) the cost of compliance with any other
10    Requirements (as hereinafter defined) (including, without limitation, the Americans With Disabilities
11    Act); (22) the cost of any work or services performed for any facility other than the Shopping
12    Center; (23) any costs representing an amount paid to a person, firm, corporation or other entity
13    related to Landlord which is in excess of the amount which would have been paid in the absence of
14    such relationship; (24) management, supervision, administrative and overhead costs (including, but
15    not limited to, office space, equipment, Utilities, and personnel) other than the fee described in
16    Section 1.8; (25) the cost of acquiring sculptures or other art objects and costs of decorative
17    monuments; (26) costs of tools and equipment for operation, repair and maintenance of the
18    Common Area which are not customarily expensed in the year placed in operation pursuant to
19    generally accepted accounting principles; (27) costs incurred in the construction, maintenance, repair
20    or replacement of any buildings in the Shopping Center (whether relating to structural or
21    nonstructural, exterior or interior portions of such buildings), specifically excluding from Common
22    Area Charges any costs incurred for maintenance, repair, Utilities or any other costs with respect to
23    restrooms or restroom facilities, or signs which identify the Shopping Center; (28) any costs to clean
24    up or repair the Common Area as a result of promotional activities or because of construction,
25    maintenance, or reconstruction of buildings in the Shopping Center; (29) premiums for liability
26    insurance of any kind except as specified in Section 7.3.1 above; (30) costs incurred by Landlord as a
27    result of any claim covered by the insurance which Landlord is required to maintain under this
28    Lease, including deductible amounts; (31) any expense associated with "food courts" as that term is
29    described in Article 2 - "Common Areas", such as maintenance, repair, purchase of personal
30    property or any other cost related thereto; (32) sanitary sewer charges (but storm sewer charges shall
31    be included in Common Area Charges) unless such sanitary sewer charges are: (a) assessed solely as
32    a surcharge on water used for Common Area landscaping, or (b) for public toilet(s) located in the
33    Common Areas; (33) should there be commercial offices within the Shopping Center which occupy,
34    in the aggregate more than five thousand (5,000) square feet of Leasable Floor Area, the charges
35    incurred in respect of such office facilities such as, by way of example, elevator charges, common
36    hallways, electricity, water and janitorial expenses; (34) any unreimbursed Common Area Charges
37    arising from a reimbursement to Landlord from an occupant of the Shopping Center of less than its
38    mathematical pro rata share thereof calculated based upon Leasable Floor Area occupied by such
39    occupant relative to the Leasable Floor Area of all occupants of the Shopping Center; (35) the cost
40    of promotional and seasonal decorations, including the purchase, leasing, storage, installation and/or
41    removal and clean-up of same; (36) costs of replacing, repairing, or restoring the Shopping Center,
42    or any portion thereof, in the event of a Casualty of any type, regardless of whether insurable or
43    uninsurable, insured or uninsured; (37) rent or other costs for security offices or a police station in
44    the Shopping Center; (38) premiums for earthquake or flood or terrorism insurance of any kind;
45    (39) costs for the construction and maintenance of any pylon or monument signs for the Shopping
46    Center, except for any sign maintenance costs expressly permitted under Section 7.3.1; and (40) any

Store No. 1610, "Stafford"                        - 33 -                        11/01/12
Fountains on the Lake                                                              FINAL
Stafford, TX
9320.1610.4

costs or expenses incurred by Landlord in sponsoring events in or upon the Shopping Center or in creating a "brand" or name recognition for the Shopping Center. Additionally, Tenant shall have no obligation to contribute to a marketing fund or merchants' association for the Shopping Center. Notwithstanding anything to the contrary contained in this Article 7, any income received by Landlord from the use of portions of the Common Areas for which Tenant reimburses Landlord for Tenant's Pro Rata Share of Common Area Charges, such as, for example, income received by Landlord for use of the Common Areas for advertising or for special events, shall be deducted from the Common Area Charges to which Tenant contributes.

## 7.4.    Payment of Tenant's Pro Rata Share.

**7.4.1.**    Payment.    Provided Landlord maintains the Common Areas as specified in Section 7.1, commencing on the Commencement Date, Tenant shall pay Tenant's Pro Rata Share of the Common Area Charges in the manner set forth herein.

**7.4.2.**    Estimated Payments.    Landlord shall, once a year, estimate Common Area Charges for the ensuing calendar year, and Tenant's share thereof, based on the previous year's actual expenditures and Landlord's reasonable projections for the following calendar year, which projections shall be set forth in a detailed budget for Common Area Charges. Landlord shall deliver to Tenant the projections and budget in writing along with the Annual Statement delivered pursuant to Section 7.4.5. If the Shopping Center has not been operated for one (1) year or more as of the Commencement Date of the Term, Common Area Charges shall be based on Landlord's reasonable estimate thereof based on typical charges for similar shopping centers within five (5) miles of the Shopping Center and Landlord shall provide Tenant with a detailed budget for Common Area Charges based upon Landlord's estimates within thirty (30) days following the Delivery Date. Notwithstanding the foregoing, in the event Landlord fails to retain its records of Common Area Charges as required by Section 7.4.7 and records of Common Area Charges for the immediately preceding calendar year are not available to Tenant, then, in addition to all other remedies available to Tenant at law or in equity or under this Lease, including the provisions of Section 7.4.7, Landlord shall not be permitted to increase its estimate of Common Area Charges for the following calendar year and Tenant shall be under no obligation with respect to such calendar year to pay more than the amount payable by Tenant for the last calendar year for which Landlord's records of Common Area Charges were reviewed and approved by Tenant. Beginning with the first (1st) day of the first calendar month of the Term following Tenant's receipt of Landlord's written estimate of its annual obligation in respect of Common Area Charges (but not in any event before thirty (30) days after receipt thereof), Tenant shall include one-twelfth ($1/12$th) of its annual obligations set forth in such estimate with each payment of Minimum Rent for the ensuing twelve (12) month period. After the first calendar year, any proposed increase in total Common Area Charges (excluding increases in the cost of Utilities provided by public Utility providers, and not by or through Landlord) in excess of five percent (5%) over the previous year's expenditures must be justified by itemization of each element of charge, together with (a) a written explanation of the reason (i.e., increased scope of work, deferred work, etc.) for the increase in excess of five percent (5%), and (b) copies of the competitive bids described in Section 7.4.3 below. The requirement for bids shall also apply at any time an element of the Common Area Charge is proposed to increase more than ten percent (10%) in any year, in relation to the cost for such element for the previous twelve (12) month period, whether the resulting proposed Common Area Charges for the subject year will be in excess of three percent (3%) over the amount paid by Tenant for the previous twelve (12) month period. In the

Store No. 1610, "Stafford"
Fountains on the Lake
Stafford, TX
9320.1610.4

- 34 -

11/01/12
FINAL

absence of the required explanation for the proposed increase (as described above) in Common
Area Charges in excess of five percent (5%), Tenant shall be under no obligation in respect of such
year to pay more than the amount payable by Tenant for the previous twelve (12) months plus five
percent (5%).

**7.4.3.** <u>Landlord's Contracts</u>. All Landlord's contracts with third parties for work,
service or materials, the cost of which may be included in the Common Area Charges, shall include
a detailed description of the work, service, or material to be provided by the contractor. No such
contracts shall involve a duplication of the work or service provided by other contractors, their
employees or agents or the employees of Landlord. Landlord shall maintain detailed job
descriptions for all employees employed by Landlord for the purpose of performing Common Area
maintenance activities whose salaries, wages and/or benefits may be included in Common Area
Charges. Landlord's employees shall not provide duplicate services to those provided by Landlord's
third party contractors. Any individual third party contract in excess of Twenty Thousand Dollars
($20,000) shall be commercially reasonable and competitively priced.

**7.4.4.** <u>Intentionally deleted</u>.

**7.4.5.** <u>Annual Statement</u>. Within ninety (90) days following the close of each calendar
year, Landlord shall submit to Tenant a statement ("Annual Statement"), in which Landlord shall set
forth in reasonable detail the actual expenditures for Common Area Charges for such calendar year
and Tenant's Pro Rata Share of Common Area Charges thereof and Landlord shall also provide
Tenant with copies of all invoices and other written evidence of Common Area Charges paid by
Landlord ("CAM Evidence"). In addition, within sixty (60) days following the close of the first
calendar year of the Term, Landlord shall provide Tenant with a copy of the Annual Statement for
the prior calendar year. The Annual Statement shall be certified by an authorized agent of Landlord
to be correct. In the event Landlord fails to provide such Annual Statement or CAM Evidence
within the time periods required hereby, Tenant may thereupon defer any payments relating to
Common Area Charges until sixty (60) days following its receipt of the last to occur of (a) the
Annual Statement, or (b) the CAM Evidence.

**7.4.6.** <u>Reconciliation of Annual Statement</u>. If the Annual Statement indicates that
Tenant's payments of estimated Common Area Charges exceeded Tenant's total obligation relating
to such calendar year ("Overpayment"), Landlord shall accompany said Annual Statement with a
refund to Tenant in the amount of such Overpayment ("Overpayment Refund"), and Landlord shall
concurrently adjust its accounting records to reflect such refund of Tenant's Overpayment. If the
Annual Statement shows that Tenant's payments of estimated Common Area Charges were less
than its total obligation relating to such calendar year, Tenant shall pay the difference to Landlord
within sixty (60) days of Tenant's receipt of the Annual Statement. In the event an Overpayment
Refund is due Tenant, but Landlord does not deliver the Overpayment Refund to Tenant
concurrently with the Annual Statement, as provided above, then Tenant shall have the right to
defer any payments relating to Common Area Charges until Tenant receives such Overpayment
Refund from Landlord. Tenant shall pay to Landlord any such deferred Common Area Charges
within thirty (30) days after Tenant's receipt of the Overpayment Refund. In addition, if Tenant
does not receive the Overpayment Refund within thirty (30) days after the date of Tenant's receipt
of the Annual Statement indicating an Overpayment by Tenant, then Tenant shall have the right to
deduct the amount of the Overpayment Refund due Tenant from the Rent due under this Lease. In

such event, Landlord and Tenant shall each adjust their accounting records to reflect the refund of the Overpayment. In addition to the foregoing, if after the Annual Statement is delivered to Tenant, it is subsequently determined that there was an Overpayment by Tenant, Landlord shall deliver the Overpayment Refund to Tenant within thirty (30) days following receipt of Tenant's written notice indicating such Overpayment by Tenant. If Tenant does not receive the Overpayment Refund within the thirty (30) day period set forth in the preceding sentence, Tenant shall have the right to deduct the amount of the Overpayment Refund due Tenant from the Rent due under this Lease. In such event, Landlord and Tenant shall each adjust their accounting records to reflect the refund of the Overpayment. Notwithstanding the foregoing, if at the time Landlord delivers such Annual Statement to Tenant, Tenant is auditing Landlord's records of Common Area Charges, or, if Landlord has not provided the CAM Evidence previously requested by Tenant, any payment which may be determined to be due from Tenant shall be made by Tenant within sixty (60) days following conclusion of such audit, or within sixty (60) days following Tenant's receipt of the CAM Evidence previously requested by Tenant, as applicable.

    **7.4.7.**  Audit. Tenant shall have the right to audit (the "Audit") all of Landlord's or Landlord's agent's records pertaining to the Reimbursements payable by Tenant pursuant to Sections 7.4.1, 8.2.1 and 9.1.4, including Common Area Charges, Taxes, and the Special Form Policy with a representative of Tenant's choice. Tenant shall also have the right to Audit all of Landlord's or Landlord's agent's records pertaining to the Co-Tenancy Requirements, Landlord's Co-Tenancy Certification, the Co-Tenancy Report and any Reduced Occupancy Period (collectively "Co-Tenancy Records") with a representative of Tenant's choice ("Co-Tenancy Audit"). Tenant may conduct a separate Audit for each category of Reimbursements but no separate Audit may occur more frequently than once in any calendar year. Landlord shall retain its records of Reimbursements for a period of at least three (3) years following the final billing for each calendar year during the Term and Landlord shall retain its Co-Tenancy Records for a period of at least three (3) years following the end of each calendar year during the Term. Landlord covenants and agrees that in the event Landlord assigns this Lease in connection with a transfer of the Shopping Center, Landlord shall deliver to the assignee all of the records of Reimbursements and all Co-Tenancy Records required to be retained by Landlord pursuant to this Lease. In the event Landlord fails to retain its records as required by this Section 7.4.7, Landlord's failure shall constitute a default by Landlord under this Lease and Tenant shall have the following remedies, in addition to all other remedies available to Tenant at law or in equity:

    (a)  Landlord acknowledges and agrees that Tenant's obligation to reimburse Landlord for Tenant's Pro Rata Share of Reimbursements is contingent upon Landlord maintaining records of Reimbursements as required by this Section 7.4.7 so that Tenant can verify that the Reimbursements billed to Tenant and Tenant's Pro Rata Share thereof are in accordance with the terms of this Lease. Accordingly, if Landlord fails to maintain records of any Reimbursements as required by the terms of this Lease, and Tenant is not able to verify that such Reimbursements and Tenant's Pro Rata Share thereof are billed and calculated in accordance with the terms of this Lease ("Unsubstantiated Reimbursement"), Tenant shall have no obligation to pay to Landlord, Tenant's Pro Rata Share of any such Unsubstantiated Reimbursement. In such event, if Tenant previously made estimated payments with respect to any Unsubstantiated Reimbursement, Landlord shall reimburse Tenant for the amount of such estimated payments within thirty (30) days following receipt of Tenant's written demand therefor, and if Landlord fails to do so, Tenant shall have the right to deduct the

Store No. 1610, "Stafford"
Fountains on the Lake
Stafford, TX
9320.1610.4

- 36 -

11/01/12
FINAL

1    amount of such estimated payments made by Tenant with respect to any Unsubstantiated
2    Reimbursement from the Rent due under this Lease until Tenant is fully reimbursed.

3                    (b)    If Landlord fails to maintain Co-Tenancy Records as required by the terms
4    of this Lease, Landlord acknowledges and agrees that it will be deemed that a Reduced Occupancy
5    Period was (or is) in effect for the entire period that the Co-Tenancy Records were not maintained and
6    made available to Tenant, and Tenant will have the remedies set forth in Section 6.1.3 with respect to a
7    Commencement Date Reduced Occupancy Period or a Secondary Reduced Occupancy Period, as
8    applicable, including, but not limited to, Tenant's right to pay no Rent and/or Substitute Rent, as
9    applicable. If Tenant previously paid Rent during any period that a Commencement Date Reduced
10   Occupancy Period or a Secondary Reduced Occupancy Period was in effect (or was deemed to have
11   been in effect) and as a result thereof, Tenant overpaid any Rent, Landlord shall reimburse Tenant for
12   such overpaid Rent within thirty (30) days following receipt of Tenant's written demand therefor, and
13   if Landlord fails to do so, Tenant shall have the right to deduct the amount of such overpaid Rent from
14   the Rent due under this Lease until Tenant is fully reimbursed.

15   At any time during the three (3) year period following the final billing for each calendar year
16   during the Term, upon at least thirty (30) days' advance notice to Landlord, Tenant may conduct an
17   Audit of any or all Reimbursements. At any time during the three (3) year period following the end
18   of each calendar year during the Term, upon at least thirty (30) days' advance notice to Landlord,
19   Tenant may conduct a Co-Tenancy Audit. The Audit or Co-Tenancy Audit, as applicable, shall
20   commence on a date (the "Audit Date") of which Tenant has notified Landlord not less than thirty
21   (30) days in advance. In the event of cancellation of the Audit by Landlord that is not concurrently
22   rescheduled to a new date by mutual agreement of Landlord and Tenant, Tenant shall be relieved of
23   its obligation to make monthly payments of the estimated Common Area Charges and any other
24   Reimbursements which Landlord estimates under the express provisions of this Lease, until the first
25   to occur of twelve (12) months thereafter, or until the Audit is performed and completed. In the
26   event of a cancellation of a Co-Tenancy Audit by Landlord and provided Landlord and Tenant do
27   not reschedule such Co-Tenancy Audit to a mutually agreed upon date, Tenant may defer payment
28   of all Rent until the Co-Tenancy Audit is performed and completed.    In addition, in the event of
29   cancellation of an Audit or a Co-Tenancy Audit by Landlord, and provided Landlord and Tenant do
30   not reschedule such Audit or Co-Tenancy Audit to a mutually agreed upon date, the three (3) year
31   period set forth above shall be extended until the Audit or the Co-Tenancy Audit, as applicable, is
32   performed and completed. In addition, in the event Landlord cancels the Audit or the Co-Tenancy
33   Audit, as applicable, less than fifteen (15) days prior to the scheduled Audit Date, Landlord shall
34   reimburse Tenant for all costs incurred by Tenant, such as, for example, the cost of nonrefundable
35   airfares, resulting from Landlord's cancellation of the Audit or the Co-Tenancy Audit, as applicable.
36   Landlord shall reimburse such costs to Tenant within ten (10) days following receipt of Tenant's
37   invoice therefor and if Landlord fails to do so, Tenant may deduct the full amount of such costs
38   from any subsequent Rents coming due under this Lease.

39   Any overbilling discovered in the course of the Audit or any overpayment of Rent
40   discovered in the course of a Co-Tenancy Audit ("Overbilled Amount") shall be refunded to Tenant
41   (together with interest at the Legal Rate) within thirty (30) days following the date that Landlord is
42   provided with a copy of Tenant's Audit or the Co-Tenancy Audit, as applicable (the "Refund
43   Date"). In the event the Overbilled Amount with respect to an Audit of Reimbursements exceeds
44   three percent (3%) of the sum previously billed to Tenant by Landlord, or in the event a

Co-Tenancy Audit discloses the occurrence or existence of a Reduced Occupancy Period, then in either event, Landlord shall also reimburse Tenant for all reasonable expenses of the Audit or the Co-Tenancy Audit, as applicable, by the Refund Date.  On or before the Refund Date, Landlord shall:  (a) refund any Overbilled Amount (together with interest at the Legal Rate) and the Audit or the Co-Tenancy Audit expenses, if applicable; or (b) provide Tenant with (i) the reasons for any disagreement by Landlord with the findings of Tenant's Audit or Tenant's Co-Tenancy Audit, as applicable, (ii) together with any supporting documentation, and (iii) accompanied by cash payment in the amount of any undisputed  Overbilled Amount.  In the event Landlord fails to respond by either of the foregoing methods, the Audit or the Co-Tenancy Audit, as applicable, shall be deemed conclusive.  In such event, Landlord shall refund to Tenant the Overbilled Amount within thirty (30) days following the Refund Date and Landlord and Tenant shall each adjust their accounting records to reflect such refund to Tenant of the Overbilled Amount.  In the event the Overbilled Amount relates to an Audit of Reimbursements (and not a Co-Tenancy Audit) and Landlord does not refund Tenant the Overbilled Amount within thirty (30) days following the Refund Date, then Tenant may, in addition to its other remedies, defer any payments relating to Reimbursements until thirty (30) days following Tenant's receipt from Landlord of (a) the Overbilled Amount, and (b) evidence that Landlord has adjusted its accounting records to reflect the refund of the Overbilled Amount.  In addition, if Landlord does not refund to Tenant the Overbilled Amount (with respect to either an Audit or a Co-Tenancy Audit) within such thirty (30) day period, then Tenant may, in addition to its other remedies, deduct the Overbilled Amount from the Rent due under this Lease.  In such event, Landlord and Tenant shall each adjust their accounting records to reflect the refund of the Overbilled Amount.  In the event Landlord disputes Tenant's Audit or the Co-Tenancy Audit, as applicable, and provides the reasons and documentation supporting such claim, the parties shall diligently, within ten (10) Business Days thereafter, attempt to resolve their differences, and, in failing to do so, the matter may be submitted by either party for mediation under the provisions of Section 20.2.2 hereof.  In the event Landlord fails to pay Tenant the Overbilled Amount (together with interest at the Legal Rate) as well as Audit expenses or Co-Tenancy Audit expenses, if applicable, within thirty (30) days of a final court order if Landlord disputes the Audit or the Co-Tenancy Audit, as applicable, Tenant shall have the right to deduct all unpaid amounts from the Rent due under this Lease until Tenant is fully paid.

**7.4.8.**    Intentionally Deleted.

## 8.  REAL ESTATE TAXES AND ASSESSMENTS

**8.1.    Obligation to Pay.**

Landlord shall pay all real property taxes and assessments ("Tax" or "Taxes") levied by a government agency against Landlord's Parcel or smaller Tax parcel which includes the Store (the "Tax Bill") on or before the last day that such Taxes may be paid without penalty, commission, interest or other charge. A "Tax parcel" is a single parcel of land for which the relevant taxing authority renders a separate billing.

**8.2.    Tenant's Pro Rata Share.**

**8.2.1.**    Payment of Tenant's Pro Rata Share.  In addition to the Minimum Rent herein reserved, Tenant shall reimburse Landlord for Tenant's Pro Rata Share (calculated in accordance

with Section 8.2.3 hereafter) of the Tax Bill, applicable to each Tax Year or part thereof which falls within the Term. Tenant's payment shall be made within thirty (30) days after receipt by Tenant of (a) a copy of Landlord's cancelled check for payment of Taxes or other evidence of payment reasonably satisfactory to Tenant, (b) a copy of Landlord's Tax Bill (which Tax Bill must state the assessed value of the property included in the Tax Bill and itemize all general and special assessments), and (c) a statement in writing from Landlord setting forth the amount of Tenant's Pro Rata Share of the Tax Bill and the method of calculation thereof. Tenant's schedule of payments shall be concurrent with Landlord's obligations for payment to the taxing authority; however, Tenant shall have no obligation to pay Tenant's Pro Rata Share of the Tax Bill until Landlord has supplied Tenant the written evidence of payment as specified in clauses (a), (b) and (c) above in this Section 8.2.1. In the event Landlord fails to pay the Taxes and provide Tenant with evidence of payment, Tenant may deduct from Rent coming due under this Lease an amount equal to the sum of delinquent Taxes for the Building or at Tenant's option, the entire Landlord's Parcel, and at Tenant's option, pay such amount of delinquent Taxes for the Building or at Tenant's option, the entire Landlord's Parcel to the applicable taxing authority. Should Tenant elect to make the payment of delinquent Taxes, and thereafter Landlord makes such payment to the taxing authority as well, Tenant shall nonetheless be deemed to have fulfilled its payment obligation and the responsibility for obtaining a refund from the taxing authority shall be that of Landlord.

8.2.2.    Installments. In the event of Tax assessments which may be paid in installments by reason of bonding or otherwise, Landlord shall elect to make payment based upon the longest period of installment payments permitted by the appropriate taxing authority. Tenant shall bear no liability as to installments due following the expiration or earlier termination of this Lease except for prorated amounts due prior to the expiration or earlier termination of this Lease. Tenant shall not be responsible for any interest, late charge or other penalty resulting from Landlord's late payment or non-payment of Taxes, nor any administrative or other charge which may be claimed by Landlord, unless such late payment or non-payment of Taxes is due to Tenant's failure to pay Tenant's Pro Rata Share of Taxes in a timely manner.

8.2.3.    Calculation of Tenant's Pro Rata Share. Tenant's Pro Rata Share of the Tax Bill is defined as that fraction of Taxes the numerator of which is the Leasable Floor Area in the Store and the denominator of which is the Leasable Floor Area in the Tax parcel of which the Store is a part; provided, however, in no event shall the denominator of said fraction be less than the Minimum Leasable Floor Area as set forth in Section 1.3.2(b). Notwithstanding the foregoing, in no event shall Tenant's Pro Rata Share of the Tax Bill calculated in the manner set forth above exceed the amount that Tenant would have paid had the Tax Bill been for the entire Landlord's Parcel and Tenant's Pro Rata Share of such Tax Bill been calculated based upon that fraction of Taxes, the numerator of which is the Leasable Floor Area in the Store and the denominator of which is the Leasable Floor Area of Landlord's Parcel. Such computation shall be made separately for each Tax Year and shall be set forth in reasonable detail as a part of Landlord's Annual Statement to Tenant pursuant to Section 7.4.5. The Tax parcel in which the Store is located shall not contain more Common Areas than is consistent with the overall Common Area square footage to building area ratio of the Shopping Center. At Tenant's option, Tenant's Tax obligation related to the Store shall be determined by reference to the county assessor's work sheets or other appraisal information in the assessor's office reflecting the assessed value of the Store.

Store No. 1610, "Stafford"
Fountains on the Lake
Stafford, TX
9320.1610.4

- 39 -

11/01/12
FINAL

1       **8.2.4.**    <u>Partial Year</u>. Should Tenant be in occupancy during only a portion of the first or
2  final Tax Years, Tenant shall be responsible to pay Landlord only for a ratable portion of its Tax
3  obligation, based on the portion of such Tax Year included in the Term of this Lease.

4       **8.2.5.**    <u>Tenant Audit</u>. Tenant shall have the right to Audit Landlord's or Landlord's
5  agent's records pertaining to Taxes, the Tax Bill and Tenant's Pro Rata Share thereof pursuant to the
6  provisions of Section 7.4.7.

7  **8.3.**   **Exclusions.**

8       There shall be excluded from the Taxes to which Tenant contributes any of the following:
9  (a) any increase in Taxes caused by construction in Landlord's Parcel commenced subsequent to the
10  Effective Date of this Lease until such time as such newly constructed space constitutes Leasable
11  Floor Area; (b) any increase in Taxes caused by a Change of Ownership Assessment, as hereinafter
12  defined, more than once every five (5) years during the Term; (c) income, excess profits, gross
13  profits, estate, single business, inheritance, succession, transfer, franchise, capital, occupancy,
14  margin, or other tax or assessment upon Landlord or the Rent payable under this Lease; (d) bonds
15  and/or assessments which have been or, subsequent to the date hereof are, levied for the purpose of
16  funding the costs of construction for Landlord's development or redevelopment of, all or any
17  portion of Landlord's Parcel or capital improvements constructed therein or with respect thereto, or
18  any Off-Site Improvements; (e) any taxes or assessments for the construction or installation of any
19  Utilities to the Store or Landlord's Parcel, or any taxes or assessments related to the usage of any
20  Utilities to the Store or Landlord's Parcel, such as water or sewer charges included in the Tax Bill
21  ("Utility Taxes"), except to the extent such Utility Taxes are calculated based upon Tenant's actual
22  usage of such Utilities without consideration of the usage of such Utilities by other tenants or
23  occupants of the Shopping Center; (f) any special (non-general) assessments which are assessed for
24  the benefit of improvements to Landlord's Parcel or the Shopping Center rather than for the general
25  community at large; (g) tax increment financing fees, taxes or assessments; and (h) any Taxes
26  assessed against land in Landlord's Parcel that has not been fully developed as buildings or Common
27  Areas.  A "Change of Ownership Assessment" is any increase in the Tax assessment of the
28  Shopping Center or Tax parcel (as herein defined) resulting from a change in the ownership or title
29  holding of any property within the Tax parcel under the provisions of any real property tax statute
30  for the state in which the property is located, such as, by way of example, California Revenue and
31  Taxation Code section 60 et. seq.

32  **8.4.**   **Rebates.**

33       Any rebates, refunds, or abatements of Taxes received by Landlord subsequent to Tenant's
34  payment of its Pro Rata Share of the Tax Bill, including, but not limited to, tax increment financing
35  rebates or subsidies received by Landlord from the applicable taxing authority, shall be refunded to
36  Tenant on a ratable basis within thirty (30) days of receipt by Landlord.  Any such rebate, refund or
37  abatement realized by Landlord prior to payment by Tenant shall result in an immediate reduction in
38  Tenant's Pro Rata Share of the Tax Bill then due to Landlord.

Store No. 1610, "Stafford"               - 40 -                        11/01/12
Fountains on the Lake                                                  FINAL
Stafford, TX
9320.1610.4

1    **8.5.    Contest.**

2        Tenant shall have such rights to contest the validity or amount of Taxes in the Tax Bill in its
3    own name or in the name of Landlord, in either case with Landlord's full cooperation.    In
4    conjunction with any such contest, Landlord shall make available to Tenant all information as
5    Tenant may reasonably request related to a Tax contest, including information required by the
6    Assessor for the taxing authority.    Landlord shall provide Tenant with government notices of
7    assessment (or reassessment) within ten (10) Business Days after Landlord's receipt of such notices.
8    If Tenant declines to contest Taxes, and if Landlord chooses to do so, Landlord shall notify Tenant
9    immediately upon Landlord's filing of any contest.    The term "contest" as used in this Section 8.5
10    means contest, appeal, abatement or other proceeding prescribed by applicable law to obtain a tax
11    reduction or tax refund, howsoever denominated.    The net benefit of any contest, after the payment
12    of expenses thereof, shall inure to the benefit of Tenant and all other occupants of the parcel(s)
13    included in the Tax Bill in the same proportions as their respective obligations for Taxes to which
14    the contest relates.

15    **8.6.    Separate Assessment.**

16        Notwithstanding Section 8.2.1, Tenant may at its option apply for a separate Tax assessment
17    of the Store, which may also include an allocated portion of Common Areas based on the parking
18    ratio for Tenant's use as required by the governing jurisdiction in which the Store is located.    In the
19    event Tenant obtains a separate assessment for the Store, Tenant shall have the right to pay the
20    Taxes thereon directly to the taxing authority in lieu of payment pursuant to Section 8.2.1.    If Tenant
21    makes payment of Taxes for the Store directly to the taxing authority pursuant to this Section 8.6,
22    Tenant shall pay Tenant's Pro Rata Share of Taxes on the Common Areas of Landlord's Parcel to
23    Landlord pursuant to Section 8.2.1 except as to any part of the Common Area separately assessed to
24    any other occupant.    Landlord shall make a fair and reasonable allocation of Taxes between the
25    Common Areas of Landlord's Parcel and the remainder of Landlord's Parcel, using any data
26    available from the county assessor's office or other pertinent information in the absence thereof.

