**COLE SCHOTZ** P.C.

Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, NJ 07602-0800
201-489-3000    201-489-1536  fax

—
New York
—
Delaware
—
Maryland
—
Texas
—
Florida

Michael D. Sirota
Member
Admitted in NJ and NY

Reply to New Jersey Office
Writer's Direct Line: 201.525.6262
Writer's Direct Fax: 201.678.6262
Writer's E-Mail: msirota@coleschotz.com

July 16, 2023

**Via CM/ECF Filing**

Honorable Vincent F. Papalia, U.S.B.J.
United States Bankruptcy Court for the District
of New Jersey
Martin Luther King Federal Building
50 Walnut Street
Newark, NJ 07102

Re:  In re Bed Bath & Beyond, Inc., *et al.*
     Case No. 23-13359 (VFP)
     Objection to Motion to Confirm Absence of Stay [Docket No. 495]

Dear Judge Papalia:

As Your Honor is aware, we are co-counsel to the above-referenced debtors and debtors-in-possession (the "Debtors").  Please accept this letter in lieu of a more formal objection to the *Motion to Confirm Absence of Stay* [Docket No. 495] (the "Motion").[1]

## OBJECTION

The Debtors' lease with Telegraph Partners (attached to the Motion as Exhibit "A" and hereafter, the "Lease") is a valuable one, with the Debtors' real estate advisors A&G Realty

---

[1] We recognize opposition to the Motion was due on July 11, 2023.  Prior to that time, the Debtors were engaged in discussions with counsel for the landlord, Telegraph Marketplace Partners II, LLC ("Telegraph Partners" or the "Landlord") and were advised that the Landlord would provide a proposal as early as July 7, 2023 that would potentially resolve the Motion.  When that proposal had not arrived, the Debtors followed up, seeking an extension of the objection deadline (as the Debtors had sought to avoid the cost of an objection if the matter was to be resolved).  While as late as July 11, 2023, the landlord's counsel reiterated its intent to provide that proposal, it never arrived and the Debtors' efforts to understand the status (and their request for a further extension pending receipt of the proposal) have since gone unanswered.  Accordingly, the Debtors request Your Honor's indulgence to accept this objection after the original deadline.  Alternatively, given that there are factual disputes (as highlighted in part below) we ask that Your Honor treat the hearing date on July 18, 2023 as a preliminary hearing and set a briefing and discovery schedule with respect to the Motion.  The Debtors submit there is no prejudice to the Landlord since the same issues were raised in the *Objection to Assignment of Telegraph Marketplace Partners II, LLC's to Burlington Coat Factory Warehouse Corporation, and Objection to Cure Amounts* [Response to Docket No. 1157] [Docket No. 1293] and will be addressed in the Debtors' omnibus reply, which will be filed in accordance with the Court's approval, on July 17, 2023, at 4:00 p.m.



Honorable Vincent F. Papalia
July 16, 2023
Page 2

estimating its likely value in the hundreds of thousands of dollars, and Burlington Coat Factory Warehouse Corporation ("Burlington") recently including it within a recent package of 44 leases it seeks to have assumed and assigned to it for $12 million. The Landlord is no doubt keenly aware that the Lease and its remaining options render it below market and that it has substantial value to whoever owns that interest.

With that in mind, in the days leading up to bankruptcy, the Landlord pounced upon the purported non-payment of a CAM reconciliation bill *for approximately $5,000*, <u>while all other Rent (as defined in the Lease) was being paid</u>, to issue a Notice of Default under the Lease (Exhibit "C" to the Motion). In accordance with the terms of the Lease, and as acknowledged by the Landlord both in the Notice of Default and the Motion, the Debtors had right to cure the alleged default set out in the Notice of Default (assuming the Notice of Default was valid, which the Debtors dispute).

In that regard, and again assuming the Notice of Default was proper, which is disputed, immediately upon receipt of the Notice of Default, and prior to when cure periods under the Lease would have expired, the Debtors' representatives reached out to the Landlord to obtain information relative to the alleged CAM reconciliation to confirm the amount was, in fact, due – *a right the Debtors had under the Lease and a fact conveniently omitted from the Motion and supporting declaration, implying that the Debtors simply ignored the Notice of Default*. Copies of emails relative to the Debtors' efforts to audit and confirm the billed CAM reconciliation are attached hereto as **Exhibit A**. As set forth on Exhibit A, Eileen Higgins, the person who submitted the Declaration in support of the Motion is the same person who was communicating with the Debtors' representatives on the requested information during the cure period.

Despite the ongoing efforts *during the cure period* to obtain the necessary information to audit and confirm the CAM reconciliation, and the Landlord understanding the Debtors were still in the process of auditing the information provided by the Landlord during the cure period, the Landlord then issued a Notice of Termination (Exhibit "D" to the Motion) on March 31, 2023, for the alleged $5,205.97 delinquency. **<u>At the time of the Notice of Termination all other Rent due under the Lease, including Fixed Rent for each of January, February and March, 2023 had been timely paid</u>**. The Notice of Termination reflected that the termination was effective on April 6, 2023, and demanded the surrender of the Premises on or before April 6, 2023.

