**LOWENSTEIN SANDLER LLP**
Kenneth A. Rosen, Esq.
Mary E. Seymour, Esq.
Philip Gross, Esq.
One Lowenstein Drive
Roseland, NJ 07068
Telephone: (973) 597-2500
Email: krosen@lowenstein.com
Email: mseymour@lowenstein.com
Email: pgross@lowenstein.com

*Co-Counsel to Michaels Stores, Inc*

**WHITE & CASE LLP**
Gregory F. Pesce, Esq. *(pro hac vice pending)*
Laura E. Baccash, Esq. *(pro hac vice pending)*
111 South Wacker Drive, Suite 5100
Chicago, IL 60606-4302
Telephone: (312) 881-5400
Email: gregory.pesce@whitecase.com
Email:  laura.baccash@whitecase.com

-and-

Samuel P. Hershey, Esq. *(pro hac vice pending)*
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Email: sam.hershey@whitecase.com

-and-

Devin J. Rivero, Esq. *(pro hac vice pending)*
Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, FL 33131-2352
Telephone: (305) 371-2700
Email:  devin.rivero@whitecase.com

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| BED BATH & BEYOND INC., *et al.,* | Case No. 23-13359 (VFP) |
| Debtors.[1] | (Jointly Administered) |

**MICHAELS STORES, INC.'S REPLY TO OBJECTION OF**
**PINNACLE HILLS, LLC TO DEBTORS' MOTION FOR ORDER**
**AUTHORIZING DEBTORS TO ASSUME AND ASSIGN LEASE FOR STORE NO. 1142**

---

[1] The last four digits of Debtor Bed Bath & Beyond Inc.'s tax identification number are 0488. A complete list of the Debtors in these Chapter 11 Cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/bbby. The location of Debtor Bed Bath & Beyond Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 650 Liberty Avenue, Union, New Jersey 07083.

Michaels Stores, Inc. ("**Michaels**") respectfully states as follows (this "**Reply**") in response to the *Objection of Pinnacle Hills, LLC to Debtors' Motion for Order Authorizing Debtors to Assume and Assign Lease for Store No. 1142* [Docket No. 1323] (the "**Objection**"):[2]

### Preliminary Statement

1. As a retail business with over 360 stores as of the petition date,[3] a key component of the Debtors' ability to restructure is the right under the Bankruptcy Code to extract value from the assumption and assignment of unexpired leases for retail premises that the Debtors no longer seek to operate. On May 3, 2023, the Debtors filed their motion to establish bidding procedures for certain unexpired leases under section 365 of the Bankruptcy Code, which was granted on May 22, 2023 [Docket No. 422] (the "**Sale Procedures Order**"). The Debtors conducted an auction on June 26, 2023, and subsequently filed the *Notice of Assumption of Certain Unexpired Leases* (the "**Assignment Notice**") [Docket No. 1157].

2. One of the unexpired leases that the Debtors seek to assume and assign is for a retail premises located in the Pinnacle Hills Promenade (the "**Promenade**"), an open-air retail development containing 105 retail stores and restaurants (as amended and extended, the "**BBBY Lease**").[4] The Debtors seek to assume and assign this lease to Michaels, which was the sole bidder at the auction for the BBBY Lease.

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Objection.

[3] *See Declaration of Holly Etlin, Chief Restructuring Officer and Chief Financial Officer of Bed Bath & Beyond Inc., In Support the Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 10].

[4] The assumption and assignment of the BBBY Lease is subject to the Acquisition of Designation Rights Agreement, dated as of June 22, 2023, by and between Bed Bath & Beyond, Inc. and Michaels Stores, Inc. (the "**Designation Rights Agreement**").

3.       As set forth in detail below (*see* ¶¶ 8-10, *infra*), the BBBY Lease specifically provides the Debtors with the right to freely assign the Debtors' interest in that lease, subject only to certain non-permitted uses and pre-existing exclusivity provisions granted to only eight tenants in the Pinnacle Hills Promenade, none of which is Hobby Lobby Stores, Inc. ("**Hobby Lobby**"). The BBBY Lease further provides that the Debtors shall not be obligated to honor ***any other*** exclusivity provision that might be granted by Landlord to any tenant in the Pinnacle Hills Promenade, either at the time of execution of the BBBY Lease or in the future.

