# EXHIBIT 1

**LEASE AGREEMENT**


Between


**NORTHWAY PROPERTIES, LLC,**
**a Delaware limited liability company**


**Landlord**


**and**


**BUY BUY BABY, INC.,**
**a Delaware corporation,**


**Tenant**


**Northway Mall**
**1440 Central Avenue,**
**Colonie, New York**


**Dated as of:  March _____, 2010**


\* \* \* \* \* \*


\* \* \* \* \* \*

# TABLE OF CONTENTS

Page

ARTICLE 1 BASIC TERMS AND DEFINITIONS ............................................... 1
    Section 1.1    Basic Terms and Definitions. ........................................... 1

ARTICLE 2 LEASE OF PREMISES; LEASE TERM; DELIVERY DATE ................... 5
    Section 2.1    Lease of Premises. .......................................................... 5
    Section 2.2    Term. ............................................................................... 5
    Section 2.3    Delivery Date. ................................................................. 6
    Section 2.4    Intentionally Deleted ...................................................... 8
    Section 2.5    Initial Co-Tenancy Condition. ....................................... 8
    Section 2.6    Permits Contingency. ..................................................... 9

ARTICLE 3 IMPROVEMENTS ...................................................................... 10
    Section 3.1    Landlord's Work and Tenant's Work. ........................... 10
    Section 3.2    Plan Approvals. ............................................................ 10
    Section 3.3    Performance of Work. .................................................. 10
    Section 3.4    Intentionally Omitted. .................................................. 13

ARTICLE 4 FIXED RENT, TAXES AND PERCENTAGE RENT: DETERMINATION
                  AND PAYMENT ........................................................... 13
    Section 4.1    Fixed Rent. ................................................................... 13
    Section 4.2    Payment of Rent. ......................................................... 13
    Section 4.3    Real Estate and Other Taxes. ...................................... 13
    Section 4.4    Percentage Rent. .......................................................... 15

ARTICLE 5 COMMON AREAS, THEIR USE AND CHARGES .............................. 18
    Section 5.1    Common Areas: Maintenance. ..................................... 18
    Section 5.2    Common Areas: Restrictions. ....................................... 20

ARTICLE 6 UTILITIES ............................................................................... 23
    Section 6.1    Utility Service .............................................................. 23
    Section 6.2    Interruption. ................................................................. 23

ARTICLE 7 SIGNS ..................................................................................... 23
    Section 7.1    Tenant's Building Signage. ........................................... 23
    Section 7.2    Pylon/Monument Signage. ........................................... 24
    Section 7.3    Signage: Alteration/Removal/Allocation. ..................... 24
    Section 7.4    Cooperation. ................................................................. 24
    Section 7.5    Signage and Building Restrictions and Criteria. ............. 24

ARTICLE 8 ALTERATIONS AND IMPROVEMENTS ......................................... 25
    Section 8.1    Alterations and Improvements. ..................................... 25

ARTICLE 9 REPAIRS .................................................................................. 27
    Section 9.1    Tenant's Repairs. .......................................................... <u>27</u>
    Section 9.2    Landlord's Repairs. ...................................................... 27
    Section 9.3    Legal Compliance Work. .............................................. 28

ARTICLE 10 INDEMNIFICATION, INSURANCE AND WAIVER OF
                  SUBROGATION ........................................................... 28
    Section 10.1    Mutual Release, Waiver of Subrogation and Mutual Indemnification. 28
    Section 10.2    Tenant's Insurance. ...................................................... 29
    Section 10.3    Landlord's Insurance. ................................................... 29
    Section 10.4    General Insurance Requirements. ................................. 30

ARTICLE 11 FIRE AND OTHER CASUALTY; EMINENT DOMAIN ...................... 31

i

Section 11.1     Fire and Other Casualty. ........................................................ 31
Section 11.2     Eminent Domain. .................................................................... 32
Section 11.3     Abatement of Rent Charges. .................................................... 34

ARTICLE 12 COVENANTS, REPRESENTATIONS AND WARRANTIES ............... 34
Section 12.1     Quiet Enjoyment. .................................................................... 34
Section 12.2     Authority. ............................................................................... 34
Section 12.3     Landlord's Covenants, Warranties and Representations. ................. 34
Section 12.4     Environmental Matters. ........................................................... 36
Section 12.5     OEA ....................................................................................... 38

ARTICLE 13 USES AND RESTRICTIONS ............................................................ 39
Section 13.1     Permitted and Prohibited Uses. ............................................... 39
Section 13.2     Tenant's Exclusive in Center ................................................... 39
Section 13.3     Exclusives Which Tenant Must Honor. .................................... 41

ARTICLE 14 CONDUCT OF BUSINESS OPERATIONS ....................................... 41

ARTICLE 15 TENANT ASSIGNMENT AND SUBLETTING .................................. 42
Section 15.1     Assignment and Subletting. ..................................................... 42
Section 15.2     Liability of Tenant. ................................................................. 42
Section 15.3     Collateral Assignment. ............................................................ 43
Section 15.4     Cure Rights of Original Tenant. .............................................. 43
Section 15.5     Recognition Agreement. .......................................................... 43

ARTICLE 16 DEFAULT AND DISPUTE RESOLUTION ....................................... 44
Section 16.1     Tenant Default. ....................................................................... 44
Section 16.2     Landlord Default. .................................................................... 45
Section 16.3     Arbitration. ............................................................................. 46

ARTICLE 17 RIGHT TO MORTGAGE AND NON-DISTURBANCE; ESTOPPEL
CERTIFICATE ................................................................................ 46
Section 17.1     Right to Mortgage and Non-Disturbance ................................. 46
Section 17.2     Estoppel Certificate. ............................................................... 47
Section 17.3     Existing Mortgages and Ground Leases. .................................. 47

ARTICLE 18 NOTICE ............................................................................................ 47

ARTICLE 19 TENANT'S PROPERTY ..................................................................... 48

ARTICLE 20 END OF TERM ................................................................................. 48
Section 20.1     Surrender of Premises. ............................................................. 48
Section 20.2     Hold Over. .............................................................................. 48

ARTICLE 21 TENANT'S RIGHT OF FIRST OFFER ............................................. 48

ARTICLE 22 ONGOING CO-TENANCY ............................................................... 49

ARTICLE 23 MISCELLANEOUS ........................................................................... 50
Section 23.1     Loading Facilities. ................................................................... 50
Section 23.2     Liens. ...................................................................................... 50
Section 23.3     Broker's Commission ............................................................. 50
Section 23.4     Force Majeure ......................................................................... 50
Section 23.5     Consents. ................................................................................ 50
Section 23.6     Costs. ...................................................................................... 51
Section 23.7     Attorneys' Fees. ...................................................................... 51
Section 23.8     Survival of Obligations. .......................................................... 51
Section 23.9     Non-Waiver. ............................................................................ 51
Section 23.10    Rights Cumulative. .................................................................. 51

3991270

Section 23.11    Definition of Landlord. ................................................................ 51
Section 23.12    Successors and Assigns................................................................ 51
Section 23.13    Limitation of Landlord's Liability. ............................................. 51
Section 23.14    Limitation of Tenant's Liability................................................... 52
Section 23.15    Joint and Several Liability.. ......................................................... 52
Section 23.16    Severability. ................................................................................ 52
Section 23.17    Grammatical Usages and Construction......................................... 52
Section 23.18    Table of Contents, Line Numbering and Paragraph Headings. ........ 52
Section 23.19    Definition of Hereunder, Herein, etc.. .......................................... 52
Section 23.20    Short Form Lease.. ...................................................................... 52
Section 23.21    Entire Agreement and Modification. ............................................ 52
Section 23.22    No Joint Venture or Partnership Created by Lease......................... 52
Section 23.23    Tenant's Tradename.  .................................................................. 53
Section 23.24    Counterparts. ............................................................................. 53
Section 23.25    Waiver of Trial by Jury. .............................................................. 53
Section 23.26    Governing Law............................................................................ 54

iii

## EXHIBITS

| | |
|---|---|
| Exhibit A | Legal Description of Shopping Center |
| Exhibit B | Site Plan |
| Exhibit C | Form of Rent Commencement and Expiration Date Agreement |
| Exhibit D | Landlord's Obligations (As-Is Delivery) and Tenant's Optional Work |
| Exhibit D-1 | Exterior Elevations of the Premises, and Sidewalk Plan |
| Exhibit D-2 | Existing Plans |
| Exhibit E | Permitted Encumbrances |
| Exhibit F | Signage |
| Exhibit G | Form of Subordination, Non-Disturbance and Attornment Agreement |
| Exhibit H | Form of Subtenant Recognition Agreement |
| Exhibit I | Form of Delivery Date Notice |
| Exhibit J | Form of Delivery Date Certification |
| Exhibit K-1 | Existing Exclusives |
| Exhibit K-2 | Existing Leases |
| Exhibit L | Intentionally Omitted |
| Exhibit M | Prohibited Uses |
| Exhibit N | Form of Mechanics' Lien Indemnification Agreement |
| Exhibit O | Form of Declaration of Restrictions Against Related Land (Use if Related Land exists) |

3991270

**LEASE AGREEMENT**

THIS LEASE AGREEMENT (*"Lease"*) is entered into as of March ___, 2010 by and between NORTHWAY PROPERTIES, LLC, a Delaware limited liability company, having an office at 654 Madison Avenue, New York, New York 10065 (*"Landlord"*), and BUY BUY BABY, INC., a Delaware corporation, having an office at 650 Liberty Avenue, Union, New Jersey 07083 (*"Tenant"*).

**W I T N E S S E T H :**

ARTICLE 1
BASIC TERMS AND DEFINITIONS

Section 1.1    Basic Terms and Definitions.  The following terms shall have the meanings set forth in this Section 1.1 except as otherwise expressly provided herein.

1.1.1    Additional Rent:  Any monies which Tenant is required to pay to Landlord under the terms and conditions of this Lease, other than Fixed Rent.

1.1.2    Affiliate:  A corporation, partnership, limited liability company, person or other entity which is controlling, controlled by, or under common control with, Landlord or Tenant, as the case may be.  As used herein, *"control"* shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person or entity, whether through the ownership of voting securities or rights, by contract, or otherwise.

1.1.3    Alternate Rent:  Payment of Percentage Rent (except that for purposes of this paragraph, the Sales Break Point shall be deemed to be One ($1.00) Dollar), not to exceed fifty percent (50%) of the amount of Fixed Rent which otherwise would have been payable during such period (the *"Cap"*).  Alternate Rent shall be payable within thirty (30) days after the end of the calendar month to which it pertains, and shall be payable in lieu of Fixed Rent and Percentage Rent normally payable under Article 4 below.  If the Alternate Rent for a calendar month does not exceed the Cap, such payment shall be accompanied by a statement prepared by an officer of Tenant setting forth the amount of "Gross Sales" (hereinafter defined in Subsection 4.4.2) achieved during, and the amount of Alternate Rent payable for, such month.

1.1.4    Common Areas:  All areas in the Shopping Center which are, from time to time, available for the joint use and benefit of Tenant and other tenants and occupants of the Shopping Center, and their respective employees, agents, subtenants, concessionaires, licensees, customers and other invitees, including, but not limited to, any and all parking areas, parking spaces, driveways, truck serviceways, passageways, sidewalks, entrances, exits, lighting facilities, courts, landscaped areas, retention or detention areas, and common utility lines.

1.1.5    Intentionally Omitted.

1.1.6    Delivery Date: As defined in Section 2.3 hereof.

1.1.7    Effective Date: The date hereof.

1.1.8    Event of Default:  As defined in Section 16.1 hereof.

1.1.9    Excused Periods:  Periods during which Tenant's (or, as the case may be, another tenant's) failure to conduct the operations of its business or any other business: (x) resulted from alterations or renovations being performed in and to the Premises, (y) was caused by damage or destruction, eminent domain proceedings or actions, or *Force Majeure*, or (z) was caused by any act or omission of Landlord, or its employees, agents, or contractors.

1.1.10 <u>Exhibits</u>.  The exhibits listed in the Table of Contents annexed to this Lease have been agreed to by the parties and attached hereto, it being the intention of the parties that they shall become a binding part of this Lease as if fully set forth herein.

1.1.10A. <u>Fixed Common Areas Charges</u>:  As defined in Section 5.1 hereof.

1.1.11 <u>Fixed Rent</u>:  The following amounts for the periods indicated:

(a)    For the period commencing on the Rent Commencement Date and ending on the last day of the "Initial Term" (defined in Subsection 1.1.43 below), at the rate of Two Hundred Eighty Five Thousand Twenty Eight and 60/100 Dollars ($285,028.60) per year [based on Seven and 66/100 Dollars ($7.66) per square foot of Floor Area in the Premises];

(b)    In the event Tenant exercises the first Renewal Option, for the first five (5) year Renewal Period, at the rate of Three Hundred Fifty Four Thousand Nine Hundred Eighty Three and 40/100 Dollars ($354,983.40) per year [based on Nine and 54/100 Dollars ($9.54) per square foot of Floor Area in the Premises];

(c)    In the event Tenant exercises the second Renewal Option, for the second five (5) year Renewal Period, at the rate of Three Hundred Ninety Seven Thousand Four Hundred Two and 80/100 Dollars ($397,402.80) per year [based on Ten and 68/100 Dollars ($10.68) per square foot of Floor Area in the Premises]; and

(d)    In the event Tenant exercises the third Renewal Option, for the third five (5) year Renewal Period, at the rate of Four Hundred Forty Three Thousand Nine Hundred Fifteen and 30/100 Dollars ($443,915.30) per year [based on Eleven and 93/100 Dollars ($11.93) per square foot of Floor Area in the Premises].

1.1.12 <u>Floor Area</u>:  The actual number of square feet of space contained on all floors within any building area in the Shopping Center (including the Premises) and, with respect to exterior areas, including all exterior areas leased to or exclusively used by one or more tenants (other than [exterior] loading dock areas, trash compactor areas, and trash container areas).  All measurements pursuant to this Subsection shall be from the exterior of outside walls or store front and/or to the centerline of any common walls, but in no event shall Floor Area within either the Premises or the remainder of the Shopping Center include any non-selling or storage space areas within any mezzanine, lower floor, second floor or, except as set forth above, any exterior areas.

1.1.13 <u>Force Majeure</u>:  As defined in Section 23.4 hereof.

1.1.14 <u>Ground Lessor</u>: The landlord under any existing or future ground or underlying leases encumbering or affecting all or any part of the Shopping Center.

1.1.15 <u>Intentionally Deleted</u>.

1.1.16 <u>Hazardous Substances</u>:  As defined in Subsection 12.4.1 hereof.

1.1.17 <u>Inducement Tenants</u>:  As defined in Subsection 2.3.1 hereof.

1.1.18 <u>Landlord</u>:  As defined in the preamble and Section 23.11 hereof.

1.1.19 <u>Landlord's Mailing Address</u>:  654 Madison Avenue, New York, New York 10065, or such other place and/or to the attention of such other person as Landlord may notify Tenant from time to time by notice given in accordance with the provisions of Article 18 hereof.  If the "Landlord" consists of more than one person, then notices given to the entity listed in Landlord's Mailing Address will be deemed to have been given automatically to all of the parties which constitute Landlord, and Tenant shall be entitled to rely exclusively on any notice sent by said entity.

2

1    1.1.20 Landlord's Work:  As defined in Section 3.1 hereof.

2    1.1.21 Lease Interest Rate: The then effective prime rate as published from
3  time to time in the "Money Rates" section of *The Wall Street Journal* (or any successor
4  publication thereto) plus two (2%) percent.

5    1.1.22 Legal Requirements: All laws, statutes, codes, acts, ordinances,
6  judgments, decrees, authorizations, directions and requirements of, and agreements with,
7  all governmental departments, commissions, boards, courts, authorities, agencies,
8  officials and officers, which now or at any time hereafter may be applicable to the
9  Premises, the Shopping Center, or any part(s) thereof.

10    1.1.23 Mortgagee:  Any state or federally regulated: bank, savings and loan
11  association, insurance company, pension fund, credit union, real estate investment trust,
12  or other institutional lender, which is not an Affiliate of Landlord, and which holds a
13  mortgage on the Shopping Center or is the beneficiary under a deed of trust encumbering
14  the Shopping Center.

15    1.1.24 Intentionally Deleted.

16    1.1.25 Percentage Multiple:  Four (4%) percent.

17    1.1.26  Percentage Rent:  As defined in Section 4.4 hereof.

18    1.1.27 Permitted Use: The sale (including the incidental rental), at retail of
19  infant, juvenile and children's goods and services, including, but not limited to, a variety
20  (in Tenant's sole discretion as to the mix and proportions) of the following: infant's,
21  juvenile's and children's  furniture, furnishings, beds (including, without limitation,
22  mattresses and bedding), changing tables, gliders and rockers (including coordinating
23  ottomans), high chairs, lamps, walkers, play yards, swings, car seats, booster seats,
24  carriages, strollers, cradles, playpens, cribs, toy or clothing chests, stuffed animals, games
25  and toys, bedding accessories, maternity clothing and related items, clothing and
26  accessories for infants, juveniles or children, apparel, layettes, shoes, toys, bottles, food
27  or formula for infants, juveniles and children, feeding items, safety items, nursing items,
28  health and beauty care items, drug remedies, diapers, wipes, bathroom and personal care
29  devices and items, indoor or outdoor play and recreational equipment, pacifiers, baby
30  safety items, diaper bags, nursing and bathing items, children's books, pregnancy books,
31  magazines, computer software, audio and video cassettes or tapes, picture frames, portrait
32  studio items and services, party supplies, invitations, greeting cards, gift items, arts and
33  crafts, stationery, teachers' and parents' resources, other educational and multi-media
34  children's items, hair cutting services, fitness center development and learning services,
35  and any and all other items sold or services provided from time to time in any store
36  owned or operated by Tenant or its Affiliate(s) (the aforementioned items are hereinafter
37  collectively referred to as the ***"Permitted Items"***); and for any other lawful retail use not
38  specifically prohibited by the provisions of Section 13.1.1 below.  In addition, Tenant
39  shall be permitted to use portions of the Premises for storage and office uses incidental to
40  the Permitted Use.

41    1.1.28 Premises: Being the area cross-hatched on Exhibit B hereto, having
42  dimensions as shown on Exhibit B and containing approximately: (i) thirty-seven
43  thousand two hundred ten (37,210) square feet of Floor Area, and (ii) one thousand
44  (1,000) square feet of mezzanine level space for office purposes.  In no event shall such
45  non-selling space (or any space used for fire pump facilities) result in any charge to
46  Tenant by way of Fixed Rent or any Additional Rent, nor shall such space be included in
47  the determination of Tenant's Pro Rata Share.

48    1.1.29 Renewal Option:  As defined in Section 2.2.2 hereof.

3

3991270

1.1.30 <u>Renewal Period(s)</u>:  three (3) successive periods of five (5) years each, as provided in Section 2.2.2 hereof.

1.1.31 <u>Rent</u>:  Fixed Rent and/or Additional Rent.

1.1.32 <u>Rent Commencement Date</u>: As defined in Section 2.2 hereof.

1.1.33 <u>Sales Break Point</u>:  As defined in Section 4.4.1 hereof.

1.1.34 <u>Shopping Center</u>:  The shopping center commonly known as Northway Mall Shopping Center, containing approximately two hundred nine thousand five hundred twenty-eight  (209,528) square feet of Floor Area, on the property located at the southeast corner of Interstate I-87 and U. S. Highway 5, in Colonie, New York, and more particularly described in <u>Exhibit A</u> hereto.  The Shopping Center is part of a larger retail development, which includes, in addition to the Shopping Center, the land and building owned by Dayton Hudson Corporation, identified as the "Target Parcel" on <u>Exhibit B</u>, and the land and building owned by an Affiliate of Landlord, identified as the "Lowes Parcel" on <u>Exhibit B</u>.  Anything contained in this Lease to the contrary notwithstanding, if Landlord or its Affiliate acquires title to or control over, by deed, ground lease or otherwise, the Target Parcel and/or the Lowes Parcel (or any portion of either parcel), then the Target Parcel and/or the Lowes Parcel (or such portion either parcel), as the case may be, shall be deemed to be included within the Shopping Center for all purposes and Landlord shall comply with its obligations imposed against the Shopping Center by this Lease regarding the Target Parcel and/or the Lowes Parcel (or such applicable portion of either parcel), as the case may be, including, without limitation, entering into an amendment to the short form lease or memorandum for recording pursuant to Section 23.20 below to reflect the foregoing.  Landlord shall not change the name of the Shopping Center without giving at least ninety (90) days prior notice to Tenant, and Landlord shall not include the name of any tenant (other than Tenant) in the name of the Shopping Center.

1.1.35 <u>Substantially Completed or Substantial Completion</u>:  The completion of specified work at the Shopping Center (including, without limitation, as applicable, Landlord's Work) to the extent that only "Punch List Items" of such work (defined in Subsection 3.3.3 below) shall not be completed.

1.1.36 <u>Taxes</u>:  As defined in Subsection 4.3.3 hereof.

1.1.37 <u>Tenant</u>:  As defined in the preamble hereof.

1.1.38 <u>Tenant's Mailing Address</u>:  650 Liberty Avenue, Union, New Jersey 07083, Attn: Mr. Eugene A. Castagna, President, or such other place and/or to the attention of such other person as Tenant may notify Landlord from time to time by notice given in accordance with the provisions of Article 18 hereof.

1.1.39 <u>Tenant's Permits</u>:  As defined in Subsection 2.3.1(b) hereof.

1.1.40 <u>Tenant's Property</u>:  All of Tenant's personal property, including, without limitation, phone and alarm systems, satellite antennae, shelving, computers, furniture, cash registers and customer service counters, specialty lighting, track lighting, millwork, conveyor systems, storage racks and signage and any and all other personal property of Tenant which is capable of being removed from the Premises without material damage thereto, but which shall not include electrical systems, heating, ventilation and air conditioning systems, and other mechanical systems, flooring, carpet, elevators, standard lighting and wiring installed within the walls of the Premises.

1.1.41 <u>Tenant's Pro Rata Share</u>:  A fraction whose numerator is the Floor Area of the Premises and whose denominator (the "***Denominator***") is the Floor Area of the Shopping Center as may be re-determined any time a building (and/or Floor Area) is

4

3991270

added to or removed from the Shopping Center, but in no event shall Tenant's Pro Rata Share be greater than Eighteen (18%) percent.  Floor Area shall be deemed added to or removed from the Shopping Center on the earlier of (i) the date upon which such Floor Area is Substantially Completed, or (ii) at such time as an assessment for Taxes is made or removed, as the case may be, with respect to such Floor Area.  Within thirty (30) days following written request from Tenant, Landlord shall certify to Tenant in writing as to the then Floor Area of the Shopping Center.

Notwithstanding the foregoing provisions, adjustments may be made to the Denominator used in the calculation of Tenant's Pro Rata Share with respect to Tax Increases in the following circumstance, in which event, notwithstanding the limits on the Tenant's Pro Rata Share set forth above, the subtraction of the Floor Area from the Denominator described below will be permitted and Tenant's Maximum Tenant's Pro Rata Share set forth above will be appropriately increased:

(a)    if any tenant or owner other than Landlord pays Taxes pursuant to a separate tax assessment of its premises (in which case this clause shall apply only to the improvement assessment and not the land assessment) and such separately assessed Taxes are not included in Taxes hereunder; or

(b)    if any tenant or owner other than Landlord pays Taxes pursuant to a separate tax assessment of its premises and no less than its pro rata share of the Common Area (in which case this clause shall apply to the improvement and land assessment) and such separately assessed Taxes are not included in Taxes hereunder;

then, to the extent, but only to the extent, that the above conditions are satisfied, when calculating the Tenant's Pro Rata Share of Increased Taxes, the Floor Area of the tenant paying such obligation directly shall be excluded from the Denominator, provided, however, that this exclusion shall not apply in any instance if it would not be equitable to do so.

1.1.42 <u>Tenant's Work</u>:  As defined in Section 3.1 hereof.

1.1.43 <u>Term</u>:  A period (the "***Initial Term***") of approximately ten (10) years beginning on the Rent Commencement Date and expiring at midnight on the last day of January following the tenth (10th) anniversary of the Rent Commencement Date, unless the Rent Commencement Date is February 1, in which event the Expiration Date shall be the day before the tenth (10th) anniversary of the Rent Commencement Date.  As used herein: (i) "***Term***" shall refer to the Initial Term, as the same may be extended by any Renewal Period exercised pursuant to Subsection 2.2.2 below; and (ii) "***Expiration Date***" shall mean the date on which the Term expires.

## ARTICLE 2
LEASE OF PREMISES; LEASE TERM; DELIVERY DATE

Section 2.1    <u>Lease of Premises</u>.  Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the Premises together with any and all rights, benefits, privileges and easements, now or hereafter appurtenant to either or both of the Premises and the Shopping Center, arising out of any public or private grant or authority, including, without limitation, the non-exclusive right and easement to use the Common Areas in common with other tenants and occupants of the Shopping Center.

Section 2.2    <u>Term</u>.

2.2.1    <u>Initial Term</u>.  Subject to the provisions of this Article 2, the Term of this Lease shall begin on the one hundred fiftieth (150th) day following the later of the Delivery Date or the "Permit Contingency Date" (hereinafter defined in Section 2.6) (the "***Rent Commencement Date***").  The Term shall expire on the Expiration Date, unless earlier terminated as herein provided.  When the Rent Commencement Date has been

1    determined, as provided in this Section, Landlord and Tenant shall execute, acknowledge
2    and deliver, each to the other, a written statement in the form attached hereto as Exhibit C
3    specifying the Rent Commencement Date.

4    2.2.2  Renewal Options.  Tenant shall have the right and option
5    (hereinafter a *"Renewal Option"*) to extend the Initial Term from the date on which it
6    would otherwise expire for three (3) successive renewal periods of five (5) years each
7    (individually, a *"Renewal Period"*, and collectively, the *"Renewal Periods"*) upon the
8    same terms and conditions as are herein set forth.  Each Renewal Option shall be
9    exercisable by notice given to Landlord at least two hundred seventy (270) days prior to
10   the commencement of the applicable Renewal Period(s).  In order to prevent the
11   inadvertent failure of Tenant to exercise any of the Renewal Options within the time
12   specified above, the Term of this Lease shall not expire unless and until Tenant fails to
13   exercise a Renewal Option within fifteen (15) days after receiving notice from Landlord
14   that the Renewal Option in question has not been exercised (Landlord's notice shall not
15   be given prior to the 270th day prior to the Expiration Date), or unless and until Tenant
16   gives notice to Landlord that it will not be exercising any remaining Renewal Options.  If
17   Landlord fails to give Tenant such notice prior to the Expiration Date, and Tenant
18   occupies the Premises after the Expiration Date, then Tenant shall remain in possession
19   subject to the provisions of this Lease but without the application of Article 20 hereof.  If
20   Landlord then gives Tenant such notice and Tenant exercises its Renewal Option, then
21   the effective date of such exercise shall be retroactive to the Expiration Date.

22   Section 2.3    Delivery Date.

23   2.3.1  Definition.  Subject to Landlord's delivery to Tenant of the Delivery
24   Date Notice in accordance with the provisions of Subsection 2.3.2 below and Landlord's
25   timely compliance therewith, Landlord shall be deemed to have delivered possession of
26   the Premises to Tenant at 8:00 a.m. on the date (the *"Delivery Date"*) following the day
27   on which all of the following conditions (the *"Delivery Date Conditions"*) shall have
28   occurred and Tenant shall have received from Landlord the Delivery Date Certification in
29   accordance with the provisions of Subsection 2.3.3 below, which shall constitute
30   Landlord's written certification that all of the following shall have occurred:

31   (a)    Actual possession of the Premises shall have been delivered
32   to Tenant water-tight, free of Hazardous Substances, broom clean and free of any
33   previous tenant's or occupant's furniture, fixtures, and equipment, in a good, structurally
34   sound condition, with all of Landlord's Work Substantially Completed, which Substantial
35   Completion shall be evidenced by a written certification by Landlord's architect to
36   Tenant;

37   (b)    Landlord shall have obtained (and delivered copies thereof to
38   Tenant, upon request) all permits and approvals required from all applicable
39   governmental authorities to enable Tenant to occupy and use the Premises for the conduct
40   of its business in the Premises (exclusive of building permits which may be necessary for
41   the performance of Tenant's Work and any business licenses which Tenant may be
42   required to obtain in order to open and operate its specific business and not a general
43   retail business (collectively *"Tenant's Permits"*)), which permits and approvals shall
44   include, without limitation, zoning and building code approvals, environmental
45   requirements, and a certificate of occupancy for the Premises (unless a certificate of
46   occupancy for the Premises cannot be obtained solely as a result of Tenant's Work not
47   having been commenced or completed, in which event the delivery of a certificate of
48   occupancy for the Premises shall not be a condition to the occurrence of the Delivery
49   Date);

50   (c)    The Common Areas, and all of the improvements thereto
51   shown on Exhibit B hereto shall have been Substantially Completed and operational, and
52   all off-site improvements (including, without limitation, street, storm drainage, and traffic

6

3991270

1      signalization improvements) required for the Shopping Center to open for business and
2      for Tenant to receive a permanent certificate of occupancy shall have been Substantially
3      Completed (it being agreed that if on the Delivery Date, the Common Areas and off-site
4      improvements are in substantially the same condition as they existed as of the Effective
5      Date, then the foregoing condition set forth in this subparagraph (c) shall be deemed
6      satisfied (with the exception of any work required to be performed in the Common Areas
7      as part of Landlord's Work as described on Exhibit D).  If any governmental authority
8      requires Tenant to provide same; Landlord, at its sole cost and expense, shall deliver
9      copies to Tenant, upon request of all permits and approvals required from applicable
10     governmental authorities to enable the Common Areas to be developed, operated, and
11     used for the purposes herein contemplated, which permits and approvals shall include,
12     without limitation, zoning, building code, environmental requirements, curb cut and site
13     plan approvals, construction, and development and use permits;

14            (d)    The representations and warranties of Landlord set forth in
15     subparagraphs (a) through (i) of Section 12.3 below shall then be true and in effect;

16            (e)    Leases or other occupancy agreements shall have been
17     entered into with the following tenants or occupants (hereinafter collectively referred to
18     as the *"Inducement Tenants"*) on the following terms, for occupancy of the premises
19     designated for them on Exhibit B; such leases shall not be cancelable by any of the
20     Inducement Tenants, except for injury to or loss of the premises thereby demised because
21     of fire or other casualty, or for a taking or for other reasons similar to those for which this
22     Lease is cancelable by Tenant:

| Inducement Tenants | Approximate Minimum Square-foot Gross Floor Area | Minimum Term |
|---|---|---|
| Target | 124,500 | 10 Years |
| Marshalls | 30,000 | 10 Years |
| Jo-Ann | 45,500 | 10 Years |
| Staples | 22,500 | 10 Years |

23

24            (f)    Landlord shall have delivered to Tenant, in recordable form, a
25     subordination, non-disturbance and attornment agreement substantially in the form
26     attached hereto as Exhibit G executed by each holder of any mortgage or deed of trust
27     encumbering or affecting the Shopping Center or any portion thereof (it being understood
28     and agreed that this Subsection 2.3.1 (f) is not intended to extend the date by which
29     Landlord is to deliver to Tenant any document(s) required pursuant to Section 17.3
30     hereof);

31            (g)    Any third-party approvals required under Article 3 of the
32     OEA for the performance of Landlord's Work and Tenant's Work (including, without
33     limitation, Tenant's elevations and signage, as shown on Exhibit D-1 and Exhibit F
34     hereto) shall have been obtained; and

35            (h)    The Declaration of Restrictions (hereinafter defined in
36     Section 13.2.5) is (x) fully executed, delivered and recorded in Clerk's Office of the
37     Albany County, New York, and (y) superior to all mortgages, deeds of trust and other
38     liens affecting the Related Land.

39         2.3.2   Delivery Date.

40            (a)    Landlord shall give Tenant at least thirty (30) days prior
41     notice of the Delivery Date, using the form of Delivery Date Notice attached hereto as
42     Exhibit I (the *"Delivery Date Notice"*).  Landlord's delivery of the Delivery Date Notice

3991270

1    shall be a condition precedent to the Rent Commencement Date. Notwithstanding any
2    provision of this Lease to the contrary, in no event shall the Delivery Date be deemed to
3    occur prior to the Delivery Date established in the Delivery Date Notice. No event of
4    Force Majeure occurring prior to the giving of the Delivery Date Notice shall serve to
5    delay the Delivery Date thereby established.

