# EXHIBIT 2

Colonie, NY/60-85-584                                                          04/23/99

AMENDED AND RESTATED

OPERATION AND EASEMENT AGREEMENT

BETWEEN

DAYTON HUDSON CORPORATION

AND

NORTHWAY MALL ASSOCIATES

DHC: 30278 v5

# AMENDED AND RESTATED
## OPERATION AND EASEMENT AGREEMENT
### TABLE OF CONTENTS

| **Section** | | **Page** |
|---|---|---|
| **Article I** | DEFINITIONS | |
| 1.1 | Approving Party | 2 |
| 1.2 | Building | 3 |
| 1.3 | Building Area | 3 |
| 1.4 | Common Area | 3 |
| 1.5 | Constant Dollars | 3 |
| 1.6 | Floor Area | 4 |
| 1.7 | Occupant | 4 |
| 1.8 | Operator | 5 |
| 1.9 | Outside Sales Area | 5 |
| 1.10 | Party | 5 |
| 1.11 | Permittee | 6 |
| 1.12 | Person | 7 |
| 1.13 | Primary Building Area | 7 |
| 1.14 | Restaurant | 7 |
| 1.15 | Tract | 7 |
| 1.16 | Utility Lines | 7 |
| | | |
| **Article II** | EASEMENTS | |
| 2.1 | Ingress, Egress and Parking | 8 |
| 2.2 | Utilities | 10 |
| 2.3 | Construction, Maintenance and Reconstruction | 14 |
| 2.4 | Adjacent Site | 16 |
| 2.5 | Restriction | 20 |

| Article III | CONSTRUCTION | |
|---|---|---|
| 3.1 | General Requirements | .20 |
| 3.2 | Common Area | 23 |
| 3.3 | Building Improvements | 28 |
| 3.4 | Liens | 32 |

| Article IV | MAINTENANCE AND REPAIR | |
|---|---|---|
| 4.1 | Utilities Lines | .33 |
| 4.2 | Common Area | 34 |
| 4.3 | Building Improvements and Outside Sales Area | 44 |

| Article V | OPERATION OF THE SHOPPING CENTER | |
|---|---|---|
| 5.1 | Uses | 45 |
| 5.2 | Lighting | 52 |
| 5.3 | Occupant Signs | 53 |
| 5.4 | Insurance | 56 |
| 5.5 | Taxes and Assessments | 64 |

| Article VI | MISCELLANEOUS | |
|---|---|---|
| 6.1 | Default | 64 |
| 6.2 | Interest | 67 |
| 6.3 | Estoppel Certificate | 68 |
| 6.4 | Notices | .69 |
| 6.5 | Approval Rights | 69 |
| 6.6 | Condemnation | 70 |
| 6.7 | Binding Effect | .71 |
| 6.8 | Construction and Interpretation | 71 |
| 6.9 | Negation of Partnership | 73 |
| 6.10 | Not a Public Dedication | 73 |
| 6.11 | Excusable Delays | .73 |

| 6.12 | Intentionally Not Used | 73 |
| 6.13 | OEA Shall Continue Notwithstanding Breach | 73 |
| 6.14 | Intentionally Not Used | 74 |
| 6.15 | No Waiver | 74 |

**Article VII**    **TERM**

| 7.1 | Term of this OEA | 74 |

**Article VIII**    **EXCULPATION**

| 8.1 | Certain Limitations on Remedies | 75 |

## EXHIBITS

**Exhibit A**  Legal Description of Target Tract

**Exhibit B**  Legal Description of Developer Tract

**Exhibit B-1**  Legal Description of Adjacent Site

**Exhibit C**  Architectural Theme

**Exhibit D**  Submission Guidelines

**Exhibit E**  Approved Target Plans

**Exhibit X**  Site Plan

## AMENDED AND RESTATED
## OPERATION AND EASEMENT AGREEMENT

THIS AMENDED AND RESTATED OPERATION AND EASEMENT AGREEMENT ("OEA") is made and entered into as of the ___28___ day of _October_, 1999, between DAYTON HUDSON CORPORATION, a Minnesota corporation ("Target") and Northway Mall Associates, a New York partnership ("Developer").

### WITNESSETH

WHEREAS, Target is the owner of a certain tract of land described in Exhibit A attached hereto and identified as the "Target Tract" on Exhibit X (the "Site Plan") attached hereto; and

WHEREAS, Developer is the owner of a certain tract of land described in Exhibit B attached hereto and identified as the "Developer Tract" on the Site Plan; and

WHEREAS, the Target Tract and the Developer Tract (collectively the "Shopping Center") are contiguous and adjacent as shown on the Site Plan; and

WHEREAS, Developer and other parties entered into that certain Operating Agreement dated October 4, 1968 and recorded in Liber 1981 at page 349, and amendments thereto recorded at Liber 2005 at page 135; Liber 2016 at page 1147; Liber 2032 at page 1037; Liber 2045 at page 853; Liber 2073 at page 299; Liber 2225 at page 433; and Liber 2083 at page 409 (collectively hereinafter called the "REA"); and

WHEREAS, Developer and Target now together own all of the land encumbered by the REA; and

WHEREAS, Developer and Target now desire to amend and restate the REA in its entirely; and

WHEREAS, the signatories hereto intend to develop and operate their respective Tracts in conjunction with each other as integral parts of a retail shopping complex, but not a planned or common interest development/community, and in order to effectuate the common use and operation thereof they desire to enter into certain covenants and agreements, and to grant to each other certain reciprocal easements, in, to, over, and across their respective Tracts.

NOW, THEREFORE, in consideration of the premises, the covenants and agreements hereinafter set forth and in furtherance of the parties understanding, it is agreed that the REA is hereby amended and restated in its entirety to read as follows:

## ARTICLE I
### DEFINITIONS

1.1    Approving Party.  "Approving Party" shall mean the Party designated from time to time to make certain decisions and/or give certain approvals pursuant to the terms of this OEA.  There shall be one Approving Party representing the Developer Tract and one Approving Party representing the Target Tract.  Each Approving Party shall have the right to make the decisions and/or give the approvals expressly designated to be made and/or given in accordance with this OEA on behalf of the real estate represented by such position regardless of whether the Approving Party then owns all or less than all of the Developer Tract or the Target Tract, as the case may be.  The holder of the Approving Party position shall have the right to assign such position to any other Party owning a Tract within the Developer Tract or the Target Tract, as the case may be, but if an assignment is not made, then such Approving Party position shall automatically be deemed assigned to the Party acquiring the last Tract owned by the transferring Approving Party.  Developer shall be the

initial Approving Party for the Developer Tract; Target shall be the initial Approving Party for the Target Tract.

1.2 <u>Building</u>. "Building" shall mean any permanently enclosed structure placed, constructed or located on a Tract, which for the purpose of this OEA shall include any appurtenant canopies, supports, loading docks, truck ramps and other outward extensions.

1.3 <u>Building Area</u>. "Building Area" shall mean the limited areas of the Shopping Center within which Buildings may be constructed, placed or located; Building Areas are designated on the Site Plan. One or more Buildings may be within a Building Area.

1.4 <u>Common Area</u>. "Common Area" shall mean all areas within the exterior boundaries of the Shopping Center, exclusive of (i) Buildings and (ii) any Outside Sales Area.

1.5 <u>Constant Dollars.</u> "Constant Dollars" means the present value of the dollars to which such phrase refers. An adjustment shall occur on January 1 of the sixth calendar year following the date of this OEA, and thereafter at five (5) year intervals. Constant Dollars shall be determined by multiplying the dollar amount to be adjusted by a fraction, the numerator of which is the Current Index Number and the denominator of which is the Base Index Number. The "Base Index Number" shall be the level of the Index for the month during which this OEA is dated; the "Current Index Number" shall be the level of the Index for the month of September of the year preceding the adjustment year; the "Index" shall be the Consumer Price Index for All Urban Consumers, U.S. City Average, All items published by the Bureau of Labor Statistics of United States Department of Labor (base year 1982-84=100), or any successor index thereto as hereinafter provided. If publication of the Index is discontinued, or if the basis of calculating the Index is materially changed, then the Approving Parties shall substitute for the Index comparable statistics as computed by an agency of the United States Government or, if none, by a substantial and responsible

3

periodical or publication of recognized authority most closely approximating the result which would have been achieved by the Index.

1.6  Floor Area.  "Floor Area" shall mean the actual number of square feet of space contained on each floor within a Building, including any mezzanine or basement space used as sales area, as measured from the exterior faces of the exterior walls or store front and/or the center line of any common walls; provided, however, that the following areas shall not be included in such calculations:  space attributable to any multi-deck, platform, rack or other multi-level system used solely for the storage of merchandise which is located vertically above ground floor; any space used for Building utilities or mechanical equipment; a drive through facility, and, notwithstanding anything in this OEA to the contrary, any Outside Sales Area not included within a Building.  Within thirty (30) days of a request, a Party shall certify to the requesting Party the amount of Floor Area applicable to each Building on its Tract.  If any Party causes an as-built survey to be prepared with respect to any portion of the Shopping Center, such Party shall furnish a copy of the survey to the other Parties for informational purposes only.

During any period of rebuilding, repairing, replacement or reconstruction of a Building, the Floor Area of that Building shall be deemed to be the same as existed immediately prior to that period.  Upon completion of such rebuilding, repairing, replacement or reconstruction, the Party upon whose Tract such Building is located, shall cause a new determination of Floor Area for such Building to be made in the manner described above, and such determination shall be sent to any Party requesting the same.

1.7  Occupant.  "Occupant" shall mean any Person from time to time entitled to the use and occupancy of any portion of a Building in the Shopping Center under an ownership right or any lease, sublease, license, concession, or other similar agreement.

1.8  Operator.  "Operator" shall mean the Person designated from time to time by the Approving Parties to maintain and operate the Common Area of the Shopping Center.

4

The Person designated as Operator shall serve in such capacity until he resigns or is removed by the Approving Parties.  The Approving Parties hereby designate Developer as the initial Operator, and Developer accepts such appointment.

1.9  Outside Sales Area.  "Outside Sales Area" shall mean those areas, if any, designated on the Site Plan which from time to time may be used for sales, display and/or storage purposes; provided however, with respect to any Outside Sales Area shown in the parking lot, the Parties acknowledge and agree that the actual location may vary from time to time, subject to the approval of the Approving Parties.  During the period an Outside Sales Area is used for any of the foregoing purposes, such area shall not be considered part of the Common Area.  If an Occupant chooses not to use its designated Outside Sales Area, either permanently or temporarily, such area shall be deemed to be Common Area if located outside a Building Area, until such Occupant again elects to use such Outside Sales Area as permitted hereunder.

1.10  Party.  "Party" shall mean each signatory hereto and, after compliance with the notice requirements set forth below, their respective successors and assigns who become owners of any portion of the Shopping Center.  Each Party shall be liable for the performance of all covenants, obligations and undertakings herein set forth with respect to the portion of the Shopping Center owned by it which accrue during the period of such ownership, and such liability shall continue with respect to any portion transferred until the notice of transfer set forth below is given, at which time the transferring Party shall be released from the obligations of this OEA arising subsequent to the effective date on the transfer notice.  A Party transferring all or any portion of its interest in the Shopping Center as a means of giving notice shall prepare and circulate for signature by all Parties an amendment to this OEA in recordable form which amendment shall include therein at least the following information:

      (i)     the name and address of the new Party;

(ii)     a copy of the legal description of the portion of the Shopping Center transferred; and

(iii)    if the transferee is the designated Approving Party.

If a Tract is owned by more than one Person, the Person or Persons holding at least fifty-one percent (51%) of the ownership interest in the Tract shall designate one of their number to represent all owners of the Tract and such designated Person shall be deemed the Party for such Tract.   Until the notice of transfer is given and the OEA amendment signed, the transferring Party shall (for the purpose of this OEA only) be the transferee's agent.

The transferring Party shall provide a copy of any such notice and amendment to the Operator for informational purposes.

Notwithstanding any other provision of this OEA, no transfer by Target shall relieve Target of its obligation to build and open a Target store as set out in Section 3.3(A) of this OEA.

Nothing contained herein to the contrary shall affect the existence, priority, validity or enforceability of any lien permitted hereunder which is placed upon the transferred portion of the Shopping Center prior to receipt of the notice.

1.11    Permittee.  "Permittee" shall mean all Occupants and the officers, directors, employees, agents, contractors, customers, vendors, suppliers, visitors, invitees, licensees, subtenants, and concessionaires of Occupants insofar as their activities relate to the intended development, use and occupancy of the Shopping Center.

The following activities shall be, to the extent permitted by law, be prohibited within the Shopping Center:

    (i)       Political activities;

    (ii)      Exhibiting any placard, sign, or notice;

    (iii)     Distributing any circular, handbill, placard, or booklet;

    (iv)     Soliciting memberships, signatures or contributions for private, civic, public or charitable purposes;

    (v)      Parading, picketing, or demonstrating;

    (vi)     Failing to follow regulations established by the Parties relating to the use of the Shopping Center; and

    (vii)    campaigning for public office.

1.12   <u>Person</u>. "Person" shall mean any individual, partnership, firm, association, corporation, trust, or any other form of business or government entity.

1.13   <u>Primary Building Area</u>. "Primary Building Area" shall mean collectively the Building Areas designated as such on the Site Plan.

1.14   <u>Restaurant.</u>  "Restaurant" shall mean any operation or business which requires a governmental permit, license and/or authorization to prepare and/or serve food for either on or off site consumption; provided, however, notwithstanding anything herein to the contrary, a supermarket, grocery store or similar operation shall not be deemed a Restaurant.

1.15   <u>Tract</u>. "Tract" shall mean that portion of the Shopping Center owned by a Party.

1.16   <u>Utility Lines.</u> "Utility Lines" shall mean those facilities and systems for the transmission of utility services, including drainage and storage of surface water. "Common Utility Lines" shall mean those Utility Lines which are installed to provide the applicable service to both the Developer Tract and the Target Tract. "Separate Utility Lines" shall mean those Utility Lines which are installed to provide the applicable service to either the

Developer Tract or the Target Tract. For the purpose of this OEA, the portion of a Utility Line extending between a Common Utility Line and a Building shall be considered a Separate Utility Line.

## ARTICLE II
## EASEMENTS

2.1     Ingress, Egress and Parking.

(A)     During the term of this OEA each Party hereby grants and conveys to each other Party for its use and for the use of its Permittees, in common with others entitled to use the same, a non-exclusive easement for the passage and parking of vehicles over and across the parking and driveway areas of the grantor's Tract, as the same may from time to time be constructed and maintained for such use, and for the passage and accommodation of pedestrians over and across the parking, driveways and sidewalk areas of the grantor's Tract, as the same may from time to time be constructed and maintained for such use. Such easement rights shall be subject to the following reservations as well as other provisions contained in this OEA:

(i)     Each Party further reserves the right to close off its portion of the Common Area for such reasonable period of time as may be legally necessary, in the opinion of such Party's counsel, to prevent the acquisition of prescriptive rights by anyone; provided, however, that prior to closing off any portion of the Common Area, as herein provided, such Party shall give written notice to each other Party of its intention to do so, and shall attempt to coordinate such closing with each other Party so that no unreasonable interference in the passage of pedestrians or vehicles shall occur, and

8

   (ii)  Each Party reserves the right at any time and from time to time to exclude and restrain any Person who is not a Permittee from using the Common Area on its Tract.

  (B)  In addition to the general easement specified in (A) above, the Parties hereby grant, bargain, sell and convey to each other, for the grantee's use and for the use of its Permittees, in common with others entitled to use the same, a non-exclusive perpetual easement for the passage and accommodation of pedestrians and vehicles (but not for parking purposes) upon, over and across that portion of the grantor's Tract which is designated on the Site Plan as the (i) Front Service Drive; (ii) the Rear Service Drive; and (iii) the Access Drive. The Front Service Drive, Rear Service Drive and Access Drive are each individually designated on the Site Plan and are collectively the "Drives". The easements herein established shall be appurtenant to and for the benefit of each grantee's Tract. During the term of the OEA, the Drives shall be maintained in accordance with the provisions governing the Common Area of each Tract, and it shall not be relocated without the approval of the Parties. After the termination of the OEA, any Party may relocate the portion of the Drives located upon its Tract so long as the relocated portion remains reasonably direct and ties into/connects with the other portions of the Drives on the immediately adjacent Tracts; notice of such relocation shall be provided to other Parties at least 30 days prior to construction.

