Robert L. LeHane, Esq.
Jennifer D. Raviele, Esq.
Connie Y. Choe, Esq.
**KELLEY DRYE & WARREN LLP**
3 World Trade Center
175 Greenwich Street
New York, NY 10007
Tel:  212-808-7800
Fax: 212-808-7897
Email:  rlehane@kelleydrye.com
          jraviele@kelleydrye.com
          cchoe@kelleydrye.com

-and-

One Jefferson Road
Parsippany, NJ 07054
Tel: 973-503-5900

*Counsel for Kite Realty Group*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

-------------------------------------------------------------x
|   |   |   |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| BED BATH & BEYOND, INC., *et al.*, | : | Case No. 23-13359 (VFP) |
|  | : |  |
| Debtors. | : | (Jointly Administered) |
|  | : |  |
|  | : |  |

-------------------------------------------------------------x

## DECLARATION OF DAVID J. RISKI IN SUPPORT OF OBJECTION OF KITE REALTY GROUP TO DEBTORS' MOTION FOR ORDER AUTHORIZING DEBTORS' MOTION TO ASSUME AND ASSIGN LEASES FOR STORE NO. 591, 1405 AND 3131

I, David J. Riski, declare the following:

1.      I am the Vice President - Head of Legal Disputes for Kite Realty Group

("KRG").  KRG is the managing agent for various landlords, including (i) Gateway Pavilions,

L.L.C., ("Gateway"), landlord for Store No. 591 located in Avondale, Arizona (the "Avondale

Lease"), (ii) KRG New Hill Place, LLC ("New Hill"), landlord for Store No. 1405 located in Holly

Springs, North Carolina (the "Holly Springs Lease"), and (iii) RPAI King's Grant II Limited

Partnership ("King's Grant"), landlord for Store No. 3131 located in Concord, North Carolina (the

"Concord Lease", together with the Avondale Lease and the Holly Springs Lease, the "Leases",

or the "Leased Premises").

2.       I am responsible for managing legal disputes for KRG's entire retail

portfolio of shopping centers across the country, including the Leased Premises, and am directly

involved in business operations for all prospective and current retail leases in KRG's portfolio.  As

the Vice President - Head of Legal Disputes, I am familiar with KRG's asset portfolio, documents,

and business records, and I (and those working with me and at my direction) have been personally

involved in various capacities in connection with asset management, leasing, dispositions, and

lease and claims administration.

3.       I have approximately twenty years of experience in the retail and real estate

industry. From 2004 to 2011, I represented various commercial landlords in retail settings at the

firm, Swanson, Martin & Bell, LLP.  From 2011 to 2015, I managed real estate transactions for

individual and corporate clients at the firm, Laduzinsky & Associates, P.C.  I joined Retail

Properties of America, Inc. ("RPAI"), a real estate investment trust operating shopping centers in

the United States, in 2015, and served as the Vice President – Assistant Counsel until 2021, when

RPAI merged with and into KRG.

4.       In connection with my role, I am one of the custodians of records of the

Landlord's books, records, and files that relate to the use and occupancy of the Leased Premises.

I am personally familiar with the (i) the Leased Premises, and (ii) the Leases.  If called upon to

testify in this proceeding as to the matters set forth in this declaration, I could and would competently testify thereto, since the facts set forth herein are personally known to me to be true.

### A.    <u>The Concord Lease</u>

5.    King's Grant is landlord to various retailers at Pavilion at King's Grant, a shopping center located at the intersection of Concord Mills Boulevard and Interstate 85 in Concord, North Carolina, containing approximately 303,328 square feet of floor area. Pavilion at King's Grant is anchored by well-known retailers, including Buy Buy Baby, Inc., Total Wine & More, Ross Dress for Less, Michaels, PetCo, Floor & Decor, HomeGoods, and T.J. Maxx.

6.    Debtor, Buy Buy Baby, is the tenant of the leased premises pursuant to that certain written lease, dated February 7, 2020. The Concord Lease is currently set to expire on January 31, 2031, with options to extend the term in favor of the tenant.

7.    On June 30, 2023, the Debtors filed their *Notice of Assumption of Certain Unexpired Leases* (the "<u>Assumption Notice</u>"),[1] exhibiting their intent to assume and assign the Concord Lease to Barnes & Nobles Booksellers, Inc. ("<u>Barnes & Nobles</u>").

8.    Pursuant to the Concord Lease, the Debtors are obligated to pay regular installments of fixed monthly rent, as well as monthly payment of real estate taxes, utility charges, and any other amounts, sums, charges, liabilities and obligations which the Tenant assumes or agrees to pay. Such amounts may be subject to change after the landlord accounts for year-end adjustments or reconciliations (the "<u>Adjustment Amounts</u>"), which have not yet been billed or have not yet become due under the terms of the Concord Lease, but for which the Debtors remain liable for pursuant to the Concord Lease.

---

[1]    Docket No. 1147.

9.      As of the date hereof, the Debtors have approximately $42,664.81 in outstanding obligations, including attorneys' fees, under the Concord Lease.  To the best of my knowledge and based on the information available to me, KRG has incurred, or is expected to incur, approximately $11,000.00 in attorneys' fees related to outstanding obligations under the Concord Lease.

10.     Pursuant to the Concord Lease, the tenant must indemnify and hold the Landlord "harmless from and against any and all claims, actions, damages, liability and expenses, including reasonable attorneys' fees", arising from, among other things, the tenant's use of the premises or breach of any provision of the Concord Lease.[2]

**B.      The Avondale Lease**

11.     Gateway is landlord to certain property leased at Gateway Pavilions, a shopping center located at NWC 99th Avenue & McDowell Road, Avondale, Arizona, containing approximately 290,283 square feet of floor area.  Gateway Pavilions is occupied by well-known retailers including Marshalls of MA, Inc. ("Marshalls"), DSW and Ross Dress for Less.

12.     Debtor, Bed Bath & Beyond, Inc. ("BBBY") is the tenant of leased premises pursuant to that certain written lease, dated December 24, 2002, which was subsequently amended on August 31, 2004, and by three exercised options to extend.[3]  The Avondale Lease is currently set to expire on January 31, 2029, with options to extend the term in favor of BBBY.

13.     Section 13.3.2 of the Avondale Lease provides that the "Tenant shall honor future exclusives granted by Gateway to certain other tenants in the Shopping Center pursuant to the terms of leases which are executed from and after the Effective Date."

---

[2]      *See* Concord Lease, at § 12.4.7.

[3]      A true and correct copy of the Avondale Lease is attached hereto as **Exhibit A**.

Accordingly, Tenant "shall not sublease, occupy or use the Premises to be leased, whether by Tenant or any assignee in violation of any such future exclusive."[4]  Such future exclusives may restrict the tenant from operating primarily for the same use as that engaged in by the beneficiary of the future exclusive including with respect to "off-price" stores.

14.     Section 15 of the Avondale Lease further provides that in the event BBBY proposes to assign the Avondale Lease, Gateway has the right to terminate the Avondale Lease and recapture the premises if the proposed use by the assignee is unacceptable to the Landlord.[5]

15.     Pursuant to the Assumption Notice, Debtors intend to assume and assign the Avondale Lease to Burlington Coat Factory Warehouse Corporation and/or one of its affiliates ("Burlington").

C.     **The Marshalls Avondale Lease**

16.      On June 19, 2003, Gateway, as landlord, and Marshalls, as tenant, entered into a written lease agreement for approximately 28,000 square feet of retail premises located in Gateway Pavilions (the "Marshalls Avondale Lease").[6]

17.     The Marshalls Avondale Lease provides that Landlord agrees that, during the terms of the lease, "no other premises in the [shopping center] shall at any time contain more than fifteen thousand (15,000) square feet of floor area therein used or occupied for, or devoted to, the sale or display of brand-name off-price apparel."[7]

18.     The Marshalls Avondale Lease provides explicit tenant remedies in the event Gateway or other shopping center tenants violate Marshall's exclusivity provision:

---

[4]     Avondale Lease, at § 13.3.1.

[5]     *Id.* at § 15.1.

[6]     A true and correct copy of the Marshalls Avondale Lease is attached hereto as **Exhibit B,** and is being filed under seal.

[7]     *See* Marshalls Avondale Lease, Schedule B § 4(B).

Section § 14.2. If after notice from Tenant of any failure by Landlord to comply with Landlord's obligations under this Lease, [including any exclusivity provision], Tenant shall have the option to deduct no more than fifty percent (50%) of any payment due hereunder, including the payment of rent.

19.     To the best of my knowledge, Burlington advertises itself as a "nationally recognized off-price retailer of high-quality, branded merchandise at everyday low prices."[8]  As such, because Burlington is an "off-price retailer", assignment of the Avondale Lease to Burlington selling off-price apparel in more than 15,000 square feet could result in breach of the exclusivity provision in the Avondale Lease in violation of section 365(b)(3)(C) of the Bankruptcy Code.  Moreover, pursuant to Section 15 of the Avondale Lease, Gateway has the right to terminate the Avondale Lease and recapture the premises if Burlington's proposed use is unacceptable to the landlord.

20.     Based on the above, it is my understanding that the proposed assignment of the Avondale Lease to Burlington, if approved, could result in a violation of Section 14.2 of the Marshalls Avondale Lease if Burlington sold apparel and accessories in more than 15,000 square feet, which could entitle Marshalls to a fifty percent (50%) rent abatement throughout the time that Burlington occupies the leased premises, causing Gateway significant harm.

### D.     Avondale Lease Cure Amount/Adequate Assurance

21.     Pursuant to the Avondale Lease, the Debtors are obligated to pay regular installments of fixed monthly rent, as well as monthly payment of real estate taxes, utility charges, and any other amounts, sums, charges, liabilities and obligations which the tenant assumes or agrees to pay.  Such amounts may be subject to change after KRG accounts for Adjustment

---

[8]     *See* Burlington Stores, Inc., Form 10-Q.

Amounts, which have not yet been billed or have not yet become due under the terms of the Avondale Lease, but for which the Debtors still remain liable.

22.    As of the date hereof, the Debtors have approximately $60,565.44 in outstanding obligations under the Avondale Lease, comprised of certain real estate taxes and attorneys' fees.  To the best of my knowledge and based on the information available to me, KRG has incurred, or is expected to incur, approximately $11,000.00 in attorneys' fees related to the outstanding obligations under the Avondale Lease.

23.    Pursuant to the Avondale Lease, the tenant must indemnify and hold the Landlord "harmless from any and all claims, losses, expenses, costs, lawsuits, actions, administrative proceedings, damage, orders, judgments, penalties, and liabilities of any nature . . . including reasonable attorneys' fees" arising from, among other things, tenant's use of the leased premises or breach of any provision of the Avondale Lease.[9]

### E.    The Holly Springs Lease

24.    New Hill is landlord to certain property located at Holly Springs Towne Center II, a shopping center located along NC State Highway 55, Holly Springs, North Carolina,. Holly Springs Towne Center II is occupied by well-known retailers including Marshalls, Michaels, DSW, Five Below, Old Navy, PetCo, Dick's Sporting Goods, AMC Theatres, and Target.

25.    Debtor, BBBY, is the tenant of leased premises pursuant to that certain written lease, dated March 31, 2014, which was subsequently amended on August 29, 2014.[10]  The Holly Springs is currently set to expire on January 31, 2026, subject to options to extend the term in favor of BBBY.

---

[9]        See Avondale Lease, at § 12.4.7.

[10]        A true and correct copy of the Holly Springs Lease is attached hereto as **Exhibit C**.

26.     Section 13.3.1 of the Holly Springs Lease provides that Bed Bath & Beyond shall be bound by certain exclusives granted by the landlord to certain other tenants in the shopping center which have been executed prior to the effective date of the lease, and are listed on Exhibit K, attached to the Holly Springs Lease.  Specifically, the exclusivity provision in the Holly Springs Lease provides that the premises "shall not contain more than fifteen thousand (15,000) square feet of floor area therein use or occupied for the sale of off-price apparel and related accessories."[11]

27.     Based on my review of the Holly Springs Lease, the lease provides an exception to the aforementioned exclusive use for T.J. Maxx, T.J. Maxx 'n More, Marshalls, Marshalls-Mega, Ross Stores, Bed Bath & Beyond, Inc., and Dick's Sporting Goods, but notably does not provide an exception for Burlington.  The Holly Springs Lease incorporates, by reference, the lease entered into between New Hill, as landlord, and Marshalls, as tenant, (the "Holly Springs Marshalls Lease") prior to commencement of the Holly Springs Lease.[12]

28.     To the best of my knowledge, an assignment of the Holly Springs Lease to Burlington could result in breach of Section 13.3.1 of the Holly Springs Lease (and by operation, the Holly Springs Marshalls Lease), which prevents other tenants in the shopping center from occupying more than 15,000 square feet of floor area for the sale of off-price apparel.  Because Burlington operates as a, off-price retailer of apparel and accessories, and the subject space is approximately 23,400 square feet, the assignment could result in breach of the exclusivity provision in the Holly Springs Marshalls Lease in violation of section 365(b)(3)(C) of the Bankruptcy Code.

---

[11]     Holly Springs Lease, § 13.3.1.

[12]     A true and correct copy of the Marshalls Holly Springs Lease is attached hereto as **Exhibit D**, and is being filed under seal.

29.     Based on the above, it is my understanding that the proposed assignment, if approved, could result in a violation of the exclusive use provision in the Holly Springs Marshalls Lease, which could entitle Marshalls to a fifty percent (50%) rent abatement throughout the time that Burlington occupies the lease premises, causing the landlord significant financial harm.

### F.    Holly Springs Cure Amount/Adequate Assurance

30.     Pursuant to the Holly Springs Lease, the Debtors are obligated to pay regular installments of fixed monthly rent, as well as monthly payment of real estate taxes, utility charges, and any other amounts, sums, charges, liabilities and obligations which BBBY assumes or agrees to pay.  Such amounts may be subject to change after KRG accounts for Adjustment Amounts, which have not yet been billed or have not yet become due under the terms of the Holly Springs Lease, but for which the Debtors still remain liable.

31.     As of the date hereof, the Debtors have approximately $48,030.79 in outstanding obligations, including attorneys' fees under the Holly Springs Lease.  Further, to the best of my knowledge and based on the information available to me, KRG has incurred, or is expected to incur, approximately $11,000.00 in attorneys' fees related to outstanding obligations under the Holly Springs Lease.

32.     Pursuant to the Holly Springs Lease, the tenant must indemnify and hold the Landlord "harmless from any and all claims, losses, expenses, costs, lawsuits, actions, administrative proceedings, damage, orders, judgments, penalties, and liabilities of any nature . . . including reasonable attorneys' fees" arising from, among other things, tenant's use of the premises or breach of any provision of the lease.[13]

---

[13]     See Holly Springs Lease, at § 12.4.7.

**G.**    __Tenant Mix__

33.    In leasing out its retail space, it is KRG's customary practice to ensure that incoming tenants do not disrupt the carefully planned tenant mix and balance currently in place at the respective shopping centers.

34.    To the best of my knowledge and belief, the addition of another off-price retailer, such as Burlington, rather than a store that does not conflict with the primary use of the respective shopping centers' – Gateway Pavilions and Holly Towne Center II - existing tenants, would disrupt the carefully planned tenant mix and balance at the shopping centers.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: Oak Brook, Illinois
       July 17, 2023

David J. Riski

## **EXHIBIT A**

**Avondale Lease**

# LEASE AGREEMENT

LEASE

Between

## GATEWAY PAVILIONS, L.L.C.,

Landlord

and

## BED BATH & BEYOND INC.,

a New York corporation,

Tenant

Gateway Pavilions

Avondale, Arizona

Dated: December 24, 2002

\* \* \* \* \* \*

RECEIVED JUN 2 4 2004

SHIPPED JUN 2 4 2004

## TABLE OF CONTENTS

ARTICLE 1.
    BASIC TERMS AND DEFINITIONS .................................................................. 1
    Section 1.1  Basic Terms and Definitions.  ........................................................ 1

ARTICLE 2.
    LEASE OF PREMISES; LEASE TERM; DELIVERY DATE............................... 5
    Section 2.1  Lease of Premises........................................................................... 5
    Section 2.2  Term. ............................................................................................. 5
    Section 2.3  Delivery Date. ............................................................................... 5
    Section 2.4  Unseasonable Delivery: Slack Period. ........................................... 7
    Section 2.5  Initial Co-Tenancy Condition. ....................................................... 7

ARTICLE 3.
    IMPROVEMENTS ............................................................................................ 8
    Section 3.1  Landlord's Work and Tenant's Work.  ............................................ 8
    Section 3.2  Plan Approvals. ............................................................................. 8
    Section 3.3  Performance of Work..................................................................... 10
    Section 3.4  Measurement: Adjustment of Rent. ............................................... 12

ARTICLE 4.
    FIXED RENT AND TAXES : DETERMINATION AND PAYMENT............... 13
    Section 4.1  Fixed Rent. . ................................................................................... 13
    Section 4.2  Payment of Rent............................................................................. 13
    Section 4.3  Real Estate and Other Taxes. ......................................................... 14

ARTICLE 5.
    COMMON AREAS, THEIR USE AND CHARGES .......................................... 15
    Section 5.1  Common Areas: Maintenance......................................................... 15
    Section 5.2  Common Areas: Restrictions. ......................................................... 18

ARTICLE 6.
    UTILITIES....................................................................................................... 21
    Section 6.1  Utility Service.. .............................................................................. 21
    Section 6.2  Interruption.  .................................................................................. 21

ARTICLE 7.
    SIGNS ............................................................................................................. 22
    Section 7.1  Tenant's Building Signage.............................................................. 22
    Section 7.2  Pylon Signage................................................................................ 22
    Section 7.3  Signage: Alteration/Removal/Allocation. ....................................... 22
    Section 7.4  Cooperation.  . ................................................................................ 23
    Section 7.5  Signage Restrictions and Criteria.................................................... 23

ARTICLE 8.
    ALTERATIONS AND IMPROVEMENTS......................................................... 23
    Section 8.1  Alterations and Improvements. ...................................................... 23

ARTICLE 9.
REPAIRS ........................................................................................ 24
Section 9.1  Tenant's Repairs.................................................. 24
Section 9.2  Landlord's Repairs. ........................................... 24
Section 9.3  Legal Compliance Work. ................................... 25

ARTICLE 10.
INDEMNIFICATION, INSURANCE AND WAIVER OF
SUBROGATION .......................................................................... 26
Section 10.1  Mutual Release, Waiver of Subrogation and Mutual Indemnification.26
Section 10.2  Tenant's Insurance. .......................................... 26
Section 10.3  Landlord's Insurance........................................ 27
Section 10.4  General Insurance Requirements. ..................... 28

ARTICLE 11.
FIRE AND OTHER CASUALTY; EMINENT DOMAIN ................ 29
Section 11.1  Fire and Other Casualty. .................................. 29
Section 11.2  Eminent Domain. .............................................. 31
Section 11.3  Abatement of Rent Charges. ............................ 32

ARTICLE 12.
COVENANTS, REPRESENTATIONS AND WARRANTIES ........... 33
Section 12.1  Quiet Enjoyment. .............................................. 33
Section 12.2  Authority. ......................................................... 33
Section 12.3  Landlord's Covenants, Warranties and Representations. ............... 33
Section 12.4  Environmental Matters...................................... 34
Section 12.5  REA................................................................... 36

ARTICLE 13.
USES AND RESTRICTIONS ......................................................... 37
Section 13.1  Permitted and Prohibited Uses.......................... 37
Section 13.2  Tenant's Exclusive in Center. ........................... 38
Section 13.3  Exclusives Which Tenant Must Honor. ............. 40

ARTICLE 14.
CONDUCT OF BUSINESS OPERATIONS ..................................... 41

ARTICLE 15.
TENANT ASSIGNMENT AND SUBLETTING................................ 41
Section 15.1  Assignment and Subletting. .............................. 41
Section 15.2  Liability of Tenant............................................ 43
Section 15.3  Collateral Assignment. ..................................... 43
Section 15.4  Cure Rights of Original Tenant........................ 43
Section 15.5  Recognition Agreement.  .................................. 44

ARTICLE 16.
DEFAULT AND DISPUTE RESOLUTION ..................................... 44
Section 16.1  Tenant Default................................................... 44
Section 16.2  Landlord Default. ............................................. 46
Section 16.3  Arbitration........................................................ 47

ii

ARTICLE 17.
    RIGHT TO MORTGAGE AND NON-DISTURBANCE; ESTOPPEL
    CERTIFICATE ................................................................................ 47
    Section 17.1 Right to Mortgage and Non-Disturbance........................... 47
    Section 17.2 Estoppel Certificate................................................. 48
    Section 17.3 Existing Mortgages.. ............................................... 48

ARTICLE 18.
    NOTICE ............................................................................... 49

ARTICLE 19.
    TENANT'S PROPERTY ............................................................. 49

ARTICLE 20.
    END OF TERM ...................................................................... 49
    Section 20.1 Surrender of Premises. ............................................ 49
    Section 20.2 Hold Over. .......................................................... 49

ARTICLE 21.
    INTENTIONALLY OMITTED........................................................ 50

ARTICLE 22.
    ONGOING CO-TENANCY ......................................................... 50

ARTICLE 23.
    MISCELLANEOUS ................................................................. 50
    Section 23.1 Loading Facilities................................................... 50
    Section 23.2 Liens................................................................. 50
    Section 23.3 Broker's Commission.............................................. 50
    Section 23.4 Force Majeure. ..................................................... 51
    Section 23.5 Consents ............................................................ 52
    Section 23.6 Costs................................................................. 51
    Section 23.7 Attorneys' Fees. ................................................... 51
    Section 23.8 Survival of Obligations. .......................................... 51
    Section 23.9 Non-Waiver. ........................................................ 51
    Section 23.10 Rights Cumulative................................................ 51
    Section 23.11 Definition of Landlord............................................ 51
    Section 23.12 Successors and Assigns.......................................... 52
    Section 23.13 Limitation of Landlord's Liability. ............................. 52
    Section 23.14 Limitation of Tenant's Liability................................. 52
    Section 23.15 Joint and Several Liability. ...................................... 52
    Section 23.16 Severability. ....................................................... 52
    Section 23.17 Grammatical Usages and Construction......................... 52
    Section 23.18 Table of Contents, Line Numbering and Paragraph Headings. ..... 52
    Section 23.19 Definition of Hereunder, Herein, etc. .......................... 52
    Section 23.20 Short Form Lease. ................................................ 53
    Section 23.21 Entire Agreement and Modification. ........................... 53
    Section 23.22 No Joint Venture or Partnership Created by Lease............. 53
    Section 23.23 Tenant's Tradename. ............................................. 53
    Section 23.24 Governing Law.................................................... 53
    Section 23.25 Landlord's Entry................................................... 53
    Section 23.26 Counterparts. ...................................................... 53
    Section 23.27 Waiver of Trial by Jury. ......................................... 53

EXHIBITS

Exhibit A          Legal Description of Shopping Center

Exhibit B          Site Plan

Exhibit C          Rent Commencement and Expiration Date Agreement

Exhibit D          Specifications for Landlord's Work

Exhibit D-1        Exterior Elevations of the Premises and Sidewalk Plan

Exhibit D-2        Exterior Elevations of the Shopping Center

Exhibit E          Permitted Encumbrances

Exhibit F          Signage

Exhibit G          Subordination, Non-Disturbance and Attornment Agreement

Exhibit H          Subtenant Recognition Agreement

Exhibit I          Delivery Date Notice

Exhibit J          Delivery Date Certification

Exhibit K-1        Existing Exclusives

Exhibit K-2        Existing Leases

Exhibit L          Alternate Rent

Exhibit M          Prohibited Uses

Exhibit N          Tax Bill

Exhibit O          Sign Criteria

Exhibit P          Form Side Letters

# LEASE AGREEMENT

THIS LEASE AGREEMENT (*"Lease"*) is entered into as of December 24 , 2002 by and between GATEWAY PAVILIONS, L.L.C., an Arizona limited liability company, having an office at 1707 E. Highland Avenue, Suite 100, Phoenix, Arizona 85016-4658 (*"Landlord"*), and BED BATH & BEYOND INC., a New York corporation, having an office at 650 Liberty Avenue, Union, New Jersey 07083 (*"Tenant"*).

## WITNESSETH:

## ARTICLE I.
## BASIC TERMS AND DEFINITIONS

Section 1.1   Basic Terms and Definitions. The following terms shall have the meanings set forth in this Section 1.1 except as otherwise expressly provided herein.

1.1.1   Additional Rent: Any monies which Tenant is required to pay to Landlord under the terms and conditions of this Lease, other than Fixed Rent.

1.1.2   Affiliate: A corporation, partnership, person or other entity which is controlling, controlled by, or under common control with, Landlord or Tenant, as the case may be. As used herein, *"control"* shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person or entity, whether through the ownership of voting securities or rights, by contract, or otherwise.

1.1.3   Alternate Rent: Payment of rent as defined in and payable in the manner set forth in Exhibit L attached hereto, not to exceed fifty (50%) percent of the amount of Fixed Rent which otherwise would have been payable during such period (the *"Cap"*). Alternate Rent shall be payable within thirty (30) days after the end of the calendar month to which it pertains. If the Alternate Rent for a calendar month does not exceed the Cap, such payment shall be accompanied by a statement prepared by an officer of Tenant setting forth the amount of *"Gross Sales"* (hereinafter defined in Subsection 4.4.2) achieved during, and the amount of Alternate Rent payable for, such month.

1.1.4   Common Areas: All areas in the Shopping Center which are, from time to time, available for the joint use and benefit of Tenant and other tenants and occupants of the Shopping Center and occupants of the Other Tracts, and their respective employees, agents, subtenants, concessionaires, licensees, customers and other invitees, including, but not limited to, any and all parking areas, parking spaces, driveways, truck serviceways, passageways, sidewalks, entrances, exits, lighting facilities, courts, landscaped areas, retention or detention areas and common utility lines.

1.1.5   Common Areas Charges: As defined in Section 5.1 hereof.

1.1.6   Delivery Date: As defined in Section 2.3 hereof.

1.1.7   Effective Date: The date hereof.

1.1.8   Event of Default: As defined in Section 16.1 hereof.

1.1.9   Excused Periods: Periods during which Tenant's (or, as the case may be, another occupant's) failure to conduct the operations of its business or any other business: (w) resulted from renovations to the applicable premises after an assignment of the applicable lease or a subletting of such premises (not to exceed one hundred eighty (180) consecutive days), (x) resulted from alterations or renovations being performed in and to the Premises or other premises (not to exceed three consecutive months), (y) was caused by damage or destruction, eminent domain proceedings or actions, or Force

1

Majeure, or (z) was caused by any breach of any obligation of Landlord under this Lease or by a negligent or willful act of Landlord.

    1.1.10 Exhibits. The exhibits listed in the Table of Contents annexed to this Lease have been agreed to by the parties and attached hereto, it being the intention of the parties that they shall become a binding part of this Lease as if fully set forth herein.

    1.1.11 Fixed Rent: The following amounts for the periods indicated (subject to adjustment pursuant to Section 3.4 hereof):

    (a)    For the period commencing on the Rent Commencement Date and ending on the last day of the *"Initial Term"* (defined in Subsection 1.1.40 below), at the rate of Two Hundred Seventy-Five Thousand and 00/100 ($275,000.00) Dollars per year [based on Eleven and 00/100 ($11.00) Dollars per square foot of Floor Area];

    (b)    In the event Tenant exercises the first Renewal Option, for the first five (5) year Renewal Period, at the rate of Three Hundred Thousand and 00/100 ($300,000.00) Dollars per year [based on Twelve and 00/100 ($12.00) Dollars per square foot of Floor Area];

    (c)    In the event Tenant exercises the second Renewal Option, for the second five (5) year Renewal Period, at the rate of Three Hundred Twelve Thousand Five Hundred and 00/100 ($312,500.00) Dollars per year [based on Twelve and 50/100 ($12.50) Dollars per square foot of Floor Area]; and

    (d)    In the event Tenant exercises the third Renewal Option, for the third five (5) year Renewal Period, at the rate of Three Hundred Twenty-Five Thousand and 00/100 ($325,000.00) Dollars per year [based on Thirteen and 00/100 ($13.00) Dollars per square foot of Floor Area]; and

    (e)    In the event Tenant exercises the fourth Renewal Option, for the fourth five (5) year Renewal Period, at the rate of Three Hundred Thirty-Seven Thousand Five Hundred and 00/100 ($337,500.00) Dollars per year [based on Thirteen and 50/100 ($13.50) Dollars per square foot of Floor Area].

    1.1.12 Floor Area: The actual number of square feet of space contained on all floors within any building in the Shopping Center (including the Premises) or on the Other Tracts and, with respect to exterior areas, including all exterior areas leased to or exclusively available for use by one or more tenants (other than exterior loading dock areas, trash compactor areas, and trash container areas). All measurements pursuant to this Subsection shall be from the exterior of outside walls or store front and/or to the centerline of any common walls, but in no event shall Floor Area within either the Premises or the remainder of the Shopping Center or of buildings on the Other Tracts include any non-selling or storage space areas within any mezzanine, basement, second floor or, except as set forth above, any exterior areas or Common Area.

    1.1.13 Force Majeure: As defined in Section 23.4 hereof.

    1.1.14 Ground Lessor: The landlord under any existing or future ground or underlying leases encumbering or affecting all or any part of the Shopping Center, where Landlord is the holder of the leasehold interest thereunder.

    1.1.15 Hazardous Substances: As defined in Subsection 12.4.1 hereof.

    1.1.16 Inducement Tenants: As defined in Subsection 2.3.1 hereof.

    1.1.17 Landlord: As defined in the preamble and Section 23.11 hereof.

2

1.1.18 <u>Landlord's Mailing Address</u>: c/o Kitchell Development Company, 1707 E. Highland Avenue, Suite 100, Phoenix, Arizona 85016-4658, or such other place and/or to the attention of such other person as Landlord may notify Tenant from time to time by notice given in accordance with the provisions of Article 18 hereof.

1.1.19 <u>Landlord's Work</u>: As defined in Section 3.1 hereof.

1.1.20 <u>Lease Interest Rate</u>: The then effective prime rate as published from time to time in the "Money Rates" section of *The Wall Street Journal* (or any successor publication thereto) plus two (2%) percent.

1.1.21 <u>Legal Requirements</u>: All laws, statutes, codes, acts, ordinances, judgments, decrees, authorizations, directions and requirements of, and agreements with, all governmental departments, commissions, boards, courts, authorities, agencies, officials and officers, which now or at any time hereafter may be applicable to the Premises, the Shopping Center, or any part(s) thereof.

1.1.22 <u>Mortgagee</u>: Any entity which holds a mortgage on the Shopping Center or is the beneficiary under a deed of trust encumbering the Shopping Center.

1.1.23 <u>Other Tracts</u>: The Costco Block (as defined in the REA) and the Harkins Block (as defined in the REA).

1.1.24 <u>Permitted Use</u>: Subject to the Existing Exclusives set forth on <u>Exhibit K-1</u>, the sale at retail of a variety of linens and domestics (including, but not limited to, sheets, bedspreads, comforters, duvets, pillows, pillow covers, chair pads, placemats, tablecloths, dish towels, oven mittens and aprons); bathroom items (including, but not limited to, towels, shower curtains, bathroom rugs, toilet seats, personal care devices and other bathroom appliances and accessories); housewares (including, but not limited to, kitchen utensils, kitchen appliances and kitchen "gadgets," cleaning appliances and supplies, cookware, bakeware, dishes and china, glassware, garbage pails, ironing boards and other laundry items, mops and brooms, candles and candle holders, ready-to-assemble furniture and artificial flowers); frames and wall art; window treatments; closet, shelving and storage items; home furnishings; area rugs; wall and floor coverings; furniture (including, without limitation, mattresses, box springs, bed frames, and bedroom furniture); decorative accessories; photo albums; photo storage boxes; luggage; books; party supplies; cards and stationery; seasonal items; juvenile merchandise (including, but not limited to, toys, car seats and safety-proofing items); health and beauty aids; specialty food items; food and non-alcoholic beverage services similar to a coffee and cappuccino bar and which shall be limited to not more than 1,850 square feet (exclusive of Floor Area devoted to aisles and storage space) and which shall be further limited by prohibiting any heating or cooking of food which requires outside venting; any and all other items sold or services (not a Prohibited Use under <u>Exhibit M</u>) provided from time to time in general conformity with a majority of typical Bed Bath & Beyond stores over 25,000 square feet owned or operated by Tenant or its Affiliate(s) in the Arizona, Utah, Colorado and New Mexico (such majority numbering not fewer than ten (10) stores) (the aforementioned items are hereinafter collectively referred to as the *"Permitted Items"*); and for any other lawful retail use not specifically prohibited by the provisions of Section 13.1.1 below. In addition, Tenant shall be permitted to use portions of the Premises for storage and office uses incidental to the Permitted Use. Tenant's permitted assignees and sublessees may use the Premises (or an applicable portion thereof) for the uses permitted in Section 15.1.1 hereof.

1.1.25 <u>Premises</u>: Being the area cross-hatched on <u>Exhibit B</u> hereto having dimensions as shown on <u>Exhibit B</u> and containing approximately Twenty-Five Thousand (25,000) square feet of Floor Area and one thousand (1,000) square feet of mezzanine level space for office purposes, subject to adjustment in accordance with the provisions of Section 3.4 below. In no event shall such non-selling space result in any charge to

3

Tenant by way of Fixed Rent or any Additional Rent, nor shall such space be included in the determination of Tenant's Pro Rata Share.

1.1.26 REA: As defined in Section 12.5.1 hereof.

1.1.27 Renewal Option: As defined in Section 2.2.2 hereof.

1.1.28 Renewal Period(s): four successive periods of five (5) years each, as provided in Section 2.2.2 hereof.

1.1.29 Rent: Fixed Rent and/or Additional Rent.

1.1.30 Rent Commencement Date: As defined in Section 2.2 hereof.

1.1.31 Shopping Center: The part of the shopping center commonly known as Gateway Pavilions, owned, as of the Effective Date, by Landlord containing, or to contain, approximately three hundred thousand (300,000) square feet of Floor Area, on the property located at NWC 99th Avenue & McDowell Road, Avondale, Arizona, and more particularly described in Exhibit A hereto. Landlord shall not change the name of the Shopping Center without giving at least ninety (90) days prior notice to Tenant, and Landlord shall not include the name of any tenant (other than Tenant) in the name of the Shopping Center.

1.1.32 Substantially Completed or Substantial Completion: The completion of such work specified in this Lease at the Shopping Center (including, without limitation, as applicable, Landlord's Work) to the extent that only "Punch List Items" of such work (defined in Subsection 3.3.3 below) shall not be completed.

1.1.33 Taxes: As defined in Section 4.3.3 hereof.

1.1.34 Tenant: As defined in the preamble hereof.

1.1.35 Tenant's Mailing Address: 650 Liberty Avenue, Union, New Jersey 07083, Attn: Mr. Warren Eisenberg, or such other place and/or to the attention of such other person as Tenant may notify Landlord from time to time by notice given in accordance with the provisions of Article 18 hereof.

1.1.36 Tenant's Permits: As defined in Section 2.3.1(b) hereof.

1.1.37 Tenant's Property: All of Tenant's personal property, including, without limitation, phone and alarm systems, satellite antennae, shelving, computers, furniture, cash registers and customer service counters, specialty lighting, track lighting, millwork, conveyor systems, storage racks and signage and any and all other personal property of Tenant which is capable of being removed from the Premises without material damage thereto, but which shall not include, without limitation, electrical systems, heating, ventilation and air conditioning systems, and other mechanical systems, flooring, carpet, elevators, standard lighting and wiring installed within the walls of the Premises.

1.1.38 Tenant's Pro Rata Share: A fraction whose numerator is the Floor Area of the Premises and whose denominator is the Floor Area of the Shopping Center as may be re-determined any time a building (and/or Floor Area) is added to or removed from the Shopping Center, but excluding, as to Taxes, separately taxed parcels, or excluding, as to Common Area Charges, separately maintained parcels. In no event, however, shall Tenant's Pro Rata Share be greater than ten (10%) percent, unless a particular occupant(s) within the Shopping Center maintain, at their own cost and expense, a part of the Common Areas proportionate to the size of their own premises, in which event the aforesaid cap shall be adjusted accordingly. Floor Area shall be deemed added to or removed from the Shopping Center on the earlier of (i) the date upon which

4

such Floor Area is opened to the public for business, or (ii) at such time as an assessment for Taxes is made or removed, as the case may be, with respect to such Floor Area. Within thirty (30) days following written request from Tenant, Landlord shall certify to Tenant in writing as to the then Floor Area of the Shopping Center.

1.1.39 Tenant's Work: As defined in Section 3.1 hereof.

1.1.40 Term: A period (the *"Initial Term"*) of ten (10) years beginning on the Rent Commencement Date and ending at midnight on the last day of January following the tenth (10th) anniversary of the Rent Commencement Date. As used herein, *"Term"* shall refer to the Initial Term, as the same may be extended by any Renewal Period exercised pursuant to Section 2.2.2 below. *"Expiration Date"* shall be the date on which the Term expires pursuant to the foregoing.

ARTICLE 2.
LEASE OF PREMISES; LEASE TERM; DELIVERY DATE

Section 2.1    Lease of Premises. Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the Premises together with any and all rights, benefits, privileges and easements, now or hereafter appurtenant to either or both of the Premises and the Shopping Center, arising out of any public or private grant or authority (including the right to use the common areas on the Other Tracts under the REA and those other rights, benefits, privileges and easements arising out of the REA), including, without limitation, the non-exclusive right and easement to use the Common Areas in common with other tenants and occupants of the Shopping Center and the Other Tracts.

Section 2.2    Term.

2.2.1    Initial Term. Subject to the provisions of this Article 2, the Term shall begin on the sixtieth (60th) day following the Delivery Date (the *"Rent Commencement Date"*). The Term shall expire on the Expiration Date, unless earlier terminated as herein provided. When the Rent Commencement Date has been determined, as provided in this Section, Landlord and Tenant shall execute, acknowledge and deliver, each to the other, a written statement in the form attached hereto as Exhibit C specifying the Rent Commencement Date.

2.2.2    Renewal Options. If Tenant is not in default (beyond all applicable notice and grace periods provided herein for the curing of such default) on the date of exercise and on the first (1st) day of the Renewal Period, Tenant shall have the right and option (hereinafter a *"Renewal Option"*) to extend the Initial Term from the date on which it would otherwise expire for four (4) successive renewal periods of five (5) years each (individually, a *"Renewal Period"*, and collectively, the *"Renewal Periods"*) upon the same terms and conditions as are herein set forth, except that the Fixed Rent during such Renewal Periods shall be as set forth in Section 1.1.11 hereof. Each Renewal Option shall be exercisable by notice given to Landlord at least two hundred seventy (270) days prior to the commencement of the applicable Renewal Period(s).

Section 2.3    Delivery Date.

2.3.1    Definition. Subject to Landlord's delivery to Tenant of the Delivery Date Notice in accordance with the provisions of Subsection 2.3.2 below and Landlord's timely compliance therewith, Landlord shall be deemed to have delivered possession of the Premises to Tenant at 8:00 a.m. on the date (the *"Delivery Date"*) following the day on which all of the following conditions (the *"Delivery Date Conditions"*) shall have occurred and Tenant shall have received from Landlord the Delivery Date Certification in accordance with the provisions of Section 2.3.3 below, which shall constitute Landlord's written certification that all of the following shall have occurred:

5

(a)     Actual possession of the Premises shall have been delivered to Tenant water-tight, free of Hazardous Substances required by any governmental authority to be remediated, in a good, structurally sound condition, with all of Landlord's Work Substantially Completed, which Substantial Completion shall be evidenced by a written certification by Landlord's architect to Tenant;

(b)     Landlord shall have obtained (and delivered copies thereof to Tenant, upon request) all permits and approvals required from all applicable governmental authorities to enable Tenant to occupy and use the Premises for the conduct of its business in the Premises (exclusive of any permits required for Tenant's Work and business licenses which Tenant may be required to obtain in order to open and operate its specific business and not a general retail business, collectively, *"Tenant's Permits"*)) which permits and approvals shall include, without limitation, any permits required to operate the Shopping Center as a retail shopping center, zoning and building code approvals, environmental requirements, and a permanent certificate of occupancy for the Premises (unless a permanent certificate of occupancy for the Premises cannot be obtained, in which event: (1) the delivery of a permanent certificate of occupancy for the Premises shall not be a condition to the occurrence of the Delivery Date, (2) the obtaining of a temporary certificate of occupancy or its local equivalent shall be a condition to the occurrence of the Delivery Date, and (3) Landlord shall obtain the permanent certificate of occupancy within sixty (60) days after the correction or completion of Tenant's Work); and

(c)     The Common Areas, and all of the improvements in the Common Areas shown labeled "Delivery Date Common Areas" shall have been Substantially Completed and operational, and any other Common Areas or other building area where no construction has commenced (including, without limitation, the outparcels labeled "Shop 5", "Shops 6", "Pad L", "Pad E" and "Shop 7") shall be in a safe and sightly condition, and all off-site improvements (including, without limitation, street, storm drainage, and traffic signalization improvements) required for the Shopping Center to open for business and for Tenant to receive a permanent certificate of occupancy shall have been Substantially Completed; Landlord, at its sole cost and expense, shall have obtained (and delivered copies thereof to Tenant, upon request) all permits and approvals required from applicable governmental authorities to enable the Common Areas to be developed, operated, and used for the purposes herein contemplated, which permits and approvals shall include, without limitation, zoning, building code, environmental requirements, curb cut and site plan approvals, all permits pertaining to pylon and/or monument signage (and Tenant's panel(s) thereon), construction, and development and use permits;

(d)     The representations and warranties of Landlord set forth in subparagraphs (a) through (h) of Section 12.3.1 below shall then be true and in effect;

(e)     Leases shall have been entered into with Borders and Gart Bros. (a/k/a "SportsMart") (hereinafter collectively referred to as the *"Inducement Tenants"*) for lease terms of at least ten years, for occupancy of the premises designated for them on Exhibit B, the construction of the premises to be occupied by Borders and Gart Bros. shall have progressed at least as far as the construction of the Premises; and

(f)     Landlord shall have delivered to Tenant in recordable form (i) a subordination, non-disturbance and attornment agreement in the form attached hereto as Exhibit G executed by each holder of any mortgage or deed of trust encumbering or affecting the Shopping Center or any portion thereof, and (ii) a fee owner recognition agreement in the form and content described in clause (b) of Section 17.1 hereof executed by any existing Ground Lessor.

2.3.2 Delivery Date.

6

(a)      Landlord shall give Tenant at least ninety (90) days prior notice of the Delivery Date, using the form of Delivery Date Notice attached hereto as Exhibit I.  Landlord's delivery of the Delivery Date Notice shall be a condition precedent to the Rent Commencement Date.  Notwithstanding any provision of this Lease to the contrary, in no event shall the Delivery Date be deemed to occur prior to the Delivery Date established in the Delivery Date Notice.

(b)      Landlord acknowledges that if it shall fail to satisfy all of the Delivery Date Conditions by the Delivery Date as established in the Delivery Date Notice, Tenant will sustain substantial, additional costs and expenses, including, without limitation, storage costs for fixtures, equipment, and inventory, and additional advertising and promotional costs, the exact amount of which would be impracticable or extremely difficult to ascertain.  If the Delivery Date does not occur by the date established therefor in the Delivery Date Notice, then if Tenant subsequently accepts possession of the Premises, as Tenant's sole monetary remedy for late delivery of the Premises, Landlord agrees to allow to Tenant a credit against the initial installment(s) of Rent hereunder, as liquidated reimbursement to Tenant (and not as a penalty) for all of the aforesaid costs incurred by Tenant, equal to the sum of: (i) Eighty-Five Thousand and 00/100 ($85,000.00) Dollars, plus (ii) Two Thousand Five Hundred and 00/100 ($2,500.00) Dollars for each day that the Delivery Date established in the Delivery Date Notice is delayed. The foregoing liquidated reimbursements represent the parties' good faith agreement as to an agreed upon amount which shall have been incurred by Tenant and which shall otherwise not be susceptible of exact ascertainment.

2.3.3  Delivery Date Certification.  Upon the satisfaction of all of the Delivery Date Conditions, Landlord shall so certify to Tenant, using the form of Delivery Date Certification attached hereto as Exhibit J.

2.3.4  No Waiver.  Neither Tenant's acceptance of physical possession of the Premises nor Tenant's opening of the Premises for business to the public prior to the Delivery Date shall: (i) be deemed a waiver by Tenant of any of the Delivery Date Conditions, or (ii) relieve Landlord of any obligation under this Lease, unless such condition or obligation is expressly waived in writing by Tenant.

Section 2.4    Unseasonable Delivery: Slack Period.

2.4.1  If, for any reason (including, without limitation, Force Majeure), the Delivery Date occurs during the period commencing on September 15 and ending on the March 31 next following (the *"Slack Period"*), then Tenant shall have, in addition to any other remedies under Sections 2.3.2(b) and 3.3.2 hereof, if applicable according to their terms, the right to :

(a)      accept delivery of physical possession of the Premises; or

(b)      defer its acceptance of delivery of physical possession of the Premises to a later date within the Slack Period, whereupon the Delivery Date shall be deemed to have occurred on the date that Tenant actually accepts physical possession of the Premises (subject to the other provisions of this Article 2 and the continuing satisfaction of the Delivery Date Conditions); and in either event, if the Rent Commencement Date occurs before the April 1 next following the Slack Period, Tenant shall be entitled to pay Alternate Rent in lieu of Fixed Rent for the period commencing on the Rent Commencement Date and ending on the March 31 next following; any benefit which Tenant may realize thereby shall constitute a reimbursement to Tenant for certain pre-opening expenses incurred by Tenant in connection with this Lease.

Section 2.5    Initial Co-Tenancy Condition.

2.5.1  As used herein, the *"Initial Co-Tenancy Condition"* shall mean that each and every Inducement Tenant shall have accepted possession of its entire premises, such premises shall have been substantially completed, and each Inducement Tenant shall, if not already open for business, then be actively and continuously engaged in the fixturing and merchandising therein.

If, on the Delivery Date, the Initial Co-Tenancy Condition has not been satisfied, Tenant shall, subject to the satisfaction of the other conditions to the occurrence of the Delivery Date, accept delivery of physical possession of the Premises, however Tenant shall be entitled to pay Alternate Rent in lieu of Fixed Rent until the Inducement Date, subject to any other applicable provisions of this Article 2, provided, however, that if Tenant is not operating during such period and as a result the amount of Alternate Rent cannot be calculated then Alternate Rent for the purposes of this sentence only shall be deemed to be an amount equal to fifty (50%) of Fixed Rent for such period.

2.5.2  In the event that all of the Inducement Tenants shall not have opened their respective premises to the general public for business for one (1) day within twelve (12) months after Tenant shall either have been ready to open or shall have opened the Premises to the general public for business, then Tenant shall either (i) resume paying all Fixed Rent at the rates set forth in Section 1.1.11 hereof, or (ii) terminate this Lease as of a date specified in a notice by Tenant to Landlord (such notice being given within ten (10) days after the expiration of such twelve (12) month period and such termination date being at least sixty (60) days after the date of Tenant's notice), in which event neither party shall have any further liability under this Lease, hereunder except: (i) as set forth in Section 23.8 below, and (ii) that Landlord shall be obligated to promptly reimburse Tenant for all its reasonable third-party costs, damages and expenses (but not loss of profits and other consequential damages) incurred in connection with this Lease, including, without limitation, costs associated with the preparation and review of plans and specifications for, and the performance of Tenant's Work and all fixturing and fit out work performed by Tenant in Tenant's Building (*"Tenant's Fixturing Work"*). Landlord may negate such termination by causing the Inducement Tenants to open their respective premises to the general public for business for one (1) day not later than thirty (30) days after the date on which Tenant has given the foregoing notice of termination.  If no notice of termination is given by Tenant within ten (10) days after the date which is twelve (12) months after Tenant shall either have been ready to open or shall have opened the Premises to the general public for business, then the Inducement Date shall be deemed to have occurred on the day after the expiration of such period.

ARTICLE 3.
IMPROVEMENTS

Section 3.1   Landlord's Work and Tenant's Work.  Landlord shall, at its sole cost and expense, perform the work and obligations described on Exhibit D, Exhibit D-1 and Exhibit F hereto, and the *"Final Plans and Specifications"* (hereinafter defined in Section 3.2) (collectively, *"Landlord's Work"*), and shall deliver possession of the Premises to Tenant in the condition described therein.  Except for Landlord's Work, Tenant shall, at its own cost and expense, do any and all other work (hereinafter referred to as *"Tenant's Work"*) which Tenant desires to adapt the Premises to Tenant's use.

Section 3.2   Plan Approvals.

3.2.1  Preparation of Plans and Specifications.

(a)    Prior to the date hereof,  (i) Landlord delivered to Tenant drawings showing the proposed footprint, column layout, and interior clear dimensions of the Premises (the *"Preliminary LOD"*)("Limits of Demise"), (ii) Tenant delivered to Landlord its revisions thereto (the *"Revised LOD"*), showing the location of the interior structural grid (column layout), storefront opening, and mezzanine and/or office core, the

8

location and arrangement of the loading facilities, trash compactor pad, and trash container pad(s), and Tenant's revisions to the interior clear dimensions, (iii) Landlord delivered to Tenant the final LOD (the *"Certified LOD"*), certified by Landlord, which incorporated all of the elements of the Revised LOD, which have been approved by Tenant. Landlord shall be responsible for any and all reasonable costs incurred and delays experienced by Tenant in connection with any further changes to the Certified LOD required by Landlord, not resulting from Tenant's delays or changes. Prior to the date hereof Tenant delivered to Landlord its Fixture Plan (F1); Floor Finish Plans Notes and Details (F2); Power/Specialty Lighting Plan and Notes (F3); and Lighting Plans and Notes (F4) (collectively, *"Tenant's Plans"*), all of which were substantially consistent with the Certified LOD.

(b)     Prior to the date hereof, Landlord prepared and submitted to Tenant, in a single submission, Landlord's preliminary plans and specifications (the *"Preliminary Plans"*) for Landlord's Work (which shall include, without limitation, mechanical, electrical, plumbing, fire protection and high-pile storage, structural, architectural and site plans [including, without limitation, a site lighting plan with photometrics]), and each of the plans which collectively constitute the Preliminary Plans shall be at least eighty-five (85%) percent complete. The Preliminary Plans shall be substantially consistent with Tenant's Plans, the Certified LOD, and Exhibit B, Exhibit D, Exhibit D-1, and Exhibit F hereto.

(c)     Prior to the date hereof, Tenant has given Landlord notice of the respects, if any, in which said Preliminary Plans fail to meet Tenant's reasonable approval and/or fail to conform to the Certified LOD, Tenant's Plans, and/or Exhibit B, Exhibit D, Exhibit D-1, and Exhibit F hereto, and Landlord shall promptly make any revisions necessary to correct such matters and obtain Tenant's approval.

(d)     Within thirty (30) days after the date hereof, Landlord shall prepare and deliver to Tenant, in a single submission, final plans and specifications (the *"Final Plans and Specifications"*), which shall be substantially consistent with the Preliminary Plans, as approved by Tenant.

(e)     Within fifteen (15) days after its receipt of the Final Plans and Specifications, Tenant shall notify Landlord of Tenant's approval thereof, or the reasons why such approval cannot be granted, and Landlord shall, within fifteen (15) days after receiving such notice, make any revisions necessary to correct such matters and obtain Tenant's approval. Upon Tenant's approval of the Final Plans and Specifications, any further material changes thereto shall be subject to Tenant's prior written approval. Unless specifically noted on a separate summary sheet attached to the Final Plans and Specifications, to the extent of a conflict between the terms and provisions of Tenant's Plans, Exhibit B, Exhibit D, Exhibit D-1, and/or Exhibit F hereto, and the terms and provisions of the Final Plans and Specifications, then the terms and provisions of Tenant's Plans, Exhibit B, Exhibit D, Exhibit D-1, and Exhibit F shall govern and prevail. If all conflicts between the Tenant's Plans, Exhibit B, Exhibit D, Exhibit D-1 and/or Exhibit F hereto, and the Final Plans and Specifications are noted on a separate summary sheet, as aforesaid, then the Final Plans and Specifications shall prevail.

(f)     All submissions by the parties of the Preliminary LOD, the Revised LOD, the Certified LOD, the Tenant's Plans, the Preliminary Plans, and the Final Plans and Specifications shall be made (or accompanied) by the computer files thereof formatted in *"Autocad 14"* format.

(g)     If Tenant fails to approve or disapprove under Subsections (b) through (e), above, within the required period, Tenant shall be deemed to have approved provided that the same were furnished to Tenant with a notice specifying in bold face

9

capitalized letters that they will be deemed approved if not approved or disapproved by
Tenant within the pertinent period.

### 3.2.2   Plan Changes.

(a)     Tenant shall have the right to make changes from the
standards and specifications set forth in *"Tenant's Prototype Drawings and
Specifications"* and/or the *"Project Manual"*, referred to in <u>Exhibit D</u> hereto, and/or to
require Landlord to subsequently make changes to either or both of the Preliminary Plans
and Specifications and/or the Final Plans and Specifications. Notwithstanding any
provisions of this Lease to the contrary, to be effective and binding on the parties hereto,
any change to the Final Plans and Specifications must be set forth in a written change
order signed by Landlord and Tenant that describes in detail the change, the net
additional construction time, if any, that will be required to complete Landlord's Work as
a result of the change, and the net increase or decrease in the cost (including reasonable
architectural fees, if any, incurred for Tenant's required changes in Landlord's Plans) to
Landlord of having Landlord perform such changes. Within five (5) days following its
receipt of a change order from Tenant, Landlord shall provide to Tenant in writing
Landlord's estimate of the net increase or decrease in the cost of Landlord's Work as a
result thereof and any estimated additional construction time. Tenant shall have the right
to rescind such change order based upon Landlord's estimates or otherwise. Any changes
agreed between Landlord and Tenant are hereinafter referred to as *"Changes"*. Nothing
in this paragraph (a) shall limit the application of paragraphs (b) and (c) below.

(b)     Tenant shall pay to Landlord the net reasonable additional
third-party costs of Landlord's Work resulting directly and solely from the aggregate
Changes (exclusive of any charges for overhead and profit, other than sums not
exceeding fifteen (15%) percent subcontractor profit (provided that such amount of
subcontractor profit is typical in building contracts in the Avondale area) and five (5%)
percent general contractor profit thereon), taking into consideration related soft costs and
any and all actual reduced and added costs and savings resulting from all Changes, in the
aggregate. Any such net increase shall be paid by Tenant to Landlord within thirty (30)
days after the Delivery Date, provided that Tenant shall have received backup
information reasonably supporting all such costs, including, without limitation, invoices,
receipts and lien waivers of subcontractors and materialmen.

(c)     If the Changes occur during the preparation of any of the
plans described in Section 3.2.1 above, then the deadlines for preparation and delivery of
the plans then being prepared shall be extended as reasonably necessary to incorporate
such Changes. If, despite Landlord's diligent efforts in performing Landlord's Work, the
Changes cause a net delay in the Substantial Completion of Landlord's Work (taking into
consideration any time reductions resulting from such changes), then (i) the Rent
Commencement Date shall be determined as if such delay had not occurred, and (ii) the
commencement of the Slack Period and, for purposes of calculating liquidated damages
under Subsection 2.3.2(b) above, the Delivery Date, shall be extended by the number of
days of such net delay; *provided, however, that, in accordance with subsection (a) above,
Landlord shall have notified Tenant in reasonable detail as to the nature and extent of
such delay.*

### Section 3.3   Performance of Work.

3.3.1   Both Landlord's Work and Tenant's Work shall be performed in a
good and workmanlike manner, in compliance with all applicable Legal Requirements,
utilizing only new, first-class materials, and in accordance with all insurance company
requirements. Landlord shall perform Landlord's Work in a manner such that Tenant
will be able to obtain Tenant's Permits. Landlord shall pay all impact fees and related
governmental charges in connection with Landlord's Work and all other work performed

10

by or on behalf of Landlord in connection with the Shopping Center. If Tenant's Permits cannot be obtained because Landlord's Work has not been completed or has been done improperly (and not because of the manner in which Tenant shall have done its work or any negligence or willful misconduct of Tenant), or by reason of any condition of the Shopping Center or the building containing the Premises not resulting from Tenant's or its agents' negligence or willful misconduct, then it shall be Landlord's obligation to remedy the situation so as to enable Tenant to obtain Tenant's Permits, and the Delivery Date shall be deemed delayed, for Tenant's benefit only, on a day-for-day basis for each day of delay occasioned thereby.

3.3.2  If: (a) Landlord's Work has not been commenced by September 1, 2003, or (b) the Delivery Date shall not have occurred by April 1, 2004 (subject to Force Majeure, not to exceed thirty (30) days in the aggregate, and provided that Landlord shall have given Tenant notice of such event of Force Majeure promptly after its occurrence), Tenant may thereafter, during such time as Landlord's Work has not been commenced or the Delivery Date has not occurred, as the case may be, consider Landlord to be in default hereunder and, at Tenant's option in its sole discretion, elect to:

(i)  terminate this Lease, if Landlord shall fail to fully cure such default within thirty (30) days after receiving Tenant's notice thereof, in which event neither party shall have any further liability hereunder (other than as set forth in Section 23.8 below), except that Landlord shall be obligated to promptly reimburse Tenant, as Tenant's sole monetary remedy by reason thereof, for all its reasonable third-party costs and expenses incurred in connection with this Lease (including, without limitation, costs associated with the preparation and review of plans and specifications, and the performance of Tenant's Work), not to exceed Fifty Thousand Dollars and 00/100 ($50,000.00) Dollars; and/or

(ii)  avail itself of the remedies set forth in Section 16.2 below (provided, however, that the cure period set forth therein shall not be applicable); and/or

(iii)  extend one or more times the dates set forth in clauses (a) and/or (b) of this Subsection 3.3.2 to such future dates designated by Tenant in notice given to Landlord.

The election by Tenant of any one or more of the foregoing remedies shall not preclude the subsequent election of any alternative remedy provided in this Section, this Lease, at law, or in equity.

3.3.3  Landlord's Work Performed After Delivery of Possession. On or before the Delivery Date, Landlord's and Tenant's representatives together shall conduct a walk-through of the Premises to compile a punch list of the *"Punch List Items"* (hereinafter defined). Tenant shall deliver to Landlord a copy of said punch list within five (5) days after the walk-through. Landlord shall complete any Punch List Items within twenty (20) days after it receives a copy of said punch list. If Landlord fails to complete any item on said punch list within said twenty (20) day period, [provided that with respect to any items of work which are incapable of being completed by the performance of affirmative acts within said twenty (20) days, that period shall be extended in respect of such item only if Landlord commences the performance of said affirmative acts within twenty (20) days after it receives notification thereof and Landlord thereafter diligently prosecutes the same to completion] Tenant shall have the right after written notice to Landlord to complete the same utilizing its own contractors and receive reimbursement from Landlord for the reasonable costs and expenses thereof upon demand (which shall be accompanied by an itemized statement and copies of all supporting bills). If reasonably required by Tenant, any portion of Landlord's Work which is performed after Tenant accepts physical possession of the Premises shall occur

11

only "after hours", when neither Tenant nor any of its agents, contractors, employees and servants are working within the Premises. Within forty-five (45) days following Substantial Completion of Landlord's Work, Landlord shall deliver to Tenant a duplicate copy of the "as built" plans for the building containing the Premises. As used herein, the term *"Punch List Items"* shall mean such minor items of a nature which, when considered as a whole, do not adversely affect either the performance of Tenant's Work or Tenant's ability to conduct its normal business operations in the Premises.

3.3.4   Tenant's Right of Entry. Prior to the Delivery Date, Tenant may enter upon the Premises for the purposes of inspecting the work, taking measurements, making plans, erecting temporary or permanent signs and doing such other work as may be appropriate or desirable without being deemed thereby to have taken possession or obligated itself to pay Rent, provided, however, that Tenant shall not, during the course of such work, interfere with the performance of Landlord's Work and shall indemnify and hold Landlord harmless from and against any and all claims or losses arising from Tenant's entry upon the Premises. If there is a delay caused in the performance of Landlord's Work by Tenant's entry or by any work performed by Tenant before the Delivery Date, and such delay was not caused by Landlord's negligence or breach under this Lease, Landlord may, extend the time for completion of Landlord's Work for a period equal to the delay, and may require Tenant, upon five (5) days prior notice, to cease all work and vacate the Premises until the Delivery Date. Tenant and its contractors shall maintain insurance reasonably satisfactory to Landlord covering Tenant's construction activities in the Premises.

3.3.5   Work Requirements After Delivery Date. Following the Delivery Date, any construction by Landlord or other tenants or occupants of the Shopping Center affecting any portion of the Shopping Center shall be subject to the following terms and conditions:

(a)   all staging and storage of materials and parking of construction vehicles shall at all times occur only within those portions of the Shopping Center designated therefor in the REA which are immediately adjacent to the area where work is being formed (but in any event outside of the Control Area);

(b)   Landlord shall at all times proceed diligently to ensure that from and after Tenant's opening for business to the public, all ingress, egress or passage of any construction, delivery and related vehicles engaged in the performance of such work or other construction activities shall take place as allowed under the REA; and

(c)   Landlord shall maintain, or cause to be maintained, the Shopping Center in a clean, safe, and sightly condition, and shall use reasonable efforts to ensure that such construction shall not otherwise materially adversely interfere with the normal conduct of any business operations in the Premises.

3.3.6   Tenant's Trailer. After Tenant's receipt of the Delivery Date Notice, Tenant may install a trailer for Tenant's exclusive use in conducting employee interviews and recruiting, in accordance with Exhibit D hereto, in the location shown on Exhibit B hereto. Landlord shall provide utilities to such trailer, but Tenant shall pay for utilities consumed therein. Said trailer shall be removed within ten (10) days after the Delivery Date.

Section 3.4   Measurement; Adjustment of Rent.

3.4.1   Measurement of Premises and Shopping Center. At least thirty (30) days prior to the Delivery Date, Landlord shall deliver to Tenant a certification to Tenant by Landlord's licensed architect, surveyor or engineer of the Floor Area of the Premises and of the Shopping Center, the measurements of which shall be subject to confirmation by Tenant's licensed architect, surveyor or engineer within fifteen (15) days after their

12

receipt by Tenant (although entry only into the Premises shall be allowed). Landlord's certification to Tenant shall contain a reminder that confirmation thereof is due in fifteen (15) days. If Landlord shall fail so to deliver such certification to Tenant within five (5) days after written notice from Tenant, Tenant shall have the right to have such measurement made and certified to Landlord not later than the date which is fifteen (15) days after the Delivery Date, by Tenant's architect, surveyor or engineer. If the Floor Area of the Premises is determined to be less than ninety-seven and one-half (97.5%) percent of that shown on the Final Plans and Specifications, then, without limiting Tenant's other rights and remedies under this Lease, Tenant shall have the right to terminate this Lease upon notice to Landlord given within fifteen (15) days after Tenant's receipt of the final measurement determination and to receive a refund from Landlord of all amounts theretofore paid to Landlord pursuant to the terms of this Lease and all reasonable, third-party costs and expenses incurred by Tenant in connection with Tenant's Work (including, without limitation, plan preparation and review), not to exceed Fifty Thousand Dollars and 00/100($50,000.00) Dollars.

3.4.2  Measurement of Mezzanine. At least thirty (30) days prior to the Delivery Date, Landlord shall deliver to Tenant a certification to Tenant by Landlord's licensed architect, surveyor or engineer of the Floor Area of the mezzanine, the measurements of which shall be subject to confirmation by Tenant's licensed architect, surveyor or engineer within fifteen (15) days after their receipt by Tenant. Landlord's certification to Tenant shall contain a reminder that confirmation thereof is due in fifteen (15) days. If the square footage of the mezzanine varies from that shown in the Final Plans and Specifications by more than fifty (50) square feet, then, at Tenant's request, Landlord shall correct such work so that the Floor Area does not vary by more than fifty (50) square feet.

3.4.3  Adjustment of Fixed Rent and Tenant's Pro Rata Share. If the measurement of the Premises shall indicate a Floor Area less than the Floor Area of the Premises set forth in Section 1.1.25 hereof, the Fixed Rent and any other applicable provision of this Lease (including, without limitation, Tenant's Pro Rata Share and Tenant's CAM Share (defined in Section 5.1.2(a), below) shall be reduced to conform to the actual measurement, and Tenant shall receive a proportional refund of any Rent theretofore paid to Landlord. If the measurement of the Premises indicates that the actual Floor Area of the Premises exceeds the Floor Area of the Premises set forth in Section 1.1.25 hereof, Fixed Rent, Tenant's Pro Rata Share and Tenant's CAM Share shall be calculated on the basis of the actual Floor Area of the Premises but in no event shall such calculation be made on a Floor Area which is more than two hundred fifty (250) square feet higher than that set forth in Section 1.1.25 hereof. Landlord and Tenant shall each promptly execute and deliver to the other an amendment memorializing any change to the Fixed Rent, Tenant's Pro Rata Share, Tenant's CAM Share or any other applicable provisions of this Lease, made pursuant to this Section 3.4. Any dispute between the parties with respect to the Floor Area of the Premises, the square footage of said non-selling space or the Floor Area of the Shopping Center shall be resolved by arbitration in accordance with the provisions of Section 16.3 below.

ARTICLE 4.
FIXED RENT AND TAXES : DETERMINATION AND PAYMENT

Section 4.1  Fixed Rent. Commencing on the Rent Commencement Date and continuing throughout the Term, Tenant shall pay to Landlord the Fixed Rent, in equal successive monthly installments, in advance, on the first day of each and every calendar month throughout the Term, except that Fixed Rent payable for any partial calendar month during the Term shall be prorated. Fixed Rent shall be paid without demand, deduction or set-off, except to the extent otherwise expressly provided herein.

Section 4.2  Payment of Rent. All Rent shall be mailed or otherwise delivered to

13

Landlord's Mailing Address above or, upon at least thirty (30) days' prior notice to Tenant, to such other address as Landlord may from time to time designate. Landlord acknowledges and agrees that for administrative purposes, Tenant has designated BBBY Management Corporation, a New York corporation (the *"Paying Agent"*), to make all Rent payments due to Landlord under this Lease. Said designation (which may be revoked by Tenant at any time) is not intended as, and shall not constitute, an assignment of any rights or obligations of Tenant to the Paying Agent, and Tenant shall remain primarily liable for payment of Rent under this Lease. All payments of Rent received by Landlord from the Paying Agent shall be credited to Tenant as if such payments of Rent had been made by Tenant directly to Landlord.

Section 4.3    Real Estate and Other Taxes.

4.3.1    Landlord shall pay, or cause to be paid, on or before the due dates thereof all *"Taxes"* (defined in Subsection 4.3.3 below) other than personal property taxes levied against tenants. Throughout the Term, Landlord shall cause the Shopping Center to be maintained entirely within tax parcels and lots that exclude any property not a part of the Shopping Center.

4.3.2    (a)    Tenant shall pay to Landlord Tenant's Pro Rata Share of the Taxes which accrue during the Term, subject to the provisions of this Section 4.3. Any Taxes for a real estate fiscal tax year, only a part of which is included within the Term, shall be adjusted between Landlord and Tenant on the basis of a three hundred sixty-five (365) day year as of the Rent Commencement Date or the date on which the Term expires or earlier terminates, as the case may be, for the purpose of computing Tenant's Pro Rata Share of Taxes. If, by law, any Taxes may, at the option of the taxpayer, be paid in installments (without penalty or interest on the unpaid balance thereof), Landlord shall exercise such option so as to maximize the number of installments, and Landlord shall pay the same as they come due and before any fine, penalty, interest or cost may be added thereto for nonpayment thereof.

(b)    Landlord shall submit to Tenant a copy of the bill for Taxes issued by the applicable taxing authority, a computation of Tenant's Pro Rata Share of such Taxes and proof of the payment of Taxes for the previous payment period, as well as copies of all notices concerning assessments, tax rates, and changes thereto. Tenant shall pay Landlord in the amount required by this Subsection 4.3.2 within thirty (30) days after receipt of such bill (but in no event earlier than the thirtieth (30th) day prior to the date on which such Taxes would become delinquent).

4.3.3    As used herein, *"Taxes"* shall mean all general, *ad valorem* real estate taxes, and assessments for betterments and improvements that are levied or assessed by any lawful authority on the Shopping Center (general or special), including any substitution therefor, in whole or in part, due to a future change in the method of taxation. Taxes shall be reduced by any deferral, abatement, or other tax-lowering adjustment received by Landlord from the taxing authorities, but not by any sales tax reimbursement. Except as shown on the Tax Bill attached hereto as Exhibit N, Taxes shall not include any: (1) income, excise, profits, estate, inheritance, succession, gift, transfer, franchise, capital, or other tax or assessment upon Landlord or, except as otherwise provided in this section 4.3.3, upon the rentals payable under this Lease; (2) taxes on rents (other than to the extent that such taxes are customarily paid by retail tenants in the State of Arizona), gross receipts or revenues of Landlord from the Premises; (3) fine, penalty, cost or interest for any tax or assessment, or part thereof, which Landlord or its lender failed to timely pay (except if same are caused by an Event of Default); (4) assessment for a public improvement arising from the initial construction or expansion of the Shopping Center or the Premises; (5) Taxes resulting directly from an increase in the assessment caused by a sale or ground lease of all or any portion of the Shopping Center to an Affiliate of Landlord for a consideration above market value; or

14

(6) fees imposed upon Landlord in connection with Landlord's development of the Shopping Center (including, without limitation, trip generation fees except where such trip generation fees are a condition of any building permit issued to Tenant). Notwithstanding the foregoing, if at any time during the Term any tax of whatever nature is levied, assessed or imposed in lieu of, or as a substitute for, the whole or any part of Taxes, the same shall be deemed to be Taxes for the purpose of this Lease. All Taxes payable by Tenant pursuant to this Section 4.3 shall be determined as if the Shopping Center was the only property owned by Landlord. Landlord represents to Tenant that, as of the Effective Date and, to the best of Landlord's knowledge, as of the anticipated Delivery Date, no portion of the Shopping Center is or will be (i) subject to or the beneficiary of an abatement of Taxes, or (ii) subject to any special assessments or similar charges, or (iii) are included in any special improvement district(s) which would result in higher sales taxes or other similar impositions than would exist.

4.3.4  Landlord shall provide Tenant with a copy of any increased tax assessment within fifteen (15) days of its receipt. Provided that at least two (2) tenants (including Tenant) of the Shopping Center having more than 100,000 square feet of leasable square footage in the aggregate have agreed to pursue such contest, if Landlord shall have elected not to do so, Tenant shall have the right to contest any assessment or the validity of any tax at its own cost and expense. If, pursuant to any such contest, Tenant is withholding its payment of Taxes, Tenant shall provide to Landlord such financial security (at Landlord's option in the form of a cash deposit, letter of credit, bond or other similar means) as may be reasonably required by Landlord or any Mortgagee. Tenant agrees that Landlord may utilize such security and pay Taxes to the appropriate governmental authority if required to do so under any such mortgage or deed of trust or for the purposes of avoiding a tax sale of the Shopping Center.

ARTICLE 5.

COMMON AREAS, THEIR USE AND CHARGES

Section 5.1   Common Areas: Maintenance.

5.1.1  Maintenance of Common Areas. Landlord shall operate, maintain, repair and replace the Common Areas, or cause the Common Areas to be operated, maintained, repaired and replaced, as required by the REA. Landlord may retain the services of a third party to manage and operate the Common Areas but (i) Landlord shall remain primarily responsible for the duties and responsibilities imposed upon it pursuant to this Section 5.1.1, and (ii) any fees or other compensation paid to such third party shall be deemed included in the ten (10%) percent administrative fee described in Section 5.1.2, below, and shall not be a part of Common Areas Charges hereunder. Tenant acknowledges that certain other parties to the REA will have the right to assume the maintenance of the common areas on either or both of the Other Tracts, as applicable.

5.1.2  Tenant's Pro Rata Share of Common Areas Charges.

(a)      During the Term, Tenant shall pay to Landlord Tenant's CAM Share of the reasonable costs (hereinafter referred to as the *"Common Areas Charges"*) paid by Landlord to operate, replace, maintain, insure and repair the Common Areas, including any amounts payable under the REA for the operation, replacement, maintenance and repair of the Common Areas and the common areas on the Other Tracts. For the purposes hereof, the phrase *"Tenant's CAM Share"* shall mean (i) in respect of any item of Common Areas Charges hereunder payable in respect of both the Shopping Center and the Other Tracts pursuant to the REA, a fraction whose numerator is the Floor Area of the Premises and whose denominator is the Floor Area of the Shopping Center and the Other Tracts provided that in no event shall such fraction exceed five and three-tenths (5.3%) percent and (ii) in respect of any other items of Common Areas Charges

15

shall mean Tenant's Pro Rata Share, provided that in no event shall Tenant's CAM Share exceed ten (10%) percent. The maximum percentages on Tenant's CAM Share set forth in subparagraphs (i) and (ii) shall be adjusted if a particular occupant(s) within the Shopping Center or the Other Tract maintain, at their own cost and expense, a part of the Common Areas or the common areas on such Other Tracts proportionate to the size of their own premises. Tenant's CAM Share of Common Areas Charges shall be paid in equal monthly installments on the first day of each calendar month, in advance, during each calendar year based on Landlord's reasonable budget, with respect to which budget the amount thereof shall not exceed one hundred five (105%) percent of the actual Common Areas Charges for the most recent calendar year for which such information is available (exclusive of extraordinary non-recurring expenses during such prior calendar year).

(b)      Within sixty (60) days after the end of each calendar year, Landlord shall provide to Tenant a statement, in reasonable detail, of Common Areas Charges for such year, which statement shall be prepared in accordance with generally accepted accounting principles consistently applied (the *"CAC Reconciliation Statement"*). The CAC Reconciliation Statement shall be certified by Landlord as being accurate and shall be accompanied by a calculation of Tenant's CAM Share of Common Areas Charges, and payment to Tenant in the amount of any overpayment made by Tenant during the preceding calendar year. If Tenant's CAM Share of the actual Common Areas Charges for a calendar year shall exceed the aggregate monthly installments paid by Tenant during said calendar year, Tenant shall pay to Landlord the deficiency within sixty (60) days after receipt of such notice. Notwithstanding anything contained herein, in no event shall the Tenant's CAM Share of Common Areas Charges with respect to the first full calendar year of the Term exceed One and 40/100 ($1.40) Dollars (excluding insurance premiums) and with respect to any other calendar year thereafter (exclusive of the costs of snow removal and utility service for the Common Areas during such calendar year) exceed one hundred five (105%) percent of the Tenant's CAM Share of Common Areas Charges (including insurance premiums) paid by Tenant for the then immediately preceding calendar year for which such information is available (exclusive of the costs of snow removal, utility service for the Common Areas and extraordinary non-recurring expenses during such immediately preceding calendar year).

5.1.3   Exclusions from Common Areas Charges.

Common Areas Charges shall not include: (i) the capital cost of any additions to the Common Areas pursuant to an expansion of the Shopping Center; (ii) the cost of capital improvements or replacements to the Common Areas [for example, the cost of repaving the parking areas as opposed to patching but the repaving of not less than one-half (½) of the parking lot may be done not more frequently than once every seven (7) years, in which event the cost thereof shall be amortized over the useful life of such repavement and Common Areas Charges may include the annual amortized cost]; (iii) the cost of investigating, monitoring or remedying any environmental condition or "Hazardous Substances" or any other "Compliance Costs"; (iv) except to the extent covered by subclause (ii) above, any debt service (including principal and interest) or payments of any judgments or other liens against Landlord; (v) the cost of maintaining, repairing or providing security for interior portions of buildings; (vi) Taxes or other taxes levied or assessed against Landlord or the Shopping Center except for personal property used to maintain Common Areas; (vii) the cost of compliance with laws (including, without limitation, the cost of curing violations or contesting such laws or violations), except that Common Areas Charges shall include the cost of compliance with laws affecting only the Common Areas provided that same shall (A) apply only to laws enacted after the Rent Commencement Date, (B) not be necessitated by the acts or omissions of Landlord or any other tenant or any of their respective agents, subtenants, occupants, contractors or employees, (C) benefit a majority of all tenants of the Shopping Center equally, (D) if a

16

capital cost, be amortized on a straight-line basis over the useful life thereof under generally accepted accounting practices, and (E) be similarly imposed on a majority of all other tenants of the Shopping Center; (viii) any costs resulting from insurance deductibles or any payments made under any self-insurance policy maintained by Landlord; (ix) any costs which would have been reimbursed or paid for by insurance proceeds had Landlord maintained the insurance required under Section 10 hereof and the amount of any judgment or other charge entered or costs assessed against Landlord in excess of the policy limits of the insurance maintained by Landlord under Section 10 hereof (including, without limitation, liability insurance); (x) those portions of Landlord's insurance premiums which are reimbursed to Landlord by any other tenant in the Shopping Center other than through the payment of such tenant's proportionate share of insurance premiums otherwise included as part of Common Areas Charges; (xi) any costs of refinancing any debt encumbering the Shopping Center; (xii) sums paid or owed by Landlord to any tenant in the Shopping Center; (xiii) costs incurred in connection with the negotiation of leases with, or construction of improvements for, any tenant in the Shopping Center (including, without limitation, brokerage commissions and legal fees); (xiv) costs incurred in connection with a sale, ground leasing or sale-leaseback of all or any part of the Shopping Center; (xv) costs incurred in connection with lawsuits or other legal actions (including, without limitation, arbitrations and mediations) instituted or defended by Landlord, provided, however, that so long as said lawsuits or other legal actions affect the Common Areas only, then, without limiting the further provisions of this subclause (xv), the reasonable attorneys fees and court costs incurred by Landlord in connection therewith shall be included within Common Areas Charges so long as (A) the matter of any such lawsuit or other legal action first arises after the Rent Commencement Date, (B) any such lawsuit or other legal action does not result from the negligent acts or negligent omissions of Landlord or any other tenant or any of their respective agents, subtenants, occupants, contractors or employees, and (C) any such lawsuit or other legal action does not arise from Landlord's Work, any matter of title, any dispute with Landlord's insurance carrier or any condemnation proceeding; (xvi) sums incurred as late payment fees, penalties or interest unless resulting solely from the fault of Tenant; (xvii) ground rent; (xviii) depreciation except as set forth in subclause (ii), above; (xix) costs disproportionately incurred by or on behalf of any one or more (but less than a majority) of the tenants in the Shopping Center (xx) electricity costs for lighting Common Areas later than one (1) hour after the regular closing time of the Shopping Center as determined by those occupants (including Tenant) occupying collectively a majority of the Floor Area in the Shopping Center and the Other Tracts, but in no event later than 11:00 p.m. unless Tenant is regularly open after 11:00 p.m.; (xxi) Landlord's advertising, entertainment and promotional costs for the Shopping Center; (xxii) costs of acquiring, or leasing, sculptures, paintings and other objects of art located within or outside the Shopping Center; (xxiii) costs and expenses payable to Landlord or to an affiliate of Landlord to the extent that such costs and expenses exceed competitive costs and expenses for materials and services by unrelated persons or entities of similar skill and experience in the Maricopa County metropolitan area; (xxiv) repairs or replacements resulting from defects in the original construction of the Shopping Center arising within three (3) years after the Rent Commencement Date; (xxv) the cost of mechanical equipment (but not the straight line depreciation thereof over its useful life, as determined in accordance with generally accepted accounting principles); (xxvi) cost and expense relating to the Common Areas adjacent to any other occupant or "Owners" premises if such occupant or "Owner" assumes the maintenance of such areas; and (xxvii) any cost or expense relating to the administration and management of the Common Areas including but not limited to overhead, office salaries and benefits, office rental, office supplies, dues and subscriptions, office utility charges, telephone charges and automobile expenses, but (A) in lieu thereof a fee of ten (10%) percent of Common Area Charges as defined above except that when computing such fee, Common Area Charges shall not be deemed to include Taxes, utility charges, capital items or insurance costs, and (B) the cost of on-site personnel engaged in the repair, maintenance and operation of the

17

Common Areas shall be included provided that such personnel are below the level of "supervisor" and if such personnel perform services at more than one shopping center the costs of such personnel shall be equitably pro rated.  The aforesaid exclusions shall apply to any costs payable under the terms of the REA as if such exclusions referred to the Other Tracts and the common areas on the Other Tracts.  Subject to Section 5.2.8(a) hereof, Common Area Charges shall be reduced by the amount of any rent and the fair market value of any other consideration paid to Landlord by any person or entity which utilizes space in the Common Areas for the sale or rental of any products or services or for parking or easements.

(a)     Common Areas Charges for any period during the Term which constitutes less than a full calendar year shall be equitably prorated.

5.1.4  <u>Tenant's Right to Audit</u>.  Tenant shall have the right, within three (3) years after receiving any CAC Reconciliation Statement (and not more than once annually) to audit Landlord's books and records at Landlord's principal office where maintained in the continental United States to verify Landlord's calculation of Common Areas Charges as reflected therein and Tenant's CAM Share thereof.  Upon Tenant's reasonable request, Landlord shall promptly deliver to Tenant copies of relevant backup materials (including, but not limited to, contracts, correspondence and paid invoices) reasonably required by Tenant.  In the event of an error in Landlord's favor, Landlord shall refund the overcharge to Tenant within thirty (30) days after Tenant's demand therefor, and if the overcharge exceeds three (3%) percent of Tenant's Pro Rata Share of Common Areas Charges, Landlord shall pay to Tenant the reasonable expenses of the audit within thirty (30) days after Tenant's demand therefor.  If an error is found in Tenant's favor, Tenant shall promptly pay the undercharge to Landlord.  Landlord shall maintain all books and records pertaining to a calendar year for at least three (3) years after it delivers to Tenant a CAC Reconciliation Statement for such calendar year.  Tenant shall keep the results of any such audit confidential, although they shall be disclosed to Landlord, provided that nothing contained herein shall restrict Tenant from disclosing such information as may be required by applicable Legal Requirements, or to its accountants.  Any dispute by Landlord with respect to an audit by Tenant shall be submitted to arbitration in accordance with the provisions of Section 16.3 below.

5.1.5  In no event shall Tenant be required to join, participate in or contribute to any promotional fund, marketing fund or merchants' association.

Section 5.2   <u>Common Areas: Restrictions</u>.

5.2.1  <u>Continuous Access</u>.  No entrances, exits, approaches and means of ingress and egress to and from the Shopping Center or the Premises in the area shown on <u>Exhibit B</u> and labeled the *"Control Area"* (the *"Control Area"*) shall be interrupted or disturbed by any act or omission of Landlord during the Term, except (i) as may be reasonably necessary as a result of the performance of Common Areas maintenance, (ii) in the event of an emergency, or (iii) as may be otherwise required by applicable Legal Requirements, in which event Landlord shall use reasonable efforts to give Tenant advance notice of same and to minimize interference to Tenant's normal business operations in the Premises as a result thereof.  Notwithstanding the foregoing, Landlord shall be permitted, upon at least thirty (30) days prior notice given to Tenant, to temporarily close the Common Areas for the minimum time legally necessary to prevent a dedication thereof or an accrual of any rights in any person or the public generally therein; provided that such closure shall not occur during November or December of any calendar year.  Notwithstanding any other provisions of this Lease, Landlord may temporarily close parts (but not the whole at any one time) of the Common Areas for such periods of time as may be necessary for (a) temporary use as a work area in connection with the construction of buildings or other improvements in the Shopping Center or contiguous property; or (b) repairs or alterations in or to the Common Areas or to any utility-type facilities; provided, however, that no such closure (unless solely

18

caused by the necessity for major repairs, repaving or restorations in any of which events Landlord shall use all reasonable efforts and proceed with all due diligence to minimize the period of closure) shall (1) materially interfere with the normal conduct of Tenant's business in the Premises, (2) materially adversely affect ingress to or egress from the Shopping Center, or (3) have a material adverse effect on the visibility of the Premises or any signs in the Shopping Center containing Tenant's name or logo.

5.2.2 No Alterations. Landlord shall not, without obtaining Tenant's prior written consent in each instance, which consent may be withheld in its sole discretion, in the Control Area (i) alter the Shopping Center as shown on Exhibit B (except as may be required as the result of a condemnation), construct or permit to be constructed any building, sign, tower or other structure or improvement, but Landlord shall have the right within the Control Area to (A) plant trees and other growing plants pursuant to a landscape plan which provides for the uniform distribution of trees throughout the Shopping Center, provided no tree or trees shall unreasonably interfere with the visibility of Tenant's signage, and (B) construct other items or amenities customary in first-class retail centers, such as light standards, benches and directional signage, provided the same do not unreasonably interfere with access to the Premises or visibility of Tenant's signage (ii) change the number, location, or layout of parking spaces within the Control Area except as required by law; (iii) construct additional structures or buildings in the Shopping Center except as shown in the building pad areas shown on Exhibit B; or (iv) change the entrances or exits to and from the Shopping Center, or the curb cuts, roadways and sidewalks except as may be necessary to conform to Legal Requirements. Notwithstanding any provision herein to the contrary, except for the initial construction of the Shopping Center, Landlord shall neither perform nor permit to be performed, any construction, repairs, replacements or maintenance to any portion of the Shopping Center, including the Premises, (other than emergency repairs to utilities and Common Areas) during the months of August (as to the Control Area only), November and December of any year, without the prior consent of Tenant, which consent may be granted or denied in Tenant's sole and unfettered discretion, reasonably or unreasonably exercised.

5.2.3 Outparcels. In addition to the provisions of Subsection 5.2.2 above, and the restrictions set forth in the REA, during the Term: (i) the restrictions set forth in Section 4.14 of the REA with respect to the buildings in Satellite Zone A shall encumber and bind the outparcels designated on Exhibit B hereto as "Pad L", Shops 5", Shops 6". The outparcel designated on Exhibit B hereto as "Pad L" shall be located within the Building Envelope shown therefor on Exhibit B and shall not contain more than six thousand square feet of Floor Area.

5.2.4 Parking Area. During the Term, except as set forth in Section 11, Landlord shall maintain, or cause to be maintained, in the Shopping Center, at a minimum, the greater of (i) the number of parking spaces required by applicable Legal Requirements, without variance, or (ii) 4.5 ground-level parking spaces for every one thousand (1,000) square feet of Floor Area in the Shopping Center, with each such space being at least nine (9) feet in width and eighteen (18) feet in length, except for compact car spaces as allowed by all governmental bodies having appropriate jurisdiction. Parking spaces shall at all times be clearly marked by painting, striping or otherwise. Landlord shall not designate specific parking spaces for use by other tenants or occupants of the Shopping Center, except (i) outside the Control Area, and (ii) outside of the Control Area Landlord shall be entitled to designate a minimal number of spaces as restricted time, for example "twenty-minute parking", nor shall Landlord permit any person or entity to use the parking areas other than Tenant, the other tenants and occupants of the Shopping Center and the Other Tracts, and their respective employees, agents, subtenants, concessionaires, licensees, customers and invitees. Tenant shall use reasonable efforts to have its employees park their motor vehicles in the area designated as *"Employee Parking"* on Exhibit B hereto and Landlord shall use reasonable efforts to have other tenants and occupants of the Shopping Center do the same. Tenant shall not

19

unreasonably withhold or delay its consent to a change in the Employee Parking area if the same is in reasonable proximity to the Premises and is not in the Control Area (provided that the same may be located in that part of the Control Area behind the Premises). There shall be no charge whatsoever levied for the use of any parking areas within the Shopping Center. Landlord shall not permit overnight parking in the Shopping Center.

      5.2.5 <u>Lighting</u>. Subject to the terms of the REA, throughout the Term, Landlord shall keep the Common Areas fully lighted and open to the customers of the Shopping Center seven (7) days a week from dusk until 11:00 p.m. Monday through Saturday and until 7:00 p.m. on Sunday *("Normal Hours")*. Upon request of Tenant, Landlord shall keep the Common Areas lighted for as long after Normal Hours as Tenant shall request, <u>provided</u> Tenant shall pay for a share of the cost of said requested lighting, which share shall be equal to the product of (x) such cost, and (y) a fraction, the numerator of which shall be the number of square feet of Floor Area within the Premises and the denominator of which shall be the aggregate number of square feet of Floor Area of all premises within the Shopping Center (including the Premises) open later than Normal Hours (<u>excluding</u>, however, those tenants and occupants who separately control and pay for their own Common Area lighting). In addition to the foregoing, Landlord shall provide for low level security lighting as required in the REA.

      5.2.6 <u>Repairs</u>. During the Term, after the initial construction of the Shopping Center, any construction or repair by Landlord permitted or required under this Lease and undertaken in the Control Area shall:

      (a)    not be performed during the months of August, November, or December of any year, except in the event of an emergency or as may be otherwise required by applicable Legal Requirements; and

      (b)    be commenced only upon at least five (5) days' prior notice to Tenant (except in an emergency, in which event Landlord shall only be required to give such notice as is reasonable under the circumstances).

      Any other construction or repair by Landlord after the initial construction of the Shopping Center shall be performed in accordance with the requirements of Section 3.3.5 above and in such a manner so as not to materially interfere with the normal conduct of any business operations in the Premises.

      5.2.7 <u>Rules and Regulations</u>. Tenant shall comply with the rules and regulations of the Shopping Center as established from time to time by Landlord, within sixty (60) days after Landlord notifies Tenant thereof, provided they: (i) are reasonable, (ii) do not adversely affect the normal conduct of any business operations in the Premises, (iii) do not adversely affect any of Tenant's rights under this Lease, and (iv) are uniformly enforced against all tenants of the Shopping Center and without prejudice against Tenant. In the event of any conflict between the provisions of this Lease and any rules or regulations, the provisions of this Lease shall prevail and govern.

      5.2.8 <u>Miscellaneous</u>.

      (a)    <u>No Promotional Use</u>. Landlord shall not use or permit the use of all or any portion of the Common Areas (other than the "Majors Temporary Outdoor Sales Areas", as such term is defined in the REA, subject, however, to the next sentence hereof) for retail sales or for promotional purposes. Notwithstanding any clause in the REA permitting such use Landlord shall not permit the Majors Temporary Outdoor Sales Areas shown label on Exhibit B to be used more than twice per year (with each period being no longer than four days) and during such promotional use there shall be no structures in such area (provided that Gart Bros. shall be permitted to erect a tent during such periods but such tent shall not exceed 80 feet by 80 feet with a maximum height of

20

40 feet and such tent shall not be placed upon the Majors Temporary Outdoor Sales Areas shown label on Exhibit B during the months of August, October, November or December) and there shall be no material interference with the use by other tenants or occupants, including, without limitation Tenant, of the balance of the Common Areas. Notwithstanding the foregoing provision, tenants of the Shopping Center (including Tenant) shall be permitted to conduct sidewalk sales in front of their respective stores only, provided that such sales shall: (A) be conducted in a manner consistent with the REA, (B) not materially interfere with normal pedestrian access over the sidewalks, and (C) not materially interfere with the normal business operations of Tenant in the Premises or materially impair the visibility of Tenant's signage.

(b)   Trash Compactor & Containers. Tenant shall be permitted to maintain and operate, at no extra charge, a trash compactor in the portion of the Common Areas designated on Exhibit B hereto as *"Trash Compactor Pad"*; and (ii) a trash container(s) in the portions of the Common Areas designated on Exhibit B hereto as *"Trash Container Pad"*. Tenant, at its sole cost and expense, shall keep the trash compactor and containers neat and clean and repair any damage caused by use and storage of such compactor and containers.

(c)   Shopping Carts. Tenant shall be permitted to store its shopping carts in such exterior cart corrals as may be reflected on Exhibit B and the Final Plans and Specifications. Other occupants shall also be permitted to provide and store shopping carts for use in the Shopping Center and Other Tracts allowed under the REA. With respect to shopping carts provided by Tenant for the use of its customers, Tenant will use reasonable efforts to periodically remove same from the Common Areas.

ARTICLE 6.
UTILITIES

Section 6.1   Utility Service. From and after the Delivery Date and continuing thereafter through the end of the Term, Tenant shall be solely responsible to contract for and shall pay the cost of utilities services (including, without limitation, electricity, gas, water, sanitary sewer, alarm and telecommunications) consumed in the Premises. Tenant shall not be obligated to purchase utility service(s) directly from Landlord. Landlord shall provide separate utility meters exclusively serving the Premises, at its sole cost and expense (including, without limitation, all connection and hook-up fees). Tenant's entry upon the Premises prior to the Delivery Date shall not constitute a waiver by Tenant of Landlord's obligation to pay the costs of all utility charges incurred in the Premises prior to the Delivery Date. To the extent Landlord has any control or authority over the use of utility lines, Landlord shall not permit the capacity of utility lines available for use at the Premises to be reduced or overloaded by any other persons or entities. To the extent Landlord has any control or authority over the use of utility lines, Landlord shall permit Tenant and its telecommunications provider full and free access to, and use of, available telecommunications conduits in the Shopping Center for the provision of telecommunications service to the Premises, subject to such reasonable requirements as Landlord may impose.

Section 6.2   Interruption. Notwithstanding any provision of this Lease to the contrary, in the event utilities serving the Premises are disrupted due to the acts or omissions of Landlord, its agents, contractors, servants or employees, Landlord shall promptly undertake reasonable diligent efforts to restore the affected utilities at Landlord's sole cost and expense. If the disrupted utilities are not restored within forty-eight (48) hours after Landlord has knowledge of the disruption, and Tenant is unable to conduct its normal business in the Premises due to the disruption of such utility service, Rent shall be equitably abated during the period commencing on the expiration of the aforementioned forty-eight (48) hours and ending on the date the disrupted utilities are restored. In addition, a disruption of utility services caused by the acts or omissions of

21

Landlord, its agents, contractors, servants, or employees shall not entitle Tenant to terminate this Lease, nor shall it constitute a constructive or actual eviction of Tenant provided Landlord acts reasonably under the circumstances to restore the affected utility service.

<div align="center">

ARTICLE 7.
SIGNS

</div>

Section 7.1    Tenant's Building Signage. Landlord shall supply and install signage (and obtain all permits and approvals therefor) as part of Landlord's Work in accordance with Exhibit D, Exhibit D-1, and Exhibit F hereto, and with the additional provisions of this Lease. Thereafter, subject to Legal Requirements and Exhibit O attached hereto, Tenant shall have the exclusive right during the Term, at its sole cost and expense, to erect, maintain, and replace on the storefront and exterior walls of the Premises, and on the side walls of any entrance design element, if any, any signs (including, without limitation, under-canopy or blade signs). Tenant may, at its sole cost and expense, install and maintain on the storefront of the Premises a temporary banner announcing *"Coming Soon"* at such time, and for such duration prior the Rent Commencement Date, as Tenant may require. Tenant may erect and maintain in the interior of the Premises any signs it may desire, provided that same are professionally prepared.

Section 7.2    Pylon Signage. Landlord shall provide pylons at the locations shown on Exhibit B hereto during the entire Term, and obtain all permits and approvals therefor. Landlord, as part of Landlord's Work, shall obtain all governmental approvals and permits for Tenant's sign panel(s) on all sides of such pylons (excluding the Costco Pylon located on the Costco Parcel) in accordance with the provisions of Article 3 and Exhibit D and Exhibit F hereto. Tenant shall provide its pylon sign panels and Landlord shall install the same in accordance with Exhibit D and Exhibit F. The dimensions and position of Tenant's pylon sign panel(s) shall be as shown on Exhibit F hereto. If Landlord erects or allows to be erected any additional pylon (but not monument) sign(s) and elects to permit any of the occupants who are identified on the Pylon Signs also to be identified on such additional pylon sign(s), then Landlord will either (1) permit Tenant to be identified on such additional pylon sign(s) on the same basis as such other occupants identified on the Pylon Sign(s) (i.e, those occupants identified on such sign shall be entitled to erect their sign panels in the order of the size of their respective premises); or (2) permit Tenant to competitively bid with such other occupants identified on the Pylon Sign(s) for the right to be identified on such new pylon sign(s). Landlord shall maintain all pylons, and Tenant's signs thereon, in good order and repair, and allow Tenant access to replace its signs thereon, at Tenant's cost and expense. Landlord shall not change or alter the location, structure, height or general appearance of the pylons without obtaining Tenant's prior consent. The cost of maintenance of any pylon, and the cost of any electricity used to illuminate them, shall be charged to and paid by those tenants (including Tenant) whose signs are installed on the pylon based upon the area of the sign panels erected by Tenant on such pylons signs as compared to the total area of the sign panels of all tenants (including Tenant) on such pylons.

Section 7.3    Signage: Alteration/Removal/Allocation. Tenant shall have the right, from time to time, without Landlord's approval, but subject to Legal Requirements and Exhibit O attached hereto, to change its signs on the storefront and exterior of the Premises, as well as on any pylon or monument, provided that the area of the new sign is no larger than the area of the sign which it replaces and that the method of construction and attachment is substantially the same. Upon the expiration or earlier termination of the Lease, Tenant shall remove its signs from the fascia or other exterior walls of the Premises and from any pylon or monument and shall repair any damage occasioned thereby. The signage rights granted to Tenant pursuant to this Article 7 shall, at Tenant's option, be allocated to or between Tenant and/or any subtenant(s) of all or any portion of

<div align="center">22</div>

the Premises. All signage installed by Tenant hereunder shall comply with applicable Legal Requirements.

Section 7.4   Cooperation.  At no cost to Landlord, Landlord, upon request, shall execute any consents or applications which may be required by applicable Legal Requirements to permit the placement, installation, and/or replacement by Tenant of any signs on any part of the Premises or on any pylon or monument, to which Tenant may be entitled under this Lease.

Section 7.5   Signage Restrictions and Criteria.

7.5.1   During the Term, no exterior identification signs attached to any building of the Shopping Center shall violate the REA, Exhibit O or Legal Requirements.

7.5.2   Subject to Legal Requirements, Landlord shall not permit any trees, bushes or other landscaping, scaffolding or architectural details to unreasonably obscure Tenant's storefront, storefront signs or other exterior wall signs or any pylons, monuments or other freestanding signs. Except as otherwise permitted under Existing Leases (hereinafter defined in Section 12.3(i)), no premises in the Shopping Center containing less Floor Area than the Floor Area of the Premises, shall have a building and entrance design element higher or wider than the height or width of the building and entrance design element of the Premises.

ARTICLE 8.
ALTERATIONS AND IMPROVEMENTS

Section 8.1   Alterations and Improvements.

8.1.1   Tenant shall not make any alterations or improvements to the roof, exterior or structure of the Premises without the prior written approval of Landlord, provided, however, that if Tenant's alteration of the exterior of the Premises conforms to Tenant's then-current prototypical elevation and the architectural theme of the Shopping Center Landlord's consent shall not be required. All work performed by Tenant done in connection with structural and non-structural alterations or improvements shall be done at Tenant's sole cost and expense, lien free, in a good and workmanlike manner and in compliance with all applicable governmental requirements. In no event shall any such alterations or improvements encroach on the Common Areas. The provisions of this Section 8.1 shall not apply to Tenant's building signage, which shall be governed by the applicable provisions of Article 7 above.

8.1.2   Tenant may, from time to time, at its sole cost and expense, without the prior approval of Landlord, make lien free, non-structural alterations and non-structural improvements to the Premises as Tenant deems necessary or desirable, including, but not limited to, electrical systems, heating, ventilation and air conditioning and other mechanical systems, installation of fixtures and equipment, painting, and wall and floor coverings, provided that the structural integrity of the Premises shall not be adversely affected thereby, Tenant complies with all Legal Requirements, and such work does not violate or invalidate any warranties of which Tenant has received previous notice from Landlord.

8.1.3   Subject to Sections 8.1.1 and 8.1.2, above, Tenant shall have the right to subdivide the Premises into two (2) or more separate stores, each of which may have its own front entrance and access to the loading docks in the rear of the Premises, as well as separately sub-metered utilities, provided that each such store shall contain no less than eight thousand (8,000) square feet of Floor Area.

8.1.4   Tenant shall have the right to erect and maintain an antenna and a satellite dish on the roof of the Premises, provided that Tenant: (i) obtains Landlord's

23

prior approval of its plans for the installation of such equipment, (ii) uses a contractor designated or approved by Landlord for all roof penetrations so as not to violate or invalidate any roof warranties maintained by Landlord, (iii) maintains the area where roof penetrations are made while Tenant's equipment is present, (iv) repairs any damage to the roof caused by the making of the roof penetrations, including, but not limited to, the repair of the roof penetrations upon the removal of any equipment installed thereon, and (v) erects and maintains such equipment in accordance with applicable Legal Requirements.

8.1.5   Landlord shall execute and return to Tenant all appropriately completed building department or equivalent applications within ten (10) days after Tenant's request therefor, and, at no cost to Landlord, will reasonably cooperate with Tenant in the permitting process.

8.1.6   If any violation of any applicable Legal Requirement which is noted against the Shopping Center or the Premises (other than a violation caused by Tenant) prevents Tenant from obtaining a building permit for any alterations or a certificate of occupancy, then, upon request by Tenant, Landlord shall promptly and diligently pursue the cure of the same and use all reasonable efforts to cause such violation to be removed of record to the extent required to permit Tenant to obtain its building permit or certificate of occupancy, as the case may be.  If any violation of any applicable Legal Requirement by Tenant prevents Landlord from obtaining a building permit for any alterations or a certificate of occupancy, then, upon request by Landlord, Tenant shall promptly and diligently pursue the cure of the same and use all reasonable efforts to cause such violation to be removed of record to the extent required to permit Landlord to obtain its building permit or certificate of occupancy, as the case may be.

8.1.7   Landlord shall not make any alterations to the Premises (including, without limitation, changing the design, color or materials of the exterior of the Premises) nor shall Landlord construct an additional floor or floors above the Premises.  Landlord shall neither make, nor permit to be made, any alterations to the exterior architectural theme of the remainder of the Shopping Center (as shown on Exhibit D-2 hereto) which would be inconsistent with shopping centers similar to the Shopping Center in the State of Arizona (exclusive of other tenants' storefront and entrance features) without the prior consent of Tenant.

ARTICLE 9.
REPAIRS

Section 9.1   Tenant's Repairs.  Subject to the provisions of Article 11 hereof, and except as otherwise provided in Section 9.2 below, Tenant shall maintain in good condition and repair, at its sole cost and expense: (i) the non-structural, interior elements of the Premises (including, without limitation, plate glass, and the electrical, plumbing, mechanical and/or alarm systems located in, or serving, exclusively the Premises); and (ii) the heating, ventilation and air conditioning ("HVAC") units exclusively serving the Premises.  All repairs and replacements on Tenant's part to be performed hereunder shall be at Tenant's sole cost and expense, and performed in a good and workmanlike manner in accordance with all applicable Legal Requirements.

Section 9.2   Landlord's Repairs.  Subject to the provisions of Article 11 hereof, Landlord shall perform, or cause to be performed, as the same shall from time to time be necessary, all repairs and replacements to the following:

(a)     the buildings of the Shopping Center as necessary to maintain same in good condition and repair (including, without limitation, repainting the exterior walls of the buildings of the Shopping Center (including, without limitation, the Premises)) as same may be reasonably required from time to time during the Term;

24

(b)    the structural elements of the Premises, which shall be deemed to include, without limitation, the roof joists, columns, footings, foundation, exterior walls (including, without limitation, repainting, but excluding plate glass, storefront windows, doors, door closure devices, window and door frames, molding, locks and hardware, and painting or other treatment of interior walls), floor (but not the floor covering, unless the same is damaged as a result of a floor defect or settling), and the structural elements of any building of which the Premises may be a part;

(c)    the roof, gutters, flashings, downspouts and scuppers;

(d)    the electric, gas if any, water, sanitary sewer, and other public utility lines serving the Premises, to the point of connection to the Premises;

(e)    all electric, gas, water, sanitary sewer, and other public utility lines and ducts in or passing through the Premises which do not exclusively serve the Premises;

(f)    the non-structural elements of the Premises (including, without limitation, the HVAC units and the electrical, plumbing, mechanical, and/or fire alarm systems located in or serving the Premises) until the first (1st) anniversary of the Delivery Date, but, subject to Section 10.1.2 hereof, excluding any repairs and replacements which are required by the act or omission of Tenant, its employees, agents or contractors, and thereafter for such period of time and to the extent any such non-structural elements are covered by any contractors', manufacturers', vendors', or insurers' warranties or guarantees relating to the Premises; and

(g)    any damage to the Premises or the Shopping Center which is occasioned by (A) the act or omission of Landlord, its employees, agents or contractors, or (B) any breach by Landlord of any provision of this Lease.

All repairs and replacements on Landlord's part to be performed hereunder shall be at Landlord's sole cost and expense (and not includable in Common Areas Charges), performed in a good and workmanlike manner in accordance with all applicable Legal Requirements, and without material interference with or disruption to the normal conduct of any business operations in the Premises. Landlord shall give Tenant at least three (3) days' prior notice of any repairs or replacements to, or which would otherwise affect the normal conduct of any business operations in the Premises (except in the case of an emergency posing imminent risk of material harm to persons or property, in which event Landlord shall only be required to give such notice as is reasonable under the circumstances). If Landlord's repairs would materially interfere with or disrupt the normal conduct of any business operations in the Premises, Landlord shall perform such repairs only after the regular hours of operation of Tenant and any other occupant of the Premises (or any portion thereof).

Section 9.3    Legal Compliance Work. Except as hereinafter expressly provided, Landlord shall be responsible, at its sole cost and expense (and not includable in Common Areas Charges) for performing all *"Legal Compliance Work"* (hereinafter defined). Notwithstanding the foregoing, after the completion of Landlord's Work in accordance with all applicable Legal Requirements, Tenant shall be responsible, at its sole cost and expense, for the performance of Legal Compliance Work: (a) pertaining to the interior elements of the Premises which are neither structural nor affect the major building systems serving the Premises; or (b) are required solely as a result of Tenant's specific manner of use and occupancy of the Premises (i.e., are not of general applicability to tenants and occupants of the Shopping Center). As used herein, *"Legal Compliance Work"* shall mean any obligation, addition, alteration, improvement, or rebuilding, structural or otherwise, to or of the Premises, the Shopping Center, or any part thereof, as applicable, which may be required by reason of any Legal Requirement.

25

ARTICLE 10.
INDEMNIFICATION, INSURANCE AND WAIVER OF SUBROGATION

Section 10.1 <u>Mutual Release, Waiver of Subrogation and Mutual Indemnification</u>.

10.1.1 <u>Mutual Waiver of Claims</u>. Landlord and Tenant, on their own behalf and on behalf of anyone claiming under or through either one by way of subrogation, hereby release and waive all rights of recovery and causes of action against each other from any and all liability for any loss or damage to property or resulting from damage to such property (and, in either case, any resulting loss of business or rental income), whether caused by the negligence or fault of the other party, which is normally insured under *"Special Form"* property and time element insurance required to be maintained hereunder. In the event either Landlord or Tenant is a self-insurer or maintains a deductible (as either may be permitted hereunder), then the self-insuring party or the party maintaining the deductible hereby releases the other party from any liability arising from any event which would have been covered had the required insurance been obtained and/or the deductible not been maintained.

10.1.2 <u>Waiver of Subrogation</u>. Landlord and Tenant shall cause each property insurance policy carried by either of them insuring the Premises, the contents thereof, or the Shopping Center, to provide that the insurer waives all rights of recovery by way of subrogation or otherwise against the other party hereto in connection with any loss or damage which is covered by such policy or that such policy shall otherwise permit, and shall not be voided by the releases provided above.

10.1.3 <u>Mutual Indemnification</u>.

(a)    Except as otherwise provided in Subsections 10.1.1 and 10.1.2 above, Tenant covenants to defend and indemnify Landlord and hold Landlord harmless from and against any and all claims, actions, damages, liability and expense, including reasonable attorneys' fees, (x) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon the Premises, or any part thereof, or (y) occasioned wholly or in part by any act or omission of Tenant, its agents, contractors, employees, servants, or licensees, <u>except</u> to the extent such claims, actions, damages, liability and expense are caused by the acts or omissions of Landlord, its agents, contractors, licensees, employees, or other tenants and occupants, or for which any of said parties may be statutorily liable.

(b)    Except as otherwise provided in Subsections 10.1.1 and 10.1.2 above, Landlord covenants to defend and indemnify Tenant and hold Tenant harmless from and against any and all claims, actions, damages, liability and expense, including reasonable attorneys' fees, (x) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon any portion(s) of the Common Area, or (y) occasioned wholly or in part by any act or omission of Landlord, its agents, contractors, employees, servants or licensees, except to the extent such claims, actions, damages, liability and expense are caused by the acts or omissions of Tenant, its agents, contractors, licensees or employees, or for which any of said parties may be statutorily liable.

Section 10.2 <u>Tenant's Insurance</u>.

10.2.1 <u>Tenant's Insurance</u>. Tenant, at its own cost and expense, shall maintain in full force and effect from and after the Delivery Date and throughout the Term: (i) commercial general liability insurance protecting and insuring Tenant, naming Landlord and Landlord's Mortgagee as "additional insureds" for claims arising out of the use or occupancy of the Premises by Tenant and the obligations assumed by Tenant under this Lease, and having a combined single limit of liability of not less than Five Million and 00/100 ($5,000,000.00) Dollars for bodily injury, death and property damage

26

liability; and (ii) standard *"Special Form"* property insurance, on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of all of Tenant's Property. Tenant may carry any of its insurance under "blanket policies" covering the Premises and other locations it or any Affiliate of Tenant owns or leases, provided that: (i) the amount of the total insurance available shall be at least the protection equivalent to separate policies in the amounts herein required, and (ii) in all other respects, any such policy or policies shall comply with the applicable provisions of this Article 10.

10.2.2 <u>Self-Insurance</u>. All insurance required to be maintained under this Section 10.2 may be provided under: (i) an individual policy covering this location; (ii) a blanket policy or policies which includes other liabilities, properties and locations of Tenant or its Affiliates; (iii) a plan of self-insurance meeting the requirements of the next paragraph; or (iv) a combination of any of the foregoing insurance programs. To the extent any deductible is permitted or allowed as a part of any insurance policy carried by Tenant in compliance with this Section 10.2, then Tenant shall be deemed to be covering the amount thereof under an informal plan of self-insurance; provided, however, that in no event shall any deductible exceed Two Hundred Fifty Thousand and 00/100 ($250,000.00) Dollars unless Tenant complies with the requirements regarding self-insurance pursuant to the next paragraph.

If Tenant has and maintains a net worth of at least One Hundred Million ($100,000,000.00) Dollars, increased at the same times and in the same proportions as increases in Fixed Rent, as evidenced by Tenant's current audited financial statements or other evidence satisfactory to Landlord, Tenant shall be permitted to self-insure against any of the risks for which insurance is required under the Lease for such portion of the minimum coverage limitation, if any, provided in Section 10.2 as may be established from time to time as its company-wide limit of self-insurance against such risk. To the extent that Tenant shall self-insure against any risk, Tenant shall maintain adequate reserves against claims, losses and liabilities arising from causes which would otherwise have been covered by insurance and shall reimburse, pay, indemnify and hold Landlord harmless, and defend Landlord against, all claims, liabilities, losses, damages, expenses and costs which would otherwise have been covered by insurance required herein. Concurrently with the delivery of the certificates of insurance required by Section 10.4.1, Tenant shall deliver to Landlord a certificate signed by an officer of Tenant (as an officer and not in their individual capacity) setting forth the amount of Tenant's self-insured retention or deductible respecting each risk or peril against which Tenant is required to insure hereunder. Tenant shall, within thirty (30) days after any change in the amount of its self-insured retention or deductible respecting any such risk or peril, deliver to Landlord a revised certificate setting forth the current amount of any self-insured retention or deductible.

Section 10.3   <u>Landlord's Insurance</u>.

10.3.1 <u>Liability Insurance</u>. Landlord shall maintain in full force and effect on and after the Effective Date and throughout the Term commercial general liability insurance with regard to the Common Areas protecting and insuring Landlord, naming Tenant as "additional insured-lessee", and having a combined single limit of liability of not less than Five Million and 00/100 ($5,000,000.00) Dollars for bodily injury, death and property damage liability. Landlord shall have the right to carry its insurance under "blanket policies" covering the Shopping Center and other properties provided that: (i) the amount of the total insurance available shall be at least the protection equivalent to separate policies in the amounts herein required, and (ii) in all other respects, any such policy or policies shall comply with the applicable provisions of this Article 10.

10.3.2 <u>"Special Form" Property Insurance</u>. Landlord shall procure and maintain, or cause to be procured and maintained, in full force and effect on and after the

27

Effective Date and throughout the Term standard *"Special Form"* property insurance (including loss of rents for a minimum period of one (1) year) and endorsements for coverages for flood, earthquake (at Landlord's option), windstorm, earth movement [sinkholes], demolition, increased cost of construction and contingent operation of building laws coverages, (but excluding Tenant's Work and other leasehold improvements performed by Tenant and Tenant's Property and excluding similar items from other tenant's premises), on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of all of the buildings (including the Premises) and other insurable improvements in the Shopping Center. The property insurance required to be maintained by Landlord pursuant to this Section shall not have deductibles exceeding One Hundred Thousand and 00/100 ($100,000.00) Dollars (which amount shall increase by the same percentage as the increase in Fixed Rent during the Term) without Tenant's prior consent.

10.3.3 Tenant's Pro Rata Share of Insurance Premiums. Tenant shall reimburse Landlord for Tenant's CAM Share of the insurance premiums attributable to the policies required to be maintained by Landlord pursuant to this Section 10.3 as part of Common Areas Charges, provided that for the purposes hereof Tenant's CAM Share shall be proportionately adjusted if such insurance is not carried by Landlord upon any other occupant's premises in the Shopping Center pursuant to an agreement between Landlord and such occupant that it shall carry its own insurance. Tenant shall not conduct any operation in the Premises (except for the Permitted Use in a lawful manner) which would cause suspension or cancellation of the *"Special Form"* property damage insurance carried by Landlord, or increase the premiums for any of the insurance policies which Landlord is required to carry hereunder. If Tenant should change its use of the Premises and thereby cause an increase above normal rates in the premium for the *"Special Form"* property damage insurance carried by Landlord, the amount of such increase shall be reimbursed to Landlord by Tenant upon demand and presentation by Landlord of written evidence of such increase and paid invoices therefor. If the rates for any insurance Landlord is required to carry hereunder are increased as a result of the use or other activity of any other occupant of the Shopping Center, the amount of such increase shall be excluded from Common Areas Charges. To the extent that Landlord receives a dividend, credit, rebate or other return of a premium which had previously been included in Common Areas Charges, Landlord shall promptly refund Tenant's CAM Share of such dividend, credit, rebate, or return to Tenant. Tenant's CAM Share of any insurance premium for any period during the Term which constitutes less than a full calendar year shall be equitably prorated. The provisions of this Subsection 10.3.3 shall survive the expiration or earlier termination of this Lease.

Section 10.4 General Insurance Requirements.

10.4.1 All insurance required to be maintained by the parties under this Lease shall be maintained with insurance companies qualified to do business in the State of Arizona, and rated at least A-/VIII by the most current Best's Key Rating Guide (or its equivalent, if such Guide ceases to be published). Each party shall use its diligent efforts to have its insurers provide thirty (30) days [ten (10) days in the event of non-payment of premium] prior notice to the other party of cancellation or non-renewal of any policy required hereunder. Each party shall provide to the other duly executed certificates evidencing the insurance coverage described in Sections 10.2.1(ii) and 10.3 above.

10.4.2 The liability insurance requirements under Sections 10.2 and 10.3 above shall be reviewed by Landlord and Tenant every five (5) years for the purpose of mutually increasing (in consultation with their respective insurance advisors) the minimum limits of such insurance to limits which shall be reasonable and customary for similar facilities of like size and operation in accordance with generally accepted insurance industry standards. The replacement value of the buildings and other insurable

28

improvements constituting the Shopping Center shall be re-evaluated from time to time at the request of either Landlord or Tenant.

ARTICLE 11.
FIRE AND OTHER CASUALTY; EMINENT DOMAIN

Section 11.1  Fire and Other Casualty.

(a)     Except as otherwise provided in this Section 11.1, if all or a portion of the Premises or the Common Areas, including all improvements thereto shall be damaged by fire or other casualty, Landlord shall promptly rebuild and restore the Premises and the Common Area to the condition existing immediately prior to such fire or other casualty (which restoration shall not include Tenant's Work, other leasehold improvements performed by Tenant, or any of Tenant's Property). To the extent that all or any portion of the proceeds from Landlord's insurance policies may be paid directly to Landlord, such proceeds shall be applied to the costs of restoration. In the event such insurance proceeds are insufficient to complete such work, Landlord shall provide the balance of the amount necessary to rebuild or restore the Shopping Center to the extent and in the manner provided in this Section 11.1. As a condition precedent to Landlord's obligation to rebuild and restore the Premises, Landlord may require that Tenant agree in writing that, upon completion of the rebuilding and restoration, Tenant will (i) restore and replace any and all damaged or destroyed portions of Tenant's Work and Tenant's Property in the Premises, (ii) reopen the Premises for business to the public within sixty (60) days after completion of Landlord's rebuilding and restoration, and (iii) operate its business in the Premises for at least one (1) year thereafter subject to the Excused Periods. Tenant shall have the right to require Landlord to make changes to the Premises in the course of such restoration (the **"Restoration Change Order"**), subject to Landlord's reasonable approval of such changes, although no change to the Premises location or footprint shall be permitted. If the net cost and expense of restoration of the Premises is increased by any Restoration Change Order made by Tenant, then Tenant shall pay Landlord, within thirty (30) days after demand therefor, the amount or amounts by which the net cost or expense of restoration of the Premises was thereby increased. In the case where Tenant has formally requested a Restoration Change Order, Landlord shall promptly give Tenant (i) a written description of the changes or additional details required by Landlord to process and/or approve each Restoration Change Order, (ii) a non-binding estimate of Tenant's net delay, if any, expected because of such Restoration Change Order, (iii) an itemized non-binding estimate of the net cost of implementing such Restoration Change Order, and (iv) a non-binding general description of any indirect costs that would be incurred or suffered by Landlord resulting directly from the Restoration Change Order. Each Restoration Change Order requested by Tenant shall be subject to the prior written approval of Landlord. In all cases, however, Landlord may withhold its approval in any case where the requested Restoration Change Order (x) would not be in compliance with then applicable Legal Requirements, (y) would not be compatible, in Landlord's reasonable judgment, with other improvements or restoration then being made to the Shopping Center or the utility systems servicing the Premises, or (z) involves a significant possibility of an unreasonable delay in the restoration of the Premises or Shopping Center. Following receipt of such description and estimates, Tenant shall promptly deliver to Landlord notice either granting or withholding Tenant's authorization to proceed with the performance of the work shown on the Restoration Change Order. If no such authorization is received by Landlord within five (5) business days thereafter, Tenant shall be deemed to have withheld authorization or performance of the Restoration Change Order, in which case, the Restoration Change Order shall not be implemented. Tenant shall bear all reasonable costs and expenses associated with any net increase in Landlord's cost to reconstruct the Premises over the cost to so reconstruct in the absence of the Restoration Change Order resulting from the Restoration Change Order, and, as long as the same was disclosed to Tenant as required herein, any costs and expenses related to any net delays in Landlord's completion of other improvements on or

29

about the Shopping Center resulting directly from the Restoration Change Order.  If Landlord is delayed in repairing or restoring the Premises or any portion of the Shopping Center as a result of any Restoration Change Order and the same was disclosed to Tenant pursuant to the requirements above, for purposes of rental payment obligations, the repair or restoration taken by Landlord shall be deemed to have been substantially completed, and the abatement of Fixed Rent permitted hereunder shall cease sixty (60) days after the date the restoration or repair would have been substantially completed without such delay.  Nothing in this Article 11 shall affect the rights of Tenant under Article 22 hereof.

(b)     If, in Tenant's reasonable judgment, any damage to the Premises renders all or any portion of the Premises unusable for the conduct of Tenant's business or, in the case of damage to the Shopping Center, materially interferes with the normal conduct of any business operations in the Premises, the Rent shall be equitably reduced or totally abated based upon the extent to which the remaining portion of the Premises may be utilized for its normal conduct of business.

11.1.2  In the event that:

(A)   Landlord does not commence the repair and restoration work to the Premises or the Common Areas as required pursuant to this Section 11.1 within one hundred twenty (120) days after the date of such destruction, or thereafter fails to diligently pursue the completion of such repair and restoration work (subject to such period as may be reasonably necessary for the adjustment of insurance proceeds, not to exceed thirty (30) days in the aggregate); or

(B)   the required repairs and restorations to the Premises or the Common Areas are not Substantially Completed by Landlord in accordance with the provisions of this Section 11.1 within one (1) year after the date of destruction (which period may be extended by reason of an event of *Force Majeure*, not to exceed ninety (90) days in the aggregate, provided that Landlord shall have given Tenant notice thereof promptly after its occurrence),

then, in either of such events, Tenant shall have the right, at its sole discretion and option, to:

(1)     in respect of partial damage to the Premises, after giving thirty (30) days' prior notice to Landlord (and Landlord's continued failure to commence and diligently pursue such repairs and restoration work to completion), perform or complete, as the case may be, said work (or any portion thereof) on Landlord's behalf and at the sole cost of Landlord, which cost Landlord shall pay to Tenant during the course of such repairs within ten (10) days after Tenant's delivery to Landlord of an invoice therefor; or

(2)     seek to obtain specific performance of Landlord's repair and restoration obligations pursuant to the laws of the state in which the Shopping Center is located; or

(3)     terminate this Lease by thirty (30) days' notice to Landlord but only if Landlord shall not have remedied the event giving rise to such termination on or before the expiration of the aforesaid thirty (30) day period.

In addition to the foregoing, if, in the opinion of an independent licensed architect designated by Tenant (and reasonably acceptable to Landlord), the required repairs and restorations to the Premises or the Common Areas cannot be completed by Landlord in accordance with the provisions of this Section 11.1 within one (1) year after the date of destruction, Tenant shall have the right, at its sole discretion and option, to terminate this Lease by giving Landlord at least thirty (30) days' notice thereof, given within thirty (30) days after such independent opinion is given.

30

11.1.3 If the Premises are substantially destroyed by fire or other casualty during the last two years of the Term to the extent of more than one-third (1/3) of the Floor Area thereof, Landlord or Tenant shall each have the right to terminate this Lease as of the date of such damage or destruction by giving notice within thirty (30) days following such damage or destruction, but Tenant may negate any termination by Landlord by agreeing to extend the Term for an additional five (5) year period by exercising an option pursuant to Subsection 2.2.2 hereof, if available, within ten (10) days after receipt of the termination notice from Landlord.

Section 11.2. Eminent Domain.

11.2.1 As used in this Section 11.2, *"Taking"* or *"Taken"* shall mean a taking for any public or quasi-public use by any lawful power or authority by exercise of the right of condemnation or eminent domain or by agreement between Landlord and those having the authority to exercise such right.

11.2.2 If all of the Premises shall be Taken, this Lease shall terminate as of the date of vesting of title or transfer of possession, whichever is earlier, without further liability on the part of either Landlord or Tenant, except for an adjustment between the parties for the Rent payable by Tenant hereunder and except for the matters, which under this Lease, survive its termination.

11.2.3 In the event that:

(a) any portion of the Premises shall be Taken so that it is commercially unreasonable or unfeasible for Tenant, in its reasonable judgment, to conduct its normal business in the Premises;

(b) as a consequence of any Taking: (i) portions of the Control Area shall be divided or separated in any manner that it materially interferes with parking, visibility, or access to the Premises from other portions of the Shopping Center, or (ii) the Shopping Center no longer has a signaled entrance from McDowell Road, and as a result, in either case, it is not commercially reasonable or feasible for Tenant, in its reasonable judgment, to conduct its normal business in the Premises;

(c) any portion of the Shopping Center shall be Taken which materially interferes with parking, visibility or access to the Premises, and as a result of such taking it is commercially unreasonable or unfeasible for Tenant, in its reasonable judgment, to conduct its normal business in the Premises;

(d) more than forty (40%) percent of the total Floor Area of all of the buildings in the Shopping Center (other than the Premises) are Taken; or

(e) if so many of the parking spaces in the Control Area are Taken such that there are fewer than four-hundred fifty (450) spaces therein or if so many of the parking spaces in the Shopping Center are Taken such that there are fewer than (i) four (4) parking spaces for every one thousand (1,000) square feet of Floor Area in the Shopping Center, or (ii) the number of parking spaces required by applicable Legal Requirements; then, in any of such events, Tenant shall have the right to terminate this Lease by giving at least sixty (60) days' prior notice to Landlord within sixty (60) days of any such event, in which event this Lease shall terminate without any further liability on the part of either Landlord or Tenant, except for an adjustment between the parties for the Rent payable by Tenant hereunder and for payment to Tenant for its share of the award for the taking pursuant to Subsection 11.2.5 below and except for the matters, which under this Lease, survive its termination. Upon any partial Taking of the Premises, the Rent shall be equitably reduced or totally abated based upon the extent to which the remaining portion of the Premises may, in Tenant's reasonable judgment, be utilized for its normal conduct of business.

31

11.2.4 If this Lease is not terminated pursuant to this Section 11.2, Landlord, at its sole cost and expense, within a reasonable period of time after such Taking, shall repair and restore the area not so Taken to tenantable condition, similar in physical appearance to the condition of the area immediately prior to the Taking, pursuant to plans and specifications approved by Tenant (which repair and restoration shall, include all leasehold improvements performed by Tenant; provided, however, that Landlord shall not be obligated to repair or restore Tenant's Property). During the period of such repairs and restoration, all Rent shall abate to the extent that the Premises may not, in Tenant's reasonable judgment, be used by Tenant for the normal conduct of its business. Such abatement shall terminate in accordance with the terms of Section 11.3 below.

If (i) all or any portion of the Floor Area of the Premises is Taken, and (ii) the estimated cost of repair and restoration with respect to the subject taking exceeds the condemnation proceeds awarded to Landlord with respect to the subject taking, then Landlord shall have the option to terminate this Lease by delivering written notice to Tenant at least sixty (60) days after the amount of the condemnation award is determined. Upon the date of termination, Tenant shall vacate and surrender the Premises to Landlord in accordance with Section 20.1 of this Lease as if such date of taking was originally set forth herein as the Expiration Date, whereafter neither party shall have any obligation to the other occurring thereafter under this Lease except for adjustments for any prepaid or unpaid Rent hereunder adjusted to the day of Taking and except for the matters, which under this Lease, survive its termination. If, however, Tenant delivers into escrow with an escrow holder mutually satisfactory to Landlord and Tenant (with all interest payable to Tenant when received or credited to the escrow account) within thirty (30) days after receipt of Landlord's notice of termination (which shall set forth the estimated cost of repair and restoration), such estimated cost of repair and restoration in excess of the condemnation award, Landlord's election to terminate this Lease shall be void. If Tenant so elects to void Landlord's election to terminate this Lease, upon Substantial Completion of the subject restoration, the escrow holder shall deliver to Landlord the amount delivered to it by Tenant.

As a condition precedent to Landlord's obligation to rebuild and restore the Premises, Landlord may require that Tenant agree in writing that, upon completion of the rebuilding and restoration, Tenant will (i) restore and replace any and all damaged or destroyed portions of Tenant's Property in the Premises, (ii) reopen the Premises for business to the public within the period described in Section 11.3(b) hereof, and (iii) operate its business in the Premises for at least one (1) year thereafter.

11.2.5 In connection with any Taking or partial Taking of the Premises, Tenant shall be entitled to claim an award for loss of business, fixtures and equipment and removal and reinstallation costs; provided, however, that no award shall be payable to Tenant which reduces the award payable to Landlord for its fee interest in the Premises.

11.2.6 Any dispute between the parties with respect to this Section 11.2 shall be resolved by arbitration in accordance with the provisions of Section 16.3 below.

Section 11.3 Abatement of Rent Charges. Notwithstanding any other provisions of this Lease, if the Fixed Rent and Additional Rent payable by Tenant hereunder shall be abated pursuant to Sections 11.1 or 11.2 above, such abatement shall terminate upon the first to occur of: (a) the date on which Tenant shall reopen the Premises to the general public for business; or (b) the expiration of the period which is sixty (60) days after Landlord shall have completed such repairs and restoration work as Landlord is obligated to perform hereunder and the interference with the operation of business in the Premises has ceased.

32

ARTICLE 12.
COVENANTS, REPRESENTATIONS AND WARRANTIES

Section 12.1 Quiet Enjoyment. Provided Tenant is not in default of its obligations under this Lease beyond the expiration of any applicable notice and grace periods for the curing of such default, Tenant shall peaceably and quietly have, hold, occupy and enjoy the Premises for the Term, without hindrance from Landlord or any party claiming by, through, or under Landlord, subject only to the encumbrances listed on Exhibit E. Whether or not reference to the REA is made in any provision of this Lease, all provisions of, and all of Tenant's rights under, this Lease are subject to, all encumbrances listed on Exhibit E, including, without limitation, the REA and Tenant is leasing the Premises subject thereto, provided that the foregoing is subject to Section 5.2.8(a) hereof.

Section 12.2 Authority. Tenant and Landlord each warrant and represent that the person(s) signing this Lease on their behalf has authority to enter into this Lease and to bind Tenant and Landlord, respectively, to the terms, covenants and conditions contained herein. The submission of this Lease to each party hereto shall be for examination and negotiation purposes only, and does not and shall not constitute a reservation of or an obligation of Tenant to lease, or otherwise create any interest of Tenant in, the Premises or any other premises situated in the Shopping Center unless and until the Lease is fully executed and delivered by Tenant and Landlord.

Section 12.3 Landlord's Covenants, Warranties and Representations.

12.3.1 To induce Tenant to execute this Lease, and in consideration thereof, Landlord covenants, warrants and represents to Tenant as follows:

(a)     As of the Effective Date, Landlord has, and as of the Delivery Date Landlord shall have, good and marketable fee simple title to the Shopping Center (provided, however, that Tenant acknowledges that after the Effective Date and before the Delivery Date, Landlord may sell fee title to some or all of the outparcels, subject however to the restrictions granted to Tenant in this Lease), free and clear of all easements, restrictions, liens, encumbrances, leases and the like, except for the encumbrances described on Exhibit E hereto and prior to the Effective Date Costco and Harkin's Theater each acquired title to the Costco Block and the Harkin's Block, respectively;

(b)     In the event the legal description of the Shopping Center described in Exhibit A hereto indicates that the Shopping Center is composed of more than one parcel or lot, Landlord represents that, as of the Effective Date, except as shown on Exhibit B, there exist no strips or gores between such parcels or lots which are not owned by Landlord;

(c)     Except as provided in the REA, as of the Effective Date, no third party consents or approvals are required in order for Landlord to enter into this Lease, for the performance of Landlord's Work and Tenant's Work (excluding, as of the Effective Date, governmental permits and approvals), or for the location of the Trash Compactor Area and Trash Container Area. To the extent that any such consents or approvals are required under the REA, Landlord hereby represents that the same have been obtained;

(d)     Tenant's use of the Premises for sale of Permitted Items (defined in Section 1.1.24 above) will not violate any exclusive provision or prohibited use restriction granted to any other tenant or occupant in the Shopping Center;

33

(e)    The Shopping Center, on the Delivery Date, shall have access to 99th Avenue, McDowell Road and 103rd Avenue for the purpose of vehicular traffic as shown on Exhibit B;

(f)    As of the Effective Date, this Lease does not violate the provisions of any instrument heretofore executed and/or binding on Landlord, or affecting or encumbering the Shopping Center, or the Premises, and, except as set forth in Exhibit K-1, no rights granted by Landlord to Tenant under the terms of this Lease will be limited by any rights granted by Landlord to any other tenant or occupant in the Shopping Center, except as otherwise expressly provided in this Lease;

(g)    There shall be no restrictions or other legal impediments imposed by any public or private instrument which would prevent: (i) the use of the Premises for the Permitted Use; (ii) the use of the parking facilities, access roads, and other Common Areas in the manner contemplated by this Lease, or (iii) the performance of Tenant's Work ;

(h)    As of the Effective Date, except as provided in Section 7.1 hereof, to the best of Landlord's actual knowledge, there are no sign ordinances, restrictive covenants, uniform sign plans or other signage restrictions which would prevent the Premises from having the signage (including, without limitation, the square foot area and size of letters) as depicted on Exhibit D-1 and Exhibit F hereof.

(i)    Attached hereto as Exhibit K-2 is a complete list of all fully executed and delivered leases in effect on the Effective Date with respect to the Shopping Center (the *"Existing Leases"*);

12.3.2 Landlord shall promptly forward to Tenant any notice or other communication received by Landlord from any owner of property adjoining or adjacent to the Shopping Center or from any municipal or other governmental authority, in connection with any hearing or other administrative proceeding relating to any proposed zoning, building code, signage, or related variance affecting the Shopping Center or any adjoining or adjacent property, which, if granted, could adversely affect Tenant's use or occupancy of the Premises, the conduct of Tenant's business therein, or Tenant's rights and benefits under this Lease. Landlord, at its sole cost and expense, shall appear in such proceeding and shall contest such proposed variance. If Landlord fails so to appear and contest such proposed variance after receiving five (5) days' notice from Tenant (or such shorter notice as may be practicable under the circumstances), then Tenant shall be entitled (but shall not be obligated to), in its own name and/or in the name of Landlord, appear in such proceeding, in which event Landlord shall fully cooperate with Tenant, provide such information, and execute any documents or other instruments as Tenant may reasonably request in connection with any such proceeding.

Section 12.4 Environmental Matters.

12.4.1 Definitions.

(a)    As used herein, the term *"Environmental Laws"* shall mean any and all Legal Requirements concerning the protection of the environment, human health or safety.

(b)    As used herein, the term *"Hazardous Substances"* shall mean each and every element, compound, material, mixture, substance, waste, hazardous substance, hazardous waste, hazardous material, toxic substance, pollutant or contaminant either as those terms are defined in any of the Environmental Laws or the presence of which may cause liability at common law, including, without limitation, asbestos and/or asbestos containing products, whether or not currently friable.

34

(c)    As used herein, the term *"Environmental Notice"* shall mean a summons, citation, directive, order, claim, notice, litigation, investigation, judgment, legal pleading, letter or other communication, written or oral, actual or threatened, from the United States Environmental Protection Agency or other federal, state or local governmental agency or authority, or any other private individual or entity concerning (i) any Hazardous Substances at, on, in, under or emanating from the Premises, the Shopping Center or any contiguous property; (ii) any violation or potential violation of Environmental Laws at the Premises, the Shopping Center or any contiguous property; or (iii) any underground storage tanks on the Premises or the Shopping Center.

(d)    As used herein, the term *"Releasing"* or *"Release"* shall mean releasing, spilling, leaking, discharging, disposing or dumping or otherwise introducing any substance into the environment or into any building or other improvements in violation of Environmental Laws.

(e)    As used herein, the term *"Compliance Costs"* shall mean any and all costs incurred by a party in complying with applicable Environmental Laws, including, without limitation: consultant's and engineer's fees; laboratory costs; contractor's and subcontractor's fees; application and filing fees; costs of investigation, monitoring or cleanup of soil or other substrate, surface water, groundwater, or buildings or other improvements; equipment costs; disposal fees; costs of operation and maintenance of equipment; legal fees; other governmental fees or costs; interest at the Lease Interest Rate from the date of expenditure until paid in full; and other similar or related costs.

(f)    As used herein, the term *"Tenant Related Parties"* shall mean Tenant's agents, servants, employees, contractors or licensees.

12.4.2 Compliance with Environmental Laws.  Tenant shall comply with all applicable requirements of Environmental Laws governing its occupancy and use of, and operations at, the Shopping Center and the Premises.  Landlord shall comply with all applicable requirements of Environmental Laws relating to the Shopping Center and the Premises, except to the extent such requirements arise from Tenant's use and occupancy of the Premises, and operations thereon.

12.4.3 Responsibility for Releases of Hazardous Substances. Notwithstanding any other provision of this Lease, Tenant shall only be liable to remedy any Release of Hazardous Substances at, on, in, under or emanating from the Premises or Shopping Center which were caused by Tenant or Tenant Related Parties (hereinafter *"Tenant Releases"*), including, without limitation, any Compliance Costs required to address Tenant Releases.  Landlord shall be liable to remedy any Release of Hazardous Substances at, on, in, under or emanating from the Premises or Shopping Center, including, without limitation, any Compliance Costs attributable to such Hazardous Substances, unless the Hazardous Substances are caused by Tenant Releases.  Except in the event of an emergency or as may be required by law, any work performed by Landlord relating to Hazardous Substances shall be performed by Landlord at any time other than during the months of August (in respect of the Control Area only), November and December, and shall be undertaken in such a manner so as to (i) not adversely affect ingress to or egress from the Shopping Center, (ii) have no adverse effect on the visibility of the Premises or any signs which contain Tenant's name, and (iii) not otherwise materially interfere with the normal conduct of any business operations in the Premises.

12.4.4 Standards.  Except as expressly provided herein, the parties agree that any investigation or remediation of Hazardous Substances, or cure of a violation of Environmental Laws, required to be conducted at the Premises or Shopping Center shall be no more stringent than necessary to meet the minimum standards of Environmental Laws applicable to properties used in the manner the Shopping Center is being used.

35

12.4.5 <u>Landlord's Representations and Warranties</u>. Landlord represents and warrants, as of the Effective Date, that: (i) Landlord has received no Environmental Notices concerning the Shopping Center, the Premises or any contiguous properties; (ii) Landlord has no actual knowledge of, and has received no actual notice of, any violation, or potential or alleged violation, of any Environmental Laws affecting the Shopping Center, the Premises or any contiguous properties, regardless of whether same has been cured; and (iii) to the best of Landlord's actual knowledge: (A) no Hazardous Substances requiring, as of the Effective Date, under then existing Legal Requirements, remediation, are located at, on, in, under or emanating from the Shopping Center, the Premises or any contiguous properties; and (B) no underground storage tank exists at the Shopping Center or the Premises.

12.4.6 <u>Documents</u>. Each party shall immediately notify the other party of the notifying party's receipt of an Environmental Notice.

12.4.7 <u>Indemnity</u>. Each party to this Lease shall indemnify, defend and hold the other party, and its agents, servants, shareholders, directors, officers and employees harmless from any and all claims, losses, expenses, costs, lawsuits, actions, administrative proceedings, damage, orders, judgments, penalties and liabilities of any nature whatsoever, including, without limitation, reasonable attorneys' fees (incurred to enforce this indemnity or for any other purpose) and Compliance Costs, arising from (i) the indemnifying party's breach of any of its representations, warranties, covenants or other obligations under this Section 12.4; (ii) Hazardous Substances brought on the Premises or the Shopping Center by the indemnifying party; or (iii) violations of Environmental Laws by the indemnifying party.

12.4.8 <u>Survival</u>. The obligations of the parties under this Section 12.4 shall survive the renewal, expiration, breach or earlier termination of this Lease.

12.4.9 <u>Conflict</u>. In the event of any conflict between the provisions of this Section 12.4 and any other provision of this Lease, the provisions of this Section 12.4 shall control.

12.4.10 <u>Tenant's Representations and Warranties</u>. To induce Landlord to execute this Lease, and in consideration thereof, Tenant warrants and represents to Landlord as follows: Tenant shall not cause or permit any Hazardous Substance to be generated, produced, brought upon, used, stored, treated, discharged, released, spilled or disposed of on, in, under or about the Premises or other portions of the Shopping Center, except de minimis quantities of cleaning materials used only for maintenance purposes and except as is used in any occupant's retail business.

Section 12.5 <u>REA</u>.

12.5.1 As used in this Lease, the term *"REA"* shall mean that certain Construction Operation and Reciprocal Easement Agreement, by and among Landlord, Harkins Phoenix Cinemas, L.L.C., an Arizona limited liability company, and Costco Wholesale Corporation, a Washington corporation, recorded on November 5, 2001, in the Recorder's Office of Maricopa County, State of Arizona (the *"Clerk's Office"*) as instrument no. 2001-1034470, as amended.

12.5.2 Landlord covenants, represents and warrants to Tenant that: (i) the REA has not been modified, amended or terminated; (ii) the REA is currently in full force and effect; (iii) to its actual knowledge as of the date hereof, no default under the REA exists thereunder beyond any applicable notice and cure period; and (iv) the REA is, and shall remain, superior in lien to all mortgages and related liens affecting the Shopping Center. Landlord and Tenant each acknowledge that this Lease is made and shall continue to be subject and subordinate to the REA, subject to the provisions of this Section 12.5. Tenant shall comply with the terms and conditions of the REA to the extent

36

same affects the Premises (it being agreed that Tenant shall not be obligated to expend any sums in connection with such compliance, unless such sums are payable in accordance with this Lease or results from Tenant's breach of the REA).

12.5.3 Landlord shall, during the Term: (i) perform and observe all of the terms, covenants, provisions and conditions of the REA on Landlord's part to be performed and observed; (ii) defend, indemnify and hold harmless Tenant from and against any and all claims, demands, causes of action, suits, damages, liabilities, and expenses of any nature arising out of or in connection with the enforcement of, or a claimed breach by, Landlord of any covenant, term, condition, or provision of the REA unless resulting from Tenant's acts or omissions; and (iii) diligently enforce, at its sole expense, the covenants, agreements, and obligations of the REA.

12.5.4 Whenever, pursuant to the REA, the consent or approval of Landlord shall be required by or requested, and such consent or approval could materially diminish the rights or materially increase the obligations of Tenant thereunder or under this Lease, or could materially adversely affect Tenant's use or occupancy of the Premises, or the conduct of Tenant's business therein, such consent or approval shall not be granted without the prior consent of Tenant, which consent may be withheld in its sole and absolute discretion, unless the failure to so grant would constitute a default under the REA.

12.5.5 Landlord shall, immediately upon receipt, forward to Tenant and Tenant's leasehold mortgagee, if any, a copy of any and all notices and/or demands received by Landlord under or pursuant to the REA, which relate to, or could adversely affect, Tenant's use or occupancy of the Premises, the conduct of Tenant's business therein, or Tenant's rights pursuant to this Lease.

12.5.6 Landlord shall not amend, or modify the REA if such amendment or modification could materially diminish the rights or materially increase the obligations of Tenant thereunder or under this Lease, or could materially adversely affect Tenant's use or occupancy of the Premises or the conduct of Tenant's business therein, nor shall Landlord terminate the REA, unless the failure to so grant would constitute a default under the REA.

12.5.7 As between Landlord and Tenant, in the event of any conflict between the REA and this Lease shall in all respects control, unless the conflict would grant Tenant a right, or would require Landlord to take an action, or fail to take an action, which would constitute a default under the REA.

ARTICLE 13.
USES AND RESTRICTIONS

Section 13.1  Permitted and Prohibited Uses.

13.1.1 Tenant's Permitted Use.  The Premises may be used and occupied for the Permitted Use (defined in Subsection 1.1.24 above). Tenant shall not use the Premises for any of the *"Prohibited Uses"* (defined in Exhibit M hereto) or the *"Existing Exclusives"* (hereinafter defined in Subsection 13.3.1), to the extent then applicable. Tenant shall use commercially reasonable efforts to cause occupants in the Premises to conduct their activities in such a manner as not to constitute a nuisance or create unreasonable interference with other Shopping Center and Other Tracts occupants, their customers and business invitees.

13.1.2 Prohibited Uses.  Landlord shall construct, lease, operate, maintain and manage the Shopping Center as a shopping center comparable to similar shopping centers in the State of Arizona.  Landlord shall not lease, rent or occupy or permit any portion of the Shopping Center or on either of the Other Tracts to the extent that either or

37

both of the Other Tracts are now or hereafter owned or controlled by Landlord or its Affiliate(s) (the Other Tracts, from the date that Landlord or its Affiliate(s) has any ownership interest therein of control thereof being hereinafter referred to as the "Related Land"), to be occupied (except to the extent otherwise permitted under any lease for space in the Shopping Center existing as of the Effective Date or for space on the Related Land as of the date the Other Tract became Related Land hereunder) for any of the *"Prohibited Uses"* (defined in Exhibit M hereto annexed), provided, however, that the foregoing provisions of this Subsection 13.1.2 shall not apply to any business existing on any Related Land owned or controlled by a person or entity which: (i) was previously, but is no longer, the Landlord hereunder, or (ii) already owned or controlled such Related Land at the time it became Landlord hereunder (excluding, however, the Landlord originally named herein and its Affiliates), excluding any Mortgagee of Landlord's interest in the Shopping Center.

Section 13.2  Tenant's Exclusive in Center.  To induce Tenant to execute this Lease, and subject to all of the terms and provisions of this Section 13.2, Landlord covenants and agrees as follows.

13.2.1 Landlord shall not lease, rent or occupy or permit any other premises in the Shopping Center or on any Related Land (defined in Subsection 13.1.2 above) (except to the extent otherwise permitted under any lease for space on the Related Land as of the date the Other Tract became Related Land hereunder) to be occupied, whether by a tenant, sublessee, assignee, licensee or other occupant or itself, for the sale, rental or distribution, either singly or in any combination, of items contained in any of the following respective categories of merchandise: (a) linens and domestics; (b) bathroom items (excluding plumbing hardware); (c) housewares (including, but not limited to, kitchen utensils, kitchen appliances and kitchen "gadgets," cleaning appliances and supplies, cookware, bakeware, dishes and china, glassware, garbage pails, ironing boards and other laundry items, mops and brooms, candles and candle holders, ready-to-assemble furniture and artificial flowers but excluding any furniture, and major appliances or "white goods"); (d) frames and wall art (provided that (i) a custom framing store comprising not more than 2,500 square feet of Floor Area shall be permitted, and (ii) a fine art gallery shall not be precluded); (e) window treatments (provided that a custom blind store than does not sell window treatments comprising no more than 3,000 square feet of Floor Area shall be permitted); and/or (f) closet, shelving and storage items (which items, either singly or in any combination, are hereinafter referred to as the *"Exclusive Items"*). Notwithstanding the foregoing, any tenant, occupant or subtenant in the Shopping Center or the Related Land shall have the right to utilize its respective premises for the sale, rental and/or distribution of Exclusive Items within an aggregate area (which shall include an allocable portion of the aisle space adjacent to such sales, rental and/or distribution area) not to exceed (x) for premises comprising less than five thousand (5,000) square feet, seven and one-half percent of the Floor Area of such tenant's or subtenant's premises, or (y) for premises comprising five thousand (5,000) square feet of Floor Area or more, the lesser of (x) five (5%) percent of the Floor Area of such tenant's, occupant's or subtenant's premises, or (y) two thousand (2,000) square feet of Floor Area within such tenant's, occupant's or subtenant's premises. For example only, a tenant occupying premises containing a total of five thousand (5,000) square feet of Floor Area could sell Exclusive Items (either singly or in any combination) so long as the aggregate area within its entire demised premises in which any and all Exclusive Items are sold shall not exceed two hundred fifty (250) square feet. This Section 13.2.1 shall not apply to the sale, rental or distribution of the Exclusive Items on Related Land owned or controlled by a person or entity which: (i) was previously, but is no longer, the Landlord hereunder, or (ii) already owned or controlled such Related Land at the time it became Landlord hereunder (excluding, however, the Landlord originally named herein and its Affiliates), excluding any Mortgagee of Landlord's interest in the Shopping Center.

38

13.2.2 The restrictions set forth in Subsection 13.2.1 above shall not apply to (i) a full-line national or regional department store [for example, Wal-Mart, Macy's, or Target], (ii) a full-line national or regional discount club [for example, Costco, BJ's Wholesale Club, or Sam's Club], (iii) a full-line national or regional home improvement center [for example Home Depot or Lowe's], commonly located in shopping centers in the state in which the Shopping Center is located similar to the Shopping Center, each occupying at least 80,000 square feet of Floor Area within the Shopping Center, as such stores are currently operated (as of the Effective Date), or (iv) to any building on the Other Tracts, unless such Other Tract or Tracts become Related Land for the purposes of this Article 13 as set forth above. Tenant hereby agrees at the request of Landlord to enter into Tenant's standard letter agreement modifying the restrictions set forth in Subsection 13.2.1 hereof with Borders, Micheals Stores, JoAnn Fabrics, TJ Maxx and Marshalls (but not Mega Marshalls, Homegoods, or Maxx & More), and one of either Pier 1 or Cost Plus in the forms attached hereto as Exhibit P, and (b) Circuit City in the form attached hereto as Exhibit P.

13.2.3 The exclusive rights granted to Tenant with respect to any respective category listed in Subsection 13.2.1 above shall be conditioned upon Tenant using portions of the Premises for the sale, rental or distribution of items contained in such category (other than during "Excused Periods" [defined in Section 1.1.9 above] and for periods of time not exceeding six (6) consecutive months). The exclusive rights granted to Tenant in this Section 13.2 shall inure to the benefit of any assignee of Tenant's interest in this Lease and to any sublessee of at least fifteen thousand square feet of Floor Area within the Premises for the sale of the Exclusive Items.

13.2.4 (a)    Upon breach of the aforesaid covenant and agreement by Landlord (which breach shall not include a situation in which the lease between Landlord and any tenant in the Shopping Center or in the Related Land prohibits the tenant therein from violating the exclusive rights granted to Tenant in this Section 13.2 and, despite such prohibition, such tenant violates such exclusive rights unless Landlord fails to comply with any of the provisions of subparagraph (b) below), the Rent payable hereunder shall be reduced by fifty (50%) percent for so long as such violation shall continue, and Tenant shall have all remedies given to it at law and in equity, including, without limitation, the right to obtain injunctive relief, and/or to commence and prosecute an action against Landlord or any other violator for damages. In the event, however, that any such breach is caused by an overt act or omission on the part of Landlord, in addition to its obligation to cure such breach, Landlord shall be liable for all damages incurred by Tenant arising out of Landlord's breach from the date of Tenant's notice to Landlord of the occurrence of the breach. If Rent shall have been reduced hereunder for 12 consecutive months, within thirty (30) days after the last day of such twelfth (12th) month, Tenant may, upon written notice to Landlord, terminate this Lease. If Tenant shall not timely give such termination notice, beginning on the first (1st) day after the last day of such twelfth (12th) month, the reduction shall thereafter end.

(b)    If any person or entity other than Landlord shall violate any of the exclusive provisions herein set forth, or shall indicate in writing to Landlord that it intends to violate any of said provisions, Landlord shall promptly commence appropriate legal proceedings, and vigorously prosecute the same, to enjoin and prohibit any such violation. If Landlord fails to promptly commence such proceedings, or shall fail thereafter to vigorously prosecute the same, then Tenant shall have the right (a) to conduct and prosecute such legal proceedings (including, without limitation, an action for injunctive relief) in its own name, at Landlord's expense, or (b) in the event the right set forth in (a) above is not permitted to be exercised under applicable Legal Requirements, to conduct and prosecute such legal proceedings in the name of Landlord, at Landlord's expense, and Landlord shall cooperate with Tenant with respect to such prosecution (including, without limitation, by executing any documentation or authorization reasonably required by Tenant in connection with such prosecution and by appearing at any hearing or trial with respect to such prosecution).

39

Section 13.3  Exclusives Which Tenant Must Honor.

13.3.1 Tenant shall honor certain exclusives granted by Landlord to certain other tenants in the Shopping Center pursuant to the terms of leases which have been executed prior to the Effective Date (hereinafter, *"Existing Exclusives"*) [a true and complete listing and description of such Existing Exclusives being attached hereto as Exhibit K-1], and shall not sublease, occupy or use all or any portion of the Premises, or permit all or any portion of the Premises to be occupied or used in violation of any such Existing Exclusive (except as may be specifically set forth on Exhibit K-1).  Landlord represents and warrants that no Existing Exclusive(s) exist other than those listed on Exhibit K-1 hereto and that Exhibit K-1 is true accurate and complete, and covenants to indemnify, defend and hold Tenant harmless from and against all loss, cost, liability or expense (including, without limitation, reasonable legal fees) incurred by Tenant by reason of the enforcement by any person or entity of such unlisted Existing Exclusive. Notwithstanding the foregoing, Tenant shall be entitled to enter into a separate agreement with any tenant or other occupant for whose benefit the existing Exclusive is granted which nullifies or modifies the corresponding Existing Exclusive with regard to the Premises.

13.3.2 Tenant shall honor certain exclusives granted by Landlord to certain other tenants in the Shopping Center pursuant to the terms of leases which are executed from and after the Effective Date (hereinafter, *"Future Exclusives"*), and shall not sublease, occupy or use the Premises (or, in the event of a sublease, any applicable portion of the Premises), or permit the Premises (or, in the event of a sublease, any applicable portion of the Premises) to be leased, occupied or used, whether by Tenant or any sublessee, assignee, licensee or other occupant, in violation of any such Future Exclusive; provided, and on the condition that:

(a)     The Future Exclusive shall bind Tenant only to the extent that it restricts Tenant from operating primarily for the same primary use as that engaged in by the beneficiary of the Future Exclusive (*e.g.*, primarily as a bookstore, an office supplies store, a sporting goods store, a toy store, *etc.*);

(b)     Landlord shall notify Tenant of the granting of such Future Exclusive within ten (10) business days after the execution of a lease containing such Future Exclusive, and, at the time Tenant receives such notice, (i) Tenant shall not have previously entered into an assignment of this Lease or a sublease of the Premises (or any portion thereof) which specifically permits a primary use which would violate such Future Exclusive; or (ii) neither Tenant nor any assignee of this Lease or subtenant of the Premises (or any portion thereof) shall then be engaged in a primary use which would violate such Future Exclusive, provided that for the period from the Effective date and expiring one (1) year after the Effective Date Tenant agrees not to use the Premises for the same primary use as the typical primary use of Borders, Circuit City, Michael's Stores, Jo Ann Fabrics or Petco;

(c)     the premises occupied by the tenant benefiting from such Future Exclusive shall contain at least twenty thousand (20,000) square feet of Floor Area, provided that a Petco in at least fourteen thousand (14,000) square feet of Floor Area shall be deemed to satisfy this requirement;

(d)     such Future Exclusive shall not relate to the sale, rental or distribution of men's, women's, and/or children's apparel or footwear (unless such Future Exclusive relates to specialized apparel, such as, for example, maternity apparel only, formalwear only, larger-sized apparel only, or uniforms only);

(e)     Landlord and the tenant or occupant benefiting from the Future Exclusive shall have entered into a lease or other occupancy agreement for its premises within one (1) year after the Effective Date;

40

(f)      the beneficiary of the Future Exclusive shall be a national or regional tenant of the Shopping Center; and

(g)      no Future Exclusive shall be granted for the sale of any or all of the Exclusive Items.

13.3.3 Except as expressly set forth in this Section 13.3, Tenant shall not be obligated to honor any exclusive granted by Landlord to any tenant in the Shopping Center.

ARTICLE 14.
CONDUCT OF BUSINESS OPERATIONS

Subject to the other provisions of this Lease (including, without limitation, Article 3 hereof) Tenant shall initially open a Bed Bath & Beyond store for business to the public in substantially all of the Premises for at least one (1) day, not later than the one hundred eightieth (180th) day after the Rent Commencement Date (which date shall, as applicable, be extended by reason of (A) damage or destruction, eminent domain proceedings or actions, or Force Majeure, or (B) the acts or omissions of Landlord). Other than as expressly set forth in the preceding sentence, Tenant shall have no obligation to open or operate any business in the Premises, and shall have the right, at any time, to cease to conduct any business operations in the Premises, and Tenant shall incur no liability to Landlord or its Mortgagee by reason thereof (it being understood and agreed that all of Tenant's obligations under this Lease shall continue unless this Lease is terminated pursuant, inter alia, to the further provisions of this Article 14 or any other provision of this Lease [other than by reason of an Event of Default]). In the event that Tenant shall elect not to operate or cause to be operated any retail business in the Premises (other than prior to the Delivery Date or during Excused Periods) it shall give Landlord notice in writing of such discontinuance at least ninety (90) days prior to the date on which Tenant proposes to discontinue its operations (hereinafter called the *"Closing Date"*). In such event Landlord shall have the option, to be exercised by written notice to Tenant given at any time after the date on which Landlord receives Tenant's notice, to cancel and terminate this Lease, in which event, this Lease shall terminate (the *"Recapture Date"*) upon the date which is thirty (30) days after the later to occur of (a) the date on which Landlord gives Tenant a termination notice; or (b) the Closing Date, as if such date was originally set forth herein as the expiration date of the Term. Upon such termination, Landlord and Tenant shall each be released from any and all liabilities thereafter accruing hereunder, except as set forth in Section 23.8 below. All Rent payable by Tenant hereunder shall be apportioned as of the Recapture Date and Tenant shall promptly pay to Landlord any amounts so determined to be due and owing by Tenant to Landlord, and conversely Landlord shall promptly reimburse Tenant for any amounts prepaid by Tenant for periods subsequent to the Recapture Date.

ARTICLE 15.

TENANT ASSIGNMENT AND SUBLETTING

Section 15.1  Assignment and Subletting.

15.1.1 (a)      Tenant shall have the right from time to time, without the consent of Landlord, to(i) sublet to not more than three (3) subtenants at any one time, each of which shall sublease not less than eight thousand (8,000) square feet of Floor Area in the Premises, (ii) concession, or (iii) license, a portion or portions of the Premises, but not more than an aggregate of fifty (50%) percent of the Floor Area of the Premises; provided, however, that (A) any space so occupied by a concessionaire or licensee shall not be partitioned in any manner from the other portions of the Premises occupied and used by Tenant, and (B) any such concessionaires or licensees shall have no separate exterior identification (by way of signs, logos or other means) or entrance from

41

the business of Tenant. Any assignment or subletting shall not be for a use prohibited to Tenant by Article 13 hereof.

(b)      Except as set forth in Subsection (c) and Section 15.3, below, in the event Tenant proposes to assign this Lease or sublet the whole of the Premises in a single transaction, it shall first give notice thereof (hereinafter called the *"Assignment/Subletting Notice"*) to Landlord, which notice shall specify (i) the name and address of the proposed assignee or sublessee, (ii) the entire terms of the proposed assignment or subletting, (iii) a description of the business to be conducted in the Premises by the proposed assignee or sublessee, which shall not be a violation of Article 13, above and (iv) the retail business experience of the proposed assignee or sublessee. Within thirty (30) days after receipt of an Assignment/Subletting Notice from Tenant, Landlord may elect by notice (hereinafter called the *"Termination Notice"*) in writing to Tenant to terminate this Lease and recapture the Premises, in which event this Lease shall automatically terminate on the ninetieth (90th) day (hereinafter called the *"Termination Date"*) following Tenant's receipt of the Termination Notice with the same force and effect as if said Termination Date had been designated as the expiration date of this Lease and Landlord and Tenant shall upon such Termination Date be released from any and all liabilities thereafter accruing hereunder. All Rent payable by Tenant hereunder shall be apportioned as of the Termination Date, and Tenant shall promptly pay to Landlord any amounts so determined to be due and owing by Tenant to Landlord. Conversely, Landlord shall promptly reimburse Tenant for any amounts prepaid by Tenant for periods subsequent to the Termination Date. Notwithstanding any Termination Notice given to Tenant by Landlord within the aforesaid thirty (30) day period, Tenant shall have the right, within ten (10) days thereafter, to give Landlord notice (hereinafter called the *"Rescision Notice"*) of its rescision of the Assignment/Subletting Notice and, upon the receipt of the Rescision Notice, the Termination Notice previously given by Landlord shall be deemed null and void and Tenant shall not assign this Lease or sublet the whole of the Premises as proposed in its Assignment/Subletting Notice. If Landlord does not exercise its right of termination within the aforesaid thirty (30) day period, Landlord shall conclusively be deemed to have consented to the proposed assignment or subletting, as the case may be, and Tenant may assign this Lease or sublet the entire Premises pursuant to its Assignment/Subletting Notice.

(c)      Notwithstanding anything contained herein to the contrary, Tenant shall have the unrestricted right, from time to time without the consent of Landlord, to: (i) assign and/or sublet the whole of the Premises to any Affiliate, (ii) assign this Lease to any company which purchases all or substantially all of the assets of Tenant; (iii) assign this Lease to any company which purchases Tenant's interest in the Premises in a transaction involving the sale of either six (6) stores (including the Premises) or all of the stores operated by Tenant or its parent company in the State of Arizona, whichever is the greater; and/or (iv) assign this Lease in conjunction with any merger, consolidation or public offering of stock involving Tenant and its Affiliate, notice of which shall be given to Landlord not later than thirty (30) days after the effective date of the transaction.

(d)      All assignees and sublessees shall be permitted to use the Premises (or the applicable portion thereof) for any lawful retail purpose not specifically prohibited or limited by the provisions of this Lease.

(e)      A sublessee shall have the right to assign its sublease or sublet the Premises subject to the same limitations as imposed upon the Tenant hereunder.

(f)      Tenant shall not have the right to assign this Lease or sublet all or any part of the Premises if, at the time it gives Landlord an Assignment/Subletting

42

Notice, Tenant is in default under this Lease beyond all applicable notice and cure periods provided herein for the curing of such default.

Section 15.2 Liability of Tenant. No assignment, subletting, licensing or concessioning by Tenant, including a collateral assignment under Section 15.3 hereof, shall reduce, diminish, or otherwise affect the liability of Tenant hereunder.

Section 15.3 Collateral Assignment. In addition to Tenant's other rights set forth in this Article 15, a collateral assignment of Tenant's interest in this Lease by Tenant to one or more *"Lenders"* (hereinafter defined), as collateral security for an indebtedness or other obligation of Tenant or its Affiliates shall be permitted and Landlord shall execute all documentation reasonably requested by Tenant or any such Lender in connection therewith. In addition, Tenant shall have the right, without Landlord's consent, to grant to an Affiliate of Tenant a license to operate all of Tenant's business operations at the Premises, without such Affiliate having assumed any liability for the performance of Tenant's obligations under this Lease. As used herein, *"Lender"* shall mean a state or federally regulated bank, savings and loan association, insurance company, pension fund, credit union, real estate investment trust, or other institutional lender. No collateral assignment of this Lease by Tenant shall abrogate the provisions of Section 17, below, relating to the subordination of this Lease.

Section 15.4 Cure Rights of Original Tenant.

15.4.1 If Tenant assigns Tenant's interest in this Lease, then Landlord, when giving notice to said assignee or any future assignee in respect of any default, shall also give a copy of such notice to the original tenant named herein (*"Original Tenant"*), and no notice of default shall be effective until a copy thereof is so given to Original Tenant. Original Tenant shall have the same period after receipt of such notice to cure such default as is given to Tenant therefor under this Lease.

15.4.2 If this Lease is terminated because of: (a) an Event of Default of such assignee, or (b) the rejection, disaffirmation, or other termination of this Lease by or on behalf of the assignee pursuant to any proceeding in bankruptcy under any Legal Requirement of any State or of the United States, or any other Legal Requirements affecting creditors' rights, then Landlord shall promptly give to Original Tenant notice thereof, and Original Tenant shall have the right, exercisable by notice given to Landlord within fifteen (15) days after receipt by Original Tenant of Landlord's notice, to enter into a new lease of the Premises with Landlord (*"New Lease"*), provided that the Original Tenant shall have remedied all Events of Default of the assignee hereunder, unless such Events of Default are not reasonably susceptible of cure by the Original Tenant, in which event the Original Tenant shall not be obligated to cure such Events of Default as a condition to the exercise of its rights under this Subsection 15.4.2. Upon the Original Tenant's curing of any such Event of Default of the assignee as aforesaid, Landlord shall assign to the Original Tenant all of Landlord's rights against such assignee (whether arising as a result of bankruptcy court proceedings or otherwise). The term of said New Lease shall begin on the date of termination of this Lease and shall continue for the remainder of the Term (including any Renewal Periods). Such New Lease shall otherwise contain the same terms and conditions as those set forth herein, except for requirements which are no longer applicable or have already been performed. It is the intention of the parties hereto that such New Lease shall have the same priority relative to other rights or interests in or to the Premises as this Lease. The provisions of this Subsection 15.4.2 shall survive the termination of this Lease and shall continue in full force and effect thereafter to the same extent as if this Subsection 15.4.2 were a separate and independent contract between Landlord and the Original Tenant. From the date on which the Original Tenant shall serve Landlord with the aforesaid notice of the exercise of its right to a New Lease, the Original Tenant shall have quiet and undisturbed use and enjoyment of the Premises and all appurtenances thereto, as contemplated in this Lease.

43

Section 15.5 <u>Recognition Agreement</u>. In the event Tenant sublets the entire Premises after Tenant has met its obligation to operate under Article 14, with respect to any subtenant whose sublease satisfied the conditions set forth in the next paragraph, then, notwithstanding any other provisions of this Lease, Landlord shall, upon Tenant's request, execute and deliver an agreement among Landlord, Tenant and each such subtenant in the form of <u>Exhibit H</u> hereto, in recordable form.

The conditions applicable to any subtenant entitled to receive such an agreement as aforesaid are as follows:

(a)     the sublease obligates the subtenant to pay at least the same Rent, on a per square foot basis, as is payable under this Lease, or the subtenant would, on the implementation of any such agreement, be obligated to pay Landlord at least the same Rent on a per square foot basis as is payable under this Lease;

(b)     the sublease is on terms and conditions which are no more onerous to the sublessor thereunder than those pertaining to Landlord under this Lease, or the subtenant would, on the implementation of any such agreement, be obligated to Landlord under terms and conditions which are no more onerous to the Landlord than those pertaining to Landlord under this Lease;

(c)     upon the implementation of any such agreement, the subtenant attorns to Landlord upon the terms and conditions set forth in the sublease;

(d)     the term of the sublease, inclusive of renewal options, shall be not less than five (5) years and shall not exceed the Term, inclusive of renewal options;

(e)     if, pursuant to the terms of the aforesaid agreement, Landlord and any subtenant become bound to each other as landlord and tenant on the terms set forth in the sublease, then (A) Landlord shall not be liable to subtenant for any prior default of the sublessor under the sublease, (B) Landlord shall not be bound by the payment of rent more than one (1) month in advance, and (C) Landlord shall not be bound by any amendment of the sublease not received by Landlord or which does not meet the standards set forth in this Section 15.5;

(f)     the sublease is expressly stated to be subordinate to this Lease; and

(g)     as of the date of the sublease, subtenant's net worth is at least Twenty Million and 00/100 ($20,000,000.00) Dollars which sum shall increase at the same rate as increases in Fixed Rent under this Lease.

ARTICLE 16.

DEFAULT AND DISPUTE RESOLUTION

Section 16.1 <u>Tenant Default</u>.

16.1.1 If Tenant shall fail to: (i) pay any Rent when due, within ten (10) days after its receipt of notice thereof from Landlord specifying the amount and details of the unpaid Rent, or (ii) perform or observe any of the other covenants of this Lease on Tenant's part to be performed or observed within thirty (30) days after its receipt of notice thereof from Landlord specifying the nature of such default (or, if such default shall be of a nature that same cannot reasonably be cured within thirty (30) days and Tenant does not commence to cure such default on or before such thirtieth (30th) day and thereafter diligently prosecute said cure to completion), such circumstance shall constitute an *"Event of Default"*.

44

16.1.2 Upon an Event of Default, Landlord shall have all remedies given to it at law or in equity (except that Landlord hereby expressly waives any rights to accelerate any element of the Rent, and any right of distraint, which may be granted to it by law), including the following:

(a)     to bring suit for the collection of such unpaid Rent or for the performance of such other covenant of this Lease on Tenant's part to be performed; and/or

(b)     without waiving any non-monetary default, may (but shall not be obligated to) perform any covenant which is capable of being remedied by the performance of affirmative acts for the account and at the reasonable expense of Tenant (it being agreed that should Landlord require access to the Premises in order to perform such covenant as aforesaid, Landlord shall comply with the applicable provisions of Sections 9.2 hereof), in which event, Tenant shall pay to Landlord on demand, as Additional Rent, the reasonable cost or amount thereof, together with interest thereon at the Lease Interest Rate from the date of outlay of expense until payment; and/or

(c)     upon at least five (5) days' notice to Tenant (which notice shall run concurrently with, and not in lieu of or in addition to, any statutory notice), to terminate this Lease, whereupon Landlord shall have and retain full right to sue for and collect all unpaid Rent which shall have accrued up to the date of termination and any damages to Landlord by reason of any such breach, and Tenant shall surrender and deliver the Premises to Landlord, failing which, Landlord shall have the right to initiate summary proceedings to recover possession; and/or

(d)     upon at least five (5) days' notice to Tenant (which notice shall run concurrently with, and not in lieu of or in addition to, any statutory notice), to terminate Tenant's right of possession, re-enter the Premises and take possession thereof by lawful means. If Landlord shall so elect to repossess the Premises without terminating the Lease, then Tenant shall be liable for and shall pay to Landlord all Rent payable to Landlord pursuant to the terms of this Lease which shall have accrued up to the date of repossession.

(e)     under Subsections (c) and (d), above, Tenant shall be liable for and shall pay to Landlord all Rent as and when same shall become due and payable pursuant to the terms of this Lease during the remainder of the Term (under Subsection (c), above, as if Landlord had not terminated the Lease thereunder), diminished by any net sums thereafter received by Landlord through reletting the Premises during said period (after deducting reasonable expenses incurred by Landlord in connection with such reletting). In no event shall Tenant be entitled to any excess of any rent obtained by such reletting over and above the Rent herein reserved. Landlord may bring actions to collect amounts due by Tenant under this Lease, from time to time, prior to the expiration of the Term.

16.1.3 Upon an Event of Default, Tenant shall be liable for and shall pay to Landlord, in addition to any sum provided to be paid above, brokers' fees incurred by Landlord in connection with reletting the whole or any part of the Premises for the remainder of the then unexpired Term (excluding any then unexercised Renewal Periods), the costs of removing and storing Tenant's or other occupant's property; the cost of repairs; and all other commercially reasonable expenses incurred by Landlord in enforcing or defending Landlord's rights and/or remedies, including reasonable attorneys' fees.

16.1.4 Upon an Event of Default, any amounts paid by Landlord to cure said Event of Default and any Rent payments not paid after notice thereof is given shall bear interest at the Lease Interest Rate from and after the expiration of any applicable grace period until paid.

45

16.1.5 Landlord shall use all reasonable efforts to relet the Premises or any portion thereof to mitigate Landlord's damages to which Landlord would otherwise be entitled to as a result of an Event of Default. In no event shall Tenant be liable to Landlord for any consequential damages suffered by Landlord as a result of an Event of Default by, or any other act of, Tenant.

Section 16.2 <u>Landlord Default</u>. If Landlord shall fail to perform or observe any of the covenants of this Lease on Landlord's part to be performed or observed within thirty (30) days after receiving notice from Tenant specifying the nature of such default (or, if such default shall be of a nature that same cannot reasonably be cured within thirty (30) days, and Landlord does not commence to cure such default on or before such thirtieth (30th) day and thereafter diligently prosecute said cure to completion) (*"Landlord's Default"*), then Tenant, in addition to such other rights and remedies as may be available under this Lease, or at law or in equity, may, in its sole discretion:

(a)     as applicable, perform such obligation(s) of Landlord in accordance with the provisions of this Lease on behalf of, and at the expense of Landlord; and/or

(b)     bring suit for the collection of any amounts for which Landlord is in default, seek injunctive relief, or seek specific performance for any other covenant or agreement of Landlord, without terminating this Lease;

(c)     Landlord shall reimburse Tenant for the amounts reasonably expended by Tenant in performing any repairs or work, including costs and attorneys fees. If Landlord fails to reimburse Tenant, or if Landlord fails to timely pay to Tenant any other amount due to Tenant under this Lease within fifteen (15) days after Tenant gives Landlord notice of such past due amount, then Tenant may in either of such events deduct on a monthly basis any such amounts owing from Landlord, plus interest thereon at the Lease Interest Rate from charges due or to become due Landlord under this Lease in the following order: Tenant's CAM Share of Common Areas Charges; Tenant's Pro Rata Share of Taxes; and provided Tenant has not fully realized its offset right within two (2) months from Tenant's original demand, upon Tenant's Fixed Rent obligation. With respect to the foregoing, Tenant shall only proceed from one item to the next to the extent Tenant is unable to realize fully its offset right by deducting monies from the previous item. Further, in the event no such item is due in any given month, Tenant shall skip such item and proceed to the next item in order. In the event any deduction from charges due or to become due Landlord under this Lease as provided in the previous sentences would otherwise occur on a date at which time Tenant is in default of its obligations under of this Lease beyond all applicable notice and grace periods for the curing of such default, Tenant shall not have the right to effect such deduction until such time as Tenant has cured the default. If Tenant has not received credit for all such amounts and interest thereon at the expiration of the Term, Tenant may, at its option, extend the Term on the same terms and conditions then in effect until all such amounts and interest thereon are fully paid by application against all charges accruing during such extended Term; and/or

(d)     Tenant may terminate this Lease, without waiving its rights to damages for Landlord's Default, provided that (1) Landlord's Default materially interferes with the normal conduct of any business operations in the Premises, (2) Landlord's Default is not reasonably capable of being cured by Tenant, and (3) Tenant gives notice of Landlord's Default to any Mortgagee whom Landlord shall have previously given Tenant notice (including its address), and such Mortgagee shall not have cured Landlord's Default within thirty (30) days after Landlord's and Mortgagee's receipt of a second notice advising Mortgagee that Landlord has failed to cure Landlord's Default (or if such default cannot reasonably by cured within thirty (30) days such Mortgagee fails to promptly commence and diligently prosecute said cure to completion).

46

As a condition to the effectiveness of any notice of default given by Tenant to Landlord pursuant to this Section 16.2, Tenant shall also concurrently give such notice, in the manner provided in Article 18, to each Mortgagee for whom Tenant has received written notice (such notice to specify the address of the beneficiary). In the event Landlord shall fail to cure any breach or default within the time period specified above, then prior to the pursuit of any remedy therefor by Tenant, each such Mortgagee shall have an additional thirty (30) days within which to cure such default, or if such default cannot reasonably be cured within such period, then each such Mortgagee shall have such additional time as shall be necessary to cure such default, provided that within such thirty (30) day period, such Mortgagee has commenced and is diligently pursuing the remedies available to it which are necessary to cure such default (including, without limitation, as appropriate, commencement of foreclosure proceedings); provided, however, that if (i) the default by Landlord materially adversely affects the ability of Tenant to conduct its normal business operations in the Premises, and (ii) the notices to Landlord and any such Mortgagee so state and require that the default be cured within the time period specified above, then any such Mortgagee receiving that notice from Tenant shall not have the additional time provided herein for the curing of the default.

Notwithstanding the foregoing, if a condition posing imminent risk of material harm to persons or property shall exist, Tenant may, at its election, and without prior notice to Landlord, exercise any or all of the remedies set forth in (a), (b) and (c) above. In no event shall Landlord be liable to Tenant for any consequential damages suffered by Tenant as a result of a default by, or any other act of, Landlord.

Section 16.3 <u>Arbitration</u>. In any case where this Lease expressly provides for submission of a dispute or matter to arbitration (but not otherwise), the same shall be settled by arbitration in Avondale, Arizona, before one arbitrator in accordance with the procedural rules then obtaining of the American Arbitration Association or any successor thereto. The decision of the arbitrator shall be final, conclusive and binding on the parties, but the powers of the arbitrator are hereby expressly limited to the determination of factual issues, and the arbitrator shall have no power to reform, supplement or modify this Lease. The arbitrator shall make only required findings of fact incident to an arbitrable dispute, which findings shall be set forth in reasonable detail in a written decision by the arbitrator. Landlord and Tenant shall share equally in the cost and expenses of such arbitration, and each shall separately pay its own attorneys' fees and expenses, unless the arbitrator finds that one of the parties did not act in good faith in connection with the dispute or the conduct of the arbitration proceeding, in which case the arbitrator may award all or part of said costs, expenses and fees to the other party.

## ARTICLE 17.
### RIGHT TO MORTGAGE AND NON-DISTURBANCE; ESTOPPEL CERTIFICATE

Section 17.1 <u>Right to Mortgage and Non-Disturbance</u>. Landlord reserves the right to subject and subordinate this Lease at all times to any mortgage or deed of trust for the benefit of any Mortgagee hereafter encumbering or affecting all or any portion of the Shopping Center, as well as to any future ground or underlying leases encumbering or affecting all or any part of the Shopping Center; provided, however, that (a) each Mortgagee shall first execute and deliver to Tenant a subordination, non-disturbance and attornment agreement in substantially the form attached as <u>Exhibit G</u> hereto, in recordable form, and (b) any Ground Lessor shall execute (and shall obtain the written consent of any holder of any mortgage, deed of trust or any other existing lien encumbering or affecting the Shopping Center or any portion thereof, as applicable) and deliver to Tenant a fee owner recognition agreement in a form reasonably satisfactory to Tenant, which shall include the following provisions: (i) the Ground Lessor will not, in the exercise of any of the rights arising or which may arise out of such lease, if Tenant shall not then be in default under this Lease beyond any applicable cure periods, disturb or deprive Tenant in or of its possession or its rights to possession of the Premises or of

any right or privilege granted to or inuring to the benefit of Tenant under this Lease; (ii) in the event of the termination of the ground or underlying lease, if Tenant shall not then be in default under this Lease beyond any applicable cure periods, Tenant will not be made a party in any removal or eviction action or proceeding, nor if Tenant shall not then be in default under this Lease beyond any applicable cure periods, shall Tenant be evicted or removed of its possession or its right of possession of the Premises, and if Tenant shall not then be in default under this Lease beyond any applicable cure periods, this Lease shall continue in full force and effect as a direct lease between the Ground Lessor and Tenant for the remainder of the Term and on the same terms and conditions as contained herein, without the necessity of executing a new lease; and (iii) Landlord and Tenant shall have the right to execute any amendment to this Lease which is specifically required hereunder and if Tenant shall not then be in default under this Lease beyond any applicable cure periods, the Ground Lessor shall recognize and be bound thereto.

Section 17.2  Estoppel Certificate.  Upon written request of Landlord or Tenant, the other party, within thirty (30) days of the date of such request, shall execute and deliver to and only for the benefit of the requesting party or any Mortgagee or bona fide prospective purchaser, or assignee or sublessee described in Section 15.5, above, of the requesting party, without charge, a written statement: (1) ratifying this Lease; (2) certifying, to such party's actual knowledge, that this Lease is in full force and effect, if such is the case, and has not been modified, assigned, supplemented or amended, except by such writings as shall be stated; (3) specifying the dates to which Fixed Rent and Additional Rent have been paid; (4) stating whether or not, to either party's actual knowledge, the other party is in default and, if so, stating the nature of such default, (5) stating the Rent Commencement Date, (6) stating which options to extend the Lease Term have been exercised, if any, (7) certifying to such other matters as the requesting party may reasonably require.  Each request for a written statement pursuant to this Section 17.2 shall be accompanied by a payment, from the requesting party to the other party, in the amount of Five Hundred and 00/100 ($500.00) Dollars (which sum shall be increased by One Hundred and 00/100 ($100.00) Dollars on each date that the Fixed Rent increases); provided, however, that such payment shall not apply to the first request made by either party during each calendar year.

Section 17.3  Existing Mortgages.  If a mortgage, deed of trust, or other security instrument encumbers the Shopping Center or any part thereof on the Effective Date, then within sixty (60) days after the Effective Date, Landlord shall deliver to Tenant, in recordable form: (x) a subordination, non-disturbance and attornment agreement substantially in the form attached hereto as Exhibit G, in recordable form (with such changes as are reasonably agreed between Tenant and the holder), executed by each and every holder of any mortgage, deed of trust or any other existing lien encumbering or affecting the Shopping Center or any portion thereof, and (y) a fee owner recognition agreement in the form and content described in clause (b) of Section 17.1 hereof, in recordable form, executed by any Ground Lessor (and, as may be required, consented to by the holder of any mortgage, deed of trust or other existing lien as aforesaid).  Should Landlord fail to so deliver such instrument(s) within said sixty (60) day period, Tenant shall have the right by thirty (30) days' notice given to Landlord at any time prior to the date on which such instrument(s) are delivered, to terminate this Lease, in which event, unless Landlord delivers such instrument(s) within such thirty (30) day period, this Lease shall terminate and neither party shall have any further liability hereunder (other than as set forth in Section 23.3 below), except that Landlord shall be obligated to promptly reimburse Tenant for all its reasonable, third-party costs and expenses incurred in connection with this Lease, including, without limitation, the preparation and review of plans and specifications, and the performance of Tenant's Work, provided, however, that such reimbursement by Landlord shall not exceed the aggregate sum of Fifty Thousand and 00/100 ($50,000.00) Dollars.

48

ARTICLE 18.
NOTICE

Subject to the further provisions of this Article 18, whenever it is provided herein that any notice, demand, request, consent, approval or other communication (*"Notice"*) shall or may be given to either of the parties by the other, it shall be in writing and, any Legal Requirement to the contrary notwithstanding, shall not be effective for any purpose unless same shall be given by registered or certified mail, postage prepaid, return receipt requested, or by any recognized overnight mail carrier, with proof of delivery slip, addressed to Landlord at Landlord's Mailing Address or to Tenant at Tenant's Mailing Address, with copies of notices to Tenant also given to: (i) Allan N. Rauch, Esq., c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, and (ii) Edward M. Schotz, Esq., c/o Cole, Schotz, Meisel, Forman & Leonard, P.A., Court Plaza North, 25 Main Street, Hackensack, New Jersey 07601, or to such other person [but not exceeding a total of three (3) notices] or other address as may, from time to time, be specified by either party in a written notice to the other party. All notices given in accordance with the provisions of this Section shall be effective upon receipt (or refusal of receipt) at the address of the addressee. Notwithstanding the foregoing, Landlord shall instead send the following items to Tenant (Attention: Lease Administration) at Tenant's Mailing Address: (A) all bills, notices (but not notices of default) and related information pertaining to Tenant's Pro Rata Share of Taxes as described in Section 4.3 of this Lease, and (B) all budgetary information, notices (but not notices of default), statements, bills and related information pertaining to Tenant's CAM Share of Common Areas Charges as described in Section 5.1 of this Lease.

ARTICLE 19.
TENANT'S PROPERTY

All of Tenant's Property which may be installed or placed in or upon the Premises by Tenant shall remain the property of Tenant. Tenant may assign, hypothecate, encumber, mortgage or create a security interest in or upon Tenant's Property in the Premises without the consent of Landlord and may remove Tenant's Property at any time during the Term. Landlord waives any right it may have in Tenant's Property. To the extent Landlord may have a lien on or security interest in the Tenant's Property pursuant to this Lease, by law or otherwise, Landlord hereby waives, and agrees not to assert, such lien or security interest. Landlord shall provide to Tenant, within ten (10) days after Tenant's request therefor, a written waiver in form reasonably satisfactory to Tenant and Landlord evidencing Landlord's waiver of any rights it has or may have in Tenant's Property.

ARTICLE 20.
END OF TERM

Section 20.1  <u>Surrender of Premises</u>.  At the expiration or earlier termination of the Term, Tenant will quit and surrender the Premises in good condition and repair, excepting, however, reasonable wear and tear, damage by fire or other casualty, damage by eminent domain, and repairs and replacements to be made by Landlord hereunder. If Tenant does not remove all of its Tenant's Property within ten (10) days after the expiration or sooner termination of this Lease, Landlord may remove the same at Tenant's cost. Tenant shall repair any damage caused by its removal of Tenant's Property.

Section 20.2  <u>Hold Over</u>.  If Tenant fails to deliver possession of the Premises to Landlord at the end or earlier termination of the Term, Tenant shall be a tenant at sufferance and shall be liable for Fixed Rent on a monthly basis (or, if applicable, on a prorated daily basis) in an amount equal to one hundred fifty (150%) percent of the amount thereof payable by Tenant for the month immediately preceding the last day of the Term as well as for all Additional Rent payable by Tenant hereunder.

49

ARTICLE 21.
INTENTIONALLY OMITTED

ARTICLE 22.
ONGOING CO-TENANCY

If, at any time during the Term during which Tenant is open for business in the Premises and is not in default hereunder beyond any applicable notice and cure period, less than the lesser of sixty (60%) percent of the total Floor Area of all buildings in the Shopping Center or one hundred thousand (100,000) square feet of Floor Area in the Shopping Center, (excluding the Premises) is used for the operation of retail business by tenants of the type typically found in first-class regional shopping centers located in the Avondale metropolitan area (other than during Excused Periods)(such condition being hereinafter referred to as an *"Excess Vacancy"*), then in such event, Tenant shall have the right to: (i) pay Alternate Rent in lieu of Fixed Rent during the period of such Excess Vacancy, and/or (ii) if the Excess Vacancy continues for a period in excess of three hundred sixty-five (365) continuous days, to terminate this Lease exercisable by giving Landlord, within one hundred twenty (120) days after the expiration of such three hundred sixty-five (365) day period, at least sixty (60) days' prior notice, in which event this Lease shall terminate on the date set forth in Tenant's notice of termination without further liability on the part of either Landlord or Tenant, except as set forth in Section 23.8 below. If Tenant does not terminate this Lease pursuant to this Article 22, then commencing on the expiration of the aforesaid one hundred twenty (120) day period, Tenant shall resume paying full Rent, provided, however, that Tenant shall: (x) again be entitled to exercise its rights under this Article 22 each time the then existing condition of Excess Vacancy worsens by more than ten (10%) percent; and (y) retain all of its original rights under this Article 22 with respect to any future condition(s) of Excess Vacancy.

ARTICLE 23.
MISCELLANEOUS

Section 23.1 <u>Loading Facilities</u>. Subject to Legal Requirements, Tenant shall have the exclusive right to utilize the loading facilities serving the Premises (shown on <u>Exhibit B</u>) on a "24 hour a day", "365 days a year" basis.

Section 23.2 <u>Liens</u>. Within thirty (30) days after notice of the filing thereof, Tenant shall discharge (either by payment or by filing of the necessary bond, or otherwise) any lien against the Premises, the Shopping Center and/or Landlord's interest therein, which may arise out of any payment due for, or purported to be due for, any labor, services, materials, supplies or equipment alleged to have been furnished to or for Tenant in, upon or about the Premises.

Section 23.3 <u>Broker's Commission</u>. Landlord and Tenant each warrant and represent to the other that they did not deal with any real estate broker in connection with the negotiation, execution and delivery of this Lease, except for Phoenix Commercial Advisors (the *"Broker"*). Landlord shall pay the Broker a commission pursuant to a separate agreement. Each party agrees to indemnify, defend, and save the other harmless from and against any and all liabilities, costs, causes of action, damages and expenses, including, without limitation, attorneys' fees, with respect to or arising out of any claims made by any real estate broker (other than the Broker), agent or finder with respect to this Lease in breach of the foregoing representation. The provisions of this Section shall survive the expiration or earlier termination of this Lease.

Section 23.4 <u>Force Majeure</u>. Except as otherwise expressly set forth herein, in the event either party hereto shall be delayed or hindered in, or prevented from, the performance of any act required hereunder (except for the payment of a monetary sum to be paid by either party to the other party) by reason of strikes, Legal Requirements, inability to procure materials, failure of power, riots, insurrection, war, earthquake,

50

hurricane or tornado(or comparable weather conditions or unusual severity) or other reasons of a like nature which are beyond the reasonable control of the party (collectively referred to herein as *"Force Majeure"*), then the performance of any such act shall be excused for the period of the delay and the period of the performance of any such act shall be extended for a period equivalent to the period of such delay. Notwithstanding the foregoing provisions, the financial inability of a party to perform its obligations under this Lease shall not constitute an event of Force Majeure. Any time either party is experiencing delay under this provision, such party will give notice to the other party detailing the nature of the delay and giving an estimate as to how long the delay is expected to be.

Section 23.5  <u>Consents</u>. Except as may be otherwise expressly set forth in this Lease, whenever under this Lease provision is made for either party's securing the consent or approval of the other party, (i) such consent or approval shall be in writing and shall not be unreasonably withheld, delayed or conditioned, and (ii) in all matters contained herein, both parties shall have an implied obligation of reasonableness.

Section 23.6  <u>Costs</u>. Whenever this Lease requires the performance of an act by a party, such party shall perform the act at its own cost and expense, unless expressly provided to the contrary.

Section 23.7  <u>Attorneys' Fees</u>. In any action or proceeding hereunder (whether to enforce the terms and provisions of an indemnity or otherwise), the prevailing party shall be entitled to recover from the other party the prevailing party's reasonable costs and expenses in such action or proceeding, including reasonable attorneys' fees, costs and expenses. If either party is sued by a third party as a result of a violation of a covenant or warranty herein contained by the other party hereto, then the party who has violated the covenant or warranty shall be responsible for the reasonable costs and expenses in such action or proceeding against the non-violating party, including reasonable attorneys' fees, costs and expenses.

Section 23.8  <u>Survival of Obligations</u>. The obligation to pay any sums due to either party from the other that by the terms herein would not be payable, or are incapable of calculation, until after the expiration or sooner termination of this Lease shall survive and remain a continuing obligation until paid. All indemnity obligations under this Lease shall survive the expiration or earlier termination of this Lease.

Section 23.9  <u>Non-Waiver</u>. The failure of Landlord or Tenant to insist upon the strict performance of, or to enforce, any provision, covenant or condition herein shall not be deemed to be a waiver thereof, nor void or affect the right of the aggrieved party to enforce the same covenant or condition on the occasion of any subsequent breach or default; nor shall the failure of either party to exercise any option in this Lease upon any occasion arising therefor be deemed or construed to be a waiver of the right to exercise that same kind of option upon any subsequent occasion. The acceptance of Rent hereunder by Landlord shall not be deemed to be a waiver by Landlord of any claim it may then have against Tenant.

Section 23.10<u>Rights Cumulative</u>. Unless expressly provided to the contrary in this Lease, each and every one of the rights, remedies and benefits provided by this Lease shall be cumulative and shall not be exclusive of any other such rights, remedies and benefits allowed by applicable Legal Requirements.

Section 23.11<u>Definition of Landlord</u>. The term *"Landlord"* shall mean only the person or entity which, from time to time, shall then own that part of the Shopping Center in which the Premises are located, and in the event of the transfer by such owner of such interest in the Shopping Center, such owner shall (except to the extent of (1) claims made by Tenant against Landlord which arose prior to the effective date of the transfer of such ownership interest, and/or (2) judgments obtained by Tenant against Landlord, on or

51.

events occurring prior to the effective date of the transfer of such ownership interest) thereupon be released and discharged from all covenants and obligations of Landlord thereafter accruing, but such covenants and obligations shall be binding during the Term upon each new owner for the duration of such owner's ownership.

Section 23.12 <u>Successors and Assigns</u>. The provisions of this Lease shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns permitted under this Lease .

Section 23.13 <u>Limitation of Landlord's Liability</u>. Except with respect to insurance proceeds or condemnation awards received by Landlord which are required by the terms of this Lease to be applied to the repair or restoration of the Premises or the Shopping Center, Tenant shall look only to Landlord's estate and property in the Shopping Center (or the proceeds from the sale of all or any portion thereof) and net income derived from the Shopping Center for the satisfaction of Tenant's remedies for the collection of a judgment (or other judicial process) requiring the payment of money by Landlord hereunder and no other property or assets of Landlord, its officers, directors, members, managers, stockholders or partners shall be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies under or with respect to this Lease. Except with respect to the limitation on personal liability hereinabove set forth, the provisions of this Section 23.13 shall not be deemed or construed to limit Tenant's rights and remedies pursuant to this Lease or which may be available at law or in equity.

Section 23.14 <u>Limitation of Tenant's Liability</u>. Landlord, its successors and assigns, shall look solely to the assets, if any, of Tenant and its successors and assigns, for the satisfaction of any claim arising from or under this Lease and shall not seek to impose personal liability on any shareholder, officer, director or employee of Tenant or any of its Affiliates.

Section 23.15 <u>Joint and Several Liability</u>. If either party consists of more than one person, then the persons constituting such party shall be jointly and severally liable hereunder.

Section 23.16 <u>Severability</u>. If any term, covenant, condition or provision of this Lease is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions hereof shall remain in full force and effect and shall in no way be affected, impaired, or invalidated thereby.

Section 23.17 <u>Grammatical Usages and Construction</u>. In construing this Lease, feminine or neuter pronouns shall be substituted for those masculine in form and vice versa, and plural terms shall be substituted for singular and singular for plural in any place in which the context so requires. This Lease shall be construed without regard to the identity of the party who drafted the various provisions hereof. Moreover, each and every provision of this Lease shall be construed as though all parties hereto participated equally in the drafting thereof. As a result of the foregoing, any rule or construction that a document is to be construed against the drafting party shall not be applicable hereto.

Section 23.18 <u>Table of Contents, Line Numbering and Paragraph Headings</u>. The table of contents and line numbering, if any, and section headings are inserted only for convenience and in no way define, limit or describe the scope or intent of this Lease, nor in any way affect this Lease.

Section 23.19 <u>Definition of Hereunder, Herein, etc</u>. Unless the context clearly indicates to the contrary, the words "herein," "hereof," "hereunder," "hereafter," and words of similar import refer to this Lease and all the Exhibits attached hereto as a whole and not to any particular section, subsection, or paragraph hereof.

52

Section 23.20 Short Form Lease. Upon the request of either party following the execution and delivery of this Lease, Landlord and Tenant shall execute a short form lease or memorandum for recording, which shall be in form and substance as either party shall reasonably request. In no event shall the amount of Fixed Rent reserved hereunder be included in any such short form lease or memorandum.

Section 23.21 Entire Agreement and Modification. This Lease constitutes the entire agreement of the parties hereto, and all prior agreements between the parties, whether written or oral, are merged herein and, except as may be specifically set forth herein, shall be of no force and effect. This Lease cannot be changed, modified or discharged orally, but only by an agreement in writing, signed by the party against whom enforcement of the change, modification or discharge is sought.

Section 23.22 No Joint Venture or Partnership Created by Lease. Nothing contained herein shall be deemed or construed as creating the relationship of principal and agent or of partnership or of joint venture between the parties hereto.

Section 23.23 Tenant's Tradename. Landlord shall not make use of Tenant's tradename [*i.e., "Bed Bath & Beyond"®*] in any advertising or marketing material, including, without limitation, on any internet website, without obtaining Tenant's prior written approval, which may be withheld in Tenant's sole and absolute discretion.

Section 23.24 Governing Law. This Lease shall be governed by, construed, and enforced in accordance with the laws of the State in which the Premises are located.

Section 23.25 Landlord's Entry. Tenant shall permit Landlord to enter upon the Premises during Tenant's business hours, upon at least three (3) days prior notice to Tenant, to exhibit same to prospective bona-fide purchasers and mortgagees of the Shopping Center, and during the last six (6) months of the Term, to exhibit same to prospective bona-fide tenants; provided, however, that Landlord's employees, agents and contractors shall identify themselves to the store manager upon entering the Premises.

Section 23.26 Counterparts. This instrument may be executed in several counterparts, each of which shall be deemed an original. The signatures to this instrument may be executed and notarized on separate pages, and when attached to this instrument, shall constitute one complete document.

Section 23.27 Waiver of Trial by Jury. Landlord and Tenant hereby mutually waive any and all rights which either may have to request a jury trial in any proceeding between them at law or in equity.

[Signature page follows]

53

IN WITNESS WHEREOF, the parties have executed this instrument under seal the day and year first-above written.

LANDLORD:

WITNESS:

**GATEWAY PAVILIONS, L.L.C.,**
an Arizona limited liability company

By: KDC-GP Partners, L.L.C.,
    an Arizona limited liability
    company, Manager and Member

    By: Kitchell Development
        Company, an Arizona
        corporation, Managing Member

        By:
        Print Name: Jeffrey W. Allen
        Print Title: Vice President

        [SEAL]

TENANT:

WITNESS:

**BED BATH & BEYOND INC.,**
a New York corporation

By:
Warren Eisenberg
Co-Chief Executive Officer

[SEAL]

54

## INDEX OF EXHIBITS

| | |
|---|---|
| Exhibit A | Legal Description of Shopping Center |
| Exhibit B | Site Plan |
| Exhibit C | Rent Commencement and Expiration Date Agreement |
| Exhibit D | Specifications for Landlord's Work |
| Exhibit D-1 | Exterior Elevations of the Premises and Sidewalk Plan |
| Exhibit D-2 | Exterior Elevations of the Shopping Center |
| Exhibit E | Permitted Encumbrances |
| Exhibit F | Signage |
| Exhibit G | Subordination, Non-Disturbance and Attornment Agreement |
| Exhibit H | Subtenant Recognition Agreement |
| Exhibit I | Delivery Date Notice |
| Exhibit J | Delivery Date Certification |
| Exhibit K-1 | Existing Exclusives |
| Exhibit K-2 | Existing Leases |
| Exhibit L | Alternate Rent |
| Exhibit M | Prohibited Uses |
| Exhibit N | Tax Bill |
| Exhibit O | Sign Criteria |
| Exhibit P | Form Side Letters |

Exhibit A

Legal Description of Shopping Center

PARCEL NO. 3:

That Portion of South half of the Southeast quarter of Section 32, Township 2 North, Range 1 East of the Gila and Salt River Meridian, Maricopa County, Arizona, described as follows:

Commencing at the Southeast corner of said Section 32;

Thence South 87 degrees 35 minutes 38 seconds West, along the South line of said Section 32, a distance of 987.45 feet to the **Point of Beginning**;

Thence South 87 degrees 35 minutes 38 seconds West, along said South line, a distance of 1646.81 feet to the South quarter corner of said Section 32;

Thence North 01 degrees 03 minutes 42 seconds West, along the West line of said Southeast quarter, a distance of 521.81 feet;

Thence North 87 degrees 35 minutes 38 seconds East a distance of 257.21 feet;

Thence North 21 degrees 49 minutes 25 seconds East a distance of 194.11 feet;

Thence South 68 degrees 10 minutes 35 seconds East a distance of 103.18 feet;

Thence South 03 degrees 35 minutes 03 seconds West a distance of 217.82 feet;

Thence South 87 degrees 35 minutes 38 seconds West a distance of 221.13 feet;

Thence South 02 degrees 24 minutes 22 seconds East a distance of 37.05 feet;

Thence North 87 degrees 35 minutes 38 seconds East a distance of 21.21 feet;

Thence South 02 degrees 24 minutes 22 seconds East a distance of 53.12 feet;

Thence North 87 degrees 35 minutes 38 seconds East a distance of 614.21 feet:

Thence North 02 degrees 24 minutes 22 seconds West a distance of 232.12 feet;

Thence North 87 degrees 35 minutes 38 seconds East a distance of 57.00 feet;

Thence North 02 degrees 24 minutes 22 seconds West a distance of 103.39 feet;

Thence South 87 degrees 35 minutes 38 seconds West a distance of 180.00 feet;

Thence North 02 degrees 24 minutes 22 seconds West a distance of 70.68 feet;

Thence South 87 degrees 35 minutes 38 seconds West a distance of 131.02 feet to the beginning of a non-tangent curve concave to the Southeast having a radius of 340.00 feet, the center of which bears South 41 degrees 34 minutes 43 seconds East;

Thence southwesterly along said curve through a central angle of 07 degrees 26 minutes 01 seconds an arc length of 44.11 feet;

Thence South 87 degrees 35 minutes 38 seconds West a distance of 75.33 feet;

Thence North 68 degrees 10 minutes 35 seconds West a distance of 101.98 feet;

Thence North 21 degrees 49 minutes 25 seconds East a distance of 169.49 feet;

A-1

Thence North 87 degrees 35 minutes 38 seconds East a distance of 148.30 feet to the beginning of a tangent curve concave to the North having a radius of 135.00 feet;

Thence Northeasterly along said curve through a central angle of 15 degrees 00 minutes 00 seconds an arc length of 35.34 feet;

Thence North 72 degrees 35 minutes 38 seconds East a distance of 82.55 feet to the beginning of a tangent curve concave to the Northwest having a radius of 15 feet;

Thence Northeasterly along said curve through a central angle of 75 degrees 00 minutes 00 seconds an arc length of 19.63 feet;

Thence North 02 degrees 24 minutes 22 seconds West a distance of 122.01 feet;

Thence North 87 degrees 35 minutes 38 seconds East a distance of 53.00 feet;

Thence North 02 degrees 24 minutes 22 seconds West a distance of 80.53 feet;

Thence North 87 degrees 35 minutes 38 seconds East a distance of 140.92 feet;

Thence North 02 degrees 24 minutes 22 seconds West a distance of 154.96 feet;

Thence North 87 degrees 34 minutes 17 seconds East a distance of 729.12 feet;

Thence South 02 degrees 24 minutes 22 seconds East a distance of 1320.38 feet to the **Point of Beginning**.

PARCEL NO. 4:

That portion of South half of the Southeast quarter of Section 32, Township 2 North, Range 1 East of the Gila and Salt River Meridian, Maricopa County, Arizona, described as follows:

Commencing at the Southeast corner of said Section 32;

Thence South 87 degrees 35 minutes 38 seconds West, along the South line of said Section 32, a distance of 687.45 feet to the **Point of Beginning**;

Thence South 87 degrees 35 minutes 38 seconds West, along the South line, a distance of 270.00 feet;

Thence North 02 degrees 24 minutes 22 seconds West a distance of 506.64 feet;

Thence North 87 degrees 35 minutes 38 seconds East a distance of 270.00 feet;

Thence South 02 degrees 24 minutes 22 seconds East a distance of 506.64 feet to the **Point of Beginning**.

PARCEL NO. 5:

That portion of South half of the Southeast quarter of Section 32, Township 2 North, Range 1 East, of the Gila and Salt River Meridian, Maricopa County, Arizona, described as follows:

Beginning at the Southeast corner of said Section 32;

Thence South 87 degrees 35 minutes 38 seconds West, along the South line of said Section 32, a distance of 657.45 feet;

A-2

Thence North 02 degrees 24 minutes 22 seconds West a distance of 506.64 feet;

Thence North 87 degrees 35 minutes 38 seconds East a distance of 670.57 feet to the East line of said Section 32;

Thence South 00 degrees 55 minutes 21 seconds East, along the East line, a distance of 506.81 feet to the **Point of Beginning**.

Except that portion of Parcel No. 3 described as follows:

Commencing at the Southeast corner of said Section 32;

Thence North 00 degrees 55 minutes 21 seconds West, along the East line of said Section 32, a distance of 32.13 feet;

Thence South 89 degrees 04 minutes 39 seconds West a distance of 34.00 feet to the **Point of Beginning;**

Thence South 87 degrees 35 minutes 38 seconds West a distance of 60.02 feet;

Thence North 00 degrees 55 minutes 21 seconds West a distance of 25.01 feet;

Thence North 87 degrees 35 minutes 38 seconds East a distance of 60.02 feet;

Thence South 00 degrees 55 minutes 21 seconds East a distance of 25.01 feet to the **Point of Beginning**.

A-3

<u>Exhibit B</u>

Site Plan

B-1

<u>Exhibit C</u>

Rent Commencement and Expiration Date Agreement

THIS RENT COMMENCEMENT AND EXPIRATION DATE AGREEMENT, made as of the ____ day of _____,200__, by and between Gateway Pavilions, L.L.C. (*"Landlord"*) and BED BATH & BEYOND INC. (*"Tenant"*).

WITNESSETH:

WHEREAS, Landlord is the owner of a certain shopping center known as Gateway Pavilions (the *"Shopping Center"*), situated in NWC 99th Avenue & McDowell Road, Avondale, Arizona;

WHEREAS, by that certain lease dated _____, 200__ (the *"Lease"*), Landlord leased a portion (the *"Premises"*) of the Shopping Center to Tenant;

WHEREAS, Tenant is in possession of the Premises and the Term of the Lease has commenced; and

WHEREAS, under Section 2.2 of the Lease, Landlord and Tenant agreed to enter into an agreement setting forth certain information in respect of the Premises and the Lease.

NOW, THEREFORE, Landlord and Tenant agree as follows:

1.      The Rent Commencement Date occurred on _____, 200__.

2.      The Initial Term of the Lease shall expire on January 31, 20___, unless Tenant exercises any option to extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

3.      The date of commencement of the first Renewal Period shall be February 1, 20___, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 20___, unless Tenant exercises any option to further extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

4.      The date of commencement of the second Renewal Period shall be February 1, 20___, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 20___, unless Tenant exercises any option to further extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

5.      The date of commencement of the third Renewal Period shall be February 1, 20___, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 20___, unless the Lease terminates earlier as provided in the Lease.

6.      The date of commencement of the fourth Renewal Period shall be February 1, 20___, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 20___, unless the Lease terminates earlier as provided in the Lease.

7.      Capitalized terms used, but not defined, herein shall have the meanings ascribed to them in the Lease.

C-1

IN WITNESS WHEREOF, the parties hereto have caused this Rent Commencement and Expiration Date Agreement to be executed the date and year first above written.

LANDLORD:

**GATEWAY PAVILIONS, L.L.C.,**
an Arizona limited liability company

By: KDC-GP Partners, L.L.C.,
an Arizona limited liability
company, Manager and Member

By:   Kitchell Development
      Company, an Arizona
      corporation, Managing Member

By:_____
      Print Name:_____
      Print Title:_____

TENANT:

**BED BATH & BEYOND INC.**

By:_____
      Warren Eisenberg
      Co-Chief Executive Officer

C-2

Exhibit D

Specifications for Landlord's Work

D-1

*Avondale, AZ*

## Exhibit D - Standard Landlord's Work
11/22/02

[All capitalized terms used, but not otherwise defined herein shall have the meanings ascribed to them in the Lease. The terms of the Lease regarding Landlord's Work shall be deemed to supplement the provisions of the Exhibit D, to the extent not inconsistent with the terms of this Exhibit D. It is specifically understood and agreed that all materials and supplies shall be installed in strict accordance with all manufacturers' specifications.]

### Landlord's Final Plans and Specifications

Landlord shall provide three (3) complete full size sets, three (3) complete ½ size sets and one (1) copy of electronic file of the Final Plans and Specifications as well as each subsequent revision to Landlord's Plans for Tenant's use. Landlord shall develop project-specific Final Plans and Specifications in accordance with following documents:

A.    Tenant's Plans consist of the following: FIXTURE PLAN (F1); FLOOR FINISH PLANS, NOTES AND DETAILS (F2); POWER/SPECIALTY LIGHTING PLANS AND NOTES (F3); LIGHTING PLANS AND NOTES (F4); and HIGH PILE STORAGE PLAN (F5). Tenant's Plans are project-specific design-development documents. In the event of a conflict between Tenant's Plans and "Tenant's Prototype Drawings and Specifications"(defined below), then Tenant's Plans shall govern and prevail. Tenant's Plans shall be delivered to Landlord in accordance with Article 3 of the Lease.

B.    Tenant's Prototype Drawings and Specifications entitled "Bed Bath & Beyond Prototype Drawings and Specifications – version 1.2002, dated 4-01-02 developed by Ignarri-Lummis Architects, comprise the following drawings and specifications:

At the time the Preliminary Plans are 85% complete, LL shall be obligated to issue Preliminary Plans to "BBBY Consultant" for review against "Quality Control Checklist". If Preliminary Plans are "rejected" or noted "revise and resubmit" by the BBBY consultant then LL shall be obligated for all expenses related to these subsequent reviews until Preliminary Plans are deemed approved. Project specific BBBY consultants to be determined by BBBY post lease execution. If LL fails to pay consultant, then Tenant shall have the right to receive a credit against "Changes" under the lease or deduct amount from Rent in order to satisfy outstanding invoice.

C.

| SHEET # | DRAWING TITLE | CURRENT ISSUE | DRAWING DATE |
|---|---|---|---|
| A0.1 | Code Data, Project Data, Responsibility Schedule | Prototype Version 1.2002 | 04/01/02 |
| A0.2 | Generic Site Requirements Plan | Prototype Version 1.2002 | 04/01/02 |
| A1.1 | Site Details | Prototype Version 1.2002 | 04/01/02 |
| A1.2 | Demolition Plan | Prototype Version 1.2002 | 04/01/02 |
| A2.1 | Store Fixture Plan & Notes | Prototype Version 1.2002 | 04/01/02 |
| A2.2 | Floor Plan & Partition Types | Prototype Version 1.2002 | 04/01/02 |
| A2.3 | Floor Finish Plan, Transition Strip Details & Interior Finishes Legend | Prototype Version 1.2002 | 04/01/02 |
| A2.4 | Reflected Ceiling Plans & Notes | Prototype Version 1.2002 | 04/01/02 |
| A2.5 | Roof Plan & Notes | Prototype Version 1.2002 | 04/01/02 |
| A3.1 | Door & Finish Schedules, Door & Storefront Types, Vestibule Elevations | Prototype Version 1.2002 | 04/01/02 |
| A3.2 | Finish Hardware Schedule | Prototype Version 1.2002 | 04/01/02 |
| A3.3 | BBB National Account Vendors & Distribution Schedule | Prototype Version 1.2002 | 04/01/02 |
| A3.4 | BBB Specified Manufacturers & Distribution Schedule | Prototype Version 1.2002 | 04/01/02 |
| A4.1 | Exterior Elevations | Prototype Version 1.2002 | 04/01/02 |
| A5.1 | Building Sections, Interior Wall Sections | Prototype Version 1.2002 | 04/01/02 |
| A5.2 | Exterior Wall Sections | Prototype Version 1.2002 | 04/01/02 |
| A5.3 | Exterior Wall Sections | Prototype Version 1.2002 | 04/01/02 |
| A5.4 | Exterior Wall Sections | Prototype Version 1.2002 | 04/01/02 |
| A6.1 | Exterior Details | Prototype Version 1.2002 | 04/01/02 |
| A7.1 | Large Scale Plans | Prototype Version 1.2002 | 04/01/02 |
| A7.2 | Large Scale Plans | Prototype Version 1.2002 | 04/01/02 |
| A8.1 | Interior Details | Prototype Version 1.2002 | 04/01/02 |
| A8.2 | Interior Details | Prototype Version 1.2002 | 04/01/02 |
| A8.3 | Customer Service Desk *(1 of 4 optional sheets)* | Prototype Version 1.2002 | 04/01/02 |

1

| A8.4 | Register Bays  *(1 of 2 optional sheets)* | Prototype Version 1.2002 | 04/01/02 |
|------|------|------|------|
| A8.5 | Remote Service Desks | Prototype Version 1.2002 | 04/01/02 |
| A9.1 | Interior Elevations | Prototype Version 1.2002 | 04/01/02 |
| A9.2 | *Alternate* Elevations & Details | Prototype Version 1.2002 | 04/01/02 |
| A9.3 | *Alternate* Plans, Elevations & Details | Prototype Version 1.2002 | 04/01/02 |
| HP1.1 | High Pile Storage Plan & Fixture-Shelf Details | Prototype Version 1.2002 | 04/01/02 |
| CH-1 | Fine China – Floor / Framing / Ceiling Plans & Schedules | Prototype Version 1.2002 | 04/01/02 |
| CH-2 | Fine China – Wall Sections & Details | Prototype Version 1.2002 | 04/01/02 |
| CH-3 | Fine China – Electrical Plans, Details & Notes | Prototype Version 1.2002 | 04/01/02 |
| S1.1 | Structural General Information & Schedules | Prototype Version 1.2002 | 04/01/02 |
| S2.1 | Foundation Plan | Prototype Version 1.2002 | 04/01/02 |
| S2.2 | Roof Framing Plan | Prototype Version 1.2002 | 04/01/02 |
| S3.1 | Structural Wall Sections | Prototype Version 1.2002 | 04/01/02 |
| S3.2 | Typical Structural Details | Prototype Version 1.2002 | 04/01/02 |
| PME1.1 | Plumbing, Mechanical & Electrical General Information | Prototype Version 1.2002 | 04/01/02 |
| P1.1 | Plumbing General Information & Schedules | Prototype Version 1.2002 | 04/01/02 |
| P1.2 | Plumbing Riser Diagrams | Prototype Version 1.2002 | 04/01/02 |
| P2.1 | Plumbing Floor Plan | Prototype Version 1.2002 | 04/01/02 |
| P3.1 | Plumbing Enlarged Plans & Details | Prototype Version 1.2002 | 04/01/02 |
| FP1.0 | Fire Sprinkler Plans, Notes & Details | Prototype Version 1.2002 | 04/01/02 |
| M1.1 | Mechanical General Information | Prototype Version 1.2002 | 04/01/02 |
| M2.1 | Mechanical Floor Plan | Prototype Version 1.2002 | 04/01/02 |
| M3.1 | Mechanical Large Scale Plans & Details | Prototype Version 1.2002 | 04/01/02 |
| M4.1 | Mechanical Schedules & Details | Prototype Version 1.2002 | 04/01/02 |
| M4.2 | ETM Wiring Details for Lennox RTU's | Prototype Version 1.2002 | 04/01/02 |
| M4.2a | *Alternate* ETM Wiring Details for non-Lennox RTU's | Prototype Version 1.2002 | 04/01/02 |
| E1.1 | Electrical General Information & Schedules | Prototype Version 1.2002 | 04/01/02 |
| E2.1 | Power Plan | Prototype Version 1.2002 | 04/01/02 |
| E2.2 | Lighting Plan | Prototype Version 1.2002 | 04/01/02 |
| E2.3 | Specialty Lighting Plan | Prototype Version 1.2002 | 04/01/02 |
| E3.1 | Electrical Large Scale Plans & Details | Prototype Version 1.2002 | 04/01/02 |
| E3.2 | Lighting Sequencing | Prototype Version 1.2002 | 04/01/02 |
| E3.3 | Specialty Lighting Power Diagrams | Prototype Version 1.2002 | 04/01/02 |
| E3.4 | Electrical Details | Prototype Version 1.2002 | 04/01/02 |
| E4.1 | Electrical Schedules | Prototype Version 1.2002 | 04/01/02 |
| E4.2 | Electrical Riser Diagrams | Prototype Version 1.2002 | 04/01/02 |
| E4.3 | Electrical Schedules | Prototype Version 1.2002 | 04/01/02 |
| E4.4 | Novar Wiring Details | Prototype Version 1.2002 | 04/01/02 |
| E4.4a | *Alternate* Novar Wiring Details for non-Lennox RTU's | Prototype Version 1.2002 | 04/01/02 |

Project Manual for Bed Bath & Beyond, dated April 1, 2002.

D.   Neither Tenant's Plans nor Tenant's Prototype Drawings and Specifications reflect regional or governmental requirements.  Such regional/governmental requirements may include but not limited to the following: Stockroom/Sales Area partition between sales area and stockroom may be required including all openings through the partition be properly protected; Disability access to mezzanine level such as an ADA lift, limited use/limited application elevator, or elevator may be required including installation of phone lines to cab; The number of restroom fixtures, number of exit stairs, smoke purge and pressurization system, smoke/heat vents, draft curtains, fire rated walls, ceiling or floors required to meet high pile storage requirements, etc. may need to be modified to comply with all applicable Legal Requirements.

In addition, Landlord shall include the following items as part of the Final Plans and Specifications:

1.   All architectural elevations and construction details for all pylon, monument and directional signs located throughout the Shopping Center.

2.   All architectural elevations and partial sidewalk plans of other tenants and occupants of the Shopping Center adjacent to tenant.

2

3.   Complete civil engineering documents that describe planned improvements to the Shopping Center, including geo-technical and stormwater design reports.

## Site Specifications

A.   All parking areas and traffic drives in the Shopping Center shall consist of light duty pavement: 2" asphalt concrete (1/2" aggregate mix-D-1/2), and 5" aggregate base course.  Grading of these areas shall be as indicated on drawings prepared by Norman Engineering Group for Gateway Pavilions, Grading and Drainage Plans, Phase I, dated 10/3/02 .  Utilization of any portion of the parking field for above ground storm water retention/detention is not acceptable to Tenant, with the exception of impact of a two hour, 100 year storm.

B.   All major access drives shall consist of heavy duty pavement: 2.5" asphalt concrete (1/2" aggregate mix-D-1/2), 6" aggregate base course.  Grading of truck access drives is not to exceed a slope of 3%.

C.   All truck ramps and dumpster pads shall consist of 12" compacted sub-base (95% compacted), 4" compacted granular base and 6" Portland cement concrete surface finish.  All truck ramps shall consist of 6 x 6- W1.4 x W1.4 WWF each direction.  Recessed truck ramps shall not exceed slope of 5%.

If Landlord's geo-technical report for the Shopping Center recommends more stringent requirements, then the geo-technical report recommendations shall supersede the criteria stated in items A, B, and C above.

D.   The minimum lighting level throughout the Shopping Center (parking areas, traffic drives, service drives, etc.) shall be at least two (2) foot-candles, measured 30" above grade.  Landlord shall include a photometric plan, which shall confirm that the proposed lighting meets these requirements as part of the Final Plans and Specifications.  Landlord shall not include illumination from building-mounted wall packs when calculating the required foot-candle level.  Landlord shall provide low level security lighting min. (1) foot-candle throughout center that shall remain illuminated from dusk to dawn seven days a week.

## Building Requirements

The following describes project-specific elements of Landlord's Work in addition to the scope detailed in Tenant's Prototype Drawings and Specifications:

A.   Clear Height - Building systems (mechanical, plumbing, electrical) shall be designed to allow Tenant to stock merchandise up to at least 16'-6" a.f.f.  All mechanical, plumbing and electrical elements shall be located at least 16'-6" a.f.f., except for Tenant's light fixtures.  Fire protection sprinkler piping shall be located at least 16'-6" a.f.f., sprinkler heads shall be located at least 18'-0" a.f.f.  Bottom of all structural elements shall be located at least 18'-0" a.f.f.

B.   Fire Alarm System - Landlord shall furnish and install a fire alarm system in accordance with the minimum base standards set forth in Tenant's Prototypical Plans and Specifications, or more stringent requirements as may be required by law.  Landlord shall be responsible for monitoring the fire alarm system up to (and including) the Delivery Date.  Landlord shall be obligated to contract directly with "ADT" to provide required FA system.

C.   1st Level Structure (sales/non-sales level) - Landlord shall provide a minimum 4000 psi concrete floor slab having a minimum thickness of 4".  Structural system shall be rated to accept 125 lb. per square foot of live load.  If rebar or pretensioned or post-tensioned steel is required, it shall not be placed within the top 2 ½" of the concrete slab.

D.   Sprinkler System - The sprinkler system shall be designed to allow fixturing and storage to be within 18" of heads.  System shall comply with NFPA 231-C and or NFPA13, (high-rack storage) for class IV commodity solid shelves, minimum 4 foot aisles.  Typically, .486 GPM over 2000 sf will be required.

E.   Landlord shall provide sprinkler system sufficient to meet the requirements specified within Tenant's Prototype Drawings and Specifications without utilizing a fire pump if existing water pressure allows.  If water pressure is inadequate and system cannot be designed to properly function without incorporating a fire pump, then Landlord shall locate Fire Pump outside of Premises.  Landlord shall maintain Fire Pump for the full term of the Lease without any cost to Tenant.  Landlord shall, without any cost to Tenant and for the full term of the Lease, routinely inspect, test, and maintain the Fire Pump in accordance with NFPA 25, Standard for the Inspection, Testing, and Maintenance of Water-based Fire Protection Systems (Chapter 5 of 1998 Edition).

F.   LL shall issue complete fire protection submittal consisting of site specific head locations, hydraulic calculations and equipment cut sheets for their review and approval no later than (16) weeks prior to projected delivery date.  The tenant is responsible for the cost of the initial review.  If subsequent reviews are required by CCI/TVA due to initial rejection, then fixed cost to LL for subsequent reviews shall be on a time and material basis.  The hourly rate for these subsequent reviews shall be $125.00/hour plus reimbursables associated with printing and shipping.

If BBBY national fire protection consultants are needed to assist LL with approvals from governmental authorities such as completing technical discussions with governmental authorities to explain/clarify design

3

parameters, calculations, high pile storage commodity classifications, fire pump design, etc., then LL shall directly pay consultant for all time and materials. If LL fails to pay consultant, then Tenant shall have the right to receive a credit against "Changes" under the lease or deduct amount from Rent in order to satisfy outstanding invoice.

| | |
|---|---|
| Mr. Will Smith<br>Code Consultants, INC.<br>Work:          (314) 991-2633<br>Fax:          (314) 991-4614<br>1804 Borman Circle Drive<br>St. Louis, Missouri 63146-4136 | Gerald Lingenfelter<br>TVA Fire and Life Safety<br>Work:          973-398-1445x 4525<br>Fax:          973-398-1442<br>200 Valley Road Suite 306<br>Mt. Arlington, NJ 07856 |

G.    If fire-proofing of structural elements is required, then Landlord shall use intumescent fire resistive coating. All edges of application shall be neat, clean and straight.  All edges of material to be parallel to structural element being treated.

H.    Office Mezzanine- Landlord shall provide a ¾" APA rated Sturd-I-Floor subfloor, or approved equal, on steel joists capable of bearing 80# live load. See prototype drawings for requirements at store safe.

### Construction Coordination Requirements

A.    Landlord shall provide Tenant with a critical path schedule prior to commencement of Landlord's Work, and shall provide to Tenant's construction project manager an updated critical path schedule every four weeks thereafter until Landlord's Work is completed

B.    Throughout the period during which Landlord's Work is being performed, Landlord shall provide to Tenant's construction project manager, on a bi-weekly basis, then-current photographs of the interior and exterior of the Premises, and the Shopping Center site, showing the progression of Landlord's Work.  All photographs shall be in a digital format, and transmitted to Tenant at e-mail address at **BBB.2000photos@bedbath.com**

### Building and Site Signs

A.    Building Signs -- Landlord shall furnish and install all building signs shown on Exhibits D-1 and F utilizing Tenant's specified vendor only.  Landlord is responsible to verify actual number of circuits required with Tenant's specified vendor.  Conduit to be installed continuously from Tenant's panel in Premises to sign location(s).   Landlord required to execute purchase order with Tenant's specified vendor within 10 weeks prior to Delivery Date.  If Landlord fails to execute purchase order within this time frame, then at Tenant's option, Tenant may execute purchase order with Tenant's specified vendor and deduct all costs from rent, (or , at Tenant's option , receive a credit against "Changes" under the lease).  If Tenant does not provide written notice to Landlord regarding Tenant's decision to execute purchase order with Tenant's specified vendor, then Landlord shall remain responsible to execute purchase order.

B.    Remote Building Signs -- (Building Sign not located on Premises) Landlord shall furnish and install all building signs shown on Exhibits D-1 and F utilizing Tenant's specified vendor only.  Landlord is responsible to verify actual number of circuits required with sign manufacturer.  Conduit to be installed continuously from Tenant's panel in Premises or other source to remote sign location(s).

C.    Pylon/Monument/Directional Signs -- Landlord shall furnish and install all pylon /monument /directional signs (s) shown on Exhibit F to this Lease, complete (including, without limitation, sign structure and required electrical service). Tenant shall pay for the cost of the pylon panels. Landlord shall install panels.

D.    Temporary Signs -- commencing on the Effective Date, and continuing thereafter through the Rent Commencement Date, Landlord shall install and maintain, for such duration as Tenant may desire, and in accordance with Tenant's Prototype Drawings and Specifications [and Exhibit F to this Lease, as applicable]: (i) a temporary banner bearing the phrase "Coming Soon" on the storefront of the Premises. At Tenant's request, Landlord shall relocate Tenant's temporary signage, in the event the visibility thereof becomes obstructed.

E.    Landlord shall provide complete shop drawings of all Landlord-furnished signs to Tenant for Tenant's approval at least (12) weeks prior to delivery date.

### Permits and Approvals

A.    Landlord to secure all permits & obtain certificate of occupancy, allowing Tenant to fixture, merchandise, and open for business to the public in the Premises.

4

B.     Sprinkler system design shall allow Landlord to obtain and secure "high pile storage" permit.

## Construction Closeout

A.     Landlord shall deliver to Tenant's Construction Project Manager two (2) hard-copy sets of as-built drawings of the Premises, one (1) electronic copy CD-ROM (*"Auto Cad" Rel. 14* Format) of As-built along with all close-out books and warranty information, as specified within Tenant's Prototype Drawings and Specifications (refer to Section 01700 for complete list of closeout documents) within forty-five (45) days after the "Substantial Completion Date".

B.     Warranties - Landlord shall provide Tenant with a list of contractors' and subcontractors' contacts and addresses, and a guarantee, including parts and labor, for a period of at least one (1) year after the Substantial Completion Date.  Landlord shall deliver all warranties of equipment, service manuals, and as-built drawings to Tenant's construction project manager within forty-five (45) days after the "Substantial Completion Date".  Landlord shall cause its contractor(s) to instruct Tenant's Construction Project Manager in the operation of any equipment installed pursuant to these specifications.  All of Landlord's Work shall be performed in a manner which will not void, impair or diminish any manufacturers', installers', or contractors' warranties which otherwise would have been provided by such manufacturer, installer, or contractor to either Landlord or Tenant.  Two (2) months prior to the end of the warranty period, Landlord must forward a written report to Tenant on the condition of all warranty items.

C.     If Landlord fails to deliver any of the instruments and items (collectively, the "Close-out Documents") described in the immediately preceding paragraphs A and B within the prescribed forty-five (45) day period, then Tenant may provide Landlord with notice of such failure.  If Landlord has not remedied such failure within fifteen (30) days after Tenant's delivery of such notice, then Tenant shall be entitled to an abatement in Rent in the amount of One Hundred ($100.00) dollars for each day that Landlord has not so delivered all of the Close-out Documents.

D.     Itemized Budget - Landlord shall provide Tenant with its itemized "budget" and "final cost" within forty-five (45) days after the Substantial Completion Date.

E.     After delivery date, Tenant shall request manufacturer's invoices, manufacturer's cut sheets, and/or subcontractor invoices for the items described below. Landlord shall assist with this requirement:

Roofing

Gas-Using Devices (RTU's, Hot Water Heaters)

Electric Lighting and Devices

Plumbing Fixtures

5

<u>Exhibit D-1</u>

Exterior Elevations of Premises and Sidewalk Plan

D-1-1

<u>Exhibit E</u>

Permitted Encumbrances

1.     The terms, conditions and provisions contained in the document entitled "Construction Operation and Reciprocal Easement Agreement" recorded as 2001-1034470, and as 2002-0157426 of Official Records.

2.     The terms, conditions and provisions contained in the document entitled "Memorandum of Development Agreement" recorded as 2001-1034471 of Official Records.

3.     An easement for electric lines and incidental purposes, recorded as Book 59 of Miscellaneous, Page 173 of Official Records.

4.     An easement for roadway and incidental purposes, recorded as Docket 13815, Page 210 of Official Records.

5.     An easement for roadway and incidental purposes, recorded as 83-462019 of Official Records.

6.     An easement for roadway and incidental purposes, recorded as 85-455048 of Official Records.

7.     A plat recorded in Book 1, Page 60 of Road Maps, purporting to show a county roadway.

8.     A plat record in Book 29, Page 31 of Road Maps, purporting to show a county roadway.

9.     A plat recorded in Book 24, Page 33 of Road Maps, purporting to show a county roadway.

10.    Deed of Trust Securing an original indebtedness in the amount of Eleven Million Eight Hundred Twenty-Nine Thousand Three Hundred Fifty-Seven and 00/100 ($11,829,357.00) Dollars, recorded November 5, 2001 as 2001-1024472 of Official records, provided that Landlord obtains and delivers to Tenant an executed and recorded Subordination, Non-Disturbance and Attornment Agreement in Accordance with the provisions of Article 17 of the Lease.

11.    A document recorded October 2, 2002 as 2002-1022825 of Official Records provides that the Deed of Trust or the obligation secured thereby has been modified.

12.    B of A Supplemental Agreement recorded December 16, 2002.

13.    The terms, conditions and provisions contained in the document entitled "Sanitary Sewer Line Construction Easement" recorded August 13, 2002 as 2002-0823564 of Official Records.

14.    An unrecorded lease dated September 5, 2002, executed by Gateway Pavilions, L.L.C., an Arizona limited liability company as lessor and Gear 2, LLC, an Arizona limited liability company, dba: Quizno's Classic Subs as lessee, as disclosed by a(n) Subordination, Attornment and Non-Disturbance Agreement recorded October 30, 2002 as 2002-1135551 of Official Records.

15.    An unrecorded lease dated September 5, 2002, executed by Gateway Pavilions, L.L.C., an Arizona limited liability company as lessor and Kula, Inc., an Arizona corporation, dba: Great Clips as lessee, as disclosed by a (n) Subordination

E-1

Attornment and Non-Disturbance Agreement recorded November 15, 2002 as 2002-1213129 of Official Records.

16.   An unrecorded lease dated October 1, 2002, executed by Gateway Pavilions, L.L.C., an Arizona limited liability company as lessor and Mattress Outlet, Inc., an Arizona corporation as lessee, as disclosed by a(n) Subordination, Attornment and Non-Disturbance Agreement recorded November 15, 2002 as1213130 of Official Records.

17.   An unrecorded lease dated July 19, 2002, executed by Gateway Pavilions, L.L.C., an Arizona limited liability company as lessor and Sunny Shunyu Nieh, an unmarried man as lessee, as disclosed by a (n) Subordination, Attornment and Non-Disturbance Agreement recorded November 15, 2002 as 2002-1213131 of Official Records.

The inclusion of the foregoing "unrecorded leases" [items 14-17 above] within these "Permitted Encumbrances" is for informational purposes only, and without, limiting the applicable provisions of Sections 13.2.2 and 13.3.1 of this Lease, shall not be deemed to diminish any of Tenant's rights, or increase any of Tenant's obligations, under this Lease.

18.   The liabilities and obligations imposed upon said land by reason of: (a) inclusion thereof within the boundaries of the Salt River Project Agricultural Improvement and Power District; (b) membership of the owner thereof in the Salt River Valley Water Users' Association, an Arizona corporation, and (c) the terms of any Water Right Application made under the reclamation laws of the United States for the purpose of obtaining water rights for said land  (All assessments due and payable are paid).

E-2

<u>Exhibit F</u>

Signage

Exhibit G

Subordination, Non-Disturbance and Attornment Agreement

THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT
AGREEMENT, made as of the _____ day of _____, 200__, by and between
_____, a _____ [corporation] [limited] [general]
[partnership] [national banking association], having an office at _____
(the *"Mortgagee"*) and Bed Bath & Beyond Inc., a New York corporation, having an
office at 650 Liberty Avenue, Union, New Jersey 07083 (the *"Tenant"*).

W I T N E S S E T H :

WHEREAS, Mortgagee is the holder of a mortgage (hereinafter called the
*"Mortgage"*) covering a parcel of land owned by Gateway Pavilions, LLC, a Arizona
limited liability company (hereinafter called *"Landlord"*) together with the
improvements [to be] erected thereon (said parcel of land and improvements thereon
being hereinafter referred to as the *"Shopping Center"* and being more particularly
described on Exhibit A attached hereto and made a part hereof); and

WHEREAS, by a certain lease heretofore entered into between Landlord and
Tenant dated as of _____ (the *"Lease"*), Landlord leased to Tenant a portion
of the Shopping Center, as more particularly described in the Lease (the *"Premises"*); and

WHEREAS, a copy of the Lease has been delivered to Mortgagee, the receipt of
which is hereby acknowledged; and

---

[For New Leases: WHEREAS, as an inducement to Tenant to enter into the
Lease, Section 2.3.1 thereof provides that the Lease is conditioned upon Landlord
obtaining this Agreement from Mortgagee; and

WHEREAS, the parties desire to satisfy the foregoing condition and to provide for
the non-disturbance of Tenant by the holder of the Mortgage; and]

---

[For Existing Leases: WHEREAS, Section 17.1 of the Lease provides that the
Lease shall become subject and subordinate to a mortgage encumbering the fee interest of
Landlord in and to the Shopping Center if and when a non-disturbance agreement is
entered into with respect to such mortgage; and

WHEREAS, the parties hereto desire to effect the subordination of the Lease to
the Mortgage and to provide for the non-disturbance of Tenant by Mortgagee.]

---

NOW, THEREFORE, in consideration of the premises and of the mutual
covenants and agreements herein contained, the parties hereto, intending to be legally
bound hereby, agree as follows:

1.     Mortgagee hereby consents to and approves the Lease and the term thereof,
including the options to extend the term as set forth in the Lease, and covenants and
agrees that the exercise by Tenant of any of the rights, remedies and options therein
contained shall not constitute a default under the Mortgage.

G-1

2.    Tenant covenants and agrees with Mortgagee that the Lease hereby is made and shall continue hereafter to be subject and subordinate to the lien of the Mortgage, and to all modifications and extensions thereof (and such subordination shall not lessen or diminish Tenant's rights under the Lease), subject, however, to the provisions of this Agreement.

3.    Mortgagee agrees that so long as the Lease shall be in full force and effect, and so long as Tenant shall not be in default under the Lease beyond any applicable notice and grace period:

(a)    Tenant shall not be named or joined as a party or otherwise in any suit, action or proceeding for the foreclosure of the Mortgage or to enforce any rights under the Mortgage or the bond or note or other obligation secured thereby;

(b)    The possession by Tenant of the Premises and Tenant's rights thereto shall not be disturbed, affected or impaired by, nor will the Lease or the term thereof be terminated or otherwise affected by (i) any suit, action or proceeding brought upon the Mortgage or the bond or note or other obligation secured thereby, or for the foreclosure of the Mortgage or the enforcement of any rights under the Mortgage, or by any judicial sale or execution or other sale of the Premises or the Shopping Center, or any deed given in lieu of foreclosure, or by the exercise of any other rights given to any holder of the Mortgage or other documents as a matter of law, or (ii) any default under the Mortgage or the bond or note or other obligation secured thereby; and

(c)    All condemnation awards and insurance proceeds paid or payable with respect to the Premises or any other part of the Shopping Center shall be applied and paid in the manner set forth in the Lease.

4.    If Mortgagee or any future holder of the Mortgage shall become the owner of the Shopping Center by reason of foreclosure of the Mortgage or otherwise, or if the Shopping Center shall be sold as a result of any action or proceeding to foreclose the Mortgage, or transfer of ownership by deed given in lieu of foreclosure, the Lease shall continue in full force and effect, without necessity for executing any new lease, as a direct lease between Tenant and the then owner of the Shopping Center, as "landlord", upon all of the same terms, covenants and provisions contained in the Lease, and in such event:

(a)    Tenant shall be bound to such new owner under all of the terms, covenants and provisions of the Lease for the remainder of the term thereof (including the Renewal Periods, if Tenant elects or has elected to exercise its options to extend the term) and Tenant hereby agrees to attorn to such new owner and to recognize such new owner as "landlord" under the Lease; and

(b)    Such new owner shall be bound to Tenant under all of the terms, covenants and provisions of the Lease for the remainder of the term thereof (including the Renewal Periods, if Tenant elects or has elected to exercise its options to extend the term) which such new owner hereby agrees to assume and perform and Tenant shall, from and after the date such new owner succeeds to the interest of "landlord" under the Lease, have the same remedies against such new owner for the breach of any covenant contained in the Lease that Tenant might have had under the Lease against Landlord if such new owner had not succeeded to the interest of "landlord"; provided, however, that such new owner shall not be:

(i)    liable for any act or omission of any prior landlord (including Landlord) unless such act or omission continues from and after the date upon which the new owner succeeds to the interest of such prior landlord;

G-2

(ii)    subject to any defenses which Tenant may have against any prior landlord (including Landlord) unless resulting from any default or breach by such prior landlord which continues from and after the date upon which the new owner succeeds to the interest of such prior landlord;

(iii)    subject to any offsets which Tenant may have against any prior landlord, except to the extent such offsets are expressly provided under the Lease and Mortgagee has received notice thereof and the opportunity to cure within the applicable time periods set forth in the Lease (it being further agreed that offsets under the Lease that were deducted by Tenant prior to the date upon which the new owner succeeds to the interest of such prior landlord shall not be subject to challenge);

(iv)    bound by any fixed rent or additional rent which Tenant might have paid for more than one month in advance of its due date under the Lease to any prior landlord (including Landlord), unless such additional rent is paid in accordance with the applicable provisions of the Lease; or

(v)    bound by any amendment or modification of the Lease made without its consent; notwithstanding the foregoing, Mortgagee acknowledges that the Lease specifically provides for amendments thereof upon the occurrence of certain events described in the Lease (such as, for example, an amendment to the Lease confirming the measurement of the Premises), and, by its execution below, Mortgagee agrees to recognize such amendments as part of the Lease, and Mortgagee further agrees that such new owner shall also be bound by such amendment(s) to the Lease, without any consent on the part of Mortgagee or such new owner.

(c)    Tenant's obligations hereunder shall be effective only so long as Mortgagee is bound to Mortgagee's obligations hereunder.

5.    Tenant will notify Mortgagee of any default by Landlord under the Lease which would entitle Tenant to terminate the Lease or abate the rent payable thereunder and agrees that notwithstanding any provision of the Lease, no notice of termination thereof nor any abatement shall be effective unless Mortgagee has received the aforesaid notice and has failed to cure the subject default within the same time period allowed Landlord under the Lease.  It is understood that the abatement provisions of this Section relate to abatements by reason of Landlord's default and do not apply to provisions of the Lease whereby Tenant has the automatic right to abate rentals such as, for example, abatement upon casualty or condemnation.

6.    Neither the Mortgage nor any other security instrument executed in connection therewith shall encumber or be construed as subjecting in any manner to the lien thereof, any trade fixtures, signs or other personal property at any time furnished or installed by or for Tenant or its subtenants or licensees on the aforementioned property regardless of the manner or mode of attachment thereof.

7.    Any notices of communications given under this Agreement shall be in writing and shall be given by registered or certified mail, return receipt requested, postage prepaid, (a) if to Mortgagee, at the address of Mortgagee as hereinabove set forth or at such other address or persons as Mortgagee may designate by notice in the manner herein set forth, or (b) if to Tenant, at the address of Tenant as hereinabove set forth, with duplicate copies to  Allan N. Rauch, Esq., c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, and  Edward M. Schotz, Esq., c/o Cole, Schotz, Meisel, Forman & Leonard, P.A., Court Plaza North, 25 Main Street, P.O. Box 800, Hackensack, New Jersey 07601, or such other address or persons as Tenant may designate by notice in the manner herein set forth.  All notices given in accordance with the provisions of this Section shall be effective upon receipt (or refusal of receipt) at the address of the addressee.

G-3

8.    This Agreement shall bind and inure to the benefit of and be binding upon and enforceable by the parties hereto and their respective successors, assigns and sublessees.

9.    This Agreement contains the entire agreement between the parties and cannot be changed, modified, waived or canceled except by an agreement in writing executed by the party against whom enforcement of such modification, change, waiver or cancellation is sought.

10.    This Agreement and the covenants herein contained are intended to run with and bind all lands affected thereby.

THIS AGREEMENT BY TENANT SHALL NOT BE EFFECTIVE UNLESS AND UNTIL ANY PRIOR MORTGAGES ON THIS PROPERTY HAVE BEEN SATISFIED SO THAT TENANT'S PRIOR AGREEMENTS TO ATTORN TO SAID MORTGAGES AND/OR TO SUBORDINATE ITS LEASE TO SAID MORTGAGES SHALL HAVE BEEN EXTINGUISHED.

IN WITNESS WHEREOF, the parties hereto have duly executed this Subordination, Non-Disturbance and Attornment Agreement as of the day and year first above written.

MORTGAGEE:

ATTEST:    _____

[Corporate Seal]                     By:_____
(Assistant) Secretary                Print Name:_____
                                     Print Title:_____

TENANT:

ATTEST:                              BED BATH & BEYOND INC.

[Corporate Seal]                     By:_____
(Assistant) Secretary                        Warren Eisenberg
                                             Co-Chief Executive Officer

G-4

<u>Exhibit H</u>

Recognition Agreement

THIS RECOGNITION AGREEMENT, made as of the _____ day of _____, 200__, by and between GATEWAY PAVILIONS, L.L.C., an Arizona limited liability company, having an address at 1707 E. Highland Avenue, Suite 100, Phoenix, Arizona 85016-4658 ("Landlord"); Bed Bath & Beyond Inc., a New York corporation, having an address at 650 Liberty Avenue, Union, New Jersey 07083 ("Tenant"); and _____, a [_____] [corporation] [limited] [general] [partnership], having an address at _____ _____ ("Subtenant").

R E C I T A L S :

A.     Landlord and Tenant have entered into a certain lease (the *"Lease"*) dated as of _____, 200__, a short form of which has been recorded in _____, which demises certain premises (the *"Premises"*) located in the Gateway Pavilions, Avondale, Arizona, which Shopping Center is more particularly described on Exhibit A annexed hereto and made a part hereof.

B.     Section 15.5 of the Lease provides that in the event Tenant subleases all of the Premises for a term of at least five (5) years, Landlord shall, upon Tenant's request, execute and deliver a Recognition Agreement among Landlord, Tenant and each such subtenant in the form attached to the Lease, in recordable form.

C.     Pursuant to a Sublease dated as of _____ (the *"Sublease"*), Tenant has subleased [a portion of] the Premises to Subtenant (the *"Subleased Premises"*).

D.     The parties hereto desire to effectuate the provisions of Section 15.5 of the Lease with respect to the Sublease and the Subleased Premises.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereto, intending to be legally bound hereby, agree as follows:

1.     Landlord warrants and represents as follows:

(i)     that it is the fee owner of the Premises,

(ii)     that the Lease is unmodified (except as may be otherwise set forth in <u>Exhibit B</u> annexed hereto, if any) and is in full force and effect,

(iii)     that the term of the Lease expires on _____, but is subject to four (4) renewal periods of five (5) years each and

(iv)     to the best of Landlord's actual knowledge, that Tenant is not in default under the Lease nor has any event occurred which would after notice to Tenant and the passage of time become a default of Tenant under the Lease.

2.     Landlord agrees that whenever it has an obligation with respect to the Premises, or its consent or approval is required for any action of Tenant under the Lease, then, to the extent such obligation, consent or approval relates to the Subleased Premises or Subtenant's use and occupation thereof, it will perform such obligation in accordance with the terms and conditions of the Lease.

H-1

3.    Landlord shall not, in the exercise of any of the rights arising or which may arise out of the Lease or of any instrument modifying or amending the same or entered into in substitution or replacement thereof (whether as a result of Tenant's default or otherwise), disturb or deprive Subtenant in or of its possession or its rights to possession of the Subleased Premises or of any right or privilege granted to or inuring to the benefit of Subtenant under the Sublease, provided that Subtenant is not in default under the Sublease beyond the expiration of any applicable notice and cure period.

4.    In the event of the termination of the Lease by reentry, notice, conditional limitation, surrender, summary proceeding or other action or proceeding, or otherwise, or, if the Lease shall terminate or expire for any reason before any of the dates provided in the Sublease for the termination of the initial or renewal terms of the Sublease and if immediately prior to such surrender, termination or expiration the Sublease shall be in full force and effect, Subtenant shall not be made a party in any removal or eviction action or proceeding nor shall Subtenant be evicted or removed of its possession or its right of possession of the Subleased Premises be disturbed or in any way interfered with, and the Sublease shall continue in full force and effect as a direct lease between Landlord and Subtenant (provided that in such event Subtenant shall, for the then remainder of the term of the Sublease, pay fixed rent and additional rent in an amount equal to the greater of (x) the Fixed Rent and Additional Rent then payable under the Lease, or (y) the fixed rent and additional rent then payable under the Sublease).

5.    Landlord hereby waives and relinquishes any and all rights or remedies against Subtenant, pursuant to any lien, statutory or otherwise, that it may have against the property, goods or chattels of Subtenant in or on the Subleased Premises.

6.    This Agreement is not, and shall not be deemed or construed, to modify, waive or affect any of the provisions, covenants or conditions of the Lease, waive any breach of the Lease or any of the rights of Landlord under the Lease against Tenant, or enlarge or increase Landlord's obligations under the Lease.

7.    (a)    Neither the sublease of the Premises nor this Agreement shall: (i) release Tenant from any liability, whether past, present or future, under the Lease; (ii) alter the sole liability of Tenant to pay the rent, additional rent and all other charges under the Lease, and the primary liability of Tenant to perform all of "Tenant's" other obligations under the Lease; or (iii) be construed as a consent to any portion of the Premises being used or occupied by any other party other than Subtenant, except as permitted by the Lease.

(b)    In granting its consent hereunder: (i) Landlord does not consent to or approve any term, provision, covenant or condition in the Sublease, and, except as provided herein, Landlord shall not be bound by the Sublease, (ii) no rights shall be granted to Subtenant under the Sublease that are greater than those granted to Tenant under the Lease, and (iii) Landlord does not consent to the term of the Sublease extending beyond the original Term, plus any Renewal Options pursuant to the Lease. In the event of any conflict between the terms and provisions of the Lease or this Agreement, and the terms and provisions of the Sublease, the terms and provisions of the Lease or this Agreement, as applicable, shall prevail.

(c)    Landlord shall not be liable for any cost or obligation of any kind arising in connection with the Sublease, including without limitation, brokerage commissions, improvements to the Premises, or any security deposit required to be paid by Subtenant under the Sublease, Tenant and Subtenant jointly and severally agree to indemnify, protect, defend and hold Landlord harmless from all claims, losses, liabilities, costs and expenses (including attorneys' fees) which Landlord may incur as a result of any claim to pay any person or entity any commission, finder's fee or other charge in connection with the Sublease.

H-2

8.    (a)    Upon a termination of the Lease and the recognition by Landlord of Subtenant in accordance herewith, for the benefit of Landlord and Tenant, Subtenant shall attorn to Landlord as its landlord under the terms of the Sublease. The attornment by Subtenant, the sublease, or this Agreement shall not release or discharge Tenant from any liability under the Lease, and Tenant shall remain liable and responsible for the full performance and observance of all the provisions, covenants and conditions in the Lease to be performed and observed by Tenant. Any breach or violation of any provision of the Lease by Tenant or Subtenant, or both, shall constitute a default by Tenant under the Lease. Upon such assumption Landlord may proceed directly against Tenant without first exhausting Landlord's remedies against Subtenant, or Landlord may proceed directly against Subtenant without first exhausting Landlord's remedies against Tenant.

(b)    Landlord shall not, as a result of the Sublease, be liable to Subtenant for any failure of Tenant to perform any obligation of Tenant under the Sublease.

(c)    If the Lease is terminated before the expiration of the term of the Sublease, Landlord shall assume the obligations of Tenant under the Sublease from the time of the exercise of the option, but Landlord shall not be:

(i)    liable for any rent paid by Subtenant to Tenant more than one month in advance, or any security deposit paid by Subtenant to Tenant;

(ii)    liable for any act or omission of Tenant under the Lease or for any default of Tenant under the Sublease which occurred before Landlord's assumption;

(iii)    subject to any defenses or offsets which Subtenant may have against Tenant which arose before Landlord's assumption; or

(iv)    bound by any changes or modifications made to the Sublease which are inconsistent with this Agreement or Section 15.5 of the Lease without the written consent of Landlord.

(d)    After Landlord shall have succeeded to Tenant's interest in the Sublease and Subtenant shall have attorned to Landlord as provided above, but not otherwise, Landlord may consent to subsequent sub-subleases and assignments of the Sublease or to any amendments or modifications to the Sublease, without notifying Tenant. No such action by Landlord shall relieve any person from any liability to Landlord or otherwise with regard to the Premises, to the extent any such liability shall exist under the Lease.

9.    Tenant and Subtenant represent and warrant that there are no additional payments of rent or any other consideration of any type has been paid or is payable by Subtenant to Tenant in connection with the Sublease, other than as disclosed in the Sublease.

10.    Any notices, consents, approvals, submissions, demands or other communications (hereinafter collectively referred to as "Notice") given under this Agreement shall be in writing. Unless otherwise required by law or governmental regulation, Notices shall be deemed given if sent by registered or certified mail, return receipt requested, postage prepaid (a) to Landlord, at the address of Landlord as hereinabove set forth or such other address or persons as Landlord may designate by Notice to the other parties hereto, (b) to Tenant, at the address of Tenant as hereinabove set forth, with duplicate copies to  Allan N. Rauch, Esq., c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, and  Edward M. Schotz, Esq., c/o Cole, Schotz, Meisel, Forman & Leonard, P.A., Court Plaza North, 25 Main Street, P.O. Box 800, Hackensack, New Jersey 07601, or such other address or persons as Tenant may designate by Notice to the other parties hereto, and (c) to Subtenant, at the address of Subtenant as hereinabove set forth or such other address or persons as Subtenant may

H-3

designate by Notice to the other parties hereto.  During the period of any postal strike or other interference with the mails, personal delivery shall be substitute for registered or certified mail.  All Notices shall become effective only on the receipt or rejection of same by the proper parties.

11.    No modification, amendment, waiver or release of any provision of this Agreement or of any right, obligation, claim or cause of action arising hereunder shall be valid or binding for any purpose whatsoever unless in writing and duly executed by the party against whom the same is sought to be asserted.

12.    This Agreement shall be binding on and shall inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors, assigns and sublessees.

H-4

IN WITNESS WHEREOF, the parties have caused this Recognition Agreement to be executed under seal the date first above written.

LANDLORD:

**GATEWAY PAVILIONS, L.L.C.,**
an Arizona limited liability company

By: KDC-GP Partners, L.L.C.,
    an Arizona limited liability company,
    Manager and Member

    By: Kitchell Development
       Company, an Arizona
       corporation, Managing Member

       By:_____
          Print Name:_____
          Print Title:_____

TENANT:

**BED BATH & BEYOND INC.**
a New York corporation

By:_____
      Warren Eisenberg
      Co-Chief Executive Officer

SUBTENANT:

_____
a

By:_____
    Print Name:_____
    Print Title:_____

H-5

STATE OF NEW JERSEY )

                     ) : ss.

COUNTY OF UNION     )

      On this ___ day of _____, 200__, before me personally came Warren Eisenberg to me known, who being by me duly sworn, did depose and say that he is the Co-Chief Executive Officer of Bed Bath & Beyond Inc., the corporation described in and which executed the above instrument and that he signed his name thereto by order of the Board of Directors of said corporation.

                          _____
                          Notary Public

My Commission Expires:

H-6

<u>Exhibit I</u>

Delivery Date Notice

**[Letterhead of Landlord]**

_____, ____

VIA Federal Express or other
recognized overnight delivery
service per Article 18 of the foregoing lease

Bed Bath & Beyond Inc.
650 Liberty Avenue
Union, NJ 07083
Attn: Warren Eisenberg

Re:    Agreement of Lease, dated _____, 200__ (the "Lease"), between
Gateway Pavilions, L.L.C., as landlord ("Landlord"), and Bed Bath &
Beyond Inc., as tenant ("Tenant"), with respect to certain retail premises
(the "Premises") located in the Gateway Pavilions, Avondale, Arizona.

Gentlemen:

In accordance with the provisions of Subsection 2.3.2 of the Lease, the Landlord
hereby informs the Tenant that the Delivery Date shall take place at 8:00 A.M. on
_____, 200__. This notice shall constitute the Delivery Date Notice referred to
in Subsection 2.3.2 of the Lease.

**GATEWAY PAVILIONS, L.L.C.,**
an Arizona limited liability company

By: KDC-GP Partners, L.L.C.,
an Arizona limited liability
company, Manager and Member

By: Kitchell Development
Company, an Arizona
corporation, Managing Member

By:_____
   Print Name:_____
   Print Title:_____

cc:    [Edward M. Schotz, Esq.]
    [Allan N. Rauch, Esq.]

I-1

Exhibit J

Delivery Date Certification

[Letterhead of Landlord]

_____, 200__

[via Federal Express or other
recognized overnight delivery
service per Article 18 of the
foregoing lease]

Bed Bath & Beyond Inc.
650 Liberty Avenue
Union, NJ 07083
Attn: Warren Eisenberg

Re:    Agreement of Lease, dated _____, 200__ (the "Lease"), between Gateway
Pavilions, L.L.C., as landlord ("Landlord"), and Bed Bath & Beyond Inc., as
tenant ("Tenant"), with respect to certain retail premises (the "Premises") located
in the Gateway Pavilions, Avondale, Arizona _____

Gentlemen:

In accordance with the provisions of Subsection 2.3.3 of the Lease, Landlord
hereby certifies to Tenant that, as of the date of this certification, all of the Delivery Date
Conditions (as defined in the Lease) have been satisfied, and that, as a result, the Delivery
Date (as such term is defined in the Lease) will be deemed to be _____, 200__
[INSERT THE DATE WHICH IS TWO DAYS AFTER THE DATE OF THIS
LETTER]. This notice shall constitute the Delivery Date Certification referred to in
Subsection 2.3.3 of the Lease.

> **GATEWAY PAVILIONS, L.L.C.,**
> an Arizona limited liability company
>
> By:   KDC-GP Partners, L.L.C.
> an Arizona limited liability
> company, Manager and Member
>
>     By: Kitchell Development
>        Company, an Arizona
>        corporation, Managing Member
>
>        By:_____
>           Print Name:_____
>           Print Title:_____

cc: [Edward M. Schotz, Esq.]
    [Allan N. Rauch, Esq.]

Exhibit K-1

Existing Exclusives

SENT BY:                    12-20- 2 ; 2:09PM ;                    →           908 688 8385;# 2/ 2

DEC-02-02   06:31PM   FROM-BBB REAL ESTATE/LEGAL        908-688-8385 ,        T-637  P.002/003  F-284

*EXHIBIT K-1*

**EXISTING EXCLUSIVE USE LANGUAGE (MAJORS)**
**AS OF NOVEMBER 27, 2002**
**GATEWAY PAVILIONS, AVONDALE AZ**

**SPORTMART**

17.4   <u>Exclusive Use</u>.

      17.4.1. <u>Limitation on Use</u>. Neither Landlord nor any affiliate of Landlord (i.e., any individual or entity that controls, is controlled by, or is under common control with Landlord) will authorize or permit any premises or space in, or portion of, the Shopping Center, or , from and after the date that Landlord or any such affiliate acquires title thereto, any other property within the Project, other than the Premises, to be used for the retail sale and/or rental of sporting goods, sports apparel or athletic footwear, provided that such exclusive will not apply to (i) the incidental sale of sporting goods by an occupant so long as the retail display space in such occupant's premises that is used for the display of such merchandise is of a size not greater than the lesser of 500 Leasable Square Feet or 10% of such occupant's total Leasable Square Feet; or (ii) the incidental sale of sports apparel or athletic footwear by an occupant so long as the retail display space in such occupant's premises that is used for the display of such merchandise is of a size not greater than the lesser of 1,000 Leasable Square Feet or 10% of such occupant's total Leasable Square Feet; or (iii) the operation of a Kohl's, KMart, Ross or similar department store that does not sell primarily sporting goods, sports apparel or athletic footwear. As used herein, "athletic footwear" means footwear associated with sports and sport purposes (including, without limitation, running, jogging and aerobic activity).

GATEWAY PAVILIONS
COLD STONE
EXCLUSIVE

10.8 Exclusive.

1. From and after the Effective Date, Landlord shall not execute and deliver any lease for space in the Center pursuant to which Landlord authorizes the use of the premises demised by said lease primarily for: the retail sale of ice cream ("Exclusive Use").

2. Notwithstanding any provision of this Lease to the contrary, the Exclusive Use shall not restrict, in any manner whatsoever, the sale, by any occupant of the Center, of ice cream, where such sale of ice cream constitutes less than 50% of such occupant's gross sales during any calendar year.

3. Further notwithstanding anything in this Lease to the contrary, the Exclusive Use shall not apply: (i) to any portion of the Center not owned, or the use of which is not controlled, by Landlord as of the date of the Lease, and (ii) to any portion of the Center in excess of 5,000 square feet of floor area leased to, or occupied or owned by, a single person or entity. Landlord warrants to Tenant that there are no leases in existence as of the Effective Date under which the tenant's primary use is the Exclusive Use.

4. The failure of Tenant to continuously conduct business in the Premises primarily for the Exclusive Use shall constitute an abandonment of the Exclusive Use, which shall thereupon release Landlord from all obligations with respect to the Exclusive Use. Additionally, Landlord's obligations hereunder shall be conditioned upon Tenant's not being in default under the Lease. No action shall be brought or prosecuted by Tenant against Landlord for any breach of the Exclusive Use if Tenant then is in default of any obligation of Tenant under this Lease, after applicable cure periods.

5. If the Exclusive Use or Tenant's or Landlord's enforcement of same violates, or is alleged or claimed to violate, any law or governmental rule or regulation, Tenant shall indemnify, defend and hold Landlord harmless from and against all claims, losses, damages and expenses, including reasonable attorneys' fees, asserted against or suffered by Landlord resulting from any liability or obligation of Landlord arising out of, or in connection with, such violation, or alleged or claimed violation.

6. Except as expressly set forth in this Lease, Tenant shall have no exclusive right, express or implied, to conduct business of any nature whatsoever in the Center.

GATEWAY PAVILIONS
KULA, INC. (GREAT CLIPS)
EXCLUSIVE

10.8 Exclusive.

1. From and after the Effective Date, Landlord shall not execute and deliver any lease for space in the Center pursuant to which Landlord authorizes the use of the premises demised by said lease primarily for the retail operation of a family, no-appointment, haircutting business ("Exclusive Use").

2. Notwithstanding any provision of this Lease to the contrary, the Exclusive Use shall not restrict, in any manner whatsoever, the incidental use of any portion of the Center for the conduct of business in conflict with the Exclusive Use.

3. Further notwithstanding anything in this Lease to the contrary, the Exclusive Use shall not apply: (i) to any portion of the Center not owned, or the use of which is not controlled, by Landlord as of the date of the Lease, (ii) to any portion of the Center in excess of 5,000 square feet of floor area leased to, or occupied or owned by, a single person or entity, and (iii) to any leases in existence as of the Effective Date, and any amendments, extensions and renewals thereof as follows: None.

4. The failure of Tenant to continuously conduct business in the Premises primarily for the Exclusive Use shall constitute an abandonment of the Exclusive Use, which shall thereupon release Landlord from all obligations with respect to the Exclusive Use. Additionally, Landlord's obligations hereunder shall be conditioned upon Tenant's not being in default under the Lease. No action shall be brought or prosecuted by Tenant against Landlord for any breach of the Exclusive Use if Tenant then is, or has been at any time, in default of any obligation of Tenant under this Lease.

5. If the Exclusive Use or Tenant's or Landlord's enforcement of same violates, or is alleged or claimed to violate, any law or governmental rule or regulation, Tenant shall indemnify, defend and hold Landlord harmless from and against all claims, losses, damages and expenses, including reasonable attorneys' fees, asserted against or suffered by Landlord resulting from any liability or obligation of Landlord arising out of, or in connection with, such violation, or alleged or claimed violation.

6. Except as expressly set forth in this Lease, Tenant shall have no exclusive right, express or implied, to conduct business of any nature whatsoever in the Center.

3 of 12

GATEWAY PAVILIONS
KYOTO BOWL
EXCLUSIVE

## 10.8  Exclusive.

1.    From and after the Effective Date, Landlord shall not execute and deliver any lease for space in the part of the Center designated Shop 2 and Shop 3 (collectively, the "Exclusive Area") pursuant to which Landlord authorizes the use of the premises demised by said lease primarily for: the retail sale of prepared Japanese, Thai or Chinese food (collectively, "Exclusive Use").

2.    Notwithstanding any provision of this Lease to the contrary, the Exclusive Use shall not restrict, in any manner whatsoever, the use of any portion of the Exclusive Area for the conduct of business in conflict with the Exclusive Use, not exceeding 10% of such portion's gross sales during any calendar year.

3.    Further notwithstanding anything in this Lease to the contrary, the Exclusive Use shall not apply:   (i) to any portion of the Exclusive Area not owned, or the use of which is not controlled, by Landlord as of the date of the Lease, (ii) to any portion of the Exclusive Area in excess of 5,000 square feet of floor area leased to, or occupied or owned by, a single person or entity, and (iii) to any leases in existence as of the Effective Date, and any amendments, extensions and renewals thereof.

4.    The failure of Tenant to continuously conduct business in the Premises primarily for the Exclusive Use shall constitute an abandonment of the Exclusive Use, which shall thereupon release Landlord from all obligations with respect to the Exclusive Use. Additionally, Landlord's obligations hereunder shall be conditioned upon Tenant's not being in default, after any applicable cure period, under the Lease. No action shall be brought or prosecuted by Tenant against Landlord for any breach of the Exclusive Use if Tenant then is in default, after any applicable cure period, of any obligation of Tenant under this Lease.

5.    If the Exclusive Use or Tenant's or Landlord's enforcement of same violates, or is alleged or claimed to violate, any law or governmental rule or regulation, Tenant shall indemnify, defend and hold Landlord harmless from and against all claims, losses, damages and expenses, including reasonable attorneys' fees, asserted against or suffered by Landlord resulting from any liability or obligation of Landlord arising out of, or in connection with, such violation, or alleged or claimed violation.

6.    Except as expressly set forth in this Lease, Tenant shall have no exclusive right, express or implied, to conduct business of any nature whatsoever in the Center.

4 of 12

GATEWAY PAVILIONS
MATTRESS OUTLET
EXCLUSIVE

10.8 Exclusive.

1.    From and after the Effective Date, Landlord shall not execute and deliver any lease for space in the Center pursuant to which Landlord authorizes the use of the premises demised by said lease primarily for: the retail sale of mattresses ("Exclusive Use").

2.    Notwithstanding any provision of this Lease to the contrary, the Exclusive Use shall not restrict, in any manner whatsoever, the incidental use of any portion of the Center for the conduct of business in conflict with the Exclusive Use.

3.    Further notwithstanding anything in this Lease to the contrary, the Exclusive Use shall not apply: (i) to any portion of the Center not owned, or the use of which is not controlled, by Landlord as of the date of the Lease, (ii) to any portion of the Center in excess of 5,000 square feet of floor area leased to, or occupied or owned by, a single person or entity, and (iii) to any leases in existence as of the Effective Date, and any amendments, extensions and renewals thereof.

4.    The failure of Tenant to continuously conduct business in the Premises primarily for the Exclusive Use shall constitute an abandonment of the Exclusive Use, which shall thereupon release Landlord from all obligations with respect to the Exclusive Use. Additionally, Landlord's obligations hereunder shall be conditioned upon Tenant's not being in default under the Lease. No action shall be brought or prosecuted by Tenant against Landlord for any breach of the Exclusive Use if Tenant then is in default of any obligation of Tenant under this Lease.

5.    If the Exclusive Use or Tenant's or Landlord's enforcement of same violates, or is alleged or claimed to violate, any law or governmental rule or regulation, Tenant shall indemnify, defend and hold Landlord harmless from and against all claims, losses, damages and expenses, including reasonable attorneys' fees, asserted against or suffered by Landlord resulting from any liability or obligation of Landlord arising out of, or in connection with, such violation, or alleged or claimed violation.

6.    Except as expressly set forth in this Lease, Tenant shall have no exclusive right, express or implied, to conduct business of any nature whatsoever in the Center.

5 of 12

GREENWAY

QUIZNO'S

EXCLUSIVE

10.8  Exclusive.

1.  From and after the Effective Date, Landlord shall not execute and deliver any lease for space in the part of the Center designated Shop 5, Shop 6, Shop 7 and Pad E (collectively, the "Exclusive Area") pursuant to which Landlord authorizes the use of the premises demised by said lease primarily for: the retail sale of submarine sandwiches ("Exclusive Use").

2.  Notwithstanding any provision of this Lease to the contrary, the Exclusive Use shall not restrict, in any manner whatsoever, the incidental use of any portion of the Exclusive Area for the conduct of business in conflict with the Exclusive Use.

3.  Further notwithstanding anything in this Lease to the contrary, the Exclusive Use shall not apply:  (i) to any portion of the Exclusive Area not owned, or the use of which is not controlled, by Landlord as of the date of the Lease, (ii) to any portion of the Exclusive Area equal to or greater than 5,000 square feet of floor area leased to, or occupied or owned by, a single person or entity, (iii) to any part of the Center outside of the Exclusive Area, (iv) to any leases in existence as of the Effective Date that allow the Exclusive Use without an amendment thereof, and any amendments, extensions and renewals thereof, although no such amendment, extension or renewal shall allow any tenant, under any lease in existence as of the Effective Date, to use its premises for the Exclusive Use, if such use was not so allowed, as of the Effective Date, under its lease, (v) to any single-user pads, and (vi) to any occupant of the Exclusive Area or the remainder of the Center whose use includes the retail sale of steak sandwiches, as a primary business.

4.  The failure of Tenant to continuously conduct business in the Premises primarily for the Exclusive Use shall constitute an abandonment of the Exclusive Use, which shall thereupon release Landlord from all obligations with respect to the Exclusive Use. Additionally, Landlord's obligations hereunder shall be conditioned upon Tenant's not being in default under the Lease. No action shall be brought or prosecuted by Tenant against Landlord for any breach of the Exclusive Use if Tenant then is in default of any obligation of Tenant under this Lease beyond any applicable cure period.

5.  If the Exclusive Use or Tenant's or Landlord's enforcement of same violates, or is alleged or claimed to violate, any law or governmental rule or regulation, Tenant shall indemnify, defend and hold Landlord harmless from and against all claims, losses, damages and expenses, including reasonable attorneys' fees, asserted against or suffered by Landlord resulting from any liability or obligation of Landlord arising out of, or in connection with, such violation, or alleged or claimed violation.

5.  Except as expressly set forth in this Lease, Tenant shall have no exclusive right, express or implied to ...

6  of  12

GATEWAY PAVILIONS
TONY'S LA NAILS
EXCLUSIVE

### 10.8 Exclusive.

**1.** From and after the Effective Date, Landlord shall not execute and deliver any lease for space in the Center pursuant to which Landlord authorizes the use of the premises demised by said lease primarily for: a nail salon ("Exclusive Use").

**2.** Notwithstanding any provision of this Lease to the contrary, the Exclusive Use shall not restrict, in any manner whatsoever, the incidental use of any portion of the Center for the conduct of business in conflict with the Exclusive Use.

**3.** Further notwithstanding anything in this Lease to the contrary, the Exclusive Use shall not apply: (i) to any portion of the Center not owned, or the use of which is not controlled, by Landlord as of the date of the Lease, (ii) to any portion of the Center in excess of 5,000 square feet of floor area leased to, or occupied or owned by, a single person or entity, and (iii) to any leases in existence as of the Effective Date, and any amendments, extensions and renewals thereof.

**4.** The failure of Tenant to continuously conduct business in the Premises primarily for the Exclusive Use shall constitute an abandonment of the Exclusive Use, which shall thereupon release Landlord from all obligations with respect to the Exclusive Use. Additionally, Landlord's obligations hereunder shall be conditioned upon Tenant's not being in default under the Lease. No action shall be brought or prosecuted by Tenant against Landlord for any breach of the Exclusive Use if Tenant then is, or has been at any time, in default of any obligation of Tenant under this Lease.

**5.** If the Exclusive Use or Tenant's or Landlord's enforcement of same violates, or is alleged or claimed to violate, any law or governmental rule or regulation, Tenant shall indemnify, defend and hold Landlord harmless from and against all claims, losses, damages and expenses, including reasonable attorneys' fees, asserted against or suffered by Landlord resulting from any liability or obligation of Landlord arising out of, or in connection with, such violation, or alleged or claimed violation.

**6.** Except as expressly set forth in this Lease, Tenant shall have no exclusive right, express or implied, to conduct business of any nature whatsoever in the Center.

7 of 12

GATEWAY PAVILIONS
SUNNY NIEH, DDS
EXCLUSIVE

10.8 Exclusive.

1. From and after the Effective Date, Landlord shall not execute and deliver any lease for space in the Center pursuant to which Landlord authorizes the use of the premises demised by said lease primarily for: the retail providing of general dental services ("Exclusive Use").

2. Notwithstanding any provision of this Lease to the contrary, the Exclusive Use shall not restrict, in any manner whatsoever, the incidental use of any portion of the Center for the conduct of business in conflict with the Exclusive Use.

3. Further notwithstanding anything in this Lease to the contrary, the Exclusive Use shall not apply: (i) to any portion of the Center not owned, or the use of which is not controlled, by Landlord as of the date of the Lease, (ii) to any portion of the Center in excess of 8,000 square feet of floor area leased to, or occupied or owned by, a single person or entity, (iii) to any premises in the Center wherein the primary use is the providing of specialized dental services, for example, without limitation, orthodonture and/or endodontics, and (iv) to any leases in existence as of the Effective Date, and any amendments, extensions and renewals thereof.

4. The failure of Tenant to continuously conduct business in the Premises primarily for the Exclusive Use shall constitute an abandonment of the Exclusive Use, which shall thereupon release Landlord from all obligations with respect to the Exclusive Use. Additionally, Landlord's obligations hereunder shall be conditioned upon Tenant's not being in default under the Lease. No action shall be brought or prosecuted by Tenant against Landlord for any breach of the Exclusive Use if Tenant then is, or has been at any time, in default of any obligation of Tenant under this Lease.

5. If the Exclusive Use or Tenant's or Landlord's enforcement of same violates, or is alleged or claimed to violate, any law or governmental rule or regulation, Tenant shall indemnify, defend and hold Landlord harmless from and against all claims, losses, damages and expenses, including reasonable attorneys' fees, asserted against or suffered by Landlord resulting from any liability or obligation of Landlord arising out of, or in connection with, such violation, or alleged or claimed violation.

6. Except as expressly set forth in this Lease, Tenant shall have no exclusive right, express or implied, to conduct business of any nature whatsoever in the Center.

8 of 12

GATEWAY PAVILIONS
CLEAR INTELLIGENT WIRELESS
EXCLUSIVE

### 10.8 Exclusive.

1.    From and after the Effective Date, Landlord shall not execute and deliver any lease for space in the part of the Center designated Shop 2, Shop 3 and Shop 4 (collectively, the "Exclusive Area") pursuant to which Landlord authorizes the use of the premises demised by said lease primarily for: the retail sale of wireless telephones and services ("Exclusive Use").

2.    Notwithstanding any provision of this Lease to the contrary, the Exclusive Use shall not restrict, in any manner whatsoever, the incidental use of any portion of the Exclusive Area for the conduct of business in conflict with the Exclusive Use.

3.    Further notwithstanding anything in this Lease to the contrary, the Exclusive Use shall not apply:  (i) to any portion of the Exclusive Area not owned, or the use of which is not controlled, by Landlord as of the date of the Lease, (ii) to any portion of the Exclusive Area in excess of 7,500 square feet of floor area leased to, or occupied or owned by, a single person or entity, (iii) to any part of the Center outside of the Exclusive Area, and (iv) to any leases in existence as of the Effective Date, and any amendments, extensions and renewals thereof.

4.    The failure of Tenant to continuously conduct business in the Premises primarily for the Exclusive Use shall constitute an abandonment of the Exclusive Use, which shall thereupon release Landlord from all obligations with respect to the Exclusive Use. Additionally, Landlord's obligations hereunder shall be conditioned upon Tenant's not being in default under the Lease. No action shall be brought or prosecuted by Tenant against Landlord for any breach of the Exclusive Use if Tenant then is in default of any obligation of Tenant under this Lease.

5.    If the Exclusive Use or Tenant's or Landlord's enforcement of same violates, or is alleged or claimed to violate, any law or governmental rule or regulation, Tenant shall indemnify, defend and hold Landlord harmless from and against all claims, losses, damages and expenses, including reasonable attorneys' fees, asserted against or suffered by Landlord resulting from any liability or obligation of Landlord arising out of, or in connection with, such violation, or alleged or claimed violation.

6.    Except as expressly set forth in this Lease, Tenant shall have no exclusive right, express or implied, to conduct business of any nature whatsoever in the Center.

9 of 12

*Part of Sub*

## 10.8 Exclusive.

1. From and after the Effective Date, Landlord shall not execute and deliver any lease for space in the part of the Center designated Shop 2, Shop 3, Shop 4, Pad A, Pad B, Pad C, Pad D and Pad K (collectively, the "Exclusive Area") pursuant to which Landlord authorizes the use of the premises demised by said lease primarily for: the retail sale of submarine sandwichs ("Exclusive Use").

2. Notwithstanding any provision of this Lease to the contrary, the Exclusive Use shall not restrict, in any manner whatsoever, the incidental use of any portion of the Exclusive Area for the conduct of business in conflict with the Exclusive Use.

3. Further notwithstanding anything in this Lease to the contrary, the Exclusive Use shall not apply: (i) to any portion of the Exclusive Area not owned, or the use of which is not controlled, by Landlord as of the date of the Lease, (ii) to any portion of the Exclusive Area in excess of 5,000 square feet of floor area leased to, or occupied or owned by, a single person or entity, (iii) to any part of the Center outside of the Exclusive Area, and (iv) to any leases in existence as of the Effective Date, and any amendments, extensions and renewals thereof.

4. The failure of Tenant to continuously conduct business in the Premises primarily for the Exclusive Use shall constitute an abandonment of the Exclusive Use, which shall thereupon release Landlord from all obligations with respect to the Exclusive Use. Additionally, Landlord's obligations hereunder shall be conditioned upon Tenant's not being in default under the Lease. No action shall be brought or prosecuted by Tenant against Landlord for any breach of the Exclusive Use if Tenant then is in default of any obligation of Tenant under this Lease.

5. If the Exclusive Use or Tenant's or Landlord's enforcement of same violates, or is alleged or claimed to violate, any law or governmental rule or regulation, Tenant shall indemnify, defend and hold Landlord harmless from and against all claims, losses, damages and expenses, including reasonable attorneys' fees, asserted against or suffered by Landlord resulting from any liability or obligation of Landlord arising out of, or in connection with, such violation, or alleged or claimed violation.

6. Except as expressly set forth in this Lease, Tenant shall have no exclusive right, express or implied, to conduct business of any nature whatsoever in the Center.

10 of 12

_VoiceStream_

## 10.8 Exclusive.

1. From and after the Effective Date, Landlord shall not execute and deliver any lease for space in the part of the Center shown as hachured on Exhibit A (the "Exclusive Area") pursuant to which Landlord authorizes the use of the premises demised by said lease primarily for: the retail sale of wireless telephones and services ("Exclusive Use"). Additionally, Landlord will use its best efforts to prohibit all tenants in the Center under 10,000 square feet from selling VoiceStream cellular service.

2. Notwithstanding any provision of this Lease to the contrary, the Exclusive Use shall not restrict, in any manner whatsoever, the incidental use of any portion of the Exclusive Area for the conduct of business in conflict with the Exclusive Use. The definition of incidental use for purposes of this Section 10.8.2 shall be any gross sales of 5% or less per year.

3. Further notwithstanding anything in this Lease to the contrary, the Exclusive Use shall not apply: (i) to any portion of the Exclusive Area not owned, or the use of which is not controlled, by Landlord as of the date of the Lease, (ii) to any portion of the Exclusive Area in excess of 5,000 square feet of floor area leased to, or occupied or owned by, a single person or entity, (iii) to any part of the Center outside of the Exclusive Area, (iv) to any leases in existence as of the Effective Date, and any amendments, extensions and renewals thereof, and (v) to Majors "A" through "F" as shown on Exhibit A.

4. The failure of Tenant to continuously conduct business in the Premises primarily for the Exclusive Use shall constitute an abandonment of the Exclusive Use, which shall thereupon release Landlord from all obligations with respect to the Exclusive Use. Additionally, Landlord's obligations hereunder shall be conditioned upon Tenant's not being in default under the Lease. No action shall be brought or prosecuted by Tenant against Landlord for any breach of the Exclusive Use if Tenant then is in default of any obligation of Tenant under this Lease. The phrase "continuously conduct business" as utilized in this Lease shall not include any interruption of Tenant's business on the Premises for three or fewer consecutive business days within any month of this Lease and shall not apply for the period prior to 90 days after Tenant opens for business.

5. If the Exclusive Use or Tenant's or Landlord's enforcement of same violates, or is alleged or claimed to violate, any law or governmental rule or regulation, Tenant shall indemnify, defend and hold Landlord harmless from and against all claims, losses, damages and expenses, including reasonable attorneys' fees, asserted against or suffered by Landlord resulting from any liability or obligation of Landlord arising out of, or in connection with, such violation, or alleged or claimed violation.

6. Except as expressly set forth in this Lease, Tenant shall have no exclusive right, express or implied, to conduct business of any nature whatsoever in the Center.
conduct business" as utilized in this Lease shall not include any interruption of Tenant's business on the Premises for three or fewer consecutive business days within any month of this Lease and shall not apply for the period prior to 90 days after Tenant opens for business.

5. If the Exclusive Use or Tenant's or Landlord's enforcement of same violates, or is alleged or claimed to violate, any law or governmental rule or regulation, Tenant shall indemnify, defend and hold Landlord harmless from and against all claims, losses, damages and expenses, including reasonable attorneys' fees, asserted against or suffered by Landlord resulting from any liability or obligation of Landlord arising out of, or in connection with, such violation, or alleged or claimed violation.

6. Except as expressly set forth in this Lease, Tenant shall have no exclusive right, express or implied, to conduct business of any nature whatsoever in the Center.

11 of 12

Tarzla Express

1. From and after the Effective Date, Landlord shall not execute and deliver any lease for space in the Center pursuant to which Landlord authorizes the use of the premises demised by said lease primarily for: a quick serve restaurant which sells Asian food or uses a wok ("Exclusive Use"). For purposes hereof, (a) the term "Asian food" shall mean Chinese, Japanese, Vietnamese, Thai, Mongolian, Hawaiian, Cajun or Korean cuisine, (b) primary use shall mean ten percent (10%) of the Gross Sales or menu items of such business, and (c) quick serve shall mean a restaurant that does not have waiters/waitresses that both take orders tableside and deliver food tableside.

2. Notwithstanding any provision of this Lease to the contrary, the Exclusive Use shall not restrict, in any manner whatsoever, the non-primary use of any portion of the Center for the conduct of business in conflict with the Exclusive Use.

3. Further notwithstanding anything in this Lease to the contrary, the Exclusive Use shall not apply: (i) to any portion of the Center not owned, or the use of which is not controlled, by Landlord as of the date of the Lease, (ii) to any portion of the Center in excess of 8,000 square feet of floor area leased to, or occupied or owned by, a single person or entity, (iii) to, at any time and from time to time, one (1) quick-serve restaurant which sells Asian food other than one that sells primarily Chinese food in Shop 1, Shop 2 or Shop 3 (by example, restaurants that shall be permitted are: Kyoto Bowl, Tokyo Express, Samurai Sams, Yoshis and YC's Mongolian Grill, and, by example, restaurants not permitted are Pei Wai, Shogun (Express) and Pick Up Styx), (iv) to any leases in existence as of the Effective Date, and any amendments, extensions and renewals thereof, and (v) to the buildings shown as Majors "A" through "F" on Exhibit A.

4. The failure of Tenant to continuously conduct business in the Premises primarily for the Exclusive Use shall constitute an abandonment of the Exclusive Use, which shall thereupon release Landlord from all obligations with respect to the Exclusive Use. Additionally, Landlord's obligations hereunder shall be conditioned upon Tenant's not being in default (beyond any applicable cure period) under the Lease. No action shall be brought or prosecuted by Tenant against Landlord for any breach of the Exclusive Use if Tenant then is in default (beyond any applicable cure period) of any obligation of Tenant under this Lease.

5. If the Exclusive Use or Tenant's or Landlord's enforcement of same violates, or is sufficiently alleged to violate any law or governmental rule or regulation, Tenant shall indemnify, defend and hold Landlord harmless from and against all claims, losses, damages and expenses, including reasonable attorneys' fees, asserted against or suffered by Landlord resulting from any liability or obligation of Landlord arising out of, or in connection with, such violation, or alleged or claimed violation.

6. Except as expressly set forth in this Lease, Tenant shall have no exclusive right, express or implied, to conduct business of any nature whatsoever in the Center.

7. In determining the foregoing restrictions, tenants, occupants or users in the Center which are owned, controlled, under common control with, or affiliated with, any other tenant, occupant or user in the Center shall be treated as one and the same entity. Further, Landlord hereby represents and warrants that, as of the Effective Date, there are no tenants, occupants or users or any other parties in the Center who have leases or agreements which (i) except as allowed under section 3(i), (ii) and (iii), above, and as described on Exhibit "L", permit the primary use as a restaurant which sells "Asian food", or (ii) prohibit the use of the Premises allowed under section 1.13.

8. Upon breach of this exclusive use right, Tenant shall have all remedies given to it at law or in equity, including the right to injunctive relief and damages.

12 of 12

<u>Exhibit K-2</u>

Existing Leases

GATEWAY PAVILIONS
EXECUTED LEASES
AS OF JANUARY 6, 2003

1   JESSE RICHARDSON and CARRIE RICHARDSON, individually and as husband and wife.
    Dba:   Clear Intelligent Wireless

2   COLD STONE CREAMERY LEASING COMPANY, INC., an Arizona corporation.
    Dba:   Cold Stone Creamery

3   KULA, INC., an Arizona corporation.
    Dba:   Great Clips

4   KYOTO BOWL RESTAURANT GROUP, INC., an Arizona corporation.
    Dba:   Kyoto Bowl

5   MATTRESS OUTLET, INC., an Arizona corporation.
    Dba:   Mattress Outlet

6   SUNNY SHUNYU NIEH, an unmarried man.
    Dba:   Sunny S. Nieh, D.D.S., and/or Sunny Smile Dental

7   GEAR 2, LLC, an Arizona limited liability company.
    Dba:   Quizno's Classic Subs

8   MODULATOR RESTAURANT GROUP, LLC, an Arizona limited liability company,
    Dba:   Port of Subs

9   TONY'S LA NAILS, INC., an Arizona corporation.
    Dba:   LA Nails

10  VOICESTREAM PCS III CORP., a Delaware corporation
    Dba:  VoiceStream Wireless or T-Mobile

11  PANDA EXPRESS, INC., a California corporation
    Dba:   Panda Express

K-2-1

Exhibit L

Alternate Rent

1.      During the applicable period(s) described within Sections 2.4 and/or 2.5 and/or Article 22 of the Lease, Tenant shall pay as "Alternate Rent" an amount equal to three (3%) percent of all "Gross Sales" (as hereinafter defined) resulting from business conducted in, on or from the Premises, not to exceed fifty (50%) percent of the amount of Fixed Rent which otherwise would have been payable during such period (the "Cap").

2.      As used herein, the term *Gross Sales* shall mean the total amount of all sales and rental of merchandise or services arising out of or payable on account of all the business conducted in, on or from the Premises by or on account of Tenant and any sublessee, licensee or concessionaire of Tenant and any other person or entity operating in the Premises, whether for cash, credit or otherwise, including redemption of gift certificates, orders for merchandise taken from and filled at or from the Premises and deposits not refunded to customers. A sale shall be deemed to have been consummated for purposes of this Lease, and the entire amount of the sales price shall be included in Gross Sales, at such time as (A) the transaction is initially reflected in the books or records of Tenant, or any sublessee, licensee or concessionaire of Tenant, or any other person or entity operating its business in the Premises, (B) Tenant or any other person or entity operating its business in the Premises receives all or any portion of the sales price, or (C) the applicable goods or services are delivered to the customer, whichever of (A), (B) or (C) first occurs, irrespective of whether payment is made in installments, the sale is for cash or credit or otherwise, or all or any portion of the sales price has actually been paid at the time of inclusion in Gross Sales or at any other time. Tenant and the other persons and entities operating their business in the Premises shall record, at the time of each sale, all receipts from such sale, whether for cash, credit or otherwise, in a cash register or cash registers, or in such electronic or computer device which records sales in a manner which is generally acceptable by industry standards. The term *Gross Sales* shall exclude (1) proceeds from any sales tax, gross receipts tax or similar tax, by whatever name called, which are separately stated and are in addition to the sales price, (2) *bona fide* transfers or exchanges of merchandise from the Premises to any other stores or warehouses of Tenant or any Affiliates of Tenant, and returns to shippers and manufacturers for credit, (3) refunds or credits given to customers for merchandise returned or exchanged at the Premises, (4) sales of Tenant's fixtures and equipment not in the ordinary course of Tenant's business, (5) to the extent of prior inclusion in Gross Sales, bad debts when written off the books of Tenant, provided that any collections made on account of such bad debts shall be included in Gross Sales when received, (6) receipts from vending machines installed solely for the use of Tenant's employees and receipts from pay telephones, (7) sales to employees of Tenant at discount [which, for the purposes of determining Alternate Rent hereunder, shall not exceed two (2%) percent of Gross Sales per calendar year or pro rata portion thereof, as applicable], (8) fees (not to exceed three (3%) percent of Gross Sales) paid to independent third party credit card and debit card companies in connection with sales charged to or debited from customers' credit cards or debit cards, as applicable, (9) proceeds from delivery, wrapping and check cashing charges [which, for the purposes of determining Alternate Rent hereunder, shall not exceed two (2%) percent of Gross Sales per calendar year or pro rata portion thereof, as applicable], (10) sums and credits received in settlement of claims for loss or damage to merchandise, (11) separately stated service, finance and interest charges, (12) the dollar value of Tenant coupons utilized by customers in the purchase of merchandise from the Premises, (13) close-out or bulk sales of inventory to jobbers or wholesalers, (14) sales of gift certificates, and (15) sales filled from, but not taken at, the Premises.

L-1

3.    Alternate Rent shall be payable within thirty (30) days after the end of the calendar month to which it pertains. If the Alternate Rent for a calendar month does not exceed the Cap, such payment shall be accompanied by a statement prepared by an officer of Tenant setting forth the amount of Gross Sales achieved during, and the amount of Alternate Rent payable for, such month.

4.    Tenant shall maintain at the Premises or at its principal office, complete books and records reflecting all elements of Gross Sales. Tenant shall be permitted to maintain its books and records in a computerized form; provided, however, that (A) such computerized books and records provide the same level of information as the books and records described above and are retained for the full record retention period provided for herein, and (B) promptly upon request, printed copies of any such books and records shall be made available at Tenant's principal office for inspection by Landlord's representatives who are engaged in inspecting and/or auditing Tenant's books and records as provided herein. Such books and records shall be kept in accordance with generally accepted accounting principles and practices consistently applied and shall be retained by Tenant for not less than two (2) years following the end of the calendar year to which they refer.

5.    Provided that the Alternate Rent payable for a calendar month does not exceed the Cap, Landlord and/or its auditor shall have the right, upon at least ten (10) days prior notice to Tenant, to inspect and/or audit Tenant's records relating solely to Gross Sales achieved in the Premises for such calendar month. If such audit shows that Tenant has underpaid any amount due by an amount greater than four (4%) percent thereof under this Exhibit L then Tenant shall pay to Landlord the reasonable costs of the audit.

6.    Landlord shall not disclose to any third party Tenant's Gross Sales or the amount of Alternate Rent paid or payable by Tenant, provided, however, that (A) such information was not previously disclosed by Tenant to such third party or to the public generally, and (B) nothing contained herein shall restrict Landlord from disclosing such information as may be required by law, or to its accountants, attorneys, *bona-fide* prospective purchasers, or current or prospective Mortgagees or Ground Lessor(s) of all or any portion of Landlord's interest in the Shopping Center (provided that each of such recipients shall be bound to the same non-disclosure provisions as are imposed upon Landlord).

L-2

Exhibit M

Prohibited Uses

As used in this Lease, the term *"Prohibited Uses"* shall mean: (i) any of the uses prohibited or restricted (but only to the extent so restricted), as of the Effective Date, by the REA; (ii) any use requiring, under Section 4.8(ii) of the REA, parking greater than 5.5 spaces per 1,000 square feet of Floor Area or under Section 4.10(i) of the REA, parking greater than 4.5 spaces per 1,000 square feet of Floor Area (as defined in the REA); and (iii) the following uses:

1.     Any "second hand" store, "surplus" store (it being agreed that the foregoing restriction shall not prohibit a "second-hand" store of the type commonly located in first-class shopping centers in Avondale, Arizona, such as Consign and Design, Play-It-Again Sports and Once Upon a Child, provided that same shall be located at least one hundred (100) linear feet from the perimeter of the Premises and maintain approximately the same hours of operation as other stores located in the Shopping Center);

2.     Any so-called "head shop", or other establishment primarily selling or exhibiting drug-related paraphernalia;

3.     Any central laundry, dry cleaning plant, or laundromat (except that a dry cleaner that performs all dry cleaning outside the Shopping Center shall be permitted, so long as its on-site premises are not located in the premises labeled "Majors" on Exhibit B);

4.     Any automobile, truck, trailer, boat, or recreational vehicle sales, leasing, display shall be a prohibited use on the Shopping Center notwithstanding that such use is permitted inside any building under the REA;

5.     Any "Pornographic Use", which shall include, without limitation, a store displaying for sale or exhibition books, magazines or other publications containing any combination of photographs, drawings or sketches of a sexual nature, which are not primarily scientific or educational, or a store offering for exhibition, sale or rental video cassettes or other medium capable of projecting, transmitting or reproducing, independently or in conjunction with another device, machine or equipment, an image or series of images, the content of which has been rated or advertised generally as NC-17 or "X" or unrated by the Motion Picture Rating Association, or any successor thereto; the parties hereto acknowledge and agree the sale of books, magazines and other publications by a national bookstore of the type normally located in first-class shopping centers in the State in which the Shopping Center is located (such as, for example, Borders and Barnes & Noble, as said stores currently operate) shall not be deemed a "pornographic use" hereunder; or massage parlor;

6.     Any medical offices, other than those typically located in first class shopping centers and then not located in the Majors, or medical clinics or family planning facilities;

7.     Any supermarket, except that a first class supermarket shall be permitted if located at least 200 feet away from the Premises and the door to the supermarket is located at least 250 feet away from the Premises;

8.     Any office use, other than: (x) office space used in connection with and ancillary to a permitted retail use hereunder; and (y) retail offices providing services commonly found in similar first-class shopping centers in the Phoenix metropolitan area (for example, financial services, real estate brokerage, insurance agency, banking, travel

agency), <u>provided</u> that such uses are located at least seventy-five (75) feet away from the Premises, contain not more than thirty thousand (30,000) square feet in the aggregate in the Shopping Center shall be devoted to such uses, and such uses shall not be located in "Majors" or "Pad L" on Exhibit B or comprise more than five thousand square feet of Floor Area on "Pad K" on Exhibit B.

9.      Any pawn shop, gun shop, or tattoo parlor;

10.     Any car wash located in "Majors", "Shops 4", "Pad K" or "Pad L" on Exhibit B.

In addition, while the following uses are permitted under the REA with the consent of certain parties, Landlord hereby agrees not to use, permit or consent to any of the following uses on any part of the Shopping Center or the Other Tracts to the extent Landlord may withhold consent under the REA without being in default thereunder:

1.      Any bar, tavern, or other establishment selling alcoholic beverages for on- or off-premises consumption, except a restaurant as otherwise permitted herein;

2.      Any catering or banquet hall;

3.      Any amusement or video arcade (other than in "Shops 3" or Pad K on Exhibit B, except that such use on Pad K shall be incidental to a restaurant and the entrance/exit to such premises shall not face east), pool or billiard hall, night club, discotheque, or dance hall;

4.      Any bowling alley or skating rink;

5.      Any live performance theater, auditorium, meeting hall, sporting event, or other "Entertainment Use" (as defined in the REA);

6.      Any training or education facility, including but not limited to: beauty schools, barber colleges, reading rooms, places of instruction or other operations catering primarily to students or trainees rather than to customers; provided, however, this prohibition shall not be applicable to on-site employee training by an occupant incidental to the conduct of its business at the Shopping Center;

7.      Any gambling facility or operation, including but not limited to: off-track or sports betting parlor; table games such as black-jack or poker; slot machines; video poker/black-jack/keno machines or similar devices; or bingo hall. Notwithstanding the foregoing, this prohibition shall not apply to governmental sponsored gambling activities, or charitable gambling activities, so long as such governmental and/or charitable activities are incidental to the business operation being conducted by the Occupant;

8.      Any carnival, amusement park or circus;

9.      daycare center;

10.     children's entertainment or activity facility (such as "Discovery Zone", or "Chuck E. Cheese's") in the areas labeled "Pad L" "Shops 4" or "Majors" on Exhibit B;

11.     restaurant serving meals for on- or off-premises consumption in the areas labeled "Pad L" "Shops 4" or "Majors" on Exhibit B and, the sale of alcohol from restaurants in the Shopping Center shall not exceed 40% of each such restaurant's gross sales;

12.     beauty parlor or nail salon in the area labeled "Majors" on Exhibit B; or

M-2

13.    health spa, exercise facility or similar type business in the areas labeled "Pad L" or "Majors" on Exhibit B.

Exhibit N

Tax Bill

N-1

# 2. ). Property Tax Statement

Maricopa County Treasurer
301 W. Jefferson St. - RM 100
Phoenix, AZ 85003-2199

Doug Todd, Treasurer
Phone: (602) 506-8511
http://treasurer.maricopa.gov

| Tax Bill | Tax Summary | Valuations | Activities |
|----------|-------------|------------|------------|
| Tax Stub | Address | New Parcel | Home |

## Tax Bill Summary

| Parcel Number | | 102-32-007 8 |
|---|---|---|
| **2001 Assessed Value** | **Totals** | **2001 Tax Amount** |
| $4,322.00 | Primary (limited) | $360.66 |
| $4,322.00 | Secondary (full cash) | $334.58 |
| | Special Districts | $0.00 |
| No delinquent prior year taxes | Full Year Amount* | $695.24 |
| $347.62 | <1st   Due each half   2nd> | $347.62 |
| Area Code: 920101 | Total Payments Made | $695.24 |

\* The Full Year Amount is for the current tax year only.  It does NOT include late payment interest charges or delinquent prior year taxes.  The statement is for 2001 only.  To view the Total Amount Due including interest and penalties Click Here. The first half payment is due 1 Oct 2001, and the second half is due 1 Mar 2002.  Please call (602) 506-8511 for any questions concerning the Statement or Amount Due. Include a Tax Stub with your check.

Tax History     New Parcel     Treasurer's Home Page     Current Assessed Value     Parcel Map

## Property Information

### Legal Description

| Section/Lot | Township/Block | Range/Tract |
|---|---|---|
| 32 | 2N | 1E |
| W2 SE4 SE4 EX S 60F | | |
| *A complete legal description is available from the Maricopa County Assessor at (602)506-3406. | | |
| | | |
| Current Mailing Name & Address | | |
| VIEL GLUCK L P/BEN FATTO L P ETAL | | |
| 1819 E SOUTHERN AVE STE B10 | | |
| MESA  AZ  852045219 | | |

Request Name/Mailing Address Changes
or call the Treasurer at (602)506-8511.
Top

h      e      e      c      g      ce      b



Pie chart of where your tax dollar goes.

| Parcel 102-32-007 2001 Primary (Limited) Assessed Values | | | |
|---|---|---|---|
| Assessment Type | Limited Value | Assessment Ratio | Assessed Value |
| Land/Bldg/Improvements | $27,012.00 | 16% | $4,322.00 |
| Primary Total | $27,012.00 | | $4,322.00 |

| 2001 Primary (limited) Tax Amounts | | | | |
|---|---|---|---|---|
| Tax District | Phone | Rate/100 | 2001 Tax | 2000 Tax |
| County | 602-506-8511 | 1.1832 | $51.13 | $50.30 |
| Educ. Equal | 602-506-8511 | 0.4974 | $21.51 | $22.15 |
| CITY OF AVONDALE | 623-925-0018 | 0.5484 | $23.70 | $25.91 |
| SCHOOL | | 5.1573 | $222.90 | $229.80 |
| Elementary District | 623-872-8484 | PENDERGAST ELEMENTARY | | |
| High School District | 623-936-1276 | TOLLESON HIGH SCHOOL | | |
| COMMUNITY COLLEGE DIST. | 480-731-8510 | 0.9583 | $41.42 | $41.88 |
| State Aid Credit | | | $0.00 | $0.00 |
| Primary Totals | | 8.3446 | $360.66 | $370.04 |

Top

| Parcel 102-32-007 2001 Secondary (Full Cash) Assessed Values | | | |
|---|---|---|---|
| Assessment Type | Full Cash Value | Assessment Ratio | Assessed Value |
| Land/Bldg/Improvements | $27,012.00 | 16% | $4,322.00 |
| Secondary Total | $27,012.00 | | $4,322.00 |

| 2001Secondary (Full Cash) Tax Amounts | | | |
|---|---|---|---|
| Tax District | Phone | Rate/100 | 2001 Tax |

h        e      e      c      g      ce      b

## 2u01 Property Tax Statement

Maricopa County Treasurer
301 W. Jefferson St. - RM 100
Phoenix, AZ 85003-2199

Doug Todd, Treasurer
Phone: (602) 506-8511
http://treasurer.maricopa.gov

| Tax Bill | Tax Summary | Valuations | Activities |
|----------|-------------|------------|------------|
| Tax Stub | Address | New Parcel | Home |

| Tax Bill Summary | | |
|---|---|---|
| Parcel Number | 102-32-006D 7 | |
| 2001 Assessed Value | Totals | 2001 Tax Amount |
| $3,858.00 | Primary (limited) | $321.94 |
| $3,858.00 | Secondary (full cash) | $298.64 |
| | Special Districts | $0.00 |
| No delinquent prior year taxes | Full Year Amount* | $620.58 |
| $310.29 | <1st   Due each half   2nd> | $310.29 |
| Area Code: 920101 | Total Payments Made | $620.58 |

\* The Full Year Amount is for the current tax year only.   It does NOT include late payment interest charges or delinquent prior year taxes.   The statement is for 2001 only.   To view the Total Amount Due including interest and penalties Click Here. The first half payment is due 1 Oct 2001, and the second half is due 1 Mar 2002.   Please call (602) 506-8511 for any questions concerning the Statement or Amount Due. Include a Tax Stub with your check.

Tax History      New Parcel      Treasurer's Home Page      Current Assessed Value      Parcel Map

| Property Information | | |
|---|---|---|
| Legal Description | | |
| Section/Lot | Township/Block | Range/Tract |
| 32 | 2N | 1E |
| E2 SE4 SE4 EX N 25F OF S 58F OF W 60F OF E 94F | | |
| TH/OF & EX EX BEG AT PT 33F N & 94F W OF SE COR | | |
| SEC TH W 178F TH N 136F TH E 178F TH S 136F TO | | |
| POB & EX PT DAF COM SE COR SEC TH N 1290.25F | | |
| TH S 88D 48M W 45F TO POB TH CONT S 88D 48M W | | |
| 140F TH S 140F TH N 88D 48M E 140F TH N 140F TO | | |
| POB & EX S 60F RD & EX E 33F RD & EX RD P/D | | |
| 13815-210 | | |
| *A complete legal description is available from the Maricopa County Assessor at (602)506-3406. | | |
| | | |
| | | |

h      e      e      c      g      ce      b

| Current Mailing Name & Address |
| --- |
| VIEL GLUCK L P/BEN FATTO L P ETAL |
| 1819 E SOUTHERN AVE STE B10 |
| MESA AZ 852045219 |

**Request Name/Mailing Address Changes**
or call the Treasurer at (602)506-8511.
Top



Pie chart of where your tax dollar goes.

| Parcel 102-32-006D 2001 Primary (Limited) Assessed Values | | | |
| --- | --- | --- | --- |
| Assessment Type | Limited Value | Assessment Ratio | Assessed Value |
| Land/Bldg/Improvements | $24,112.00 | 16% | $3,858.00 |
| Primary Total | $24,112.00 | | $3,858.00 |

| 2001 Primary (limited) Tax Amounts | | | | |
| --- | --- | --- | --- | --- |
| Tax District | Phone | Rate/100 | 2001 Tax | 2000 Tax |
| County | 602-506-8511 | 1.1832 | $45.64 | $44.91 |
| Educ. Equal | 602-506-8511 | 0.4974 | $19.20 | $19.77 |
| CITY OF AVONDALE | 623-925-0018 | 0.5484 | $21.16 | $23.13 |
| SCHOOL | | 5.1573 | $198.97 | $205.12 |
| Elementary District | 623-872-8484 | PENDERGAST ELEMENTARY | | |
| High School District | 623-936-1276 | TOLLESON HIGH SCHOOL | | |
| COMMUNITY COLLEGE DIST. | 480-731-8510 | 0.9583 | $36.97 | $37.39 |
| State Aid Credit | | | $0.00 | $0.00 |
| Primary Totals | | 8.3446 | $321.94 | $330.32 |

Top

| Parcel 102-32-006D 2001 Secondary (Full Cash) Assessed Values | | | |
| --- | --- | --- | --- |
| Assessment Type | Full Cash Value | Assessment Ratio | Assessed Value |
| Land/Bldg/Improvements | $24,112.00 | 16% | $3,858.00 |
| Secondary Total | $24,112.00 | | $3,858.00 |

h      e      e      c      g      ce      b

## 2001 Secondary (Full Cash) Tax Amounts

| Tax District | Phone | Rate/100 | 2001 Tax | 2000 Tax |
|---|---|---|---|---|
| Flood | 602-506-1501 | 0.2319 | $8.94 | $9.78 |
| CAWCD | 623-869-2333 | 0.1300 | $5.02 | $5.02 |
| Overrides | | 3.4468 | $132.98 | $142.26 |
| Fire | 602-506-8511 | 0.0091 | $0.36 | $0.38 |
| Library | 602-506-8511 | 0.0421 | $1.62 | $1.62 |
| BONDS | | | | |
| County Bond | | 0.0876 | $3.38 | $4.45 |
| City Bond | | 0.7347 | $28.34 | $26.18 |
| School Bond | | 2.9063 | $112.12 | $110.79 |
| Com Col Bond | | 0.1524 | $5.88 | $5.80 |
| Secondary Totals | | 7.7409 | $298.64 | $306.28 |

Top

No special districts

Top   New Parcel   Home

h       e       e       c       g       ce       b

## 2001 Property Tax Statement

Maricopa County Treasurer
301 W. Jefferson St. - RM 100
Phoenix, AZ 85003-2199

Doug Todd, Treasurer
Phone: (602) 506-8511
http://treasurer.maricopa.gov

| Tax Bill | Tax Summary | Valuations | Activities |
|---|---|---|---|
| Tax Stub | Address | New Parcel | Home |

### Tax Bill Summary

| Parcel Number | | 102-32-005B 1 | |
|---|---|---|---|
| **2001 Assessed Value** | Totals | | 2001 Tax Amount |
| $136,245.00 | Primary (limited) | | $11,369.10 |
| $191,894.00 | Secondary (full cash) | | $14,854.30 |
| | Special Districts | | $0.00 |
| No delinquent prior year taxes | Full Year Amount* | | $26,223.40 |
| $13,111.70 | <1st   Due each half   2nd> | | $13,111.70 |
| Area Code: 920101 | Total Payments Made | | $26,223.40 |

\* The Full Year Amount is for the current tax year only.   It does NOT include late payment interest charges or delinquent prior year taxes.   The statement is for 2001 only.   To view the Total Amount Due including interest and penalties Click Here. The first half payment is due 1 Oct 2001, and the second half is due 1 Mar 2002.   Please call (602) 506-8511 for any questions concerning the Statement or Amount Due. Include a Tax Stub with your check.

Tax History     New Parcel     Treasurer's Home Page     Current Assessed Value     Parcel Map

### Property Information

#### Legal Description

| Section/Lot | Township/Block | Range/Tract |
|---|---|---|
| 32 | 2N | 1E |
| S2 W2 SW4 SE4 SEC 32 EX S 60F | | |
| *A complete legal description is available from the Maricopa County Assessor at (602)506-3406. | | |
| | | |
| Current Mailing Name & Address | | |
| BOA SORTE LTD PARTNERSHIP ETAL | | |
| 1819 E SOUTHERN AVE STE B10 | | |
| MESA  AZ  85204 | | |

Request Name/Mailing Address Changes
or call the Treasurer at (602)506-8511.
Top

h        e        e        c        g        ce        b



Pie chart of where your tax dollar goes.

| Parcel 102-32-005B 2001 Primary (Limited) Assessed Values | | | |
|---|---|---|---|
| Assessment Type | Limited Value | Assessment Ratio | Assessed Value |
| Land/Bldg/Improvements | $851,529.00 | 16% | $136,245.00 |
| Primary Total | $851,529.00 | | $136,245.00 |

| 2001 Primary (limited) Tax Amounts | | | | |
|---|---|---|---|---|
| Tax District | Phone | Rate/100 | 2001 Tax | 2000 Tax |
| County | 602-506-8511 | 1.1832 | $1,611.96 | $23.44 |
| Educ. Equal | 602-506-8511 | 0.4974 | $677.77 | $10.32 |
| CITY OF AVONDALE | 623-925-0018 | 0.5484 | $747.17 | $12.08 |
| SCHOOL | | 5.1573 | $7,026.56 | $107.08 |
| Elementary District | 623-872-8484 | PENDERGAST ELEMENTARY | | |
| High School District | 623-936-1276 | TOLLESON HIGH SCHOOL | | |
| COMMUNITY COLLEGE DIST. | 480-731-8510 | 0.9583 | $1,305.64 | $19.52 |
| State Aid Credit | | | $0.00 | $0.00 |
| Primary Totals | | 8.3446 | $11,369.10 | $172.44 |

Top

| Parcel 102-32-005B 2001 Secondary (Full Cash) Assessed Values | | | |
|---|---|---|---|
| Assessment Type | Full Cash Value | Assessment Ratio | Assessed Value |
| Land/Bldg/Improvements | $1,199,337.00 | 16% | $191,894.00 |
| Secondary Total | $1,199,337.00 | | $191,894.00 |

| 2001 Secondary (Full Cash) Tax Amounts | | | | |
|---|---|---|---|---|
| Tax District | Phone | Rate/100 | 2001 Tax | 2000 Tax |
| Flood | 602-506-1501 | 0.2319 | $445.00 | $5.22 |
| CAWCD | 623-869-2333 | 0.1300 | $249.46 | $2.68 |
| Overrides | | 3.4468 | $6,614.20 | $75.88 |
| Fire | 602-506-8511 | 0.0091 | $17.46 | $0.20 |
| Library | 602-506-8511 | 0.0421 | $80.78 | $0.86 |

h       e       e       c       g       ce       b

| BONDS | | | | |
|---|---|---|---|---|
| County Bond | | 0.0876 | $168.11 | $2.37 |
| City Bond | | 0.7347 | $1,409.84 | $13.97 |
| School Bond | | 2.9063 | $5,577.01 | $59.11 |
| Com Col Bond | | 0.1524 | $292.44 | $3.09 |
| Secondary Totals | | 7.7409 | $14,854.30 | $163.38 |

Top

No special districts

Top   New Parcel   Home

h       e      e       c      g      ce      b

## 2001 Property Tax Statement

Maricopa County Treasurer
301 W. Jefferson St. - RM 100
Phoenix, AZ 85003-2199

Doug Todd, Treasurer
Phone: (602) 506-8511
http://treasurer.maricopa.gov

| Tax Bill | Tax Summary | Valuations | Activities |
| Tax Stub | Address | New Parcel | Home |

| Tax Bill Summary | | |
|---|---|---|
| Parcel Number | 102-32-005A 2 | |
| 2001 Assessed Value | Totals | 2001 Tax Amount |
| $2,264.00 | Primary (limited) | $188.92 |
| $2,264.00 | Secondary (full cash) | $175.26 |
| | Special Districts | $0.00 |
| No delinquent prior year taxes | Full Year Amount* | $364.18 |
| $182.09 | <1st   Due each half   2nd> | $182.09 |
| Area Code: 920101 | Total Payments Made | $364.18 |

* The Full Year Amount is for the current tax year only.   It does NOT include late payment interest charges or delinquent prior year taxes.   The statement is for 2001 only.   To view the Total Amount Due including interest and penalties Click Here. The first half payment is due 1 Oct 2001, and the second half is due 1 Mar 2002.   Please call (602) 506-8511 for any questions concerning the Statement or Amount Due. Include a Tax Stub with your check.

Tax History   New Parcel   Treasurer's Home Page   Current Assessed Value   Parcel Map

| Property Information | | |
|---|---|---|
| Legal Description | | |
| Section/Lot | Township/Block | Range/Tract |
| 32 | 2N | 1E |
| N2 W2 SW4 SE4 SEC 32 | | |
| *A complete legal description is available from the Maricopa County Assessor at (602)506-3406. | | |
| | | |
| Current Mailing Name & Address | | |
| VIEL GLUCK L P/BEN FATTO L P ETAL | | |
| 1819 E SOUTHERN AVE STE B10 | | |
| MESA  AZ  852045219 | | |

Request Name/Mailing Address Changes
or call the Treasurer at (602)506-8511.
Top

h      e      e      c      g      ce      b



Pie chart of where your tax dollar goes.

## Parcel 102-32-005A 2001 Primary (Limited) Assessed Values

| Assessment Type | Limited Value | Assessment Ratio | Assessed Value |
|---|---|---|---|
| Land/Bldg/Improvements | $14,150.00 | 16% | $2,264.00 |
| Primary Total | $14,150.00 | | $2,264.00 |

## 2001 Primary (limited) Tax Amounts

| Tax District | Phone | Rate/100 | 2001 Tax | 2000 Tax |
|---|---|---|---|---|
| County | 602-506-8511 | 1.1832 | $26.78 | $26.35 |
| Educ. Equal | 602-506-8511 | 0.4974 | $11.27 | $11.60 |
| CITY OF AVONDALE | 623-925-0018 | 0.5484 | $12.42 | $13.57 |
| SCHOOL | | 5.1573 | $116.75 | $120.38 |
| Elementary District | 623-872-8484 | PENDERGAST ELEMENTARY | | |
| High School District | 623-936-1276 | TOLLESON HIGH SCHOOL | | |
| COMMUNITY COLLEGE DIST. | 480-731-8510 | 0.9583 | $21.70 | $21.94 |
| State Aid Credit | | | $0.00 | $0.00 |
| Primary Totals | | 8.3446 | $188.92 | $193.84 |

Top

## Parcel 102-32-005A 2001 Secondary (Full Cash) Assessed Values

| Assessment Type | Full Cash Value | Assessment Ratio | Assessed Value |
|---|---|---|---|
| Land/Bldg/Improvements | $14,150.00 | 16% | $2,264.00 |
| Secondary Total | $14,150.00 | | $2,264.00 |

## 2001 Secondary (Full Cash) Tax Amounts

| Tax District | Phone | Rate/100 | 2001 Tax | 2000 Tax |
|---|---|---|---|---|
| Flood | 602-506-1501 | 0.2319 | $5.26 | $5.74 |
| CAWCD | 623-869-2333 | 0.1300 | $2.94 | $2.94 |
| Overrides | | 3.4468 | $78.04 | $83.48 |
| Fire | 602-506-8511 | 0.0091 | $0.20 | $0.22 |
| Library | 602-506-8511 | 0.0421 | $0.96 | $0.96 |

h     e     e     c     g     ce     b

| | BONDS | | | | |
|---|---|---|---|---|---|
| County Bond | | 0.0876 | $1.99 | $2.61 | |
| City Bond | | 0.7347 | $16.63 | $15.37 | |
| School Bond | | 2.9063 | $65.79 | $65.02 | |
| Com Col Bond | | 0.1524 | $3.45 | $3.40 | |
| Secondary Totals | | 7.7409 | $175.26 | $179.74 | |

Top

No special districts

Top   New Parcel   Home

h     e     e     c     g     ce     b

# 2001 Property Tax Statement

Maricopa County Treasurer
301 W. Jefferson St. - RM 100
Phoenix, AZ 85003-2199

Doug Todd, Treasurer
Phone: (602) 506-8511
http://treasurer.maricopa.gov

| Tax Bill | Tax Summary | Valuations | Activities |
|----------|-------------|------------|------------|
| Tax Stub | Address | New Parcel | Home |

| Tax Bill Summary | | |
|------------------|---|---|
| Parcel Number | 102-32-004 6 | |
| 2001 Assessed Value | Totals | 2001 Tax Amount |
| $4,322.00 | Primary (limited) | $360.66 |
| $4,322.00 | Secondary (full cash) | $334.58 |
| | Special Districts | $0.00 |
| No delinquent prior year taxes | Full Year Amount* | $695.24 |
| $347.62 | <1st   Due each half   2nd> | $347.62 |
| Area Code: 920101 | Total Payments Made | $695.24 |

\* The Full Year Amount is for the current tax year only.  It does NOT include late payment interest charges or delinquent prior year taxes.  The statement is for 2001 only.  To view the *Total Amount Due* including interest and penalties Click Here. The first half payment is due 1 Oct 2001, *and the second half is due 1 Mar 2002*.  Please call (602) 506-8511 for any questions concerning the Statement or Amount Due. Include a Tax Stub with your check.

Tax History     New Parcel     Treasurer's Home Page     Current Assessed Value     Parcel Map

| Property Information | | |
|----------------------|---|---|
| Legal Description | | |
| Section/Lot | Township/Block | Range/Tract |
| 32 | 2N | 1E |
| E2 SW4 SE4 EX S 60F | | |
| *A complete legal description is available from the Maricopa County Assessor at (602)506-3406. | | |
| | | |
| Current Mailing Name & Address | | |
| VIEL GLUCK L P/BEN FATTO L P/BOA SORTE L | | |
| 1819 E SOUTHERN AVE STE B10 | | |
| MESA  AZ  852045219 | | |

Request Name/Mailing Address Changes
or call the Treasurer at (602)506-8511.
Top

h     e     e     c     g     ce     b

 Pie chart of where your tax dollar goes.

| Parcel 102-32-004 2001 Primary (Limited) Assessed Values | | | |
|---|---|---|---|
| Assessment Type | Limited Value | Assessment Ratio | Assessed Value |
| Land/Bldg/Improvements | $27,012.00 | 16% | $4,322.00 |
| Primary Total | $27,012.00 | | $4,322.00 |

| 2001 Primary (limited) Tax Amounts | | | | |
|---|---|---|---|---|
| Tax District | Phone | Rate/100 | 2001 Tax | 2000 Tax |
| County | 602-506-8511 | 1.1832 | $51.13 | $50.30 |
| Educ. Equal | 602-506-8511 | 0.4974 | $21.51 | $22.15 |
| CITY OF AVONDALE | 623-925-0018 | 0.5484 | $23.70 | $25.91 |
| SCHOOL | | 5.1573 | $222.90 | $229.80 |
| Elementary District | 623-872-8484 | PENDERGAST ELEMENTARY | | |
| High School District | 623-936-1276 | TOLLESON HIGH SCHOOL | | |
| COMMUNITY COLLEGE DIST. | 480-731-8510 | 0.9583 | $41.42 | $41.88 |
| State Aid Credit | | | $0.00 | $0.00 |
| Primary Totals | | 8.3446 | $360.66 | $370.04 |

Top

| Parcel 102-32-004 2001 Secondary (Full Cash) Assessed Values | | | |
|---|---|---|---|
| Assessment Type | Full Cash Value | Assessment Ratio | Assessed Value |
| Land/Bldg/Improvements | $27,012.00 | 16% | $4,322.00 |
| Secondary Total | $27,012.00 | | $4,322.00 |

| 2001Secondary (Full Cash) Tax Amounts | | | | |
|---|---|---|---|---|
| Tax District | Phone | Rate/100 | 2001 Tax | 2000 Tax |
| Flood | 602-506-1501 | 0.2319 | $10.02 | $10.96 |
| CAWCD | 623-869-2333 | 0.1300 | $5.62 | $5.62 |
| Overrides | | 3.4468 | $148.98 | $159.36 |
| Fire | 602-506-8511 | 0.0091 | $0.40 | $0.42 |
| Library | 602-506-8511 | 0.0421 | $1.82 | $1.82 |

h      e     e     c     g     ce     b

| BONDS | | | | |
|---|---|---|---|---|
| County Bond | | 0.0876 | $3.79 | $4.98 |
| City Bond | | 0.7347 | $31.75 | $29.33 |
| School Bond | | 2.9063 | $125.61 | $124.11 |
| Com Col Bond | | 0.1524 | $6.59 | $6.50 |
| Secondary Totals | | 7.7409 | $334.58 | $343.10 |

Top

No special districts

Top  New Parcel  Home

h      e    e     c    g    ce    b

## EXHIBIT B

**Marshalls Avondale Lease**

**(FILED UNDER SEAL)**

**EXHIBIT C**

**Holly Springs Lease**

# LEASE AGREEMENT

## Between

### KRG NEW HILL PLACE, LLC, an Indiana limited liability company

### Landlord

### and

### BED BATH & BEYOND INC.,

### a New York corporation,

### Tenant

### HOLLY SPRINGS TOWNE CENTER
### NC State Highway 55
### Holly Springs, North Carolina

### Dated as of:  March 31, 2014

\* \* \* \* \* \*

The mailing, delivery or negotiation of this Lease shall not be deemed an offer to enter into any transaction or to enter into any relationship, whether on the terms contained herein or on any other terms.  This Lease shall not be binding nor shall either party have any obligations or liabilities or any rights with respect thereto, or with respect to the premises, unless and until both parties have executed and delivered this Lease. Until such execution and delivery of this Lease, either party may terminate all negotiation and discussion of the subject matter hereof, without causes and for any reason, without recourse or liability.

\* \* \* \* \* \*

# TABLE OF CONTENTS

**Page**

ARTICLE 1      BASIC TERMS AND DEFINITIONS ................................................... 1

    Section 1.1         Basic Terms and Definitions ...................................................... 1

ARTICLE 2      LEASE OF PREMISES; LEASE TERM; DELIVERY DATE ............. 5

    Section 2.1         Lease of Premises ..................................................................... 5

    Section 2.2         Term ........................................................................................ 6

    Section 2.3         Delivery Date ........................................................................... 6

    Section 2.4         Unseasonable Delivery: Slack Period ..................................... 9

    Section 2.5         Initial Co-Tenancy Condition .................................................. 9

    Section 2.6         Landlord Right To Terminate .................................................. 10

ARTICLE 3      IMPROVEMENTS ............................................................................ 11

    Section 3.1         Landlord's Work and Tenant's Work ...................................... 11

    Section 3.2         Plan Approvals ........................................................................ 11

    Section 3.3         Performance of Work .............................................................. 13

    Section 3.4         Measurement; Adjustment of Rent .......................................... 16

ARTICLE 4      FIXED RENT AND TAXES: DETERMINATION AND
                     PAYMENT ....................................................................................... 17

    Section 4.1         Fixed Rent ............................................................................... 17

    Section 4.2         Payment of Rent ...................................................................... 17

    Section 4.3         Real Estate and Other Taxes ................................................... 17

ARTICLE 5      COMMON AREAS, THEIR USE AND CHARGES .......................... 19

    Section 5.1         Common Areas: Maintenance .................................................. 19

    Section 5.2         Common Areas: Restrictions ................................................... 22

ARTICLE 6      UTILITIES ........................................................................................ 24

    Section 6.1         Utility Service ......................................................................... 24

    Section 6.2         Interruption ............................................................................. 25

ARTICLE 7      SIGNS ............................................................................................... 25

    Section 7.1         Tenant's Building Signage ...................................................... 25

    Section 7.2         Pylon/Monument Signage ....................................................... 25

    Section 7.3         Signage: Alteration/Removal/Allocation ................................ 26

    Section 7.4         Cooperation ............................................................................. 26

    Section 7.5         Signage and Building Restrictions and Criteria ...................... 26

ARTICLE 8      ALTERATIONS AND IMPROVEMENTS ....................................... 27

    Section 8.1         Alterations and Improvements ................................................ 27

ARTICLE 9      REPAIRS ........................................................................................... 29

    Section 9.1         Tenant's Repairs ...................................................................... 29

    Section 9.2         Landlord's Repairs .................................................................. 29

    Section 9.3         Legal Compliance Work ......................................................... 30

## TABLE OF CONTENTS
(continued)

Page

ARTICLE 10     INDEMNIFICATION, INSURANCE AND WAIVER OF
               SUBROGATION ................................................................ 30

    Section 10.1     Mutual Release, Waiver of Subrogation and Mutual
                                 Indemnification ........................................................ 30

    Section 10.2     Tenant's Insurance ................................................... 31

    Section 10.3     Landlord's Insurance ............................................... 32

    Section 10.4     General Insurance Requirements............................. 32

ARTICLE 11     FIRE AND OTHER CASUALTY; EMINENT DOMAIN ................. 33

    Section 11.1     Fire and Other Casualty.......................................... 33

    Section 11.2     Eminent Domain...................................................... 36

    Section 11.3     Abatement of Rent Charges .................................... 37

ARTICLE 12     COVENANTS, REPRESENTATIONS AND WARRANTIES.......... 37

    Section 12.1     Quiet Enjoyment...................................................... 37

    Section 12.2     Authority.................................................................. 38

    Section 12.3     Landlord's Covenants, Warranties and Representations........... 38

    Section 12.4     Environmental Matters ............................................ 39

    Section 12.5     OEA .......................................................................... 41

ARTICLE 13     USES AND RESTRICTIONS .............................................. 43

    Section 13.1     Permitted and Prohibited Uses ............................... 43

    Section 13.2     Tenant's Exclusive in Center .................................. 43

    Section 13.3     Exclusives Which Tenant Must Honor .................... 45

ARTICLE 14     CONDUCT OF BUSINESS OPERATIONS.............................. 45

ARTICLE 15     TENANT ASSIGNMENT AND SUBLETTING............................ 46

    Section 15.1     Assignment and Subletting...................................... 46

    Section 15.2     Liability of Tenant .................................................. 46

    Section 15.3     Collateral Assignment ............................................ 46

    Section 15.4     Cure Rights of Original Tenant ............................... 46

    Section 15.5     Recognition Agreement........................................... 47

ARTICLE 16     DEFAULT AND DISPUTE RESOLUTION............................... 48

    Section 16.1     Tenant Default.......................................................... 48

    Section 16.2     Landlord Default ..................................................... 49

    Section 16.3     Arbitration ............................................................... 50

ARTICLE 17     RIGHT TO MORTGAGE AND NON-DISTURBANCE;
               ESTOPPEL CERTIFICATE .............................................. 50

    Section 17.1     Right to Mortgage and Non-Disturbance ............... 50

    Section 17.2     Estoppel Certificate ................................................ 51

    Section 17.3     No Existing Mortgages or Ground Leases .............. 51

ARTICLE 18     NOTICE........................................................................... 51

## TABLE OF CONTENTS
(continued)

**Page**

ARTICLE 19 TENANT'S PROPERTY .................................................................. 52

ARTICLE 20 END OF TERM......................................................................... 52

    Section 20.1 Surrender of Premises ............................................. 52

    Section 20.2 Hold Over ............................................................... 52

ARTICLE 21 TENANT'S RIGHT OF FIRST OFFER.............................. 52

ARTICLE 22 ONGOING CO-TENANCY ................................................ 53

ARTICLE 23 MISCELLANEOUS............................................................ 53

    Section 23.1 Loading Facilities ................................................. 53

    Section 23.2 Liens ..................................................................... 53

    Section 23.3 Broker's Commission ........................................... 54

    Section 23.4 Force Majeure........................................................ 54

    Section 23.5 Consents ................................................................ 54

    Section 23.6 Costs ..................................................................... 54

    Section 23.7 Attorneys' Fees...................................................... 54

    Section 23.8 Survival of Obligations ......................................... 55

    Section 23.9 Non-Waiver ........................................................... 55

    Section 23.10 Rights Cumulative ................................................. 55

    Section 23.11 Definition of Landlord............................................ 55

    Section 23.12 Successors and Assigns.......................................... 55

    Section 23.13 Limitation of Landlord's Liability .......................... 55

    Section 23.14 Limitation of Tenant's Liability.............................. 55

    Section 23.15 Joint and Several Liability...................................... 55

    Section 23.16 Severability............................................................ 56

    Section 23.17 Grammatical Usages and Construction ................... 56

    Section 23.18 Table of Contents, Line Numbering and Paragraph Headings ............................................................ 56

    Section 23.19 Definition of Hereunder, Herein, etc....................... 56

    Section 23.20 Short Form Lease ................................................... 56

    Section 23.21 Entire Agreement and Modification......................... 56

    Section 23.22 No Joint Venture or Partnership Created by Lease ................... 56

    Section 23.23 Tenant's Tradename ............................................... 56

    Section 23.24 Counterparts ......................................................... 56

    Section 23.25 Waiver of Trial by Jury ......................................... 56

    Section 23.26 Ethical Conduct Policy........................................... 57

    Section 23.27 Confidentiality....................................................... 57

    Section 23.28 Governing Law....................................................... 57

## **EXHIBITS**

| | |
|---|---|
| Exhibit A | Legal Description of Shopping Center |
| Exhibit B | Site Plan |
| Exhibit C | Form of Rent Commencement and Expiration Date Agreement |
| Exhibit D | Specifications for Landlord's Work |
| Exhibit D-1 | Exterior Elevations of the Premises, and Sidewalk Plan |
| Exhibit D-2 | Exterior Elevations of the Shopping Center |
| Exhibit E | Permitted Encumbrances |
| Exhibit F | Signage |
| Exhibit G | Form of Subordination, Non-Disturbance and Attornment Agreement |
| Exhibit H | Form of Subtenant Recognition Agreement |
| Exhibit I | Form of Delivery Date Notice |
| Exhibit J | Form of Delivery Date Certification |
| Exhibit K-1 | Existing Exclusives |
| Exhibit K-2 | Existing Leases |
| Exhibit L | Alternate Rent |
| Exhibit M-1 | Tenant Prohibited Uses (including Schedule 1 with OEA prohibited uses) |
| Exhibit M-2 | Landlord Prohibited Uses |
| Exhibit N | Form of Declaration of Restrictions |

## LEASE AGREEMENT

THIS LEASE AGREEMENT ("***Lease***") is entered into as of March 31, 2014 by and between KRG NEW HILL PLACE, LLC, an Indiana limited liability company, having an office at 30 South Meridian Street, Suite 1100, Indianapolis, Indiana 46204 ("***Landlord***"), and BED BATH & BEYOND INC., a New York corporation, having an office at 650 Liberty Avenue, Union, New Jersey 07083 ("***Tenant***").

WITNESSETH:

## ARTICLE 1
## BASIC TERMS AND DEFINITIONS

Section 1.1   Basic Terms and Definitions.  The following terms shall have the meanings set forth in this Section 1.1 except as otherwise expressly provided herein.

1.1.1   Additional Rent:   Any monies which Tenant is required to pay to Landlord under the terms and conditions of this Lease, other than Fixed Rent.

1.1.2   Affiliate:   A corporation, partnership, limited liability company, person or other entity which is controlling, controlled by, or under common control with, Landlord or Tenant, as the case may be.  As used herein, "***control***" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person or entity, whether through the ownership of voting securities or rights, by contract, or otherwise.

1.1.3   Alternate Rent:   As defined in and payable in the manner set forth in Exhibit L attached hereto.

1.1.4   Common Areas:   All areas in the Shopping Center which are, from time to time, available for the joint use and benefit of Tenant and other tenants and occupants of the Shopping Center, and their respective employees, agents, subtenants, concessionaires, licensees, customers and other invitees, including, but not limited to, any and all parking areas, parking spaces, driveways, truck serviceways, passageways, sidewalks, entrances, exits, lighting facilities, courts, landscaped areas, retention or detention areas, elevators, escalators and common utility lines.  The common areas in the Complex which are outside the Shopping Center shall also be available as aforesaid if and to the extent provided in the OEA.

1.1.5   Common Areas Charges:   As defined in Section 5.1 hereof.

1.1.5A Complex:   The retail shopping center project on the property located along NC State Highway 55 in Holly Springs, North Carolina, commonly known as "Holly Springs Towne Center".  The Complex includes the Shopping Center, the Target Tract and Developer Tract A.  Landlord shall not change the name of the Complex without giving at least ninety (90) days' prior notice to Tenant.  The entire Complex is subject to the OEA.

1.1.6   Delivery Date: As defined in Section 2.3 hereof.

1.1.6A Developer Tract A:   The approximately 51.87 acre parcel of land within the Complex which, as of the Effective Date, is owned in fee simple by KRG New Hill Place I, LLC which is an Affiliate of Landlord.

1.1.7   Effective Date: The date hereof.

1.1.8   Event of Default:   As defined in Section 16.1 hereof.

1.1.9   Excused Periods:  Periods during which Tenant's failure to conduct the operations of its business or any other business: (x) resulted from alterations or renovations being performed by Tenant in and to the Premises, which for the purpose of this Section 1.1.9, shall not include any period beyond the two hundred seventieth (270th) day, (y) was caused by damage or destruction, eminent domain proceedings or actions, or Force Majeure, or (z) was caused by any act or omission of Landlord, or its employees, agents, or contractors.

1.1.10   Exhibits.  The exhibits listed in the Table of Contents annexed to this Lease have been agreed to by the parties and attached hereto, it being the intention of the parties that they shall become a binding part of this Lease as if fully set forth herein.

1.1.10A   Fixed Component:  As described in Subsection 5.1.2(a).

1.1.11   Fixed Rent:  The following amounts for the periods indicated (based on 23,400 square feet of Floor Area and subject to adjustment pursuant to Section 3.4 hereof):

(a)   For the period commencing on the Rent Commencement Date and ending on the last day of the "Initial Term" (defined in Subsection 1.43 below), at the rate of Two Hundred Ten Thousand Six Hundred and 00/100 ($210,600.00) Dollars per year [based on Nine and 00/100 ($9.00) Dollars per square foot of Floor Area in the Premises];

(b)   In the event Tenant exercises the first Renewal Option, for the first Renewal Period consisting of seven (7) years, at the rate of Two Hundred Thirty Four Thousand and 00/100 ($234,000.00) Dollars per year [based on Ten and 00/100 ($10.00) Dollars per square foot of Floor Area in the Premises];

(c)   In the event Tenant exercises the second Renewal Option, for the second Renewal Period consisting of five (5) years, at the rate of Two Hundred Fifty Seven Thousand Four Hundred and 00/100 ($257,400.00) Dollars per year [based on Eleven and 00/100 ($11.00) Dollars per square foot of Floor Area in the Premises]; and

(d)   In the event Tenant exercises the third Renewal Option, for the third Renewal Period consisting of five (5) years, at the rate of Two Hundred Eighty Thousand Eight Hundred and 00/100 ($280,800.00) Dollars per year [based on Twelve and 00/100 ($12.00) Dollars per square foot of Floor Area in the Premises].

1.1.12   Floor Area:  The actual number of square feet of space contained on all floors within any building area in the Shopping Center (including the Premises) and, with respect to exterior areas, including all exterior areas leased to or exclusively used by one or more tenants (other than [exterior] loading dock areas, trash compactor areas, and trash container areas). All measurements pursuant to this Subsection shall be from the exterior of outside walls or store front and/or to the centerline of any common walls, but in no event shall Floor Area within either the Premises or the remainder of the Shopping Center include any non-selling or storage space areas within any mezzanine, lower floor, second floor or, except as set forth above, any exterior areas.

1.1.13   Force Majeure:  As defined in Section 23.4 hereof.

1.1.14   Ground Lessor:  The landlord under any existing or future ground or underlying leases encumbering or affecting all or any part of the Shopping Center.

1.1.15   Intentionally Omitted.

1.1.16   Hazardous Substances:  As defined in Subsection 12.4.1 hereof.

1.1.17   Inducement Tenants:  As defined in Subsection 2.3.1 hereof.

2

1.1.18 <u>Landlord</u>: As defined in the preamble and Section 23.11 hereof.

1.1.19 <u>Landlord's Mailing Address and Landlord's Payment Address</u>:  All notices, but not including payment of Rent or other charges due under the Lease, shall be delivered to 30 South Meridian Street, Suite 1100, Indianapolis, IN 46204, or such other place and/or to the attention of such other person as Landlord may notify Tenant from time to time by notice given in accordance with the provisions of Article 18 hereof ("Landlord's Mailing Address").  Rent and other charges due under the Lease shall be delivered to: KRG New Hill Place, LLC, 6754 Paysphere Circle, Chicago, Illinois 60674 ("Landlord's Payment Address").  If the "Landlord" consists of more than one person, then notices given to the entity listed in Landlord's Mailing Address will be deemed to have been given automatically to all of the parties which constitute Landlord, and Tenant shall be entitled to rely exclusively on any notice sent by said entity.

1.1.20 <u>Landlord's Work</u>: As defined in Section 3.1 hereof.

1.1.21 <u>Lease Interest Rate</u>: The then effective prime rate as published from time to time in the "Money Rates" section of The Wall Street Journal (or any successor publication thereto) plus two (2%) percent.

1.1.22 <u>Legal Requirements</u>: All laws, statutes, codes, acts, ordinances, judgments, decrees, authorizations, directions and requirements of, and agreements with, all governmental departments, commissions, boards, courts, authorities, agencies, officials and officers, which now or at any time hereafter may be applicable to the Premises, the Shopping Center, or any part(s) thereof.

1.1.23 <u>Mortgagee</u>:  Any bank, savings and loan association, insurance company, pension fund, credit union, real estate investment trust, or other lender, which is not an Affiliate of Landlord, and which holds a mortgage on the Shopping Center or is the beneficiary under a deed of trust encumbering the Shopping Center.

1.1.24 <u>National Tenant</u>:  A retailer operating at least thirty (30) retail stores in the continental United States under a single trade name and typically found in first-class shopping centers.

1.1.24A <u>Northern Area</u>:  The portion of the Shopping Center shown on Exhibit B and referred to in the OEA.  The Frank Theatre will be located in the Northern Area.

1.1.25 <u>OEA</u>:  That certain Operation and Easement Agreement between Target Corporation and Landlord dated March 1, 2012 and recorded on March 2, 2012 in Book 014672 page 02597 et seq. in the office of the Register of Deeds for Wake County, North Carolina ("***Register***").

1.1.26 <u>Intentionally Omitted</u>

1.1.27 <u>Permitted Use</u>:  Subject to the "Tenant Prohibited Uses" and the "Existing Exclusives" identified in <u>Exhibits M-1</u> and <u>K-1</u> respectively:  The sale at retail of a variety of linens and domestics (including, but not limited to, sheets, bedspreads, comforters, duvets, pillows, pillow covers, chair pads, placemats, tablecloths, dish towels, oven mittens and aprons); bathroom items (including, but not limited to, towels, shower curtains, bathroom rugs, toilet seats, health and beauty care items, cosmetics, and drug remedies, personal care devices and other bathroom appliances and accessories); housewares (including, but not limited to, kitchen utensils, kitchen appliances and kitchen "gadgets," cleaning appliances and supplies, cookware, bakeware, dishes and china, glassware, garbage pails, ironing boards and other laundry items, mops and brooms, candles and candle holders, ready-to-assemble furniture and artificial flowers); frames and wall art; window treatments; closet, shelving and storage items; home furnishings; area rugs; wall and floor coverings; furniture (including, without limitation, mattresses,

3

box springs, bed frames, and bedroom furniture); decorative accessories; photo albums; photo storage boxes; luggage; books; party supplies; cards and stationery; seasonal items; juvenile merchandise (including, but not limited to, toys, car seats and safety-proofing items); specialty food items; alcoholic beverages for off-premises consumption, food and beverage services; any and all other items sold or services provided from time to time in any store owned or operated by Tenant or its Affiliate(s) (the aforementioned items are hereinafter collectively referred to as the *"Permitted Items"*); and for any other lawful retail use not specifically prohibited by the provisions of Section 13.1.1 below. In addition, Tenant shall be permitted to use portions of the Premises for storage and office uses incidental to the Permitted Use.

      1.1.28 Premises: Being the area within the Shopping Center which is cross-hatched on Exhibit B hereto, having dimensions as shown on Exhibit B and containing approximately (i) twenty three thousand four hundred (23,400) square feet of Floor Area, and (ii) one thousand (1,000) square feet of mezzanine level space for non-selling office purposes, subject to adjustment in accordance with the provisions of Section 3.4 below. In no event shall such non-selling space (or any space used for fire pump facilities or electrical switch gear) result in any charge to Tenant by way of Fixed Rent or any Additional Rent, nor shall such space be included in the determination of Tenant's Pro Rata Share.

      1.1.28A Regional Tenant: A retailer operating at least fifteen (15) retail stores in the North Carolina/South Carolina/Virginia/West Virginia/Tennessee/Georgia market region under a single trade name and typically found in the first-class shopping centers.

      1.1.29 Renewal Option: As defined in Section 2.2.2 hereof.

      1.1.30 Renewal Period(s): Three (3) successive periods, the first period consisting of seven (7) years and the second and third periods consisting of five (5) years each, as provided in Section 2.2.2 hereof.

      1.1.31 Rent: Fixed Rent or Alternate Rent, as applicable, and Additional Rent.

      1.1.32 Rent Commencement Date: As defined in Section 2.2 hereof.

      1.1.33 Intentionally Omitted.

      1.1.34 Shopping Center: The portion of the Complex which is anticipated to contain approximately 160,000 square feet of Floor Area and is shown on Exhibit B. The Shopping Center is (or will be) located on the approximately 37.22 acre parcel of land which is owned by Landlord and more particularly described in Exhibit A hereto. Landlord shall not change the name of the Shopping Center without giving at least ninety (90) days' prior notice to Tenant, and Landlord shall not include the name of any tenant (other than Tenant) in the name of the Shopping Center provided that the use of the name "Holly Springs" in the name of any other tenant of the Shopping Center shall not be deemed to constitute a violation of this Section 1.1.34. The Shopping Center is called "Developer Tract B" in the OEA and includes the Northern Area shown on Exhibit B.

      1.1.35 Substantially Completed or Substantial Completion: The completion of specified work at the Shopping Center (including, without limitation, as applicable, Landlord's Work) to the extent that only "Punch List Items" of such work (defined in Subsection 3.3.3 below) shall not be completed.

      1.1.35A Target Tract: The approximately 12.86 acre parcel of land within the Complex which, as of the Effective Date, is owned in fee simple by Target Corporation (*"Target"*). The Target Tract is subject to the OEA.

1.1.36 <u>Taxes</u>: As defined in Subsection 4.3.3 hereof.

1.1.37 <u>Tenant</u>: As defined in the preamble hereof.

1.1.37(A) <u>Tenant Delay</u>: As defined in Section 3.3.1 hereof.

1.1.37(b) <u>Tenant's CAM Contribution</u>: As defined in Subsection 5.1.2(a) hereof.

1.1.38 <u>Tenant's Mailing Address</u>: 650 Liberty Avenue, Union, New Jersey 07083, Attn: Mr. Warren Eisenberg, or such other place and/or to the attention of such other person as Tenant may notify Landlord from time to time by notice given in accordance with the provisions of Article 18 hereof.

1.1.39 <u>Tenant's Permits</u>: As defined in Subsection 2.3.1(b) hereof.

1.1.40 <u>Tenant's Property</u>: All of Tenant's personal property, including, without limitation, phone and alarm systems, satellite antennae, shelving, computers, furniture, cash registers and customer service counters, specialty lighting, track lighting, millwork, conveyor systems, storage racks and signage and any and all other personal property of Tenant which is capable of being removed from the Premises without material damage thereto, but which shall not include electrical systems, heating, ventilation and air conditioning systems, and other mechanical systems, flooring, carpet, elevators, standard lighting and wiring installed within the walls of the Premises.

1.1.41 <u>Tenant's Pro Rata Share</u>: A fraction whose numerator is the ground floor Floor Area of the Premises and whose denominator (subject to adjustment pursuant to Subsections 4.3.3 and/or 5.1.3(b) below if and to the extent portions of the Shopping Center are separately assessed for Taxes or separately maintained or insured) is the Floor Area of the Shopping Center as may be re-determined any time a building (and/or Floor Area) is added to or removed from the Shopping Center, but in no event shall Tenant's Pro Rata Share be greater than thirteen percent (13%) unless the Taxes and/or Insurance Costs and/or Variable Costs for portions of the Shopping Center are paid directly by the tenants or occupants thereof as described in Subsections 4.3.3 and/or 5.1.3(b). Floor Area shall be deemed added to or removed from the Shopping Center on the earlier of (i) the date upon which such Floor Area is Substantially Completed, or (ii) at such time as an assessment for Taxes is made or removed, as the case may be, with respect to such Floor Area. Within thirty (30) days following written request from Tenant, Landlord shall certify to Tenant in writing as to the then Floor Area of the Shopping Center.

1.1.42 <u>Tenant's Work</u>: As defined in Section 3.1 hereof.

1.1.43 <u>Term</u>: A period (the "***Initial Term***") of approximately ten (10) years beginning on the Rent Commencement Date and expiring at midnight on the last day of January following the tenth (10th) anniversary of the Rent Commencement Date, unless the Rent Commencement Date is February 1, in which event the Expiration Date shall be the day before the tenth (10th) anniversary of the Rent Commencement Date. As used herein: (i) "***Term***" shall refer to the Initial Term, as the same may be extended by any Renewal Period exercised pursuant to Subsection 2.2.2 below; and (ii) "***Expiration Date***" shall mean the date on which the Term expires.

1.1.44 <u>Variable Costs</u>. As defined in Subsection 5.1.2(a) hereof.

## ARTICLE 2
## LEASE OF PREMISES; LEASE TERM; DELIVERY DATE

Section 2.1   <u>Lease of Premises</u>. Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the Premises together with any and all rights, benefits, privileges and easements, now or hereafter appurtenant to either or both of the Premises

5

and the Shopping Center, arising out of any public or private grant or authority, including, without limitation, the non exclusive right and easement to use the Common Areas in common with other tenants and occupants of the Shopping Center until the expiration or earlier termination of this Lease.

Section 2.2    Term.

2.2.1    Initial Term.  Subject to the provisions of this Article 2, the Term of this Lease shall begin on the sixtieth (60th) day following the Delivery Date (the "Rent Commencement Date").  The Term shall expire on the Expiration Date, unless earlier terminated as herein provided.  When the Rent Commencement Date has been determined, as provided in this Section, Landlord and Tenant shall execute, acknowledge and deliver, each to the other, a written statement in the form attached hereto as Exhibit C specifying the Rent Commencement Date, and Landlord shall deliver to Tenant a completed and signed IRS Form W-9 contemporaneously therewith; the delivery of the Form W-9 shall be a condition precedent to the payment of Rent.

2.2.2    Renewal Options.  Provided no Event of Default then exists pursuant to which Landlord elects to terminate either this Lease or Tenant's possession of the Premises, Tenant shall have the right and option (hereinafter a "*Renewal Option*") to extend the Initial Term from the date on which it would otherwise expire for three (3) successive renewal periods, the first period consisting of seven (7) years and the second and third periods consisting of five (5) years each (individually, a "*Renewal Period*", and collectively, the "*Renewal Periods*") upon the same terms and conditions as are herein set forth.  Each Renewal Option shall be exercisable by notice given to Landlord at least two hundred seventy (270) days prior to the commencement of the applicable Renewal Period(s).

Section 2.3    Delivery Date.

2.3.1    Definition.  Subject to Landlord's delivery to Tenant of the Delivery Date Notice in accordance with the provisions of Subsection 2.3.2 below and Landlord's timely compliance therewith, Landlord shall be deemed to have delivered possession of the Premises to Tenant at 8:00 a.m. on the date (the "*Delivery Date*") following the day on which all of the following conditions (the "*Delivery Date Conditions*") shall have occurred and Tenant shall have received from Landlord the Delivery Date Certification in accordance with the provisions of Section 2.3.3 below, which shall constitute Landlord's written certification that all of the following shall have occurred:

(a)    Actual possession of the Premises shall have been delivered to Tenant water-tight, free of Hazardous Substances, in a good, structurally sound condition, with all of Landlord's Work Substantially Completed, which Substantial Completion shall be evidenced by a written certification by Landlord's architect to Tenant;

(b)    Landlord shall have obtained (and delivered copies thereof to Tenant, upon request) all permits and approvals required from all applicable governmental authorities to enable Tenant to occupy and use the Premises for the conduct of its business in the Premises (exclusive of any business licenses which Tenant may be required to obtain in order to open and operate its specific business and not a general retail business (collectively, "*Tenant's Permits*")), which permits and approvals shall include, without limitation, zoning and building code approvals, environmental requirements, and a permanent certificate of occupancy for the Premises (unless a permanent certificate of occupancy for the Premises cannot be obtained solely as a result of the failure to complete Tenant's Work in the manner required hereunder, in which event: (1) the delivery of a permanent certificate of occupancy for the Premises shall not be a condition to the occurrence of the Delivery Date, (2) the obtaining of a temporary certificate of occupancy shall be a condition to the occurrence of the Delivery Date, and

6

(3) Landlord shall obtain the permanent certificate of occupancy promptly following the correction or completion of Tenant's Work);

(c)    The Common Areas within all portions of the Shopping Center other than the Northern Area (the "**Required Common Areas**"), and all of the improvements thereto shown on Exhibit B hereto, shall have been Substantially Completed and operational, and all off-site improvements (including, without limitation, street, storm drainage, and traffic signalization improvements) required for the Shopping Center to open for business and for Tenant to receive a permanent certificate of occupancy shall have been Substantially Completed; Landlord, at its sole cost and expense, shall have obtained (and delivered copies thereof to Tenant, upon request) all permits and approvals required from applicable governmental authorities to enable the Required Common Areas to be developed, operated, and used for the purposes herein contemplated, which permits and approvals shall include, without limitation, zoning, building code, environmental requirements, curb cut and site plan approvals, all permits pertaining to pylon and/or monument signage (and Tenant's panel(s) thereon), construction, and development and use permits;

(d)    The representations and warranties of Landlord set forth in subparagraphs (a) through (i) of Section 12.3 below shall then be true and in effect;

(e)    Leases or other occupancy agreements shall have been entered into (and shall continue to be in effect) with the following tenants or occupants (each, an "**Inducement Tenant**") on the following terms, for occupancy of the premises designated for them on Exhibit B; such leases or agreements shall not be cancelable by any of the Inducement Tenants, except for injury to or loss of the premises thereby demised because of fire or other casualty, or for a taking or for other reasons similar to those for which this Lease is cancelable by Tenant:

| Inducement Tenant | Minimum Square-foot Gross Floor Area | Minimum Term |
|---|---|---|
| Target* | At least 80% of the Floor Area shown on Exhibit B | 10 Years |
| DSW* | 100% of the Floor Area shown on Exhibit B | 10 Years |
| Three (3) of the following: Michael's*, Marshall's*, Dick's* or Petco* | 100% of the Floor Area shown on Exhibit B | 10 Years |
| One (1) of the following: Frank Theatre**, Ross Stores*, Fresh Market**, Sprouts** or LA Fitness** | 100% of the Floor Area shown on Exhibit B | 10 Years |

For purposes of this Lease, Target (and any other retailer listed above) shall be deemed an Inducement Tenant notwithstanding that Target (or such other retailer) owns instead of leases its premises in the Complex. The Inducement Tenants marked with one (1) asterisk (*) above may be replaced only by a "**National Tenant**" as defined in Subsection 1.1.24. The Inducement Tenants marked with two (2) asterisks (**) above may be replaced by either a National Tenant or a "**Regional Tenant**" as defined in Subsection 1.1.28A. Landlord represents, and Tenant acknowledges (without impairing Tenant's rights under Section 2.5 below) that, as of the Effective Date, Target has purchased and opened the Target Tract for business, and leases have been signed with sufficient

7

Inducement Tenants to satisfy all the requirements set forth above except for the requirement pertaining to DSW or its replacement tenant;

(f)     Landlord shall have delivered to Tenant, in recordable form: (i) a subordination, non-disturbance and attornment agreement substantially in the form attached hereto as Exhibit G, or another mutually acceptable form (provided such other form shall contain the provisions of Sections 3(c) and 4 in Exhibit G), executed by each holder of any mortgage or deed of trust encumbering or affecting the Shopping Center or any portion thereof, and (ii) a fee owner recognition agreement in the form and content described in clause (b) of Section 17.1 hereof executed by any existing Ground Lessor;

(g)     Landlord shall have obtained any and all approvals required from Target (the "*Target Approvals*") under the OEA for the performance of Landlord's Work (including, without limitation, Tenant's elevations and signage, as shown on Exhibit D-1 and Exhibit F hereto) and the storage of its shopping carts and the use of its temporary storage containers pursuant to Section 5.2.8;

(h)     The Declaration of Restrictions (hereinafter defined in Section 13.2.5) is fully executed, delivered and recorded in the Register's office against Developer Tract A.

2.3.2   Delivery Date.

(a)     Landlord shall give Tenant at least one hundred twenty (120) days prior notice of the Delivery Date, using the form of Delivery Date Notice attached hereto as Exhibit I (the "*Delivery Date Notice*"). Landlord's delivery of the Delivery Date Notice shall be a condition precedent to the Rent Commencement Date. Notwithstanding any provision of this Lease to the contrary, in no event shall the Delivery Date be deemed to occur prior to the Delivery Date established in the Delivery Date Notice. No event of Force Majeure occurring prior to the giving of the Delivery Date Notice shall serve to delay the Delivery Date thereby established.

(b)     Landlord acknowledges that if it shall fail to satisfy all of the Delivery Date Conditions by the Delivery Date as established in the Delivery Date Notice, Tenant will sustain substantial, additional costs and expenses, including, without limitation, storage costs for fixtures, equipment, and inventory, employee costs during the waiting period, and additional advertising and promotional costs, the exact amount of which would be impracticable or extremely difficult to ascertain. If the Delivery Date does not occur by the date established therefor in the Delivery Date Notice for any reason other than Tenant Delay or Force Majeure occurring after the Delivery Date Notice has been given, then, in addition to any other remedies available to Tenant under this Lease (except as provided below), Tenant shall be entitled to a credit against the initial installment(s) of Rent hereunder, as liquidated reimbursement (and not as a penalty) for all of the aforesaid costs incurred by Tenant, an amount equal to the sum of: (i) Eighty Five Thousand Dollars ($85,000), plus (ii) Two Thousand Five Hundred Dollars ($2,500) for each day that the Delivery Date established in the Delivery Date Notice is so delayed, provided that the amounts pursuant to clause (ii) above shall not exceed Two Hundred Twenty Thousand Dollars ($220,000) in the aggregate. The foregoing liquidated reimbursements shall be Tenant's sole and exclusive monetary remedy for such a delay in the Delivery Date, so long as the Delivery Date actually occurs and Tenant is otherwise not able to terminate this Lease under Section 3.3.2(i) hereof, and represent the parties' good faith agreement as to an agreed upon amount which shall have been incurred by Tenant and which shall otherwise not be susceptible of exact ascertainment.

2.3.3   Delivery Date Certification. Upon the satisfaction of all of the Delivery Date Conditions, Landlord shall so certify to Tenant, using the form of Delivery Date Certification attached hereto as Exhibit J.

2.3.4   No Waiver.  Neither Tenant's acceptance of physical possession of the Premises nor Tenant's opening of the Premises for business to the public prior to the Delivery Date shall: (i) be deemed a waiver by Tenant of any of the Delivery Date Conditions, or (ii) relieve Landlord of any obligation under this Lease, unless such condition or obligation is expressly waived in writing by Tenant.

Section 2.4   Unseasonable Delivery: Slack Period.  If, for any reason (including, without limitation, Force Majeure), but excluding Tenant Delays, the Delivery Date occurs during the period commencing on September 30 and ending on the February 28 next following (the "Slack Period"), then Tenant shall have, in addition to any other remedies, the right to:

(a)   accept delivery of physical possession of the Premises; or

(b)   defer its acceptance of delivery of physical possession of the Premises to a later date within the Slack Period, whereupon the Delivery Date shall be deemed to have occurred on the earliest of (i) the date that Tenant actually accepts physical possession of the Premises, (ii) the date that all of the Delivery Date Conditions have been satisfied, or (iii) the end of the Slack Period (subject, in all cases, to the other provisions of this Article 2 and the continuing satisfaction of the Delivery Date Conditions); and

in either event, if both the Delivery Date and the Rent Commencement Date occur during the Slack Period, Tenant shall be entitled to pay Alternate Rent in lieu of Fixed Rent for the period commencing on the Rent Commencement Date and ending on the expiration of the Slack Period; any benefit which Tenant may realize thereby shall constitute a reimbursement to Tenant for certain pre-opening expenses incurred by Tenant in connection with this Lease.  In the event Tenant is entitled to the liquidated reimbursement provided for in Section 2.3.2(b) above, and Tenant defers the acceptance of physical possession of the Premises as set forth in this Section 2.4, the per diem liquidated reimbursement of $2,500 payable by Landlord to Tenant under Section 2.3.2(b) shall cease to accrue as of the date the Delivery Date would have occurred had Tenant not elected to defer acceptance, but shall recommence on the date later in the Slack Period which Tenant designates for delivery of the Premises if Landlord fails to deliver the Premises with all Delivery Date Conditions satisfied on such date.

Section 2.5   Initial Co-Tenancy Condition.

2.5.1   As used herein, the "***Initial Co-Tenancy Condition***" shall mean that each and every Inducement Tenant shall have accepted possession of its entire premises, such premises shall have been substantially completed, and each Inducement Tenant shall, if not already open for business, then be actively and continuously engaged in the fixturing and merchandising therein, unless any such Inducement Tenant is temporarily closed for the purposes of taking inventory, repairing or altering its premises, or other such temporary closures, in which case the Initial Co-Tenancy Condition shall nevertheless be deemed satisfied as to such Inducement Tenant unless such Inducement Tenant fails to reopen for business within sixty (60) days of the date on which Tenant opens for business.

2.5.2   If, on the Delivery Date, the Initial Co-Tenancy Condition has not been satisfied, Tenant shall have the right, at its sole option, to:

(a)   accept delivery of physical possession of the Premises; or

(b)   defer its acceptance of delivery of physical possession of the Premises to a later date (but not later than the date on which the Initial Co-Tenancy Condition is satisfied and Tenant receives notice from Landlord thereof), whereupon the Delivery Date shall be deemed to have occurred on the date that Tenant actually accepts

9

physical possession of the Premises (subject to the other provisions of this Article 2 and the continuing satisfaction of the Delivery Date Conditions); and

in either event, if the Rent Commencement Date occurs before the satisfaction of the Initial Co-Tenancy Condition, Tenant shall be entitled to pay Alternate Rent in lieu of Fixed Rent until the Initial Co-Tenancy Condition is satisfied and the Landlord gives Tenant notice thereof, subject to any other applicable provisions of this Article 2. Notwithstanding the foregoing, if Frank Theatre is one of the Inducement Tenants on which Landlord is relying to satisfy the requirements of Section 2.3.1(e) and if the Initial Co-Tenancy Condition is satisfied on the Delivery Date as to all Inducement Tenants other than Frank Theatre, then Tenant shall not be permitted to defer acceptance of delivery of possession of the Premises pursuant to Section 2.5.2(b) above, but Tenant shall be entitled to pay Alternate Rent in lieu of Fixed Rent until Frank Theatre begins to actively and continually engage in the fixturing and merchandising of its entire premises.

2.5.3    In addition to the provisions of Section 2.5.2 above, if the Initial Co-Tenancy Condition has not been fully satisfied with respect to all Inducement Tenants (including Frank Theatre, if Frank Theatre is one of the Inducement Tenants on which Landlord is relying to satisfy the requirements of Section 2.3.1(e)) by the first (1st) anniversary of the Delivery Date established pursuant to Section 2.3.2(a) above, then Tenant shall have the right, within thirty (30) days after such anniversary date (but prior to the satisfaction of the Initial Co-Tenancy Condition), upon giving Landlord at least one hundred twenty (120) days' prior notice, to terminate this Lease as of the date specified in said notice. Landlord may negate such termination by causing the Initial Co-Tenancy Condition to be satisfied within thirty (30) days after the date on which said termination notice is given. If this Lease is terminated hereunder, neither party shall have any further liability under this Lease, except for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease. If this Lease is not terminated by Tenant in a timely manner as aforesaid, Tenant shall commence the payment of full Fixed Rent in lieu of Alternate Rent as of the later to occur of (i) the day after such anniversary date or (ii) the negation of such termination by Landlord, if applicable, and, if Tenant has not already done so, Tenant shall open the store for business subject to and in accordance with Article 14 within thirty (30) days after the later to occur of (i) or (ii) as aforesaid.

Section 2.6    Landlord Right To Terminate.  If Landlord has not started either Landlord's Work or the site work for the Shopping Center by **June 1, 2016** for any reason other than Landlord's failure to perform or observe any of its obligations under this Lease, then, provided Landlord terminates the leases of all other tenants for the Shopping Center, Landlord shall have the option, upon notice given to Tenant by not later than **July 31, 2016**, to terminate this Lease, in which event neither party shall have any further liability hereunder, except: (i) for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease, and (ii) simultaneously with such termination notice, Landlord shall be obligated to pay to Tenant the fixed amount of Fifty Thousand Dollars ($50,000), as a liquidated reimbursement (and not as a penalty) for costs sustained by Tenant in connection with this Lease which would be impracticable or extremely difficult to ascertain. If this Lease is terminated by Landlord pursuant to this Section 2.6, and Landlord or its Affiliate commences the site work for the Shopping Center within three (3) years after the date on which the Lease termination becomes effective hereunder, then Landlord shall offer to Tenant, within thirty (30) days after Landlord's (or its Affiliate's) commencement of such site work, the option to lease the Premises upon the terms and conditions of this Lease; provided, however, that all dates set forth in this Lease shall be appropriately extended. In the event Tenant elects, within thirty (30) days after its receipt of such offer, to exercise such option, Landlord and Tenant shall promptly execute a lease upon substantially the same terms and provisions of this Lease. In the event Tenant does not elect, within thirty (30) days after its receipt of such offer, to exercise such option, Landlord shall be free to lease

10

the Premises to any other person or entity, upon economic terms which are not materially more favorable to the tenant than those contained in this Lease. The provisions of this Section 2.6 shall survive the termination of this Lease.

ARTICLE 3
IMPROVEMENTS

Section 3.1    Landlord's Work and Tenant's Work.  Landlord shall, at its sole cost and expense, perform the work and obligations described on Exhibit D, Exhibit D-1, and Exhibit F hereto, and the "Final Landlord's Plans and Specifications" (hereinafter defined in Section 3.2) (collectively, *"Landlord's Work"*), and shall deliver possession of the Premises to Tenant in the condition described therein.  Except for Landlord's Work, Tenant shall, at its own cost and expense, do any and all work (hereinafter referred to as *"Tenant's Work"*) which Tenant desires to adapt the Premises to Tenant's use.

Section 3.2    Plan Approvals.

3.2.1    Preparation of Plans and Specifications.

(a)    Within thirty (30) days after the Effective Date, Landlord shall deliver to Tenant drawings showing the proposed footprint, column layout, and interior clear dimensions of the Premises (the *"Preliminary LOD"*) [Limits of Demised], which shall be subject to any reasonable modifications indicated by Tenant as provided below. The Preliminary LOD shall be substantially consistent with Exhibits B, D, and D-1 hereto.  The foregoing has been satisfied as of the Effective Date.

(b)    Within thirty (30) days after Tenant's receipt of the Preliminary LOD, Tenant shall deliver to Landlord its revisions thereto (the *"Revised LOD"*), showing the location of the interior structural grid (column layout), storefront opening, and mezzanine and/or office core, the location and arrangement of the loading facilities, trash compactor pad, and trash container pad(s), and any reasonable revisions to the interior clear dimensions.  The foregoing has been satisfied as of the Effective Date.

(c)    Within fifteen (15) days after Landlord's receipt of the Revised LOD, Landlord shall deliver to Tenant a final LOD (as approved by Tenant, the *"Certified LOD"*), certified by Landlord, which shall incorporate all of the elements of the Revised LOD. Within fifteen (15) days after its receipt of the Certified LOD, Tenant shall notify Landlord of Tenant's approval thereof or the reasons why such approval cannot be granted, and Landlord shall, within fifteen (15) days after receiving such notice, make any revisions necessary to correct such matters and thereby obtain Tenant's approval.  Upon Tenant's approval of the Certified LOD, any further changes thereto shall be subject to Tenant's prior written approval (which may be withheld in its sole discretion), provided that, as to changes required to conform to Legal Requirements, Tenant shall have reasonable approval rights within the confines of said Legal Requirements.  After Tenant approves the Certified LOD, (i) Landlord shall be responsible for any and all reasonable costs incurred and delays experienced by Tenant in connection with any further changes to the Certified LOD required by Landlord other than those due to Tenant Delays or Force Majeure, and (ii) any further changes to the Certified LOD required by Tenant shall constitute "Changes" as described in Section 3.2.2 below.  The foregoing has been satisfied as of the Effective Date.

(d)    Not earlier than **September 1, 2014** (unless Tenant elects to deliver Tenant's Plans earlier), Tenant shall deliver to Landlord its Fixture Plan (F1); Floor Finish Plans Notes and Details (F2); Power/Specialty Lighting Plan and Notes (F3); Lighting Plans and Notes (F4); and High-Pile Storage Plan (F5) (collectively, *"Tenant's Plans"*), all of which shall be substantially consistent with the Certified LOD (as same may be reasonably modified by Tenant, as noted above) and the Prototype Standards/Specifications defined in Section 3.2.2 herein.

11

(e)      Within thirty (30) days after receipt of Tenant's Plans, Landlord shall prepare and deliver to Tenant, in a single submission, "***Landlord's Plans and Specifications***" (as defined in Exhibit D hereto), and each of the plans which collectively constitute Landlord's Plans and Specifications shall be at least 85% complete, in Tenant's reasonable judgment. Landlord's Plans and Specifications shall be substantially consistent with Tenant's Plans, the Certified LOD, and Exhibits B, D, D-1, and F hereto.

(f)      Within thirty (30) days after its receipt of Landlord's Plans and Specifications, Tenant shall give Landlord notice of the respects, if any, in which said Plans fail to meet Tenant's reasonable approval and/or fail to conform to the Certified LOD, Tenant's Plans, and/or Exhibits B, D, D-1, and F hereto; however, any such deficiencies identified by Tenant which are not directly attributable to a failure of said Plans to conform to the Certified LOD, Tenant's Plans, and/or Exhibits B, D, D-1, and F shall be addressed as if they were Changes as defined in Section 3.2.2 herein.

(g)      Within fifteen (15) days after the date on which Landlord receives Tenant's notice (described in the preceding paragraph), Landlord shall deliver to Tenant, in a single submission, revised Landlord's Plans and Specifications, which shall be 100% complete and shall address all of Tenant's comments.

(h)      Within fifteen (15) days after its receipt of the revised Landlord's Plans and Specifications, Tenant shall notify Landlord of Tenant's approval thereof or the reasons why such approval cannot be granted; however, such notice shall be based upon and limited to those issues raised in Tenant's prior notice of non-approval, and any other issues raised therein shall be addressed as if they were Changes as defined in Section 3.2.2 herein.

(i)      In the event that the Landlord's re-submittal of Landlord's Plans and Specifications is not approved by the Tenant, then Landlord shall further revise Landlord's Plans and Specifications to address all Tenant comments and re-submit them to Tenant for Tenant's review and approval. The re-submittal described in the preceding sentence shall be delivered to Tenant by Landlord within fifteen (15) days of receipt of Tenant's notice that the previous submittal has not been approved. The process described in this subparagraph (i) and subparagraph (h) above shall be repeated until Landlord has secured Tenant's approval of Landlord's Plans and Specifications. Landlord's Plans and Specifications as finally approved by Tenant are referred to herein as the "***Final Landlord's Plans and Specifications***".

(j)      Upon Tenant's approval of the Final Landlord's Plans and Specifications, any further changes thereto shall be subject to Tenant's prior written approval. Unless specifically noted on a separate summary sheet attached to the Final Landlord's Plans and Specifications, to the extent of a conflict between the terms and provisions of Tenant's Plans, Exhibit B, Exhibit D, Exhibit D-1, and/or Exhibit F hereto, and the terms and provisions of the Final Landlord's Plans and Specifications, then the terms and provisions of Tenant's Plans, Exhibit B, Exhibit D, Exhibit D-1, and Exhibit F shall govern and prevail.

(k)      All submissions by the parties of the Preliminary LOD, the Revised LOD, the Certified LOD, the Tenant's Plans, the Landlord's Plans and Specifications, the Final Landlord's Plans and Specifications, and the measurements required under Section 3.4.1 and 3.4.2 below shall be made (or accompanied) by the computer files thereof formatted in any version of "*Autocad 2002*" up to "*Autocad 2007*".

3.2.2   Plan Changes.

(a)      Tenant shall have the right to make changes from the standards and specifications set forth in "Tenant's Prototype Drawings and

12

Specifications" and/or the "Project Manual", referred to in Exhibit D hereto (collectively, the "*Prototype Standards/Specifications*"), and/or to require Landlord to subsequently make changes to Landlord's Plans and Specifications and/or the Final Landlord's Plans and Specifications in accordance therewith (the "*Changes*"). Within ten (10) business days after receiving Tenant's request for any Change, Landlord shall give Tenant notice of the cost or savings, and any delay, that may be occasioned by such Change, which notice shall be accompanied by reasonable back-up supporting the cost increases or delays. If Tenant fails to authorize such Change in writing within five (5) business days after receiving Landlord's notice, then such Change shall be deemed null and void. Notwithstanding anything to the contrary contained herein, Landlord shall not be required to begin performing Landlord's Work in absence of written confirmation from Tenant identifying all Changes agreed to as of such date. If, after delivering Tenant's Plans to Landlord pursuant to Section 3.2.1(d) above, Tenant subsequently revises Tenant's Plans, and such changes result in Changes to the Landlord's Plans and Specifications or the Final Landlord's Plans and Specifications, Tenant shall not be responsible for "soft" architectural costs up to $6,000 associated with such Changes to Landlord's Plans and Specifications or the Final Landlord's Plans and Specifications resulting from the first set of changes to the Tenant's Plans only. In the event such "soft" costs are anticipated to exceed $6,000, at least ten (10) days prior to making any Changes to the Landlord's Plans and Specifications or the Final Landlord's Plans and Specifications which are required as a result of changes to the Tenant's Plans, Landlord shall notify Tenant in writing of the anticipated "soft" architectural costs associated with making such Changes to the Landlord's Plans and Specifications or the Final Landlord's Plans and Specifications, and Tenant shall have a period of ten (10) days following receipt of Landlord's notice to notify Landlord that it retracts its proposed revision to the Tenant's Plans, in which case the Changes to the Landlord's Plans and Specifications or the Final Landlord's Plans and Specifications shall not be incorporated.

(b)     Tenant shall pay to Landlord the net reasonable additional third-party costs of Landlord's Work resulting directly and solely from the aggregate Changes (exclusive of any charges for overhead and profit, other than sums not exceeding 5% subcontractor profit and 5% general contractor profit thereon), taking into consideration any and all actual costs and savings resulting from all Changes theretofore approved by Tenant, in the aggregate (including, without limitation, reasonable costs approved by Tenant in advance associated with any acceleration of the work schedule which Tenant, at its sole option, may require). Such payment shall be due and payable within thirty (30) days after Tenant's receipt of backup information reasonably supporting all such costs, including, without limitation, invoices, receipts and lien waivers of subcontractors and materialmen, but in no event earlier than the Delivery Date.

(c)     Intentionally omitted.

(d)     If the Changes occur during the preparation of any of the plans described in Section 3.2.1 above, then the deadlines for preparation and delivery of the plans then being prepared shall be extended as reasonably necessary to incorporate such Changes. If, despite Landlord's diligent efforts in performing Landlord's Work, the Changes cause a net delay in the Substantial Completion of Landlord's Work (taking into consideration any time reductions resulting from such changes), then: (i) the Rent Commencement Date shall be determined as if such delay had not occurred, (ii) the commencement of the Slack Period, and the dates set forth in clauses (a) and (b) of Section 3.3.2 below, shall be extended by the number of days of such net delay; and (iii) with respect to Changes requested after the Delivery Date Notice is given, for purposes of calculating liquidated damages under Subsection 2.3.2(b) above, the Delivery Date shall be extended by the number of days of such net delay.

Section 3.3     Performance of Work.

13

3.3.1   Both Landlord's Work and Tenant's Work shall be performed in a good and workmanlike manner, in compliance with all applicable Legal Requirements then in effect, utilizing only new, first-class materials and in accordance with all insurance company requirements. Landlord shall perform Landlord's Work in a manner such that Tenant will be able to obtain Tenant's Permits. Landlord shall pay any and all impact fees and related governmental charges in connection with the Shopping Center and the Premises. If Tenant's Permits cannot be obtained because Landlord's Work has not been completed or has been performed improperly or by reason of any then existing condition of the Shopping Center, Landlord shall remedy the situation so as to enable Tenant to obtain Tenant's Permits, and the Delivery Date shall be deemed delayed, for Tenant's benefit only, on a day-for-day basis for each day of delay occasioned thereby. Notwithstanding anything to the contrary contained herein, if the Delivery Date is delayed as a result of a Tenant Delay, Landlord shall have no liability to Tenant for the delay, and the Delivery Date (as anticipated in Section 3.3.2 hereinafter) shall be adjusted by the number of days of such delay. As used herein, the term *"Tenant Delay"* shall mean any net delay in the performance by Landlord of any obligation Landlord is required to perform hereunder attributable to Tenant including, without limitation: (a) Tenant's failure to approve or otherwise timely respond to a request for approval of any plans within the time provided herein; (b) the interference by Tenant or Tenant's contractors in the performance by Landlord or Landlord's contractors of Landlord's Work; (c) Changes to Landlord's Work made at the request of Tenant; or (d) any other act or omission of Tenant, its contractors, employees or agents; provided, however, that Landlord shall have notified Tenant in writing of such Tenant Delay within ten (10) days after the occurrence thereof.

3.3.2   If: (a) Landlord's Work (i.e., the pouring of foundation footings for the Premises) has not been commenced by **June 1, 2015**, subject to *Force Majeure* and Tenant Delay or (b) the Delivery Date shall not have occurred by **June 1, 2016** (subject to *Force Majeure*, not to exceed thirty (30) days in the aggregate, and Tenant Delays, and provided that Landlord shall have given Tenant notice of such event of Force Majeure or Tenant Delay promptly after its occurrence), Tenant may thereafter, during such time as Landlord's Work has not been commenced or the Delivery Date has not occurred, as the case may be, consider Landlord to be in default hereunder and, at Tenant's option in its sole discretion, elect to:

(i)   terminate this Lease, if Landlord shall fail to fully cure such default within thirty (30) days after receiving Tenant's notice thereof, in which event neither party shall have any further liability hereunder, except: (i) for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease, and (ii) Landlord shall be obligated to promptly reimburse Tenant, as Tenant's sole monetary remedy by reason thereof, for all its reasonable third-party costs and expenses incurred in connection with this Lease (including, without limitation, costs associated with the preparation and review of plans and specifications, attorney's fees, and the performance of Tenant's Work), not to exceed Fifty Thousand Dollars ($50,000); and/or

(ii)   avail itself of the remedies set forth in Section 16.2 below (provided, however, that the cure period set forth therein shall not be applicable and Tenant's claim against Landlord for monetary damages if Tenant terminates this Lease pursuant to Section 3.3.2(i) above shall be limited by Section 3.3.2(i)); and/or

(iii)   extend one or more times the dates set forth in clauses (a) and/or (b) of this Subsection 3.3.2 to such future dates designated by Tenant in notice given to Landlord, and as to any extension granted with respect to the clause 3.3.2(b) above, in addition to any other rights and remedies to which Tenant may be entitled, the Rent Commencement Date shall be postponed by two (2) days for each day of the extension granted as to clause 3.3.2(b) above.

14

Except as provided in clause (ii) above, the election by Tenant of any one or more of the foregoing remedies shall not preclude the subsequent election of any alternative remedy provided in this Section, this Lease, at law, or in equity (it being the understanding of the parties that Tenant may not exercise more than one of the foregoing remedies at any one time).

3.3.3 <u>Landlord's Work Performed After Delivery of Possession</u>. On or before the Delivery Date, Landlord's and Tenant's representatives together shall conduct a walk-through of the Premises to compile a punch list of the "Punch List Items" (hereinafter defined). Tenant shall deliver to Landlord a copy of said punch list within five (5) days after the walk-through. Landlord shall complete any Punch List Items within fifteen (15) days after it receives a copy of said punch list. If Landlord fails to complete any item on said punch list within said 15-day period, Tenant shall have the right to complete such item(s) using its own contractors and receive reimbursement from Landlord for the reasonable costs and expenses thereof upon demand. If reasonably required by Tenant, any portion of Landlord's Work which is performed after Tenant accepts physical possession of the Premises shall occur only "after hours", when neither Tenant nor any of its agents, contractors, employees and servants are working within the Premises. As used herein, the term "**Punch List Items**" shall mean such minor items of a cosmetic nature which, when considered as a whole, do not adversely affect either the performance of Tenant's Work or Tenant's ability to conduct its normal business operations in the Premises.

3.3.4 <u>Tenant's Right of Entry</u>. Prior to the Delivery Date, Tenant may enter upon the Premises for the purposes of inspecting the work, taking measurements, making plans, erecting temporary or permanent signs and doing such other work as may be appropriate or desirable without being deemed thereby to have taken possession or obligated itself to pay Rent, provided, however, that Tenant shall not, during the course of such work, interfere with the performance of Landlord's Work and shall indemnify and hold Landlord harmless from and against any and all claims or losses arising from Tenant's entry upon the Premises, except to the extent caused by Landlord, its agents, employees, or contractors.

3.3.5 <u>Intentionally Omitted</u>.

3.3.6 <u>Work Requirements After Delivery Date</u>. Following the Delivery Date, any construction by Landlord or, subject to the rights of tenants under the Existing Leases, other tenants or occupants of the Shopping Center affecting any portion of the Shopping Center shall be subject to the following terms and conditions:

(a)      staging and storage of materials and parking of construction vehicles shall occur only outside the portions of the Shopping Center designated as "Critical Area" on <u>Exhibit B</u> hereto;

(b)      Landlord shall diligently ensure that, from and after Tenant's opening for business to the public, no ingress, egress or passage of any construction, delivery and related vehicles engaged in the performance of such work or other construction activities shall take place except through the entrance/exit drive designated as the "Construction Drive" on <u>Exhibit B</u> hereto; and

(c)      Landlord shall maintain the Shopping Center in a clean, safe, and sightly condition, and shall use reasonable efforts to ensure that such construction shall not materially adversely interfere with the normal conduct of any business operations in the Premises.

3.3.7 <u>Tenant's Recruiting Space</u>. Landlord shall either (i) provide Tenant with unleased space at the Shopping Center (having comparable specifications to "Tenant's Trailer" referred to in <u>Exhibit D</u> and including all utilities) free of charge to

15

Tenant or (ii) install a trailer for Tenant's exclusive use in conducting employee
interviews and recruiting, in accordance with Exhibit D hereto, in the location shown on
Exhibit B hereto. Such temporary space or trailer shall be available to Tenant at least
forty-five (45) days prior to the Delivery Date, and Tenant shall vacate such temporary
space or trailer within twenty (20) days (but not sooner than ten days) after the Delivery
Date.

Section 3.4   Measurement; Adjustment of Rent.

3.4.1   Measurement of Premises and Shopping Center.  Within five (5)
days after the completion of the demising walls of the Premises (and at least sixty (60)
days prior to the Delivery Date), Landlord shall deliver to Tenant a certification to Tenant
by Landlord's licensed architect, surveyor or engineer of the interior clear dimensions
and the Floor Area (with the dimensions on which it is based) of the Premises, and Floor
Area of the Shopping Center, the measurements of which shall be subject to confirmation
by Tenant's licensed architect, surveyor or engineer. If Landlord shall fail so to deliver
such certification to Tenant, Tenant shall have the right to have any of such
measurements made and certified to Landlord by Tenant's licensed architect, surveyor or
engineer. If the interior clear dimensions and/or the Floor Area of the Premises vary
from those shown on the Certified LOD (as may be modified by any applicable
Changes), then Landlord shall correct such work to conform to the Certified LOD (as
may be modified by any applicable Changes).

3.4.2   Measurement of Mezzanine.  Within five (5) days after the
substantial completion of the floor system for the office mezzanine and the installation of
the floor tracks for the walls enclosing it, Landlord shall deliver to Tenant a certification
to Tenant by Landlord's licensed architect, surveyor or engineer of the square footage of
said non-selling space, the measurements of which shall be subject to confirmation by
Tenant's licensed architect, surveyor or engineer. If the square footage of the non-selling
space on the office mezzanine varies from that shown on the Final Landlord's Plans and
Specifications by more than 100 square feet, then, at Tenant's request, Landlord shall
correct such work to conform to the Final Landlord's Plans and Specifications.

3.4.3   Adjustment of Fixed Rent and Tenant's Pro Rata Share.  Subject to
the foregoing provisions of this Section 3.4, if the measurement of the ground floor
Premises shall indicate a Floor Area less than the Floor Area of the ground floor Premises
set forth in Subsection 1.1.28(i) above, the Fixed Rent and any other applicable provision
of this Lease (including, without limitation, Tenant's Pro Rata Share) shall be reduced to
conform to the actual measurement, and Tenant shall receive a proportional refund of any
Rent theretofore paid to Landlord.  If the measurement of the ground floor Premises
indicates that the actual Floor Area of the ground floor Premises exceeds the Floor Area
of the ground floor Premises set forth in Subsection 1.1.28(i) hereof, but such Floor Area
is not greater than the Floor Area shown on the Final Landlord's Plans and Specifications
(as same may be increased due to Changes under Section 3.2 above), then, provided that
Landlord shall have clearly indicated on the first page of the Final Landlord's Plans and
Specifications the total Floor Area of the ground floor Premises (not just the dimensions),
then the Fixed Rent and any other applicable provision of this Lease shall be increased to
conform to the actual measurement.  If the measurement of the ground floor Premises
indicates that the actual Floor Area of the ground floor Premises exceeds the Floor Area
shown on the Final Landlord's Plans and Specifications (as same may be increased due to
Changes under Section 3.2 above), and such increase in Floor Area was not noted on the
first page of the Final Landlord's Plans and Specifications, then neither Fixed Rent nor
Tenant's Pro Rata Share shall be increased by reason thereof.  Landlord and Tenant shall
each promptly execute and deliver to the other an amendment memorializing any change
to the Fixed Rent, Tenant's Pro Rata Share, or any other applicable provisions of this
Lease, made pursuant to this Section 3.4.  Any dispute between the parties with respect to
the Floor Area of the ground floor Premises, the square footage of said non-selling space

16

or the Floor Area of the Shopping Center shall be resolved by arbitration in accordance with the provisions of Section 16.3 below.

## ARTICLE 4
### FIXED RENT AND TAXES: DETERMINATION AND PAYMENT

Section 4.1    <u>Fixed Rent</u>. Commencing on the Rent Commencement Date and continuing throughout the Term, Tenant shall pay to Landlord the Fixed Rent, in equal successive monthly installments, in advance, on the first day of each and every calendar month throughout the Term, except that Fixed Rent payable for any partial calendar month during the Term shall be prorated based on a 365-day year. Fixed Rent shall be paid without deduction or set off, except to the extent otherwise expressly provided herein.

Section 4.2    <u>Payment of Rent</u>. All Rent shall be mailed or otherwise delivered to Landlord's Mailing Address above or, upon at least thirty (30) days' prior notice to Tenant, to such other address as Landlord may from time to time designate. Landlord acknowledges and agrees that for administrative purposes, Tenant has designated BBBY Management Corporation, a New York corporation (the "***Paying Agent***"), to make all Rent payments due to Landlord under this Lease. Said designation (which may be revoked by Tenant at any time) is not intended as, and shall not constitute, an assignment of any rights or obligations of Tenant to the Paying Agent, and Tenant shall remain primarily liable for payment of Rent under this Lease. All payments of Rent received by Landlord from the Paying Agent shall be credited to Tenant as if such payments of Rent had been made by Tenant directly to Landlord.

Section 4.3    <u>Real Estate and Other Taxes</u>.

4.3.1    Landlord shall pay on or before the due dates thereof all "Taxes" (defined in Subsection 4.3.3 below) other than personal property taxes levied against tenants. Throughout the Term, Landlord shall cause the Shopping Center to be maintained entirely within tax parcels and lots that exclude any property not a part of the Shopping Center.

4.3.2    (a)    Tenant shall pay to Landlord Tenant's Pro Rata Share of the Taxes which accrue during the Term, subject to the provisions of this Section 4.3. Any Taxes for a real estate fiscal tax year, only a part of which is included within the Term, shall be adjusted between Landlord and Tenant on the basis of a 365-day year as of the Rent Commencement Date or the date on which the Term expires or earlier terminates, as the case may be, for the purpose of computing Tenant's Pro Rata Share of Taxes. If, by law, any Taxes may, at the option of the taxpayer, be paid in installments (whether or not interest shall accrue on the unpaid balance thereof), Landlord shall exercise such option so as to maximize the number of installments, and Landlord shall pay the same as they come due and before any fine, penalty, interest or cost may be added thereto for nonpayment thereof.

(b)    Landlord shall submit to Tenant a copy of the bill for Taxes issued by the applicable taxing authority, a computation of Tenant's Pro Rata Share of such Taxes and proof of the payment of Taxes for the previous payment period, as well as copies of all notices concerning assessments, tax rates, and changes thereto. Tenant shall pay Landlord in the amount required by this Subsection 4.3.2 within thirty (30) days after receipt of such bill (but in no event earlier than the fifteenth (15th) day prior to the date on which such Taxes would become delinquent).

(c)    In the event that Landlord's Mortgagee shall require Landlord to escrow monthly payments for Taxes, then, so long as such escrow shall be so required and all other tenants and occupants of the Shopping Center are similarly required to make monthly payments to Landlord with respect to Taxes, Tenant shall, in lieu of making

17

payments pursuant to subparagraph (b) above, pay Landlord monthly with each installment of Fixed Rent an amount equal to one-twelfth (1/12) of Tenant's Pro Rata Share of Landlord's (or Landlord's Mortgagee's) good faith estimate of such Taxes for the then applicable fiscal tax year(s) only. Such payments shall be held in trust to be applied towards payment of the Taxes when the same shall become due. Within thirty (30) days following the issuance by the taxing authority of the bill covering the applicable fiscal tax year, Landlord shall provide to Tenant a statement, in detail reasonably satisfactory to Tenant, of the Taxes and Tenant's Pro Rata Share thereof for such year (the "*Tax Reconciliation Statement*"). The Tax Reconciliation Statement shall be certified by Landlord as being accurate and shall be accompanied by (x) copies of the applicable tax bills, (y) a calculation of Tenant's Pro Rata Share of Taxes, and (z) payment to Tenant in the amount of any overpayment made by Tenant in respect of the applicable fiscal tax year. If Tenant's Pro Rata Share of the actual Taxes for a fiscal tax year shall exceed the aggregate monthly installments paid by Tenant in respect of said fiscal tax year, Tenant shall pay to Landlord the deficiency within thirty (30) days after receipt of such notice. If Landlord fails to timely remit to Tenant the amount of any overpayment, Tenant shall have the right (in addition to any rights and remedies to which it may be entitled under this Lease, at law, or in equity) to offset such amount from payments of Rent next becoming due hereunder, together with interest thereon at the Lease Interest Rate from the date such remittance is due until reimbursement or full satisfaction by credit.

      4.3.3   As used herein, "*Taxes*" shall mean all general, ad valorem real estate taxes, and assessments for betterments and improvements that are levied or assessed by any lawful authority on the Shopping Center (general or special), including any substitution therefor, in whole or in part, due to a future change in the method of taxation. Taxes shall be reduced by any deferral, abatement, or other tax-lowering adjustment received by Landlord from the taxing authorities. For purposes of computing Tenant's Pro Rata Share of Taxes, Taxes shall not include any: (1) income, excise, profits, estate, inheritance, succession, gift, transfer, franchise, capital, or other tax or assessment upon Landlord or (except as provided below) upon the rentals payable under this Lease; (2) taxes on rents (except that Tenant shall pay taxes on rent to the extent that such taxes are customarily paid by retail tenants in the state in which the Shopping Center is located), gross receipts or revenues of Landlord from the Premises; (3) fine, penalty, cost or interest for any tax or assessment, or part thereof, which Landlord or its lender failed to timely pay (except if same are caused by an Event of Default); (4) assessment for a public improvement arising from the initial construction or expansion of the Shopping Center or the Premises (it being agreed that all assessments imposed during the Term which are permitted to be included within Taxes hereunder shall, for the purposes of computing Tenant's Pro Rata Share thereof, be deemed to have been paid in the maximum number of installments permitted by the applicable taxing authority); (5) Taxes resulting directly from an increase in the assessment caused by a sale or ground lease of all or any portion of the Shopping Center to an Affiliate of Landlord; or (6) fees imposed upon Landlord in connection with Landlord's development of the Shopping Center (including, without limitation, trip generation fees). All Taxes payable by Tenant pursuant to this Section 4.3 shall be determined as if the Shopping Center was the only property owned by Landlord. If any tenant or occupant of the Shopping Center pays real estate taxes pursuant to a separate tax assessment which includes its premises and no less than its fair and equitable share of the Common Areas in the Shopping Center, then such separately assessed real estate taxes shall not be included in "Taxes" hereunder and the denominator used to determine Tenant's Pro Rata Share of Taxes shall be reduced by the Floor Area occupied by such tenant or occupant. Landlord represents to Tenant that, as of the Effective Date and, to the best of Landlord's knowledge, as of the anticipated Delivery Date, no portion of the Shopping Center is or will be (i) subject to or the beneficiary of an abatement, exemption and/or phase in of Taxes, (ii) subject to any special assessments or similar charges, or (iii) included in any special improvement district(s) which would result in higher sales taxes or other similar impositions than

18

would exist in the absence of such district(s). Landlord estimates that the Tenant's Pro Rata Share of Taxes for the first full calendar year after the Shopping Center has been completed and fully-assessed will be approximately $1.90 per square foot of Floor Area in the Premises.

       4.3.4  If requested to do so by Tenant and other tenants of the Shopping Center which occupy, in the aggregate, 50% or more of the Floor Area of the Shopping Center, Landlord shall contest the amount or validity of any assessed valuation or Taxes. If, as a result of any contest or otherwise, any rebate or refund of Taxes is received, Tenant shall be entitled to Tenant's Pro Rata Share thereof (after deducting reasonable and customary expenses incurred by Landlord in connection with such contest).

<div align="center">

ARTICLE 5

COMMON AREAS, THEIR USE AND CHARGES

</div>

Section 5.1   Common Areas: Maintenance.

       5.1.1  Maintenance of Common Areas.  Landlord shall operate, maintain, repair and replace the Common Areas as required by this Lease and otherwise to the standard by which common areas of first-class shopping centers in the state in which the Shopping Center is located are operated, maintained, repaired and replaced, including, without limitation, snow, ice, rubbish and debris removal (including installation and maintenance of sidewalk refuse containers), landscaping (including, without limitation, the trimming and pruning of trees to avoid interference with the use or visibility of canopies or signs on the exterior of the Premises), adequate lighting, insurance, supervision, use, parking lot paving and striping, drainage, security (as reasonably required), and control of all Common Areas, and Landlord shall comply with all applicable Legal Requirements.  The costs to perform the foregoing responsibilities shall be deemed included in "**Common Areas Charges**."

       5.1.2  Tenant's Pro Rata Share of Common Areas Charges.

         (a)    During the Term, Tenant shall pay Tenant's CAM Contribution to Landlord.  "**Tenant's CAM Contribution**" shall consist of the sum of the following two (2) components: (i) a fixed annual amount ("**Fixed Component**") initially equal to $1.50 per annum per square foot of Floor Area in the Premises for the period commencing on the Rent Commencement Date and continuing through the first full calendar year of the Term (the "**First Year**") (which amount shall be deemed to include the costs of snow removal, electricity and other utilities for the Common Areas [the "**Variable Costs**"] for the First Year), and with respect to all subsequent calendar years of the Term, an annual amount equal to one hundred three percent (103%) of the Fixed Component for the immediately preceding calendar year (provided that the actual Variable Costs for the First Year shall be deducted from the Fixed Component for the First Year [i.e., $1.50 per square foot] for purposes of calculating the Fixed Component for future calendar years); and (ii) a variable annual amount (the "**Pass-Through Component**") equal to Tenant's Pro Rata Share of the reasonable costs paid by Landlord for (A) the "Insurance Costs" as defined in Subsection 10.3.3, and (B) after the First Year, the actual Variable Costs.

         (b)    To illustrate the foregoing formula, assume the following: the Insurance Costs are $.30 per square foot (psf) for the First Year and $.35 psf for the following calendar year, and the actual Variable Costs are $.20 psf for the First Year and $.15 psf for the following calendar year.  Accordingly, Tenant's CAM Contribution will be $1.80 psf for the First Year ($1.50 psf plus $.30 psf) and $1.839 psf for the following calendar year ($1.50 psf - $.20 psf [representing the actual First Year Variable Costs] = $1.30 psf x 103% = $1.339 psf [representing the Fixed Component] + $.35 psf [representing Insurance Costs] + $.15 psf [representing the Variable Costs]).

<div align="center">19</div>

(c)     Tenant's CAM Contribution shall be paid in equal monthly installments on the first day of each calendar month, in advance, during each calendar year, and the Pass-Through Component thereof shall be based on Landlord's reasonable budget for the Insurance Costs and the Variable Costs.

(d)     Within one hundred twenty (120) days after the end of each calendar year, Landlord shall provide to Tenant a statement, in detail reasonably satisfactory to Tenant, of the Insurance Costs and Variable Costs for such year, which statement shall be prepared in accordance with sound accounting practices commonly used in the shopping center industry (the "*CAC Reconciliation Statement*"). The CAC Reconciliation Statement shall be certified by Landlord as being accurate and shall be accompanied by a calculation of Tenant's Pro Rata Share of the Insurance Costs and Variable Costs and payment to Tenant in the amount of any overpayment made by Tenant during the preceding calendar year. If Tenant's Pro Rata Share of the actual Insurance Costs and Variable Costs for a calendar year shall exceed the aggregate monthly installments paid by Tenant during said calendar year, Tenant shall pay to Landlord the deficiency within thirty (30) days after receipt of such notice. Upon Tenant's request, Landlord shall promptly deliver to Tenant copies of relevant backup materials (including, but not limited to, contracts, correspondence and paid invoices) reasonably required by Tenant. If Landlord fails to timely remit to Tenant the amount of any overpayment hereunder, Tenant shall have the right (in addition to any rights and remedies to which it may be entitled under this Lease, at law, or in equity) to offset such amount from payments of Rent next becoming due hereunder, together with interest thereon at the Lease Interest Rate from the date such remittance is due until reimbursement or full satisfaction by credit.

### 5.1.3   Exclusions from Variable Costs.

(a)     For purposes of determining the Insurance Costs and Variable Costs which may be included in the Pass-Through Component of Tenant's CAM Contribution, the following shall be excluded: **(1)** any capital costs; **(2)** the cost of investigating, monitoring or remedying any environmental condition or "Hazardous Substances" or any other "Compliance Costs" (both as hereinafter defined in Subsection 12.4.1); **(3)** any debt service (including principal and interest) or payments of any judgments or other liens against Landlord; **(4)** the cost of compliance with applicable Legal Requirements (including, without limitation, the cost of curing violations or contesting such Legal Requirements); **(5)** any costs resulting from insurance deductibles or any payments made under any self-insurance policy maintained by Landlord in excess of commercially reasonable deductible amounts; **(6)** any costs which would have been reimbursed or paid for by insurance proceeds had Landlord maintained the insurance required under Section 10.3 hereof and the amount of any judgment or other charge entered or costs assessed against Landlord in excess of the policy limits of the insurance maintained by Landlord under Section 10.3 hereof); **(7)** those portions of Landlord's insurance premiums which are reimbursed to Landlord by any other tenant in the Shopping Center other than through the payment of such tenant's proportionate share of insurance premiums otherwise includable as part of Common Areas Charges; **(8)** sums paid or owed by Landlord to any tenant in the Shopping Center; **(9)** costs incurred in connection with lawsuits or other legal actions (including, without limitation, arbitrations and mediations) instituted or defended by Landlord; **(10)** sums incurred as late payment fees, penalties or interest; **(11)** depreciation [except as expressly permitted pursuant to item 17 below]; **(12)** costs disproportionately incurred by or on behalf of any one or more of the tenants in the Shopping Center (including, without limitation, all costs relating to the operation of any food court or exterior dining area in the Shopping Center); **(13)** electricity costs for lighting Common Areas later than the "Normal Hours" [hereinafter defined in Section 5.2], other than low-level security lighting; **(14)** costs of insuring sculptures, paintings and other objects of art located within or outside the Shopping Center; **(15)** costs and expenses payable to Landlord or its Affiliate, to the extent that

20

such costs and expenses materially exceed competitive costs and expenses for materials and services by unrelated persons or entities of similar skill and experience; **(16)** costs resulting from defects in the original construction of the Shopping Center arising within one (1) year after the Rent Commencement Date; **(17)** the cost of mechanized equipment for the maintenance of the Common Areas (but not the straight-line depreciation of snow removal equipment over its useful life, as determined in accordance with generally accepted accounting principles); **(18)** reserves for anticipated future expenses; **(19)** any cost or expense relating to the administration and management of the Common Areas or the Insurance Costs or Variable Costs (whether on-site or off-site) including, but not limited to, overhead, management fees, office salaries and benefits, office rental, office supplies, dues and subscriptions, office utility charges, telephone charges and automobile expenses; **(20)** costs incurred in connection with the monitoring, maintenance, inspection, or testing of fire alarm systems; **(21)** costs and expenses payable to Landlord, or its Affiliate or designee, for the provision of utility service(s) to the Common Areas, to the extent that such costs and expenses materially exceed competitive market rates; **(22)** except as specifically provided in Section 7.2 hereof, any costs relating to any pylon signs or other signage identifying tenants or occupants of the Shopping Center; or **(23)** any costs relating to areas outside the Shopping Center, whether located on the Target Tract, Developer Tract A or elsewhere.

(b)     In addition, if any tenant or other occupant of the Shopping Center (i) provides any services the cost of which would otherwise be includable in Insurance Costs or Variable Costs, and/or (ii) pays directly for costs which would otherwise be included in the Insurance Costs or Variable Costs, then the costs associated with or attributable to any of the foregoing shall be excluded from Insurance Costs and/or Variable Costs, as the case may be, and the denominator used to determine Tenant's Pro Rata Share of such costs (and only such costs) shall be reduced by the Floor Area occupied by such tenant or other occupant. In applying the provisions hereof, Landlord shall act equitably, taking into account, for example, the relationship of the size of the Common Areas maintained by the other tenant or occupant to the size of its premises.

(c)     Tenant's CAM Contribution for any period during the Term which constitutes less than a full calendar year shall be equitably prorated.

5.1.4   <u>Tenant's Right to Audit</u>. Tenant shall have the right, within three (3) years after receiving any CAC Reconciliation Statement (and not more than once annually) to audit Landlord's books and records to verify Landlord's calculation of Insurance Costs and Variable Costs, as reflected therein and Tenant's Pro Rata Share thereof. Tenant may not audit such records by utilizing a contingency fee based auditor. Upon Tenant's request, Landlord shall promptly deliver to Tenant copies of relevant backup materials (including, but not limited to, contracts, correspondence and paid invoices) reasonably required by Tenant. In the event the audit reveals that Tenant was overcharged, Landlord shall refund the overcharge to Tenant within thirty (30) days after Tenant's demand therefor (provided the audit is completed), and if the overcharge exceeds six (6%) percent of Tenant's Pro Rata Share of Insurance Costs and/or Variable Costs, Landlord shall pay to Tenant the reasonable expenses of the audit (not to exceed $2,500) within thirty (30) days after Tenant's demand therefor, failing which, Tenant shall have the right (in addition to any rights and remedies to which it may be entitled under this Lease, at law, or in equity) to offset such amount from payments of Rent next becoming due hereunder, together with interest thereon at the Lease Interest Rate from the date such remittance is due until reimbursement or full satisfaction by credit. Landlord shall maintain all books and records pertaining to a calendar year for at least three (3) years after it delivers to Tenant a CAC Reconciliation Statement for such calendar year. Tenant shall keep the results of any such audit confidential, provided that nothing contained herein shall restrict Tenant from disclosing such information as may be required by applicable Legal Requirements, or to its accountants, attorneys or bona fide prospective assignees or subtenants (provided that each of such recipients shall be bound

21

by the same non-disclosure provisions as are imposed upon Tenant). Any dispute by Landlord with respect to an audit by Tenant shall be submitted to arbitration in accordance with the provisions of Section 16.3 below.

5.1.5   In no event shall Tenant be required to join, participate in or contribute to any promotional fund, marketing fund or merchants' association.

Section 5.2   Common Areas: Restrictions.

5.2.1   Continuous Access.   No entrances, exits, approaches and means of ingress and egress to, from, and/or within the Shopping Center or the Premises as shown on Exhibit B hereto, after their initial construction, shall be interrupted or disturbed by any act or omission of Landlord during the Term, except: (i) in the event of an emergency or as may be otherwise required by applicable Legal Requirements, in which event Landlord shall use reasonable efforts to give Tenant advance notice of same and to minimize interference to Tenant's normal business operations in the Premises as a result thereof; (ii) for repairs thereto, subject to Section 5.2.6; or (iii) in the event that Landlord is required to temporarily close the Common Areas, for the minimum time legally necessary to prevent a dedication thereof or an accrual of any rights in any person or the public generally therein; provided that with respect to clauses (ii) and (iii) above, except in the event of an emergency, such repairs or closures shall not occur during August (through Labor Day), November or December of any calendar year, and Landlord shall give Tenant at least thirty (30) days' prior notice thereof.

5.2.2   No Alterations.   Landlord shall not, without obtaining Tenant's prior written consent in each instance, which consent may be withheld in its sole discretion: (i) alter the area of the Shopping Center (except for additions to the Shopping Center within each area designated as "*Permissible Building Area*" on Exhibit B hereto) or the location, availability, or size of any Common Area improvement located within the area designated as "Critical Area" on Exhibit B hereto (the "*Critical Area*") from that shown on Exhibit B hereto; (ii) construct or permit to be constructed any structures in the Critical Area (including, without limitation, any buildings, kiosks, booths, signs or similar structures in the Critical Area), other than as shown on Exhibit B hereto; or (iii) materially change the entrances or exits to and from the Critical Area, or the curb cuts, roadways, drive aisles, sidewalks or other elements of the Critical Area, or the number, location or layout of parking spaces located within the Critical Area, from those shown on Exhibit B hereto. Landlord shall neither perform nor permit to be performed, any construction, repairs, replacements or maintenance to any portion of the Critical Area, including the Premises (other than emergency repairs to utilities and Common Areas) during the months of August (through Labor Day), November and December of any year, without the prior consent of Tenant, which consent may be withheld in Tenant's sole discretion.

5.2.3   Outpad.   In addition to the provisions of Subsection 5.2.2 above, during the Term, the following restrictions shall encumber and bind the three (3) outpads in front of the Premises (each, an "*Outpad*" and collectively, the "*Outpads*") designated on Exhibit B hereto as Lot E, Lot G, and Lot H: (a) no more than one building shall be constructed on any Outpad; (b) no building shall exceed one story in height; (c) no building shall exceed a maximum height of twenty-eight feet (28') as measured from the finished floor level to the highest point on such building or structure (inclusive of the height of all types of projections or architectural treatments or embellishments thereon, such as, but without limitation, HVAC equipment, parapets, mansards, signs, satellite dishes, and antennae); (d) the Floor Area of any building constructed on any Outpad shall not exceed 8,000 square feet.

5.2.4   Parking Area.   During the Term, Landlord shall maintain in the Shopping Center, at a minimum, the greater of (i) the number of parking spaces required by applicable Legal Requirements, without variance, or (ii) four (4) ground-level parking

22

spaces for every one thousand (1,000) square feet of Floor Area in the Shopping Center, with each such space being at least nine (9) feet in width and eighteen (18) feet in length. Parking spaces shall at all times be clearly marked by painting, striping or otherwise. Landlord shall not designate specific parking spaces for use by other tenants or occupants of the Shopping Center, nor shall Landlord permit any person or entity to use the parking areas other than Tenant, the other tenants and occupants of the Shopping Center, and their respective employees, agents, subtenants, concessionaires, licensees, customers, and invitees. Landlord shall use commercially reasonable and diligent efforts to enforce the foregoing restrictions. There shall be no charge whatsoever levied for the use of any parking areas within the Shopping Center. Landlord shall not permit overnight parking in the Shopping Center, except that Tenant shall be entitled to park overnight in the parking lot located directly in front of the Premises one box truck that does not contain any advertising of Tenant and that is used exclusively for delivery of merchandise purchased by Tenant's customers. Tenant will use commercially reasonable efforts to ensure that the box truck does not interfere with use of the parking lot by customers of the Shopping Center during business hours.

      5.2.5   _Lighting_. Throughout the Term, Landlord shall keep the Common Areas (after their initial construction) fully lighted and open to the customers of the Shopping Center seven (7) days a week from dusk until 11:00 p.m. Monday through Saturday and until 7:00 p.m. on Sunday ("**Normal Hours**"). Upon request of Tenant, Landlord shall endeavor to keep the Common Areas lighted for as long after Normal Hours as Tenant shall request, _provided_ Tenant shall pay for Tenant's share of the cost of said requested lighting, which share shall be equal to the product of (x) such cost, and (y) a fraction, the numerator of which shall be the number of square feet of Floor Area within the Premises and the denominator of which shall be the aggregate number of square feet of Floor Area of all premises within the Shopping Center (including the Premises) who remain open later than Normal Hours (_excluding_, however, those tenants and occupants who separately control and pay for their own Common Area lighting). In addition to the foregoing, Landlord shall provide for low level security lighting from one (1) hour after the close of business in the Premises until dawn.

      5.2.6   _Repairs_. During the Term, any construction or repair by Landlord permitted or required under this Lease and undertaken in the Shopping Center shall:

            (a)   not be performed in the Critical Area during the months of August (through Labor Day), November, or December of any year, except in the event of an emergency or as may be otherwise required by applicable Legal Requirements;

            (b)   with respect to the Critical Area, be commenced only upon at least five (5) days' prior notice to Tenant (except in an emergency, in which event Landlord shall only be required to give such notice as is reasonable under the circumstances); and

            (c)   be performed in accordance with the requirements of Subsection 3.3.6 above and in such a manner so as not to materially interfere with the normal conduct of any business operations in the Premises.

      5.2.7   _Rules and Regulations_. Tenant shall comply with the rules and regulations of the Shopping Center as established from time to time by Landlord, within sixty (60) days after Landlord notifies Tenant thereof, provided they: (i) are reasonable, (ii) do not adversely affect the normal conduct of any business operations in the Premises, (iii) do not adversely affect any of Tenant's rights under this Lease, and (iv) are uniformly enforced against all tenants of the Shopping Center on a non-discriminatory basis. In the event of any conflict between the provisions of this Lease and any rules or regulations, the provisions of this Lease shall prevail and govern.

      5.2.8   _Miscellaneous_.

<div align="center">23</div>

(a)    No Promotional Use.  Subject to the rights of tenants under Existing Leases (hereinafter defined in Subsection 12.3(j)), Landlord shall not use or permit the use of all or any portion of the Common Areas for retail sales or for promotional purposes.  Notwithstanding the foregoing provision, (I) tenants of the Shopping Center (including Tenant) shall be permitted to display seasonal merchandise and conduct sidewalk sales in front of their respective stores only, provided that such sales shall: (A) be conducted in a manner consistent with sidewalk sales in first-class shopping centers in the state in which the Shopping Center is located and consistent with the requirements of the OEA, (B) not materially interfere with normal pedestrian access over the sidewalks, and (C) not materially interfere with the normal business operations of Tenant in the Premises or materially impair the visibility of Tenant's signage; and (II) Landlord may authorize the use of portions of the Northern Area of the Shopping Center for ancillary purposes, such as clothing donation boxes, book collection boxes, and recycling collection boxes, provided same are neatly maintained.  Landlord represents that so long as Tenant complies with the foregoing criteria governing display of seasonal merchandise and sidewalk sales, then Tenant shall be in compliance with the requirements of any Existing Leases with respect to such items.  Landlord shall not knowingly permit any solicitation, distribution of handbills, picketing, or other public demonstration in the Common Areas, except as otherwise may be mandated by applicable Legal Requirements.

(b)    Trash Compactor and Containers.  Tenant shall be permitted to maintain and operate, at no extra charge: (i) a trash compactor in the portion of the Common Areas designated on Exhibit B hereto as "Trash Compactor Pad"; and (ii) a trash container(s) in the portion(s) of the Common Areas designated on Exhibit B hereto as "Trash Container Pad".  Tenant, at its sole cost and expense, shall keep the trash compactor and containers neat and clean and repair any damage caused by use and storage of such compactor and containers.

(c)    Shopping Carts.  During the hours that the Premises is open for business, Tenant shall be permitted to store its shopping carts in designated cart corrals within the Shopping Center and/or on its sidewalk within the landscaped/screened areas designated for such purpose provided that Tenant will store its shopping carts inside the Premises during the hours that Tenant is not open for business.  With respect to shopping carts provided by Tenant for the use of its customers, Tenant will use reasonable efforts to periodically remove same from the Common Areas.

(d)    Cellular Towers.  No transmission and/or reception towers for wireless telephone or internet communications shall be permitted within the Shopping Center, except in the back of the buildings in the Shopping Center but in no event in the Critical Area.

(e)    Temporary Storage Containers.  Tenant shall be permitted to maintain one (1) temporary storage container or trailer in the location designated on Exhibit B hereto during the Term, subject to applicable Legal Requirements.  Such container shall not be larger than 10 feet by 40 feet and shall not be used on more than two (2) occasions per year or more than eight (8) continuous weeks per occasion.

ARTICLE 6
UTILITIES

Section 6.1    Utility Service.  From and after the Delivery Date and continuing thereafter through the end of the Term, Tenant shall be solely responsible for and shall pay the cost of utilities services (including, without limitation, electricity, gas, water, sanitary sewer, alarm and telecommunications) consumed in the Premises by Tenant.  Tenant shall not be obligated to purchase utility service(s) directly from Landlord, or from any utility provider designated by Landlord.  Landlord shall provide separate utility

24

meters exclusively serving the Premises, at its sole cost and expense (including, without limitation, all connection and hook-up fees). Tenant's entry upon the Premises prior to the Delivery Date shall not constitute a waiver by Tenant of Landlord's obligation to pay the costs of all utility charges incurred in the Premises prior to the Delivery Date. Landlord shall not knowingly permit the capacity of utility lines available for use at the Premises to be reduced or overloaded by any other persons or entities. Landlord shall permit Tenant and its telecommunications provider full and free access to, and use of, available telecommunications conduits in the Shopping Center for the provision of telecommunications service to the Premises, subject to such reasonable requirements as Landlord may impose.

Section 6.2    Interruption. Notwithstanding any provision of this Lease to the contrary, in the event utilities serving the Premises are disrupted due to the acts or omissions of Landlord, its agents, contractors, servants or employees, Landlord shall promptly restore the affected utilities at Landlord's sole cost and expense. If (i) restoration of the utilities is wholly within Landlord's control, (ii) (a) the disrupted utilities are not restored within twenty-four (24) hours after notice from Tenant of the disruption (which notice may be by telephone, fax or e-mail) or (b) if Landlord has commenced the restoration of such utilities within twenty-four (24) hours after notice of the disruption from Tenant and diligently attempts to cure same but such utilities are not restored within forty-eight (48) hours, and (iii) Tenant is unable to conduct its normal business in the Premises as a result thereof, Rent shall be equitably abated during the period of disruption as Tenant's sole remedy for such disruption.

ARTICLE 7
SIGNS

Section 7.1    Tenant's Building Signage. Landlord shall supply and install signage (and obtain all permits and approvals therefor) as part of Landlord's Work in accordance with Exhibits D, D-1, and F hereto, and with the additional provisions of this Lease. Thereafter, Tenant shall have the exclusive right during the Term, at its sole cost and expense, to erect, maintain, and replace on the storefront and exterior walls of the Premises, and on the side walls of any entrance design element, if any, signs (including, without limitation, under-canopy or blade signs), banners (including temporary banners placed on the storefront of the Premises and such other walls of the Premises as selected by Tenant), awnings, and flags of such size, design and color as Tenant, from time to time, may desire, subject to compliance with applicable Legal Requirements. Tenant may erect and maintain in the interior of the Premises any signs it may desire, provided that same are professionally prepared and are in compliance with all Legal Requirements.

Section 7.2    Pylon/Monument Signage. Landlord shall provide two (2) pylon signs for the Shopping Center, at the locations shown on Exhibit B hereto, during the entire Term (the "*Anchor Signs*"), and obtain all permits and approvals therefor. Landlord, as part of Landlord's Work, shall obtain all governmental approvals and permits for, and shall procure and install, Tenant's sign panel(s) on all sides of the Anchor Signs, in accordance with the provisions of Article 3 and Exhibits D and F hereto. The dimensions of Tenant's pylon sign panel(s) shall be at least as large as those of other occupants of the Shopping Center and shall be located as shown on Exhibit F. In addition, if Landlord constructs or makes available to any other tenant or tenants in the Shopping Center any other signage not included in the drawings attached as Exhibit F hereto, which is located in the Common Areas, such signage shall also include Tenant's identification sign, as shown on Exhibit F hereto, which shall be at least as large as the largest sign made available to such other tenant or tenants and higher than the signs of all other tenants or occupants of the Shopping Center whose Floor Area is less than Tenant's, provided, however, that notwithstanding the foregoing, (a) Landlord shall be permitted to construct and make available solely to tenants of the Shopping Center who are not listed on the Anchor Signs one monument sign at the Shopping Center (the "*Monument Sign*") and (b) such Monument Sign must be materially smaller than the

25

Anchor Signs and feature panel sizes which are materially smaller than the panel sizes of the Anchor Signs. Landlord shall maintain all pylons and monuments, and Tenant's signs thereon, in good order and repair, and allow Tenant access to replace its signs thereon, at Tenant's cost and expense. Landlord shall not materially change or alter the location, structure, height or general appearance of the Anchor Signs without obtaining Tenant's prior consent. The cost of maintaining all pylons and monuments bearing Tenant's sign panel(s) shall be deemed included in the Fixed Component of Tenant's CAM Contribution, but the cost of any electricity used to illuminate them shall be includable in the Variable Costs on the basis of relative panel size. Tenant shall have the right to move into a higher position currently designated for a larger tenant or occupant on the Anchor Signs as shown on Exhibit F only in the event that: (i) such larger tenant ceases to operate in the Shopping Center; and (ii) their replacement does not occupy the entire premises previously leased to such larger tenant or occupant.

Section 7.3   Signage: Alteration/Removal/Allocation. Tenant shall have the right, from time to time, without Landlord's approval, to change its signs on the storefront and exterior of the Premises, as well as on the Anchor Signs or any other pylon or monument featuring Tenant's sign, provided that the area of the new sign is no larger than the area of the sign which it replaces and that the method of construction and attachment is substantially the same, and that Tenant obtains, at Tenant's expense, any government approvals required for such changes. Upon the expiration or earlier termination of the Lease, Tenant shall remove its signs from the fascia or other exterior walls of the Premises and from any pylon or monument, and shall repair any damage occasioned thereby. The signage rights granted to Tenant pursuant to this Article 7 shall, at Tenant's option but subject to the limitations in Section 8.1.3, be allocated to or between Tenant and/or any subtenant(s) of all or any portion of the Premises. All signage installed by Landlord and Tenant hereunder shall comply with applicable Legal Requirements and the OEA, as modified by the Target Approvals.

Section 7.4   Cooperation. Landlord, upon request, shall execute any consents or applications which may be required by applicable Legal Requirements to permit the placement, installation, and/or replacement by Tenant of any signs on any part of the Premises or on any pylon or monument, to which Tenant may be entitled under this Lease.

Section 7.5   Signage and Building Restrictions and Criteria.

7.5.1   During the Term and except for existing signs and replacements thereof, and as otherwise permitted under Existing Leases, no exterior identification signs attached to any building in the Shopping Center shall be of the following type: (i) flashing, moving or audible signs; (ii) signs employing exposed raceways, exposed neon tubes, exposed ballast boxes, or exposed transformers, provided that Tenant shall have the right to employ any methods necessary for the installation of internally illuminated self-contained channel letters; or (iii) paper or cardboard signs other than professionally prepared interior window signs advertising special sales within the subject premises, temporary signs (exclusive of contractor signs), stickers or decals, provided, however, the foregoing shall not prohibit the placement at the entrance of each such premises of (A) small stickers or decals which indicate hours of business, emergency telephone numbers, credit cards accepted, and other similar information, and/or (B) a sticker or decal which contains the phrase "no solicitation" or words of like import. No billboard signs shall be permitted within the Shopping Center.

7.5.2   Landlord shall not permit any obstructions (including, without limitation, any trees, bushes or other landscaping, scaffolding or architectural details) to obscure Tenant's storefront, storefront signs or other exterior wall signs or any pylons, monuments or other freestanding signs. Subject to the rights of tenants under Existing Leases, no premises in the Shopping Center containing less Floor Area than the Floor Area of the Premises shall have: (i) building signage possessing more total square footage

26

than the total square footage available for use by Tenant, or a maximum height greater than the maximum height of Tenant's building signage, as measured from the finished floor level to the highest point on such signage, or (ii) a building and entrance design element higher, wider, or which projects farther than the height, width, or projection of the building and entrance design element of the Premises.

## ARTICLE 8
## ALTERATIONS AND IMPROVEMENTS

Section 8.1     Alterations and Improvements.

8.1.1   Tenant shall not perform any exterior or structural alterations or structural improvements to the Premises (except to the extent same pertain to Tenant's Work) without the prior approval of Landlord, provided, however, that Tenant's alteration of the exterior of the Premises to conform to Tenant's then-current prototypical elevation shall not require Landlord's consent so long as such alterations or improvements are architecturally compatible with the balance of the Shopping Center.  If Tenant is not a National Tenant or a Regional Tenant, then any material exterior or structural alterations to its storefront elevation shall be subject to Landlord's prior written approval.  All work performed by Tenant in connection with structural and non-structural alterations or improvements shall be done at Tenant's sole cost and expense, in a good and workmanlike manner and in compliance with all applicable Legal Requirements. The provisions of this Section 8.1 shall not apply to Tenant's building signage, which shall be governed by the applicable provisions of Article 7 above.

8.1.2   Tenant may, from time to time, at its sole cost and expense, without the prior approval of Landlord, make non-structural alterations and non-structural improvements to the Premises as Tenant deems necessary or desirable, including, but not limited to, electrical systems, heating, ventilation and air conditioning and other mechanical systems, installation of fixtures and equipment, painting, and wall and floor coverings.  If a building permit is required for any such alterations or improvements, Tenant shall provide Landlord, for its information only, with copies of its application for such permit, together with any plans submitted therefor.

8.1.3   Tenant shall have the right to subdivide the Premises into not more than two (2) separate stores, each of which may have its own front entrance and access to the loading docks in the rear of the Premises, as well as separately sub-metered utilities; provided that both units created as a result of such subdivision shall be commercially viable retail stores, each consisting of not less than ten thousand (10,000) square feet of Floor Area.

8.1.4   Tenant shall have the right to erect and maintain an antenna and a satellite dish on the roof of the Premises, provided that Tenant: (i) obtains Landlord's prior approval of its plans for the installation of such equipment, (ii) uses a contractor designated or approved by Landlord for all roof penetrations so as not to violate or invalidate any roof warranties maintained by Landlord, (iii) maintains the area where roof penetrations are made while Tenant's equipment is present, (iv) repairs any damage to the roof caused by the making of the roof penetrations, including, but not limited to, the repair of the roof penetrations upon the removal of any equipment installed thereon, (v) does not interfere with the operation of other occupants at the Shopping Center, and (vi) erects and maintains such equipment in accordance with applicable Legal Requirements.

8.1.5   Landlord shall execute and return to Tenant all appropriately completed building department or equivalent applications within ten (10) days after Tenant's request therefor, and will reasonably cooperate with Tenant in the permitting process.  Tenant shall provide Landlord with copies of any building permits which Tenant is required to obtain in accordance with applicable Legal Requirements.

27

8.1.6   If any violation of any applicable Legal Requirement which is noted against the Shopping Center or the Premises (other than a violation caused by Tenant) prevents Tenant from obtaining a building permit for any alterations or a certificate of occupancy, then, upon request by Tenant, Landlord shall promptly and diligently use commercially reasonable efforts to cause such violation to be removed of record to the extent required to permit Tenant to obtain its building permit or certificate of occupancy, as the case may be.

8.1.7   Landlord shall not make any alterations to the Premises (including, without limitation, changing the design, color or materials of the exterior of the Premises) nor shall Landlord construct an additional floor or floors above the Premises; provided that, subject to the requirements and limitations of Section 9.2, Landlord shall have the right to make such alterations as shall be necessary to perform repairs and replacements required by Section 9.2.  Landlord shall neither make nor permit to be made any alterations to the exterior architectural theme of the remainder of the Shopping Center (as shown on Exhibit D-2 hereto) which would be inconsistent with a first-class shopping center in the state in which the Shopping Center is located (exclusive of other tenants' entrance features) without the prior consent of Tenant.

8.1.8   Tenant shall have the right to erect and maintain on the roof of the Premises, a passive solar array for the production of electricity (the "*System*"), provided that Tenant: (i) obtains Landlord's prior approval of its plans for the installation of the System, (ii) uses a contractor designated or approved by Landlord for all roof penetrations so as not to violate or invalidate any roof warranties maintained by Landlord, (iii) maintains the area where roof penetrations are made while the System is present, (iv) repairs any damage to the roof caused by the making of the roof penetrations, including, but not limited to, the repair of the roof penetrations upon the removal of any component of the System, and (v) erects and maintains the System in accordance with applicable Legal Requirements.  The System shall be deemed to be part of Tenant's Property.  Landlord acknowledges and agrees that Tenant or its Affiliate or transferee shall be the exclusive owner and operator of the System and Landlord shall have no right, title or interest in such equipment or any component thereof, notwithstanding that any such equipment may be physically mounted or adhered to the Premises.  Landlord acknowledges and agrees that, notwithstanding the System's presence as a fixture on the Premises, Tenant or its Affiliate or transferee is the sole and exclusive owner of: (i) the electricity generated by the System, (ii) the environmental attributes of the System, and (iii) any and all credits (including tax credits), rebates, benefits, reductions, offsets, and allowances and entitlements of any kind, howsoever entitled, resulting from the environmental or related attributes of the System.  Without the express written consent of Tenant, Landlord shall not make or publish any public statement or notice regarding any environmental incentive relating to the System or any environmental attribute of the System or the energy output from the System.

8.1.9   Landlord and Tenant agree that in the event that Tenant shall perform or cause to be performed any alterations or improvements (including, without limitation, Tenant's Work) to, or within, the Premises which would cause an owner or occupant of the Premises to be entitled to an "Energy Rebate" (hereinafter defined), then Tenant shall be solely entitled to the benefit of such Energy Rebate.  As used herein, an "*Energy Rebate*" shall be deemed to be any rebate, refund, voucher, credit, tax relief, abatement, or other monetary inducement (such as, for examples only, energy efficiency incentives, property tax abatements, sales tax refunds, tax credits, governmental grants, utility rebates or refunds) given by a governmental, non-governmental, private or public utility, or other entity as a result of efforts to conserve energy or other utilities or cause property or processes to be more environmentally friendly. If any such Energy Rebate is required to be paid or credited directly to Landlord, then, then: (i) Landlord shall elect to take the Energy Rebate in a lump sum, or if that is not permitted, then in the shortest number of installments possible, so as to permit Tenant to recoup the full amount of the

28

Energy Rebate during the Term of this Lease, and (ii) within thirty (30) days after Landlord's receipt of the Energy Rebate, Landlord shall deliver a check to Tenant for such amount, or in the alternative, Tenant shall be entitled to offset the full amount of such Energy Rebate against the next succeeding installment(s) of Rent then payable under the Lease.

<div align="center">

ARTICLE 9
REPAIRS

</div>

Section 9.1    <u>Tenant's Repairs</u>.  Subject to the provisions of Articles 10 and 11 hereof, and except as otherwise provided in Section 9.2 below, Tenant shall maintain in good condition and repair, and replace as necessary, at its sole cost and expense: (i) the non-structural, interior elements of the Premises (including plate glass, and the electrical, plumbing, mechanical, and/or alarm systems located in, and serving exclusively the Premises); (ii) the heating, ventilation and air conditioning ("*HVAC*") units exclusively serving the Premises; and (iii) any damage to the Premises or the Shopping Center caused by: (A) Tenant or any of its employees, agents or contractors; or (B) any breach by Tenant of a provision of this Lease.  All repairs and replacements on Tenant's part to be performed hereunder shall be at Tenant's sole cost and expense, and performed in a good and workmanlike manner in accordance with all applicable Legal Requirements.

Section 9.2    <u>Landlord's Repairs</u>.  Subject to the provisions of Articles 10 and 11 hereof, Landlord shall perform, as the same shall from time to time be necessary, all repairs and replacements to the following:

(a)    the structural and exterior portions of the buildings of the Shopping Center as necessary to maintain same in good condition and repair (including, without limitation, repainting the exterior walls of the buildings of the Shopping Center (including, without limitation, the Premises)) as same may be reasonably required from time to time during the Term;

(b)    the structural elements of the Premises, which shall be deemed to include, without limitation, the roof joists, columns, footings, foundation, exterior walls (including, without limitation, repainting, but <u>excluding</u> plate glass, storefront windows, doors, door closure devices, window and door frames, molding, locks and hardware, and painting or other treatment of interior walls), floor (but not the floor covering, unless the same is damaged as a result of a floor defect or settling), and the structural elements of any building of which the Premises may be a part;

(c)    the roof, gutters, flashings, downspouts and scuppers;

(d)    the electric, gas, water, sanitary sewer, and other public utility lines serving the Premises, to the point of connection to the Premises, except to the extent same are maintained by the utility provider;

(e)    all electric, gas, water, sanitary sewer, and other public utility lines and ducts in or passing through the Premises which do not exclusively serve the Premises; and

(f)    the non-structural elements of the Premises (including, without limitation, the maintenance, repair and replacement of the HVAC units and the electrical, plumbing, mechanical, and/or fire alarm systems located in or serving the Premises) until the first (1st) anniversary of the Delivery Date, at which time any contractors', manufacturers', vendors', or insurers' warranties or guarantees shall be assigned to Tenant; and

(g)    any damage to the Premises or the Shopping Center which is occasioned by (A) the act or omission of Landlord, its employees, agents or contractors, or (B) any breach by Landlord of any provision of this Lease.

<div align="center">29</div>

All repairs and replacements on Landlord's part to be performed hereunder shall be at Landlord's sole cost and expense, performed in a good and workmanlike manner in accordance with all applicable Legal Requirements, and without material interference with or disruption to the normal conduct of any business operations in the Premises. Landlord shall give Tenant at least five (5) days' prior notice of any repairs or replacements to, or which would otherwise affect the normal conduct of any business operations in, the Premises (except in the case of an emergency posing imminent risk of material harm to persons or property, in which event Landlord shall only be required to give such notice as is reasonable under the circumstances). If, in Tenant's reasonable judgment, Landlord's repairs would materially interfere with or disrupt the normal conduct of any business operations in the Premises, Landlord shall perform such repairs only after the regular hours of operation of Tenant and any other occupant of the Premises (or any portion thereof).

Section 9.3    Legal Compliance Work. Except as hereinafter expressly provided, as between Landlord and Tenant, Landlord shall be responsible, at its sole cost and expense, for performing all "Legal Compliance Work" (hereinafter defined). Notwithstanding the foregoing, Tenant shall be responsible, at its sole cost and expense, for the performance of Legal Compliance Work: (a) pertaining to the interior elements of the Premises which are neither structural nor comprise the major building systems serving the Premises; (b) required solely as a result of Tenant's specific manner of use of the Premises (i.e., are not of general applicability to tenants and occupants of the Shopping Center); or (c) required solely as a result of Tenant's specific alterations to the Premises (i.e., are not of general applicability to tenants and occupants of the Shopping Center) and first arising after the date of approval by Tenant of the Final Plans and Specifications; provided, however, that the foregoing shall not relieve Landlord of its obligations to perform: (x) Landlord's Work in accordance with all Legal Requirements, and (y) the repairs required in this Lease. As used herein, "**Legal Compliance Work**" shall mean any obligation, addition, alteration, improvement, or rebuilding, structural or otherwise, to or of the Premises, the Shopping Center, or any part thereof, as applicable, which may be required by reason of any Legal Requirement.

ARTICLE 10
INDEMNIFICATION, INSURANCE AND WAIVER OF SUBROGATION

Section 10.1   Mutual Release, Waiver of Subrogation and Mutual Indemnification.

10.1.1 Mutual Waiver of Claims. Landlord and Tenant, on their own behalf and on behalf of anyone claiming under or through either one by way of subrogation, hereby release and waive all rights of recovery and causes of action against each other and their respective Affiliates from any and all liability for any loss or damage to property or resulting from damage to such property (and, in either case, any resulting loss of business or rental income), whether caused by the negligence or fault of the other party, which is normally insured under Special Form property insurance (formerly known as "All-Risk") and time element insurance required to be maintained hereunder. In the event either Landlord or Tenant is a self-insurer or maintains a deductible (as either may be permitted hereunder), then the self-insuring party or the party maintaining the deductible hereby releases the other party from any liability arising from any event which would have been covered had the required insurance been obtained and/or the deductible not been maintained.

10.1.2 Waiver of Subrogation. Landlord and Tenant shall cause each property insurance policy carried by either of them insuring the Premises, the contents thereof, or the Shopping Center, to provide that the insurer waives all rights of recovery by way of subrogation or otherwise against the other party hereto (and all of such other party's Affiliates) in connection with any loss or damage which is covered by such policy or that such policy shall otherwise permit, and shall not be voided by the releases provided above.

30

10.1.3 <u>Mutual Indemnification</u>.

(a)    Except as otherwise provided in Subsections 10.1.1 and 10.1.2 above, Tenant covenants to defend and indemnify Landlord and hold Landlord harmless from and against any and all claims, actions, damages, liability and expense, including reasonable attorneys' fees, (x) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon the Premises, or any part thereof, or (y) occasioned wholly or in part by any act or omission of Tenant, its agents, contractors, employees, servants, or licensees, except to the extent such claims, actions, damages, liability and expense are caused by the acts or omissions of Landlord, its agents, contractors, licensees, employees, or other tenants and occupants, or for which any of said parties may be statutorily liable.

(b)    Except as otherwise provided in Subsections 10.1.1 and 10.1.2 above, Landlord covenants to defend and indemnify Tenant and hold Tenant harmless from and against any and all claims, actions, damages, liability and expense, including reasonable attorneys' fees, (x) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon any portion(s) of the Shopping Center (excluding the Premises), or (y) occasioned wholly or in part by any act or omission of Landlord, its agents, contractors, employees, servants, tenants (other than Tenant), occupants or licensees, except to the extent such claims, actions, damages, liability and expense are caused by the acts or omissions of Tenant, its agents, contractors, licensees or employees, or for which any of said parties may be statutorily liable.

Section 10.2  <u>Tenant's Insurance</u>.

10.2.1 <u>Tenant's Insurance</u>. Tenant, at its own cost and expense, shall maintain in full force and effect from and after the Delivery Date and throughout the Term: (i) commercial general liability insurance protecting and insuring Tenant, naming Landlord as "additional insured-lessor" for claims arising out of the use or occupancy of the Premises by Tenant and the obligations assumed by Tenant under this Lease, and having a combined single limit of liability of not less than Ten Million Dollars ($10,000,000) per policy year for bodily injury, death and property damage liability; and (ii) Special Form (formerly known as "All-Risk") property insurance, on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of all of Tenant's Property. Tenant may carry any of its insurance under "blanket policies" covering the Premises and other locations it or any Affiliate of Tenant owns or leases, <u>provided</u> that: (i) the amount of the total insurance available shall be at least the protection equivalent to separate policies in the amounts herein required, and (ii) in all other respects, any such policy or policies shall comply with the applicable provisions of this Article 10.

10.2.2 <u>Self-Insurance</u>. All insurance required to be maintained under this Section 10.2 may be provided under: (i) an individual policy covering this location; (ii) a blanket policy or policies which includes other liabilities, properties and locations of Tenant or its Affiliates; (iii) a plan of self-insurance, provided that Tenant or any guarantor of Tenant's obligations under this Lease maintains, during the period of such self-insurance, a tangible net worth of at least One Hundred Fifty Million Dollars ($150,000,000), which amount shall be subject to increase on each anniversary of the Delivery Date based upon annual increases, if any, in the Consumer Price Index for the region in which the Shopping Center is located; or (iv) a combination of any of the foregoing insurance programs. If Tenant elects to self-insure as aforesaid, upon Landlord's request, Tenant shall provide Landlord with reasonable evidence confirming the satisfaction of the foregoing net worth requirements not more frequently than annually. To the extent any deductible is permitted or allowed as a part of any insurance policy carried by Tenant in compliance with this Section 10.2, then Tenant shall be deemed to be covering the amount thereof under an informal plan of self-insurance;

31

provided, however, that in no event shall any deductible exceed Two Hundred Fifty
Thousand Dollars ($250,000) unless Tenant complies with the requirements regarding
self-insurance pursuant to clause (iii) above.

Section 10.3   Landlord's Insurance.

10.3.1 Liability Insurance. Landlord shall maintain in full force and effect
on and after the Effective Date and throughout the Term commercial general liability
insurance with regard to the Common Areas protecting and insuring Landlord, naming
Tenant as an "additional insured-lessee", and having a combined single limit of liability
of not less than Ten Million Dollars ($10,000,000) per policy year for bodily injury,
death and property damage liability. Landlord shall have the right to carry its insurance
under "blanket policies" covering the Shopping Center and other properties provided
that: (i) the amount of the total insurance available shall be at least the protection
equivalent to separate policies in the amounts herein required, and (ii) in all other
respects, any such policy or policies shall comply with the applicable provisions of this
Article 10.

10.3.2 Special Form Property Insurance. Landlord shall procure and
maintain in full force and effect on and after the Effective Date and throughout the Term,
Special Form (formerly known as "All-Risk") property insurance (including loss of rents
for a minimum period of one (1) year) and endorsements for coverages for flood (if
available), earthquake (if required by Landlord's Mortgagee), windstorm, earth
movement [sinkholes], demolition, increased cost of construction and contingent
operation of building laws coverages, on a replacement cost basis, in an amount adequate
to cover the full insurable replacement value of all of the buildings (including the
Premises) and other insurable improvements in the Shopping Center; provided, however,
in no event shall such insurance cover Tenant's Property. The foregoing insurance may
be in the form of "blanket" style portfolio coverage. All policies required to be
maintained by Landlord pursuant to this Subsection 10.3.2 shall provide that any
proceeds thereof shall be deposited with Landlord's Mortgagee, or if none, to Landlord,
in either event to be held in trust by such party and disbursed only in accordance with the
provisions of, and for the purposes set forth in, Section 11.1 hereof. The property
insurance required to be maintained by Landlord pursuant to this Section shall not have
deductibles exceeding One Hundred Thousand Dollars ($100,000) without Tenant's prior
consent.

10.3.3 Tenant's Pro Rata Share of Insurance Premiums. Tenant shall
reimburse Landlord for Tenant's Pro Rata Share of the reasonable insurance premiums
attributable to the policies required to be maintained by Landlord pursuant to this Section
10.3 (the ***Insurance Costs***") as part of the Pass-Through Component included in
Tenant's CAM Contribution. If the rates for any insurance Landlord is required to carry
hereunder are increased as a result of the use or other activity of any other occupant of
the Shopping Center, the amount of such increase shall be excluded from Insurance
Costs. To the extent that Landlord receives a dividend, credit, rebate or other return of a
premium which had previously been included in Insurance Costs, Landlord shall
promptly refund Tenant's Pro Rata Share of such dividend, credit, rebate, or return to
Tenant. Tenant's Pro Rata Share of any insurance premium for any period during the
Term which constitutes less than a full calendar year shall be equitably prorated. The
provisions of this Subsection 10.3.3 shall survive the expiration or earlier termination of
this Lease. Tenant's Pro Rata Share of the Insurance Costs for the First Year is estimated
to be an amount equal to $.35 per square foot of Floor Area in the Premises.

Section 10.4   General Insurance Requirements.

10.4.1 All insurance required to be maintained by the parties under this
Lease shall be maintained with insurance companies qualified to do business in the state
in which the Shopping Center is located, and rated at least A-/VIII by the most current

32

Best's Key Rating Guide (or its equivalent, if such Guide ceases to be published). Each party shall use its diligent efforts to have its insurers provide thirty (30) days [ten (10) days in the event of non-payment of premium] prior notice to the other party of cancellation or non-renewal of any policy required hereunder. Each party shall provide to the other duly executed certificates evidencing the insurance coverage described in Sections 10.2.1 and 10.3 above.

      10.4.2 The liability insurance requirements under Sections 10.2 and 10.3 above shall be reviewed by Landlord and Tenant every five (5) years for the purpose of mutually increasing (in consultation with their respective insurance advisors) the minimum limits of such insurance to limits which shall be reasonable and customary for similar facilities of like size and operation in accordance with generally accepted insurance industry standards. The replacement value of the buildings and other insurable improvements constituting the Shopping Center shall be re-evaluated from time to time at the request of either Landlord or Tenant.

## ARTICLE 11
## FIRE AND OTHER CASUALTY; EMINENT DOMAIN

Section 11.1  Fire and Other Casualty.

      11.1.1 (a)     Except as otherwise provided in this Subsection 11.1.1, if all or a portion of the Premises, the Common Areas or other buildings, including all improvements thereto, in the Shopping Center shall be damaged by fire or other casualty, Landlord shall promptly (x) rebuild and restore the Premises and the Common Areas to the condition existing immediately prior to such fire or other casualty (which restoration shall include all Tenant's Work and all other leasehold improvements performed by Tenant), and (y) rebuild and restore additional Floor Area in the Shopping Center (exclusive of the Premises) so that, following such restoration, there will not be an Excess Vacancy (as defined in Article 22) (all of the foregoing work is hereinafter referred to as the "*Primary Restoration*"). With respect to buildings or improvements within the Shopping Center which are damaged by fire or other casualty but which are not required to be restored by Landlord as part of the Primary Restoration, Landlord shall promptly either (aa) rebuild and restore all or portions of the same in good condition and repair, or (bb) raze the remaining portions of such buildings or improvements not rebuilt, remove all debris resulting therefrom, and pave such areas for parking or landscape such areas in a sightly manner (all of the foregoing work is hereinafter referred to as the "*Secondary Restoration*"). The proceeds of the policies required to be obtained and maintained by Landlord pursuant to Section 10.3 hereof shall, to the extent necessary, be used for the performance of the Primary Restoration and the Secondary Restoration (it being agreed that subject to the provisions of this Lease, such proceeds delivered to Landlord's Mortgagee may be disbursed in accordance with such Mortgagee's commercially reasonable disbursement requirements). In the event such insurance proceeds are insufficient to complete such work, Landlord shall provide the balance of the amount necessary to rebuild or restore the Shopping Center in the manner provided in this Subsection 11.1.1. Landlord shall endeavor to give Tenant at least ninety (90) days' prior notice of the date on which the restoration work to the Premises will be Substantially Completed.

      (b)     Notwithstanding the foregoing, if any portion of the Premises are so damaged or destroyed, Tenant shall have the right to require Landlord to make changes to such portion of the Premises which is damaged or destroyed in the course of, and as part of, such rebuilding or restoration work. Within ten (10) business days after receiving Tenant's request for any such change, Landlord shall give Tenant notice of the cost or savings, and any delay, that may be occasioned by such change, which notice shall be accompanied by reasonable back-up supporting the cost increases or delays. If Tenant fails to reject such change in writing within five (5) business days after receiving Landlord's notice, Tenant shall be deemed to have approved such change.

33

Notwithstanding anything to the contrary contained herein, Landlord shall not be required to begin performing restoration work in absence of a duly executed written agreement identifying the final changes. If the net cost and expense of such rebuilding or restoration work is increased solely as a result of such changes (taking into consideration any and all actual reduced and additional costs resulting from such changes and/or other cost savings arising therefrom), then Tenant shall pay to Landlord, as Additional Rent, the amount of such net increase, which amount shall be due and payable within thirty (30) days after Landlord has delivered to Tenant backup information evidencing such increase (including, without limitation, receipted invoices) as may be reasonably required by Tenant (but in no event earlier than the occurrence of the date on which possession of the restored areas of the Premises are delivered to Tenant). To the extent that Landlord's substantial completion of such rebuilding or restoration work is delayed solely as a result of such changes (taking into consideration any and all reasonable time savings to Landlord resulting from such changes), then the applicable period(s) specified in Section 11.1.2 below shall be appropriately adjusted to the extent of such net delay.

(c)    If, in Tenant's reasonable judgment, any damage to the Premises renders all or any portion of the Premises unusable for the conduct of Tenant's business or, in the case of damage to the Shopping Center, materially interferes with the normal conduct of any business operations in the Premises, the Rent shall be equitably reduced or totally abated based upon the extent to which the remaining portion of the Premises may, in Tenant's reasonable judgment, be utilized for its normal conduct of business.

(d)    If an uninsured casualty occurs and Landlord was not required to carry insurance covering such a casualty under the terms of this Lease (an "**Uninsurable Casualty**"), and provided that (I) more than thirty five percent (35%) of the Shopping Center shall have been damaged in such Uninsurable Casualty, and (II) more than thirty five percent (35%) of the Premises are damaged or destroyed by such Uninsurable Casualty, Landlord shall have the option of not rebuilding such portion of the Shopping Center, in which case Landlord shall promptly notify Tenant thereof, and this Lease shall terminate not less than thirty (30) days after Tenant's receipt of said Landlord's notice, so long as the leases of other tenants occupying the portion of the Shopping Center damaged in such Uninsurable Casualty are similarly terminated. Notwithstanding the foregoing to the contrary, if within thirty (30) days of Tenant's receipt of Landlord's non-rebuild and termination notice, Tenant notifies Landlord that it wants Landlord to rebuild the Premises (or, if Landlord is unwilling to rebuild only the Premises, then the Premises and not less than additional Floor Area in the Shopping Center (excluding the Premises from such calculation) so that, following such restoration, there will not be an Excess Vacancy), then Landlord shall rebuild or restore all of same to substantially the condition the Premises were in immediately prior to the Uninsurable Casualty provided that Tenant provides the funds for such restoration or rebuilding. In addition, notwithstanding the foregoing, if (I) this Lease shall be terminated pursuant to this Section 11.1.1(d) and (II) Landlord or any of Landlord's affiliates shall commence to reconstruct the Shopping Center (or a shopping center of a substantially similar type to the Shopping Center on the same site) on or before the date that is three (3) years after the date of such casualty, Landlord shall be obligated to offer to Tenant, at the time of the commencement of such construction, the option to lease a portion of the Shopping Center (or a portion of such shopping center) equal in size to not less than twenty five thousand (25,000) square feet of Floor Area nor more than twenty seven thousand (27,000) square feet of Floor Area, on all the same terms and conditions of this Lease [including, without limitation, the amount of Fixed Rent per square foot of Floor Area which is not greater than (but which may be less than) the then applicable Fixed Rent per square foot set forth herein for the remaining Term of the Lease (and any unexercised Renewal Options)]. If Tenant shall fail to elect, within such thirty (30) day period, to exercise such option, Landlord shall be free to lease such premises to any other person, on any terms and

34

provisions acceptable to Landlord.  The provisions of this Section shall survive the expiration or earlier termination of this Lease.

11.1.2 In the event that:

(a)      Landlord does not commence the Primary Restoration as required pursuant to this Section 11.1 within ninety (90) days after the date of such destruction, or thereafter fails to diligently pursue the completion of such repair and restoration work (subject to such period as may be reasonably necessary for the adjustment of insurance proceeds, not to exceed thirty (30) days in the aggregate); or

(b)      the Primary Restoration and Secondary Restoration are not Substantially Completed by Landlord in accordance with the provisions of this Section 11.1 within one (1) year after the date of destruction (which period may be extended by reason of an event of *Force Majeure*, not to exceed ninety (90) days in the aggregate, provided that Landlord shall have given Tenant notice thereof promptly after its occurrence),

then, in either of such events, Tenant shall have the right, at its sole discretion and option, to:

(i)      after giving thirty (30) days' prior notice to Landlord (and Landlord's continued failure to commence and diligently pursue such repairs and restoration work to completion), perform or complete with respect to the Premises or the Critical Area, as the case may be, said work (or any portion thereof) on Landlord's behalf and at the sole cost of Landlord, which cost Landlord shall pay to Tenant during the course of such repairs within ten (10) days after Tenant's delivery to Landlord of an invoice therefor and, in default of any such payment, Tenant shall have the right to offset the amount thereof, together with interest at the Lease Interest Rate, against the Rent next accruing hereunder (it being agreed, without limiting the foregoing provisions of this Subsection 11.1.2, that at Tenant's election all insurance proceeds paid or payable to Landlord or Landlord's Mortgagee pursuant to Section 10.3 hereof shall be paid (or, as applicable, in turn delivered) directly to Tenant, to be applied to such work by Tenant as same is being performed); or

(ii)      seek to obtain specific performance of Landlord's repair and restoration obligations pursuant to the laws of the state in which the Shopping Center is located; or

(iii)      terminate this Lease by thirty (30) days' notice to Landlord.

In addition to the foregoing, if, in the opinion of an independent licensed architect designated by Tenant (and reasonably acceptable to Landlord), the required repairs and restorations to the Premises, the Critical Area and the Common Areas serving same cannot be completed by Landlord in accordance with the provisions of this Section 11.1 within one (1) year after the date of destruction, Tenant shall have the right, at its sole discretion and option, to terminate this Lease by giving Landlord at least thirty (30) days' notice thereof.

11.1.3 If the Premises are substantially destroyed by fire or other casualty during the last two (2) years of the Term to the extent of more than fifty percent (50%) of the Floor Area thereof, Landlord or Tenant shall each have the right to terminate this Lease as of the date of such damage or destruction by giving notice within thirty (30) days following such damage or destruction, but Tenant may negate any termination by Landlord by agreeing to extend the Term for an additional five (5) year period by exercising an option pursuant to Subsection 2.2.2 hereof, if available, within ten (10) days after receipt of the termination notice from Landlord.

35

11.1.4 Notwithstanding the foregoing, if immediately prior to such casualty, Tenant shall not have been conducting business operations within the Premises (other than during Excused Periods) for more than ninety (90) consecutive days, then Landlord shall have the right to terminate this Lease, in lieu of performing any restoration or reconstruction hereunder, provided Landlord sends Tenant such notice of termination within thirty (30) days following such casualty and Tenant fails to give notice to Landlord, within twenty (20) days after Tenant's receipt of Landlord's termination notice, of Tenant's intention to re-open the Premises for the operation of Tenant's business or another retail business within ninety (90) days after such restoration or reconstruction is Substantially Completed.

Section 11.2   Eminent Domain.

11.2.1 As used in this Section 11.2, "**Taking**" or "**Taken**" shall mean a taking for any public or quasi-public use by any lawful power or authority by exercise of the right of condemnation or eminent domain or by agreement between Landlord and those having the authority to exercise such right.

11.2.2 If all of the Premises shall be Taken, this Lease shall terminate as of the date of vesting of title or transfer of possession, whichever is earlier, without further liability on the part of either Landlord or Tenant, except for an adjustment between the parties for the Rent payable by Tenant hereunder.

11.2.3 In the event that:

(a)      any portion of the Premises shall be Taken so that it is commercially unreasonable or not feasible for Tenant, in its reasonable judgment, to conduct its normal business in the Premises;

(b)      as a consequence of any Taking: (i) portions of the Shopping Center shall be divided or separated in any manner that it materially interferes with parking, visibility, or access to the Premises from other portions of the Shopping Center, or (ii) the Shopping Center no longer has direct access to and from NC State Highway 55 via Beaconwood Lane, and as a result, it is not commercially reasonable or feasible for Tenant, in its reasonable judgment, to conduct its normal business in the Premises;

(c)      there occurs a denial of adequate access to the Shopping Center at the grade of any street adjoining the Shopping Center or to any easement granted under this Lease, whether or not a Taking shall have occurred and as a result, it is not commercially reasonable or feasible for Tenant to conduct its normal business in the Premises;

(d)      any portion of the Shopping Center shall be Taken which materially interferes with parking, visibility or access to the Premises, and as a result of such taking it is commercially unreasonable or unfeasible for Tenant to conduct its normal business in the Premises;

(e)      more than twenty-five percent (25%) of the total Floor Area of the buildings in the Shopping Center (other than the Premises) are Taken; or

(f)      five (5%) percent or more of the parking spaces located in the Critical Area are Taken, or if so many of the parking spaces in the Shopping Center are Taken such that there are fewer than (i) four (4) parking spaces for every one thousand (1,000) square feet of Floor Area in the Shopping Center, or (ii) the number of parking spaces required by applicable Legal Requirements; and such diminution cannot be cured by Landlord through substitution of adjacent land within sixty (60) days after the Taking;

then, in any of such events, Tenant shall have the right to terminate this Lease by giving at least sixty (60) days' prior notice to Landlord within sixty (60) days of any such

36

event, in which event this Lease shall terminate without any further liability on the part of either Landlord or Tenant, except for an adjustment between the parties for the Rent payable by Tenant hereunder and for payment to Tenant for its share of the award for the taking pursuant to Subsection 11.2.5 below. Upon any partial Taking of the Premises, the Rent shall be equitably reduced or totally abated based upon the extent to which the remaining portion of the Premises may, in Tenant's reasonable judgment, be utilized for its normal conduct of business.

11.2.4 If this Lease is not terminated pursuant to this Section 11.2, Landlord, at its sole cost and expense, within a reasonable period of time after such Taking, shall repair and restore the area not so Taken to tenantable condition, as similar as reasonably possible in physical appearance to the condition of the area immediately prior to the Taking, pursuant to plans and specifications approved by Tenant, and any and all amounts awarded to Landlord for any Taking shall be made available to and used by Landlord for any rebuilding or restoration which it is required to perform hereunder. During the period of such repairs and restoration, all Rent shall abate to the extent that the Premises may not, in Tenant's reasonable judgment, be used by Tenant for the normal conduct of its business. Such abatement shall terminate in accordance with the terms of Section 11.3 below. Landlord shall give Tenant at least ninety (90) days' prior notice of the date on which the restoration work to the Premises will be Substantially Completed.

11.2.5 In connection with any Taking or partial Taking of the Premises, Tenant shall be entitled to claim an award for loss of business, leasehold improvements installed at Tenant's expense, fixtures and equipment and removal and reinstallation costs; provided, however, that no award shall be payable to Tenant which reduces the award payable to Landlord for its fee interest in the Premises.

11.2.6 Except in the case of a condemnation proceeding where Tenant has the opportunity with Landlord's permission to participate as a party, any dispute between the parties with respect to this Section 11.2 shall be resolved by arbitration in accordance with the provisions of Section 16.3 below.

11.2.7 Notwithstanding the foregoing, if immediately prior to such Taking, Tenant shall not have been conducting business operations within the Premises (other than during Excused Periods) for more than ninety (90) consecutive days, then Landlord shall have the right to terminate this Lease, in lieu of performing any restoration or reconstruction hereunder, provided Landlord sends Tenant such notice of termination within thirty (30) days following such Taking and Tenant fails to give notice to Landlord, within twenty (20) days after Tenant's receipt of Landlord's termination notice, of Tenant's intention to re-open the Premises for the operation of Tenant's business or another retail business within ninety (90) days after such restoration or reconstruction is Substantially Completed.

Section 11.3  Abatement of Rent Charges. Notwithstanding any other provisions of this Lease, if the Fixed Rent and Additional Rent payable by Tenant hereunder shall be abated pursuant to Sections 11.1 or 11.2 above, such abatement shall terminate upon the first to occur of: (a) the date on which Tenant shall reopen the Premises to the general public for business; or (b) the expiration of the period which is sixty (60) days after Landlord shall have completed such repairs and restoration work as Landlord is obligated to perform hereunder provided no interference with Tenant's opening or operation of business in the Premises then exists.

ARTICLE 12
COVENANTS, REPRESENTATIONS AND WARRANTIES

Section 12.1  Quiet Enjoyment. So long as there is no Event of Default pursuant to which Landlord pursues its remedies under Article 16 of the Lease, Tenant shall

37

peaceably and quietly have, hold, occupy and enjoy the Premises for the Term, without hindrance from Landlord or any party claiming by, through, or under Landlord.

Section 12.2 <u>Authority</u>. Tenant and Landlord each warrant and represent that the person(s) signing this Lease on their behalf has authority to enter into this Lease and to bind Tenant and Landlord, respectively, to the terms, covenants and conditions contained herein. The submission of this Lease to each party hereto shall be for examination and negotiation purposes only, and does not and shall not constitute a reservation of or an obligation of Tenant to lease, or otherwise create any interest of Tenant in, the Premises or any other premises situated in the Shopping Center unless and until the Lease is fully executed and delivered by Tenant and Landlord.

Section 12.3 <u>Landlord's Covenants, Warranties and Representations</u>. To induce Tenant to execute this Lease, and in consideration thereof, Landlord covenants, warrants and represents to Tenant as follows:

(a)  As of the Effective Date, Landlord has, and as of the Delivery Date Landlord shall have, good and marketable fee simple title to the entire Shopping Center, free and clear of all easements, restrictions, liens, encumbrances, leases and the like, except for the encumbrances described on Exhibit E hereto;

(b)  In the event the legal description of the Shopping Center described in Exhibit A hereto indicates that the Shopping Center is composed of more than one parcel or lot, Landlord represents that there exist no strips or gores between such parcels or lots which are not owned by Landlord;

(c)  No third party consents or approvals are required in order for Landlord to enter into this Lease, or for the performance of Landlord's Work and Tenant's Work (excluding, as of the Effective Date, governmental permits and approvals and the Target Approvals);

(d)  Tenant's use of the Premises for sale of "Permitted Items" (defined in Section 1.1.27 above) will not violate any exclusive provision or prohibited use restriction granted to any other tenant or occupant in the Shopping Center;

(e)  The Shopping Center now has, and, on the Delivery Date, shall have, access to and from NC State Highway 55 via Beaconwood Lane, as shown on <u>Exhibit B</u> hereto, for the passage of vehicular traffic;

(f)  This Lease does not violate the provisions of any instrument heretofore executed and/or binding on Landlord, or affecting or encumbering the Shopping Center, or the Premises, and no rights granted by Landlord to Tenant under the terms of this Lease conflict with any rights granted by Landlord to any other tenant or occupant in the Shopping Center (including, without limitation, any rights of first offer or first refusal or the like);

(g)  Landlord shall not be a party or give its consent (subject to "Takings") to any restrictions or other legal impediments imposed by any public or private instrument which would prevent: (i) the use of the Premises for the sale of Permitted Items, subject to the Existing Exclusives; (ii) the use of the parking facilities, access roads, and other Common Areas in the manner contemplated by this Lease; or (iii) the performance of Tenant's Work;

(h)  As of the Effective Date, provided that the Target Approvals are obtained, there are no sign ordinances, restrictive covenants, uniform sign plans or other signage restrictions which would prevent the Premises from having the signage (including, without limitation, the square foot area and size of letters) as depicted on <u>Exhibit D-1</u> and <u>Exhibit F</u> hereof. With respect to any and all exit signs containing tritium gas that are located within or upon the Premises, Landlord shall cause same to be

38

removed from the Premises prior to the Delivery Date and thereafter disposed of in full compliance with all applicable Legal Requirements.

(i)     Attached hereto as <u>Exhibit K-1</u> is a complete copy of all existing use restrictions, whether in the OEA or in the Existing Leases, which are in effect on the Effective Date and binding with respect to the Shopping Center *("Existing Use Restrictions")*;

(j)     Attached hereto as <u>Exhibit K-2</u> is a complete list of the trade names of the tenants under all fully executed and delivered leases in effect on the Effective Date with respect to the Complex (the *"Existing Leases"*); and

(k)     Landlord shall promptly forward to Tenant any notice or other communication received by Landlord from any owner of property adjoining or adjacent to the Shopping Center or from any municipal or other governmental authority, in connection with any hearing or other administrative proceeding relating to any proposed zoning, building code, signage, or related variance affecting the Shopping Center or any adjoining or adjacent property, which, if granted, could adversely affect Tenant's use or occupancy of the Premises, the conduct of Tenant's business therein, or Tenant's rights and benefits under this Lease. If Landlord fails to so appear and contest such proposed variance after receiving 5 days' notice from Tenant (or shorter notice as may be practicable under the circumstances), then Tenant shall be entitled (but shall not be obligated to), in its own name and/or in the name of Landlord, to appear in such proceeding, in which event Landlord shall reasonably cooperate with Tenant, provide such information, and execute any documents or other instruments as Tenant may reasonably request in connection with any such proceeding.

Section 12.4 <u>Environmental Matters</u>.

12.4.1 <u>Definitions</u>.

(a)     As used herein, the term *"Environmental Laws"* shall mean any and all Legal Requirements concerning the protection of the environment, human health or safety.

(b)     As used herein, the term *"Hazardous Substances"* shall mean each and every element, compound, material, mixture, substance, waste, hazardous substance, hazardous waste, hazardous material, toxic substance, pollutant or contaminant either as those terms are defined in any of the Environmental Laws or the presence of which may cause liability at common law, including, without limitation, asbestos and/or asbestos-containing products, whether or not currently friable.

(c)     As used herein, the term *"Environmental Notice"* shall mean a summons, citation, directive, order, claim, notice, litigation, investigation, judgment, legal pleading, letter or other communication, written or oral, actual or threatened, from the United States Environmental Protection Agency or other federal, state or local governmental agency or authority, or any other private individual or entity concerning (i) any Hazardous Substances at, on, in, under or emanating from the Premises, the Shopping Center or any contiguous property; (ii) any violation or potential violation of Environmental Laws at the Premises, the Shopping Center or any contiguous property; or (iii) any underground storage tanks on the Premises or the Shopping Center.

(d)     As used herein, the term *"Releasing"* or *"Release"* shall mean releasing, spilling, leaking, discharging, disposing or dumping or otherwise introducing any substance into the environment or into any building or other improvements in violation of Environmental Laws.

(e)     As used herein, the term *"Compliance Costs"* shall mean any and all costs incurred by a party in complying with applicable Environmental Laws,

39

including, without limitation, consultant's and engineer's fees; laboratory costs; contractor's and subcontractor's fees; application and filing fees; costs of investigation, monitoring or cleanup of soil or other substrate, surface water, groundwater, or buildings or other improvements; equipment costs; disposal fees; costs of operation and maintenance of equipment; legal fees; other governmental fees or costs; interest at the Lease Interest Rate from the date of expenditure until paid in full; and other similar or related costs.

(f)  As used herein, the term *"Tenant Related Parties"* shall mean Tenant's agents, servants, employees, contractors or licensees.

12.4.2 <u>Compliance with Environmental Laws</u>. Tenant shall comply with all applicable requirements of Environmental Laws governing its use of, and operations at, the Shopping Center and the Premises. Landlord shall comply with all applicable requirements of Environmental Laws relating to the Shopping Center and the Premises, except to the extent such requirements arise from Tenant's operations thereon.

12.4.3 <u>Responsibility for Releases of Hazardous Substances</u>. Notwithstanding any other provision of this Lease, Tenant shall only be liable for any Release of Hazardous Substances at, on, in, under or emanating from the Premises or Shopping Center which were introduced by Tenant or Tenant Related Parties (hereinafter *"Tenant Releases"*), including, without limitation, any Compliance Costs required to address Tenant Releases. As between Landlord and Tenant, Landlord shall be liable for any Hazardous Substances at, on, in, under or emanating from the Premises or Shopping Center, including, without limitation, any Compliance Costs attributable to such Hazardous Substances, unless the Hazardous Substances are caused by Tenant Releases. Except in the event of an emergency or if compelled by applicable governmental authority, any work performed by Landlord relating to Hazardous Substances shall be performed by Landlord at any time other than during the months of August (through Labor Day), November and December, and shall be undertaken in such a manner so as to (i) not adversely affect ingress to or egress from the Shopping Center, (ii) have no adverse effect on the visibility of the Premises or any signs which contain Tenant's name, and (iii) not otherwise materially interfere with the normal conduct of any business operations in the Premises. If the presence of Hazardous Substances, or Landlord's remediative work relative thereto, materially interferes with Tenant's normal business operations in the Premises, then Tenant shall be entitled to an equitable abatement of Rent for so long as such condition persists.

12.4.4 <u>Standards</u>. Except as expressly provided herein, the parties agree that any investigation or remediation of Hazardous Substances, or cure of a violation of Environmental Laws, required to be conducted at the Premises or Shopping Center shall be no more stringent than necessary to meet the minimum standards of Environmental Laws applicable to properties used in the manner the Shopping Center is being used.

12.4.5 <u>Landlord's Representations and Warranties</u>. Landlord represents and warrants that: (i) Landlord has received no Environmental Notices concerning the Shopping Center, the Premises or any contiguous properties; (ii) Landlord has no knowledge of, and has received no notice of, any violation, or potential or alleged violation, of any Legal Requirement, including, without limitation, Environmental Laws, affecting the Shopping Center, the Premises or any contiguous properties, regardless of whether same has been cured; and (iii) to the best of Landlord's knowledge: (A) no Hazardous Substances are located at, on, in, under or emanating from the Shopping Center, the Premises or any contiguous properties; and (B) no underground storage tank exists at the Shopping Center or the Premises. The foregoing representations and warranties shall in no way serve to vitiate Landlord's obligations under this Article 12.

12.4.6 <u>Documents</u>. Each party shall immediately notify the other party of the notifying party's receipt of an Environmental Notice.

40

12.4.7 <u>Indemnity</u>. Each party to this Lease shall indemnify, defend and hold the other party, and its agents, servants, shareholders, directors, officers, partners, members and employees harmless from any and all claims, losses, expenses, costs, lawsuits, actions, administrative proceedings, damage, orders, judgments, penalties and liabilities of any nature whatsoever, including, without limitation, reasonable attorneys' fees (incurred to enforce this indemnity or for any other purpose) and Compliance Costs, arising from (i) the indemnifying party's breach of any of its representations, warranties, covenants or other obligations under this Section 12.4; (ii) Hazardous Substances for which the indemnifying party is liable under this Section 12.4; or (iii) violations of Environmental Laws for which the indemnifying party is liable under this Section 12.4. Notwithstanding the foregoing provisions of this Subsection 12.4.7, Landlord's agreement to indemnify, defend and hold Tenant harmless shall not apply with respect to Hazardous Substances which are introduced to the Shopping Center or the Premises after the Delivery Date by any party other than Landlord or an Affiliate of Landlord or any contractor, employee, agent or representative of Landlord or an Affiliate of Landlord, subject to the following conditions: (a) Landlord shall otherwise comply with its duties and obligations under this Section 12.4, (b) upon request by Tenant, Landlord shall at its expense commence appropriate actions or proceedings against the party who shall have introduced (or be legally responsible for the introduction of) such Hazardous Substances to the Shopping Center or the Premises and thereafter diligently pursue same, and (c) should the introduction of such Hazardous Substances as aforesaid materially interfere with the normal conduct of Tenant's business in the Premises, its use and enjoyment of the Common Areas or its other rights, benefits and entitlements under this Lease, then Tenant shall be entitled to an equitable abatement of Rent, and if such material interference continues for a period of one hundred twenty (120) days after notice to Landlord that such Hazardous Substances materially interfere with Tenant's conduct of business in the Premises and Landlord is unable to remediate (or cause the remediation of) such Hazardous Substances as required by Legal Requirements within such period of one hundred twenty (120) days, then Tenant shall be entitled to terminate this Lease at any time prior to the completion of such remediation upon thirty (30) days prior notice to Landlord. However, if such interference shall continue for three hundred sixty-five (365) days after the date of discovery of same and Tenant has not already notified Landlord that Tenant has elected to terminate this Lease, then, provided that Landlord has complied with its obligations under this Section 12.4, Landlord shall have the right to send a notice to Tenant which advises Tenant that Tenant must elect, by notice to Landlord within thirty (30) days after Tenant's receipt of Landlord's notice, to either terminate this Lease or resume paying full Rent. If Tenant elects to resume paying full Rent, then Landlord shall continue to perform its obligations under this Section 12.4, and, provided that Landlord is performing such obligations, Tenant's right to terminate this Lease as a result of the aforesaid introduction of Hazardous Substances shall be null and void.

12.4.8 <u>Survival</u>. The obligations of the parties under this Section 12.4 shall survive the renewal, expiration, breach or earlier termination of this Lease.

12.4.9 <u>Conflict</u>. In the event of any conflict between the provisions of this Section 12.4 and any other provision of this Lease (except for the provisions regarding waiver of subrogation contained in Section 10.1.2 herein, which shall at all times supercede this Section 12.4 to the extent applicable), the provisions of this Section 12.4 shall control.

Section 12.5  <u>OEA</u>.

12.5.1 The Shopping Center and the remainder of the Complex are subject to the OEA as defined in Section 1.1.25.

12.5.2 Landlord covenants, represents and warrants to Tenant that: (i) the OEA has not been modified, amended or terminated; (ii) the OEA is currently in full force and effect; (iii) to its actual knowledge as of the date hereof, no default under the

41

OEA exists thereunder beyond any applicable notice and cure period; and (iv) the OEA is, and shall remain, superior in lien to all mortgages and related liens affecting the Shopping Center and all other land which is encumbered by the OEA. Landlord and Tenant each acknowledge that this Lease is made and shall continue to be subject and subordinate to the OEA, subject to the provisions of this Section 12.5. Tenant shall comply with the terms and conditions of the OEA to the extent same affects the Premises (it being agreed that Tenant shall not be obligated to expend any sums in connection with such compliance).

12.5.3 Landlord shall, during the Term: (i) perform and observe all of the terms, covenants, provisions and conditions of the OEA on Landlord's part to be performed and observed; (ii) defend, indemnify and hold harmless Tenant from and against any and all claims, demands, causes of action, suits, damages, liabilities, and expenses of any nature arising out of or in connection with the enforcement of, or a claimed breach by, Landlord of any covenant, term, condition, or provision of the OEA; and (iii) diligently enforce, at its sole expense, the covenants, agreements, and obligations of the OEA.

12.5.4 Whenever, pursuant to the OEA, the consent or approval of Landlord shall be required by or requested, and such consent or approval could diminish the rights or increase the obligations of Tenant thereunder or under this Lease, or could adversely affect Tenant's use or occupancy of the Premises, or the conduct of Tenant's business therein, such consent or approval shall not be granted without the prior consent of Tenant, which consent may be withheld in its sole and absolute discretion.

12.5.5 Landlord shall, immediately upon receipt, forward to Tenant and Tenant's leasehold mortgagee, if any, a copy of any and all notices and/or demands received by Landlord under or pursuant to the OEA, which relate to, or could adversely affect, Tenant's use or occupancy of the Premises, the conduct of Tenant's business therein, or Tenant's rights pursuant to this Lease.

12.5.6 Landlord shall not amend, or modify the OEA if such amendment or modification could diminish the rights or increase the obligations of Tenant thereunder or under this Lease, or could adversely affect Tenant's use or occupancy of the Premises or the conduct of Tenant's business therein, nor shall Landlord terminate the OEA.

12.5.7 In the event Landlord defaults in the performance of any of its obligations under the OEA or fails to enforce the obligations of any other obligee under the OEA, and such default or failure to enforce could adversely affect Tenant's rights thereunder or under this Lease, Tenant's Work, Tenant's use or occupancy of the Premises or the conduct of Tenant's business therein, Tenant may, but shall not be obligated to, after thirty (30) days written notice (except in the event of emergency, in which case no notice shall be required) cure any default by Landlord under the OEA and/or enforce, in its own name, at Landlord's expense, the obligations of any other obligee under the OEA. Landlord shall, upon demand, reimburse Tenant for the costs incurred by Tenant in performing any of Landlord's obligations under the OEA or enforcing the obligations of any obligee under the OEA, together with interest thereon at the Lease Interest Rate, and failing such reimbursement, Tenant shall have the right (in addition to any rights and remedies to which it may be entitled under this Lease, at law, or in equity), upon ten (10) days' prior notice to Landlord, to offset such costs from the next succeeding payment or payments of any Rent due hereunder, together with interest thereon at the Lease Interest Rate from the date of outlay until reimbursement or full satisfaction by credit.

12.5.8 As between Landlord and Tenant, in the event of any conflict between the OEA and this Lease, this Lease shall in all respects control.

42

12.5.9 Landlord shall use good faith and diligent efforts to obtain the Target Approvals.

12.5.10      Landlord hereby warrants, covenants and represents to Tenant that Landlord shall not assign its rights as an "Approving Party" under the OEA separate and apart from its interest as Landlord under this Lease. Landlord further warrants, covenants and represents to Tenant that any assignment of its rights as an Approving Party under the OEA shall be set forth in a written instrument.

<div align="center">

ARTICLE 13
USES AND RESTRICTIONS

</div>

Section 13.1 <u>Permitted and Prohibited Uses</u>.

13.1.1 <u>Tenant's Permitted Use</u>. The Premises may be used and occupied only for the Permitted Use (defined in Subsection 1.1.27 above). The Premises may not be used for any of the "Tenant Prohibited Uses" (defined in <u>Exhibit M-1</u> hereto annexed) or the "Existing Exclusives" (hereinafter defined in Subsection 13.3.1), to the extent then applicable.

13.1.2 <u>Prohibited Uses</u>. Landlord shall construct, lease, operate, maintain and manage the Shopping Center as a first-class shopping center comparable to other first-class shopping centers in the state in which the Shopping Center is located. Landlord shall not lease, rent or occupy or permit any portion of the Shopping Center to be occupied (except to the extent otherwise permitted under any lease or renewals thereof for space in the Shopping Center existing as of the Effective Date) for any of the "Landlord Prohibited Uses" (defined in <u>Exhibit M-2</u> hereto annexed).

Section 13.2 <u>Tenant's Exclusive in Center</u>. To induce Tenant to execute this Lease, and subject to all of the terms and provisions of this Section 13.2, Landlord covenants and agrees as follows.

13.2.1 Subject to the rights of tenants under Existing Leases, Landlord shall not lease, rent or occupy or permit any other premises in the Shopping Center or Developer Tract A to be occupied, whether by a tenant, sublessee, assignee, licensee or other occupant or itself, for the storage, sale, rental or distribution, at retail or at wholesale, either singly or in any combination, of items contained in any of the following respective categories of merchandise: (a) linens and domestics; (b) bathroom items (excluding plumbing hardware); (c) housewares (excluding furniture, and major appliances or "white goods"); (d) frames and wall art (provided that a fine art gallery shall not be precluded); (e) window treatments; and/or (f) closet, shelving and storage items (which items, either singly or in any combination, are hereinafter referred to as the *"Exclusive Items"*). Notwithstanding the foregoing, any tenant or subtenant in the Shopping Center or Developer Tract A shall have the right to utilize its respective premises for the sale, rental and/or distribution of Exclusive Items within an aggregate area (which shall include an allocable portion of the aisle space adjacent to such storage, sales, rental and/or distribution area) not to exceed the lesser of (x) five percent (5%) of the Floor Area of such tenant's or subtenant's premises, or (y) two thousand (2,000) square feet of Floor Area within such tenant's or subtenant's premises. [For example only, a tenant occupying premises containing a total of five thousand (5,000) square feet of Floor Area could sell Exclusive Items (either singly or in any combination) so long as the <u>aggregate</u> area within its entire demised premises in which any and all Exclusive Items are sold or stored shall not exceed two hundred fifty (250) square feet.] Existing tenants of the Shopping Center or Developer Tract A (and current or future assignees or sublessees of such tenants) shall nevertheless be subject to the restrictions contained in this Section 13.2 in the event that: (i) the lease between Landlord (or Landlord's Affiliate) and any such tenant requires the consent of Landlord (or its Affiliate) to any assignment or subletting or to a change in the use of the applicable premises to permit the

<div align="center">43</div>

sale, rental or distribution of the Exclusive Items; or (ii) Landlord or its Affiliate permits or agrees to an expansion of the applicable premises for the sale, rental, or distribution of the Exclusive Items.

13.2.2 The restrictions set forth in Subsection 13.2.1 above shall not apply to a full-line national or regional: (i) department or discount store [for example, Big Kmart, Wal-Mart, Macy's, Kohl's or Target], (ii) discount club [for example, Costco, BJ's Wholesale Club, or Sam's Club], or (iii) home improvement center [for example, Home Depot or Lowe's], commonly located in first-class shopping centers, each occupying at least 65,000 square feet of Floor Area within the Shopping Center or Developer Tract A, as such stores are currently operated (as of the Effective Date) and as the same may be operated from time to time. The restrictions set forth in Subsection 13.2.1 above shall only apply to Michaels, Ross Stores, TJMaxx, Marshalls and Nordstrom Rack, to the extent set forth in the standard form of Side Letter (as defined in Section 13.3.1) used by Tenant and each of such retailers as of the Effective Date which nullifies or modifies the restrictions set forth in Section 13.2.1 above, provided each retailer enters into such Side Letter with Tenant.

13.2.3 The exclusive rights granted to Tenant in this Section 13.2 shall inure to the benefit of any assignee of Tenant's interest in this Lease and to any sublessee of the entire Premises.

13.2.4 (a)     Upon breach of the aforesaid covenant and agreement by Landlord (which breach shall not include a situation in which the lease between Landlord (or Landlord's Affiliate) and any tenant in the Shopping Center or Developer Tract A prohibits the tenant therein from violating the exclusive rights granted to Tenant in this Section 13.2 and despite such prohibition, such tenant violates such exclusive rights, unless Landlord (or Landlord's Affiliate) fails to comply with any of the provisions of subparagraph (b) below), the Rent payable hereunder shall be reduced by fifty percent (50%) for so long as such violation shall continue, and Tenant shall have all remedies given to it at law and in equity, including, without limitation, the right to obtain injunctive relief, and/or to terminate this Lease, and/or to commence and prosecute an action against Landlord or any other violator for damages.

(b)     If any person or entity other than Landlord (or Landlord's Affiliate) shall violate any of the exclusive provisions herein set forth, or shall indicate in writing to Landlord (or Landlord's Affiliate) that it intends to violate any of said provisions, Tenant shall not have the right to exercise its remedies as described in Section 13.2.4(a) above so long as Landlord (or Landlord's Affiliate) shall promptly commence appropriate legal proceedings, and vigorously prosecute the same, to enjoin and prohibit any such violation. If Landlord (or Landlord's Affiliate) fails to promptly commence such proceedings within sixty (60) days after Landlord receives notice of such violation, or shall fail thereafter to vigorously prosecute the same and such failure shall continue for more than thirty (30) days after written notice by Tenant, then, in addition to Tenant's right to exercise its remedies as described in Section 13.2.4(a) above, Tenant shall have the right (a) to conduct and prosecute such legal proceedings (including, without limitation, an action for injunctive relief) in its own name, at Landlord's expense (if Tenant is successful), or (b) in the event the right set forth in (a) immediately above is not permitted to be exercised under applicable Legal Requirements, to conduct and prosecute such legal proceedings in the name of Landlord, at Landlord's expense (if Tenant is successful), and Landlord shall cooperate with Tenant with respect to such prosecution (including, without limitation, by executing any documentation or authorization reasonably required by Tenant in connection with such prosecution and by appearing at any hearing or trial with respect to such prosecution).

13.2.5 Simultaneously with the execution and delivery of this Lease, Landlord shall execute and record, or cause to be executed by Landlord's Affiliate and

44

recorded, a Declaration of Restrictions substantially in the form attached hereto as Exhibit N, against Developer Tract A.

Section 13.3  Exclusives Which Tenant Must Honor.

13.3.1 Tenant shall honor certain exclusives granted by Landlord (or Landlord's Affiliate) to certain other tenants in the Complex pursuant to the terms of leases which have been executed prior to the Effective Date (hereinafter, "*Existing Exclusives*") [a true and complete listing and description of such Existing Exclusives being attached hereto as Exhibit K-1], and shall not sublease, occupy or use all or any portion of the Premises, or permit all or any portion of the Premises to be occupied or used in violation of any such Existing Exclusive (except as may be specifically set forth on Exhibit K-1). Landlord represents and warrants that no Existing Exclusive(s) exist other than those listed on Exhibit K-1 hereto and that Exhibit K-1 is true accurate and complete, and covenants to indemnify, defend and hold Tenant harmless from and against all loss, cost, liability or expense (including, without limitation, reasonable legal fees) incurred by Tenant by reason of the attempted enforcement by any person or entity of such unlisted Existing Exclusive. Notwithstanding the foregoing, Tenant shall be entitled to enter into a separate agreement ("*Side Letter*") with any tenant or other occupant for whose benefit the Existing Exclusive is granted which nullifies or modifies the corresponding Existing Exclusive with regard to the Premises.

13.3.2 Intentionally Omitted.

13.3.3 Except as expressly set forth in this Section 13.3, Tenant shall not be obligated to honor any exclusive granted by Landlord to any tenant in the Shopping Center or in any other property owned by Landlord or Landlord's Affiliate in the vicinity of the Shopping Center, whether located within or outside the Complex.

ARTICLE 14
CONDUCT OF BUSINESS OPERATIONS

Subject to the other provisions of this Lease (including, without limitation, Articles 2 and 3 and Subsection 12.4.3 hereof) Tenant shall fully fixture, stock and staff its store and shall initially open a Bed Bath & Beyond store for business to the public in the Premises for at least one (1) day, not later than the Rent Commencement Date (which date shall, as applicable, be extended by reason of (A) damage or destruction, eminent domain proceedings or actions, or Force Majeure, or (B) the acts or omissions of Landlord). Other than as expressly set forth in the preceding sentence, Tenant shall have no obligation to open or operate any business in the Premises, and shall have the right, at any time, to cease to conduct any business operations in the Premises, and Tenant shall incur no liability to Landlord or its Mortgagee by reason thereof (it being understood and agreed that all of Tenant's obligations under this Lease shall continue unless this Lease is terminated pursuant, inter alia, to the further provisions of this Article 14 or any other provision of this Lease [other than by reason of an Event of Default]). In the event that Tenant does not operate or cause to be operated any retail business in the Premises (other than prior to the Rent Commencement Date or during Excused Periods) for more than one hundred eighty (180) consecutive days, Landlord shall have the option to terminate this Lease, which option shall be exercisable by giving notice thereof to Tenant at any time after the date on which said 180-day period expires, whereupon this Lease shall terminate upon the sixtieth (60th) day (the "*Recapture Date*") after the date on which Tenant receives Landlord's termination notice, as if the Recapture Date was originally set forth herein as the expiration date of the Term. Upon such termination, Landlord and Tenant shall each be released from any and all liabilities thereafter accruing hereunder, except for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease. All Rent payable by Tenant hereunder shall be apportioned as of the Recapture Date and Tenant shall promptly pay to Landlord any amounts so determined to be due and owing by Tenant to Landlord, and conversely

45

Landlord shall promptly reimburse Tenant for any amounts prepaid by Tenant for periods subsequent to the Recapture Date. Notwithstanding the foregoing, Tenant shall have the right, to be exercised within twenty (20) days after Tenant's receipt of Landlord's termination notice, to give Landlord notice (such notice being referred to as the "**Rescission Notice**") of Tenant's intention to open the Premises for the operation of Tenant's business or any other business within ninety (90) days after Tenant's delivery of the Rescission Notice to Landlord, in which event Landlord's termination notice shall be deemed null and void, and Tenant (or its assignee or subtenant) shall be obligated to re-open for business in at least seventy-five percent (75%) of the Floor Area of the Premises, fully staffed and merchandised, and to thereafter operate in good faith for at least ninety (90) consecutive days (subject to Excused Periods). Tenant agrees that it shall not open a store in the Premises for business to the public for one or more days, without the intent of remaining open in the Premises for business to the public on a continuous basis as a subterfuge which will have the effect of vitiating Landlord's termination rights under this Article 14.

## ARTICLE 15
## TENANT ASSIGNMENT AND SUBLETTING

Section 15.1  Assignment and Subletting.

15.1.1 Tenant shall have the right from time to time, without the consent of Landlord, to assign Tenant's interest in this Lease and/or to sublet, concession or license all or any portion of the Premises, subject to all of the terms and conditions of this Lease including Section 13.1.1 of this Lease. Tenant shall not have the right to subdivide the Premises into more than two stores.

Section 15.2  Liability of Tenant.  Unless otherwise agreed to in writing by Landlord, no assignment, subletting, licensing or concessioning by Tenant shall reduce, diminish, or otherwise affect the liability of Tenant hereunder; provided, however, that, from and after the sixth (6th) anniversary of the Delivery Date, that in the event of an assignment by the Tenant originally named herein or its Affiliate (collectively, the "**Original Tenant**") of its interest in this Lease to a Major Assignee or to a tenant whose obligations under this Lease are guaranteed by a Major Guarantor, all liability of the Original Tenant under this Lease accruing from and after the effective date of such assignment, shall terminate except to the extent of (1) claims made by Landlord against Tenant which arose prior to the effective date of such assignment, and/or (2) judgments obtained by Landlord against Tenant on or prior to the effective date of the assignment. For purposes of this Section 15.2, the term "**Major Assignee**" or "**Major Guarantor**", as the case may be, shall mean a person or entity which has, as of the effective date of such assignment, a net worth of at least One Hundred Million ($100,000,000) Dollars and liquid current assets of at least Ten Million ($10,000,000) Dollars.

Section 15.3  Collateral Assignment.  In addition to Tenant's other rights set forth in this Article 15, a collateral assignment of Tenant's interest in this Lease by Tenant to one or more "Lenders" (hereinafter defined), as collateral security for an indebtedness or other obligation of Tenant or its Affiliates shall be permitted and Landlord shall execute all documentation reasonably requested by Tenant or any such Lender to consent thereto, provided that Tenant reimburses Landlord for its reasonable cost in preparing such documentation, including, but not limited to, attorney's fees, not to exceed $1,000. In addition, Tenant shall have the right, without Landlord's consent, to grant to an Affiliate of Tenant a license to operate all of Tenant's business operations at the Premises, without such Affiliate having assumed any liability for the performance of Tenant's obligations under this Lease. As used herein, "**Lender**" shall mean a state or federally regulated: bank, savings and loan association, insurance company, pension fund, credit union, real estate investment trust, or other institutional lender.

Section 15.4  Cure Rights of Original Tenant.

46

15.4.1 If Tenant assigns Tenant's interest in this Lease, then Landlord, when giving notice to said assignee or any future assignee in respect of any default, shall also give a copy of such notice to the Original Tenant, and no notice of default shall be effective against the Original Tenant until a copy thereof is so given to Original Tenant. Original Tenant shall have the same period after receipt of such notice to cure such default as is given to Tenant therefor under this Lease.

15.4.2 If this Lease is terminated because of: (a) an Event of Default of such assignee, or (b) the rejection, disaffirmation, or other termination of this Lease by or on behalf of the assignee pursuant to any proceeding in bankruptcy under any Legal Requirement of any State or of the United States, or any other Legal Requirements affecting creditors' rights, then, unless the Original Tenant has been released of all liability under this Lease, Landlord shall promptly give to Original Tenant notice thereof, and Original Tenant shall have the right, exercisable by notice given to Landlord within fifteen (15) days after receipt by Original Tenant of Landlord's notice, to enter into a new lease of the Premises with Landlord ("*New Lease*"), provided that the Original Tenant shall have remedied all Events of Default of the assignee hereunder, unless such Events of Default are of a so-called "personal" nature that are not reasonably susceptible of cure by the Original Tenant (i.e., the bankruptcy of the assignee), in which event the Original Tenant shall not be obligated to cure such Events of Default as a condition to the exercise of its rights under this Subsection 15.4.2. Upon the Original Tenant's curing of any such Event of Default of the assignee as aforesaid, Landlord shall assign to the Original Tenant all of Landlord's rights against such assignee (whether arising as a result of bankruptcy court proceedings or otherwise). The term of said New Lease shall begin on the date of termination of this Lease and shall continue for the remainder of the Term (including any Renewal Periods). Such New Lease shall otherwise contain the same terms and conditions as those set forth herein, except for requirements which are no longer applicable or have already been performed. It is the intention of the parties hereto that, subject to Legal Requirements, such New Lease shall have the same priority relative to other rights or interests in or to the Premises as this Lease. The provisions of this Subsection 15.4.2 shall survive the termination of this Lease and shall continue in full force and effect thereafter to the same extent as if this Subsection 15.4.2 were a separate and independent contract between Landlord and the Original Tenant. From the date on which the Original Tenant shall serve Landlord with the aforesaid notice of the exercise of its right to a New Lease, the Original Tenant shall have quiet and undisturbed use and enjoyment of the Premises and all appurtenances thereto, as contemplated in this Lease.

Section 15.5 Recognition Agreement. In the event Tenant subleases all of the Premises, then, notwithstanding any other provisions of this Lease, Landlord shall, upon Tenant's request, execute and deliver an agreement among Landlord, Tenant and each such subtenant in the form of Exhibit H hereto, in recordable form. Notwithstanding the foregoing, Landlord, if requested by Tenant, shall only be obligated to enter into a Recognition Agreement if the sublease is to an Affiliate of Original Tenant or if the following additional conditions are satisfied: (a) the sublease does not impose, or upon implementation of any such Recognition Agreement will not impose, on Landlord any obligation, liability or duty greater or different than this Lease and does not otherwise diminish or otherwise alter any of the rights of Landlord under this Lease; (b) the obligations, liabilities and duties of the subtenant under the sublease, or upon implementation of any such Recognition Agreement, are at least as extensive in all respects as those of Tenant under this Lease; (c) the subtenant shall have cured all Events of Default under this Lease (other than Events of Default which, by their nature, are personal to Tenant and therefore not susceptible of cure by any other party); (d) if alternate rent is payable under the sublease (which shall be on no lesser terms than the terms on which Alternate Rent is payable under this Lease), then the subtenant, upon implementation of any such Recognition Agreement, shall pay at least fifty percent (50%) of the Fixed Rent due under this Lease during the period alternate rent is payable under the sublease; (e) the sublease obligates the subtenant, or the subtenant would on

47

implementation of any such Recognition Agreement be obligated, to pay Landlord at least the same fixed rent and additional rent as the Rent payable under this Lease for the period of the sublease; (f) the net worth of the subtenant (or any guarantor of the subtenant's obligations under the sublease under a guaranty the form of which shall be designated by Landlord in its reasonable discretion) is at least Twenty Million ($20,000,000) Dollars; and (g) the expiration date of the initial term of the sublease shall coincide with the expiration date of the Initial Term and any renewal options under the sublease shall not go beyond the expiration dates of the Renewal Options.

ARTICLE 16
DEFAULT AND DISPUTE RESOLUTION

Section 16.1  Tenant Default.

16.1.1 If Tenant shall fail to: (i) pay any Rent when due, within ten (10) days after its receipt of notice thereof from Landlord specifying the amount and details of the unpaid Rent, or (ii) perform or observe any of the other covenants of this Lease on Tenant's part to be performed or observed within thirty (30) days after its receipt of notice thereof from Landlord specifying the nature of such default (or, if such default shall be of a nature that same cannot reasonably be cured within thirty (30) days and Tenant does not commence to cure such default on or before such thirtieth (30th) day and thereafter diligently prosecute said cure to completion), such circumstance shall constitute an "*Event of Default*". If any installment of Rent becomes due and payable by Tenant hereunder and is not paid by Tenant within ten (10) days after Tenant's receipt of a reminder notice from Landlord, then Tenant shall pay to Landlord, as additional rent together with the next due payment of Fixed Rent, a late charge ("*Late Charge*") equal to three percent (3%) of such unpaid amount (it being agreed that Landlord shall not be required to notify Tenant more often than two (2) times during any twelve-month period during the Term as a condition to Landlord's being entitled to receive such Late Charge hereunder). The parties agree that such Late Charge represents a fair and reasonable estimate of the costs Landlord will incur by reason of the late payment of Rent by Tenant.

16.1.2 Upon an Event of Default, Landlord shall have all remedies given to it at law or in equity (except that Landlord hereby expressly waives any rights to accelerate any element of the Rent, and any right of distraint, which may be granted to it by law), including the following:

(a)    to bring suit for the collection of such unpaid Rent or for the performance of such other covenant of this Lease on Tenant's part to be performed; and/or

(b)    without waiving any non-monetary default, may (but shall not be obligated to) perform any covenant which is capable of being remedied by the performance of affirmative acts for the account and at the reasonable expense of Tenant (it being agreed that should Landlord require access to the Premises in order to perform such covenant as aforesaid, Landlord shall comply with the applicable provisions of Sections 9.2 hereof), in which event, Tenant shall pay to Landlord on demand, as Additional Rent, the reasonable cost or amount thereof, together with interest thereon at the Lease Interest Rate from the date of outlay of expense until payment; and/or

(c)    upon at least five (5) days' notice to Tenant, to terminate this Lease, whereupon Landlord shall have and retain full right to sue for and collect all unpaid Rent which shall have accrued up to the date of termination and any damages to Landlord by reason of any such breach, including damages for periods after such termination (which damages shall include all Rent that would have been payable under this Lease in the absence of such termination, as and when the same would have become payable pursuant to the terms of this Lease, diminished by any net sums thereafter received by Landlord through reletting the Premises during said period, after deducting

48

reasonable expenses incurred by Landlord in connection with such reletting), and Tenant shall surrender and deliver the Premises to Landlord, failing which, Landlord shall have the right to initiate summary proceedings to recover possession; and/or

(d)    upon at least five (5) days' notice to Tenant to terminate Tenant's right of possession, re-enter the Premises and take possession thereof by lawful means. If Landlord shall so elect to repossess the Premises without terminating the Lease, then Tenant shall be liable for and shall pay to Landlord all Rent payable to Landlord pursuant to the terms of this Lease which shall have accrued up to the date of repossession, as well as all Rent as and when same shall become due and payable pursuant to the terms of this Lease during the remainder of the Term, diminished by any net sums thereafter received by Landlord through reletting the Premises during said period (after deducting reasonable expenses incurred by Landlord in connection with such reletting). In no event shall Tenant be entitled to any excess of any rent obtained by such reletting over and above the Rent herein reserved. Landlord may bring actions to collect amounts due by Tenant under this Lease, from time to time, prior to the expiration of the Term. In no event shall any such possession or reletting by Landlord constitute an acceptance of a surrender of the Premises or a waiver of any rights or remedies against Tenant, including unpaid Rent (diminished as aforesaid) for the full scheduled Term (exclusive of any unexercised Renewal Options), notwithstanding any termination of this Lease.

16.1.3 Upon an Event of Default, Tenant shall be liable for and shall pay to Landlord, in addition to any sum provided to be paid above, brokers' fees incurred by Landlord in connection with reletting the whole or any part of the Premises for the remainder of the then unexpired Term (excluding any then unexercised Renewal Periods), the costs of removing and storing Tenant's or other occupant's property; the cost of repairs; and all other commercially reasonable expenses incurred by Landlord in enforcing or defending Landlord's rights and/or remedies, including reasonable attorneys' fees.

16.1.4 Upon an Event of Default, any amounts paid by Landlord to cure said Event of Default and any Rent payments not paid after notice thereof is given shall bear interest at the Lease Interest Rate from and after the expiration of any applicable grace period until paid.

16.1.5 Landlord shall have the duty and obligation to mitigate, in a commercially reasonable manner, any and all damages that may or shall be caused or suffered by virtue of any Event of Default by Tenant, or violation of any of the terms and provisions of this Lease committed by Tenant, as required by law. In no event shall Tenant be liable to Landlord for any consequential damages suffered by Landlord as a result of an Event of Default by, or any other act of, Tenant.

Section 16.2  Landlord Default.  If Landlord shall: (i) fail to perform or observe any of the covenants of this Lease on Landlord's part to be performed or observed within thirty (30) days after receiving notice from Tenant thereof (or, if same cannot reasonably be cured within thirty (30) days, if Landlord shall fail to promptly commence and diligently prosecute said cure to completion), or (ii) materially breach any warranty or representation under this Lease (either of (i) or (ii) above being hereinafter referred to as a "*Landlord's Default*"), then Tenant, in addition to such other rights and remedies as may be available under this Lease, or at law or in equity, may, in its sole discretion:

(a)    as applicable, perform such obligation(s) of Landlord in accordance with the provisions of this Lease on behalf of, and at the expense of Landlord; provided that if, in Tenant's reasonable judgment, a condition posing imminent risk of liability or material harm to persons or property or material disruption to the normal conduct of any business operations in the Premises shall exist (it being agreed, without limitation, that any water infiltration into the Premises from within or without the

49

Premises, or mold remediation in connection therewith, shall be deemed to be such a condition), Tenant may, at its election, and without prior notice to Landlord, exercise the foregoing remedy; and/or

(b)     bring suit for the collection of any amounts for which Landlord is in default, seek injunctive relief, or seek specific performance for any other covenant or agreement of Landlord, without terminating this Lease; and/or

(c)     offset against the Rent payable by Tenant hereunder for amounts owed by Landlord to Tenant and/or for the amounts reasonably expended by Tenant performing Landlord's obligations hereunder, including costs and reasonable attorneys' fees, together with interest thereon at the Lease Interest Rate from the date of the outlay until paid; provided, however, such offset and any other offset right in this Lease (except as same relates to any matters arising during the restoration of the Premises pursuant to Sections 11.1 and 11.2, or Landlord's failure to pay Taxes pursuant to Section 4.3, in which event Tenant shall be entitled to offset one hundred percent [100%] of such costs) shall not exceed twenty-five percent (25%) of the installments of Rent then payable by Tenant hereunder provided that sufficient Term (not including any unexercised Renewal Options) remains to recoup the entire amount owed to Tenant by Landlord hereunder; and/or

(d)     terminate this Lease, without waiving its rights to damages for Landlord's Default, provided that Tenant may exercise such remedy only if: (1) Landlord's Default materially interferes with the normal conduct of any business operations in the Premises, (2) Landlord's Default is not reasonably capable of being cured by Tenant, and (3) Tenant gives notice of Landlord's Default to any Mortgagee of whom Landlord shall have previously given Tenant notice (including its address), and such Mortgagee shall not have cured Landlord's Default within thirty (30) days after such notice is given (or, if such default cannot reasonably be cured within thirty (30) days, such Mortgagee fails to promptly commence and diligently prosecute said cure to completion).

In no event shall Landlord be liable to Tenant for any consequential damages suffered by Tenant as a result of a Landlord's Default or any other act of Landlord.

Section 16.3 <u>Arbitration</u>. Regarding Sections 3.4.3, 5.1.4, 11.2 and Article 21 of this Lease which expressly provide for submission of a dispute or matter to arbitration (but not otherwise), such items shall be settled by arbitration in Raleigh, North Carolina before one arbitrator in accordance with the procedural rules of the American Arbitration Association (or any successor thereto) then in effect. The decision of the arbitrator shall be final, conclusive and binding on the parties, but the powers of the arbitrator are hereby expressly limited to the determination of factual issues, and the arbitrator shall have no power to reform, supplement or modify this Lease. The arbitrator shall make only required findings of fact incident to an arbitrable dispute, which findings shall be set forth in reasonable detail in a written decision by the arbitrator. Landlord and Tenant shall share equally in the cost and expenses of such arbitration, and each shall separately pay its own attorneys' fees and expenses, unless the arbitrator finds that one of the parties did not act in good faith in connection with the dispute or the conduct of the arbitration proceeding, in which case the arbitrator may award all or part of said costs, expenses and fees to the other party.

ARTICLE 17
RIGHT TO MORTGAGE AND NON-DISTURBANCE; ESTOPPEL CERTIFICATE

Section 17.1 <u>Right to Mortgage and Non-Disturbance</u>. Landlord reserves the right to subject and subordinate this Lease at all times to the lien of any first mortgage or deed of trust for the benefit of any Mortgagee hereafter encumbering or affecting all or any portion of the Shopping Center, as well as to any future ground or underlying leases

50

encumbering or affecting all or any part of the Shopping Center; provided, however, that (a) each Mortgagee shall first execute and deliver to Tenant a subordination, non-disturbance and attornment agreement in substantially the form attached as Exhibit G hereto, in recordable form, and (b) any Ground Lessor shall execute (and shall obtain the written consent of any holder of any mortgage, deed of trust or any other existing lien encumbering or affecting the Shopping Center or any portion thereof, as applicable) and deliver to Tenant a fee owner recognition agreement in a form reasonably satisfactory to Tenant, which shall include the following provisions: (i) the Ground Lessor will not, in the exercise of any of the rights arising or which may arise out of such lease, disturb or deprive Tenant in or of its possession or its rights to possession of the Premises or of any right or privilege granted to or inuring to the benefit of Tenant under this Lease; (ii) in the event of the termination of the ground or underlying lease, Tenant will not be made a party in any removal or eviction action or proceeding, nor shall Tenant be evicted or removed of its possession or its right of possession of the Premises, and this Lease shall continue in full force and effect as a direct lease between the Ground Lessor and Tenant for the remainder of the Term and on the same terms and conditions as contained herein, without the necessity of executing a new lease; and (iii) Landlord and Tenant shall have the right to execute any amendment to this Lease which is specifically required hereunder and the Ground Lessor shall recognize and be bound thereto.

Section 17.2 Estoppel Certificate. Upon written request of Landlord or Tenant, the other party, within thirty (30) days after the date of receipt of such request, shall execute and deliver to and only for the benefit of the requesting party or any Mortgagee, *bona fide* prospective purchaser, assignee, or sublessee of the requesting party, without charge, a written statement: (1) ratifying this Lease; (2) certifying, to such party's actual knowledge, that this Lease is in full force and effect, if such is the case, and has not been modified, assigned, supplemented or amended, except by such writings as shall be stated; (3) specifying the dates to which Fixed Rent and Additional Rent have been paid; (4) stating whether or not, to such party's actual knowledge, the party requesting the estoppel is in default and, if so, stating the nature of such default, (5) stating the Rent Commencement Date, and (6) stating which options to extend the Lease Term have been exercised, if any. Each request for a written statement pursuant to this Section 17.2 made within twelve (12) months of an earlier request for such a written statement shall be accompanied by a payment, from the requesting party to the other party, in the amount of One Thousand ($1000) Dollars (increased by Two Hundred ($200 Dollars on each date that the Fixed Rent increases pursuant to Subsection 1.1.11 hereof).

Section 17.3 No Existing Mortgages or Ground Leases. Landlord represents and warrants that there are no mortgages, deeds of trust or other security instruments, or any ground or underlying leases encumbering the Shopping Center or any part thereof as of the Effective Date.

ARTICLE 18
NOTICE

Subject to the further provisions of this Article 18, whenever it is provided herein that any notice, demand, request, consent, approval or other communication (*"Notice"*) shall or may be given to either of the parties by the other, it shall be in writing and, any Legal Requirement to the contrary notwithstanding, shall not be effective for any purpose unless same shall be given by registered or certified mail, postage prepaid, return receipt requested, or by any recognized overnight mail carrier, with proof of delivery slip, addressed to Landlord at Landlord's Mailing Address or to Tenant at Tenant's Mailing Address, with copies of notices to Tenant also given to: (i) Allan N. Rauch, Esq., c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, and (ii) Margaret F. Black, Esq., Sills Cummis & Gross P.C., The Legal Center, One Riverfront Plaza, Newark, New Jersey 07102, or to such other person or other address as may, from time to time, be specified by either party in a written notice to the other party. If Landlord shall consist of more than one person or entity, notices delivered by Tenant to Landlord's

51

Mailing Address shall be deemed to be delivered to, and effective notice to, all such persons or entities comprising Landlord.  All notices given in accordance with the provisions of this Section shall be effective upon receipt (or refusal of receipt) at the address of the addressee, provided, however, that if a deadline for the giving of any notice under this Lease occurs on Saturday, Sunday, or a legal holiday, then such deadline should be extended to the next business day thereafter occurring. Notwithstanding the foregoing, Landlord shall instead send the following items to Tenant (Attention: Lease Administration) at Tenant's Mailing Address: (A) all bills, notices (but not notices of default) and related information pertaining to Tenant's Pro Rata Share of Taxes as described in Section 4.3 of this Lease, and (B) all budgetary information, notices (but not notices of default), statements, bills and related information pertaining to Tenant's CAM Contribution as described in Section 5.1 of this Lease.

## ARTICLE 19
## TENANT'S PROPERTY

All of Tenant's Property which may be installed or placed in or upon the Premises by Tenant shall remain the property of Tenant.  Tenant may assign, hypothecate, encumber, mortgage or create a security interest in or upon Tenant's Property in the Premises without the consent of Landlord and may remove Tenant's Property at any time during the Term.  Landlord waives any right it may have in Tenant's Property.  To the extent Landlord may have a lien on or security interest in the Tenant's Property pursuant to this Lease, by law or otherwise, Landlord hereby waives, and agrees not to assert, such lien or security interest.  Landlord shall provide to Tenant, within ten (10) days after Tenant's request therefor, a written waiver in form reasonably satisfactory to Tenant evidencing Landlord's waiver of any rights it has or may have in Tenant's Property.

## ARTICLE 20
## END OF TERM

Section 20.1  Surrender of Premises.  At the expiration of the Term, Tenant will quit and surrender the Premises in good condition and repair, excepting, however, reasonable wear and tear, damage by fire or other casualty, damage by eminent domain, and repairs and replacements to be made by Landlord hereunder.

Section 20.2  Hold Over.  If Tenant fails to deliver possession of the Premises to Landlord at the end of the Term, Tenant shall be a tenant at sufferance and shall be liable for Fixed Rent on a monthly basis (or, if applicable, on a prorated daily basis) in an amount equal to one hundred fifty (150%) percent of the amount thereof payable by Tenant for the month immediately preceding the last day of the Term as well as for all Additional Rent payable by Tenant hereunder.

## ARTICLE 21
## TENANT'S RIGHT OF FIRST OFFER

Provided an uncured Event of Default does not then exist under this Lease and Tenant is operating as a Bed Bath & Beyond store or a store of an Affiliate of Tenant in substantially all of the Premises, Tenant shall have continuing rights of first offer to lease additional space in the Shopping Center which is contiguous to the Premises and which may become available on and after the date Tenant first opens for business.  At such time that Landlord has knowledge that such space ("*Offered Space*") is or will become available, Landlord will give Tenant notice (the "*Offering Notice*") of the terms and conditions Landlord would be willing to accept with respect to the Offered Space (including, without limitation, the proposed rent, additional rent, scope of Landlord's proposed tenant improvements, location and Floor Area), and Tenant shall have thirty (30) days within which to respond to Landlord's offer.  In the event Tenant elects to accept Landlord's offer, then Tenant shall notify Landlord of such election by giving notice to Landlord during such thirty (30) day period and Landlord and Tenant shall

52

thereupon enter into an amendment to this Lease for the leasing of the Offered Space, which amendment shall (a) contain the terms and conditions set forth in the Offering Notice, (b) provide that the term thereunder shall expire or sooner terminate contemporaneously with the expiration or sooner termination of the Term hereof (subject to extension in accordance with Subsection 2.2.2 above), and (c) contain such other terms and provisions as either Landlord or Tenant may reasonably require in order to effectuate the incorporation of the Offered Space into the Premises and to otherwise effectuate the intent of this Article 21. Should Tenant decline Landlord's offer or fail to respond thereto, then, and in such event, Tenant shall have been deemed to have waived any prospective rights of first offer to the Offered Space (but Tenant shall not lose any prospective rights of first offer with respect to any space (including, without limitation, the Offered Space) which may in the future become vacant and available), and Landlord may lease the Offered Space to any other party upon substantially the same terms and conditions as that offered to Tenant, provided that such lease is executed within one (1) year after Tenant has declined (or has been deemed to have waived) Landlord's offer with respect to the Offered Space. As used herein, the phrase "*substantially the same terms and conditions as that offered to Tenant*" shall mean terms not materially different and/or a rent of not more than five (5%) percent below the rent requested by Landlord of Tenant. Any dispute between the parties with respect to this Article 21 (including, without limitation, any dispute as to the provisions of the amendment described in this Article 21) shall be resolved by arbitration in accordance with the provisions of Section 16.3 above. The benefit of Tenant's Right of First Offer shall inure solely to Tenant (as originally defined herein) and shall not be otherwise assignable or transferable without the express written consent of Landlord.

<div align="center">ARTICLE 22<br>ONGOING CO-TENANCY</div>

If, at any time during the Term, more than thirty-five percent (35%) of the total Floor Area of all buildings in the Complex (excluding the Premises) ceases to be open and operating by National Tenants or Regional Tenants (such condition being hereinafter referred to as an "*Excess Vacancy*"), then in such event, Tenant shall have the right to: (i) pay Alternate Rent in lieu of Fixed Rent during the period of such Excess Vacancy, and/or (ii) if the Excess Vacancy continues for a period in excess of three hundred sixty-five (365) continuous days after Alternate Rent commences, to terminate this Lease, exercisable by giving Landlord, within one hundred twenty (120) days after the expiration of such 365-day period, at least sixty (60) days' prior notice, in which event this Lease shall terminate on the date set forth in Tenant's notice of termination without further liability on the part of either Landlord or Tenant, except for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease. If Tenant does not terminate this Lease pursuant to this Article 22, then commencing on the expiration of the aforesaid 120-day period, Tenant shall resume paying full Rent, provided, however, that Tenant shall retain all of its original rights under this Article 22 with respect to any future condition(s) of Excess Vacancy which worsen by more than five percent (5%) from the condition(s) which triggered the prior Excess Vacancy.

<div align="center">ARTICLE 23<br>MISCELLANEOUS</div>

Section 23.1  Loading Facilities. Tenant shall have the exclusive right to utilize the loading facilities serving the Premises (shown on Exhibit B) on a "24 hour a day", "365 days a year" basis.

Section 23.2  Liens. Within thirty (30) days after notice of the filing thereof, Tenant shall discharge (either by payment or by filing of the necessary bond, or otherwise) any lien against the Premises and/or Landlord's interest therein, which may arise out of any payment due for, or purported to be due for, any labor, services,

<div align="center">53</div>

materials, supplies or equipment alleged to have been furnished to or for Tenant in, upon or about the Premises. Similarly, within thirty (30) days after notice of the filing thereof, Landlord shall discharge (either by payment or by filing of the necessary bond, or otherwise) any lien against the Premises and/or Landlord's interest therein, which may arise out of any payment due for, or purported to be due for, any labor, services, materials, supplies or equipment alleged to have been furnished to or for Landlord in, upon or about the Premises.

Section 23.3 Broker's Commission. Landlord and Tenant each warrant and represent to the other that they did not deal with any real estate broker in connection with the negotiation, execution and delivery of this Lease, except for HRS Retail, Inc. (the "**Broker**"). Landlord shall pay the Broker a commission pursuant to a separate agreement. Each party agrees to indemnify, defend, and save the other harmless from and against any and all liabilities, costs, causes of action, damages and expenses, including, without limitation, attorneys' fees, with respect to or arising out of any claims made by any real estate broker (other than the Broker), agent or finder with respect to this Lease in breach of the foregoing representation. The provisions of this Section shall survive the expiration or earlier termination of this Lease.

Section 23.4 *Force Majeure*. Except as otherwise expressly set forth herein, in the event either party hereto shall be delayed or hindered in, or prevented from, the performance of any act required hereunder by reason of strikes, failure of power, riots, insurrection, war, earthquake, hurricane or tornado (or comparable weather conditions of unusual severity), or other reasons of an extraordinary nature which are beyond the reasonable control of the party, and which could not have been avoided through the exercise of due diligence by a party (collectively referred to herein as "*Force Majeure*"), then the performance of any such act shall be excused for a period equal to the period of the delay. Notwithstanding the foregoing provisions, the following shall not constitute Force Majeure: (i) the financial inability of a party to perform its obligations under this Lease; or (ii) delays occurring in the course of complying with applicable Legal Requirements that could have been avoided through the exercise of due diligence by a party hereto. A party wishing to invoke this Section shall give the other party notice of that intention within thirty (30) days of the commencement of any event of Force Majeure and shall, at that time, specify the reasons therefor, the specific provision of this Lease which will be delayed as a result, and the period of such extension, if known, or if not known, a reasonable estimate thereof.

Section 23.5 Consents. Except as may be otherwise expressly set forth in this Lease, whenever under this Lease provision is made for either party's securing the consent or approval of the other party, (i) such consent or approval shall be in writing and shall not be unreasonably withheld, delayed or conditioned, and (ii) in all matters contained herein, both parties shall have an implied obligation of reasonableness.

Section 23.6 Costs. Whenever this Lease requires the performance of an act by a party, such party shall perform the act at its own cost and expense, unless expressly provided to the contrary.

Section 23.7 Attorneys' Fees. In any action or proceeding hereunder (whether to enforce the terms and provisions of an indemnity or otherwise), the prevailing party shall be entitled to recover from the other party the prevailing party's reasonable costs and expenses in such action or proceeding, including reasonable attorneys' fees, costs and expenses. Except as otherwise set forth herein, if either party is sued by a third party as a result of a violation of a covenant or warranty herein contained by the other party hereto, then the party who has violated the covenant or warranty shall be responsible for the reasonable costs and expenses in such action or proceeding against the non-violating party, including reasonable attorneys' fees, costs and expenses.

54

Section 23.8  Survival of Obligations.  The obligation to pay any sums due to either party from the other that by the terms herein would not be payable, or are incapable of calculation, until after the expiration or sooner termination of this Lease shall survive and remain a continuing obligation until paid.  All indemnity obligations under this Lease shall survive the expiration or earlier termination of this Lease.

Section 23.9  Non-Waiver.  The failure of Landlord or Tenant to insist upon the strict performance of, or to enforce, any provision, covenant or condition herein shall not be deemed to be a waiver thereof, nor void or affect the right of the aggrieved party to enforce the same covenant or condition on the occasion of any subsequent breach or default; nor shall the failure of either party to exercise any option in this Lease upon any occasion arising therefor be deemed or construed to be a waiver of the right to exercise that same kind of option upon any subsequent occasion.

Section 23.10 Rights Cumulative.  Unless expressly provided to the contrary in this Lease, each and every one of the rights, remedies and benefits provided by this Lease shall be cumulative and shall not be exclusive of any other such rights, remedies and benefits allowed by applicable Legal Requirements.

Section 23.11 Definition of Landlord.  The term *"Landlord"* shall mean only the person or entity which, from time to time, shall then own the Shopping Center, and in the event of the transfer by such owner of its interest in the Shopping Center, such owner shall (except to the extent of (1) claims made by Tenant against Landlord which arose prior to the effective date of the transfer of such ownership interest, and/or (2) judgments obtained by Tenant against Landlord, on or prior to the effective date of the transfer of such ownership interest) thereupon be released and discharged from all covenants and obligations of Landlord thereafter accruing, but such covenants and obligations shall be binding during the Term upon each new owner for the duration of such owner's ownership.

Section 23.12 Successors and Assigns.  The provisions of this Lease shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns.

Section 23.13 Limitation of Landlord's Liability.  Tenant shall, on and after the Delivery Date, look only to Landlord's estate and property in the Shopping Center (or the proceeds from the sale of all or any portion thereof) and net income derived from the Shopping Center (including insurance proceeds and proceeds of condemnation events) for the satisfaction of Tenant's remedies for the collection of a judgment (or other judicial process) requiring the payment of money by Landlord hereunder and no other property or assets of Landlord, its officers, directors, stockholders, members or partners shall be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies under or with respect to this Lease.  Except with respect to the limitation on personal liability hereinabove set forth, the provisions of this Section 23.13 shall not be deemed or construed to limit Tenant's rights and remedies pursuant to this Lease or which may be available at law or in equity.

Section 23.14 Limitation of Tenant's Liability.

Landlord, its successors and assigns, shall look solely to the assets, if any, of Tenant and its successors and assigns, for the satisfaction of any claim arising from or under this Lease and shall not seek to impose personal liability on any shareholder, officer, director, member or employee of Tenant or any of its Affiliates.

Section 23.15 Joint and Several Liability.  If either party consists of more than one person, then the persons constituting such party shall be jointly and severally liable hereunder.

2429134 v3 Holly Springs - Lease

Section 23.16 <u>Severability</u>. If any term, covenant, condition or provision of this Lease is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions hereof shall remain in full force and effect and shall in no way be affected, impaired, or invalidated thereby.

Section 23.17 <u>Grammatical Usages and Construction</u>. In construing this Lease, feminine or neuter pronouns shall be substituted for those masculine in form and vice versa, and plural terms shall be substituted for singular and singular for plural in any place in which the context so requires. This Lease shall be construed without regard to: (i) the identity of the party who drafted the various provisions hereof, and (ii) the addition or deletion of text made during the negotiation of this Lease. Moreover, each and every provision of this Lease shall be construed as though all parties hereto participated equally in the drafting thereof. As a result of the foregoing, any rule or construction that a document is to be construed against the drafting party shall not be applicable hereto.

Section 23.18 <u>Table of Contents, Line Numbering and Paragraph Headings</u>. The table of contents and line numbering, if any, and section headings are inserted only for convenience and in no way define, limit or describe the scope or intent of this Lease, nor in any way affect this Lease.

Section 23.19 <u>Definition of Hereunder, Herein, etc.</u>. Unless the context clearly indicates to the contrary, the words "herein," "hereof," "hereunder," "hereafter," and words of similar import refer to this Lease and all the Exhibits attached hereto as a whole and not to any particular section, subsection, or paragraph hereof.

Section 23.20 <u>Short Form Lease</u>. Upon the request of either party following the execution and delivery of this Lease, Landlord and Tenant shall execute a short form lease or memorandum for recording, which shall be in form and substance as either party shall reasonably request. In no event shall the amount of Fixed Rent reserved hereunder be included in any such short form lease or memorandum.

Section 23.21 <u>Entire Agreement and Modification</u>. This Lease constitutes the entire agreement of the parties hereto, and all prior agreements between the parties, whether written or oral, are merged herein and, except as may be specifically set forth herein, shall be of no force and effect. This Lease cannot be changed, modified or discharged orally, but only by an agreement in writing, signed by the party against whom enforcement of the change, modification or discharge is sought.

Section 23.22 <u>No Joint Venture or Partnership Created by Lease</u>. Nothing contained herein shall be deemed or construed as creating the relationship of principal and agent or of partnership or of joint venture between the parties hereto.

Section 23.23 <u>Tenant's Tradename</u>. Landlord shall not make use of Tenant's tradename [i.e., "*Bed Bath & Beyond*"®] in any advertising or marketing material, including, without limitation, on any internet website, without obtaining Tenant's prior written approval, which may be withheld in Tenant's sole and absolute discretion. Notwithstanding anything to the contrary in this Section 23.23, Landlord may, however, photograph or otherwise render artwork containing an image of Tenant's finished store, signage, or likeness for the purpose of advertising or marketing the Shopping Center.

Section 23.24 <u>Counterparts</u>. This instrument may be executed in several counterparts, each of which shall be deemed an original. The signatures to this instrument may be executed and notarized on separate pages, and when attached to this instrument, shall constitute one complete document.

Section 23.25 <u>Waiver of Trial by Jury</u>. Landlord and Tenant hereby mutually waive any and all rights which either may have to request a jury trial in any proceeding between them at law or in equity.

56

Section 23.26 Ethical Conduct Policy. It is the policy of Tenant and its subsidiaries and affiliates (collectively, *"the Company"*) to conduct all its business transactions in accordance with the highest ethical standards and all applicable laws (including, but not limited to, the U.S. Foreign Corrupt Practices Act). No individual who is employed by or who represents the Company, and no individual or entity that contracts with the Company or otherwise performs services on behalf of the Company, is permitted to solicit, accept, offer, promise or pay any bribe, kickback or any other improper payment of money, products or services. This includes, but is not limited to, any improper payment in exchange for (i) the Company's execution of this Lease, (ii) any action taken by such individual on behalf of the Company, or (iii) any action taken by a third party. Any individual or entity having a business relationship with the Company shall require any subcontractor (of any level) to adhere to the same standards and are expected to appropriately monitor their subcontractors to ensure such adherence. If any such improper actions are observed, please contact the Tenant's Legal Department (Attention: General Counsel) at 908-688-0888 so that the incident may be fully investigated and appropriate remedial action taken.

Section 23.27 Confidentiality. Landlord shall not reveal to anyone, or otherwise make or publish any public statement or notice regarding the economic or other business terms of this Lease (including, without limitation, the Term and the Rent), except as required by Legal Requirements; or for disclosure to Landlord's accountants, attorneys, bona fide prospective purchasers, or current or prospective Mortgagees or underlying lessors of all or any portion of Landlord's interest in the Shopping Center, provided that each of such recipients shall be bound to the same non-disclosure provisions as are imposed upon Landlord.

Section 23.28 Governing Law. This Lease shall be governed by, construed, and enforced in accordance with the laws of the State in which the Premises are located.

[Signature page follows]

57

IN WITNESS WHEREOF, the parties have executed this instrument under seal the day and year first-above written.

**LANDLORD:**

WITNESS:

KRG NEW HILL PLACE, an Indiana limited liability company

By: _____
Name: ~~John A. Kite~~ Thomas K McGowan
Title: ~~Chief Executive Officer~~
~~President~~ & COO

Jennifer A. Sherman
Legal Coordinator

[SEAL]

**TENANT:**

ATTEST:

BED BATH & BEYOND INC., a New York corporation

By: _____
Name: Steven H. Temares
Title:    Chief Executive Officer

Name: Alan M. Freeman
Title:  Assistant Secretary

[SEAL]

58

## INDEX OF EXHIBITS

Exhibit A       Legal Description of Shopping Center
Exhibit B       Site Plan
Exhibit C       Form of Rent Commencement and Expiration Date Agreement
Exhibit D       Specifications for Landlord's Work
Exhibit D-1     Exterior Elevations of the Premises, and Sidewalk Plan
Exhibit D-2     Exterior Elevations of the Shopping Center
Exhibit E       Permitted Encumbrances
Exhibit F       Signage
Exhibit G       Form of Subordination, Non-Disturbance and Attornment Agreement
Exhibit H       Form of Subtenant Recognition Agreement
Exhibit I       Form of Delivery Date Notice
Exhibit J       Form of Delivery Date Certification
Exhibit K-1     Existing Exclusives
Exhibit K-2     Existing Leases
Exhibit L       Alternate Rent
Exhibit M-1     Tenant Prohibited Uses (including Schedule 1 with OEA prohibited uses)
Exhibit M-2     Landlord Prohibited Uses
Exhibit N       Form of Declaration of Restrictions

Exhibit A

Legal Description of the Shopping Center

Being that certain parcel of land located in Holly Springs, Wake County, North Carolina and more particularly described as follows:

Beginning at an iron pipe set on the western right of way line of NC Highway 55 Bypass (a variable width public R/W), said pipe having an NC Grid Coordinate (NAD 83) of Northing: 696,325.82 feet and Easting: 2,045,669.72 feet;  thence leaving the western R/W of NC Highway 55 Bypass (a variable width public R/W) and along the eastern right-of-way of Beaconwood Lane, a variable width public R/W (BM 2013, PG 327), North 48°38'44" West a distance of 132.61 feet to an iron pipe set; thence along a curve to the right having a radius of 261.50 feet, an arc length of 183.52 feet and a chord of North 28°32'27" West 179.77 feet to an iron pipe set; thence North 08°26'10" West a distance of 215.83 feet to an iron pipe set; thence South 81°33'50" West a distance of 4.17 feet to an iron pipe set; thence North 10°20'30" West a distance of 55.14 feet to an iron pipe set; thence North 08°26'10" West a distance of 192.97 feet to an iron pipe set; thence along a curve to the left having a radius of 332.50 feet, an arc length of 133.71 feet and a chord of North 19°57'24" West 132.81 feet to an iron pipe set; thence North 31°28'38" West a distance of 99.98 feet to an iron pipe set; thence along a curve to the right having a radius of 35.50 feet, an arc length of 19.31 feet and a chord of North 15°53'28" West 19.08 feet to an iron pipe set; thence North 60°01'24" East a distance of 6.86 feet to an iron pipe set along the southern right-of-way of (Proposed) Bennett Knoll Parkway (a variable width proposed public R/W) ; thence with the southern R/W of (Proposed) Bennett Knoll Parkway, North 19°38'47" East 27.47 feet to an iron pipe set; thence along a curve to the left having a radius of 965.00 feet, an arc length of 249.29 feet and a chord of North 47°07'02" East 248.60 feet to a calculated point; thence North 39°42'59" East 81.78 feet to a calculated point; thence North 34°41'06" East 200.99 feet to a calculated point; thence North 37°23'44" East 55.33 feet to a calculated point; thence along a curve to the right having a radius of 1155.00 feet, an arc length of 863.99 feet, and a chord of North 58°49'31" East 843.99 feet to a calculated point; thence South 64°13'00" East 24.42 feet to a calculated point; thence North 87°11'52" East 107.79 feet to a calculated point; thence North 54°08'53" East 8.74 feet to an iron pipe set on the southern right-of-way of Bennett Knoll Parkway, a variable width public R/W (BM 2012, PG 591); thence with the southern R/W of Bennett Knoll Parkway, South 87°04'52" East 5.42 feet to an existing iron pipe; thence North 69°29'18" East 18.48 feet to an iron pipe set along the southern right-of-way of Bennett Knoll Parkway, a variable width controlled access R/W; thence with the southern right-of-way of Bennett Knoll Parkway, along a curve to the right having a radius of 1145.00 feet, an arc length of 324.78 feet, and a chord of South 83°37'55" East 323.69 feet to an iron pipe set; thence along a curve to the right having a radius of 2335.38 feet, an arc length of 17.71 feet, and a chord of South 74°30'41" 17.71 feet to an iron pipe set;  thence South 86°51'18" East 37.71 feet to an iron pipe set; thence South 72°26'28" East 132.00 feet to an iron pipe set; thence South 70°57'06" East 88.31 feet to an iron pipe set on the western right of way of NC Highway 55 Bypass (a variable width public R/W); thence with the western right of way of NC Highway 55 Bypass, South 35°23'24" West 236.72 feet to a calculated point; thence South 37°50'18" West 392.11 feet to an existing concrete monument; thence South 44°49'57" West 328.56 feet to an existing concrete monument; thence South 42°04'25" West 1,050.04 feet to a calculated point; thence South 40°54'31" West 289.82 feet to the POINT OF BEGINNING, containing 1,621,440 square feet or 37.22 acres, more or less.

Exhibit B

Site Plan



EX. B (1 OF 3)



PREMISES

SHOPPING CENTER

NORTHERN AREA

PERMISSIBLE BUILDING AREA

CRITICAL
AREA

HOLLY SPRINGS TOWNE CENTER
BED BATH & BEYOND - EXHIBIT B
TRACT SITE PLAN
HOLLY SPRINGS, NORTH CAROLINA

GRAPHIC SCALE

1 inch = 200 ft.

EX. B (2 OF 3)



TEMPORARY STORAGE
CONTAINER (10'x40')

TRASH
CONTAINER
PAD

TRASH
CONTAINER
PAD

TRASH
COMPACTOR PAD

LOADING FACILITIES

TRASH
CONTAINER
PAD

BEACONWOOD LANE

CONCRETE
SIDEWALK

CONCRETE
SIDEWALK

TENANT'S
HIRING TRAILER
FINAL LOCATION TO
BE MUTUALLY AGREED
TO BY LANDLORD
AND TENANT

ACCESSIBLE
PARKING SPACES

CURB RAMP

GRAND HILL PLACE

DECORATIVE CROSSWALK (BY LANDLORD)
WITH SIGN (BY LANDLORD) STATING: STOP
FOR PEDESTRIANS IN CROSSWALK. SUBJECT
TO LANDLORD APPROVAL PRIOR TO
INSTALLATION. (PENDING LOCAL AUTHORITY
APPROVAL)

NOTES:
1.  SITE PLAN LAYOUT TO ADEQUATELY
    ACCOMODATE A 55' (WB-65) TRAILER ROUTE,
    FROM POINT OF ENTRY TO TENANT'S LOADING
    DOCK AND THEN FOR EXITING THE SHOPPING
    CENTER.
2.  EXIT DOORS TO BE COORDINATED WITH
    TENANT'S PLANS (TYP.)

PREMISES

GRAPHIC SCALE
50   0   25   50   100

1 inch = 50 ft.

THE JOHN R. McADAMS
COMPANY, INC.

McADAMS

HOLLY SPRINGS TOWNE CENTER
BED BATH & BEYOND - EXHIBIT B
SITE PLAN
HOLLY SPRINGS, NORTH CAROLINA

EX. B (3 OF 3)

Exhibit C

Rent Commencement and Expiration Date Agreement

THIS RENT COMMENCEMENT AND EXPIRATION DATE AGREEMENT, made as of the _____ day of _____, 20___, by and between KRG NEW HILL PLACE, LLC (*"Landlord"*) and BED BATH & BEYOND INC. (*"Tenant"*).

# WITNESSETH:

WHEREAS, Landlord is the owner of a certain shopping center known as Holly Springs Towne Center (the *"Shopping Center"*), situated in Holly Springs, North Carolina;

WHEREAS, by that certain Lease Agreement dated as of _____, 20__ (the *"Lease"*), Landlord leased a portion (the *"Premises"*) of the Shopping Center to Tenant;

WHEREAS, Tenant is in possession of the Premises and the Term of the Lease has commenced; and

WHEREAS, under Section 2.2 of the Lease, Landlord and Tenant agreed to enter into an agreement setting forth certain information in respect of the Premises and the Lease.

NOW, THEREFORE, Landlord and Tenant agree as follows:

1.      The Rent Commencement Date occurred on _____, 20___.

2.      The Initial Term of the Lease shall expire on January 31, 20___, unless Tenant exercises any option to extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

3.      The date of commencement of the first Renewal Period shall be February 1, 20___, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 20___, unless Tenant exercises any option to further extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

4.      The date of commencement of the second Renewal Period shall be February 1, 20___, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 20___, unless Tenant exercises any option to further extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

5.      The date of commencement of the third Renewal Period shall be February 1, 20___, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 20___, unless the Lease terminates earlier as provided in the Lease.

6.      Capitalized terms used, but not defined, herein shall have the meanings ascribed to them in the Lease.

C-1

IN WITNESS WHEREOF, the parties hereto have caused this Rent Commencement and Expiration Date Agreement to be executed the date and year first above written.

**LANDLORD**:

KRG NEW HILL PLACE, LLC, an Indiana limited liability company

By:_____
Name:_____
Title:_____

**TENANT**:

BED BATH & BEYOND INC., a New York corporation

By:_____
Name:  Warren Eisenberg
Title:   Co-Chairman

C-2

Exhibit D

Specifications for Landlord's Work

D-1



## Holly Springs, NC
### Exhibit D - Landlord's Work
### 2-17-14


Beyond any store of its kind."

[All capitalized terms used, but not otherwise defined herein shall have the meanings ascribed to them in the Lease. The terms of the Lease regarding Landlord's Work shall be deemed to supplement the provisions of this Exhibit D, to the extent not inconsistent with the terms of this Exhibit D. It is specifically understood and agreed that all materials and supplies shall be installed in strict accordance with all manufacturers' specifications.]

## I. Landlord's Plans & Specifications

A.  Landlord shall generate a complete set of project-specific construction documents hereinafter collectively referred to as "Landlord's Plans & Specifications" which shall be in accordance with the following :

1.  Tenant's Plans : Site-specific design-development drawings prepared by Tenant which shall include :
    a)  F1 - FIXTURE PLAN
    b)  F2 - FLOOR FINISH PLANS, NOTES AND DETAILS
    c)  F3 - POWER/SPECIALTY LIGHTING PLANS AND NOTES
    d)  F4 - LIGHTING PLANS AND NOTES
    e)  F5 - HIGH PILE STORAGE PLAN
    f)  Additional F-drawings as may be required to address atypical site-specific conditions

2.  Tenant's Prototype Drawings & Specifications – [developed by Casco Corporation ,St. Louis, MO] which consist of :

    a)  Bed Bath & Beyond – PROTOTYPE VERSION 1.2013 – Drawings (dated 10/15/13)

| | | | |
|---|---|---|---|
| A0.1 | Code Data, Project Data and Responsibility Schedule | P1.1 | Plumbing Riser Diagrams and Fixture Schedule |
| A0.2 | Generic Site Requirements Plan | P2.1 | Plumbing Floor Plan |
| A1.1 | Site Details | P3.1 | Plumbing Enlarged Plans & Details |
| A1.2 | Demolition Plan | | |
| A2.1 | Cable Clip/Store Fixture/Egress Path Plan & Notes | FP1.0 | Fire Sprinkler Plans & Details |
| A2.2 | Floor Plan | FP1.1 | Fire Sprinkler Notes and Details |
| A2.3 | Floor Finish Plans | | |
| A2.4 | Reflected Ceiling Plans & Notes | FA1.0a | Fire Alarm Plans & Notes Base System |
| A2.5 | Roof Plan, Details & Notes | FA1.0b | (Alternate) Fire Alarm Plans & Notes – |
| A3.1 | Finish Schedule, Storefront Types & | | Occupant Notification |
| | Vestibule Elevations | FA1.0c | (Alternate) Fire Alarm Plans & Notes - |
| A3.2 | Door Hardware, Door Schedules & | | Full Smoke Detection |
| | Door Types | FA1.1a | Fire Alarm Details - Base System |
| A4.1 | Exterior Elevations | FA.1.1b | (Alternate) Fire Alarm Details – |
| A5.1 | Building Sections, Interior Wall Sections | | Occupant Notification |
| A5.2 | Exterior Wall Sections | FA1.1c | (Alternate) Fire Alarm Details – |
| A5.3 | Exterior Wall Sections | | Full Smoke Detection |
| A5.4 | Exterior Wall Sections | FA1.2a | Fire Alarm Device Lists & Calcs - Base System |
| A5.5 | Interior Wall Sections | FA1.2b | (Alternate) Fire Alarm Device Lists & Calcs - |
| A5.6 | Alternate Scissor Lift Plan, Section, | | Occupant Notification |
| | Specification & Notes | FA1.2c | (Alternate) Fire Alarm Device Lists & Calcs - |
| A6.1 | Exterior Details | | Full Smoke Detection |
| A6.2 | Interior and Exterior Details | | |
| A6.3 | Slatwall Details | M1.1 | Mechanical General Information |
| A7.1 | Large Scale Plans | M2.1 | Mechanical Floor Plan |
| A7.2 | Large Scale Plans & Partition Types | M2.1a | (Alternate) Mechanical Floor Plan |
| A8.1 | Interior Details | M3.1 | Mechanical Enlarged Plans & Details |
| A8.2 | Interior Details | M4.1 | Mechanical Schedules |
| A8.3 | Customer Service Desk | | |
| A8.4 | Register Bays and Remote Service Desks | E1.1 | Electrical General Information & Schedules |
| A9.1 | Interior Elevations | E2.1 | Power Plan |
| A9.2 | Food Prep Room | E2.2 | Lighting Layout Plan |
| A9.3 | Alternate Plans, Elevations & Details | E2.3 | Lighting Circuiting Plan |
| A9.4 | FTG Fixture Plan & Vendor Responsibility Schedule | E2.4 | Specialty Lighting Plans & Diagrams |
| A9.5a | (Alternate) – Vertical Core Sections | E2.5 | Specialty Lighting Elevations |
| A9.5b | (Alternate) – Vertical Core Plans Elevation & Details | E3.1 | Electrical Large Scale Plans & Details |
| A9.6a | (Alternate) – Awning Elevations & Details | E3.2 | Lighting Sequencing |
| A9.6b | (Alternate) - Awning Details | E3.3 | Electrical Details |
| A9.6c | (Alternate) – Awning Wall Sections | E4.1 | Electrical Schedules |
| | | E4.2 | Electrical Diagrams |
| HP1.1 | High Pile Storage Plan & Fixture-Shelf Details | E4.3 | Power Wall Details, Security Detail & E.A.S. System |
| | | E4.4 | Novar Wiring Details |
| S1.1 | Structural General Information & Typical Details | E4.4a | (Alternate) Novar Wiring Details for |
| S2.1 | Foundation Plan | | Non-Lennox RTU's |
| S2.2 | Roof Framing Plan | E4.5 | ETM Wiring Details for Lennox RTU's |
| S3.1 | Foundation Details | E4.5a | (Alternate) ETM Wiring Dtls for Non-Lennox RTU's |
| S3.2 | Roof Framing Details | E5.1 | FTG Power, Lighting, Specialty Lighting |

    b)  Bed Bath & Beyond – PROTOTYPE VERSION 1.2013 – Project Manual (dated 10/15/13)

3.  Lease Exhibits : Landlord's Plans & Specifications shall conform to all provisions of Exhibits B, D, D-1, D-2 and F to this Lease.

B.   Landlord's Plans & Specifications shall also include the following items :

   1.   All architectural elevations and construction details for all pylon, monument and directional signs located throughout the Shopping Center.

   2.   All architectural elevations and partial sidewalk plans of all other tenants and occupants of the Shopping Center.

   3.   Complete civil engineering documents that describe planned improvements a the Shopping Center.

   4.   Geo-technical and Storm-water design reports.

C.   Landlord shall be responsible for ensuring that Landlord's Plans & Specifications are in full compliance with all applicable regional/governmental Requirements.   Such regional/governmental Requirements may not be addressed in the "Tenant's Plans" or the "Tenant's Prototype Drawings & Specifications".   Such Requirements may include (but shall not be limited to) the following: Fire-rated partitions separating Receiving/Pre-Sales Areas from Sales Areas [incl. protection of openings through fire-rated partitions]; Disability access to mezzanine level [i.e. - ADA lift; limited use/limited application elevator; passenger elevator]; Second egress stair from the mezzanine level; Quantity of restroom fixtures; Quantity & location of egress doors, Quantity & location of egress stairs; Smoke purge and pressurization system; Smoke/heat vents; Draft curtains; Fire rated assemblies, Etc.   Landlord shall be responsible for coordination of all regional/governmental requirements with Tenant and "Tenant's Plans".

D.   Hierarchy :

   1.   In the event of a conflict among the following documents, the following hierarchy ('a' representing the highest priority) shall be used to determine which documents govern :
      a.   Lease Exhibits B, D [excluding Tenant's Prototype], D-1, D-2 & F
      b.   Tenant's Plans
      c.   Tenant's Prototype Drawings and Specifications
      d.   Landlord's Plans and Specifications

   2.   To the extent any of the documents listed above conflict with applicable regional or governmental requirements, said documents shall be revised (prior to construction) to accommodate the regional or governmental requirements to the mutual satisfaction of both Landlord and Tenant.

E.   Quality Control Review :

   1.   At the time the Landlord's Plans & Specifications are 85% complete, Landlord shall submit to Tenant for Tenant's review one (1) complete full size set and one (1) complete ½ size set.   Tenant may (at Tenant's option) employ a third party consultant to review the submittal, in which event, prior to the commencement thereof, Landlord shall reimburse Tenant for the fixed cost ($2,500 - All payments must be made in US Dollars or the foreign equivalent thereof) related to such third party review.   If the submittal is "rejected" or noted as "revise and resubmit" by Tenant then Landlord shall revise the Landlord's Plans & Specifications to address all Tenant comments.

   2.   Landlord shall provide to Tenant (for Tenant's review and approval) a separate and complete submittal for each subsequent iteration/revision to Landlord's Plans & Specifications.   Tenant may (at Tenant's option) employ a third party consultant to review each subsequent submittal, in which event, prior to the commencement thereof, Landlord shall reimburse Tenant for the fixed cost ($1,500 - All payments must be made in US Dollars or the foreign equivalent thereof) related to such third party review.   If the submittal is "rejected" or noted as "revise and resubmit" by Tenant then Landlord shall revise the Landlord's Plans & Specifications to address all Tenant comments.

   3.   Landlord's Plans & Specifications submitted to Tenant for review and approval must be in the same Format as "Tenant's Prototype Plans & Specifications" unless otherwise authorized in writing by Tenant.   Tenant shall not be obligated to review or approve improperly formatted submittals of Landlord's Plans & Specifications.   Improperly formatted submittals shall not be deemed to be in compliance with Section 3.2 ("Plan Approvals") of the Lease.   Tenant reserves the right to immediately disapprove and return improperly formatted submittals to the Landlord and the Landlord shall be solely responsible for all costs and/or delays relating to revising/correcting and resubmitting the Landlord's Plans & Specifications to Tenant for review and approval.

   4.   Construction Closeout (subsequently outlined in this Exhibit) shall not be deemed "complete" until Landlord has secured Tenant approval of Landlord's Plans and Specifications.

## II. Site Specifications

A.   All parking areas and traffic drives in the Shopping Center shall consist of a minimum 6" of compacted stone sub-base (95% compacted), 2.5" asphalt base, and 1.5" asphalt surface finish.  **All work shall be in accordance the documents prepared by McAdams Engineering Co. and per the applicable codes and with the approval of the governing agencies having jurisdiction.**  Grading of these areas shall not exceed a slope of 2% unless specifically approved in writing by Tenant. Utilization of any portion of the parking field for above ground storm water retention/detention is prohibited.

B.   All truck access drives in the Shopping Center shall consist of a minimum 8" of compacted sub-base (95% compacted), 2.5" asphalt base, and 1.5" asphalt surface finish.  **All work shall be in accordance the documents prepared by McAdams Engineering Co. and per the applicable codes and with the approval of the governing agencies having jurisdiction.**  Grading of these areas are not to exceed a slope of 3% unless specifically approved in writing by Tenant.

C.   Tenant's truck ramp, Trash Compactor Pad and Trash Container Pad shall consist of 12" compacted sub-base (95% compacted), 4" compacted granular base and 6" Portland cement concrete surface finish.  Tenant's truck ramp shall include #4 re-bars at 18" on center each direction.  Tenant's recessed truck ramp shall not exceed slope of 6%.

D.   If Landlord's geo-technical report for the Shopping Center recommends more stringent requirements, then the geo-technical report recommendations shall supersede the criteria stated in items A, B, and C above.

E.   The minimum lighting level throughout the Shopping Center (parking areas, traffic drives, service drives, etc.) shall be two (2) foot-candles, measured 30" above grade.  Landlord shall include a photometric plan, which shall confirm that the proposed lighting meets these requirements as part of Landlord's Plans & Specifications.  Landlord shall not include illumination from building-mounted wall packs when calculating the required foot-candle level.  Landlord shall also provide low level security lighting min. (1) foot-candle throughout center that shall remain illuminated from dusk to dawn seven days a week.

## III. Building Requirements

The following section both (a) highlights elements of Landlord's Work which are already specified in "Tenant's Prototype Drawings & Specifications" and (b) identifies project-specific elements of Landlord's Work which are in addition to the scope detailed in "Tenant's Prototype Drawings & Specifications":

A. **Clear Height** : All Building Systems shall be designed to allow Tenant to stock merchandise to 16'-6" a.f.f. Various systems shall be designed to conform with the following criteria :
   1. 18'-4" minimum clear height to underside of all structural system components.
   2. 16'-6" minimum clear height to underside of all plumbing & electrical system components [excluding lighting]
   3. 17'-6" minimum clear height to underside of all mechanical system components [i.e. - ductwork]
   4. 19'-0" maximum clear height to underside of all mechanical supply and return ducts
   5. 16'-6" minimum clear height to underside of all fire protection sprinkler piping (main and branch lines)
   6. 1" minimum and 6" maximum from fire sprinkler heads to underside of roof/floor deck above
   7. 22'-0" maximum clear height at the lowest point of the underside of roof/floor deck above (excluding elevator override)

B. **Fire Protection** : Landlord shall furnish and install both a fire alarm system and a fire sprinkler system in accordance with the criteria established in "Tenant's Prototype Drawings & Specifications", or more stringent criteria as may be applicable.

   1. Landlord shall issue one complete submittal each for : (i) the fire alarm system and (ii) the fire sprinkler system (per Sections 01340, 15300 and 16720 of the "Tenant's Prototype Drawings & Specifications") to Tenant's National Fire Protection Consultant (listed below) for review and approval. Each initial submittal must be received by Tenant's Consultant no later than (12) weeks prior to projected Delivery Date. Prior to the commencement of Consultant's review, Landlord shall pay a fixed fee ($625 for Fire Alarm + $625 for Fire Sprinkler) directly to Tenant's Consultant. If any submittal is "rejected" or noted as "amend and resubmit" by Tenant's Consultant then Landlord shall revise the submittal to address all Consultant comments and resubmit. Prior to the commencement of Consultant's review of any resubmittal, Landlord shall pay a fixed fee ($625 each) directly to Tenant's Consultant. All payments must be made in US Dollars or the foreign equivalent thereof.

   2. Landlord shall be responsible for monitoring the fire alarm system up to 90 days following the Delivery Date.

   3. Fire Alarm system components shall be purchased by the Landlord thru Tenant's National Account vendor :
      **FE Moran**
      33341 Kelly Road
      Fraser, MI 48026
      855-FE-MORAN (855-336-6726)
      contact: BBB/Baby/CTS Coordinator
      e-mail: bbb@femoranalarm.com

   4. The sprinkler system shall be designed to allow merchandise to be stored to 16'-6" AFF or within 24 inches of the underside of the roof deck. The system shall comply with 2007 (or later) version of NFPA13, (high pile solid shelf storage) for class I-IV commodity and a limited amount of group A plastics on solid shelves, minimum 4-foot aisles [typical requirement = 0.49 GPM/sf over a 2000 sf area].

   5. The sprinkler system shall NOT utilize a fire pump. If water pressure is inadequate and system cannot be designed to properly function without incorporating a fire pump, then Landlord shall locate any required Fire Pump outside of the Premises. Landlord shall, at no cost to Tenant and for the full term of the Lease, routinely inspect, test, and maintain the Fire Pump in accordance with NFPA 25, Standard for the Inspection, Testing, and Maintenance of Water-based Fire Protection Systems (Chapter 8 of 2008 Edition), and shall otherwise maintain the fire pump.

   6. Consulting Services : If Tenant's National Fire Protection Consultant (listed below) is needed to assist Landlord with approvals from governmental authorities (i.e. - completing technical discussions with governmental authorities to explain/clarify design parameters, calculations, high pile storage commodity classifications, fire pump design, etc.), then Landlord shall directly pay Tenant's Consultant for all time and materials. If Landlord fails to pay Tenant's Consultant in a timely manner, then Tenant shall have the right to make said payment and, at Tenant's option, receive a credit against "Changes" under the lease or deduct the amount from Rent in order to satisfy outstanding invoice.

   7. Tenant's National Fire Protection Consultant :    Mr. Will Smith / Code Consultants, Inc. (CCI)
                                                          2043 Woodland Pkwy, Ste. 300
                                                          St. Louis, MO   63146-4136
                                                          (314) 991-2633 [ph]
                                                          (314) 991-4614 [fax]

C. **Office Mezzanine Access** : Prior to the development of Tenant's Plans, Landlord shall coordinate with the Authority Having Jurisdiction and advise Tenant of all applicable requirements regarding vertical transportation at the office mezzanine. In the event that vertical transportation equipment is required, Landlord shall provide and install the appropriate vertical transportation equipment in accordance with "Tenant's Prototype Drawings & Specifications". Vertical transportation equipment installation by the Landlord shall be complete, fully code compliant and inspected and shall allow Tenant to fixture, merchandise and open for business to the public in the Premises. All equipment shall be operational a minimum of (2) two weeks prior to the Delivery Date to allow for proper "burn-in" in accordance with Tenant's Prototype Specifications Sections 14205 and 14255. Final locations of all equipment shall be in accordance with Tenant's Plans.

D. **Floor System** : Landlord shall provide and install a concrete floor slab in accordance with "Tenant's Prototype Drawings & Specifications". The floor system shall utilize 4,000 psi concrete and maintain a minimum thickness of 4 inches. The floor system shall be designed to accept a minimum 125 lbs. per square foot of live load. If rebar or pre-tensioned / post-tensioned steel is required, such reinforcement shall not be placed within the top 2 ½" of the concrete slab.

E. **Utilities** : Landlord shall ensure that all utilities serving the Premises (including but not limited to electric, gas, water, fire protection water, sanitary sewer and phone services) are separately metered exclusive of all other tenants and occupants in the Shopping Center. Tenant's utility services shall be provided directly by the utility company (sub-metering is prohibited). Location of utility lines and equipment serving other Tenants in the Shopping Center shall be prohibited on, under, over, across or within the Premises. Landlord shall ensure that all utilities serving the Premises are active or are made active on or before the Delivery Date. Landlord shall assist Tenant in transferring all utility accounts to Tenant so that Tenant may assume responsibility for utility costs commencing on the Delivery Date. If Landlord and Tenant are unable to complete transfer at time of Delivery, then Tenant shall reimburse Landlord for utility costs from Delivery Date until transfer has been completed.

---

F. **Intumescent Paint** : In the event that fire-proofing of exposed structural elements is required, then Landlord shall use intumescent fire resistant coating to achieve the required fire rating. Application shall be neat & clean and in accordance with manufacturer's recommendations.

G. **Exit Signs** - Any existing Self Luminous Exit Signs containing Tritium Gas shall be removed from the Premises at the Landlord's cost (if applicable).

H. **Security Equipment** : Landlord shall provide and install new security equipment (including Electronic Article Surveillance [EAS] and Closed Circuit Television [CCTV]) in accordance with Tenant requirements. Landlord shall purchase such EAS equipment directly from Tenant's National Account Vendor (WG Security Products, Inc. / Attn: Ed Wolfe / 678-614-6574 / ) Landlord shall purchase such CCTV equipment directly from Tenant's National Account Vendor (Sensormatic / Attn: Doug Thomas / 804-739-8144 / ).

I. **Sanitary Survey** - Landlord shall perform a videographic, fiber optic camera survey of the existing sanitary drainage system 7-days prior to Delivery (plus a second camera survey within 7 days of the start of construction for all renovation projects). The survey(s) shall include the entire sanitary line serving the Premises to a minimum of 50-feet outside the building. Sanitary lines shall be "jetted" prior to starting the survey(s) to remove any existing waste, construction debris or standing clogs. Camera recording shall indicate the operating camera depth. Camera recording shall include a verbal narrative by the technician (including technician's name, company name, store number, store address, starting location of survey, and a brief description of any problems, deficiencies or points of interest identified throughout the inspection). Camera recording shall be submitted in VHS or DVD format and shall contain only the camera survey for this project. Camera recording shall be clearly labeled with store number, store address, date of inspection, name of inspector and inspection company. Camera recording shall be accompanied by a written evaluation report highlighting any problems, deficiencies or points of interest and shall include a schematic diagram of the sanitary line which indicates the size, slope and material of the pipe and all cleanout locations.

J. **NA**

K. **NA**

L. **NA**

M. **NA**

N. **Vertical Transportation** – Landlord shall provide and install all vertical transportation equipment (including but not limited to - lifts, passenger elevators, freight elevators, escalators, shopping cart escalators, scissor lifts, dedicated service stairs, etc.) in accordance with Tenant's Plans and "Tenant's Prototype Drawings & Specifications". Vertical transportation equipment installation by the Landlord shall be complete and fully code compliant and shall allow Tenant to fixture, merchandise and open for business to the public in the Premises. All equipment shall be operational a minimum of (2) two weeks prior to the Delivery Date to allow for proper "burn-in" in accordance with Tenant's Prototype Specifications Sections 14205, 14255 and 14305. Final sizes and locations of all equipment shall be in accordance with Tenant's Plans.

O. **NA**

## IV. Construction Coordination Requirements

A. **Schedule** : Landlord shall provide Tenant with a critical path construction schedule prior to commencement of Landlord's Work. Following the commencement of Landlord's Work, Landlord shall provide an updated critical path construction schedule to Tenant's Construction Project Manager every two weeks until Landlord's Work is complete.

B. **Photographs** : Throughout the period during which Landlord's Work is being performed, Landlord shall provide to Tenant's Construction Project Manager, on a weekly basis, then-current photographs of the interior and exterior of the Premises, and the Shopping Center site, showing the progression of Landlord's Work. All photographs shall be in a digital format, and transmitted to Tenant at the following e-mail address : **BBB.2000photos@bedbath.com**

C. **Vendor Coordination** : Landlord shall be responsible for contracting, coordinating and scheduling directly with Tenant's Specified National Account Vendors.

D. **Certification** : Whenever testing, certification, or verification is required in Tenant's Prototype Drawings & Specifications, Landlord shall, at Tenant's request, provide Tenant with copies of tests, certifications, or verifications, and shall otherwise cooperate with Tenant's reasonable informational requests.

## V. Building and Site Signs

A. **Building Signs** – Landlord shall furnish and install all building signs shown on Exhibits D-1 and F of this Lease using Tenant's specified vendor only. Landlord shall verify actual number of circuits required for each sign with Tenant's specified vendor. Landlord shall install conduit continuously from Tenant's panel in Premises to all sign locations. Landlord shall execute a purchase order with Tenant's specified vendor no later than ten (10) weeks prior to Delivery Date. If Landlord fails to execute a purchase order prior to the established deadline, then Tenant (at its option) may execute a purchase order with Tenant's specified vendor and (at its option) deduct all costs from rent or receive a credit against "Changes" as defined in the Lease. If Tenant does not provide written notice to Landlord regarding Tenant's decision to execute a purchase order with Tenant's specified vendor, then Landlord shall remain responsible to execute the purchase order.

B. **Remote Building Sign(s)** – [Building Sign(s) not located on Premises] Landlord shall furnish and install all building signs shown on Exhibits D-1 and F of this Lease using Tenant's specified vendor only. Landlord shall verify actual number of circuits required for each sign with Tenant's specified vendor. Landlord shall install conduit continuously from Tenant's panel in Premises to all remote sign locations. Landlord shall execute a purchase order with Tenant's specified vendor no later than ten (10) weeks prior to Delivery Date. If Landlord fails to execute a purchase order prior to the established deadline, then Tenant (at its option) may execute a purchase order with Tenant's specified vendor and (at its option) deduct all costs from rent or receive a credit against "Changes" as defined in the Lease. If Tenant does not provide written notice to Landlord regarding

Tenant's decision to execute a purchase order with Tenant's specified vendor, then Landlord shall remain responsible to execute the purchase order.

C.  Pylon/Monument/Directional Signs – Landlord shall furnish and install all pylon /monument /directional signs (s) shown on Exhibit F to this Lease, complete (including, without limitation, sign structure, any required electrical service, sign panels, and Tenant's specified graphics). Landlord to furnish, install and remove (at Tenant's request) temporary non stick vinyl graphics as detailed in exhibit F.

D.  Temporary Signs – Commencing on the Effective Date, and continuing thereafter through the Rent Commencement Date, Landlord shall furnish, install and maintain (for such duration as Tenant may desire) all temporary signs as detailed in Exhibit F to the Lease and listed below. Landlord shall also remove the temporary banners on the date designated by the Tenant. Temporary signage shall be in accordance with Tenant's Prototype Drawings & Specifications :
   1.  Two double sided temporary banners mounted to the Premises bearing the phrase :
       Banner #1 - "Coming Soon" (side a) and "Grand Opening" (side b).
       Banner #2 - "Why Wait ? Shop Online" (side a) and "Now Open" (side b).
   2.  Four single-sided banners at the temporary site sign located per Exhibit B to the Lease, bearing the phrase:
       Banners #1 & #2 - "Coming Soon"
       Banners #3 & #4 - "Now Open"
   3.  One double sided banner sign mounted to Tenant's Hiring Trailer bearing the phrase :
       "Now Hiring" (side a) and "Now Open" (side b).
   At Tenant's request, Landlord shall relocate Tenant's temporary signage should the signage visibility become obstructed.

   Landlord shall secure banners through the following vendor:

                Auna Foote / Corporate Identification Solutions
                5563 North Elston Avenue
                Chicago, IL 60630
                (773) 763-9600 [ph]
                (773) 763-9606 [fax]
                [illegible]
                [illegible]

E.  Shop Drawings : Landlord shall provide complete shop drawings of all Landlord-furnished signs to Tenant for Tenant's approval no later than twelve (12) weeks prior to the Delivery Date.


## VI. Permits and Approvals

A.  Landlord shall be obligated to secure all permits required to allow Tenant to fixture, merchandise and open for business to the public in the Premises. Such permits may include (but shall not be limited to) the following : Building Permit, Health Permit [for the sale of prepackaged foods], Fixture Permit, Seismic Permit, High Pile Storage Permit [for storage of merchandise above 12'-0-"] and Signage Permits.

   If seismic calculations, plans and details are required, then Landlord shall be obligated to contract with "Seizmic Inc." no later than twelve (12) weeks prior to the Delivery Date. Seizmic Inc. shall provide all necessary services to assist Landlord in securing the Fixture Permit. These services include completion of all required submittal documents, required applications, responses to inquiries from the authority having jurisdiction and monitoring status of the permit application. Actual submission of the required documents to the Authority Having Jurisdiction shall be made only by Seizmic, Inc. (or other vendor selected at Tenant's discretion).
                Seizmic Inc.
                Sal Fateen / Genie Fateen / Keri Putnam
                161 Atlantic Street, Pomona, CA 91768
                (909) 869-0989 [ph]

   Landlord shall be obligated to take possession of fixture permit and transfer the permit to Tenant's fixture installer. If fixture permit is required, then Landlord shall secure fixture permit no later than (2) weeks prior to Delivery Date.


## VII. Construction Closeout

A.  Electronic Format: Within thirty (30) days following the "Substantial Completion" date, Landlord shall be responsible for uploading all required documents to the Digital Reliance Inc. (DRI) website [http//www.closeoutassistant.com]. For additional information or assistance contact DRI at 614-430-5950. Special software is not required. All documents shall be uploaded in pdf format to the DRI website within thirty (30) days following "substantial completion". Landlord shall pay the mandatory $725 service fee to DRI prior to uploading files. All payments must be made in US Dollars or the foreign equivalent thereof. DRI will confirm submittal meets base requirements and shall inform Landlord or Landlord's Contractor if certain documents are missing. DRI will not review items for content. The content will be reviewed by the BBB Construction Manager after posting of all documents is complete. Any need for resubmittal due to incorrect content, etc. will be communicated to Landlord or Landlord's Contractor from BBB's Construction Manager. Landlord shall resubmit amended document(s) to DRI until approved by BBB's Construction Manager. Closeout Documents shall be in accordance with those requirements outlined in "Tenant's Prototype Drawings & Specifications" Project Manual Section 01700.

B.  Warranties : Landlord shall cause its contractor(s) to instruct Tenant's Construction Project Manager in the operation of any equipment installed as part of Landlord's Work. All of Landlord's Work shall be performed in a manner which will not void, impair or diminish any manufacturers', installers', or contractors' warranties which otherwise would have been provided by such

manufacturer, installer, or contractor to either Landlord or Tenant.  Two (2) months prior to the end of the warranty period, Landlord shall forward a written report to Tenant outlining the condition of all warranty items.

C.  **Late Closeouts** : If Landlord fails to deliver any of the instruments and items (collectively, the "Close-out Documents") described in paragraph A above within the prescribed thirty (30) day period, then Tenant may provide Landlord with notice of such failure. If Landlord has not remedied such failure within fifteen (15) days after Tenant's delivery of such notice, then Tenant shall be entitled to an abatement in Rent in the amount of One Hundred ($100.00) dollars for each day that Landlord has not so delivered all of the Close-out Documents.

D.  **Itemized Budget** : Landlord shall provide Tenant with its itemized "budget" and "final cost" for all of Landlord's Work within thirty (30) days following the Substantial Completion Date.

E.  **Energy Rebate Information** : Landlord shall be obligated to provide to Tenant (within 30 days of Tenants request) copies of manufacturer invoice(s), manufacturer cut sheets, subcontractor invoices, etc. for any item or items described within this Exhibit for Tenant's pursuit of energy rebate programs that are in force by the Authority Having Jurisdiction and/or the utility provider.

Exhibit D-1

Exterior Elevations of Premises and Sidewalk Plan



KITE REALTY GROUP
## Holly Springs Town Center Ph. II
Holly Springs, North Carolina

D-1

Exhibit D-2

Exterior Elevations of the Shopping Center

D-2-1



Exhibit E

Permitted Encumbrances

Sanitary Sewer Easement Agreement by and among BMV, LLC; Spring Investors, LLC; and KRG New Hill Place, LLC (and one or more of its affiliates) recorded in Book 15025, Page 2234, Wake County Registry.

Easements and any other facts as shown in Map Book 1935, Page 53; Map Book 1986, Page 107; Map Book 1986, Page 577; Map Book 1993, Page 623; Map Book 2006, Page 1874; Map Book 2006, Page 2676; Map Book 2007, Page 405; Map Book 2008, Page 1341; Map Book 2008, Page 178; Map Book 2012, Page 191; Map Book 2012, Page 553; Map Book 2012, Page 554; and Map Book 2012, Page 556; Book of Maps 2012, Page 1369; Book of Maps 2012, Page 1370; Book of Maps 2012, Page 1371, Wake County Registry.

Easement to Carolina Power and Light Company recorded in Book 934, Page 324; Book 956, Page 73; Book 1033, Page 235; Book 1058, Page 289; Book 1079, Page 354; Book 1095, Page 393; Book 1494, Page 625; Book 1558, Page 36; Book 2942, Page 378; Book 2949, Page 505; Book 14757, Page 1905; and Book 14757, Page 1908, Wake County Registry.

Restrictions to abutter's rights of access to State Highway 55 as contained in the Deed recorded in Book 8341, Page 1431, Wake County Registry.

Easement(s) to the Town of Holly Springs recorded in Book 12481, Page 1704, Wake County Registry.

Easement to Carolina Telephone & Telegraph Company recorded in Book 1225, Page 137, Wake County Registry.

Rights of way of New Hill Road and Old Holly Springs Road to their full legal widths.

Riparian rights incident to the Cape Fear/Holly Spring and the Perennial Channel.

Easements and any other facts as shown in Book of Maps 2012, Pages 589-591, Wake County Registry.

Memorandum of Lease with Petco Animal Supplies Stores, Inc. recorded in Book 14409, Page 2490; as amended by First Amendment to Memorandum of Lease recorded in Book 14672, Page 2574, Wake County Registry. Subordination, Non-Disturbance and Attornment Agreement dated July 30, 2012, recorded August 28, 2012, in Book 14902, Page 2610.

Memorandum of Lease to Michael's Stores, Inc. as evidenced by that First Amendment to Memorandum of Lease recorded in Book 14672, Page 2582, Wake County Registry. Subordination, Non-Disturbance and Attornment Agreement dated July 30, 2012, recorded August 28, 2012, in Book 14902, Page 2622.

Operation and easement Agreement between Target Corporation and KRG New Hill Place, LLC for New Hill Place Shopping Center recorded in Book 14672, Page 2597, Wake County Registry.

Memorandum of Site Development Agreement between Target Corporation and KRG New Hill Place, LLC recorded in Book 14672, Page 2700 and Corrective Affidavit recorded in Book 14690, Page 824, Wake County Registry.

E-1

Memorandum of Acquisition Rights Agreement between KRG New Hill Place, LLC and Target Corporation recorded in Book 14672, Page 2710, Wake County Registry.

Memorandum of Lease from KRG New Hill Place, LLC to Mattress Firm, Inc. recorded in Book 14735, Page 2012, Wake County Registry.

Memorandum of Lease from KRG New Hill Place, LLC to Ulta Salon, Inc. recorded in Book 14801, Page 494, Wake County Registry. Subordination, Non-Disturbance and Attornment Agreement dated July 30, 2012, recorded August 28, 2012, in Book 14902, Page 2600.

Declaration of Easements, Covenants and Restrictions by and between KRG New Hill Place I, LLC and GMRI, Inc., dated as of February 28, 2013, and recorded March 6, 2013 in Book 15172, Page 1129, Wake County Registry.

Rights of the following parties as tenants only, under unrecorded leases(s) or rental agreement(s).

a. Dick's Sporting Goods

b. Pier 1

c. Massage Envy

d. Tijuana Flats

e. Nails

f. Orange Leaf

g. Sport Clips

h. Olive Garden

i. Sprint

j. Other Tenants listed on Exhibit K-2

Landlord represents and warrants that (i) none of the foregoing will interfere with or prevent Tenant from operating its Premises in accordance with the terms of this Lease, (ii) conflict with any right granted Tenant under this Lease, (iii) impose on Tenant any obligation(s) in excess of those set forth in this Lease, and (iv) none of the foregoing easements or rights of way (a) are located beneath the Premises, or (b) will interfere with Tenant's use and enjoyment of the Premises.

The inclusion of the foregoing memoranda of lease and references to leases within these "Permitted Encumbrances" is for informational purposes only, and shall not be deemed to diminish any of Tenant's rights, or increase any of Tenant's obligations, under this Lease.

E-2

Exhibit F

<u>Signage</u>

F-1



**TEMPORARY BUILDING SIGN**
(REFER TO EXHIBIT D-1 FOR LOCATION ON BUILDING)



**TEMPORARY SIGN**
(TENANT'S HIRING TRAILER)



**TEMPORARY SITE SIGN**
(REFER TO EXHIBIT B FOR LOCATION)



**TEMPORARY BUILDING SIGN**
(REFER TO EXHIBIT D-1 FOR LOCATION ON BUILDING)



**TEMPORARY SASH**
(AT PYLON / MONUMENT PANELS)

**EXHIBIT 'F' (3 OF 3)**
**BED BATH & BEYOND**

HOLLY SPRINGS, NC

✱ NOTE: ALL TEMP. SIGNAGE SUBJECT
TO APPLICABLE GOVERNING
AGENCIES HAVING JURISDICTION

4.3.14



*NOTE: THIS EXHIBIT IS FOR     BBBY HOLLY SPRINGS, NC
2 MONUMENTS —SAME           EXH. F (1 OF 3)
DESIGN W/BBBY ON
BOTH W/2 PANELS-EACH SAME POSITIONS.



Proposed Channel Letters | 8'-0" x 32'-0"

Various Locations

BBBY HOLLY SPRINGS, NC
EXHIBIT F (2 OF 3)

1                            Exhibit G

2             Form of Subordination, Non-Disturbance and Attornment Agreement

3

4                THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT

5     AGREEMENT, made as of the _____ day of _____, 200__, by and between

6     _____, a _____ **[corporation] [limited] [general]**

7     **[partnership] [national banking association]**, having an office at

8     _____ (the *"Mortgagee"*) and Bed Bath &

9     Beyond Inc., a New York corporation, having an office at 650 Liberty Avenue, Union,

10    New Jersey 07083 (the *"Tenant"*).

11                       W I T N E S S E T H :

12               WHEREAS, Mortgagee is the holder of a mortgage (the *"Mortgage"*) covering a

13    parcel of land owned by

14    _____ (the *"Landlord"*)

15    together with the improvements erected thereon (said parcel of land and improvements

16    thereon being hereinafter referred to as the *"Shopping Center"* and being more

17    particularly described on Exhibit A attached hereto and made a part hereof); and

18               WHEREAS, by a certain Lease Agreement heretofore entered into between

19    Landlord and Tenant dated as of _____, 20__ (the *"Lease"*), Landlord leased

20    to Tenant a portion of the Shopping Center, as more particularly described in the Lease

21    (the *"Premises"*); and

22               WHEREAS, a copy of the Lease has been delivered to Mortgagee, the receipt of

23    which is hereby acknowledged; and

24               **[For mortgages existing as of the date Lease is executed:** WHEREAS, as an

25    inducement to Tenant to enter into the Lease, **[Section 2.3.1/Section 17.3]** thereof

26    provides that the Lease is conditioned upon Landlord obtaining this Agreement from

27    Mortgagee; and

28               WHEREAS, the parties desire to satisfy the foregoing condition and to provide for

29    the non-disturbance of Tenant by the holder of the Mortgage; and]

30               **[For mortgages occurring after the Lease is executed:** WHEREAS, Section

31    17.1 of the Lease provides that the Lease shall become subject and subordinate to a

32    mortgage encumbering the fee interest of Landlord in and to the Shopping Center if and

33    when a non-disturbance agreement is entered into with respect to such mortgage; and

34               WHEREAS, the parties hereto desire to effect the subordination of the Lease to

35    the Mortgage and to provide for the non-disturbance of Tenant by Mortgagee.]

36               NOW, THEREFORE, in consideration of the premises and of the mutual

37    covenants and agreements herein contained, the parties hereto, intending to be legally

38    bound hereby, agree as follows:

39              1.      Mortgagee hereby consents to and approves the Lease and the term thereof,

40    including the options to extend the term as set forth in the Lease, and covenants and

41    agrees that the exercise by Tenant of any of the rights, remedies and options therein

42    contained shall not constitute a default under the Mortgage.

43

44              2.      Tenant covenants and agrees with Mortgagee that the Lease hereby is made

45    and shall continue hereafter to be subject and subordinate to the lien of the Mortgage, and

46    to all modifications and extensions thereof (and such subordination shall not lessen or

diminish Tenant's rights under the Lease), subject, however, to the provisions of this Agreement.

3.    Mortgagee agrees that so long as the Lease shall be in full force and effect, and so long as Tenant shall not be in default under the Lease beyond any applicable notice and grace period:

a.    Tenant shall not be named or joined as a party or otherwise in any suit, action or proceeding for the foreclosure of the Mortgage or to enforce any rights under the Mortgage or the bond or note or other obligation secured thereby;

b.    The possession by Tenant of the Premises and Tenant's rights thereto shall not be disturbed, affected or impaired by, nor will the Lease or the term thereof be terminated or otherwise affected by (i) any suit, action or proceeding brought upon the Mortgage or the bond or note or other obligation secured thereby, or for the foreclosure of the Mortgage or the enforcement of any rights under the Mortgage, or by any judicial sale or execution or other sale of the Premises or the Shopping Center, or any deed given in lieu of foreclosure, or by the exercise of any other rights given to any holder of the Mortgage or other documents as a matter of law, or (ii) any default under the Mortgage or the bond or note or other obligation secured thereby; and

c.    All condemnation awards and insurance proceeds paid or payable with respect to the Premises or any other part of the Shopping Center shall be applied and paid in the manner set forth in the Lease.

4.    If Mortgagee or any future holder of the Mortgage shall become the owner of the Shopping Center by reason of foreclosure of the Mortgage or otherwise, or if the Shopping Center shall be sold as a result of any action or proceeding to foreclose the Mortgage, or transfer of ownership by deed given in lieu of foreclosure, the Lease shall continue in full force and effect, without necessity for executing any new lease, as a direct lease between Tenant and the then owner of the Shopping Center, as "landlord", upon all of the same terms, covenants and provisions contained in the Lease, and in such event:

(a)    Tenant shall be bound to such new owner under all of the terms, covenants and provisions of the Lease for the remainder of the term thereof (including the Renewal Periods, if Tenant elects or has elected to exercise its options to extend the term) and Tenant hereby agrees to attorn to such new owner and to recognize such new owner as "landlord" under the Lease; and

(b)    Such new owner shall be bound to Tenant under all of the terms, covenants and provisions of the Lease for the remainder of the term thereof (including the Renewal Periods, if Tenant elects or has elected to exercise its options to extend the term) which such new owner hereby agrees to assume and perform and Tenant shall, from and after the date such new owner succeeds to the interest of "landlord" under the Lease, have the same remedies against such new owner for the breach of any covenant contained in the Lease that Tenant might have had under the Lease against Landlord if such new owner had not succeeded to the interest of "landlord"; provided, however, that such new owner shall not be:

(i)    liable for any act or omission of any prior landlord (including Landlord) unless such act or omission continues from and after the date upon which the new owner succeeds to the interest of such prior landlord;

(ii)    subject to any defenses which Tenant may have against any prior landlord (including Landlord) unless resulting from any default or breach by such

G-2

prior landlord which continues from and after the date upon which the new owner succeeds to the interest of such prior landlord;

(iii)    subject to any offsets which Tenant may have against any prior landlord, except to the extent such offsets are expressly provided under the Lease and Mortgagee has received notice thereof and the opportunity to cure within the applicable time periods set forth in the Lease (it being further agreed that offsets under the Lease that were deducted by Tenant prior to the date upon which the new owner succeeds to the interest of such prior landlord shall not be subject to challenge);

(iv)    bound by any fixed rent or additional rent which Tenant might have paid for more than one month in advance of its due date under the Lease to any prior landlord (including Landlord), unless such additional rent is paid in accordance with the applicable provisions of the Lease; or

(v)    bound by any amendment or modification of the Lease made without its consent; notwithstanding the foregoing, Mortgagee acknowledges that the Lease specifically provides for amendments thereof upon the occurrence of certain events described in the Lease (such as, for example, an amendment to the Lease confirming the measurement of the Premises), and, by its execution below, Mortgagee agrees to recognize such amendments as part of the Lease, and Mortgagee further agrees that such new owner shall also be bound by such amendment(s) to the Lease, without any consent on the part of Mortgagee or such new owner.

(c)    Tenant's obligations hereunder shall be effective only so long as Mortgagee is bound to Mortgagee's obligations hereunder.

5.    Tenant will notify Mortgagee of any default by Landlord under the Lease which would entitle Tenant to terminate the Lease or abate the rent payable thereunder and agrees that notwithstanding any provision of the Lease, no notice of termination thereof nor any abatement shall be effective unless Mortgagee has received the aforesaid notice and has failed to cure the subject default within the same time period allowed Landlord under the Lease. It is understood that the abatement provisions of this Section relate to abatements by reason of Landlord's default and do not apply to provisions of the Lease whereby Tenant has the automatic right to abate rentals such as, for example, abatement upon casualty or condemnation.

6.    Neither the Mortgage nor any other security instrument executed in connection therewith shall encumber or be construed as subjecting in any manner to the lien thereof, any trade fixtures, signs or other personal property at any time furnished or installed by or for Tenant or its subtenants or licensees on the aforementioned property regardless of the manner or mode of attachment thereof.

7.    Any notices of communications given under this Agreement shall be in writing and shall be given by registered or certified mail, return receipt requested, or by any recognized overnight mail carrier, with proof of delivery slip, postage prepaid, (a) if to Mortgagee, at the address of Mortgagee as hereinabove set forth or at such other address or persons as Mortgagee may designate by notice in the manner herein set forth, or (b) if to Tenant, at the address of Tenant as hereinabove set forth, with duplicate copies to Allan N. Rauch, Esq., c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, and

_____ ,

or such other address or persons as Tenant may designate by notice in the manner herein

G-3

set forth.  All notices given in accordance with the provisions of this Section shall be effective upon receipt (or refusal of receipt) at the address of the addressee.

8.     This Agreement shall bind and inure to the benefit of and be binding upon and enforceable by the parties hereto and their respective successors, assigns, and sublessees.

9.     This Agreement contains the entire agreement between the parties and cannot be changed, modified, waived or canceled except by an agreement in writing executed by the party against whom enforcement of such modification, change, waiver or cancellation is sought.

10.     This Agreement and the covenants herein contained are intended to run with and bind all lands affected thereby.

11.

**[to add if our memorandum of lease has been recorded prior to the subject mortgage]** NOTE: THIS AGREEMENT BY TENANT SHALL NOT BE EFFECTIVE UNLESS AND UNTIL ANY PRIOR MORTGAGES ON THIS PROPERTY HAVE BEEN SATISFIED SO THAT TENANT'S PRIOR AGREEMENTS TO ATTORN TO SAID MORTGAGES AND/OR TO SUBORDINATE ITS LEASE TO SAID MORTGAGES SHALL HAVE BEEN EXTINGUISHED.

IN WITNESS WHEREOF, the parties hereto have duly executed this Subordination, Non-Disturbance and Attornment Agreement as of the day and year first above written.

**MORTGAGEE:**

ATTEST:                                      _____

By:_____    By:_____
Name:_____    Name:_____
Title:  (Assistant) Secretary           Title:   (Vice) President

[SEAL]

**TENANT:**

ATTEST:                                      BED BATH & BEYOND INC., a New
                                                     York corporation

By:_____    By:_____
Name: Alan M. Freeman                  Name:  Warren Eisenberg
Title:  (Assistant) Secretary           Title:   Co-Chairman

[SEAL]

G-4

1       **[INSERT APPROPRIATE JURAT FOR MORTGAGEE]**

2       _____

3       STATE OF NEW JERSEY          )
4                                    ) : ss.
5       COUNTY OF UNION              )

6               On this ___ day of _____, 20___, before me personally came Warren
7       Eisenberg to me known, who being by me duly sworn, did depose and say that he is the
8       Co-Chairman of Bed Bath & Beyond Inc., the corporation described in and which
9       executed the above instrument and that he signed his name thereto by order of the Board
10      of Directors of said corporation.

11
12                                               _____
                                                 Notary Public
13      My Commission Expires:
14
15
16      _____

17              _____

G-5

Exhibit H
Form of Recognition Agreement

THIS RECOGNITION AGREEMENT, made as of the _____ day of _____, 20__, by and between _____, having an address at _____ ("**Landlord**"); Bed Bath & Beyond Inc., a New York corporation, having an address at 650 Liberty Avenue, Union, New Jersey 07083 ("**Tenant**"); and _____, a [_____] [corporation] [limited] [general] [partnership], having an address at _____ ("**Subtenant**").

## R E C I T A L S:

A.     Landlord and Tenant have entered into a certain Lease Agreement (the "**Lease**") dated as of _____ ___, 20__, a short form of which has been recorded in _____ County, North Carolina, which demises certain premises (the "**Premises**") located in the Shopping Center known as Holly Springs Towne Center, which Shopping Center is more particularly described on Exhibit A annexed hereto and made a part hereof.

B.     Section 15.5 of the Lease provides that in the event Tenant subleases all of the Premises under certain conditions, Landlord shall, upon Tenant's request, execute and deliver a Recognition Agreement among Landlord, Tenant and each such subtenant in the form attached to the Lease, in recordable form.

C.     Pursuant to a Sublease dated as of _____ (the "**Sublease**"), Tenant has subleased the Premises to Subtenant (the "**Subleased Premises**").

D.     The parties hereto desire to effectuate the provisions of Section 15.5 of the Lease with respect to the Sublease and the Subleased Premises.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereto, intending to be legally bound hereby, agree as follows:

1.     Landlord warrants and represents as follows:

d.     that it is the fee owner of the Premises,

e.     that the Lease is unmodified (except as may be otherwise set forth in Exhibit B annexed hereto, if any) and is in full force and effect,

f.     that the term of the Lease expires on _____, but is subject to four renewal periods of five years each and

g.     that Tenant is not in default under the Lease nor has any event occurred which would after notice to Tenant and the passage of time become a default of Tenant under the Lease.

2.     Landlord hereby acknowledges receipt of a copy of, and consents to and approves, the Sublease and all of the terms, covenants and provisions thereof, and agrees that the exercise by Subtenant of any of its rights, remedies and options contained therein shall not constitute a default under the Lease.

3.     Landlord agrees that whenever it has an obligation with respect to the Premises, or its consent or approval is required for any action of Tenant under the Lease, then, to the extent such obligation, consent or approval relates to the Subleased Premises or Subtenant's use and occupation thereof, it will perform such obligation in accordance

H-1

with the terms and conditions of the Lease, and, subject to the applicable terms of the Lease, will not unreasonably withhold or unduly delay such consent or approval.

4.      Landlord shall not, in the exercise of any of the rights arising or which may arise out of the Lease or of any instrument modifying or amending the same or entered into in substitution or replacement thereof (whether as a result of Tenant's default or otherwise), disturb or deprive Subtenant in or of its possession or its rights to possession of the Subleased Premises or of any right or privilege granted to or inuring to the benefit of Subtenant under the Sublease, provided that Subtenant is not in default under the Sublease beyond the expiration of any applicable notice and cure period.

5.      In the event of the termination of the Lease by reentry, notice, conditional limitation, surrender, summary proceeding or other action or proceeding, or otherwise, or, if the Lease shall terminate or expire for any reason before any of the dates provided in the Sublease for the termination of the initial or renewal terms of the Sublease and if immediately prior to such surrender, termination or expiration the Sublease shall be in full force and effect, Subtenant shall not be made a party in any removal or eviction action or proceeding nor shall Subtenant be evicted or removed of its possession or its right of possession of the Subleased Premises be disturbed or in any way interfered with, and the Sublease shall continue in full force and effect as a direct lease between Landlord and Subtenant (provided, that in such event, Subtenant shall, for the then remainder of the term of the Sublease, pay fixed rent and additional rent in an amount equal to the greater of (x) the Fixed Rent and additional rent then payable under the Lease, prorated on the basis of the ratio which the Floor Area of the Subleased Premises bears to the Floor Area of the Premises, or (y) the fixed rent and additional rent then payable under the Sublease).

6.      Landlord hereby waives and relinquishes any and all rights or remedies against Subtenant, pursuant to any lien, statutory or otherwise, that it may have against the property, goods or chattels of Subtenant in or on the Subleased Premises.

7.      Any notices, consents, approvals, submissions, demands or other communications (hereinafter collectively referred to as "*Notice*") given under this Agreement shall be in writing. Unless otherwise required by law or governmental regulation, Notices shall be deemed given if sent by registered or certified mail, return receipt requested, or by any recognized overnight mail carrier, with proof of delivery slip, postage prepaid (a) to Landlord, at the address of Landlord as hereinabove set forth or such other address or persons as Landlord may designate by Notice to the other parties hereto, (b) to Tenant, at the address of Tenant as hereinabove set forth, with duplicate copies to Allan N. Rauch, Esq., c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, and

_____, or such other address or persons as Tenant may designate by Notice to the other parties hereto, and (c) to Subtenant, at the address of Subtenant as hereinabove set forth or such other address or persons as Subtenant may designate by Notice to the other parties hereto. During the period of any postal strike or other interference with the mails, personal delivery shall be substitute for registered or certified mail. All Notices shall become effective only on the receipt or rejection of same by the proper parties.

8.      No modification, amendment, waiver or release of any provision of this Agreement or of any right, obligation, claim or cause of action arising hereunder shall be valid or binding for any purpose whatsoever unless in writing and duly executed by the party against whom the same is sought to be asserted.

[Signature Page Follows]

H-2

9.    This Agreement shall be binding on and shall inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors, assigns and sublessees.

IN WITNESS WHEREOF, the parties have caused this Recognition Agreement to be executed under seal the date first above written.

<div align="center">

**LANDLORD**:

</div>

_____

By:_____
Name:_____
Title:_____

**TENANT**:

BED BATH & BEYOND INC., a New York corporation

By:_____
Name:  Warren Eisenberg
Title:   Co-Chairman

**SUBTENANT**:

_____

By:_____
Name:_____
Title:_____

<div align="center">

H-3

</div>

**[INSERT APPROPRIATE JURATS FOR <u>LANDLORD</u> AND <u>SUBTENANT</u>]**

_____

STATE OF NEW JERSEY        )
                           ) : ss.
COUNTY OF UNION            )

On this ___ day of _____, 20__, before me personally came Warren Eisenberg to me known, who being by me duly sworn, did depose and say that he is the Co-Chairman of Bed Bath & Beyond Inc., the corporation described in and which executed the above instrument and that he signed his name thereto by order of the Board of Directors of said corporation.

                                        _____
                                        Notary Public

My Commission Expires:

_____

_____

H-4

<u>Exhibit I</u>
<u>Form of Delivery Date Notice</u>
[Letterhead of Landlord]


_____, 20__


[via Federal Express or other
recognized overnight delivery
service per Article 18 of the foregoing
lease]

Bed Bath & Beyond Inc.
650 Liberty Avenue
Union, NJ 07083
Attn: Warren Eisenberg

Re:   Lease Agreement dated as of _____, 20__ (the "***Lease***"), between KRG New
      Hill Place, LLC, as landlord ("***Landlord***"), and Bed Bath & Beyond Inc., as tenant
      ("***Tenant***"), with respect to certain retail premises (the "***Premises***") located in the
      Shopping Center known as Holly Springs Towne Center

      Gentlemen:

      In accordance with the provisions of Subsection 2.3.2 of the Lease, the Landlord
hereby informs the Tenant that the Delivery Date shall take place at 8:00 A.M. on
_____, 20__.  This notice shall constitute the Delivery Date Notice referred to in
Subsection 2.3.2 of the Lease.

                                 KRG NEW HILL PLACE, LLC, an Indiana
                                 limited liability company


                                 By:_____
                                 Name:
                                 Title:

cc:   Margaret F. Black, Esq.
      Allan N. Rauch, Esq.


I-1

2429134 v3 Holly Springs - Lease

Exhibit J
Form of Delivery Date Certification


[Letterhead of Landlord]


_____, 20__


[via Federal Express or other
recognized overnight delivery
service per Article 18 of the foregoing
lease]

Bed Bath & Beyond Inc.
650 Liberty Avenue
Union, NJ 07083
Attn: Warren Eisenberg

Re:   Lease Agreement dated as of _____, 20__ (the "**Lease**"), between KRG New
      Hill Place, LLC, as landlord ("**Landlord**"), and Bed Bath & Beyond Inc., as tenant
      ("**Tenant**"), with respect to certain retail premises (the "**Premises**") located in the
      Shopping Center known as Holly Springs Towne Center

      Gentlemen:

          In accordance with the provisions of Subsection 2.3.3 of the Lease, Landlord
hereby certifies to Tenant that, as of the date of this certification, all of the Delivery Date
Conditions (as defined in the Lease) have been satisfied, and that, as a result, the Delivery
Date (as such term is defined in the Lease) will be deemed to be _____, 20__ .
This notice shall constitute the Delivery Date Certification referred to in Subsection 2.3.3
of the Lease.

                              KRG NEW HILL PLACE, LLC, an Indiana
                              limited liability company


                              By:_____
                              Name:
                              Title:


cc:   Margaret F. Black, Esq.
      Allan N. Rauch, Esq.


J-1

## Exhibit K-1

## Existing Exclusives

**Charming Charlie** (As used in the Charming Charlie Lease, the "Shopping Center" is defined as the entire Complex)

Subject to rights of tenants under any existing leases and any renewals, assignments or extensions thereof and provided that Tenant (i) is not in default under the Lease beyond any applicable notice and cure period, and (ii) is continuously operating in the Premises (except for permitted closures due to casualty, condemnation, alterations, holidays, inventory, maintenance or repair), Landlord shall not enter into a lease that would permit the tenant or purchaser thereunder to engage in the "Restricted Use," as hereinafter defined, in any or all of the Shopping Center, excluding outparcels (the "Exclusive Use Restriction"). "Restricted Use" shall mean the operation of a retail store selling women's fashion jewelry as sold in a majority of Tenant's other stores as of the Effective Date and excluding the sale of fine jewelry, gold, diamonds and other precious gems. The aforementioned Exclusive Use Restriction shall not apply to any tenant in the Shopping Center (i) occupying less than 1,500 square feet; or (ii) occupying 1,500 square feet or more, and whose yearly gross sales in such store from the sale of items covered by the Restricted Use comprise less than fifty percent (50%) of the total gross sales in such store. The Exclusive Use Restriction shall also not apply to (i) Incidental Sales (as defined below); (ii) Love Culture, Apricot Lane, Coldwater Creek, J.Jill, Ann Taylor/Loft, Talbots, Victoria's Secret, Lane Bryant Claire's Boutique (or stores operated by Claire's), ULTA, Kay Jewelers, Piercing Pagoda, Dollar Tree, Justice, Fashion Bug, Catherines, Avenue, Rue 21, Coach, any costume store, or any store selling primarily shoes; or (iii) any tenant occupying more than 10,000 square feet; provided, however, that subject to the first sentence of this paragraph, the Exclusive Use Restriction shall apply to an "Accessory Superstore" occupying more than 10,000 square feet. For purposes of this Exclusive Use Rider, the term "Accessory Superstore" shall mean any retail store occupying more than 10,000 square feet that derives greater than fifty percent (50%) of its annual gross sales from the sale of women's fashion accessories other than apparel (i.e., in no event shall the sale of apparel be included in determining such fifty percent (50%) threshold). The term "Incidental Sales" as used herein shall mean the sale by another tenant of items covered by the Exclusive Use Restriction from the lesser of (i) 200 square feet of surface display area, or (ii) 5% of the aggregate leasable retail area leased or occupied by such tenant; provided that in each such case the "Incidental Sales" are related to the primary retail use of such tenant's premises.

Notwithstanding anything to the contrary herein, in no event shall Landlord lease any space in the Shopping Center to any entity operating under the following trade names: (i) Compass Trading Co., (ii) Versona, (iii) Accessorize, or (iv) Francesca's Collection, and any lease to any of such entities shall be deemed to be a violation of the Exclusive Use Restriction.

**The Children's Place** (As used in The Children's Place Lease, the "Shopping Center" is defined as the entire Complex)

(d)    Notwithstanding anything contained to the contrary herein, Landlord shall not permit a tenant or other occupant of the Shopping Center to sell, as a primary business (51% or more), children's apparel (the "Protected Use"). The foregoing use restriction shall not apply to: (i) retail tenants with premises equal to or greater than ten thousand (10,000) square feet; (ii) those stores operated under the trade name Justice for Girls, Rue 21, Claire's, Aeropostale, American Eagle, and Abercrombie and Fitch; or (iii) tenants with premises located in Phase II of the Shopping Center provided that such Phase II tenants have a price point of at least $10.00 greater than Tenant's.

K-1-1

**Dick's Sporting Goods** (As used in the Dick's Sporting Goods Lease, the "Shopping Center" is defined as the entire Complex)

(a)     Landlord agrees that, during the term of this Lease, it has not and will not, nor will any entity under common control with Landlord, enter into any lease, license agreement or other similar agreement nor permit any premises in the Shopping Center (other than the Demised Premises) or any land adjacent to or contiguous (but for roadways or access ways) to the Shopping Center which is owned or otherwise controlled by Landlord or a parent, subsidiary or affiliate of Landlord or in which any officer, partner, director or owner of Landlord has any interest (collectively, the "Restricted Property"), or otherwise transfer or allow a possessory interest in the Restricted Property to an Occupant to be used for the sale, rental and/or distribution, either singly or in any combination of (i) health, fitness and/or exercise equipment; (ii) sporting goods and sporting equipment (including, but not limited to, golf equipment and accessories); (iii) hunting, camping and fishing equipment and accessories; and/or (iv) athletic footwear ("Precluded Use Activity(ies)")

(b)     Notwithstanding the foregoing Precluded Use Activity(ies) set forth in Subsection (a) above, the retail sale and/or distribution of the Precluded Use Activity(ies) in the lesser of (i) five percent (5%) in the aggregate of any such Occupant's LFA (which shall include an allocable portion of the aisle space adjacent to such sales floor area of such use) or (ii) two thousand (2,000) square feet in the aggregate of such Occupant's LFA (which shall include an allocable portion of the aisle space adjacent to such sales floor area of such use) shall be permitted. Furthermore, Landlord may lease space for either a DSW Shoe Warehouse or an Off Broadway Shoes, provided: (x) such user operates in at least 12,500 square feet; (y) such space is operated as a typical DSW Shoe Warehouse or Off Broadway Shoes; and (z) during the original term, such user may not be located adjacent to the Demised Premises.

**Frank Theatre** (As used in the Frank Theatre Lease, the "Shopping Center" is defined as the entire Complex)

Subject to rights of tenants under any existing leases and any renewals, assignments or extensions thereof (provided that no such other tenants shall have any rights with respect to the operation of the Restricted Use defined in Section 7.8(a)(i) below). Landlord shall not enter into a lease nor execute and consummate a purchase agreement that would permit the tenant or purchaser thereunder to engage in the "Restricted Use," as hereinafter defined, during the "Restricted Period," as hereinafter defined, in any or all of the "Restricted Area," as hereinafter defined (the "Exclusive Use Restriction").

(a)     "Restricted Use" shall mean (i) the exhibition and display of motion pictures and projected digital concerts or performances, (ii) the sale of prepared, ready-to-eat popcorn, (iii) a business operation whose primary purpose is the sale of pre-packaged candies other than chocolates and other fine candies, and (iv) the operation of a bowling alley or alleys.

(b)     "Restricted Area" shall mean the entire Shopping Center.

Nothing herein shall prevent Landlord from entering into a lease or executing and consummating a purchase agreement that would permit a tenant or purchaser to operate: (A) an electronic goods store or any business selling or renting motion pictures through any means, which stores may exhibit all or portions of motion pictures on televisions or monitors displayed for sale or otherwise, so long as no admission is charged in connection with such exhibition; or (B) any business which sells uncooked popcorn, or pre-packaged popcorn prepared off-premises; or (C) any business selling chocolates or other fine candies, or bulk candies for sale by the pound; or (D) a supermarket or grocery store; or (E) a drug store or pharmacy. Furthermore, the Restricted Uses in (ii) and (iii) of Section 7.8(a) shall not apply to any occupant of the Shopping Center operating in excess of 15,000 square feet of space. Landlord does hereby agree that throughout the Restricted Period Landlord shall not develop or lease any real property within the Five-Mile Radius for the Restricted Use described in Section 7.8(a)(i) unless such property is part of an integrated center which is developed for uses in addition to such Restricted Use.

K-1-2

JoS. A. Bank (As used in the JoS A. Bank Lease, the "Shopping Center" is defined as the entire Complex)

(a)     Subject to rights of tenants under any existing leases and any renewals, assignments or extensions thereof and provided that Tenant (i) is not in default hereunder, (ii) is continuously operating in the Leased Premises (except for permitted closures due to casualty, condemnation, alterations, maintenance or repair), and (iii) has not assigned the Lease or sublet the Leased Premises, Landlord shall not enter into a lease or sale agreement that would permit the tenant or purchaser thereunder to engage in the "Restricted Use" (as hereinafter defined) in any or all of the Shopping Center, excluding outparcels, as its primary purpose (the "Exclusive Use Restriction"). "Restricted Use" shall mean the sale of men's traditional business apparel. The aforementioned Exclusive Use Restriction shall not apply (i) to any Anchor Tenant (a tenant in the Shopping Center occupying more than fifteen thousand [15,000] square feet), (ii) to any tenant in the Shopping Center who executed a lease prior to the Effective Date hereof, and (iii) during any holdover period by Tenant. Nothing herein shall prevent Landlord from entering into a lease or executing and consummating a purchase agreement that would permit a tenant or purchaser to operate: Bobby Chan, Hugo Boss, Guy La Ferrera (or a retail tenant with less than 10 locations selling high end business suits and high end menswear, i.e., Hickey Freeman, Armani, Brioni products); Theory, Ermenegildo Zenga, Salvatore Ferragamo, Zara, Calvin Klein, Cole Haan, Banana Republic, J. Crew, Armani, Kenneth Cole, Johnston and Murphy, Guess, Tommy Bahama or Express). In no event shall the Exclusive Use Restriction prohibit in any way the sale of shoes or restrict any business that produces and/or sells custom-made tailored suits or other apparel.

Kay Jewelers (As used in the Kay Jewelers Lease, the "Shopping Center" is defined as the entire Complex)

If Landlord enters into a lease with any other tenant, excluding Tenant, whose Primary Use is the sale of jewelry, ("Primary Use" shall be defined as more than ten percent (10%) of its sales floor area devoted to the sale of 10k or better, gold, white gold, platinum, or other precious metals, diamonds or colored gem stones), then said condition shall be defined as a "Jewelry Competitive Event". If a Jewelry Competitive Event occurs and provided that Tenant is not in default beyond any applicable notice and cure period hereunder, Tenant shall immediately pay, Alternative Rent (as defined below).

If this Jewelry Competitive Event continues for twelve (12) months or more, Tenant may terminate this Lease upon thirty (30) days written notice to Landlord, or if Tenant chooses not to terminate, Tenant shall continue to operate and resume payment of full Minimum Rent and Additional Rent owed hereunder. If Tenant terminates said Lease, Landlord shall reimburse Tenant for Tenant's unamortized leasehold improvements less the unamortized amount of the Tenant Allowance. This covenant is not an "exclusive", but rather a personal covenant between Landlord and Tenant, and this covenant shall not (i) restrict any tenant from changing its use or subleasing its premises or assigning its lease to a party that will compete with Tenant's Use, (ii) prohibit Landlord from entering into a lease containing an "open" use clause or other use clause not restricting a tenant's use, (iii) apply to any tenant over 10,000 square feet (iv) apply to any tenant specializing in the sale of fashion jewelry and related accessories such as, by way of example only, Charming Charlie, Claire's and Francesca's and similar type tenants, provided that any such tenants do not engage in Tenant's Primary Use, or (v) apply to any other leases at the Shopping Center in existence as of the date hereof.

K-1-3

**Massage Envy.** (As used in the Massage Envy Lease, the "Shopping Center" is defined as the entire Complex)

Subject to rights of tenants under any existing leases (a list of which Landlord shall have provided to Tenant prior to the execution of this Lease) and any renewals, assignments or extensions thereof, Landlord shall not enter into a lease nor execute and consummate a purchase agreement that would permit the tenant or purchaser thereunder to engage in the "Restricted Use," as hereinafter defined, during the "Restricted Period," as hereinafter defined, in any or all of the "Restricted Area," as hereinafter defined (the "Exclusive Use Restriction")

1. "Restricted Use" shall mean the operation of a business performing massage therapy and/or muscle therapy as a primary business, such that the revenues achieved by such business from performing massage therapy exceeds twenty percent of the total gross sales of such business determined on an annual basis.

2. "Restricted Area" shall mean the Shopping Center.

Nothing herein shall prevent Landlord from entering into a lease or executing and consummating a purchase agreement that would permit a tenant or purchaser to operate a chiropractic center, spa, salon, a business providing non-customized or standard facials, medical office, fitness center, exercise studio, provided that such tenant or purchaser's business derives less than twenty percent of its gross sales from the performance of massage and/or muscle therapy and customized facials.

The Exclusive Use Restriction shall not apply to any tenant in the Shopping Center occupying more than six thousand square feet or amount of space in the Shopping Center expressly permitted or authorized by a court of competent jurisdiction. In the event

**Marshall's** (As used in the Marshall's Lease, the "Landlord's Parcel" is defined as the entire Complex, less any parcel not owned by Landlord)

(B) Landlord agrees that, from the date hereof until expiration of the term of this lease, no other premises in the Landlord's Parcel shall at any time contain more than (i) fifteen thousand (15,000) square feet of floor area therein used or occupied for, or devoted to, the sale or display of off-price apparel and related accessories, and/or (ii) eight thousand (8,000) square feet of floor area therein used or occupied for, or devoted to the sale or display of shoes, footwear and related accessories (all of the foregoing hereinafter referred to as a "Competing Use" and the merchandise referred to therein as the "Protected Merchandise". The computation of such floor area shall include one half (1/2) of all floor area in any aisles, corridors or similar spaces adjacent to or abutting any racks, gondolas, shelves, cabinets, counters or other fixtures or equipment containing or used for the sale or display of the Protected Merchandise. Notwithstanding the foregoing, in the event that the Demised Premises are open and operating with a primary use other than the sale of apparel and/or shoes, then so long as such other use is continuing, Landlord may lease premises within the Landlord's Parcel for uses which would otherwise be prohibited by the foregoing provisions of this paragraph.

All of the foregoing uses described in this Paragraph 4(B) are hereinafter collectively referred to as a "Competing Use" and the merchandise referred to therein as the "Protected Merchandise". However, the following retailers shall not be deemed a Competing Use and shall be permitted within the Landlord's Parcel: T.J. Maxx, T.J. Maxx 'N More, Marshalls, Mega Marshalls, Ross Dress for Less, Bed Bath & Beyond, Dick's Sporting Goods and one (but not both) of either Off Broadway or DSW. Further, the foregoing use restriction shall not apply to retail space owned, operated or leased within the Shopping Center consisting of forty thousand (40,000) square feet or more.

K-1-4

**Michaels** (As used in the Michaels Lease, the "Shopping Center" is defined as the entire Complex)

16.4.   Exclusive Use.

16.4.1   Limitation on Use.   Neither Landlord nor any entity controlled by Landlord will use, lease (or permit the use, leasing or subleasing of) or sell any space in or portion of the Shopping Center (other than the Premises) or any property contiguous to the Shopping Center (including, without limitation, any property that would be contiguous or adjacent to the Shopping Center but for any intervening road, street, alley or highway) owned or controlled now or at any time hereafter by Landlord or any affiliate of Landlord, for any "craft store", store selling arts and crafts, art supplies, craft supplies, picture frames or picture framing services, framed art, artificial flowers and/or plants, artificial floral and/or plant arrangements, holiday themed décor, decorations and costumes, wedding goods (except apparel), party goods, scrapbooking/memory book store, or a store selling scrapbooking/memory book supplies, accessories, and/or decorations or other papercrafting (e.g. making greeting cards, gift bags, tags, and other related or similar items) supplies, accessories and/or decorations associated with the foregoing, or providing classes on any of the foregoing or any combination of the foregoing categories, or any store similar to Tenant in operation or merchandising.   This Section 16.4.1 shall not apply to (i) any lessee whose lease was fully executed on the Effective Date hereof and is identified on Exhibit I as an "Existing Lease Not Subject to Tenant's Exclusive; provided, however, that this exception shall not apply if (a) Landlord permits or agrees to an expansion of the premises for any such permitted use which violates Tenant's exclusive, or (b) Landlord permits or agrees to the change of a permitted use by any such lessee or its successors or assigns, or (c) Landlord permits or agrees to  an assignment or sublease of such existing lease if Landlord may avoid the granting of such permission, or (d) Landlord has the right, by virtue of the provisions of the existing lease, to cause said lessee to honor the exclusive granted to Tenant by giving said existing lessee notice of this exclusive or otherwise, or (ii) to any lessee for which the sale of a product or service covered by Tenant's exclusive is merely incidental to such lessee's primary use, with the term "incidental" being defined as the devotion of not more than the lesser of (a) one thousand (1,000) Leasable Square Feet (inclusive of allocable aisle space and linear space) to the display of the products and services covered by Tenant's exclusive or (b) ten percent (10%) of said lessee's Leasable Square Feet; provided, in no event shall this exception for incidental use apply to custom framing services, it being the intention that no other lessee or occupant of the Shopping Center shall be permitted to offer custom framing services and in no event shall this exception for incidental use apply to any temporary or seasonal store or dollar store which operates within Phase II of the Shopping Center (it being agreed that, pursuant to Exhibit I, temporary or seasonal stores and dollar stores are not permitted to operate within Phase I of the Shopping Center).   This Section 16.4.1 shall also not prohibit the operation of a typical Target store, Marshalls, Babies "R" Us/Toys "R" Us or a typical Hallmark or Cardsmart store in the Shopping Center as such stores are typically operated as of the Effective Date.   If Landlord enters into a lease with Ross Stores ("Ross") for space in the Shopping Center prior to the date Tenant's store opens in the Shopping Center, then for so long as the lease with Tenant is in effect and for so long as Tenant uses its premises as an "arts and crafts store" Tenant's exclusive as set forth in this Section 16.4.1 shall not apply to Ross and its assignees and sublessees except that Ross and its assignees and sublessees shall not use its premises as an "arts and crafts store", and no portion of the Ross premises may be devoted to performing picture framing services.   The term "arts and crafts store" means a store whose primary use is the sale of arts and crafts, art supplies, craft supplies, picture frames, framed art, artificial flowers and/or plants, artificial floral and/or plant arrangements, wedding or party goods (except apparel).   If Landlord enters into a lease with Ross for space in the Shopping Center subsequent to the date Tenant's store opens in the Shopping Center, then Tenant shall, within thirty (30) days after receipt of Landlord's written request, execute such agreement (if any) which is then customarily executed by Tenant with respect to the application of Tenant's exclusive against Ross for situations within which Tenant and Ross both operate.

Tenant hereby agrees to waive any claim of a violation of Tenant's exclusive as set forth in this Section 16.4.1 arising out of the operation in the Shopping Center of a typical Pier 1 Imports store as such stores typically operate from time to time, provided, however, in no event shall such Pier 1 Imports store provide picture framing services, operate an arts and crafts store as its primary use, or devote more than the lesser of (i) 1,500 Leasable Square Feet, or (ii) ten percent (10%) of its Leasable Square Feet in the Shopping Center, in the aggregate, to the sale of frames, artificial flowers, artificial floral arrangements, wedding or party goods.

K-1-5

<u>Petco Animal Supplies</u>  (As used in the Petco Lease, the "Shopping Center" is defined as the entire Complex).

10.    (a) NON-COMPETITION

So long as Tenant (i) is then open and operating for business in substantially all of the Premises for the Pet Related Uses (subject to temporary disruptions due to alterations, casualty, condemnation or any other reason beyond Tenant's reasonable control); and/or (ii) has not been in default under this Lease beyond applicable notice and cure periods, Landlord covenants and agrees that during the term of this Lease, Tenant shall have the exclusive right to engage in any and/or all aspects of the sale of pet food and supplies, live animals, grooming, training and/or veterinary services in the Shopping Center, except for (i) Target, (ii) any grocery store operating in at least twenty-five thousand (25,000) square feet of contiguous leasable floor area in the Shopping Center, (iii) a Fresh Market, Whole Foods or Trader Joe's grocery store (and such three (3) named grocers shall be exempt from the foregoing size restriction), and (iv) incidental sales.  As used herein incidental sales means the sale or display for sale of such items or services not as the primary use of the competing tenant and taking up no more than five hundred (500) square feet of such tenant's leasable floor area.  This covenant shall run with the land on which the Shopping Center is located so long as the Premises are used as a pet food and supply store.  Landlord agrees not to sell to, lease to, nor approve any sublease or assignment of lease, or change in use, unless prevented by the terms of any lease then currently in force and effect, for any tenant, sub-tenant, assignee or user that would use its premises for any and/or all aspects of the Pet Related Uses, except to the extent permitted in this *Paragraph 10(a)*.  Landlord agrees at its sole cost and expense to promptly and continuously enforce this non-competition covenant using all reasonable legal means.  Tenant agrees that Landlord shall not be deemed to be in violation of the provisions of this *Paragraph 10(a)* if a tenant or occupant of the Shopping Center shall engage in any business for which Tenant shall have the exclusive right to engage in hereunder, but such tenant or occupant shall, in so doing, be in violation of its lease or other occupancy agreement with Landlord, so long as Landlord shall have undertaken reasonable

<u>Starbucks</u>  As used in the Starbucks Lease, the "Property" is defined as the entire Complex)

5.4  EXCLUSIVITY.  Landlord shall not use or allow any other person or entity (except Tenant) to use any portion of the Property for the sale of: (a) whole or ground coffee beans, (b) espresso, espresso-based drinks or coffee-based drinks, (c) tea or tea-based drinks, (d) brewed coffee except that other tenants may sell non-gourmet, non-brand identified brewed coffee or brewed tea.  For purposes of this Lease, "gourmet" shall be defined as (a) beverages made using Arabica beans or (b) sourced from a gourmet coffee brand such as Coffee Bean & Tea Leaf, Intelligentsia, Peets, Caribou or other coffee purveyor.  For purposes of this Lease, "brand identified" shall mean beverages advertised or marketed within the applicable retail space using a brand name.  If Landlord breaches its covenants under the first sentence of this Section 5.4 (which breach shall not include a situation in which the lease between Landlord and any tenant in the Shopping Center prohibits the tenant from violating the exclusive rights granted to Tenant in this Section 5.4 and despite such prohibition, such tenant violates such exclusive rights), in addition to all of Tenant's other rights and remedies contained in this Lease, Tenant shall be

K-1-6

Notwithstanding the foregoing, other tenants may sell pre-bottled tea or pre-bottled tea-based beverages. Any tenant (or its assignees or sublessees) in the Shopping Center with a lease which predates the date of this Lease (and any renewals or extensions thereof), which existing tenants, with a statement of their permitted use clauses, are set forth on **Exhibit H** attached hereto and by this reference incorporated herein, shall not be subject to Tenant's exclusive use restriction set forth herein, if and to the extent that any such existing tenant (or its assignees or sublessees) is permitted by its lease to sell any of Tenant's exclusive use items; provided, however, that with respect to the tenants set forth on **Exhibit H**, Landlord agrees that to the extent Landlord has reasonable control over any such tenant's use and changes in use or assignment or subletting of the Premises, Landlord shall exercise such control to enforce and protect Tenant's exclusive use rights described herein. Non full-line grocery store tenants occupying at least twenty thousand (20,000) contiguous square feet operating under a single trade name and full-line grocery store tenants occupying at least thirty thousand (30,000) contiguous square feet operating under a single trade name shall not be subject to Tenant's exclusive so long as any such anchor or grocery store tenant at all times occupies and operates out of the foregoing minimum square footage, does not have a separate entrance or exterior signage for the sale of Tenant's exclusive items, or otherwise advertises, in a manner visible from the exterior of such tenant's space, the sale of Tenant's exclusive items.

Notwithstanding anything to the contrary herein, full service, sit-down restaurants with a wait staff and table service serving a complete dinner menu may sell, in conjunction with a sale of a meal, brewed coffee or tea and hot espresso drinks for on-premises consumption only. Furthermore, tenants such as Newk's, Bear Rock Café, Panera Bread Co., Atlanta Bread Company, Caal, La Madeleine, Bruegger's Bagels, Einstein's Bros., or other similar concepts whose primary use is the sale of bagels, sandwiches, salads and soups are not subject to Tenant's exclusive set forth in this Section 5.4.

**Tijuana Flats** (As used in the Tijuana Flats Lease, the "Shopping Center" is defined as the entire Complex; Phase II of the Shopping Center is the "Shopping Center" as defined in this Lease; and the fifth lease year of the Tijuana Flats lease term expires on April 30, 2018)

Subject to rights of tenants under any existing leases and any renewals, assignments or extensions thereof, Landlord shall not enter into a lease nor execute and consummate a purchase agreement that would permit the tenant or purchaser thereunder to engage in the "Restricted Use," as hereinafter defined, during the "Restricted Period," as hereinafter defined, in any or all of the "Restricted Area," as hereinafter defined (the "Exclusive Use Restriction").

1.    "Restricted Use" shall mean the operation of a Tex-Mex restaurant the primary purpose of which is the sale of southwestern style food. As used herein the term "Mexican Restaurant" shall mean thirty-five percent or more of typical annual gross sales from the sale of Mexican food products, including by not limited to burritos, chimichangas, enchiladas, quesadillas, nachos and tacos.

2.    "Restricted Area" shall mean those portions of the Shopping Center depicted on Exhibit A as Phase I (excluding those areas depicted thereon as "PBA" areas within Phase II, and Phase II, excluding any outlot area therein; provided, however, that after the expiration of the fifth Lease Year, the Restricted Area shall include any portion of the Shopping Center located in Phase II of the Shopping Center as shown on Exhibit A.

Nothing herein shall prevent Landlord from entering into a lease or executing and consummating a purchase agreement that would permit a tenant or purchaser to operate a restaurant whose annual gross sales of southwestern or Mexican style food for on and off premises consumption do not exceed thirty-five percent of such restaurant's total, annual gross sales, including Chipotle, Qdoba, Salsaritas, Baja Fresh, Lime, Pancheros, California Tortilla and Willies.

The Exclusive Use Restriction shall not apply to any restaurant operating any outparcel or to any counter service of so-called fast food retailer, including, but not limited to Taco Bell, Cookout, Don Pedro Mexican Restaurant, Cantina, Laredo, Chuy's, On the Border, Cantina 1511, El Pollo Loco, Taco Mac Bar and Grill or to any tenant in the Shopping Center occupying more than five thousand square feet or any use of space in the Shopping Center expressly permitted or authorized by a court of competent jurisdiction. Landlord shall have no liability for any violation of the Exclusive Use Restriction if a tenant or occupant of the

K-1-7

**<u>Ulta Salon</u>** (As used in the Ulta Salon Lease, the "Shopping Center" is defined as the entire Complex)

5.4 **Tenant's Exclusive Rights.** Tenant shall have the exclusive right ("Tenant's Exclusive") to conduct any portion of Tenant's Protected Uses in the Shopping Center, and all other tenants or other occupants of any portion of the Shopping Center shall be prohibited from engaging in any portion of Tenant's Protected Uses for so long as Tenant is operating any portion of Tenant's Protected Uses in the Premises (excepting Permitted Closures). Notwithstanding the foregoing, Tenant's Exclusive shall not apply to uses associated with (a) existing tenants in the Shopping Center who are as of the Effective Date entitled to sell such products and/or provide the services that are covered by Tenant's exclusive rights pursuant to their respective leases and, except to the extent Landlord has any control thereover, their respective assignees, subtenants and licensees, (b) any national retail tenant in excess of twenty-five thousand (25,000) square feet that sells the goods and/or provides the services that are covered by Tenant's exclusive rights as a part of its normal business operations, but not as its primary use, (c) incidental sales (less than 200 square feet total of such tenant's premises is used to sell any of the products that comprise Tenant's Protected Uses), (d) stores such as Great Clips and Fiesta Hair primarily providing discount hair cuts, (e) a day spa not in excess of five thousand (5,000) square feet, (f) stores such as Massage Envy primarily providing therapeutic massage services, (g) stores primarily providing tanning services, (h) a store primarily selling Aveda private label products, (h) stores such as Sport Clips primarily providing hair cuts to men and (i) stores primarily providing hair cuts to children. The specific exceptions to Tenant's Exclusive set forth in clauses (d) through (i) above, however, shall not be deemed or construed to approve such retailers from otherwise using their premises for any of Tenant's Protected Uses, except for incidental sales as permitted under clause (c) above. Additionally, notwithstanding the foregoing, Tenant's Exclusive shall not apply to the Target parcel as identified on the Site Plan.

---

30. "<u>Tenant's Protected Uses</u>" shall mean (i) the retail sale of cosmetics, fragrances, health and beauty products, hair care products and accessories, personal care appliances, skin care products, and body care products; and (ii) the operation of a full service beauty salon. The term "full service beauty salon" for purposes of this Section shall be defined as the offering of any of or a combination of the following services: hair care (including, without limitation, cutting, styling, hair treatments, highlighting, tinting, coloring, texturizing, smoothing and hair extensions); facials; esthetician services; skin care services (skin treatments for face and body); beauty treatments/services; hair removal (including, without limitation, waxing, threading and tweezing for face and body); eye lash extension services; nail services; and therapeutic massage.

---

The foregoing restrictions are subject to the Side Letter between the retailer doing business as Ulta Salon and Tenant, dated March 26, 2014.

Exhibit K-2

Existing Leases

- Buffalo Wild Wings
- Charming Charlie
- D'Andrea's Deli
- The Children's Place
- Dick's Sporting Goods
- Dress Barn
- Eye Care Associates
- Frank Theatres
- Friendly Dental
- GNC
- Hallmark
- JoS A. Bank
- Kay Jewelers
- Marshalls
- Massage Envy
- Mattress Firm
- Michaels
- Olive Garden (Not a tenant but owns its parcel within the Complex)
- Orange Leaf Frozen Yogurt
- Petco
- Pier 1 Imports
- Platinum Nail Spa
- rue21
- Sleepy's
- Sport Clips
- Sprint
- Starbucks
- Target (Not a tenant but owns its parcel within the Complex)
- Tijuana Flats
- Ulta Salon
- Verizon
- Wendy's
- Which Wich?
- Zaxby's

K-2-1

<u>Exhibit L</u>

<u>Alternate Rent</u>

1.     During the applicable period(s) described within Sections 2.4 and/or 2.5 and/or Article 22 of the Lease, Tenant shall pay as "***Alternate Rent***" an amount equal to three (3%) percent of all "Gross Sales" (hereinafter defined) resulting from business conducted in, on or from the Premises, not to exceed fifty percent (50%) of the amount of Fixed Rent which otherwise would have been payable during such period (the "***Cap***") <u>provided that</u> if during such applicable periods, Tenant is not open and operating a retail business in the Premises (other than prior to the Rent Commencement Date or during Excused Periods), then Alternate Rent shall be fifty percent (50%) of the amount of Fixed Rent which otherwise would have been due and payable during such period.

2.     As used herein, the term "***Gross Sales***" shall mean the total amount of all sales of merchandise or services completed at the Premises by Tenant or any sublessee, licensee or concessionaire of Tenant and any other person or entity operating in the Premises (for purposes of this Paragraph 2 only, collectively, "***Tenant***"), whether for cash, credit or otherwise, including redemption of gift certificates and gift cards (regardless of where or how such gift certificates and gift cards were purchased).  Tenant shall record, at the time of each Gross Sale, all receipts from such sale, whether for cash, credit or otherwise, in a cash register or cash registers, or in such electronic or computer device which records sales in a manner which is generally acceptable by industry standards.  The term "*Gross Sales*" shall <u>exclude</u>: **(1)** proceeds from any sales tax, gross receipts tax or similar tax, by whatever name called, which are separately stated and are in addition to the sales price, **(2)** *bona fide* transfers or exchanges of merchandise from the Premises to any other stores or warehouses of Tenant or any Affiliates of Tenant, and returns to shippers and manufacturers for credit, **(3)** refunds or credits given to customers for merchandise returned or exchanged at the Premises (regardless of where or how purchased), **(4)** sales of Tenant's fixtures and equipment not in the ordinary course of Tenant's business, **(5)** to the extent of prior inclusion in Gross Sales, bad debts when written off the books of Tenant, provided that any collections made on account of such bad debts shall be included in Gross Sales when received, **(6)** receipts from vending machines installed solely for the use of Tenant's employees and receipts from pay telephones, **(7)** sales to employees of Tenant at discount [which, for the purposes of determining Alternate Rent hereunder, shall not exceed two percent (2%) of Gross Sales per calendar year or pro rata portion thereof, as applicable], **(8)** fees paid to independent third party credit card, charge card, and debit card companies in connection with sales charged to or debited from customers' credit cards, charge cards, or debit cards, as applicable, **(9)** proceeds from delivery, gift-wrapping and check cashing charges [which, for the purposes of determining Alternate Rent hereunder, shall not exceed two percent (2%) of Gross Sales per calendar year or pro rata portion thereof, as applicable], **(10)** sums and credits received in settlement of claims for loss or damage to merchandise, **(11)** separately stated service, finance and interest charges, **(12)** the dollar value of coupons utilized by customers in the purchase of merchandise from the Premises, **(13)** close-out or bulk sales of inventory to jobbers or wholesalers, **(14)** sales of gift certificates or gift cards, and **(15)** forfeited deposits.

3.     Alternate Rent shall be payable within thirty (30) days after the end of the calendar month to which it pertains.  If the Alternate Rent for a calendar month does not exceed the Cap, such payment shall be accompanied by a statement prepared by an officer of Tenant setting forth the amount of Gross Sales achieved during, and the amount of Alternate Rent payable for, such month.

4.      Tenant shall maintain at the Premises or at its principal office, complete books and records reflecting all elements of Gross Sales. Tenant shall be permitted to maintain its books and records in a computerized form; provided, however, that (A) such computerized books and records provide the same level of information as the books and records described above and are retained for the full record retention period provided for herein, and (B) promptly upon request, printed copies of any such books and records shall be made available at Tenant's principal office for inspection by Landlord's representatives who are engaged in inspecting and/or auditing Tenant's books and records as provided herein. Such books and records shall be kept in accordance with generally accepted accounting principles and practices consistently applied and shall be retained by Tenant for not less than one (1) year following the end of the calendar year to which they refer.

5.      Provided that the Alternate Rent payable for a calendar month does not exceed the Cap, Landlord and/or its auditor shall have the right, upon at least thirty (30) days prior notice to Tenant, to inspect and/or audit Tenant's records relating solely to Gross Sales achieved in the Premises for such calendar month.

6.      Landlord shall not disclose to any third party Tenant's Gross Sales or the amount of Alternate Rent paid or payable by Tenant, provided, however, that (A) such information was not previously disclosed by Tenant to such third party or to the public generally, and (B) nothing contained herein shall restrict Landlord from disclosing such information as may be required by law, or to its accountants, attorneys, *bona fide* prospective purchasers, or current or prospective Mortgagees or Ground Lessor(s) of all or any portion of Landlord's interest in the Shopping Center (provided that each of such recipients shall be bound to the same non-disclosure provisions as are imposed upon Landlord).

**Exhibit M-1**

**Tenant Prohibited Uses**

As used in this Lease, the term "Tenant Prohibited Uses" shall mean any of the uses prohibited in the Shopping Center by the OEA, as set forth on Schedule 1 attached hereto, and any of the following uses:

(1)     any use that causes vibrations that can be heard and/or felt in the Common Areas or other premises; or any facility which is illegal or dangerous, constitutes a nuisance, emits offensive odors, fumes, dust, vapors, loud noise, sounds or vibrations or is inconsistent with community oriented first-class shopping centers in the metropolitan area in which the Premises are located;

(2)     "Business Office" (defined as an office not providing services directly to consumers) or "Retail Office" (defined as an office providing services directly to consumers (i.e., financial institutions, real estate or stock brokerage, title companies, travel and insurance agencies, and medical, dental and legal clinics)); provided, however, that office space used by an occupant for administrative purposes and which is not open to the general public shall not be considered Retail Office or Business Office for the purpose of this limitation;

(3)     dry cleaning services;

(4)     a facility dispensing gasoline, diesel or other petroleum products;

(5)     a car wash or automotive service/repair station, or any facility selling & installing lubricants, tires, batteries, transmissions, brake shoes or other similar accessories;

(6)     a convenience store;

(7)     a "dollar"' (or any increment of a dollar) store or other similar variety discount type stores  under the trade name Dollar Tree, Family Dollar, 99 Cents Only, and Five Below;

(8)     a liquidation outlet store;

(9)     an auction house:

(10)    an automobile, truck, trailer or recreational vehicle repair, quick lube, tire and battery facilities, car wash, or car rental, or the sale of automotive parts including tires (other than as an incidental use); or any automotive maintenance or automotive repair facility;

(11)    the sale of caskets (other than sales of caskets as an incidental use);

(12)    blood bank;

(13)    Gymnasium, health club, workout facility, exercise or dance studio;

(14)    pool or billiard hall, dance hall, swimming pool, or hot tub;

(15)    any outdoor circus, carnival or amusement park, or other Entertainment or Recreational Facility. "Entertainment or Recreational Facility" means a facility primarily for entertainment or recreation, including, without limitation, a movie or live theater or cinema, bowling alley, skating rink, gym, yoga studio, health spa or studio, dance hall or night club, billiard or pool hall, massage parlor, health club, game parlor, video arcade (which shall be defined as any store containing more than five (5) electronic games), "laser tag," "bounce house" or "virtual reality" operation;

M-1

(16)    any outdoor meetings;

(17)    any off-track betting;

(18)    the sale or display of pornographic books, literature, videotapes, DVDs, Blu-rays or other electronic media and/or a theatre or establishment regularly showing films that children under the age of 17 are not permitted to attend, or an adult book or adult video store (defined for the purposes hereof as a store devoting 10% or more of its floor space to offering books and/or video materials and/or other sexually explicit merchandise or services for sale or for rent which are directed to or restricted to adult customers due to sexually explicit subject matter or for any other reason making it inappropriate for general use), or an adult theater or "strip-tease" establishment;

(19)    any auditorium, meeting hall, banquet room, ballroom, day care facility, school or other place of public assembly, or any facility primarily for training or education, including, without limitation, a beauty school, nail salon, barber college, reading room, place of instruction or any other operation catering primarily to students or trainees as opposed to customers;

(20)    any agency, department or bureau of any governmental authority or unemployment agency, service or commission;

(21)    a bar/cocktail lounge;

(22)    temporary or seasonal stores;

(23)    a church;

(24)    any non-retail purposes;

(25)    a telemarketing or call center;

(26)    a hair or nail salon;

(27)    a drug store/pharmacy;

(28)    a bingo parlor or gambling establishment;

(29)    a payroll loan/check cashing service;

(30)    the sale of Christmas trees or pumpkins within the parking lot or other Common Areas;

(31)    the sale of fireworks;

(32)    video rental store;

(33)    a karate center;

(34)    (a) no auction, fire or going-out-of-business sales; and (b) no exterior identification signs attached to the exterior façade of any building in the Shopping Center shall be flashing, moving or audible signs, or signs employing exposed neon tubes, exposed ballast boxes or exposed transformers; and

(35)    a restaurant.

M-1-2

## Schedule 1

## OEA Shopping Center Restrictions

•     Obnoxious odors or sound that can be smelled or heard outside any building (except normal emissions associated with a first class restaurant);

•     Storage or warehousing, assembling, manufacturing, distilling, refining, smelting, or agricultural or mining operations;

•     Second-hand or surplus store or pawn shop;

•     Mobile home park, trailer court, labor camp, junk yard, or stockyard (except construction trailers during periods of construction, reconstruction or maintenance);

•     Dumping, disposing, incinerating or reducing garbage (except compactors located near the rear of a building);

•     Fire or bankruptcy sale (except pursuant to a court order) or auction house;

•     Central laundry, dry cleaning plant or laundromat.

•     Automobile, truck, trailer or recreational vehicle sales, leasing, rental, display or body shop repair;

•     Skating rink;

•     Live performance theater;

•     Movie theater;

•     Bowling alley;

•     Hotel, motel, short or long term residential use, including but not limited to single family dwellings, townhouses, condominiums, other multi-family units, and other forms of living quarters, sleeping apartments or lodging rooms;

•     Veterinary hospital, or animal raising or boarding facility;

•     Mortuary or funeral home;

•     Establishment selling or exhibiting pornographic materials;

•     Establishment selling illicit drug-related paraphernalia or exhibiting either live, or by other means, to any degree, nude or partially clothed dancers or wait staff.

•     Establishment requiring personnel to wear uniforms which a reasonable person would consider sexually provocative (e.g. hot pants, short shorts, shorts not covering the entire buttocks, tight-fitting or otherwise revealing tank tops or halter tops);

•     Establishment with projected annual gross revenues from the sale of alcohol for on-premises consumption exceeding 40% of the gross revenues of such business;

•     Massage parlor or similar establishment;

•     Health spa, fitness center or workout facility;

•     Flea market, amusement or video arcade;

•     Firearms testing, firing range, or sale or display of any type of Firearms or ammunition; and

•     No store, department or operation of any size selling or offering for sale any pharmaceutical drugs requiring a licensed pharmacist.

**Exhibit M-2**

**Landlord Prohibited Uses**

As used in this Lease, the term "Landlord Prohibited Uses" shall mean any of the following uses:

(1)     Any use which emits or results in strong, unusual or offensive odors, fumes, dust or vapors, is a public or private nuisance, emits noise or sounds which are objectionable due to intermittence, beat, frequency, shrillness or loudness, creates a hazardous condition, or is used, in whole or in part, as or for warehousing or the dumping or disposing of garbage or refuse;

(2)     Any operation primarily used as a storage facility and any assembling, manufacturing, distilling, refining, smelting, agricultural, or mining operation;

(3)     Any "second hand" store, "surplus" store or pawn shop; provided, however the foregoing shall not prohibit the operation of a national or regional second hand goods retailer operating in no more than five thousand (5,000) square feet of LFA, to the extent such retailer is typically found in first class shopping centers in the Raleigh, North Carolina metropolitan area, such as, without limitation, Plato's Closet, Once Upon a Child, Goodwill, GameStop, and Play It Again Sports;

(4)     Any mobile home park, trailer court, labor camp, junkyard, or stockyard (except that this provision shall not prohibit the temporary use of construction trailers during periods of construction, reconstruction, or maintenance);

(5)     Any dumping, disposing, incineration, or reduction of garbage (exclusive of trash compactors or trash containers located near the rear of any building);

(6)     Any fire sale, bankruptcy sale (unless pursuant to a court order), auction house operation, fictitious going-out-of-business sale, lost-our-lease sale or similarly advertised event;

(7)     Any central laundry, dry cleaning plant, or laundromat (except that a dry cleaner that performs all dry cleaning outside the Shopping Center shall be permitted so long as its on-site premises are not located adjacent to the Premises);

(8)     Any automobile, truck, trailer, boat, or recreational vehicle sales, leasing, display or body shop repair operation; provided, however, that an automotive quick-lube, tire, battery or repair establishment shall be permitted to operate within the Shopping Center so long as same is located on an out parcel or pad site, and a car rental agency shall be permitted to operate within the Shopping Center so long as same is located on an out parcel or pad site and so long as no automobiles which are available for lease or rental shall be permitted to park for more than twenty-four consecutive hours within the Shopping Center;

(9)     Any skating rink;

(10)    Any living quarters, sleeping apartments, or lodging rooms;

(12)    Any veterinary hospital or animal raising or boarding facilities (except to the extent permitted below);

(13)    Any mortuary or funeral home;

(14)    Any "Pornographic Use", which shall include, without limitation: (x) a store displaying for sale or exhibition books, magazines or other publications containing any combination of photographs, drawings or sketches of a sexual nature, which are not primarily scientific or educational [provided, however, that the sale of books, magazines

M-2-4

and other publications by a national bookstore of the type normally located in first-class shopping centers in the State in which the Shopping Center is located (such as, for example, Borders and Barnes & Noble, as said stores currently operate) shall not be deemed a "pornographic use" hereunder]; or (y) a store offering for exhibition, sale or rental video cassettes or other medium capable of projecting, transmitting or reproducing, independently or in conjunction with another device, machine or equipment, an image or series of images, the content of which has been rated or advertised generally as NC-17 or "X" or unrated by the Motion Picture Rating Association, or any successor thereto [provided, however, that the sale or rental of such videos by a national video store of the type normally located in first-class shopping centers in the State in which the Shopping Center is located (such as, for example, Blockbuster or West Coast Video, as said stores currently operate) shall not be deemed a "pornographic use" hereunder]; or massage parlor [except for therapeutic massages given in connection with the operation of a day spa or health club which may otherwise be permitted under this Exhibit M-2];

(15)   Any so-called "head shop", or other establishment primarily selling or exhibiting drug-related paraphernalia;

(16)   Any bar, tavern, night club, discothèque, dance hall, or other establishment selling alcoholic beverages for on- or off-premises consumption, except for (a) any such establishment incidental to a restaurant permitted below, provided that the reasonably projected annual gross revenues from the sale of alcoholic beverages for on-premises consumption at such restaurant shall not exceed fifty percent (50%) of the gross revenues of such business, and (b) any such establishment located in excess of 150 feet of the front door of the Premises;

(17)   Any catering or banquet hall;

(18)   Any flea market, amusement or video arcade, or pool or billiard hall;

(19)   Any training or education facility, including but not limited to:  beauty schools, barber colleges, reading rooms, places of instruction or other operations catering primarily to students or trainees rather than to customers; provided, however, this prohibition shall not be applicable to on-site employee training by an Occupant incidental to the conduct of its business at the Shopping Center;

(20)   Any gambling facility or operation, including but not limited to:  off-track or sports betting parlor; table games such as black-jack or poker; slot machines; video poker/black-jack/keno machines or similar devices; or bingo hall. Notwithstanding the foregoing, this prohibition shall not apply to governmental sponsored gambling activities, or charitable gambling activities, so long as such governmental and/or charitable activities are incidental to the business operation being conducted by the Occupant;

(21)   Any unlawful use;

(22)   Any check-cashing store or tattoo parlor;

(23)   Any church or other place of religious worship;

(24)   Any carnival, amusement park or circus;

(26)   Any medical clinics or medical offices within 150 feet of the front door of the Premises;

(27)   Any office use, other than: (x) office space used in connection with and ancillary to a permitted retail use hereunder; and (y) retail offices providing services commonly found in similar first-class shopping centers in the Raleigh metropolitan area (for example, financial services, real estate brokerage, insurance agency, banking, travel agency), provided that such uses are located at least 150 feet away from the front door of

M-2-5

the Premises, and not more than ten thousand (10,000) square feet of Floor Area in the Shopping Center, in the aggregate, shall be devoted to such uses;

(29)   hotel/motel;

(30)   daycare center;

(31)   veterinary office, except as may be incidental to a permitted full-line pet and pet supply store operating in at least 10,000 square feet of Floor Area and located at least 100 feet away from the Premises (except that a full-line pet and pet supply store shall be permitted to be located within the Premises); such occupant shall use reasonable efforts to prevent its customers from allowing their pets to urinate or defecate in the Common Areas and will promptly remove any "dog dirt" from in front of the Premises; no pet or pet supply store shall be located within 100 feet of the Premises;

(32)   children's entertainment or activity facility (such as "Discovery Zone", or "Chuck E. Cheese's"), provided, however, that a development, learning or fitness center specializing primarily to a clientele of infants, juveniles and children 0-4 years in age similar to a Gymboree, My Gym or Little Gym shall be permitted provided that such uses are located at least 150 feet away from the Premises and not more than three thousand five hundred (3,500) square feet of Floor Area in the Shopping Center, in the aggregate, shall be devoted to such uses;

(33)   karate center;

(34)   beauty parlor or nail salon within 150 feet of the front door of the Premises;

(37)   health spa, exercise facility or similar type business within 150 feet of the front door of the Premises;

(38)   sit-down, table service restaurant within 150 feet of the front door of the Premises; or

(39)   a store primarily selling merchandise which is classed as "odd lot," "close out," "clearance," "discontinued," "cancellation," "second," "factory reject," "sample," "floor model," "demonstrator," "obsolescent," "over stock," "distressed," "bankruptcy," "fire sale" or "damaged", such as, for example, "Grossman's Bargain Outlet", "Contractor's Warehouse", "Big Lots", "Liquidation World", or "Odd Job"; the retailer commonly known as "Christmas Tree Shops" shall be deemed not to violate the foregoing restriction; provided, however, that one "dollar" (or any increment of a dollar) store or other similar variety discount type stores under the trade name Dollar Tree, Dollar General, Family Dollar, 99 Cents Only, and Five Below shall be permitted.

M-2-6

1       Exhibit N

2       Form of Declaration of Restrictions

3
4       RECORDING REQUESTED BY AND WHEN RECORDED MAIL TO:
5
6       Bed Bath & Beyond Inc.
7       650 Liberty Avenue
8       Union, NJ 07083
9       Attention: Kathleen Currie
10
11      _____
12                  (Space Above Line For Recorder's Use Only)

13                      **DECLARATION OF RESTRICTIONS**

14              This Declaration of Restrictions (*"Declaration"*) is made as of the _____
15      day of _____ 20__ (the *"Effective Date"*) by **KRG NEW HILL**
16      **PLACE I, LLC,** an Indiana limited liability company, having an address at 30 South
17      Meridian Street, Suite 1100, Indianapolis, Indiana 43204 (*"Declarant"*) for the benefit
18      of **BED BATH & BEYOND INC.**, a New York corporation, having an office at 650
19      Liberty Avenue, Union, New Jersey 07083 (*"Tenant"*).

20              WHEREAS, the Declarant is the owner of that certain real property located
21      in the County of Wake, State of North Carolina, as more particularly described on
22      Exhibit A annexed hereto (*"Developer Tract A"*).

23              WHEREAS, **KRG New Hill Place, LLC,** an Indiana limited liability
24      company (*"Landlord"*) is the owner of certain real property located in the County of
25      Wake, State of North Carolina, commonly referred to as Holly Springs Towne Center as
26      more particularly described on Exhibit B annexed hereto (the *"Shopping Center"*).

27              WHEREAS, Landlord and Tenant, as of the date hereof, have entered into a
28      lease (the *"Lease"*) demising a portion of the Shopping Center as more particularly
29      described in the Lease (the *"Premises"*) to Tenant.

30              WHEREAS, Declarant controls, is controlled by, or is under common
31      control with, Landlord, and therefore will derive a direct or indirect financial benefit from
32      the Lease (as used herein, *"control"* shall mean the possession, direct or indirect, of the
33      power to direct or cause the direction of the management and policies of a person or
34      entity, whether through the ownership of voting securities or rights, by contract, or
35      otherwise).

36              WHEREAS, Tenant is not willing to enter into the Lease unless Developer
37      Tract A is restricted in accordance with this Declaration and the imposition of the terms
38      of this Declaration on Developer Tract A is a material inducement to Tenant in
39      connection with the Lease.

40              WHEREAS, the Declarant is willing to restrict Developer Tract A as set
41      forth in this Declaration and by executing this Declaration does so restrict it for the
42      benefit of Tenant and its successors and assigns.

43                              DECLARATION

44              NOW, THEREFORE, in consideration of One Dollar and other good and
45      valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the
46      parties state as follows:

2429134 v3 Holly Springs - Lease

1           1.    All capitalized terms used, but not otherwise defined, herein shall
2    have the meanings ascribed to them in the Lease.

3           2.    Developer Tract A shall be subject to the restrictions as set forth
4    herein which are declared and agreed to be for the benefit of Tenant and its successors
5    and assigns and which restrictions shall run with Developer Tract A and be binding upon
6    the successors and assigns of the Declarant, and subject to the terms of leases for
7    premises on Developer Tract A existing on the date hereof, all tenants, licensees and
8    other occupants and users of Developer Tract A, and any other party claiming by, through
9    or under the Declarant.

10          3.    For so long as the Lease (as same may be amended, modified,
11    extended or renewed from time to time) shall remain in effect, and subject to the terms of
12    leases for premises on Developer Tract A existing on the date hereof, the Declarant shall
13    not lease, rent or occupy or permit any portion of Developer Tract A to be occupied for
14    any of the "Prohibited Uses" (defined in <u>Exhibit C</u> annexed hereto and made a part
15    hereof).

16          4.    For so long as the Lease (as same may be amended, modified,
17    extended or renewed from time to time) shall remain in effect, and subject to the terms of
18    leases existing on the date hereof, the Declarant shall not lease, rent or occupy or permit
19    any other premises in Developer Tract A to be occupied, whether by a tenant, sublessee,
20    assignee, licensee or other occupant or itself, for the storage, sale, rental or distribution, at
21    retail or at wholesale, either singly or in any combination, of items contained in any of
22    the following respective categories of merchandise: (a) linens and domestics;
23    (b) bathroom items (excluding plumbing hardware); (c) housewares (excluding furniture,
24    and major appliances or "white goods"); (d) frames and wall art (provided that a fine art
25    gallery shall not be precluded); (e) window treatments; and/or (f) closet, shelving and
26    storage items (which items, either singly or in any combination, are hereinafter referred
27    to as the *"Exclusive Items"*).  Notwithstanding the foregoing, any tenant or subtenant in
28    Developer Tract A shall have the right to utilize its respective premises for the sale, rental
29    and/or distribution of Exclusive Items within an aggregate area (which shall include an
30    allocable portion of the aisle space adjacent to such storage, sales, rental and/or
31    distribution area) not to exceed the lesser of (x) five percent (5%) of the Floor Area of
32    such tenant's or subtenant's premises, or (y) two thousand (2,000) square feet of Floor
33    Area within such tenant's or subtenant's premises. [For example only, a tenant occupying
34    premises containing a total of five thousand (5,000) square feet of Floor Area could sell
35    Exclusive Items (either singly or in any combination) so long as the <u>aggregate</u> area within
36    its entire demised premises in which any and all Exclusive Items are sold or stored shall
37    not exceed two hundred fifty (250) square feet.] Existing tenants of Developer Tract A
38    (and current or future assignees or sublessees of such tenants) shall nevertheless be
39    subject to the restrictions contained in this Section 4 in the event that: (i) the lease
40    between Declarant and any such tenant requires the consent of Declarant to any
41    assignment or subletting or to a change in the use of the applicable premises to permit the
42    sale, rental or distribution of the Exclusive Items; or (ii) Declarant permits or agrees to an
43    expansion of the applicable premises for the sale, rental, or distribution of the Exclusive
44    Items.

45          5.    The restrictions set forth in Section 4 above shall not apply to a full-
46    line national or regional: (i) department or discount store [for example, Big Kmart, Wal-
47    Mart, Macy's, Kohl's or Target], (ii) discount club [for example, Costco, BJ's Wholesale
48    Club, or Sam's Club], or (iii) home improvement center [for example, Home Depot or
49    Lowe's], commonly located in first-class shopping centers, each occupying at least
50    65,000 square feet of Floor Area within the Shopping Center or Developer Tract A, as
51    such stores are currently operated (as of the Effective Date) and as the same may be
52    operated from time to time. The restrictions set forth in Section 4 above shall only apply
53    to Michaels, Ross Stores, TJMaxx, Marshalls and Nordstrom Rack, to the extent set forth

2429134 v3 Holly Springs - Lease N-2

in the standard form of Side Letter (as defined in Section 13.3.1 of the Lease) used by Tenant and each of such retailers as of the Effective Date which nullifies or modifies the restrictions set forth in Section 4 above, provided each retailer enters into such Side Letter with Tenant.

6.      The exclusive rights granted to Tenant in Section 4 above shall inure to the benefit of any assignee of Tenant's interest in the Lease and to any sublessee of the entire Premises.

7.      In the event of a breach of the restrictions set forth in this Declaration, Tenant and its successors and assigns may prosecute any appropriate proceedings at law or in equity. They may, in any such proceeding, obtain injunctive or other equitable relief to enforce this Declaration or restrain violations of this Declaration; recover damages on account of such violation; secure, by way of specific performance or otherwise, the performance of this Declaration; and/or obtain any other remedy provided for at law or in equity.

8.      The Declarant represents and warrants to Tenant that it is duly authorized to execute this Declaration and that no joinder by or consent or approval of any other party is necessary to fully bind the Declarant and the interests in Developer Tract A held by the Declarant to the terms of this Declaration.

IN WITNESS WHEREOF, the undersigned has executed this Declaration as of the date hereinabove provided.

**DECLARANT:**

Witness/Attest:                                    **KRG NEW HILL PLACE I, LLC,**
                                                   an Indiana limited liability company

_____

                                                   By: _____
                                                   Name:
                                                   Title:

1                        **ACKNOWLEDGMENT**

2

3

4    STATE OF _____ )

5                        ): SS.

6    COUNTY OF _____ )

7

8        On the _____ day of _____ in the year 200__ before me, the undersigned, a

9    Notary Public in and for said State, personally appeared

10   _____ personally known on the basis of satisfactory

11   evidence to be the individual whose name is subscribed to the within instrument and

12   acknowledged to me that he executed same in his capacity, and that by his signature on

13   the instrument, the individual, or the person upon behalf of which the individual acted,

14   executed the instrument, and that such individual made such appearance before the

15   undersigned in the municipality of _____, _____ County, State of

16   _____.

17

18

19                                 _____

20                                 Notary Public

21                                 My Commission Expires:

22

23   (SEAL)

24

25

26

2429134 v3 Holly Springs - Lease N-4

1

2

3

4

5

# Exhibit A

## Legal Description of Developer Tract A

BK014672P902474

### Development Area "A"

Being that certain parcel of land located in Holly Springs, Wake County, North Carolina and more particularly described as follows:

Commencing at an iron pipe set on the eastern right of way line of Re-aligned New Hill Road (SR 1152) a variable width public R/W (Book of Maps _2012_, Pages _1917_) said pipe having an NC Grid Coordinate (NAD 83) of Northing: 695,497.21 feet and Easting: 2,043,552.85 feet; thence leaving the right of way line of said New Hill Road, North 87°52'45" East 105.64 feet to an iron pipe set; thence North 42°29'51" East 249.52 feet to an iron pipe set on the centerline of an existing stream; said point being the POINT OF BEGINNING; thence with the centerline of an existing stream, North 47°30'09" West 6.17 feet to a calculated point; thence North 00°46'18" West 36.19 feet to a calculated point; thence North 23°11'26" West 19.53 feet to a calculated point; thence North 16°50'35" East 22.78 feet to a calculated point; thence North 12°28'10" West 40.37 feet to a calculated point; thence North 02°51'39" East 29.37 feet to a calculated point; thence North 20°41'51" West 23.25 feet to a calculated point; thence North 18°17'06" East 45.96 feet to a calculated point; thence North 29°31'40" East 55.97 feet to a calculated point; thence North 01°53'18" West 23.35 feet to a calculated point; thence North 34°50'38" East 5.18 feet to a calculated point; thence North 48°32'14" East 60.76 feet to a calculated point; thence North 23°34'43" East 37.97 feet to a calculated point; thence North 07°36'40" East 42.71 feet to a calculated point; thence North 45°35'59" East 34.79 feet to a calculated point; thence North 46°55'16" East 25.83 feet to a calculated point; thence North 23°36'08" East 56.00 feet to a calculated point; thence North 46°56'52" East 48.84 feet to a calculated point; thence North 02°23'34" East 40.30 feet to a calculated point; thence North 50°41'44" East 25.79 feet to a calculated point; thence North 75°32'46" East 59.43 feet to a calculated point; thence North 23°26'46" East 15.78 feet to a calculated point; thence North 75°04'50" East 2.19 feet to a calculated point; thence North 52°34'27" East 14.06 feet to a calculated point; thence North 00°59'28" East 8.60 feet to a calculated point; thence North 05°14'03" West 8.08 feet to a calculated point; thence North 34°13'21" West 11.78 feet to a calculated point; thence North 28°37'57" East 10.03 feet to a calculated point; thence North 05°44'30" West 11.42 feet to a calculated point; thence North 49°25'09" East 5.96 feet to a calculated point; thence North 84°09'28" East 10.62 feet to a calculated point; thence North 40°11'20" East 5.96 feet to a calculated point; thence North 12°36'53" West 18.51 feet to a calculated point; thence North 05°50'24" West 13.68 feet to a calculated point; thence North 01°30'07" West 6.47 feet to a calculated point; thence North 46°44'45" East 27.56 feet to a calculated point; thence North 01°51'26" East 30.81 feet to a calculated point; thence North 66°27'33" West 40.69 feet to a calculated point; thence North 22°02'35" West 57.46 feet to a calculated point; thence North 62°25'01" West 30.56 feet to a calculated point; thence North 05°25'17" West 40.46 feet to a calculated point; thence North 01°56'40" East 53.64 feet to a calculated point; thence North 48°34'05" East 41.31 feet to a calculated point; thence North 29°54'36" West 36.81 feet to a calculated point; thence North 11°42'20" East 47.57 feet to a calculated point; thence North 46°19'27" West 18.55 feet to a calculated point; thence North 21°57'06" East 29.98 feet to a calculated point; thence North 50°27'12" East 42.70 feet to a calculated point; thence North 25°09'36" East 26.79 feet to a calculated point; thence North 65°30'17" East 46.01 feet to a calculated point; thence North 71°36'21" East 32.34 feet to a calculated point; thence South 08°07'01" West 12.75 feet to a calculated point; thence South 07°29'40" East 15.60 feet to a calculated point; thence South 25°08'39" East 22.12 feet to a calculated point; thence South 34°52'58" West 26.45 feet to a

6

7

*thru 197

BK01467?PG02676

calculated point; thence South 43°46'07" East 29.05 feet to a calculated point; thence South 61°08'13" West 16.88 feet to a calculated point; thence South 23°19'05" East 41.52 feet to a calculated point; thence South 66°49'10" East 58.74 feet to a calculated point; thence South 37°45'35" East 55.28 feet to a calculated point; South 65°08'19" East 26.63 feet to a calculated point; thence South 60°09'13" East 21.31 feet to a calculated point; South 33°53'44" East 36.09 feet to a calculated point; South 18°59'03" East 7.48 feet to a calculated point; thence South 47°50'23" East 35.56 feet to a calculated point; South 45°36'07" East 40.97 feet to a calculated point; South 55°48'37" East 35.57 feet to a calculated point; thence South 22°57'21" East 46.32 feet to a calculated point; thence South 33°15'33" East 45.70 feet to a calculated point; thence South 45°20'55" East 38.51 feet to a calculated point; thence South 48°01'37" East 56.03 feet to a calculated point; thence North 41°58'23" East 606.10 feet to a calculated point; North 36°58'23" East 50.53 feet to a calculated point; thence South 48°01'37" East 114.26 feet to a calculated point; North 41°58'23" East 109.41 feet to a calculated point; North 20°09'31" East 30.39 feet to a calculated point; North 02°05'37" West 70.87 feet to a calculated point; North 40°33'52" West 4.49 feet to a calculated point; North 19°11'48" West 11.79 feet to a calculated point; North 58°12'12" West 32.60 feet to a calculated point; thence South 85°45'41" West 11.63 feet to a calculated point; thence North 64°45'16" West 13.26 feet to a calculated point; thence North 81°38'52" West 6.54 feet to a calculated point; North 32°21'28" West 52.99 feet to a calculated point; thence North 77°44'04" West 11.69 feet to a calculated point; thence South 73°55'03" West 12.50 feet to a calculated point; thence South 49°30'20" West 6.52 feet to a calculated point; thence North 82°22'51" West 8.95 feet to a calculated point; thence North 13°18'00" West 4.19 feet to a calculated point; thence South 81°35'35" West 12.37 feet to a calculated point; thence South 35°43'30" West 7.06 feet to a calculated point; thence South 70°43'33" West 11.91 feet to a calculated point; thence North 47°49'01" West 24.72 feet to a calculated point; thence North 83°43'09" West 13.81 feet to a calculated point; thence North 57°58'56" West 27.06 feet to a calculated point; thence North 81°20'45" West 15.59 feet to a calculated point; thence South 82°23'42" West 36.28 feet to a calculated point; thence North 46°29'27" West 30.07 feet to a calculated point; thence North 15°24'35" West 16.02 feet to a calculated point; thence North 02°12'37" East 47.86 feet to a calculated point; thence North 80°21'14" East 26.78 feet to an iron pipe set; thence North 74°55'20" East 107.91 feet to an iron pipe set; thence along a curve to the left having a radius of 965.00 feet, an arc length of 171.10 feet and a chord of North 68°12'16" East 170.86 feet to an iron pipe set; thence South 84°07'09" East 25.44 feet to an iron pipe set; thence North 60°01'24" East a distance of 94.66 feet to a calculated point; thence along a curve to the left having a radius of 35.50 feet, an arc length of 19.31 feet and a chord of South 15°53'26" East 19.09 feet to a calculated point; thence South 31°26'36" East a distance of 99.66 feet to a calculated point; thence along a curve to the right having a radius of 332.50 feet, an arc length of 133.71 feet and a chord of South 19°57'24" East 132.81 feet to a calculated point; thence South 08°26'10" East a distance of 192.97 feet to a calculated point; thence South 10°20'30" East a distance of 55.14 feet to a calculated point; thence North 81°33'50" East a distance of 4.17 feet to a calculated point; thence South 08°26'10" East a distance of 215.63 feet to a calculated point; thence along a curve to the left having a radius of 261.50 feet, an arc length of 183.52 feet and a chord of South 28°32'27" East 179.77 feet to a calculated point; thence South 48°38'44" East a distance of 132.6 tfeet to a calculated point on the western right of way line of NC Highway 55 Bypass (a variable width public R/W); thence with the western right of way line of NC Highway 55 Bypass (a variable width public R/W), South 40°54'31" West a distance of 134.40 feet to an iron pipe set; thence South 36°19'01" West a distance of 263.32 feet to a calculated point; thence along a

1

2

BK01467ZPG02677

curve to the left, having a radius of 2,404.63 feet, an arc length of 958.70 feet and a chord of South 26°29'53" West 952.37 feet to an existing concrete monument; thence South 11°27'26" West 285.91 feet to an existing concrete monument; thence along a curve to the left, having a radius of 4,984.50 feet, an arc length of 399.18 feet and a chord of South 06°45'20" West 399.07 feet to an iron pipe set; thence South 39°59'15" West 65.50 feet to an iron pipe set on the eastern right of way line of Re-aligned New Hill Road (SR 1152) a variable width public R/W (Book of Maps 2012, Pages 191-6; thence with the eastern right of way line of Re-aligned New Hill Road (SR 1152), North 55°54'01" West 159.88 feet to an iron pipe set; thence along a curve to the right having a radius of 1,477.00 feet, and arc length of 204.96 feet and a chord of North 61°55'30" West 204.79 feet to an iron pipe set;  thence along a curve to the right having a radius of 2,300.00 feet, an arc length of 293.08 feet and a chord of North 54°17'57" West 292.88 feet to an iron pipe set; thence leaving the right of way of said re-aligned New Hill Road along a curve to the right, having a radius of 55.55 feet, an arc length of 48.92 feet and a chord of North 07°36'40" East 47.36 feet to an iron pipe set; thence along a curve to the right, having a radius of 173.00 feet, an arc length of 45.32 feet and a chord of North 34°59'35" East 45.19 feet to an iron pipe set; thence North 42°29'51" East 124.05 feet to an iron pipe set; thence North 39°30'57" East 192.26 feet to an iron pipe set; thence North 42°29'51" East 81.20 feet to an iron pipe set; thence along a curve to the left, having a radius of 220.00 feet, an arc length of 124.74 feet and a chord of North 26°15'12" East 123.08 feet to an iron pipe set; thence North 47°30'09" West 700.84 feet to an iron pipe set; thence North 02°19'18" East 103.14 feet to an iron pipe set; thence North 47°30'09" West 59.65 feet to an iron pipe set; thence North 87°40'41" West 79.35 feet to an iron pipe set; thence South 42°29'51" West 241.86 feet to the POINT OF BEGINNING, containing 2,256,473 square feet or 51.87 acres, more or less.

\*John 197

1

2

3

1                              Exhibit B

2                   Legal Description of Shopping Center

3   Being that certain parcel of land located in Holly Springs, Wake County, North Carolina
4   and more particularly described as follows:

5   Beginning at an iron pipe set on the western right of way line of NC Highway 55 Bypass
6   (a variable width public R/W), said pipe having an NC Grid Coordinate (NAD 83) of
7   Northing: 696,325.82 feet and Easting: 2,045,669.72 feet; thence leaving the western
8   R/W of NC Highway 55 Bypass (a variable width public R/W) and along the eastern
9   right-of-way of Beaconwood Lane, a variable width public R/W (BM 2013, PG 327),
10  North 48°38'44" West a distance of 132.61 feet to an iron pipe set; thence along a curve
11  to the right having a radius of 261.50 feet, an arc length of 183.52 feet and a chord of
12  North 28°32'27" West 179.77 feet to an iron pipe set; thence North 08°26'10" West a
13  distance of 215.83 feet to an iron pipe set; thence South 81°33'50" West a distance of
14  4.17 feet to an iron pipe set; thence North 10°20'30" West a distance of 55.14 feet to an
15  iron pipe set; thence North 08°26'10" West a distance of 192.97 feet to an iron pipe set;
16  thence along a curve to the left having a radius of 332.50 feet, an arc length of 133.71
17  feet and a chord of North 19°57'24" West 132.81 feet to an iron pipe set; thence North
18  31°28'38" West a distance of 99.98 feet to an iron pipe set; thence along a curve to the
19  right having a radius of 35.50 feet, an arc length of 19.31 feet and a chord of North
20  15°53'28" West 19.08 feet to an iron pipe set; thence North 60°01'24" East a distance of
21  6.86 feet to an iron pipe set along the southern right-of-way of (Proposed) Bennett Knoll
22  Parkway (a variable width proposed public R/W) ; thence with the southern R/W of
23  (Proposed) Bennett Knoll Parkway, North 19°38'47" East 27.47 feet to an iron pipe set;
24  thence along a curve to the left having a radius of 965.00 feet, an arc length of 249.29
25  feet and a chord of North 47°07'02" East 248.60 feet to a calculated point; thence North
26  39°42'59" East 81.78 feet to a calculated point; thence North 34°41'06" East 200.99 feet
27  to a calculated point; thence North 37°23'44" East 55.33 feet to a calculated point; thence
28  along a curve to the right having a radius of 1155.00 feet, an arc length of 863.99 feet,
29  and a chord of North 58°49'31" East 843.99 feet to a calculated point; thence South
30  64°13'00" East 24.42 feet to a calculated point; thence North 87°11'52" East 107.79 feet
31  to a calculated point; thence North 54°08'53" East 8.74 feet to an iron pipe set on the
32  southern right-of-way of Bennett Knoll Parkway, a variable width public R/W (BM 2012,
33  PG 591); thence with the southern R/W of Bennett Knoll Parkway, South 87°04'52" East
34  5.42 feet to an existing iron pipe; thence North 69°29'18" East 18.48 feet to an iron pipe
35  set along the southern right-of-way of Bennett Knoll Parkway, a variable width
36  controlled access R/W; thence with the southern right-of-way of Bennett Knoll Parkway,
37  along a curve to the right having a radius of 1145.00 feet, an arc length of 324.78 feet,
38  and a chord of South 83°37'55" East 323.69 feet to an iron pipe set; thence along a curve
39  to the right having a radius of 2335.38 feet, an arc length of 17.71 feet, and a chord of
40  South 74°30'41" 17.71 feet to an iron pipe set; thence South 86°51'18" East 37.71 feet to
41  an iron pipe set; thence South 72°26'28" East 132.00 feet to an iron pipe set; thence South
42  70°57'06" East 88.31 feet to an iron pipe set on the western right of way of NC Highway
43  55 Bypass (a variable width public R/W); thence with the western right of way of NC
44  Highway 55 Bypass, South 35°23'24" West 236.72 feet to a calculated point; thence
45  South 37°50'18" West 392.11 feet to an existing concrete monument; thence South
46  44°49'57" West 328.56 feet to an existing concrete monument; thence South 42°04'25"
47  West 1,050.04 feet to a calculated point; thence South 40°54'31" West 289.82 feet to the
48  POINT OF BEGINNING, containing 1,621,440 square feet or 37.22 acres, more or less.

49

50

1                                   Exhibit C

2                                  Prohibited Uses

3   (1)    Any use which emits or results in strong, unusual or offensive odors, fumes, dust
4   or vapors, is a public or private nuisance, emits noise or sounds which are objectionable
5   due to intermittence, beat, frequency, shrillness or loudness, creates a hazardous
6   condition, or is used, in whole or in part, as or for warehousing or the dumping or
7   disposing of garbage or refuse;

8   (2)    Any operation primarily used as a storage facility and any assembling,
9   manufacturing, distilling, refining, smelting, agricultural, or mining operation;

10  (3)    Any mobile home park, trailer court, labor camp, junkyard, or stockyard (except
11  that this provision shall not prohibit the temporary use of construction trailers during
12  periods of construction, reconstruction, or maintenance);

13  (4)    Any dumping, disposing, incineration, or reduction of garbage (exclusive of trash
14  compactors or trash containers located near the rear of any building);

15  (5)    Any "Pornographic Use", which shall include, without limitation: (x) a store
16  displaying for sale or exhibition books, magazines or other publications containing any
17  combination of photographs, drawings or sketches of a sexual nature, which are not
18  primarily scientific or educational [provided, however, that the sale of books, magazines
19  and other publications by a national bookstore of the type normally located in first-class
20  shopping centers in the State in which the Shopping Center is located (such as, for
21  example, Borders and Barnes & Noble, as said stores currently operate) shall not be
22  deemed a "pornographic use" hereunder]; or (y) a store offering for exhibition, sale or
23  rental video cassettes or other medium capable of projecting, transmitting or reproducing,
24  independently or in conjunction with another device, machine or equipment, an image or
25  series of images, the content of which has been rated or advertised generally as NC-17 or
26  "X" or unrated by the Motion Picture Rating Association, or any successor thereto
27  [provided, however, that the sale or rental of such videos by a national video store of the
28  type normally located in first-class shopping centers in the State in which the Shopping
29  Center is located (such as, for example, Blockbuster or West Coast Video, as said stores
30  currently operate) shall not be deemed a "pornographic use" hereunder]; or massage
31  parlor [except for therapeutic massages given in connection with the operation of a day
32  spa or health club];

33  (6)    Any so-called "head shop", or other establishment primarily selling or exhibiting
34  drug-related paraphernalia;

35  (7)    Any unlawful use; or

36  (8)    Any carnival, amusement park or circus.

37

38
39

2429134 v3 Holly Springs - Lease N-9

# **EXHIBIT D**

**Marshalls Holly Springs Lease**

**(FILED UNDER SEAL)**