27                                **9.    INSURANCE**

28    **9.1.    Property Insurance.**

29        **9.1.1.**    Special Form Policy.    A policy of fire and Property Insurance in the form of the
30    Insurance Services Offices' ISO Property form 1030 - Causes of Loss Special Form or equivalent
31    ("Special Form Policy").    The term "Property Insurance" means insurance covering damage to
32    tangible real and personal property.

33        **9.1.2.**    Landlord Insurance.    Commencing on the Delivery Date, as defined in Article 2
34    hereof, and at all times during the Term, Landlord shall maintain a Special Form Policy insuring
35    against damage to Landlord's Parcel, including Tenant's leasehold improvements and alterations in
36    the Store, but excluding Tenant's trade fixtures, trade equipment and other personal property in the
37    Store.    Further, upon completion of construction of Landlord's Parcel (exclusive of pads, Outparcels
38    and any phase of development to be completed at a later date) the Special Form Policy shall be
39    obtained with an owner's rating for Landlord's Parcel based upon a completed project as opposed to
40    a property under development.    All Special Form Policy(ies) shall be in the amount of the full

replacement cost of the insured improvements, including demolition cost less a deductible of not less than Ten Thousand Dollars ($10,000) and shall name Tenant as an additional insured. Landlord shall, on the Delivery Date and thereafter upon request of Tenant, provide Tenant with a certificate of such insurance coverage from an insurer authorized to do business within the state in which the Store is located, and which insurer is rated at least A- and VIII in Best's Insurance Reports, or equivalent.

**9.1.3.**    Tenant Insurance. Tenant may, at its option, elect to carry the Special Form Policy (or its equivalent) on the Store, all at Tenant's sole cost and expense. If Tenant elects to carry the Special Form Policy on the Store, Tenant shall not be responsible for reimbursement to Landlord under Section 9.1.4(a).

**9.1.4.**    Tenant's Pro Rata Share.

(a)    If Tenant does not exercise its rights to insure under Section 9.1.3, Tenant shall be responsible to reimburse Landlord for Tenant's Pro Rata Share of the premium for the Special Form Policy described in Section 9.1.1 above, excluding (i) any management or administrative fees, and (ii) earthquake or flood or terrorism insurance. Tenant shall pay Tenant's Pro Rata Share within thirty (30) days after Tenant's receipt of the following: (A) written evidence of Landlord's payment of the insurance premium; and (B) a statement, certified by an authorized agent of Landlord, indicating the total cost of the premium applicable to Landlord's Parcel, accompanied by a copy of the premium billing ("Insurance Bill") and the declaration page from Landlord's policy, together with such further information as Tenant may reasonably require to substantiate the amount of such premium and the manner in which the premium and Tenant's Pro Rata Share thereof have been calculated ("Landlord Special Form Information"). If Landlord covers the Store with a Special Form Policy which includes property other than Landlord's Parcel, Landlord shall provide a breakdown indicating the premium portion allocable to Landlord's Parcel. Tenant's Pro Rata Share of the Special Form Policy premium shall be that fraction of the total premium the numerator of which is the Leasable Floor Area of the Store and the denominator of which is the Leasable Floor Area of the applicable portion of Landlord's Parcel which includes the Store for which the Insurance Bill was issued by the insurer. In no event, however, shall the denominator of the fraction stated in the preceding sentence be less than the Minimum Leasable Floor Area as set forth in Section 1.3.2(c). In no event shall Tenant's payment to Landlord of Tenant's Pro Rata Share of the Special Form Policy premium exceed that amount which Tenant would have paid had Tenant obtained a Special Form Policy on the Store as required under Section 9.1 above from its own carrier. Tenant shall not be responsible for any interest, late charge or other penalty resulting from Landlord's late payment or nonpayment of the Special Form Policy premium.

(b)    In the event Landlord fails to provide the Landlord Special Form Information as required in Section 9.1.4(a) above, Tenant may obtain the same or comparable insurance coverage and deduct from Rent coming due under this Lease an amount equal to the amount of Tenant's Pro Rata Share of the Special Form Policy premium, which sum shall be repaid to Landlord (less the cost of any insurance Tenant carried before Landlord provided the evidence of coverage) upon Landlord's delivery to Tenant of the Landlord Special Form Information. Further, if Tenant receives a notice of cancellation of the Special Form Policy or other evidence indicating that Landlord has failed to maintain the Special Form Policy on the Store, Tenant shall not be responsible for reimbursement under Section 9.1.4(a). In the event Landlord fails to maintain the Special Form

1  Policy on the Store and it is not possible for Tenant to separately insure the Store, Tenant may obtain
2  the Special Form Policy for the entire Landlord's Parcel and deduct all premium amounts related
3  thereto from Rent coming due.

4  (c)    Tenant shall have the right to Audit Landlord's or Landlord's agent's
5  records pertaining to the Special Form Policy, the Insurance Bill and Tenant's Pro Rata Share thereof
6  pursuant to the provisions of Section 7.4.7.

7  **9.2.    Liability Insurance.**

8  **9.2.1.**    Tenant.  Tenant shall, at its sole cost and expense, commencing on the Delivery
9  Date, and at all times during the Term, keep in force a policy or policies of commercial general
10  liability insurance, or an endorsement on a blanket commercial general liability insurance policy or
11  policies, naming Landlord as an additional insured, as their interests may appear, protecting against
12  (except to the extent caused by the negligence or willful act of Landlord or its agents, contractors,
13  employees or representatives and not waived per Section 9.4 hereof) any and all claims and liabilities
14  arising out of injuries to or the death of any persons in the Store, or for property damage in the
15  Store, in the minimum amount of One Million Dollars ($1,000,000) per occurrence so long as
16  Tenant also carries an excess liability policy in an amount of at least Five Million Dollars
17  ($5,000,000), the coverage of which includes the Store.  Tenant's policy or policies shall include
18  contractual liability insurance recognizing the liability assumed by Tenant in Section 14.1, and shall
19  be with an insurer which is rated at least A- and VIII in Best's Insurance Reports, or equivalent.

20  **9.2.2.**    Landlord.  Commencing on the Delivery Date, and at all times during the Term,
21  Landlord shall (as a Common Area Charge payable by Tenant for any period during the Term that
22  follows the Commencement Date) at all times keep (or cause to be kept) in force a policy or policies
23  of commercial general liability insurance for the Common Areas, or an endorsement on a blanket
24  commercial general liability insurance policy or policies, naming Tenant as an additional insured,
25  protecting against (except to the extent caused by the negligence or willful act of Tenant or its
26  agents, contractors, employees or representatives and not waived per Section 9.4 hereof) any and all
27  claims and liabilities arising out of injuries to or the death of any persons in the Common Area or
28  for property damage in the Common Area, in the minimum amount of Five Million Dollars
29  ($5,000,000) per occurrence with a deductible not less than Ten Thousand Dollars ($10,000).  Said
30  policy or policies shall include contractual liability insurance recognizing the liability assumed by
31  Landlord in Section 14.2, and shall be with an insurer which is rated at least A- and VIII in Best's
32  Insurance Reports, or equivalent.  Tenant's Pro Rata Share of Landlord's commercial general liability
33  insurance for the Common Areas shall not exceed the commercially reasonable cost for such
34  insurance for similar shopping centers in the same geographic area as the Shopping Center.

35  **9.3.    Evidence of Insurance.**

36  Landlord and Tenant agree to deliver to the other certificates of insurance evidencing the
37  existence in force of the policies of insurance described in Sections 9.1.1, 9.1.2, 9.2.1 and 9.2.2,
38  together with endorsements showing that the parties have been named as additional insureds.
39  Landlord's and Tenant's insurers shall each use reasonable efforts to provide the party designated on
40  the certificate of insurance as the holder thereof, with at least twenty (20) days' prior written notice
41  of cancellation or of a material change to the insurance policy.  Landlord's certificate related to

1    Section 9.2.2 shall provide a breakdown of the premium cost related to the Common Area only as
2    distinguished from the buildings and the remainder of Landlord's Parcel.

3    **9.4.**    **Waiver of Subrogation.**

4         On and after the Delivery Date and throughout the Term, Landlord and Tenant hereby
5    waive and release any and all right to maintain a direct action to recover against the other, including
6    the employees, officers, directors and agents of Landlord and Tenant, for damages and any and all
7    loss (including loss of Rent) to any property located within the Store or the Shopping Center, which
8    damage or loss occurs during a period which is covered or could be covered by a Special Form
9    Policy required under this Lease, and which arises out of the other party's negligence or otherwise
10   tortious acts or omissions, but only to the extent that the cost of repairing such damage or loss is
11   covered by insurance required under this Lease, or would have been covered by insurance proceeds
12   payable under any policy required to be maintained under this Lease, but not so maintained. Each
13   policy of such insurance shall either, (a) contain a waiver of subrogation by the insurer against
14   Tenant and Landlord, as the case may be, or (b) include the name of Landlord or Tenant, as the case
15   may be, as an additional insured, but not as a party to whom any loss shall be made payable. In the
16   event a party is unable to obtain such a waiver, it shall immediately notify the other of this inability.
17   In the absence of such notification, each party shall be deemed to have obtained such waiver of
18   subrogation. Further, Tenant's agreement to indemnify Landlord, and Landlord's agreement to
19   indemnify Tenant under this Lease, are not intended and shall not relieve any insurance carrier of its
20   obligations under policies required to be carried by Tenant or Landlord pursuant to the provisions
21   of this Lease, to the extent such policies cover, or if carried would have covered the matters subject
22   to the parties' respective indemnification obligations; nor shall they supersede any inconsistent
23   agreement of the parties set forth in any other provision of this Lease. This mutual waiver is in
24   addition to any other waiver or release contained in this Lease. The provisions of this Section 9.4
25   shall not apply to Landlord's obligation to repair and replace any portion of the Store and Tenant's
26   merchandise damaged by roof leaks as specified in Section 11.2.1.

27   **9.5.**    **Tenant's Right to Self-Insure.**

28        Notwithstanding anything to the contrary herein contained, provided [either] the Tenant
29   described in Section 1.2.2 (the "Signatory Tenant") [or Ross Stores, Inc., as Guarantor,] maintains a
30   net worth of at least Fifty Million Dollars ($50,000,000), then the Signatory Tenant shall have the
31   option, either alone or in conjunction with any parent, subsidiaries or affiliates of Signatory Tenant,
32   to maintain self-insurance and/or provide or maintain any insurance required by Signatory Tenant
33   under this Lease under blanket and/or broad form insurance policies maintained by Signatory
34   Tenant or by any such parent, subsidiaries or affiliates of Signatory Tenant, provided the same does
35   not thereby decrease the insurance coverage or limits set forth in this Lease. Any self-insurance shall
36   be deemed to contain all of the terms and conditions applicable to such insurance as required in this
37   Lease, including, without limitation, a full waiver of subrogation. If Signatory Tenant elects to so
38   self-insure, then with respect to any claims which may result from incidents occurring during the
39   Lease Term, such self-insurance obligation shall survive the expiration or earlier termination of this
40   Lease to the same extent as the insurance required would survive.

Store No. 1610, "Stafford"                   - 44 -                    11/01/12
Fountains on the Lake                                          FINAL
Stafford, TX
9320.1610.4

## 10. UTILITIES SERVICES

Landlord agrees to make available for Tenant's use at the Store all necessary Utilities and other necessary Utility lines and a separate sprinkler riser, as well as refuse collection service and sewerage lines all sufficient to service Tenant's operations, and having no less capacity than specified in the Final Plans (as defined in **Exhibit C**).  The Utilities shall be registered by Tenant in Tenant's name.  Tenant agrees to pay all use charges for all such Utilities provided to the Store commencing on the Delivery Date and throughout the Term.  If Landlord or an affiliated company of Landlord provides some or all of such Utility services, Tenant's obligation to pay for such services shall not exceed the rate that Tenant would have paid had Tenant obtained such Utility service from a Utility provider selected by Tenant.  At all times during the Term, Tenant shall have the right to contract with any third party of Tenant's choice to provide some or all of the Utility services for the Store. Landlord shall, at Landlord's sole cost and expense, pay for all Utility hookup, connection or impact fees and permits.  Landlord shall separate out all Utilities and install separate meters for the Store. In the event that Landlord is prohibited by Requirements to install separate meters for any specific Utility including water, Landlord shall promptly notify Tenant in writing and provide evidence of the Requirement.  If Tenant agrees that installation of a separate meter for a specific Utility is prohibited by such Requirement and so notifies Landlord, Landlord shall install a submeter for such Utility and shall cause  such submeter to be read on a monthly basis, billing Tenant for its proper share.  Each such bill shall be accompanied by such supporting information as Tenant may reasonably request and shall be payable within thirty (30) days after Tenant's receipt of the bill (with Tenant to have the right to check the submeters at any time).  However, Landlord shall permit Tenant to read each submeter and to bill Landlord an amount equal to the charges not attributable to Tenant, which sum shall be paid by Landlord to Tenant within thirty (30) days after Landlord's receipt of each bill.  No administrative or management charge or fee shall be payable by Tenant related to any Utility charges emanating from a meter used in common by Tenant with any other party.  Further, in the event of a meter-sharing arrangement, Tenant may require that the charges emanating from any common meter be allocated, by a reputable Utility engineer reasonably approved by Tenant, among the common users thereof in accordance with usage.  Neither party shall have the right to charge the other party any administrative, service or other fee in connection with the reading of the submeters. If  Requirements prohibit the installation in the Store of a separate water meter or submeter, Landlord shall provide to Tenant the calculation of Tenant's water usage as prepared by or compiled by the Utility agency which provides water service so as to calculate Tenant's share of the sewer service charges without consideration of the use of water by any other tenant in the Shopping Center.  In no event shall Tenant's share of any submetered Utility calculated or allocated as provided above, exceed the rate that Tenant would have paid had Tenant obtained such Utility service from a Utility provider selected by Tenant.  Tenant shall be entitled to collect, and Landlord shall cooperate with Tenant in collecting, any rebate which is made available by a Utility company for the installation of energy efficient lighting.  All Utilities serving the Common Areas shall be separately metered.

Store No. 1610, "Stafford"
Fountains on the Lake
Stafford, TX
9320.1610.4

- 45 -

11/01/12
FINAL

1                **11. MAINTENANCE/REPAIR/ENVIRONMENTAL COMPLIANCE**

2    **11.1.    Maintenance and Repair by Tenant.**

3           Except for Landlord's interior maintenance obligations under Section 11.2, and subject to
4    the terms of Articles 21 and 22, Tenant shall maintain the interior of the Store, in good repair and
5    condition, reasonable wear and tear excepted.  Tenant shall, at its expense, perform or cause to be
6    performed all routine maintenance and servicing of the heating, ventilating, and air conditioning
7    system serving the Store (the "HVAC") in accordance with the terms of a customary air
8    conditioning service contract as performed by reputable service companies in the state in which the
9    Shopping Center is located.  However, any repairs to the HVAC beyond routine maintenance and
10   servicing shall be the responsibility of Landlord, including, without limitation, any replacements
11   thereof (other than replacements of noncapital components, such as air filters).  A "replacement" as
12   that term is used in this Section 11.1 shall mean that the compressor, condenser, motors, the chiller,
13   duct work or heating/cooling coils must be removed and replaced by new equipment, in the
14   reasonable judgment of Tenant's HVAC consultant.  Tenant's obligations above are contingent
15   upon receipt by Tenant prior to the Commencement Date of a valid assignment, in form satisfactory
16   to Tenant's counsel, of all warranties, if any, which are available from subcontractors, suppliers,
17   manufacturers, and materialmen for construction of that portion of the Store which is Landlord's
18   responsibility under **Exhibit C,** but which will be Tenant's maintenance responsibility under this
19   Section 11.1.

20   **11.2.    Maintenance and Repair by Landlord.**

21           **11.2.1.**    (a)    Landlord's Obligations.  Landlord shall, at its sole cost and expense (not
22   passed through to Tenant as a Common Area Charge), be responsible for correcting all defects in
23   Landlord's (or Landlord's contractor's) construction of the Store.  Further, Landlord, at Landlord's
24   sole cost and expense (not passed through to Tenant as a Common Area Charge) shall maintain,
25   repair and replace, in good and sightly condition consistent with first class shopping centers in the
26   county in which the Store is located, the foundation, floor slab [including maintaining moisture
27   vapor emissions at or below five (5) pounds per one thousand (1,000) square feet per twenty-four
28   (24) hours using the calcium chloride method], flooring (including flooring damaged by moisture
29   vapor emissions or subterranean water infiltration but excluding maintenance, repair and
30   replacement required due to Tenant's ordinary wear and tear), roof (including all structural elements
31   and waterproofing membrane), roofing (including the interior ceiling, walls, floors and merchandise
32   damaged from leaking), roof drainage system, including gutters and downspouts, exterior walls
33   (including any wallpack or other lighting fixtures located thereon), all exterior doors, plate glass,
34   storefronts (including front doors and canopy), all structural portions of the Store, sprinkler system
35   (including the fire detection monitoring panel and the regular testing and inspection thereof and
36   Landlord shall provide Tenant with copies of all testing and inspection reports), all concealed wiring
37   and plumbing, pipes, conduits and Utility systems and lines inside the Store, including in the exterior
38   walls and interior walls of the Store, and Landlord shall maintain and repair all such wiring,
39   plumbing, pipes, conduits and Utility systems and lines outside the Store, whether exclusively
40   serving the Store or not, as well as all portions of the Store which are not specifically Tenant's
41   obligation under Section 11.1 above.  Landlord shall perform repairs and replacements to the
42   HVAC as required by Section 11.1 hereof except that Tenant may, at its option, undertake to
43   perform repairs and replacements to the HVAC and to deduct the cost from Rent, up to Two

1  Thousand Five Hundred Dollars ($2,500) for any such repair event.  In addition to Tenant's right to
2  perform repairs to the HVAC as provided in the preceding sentence, in the event Landlord fails to
3  perform the required repairs and replacements to the HVAC, then, in addition to all other remedies
4  available to Tenant at law or in equity or under the terms of this Lease, Tenant may undertake to
5  perform such obligations and to deduct from Rent, the cost thereof, plus the Repair Supervision Fee
6  defined in Section 11.2.1(b).  Subject to the Waiver of Subrogation provisions of Section 9.4,
7  Landlord shall maintain and repair any damage or defects in any part of the Store caused by the acts
8  or omissions of Landlord, its agents or contractors regardless of which party has the maintenance
9  obligation under this Article 11.

10                  (b)    Notice for Repair.  Tenant may give Landlord notice of the need for
11  those repairs as may be required under the terms of Section 11.2.1(a) above, and Landlord shall
12  proceed forthwith to effect the necessary repairs with reasonable diligence, but in no event later than
13  thirty (30) days after having received Tenant's notice.  If Landlord fails to either: (x) repair or
14  maintain the Store within the thirty (30) day period, or (y) if such work cannot be completed within
15  thirty (30) days, commence the item(s) of repair or maintenance and thereafter diligently pursue
16  same to completion, then Tenant may, in addition to Tenant's other remedies available at law, in
17  equity or under the terms of this Lease, perform the repairs, maintenance or replacements and
18  deduct the cost thereof, plus an administrative fee to reimburse Tenant for, among other things, the
19  cost of arranging, supervising, financing, and/or advancing the costs for the repairs or replacements,
20  equal to ten percent (10%) of the cost of the repairs or replacements (the "Repair Supervision Fee"),
21  from the subsequent Rent payment(s) thereafter coming due.  In the event of an emergency, Tenant
22  may undertake immediate repairs (without the need for advance notice) which are Landlord's
23  responsibility.  If Landlord shall fail to reimburse Tenant for the repair costs incurred by Tenant
24  within thirty (30) days after receipt of Tenant's billing, Tenant may deduct the cost, plus the Repair
25  Supervision Fee, from the subsequent installments of Rent payment(s) thereafter coming due.

26      **11.2.2.**    Earth Movement.  Landlord shall perform, at its sole cost and expense, without
27  reimbursement from Tenant, whether directly or through Reimbursements, any maintenance,
28  repairs, alterations or replacements that shall be required by governmental authority, or insurance
29  requirements, or by the ordinary exercise of due care at any time during the Term as a result of
30  movement or threatened movement or settlement affecting the land under (a) the Store, or (b) any
31  buildings within Landlord's Parcel (and the Shopping Center if Landlord is legally able to perform or
32  cause to be performed such required maintenance, repairs, alterations or replacements), or (c) any
33  portion of the Common Areas in Landlord's Parcel.

34      **11.2.3.**    First Year Repairs.  Notwithstanding the foregoing provisions of Sections 11.1
35  and 11.2.1 above, Landlord shall make all repairs, alterations and replacements to the portions of the
36  Store included in Landlord's Work (excluding those required as the result of repairs, alterations,
37  replacements, other improvements or installations by Tenant or any subtenant or concessionaire of
38  Tenant or the agents of any of them) which may become necessary for any cause except for
39  Tenant's negligence or willful acts or omissions on or after the Delivery Date and during the first
40  twelve (12) months of the Term.

41      **11.2.4.**    Shopping Center Maintenance.  Landlord shall, at no cost or expense to Tenant,
42  maintain and repair (or cause to be maintained and repaired) all buildings within the Shopping
43  Center in good condition, consistent with the standards for first class shopping centers in the county

in which the Shopping Center is located, including the painting of exterior walls of the buildings on a periodic basis.

**11.3.    Repairs Required by Governmental Authorities.**

**11.3.1.**    Store.  After completion of Landlord's Construction Obligations, any repairs, alterations or other improvements to the Store required by governmental authority or insurance rating bureau having jurisdiction because of the particular type of retail use of the Store by Tenant shall be performed by Tenant at its sole cost and expense.  Any such work, however, which is required to Landlord's Parcel or the Shopping Center in general, or to all similar buildings or uses in the area of the Shopping Center, shall be done at the sole cost and expense of Landlord.

**11.3.2.**    Shopping Center.  Landlord warrants that the construction and the proposed use of the Shopping Center's Common Areas and buildings, including the Store, for retail purposes shall comply with all laws, ordinances, regulations and standards of governmental authorities and insurance rating bureaus having jurisdiction, including, without limitation, Environmental Regulations, as hereinafter defined, and zoning and building codes (all of the foregoing being hereinafter collectively referred to as the "Requirements").

**11.3.3.**    Non-Compliance.  Landlord agrees that if, at any time on or after the Delivery Date, any governmental authorities or insurance rating bureau having jurisdiction shall determine that the Store or Landlord's Parcel was constructed, or is being operated, in violation of, any Requirement and shall request compliance, with any Requirement or, absent such a request from the governmental authority, if the Store or Landlord's Parcel is otherwise not in compliance with or is in violation of any Requirement, and if failure to comply shall in any way adversely affect the use of the Store by Tenant or adversely affect any other rights of Tenant under this Lease or impose any obligation upon Tenant not contained in this Lease or shall increase the obligation of Tenant (such as, by way of example, increased insurance costs), Landlord shall, upon receipt of notice thereof, at Landlord's sole cost and expense, cause such repairs, alterations or other work to be done or action to be taken so as to bring about the compliance, or to effect the Requirement requested.  If by reason of such failure of compliance or by reason of such repairs, alterations or other work done by Landlord, Tenant shall be deprived of the use or enjoyment of the whole or any part of the Store or the Common Areas, Rent shall abate and in lieu thereof Tenant shall pay Substitute Rent on a per diem basis until compliance with the Requirement is completed.

**11.3.4.**    Zoning.  If at any time the applicable zoning shall not permit the retail sale in the Store of all the types of merchandise customarily sold in Tenant's other stores, Tenant may, without waiving any other rights Tenant may have on account thereof, terminate this Lease by giving Landlord thirty (30) days' prior written notice thereof.  Tenant's Termination Notice shall include a written specification of the Unamortized Cost of any leasehold improvements made to the Store by Tenant.  Landlord shall pay such Unamortized Cost to Tenant, within thirty (30) days following the date of termination.

**11.4.    Hazardous Material.**

**11.4.1.**    Definition.  As used herein, the term "Hazardous Material" or "Hazardous Materials" shall mean (a) any waste, material or substance (whether in the form of a liquid, a solid, or

a gas and whether or not air-borne), which is or is deemed by governmental authority to be a pollutant or a contaminant, or which is or is deemed by governmental authority to be hazardous, toxic, ignitable, reactive, corrosive, dangerous, harmful or injurious, or which presents a risk, to public health or to the environment, or which is or may become regulated by or under the authority of any applicable local, state or federal laws, judgments, ordinances, orders, rules, regulations, codes or other governmental restrictions, guidelines or requirements, any amendments or successor(s) thereto, replacements thereof or publications promulgated pursuant thereto ("Environmental Regulations"); (b) petroleum, including crude oil or any fraction thereof; (c) any asbestos or asbestos containing material; (d) any polychlorinated biphenyl; (e) any radioactive material; (f) radon gas; (g) urea formaldehyde; and (h) mold.

**11.4.2.**    Landlord's Warranties and Representations.    Landlord expressly represents and warrants that:

(a)    To the best of Landlord's actual knowledge based upon that certain Phase I Environmental Site Assessment Report, prepared by Nova Consulting Group, Inc., dated November 28, 2007 as Project No. B07-3996, no escape, seepage, leakage, spillage, discharge, emission, release or disposal of Hazardous Material has occurred within the Store or Landlord's Parcel to date, and the Store and Landlord's Parcel, as well as the soil, groundwater and soil vapor within or under the Store and Landlord's Parcel, are free of Hazardous Material as of the Effective Date, and will be free of Hazardous Material as of the Delivery Date and throughout the Lease Term.

(b)    Landlord shall not use or knowingly permit any Hazardous Materials to be used in the construction of the Store or in connection with the installation of any Utility system or other facility which serves the Store (whether located in the Store or in other portions of the Shopping Center) including by way of example, but not by limitation, the interior of any partition or demising walls, whether structural or otherwise, columns or beams, and all Utility lines, shafts and ducts, HVAC or other equipment. Such Utility systems and other facilities as hereinabove described, whether located in the Store or other portions of the Building or the Shopping Center, shall be collectively referred to as "Support Systems."

**11.4.3.**    Landlord's Responsibilities Prior to the Delivery Date to Tenant.    On or prior to the Delivery Date, Landlord shall have delivered to Tenant the Environmental Report as required by clause (d) of the Article 2 - Delivery Date definition. If, prior to the Delivery Date, Hazardous Materials are found to be present in the Store, the Support Systems or Landlord's Parcel, then Landlord, at its sole cost and expense, shall cause such Hazardous Materials to be removed from the Store or such other property of Landlord (hereinafter referred to as the "Abatement Work"), and Landlord shall complete such removal prior to the Delivery Date. Upon completion of the Abatement Work, Landlord shall furnish Tenant evidence of removal of the Hazardous Material, including copies of the final inspection report together with a clearance certificate or other document of release or approval from a licensed environmental consultant, and if applicable from other applicable governmental authority such as health department or Environmental Protection Agency (a "Clearance Certificate") certifying that the Store, all Support Systems and other portions of Landlord's Parcel are free of Hazardous Materials.

**11.4.4.**    Landlord's Responsibilities After the Delivery Date.    If Hazardous Materials are found to be present in the Store, Support Systems or Landlord's Parcel at any time after delivery of

Store No. 1610, "Stafford"
Fountains on the Lake
Stafford, TX
9320.1610.4

- 49 -

11/01/12
FINAL

possession of the Store to Tenant, then Tenant shall have the right to vacate the Store, at which time all Rent shall abate, unless the presence of such Hazardous Materials was a result of the acts of Tenant. Landlord shall, at its sole cost and expense, complete such Abatement Work as soon as practicable after the discovery of such Hazardous Materials; provided, however, in the event the presence of Hazardous Materials in the Store or Landlord's Parcel is caused by Tenant or Tenant's contractors, agents or employees, then Tenant shall pay the reasonable cost of the Abatement Work within thirty (30) days of receipt of the invoice therefor. Upon completion of the Abatement Work, Landlord shall furnish Tenant with a copy of the Clearance Certificate. During such Abatement Work, Tenant's fixturization or construction period, if applicable (as provided for elsewhere in this Lease), shall be tolled until the Abatement Work is complete and a Clearance Certificate is issued. In the event Landlord is required to undertake Abatement Work, it is understood and agreed that (excepting any Hazardous Materials caused by Tenant or Tenant's contractors, agents or employees) Landlord shall be responsible for the cost of the replacement of all of Tenant's improvements and alterations damaged or destroyed as a result of such Abatement Work.

    **11.4.5.** <u>Tenant's Rights</u>.

        (a) <u>Tenant's Awareness of Hazardous Materials</u>. If, at any time, Tenant becomes aware of the presence of Hazardous Materials in the Store, Support Systems and/or Landlord's Parcel, Tenant may give Landlord written notice to remove and/or abate same and to restore the Store, Support Systems and/or Landlord's Parcel to a condition which is free of Hazardous Materials, unless the presence of such Hazardous Materials was a result of the acts of Tenant. If within thirty (30) days of receipt of such notice Landlord has not completed the Abatement Work, Tenant may either (i) terminate this Lease upon thirty (30) days' written notice to Landlord, or (ii) undertake all necessary Abatement Work, including the hiring of any contractors and experts Tenant reasonably deems necessary to effect and supervise the Abatement Work.

        (b) <u>Claim Against Landlord</u>. Tenant shall be entitled to claim from Landlord all consequential damages (including lost profits) arising out of Landlord's breach of any of the provisions of this Section 11.4. Furthermore, if Tenant effects Abatement Work, Tenant shall be entitled to claim from Landlord all costs and expenses associated therewith, including, but not limited to, (i) the Abatement Work, (ii) disposal of Hazardous Materials, (iii) air quality and materials testing, (iv) related consultants' and experts' fees, and (v) fines, fees or costs of any nature whatsoever charged or assessed by any governmental authority or agency regulating and/or supervising such Abatement Work and/or disposal of Hazardous Materials.