On April 6, 2023, the Debtors paid the CAM reconciliation amount demanded, along with the Fixed Rent for April 2023, via ACH. On April 12, 2023, the Landlord sent a "FIVE DAY NOTICE TO VACATE PREMISES, or, in the alternative, FIFTEEN DAY NOTICE TO VACATE PREMISES" to the Debtors (Exhibit "E" to the Motion). In that communication, the Landlord acknowledged receipt of the payments made electronically on April 6, 2023, and that it would be retaining the funds notwithstanding the purported termination of the Lease. In that regard, the letter noted as follows:

> Landlord received an electronic transfer of funds from Tenant after delivering the Notice of Termination of Lease to Tenant. Be advised that Landlord will maintain all such funds for Tenant's account until



Honorable Vincent F. Papalia
July 16, 2023
Page 3

> Tenant relinquishes possession of the Premises to Landlord as required, and will then conduct a full accounting of such funds. In the event Landlord is required to institute legal action against Tenant to obtain such possession, Landlord will pay such funds into court in connection with such action for disposition by the court in accordance with Utah law and the terms of the Lease.

Then, on April 13, 2023, after perhaps recognizing that the Landlord's claimed termination might conflict with its stated intent to retain the Rent payments made in April 2023, the Landlord mailed a check to the Debtors refunding the Rent paid for the period April 7, 2023 through April 30, 2023 (*i.e.*, the date it claims its Notice of Termination became effective). Notably, the Landlord did retain a portion of the amounts paid, ***including the amount advanced on the CAM reconciliation*** (as well as that amount which related to the time period April 1 through April 6, 2023). The Landlord did not attach the April 13, 2023 correspondence to its Motion or the supporting Higgins Declaration. A copy of that letter and the check returning the sums described above is hereto as **Exhibit B**.

Even after the flurry of correspondence from the Landlord attempting to terminate the Lease and obtain possession of the Premises, the Landlord recognized that it was still required to commence an unlawful detainer action against the Debtor-tenant and that a state court would be required to determine that the Debtor-tenant was in unlawful detainer. *See* Exhibit E to the Motion ("*If* Tenant fails to comply with this notice, Tenant will be served with a summons and complaint for unlawful detainer. Unlawful detainer is when a tenant remains in possession of rental property after the owner serves you with a *lawful* notice to vacate, such as this notice. If Tenant is found by the court to be in unlawful detainer, Tenant will be evicted by the court …") (emphasis added). The Landlord never commenced an unlawful detainer proceeding or sought a determination that Debtor-tenant failed to perform in accordance with the Lease. The Debtors understand, and the purported notice to vacate seems to acknowledge, that Utah law would afford the Debtors the opportunity to contest the unlawful detainer and/or that the Notice of Termination was lawful. The Debtors also believe under Utah law, the Landlord was still required, at the time the bankruptcy cases were filed, to bring an action for breach of contract, and that the Landlord could not circumvent the state court on that issue and unilaterally terminate all of the Debtors' rights in the Lease.

Following the Petition Date, the Debtors have remained in possession of the Premises and have been operating their business there. The Debtors have paid Rent for each of May, June, and July 2023 and the Landlord has accepted the Rent for each these periods. The only amount unpaid at this point is the amount returned to the Debtors with the April 13, 2023 letter.

## ARGUMENT

Under §§ 541(b)(2) and 365 of title 11 of the United States Code (the "Bankruptcy Code"), a debtor does not have the authority to assume an unexpired nonresidential lease that terminated prior to the filing of the bankruptcy petition, and such a lease does not become property of the estate. *In re C.W. Mining Co.*, 2009 WL 1118717 (Bankr. D. Ut. April 23, 2009), *aff'd C.O.P.*

 COLE SCHOTZ P.C.

Honorable Vincent F. Papalia
July 16, 2023
Page 4

*Coal Dev. Co. v. C.W. Mining Co.*, 422 B.R. 746 (B.A.P. 10th Cir. 2010), *aff'd C.O.P. Coal Dev. Co. v. C.W. Mining Co.*, 641 F.3d 1325 (10th Cir. 2010).  As the bankruptcy court in *C.W. Mining* then observed:

> "However, the termination must be complete and not subject to reversal, either under the terms of the contract or under state law."[...] In determining whether an unexpired lease has terminated prepetition, and the extent of a debtor's interest in property as of the petition date, courts must refer to state law.[...] Consequently, this Court must look to the Agreement and Utah law to make this determination.  Under Utah law, the initial review of a contract begins with a court examining the contract itself to ascertain the intent of the parties. [...]  COP sent the Default Notice to the Debtor (at the earliest) on November 9, 2007 informing the Debtor that it was in default.  The Default Notice provided the Debtor with specific actions that the Debtor needed to take to cure that default.  Under paragraph 9 of the Agreement, the Debtor had 60 days after the Default Notice was given to cure the defaults or "this Agreement *may* be terminated and all of the rights of the [Debtor] shall cease and be wholly determined and COP may at once take possession of any or all of the properties herein described."[...]  Sixty days from November 9, 2007 (Friday) was January 8, 2008 (Tuesday).  The cure period did not expire until close of business on January 8, 2008.  The involuntary petition was filed on January 8, 2008 at 3:36 p.m. prevailing MST.  The termination of the Agreement was not complete under its default provision when the involuntary petition was filed.  As such, any of the Debtor's legal or equitable interests in the Agreement became property of the estate under  § 541(a).
>
> *          *          *
>
> At the time a bankruptcy petition is filed, the estate includes any rights under a contract that a debtor has—no more, no less.  Here, the Debtor still had all of the rights afforded to it under the Agreement when the petition was filed because the Agreement had not automatically terminated and any act to prematurely terminate the lease violated the Supplemental Order.  As a result, the Agreement and any rights thereunder became property of the estate.

*See C.W. Mining Co.*, 2009 WL 1118717 at *10-11 (internal citations omitted) (emphasis in original).

In reaching its decision, the bankruptcy judge noted an important element of contract interpretation under Utah law, stating that "[o]ur rules of contract interpretation require, [i]f the language within the four corners of the contract is unambiguous, that courts first look to the four



Honorable Vincent F. Papalia
July 16, 2023
Page 5

corners of the agreement to determine the intentions of the parties ... from the plain meaning of the contractual language. However, Utah law does not strictly require courts to only view the terms of a contract within its four corners, according to their *plain meaning*, when making the determination of whether there is an ambiguity in a contract" (internal citations and quotations omitted) (emphasis in original).  *Id.* at *10, n. 22, quoting *Gillmor v. Macy*, 121 P.3d 57, 69–70 (Utah App. 2005).

The bankruptcy court's decision was affirmed by the B.A.P and then the United States Court of Appeals for the Tenth Circuit.  In affirming the bankruptcy court, the B.A.P. observed and then held as follows:

> [C]ourts have also distinguished situations in which the contract at issue provides the right to cure and those which do not. [...] Although the reasoning of these cases is not always explicit, courts appear to focus on a debtor's existing contractual right to cure and revive the contract, thus making termination incomplete and giving the debtor a sufficient interest in the contract to assume. [...] It follows that if there is an assumable lease under § 365 which is property of the estate, it is subject to the automatic stay provisions of § 362(a).
>
> Once a petition is filed, a debtor's cure rights are controlled by § 365.  "Section 365, in conjunction with the automatic stay provision of section 362, accordingly suspends, once the bankruptcy petition is filed, the termination of a lease that is in default; it extends a debtor lessee's opportunity to cure any defaults until the debtor has the chance to decide whether to assume the lease."  The right to cure and assume is independent of any state law or contractual provision. [...] Although a debtor's cure rights under § 365 may seem to interfere with the parties' contractual rights, "[t]he purpose behind § 365 is to balance the state law contract right of the creditor to receive the benefit of his bargain with the federal law equitable right of the debtor to have an opportunity to reorganize." [...] To hold otherwise would deny the debtor "the benefit of section 365's 'suspension of time' in order to determine whether to assume or reject the lease." [...]
>
> Applying these principles in this case, we agree with the bankruptcy court that Debtor had an existing contractual right to cure the Lease at the time the involuntary petition was filed.  Termination of the Lease was not complete and it was subject to reversal.  As such, Debtor's retained interest in the Lease became property of the estate, including the right to cure the default.  After filing of the petition, Debtor's cure rights, including the deadline for curing defaults, were controlled by § 365 and not the January 5 & 6 Letters.  Debtor's interest in the Lease came under the protection of the automatic stay.

 COLE SCHOTZ P.C.

Honorable Vincent F. Papalia
July 16, 2023
Page 6

> Thus, even considering the January 5 and January 6 Letters relied on by COP, we conclude that the Lease did not automatically terminate on January 8.

*See C.O.P. Coal Dev. Co.*, 422 B.R. at 758-59 (internal citations omitted). As noted above, the B.A.P. was affirmed by the United States Court of Appeals for the Tenth Circuit. *See C.O.P. Coal Dev. Co. v. C.W. Mining Co.*, 641 F.3d 1325 (10th Cir. 2010).

Here too, the Debtors submit the Lease was not validly terminated pre-petition and the Lease was property of the Debtor-tenant's estate at the time it filed its bankruptcy petition.