4.       Notwithstanding the Debtors' clear right under the BBBY Lease to assign that lease to Michaels, on July 12, 2023 Pinnacle Hills, LLC (the "**Landlord**") filed its Objection to the assumption and assignment of the BBBY Lease. Far from seeking to protect "the benefit of its bargain" (Obj. ¶ 28), the Landlord seeks to use the Debtors' bankruptcy to impermissibly improve on its position. The Objection argues, among other things, that the proposed assignment would violate sections 365(b)(3)(C) and (D) of the Bankruptcy Code by breaching the exclusive use provisions set forth in the Landlord's lease not with the Debtors, but with Hobby Lobby (the "**Hobby Lobby Lease**"), to which the Debtors are not party and which was entered into nearly 14 years after the BBBY Lease.

5.       The Landlord's proposed reading of section 365 of the Bankruptcy Code would lead to absurd results that have no basis in the plain language of the statute or applicable case law. Under the Landlord's proposed reading, debtors would be unable to assume and assign leases in shopping centers if such assignments allegedly violated a provision not in the lease between the debtor-tenant and landlord, but rather in ***any other tenant's*** lease. Thus, far from facilitating a debtor's ability to maximize the value of its estate for the benefit of its stakeholders, section 365 would stand as a potentially insurmountable obstacle to the assumption and assignment provisions

AMERICAS 124362052

of the Bankruptcy Code, a key tool in the monetization of leases, particularly in retail bankruptcy cases.

6. This case is a perfect example: there is no dispute that the BBBY Lease is void of any restrictive clauses that would prevent the assignment to Michaels. But, according to the Landlord, so long as ***any one*** of the 104 other leases in the Promenade shopping center contains language that would prohibit the proposed assignment—on a potentially infinite number of contractual provisions "including (but not limited to) provisions such as a radius, location, use, or exclusivity provision" (11 U.S.C. § 365(b)(3)(C))—then the assignment must be denied. Notably, these are provisions that the Debtors never agreed to and are not (and cannot be) aware of, as they are provisions in other parties' leases to which the Debtors lack access. Indeed, the Landlord's proposed interpretation of section 365 would lead to the absurd result that a debtor would have ***fewer*** rights in bankruptcy than outside of it. That is why the one case squarely on point and "on all fours" with the facts here—*In re Toys "R" Us, Inc.*—supports the Debtors' proposed assignment of the BBBY Lease and refutes the Landlord's position.[5] The Landlord conspicuously fails to bring this directly applicable recent and highly relevant authority to the Court's attention, much less distinguish it.

7. Additionally, citing no evidence, the Landlord argues that the assignment to Michaels would disrupt the tenant mix and balance in the Promenade, in purported violation of section 365(b)(3)(D). But as reflected in the *Declaration of Todd Powers in Support of Michaels Stores, Inc.'s Reply to Objection of Pinnacle Hills, LLC to Debtors' Motion for Order Authorizing Debtors to Assume and Assign Lease for Store No. 1142* (the "**Powers Declaration**"), filed

---

[5] *In re Toys "R" Us, Inc.*, 587 B.R. 304 (Bankr. E.D. Va. 2018).

contemporaneously herewith, the proposed assumption and assignment of the BBBY Lease to Michaels would do no such thing. Michaels and Hobby Lobby retail locations co-exist in numerous shopping centers across the country, and other stores in the Promenade shopping center sell many of the items that the Hobby Lobby lease purports to prohibit.

8.      For these reasons, and as more fully set forth herein, the Debtors respectfully request that this Court overrule the Objection and authorize the assumption and assignment of the BBBY Lease in accordance with the Designation Rights Agreement.

## Argument

**I.    Under the Plain Terms of the BBBY Lease, the Debtors Are Authorized to Assign the Lease to Michaels, and the Landlord Has Breached the Lease by Seeking to Block That Assignment Based on Another Tenant's Lease Agreement**

9.      The Landlord does not argue, and cannot argue, that the proposed assignment breaches the BBBY Lease. To the contrary, the plain terms of the BBBY Lease provide that the Debtors have the express right to assign their interest in that lease to Michaels. *See* BBBY Lease, §15.1.1.

10.     The BBBY Lease authorizes the Debtors to use the leased premises for any "Permitted Use", a broadly defined term that includes ***any*** lawful use not specifically prohibited by Section 13.1.1 of the BBBY Lease. *See* BBBY Lease § 1.1.27. Operation of a Michaels store is not an enumerated "Prohibited Use". Rather, "Prohibited Use" includes things like non-retail uses (*e.g.*, houses of worship or medical centers) and certain unsightly or unseemly uses that could impede the operation of the Pinnacle Hills Promenade (*e.g.*, discount stores, pawn shops, or tattoo parlors). BBBY Lease § 13.1.1, Ex. L. These terms have remained consistent during the approximately 16 years that the BBBY Lease has been effective, including two extensions and an