6            (b)    Landlord acknowledges that if it shall fail to satisfy all of the
7    Delivery Date Conditions by the Delivery Date as established in subparagraph (a) above,
8    subject to (i) Force Majeure (not to exceed thirty (30) days in the aggregate) and (ii)
9    Tenant Delays, Tenant will sustain substantial, additional costs and expenses, including,
10    without limitation, costs incurred in connection with contractors and subcontractors hired
11    to perform Tenant's Work, the exact amount of which would be impracticable or
12    extremely difficult to ascertain. If the Delivery Date does not occur by the date
13    established therefor in subparagraph (a) above , then, in addition to any other remedies
14    available to Tenant under this Lease, Tenant shall be entitled to offset against the initial
15    installment(s) of Fixed Rent hereunder, as liquidated reimbursement (and not as a
16    penalty) for all of the aforesaid costs incurred by Tenant, an amount equal to the sum of:
17    (i) Twenty-Five Thousand Dollars ($25,000), plus (ii) Five Thousand Dollars ($5,000)
18    for each day that the Delivery Date established in subparagraph (a) above is delayed. The
19    foregoing liquidated reimbursements represent the parties' good faith agreement as to an
20    amount which shall have been incurred by Tenant and which shall otherwise not be
21    susceptible of exact ascertainment. For purposes of this Lease, the term *"Tenant Delay"*
22    shall mean those acts or omissions of Tenant or its agents, employees, or contractors
23    which materially and adversely interfere with Landlord's capacity to satisfy the Delivery
24    Date Conditions and which are not within the scope of customary and usual delays in the
25    construction process. Within ten (10) days after the occurrence of a Tenant Delay,
26    Landlord shall notify Tenant, in reasonable detail, of the nature and existence of such
27    Tenant Delay and the estimated delay in Landlord's satisfaction of the Delivery Date
28    Conditions as a result of the Tenant Delay. Landlord's failure to so notify Tenant of such
29    Tenant Delay within the ten (10) day period shall be deemed a waiver of such Tenant
30    Delay.

31           2.3.3   Delivery Date Certification. Upon the satisfaction of all of the
32    Delivery Date Conditions, Landlord shall so certify to Tenant, using the form of Delivery
33    Date Certification attached hereto as Exhibit J.

34           2.3.4   No Waiver. Neither Tenant's acceptance of physical possession of
35    the Premises nor Tenant's opening of the Premises for business to the public prior to the
36    Delivery Date shall: (i) be deemed a waiver by Tenant of any of the Delivery Date
37    Conditions, or (ii) relieve Landlord of any obligation under this Lease, unless such
38    condition or obligation is expressly waived in writing by Tenant.

39           Section 2.4    Intentionally Omitted.

40           Section 2.5    Initial Co-Tenancy Condition.

41           2.5.1  As used herein, the ***"Initial Co-Tenancy Condition"*** shall mean that
42    each and every Inducement Tenant shall have accepted possession of its entire premises,
43    such premises shall have been substantially completed, and each Inducement Tenant
44    shall, if not already open for business, then be actively and continuously engaged in the
45    fixturing and merchandising therein.

46           2.5.2  If, on the Delivery Date, the Initial Co-Tenancy Condition has not
47    been satisfied, Tenant shall have the right, at its sole option, to:

48           (a)    accept delivery of physical possession of the Premises; or

8

1         (b)    defer its acceptance of delivery of physical possession of the
2     Premises to a later date (but not later than the date on which the Initial Co-
3     Tenancy Condition is satisfied and Tenant receives notice from Landlord thereof),
4     whereupon the Delivery Date shall be deemed to have occurred on the date that
5     Tenant actually accepts physical possession of the Premises (subject to the other
6     provisions of this Article 2 and the continuing satisfaction of the Delivery Date
7     Conditions); and

8     in either event, if the Rent Commencement Date occurs before the satisfaction of the
9     Initial Co-Tenancy Condition, Tenant shall be entitled to pay Alternate Rent in lieu of
10     Fixed Rent until the Initial Co-Tenancy Condition is satisfied and the Landlord gives
11     Tenant notice thereof, subject to any other applicable provisions of this Article 2.

12         2.5.3   In addition to the provisions of Subsection 2.5.2 above, if the Initial
13     Co-Tenancy Condition has not been satisfied by the first (1st) anniversary of the Delivery
14     Date established pursuant to Subsection 2.3.2(a) above, then Tenant shall have the right,
15     at any time prior to the satisfaction of the Initial Co-Tenancy Condition, upon giving
16     Landlord at least one hundred twenty (120) days' prior notice, to terminate this Lease as
17     of the date specified in said notice. Landlord may negate such termination by causing the
18     Initial Co-Tenancy Condition to be satisfied within thirty (30) days after the date on
19     which said termination notice is given. If this Lease is terminated hereunder, neither
20     party shall have any further liability under this Lease, except: (i) for those obligations
21     which survive the expiration or other termination of this Lease pursuant to the express
22     terms of this Lease, and (ii) Landlord shall promptly reimburse Tenant for all of its
23     reasonable third-party costs and expenses incurred in connection with this Lease,
24     including, without limitation, costs associated with the preparation and review of plans
25     and specifications, attorney's fees, and the performance of Tenant's Work, not to exceed
26     Seventy-five Thousand Dollars ($75,000).

27     Section 2.6    <u>Permits Contingency</u>.

28         2.6.1   Tenant shall use diligent efforts to obtain all of Tenant's Permits
29     (defined in Subsection 2.3.1(b) above) on or before the date that is one hundred eighty
30     (180) days following the Effective Date. Notwithstanding the provisions of this Article 2
31     to the contrary, if, despite Tenant's diligent efforts, all Tenant's Permits have not been
32     obtained by said date, Tenant shall have the right, upon notice given to Landlord prior to
33     the unconditional grant of all of Tenant's Permits, to: (a) delay its acceptance of physical
34     possession of the Premises to the date on which all of the Tenant's Permits have been
35     obtained, whereupon the Delivery Date shall be deemed to have occurred on such date
36     (subject to the other provisions of this Article 2 and the continuing satisfaction of the
37     Delivery Date Conditions); or (b) terminate this Lease. Tenant's exercise of its rights
38     under (a) above shall not preclude the subsequent exercise of its rights under (b) above.
39     The date on which all Tenant's Permits are unconditionally granted is referred to herein
40     as the "***Permit Contingency Date***".

41         2.6.2   If all of Tenant's Permits have not been obtained within three
42     hundred sixty-five (365) days after the date set forth in the first sentence of Subsection
43     2.6.1 above for any reason other than Landlord's failure to perform or observe any of its
44     obligations under this Lease, then Landlord shall have the option, upon notice given to
45     Tenant prior to the unconditional grant of all Tenant's Permits, to terminate this Lease,
46     <u>provided</u>, <u>however</u>, that Tenant shall have the right to avoid Landlord's termination by
47     giving notice to Landlord, within fifteen (15) days after receiving Landlord's termination
48     notice, of Tenant's waiver of its rights under Subsection 2.6.1 above, whereupon
49     Landlord's termination notice shall be rendered null and void.

50         2.6.3   In the event Tenant or Landlord elects to terminate this Lease
51     pursuant to this Section 2.6, this Lease shall cease and be deemed canceled and
52     terminated as of the date set forth in Tenant's or Landlord's notice of such termination

3991270

and upon such termination, Tenant and Landlord shall be relieved of any and all further liability hereunder, except for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease.

## ARTICLE 3
## IMPROVEMENTS

Section 3.1    <u>Landlord's Work and Tenant's Work</u>.  Landlord shall, at its sole cost and expense, perform the work and obligations described on <u>Exhibit D</u> (collectively, *"Landlord's Work"*), and shall deliver possession of the Premises to Tenant in the condition described therein.  Except for Landlord's Work, Tenant shall, at its own cost and expense, do any and all work (hereinafter referred to as *"Tenant's Work"*) which Tenant desires to adapt the Premises to Tenant's use.

Section 3.2    <u>Plan Approvals</u>.

3.2.1  <u>Preparation of Plans</u>.

(a)    Prior to the Effective Date, Landlord has delivered to Tenant the plans set forth on <u>Exhibit D-2</u> attached hereto (the *"Existing Plans"*), which plans Landlord represents and warrants are true and correct and accurately depict the building in which the Premises are located, and acknowledges that Tenant is relying on the accuracy of Existing Plans.

(b)    Within ninety (90) days after the Effective Date, Tenant shall prepare and submit to Landlord, in a single submission (which, in Tenant's reasonable opinion, shall be at least eighty-five percent (85%) complete), Tenant's preliminary plans and specifications for Tenant's Work (the *"Preliminary Plans"*).  Landlord shall have thirty (30) days from its receipt of the Preliminary Plans to approve or disapprove Tenant's Work depicted thereon, which plans and work shall be approved so long as they: (i) comply with all Legal Requirements, (ii) do not materially reduce or materially adversely affect the structural soundness of the building containing the Premises, (iii) do not materially adversely affect the Shopping Center buildings or systems and (iv) are not substantially different than customary Buy Buy Baby installations.  If Landlord shall fail to disapprove the Preliminary Plans with reasonable specificity within said 30-day period, the Preliminary Plans shall be deemed approved.  This Lease is subject to and conditioned upon Landlord's approval (or deemed approval) of the Preliminary Plans.  Following Landlord's approval (or deemed approval) of the Preliminary Plans, Tenant shall be entitled to make changes to same, which changes shall be deemed approved by Landlord so long as they comply with the foregoing clauses (i) (ii) (iii) and (iv) of this Subsection 3.2.1(b).

(c)    Within thirty (30) days after its receipt of notice of Landlord's approval of the Preliminary Plans, Tenant shall prepare and deliver to Landlord, for informational purposes only, final plans and specifications (the *"Final Plans and Specifications"*) based upon the approved Preliminary Plans.

3.2.2  <u>Intentionally Omitted</u>.

Section 3.3    <u>Performance of Work</u>.

3.3.1  Both Landlord's Work and Tenant's Work shall be performed in a good and workmanlike manner, in compliance with all applicable Legal Requirements, utilizing only new, first-class materials.  Landlord shall perform Landlord's Work in a manner such that Tenant will be able to obtain Tenant's Permits.  Landlord shall pay any and all impact fees and related governmental charges in connection with the Shopping Center and the Premises.  If Tenant's Permits cannot be obtained because Landlord's Work has not been completed or has been performed improperly or by reason of any then existing condition of the Shopping Center, Landlord shall remedy the situation so as to

1    enable Tenant to obtain Tenant's Permits, and the Delivery Date shall be deemed
2    delayed, for Tenant's benefit only, on a day-for-day basis for each day of delay
3    occasioned thereby.

4         3.3.2   If the Delivery Date shall not have occurred by June 30, 2010 (which
5    Delivery Date is subject to Tenant Delay (provided that Landlord shall have given Tenant
6    notice of such event of Tenant Delay as required herein), but is not subject to extension
7    as a result of Force Majeure), Tenant may thereafter, during such time as Landlord's
8    Work has not been commenced or the Delivery Date has not occurred, as the case may
9    be, consider Landlord to be in default hereunder and, at Tenant's option in its sole
10   discretion, elect to:

11                    (i)    terminate this Lease, if Landlord shall fail to fully cure
12        such default within thirty (30) days after receiving Tenant's notice thereof, in
13        which event neither party shall have any further liability hereunder, except: (i) for
14        those obligations which survive the expiration or other termination of this Lease
15        pursuant to the express terms of this Lease, and (ii) Landlord shall be obligated to
16        promptly reimburse Tenant, as Tenant's sole monetary remedy by reason thereof,
17        for all its reasonable third-party costs and expenses incurred in connection with
18        this Lease (including, without limitation, costs associated with the preparation and
19        review of plans and specifications, attorney's fees, and the performance of
20        Tenant's Work), not to exceed Seventy-five Thousand Dollars ($75,000) and/or

21                    (ii)   avail itself of the remedies set forth in Section 16.2
22        below (provided, however, that the cure period set forth therein shall not be
23        applicable); and/or

24                    (iii)  extend one or more times the date set forth above to
25        such future date designated by Tenant in notice given to Landlord, and as to any
26        extension granted, in addition to any other rights and remedies to which Tenant
27        may be entitled, the Rent Commencement Date shall be postponed by two (2)
28        days for each day of the extension granted.

29   The election by Tenant of any one or more of the foregoing remedies shall not preclude
30   the subsequent election of any alternative remedy provided in this Section, this Lease, at
31   law, or in equity.

32        3.3.3   Landlord's Work Performed After Delivery of Possession.   On or
33   before the Delivery Date, Landlord's and Tenant's representatives together shall conduct
34   a walk-through of the Premises to compile a punch list of the "Punch List Items"
35   (hereinafter defined).  Tenant shall deliver to Landlord a copy of said punch list within
36   five (5) days after the walk-through.  Landlord shall complete any Punch List Items
37   within ten (10) days after it receives a copy of said punch list.  If Landlord fails to
38   complete any item on said punch list within said 10-day period, Tenant shall have the
39   right to complete such item(s) using its own contractors and receive reimbursement from
40   Landlord for the reasonable costs and expenses thereof upon demand.  If reasonably
41   required by Tenant, any portion of Landlord's Work which is performed after Tenant
42   accepts physical possession of the Premises shall occur only "after hours", when neither
43   Tenant nor any of its agents, contractors, employees and servants are working within the
44   Premises, and Landlord shall reimburse Tenant for the reasonable costs and expenses
45   incurred by Tenant by reason of such "after hours" performance of Landlord's Work.  As
46   used herein, the term *"Punch List Items"* shall mean such minor items of a cosmetic
47   nature which, when considered as a whole, do not materially and adversely affect either
48   the performance of Tenant's Work or Tenant's ability to conduct its normal business
49   operations in the Premises.

50        3.3.4   Tenant's Right of Entry.  Prior to the Delivery Date, Tenant may
51   enter upon the Premises for the purposes of inspecting the work, taking measurements,

11

3991270

making plans, erecting temporary or permanent signs and doing such other work as may be appropriate or desirable without being deemed thereby to have taken possession or obligated itself to pay Rent, provided, however, that Tenant shall not, during the course of such work, materially interfere with the performance of Landlord's Work and shall indemnify and hold Landlord harmless from and against any and all claims or losses arising from Tenant's entry upon the Premises, except to the extent caused by Landlord, its agents, employees, or contractors.

3.3.5  Tenant's Leasehold Improvements.  Subject to Section 3.3.8 below, Tenant's Work and all other improvements erected by Tenant with respect to the Premises, together with any replacements thereof, shall be and remain the property of Tenant throughout the Term, and Tenant alone shall be entitled to the benefits of ownership thereof, including, but not limited to, depreciation of same as an asset for tax purposes.

3.3.6  Work Requirements After Delivery Date.  Following the Delivery Date, any construction by Landlord or other tenants or occupants of the Shopping Center affecting any portion of the Shopping Center shall be subject to the following terms and conditions:

(a)    staging and storage of materials and parking of construction vehicles shall occur only within the portions of the Shopping Center designated as "Staging" on Exhibit B hereto;

(b)    Landlord shall diligently ensure that, from and after Tenant's opening for business to the public, no ingress, egress or passage of any construction, delivery and related vehicles engaged in the performance of such work or other construction activities shall take place in a manner which will interfere (other than de minimus interferences) with vehicular access to the Premises from the roads adjacent to the Shopping Center or otherwise materially interfere with the normal conduct of any business operation in the Premises; and

(c)    Landlord shall maintain the Shopping Center in a clean, safe, and sightly condition, and shall use reasonable efforts to ensure that such construction shall not materially and adversely interfere with the normal conduct of any business operations in the Premises.

3.3.7  Tenant's Trailer.  Tenant shall have the right, subject to applicable Legal Requirements, to place a trailer on the Common Areas in an area immediately adjacent to the Premises, in the location shown on Exhibit B hereto, during the period commencing on the forty-fifth (45th) day prior to date on which Tenant has scheduled for the commencement of its fixturing in the Premises, until the twentieth (20th) day after said fixturing date (but not later than the date Tenant opens for business in the Premises), for the purpose of conducting employee interviews and recruiting.  Landlord shall install, at Landlord's expense, utility hookups to the trailer in accordance with the specifications set forth in Exhibit D hereto.

3.3.8  Tenant Allowance.  Landlord shall pay Tenant the sum of One Million One Hundred Ninety-One Thousand Twenty-Five and 00/100 Dollars ($1,191,025.00) (the *"Tenant Allowance"*) in consideration for Tenant's construction of "Landlord's Special Improvements" (defined below).  Landlord and Tenant hereby acknowledge and agree that the Tenant Allowance shall be in addition to Landlord's Work.  Landlord shall pay the Tenant Allowance to Tenant on or before the later of fifteen (15) days after the occurrence of all of the following: (i) the date Tenant opens for business in the Premises, and (ii) Landlord's receipt, at Tenant's discretion, of either (y) a lien waiver from Tenant's general contractor, or (z) an agreement regarding mechanics' and materialman's liens in the form attached hereto as Exhibit N.

12

3991270

If Landlord fails to provide Tenant with the Tenant Allowance or applicable portion thereof within twenty (20) days of the date due, then in addition to the rights and remedies under Section 16.2 of this Lease, Tenant shall have the right to a credit against one hundred percent (100%) of the Rent payable by Tenant hereunder, together with interest thereon at the Lease Interest Rate. The Tenant Allowance is an offset (and not an inducement) for Tenant's construction, on behalf of Landlord, of Tenant's Work (the *"Landlord's Special Improvements"*) (which Landlord's Special Improvements, together with any replacements thereof, when completed shall be the property of Landlord, subject to use by Tenant of same during the Term of, and in accordance with, this Lease). Landlord alone shall be entitled to depreciate the Landlord's Special Improvements as an asset for tax purposes, and Tenant shall not recognize income with respect to the Tenant Allowance. Tenant shall be responsible for and herewith agrees to pay all costs of Tenant's Work in excess of the Tenant's Allowance.

Section 3.4    Intentionally Omitted.

ARTICLE 4
FIXED RENT, TAXES AND PERCENTAGE RENT: DETERMINATION AND PAYMENT

Section 4.1    Fixed Rent.    Commencing on the Rent Commencement Date and continuing throughout the Term, Tenant shall pay to Landlord the Fixed Rent, in equal successive monthly installments, in advance, on the first day of each and every calendar month throughout the Term, except that Fixed Rent payable for any partial calendar month during the Term shall be prorated based on a 365-day year. Fixed Rent shall be paid without deduction or set-off, except to the extent otherwise expressly provided herein.

Section 4.2    Payment of Rent.    All Rent shall be mailed or otherwise delivered to Landlord's Mailing Address above or, upon at least thirty (30) days' prior notice to Tenant, to such other address as Landlord may from time to time designate. Landlord acknowledges and agrees that for administrative purposes, Tenant may designate a corporation or other entity to act as a paying agent (the *"Paying Agent"*), to make all Rent payments due to Landlord under this Lease. Said designation (which may be revoked by Tenant at any time) is not intended as, and shall not constitute, an assignment of any rights or obligations of Tenant to the Paying Agent, and Tenant shall remain primarily liable for payment of Rent under this Lease. All payments of Rent received by Landlord from the Paying Agent shall be credited to Tenant as if such payments of Rent had been made by Tenant directly to Landlord.

Section 4.3    Real Estate and Other Taxes.

4.3.1    Landlord shall pay on or before the due dates thereof all "Taxes" (defined in Subsection 4.3.3 below) other than personal property taxes levied against tenants. Throughout the Term, Landlord shall cause the Shopping Center to be maintained entirely within tax parcels and lots that exclude any property not a part of the Shopping Center.

4.3.2    (a)    Commencing as of January 1, 2011, Tenant shall pay to Landlord Tenant's Pro Rata Share of Tax Increases (hereinafter defined) which are payable during calendar years occurring during the Term, subject to the provisions of this Section 4.3. It is understood and agreed that Tenant shall have no obligation to pay Tax Increases that are payable during calendar years after the expiration or earlier termination of the Term, notwithstanding that such Tax Increases may be attributable to a period within the Term. Any Tax Increases for a calendar year, only a part of which is included within the Term, shall be adjusted between Landlord and Tenant on the basis of a 365-

13

day year as of the Rent Commencement Date or the date on which the Term expires or earlier terminates, as the case may be, for the purpose of computing Tenant's Pro Rata Share of Tax Increases. If, by law, any Taxes may, at the option of the taxpayer, be paid in installments (whether or not interest shall accrue on the unpaid balance thereof), Landlord shall exercise such option so as to maximize the number of installments, and Landlord shall pay the same as they come due and before any fine, penalty, interest or cost may be added thereto for nonpayment thereof.

(b)    As used in this Lease, "*Tax Increases*" shall mean, with respect to any particular calendar year during the Term, the amount by which the aggregate Taxes for such calendar year exceed the Base Year Taxes; and "*Base Year Taxes*" shall mean all Taxes payable during the Base Year. As used herein, "*Base Year*" shall mean calendar year 2010. The amount of Taxes attributable to any such calendar year occurring during the Term shall be the amount of Taxes payable during such year.

(d)    Landlord shall submit to Tenant a copy of each bill for Taxes issued by the applicable taxing authority, a computation of the Tax Increase and Tenant's Pro Rata Share of such Tax Increase and proof of the payment of Taxes for the previous payment period, as well as copies of all notices concerning assessments, tax rates, and changes thereto (a "*Tax Bill Statement*"). Tenant shall pay Landlord in the amount required by this Subsection 4.3.2 within thirty (30) days after receipt of such Tax Bill Statement (but in no event earlier than the fifteenth (15th) day prior to the date on which such Taxes would become delinquent).

4.3.3  As used herein, "*Taxes*" shall mean all general, *ad valorem* real estate taxes, and assessments for betterments and improvements that are levied or assessed by any lawful authority on the Shopping Center (general or special), including any substitution therefor, in whole or in part, due to a future change in the method of taxation. Taxes shall be reduced by any deferral, abatement, or other tax-lowering adjustment received by Landlord from the taxing authorities. For purposes of computing Tenant's Pro Rata Share of Taxes, Taxes shall not include any: (1) income, excise, profits, estate, inheritance, succession, gift, transfer, franchise, capital, or other tax or assessment upon Landlord or upon the rentals payable under this Lease; (2) taxes on rents (other than to the extent that such taxes are customarily paid by retail tenants in the state in which the Shopping Center is located), gross receipts or revenues of Landlord from the Premises; (3) fine, penalty, cost or interest for any tax or assessment, or part thereof, which Landlord or its lender failed to timely pay (except if same are caused by an Event of Default); (4) assessment for a public improvement arising from the initial construction or expansion of the Shopping Center or the Premises (it being agreed that all assessments imposed during the Term which are permitted to be included within Taxes hereunder shall, for the purposes of computing Tenant's Pro Rata Share thereof, be deemed to have been paid in the maximum number of installments permitted by the applicable taxing authority); (5) Taxes resulting directly from an increase in the assessment caused by a sale or ground lease of all or any portion of the Shopping Center to an Affiliate of Landlord or more than once every five (5) years; or (6) fees imposed upon Landlord in connection with Landlord's development of the Shopping Center (including, without limitation, trip generation fees). All Taxes payable by Tenant pursuant to this Section 4.3 shall be determined as if the Shopping Center was the only property owned by Landlord. Landlord represents to Tenant that, as of the Effective Date and, to the best of Landlord's knowledge, as of the anticipated Delivery Date, no portion of the Shopping Center is or will be (i) subject to or the beneficiary of an abatement, exemption and/or phase-in of Taxes, (ii) subject to any special assessments or similar charges, or (iii) included in any special improvement district(s) which would result in higher sales taxes or other similar impositions than would exist in the absence of such district(s). Landlord estimates that the Base Year Taxes will be approximately $2.78 per square foot of Floor Area in the Premises.

14

4.3.4  At Tenant's request, Landlord shall contest the amount or validity of any assessed valuation or Taxes, failing which, Tenant shall have the right to contest the assessed valuation or Taxes by appropriate proceedings conducted in good faith, whereupon Landlord shall cooperate with Tenant, execute any and all documents required in connection therewith and, if required by any governmental authority having jurisdiction, join with Tenant in the prosecution thereof.  If, as a result of any contest or otherwise, any rebate or refund of Taxes is received, Tenant shall be entitled to Tenant's Pro Rata Share thereof (after reasonable and customary expenses incurred by Landlord and/or Tenant in connection with such contest are paid to the party which incurred such expense).

Section 4.4    Percentage Rent.

4.4.1  Payment.  (a) During and for each full calendar year during the Term, Tenant shall pay annual percentage rent (*"Percentage Rent"*) equal to four percent (4%) (the *"Percentage Multiple"*) of all "Gross Sales" (hereinafter defined in Subsection 4.4.2) resulting from business conducted in, on or from the Premises during such calendar year in excess of the following:

| Time Period | Sales Break Point |
|---|---|
| Rent Commencement Date to end of first full calendar year of the Initial Term. | No Percentage Rent payable |
| First day of the second full calendar year of the Initial Term, through the end of the Initial Term | $7,000,000 Sales Break Point; provided that the Percentage Rent payable shall not exceed $120,000 per year |
| During the First Renewal Period | $8,400,000 Sales Break Point; provided that the Percentage Rent payable shall not exceed $144,000 per year |
| During the Second Renewal Period | $9,240,000 Sales Break Point; provided that the Percentage Rent payable shall not exceed $158,400 per year |
| During the Third Renewal Period | $10,164,000 Sales Break Point; provided that the Percentage Rent payable shall not exceed $174,240 per year |

Within sixty (60) days after the close of each calendar year, Tenant shall furnish to Landlord a compilation prepared by an officer of Tenant setting forth the amount of Gross Sales during the preceding calendar year and showing the amount of Percentage Rent, if any, required to be paid by Tenant for such calendar year, provided, however, that Tenant shall not be required to provide such compilation if the amount of Gross Sales for such calendar year is less than ninety percent (90%) of the Sales Break Point. The full amount of any Percentage Rent due shall be paid to Landlord simultaneously with the furnishing of said compilation.  Notwithstanding the foregoing, Gross Sales generated during any period when Alternate Rent is payable under this Lease shall be excluded from the determination of Gross Sales for purposes of computing Percentage Rent hereunder.

(b)    Notwithstanding anything to the contrary contained in this Lease, during the fourth (4th) through the tenth (10th) full calendar years of the Term, a minimum percentage rent (the *"Minimum Percentage Rent"*) shall be payable by Tenant regardless of the amount of Gross Sales, but which shall be fully credited against the Percentage Rent otherwise due under Subsection 4.4.1(a) above. The Minimum Percentage Rent shall be an amount equal to seventy-five (75%) percent of the actual Percentage Rent, if any, payable by Tenant pursuant to this Lease during the third (3rd) full calendar year of

3991270

the Term.  Commencing as of the fourth (4th) full calendar year of the Term, one-twelfth (12th) of the Minimum Percentage Rent, if any, for each full calendar year shall be payable on the first day of each month of said calendar year; however, the parties recognize that the Minimum Percentage Rent will not be able to be calculated until after the first payment would be due during the fourth (4th) calendar year of the Term.  The parties therefore agree that during the fourth (4th) calendar year of the Term only, the first payment of Minimum Percentage Rent shall be payable on April 1 of such year and shall be equal to four (4) months' payments.

4.4.2  Definition of Gross Sales.  As used herein, the term *"Gross Sales"* shall mean the total amount of all sales of merchandise or services completed at the Premises by Tenant or any sublessee, licensee or concessionaire of Tenant (subject, however, to Subsection 4.4.6) and any other person or entity operating in the Premises (for purposes of this Subsection 4.4.2 only, collectively, *"Tenant"*), whether for cash, credit or otherwise, including redemption of gift certificates and gift cards.  Tenant shall record, at the time of each Gross Sale, all receipts from such sale, whether for cash, credit or otherwise, in a cash register or cash registers, or in such electronic or computer device which records sales in a manner which is generally acceptable by industry standards.  The term *"Gross Sales"* shall exclude: **(1)** proceeds from any sales tax, gross receipts tax or similar tax, by whatever name called, which are separately stated and are in addition to the sales price, **(2)** *bona fide* transfers or exchanges of merchandise from the Premises to any other stores or warehouses of Tenant or any Affiliates of Tenant, and returns to shippers and manufacturers for credit, **(3)** refunds or credits given to customers for merchandise returned or exchanged at the Premises (regardless of where or how purchased), **(4)** sales of Tenant's fixtures and equipment not in the ordinary course of Tenant's business, **(5)** to the extent of prior inclusion in Gross Sales, bad debts when written off the books of Tenant, provided that any collections made on account of such bad debts shall be included in Gross Sales when received, **(6)** receipts from vending machines installed solely for the use of Tenant's employees and receipts from pay telephones, **(7)** sales to employees of Tenant at discount (which, for the purposes of determining Percentage Rent hereunder, shall not exceed two percent (2%) of Gross Sales per calendar year or pro rata portion thereof, as applicable), **(8)** fees paid to independent third party credit card, charge card, debit card, and check verification/guaranty companies in connection with sales charged to or debited from customers' credit cards, charge cards, or debit cards, or sales paid for by customers by checks, as applicable, **(9)** proceeds from delivery, gift-wrapping and check cashing charges (which, for the purposes of determining Percentage Rent hereunder, shall not exceed two percent (2%) of Gross Sales per calendar year or pro rata portion thereof, as applicable), **(10)** sums and credits received in settlement of claims for loss or damage to merchandise, **(11)** separately stated service, finance and interest charges, **(12)** the dollar value of coupons utilized by customers in the purchase of merchandise from the Premises, **(13)** close-out or bulk sales of inventory to jobbers or wholesalers, **(14)** sales of gift certificates and/or gift cards, and **(15)** forfeited deposits.

4.4.3  Books and Records.  Tenant shall maintain at the Premises or at its principal office, complete books and records reflecting all elements of Gross Sales. Tenant shall be allowed to maintain its books and records in a computerized form; provided, however, that (i) such computerized books and records provide the same level of information as the books and records described above, are retained for the full record retention period provided for herein, and (ii) promptly upon request, printed copies of any such books and records are made available at Tenant's principal office for inspection by Landlord's representatives who are engaged in inspecting and/or auditing Tenant's books and records as provided herein.  Such books and records shall be kept in accordance with generally accepted accounting principles (or successor accounting standards) and practices consistently applied and shall be retained by Tenant for at least three (3) years following the end of the calendar year to which they refer.

16

4.4.4  Landlord's Right to Audit.  Landlord and/or Landlord's auditor shall have the right, upon at least thirty (30) days prior notice to Tenant (but not more than once per annum), to inspect and/or audit the records of Tenant relating to Gross Sales.  If any such audit discloses a deficiency in the Gross Sales reported by Tenant, Tenant shall pay any deficiency in Percentage Rent owing to Landlord on account of such deficiency.  If such deficiency is in excess of three (3%) percent of the Gross Sales reported by Tenant and Percentage Rent is then payable, Tenant shall also pay Landlord's reasonable costs of the inspection and audit.  Tenant has not and does not make any representation or warranty as to the amount of Gross Sales which are anticipated from the Premises.

4.4.5  Confidentiality.  Landlord shall not disclose to any third party Tenant's Gross Sales or the amount of Percentage Rent paid or payable by Tenant, provided, however, that (i) such information was not previously disclosed by Tenant to such third party or to the public generally, and (ii) nothing contained herein shall restrict Landlord from disclosing such information as may be required by applicable Legal Requirements or to its accountants, attorneys, *bona fide* prospective purchasers, or current or prospective Mortgagees or underlying lessors of all or any portion of Landlord's interest in the Shopping Center (provided that each of such recipients shall be bound to the same non-disclosure provisions as are imposed upon Landlord).

4.4.6  Licensees.  If Tenant enters into any agreement(s) with any non-Affiliate person or entity (hereinafter, the *"Licensees"*) permitting the Licensees to operate businesses or concessions within the Premises, then, in lieu of including the Gross Sales actually achieved by such Licensee(s) from such licensed portion of the Premises, Tenant may elect to include in Gross Sales an amount equal to the product obtained by multiplying (i) the Floor Area of such licensed space, by (ii) the average Gross Sales per square foot of Floor Area for the remainder (*i.e.*, the unlicensed portion) of the Premises.  The provisions of this Subsection 4.4.6 shall not apply to more than 4,000 square feet of Floor Area, in the aggregate, in the Premises at any one time.  If more than 4,000 square feet of the Floor Area of the Premises is licensed to Licensees at any one time, then Tenant shall have the right to designate, from time to time, those portions of the Premises which will be entitled to the benefit of this Subsection 4.4.6.

4.4.7  Adjustment for Assignees and Sublessees.  In the event an assignee of this Lease or any sublessee of all or any portion of the Floor Area of the Premises does not use the Premises (or, as applicable, the subleased portion thereof) as a store specializing primarily in the sale of the Permitted Items, then the Percentage Multiple and the Sales Break Point shall be amended, with respect to the Premises (or, as applicable, the subleased portion thereof), to such other percentage (the *"Adjusted Percentage Multiple"*) and such other break point (the *"Adjusted Break Point"*) as shall, as of the effective date of such assignment or sublease, be then generally applicable to such use of the Premises (or, as applicable, the subleased portion thereof) by normal and accepted business standards applicable to such use, taking into consideration (i)  the location of the Shopping Center, and (ii) the nature of the Shopping Center (*e.g.*, strip center, mall, power center, etc.) [it being agreed that with respect to any sublease covering less than all of the Floor Area of the Premises, the following shall apply: (1) the Sales Break Point relating to any portion of the Premises so subleased shall be the quotient of (aa) the annual base subrent payable by each sublessee under the terms of its sublease on account of the calendar year for which Percentage Rent is being determined, divided by (bb) the Adjusted Percentage Multiple applicable to such sublessee, and (2) the Sales Break Point relating to the non-subleased portions of the Premises shall be determined by dividing the product of (x) the Fixed Rent for the calendar year for which Percentage Rent is being determined per square foot of the Premises, and (y) the Floor Area of such retained portion of the Premises, by the Percentage Multiple.