  After termination of the OEA, that portion of the grantor's Tract which is covered by the Drives shall be maintained in a safe, clean and good state of repair condition by the grantor, at its sole cost and expense. In the event such grantor shall fail to perform the required maintenance, the grantee, after at least 30 days advance notice to the grantor, shall have the right, but not the obligation, to cause such maintenance to be performed, and the grantor shall, upon demand, immediately reimburse the grantee curing such default for all costs and expenses incurred with respect to such curative action; if such reimbursement is not made within 30 days following request therefor the curing grantee shall have the right to

file a mechanic's lien against the grantor's Tract in order to secure payment of the amount expended.

(C)     Developer hereby grants and conveys to Target for its use and for the use of the Permittees of the Building located upon the Target Tract, a non-exclusive perpetual easement for the passage and accommodation of pedestrians over and across that portion of the Developer Tract identified on the Site Plan as "Pedestrian Access Area"; the easement shall be the greater of either eight (8) feet in width (measured perpendicular to the boundary line of the Target Tract), or of such width as necessary to fulfill applicable legal requirements from time to time in effect, including those under any life safety, or fire or building code applicable to building exits. The foregoing easement shall be appurtenant to and for the benefit of the Target Tract, shall be binding on and burden the Developer Tract, and shall continue in effect for the term of this OEA and thereafter for so long as the Building utilizing the easement area for access exists (including a reasonable period of time to permit reconstruction or replacement of such Building if the same shall be destroyed, damaged, or demolished). Target shall have the right to construct, install, maintain, repair and replace steps and/or hard surface within the easement area.

2.2     Utilities.

(A)     Each Party hereby grants and conveys to each other Party non-exclusive perpetual easements in, to, over, under, along and across those portions of the Common Area (exclusive of any portion located within Building Areas) located on the grantor's Tract necessary for the installation, operation, flow, passage, use, maintenance, connection, repair, relocation, and removal of Utility Lines serving the grantee's Tract, including but not limited to, sanitary sewers, storm drains, water (fire and domestic), gas, electrical, telephone and communication lines. The initial location (and any subsequent relocation and/or new line) of any Utility Line shall be subject to the prior written approval of the Party whose Common Area is to be burdened thereby, such approval not to be unreasonably withheld or delayed. The easement area shall be no wider than necessary to reasonably satisfy the

requirements of a private or public utility, or five feet (5') on each side of the centerline if the easement is granted to a Party. Upon request, the grantee shall provide to the grantor a copy of an as-built survey showing the location of such Utility Line. All Utility Lines shall be underground except:

      (i)      ground mounted electrical transformers;

      (ii)      as may be necessary during periods of construction, reconstruction, repair, or temporary service;

      (iii)      as may be required by governmental agencies having jurisdiction;

      (iv)      as may be required by the provider of such service; and

      (v)      fire hydrants.

At least thirty (30) days prior to exercising the right granted herein, the grantee shall first provide the grantor with a written statement describing the need for such easement, shall identify the proposed location of the Utility Line, the nature of the service to be provided, the anticipated commencement and completion dates for the work and shall furnish a certificate of insurance showing that its contractor has obtained the minimum insurance coverage required by 5.4(C) hereof. Except as otherwise agreed to by the grantor and the grantee, any Party installing Separate Utility Lines pursuant to the provisions of this subparagraph shall pay all costs and expenses with respect thereto and shall cause all work in connection therewith (including general clean-up and proper surface and/or subsurface restoration) to be completed as quickly as possible and in a manner so as to minimize interference with the use of the Common Area. In addition, the grantee of any Separate Utility Line agrees to defend, protect, indemnify and hold harmless the grantor from and against all claims or demands, including any action or proceeding brought thereon, and all costs, losses, expenses and liabilities of any kind relating thereto, including reasonable

attorneys fees and cost of suit, arising out of or resulting from the exercise of the right to install, maintain and operate the Separate Utility Line. If the Parties elect to install Common Utility Lines, all repair, maintenance, replacement and other work thereon shall be performed by the Operator as part of Common Area maintenance.

(B)   The grantor shall have the right to relocate a Utility Line upon thirty (30) days' prior written notice, provided that such relocation:

(i)   shall not be commenced during the months of November, December or January;

(ii)   shall not interfere with or diminish the utility service to the grantee during the grantee's business hours; and if an electrical line/computer line is being relocated, then the grantor and grantee shall coordinate such interruption to eliminate any detrimental effects;

(iii)   shall not reduce or unreasonably impair the usefulness or function of such Utility Line;

(iv)   shall be performed without cost or expense to grantee;

(v)   shall be completed using materials and design standards which equal or exceed those originally used; and

(vi)   shall have been approved by the provider of such service and the appropriate governmental or quasi-governmental agencies having jurisdiction thereover.

12

Documentation of the relocated easement area, including the furnishing of an "as-built" survey, shall be the grantor's expense and shall be accomplished as soon as possible following completion of such relocation.

(C)     Each Party hereby grants and conveys to each Party owning an adjacent Tract the perpetual right and easement to discharge surface storm drainage and/or runoff from the grantee's Tract over, upon and across the Common Area of the grantor's Tract, upon the following conditions and terms:

> (i)     The Common Area grades and the surface water drainage/retention system for the Shopping Center shall be initially constructed in strict conformance with the details approved by the Approving Parties; and

> (ii)    No Party shall alter or permit to be altered the surface of the Common Area or the drainage/retention system constructed on its Tract if such alteration would materially increase the flow of surface water onto an adjacent Tract either in the aggregate or by directing the flow of surface water to a limited area.

The surface water collection, retention and distribution facilities shall be deemed a Common Utility Line.

2.3    Construction, Maintenance and Reconstruction.

(A)    In order to accommodate any Building improvements which may inadvertently be constructed beyond a Tract's boundary line, each Party grants to each Party owning an adjacent Tract an easement, not to exceed a maximum lateral distance of six inches (6"), in, to, over, under, and across that portion of the grantor's Tract adjacent to such common boundary line for the maintenance and replacement of such encroaching Building improvements.

(B)    In the event a constructing Party (the "Constructing Party") determines that it is necessary to place underground piers, footings and/or foundations ("Subsurface Construction Elements") across the boundary line of its Tract, the Constructing Party shall advise the Party owning the adjacent Tract (the "Adjacent Party") of its construction requirement and shall provide plans and specifications relating thereto, including proposed construction techniques for the Subsurface Construction Elements.  The Adjacent Party hereby grants and conveys to the Constructing Party for the benefit of its Tract an easement, not to exceed a maximum lateral distance of five feet (5'), in, to, under, and across that portion of the Adjacent Party's Tract not theretofore occupied by any then existing structure, for the installation, maintenance and replacement of such Subsurface Construction Elements;  provided, however, that the Constructing Party shall have no right to use such easement if the Adjacent Party is able to provide the Constructing Party a reasonable alternative construction method for the placement of the Subsurface Construction Elements entirely on the Constructing Party's Tract.

The Adjacent Party reserves the right to require the Constructing Party to modify the design specifications for the Subsurface Construction Elements in order to permit the Adjacent Party the opportunity to utilize the same in connection with the construction of its Building improvements to the end that each Party shall be able to place its Building immediately adjacent to the common boundary line.  If a common Subsurface Construction Element is used by the Parties, each shall assume and pay its reasonable share

of the cost and expense of the design and construction thereof.  In the event any Building utilizing a common Subsurface Construction Element is destroyed and not replaced or is removed, the common Subsurface Construction Element shall remain in place for the benefit of the other Building utilizing the same.  The Constructing Party, by installation of the Subsurface Construction Element, agrees to indemnify and hold harmless the Adjacent Party, and agrees, at its sole cost and expense, to maintain and repair such Subsurface Construction Element.

(C)  The foregoing easement grants shall not diminish or waive any right of a Party to recover damages resulting from the constructing Party's failure to construct its Building within its Tract in the case of (A) above, or within the easement area limits in the case of (B) above.  The easements in each instance shall:

> (i)    continue in effect for the term of this OEA and thereafter for so long as the Building utilizing the easement area exists (including a reasonable period to permit reconstruction or replacement of such Building if the same shall be destroyed, damaged, or demolished); and

> (ii)   include the reasonable right of access necessary to exercise and enjoy such grant upon terms and with the limitations described in 3.1(E) below.

(D)    With respect to Buildings constructed along the common boundary line between Tracts, nothing herein shall be deemed to create or establish:

> (i)    a "common" or "party" wall to be shared with the adjacent Building, or

15

(ii)   the right for a Building to receive support from or apply pressure to the adjacent Building.

2.4   Adjacent Site.   Pursuant to the provisions of the REA, the following provisions of this Section 2.4 apply to the owners and occupants of the property ("Adjacent Site") adjacent to the Shopping Center and which is more fully described in Exhibit B-1 attached hereto.

(A)   Subject to the provisions of this OEA, Developer and Target hereby expressly grant to the owners and occupants of the Adjacent Site, and to all persons holding under or through any of them, their mortgagees, respective lessees and sublessees, concessionaires and licensees and the respective officers, employees, agents, customers and invitees of each, a non-exclusive, irrevocable, perpetual right and easement in common with Developer and Target and such respective persons holding under or through any of them, their mortgages, respective lessees, sublessees, concessionaires, licensees, officers, employees agents, customers and invitees to use without charge the Common Area portions of the respective grantor's Tracts, including, without being limited to, the entire proposed automobile parking areas and driveway areas as may from time to time be located on the Developer Tract and the Target Tract for the parking of automobiles and for ingress and egress of pedestrians and vehicles between the Adjacent Site and the Shopping Center and the adjoining present and future public highways, and for such other purposes for which the Common Area are designed, provided that any party hereto shall have the right, at least once in each calendar year, upon thirty (30) days notice to the owners of the Target Tract, Developer Tract and Adjacent Site, to designate a non-business day for the erection of barriers or chains for the purpose of blocking off access to the Common Area on its Tract or Site for the minimum period of time required under the laws of New York in order to avoid the possibility of dedicating the same for public use or creating prescriptive rights therein, and in such event, all other parties hereto desiring to so erect barriers or chains on its Tract shall do so only during the designated time.   To the extent that parking areas and driveways are located on portions of the Adjacent Site, the right to use the same in accordance with the

16

foregoing provisions of this Paragraph (A) shall inure to the benefit of Developer, Target, and the owners and occupants of the portions of the Adjacent Site. Except as provided in this OEA, there shall be no curbs, fences, rails, walls, planters or other obstructions erected between the Developer Tract, the Target Tract, the Adjacent Site and the respective parking areas therefor.

      (B)      Developer and Target hereby expressly grant to the owners and occupants of the Adjacent Site the non-exclusive, irrevocable easement, for so long as the building or improvement serviced thereby, or any replacement thereof, stands or for the term of this OEA, whichever is longer, to install, maintain, repair and replace utility facilities, such as water, gas, electric and telephone lines and storm and sanitary sewers, underground and within the grantor's Tract (except under any buildings or leading docks). Any party hereto upon whose Tract any such utility facility shall have been installed shall have the right, upon sixty (60) days' prior notice to the other parties, at any time from time to time, to move and relocate such facility to such place as it shall designate; provided, however, that such relocation shall be made at the sole cost and expense of the party requesting such relocation and that such relocation or relocated facility shall not interfere with, or increase the cost of, any other party's utility service or unreasonably interfere with the conduct or operation of its business. In addition to the foregoing, no replacement or relocation of any utility facility shall interfere with or increase the cost of the utility service being furnished to the Adjacent Site, or unreasonably interfere with the conduct or operation of the business then being conducted on any portion thereof. Each party shall maintain and repair, as necessary, any utility line traversing its Tract and the cost of such repair or maintenance shall be borne solely by the party serviced thereby if only one party, or if more than one party is serviced thereby, by each party in the proportion which its Floor Area bears to the total Floor Area of all parties serviced thereby. Developer shall use its reasonable efforts to insure that except for emergency repairs, no repairs and/or relocation work shall be undertaken by any party during (I) the 30 calendar day period prior to Easter; (ii) the month of August; or (iii) from November 1 to the following January 15. The Adjacent Site shall be deemed burdened by the Easements granted pursuant to this Paragraph (B) with the same force and effect as if it

were expressly referred to herein as a "grantor's Tract". Developer and Target (as to Target only, after fifteen (15) days advance written notice to Developer) are hereby granted the right to tap into the extension of the Common Utility Lines installed on the Shopping Center for the benefit of the Adjacent Site without charge, provided the capacity of said improvements as required by the Shopping Center is sufficient to handle the requirements of the Adjacent Site in addition to the Shopping Center.

(C)     The Adjacent Site is hereby burdened with the restrictions that if any occupants thereof utilize any of the Common Area then the same shall not be used for heavy industry or warehousing. The on premises storage of merchandise contemplated to be sold from such premises shall not be deemed warehousing for the purposes of this OEA. If at any time Railroad Avenue shall be closed or made unavailable for use by trucks for access to the Shopping Center such trucks shall be permitted to utilize the means of ingress and egress from Central Avenue. Nothing herein contained shall be construed as preventing ingress and egress over the Shopping Center, including without limitation, the Adjacent Site to and from Central Avenue over the roadways as shown on Exhibit X.

(D)     Each owner and occupant of all or any portion of the Adjacent Site shall be obligated to conform with the parking ratio required by applicable governmental regulations or zoning ordinances and in any event there shall be separately maintained, except to the extent that such parking area may be reduced as a result of a taking in condemnation, sufficient car spaces to maintain a ratio of 4 car spaces for each 1,000 square feet of Floor Area of buildings erected on each of said parcels.

(E)     The presently existing billboard sign, in addition to naming the Shopping Center, may also contain panels identifying the current and future occupants of the Adjacent Site.

(F)     No termination, modification or amendment of this OEA shall terminate, modify or amend the rights of the owners and occupants of the Adjacent Site to use the Common Area of the Shopping Center pursuant to paragraph (A) of this Section 2.4.

(G)     Notwithstanding the foregoing, no portion of the Adjacent Site shall be designated as an employee parking area of the Shopping Center, except that the employees employed by the occupants of the Adjacent Site shall park their vehicles on the respective parcel of which the establishment employing them is located.  No portion of the Shopping Center shall be designated as an employee parking area of the Adjacent Site, except that employees employed by the occupants of the Shopping Center shall park their vehicles on the respective parcel of which the establishment employing them is located.  No portion of the Shopping Center shall be designated as an employee parking area of the Adjacent Site, except that employees employed by the occupants of the Shopping Center shall park their vehicles on the respective parcel of which the establishment employing them is located.

(H)     The rights, obligations and benefits imposed upon each party pursuant to Section 4.2 of this OEA in addition to binding the parties to the OEA and their respective successors and assigns, shall be binding upon and inure to the benefit of the owners of the Adjacent Site, and their respective successors and assigns, each of whom shall be obligated to perform the obligations to be performed with respect to its respective parcel at no cost or expense to the other parties hereto, except as specifically set forth in said Section 4.2.

(I)     All of the easements, restrictions and covenants in this Section 2.4 shall run with and against the lands so described and shall be a perpetual charge and burden thereon for the benefit of the parties and lands described hereunder and the holders of any first mortgage(s) (being first mortgage(s) as to the priority of Lien) affecting any of said parcels or any portion or portions thereof, and no such rights and privileges or any similar rights or privileges are hereby extended by any grant, license or other manner or means whatsoever to any other parties except as herein provided.

2.5     Restriction.  Other than as set out in Section 2.4 hereof, no Party shall grant any easement for the benefit of any property not within the Shopping Center; provided, however, that the foregoing shall not prohibit the granting or dedicating of easements by a Party on its Tract to governmental or quasi-governmental authorities or to public utilities.

ARTICLE III

CONSTRUCTION

3.1     General Requirements.

(A)     Each Party agrees that all construction activities performed by it within the Shopping Center shall be performed in compliance with all applicable laws, rules, regulations, orders, and ordinances of the city, county, state, and federal government, or any department or agency thereof.   All construction shall utilize new materials, and shall be performed in a good, safe, workmanlike manner.