        (c) <u>Reimbursement of Tenant</u>. Landlord shall promptly reimburse Tenant for Tenant's costs and expenses incurred pursuant to Section 11.4.5(b) above within thirty (30) days after Landlord's receipt of copies of Tenant's paid invoices or documentation. In addition to any other remedy which Tenant may have under this Lease, at law or in equity, in the event of Landlord's breach of any of the provisions of this Section 11.4, Tenant shall be entitled (i) to claim from Landlord and to deduct from Rent payable to Landlord hereunder all consequential damages (including lost profits), expenses, costs, fees and fines incurred by it as a result of such breach, and (ii) to extend the Term hereof by a period equal to the time elapsed from the date of Tenant's initial notice to Landlord to the date that the Abatement Work is completed, and during such period, all Rent and other charges payable hereunder shall abate.

Store No. 1610, "Stafford"
Fountains on the Lake
Stafford, TX
9320.1610.4

- 50 -

11/01/12
FINAL

1       **11.4.6.**   <u>Landlord's Indemnity</u>. Excepting Hazardous Materials existing solely as a result
2 of the acts of Tenant or Tenant's agents, employees or contractors, Landlord hereby indemnifies
3 Tenant and its successors and assigns, and agrees to hold Tenant and its successors and assigns
4 harmless from and against any and all losses, liabilities, damages, injuries, penalties, fines, costs,
5 expenses and claims of any and every kind whatsoever, including, without limitation, attorneys' and
6 consultants' fees and costs, and the costs of cleanup, remediation, Abatement Work, paid, incurred
7 or suffered by, or asserted against, Tenant and/or its successors and/or assigns as a result of any
8 claim, demand or judicial or administrative action by any person or entity (including governmental
9 or private entities) for, with respect to, or as a direct or indirect result of, the presence on or under,
10 or the escape, seepage, leakage, spillage, discharge, emission, release or disposal on, under or from
11 the Shopping Center or the improvements thereon of any Hazardous Material, or the breach of any
12 Environmental Regulations to which Landlord or any portion of the Shopping Center is subject.
13 Landlord shall be solely responsible for and shall comply with all laws, rules, ordinances or
14 regulations of any governmental authority having jurisdiction over the Store and the Shopping
15 Center with respect to the presence or removal of Hazardous Materials, unless the presence of such
16 Hazardous Materials is the result of the acts of Tenant or Tenant's agents, employees or contractors.

17       **11.4.7.**   <u>Tenant's Indemnity</u>. Tenant hereby indemnifies Landlord and its successors and
18 assigns, and agrees to hold Landlord and its successors and assigns harmless from and against any
19 and all losses, liabilities, damages, injuries, penalties, fines, costs, expenses and claims of any and
20 every kind whatsoever, including, without limitation, attorneys' and consultants' fees and costs, and
21 the costs of cleanup, remediation, Abatement Work, paid, incurred or suffered by, or asserted
22 against, Landlord and/or its successors and/or assigns as a result of any claim, demand or judicial or
23 administrative action by any person or entity (including governmental or private entities) for, with
24 respect to, or as a direct or indirect result of, the presence on or under, or the escape, seepage,
25 leakage, spillage, discharge, emission, release or disposal on, under or from the Store of any
26 Hazardous Material in violation of Environmental Regulations, or the breach of any Environmental
27 Regulations to which Tenant or any portion of the Store is subject which are solely the result of the
28 acts of Tenant or Tenant's agents, employees or contractors. Tenant shall not cause any Hazardous
29 Materials to be released or discharged on, under or from the Store in violation of Environmental
30 Regulations.

31       **11.4.8.**   <u>Survival</u>. The representations, warranties and indemnities contained in this
32 Article 11 shall survive the termination of this Lease.

33                                                            **12. ALTERATIONS**

34 **12.1.**   **Permitted Alterations.**

35       **12.1.1.**   Tenant may make non-structural alterations or improvements to the interior of
36 the Store (including interior roll down security grills), and signage on the exterior of the Store and its
37 signage (subject to compliance with the sign criteria for the Shopping Center) on the Shopping
38 Center pylon and monument signs, provided Tenant shall make all such alterations or improvements
39 in a good and workmanlike manner, and in conformity with all laws, ordinances and regulations of
40 public authorities having jurisdiction. Tenant shall not make any alterations to the foundation, roof,
41 or any structural portions of the Store without first obtaining the written approval of Landlord,
42 except as specified in Section 12.2. Such approval by Landlord may not be unreasonably withheld,

Store No. 1610, "Stafford"
Fountains on the Lake
Stafford, TX
9320.1610.4

- 51 -

11/01/12
FINAL

conditioned or delayed and shall be deemed granted if Tenant is not notified in writing of a reasonable basis for withholding such approval within thirty (30) days of Tenant's request for approval. Any disapproval shall be supported by a written statement of reasons and suggested revisions to the proposed work that, if incorporated by Tenant, shall constitute the plans as approved without further review by Landlord. Subject to Section 12.1.2 following, all alterations and improvements made to the Store by Landlord or Tenant (other than Store furniture, trade fixtures, equipment and personal property installed by Tenant), shall, at the end of the Term, become Landlord's property, and, at the end of the Term, shall remain in the Store without compensation to Tenant, unless otherwise stated in this Lease to the contrary.

**12.1.2.**    It is further agreed that upon termination of this Lease, Tenant may remove its furniture, fixtures, equipment and personal property, and Landlord will accept the Store, with all alterations made by Tenant, without any obligation upon Tenant to restore the Store to its former condition.

## 12.2.   Communication Equipment.

**12.2.1.**    At any time subsequent to the Delivery Date (or such earlier date that Tenant occupies the Store pursuant to Section 5.4(c)), Tenant shall have the right to place upon the Store one or more so-called "satellite dish(es)" or other similar device(s) and/or one or more roof mounted cameras and to replace, remove, and repair any such device(s), such as antenna, for the purpose of receiving and sending radio, television, computer, telephone, or other communication signals (collectively, the "Communication Equipment"). Any such installation shall be in accordance with plans and specifications previously approved by Landlord. Such equipment shall be installed in a location or locations substantially shielded from visibility from the principal frontages of the Shopping Center. Tenant shall be responsible for any damage to the Store caused by installing, removing, replacing, or repairing any such device(s).

**12.2.2.**    In the event Landlord desires to perform roof repairs and/or roof replacements to the Store and/or the Building or its rooftop equipment in which the Store is located (the "Roof Repairs"), Landlord shall give Tenant at least twenty (20) days' prior written notice of the date Landlord intends to commence such Roof Repairs. Tenant shall, within twenty (20) days following receipt of such notice, undertake such measures as it deems suitable to protect its Communication Equipment from interference by Landlord, its agents, contractors or employees, in the course of any Roof Repairs. Nothing herein shall relieve Landlord of its obligation not to cause any interference with, or damage to, the Communication Equipment, and Landlord shall remain fully responsible for any loss, cost, or claim resulting from any damage to any part of the Communication Equipment arising as a result of the Roof Repairs.

## 13. NON-DISTURBANCE AND SUBORDINATION/ ESTOPPEL CERTIFICATES

### 13.1.   Non-Disturbance and Subordination.

**13.1.1.**    Existing Loans/Master Lease(s). Landlord covenants to obtain from each lender whose loan is secured by the Store or Landlord's Parcel, within thirty (30) days after the Effective Date, an executed agreement ("Non-Disturbance Agreement"), in the form set forth in **Exhibit F.**

Landlord further covenants to obtain from each lessor whose interest in Landlord's Parcel is paramount to Landlord's ("Overlessor"), if any, within thirty (30) days after the Effective Date, an executed agreement ("Sublease Non-Disturbance Agreement") in the form set forth in **Exhibit F-1**. If Landlord breaches its obligation(s) hereunder, Tenant may terminate this Lease by written notice to Landlord at any time prior to Tenant's receipt of all required Non-Disturbance Agreements, or if Tenant has not terminated this Lease, Rent shall abate pending delivery of said Agreements.

**13.1.2.**    Future Loans.    Tenant shall, within twenty (20) Business Days after Tenant's receipt of Landlord's request, subordinate this Lease in the future to any first mortgage or deed of trust placed by Landlord upon the Store, Landlord's Parcel or the Building, with an insurance company, bank or any other lender which customarily provides financing for shopping centers, provided that such lender executes a Non-Disturbance Agreement substantially in the form set forth in **Exhibit F**.

**13.2.    Estoppel Certificates.**

Within twenty (20) Business Days after the last to occur of (a) receipt of request therefor, and (b) receipt of the fee described in Section 13.3 below, either party shall deliver to the other a written statement acknowledging (i) the Commencement Date and termination date of this Lease, (ii) that this Lease is in full force and effect (if true), (iii) that this Lease has not been modified (or if it has, stating the dates of such modifications), and (iv) any such other pertinent information which is customary to supply to such a requesting party for purposes of financing or sale (in the case of Landlord's request) or financing, assignment or sublease, or sale (in the case of Tenant's request). In no event shall Tenant be estopped, as a result of Tenant's execution of such certificate, as between Tenant and Landlord or Landlord's affiliates. In no event shall Landlord be estopped, as a result of Landlord's execution of such certificate, as between Landlord and Tenant or Tenant's affiliates.

**13.3.    Processing Fees for Non-Disturbance Agreements and Estoppel Certificates.**

At the time of each request for a Non-Disturbance Agreement under Section 13.1.2 or an Estoppel Certificate under Section 13.2, the requesting party shall pay to the other, to defray the expenses of processing, the sum of One Thousand Dollars ($1,000) for each such Non-Disturbance Agreement or Estoppel Certificate, which sum shall be increased from time to time in direct proportion to increases in Minimum Rent over the amount of Minimum Rent as of the Commencement Date.

# 14. INDEMNIFICATION

**14.1.    Tenant Indemnity.**

Tenant agrees to hold Landlord harmless from and indemnify and defend Landlord against any and all injury, loss, damage, liability (or any claims related to the foregoing), costs or expenses (including, without limitation, attorneys' fees, reasonable investigation and discovery costs), of whatever nature, to any person or property caused or claimed to be caused by or resulting from any occurrence within the Store on and after the Delivery Date (or such earlier date that Tenant occupies the Store pursuant to Section 5.4(c)) and during the Term, provided nothing contained herein shall require Tenant to indemnify Landlord against matters resulting from the negligence or

Store No. 1610, "Stafford"
Fountains on the Lake
Stafford, TX
9320.1610.4

- 53 -

11/01/12
FINAL

1    willful acts or omissions of Landlord or Landlord's employees, agents, or contractors, except to the
2    extent Tenant has waived a claim against Landlord pursuant to Section 9.4 hereof.

3    **14.2.    Landlord Indemnity.**

4          Landlord agrees to hold Tenant harmless from and indemnify and defend Tenant against any
5    and all injury, loss, damage, liability (or any claims related to the foregoing), costs or expenses
6    (including, without limitation, attorneys' fees, reasonable investigation and discovery costs), of
7    whatever nature, to any person or property caused or claimed to be caused by or resulting from: (1)
8    any occurrence within the Common Area, or any portion of the Shopping Center, on and after the
9    Effective Date of this Lease, provided nothing contained herein shall require Landlord to indemnify
10   Tenant against matters resulting from the negligence or willful acts or omissions of Tenant or
11   Tenant's employees, agents or contractors, except to the extent Landlord has waived a claim against
12   Tenant pursuant to Section 9.4 hereof, and (2) the Mechanic's Liens described in Section 23.1.2 and
13   more specifically identified on **Exhibit I**.

14   **15. USE**

15   **15.1.    Tenant's Business.**

16        Tenant's intended use of the Store shall be as a full line department store including, at its
17   option, the sale of soft goods merchandise, including men's, women's and children's apparel, shoes,
18   accessories, such as jewelry and cosmetics, health and beauty aids and related sundries, domestics
19   and linens, housewares, art, pictures, posters, frames, artificial flora, office supplies, sporting goods,
20   furniture and lamps, window and floor coverings, electronics, prerecorded audio and video
21   merchandise and electronic games software and technological evolutions thereof, books, toys, party
22   goods, pet supplies, luggage, packaged foods, including whole bean and ground coffee, and such
23   other items as are sold in Tenant's similarly merchandised stores.

24   **15.2.    Operation.**

25        Notwithstanding any provision in this Lease to the contrary, it is expressly acknowledged by
26   Landlord that this Lease contains no express or implied covenant for Tenant to conduct business in
27   the Store, continuously or otherwise, or (when conducting business in the Store) to operate during
28   any particular hours or to conduct its business in any particular manner. Tenant has the sole right in
29   its unrestricted discretion to decide whether or not to operate in the Store and in what manner to
30   conduct operations, if any, and if the Store has more than one (1) customer door ("Excess Customer
31   Doors"), Tenant may, at its option, close any such Excess Customer Doors and operate with only
32   one (1) customer door.

33
34   **15.3.    Protection.**

35            (a)    Subject to Section 15.3(b) below respecting Existing Leases, without the
36   prior written consent of Tenant, which consent may be withheld in the absolute and sole discretion of
37   Tenant, no tenant or occupant of the Shopping Center (other than Tenant) may use, and Landlord, if it
38   has the capacity to do so, shall not permit any other tenant or occupant of the Shopping Center to

Store No. 1610, "Stafford"           - 54 -           11/01/12
Fountains on the Lake                                      FINAL
Stafford, TX
9320.1610.4

(a) use its premises for the Off Price Sale (as hereinafter defined) of merchandise, or (b) use more than ten thousand (10,000) square feet of Leasable Floor Area of its premises for the sale of apparel (except for discount department stores in excess of eighty-five thousand (85,000) square feet of Leasable Floor Area), or (c) use its premises for the sale of whole bean and ground coffee (other than Tenant, a supermarket, grocery store, or local bakery, or by Dunkin' Donuts, Caribou Coffee, Peets, Indigo, or other national or regional coffee retailer or coffee shop with up to (but not more than) 500 stores. For purposes of this Section 15.3, "Off Price Sale" shall mean the retail sale of merchandise on an every day basis at prices reduced from those charged by full price retailers, such as full price department stores; provided, however, this definition shall not prohibit sales events by a retailer at a price discounted from that retailer's every day price. (As of the Effective Date, examples of Off Price Sale retailers include such retailers as T.J. Maxx, Marshalls, A.J. Wright, Fallas Paredes, Nordstrom Rack, Goody's, Factory 2U, Burlington Coat, Steinmart, Filene's Basement, Gordmans and Beall's Outlet.) If any of the foregoing provisions is violated ("Protection Violation"), commencing on the first day of the Protection Violation and continuing throughout the period of the Protection Violation, Tenant, in addition to all other remedies available at law or in equity, including injunctive relief, shall have the ongoing right, exercisable by written notice to Landlord, either to terminate this Lease or to pay Substitute Rent within fifteen (15) days after the close of each calendar month. The parties agree that the monetary damages to be suffered by Tenant as a result of a breach by Landlord (or Landlord's tenant(s)) of the provisions of this Section 15.3 are difficult to ascertain and that the payment of Substitute Rent, after negotiation, constitutes the best estimate by the parties of the amount of such damage. If Tenant elects to terminate this Lease as provided in this Section 15.3, this Lease shall terminate on a date indicated by Tenant in its notice of termination, which in no event shall be sooner than thirty (30) nor later than ninety (90) days after the date of Tenant's notice of termination. In the event of termination, Landlord shall be obligated to pay Tenant for the Unamortized Cost of Tenant's leasehold improvements in the Store, which costs Tenant agrees to specify in its notice of termination. If Tenant elects to pay Substitute Rent, (a) such payment of Substitute Rent shall be retroactive to the date any such Protection Violation commenced, and Tenant shall deduct any overpayments of Rent from Rent coming due under this Lease, and (b) at such time as all such Protection Violations cease (the "Cure Date"), Rent shall resume at the rate which would have pertained at the Cure Date had the Protection Violation not occurred. The provisions of this Section 15.3 shall apply to any subsequent Protection Violation.

(b) Exceptions. Notwithstanding the provisions of Section 15.3(a) above, the following exceptions shall be applicable:

(i) Existing Leases. The tenants and occupants operating in the Shopping Center as of the Effective Date under the Existing Leases listed on **Exhibit K** shall not be subject to the use restriction(s) set forth in Section 15.3(a) above. However, if Landlord has the right of consent to any change in use of the premises occupied by a tenant or occupant operating under an Existing Lease, Landlord shall not consent to any use in such premises in violation of the use restriction(s) set forth in Section 15.3(a) above. In the event of any violation of this provision, Tenant shall have all of the rights and remedies set forth in Section 15.3(a) in addition to any other rights, at law or in equity or under this Lease, for breach of the provisions of this Lease.

Store No. 1610, "Stafford"
Fountains on the Lake
Stafford, TX
9320.1610.4

- 55 -

11/01/12
FINAL

1  **15.4.  Exclusive Uses.**

2  Landlord shall obtain letters waiving in favor of Tenant the exclusive use restrictions set
3  forth in Landlord's leases with The Sports Authority, Bed Bath and Beyond, and Chair King, which
4  waiver letters shall be attached as **Exhibits H-1, H-2** and **H-3** to this Lease, respectively. Tenant
5  shall not use the Store for any use which is listed on **Exhibit H**, as modified by **Exhibits H-1, H-2**
6  and **H-3** (the "Exclusive Use"), so long as the Exclusive Use is in existence in the Shopping Center.
7  Any exclusive granted by Landlord which is not listed on **Exhibit H** (the "Unauthorized
8  Exclusive") shall be null and void as against Tenant and any assignee or sublessee of Tenant.
9  Landlord shall indemnify, defend and hold harmless Tenant and any assignee or sublessee against
10  any and all claims by any other occupant of the Shopping Center that Tenant and/or an assignee or
11  sublessee has violated an Unauthorized Exclusive. Landlord agrees that the sale of the Office Max
12  exclusive items described in subparagraph (a) of Section 21 of the Office Max lease (as excerpted on
13  **Exhibit H** to this Lease) by Tenant shall be included within the Five Thousand (5,000) square foot
14  aggregate cap on the sale of such items in the Shopping Center.

15  **15.5.  Other Exclusives Not Binding on Tenant.**

16  Except for those Exclusive Uses specifically set forth in **Exhibit H**, as modified by
17  **Exhibits H-1, H-2**, and **H-3** neither Tenant nor any Related Party nor any of its subtenants,
18  licensees, assignees, or other Transferees, or the use of the Store shall be subject to any exclusives or
19  restrictions granted to or for the benefit of any other tenants or occupants in the Shopping Center
20  or on any Outparcel or adjacent parcel owned by Landlord. Except for those Exclusive Uses
21  specifically set forth in **Exhibit H**, Landlord agrees that it has not entered into a lease or other
22  occupancy agreement with nor shall it lease to or permit occupancy in the Shopping Center by any
23  tenant, subtenant, assignee or other occupant, which has imposed or proposes to impose a
24  restriction on Tenant or Tenant's business. Landlord shall hold Tenant harmless from any claims or
25  damages suffered or claimed to be suffered by Tenant as a result of any breach or alleged breach of
26  Landlord's representation and warranty set forth in this Section 15.5.

27  # 16. SURRENDER

28  **16.1.  Condition of Premises.**

29  Upon the expiration or earlier termination of this Lease, Tenant shall surrender possession
30  of the Store to Landlord in broom clean condition, and in good order and repair, reasonable wear
31  and tear and damage by Casualty or condemnation excepted, and with all of Tenant's alterations and
32  leasehold improvements in place. Tenant may remove from the Store Tenant's furniture, fixtures,
33  equipment and personal property. However, Tenant shall have no obligation to remove from the
34  Store or to demolish any alterations or leasehold improvements made to the Store nor to restore the
35  Store to its condition prior to Tenant's use and occupancy thereof.

36  **16.2.  Continuance of Possession.**

37  If Tenant shall remain in possession of the Store or any portion thereof after the expiration
38  of the Term, then in the absence of an agreement in writing between the parties, Tenant shall be
39  deemed a tenant at sufferance until acceptance of Rent by Landlord, at which time, Tenant shall

Store No. 1610, "Stafford"
Fountains on the Lake
Stafford, TX
9320.1610.4

- 56 -

11/01/12
FINAL

become a tenant from month-to-month under the same terms and conditions as existed immediately prior to the expiration of this Lease, except that Minimum Rent shall be at a rate equal to one hundred twenty-five percent (125%) of the Minimum Rent applicable to the month preceding the expiration of the Term of this Lease, notwithstanding any Substitute Rent that may have been applicable immediately prior to the expiration of the Lease.

## 17. LANDLORD'S COVENANTS

**17.1.   Landlord's Warranty.**

Landlord warrants to Tenant that (a) Tenant, while operating in the Store for the use stated in Section 15.1 will not be in violation of any exclusives, restrictions or other agreements which Landlord may have with other lessees, lenders, governmental authorities or any other parties, and (b) the use stated in Section 15.1 is not a violation of any restrictions imposed by any governmental body or authority.  Landlord shall hold Tenant harmless from any claims or damages suffered or claimed to be suffered by Tenant as a result of any breach or alleged breach of Landlord's warranties.

**17.2.   Landlord's Title.**

Landlord has provided Tenant with the Title Report.  Landlord represents and warrants that: (a) Landlord has lawful title to the Shopping Center and full right to make and execute this Lease; (b) at the time of recording of the Memorandum of Lease, the Shopping Center will be free from all other liens, title exceptions and other encumbrances of any kind whatsoever, except those set forth in **Exhibit I** attached hereto and incorporated by this reference ("Permitted Title Exceptions"); (c) none of the Permitted Title Exceptions, including, but not limited to, any easements (i) adversely affect Tenant's access to, or use of the Store, or (ii) alter the boundaries or the configuration of the Common Areas, including, but not limited to, the methods of ingress and egress, from that depicted on the Site Plan; and (d) no other party is required to consent to this Lease as a condition to the effectiveness of this Lease or any of the provisions hereof, including, but not limited to, the consent of any lender or ground lessor relating to the Shopping Center, or if consent is required Landlord shall have obtained such consent prior to its execution of this Lease.

**17.3.   Remedies.**

In the event of any violation of any of the covenants made by Landlord in this Article 17, Tenant may give Landlord notice of the violation.  If Landlord fails to cure the violation within thirty (30) days of such notice, and if such violation has a material and adverse effect upon Tenant's business operations in the Store or Tenant's interest in this Lease, Tenant may exercise its remedies available at law and in equity, including the right to terminate this Lease by written notice to Landlord.

# 18. QUIET ENJOYMENT

Landlord represents and warrants that it has full authority to execute and perform this Lease and to grant the subject leasehold estate to Tenant, and that Tenant shall peaceably and quietly have, hold and enjoy the Store with all appurtenances without any manner of hindrance or interference with its quiet enjoyment, possession and use.

# 19. ASSIGNMENT/SUBLETTING

**19.1.    General.**

Tenant shall have the right to assign this Lease, or sublet the Store, or any portion thereof (a "Transfer" and the assignee or sublessee thereof is herein a "Transferee") without the prior written consent of Landlord. Tenant shall have the right to operate departments within the Store by means of subleases, licenses or concession agreements. Except in the event of an assignment or other transfer of this Lease or a sublease to a "Related Entity," Tenant agrees to notify Landlord in writing within thirty (30) days following any Transfer specifying the Transferee, its address, and contact person.

**19.2.    Related Entity.**

An assignment or other transfer of this Lease or any sublease of all or any portion of the Store to a "Related Entity" shall not constitute a Transfer under the terms of this Lease. The term "Related Entity" means: a corporation or other entity with which Tenant may merge or consolidate; or to which Tenant sells at least five (5) stores; or any parent, affiliate or subsidiary of Tenant; or an affiliate or subsidiary of Tenant's parent.

**19.3.    Stock.**

The sale of stock by Tenant or by any shareholder of Tenant shall not constitute a Transfer under the terms of this Lease.

**19.4.    Release of Liability.**

In the event of a Transfer of this Lease, Tenant and Tenant's guarantor, if any, shall remain liable; provided, however, if Tenant's assignee (or any subsequent assignee) has at the time of the Transfer, or at any time after the Transfer attains, a "Net Worth" (as hereinafter defined) of at least Twenty Million Dollars ($20,000,000), Tenant and Tenant's guarantor, if any, shall thereafter and forever be released from further liability under this Lease. "Net Worth" shall mean the book net worth of the assignee determined from the audited statement of the most recent fiscal year balance sheet immediately preceding the Transfer.

**19.5.    Landlord Notice to Assignee.**

Landlord, when giving notice to any Transferee of this Lease related to any default hereunder, shall simultaneously give notice thereof to Tenant, who may cure said default at any time during the notice period; and in the event that Tenant shall cure the default, Tenant shall be subrogated to all rights and remedies of Landlord as against the Transferee related to the default and shall have the right at its election to recover possession of the Store from the defaulting Transferee, to cancel and revoke the Transfer, and to be restored by Landlord to its leasehold estate hereunder.

**19.6.    Restriction on Landlord's Right to Assign.**

Landlord shall not assign this Lease prior to the Delivery Date and the date that Landlord performs all of its obligations and duties under this Lease which are conditions precedent to this Lease becoming effective.

## 20. DEFAULTS/DISPUTE RESOLUTION/ATTORNEYS' FEES

**20.1.    Defaults.**

**20.1.1.    Tenant's Default.**

(a)    Breach. The occurrence of either of the following shall constitute a default by Tenant pursuant to this Lease: (i) a failure by Tenant to pay Rent within ten (10) Business Days after Tenant's receipt of written notice from Landlord specifying such failure; or (ii) a failure by Tenant to perform obligations pursuant to this Lease, other than as specified in (i) above, within thirty (30) days after Tenant's receipt of written notice from Landlord specifying such failure; however, such thirty (30) day period may be extended for such period of time as may be reasonably required to perform the obligation provided: (A) such obligation cannot be reasonably performed within thirty (30) days after such notice; (B) Tenant commences efforts to cure the default within thirty (30) days after receipt of Landlord's notice of default; and (C) Tenant diligently pursues completion of the obligation. Tenant's withholding, deducting or offsetting of, or failure to pay Rent pursuant to a bona fide dispute between Landlord and Tenant pursuant to the terms of this Lease shall not be deemed a default by Tenant under the provisions of this Lease.

(b)    Insolvency. If Tenant makes an assignment for the benefit of creditors, or if any proceedings are commenced under the provisions of the Bankruptcy Act whereby Tenant seeks to be, or would be, discharged of its debts, or the payment of its debts are sought to be delayed, this Lease shall be governed by the provisions of the Federal Bankruptcy Act.

(c)    Prohibition Against Landlord Accelerating Rent.

(i)    Except as provided in Section 20.1.1(c)(ii) below, and whether or not Landlord terminates this Lease, Tenant shall have no obligation to pay Rent until the date it would otherwise be due in the absence of Tenant's default. Landlord shall have no right to accelerate Rent which would become due except as provided hereafter.

Store No. 1610, "Stafford"
Fountains on the Lake
Stafford, TX
9320.1610.4

- 59 -

11/01/12
FINAL

1          (ii)    In the event Landlord terminates this Lease due to a default by
2    Tenant, Landlord may recover from Tenant the balance of the Rent payable by Tenant for the
3    remainder of the Term, minus the fair market rental value of the Store for such period, each
4    discounted to present value using a discount rate of eight percent (8%) per annum.

5          (d)    Personal Property Waiver.  Landlord waives such liens, if any, to which it
6    may have a right with respect to the merchandise, furniture, trade fixtures and other personal property
7    of Tenant located on or about the Store, and Landlord shall from time to time execute such documents
8    as Tenant may reasonably request to acknowledge such waiver.

9          (e)    Landlord's Remedy for Improper Offset.  Certain provisions of this Lease
10   grant to Tenant the right to offset specified amounts against, or to deduct such amounts from, Rent or
11   other charges payable under this Lease.  The exercise by Tenant of any such right or Tenant's
12   withholding of any disputed amount of Rent or other sum shall not constitute a default under this
13   Lease by Tenant unless and until (i) a mediator per Section 20.2.2 or a court, if the matter is litigated,
14   shall determine by means of a final award that such right to offset, deduct, or refusal to pay has been
15   exercised improperly by Tenant, and (ii) following the entry of such award, and within thirty (30) days
16   after receipt by Tenant from Landlord of a bill in the amount determined by such award to have been
17   improperly offset, deducted, or withheld by Tenant, Tenant shall fail to pay such amount to Landlord,
18   together with interest thereon at the Legal Rate retroactive to the date that the offset or deduction was
19   taken by Tenant.

20         (f)    Inaccurate Default Notices.  If during the Term, Landlord sends Tenant
21   two (2) default notices which are determined to be false or inaccurate, then the following procedures
22   shall apply.  If Landlord sends Tenant a subsequent default notice which Tenant contends is false or
23   inaccurate, Tenant may send written notice to Landlord, objecting to Landlord's default notice and
24   setting forth the basis for Tenant's objection ("Tenant's Objection Notice").  If Landlord does not
25   rescind its default notice by written notice to Tenant within ten (10) Business Days following receipt of
26   Tenant's Objection Notice, then, if Landlord's subsequent default notice is determined to be false or
27   inaccurate, then Landlord shall be obligated to pay Tenant a One Thousand Dollar ($1,000) processing
28   fee to defray Tenant's costs incurred in processing and responding to Landlord's default notice,
29   whether or not litigation or an Alternative Dispute Resolution proceeding is commenced in connection
30   with Landlord's default notice.  Landlord shall reimburse Tenant such processing fee within ten (10)
31   days following receipt of Tenant's invoice therefor.  If Landlord fails to reimburse Tenant within such
32   ten (10) day period, Tenant may deduct the processing fee from the Rent due under this Lease.  In
33   such event, Landlord and Tenant shall each adjust their accounting records to reflect the payment of
34   the processing fee to Tenant.  Nothing in this Section 20.1.1(f) shall limit Tenant's right to recover its
35   attorneys' fees and costs under any other provision of this Lease, including, but not limited to, the
36   provisions of Section 20.4.