For example, the Landlord alleges in the purported Notice of Termination as follows:

> Section 5.1.2 (b) of the Lease requires that Tenant resolve any and all questions, request any additional information and pay a reconciliation of its share of Common Area Charges for the immediately preceding calendar year within sixty (60) days following receipt from Landlord of the applicable "CAC Reconciliation Statement" documenting the same. Landlord delivered a CAC Reconciliation Statement for calendar year 2022 on January 3, 2023; therefore, the deadline for Tenant to resolve all questions and pay its reconciliation share of Common area Charges was March 4, 2023. However, Tenant failed resolve any questions and pay its reconciliation share on or before such deadline. Landlord then delivered to Tenant a notice of default in connection with such failure, which notice of default was delivered to Tenant on March 6, 2023. A copy of such notice of default, together with the related delivery receipt, is enclosed for reference. Tenant then had had ten (10) days, until March 16, 2023, to cure such default by paying Tenant's reconciliation share.

Thus, even accepting the Landlord's version of the facts, *i.e.*, that the Debtor-tenant was required to "resolve all questions and pay its reconciliation share of Common area Charges on **March 4, 2023**" (assuming of course that the Debtors were in possession of all of the necessary information as of that date to conclude the CAC Reconciliation Statement was correct and the CAM reconciliation charges were due), the Landlord's issuance of the "Notice of Default" on **March 2, 2023**, two days **prior** to the purported deadline to pay rendered the Notice of Default ineffective, as it was premature. Therefore, despite the contention otherwise in the Notice of Default, the Debtor-tenant was not in "default" on March 2, 2023 and the Landlord had no right, on March 2, 2023, to demand "the tenant cure their default" on that date. In other words, the Notice of Default was premature and, thus, ineffective.

Moreover, the Debtors dispute that it was without any rights to challenge the CAC Reconciliation Statement after March 4, 2023. The Lease provides in relevant part, at Section 5.1.2(b) as follows:


COLE SCHOTZ P.C.

Honorable Vincent F. Papalia
July 16, 2023
Page 7

> Upon Tenant's request, Landlord shall promptly deliver to Tenant
> copies of relevant backup materials (including, but not limited to,
> contracts, correspondence and paid invoices) reasonably required by
> Tenant …

*See* Lease at Section 5.1.2(b), lines 63-65.

While the obligation to pay the CAM reconciliation amount may be keyed off the 60-day period following the delivery of the CAC Reconciliation Statement, *see* Lease at Section 5.1.2(b), line 62-63 ("Tenant shall pay to Landlord the deficiency within sixty (60) days after receipt of such notice…"), there is *no* such time limitation for the Tenant to request "copies of relevant backup materials (including, but not limited to, contracts, correspondence and paid invoices)" despite the Landlord's contention otherwise.

Accordingly, the Debtors submit that they were *not* foreclosed as of March 4, 2023 from auditing the CAC Reconciliation Statement as of that date), despite the Landlord's contention in its Notice of Termination to the contrary.

In that regard, following the delivery of the (ineffective) Notice of Default, the Debtors were still within their rights to cure the alleged non-payment and seek copies "copies of relevant backup materials (including, but not limited to, contracts, correspondence and paid invoices)" during that cure period to determine if the amounts asserted in the CAC Reconciliation Statement were valid. The Debtors did just that.

During the 10-day cure period provided in the Lease (in Section 16.1.1(i)), *i.e.*, before the non-payment could constitute an "Event of Default" under the Lease, the Debtors' representatives did, in fact, request "copies of relevant backup materials (including, but not limited to, contracts, correspondence and paid invoices)." *See* **Exhibit A**. Moreover, the Landlord clearly understood that during the applicable cure period, the Debtors were auditing the information provided. The Debtors submit that even if the Court were to, *arguendo*, determine that the Notice of Default was effective and enforceable, no Event of Default existed when the Landlord issued the Notice of Termination. For example, following Notice of Default, the Debtors efforts to immediately confirm the CAC Reconciliation Statement, were efforts to perform or observe the covenants of the Lease, preclude a determination that an Event of Default existed under the Lease.

In that regard, Section 16.1.1(ii) provides as follows:

> If Tenant shall fail to: … (ii) perform or observe any of the other
> covenants of this Lease on Tenant's part to be performed or
> observed within thirty (30) days after its receipt of notice thereof
> from Landlord specifying the nature of such default (or, if such
> default shall be of a nature that same cannot reasonably be cured
> within thirty (30) days and Tenant does not commence to cure such
> default on or before such thirtieth (30th) day and thereafter
> diligently prosecute said cure to completion), such circumstance
> shall constitute an "*Event of Default*".



Honorable Vincent F. Papalia
July 16, 2023
Page 8

The Debtors took efforts in the thirty (30) day period to audit and confirm the CAC Reconciliation Statement and avoid the contention that an Event of Default had occurred.

Accordingly, because the Notice of Default was premature and ineffective, and because the Debtors were still in the process of timely curing any alleged default identified in the Notice of Default, no Event of Default occurred and the Landlord was not permitted to issue the Notice of Termination, a right that exists under the Lease only *after* an Event of Default. *See* Lease at Sections 16.1.1. and 16.1.2.(c).