AMERICAS 124362052

amendment. Accordingly, "Permitted Use" encompasses the operation of a Michaels store, and the Landlord does not argue otherwise.[6]

11. Moreover, the BBBY Lease obligates the Debtors to honor only those "Existing Exclusives" granted by the Landlord to eight tenants as of the execution of the BBBY Lease, each as expressly enumerated in the lease.[7] Indeed, the BBBY Lease expressly disclaims any obligation by the Debtors to honor any exclusivity provisions besides the Existing Exclusives. *See* BBBY Lease § 13.3.2 ("Except as expressly set forth [herein], Tenant shall not be obligated to honor any exclusive granted by Landlord to any tenant in the Shopping Center."). It is, therefore, the Landlord—not the Debtors—who has breached the BBBY Lease by seeking to use "an exclusive granted by Landlord to an[other] tenant in the Shopping Center"—*i.e.*, Hobby Lobby—to block the Debtors' assignment of the BBBY Lease to Michaels, in violation of the express terms of the BBBY Lease.[8]

---

[6] For this reason, *In re TSW Stores of Nanuet Inc.*, which the Landlord purports to rely on and which involved a "restrictive use clause in the debtor's shopping center lease," is inapt. *See In re TSW Stores of Nanuet, Inc.*, 34 B.R. 299, 304 (Bankr. S.D.N.Y. 1983).

[7] Hobby Lobby is not one of the eight enumerated tenants. Rather, they are: (i) Build-a-Bear, (ii) Dairy Queen/Orange Julius, (iii) Fish City Grill, (iv) GNC, (v) Great American Cookie, (vi) Malco Theatre, (vii) P.F. Chang's China Bistro, and (viii) The Picture People. BBBY Lease § 13.1.1, Exh. K-1.

[8] The Landlord argues that "Section 15 of the Lease provides the Landlord with the right to terminate the Lease in the event of an unacceptable proposed assignment." Obj. ¶ 4 (citing BBBY Lease § 15.1.2). However, the Landlord also acknowledges that "[i]n the Chapter 11 context, this provision would operate as an unenforceable anti-assignment provision and cannot be taken at face value." Obj. ¶ 29. Moreover, the Landlord fails to mention that (i) the exercise of this termination right requires the Landlord to pay substantial damages to the Debtors (*see* BBBY Lease § 15.1.2) and (ii) the BBBY Lease also gives the Debtors "the right from time to time, ***without the consent of Landlord***, to assign Tenant's interest in this Lease and/or to sublet, concession or license ***all or any portion*** of the Premises for retail uses[.]" BBBY Lease § 15.1.1 (emphasis added).

II. **The Relevant "Shopping Center" Provisions of the Bankruptcy Code, 11 U.S.C. § 365(b)(3)(C)-(D), Do Not and Cannot Enlarge the Landlord's Rights Beyond the Applicable Lease Agreement Between the Landlord and the Debtors, and the Landlord's Proposed Reading of Section 365(b)(3)(C) Would Lead to Absurd Results That Would Hinder the Debtors' Ability to Maximize the Value of Their Assets under the Bankruptcy Code**

12. Unable to find support for its position in the BBBY Lease, the Landlord urges the Court to interpret section 365(b)(3)(C) to require that "even where the Debtor's own lease contains no effective exclusives or other use restrictions"—as is the case here—a proposed assignment must still be denied if it would "violate exclusive use provisions in other tenant leases." Obj. ¶¶ 22-23. Accordingly, the Landlord argues that because "the operation of a Michaels store at Pinnacle Hills Promenade would breach the exclusivity provision in the Hobby Lobby Lease," the proposed assignment must be denied. *Id.* ¶ 24. This argument (a) evidences a fundamental misunderstanding of the protections provided to a shopping center landlord[9] by sections 365(b)(3) of the Bankruptcy Code,[10] and (b) ignores and has been expressly rejected by authority directly on point.

13. ***First***, as explained by the United States Court of Appeals for the Fourth Circuit, "Congress's purpose in § 365(b)(3)(C) is to preserve the ***landlord's bargained-for protection***s with respect to premises use and other matters ***that are spelled out in the lease with the debtor-tenant***." *In re Trak Auto Corp.*, 367 F.3d 237, 244 (4th Cir. 2004) (emphasis added). For this

---

[9] There is no dispute that the Promenade is a "shopping center" within the meaning of section 365(b)(3) of the Bankruptcy Code.