17

4.4.8  Any dispute between the parties relative to the provisions of this Section 4.4, including, without limitation, the amount of Percentage Rent payable by Tenant, shall be submitted to arbitration in accordance with the provisions of Section 16.3 of this Lease.

## ARTICLE 5
## COMMON AREAS, THEIR USE AND CHARGES

Section 5.1    Common Areas: Maintenance.

5.1.1  Maintenance of Common Areas.  Landlord shall operate, maintain, repair and replace the Common Areas as required by this Lease and otherwise to the standard by which Common Areas of first-class shopping centers in the state in which the Shopping Center is located are operated, maintained, repaired and replaced, including, without limitation, snow, ice, rubbish and debris removal (including installation and maintenance of sidewalk refuse containers), landscaping (including, without limitation, the trimming and pruning of trees to avoid interference with the use or visibility of canopies or signs on the exterior of the Premises), adequate lighting, insurance, supervision, use, parking lot paving and striping, drainage, security (as reasonably required), and control of all Common Areas, and Landlord shall comply with all applicable Legal Requirements.

5.1.2  Fixed Common Areas Charges and Increased Insurance Charges.

(a)    During the Term, Tenant shall pay to Landlord a fixed charge per square foot of Floor Area (hereinafter referred to as the *"Fixed Common Areas Charges"*) for Landlord to operate, maintain and repair the Common Areas.  From the Rent Commencement Date through the end of the first full calendar year of the Term, the fixed charge per square foot of Floor Area for Fixed Common Areas Charges shall be One and 78/100 ($1.78) Dollars per square foot of Floor Area per annum.  Thereafter, the Fixed Common Areas Charges per square foot of Floor Area shall increase at the rate of two percent (2%) for each subsequent calendar year of the Term.  Thus, for example, through the end of the first full calendar year of the Term, based on 37,210 square feet of Floor Area, Fixed Common Areas Charges shall be Sixty Six Thousand Two Hundred Thirty Three and 80/100 Dollars ($66,233.80) per annum, and during the second and third calendar years of the Term, Sixty Seven Thousand Five Hundred Fifty Eight and 48/100 Dollars ($67,558.48) per annum and Sixty Eight Thousand Nine Hundred Nine and 64/100 Dollars ($68,909.64) per annum respectively.  Commencing as of the Rent Commencement Date, Fixed Common Areas Charges shall be paid by Tenant in equal monthly installments on the first day of each calendar month, in advance, during each calendar year of the Term.  Fixed Common Areas Charges for any period during the Term which constitutes less than a full calendar year shall be equitably prorated.

(b)    Commencing as of January 1, 2011, Tenant shall pay to Landlord Tenant's Pro Rata Share of the amount (hereinafter referred to as the *"Increased Insurance Charges"*), if any, equal to the Insurance Charges (as hereinafter defined in Section 10.3.3) payable by Landlord with respect to such calendar year less the Base Insurance Amount (as hereinafter defined).  *"Base Insurance Amount"* shall mean the Insurance Charges paid by Landlord during calendar year 2010.  Equitable adjustments shall be made to the Base Insurance Amount to treat as paid in calendar year 2010 all amounts that should have been paid in such calendar year, regardless of whether Landlord paid them on a timely basis and to include Insurance Charges that would have been paid by Landlord had the Shopping Center been fully completed, operational and tenanted for the entire calendar year if any portion of it is not so completed, operational and tenanted during any portion of calendar year 2010.  In addition, other equitable adjustments shall be made to the Base Insurance Amount from time to time as reasonably necessary, including adjustments necessary to reflect new buildings and/or common areas that may be added to the Shopping Center during the term, so that the Increased

18

1    Insurance Charges accurately reflect actual increases in Insurance Charges and not
2    changes in the insurance included therein or the timing of billing or payments, the intent
3    being that Increased Insurance Charges shall include increases in costs of the included
4    insurance, and not the cost of insurance that was not being maintained by Landlord
5    during the Base Year, or costs resulting from billing or payment timing differences.
6    Commencing on January 1, 2011, Tenant's Pro Rata Share of Increased Insurance
7    Charges shall be paid in equal monthly installments on the first day of each calendar
8    month, in advance, during each calendar year based on Landlord's reasonable budget.
9    Landlord estimates that the Base Insurance Amount will be approximately sixty cents
10   ($.60) per square foot of Floor Area in the Premises.  Tenant's Pro Rata Share of
11   Increased Insurance Charges for any period during the Term which constitutes less than a
12   full calendar year shall be equitably prorated.

13              (c)    Within one hundred twenty (120) days after the end of each
14   calendar year, Landlord shall provide to Tenant a statement, in detail reasonably
15   satisfactory to Tenant, of the Insurance Charges (the *"Insurance Reconciliation
16   Statement"*).  The Insurance Reconciliation Statement shall be certified by Landlord as
17   being accurate (other than for de minimis mathematical errors) and shall be accompanied
18   by (i) documentation  supporting the applicable Insurance Charges, (ii) a calculation of
19   Tenant's Pro Rata Share of Increased Insurance Charges, and (iii) payment to Tenant in
20   the amount of any overpayment made by Tenant during the preceding calendar year.  If
21   Tenant's Pro Rata Share of the actual Increased Insurance Charges for a calendar year
22   shall exceed the aggregate monthly installments paid by Tenant during said calendar
23   year, Tenant shall pay to Landlord the deficiency within sixty (60) days after receipt of
24   such notice. Upon Tenant's request, Landlord shall promptly deliver to Tenant copies of
25   relevant backup materials (including, but not limited to, contracts, correspondence and
26   paid invoices) reasonably required by Tenant.  If Landlord fails to timely remit to Tenant
27   the amount of any overpayment hereunder, which failure continues for more than sixty
28   (60) days after written notice thereof from Tenant, Tenant shall have the right (in addition
29   to any rights and remedies to which it may be entitled under this Lease, at law, or in
30   equity) to offset such amount from payments of Fixed Rent next becoming due
31   hereunder, together with interest thereon at the Lease Interest Rate from the date such
32   remittance is due until reimbursement or full satisfaction by credit.

33              5.1.3   Intentionally Omitted.

34              5.1.4   Tenant's Pro Rata Share of Snow Removal Charges.

35              (a)    During the Term, Tenant shall pay to Landlord Tenant's Pro
36   Rata Share of the reasonable costs (hereinafter referred to as the *"Snow Removal
37   Charges"*) paid by Landlord to remove snow and ice in the Common Areas.  Tenant's
38   Pro Rata Share of Snow Removal Charges shall be paid in equal monthly installments on
39   the first day of each calendar month, in advance, during each calendar year based on
40   Landlord's reasonable budget for such costs.  If Snow Removal Charges cover more than
41   the Common Areas of the Shopping Center (e.g. if the service extends to the Lowe's
42   Parcel and/or the Target Parcel), Tenant's Pro Rata Share shall be calculated accordingly.

43              (b)    Within one hundred twenty (120) days after the end of each
44   calendar year, Landlord shall provide to Tenant a statement, in detail reasonably
45   satisfactory to Tenant, of Snow Removal Charges for such year, which statement shall be
46   prepared in accordance with generally accepted accounting principles consistently
47   applied (the *"Snow Removal Reconciliation Statement"*).  The Snow Removal
48   Reconciliation Statement shall be certified by Landlord as being accurate (other than for
49   de minimis mathematical errors) and shall be accompanied by a calculation of Tenant's
50   Pro Rata Share of Snow Removal Charges, and payment to Tenant in the amount of any
51   overpayment made by Tenant during the preceding calendar year.  If Tenant's Pro Rata
52   Share of the actual Snow Removal Charges for a calendar year shall exceed the aggregate
53   monthly installments paid by Tenant during said calendar year, Tenant shall pay to

19

Landlord the deficiency within sixty (60) days after receipt of such notice. Upon Tenant's request, Landlord shall promptly deliver to Tenant copies of relevant backup materials (including, but not limited to, contracts, correspondence and paid invoices) reasonably required by Tenant. If Landlord fails to timely remit to Tenant the amount of any overpayment hereunder, which failure continues for more than sixty (60) days after written notice thereof from Tenant, Tenant shall have the right (in addition to any rights and remedies to which it may be entitled under this Lease, at law, or in equity) to offset such amount from payments of Fixed Rent next becoming due hereunder, together with interest thereon at the Lease Interest Rate from the date such remittance is due until reimbursement or full satisfaction by credit.

5.1.5   In no event shall Tenant be required to join, participate in or contribute to any promotional fund, marketing fund or merchants' association.

Section 5.2    Common Areas; Restrictions.

5.2.1   Continuous Access. No entrances, exits, approaches and means of ingress and egress to, from, and/or within the Shopping Center or the Premises as shown on Exhibit B hereto shall be interrupted or disturbed by any act or omission of Landlord during the Term, except: (i) in the event of an emergency or as may be otherwise required by applicable Legal Requirements, in which event Landlord shall use reasonable efforts to give Tenant advance notice of same and to minimize interference to Tenant's normal business operations in the Premises as a result thereof; or (ii) in the event that Landlord is required to temporarily close the Common Areas, for the minimum time legally necessary to prevent a dedication thereof or an accrual of any rights in any person or the public generally therein; provided that such closure shall not occur during August, November or December of any calendar year, and Landlord shall give Tenant at least thirty (30) days' prior notice thereof.

5.2.2   No Alterations. Landlord shall not, without obtaining Tenant's prior written consent in each instance, which consent may be withheld in its sole discretion: **(i)** alter the area of the Shopping Center or the location, availability, or size of any Common Area improvement located within the area designated as "Critical Area" on Exhibit B hereto, (the *"Critical Area"*), from that shown on Exhibit B hereto; **(ii)** construct or permit to be constructed any structures in the Critical Area//Common Areas of the Shopping Center (including, without limitation, any buildings, kiosks, booths, signs or similar structures in the Critical Area), other than as shown on Exhibit B hereto; or **(iii)** materially change the entrances or exits to and from the Shopping Center, or the curb cuts, roadways, drive aisles, sidewalks or other elements of the Common Areas, or the number, location or layout of parking spaces, located within the Critical Area from those shown on Exhibit B hereto. Landlord shall neither perform nor permit to be performed, any construction, repairs, replacements or maintenance to any portion of the Shopping Center, including the Premises (other than emergency repairs to utilities and Common Areas) during the months of August, November and December of any year, without the prior consent of Tenant, which consent may be withheld in Tenant's sole discretion.

5.2.3   Out Buildings. In addition to the provisions of Subsection 5.2.2 above, during the Term, the following restrictions shall encumber and bind the outbuildings (collectively, the *"Outbuildings"* and individually, an *"Outbuilding"*) designated on Exhibit B hereto as "Parcel A," "Parcel B," "Parcel C," and "Parcel D": (a) no Outbuilding shall exceed one story in height; (b) no Outbuilding shall exceed a maximum height of twenty-two feet (22') as measured from the finished floor level to the highest point on such building or structure (inclusive of the height of all types of projections or architectural treatments or embellishments thereon, such as, but without limitation, HVAC equipment, parapets, mansards, signs, satellite dishes, and antennae); and (c) the Floor Area of any Outbuilding shall not exceed the Floor Area established therefor on Exhibit B hereto. For purposes of this Subsection 5.2.3, the Floor Area of any

3991270

20

Outbuilding shall also be deemed to include outdoor balconies, patios or other outdoor areas utilized for retail sales or food or beverage service (exclusive of drive through or walk-up take-out food or beverage service).

5.2.4  <u>Parking Area</u>.  During the Term, Landlord shall maintain in the Shopping Center, at a minimum, the greater of (i) the number of parking spaces required by applicable Legal Requirements, without variance, or (ii) with respect to (y) the portion of the Shopping Center designated as Critical Area on <u>Exhibit B</u>, the amount of ground-level parking spaces shown on <u>Exhibit B</u> as of the Effective Date (provided, however a de minimis reduction of said spaces shall be permitted, but in no event shall such reduction result in a loss of more than three (3) parking spaces), and (z) the remainder of the Shopping Center, exclusive of the Critical Area, four (4) ground-level parking spaces for every one thousand (1,000) square feet of Floor Area in such portions of the Shopping Center, with each such space being at least nine (9) feet in width and eighteen (18) feet in length.  Parking spaces shall at all times be clearly marked by painting, striping or otherwise.  Landlord shall not designate specific parking spaces for use by other tenants or occupants of the Shopping Center, nor shall Landlord permit any person or entity to use the parking areas other than Tenant, the other tenants and occupants of the Shopping Center, and their respective employees, agents, subtenants, concessionaires, licensees, customers, and invitees.  Notwithstanding the foregoing, subject to the rights of tenants under Existing Leases and applicable Legal Requirements, Tenant shall have the right to maintain in the location identified on <u>Exhibit B</u> as the "Expectant Mother Parking Area", a minimum of six (6) parking spaces reserved for the exclusive use of expectant mothers and/or parents with infants who are customers of Tenant (the ***"Expectant Mother Parking Spaces"***).  The Expectant Mother Parking Spaces shall be prominently marked and/or signed as reserved for expectant mothers and/or parents with infants who are customers of Tenant.  Landlord agrees, in the event that any tenant or occupant of the Shopping Center objects to Tenant's right to maintain the Expectant Mother Parking Spaces, Landlord shall, at Landlord's cost and expense, use commercially reasonable and diligent efforts to protect and safeguard Tenant's right to maintain the Expectant Mother Parking Spaces.  Landlord shall promptly forward to Tenant any notice or other communication received by Landlord from any other tenant or occupant of the Shopping Center objecting to Tenant's right to maintain the Expectant Mother Parking Spaces and shall keep Tenant informed of Landlord's efforts to protect and safeguard Tenant's right to maintain said spaces.  If the Expectant Mother Parking Spaces are prohibited by Legal Requirements or under an Existing Lease and/or requires the consent of a tenant or occupant under an Existing Lease and despite Landlord's diligent efforts, such tenant or occupant requires the removal of the Expectant Mother Parking Spaces, Tenant shall remove any signage or other markings designating the reservation of said spaces.  There shall be no charge whatsoever levied for the use of any parking areas within the Shopping Center.  Landlord shall not permit overnight parking in the Shopping Center, except that Tenant shall be entitled to park overnight in the parking lot located in front of the Premises one box truck that is used exclusively for delivery of merchandise purchased by Tenant's customers.

5.2.5  <u>Lighting</u>.  Throughout the Term, Landlord shall keep the Common Areas fully lighted and open to the customers of the Shopping Center seven (7) days a week from dusk until 11:00 p.m. Monday through Saturday and until 7:00 p.m. on Sunday (***"Normal Hours"***).  Upon request of Tenant, Landlord shall keep the Common Areas lighted for as long after Normal Hours as Tenant shall request, <u>provided</u> Tenant shall pay for a share of the reasonable cost of said requested lighting, which share shall be equal to the product of (x) such cost, and (y) a fraction, the numerator of which shall be the number of square feet of Floor Area within the Premises and the denominator of which shall be the aggregate number of square feet of Floor Area of all premises within the Shopping Center (including the Premises) open later than Normal Hours (<u>excluding</u>, however, those tenants and occupants who separately control and pay for their own Common Area lighting).  In addition to the foregoing, Landlord shall provide for low

21

level security lighting from one (1) hour after the close of business in the Premises until dawn.

5.2.6  Repairs. During the Term, any construction or repair by Landlord permitted or required under this Lease and undertaken in the Common Areas or in any other portion of the Shopping Center shall:

(a)  not be performed during the months of August, November, or December of any year, except in the event of an emergency or as may be otherwise required by applicable Legal Requirements;

(b)  be commenced only upon at least five (5) days' prior notice to Tenant (except in an emergency, in which event Landlord shall only be required to give such notice as is reasonable under the circumstances); and

(c)  be performed in accordance with the requirements of Subsection 3.3.6 above and in such a manner so as not to materially interfere with the normal conduct of any business operations in the Premises.

5.2.7  Rules and Regulations. Tenant shall comply with the rules and regulations of the Shopping Center as established from time to time by Landlord, within sixty (60) days after Landlord notifies Tenant thereof, provided they: (i) are reasonable, (ii) do not adversely affect the normal conduct of any business operations in the Premises, (iii) do not adversely affect any of Tenant's rights under this Lease, and (iv) are uniformly enforced against all tenants of the Shopping Center and without prejudice against Tenant. In the event of any conflict between the provisions of this Lease and any rules or regulations, the provisions of this Lease shall prevail and govern.

5.2.8  Miscellaneous.

(a)  No Promotional Use. Landlord shall not use or permit the use of all or any portion of the Common Areas for retail sales or for promotional purposes. Notwithstanding the foregoing provision, tenants of the Shopping Center (including Tenant) shall be permitted to display seasonal merchandise and conduct sidewalk sales in front of their respective stores only, provided that such sales shall: (A) be conducted in a manner consistent with sidewalk sales in first-class shopping centers in the state in which the Shopping Center is located, (B) not materially interfere with normal pedestrian access over the sidewalks, and (C) not materially interfere with the normal business operations of Tenant in the Premises or materially impair the visibility of Tenant's signage. Landlord shall not permit any solicitation, distribution of handbills, picketing, or other public demonstration in the Common Areas, except as otherwise may be mandated by applicable Legal Requirements.

(b)  Trash Compactor and Containers. Tenant shall be permitted to maintain and operate, at no extra charge: (i) a trash compactor in the portion of the Common Areas designated on Exhibit B hereto as "Trash Compactor Pad"; and (ii) a trash container(s) in the portion(s) of the Common Areas designated on Exhibit B hereto as "Trash Container Pad". Tenant, at its sole cost and expense, shall keep the trash compactor and containers neat and clean and repair any damage caused by use and storage of such compactor and containers.

(c)  Shopping Carts. Subject to Legal Requirements, Tenant shall be permitted to store its shopping carts in such exterior cart corrals as may be reflected on Exhibits B and D-1 hereto. With respect to shopping carts provided by Tenant for the use of its customers, Tenant will use reasonable efforts to periodically remove same from the Common Areas.

(d)  Cellular Towers. Excluding telecommunicating equipment used by existing tenants for their business at the Shopping Center, no transmission and/or

reception towers for wireless telephone or internet communications shall be permitted within the Shopping Center within three hundred (300) feet of the Premises.

(e)    Temporary Storage Containers.  Tenant shall be permitted to maintain temporary storage containers or trailers in the locations designated on Exhibit B hereto during the Term, subject to the OEA and applicable Legal Requirements.

ARTICLE 6
UTILITIES

Section 6.1    Utility Service.  From and after the Delivery Date and continuing thereafter through the end of the Term, Tenant shall be solely responsible for and shall pay the cost of utilities services (including, without limitation, electricity, gas, water, sanitary sewer, alarm and telecommunications) consumed in the Premises by Tenant. Tenant shall not be obligated to purchase utility service(s) directly from Landlord, or from any utility provider designated by Landlord.  Landlord shall provide separate utility meters exclusively serving the Premises, at its sole cost and expense (including, without limitation, all connection and hook-up fees).  Tenant's entry upon the Premises prior to the Delivery Date shall not constitute a waiver by Tenant of Landlord's obligation to pay the costs of all utility charges incurred in the Premises prior to the Delivery Date. Landlord shall not permit the capacity of utility lines available for use at the Premises to be reduced or overloaded by any other persons or entities.  Landlord shall permit Tenant and its telecommunications provider full and free access to, and use of, available telecommunications conduits in the Shopping Center for the provision of telecommunications service to the Premises, subject to such reasonable requirements as Landlord may impose.

Section 6.2    Interruption.  Notwithstanding any provision of this Lease to the contrary, in the event utilities serving the Premises are disrupted due to the acts or omissions of Landlord, its agents, contractors, servants or employees, Landlord shall promptly restore the affected utilities at Landlord's sole cost and expense.  If the disrupted utilities are not restored within twenty-four (24) hours after the Landlord has knowledge of the disruption, and Tenant is unable to conduct its normal business in the Premises as a result thereof, Rent shall be equitably abated during the period of disruption.

ARTICLE 7
SIGNS

Section 7.1    Tenant's Building Signage.  Subject to compliance with applicable Legal Requirements, Tenant shall have the exclusive right, in connection with Tenant's Work, and thereafter during the Term, at its sole cost and expense, to erect, maintain, and replace on the storefront and exterior walls of the Premises, and on the side walls of any entrance design element, if any, signs (including, without limitation, under-canopy (e.g., blade) signs), banners (including temporary banners placed on the storefront of the Premises and such other walls of the Premises as selected by Tenant), awnings, and flags of such size, design and color as Tenant, from time to time, may desire.  Tenant shall also be entitled, at Tenant's sole cost and expense, to install and maintain, during the period commencing on the Effective Date and ending on the day prior to the Rent Commencement Date, one temporary sign near the site of the main entrance to the Shopping Center which states "buybuy BABY Coming Soon".  Landlord agrees, in the event that any tenant or occupant of the Shopping Center objects to Tenant's right to maintain the temporary sign, Landlord shall, at Landlord's cost and expense, use commercially reasonable and diligent efforts to protect and safeguard Tenant's right to maintain the temporary sign.  Landlord shall promptly forward to Tenant any notice or other communication received by Landlord from any other tenant or occupant of the Shopping Center objecting to Tenant's right to maintain the temporary sign and shall keep Tenant informed of Landlord's efforts to protect and safeguard Tenant's right to

23

1   maintain said sign.  If the temporary sign is prohibited by Legal Requirements or under
2   an Existing Lease and/or requires the consent of a tenant or occupant under an Existing
3   Lease and despite Landlord's diligent efforts, such tenant or occupant requires the
4   removal of the temporary sign, Tenant shall remove said sign.  Tenant may erect and
5   maintain in the interior of the Premises any signs it may desire, provided same are
6   professionally prepared.

7        Section 7.2   Pylon/Monument Signage.  On the Effective Date, there are no
8   pylons or monument signs available for use by the tenants of the Shopping Center.  If
9   Landlord constructs or makes available to any other tenant or tenants in the Shopping
10  Center any signage located in the Common Areas, Landlord shall also include on such
11  signage Tenant's identification sign, as shown on Exhibit F hereto, which shall be at least
12  as large as those of other occupants of the Shopping Center and higher than the sign panel
13  of any other tenant in the Shopping Center having a panel on such signage whose Floor
14  Area is less than or equal to the Floor Area of the Premises.  Landlord shall maintain all
15  monuments and pylons, if any, and Tenant's signs thereon, in good order and repair, and
16  allow Tenant access to replace its signs thereon, at Tenant's cost and expense.  Landlord
17  shall not change or alter the location, structure, height or general appearance of the
18  monuments and pylons, if any, without obtaining Tenant's prior consent.  The cost of
19  maintaining all monuments and pylons, if any, bearing Tenant's sign panel(s) [but not the
20  cost of individual tenants' signs thereon or the cost of the construction of the pylons and
21  monuments] and the cost of any electricity used to illuminate them, shall be includable in
22  Common Areas Charges.

23       Section 7.3   Signage: Alteration/Removal/Allocation.  Tenant shall have the
24  right, from time to time, without Landlord's approval, to change its signs on the
25  storefront and exterior of the Premises, as well as on any pylon or monument, provided
26  that (i) the area of the new sign is no larger than the area of the sign which it replaces, (ii)
27  that the method of construction and attachment is substantially the same, and (iii) such
28  signs are in compliance with all Legal Requirements.  Upon the expiration or earlier
29  termination of the Lease, Tenant shall remove its signs from the fascia or other exterior
30  walls of the Premises and from any pylon or monument, and shall repair any damage
31  occasioned thereby.  The signage rights granted to Tenant pursuant to this Article 7 shall,
32  at Tenant's option, be allocated to or between Tenant and/or any subtenant(s) of all or
33  any portion of the Premises.  All signage installed by Landlord and Tenant hereunder
34  shall comply with applicable Legal Requirements.

35       Section 7.4   Cooperation.  Landlord, upon request, shall execute any consents
36  or applications which may be required by applicable Legal Requirements to permit the
37  placement, installation, and/or replacement by Tenant of any signs on any part of the
38  Premises or on any pylon or monument, to which Tenant may be entitled under this
39  Lease.

40       Section 7.5   Signage and Building Restrictions and Criteria.

41       7.5.1  During the Term, no exterior identification signs attached to any
42  building of the Shopping Center shall be of the following type: (i) flashing, moving or
43  audible signs; (ii) signs employing exposed raceways, exposed neon tubes, exposed
44  ballast boxes, or exposed transformers, provided that Tenant shall have the right to
45  employ any methods necessary for the installation of internally illuminated self-contained
46  channel letters; or (iii) paper or cardboard signs other than professionally prepared
47  interior window signs advertising special sales within the subject premises, temporary
48  signs (exclusive of contractor signs), stickers or decals, provided, however, the foregoing
49  shall not prohibit the placement at the entrance of each such premises of (A) small
50  stickers or decals which  indicate hours of business, emergency telephone numbers, credit
51  cards accepted, and other similar information, and/or (B) a sticker or decal which
52  contains the phrase "no solicitation" or words of like import.  No billboard signs shall be
53  permitted within the Shopping Center.

24

7.5.2  Landlord shall not permit any obstructions (including, without limitation, any trees, bushes or other landscaping, scaffolding or architectural details) to obscure Tenant's storefront, storefront signs or other exterior wall signs or any pylons, monuments or other freestanding signs.  Except as otherwise permitted under Existing Leases (hereinafter defined in Subsection 12.3(j)), no premises in the Shopping Center containing less Floor Area than the Floor Area of the Premises shall have: **(i)** building signage possessing more total square footage than the total square footage available for use by Tenant, or a maximum height greater than the maximum height of Tenant's building signage, as measured from the finished floor level to the highest point on such signage, or **(ii)** a building and entrance design element higher, wider, or which projects farther than the height, width or projection of the building and entrance design element of the Premises.

ARTICLE 8
ALTERATIONS AND IMPROVEMENTS

Section 8.1     Alterations and Improvements.

8.1.1  Tenant shall not perform any structural alterations or structural improvements to the Premises (except to the extent same pertain to Tenant's Work) without the prior approval of Landlord, provided, however, that Tenant's alteration of the exterior of the Premises to conform to Tenant's then-current prototypical elevation shall not require Landlord's consent so long as such alteration complies with all Legal Requirements.  All work performed by Tenant in connection with structural and non-structural alterations or improvements shall be done at Tenant's sole cost and expense, in a good and workmanlike manner and in compliance with all applicable Legal Requirements and without materially and adversely interfering with the operation of any other tenant in the Shopping Center.  The provisions of this Section 8.1 shall not apply to Tenant's building signage, which shall be governed by the applicable provisions of Article 7 above.

8.1.2  Tenant may, from time to time, at its sole cost and expense, without the prior approval of Landlord, make non-structural alterations and non-structural improvements to the Premises as Tenant deems necessary or desirable, including, but not limited to, electrical systems, heating, ventilation and air conditioning and other mechanical systems, installation of fixtures and equipment, painting, and wall and floor coverings.

8.1.3  Tenant shall have the right to subdivide the Premises into two (2) (but not more) separate stores, neither of which shall contain less than fifteen thousand (15,000) square feet of Floor Area and each of which may have its own front entrance and access to the loading docks in the rear of the Premises, as well as separately sub-metered utilities.

8.1.4  Tenant shall have the right to erect and maintain an antenna and a satellite dish on the roof of the Premises, provided that Tenant: (i) obtains Landlord's prior approval of its plans for the installation of such equipment, (ii) uses a contractor designated or approved by Landlord for all roof penetrations so as not to violate or invalidate any roof warranties maintained by Landlord, (iii) maintains the area where roof penetrations are made while Tenant's equipment is present, (iv) repairs any damage to the roof caused by the making of the roof penetrations, including, but not limited to, the repair of the roof penetrations upon the removal of any equipment installed thereon, (v) erects and maintains such equipment in accordance with applicable Legal Requirements, and (vi) to the extent reasonably practical, screens such antenna and satellite dish from sight at the street level of the Shopping Center.

8.1.5  Landlord shall execute and return to Tenant all appropriately completed building department or equivalent applications within ten (10) days after

25

3991270

1  Tenant's request therefor, and will reasonably cooperate with Tenant in the permitting
2  process.

3       8.1.6  If any violation of any applicable Legal Requirement which is noted
4  against the Shopping Center or the Premises (other than a violation caused by Tenant)
5  prevents Tenant from obtaining a building permit for any alterations or a certificate of
6  occupancy, then, upon request by Tenant, Landlord shall promptly and diligently cause
7  such violation to be removed of record to the extent required to permit Tenant to obtain
8  its building permit or certificate of occupancy, as the case may be.

9       8.1.7  Landlord shall not make any alterations to the Premises (including,
10  without limitation, changing the design, color or materials of the exterior of the Premises)
11  nor shall Landlord construct an additional floor or floors above the Premises.  Landlord
12  shall neither make nor permit to be made any alterations to the exterior architectural
13  theme of the remainder of the Shopping Center which would be inconsistent with a first-
14  class shopping center in the state in which the Shopping Center is located (exclusive of
15  other tenants' entrance features) without the prior consent of Tenant.

16       8.1.8  Tenant shall have the right to erect and maintain on the roof of the
17  Premises, a passive solar array for the production of electricity (the *"System"*), provided
18  that Tenant: (i) obtains Landlord's prior approval of its plans for the installation of the
19  System, (ii) uses a contractor designated or approved by Landlord for all roof
20  penetrations so as not to violate or invalidate any roof warranties maintained by
21  Landlord, (iii) maintains the area where roof penetrations are made while the System is
22  present, (iv) repairs any damage to the roof caused by the making of the roof
23  penetrations, including, but not limited to, the repair of the roof penetrations upon the
24  removal of any component of the System, (v) erects and maintains the System in
25  accordance with applicable Legal Requirements, and (vi) to the extent reasonably
26  practical, screens such System from sight at the street level of the Shopping Center.  The
27  System shall be deemed to be part of Tenant's Property  Landlord acknowledges and
28  agrees that Tenant or its Affiliate or transferee shall be the exclusive owner and operator
29  of the System and Landlord shall have no right, title or interest in such equipment or any
30  component thereof, notwithstanding that any such equipment may be physically mounted
31  or adhered to the Premises.  Landlord acknowledges and agrees that, notwithstanding the
32  System's presence as a fixture on the Premises, Tenant or its Affiliate or transferee is the
33  sole and exclusive owner of: (i) the electricity generated by the System, (ii) the
34  environmental attributes of the System, and (iii) any and all credits (including tax
35  credits), rebates, benefits, reductions, offsets, and allowances and entitlements of any
36  kind, howsoever entitled, resulting from the environmental or related attributes of the
37  System.  Without the express written consent of Tenant, Landlord shall not make or
38  publish any public statement or notice regarding any environmental incentive relating to
39  the System or any environmental attribute of the System or the energy output from the
40  System.

41       8.1.9  Landlord and Tenant agree that in the event that Tenant shall
42  perform or cause to be performed any alterations or improvements (including, without
43  limitation, Tenant's Work) to, or within, the Premises which would cause an owner or
44  occupant of the Premises to be entitled to an "Energy Rebate" (hereinafter defined), then
45  Tenant shall be solely entitled to the benefit of such Energy Rebate.  As used herein, an
46  *"Energy Rebate"* shall be deemed to be any rebate, refund, voucher, credit, tax relief,
47  abatement, or other monetary inducement (such as, for examples only, energy efficiency
48  incentives, property tax abatements, sales tax refunds, tax credits, governmental grants,
49  utility rebates or refunds) given by a governmental, non-governmental, private or public
50  utility, or other entity as a result of efforts to conserve energy or other utilities or cause
51  property or processes to be more environmentally friendly. If any such Energy Rebate is
52  required to be paid or credited directly to Landlord, then, then: (i) Landlord shall elect to
53  take the Energy Rebate in a lump sum, or if that is not permitted, then in the shortest

26

3991270

number of installments possible, so as to permit Tenant to recoup the full amount of the
Energy Rebate during the Term of this Lease, and (ii) within thirty (30) days after
Landlord's receipt of the Energy Rebate, Landlord shall deliver a check to Tenant for
such amount, or in the alternative, Tenant shall be entitled to offset the full amount of
such Energy Rebate against the next succeeding installment(s) of Fixed Rent then
payable under the Lease.

ARTICLE 9

REPAIRS

Section 9.1    Tenant's Repairs.  Subject to the provisions of Articles 10 and 11
hereof, and except as otherwise provided in Section 9.2 below, Tenant shall maintain in
good condition and repair, at its sole cost and expense:  (i) the non-structural, interior
elements of the Premises (including plate glass, and the electrical, plumbing, mechanical,
sprinkler and/or alarm systems located in, or serving, exclusively the Premises); (ii) the
heating, ventilation and air conditioning ("**HVAC**") units exclusively serving the
Premises, (iii) any damage to the Premises or the Shopping Center which is occasioned
by (A) the act or omission of Tenant, its employees, agents or contractors, or (B) any
breach by Tenant of any provision of this Lease; and (iv) the improvements which
constitute Tenant's Work, except for the elements described in Subsection 9.2(b), which
shall be the responsibility of Landlord from and after the Rent Commencement Date.  All
repairs and replacements on Tenant's part to be performed hereunder shall be at Tenant's
sole cost and expense, and performed in a good and workmanlike manner in accordance
with all applicable Legal Requirements and without materially and adversely interfering
with the business of other tenants in the Shopping Center.