(B)     Each Party further agrees that its construction activities shall not:

(i)     cause any unreasonable increase in the cost of constructing improvements upon another Party's Tract;

(ii)     unreasonably interfere with construction work being performed on any other part of the Shopping Center;

(iii)     unreasonably interfere with the use, occupancy or enjoyment of any part of the remainder of the Shopping Center by any other Party or its Permittees; or

(iv)     cause any Building located on another Tract to be in violation of any law, rule, regulation, order or ordinance authorized by any city,

20

county, state, federal government, or any department or agency thereof.

(C)     Each Party agrees to defend, protect, indemnify and hold harmless each other Party from and against all claims and demands, including any action or proceeding brought thereon, and all costs, losses, expenses and liabilities of any kind relating thereto, including reasonable attorneys fees and cost of suit, arising out of or resulting from any construction activities performed or authorized by such indemnifying Party; provided however, that the foregoing shall not be applicable to either events or circumstances caused by the negligence or willful act or omission of such indemnified Party, its licensees, concessionaires, agents, servants, employees, or anyone claiming by, through, or under any of them, or claims covered by the release set forth in 5.4(D).

(D)     In connection with any construction, reconstruction, repair or maintenance on its Tract, each Party reserves the right to create a temporary staging and/or storage area in the Common Area or in the Building Area on its Tract at such location as are shown on the Site Plan. Prior to the commencement of any work which requires the establishment of a staging and/or storage area on its Tract, a Party shall give at least 30 days prior notice to the Approving Parties, for their approval, of the proposed location, provided, however, that if a business is operating on the Target Tract then no other Party's staging area shall be located within 100 feet of the Target Tract, unless located within a Building Area, and if substantial work is to be performed, the constructing Party shall, at the request of any Approving Party, fence off the staging and storage area. If the Approving Parties do not approve the proposed location of the staging and/or storage area, the Party shall modify the proposed location to satisfy the reasonable requirements of the Approving Parties. All storage of materials and the parking of construction vehicles, including vehicles of workers, shall occur only on the constructing Party's Tract, and all laborers, suppliers, contractors and others connected with such construction activities shall use only the access points located upon the constructing Party's Tract. Upon completion of such work, the constructing Party shall restore the affected Common Area to a condition equal to or better than that existing prior to

21

commencement of such work.  Each Party shall use its best efforts to require all construction traffic to use access points and roadways designated in writing by Developer and to cause all contractors to abide by rules and regulations proposed by Developer and approved by Target.  Such rules shall be reasonable and nondiscriminatory and shall be applicable to all construction, including initial construction, and any remodeling and/or alteration work by any Party or Occupant.

(E)    Each Party hereby grants and conveys to each other Party and to its respective contractors, materialmen and laborers a temporary license for access and passage over and across the Common Area of the grantor's Tract as shall be reasonably necessary for the grantee to construct and/or maintain improvements upon the grantee's Tract; provided, however, that such license shall be in effect only during periods when actual construction and/or maintenance is being performed and provided further that the use of such license shall not unreasonably interfere with the use and operation of the Common Area by others. Prior to exercising the rights granted herein, the grantee shall first provide the grantor with a written statement describing the need for such license, and shall furnish a certificate of insurance showing that its contractor has obtained the minimum insurance coverage required by 5.4(C) hereof.  Any Party availing itself of the temporary license shall promptly pay all costs and expenses associated with such work, shall diligently complete such work as quickly as possible, and shall promptly clean the area, and restore and/or repair the affected portion of the Common Area to a condition which is equal to or better than the condition which existed prior to the commencement of such work.  Notwithstanding the foregoing, in the event a dispute exists between the contractors, laborers, suppliers and/or others connected with construction activities, each Party shall have the right to prohibit the contractors, laborers, suppliers and/or others working for another Party from using the Common Area on its Tract.

3.2    Common Area. The Parties have agreed that the Common Area of the Shopping Center shall be constructed as shown on the Site Plan, provided, however, no fence or other barrier which would prevent or unreasonably obstruct the passage of

pedestrian or vehicular travel shall be erected or permitted within or across the Common Area, exclusive of the limited curbing and other forms of traffic control depicted on the Site Plan, permitted staging and/or storage areas and Outside Sales Areas. Contemporaneously with the construction of a Building upon its Tract, the constructing Party shall cause the Common Area on its Tract to be substantially completed no later than the day the first Occupant of such Tract opens for business with the public and in the case of Target work to complete truck access from the Target Tract to Railroad Avenue and access to Central Avenue (it being understood that all Common Area work in front of Buildings A, B and C as shown on the Site Plan may not be completed at the time Target initially opens for business. If such is the case, Developer shall, at Developer's expense, cause appropriate barricades to be constructed so as to protect the completed Common Areas on the Target Tract from damage). Such work shall be done in a good and workmanlike manner and in accordance with good engineering standards; provided, however, the following minimum general design standards shall be complied with throughout the term of this Agreement:

(A)    The lighting system shall use a lamp source of metal halide, and shall be designed to produce a minimum maintained lighting intensity measured at grade at all points of at least:

      (i)    5 footcandles at curb in front of the entrance to any Building;

      (ii)    5 footcandles at entry drives to Shopping Center;

      (iii)    5 footcandles in the general parking areas; and

      (iv)    3 footcandles at the perimeter of the parking areas.

Each party may elect to control the lighting system located on its Tract. The type and design of the Common Area light standards shall be approved by the Approving Parties.

(B)    The slope in the parking area shall not exceed a maximum of three percent (3%), nor be less than a minimum of one and one-half percent (1 1/2%).

(C)    All sidewalks and pedestrian aisles shall be concrete or other materials approved by the Approving Parties; the automobile parking areas, drives, and access roads shall be designed in conformity with the recommendations of a registered soils engineer approved by the Approving Parties which shall require the installation of a suitable base and the surfacing with an asphaltic concrete or concrete wearing material.

(D)    Utility Lines that are placed underground shall be at depths designated by consultants approved by the Approving Parties.  If surface water retention and/or detention areas are located outside of the general parking lots, such areas shall be fenced or otherwise secured to impede public access thereto.

(E)    The parking area on the Target Tract and on the Developer Tract (and in the event Developer shall subdivide the Developer Tract and sell a lot, then each lot within the within the Developer Tract) shall contain sufficient ground level, parking spaces in order to comply with the following minimum requirements:

(i)    five (5.0) parking spaces for each one thousand (1,000) square feet of Floor Area, exclusive of Restaurant parking requirements set forth below; provided, however, that compact car parking spaces shall be located only in the areas, if any, designated on the Site Plan;

(ii)    if a business use contains a drive-up unit (such as remote banking teller or food ordering/dispensing facility), then there shall also be created space for stacking not less than five (5) automobiles for each drive-up unit;

(iii)    for each single Restaurant which has less than five thousand (5,000) square feet of Floor Area, then ten (10) parking spaces for each one thousand (1,000) square feet of Floor Area devoted to such use;

(iv)    for each single Restaurant which has at least five thousand (5,000) square feet of Floor Area, but less than seven thousand (7,000) square feet of Floor Area, then fifteen (15) parking spaces for each one thousand (1,000) square feet of Floor Area devoted to such use;

(v)    for each single Restaurant which has seven thousand (7,000) square feet of Floor Area or more, then twenty (20) parking spaces for each one thousand (1,000) square feet of Floor Area devoted to such use.

If an Occupant operates a Restaurant incidentally to its primary business purpose, then so long as such incidental operation continues, the portion of the Floor Area occupied by such Restaurant shall be excluded from the application of (iii), (iv) and (v) above. For the purpose of this clause only, a Restaurant shall be an "incidental operation" if it occupies less than seven percent (7%) of the Occupant's Floor Area and does not have a separate customer entry/exit door to the outside of the Building. In the event an Occupant utilizes Floor Area for Restaurant and other purposes, only the portion of Floor Area allocated for Restaurant purposes shall be subject to the increased parking requirements.

In the event of a condemnation of part of a Tract or sale or transfer in lieu thereof that reduces the number of usable parking spaces below that which is required herein, the Party whose Tract is so affected shall use its best efforts (including using proceeds from the condemnation award or settlement) to restore and/or substitute ground level parking spaces in order to comply with the parking requirements set forth in this OEA. If such compliance is not possible, such Party shall not be deemed in default hereunder, but such Party shall not be permitted to expand the amount of Floor Area located upon its Tract. If such Floor Area is thereafter reduced other than by casualty, then the Floor Area on such Tract may not subsequently be increased unless the parking requirement is satisfied.

(F)    Each Party hereby reserves the right, from time to time to make at its own expense any insignificant change, modification or alteration in its portion of the Common

Area, including landscaping, the installation of convenience facilities such as mailboxes, public telephones, benches, directional and/or parking information signs provided that:

(i)     the accessibility of such Common Area for pedestrian and vehicular traffic (as it relates to the remainder of the Shopping Center) is not unreasonably restricted or hindered, and all parking stalls and rows and vehicular traffic lanes shall remain generally as shown on the Site Plan;

(ii)    there shall be maintained at all times within such Common Area, a sufficient number of vehicular parking spaces to meet the parking requirements set forth in Section 3.2(E), as well as all governmental rules, regulations, and/or ordinances relating to parking requirements, but without reliance on parking spaces that may be available on another Tract; provided, however, that no more than the greater of (a) two percent (2%) of the parking spaces depicted on the Site Plan for such Tract or (b) the number of spaces which when eliminated will reduce the available parking spaces to the number required by this Agreement, shall be eliminated;

(iii)   no governmental rule, ordinance or regulation shall be violated as a result of such action; any and all governmental conditions applicable to such modifications shall be satisfied by the Party performing the same; and such action shall not result in any other Party being in violation of any governmental rule, ordinance or regulation;

(iv)    no change shall be made in the access points between the Common Area and the public streets; provided, however, that additional access points may be created with the approval of the Approving Parties, such approval not to be unreasonably withheld; and

(v) at least thirty (30) days prior to making any such change, modification or alteration, the Party desiring to do such work shall deliver to each other Party copies of the plans therefor and Developer shall approve and coordinate the location and type of all such facilities, such approval not to be unreasonably withheld or delayed, and provided further that such work shall not occur during the months of October, November, December or January;

The provisions of this paragraph (F) do not apply to any changes, modifications or alterations of Common Area located within Building Areas which result from or arise out of the construction, expansion or maintenance of Buildings or Outside Sales Areas.

The Party making changes under this Section 3.2(F) shall not be required to seek the approval of the other Party unless such change or changes either (i) involve a Tract other than the tract owned by the Party making such changes; or (ii) increased the cost of maintaining the Common Areas.

3.3     Building Improvements.

(A)     Target agrees to commence construction of its contemplated store building, to expeditiously prosecute such construction to completion, to open the Target store building under the name "Target" no later than October 31, 2000, and to operate the Target store for one (1) business day.     Developer agrees to commence construction of improvements within the Building Area on the Developer Tract; to expeditiously prosecute such construction to completion, and to cause tenant facilities containing at least 115,000 square feet (including the existing Staples and Davids' facilities shown on the Site Plan) to open for business within 180 calendar days following the date Target opens for business. If the Site Plan contains a statement or other form of notation which establishes the maximum

Floor Area to be located within a Building Area, such designated amount shall not be exceeded.

If the number of "square feet" of building space within the Shopping Center is restricted by governmental authority, the Parties hereby allocate the permitted square feet as follows:  to the Target Tract, the number of square feet necessary to accommodate the building size shown on the Site Plan, plus any Outdoor Sales Area; and to the Developer Tract, the balance of such permitted square footage.  The Parties understand that the calculation of building sizes shown on the Site Plan is based on the definition of "Floor Area" set forth in this Agreement, and further that such term is unique to this Agreement and is not intended to mirror the definition of "square feet" set forth in codes/regulations established by the local governmental authorities.

(B)    The Approving Parties have agreed upon an architecturally compatible theme for the exterior of all Buildings to be constructed, placed or located within the Shopping Center, such theme being shown on the drawings attached hereto as Exhibit C, and each Party agrees that any Building located on its Tract shall comply with such architectural theme. In order to insure compliance with such theme, each Party shall submit to the Approving Parties detailed plans ("Plans") as required by Exhibit D attached hereto covering the initial construction of each Building and any additions, remodeling, reconstruction or other alteration thereto which changes the exterior thereof for approval at least 30 days prior to the commencement of any such work. If an Approving Party should reject the Plans for not complying with the architectural theme established by Exhibit C, the submitting Party, and the Approving Parties shall mutually consult to establish approved Plans for the proposed work.  The Approving Parties shall not withhold approval of the Plans or recommend changes in the Plans which otherwise conform with the requirements hereof, nor shall they withhold approval of exterior remodeling or exterior reconstruction which does not either substantially enlarge an existing structure, or substantially change an existing structure.  In no event shall an Approving Party require any other Party to utilize design standards superior to those utilized by the Approving Party in the construction of

28

Buildings on its Tract. Approval of Plans by the Approving Parties shall not constitute assumption of responsibility for the accuracy, sufficiency, or propriety thereof, nor shall such approval constitute a representation or warranty that the Plans comply with applicable laws. No material deviation shall be made from the approved Plans. Notwithstanding anything contained herein, the Approving Parties waive the requirement for the submission of Plans for the initial Building to be constructed on the Target Tract as Target has provided plans identified on Exhibit E and Developer has approved the same.

(C)     The Parties hereby specifically consent to the placement of Buildings along their respective common boundary lines, and each agrees to support any request by another Party for a side-yard or setback variance if the same is required in order to accommodate such construction. The second Party to construct a Building along a common boundary line shall:

(i)     cause such construction to be completed in such a manner that the improvements on the adjoining Tract are nor damaged, and that the wall of one Building does not receive support from nor apply pressure to the wall of the other Building; and

(ii)     undertake and assume the obligation of completing and maintaining the nominal attachment (flashing and seal) of its Building to that of the existing Building on the adjoining Tract, it being the intent of the Parties to establish and maintain the appearance of one  continuous Building complex.

Along the common boundary line between the Developer Tract and the Target Tract, the separation of Building walls shall be no less than two (2) inches. Target agrees to use reasonable efforts to locate its Building wall at least one (1) inch from the common boundary line, but in no event more than two (2) inches therefrom. Developer

agrees to use reasonable efforts to locate its Building wall at least one (1) inch from the common boundary line, but in no event more than two (2) inches therefrom.

(D)    The Parties acknowledge that Target initially proposes to construct on the Target Tract a Building which is classified as an "unlimited area" building under certain building codes. (By way of explanation, but not limitation, an "unlimited area" building is designated II-N or V-N under the Uniform Building Code.)  The Parties agree that all Buildings constructed within the Primary Building Area shall comply with the following requirements:

(i)    no Building shall be constructed within sixty feet (60') of the Building Area on an adjoining Tract unless such Building, hereinafter referred to as the "Adjacent Building," shall be located immediately adjacent to the common boundary line and is attached to the Building, if any, on the adjacent Tract in accordance with Section 3.3(C);

(ii)    if an Adjacent Building exists, then no Building shall be located within sixty feet (60') of the Adjacent Building unless such Building is attached to the Adjacent Building in accordance with Section 3.3(C); the Adjacent Building and all other Buildings on the Tract that are attached to the Adjacent Building and to each other are hereinafter referred to as the "Building Group";

(iii)    any Building that is not part of the Building Group, shall be located at least sixty feet (60') distant from the Building Group;

(iv)    the Adjacent Building or the Building Group, as the case may be, shall comply with the Building code requirements applicable to an

30

"unlimited area" building, including without limitation the installation of an approved sprinkler system for fire protection.

In addition to the requirements set forth above, the Parties agree that no Building shall initially be placed or constructed on their respective Tracts in a manner which will, based on then existing governmental regulations, either preclude the construction on the Primary Building Areas of an "unlimited area" building, or cause an existing "unlimited area" building thereon to no longer be in conformance with applicable building code requirements, it being understood and agreed, however, that subsequent changes in governmental regulations shall not obligate a Party to modify or alter its existing Building.

If required by any governmental authority, each Party agrees to join in a recordable declaration which confirms the existence of a sixty foot (60') clear area around the Primary Building Areas.