37       **20.1.2.**    Landlord's Default.

38         (a)    Breach.  Except for a violation by Landlord of express provisions of this
39   Lease which require specific notice provisions which are shorter or longer than thirty (30) days (which
40   notice provisions shall control over the provisions of this Section 20.1.2(a)), the occurrence of the
41   following shall constitute a default by Landlord pursuant to this Lease: Landlord's failure to perform
42   any of its obligations under this Lease, which default continues for a period of more than thirty (30)

days after receipt of written notice from Tenant specifying such default; however, such thirty (30) day period may be extended for such period of time as may be reasonably required to perform the obligation (not to exceed ninety (90) days after Landlord's receipt of such notice) provided: (i) such obligation cannot be reasonably performed within thirty (30) days after such notice; (ii) Landlord commences efforts to cure the default within thirty (30) days after receipt of Tenant's notice of default; and (iii) Landlord diligently pursues completion of the obligation.

        (b)    Remedies.

               (i)    General. In the event of Landlord's default, Tenant may avail itself of all of its remedies available at law and in equity, and Tenant may, at its election, upon written notice to Landlord, incur any expense necessary to perform the obligation of Landlord specified in such notice and deduct such expense from the Rent or other charges coming due.

               (ii)    Interruption of Utility Service. In addition to the remedies described above, in the event Tenant is prevented from using the Store, or any material portion thereof, to conduct its normal retail operations for a period exceeding three (3) consecutive Business Days as a result of the interruption of any Utility service ("Utility Interruption") to the Store which is required to be provided by the terms of this Lease and the Utility Interruption is not caused by the willful acts or negligence of Tenant or its contractors, agents or employees, then the provisions of this Section 20.1.2(b)(ii) shall apply. Tenant shall promptly deliver to Landlord notice of the interruption (the "Interruption Notice") of such condition. If the Utility Interruption was caused by Landlord, Landlord shall have five (5) days after receipt of the Interruption Notice to cure the Utility Interruption caused by Landlord. If Landlord fails to cure the Utility Interruption caused by Landlord within five (5) days after delivery to it of the Interruption Notice, then Rent applicable to the Store shall be abated from the date of the Interruption Notice until the date when such failure is cured. If the Utility Interruption was not caused by Landlord, Landlord shall have sixty (60) days after receipt of the Interruption Notice to cure the Utility Interruption and if Landlord fails to cure the Utility Interruption within sixty (60) days after the Interruption Notice, regardless of whether Landlord did or did not cause the Utility Interruption, then Rent shall be abated from the date of the Interruption Notice until the date such failure is cured. If the Utility Interruption shall not be cured within ninety (90) days after Landlord's receipt of the Interruption Notice, then Tenant, regardless of whether Landlord did or did not cause the Utility Interruption, upon notice to Landlord after expiration of such period, may terminate this Lease, which termination shall be deemed effective upon Tenant's vacation of the Store. In the event Tenant terminates this Lease because of a Utility Interruption caused by Landlord, Landlord shall pay Tenant the Unamortized Cost of Tenant's leasehold improvements within thirty (30) days of Tenant's Termination Notice. Notwithstanding the foregoing, if the Utility Interruption is caused by a Casualty, the provisions of Article 21 shall apply. If the Utility Interruption is caused by Tenant or Tenant's contractors, agents or employees, then Tenant, at its sole cost and expense, shall be responsible for restoring the Utilities to the Store.

## 20.2.   Alternative Dispute Resolution Process.

    **20.2.1.**    Means of Resolution. In the event that any controversy or dispute ("Dispute") shall arise under this Lease and in the event that the parties have been unable to resolve such Dispute within thirty (30) days, the Dispute shall be resolved as provided in this Section 20.2. All Disputes, other than those arising from the non-payment of Rent by Tenant that is not specifically

Store No. 1610, "Stafford"
Fountains on the Lake
Stafford, TX
9320.1610.4

- 61 -

11/01/12
FINAL

authorized under the terms of this Lease, shall require the utilization of Mediation as provided in Section 20.2.2 below.    Nothing contained in this Section 20.2 shall infer an obligation upon Landlord to pursue mediation prior to exercising its remedies, at law or in equity, upon the occurrence of a monetary default by Tenant under the Lease that is not the subject of a bona fide dispute between the parties.

   **20.2.2.** Mediation. The parties shall first try in good faith to settle the Dispute by Mediation pursuant to the provisions as set forth below. Either party may initiate Mediation. The party commencing the Mediation shall first give a written notice (a "Mediation Notice") to the other party setting forth the nature of the Dispute. The Mediation shall be administered by the American Arbitration Association under its Commercial Mediation Rules, except to the extent that this Section 20.2.2 is inconsistent therewith, in which event this Section 20.2.2 shall govern and prevail. If the parties cannot agree on the selection of a Mediator within twenty (20) days after receipt of the Mediation Notice, the Mediator shall be selected in accordance with the American Arbitration Association procedure. If the Dispute or any part thereof has not been resolved by Mediation as provided above within sixty (60) days after receipt of the Mediation Notice, or if a party fails to participate in Mediation, then at the election of either party by written notice, the Dispute shall be determined by suit or action in court.  The costs of the Mediator and the Mediation service shall be shared equally by the parties; each party shall otherwise bear its own costs incurred in connection with the Mediation, including its own attorneys' fees.

   **20.2.3.** Intentionally deleted.

   **20.2.4.** Confidentiality.  Except as otherwise required by law, the parties, and Mediator agree to keep confidential and not disclose to third parties any information or documents obtained in connection with the Mediation process, including the resolution of the Dispute.

**20.3. Unlawful Detainer.**

   Landlord agrees not to initiate (including the service of any notice to pay rent or quit or comparable notice), file, prosecute, or maintain any proceeding for eviction, unlawful detainer, or termination of this Lease against Tenant (and any such proceeding shall be null and void) during the Alternative Dispute Resolution process as set forth in Section 20.2 and/or in the event of a bona fide dispute between the parties with respect to any alleged default by Tenant or any provision of this Lease, including, without limitation, Tenant's non-payment of Rent pursuant to Tenant's right to withhold, deduct or offset Rent in accordance with this Lease; provided, however, this Section 20.3 shall not apply to Tenant's non-payment of Rent that is due under this Lease that is not the subject of a bona fide dispute between the parties and is not subject to Tenant's express right to withhold, deduct or offset under the terms of this Lease.

**20.4. Attorneys' Fees.**

   **20.4.1.** Third Party Litigation.    If either party becomes a party to any litigation concerning this Lease, the Store or the Shopping Center by reason of any act or omission of the other party or its authorized representatives, and not by its own act or omission or that of its authorized representatives, the other party shall be liable to that party for reasonable attorneys' fees,

Store No. 1610, "Stafford"
Fountains on the Lake
Stafford, TX
9320.1610.4

- 62 -

11/01/12
FINAL

1 court costs, investigation expenses, discovery costs and costs of appeal incurred by it in the
2 litigation.

3        **20.4.2.**   <u>Actions Between the Parties</u>. If either party commences an action against the
4 other party arising out of or in connection with this Lease, the prevailing party shall be entitled to
5 have and recover from the losing party reasonable attorneys' fees, costs of suit, investigation costs,
6 discovery costs, and expert witness fees and costs, including costs of appeal. When this Lease
7 imposes upon a party an obligation to indemnify the other, the indemnification obligation shall
8 include the obligation to pay the indemnitee's reasonable attorneys' fees, costs and disbursements,
9 whether the indemnitee be the plaintiff or defendant.

10                         **21.**     **CASUALTY**

11 **21.1.**   **Definitions.**

12        **21.1.1.**   <u>Casualty</u>. An event, or act of God, such as fire, windstorm, flood or earthquake,
13 riot, civil commotion, perils or other matters which are unforeseen and unpredictable, whether
14 insured or uninsured, which causes damage or destruction to the Store or the Shopping Center.

15        **21.1.2.**   <u>Casualty Date</u>. The date of the occurrence of a Casualty.

16        **21.1.3.**   <u>Permitted Repair Period</u>. A period of one hundred eighty (180) days following
17 the Casualty Date.

18        **21.1.4.**   <u>Restoration (sometimes referred to herein as "Restore")</u>. Restoration, rebuilding
19 or repairs due to a Casualty under Section 21.2 of this Lease or due to a Taking under Section 22.1
20 of this Lease.

21 **21.2.**   **Insured Casualty.**

22        If the Store is damaged or destroyed by a Casualty insured against or that Landlord is
23 obligated to insure against under this Lease, to the extent that Restoration cannot reasonably be
24 completed within the Permitted Repair Period, as reasonably determined by Landlord (and Landlord
25 shall deliver notice to Tenant of such determination within thirty (30) days of the Casualty Date),
26 Tenant may, at its election, terminate this Lease as of the Casualty Date by notice to Landlord within
27 forty-five (45) days after the Casualty Date. If Tenant does not so terminate this Lease, or if
28 Restoration to the Store may be completed within the Permitted Repair Period, then this Lease shall
29 not terminate, and Landlord shall, following its receipt of the insurance proceeds, diligently proceed
30 to Restore the Store to substantially the condition as existed immediately prior to the Casualty, and
31 Landlord shall diligently pursue such Restoration to completion. If the Restoration is not completed
32 within the Permitted Repair Period, Tenant may terminate this Lease by written notice to Landlord
33 at any time prior to the Redelivery Date. All Rent payable hereunder shall abate from the Casualty
34 Date to the earlier of (a) sixty (60) days following the Redelivery Date (but only if the Redelivery
35 Date falls on a Permitted Delivery Day, and if the Redelivery Date does not fall on a Permitted
36 Delivery Day, the sixtieth (60th) day following the next Permitted Delivery Day); or (b) the date on
37 which Tenant again opens for business in the Store (in either case the "Recommencement Date");
38 provided that if Tenant continues to do business in the Store during the period of Restoration,

Store No. 1610, "Stafford"
Fountains on the Lake
Stafford, TX
9320.1610.4

- 63 -

11/01/12
FINAL

Tenant's total obligation for Rent shall be to pay Substitute Rent within fifteen (15) days after the close of each calendar month. The election by Tenant to carry the insurance on the Store pursuant to the terms of Section 9.1.3 shall not create any obligation on the part of Tenant to Restore, but Tenant shall make available to Landlord the proceeds from such insurance and the amount of Tenant's deductible with respect to Tenant's insurance on the Store for Landlord's use in discharging Landlord's Restoration obligations under this Section 21.2.

**21.3.    Uninsured Casualty.**

If the Store is damaged or destroyed by a peril not covered by the standard form of Special Form Policy or not covered by any other insurance maintained by Landlord (hereinafter collectively referred to as an "Uninsured Casualty") and the cost of the Restoration of the Store as reasonably determined by Landlord exceeds by more than Two Hundred Thousand Dollars ($200,000) ("Threshold Amount") the amount of insurance proceeds available (i.e., net of any applicable deductible) to Landlord, Landlord may elect not to Restore the Store and to terminate this Lease on at least ninety (90) days' prior written notice to Tenant. If only the Store and no other part of the Building is damaged, Tenant may elect to pay the difference between the cost of Restoration (less available insurance proceeds) and the Threshold Amount (which amount Landlord shall be required to contribute for purposes of Restoration) (the "Difference") by delivering written notice of such election, together with payment of such Difference to a Stakeholder as defined in Section 21.6 hereof, if any, to Landlord within sixty (60) days after delivery of Landlord's notice of election to terminate this Lease. Upon receipt of such notice and confirmation of payment by Tenant of the Difference to the Stakeholder, if any, the Landlord termination shall be deemed rescinded and Landlord shall pay the Threshold Amount to the Stakeholder and shall proceed with the Restoration of the Store. If Landlord elects to terminate this Lease under this Section 21.3 and Tenant does not elect to pay the Difference, this Lease shall terminate as of the date set forth in Landlord's notice of election to terminate this Lease. If this Lease is not terminated under this Section 21.3, all Rent payable hereunder shall abate from the Casualty Date to the Recommencement Date; provided that if Tenant continues to do business in the Store during the period of Restoration, Tenant's total obligation for Rent shall be to pay Substitute Rent within fifteen (15) days after the close of each calendar month.

**21.4.    End of Term Casualty.**

Notwithstanding any provision in this Article 21 to the contrary, Landlord shall not be required to Restore any Casualty to the Store occurring during the final eighteen (18) months of the Term if the cost of such Restoration is greater than One Hundred Thousand Dollars ($100,000) unless, within thirty (30) days after receipt of Landlord's notice to Tenant that it intends not to effect Restoration, Tenant exercises in writing any next immediately succeeding Option to extend the Term given Tenant hereunder. If Tenant does not elect to exercise the next immediately succeeding Option so as to extend the Term, Tenant shall so notify Landlord within thirty (30) days of Landlord's notice of election not to Restore, and, thereupon, this Lease shall terminate effective as of the Casualty Date.

**21.5.    Shopping Center Casualty.**

In the event that the Store is not damaged or destroyed by a Casualty, but other buildings in the Shopping Center, or the Building, excluding the Store, or if any of the Common Areas, are damaged or destroyed by a Casualty, whether or not insured against (collectively a "Shopping Center Casualty"), Landlord shall promptly remove all rubble and debris resulting from such damage or destruction, and, subject to the provisions of Sections 21.1 through 21.4, Landlord shall promptly Restore the damaged buildings in the Shopping Center as well as the Common Areas as nearly as possible to the condition the same were in immediately prior to such damage or destruction. Notwithstanding anything to the contrary contained herein, and regardless of the extent of damage, Landlord shall promptly remove all rubble and debris so that the Common Areas are usable. Except as otherwise expressly stated in this Section 21.5, the provisions of Sections 21.1 through 21.4 shall apply to a Shopping Center Casualty. If the damage to the Common Areas shall render the whole or any part of the Store unsuitable for Tenant's use, all Rent payable hereunder shall abate from the Casualty Date to the Recommencement Date; provided that if Tenant continues to do business in the Store during the period of Restoration, Tenant's total obligation for Rent shall be to pay Substitute Rent within fifteen (15) days after the close of each calendar month.

**21.6.    Insurance Proceeds.**

Insurance proceeds for damage or destruction to the Store ("Proceeds"), if under One Hundred Thousand Dollars ($100,000), shall be paid directly to Landlord, subject to the terms of any applicable Non-Disturbance Agreement. If in excess of such amount, all of the Proceeds shall be deposited with Lender (as hereinafter defined), provided Lender agrees to apply the Proceeds in the manner described herein. As used in this Section 21.6, the term "Lender" means the holder of indebtedness secured by a first lien upon Landlord's Parcel, whether the interest creating such lien be denominated as a mortgage, deed of trust, security agreement, vendor's lien or otherwise, but only if Lender is a financial institution, such as a bank, savings and loan, insurance company, or other entity regularly engaged in making loans secured by shopping center real property. If Lender does not so agree, or there is no Lender, then the Proceeds shall be deposited with a bank, trust company, or title insurance company designated by Tenant and approved by Landlord, for the use of the Proceeds as provided in this Section 21.6. The Lender, if it agrees, or such other qualified party so designated to hold and disburse the proceeds is herein referred to as the "Stakeholder." Stakeholder shall disburse the Proceeds to the party performing Restoration upon certification by the architect in charge of Restoration that the amounts requested have been paid in connection with such Restoration or shall be due to contractor, subcontractors, materialmen, architects, suppliers or other persons who have rendered services or have furnished materials for such Restoration, and upon completion of such Restoration, the remaining balance of any Proceeds shall be paid to Landlord upon demand.

**21.7.    Tenant Repair.**

If Landlord is obligated to Restore the Store under the terms of this Article 21 but does not commence Restoration as soon as practicable after the Casualty, or does not continue the Restoration of the Store thereafter with reasonable dispatch, Tenant, upon thirty (30) days' prior notice to Landlord, subject to the terms of any applicable Non-Disturbance Agreement, shall have the right to Restore the Store at Landlord's sole cost and expense. If Tenant elects to Restore,

subject to the terms of any applicable Non-Disturbance Agreement, Landlord shall promptly pay to
Tenant any insurance proceeds relating to the Casualty and shall assign to Tenant all Proceeds held
by Stakeholder as provided in Section 21.6 and shall so instruct the Stakeholder in writing.  In
addition, all Rent shall abate as described in Section 21.2 above; provided that if Tenant continues to
do business in the Store during the period of Repair, Tenant's total obligation for Rent shall be to
pay Substitute Rent within fifteen (15) days after the close of each calendar month.  Further,
Landlord shall reimburse Tenant upon demand for any cost or expense incurred by Tenant for such
Restoration (not including any amount by which the cost and expense of Restoration is increased by
any change or changes made by Tenant) in excess of Proceeds received by Tenant plus interest at
the Legal Rate.  Until Tenant has been fully reimbursed for such costs and expenses, Tenant may
deduct the same from any payments of Rent or other charges due hereunder to Landlord.  If at the
expiration of the Term, Tenant has not been fully reimbursed, Tenant shall have the right to extend
the Term for any period of time (but not in excess of twenty-one (21) years) selected by Tenant
which is less than or equal to the period which shall enable Tenant to recover such cost and expense
plus interest at the Legal Rate from Rent due hereunder.  During such extension, Rent shall be
imputed as being that in effect in the month immediately preceding such extension.  The remedy
stated hereinabove shall be cumulative with any other remedy available to Tenant at law or in equity
or under the terms of this Lease, including the right to collect the full amount of any such advance
from Landlord immediately.

**21.8.    Waiver of Statute.**

The parties waive such rights of Lease termination as are granted to them under the laws of
the state wherein the Store is located, it being their agreement that the rights of termination in the
event of Casualty, as set forth herein, shall be exclusive.

**21.9.    Laws.**

If applicable governmental laws and regulations prohibit the Restoration of the Store or
Common Areas to substantially the condition as existed immediately prior to the Casualty, either
party may elect to terminate this Lease effective thirty (30) days after the delivery to the other party
of written notice of the election to terminate.  Notwithstanding the foregoing, if Landlord elects to
terminate this Lease pursuant to this Section 21.9, Tenant may void Landlord's termination by
notifying Landlord in writing, within thirty (30) days following receipt of Landlord's Termination
Notice, that Tenant will accept Landlord's Restoration of the Store and/or the Common Areas, as
applicable, to the extent permitted by applicable governmental laws and regulations, even if such
Restoration of the Store and/or the Common Areas, as applicable, will not be to substantially the
condition as existed immediately prior to the Casualty.

**21.10.    Tolling of Term.**

During the period between Landlord's completion of Landlord's Restoration obligations and
the Recommencement Date, Tenant and Tenant's employees, agents and contractors shall have the
right to enter upon the Store for the purpose of erecting, constructing, or installing such
improvements, alterations, fixtures, equipment and furniture as Tenant deems necessary for
resuming business in the Store.  In the event Rent shall completely abate for any period pursuant to
the provisions of this Article 21, the Term shall toll for the period of such abatement, in which

event, the monthly installments of Rent following the end of the period of such abatement shall recommence and thereafter continue at the same Rent rate that was in effect at the time of such abatement; the remaining scheduled increases of Minimum Rent shall be postponed for the period of such abatement to reflect such tolling, the expiration date of the then applicable Term (whether the Initial Term or any Option Period) and the commencement and expiration dates of any subsequent Option Periods shall be extended for the period of such abatement, as shall be the deadline dates for notices exercising Option Periods.  Any period of tolling shall be added to the calculation of the Initial Term (or any then current Option Period, as the case may be) for purposes of the calculation of the Expiration Date.  For example, if the Term of this Lease is tolled under the provisions of this Section 21.10 for a period of four (4) months, and the tolling occurs during the Initial Term, then the definition of Initial Term in Section 1.5.1 shall be:  "From the Commencement Date through the January 31 next following the expiration of one hundred twenty-four (124) months thereafter."

**21.11.  Effect of Termination.**

Upon termination of this Lease pursuant to this Article 21, (a) each of the parties shall be thereby released from all further obligations and duties to the other party as of the Casualty Date, except for items and liabilities which have theretofore accrued and be then unpaid, and (b) Landlord shall promptly refund to Tenant all unearned Rent and other amounts prepaid by Tenant under this Lease.

**21.12.  Tenant's Right of First Offer.**

The provisions of this Article 21 to the contrary notwithstanding, if this Lease is terminated in accordance with this Article 21, and Landlord elects to rebuild the Store or a substantially similar building in Landlord's Parcel within two (2) years after the Casualty Date, Landlord shall, before marketing space in such building to any person or entity, first offer space in such building to Tenant on terms no less favorable than those for which Landlord will market such space on the open market.

## 22.    CONDEMNATION

**22.1.  Taking.**

A "Taking" means any governmental act, condemnation proceeding, moratorium, initiative, or referendum whereby Landlord or Tenant is divested of ownership or any of the incidents thereof, or any transfer in lieu thereof, and physical possession is taken by the governmental or condemning authority.  In the event Tenant does not terminate this Lease as provided in Section 22.2 following, Landlord shall promptly and diligently Restore the Store, Common Areas, or other space, as the case may be, to as near their condition as existed prior to such Taking as is reasonably possible.  During the course of such Restoration, if Tenant is not operating in the Store, all Rent shall abate from the date of the Taking to the Recommencement Date.  If Tenant continues to do business in the Store during the period of Restoration, Tenant's total obligation for Rent shall be to pay Substitute Rent within fifteen (15) days after the close of each calendar month.  When Restoration is complete, Tenant's total obligation for Minimum Rent shall be adjusted as provided in Section 3.7 in the event the size of the Store is reduced.  When Restoration is complete, if the size of the Store is not

reduced, but the size of the Common Areas is reduced, Minimum Rent shall thereafter be reduced to an amount calculated by multiplying the Minimum Rent stated in this Lease by a fraction the numerator of which is the fair market rental value of the Store immediately following the Taking and the denominator of which is the fair market rental value of the Store immediately prior to the Taking.

## 22.2.  **Right to Terminate.**

Tenant may terminate this Lease upon written notice to Landlord in the event of any one or more of the following Takings:

**22.2.1.**    A Taking of any material portion of or interest in the Store;

**22.2.2.**    Any Taking of the Common Areas if the number of parking spaces is reduced below applicable parking codes or ordinances, or access to the Store is materially impaired, or access to the Shopping Center is materially impaired;

**22.2.3.**    Any Taking of any portion of the Shopping Center which materially impairs the operation of Tenant's business; or

**22.2.4.**    Any Taking of twenty-five percent (25%) or more of the Leasable Floor Area of the Shopping Center (not including the Store in either the numerator or denominator of such calculation).

**22.2.5.**    Landlord shall promptly notify Tenant of any Taking.  Tenant's termination must be exercised by written notice to Landlord given within sixty (60) days following the date of Tenant's receipt of Landlord's notice of the occurrence of such Taking (as defined in Section 22.1).

## 22.3.  **Claims.**

Nothing herein contained shall prevent Landlord and Tenant from prosecuting claims in any condemnation proceedings or otherwise for the value of their respective interests, as well as any damages.  Notwithstanding anything to the contrary contained herein, if this Lease is terminated, Landlord shall pay to Tenant from any Landlord award an amount equal to the Unamortized Cost of any leasehold improvements to the Store and Tenant's moving expenses (less any amount recovered by Tenant with respect to same).  If this Lease is not terminated pursuant to a Taking, Landlord shall pay to Tenant the amount of the Unamortized Cost of any leasehold improvements made to the Store by Tenant which shall have been taken or rendered unusable, and not restored (less any amount recovered by Tenant with respect to same).

## 22.4.  **Waiver.**

The parties waive such rights of Lease termination as may be granted them in the event of condemnation by the laws of the state wherein the Store is located, it being their agreement that the rights of termination set forth in this Lease shall be exclusive.

## 23.    MECHANIC'S LIENS

**23.1.1.**    Landlord and Tenant shall prevent any mechanic's, materialman's or other liens against the Store or the Shopping Center in connection with any labor, materials or services furnished or claimed to have been furnished.  If any such lien shall be filed against the Store or Landlord's Parcel, the party through whom the lien arose will cause the same to be discharged within thirty (30) days of the filing of the lien, provided, however, that either party may contest any such lien, so long as the enforcement thereof is stayed by bonding or otherwise expunging the lien from the official property records in the jurisdiction.

**23.1.2.**    Tenant expressly rejects, and does not agree to be subject to or bound by, the mechanic's and/or materialman's liens appearing of record against the Shopping Center as of the Effective Date as more specifically identified on **Exhibit I** hereto (the "Mechanic's Liens"). Landlord represents, and Tenant shall rely upon such representation, that the remaining Mechanic's Liens shall be discharged and removed of record within sixty (60) days of the Effective Date of this Lease.  Landlord agrees to indemnify, defend and hold Tenant harmless against the Mechanic's Liens pursuant to its indemnity under Section 14.2 of this Lease.

## 24.    SIGNS

### 24.1.    Governmental Approval and Compliance.

All exterior signs shall be subject to approval by local governmental authority and shall conform to all requirements of the REA.  Landlord shall cooperate fully with Tenant and assist Tenant in Tenant's efforts to obtain approval for Tenant's signs as shown on **Exhibit J** ("Tenant's Signs") and made a part hereof, from the local governmental authority and from any other occupants in the Shopping Center, whose approval is required under the REA or otherwise. Landlord's approval for a change to Tenant's signage on the exterior of the Store or Tenant's sign panels on the Shopping Center's pylon or monument or directional signs shall not be required if such change is in connection with a corporate-wide and/or multi-store signage change program by Tenant, however, such change shall be subject to the approval of the local governmental authority and parties under the REA, if required.  Tenant shall have the right to install Tenant's signage within the Store without Landlord's approval.  Landlord approves of all Tenant's Signs shown on **Exhibit J**.  Landlord represents that Tenant's Signs do not violate the requirements of the REA. The installation of Tenant's Signs shall be at the sole cost and expense of Tenant.

### 24.2.    Building Signs.

Tenant may, at its sole cost and expense, erect and maintain Tenant's Signs upon the exterior walls of all sides of the Store, as specified on **Exhibit J**.  Tenant's Signs shall be included by Landlord in the sign criteria for the Shopping Center.  Tenant's Signs, including Tenant's signage on any sign structure(s) provided by Landlord, shall be fabricated, installed and maintained by Tenant at its sole cost and expense and, at Tenant's election, shall be of no less sign area than the largest sign of any other tenant or occupant in the Shopping Center.  In no event shall Tenant's storefront Signs be configured with less than a seventy-two (72) inch "Ross" and a forty-two (42) inch "Dress for Less."  Tenant shall have the right, but not the obligation, to install under-canopy signs if permitted by local governmental authority.  In the event the sign criteria for the Shopping Center require only

1      a specific type or style of under-canopy sign, then Tenant shall have the right to approve any such
2      under-canopy sign prior to such under-canopy sign's installation.

3    **24.3.    Pylon or Monument or Directional Signs.**

4      Landlord shall, at its sole cost and expense, maintain and repair the
5      pylon/monument/directional sign structure(s) specified in the Site Plan and **Exhibit J** upon which
6      Tenant may, at its sole cost and expense, install and maintain Tenant's sign panels. Landlord shall
7      cooperate fully with Tenant and assist Tenant in obtaining all permits to install Tenant's sign panels
8      on Landlord's pylon/monument/directional sign structure(s) as specified on **Exhibit J**. The size
9      and location of the panels shall be as specified in **Exhibit J** attached hereto. Tenant shall have the
10     right to decorate such sign panels with Tenant's logo and/or trade name in format and color
11     typically used or adopted by Tenant as specified in **Exhibit J**. Tenant shall pay for the expense of
12     fabricating, installing and maintaining its sign panels on the pylon/monument/directional sign
13     structure(s). Utility charges for the pylon sign(s) on which Tenant places its sign panels shall be a
14     Common Area Charge.

15    **24.4.    Temporary Signs.**

16      Subject to the provisions of the REA, during the period of construction described in
17      Section 5.1, Tenant shall have the right to construct temporary signage adjacent to and/or on the
18      Store and at the perimeter of the Shopping Center indicating the anticipated opening of the Store
19      for business. Additionally, Tenant may, through the thirtieth (30th) day following the opening of
20      the Store for business, advertise such new business by means of banners, flags and other signage
21      attached to the Store.

22    **24.5.    Visibility of Tenant's Store and Signs.**

23      Landlord covenants and agrees that no landscaping, structures or other improvements shall
24      be installed or permitted in the Shopping Center which interfere with or obstruct the visibility of the
25      Store or any of Tenant's Signs. Landlord further covenants and agrees that it shall regularly prune
26      landscaping in the Shopping Center so that such landscaping does not interfere with or obstruct the
27      visibility of the Store or any of Tenant's Signs. If any landscaping, structures or other improvements
28      interfere with or obstruct the visibility of the Store or any of Tenant's Signs, Tenant may give
29      Landlord written notice thereof and Landlord shall have ten (10) days from the date of Tenant's
30      notice to remove or alter the structures or other improvements or to remove or prune the
31      landscaping to eliminate the interference with or obstruction of the visibility of Tenant's Store or
32      any of Tenant's Signs ("Corrective Measures"). If Landlord fails to complete the Corrective
33      Measures prior to the expiration of the ten (10) day period, then Tenant shall have the right, at its
34      election, to take such Corrective Measures as Tenant deems reasonably necessary to eliminate the
35      interference or obstruction, and Tenant may deduct the cost of such Corrective Measures from Rent
36      due under this Lease.