When examined in its entirety, it is clear the Landlord's only objective here was to repossess its below-market Lease. Even if the Landlord truly believed it had a right to issue the Notice of Default, and then issue the Notice of Termination, the deficiencies in its Notices and its misreading of its rights under the Lease preclude any determination that the Lease was terminated prior to the Petition Date and, as such, the Lease remains property of the Debtors' estates. The Landlord's manipulated termination should not stand. As a Court of equity, and the recognition that equity abhors a forfeiture, this Court should deny the Landlord's efforts to repossess its valuable below market lease for its own benefit and to the substantial detriment of the Debtors' estates. As such, the Court should deny the Motion.

Respectfully submitted,

*/s/ Michael D. Sirota*

Michael D. Sirota

DMB:
cc:    David Graff, Esq.
       Darren Neilson, Esq.

# EXHIBIT A

**Ramdas Amit**

---

| | |
|---|---|
| **From:** | Leasepayable |
| **To:** | Christine Donvito |
| **Subject:** | FW: Store No 777 Receipt of Delivery of Packet on 1/3/2023 |

#777

Mid-April 2023

$5,205.97 – 2022 CAM Rec Unaudited

Thank you,
Amit Ramdas Parkar
Real Estate Lease Accounting **|** **Leasepayable@bedbath.com**
Bed Bath & Beyond**|**Harmon**|**BuyBuyBABY**|** Bed Bath & Beyond Canada **|**
650 Liberty Avenue Union, NJ  07083

---

**From:** Eileen Higgins <eileen.t.higgins@gmail.com>
**Sent:** Monday, March 20, 2023 2:37 PM
**To:** Leasepayable <Leasepayable@bedbath.com>
**Cc:** Christine Donvito <Christine.Donvito@bedbath.com>; Gregory Cropper <GCropper@parsonsbehle.com>; Savita Gupta <savita.gupta@consultant.bedbath.com>; michael martin <michaelmartin3@hotmail.com>
**Subject:** Re: Store No 777 Receipt of Delivery of Packet on 1/3/2023


CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links, especially from unknown senders.

Hello to the representatives of consultant and Bed Bath,     EMAIL 1

Attached is the letter sent at the beginning of the to Bed Bath & Beyond for Store #777 and additional documents.

On Mon, Mar 20, 2023 at 11:44 AM Leasepayable <Leasepayable@bedbath.com> wrote:

> Hello Eileen,
>
>
> Can you please email us the backup documents? Send us the backup documents in multiple emails, if the files are too large.
>
>
>
> Thank you,
>
> Amit Ramdas Parkar
>
> Real Estate Lease Accounting | **Leasepayable@bedbath.com**

Bed Bath & Beyond**|**Harmon**|**BuyBuyBABY**|** Bed Bath & Beyond Canada **|**

650 Liberty Avenue Union, NJ  07083

---

**From:** Eileen Higgins <eileen.t.higgins@gmail.com>
**Sent:** Monday, March 13, 2023 9:04 AM
**To:** Ramdas Amit <Ramdas.Amit@Consultant.Bedbath.com>
**Cc:** Christine Donvito <Christine.Donvito@bedbath.com>; Gregory Cropper <GCropper@parsonsbehle.com>;
Leasepayable <Leasepayable@bedbath.com>; Savita Gupta <savita.gupta@consultant.bedbath.com>; michael martin
<michaelmartin3@hotmail.com>
**Subject:** Re: Store No 777 Receipt of Delivery of Packet on 1/3/2023

CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking
links, especially from unknown senders.

Hi  Amit,


I sent the Packet by USPS on 12/30/2022 and I have receipt it was received.   You also have receipt of it being received
and signed for on 1/3/2023.  You now want it again.   The only way is for you to Tell me you cannot find it and you lost
it.  I have been doing this since 2004 with Bed Bath and Beyond.



If you tell me this, I would only send them to you by email and it is quite a bit of emails on the invoices.   You let me
know what you want done.


I sent the roster, I send the insurance invoice as well as requested.  Tell me first that my packet is lost at Bed Bath and
Beyond and as a consultant for BBBY you need it again.   This is 2-1/2 months later.


Thank you.

Eileen Higgins


On Mon, Mar 13, 2023 at 8:26 AM Ramdas Amit <Ramdas.Amit@consultant.bedbath.com> wrote:

> Dear Landlord,

Please note that all invoices and inquiries should be forwarded to **Leasepayable@bedbath.com**


Thank you,

Amit Ramdas Parkar

Real Estate Lease Accounting **|** **Leasepayable@bedbath.com**

Bed Bath & Beyond**|**Harmon**|**BuyBuyBABY**|** Bed Bath & Beyond Canada **|**

650 Liberty Avenue Union, NJ  07083

---

**From:** Eileen Higgins eileen.t.higgins@gmail.com
**Sent:** Sunday, March 12, 2023 10:41 AM
**To:** Savita Gupta savita.gupta@consultant.bedbath.com; Christine Donvito Christine.Donvito@bedbath.com; Ramdas
Amit Ramdas.Amit@Consultant.Bedbath.com
**Subject:** Store No 777 Receipt of Delivery of Packet on 1/3/2023


CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or
clicking links, especially from unknown senders.