[10] Section 365(b)(3) of the Bankruptcy Code has four subsections applicable to shopping centers, including subsections (C) and (D), which are at issue in this case. Subsection (C) requires adequate assurance "that assumption or assignment of such lease is subject to all the provisions thereof, including (but not limited to) provisions such as a radius, location, use, or exclusivity provision, and will not breach any such provision contained in any other lease, financing agreement, or master agreement relating to such shopping center." 11 U.S.C. § 365(b)(3)(C) (emphasis added). Subsection (D) requires adequate assurance "that assumption or assignment of such lease will not disrupt any tenant mix or balance in such shopping center."

AMERICAS 124362052

reason, directly applicable case law—which the Landlord failed to raise to this Court's attention, much less distinguish—supports the Debtors' proposed assignment.

14. Specifically, in *Toys "R" Us*, 587 B.R. 304, 307-08 (Bankr. E.D. Va. 2018), debtor Toys "R" Us ("**TRU**") proposed to assign a certain leased premises in a shopping center following a court-approved auction to Burlington Coat Factory. The landlord objected to the assignment, arguing that TRU had not satisfied the adequate assurance of future performance requirements of 11 U.S.C. § 365(b)(3) because the assignment of the lease to Burlington would violate the exclusivity provision of another lease[11] in the shopping center and would disrupt the shopping center's tenant mix and balance. *Id.* at 307 (Bankr. E.D. Va. 2018). *Id.* Recognizing that "the purpose of § 365(b)(3)(C) is to preserve the landlord's bargained-for protections with respect to premises use and other matters that are spelled out *in the lease with the debtor-tenant*," the bankruptcy court found that the assignment did not violate any terms in the debtor's lease and therefore approved the assignment. *Id.* at 309 (emphasis in original) (citations and quotation marks omitted).

15. *Toys "R" Us* is squarely "on all fours" with the facts here. Here, as in *Toys "R" Us*, the Debtors are owners of a national retail chain. Here, as in *Toys "R" Us*, the Debtors are seeking to assign one of their leases to the winner (in fact, the sole bidder) at a court-approved auction and preserve valuable lease rights for the benefit of the Debtors' estates. Here, as in *Toys "R" Us*, nothing in the applicable lease agreement between the Landlord and the Debtors prohibits the assignment. And here, as in *Toys "R" Us*, a landlord seeks to block the proposed assignment

---

[11] The second lease, which like here was located adjacent to the leased premises at issue, was entered into by the landlord with Ross Dress for Less in 2007 (eleven years after the entry into the lease with the debtor) and provided for an exclusive use of the premises for the "off-price" sale of apparel. The parties did not dispute that the proposed lease assignee of TRU, Burlington, would also be selling "off-price" apparel.

AMERICAS 124362052

based on exclusive use provisions contained not in the debtor's lease, but in another tenant's later lease. Faced with these identical facts, this Court should reach the same conclusion as the *Toys "R" Us* court and approve the assignment.[12]

16. **Second**, this Court should reject statutory interpretations that lead to absurd results. *United States v. Fontaine*, 697 F. 3d 221, 227 (3d Cir. 2012) (courts must "construe statutes sensibly and avoid constructions which yield absurd or unjust results"). The Landlord's interpretation of section 365(b)(3)(C) would lead to the absurd result of giving a debtor ***fewer*** rights in bankruptcy than it would have outside of bankruptcy. This case provides a perfect example. As explained above, no provisions in the BBBY Lease would impede the Debtors' ability to assign that lease to Michaels outside of bankruptcy. However, according to the Landlord, that right disappeared the moment the Debtors filed bankruptcy petitions, at which point their ability to assign the BBBY Lease became subject to the myriad assignment-related provisions in more than 100 other leases entered into between the Landlord and other tenants. Under this interpretation, the Bankruptcy Code would actually impede, rather than facilitate, the Debtors' ability to maximize the value of their assets, including valuable contract and lease assignment

---

[12] Moreover, the *Toys "R" Us* holding comports with similar rulings by other courts. *See, e.g.*, *In re Martin Paint Stores*, 199 B.R. 258, 266 (Bankr. S.D.N.Y. 1996), *aff'd sub nom. S. Blvd., Inc. v. Martin Paint Stores*, 207 B.R. 57 (S.D.N.Y. 1997) ("[W]hen all of the other factors point toward permitting the assignment, the exclusivity provision in another tenant's lease cannot stand in the way."); *In re Ames Dep't Stores*, 127 B.R. 744, 753 (Bankr. S.D.N.Y. 1991) ("Where there is no indication of any intention by Congress to do anything other than hold a shopping center debtor tenant to its bargain with a landlord and to leave intact the property interests of debtor and landlord as set forth in that bargain, the courts should not imply an additional non-bargained-for term.").