Section 9.2    Landlord's Repairs.  Subject to the provisions of Articles 10 and 11
hereof, and except as otherwise provided in Section 9.1 above, Landlord shall perform, as
the same shall from time to time be necessary, all repairs and replacements to the
following:

(a) the exterior of the buildings of the Shopping Center (including
without limitation the Premises) as necessary to maintain same in good condition and
repair (including, without limitation, repainting the exterior walls of the buildings of the
Shopping Center (including, without limitation, the Premises)) as same may be
reasonably required from time to time during the Term;

(b) from and after the Rent Commencement Date, the structural
elements of the Premises, which shall be deemed to include, without limitation, the roof
joists, columns, footings, foundation, exterior walls (including, without limitation,
repainting, but excluding plate glass, storefront windows, doors, door closure devices,
window and door frames, molding, locks and hardware, and painting or other treatment
of interior walls), and floor (but not the floor covering, unless the same is damaged as a
result of a floor defect or settling);

(c) the roof, gutters, flashings, downspouts and scuppers;

(d) the electric, gas, water, sanitary sewer, and other public utility
lines serving the Premises, to the point of connection to the Premises;

(e) all electric, gas, water, sanitary sewer, and other public utility
lines and ducts in or passing through the Premises which do not exclusively serve the
Premises; and

(f) any damage to the Premises or the Shopping Center which is
occasioned by (A) the act or omission of Landlord, its employees, agents or contractors,
or (B) any breach by Landlord of any provision of this Lease.

27

1     All repairs and replacements on Landlord's part to be performed hereunder shall be at
2     Landlord's sole cost and expense performed in a good and workmanlike manner in
3     accordance with all applicable Legal Requirements, and without material interference
4     with or disruption to the normal conduct of any business operations in the Premises.
5     Landlord shall give Tenant at least five (5) days' prior notice of any repairs or
6     replacements to, or which would otherwise affect the normal conduct of any business
7     operations in, the Premises (except in the case of an emergency posing imminent risk of
8     material harm to persons or property, in which event Landlord shall only be required to
9     give such notice as is reasonable under the circumstances).  If, in Tenant's reasonable
10    judgment, Landlord's repairs would materially interfere with or disrupt the normal
11    conduct of any business operations in the Premises, Landlord shall perform such repairs
12    only after the regular hours of operation of Tenant and any other occupant of the
13    Premises (or any portion thereof), and Landlord shall reimburse Tenant for the reasonable
14    costs and expenses incurred by Tenant in connection with such "after hours" repairs,
15    including, without limitation, utilities charges and security expenses.  In the event
16    Landlord does not reimburse Tenant for any amounts payable to Tenant hereunder within
17    ten (10) days after Tenant's demand therefor, Tenant shall have the right (in addition to
18    any rights and remedies to which it may be entitled under this Lease, at law, or in equity)
19    to offset such amounts against Fixed Rent, together with interest thereon at the Lease
20    Interest Rate from the date of outlay until reimbursement or full satisfaction by credit.

21          Section 9.3    Legal Compliance Work.  Except as hereinafter expressly
22    provided, Landlord shall be responsible, at its sole cost and expense, for performing all
23    "Legal Compliance Work" (hereinafter defined).  Notwithstanding the foregoing, Tenant
24    shall be responsible, at its sole cost and expense, for the performance of Legal
25    Compliance Work: (a) pertaining to the interior elements of the Premises which are
26    neither structural nor comprise the major building systems serving the Premises; or
27    (b) required solely as a result of Tenant's specific use or manner of use of the Premises
28    (i.e., are not of general applicability to tenants and occupants of the Shopping Center);
29    provided, however, that the foregoing shall not relieve Landlord of its obligations to
30    perform: (x) Landlord's Work in accordance with all Legal Requirements, and (y) the
31    repairs required in Section 9.2 of this Lease.  As used herein, "***Legal Compliance Work***"
32    shall mean any obligation, addition, alteration, improvement, or rebuilding, structural or
33    otherwise, to or of the Premises, the Shopping Center, or any part thereof, as applicable,
34    which may be required by reason of any Legal Requirement.

35                              ARTICLE 10
36          INDEMNIFICATION, INSURANCE AND WAIVER OF SUBROGATION

37          Section 10.1    Mutual Release, Waiver of Subrogation and Mutual
38                              Indemnification.

39                10.1.1 Mutual Waiver of Claims.  Landlord and Tenant, on their own behalf
40    and on behalf of anyone claiming under or through either one by way of subrogation,
41    hereby release and waive all rights of recovery and causes of action against each other
42    and their respective Affiliates  from any and all liability for any loss or damage to
43    property or resulting from damage to such property (and, in either case, any resulting loss
44    of business or rental income), whether caused by the negligence or fault of the other
45    party, which is normally insured under Special Form property insurance (so-called "All-
46    Risk") and time element insurance required to be maintained hereunder.  In the event
47    either Landlord or Tenant is a self-insurer or maintains a deductible (as either may be
48    permitted hereunder), then the self-insuring party or the party maintaining the deductible
49    hereby releases the other party from any liability arising from any event which would
50    have been covered had the required insurance been obtained and/or the deductible not
51    been maintained.

52                10.1.2 Waiver of Subrogation.  Landlord and Tenant shall cause each
53    property insurance policy carried by either of them insuring the Premises, the contents

28

thereof, or the Shopping Center, to provide that the insurer waives all rights of recovery by way of subrogation or otherwise against the other party hereto (and all of such other party's Affiliates) in connection with any loss or damage which is covered by such policy or that such policy shall otherwise permit, and shall not be voided by the releases provided above.

        10.1.3 Mutual Indemnification.

        (a)    Except as otherwise provided in Subsections 10.1.1 and 10.1.2 above, Tenant covenants to defend and indemnify Landlord and hold Landlord harmless from and against any and all claims, actions, damages, liability and expense, including reasonable attorneys' fees, (x) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon the Premises, or any part thereof, or (y) occasioned wholly or in part by any act or omission of Tenant, its agents, contractors, employees, servants, or licensees, except to the extent such claims, actions, damages, liability and expense are caused by the acts or omissions of Landlord, its agents, contractors, licensees, employees, or other tenants and occupants, or for which any of said parties may be statutorily liable.

        (b)    Except as otherwise provided in Subsections 10.1.1 and 10.1.2 above, Landlord covenants to defend and indemnify Tenant and hold Tenant harmless from and against any and all claims, actions, damages, liability and expense, including reasonable attorneys' fees, (x) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon any portion(s) of the Shopping Center (excluding the Premises), or (y) occasioned wholly or in part by any act or omission of Landlord, its agents, contractors, employees, servants, tenants (other than Tenant), occupants or licensees, except to the extent such claims, actions, damages, liability and expense are caused by the acts or omissions of Tenant, its agents, contractors, licensees or employees, or for which any of said parties may be statutorily liable.

    Section 10.2    Tenant's Insurance.

        10.2.1 Tenant's Insurance.  Tenant, at its own cost and expense, shall maintain in full force and effect from and after the Delivery Date and throughout the Term: (i) commercial general liability insurance protecting and insuring Tenant, naming Landlord as "additional insured-lessor" for claims arising out of the use or occupancy of the Premises by Tenant and the obligations assumed by Tenant under this Lease, and having a combined single limit of liability of not less than Ten Million Dollars ($10,000,000) for bodily injury, death and property damage liability; and (ii) Special Form (so-called "All-Risk") property insurance, on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of all of Tenant's Property.

        10.2.2 Self-Insurance.  All insurance required to be maintained under this Section 10.2 may be: **(i)** insured under an individual policy covering this location, or a blanket policy or policies which includes other liabilities, properties and locations of Tenant or its Affiliates; **(ii)** self-insured by Tenant via a deductible, a formal plan of self-insurance, or otherwise, provided that Tenant or any guarantor of Tenant's obligations under this Lease maintains, during the period of such self-insurance, a net worth of at least One Hundred Million Dollars ($100,000,000); or **(iii)** insured or self-insured by Tenant through a combination of any of the foregoing insurance programs.

    Section 10.3    Landlord's Insurance.

        10.3.1 Liability Insurance.  Landlord shall maintain in full force and effect on and after the Effective Date and throughout the Term commercial general liability insurance with regard to the Common Areas protecting and insuring Landlord, naming Tenant as an "additional insured-lessee", and having a combined single limit of liability

29

of not less than Ten Million Dollars ($10,000,000) for bodily injury, death and property damage liability.

10.3.2 Special Form Property Insurance. Landlord shall procure and maintain in full force and effect on and after the Effective Date and throughout the Term, Special Form (so-called "All-Risk") property insurance (including loss of rents for a minimum period of one (1) year) and endorsements for coverages for flood, earthquake, windstorm, earth movement [sinkholes], Ordinance or Law coverage, on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of all of the buildings (including the Premises) and other insurable improvements in the Shopping Center; provided, however, in no event shall such insurance cover Tenant's Property. All policies required to be maintained by Landlord pursuant to this Subsection 10.3.2 shall provide that any proceeds thereof shall be deposited with Landlord's Mortgagee, or if none, to Landlord, in either event to be held in trust by such party and disbursed only in accordance with the provisions of, and for the purposes set forth in, Section 11.1 hereof. The property insurance required to be maintained by Landlord pursuant to this Section shall not have deductibles exceeding One Hundred Thousand Dollars ($100,000) without Tenant's prior consent.

10.3.3 Tenant's Pro Rata Share of Insurance Premiums. Tenant shall reimburse Landlord for Tenant's Pro Rata Share of the increase in the cost of insurance premiums attributable to the policies required to be maintained by Landlord pursuant to this Section 10.3 (*"Insurance Charges"*) in accordance with the provisions of Section 5.1 above. If the rates for any insurance Landlord is required to carry hereunder are increased as a result of the use or other activity of any other occupant of the Shopping Center, the amount of such increase shall be excluded from Insurance Charges. In addition, those portions of Landlord's insurance premiums which are reimbursed to Landlord by any other tenant in the Shopping Center other than through the payment of such tenant's proportionate share of insurance premiums otherwise includable as part of Insurance Charges shall be excluded from Insurance Charges. To the extent that Landlord receives a dividend, credit, rebate or other return of a premium which had previously been included in the calculation of Tenant's Pro Rata Share of Increased Common Areas Charges, Landlord shall promptly refund Tenant's Pro Rata Share of such dividend, credit, rebate, or return same to Tenant to the extent paid by Tenant. The provisions of this Subsection 10.3.3 shall survive the expiration or earlier termination of this Lease.

Section 10.4    General Insurance Requirements.

10.4.1 All insurance required to be maintained by the parties under this Lease shall be maintained with insurance companies qualified to do business in the state in which the Shopping Center is located, and rated at least A-/VIII by the most current Best's Key Rating Guide (or its equivalent, if such Guide ceases to be published). Each party shall use its diligent efforts to have its insurers provide thirty (30) days [ten (10) days in the event of non-payment of premium] prior notice to the other party of cancellation or non-renewal of any policy required hereunder. Each party shall provide to the other duly executed certificates evidencing the insurance coverage described in Sections 10.2.1 and 10.3 above.

10.4.2 The liability insurance requirements under Sections 10.2 and 10.3 above shall be reviewed by Landlord and Tenant every five (5) years for the purpose of mutually increasing (in consultation with their respective insurance advisors) the minimum limits of such insurance to limits which shall be reasonable and customary for similar facilities of like size and operation in accordance with generally accepted insurance industry standards. The replacement value of the buildings and other insurable improvements constituting the Shopping Center shall be re-evaluated from time to time at the request of either Landlord or Tenant.

30

ARTICLE 11
FIRE AND OTHER CASUALTY; EMINENT DOMAIN

Section 11.1   Fire and Other Casualty.

11.1.1 (a)   Except as otherwise provided in this Section 11.1, if all or a portion of the Premises, the Common Areas (including all improvements thereto) or other buildings in the Shopping Center shall be damaged by fire or other casualty, Landlord shall promptly rebuild and restore the same to the condition existing immediately prior to such fire or other casualty, which restoration shall include all Tenant's Work and all other leasehold improvements performed by Tenant, and shall not include any of Tenant's Property.  The proceeds of the policies required to be obtained and maintained by Landlord pursuant to Subsection 10.3.2 hereof shall, to the extent necessary, be used for the performance of such rebuilding and restoration work.  In the event such insurance proceeds are insufficient to complete such work, Landlord shall provide the balance of the amount necessary to rebuild or restore the Shopping Center in the manner provided in this Section 11.1.  Landlord shall give Tenant at least ninety (90) days' prior notice of the date on which the restoration work to the Premises will be Substantially Completed.

(b)   Notwithstanding the foregoing, if any portion of the Premises are so damaged or destroyed, Tenant shall have the right to require Landlord to make changes to the Premises in the course of, and as part of, such rebuilding or restoration work.  If the net cost and expense of such rebuilding or restoration work is increased solely as a result of such changes (taking into consideration any and all actual reduced and additional costs resulting from such changes and/or other cost savings arising therefrom), then Tenant shall pay to Landlord, as Additional Rent, the amount of such net increase, which amount shall be due and payable within thirty (30) days after Landlord has delivered to Tenant backup information evidencing such increase (including, without limitation, receipted invoices) as may be reasonably required by Tenant (but in no event earlier than the occurrence of the date on which possession of the restored areas of the Premises are delivered to Tenant).  To the extent that Landlord's substantial completion of such rebuilding or restoration work is delayed solely as a result of such changes (taking into consideration any and all reasonable time savings to Landlord resulting from such changes), then the applicable period(s) specified in Subsection 11.1.2 below shall be appropriately adjusted to the extent of such net delay.

(c)   If, in Tenant's reasonable judgment, any condition affecting, or damage to, the Premises renders all or any portion of the Premises unusable for the conduct of Tenant's business or, in the case of any condition affecting, or damage to, the Shopping Center, materially interferes with the normal conduct of any business operations in the Premises, the Rent shall be equitably reduced or totally abated based upon the extent to which the remaining portion of the Premises may, in Tenant's reasonable judgment, be utilized for its normal conduct of business.

11.1.2 In the event that:

(a)   Landlord does not commence the repair and restoration work to the Premises, the Common Areas, or other buildings in the Shopping Center as required pursuant to this Section 11.1 within ninety (90) days after the date of such destruction, or thereafter fails to diligently pursue the completion of such repair and restoration work (subject to such period as may be reasonably necessary for the adjustment of insurance proceeds, not to exceed forty-five (45) days in the aggregate); or

(b)   the required repairs and restorations to the Premises, the Common Areas, or other buildings in the Shopping Center are not Substantially Completed by Landlord in accordance with the provisions of this Section 11.1 within one (1) year after the date of destruction (which period may be extended by

31

1    reason of an event of *Force Majeure*, not to exceed thirty (30) days in the
2    aggregate, provided that Landlord shall have given Tenant notice thereof promptly
3    after its occurrence),

4    then, in either of such events, Tenant shall have the right, at its sole discretion and option,
5    to:

6                (i)    after giving thirty (30) days' prior notice to Landlord
7    (and Landlord's continued failure to commence and diligently pursue such repairs
8    and restoration work to completion), perform or complete, as the case may be, said
9    work (or any portion thereof) on Landlord's behalf and at the sole cost of
10    Landlord, which cost Landlord shall pay to Tenant during the course of such
11    repairs within thirty (30) days after Tenant's delivery to Landlord of an invoice
12    therefor and, in default of any such payment, Tenant shall have the right to offset
13    the amount thereof, together with interest at the Lease Interest Rate, against the
14    Fixed Rent next accruing hereunder (it being agreed, without limiting the
15    foregoing provisions of this Subsection 11.1.2, that at Tenant's election all
16    insurance proceeds paid or payable to Landlord or Landlord's Mortgagee pursuant
17    to Section 10.3 hereof shall be paid (or, as applicable, in turn delivered) directly to
18    Tenant, to be applied to such work by Tenant as same is being performed); or

19                (ii)    seek to obtain specific performance of Landlord's
20    repair and restoration obligations pursuant to the laws of the state in which the
21    Shopping Center is located; or

22                (iii)    terminate this Lease by thirty (30) days' notice to
23    Landlord.

24    In addition to the foregoing, if, in the opinion of an independent licensed architect
25    designated by Tenant (and reasonably acceptable to Landlord), the required repairs and
26    restorations to the Premises, the Common Areas or other buildings in the Shopping
27    Center cannot be completed by Landlord in accordance with the provisions of this
28    Section 11.1 within one (1) year after the date of destruction, Tenant shall have the right,
29    at its sole discretion and option, to terminate this Lease by giving Landlord at least thirty
30    (30) days' notice thereof.

31    11.1.3 If the Premises are substantially destroyed by fire or other casualty
32    during the last three (3) years of the Term to the extent of more than one-third (1/3) of the
33    Floor Area thereof, Landlord or Tenant shall each have the right to terminate this Lease
34    as of the date of such damage or destruction by giving notice within thirty (30) days
35    following such damage or destruction, but Tenant may negate any termination by
36    Landlord by agreeing to extend the Term for an additional five (5) year period by
37    exercising an option pursuant to Subsection 2.2.2 hereof, if available, within ten (10)
38    days after receipt of the termination notice from Landlord.

39    Section 11.2    Eminent Domain.

40    11.2.1 As used in this Section 11.2, *"Taking"* or *"Taken"* shall mean a
41    taking for any public or quasi-public use by any lawful power or authority by exercise of
42    the right of condemnation or eminent domain or by agreement between Landlord and
43    those having the authority to exercise such right.

44    11.2.2 If all of the Premises shall be Taken, this Lease shall terminate as of
45    the date of vesting of title or transfer of possession, whichever is earlier, without further
46    liability on the part of either Landlord or Tenant, except for an adjustment between the
47    parties for the Rent payable by Tenant hereunder.

48    11.2.3 In the event that:

32

3991270

1           (a)   any portion of the Premises shall be Taken so that it is
2    commercially unreasonable or unfeasible for Tenant, in its reasonable judgment, to
3    conduct its normal business in the Premises;

4           (b)   as a consequence of any Taking: (i) portions of the Shopping
5    Center shall be divided or separated in any manner that it materially interferes with
6    parking, visibility, or access to the Premises from other portions of the Shopping
7    Center, or (ii) the Shopping Center no longer has all of the entrances from Central
8    Avenue, and as a result, it is not commercially reasonable or feasible for Tenant, in
9    its reasonable judgment, to conduct its normal business in the Premises;

10           (c)   there occurs, in Tenant's reasonable judgment, a denial of
11    adequate access to the Shopping Center at the grade of any street adjoining the
12    Shopping Center or to any easement granted under this Lease, whether or not a
13    Taking shall have occurred;

14           (d)   any portion of the Shopping Center shall be Taken which
15    materially interferes with parking, visibility or access to the Premises, and as a
16    result of such taking it is commercially unreasonable or unfeasible for Tenant, in
17    its reasonable judgment, to conduct its normal business in the Premises;

18           (e)   more than twenty-five (25%) percent of the total Floor Area
19    of all of the buildings in the Shopping Center (other than the Premises) are Taken;
20    or

21           (f)   five (5%) percent or more of the parking spaces located in the
22    Shopping Center are Taken, or if so many of the parking spaces in the Shopping
23    Center are Taken such that there are fewer than (i) four and one-half (4.5) parking
24    spaces for every one thousand (1,000) square feet of Floor Area in the Shopping
25    Center, or (ii) the number of parking spaces required by applicable Legal
26    Requirements;

27 then, in any of such events, Tenant shall have the right to terminate this Lease by giving
28 at least sixty (60) days' prior notice to Landlord within sixty (60) days of any such event,
29 in which event this Lease shall terminate without any further liability on the part of either
30 Landlord or Tenant, except for an adjustment between the parties for the Rent payable by
31 Tenant hereunder and for payment to Tenant for its share of the award for the taking
32 pursuant to Subsection 11.2.5 below.  Upon any partial Taking of the Premises, the Rent
33 shall be equitably reduced or totally abated based upon the extent to which the remaining
34 portion of the Premises may, in Tenant's reasonable judgment, be utilized for its normal
35 conduct of business.

36        11.2.4 If this Lease is not terminated pursuant to this Section 11.2,
37 Landlord, at its sole cost and expense, within a reasonable period of time after such
38 Taking, shall repair and restore the area not so Taken to tenantable condition, similar in
39 physical appearance to the condition of the area immediately prior to the Taking,
40 pursuant to plans and specifications approved by Tenant (which repair and restoration
41 shall, as applicable, include all Tenant's Work and all other leasehold improvements
42 performed by Tenant based on Tenant's as-built plans, if available; provided, however,
43 that Landlord shall not be obligated to repair or restore Tenant's Property), and any and
44 all amounts awarded to Landlord for any Taking shall be made available to and used by
45 Landlord for any rebuilding or restoration which it is required to perform hereunder.
46 During the period of such repairs and restoration, all Rent shall abate to the extent that
47 the Premises may not, in Tenant's reasonable judgment, be used by Tenant for the normal
48 conduct of its business.  Such abatement shall terminate in accordance with the terms of
49 Section 11.3 below.  Landlord shall give Tenant at least ninety (90) days' prior notice of
50 the date on which the restoration work to the Premises will be Substantially Completed.

3991270

1        11.2.5 In connection with any Taking or partial Taking of the Premises,
2 Tenant shall be entitled to claim an award for loss of business, leasehold improvements,
3 fixtures and equipment and removal and reinstallation costs; provided, however, that no
4 award shall be payable to Tenant which reduces the award payable to Landlord for its fee
5 interest in the Premises; provided, further, that to the extent that Tenant shall be entitled to
6 any Tenant Allowance that shall not then have been paid to Tenant by Landlord then
7 Tenant shall be entitled to claim the amount thereof out of any such award payable to
8 Landlord for its fee interest in the Premises.

9

10        11.2.6 Any dispute between the parties with respect to this Section 11.2
11 shall be resolved by arbitration in accordance with the provisions of Section 16.3 below.

12      Section 11.3   Abatement of Rent Charges. Notwithstanding any other provisions
13 of this Lease, if the Fixed Rent and Additional Rent payable by Tenant hereunder shall be
14 abated pursuant to Sections 11.1 or 11.2 above, such abatement shall terminate upon the
15 first to occur of: (a) the date on which Tenant shall reopen the Premises to the general
16 public for business; or (b) the expiration of the period which is one hundred fifty (150)
17 days after Landlord shall have completed such repairs and restoration work as Landlord
18 is obligated to perform hereunder and the interference with the operation of business in
19 the Premises has ceased.

20                     ARTICLE 12
21      COVENANTS, REPRESENTATIONS AND WARRANTIES

22      Section 12.1   Quiet Enjoyment. Tenant shall peaceably and quietly have, hold,
23 occupy and enjoy the Premises for the Term, without hindrance from Landlord or any
24 party claiming by, through, or under Landlord.

25      Section 12.2   Authority. Tenant and Landlord each warrant and represent that
26 the person(s) signing this Lease on their behalf has authority to enter into this Lease and
27 to bind Tenant and Landlord, respectively, to the terms, covenants and conditions
28 contained herein. The submission of this Lease to each party hereto shall be for
29 examination and negotiation purposes only, and does not and shall not constitute a
30 reservation of or an obligation of Tenant to lease, or otherwise create any interest of
31 Tenant in, the Premises or any other premises situated in the Shopping Center unless and
32 until the Lease is fully executed and delivered by Tenant and Landlord.

33      Section 12.3   Landlord's Covenants, Warranties and Representations. To induce
34 Tenant to execute this Lease, and in consideration thereof, Landlord covenants, warrants
35 and represents to Tenant as follows:

36             (a)   As of the Effective Date, Landlord has, and as of the Delivery
37 Date Landlord shall have, good and marketable fee simple title to the entire Shopping
38 Center, free and clear of all easements, restrictions, liens, encumbrances, leases and the
39 like, except for the encumbrances described on Exhibit E hereto;

40             (b)   In the event the legal description of the Shopping Center
41 described in Exhibit A hereto indicates that the Shopping Center is composed of more
42 than one parcel or lot, Landlord represents that there exist no strips or gores between such
43 parcels or lots which are not owned by Landlord;

44             (c)   No third party consents or approvals are required in order for
45 Landlord to enter into this Lease, or for the performance of Landlord's Work and
46 Tenant's Work (excluding, as of the Effective Date, governmental permits and
47 approvals), other than Dayton Hudson Corporation's consent pursuant to Article 3 of the
48 OEA;

34

(d)    Tenant's use of the Premises for sale of "Permitted Items" (defined in Subsection 1.1.27 above) will not violate any exclusive provision or prohibited use restriction granted to any other tenant or occupant in the Shopping Center provided however, that the Landlord's representation contained in this clause shall not apply to the exclusive provisions set forth on Exhibit K-1, Tenant hereby acknowledging and agreeing that Tenant's use of the Premises for the sale of the Permitted Items shall be subject to the exclusive provisions set forth on Exhibit K-1;

(e)    The Shopping Center now has, and, on the Delivery Date, shall have, access to and from Central Avenue, as shown on Exhibit B hereto, for the passage of vehicular traffic;

(f)    This Lease does not violate the provisions of any instrument heretofore executed and/or binding on Landlord, or affecting or encumbering the Shopping Center, or the Premises, and no rights granted by Landlord to Tenant under the terms of this Lease conflict with any rights granted by Landlord to any other tenant or occupant in the Shopping Center (including, without limitation, any rights of first offer or first refusal or the like);

(g)    Subject to the OEA, there are no restrictions or other legal impediments imposed by any private instrument which would prevent: (i) the use of the Premises for the Permitted Use; subject to the Existing Exclusives set forth on Exhibit K-1 and the Prohibited Uses set forth on Exhibit M; (ii) the use of the parking facilities, access roads, and other Common Areas in the manner contemplated by this Lease; or (iii) the performance of Tenant's Work (provided any permit or other authorization to proceed with Tenant's Work shall have been obtained by Tenant);

(h)    As of the Effective Date, there are no sign ordinances, restrictive covenants, uniform sign plans or other signage restrictions which would prevent the Premises from having the signage (including, without limitation, the square foot area and size of letters) as depicted on Exhibit D-1 and Exhibit F hereof. With respect to any and all exit signs containing tritium gas that are located within or upon the Premises, Landlord shall cause same to be removed from the Premises prior to the Delivery Date and thereafter disposed of in full compliance with all applicable Legal Requirements;

(i)    As of the Effective Date there is no "Related Land" (defined in Subsection 13.1.2 below) in existence and as of the Delivery Date there will not be any Related Land in existence, other than the Lowes Parcel;

(j)    Attached hereto as Exhibit K-2 is a complete list of all fully executed and delivered leases in effect on the Effective Date with respect to the Shopping Center (the "*Existing Leases*"); and

(k)    Landlord shall promptly forward to Tenant any notice or other communication received by Landlord from any owner of property adjoining or adjacent to the Shopping Center or from any municipal or other governmental authority, in connection with any hearing or other administrative proceeding relating to any proposed zoning, building code, signage, or related variance affecting the Shopping Center or any adjoining or adjacent property, which, if granted, could adversely affect Tenant's use or occupancy of the Premises, the conduct of Tenant's business therein, or Tenant's rights and benefits under this Lease.  Landlord, at its sole cost and expense, shall appear in such proceeding and shall contest such proposed variance.  If Landlord fails so to appear and contest such proposed variance after receiving five (5) days' notice from Tenant (or such shorter notice as may be practicable under the circumstances), then Tenant shall be entitled (but shall not be obligated to), in its own name and/or in the name of Landlord, to appear in such proceeding, in which event Landlord shall fully cooperate

35

1    with Tenant, provide such information, and execute any documents or other instruments
2    as Tenant may reasonably request in connection with any such proceeding.

3          Section 12.4   Environmental Matters.

4              12.4.1 Definitions.

5                  (a)   As used herein, the term *"Environmental Laws"* shall mean
6    any and all Legal Requirements concerning the protection of the environment, human
7    health or safety.

8                  (b)   As used herein, the term *"Hazardous Substances"* shall mean
9    each and every element, compound, material, mixture, substance, waste, hazardous
10   substance, hazardous waste, hazardous material, toxic substance, pollutant or
11   contaminant either as those terms are defined in any of the Environmental Laws or the
12   presence of which may cause liability at common law, including, without limitation,
13   asbestos and/or asbestos-containing products, whether or not currently friable.

14               (c)   As used herein, the term *"Environmental Notice"* shall mean
15   a summons, citation, directive, order, claim, notice, litigation, investigation, judgment,
16   legal pleading, letter or other communication, written or oral, actual or threatened, from
17   the United States Environmental Protection Agency or other federal, state or local
18   governmental agency or authority, or any other private individual or entity concerning (i)
19   any Hazardous Substances at, on, in, under or emanating from the Premises, the
20   Shopping Center or any contiguous property; (ii) any violation or potential violation of
21   Environmental Laws at the Premises, the Shopping Center or any contiguous property; or
22   (iii) any underground storage tanks on the Premises or the Shopping Center.

23               (d)   As used herein, the term *"Releasing"* or *"Release"* shall
24   mean releasing, spilling, leaking, discharging, disposing or dumping or otherwise
25   introducing any substance into the environment or into any building or other
26   improvements in violation of Environmental Laws.

27               (e)   As used herein, the term *"Compliance Costs"* shall mean any
28   and all costs incurred by a party in complying with applicable Environmental Laws,
29   including, without limitation, consultant's and engineer's fees; laboratory costs;
30   contractor's and subcontractor's fees; application and filing fees; costs of investigation,
31   monitoring or cleanup of soil or other substrate, surface water, groundwater, or buildings
32   or other improvements; equipment costs; disposal fees; costs of operation and
33   maintenance of equipment; legal fees; other governmental fees or costs; interest at the
34   Lease Interest Rate from the date of expenditure until paid in full; and other similar or
35   related costs.

36               (f)   As used herein, the term *"Tenant Related Parties"* shall
37   mean Tenant's agents, servants, employees, contractors or licensees.

38             12.4.2 Compliance with Environmental Laws.  Tenant shall comply with all
39   applicable requirements of Environmental Laws governing its use of, and operations at,
40   the Shopping Center and the Premises.  Landlord shall comply with all applicable
41   requirements of Environmental Laws relating to the Shopping Center and the Premises,
42   except to the extent such requirements arise from Tenant's operations thereon.

43             12.4.3 Responsibility for Releases of Hazardous Substances.
44   Notwithstanding any other provision of this Lease, Tenant shall only be liable for any
45   Release of Hazardous Substances at, on, in, under or emanating from the Premises or
46   Shopping Center which were introduced by Tenant or Tenant Related Parties (hereinafter
47   *"Tenant Releases"*), including, without limitation, any Compliance Costs required to
48   address Tenant Releases.  Landlord shall be liable for any Hazardous Substances at, on,
49   in, under or emanating from the Premises or Shopping Center, including, without

limitation, any Compliance Costs attributable to such Hazardous Substances, unless the Hazardous Substances are caused by Tenant Releases. Notwithstanding anything to the contrary in this Lease, if any Hazardous Substances are found in or on the Premises (including, without limitation, in the roof system thereof) or the Shopping Center which pre-date the Delivery Date, then Landlord shall promptly remove the same in compliance with all applicable laws at Landlord's sole cost and expense, and, to the extent such work delays Tenant's Work, then the Rent Commencement Date and the date on which Tenant is required to open for business under Article 14 hereof shall be delayed on a day for day basis for each day of such delay, and Landlord shall reimburse Tenant for any and all reasonable costs incurred by Tenant in connection with such delay. Except in the event of an emergency or if compelled by applicable governmental authority, any work performed by Landlord relating to Hazardous Substances shall be performed by Landlord at any time other than during the months of August, November and December, and shall be undertaken in such a manner so as to (i) not materially adversely affect ingress to or egress from the Shopping Center, (ii) have no material adverse effect on the visibility of the Premises or any signs which contain Tenant's name, and (iii) not otherwise materially interfere with the normal conduct of any business operations in the Premises. If the presence of Hazardous Substances, or Landlord's remediative work relative thereto, interferes with Tenant's normal business operations in the Premises, then Tenant shall be entitled to an equitable abatement of Rent for so long as such condition persists.

12.4.4 <u>Standards</u>. Except as expressly provided herein, the parties agree that any investigation or remediation of Hazardous Substances, or cure of a violation of Environmental Laws, required to be conducted at the Premises or Shopping Center shall be no more stringent than necessary to meet the minimum standards of Environmental Laws applicable to properties used in the manner the Shopping Center is being used.

12.4.5 <u>Landlord's Representations and Warranties</u>. Landlord represents and warrants that: (i) Landlord has received no Environmental Notices concerning the Shopping Center, the Premises or any contiguous properties; (ii) Landlord has no knowledge of, and has received no notice of, any violation, or potential or alleged violation, of any Legal Requirement, including, without limitation, Environmental Laws, affecting the Shopping Center, the Premises or any contiguous properties, regardless of whether same has been cured; and (iii) to the best of Landlord's knowledge: (A) no Hazardous Substances are located at, on, in, under or emanating from the Shopping Center, the Premises or any contiguous properties; and (B) no underground storage tank exists at the Shopping Center or the Premises. The foregoing representations and warranties shall in no way serve to vitiate Landlord's obligations under this Article 12.