(E)     No Building shall exceed one story, nor the following height restrictions:

(i)     On the Target Tract                        -30 feet

(ii)    In line buildings on the Developer Tract     -30 feet, (except for national or regional tenants having at least 75 existing and operating stores, which tenants may use their existing prototype store building, it being understood and agreed that a building built under the provision in this Subsection (ii) dealing with 75 stores shall after the original occupancy by such national or regional tenant shall, after such tenant vacates such building, be permitted to continue to exceed 30 feet in height as a "grandfathered" building with Target retaining Target's right to review and approve the architectural treatment of the exterior of such building by the succeeding tenant).

(iii)    Outlots of the Developer Tract        -25 feet, (except for national
or regional tenants having at least 75 existing and operating stores,
which tenants may use their existing prototype store building, it
being understood and agreed that a building built under the provision
in this Subsection (ii) dealing with 75 stores shall after the original
occupancy by such national or regional tenant shall, after such tenant
vacates such building, be permitted to continue to exceed 30 feet in
height as a "grandfathered" building with Target retaining Target's
right to review and approve the architectural treatment of the exterior
of such building by the succeeding tenant), it being understood that
the building height of the existing buildings occupied by Davids and
Staples shown on the Site Plan are approved.

The height of any Building shall be measured perpendicular from the
finished floor elevation to the top of the roof structure, including any screening, parapet,
penthouse, mechanical equipment or similar appurtenance located on the roof of such
Building. Any Party shall have the right to install, maintain, repair, replace and remove
Communications Equipment (defined below) on the top of the Building on its Tract which
may extend above the height limits established above; provided, however, such
Communication Equipment shall be set back from the front of the Building to reduce
visibility thereof by customers. As used herein, the phrase "Communications Equipment"
means such things as satellite and microwave dishes, antennas and laser heads, together
with associated equipment and cable.

3.4     Liens.  In the event any mechanic's lien is filed against the Tract of one Party
as a result of services performed or materials furnished for the use of another Party upon
request of the Party whose Tract is subject to such lien, the Party permitting or causing such
lien to be filed agrees to promptly cause such lien to be released and discharged of record,
either by paying the indebtedness which gave rise to such lien or by posting bond or other
security as shall be required by law to obtain such release and discharge. Nothing herein

shall prevent the Party permitting or causing such lien from contesting the validity thereof in any manner such Party chooses so long as such contest is pursued with reasonable diligence. The Party permitting or causing the lien agrees to defend, protect, indemnify and hold harmless the other Party and its Tract from and against all claims and demands, including any action or proceeding brought thereon, and all costs, losses, expenses and liabilities of any kind relating thereto, including reasonable attorneys' fees and cost of suit, arising out of or resulting from such lien.

ARTICLE IV

MAINTENANCE AND REPAIR

4.1     Utility Lines.

(A)     Each Party shall maintain and repair, or cause to be maintained and repaired, in a good state of repair and safe condition, all Separate Utility lines utilized by it regardless of where located. any maintenance, replacement and/or repair of nondedicated Utility Lines located on another Party's Tract shall be performed: after two (2) weeks' notice to the grantor (except in an emergency the work may be initiated with reasonable notice); after normal business hours whenever possible; and in such a manner as to cause as little disturbance in the use of the grantor's Tract as is practicable under the circumstances. Any Party performing or causing to be performed maintenance or repair work agrees: to promptly pay all costs and expenses associated therewith; to diligently complete such work as quickly as possible; and to promptly clean the area and restore the affected portion of the Common Area to a condition equal to or better than the condition which existed prior to the commencement of such work.

(B)     Common Utility Lines shall be maintained, repaired and/or replaced as part of the Common Area pursuant to 4.2 below.

4.2     Common Area.

33

(A)    Subject to the joint maintenance provision set forth in (B) below, each Party shall maintain, or cause to be maintained, the Common Area on its Tract in a sightly, safe condition and good state of repair.  The unimproved Common Area shall be mowed and kept litter-free.  The minimum standard of maintenance for the improved Common Area shall be comparable to the standard of maintenance followed in other similar first class retail developments of comparable size in the Albany, New York area; notwithstanding the foregoing, however, the Common Area shall be operated and maintained in compliance with all applicable governmental laws, rules, regulations, orders and ordinances, and the provisions of this OEA.  All Common Area improvements shall be repaired or replaced with materials at least equal to the quality of the materials being repaired or replaced so as to maintain the architectural and aesthetic harmony of the Shopping Center as a whole.  The maintenance and repair obligation shall include but not be limited to the following:

(i)    Drive and Parking Areas.  Maintaining all paved surfaces and curbs in a smooth and evenly covered condition, including, without limitation, replacement of base, skin patch, resealing and resurfacing. (For the purpose of this section, an overlay of the drives and parking areas shall be considered a maintenance item.)

(ii)    Debris and Refuse.  Periodic removal of all papers, debris, filth, refuse, ice and snow (2" on surface), including daily vacuuming and broom sweeping to the extent necessary to keep the Common Area in a first-class, clean and orderly condition; provided, however, that Occupant trash and/or garbage removal shall not be a Common Area Maintenance Cost since such removal obligation is covered by Section 4.3(A).  All sweeping shall be at appropriate intervals during such times as shall not interfere with the conduct of business or use of the Common Area by Permittees.

(iii)   Non-Occupant Signs and Markers.   Maintaining, cleaning and replacing any appropriate directional, stop or handicapped parking signs or markers; restripe parking lots and drive lanes as necessary to maintain parking space designation and traffic direction; and keep clearly marked fire lanes, loading zones, no parking areas and pedestrian cross-walks.

(iv)   Lighting.   Maintaining, cleaning and replacing Common Area lighting facilities, including light standards, wires, conduits, lamps, ballasts and lenses, time clocks and circuit breakers.   Exterior Building lighting, including any associated with a canopy or other architectural feature forming a part of such Building, shall not be considered a Common Area improvement, but instead the maintenance and replacement of such fixtures, and the cost of illumination, shall be the obligation of the Party upon whose Tract such fixtures are located.

(v)   Landscaping.   Maintaining and replacing of all landscape plantings, trees and shrubs in an attractive and thriving condition, trimmed and weed free.   Maintain and replace landscape planters, including those adjacent to exterior walls of Buildings.   Modify irrigation system to satisfy governmental water allocation or emergency requirements.   If any Occupant requires "special" landscaping (i.e. beyond the standard landscaping requirements for the remainder of the Shopping Center), or if landscaping additions/modifications are required as a result of a Building addition, expansion or remodel, the cost of installation, replacement and maintenance of such special or required landscaping shall be borne solely by such Occupant and shall not be included in Common Area Maintenance Costs.

(vi)   Common Utility Lines.   Maintaining, cleaning, replacing, and repairing any and all Common Utility Lines.

(vii)   Obstructions.  Keeping the Common Area free from any obstructions including those caused by the sale or display of merchandise, unless such obstruction is permitted under the provisions of this OEA.

(viii)   Sidewalks.  Maintaining, cleaning and replacing of all sidewalks, including those adjacent and contiguous to Buildings located within the Shopping Center.  Sidewalks shall be steam cleaned at least monthly and shall be swept at appropriate intervals during such time as shall not interfere with the conduct of business or use of the Common Area.

(ix)   Supervisory Personnel.  Providing of professional security and/or supervisory personnel for the Common Area, if reasonably required.

(x)   Traffic.  Supervision of traffic at entrances and exits to the Shopping Center and within the Shopping Center as conditions reasonably require in order to maintain an orderly and proper traffic flow.

(B)     Commencing on the earlier of (i) the date the Occupant of the Target Tract opens for business with the general public, or (ii) the date the Approving Parties designate in writing, but in no event prior to the date that Target first opens for business, the Operator shall operate and maintain the Common Area of the Shopping Center in accordance with the requirements of (A) above.  Within 30 days following the commencement of such maintenance and operation, Operator shall provide the Approving Parties an estimated budget for the balance of the current calendar year containing the information required by (C) below, and each Party agrees to pay its share thereof in accordance with (D) below. Operator may hire companies affiliated with it to perform the maintenance and operation of

the Common Area, but only if the rates charged by such companies are competitive with those of other companies furnishing similar services in the metropolitan area in or about the Shopping Center, it being agreed that this provision shall be construed strictly against Operator. Each Party hereby grants to Operator, its agents and employees a license to enter upon its Tract to discharge the duties to operate, maintain and repair the Common Area. Operator shall expend only such funds as are reasonably necessary for the operation, maintenance and insurance of the Common Area and shall promptly pay such costs ("Common Area Maintenance Costs") when incurred.   For the purpose of this OEA, Common Area Maintenance Costs shall not include:

     (i)    any late charges or fees;

     (ii)    any charge for electricity to a Party that separately pays the electrical costs for lighting the Common Area on its Tract;

     (iii)    any costs to clean up or repair the Common Area resulting from promotional activities or from construction, maintenance or replacement of Buildings;

     (iv)    real property taxes and assessments;

     (v)    Operator's profit, administrative and overhead costs including but not limited to: office space, equipment and utilities; legal, accounting or administrative services; Operator's personnel who are not permanently located at the Shopping Center, but shall include the cost of any of Operator's on site personnel used exclusively for maintenance and repair of the Common Areas (as the term "maintenance and repair" is defined in Section 4.2(A) above);

     (vi)    any fee or charge paid to a third party, commercial management company or similar provider for services and/or supervision of the

management or operation of the Common Area, or any part thereof;
and

(vii)    entertainment, transportation, meals and lodging of anyone.

In lieu of Operator's profit, administrative and overhead costs, Operator shall
be permitted to charge an amount ("Administration Fee") computed by multiplying the
Common Area Maintenance Costs (exclusive of insurance premiums, taxes, construction
costs, interest on investments, executive compensation, overhead, profit, rent or other
expense that is properly classified as capital expenditure, and utility charges) by three
percent (3%).  If any of Operator's personnel at the Shopping Center perform services,
functions or tasks in addition to Common Area duties, then the cost of such personnel shall
be equitably allocated according to time spent performing such duties.

(C)    Operator shall, at least 90 days prior to the beginning of each calendar year,
submit to the Approving Parties an estimated budget ("Budget") for the Common Area
Maintenance Costs and the Administration Fee for operating and maintaining the Common
Area of the Shopping Center for the ensuing calendar year.  The Budget shall be in a form
and content reasonably acceptable to the Approving Parties and shall identify separate cost
estimates for at least the categories specified under 4.2 (A), plus:

(i)    premium for Commercial General Liability Insurance covering the
Common Area as required by 5.4(A) below; provided however, such
premium shall not exceed the current filed Insurance Services
Offices (ISO) rate for premises operations, adjusted by the increased
limits factor.

(ii)    rental or purchase of equipment and supplies;

      (iii)    depreciation or trade-in allowance applicable to items purchased for Common Area purposes; and

      (iv)    Administration Fee.

      If an item of maintenance or replacement is to be accomplished in phases over a period of calendar years, such as resurfacing of the drive and/or parking areas, then the Budget shall separately identify the cost attributable to such year (including the area of the Common Area affected), and shall note the anticipated cost and timing (indicating the area of the Common Area affected) of such phased work during succeeding calendar years. The cost of approved "phased" work shall be paid by the Parties approving the same, or their successors or assigns, as the case may be, notwithstanding that when such work is performed a Party may not then be participating in the joint maintenance of the Shopping Center.

      If an Approving Party disapproves the proposed Budget, it shall consult with the other Approving Party and the Operator to establish a final approved Budget.   If a Budget is not approved by December 1st of any calendar year, Operator shall have the right to terminate its maintenance obligation with respect to the Common Area located on the Tract of the disapproving Approving Party by written notice prior to December 10th.  If the notice is given, then such Approving Party shall maintain and operate the Common Area on its Tract and the Operator shall maintain and operate the balance of the Common Area, commencing on the following January 1st.  If the notice is not given, then Operator shall continue to maintain and operate the Common Area for the next calendar year.

      Operator shall use its diligent, good faith efforts to operate and maintain the Common Area of the Shopping Center in accordance with the Budget.  Notwithstanding the foregoing, Operator shall have the right to make emergency repairs to the Common Area to prevent injury or damage to person or property, it being understood that Operator shall nevertheless advise each Party of such emergency condition as soon as reasonably possible,

including the corrective measures taken and the cost thereof. If the cost of the emergency action exceeds $10,000.00 in Constant Dollars then Operator may submit a supplemental billing to each Party, together with evidence supporting such payment, and each Party shall pay its share thereof within thirty (30) days; if the cost limitation set forth above is not exceeded then such costs shall be included as part of the Common Area Maintenance Costs at the year end.

(D)    Common Area Maintenance Costs and the Administration Fee shall be initially fixed as:

(i)    To the Developer Tract        58.84%

(ii)    To the Target Tract        41.16%

It is understood and agreed that such percentages are based on the maximum Floor Area permitted on each of Target and Developer Tracts. After the initial construction on its Tract is completed each Party shall certify to the other the then existing Floor Area on its Tract. The percentages shall be adjusted if (a) either Party elects not to construct its maximum Floor Area or (b) at the request of either Party as a result of demolition or addition of Floor Area.

In the event an existing Tract is divided, the Party causing such division shall prorate the allocation attributable to the existing Tract between the newly created Tracts, file a recorded declaration confirming such allocation and deliver a copy of such declaration to the Operator and each other Party. Each Party shall pay to the Operator in equal monthly payments, in advance, the share of the Common Area Maintenance Costs and the Administration Fee attributable to its Tract based either upon the amount set forth in the approved Budget, or if a Budget is not approved, then the lesser of the amount set forth in the unapproved Budget or the monthly payment established for the prior year. The Operator shall reasonably estimate such costs for the partial year during which its

maintenance obligations commence and each Party shall make its first payment in the month following Operator's undertaking of such maintenance and repair of the Common Area. Within 45 days after the end of each calendar year, Operator shall provide each Party with a statement certified by an authorized Person, together with supporting invoices and other materials setting forth the actual Common Area Maintenance Costs paid by it for the operation and maintenance of such Common Area, the Administration Fee, and the share of the aggregate thereof that is attributable to such Party's Tract. If the amount paid with respect to a Tract for such calendar year shall have exceeded the share allocable to such Tract, Operator shall refund the excess to the Party owning such Tract at the time such certified statement is delivered, or if the amount paid with respect to a Tract for such calendar year shall be less than the share allocable to such Tract, the Party owning such Tract at the time such certified statement is delivered shall pay the balance of the Tract's share to Operator within 30 days after receipt of such certified statement.

Within two years after receipt of any such certified statement, each Party shall have the right to audit Operator's books and records at Operator's primary offices pertaining to the operation and maintenance of the Common Area for the calendar year covered by such certified statement; the Party shall notify Operator of its intent to audit at least 15 days prior to the designated audit date. In the event that such audit shall disclose any error in the determination of the Common Area Maintenance Costs, the Administration Fee or in the allocation thereof to a Tract, an appropriate adjustment shall be made forthwith. The cost of any audit shall be assumed by the auditing Party unless such Party shall be entitled to a refund in excess of three percent (3%) of the amount calculated by Operator as its share for the calendar year, in which case Operator shall pay the cost of such audit.

(E)     Operator agrees to defend, indemnify and hold each Party harmless from and against any mechanic's, materialmen's and/or laborer's liens, and all costs, expenses and liabilities in connection therewith, including reasonable attorney's fees and court costs, arising out of the maintenance and operation by Operator of the Common Area, and in the

event that any Tract shall become subject to any such lien, Operator shall promptly cause such lien to be released and discharged of record, either by paying the indebtedness which gave rise to such lien or by posting such bond or other security as shall be required by law to obtain such release and discharge.



(F)    In the event any of the Common Area is damaged or destroyed by any cause whatsoever, whether insured or uninsured, during the term of this OEA, other than damage caused by ordinary use or wear and tear, the Party upon whose Tract such Common Area is located shall repair or restore such Common Area at its sole cost and expense with all due diligence; provided that no Party shall be required to expend more than $250,000 in Constant Dollars in excess of insurance proceeds which may be available (or which would have been available except for elections relating to deductibles or self-insurance for which the Party shall be responsible to contribute or if such Party fails to maintain insurance in accordance with this OEA, the amount of proceeds which would have been available had such insurance been maintained) for such repair or restoration.    Notwithstanding the limitation set forth in the preceding sentence, a Party may require another Party to do such restoration work if the requiring Party has agreed in writing to pay the costs in excess of such sum.    Except to the extent limited by 5.4(D) hereof, in the event such damage or destruction of Common Area is caused in whole or in part by another Party or third Person, the Party obligated to make such repair or restoration reserves and retains the right to proceed against such other Party or third Person for indemnity, contribution or damages.