37                            **25.    NOTICE**

38      Any notice to be given in connection with this Lease shall be in writing and shall reference
39      (a) this Lease, (b) the store number which has been assigned to the Store by Tenant (if known to

Store No. 1610, "Stafford"            - 70 -            11/01/12
Fountains on the Lake                                                 FINAL
Stafford, TX
9320.1610.4

Landlord), and (c) the location of the Store. The notice shall be served (i) personally, or (ii) by certified mail, return receipt requested, or (iii) by reputable courier service which provides written evidence of delivery, addressed to Landlord as specified in Section 1.2.1 and addressed to Tenant as specified in Section 1.2.2 (or to such other address as requested by either party in writing), or (iv) by telephone facsimile upon which the date and time of transmission is machine imprinted to the number specified in Section 1.2.1 as to Landlord and as specified in Section 1.2.2 as to Tenant, provided that a copy of the notice is concurrently sent by reputable courier service in accordance with clause (iii) above. Copies of any notices sent to Tenant (addressed to Tenant as specified in Section 1.2.2) shall also be sent to Bartko, Zankel, Tarrant & Miller, 900 Front Street, Suite 300, San Francisco, CA 94111, Attention: Ross Notices. All notices given in the manner specified herein shall be effective upon actual receipt or upon refusal to accept delivery.

Either party, by written notice to the other, may designate two (2) additional parties to receive copies of notices. Any notice party to this Lease may change its address or location for service of notices, for themselves or any of their respective designees by written notice.

## 26.    GENERAL CONDITIONS

### 26.1.   Partial Invalidity.

If any term, covenant, condition, provision or restriction of this Lease is held by a Court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions hereof shall remain in full force and effect and shall in no way be affected, impaired, or invalidated thereby.

### 26.2.   Relationship of Parties.

Nothing contained in this Lease shall be deemed or construed by the parties hereto or by any third person to create the relationship of principal and agent, or of partnership, or of joint venture, or of any other association between the parties other than Landlord and Tenant, or to prevent Landlord or Tenant from entering into ventures in direct competition with the Shopping Center, or the Store.

### 26.3.   Time.

Time is of the essence in the performance of each provision of this Lease.

### 26.4.   Waiver.

The waiver of the performance of any term, covenant, condition, provision or restriction of this Lease by Landlord or Tenant shall not be construed as a waiver of any subsequent breach of the same term, covenant, condition, provision or restriction. The various rights, options, elections, powers and remedies of the parties contained in this Lease shall be construed as cumulative and no one of them exclusive of any other or of any legal or equitable remedy which either party might otherwise have in the event of a breach by the other, and the exercise of one right or remedy by a party shall not in any way impair its right to any other right or remedy.

**26.5.    Partial Months.**

For purposes of computing dates for expirations, Option Periods, Rent adjustments or cancellations (except for those dates specifically designated herein), any partial month at the commencement of the Term shall be disregarded.

**26.6.    Consent.**

Unless a different standard is otherwise specifically stated, wherever in this Lease Landlord or Tenant is required to give its consent or approval to any action on the part of the other, such consent or approval shall not be unreasonably withheld, conditioned or delayed.

**26.7.    Intentionally Deleted.**

**26.8.    Governing Law.**

This Lease shall be construed in accordance with and governed by the laws of the state wherein the Store is located, except as otherwise required by mandatory provisions of law.

**26.9.    Due Authority.**

If Tenant or Landlord is a corporation, partnership, limited liability company, trustee or other entity, each individual executing this Lease on behalf of said entity (in his/her representative capacity only) represents and warrants that he or she is duly authorized to execute and deliver this Lease on behalf of the entity and that this Lease is binding upon the entity.

**26.10.    No Prior Agreements.**

It is understood that there are no oral agreements or representations between the parties hereto affecting this Lease, and this Lease supersedes and cancels any and all previous negotiations, arrangements, brochures, agreements or representations and understandings, if any, between the parties hereto or displayed by Landlord to Tenant with respect to the subject matter thereof, and none thereof shall be used to interpret or construe this Lease. There are no other representations or warranties between the parties, and all reliance with respect to representations is solely upon the representations and agreements contained in this Lease. This Lease may be modified or amended only by an agreement in writing signed by the parties hereto.

**26.11.    Entry by Landlord.**

Upon reasonable prior notice, in no event to be less than ten (10) Business Days (except in the case of a bona fide emergency, in which event, no prior written notice shall be required, but prior verbal notice shall be required promptly confirmed in writing thereafter), Landlord may enter the Store during Tenant's business hours for purposes of inspection, to show the Store to prospective purchasers and lenders, or to perform maintenance and repair obligations imposed upon Landlord by this Lease. All maintenance, repairs or replacements by Landlord to the interior of the Store or using the interior of the Store or maintenance, repairs or replacements to any portion of the Shopping Center that will create dust, noise, vibration or other disturbance of Tenant's use of the Store shall be performed only during hours that the Store is not open to the public. Should

Store No. 1610, "Stafford"
Fountains on the Lake
Stafford, TX
9320.1610.4

- 72 -

11/01/12
FINAL

Landlord unreasonably interfere with Tenant's business by such entry, Rent shall equitably abate in an amount reasonably determined with reference to the nature, extent and duration of the deprivation of Tenant's business in connection with Landlord's entry into the Store.

**26.12.  Neutral Interpretation.**

Landlord and Tenant agree that this Lease has been freely negotiated and that in the event a dispute arises with respect to the meaning or interpretation of any provision of this Lease, no presumption, inference or conclusion shall be drawn against the party that drafted the provision in question.

**26.13.  Force Majeure.**

As used in this Lease, the term "Force Majeure" means delay resulting from the following causes beyond a party's reasonable control:   acts of God such as fire, windstorm, flood or earthquake; industry wide inability to obtain materials or merchandise; war; riot or civil commotion; governmental laws or regulations, including a building moratorium (hereinafter "governmental matters"), provided that "governmental matters" shall exclude planning and building permits, governmental inspections, permanent or temporary certificates of occupancy (or their equivalent in the applicable local jurisdiction) and similar governmental approvals.  The party obliged to perform shall give notice to the other as soon as reasonably possible after the onset of such delay stating the cause and an estimate of the duration thereof.  If, as a result of an event of Force Majeure, either party shall be delayed or hindered or prevented from the performance of any act required hereunder (other than the making of payments) within the time period set forth herein, the performance of such act shall be excused for the period of delay not to exceed sixty (60) days, and the period of performance of such act shall be extended for a period equivalent to the period of such delay, not to exceed sixty (60) days, unless a provision of this Lease expressly states that Force Majeure is not applicable.  Financial inability to perform shall not constitute an event of Force Majeure.

**26.14.  Successors in Interest.**

The terms, conditions and covenants herein contained shall inure to the benefit of and be binding upon the heirs, assigns and other successors in interest to the parties hereto, except as otherwise provided in this Lease.

**26.15.  Memorandum of Lease.**

This Lease shall not be recorded.  However, a Memorandum of Lease shall be executed, in recordable form, by both parties concurrently herewith.  Either party may record the same at its own cost and expense.

**26.16.  Real Estate Brokers.**

Landlord and Tenant each represents and warrants to the other party that it has not authorized or employed, or acted by implication to authorize or employ, any real estate broker or salesman to act for it in connection with this Lease, other than NewQuest Properties ("Brokers"), who shall be paid by Landlord the sum of Seventy-Five Thousand Dollars ($75,000), fifty percent (50%) upon the execution of this Lease by Landlord and Tenant and fifty percent (50%) upon the

earlier of (a) Tenant opening the Store for business, or (b) the Commencement Date.  Landlord and
Tenant shall each indemnify, defend and hold the other party harmless from and against any and all
claims by any other real estate broker or salesman whom the indemnifying party authorized or
employed, or acted by implication to authorize or employ, to act for the indemnifying party in
connection with this Lease.  Further, in the event Landlord fails to pay the Brokers within ten (10)
days of the date that such commission is due to be paid, Tenant, at its option, may pay the Brokers'
fees and deduct the same from Rent as it comes due.

### 26.17.  Confidentiality Agreement.

Except as otherwise required by law, Landlord agrees to keep the terms of this Lease
confidential and Landlord agrees that it shall not disclose any information with regard to this Lease,
including, but not limited to, any information regarding Rent, intended Store opening dates, and
sales figures or estimated sales figures, except that Landlord may release such information to its
accountants, attorneys, investors, lenders and prospective purchasers of Landlord's Parcel to the
extent reasonably necessary for Landlord's business purposes, provided such recipients agree in
writing to keep such information confidential, pursuant to the terms of this Section 26.17
("Confidentiality Agreement").  Further, except as set forth herein, Landlord shall not disclose to
any person not a party to this Lease the following, including, without limitation: press releases, any
proposed press release and/or public disclosure about Tenant's anticipated occupancy, opening
and/or other lease or purchase terms, nor shall Landlord post the terms of this Lease or any part
thereof on the Internet or in any mailing, or provide a copy to third parties via electronic mail, or
release any information in connection with this Lease to the media or other third parties without the
prior written consent of Tenant, which consent can be withheld, delayed, conditioned or denied, in
Tenant's sole discretion.  Notwithstanding the foregoing, Landlord may disclose the Ross Prohibited
Uses set forth in Section 3.2.1 and the Protection clause set forth in Section 15.3 of this Lease to
tenants and prospective tenants of the Shopping Center without Tenant's prior consent, but subject
to this Confidentiality Agreement.  Landlord shall cause its employees and agents to adhere to this
Confidentiality Agreement.  Nothing herein shall preclude Tenant from exercising any rights or
remedies available at law or in equity or under this Lease in the event of a breach of this
Confidentiality Agreement.

| LANDLORD: | TENANT: |
|---|---|
| FOUNTAINS DUNHILL, LLC, | ROSS DRESS FOR LESS, INC., |
| a Delaware limited liability company | a Virginia corporation |

By:_____

    William L. Hutchison

Its: President


By:_____

Name:_____

Its:_____


By:_____

    James Fassio

Its:  President and Chief Development Officer


By:_____

    Gregg McGillis

Its:  Senior Vice President, Property Development

1

State of California                                    )
                                                       )
County of Alameda                                      )

2
3
4    On December 5, 2012 before me, Sandra Powers
5    a Notary Public, personally appeared James Fassio and Gregg McGillis, who proved to me on the basis
6    of satisfactory evidence to be the persons whose names are subscribed to the within instrument and
7    acknowledged to me that they executed the same in their authorized capacities, and that by their
8    signatures on the instrument the persons, or the entity upon behalf of which the persons acted,
9    executed the instrument.

10
11   I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing
12   paragraph is true and correct.

13
14   WITNESS my hand and official seal.
15
         SANDRA POWERS
         Commission # 1871267
         Notary Public - California
         Alameda County
16       My Comm. Expires Dec 11, 2013                         Sandra Powers
17                                                              Notary Public
18
19
     State of Texas                                    )
                                                       )
     County of Dallas                                  )

20
21   On December 21, 2012 before me, Mary McCorkle _____, a Notary Public,
22   personally appeared William L. Hutchinson _____, personally known to me, or who
23   proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed
24   to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their
25   authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the
26   entity upon behalf of which the person(s) acted, executed the instrument.

27
28
29   WITNESS my hand and official seal.
30
                                                              Notary Public
31           MARY MCCORKLE
32        Notary Public, State of Texas
          My Commission Expires
          December 06, 2014

1
2

State of _____)
                                   )
County of _____)

3
4
5    On _____ before me, _____, a Notary Public,
6    personally appeared _____, personally known to me, or who
7    proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed
8    to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their
9    authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the
10   entity upon behalf of which the person(s) acted, executed the instrument.
11
12
13   WITNESS my hand and official seal.
14

                                        _____
                                             Notary Public
15

## EXHIBIT A
## LEGAL DESCRIPTION OF THE SHOPPING CENTER

Tract 1:
Being a tract or parcel of land containing 43.084 acres (1,876,717 square feet) of land situated in the
Thomas J. Nichols Survey, Abstract Number 296, Fort Bend County, Texas; being part of Unrestricted
Reserve "F", Block 6, of The Fountains Section )ne, a subdivision in Stafford, Texas, according to the map
or plat filed for record in Slide Nos. 1453/B, 1454/A & B, and 1455/A & B of the Plat Records of Fort
Bend County, Texas; Said 43.084 acre tract being more particularly described by metes and bounds in
Exhibit "A" attached hereto and made a part hereof.

Tract 2:
Being a tract or parcel of land containing 17.445 acres (759,900 square feet) of land situated in the
Thomas J. Nichols Survey, Abstract Number 296, Fort Bend County, Texas; being part of Unrestricted
Reserve "I", Block 8, of The Fountains Section One, a subdivision in Stafford, Texas, according to the map
or plat filed for record in Slide Nos. 1453/B, 1454/A & B, and 1455/A & B of the Plat Records of Fort
Bend County, Texas; Said 17.445es being more particularly described by metes and bounds in Exhibit "A"
attached hereto and made a part hereof.

Tract 3:
Being a tract or parcel of land containing 11.281 acres (1,491,383 square feet) of land situated in the
Thomas J. Nichols Survey, Abstract Number 296, Fort Bend County, Texas; being part of Unrestricted
Reserve "J", Block 7, of The Fountains Section One, a subdivision in Stafford, Texas, according to the map
or plat filed for record in Slide Nos. 1453/B, 1454/A & B, and 1455/A & B of the Plat Records of Fort
Bend County, Texas; Said 11.281 acres being more particularly described by metes and bounds in Exhibit
"A" attached hereto and made a part hereof.

Tract 4:
Appurtenant easements benefiting Tracts 1, 2, and 3 as created by that certain Declaration of
Covenants, Conditions and Restrictions and Grant of Easements executed by Fountains Properties
Limited, filed for record April 12, 1996 under Clerk's File No. 9622662, as amended and restated by that
certain Amended and Restated Declaration of Covenants, Conditions and Restrictions and Grant of
Easement filed for record under Fort Bend County Clerk's File No. 2008000883.

# Fountains on the Lake

## Stafford, Texas



**RESTRICTED AREA**

**ROSS CONTROL AREA**

**INLINE BUILDING**







## EXHIBIT C
## CONSTRUCTION OBLIGATIONS OF LANDLORD (TURNKEY)

**1.**    **Description of Work.**  Landlord shall, at Landlord's sole cost and expense, furnish all labor and materials to construct and complete in a good, expeditious and workmanlike manner, to the satisfaction of Tenant, in a Turnkey condition (as described in Paragraph 13 hereof) ready for fixturing, the work described in the Final Plans (the "Work" or the "Improvements") for the Store. Landlord shall supervise and direct all Work, using its best skill and attention.  Landlord shall be solely responsible for all construction means and methods, techniques, sequences and procedures, and for coordinating all portions of the Work.  All Work shall be performed in accordance with the terms and conditions of the Lease to which this Exhibit is attached (the "Lease").

**2.**    **Prototype Plans.**  Landlord acknowledges having previously received Tenant's prototype plans and specifications and Tenant's Design Guidelines for a typical Ross store (collectively, "Prototype Plans").

**3.**    **Shell Plans.**

  **3.1.**    Definition and Requirements. "Shell" is defined as a fully enclosed building structure that shall include all structural members to be constructed and installed; and all exterior materials to be installed so that the building is wind and watertight.  "Construction" means the type of building material (block, tilt wall, etc.).  Included in the plans for the Shell ("Shell Plan") are surveyed dimensions, building lines, column lines, shear walls, openings and clearances, clear heights, exterior elevations, as well as all interior obstructions to use (such as piping, conduits, drains, equipment, devices, mezzanines), utility entrances and assemblies for the sprinkler system, communications lines, water, gas, electricity, and sewer, foundation walls and footings extending above the surface of the floor, and retained building systems, if any, such as mechanical, plumbing, docks and compactor pads as well as adjacent grades and docks. The type of Construction shall also be set forth.

  **3.2.**    When Due.  Prior to execution of the Lease, Landlord shall provide Tenant with the Shell Plan for Tenant's Store, elevations of all other buildings in the Shopping Center and a Site Plan of the Shopping Center, all of which shall be in an AutoCad v.2000 ".dwg" format (or such other format as may be required by Tenant by written notice to Landlord), and shall include notation of colors and materials.

  **3.3.**    Tenant Review. Tenant shall review the Shell Plans and provide Landlord with any comments it wishes to make within thirty (30) business days after the later to occur of: (1) Tenant's receipt of the Shell Plans or (2) Tenant's receipt of a fully executed original of the Lease.

  **3.4.**    Ratification.  Within ten (10) business days after receipt of Tenant's comments to the Shell Plans, Landlord shall ratify the Shell Plans that incorporate Tenant's requested modifications.

**4.**    **Tenant Plans.**  Based on the approved Shell Plans, Tenant shall deliver to Landlord a floor plan for the Store ("Tenant's Floor Plan") on or before the later to occur of ninety (90) days

from (1) the date of execution of the Lease, or (2) Landlord's ratification of the Shell Plans with Tenant's requested modifications, if any, incorporated therein.

5.    **Completed Plans.**

    **5.1.**    <u>Production of Landlord's Completed Plans</u>. Within forty-five (45) business days after Landlord's receipt of Tenant's Floor Plan, Landlord's architect(s) (hereinafter "Architect") shall provide Tenant with a copy of complete plans of the Work to be performed in fulfillment of Landlord's construction obligations for the shell of Tenant's Store and interior improvement and related site work, for Tenant's review and comment ("Completed Plans"). The Completed Plans shall be based upon and shall incorporate the Prototype Plans, Shell Plans and Tenant's Floor Plan.

    **5.2.**    <u>Tenant Review of Completed Plans</u>. Within thirty (30) business days after receipt of the Completed Plans, Tenant shall approve or disapprove the Completed Plans and provide the Architect with Tenant's requested modifications, if any.

    **5.3.**    <u>Revision of Completed Plans</u>. Within fifteen (15) business days following receipt of any comments by Tenant to the Completed Plans, Landlord's architect shall prepare and submit revised Completed Plans to Tenant for approval. Landlord and Tenant shall each have ten (10) business days thereafter to either approve or disapprove the revised plans. Any disapproval by either Landlord or Tenant must be accompanied by a specific description of the revisions that the disapproving party would require in order to approve the revised Completed Plans. Architect shall incorporate any suggested revisions received from Landlord or Tenant into the revised Completed Plans and resubmit the revised Completed Plans to both Landlord and Tenant for approval within five (5) business days following receipt of a notice of disapproval. If the parties cannot reach agreement within twenty (20) business days after receipt of the revised Completed Plans, the Lease may be terminated by either party on written notice to the other at any time thereafter.

6.    **Final Plans.**

    **6.1.**    The Landlord's Final Plans ("Final Plans") shall consist of the revised Completed Plans with all requested and mutually approved modifications incorporated therein. A site plan shall be included in the Final Plans and shall substantially conform to the Site Plan (Exhibit "B") of the Lease. In the event of any conflict between such site plan and Exhibit "B", Exhibit "B" shall control. The Final Plans shall include, without limitation, grading, driveways, parking areas, exterior elevations, and landscaping, as well as the Store building. The Store building shall contain approximately the number of square feet as set forth in this Lease. The Final Plans shall set forth the construction to be performed by each party, it being understood that trade fixtures, except as otherwise provided in the Final Plans, shall be the responsibility of Tenant, and all other construction shall be the responsibility of Landlord. Slot walls shall not be considered trade fixtures. Landlord shall obtain Tenant's written approval of the Final Plans prior to the commencement by Landlord of the Work and the construction of exterior elevations.

    **6.2.**    <u>Final Plans - Record Set</u>. A Record Set, identified as such, of the Permitted Work embodied in the Final Plans to be performed pursuant to the Landlord's construction obligations under the Lease shall be submitted to Tenant within ten (10) business days of issuance of

Store No. 1610, "Stafford"              EXHIBIT C                  FINAL
Fountains on the Lake                   Page 2
Stafford, TX

the Building Permit described in Paragraph 9.1 hereof. The Record Set shall include AutoCad v.2000 files of the building shell, floor plan, reflected ceiling, and exterior elevations of the Tenant's Store and Site Plan.

**7.**    **Approvals.** Any disapproval or proposed revisions hereunder shall be on reasonable grounds and supported by a detailed written statement thereof. An untimely, unreasonable or unsupported disapproval or a failure to respond within the time allowed shall be deemed an approval for all purposes hereof.

**8.**    **Plan Format.** All plans of any type required by Tenant under the terms of this Exhibit must be submitted by Landlord in an AutoCad v.2000 ".dwg" format (or such other format as may be required by Tenant by written notice to Landlord) as well as in printed form in order to constitute a valid submission.

**9.**    **Permits.**

**9.1.**    Application. Upon approval of the Final Plans by both parties, Landlord at its own cost and expense, shall forthwith make application to all relevant governmental agencies for necessary building permits, licenses and other grants of authority, which may be required in connection with the construction of the Improvements (hereinafter collectively the "Building Permit"). Upon issuance of the Building Permit, a final initialed and dated set of plans reflecting all governmentally required changes shall be delivered to Tenant to review and approve. Tenant's review and Landlord's revision of the Final Plans shall occur on the same time schedule as set forth in 5.1 and 5.2 above. If Tenant objects to any of the governmentally required changes and the parties cannot reach agreement within twenty (20) business days after receipt of the revised Final Plans, Tenant may terminate this Lease by written notice to Landlord at any time thereafter. No changes, including those required by local building authority plan check, shall be made in the Final Plans without Tenant's prior written approval.

**9.2.**    Failure to Obtain. Landlord shall have ninety (90) business days from the date the Final Plans are approved by both parties in which to obtain the Building Permit. If the Building Permit is not obtained (including the inability to obtain any required variance from such governmental authority) within the ninety (90) day period, Tenant, at its sole option, may terminate this Lease upon written notice to Landlord. If the Building Permit is not obtained, despite Landlord's best efforts, within two hundred seventy (270) business days from the date the Final Plans are approved by both parties hereto, either party may terminate this Lease thereafter by written notice to the other.

**9.3.**    Landlord shall timely keep Tenant fully informed of the status of the application for the Building Permit and any negotiations relating to its issuance. Further, at the election of Tenant, Tenant may take part in any such negotiations.

**10.**    **Land Entitlement Permits.** Should it be necessary for Landlord to obtain a Land Entitlement Permit (as defined hereinbelow) of any sort, the time for preparation of Tenant's Floor Plan, Completed or Final Plans shall be extended by the time reasonably required to obtain such Land Entitlement Permit. Landlord shall prepare such plans and specifications as may be

reasonably required for the processing of such Land Entitlement Permit for the Store only. The term "Land Entitlement Permit" as used herein shall include without limitation an environmental impact report or statement or its equivalent, a zoning change or variance, an architectural or design review approval, general plan change, planned unit development approval or its equivalent, subdivision approval or its equivalent, or any other approval pertaining to the use or general design of the Shopping Center, Store or Improvements other than a Building Permit.

**11.    Access to Premises.** Tenant's construction representatives at all times shall have access to the premises during construction for purposes of inspection.

**12.    Landlord to Pay for Plans.** Within ten (10) days after receipt of Tenant's invoice, Landlord shall pay Tenant an allowance ("Architectural Allowance") of Ten Thousand Dollars ($10,000) on account of the costs incurred by Tenant in the preparation, revision and review of the Completed and Final Plans as well as the preparation of the Tenant's Floor Plan, site specific plans, specifications and requirements. Notwithstanding any other provision of the Lease, the obligation imposed herein upon Landlord shall exist even if the Lease to which this Exhibit is attached is terminated by reason of Landlord's inability to obtain Building Permits, Land Entitlement Permits or financing or failure of Landlord and Tenant to agree upon a set of Final Plans; provided, however, if this Lease is so terminated, the right to use the plans shall vest in Landlord; otherwise, title to the plans shall vest in Tenant. If Landlord fails to pay Tenant the entire Architectural Allowance within thirty (30) days after Tenant's written notice, in addition to any legal or equitable remedy available to Tenant, Tenant shall have the right to deduct all amounts of the unpaid Architectural Allowance from Rent as it becomes due under the Lease.

**13.    Landlord Improvements Allowance; Trash Compactor.** "Turnkey" condition means completion of all of the Work as set forth in the Final Plans and includes Landlord furnishing, at Landlord's expense, a trash compactor and a pad on which to place it pursuant to the Final Plans. Landlord shall also pay to Tenant a Leasehold Improvements Allowance of Thirty Eight Thousand Dollars ($38,000). The Leasehold Improvement Allowance is for the purpose of constructing or improving qualified long-term real property for use in Tenant's trade or business at the Store, in accordance with Section 110(a) of the Internal Revenue Code. Landlord shall pay the Leasehold Improvements Allowance within thirty (30) business days of Landlord's receipt of Tenant's invoice therefor. If Landlord fails to pay Tenant the entire Leasehold Improvement Allowance within thirty (30) days after Tenant's written notice, in addition to any legal or equitable remedy available to Tenant, Tenant shall have the right to deduct all amounts of the unpaid Leasehold Improvement Allowance from Rent as it becomes due under the Lease.

**14.    Change Orders.** Any changes to the Final Plans desired by Tenant subsequent to the approval of such plans by both parties shall be requested in writing. Landlord agrees to use its reasonable, good faith efforts to incorporate plan changes requested in writing by Tenant and to notify Tenant immediately of any cost increase or potential delay which shall result if such changes are incorporated into the Work, based on the information provided by Architect and Landlord's general contractor. Landlord shall not be required to incorporate any plan changes requested by Tenant unless Tenant: (a) approves in writing and agrees to pay to Landlord the actual cost increase (including any associated architectural, engineering and general conditions costs and expenses) caused by such changes, and (b) approves in writing and agrees to extensions of all construction

deadlines in the Lease (including, without limitation, those set forth in Section 1.4 and Article 5) equal to the delays caused by such changes.

**15.    Change Order Payment or Refund.**  Within thirty (30) days after the Delivery Date and upon notice from Landlord of the amount due, Tenant shall reimburse Landlord in cash for the net cost increase, if any caused by plan changes requested in writing by Tenant.   If the net effect of Tenant's changes is a cost savings, Landlord shall timely remit such savings in cash to Tenant within thirty (30) days after the Delivery Date.

# EXHIBIT D
## PROHIBITED USES

### SOURCE: GUITAR CENTER LEASE:

Exhibit F - In no event, without the consent of Tenant, shall Landlord lease to any tenant more than ten percent (10%) of the gross leasable area of the Shopping Center, or authorize, lease, sublease, assign, operate or consent to the operation of, any of the following primary uses within the Shopping Center that are not currently existing in the Shopping Center: (a) any use which is not a lawful retail, office or service use; (b) general office or medical office uses (such as doctors' offices, medical clinics or outpatient centers); (c) any use which is a public nuisance; (d) any use which produces dust, dirt or fly ash in excessive quantities; (e) any use which produces fire, explosion or other damaging or dangerous hazard (including the storage, display or sale of explosives or fireworks); (f) a warehouse (provided that warehouse use incidental to retail operations shall not be prohibited); (g) any assembling, manufacturing, industrial, distilling, refining, smelting, agriculture or mining operation; (h) a dry cleaning plant; (i) living quarters, sleeping apartment or lodging rooms; (j) a massage, tattoo, or piercing parlor, other than a "Massage Envy", "Relax the Back" or similar type uses, that is less than 200' from premises. (k) any establishment with a business, the principal purpose of which is selling, renting or displaying of pornographic or "adult" materials, including, without limitation, magazines, books, movies, videos, and photographs; that is less than 200' from the premises. (l) a mortuary, funeral home or crematorium; (m) a flea market; (n) a carnival, amusement park or circus; (o) a facility for the sale of new or used motor vehicles, trailers or mobile homes; (p) a tire, battery, automotive, or gasoline fueling facility, except in the areas marked "Landlord Permitted Gas Kiosk or tire and battery area or automotive servicing" on the Site Plan attached as Exhibit "A" hereto; (q) a meeting hall, auditorium, or place of public assembly; (r) a health or fitness club larger than 5,000 square feet located in any of the spaces between and including plots 5 and 28 as shown on the Site Plan attached as Exhibit "A" hereto; that is less than 200' from the premises. (s) or (t) an entertainment/amusement/billiard center except in conjunction with a restaurant that is less than 200' feet from premises.

### SOURCE: JOS A. BANK LEASE:

Section 10.08. Prohibited Uses. Landlord covenants and agrees that it shall not lease any space within the Shopping Center for any of the following purposes: a massage parlor; a video Store or book store selling or exhibiting material of a pornographic or adult nature; or for any illegal purpose. In addition, Landlord agrees not to lease any space within one hundred (100) feet of the Demised Premises for any of the following purposes: arcade, billiard hall, hair salon, bowling alley, medical clinics or facilities, theatres/cinemas, pet store, gambling or betting (other than sale of state-sponsored Lottery tickets).

## SOURCE: LOEWS LEASE:

Section 6.02. (a) Landlord agrees that so long as this Lease remains in effect, (i) neither Landlord nor any Related Entity (as hereinafter defined) of Landlord shall directly or indirectly on land now or hereafter owned or hired by it or any of the foregoing, construct, erect, build, own, lease, operate, or have any interest in any motion picture theatre within five (5) miles of the Shopping Center (the "Radius") other than the motion picture theatres in respect of this Lease, and (ii) no portion of the Temporary Parking Area shall be used as a motion picture theatre.

Section 6.03. (a) Landlord agrees not to authorize or permit any food court, tenant, licensee or concessionaire within one hundred fifty (150) feet of the main entrance to the demised premises to sell for off-premises consumption the type of items described in clause (ii) of Section 6.01. The foregoing sentence shall not be deemed to prohibit a drugstore, restaurant except for a food court) or supermarket within the proscribed area from selling the foregoing items. (b) Landlord agrees not to authorize or permit any tenant, licensee or concessionaire within one hundred fifty (150) feet of the main entrance to the demised premises to (i) advertise, display or announce by sign or other display visible within such area the present or future sale or rental of any videotape, compact disk or other media production or replication of any motion picture which is then being exhibited at the Theatre Building or (ii) operate arcade-type games within such tenant's, licensee's or concessionaire's premises.