Hello to Bed Bath Consultants and Employee:


Here is the confirmation of Delivery of the packet with flash drive including invoices sent and received by bed bath on
1/3/3023 and signed for by G Y.


You asked for a roster and insurance invoice and these have been sent.


Please find the packet and complete the cam invoice.   It took time doing this report.

Thank you.   Eileen Higgins

https://us01.z.antigena.com/l/iULSqbRmiHqy2-
id_ofdYVMGSt6mGCLEkZ9NKvKDY9S~Fp2UZQK~PEhNuVcbJy1KpIml8a4vgj~XU~aQyhj~XWWRaQhjXodH8Z1WtGrrRcw
uKnuuByGIwEJAn32A0IlkztEAeh2IuH2LGiKsmfKyENFK6YcnPR2RKvGe0cRuANtmbH6qmanQxVq3cmJzwpPIS4xMiTxaYk
himnNS2lj

--

Eileen Higgins on behalf of Telegraph
Landline 803-732-3442
Cell 803-361-6530

--
Thanks

Eileen T. Higgins,
On behalf of Telegraph Marketplace
Phone:  803-732-3442
Cell:  803-361-6530



JAN 3 0 2023

C/O Eileen Higgins
226 Bronlow Drive
Irmo, SC 29063
Email: Eileen.t.Higgins@gmail.com
Phone: 803-732-3442 (land line)
Cell: 803-361-6530

January 1, 2023

Bed Bath & Beyond, Inc.
650 Liberty Avenue
Union, NJ 07083

Re:   Telegraph Marketplace Shopping Center, Suite 2
      Store #777 – Washington, UT – CAM Reconciliation for 2022 - No Budget Change for 2023

Dear Bed Bath Specialist,

According to the Declaration of Covenants, Conditions and Restrictions that follow your land, Article IV, a written report about the Shared Maintenance Costs shall be provided to each owner by no later than sixty (60) days after the end of each calendar year.  Your pro-rata share of the shopping center costs is 31.51% and the building share is 42.55%. You paid $18,000.00 in 2022 and the shortage is $5,205.97. An Invoice is included here with this letter (see spreadsheet attached ).

*Also, please note that the signage fee of $833.13 is included which is pro-rated at 20.34 that was brought to your attention for the cam report last year.* This is your advertising cost and it is charged by your square footage on the pylon and monument signage.  The fee is not a signage charge such as a No Overnight Parking Sign which is included elsewhere in the spreadsheet as is an expense this past year. Not all tenants have signage on the Pylon sign.  Not all pylon tenants are listed on the Monument Sign. However, both Best Buy (First line per CC&Rs) and Bed Bath & Beyond (Second Line per CC&RS) are on both signs.  The Tenants are charged for this signage per their pro-rata share of the space on the signage since the operation of the shopping center in 2004.  This is not considered a capped expense. I believe that you have been capping this expense and including it in Common Area Expenses and haven't been paying for your proper share.

Likewise, the Building Repairs for 2022 again is not shopping center expense that are capped.  There are two spaces the tenants share and they are the riser (pump room) and electrical room.  If there are repairs to these areas like lock changes; the tenants in that building share the expense on a pro-rate basis.  Your building share is 42.55%.  *Another point here is that the maintenance charges for the slurry coat and stripping are included here.*  **The amount is broken down into five equal yearly installments of $2313.40. This is year 5 charges.  It is not a capped expense and it is covered in Section 5.1.3 of the lease on a straight-line basis over 5 years.**

Attached is the flash drive with copies of the invoice included and also included is the spreadsheet breakdown of the charges and an invoice in the amount of $5,205.97.  I have also included a copy of the transaction detail by account of these payments.  The copies of the invoices are in many cases in two parts, January to July and August through December 2022.   *The budget will remain the same for 2022.*

We want to thank Bed Bath & Beyond for being our tenant and hope that your 2023 is prosperous.  The Landlord has been in contact with Bed Bath & Beyond and is currently working with Bed Bath & Beyond.  Thank you in advance with any questions you may have regarding the cam report for 2022.