rights.[13]  That is an absurd result that is contrary to the intent of section 365 of the Bankruptcy Code and this Court should reject.[14]

17. Additionally, the Landlord's argument would hold debtors accountable for contractual terms that they never negotiated, did not agree to, and likely do not (and cannot) know. Sticking with the example of this case, the Hobby Lobby Lease was entered into nearly 14 years after the Debtors entered into BBBY Lease. Not only did the Debtors never agree to the terms of the Hobby Lobby Lease, but they were never presented those lease terms before the Hobby Lobby Lease was executed, much less given an opportunity to negotiate them. Indeed, the Debtors and Michaels were provided the Hobby Lobby Lease for the first time only a few days ago, after the Landlord filed the Objection, and only in redacted form. Yet, according to the Landlord, the Hobby Lobby Lease is just one of more than 100 undisclosed leases whose terms are binding on the Debtors now that they are in bankruptcy. Per the Landlord, so long as the Debtors' proposed assignment violates any one of the innumerable contractual provisions in those leases—"including (but not limited to) provisions such as a radius, location, use, or exclusivity provision"—then the assignment must be denied. Obj. ¶ 18 (citing 11 U.S.C. § 365). That, too, is an absurd result that this Court must avoid. *United States v. Fontaine*, 697 F. 3d at 227.

---

[13] That is particularly the case here, given that Michaels was the only bidder for the BBBY Lease at auction.

[14] *See Toys "R" Us,* 587 B.R. at 311 n.5 ("§ 365's intended purpose [is to allow for the maximizing the value of the bankruptcy estate.") (citing *In re Ames Department Stores, Inc*, 348 B.R. 91, 98 (Bankr. S.D.N.Y. 2006) ("Congress has determined that, subject only to certain statutory safeguards, the value of a debtor's leases should go to the debtor's creditors, and that leases can be sold to achieve that end—with or without landlord consent. . . . [T]he norm in bankruptcy [is] to implement that Congressional policy in order to benefit the general body of the debtor's creditors, and not the single creditor landlord that would like to get a lease back. I fully understand why a landlord would like to terminate a 1973 lease under which it gets a below market rate, but Congress has determined that the economic value in below market leases is to go to creditor bodies generally, and not to a windfall for a single creditor.")).

18. ***Third***, the proposed assignment comports with the plain language of section 365(b)(3)(C) because the assignment of the BBBY Lease to Michaels does not, and cannot, "breach" the provisions of any other lease agreement. Despite the repeated references in the Objection to purported "violations" of the terms in other leases,[15] that is not the language used in the statute. Rather, section 365(b)(3)(C) requires that an assignment "will not ***breach*** any such provision contained in any other lease." 11 U.S.C. § 365(b)(3)(C) (emphasis added). It is a fundamental principle of statutory interpretation that words should be given their plain meaning. *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989) (citing *Caminetti v. United States*, 242 U.S. 470, 485 (1917)). "Breach" is defined by Black's Law Dictionary as "a violation or infraction of a law, obligation, or agreement." *Black's Law Dictionary* (11th ed. 2019). Accordingly, consistent with elementary tenets of contract law, a breach can be committed only by a party to a contract or agreement. Where, as here, the debtor is a party to only one agreement, a "breach" of any other agreement is not possible.

19. Of course, one can easily imagine a scenario in which a debtor's assignment of a lease agreement could breach another lease agreement. For example, a debtor may be party to multiple lease agreements with the same landlord. In such a situation, the debtor should not be allowed to use the Bankruptcy Code to assign one of its lease agreements in breach of the others. Alternatively, a debtor may be party not just to a lease agreement, but may also be party or subject to a master agreement, which might be breached by a proposed assignment.[16] Indeed, the

---

[15] *See, e.g.*, Obj. ¶ 22 ("the proposed assignment would violate exclusive use provisions in other tenant leases").

[16] For example, *In re Three A's Holdings, LLC*, on which the Landlord purports to rely, involved an owner's association that sought to prevent a debtor from assigning its lease in breach of certain general covenants and restrictions applicable to the municipal development in which the debtor's lease was located. *See generally In re Three A's Holdings, L.L.C.*, 364 B.R. 550 (Bankr. D. Del. 2007).

legislative history reflects that this was the exact situation that Congress contemplated when drafting section 365(b)(3)(C):

> "Thus, in order to assure a landlord of his bargained for exchange, the court would have to consider such factors as . . . whether that business complies with the requirements of any *master agreement* . . . and whether the business proposed to be conducted would result in a breach of other clauses in *master agreements* . . . ."