12.4.6 <u>Documents</u>. Each party shall immediately notify the other party of the notifying party's receipt of an Environmental Notice.

12.4.7 <u>Indemnity</u>. Each party to this Lease shall indemnify, defend and hold the other party, and its agents, servants, shareholders, directors, officers, partners, members and employees harmless from any and all claims, losses, expenses, costs, lawsuits, actions, administrative proceedings, damage, orders, judgments, penalties and liabilities of any nature whatsoever, including, without limitation, reasonable attorneys' fees (incurred to enforce this indemnity or for any other purpose) and Compliance Costs, arising from (i) the indemnifying party's breach of any of its representations, warranties, covenants or other obligations under this Section 12.4; (ii) Hazardous Substances for which the indemnifying party is liable under this Section 12.4; or (iii) violations of Environmental Laws for which the indemnifying party is liable under this Section 12.4.

12.4.8 <u>Survival</u>. The obligations of the parties under this Section 12.4 shall survive the renewal, expiration, breach or earlier termination of this Lease.

3991270

12.4.9 <u>Conflict</u>. In the event of any conflict between the provisions of this Section 12.4 and any other provision of this Lease, the provisions of this Section 12.4 shall control.

Section 12.5    <u>OEA</u>.

12.5.1 As used in this Lease, the term *"OEA"* shall mean that certain Amended and Restated Operation and Easement Agreement between Dayton Hudson Corporation and Northway Mall Associates, dated as of October 28, 1998 and recorded on November 16, 1999 in the County Clerk's Office of Albany County, State of New York (the *"Clerk's Office"*) in Book 2643 of Deeds at Page 799.

12.5.2 Landlord covenants, represents and warrants to Tenant that: (i) the OEA has not been modified, amended or terminated; (ii) the OEA is currently in full force and effect; (iii) to its actual knowledge as of the date hereof, no default under the OEA exists thereunder beyond any applicable notice and cure period; and (iv) the OEA is, and shall remain, superior in lien to all mortgages and related liens affecting the Shopping Center and all other land which is encumbered by the OEA. Landlord and Tenant each acknowledge that this Lease is made and shall continue to be subject and subordinate to the OEA, subject to the provisions of this Section 12.5. Tenant shall comply with the terms and conditions of the OEA to the extent same affects the Premises (it being agreed that Tenant shall not be obligated to expend any sums in connection with such compliance).

12.5.3 Landlord shall, during the Term: (i) perform and observe all of the terms, covenants, provisions and conditions of the OEA on Landlord's part to be performed and observed; (ii) defend, indemnify and hold harmless Tenant from and against any and all claims, demands, causes of action, suits, damages, liabilities, and expenses of any nature arising out of or in connection with the enforcement of, or a claimed breach by, Landlord of any covenant, term, condition, or provision of the OEA; and (iii) diligently enforce, at its sole expense, the covenants, agreements, and obligations of the OEA.

12.5.4 Whenever, pursuant to the OEA, the consent or approval of Landlord shall be required by or requested, and such consent or approval could diminish the rights or increase the obligations of Tenant thereunder or under this Lease, or could adversely affect Tenant's use or occupancy of the Premises, or the conduct of Tenant's business therein, such consent or approval shall not be granted without the prior consent of Tenant, which consent may be withheld in its sole and absolute discretion.

12.5.5 Landlord shall, immediately upon receipt, forward to Tenant and Tenant's leasehold mortgagee, if any, a copy of any and all notices and/or demands received by Landlord under or pursuant to the OEA, which relate to, or could adversely affect, Tenant's use or occupancy of the Premises, the conduct of Tenant's business therein, or Tenant's rights pursuant to this Lease.

12.5.6 Landlord shall not amend, or modify the OEA if such amendment or modification could diminish the rights or increase the obligations of Tenant thereunder or under this Lease, or could adversely affect Tenant's use or occupancy of the Premises or the conduct of Tenant's business therein, nor shall Landlord terminate the OEA.

12.5.7 In the event Landlord defaults in the performance of any of its obligations under the OEA or fails to enforce the obligations of any other obligee under the OEA, and such default or failure to enforce could adversely affect Tenant's rights thereunder or under this Lease, Tenant's Work, Tenant's use or occupancy of the Premises or the conduct of Tenant's business therein, Tenant may, but shall not be obligated to, after thirty (30) days written notice (except in the event of emergency, in which case no notice shall be required) cure any default by Landlord under the OEA

38

and/or enforce, in its own name, at Landlord's expense, the obligations of any other obligee under the OEA.  Landlord shall, upon demand, reimburse Tenant for the costs incurred by Tenant in performing any of Landlord's obligations under the OEA  or enforcing the obligations of any obligee under the OEA, together with interest thereon at the Lease Interest Rate, and failing such reimbursement, Tenant shall have the right (in addition to any rights and remedies to which it may be entitled under this Lease, at law, or in equity), upon ten (10) days' prior notice to Landlord, to offset such costs from the next succeeding payment or payments of any Fixed Rent due hereunder, together with interest thereon at the Lease Interest Rate from the date of outlay until reimbursement or full satisfaction by credit.

12.5.8 As between Landlord and Tenant, in the event of any conflict between the OEA and this Lease, this Lease shall in all respects control.

12.5.9 Landlord shall obtain any third-party approvals required under Article 3 of the OEA for the performance of Landlord's Work, Tenant's Work (including, without limitation, Tenant's elevations and signage, as shown on Exhibit D-1 and Exhibit F hereto), and the operation of Tenant's business in the Premises.

12.5.10    Landlord hereby warrants, covenants and represents to Tenant that Landlord shall not assign its rights as an "Approving Party" under the OEA separate and apart from its interest as Landlord under this Lease.  Landlord further warrants, covenants and represents to Tenant that any assignment of its rights as an Approving Party under the OEA shall be set forth in a written instrument.


ARTICLE 13
USES AND RESTRICTIONS

Section 13.1    Permitted and Prohibited Uses.

13.1.1 Tenant's Permitted Use.  The Premises may be used and occupied for the Permitted Use (defined in Subsection 1.1.27 above); provided, however, Tenant shall not use the Premises for any of the "Prohibited Uses" (defined in Exhibit M hereto annexed) or in violation of the "Existing Exclusives" (hereinafter defined in Subsection 13.3.1), to the extent then applicable, or the OEA.

13.1.2 Prohibited Uses.  Landlord shall construct, lease, operate, maintain and manage the Shopping Center as a first-class shopping center comparable to other first-class shopping centers in the state in which the Shopping Center is located. Landlord shall not lease, rent or occupy or permit to be occupied any portion of the Shopping Center or any "Related Land" (hereinafter defined) for any of the "Prohibited Uses" that pertain to the Shopping Center or the Related Land, as the case may be (as set forth in Exhibit M hereto annexed), provided, however, that as to any future Related Land, the foregoing restriction shall not apply to the extent that any Prohibited Uses are otherwise permitted under leases entered into prior to the date on which such land becomes Related Land.  As used in this Lease, the term *"Related Land"* shall mean any land contiguous or adjacent to the Shopping Center (including, without limitation, any land that would be contiguous or adjacent to the Shopping Center but for any intervening road, street, alley or highway) owned or controlled by Landlord or its Affiliate(s).

Section 13.2    Tenant's Exclusive in Center.  To induce Tenant to execute this Lease, and subject to all of the terms and provisions of this Section 13.2, Landlord covenants and agrees as follows.

13.2.1 Subject to the rights of tenants under Existing Leases, Landlord shall not lease, rent or occupy or permit any other premises in the Shopping Center or on any Related Land to be occupied, whether by a tenant, sublessee, assignee, licensee or other

39

occupant or itself, for the sale, rental or distribution, at retail or at wholesale, either singly
or in any combination, of items contained in any of the following respective categories of
merchandise: (a) infant, juvenile and children's furniture (including, without limitation,
infant, juvenile and children's: cribs, beds, mattresses, bedding, changing tables, gliders,
rockers (including coordinating ottomans), high chairs, lamps, walkers, play yards, play
pens, car seats, booster seats, cradles, carriages, strollers, toy and clothing chests, swings,
or any other furnishings similar to the foregoing enumerated items) (collectively,
*"Restricted Furniture"*); (b) clothing, layettes, apparel, shoes and/or accessories for
infants, juveniles and children 0-4 years in age (collectively, *"Restricted Clothing"*); and
(c) merchandise and products targeted for use by or for infants, juveniles and children 0-4
years in age (including, without limitation, infant, juvenile and children's: toys, books,
food, formula, indoor and/or outdoor play and recreational equipment, audio and video
cassettes or equipment, safety items, feeding items, nursing items, health and beauty care
items, drug remedies, diapers, wipes, bathroom items (including, without limitation,
personal care devices and other bathroom appliances, accessories and toiletries))
(collectively, *"Restricted Products"*) (which items in clauses (a), (b) and (c) above, either
singly or in any combination, are hereinafter referred to as the *"Exclusive Items"*).
Notwithstanding the foregoing, any tenant or subtenant in the Shopping Center or the
Related Land shall have the right to utilize its respective premises for the sale, rental
and/or distribution of Exclusive Items within an aggregate area (which shall include an
allocable portion of the aisle space adjacent to such sales, rental and/or distribution area)
not to exceed the lesser of (x) five percent (5%) of the Floor Area of such tenant's or
subtenant's premises, or (y) five hundred (500) square feet of Floor Area within such
tenant's or subtenant's premises.  In addition to the foregoing, Landlord shall not lease,
rent or occupy or permit any other tenant or occupant of the Shopping Center or Related
Land to operate a (x) hair cutting salon specializing primarily to a clientele of infants,
juveniles or children; (y) photo studio specializing primarily to a clientele of infants,
juveniles or children; and/or (z) development, learning or fitness center specializing
primarily to a clientele of infants, juveniles and children 0-4 years in age similar to a
Gymboree, My Gym or Little Gym.  As to any future Related Land, the foregoing
restrictions shall not apply to the extent that any Exclusive Items are otherwise permitted
under leases entered into prior to the date on which such land became Related Land.
Existing tenants of the Shopping Center and any Related Land (and current or future
assignees or sublessees of such tenants) shall nevertheless be subject to the restrictions
contained in this Section 13.2 in the event that: (i) the lease between Landlord (or
Landlord's Affiliate) and any such tenant requires the consent of Landlord (or its
Affiliate) to any assignment or subletting or to a change in the use of the applicable
premises to permit the sale, rental or distribution of the Exclusive Items; or (ii) Landlord
or its Affiliate permits or agrees to an expansion of the applicable premises for the sale,
rental, or distribution of the Exclusive Items.

13.2.2 The restrictions set forth in Subsection 13.2.1 above shall not apply
to a full-line national or regional: (i) department store [for example, Wal-Mart, Macy's,
or Target], (ii) discount club [for example, Costco, BJ's Wholesale Club, or Sam's Club],
or (iii) home improvement center [for example, Home Depot or Lowe's], commonly
located in first-class shopping centers in the state in which the Shopping Center is
located, each occupying at least 75,000 square feet of Floor Area within the Shopping
Center, as such stores are currently operated (as of the Effective Date).

13.2.3 The exclusive rights granted to Tenant in this Section 13.2 shall
inure to the benefit of any assignee of Tenant's interest in this Lease and to any sublessee
of at least fifty percent (50%) of the Floor Area of the Premises.

13.2.4 (a)    Upon breach of the aforesaid covenant and agreement by
Landlord (which breach shall not include a situation in which the lease between Landlord
and any tenant in the Shopping Center or in the Related Land prohibits the tenant therein
from violating the exclusive rights granted to Tenant in this Section 13.2 and despite such

1   prohibition, such tenant violates such exclusive rights, unless Landlord fails to comply
2   with any of the provisions of subparagraph (b) below), the Rent payable hereunder shall
3   be reduced by fifty percent (50%) for so long as such violation shall continue, and Tenant
4   shall have all remedies given to it at law and in equity, including, without limitation, the
5   right to obtain injunctive relief, and/or to terminate this Lease, and/or to commence and
6   prosecute an action against Landlord or any other violator for damages.

7          (b)   If any person or entity other than Landlord shall violate any
8   of the exclusive provisions herein set forth, or shall indicate in writing to Landlord that it
9   intends to violate any of said provisions, Landlord shall promptly commence appropriate
10  legal proceedings, and diligently prosecute the same, to enjoin and prohibit any such
11  violation.  If Landlord fails to promptly commence such proceedings, or shall fail
12  thereafter to diligently prosecute the same, then Tenant shall have the right (a) to conduct
13  and prosecute such legal proceedings (including, without limitation, an action for
14  injunctive relief) in its own name, at Landlord's expense, or (b) in the event the right set
15  forth in (a) above is not permitted to be exercised under applicable Legal Requirements,
16  to conduct and prosecute such legal proceedings in the name of Landlord, at Landlord's
17  expense, and Landlord shall cooperate with Tenant with respect to such prosecution
18  (including, without limitation, by executing any documentation or authorization
19  reasonably required by Tenant in connection with such prosecution and by appearing at
20  any hearing or trial with respect to such prosecution).

21          13.2.5   Simultaneously with the execution and delivery of this Lease,
22  Landlord shall execute and record, or cause to be executed and recorded, a Declaration of
23  Restrictions substantially in the form attached hereto as Exhibit O, against all Related
24  Land existing as of the Effective Date.

25      Section 13.3   Exclusives Which Tenant Must Honor.

26          13.3.1 Tenant shall honor certain exclusives granted by Landlord to certain
27  other tenants in the Shopping Center pursuant to the terms of leases which have been
28  executed prior to the Effective Date (hereinafter, *"Existing Exclusives"*) [a true and
29  complete listing and description of such Existing Exclusives being attached hereto as
30  Exhibit K-1], and shall not sublease, occupy or use all or any portion of the Premises, or
31  permit all or any portion of the Premises to be occupied or used in violation of any such
32  Existing Exclusive (except as may be specifically set forth on Exhibit K-1).  Landlord
33  represents and warrants that no Existing Exclusive(s) exist other than those listed on
34  Exhibit K-1 hereto and that Exhibit K-1 is true accurate and complete, and covenants to
35  indemnify, defend and hold Tenant harmless from and against all loss, cost, liability or
36  expense (including, without limitation, reasonable legal fees) incurred by Tenant by
37  reason of the enforcement by any person or entity of such unlisted Existing Exclusive.
38  Notwithstanding the foregoing, Tenant shall be entitled to enter into a separate agreement
39  with any tenant or other occupant for whose benefit the Existing Exclusive is granted
40  which nullifies or modifies the corresponding Existing Exclusive with regard to the
41  Premises.

42          13.3.2  Except as expressly set forth in this Section 13.3, Tenant shall not
43  be obligated to honor any exclusive granted by Landlord to any tenant in the Shopping
44  Center or in any other property owned by Landlord or Landlord's Affiliate.

45                      ARTICLE 14
46              CONDUCT OF BUSINESS OPERATIONS

47      Subject to the other provisions of this Lease (including, without limitation,
48  Articles 2 and 3 hereof) Tenant shall initially open its store for business to the public in
49  the Premises for at least one (1) day under the name "Buy Buy Baby," not later than the
50  two hundred seventieth (270th) day after the Rent Commencement Date (which date
51  shall, as applicable, be extended by reason of (A) damage or destruction, eminent domain

proceedings or actions, or Force Majeure, or (B) the acts or omissions of Landlord). Other than as expressly set forth in the preceding sentence, Tenant shall have no obligation to open or operate any business in the Premises, and shall have the right, at any time, to cease to conduct any business operations in the Premises, and Tenant shall incur no liability to Landlord or its Mortgagee by reason thereof (it being understood and agreed that all of Tenant's obligations under this Lease shall continue unless this Lease is terminated pursuant, inter alia, to the further provisions of this Article 14 or any other provision of this Lease [other than by reason of an Event of Default]). In the event that Tenant does not operate or cause to be operated any retail business in the Premises in at least eighteen thousand five hundred (18,500) square feet of Floor Area (other than prior to the Delivery Date or during Excused Periods) for more than three hundred sixty-five (365) consecutive days, Landlord shall have the option to terminate this Lease, which option shall be exercisable by:

(a) giving notice thereof to Tenant by not later than the ninetieth (90th) day after the date on which said 365-day period expires, and

(b) paying to Tenant, within thirty (30) days after such notice is given, all of Tenant's costs and expenses incurred in connection the preparation and review of plans and specifications for, and the then unamortized costs (amortized on a straight-line basis over the Initial Term) of, Tenant's Work (less any Tenant Allowance received by Tenant) and any alterations or improvements made by Tenant and permitted under this Lease,

whereupon this Lease shall terminate upon the sixtieth (60th) day (the "***Recapture Date***") after the date on which Tenant receives Landlord's termination notice, as if the Recapture Date was originally set forth herein as the expiration date of the Term. Upon such termination, Landlord and Tenant shall each be released from any and all liabilities thereafter accruing hereunder, except for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease. All Rent payable by Tenant hereunder shall be apportioned as of the Recapture Date and Tenant shall promptly pay to Landlord any amounts so determined to be due and owing by Tenant to Landlord, and conversely Landlord shall promptly reimburse Tenant for any amounts prepaid by Tenant for periods subsequent to the Recapture Date.

## ARTICLE 15
## TENANT ASSIGNMENT AND SUBLETTING

Section 15.1    Assignment and Subletting. Tenant shall have the right from time to time, without the consent of Landlord, to assign Tenant's interest in this Lease and/or to sublet, concession or license all or any portion of the Premises, subject to all of the terms and conditions of this Lease.

Section 15.2    Liability of Tenant. Unless otherwise agreed to in writing by Landlord, no assignment, subletting, licensing or concessioning by Tenant shall reduce, diminish, or otherwise affect the liability of Tenant hereunder; provided, however, that in the event of an assignment by the Tenant originally named herein or its Affiliate (collectively, the "***Original Tenant***") of its interest in this Lease to a Major Assignee or to a tenant whose obligations under this Lease are guaranteed by a Major Guarantor, all liability of the Original Tenant under this Lease accruing from and after the effective date of such assignment, shall terminate and all liability of any guarantor of this Lease, accruing from and after the effective date of such assignment, shall terminate. For purposes of this Section 15.2, the term "***Major Assignee***" or "***Major Guarantor***", as the case may be, shall mean a person or entity which has, as of the effective date of such assignment, a net worth of at least One Hundred Million Dollars ($100,000,000), and is acquiring at least ten (10) of Tenant's stores in the aggregate, in the states of New York and Connecticut or at such time is operating at least ten (10) stores in all or any portion of such area.

42

3991270

Section 15.3 <u>Collateral Assignment</u>. In addition to Tenant's other rights set
forth in this Article 15, a collateral assignment of Tenant's interest in this Lease by
Tenant to one or more "Lenders" (hereinafter defined), as collateral security for an
indebtedness or other obligation of Tenant or its Affiliates shall be permitted and
Landlord shall execute all documentation reasonably requested by Tenant or any such
Lender in connection therewith, so long as Tenant's obligations under this Lease are not
diminished and Landlord's obligations under this Lease are not increased other than to a
de minimis extent. In addition, Tenant shall have the right, without Landlord's consent,
to grant to an Affiliate of Tenant a license to operate all of Tenant's business operations
at the Premises, without such Affiliate having assumed any liability for the performance
of Tenant's obligations under this Lease and without this Lease having been assigned to
such Affiliate. As used herein, "***Lender***" shall mean a state or federally regulated: bank,
savings and loan association, insurance company, pension fund, credit union, real estate
investment trust, or other institutional lender.

Section 15.4 <u>Cure Rights of Original Tenant</u>.

15.4.1 If Tenant assigns Tenant's interest in this Lease, then Landlord,
when giving notice to said assignee or any future assignee in respect of any default, shall
also give a copy of such notice to the Original Tenant if the Original Tenant is still liable
under this Lease, and no notice of default shall be effective until a copy thereof is so
given to Original Tenant. Original Tenant shall have the same period after receipt of
such notice to cure such default as is given to Tenant therefor under this Lease.

15.4.2 If this Lease is terminated because of: (a) an Event of Default of
such assignee, or (b) the rejection, disaffirmation, or other termination of this Lease by or
on behalf of the assignee pursuant to any proceeding in bankruptcy under any Legal
Requirement of any State or of the United States, or any other Legal Requirements
affecting creditors' rights, then Landlord shall promptly give to Original Tenant notice
thereof if the Original Tenant is still liable under this Lease, and Original Tenant shall
have the right, exercisable by notice given to Landlord within fifteen (15) days after
receipt by Original Tenant of Landlord's notice, to enter into a new lease of the Premises
with Landlord ("***New Lease***"), provided that the Original Tenant shall have remedied all
Events of Default of the assignee hereunder, unless such Events of Default are not
reasonably susceptible of cure by the Original Tenant, in which event the Original Tenant
shall not be obligated to cure such Events of Default as a condition to the exercise of its
rights under this Subsection 15.4.2. Upon the Original Tenant's curing of any such Event
of Default of the assignee as aforesaid, Landlord shall assign to the Original Tenant all of
Landlord's rights against such assignee (whether arising as a result of bankruptcy court
proceedings or otherwise). The term of said New Lease shall begin on the date of
termination of this Lease and shall continue for the remainder of the Term (including any
Renewal Periods). Such New Lease shall otherwise contain the same terms and
conditions as those set forth herein, except for requirements which are no longer
applicable or have already been performed. It is the intention of the parties hereto that
such New Lease shall have the same priority relative to other rights or interests in or to
the Premises as this Lease. The provisions of this Subsection 15.4.2 shall survive the
termination of this Lease and shall continue in full force and effect thereafter to the same
extent as if this Subsection 15.4.2 were a separate and independent contract between
Landlord and the Original Tenant. From the date on which the Original Tenant shall
serve Landlord with the aforesaid notice of the exercise of its right to a New Lease, the
Original Tenant shall have quiet and undisturbed use and enjoyment of the Premises and
all appurtenances thereto, as contemplated in this Lease.

Section 15.5 <u>Recognition Agreement</u>. In the event Tenant subleases at least
fifteen thousand (15,000) square feet of Floor Area of the Premises with an
approximately proportionate amount of store frontage, for a term of at least five (5) years,
then, notwithstanding any other provisions of this Lease, Landlord shall, upon Tenant's

3991270

1   request, execute and deliver an agreement among Landlord, Tenant and each such
2   subtenant in the form of Exhibit H hereto, in recordable form.

3                                 ARTICLE 16
4                 DEFAULT AND DISPUTE RESOLUTION

5       Section 16.1   Tenant Default.

6       16.1.1 If Tenant shall fail to: (i) pay any Rent when due, within ten (10)
7   days after its receipt of notice thereof from Landlord specifying the amount and details of
8   the unpaid Rent, or (ii) perform or observe any of the other covenants of this Lease on
9   Tenant's part to be performed or observed within thirty (30) days after its receipt of
10  notice thereof from Landlord specifying the nature of such default (or, if such default
11  shall be of a nature that same cannot reasonably be cured within thirty (30) days and
12  Tenant does not commence to cure such default on or before such thirtieth (30th) day and
13  thereafter diligently prosecute said cure to completion), such circumstance shall
14  constitute an *"Event of Default"*.

15      16.1.2 Upon an Event of Default, Landlord shall have all remedies given to
16  it at law or in equity (except that Landlord hereby expressly waives any rights to
17  accelerate any element of the Rent, and any right of distraint, which may be granted to it
18  by law), including the following:

19          (a)   to bring suit for the collection of such unpaid Rent or for the
20  performance of such other covenant of this Lease on Tenant's part to be performed;
21  and/or

22          (b)   without waiving any non-monetary default, may (but shall not
23  be obligated to) perform any covenant which is capable of being remedied by the
24  performance of affirmative acts for the account and at the reasonable expense of Tenant
25  (it being agreed that should Landlord require access to the Premises in order to perform
26  such covenant as aforesaid, Landlord shall comply with the applicable provisions of
27  Sections 9.2 hereof), in which event, Tenant shall pay to Landlord on demand, as
28  Additional Rent, the reasonable cost or amount thereof, together with interest thereon at
29  the Lease Interest Rate from the date of outlay of expense until payment; and/or

30          (c)   upon at least five (5) days' notice to Tenant, to terminate this
31  Lease, whereupon Landlord shall have and retain full right to sue for and collect all
32  unpaid Rent which shall have accrued up to the date of termination and any damages to
33  Landlord by reason of any such breach as provided in Subsection 16.1.3 below, and
34  Tenant shall surrender and deliver the Premises to Landlord, failing which, Landlord
35  shall have the right to initiate summary proceedings to recover possession; and/or

36          (d)   upon at least five (5) days' notice to Tenant to terminate
37  Tenant's right of possession, re-enter the Premises and take possession thereof by lawful
38  means.  If Landlord shall so elect to repossess the Premises without terminating the
39  Lease, then Tenant shall be liable for and shall pay to Landlord all Rent payable to
40  Landlord pursuant to the terms of this Lease which shall have accrued up to the date of
41  repossession, as well as all Rent as and when same shall become due and payable
42  pursuant to the terms of this Lease during the remainder of the Term, diminished by any
43  net sums thereafter received by Landlord through reletting the Premises during said
44  period (after deducting reasonable expenses incurred by Landlord in connection with
45  such reletting).  In no event shall Tenant be entitled to any excess of any rent obtained by
46  such reletting over and above the Rent herein reserved.  Landlord may bring actions to
47  collect amounts due by Tenant under this Lease, from time to time, prior to the expiration
48  of the Term.

3991270

16.1.3 Upon an Event of Default, Tenant shall be liable for and shall pay to Landlord, in addition to any sum provided to be paid above, brokers' fees incurred by Landlord in connection with reletting the whole or any part of the Premises for the remainder of the then unexpired Term (excluding any then unexercised Renewal Periods), the costs of removing and storing Tenant's or other occupant's property; the cost of repairs; and all other commercially reasonable expenses incurred by Landlord in enforcing or defending Landlord's rights and/or remedies, including reasonable attorneys' fees.

16.1.4 Upon an Event of Default, any amounts paid by Landlord to cure said Event of Default and any Rent payments not paid after notice thereof is given shall bear interest at the Lease Interest Rate from and after the expiration of any applicable grace period until paid.

16.1.5 Landlord shall use all reasonable efforts to relet the Premises or any portion thereof to mitigate Landlord's damages to which Landlord would otherwise be entitled to as a result of an Event of Default. In no event shall Tenant be liable to Landlord for any consequential damages suffered by Landlord as a result of an Event of Default by, or any other act of, Tenant.

Section 16.2    Landlord Default.  If Landlord shall: (i) fail to perform or observe any of the covenants of this Lease on Landlord's part to be performed or observed within thirty (30) days after receiving notice from Tenant thereof (or, if same cannot reasonably be cured within thirty (30) days, if Landlord shall fail to promptly commence and diligently prosecute said cure to completion), or (ii) materially breach any warranty or representation under this Lease (either of (i) or (ii) above being hereinafter referred to as a *"Landlord's Default"*), then Tenant, in addition to such other rights and remedies as may be available under this Lease, or at law or in equity, may, in its sole discretion:

(a)    as applicable, perform such obligation(s) of Landlord in accordance with the provisions of this Lease on behalf of, and at the expense of Landlord; and/or

(b)    bring suit for the collection of any amounts for which Landlord is in default, seek injunctive relief, or seek specific performance for any other covenant or agreement of Landlord, without terminating this Lease; and/or

(c)    offset against up to fifty percent (50%) of the Fixed Rent payable by Tenant hereunder for amounts owed by Landlord to Tenant and/or for the amounts reasonably expended by Tenant performing Landlord's obligations hereunder, including costs and reasonable attorneys' fees, together with interest thereon at the Lease Interest Rate from the date of the outlay until paid if Landlord fails to reimburse such costs to Tenant within five (5) days of demand therefor. Notwithstanding the foregoing, if Tenant shall be unable to recoup the amounts owing to Tenant by offsetting or withholding the foregoing fifty (50%) percent of the Fixed Rent during the remainder of the Term, the fifty (50%) percent limitation shall be increased to an amount each month required to enable Tenant to recover such amount monthly, amortized over the remaining months of the Term. This limitation to fifty percent (50%) shall not apply to amounts owed to Tenant pursuant to Section 2.3.2(b), or Landlord's failure to pay to Tenant the Tenant Allowance pursuant to Section 3.3.8, or Landlord's failure to pay Taxes pursuant to Section 4.3, or performance of Landlord's Work by Tenant pursuant to Section 3.3 or as a result of Landlord's failure to carry out its restoration obligations as set forth in Section 11.1 or 11.2 hereof, which amounts may be offset against 100% of Fixed Rent; and/or

(d)    terminate this Lease, without waiving its rights to damages for Landlord's Default, provided that: (1) Landlord's Default materially adversely interferes with the normal conduct of any business operations in the Premises,

45

1  (2) Landlord's Default is not reasonably capable of being cured by Tenant, and
2  (3) Tenant gives notice of Landlord's Default to any Mortgagee of whom Landlord shall
3  have previously given Tenant notice (including its address), and such Mortgagee shall not
4  have cured Landlord's Default within thirty (30) days after such notice is given (or, if
5  such default cannot reasonably be cured within thirty (30) days, such Mortgagee fails to
6  promptly commence and diligently prosecute said cure to completion).

7          Notwithstanding the foregoing, if, in Tenant's reasonable judgment, a condition
8  posing imminent risk of liability or material harm to persons or property or material
9  disruption to the normal conduct of any business operations in the Premises shall exist (it
10  being agreed, without limitation, that any water infiltration into the Premises from within
11  or without the Premises, or mold remediation in connection therewith, shall be deemed to
12  be such a condition), Tenant may, at its election, and without prior notice to Landlord,
13  exercise any or all of the remedies set forth in (a), (b) and (c) above.  In no event shall
14  Landlord be liable to Tenant for any consequential damages suffered by Tenant as a
15  result of a default by, or any other act of, Landlord.

16          Section 16.3    Arbitration.  In any case where this Lease expressly provides for
17  submission of a dispute or matter to arbitration (but not otherwise), the same shall be
18  settled by arbitration in Albany, New York, before one arbitrator in accordance with the
19  procedural rules of the American Arbitration Association (or any successor thereto) then
20  in effect.  The decision of the arbitrator shall be final, conclusive and binding on the
21  parties, but the powers of the arbitrator are hereby expressly limited to the determination
22  of factual issues, and the arbitrator shall have no power to reform, supplement or modify
23  this Lease.  The arbitrator shall make only required findings of fact incident to an
24  arbitrable dispute, which findings shall be set forth in reasonable detail in a written
25  decision by the arbitrator.  Landlord and Tenant shall share equally in the cost and
26  expenses of such arbitration, and each shall separately pay its own attorneys' fees and
27  expenses, unless the arbitrator finds that one of the parties did not act in good faith in
28  connection with the dispute or the conduct of the arbitration proceeding, in which case
29  the arbitrator may award all or part of said costs, expenses and fees to the other party.

30                          ARTICLE 17
31  RIGHT TO MORTGAGE AND NON-DISTURBANCE; ESTOPPEL CERTIFICATE

32          Section 17.1    Right to Mortgage and Non-Disturbance.  Landlord reserves the
33  right to subject and subordinate this Lease at all times to the lien of any first mortgage or
34  deed of trust for the benefit of any Mortgagee hereafter encumbering or affecting all or
35  any portion of the Shopping Center, as well as to any future ground or underlying leases
36  encumbering or affecting all or any part of the Shopping Center; provided, however, that
37  (a) each Mortgagee shall first execute and deliver to Tenant a subordination, non-
38  disturbance and attornment agreement in substantially the form attached as Exhibit G
39  hereto, in recordable form, and (b) any Ground Lessor shall execute (and shall obtain the
40  written consent of any holder of any mortgage, deed of trust or any other existing lien
41  encumbering or affecting the Shopping Center or any portion thereof, as applicable) and
42  deliver to Tenant a fee owner recognition agreement in a form reasonably satisfactory to
43  Tenant, which shall include the following provisions: (i) the Ground Lessor will not, in
44  the exercise of any of the rights arising or which may arise out of such lease, disturb or
45  deprive Tenant  in or of its possession or its rights to possession of the Premises or of any
46  right or privilege granted to or inuring to the benefit of Tenant under this Lease; (ii) in the
47  event of the termination of the ground or underlying lease, Tenant will not be made a
48  party in any removal or eviction action or proceeding, nor shall Tenant be evicted or
49  removed of its possession or its right of possession of the Premises, and this Lease shall
50  continue in full force and effect as a direct lease between the Ground Lessor and Tenant
51  for the remainder of the Term and on the same terms and conditions as contained herein,
52  without the necessity of executing a new lease; and (iii) Landlord and Tenant shall have

3991270

1  the right to execute any amendment to this Lease which is specifically required hereunder
2  and the Ground Lessor shall recognize and be bound thereto.

3  　　　　Section 17.2　Estoppel Certificate.  Upon written request of Landlord or Tenant,
4  the other party, within thirty (30) days after the date of receipt of such request, shall
5  execute and deliver to and only for the benefit of the requesting party or any Mortgagee,
6  *bona fide* prospective purchaser, assignee, or sublessee of the requesting party, without
7  charge, a written statement:  (1) ratifying this Lease; (2) certifying, to such party's actual
8  knowledge, that this Lease is in full force and effect, if such is the case, and has not been
9  modified, assigned, supplemented or amended, except by such writings as shall be stated;
10  (3) specifying the dates to which Fixed Rent and Additional Rent have been paid;
11  (4) stating whether or not, to such party's actual knowledge, the party requesting the
12  estoppel is in default and, if so, stating the nature of such default, (5) stating the Rent
13  Commencement Date, and (6) stating which options to extend the Lease Term have been
14  exercised, if any.