(G)    In the event Target believes that Developer is not maintaining the Common Area in accordance with the terms of this Agreement, Target shall give Developer written notice and Developer shall have thirty (30) days to correct the same.  If Developer fails to correct the deficiency or in the event Target, for any reason other than default by Developer desires to take over maintenance of the Common Areas on the Target Tract, then in either event Target shall have the right, upon giving not less than sixty (60) days' written notice to Operator, to take over and assume the maintenance of the Common Area upon the Target Tract.  Following the effective date of such assumption, Target shall maintain the Common

Area on its Tract in accordance with the provisions of this OEA, and shall pay all costs and expenses incurred in connection therewith; provided, however, Operator shall continue to maintain the Common Utility Lines of the Shopping Center regardless of location, shall continue to maintain the Common Area supervisory program, if any, and shall continue to insure the Common Area on the Target Tract under the Operator's Common Area public liability insurance program if Target elects to participate therein by written notice to the Operator. Upon such assumption Target shall be released from the obligation to contribute towards Operator's maintenance and operation of the balance of the Common Area, except with respect to those functions identified above for which continued participation is mandatory or elected; Target's share of such costs shall be paid in accordance with the allocation set forth in Section 4.2 (D) above. Operator shall continue to maintain the balance of the Common Area in accordance with the standards set forth herein.

Target shall have the right to cause the Operator to resume the operation and maintenance of its Common Area upon the satisfaction of the following conditions:

(i)     Target shall give the Operator at least 60 days' prior notice of its intention to have the Operator reassume the operation and maintenance of its Common Area; provided however, such date for reassumption shall always be the first day of a calendar quarter; and

(ii)    Prior to the date established for Operator to reassume the maintenance and operation thereof, Target shall, at its sole cost and expense, cause the Common Area on its Tract to be at least equal to the same condition of maintenance then existing on the other portions of the Common Area then being maintained by the Operator.

Provided the above conditions are satisfied, concurrently with the designated date, Operator shall resume full operation and maintenance of the Common Area located on

the Target Tract and Target shall be responsible for its share of the costs and expenses of Operator's performance as set forth in (D) above.

### 4.3    Building Improvements and Outside Sales Area.

(A)    After completion of construction, each Party covenants and agrees to maintain and keep the exterior portion of the Buildings and Outside Sales Area, if any, located on its Tract in first-class condition and state of repair, in compliance with all governmental laws, rules, regulations, orders, and ordinances exercising jurisdiction thereover, and in compliance with the provisions of this OEA, including the architectural theme set forth in Exhibit C. Each Party further agrees to store all trash and garbage in adequate containers, to locate such containers so that they are not readily visible from the parking area, and to arrange for regular removal of such trash or garbage.

(B)    In the event any of the Buildings are damaged by fire or other casualty (whether insured or not), the Party upon whose Tract such Building is located shall, subject to governmental regulations and/or insurance adjustment delays, immediately remove the debris resulting from such event and provide a sightly barrier, and within a reasonable time thereafter shall either (i) repair or restore the Building so damaged to a complete unit, such repair or restoration to be performed in accordance with all provisions of this OEA, or (ii) erect another Building in such location, such construction to be performed in accordance with all provisions of this OEA, or (iii) demolish the damaged portion and/or the balance of such Building and restore the cleared area to either a hard surface condition or a landscaped condition in which event the area shall be Common Area until a replacement Building is erected. Such Party shall have the option to choose which of the foregoing alternatives to perform, but such Party shall be obligated to perform one of such alternatives. Such Party shall give notice to each other Party within ninety (90) days from the date of such casualty of which alternative it elects.

(C)    Notwithstanding anything to the contrary, each Party shall have the obligation to operate, maintain, and repair, in a clean, sightly and safe condition, the following items located on its Tract: any exterior shipping/receiving dock area; any truck ramp or truck parking area; any recycling center or similarly designated area for the collection of items intended for recycling; and any refuse, compactor or dumpster area.

## ARTICLE V
## OPERATION OF THE SHOPPING CENTER

5.1    Uses.

(A)    The Shopping Center shall be used only for retail sales, offices, Restaurants or other commercial purposes.  Target shall have the right to use the Target building for retail purposes.  "Business Office" shall mean an office which does not provide services directly to consumers; "Retail Office" shall mean an office which provides services directly to consumers, including but not limited to financial institutions, real estate, stock brokerages, title company and escrow offices, travel and insurance agencies, and medical, dental and legal clinics.  Not more than ten percent (10%) of the total Floor Area on each of the Target Tract and the Developer Tract may be used for Retail Office and/or Business Office purposes; provided, however, that office space used by an Occupant for administrative purposes, and which is not open to the general public shall not be considered office space for the purpose of this limitation.

(B)    No use shall be permitted in the Shopping Center which is inconsistent with the operation of a first-class retail shopping center.  Without limiting the generality of the foregoing, the following uses shall not be permitted:

(i)    Any use which emits an obnoxious odor, noise, or sound which can be heard or smelled outside of any Building in the Shopping Center;

   (ii)   Any operation primarily used as a storage warehouse operation and any assembling, manufacturing, distilling, refining, smelting, agricultural, or mining operation;

   (iii)   Any "second hand" store or "surplus" store;

   (iv)   Any mobile home park, trailer court, labor camp, junkyard, or stockyard (except that this provision shall not prohibit the temporary use of construction trailers during periods of construction, reconstruction, or maintenance);

   (v)   Any dumping, disposing, incineration, or reduction of garbage (exclusive of garbage compactors located near the rear of any Building);

   (vi)   Any fire sale, bankruptcy sale (unless pursuant to a court order) or auction house operation;

   (vii)   Any central laundry, dry cleaning plant, or laundromat; provided, however, this prohibition shall not be applicable to nominal supportive facilities for on-site service oriented to pickup and delivery by the ultimate consumer as the same may be found in retail shopping districts in the metropolitan area where the Shopping Center is located;

   (viii)   Any automobile, truck, trailer, boat or recreational vehicles sales, leasing, display or body shop repair operation;

   (ix)   Any bowling alley or skating rink;

(x)   Any movie theater or live performance theater;

(xi)   Any residential use, including but not limited to: single family dwellings, townhouses, condominiums, other multi-family units, and other forms of living quarters, sleeping apartments, or lodging rooms;

(xii)   Any veterinary hospital, or animal raising or boarding facilities (except that this prohibition shall not prohibit pet shops);

(xiii)   Any mortuary or funeral home;

(xiv)   Any establishment selling or exhibiting pornographic materials or drug-related paraphernalia or any "head" shop;

(xv)   Any bar, tavern, or Restaurant in the "inline buildings" on the Developer Tract or in the building occupied by Davids, both as shown on the Site Plan, (as used herein "inline building" shall be deemed to mean buildings "A", "B", "C", "G" and "H" as shown on Exhibit X and it being understood that if a Restaurant is built, any such Restaurant whose reasonably projected annual gross revenues from the sale of alcoholic beverages for on-premises consumption is less than thirty percent (30%) shall be permitted in the building currently occupied by Staples and in Outlots D and E as shown on the Site Plan);

(xvi)   Any health spa, fitness center or workout facility within 500 linear feet from the building line of the other Party;

47

(xvii)  Any flea market, amusement or video arcade, pool or billiard hall, car wash, disco, night club, dance hall, massage parlor, pawn shop, or check cashing facility;

(xviii)  Any training or educational facility, including but not limited to: beauty schools, barber colleges, reading rooms, places of instruction or other operations catering primarily to students or trainees rather than to customers; provided however, this prohibition shall not be applicable to on-site employee training by an Occupant incidental to the conduct of its business at the Shopping Center.

(xix)  Any gambling facility or operation, including but not limited to: off-track or sports betting parlor; table games such as black-jack or poker; slot machines, video poker/black-jack/keno machines or similar devices; or bingo hall. Notwithstanding the foregoing, this prohibition shall not apply to governmental sponsored gambling activities, or charitable gambling activities, so long as such governmental and/or charitable activities are incidental to the business operation being conducted by the Occupant.

(C)  No Party shall use, or permit the use of Hazardous Materials on, about, under or in its Tract, or the Shopping Center, except in the ordinary course of its usual business operations conducted thereon, and any such use shall at all times be in compliance with all Environmental Laws. Each Party agrees to defend, protect, indemnify and hold harmless each other Party from and against all claims or demands, including any action or proceeding brought thereon, and all costs, losses, expenses and liabilities of any kind relating thereto, including but not limited to costs of investigation, remedial response, and reasonable attorneys' fees and cost of suit, arising out of or resulting from any Hazardous Material used or permitted to be used by such Party, whether or not in the ordinary course of business.

For the purpose of this paragraph (C), the term (i) "Hazardous Materials" shall mean: petroleum products, asbestos, polychlorinated biphenyls, radioactive materials and all other dangerous, toxic or hazardous pollutants, contaminants, chemicals, materials or substances listed or identified in, or regulated by, any Environmental Law, and (ii) "Environmental Laws" shall mean: all federal, state, county, municipal, local and other statutes, laws, ordinances and regulations which relate to or deal with human health or the environment applicable to the Shopping Center, all as may be amended from time to time.

(D)   No merchandise, equipment or services, including but not limited to vending machines, promotional devices and similar items, shall be displayed, offered for sale or lease, or stored within the Common Area; provided however, that the foregoing prohibition shall not be applicable to (i) the storage of shopping carts or the installation of an "ATM" banking facility within any Building on either the Developer Tract or the Target Tract; (ii) the seasonal display and sale of bedding plants on the sidewalk in front of any Building located within the Shopping Center, (iii) temporary Shopping Center promotions, except that no promotional activities will be allowed in the Common Area of an Approving Party without the prior written approval of such Approving Party which may be withheld in their sole and absolute discretion, (iv) any recycling center required by law, the location of which shall be subject to the approval of the Approving Parties, or (v) any designated Outside Sales Area, provided, however, with respect to any Outside Sales Area which is not included within a Building Area, such space may be used not more than three (3) times per calendar year, and the duration of such use shall not exceed the following limitations:  all days during the period commencing on October 15th and ending on December 27th; not more than 120 consecutive days, depending upon geographical location, during the period commencing February 15th and ending on July 10th; and any other period, 30 consecutive days.

(E)   The following use and occupancy restrictions shall be applicable to the Developer Tract:

(i)     No toy store exceeding 5,000 square feet of Floor Area shall be permitted;

(ii)    No junior department store and/or apparel store exceeding in the aggregate 40,000 square feet of Floor Area shall be permitted; and

(iii)   No drug store exceeding 15,000 square feet of Floor Area shall be permitted.

(F)    The name "Target" shall not be used to identify the Shopping Center or any business or trade conducted on the Developer Tract.  Until the Approving Parties agree upon a name change, the Shopping Center shall be called Northway Mall.

(G)    Except to the extent required by law, no Permittee shall be charged for the right to use the Common Area; for the purpose of this provision, a tax assessment or other form of charge applicable to parking spaces or parking lots may be deemed by the Approving Parties an imposition required by law.

(H)    Each Party shall use its best efforts to cause the employees of the Occupants of its Tract to park their vehicles only on such Tract.

(I)    Other than as specifically set out in this OEA, this OEA is not intended to, and does not, create or impose any obligation on a Party to operate, continuously operate, or cause to be operated a business or any particular business at the Shopping Center or on any Tract.

(J)    Notwithstanding anything in this OEA to the contrary, Developer already has agreements with "Marshalls", "Staples", "David's Bridal" and "Jo Ann Fabrics" relating to premises in the proposed Developer tenant buildings.  Therefore it is specifically

understood and agreed that the restriction found in this Section 5.1 shall not apply to premises occupied by "Marshalls", "Staples", "Davids Bridal", or "Jo Ann Fabrics" or their respective successors and assigns under leases existing as of the date hereof (and as to "Jo Ann Fabrics" only, any subsequent and/or replacement lease) so long as such tenants are occupying their respective premises.

(K)     Target understands that Developer as Landlord has heretofore entered into a lease with Staples, Inc. that contains an "Exclusive use" provision in favor of Staples, Inc. Therefore so long as Staples, Inc. is open and operating within the Shopping Center, Target agrees that not more than 5,000 square feet of selling space within the Target Building may be used for the sale or leasing of office equipment (including computers), office furniture or office supplies or the providing of copying or printing services or other similar office services.  Target further agrees that so long as Staples, Inc. is open and operating in the Shopping Center Target will not lease, sublease, license, sell or otherwise use any space in excess of such 5,000 square feet within the Target Tract for such use as a primary purpose.

5.2     Lighting.

(A)     After completion of the Common Area lighting system on its Tract, each Party hereby covenants and agrees to keep its Tract fully illuminated each day from dusk to at least 10:00 p.m. unless the Approving Parties agree upon a different time.  Each Party further agrees to keep any exterior Building security lights on from dusk until dawn.  During the term of this OEA, each Party grants an irrevocable license to each other Party for the purpose of permitting the lighting from one Tract to incidentally shine on the adjoining Tract.

(B)     It is recognized that Occupants within the Shopping Center may be open for business at different hours, and that a Party may wish to have the Common Area lights on another Tract to be illuminated before or after the required period.  Accordingly, a Party ("Requesting Party") shall have the right, at any time to require another Party ("Requested

Party") to keep its Common Area lights operating as stipulated by the Requesting Party; provided that the Requesting Party notifies the Requested Party of such request not less than fifteen (15) days in advance.  The Requesting Party shall state the period during which it wishes the lights to be kept operating and shall pay to the Requested Party a prepayment as follows:

(i)    If the period is less than thirty (30) days, then the prepayment shall be one hundred ten percent (110%) of the reasonable cost for such additional operation (including electrical power, bulbs and manpower), as estimated by the Requested Party; or

(ii)   If the period is greater than or equal to thirty (30) days, then the prepayment shall be one hundred ten percent (110%) of the reasonable cost for such additional operation (including electrical power, bulbs and manpower) for thirty (30) days, as estimated by the Requested Party.  If the period is greater than thirty (30) days, then the Requesting Party shall renew such prepayment at the end of each thirty (30) day period.

The Requesting Party agrees to pay one hundred ten percent (110%) of the cost to the Requested Party of electrical power to provide such extra-hours illumination, and the prepayment shall be applied to such obligation as incurred.  If the Requesting Party is of the opinion that the estimated prepayment made by the Requested Party is greater than one hundred ten percent (110%) of such costs, the Parties shall attempt to agree to the cost of such electrical power and if they cannot do so, then the amount the Requesting Party is obligated to pay shall be determined from the power costs as estimated by the electrical utility company furnishing such power, or if the utility fails to do so, by a reputable engineer.  Upon the failure of a Requesting Party to pay the estimated amount or renew a prepayment as required hereby, the Requested Party shall have the right to discontinue such additional lighting and to exercise other remedies herein provided.  Any such request for

additional lighting may be withdrawn or terminated at any time by written notice from the Requesting Party, and a new request or requests for changed hours may be made from time to time.

5.3    Occupant Signs.

(A)    No freestanding sign ("Sign") shall be permitted within the Shopping Center unless constructed in an area approved by Developer and Target, and only one such Sign may be located in each designated area. It is understood and agreed that at the time of execution of this OEA the applicable governmental regulations do not permit any freestanding signs. Developer and Target, without the consent of the other, shall have the right to apply for variances for such a sign and if either Party shall obtain the right to have such a freestanding sign, then such Party may erect such sign. Each Party agrees to cooperate with the other Party in any sign application.

In the event Target is successful in obtaining permission for a sign, Developer agrees to grant a non exclusive easement to Target to permit the construction and operation of a free standing sign at the governmental approved location, together with a non exclusive easement to run utilities under the Developer Tract to such designated location.

The existing billboard sign shown on the Site Plan is a category no longer existing under the Colonie sign ordinance and cannot be relocated. No modifications of such sign are permitted under certain of Developer's tenant leases.