## SOURCE: DECLARATION OF COVENANTS, CONDITIONS AND RESTRICTIONS AND GRANT OF EASEMENTS, DATED APRIL 10, 1996:

### ARTICLE II
### RESTRICTIONS

2.1 No part of the Reserve J shall be used for any purpose other than for the Lake, the monument sign provided for in Section 4.3 and parking; and for Retail Offices, Restaurants and bars. No part of Reserve J shall be used for (a) any business featuring topless, bottomless or totally nude performers or personnel, or (b) any business which shows X-rated movies or pornographic movies or sells pornographic materials.

## SOURCE: BED BATH & BEYOND LEASE:

SECTION 7.    PERMITTED AND PROHIBITED USES.

(a)  The Premises may be used and occupied for the Permitted Use.

(b)  Landlord covenants and agrees that the Shopping Center shall be constructed, leased, operated, maintained and managed as a first class shopping center and that no premises in the Shopping Center or on any land (hereinafter the "Related Land") contiguous or adjacent to the Shopping Center (which shall include land that would be contiguous or adjacent to the Shopping Center but for any intervening road, street, alley or highway) owned now or at any time in the future by Landlord or any affiliated company (referring to the actual Landlord from time to time, without regard to land owned by any prior landlords, and excluding from the operation hereof any business existing at the time any future landlord becomes Landlord hereunder) shall be used or occupied for any of the following: pornographic use, "second-hand" or "surplus" store, laundry or dry cleaners, veterinary office, living quarters, manufacturing, bowling alley, off-track betting parlor or other gambling establishment, funeral parlor, skating rink, children's entertainment or activity facility (except as an incidental use to a theater and then only if located in the interior of the theater (as shown on Exhibit B)], meeting hall, place of religious worship, sporting event, auditorium, warehouse, theater (except if located in the building labelled "theater" on Exhibit B), automobile repair shop, gasoline or service station, supermarket (except if located in a building whose entrance is not within three hundred (300) feet from the front entrance to the Premises), restaurant serving meals for on or off premises consumption in the Primary Building Area (except if located between the buildings labelled "A" and "B" on Exhibit B and if located in building "C" (the "Adjacent Restaurant") then only if (i) the entrance to such Adjacent Restaurant is facing the theater as shown on Exhibit B, (ii) such Adjacent Restaurant shall not exceed six thousand (6,000) square feet of Floor Area, and (iii) the frontage of such Adjacent Restaurant facing Southwest Freeway (U.S. 59) shall not exceed

## SOURCE: BED BATH & BEYOND LEASE (CONTINUED):

fifty (50) feet), beauty parlor (except if located between the buildings labelled "A" and "B" on Exhibit B), nail salon (except if located between the buildings labelled "A" and "B" on Exhibit B), billiard parlor, sales office or showroom for automobiles or other vehicles, an establishment serving or selling alcoholic beverages for on or off premises consumption in the Primary Building Area (except in that part of the Shopping Center labelled "Restaurant" on Exhibit B and then only if incidental to their main use of serving food for on-premises consumption, which for the purposes hereof shall mean that such restaurants realize a maximum of forty (40%) percent of their gross sales from the sale of alcoholic beverages, and except for a package liquor store located to the Southwest of the premises labelled "Lil Things" on Exhibit B), massage parlor, health spa or similar type business, car wash, a so-called "flea market", video/pinball arcade [except as an incidental use to a theater and then only if located in the interior of the theater (as shown on Exhibit B)], any use generally deemed to be obnoxious or a nuisance (including, without limitation, a use which generates offensive odors or noise), medical offices or any other non-retail uses in the Primary Building Area (except medical offices and other non-retail uses shall be permitted in portions of the Primary Building Area only if (a) not located within one hundred sixty-five (165) feet from the southwest exterior demising wall of the Premises, (b) not located in the Adjacent Restaurant, (c) not exceeding twenty thousand (20,000) square feet of Floor Area in the aggregate, (d) not exceeding eight (8) separate spaces, (e) no single premises is greater than seven thousand (7,000) square feet of Floor Area, and (f) such uses are customarily found in first class shopping centers in the greater Houston area), (herein collectively called the "Prohibited Uses").

   (c) Tenant covenants and agrees the Premises shall not be used for any of the Prohibited Uses.

## SOURCE: OFFICE MAX LEASE:

Notwithstanding anything contained herein to the contrary, the foregoing Prohibited Uses shall not apply to the respective premises occupied by tenants under other leases in effect as of the date hereof to the extent such other leases do not contain provisions restricting the use of such premises for the Prohibited Uses.

In addition, during the initial term of this lease and during any renewal period hereunder:

(w)    No portion of the Shopping Center located within two hundred linear feet (200') of the demising walls of the Demised Premises shall have as its primary purposes a restaurant, delicatessen, nightclub or other entertainment facility, bowling alley, arcade, game room, skating rink, billiard room, theater, health club or spa, or for commercial purposes (such as medical or office uses), liquor store or store selling alcoholic beverages for off-premises consumption or for any use that requires parking in excess of five (5) spaces for each one thousand (1,000) square feet of leasable floor area in the Shopping Center;

(x)    No outlot (or any portion thereof) within the Shopping Center shall be used for purposes of any of the Restricted Uses (as hereinafter defined), if such outlot shall have the right to use any of the parking areas located within one hundred feet (100') of the Demised Premises;

(y)    No portion of the Primary Building Area shall be occupied or used, directly or indirectly, for a bowling alley, arcade, amusement center, fitness center, game room, skating rink, billiard room, massage parlor, adult book store or any other purpose which includes the display or sale of pornographic or obscene materials or entertainment, off-track betting facility, flea market, bar (except in connection with a restaurant operation), tavern, pub, ballroom, dance hall, day care center (other than a Discovery Zone and similar types of operations), discotheque, beauty school, barber college, offices (other than a full service bank office, savings and loan association office, or credit union), place of instruction, reading room or any operation catering primarily to students or trainees rather than to customers. Notwithstanding the foregoing provisions of this Article 21(y), it is expressly understood and agreed that the Expansion Area may be used for offices, health club, beauty shop and/or theater purposes. It is further expressly understood and agreed that the provisions of this Article 21(y) shall not be applicable to any portion of the Shopping Center other than the Primary Building Area; and

(z)    No portion of the Shopping Center shall be occupied or used in violation of any prohibitions or restrictions on use contained in any document or instrument listed on EXHIBIT "D".

The restricted uses set forth in items (w)-(z) above, are hereinafter referred to collectively as the "Restricted Uses".

SOURCE:    AMEDED    AND    RESTATES    DECLARATION    OF    COVNANTS,
CONDITIONS AND RESTRICTIONS AND GRANT OF EASEMENTS:

ARTICLE V  OPERATION OF THE SHOPPING CENTER

5.1    Uses.

5.1.1    The Shopping Center shall be used only for retail sales, offices, Restaurants or other permitted commercial purposes.

5.1.2    No use shall be permitted in the Shopping Center which is inconsistent with the operation of a first class retail shopping center. Without limiting the generality of the foregoing, the following uses shall not be permitted:

(A)    Any use which emits an obnoxious odor, noise or sound which can be heard or smelled outside of any Building in the Shopping Center.

(B)    An operation primarily used as a storage warehouse operation and any assembling, manufacturing, distilling, refining, smelting, agricultural or mining operation.

(C)    Any "second hand" store, "surplus" store, or pawn shop.

(D)    Any mobile home park, trailer court, labor camp, junkyard, or stockyard; provided, however, this prohibition shall not be applicable to the temporary use of construction trailers during periods of construction, reconstruction or maintenance.

(E)    Any dumping, disposing, incineration or reduction of garbage; provided, however, this prohibition shall not be applicable to garbage compactors located near the rear of any Building.

(F)    Any fire sale, bankruptcy sale (unless pursuant to a court order) or auction house operation.

(G)    Any central laundry, dry cleaning plant or laundromat; provided, however, this prohibition shall not be applicable to nominal supportive facilities for on site service oriented to pickup and delivery by the ultimate consumer as the same may be found in

retail shopping centers in the metropolitan area where the Shopping Center is located.

(H)     Any automobile, truck, trailer or recreational vehicle sales, leasing, display or body shop repair operation.

(I)     Any bowling alley or skating rink.

(J)     Any movie theater or live performance theater.

(K)     Any hotel, motel, short or long term residential use, including but not limited to: single family dwellings, townhouses, condominiums, other multi-family units, and other forms of living quarters, sleeping apartments or lodging rooms.

(L)     Any veterinary hospital or animal raising or boarding facility; provided, however, this prohibition shall not be applicable to pet shops. Notwithstanding the foregoing exception, any veterinary or boarding services provided in connection with the operation of a pet shop shall only be incidental to such operation; the boarding of pets as a separate customer service shall be prohibited; all kennels, runs and pens shall be located inside the Building; and the combined incidental veterinary and boarding facilities shall occupy no more than fifteen percent (15%) of the Floor Area of the pet shop.

(M)     Any mortuary or funeral home.

(N)     Any establishment selling or exhibiting "obscene" material.

(O)     Any establishment selling or exhibiting drug-related paraphernalia or which exhibits either live or by other means to any degree, nude or partially clothed dancers or wait staff.

(P)     Any bar, tavern, Restaurant or other establishment whose reasonably projected annual gross revenues from the sale of alcoholic beverages for on premises consumption exceeds fifty percent (50%) of the gross revenues of such business.

(Q)     Any massage parlor or similar establishment.

(R)     Any health spa, fitness center or workout facility exceeding 3,500 square feet of Floor Area.

(S)     Any flea market, amusement or video arcade, pool or billiard hall, car wash or dance hall.



(T)    Any training or educational facility, including but not limited to: beauty schools, barber colleges, reading rooms, places of instruction or other operations catering primarily to students or trainees rather than to customers; provided, however, this prohibition shall not be applicable to on site employee training by an Occupant incidental to the conduct of its business at the Shopping Center.

(U)    Any gambling facility or operation, including but not limited to: off-track or sports betting parlor; table games such as blackjack or poker; slot machines, video poker/blackjack/keno machines or similar devices; or bingo hall. Notwithstanding the foregoing, this prohibition shall not be applicable to government sponsored gambling activities or charitable gambling activities, so long as such activities are incidental to the business operation being conducted by the Occupant.

Notwithstanding anything to the contrary herein, existing uses at the Shopping Center as of the date hereof shall be deemed to be permitted uses under this Declaration.

5.1.3    No Party shall use, or permit the use of, Hazardous Materials on, about, under or in its Parcel, or the balance of the Shopping Center, except in the ordinary course of its usual business operations conducted thereon, and any such use shall at all times be in compliance with all Environmental Laws. Each Party agrees to defend, protect, indemnify and hold harmless each other Party from and against all claims or demands, including any action or proceeding brought thereon, and all costs, losses, expenses and liabilities of any kind relating thereto, including but not limited to costs of investigation, remedial or removal response, and reasonable attorneys' fees and cost of suit, arising out of or resulting from any Hazardous Material used or permitted to be used by such Party, whether or not in the ordinary course of business.

For the purpose of this Section 5.1.3, the term (i) "**Hazardous Materials**" shall mean and refer to the following: petroleum products and fractions thereof, asbestos, asbestos containing materials, urea formaldehyde, polychlorinated biphenyls, radioactive materials and all other dangerous, toxic or hazardous pollutants, contaminants, chemicals, materials, substances and wastes listed or identified in, or regulated by, any Environmental Law, and (ii) "Environmental Laws" shall mean and refer to the following: all federal, state, county, municipal, local and other statutes, laws, ordinances and regulations which relate to or deal with human health or the environment, all as may be amended from time to time.

5.1.4    No merchandise, equipment or services, including but not limited to vending machines, promotional devices and similar items, shall be displayed, offered for sale or lease, or stored within the Common Area; provided, however, the foregoing prohibition shall not be applicable to:

(A)    the storage of shopping carts for any Permittee;

Store No. 1610, "Stafford"
Fountains on the Lake
Stafford, TX

EXHIBIT D
Page 8 of 9

FINAL

(B) the installation of an "ATM" banking facility within an exterior wall of any Building;

(C) the placement of bicycle racks and landscaping planters on the sidewalk in front of any Building;

(D) temporary Shopping Center promotions, except that no promotional activities will be allowed in the Common Area without the prior written approval of the Approving Parties;

(E) any recycling center required by law, the location of which shall be subject to the approval of the Approving Parties;

(F) outdoor seating shown on the Site Plan;

(G) any designated Outside Storage Area; or 31

(H) any designated Outside Sales Area; provided, however, with respect to any Outside Sales Area which is not included within a Building Area, such space may be used not more than three (3) times per calendar year, and the duration of such use shall be subject to the following limitations: during the period commencing on October 15th and ending on December 27th —no limitation on the number of days of consecutive use; during the period commencing February 15th and ending on July 10th -- not more than one hundred twenty-five (125) consecutive days of use; and, during any other period -- not more than thirty (30) consecutive days of use.

5.1.5 The following use and occupancy restrictions shall be applicable to the Tracts:

(A) No gas station and/or other facility that dispenses gasoline, diesel or other petroleum products as fuel shall be permitted.

(B) No automotive service/repair station or any other facility that both sells and installs any lubricants, tires, batteries, transmissions, brake shoes or any other similar vehicle accessories shall be permitted.

(C) No liquor store offering the sale of alcoholic beverages for off-premises consumption exceeding five thousand (5,000) square feet of Floor Area shall be permitted.

(D) No freestanding convenience store shall be permitted.

# EXHIBIT E

## ACKNOWLEDGMENT OF COMMENCEMENT

This Acknowledgment is made as of _____, 20___ with reference to that certain lease (hereinafter referred to as the "Lease") dated _____, 20____, between **FOUNTAINS DUNHILL, LLC**, as "Landlord" therein, and **ROSS DRESS FOR LESS, INC.**, as "Tenant."

The undersigned hereby confirms the following:

1.    The Delivery Date (as described in said Lease) occurred on _____.

2.    In accordance with the provisions of said Lease the commencement date of the term is _____, and that, unless sooner terminated, the original term thereof expires on _____.

3.    The Agreed Size is _____ square feet.

4.    The notice date for the exercise of the first option is on or before _____, 20___.

**LANDLORD:**
**FOUNTAINS DUNHILL, LLC,**
**a Delaware limited liability company**

**TENANT:**
**ROSS DRESS FOR LESS, INC.,**
**a Virginia corporation**

By:_____
   William H. Hutchinson
Its: President

By: _____
   James Fassio
Its:    President and Chief Development Officer

By: _____
   Gregg McGillis
Its:    Senior Vice President, Property Development

## EXHIBIT G

### CONSTRUCTION COMPLETION NOTICE

1.  The "Lease"
    Landlord:  Fountains Dunhill, LLC
    Tenant:  Ross Dress For Less, Inc.
    Location:  Stafford, Texas
    Lease Dated:  _____

2.  All terms used herein shall be as defined in the Lease.

3.  Date of this Notice:  _____

4.  Ross Store #:  1610
    Project Address:  Southwest corner of US Highway 59 and Fountain Lake
    Dr, Stafford, Fort Bend County, Texas

5.  Pursuant to Section 5.4 of the Lease, this shall constitute the "Construction
    Completion Notice":

    (a)  The "Delivery Date," shall occur on: _____.

    (b)  Landlord acknowledges that all the requirements specified in Article 2,
         "Delivery Date," will be satisfied by the date specified in subparagraph (a),
         above.

    (c)  Landlord has a fully executed contract for Landlord's Construction Obligations,
         with [Insert name of Landlord's General Contractor and contact person for
         General Contractor]: _____, Contact
         Person: _____.

    (d)  Attached hereto as **Schedule 1** is a construction schedule with respect to
         Landlord's Construction Obligations, initialed by Landlord's contractor, which
         confirms that all of Landlord's Construction Obligations will be completed by
         the Delivery Date set forth in subparagraph (a), above.

    (e)  Landlord has obtained all building permits for Landlord's Construction
         Obligations, a copy of which is/are attached hereto as **Schedule 2**.

**FOUNTAINS DUNHILL, LLC**
**a Delaware limited liability company**

By:  _____
     William L. Hutchinson
     President

Dated:  _____

## SCHEDULE 1

## SCHEDULE 2

## EXHIBIT H
## EXCLUSIVE USES

### SOURCE: APPLEBEES LEASE:

Section 10.01 Use of Demised Premises - Landlord expressly covenants and agrees that all times during the Lease Term, provided Tenant is not in default under the Lease and is open and operating as an Applebee s restaurant, that no other portion of the Restaurant Tract or the Shopping Center shall be leased by Landlord and/or operated by any tenants for a full service family oriented casual dining restaurant similar to Applebee s including Bennigan , Chili's , TGI Fridays, Ruby Tuesday , O'Charley , Red Robin, Houstons or 99 (the "Exclusive ). The Exclusive is intended to preclude Landlord from operating and/or leasing any other portion of the Restaurant Tract to any entity which operates a restaurant substantially similar to Applebee's. The Exclusive shall not apply to any current tenants on the Shopping Center or Restaurant Tract.

### SOURCE: CATHERINE'S LEASE:

Section 10.07. Tenant Exclusive. Except as hereafter provided, so long as Tenant is operating a store in the Demised Premises for the purposes specified in Section 1.14 above, Landlord agrees not to lease space to any other tenant in the Shopping Center whose primary business is the sale of women's large-size apparel and who derives more than thirty-five percent (35%) of its gross sales in any year from the sale of such apparel. The foregoing provision shall not be applicable to anchor tenants occupying more than 10,000 square feet of leased space or to any other tenants in the Shopping Center under leases in effect on and as of the date of this Lease. The provisions of this Section 10.07 shall be of no further force or effect if Tenant ceases operating a women's large-size apparel store in the Demised Premises.

### SOURCE: CHAIR KING LEASE:

Section 18.25. Tenant Exclusive. Tenant shall have the exclusive right to sell outdoor furniture in the Shopping Center. For purposes of this Lease, the term "outdoor furniture" shall mean furniture that is specifically designed for outdoor use. Tenant expressly acknowledges and agrees that the furniture carried on the date of this Lease by stores such as Star Furniture is not outdoor furniture.

### SOURCE: COLD STONE LEASE:

Section (1.M-1) - Landlord agrees that during the term of this Lease, but only for so long as Tenant is open for business, using the Leased Premises for the Exclusive Use (as hereinafter defined) and is not otherwise in default of any of the provisions of this Lease beyond any applicable cure period, Landlord will not hereafter enter into a new lease in the Shopping Center with a tenant whose principal permitted use is the retail sale of ice cream, and frozen yogurt and frozen dessert (the "Exclusive Use"). The aforementioned restriction shall not apply to: (i) any existing tenants at the Shopping Center or their successors, assigns or replacements; or (ii) any existing leases at the

Shopping Center as same may be renewed, extended, modified or amended (except that no such modification shall grant a tenant the right to engage in the Exclusive Use where such tenant did not previously have that right); (ill)any store measuring 5,000 sq. ft. or more whose sales of ice cream and frozen yogurt does not exceed 50% of that tenant's gross sales.

## SOURCE:  EDIBLE ARRANGEMENTS LEASE:

Section (1.M-1) - Landlord agrees that during the term of this Lease, but only for so long as Tenant is open for business, using the Leased Premises for the Exclusive Use (as hereinafter defined) and is not otherwise in default of any of the provisions of this Lease, Landlord will not hereafter enter into an new lease in the Shopping Center with a tenant whose principal permitted use is the retail sale of floral fruit designs (the "Exclusive Use"). For purposes of this Article 1(M-1), principal permitted use shall mean that the sale of such items constitutes more than 25% of a tenant's gross sales. The aforementioned restriction shall not apply to: (i) any existing tenants at the Shopping Center or their successors, assigns or replacements; or (ii) any existing leases at the Shopping Center as same may be renewed, modified or amended (except that no such modification shall grant a tenant the right to engage in the Exclusive Use where such tenant did not previously have that right); (iii) any store measuring 5,000 sq. ft. or more.

## SOURCE:  GNC LEASE:

Section 28.28 - Exclusive GNC and Franchise: Landlord covenants and agrees that, subsequent to the execution of this Lease, and for so long as this Lease remains in full force and effect, Landlord shall not enter into any leases with other tenants in the Shopping  Center, or any adjacent land owned or to be owned by the Landlord which contains a use clause permitting the tenant to conduct a business for the primary, purpose of the sale of health foods, vitamins or mineral supplements. In no event shall this Section 28.28 be applicable to a lease with a grocery store for over 30,000square feet.

## SOURCE:  GUITAR CENTER LEASE:

Section 51 - (a) Other than Tenant and as provided below, Landlord shall not permit any tenant, nor shall Landlord itself, at the Shopping Center or at any other shopping center within five (5) miles of the Shopping Center which is owned or partially owned by Landlord or by any of its representatives to conduct any business which, in any manner engages in the Permitted Use, as defined in Paragraph 1.8, provided that for purposes of this Paragraph 51 ONLY, the Permitted Use will exclude "any other legal purpose" ("Tenant's Exclusive Use"). For purposes of clarity, that portion of the Permitted Use specified in Paragraph 1.8(a) shall not prohibit the sale by a general products retailer (i.e., a retailer not focused on musical instruments and equipment) of computers, hardware or software for general, office or productivity applications. It is acknowledged that such general purpose computers, hardware and software may be able to play audio and/or video content, provided however, that the foregoing shall not permit such a general products retailer to utilize retail displays focusing on professional music, audio and/or video editing capabilities. (b) Notwithstanding the foregoing, other tenants in the Shopping Center may, without violating Tenant's Exclusive Use, sell the items listed in the Permitted Use, so long as the sale of such items

does not exceed an area (individually or in the aggregate) that comprises the lesser of: (a) ten percent (10%) of such other tenant's retail area; or, (b) one thousand (1,000) square feet ("Incidental Use").

Section 1.8(a) of the Guitar Center Lease.  Permitted Use. (a) For the purpose of the sale, rental, instruction and repair of (both new and previously-owned) guitars; amplifiers; keyboards; drums and percussion; band and orchestra equipment; live sound (public address systems and equipment); DJ equipment; stage, theater, DJ and special effects lighting; equipment, computers, hardware and software for (any and all) entertainment, music, audio and/or video recording, performance, editing and instructional applications; other musical instruments and related products; music books and sheet music; music and video software; instruction; rehearsal studios and other accessories and items related thereto, and/or items which are a technological evolution of the foregoing and (b) any other legal purpose, provided, however that "any other legal purpose" shall be subject to (i) Tenant's restrictions for "Exclusive Uses" (as expressly stated herein in EXHIBIT E- EXCLUSIVE USES) and (ii) the "Prohibited Uses" (as expressly stated herein in EXHIBIT F- PROHIBITED USES) ("Permitted Use"). (See Section 6 for further provisions.)

## *SOURCE:  DECLARATION OF RESTRICTIVE COVENANTS RUNNING WITH LAND (GUITAR CENTER EXCLUSIVE)*

1.    Guitar Center Restrictions.  So long as that Lease Agreement between Declarant and Guitar Center, which is dated for reference purposes June 8, 2011 (the "Lease"), remains in effect, no occupant of the Shopping Center, other than Guitar Center and its successors in interest as tenant under the Lease, shall conduct any business which, in any manner engages in the sale, rental, instruction and repair of (both new and previously-owned) guitars; amplifiers; keyboards; drums and percussion; band and orchestra equipment; live sound (public address systems and equipment); DJ equipment; stage, theater, DJ and special effects lighting; equipment, computers, hardware and software for (any and all) entertainment, music, audio and/or video recording, performance, editing and instructional applications; other musical instruments and related products; music books and sheet music; music and video software; instruction; rehearsal studios and other accessories and items related thereto, and/or items which are a technological evolution of the foregoing ("**Exclusive Use**").

1.1.    Guitar Center's Exclusive Use shall be subject to an "Incidental Use" (defined below) exception.  "**Incidental Use**" is defined as no more than the lesser of ten percent (10%) or one thousand (1,000) square feet (individually or in the aggregate) of the floor area of that tenant's premises.

1.2.    Guitar Center's Exclusive Use rights shall not apply to any existing tenants at the Shopping Center ("Existing Tenants") as of the date of the Lease.  Further, the Exclusive Use shall not prohibit the sale by a general products retailer (i.e., a retailer not focused on musical instruments and equipment) of computers, hardware or software for general, office or productivity applications.  It is acknowledged that such general purpose computers, hardware and software may be able to play audio and/or video content, provided however, that the foregoing shall not permit such a general products retailer to utilize retail displays focusing on professional music, audio and/or video editing capabilities.

## SOURCE: KIM SON LEASE:

Section 10.07. Tenant Exclusive. Landlord shall not lease any portion of the Shopping Center to a tenant which has the right under its lease with Landlord to operate a restaurant on such portion of the Shopping Center which, based on the operating history of such tenant and its affiliates with other restaurants operating under the same trade name as such restaurant will operate under, will generate (or such tenant's lease would allow Tenant to generate) revenue from the sale of Chinese and Vietnamese food for on-premises consumption, provided this exclusive shall not preclude restaurants that sell other Asian food, for example, but not by way of limitation Indian, Japanese or Thai.

## SOURCE: LADY FINGERS LUXURY SALON LEASE:

Exhibit F - The Restriction. Subject to the conditions and exceptions mentioned below, Landlord agrees that during the Lease Term Landlord will not execute any lease for space within the Shopping Center with a tenant whose principal business activity is a full service nail salon. This exclusive does not apply to salons that provide nail service as an ancillary part of their overall business.

## SOURCE: LOEWS LEASE:

Section 6.02. (a) Landlord agrees that so long as this Lease remains in effect, (i) neither Landlord nor any Related Entity (as hereinafter defined) of Landlord shall directly or indirectly on land now or hereafter owned or hired by it or any of the foregoing, construct, erect, build, own, lease, operate, or have any interest in any motion picture theatre within five (5) miles of the Shopping Center (the "Radius") other than the motion picture theatres in respect of this Lease, and (ii) no portion of the Temporary Parking Area shall be used as a motion picture theatre.

Section 6.03. (a) Landlord agrees not to authorize or permit any food court, tenant, licensee or concessionaire within one hundred fifty (150) feet of the main entrance to the demised premises to sell for off-premises consumption the type of items described in clause (ii) of Section 6.01. The foregoing sentence shall not be deemed to prohibit a drugstore, restaurant except for a food court) or supermarket within the proscribed area from selling the foregoing items. (b) Landlord agrees not to authorize or permit any tenant, licensee or concessionaire within one hundred fifty (150) feet of the main entrance to the demised premises to (i) advertise, display or announce by sign or other display visible within such area the present or future sale or rental of any videotape, compact disk or other media production or replication of any motion picture which is then being exhibited at the Theatre Building or (ii) operate arcade-type games within such tenant's, licensee's or concessionaire's premises.

## SOURCE: MAIN EVENT LEASE:

Section 1.1 (s) Exclusive use: Tenant shall have the exclusive right to operate an entertainment center in the Demised Premises. So long as the Tenant is operating an entertainment center in the Demised Premises and provided no Event of Default exists under the Leases, Landlord shall not lease any space in the Shopping Center to any tenant to operate either (a) a Splitsville, Strikes, Dave & Busters, IT'Z, Incredible Pizza Company, or substantially similar use, or (b) a similar entertainment facility offering bowling, billiards, arcade/video games, laser tag, mini golf and/or indoor climbing (the "Covered Activities"), without the prior written consent of Tenant. Notwithstanding the foregoing, the Exclusive Use does not apply to (i) tenants where such activities do not collectively exceed twenty percent (20%) of the annual gross income of such business, (ii) Chuck E. Cheese, (iii) any full service restaurant or sports bar which may offer billiards or video games, so long as any space dedicated to video games does not exceed ten percent (10%) of the square footage of such tenant's total square footage, (iv) a movie theater which may include arcade/video games, so long as the space dedicated to video games does not exceed ten percent (10%) of the square footage of such tenant's total square footage, (v) any current leases for any portion of the Shopping Center or any renewals or extensions of any existing leases; provided, however, in the event any tenant under any such lease requests Landlord's consent to a change in use that would violate the Exclusive Use (and Landlord's consent is required under such tenant's lease), Landlord shall not consent to such change in use without the prior written consent of Tenant, or (vi) Landlord's consent to any assignment or sublease of an existing lease; provided, however, in the event any such assignment or sublease contemplates a change in use that would violate the Exclusive Use and Landlord's consent is required under the subject lease, Landlord shall not consent to such change in use without the prior written consent of Tenant.

## SOURCE: MARBLE SLAB CREAMERY LEASE:

Exhibit G - The Restriction. Subject to the conditions and exceptions mentioned below, Landlord agrees that during the Lease Term Landlord will not execute any lease for space within the Shopping Center with a tenant whose principal business activity is ice cream sales namely, Coldstone Creamery, Brewsters, Baskin Robbins, Ben and Jerry's, Haagen Daz, Carvel, Friendly's, Dairy Queen, Nestle Tollhouse or any other Tenant whose primary business is that of the retail sale of ice cream (primarily shall be defined as deriving greater than 10% of gross revenues for aforementioned use). If a violation of this exclusive right occurs and is not cured within 6 months of written notice from Tenant, Tenant shall have the option to terminate the Lease and therefore be released of its leasehold obligations.