Sincerely,

Eileen Higgins

Eileen T. Higgins
Mgr.,  North Star Real Estate Co., Inc.
On behalf of Telegraph Marketplace Shopping Center
803-732-3442 (land line) 803-361-6530 (cell)

**Telegraph Marketplace Partners II, LLC**
c/o Eileen Higgins
28L Brentlow Drive Irmo, SC 29063
SC Phone: 803-732-3442
SC Cell: 803-381-6550

Report for Bed Bath & Beyond
650 Liberty Street
Union, NJ 07083
Attention: Delapp Adenuga
Building Share:
Tenant Pro Rate Share of Shopping Center per lease, page4, Section 11.41
31.41%
Building Share:
Date: 2105451932 = 4255
11.2022

Prepared by: Eileen T. Higgins, Accountant for Telegraph & Management Team for North Star Real Estate Co., Inc
2022 Telegraph Common Area Maint Report for Store #775 Store Opened on May 30. Cents from May 31, 2004 (report due within 60 days)

| | #1 Insurance | #2 Lighting | #3 Sprinkler Irrigation | '#4 Sweeping | '#5 Extermination | '#6 Landscape Maint | '#7 Parking Lot Maint | '#8 Power Wash Sidewalk | #9 Common Area Pylon & Monu Signage | Not a Cam | Building Expense |
|---|---|---|---|---|---|---|---|---|---|---|---|
| January | 844.00 | 926.31 | 83.22 | 1,100.00 | | 400.00 | | | 125.00 | | |
| February | 844.00 | 902.72 | 92.52 | 1,100.00 | | 400.00 | | | 125.00 | | |
| March | 844.00 | 901.10 | 83.22 | 1,100.00 | | 400.00 | | $12,855.48 | 125.00 | | 940.00 |
| April | 844.00 | 760.14 | 54.62 | 1,100.00 | | 400.00 | | | 521.00 | | |
| May | 426.44 | 716.96 | 44.78 | 1,100.00 | 250.00 | 400.00 | 857.71 | 800.00 | 325.00 | | |
| June | 796.08 | 625.29 | 44.78 | 1,100.00 | | 2,500.00 | | 183.76 | 325.00 | | |
| July | 796.08 | 625.09 | 49.58 | 1,100.00 | | 400.00 | | 1,000.00 | 325.00 | | |
| August | 796.08 | 585.74 | 46.98 | 1,100.00 | 125.00 | 500.00 | | | 325.00 | | |
| Sept | 796.08 | 649.43 | 50.38 | 1,100.00 | | 400.00 | | | 325.00 | | |
| Oct | 796.08 | 649.40 | 46.98 | 1,100.00 | | 400.00 | 870.40 | 1,000.00 | 325.00 | | |
| Nov. | 796.08 | 798.93 | 48.68 | 1,100.00 | 125.00 | 400.00 | | 1,000.00 | 325.00 | | |
| Dec | 796.08 | 935.17 | 45.23 | 1,600.00 | | 400.00 | 1,168.00 | 1,000.00 | 325.00 | | |
| | $9,375.00 | $9,066.28 | 726.02 | 13,700.00 | 500.00 | 7,400.00 | 15,751.59 | 3,983.76 | 4,096.00 | | 940.00 |

**Comments**

| | | | |
|---|---|---|---|
| #1 | Fire Insurance Property | $3,275.00 | 1,393.51 Pro-rated at Bldg Share at 4255 (844 Telegraph Only) |
| #1 | Liability | $4,530.00 | 1,424.25 Pro-rate Share 31.51% |
| #2 | Lighting | | 2,856.78 Pro-rate Share 31.51% |
| #3 | Landscape Irrigation | | 308.92 Pro-rate Share at 4255 |
| #4 | Sweeping | | 4,316.87 Pro-rata share = 3151 |
| #5 | Exterminating | | 157.55 Pro-rata share = 3151 |
| #6 | Landscape Maintenance* | | 2,331.74 Pro-rata share = 3151 |
| #7 | Parking Lot Maintenance* | | 4,963.33 Pro-rata share = 3151 |
| #8 | Sidewalk Power Washing* | | 1,255.28 Pro-rata share = 3151 |
| | Administrative Fee* | | 651.24 5% exclusive of ins, utilites, taxes (sum of #5 through #9) |

Amortized Amount for y 5 on Parking Lot

| | | | |
|---|---|---|---|
| #9 | Signage rental rate per space on pylon & monument | 2,313.40 | year is not capped. See Section 5.3.1 of lease. |
| | Bldg Expense | 833.15 | Pro-rate Share .3034 Not a common area cost (CAAM) |
| | Total Expenses paid by Telegraph | 399.87 | Pro-rate Bldg Share at .4255 |
| #10 | Amount paid by Telegraph | 23,205.57 | Total Charges |
| | Amount paid by BBBY | 18,000.00 | Total Payments by BBAB |
| | Amount owed to BBBY | $ (5,205.97) | shortage |

Payments in 2022
$18,000

Invoice

**Telegraph Marketplace Partners II, LLC**

C/O Eileen Higgins
226 Bronlow Drive
Irmo, SC 29063

Phone #    803-732-3442        eileen.t.higgins@gmail.com
Fax #      803-781-3604

| Date | Invoice # |
|------|-----------|
| 12/30/2022 | 157 |

| Bill To |
|---------|
| Bed Bath & Beyond #777
650 Liberty Street
Union, NJ 07083 |

| P.O. No. | Terms | Project |
|----------|-------|---------|
|          | Net 30 |         |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
|  | 2022 Cam Shortage including  Final Coat on Slurry, Crack Repair for Parking Lot, Parking Lot
Signage additions, and Parking Lot Light Repairs | 5,205.97 | 5,205.97 |
|  |  | **Total** | $5,205.97 |