H.R. Rep. No. 595, 95th Cong., 1st Sess. 349 (1977), 1978 U.S. Code Cong. & Admin. News 5963 (emphasis added). Thus, while a cross-breach of the kind Congress contemplated is certainly conceivable, there can be no dispute that a "breach" by the Debtors of any other Promenade lease agreement—particularly one that was entered into nearly 14 years after the BBBY Lease was executed—is not possible here. *See Toys "R" Us,* 587 B.R. at 310 ("The Lease was executed in 1996, long before the [other] Lease came into existence, and it contains no provision that requires compliance with the [other] Lease use restrictions. . . . [landlord's] 'plain language' argument that the proposed assignment must not breach a restriction in any other lease, 'regardless of whether that other lease is referred to in the lease sought to be assigned,' is misplaced.").

20.  **Fourth**, the imposition of the exclusivity provision in the Hobby Lobby Lease is a *de facto* anti-assignment provision, in violation of section 365(f) of the Bankruptcy Code. Section 365(b)(3) is not meant to be read in isolation. *LaSalle Nat'l Tr., N.A. v. Trak Auto Corp.*, 288 B.R. 114, 122 (E.D. Va. 2003). Rather, section 365(b)(3) must be read in conjunction with section 365(f), which it cross references. *Id.*; *In re Rickel Home Centers, Inc.,* 240 B.R. 826, 831 (D. Del. 1998).

21.  Section 365(f)(1) prohibits the enforcement in bankruptcy of anti-assignment clauses in leases. Specifically, section 365(f)(1) provides, in pertinent part:

> Except as provided in subsection(c) of this section, notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection....

22. Thus, 365(f)(1) section allows a debtor to assign a lease "notwithstanding a provision . . . that prohibits, restricts, or conditions . . . assignment." 11 U.S.C. § 365(f)(1); *In re Trak Auto Corp.*, 367 F.3d 237, 242 (4th Cir. 2004). Imposition of the exclusivity provisions in the Hobby Lobby Lease—to which the Debtors are not subject—would be tantamount to an impermissible anti-assignment provision, in contravention of section 365(f) of the Bankruptcy Code.

23. ***Fifth***, the Landlord argues that the proposed assignment should be denied because the Landlord faces the "risk of significant harm in the event that the Court approves the assignment" owing to punitive contractual provisions in the Hobby Lobby Lease. Obj. ¶ 25. Any alleged repercussions to the Landlord from its other agreements are not the responsibility of the Debtors and are irrelevant to the Court's inquiry under 365(b)(3)(C). In any case, as the *Toys "R" Us* court found, "a court order approving the assumption and assignment of a lease is a judicial action that may render the Landlord unable to comply with a restriction contained in another lease[]" and such order excuses the Landlord's performance with respect to the exclusive use restrictions contained in the later lease between the landlord and the other non-debtor tenant. *See Toys "R" Us,* 587 B.R. at 310. Accordingly, the "significant harm" that the Landlord invokes is illusory.

AMERICAS 124362052

### III. The Proposed Assignment Will Not Disrupt the Tenant Mix and Balance.

24. The Landlord's argument that the proposed assignment to Michaels would disrupt the shopping center's tenant mix in violation of section 365(b)(3)(D) also lacks merit. *See* Obj. ¶¶ 26-28. Initially, the Landlord offers no evidence to support this argument.

25. In fact, all available evidence is to the contrary. As explained in the Powers Declaration, Michaels and Hobby Lobby locations co-exist in more than 30 shopping centers across the country. Powers Decl. ¶ 3. There is no evidence that the proximity of Michaels and Hobby Lobby in any way impairs the tenant mix and balance at those shopping centers. *Toys "R" Us,* 587 B.R. at 310 (overruling landlord's objection based on "insufficient evidence to support a finding that assignment of the Lease . . . will disrupt the existing tenant mix and balance").