15  　　　　Section 17.3　Existing Mortgages and Ground Leases.  If a mortgage, deed of
16  trust, or other security instrument, or any ground or underlying lease, encumbers the
17  Shopping Center or any part thereof on the Effective Date, then within forty-five (45)
18  days after the Effective Date, Landlord shall deliver to Tenant, in recordable form: (x) a
19  subordination, non-disturbance and attornment agreement substantially in the form
20  attached hereto as Exhibit G, in recordable form, executed by each and every holder of
21  any mortgage, deed of trust or any other existing lien encumbering or affecting the
22  Shopping Center or any portion thereof, and (y) a fee owner recognition agreement in the
23  form and content described in clause (b) of Section 17.1 hereof, in recordable form,
24  executed by any Ground Lessor (and, as may be required, consented to by the holder of
25  any mortgage, deed of trust or other existing lien as aforesaid).  Should Landlord fail to
26  so deliver such instrument(s) within said 30-day period, Tenant shall have the right by
27  notice given to Landlord at any time prior to the date on which such instrument(s) are
28  delivered, to terminate this Lease, in which event, neither party shall have any further
29  liability hereunder, except: (i) for those obligations which survive the expiration or other
30  termination of this Lease pursuant to the express terms of this Lease, and (ii) Landlord
31  shall be obligated to promptly reimburse Tenant for all its reasonable, third-party costs
32  and expenses incurred in connection with this Lease, including, without limitation, the
33  preparation and review of plans and specifications, and the performance of Tenant's
34  Work, provided, however, that such reimbursement by Landlord shall not exceed the
35  aggregate sum of Seventy-five Thousand Dollars ($75,000).  Landlord represents and
36  warrants to Tenant that as of the Effective Date there are no existing ground or
37  underlying leases affecting the Shopping Center.

38  　　　　　　　　　　　　ARTICLE 18
39  　　　　　　　　　　　　NOTICE

40  　　　　Subject to the further provisions of this Article 18, whenever it is provided herein
41  that any notice, demand, request, consent, approval or other communication (*"Notice"*)
42  shall or may be given to either of the parties by the other, it shall be in writing and, any
43  Legal Requirement to the contrary notwithstanding, shall not be effective for any purpose
44  unless same shall be given by registered or certified mail, postage prepaid, return receipt
45  requested, or by any recognized overnight mail carrier, with proof of delivery slip,
46  addressed to Landlord at Landlord's Mailing Address or to Tenant at Tenant's Mailing
47  Address, with copies of notices to Tenant also given to: (i) Allan N. Rauch, Esq., c/o Bed
48  Bath & Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, and (ii) Cathleen H.
49  Giuliana, Esq., Riker, Danzig, Scherer, Hyland & Perretti LLP, Headquarters Plaza, One
50  Speedwell Avenue, P.O. Box 1981, Morristown, New Jersey 07962-1981, or to such
51  other person or other address as may, from time to time, be specified by either party in a
52  written notice to the other party.  If Landlord shall consist of more than one person or
53  entity, notices delivered by Tenant to Landlord's Mailing Address shall be deemed to be

3991270

delivered to, and effective notice to, all such persons or entities comprising Landlord. All notices given in accordance with the provisions of this Section shall be effective upon receipt (or refusal of receipt) at the address of the addressee. Notwithstanding the foregoing, Landlord shall instead send the following items to Tenant (Attention: Lease Administration) at Tenant's Mailing Address: (A) all bills, notices (but not notices of default) and related information pertaining to Tenant's Pro Rata Share of Taxes as described in Section 4.3 of this Lease, and (B) all budgetary information, notices (but not notices of default), statements, bills and related information pertaining to Tenant's Pro Rata Share of Increased Common Areas Charges as described in Section 5.1 of this Lease.

## ARTICLE 19
## TENANT'S PROPERTY

All of Tenant's Property which may be installed or placed in or upon the Premises by Tenant shall remain the property of Tenant. Tenant may assign, hypothecate, encumber, mortgage or create a security interest in or upon Tenant's Property in the Premises without the consent of Landlord and may remove Tenant's Property at any time during the Term. Landlord waives any right it may have in Tenant's Property. To the extent Landlord may have a lien on or security interest in the Tenant's Property pursuant to this Lease, by law or otherwise, Landlord hereby waives, and agrees not to assert, such lien or security interest. Landlord shall provide to Tenant, within ten (10) days after Tenant's request therefor, a written waiver in form reasonably satisfactory to Tenant evidencing Landlord's waiver of any rights it has or may have in Tenant's Property.

## ARTICLE 20
## END OF TERM

Section 20.1    <u>Surrender of Premises</u>.  At the expiration of the Term, Tenant will quit and surrender the Premises in good condition and repair, <u>excepting</u>, <u>however</u>, reasonable wear and tear, damage by fire or other casualty, damage by eminent domain, and repairs and replacements to be made by Landlord hereunder.

Section 20.2    <u>Hold Over</u>.  If Tenant fails to deliver possession of the Premises to Landlord at the end of the Term, and unless Landlord and Tenant are, at such time, engaged in good faith negotiations to extend the Term, Tenant shall be a tenant at sufferance and shall be liable for Fixed Rent on a monthly basis (or, if applicable, on a prorated daily basis) in an amount equal to one hundred twenty-five (125%) percent of the amount thereof payable by Tenant for the month immediately preceding the last day of the Term as well as for all Additional Rent payable by Tenant hereunder; provided, however, if Tenant shall hold over or remain in possession of any portion of the Premises for more than sixty (60) days beyond the Expiration Date of this Lease, from and after such sixtieth (60th) day Tenant shall be liable for Fixed Rent on a monthly basis (or, if applicable, on a prorated daily basis) in an amount equal to two hundred (200%) percent of the amount thereof payable by Tenant for the month immediately preceding the last day of the Term as well as for all Additional Rent payable by Tenant hereunder.

## ARTICLE 21
## TENANT'S RIGHT OF FIRST OFFER

Provided an uncured Event of Default does not then exist under this Lease, Tenant shall have continuing rights of first offer to lease additional space in the Shopping Center which is contiguous to the Premises and which may become available on and after the date of this Lease. At such time that Landlord has knowledge that such space (***"Offered Space"***) is or will become available, Landlord will give Tenant notice (the ***"Offering Notice"***) of the terms and conditions Landlord would be willing to accept with respect to the Offered Space (including, without limitation, the proposed rent, additional rent, scope of Landlord's proposed tenant improvements, location and Floor Area), and Tenant shall

3991270

have thirty (30) days within which to respond to Landlord's offer.  In the event Tenant elects to accept Landlord's offer, then Tenant shall notify Landlord of such election by giving notice to Landlord during such thirty (30) day period and Landlord and Tenant shall thereupon enter into an amendment to this Lease for the leasing of the Offered Space, which amendment shall (a) contain the terms and conditions set forth in the Offering Notice, (b) provide that the term thereunder shall expire or sooner terminate contemporaneously with the expiration or sooner termination of the Term hereof (subject to extension in accordance with Subsection 2.2.2 above), and (c) contain such other terms and provisions as either Landlord or Tenant may reasonably require in order to effectuate the incorporation of the Offered Space into the Premises and to otherwise effectuate the intent of this Article 21.  Should Tenant decline Landlord's offer or fail to respond thereto, then, and in such event, Tenant shall have been deemed to have waived any prospective rights of first offer to the Offered Space (but Tenant shall not lose any prospective rights of first offer with respect to any space (including, without limitation, the Offered Space) which may in the future become vacant and available), and Landlord may lease the Offered Space to any other party upon substantially the same terms and conditions as that offered to Tenant, provided that such lease is executed within six (6) months after Tenant has declined (or has been deemed to have waived) Landlord's offer with respect to the Offered Space.  As used herein, the phrase *"substantially the same terms and conditions as that offered to Tenant"* shall mean terms not materially different and/or a rent of not more than five (5%) percent below the rent requested by Landlord of Tenant.  Any dispute between the parties with respect to this Article 21 (including, without limitation, any dispute as to the provisions of the amendment described in this Article 21) shall be resolved by arbitration in accordance with the provisions of Section 16.3 above.

ARTICLE 22
ONGOING CO-TENANCY

If, at any time during the Term (other than during Excused Periods), (a) Target or a Replacement Tenant ceases to be open for business to the public in the space designated for Target on <u>Exhibit B</u>. or (b) two of the following Inducement Tenants: (i) Marshalls, (ii) Jo-Ann, and (iii) Staples, or a Replacement Tenant for any such Inducement Tenants, ceases to be open for business to the public in the space designated for such Inducement Tenants on <u>Exhibit B</u> (either condition being hereinafter referred to as an *"Excess Vacancy"*), then in such event, Tenant shall have the right to: (i) pay Alternate Rent in lieu of Fixed Rent during the period of such Excess Vacancy, and/or (ii) if the Excess Vacancy continues for a period in excess of three hundred sixty-five (365) continuous days, to terminate this Lease, exercisable by giving Landlord, within one hundred twenty (120) days after the expiration of such 365-day period, at least sixty (60) days' prior notice, in which event this Lease shall terminate on the date set forth in Tenant's notice of termination without further liability on the part of either Landlord or Tenant, <u>except</u>: (A) for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease, and (B) Landlord, promptly after receiving a statement from Tenant showing the costs and expenses of Tenant's Work (less any Tenant Allowance received by Tenant) and any alterations made by Tenant, shall reimburse Tenant for the unamortized portion of such costs and expenses based upon such costs and expenses being amortized on a straight-line basis over the Initial Term. For purposes hereof a "Replacement Tenant" shall mean a single national tenant typically found in first-class shopping centers in the Albany, New York metropolitan area which occupies substantially all of the Floor Area occupied by the tenant or occupant that the Replacement Tenant is replacing. If Tenant does not terminate this Lease pursuant to this Article 22, then commencing on the expiration of the aforesaid 120-day period, Tenant shall resume paying full Rent, <u>provided</u>, <u>however</u>, that Tenant shall retain all of its

49

3991270

original rights under this Article 22 with respect to any future condition(s) of Excess Vacancy.

ARTICLE 23

MISCELLANEOUS

Section 23.1    <u>Loading Facilities</u>.  Tenant shall have the exclusive right to utilize the loading facilities serving the Premises (shown on <u>Exhibit B</u>) on a "24 hour a day", "365 days a year" basis.

Section 23.2    <u>Liens</u>.  Within thirty (30) days after notice of the filing thereof, Tenant shall discharge (either by payment or by filing of the necessary bond, or otherwise) any lien against the Premises and/or Landlord's interest therein, which may arise out of any payment due for, or purported to be due for, any labor, services, materials, supplies or equipment alleged to have been furnished to or for Tenant in, upon or about the Premises.  Similarly, within thirty (30) days after notice of the filing thereof, Landlord shall discharge (either by payment or by filing of the necessary bond, or otherwise) any lien against the Premises and/or Landlord's interest therein, which may arise out of any payment due for, or purported to be due for, any labor, services, materials, supplies or equipment alleged to have been furnished to or for Landlord in, upon or about the Premises.

Section 23.3    <u>Broker's Commission</u>.  Landlord and Tenant each warrant and represent to the other that they did not deal with any real estate broker in connection with the negotiation, execution and delivery of this Lease, except for Atlantic Retail Properties (the "***Broker***").  Landlord shall pay the Broker a commission pursuant to a separate agreement.  Each party agrees to indemnify, defend, and save the other harmless from and against any and all liabilities, costs, causes of action, damages and expenses, including, without limitation, attorneys' fees, with respect to or arising out of any claims made by any real estate broker (other than the Broker), agent or finder with respect to this Lease in breach of the foregoing representation.  The provisions of this Section shall survive the expiration or earlier termination of this Lease.

Section 23.4    *Force Majeure*.  Except as otherwise expressly set forth herein, in the event either party hereto shall be delayed or hindered in, or prevented from, the performance of any act required hereunder by reason of strikes, failure of power, riots, insurrection, war, earthquake, hurricane or tornado (or comparable weather conditions of unusual severity), or other reasons of an extraordinary nature which are beyond the reasonable control of the party, and which could not have been avoided through the exercise of due diligence by a party (collectively referred to herein as "***Force Majeure***"), then the performance of any such act shall be excused for a period equal to the period of the delay.  Notwithstanding the foregoing provisions, the following shall not constitute Force Majeure: (i) the financial inability of a party to perform its obligations under this Lease; or (ii) delays occurring in the course of complying with applicable Legal Requirements that could have been avoided through the exercise of due diligence by a party hereto.  A party wishing to invoke this Section shall give the other party notice of that intention within ten (10) days of the commencement of any event of *Force Majeure* and shall, at that time, specify the reasons therefor, the specific provision of this Lease which will be delayed as a result, and the period of such extension, if known, or if not known, a reasonable estimate thereof.

Section 23.5    <u>Consents</u>.  Except as may be otherwise expressly set forth in this Lease, whenever under this Lease provision is made for either party's securing the consent or approval of the other party, (i) such consent or approval shall be in writing and shall not be unreasonably withheld, delayed or conditioned, and (ii) in all matters contained herein, both parties shall have an implied obligation of reasonableness.

50

3991270

**Section 23.6**    Costs.  Whenever this Lease requires the performance of an act by a party, such party shall perform the act at its own cost and expense, unless expressly provided to the contrary.

**Section 23.7**    Attorneys' Fees.  In any action or proceeding hereunder (whether to enforce the terms and provisions of an indemnity or otherwise), the prevailing party shall be entitled to recover from the other party the prevailing party's reasonable costs and expenses in such action or proceeding, including reasonable attorneys' fees, costs and expenses.  Except as otherwise set forth herein, if either party is sued by a third party as a result of a violation of a covenant or warranty herein contained by the other party hereto, then the party who has violated the covenant or warranty shall be responsible for the reasonable costs and expenses in such action or proceeding against the non-violating party, including reasonable attorneys' fees, costs and expenses.

**Section 23.8**    Survival of Obligations.  The obligation to pay any sums due to either party from the other that by the terms herein would not be payable, or are incapable of calculation, until after the expiration or sooner termination of this Lease shall survive and remain a continuing obligation until paid.  All indemnity obligations under this Lease shall survive the expiration or earlier termination of this Lease.

**Section 23.9**    Non-Waiver.  The failure of Landlord or Tenant to insist upon the strict performance of, or to enforce, any provision, covenant or condition herein shall not be deemed to be a waiver thereof, nor void or affect the right of the aggrieved party to enforce the same covenant or condition on the occasion of any subsequent breach or default; nor shall the failure of either party to exercise any option in this Lease upon any occasion arising therefor be deemed or construed to be a waiver of the right to exercise that same kind of option upon any subsequent occasion.

**Section 23.10**    Rights Cumulative.  Unless expressly provided to the contrary in this Lease, each and every one of the rights, remedies and benefits provided by this Lease shall be cumulative and shall not be exclusive of any other such rights, remedies and benefits allowed by applicable Legal Requirements.

**Section 23.11**    Definition of Landlord.  The term *"Landlord"* shall mean only the person or entity which, from time to time, shall then own the Shopping Center, and in the event of the transfer by such owner of its interest in the Shopping Center, such owner shall (except to the extent of (1) claims made by Tenant against Landlord which arose prior to the effective date of the transfer of such ownership interest, and/or (2) judgments obtained by Tenant against Landlord, on or prior to the effective date of the transfer of such ownership interest) thereupon be released and discharged from all covenants and obligations of Landlord thereafter accruing, but such covenants and obligations shall be binding during the Term upon each new owner for the duration of such owner's ownership.

**Section 23.12**    Successors and Assigns.  The provisions of this Lease shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns.

**Section 23.13**    Limitation of Landlord's Liability.  Except with respect to insurance proceeds or condemnation awards received by Landlord which are required by the terms of this Lease to be applied to the repair or restoration of the Premises or the Shopping Center and any construction contribution or reimbursement from Landlord (including, without limitation, the Tenant Allowance to the extent not yet paid to Tenant by Landlord), Tenant shall, on and after the Delivery Date, look only to Landlord's estate and property in the Shopping Center (or the proceeds from the sale of all or any portion thereof) and net income derived from the Shopping Center for the satisfaction of Tenant's remedies for the collection of a judgment (or other judicial process) requiring the payment of money by Landlord hereunder and no other property or assets of Landlord, its

51

officers, directors, stockholders, members or partners shall be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies under or with respect to this Lease.  Except with respect to the limitation on personal liability hereinabove set forth, the provisions of this Section 23.13 shall not be deemed or construed to limit Tenant's rights and remedies pursuant to this Lease or which may be available at law or in equity.

Section 23.14  Limitation of Tenant's Liability.

Landlord, its successors and assigns, shall look solely to the assets, if any, of Tenant and its successors and assigns, for the satisfaction of any claim arising from or under this Lease and shall not seek to impose personal liability on any shareholder, officer, director, member or employee of Tenant or any of its Affiliates.

Section 23.15  Joint and Several Liability.  If either party consists of more than one person, then the persons constituting such party shall be jointly and severally liable hereunder.

Section 23.16  Severability.  If any term, covenant, condition or provision of this Lease is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions hereof shall remain in full force and effect and shall in no way be affected, impaired, or invalidated thereby.

Section 23.17  Grammatical Usages and Construction.  In construing this Lease, feminine or neuter pronouns shall be substituted for those masculine in form and vice versa, and plural terms shall be substituted for singular and singular for plural in any place in which the context so requires.  This Lease shall be construed without regard to: (i) the identity of the party who drafted the various provisions hereof, and (ii) the addition or deletion of text made during the negotiation of this Lease.  Moreover, each and every provision of this Lease shall be construed as though all parties hereto participated equally in the drafting thereof.  As a result of the foregoing, any rule or construction that a document is to be construed against the drafting party shall not be applicable hereto.

Section 23.18  Table of Contents, Line Numbering and Paragraph Headings.  The table of contents and line numbering, if any, and section headings are inserted only for convenience and in no way define, limit or describe the scope or intent of this Lease, nor in any way affect this Lease.

Section 23.19  Definition of Hereunder, Herein, etc..  Unless the context clearly indicates to the contrary, the words "herein," "hereof," "hereunder," "hereafter," and words of similar import refer to this Lease and all the Exhibits attached hereto as a whole and not to any particular section, subsection, or paragraph hereof.

Section 23.20  Short Form Lease.  Upon the request of either party following the execution and delivery of this Lease, Landlord and Tenant shall execute a short form lease or memorandum for recording, which shall be in form and substance as either party shall reasonably request.  In no event shall the amount of Fixed Rent reserved hereunder be included in any such short form lease or memorandum.

Section 23.21  Entire Agreement and Modification.  This Lease constitutes the entire agreement of the parties hereto, and all prior agreements between the parties, whether written or oral, are merged herein and, except as may be specifically set forth herein, shall be of no force and effect.  This Lease cannot be changed, modified or discharged orally, but only by an agreement in writing, signed by the party against whom enforcement of the change, modification or discharge is sought.

Section 23.22  No Joint Venture or Partnership Created by Lease.  Nothing contained herein shall be deemed or construed as creating the relationship of principal and agent or of partnership or of joint venture between the parties hereto.

1
2
3
4

      Section 23.23  <u>Tenant's Tradename</u>.  Landlord shall not make use of Tenant's tradename [*i.e.*, "*buybuy BABY*"®] in any advertising or marketing material, including, without limitation, on any internet website, without obtaining Tenant's prior written approval, which may be withheld in Tenant's sole and absolute discretion.

5
6
7
8

      Section 23.24   <u>Counterparts</u>. This instrument may be executed in several counterparts, each of which shall be deemed an original.  The signatures to this instrument may be executed and notarized on separate pages, and when attached to this instrument, shall constitute one complete document.

9
10
11

      Section 23.25  <u>Waiver of Trial by Jury</u>.  Landlord and Tenant hereby mutually waive any and all rights which either may have to request a jury trial in any proceeding between them at law or in equity.

12

                  [Signature page follows]

3991270

1        Section 23.26 <u>Governing Law</u>.  This Lease shall be governed by, construed, and
2    enforced in accordance with the laws of the State in which the Premises are located.

3        IN WITNESS WHEREOF, the parties have executed this instrument under seal
4    the day and year first-above written.

**LANDLORD:**

WITNESS:

NORTHWAY PROPERTIES, LLC, a
Delaware limited liability company

By: _____

[SEAL]

Name:  _MORTON L. OLSHAN_

Title:  _MANAGER_

**TENANT:**

ATTEST:

BUY BUY BABY, INC.,
a Delaware corporation

By: _____

Name:  Alan M. Freeman

Name:  Steven H. Temares

Title:  Assistant Secretary

Title:    Director and Authorized Signatory

[SEAL]

5
6

3991270

1

## INDEX OF EXHIBITS

2    Exhibit A         Legal Description of Shopping Center
3    Exhibit B         Site Plan
4    Exhibit C         Form of Rent Commencement and Expiration Date Agreement
5    Exhibit D         Landlord's Obligations (As-Is Delivery) and Tenant's Optional
6                      Work
7    Exhibit D-1       Exterior Elevations of the Premises, and Sidewalk Plan
8    Exhibit D-2       Existing Plans
9    Exhibit E         Permitted Encumbrances
10   Exhibit F         Signage
11   Exhibit G         Form of Subordination, Non-Disturbance and Attornment
12                     Agreement
13   Exhibit H         Form of Subtenant Recognition Agreement
14   Exhibit I         Form of Delivery Date Notice
15   Exhibit J         Form of Delivery Date Certification
16   Exhibit K-1       Existing Exclusives
17   Exhibit K-2       Existing Leases
18   Exhibit L         Intentionally Omitted
19   Exhibit M         Prohibited Uses
20   Exhibit N         Form of Mechanics' Lien Indemnification Agreement
21   Exhibit O         Form of Declaration of Restrictions Against Related Land (Use if
22                     Related Land exists)
23

24

1                       Exhibit A

2                  Legal Description of Shopping Center

3  ALL that piece or parcel of land situate, lying and being located in the Town of Colonie
4  and partly in the Village of Colonie, County of Albany and State of New York, being
5  more particularly bounded and described as follows:

6

7  BEGINNING at a point in the southwesterly line of Central Avenue – NYS Route 5 at its
8  intersection with the division line between lands of Northway Mall Associates on the
9  northwest and lands now or formerly of Robert L. Frey, et al. on the southeast said point
10  being distant  441.0± feet northwesterly measured along the southwesterly line of Central
11  Avenue from its intersection with the northwesterly line of Nolan Road; thence
12  southwesterly along said division line between lands of Northway Mall Associates on the
13  northwest and lands now or formerly of Robert L. Frey, et al., Paulinga Corporation, and
14  Joan Snyder on the southeast, South 50° 03' 01" West, 74.91 feet to a point; thence along
15  the division line between lands of Northway Mall Associates and lands of Dayton
16  Hudson Corporation, the following seven courses and distances:

17

18  1.    North 39° 56' 12" West, 201.45 feet to a point; thence
19  2.    North 50° 03' 48" East, 504.89 feet to a point; thence
20  3.    North 39° 56' 59" West, 282.67 feet to a point; thence
21  4.    South 50° 03' 01" West, 13.00 feet to a point; thence
22  5.    North 39° 56' 59" West, 92.41 feet to a point; thence
23  6.    South 50° 01' 46" West, 471.74 feet to a point; thence
24  7.    South 50° 03' 48" West, 435.39 feet to a point.

25

26  Thence northerly along the westerly line of lands of Northway Mall Associates and its
27  northerly extension and prolongation, North 24° 00' 26" West, 966.83 feet to a point in
28  the southerly line of lands of the State of New York – Interstate Route 87; thence easterly
29  along the southerly line of lands of the State of New York – Interstate Route 87, the
30  following two courses and distances:

31

32  1.    North 79° 56' 00" East, 996.33 feet to a point; thence
33  2.    South 71° 57' 19" East, 240.10 feet to a point;

34

35  Thence southeasterly along the southwesterly line of Central Avenue, N.Y.S. Route 5, the
36  following three courses and distances:

37

38  1.    South 41° 25' 30" East, 340.03 feet to a point; thence
39  2.    South 43° 11' 25" East, 450.47 feet to a point; thence
40  3.    South 37° 12' 36" East, 16.34 feet to the point or place of beginning.

41

42  TOGETHER with and subject to the rights, easements, terms and provisions of an
43  Operating Agreement among Northway Properties and Bernlee Development Corp. and
44  Alstores Realty Corporation and Almart Stores, Inc. dated as of October 4, 1968 recorded
45  in the Albany County Clerk's Office July 23, 1969 in Book 1981 of Deeds, at Page 349
46  as amended by mesne amendments of record and amended and restated by an Amended
47  and Restated Operation and Easement Agreement between Dayton Hudson Corporation
48  and Northway Mall Associates dated as of October 28, 1999 recorded in the Albany
49  County Clerk's Office November 16, 1999 in Book 2463 of Deeds, at Page 799.

50

1                                        <u>Exhibit B</u>

2                                        <u>Site Plan</u>

<u>Exhibit C</u>

<u>Rent Commencement and Expiration Date Agreement</u>

THIS RENT COMMENCEMENT AND EXPIRATION DATE AGREEMENT, made as of the _____ day of _____, 201_, by and between NORTHWAY PROPERTIES, LLC (*"Landlord"*) and BUY BUY BABY, INC. (*"Tenant"*).

**W I T N E S S E T H :**

WHEREAS, Landlord is the owner of a certain shopping center known as Northway Mall (the *"Shopping Center"*), situated in Colonie, New York;

WHEREAS, by that certain Lease Agreement dated as of _____ __, 2010 (the *"Lease"*), Landlord leased a portion (the *"Premises"*) of the Shopping Center to Tenant;

WHEREAS, Tenant is in possession of the Premises and the Term of the Lease has commenced; and

WHEREAS, under Section 2.2 of the Lease, Landlord and Tenant agreed to enter into an agreement setting forth certain information in respect of the Premises and the Lease.

NOW, THEREFORE, Landlord and Tenant agree as follows:

1.    The Rent Commencement Date occurred on _____, 201___.

2.    The **Initial Term** of the Lease shall expire on January 31, 20___, unless Tenant exercises any option to extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

3.    The date of commencement of the **first Renewal Period** shall be February 1, 20___, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 20___, unless Tenant exercises any option to further extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

4.    The date of commencement of the **second Renewal Period** shall be February 1, 20___, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 20___, unless Tenant exercises any option to further extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

5.    The date of commencement of the **third Renewal Period** shall be February 1, 20___, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 20___, unless the Lease terminates earlier as provided in the Lease.

6.    Capitalized terms used, but not defined, herein shall have the meanings ascribed to them in the Lease.

1

2       IN WITNESS WHEREOF, the parties hereto have caused this Rent
3   Commencement and Expiration Date Agreement to be executed the date and year first
4   above written.

**LANDLORD:**

NORTHWAY PROPERTIES, LLC

By:_____
Name:_____
Title:_____

**TENANT:**

BUY BUY BABY, INC., a Delaware
corporation

By:_____
Name:  Eugene A. Castagna
Title:   President

1                                          <u>Exhibit D</u>

2                  <u>Landlord's Obligations (As-Is Delivery) and Tenant's Optional Work</u>

.

**buybuy**
# BABY

**COLONIE, NY**

## Exhibit D

Landlord's Obligations (As-Is Delivery) and Tenant's Optional Work

02-08-10

[All capitalized terms used, but not otherwise defined, herein shall have the meanings ascribed to them in the Lease. It is specifically understood and agreed that all materials and supplies shall be installed in strict accordance with all manufacturers' specifications.]

### Section A – Landlord's Obligations

Landlord agrees to fully perform (at its sole cost) all of the work ("Landlord's Work") set forth below:

1. <u>Schedule</u> : Landlord's Work shall be substantially complete within 45 days following Lease Execution.

2. <u>As-Is</u> : Except as otherwise provided in this Lease and the Exhibits thereto, Landlord shall deliver the Premises to Tenant in its present "As Is" physical condition. The foregoing reference to the Premises being delivered in "As Is" condition shall not relieve Landlord of any maintenance or repair obligations with respect to the Premises otherwise specifically set forth in this Lease as the responsibility of Landlord. Subject to the above, the Premises shall be delivered to Tenant in substantially the same condition and state of repair as existed on the date of Tenant's inspection thereof on 11-18-09.

3. <u>Demised</u> : Landlord represents that the Premises is fully demised/separated from all other spaces in the Shopping Center in accordance with all applicable codes and insurance regulations.

4. <u>Clean</u> : The Premises shall be delivered to Tenant by Landlord in a neat and broom clean condition, free of all prior tenants and occupants, and free of all store fixtures and the like from prior occupants. Any damage caused to the structure or finishes by the removal of the prior tenant's fixtures shall be repaired by Landlord.

5. <u>Watertight</u> : The Premises shall be delivered to Tenant by Landlord in a secured condition with the roof watertight (and all gutters, downspouts, roof drains in good working order), all systems and equipment (including, without limitation, the heating, plumbing, electrical systems, and air conditioning/ventilation systems) in good working order, and the structural components (including, without limitation, the foundation, exterior walls, structural supports and roof) in good order and repair. Landlord shall provide Tenant with a copy of any available warranty for the roof installation and the existing rooftop units.

6. <u>Utilities</u> : Landlord shall be responsible to ensure that all utilities serving the Premises are separately metered and independent from all other Tenants/Spaces in the Shopping Center. Landlord shall be responsible to ensure that any utility lines which serve other Tenants/Spaces in the Shopping Center do NOT pass through or under the Premises. Landlord shall be responsible for all costs associated with the relocation/ reconfiguration of any utilities which do not conform with the requirements of this paragraph.

7. <u>Utilities</u> : All existing electric, gas, water (fire and domestic), sanitary and phone utilities shall independently serve the Premises and shall be in good working order with capacities as defined below:

   a) *<u>Electric</u>* : existing 800-Amp 277/480-Volt 3-Phase service located at the rear Southwest corner of the Premises
   b) *<u>Telephone</u>* : existing (1) 3-inch conduit located at the rear Southwest corner of the Premises to be re-used
   c) *<u>Gas</u>* : Existing gas meter and service located on exterior rear wall (Southwest side) of the building to be reused.
   d) *<u>Domestic Water</u>* : existing 2-inch incoming domestic water service (with meter) enters the building at the mid-point along the rear wall (Southwest side) of the building.
   e) *<u>Fire Suppression</u>* – existing 8-inch fire sprinkler riser located along the rear wall (Southwest side) of the Premises.
   f) *<u>Sanitary</u>* – existing 6-inch Sanitary Waste Line which exits along the rear wall (Southwest side) of the Premises.

8. <u>Haz-Mat</u> : The Premises shall be delivered to Tenant by Landlord free from asbestos containing material and all other Hazardous Substances.

9. <u>Quality</u> : All work performed in the Premises by Landlord shall be done in a good and first class workmanlike manner; in accordance with all applicable laws, ordinances, codes and insurance requirements.

10. <u>Cooperation</u> : Landlord agrees to fully cooperate with Tenant and to assist Tenant (including without limitation performing any work outside of the Premises required by governmental authority) in obtaining all required building permits for Tenant's Work, and in obtaining an unconditional permanent certificate of occupancy, or the local equivalent thereof.

11. Lighting : The minimum lighting level throughout the Shopping Center (parking areas, traffic drives, service drives, etc.) is existing and shall be in proper working order consistent with a first class Shopping Center in the State of New York. Landlord shall provide low level security lighting (min. 1.0 foot-candle measured at 30" above grade) throughout the center that shall remain illuminated from dusk to dawn seven days a week. Landlord has supplied for Tenant's review and approval, a photometric plan which confirms that the existing lighting *layout meets the required illumination levels* detailed above (drawing # WL-31670 : sheet 1 of 1, by WLS Lighting Systems rev. # 7 dated 01-28-2000)..   Landlord shall clean all lenses and repair or replace any damaged or non-functioning site lighting fixtures prior to Delivery and maintain throughout the Term.

12. Landlord shall be responsible to remove the exterior building sign left by the previous Tenant.

13. Landlord shall ensure that all common areas around the rear of the buildings and embankments along the rear service drive are cleared of all trash and debris (typ).

14. If any other party has approval rights over Tenant's Work then Landlord shall pursue such approvals and confirm same to Tenant prior to Tenant commencing work on site. Tenant shall supply Landlord with all available documents to support the pursuit of these approvals and Tenant agrees to assist Landlord to the maximum extent practical.

<u>Section B – Tenant's Optional Work</u>

Landlord shall allow Tenant to perform the work set forth below; provided, however, all such work performed by Tenant in the Common Areas shall be: (i) subject to applicable governmental laws, rules and regulations; (ii) completed expeditiously upon commencement of work; and (iii) performed in such a manner as to minimize any impact on shopping center operations.

1. <u>Mechanical</u> : Landlord shall allow Tenant to re-use and/or remove and dispose of existing RTU's (at Tenant's discretion) solely serving the Premises including all associated ductwork, grilles, diffusers, accessories, controls, etc.