The Approving Parties shall have the right to approve the design and size of all Building Signs, including the identification panel inserts; provided, however, it is agreed that any Occupant of more than 60,000 square feet of Floor Area shall have the unqualified right to use its standard prototype Building Signs as the same exists from time to time. No "reader board" type sign shall be permitted within the Shopping Center.

(B)    Any Occupant occupying less than fifteen thousand (15,000) square feet of Floor Area may have only one (1) identification sign placed on the exterior of the Building it occupies; provided however, that if any such Occupant is located at the corner of a Building, then such Occupant may have an identification sign on each side of such corner. Any Occupant occupying at least fifteen thousand (15,000) square feet of Floor Area may have more than one identification sign placed on the exterior of the Building it occupies. Any freestanding building within the Shopping Center shall be permitted to have one sign on each of the four (4) sides of its building

No Occupant identification sign attached to the exterior of a Building shall be:

(i)    placed on canopy roofs extending above the Building roof, placed on penthouse walls, or placed so as to project above the parapet, canopy, or top of the wall upon which it is mounted;

(ii)    placed at any angle to the Building; provided, however, the foregoing shall not apply to any sign located under a sidewalk canopy if such sign is at least eight (8) feet above the sidewalk;

(iii)    painted on the surface of any Building;

(iv)    flashing, moving or audible signs;

(v)    signs employing exposed raceways, exposed neon tubes, exposed ballast boxes, or exposed transformers; or

(vi)    paper or cardboard signs, temporary signs (exclusive of contractor signs), stickers or decals; provided, however, the foregoing shall not prohibit the placement at the entrance of each Occupant's space a

54

small sticker or decal, indicating hours of business, emergency telephone numbers, acceptance of credit cards, and other similar bits of information.

No Occupant of less than thirty thousand (30,000) square feet of Floor Area shall have an exterior sign which identifies leased departments, and/or concessionaires operating under the Occupant's business or trade name, nor, shall such sign identify specific brands or products for sale or services offered within a business establishment, unless such identification is used as part of the Occupant's trade name.

(C)    Notwithstanding anything above to the contrary, each Party shall be permitted to place within the Common Area located on its Tract the temporary display of leasing information and the temporary erection of one sign identifying each contractor working on a construction job.  Each Party shall have the obligation to operate, maintain, and repair, in a clean, sightly and safe condition, all signs, including components thereof, located upon its Tract pursuant to (B) above or the provisions hereof.

(D)    Target shall have the right, subject to governmental approval to have its standard building sign and logo over its interior entrance.

5.4    Insurance.

(A)    During the period the Operator is maintaining the Common Area, Operator shall maintain or cause to be maintained in full force and effect at least the minimum insurance coverages in Constant Dollars set forth below:

(i)    Commercial General Liability Insurance covering the Common Area of the Shopping Center with a combined single limit of liability of Five Million Dollars ($5,000,000.00) in Constant Dollars for bodily injury, personal injury and property damage, arising out of any one

55

occurrence; each Party shall be a "named insured" under such policy. It is the agreement of the Parties that the insurance maintained by Operator shall be primary insurance and not contributory with the insurance maintained by the Parties pursuant to (B) below, or any other insurance maintained by the Parties. If any Party is operating and maintaining the Common Area on its Tract, and such Party elects not to participate in Operator's insurance program regarding the Common Area, then such Party shall maintain or cause to be maintained the insurance coverage required above; provided however, the other Parties shall be "additional insureds" under such policy, and Operator shall be released from its obligation to carry such insurance on such Party's Tract.

(ii)    Workers' compensation and employer's liability insurance:

(a)    Worker's compensation insurance as required by any applicable law or regulation.

(b)    Employer's liability insurance in the amount of $1,000,000 each accident for bodily injury, $1,000,000 policy limit for bodily injury by disease and $1,000,000 each employee for bodily injury by disease.

(iii)    Automobile Liability Insurance: Automobile liability insurance including coverage for owned, hired, and non-owned automobiles. The limits of liability shall not be less than $1,000,000 combined single limit each accident for bodily injury and property damage combined.

Operator agrees to defend, protect, indemnify and hold harmless each Party from and against all claims or demands, including any action or proceeding brought thereon, and all costs, losses, expenses and liabilities of any kind, including reasonable attorneys' fees and cost of suit, asserted or incurred in connection with or arising out of the performance, or failure to perform, by Operator of its duties or obligations under this Agreement with respect to the maintenance and operation of the Common Area; provided however, the foregoing obligation shall not apply to claims caused by the sole negligence or by the willful act or omission of the Party to be indemnified. If any Party is operating and maintaining the Common Area on its Tract, such Party agrees to defend, protect, indemnify and hold harmless the other Parties in identical fashion to that required of Operator in the immediately preceding sentence.

(B)   Each Party (as to its Tract only) shall maintain or cause to be maintained in full force and effect at least the minimum insurance coverages in Constant Dollars set forth below:

(i)   Commercial General Liability Insurance with a combined single limit of liability of Five Million Dollars ($5,000,000.00) in Constant Dollars for bodily injury, personal injury and property damage, arising out of any one occurrence; the other Parties shall be "additional insureds" under such policy as it applies to the insuring Party's Tract. Each Party agrees to look first to the insurance coverage obtained pursuant to (A) above, and to exhaust all limits thereof before making any claim, other than to preserve rights if coverage under (A) is inadequate, under the insurance carried by a Party hereunder.

(ii)   Workers' compensation and employer's liability insurance:

        (a)      Worker's compensation insurance as required by any applicable law or regulation.

        (b)      Employer's liability insurance in the amount of $1,000,000 each accident for bodily injury, $1,000,000 policy limit for bodily injury by disease and $1,000,000 each employee for bodily injury by disease.

    (iii)      Automobile Liability Insurance: Automobile liability insurance including coverage for owned, hired, and non-owned automobiles. The limits of liability shall not be less than $1,000,000 combined single limit each accident for bodily injury and property damage combined.

Each Party agrees to defend, protect, indemnify and hold harmless each other Party from and against all claims or demands, including any action or proceedings brought thereon, and all costs, losses, expenses and liability of any kind relating thereto, including reasonable attorney's fees and cost of suit, arising out of or resulting from the injury to or death of any Person, or damage to the property of any Person located on the Tract owned by each indemnifying Party; provided however, the foregoing obligation shall not apply to claims caused by the negligence or willful act or omission of such other Party, its licensees, concessionaires, agents, servants, or employees, or the agents, servants, or employees of any licensee or concessionaire thereof.

(C)    Prior to commencing any construction activities within the Shopping Center, each Party and Operator shall obtain or require its contractor to obtain and thereafter maintain so long as such construction activity is occurring, at least the minimum insurance coverages in Constant Dollars set forth below:

(i)     Workers' compensation and employer's liability insurance:

        (a)     Worker's compensation insurance as required by any
applicable law or regulation.

        (b)     Employer's liability insurance in the amount of
$1,000,000 each accident for bodily injury,
$1,000,000 policy limit for bodily injury by disease
and $1,000,000 each employee for bodily injury by
disease.

(ii)    General liability insurance:  Commercial General Liability insurance
covering all operations by or on behalf of the Contractor, which shall
include the following minimum limits of liability and coverages:

        (a)     Required coverages:
            (1)     Premises and Operations,
            (2)     Products and Completed Operations;
            (3)     Contractual Liability, insuring the indemnity
obligations assumed by Contractor under the
Contract Documents,
            (4)     Broad Form Property Damage (including
Completed Operations),
            (5)     Explosion, Collapse and Underground
Hazards, and
            (6)     Personal Injury Liability.
        (b)     Minimum limits of liability:

            1.      $1,000,000 each occurrence (for bodily injury
and property damage)

2.      $1,000,000 for Personal Injury Liability,

3.      $2,000,000 aggregate for Products and Completed Operations (which shall be maintained for a three (3) year period following final completion of the Work),

4.      $2,000,000 general aggregate applying separately to this Project.

(iii)   Automobile Liability Insurance: Automobile liability insurance including coverage for owned, hired, and non-owned automobiles. The limits of liability shall not be less than $1,000,000 combined single limit each accident for bodily injury and property damage combined. The Contractor shall require each of his Subcontractors to include in their liability insurance policies coverage for Automobile Contractual Liability.

(iv)    Umbrella/Excess Liability Insurance: The Contractor shall also carry umbrella/excess liability insurance in the amount of $5,000,000. If there is no per project aggregate under the Commercial General Liability policy, the limit shall be $10,000,000.

If the construction activity involves the use of another Party's Tract, then the owner of such Tract shall be an additional insured and such insurance shall provide that the same shall not be canceled, or reduced in amount or coverage below the requirements of this OEA, nor shall it be allowed to expire, without at least thirty (30) days prior written notice to each insured. If such insurance is canceled or expires then the constructing Party shall immediately stop all work on or use of the other Party's Tract until either the required insurance is reinstated or replacement insurance obtained.

(D)    Effective upon the commencement of construction of any Building on its Tract and so long as such Building exists, a Party shall carry, or cause to be carried, property

insurance with "all-risk" coverage, in the amount of 100% of full replacement cost thereof (excluding footings, foundations or excavations).

Each Party (the "Releasing Party") hereby releases and waives for itself, and each Person claiming by, through or under it, each other Party (the "Released Party") from any liability for any loss or damage to all property of such Releasing Party located upon any portion of the Shopping Center, which loss or damage is of the type covered by the insurance required to be maintained under 5.4(D), irrespective either of any negligence on the part of the Released Party which may have contributed to or caused such loss, or of the amount of such insurance required or actually carried, including any deductible or self insurance reserve. Releasing Party agrees to use its reasonable efforts to obtain, if needed, appropriate endorsements to its policies of insurance, and to the policies of insurance carried by its Occupants, with respect to the foregoing release; provided, however, that failure to obtain such endorsements shall not affect the release hereinabove given.

Each Party agrees to defend, protect, indemnify and hold harmless each other Party from and against all claims or demands, including any action or proceeding brought thereon, and all costs, losses, expenses, and liabilities of any kind relating thereto, including reasonable attorneys' fees and cost of suit asserted by or through any Permittees of the indemnifying Party's Tract for any loss or damage to the property of such Permittee located upon the indemnifying Party's Tract, which loss or damage would have been covered by the insurance required to be maintained under 5.4(D), irrespective of any negligence on the part of any other Party which may have contributed to or caused such loss.

All insurance required by Section 5.4 shall be written on an occurrence basis and procured from companies rated by Best's Insurance Reports not less than A-/X which are authorized to do business in the state where the Shopping Center is located. All insurance may be provided under (i) an individual policy covering this location, (ii) a blanket policy or policies which includes other liabilities, properties and locations of such

Party; provided, however, that if such blanket commercial general liability insurance policy or policies contain a general policy aggregate of less than $20,000,000 in Constant Dollars, then such insuring Party shall also maintain excess liability coverage necessary to establish a total liability insurance limit of $20,000,000 in Constant Dollars, (iii) a plan of self-insurance, provided that any Party so self-insuring notifies the other Parties of its intent to self-insure and agrees that upon request it shall deliver to such other Parties each calendar year a copy of its annual report that is audited by an independent certified public accountant which discloses that such Party has $100,000,000 in Constant Dollars of both net worth and net current assets, or (iv) a combination of any of the foregoing insurance programs. To the extent any deductible is permitted or allowed as a part of any insurance policy carried by a Party in compliance with 5.4, such Party shall be deemed to be covering the amount thereof under an informal plan of self-insurance; provided, however, that in no event shall any deductible exceed $50,000.00 in Constant Dollars unless such Party complies with the requirements regarding self-insurance pursuant to (iii) above. Each Party and Operator agree to furnish to any Party requesting the same, a certificate(s) of insurance, or statement of self-insurance, as the case may be, evidencing that the insurance required to be carried by such Person is in full force and effect.

The insurance required pursuant to (A) and (B) above shall include the following provisions:

(i)     shall provide that the policy shall not be canceled, or reduced in amount or coverage below the requirements of this OEA, nor shall it be allowed to expire, without at least thirty (30) days prior written notice by the insurer to each insured and to each additional insured;

(ii)    shall provide for severability of interests;

(iii)    shall provide that an act or omission of one of the insureds or additional insureds which would void or otherwise reduce coverage, shall not reduce or void the coverage as to the other insureds; and

(iv)    shall provide for contractual liability coverage with respect to the indemnity obligation set forth in 5.4(A) for Operator and 5.4(B) for a Party.

5.5    <u>Taxes and Assessments</u>. Each Party shall pay, or cause to be paid prior to delinquency, all taxes and assessments with respect to its Tract, the Building, and other improvements located thereon, and any personal property owned or leased by such Party in the Shopping Center, provided that if the taxes or assessments or any part thereof may be paid in installments, the Party may pay each such installment as and when the same becomes due and payable. Nothing contained in this subsection shall prevent any Party from contesting at its cost and expense any such taxes and assessments with respect to its Tract in any manner such Party elects, so long as such contest is maintained with reasonable diligence and in good faith. At the time as such contest is concluded (allowing for appeal to the highest appellate court), the contesting Party shall promptly pay all such taxes and assessments determined to be owing, together with all interest, penalties and costs thereon.

## ARTICLE VI
## MISCELLANEOUS

6.1    <u>Default</u>.

(A)    The occurrence of any one or more of the following events shall constitute a material default and breach of this OEA by the non-performing Party (the "Defaulting Party"):

(i)     The failure to make any payment required to be made hereunder to the other Party within ten (10) days of the due date, or

(ii)    The failure to observe or perform any of the covenants, conditions or obligations of this OEA, other than as described in (i) above, within thirty (30) days after the issuance of a notice by another Party (the Non-Defaulting Party") specifying the nature of the default claimed.

(B)     With respect to any default under (A)-(ii) above adversely affecting the Non-Defaulting Party, any Non-Defaulting Party shall have the right following the expiration of any applicable cure period, but not the obligation, to cure such default by the payment of money or the performance of some other action for the account of and at the expense of the Defaulting Party; provided, however, that in the event the default shall constitute an emergency condition, the Non-Defaulting Party, acting in good faith, shall have the right to cure such default upon such advance notice as is reasonably possible under the circumstances or, if necessary, without advance notice, so long as notice is given as soon as possible thereafter.  To effectuate any such cure, the Non-Defaulting Party shall have the right to enter upon the Tract of the Defaulting Party (but not into any Building) to perform any necessary work or furnish any necessary materials or services to cure the default of the Defaulting Party.  Each Party shall be responsible for the default of its Occupants.  In the event any Non-Defaulting Party shall cure a default, the Defaulting Party shall reimburse the Non-Defaulting Party for all costs and expenses incurred in connection with such curative action, plus interest as provided herein, within ten (10) days of receipt of demand, together with reasonable documentation supporting the expenditures made.

(C)     Costs and expenses accruing and/or assessed pursuant to 6.1(A)(i) and/or 6.1(B) above shall constitute a lien against the Defaulting Party's Tract provided, however, the Non Defaulting Party shall first offset any monies due against any Common Area Maintenance Costs due to the Defaulting Party, if any, and then claim a lien for any balance. The lien shall attach and take effect only upon recordation of a claim of lien in the office of

the Recorder of the County of the State in which the Shopping Center is located, by the Party making the claim. The claim of lien shall include the following:

    (i)     The name of the lien claimant;

    (ii)    A statement concerning the basis for the claim of lien and identifying the lien claimant as a curing Party;

    (iii)   An identification of the owner or reputed owner of the Tract or interest therein against which the lien is claimed;

    (iv)   A description of the Tract against which the lien is claimed;

    (v)    A description of the work performed which has given rise to the claim of lien and a statement itemizing the amount thereof; and

    (vi)   A statement that the lien is claimed pursuant to the provisions of this OEA, reciting the date, book and page of recordation hereof. The notice shall be duly verified, acknowledged and contain a certificate that a copy thereof has been served upon the Party against whom the lien is claimed, by personal service or by mailing pursuant to 6.4 below. The lien so claimed shall attach from the date of recordation solely in the amount claimed thereby and may be enforced in any judicial proceedings allowed by law, including without limitation, suit in the nature of a suit to foreclose a mortgage/deed of trust or mechanic's lien under the applicable provisions of the law of the State in which the Shopping Center is located.