## SOURCE: MATTRESS GIANT LEASE:

Addendum to Lease - 11. Exclusive. So long as the Demised Premises are used for the Permitted Use specified in Section 1.14 of the Lease, no other tenant or occupant of the Shopping Center shall be entitled to sell mattresses and/or box springs (the "Products"), except as hereinafter provided. The Incidental Sale (as hereinafter defined) of the Products in connection with the overall business of another tenant or occupant shall not be deemed or construed to be a violation of this paragraph 11. As used herein, "Incidental Sale" shall mean not more than thirty (30%) of such other tenant's or occupant's aggregate gross sales from the Shopping Center. To the extent legally permissible,

Landlord expressly agrees not to lease or rent any other space in the Shopping Center to The Mattress Firm, Sleep City and/or The Back Superstore for a store selling the Products during the term of this Lease so long as the Demised Premises are used for the Permitted Use specified in Section 1.14 of the Lease. Notwithstanding the foregoing, the provisions contained in this paragraph 11 are subject to rights granted to other tenants or occupants under leases in existence as of the date of this Lease and shall not be deemed or construed to restrict or limit sales of the Products by such other tenants or occupants in accordance with the terms and provisions of such other leases.

## SOURCE:  OFFICE MAX LEASE:

Section 21 - During the initial term of this lease or during any renewal period hereunder, except as hereinafter expressly provided, no portion of the Shopping Center (excluding the Demised Premises) shall be used:  (a) for the purposes of, or which is permitted to be, the sale of office, home office, school or business products, computers and computer products, office, home office, school or business supplies or equipment; office furniture, or electronics (including by way of example those businesses operated by Office Depot, Staples, Office Shop Warehouse, and Workplace), or for use as a copy center or "Kinko" type operation (all of which are hereinafter referred to as the "Prohibited Uses"), except to the extent permitted by subparagraphs (b) and (c) immediately below; (b) For any purpose which would permit more than (i) two thousand (2,000) square feet of space to be used for any Prohibited Use or (ii) seven percent (7%) of such user's floor area to be used for purposes of an Prohibited Uses, whichever is less; or (c) For any purpose which, taken in the aggregate for the entire Shopping Center, would permit more than five thousand (5,000) square feet of space in the Shopping Center to be used for any one of the Prohibited Uses.

## SOURCE:  OGLE LEASE:

Section 1.1 (s) Exclusive Use: Tenant shall have the exclusive right to operate a cosmetology career center in the Demised Premises. So long as the Tenant is operating a cosmetology career college in the Demised Premises and provided no Event of Default exists under the Lases, Landlord shall not lease any space in the Shopping Center to any tenant to operate a cosmetology school or discount hair salon, such as a "Supercuts" (the "Covered Activities"), within the Shopping Center, without the prior written consent of Tenant. Notwithstanding the foregoing, the Exclusive Use does not apply to (i) tenants where such activities do not collectively exceed fifteen percent (15%) of the annual gross income of such business, or (ii) any current leases for any portion of the Shopping Center or any renewals or extensions of any existing leases, in each case, to the extent such tenants are conducting business as a cosmetology school or discount hair salon as of the date of this Lease. Tenant hereby acknowledges that, as of the execution of this Lease, Landlord has leased space in the Shopping Center to a Supercuts and that such lease shall not be deemed a breach of Landlord's obligations in this Section 1.1 (s). If Landlord breaches its obligations in this Section 1.1 (s) and such breach continues for thirty (30) days following written notice from Tenant, Tenant may (a) terminate this Lease upon thirty (30) days written notice and receive from Landlord reimbursement of all incurred construction costs to Tenant's Work unamortized over the original Lease Term to the time of such termination, and (b) have any rights and remedies available to Tenant at law or in equity, including, without limitation, the right of  injunction.

## SOURCE:  OSHMANS/SPORTS AUTHORITY LEASE:

Section 10.06 Exclusive - So long as Tenant is operating a full line sporting goods store in the Demised Premise, Landlord shall not lease to any other tenant whose store is in excess of 5,000 square feet and whose principal use is that of a sporting goods store, including without limitation athletic shoe or athletic apparel stores in excess of 5,000 square feet each. The foregoing provision shall not be applicable to and shall not be deemed or construed to limit or preclude the sale of athletic shoes or athletic apparel by stores in the Shopping Center in excess of 5,000 square feet so long as the area devoted to the sale of athletic shoes or athletic apparel by any such store is less than 5,000 square feet, including aisle space, and such area comprises less than 20% of the entire leasable space in any such store. The foregoing provision shall cease to be of any force or effect if Tenant ceases operating a full line sporting goods store in the Demised Premises, except for temporary cessations due to repair, restoration or remodeling of the Demised Premises.

## SOURCE: OTTO'S LEASE:

Section 10.07. Tenant Exclusive. So long as Tenant is operating a restaurant in the Demised Premises whose primary fare is barbeque, Landlord agrees not to lease any other space in the Shopping Center to a sit-down restaurant which customarily derives more than twenty-five percent (25%) of its total revenues from the sale of barbeque; provided, however, the foregoing exclusive shall not be applicable with respect to any spaces in the Shopping Center covered by existing leases which do not prohibit or restrict the use of such space for a restaurant serving barbeque.

## SOURCE:  QUIZNO'S LEASE:

Section 10.07. Tenant Exclusive. Throughout the Lease Term, as it may be extended under the terms of this Lease, no other tenant in the building in which the Demised Premises are located shall be permitted to derive more than 35% of its annual gross sales from the sale of sandwiches. Such exclusive shall not apply to any existing tenants whose leases permit such use or to any other buildings in the Shopping Center. If such a violation occurs and continues more than 30 days after written notice thereof from Tenant to Landlord, then, in addition to any other remedies Tenant may have at law or in equity, Tenant shall have the right to terminate this Lease upon thirty (30) days prior written notice to Landlord.

## SOURCE:  RACKROOM LEASE:

First Amendment - 4. "Exclusive. Landlord agrees that during the term of this Lease, but only for so long as Tenant is open for business, using the Leased Premises for the Exclusive Use (as hereinafter defined) and is not otherwise in default of any of the provisions of this Lease, Landlord will not hereafter enter into a new lease in the portions of the Shopping Center designated on Exhibit B-1 attached hereto as the "Exclusive Use Area" and "Limited Exclusive Use Area" with a tenant whose principal permitted use is the retail sale of family branded footwear (the "Exclusive Use"). The aforementioned restriction shall not apply to: (i) any existing tenants at the Shopping Center or their successors, assigns or replacements; (ii) any existing leases at the Shopping Center as same may be renewed, extended, modified or amended (except that no such modification shall grant a tenant the

right to engage in the Exclusive Use where such tenant did not previously have that right); (iii) any family branded footwear store measuring 5,000 square feet or less in the Limited Exclusive Use Area"; or (iv) any specialty footwear store at the Shopping Center. For purposes of this Article, the term "Specialty Footwear Store" shall mean (i) a retail shoe store that sells only the shoe brands that it (or its parent or affiliate) manufactures, (ii) a retail shoe store that sells exclusively men's shoes or women's shoes or children's shoes, or (iii) any retail shoe store that exclusively sells athletic shoes: by way of example, but not limitation, Nine West, Stride Rite, Cole Hahn, Payless Shoes, Fleet Feet Sports."

## SOURCE:  RAZZOO'S LEASE:

Section 10.07 Tenant Exclusive. Landlord shall not lease any portion of the Shopping Center to a tenant which has the right under its lease with Landlord to operate a restaurant on such portion of the Shopping Center which, based on the operating history of such tenant and its affiliates with other restaurants operating under the same trade name as such restaurant will operate under, will generate (or such tenant's lease would allow Tenant to generate) a majority of its revenue from the sale of seafood for on-premises consumption.

## SOURCE:  REMAX LEASE:

Section 10.4 Tenant Exclusive. Landlord has not, and so long as this Lease shall be in effect, will not lease or rent any part of the Shopping Center (other than the Demised Premises) to any person or entity whose primary business in the Shopping Center is residential real estate brokerage. The foregoing restriction is subject, however, to the rights of third parties under the terms and provisions of existing leases in effect as of the date hereof.

## SOURCE:  RITZ CAMERA LEASE:

None.

## SOURCE:  STERLING BANK LEASE:

Section 10.06. Exclusive. For so long as (i) this Lease remains in full force and effect, (ii) Tenant is not in default hereunder, and (iii) Tenant is operating a commercial bank in the Demised Premises, Landlord shall not permit any other tenant in the Shopping Center to operate a commercial bank; provided, however, the foregoing provision (a) shall not be deemed or construed to preclude the operation of automatic teller machines by other tenants in the Shopping Center; (b) shall not be applicable to any space in the Shopping Center covered by a lease in existence as of the date hereof which does not preclude or restrict the operation of a commercial bank in such space; and (e) shall apply only to the usual and customary depository and lending activities of a commercial bank and not to any other activities, such as the sale of investment and insurance products and services.

## SOURCE:  SUBWAY LEASE:

R17. Landlord agrees not to sell, lease, let, use or permit to be used, any property owned or controlled by it within the Shopping Center now or at any time during the initial term of this Lease or any renewal thereof to any entity which primarily sells or serves deli or submarine-style sandwiches except current Tenant, Quizno's. Landlord will allow any restaurant/deli over 4,000 square feet (i.e. Jason's Deli, La Madeleine, etc ... ) Landlord will not sell, lease, let use or permit to be used by Pepperoni's Pizza. Further, current tenants shall be prohibited from adding items to their menus which conflict with this exclusive right. Landlord warrants that Tenant shall not be in violation of any other exclusive rights when this Lease commences. Further, Landlord shall indemnify and hold the Tenant harmless from any third party claim or suit regarding any other exclusive right granted by Landlord after the date of this Agreement. Landlord agrees to provide the Tenant with all current and future exclusivity agreements with other tenants.

## SOURCE:  SUPERCUTS LEASE:

Schedule 1 to Addendum, 1. Subject to the conditions and exceptions mentioned below, Landlord agrees that during the original term of this lease, Landlord will not execute any lease for space within the Shopping Center with a tenant whose principal business activity is a hair salon.

## SOURCE:  SYLVAN LEASE:

Section 1M-1 - Landlord agrees that during the term of this Lease, but only for so long as Tenant is open for business, using the Leased Premises for the Exclusive Use (as hereinafter defined) and is not otherwise in default of any of the provisions of this Lease, Landlord will not hereafter enter into a new lease in the Shopping Center with a tenant whose principal permitted use Is the operation of an educational and testing center (the "Exclusive Use"). The aforementioned restriction shall not apply to: (i) any existing tenants at the Shopping Center or their successors, assigns or replacements; or (ii) any existing leases at the Shopping Center as same may be renewed, extended, modified or amended (except that no such modification shall grant a tenant the right to engage in the Exclusive Use where such tenant did not previously have that right); (iii) any store measuring 10,000 sq. ft. or more.

## SOURCE:  TX LAND AND CATTLE ELASE:

Section 10.07. Tenant Exclusive. Landlord shall not lease any portion of the Restaurant Tract to a tenant which has the right under its lease with Landlord to operate a restaurant on such portion of the Restaurant Tract which, based on the operating history of such tenant and its affiliates with other restaurants operating under the same trade name as such restaurant will operate under, will generate a majority of its revenue from the sale of steaks for on-premises consumption.

## SOURCE: THE CHILDREN'S PLACE LEASE:

1.1(u) - Exclusive use: Tenant shall have the exclusive right to sell retail children's apparel, footwear and related accessories. Notwithstanding the foregoing, the Exclusive Use does not apply to (i) tenants where such activities do not collectively exceed ten percent (10%) of the annual gross income of such business, (ii) tenants occupying more than 10,000 square feet of the Shopping Center, (iii) any current leases for any portion of the Shopping Center or any renewals or extensions of any existing leases, or (iv) Landlord's consent to any assignment or sublease of an existing lease. In the event Landlord violates Tenant's right to the exclusive use described above, Tenant may either (i) terminate the Lease upon sixty (60) days prior written notice to Landlord, and thereafter, this Lease shall be null and void and neither of the parties shall have any further obligations under the Lease (except those obligations that survive termination of the Lease as specifically stated herein); (ii) continue to operate its business in the Demised Premises and for a period of forty-eight (48) months after Landlord's receipt of Tenant's written notice of a violation of this subsection, pay Landlord the lesser of (a) Minimum Guaranteed Rental and all additional charges due under the Lease, or (b) three percent (3.0%) of the total Gross Sales made in or from the Demised Premises during the previous month, within twenty (20) days after the end of each calendar month (together with a statement of Gross Sales in electronic format), in lieu of Minimum Guaranteed Rental and all additional charges due under the Lease, exclusive of utilities billed directly to Tenant by the utility company(ies). Tenant shall retain the right to terminate the Lease during said 48 month period. If Tenant elects to terminate the Lease under this Section 1.1 (t), Landlord shall pay within thirty (30) days notice the actual unamortized costs (not paid by Landlord as provided herein) of the leasehold improvements made by Tenant to the Demised Premises amortized on a straightline basis over the term of the Lease.

## SOURCE: WINGS N MORE LEASE:

Exhibit F - During the term of the Lease and for so long and only so long as Tenant is not in default beyond any applicable cure periods of Tenant's obligations under the Lease and Tenant is open for business to the public, Landlord shall not enter into any leases which permit, expressly or impliedly, the tenant thereunder to operate a business within the Shopping Center whose sales are primarily derived from the sale of Chicken Wings (for purposes of the Lease 'primarily' means sales in excess of 20% of the gross sales of such tenant from such premises within the Shopping Center - by way of example: Hooter's, Buffalo Wild Wings, Wings 'N Things, The Wing Stop, The Wing Factory, Wild Wing Cafe, Wings Zone or Bayou City Wings; the foregoing shall specifically exclude restaurants whose primary menu is chicken but which do not specialize in Chicken Wings, such as Chick-FilA, Popeye's, Church's, or KFC, or "restaurants whose primary menus may otherwise include chicken wings with sales in excess of 20% of gross sales); provided, however, that the exclusivity provisions of this Section shall not apply to any leases of spaces within the Shopping Center existing on the date of the Lease or any renewals, extensions or replacements of such leases, except, so long as it does not constitute a breach of such lease on the part of Landlord, Landlord agrees to use commercially reasonable efforts to prevent the tenant, or any subtenant or assignee from operating in violation of this Restriction. Additionally, the Landlord agrees not to lease space to or allow space in the Shopping Center to be operated as a Hooter's, Buffalo Wild Wings, Wings 'N Things, The Wing Stop, Wild Wing Cafe, Wings Zone, The Wing Factory or Bayou City Wings while the Lease

remains in force and effect and Tenant occupies the Premises. This Restriction shall not include the Twin Peaks restaurant concept.

## SOURCE:  YO SUSHI LEASE:

Exhibit F - The Restriction. Subject to the conditions and exceptions mentioned below, Landlord agrees that during the Lease Term Landlord will not execute any lease for space within the Shopping Center with a tenant whose principal business activity is operation of a Japanese Restaurant.

## SOURCE:  BED BATH & BEYOND LEASE:

Section 23 - Exclusive in Center - (a) To induce Tenant to execute this Lease, Landlord covenants and agrees that Landlord will not lease, rent or occupy or permit any other premises in the Shopping Center or any Related Land (as such term is defined in Section 7 hereof) to be occupied, whether by a tenant, sublessee, assignee, licensee or other occupant, for the sale rental or distribution, in any manner whatsoever, of linens and domestic's bathroom items, housewares, frames and wall art, window treatments and/or closet, shelving and storage items (which items, either together or separately, are hereinafter referred to as the "Exclusive Items"); except on an Incidental Basis (as hereinafter defined). For purposes of this Section 23(a), the term "Incidental Basis" shall mean the sale of such Exclusive Items but only to the extent that the total selling space (including allocable portion of the aisle space adjacent to such selling space) in any one store (other than the Premises) in the Shopping Center utilized for the sale of such Exclusive Items at any one time shall not exceed the lesser of five (5%) percent of the total selling space (including an allocable portion of the aisle space adjacent to such selling space) in such store, or a Floor Area of two thousand five hundred (2,500) square feet of the selling space (including an allocable portion of the aisle space adjacent to such selling space) in such store.

**The Sports Authority**          **Ross Dress For Less, Inc.**
**1050 West Hampden Ave.**          **4440 Rosewood Drive**
**Englewood, CO  80110**          **Mail Stop PL4 4E2**
**Attention: Missy Mayne**          **Pleasanton, CA 94588**
                                    **Attention: Kimberly Goto**


October 10, 2012


Re:    Sports Authority Store No. 227
       Ross Store No. 1610
       Fountains on the Lake, Stafford Texas (the "**Shopping Center**")


To Whom It May Concern:

TSA Stores, Inc., a Delaware corporation ("**TSA**") previously executed a lease dated June 27, 1995 (as amended from time to time, the "**Sports Authority Lease**") with respect to certain retail space shown on Exhibit A attached hereto. Ross Dress For Less, Inc., a Virginia corporation ("**Ross**"), is negotiating a lease for another building in the Shopping Center, in the location shown on Exhibit A (the "**Ross Premises**"). Notwithstanding the prohibition in Section 10.6 of the Sports Authority Lease, TSA is willing to permit Ross the right to engage in certain sales as set forth below.

TSA will permit the operation of a retail store by Ross and/or its related corporate affiliates in the premises so long as Ross (i) operates in such premises as an "Off-Price Department Store" (as hereinafter defined), (ii) operates in the manner that it typically operates in a majority of its stores, and (iii) does not operate primarily as a sporting goods store. "**Off-Price Department Store**" means a store selling an assortment of first-quality, name-brand merchandise on an everyday basis at prices reduced from those charged by full price retailers, such as full-price department stores, which merchandise may include (but is not limited to) soft goods merchandise including men's, women's and children's apparel, shoes, accessories such as jewelry and cosmetics, domestics and linens, housewares, art, pictures, posters, frames, artificial floral, office supplies, sporting goods, furniture and lamps, window and floor coverings, electronics, prerecorded audio and video merchandise and electronic games software and technological evolutions thereof, books, toys, party goods, pet supplies, luggage and/or packaged foods.



EXHIBIT
H-1
Page 1 of 3

TSA Stores, Inc.
Ross Dress For Less, Inc.
Stafford, Texas
Page 2 of 3

The foregoing agreement shall be effective so long as the Sports Authority Lease and the Ross lease are in force and effect.

**TSA STORES, INC.,**
**a Delaware corporation**

By: _____

Name: FRIEDER

Title: VP

Date: 10/10/12

Approved as to
Legal Form
(pc)

**ROSS DRESS FOR LESS, INC.,**
**a Virginia corporation**

By: _____
    Gregg McGillis

Its:   Senior Vice President, Property Development

Date: 10|16|2012

EXHIBIT
H-1
Page 2 of 3



Fountains on the Lake
Stafford, Texas

EXHIBIT A

ROSS PREMISES

Bed Bath & Beyond Inc.
650 Liberty Avenue
Union, NJ 07083

Ross Dress For Less, Inc.
4440 Rosewood Drive, PL4 4E 2
Pleasanton, California  94588-3050

August 17, 2012

Re:    Fountains on the Lake, Stafford, Texas (the "*Shopping Center*")
       Ross Store No. 1610/Bed Bath & Beyond Store No. 126

Ladies and Gentlemen:

Reference is made to the Shopping Center, for which Ross Dress For Less, Inc., a Virginia corporation (*"Ross"*), is negotiating a lease (the *"Ross Lease"*) for approximately Twenty Five Thousand Thirty One (25,031) square feet of leasable floor area in the Shopping Center (the *"Ross Premises"*), and Bed Bath & Beyond Inc., a New York corporation ("*BBB*"), has executed a lease (the *"BBB Lease"*) for approximately Thirty Five Thousand (35,000) square feet of leasable floor area in the Shopping Center (the *"BBB Premises"*).

Notwithstanding the "exclusive use" provisions contained in the BBB Lease, BBB and Ross hereby agree that only the following restrictions shall apply with respect to the Ross premises so long as both the BBB Lease and the Ross Lease remain in effect:

Neither Ross, nor any assignee(s) of the Ross Lease, nor any sublessee(s) of all or any portion of the Ross Premises, shall operate in the Ross Premises primarily as a home furnishings store.  A *"home furnishings store"* shall be defined as a store selling an assortment of home-related merchandise, which may include linens and domestics, bathroom items, housewares, frames and wall art, window treatments, closet, shelving and storage items, area rugs, wall and floor coverings, furniture, decorative accessories, seasonal items relating to the home, and/or health and beauty care items.  The foregoing provision, and the exclusive use provisions in the BBB Lease, shall lapse in the event that the BBB Premises ceases to be used primarily as a home furnishings store for more than nine consecutive months (which cessation is not attributable to such periods of time which (i) result from alterations or renovations being performed in and to the BBB Premises,  (ii) are caused by damage or destruction, eminent domain proceedings or actions, or events of force majeure, or (iii) arise during active lease negotiations and any related construction periods for the assignment or sublet of the BBB Premises to an assignee or subtenant(s) which will operate primarily as a home furnishings store).



EXHIBIT
H - 2
Page 1 of 2

Bed Bath & Beyond Inc.
Ross Dress For Less, Inc.
Stafford, TX
August 17, 2012
Page 2


It shall be a condition precedent to the agreements herein set forth Ross shall have entered into a lease or occupancy agreement for its premises in the Shopping Center within eighteen (18) months after the date hereof.


**ROSS DRESS FOR LESS, INC.**

By: _____
       Gregg McGillis
Its:    Senior Vice President, Property Development

**BED BATH & BEYOND INC.**

By: _____
Name: Seth Geldzahler
Title:    Vice President – Real Estate


EXHIBIT
H·2
Page 2 of 2

<u>EXHIBIT A</u>

Ross Waiver

November 26 , 2012

Fountains Dunhill, LLC
3100 Monticello Avenue, Suite 300
Dallas, TX
Attn: Andy Crosland

**Re:    Fountains on the Lake, Stafford, Texas (the "Shopping Center")**
**Ross Store No. 1610, "Stafford"**

Ladies and Gentlemen:

    Chair King hereby waives the exclusive use provisions contained in its lease for space in the referenced Shopping Center (the "Chair King Lease") with respect to the operation of a retail store by Ross Dress For Less, Inc. or any of its affiliates, subsidiaries or related companies (collectively "Ross") in the Shopping Center <u>provided that</u> Ross does not devote more than Two Thousand (2,000) square feet of Leasable Floor Area to the sale of "outdoor furniture." "Outdoor furniture" is defined in Section 18.25 of the Chair King Lease as furniture that is specifically designed for outdoor use.

    It is understood and agreed that this waiver shall apply only to Ross and the exclusive use provisions of Section 18.25 of the Chair King Lease shall not be deemed waived or modified in any way except as provided herein. This waiver is enforceable in perpetuity and is conditioned only upon Ross becoming an occupant or tenant in the Shopping Center.

Sincerely,

Chair King

By: _____
Name:  JACQUELYN BARISH
Its:     SVP

5

EXHIBIT
H-3
Page 1 of 1

# EXHIBIT I
## PERMITTED TITLE EXCEPTIONS

ROSS DRESS FOR LESS, INC. ("Tenant"), agrees to take its leasehold interest subject only to the following items stated in that certain Owner's Policy of Title Insurance ("Policy") dated as of January 4, 2008 issued by Chicago Title Insurance Company as Policy No. 175-1025307, as updated by that certain Abstractors/Nothing Further Report ("Abstractors Report") dated as of October 23, 2012 issued by Chicago Title Insurance Company as File no. 2711001490 covering the period of January 4, 2008 through October 23, 2012, for the subject location in the City of Stafford, Fort Bend County, Texas:

From the Policy:

Schedule B:
The instruments identified in Exceptions 6(a), 6(b)(1) through 6b(11), 6(c) through 6(n); provided, however, with respect to the security instrument described in Exception numbers 6(a), 6(m) and 6(n), the agreement of Tenant herein to take its leasehold interest subject to such instruments shall be subject to the execution of a Subordination, Non-Disturbance and Attornment Agreement pursuant to Section 13.1.1 of the Lease.

With respect to the tenancies described in the Memoranda of Lease and other instruments relating to specific tenants of the Shopping Center described in Exception numbers 6(b)(1) through 6(b)(11), Tenant takes notice only of such tenancies and does not agree to be bound by the provisions of such leases except as expressly set forth in the Lease, if at all.


From the Abstractors Report:

as to "Tract 1":
The instruments identified in Exceptions 1 and 2; provided, however, with respect to the security instrument described in Exception number 1, the agreement of Tenant herein to take its leasehold interest subject to such instruments shall be subject to the execution of a Subordination, Non-Disturbance and Attornment Agreement pursuant to Section 13.1.1 of the Lease.

as to the "New Subdivision – The Fountains Section One":
The instruments identified in Exceptions 1 through 10, 13, 14, 16 through 22, 24 through 32; however, with respect to the Deed of Trust and related security instruments listed in Exception numbers 3, 5, 6, 7, 13, 20, 21, 27, and 29 through 32, the agreement of Tenant herein to take its leasehold interest subject to such instruments shall be subject to the execution of a Subordination, Non-Disturbance and Attornment Agreement pursuant to Section 13.1.1 of the Lease.

With respect to the tenancies described in the Memoranda of Lease and other instruments relating to certain tenants of the Shopping Center described in Exception numbers 18, 19, 25, 26 and 28, Tenant takes notice only of such tenancies and does not agree to be bound by the provisions of such leases except as expressly set forth in the Lease, if at all.

Tenant expressly does not accept the Mechanic's and Materialman's Liens referenced in Exceptions 11, 12, 15, 22, and 23, which such exceptions are subject to Section 23.2 of the Lease.

as to "Tract 2":
The instruments identified in Exceptions 1, 2, 3, 4, 5, 7, 8, 9, and 10; however, with respect to the Deed of Trust and related security instruments listed in Exception numbers 1, 8, 9, and 10, the agreement of Tenant herein to take its leasehold interest subject to such instruments shall be subject to the execution of a Subordination, Non-Disturbance and Attornment Agreement pursuant to Section 13.1.1 of the Lease.

Further, with respect to the tenancies described in Exception numbers 3 and 7, Tenant agrees to take notice only of such tenancies and does not agree to be bound by the provisions of such leases except as expressly set forth in the Lease, if at all.

as to "Tract 3":
The instruments identified in Exceptions 1, 2, 3, 4, 5, 6, 7, and 8; however, with respect to the financing instruments listed in Exception numbers 4 and 5, the agreement of Tenant herein to take its leasehold interest subject to such instruments shall be subject to the execution of a Subordination, Non-Disturbance and Attornment Agreement pursuant to Section 13.1.1 of the Lease.

Further, with respect to the tenancies described in the Subordination, Non-Disturbance and Attornment Agreement, Memoranda of Leases and other documents relating to certain tenants of the Shopping Center listed in Exception number 1, 2, 3 and 4, Tenant takes notice only of such tenancies and does not agree to be bound by the provisions of such leases except as expressly set forth in the Lease.

as to Tract 4, the "New Subdivision – The Fountains Section One – Re-plat of Unrestricted Reserve J":
The instruments identified in Exceptions 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, and 28; however, with respect to the financing instruments listed in Exception numbers 6, 8, 10, 11, 14, 15, 19, 20, 23, 25, 26, 27 and 28, the agreement of Tenant herein to take its leasehold interest subject to such instruments shall be subject to the execution of a Subordination, Non-Disturbance and Attornment Agreement pursuant to Section 13.1.1 of the Lease.

Further, with respect to the tenancies described in the Memoranda of Lease and other instruments relating to certain tenants of the Shopping Center listed in Exception numbers 3, 4, 5, 17, 21, 22, 23 and 24, Tenant takes notice only of such tenancies and does not agree to be bound by the provisions of such leases except as expressly set forth in the Lease, if at all.

Tenant expressly does not accept the Mechanic's and Materialman's Liens referenced in Exceptions 9 and 18, which such exceptions are subject to Section 23.2 of the Lease.







**VICINITY MAPS**
NOT TO SCALE



**AERIAL VIEW**
NOT TO SCALE

**EXHIBIT** J
PAGE 1 OF 9



bill moore & associates

1057 solano ave.
p.o. box 6153
albany, ca 94706-0153
510/526-0296 fax 526-6092
www.billmoore.com





**#1610 STAFFORD**
Fountains on the Lake
SWC US Hwy 59 & Fountain Lake Dr.
Stafford, TX 77477

drawn    09/19/12
Exhibit J    10/25/12

SHEET
**K**

**GENERAL NOTES:**

LANDLORD TO FURNISH ADEQUATE ACCESS BEHIND LOGO LETTERS FOR INSTALLATION AND MAINTENANCE, PER ARTICLE 600 OF THE N.E.C.

LANDLORD TO SUPPLY THREE (3) 20 AMP 120V ISOLATED SIGN CIRCUITS (DIRECTLY CONNECTED TO ELECTRICAL PANEL WITH NO COMMON GROUNDS OR COMMON NEUTRALS, WITH #10 WIRE MIN.) AND JUNCTION BOXES TO AREA BEHIND SIGN LETTERS CONNECTED TO THE ENERGY MANAGEMENT SYSTEM.

LANDLORD TO PROVIDE AT LEAST 1/2" THICK PLYWOOD BACKING BEHIND ALL E.I.F.S. WALL SYSTEMS FOR SIGN AND BANNER SUPPORT.

SIGN BACKGROUND FOR THE "ROSS DRESS FOR LESS" SIGN(5) LETTERS IS TO BE FREE OF JOINTS & REVEALS, AND OF A LIGHT COLOR (MINIMUM 80% L.R.V.) TO PROVIDE HIGH CONTRAST AND VISIBILITY FOR THE BLUE SIGN. IF POPOUT IS USED THEN SURROUND IS TO HAVE A MINIMUM L.R.V. OF 75%. ALL COLORS ARE SUBJECT TO ROSS STORES, INC. REVIEW AND APPROVAL. COLOR APPEARANCE MAY BE ALTERED BY PRINTING, SEE APPROVED FINAL CONSTRUCTION DRAWINGS FOR COLOR SPECIFICATIONS.