# EXHIBIT B

**TELEGRAPH MARKETPLACE PARTNERS II, LLC**
226 BRONLOW DR
IRMO, SC 29063

WELLS FARGO BANK
31-297/1240

**002470**

4/13/2023

PAY TO THE
ORDER OF ___ Bed Bath & Beyond #777

**\*\*17,740.50**

$ _____

Seventeen Thousand Seven Hundred Forty and 50/100\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

DOLLARS

Bed Bath & Beyond #777
650 Liberty Street
Union, NJ 07083

AUTHORIZED SIGNATURE

MEMO: Returned Rent and Cams after 4/6/2023

TELEGRAPH MARKETPLACE PARTNERS II, LLC

April 13, 2023

Bed Bath & Beyond, Inc.
650 Liberty Street
Union, NJ 07083

Re:     Disposition of Fixed Rent and Additional Rent pursuant to the termination of that certain Lease
        Agreement by and between Telegraph Marketplace Partners, LLC, a Utah limited liability
        company, as "Landlord", and Bed Bath & Beyond, Inc., a New York corporation, as "Tenant",
        dated September 19, 2003 (as amended, the "Lease"), pertaining to certain premises located in
        Telegraph Marketplace, 844 Telegraph Street, Suite 2, Washington, Utah; Bed Bath & Beyond
        Store #777 (the "Premises")

To Whom it May Concern,

Landlord delivered to Tenant a Notice of Vacate Premises dated April 12, 2023, in connection with the
termination of the Lease by Landlord, and Landlord's subsequent demand that Tenant relinquish
possession of the Premises to Landlord as required under the Lease and under Utah law.  One of the
matters addressed was the disposition of payments made by Tenant following the effective date of the
termination of the Lease.  In light of a degree of uncertainty regarding the date on which Tenant is
required to vacate the Premises pursuant to the Notice to Vacate Premises (*i.e.,* either April 18, 2023 or
April 30, 2023), Landlord has determined to retain all amounts relating to the period prior to April 6,
2023 (the effective date of the termination of the Lease) and refund the balance of the funds to Tenant.
Landlord has enclosed herein a check and a statement for such refund.

Once Tenant has vacated the Premises as and when required, Landlord will deliver to Tenant a full and
final reconciliation statement for all amounts due and payable by Tenant under the Lease pre-
termination, under Utah law and otherwise arising in connection with Tenant's post-termination
possession of the Premises, including post-termination Fixed Rent and Additional Rent, property taxes,
statutory damages and attorney's fees.

Sincerely,

TELEGRAPH MARKET PLACE PARTNERS II, LLC,
a Utah limited liability company

By _____
By Eileen Higgins under Power of Attorney dated
    the 26th day of September, 2007

RECEIVED
APR 18 2023

Cc: J. Michael Martin – Telegraph Marketplace
Cc: Gregory Cropper, Esq.
Cc: Sills Cummis Radin Tischman Epstein & Gross, P.A., Attn: Jeffrey H. Newman, Esq.
Cc: Allan N. Rauch, Esq., Bed Bath & Beyond, 650 Liberty St., Union, NJ 07083

4892-0166-0250.v1

ck #2470
$17,740.50

| Telegraph Marketplace Partners II, LLC | | | | | Bed Bath & Beyond |
| | Monthly Rent | Days In Apr | Daily Rent | Days | Total to be Returned |
|---|---|---|---|---|---|
| Bed Bath | $20,675.63 | 30 | $689.19 | 6 | $4,135.13 |
| Bed Bath | Monthly Cams | | | | |
| | $1,500.00 | 30 | $50.00 | 6 | $300.00 |
| Total | $22,175.63 | | | | $4,435.13 |
| | | | | | $17,740.50 |

Telegraph Marketplace Partners II, LLC

C/O Eileen Higgins
226 Bronlow Drive
Irmo, SC 29063

# Credit Memo

| Date | Credit No. |
|---|---|
| 4/13/2023 | 175 |

| Customer |
|---|
| Bed Bath & Beyond #777<br>650 Liberty Street<br>Union, NJ 07083 |

| P.O. No. | Project |
|---|---|
|  |  |

| Description | Qty | Rate | Amount |
|---|---|---|---|
| Bed Bath Rent | | 16,540.50 | -16,540.50 |
| Bed Bath Cams as of 1/1/2023 | | 1,200.00 | -1,200.00 |

| | |
|---|---|
| **Total** | -$17,740.50 |
| **Invoices** | $0.00 |
| **Balance Credit** | -$17,740.50 |