26. Moreover, various existing stores at the Promenade—such as Pottery Barn, Dollar Tree, Target, TJ Maxx, Harverty's, Williams Sonoma, Dillards, JC Penney and the Debtors themselves—sell many of the same items (art supplies, craft supplies, fabrics, photo frames, frames, framed art, wall art, and wall décor) that the Hobby Lobby Lease purports to prohibit other Promenade stores from selling. Powers Decl. ¶ 3; Obj. ¶ 6 (citing Hobby Lobby Lease § 7.3). It is therefore incorrect that the addition of Michaels would materially alter the existing tenant mix and balance. Nor is it the case that having multiple stores selling certain of the same products necessarily disrupts tenant mix and balance. Rather, in a shopping center comprising more than 100 stores and spanning more than 150 acres, it is often part of the design. Indeed, the Promenade website reflects that it contains five stores selling children's clothing, five department stores, six electronics stores, nine beauty stores, seven jewelry stores, seven sports and fitness stores and 28 women's clothing stores. *See* https://www.pinnaclehillspromenade.com/en/directory/. Accordingly, the Landlord's conclusory assertion that "[t]he operation of a second retailer selling

primarily arts and crafts supplies . . . will disrupt the carefully planned tenant mix and balance currently in place" has no basis.

27. Additionally, when considering whether an assignment would disrupt the tenant mix and balance, courts look first at the bargained-for exchange between the parties at issue—here, the Landlord and the Debtors. *See In re Ames Dept. Stores, Inc.*, 121 B.R. 160, 165 (Bankr. S.D.N.Y. 1990) ("It is, nevertheless, clear that section 365(b)(3)(D) must be interpreted to refer to contractual protections and not undefined notion of tenant mix."); *see also Toys "R" Us,* 587 B.R. at 310-311 n.4 (tenant mix intent must be established in reference to the lease between the debtor and landlord). Where there are no provisions in the BBBY Lease or any applicable master agreement regarding tenant mix and balance that would prohibit the assignment of the Lease to Michaels, such arguments are without merit. As discussed above, the BBBY Lease allows the assignment of the BBBY Lease to Michaels. If the co-existence of two stores selling craft items were truly detrimental to the tenant mix and balance at the Promenade, the Landlord would have and should have required terms preventing such a scenario in the BBBY Lease, either when that lease was first negotiated or upon any of its several renewals and amendment. The best evidence that the Landlord's argument lacks merit is that its bargained-for exchange with the Debtors reflects no such terms. Accordingly, it must be rejected. *See Toys "R" Us,* 587 B.R. (overruling landlord's objection because landlord "pointed to no provisions in the Lease or any applicable master agreement relating to tenant mix and balance that would prohibit the assignment of the Lease").

28. The Landlord's attempt to rely on *Matter of Federated Dept Stores, Inc.* is misplaced. There, the court denied a proposed assignment for reasons that are inapplicable here. As the court summarized:

AMERICAS 124362052

> "This case involves preservation of the value of a 'super-regional mall' valued at nearly one-quarter billion dollars. The Court is concerned about the impact upon value to the owner and 170 tenants when a full-line anchor tenant of 25 years duration in a three-story 210,000 square foot building attempts to assign its lease to . . . a newcomer to the market, a limited user of part of this space, and a company embarking on a risky experimental expansion of its usual way of conducting business."

*Matter of Federated Dep't Stores, Inc.*, 135 B.R. 941, 946 (Bankr. S.D. Ohio 1991). The facts at issue in this case are distinct in all respects.

### IV. The Proposed Cure Amount Is Proper

29. The Landlord purports to dispute the cure amount proposed by the Debtors because it allegedly fails to include the Landlord's "attorneys' fees incurred to date." *See* Obj. ¶ 8. But as the Landlord's own cases provide, "attorney's fees are not independently recoverable under the Bankruptcy Code." *In re Crown Books Corp.*, 269 B.R. 12, 15 (Bankr. D. Del. 2001) (cited at Obj. ¶ 10). Rather, "section 365(b)(1)(B) allows for such recovery if based upon the existence of a separate agreement between the parties." *Id.* Here, there is such a "separate agreement between the parties"—the BBBY Lease. Under the BBBY Lease, a party is entitled to attorneys' fees only if that party prevails in a dispute regarding the lease. *See* BBBY Lease § 23.7 ("[i]n any action or proceeding hereunder . . . the prevailing party shall be entitled to recover from the other party the prevailing party's reasonable costs and expenses in such action or proceeding, including reasonable attorneys' fees, costs and expenses"). Accordingly, if the Landlord does not prevail on the Objection, it will not be entitled to any attorneys' fees, and its objection to the proposed cure amount should be overruled.

### V. The Landlord Must Pay Attorneys' Fees in Connection with This Dispute

30. As noted above, the BBBY Lease provides that "[i]n any action or proceeding hereunder . . . the prevailing party shall be entitled to recover from the other party the prevailing

AMERICAS 124362052

party's reasonable costs and expenses in such action or proceeding, including reasonable attorneys' fees, costs and expenses." BBBY Lease § 23.7. Accordingly, should the Debtors prevail in this dispute, they are entitled to receive payment of their attorneys' fees, costs and expenses from the Landlord. Additionally, Michaels reserves the right to seek payment of its attorneys' fees, costs and expenses should the Landlord continue to litigate after the assignment of the BBBY Lease is approved.