2. <u>Crosswalk</u> :Subject to approval by Local Authorities,  Landlord shall allow Tenant (at Tenant's option) to provide painted ADA crosswalk striping with flexible pedestrian "warning" sign at the drive aisle located directly in front of the Premises as shown on Exhibit B (site plan).  In the event that it is reasonably determined by the Tenant that vehicular traffic through the main drive aisle directly in front of the main entrance to the Premises presents a danger to pedestrians, then, subject to governmental laws, rules and regulations, Tenant shall have the right to install "traffic calming measures" to protect pedestrians crossing the drive aisle.  Final traffic calming measures shall be mutually agreed upon by both Landlord and Tenant and may include speed bumps, striping, warning signs, etc.

3. <u>Cart Corrals</u> : Subject to approval by Local Authorities, Tenant shall have the right (at Tenant's option) to install parking lot and sidewalk cart corrals in accordance with Tenant's prototypical specifications. Any such cart corrals shall be subject to governmental approval.

4. <u>Expectant Mother Parking</u> : Tenant shall have the right (at Tenant's option) to install freestanding signs reserving parking spaces for expectant mothers. Locations and quantity shall be approximately as shown on Exhibit B. Such signage shall be subject to governmental approval and the terms of the lease agreement.

5. <u>Graphic Artwork</u> : Tenant shall have the right (at Tenant's option) to apply graphic artwork directly to the storefront glass located along the perimeter of the Premises.  Such artwork shall be subject to governmental approval.

6. <u>Building Signage</u> : Tenant shall furnish and install all building signs shown on Exhibits D-1 and F of this Lease using Tenant's specified vendor.

7. <u>Temporary Signs</u> : Subject to approval by Local Authorities, commencing on the Effective Date (subject to governmental approval), and continuing thereafter through the Rent Commencement Date, Tenant shall furnish, install and maintain (for such duration as Tenant may desire) all temporary signs as detailed in Exhibit F to the Lease and    listed below.  Temporary signage shall be in accordance with Tenant's Prototype Drawings & Specifications :
   a)  Two double sided temporary banners mounted to the Premises bearing the phrase :
      (1) Banner #1 - "Coming Soon" (side a) and "Grand Opening" (side b).
      (2) Banner #2 - "Why Wait ? Shop Online" (side a) and "Now Open" (side b).
   b)  One double sided banner sign mounted to Tenant's Hiring Trailer bearing the phrase :
      (1) "Now Hiring" (side a) and "Now Open" (side b)
At Tenant's discretion, Tenant may relocate Tenant's temporary signage should the signage visibility become obstructed.

8. <u>High Pile</u> : Landlord acknowledges and approves Tenant's intent to store merchandise above 12'-0". Such merchandise storage height shall be subject only to governmental approval.

1                                         Exhibit D-1

2                            Exterior Elevations of Premises and Sidewalk Plan

3

1                                    <u>Exhibit D-2</u>

2                                    <u>Existing Plans</u>



# NORTHWAY MALL

## 1440 CENTRAL AVENUE

## TOWN & VILLAGE OF COLONIE, NEW YORK

**CLIENT:**

NORTHWAY MALL ASSOCIATES
654 MADISON AVENUE
NEW YORK, NY 10021
PHONE: (212) 935-1330
FAX: (212) 832-5369

LANDSCAPE ARCHITECTS,
CIVIL & TRAFFIC ENGINEERS:

JOHN MEYER CONSULTING
130 BEDFORD ROAD
ARMONK, NY 10504
PHONE: (914) 273-5225
FAX: (914) 273-2102

**ATTORNEY:**

TABNER, RYAN AND KENRY
ATTORNEYS AT LAW
26 COMPUTER DRIVE WEST
ALBANY, NY 12212-2905
PHONE: (518) 489-9000
FAX: (518) 459-9165

**SURVEYOR:**

SIPPERLY & ASSOCIATES
17 COMPUTER DRIVE EAST
ALBANY, NY 12205
PHONE: (518) 438-4801
FAX: (518) 438-3925

**ARCHITECT:**

CULPEN & WOODS ARCHITECTS, LLC
400 MAIN STREET
STAMFORD, CT 06901
PHONE: (203) 969-1444
FAX: (203) 969-1448

**DRAWING LIST:**

| | |
|---|---|
| CD-1 | LAYOUT AND STRIPING PLAN |
| CD-1A | LAYOUT AND STRIPING PLAN |
| CD-2 | GRADING AND DRAINAGE PLAN |
| CD-3 | GRADING AND DRAINAGE PLAN |
| CD-3A | UTILITIES PLAN |
| CD-4 | UTILITIES PLAN |
| CD-4A | SEDIMENT AND EROSION CONTROL PLAN |
| CD-5 | SEDIMENT AND EROSION CONTROL PLAN |
| CD-5A | LANDSCAPING PLAN |
| CD-6 | LANDSCAPING PLAN |
| CD-6A | SITE LIGHTING PLAN |
| CD-6B | SITE LIGHTING PLAN |
| CD-7 | SITE LIGHTING PLAN |
| CD-7A | IRRIGATION LOCATION PLAN |
| CD-8 | IRRIGATION LOCATION PLAN |
| CD-8A | DEMOLITION PLAN |
| CD-9 | DEMOLITION PLAN |
| CD-10 | SANITARY SEWER PROFILES |
| CD-11 | WATER MAIN PROFILES |
| CD-12 | WATER MAIN PROFILES |
| CD-13 | DETAILS |
| CD-14 | DETAILS |
| CD-15 | DETAILS |

DEVELOPMENT PLAN





LOCATION MAP

DRAWING INDEX

ABBREVIATIONS

SYMBOLS

OWNERS

GENERAL CONTRACTOR

ARCHITECTS

NORTHWAY MALL
1440 CENTRAL AVENUE
COLONIE, NEW YORK

MALL PROPERTIES
654 MADISON AVENUE
NEW YORK, N.Y. 10021

BURGIO & CAMPOFELICE, INC.
2570 WALDEN AVENUE
CHEEKTOWAGA, N.Y. 14225

LAUER–MANGUSO
& ASSOCIATES
ARCHITECTS
4040 Ridge Lea Road
Buffalo N.Y. 14228
(716) 837–0933

BUILDING DATA

DETAIL NAME
SCALE

Exhibit E

**Permitted Encumbrances**

All of the items set forth in this Exhibit E have been recorded in the Office of Clerk of Albany County, State of New York.

1.  Utility Easements as recorded in Liber 2013 cp 341, Liber 2586 cp 183, Liber 2641 cp 1101, Liber 2648 cp 210, Liber 2654 cp 802 and Liber 2660 cp 543.

2.  Sewer Easement as recorded in Liber 2090 cp 5.

3.  Drainage Easements as recorded in Liber 1642 cp 409 and Liber 1811 cp 115.

4.  Operating Agreement among Northway Properties and Bernlee Development Corp. and Alstores Realty Corporation and Almart Stores, Inc. dated as of October 4, 1968, recorded July 23, 1969 in Liber 1981 cp 349 as amended by mesne amendments and as amended by Amended and Restated Operation and Easement Agreement between Dayton Hudson Corporation and Northway Mall Associates dated as of October 28, 1999 recorded on November 16, 1999 in Book 2643 of Deeds at Page 799.

5.  Agreement between Northway Mall Associates and Colonie Associates Limited Partnership recorded in Liber 2663 cp 856.

6.  Declaration by Northway Mall Associates recorded in Liber 2694 cp 482.

7.  Access Easement Agreement between Northway Mall Associates, LLC and Northway Mall Properties, LLC recorded in Liber _____ cp _____.

8.  Lease made by and between Northway Mall Associates, Landlord and Staples, Inc., Tenant, dated December 8, 1995, a memorandum of which is recorded June 14, 1996 in Liber 2558 cp 159, Non-Disturbance and Attornment Agreement recorded in Liber 2558 cp 149 and First Amendment to Memorandum of Lease recorded in Liber 2694 cp 488.

    The inclusion of the foregoing memorandum of lease within these "Permitted Encumbrances" is for informational purposes only, and shall not be deemed to diminish any of Tenant's rights, or increase any of Tenant's obligations, under this Lease.

9.  Mortgage dated August 28, 1970, from LBS Realty Corp., Mortgagor, in favor of The Chase Manhattan Bank, Mortgagee, and recorded on August 31, 1970 in Liber 1996 mp 957.

10. Spreader Agreement dated May 25, 1972, from LBS Realty Corp., Mortgagor, in favor of The Chase Manhattan Bank, Mortgagee, and recorded on May 26, 1972, in Liber 2023 mp 963, which instrument spread the mortgage at Liber 1996 mp 957 over the leasehold dated May 25, 1972, between John Hancock Mutual Life Insurance Company and LBS Realty Corp.

11. Assignment of Mortgage dated May 25, 1972, between The Chase Manhattan Bank, Assignor, and John Hancock Mutual Life Insurance Company, Assignee, and recorded on May 26, 1972, in Liber 2023 mp 969, which instrument assigns the mortgage in Liber 1996 mp 957.

12. Mortgage dated May 25, 1972, from LBS Realty Corp., Mortgagor, in favor of John Hancock Mutual Life Insurance Company, Mortgagee, recorded on May 26, 1972, in Liber 2023 mp 973.

13. Consolidation, Modification, Spreading and Extension Agreement dated May 25, 1972, from LBS Realty Corp., Mortgagor, in favor of John Hancock Mutual Life Insurance Company, Mortgagee, recorded on May 26, 1972, in Liber 2023 mp 1013, which instrument consolidates Liber 1996 mp 957 with Liber 2023 mp 973.

14. Mortgage dated June 18, 1974, from LBS Realty Corp., Mortgagor, in favor of John Hancock Mutual Life Insurance Company, Mortgagee, recorded on June 27, 1974, in Liber 2061 mp 40.

15. Assignment of Mortgage dated August 18, 1986, from John Hancock Mutual Life Insurance Company, Assignor, to Morton L. Olshan, Assignee, recorded August 25, 1986, in Liber 2433 mp 344, which instrument assigns Liber 1996 mp 957 and Liber 2023 mp 973 together with Assignments of Rents & Leases at Liber 2045 cp 887, 761 and 885.

16. Mortgage Spreader Agreement dated August 18, 1986, from Northway Mall Associates, Mortgagor, in favor of Morton L. Olshan, Mortgagee, and recorded on August 25, 1986, in Liber 2433 mp 332, which instrument spreads the mortgages in Liber 1996 mp 957 and Liber 2023 mp 973 over the fee simple estate.

17. Mortgage dated June 19, 1984, from Northway Mall Associates c/o Mall Properties Inc. and Town of Colonie Industrial Development Agency, Mortgagor, in favor of The Chase Manhattan Bank, Mortgagee, recorded on July 5, 1984, in Liber 2296, mp 1107.

18. Assignment of Mortgage dated March 30, 1994, from The Chase Manhattan Bank, Assignor, to National Westminster Bank USA, Assignee, and recorded on April 27, 1994, in Liber 3220 mp 541, which instrument assigns Liber 2296 mp 1107.

19. Assignment of Mortgage dated October 28, 1999, from Fleet Bank, National Association, successor by merger to National Westminster Bank, USA, Assignor, to Morton L. Olshan, Assignee, and recorded on November 16, 1999, in Liber 3792, mp 101, which instrument assigns Liber 2296 mp 1107.

20. Mortgage Spreader Agreement dated October 28, 1999, from Northway Mall Associates, Mortgagor, in favor of Morton L. Olshan, Mortgagee, recorded November 16, 1999, in Liber 3792 mp 107, which instrument spreads the mortgage in Liber 2296 mp 1107 over additional premises.

21. Assignment of Mortgage dated December 23, 1999, between Morton Olshan, Assignor, and The Bank of New York, Assignee, recorded March 22, 2000, in Liber 3822 mp 605, which instrument assigns mortgages at Liber 1996 mp 957 and Liber 2023 mp 973.

22. Assignment of Mortgage dated February 14, 2000, between John Hancock Life Insurance Company f/k/a John Hancock Mutual Life Insurance Company, Assignor, and The Bank of New York, Assignee, recorded March 22, 2000, in Liber 3822 mp 602, which instrument assigns the mortgage at Liber 2061 mp 40.

23. Assignment of Mortgage dated December 23, 1999, between Morton Olshan, Assignor, and The Bank of New York, Assignee, recorded on March 22, 2000, in Liber 3822 mp 614, which instrument assigns mortgages at Liber 2296 mp 1107.

24. Mortgage dated as of December 23, 1999, from Northway Mall Associates, Mortgagor, in favor of The Bank of New York, Mortgagee, and recorded on March 22, 2000, in Liber 3822 mp 624.

25. Consolidated, Amended and Restated Building Loan Mortgage and Security Agreement dated as of December 23, 1999, from Northway Mall Associates, Mortgagor, in favor of The Bank of New York, Mortgagee, and recorded on March 22, 2000, in Liber 3822 mp 627, which instrument consolidates mortgages at Liber 1996 mp 951, Liber 2023 mp 973, Liber 2296 mp 1107, Liber 2061 mp 40 and Liber 3822 mp 624 to form one $16,800,000.00 lien.

26. Assignment of Mortgage dated May ___, 2002, between The Bank of New York Assignor, and Deutsche Banc Mortgage Capital, L.L.C., Assignee, recorded on May ___, 2002, in Liber _____ mp ____, which instrument assigns mortgages at Liber 1996 mp 951, Liber 2023 mp 973, Liber 2296 mp 1107, Liber 2061 mp 40 and Liber 3822 mp 624.

27. Gap Mortgage dated May ___, 2002, from Northway Mall Properties, LLC, Mortgagor, in favor of Deutsche Banc Mortgage Capital, L.L.C., Mortgagee, recorded on May ___, 2002, in Liber _____ mp ____.

28. Consolidated, Amended and Restated Mortgage and Security Agreement dated May ___, 2002, from Northway Mall Properties, LLC, Mortgagor, in favor of Deutsche Bank Mortgage Capital, L.L.C., Mortgagee, recorded on May ___, 2002, in Liber _____ mp ____, which instrument consolidates mortgages at Liber 1996 mp 951, Liber 2023 mp 973, Liber 2296 mp 1107, Liber 2061 mp 40, Liber 3822 mp 624, and Liber _____ mp ____ to form one $20,500,000.00 lien.

Each foregoing reference to a mortgage, deed of trust, or other security instrument or lien, shall be made subject to the provisions of Section 17.3 or Subsection 2.3.1(f) of the Lease.

Landlord represents and warrants that (i) none of the foregoing will interfere with or prevent Tenant from operating its Premises in accordance with the terms of this Lease, (ii) conflict with any right granted Tenant under this Lease, (iii) impose on Tenant any obligation(s) in excess of those set forth in this Lease, and (iv) none of the foregoing easements or rights of way (a) are located beneath the Premises, or (b) will interfere with Tenant's use and enjoyment of the Premises.

1                                                   <u>Exhibit F</u>

2                                                   <u>Signage</u>

3        •

Exhibit G

Form of Subordination, Non-Disturbance and Attornment Agreement

THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT, made as of the _____ day of _____, 201__, by and between _____, a _____ **[corporation] [limited] [general] [partnership] [national banking association]**, having an office at _____ (the "*Mortgagee*") and Buy Buy Baby, Inc., a Delaware corporation, having an office at 650 Liberty Avenue, Union, New Jersey 07083 (the "*Tenant*").

W I T N E S S E T H :

WHEREAS, Mortgagee is the holder of a mortgage (the "*Mortgage*") covering a parcel of land owned by Northway Properties, LLC, a Delaware limited liability company (the "*Landlord*") together with the improvements erected thereon (said parcel of land and improvements thereon being hereinafter referred to as the "*Shopping Center*" and being more particularly described on Exhibit A attached hereto and made a part hereof); and

WHEREAS, by a certain Lease Agreement heretofore entered into between Landlord and Tenant dated as of _____ (the "*Lease*"), Landlord leased to Tenant a portion of the Shopping Center, as more particularly described in the Lease (the "*Premises*"); and

WHEREAS, a copy of the Lease has been delivered to Mortgagee, the receipt of which is hereby acknowledged; and

**[For mortgages existing as of the date Lease is executed:** WHEREAS, as an inducement to Tenant to enter into the Lease, **[Section 2.3.1/Section 17.3]** thereof provides that the Lease is conditioned upon Landlord obtaining this Agreement from Mortgagee; and

WHEREAS, the parties desire to satisfy the foregoing condition and to provide for the non-disturbance of Tenant by the holder of the Mortgage; and]

**[For mortgages occurring after the Lease is executed:** WHEREAS, Section 17.1 of the Lease provides that the Lease shall become subject and subordinate to a mortgage encumbering the fee interest of Landlord in and to the Shopping Center if and when a non-disturbance agreement is entered into with respect to such mortgage; and

WHEREAS, the parties hereto desire to effect the subordination of the Lease to the Mortgage and to provide for the non-disturbance of Tenant by Mortgagee.]

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements herein contained, the parties hereto, intending to be legally bound hereby, agree as follows:

1.      Mortgagee hereby consents to and approves the Lease and the term thereof, including the options to extend the term as set forth in the Lease, and covenants and agrees that the exercise by Tenant of any of the rights, remedies and options therein contained shall not constitute a default under the Mortgage.

2.      Tenant covenants and agrees with Mortgagee that the Lease hereby is made and shall continue hereafter to be subject and subordinate to the lien of the Mortgage, and to all modifications and extensions thereof (and such subordination shall not lessen or diminish Tenant's rights under the Lease), subject, however, to the provisions of this Agreement.

G-1

3.    Mortgagee agrees that so long as the Lease shall be in full force and effect, and so long as Tenant shall not be in default under the Lease beyond any applicable notice and grace period:

(a)    Tenant shall not be named or joined as a party or otherwise in any suit, action or proceeding for the foreclosure of the Mortgage or to enforce any rights under the Mortgage or the bond or note or other obligation secured thereby;

(b)    The possession by Tenant of the Premises and Tenant's rights thereto shall not be disturbed, affected or impaired by, nor will the Lease or the term thereof be terminated or otherwise affected by (i) any suit, action or proceeding brought upon the Mortgage or the bond or note or other obligation secured thereby, or for the foreclosure of the Mortgage or the enforcement of any rights under the Mortgage, or by any judicial sale or execution or other sale of the Premises or the Shopping Center, or any deed given in lieu of foreclosure, or by the exercise of any other rights given to any holder of the Mortgage or other documents as a matter of law, or (ii) any default under the Mortgage or the bond or note or other obligation secured thereby; and

(c)    All condemnation awards and insurance proceeds paid or payable with respect to the Premises or any other part of the Shopping Center shall be applied and paid in the manner set forth in the Lease.

4.    If Mortgagee or any future holder of the Mortgage shall become the owner of the Shopping Center by reason of foreclosure of the Mortgage or otherwise, or if the Shopping Center shall be sold as a result of any action or proceeding to foreclose the Mortgage, or transfer of ownership by deed given in lieu of foreclosure, the Lease shall continue in full force and effect, without necessity for executing any new lease, as a direct lease between Tenant and the then owner of the Shopping Center, as "landlord", upon all of the same terms, covenants and provisions contained in the Lease, and in such event:

(a)    Tenant shall be bound to such new owner under all of the terms, covenants and provisions of the Lease for the remainder of the term thereof (including the Renewal Periods, if Tenant elects or has elected to exercise its options to extend the term) and Tenant hereby agrees to attorn to such new owner and to recognize such new owner as "landlord" under the Lease; and

(b)    Such new owner shall be bound to Tenant under all of the terms, covenants and provisions of the Lease for the remainder of the term thereof (including the Renewal Periods, if Tenant elects or has elected to exercise its options to extend the term) which such new owner hereby agrees to assume and perform and Tenant shall, from and after the date such new owner succeeds to the interest of "landlord" under the Lease, have the same remedies against such new owner for the breach of any covenant contained in the Lease that Tenant might have had under the Lease against Landlord if such new owner had not succeeded to the interest of "landlord"; provided, however, that such new owner shall not be:

(i)    liable for any act or omission of any prior landlord (including Landlord) unless such act or omission continues from and after the date upon which the new owner succeeds to the interest of such prior landlord;

(ii)    subject to any defenses which Tenant may have against any prior landlord (including Landlord) unless resulting from any default or breach by such prior landlord which continues from and after the date upon which the new owner succeeds to the interest of such prior landlord;

(iii)    subject to any offsets which Tenant may have against any prior landlord, except to the extent such offsets are expressly provided under the Lease and Mortgagee has received notice thereof and the opportunity to cure within the

applicable time periods set forth in the Lease (it being further agreed that offsets under the Lease that were deducted by Tenant prior to the date upon which the new owner succeeds to the interest of such prior landlord shall not be subject to challenge);

(iv)    bound by any fixed rent or additional rent which Tenant might have paid for more than one month in advance of its due date under the Lease to any prior landlord (including Landlord), unless such additional rent is paid in accordance with the applicable provisions of the Lease; or

(v)    bound by any amendment or modification of the Lease made without its consent; notwithstanding the foregoing, Mortgagee acknowledges that the Lease specifically provides for amendments thereof upon the occurrence of certain events described in the Lease (such as, for example, an amendment to the Lease confirming the measurement of the Premises), and, by its execution below, Mortgagee agrees to recognize such amendments as part of the Lease, and Mortgagee further agrees that such new owner shall also be bound by such amendment(s) to the Lease, without any consent on the part of Mortgagee or such new owner.

(c)    Tenant's obligations hereunder shall be effective only so long as Mortgagee is bound to Mortgagee's obligations hereunder.

5.    Tenant will notify Mortgagee of any default by Landlord under the Lease which would entitle Tenant to terminate the Lease or abate the rent payable thereunder and agrees that notwithstanding any provision of the Lease, no notice of termination thereof nor any abatement shall be effective unless Mortgagee has received the aforesaid notice and has failed to cure the subject default within the same time period allowed Landlord under the Lease.  It is understood that the abatement provisions of this Section relate to abatements by reason of Landlord's default and do not apply to provisions of the Lease whereby Tenant has the automatic right to abate rentals such as, for example, abatement upon casualty or condemnation.

6.    Neither the Mortgage nor any other security instrument executed in connection therewith shall encumber or be construed as subjecting in any manner to the lien thereof, any trade fixtures, signs or other personal property at any time furnished or installed by or for Tenant or its subtenants or licensees on the aforementioned property regardless of the manner or mode of attachment thereof.

7.    Any notices of communications given under this Agreement shall be in writing and shall be given by registered or certified mail, return receipt requested, or by any recognized overnight mail carrier, with proof of delivery slip, postage prepaid, (a) if to Mortgagee, at the address of Mortgagee as hereinabove set forth or at such other address or persons as Mortgagee may designate by notice in the manner herein set forth, or (b) if to Tenant, at the address of Tenant as hereinabove set forth, with duplicate copies to  Allan N. Rauch, Esq., c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, and Cathleen H. Giuliana, Esq., Riker, Danzig, Scherer, Hyland & Perretti LLP, Headquarters Plaza, One Speedwell Avenue, P.O. Box 1981, Morristown, New Jersey 07962-1981, or such other address or persons as Tenant may designate by notice in the manner herein set forth.  All notices given in accordance with the provisions of this Section shall be effective upon receipt (or refusal of receipt) at the address of the addressee.

8.    This Agreement shall bind and inure to the benefit of and be binding upon and enforceable by the parties hereto and their respective successors, assigns, and sublessees.

9.    This Agreement contains the entire agreement between the parties and cannot be changed, modified, waived or canceled except by an agreement in writing executed by the party against whom enforcement of such modification, change, waiver or cancellation is sought.

1        10.    This Agreement and the covenants herein contained are intended to run
2    with and bind all lands affected thereby.

3        **[to add if our memorandum of lease has been recorded prior to the subject**
4    **mortgage]** NOTE: THIS AGREEMENT BY TENANT SHALL NOT BE EFFECTIVE
5    UNLESS AND UNTIL ANY PRIOR MORTGAGES ON THIS PROPERTY HAVE
6    BEEN SATISFIED SO THAT TENANT'S PRIOR AGREEMENTS TO ATTORN TO
7    SAID MORTGAGES AND/OR TO SUBORDINATE ITS LEASE TO SAID
8    MORTGAGES SHALL HAVE BEEN EXTINGUISHED.

9        IN WITNESS WHEREOF, the parties hereto have duly executed this
10    Subordination, Non-Disturbance and Attornment Agreement as of the day and year first
11    above written.

<u>**MORTGAGEE:**</u>

ATTEST:

              _____

By:_____    By:_____
Name:_____    Name:_____
Title:  (Assistant) Secretary      Title:   (Vice) President

[SEAL]

<u>**TENANT:**</u>

ATTEST:                BUY BUY BABY, INC., a Delaware
                             corporation

By:_____    By:_____
Name:_____    Name:  Eugene A. Castagna
Title:  (Assistant) Secretary      Title:   President

[SEAL]

1        [INSERT APPROPRIATE JURAT FOR MORTGAGEE]

2        _____

3                   [JURAT FOR PARENT:]

4    STATE OF NEW YORK          )
5                               ) : ss.
6    COUNTY OF NASSAU           )

7            On this ___ day of _____, 201__, before me personally came Eugene A.
8    Castagna to me known, who being by me duly sworn, did depose and say that he is the
9    President of Buy Buy Baby, Inc., the corporation described in and which executed the
10   above instrument and that he signed his name thereto by order of the Board of Directors
11   of said corporation.

12
13                                            _____
13                                            Notary Public
14   My Commission Expires:
15
16
17   _____

18        _____

19

G-5

1    <u>Exhibit H</u>

2    <u>Form of Recognition Agreement</u>

3    THIS RECOGNITION AGREEMENT, made as of the _____ day of _____,
4 201__, by and between Northway Properties, LLC, a Delaware limited liability company,
5 having an address at 654 Madison Avenue, New York, New York 10065 ("***Landlord***");
6 Buy Buy Baby, Inc., a Delaware corporation, having an address at 650 Liberty Avenue,
7 Union, New Jersey 07083 ("***Tenant***"); and _____, a
8 [_____] [corporation] [limited] [general] [partnership], having an
9 address at _____ ("***Subtenant***").

10    R E C I T A L S:

11    A.    Landlord and Tenant have entered into a certain Lease Agreement (the
12 "***Lease***") dated as of _____ __, 2010, a short form of which has been recorded
13 in Albany County, which demises certain premises (the "***Premises***") located in the
14 Northway Mall Shopping Center, Colonie, New York, which Shopping Center is more
15 particularly described on <u>Exhibit A</u> annexed hereto and made a part hereof.

16    B.    Section 15.5 of the Lease provides that in the event Tenant subleases at
17 least fifteen thousand (15,000) square feet of the Premises for a term of at least five (5)
18 years, Landlord shall, upon Tenant's request, execute and deliver a Recognition
19 Agreement among Landlord, Tenant and each such subtenant in the form attached to the
20 Lease, in recordable form.

21    C.    Pursuant to a Sublease dated as of _____ (the "***Sublease***"),
22 Tenant has subleased [a portion of] the Premises to Subtenant (the "***Subleased***
23 ***Premises***").

24    D.    The parties hereto desire to effectuate the provisions of Section 15.5 of the
25 Lease with respect to the Sublease and the Subleased Premises.

26    NOW, THEREFORE, in consideration of the mutual covenants and agreements
27 herein contained, the parties hereto, intending to be legally bound hereby, agree as
28 follows:

29    1.    Landlord warrants and represents as follows:

30        (a)    that it is the fee owner of the Premises,

31        (b)    that the Lease is unmodified (except as may be otherwise set forth in
32 <u>Exhibit B</u> annexed hereto, if any) and is in full force and effect,

33        (c)    that the term of the Lease expires on _____, but is subject
34 to three renewal periods of five years each and

35        (d)    that Tenant is not in default under the Lease nor has any event
36 occurred which would after notice to Tenant and the passage of time become a default of
37 Tenant under the Lease.

38    2.    Landlord hereby acknowledges receipt of a copy of, and consents to and
39 approves, the Sublease and all of the terms, covenants and provisions thereof, and agrees
40 that the exercise by Subtenant of any of its rights, remedies and options contained therein
41 shall not constitute a default under the Lease.

42    3.    Landlord agrees that whenever it has an obligation with respect to the
43 Premises, or its consent or approval is required for any action of Tenant under the Lease,
44 then, to the extent such obligation, consent or approval relates to the Subleased Premises
45 or Subtenant's use and occupation thereof, it will perform such obligation in accordance

H-1

1   with the terms and conditions of the Lease, and, subject to the applicable terms of the
2   Lease, will not unreasonably withhold or unduly delay such consent or approval.

3       4.      Landlord shall not, in the exercise of any of the rights arising or which may
4   arise out of the Lease or of any instrument modifying or amending the same or entered
5   into in substitution or replacement thereof (whether as a result of Tenant's default or
6   otherwise), disturb or deprive Subtenant in or of its possession or its rights to possession
7   of the Subleased Premises or of any right or privilege granted to or inuring to the benefit
8   of Subtenant under the Sublease, provided that Subtenant is not in default under the
9   Sublease beyond the expiration of any applicable notice and cure period.

10      5.      In the event of the termination of the Lease by reentry, notice, conditional
11  limitation, surrender, summary proceeding or other action or proceeding, or otherwise, or,
12  if the Lease shall terminate or expire for any reason before any of the dates provided in
13  the Sublease for the termination of the initial or renewal terms of the Sublease and if
14  immediately prior to such surrender, termination or expiration the Sublease shall be in
15  full force and effect, Subtenant shall not be made a party in any removal or eviction
16  action or proceeding nor shall Subtenant be evicted or removed of its possession or its
17  right of possession of the Subleased Premises be disturbed or in any way interfered with,
18  and the Sublease shall continue in full force and effect as a direct lease between Landlord
19  and Subtenant (provided, that in such event, Subtenant shall, for the then remainder of the
20  term of the Sublease, pay fixed rent and additional rent in an amount equal to the greater
21  of (x) the Fixed Rent and additional rent then payable under the Lease, prorated on the
22  basis of the ratio which the Floor Area of the Subleased Premises bears to the Floor Area
23  of the Premises, or (y) the fixed rent and additional rent then payable under the Sublease).

24      6.      Landlord hereby waives and relinquishes any and all rights or remedies
25  against Subtenant, pursuant to any lien, statutory or otherwise, that it may have against
26  the property, goods or chattels of Subtenant in or on the Subleased Premises.

27      7.      Any notices, consents, approvals, submissions, demands or other
28  communications (hereinafter collectively referred to as "*Notice*") given under this
29  Agreement shall be in writing.  Unless otherwise required by law or governmental
30  regulation, Notices shall be deemed given if sent by registered or certified mail, return
31  receipt requested, or by any recognized overnight mail carrier, with proof of delivery slip,
32  postage prepaid (a) to Landlord, at the address of Landlord as hereinabove set forth or
33  such other address or persons as Landlord may designate by Notice to the other parties
34  hereto, (b) to Tenant, at the address of Tenant as hereinabove set forth, with duplicate
35  copies to  Allan N. Rauch, Esq., c/o Bed Bath & Beyond Inc., 650 Liberty Avenue,
36  Union, New Jersey 07083, and Cathleen H. Giuliana, Esq., Riker, Danzig, Scherer,
37  Hyland & Perretti LLP, Headquarters Plaza, One Speedwell Avenue, P.O. Box 1981,
38  Morristown, New Jersey 07962-1981, or such other address or persons as Tenant may
39  designate by Notice to the other parties hereto, and (c) to Subtenant, at the address of
40  Subtenant as hereinabove set forth or such other address or persons as Subtenant may
41  designate by Notice to the other parties hereto.  During the period of any postal strike or
42  other interference with the mails, personal delivery shall be substitute for registered or
43  certified mail.  All Notices shall become effective only on the receipt or rejection of same
44  by the proper parties.

45      8.      No modification, amendment, waiver or release of any provision of this
46  Agreement or of any right, obligation, claim or cause of action arising hereunder shall be
47  valid or binding for any purpose whatsoever unless in writing and duly executed by the
48  party against whom the same is sought to be asserted.

49                          [Signature Page Follows]

H-2

1    9.    This Agreement shall be binding on and shall inure to the benefit of the
2    parties hereto and their respective heirs, legal representatives, successors, assigns and
3    sublessees.

4    IN WITNESS WHEREOF, the parties have caused this Recognition Agreement to
5    be executed under seal the date first above written.

**LANDLORD:**

NORTHWAY PROPERTIES, LLC, a
Delaware limited liability company

By:_____
Name:_____
Title:_____

**TENANT:**

BUY BUY BABY, INC., a Delaware
corporation

By:_____
Name:  Eugene A. Castagna
Title:   President

**SUBTENANT:**

_____

By:_____
Name:_____
Title:_____

H-3

1    **[INSERT APPROPRIATE JURATS FOR <u>LANDLORD</u> AND <u>SUBTENANT</u>]**

2    _____

3                          **[JURAT FOR PARENT:]**

4    STATE OF NEW YORK              )
5                                   ) : ss.
6    COUNTY OF NASSAU               )

7            On this ___ day of _____, 201__, before me personally came Eugene A.
8    Castagna to me known, who being by me duly sworn, did depose and say that he is the
9    President of Buy Buy Baby, Inc., the corporation described in and which executed the
10   above instrument and that he signed his name thereto by order of the Board of Directors
11   of said corporation.