    (D)    Each Non-Defaulting Party shall have the right to prosecute any proceedings at law or in equity against any Defaulting Party hereto, or any other Person, violating or

attempting to violate or defaulting upon any of the provisions contained in this OEA, and to recover damages for any such violation or default. Such proceeding shall include the right to restrain by injunction any violation or threatened violation by another of any of the terms, covenants, or conditions of this OEA, or to obtain a decree to compel performance of any such terms, covenants, or conditions, it being agreed that the remedy at law for a breach of any such term, covenant, or condition (except those, if any, requiring the payment of a liquidated sum) is not adequate. All of the remedies permitted or available to a Party under this OEA or at law or in equity shall be cumulative and not alternative, and invocation of any such right or remedy shall not constitute a waiver or election of remedies with respect to any other permitted or available right or remedy.

6.2    Interest.

Any time a Party or Operator shall not pay any sum payable hereunder to another within five (5) days of the due date, such delinquent Party or Operator shall pay interest on such amount from the due date to and including the date such payment is received by the Person entitled thereto, at the lesser of:

(i)    The highest rate permitted by law to be either paid on such type of obligation by the Person obligated to make such payment or charged the Person to whom such payment is due, whichever is less; or

(ii)    3% per annum in excess of the prime rate from time to time publicly announced by Norwest Bank Minnesota, N.A. or its successor.

6.3    Estoppel Certificate.

Each Party and Operator agrees that upon written request (which shall not be more frequent than three (3) times during any calendar year) of any other Party or Operator, it will issue within thirty (30) days of receipt of such request to such Person, or its

prospective mortgagee or successor, an estoppel certificate stating to the best of the issuer's knowledge as of such date:

> (i)     whether it knows of any default under this OEA by the requesting Person, and if there are known defaults, specifying the nature thereof;

> (ii)    whether this OEA has been assigned, modified or amended in any way by it and if so, then stating the nature thereof; and

> (iii)   whether this OEA is in full force and effect.

Such estoppel certificate shall act to estop the issuer from asserting a claim or defense against a bona fide encumbrancer or purchaser for value to the extent that such claim or defense is based upon facts known to the issuer as of the date of the estoppel certificate which are contrary to the facts contained therein, and such bona fide purchaser or encumbrancer has acted in reasonable reliance upon the estoppel certificate without knowledge of facts to the contrary.  The issuance of an estoppel certificate shall in no event subject the issuer to any liability for the negligent or inadvertent failure of the issuer to disclose correct and/or relevant information, nor shall such issuance be construed to waive any rights of the issuer to perform an audit or obtain an adjustment with respect to Common Area Maintenance Costs for any year it is entitled to do so, or to challenge acts committed by other Parties for which approval by the Approving Parties was required but not sought or obtained.

6.4     Notices.

All notices, demands and requests (collectively the "notice") required or permitted to be given under this OEA must be in writing and shall be deemed to have been given as of the date such notice is (i) delivered to the Party intended, (ii) delivered to the

then designated address of the Party intended, (iii) rejected at the then designated address of the Party intended, provided such notice was sent prepaid, or (iv) sent via facsimile so long as the original copy is also sent via (i) or (ii) above on the same day.  The initial addresses of the Parties shall be:

| | |
|---|---|
| Target: | Dayton Hudson Corporation<br>Target Stores-Real Estate<br>Attn:  Property Administration<br>1000 Nicollet Mall<br>Minneapolis, MN  55403<br>Fax:  (612) 761-3728 |
| Developer: | Northway Mall Associates<br>c/o Mall Properties, Inc.<br>654 Madison Avenue<br>New York, New York 10021<br>Fax:  (212) 832-5369<br>Attn:  Craig Samson |
| Operator: | As from time to time designated. |

Upon at least ten (10) days prior written notice, each Person shall have the right to change its address to any other address within the United States of America.

6.5    Approval Rights.

(A)    With respect to any matter as to which a Party has specifically been granted an approval right under this OEA, such approval shall be deemed to mean approval not unreasonably withheld or delayed; provided if specifically otherwise set forth nothing contained in this OEA shall limit the right of a Party to exercise its business judgment, act in a subjective manner, or act in its sole discretion or sole judgment, whether or not "objectively" reasonable under the circumstances, and any such decision shall not be deemed inconsistent with any covenant of good faith and fair dealing which may be implied by law to be part of this OEA; and the Parties intend by this OEA to set forth their entire understanding with respect to the terms, covenants, conditions and standards pursuant to which their obligations are to be judged and their performance measured.

(B)     Unless provision is made for a specific time period, each response to a request for an approval or consent required to be considered pursuant to this OEA shall be given by the Person to whom directed within thirty (30) days of receipt. Each disapproval shall be in writing and, subject to (A) above, the reasons shall be clearly stated. If a response is not given within the required time period, the requested Party shall be deemed to have given its approval if the original notice stated in capitalized letters that failure to respond within the applicable time period will be deemed an approval.

6.6     Condemnation. In the event any portion of the Shopping Center shall be condemned, or conveyed under threat of condemnation, the award shall be paid to the Party owning the land or the improvements taken, and the other Parties hereby waive and release any right to recover any value attributable to the property interest so taken, except that (i) if the taking includes improvements belonging to more than one Party, such as Utility Lines or signs, the portion of the award allocable thereto shall be used to relocate, replace or restore such jointly owned improvements to a useful condition, and (ii) if the taking includes easement rights which are intended to extend beyond the term of this OEA, the portion of the award allocable to each such easement right shall be paid to the respective grantee thereof. In addition to the foregoing, if a separate claim can be filed for the taking of any other property interest existing pursuant to this OEA which does not reduce or diminish the amount paid to the Party owning the land or the improvement taken, then the owner of such other property interest shall have the right to seek an award for the taking thereof. Except to the extent they burden the land taken, no easement or license set forth in this OEA shall expire or terminate based solely upon such taking.

6.7     Binding Effect. The terms of this OEA and all easements granted hereunder shall constitute covenants running with the land and shall bind the real estate described herein and inure to the benefit of and be binding upon the signatories hereto and their respective successors and assigns who become Parties hereunder. This OEA is not intended

to supersede, modify, amend, or otherwise change the provisions of any prior instrument affecting the land burdened hereby.

6.8    Construction and Interpretation.

(A)    This OEA and the Exhibits hereto contain all the representations and the entire agreement between the Parties with respect to the subject matter hereof. Any prior negotiations, correspondence, memoranda or agreements are superseded in total by this OEA and Exhibits hereto. This OEA has been fully negotiated at arms length between the signatories hereto, and after advice by counsel and other representatives chosen by such signatories, and such signatories are fully informed with respect thereto; no such signatory shall be deemed the scrivener of this OEA; and, based on the foregoing, the provisions of this OEA and the Exhibits hereto shall be construed as a whole according to their common meaning and not strictly for or against any Party.

(B)    Whenever required by the context of this OEA, (i) the singular shall include the plural, and vice versa, and the masculine shall include the feminine and neuter genders, and vice versa and (ii) use of the words "including", "such as", or words of similar import, when following any general term, statement or matter shall not be construed to limit such statement, term or matter to specific items, whether or not language of non-limitation, such as "without limitation", or "but not limited to", are used with reference thereto, but rather shall be deemed to refer to all other items or matters that could reasonably fall within the broadest scope of such statement, terms or matter.

(C)    The captions preceding the text of each article and section are included only for convenience of reference. Captions shall be disregarded in the construction and interpretation of this OEA. Capitalized terms are also selected only for convenience of reference and do not necessarily have any connection to the meaning that might otherwise be attached to such term in a context outside of this OEA.

(D)    Invalidation of any of the provisions contained in this OEA, or of the application thereof to any person by judgment or court order shall in no way affect any of the other provisions hereof or the application thereof to any other person and the same shall remain in full force and effect.

(E)    This OEA may be amended by, and only by, a written agreement signed by all of the then current Approving Parties and shall be effective only when recorded in the county and state where the Shopping Center is located; provided, however, that no such amendment shall impose any materially greater obligation on, or materially impair any right of, a Party or its Tract without the consent of such Party.  If any such amendment is signed by a Party, such signature shall be conclusive evidence that such Party is bound by the terms and conditions of the OEA as so amended.  No consent to the amendment of this OEA shall ever be required of any Occupant or Person other than the Parties, nor shall any Occupant or Person other than the Parties have any right to enforce any of the provisions hereof.  Each Party may consider, approve or disapprove any proposed amendment to this OEA in its sole and absolute discretion without regard to reasonableness or timeliness.

(F)    This OEA may be executed in several counterparts, each of which shall be deemed an original.  The signatures to this OEA may be executed and notarized on separate pages, and when attached to this OEA shall constitute one complete document.

6.9    Negation of Partnership.  None of the terms or provisions of this OEA shall be deemed to create a partnership between or among the Parties in their respective businesses or otherwise, nor shall it cause them to be considered joint venturers or members of any joint enterprise.  Each Party shall be considered a separate owner, and no Party shall have the right to act as an agent for another Party, unless expressly authorized to do so herein or by separate written instrument signed by the Party to be charged.

6.10    Not a Public Dedication.  Nothing herein contained shall be deemed to be a gift or dedication of any portion of the Shopping Center or of any Tract or portion thereof to

the general public, or for any public use or purpose whatsoever. Except as herein specifically provided, no right, privileges or immunities of any Party hereto shall inure to the benefit of any third-party Person, nor shall any third-party Person be deemed to be a beneficiary of any of the provisions contained herein.

6.11   Excusable Delays. Whenever performance is required of any Person hereunder, such Person shall use all due diligence to perform and take all necessary measures in good faith to perform; provided, however, that if completion of performance shall be delayed at any time by reason of acts of God, war, civil commotion, riots, strikes, picketing or other labor disputes, unavailability of labor or materials, damage to work in progress by reason of fire or other casualty, or any cause beyond the reasonable control of such Person, then the time for performance as herein specified shall be appropriately extended by the amount of the delay actually so caused. The provisions of this section shall not operate to excuse any Person from the prompt payment of any monies required by this OEA.

6.12   Intentionally not used.

6.13   OEA Shall Continue Notwithstanding Breach. It is expressly agreed that no breach of this OEA shall (i) entitle any Party to cancel, rescind, or otherwise terminate this OEA, or (ii) defeat or render invalid the lien of any mortgage or deed of trust made in good faith and for value as to any part of the Shopping Center. However, such limitation shall not affect in any manner any other rights or remedies which a Party may have hereunder by reason of any such breach.

6.14   Intentionally Not Used.

6.15   No Waiver. The failure of any Party to insist upon strict performance of any of the terms, covenants or conditions hereof shall not be deemed a waiver of any rights or remedies which that Party may have hereunder, at law or in equity and shall not be deemed

72

a waiver of any subsequent breach or default in any of such terms, covenants or conditions. No waiver by any Party of any default under this OEA shall be effective or binding on such Party unless made in writing by such Party and no such waiver shall be implied from any omission by a Party to take action in respect to such default. No express written waiver of any default shall affect any other default or cover any other period of time other than any default and/or period of time specified in such express waiver. One or more written waivers or any default under any provision of this OEA shall not be deemed to be a waiver of any subsequent default in the performance or the same provision or any other term or provision contained in this OEA.

## ARTICLE VII
## TERM

7.1   <u>Term of this OEA.</u> This OEA shall be effective as of the date first above written and shall continue in full force and effect until 11:59 p.m. on December 31, 2049; provided, however, that the easements referred to in Article II hereof which are specified as being perpetual or as continuing beyond the term of this OEA shall continue in force and effect as provided therein. Upon termination of this OEA, all rights and privileges derived from and all duties and obligations created and imposed by the provisions of this OEA, except as relates to the easements mentioned above, shall terminate and have no further force or effect; provided, however, that the termination of this OEA shall not limit or affect any remedy at law or in equity that a Party may have against any other Party with respect to any liability or obligation arising or to be performed under this OEA prior to the date of such termination.

## ARTICLE VIII
## EXCULPATION

8.1   <u>Certain Limitations on Remedies.</u> None of the Persons comprising a Party (whether partners, shareholders, officers, directors, trustees, employees, beneficiaries or

otherwise) shall ever be personally liable for any such judgment obtained against a Party. Each Party agrees to look solely to the interest in the Shopping Center (subject to any first mortgage encumbering the defaulting Party's Tract) of a defaulting Party for recovery of damages for any breach of this OEA; provided, however, the foregoing shall not in any way impair, limit or prejudice the right of a Party:

    (i)    <u>Casualty Insurance and Condemnation Proceeds</u>. To recover from another Party all damages and costs on account of, or in connection with, casualty insurance or condemnation proceeds which are not applied or used in accordance with the terms of this OEA.

    (ii)    <u>Hazardous Substances</u>. To recover from a Party all damages and costs arising out of or in connection with, or on account of, breach by a Party of its obligations under 5.1(C).

    (iii)    <u>Liability Insurance</u>. To recover from a Party all loss or damages, and costs arising out of or in connection with, or on account of, breach by a Party of its obligation to carry liability insurance as specified under 5.4.

    (iv)    <u>Taxes, Assessments and Liens</u>. To recover from a Party all damages and costs arising out of or in connection with, or on account of, the failure by such Party to pay when due any tax, assessment or lien as specified under 5.5.

    (v)    <u>Fraud or Misrepresentation</u>. To recover from a Party all damages and costs as a result of any fraud or misrepresentation by such Party in connection with any term, covenants, or condition in this OEA.

(vi)    <u>Equitable Relief; Costs</u>.  To pursue equitable relief in connection with any term, covenant or condition of this OEA, including a proceeding for temporary restraining order, preliminary injunction, permanent injunction or specific performance.

SIGNATURE PAGE

FOR

OPERATION AND EASEMENT AGREEMENT

BETWEEN

DAYTON HUDSON CORPORATION

AND

NORTHWAY MALL ASSOCIATES

IN WITNESS WHEREOF, the Parties have caused this OEA to be executed effective as of the day and year first above written.

NORTHWAY MALL ASSOCIATES    DAYTON HUDSON CORPORATION

("Developer")    ("Target")

By: _____    By: _____

Name: Morton C. Olshan    Name: Edward J. Brennan
                                     Vice President
Title: General Partner    Title: Target Stores

75

STATE OF _New York_

) ss.

COUNTY OF _New York_

On this _19th_ day of _May_, 1999, before me, a Notary Public within and for said County, personally appeared _Morton L. Olshan_ to me personally known, being first by me duly sworn, did say that he/she/they is/are the _General Partner_ of _Northway Mall_ and that said instrument was signed on behalf of said corporation by authority of its Board of Directors and _partnership and_ _____ acknowledged said instrument to be the free act and deed of said corporation. _partnership_

_Janet Bernasconi_
Notary Public

**JANET BERNASCONI**
Notary Public, State of New York
No. 41-4873590
Qualified In Queens County
Commission Expires Nov. 24, ~~1924~~ 2000

My commission expires:


STATE OF MINNESOTA        )
                          ) ss.
COUNTY OF HENNEPIN        )

On this _14th_ day of _May_, 1999, before me, a Notary Public within and for said County, personally appeared _Edward J. Bierman_ to me personally known, being first by me duly sworn, did say that he/she/they is/are the _Vice President -Target Stores_ of Dayton Hudson Corporation and that said instrument was signed on behalf of said corporation by authority of its Board of Directors and _Edward J. Bierman_ acknowledged said instrument to be the free act and deed of said corporation.

_Laura R. Miller_
Notary Public

LAURA R. MILLER
NOTARY PUBLIC-MINNESOTA
My Commission Expires Jan. 31, 2000

My commission expires:

## Legal Description
## Proposed Parcel "A"
## Northway Mall, Town of Colonie, N.Y.

All that piece or parcel of land situate, lying and being located in the Town of Colonie, County of Albany and State of New York, being more particularly bounded and described as follows:

Commencing at a point in the southwesterly line of Central Avenue-NYS Rte. 5 at its intersection with the division line between lands of Northway Mall Associates on the northwest and lands now or formerly of Robert L. Frey, Et. Al. on the southeast, said point being distant 441.0'± northwesterly measured along the southwesterly line of Central Avenue from its intersection with the northwesterly line of Nolan Road; thence southwesterly along said division line between lands of Northway Mall Associates on the northwest and lands now or formerly of Robert L. Frey, Et. Al., Paulinga Corporation, and Joan Snyder on the southeast, South 50°-03'-01" West, 874.91' to the point and place of beginning for the herein to be described premises; running thence along the division line between lands of Northway Mall Associates on the northwest and lands now or formerly of Joan Snyder, Dorlyn Road, and John Cerone Inc. on the southwest, South 50°-03'-01" West, 579.84' to a point; thence along the division line between lands of Northway Mall Associates on the east and lands now or formerly of Con-Way Transportation Services, Inc. on the west, North 24°- 00'-26" West, 599.40' to a point; thence through the lands of Northway Mall Associates, the following seven courses and distances:

1) North 50°-03'-48" East, 435.39' to a point; thence
2) North 50°-01'-46" East, 471.74' to a point; thence
3) South 39°-56'-59" East , 92.41' to a point; thence
4) North 50°-03'-01" East, 13.00' to a point; thence
5) South 39°-56'-59" East, 282.67' to a point; thence
6) South 50°-03'48" West, 504.89' to a point; thence
7) South 39°-56'-12" East, 201.45' to the point and place of beginning, and containing 10.901 Acres, more or less.