IF THE SIGNAGE PROPOSED IN THIS EXHIBIT IS ALTERED BY THE ACTION OF LOCAL GOVERNMENTAL AUTHORITY, ROSS STORES INC. RESERVES THE RIGHT TO, AT NO COST, ALTER THE ARCHITECTURAL FEATURES TO BEST ACCOMMODATE THE ALTERED SIGNAGE.

**(A)** 78"H  INDIVIDUAL "ROSS" PAN CHANNEL LETTER-LOK LOGO LETTERS:
FACES: TUF-GLAS 66 2112D-E4 MATTE BLUE
RETURNS: 8"D ALUM. W/ WHITE FINISH
TRIM CAP: 2" WHITE JEWELITE
LETTER BACKS: ALUMINUM
NEON: FOUR-TUBE 15MM EGL E40 BLUE
MOUNTING: 1/4"-20 GALV. THRU BOLTS
PEG OFF: 1/2" SPACERS

**(B)** 42"H  INDIVIDUAL "DFL" LOGO LETTERS:
ALL CALLOUTS SAME AS "ROSS" EXCEPT:
RETURNS: 5"D ALUM. W/ WHITE FINISH
TRIM CAP: 1" WHITE JEWELITE
NEON: THREE-TUBE 15MM EGL E40 BLUE

**(C)** SIGN FASCIA BY LANDLORD (SEE NOTES)

**(D)** TYP. 24" H X 48" W X 1" D SINTRA OVAL "ROSS" LOGO WALL PLAQUE
(SEE SHEET EL FOR DETAILS)
TWO (2) REQUIRED AS SHOWN.
IF BACKGROUND IS UNEVEN DRESS SURFACE 2" BEYOND & BEHIND ROSS OVAL WALL PLAQUE SO THAT PLAQUE SITS FLUSH AGAINST WALL

**(E)** TYP. ARCHITECTURAL LIGHTING BY LANDLORD SUBJECT TO ROSS APPROVAL

**(F)** TYP. ROSS BLUE IDENTITY BANDS

**(G)** CLEAR ANODIZED ALUMINUM STOREFRONT & DOORS BY LANDLORD

**(H)** RECESSED ILLUMINATED NICHE BY LANDLORD

**(I)** 23" H X 46" W X 10" D DOUBLE-FACE INTERNALLY ILLUMINATED UC SIGN 8'-6" ABOVE FINISH FL.
CENTER OVER ENTRANCE DOORS (SEE SHEET UC FOR DETAILS)

**(J)** TYP. SET OF FIVE (5) EYE-BOLTS FOR BANNER ATTACHMENT, BY LANDLORD. TWO (2) SETS REQUIRED AS SHOWN.

**(K)** ADJACENT PARAPET MAY NOT BE HIGHER THAN THE ROSS BASE BUILDING

**(L)** NOT USED AT THIS LOCATION

**(M)** FROSTED FILM BY LANDLORD





159'-4" LEASE LINE TO LEASE LINE

**①  STOREFRONT • SOUTHEAST • HWY 59/FRONTAGE RD • ELEVATION**

SCALE: 3/32" = 1'-0"

TK-E

EXHIBIT J
PAGE 2 OF 9

bma
bill moore & associates
1057 solano ave.
p.o. box 6153
albany, ca 94706-0153
510/526-0396 fax 526-6092
www.billmoore.com

MEMBER
CSA
ISA

ROSS
DRESS FOR LESS

**#1610 STAFFORD**
Fountains on the Lake
SWC US Hwy 59 & Fountain Lake Dr.
Stafford, TX 77477

| | |
|---|---|
| drawn | 10/10/12 |
| per:YS approv 10/18 | 10/22/12 |
| add 78"/42" option | 10/24/12 |
| Exhibit J | 10/25/12 |

SHEET
S1 78 42

NOTES:

SEE SHEET K FOR PYLON SIGN POSITION.

LANDLORD TO PROVIDE AND MAINTAIN PYLON STRUCTURE, FINISHES, LIGHTING AND ELECTRICAL SERVICE.

"ROSS" TENANT SIGNAGE TO BE PROVIDED BY ROSS STORES, INC.

ROSS LETTERS TO BE POSITIONED AS SHOWN. ALL OTHER TENANTS SHOWN FOR GENERAL REFERENCE ONLY AND DO NOT NECESSARILY REPRESENT FINAL POSITIONING.

SIGN CONTR. TO VERIFY EXACT DIMENSIONS STRUCTURE AND LIGHTING CONDITIONS, AND PHOTOS OF FINISHED DISPLAY.

SIGN CONTRACTOR TO
VERIFY PYLON DIMENSIONS
PRIOR TO MANUFACTURE

HIGHWAY 59 FRONTAGE          PARKING LOT

EQ          12'-0"          EQ

DOUBLE-FACED
PYLON SIGN
BY LANDLORD
(SEE NOTES BELOW)

36" HI INDIVIDUAL "ROSS" PAN CHANNEL LETTER-LOK LOGO LETTERS:
FACES: TUF-GLAS SG 21210-E4 MATTE BLUE
RETURNS: 5"D ALUM. W/ WHITE FINISH
TRIM CAP: 1" WHITE JEWELITE
LETTER BACKS: ALUMINUM
NEON: THREE-TUBE 15MM EGL E40 BLUE
MOUNTING: THRU BOLTS
PEG OFF: 1/2" SPACERS

TWO (2) SETS REQUIRED: ONE ON EACH SIDE OF DOUBLE-FACED PYLON SIGN.

±16'-0" (EXISTING BACKGROUND)

EQ          12'-0"          EQ

±4'-0"
EXISTING
BACKGROUND

36"

(2)  "ROSS" TENANT LETTERS • DETAIL

SCALE: 1/2" = 1'-0"

(1)  **D/F PYLON SIGN ELEVATION**

HIGHWAY 59 FRONTAGE ROAD          SCALE: N.T.S.

EXHIBIT ___J___
PAGE __3__ OF __9__


bill moore & associates

1057 solano ave.
p.o. box 6153
albany, ca 94706-0153
510/526-0096 fax 526-6092
www.billmoore.com

MEMBER
CSA


DRESS FOR LESS

**#1610 STAFFORD**
Fountains on the Lake
SWC US Hwy 59 & Fountain Lake Dr.
Stafford, TX 77477

| drawn | 09/19/12 |
| per dimensions | 10/10/12 |
| Exhibit J | 10/25/12 |

SHEET

**P1**

**NOTES:**

SEE SHEET 51 FOR PLAQUE LOCATIONS.

BMA TO SUPPLY PLAQUES, HARDWARE AND INSTALLATION PATTERNS.

MOUNTING DETAIL MAY VARY ACCORDING TO TYPE OF WALL CONSTRUCTION: LANDLORD'S CONTRACTOR TO VERIFY CONDITIONS.

IF WALL SURFACE IS UNEVEN (EXAMPLE: SPLIT FACE BLOCK OR RIVER ROCK), THEN KNOCK DOWN ROUGH SURFACE 2" BEYOND WALL PLAQUE, SO THAT THE PLAQUE WILL SIT FLUSH AGAINST WALL. BMA TO FURNISH FULL SIZED OVAL TEMPLATE TO L/L CONTRACTOR TO FACILITATE THE RESURFACING OF THE AREA TO BE PROVIDED BEHIND THE SIGN.

**INSTALLATION INSTRUCTIONS:**

DRILL FIVE (5) 5/16" DIA. X 3" DEEP HOLES INTO WALL AS PER PATTERN.

SCREW 1/4-20 MACHINE-THREAD END OF GALV. FURNITURE BOLTS INTO EMPTY T-NUTS IN BACK OF PLAQUE UNTIL THEY CONTACT THE PVC. (DO NOT OVER TIGHTEN).

FILL HOLES IN WALL, COAT SCREW-THREAD ENDS OF FURNITURE BOLTS AND BACK OF PLAQUE WITH GE CONSTRUCTION SCS 1200 SILICONE SEALANT.

MOUNT PLAQUE ONTO WALL PUSHING BOLTS INTO HOLES UNTIL PLAQUE IS FLUSH AGAINST WALL SURFACE.

---

**Section A — SECTION AT MOUNT**

SEE NOTES BELOW FOR APPLICABLE CONDITIONS

3" HOLE

1" PLAQUE

3" X 1/4-20 GALV. STUD.

ONLY IF APPLICABLE

2"

24" X 48" X 1" SINTRA PVC PLAQUE WITH DIGITALLY PRINTED GRAPHIC OVERLAY

CLEAR "TEDLAR" GRAFFITI PROTECTING GUARD FILM (USE WET CLOTH & SOAP TO REMOVE MARKS)

THREADED 1/4-20 T-NUT PRE-SET INTO SINTRA BACKING. TYPICAL OF FIVE (5)

1/4-20 X 3" GALV. FURNITURE BOLT TYPICAL OF FIVE (5)

GE CONSTRUCTION SCS 1200 SILICONE SEALANT

5/16" DIA. X 3" DEEP HOLE IN WALL TYPICAL OF FIVE (5)

FINISH WALL MATERIAL (TO BE VERIFIED)

1" WHITE PVC SINTRA BOARD W/ ALL EXPOSED SURFACES PRIMED AND SEALED, EDGE PAINTED W/ GLOSS FINISH PAINT TO MATCH PMS #2945C BLUE

**A   SECTION AT MOUNT**

3/4 SCALE

---

**Section 1 — OVAL ENTRANCE LOGO PLAQUE ELEVATION**

48" PLAQUE

4"   20"   20"   4"

℄ FOR T-NUTS    ℄ FOR T-NUTS

0.25"    35" ROSS    0.25"

2"

3"

℄ FOR T-NUTS

9"

℄ FOR T-NUTS

9"

3"

0.25"

9.6" ROSS

24" PLAQUE

0.25"

72" ABOVE WALKWAY

DIGITALLY PRINTED 3M CONTROL TAC GRAPHIC W/ CLEAR "TEDLAR" GRAFFITI GUARD FILM:

WHITE COPY

PMS #286C DARK BLUE COPY OUTLINE

PMS #2945C BLUE BACKGROUND

PMS #286C DARK BLUE 1ST OUTLINE

WHITE 2ND OUTLINE

PMS #2945C BLUE 3RD OUTLINE

**1   OVAL ENTRANCE LOGO PLAQUE ELEVATION**

SCALE: 1-1/2" = 1'- 0"

---

EXHIBIT J
PAGE 4 OF 9



1057 solano ave.
p.o. box 6153
albany, ca 94706-0153
510/526-0296 fax 526-5092
www.billmoore.com
bill moore & associates




ROSS DRESS FOR LESS

**#1610 STAFFORD**
Fountains on the Lake
SWC US Hwy 59 & Fountain Lake Dr.
Stafford, TX 77477

| drawn | 03/13/08 |
|---|---|
| Exhibit J | 10/25/12 |

SHEET

EL

NOTES:

SEE SHEET 51 FOR UNDER-CANOPY SIGN LOCATION.

LANDLORD TO PROVIDE ACCESS ABOVE CEILING
FOR SIGN INSTALLATION, AND 120V ELECTRICAL
SERVICE AND J-BOX WITHIN FIVE (5) FEET OF SIGN
LOCATION CONNECTED TO ENERGY
MANAGEMENT SYSTEM.

LANDLORD TO PROVIDE 120V PRIMARY ELECTRICAL SERVICE
AND J-BOX ABOVE CEILING WITHIN FIVE (5) FEET OF SIGN

SIGN INSTALLERS TO PROVIDE WOOD OR STEEL ANGLE CROSS MEMBER
(AND WOOD BLOCKING IF NECESSARY)
ANCHORED TO CANOPY JOISTS.
DRILL 2" DIA. FOR PIPE SUPPORTS AND FASTEN WITH FENDER
WASHERS AND LOCK NUTS AS REQUIRED.

ESCUTCHEON PLATE AT CEILING
(PROVIDED WITH SHIPMENT)
INSTALLER TO SECURE WITH 2 SCREWS,
PRIME AND PAINT SCREW HEADS AND PLATES
TO MATCH CEILING

SIGN INSTALLERS TO PROVIDE 1-1/2" DIA.
GALVANIZED STEEL PIPE SUPPORTS
(TYP. OF TWO) CUT TO LENGTH FOR FINISH
CABINET HEIGHT AND THREAD ENDS
TO SECURE INSIDE CABINET AND
ABOVE CEILING.
PRIME AND PAINT TO MATCH CEILING.

23" x 46" x 10" DOUBLE-FACED ALUM. CABINET
PRIME W/ ZINC CHROMATE PAINT CABINET
EDGE AND 1" RETAINERS TO MATCH
SULTAN BLUE.
FACES: 0.177 (3/16") WHITE LEXAN FACE WITH
9 1/4" HIGH 'ROSS' COPY AND 3/4" WIDE WHITE
OUTLINE REVERSED OUT OF 3M 3630-157
SULTAN BLUE TRANSLUCENT VINYL OVERLAY

SIGN INSTALLER TO PROVIDE
WEATHERPROOF SILICONE SEAL
AROUND PIPE PENETRATIONS
INTO CABINET, TYP.

TWO-LAMP BALAST

1" x 1" METAL RETAINER
PAINTED TO MATCH SULTAN BLUE

1-1/2" PIPE FLANGE
1" x 4" 'C' CHANNEL
WELDED TO CABINET EDGE

2" x 2" 'C' CHANNEL LAMP
SUPPORT WELDED TO
CABINET EDGE

F36-T12-DHO FLUORESCENT
LAMP, TYPICAL OF TWO (2)

FOG INSIDE OF CABINET WHITE

CABINET EDGE PAINTED
TO MATCH SULTAN BLUE

1/4" DIA. DRAINHOLE
AT BOTTOM OF CABINET, TYP.

INSTALL CABINET SO THAT DISCONNECT
SWITCH AND U.L. LABEL ARE ON END CABINET
FACING STORE

LAMPS AT 9" O.C.

10"

TO BE VERIFIED BY FIELD CHECK

48" MAX

3/4" OUTLINE
1" RETAINER

EQ        24" O.C.        EQ

EQ

9-1/4"
COPY

EQ

23"

3/4"    3/4"
1"    EQ        33-1/2" COPY        EQ

46"

8'-6"
MIN. A.F.F.

3/4" OUTLINE
1" RETAINER







**③ SECTION A-A**
SCALE: 1" = 1'- 0"

**② FRAMING ELEVATION**
SCALE: 1" = 1'- 0"

**① D/F UNDER-CANOPY SIGN ELEVATION**
SCALE: 1" = 1'- 0"

EXHIBIT __J__
PAGE _5_ OF _9_


1057 solano ave.
p.o. box 6153
albany, ca 94706-0153
510/526-0296 fax 526-6092
www.billmoore.com
bill moore & associates

MEMBER
CSA

ROSS
DRESS FOR LESS

**#1610 STAFFORD**
Fountains on the Lake
SWC US Hwy 59 & Fountain Lake Dr.
Stafford, TX  77477

drawn        10/25/12
Exhibit J    10/25/12

SHEET

UC



ROSS STORES, INC. REQUIRES AND WILL PROVIDE:

Temporary "Now Open" banner package consisting of the following elements on storefront:

(A) 3'-0" x 16'-0" "Opening Soon / Now Open" ("Grand Opening" at New Markets only) combination double layered changeable banner (1 min). Install banner along with the installation of the building signs (see Sheet 01b). Tie off to eye-bolts at tile niche (by landlord). Remove top banner layer to reveal "Now Open" or "Grand Opening" banner on the day of store opening.

(B) 3'-0" x 15'-0" "Now Hiring" banner to remain at discretion of store manager.

(C) Two (2) sets of five (5) Threaded Eye-Bolts at 4'-0" high x 18'-0" wide for banner attachment as shown (see Sheet 01a).

(D) Multicolor pennant flags to be installed where applicable.

(E) Remove Window Banners

- BANNERS MUST NEVER BE DIRECTLY ATTACHED TO EIFS WALLS (CONCRETE, CMU, STUCCO, BRICK ETC ARE ALL OK).

- IF FASCIA IS EIFS, CONFIRM WHETHER EYE-BOLTS ARE PRESENT.

- IF YES, PROCEED WITH BANNER INSTALLATION AS SHOWN ON PLANS.

- IF NO EYE-BOLTS ARE PRESENT, DETERMINE WHETHER THE BASE BUILDING CAN BE USED FOR BANNER INSTALLATION (ONLY IF NOT ALSO EIFS).

- IF YES, PROCEED WITH INSTALLATION, PLACING BANNER ON NON-EIFS WALLS.

- IF NO EYE-BOLTS ARE PRESENT AND NO NON-EIFS SURFACES ARE AVAILABLE, CALL BMA IMMEDIATELY. DO NOT INSTALL BANNERS.

BASE BANNER "NOW OPEN": RED VINYL WITH WHITE COPY, HEMS AND GROMMETS

RED VELCRO (PART ONE) SEWN ONTO BASE BANNER IN SPOTS

VELCRO (PART TWO) ON BACK OF TOP BANNER MUST BE SEWN ALL AROUND EACH 3" LONG PIECE

ROPE WITH LOOP SEWN IN BETWEEN TOP BANNER AND VELCRO

NYLON ROPE ATTACHED TO LOOP (TO BE USED TO REMOVE TOP BANNER FROM GROUND)

TOP BANNER "OPENING SOON": RED VINYL WITH WHITE COPY

**BANNER COVER DETAIL**    N.T.S.

16'-0"

3'-0"

*Now* OPEN

(A) "NOW OPEN" BANNER DETAIL    0'  2'  4'

**Grand OPENING**

**NEW MARKET ONLY**

ALTERNATE BASE    N.T.S.

ROSS

DRESS FOR LESS

*Now* OPEN

ROSS    NOW HIRING

(1) TYPICAL STOREFRONT ELEVATION    0'  8'  16'

NOTES:

Specific conditions and codes will vary by location. BMA to provide site-specific plans prior to installation.

If storefront canopy is E.I.F.S. then landlord to provide plywood backing for sign & banner installation.

"Now Open" banner package to be provided and installed by Bill Moore & Associates, using existing eye-bolts for attachments; see notes above.

"Now Open" banner package to be installed immediately prior to the store opening and to remain for a minimum of 30 days.

Do not install banners on dryvit (E.I.F.S.) Wall(s). BMA to seal, patch and touch up all other wall penetrations on removal of banners. Save all banners for reuse.

Ross Stores Inc. reserves the right to install any other temporary opening promotional material or element they deem appropriate.

EXHIBIT __J__

PAGE _6_ OF _9_

**bma**
1057 solano ave.
p.o. box 6153
albany, ca 94706-0153
510/526-0296 fax 526-6092
www.billmoore.com
bill moore & associates

MEMBER
CSA
ISI

ROSS
DRESS FOR LESS

**PROTOTYPE STOREFRONT WITH STANDARD "NOW OPEN" CONSTRUCTION BANNER REQ'MENTS**

Issued  01/17/07
new Now Hiring bnr.  05/15/08
revised per SM  03/13/11

SHEET NO
**NO1**

NOTES:

Specific conditions and codes will vary by location. BMA to provide site-specific plans prior to installation.
If storefront canopy is E.I.F.S. then landlord to provide plywood backing for sign & banner installation.
"Opening Soon" construction banner package to be provided and installed by Bill Moore & Associates,
using existing eye-bolts for attachments; see notes above.
Do not install banners on dryvit (E.I.F.S.) Wall(s). BMA to seal, patch and touch up all other
wall penetrations on removal of banners. Save all banners for reuse.
Ross Stores Inc. reserves the right to install any other temporary opening promotional
material or element they deem appropriate.

- BANNERS MUST NEVER BE DIRECTLY ATTACHED TO EIFS WALLS
  (CONCRETE, CMU, STUCCO, BRICK ETC ARE ALL OK).
- IF FASCIA IS EIFS, CONFIRM WHETHER EYE-BOLTS ARE PRESENT.
- IF YES, PROCEED WITH BANNER INSTALLATION AS SHOWN ON PLANS.
- IF NO EYE-BOLTS ARE PRESENT, DETERMINE WHETHER THE BASE BUILDING CAN
  BE USED FOR BANNER INSTALLATION (ONLY IF NOT ALSO EIFS).
- IF YES, PROCEED WITH INSTALLATION, PLACING BANNER ON NON-EIFS WALLS.
- IF NO EYE-BOLTS ARE PRESENT AND NO NON-EIFS SURFACES ARE AVAILABLE,
  CALL BMA IMMEDIATELY. DO NOT INSTALL BANNERS.

A  "ROSS DFL OPENING SOON" BANNER DETAIL

B  WINDOW BANNER DETAIL

TILE TYP.
TILE SETTING BED
GALV. METAL COMPRESSION SLEEVE
CONTINUOUS SEALANT, COLOR TO MATCH TILE
GALVANIZED METAL, STANDARD #10, 2" THREADED EYE BOLT (PAINT TO MATCH TILE BEHIND)
GALVANIZED METAL WASHERS (PAINT FINISH SURFACE WASHER TO MATCH TILE BEHIND)
PLYWOOD SUBSTRATE, TYP.

C  EYE-BOLT DETAIL
FOR TILE NICHE          N.F.S.

1  TYPICAL STOREFRONT ELEVATION

ROSS STORES, INC. REQUIRES AND WILL PROVIDE:

Temporary "Opening Soon" construction banner package consisting of the following elements on storefront:

A  6'-0" x 24'-0"  Temporary "Ross Dress For Less Opening Soon, Discover Us! www.rossstores.com" banner.
   Banner to be installed as soon as wall is complete.

B  40" x 50"  "Ross Dress For Less Opening Soon" window banners (2 min.)

C  Two (2) sets of five (5) Threaded Eye-Bolts at 4'-0" high x 18'-0" wide



EXHIBIT  J
PAGE  7  OF  9


1057 solano ave.
p.o. box 6153
albany, ca 94706-0153
510/526-0296 fax 526-6092
www.billmoore.com
bill moore & associates


MEMBER
CSA
California Speculative

PROTOTYPE STOREFRONT
WITH STANDARD "OPENING SOON"
CONSTRUCTION BANNER REQ'MENTS

issued  01/17/07
revised per SM  05/31/11

SHEET
O1a



**NOTES:**

Specific conditions and codes will vary by location.
BMA to provide site-specific plans prior to installation.

If storefront canopy is E.I.F.S. then landlord to
provide plywood backing for sign & banner installation.

"Opening Soon / Now Open" banner package to be
provided and installed by Bill Moore & Associates, using
existing eye-bolts for attachments; see notes above.

Do not install banners on dryvit (E.I.F.S.) Wall(s).
BMA to seal, patch and touch up all other wall
penetrations on removal of banners.
Save all banners for reuse.

Ross Stores Inc. reserves the right to install any other
temporary opening promotional material or element
they deem appropriate.

**ROSS STORES, INC. REQUIRES AND WILL PROVIDE:**

Temporary "Opening Soon / Now Open" banner package
consisting of the following elements on storefront:

Ⓐ 3'-0" x 16'-0"  "Opening Soon / Now Open"
combination double layered changeable banner (1 min.).
Install banner along with the installation of the building signs.
Tie off to eyebolts at tile niche (by Landlord)

Ⓑ 40" x 50" "Ross Dress For Less Opening Soon" window banners (2 min.)

Ⓒ 3'-0" x 15'-0" "Now Hiring" banner

Ⓓ Two (2) sets of five (5) Threaded Eye-Bolts at 4'-0" high x 18'-0" wide
for banner attachment as shown (see Sheet 01a).

* BANNERS MUST NEVER BE DIRECTLY ATTACHED TO EIFS WALLS
(CONCRETE, CMU, STUCCO, BRICK ETC ARE ALL OK).

* IF FASCIA IS EIFS, CONFIRM WHETHER EYE-BOLTS ARE PRESENT.

* IF YES, PROCEED WITH BANNER INSTALLATION AS SHOWN ON PLANS.

* IF NO EYE-BOLTS ARE PRESENT, DETERMINE WHETHER THE BASE BUILDING
CAN BE USED FOR BANNER INSTALLATION (ONLY IF NOT ALSO EIFS).

* IF YES, PROCEED WITH INSTALLATION, PLACING BANNER ON NON-EIFS WALLS.

* IF NO EYE-BOLTS ARE PRESENT AND NO NON-EIFS SURFACES ARE AVAILABLE,
CALL BMA IMMEDIATELY. DO NOT INSTALL BANNERS.



Ⓐ "OPENING SOON/ NOW OPEN" BANNER DETAIL    0'  2'  4'

Ⓒ "NOW HIRING" BANNER DETAIL    0'  2'  4'

① TYPICAL STOREFRONT ELEVATION    0'  8'  16'



1057 solano ave.
p.o. box 6153
albany, ca 94706-0153
510/526-0296 fax 526-6092
www.billmoore.com
bill moore & associates





**PROTOTYPE STOREFRONT
WITH STANDARD "OPENING SOON"
"NOW HIRING" BANNER REQ'MENTS**

issued    01/17/07
new Now Hiring bnr.    05/15/08
revised per SM    05/13/11

SHEET
**01b**

EXHIBIT  J
PAGE  8  OF  9

ROSS STORES, INC. REQUIRES AND WILL PROVIDE:

At least one (1) double-faced temporary site sign per street frontage.

Sign installer to confirm location with landlord's contractor prior to installation.

8'-0"

1'-0"

③ "NOW OPEN" BANNER

1'-0" X 8'-0" RED
SINGLE FACED BANNER
(WITH HEMS AND GROMMETS)
TWO (2) BANNERS REQUIRED.

WHITE "NOW OPEN" COPY

NOTE:
ON DATE OF STORE OPENING
SECURE 1'-0" X 8'-0" "NOW OPEN"
BANNERS OVER "COMING SOON"
WORDING

8'-0"

**ROSS**
DRESS FOR LESS
**COMING SOON**
Discover us! www.rossstores.com

4'-0"

4'-0" X 8'-0" X 3/8" MEDEX SIGN PANEL
W/ WHITE ENAMEL FINISH. EDGES PAINTED WHITE.
TWO (2) PANELS REQUIRED INSTALLED BACK TO BACK
ON TWO (2) POSTS USING LAG BOLTS AND WASHERS

WHITE "ROSS DRESS FOR LESS" LOGO
REVERSED OUT OF BLUE BACKGROUND VINYL

RED "COMING SOON" COPY

BLUE "DISCOVER US! WWW.ROSSSTORES.COM" COPY

12"

1'-6"

4'-0"

2'-6" MIN.

4" X 4" X 10'-0" ROUGH SAWN POSTS PAINTED WHITE
(SEE FOOTING DETAIL AT LEFT)
MAY BE 12'-0" POSTS IF ADDITIONAL HEIGHT
IS NECESSARY FOR THE NOW HIRING PANELS

BLUE VINYL:    3M 7725-17 VIVID BLUE
RED VINYL:     3M 7725-53 CARDINAL RED

① D/F TEMPORARY SITE SIGN ELEVATION

0'    1'    2'

12"

4'-0"

7'-0"

10'-0"

GRADE

3'-0"

3'-0" DEEP X 1'-0" DIAMETER POST
HOLES (TYPICAL) BACKFILLED WITH
COMPRESSED NATURAL SOIL

② TYP. SECTION W/ FTG.

EXHIBIT ___J___

PAGE __9__ OF __9__





1067 solano ave.
p.o. box 6153
albany, ca 94706-0153
510/526-0296 fax 526-6092
www.billmoore.com

bill moore & associates



**PROTOTYPE STANDARD SITE SIGN
AND "NOW OPEN" BANNER
GRAPHIC REQUIREMENTS**

issued    01/17/07
revised    05/15/08

SHEET

**SS**

## EXHIBIT K
## EXISTING LEASES

| Tenants | | Tenants | |
|---|---|---|---|
| 11222 | Otto's Barbeque & Hamburgers | 12710 | Office Max, Inc. |
| 11225 | AMC Theater (American Multi-Cinema, Inc) | 12720 | Supercuts |
| | | 12722 | Lady Fingers Luxury Salon |
| 11303 | Brewskis No. 4, LLC | 12726 | Edible Arrangements |
| 11319 | RE/MAX Elite | 12728 | Lady Fingers Nail Care Salon |
| 11325 | Steak & Sushi (Jing Lun An) | 12730 | The Sports Authority |
| 11333 | Gallery of Salons (Westlake Salons) | 12770 | Razzoo's Inc. |
| 11339 | Quiznos Subs | 12788 | Ogle Beauty School (Shelton Ogle Enterprises, LP) |
| 11345 | Sylvan Learning Centers | | |
| 11375 | The Chair King, Inc. | 12790 | Guitar Center Stores, Inc |
| 11445 | Fuddruckers, Inc. | 12794 | Jos. A. Bank Clothiers |
| 12510 | Marble Slab (Houston Creamery, LLC) | 12800 | Southern Dental Associates (Creative Dental Systems, Inc.) |
| 12520 | Bed Bath & Beyond, Inc. | | |
| 12574 | OshKosh B'Gosh (Carter's Retail Inc.) | 12810 | Veterinary Dental Clinic |
| 12578 | Perfumania #445 | SF-12710 | Texas Land & Cattle |
| 12580 | Catherines (Catherines Partners-Texas, LP) | SF-12720 | Sam's Boat C/O Spitfire Grill |
| | | SF-12740 | Applebees, |
| 12590 | Kirkland's Home (Kirkland's Texas, LLC) | SF-12750 | Kim Son Restaurant |
| 12610 | Main Event Entertainment, L.P. | SF-12810 | Avalon Diner |
| 12634 | Old Navy | SF-12840 | Comerica Bank (Sterling Bancshares, Inc.) |
| 12638 | The Children's Place Retail Store | | |
| 12642 | Rack Room Shoes | 11388 | Wings & More |
| 12656 | Stein Mart, Inc | 11388 | Subway |
| 12680 | Hobby Lobby | 11388 | Mattress Firm |
| 12698 | General Nutrition Companies Store | | |