### VI.  Payment for Accrued But Not Yet Billed Amounts is Provided for

31. The Landlord states that, "where an agreement between the debtor and assignee attempts to limit the obligations assumed by the assignee only to obligations arising after the closing, there has not been a complete assignment" and that accordingly "either Debtors must make arrangement for such payment by establishment of a segregated, reserve account for [payment of accrued but yet unbilled obligations] or the proposed assignee must have responsibility for such yet unbilled obligations." *See* Obj. ¶ 33.

32. The Landlord's argument is without merit. The Landlord will be made whole by the (a) Debtors' payment of cure costs required to assume and assign the BBBY Lease and (b) amounts that Michaels will pay going-forward under the Designation Rights Agreement. *See* Assignment Notice at 2. In the Assignment Notice, the Debtors' proposed cure costs for the Lease was $28,384.75 with an effective assumption date of July 18, 2023. The Designation Rights Agreement provides the following:

> "[i]n addition to assuming ***all obligations that become due and are required to be paid during the Designation Period*** . . . upon the effective date of the assumption and assignment of any [BBBY] Lease(s) . . . [Michaels] shall assume (i) all obligations under such [BBBY] Lease(s) that ***both become due and accrue after the Sale Closing*** with respect to the [BBBY] Lease(s) and (ii) ***cure all outstanding liabilities that were (x) due and/or (y) accrued but not yet due prior to the Sale Closing*** under the applicable [BBBY] Lease(s) with respect to the [BBBY]

AMERICAS 124362052

> Lease(s), which cure amounts, if any, are solely limited to the amounts listed for each applicable [BBBY] Lease set forth on Schedule A thereto (the "**Cure Costs**")."

*See* Designation Rights Agreement ¶ 5 (emphasis added). On Schedule A to the Designation Rights Agreement, the Cure Costs for the Lease are properly listed at $28,384.75, which is in accordance with the Assignment Notice.

33. For any amounts that accrued *prior* to the Court's entry of the proposed sale order, the Landlord will receive the Cure Costs to pay such amounts, and for any amounts that accrued *after* the Court's entry of the proposed sale order, Michaels will pay any such carrying costs. Michaels and the Debtors complied with the Sale Procedures Order in order to assume and cure all outstanding liabilities with respect to the BBBY Lease. The Landlord will, therefore, be made whole for any amounts due prior to the commencement of the Designation Rights Period and will continue to be made whole by Michaels once the Designation Rights Period begins.

## Reservation of Rights

34. Michaels reserves the right to amend or supplement this Reply to the Objection and to assert any other rights, arguments, and remedies under and relating to the BBBY Lease, the Bankruptcy Code, or other applicable law, including the right to raise additional arguments or objections at the hearing and to interpose amended or further replies at a later date as may be warranted by the attendant facts and circumstances.

## Conclusion

For the reasons stated above, Michaels respectfully requests that the Court (i) overrule the Objection, (ii) approve the assumption and assignment of the BBBY Lease to Michaels, and (iii) grant such other and further relief as is the Court deems just and proper.

AMERICAS 124362052

Dated: July 17, 2023

**LOWENSTEIN SANDLER LLP**

By: /s/ *Kenneth A. Rosen*
Kenneth A. Rosen, Esq.
Mary E. Seymour, Esq.
Philip J. Gross, Esq.
One Lowenstein Drive
Roseland, NJ 07068
Telephone (973) 597-2500
E-mail: krosen@lowenstein.com
Email: mseymour@lowenstein.com
E-mail: pgross@lowenstein.com

-and-

**WHITE & CASE LLP**
Gregory F. Pesce, Esq. *(pro hac vice pending)*
Laura E. Baccash, Esq. *(pro hac vice pending)*
111 South Wacker Drive, Suite 5100
Chicago, IL 60606-4302
Telephone: (312) 881-5400
Email: gregory.pesce@whitecase.com
Email: laura.baccash@whitecase.com
-and-

Samuel P. Hershey, Esq. *(pro hac vice pending)*
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Email: sam.hershey@whitecase.com

-and-

Devin J. Rivero, Esq. *(pro hac vice pending)*
Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, FL 33131-2352
Telephone: (305) 371-2700
Email: devin.rivero@whitecase.com

*Co-Counsel to Michaels Stores, Inc.*

AMERICAS 124362052