12
13                                   _____
                                     Notary Public
14   My Commission Expires:
15
16
17   _____

18   _____

19

H-4

<u>Exhibit I</u>

<u>Form of Delivery Date Notice</u>

[Letterhead of Landlord]

_____, 201__

[via Federal Express or other
recognized overnight delivery
service per Article 18 of the foregoing
lease]

Buy Buy Baby, Inc.
650 Liberty Avenue
Union, New Jersey 07083
Attention: Eugene A. Castagna, President

Re:    Lease Agreement dated as of _____, 201__ (the "***Lease***"), between Northway
       Properties, LLC, as landlord ("***Landlord***"), and Buy Buy Baby, Inc., as tenant
       ("***Tenant***"), with respect to certain retail premises (the "***Premises***") located in the
       Northway Mall Shopping Center, Colonie, New York.

Gentlemen:

       In accordance with the provisions of Subsection 2.3.2 of the Lease, the Landlord
hereby informs the Tenant that the Delivery Date shall take place at 8:00 A.M. on
_____, 201__.  This notice shall constitute the Delivery Date Notice referred to
in Subsection 2.3.2 of the Lease.

                                        NORTHWAY PROPERTIES, LLC

                                        By:_____
                                            _____, (Vice) President

cc:    Cathleen H. Giuliana, Esq.
       Allan N. Rauch, Esq., 650 Liberty Avenue, Union, New Jersey 07083

<u>Exhibit J</u>

<u>Form of Delivery Date Certification</u>

[Letterhead of Landlord]

_____, 201__

[via Federal Express or other
recognized overnight delivery
service per Article 18 of the foregoing
lease]

Buy Buy Baby, Inc.
650 Liberty Avenue
Union, New Jersey 07083
Attention:  Eugene A. Castagna, President

Re:   Lease Agreement dated as of _____, 2010 (the "**Lease**"), between Northway
      Properties, LLC, as landlord ("**Landlord**"), and Buy Buy Baby, Inc., as tenant
      ("**Tenant**"), with respect to certain retail premises (the "**Premises**") located in the
      Northway Mall Shopping Center, Colonie, New York.

Gentlemen:

      In accordance with the provisions of Subsection 2.3.3 of the Lease, Landlord
hereby certifies to Tenant that, as of the date of this certification, all of the Delivery Date
Conditions (as defined in the Lease) have been satisfied, and that, as a result, the Delivery
Date (as such term is defined in the Lease) will be deemed to be _____, 201__ .
This notice shall constitute the Delivery Date Certification referred to in Subsection 2.3.3
of the Lease.

                              NORTHWAY PROPERTIES, LLC


                              By:_____
                                 _____, (Vice) President


cc:   Cathleen H. Giuliana, Esq.
      Allan N. Rauch, Esq., 650 Liberty Avenue, Union, New Jersey 07083

1

<u>Exhibit K-1</u>

2

<u>Existing Exclusives</u>

occupied by Kids 'R Us, for such period of time as Landlord shall not
have control of the uses to which such premises may be put by reason
of Landlord's existing agreements with Montgomery Ward, Woolworth and
Kids 'R Us), other than Tenant, to use more than twelve thousand
(12,000) square feet of floor area for the sale or display at
discount prices of brand-name clothing, then minimum rent payable
pursuant hereto shall be reduced to forty percent (40%) of the amount
provided for in Section 1 of ARTICLE III, and such reduction in
minimum rent shall remain effective for so long as such use
continues; provided, however, that there shall be no abatement during
any period in which Landlord shall be diligently enforcing any lease
provisions prohibiting the foregoing activities if such enforcement
in fact results in the discontinuation of the foregoing activities
unless a failure to enforce a discontinuance is the result of any of
the matters and events described in Subsection 2(D) below.  Landlord
may request in writing (the "Waiver Request") that Tenant waive the
benefit of this Subsection 2(C) with regard to a specific instance
cited in the Waiver Request.  Tenant shall respond to the Waiver
Request in writing within thirty (30) days of the date on which the
Waiver Request is received by Tenant.  If Tenant fails to respond
within the said thirty (30) days or if Tenant waives the benefit of
this Subsection 2(C), this Subsection 2(C) shall not apply to the
specific instance cited in the Waiver Request.  If Tenant responds
and refuses to waive the benefit of this Subsection 2(C), which
Tenant shall have the right to do in its sole discretion, this
Subsection 2(C) shall continue to apply to the specific instance
cited in the Waiver Request.

Lease date May 9, 1989 between Northway Mall Associates and
Marshalls of MA, Inc.

*Section 5.2.1. Exclusive Use.* No part of the Center shall be used for the sale or leasing of office equipment (including computers), office furniture or office supplies, or the provision of copying or printing services or any other office services then provided by Tenant and no property within one mile of the Center owned by Landlord or by an entity under common control with Landlord shall be used for a so-called "office supply superstore" as such retailing concept is generally defined and acknowledged within the retailing industry; provided, however, that if Tenant changes its use of the Premises from the sale and/or leasing of office equipment, office furniture and/or office supplies, and/or the provision of office related services, Tenant agrees to waive the aforesaid exclusivity rights so long as Landlord grants to Tenant, to Tenant's reasonable satisfaction, an exclusivity right for Tenant's new primary use of the Premises. In the event (i) a court of competent jurisdiction declares this Section 5.2.1 to be invalid and/or unenforceable, or (ii) a court of competent jurisdiction pursuant to a declaratory judgment or other similar mandatory order requires Landlord to act in violation hereof, or (iii) a governmental body or agency requires Landlord to enter into a consent order or decree whereby Landlord is prohibited from enforcing this Section 5.2.1, then, in any such event, Landlord shall not be liable to Tenant for damages or otherwise by reason thereof. In any such event, this Lease shall remain in full force and effect without abatement of Base Rent or other charges hereunder and Tenant's obligations pursuant to this Lease shall continue as if this Section 5.2.1 never existed. Further, provided Landlord gives Tenant notice of a threatened action or proceeding occasioned by the restrictions set forth in this Section 5.2.1, and provided Landlord is not in default of the covenants set forth in this Section 5.2.1, and Tenant elects not to release Landlord from the obligations hereof, Tenant shall indemnify, defend and hold Landlord harmless from and against any claims of damage and/or penalties made by, for and on behalf of any person, persons, firms, corporations, other entities, or governmental bodies or agencies, including costs and reasonable attorney's fees resulting therefrom; and

Lease dated December 8, 1995 between Northway Mall Associates and Staples, Inc.

OK

"From and after the date of this First Amendment, Landlord also covenants that, other than the Premises, no part of the Center shall be used for the sale or leasing of equipment (including computers and telecommunications equipment), furniture or supplies for business or office (including home office) use, or the provision of business or office services (including copying, printing, telecommunications, packing, shipping and business equipment repair services) (collectively, the "Exclusive Goods and Services") and no property located within one mile of the Center owned by Landlord or by an entity under common control with Landlord shall be used for the operation of a so-called "office supply superstore" as such retailing concept is generally defined and acknowledged within the retail industry; provided, however, that if Tenant changes its use of the Premises from the sale and leasing of equipment, furniture or supplies for business or office use, and/or the provision of business or office services as aforesaid, Tenant agrees to waive the aforesaid exclusivity right so long as Landlord grants to Tenant, to Tenant's reasonable satisfaction, an exclusivity right for Tenant's new primary use of the Premises (which new exclusivity right shall thereafter be deemed the Exclusive Goods and Services for all purposes under this Lease)."

"*Section 5.2.3. Additional Prohibited Uses and Restricted Uses.* No part of the Center shall be used for a tanning, health, exercise or racquet club or spa, gymnasium or other sports or recreational facility school, library, reading room, house of worship, movie theater, gallery, tavern, bar, gaming or gambling facility, gas station or tire store. No part of the Center within 300 feet of the Premises (including the Bank Building) nor the Petco Building shall be used for a restaurant or any other use which would place an undue burden on parking."

First Lease Amendment Dated
October 3, 2001, Between
Northway Mall Associates and Staples, Inc.

the Leased Premises which Tenant is set forth in Section 9.1 for the days and hours set forth in Section 9.1 (c) hereof, or such other days and hours subsequently agreed to by Landlord and Tenant. Landlord covenants, warrants and represents that it will not, during the term of this Lease, rent or permit any space in the Shopping Center, Tenant acknowledging that the space presently occupied by Montgomery Ward is not part of the Shopping Center for the purposes and intent hereof, to be used as follows: (i) No store, regardless of size, shall be used for what is commonly known as a bridal and/or men's formal wear catalogue store; (ii) No store of less than 35,000 square feet of gross leaseable area shall be used predominantly for the sale or rental of bridal wear. As used herein, "predominantly" means ten (10%) percent of sales area or 1,500 square feet, whichever is less; and (iii) A store of 35,000 square feet of gross leaseable area, or more, shall not use more than 4,500 square feet of its sales area for the sale or rental of bridal wear. Notwithstanding the foregoing, nothing contained herein shall restrict or prohibit an existing tenant or their permitted successors or assigns from displaying and selling goods and merchandise or offering services of any kind or nature whatsoever that is permitted by their existing lease agreements or any extensions or renewals thereof.

Lease dated December 10, 1997 between Northway Mall Associates and David's Bridal of Albany, Inc.

(a)    "Protected Use" shall mean the sale of fabrics of all kinds, yard goods, upholstery materials, patterns, knitting supplies, needlepoint, macrame, artificial flowers, accessories, arts and crafts materials and supplies, yarns and all types of notions, sewing machines, sewing machine furniture, fabric care items, products, accessories and services specifically and directly related to all of the foregoing.

OK

Lease dated June 15, 1999 between
Northway Mall Associates and Jo-Ann Stores, Inc.

14
15                    NON-COMPETITION

16          Provided Tenant is operating its business in the Premises, Landlord covenants w
17    represents that during the term of this Lease, Landlord will not rent or permit any space in th
18    Center to be used by any other tenant for the sale or service of pet food, pet supplies,    -
19    pet grooming, pet training and veterinary services, except for incidental sales.  Incidental sales
20    the sale or display of such items or services not as the primary use of the competing tenant and
21    up no more than five hundred (500) square feet of floor area.  Notwithstanding the foregoi
22    contained herein shall restrict or prohibit Target, Marshall's or Jo-Anns, or their permitted su
23    assigns from displaying and selling goods and merchandise, or offering services, as allowe
24    leases, or any amendment thereto.

31    Landlord agrees at its sole cost and expense to promptly and continuously enforce this non-
32    covenant using all reasonable legal means.  However, in the event (i) a court of competenc
33    declares Section (i) above to be invalid and/or unenforceable; or (ii) a court of competent
34    pursuant to a declaratory judgment or other similar mandatory order required Landlord to act i
35    thereof; or (iii) a governmental body or agency requires Landlord to enter into a consent order
36    whereby Landlord is prohibited from enforcing that Section, then and in any such event, Lan
37    not be liable to Tenant for damages or otherwise by reason thereof.  In any such event, this l
38    remain in full force and effect without any abatement of Rent or other changes hereunder and
39    obligations pursuant to this Lease shall continue as if Section (i) never existed.

Lease dated September 28, 1999 between Northway Mall Associa
and Petco Animal Supplies, Inc.

PAGE 8/15 * RCVD AT 2/18/2010 11:28:17 AM [Eastern Standard Time] * SVR:RDMOFAX01/7 * DNIS:3656 * CSID:2125818958 * DURATION (mm-ss):02-12

15.1    Restriction. Provided Tenant is operating its business in the Leased Premises, as set fort in Sections 1.1(I) and 9.1 hereof, Landlord covenants, warrants and represents that it will not, during th term of this Lease, rent or permit any space in the Shopping Center to be used predominantly (it bein agreed that use of fifteen (15%) percent or more of the sales area of any such space shall be deeme "predominant") for the display and sale of large size women's apparel (including half size and plus size)

Lease dated December 3, 1999 between Northway Mall Associates and The Dress Barn, Inc.

## SECTION 15.  RESTRICTION AND INDEMNITY.

15.1 :   Restriction.  Provided Tenant is operating its business in the Leased Premises, as set forth in Sections 1.1(j) and 9.1 hereof, Landlord covenants, warrants and represents that it will not, during the term of this Lease, rent or permit any space in the Shopping Center to be used as a unisex salon for the styling and cutting of hair.  Notwithstanding the foregoing, nothing contained herein shall restrict or prohibit an existing tenant or their permitted successors or assigns from displaying and selling goods and merchandise, or offering services, of any kind or nature whatsoever that is permitted by their existing leases or any renewals or extensions of the lease terms thereof.

Lease Dated 1/15/01 Between Northway Mall Associates
and Supercuts, Inc.

EXHIBIT  C

PAGE 10/15 * RCVD AT 2/18/2010 11:28:17 AM [Eastern Standard Time] * SVR:RDMOFAX01/7 * DNIS:8656 * CSID:2125818958 * DURATION (mm-ss):02-12

SECTION 15.        RESTRICTION AND INDEMNITY.

15.1    Restriction. Provided Tenant is operating its business in the Leased Premises, as set forth in Sections 1.1(1) and 9.1 hereof, Landlord covenants, warrants and represents that it will not, during the term of this Lease, rent or permit any space in the Shopping Center to be used predominantly (it being agreed that use of fifteen (15%) percent or more of the sales area of any such space shall be deemed "predominant") for general banking, private bank or automated banking services.   Notwithstanding the foregoing, nothing contained herein shall restrict or prohibit an existing tenant or their permitted successors or assigns from displaying and selling goods and merchandise, or offering services, of an kind or nature whatsoever.

Lease dated April 13, 2001, Between Northway Mall Associates and
Charter One Bank, F.S.B.

15.1    Restriction. Provided Tenant is operating its business in the Leased Premises, as set forth in Sections 1.1(l) and 9.1 hereof, Landlord covenants, warrants and represents that it will not, during the term of this Lease, rent or permit any space in the Shopping Center to be used predominantly (it being agreed that use of twenty (20%) percent or more of the sales area of any such space shall be deemed "predominant") for the display and sale of videogame hardware and software, and computer game software. Notwithstanding the foregoing, nothing contained herein shall restrict or prohibit an existing tenant or their permitted successors or assigns from displaying and selling goods and merchandise, or offering services, of any kind or nature whatsoever.

Lease Dated August 9, 2002, Between NORTHWAY MALL PROPERTIES, LLC and ELECTRONICS BOUTIQUE OF AMERICA, INC.

EXHIBIT C

15.1    <u>Restriction</u>. Provided Tenant is operating its business in the Leased Premises, as set forth in Sections 1.1(1) and 9.1 hereof, Landlord covenants, warrants and represents that it will not, during the term of this Lease, rent or permit any space in the Shopping Center to be used predominately (it being agreed that use of fifteen (15%) percent or more of the sales area of any such space shall be deemed "predominant") for the sale of unopened bottles, containers and packages of wine and spirits. Notwithstanding the foregoing, nothing contained herein shall restrict or prohibit an existing tenant or their permitted successors or assigns from displaying and selling goods and merchandise, or offering services, of any kind or nature whatsoever.

15.2    <u>Release</u>. In the event: (i) a Court of competent jurisdiction declares Section 15.1 of the Lease to be invalid and/or unenforceable; or (ii) a Court of competent jurisdiction pursuant to a declaratory judgment or other similar mandatory order requires Landlord to act in violation thereof; or (iii) a governmental body or agency requires Landlord to enter into a consent order or decree whereby Landlord is prohibited from enforcing that Section, then and in any such event, Landlord shall not be liable to Tenant for damages or otherwise by reason thereof. In any such event, this Lease shall remain in full force and effect without any abatement of Rent or other charges hereunder and Tenant's obligations pursuant to this Lease shall continue as if Section 15.1 never existed.

OK

Lease dated June 5, 2007 between Northway Mall Properties, LLC and Empire Wine & Spirits, LLC.

## SECTION 15. RESTRICTION AND INDEMNITY.

15.1    Restriction.  Provided Tenant is operating its business in the Leased Premises, as set forth in Sections 1.1(l) and 9.1 hereof, Landlord covenants, warrants and represents that it will not, directly or indirectly through any person or entity that controls or is controlled by Landlord or is under common control with Landlord, during the term of this Lease, rent or permit any space in the Shopping Center to be used for the sale of footwear. Notwithstanding the foregoing, nothing contained herein shall restrict or prohibit an existing tenant or their permitted successors or assigns from displaying and selling goods and merchandise, or offering services, of any kind or nature whatsoever, nor shall it prohibit any future tenant of the Shopping Center from devoting less than 5,000 square feet of sales area to the retail footwear business or prohibit or restrict in any manner, a store of 20,000 square feet, or more. Landlord represents that no existing tenant of the Shopping Center has an exclusive right to sell footwear.

15.2    Release.  In the event: (i) a Court of competent jurisdiction declares Section 15.1 of the Lease to be invalid and/or unenforceable; or (ii) a Court of competent jurisdiction pursuant to a declaratory judgment or other similar mandatory order requires Landlord to act in violation thereof; or (iii) a governmental body or agency requires Landlord to enter into a consent order or decree whereby Landlord is prohibited from enforcing that Section, then and in any such event, Landlord shall not be liable to Tenant for damages or otherwise by reason thereof.  In any such event, this Lease shall remain in full force and effect without any abatement of Rent or other charges hereunder and Tenant's obligations pursuant to this Lease shall continue as if Section 15.1 never existed.

15.3    Indemnity.  Provided Landlord gives Tenant Notice of a threatened action or proceeding by a governmental body or agency occasioned by the restrictions set forth in Section 15.1 and Tenant elects not to release Landlord from the obligations thereof, Tenant warrants and represents that it will indemnify, defend and hold Landlord harmless from and against any claims of damages and/or penalties made by, for and in behalf of any governmental bodies or agencies, including costs and reasonable attorneys' fees, resulting therefrom.

Northway Mall Lease – Macro Retailing – 9/10/09

1

<u>Exhibit K-2</u>

2

<u>Existing Leases</u>

3

4   1.  Charter One Bank
5   2.  David's Bridal, Inc.
6   3.  Dress Barn
7   4.  Eddie Bauer
8   5.  Empire Wine & Spirits
9   6.  Game Stop
10  7.  Jo-Ann Fabrics
11  8.  Marshalls
12  9.  Ming .99 City
13  10. Petco
14  11. Staples
15  12. Macro Shoes
16  13. Super Cuts

1                                       <u>Exhibit L</u>

2                                  <u>Intentionally Omitted</u>

1    Exhibit M

2    Prohibited Uses

3    As used in this Lease, the term "**Prohibited Uses**" shall mean any of the following uses:

4    A.    As to the Shopping Center, any of the following uses:

5    (1)    Any use which emits or results in strong, unusual or offensive odors,
6    fumes, dust or vapors, is a public or private nuisance, emits noise or sounds which are
7    objectionable due to intermittence, beat, frequency, shrillness or loudness, creates a
8    hazardous condition, or is used, in whole or in part, as or for warehousing or the dumping
9    or disposing of garbage or refuse;

10    (2)    Any operation primarily used as a storage facility and any assembling,
11    manufacturing, distilling, refining, smelting, agricultural, or mining operation;

12    (3)    Any "second hand" store, "surplus" store;

13    (4)    Any mobile home park, trailer court, labor camp, junkyard, or stockyard
14    (except that this provision shall not prohibit the temporary use of construction trailers
15    during periods of construction, reconstruction, or maintenance);

16    (5)    Any dumping, disposing, incineration, or reduction of garbage (exclusive of
17    trash compactors or trash containers located near the rear of any building);

18    (6)    Any fire sale, bankruptcy sale (unless pursuant to a court order), auction
19    house operation, fictitious going-out-of-business sale, lost-our-lease sale or similarly
20    advertised event;

21    (7)    Any central laundry, dry cleaning plant, or laundromat (except that a dry
22    cleaner that performs all dry cleaning outside the Shopping Center shall be permitted, so
23    long as its on-site premises are located more than 150 feet away from the Premises);

24    (8)    Any automobile, truck, trailer, boat, or recreational vehicle sales, leasing,
25    display or body shop repair operation;

26    (9)    Any bowling alley or skating rink;

27    (10)    Any live performance theater, auditorium, meeting hall, sporting event, or
28    other entertainment use;

29    (11)    Any living quarters, sleeping apartments, or lodging rooms;

30    (12)    Any veterinary hospital or animal raising or boarding facilities (except to
31    the extent permitted below);

32    (13)    Any mortuary or funeral home;

33    (14)    Any "Pornographic Use", which shall include, without limitation: (x) a
34    store displaying for sale or exhibition books, magazines or other publications containing
35    any combination of photographs, drawings or sketches of a sexual nature, which are not
36    primarily scientific or educational [provided, however, that the sale of books, magazines
37    and other publications by a national bookstore of the type normally located in first-class
38    shopping centers in the State in which the Shopping Center is located (such as, for
39    example, Borders and Barnes & Noble, as said stores currently operate) shall not be
40    deemed a "pornographic use" hereunder]; or (y) a store offering for exhibition, sale or
41    rental video cassettes or other medium capable of projecting, transmitting or reproducing,
42    independently or in conjunction with another device, machine or equipment, an image or
43    series of images, the content of which has been rated or advertised generally as NC-17 or

"X" or unrated by the Motion Picture Rating Association, or any successor thereto [provided, however, that the sale or rental of such videos by a national video store of the type normally located in first-class shopping centers in the State in which the Shopping Center is located (such as, for example, Blockbuster or West Coast Video, as said stores currently operate) shall not be deemed a "pornographic use" hereunder]; or massage parlor [except for therapeutic massages given in connection with the operation of a day spa or health club which may otherwise be permitted under this Exhibit M];

(15)    Any so-called "head shop", or other establishment primarily selling or exhibiting drug-related paraphernalia;

(16)    Any bar, tavern, or other establishment selling alcoholic beverages for on- or off-premises consumption, except (i) as an incidental part of a restaurant otherwise permitted herein, and (ii) as part of a grocery store, or upscale liquor store (such as BevMo!®, or Total Wine & More®) otherwise permitted herein), provided that such uses are located at least two hundred fifty (250) feet away from the Premises;

(17)    Any catering or banquet hall;

(18)    Any flea market, amusement or video arcade, pool or billiard hall, night club, discotheque, or dance hall;

(19)    Any training or education facility, including but not limited to:  beauty schools, barber colleges, reading rooms, places of instruction or other operations catering primarily to students or trainees rather than to customers; provided, however, this prohibition shall not be applicable to on-site employee training by an Occupant incidental to the conduct of its business at the Shopping Center;

(20)    Any gambling facility or operation, including but not limited to:  off-track or sports betting parlor; table games such as black-jack or poker; slot machines; video poker/black-jack/keno machines or similar devices; or bingo hall.  Notwithstanding the foregoing, this prohibition shall not apply to governmental sponsored gambling activities, or charitable gambling activities, so long as such governmental and/or charitable activities are incidental to the business operation being conducted by the Occupant;

(21)    Any unlawful use;

(22)    Any pawn shop, check-cashing store, gun shop, or tattoo parlor;

(23)    Any church or other place of religious worship;

(24)    Any car wash, automobile repair shop, or any business servicing motor vehicles in any respect, including, without limitation, any quick lube oil change service, tire center or gasoline or service station or facility

(25)    Any carnival, amusement park or circus;

(26)    Any medical clinics or medical offices;

(27)    Any supermarket, except that an upscale, boutique-type food store of the type normally operated in the Albany, New York  metropolitan area (such as, by way of example, Zagara's, Whole Foods, Fresh Fields, or Wild Oats), provided, that such store shall not occupy more than 27,000 square feet of Floor Area, and shall be located at least 200 feet away from the Premises (except that an upscale, boutique-type food store shall be permitted to be located within the Premises);

(28)    Any office use, other than: (x) office space used in connection with and ancillary to a permitted retail use hereunder; and (y) retail offices providing services commonly found in similar first-class shopping centers in the Albany, New York

1    metropolitan area (for example, financial services, real estate brokerage, insurance
2    agency, banking, travel agency), provided that such uses are located at least 200 feet
3    away from the Premises, and not more than five thousand (5,000) square feet of Floor
4    Area in the Shopping Center, in the aggregate, shall be devoted to such uses;

5          (29)    hotel/motel;

6          (30)    daycare center;

7          (31)    veterinary office, except as may be incidental to a permitted full-line pet
8    and pet supply store operating in at least 15,000 square feet of Floor Area and located at
9    least 100 feet away from the Premises (except that a full-line pet and pet supply store
10   shall be permitted to be located within the Premises); such occupant shall use reasonable
11   efforts to prevent its customers from allowing their pets to urinate or defecate in the
12   Common Areas and will promptly remove any "dog dirt" from in front of the Premises;
13   no pet or pet supply store shall be located within 100 feet of the Premises;

14         (32)    children's entertainment or activity facility (such as "Discovery Zone", or
15   "Chuck E. Cheese's");

16         (33)    karate center, except if such use is located at least 200 feet away from the
17   Premises;

18         (34)    movie theater;

19         (35)    restaurant serving meals for on- or off-premises consumption;

20         (36)    beauty parlor or nail salon;

21         (37)    health spa, exercise facility or similar type business. ; or

22         (38)    a store primarily selling merchandise which is classed as "odd lot," "close
23   out," "clearance," "discontinued," "cancellation," "second," "factory reject," "sample,"
24   "floor model," "demonstrator," "obsolescent," "over stock," "distressed," "bankruptcy,"
25   "fire sale" or "damaged," such as, for example, "Grossman's Bargain Outlet",
26   "Contractor's Warehouse", "Big Lots", "Liquidation World", or "Odd Job"; the retailer
27   commonly known as "Christmas Tree Shops" shall be deemed not to violate the
28   foregoing restriction.

29   B.        As to Related Land, any of the uses listed in Items 1, 2, 4, 5, 14, 15, 21, 22, and 25
30   above.

31

Exhibit N

Form of Mechanics' Lien Indemnification Agreement

THIS MECHANICS' LIEN INDEMNIFICATION is made this _____ day of
_____, 201__, by BUY BUY BABY, INC., a Delaware corporation
(hereinafter referred to as *"Tenant"*), for the benefit of between NORTHWAY
PROPERTIES, LLC, a Delaware limited liability company ("Landlord").

WITNESSETH

Landlord and Tenant have entered into a Lease (the *"Lease"*) dated _____,
2010, whereby Landlord has leased to Tenant a portion of the real property located in the
Northway Mall, Colonie, New York (the *"Shopping Center"*) and Tenant has
constructed on such real property a store premises (the *"Premises"*).

NOW, THEREFORE, in consideration of the payment of the Tenant Improvement
Allowance as defined in the Lease and other good and valuable consideration, the receipt
of which is hereby acknowledged, the Tenant agrees as follows:

1.    Tenant hereby indemnifies and agrees to hold Landlord harmless from any
loss, payment, claim or expense as the result of mechanics and materialmen filing liens or
otherwise making claims against Landlord's interest in the Premises and the Shopping
Center based upon materials or services provided under contract with Tenant.  In the
event that any mechanic, materialman or other claimant makes claim against the Premises
or Shopping Center based upon materials or services provided under contract with
Tenant, Tenant shall hold harmless and protect Landlord from any loss, payment, claim
or expense related thereto.

2.    Tenant reserves the right to contest in good faith the amount of any claim or
lien assessed against the Premises or the Shopping Center by any of such claimants;
provided, however, should the holder or holders of such claim or lien attempt to enforce
their lien by foreclosure by any other means, Tenant shall bond around, pay or remove
such lien by any manner reasonably necessary to protect Landlord's interest in the
Premises and the Shopping Center.  This indemnity and hold harmless shall not apply to
any liens or claims caused by Landlord or Landlord's agents.

EXECUTED this _____ day of _____, 201_.

**TENANT:**

BUY BUY BABY, INC., a Delaware
corporation

By:      _____
Name:  _____
Title:    _____

Exhibit O

Form of Declaration of Restrictions Against Related Land

RECORDING REQUESTED BY AND WHEN RECORDED MAIL TO:

**[NOTE:  THIS FORM IS SET UP TO APPLY TO RELATED LAND OWNED BY LANDLORD OR ITS AFFILIATE.]**

_____

(Space Above Line For Recorder's Use Only)

### DECLARATION OF RESTRICTIONS

     This Declaration of Restrictions (*"Declaration"*) is made as of the _____ day of _____ 200__ by **[LANDLORD OR LANDLORD'S AFFILIATE, AS APPLICABLE]**, a _____, having an address c/o _____ (*"Declarant"*) for the benefit of BUY BUY BABY, INC., a Delaware corporation, having an office at 650 Liberty Avenue, Union, New Jersey 07083 (*"Tenant"*).

     WHEREAS, the Declarant is the owner of that certain real property located in the County of Albany, State of New York, as more particularly described on <u>Exhibit A</u> annexed hereto (the *"Related Land"*).

     WHEREAS, **[the Declarant// or Name of Landlord, as applicable]**, a _____, having an address c/o _____ (*"Landlord"*)] is [also] the owner of certain real property located in the County of _____, State of _____, commonly referred to as the _____ Shopping Center as more particularly described on <u>Exhibit B</u> annexed hereto (the *"Shopping Center"*).

     WHEREAS, **[Declarant or Landlord]** and Tenant, as of the date hereof, have entered into a lease (the *"Lease"*) demising a portion of the Shopping Center as more particularly described in the Lease (the *"Premises"*) to Tenant.

     **[Add if Declarant is an Affiliate of Landlord:  WHEREAS, Declarant controls, is controlled by, or is under common control with, Landlord, and therefore will derive a direct or indirect financial benefit from the Lease (as used herein, "*control*" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person or entity, whether through the ownership of voting securities or rights, by contract, or otherwise).]**

     WHEREAS, Tenant is not willing to enter into the Lease unless the Related Land is restricted in accordance with this Declaration and the imposition of the terms of this Declaration on the Related Land is a material inducement to Tenant in connection with the Lease.

     WHEREAS, the Declarant is willing to restrict the Related Land as set forth in this Declaration and by executing this Declaration does so restrict it for the benefit of Tenant and its successors and assigns.

### DECLARATION

     NOW, THEREFORE, in consideration of One Dollar and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties state as follows:

1.    All capitalized terms used, but not otherwise defined, herein shall have the meanings ascribed to them in the Lease.

2.    The Related Land shall be subject to the restrictions as set forth herein which are declared and agreed to be for the benefit of Tenant and its successors and assigns and which restrictions shall run with the Related Land and be binding upon the successors and assigns of the Declarant, and subject to the terms of leases for premises on the Related Land existing on the date hereof, all tenants, licensees and other occupants and users of the Related Land, and any other party claiming by, through or under the Declarant.

3.    For so long as the Lease (as same may be amended, modified, extended or renewed from time to time) shall remain in effect, and subject to the terms of leases for premises on the Related Land existing on the date hereof, the Declarant shall not lease, rent or occupy or permit any portion of the Related Land to be occupied for any of the "Prohibited Uses" (defined in <u>Exhibit C</u> annexed hereto and made a part hereof).

4.    For so long as the Lease (as same may be amended, modified, extended or renewed from time to time) shall remain in effect, and subject to the terms of leases existing on the date hereof, the Declarant shall not lease, rent or occupy or permit any other premises in the Related Land to be occupied, whether by a tenant, sublessee, assignee, licensee or other occupant or itself, **[INSERT TENANT'S EXCLUSIVE FROM THE LEASE]**.

5.    In the event of a breach of the restrictions set forth in this Declaration, Tenant and its successors and assigns may prosecute any appropriate proceedings at law or in equity.  They may, in any such proceeding, obtain injunctive or other equitable relief to enforce this Declaration or restrain violations of this Declaration; recover damages on account of such violation; secure, by way of specific performance or otherwise, the performance of this Declaration; and/or obtain any other remedy provided for at law or in equity.

6.    The Declarant represents and warrants to Tenant that it is duly authorized to execute this Declaration and that this Declaration is superior to all mortgages, deeds of trust and other security instruments encumbering or otherwise affecting the Related Land, and no joinder by or consent or approval of any other party is necessary to fully bind the Declarant and the interests in the Related Land held by the Declarant to the terms of this Declaration.

7.    The restrictions set forth in Paragraphs 3 and 4 above shall automatically terminate and be of no further force and effect upon the Expiration Date (as defined in the Lease) or sooner termination of the Lease.

IN WITNESS WHEREOF, the undersigned has executed this Declaration as of the date hereinabove provided.

**DECLARANT:**

Witness/Attest:

[                                                    ]

a _____


_____         By:_____

                                Name:_____

                                Title:_____

## ACKNOWLEDGMENT

STATE OF _____

): SS.

COUNTY OF _____)

On the _____ day of _____ in the year 200__ before me, the undersigned, a Notary Public in and for said State, personally appeared _____ personally known on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument, and that such individual made such appearance before the undersigned in the municipality of _____, _____ County, State of _____.

_____

Notary Public
My Commission Expires:

(SEAL)

O-3

1
2
3
4
5
6
7
8

<u>Exhibit A</u>

<u>Legal Description of Related Land</u>

1
2
3
4
5

<u>Exhibit B</u>

<u>Legal Description of Shopping Center</u>

1
2
3
4
5
6
7
8
9
10

### Exhibit C

### Prohibited Uses