Subject to Utility Easements for electric and natural gas conveyed to Niagara Mohawk Power Corporation and recorded in Liber 2013 of Deeds at Page 341.

Subject to all easements, rights, covenants and restrictions of record.

Subject to any state of facts an up to date abstract of title would disclose.

**02/08/99**

EXHIBIT "A"

TARGET TRACT

Legal Description
Proposed Parcel "B"
Northway Mall, Town of Colonie, N.Y.

All that piece or parcel of land situate, lying and being located in the Town of
Colonie and partly in the Village of Colonie, County of Albany and State of New York,
being more particularly bounded and described as follows:

Beginning at a point in the southwesterly line of Central Avenue-NYS Rte. 5 at its
intersection with the division line between lands of Northway Mall Associates on the
northwest and lands now or formerly of Robert L. Frey, Et. Al. on the southeast, said
point being distant 441.0'± northwesterly measured along the southwesterly line of
Central Avenue from its intersection with the northwesterly line of Nolan Road; thence
southwesterly along said division line between lands of Northway Mall Associates on the
northwest and lands now or formerly of Robert L. Frey, Et. Al , Paulinga Corporation,
and Joan Snyder on the southeast, South 50°-03'-01" West, 874.91' to a point; thence
through the lands of Northway Mall Associates, the following seven courses and
distances:

| | |
|---|---|
| 1) | North 39°-56'-12" West, 201.45' to a point; thence |
| 2) | North 50°-03'-48" East, 504.89' to a point; thence |
| 3) | North 39°-56'-59" West, 282.67' to a point; thence |
| 4) | South 50°-03'-01" West, 13.00' to a point; thence |
| 5) | North 39°-56'-59" West, 92.41' to a point; thence |
| 6) | South 50°-01'-46" West, 471.74' to a point; thence |
| 7) | South 50°-03'-48" West, 435.39' to a point; |

thence northerly along the westerly line of lands of Northway Mall Associates and its
northerly extension and prolongation, North 24°-00'-26" West, 966.83' to a point; thence
easterly along the southerly line of lands of the State of New York – Interstate Route 87,
the following two courses and distances:

1) North 79°-56'-00" East, 996.33' to a point; thence
2) South 71°-57'-19" East, 240.10' to a point;

thence southeasterly along the southwesterly line of Central Avenue, N.Y.S. Route 5, the
following three courses and distances:

| | |
|---|---|
| 1) | South 41°-25'-30" East, 340.03' to a point; thence |
| 2) | South 43°-11'-25" East, 450.47' to a point; thence |
| 3) | South 37°-12'-36" East, 16.34' to the point or place of beginning, and |

containing 24.400Acres, more or less.

Subject to a Permanent Easement for drainage conveyed to the State of New York and
recorded in Liber 1642 of Deeds at Page 409.

EXHIBIT "B"
Page 1 of 2
DEVELOPER TRACT

Subject to a 30' Sanitary Sewer Easement conveyed to the Village of Colonie and recorded in Liber 2090 of Deeds at Page 5.

Subject to a Drainage Easement conveyed to the Town of Colonie and recorded in Liber 1811 of Deeds at Page 115.

Subject to Utility Easements for electric and natural gas conveyed to Niagara Mohawk Power Corporation and recorded in Liber 2013 of Deeds at Page 341.

Subject to all easements, rights, covenants and restrictions of record.

Subject to any state of facts which an up to date Abstract of Title would disclose.

02/08/99

EXHIBIT "B"
Page 2 of 2
DEVELOPER TRACT

|

## Legal Description
## Proposed Parcel "C" - Remaining lands of Northway Mall Associates
## ( Lechmere Parcel, Cinema Parcel & Remaining portion of Wards Parcel )
## Northway Mall, Town of Colonie, N.Y.

All that piece or parcel of land situate, lying and being located partly in the Town and Village of Colonie, County of Albany and State of New York, being more particularly bounded and described as follows:

Commencing at a point in the southwesterly line of Central Avenue-NYS Rte. 5 at its intersection with the division line between lands of Northway Mall Associates on the northwest and lands now or formerly of Robert L. Frey, Et. Al. on the southeast, said point being distant 441.0'± northwesterly measured along the southwesterly line of Central Avenue from its intersection with the northwesterly line of Nolan Road; thence southwesterly along said division line between lands of Northway Mall Associates on the northwest and lands now or formerly of Robert L. Frey, Et. Al., Paulinga Corporation, Joan Snyder, Dorlyn Road, and John Cerone Inc. on the southwest, South 50°-03'-01" West, 1454.75' to a point; thence along the division line between lands of Northway Mall Associates on the east and lands now or formerly of Con-Way Transportation Services, Inc. on the west, North 24°- 00'-26" West, 1338.93' to the point and place of beginning for the herein to be described premises; running thence southwesterly along the division line between lands of Northway Mall Associates on the northwest and lands now or formerly of Windsor/Railroad Avenue Associates, Kenneth Wolberg, and Garrell Brothers Inc. on the southeast, South 41°-03'-42" West, 1107.72' to a point; thence northwesterly along the division line between lands of Northway Mall Associates on the northeast and lands now or formerly of Colonie Associates Limited Partnership on the southwest, North 48°-56'-18" West, 610.74' to a point in the easterly line of lands of the State of New York –Interstate Route 87; thence northeasterly along the easterly line of lands of the State of New York -  Interstate Route 87, the following three courses and distances:

    1) North 30°-54'-02" East, 12.00' to a point; thence
    2) North 39°-56'-27" East, 670.98' to a point; thence
    3) North 79°-56'-00" East, 669.01' to a point in the westerly line of Proposed Parcel "B"- Northway Mall; thence southerly along the westerly line of Proposed Parcel "B" – Northway Mall, South 24°-00'-26" East, 227.30' to the point or place of beginning, and containing 14.453 Acres, more or less.

Subject to a Sanitary Sewer Easement conveyed to the Village of Colonie and recorded in Liber 2090 of deeds at page 5.

ADJACENT SITE
Page 1 0f 5
EXHIBIT B-1

Subject to Utility Easements for electric and natural gas conveyed to Niagara Mohawk Power Corporation and recorded in Liber 2013 of Deeds at Page 341.

Subject to all easements, rights, covenants and restrictions of record.

Subject to any state of facts an up to date abstract of title would disclose.

Prepared by,

_____

Lynn T. Sipperly
L.S. Lic. No. 47421

05/05/99

DESCRIPTION OF LANDS KNOWN AS
REMAINING PORTION OF REVISED PARCEL "D"
NORTHWAY MALL ASSOCIATES, REPUTED OWNER
TOWN & VILLAGE OF COLONIE, COUNTY OF ALBANY, NEW YORK

ALL  THAT  TRACT,  PIECE  OR PARCEL of  land,  situate,  lying and being
located  within  the  Northway  Mall  Complex  in the  Town and Village  of
Colonie, County of Albany  and  State  of  New  York,  being a portion of
Second  Revised Parcel  "D", as shown on a map entitled "Map of Lands known
as Northway  Mall  located  in  Town & Village of Colonie, Albany County,
State of New York", dated September  12,  1970, and revised February 26,
1974, prepared by Smith  and  Mahoney,  Consulting Engineers, Albany, New
York, and being more particularly bounded and described as follows:

BEGINNING at a point in the  southerly  line of Second Revised Parcel
"D" - Northway Mall Complex at  its  intersection  with  the division line
between lands  now  or  formerly known as the Alpert's Parcel on the east
and lands of Northway  Mall  Associates  on  the  west,  said point being
distant 425.66 feet southwesterly  measured  along the southerly line of
Second  Revised  Parcel  "D" and its northeasterly prolongation from  its
intersection with the division  line  between lands now or formerly known
as Alpert's Parcel (Portion Second Revised Parcel "D")  on  the  west and
lands formerly of Alstores Realty  Corporation  and  now  Montgomery Ward
Corporation  (Second  Revised Parcel  "C")  on the east; running thence
from said  point or piece of beginning in a southwesterly direction along
the  southerly  line of Second Revised Parcel  "D" - Northway Mall Complex,
South  41°-03'-42"  West  for  a distance of 792.29 feet to a point in the
northeasterly  line of lands now or formerly of the City of Albany; thence
northwesterly along  the  northeasterly  line of lands now or formerly the
City of Albany, North 48°-56'-18"  West,  468.75  feet  to a point in the
southerly  line of lands of the State of New York - Interstate Route  87;
thence northeasterly along the southerly  line  of  lands of the State of
New York - Interstate  Route  87,  North 30°-54'-02" East 804.91 feet to a
point  in  the division line between lands of Northway Mall Associates on

the west and lands now or formerly known as Alpert's Parcel on the east; thence southeasterly along said division line, South 48°-56'-18" East 610.74 feet to the point or place of beginning and containing 427,636± square feet or 9.817 Acres, more or less. Said above described premises being shown on a map entitled "Survey of Lands owned by Northway Mall Associates known as Remaining Portion of Second Revised Parcel "D", Northway Mall Complex, Town & Village of Colonie, County of Albany, State of New York", dated May 3, 1985, prepared by Smith & Mahoney, P.C., Consulting Engineers and Surveyors, Albany, New York.

SUBJECT to an easement for sewer purposes conveyed to the Albany County Sewer District known and referred to as Parcel 69 - Patroon Creek Trunk Sewer, lying in the southwesterly corner of the above described premises and being more particularly bounded and described as follows:

BEGINNING at a point in the division line between the above described premises on the northeast and lands now or formerly of the City of Albany on the southwest, distant 358.05± feet southeasterly measured along said division line from its intersection with the southerly line of lands of the State of New York - Interstate Route 87; thence from said point or place of beginning in a northeasterly direction, North 50°-47'-42" East for a distance of 27.40 feet to a point; thence in a southeasterly direction, South 14°-41'-18" East for a distance of 47.99 feet to a point; thence in a northwesterly direction, North 48°-56'-18" West for a distance of 44.30 feet to the point or place of beginning and containing 598± square feet. Said easement being recorded in the Albany County Clerk's Office in Liber 2108 of deeds at page 265.

SUBJECT also to a Permanent Easement for gas and electric service conveyed to the Niagara Mohawk Power Corporation by Deed dated May 6, 1970 and recorded in Albany County Clerk's Office July 7, 1970, in Liber 2013 of Deeds at Page 341.

ADJACENT SITE
Page 4 of 5
EXHIBIT B-1

SUBJECT to the easement and rights of the Village of Colonie for sanitary sewer, pipes and appurtenances existing within and upon the first above described premises along the northerly and westerly property lines. Said sanitary sewer being shown on the above referenced survey map.

SUBJECT to the easement and rights of the Alpert's Parcel in and to an easement for storm and surface water drainage running through and across the northerly portion of the above described premises through an existing drainage ditch and culvert pipes.    Said drainage ditch being shown on the above referenced survey map.

SUBJECT to any state of facts an up-to-date Abstract of Title would disclose.

SUBJECT also to and together with all rights, consents, agreements and easements, if any, as may be contained in the Northway Mall Operating Agreement dated October 4, 1968 and recorded in the Albany County Clerk's Office in Liber 1931 of deeds at page 349 and subsequent amendments to said Operating Agreement recorded in Liber 2005 of deeds, page 135; Liber 2016 of deeds, page 1147; Liber 2032 of deeds, page 1037; Liber 2045 of deeds, page 853; Liber 2073 of deeds, page 299; and Liber 2225 of deeds, page 433.

ADJACENT SITE

Page 5 of 5

EXHIBIT B-1

EXHIBIT D

SUBMISSION GUIDELINES

1.      During the conceptual design phase, the constructing party shall submit to the other parties the following:

    A.      Site Design Documents to Indicate the Following:

        o      Parking configurations and car parking count

        o      Typical bay width and stall dimensions

        o      Drive widths

        o      Setbacks

        o      Curb cuts

        o      Spot elevations or rough contours

        o      Rough landscape scope

        o      Lighting pole locations

        o      Preliminary utility strategies

    B.      Building Design Single Line Plans to Indicate the Following:

        o      Exterior wall configuration

        o      Doors and store front extent

        o      Canopies and overhangs

        o      Probable column locations at exterior and abutting our building on interior

    C.      Exterior Elevation Drawings to Indicate the Following:

        o      Opaque wall areas with doors and store fronts

2.      After approval has been granted of conceptual design phase submitted in accordance with the guidelines specified in 1 above, the constructing party shall submit final design phase plans to the other parties as follows:

EXHIBIT D

A.   Site Design Documents Delineating Information Outlined in the Concept Phase with the Following Added Detail:

  o   Refined grading plans

  o   Selected lighting fixtures and resultant lighting levels in foot candles

  o   Landscaping showing generic planting materials and locations

  o   Proposed paving section designs and location

  o   Utility layouts including hydrants and sizes proposed

  o   Proposed details for curbs, site structures, manholes, etc.

  o   Proposed site signage designs and locations


B.   Building Design Plans Delineating Information Outlined in the Concept Phase with the Following Added Detail:

  o   Exterior wall thicknesses

  o   Structural columns or bearing walls at building exterior and proposed foundation design at adjoining wall between abutting buildings

  o   Where common footings are to be shared provide wall or column load information for design of that footing

  o   Proposed roof plan showing slopes and location of penthouses or other major mechanical equipment

  o   References of key flashing details of roof to adjoining building


C.   Exterior Elevation Drawings Delineating Information Outlined in the Concept Phase with the Following Added Detail:

  o   Proposed building sign standards

  o   Paint color chips and samples of other materials such as brick or concrete aggregates (glass or aluminum finishes may be annotated on the elevations)

- o   Proposed large scale details of key section conditions to show exterior design intent
- o   Major penthouses or rooftop equipment profiles
- o   Features such as special masonry patterns, bands or special materials and textures
- o   Rain leaders or scuppers
- o   Wall sections at various exterior locations including at the demising wall to the adjoining building with key vertical dimensioning

3.   If a building is to have a through-the-wall pedestrian access connection to an adjoining building, then the final design phase submission shall also include (to the owner of such adjoining building) the following:

- o   Plans of the pedestrian mall circulation showing any variations in floor elevations
- o   Elevations/sections of the proposed mall space showing store front sign bulkheads and key dimensions
- o   Proposed ceiling design including special features such as variations in height or skylights
- o   Floor material patterns
- o   Landscaping and mall seating areas
- o   Proposed interior sign guidelines
- o   Paint color chips and samples of other materials such as brick or concrete aggregates (glass or aluminum finishes may be annotated on the plans or elevations)
- o   Proposed large scale details of key section conditions to show interior design intent

4.   The constructing party shall provide the other parties with a complete set of bid documents for the building and/or improvements to be located upon its Tract.

EXHIBIT D

EXHIBIT E

APPROVED TARGET PLANS

Drawing entitled "Exterior Elevation, Sheet A8-Exterior Color Elevation-P97 tracking-configuration RR, prototype P97 March '00" prepared by Target Stores, a division of Dayton Hudson Corporation

Exhibit E
p. 1 of 1



EXHIBIT X

NORTHWAY MALL
NY ROUTE 5 & NORTHWAY
TOWN AND VILLAGE OF COLONIE, NEW YORK

JOHN MEYER CONSULTING

NORTHWAY MALL ASSOCIATES
624 MADISON AVENUE
NEW YORK, NEW YORK 10022