# Exhibit A

**LEASE AGREEMENT**

**Between**

**SERITAGE SRC FINANCE LLC,**
**a Delaware limited liability company,**

**Landlord**

**and**

**BED BATH & BEYOND INC.,**
**a New York corporation**

**Tenant**

**1445 New Britain Avenue,**
**WEST HARTFORD, CONNECTICUT**

Dated: _March 31_ , 2017

\* \* \* \* \* \*

The mailing, delivery or negotiation of this Lease shall not be deemed an offer to enter into any transaction or to enter into any relationship, whether on the terms contained herein or on any other terms. This Lease shall not be binding nor shall either party have any obligations or liabilities or any rights with respect thereto, or with respect to the premises, unless and until both parties have executed and delivered this Lease. Until such execution and delivery of this Lease, either party may terminate all negotiation and discussion of the subject matter hereof, without causes and for any reason, without recourse or liability.

\* \* \* \* \* \*

**Table of Contents**

Page

ARTICLE 1. BASIC TERMS AND DEFINITIONS ..................................................................1
    Section 1.1    Basic Terms and Definitions .........................................................................1

ARTICLE 2. LEASE OF PREMISES; LEASE TERM; DELIVERY DATE................................5
    Section 2.1    Lease of Premises.........................................................................................5
    Section 2.2    Term. ............................................................................................................5
    Section 2.4    Unseasonable Delivery: Slack Period .........................................................9

ARTICLE 3. IMPROVEMENTS .............................................................................................10
    Section 3.1    Landlord's Work and Tenant's Work .......................................................10
    Section 3.2    Plan Approvals. .........................................................................................10
    Section 3.3    Performance of Work. ...............................................................................12
    Section 3.4    Measurement; Adjustment of Rent. ..........................................................14
    Section 3.5    Labor Harmony.. .......................................................................................14

ARTICLE 4. FIXED RENT AND TAXES: DETERMINATION AND PAYMENT.................14
    Section 4.1    Fixed Rent .................................................................................................14
    Section 4.2    Payment of Rent.........................................................................................14
    Section 4.3    Real Estate and Other Taxes. ....................................................................15

ARTICLE 5. COMMON AREAS, THEIR USE AND CHARGES ...........................................16
    Section 5.1    Common Areas: Maintenance.....................................................................16
    Section 5.2    Common Areas: Restrictions. ....................................................................19

ARTICLE 6. UTILITIES..........................................................................................................23
    Section 6.1    Utility Service ............................................................................................23
    Section 6.2    Interruption................................................................................................23

ARTICLE 7. SIGNS 23
    Section 7.1    Tenant's Building Signage .........................................................................23
    Section 7.2    Pylon/Monument Signage..........................................................................23
    Section 7.3    Signage: Alteration/Removal/Allocation ...................................................24
    Section 7.4    Cooperation ...............................................................................................24
    Section 7.5    Signage Restrictions and Criteria..............................................................24

ARTICLE 8. ALTERATIONS AND IMPROVEMENTS..........................................................24
    Section 8.1    Alterations and Improvements. ..................................................................24

ARTICLE 9. REPAIRS .............................................................................................................26
    Section 9.1    Tenant's Repairs.........................................................................................26
    Section 9.2    Landlord's Repairs.....................................................................................26
    Section 9.3    Legal Compliance Work ............................................................................27

ARTICLE 10. INDEMNIFICATION, INSURANCE AND WAIVER OF SUBROGATION ....28
    Section 10.1    Mutual Release, Waiver of Subrogation and Mutual Indemnification. ......28
    Section 10.2    Tenant's Insurance.....................................................................................28
    Section 10.3    Insurance Covering Tenant's Work. ..........................................................29
    Section 10.4    Landlord's Insurance..................................................................................29
    Section 10.5    General Insurance Requirements. ..............................................................30

ARTICLE 11. FIRE AND OTHER CASUALTY; EMINENT DOMAIN .................................31
    Section 11.1    Fire and Other Casualty.............................................................................31
    Section 11.2    Eminent Domain. .......................................................................................32
    Section 11.3    Abatement of Rent Charges .......................................................................33

ARTICLE 12. COVENANTS, REPRESENTATIONS AND WARRANTIES ............................34
    Section 12.1    Quiet Enjoyment .......................................................................................34
    Section 12.2    Authority ...................................................................................................34
    Section 12.3    Landlord's Covenants, Warranties and Representations.............................34
    Section 12.4    Environmental Matters. .............................................................................35

i

ARTICLE 13. USES AND RESTRICTIONS ............................................................................38
    Section 13.1     Permitted and Prohibited Uses.................................................................38
    Section 13.2     Tenant's Exclusive in Center ...................................................................38
    Section 13.3     Exclusives Which Tenant Must Honor. ....................................................40

ARTICLE 14. CONDUCT OF BUSINESS OPERATIONS .....................................................41

ARTICLE 15. TENANT ASSIGNMENT AND SUBLETTING...............................................41
    Section 15.1     Assignment and Subletting.......................................................................41
    Section 15.2     Liability of Tenant....................................................................................43
    Section 15.3     Collateral Assignment .............................................................................43
    Section 15.4     Cure Rights of Original Tenant................................................................43
    Section 15.5     Recognition Agreement............................................................................43

ARTICLE 16. DEFAULT AND DISPUTE RESOLUTION ......................................................44
    Section 16.1     Tenant Default...........................................................................................44
    Section 16.2     Landlord Default .......................................................................................45
    Section 16.3     Arbitration ................................................................................................46

ARTICLE 17. RIGHT TO MORTGAGE AND NON-DISTURBANCE; ESTOPPEL
                     CERTIFICATE ............................................................................................46
    Section 17.1     Right to Mortgage and Non-Disturbance .................................................46
    Section 17.2     Estoppel Certificate ..................................................................................47
    Section 17.3     Existing Mortgages and Ground Leases....................................................47

ARTICLE 18. NOTICE.............................................................................................................47

ARTICLE 19. TENANT'S PROPERTY.....................................................................................48

ARTICLE 20. END OF TERM .................................................................................................48
    Section 20.1     Surrender of Premises ...............................................................................48
    Section 20.2     Hold Over..................................................................................................48

ARTICLE 21. INTENTIONALLY OMITTED ..........................................................................48

ARTICLE 22. ONGOING CO-TENANCY ...............................................................................48

ARTICLE 23. MISCELLANEOUS ..........................................................................................49
    Section 23.1     Shared Areas / Loading Facilities ............................................................49
    Section 23.2     Liens.........................................................................................................49
    Section 23.3     Broker's Commission................................................................................50
    Section 23.4     Force Majeure.. ........................................................................................50
    Section 23.5     Consents ...................................................................................................50
    Section 23.6     Costs.........................................................................................................50
    Section 23.7     Attorneys' Fees ........................................................................................50
    Section 23.8     Survival of Obligations ............................................................................50
    Section 23.9     Non-Waiver..............................................................................................50
    Section 23.10    Rights Cumulative....................................................................................50
    Section 23.11    Definition of Landlord .............................................................................51
    Section 23.12    Successors and Assigns.............................................................................51
    Section 23.13    Limitation of Landlord's Liability ...........................................................51
    Section 23.14    Limitation of Tenant's Liability................................................................51
    Section 23.15    Joint and Several Liability.........................................................................51
    Section 23.16    Severability...............................................................................................51
    Section 23.17    Grammatical Usages and Construction......................................................51
    Section 23.18    Table of Contents, Line Numbering and Paragraph Headings...................51
    Section 23.19    Definition of Hereunder, Herein, etc.........................................................52
    Section 23.20    Short Form Lease ......................................................................................52
    Section 23.21    Entire Agreement and Modification..........................................................52
    Section 23.22    No Joint Venture or Partnership Created by Lease.....................................52
    Section 23.23    Tenant's Tradename...................................................................................52
    Section 23.24    Timely Billing of Charges.........................................................................52
    Section 23.25    Counterparts. ............................................................................................52
    Section 23.26    Ethical Conduct Policy..............................................................................52

Section 23.27    Confidentiality..............................................................................................52
Section 23.28    Governing Law..............................................................................................53
Section 23.29    Waiver of Trial by Jury..................................................................................53
Section 23.30    Late Fee..........................................................................................................53
Section 23.31    OFAC List Representation..............................................................................53

## EXHIBITS

| | |
|---|---|
| Exhibit A - | Legal Description of Shopping Center |
| Exhibit B - | Site Plan |
| Exhibit C - | Form of Rent Commencement and Expiration Date Agreement |
| Exhibit D - | Specifications for Landlord's Work |
| Exhibit D-1 | Exterior Elevations of the Premises, and Sidewalk Plan |
| Exhibit D-2 | Exterior Elevations of the Shopping Center |
| Exhibit E - | Permitted Encumbrances |
| Exhibit F - | Signage |
| Exhibit G - | Form of Subordination, Non-Disturbance and Attornment Agreement |
| Exhibit H - | Form of Subtenant Recognition Agreement |
| Exhibit I - | Form of Delivery Date Notice |
| Exhibit J - | Form of Delivery Date Certification |
| Exhibit K-1 | Existing Exclusives and Existing Use Restrictions |
| Exhibit K-2 | Existing Leases |
| Exhibit L-1 | Landlord Imposed Prohibited Uses |
| Exhibit L-2 | Tenant Imposed Prohibited Uses |
| Exhibit M | Permissible Common Area Retail/Promotional Uses per Existing Leases |

## LEASE AGREEMENT

THIS LEASE AGREEMENT (*"Lease"*) is entered into as of March 31, 2017 by
and between SERITAGE SRC FINANCE LLC, a Delaware limited liability company, having an
office at 489 5th Avenue, 18th Floor, New York, New York 10017 (*"Landlord"*), and BED
BATH & BEYOND INC., a New York corporation, having an office at 650 Liberty Avenue,
Union, New Jersey 07083 (*"Tenant"*).

## W I T N E S S E T H:

### ARTICLE 1.
### BASIC TERMS AND DEFINITIONS

Section 1.1    Basic Terms and Definitions.  The following terms shall have the
meanings set forth in this Section 1.1 except as otherwise expressly provided herein.

1.1.1    Additional Rent:  Any monies which Tenant is required to pay to Landlord
under the terms and conditions of this Lease, other than Fixed Rent.

1.1.2    Affiliate:  A corporation, partnership, limited liability company, person or other
entity which is controlling, controlled by, or under common control with, Landlord or Tenant, as
the case may be.  As used herein, "*control*" shall mean the possession, direct or indirect, of the
power to direct or cause the direction of the management and policies of a person or entity,
whether through the ownership of voting securities or rights, by contract, or otherwise.

1.1.3    Alternate Rent:  Fifty percent (50%) of the amount of Fixed Rent which
otherwise would have been payable during the period in which Tenant is entitled to pay
Alternate Rent.

1.1.3A  Building:  The Building of which the Premises is a part.

1.1.4    Common Areas:  All areas in the Shopping Center which are, from time to
time, available for the joint use and benefit of Tenant and other tenants and occupants of the
Shopping Center, and their respective employees, agents, subtenants, concessionaires, licensees,
customers and other invitees, including, but not limited to, any such parking areas, parking
spaces, driveways, truck serviceways, passageways, sidewalks, entrances, exits, lighting
facilities, courts, landscaped areas, retention or detention areas, and utility lines serving such
common areas and facilities.

1.1.5    Common Areas Charges:  As defined in Section 5.1 hereof.

1.1.6    Delivery Date: As defined in Section 2.3 hereof.

1.1.7    Effective Date: The date hereof.

1.1.8    Event of Default:  As defined in Section 16.1 hereof.

1.1.9    Excused Periods:  Periods during which Tenant's (or another tenant's, if being
invoked by Landlord) failure to conduct the operations of its business or any other business: (x)
resulted from alterations or renovations being performed in and to the Premises (or the premises
of such other tenant, if being invoked by Landlord), provided that the performance of such
alterations or renovations shall be conducted in good faith and with reasonable due diligence, (y)
was caused by damage or destruction, eminent domain proceedings or actions, or *Force Majeure*,
or (z) if being invoked by Tenant, was caused by any act or omission of Landlord, or its
employees, agents, or contractors (provided that Tenant shall have given Landlord notice of such
act or omission within a reasonable period after the occurrence thereof), or if being invoked by
Landlord, was caused by any act or omission of Tenant or its employees, agents or contractors
(provided that Landlord shall have given Tenant notice of such act or omission within a
reasonable period after the occurrence thereof).

1.1.10  Exhibits.  The exhibits listed in the Table of Contents annexed to this Lease
have been agreed to by the parties and attached hereto, it being the intention of the parties that
they shall become a binding part of this Lease as if fully set forth herein.

1        1.1.11  Fixed Rent: The following amounts for the periods indicated (subject to
2 adjustment pursuant to Section 3.4 hereof):

3                (a)  For the period commencing on the Rent Commencement Date and ending
4 on the last day of the "Initial Term" (defined in Subsection 1.1.45 below), at the rate of Three
5 Hundred Twenty-Nine Thousand Four Hundred Fifty and 00/100 ($329,450.00) Dollars per year
6 ; provided, however, in the event the Stub Period (as hereinafter defined) exceeds a period of six
7 (6) months, the Fixed Rent for the Stub Period shall be payable at the rate set forth in Section
8 1.1.11(b) below;

9                (b)  In the event Tenant exercises the first Renewal Option, for the first five (5)
10 year Renewal Period, at the rate of Three Hundred Sixty-Two Thousand Three Hundred Ninety-
11 Five and 00/100 ($362,395.00) Dollars per year;

12                (c)  In the event Tenant exercises the second Renewal Option, for the second
13 five (5) year Renewal Period, at the rate of Three Hundred Ninety-Eight Thousand Six Hundred
14 Thirty-Four and 50/100 ($398,634.50) Dollars per year;

15                (d)  In the event Tenant exercises the third Renewal Option, for the third five
16 (5) year Renewal Period, at the rate of Four Hundred Thirty-Eight Thousand Four Hundred
17 Ninety-Seven and 95/100 ($438,497.95) Dollars per year; and

18                (e)  In the event Tenant exercises the fourth Renewal Option, for the fourth
19 five (5) year Renewal Period, at the rate of Four Hundred Eighty-Two Thousand Three Hundred
20 Forty-Seven and 75/100 ($482,347.75) Dollars per year.

21        1.1.12  Floor Area: The actual number of square feet of space contained on all floors
22 within any building area in the Shopping Center (including the Premises) and, with respect to
23 exterior areas, including all exterior areas leased to or exclusively used by one or more tenants
24 (other than exterior loading dock areas, trash compactor areas, trash container areas, cart corral
25 areas, to-go parking spaces (as applicable) and subject to Section 5.2.8(a) below, any (a)
26 sidewalk sales areas, or (b) other seasonal or non-permanent type event areas within the
27 Common Areas). All measurements pursuant to this Subsection shall be from the exterior of
28 outside walls or store front and/or to the centerline of any common walls, but in no event shall
29 Floor Area within either the Premises or the remainder of the Shopping Center include any non-
30 selling or storage space areas within any mezzanine, lower floor, second floor or, except as set
31 forth above, any exterior areas.

32        1.1.13  *Force Majeure*:  As defined in Section 23.4 hereof.

33        1.1.14  Ground Lessor: The landlord under any existing or future ground or underlying
34 leases encumbering or affecting all or any part of the Shopping Center.

35        1.1.15  Intentionally Omitted.

36        1.1.16  Hazardous Substances:  As defined in Subsection 12.4.1 hereof.

37        1.1.17  Intentionally Omitted.

38        1.1.18  Landlord:  As defined in the preamble and Section 23.11 hereof.

39        1.1.19  Landlord Delay: Any delay in Tenant's performance of Tenant's Work,
40 Tenant's fixturing or merchandising of the Premises and/or the opening of Tenant's store for
41 business to the public to the extent same results from interference by Landlord or Landlord's
42 contractors in Tenant's ability to effect any of the foregoing.

43        1.1.20  Landlord's Mailing Address: Seritage SRC Finance LLC, 489 Fifth Avenue,
44 18th Floor, New York, New York 10017 Attention: Executive Vice President, Operations &
45 Leasing, with a copy to Seritage SRC Finance LLC, 489 Fifth Avenue, 18th Floor, New York,
46 New York 10017, Attention: Executive Vice President, General Counsel, with an additional copy
47 to Goldfarb & Fleece LLP, 560 Lexington Avenue, 6th Floor, New York, New York 10022,
48 Attention: Marc E. Wasser, Esq., or such other place and/or to the attention of such other person
49 as Landlord may notify Tenant from time to time by notice given in accordance with the
50 provisions of Article 18 hereof. If the "Landlord" consists of more than one person, then notices
51 given to the entity listed in Landlord's Mailing Address will be deemed to have been given

1  automatically to all of the parties which constitute Landlord, and Tenant shall be entitled to rely
2  exclusively on any notice sent by said entity.

3  1.1.21  Landlord's Work:  As defined in Section 3.1 hereof.

4  1.1.22  Lease Interest Rate: The then effective prime rate as published from time to
5  time in the "Money Rates" section of *The Wall Street Journal* (or any successor publication
6  thereto) plus two (2%) percent.

7  1.1.23  Legal Requirements: All laws, statutes, codes, acts, ordinances, judgments,
8  decrees, authorizations, directions and requirements of, and agreements with, all governmental
9  departments, commissions, boards, courts, authorities, agencies, officials and officers, which
10  now or at any time hereafter may be applicable to the Premises, the Shopping Center, or any
11  part(s) thereof, including, without limitation, the Americans with Disabilities Act and federal,
12  state, and local governmental interpretations thereof.

13  1.1.24  Mortgagee:  Any state or federally regulated: bank, savings and loan
14  association, insurance company, pension fund, credit union, real estate investment trust, or other
15  institutional lender, which is not an Affiliate of Landlord, and which holds a mortgage on the
16  Shopping Center or is the beneficiary under a deed of trust encumbering the Shopping Center.

17  1.1.25  National Retailer: Any national retail chain store tenant (i.e. operating in at
18  least fifty (50) stores in the United States) of the type typically found in shopping centers of
19  similar quality to that of the Shopping Center as of the Effective Date in the States of
20  Connecticut, Massachusetts or New York; provided, however, in no event shall Sears be
21  considered a National Retailer.

22  1.1.26  Intentionally Omitted.

23  1.1.27  Intentionally Omitted.

24  1.1.28  Permitted Use:  Subject to Section 13.1 hereof, The sale (including the
25  incidental rental), at retail of infant, juvenile and children's goods and services, including,
26  but not limited to, a variety (in Tenant's sole discretion as to the mix and proportions) of
27  the following: infant's, juvenile's and children's  furniture, furnishings, beds (including,
28  without limitation, mattresses and bedding), changing tables, gliders and rockers
29  (including coordinating ottomans), high chairs, lamps, walkers, play yards, swings, car
30  seats, booster seats, carriages, strollers, cradles, playpens, cribs, toy or clothing chests,
31  stuffed animals, games and toys, bedding accessories, maternity clothing and related
32  items, clothing and accessories for infants, juveniles or children, apparel, layettes, shoes,
33  toys, bottles, food or formula for infants, juveniles and children, feeding items, safety
34  items, nursing items, health and beauty care items, food and beverages, drug remedies,
35  diapers, wipes, bathroom and personal care devices and items, indoor or outdoor play and
36  recreational equipment, pacifiers, baby safety items, diaper bags, nursing and bathing
37  items, children's books, pregnancy books, magazines, computer software, audio and
38  video cassettes or tapes, picture frames, portrait studio items and services, party supplies,
39  invitations, greeting cards, gift items, arts and crafts, stationery, teachers' and parents'
40  resources, other educational and multi-media children's items, hair cutting services,
41  fitness center development and learning services, and any and all other items sold or
42  services (including, without limitation, the operation of Demonstration Areas, defined
43  below, which are incidental to the sale of the Permitted Items, defined below, and
44  aforementioned services) provided from time to time in any store owned or operated by
45  Tenant or its Affiliate(s) (the aforementioned items are hereinafter collectively referred to
46  as the *"Permitted Items"*); and for any other lawful retail use not specifically prohibited
47  by the provisions of Section 13.1.1 below.  In addition, Tenant shall be permitted to use
48  portions of the Premises for storage and office uses incidental to the Permitted Use. As used
49  herein, *"Demonstration Areas"* shall mean an area or areas located within the Premises, for the
50  purpose of demonstrating to Tenant's customers and invitees various products (including,
51  without limitation, food and cooking products), which Demonstration Areas shall be at all times
52  be operated in full compliance with all Legal Requirements.

53  1.1.29  Premises: Being the area shown as the "Premises" on Exhibit B hereto, having
54  dimensions as shown on Exhibit B and containing approximately: (i) nineteen thousand fifty-

3

three (19,053) square feet of Floor Area and (ii) and approximately five thousand eight hundred fifty-seven (5,857) of Floor Area that is the Shared Area.  In no event shall any space used for fire pump facilities be included in the determination of Tenant's Pro Rata Share nor shall the Shared Area be included in the determination of Tenant's Pro Rata Share of Common Areas Charges (subject, however, to Section 23.1(b) hereof).

        1.1.29A    Regional Retailer:  Any regional retail chain store tenant (i.e. operating in at least twenty-five (25) stores in the States of Connecticut, Massachusetts or New York) of the type typically found in shopping centers of similar quality to that of the Shopping Center on the Effective Date in the States of Connecticut, Massachusetts or New York.

        1.1.30    Renewal Option:  As defined in Section 2.2.2 hereof.

        1.1.31    Renewal Period(s): Four (4) successive periods of five (5) years each, as provided in Section 2.2.2 hereof.

        1.1.32    Rent:  Fixed Rent and/or Additional Rent.

        1.1.33    Rent Commencement Date:  As defined in Section 2.2 hereof.

        1.1.34    Shared Area:  Collectively, the areas identified on Exhibit B hereto as "Tenant 1A/1B Common Loading Area" and "Tenant 1A/1B Common Entry," including all appurtenances thereto (including vertical transportation located therein (i.e. elevators and escalators).

        1.1.35    Shopping Center:  The shopping center currently containing approximately one hundred fifty-three thousand four hundred (153,400) square feet of Floor Area, on the property located at 1445 New Britain Avenue, West Hartford, Connecticut and more particularly described in Exhibit A hereto.  Landlord shall not provide a name for or thereafter change the name of the Shopping Center without giving at least thirty (30) days prior notice to Tenant, and Landlord shall not include the name of any tenant (other than Tenant) in any name given to the Shopping Center.

        1.1.36    Substantially Completed or Substantial Completion:  The completion of specified work at the Shopping Center (including, without limitation, as applicable, Landlord's Work) to the extent that only "Punch List Items" of such work (defined in Subsection 3.3.3 below) shall not be completed.

        1.1.37    Taxes:  As defined in Section 4.3.3 hereof.

        1.1.38    Tenant:  As defined in the preamble hereof.

        1.1.39    Tenant Delay:  Any delay in Landlord's performance of any construction and/or Landlord's Work required to satisfy the Delivery Date Conditions to the extent that same results from: (a) Tenant's failure to approve, consent, comment upon, reject or otherwise timely respond to a request for plan approval within the express time provisions set forth in this Lease; or (b) the interference by Tenant or Tenant's contractors in the performance by Landlord or Landlord's contractors of any such construction and/or Landlord's Work.

        1.1.40    Tenant's Mailing Address:  650 Liberty Avenue, Union, New Jersey 07083, Attn: Mr. Warren Eisenberg, or such other place and/or to the attention of such other person as Tenant may notify Landlord from time to time by notice given in accordance with the provisions of Article 18 hereof.

        1.1.41    Tenant's Permits:  As defined in Section 2.3.1(b) hereof.

        1.1.42    Tenant's Property:  All of Tenant's personal property, including, without limitation, phone and alarm systems, satellite antennae, shelving, computers, furniture, cash registers and customer service counters, specialty lighting, track lighting, millwork, conveyor systems, storage racks and signage and any and all other personal property of Tenant which is capable of being removed from the Premises without material damage thereto, but which shall not include electrical systems, heating, ventilation and air conditioning systems, and other mechanical systems, flooring, carpet, elevators, standard lighting and wiring installed within the walls of the Premises.

4

1       1.1.43   Tenant's Pro Rata Share: A fraction whose numerator is the Floor Area of the
2   Premises and whose denominator is the Floor Area of the Shopping Center as may be re-
3   determined any time a building (and/or Floor Area) is added to or removed from the Shopping
4   Center, but in no event shall Tenant's Pro Rata Share be greater than eighteen percent (18%)
5   (except that Tenant's Pro Rata Share with respect to Taxes shall be no greater than twenty-two
6   percent (22%), subject, however, to Section 23.1(b) hereof).  Floor Area shall be deemed added
7   to or removed from the Shopping Center on the earlier of (i) the date upon which the work
8   necessary to add or remove such Floor Area, as the case may be, is Substantially Completed, or
9   (ii) at such time as an assessment for Taxes is made or removed, as the case may be, with respect
10  to such Floor Area.  Within thirty (30) days following written request from Tenant, which
11  request may not be made more than twice in any calendar year, Landlord shall certify to Tenant
12  in writing as to the then Floor Area of the Shopping Center.  Notwithstanding anything to the
13  contrary contained herein, the Floor Area of the Shared Areas shall not be included in
14  determining Tenant's Pro Rata Share except for determining Tenant's Pro Rata Share of Taxes
15  (subject, however, to Section 23.1(b) hereof).

16      1.1.44   Tenant's Work: As defined in Section 3.1 hereof.

17      1.1.45   Term: A period (the "*Initial Term*") of approximately ten (10) years beginning
18  on the Delivery Date and expiring at midnight on the last day of January following the tenth
19  (10th) anniversary of the Rent Commencement Date (the period between the tenth $(10^{th})$
20  anniversary of the Rent Commencement Date and the last day of January thereafter that the
21  Initial Term is in effect (the "*Stub Period*")), unless the Rent Commencement Date is February
22  1, in which event the Expiration Date shall be the day before the tenth $(10^{th})$ anniversary of the
23  Rent Commencement Date. As used herein: (i) "*Term*" shall refer to the Initial Term, as the
24  same may be extended by any Renewal Period exercised pursuant to Section 2.2.2 below; and
25  (ii) "*Expiration Date*" shall mean the date on which the Term expires.

26

27                                  ARTICLE 2.
28              LEASE OF PREMISES; LEASE TERM; DELIVERY DATE

29      Section 2.1   Lease of Premises.  Landlord hereby leases to Tenant, and Tenant hereby
30  leases from Landlord, the Premises together with any and all rights, benefits, privileges and
31  easements, now or hereafter appurtenant to the Premises and, to the extent applicable or relating
32  to the use and occupancy of the Premises or the operation of Tenant's business therefrom, the
33  Shopping Center, arising out of any public or private grant or authority, the foregoing to include
34  without limitation, the non-exclusive right and easement to use the Common Areas in common
35  with other tenants and occupants of the Shopping Center.

36      Section 2.2   Term.

37      2.2.1   Initial Term.  Subject to the provisions of this Article 2, the Term of this Lease
38  shall begin on the Delivery Date; provided, however, the payment of Fixed Rent shall commence
39  on the earlier of: (a) the date upon which Tenant shall initially open the Premises to the general
40  public for business or (b) the sixtieth (60th) day following the Delivery Date (such earlier date
41  being referred to herein as the "*Rent Commencement Date*").  The Term shall expire on the
42  Expiration Date, unless earlier terminated as herein provided.  When the Rent Commencement
43  Date has been determined, as provided in this Section, Landlord and Tenant shall execute,
44  acknowledge and deliver, each to the other (within thirty (30) days after request from the
45  requesting party), a written statement in the form attached hereto as Exhibit C specifying the
46  Rent Commencement Date, and Landlord shall deliver to Tenant a completed and signed IRS
47  Form W-9 contemporaneously therewith; the delivery of the Form W-9 shall be a condition
48  precedent to the payment of Rent.

49      2.2.2   Renewal Options.  Provided that an Event of Default is not then in effect
50  pursuant to the terms and conditions of this Lease, Tenant shall have the right and option
51  (hereinafter a "*Renewal Option*") to extend the Initial Term from the date on which it would
52  otherwise expire for four (4) successive renewal periods of five (5) years each (individually, a
53  "*Renewal Period*", and collectively, the "*Renewal Periods*") upon the same terms and
54  conditions as are herein set forth.  Each Renewal Option shall be exercisable by notice given to
55  Landlord at least two hundred seventy (270) days prior to the commencement of the applicable
56  Renewal Period(s), provided, however, that the Term of this Lease shall not expire unless and

1    until Tenant fails to exercise a Renewal Option within fifteen (15) days after receiving notice
2    from Landlord that the Renewal Option in question has not been exercised (Landlord's notice
3    shall not be given prior to the 270th day prior to the Expiration Date), or unless and until Tenant
4    gives notice to Landlord that it will not be exercising any remaining Renewal Options. If
5    Landlord fails to give Tenant such notice prior to the Expiration Date, and Tenant occupies the
6    Premises after the Expiration Date, then Tenant shall remain in possession subject to the
7    provisions of this Lease but without the application of Article 20 hereof. If Landlord then gives
8    Tenant such notice and Tenant exercises its Renewal Option, then the effective date of such
9    exercise shall be retroactive to the Expiration Date. If Landlord then gives Tenant such notice
10   and Tenant does not exercise its Renewal Option within fifteen (15) days after its receipt of such
11   notice, time being of the essence, then the Term shall expire on the one hundred eightieth (180th)
12   day following the expiration of such fifteen (15) days period, and in such event the terms of
13   Article 20 of this Lease shall apply.

14        2.2.3    Kick-out Rights.
15

16        (a)    Provided that the Premises are being operated as a typical buy buy Baby
17   store, if Tenant's Gross Sales do not equal or exceed Four Million Five Hundred Thousand and
18   00/100 Dollars during the one (1) year period commencing on first day of the sixty-sixth (66th)
19   month first occurring after the Rent Commencement Date and continuing through and including
20   the last day of the seventy-seventh (77th) month first occurring after the Rent Commencement
21   Date (the "*Measuring Period*"), Tenant shall have the right, as its sole remedy, to terminate this
22   Lease, provided: (A) Tenant provides written notice to Landlord (the "*Termination Notice*") on
23   or before the thirtieth (30th) day next following the expiration of the Measuring Period (the
24   "*Termination Option Notice Date*"); (B) this Lease has not been terminated previously pursuant
25   to the provisions of this Lease or pursuant to law; (C) Tenant shall have continuously operated in
26   the Premises during the Term in accordance with the terms of this Lease; and (D) Tenant is not
27   then in default under any of the terms, covenants or conditions of this Lease on Tenant's part to
28   be observed or performed beyond any applicable notice and cure period provided in the Lease.
29   The Termination Notice shall contain a compilation prepared by an officer of Tenant setting
30   forth the amount of Gross Sales during the Measuring Period (the "*Final Gross Sales Report*").
31   Time is of the essence with respect to the giving of the Termination Notice, and any notice given
32   after the Termination Option Notice Date purporting to exercise such option shall be void and of
33   no force or effect. In the event Tenant shall give the Termination Notice pursuant to the
34   provisions of this Section and shall otherwise comply with the conditions provided in this section
35   for the exercise of Tenant's right to terminate this Lease, this Lease and the Term shall come to
36   an end and expire on the date that is the last day of the eighty-fourth (84th) month first occurring
37   after the Rent Commencement Date (the "*Termination Date*"). Upon the Termination Date, this
38   Lease shall expire and come to an end with the same force and effect as if that date were the
39   expiration date originally set forth in this Lease and, except for accrued liabilities and any other
40   matters stated in this Lease to survive the end of the Term, neither party hereto shall have any
41   further liability pursuant to this Lease. In addition, in connection with such termination Tenant
42   shall pay to Landlord the Termination Payment (defined below) on or before the Termination
43   Date. As used herein the term "*Termination Payment*" shall mean the sum of Two Hundred
44   Thousand and no/100 Dollars ($200,000.00).

45

46        (b)    As used herein, the term *"Gross Sales"* shall mean the total amount of all
47   merchandise or services sold and fulfilled from the Premises by Tenant or any sublessee,
48   licensee or concessionaire of Tenant and any other person or entity operating in the Premises (for
49   purposes of this Subsection 2.2.3 only, collectively, "*Tenant*"), whether for cash, credit or
50   otherwise, including redemption of gift certificates and gift cards. Tenant shall record, at the
51   time of each Gross Sale, all receipts from such sale, whether for cash, credit or otherwise, in a
52   cash register or cash registers, or in such electronic or computer device which records sales in a
53   manner which is generally acceptable by industry standards. The term *"Gross Sales"* shall
54   exclude: **(1)** proceeds from any sales tax, gross receipts tax or similar tax, by whatever name
55   called, which are separately stated and are in addition to the sales price, **(2)** *bona fide* transfers or
56   exchanges of merchandise from the Premises to any other stores or warehouses of Tenant or any
57   Affiliates of Tenant, and returns to shippers and manufacturers for credit, **(3)** refunds or credits
58   given to customers for merchandise returned or exchanged at the Premises (regardless of where
59   or how purchased), **(4)** sales of Tenant's fixtures and equipment not in the ordinary course of
60   Tenant's business, **(5)** to the extent of prior inclusion in Gross Sales, bad debts when written off
61   the books of Tenant, provided that any collections made on account of such bad debts shall be
62   included in Gross Sales when received, **(6)** receipts from vending machines installed solely for

the use of Tenant's employees and receipts from pay telephones, **(7)** sales to employees of Tenant at discount (which for purposes of determining whether Tenant's Gross Sales exceed the amount set forth in subsection (a), above, shall not exceed two percent (2%) of Gross Sales per calendar year or pro rata portion thereof, as applicable), **(8)** fees paid to independent third party credit card, charge card, debit card, and check verification/guaranty companies in connection with sales charged to or debited from customers' credit cards, charge cards, or debit cards, or sales paid for by customers by checks, as applicable, **(9)** proceeds from delivery, gift-wrapping and check cashing charges (which for purposes of determining whether Tenant's Gross Sales exceed the amount set forth in subsection (a), above, shall not exceed two percent (2%) of Gross Sales per calendar year or pro rata portion thereof, as applicable), **(10)** sums and credits received in settlement of claims for loss or damage to merchandise, **(11)** separately stated service, finance and interest charges, **(12)** the dollar value of coupons utilized by customers in the purchase of merchandise from the Premises, **(13)** close-out or bulk sales of inventory to jobbers or wholesalers, **(14)** sales of gift certificates and/or gift cards, **(15)** forfeited deposits. Notwithstanding anything to the contrary contained herein, sales of merchandise fulfilled from the Premises, regardless of how or where paid for (e.g., online or at another store) shall be includable in Gross Sales.

(c)    Landlord's Right to Audit. Landlord shall have the right, upon at least thirty (30) days prior notice to Tenant, to audit Tenant's books and records to verify the accuracy of the Final Gross Sales Report; provided, however, that Landlord's notice to audit the Final Gross Sales Report must be given (if at all) within fifteen (15) days of its receipt of same. If Landlord fails to timely notify Tenant that Landlord is exercising its right to audit the Final Gross Sales Report then such report shall be deemed to be correct and conclusively binding upon Landlord. Upon Landlord's timely request to audit, Tenant shall promptly deliver to Landlord copies of relevant backup materials reasonably required by Landlord in furtherance of such audit. Landlord shall not employ an auditor who is paid on a contingency fee basis. Landlord shall keep the results of any such audit confidential (and if requested by Tenant, shall execute a confidentiality agreement in form reasonably acceptable to Landlord and Tenant) provided that nothing contained herein shall restrict Landlord from disclosing such information as may be required by applicable Legal Requirements, or to its accountants, or attorneys (provided that each of such recipients shall be bound by the same non-disclosure provisions as are imposed upon Tenant). Any dispute by Tenant with respect to an audit by Landlord shall be submitted to arbitration in accordance with the provisions of Section 16.3 below.

Section 2.3  Delivery Date.

2.3.1  Definition. Subject to Landlord's delivery to Tenant of the Delivery Date Notice in accordance with the provisions of Subsection 2.3.2 below and Landlord's timely compliance therewith, Landlord shall be deemed to have delivered possession of the Premises to Tenant at 8:00 a.m. on the date (the *"Delivery Date"*) following the day on which all of the following conditions (the *"Delivery Date Conditions"*) shall have occurred and Tenant shall have received from Landlord the Delivery Date Certification in accordance with the provisions of Section 2.3.3 below, which shall constitute Landlord's written certification that all of the following shall have occurred as of the Delivery Date:

(a)  Actual possession of the Premises shall have been delivered to Tenant water-tight, free of Hazardous Substances in violation of Environmental Laws (it being agreed, however, that (x) the Premises shall in any event be delivered free of any asbestos-containing materials, and (y) if the presence of Hazardous Substances within the Premises as permitted hereunder (i.e., that are not in violation of Environmental Laws on the Delivery Date) shall thereafter be deemed to violate Environmental Laws by reason of any changes in such laws (and such resulting violation is not "grandfathered" under such applicable Environmental Laws), then Landlord shall be required to remediate same at its sole cost and expense in accordance with the further terms and conditions of this Lease), in a good, structurally sound condition, with all of Landlord's Work Substantially Complete, which Substantial Completion shall be evidenced by a written certification by Landlord's architect to Tenant. Landlord and Tenant hereby agree, without limiting Tenant's rights and remedies otherwise available, that in the event that Tenant, at any time following the Delivery Date, shall discover Hazardous Substances within the Premises that Landlord was required to remove from the Premises prior to the Delivery Date (and not otherwise introduced by Tenant, its employees, agents or contractors), then Tenant shall promptly after its discovery notify Landlord of same and in such event Landlord shall proceed diligently and in good faith to remove such Hazardous Substances in full accordance with applicable Legal Requirements, in which event (i) to the extent that Landlord's removal of such

7

1    Hazardous Substances would materially interfere with or delay (or as applicable, actually does
2    materially interfere with or delay) the performance of Tenant's Work, its fixturing or
3    merchandising or the opening or subsequent normal operation of the Premises for business to the
4    public, then the Rent Commencement Date that would otherwise have occurred under this Lease
5    shall be delayed (or, to the extent that such Hazardous Substances are discovered subsequent to
6    the Rent Commencement Date, then Tenant's payment of Rent shall thereupon be abated) by the
7    same number of days that Landlord requires to remove such Hazardous Substances in full
8    accordance with applicable Legal Requirements and to obtain all applicable governmental sign-
9    offs pertaining thereto.

10                     (b)   Landlord shall have obtained (and delivered copies thereof to Tenant,
11   upon request) all permits and approvals required from all applicable governmental authorities to
12   enable Tenant to occupy and use the Premises for the conduct of its business in the Premises
13   (exclusive of (i) any permits required for Tenant's Work (except to the extent that same are
14   legally obtainable only by Landlord on Tenant's behalf, so long as Tenant shall have proceeded
15   diligently to provide Landlord with all applicable information pertaining to Tenant's Work), and
16   (ii) any business licenses which Tenant may be required to obtain in order to open and engage in
17   the sale of its Permitted Items (collectively, "*Tenant's Permits*")), which permits and approvals
18   shall include, without limitation, zoning and building code approvals, environmental
19   requirements, and a permanent certificate of occupancy or, as applicable, the corresponding legal
20   approval for the Premises (unless a permanent certificate of occupancy or, as applicable, the
21   corresponding legal approval for the Premises cannot be obtained solely as a result of the failure
22   to complete Tenant's Work in the manner required hereunder, in which event: (1) the delivery of
23   a permanent certificate of occupancy or, as applicable, the corresponding legal approval for the
24   Premises, shall not be a condition to the occurrence of the Delivery Date,  (2) the obtaining of a
25   temporary certificate of occupancy (or, as applicable, the corresponding legal approval for the
26   Premises) shall be a condition to the occurrence of the Delivery Date, and  (3) Landlord shall
27   obtain the permanent certificate of occupancy (or, as applicable, the corresponding legal
28   approval for the Premises)  promptly following the correction or completion of Tenant's Work
29   and Tenant shall reasonably cooperate with Landlord in connection therewith);

30                     (c)   The Common Areas, and all of the improvements thereto shown on
31   Exhibit B hereto shall have been Substantially Completed and operational, and all off-site
32   improvements (including, without limitation, street, storm drainage, and traffic signalization
33   improvements) required for the Shopping Center to open for business and for Tenant to receive a
34   permanent certificate of occupancy or, as applicable, the corresponding legal approval for the
35   Premises, shall have been Substantially Completed; Landlord, at its sole cost and expense, shall
36   have obtained (and delivered copies thereof to Tenant, upon request) all permits and approvals
37   required from applicable governmental authorities to enable the Common Areas to be developed,
38   operated, and used for the purposes herein contemplated, which permits and approvals shall
39   include, without limitation, zoning, building code, environmental requirements, curb cut and site
40   plan approvals, all permits pertaining to pylon and/or monument signage (and Tenant's panel(s)
41   thereon), construction, and development and use permits;

42                     (d)   The representations and warranties of Landlord set forth in subparagraphs
43   (a) through (i) of Section 12.3 below shall then be true and in effect;

44                     (e)   A lease or other occupancy agreement (other than this Lease and/or
45   Tenant's or its Affiliate's lease with respect to the Adjacent Premises) shall have been entered
46   into (or, as applicable, shall continue in effect) with a National Retailer occupying at least
47   twenty-five  (25,000) square feet of Floor Area in the Shopping Center;

48                     (f)   Landlord shall have delivered to Tenant, in recordable form: (i) a
49   subordination, non-disturbance and attornment agreement substantially in the form attached
50   hereto as Exhibit G executed by each holder of any mortgage or deed of trust encumbering or
51   affecting the Shopping Center or any portion thereof (it being understood and agreed that this
52   Subsection 2.3.1 (f) is not intended to extend the date by which Landlord is to deliver to Tenant
53   any document(s) required pursuant to Section 17.3 hereof), and (ii) a fee owner recognition
54   agreement in the form and content described in clause (b) of Section 17.1 hereof executed by any
55   existing Ground Lessor; and

56                     (g)   Landlord shall have delivered to Tenant reasonable documentation
57   evidencing that the Existing Lease (defined in Section 12.3(j) hereof) to Land's End and the

8

1    Existing Lease to Sears has been terminated and that the rights of such tenants as set forth in
2    Exhibit K-1, Exhibit K-2 and Exhibit M hereof are of no further force and effect.

3                                  2.3.2    Delivery Date.

4                                  (a)    Landlord shall give Tenant at least ninety (90) days prior notice of the
5    Delivery Date, using the form of Delivery Date Notice attached hereto as Exhibit I (the "*Delivery*
6    *Date Notice*"). Landlord's delivery of the Delivery Date Notice shall be a condition precedent to
7    the Rent Commencement Date. Notwithstanding any provision of this Lease to the contrary, in
8    no event shall the Delivery Date be deemed to occur prior to the Delivery Date established in the
9    Delivery Date Notice. No event of Force Majeure occurring prior to the giving of the Delivery
10   Date Notice shall serve to delay the Delivery Date thereby established.

11                                 (b)    Landlord acknowledges that if it shall fail to satisfy all of the Delivery
12   Date Conditions by the Delivery Date as established in the Delivery Date Notice, Tenant will
13   sustain substantial, additional costs and expenses, including, without limitation, storage costs for
14   fixtures, equipment, and inventory, employee costs during the waiting period, and additional
15   advertising and promotional costs, the exact amount of which would be impracticable or
16   extremely difficult to ascertain. If the Delivery Date does not occur by the date established
17   therefor in the Delivery Date Notice (subject to (i) events of Force Majeure first occurring after
18   the date Landlord delivers the Delivery Date Notice to Tenant, and (ii) any delays caused by the
19   acts or negligence of Tenant or its agents, employees or contractors first occurring after the date
20   Landlord delivers the Delivery Date Notice to Tenant (provided that Landlord shall have given
21   Tenant notice of such event of Force Majeure or, as the case may be, such Tenant delay,
22   promptly after the occurrence thereof)), then, in addition to any other non-monetary remedies
23   available to Tenant under this Lease (it being agreed that the Tenant's Liquidated Costs
24   hereinafter described shall be Tenant's sole monetary remedy for such failure, subject, as
25   applicable, to Section 3.3.2(i) below), Tenant shall be entitled to a credit against the initial
26   installment(s) of Fixed Rent hereunder, as liquidated reimbursement (and not as a penalty) for all
27   of the aforesaid costs incurred by Tenant, an amount equal to the sum of: (i) Fifty Thousand
28   Dollars ($50,000), plus (ii) One Thousand Dollars ($1,000) for each day that the Delivery Date
29   established in the Delivery Date Notice is delayed (*"Tenant's Liquidated Costs"*). The
30   foregoing liquidated reimbursements represent the parties' good faith agreement as to an agreed
31   upon amount which shall have been incurred by Tenant and which shall otherwise not be
32   susceptible of exact ascertainment.

33                                 (c)    Notwithstanding the provisions of subparagraphs (a) and (b)
34   above, Landlord shall have the one-time right to postpone the Delivery Date from that previously
35   established in the Delivery Date Notice by delivering to Tenant a revised Delivery Date Notice
36   within fourteen (14) days after the delivery of the original Delivery Date Notice, which revised
37   notice shall set forth the date to which the Delivery Date will be postponed, but in no event shall
38   Tenant have less than ninety (90) days advance notice of the proposed Delivery Date. In the
39   event that a revised Delivery Date Notice is timely given hereunder, Tenant's Liquidated Costs,
40   if any, shall only be deemed to accrue if, and then only to the extent, the Delivery Date occurs
41   after the new Delivery Date established in the revised Delivery Date Notice. If a revised
42   Delivery Date Notice is not given within the aforesaid 14-day period, it shall not serve to
43   postpone or curtail the availability of Tenant's remedies as provided in subparagraph (b) above.
44

45                                 2.3.3    Delivery Date Certification.    Upon the satisfaction of all of the Delivery
46   Date Conditions, Landlord shall so certify to Tenant, using the form of Delivery Date
47   Certification attached hereto as Exhibit J.

48                                 2.3.4    No Waiver.    Neither Tenant's acceptance of physical possession of the
49   Premises nor Tenant's opening of the Premises for business to the public prior to the Delivery
50   Date shall: (i) be deemed a waiver by Tenant of any of the Delivery Date Conditions, or (ii)
51   relieve Landlord of any obligation under this Lease, unless such condition or obligation is
52   expressly waived in writing by Tenant.

53                      Section 2.4    Unseasonable Delivery: Slack Period.    If, for any reason (including,
54   without limitation, Force Majeure), the Delivery Date occurs during the period commencing on
55   October 1 and ending on the March 1 next following (the *"Slack Period"*), then Tenant shall
56   have, in addition to the monetary remedy set forth in Section 2.3.2 above or the remedies set
57   forth in Section 3.3.2 hereof, the right to:

9

1                        (a)  accept delivery of physical possession of the Premises; or

2                        (b)  defer its acceptance of delivery of physical possession of the Premises to a
3  later date within the Slack Period or the date next following the expiration of the Slack Period,
4  whereupon the Delivery Date shall be deemed to have occurred on the date that Tenant actually
5  accepts physical possession of the Premises, but in no event later than the date next following the
6  expiration of the Slack Period (subject to the other provisions of this Article 2 and the continuing
7  satisfaction of the Delivery Date Conditions); and

8  in either event, if the Rent Commencement Date occurs during the Slack Period, Tenant shall be
9  entitled to pay Alternate Rent in lieu of Fixed Rent for the period commencing on the Rent
10  Commencement Date and ending on the expiration of the Slack Period; any benefit which Tenant
11  may realize thereby shall constitute a reimbursement to Tenant for certain pre-opening expenses
12  incurred by Tenant in connection with this Lease.  In the event that Tenant elects to defer the
13  Delivery Date pursuant to this Section, the accrual of any per diem liquidated reimbursement
14  under Section 2.3.2(b) above shall be suspended for the period of such deferment.

15                             ARTICLE 3.
16                        IMPROVEMENTS

17       Section 3.1    Landlord's Work and Tenant's Work.  Landlord shall, at its sole cost and
18  expense, perform the work and obligations described on Exhibit D, Exhibit D-1, and Exhibit F
19  hereto, and the "Final Landlord's Plans and Specifications" (hereinafter defined in Section 3.2)
20  (collectively, "***Landlord's Work***"), and shall deliver possession of the Premises to Tenant in the
21  condition described therein.  Notwithstanding the foregoing, the parties acknowledge that
22  Exhibit D-1 is, as of the Effective Date, subject to the final review and approval of the local
23  governmental authority.  Landlord agrees that it shall use all commercially reasonable efforts to
24  obtain such approvals.  To the extent the local governmental authority proposes changes to
25  Exhibit D-1, Landlord and Tenant shall reasonably cooperate with the local governmental
26  authority with respect to such changes.  Except for Landlord's Work, Tenant shall, at its own
27  cost and expense, do any and all work (hereinafter referred to as "***Tenant's Work***") which
28  Tenant desires to adapt the Premises to Tenant's use.

29       Section 3.2    Plan Approvals.

30           3.2.1  Preparation of Plans and Specifications.

31                      (a)  Within thirty (30) days after the Effective Date, Landlord shall deliver to
32  Tenant drawings showing the proposed footprint, column layout, and interior clear dimensions of
33  the Premises (the "***Preliminary LOD***") [Limits of Demised], which shall be subject to any
34  reasonable modifications indicated by Tenant as provided below. The Preliminary LOD shall be
35  substantially consistent with Exhibits B, D, and D-1 hereto.

36                      (b)  Within thirty (30) days after Tenant's receipt of the Preliminary LOD,
37  Tenant shall deliver to Landlord its revisions thereto (the "***Revised LOD***"), showing the location
38  of the interior structural grid (column layout), storefront opening, and mezzanine and/or office
39  core, the location and arrangement of the loading facilities, trash compactor pad, and trash
40  container pad(s), and any reasonable revisions to the interior clear dimensions.

41                      (c)  Within fifteen (15) days after Landlord's receipt of the Revised LOD,
42  Landlord shall deliver to Tenant a final LOD (as approved by Tenant, the "***Certified LOD***"),
43  certified by Landlord, which shall incorporate all of the elements of the Revised LOD.  Within
44  fifteen (15) days after its receipt of such final LOD, Tenant shall notify Landlord of Tenant's
45  approval thereof or the reasons why such approval cannot be granted, and Landlord shall, within
46  fifteen (15) days after receiving such notice, make any revisions necessary to correct such
47  matters and obtain Tenant's approval.  Upon Tenant's approval of the Certified LOD, any further
48  changes thereto shall be subject to Tenant's prior written approval (which may be withheld in its
49  sole discretion), provided that, as to changes required to conform to Legal Requirements, Tenant
50  shall have reasonable approval rights within the confines of said Legal Requirements.  After
51  Tenant approves the Certified LOD, Landlord shall be responsible for any and all reasonable
52  costs incurred and delays experienced by Tenant in connection with any further changes to the
53  Certified LOD required by Landlord.

54                      (d)  Within thirty (30) days after Tenant's receipt of the Certified LOD, Tenant
55  shall deliver to Landlord its Fixture Plan (F1); Floor Finish Plans Notes and Details (F2);

Power/Specialty Lighting Plan and Notes (F3); Lighting Plans and Notes (F4); and High Pile Storage Plan (F5) (collectively, *"Tenant's Plans"*), all of which shall be substantially consistent with the Certified LOD (as same may be reasonably modified by Tenant, as noted above).

(e)  Within thirty (30) days after receipt of Tenant's Plans, Landlord shall prepare and deliver to Tenant, in a single submission, "*Landlord's Plans and Specifications*" (as defined in Exhibit D hereto), and each of the plans which collectively constitute Landlord's Plans and Specifications shall be at least 85% complete, in Tenant's reasonable judgment. Landlord's Plans and Specifications shall be substantially consistent with Tenant's Plans, the Certified LOD, and Exhibits B, D, D-1, and F hereto.

(f)  Within thirty (30) days after its receipt of Landlord's Plans and Specifications, Tenant shall give Landlord notice of the respects, if any, in which said plans fail to meet Tenant's reasonable approval and/or fail to conform to the Certified LOD, Tenant's Plans, and/or Exhibits B, D, D-1, and F hereto

(g)  Within fifteen (15) days after the date on which Landlord receives Tenant's notice (described in the preceding paragraph), Landlord shall deliver to Tenant, in a single submission, revised Landlord's Plans and Specifications, which shall be 100% complete and shall address all of Tenant's comments.

(h)  Within fifteen (15) days after its receipt of the revised Landlord's Plans and Specifications, Tenant shall notify Landlord of Tenant's approval thereof or the reasons why such approval cannot be granted.

(i)  In the event that the Landlord's re-submittal of Landlord's Plans and Specifications is not approved by the Tenant, then Landlord shall further revise Landlord's Plans and Specifications to address all Tenant comments and re-submit them to Tenant for Tenant's review and approval. The re-submittal described in the preceding sentence shall be delivered to Tenant by Landlord within fifteen (15) days of receipt of Tenant's notice that the previous submittal has not been approved. The process described in this subparagraph (i) and subparagraph (h) above shall be repeated until Landlord has secured Tenant's approval of Landlord's Plans and Specifications. Landlord's Plans and Specifications as finally approved by Tenant are referred to herein as the "*Final Landlord's Plans and Specifications*."

(j)  Upon Tenant's approval of the Final Landlord's Plans and Specifications, any further changes thereto shall be subject to Tenant's prior written approval. Unless specifically noted on a separate summary sheet attached to the Final Landlord's Plans and Specifications, to the extent of a conflict between the terms and provisions of Tenant's Plans, Exhibit B, Exhibit D, Exhibit D-1, and/or Exhibit F hereto, and the terms and provisions of the Final Landlord's Plans and Specifications, then the terms and provisions of Tenant's Plans, Exhibit B, Exhibit D, Exhibit D-1, and Exhibit F shall govern and prevail.

(k)  All submissions by the parties of the Preliminary LOD, the Revised LOD, the Certified LOD, the Tenant's Plans, the Landlord's Plans and Specifications, the Final Landlord's Plans and Specifications, and the measurements required under Section 3.4.1 below shall be made (or accompanied) by the computer files thereof formatted in any version of *"Autocad 2002"* up to *"Autocad 2010"*.

3.2.2  Plan Changes.

(a)  Tenant shall have the right to make changes from the standards and specifications set forth in "Tenant's Prototype Drawings and Specifications" and/or the "Project Manual", referred to in Exhibit D hereto (collectively, the "*Prototype Standards/Specifications*"), and/or to require Landlord to subsequently make changes to the Landlord's Plans and Specifications and/or the Final Landlord's Plans and Specifications in accordance therewith (the "*Changes*"). Within fifteen (15) business days after receiving Tenant's request for any Change, Landlord shall give Tenant notice of the cost or savings, and any delay that may be occasioned by such Change, which notice shall be accompanied by all reasonable back-up supporting the cost increases or delays. If Tenant fails to authorize such Change within five (5) business days after receiving Landlord's notice, Tenant shall be deemed to have disapproved such Change.

(b)  Tenant shall pay to Landlord the net reasonable additional third-party costs of Landlord's Work resulting directly and solely from the aggregate Changes (exclusive of

11

1    any charges for overhead and profit, other than sums not exceeding 5% subcontractor profit and
2    5% general contractor profit thereon), taking into consideration all costs and savings realized by
3    Landlord as a result of the Changes, in the aggregate (including, without limitation, reasonable
4    costs approved by Tenant in advance associated with any acceleration of the work schedule
5    which Tenant, at its sole option, may require). Such payment shall be due and payable within
6    thirty (30) days after Tenant's receipt of backup information reasonably supporting all such
7    costs, including, without limitation, invoices, receipts and lien waivers of subcontractors and
8    materialmen, but in no event earlier than the Delivery Date.

9              (c)    Intentionally Omitted.

10             (d)    If despite Landlord's diligent efforts in performing Landlord's Work, the
11   Changes cause a net delay in the Substantial Completion of Landlord's Work (taking into
12   consideration any time reductions resulting from such Changes), then: (i) the Rent
13   Commencement Date shall be determined as if such delay had not occurred, (ii) the dates set
14   forth in clauses (a) and (b) of Section 3.3.2 below, shall be extended by the number of days of
15   such net delay; and (iii) with respect to Changes requested after the Delivery Date Notice is
16   given, for purposes of calculating liquidated damages under Subsection 2.3.2(b) above, the
17   Delivery Date shall be extended by the number of days of such net delay.

18        Section 3.3    Performance of Work.

19             3.3.1  Both Landlord's Work and Tenant's Work shall be performed in a good
20   and workmanlike manner, in compliance with all applicable Legal Requirements, utilizing only
21   new, first-class materials. Landlord shall pay all impact fees and related governmental charges
22   in connection with the Shopping Center and the Premises. If Tenant is diligently pursuing
23   Tenant's Permits in good-faith and Tenant's Permits cannot be obtained by the Delivery Date
24   because Landlord's Work has not been Substantially Completed or has been performed
25   improperly or by reason of any then existing condition or violation for which Landlord is
26   responsible hereunder and such failure actually delays Tenant from commencing Tenant's Work,
27   Tenant shall notify Landlord of such delay within ten (10) days following the commencement
28   thereof, and, Landlord shall remedy the situation so as to enable Tenant to obtain Tenant's
29   Permits, and the Delivery Date shall be deemed delayed, for Tenant's benefit only, on a day-for-
30   day basis for each day of delay occasioned thereby.

31             3.3.2  If the Delivery Date shall not have occurred by September 30, 2018
32   (subject to *Force Majeure*, not to exceed sixty (60) days in the aggregate, and provided that
33   Landlord shall have given Tenant notice of such event of *Force Majeure* promptly after its
34   occurrence), Tenant may thereafter, during such time as the Delivery Date has not occurred,
35   consider Landlord to be in default hereunder and, at Tenant's option in its sole discretion, elect
36   to:

37                     (i)    terminate this Lease, if the Delivery Date does not occur
38   within sixty (60) days after Landlord's receipt of Tenant's notice thereof, in which event
39   neither party shall have any further liability hereunder, except: (i) for those obligations
40   which survive the expiration or other termination of this Lease pursuant to the express
41   terms of this Lease, and (ii) Landlord shall be obligated to promptly reimburse Tenant, as
42   Tenant's sole monetary remedy by reason thereof, subject as applicable to Section 23.7
43   below, for all its reasonable third-party costs and expenses incurred in connection with
44   this Lease (including, without limitation, costs associated with the preparation and review
45   of plans and specifications, attorneys' fees, and the performance of Tenant's Work), not
46   to exceed Seventy-Five Thousand Dollars ($75,000); and/or

47                     (ii)   avail itself of the remedies set forth in Section 16.2(a) and
48   (c) or bring suit for specific performance as more specifically provided for in Section
49   16.2(b), below (provided, however, that the cure period set forth in such sections shall not
50   be applicable and attorneys fees may be awarded as provided for in Section 23.7 hereof);
51   and/or

52                     (iii)  extend one or more times the date set forth in the
53   introductory paragraph of this Subsection 3.3.2 to such future dates designated by Tenant
54   in notice given to Landlord.

55   The election by Tenant of any one or more of the foregoing remedies shall not preclude the
56   subsequent election of any alternative remedy provided in this Section, this Lease, at law, or in

1  equity; provided, however, the election of the remedy set forth in the foregoing subsection (i)
2  shall be Tenant's sole remedy for such failure.

3       3.3.3    Landlord's Work Performed After Delivery of Possession. On or before the
4  Delivery Date, but not more than fifteen (15) days prior thereto, Landlord's and Tenant's
5  representatives together shall conduct a walk-through of the Premises to compile a punch list of
6  the "Punch List Items" (hereinafter defined). Tenant shall deliver to Landlord a copy of said
7  punch list within five (5) days after the walk-through. Landlord shall complete any Punch List
8  Items within twenty (20) days after it receives a copy of said punch list. If Landlord fails to
9  complete any item on said punch list within said 20-day period, Tenant shall send a reminder
10  notice stating that if Landlord fails to complete such items within five (5) days after the giving of
11  such notice, then Tenant shall have the right to complete such item(s) using its own contractors
12  and receive reimbursement from Landlord for the reasonable costs and expenses thereof upon
13  demand. If reasonably required by Tenant, any portion of Landlord's Work which is performed
14  after Tenant accepts physical possession of the Premises shall occur only "after hours" when
15  neither Tenant nor any of its agents, contractors, employees and servants are working within the
16  Premises, and Landlord shall reimburse Tenant for the reasonable costs and expenses incurred by
17  Tenant by reason of such "after hours" performance of Landlord's Work, reasonable
18  documentation of which shall be provided to Landlord. As used herein, the term "**Punch List
19  Items**" shall mean such minor items of a cosmetic nature which, when considered as a whole, do
20  not adversely affect, in other than an immaterial manner, either the performance of Tenant's
21  Work or Tenant's ability to conduct its normal business operations in the Premises.

22       3.3.4    Tenant's Right of Entry. Prior to the Delivery Date and upon reasonable prior
23  notice to Landlord, Tenant may enter upon the Premises for the purposes of inspecting
24  Landlord's Work, taking measurements, making plans, erecting temporary or permanent signs
25  and doing such other work as may be appropriate or desirable, without being deemed thereby to
26  have taken possession of the Premises or obligated itself to pay Rent, provided, however, that
27  Tenant shall not, during the course of such work, materially interfere with the performance of
28  Landlord's Work and shall indemnify and hold Landlord harmless from and against any and all
29  claims or losses arising from Tenant's entry upon the Premises, except to the extent caused by
30  Landlord, its agents, employees, or contractors.

31       3.3.5    Work Requirements After Delivery Date. Following the Delivery Date, any
32  construction by Landlord or other tenants or occupants of the Shopping Center affecting any
33  portion of the Shopping Center shall be subject to the following terms and conditions:

34              (a)  staging and storage of materials and parking of construction vehicles
35  within the Common Areas shall occur only within the portions of the Shopping Center
36  designated as "Construction Staging Area" on Exhibit B hereto provided, however, that Tenant
37  acknowledges and agrees that Tenant shall have no right to stage or store materials outside of the
38  Premises;

39              (b)  Landlord shall diligently ensure that, from and after Tenant's opening for
40  business to the public, no ingress, egress or passage of any construction, delivery and related
41  vehicles engaged in the performance of such work or other construction activities shall take place
42  except through the entrance/exit drive designated as the "Construction Drive" on Exhibit B
43  hereto; and

44              (c)  Landlord shall maintain the Shopping Center in a clean, safe, and sightly
45  condition, and shall use reasonable efforts to ensure that such construction shall not materially
46  adversely interfere with the normal conduct of any business operations in the Premises.

47       3.3.6    Hiring Trailer. Tenant may install a trailer for Tenant's exclusive use in
48  conducting employee interviews and recruiting, in the location shown on Exhibit B hereto, or
49  such other location within the Shopping Center which Landlord may designate on at least ten
50  (10) days' prior notice to Tenant in the event that the location set forth on Exhibit B interferes
51  with Landlord's Work within the Common Areas, which trailer may be installed within the
52  Shopping Center no earlier than sixty (60) days prior to the Delivery Date and shall be removed
53  not later than the earlier of (i) ten (10) days after Tenant opens for business in the Premises or (ii)
54  three (3) days after Landlord notifies Tenant that the tenant under the Saks Lease (as defined on
55  Exhibit K-1 hereto) is ready to open for business. In the event such trailer is to be removed
56  pursuant to subclause (ii) of the previous sentence, Landlord shall use reasonable efforts to
57  provide Tenant with interior space within the Shopping Center for Tenant's exclusive use in

13

1  conducting employee interviews and recruiting in a location and condition reasonably acceptable
2  to Tenant (and Tenant shall vacate such interior space not later than ten (10) days after Tenant
3  opens for business in the Premises); provided, however, Tenant shall accept such interior space
4  in its then "as is" condition and Landlord shall have no obligation to perform any work to same.

5       Section 3.4    Measurement; Adjustment of Rent.

6       3.4.1    Measurement of Premises and Shopping Center. Within ten (10) days after the
7  completion of the first course of masonry for the exterior walls of the Premises and demising
8  walls of the Premises (and in all events prior to the Delivery Date), Landlord shall deliver to
9  Tenant a certification to Tenant by Landlord's licensed architect, surveyor or engineer of the
10 interior clear dimensions and the Floor Area (with the dimensions on which it is based) of the
11 Premises, and Floor Area of the Shopping Center, the measurements of the Premises shall be
12 subject to confirmation by Tenant's licensed architect, surveyor or engineer. If Landlord shall
13 fail so to deliver such certification to Tenant, Tenant shall have the right to have any of such
14 measurements made and certified to Landlord by Tenant's licensed architect, surveyor or
15 engineer. If the interior clear dimensions and/or the Floor Area of the Premises vary from those
16 shown on the Certified LOD (as may be modified by any applicable Changes), then Landlord
17 shall correct such work to conform to the Certified LOD (as may be modified by any applicable
18 Changes).

19      3.4.2    Intentionally omitted.

20      3.4.3    Adjustment of Fixed Rent and Tenant's Pro Rata Share. Subject to the
21 foregoing provisions of this Section 3.4, if the measurement of the Premises shall indicate a
22 Floor Area less than the Floor Area of the Premises set forth in Subsection 1.1.29 above,
23 Tenant's Pro Rata Share (but not Fixed Rent) shall be reduced to conform to the actual
24 measurement, and Tenant shall receive a proportional refund of any applicable Additional Rent
25 theretofore paid to Landlord. If the measurement of the Premises indicates that the actual Floor
26 Area of the Premises exceeds the Floor Area of the Premises set forth in Section 1.1.29 hereof
27 (as same may be increased due to Changes under Section 3.2 above), neither Fixed Rent nor
28 Tenant's Pro Rata Share shall be increased by reason thereof; provided, however, in the event the
29 Floor Area increases as aforesaid by less than three percent (3%), Tenant's Pro Rata Share shall
30 be proportionately increased by reason thereof. Landlord and Tenant shall each promptly execute
31 and deliver to the other an amendment memorializing any change to Tenant's Pro Rata Share, or
32 any other applicable provisions of this Lease, made pursuant to this Section 3.4. Any dispute
33 between the parties with respect to the Floor Area of the Premises, or the Floor Area of the
34 Shopping Center shall be resolved by arbitration in accordance with the provisions of Section
35 16.3 below.

36      Section 3.5    Labor Harmony. Tenant shall proceed diligently and in good faith to
37 cause the Tenant's Work (and subsequent alterations to the Premises) to be conducted in such a
38 manner so as to avoid (or, to the extent not reasonably avoidable, then to minimize) labor
39 disputes and disruptions which will interfere with other work in or the operation or use of the
40 Shopping Center and to cause its contractors to work in harmony with other contactors of the
41 Shopping Center.

42                           ARTICLE 4.
43         FIXED RENT AND TAXES: DETERMINATION AND PAYMENT

44      Section 4.1    Fixed Rent. Commencing on the Rent Commencement Date and
45 continuing throughout the Term, Tenant shall pay to Landlord the Fixed Rent, in equal
46 successive monthly installments, in advance, on the first day of each and every calendar month
47 throughout the Term, except that Fixed Rent payable for any partial calendar month during the
48 Term shall be prorated based on a 365-day year. Fixed Rent shall be paid without demand,
49 deduction, abatement or set-off, except to the extent otherwise expressly provided herein.
50 Landlord shall have the same remedies with respect to the non-payment of Additional Rent as it
51 has for the non-payment of Fixed Rent pursuant to the terms of this Lease.

52      Section 4.2    Payment of Rent. All Rent shall be mailed or otherwise delivered to the
53 following:

54      If the payment is made by wire transfer, Tenant shall transfer the applicable funds to the
55 following account:

14

| 1 | Receiving Bank: | PNC Bank |
| 2 | Receiving Bank Address: | 500 First Avenue |
| 3 | | Pittsburgh, PA 15219 |
| 4 | PNC Bank ABA: | 041000124 |
| 5 | | |
| 6 | Beneficiary: | Seritage SRC Finance LLC (Blocked) |
| 7 | | |
| 8 | Beneficiary Account Number: | 4645219913 |

If Tenant's payment is made by check, then Tenant shall send payment to the following address:

Seritage SRC Finance LLC
P.O. Box 776148
Chicago, IL 60677-6148.

or, upon at least thirty (30) days' prior notice to Tenant, to such other address as Landlord may from time to time designate.  Landlord acknowledges and agrees that for administrative purposes, Tenant may designate, upon at least thirty (30) days' prior notice to Landlord, a corporation or other entity to act as a paying agent to make all Rent payments due to Landlord under this Lease.  Said designation (which may be revoked by Tenant at any time) is not intended as, and shall not constitute, an assignment of any rights or obligations of Tenant to the paying agent, and Tenant shall remain primarily liable for payment of Rent under this Lease.  All payments of Rent received by Landlord from the paying agent shall be credited to Tenant as if such payments of Rent had been made by Tenant directly to Landlord.

Section 4.3    Real Estate and Other Taxes.

4.3.1    Landlord shall pay on or before the due dates thereof all "Taxes" (defined in Subsection 4.3.3 below) other than personal property taxes levied against tenants.  Throughout the Term, Landlord shall cause the Shopping Center to be maintained entirely within tax parcels and lots that exclude any property not a part of the Shopping Center.

4.3.2    (a)    Tenant shall pay to Landlord a contribution towards the Taxes which are payable during the Term, subject to the provisions of this Section 4.3.

(b)    Any Taxes for a calendar year ("*Tax Year*"), only a part of which is included within the Term, shall be adjusted between Landlord and Tenant on the basis of a 365-day year as of the Rent Commencement Date or the date on which the Term expires or earlier terminates, as the case may be, for the purpose of computing Tenant's Pro Rata Share of Taxes.

(c)    On and after the Rent Commencement Date and continuing through the end of the Term, Tenant shall pay as Tenant's Pro Rata Share of Taxes the following:

(i)    As used in this Lease, the term "*Base Tax Year*" shall mean the first full calendar year after the Rent Commencement Date.  For the period commencing on the Rent Commencement Date and ending on the last day of the Base Tax Year, Tenant shall have no liability for Taxes, the same being deemed to be included in Fixed Rent for such period;

(ii)    For each Tax Year (or portion thereof) after the Base Tax Year through the end of the Term, an amount equal to Tenant's Pro Rata Share of the increase, if any, in Taxes payable during such Tax Year (or portion thereof) over the Taxes payable during the entire Base Tax Year.

(iii)    To the extent that after the Base Tax Year new buildings, structures and/or Common Areas are added to the Shopping Center during the Term, then the Taxes allocable to the Base Tax Year shall for the purposes of this Section 4.3 thereafter be reasonably and equitably recalculated to reflect such new buildings, structures and/or Common Areas (as if each of the foregoing were fully in place and assessed for Taxes during the entire Base Tax Year).

15

1    (d)    If, by law, any Taxes may, at the option of the taxpayer, be
2 paid in installments (whether or not interest shall accrue on the unpaid balance thereof),
3 Landlord shall exercise such option so as to maximize the number of installments, and Landlord
4 shall pay the same as they come due and before any fine, penalty, interest or cost may be added
5 thereto for nonpayment thereof.

6    (e)    Throughout the Term hereof, Landlord shall submit to Tenant
7 a copy of the bill for Taxes issued by the applicable taxing authority, a computation of Tenant's
8 Pro Rata Share of such Taxes and proof of the payment of Taxes for the previous payment
9 period, as well as, promptly after request by Tenant, copies of all notices concerning
10 assessments, tax rates, and changes thereto.  Tenant shall pay Landlord in the amount required by
11 this Subsection 4.3.2 within thirty (30) days after receipt of such bill (but in no event earlier than
12 the fifteenth (15th) day prior to the date on which such Taxes would become delinquent).  Any
13 dispute with respect to the provisions of this Section 4.3.2 shall be resolved by arbitration in
14 accordance with Section 16.3 below.

15    4.3.3    As used herein, "*Taxes*" shall mean all general, *ad valorem* real estate taxes,
16 and assessments for betterments and improvements that are levied or assessed by any lawful
17 authority on the Shopping Center (general or special), including any substitution therefor, in
18 whole or in part, due to a future change in the method of taxation.  Taxes shall be reduced by
19 any deferral, abatement, or other tax-lowering adjustment received by Landlord from the taxing
20 authorities.  For purposes of computing Tenant's Pro Rata Share of Taxes, Taxes shall not
21 include any: (1) income, excise, profits, estate, inheritance, succession, gift, transfer, franchise,
22 capital, or other tax or assessment upon Landlord or upon the rentals payable under this Lease;
23 (2) taxes on rents (other than to the extent that such taxes are customarily paid by retail tenants
24 in the state in which the Shopping Center is located), gross receipts or revenues of Landlord
25 from the Premises (other than to the extent that such taxes are customarily paid by retail tenants
26 in the state in which the Shopping Center is located); (3) fine, penalty, cost or interest for any
27 tax or assessment, or part thereof, which Landlord or its lender failed to timely pay (except if
28 same are caused by an Event of Default); (4) assessment for a public improvement arising from
29 the initial construction or expansion of the Shopping Center or the Premises (it being agreed
30 that all assessments imposed during the Term which are permitted to be included within Taxes
31 hereunder shall, for the purposes of computing Tenant's Pro Rata Share thereof, be deemed to
32 have been paid in the maximum number of installments permitted by the applicable taxing
33 authority); (5) Taxes resulting directly from an increase in the assessment caused by a sale or
34 ground lease of all or any portion of the Shopping Center to an Affiliate of Landlord; or (6) fees
35 imposed upon Landlord in connection with Landlord's development of the Shopping Center
36 (including, without limitation, trip generation fees).  All Taxes payable by Tenant pursuant to
37 this Section 4.3 shall be determined as if the Shopping Center was the only property owned by
38 Landlord.  Landlord represents to Tenant that, as of the Effective Date, no portion of the
39 Shopping Center is or will be (i) subject to or the beneficiary of an abatement, exemption and/or
40 phase-in of Taxes, (ii) subject to any special assessments or similar charges, or (iii) included in
41 any special improvement district(s) which would result in higher sales taxes or other similar
42 impositions than would exist in the absence of such district(s); Landlord covenants and agrees
43 that during the period commencing on the Effective Date and ending on the Delivery Date,
44 Landlord shall not make application to the applicable governmental authority(ies) for any
45 abatement, exemption and/or phase-in of Taxes that, if granted, would take effect prior to or
46 during the Base Tax Year.

47    4.3.4    Landlord shall contest the amount or validity of any assessed valuation or
48 Taxes if in Landlord's commercially reasonable judgment there is a reasonable likelihood of
49 success in connection with such contest.  If, as a result of any contest or otherwise, any rebate or
50 refund of Taxes is received, Tenant shall be entitled to Tenant's Pro Rata Share thereof (after
51 deducting reasonable and customary expenses).

52    ARTICLE 5.
53    COMMON AREAS, THEIR USE AND CHARGES

54    Section 5.1    Common Areas: Maintenance.

55    5.1.1 Maintenance of Common Areas.  Landlord shall operate, maintain, repair
56 and replace (or cause to be operated, maintained, repaired and replaced) the Common Areas as
57 required by this Lease and otherwise to the standard by which Common Areas of similar
58 shopping centers on the Effective Date in the state in which the Shopping Center is located are

16

1    operated, maintained, repaired and replaced, including, without limitation, snow, ice, rubbish
2    and debris removal (including installation and maintenance of sidewalk refuse containers),
3    landscaping (including, without limitation, the trimming and pruning of trees to avoid
4    interference with the use or visibility of canopies or signs on the exterior of the Premises),
5    adequate lighting, insurance, supervision, use, parking lot paving and striping, drainage,
6    security (as reasonably required), and control of all Common Areas, and Landlord shall comply
7    with (or cause to be complied with) all applicable Legal Requirements with respect to the
8    Common Areas.

9             5.1.2   Tenant's Pro Rata Share of Common Areas Charges.

10           (a)    During the Term, Tenant shall pay to Landlord Tenant's Pro
11   Rata Share of the reasonable costs (hereinafter referred to as the *"Common Areas Charges"*)
12   paid by Landlord to operate, maintain, insure and repair the Common Areas, which shall include
13   the reasonable premiums for insurance required to be maintained by Landlord under Section 10.4
14   below, as further described in this Section 5.1.

15           (b)    On and after the Rent Commencement Date and continuing
16   through the end of the Term, Tenant shall pay (in equal monthly installments on the first day of
17   each calendar month, in advance) the following with respect to Common Areas Charges:

18           (i)    For the period commencing on the Rent Commencement
19   Date and ending on the last day of the Base CAM Year (defined below), Tenant shall
20   have no liability and make no payments for Common Areas Charges, the same being
21   deemed to be included in Fixed Rent for such period.

22           (ii)    For each calendar year or part thereof occurring after the
23   Base CAM Year and ending at the end of the Term, Tenant shall pay as Tenant's Pro
24   Rata Share of Common Areas Charges an amount equal to Tenant's Pro Rata Share of the
25   "Increase" (defined below) for such year.  For the first calendar year after the Base CAM
26   Year, for purposes of calculating Tenant's Pro Rata Share of the Increase for such year,
27   Common Areas Charges shall not exceed one hundred five percent (105%) of the "Base
28   Year CAM Amount" (defined below) (exclusive of the following expenses:  "Storm
29   Clean Up Costs" (defined below), snow and ice removal, insurance rate increases and
30   utility rate increases during such calendar year) and, for each calendar year thereafter,
31   Tenant's Pro Rata Share of Common Areas Charges shall not increase by more than five
32   percent (5%) per year (exclusive of the following expenses:  "Storm Clean Up Costs"
33   (defined below), snow and ice removal, insurance rate increases and utility rate increases
34   during such calendar year).  As used herein the term *"Storm Clean Up Costs"* shall mean
35   Landlord's actual, reasonable out of pocket common area maintenance expenses resulting
36   from a "Major Storm" (defined below) in excess of the insurance proceeds obtained by
37   Landlord therefor as required pursuant to the terms and conditions of this Lease.  A
38   *"Major Storm"* is a storm that causes damage for which Landlord is entitled to obtain
39   insurance proceeds under Section 10.4.2 of this Lease.  Storm Clean Up Costs shall not
40   be chargeable to Tenant hereunder until Landlord has diligently pursued and obtained all
41   such insurance proceeds.

42           (c)    For the purposes hereof:  the phrase *"Base CAM Year"* shall
43   mean the first full calendar year after the Rent Commencement Date; the phrase "*Base Year
44   CAM Amount*" shall mean the Common Areas Charges for the Base CAM Year; and the phrase
45   *"Increase"* shall mean the increase, if any, in Common Areas Charges for a calendar year over
46   the Common Areas Charges for the Base CAM Year.  Equitable adjustments shall be made to the
47   Base Year CAM Amount to treat as part in the Base CAM Year all amounts that should have
48   been paid in the Base CAM Year in accordance with Landlord's then accounting method under
49   generally accepted accounting principles (or successor accounting standards) consistently
50   applied, regardless of whether Landlord paid them on a timely basis. To the extent that after the
51   Base CAM Year new buildings, structures and/or Common Areas are added to the Shopping
52   Center during the Term, then the Common Areas Charges allocable to the Base CAM Year shall
53   for the purposes of this Section 5.1 thereafter be reasonably and equitably recalculated to reflect
54   such new buildings, structures and/or Common Areas (as if each of the foregoing were in place
55   during the entire Base CAM Year).

56           (d)    Within one hundred twenty (120) days after the end of each
57   calendar year, Landlord shall provide to Tenant a statement, in reasonable detail, of Common

17

1   Areas Charges for such year, which statement shall be prepared in accordance with generally
2   accepted accounting principles (or successor accounting standards) consistently applied (the
3   ***"CAC Reconciliation Statement"***).  The CAC Reconciliation Statement shall be accompanied by
4   a calculation of Tenant's Pro Rata Share of Common Areas Charges, and payment to Tenant in
5   the amount of any overpayment made by Tenant during the preceding calendar year.  If Tenant's
6   Pro Rata Share of the actual Common Areas Charges for a calendar year shall exceed the
7   aggregate monthly installments paid by Tenant during said calendar year, Tenant shall pay to
8   Landlord the deficiency within thirty (30) days after receipt of such notice.  Upon Tenant's
9   request, Landlord shall promptly deliver to Tenant copies of relevant backup materials
10  (including, but not limited to, contracts, correspondence and paid invoices) reasonably required
11  by Tenant.  If Landlord fails to timely remit to Tenant the amount of any overpayment
12  hereunder, Tenant shall have the right (in addition to any rights and remedies to which it may be
13  entitled under this Lease, at law, or in equity) to offset such amount from payments of Rent next
14  becoming due hereunder, together with interest thereon at the Lease Interest Rate from the date
15  such remittance is due until reimbursement or full satisfaction by credit.

16          5.1.3  Exclusions from Common Areas Charges.

17            (a)         Common Areas Charges shall not include: **(1)** the capital cost
18  of any improvements or additions to the Common Areas incurred prior to the Base CAM Year
19  except that from and after the Base CAM Year, the cost of any repairs, maintenance and/or
20  replacement to capital improvements to the Common Areas may be included in Common Areas
21  Charges provided that such costs are amortized on a straight-line basis over the useful life
22  thereof under generally accepted accounting principles (or successor accounting standards), and
23  are not incurred (A) prior to the expiration of the fifth (5th) full calendar year of the Term, or (B)
24  more than once during each five (5) full calendar years of the Term [it being agreed that
25  Common Areas Charges may include non-capital maintenance and non-capital repairs to the
26  improvements of the Common Areas as described in the preceding clause (1)] **(2)** [intentionally
27  deleted]; **(3)** the cost of investigating, monitoring or remedying any environmental condition or
28  "Hazardous Substances" or any other "Compliance Costs" (both as hereinafter defined in
29  Subsection 12.4.1); **(4)** any debt service (including principal and interest) or payments of any
30  judgments or other liens against Landlord; **(5)** the cost of maintaining, repairing or providing
31  security for interior portions of buildings; **(6)** Taxes or other taxes levied or assessed against
32  Landlord or the Shopping Center; **(7)** the cost of compliance with applicable Legal Requirements
33  (including, without limitation, the cost of curing violations or contesting such Legal
34  Requirements); **(8)** any costs resulting from insurance deductibles or any payments made under
35  any self-insurance policy maintained by Landlord, each in excess of Two Hundred Fifty
36  Thousand and 00/100 ($250,000.00) Dollars; **(9)** any costs which would have been reimbursed or
37  paid for by insurance proceeds had Landlord maintained the insurance required under Section
38  10.4 hereof and the amount of any judgment or other charge entered or costs assessed against
39  Landlord in excess of the policy limits of the insurance maintained by Landlord under Section
40  10.4 hereof); **(10)** those portions of Landlord's insurance premiums which are reimbursed to
41  Landlord by any other tenant in the Shopping Center other than through the payment of such
42  tenant's proportionate share of insurance premiums otherwise includable as part of Common
43  Areas Charges; **(11)** sums paid or owed by Landlord to any tenant in the Shopping Center; **(12)**
44  costs incurred in connection with the negotiation of leases with, or construction of improvements
45  for, any tenant in the Shopping Center (including, without limitation, brokerage commissions
46  and legal fees); **(13)** costs incurred in connection with lawsuits or other legal actions (including,
47  without limitation, arbitrations and mediations) instituted or defended by Landlord; **(14)** sums
48  incurred as late payment fees, penalties or interest; **(15)** ground rent; **(16)** depreciation [except as
49  expressly permitted pursuant to item 23 below]; **(17)** costs disproportionately incurred by or on
50  behalf of any one or more of the tenants in the Shopping Center (including, without limitation,
51  all costs relating to the operation of any food court or exterior dining area in the Shopping
52  Center); **(18)** electricity costs for lighting Common Areas later than the "Normal Hours"
53  [hereinafter defined in Section 5.2], other than low-level security lighting; **(19)** Landlord's
54  advertising, entertainment and promotional costs for the Shopping Center (including, without
55  limitation, holiday decorations); **(20)** costs of acquiring, leasing, restoring, insuring or displaying
56  sculptures, paintings and other objects of art located within or outside the Shopping Center; **(21)**
57  costs and expenses payable to Landlord or its Affiliate, to the extent that such costs and expenses
58  exceed competitive costs and expenses for materials and services by unrelated persons or entities
59  of similar skill and experience; **(22)** repairs resulting from defects in the original construction of
60  the Shopping Center arising within one (1) year after the Rent Commencement Date; **(23)** the
61  cost of mechanized equipment for the maintenance of the Common Areas (but not the straight-
62  line depreciation thereof over its useful life, as determined in accordance with generally accepted

18

1    accounting principles (or successor accounting standards)); **(24)** reserves for anticipated future
2    expenses; **(25)** any cost or expense relating to the administration and management of the
3    Common Areas (whether on-site or off-site) including, but not limited to, overhead, management
4    fees, office salaries and benefits, office rental, office supplies, dues and subscriptions, office
5    utility charges, telephone charges and automobile expenses; **(26)** costs incurred in connection
6    with the monitoring, maintenance, inspection, or testing of fire alarm systems; **(27)** costs and
7    expenses payable to Landlord, or its Affiliate or designee, for the provision of utility service(s) to
8    the Common Areas, to the extent that such costs and expenses exceed competitive market rates;
9    or **(28)** except as specifically provided in Section 7.2 hereof, any costs relating to any pylon signs
10    or other signage identifying tenants of the Shopping Center.

11                    (b)        In addition, if any tenant or other occupant of the Shopping
12    Center (i) maintains the Common Areas in whole or in part, or any facilities therein, (ii) provides
13    any services the cost of which would otherwise be includable in Common Areas Charges, and/or
14    (iii) pays directly for costs which would otherwise be included in the Common Areas Charges,
15    then the costs associated with or attributable to any of the foregoing shall be excluded from
16    Common Areas Charges, and the denominator used to determine Tenant's Pro Rata Share of
17    such costs (and only such costs) shall be reduced by the Floor Area occupied by such tenant or
18    other occupant. In applying the provisions hereof, Landlord shall act equitably, taking into
19    account, for example, the relationship of the size of the Common Areas maintained by the other
20    tenant or occupant to the size of its premises.

21                    (c)        Common Areas Charges for any period during the Term
22    which constitutes less than a full calendar year shall be equitably prorated.

23                    5.1.4  Tenant's Right to Audit. Tenant shall have the right, within three (3)
24    years after receiving any CAC Reconciliation Statement (and not more than once annually) to
25    audit Landlord's books and records to verify Landlord's calculation of Common Areas Charges
26    as reflected therein and Tenant's Pro Rata Share of the Increase in Common Areas Charges.
27    Landlord shall maintain such books and records for at least three (3) years after it delivers to
28    Tenant a CAC Reconciliation Statement for such calendar year. If Tenant fails to audit or
29    otherwise object to the CAC Reconciliation Statement within such three (3) year period, then
30    the CAC Reconciliation Statement shall be deemed to be correct and conclusively binding upon
31    Tenant. Upon Tenant's request, Landlord shall promptly deliver to Tenant copies of relevant
32    backup materials (including, but not limited to, contracts, correspondence and paid invoices)
33    reasonably required by Tenant. Tenant shall not employ an auditor who is paid on a
34    contingency fee basis. In the event of an error in Landlord's favor, Landlord shall refund the
35    overcharge to Tenant within thirty (30) days after Tenant's demand therefor, and if the
36    overcharge exceeds five (5%) percent of Tenant's Pro Rata Share of Common Areas Charges,
37    Landlord shall pay to Tenant the reasonable expenses of the audit within thirty (30) days after
38    Tenant's demand therefor, failing which, Tenant shall have the right (in addition to any rights
39    and remedies to which it may be entitled under this Lease, at law, or in equity) to offset such
40    amount from payments of Rent next becoming due hereunder, together with interest thereon at
41    the Lease Interest Rate from the date such remittance is due until reimbursement or full
42    satisfaction by credit. Tenant shall keep the results of any such audit confidential (and if
43    requested by Landlord, shall execute a confidentiality agreement in form reasonably acceptable
44    to Landlord and Tenant) provided that nothing contained herein shall restrict Tenant from
45    disclosing such information as may be required by applicable Legal Requirements, or to its
46    accountants, attorneys or bona fide prospective assignees or subtenants (provided that each of
47    such recipients shall be bound by the same non-disclosure provisions as are imposed upon
48    Tenant). Any dispute by Landlord with respect to an audit by Tenant shall be submitted to
49    arbitration in accordance with the provisions of Section 16.3 below.

50                    5.1.5  In no event shall Tenant be required to join, participate in or contribute to
51    any promotional fund, marketing fund or merchants' association.

52            Section 5.2    Common Areas: Restrictions.

53                    5.2.1  Continuous Access. No entrances, exits, approaches and means of ingress
54    and egress to, from, and/or within the area designated as "Critical Area" on Exhibit B hereto,
55    (the "**Critical Area**"), shall be interrupted or disturbed during the Term by any act or omission
56    of Landlord, its agents, employees or contractors, either on a temporary or permanent basis,
57    except: (i) if Landlord provides reasonably equivalent and alternative access during such period
58    of interruption or disturbance, provided that Landlord shall at all times proceed diligently and in

19

1    good faith to cause the cessation of such interruption or disturbance, or (ii) in the event of an
2    emergency or as may be otherwise required by applicable Legal Requirements, in which event
3    Landlord shall use reasonable efforts to give Tenant advance notice of same and to minimize
4    interference to Tenant's normal business operations in the Premises as a result thereof; or (iii) in
5    the event that Landlord is required to temporarily close the Common Areas, for the minimum
6    time legally necessary to prevent a dedication thereof or an accrual of any rights in any person
7    or the public generally therein; provided that such closure shall not occur during August
8    (through Labor Day), November, December or January of any calendar year, and Landlord shall
9    give Tenant at least thirty (30) days' prior notice thereof. Notwithstanding anything to the
10   contrary set forth in this Lease, at all times during the Term, Landlord shall ensure that the
11   layout of the Shopping Center adequately accommodates the turning radius of a 55-foot trailer
12   (WB-67) both to and from (a) New Britain Avenue and (b) Tenant's loading dock.

13               5.2.2  No Alterations.  Landlord shall not, without obtaining Tenant's prior
14   written consent in each instance, which consent may be withheld in its sole discretion unless
15   such changes are required by Legal Requirements, in which case Tenant's standard for consent
16   shall be reasonable: (i) alter the area of the Shopping Center or the location, availability, or size
17   of any Common Area improvement located within the Critical Area, from that shown on
18   Exhibit B hereto; (ii) construct or permit to be constructed any structures in the Critical Area of
19   the Shopping Center (including, without limitation, any buildings, kiosks, booths, signs or
20   similar structures in the Critical Area), other than as shown on Exhibit B hereto; (iii) materially
21   change the entrances or exits to and from the Shopping Center within the Critical Area or the
22   curb cuts, roadways, drive aisles, sidewalks or other elements of the Common Areas within the
23   Critical Area, or the number, location or layout of parking spaces, located within the Critical
24   Area from those shown on Exhibit B hereto. After the Delivery Date, Landlord shall neither
25   perform nor permit to be performed, any construction, repairs, replacements or maintenance to
26   any portion of the Critical Area, including the Premises (other than emergency repairs to
27   utilities and Common Areas and repairs required by Legal Requirements) during the months of
28   August (through Labor Day), November, December and January of any year, without the prior
29   consent of Tenant, which consent may be withheld in Tenant's sole discretion.

30               5.2.3  Outparcel.  In addition to the provisions of Subsection 5.2.2 above, subject
31   to the terms of any Existing Leases affecting such parcel, during the Term the following
32   restrictions shall encumber and bind the outparcel (the "**Outparcel**") designated on Exhibit B
33   hereto as "Olive Garden Parcel": (i) no building shall exceed a maximum height of twenty-
34   eight feet (28') as measured from the finished floor level to the highest point on such building or
35   structure, plus an additional four (4) feet of height for all types of projections or architectural
36   treatments or embellishments thereon, such as, but without limitation, HVAC equipment,
37   parapets, mansards, signs, satellite dishes, and antennae, provided such projections or
38   architectural treatments or embellishments shall not cover more than thirty percent (30%) of the
39   linear footage of the roofline of such premises; (ii) only one (1) building of not more than
40   10,000 square feet of floor area shall be allowed on the Outparcel (provided that such building
41   may be multi-tenanted); and (iii) all Legal Requirements relative to parking requirements for the
42   Outparcel operation(s) shall be complied with by providing the requisite number of parking
43   spaces solely within the boundaries of the Outparcel. In addition, the sale of alcoholic
44   beverages for on-premises consumption shall only be allowed on the Outparcel in conjunction
45   with a restaurant; provided, further, that the sale of alcoholic beverages for on-premises
46   consumption other than beer and wine (such as spirits and mixed drinks) shall be limited to a
47   restaurant of no more than 5,500 square feet of Floor Area.

48               5.2.4  Parking Area.  Landlord shall during the Term maintain in the Shopping
49   Center, at a minimum, 3.75 ground-level parking spaces for every one thousand (1,000) square
50   feet of Floor Area in the Shopping Center, with each such space being at least nine (9) feet in
51   width and eighteen (18) feet in length. Parking spaces shall at all times be clearly marked by
52   painting, striping or otherwise. Except as otherwise permitted under Existing Leases (as
53   hereinafter defined in Section 12.3(j) hereof) and any cross parking rights under the OEA,
54   Landlord shall not designate specific parking spaces for use by other tenants or occupants of the
55   Shopping Center, nor shall Landlord permit any person or entity to use the parking areas other
56   than Tenant, the other tenants and occupants of the Shopping Center, and their respective
57   employees, agents, subtenants, concessionaires, licensees, customers, and invitees. There shall
58   be no charge whatsoever levied for the use of any parking areas within the Shopping Center.
59   Landlord shall not permit overnight parking in the Shopping Center. Notwithstanding the
60   foregoing, Landlord shall maintain in the location identified on Exhibit B as the "Expectant
61   Mother Parking", a minimum of four (4) parking spaces reserved for the non-exclusive use of

20

expectant mothers and/or parents with infants (the "*Expectant Mother Parking Spaces*"). The Expectant Mother Parking Spaces shall be prominently marked and/or signed as reserved for expectant mothers and/or parents with infants. While the Existing Lease in favor of Saks is in effect, Tenant shall have its employees park their motor vehicles outside of the area designated as "No Employee Parking" on Exhibit B hereto provided Landlord shall have all other tenants and occupants of the Shopping Center do the same (provided, however, that neither party shall have the right to terminate this Lease in the event the other party defaults in its foregoing obligation with respect to the "No Employee Parking" area).

5.2.5   Lighting. Throughout the Term, Landlord shall keep the Common Areas fully lighted and open to the customers of the Shopping Center seven (7) days a week from dusk until 11:00 p.m. Monday through Saturday and until 7:00 p.m. on Sunday (*"Normal Hours"*). Upon request of Tenant, Landlord shall keep the Common Areas lighted for as long after Normal Hours as Tenant shall request, provided Tenant shall pay for a share of the reasonable cost of said requested lighting, which share shall be equal to the product of (x) such cost, and (y) a fraction, the numerator of which shall be the number of square feet of Floor Area within the Premises and the denominator of which shall be the aggregate number of square feet of Floor Area of all premises within the Shopping Center (including the Premises) open later than Normal Hours (excluding, however, those tenants and occupants who separately control and pay for their own Common Area lighting). In addition to the foregoing, Landlord shall provide for low level security lighting from one (1) hour after the close of business in the Premises until dawn and reasonably sufficient levels of lighting in Tenant's employee parking area from dusk to dawn.

5.2.6   Repairs.

During the Term, any construction or repair by Landlord permitted or required under this Lease and undertaken in the Critical Area shall:

(a)   not be performed during the months of August (through Labor Day), November, December or January of any year, except in the event of an emergency, for the performance of ordinary maintenance and repairs or as may be otherwise required by applicable Legal Requirements;

(b)   be commenced only upon at least five (5) days' prior notice to Tenant (except that the foregoing shall not apply to (x) ordinary maintenance and repair at the Shopping Center, provided that Landlord proceeds in good faith to advise Tenant prior to any such work that could impact Tenant's normal business operations, or (y) any construction or repair in an emergency, in which latter event Landlord shall only be required to give such notice as is reasonable under the circumstances); and

(c)   be performed in accordance with the requirements of Subsection 3.3.5 above and in such a manner so as not to materially interfere with the normal conduct of any business operations in the Premises.

(d)   Tenant hereby acknowledges that certain construction or repair by Landlord may necessitate certain portions of the Common Areas being temporarily unavailable to the tenants and other occupants of the Shopping Center. Landlord agrees that it shall at all times proceed diligently and in good faith to minimize the duration of any such temporary unavailability of Common Areas (and, as applicable, proceed to make available alternate means of access to and from the Shopping Center and as applicable, alternate temporary parking for Tenant's employees and customers).

5.2.7   Rules and Regulations.  Tenant shall comply with the rules and regulations of the Shopping Center as established from time to time by Landlord, within thirty (30) days after Landlord notifies Tenant thereof, provided they: (i) are reasonable, (ii) do not adversely affect the normal conduct of any business operations in the Premises, except to a de-minimis extent, (iii) do not adversely affect any of Tenant's rights under this Lease except to a de-minimis extent, and (iv) are uniformly enforced against all tenants of the Shopping Center and without prejudice against Tenant. In the event of any conflict between the provisions of this Lease and any rules or regulations, the provisions of this Lease shall prevail and govern.

5.2.8   Miscellaneous.

21

1                  (a)   No Promotional Use.  Except as otherwise permitted under
2  Existing Leases, Landlord shall not use or permit the use of all or any portion of the Common
3  Areas for retail sales or for promotional purposes.  Notwithstanding the foregoing provision but
4  subject to compliance with Legal Requirements, tenants of the Shopping Center (including
5  Tenant) shall be permitted to display seasonal merchandise and conduct sidewalk sales in front
6  of their respective stores only, provided that such sales shall: (A) be conducted in a manner
7  consistent with sidewalk sales in first-class shopping centers in the state in which the Shopping
8  Center is located, (B) not materially interfere with normal pedestrian access over the sidewalks,
9  and (C) not materially interfere with the normal business operations of Tenant in the Premises or
10  the business operations of other tenants in their respective premises nor materially impair the
11  visibility of Tenant's (or other tenants') signage.  Landlord shall not permit any solicitation,
12  distribution of handbills, picketing, or other public demonstration in the Common Areas, except
13  as otherwise may be mandated by applicable Legal Requirements. Landlord represents and
14  warrants that all rights under Existing Leases to use the Common Areas for retail and/or
15  promotional purposes are listed in Exhibit M hereto.

16                (b)   Trash Compactor and Containers.  Tenant shall be permitted to
17  maintain and operate, at no extra charge: (i) a trash compactor in the portion of the Common
18  Areas designated on Exhibit B hereto as "***Trash Compactor Pad***"; and (ii) a trash container(s) in
19  the portion(s) of the Common Areas designated on Exhibit B hereto as "***Trash Container Area***".
20  Tenant, at its sole cost and expense, shall keep the trash compactor and containers neat and clean
21  and repair any damage caused by use and storage of such compactor and containers.

22                (c)   Shopping Carts.  Tenant shall be permitted to store its shopping
23  carts in such exterior cart corrals as may be reflected on Exhibits B and D-1 hereto.  With respect
24  to shopping carts provided by Tenant for the use of its customers, Tenant will use reasonable
25  efforts to periodically remove same from the Common Areas.

26                (d)   Cellular Towers.  No transmission and/or reception towers for
27  wireless telephone or internet communications shall be permitted within the Shopping Center.

28                (e)   Temporary Storage Containers.  Tenant, and all other tenants of the
29  Shopping Center, shall be permitted to maintain temporary storage containers or trailers but only
30  if such containers or trailers are located solely within the respective loading dock area of Tenant
31  and such other tenants.

32                (f)   Advertising Medium.  Tenant shall not use any advertising
33  medium at the Shopping Center which may be heard, in other than a *de minimis* manner, outside
34  the Premises. Similarly, Landlord shall not permit any other tenant of the Shopping Center to use
35  any advertising medium at the Shopping Center which may be heard, in other than a *de minimis*
36  manner, from outside of its premises.

37                (g)   Plumbing Facilities.  If the plumbing facilities of the Premises are
38  connected to the plumbing facilities of the Shopping Center, Tenant shall not use the plumbing
39  facilities of the Premises for any purpose other than the purpose for which they are intended.
40  Accordingly, Tenant may not dispose of any substances there which may clog, erode or damage
41  the pipelines and conduits of the Shopping Center.

42                (h)   Floor Load.  Tenant shall not place a load on any floor exceeding
43  the floor load per square foot which such floor was designed to carry.  Tenant shall not install,
44  operate or maintain any heavy item of equipment in the Premises except in such manner as to
45  achieve a proper distribution of weight.

46                (i)   Roof and Exterior Walls. Except as otherwise expressly permitted
47  under the terms and conditions of this Lease, Tenant shall not use for any purpose all or any
48  portion of the roof or exterior walls (other than for permitted signs and Tenant's storefront
49  entrance element) of the Premises.

50                (j)   Forklift Truck.  Tenant shall not use any non-rubber wheeled
51  forklift truck or tow truck or any other non-rubber wheeled machine or any gasoline powered
52  vehicle for handling freight except as may be approved by Landlord.  Landlord hereby approves
53  Tenant's use of "Durometer" non-marking, hard poly-tires on its freight handling machines.

22

ARTICLE 6.
UTILITIES

Section 6.1    Utility Service. From and after the Delivery Date and continuing thereafter through the end of the Term, Tenant shall be solely responsible for and shall pay the cost of utilities services (including, without limitation, electricity, gas, water, sanitary sewer, alarm and telecommunications) consumed in the Premises by Tenant. Tenant shall not be obligated to purchase utility service(s) directly from Landlord, or from any utility provider designated by Landlord. Landlord shall provide separate utility meters exclusively serving the Premises, at its sole cost and expense (including, without limitation, all connection and hook-up fees). Tenant's entry upon the Premises prior to the Delivery Date shall not constitute a waiver by Tenant of Landlord's obligation to pay the costs of all utility charges incurred in the Premises prior to such date. Landlord shall not permit the capacity of utility lines available for use at the Premises to be reduced or overloaded by any other persons or entities. Landlord shall permit Tenant and its telecommunications provider full and free access to, and use of, available telecommunications conduits in the Shopping Center for the provision of telecommunications service to the Premises, subject to such reasonable requirements as Landlord may impose.

Section 6.2    Interruption. Notwithstanding any provision of this Lease to the contrary, in the event utilities serving the Premises are disrupted due to the willful or negligent acts or omissions of Landlord, its agents, contractors, servants or employees, Landlord shall promptly restore the affected utilities at Landlord's sole cost and expense. If the disrupted utilities are not restored within forty-eight (48) hours after the Landlord receives notice of the disruption from Tenant (which may be given by telephone or by e-mail communication to Landlord's property manager at the Shopping Center) and Tenant is unable to (and in fact does not) conduct its normal business in the Premises as a result thereof, then Fixed Rent and Tenant's Pro Rata Share of Common Areas Charges and Taxes shall be equitably abated during the period of disruption until the earlier of the date upon which such disruption ends or Tenant is able to conduct its normal business in the Premises.

ARTICLE 7.
SIGNS

Section 7.1    Tenant's Building Signage. Landlord shall supply and install signage (and obtain all permits and approvals therefor) as part of Landlord's Work in accordance with Exhibits D, D-1, and F hereto, and with the additional provisions of this Lease; provided; however, that Landlord's obligation to maintain any temporary site signage as set forth in Exhibit F hereto shall cease from and after the date that is fifteen (15) days after the date Tenant first opens for business from the Premises. Thereafter, Tenant shall have the exclusive right during the Term, at its sole cost and expense, to erect, maintain, and replace on the storefront and exterior walls of the Premises signs in accordance with Section 7.3 hereof; provided, however, Tenant shall also have the right, at Tenant's sole cost and expense, to install banners advertising seasonal sales or promotions within the area designated as the "Banner Area" on Exhibit F hereto, but in no event shall any single banner be installed for more than thirty (30) days and no more than four (4) such seasonal banners shall be permitted in any calendar year. Tenant may erect and maintain in the interior of the Premises any signs it may desire, provided that same are professionally prepared.

Section 7.2    Pylon/Monument Signage. Landlord shall use commercially reasonable efforts to obtain the necessary approvals for the installation of pylons and monuments at the locations shown on Exhibit B hereto. If such pylon or monument is so approved, Landlord shall obtain all governmental approvals and permits for, and shall procure and install, Tenant's sign panel(s) on all sides of such pylons and monuments, in accordance with the provisions of Article 3 and Exhibits D and F hereto. In addition, if Landlord constructs or makes available to any other tenant or tenants in the Shopping Center any other signage located in the Common Areas, Landlord shall also include on such signage Tenant's identification sign, as shown on Exhibit F hereto, in proportion to the size of the Premises to the premises of other tenants occupying space on such sign, which Tenant's identification sign, except as set forth in any Existing Lease, shall be higher than that of any tenant occupying less Floor Area than the Floor Area of the Premises. Landlord shall maintain all pylons and monuments, and Tenant's signs thereon, in good order and repair, and allow Tenant access to replace its signs thereon, at Tenant's cost and expense. Landlord shall not change or alter the location, structure, height or general appearance of the pylons or monuments without obtaining Tenant's prior consent. The cost of maintaining all pylons and monuments bearing Tenant's sign panel(s) and the cost of any electricity used to

23

1    illuminate them, shall be includable in Common Areas Charges; however, neither the cost of
2    individual tenants' signs thereon, nor the cost of the construction of the pylons and monuments,
3    shall be includable in Common Areas Charges. If a higher position on the pylon sign, as shown
4    on Exhibit F, is occupied by another tenant's sign panel, then upon the expiration or earlier
5    termination of such other tenant's lease, Tenant shall have the right to relocate its pylon sign
6    panel to such higher position on the pylon sign, at Tenant's sole expense; however, the foregoing
7    shall not apply as to the higher position sign panel of another tenant of the Shopping Center then
8    occupying greater Floor Area than that of the Premises.

9         Section 7.3    Signage: Alteration/Removal/Allocation.  Tenant shall have the right,
10   from time to time, without Landlord's approval, to change its signs on the storefront and exterior
11   of the Premises, as well as on any pylon or monument, provided that the area of the new sign is
12   no larger than the area of the sign which it replaces and that the method of construction and
13   attachment is substantially the same.  Upon the expiration or earlier termination of the Lease,
14   Tenant shall remove its signs from the fascia or other exterior walls of the Premises and from
15   any pylon or monument, and shall repair any damage occasioned thereby.  The signage rights
16   granted to Tenant pursuant to this Article 7 shall, at Tenant's option, be allocated to or between
17   Tenant and/or any subtenant(s) of all or any portion of the Premises.  All signage installed by
18   Landlord and Tenant hereunder shall comply with applicable Legal Requirements.

19        Section 7.4    Cooperation.  Landlord, upon request, shall execute any consents or
20   applications which may be required by applicable Legal Requirements to permit the placement,
21   installation, and/or replacement by Tenant of any signs on any part of the Premises or on any
22   pylon or monument, to which Tenant may be entitled under this Lease.

23        Section 7.5    Signage Restrictions and Criteria.

24             7.5.1  During the Term, no exterior identification signs attached to any building
25   of the Shopping Center shall be of the following type: (i) flashing, moving or audible signs; (ii)
26   signs employing exposed raceways, exposed neon tubes, exposed ballast boxes, or exposed
27   transformers, provided that Tenant shall have the right to employ any methods necessary for the
28   installation of internally illuminated self-contained channel letters; or (iii) paper or cardboard
29   signs other than professionally prepared interior window signs advertising special sales within
30   the subject premises, temporary signs (exclusive of contractor signs), stickers or decals,
31   provided, however, the foregoing shall not prohibit the placement at the entrance of each such
32   premises of (A) small stickers or decals which  indicate hours of business, emergency telephone
33   numbers, credit cards accepted, and other similar information, and/or (B) a sticker or decal
34   which contains the phrase "no solicitation" or words of like import.  No billboard signs shall be
35   permitted within the Shopping Center.

36             7.5.2  Without limiting Section 3.3.5 above, Landlord shall proceed diligently
37   and in good faith, subject to applicable Legal Requirements, to prevent (or if prevention is not
38   reasonably attainable, then to minimize) any obstructions (including, without limitation, any
39   trees, bushes or other landscaping, scaffolding or architectural details) that could obscure
40   Tenant's storefront, storefront signs, building signs or other exterior wall signs or any pylons,
41   monuments or other freestanding signs. Except as otherwise permitted under Existing Leases,
42   no premises in the Shopping Center containing less Floor Area than the Floor Area of the
43   Premises shall have (i) building or Common Areas signage possessing more total square footage
44   than the total square footage available for use by Tenant, or a maximum height greater than the
45   maximum height of Tenant's building signage, as measured from the finished floor level to the
46   highest point on such signage, or (ii) a building and entrance design element higher, wider or
47   which projects farther than the height, width or projection of the building and entrance design
48   element of the Premises.

49                                    ARTICLE 8.
50                          ALTERATIONS AND IMPROVEMENTS

51        Section 8.1    Alterations and Improvements.

52             8.1.1  Tenant shall not perform any structural or exterior alterations or structural
53   or exterior improvements to the Premises without the prior approval of Landlord.  All work
54   performed by Tenant in connection with exterior and structural and non-structural alterations or
55   improvements shall be done at Tenant's sole cost and expense, in a good and workmanlike
56   manner and in compliance with all applicable Legal Requirements.  The provisions of this

                                           24

1   Section 8.1 shall not apply to Tenant's building signage, which shall be governed by the
2   applicable provisions of Article 7 above.

3           8.1.2  Tenant may, from time to time, at its sole cost and expense, without the
4   prior approval of Landlord, make non-structural alterations and non-structural improvements to
5   the Premises as Tenant deems necessary or desirable, including, but not limited to, electrical
6   systems, heating, ventilation and air conditioning and other mechanical systems, installation of
7   fixtures and equipment, painting, and wall and floor coverings, provided that (i) the structural
8   integrity of the Premises shall not be adversely affected thereby; (ii) any alterations to the
9   plumbing, mechanical, electrical, sewerage, sprinkler or HVAC system shall not adversely
10  affect, in other than a de-minimis manner,  the availability or operation of such systems as they
11  affect other premises in the Shopping Center, or lessen or diminish, in other than a de-minimis
12  manner, the capacity of any such systems, (iii) such alterations shall be effected with due
13  diligence and in good and workmanlike manner in accordance with all applicable Legal
14  Requirements and insurance requirements; and (iv) Tenant shall, as applicable, within a
15  reasonable time after completion of any alteration or repair, furnish Landlord with a set of "as-
16  built" plans and specifications or "record drawings" therefor.

17          8.1.3  Tenant shall have the right to subdivide the Premises into not more than
18  two (2) separate stores, each of which may have its own front entrance and access to the loading
19  docks in the rear of the Premises, as well as separately sub-metered utilities.

20          8.1.4  Tenant shall have the right to erect and maintain a satellite dish or other
21  communications equipment (and/or such other ancillary equipment thereto) as Tenant shall
22  reasonably desire, on the roof of the Building, provided that Tenant: (i) obtains Landlord's prior
23  approval of its plans for the installation of such equipment, (ii) uses a contractor designated or
24  approved by Landlord for all roof penetrations so as not to violate or invalidate any roof
25  warranties maintained by Landlord, (iii) maintains the area where roof penetrations are made
26  while Tenant's equipment is present, (iv) repairs any damage to the roof caused by the making
27  of the roof penetrations, including, but not limited to, the repair of the roof penetrations upon
28  the removal of any equipment installed thereon, and (v) erects and maintains such equipment in
29  accordance with applicable Legal Requirements. Subject to the terms of the Existing Leases,
30  Landlord shall enforce each of the foregoing requirements with respect to any satellite dish or
31  other communications equipment and/or such other ancillary equipment thereto on the roof of
32  the Building that is installed by or on behalf of any other tenant or occupant of the Shopping
33  Center (it being agreed by Landlord that such other satellite dishes or communications
34  equipment shall be non-structural, shall not penetrate the roof so that such penetration extends
35  into either the Premises or the demising walls of the Premises and shall not interfere with the
36  placement or normal operation of Tenant's satellite dish or other equipment, or otherwise
37  interfere with the normal operation of Tenant's business within the Premises).

38          8.1.5  Landlord shall execute and return to Tenant all appropriately completed
39  building department or equivalent applications within ten (10) days after Tenant's request
40  therefor, and will reasonably cooperate with Tenant in the permitting process, provided that
41  except as may otherwise be provided in this Lease, Landlord shall not be obligated (i) to incur
42  any costs or expenses in connection therewith, or (ii) to impose any restrictions on the
43  operations of the Shopping Center as a condition to Tenant's receipt of the permits, approvals or
44  certificates being applied for (other than requirements that either affect solely the Premises or
45  affect other premises within the Shopping Center but only in a de-minimis manner).

46          8.1.6  If any violation of any applicable Legal Requirement which is noted
47  against the Shopping Center or the Premises (other than a violation caused by Tenant) prevents
48  Tenant from obtaining a building permit for any alterations or a certificate of occupancy, then,
49  upon request by Tenant, Landlord shall promptly and diligently cause such violation to be
50  removed of record to the extent required to permit Tenant to obtain its building permit or
51  certificate of occupancy, as the case may be.

52          8.1.7  Landlord shall not (i) make any alterations to the Premises (including,
53  without limitation, changing the design, color or materials of the exterior of the Premises), nor
54  (ii) construct an additional floor or floors above the Premises, nor (iii) make any material
55  alterations to the Building or any portion thereof that will either (x) adversely affect the normal
56  operation of Tenant's business at the Premises, or (y) detract from the Shopping Center as a
57  first-class shopping center. Landlord shall neither make nor permit to be made any alterations to
58  the exterior architectural theme of the Shopping Center (as shown on Exhibit D-2 hereto) which

25

1    would be inconsistent with a first-class shopping center in the state in which the Shopping
2    Center is located.

3          8.1.8  Intentionally Omitted.

4          8.1.9  Tenant shall be entitled to receive any and all "Incentives" (hereinafter
5    defined) which Tenant may negotiate with, or derive from governmental, non-governmental,
6    private or public utility, or other entities pertaining to construction and/or remodeling (including
7    without limitation Tenant's Work) of the Premises by Tenant, hiring of employees, or other
8    business operations of Tenant which would cause an owner or occupant of the Premises to be
9    entitled to an Incentive. As used herein, the term "Incentive" shall include, without limitation,
10    any cost reduction, refund, voucher, credit, tax relief, abatement, or other monetary inducement
11    (such as, for examples only, energy efficiency incentives, property tax abatements or grants,
12    sales tax refunds or grants, tax credits, governmental grants, utility rebates or refunds, or any
13    other benefit or amount negotiated by, or otherwise allowed to Tenant). If any such Incentive is
14    required to be paid or credited directly to Landlord, then: (i) Landlord shall elect to take the
15    Incentive in a lump sum, or if that is not permitted, then in the shortest number of installments
16    possible, so as to permit Tenant to recoup the full amount of the Incentive during the Term of
17    this Lease, and (ii) within thirty (30) days after Landlord's receipt of the Incentive, Landlord
18    shall pay Tenant for such amount, or in the alternative, following a second ten (10) day notice
19    from Tenant, Tenant shall be entitled to offset the full amount of such Incentive against the next
20    succeeding installment(s) of Rent then payable under the Lease.

21                 ARTICLE 9.
22                 REPAIRS

23        Section 9.1    Tenant's Repairs.  Subject to the provisions of Articles 10 and 11 hereof,
24    and except as otherwise provided in Section 9.2 below, Tenant shall maintain in good condition
25    and repair (and if necessary, replace), at its sole cost and expense: (i) the non-structural, interior
26    elements of the Premises (including plate glass, and the electrical, plumbing, mechanical, and/or
27    alarm systems to the extent same serve the Premises, provided, however that Landlord shall
28    ensure that Tenant at all times has adequate access to those portions of the Building located
29    outside of the Premises to the extent necessary for Tenant to perform its maintenance, repair
30    and/or replacement of such systems to the extent required hereunder); (ii) the heating, ventilation
31    and air conditioning ("HVAC") units exclusively serving the Premises; (iii) the improvements
32    which constitute Tenant's Work including, without limitation, Tenant's signs; and (iv) any
33    damage to the Premises or Shopping Center which is occasioned by (A) any act or omission of
34    Tenant, its employees, agents or contractors, or (B) any breach by Tenant of any provisions of
35    this Lease.  All repairs and replacements on Tenant's part to be performed hereunder shall be at
36    Tenant's sole cost and expense, and performed in a good and workmanlike manner in accordance
37    with all applicable Legal Requirements.

38        Section 9.2    Landlord's Repairs.  Subject to the provisions of Articles 10 and 11
39    hereof, Landlord shall perform, as the same shall from time to time be necessary, all repairs and
40    replacements to the following:

41              (a)       except for repairs which a specific tenant or occupant is
42    required to make pursuant to its lease or occupancy agreement with Landlord (provided that
43    Landlord hereby agrees to nevertheless be obligated to enforce the obligations of such tenant's or
44    occupant's lease or agreement), the buildings of the Shopping Center as necessary to maintain
45    same in good condition and repair (including, without limitation, repainting the exterior walls of
46    the buildings of the Shopping Center (including, without limitation, the Premises)) as same may
47    be reasonably required from time to time during the Term;

48              (b)       the structural elements of the Premises, which shall be deemed
49    to include, without limitation, the roof joists, columns, footings, foundation, exterior walls
50    (including, without limitation,  repainting, but excluding plate glass, storefront windows, doors,
51    door closure devices, window and door frames, molding, locks and hardware, and painting or
52    other treatment of interior walls), floor (but not the floor covering, unless the same is damaged as
53    a result of a floor defect or settling), and the structural elements of any building of which the
54    Premises may be a part;

55              (c)       the roof, gutters, flashings, downspouts and scuppers;

1                        (d)        the electric, gas, water, sanitary sewer, and other public utility
2   lines serving the Premises, to the point of connection to the Premises (including, without
3   limitation, any fire pump facilities or electrical switch gear serving the Premises);

4                        (e)        all electric, gas, water, sanitary sewer, and other public utility
5   lines and ducts in or passing through the Premises which do not exclusively serve the Premises;
6   and

7                        (f)        except to the extent caused by (i) the acts or omissions of Tenant,
8   its agents, employees or contractors, or (ii) normal wear and tear, the non-structural elements of
9   the Premises (including, without limitation, the maintenance, repair and replacement of the
10  HVAC units and the electrical, plumbing, mechanical, and/or fire alarm systems located in or
11  serving the Premises) until the first (1st) anniversary of the Delivery Date (or the first (1st)
12  anniversary of the commencement of the applicable warranty or guarantee therefor, if same
13  commences earlier than the Delivery Date), and thereafter for such period of time and to the
14  extent any such non-structural elements are covered by any contractors', manufacturers',
15  vendors', or insurers' warranties or guarantees; and

16                      (g)    any damage to the Premises or the Shopping Center which is
17  occasioned by (A) any act or omission of Landlord, its employees, agents or contractors, or (B)
18  any breach by Landlord of any provision of this Lease.

19  All repairs and replacements on Landlord's part to be performed hereunder shall be at Landlord's
20  sole cost and expense (and not includable in Common Areas Charges except to the extent
21  expressly permitted to be included pursuant to the provisions of Article 5 hereof), performed in a
22  good and workmanlike manner in accordance with all applicable Legal Requirements, and
23  without material interference with or disruption to the normal conduct of any business operations
24  in the Premises. Landlord shall give Tenant at least five (5) days' prior notice of any repairs or
25  replacements to, or which would otherwise affect the normal conduct of any business operations
26  in, the Premises (except in the case of an emergency posing imminent risk of material harm to
27  persons or property, in which event Landlord shall only be required to give such notice as is
28  reasonable under the circumstances). Landlord's employees, agents and contractors shall identify
29  themselves to the store manager upon entering the Premises. If, in Tenant's reasonable judgment,
30  Landlord's repairs would materially interfere with or disrupt the normal conduct of any business
31  operations in the Premises, Landlord shall perform such repairs only after the regular hours of
32  operation of Tenant and any other occupant of the Premises (or any portion thereof). Landlord
33  shall reimburse Tenant promptly upon demand for the reasonable cost and expense of Tenant
34  incurred in connection with the moving of any merchandise and trade fixtures required to enable
35  Landlord to make such repairs or replacements (it being agreed that should Landlord fail to
36  reimburse Tenant as aforesaid within thirty (30) days following demand therefor, then Tenant
37  shall have the right to offset such amount against Rent). If, in the event of an emergency posing
38  imminent risk of material harm to persons or property, it shall become necessary for Landlord to
39  make any repairs or replacements required to be made by Tenant, Landlord, upon reasonable
40  notice to Tenant under the circumstances, may enter the Premises and proceed to have such
41  repairs or replacements made at Tenant's reasonable expense. Within thirty (30) days after
42  Landlord renders a bill for such repairs or replacements, Tenant shall reimburse Landlord for the
43  reasonable cost of making such repairs.

44      Section 9.3   Legal Compliance Work. Except as hereinafter expressly provided,
45  Landlord shall be responsible, at its sole cost and expense (and, except as otherwise provided in
46  Section 5.1 above, not includable in Common Areas Charges), for performing all "Legal
47  Compliance Work" (hereinafter defined). Notwithstanding the foregoing, Tenant shall be
48  responsible, at its sole cost and expense, for the performance of Legal Compliance Work: (a)
49  pertaining to the interior elements of the Premises which are neither structural nor comprise the
50  major building systems serving the Premises; (b) comprising the structural or non-structural
51  components of Tenant's Work or alterations performed by Tenant pursuant to Section 8.1 hereof;
52  or (c) required solely as a result of Tenant's specific manner of use of the Premises (i.e., are not
53  of general applicability to tenants and occupants of the Shopping Center); provided, however,
54  that the foregoing shall not relieve Landlord of its obligations to perform: (x) Landlord's Work
55  in accordance with all Legal Requirements, and (y) the repairs required in this Lease. As used
56  herein, "Legal Compliance Work" shall mean any obligation, addition, alteration, improvement,
57  or rebuilding, structural or otherwise, to or of the Premises, the Shopping Center, or any part
58  thereof, as applicable, which may be required by reason of any Legal Requirement.

1    ARTICLE 10.
2    INDEMNIFICATION, INSURANCE AND WAIVER OF SUBROGATION

3    Section 10.1    Mutual Release, Waiver of Subrogation and Mutual Indemnification.

4    10.1.1    Mutual Waiver of Claims. Landlord and Tenant, on their own behalf and on
5    behalf of anyone claiming under or through either one by way of subrogation, hereby release and
6    waive all rights of recovery and causes of action against each other and their respective Affiliates
7    from any and all liability for any loss or damage to property or resulting from damage to such
8    property (and, in either case, any resulting loss of business or rental income), whether caused by
9    the negligence or fault of the other party, which is normally insured under Special Form property
10    insurance (formerly known as "All-Risk") and time element insurance required to be maintained
11    hereunder, provided, however, that the foregoing waiver and release by Tenant shall not apply to
12    damages suffered by Tenant to any or all of its leasehold improvements, fixtures, or merchandise
13    caused by seepage or flooding arising from the operation of any business in any premises
14    immediately above the Premises on the ground floor level of the Building of which the Premises
15    is a part (the "*Waiver of Claims Exceptions*"), other than seepage or flooding resulting from
16    mere restroom, breakroom kitchen/pantry or janitor closet type uses, which foregoing
17    occurrences shall be subject to the waiver of claims described in this Section 10.1.1; provided,
18    however, Landlord's liability for the Waiver of Claim Exceptions shall not exceed Tenant's
19    deductible under Tenant's Special Form property insurance policy.  Except as expressly provided
20    otherwise herein, in the event either Landlord or Tenant is a self-insurer or maintains a
21    deductible (as either may be permitted hereunder), then the self-insuring party or the party
22    maintaining the deductible hereby releases the other party from any liability arising from any
23    event which would have been covered had the required insurance been obtained and/or the
24    deductible not been maintained.

25    10.1.2    Waiver of Subrogation. Landlord and Tenant shall cause each property
26    insurance policy carried by either of them insuring the Premises, the contents thereof, or the
27    Shopping Center, to provide that the insurer waives all rights of recovery by way of subrogation
28    or otherwise against the other party hereto (and all of such other party's Affiliates) in connection
29    with any loss or damage which is covered by such policy or that such policy shall otherwise
30    permit, and shall not be voided by the releases provided above.

31    10.1.3    Mutual Indemnification.  Except as otherwise provided in Subsections 10.1.1
32    and 10.1.2 above, Tenant covenants to defend and indemnify Landlord and hold Landlord
33    harmless from and against any and all claims, actions, damages, liability and expense, including
34    reasonable attorneys' fees, (x) in connection with loss of life, personal injury and/or damage to
35    property arising from or out of any occurrence in or upon the Premises, or any part thereof, or (y)
36    occasioned wholly or in part by any act or omission of Tenant, its agents, contractors,
37    employees, servants, or licensees, except to the extent such claims, actions, damages, liability
38    and expense are caused by the acts or omissions of Landlord, its agents, contractors, licensees,
39    employees, or for which any of said parties may be statutorily liable.

40    Except as otherwise provided in Subsections 10.1.1 and 10.1.2 above, Landlord
41    covenants to defend and indemnify Tenant and hold Tenant harmless from and against any and
42    all claims, actions, damages, liability and expense, including reasonable attorneys' fees, (x) in
43    connection with loss of life, personal injury and/or damage to property arising from or out of any
44    occurrence in or upon any portion(s) of the Common Area (excluding the Premises), or (y)
45    occasioned wholly or in part by any act or omission of Landlord, its agents, contractors,
46    employees, servants, except to the extent such claims, actions, damages, liability and expense are
47    caused by the acts or omissions of Tenant, its agents, contractors, licensees or employees, or for
48    which any of said parties may be statutorily liable.

49    Section 10.2    Tenant's Insurance.

50    10.2.1    Tenant's Insurance.  Tenant, at its own cost and expense, shall maintain in full
51    force and effect from and after the Delivery Date and throughout the Term: (i) commercial
52    general liability insurance protecting and insuring Tenant, naming Landlord (and the Mortgagee)
53    and Landlord's designated managing agent as "additional insured-lessor" for claims arising out
54    of the use or occupancy of the Premises by Tenant and the obligations assumed by Tenant under
55    this Lease, and having a combined single limit of liability of not less than Ten Million Dollars
56    ($10,000,000) for bodily injury, death and property damage liability; (ii) Special Form (formerly
57    known as "All-Risk") property insurance, on a replacement cost basis, in an amount adequate to

28

1  cover the full insurable replacement value of all of Tenant's Property; and (iii) business
2  interruption insurance. Tenant may carry any of its insurance under "blanket policies" covering
3  the Premises and other locations it or any Affiliate of Tenant owns or leases, provided that: (i)
4  the amount of the total insurance available shall be at least the protection equivalent to separate
5  policies in the amounts herein required, and (ii) in all other respects, any such policy or policies
6  shall comply with the applicable provisions of this Article 10.

7  10.2.2  Self-Insurance. All insurance required to be maintained under this Section 10.2
8  may be provided under: (i) an individual policy covering this location; (ii) a blanket policy or
9  policies which includes other liabilities, properties and locations of Tenant or its Affiliates; (iii)
10  a plan of self-insurance provided Tenant maintains, during the period of self-insurance, a
11  tangible net worth of at least One Hundred Fifty Million and 00/100 ($150,000,000.00) Dollars;
12  or (iv) a combination of any of the foregoing insurance programs. To the extent any deductible
13  is permitted or allowed as a part of any insurance policy carried by Tenant in compliance with
14  this Section 10.2, then Tenant shall be deemed to be covering the amount thereof under an
15  informal plan of self-insurance; provided, however, that in no event shall any deductible exceed
16  Two Hundred Fifty Thousand Dollars ($250,000) unless Tenant complies with the requirements
17  regarding self-insurance pursuant to clause (iii) above. If Tenant elects to self-insure all or any
18  part of the insurance required to be maintained by Tenant pursuant to Section 10.2 hereof: (A) all
19  of the provisions relating to insurance required to be maintained by Tenant shall apply as if
20  Tenant had in fact maintained policies of insurance in lieu of self-insurance; (B) said self-
21  insurance shall not decrease the insurance coverage or limits set forth in this Lease and Landlord
22  shall have no greater liability by reason of such self-insurance, and as much protection as,
23  Landlord would have had if Tenant had provided the insurance required to be provided pursuant
24  to the relevant provisions of this Lease (including, without limitation, protection by way of
25  Tenant's waiver of subrogation provisions of this Lease and the reasonable cost of any legal
26  representation to which Landlord, its agents or any additional insureds would have been entitled
27  were such self-insurance program not been in place) and accordingly, any self-insurance shall be
28  deemed to contain all of the applicable terms and conditions applicable to such insurance as
29  required under this Lease; and (C) with respect to any claims which may result from incidents
30  occurring either before, during or after the Term, such self-insurance obligations shall survive
31  the expiration or earlier termination of this Lease to the same extent as the required insurance
32  would have survived.

33  Section 10.3  Insurance Covering Tenant's Work. Tenant shall not make any alterations
34  or installations, or perform Tenant's Work unless prior to the commencement of such work,
35  Tenant shall obtain or have its contractors obtain (and during the performance of such work keep
36  in force) builder's risk, commercial general liability, including products/completed operations,
37  auto liability and worker's compensation insurance, to cover every contractor to be employed.
38  The policies shall be in amounts reasonably satisfactory to Landlord. Prior to the
39  commencement of such work, Tenant shall deliver duplicate originals or certificates of such
40  insurance policies to Landlord. Such policies shall name Landlord and any other party
41  reasonably designated by Landlord of whom Tenant is notified (including without limitation, as
42  applicable, Landlord's managing agent and its lender(s)) as an additional insured (except for
43  worker's compensation) and, to the extent obtainable, contain a waiver of subrogation in favor of
44  Landlord.

45  Section 10.4  Landlord's Insurance.

46  10.4.1  Liability Insurance. Landlord shall maintain in full force and effect on and
47  after the Effective Date and throughout the Term commercial general liability insurance with
48  regard to the Common Areas protecting and insuring Landlord, naming Tenant as "additional
49  insured lessee," and having a combined single limit of liability of not less than Ten Million
50  Dollars ($10,000,000) for bodily injury, death and property damage liability. Landlord shall
51  have the right to carry its general liability insurance and/or Special Form property insurance
52  under "blanket policies" covering the Shopping Center and other properties provided that: (i) the
53  amount of the total insurance available shall be at least the protection equivalent to separate
54  policies in the amounts herein required, and (ii) in all other respects, any such policy or policies
55  shall comply with the applicable provisions of this Article 10.

56  10.4.2  Special Form Property Insurance. Landlord shall procure and maintain in full
57  force and effect on and after the Effective Date and throughout the Term, Special Form (formerly
58  known as "All-Risk") property insurance (including loss of rents for a minimum period of one
59  (1) year) and endorsements for coverages for flood, earthquake, windstorm, earth movement

29

1    [sinkholes], demolition, increased cost of construction and building ordinance coverages, on a
2    replacement cost basis, in an amount adequate to cover the full insurable replacement value of all
3    of the buildings (including the Premises) and other insurable improvements in the Shopping
4    Center; provided, however, in no event shall such insurance cover Tenant's Property). All
5    policies required to be maintained by Landlord pursuant to this Subsection 10.4.2 shall provide
6    that any proceeds thereof shall be deposited with Landlord's Mortgagee, or if none, to Landlord,
7    in either event to be held in trust by such party and disbursed only in accordance with the
8    provisions of, and for the purposes set forth in, Section 11.1 hereof. The property insurance
9    required to be maintained by Landlord pursuant to this Section shall not have deductibles
10    exceeding Two Hundred Fifty Thousand Dollars ($250,000) without Tenant's prior consent
11    (provided that the foregoing threshold shall increase to $1,000,000 for so long as Landlord is
12    Seritage SRC Finance LLC or its Affiliate or a real estate investment trust (REIT) of comparable
13    net worth as that of Landlord on the Effective Date; Landlord shall provide to Tenant, upon
14    request by Tenant not more often than once during any twelve-month period during the Term,
15    reasonable evidence as to (x) Landlord's net worth on the Effective Date, and (y) as applicable,
16    the then net worth of such Affiliate or REIT that becomes Landlord under this Lease and seeks to
17    increase (or maintain) the deductible threshold to $1,000,000 as described above). Landlord
18    Notwithstanding the foregoing to the contrary, Landlord shall have no obligation to provide
19    evidence of its net worth so long as Landlord or the parent of Landlord is a publicly traded REIT.

20         10.4.3   Tenant's Pro Rata Share of Insurance Premiums. Tenant shall reimburse
21    Landlord for Tenant's Pro Rata Share of (i) the reasonable insurance premiums attributable to the
22    policies required to be maintained by Landlord pursuant to this Section 10.4 and (ii) any costs
23    resulting from insurance deductibles or any payments made under any self-insurance policy
24    maintained by Landlord up to Two Hundred Fifty Thousand and 00/100 ($250,000.00) Dollars,
25    each as part of Common Areas Charges. If the rates for any insurance Landlord is required to
26    carry hereunder are increased as a result of the use or other activity of any other occupant of the
27    Shopping Center, the amount of such increase shall be excluded from Common Areas Charges.
28    If the insurance rates applicable to the Shopping Center are raised solely as a result of (x) any
29    failure by Tenant to comply with applicable insurance requirements, (y) Tenant's specific use or
30    manner of use of the Premises, or (z) the use of the Premises for other than retail sales and for
31    incidental storage and office use, then, provided Tenant receives a statement from Landlord's
32    insurance carrier setting forth the reason therefor, Tenant shall pay to Landlord, on demand, the
33    portion of the premiums for all insurance policies applicable to the Shopping Center as shall be
34    attributable to the higher rates caused by Tenant as set forth above or cease the activity which
35    caused the higher rates. To the extent that Landlord receives a dividend, credit, rebate or other
36    return of a premium which had previously been included in Common Areas Charges, Landlord
37    shall promptly refund Tenant's Pro Rata Share of such dividend, credit, rebate, or return to
38    Tenant. Tenant's Pro Rata Share of any insurance premium for any period during the Term
39    which constitutes less than a full calendar year shall be equitably prorated. The provisions of
40    this Subsection 10.4.3 shall survive the expiration or earlier termination of this Lease.

41         Section 10.5   General Insurance Requirements.

42         10.5.1   All insurance required to be maintained by the parties under this Lease shall be
43    maintained with insurance companies qualified to do business in the state in which the Shopping
44    Center is located, and rated at least A-/VIII by the most current Best's Key Rating Guide (or its
45    equivalent, if such Guide ceases to be published). Each party shall use its diligent efforts to have
46    its insurers provide thirty (30) days [ten (10) days in the event of non-payment of premium] prior
47    notice to the other party of cancellation or non-renewal of any policy required hereunder. Each
48    policy carried by either party shall be written as a primary policy. Each party shall provide to the
49    other duly executed certificates evidencing the insurance coverage described in Sections 10.2
50    and 10.4 above.

51         10.5.2   The liability insurance requirements under Sections 10.2 and 10.4 above shall
52    be reviewed by Landlord and Tenant every five (5) years for the purpose of mutually increasing
53    (in consultation with their respective insurance advisors) the minimum limits of such insurance
54    to limits which shall be reasonable and customary for similar facilities of like size and operation
55    in accordance with generally accepted insurance industry standards. The replacement value of
56    the buildings and other insurable improvements constituting the Shopping Center shall be re-
57    evaluated from time to time at the request of either Landlord or Tenant.

1    ARTICLE 11.
2    FIRE AND OTHER CASUALTY; EMINENT DOMAIN

3    Section 11.1    Fire and Other Casualty.

4    11.1.1   (a)  Except as otherwise provided in this Section 11.1, if all or a portion of the
5    Premises, the Common Areas (including all improvements thereto) or other buildings in the
6    Shopping Center shall be damaged by fire or other casualty (and any such Common Areas and/or
7    buildings are located within the "Restoration Area" described on Exhibit B, which Restoration
8    Area shall include, whether shown as part of such Restoration Area on Exhibit B or not, the
9    Critical Area), then Landlord shall promptly rebuild and restore the same to the condition
10   existing immediately prior to such fire or other casualty, which restoration shall include all
11   reasonably comparable replacements of Tenant's Work and all other leasehold improvements,
12   and shall not include any of Tenant's Property. With respect to Common Areas, buildings or
13   improvements within the Shopping Center which are damaged by fire or other casualty but
14   which are not located within the Restoration Area, Landlord may elect to either rebuild and
15   restore same to substantially the condition in which they existed immediately prior to such fire or
16   other casualty (or such other condition as Landlord deems reasonable in accordance with the
17   provisions of this Lease) or, if Landlord elects not to so rebuild and restore same, Landlord shall
18   raze the applicable portions of such buildings or improvements not rebuilt, remove all debris
19   resulting therefrom, and pave such areas for parking or landscape such areas in a sightly manner.
20   The proceeds of the policies required to be obtained and maintained by Landlord pursuant to
21   Subsection 10.4.2 hereof shall, to the extent necessary, be used for the performance of such
22   rebuilding and restoration work.  In the event such insurance proceeds are insufficient to
23   complete such work, Landlord shall provide the balance of the amount necessary to rebuild or
24   restore the Shopping Center in the manner provided in this Section 11.1.  Landlord shall give
25   Tenant at least thirty (30) days' prior notice of the date on which the rebuilding and restoration
26   work to the Premises will be Substantially Completed.

27   11.1.2   Notwithstanding the foregoing, if any portion of the Premises are so damaged
28   or destroyed, Tenant shall have the right to require Landlord to make changes to the Premises in
29   the course of, and as part of, such rebuilding or restoration work. If the net cost and expense of
30   such rebuilding or restoration work is increased solely as a result of such changes (based on the
31   design and scope thereof being materially in excess of the design and scope of Landlord's Work
32   hereunder and taking into consideration any and all actual reduced and additional costs resulting
33   from such changes and/or other cost savings arising therefrom), then Tenant shall pay to
34   Landlord, as Additional Rent, the amount of such net increase, which amount shall be due and
35   payable within thirty (30) days after Landlord has delivered to Tenant backup information
36   evidencing such increase (including, without limitation, receipted invoices) as may be reasonably
37   required by Tenant (but in no event earlier than the occurrence of the date on which possession
38   of the restored areas of the Premises are delivered to Tenant).  To the extent that Landlord's
39   substantial completion of such rebuilding or restoration work is delayed solely as a result of such
40   changes (taking into consideration any and all reasonable time savings to Landlord resulting
41   from such changes), then the applicable period(s) specified in Section 11.1.2 below shall be
42   appropriately adjusted to the extent of such net delay.

43   If, in Tenant's reasonable judgment, the damage to, the Premises renders all or
44   any portion of the Premises unusable for the conduct of Tenant's business or, in the case of any
45   damage to, the Shopping Center, materially interferes with the normal conduct of any business
46   operations in the Premises, the Fixed Rent and Tenant's Pro Rata Share of Common Areas
47   Charges and Taxes shall be equitably reduced or totally abated based upon the extent to which
48   the remaining portion of the Premises may, in Tenant's reasonable judgment, be utilized for its
49   normal conduct of business.

50   11.1.3   In the event that:

51   (a)  Landlord does not commence the repair and restoration work to the
52   Premises, the Common Areas, or other buildings in the Shopping Center as required pursuant to
53   this Section 11.1 within ninety (90) days after the date of such destruction, or thereafter fails to
54   diligently pursue the completion of such repair and restoration work (subject to such period as
55   may be reasonably necessary for the adjustment of insurance proceeds, preparation of plans and
56   obtaining a building permit, such period not to exceed sixty (60) days in the aggregate); or

31

1    (b)   the required repairs and restorations to the Premises, the Common Areas,
2    or other buildings in the Shopping Center are not Substantially Completed by Landlord in
3    accordance with the provisions of this Section 11.1 within eighteen (18) months after the date of
4    destruction (which period may be extended by reason of an event of Force Majeure not to exceed
5    sixty (60) days in the aggregate, provided that Landlord shall have given Tenant notice thereof
6    promptly after its occurrence),

7            then, in either of such events, Tenant shall have the right, at its sole discretion
8    and option, to:

9            (i)    after giving thirty (30) days' prior notice to Landlord (and
10    Landlord's continued failure to commence and diligently pursue such repairs and
11    restoration work to completion), perform or complete, as the case may be, said work (or
12    any portion thereof) on Landlord's behalf and at the sole cost of Landlord, which cost
13    Landlord shall pay to Tenant during the course of such repairs within ten (10) days after
14    Tenant's delivery to Landlord of an invoice therefor and, in default of any such payment,
15    Tenant shall have the right to offset the amount thereof, together with interest at the
16    Lease Interest Rate, against the Rent next accruing hereunder (it being agreed, without
17    limiting the foregoing provisions of this Subsection 11.1.2, that at Tenant's election all
18    insurance proceeds paid or payable to Landlord or Landlord's Mortgagee pursuant to
19    Subsection 10.4 hereof shall be paid (or, as applicable, in turn delivered) directly to
20    Tenant, to be applied to such work by Tenant as same is being performed); or

21            (ii)    seek to obtain specific performance of Landlord's repair
22    and restoration obligations pursuant to the laws of the state in which the Shopping Center
23    is located; or

24            (iii)    terminate this Lease by thirty (30) days' notice to Landlord.

25    In addition to the foregoing, if, in the opinion of an independent licensed architect designated by
26    Tenant (and reasonably acceptable to Landlord), the required repairs and restorations to the
27    Premises, the Common Areas or other buildings located in the Restoration Area (and/or, as
28    applicable, to the areas located outside of the Restoration Area to the extent repairs and
29    restorations to same are required pursuant to Section 11.1.1 above) cannot be completed by
30    Landlord in accordance with the provisions of this Section 11.1 within eighteen (18) months
31    after the date of destruction (which opinion shall be delivered by Tenant to Landlord within forty
32    five (45) days after the date of such destruction), Tenant shall have the right, at its sole discretion
33    and option, to terminate this Lease by giving Landlord at least thirty (30) days' notice thereof.

34            11.1.4   If the Premises are substantially destroyed by fire or other casualty during the
35    last two (2) years of the Term to the extent of more than one-third (1/3) of the Floor Area
36    thereof, Landlord or Tenant shall each have the right to terminate this Lease as of the date of
37    such damage or destruction by giving notice within thirty (30) days following such damage or
38    destruction, but Tenant may negate any termination by Landlord by agreeing to extend the Term
39    for an additional five (5) year period by exercising an option pursuant to Subsection 2.2.2 hereof,
40    if available, within ten (10) days after receipt of the termination notice from Landlord.

41        Section 11.2   Eminent Domain.

42            11.2.1   As used in this Section 11.2, "Taking" or "Taken" shall mean a taking for any
43    public or quasi-public use by any lawful power or authority by exercise of the right of
44    condemnation or eminent domain or by agreement between Landlord and those having the
45    authority to exercise such right.

46            11.2.2   If all of the Premises shall be Taken, this Lease shall terminate as of the date of
47    vesting of title or transfer of possession, whichever is earlier, without further liability on the part
48    of either Landlord or Tenant, except for an adjustment between the parties for the Rent payable
49    by Tenant hereunder.

50            11.2.3   In the event that:

51            (a)   any portion of the Premises shall be Taken so that it is commercially
52    unreasonable or unfeasible for Tenant, in its reasonable judgment, to conduct its normal business
53    in the Premises;

32

1                 (b)  as a consequence of any Taking, the Shopping Center no longer has all of
2  the entrances from New Britain Avenue located within the Critical Areas and as a result, it is not
3  commercially reasonable or feasible for Tenant, in its reasonable judgment, to conduct its normal
4  business in the Premises;

5                 (c)  Intentionally Omitted;

6                 (d)  any portion of the Critical Area shall be Taken which materially interferes
7  with parking, visibility or access to the Premises, and as a result of such taking it is commercially
8  unreasonable or unfeasible for Tenant, in its reasonable judgment, to conduct its normal business
9  in the Premises;

10                (e)  more than twenty-five (25%) percent of the total Floor Area of the
11  buildings in the Restoration Area (other than the Premises) is Taken; or

12                (f)  five (5%) percent or more of the parking spaces located in the "Critical
13  Area" are Taken, or if so many of the parking spaces in the Shopping Center are Taken such that
14  there are fewer than (i) 3.5 parking spaces for every one thousand (1,000) square feet of Floor
15  Area in the Shopping Center or (ii) the number of parking spaces required by applicable Legal
16  Requirements;

17  then, in any of such events, Tenant shall have the right to terminate this Lease by giving at least
18  sixty (60) days' prior notice to Landlord within sixty (60) days of any such event, in which event
19  this Lease shall terminate without any further liability on the part of either Landlord or Tenant,
20  except for an adjustment between the parties for the Fixed Rent or Tenant's Pro Rata Share of
21  Common Areas Charges or Taxes payable by Tenant hereunder and for payment to Tenant for its
22  share of the award for the taking pursuant to Subsection 11.2.5 below. Upon any partial Taking
23  of the Premises, the Fixed Rent and Tenant's Pro-Rata Share of Common Areas Charges and
24  Taxes shall be equitably reduced or totally abated based upon the extent to which the remaining
25  portion of the Premises may, in Tenant's reasonable judgment, be utilized for its normal conduct
26  of business.

27        11.2.4     If this Lease is not terminated pursuant to this Section 11.2, Landlord, at
28  its sole cost and expense, within a reasonable period of time after such Taking, shall repair and
29  restore the area not so Taken to tenantable condition, similar in physical appearance to the
30  condition of the area immediately prior to the Taking, pursuant to plans and specifications
31  approved by Tenant (which repair and restoration shall, as applicable, include all Tenant's Work
32  and all other leasehold improvements performed by Tenant; provided, however, that Landlord
33  shall not be obligated to repair or restore Tenant's Property), and any and all amounts awarded to
34  Landlord for any Taking shall be made available to and used by Landlord for any rebuilding or
35  restoration which it is required to perform hereunder.  During the period of such repairs and
36  restoration, all Fixed Rent and Tenant's Pro-Rata Share of Common Areas Charges and Taxes
37  shall abate to the extent that the Premises may not, in Tenant's reasonable judgment, be used by
38  Tenant for the normal conduct of its business.  Such abatement shall terminate in accordance
39  with the terms of Section 11.3 below.  Landlord shall give Tenant at least ninety (90) days' prior
40  notice of the date on which the restoration work to the Premises will be Substantially Completed.

41        11.2.5     In connection with any Taking or partial Taking of the Premises, Tenant
42  shall be entitled to claim an award for loss of business, leasehold improvements, fixtures and
43  equipment and removal and reinstallation costs; provided, however, that no award shall be
44  payable to Tenant which reduces the award payable to Landlord for its fee interest in the
45  Premises.

46        11.2.6     Any dispute between the parties with respect to this Section 11.2 shall be
47  resolved by arbitration in accordance with the provisions of Section 16.3 below.

48        Section 11.3   Abatement of Rent Charges.  Notwithstanding any other provisions of this
49  Lease, if the Fixed Rent and Additional Rent payable by Tenant hereunder shall be abated
50  pursuant to Sections 11.1 or 11.2 above, such abatement shall terminate upon the first to occur
51  of: (a) the date on which Tenant shall reopen the Premises to the general public for business; or
52  (b) the expiration of the period which is sixty (60) days after Landlord shall have completed such
53  repairs and restoration work as Landlord is obligated to perform hereunder and the interference
54  with the operation of business in the Premises has ceased.

33

ARTICLE 12.
COVENANTS, REPRESENTATIONS AND WARRANTIES

Section 12.1   Quiet Enjoyment.  Without limiting Landlord's rights and remedies in the event of any Event of Default then existing pursuant to this Lease, Tenant shall peaceably and quietly have, hold, occupy and enjoy the Premises for the Term, without hindrance from Landlord or any party claiming by, through, or under Landlord.

Section 12.2   Authority.  Tenant and Landlord each warrant and represent that the person(s) signing this Lease on their behalf has authority to enter into this Lease and to bind Tenant and Landlord, respectively, to the terms, covenants and conditions contained herein.  The submission of this Lease to each party hereto shall be for examination and negotiation purposes only, and does not and shall not constitute a reservation of or an obligation of Tenant to lease, or otherwise create any interest of Tenant in, the Premises or any other premises situated in the Shopping Center unless and until the Lease is fully executed and delivered by Tenant and Landlord.

Section 12.3   Landlord's Covenants, Warranties and Representations.  To induce Tenant to execute this Lease, and in consideration thereof, Landlord covenants, warrants and represents to Tenant as follows:

(a)   As of the Effective Date, Landlord has, and as of the Delivery Date Landlord shall have fee simple title to the entire Shopping Center, free and clear of all easements, restrictions, liens, encumbrances, leases and the like, except for the encumbrances described on Exhibit E hereto (collectively, the "***Permitted Encumbrances***") (it being agreed that for the purposes of this Lease, the term "Permitted Encumbrances shall also include such other matters of title that do not, in each case in other than a strictly de-minimis manner (i) increase Tenant's duties or obligations, or decrease Tenant's rights and benefits, under this Lease, or (ii) adversely affect the normal operation of Tenant's business at the Premises or with respect to the Common Areas);

(b)   In the event the legal description of the Shopping Center described in Exhibit A hereto indicates that the Shopping Center is composed of more than one parcel or lot, Landlord represents that there exist no strips or gores between such parcels or lots which are not owned by Landlord;

(c)   No third party consents or approvals are required in order for Landlord to enter into this Lease, or for the performance of Landlord's Work and Tenant's Work (excluding, as of the Effective Date, governmental permits and approvals);

(d)   Intentionally Omitted;

(e)   The Shopping Center now has, and, on the Delivery Date, shall have, access to and from New Britain Avenue, as shown on Exhibit B hereto, for the passage of vehicular traffic;

(f)   This Lease does not violate the provisions of any instrument heretofore executed and/or binding on Landlord, or affecting or encumbering the Shopping Center, or the Premises, and subject to the Landlord Imposed Prohibited Uses, Existing Exclusives and Existing Use Restrictions no rights granted by Landlord to Tenant under the terms of this Lease conflict with any rights granted by Landlord to any other tenant or occupant in the Shopping Center (including, without limitation, any rights of first offer or first refusal or the like);

(g)   Landlord has not entered into nor does Landlord have knowledge of any private instrument which would prevent: (i) the use of the Premises for the Permitted Use; (ii) the use of the parking facilities, access roads, and other Common Areas in the manner contemplated by this Lease; or (iii) the performance of Tenant's Work in accordance with the terms of this Lease;

(h)   With respect to any and all exit signs containing tritium gas that are located within or upon the Premises, Landlord shall cause same to be removed from the Premises prior to the Delivery Date and thereafter disposed of in full compliance with all applicable Legal Requirements.

34

1       (i)    As of the Effective Date there is no "Related Land" (defined in 13.1.2
2   below) in existence and as of the Delivery Date there will not be any Related Land in existence
3   (or, if there shall be Related Land in existence, Landlord shall promptly notify Tenant thereof
4   and promptly execute any recordable instrument reasonably requested by Tenant which
5   memorializes the provisions of this Lease pertaining to or otherwise affecting Related Land); and

6       (j)    Attached hereto as Exhibit K-2 is a complete list of all fully executed and
7   delivered leases in effect on the Effective Date with respect to the Shopping Center (the
8   "*Existing Leases*").

9       Section 12.4    Environmental Matters.

10      12.4.1    Definitions.

11      (a)    As used herein, the term "*Environmental Laws*" shall mean any and all
12  Legal Requirements concerning the protection of the environment, human health or safety.

13      (b)    As used herein, the term "*Hazardous Substances*" shall mean each and
14  every element, compound, material, mixture, substance, waste, hazardous substance, hazardous
15  waste, hazardous material, toxic substance, pollutant or contaminant either as those terms are
16  defined in any of the Environmental Laws or the presence of which may cause liability at
17  common law, including, without limitation, asbestos and/or asbestos-containing products,
18  whether or not currently friable.

19      (c)    As used herein, the term "*Environmental Notice*" shall mean a summons,
20  citation, directive, order, claim, notice, litigation, investigation, judgment, legal pleading, letter
21  or other communication, written or oral, actual or threatened, from the United States
22  Environmental Protection Agency or other federal, state or local governmental agency or
23  authority, or any other private individual or entity concerning (i) any Hazardous Substances at,
24  on, in, under or emanating from the Premises or the Shopping Center; (ii) any violation or
25  potential violation of Environmental Laws at the Premises or the Shopping Center; or (iii) any
26  underground storage tanks on the Premises or the Shopping Center.

27      (d)    As used herein, the term "*Releasing*" or "*Release*" shall mean releasing,
28  spilling, leaking, discharging, disposing or dumping or otherwise introducing any substance into
29  the environment or into any building or other improvements in violation of Environmental Laws.

30      (e)    As used herein, the term "*Compliance Costs*" shall mean any and all costs
31  incurred by a party in complying with applicable Environmental Laws, including, without
32  limitation, consultant's and engineer's fees; laboratory costs; contractor's and subcontractor's
33  fees; application and filing fees; costs of investigation, monitoring or cleanup of soil or other
34  substrate, surface water, groundwater, or buildings or other improvements; equipment costs;
35  disposal fees; costs of operation and maintenance of equipment; legal fees; other governmental
36  fees or costs; interest at the Lease Interest Rate from the date of expenditure until paid in full;
37  and other similar or related costs.

38      (f)    As used herein, the term "*Tenant Related Parties*" shall mean Tenant's
39  agents, servants, employees, contractors or licensees.

40      12.4.2    Compliance with Environmental Laws.  Tenant shall comply with all
41  applicable requirements of Environmental Laws governing its use of, and operations at, the
42  Shopping Center and the Premises.  Landlord shall comply with all applicable requirements of
43  Environmental Laws relating to the Shopping Center and the Premises, except to the extent such
44  requirements arise from Tenant's operations thereon.

45      12.4.3    Responsibility for Releases of Hazardous Substances.  Notwithstanding
46  any other provision of this Lease, Tenant shall only be liable for any Release of Hazardous
47  Substances at, on, in, under or emanating from the Premises or Shopping Center which were
48  introduced by Tenant or Tenant Related Parties (hereinafter "*Tenant Releases*"), including,
49  without limitation, any Compliance Costs required to address Tenant Releases.  Landlord shall
50  be liable for any Release of Hazardous Substances at, on, in, under or emanating from the
51  Premises or Shopping Center, including, without limitation, any Compliance Costs attributable to
52  such Hazardous Substances, unless the Hazardous Substances are caused by Tenant Releases.
53  Except in the event of an emergency or if compelled by applicable governmental authority, any
54  work performed by Landlord relating to Hazardous Substances shall be performed by Landlord

35

1       at any time other than during the months of August (through Labor Day), October, November,
2       December and January, and shall be undertaken in such a manner so as to (i) not adversely affect
3       ingress to or egress from the Shopping Center, (ii) have no adverse effect on the visibility of the
4       Premises or any signs which contain Tenant's name, and (iii) not otherwise materially interfere
5       with the normal conduct of any business operations in the Premises. If the presence of
6       Hazardous Substances, or Landlord's remediative work relative thereto, interferes with Tenant's
7       normal business operations in the Premises, then Tenant shall be entitled to an equitable
8       abatement of Rent for so long as such condition persists.

9           12.4.4    Standards. Except as expressly provided herein, the parties agree that any
10      investigation or remediation of Hazardous Substances, or cure of a violation of Environmental
11      Laws, required to be conducted at the Premises or Shopping Center shall be no more stringent
12      than necessary to meet the minimum standards of Environmental Laws applicable to properties
13      used in the manner the Shopping Center is being used.

14          12.4.5    Landlord's Representations and Warranties. Landlord represents and warrants
15      that: (i) Landlord has received no Environmental Notices concerning the Shopping Center or the
16      Premises; (ii) Landlord has no knowledge of, and has received no notice of, any violation that
17      has not been fully cured and removed to the satisfaction of the applicable governmental
18      authority, or any potential or alleged violation, of any Legal Requirement, including, without
19      limitation, Environmental Laws, affecting the Shopping Center or the Premises; and (iii) to the
20      best of Landlord's knowledge (Report of Phase I Environmental Site Assessment prepared by
21      BBJ Group, LLC dated December 29, 2014, Phase II Environmental Site Assessment Letter
22      Report prepared by BBJ Group, LLC dated April 14, 2015 and Hazardous Building Materials
23      Assessment prepared by Terracon Consultants, Inc. dated June 13, 2016; full and complete
24      copies of which have been delivered by Landlord to Tenant): (A) no Hazardous Substances are
25      located at, on, in, under or emanating from the Shopping Center or the Premises; and (B) no
26      underground storage tank exists at the Shopping Center or the Premises. The foregoing
27      representations and warranties shall in no way serve to vitiate Landlord's obligations under this
28      Article 12. Notwithstanding anything to the contrary herein or in this Lease, Landlord represents
29      and warrants that as of the Delivery Date the Premises shall be free from asbestos containing
30      materials.

31          12.4.6    Documents. Each party shall immediately notify the other party of the
32      notifying party's receipt of an Environmental Notice.

33          12.4.7    Indemnity. Each party to this Lease shall indemnify, defend and hold the
34      other party, and its agents, servants, shareholders, directors, officers, partners, members and
35      employees harmless from any and all claims, losses, expenses, costs, lawsuits, actions,
36      administrative proceedings, damage, orders, judgments, penalties and liabilities of any nature
37      whatsoever, including, without limitation, reasonable attorneys' fees (incurred to enforce this
38      indemnity or for any other purpose) and Compliance Costs, arising from (i) the indemnifying
39      party's breach of any of its representations, warranties, covenants or other obligations under this
40      Section 12.4; (ii) Hazardous Substances for which the indemnifying party is liable under this
41      Section 12.4; or (iii) violations of Environmental Laws for which the indemnifying party is liable
42      under this Section 12.4.

43          12.4.8    Survival. The obligations of the parties under this Section 12.4 shall
44      survive the renewal, expiration, breach or earlier termination of this Lease.

45          12.4.9    Conflict. In the event of any conflict between the provisions of this
46      Section 12.4 and any other provision of this Lease, the provisions of this Section 12.4 shall
47      control.

48          Section 12.5    OEA.

49          12.5.1    As used in this Lease, the term "*OEA*" shall mean, collectively, that certain (i)
50      Memorandum of Agreement of Sale dated September 16, 1957 between Five City Plaza, Inc., a
51      Connecticut corporation and Sears, Roebuck and Co., a New York corporation recorded October
52      2, 1957 in Volume 303 at page 456; (ii) Agreement dated September 16, 1957 between Five City
53      Plaza, Inc., a Connecticut corporation and Sears, Roebuck and Co., a New York corporation, as
54      amended by that certain Agreement dated April 12, 1961 between Five City Plaza, Incorporated,
55      a Connecticut corporation and Sears, Roebuck and Co., a New York corporation recorded
56      November 13, 1961 in Volume 345 at page 36, as further amended by that certain Letter

1   Agreement dated April 17, 1961 between Five City Plaza, Incorporated and Sears, Roebuck and
2   Co., as further amended by that certain Letter Agreement dated August 22, 1963 between Five
3   City Plaza, Incorporated and Sears, Roebuck and Co., and as further amended by that certain
4   Agreement dated September 5, 1963 between Five City Plaza, Incorporated, a Connecticut
5   corporation, Connecticut General Life Insurance Company, a Connecticut corporation and Sears,
6   Roebuck and Co., a New York corporation; and (iii) Agreement dated November 24, 1959
7   between Sears, Roebuck and Co., a New York corporation and Five City Plaza, Incorporated, a
8   Connecticut corporation.

9       12.5.2   Landlord covenants, represents and warrants to Tenant that: (i) the OEA has
10  not been modified, amended or terminated; (ii) the OEA is currently in full force and effect; (iii)
11  to its actual knowledge as of the date hereof, no default under the OEA exists thereunder beyond
12  any applicable notice and cure period; and (iv) the OEA is, and shall remain, superior in lien to
13  all mortgages and related liens affecting the Shopping Center. Landlord and Tenant each
14  acknowledge that this Lease is made and shall continue to be subject and subordinate to the
15  OEA, subject to the provisions of this Section 12.5. Tenant shall comply with the terms and
16  conditions of the OEA to the extent same affects the Premises (it being agreed that Tenant shall
17  not be obligated to expend any sums in connection with such compliance).

18      12.5.3   Landlord shall, during the Term: (i) perform and observe all of the terms,
19  covenants, provisions and conditions of the OEA on Landlord's part to be performed and
20  observed; (ii) defend, indemnify and hold harmless Tenant from and against any and all claims,
21  demands, causes of action, suits, damages, liabilities, and expenses of any nature arising out of or
22  in connection with the enforcement of, or a claimed breach by, Landlord of any covenant, term,
23  condition, or provision of the OEA; and (iii) diligently enforce, at its sole expense, the
24  covenants, agreements, and obligations of the OEA.

25      12.5.4   Whenever, pursuant to the OEA, the consent or approval of Landlord shall be
26  required by or requested, and such consent or approval could diminish the rights of Tenant
27  (except to a de-minimis extent) or increase the obligations of Tenant (except to a de-minimis
28  extent) thereunder or under this Lease, or could materially and adversely affect Tenant's use or
29  occupancy of the Premises, or the conduct of Tenant's business therein, such consent or approval
30  shall not be granted without the prior consent of Tenant, which consent may be withheld in its
31  sole and absolute discretion.

32      12.5.5   Landlord shall, upon receipt, endeavor to forward to Tenant and Tenant's
33  leasehold mortgagee, if any, a copy of any and all notices and/or demands received by Landlord
34  under or pursuant to the OEA, which relate to, or could adversely affect, Tenant's use or
35  occupancy of the Premises, the conduct of Tenant's business therein, or Tenant's rights pursuant
36  to this Lease.

37      12.5.6   Landlord shall not amend, or modify the OEA if such amendment or
38  modification could diminish the rights or increase the obligations of Tenant thereunder or under
39  this Lease, or could adversely affect Tenant's use or occupancy of the Premises or the conduct of
40  Tenant's business therein, nor shall Landlord terminate the OEA.

41      12.5.7   In the event Landlord defaults in the performance of any of its obligations
42  under the OEA or fails to enforce the obligations of any other obligee under the OEA, and such
43  default or failure to enforce could adversely affect Tenant's rights thereunder or under this
44  Lease, Tenant's Work, Tenant's use or occupancy of the Premises or the conduct of Tenant's
45  business therein, Tenant may, but shall not be obligated to, after thirty (30) days written notice
46  (except in the event of emergency, in which case no notice shall be required) cure any default by
47  Landlord under the OEA and/or enforce, in its own name, at Landlord's expense, the obligations
48  of any other obligee under the OEA. Landlord shall, upon demand, reimburse Tenant for the
49  costs incurred by Tenant in performing any of Landlord's obligations under the OEA  or
50  enforcing the obligations of any obligee under the OEA, together with interest thereon at the
51  Lease Interest Rate, and failing such reimbursement, Tenant shall have the right (in addition to
52  any rights and remedies to which it may be entitled under this Lease, at law, or in equity), upon
53  ten (10) days' prior notice to Landlord, to offset such costs from the next succeeding payment or
54  payments of any Rent due hereunder, together with interest thereon at the Lease Interest Rate
55  from the date of outlay until reimbursement or full satisfaction by credit.

56      12.5.8   As between Landlord and Tenant, in the event of any conflict between the OEA
57  and this Lease, this Lease shall in all respects control.

1        12.5.9   Landlord shall obtain any third-party approvals required under the OEA for the
2   performance of Landlord's Work (including, without limitation, Tenant's elevations and signage,
3   as shown on Exhibit D-1 and Exhibit F hereto), Tenant's Work, and the operation of Tenant's
4   business in the Premises.

5                                          ARTICLE 13.
6                            USES AND RESTRICTIONS

7        Section 13.1   Permitted and Prohibited Uses.

8        13.1.1   Tenant's Permitted Use.  The Premises may be used and occupied for the
9   Permitted Use (defined in Subsection 1.1.28 above).  Tenant shall not use the Premises for any of
10   the "Tenant Imposed Prohibited Uses" (defined in Exhibit L-2 hereto annexed), or the "Landlord
11   Imposed Prohibited Uses" (defined in Exhibit L-1 hereto annexed) or the "Existing Exclusives"
12   (hereinafter defined in Subsection 13.3.1) or the "Existing Use Restrictions" (hereinafter defined
13   in Subsection 13.3.1), to the extent then applicable.

14        13.1.2   Prohibited Uses.  Landlord shall construct, lease, operate, maintain and
15   manage the Shopping Center as a first-class shopping center comparable to other first-class
16   shopping centers in the state in which the Shopping Center is located.  Subject to the rights of
17   tenants under Existing Leases, Landlord shall not lease, rent or occupy or permit to be occupied
18   any portion of the Shopping Center or any "Related Land" (hereinafter defined) for any of the
19   "Tenant Imposed Prohibited Uses" that pertain to the Shopping Center or the Related Land, as
20   the case may be (as set forth in Exhibit L-2 hereto annexed), provided, however, that as to any
21   future Related Land, the foregoing restriction shall not apply to the extent that any Tenant
22   Imposed Prohibited Uses are otherwise permitted under leases entered into prior to the date on
23   which such land becomes Related Land.  As used in this Lease, the term *"Related Land"* shall
24   mean any land contiguous or adjacent to the Shopping Center (including, without limitation, any
25   land that would be contiguous or adjacent to the Shopping Center but for any intervening road,
26   street, alley or highway) owned or controlled by Landlord or its Affiliate(s).

27        Section 13.2   Tenant's Exclusive in Center.  To induce Tenant to execute this Lease, and
28   subject to all of the terms and provisions of this Section 13.2, Landlord covenants and agrees as
29   follows.

30        13.2.1   Subject to the rights of tenants under Existing Leases, and provided
31   Tenant is operating (subject to Excused Periods) for a use similar to the operation of a typical
32   buy buy Baby store (as such store is operated as of the Effective Date of the Lease), Landlord
33   shall not lease, rent or occupy or permit any other premises in the Shopping Center or on any
34   Related Land to be occupied, whether by a tenant, sublessee, assignee, licensee or other occupant
35   or itself, for the storage, sale, rental or distribution, at retail or at wholesale, either singly or in
36   any combination, of items contained in any of the following respective categories of
37   merchandise: (a) infant, juvenile and children's furniture and equipment; (b)  clothing, layettes,
38   apparel, shoes and/or accessories for infants, juveniles and children 0-4 years in age; and
39   maternity clothing; and (c) merchandise, products and services targeted for use by or for infants,
40   juveniles and children 0-4 years in age (including, without limitation, infant, juvenile and
41   children's:  toys, books, food, formula, indoor and/or outdoor play and recreational equipment,
42   audio and video cassettes or equipment, safety items, feeding items, nursing items, health and
43   beauty care items, drug remedies, diapers, wipes, bathroom items (including, without limitation,
44   personal care devices and other bathroom appliances, accessories and toiletries) (which items in
45   clauses (a), (b) and (c) above, either singly or in any combination, are hereinafter referred to as
46   the *"Exclusive Items"*).  Notwithstanding the foregoing, any tenant or subtenant in the Shopping
47   Center or the Related Land shall have the right to utilize its respective premises for the sale,
48   rental and/or distribution of Exclusive Items within an aggregate area (which shall include an
49   allocable portion of the aisle space adjacent to such storage, sales, rental and/or distribution area)
50   not to exceed the lesser of (x) ten percent (10%) of the Floor Area of such tenant's or subtenant's
51   premises, or (y) one thousand (1,000) square feet of Floor Area within such tenant's or
52   subtenant's premises. [For example only, a tenant occupying premises containing a total of five
53   thousand (5,000) square feet of Floor Area could sell Exclusive Items (either singly or in any
54   combination) so long as the aggregate area within its entire demised premises in which any and
55   all Exclusive Items are sold or stored shall not exceed five hundred (500) square feet.].  As to
56   any future Related Land, the foregoing restrictions shall not apply to the extent that the sale,
57   rental or distribution of the Exclusive Items was otherwise permitted under leases entered into
58   prior to the date on which such land became Related Land.  Existing tenants of the Shopping

1   Center and any Related Land (and current or future assignees or sublessees of such tenants) shall
2   nevertheless be subject to the restrictions contained in this Section 13.2 in the event that the lease
3   between Landlord (or Landlord's Affiliate) and any such tenant requires the consent of Landlord
4   (or its Affiliate) to any assignment or subletting or to a change in the use of the applicable
5   premises to permit the sale, rental or distribution of the Exclusive Items.  The restrictions set
6   forth in this Subsection 13.2.1 shall not apply during any time period in which Tenant is in
7   default of any provision of this Lease beyond any applicable notice or cure period.

8   13.2.2       The restrictions set forth in Subsection 13.2.1 above shall not apply to a
9   full-line national or regional: (i) department store [for example, Wal-Mart, Macy's, or Target],
10  (ii) discount club [for example, Costco, BJ's Wholesale Club, or Sam's Club], or (iii) home
11  improvement center [for example, Home Depot or Lowe's], commonly located in first-class
12  shopping centers in the state in which the Shopping Center is located, each occupying at least
13  50,000 square feet of Floor Area within the Shopping Center, as such stores are currently
14  operated (as of the Effective Date).  The restrictions set forth in Subsection 13.2.1 above shall
15  not apply to any store in the Shopping Center occupied and operated by Tenant or any of its
16  Affiliates.  In addition, the restriction above with respect to the exclusive sale of health and
17  beauty care items shall not apply to an Ulta store (as such store is typically operated as of the
18  Effective Date) or any other similar retailer whose primary use is the sale of cosmetics.

19  13.2.3       The exclusive rights granted to Tenant in this Section 13.2 (the "***Exclusive***
20  ***Rights***") shall inure to the benefit of any assignee of Tenant's interest in this Lease and to any
21  sublessee of at least fifty percent (50%) of the Floor Area of the Premises provided such assignee
22  or sublessee operates primarily for the use for which the exclusive was initially granted.

23  13.2.4   (a)   In the event that Landlord, in contradistinction to any tenant or other
24  occupant of the Shopping Center or on the Related Land, shall violate the Exclusive Rights,
25  Tenant's sole monetary remedy (subject, as applicable, to the last sentence of this Section
26  13.2.4(a) and Section 23.7 below), shall be that in lieu of paying Fixed Rent set forth in this
27  Lease, Tenant shall pay a monthly sum equal to fifty (50%) percent of the then Fixed Rent (that
28  arrangement, the "***Alternate Rent Arrangement***").  While the Alternate Rent Arrangement is in
29  effect, Tenant shall remain responsible for all of its covenants and obligations under the Lease,
30  including, but not limited to, the payment of all Additional Rent payable under this Lease. The
31  Alternate Rent Arrangement shall (a) commence on the date upon which Landlord receives
32  Tenant's notice of the violation of the Exclusive Rights, and (b) expire on the date on which the
33  Exclusive Rights shall cease to be violated.  Notwithstanding anything to the contrary set forth
34  herein, so long as any lease or occupancy agreement entered into subsequent to the Effective
35  Date (i.e., that is not an Existing Lease) expressly prohibits the tenant or any other occupant
36  thereunder from engaging in any of the Exclusive Rights, Landlord shall not be deemed in
37  violation of the Exclusive Rights if such tenant or other occupant violates such prohibition set
38  forth in its lease or other occupancy agreement, provided, however that Landlord shall in such
39  event proceed diligently and in good faith in accordance with the applicable terms and conditions
40  of Section 13.2(d) below. Landlord hereby acknowledges and agrees that it shall be deemed in
41  violation of the Exclusive Rights if (A) any tenant or other occupant engages in the sale, rental or
42  distribution of the Exclusive Items  and its lease or occupancy agreement does not expressly
43  prohibit the sale, rental or distribution of the Exclusive Items (the foregoing specifically
44  excluding tenants and other occupants under the Existing Leases), and (B) Landlord or its
45  Affiliate itself at any time during the Term engages in the sale, rental or distribution of the
46  Exclusive Items in the Shopping Center or on the Related Land.

47  (b)   In the further event that Landlord has not cured its violation of the
48  Exclusive Rights on or before the first (1st) anniversary of the commencement of the Alternate
49  Rent Arrangement (each such anniversary, the "***Exclusive Anniversary Date")***, then Tenant, as
50  its sole non-monetary remedy, shall have the annual right (the "***Tenant's Exclusive Termination***
51  ***Right***") to terminate this Lease as of each Exclusive Anniversary Date thereafter so long as the
52  Exclusive Rights are still being violated, subject to the further terms and conditions of this
53  Section 13.2.4(b).  If Tenant so elects to terminate this Lease, it shall do so by notice to Landlord
54  to that effect (unequivocally and irrevocably exercising that option) given to Landlord not later
55  than thirty (30) days after the applicable Exclusive Anniversary Date, as to which such specific
56  election time shall be of the essence; in which event the Term shall expire no earlier than the
57  ninetieth (90th) day next following Landlord's receipt of such notice of termination. Upon such
58  termination, this Lease shall expire and come to an end with the same force and effect as if that
59  date were the Expiration Date originally set forth in this Lease and, except for accrued liabilities

1    and any other matters stated in this Lease to survive the end of the Term, neither party hereto
2    shall have any further liability pursuant to this Lease.

3            (c)    So long as Tenant shall not timely exercise Tenant's Exclusive
4    Termination Right with respect to a given Exclusive Anniversary Date, then (i) this Lease shall
5    remain in full force and effect in accordance with its terms and conditions, subject as applicable
6    to Tenant's annual right to terminate this Lease as of each Exclusive Anniversary Date thereafter
7    so long as the Exclusive Rights are still being violated by Landlord, (ii) the Alternate Rent
8    Arrangement shall cease, as applicable, as of the applicable date set forth in Section 13.2.4(a)
9    above or pursuant to the further provisions of this Section 13.2.4(c), and (iii) upon the expiration
10   of Tenant's Exclusive Termination Right pursuant to Section 13.2.4(b) above or pursuant to the
11   further provisions of this Section 13.2.4(c), as applicable, Tenant shall have no further right to
12   terminate this Lease pursuant to this Section 13.2.4, unless and until the Exclusive Rights are
13   violated by a different tenant/lease than that which formed the basis of a previous Exclusive
14   Rights violation (which violation may include without limitation a tenant or occupant under a
15   subsequent lease or occupancy agreement affecting all or part of the same premises from which
16   the earlier violation has occurred), in which case the provisions of this Section 13.2.4 shall again
17   apply.  Notwithstanding anything to the contrary set forth herein, in no event shall the Alternate
18   Rent Arrangement or Tenant's Exclusive Termination Right extend beyond the Renewal Period
19   next following the portion of the Term in which the violation of the Exclusive Rights by
20   Landlord occurs.  By way of example, and not in limitation of the foregoing, in the event (x) the
21   violation of the Exclusive Rights by Landlord occurs during the Initial Term, the Alternate Rent
22   Arrangement shall cease at the expiration of the first Renewal Period and Tenant's Exclusive
23   Termination Right shall cease as of the thirtieth (30) day following the final Exclusive
24   Anniversary Date of the first Renewal Period and (y) the violation of the Exclusive Use by
25   Landlord occurs during the first Renewal Period Term, the Alternate Rent Arrangement shall
26   cease at the expiration of the second Renewal Period and Tenant's Exclusive Termination Right
27   shall cease as of the thirtieth (30) day following the final Exclusive Anniversary Date of the
28   second Renewal Period.

29           (d)    If any person or entity other than Landlord shall violate any of the
30   Exclusive Rights, or shall indicate in writing to Landlord that it intends to violate the Exclusive
31   Rights, Landlord shall promptly commence appropriate legal proceedings, and use commercially
32   reasonable efforts to diligently prosecute the same, to enjoin and prohibit any such violation. If
33   Landlord fails to promptly commence such proceedings, or shall fail thereafter to diligently
34   prosecute the same, then Tenant shall have the right (i) to conduct and prosecute such legal
35   proceedings (including, without limitation, an action for injunctive relief) in its own name, at
36   Landlord's reasonable expense, or (ii) in the event the right set forth in (i) above is not permitted
37   to be exercised under applicable Legal Requirements, to conduct and prosecute such legal
38   proceedings in the name of Landlord, at Landlord's reasonable expense, and Landlord shall
39   cooperate with Tenant with respect to such prosecution (including, without limitation, by
40   executing any documentation or authorization reasonably required by Tenant in connection with
41   such prosecution and by appearing at any hearing or trial with respect to such prosecution).

42           Section 13.3    Exclusives Which Tenant Must Honor.

43           13.3.1    Tenant (and any assignee of Tenant's interest in this Lease and any
44   sublessee of all or any portion of the Premises) shall honor (i) those exclusives granted by
45   Landlord to certain other tenants in the Shopping Center pursuant to the terms of leases which
46   have been executed prior to the Effective Date (hereinafter, *"Existing Exclusives"*) [a true and
47   complete listing and description of such Existing Exclusives being attached hereto as Exhibit K-
48   1], and (ii) those use restrictions and prohibitions set forth in the Existing Leases and binding on
49   Landlord (hereinafter, "*Existing Use Restrictions*") [a true and complete listing and description
50   of such Existing Use Restrictions being attached hereto as Exhibit K-1], and shall not sublease,
51   occupy or use all or any portion of the Premises, or permit all or any portion of the Premises to
52   be occupied or used in violation of any such Existing Exclusive and/or Existing Use Restriction.
53   Landlord represents and warrants that no Existing Exclusive(s) and/or Existing Use
54   Restriction(s) exist other than those listed on Exhibit K-1 hereto and that Exhibit K-1 is true
55   accurate and complete, and covenants to indemnify, defend and hold Tenant harmless from and
56   against all loss, cost, liability or expense (including, without limitation, reasonable legal fees)
57   incurred by Tenant by reason of the enforcement by any person or entity of such unlisted
58   Existing Exclusive or Existing Use Restriction.  Notwithstanding the foregoing, Tenant shall be
59   entitled to enter into a separate agreement with any tenant or other occupant for whose benefit

40

1    the Existing Exclusive is granted which nullifies or modifies the corresponding Existing
2    Exclusive with regard to the Premises.

3        13.3.2      Except as expressly set forth in this Section 13.3, Tenant shall not be
4    obligated to honor any exclusive granted by Landlord to any tenant in the Shopping Center.

5                                    ARTICLE 14.
6                        CONDUCT OF BUSINESS OPERATIONS

7        Section 14.1    Subject to the other provisions of this Lease (including, without limitation,
8    Articles 2 and 3 and Section 12.4.3 hereof), Tenant shall initially open its store for business to
9    the public in the Premises for at least one (1) day as a typical buy buy Baby store, not later than
10   the Rent Commencement Date (which date shall, as applicable, be extended by reason of (A)
11   damage or destruction, eminent domain proceedings or actions, or *Force Majeure*, or (B)
12   Landlord Delay). Other than as expressly set forth in the preceding sentence, Tenant shall have
13   no obligation to open or operate any business in the Premises, and shall have the right, at any
14   time, to cease to conduct any business operations in the Premises, and Tenant shall incur no
15   liability to Landlord or its Mortgagee by reason thereof (it being understood and agreed that all
16   of Tenant's obligations under this Lease shall continue unless this Lease is terminated pursuant,
17   *inter alia*, to the further provisions of this Article 14 or any other provision of this Lease [other
18   than by reason of an Event of Default]). In the event that Tenant does not operate or cause to be
19   operated any retail business in the Premises (other than prior to the Rent Commencement Date or
20   during Excused Periods) for more than one hundred eighty (180) consecutive days, Landlord
21   shall have the option to terminate this Lease, which option shall be exercisable by giving notice
22   thereof to Tenant by not later than the ninetieth (90th) day after the date on which said 180-day
23   period expires, and whereupon this Lease shall terminate upon the sixtieth (60th) day (the
24   "*Recapture Date*") after the date on which Tenant receives Landlord's termination notice, as if
25   the Recapture Date was originally set forth herein as the expiration date of the Term. Upon such
26   termination, Landlord and Tenant shall each be released from any and all liabilities thereafter
27   accruing hereunder, except for those obligations which survive the expiration or other
28   termination of this Lease pursuant to the express terms of this Lease. All Rent payable by
29   Tenant hereunder shall be apportioned as of the Recapture Date and Tenant shall promptly pay to
30   Landlord any amounts so determined to be due and owing by Tenant to Landlord, and conversely
31   Landlord shall promptly reimburse Tenant for any amounts prepaid by Tenant for periods
32   subsequent to the Recapture Date.

33                                    ARTICLE 15.
34                        TENANT ASSIGNMENT AND SUBLETTING

35       Section 15.1    Assignment and Subletting.

36       15.1.1      Provided Tenant is not then in default beyond any applicable notice and cure
37   period, Tenant shall have the right from time to time, (i) without the consent of Landlord, to
38   assign Tenant's interest in this Lease and/or to sublet all or any portion of the Premises to a
39   National Retailer or Regional Retailer, or (ii) if the proposed assignee or sublessee is not a
40   National Retailer or Regional Retailer, then with Landlord's consent, to assign Tenant's interest
41   in this Lease and/or to sublet, all or any portion of the Premises, subject to all of the terms and
42   conditions of this Lease. Landlord' right to consent pursuant to the foregoing clause (ii) of this
43   Section 15.1.1 is subject to Section 23.5 hereof, it also being agreed that Landlord shall be
44   entitled to withhold its consent to the subject assignment or subletting transaction if any of the
45   following conditions are not satisfied (it being acknowledged and agreed by Tenant that
46   Landlord's right to withhold its consent hereunder shall not be limited to satisfaction of these
47   specific conditions only): (i)  the proposed assignee or subtenant proposes to use the Premises for
48   a lawful retail use customarily found in shopping centers of similar quality to that of the
49   Shopping Center on the Effective Date that are located in the States of Connecticut,
50   Massachusetts or New York; (ii) the proposed assignee or subtenant is a party of reasonable
51   financial worth and/or financial stability in light of the responsibilities under this Lease or the
52   proposed sublease.

53       15.1.2      Except with respect to any transaction covered under Subsection 15.1.3 or
54   Section 15.3 below, in the event Tenant proposes to assign this Lease or sublet more than fifty
55   percent (50%) of the Floor Area of the Premises, it shall first give notice thereof (the
56   "*Assignment/Subletting Notice*") to Landlord, which notice shall specify the name and address
57   of the proposed assignee or sublessee and whether such assignee or sublessee is a National

                                        41

Retailer or Regional Retailer and the proposed use of the Premises to be made by such assignee or sublessee, together with a statement certified by Tenant of the amount of the then unamortized costs (amortized on a straight-line basis over the Initial Term) of any alterations performed by Tenant to the Premises. Thereafter, Landlord shall have the option to terminate this Lease, which option shall be exercisable by:

(a)     giving notice to Tenant (the *"Termination Notice"*) thereof within forty-five (45) days after receipt of an Assignment/Subletting Notice from Tenant, and

(b)     paying to Tenant, within thirty (30) days after such notice is given, all of Tenant's reasonable out-of-pocket costs and expenses incurred in connection with the preparation of plans and specifications for Tenant's Work and any alterations performed by Tenant to the Premises, and the then unamortized costs (amortized on a straight-line basis over the Initial Term) of, Tenant's Work and any alterations performed by Tenant to the Premises, in which event this Lease shall automatically terminate on the ninetieth (90th) day (the *"Termination Date"*) after the date on which Tenant receives Landlord's Termination Notice, with the same force and effect as if the Termination Date had been designated as the expiration date of this Lease. Upon the Termination Date, Landlord and Tenant shall each be released from any and all liabilities thereafter accruing hereunder, except for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease. To the extent applicable, Rent payable by Tenant hereunder shall be apportioned as of the Termination Date and Tenant shall promptly pay to Landlord any amounts so determined to be due and owing by Tenant to Landlord, and conversely Landlord shall promptly reimburse Tenant for any amounts prepaid by Tenant for periods subsequent to the Termination Date. Notwithstanding the foregoing, Tenant shall have the right during the term to avoid Landlord's termination by giving notice to Landlord (the *"Rescission Notice"*), within ten (10) days after receiving the Termination Notice, of its rescission of the Assignment/Subletting Notice, whereupon Landlord's Termination Notice shall be rendered null and void, and Tenant shall not assign this Lease or sublet the whole of the Premises as proposed in its Assignment/Subletting Notice (it being agreed that Tenant shall not be entitled to avoid Landlord's termination as aforesaid more often than one time per eighteen (18) months). If Landlord does not give the Termination Notice to Tenant as aforesaid, Landlord shall conclusively be deemed to have waived its termination rights hereunder with respect to such proposed assignment or subletting transaction, and, provided Landlord has not otherwise reasonably denied consent to such proposed transaction within the aforesaid forty-five (45) day period, Tenant may assign this Lease or sublet the entire Premises in accordance with its Assignment/Subletting Notice within twelve (12) months after the expiration of such forty-five (45) day period, failing which Tenant must resubmit such proposed transaction to Landlord.

15.1.3     In addition to, and not in limitation of, Tenant's other rights set forth in this Section 15.1, Tenant shall have the right from time to time, without the consent of Landlord, to assign Tenant's interest in this Lease and/or to sublet all or any portion of the Premises: (a) to an Affiliate of Tenant; (b) to any entity which purchases all or substantially all of the assets of Tenant or any of its Affiliates; (c) to any entity which purchases Tenant's interest in at least fifteen (15) stores owned or operated by Tenant or its Affiliate in the States of Connecticut, Massachusetts or New York; (d) in conjunction with any merger, acquisition, consolidation or public offering of stock or other interests involving Tenant or its Affiliate(s). Tenant agrees that it shall not utilize a series of transactions that may be permitted under this Subsection 15.1.3 as a subterfuge to avoid obtaining Landlord's consent that would otherwise be required (such as, by way of example only, assigning this Lease to an Affiliate whose only asset will be this Lease, and then transferring the ownership interest in such Affiliate to an unrelated third party that is not a National Retailer or Regional Retailer without Landlord's consent).

15.1.4     Tenant may not enter into any lease, sublease, license, concession or other agreement for use, occupancy or utilization of space in the Premises which provides for a rental or other payment for such use, occupancy or utilization based in whole or in part on the net income or profits derived by any person from the property leased, occupied or utilized, or which would require the payment of any consideration which would not fall within the definition of "rents from real property", as that term is defined in subsection 856(d) of the Internal Revenue Code of 1986, as amended to date.

15.1.5     Tenant may, without Landlord's consent, grant licenses or concessions for the operation of departments in the Premises aggregating up to ten (10%) percent of the Floor Area

42

1    of the Premises provided such licenses and concessions do not comprise separately demised
2    premises and do not have a separate exterior entrance to the Premises.

3        Section 15.2   Liability of Tenant.  Unless otherwise agreed to in writing by Landlord, no
4    assignment, subletting, licensing or concessioning by Tenant shall reduce, diminish, or otherwise
5    affect the liability of Tenant hereunder.

6        Section 15.3   Collateral Assignment.  In addition to Tenant's other rights set forth in this
7    Article 15, a collateral assignment of Tenant's interest in this Lease by Tenant to one or more
8    "Lenders" (hereinafter defined), as collateral security for an indebtedness or other obligation of
9    Tenant or its Affiliates shall be permitted and Landlord shall execute all documentation
10   reasonably requested by Tenant or any such Lender in connection therewith (it being agreed that
11   such collateral assignment shall be subject and subordinate to the terms and conditions of this
12   Lease).  In addition, Tenant shall have the right, without Landlord's consent, to grant to an
13   Affiliate of Tenant a license to operate all of Tenant's business operations at the Premises,
14   without such Affiliate having assumed any liability for the performance of Tenant's obligations
15   under this Lease.  As used herein, *"Lender"* shall mean a state or federally regulated: bank,
16   savings and loan association, debt fund, insurance company, pension fund, credit union, real
17   estate investment trust, or other institutional lender.

18        Section 15.4   Cure Rights of Original Tenant.

19        15.4.1     If Tenant assigns Tenant's interest in this Lease, then Landlord, when
20   giving notice to said assignee or any future assignee in respect of any default, shall also give a
21   copy of such notice to the Original Tenant, and no notice of default shall be effective until a copy
22   thereof is so given to Original Tenant.  Original Tenant shall have the same period after receipt
23   of such notice to cure such default as is given to Tenant therefor under this Lease.

24        15.4.2     If this Lease is terminated because of: (a) an Event of Default of such
25   assignee, or (b) the rejection, disaffirmation, or other termination of this Lease by or on behalf of
26   the assignee pursuant to any proceeding in bankruptcy under any Legal Requirement of any State
27   or of the United States, or any other Legal Requirements affecting creditors' rights, then
28   Landlord shall promptly give to Original Tenant notice thereof, and Original Tenant shall have
29   the right, exercisable by notice given to Landlord within fifteen (15) days after receipt by
30   Original Tenant of Landlord's notice (which notice by Landlord shall be sent to the last address
31   of Original Tenant of which Landlord shall have been notified), to enter into a new lease (or an
32   amended and restated lease) of the Premises with Landlord ("New Lease"), provided that the
33   Original Tenant shall have remedied all Events of Default of the assignee hereunder, unless such
34   Events of Default are personal to the assignee and/or not reasonably susceptible of cure by the
35   Original Tenant (it being agreed that until and unless it is reasonably apparent that a given Event
36   of Default is not reasonably susceptible of cure by the Original Tenant, Original Tenant shall
37   proceed in good faith to effect such cure), in which event the Original Tenant shall not be
38   obligated to cure such Events of Default as a condition to the exercise of its rights under this
39   Subsection 15.4.2. Upon the Original Tenant's curing of any such Event of Default of the
40   assignee as aforesaid, Landlord shall assign to the Original Tenant all of Landlord's rights
41   against such assignee (whether arising as a result of bankruptcy court proceedings or otherwise).
42   The term of said New Lease shall begin on the date of termination of this Lease and shall
43   continue for the remainder of the Term (including any Renewal Periods).  Such New Lease shall
44   otherwise contain the same terms and conditions as those set forth herein, except for
45   requirements which are no longer applicable or have already been performed.  It is the intention
46   of the parties hereto that such New Lease shall have the same priority relative to other rights or
47   interests in or to the Premises as this Lease.  The provisions of this Subsection 15.4.2 shall
48   survive the termination of this Lease and shall continue in full force and effect thereafter to the
49   same extent as if this Subsection 15.4.2 were a separate and independent contract between
50   Landlord and the Original Tenant.  From the date on which the Original Tenant shall serve
51   Landlord with the aforesaid notice of the exercise of its right to a New Lease, the Original
52   Tenant shall have quiet and undisturbed use and enjoyment of the Premises and all
53   appurtenances thereto, as contemplated in this Lease.

54        Section 15.5   Recognition Agreement.  In the event Tenant subleases the entire Premises
55   to a subtenant having a tangible net worth of at least Twenty-Five Million Dollars ($25,000,000)
56   for a term of at least five (5) years, then, notwithstanding any other provisions of this Lease,
57   Landlord shall, upon Tenant's request, execute and deliver an agreement among Landlord,
58   Tenant and each such subtenant in the form of Exhibit H hereto, in recordable form, subject,

43

1    however, to the following additional conditions: (i) the sublease shall be on terms and conditions
2    which are no more onerous to Tenant than those pertaining to Landlord under this Lease or the
3    subtenant would on the implementation of any such recognition agreement be obligated to
4    Landlord under terms and conditions which are no more onerous to the Landlord than those
5    pertaining to Landlord under this Lease; (ii) the term of the sublease, inclusive of renewal
6    options, shall not exceed the Term, inclusive, of renewal options; and (iii) Landlord's reasonable
7    third party attorneys' fees, to the extent actually incurred by Landlord with respect to the
8    proposed sublease, shall be paid by Tenant within thirty (30) days following Tenant's receipt of
9    reasonable supporting information (i.e., the lawyer's per hour billable rate and the breakdown of
10   the lawyer's hours' time spent on his/her review of the sublease).

11                                   ARTICLE 16.
12                       DEFAULT AND DISPUTE RESOLUTION

13        Section 16.1   Tenant Default.

14        16.1.1    The following shall each constitute an "Event of Default": (i) if Tenant
15   shall fail to: (a) pay any Rent when due and such failure shall continue for more than ten (10)
16   days after Tenant's receipt of notice thereof from Landlord specifying the amount and details of
17   the unpaid Rent, or (b) perform or observe any of the other covenants of this Lease on Tenant's
18   part to be performed or observed within thirty (30) days after its receipt of notice thereof from
19   Landlord specifying the nature of such default (or, if such default shall be of a nature that same
20   cannot reasonably be cured within thirty (30) days and Tenant does not commence to cure such
21   default on or before such thirtieth (30th) day and thereafter diligently prosecute said cure to
22   completion), or (ii) if Tenant shall (x) file or acquiesce to a petition in any court (whether or not
23   pursuant to any statute of the United States or of any state) in any bankruptcy, reorganization,
24   composition, extension, arrangement or insolvency proceedings, (y) make an application in any
25   such proceedings for or acquiesce to the appointment of a trustee or receiver for it or for all or
26   any portion of its property or (z) make an assignment for the benefit of creditors in connection
27   with any of the proceedings specified in (x) or (y) above, or (iii) if any petition shall be filed
28   against Tenant to which Tenant shall not acquiesce in any court (whether or not pursuant to any
29   statute of the United States or any state) in any bankruptcy, reorganization, composition,
30   extension, arrangement or insolvency proceedings, and (x) Tenant shall thereafter be adjudicated
31   a bankrupt, (y) such petition shall be approved by any such court, or (z) such proceedings shall
32   not be dismissed, discontinued or vacated within 120 days, or (iv) if, in any proceeding, pursuant
33   to the application of any person other than Tenant, to which Tenant does not acquiesce, a
34   receiver or trustee shall be appointed for Tenant, for all or any portion of the property of Tenant
35   and such receivership or trusteeship shall not be set aside within 120 days after such
36   appointment.

37        16.1.2    Upon an Event of Default, Landlord shall have all remedies given to it at
38   law or in equity (except that Landlord hereby expressly waives any rights to accelerate any
39   element of the Rent unless specifically provided otherwise in this Section 16.1.2, and any right of
40   distraint, which may be granted to it by law), including the following:

41              (a)  to bring suit for the collection of such unpaid Rent or for the performance
42   of such other covenant of this Lease on Tenant's part to be performed; and/or

43              (b)  without waiving any non-monetary default, may (but shall not be
44   obligated to) perform any covenant which is capable of being remedied by the performance of
45   affirmative acts for the account and at the reasonable expense of Tenant (it being agreed that
46   should Landlord require access to the Premises in order to perform such covenant as aforesaid,
47   Landlord shall comply with the applicable provisions of Sections 9.2 hereof), in which event,
48   Tenant shall pay to Landlord on demand, as Additional Rent, the reasonable cost or amount
49   thereof, together with interest thereon at the Lease Interest Rate from the date of outlay of
50   expense until payment; and/or

51              (c)  upon at least five (5) days' notice to Tenant, to terminate this Lease,
52   whereupon Landlord shall have  and retain full right to sue for and collect all (x) unpaid Rent
53   which shall have accrued under this Lease up to and including the date upon which this Lease is
54   terminated, (y) Rent which would have accrued pursuant to this Lease following such date of
55   termination had this Lease not been terminated (it being agreed that such Rent shall cover only
56   the then remaining portion of the Initial Term or the Renewal Period then in effect), discounted
57   to its then present value by the Lease Interest Rate, and (z) any damages to Landlord by reason

44

of any such breach as provided in Subsection 16.1.3 below, and Tenant shall surrender and deliver the Premises to Landlord, failing which, Landlord shall have the right to initiate summary proceedings to recover possession; and/or

(d)  upon at least five (5) days' notice to Tenant to terminate Tenant's right of possession, re-enter the Premises and take possession thereof by lawful means.  If Landlord shall so elect to repossess the Premises without terminating the Lease, then Tenant shall be liable for and shall pay to Landlord all Rent payable to Landlord pursuant to the terms of this Lease which shall have accrued up to the date of repossession, as well as all Rent as and when same shall become due and payable pursuant to the terms of this Lease during the remainder of the Term, diminished by any net sums thereafter received by Landlord through reletting the Premises during said period (after deducting reasonable expenses incurred by Landlord in connection with such reletting).  In no event shall Tenant be entitled to any excess of any rent obtained by such reletting over and above the Rent herein reserved.  Landlord may bring actions to collect amounts due by Tenant under this Lease, from time to time, prior to the expiration of the Term.

16.1.3     Upon an Event of Default, Tenant shall be liable for and shall pay to Landlord, in addition to any sum provided to be paid above, brokers' fees incurred by Landlord in connection with reletting the whole or any part of the Premises for the remainder of the then unexpired Term (excluding any then unexercised Renewal Periods), the costs of removing and storing Tenant's or other occupant's property; the cost of repairs; and all other commercially reasonable expenses incurred by Landlord in enforcing or defending Landlord's rights and/or remedies, including reasonable attorneys' fees.

16.1.4     Upon an Event of Default, any amounts paid by Landlord to cure said Event of Default and any Rent payments not paid after notice thereof is given shall bear interest at the Lease Interest Rate from and after the expiration of any applicable grace period until paid.

16.1.5     Landlord shall use all good faith and commercially reasonable efforts to relet the Premises or any portion thereof at the then fair market rental for the metropolitan area in which the Premises are located, in order to mitigate Landlord's damages to which Landlord would otherwise be entitled to as a result of an Event of Default, subject to the following conditions: (a) hiring an unaffiliated commercial broker of recognized standing with experience leasing similar properties shall be deemed presumptive of good faith, commercially reasonable efforts to relet the space at a fair market rental, (b) in no event shall Landlord be obligated to lease the space to a tenant for a rent that is less than the then prevailing market rates or to a tenant whose use, reputation, experience or financial status Landlord reasonably deems as undesirable, and (c) in no event shall Landlord be obligated to relet the Premises on terms that are reasonably unsatisfactory to Landlord. In no event shall Tenant be liable to Landlord for any consequential damages suffered by Landlord as a result of an Event of Default by, or any other act of, Tenant.

Section 16.2   Landlord Default.  If Landlord shall: (i) fail to perform or observe any of the covenants of this Lease on Landlord's part to be performed or observed within thirty (30) days after receiving notice from Tenant thereof (or, if same cannot reasonably be cured within thirty (30) days, if Landlord shall fail to promptly commence and diligently prosecute said cure to completion), or (ii) materially breach any warranty or representation under this Lease (either of (i) or (ii) above being hereinafter referred to as a "*Landlord's Default*"), then Tenant, in addition to such other rights and remedies as may be available under this Lease, or at law or in equity, may, in its sole discretion:

(a)  as applicable, following a second (2nd) notice from Tenant to Landlord and the expiration of five (5) days following Landlord's receipt of such second (2nd) notice, perform such obligation(s) of Landlord in accordance with the provisions of this Lease on behalf of, and at the expense of Landlord; provided, however, such failure affecting areas outside of the Premises must materially adversely affect the normal operation of Tenant's business in order for Tenant to perform the obligations of Landlord hereunder;

(b)  bring suit for the collection of any amounts for which Landlord is in default, seek injunctive relief, or seek specific performance for any other covenant or agreement of Landlord, without terminating this Lease; and/or

(c)  notify Landlord of any amounts owed by Landlord to Tenant and/or for the amounts reasonably expended by Tenant performing Landlord's obligations hereunder,

45

1  including costs and reasonable attorneys' fees (all of the foregoing as evidenced by receipted
2  invoices delivered by Tenant to Landlord), together with interest thereon at the Lease Interest
3  Rate from the date of the outlay until paid, and if Landlord fails to pay to Tenant such amounts
4  within thirty (30) days following Landlord's receipt of such notice (and invoice), to offset
5  against the Rent payable by Tenant hereunder. Any dispute between the parties with respect to
6  Tenant's right to offset pursuant to this Section 16.2(c) shall be resolved by arbitration in
7  accordance with the provisions of Section 16.3 below.

8  Notwithstanding the foregoing, if, in Tenant's reasonable judgment, a condition posing imminent
9  risk of liability or material harm to persons or property or material disruption to the normal
10  conduct of any business operations in the Premises shall exist (it being agreed, without
11  limitation, that any water infiltration into the Premises from within or without the Premises, or
12  mold remediation in connection therewith, shall be deemed to be such a condition), Tenant may,
13  at its election, and without prior notice to Landlord, exercise any or all of the remedies set forth
14  in (a), (b) and (c) above. In no event shall Landlord be liable to Tenant for any consequential
15  damages suffered by Tenant as a result of a default by, or any other act of, Landlord.

16      Section 16.3    Arbitration. In any case where this Lease expressly provides for
17  submission of a dispute or matter to arbitration (but not otherwise), the same shall be settled by
18  arbitration in Hartford, Connecticut before one arbitrator in accordance with the procedural rules
19  of the American Arbitration Association (or any successor thereto) then in effect. The decision
20  of the arbitrator shall be final, conclusive and binding on the parties, but the powers of the
21  arbitrator are hereby expressly limited to the determination of factual issues, and the arbitrator
22  shall have no power to reform, supplement or modify this Lease. The arbitrator shall make only
23  required findings of fact incident to an arbitrable dispute, which findings shall be set forth in
24  reasonable detail in a written decision by the arbitrator. Landlord and Tenant shall share equally
25  in the cost and expenses of such arbitration, and each shall separately pay its own attorneys' fees
26  and expenses, unless the arbitrator finds that one of the parties did not act in good faith in
27  connection with the dispute or the conduct of the arbitration proceeding, in which case the
28  arbitrator may award all or part of said costs, expenses and fees to the other party.

29                              ARTICLE 17.
30      RIGHT TO MORTGAGE AND NON-DISTURBANCE; ESTOPPEL CERTIFICATE

31      Section 17.1    Right to Mortgage and Non-Disturbance. Landlord reserves the right to
32  subject and subordinate this Lease at all times to the lien of any first mortgage or deed of trust
33  for the benefit of any Mortgagee hereafter encumbering or affecting all or any portion of the
34  Shopping Center, as well as to any future ground or underlying leases encumbering or affecting
35  all or any part of the Shopping Center; provided, however, that (a) each Mortgagee shall first
36  execute and deliver to Tenant a subordination, non-disturbance and attornment agreement in
37  substantially the form attached as Exhibit G hereto (or as to any future Mortgagee holding a
38  mortgage or a deed of trust hereafter encumbering the Shopping Center, in such other form as
39  may be agreed upon by Tenant and such future Mortgagee, provided that such other form
40  includes provisions to the effect that (i) no default by Landlord under any such lien shall affect
41  Tenant's rights under this Lease so long as Tenant is not in default of such obligations beyond
42  the applicable notice and grace periods provided herein; (ii) Tenant will not be named as a party
43  in any foreclosure or other proceedings with respect to any such lien unless required to be so
44  named by applicable Legal Requirements; (iii) the holder of any such lien agrees that the
45  insurance proceeds resulting from any fire or other casualty and the proceeds payable from any
46  taking by eminent domain will be made available in full for restoration of the Premises and the
47  Shopping Center to the extent provided in this Lease; (iv) Landlord and Tenant shall have the
48  right to execute any amendment to this Lease which is specifically required hereunder and the
49  holder of any such lien shall recognize and be bound thereto), it being further agreed that any
50  subordination, non-disturbance and attornment agreement hereunder shall be in recordable form
51  and, subject to the foregoing requirements of this Section 17.1 with respect to a subordination,
52  non-disturbance and attornment agreement that is required by a future Mortgagee and not in
53  substantially the form attached as Exhibit G, shall reflect such non-material modifications thereto
54  as may be reasonably requested by such Mortgagee and reasonably approved by Tenant, and (b)
55  any Ground Lessor shall execute (and shall obtain the written consent of any holder of any
56  mortgage, deed of trust or any other existing lien encumbering or affecting the Shopping Center
57  or any portion thereof, as applicable) and deliver to Tenant a fee owner recognition agreement in
58  a form reasonably satisfactory to Tenant, which shall include the following provisions: (i)
59  provided no Event of Default then exists, the Ground Lessor will not, in the exercise of any of
60  the rights arising or which may arise out of such lease, disturb or deprive Tenant in or of its

46

1    possession or its rights to possession of the Premises or of any right or privilege granted to or
2    inuring to the benefit of Tenant under this Lease; (ii) provided no Event of Default then exists, in
3    the event of the termination of the ground or underlying lease, Tenant will not be made a party in
4    any removal or eviction action or proceeding, nor shall Tenant be evicted or removed of its
5    possession or its right of possession of the Premises, and this Lease shall continue in full force
6    and effect as a direct lease between the Ground Lessor and Tenant for the remainder of the Term
7    and on the same terms and conditions as contained herein, without the necessity of executing a
8    new lease; and (iii) Landlord and Tenant shall have the right to execute any amendment to this
9    Lease which is specifically required hereunder and the Ground Lessor shall recognize and be
10   bound thereto.

11       Section 17.2    Estoppel Certificate. Upon written notice by Landlord or Tenant, in
12   accordance with Article 18 hereof, the other party, within thirty (30) days after receiving such
13   request, shall execute and deliver to and only for the benefit of the requesting party or any
14   Mortgagee, *bona fide* prospective purchaser, assignee, or sublessee of the requesting party,
15   without charge, a written statement: (1) ratifying this Lease; (2) certifying, to such party's actual
16   knowledge, that this Lease is in full force and effect, if such is the case, and has not been
17   modified, assigned, supplemented or amended, except by such writings as shall be stated;
18   (3) specifying the dates to which Fixed Rent and Additional Rent have been paid; (4) stating
19   whether or not, to such party's actual knowledge, the party requesting the estoppel is in default
20   and, if so, stating the nature of such default, (5) stating the Rent Commencement Date, and
21   (6) stating which options to extend the Lease Term have been exercised, if any.

22       Section 17.3    Existing Mortgages and Ground Leases. If a mortgage, deed of trust, or
23   other security instrument, or any ground or underlying lease, encumbers the Shopping Center or
24   any part thereof on the Effective Date, then within sixty (60) days after the Effective Date,
25   Landlord shall deliver to Tenant, in recordable form: (x) a subordination, non-disturbance and
26   attornment agreement substantially in the form attached hereto as Exhibit G, together with such
27   reasonable changes as may be required by such mortgagee (it being agreed that it shall be
28   unreasonable for such mortgagee not to agree to apply casualty proceeds and condemnation
29   awards in full accordance with this Lease), in recordable form, executed by each and every
30   holder of any mortgage, deed of trust or any other existing lien encumbering or affecting the
31   Shopping Center or any portion thereof, and (y) a fee owner recognition agreement in the form
32   and content described in clause (b) of Section 17.1 hereof, in recordable form, executed by any
33   Ground Lessor (and, as may be required, consented to by the holder of any mortgage, deed of
34   trust or other existing lien as aforesaid). Should Landlord fail to so deliver such instrument(s)
35   within said 60-day period, Tenant shall have the right by notice given to Landlord at any time
36   prior to the date on which such instrument(s) are delivered, to terminate this Lease, in which
37   event, neither party shall have any further liability hereunder, except: (i) for those obligations
38   which survive the expiration or other termination of this Lease pursuant to the express terms of
39   this Lease, and (ii) Landlord shall be obligated to promptly reimburse Tenant for all its
40   reasonable, third-party costs and expenses incurred in connection with this Lease, including,
41   without limitation, the preparation and review of plans and specifications, and the performance
42   of Tenant's Work, provided, however, that such reimbursement by Landlord shall not exceed the
43   aggregate sum of Thirty-Five Thousand Dollars ($35,000).

44                                   ARTICLE 18.
45                                      NOTICE

46       Section 18.1    Subject to the further provisions of this Article 18, whenever it is provided
47   herein that any notice, demand, request, consent, approval or other communication (*"Notice"*)
48   shall or may be given to either of the parties by the other, it shall be in writing and, any Legal
49   Requirement to the contrary notwithstanding, shall not be effective for any purpose unless same
50   shall be given by registered or certified mail, postage prepaid, return receipt requested, or by any
51   recognized overnight mail carrier, with proof of delivery slip, addressed to Landlord at
52   Landlord's Mailing Address or to Tenant at Tenant's Mailing Address, with copies of notices to
53   Tenant also given to: (i) General Counsel, c/o Bed Bath & Beyond, Inc., 650 Liberty Avenue,
54   Union, New Jersey 07083, and (ii) Thomas J. Phillips, Esq., Brown Rudnick LLP, One Financial
55   Center, Boston, Massachusetts 02111, or to such other person or other address as may, from time
56   to time, be specified by either party in a written notice to the other party . If "Landlord" shall
57   consist of more than one person or entity, notices delivered by Tenant to Landlord's Mailing
58   Address shall be deemed to be delivered to, and effective notice to, all such persons or entities
59   comprising Landlord. . All notices given in accordance with the provisions of this Section shall
60   be effective upon delivery (or refusal of delivery) at the address of the addressee; provided,

47

1  however, that if a deadline for the giving of any notice under this Lease occurs on Saturday,
2  Sunday, or a legal holiday, then such deadline shall be extended to the next business day
3  thereafter occurring. Notwithstanding the foregoing, Landlord shall instead send the following
4  items to Tenant (Attention: Lease Administration) at Tenant's Mailing Address: (A) all bills,
5  notices (but not notices of default) and related information pertaining to Tenant's Pro Rata Share
6  of Taxes as described in Section 4.3 of this Lease, and (B) all budgetary information, notices (but
7  not notices of default), statements, bills and related information pertaining to Tenant's Pro Rata
8  Share of Common Areas Charges as described in Section 5.1 of this Lease.

9                                              ARTICLE 19.
10                                          TENANT'S PROPERTY

11        Section 19.1    All of Tenant's Property which may be installed or placed in or upon the
12  Premises by Tenant shall remain the property of Tenant. Tenant may assign, hypothecate,
13  encumber, mortgage or create a security interest in or upon Tenant's Property in the Premises
14  without the consent of Landlord and may remove Tenant's Property at any time during the Term.
15  Landlord waives any right it may have in Tenant's Property. To the extent Landlord may have a
16  lien on or security interest in the Tenant's Property pursuant to this Lease, by law or otherwise,
17  Landlord hereby waives, and agrees not to assert, such lien or security interest. Landlord shall
18  provide to Tenant, within twenty (20) days after Tenant's request therefor, a written waiver in
19  form reasonably satisfactory to Tenant evidencing Landlord's waiver of any rights it has or may
20  have in Tenant's Property.

21                                              ARTICLE 20.
22                                            END OF TERM

23        Section 20.1    Surrender of Premises. At the expiration of the Term or earlier
24  termination of this Lease, Tenant will quit and surrender the Premises broom clean and in good
25  condition and repair, excepting, however, reasonable wear and tear, damage by fire or other
26  casualty, damage by eminent domain, and repairs and replacements to be made by Landlord
27  hereunder and Tenant shall remove Tenant's Property or any property of any subtenant or
28  occupant, provided Tenant promptly repairs any damage caused by such removal. Any Tenant's
29  Property or property of any subtenant or occupant which shall remain in or on the Premises after
30  the termination of this Lease and the removal of Tenant or such subtenant from the Premises or
31  the surrender by Tenant of the Premises may, at the option of Landlord and without notice, be
32  deemed to have been abandoned by Tenant or such subtenant or occupant and may either be
33  retained by Landlord as its property or be disposed of, without accountability, in such manner as
34  Landlord may see fit, or if Landlord shall give written notice to Tenant to such effect, such
35  property shall be removed by Tenant (or Tenant shall cause same to be removed), at Tenant's
36  cost and expense; and Landlord shall not be responsible for any loss or damage occurring to any
37  such property owned by Tenant or any subtenant or occupant. Tenant's obligations under this
38  Section 20.1 shall survive the Expiration Date. Landlord shall have the right to exhibit the
39  Premises to prospective tenants at any time and from time to time during the last one hundred
40  eighty (180) days of the Term, provided Landlord identifies itself to the store manager and such
41  entry does not disrupt Tenant's business operations.

42        Section 20.2    Hold Over. If Tenant fails to deliver possession of the Premises to
43  Landlord at the end of the Term, Tenant shall be a tenant at sufferance and shall be liable for
44  Fixed Rent on a monthly basis (or, if applicable, on a prorated daily basis) in an amount equal to
45  one hundred fifty (150%) percent of the amount thereof payable by Tenant for the month
46  immediately preceding the last day of the Term as well as for all Additional Rent payable by
47  Tenant hereunder.

48                                              ARTICLE 21.
49                                      INTENTIONALLY OMITTED

50                                              ARTICLE 22.
51                                        ONGOING CO-TENANCY

52        Section 22.1    If at any time during the Term there is not at least twenty-five thousand
53  (25,000) square feet of Floor Area at the Shopping Center (excluding (i) the Premises and (ii) the
54  Adjacent Premises (defined in Section 23.1, below) for so long as such Adjacent Premises is
55  leased by the named Tenant herein or its Affiliate), in the aggregate, operating for business to the
56  public by National Retailers and/or Regional Retailers (subject to Excused Periods) and such

                                                    48

1    failure continues for a period in excess of one hundred eighty (180) consecutive days (such
2    condition being hereinafter referred to as an "***Excess Vacancy***"), then in such event (and further
3    provided that (i) Tenant is open and operating at the Shopping Center at the time the Excess
4    Vacancy first arises and (ii) Tenant is not then in default under the Lease beyond applicable
5    notice and cure periods), Tenant shall have the right (as its sole and exclusive remedy) to: (i) pay
6    Alternate Rent in lieu of Fixed Rent during the period of such Excess Vacancy, and/or (ii) if
7    Tenant pays Alternate Rent hereunder for a period in excess of three hundred sixty-five (365)
8    continuous days, to terminate this Lease, exercisable by giving Landlord, within thirty (30) days
9    after the expiration of such 365-day period, at least one hundred twenty (120)) days' prior notice,
10   in which event this Lease shall terminate on the date set forth in Tenant's notice of termination
11   without further liability on the part of either Landlord or Tenant, except for those obligations
12   which survive the expiration or other termination of this Lease pursuant to the express terms of
13   this Lease. Landlord may negate such termination by causing the Excess Vacancy to be cured
14   within thirty (30) days after the date on which said termination notice is given. If Tenant does
15   not terminate this Lease pursuant to this Article 22, then commencing on the expiration of the
16   aforesaid 30-day period, Tenant shall resume paying full Rent, provided, however, that Tenant
17   shall retain all of its original rights under this Article 22 with respect to any future condition(s) of
18   Excess Vacancy.

19                                    ARTICLE 23.
20                                    MISCELLANEOUS

21        Section 23.1   Shared Area / Loading Facilities.

22        (a)    Subject to Legal Requirements, Tenant shall have the exclusive right to utilize the
23   southerly truck docking area located in the Common Areas and serving the Premises (as shown
24   on Exhibit B) on a "24 hour a day", "365 days a year" basis. In addition, Landlord represents,
25   warrants and covenants that the Premises do and will throughout the Term have adequate access
26   to and from adjacent public ways, without restrictions, including sufficient access (including
27   clearance and turning radius) to accommodate full sized delivery trucks to and from Tenant's
28   loading area at the Premises and adjacent public ways without interruption.

29        (b)    Landlord and Tenant acknowledge that Tenant is contemporaneously leasing the
30   premises shown as Cost Plus World Market on Exhibit B hereto (the "***Adjacent Premises***") and
31   that Tenant intends to share the use of the Shared Area between the Premises and the Adjacent
32   Premises. If the lease for the Adjacent Premises shall expire or earlier terminate prior to the
33   expiration or earlier termination of this Lease then from and after the date of such expiration or
34   earlier termination the Shared Area shall be deemed to be a part of the Common Areas and
35   Critical Area for all purposes under this Lease (such event the "***Shared Area Recapture***");
36   provided, however, that (i) such Common Areas shall be limited in use to the occupants of the
37   Premises and Adjacent Premises only, (ii) Tenant's Pro Rata Share with respect to the Common
38   Areas Charges and Taxes attributable to the Shared Area shall be fifty-five percent (55%) and
39   (iii) and the Fixed Rent shall remain unchanged.

40        (c)    From and after a Shared Area Recapture, (i) Tenant agrees that it shall not
41   interfere with the use of the Shared Area by the tenant of the Adjacent Premises and shall
42   cooperate reasonably with such tenant in connection with such tenant's reasonable use of the
43   Shared Area and (ii) Landlord shall ensure that each new lease with respect to the Adjacent
44   Premises shall require the tenant thereof to (a) not interfere with the use of the Shared Area by
45   Tenant and (b) cooperate reasonably with Tenant in connection with Tenant's reasonable use of
46   the Shared Area. Landlord agrees that it shall fully enforce such requirements.

47        (d)    If, after a Shared Area Recapture, space does not allow for separate trash
48   compactors and/or containers to be designated for each of the Premises and the Adjacent
49   Premises then such facilities shall be shared between the Tenant and the tenant of the Adjacent
50   Premises and Tenant shall be liable to pay to Landlord as part of Common Areas Charges its
51   reasonable proportionate share of trash disposal charges.

52        Section 23.2   Liens. Within thirty (30) days after notice of the filing thereof, Tenant
53   shall discharge (either by payment or by filing of the necessary bond, or otherwise) any lien
54   against the Premises and/or Landlord's interest therein, which may arise out of any payment due
55   for, or purported to be due for, any labor, services, materials, supplies or equipment alleged to
56   have been furnished to or for Tenant in, upon or about the Premises.

1          Section 23.3   Broker's Commission. Landlord and Tenant each warrant and represent to
2    the other that they did not deal with any real estate broker in connection with the negotiation,
3    execution and delivery of this Lease, except for Atlantic Retail (the "**Broker**"). Landlord shall
4    pay the Broker a commission pursuant to a separate agreement. Each party agrees to indemnify,
5    defend, and save the other harmless from and against any and all liabilities, costs, causes of
6    action, damages and expenses, including, without limitation, attorneys' fees, with respect to or
7    arising out of any claims made by any real estate broker (other than the Broker), agent or finder
8    with respect to this Lease in breach of the foregoing representation. The provisions of this
9    Section shall survive the expiration or earlier termination of this Lease.

10         Section 23.4   Force Majeure. Except as otherwise expressly set forth herein, in the
11   event either party hereto shall be delayed or hindered in, or prevented from, the performance of
12   any act required hereunder by reason of strikes, failure of power, riots, insurrection, war,
13   earthquake, hurricane or tornado (or comparable weather conditions of unusual severity), or
14   other reasons of an extraordinary nature which are beyond the reasonable control of the party and
15   which could not have been avoided through the exercise of due diligence by a party (collectively
16   referred to herein as "*Force Majeure*"), then the performance of any such act shall be excused
17   for a period equal to the period of the delay. Notwithstanding the foregoing provisions, the
18   following shall not constitute Force Majeure: (i) the financial inability of a party to perform its
19   obligations under this Lease; or (ii) delays occurring in the course of complying with applicable
20   Legal Requirements that could have been avoided through the exercise of due diligence by a
21   party hereto. A party wishing to invoke this Section shall give the other party notice of that
22   intention within a reasonable time after the commencement of any event of *Force Majeure* and
23   shall, at that time, specify the reasons therefor, the specific provision of this Lease which will be
24   delayed as a result, and the period of such extension, if known, or if not known, a reasonable
25   estimate thereof.

26         Section 23.5   Consents. Except as may be otherwise expressly set forth in this Lease,
27   whenever under this Lease provision is made for either party's securing the consent or approval
28   of the other party, (i) such consent or approval shall be in writing and shall not be unreasonably
29   withheld, delayed or conditioned, and (ii) in all matters contained herein, both parties shall have
30   an implied obligation of reasonableness.

31         Section 23.6   Costs. Whenever this Lease requires the performance of an act by a party,
32   such party shall perform the act at its own cost and expense, unless expressly provided to the
33   contrary.

34         Section 23.7   Attorneys' Fees. In any action or proceeding hereunder (whether to
35   enforce the terms and provisions of an indemnity or otherwise), the prevailing party shall be
36   entitled to recover from the other party the prevailing party's reasonable costs and expenses in
37   such action or proceeding, including reasonable attorneys' fees, costs and expenses. Except as
38   otherwise set forth herein, if either party is sued by a third party as a result of a violation of a
39   covenant or warranty herein contained by the other party hereto, then the party who has violated
40   the covenant or warranty shall be responsible for the reasonable costs and expenses in such
41   action or proceeding against the non-violating party, including reasonable attorneys' fees, costs
42   and expenses.

43         Section 23.8   Survival of Obligations. The obligation to pay any sums due to either
44   party from the other that by the terms herein would not be payable, or are incapable of
45   calculation, until after the expiration or sooner termination of this Lease shall survive and remain
46   a continuing obligation until paid. All indemnity obligations under this Lease shall survive the
47   expiration or earlier termination of this Lease.

48         Section 23.9   Non-Waiver. The failure of Landlord or Tenant to insist upon the strict
49   performance of, or to enforce, any provision, covenant or condition herein shall not be deemed to
50   be a waiver thereof, nor void or affect the right of the aggrieved party to enforce the same
51   covenant or condition on the occasion of any subsequent breach or default; nor shall the failure
52   of either party to exercise any option in this Lease upon any occasion arising therefor be deemed
53   or construed to be a waiver of the right to exercise that same kind of option upon any subsequent
54   occasion.

55         Section 23.10  Rights Cumulative. Unless expressly provided to the contrary in this
56   Lease, each and every one of the rights, remedies and benefits provided by this Lease shall be

1    cumulative and shall not be exclusive of any other such rights, remedies and benefits allowed by
2    applicable Legal Requirements.

3        Section 23.11  Definition of Landlord. The term "Landlord" shall mean only the person
4    or entity which, from time to time, shall then own the Shopping Center, and in the event of the
5    transfer by such owner of its interest in the Shopping Center, such owner shall (except to the
6    extent of (1) claims made by Tenant against Landlord which arose prior to the effective date of
7    the transfer of such ownership interest [provided that the foregoing shall not apply so long as
8    Landlord shall deliver to Tenant a written agreement whereby the new owner specifically
9    assumes all covenants and obligations of Landlord accruing prior to the effective date of such
10   transfer, including those subject to any such claims], and/or (2) judgments obtained by Tenant
11   against Landlord, on or prior to the effective date of the transfer of such ownership interest)
12   thereupon be released and discharged from all covenants and obligations of Landlord thereafter
13   accruing, but such covenants and obligations shall be binding during the Term upon each new
14   owner for the duration of such owner's ownership.

15       Section 23.12  Successors and Assigns. The provisions of this Lease shall be binding
16   upon and shall inure to the benefit of the parties hereto and their respective heirs, executors,
17   administrators, successors and assigns.

18       Section 23.13  Limitation of Landlord's Liability. Except with respect to insurance
19   proceeds or condemnation awards received by Landlord which are required by the terms of this
20   Lease to be applied to the repair or restoration of the Premises or the Shopping Center, Tenant
21   shall, on and after the Delivery Date, look only to Landlord's estate and property in the Shopping
22   Center (or, provided Tenant has sent to Landlord a notice of default prior to the transfer in
23   question, the proceeds from the sale of all or any portion thereof), except that the foregoing shall
24   not apply to the extent that a new owner of the Shopping Center shall have assumed those
25   covenants and obligations of Landlord under this Lease applicable to the period prior to such
26   new owner having acquired title, and net income derived from the Shopping Center for the
27   satisfaction of Tenant's remedies for the collection of a judgment (or other judicial process)
28   requiring the payment of money by Landlord hereunder and no other property or assets of
29   Landlord, its officers, directors, stockholders, members or partners shall be subject to levy,
30   execution or other enforcement procedure for the satisfaction of Tenant's remedies under or with
31   respect to this Lease. Except with respect to the limitation on personal liability hereinabove set
32   forth, the provisions of this Section 23.13 shall not be deemed or construed to limit Tenant's
33   rights and remedies pursuant to this Lease or which may be available at law or in equity.

34       Section 23.14  Limitation of Tenant's Liability. Landlord, its successors and assigns,
35   shall look solely to the assets, if any, of Tenant and its successors and assigns, for the satisfaction
36   of any claim arising from or under this Lease and shall not seek to impose personal liability on
37   any shareholder, officer, director, member or employee of Tenant or any of its Affiliates.

38       Section 23.15  Joint and Several Liability. If either party consists of more than one
39   person, then the persons constituting such party shall be jointly and severally liable hereunder.

40       Section 23.16  Severability. If any term, covenant, condition or provision of this Lease is
41   held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of
42   the provisions hereof shall remain in full force and effect and shall in no way be affected,
43   impaired, or invalidated thereby.

44       Section 23.17  Grammatical Usages and Construction. In construing this Lease, feminine
45   or neuter pronouns shall be substituted for those masculine in form and vice versa, and plural
46   terms shall be substituted for singular and singular for plural in any place in which the context so
47   requires. This Lease shall be construed without regard to (i) the identity of the party who drafted
48   the various provisions hereof, and (ii) the addition or deletion of text made during the negotiation
49   of this Lease. Moreover, each and every provision of this Lease shall be construed as though all
50   parties hereto participated equally in the drafting thereof. As a result of the foregoing, any rule
51   or construction that a document is to be construed against the drafting party shall not be
52   applicable hereto.

53       Section 23.18  Table of Contents, Line Numbering and Paragraph Headings. The table of
54   contents and line numbering, if any, and section headings are inserted only for convenience and
55   in no way define, limit or describe the scope or intent of this Lease, nor in any way affect this
56   Lease.

51

1         Section 23.19  Definition of Hereunder, Herein, etc.. Unless the context clearly indicates
2   to the contrary, the words "herein," "hereof," "hereunder," "hereafter," and words of similar
3   import refer to this Lease and all the Exhibits attached hereto as a whole and not to any particular
4   section, subsection, or paragraph hereof.

5         Section 23.20  Short Form Lease.  Upon the request of either party following the
6   execution and delivery of this Lease, Landlord and Tenant shall execute a short form lease or
7   memorandum for recording, which shall be in form and substance as either party shall
8   reasonably request.  In no event shall the amount of Fixed Rent reserved hereunder be included
9   in any such short form lease or memorandum. The party who records such short form or
10   memorandum shall pay all recording fees in connection therewith.  In no event may this Lease
11   itself be recorded.

12         Section 23.21  Entire Agreement and Modification.  This Lease constitutes the entire
13   agreement of the parties hereto, and all prior agreements between the parties, whether written or
14   oral, are merged herein and, except as may be specifically set forth herein, shall be of no force
15   and effect.  This Lease cannot be changed, modified or discharged orally, but only by an
16   agreement in writing, signed by the party against whom enforcement of the change, modification
17   or discharge is sought.

18         Section 23.22  No Joint Venture or Partnership Created by Lease.  Nothing contained
19   herein shall be deemed or construed as creating the relationship of principal and agent or of
20   partnership or of joint venture between the parties hereto.

21         Section 23.23  Tenant's Tradename.  Except as a nominative fair use (e.g., to show the
22   location of the Premises in the Shopping Center or to indicate that Tenant is a tenant in the
23   Shopping Center), Landlord shall not make use of Tenant's tradename [*i.e.*, "*buy buy Baby*"®]
24   in any advertising or marketing material, including, without limitation, on any internet website,
25   without obtaining Tenant's prior written approval, which may be withheld in Tenant's sole and
26   absolute discretion.

27         Section 23.24  Timely Billing of Charges.  Notwithstanding any provision of this Lease
28   to the contrary, any Additional Rent for which Tenant is to be billed or charged by Landlord
29   shall be billed or charged by (i) with respect to Taxes, the date which is two (2) years after the
30   later of (a) the date on which Landlord received the tax bill from the applicable taxing authority
31   for the Tax Year in question or (b) the completion of a reduction proceeding as contemplated by
32   Section 4.3.4 hereof and (ii) with respect to Common Areas Charges or other items of Additional
33   Rent (other than Taxes), the date which is two (2) years after the date on which Landlord
34   becomes aware of such item of Additional Rent or has received an actual invoice or statement
35   from a third-party therefor with respect to all other items of Additional Rent, failing which
36   Landlord shall be deemed to have waived its right to payment of such Additional Rent.

37         Section 23.25  Counterparts. This instrument may be executed in several counterparts,
38   each of which shall be deemed an original.  The signatures to this instrument may be executed
39   and notarized on separate pages, and when attached to this instrument, shall constitute one
40   complete document.

41         Section 23.26  Ethical Conduct Policy.  It is the policy of Tenant and its subsidiaries and
42   affiliates (collectively, the "*Company*") to conduct all its business transactions in accordance
43   with the highest ethical standards and all applicable laws (including but not limited to the U.S.
44   Foreign Corrupt Practices Act).  Landlord shall not solicit, accept, offer, promise or pay any
45   bribe, kickback or any other improper payment of money, products or services.  This includes,
46   but is not limited to, any improper payment in exchange for the Company's execution of this
47   Lease.  Landlord will also require any subcontractor (of any level) to adhere to the same
48   standards, and will appropriately monitor its subcontractors to ensure such adherence. In
49   addition, any individual who is employed by or who represents the Company is prohibited from
50   soliciting, accepting, offering, promising or paying any bribe, kickback or any other improper
51   payment of money, products or services.  If any such improper actions are observed, please
52   contact our Legal Department (Attention: General Counsel) at the address set forth in Article 18
53   hereof and/or by telephone at 908-688-0888, so that the incident may be fully investigated.

54         Section 23.27  Confidentiality.  Neither Landlord nor Tenant shall reveal to anyone, or
55   otherwise make or publish any public statement or notice regarding the economic or other
56   business terms of this Lease (including, without limitation, the Term and the Rent), except as

1  required by Legal Requirements; or for disclosure to Landlord's or Tenant's respective
2  accountants, attorneys, bona fide prospective purchasers, or current or prospective Mortgagees or
3  other lenders, underlying lessors, assignees or subtenants, of all or any portion of Landlord's
4  interest in the Shopping Center, provided that each of such recipients shall be bound to the same
5  non-disclosure provisions as are imposed upon Landlord and Tenant.

6      Section 23.28  Governing Law.  This Lease shall be governed by, construed, and
7  enforced in accordance with the laws of the State in which the Premises are located.

8      Section 23.29  Waiver of Trial by Jury.  Landlord and Tenant hereby mutually waive any
9  and all rights which either may have to request a jury trial in any proceeding between them at
10  law or in equity.

11      Section 23.30  Late Fee.  Any payment required to be made by Tenant under the
12  provisions of this Lease not made by Tenant when and as due hereunder shall thereupon be
13  deemed to be due and payable by Tenant to Landlord on demand with interest thereon at the
14  Lease Interest Rate computed from the date when the particular amount became due to the date
15  of payment thereof to Landlord. Notwithstanding anything to the contrary herein contained and
16  in addition to the interest provided for in the preceding sentence and in the other provisions of
17  this Lease, in order to cover the additional expense involved in handling delinquent payments,
18  Tenant, at Landlord's option, shall pay a "late charge" of two (2%) percent when any payment of
19  Rent hereunder is paid more than ten (10) days after the due date thereof, which charge shall be
20  deemed an additional expense incurred by Landlord and shall not be considered interest or a
21  penalty; notwithstanding the foregoing, the first two (2) late payments in any calendar year shall
22  not be subject to such late charge unless they continue unpaid ten (10) days after Landlord has
23  delivered a notice to Tenant specifying the failure of Landlord to receive such payment when
24  due.

25      Section 23.31  OFAC List Representation.  Landlord and Tenant each represent and
26  warrant to the other that the representing/warranting party it is not listed, nor is it owned or
27  controlled by, or acting for or on behalf of any person or entity on the list of Specially
28  Designated Nationals and Blocked Persons maintained by the Office of Foreign Assets Control
29  of the United States Department of the Treasury, or any other list of persons or entities with
30  whom Landlord or Tenant, as the case may be, is restricted from doing business with ("OFAC
31  List"). Notwithstanding anything to the contrary herein contained, Landlord shall not permit the
32  Shopping Center, or any portion thereof, and Tenant shall not permit the Premises or any portion
33  thereof, to be used, occupied or operated by or for the benefit of any person or entity that is on
34  the OFAC List. Each party hereto shall provide documentary and other evidence of its identity
35  and ownership as may be reasonably requested by the other party at any time to enable the
36  requesting party to verify the requested party's identity (but only in situations when the
37  requesting party has reasonable grounds for making such request and provides to the requested
38  party documentary evidence of such grounds) or to comply with any legal request. Each party
39  hereto shall indemnify and hold the other harmless from and against all losses, damages,
40  liabilities, cost and expenses (including, without limitation, reasonable attorneys' fees and
41  expenses) that are incurred by the other party and/or its affiliate that derive from a claim made by
42  a third party against the indemnified party and/or its affiliates arising or alleged to arise from a
43  misrepresentation made by the indemnifying party hereunder or a breach of any covenant to be
44  performed by the indemnifying party hereunder.

45                              [SIGNATURE PAGE FOLLOWS]

1       IN WITNESS WHEREOF, the parties have executed this instrument under seal the day
2   and year first-above written.

**LANDLORD:**

WITNESS:

SERITAGE SRC FINANCE LLC, a Delaware
limited liability company

[SEAL]

By:
Name:       Benjamin Schall
Title:          President

**TENANT:**

ATTEST:

BED BATH & BEYOND INC., a New York
corporation

By:
Name:  Alan M. Freeman
Title:  Assistant Secretary

By:
Name:  Steven H. Temares
Title:   Chief Executive Officer

[SEAL]

1

## INDEX OF EXHIBITS

2    Exhibit A -    Legal Description of Shopping Center
3    Exhibit B -    Site Plan
4    Exhibit C -    Form of Rent Commencement and Expiration Date Agreement
5    Exhibit D -    Specifications for Landlord's Work
6    Exhibit D-1    Exterior Elevations of the Premises, and Sidewalk Plan
7    Exhibit D-2    Exterior Elevations of the Shopping Center
8    Exhibit E -    Permitted Encumbrances
9    Exhibit F -    Signage
10   Exhibit G -    Form of Subordination, Non-Disturbance and Attornment Agreement
11   Exhibit H -    Form of Subtenant Recognition Agreement
12   Exhibit I -    Form of Delivery Date Notice
13   Exhibit J -    Form of Delivery Date Certification
14   Exhibit K-1    Existing Exclusives and Existing Use Restrictions
15   Exhibit K-2    Existing Leases
16   Exhibit L-1    Landlord Imposed Prohibited Uses
17   Exhibit L-2    Tenant Imposed Prohibited Uses
18   Exhibit M      Permissible Common Area Retail/Promotional Uses per Existing Leases

1                                  <u>Exhibit A</u>

2                          <u>Legal Description of Shopping Center</u>

All that certain plot, piece or parcel of land, situate, lying and being in the Town of West Hartford, County of Hartford and State of Connecticut, on the southerly and easterly sides of New Britain Avenue, bounded as follows:

Beginning at a point in the southerly line of New Britain Avenue at the intersection thereof with the division line between the lands now or formerly of Maude Chatfield Gerth, on the east, and the premises herein described; running thence westerly and southerly along the southerly, southeasterly and easterly sides of said New Britain Avenue as follows:

Westerly along New Britain Avenue on a course to the left, the radius of which is 1166.6 feet, the central angle of which is 10 degrees 00 minutes 07 seconds and the chord of which is 203.39 feet a distance of 203.65 feet, said chord making an interior angle with the last mentioned course herein of 57 degrees 34 minutes 10 seconds to a West Hartford Highway boundstone;

Running thence westerly still along New Britain Avenue, at an interior angle of 174 degrees 59 minutes 57 seconds with the last described chord, a distance of 624.98 feet to a West Hartford Highway boundstone;

Running thence westerly still along New Britain Avenue on a curve to the left, the radius of which is 912.47 feet, the central angle of which is 3 degrees 05 minutes 43 seconds and the chord of which is 49.29 feet, a distance of 49.29 feet, said chord making an interior angle with the last described course of 178 degrees 27 minutes 10 seconds, to a West Hartford Highway boundstone;

Running thence westerly still along New Britain Avenue at an interior angle of 178 degrees 27 minutes 10 seconds with the last described chord, a distance of 44.33 feet to a highway marker;

Running thence southwesterly still along New Britain Avenue at an interior angle of 145 degrees 08 minutes 20 seconds with the last described course a distance of 141.87 feet to a highway marker;

Running thence southwesterly still along New Britain Avenue on a curve to the right, the radius of which is 200 feet, a distance of 236 feet to a highway marker;

Running thence southwesterly still along New Britain Avenue 142.10 feet to a highway marker;

Running thence southerly still along New Britain Avenue on a curve to the left, the radius of which is 912.47 feet, the central angle of which is 9 degrees 11 minutes 34 seconds a distance of 146.40 feet, the chord of which makes an interior angle of 145 degrees 25 minutes with the last mentioned course, to a highway marker;

Running thence southerly still along New Britain Avenue at an interior angle of 166 degrees 48 minutes with the chord of the last described line, a distance of 193.35 feet;

Running thence easterly along other land of the grantor on a straight line forming an interior angle of 88 degrees 33 minutes 32 seconds with the last mentioned course a distance of 583.44 feet;

Running thence northerly along said other land of the grantor on a straight line forming an interior angle of 91 degrees 45 minutes 35 seconds with the last mentioned course a distance of 95 feet;

Running thence easterly along said other land of the grantor at right angles to the last mentioned course a distance of 415.67 feet;

Running thence northerly along land now or formerly of Suburban Development Corp., along a line forming an interior angle of 97 degrees 02 minutes 51 seconds with the last mentioned courses a distance of 366.84 feet;

Running thence still northerly along land now or formerly of Maude Chatfield Gerth along a line forming an interior angle of 169 degrees 14 minutes 53 seconds with the last mentioned course a

3

distance of 126.26 feet;

Running thence still northerly along land now or formerly of Maude Chatfield Gerth along a line forming an interior angle of 136 degrees 17 minutes 52 seconds with the last mentioned course a distance of 665.15 feet to a point in the southerly line of New Britain Avenue at the point or place of beginning.

Said parcel is bounded easterly by land now or formerly of Maude Chatfield Gerth and land now or formerly of Suburban Development Corporation and by other land of the grantor herein in part by east. Southerly by other land or the grantor herein and Westerly north Westerly and northerly by New Britain Avenue.

Less and exception therefrom the land described in Certificate of Condemnation by the State of Connecticut dated August 2, 1963 and recorded in <u>Volume 369, Page 308</u> of the West Hartford Land Records, and in Quit-Claim Deed from Sears, Roebuck and Co. to the State of Connecticut dated July 17, 1964 and recorded in <u>Volume 388, Page 75</u> of the West Hartford Land Records.

4

1

**Exhibit B**

2

**Site Plan**

3

4

5



GROUND FLOOR PLAN

REI
TENANT 1C

1E

SAK'S OFF 5TH
TENANT 1D

TRASH COMPACTOR PAD

TENANT TRASH
CONTAINER AREA

LOADING FACILITIES

EXHIBIT B
(Page 2 of 4)
BUY BUY BABY
WEST HARTFORD, CT
3/24/2017

GROUND FLOOR PLAN

TENANT 1A/1B COMMON ENTRY
"SHARED AREA"

TENANT 1A/1B COMMON LOADING AREA
"SHARED AREA"

ELEVATORS TO
LOWER LEVEL

ESCALATORS TO
LOWER LEVEL

EXHIBIT B
(Page 3 of 4)
BUY BUY BABY
WEST HARTFORD, CT
3/24/2017

LOWER LEVEL FLOOR PLAN

ADJACENT PREMISES
1A

PREMISES
1B

TENANT 1A/1B COMMON ENTRY
"SHARED AREA"

TENANT 1A/1B COMMON LOADING AREA
"SHARED AREA"



EXHIBIT B
(Page 4 of 4)
BUY BUY BABY
WEST HARTFORD, CT
3/24/2017

1       Exhibit C

2       Rent Commencement and Expiration Date Agreement

3       THIS RENT COMMENCEMENT AND EXPIRATION DATE AGREEMENT, made as of the
4       ____ day of _____, 201___, by and between SERITAGE SRC FINANCE LLC, a
5       Delaware limited liability company (*"Landlord"*) and BED BATH & BEYOND INC., a New
6       York corporation (*"Tenant"*).

7       **W I T N E S E T H:**

8       WHEREAS, Landlord is the owner of a certain shopping center known as
9       _____ (the *"Shopping Center"*), situated in West Hartford, Connecticut;

10      WHEREAS, by that certain Lease Agreement dated as of _____ __, 201__ (the *"Lease"*),
11      Landlord leased a portion (the *"Premises"*) of the Shopping Center to Tenant;

12      WHEREAS, Tenant is in possession of the Premises and the Term of the Lease has commenced;
13      and

14      WHEREAS, under Section 2.2 of the Lease, Landlord and Tenant agreed to enter into an
15      agreement setting forth certain information in respect of the Premises and the Lease.

16      NOW, THEREFORE, Landlord and Tenant agree as follows:

17      1.      The **Rent Commencement Date** occurred on _____, 201__.

18      2.      The **Initial Term** of the Lease shall expire on January 31, 20___, unless Tenant exercises
19      any option to extend the Term of the Lease or unless the Lease terminates earlier as provided in
20      the Lease.

21      3.      The date of commencement of the **first Renewal Period** shall be February 1, 20___, if
22      Tenant effectively exercises its option in respect thereof (the deadline for such exercise being
23      [insert date]    ), and if Tenant does so, the Term of the Lease shall expire on January 31,
24      20___, unless Tenant exercises any option to further extend the Term of the Lease or unless the
25      Lease terminates earlier as provided in the Lease.

26      4.      The date of commencement of the **second Renewal Period** shall be February 1, 20___, if
27      Tenant effectively exercises its option in respect thereof (the deadline for such exercise being
28      [insert date]    ), and if Tenant does so, the Term of the Lease shall expire on January 31,
29      20___, unless Tenant exercises any option to further extend the Term of the Lease or unless the
30      Lease terminates earlier as provided in the Lease.

31      5.      The date of commencement of the **third Renewal Period** shall be February 1, 20___, if
32      Tenant effectively exercises its option in respect thereof (the deadline for such exercise being
33      [insert date]    ), and if Tenant does so, the Term of the Lease shall expire on January 31,
34      20___, unless the Lease terminates earlier as provided in the Lease

35      6.      The date of commencement of the **fourth Renewal Period** shall be February 1, 20___, if
36      Tenant effectively exercises its option in respect thereof (the deadline for such exercise being
37      [insert date]    ), and if Tenant does so, the Term of the Lease shall expire on January 31,
38      20___, unless the Lease terminates earlier as provided in the Lease.

39      7.      The Measuring Period (defined in Section 2.2.3 of the Lease) shall commence on
40      _____, 20___ and end on _____, 20__. The date by which Tenant must elect
41      whether to terminate this Lease pursuant to Section 2.2.3 of the Lease shall be _____,
42      20__.

43      8.      Capitalized terms used, but not defined, herein shall have the meanings ascribed to them
44      in the Lease.

45      IN WITNESS WHEREOF, the parties hereto have caused this Rent Commencement and
46      Expiration Date Agreement to be executed the date and year first above written.

**LANDLORD:**

SERITAGE SRC FINANCE LLC, a Delaware

C-1

limited liability company

By:_____
Name:_____
Title:_____

**TENANT:**

BED BATH & BEYOND INC., a New York
corporation

By:_____
Name:
Title:

1                                    <u>Exhibit D</u>

2                           <u>Specifications for Landlord's Work</u>



## WEST HARTFORD, CT.

### Exhibit D - Landlord's Work

#### 03/29/2017

[All capitalized terms used, but not otherwise defined herein shall have the meanings ascribed to them in the Lease. The terms of the Lease regarding Landlord's Work shall be deemed to supplement the provisions of this Exhibit D, to the extent not inconsistent with the terms of this Exhibit D. It is specifically understood and agreed that all materials and supplies shall be installed in strict accordance with all manufacturers' specifications.]

### I.   Landlord's Plans & Specifications

A.   Landlord shall generate a complete set of project-specific construction documents hereinafter collectively referred to as "Landlord's Plans & Specifications" which shall be in accordance with the following:

   1.   Tenant's Plans: Site-specific design-development drawings prepared by Tenant which shall include:
      a)   F1 - FIXTURE PLAN/BANNER LOCATION
      b)   F2 - FLOOR FINISH PLANS, NOTES AND DETAILS
      c)   F3 - POWER/SPECIALTY LIGHTING PLANS AND NOTES
      d)   F4 - LIGHTING PLANS AND NOTES
      e)   F5 - HIGH PILE STORAGE PLAN
      f)   Additional F-drawings as may be required to address atypical site-specific conditions

   2.   Tenant's Prototype Drawings & Specifications [developed MCG Architecture, Cleveland, OH]which consist of :

      a)   buybuy BABY – PROTOTYPE VERSION 1.2015.A – Drawings (dated 12/21/15)
      b)   buybuy BABY – PROTOTYPE VERSION 1.2015.A – Project Manual (dated 12/21/15)

   3.   Lease Exhibits: Landlord's Plans & Specifications shall conform to all provisions of Exhibits B, D, D-1, D-2 and F to this Lease.

B.   Landlord's Plans & Specifications shall also include the following items:

   1.   All available architectural elevations and panel locations for all pylon, monument and directional signs located throughout the Shopping Center that Baby panel will be located on.

   2.   Available architectural elevations and partial sidewalk plans of all other tenants and occupants of the Shopping Center that are being remodeled, redeveloped or changed as part of any new work...

   3.   Available civil engineering documents for the Shopping Center.

   4.   Available geo-technical and storm-water design reports.

C.   Landlord shall be responsible for ensuring that Landlord's Plans & Specifications are in full compliance with all applicable regional/governmental Requirements.  Such regional/governmental Requirements may not be addressed in the "Tenant's Plans" or the "Tenant's Prototype Drawings & Specifications".  Such Requirements may include (but shall not be limited to) the following: Fire-rated partitions separating Receiving/Pre-Sales Areas from Sales Areas [incl. protection of openings through fire-rated partitions]; Disability access to mezzanine level [i.e. - ADA lift; limited use/limited application elevator; passenger elevator]; Second egress stair from the mezzanine level; Elevators and escalators in Common Entry; Quantity of restroom fixtures; Quantity & location of egress doors, Quantity & location of egress stairs; Smoke purge and pressurization system; Smoke/heat vents; Draft curtains; Fire rated assemblies, Etc..   Landlord shall be responsible for coordination of all regional/governmental requirements with Tenant and "Tenant's Plans".

D.   Hierarchy:

   1.   In the event of a conflict among the following documents, the following hierarchy ('a' representing the highest priority) shall be used to determine which documents govern:
      a)   Lease Exhibits B, D [excluding Tenant's Prototype], D-1, D-2 & F
      b)   Tenant's Plans
      c)   Tenant's Prototype Drawings and Specifications
      d)   Landlord's Plans and Specifications

   2.   To the extent any of the documents listed above conflict with applicable regional or governmental requirements, said documents shall be revised (prior to construction) to accommodate the regional or governmental requirements to the mutual satisfaction of both Landlord and Tenant.

E.   Quality Control Review:

   1.   At the time the Landlord's Plans & Specifications are 85% complete, Landlord shall submit to Tenant for Tenant's review one (1) complete full size set and one (1) complete ½ size set.  Tenant may (at Tenant's option) employ a third party consultant to review the submittal, in which event, prior to the commencement thereof, Landlord shall reimburse Tenant for the fixed cost ($2,500 USD) related to such third party review.  If the submittal is "rejected" or noted as "revise and resubmit" by Tenant, then Landlord shall revise the Landlord's Plans & Specifications to address all Tenant comments.

   2.   Landlord shall provide to Tenant (for Tenant's review and approval) a separate and complete submittal for each subsequent iteration/revision to Landlord's Plans & Specifications.   Tenant may (at Tenant's option) employ a third party consultant to review each subsequent submittal, in which event, prior to the commencement thereof, Landlord shall reimburse Tenant for the fixed cost ($1,500 USD) related to such third party review.  If the submittal is "rejected" or noted as "revise and resubmit" by Tenant, then Landlord shall revise the Landlord's Plans & Specifications to address all Tenant comments.

3. Landlord's Plans & Specifications submitted to Tenant for review and approval must be in the same Format as "Tenant's Prototype Plans & Specifications" unless otherwise authorized in writing by Tenant. Tenant shall not be obligated to review or approve improperly formatted submittals of Landlord's Plans & Specifications. Improperly formatted submittals shall not be deemed to be in compliance with Section 3.2 ("Plan Approvals") of the Lease. Tenant reserves the right to disapprove and return improperly formatted submittals to the Landlord and the Landlord shall be solely responsible for all costs and/or delays relating to revising/correcting and resubmitting the Landlord's Plans & Specifications to Tenant for review and approval.

4. Construction Closeout (subsequently outlined in this Exhibit) shall not be deemed "complete" until Landlord has secured Tenant approval of Landlord's Plans and Specifications.

F. Landlord's Plans and Specifications shall indicate all existing items which are to remain (i.e. - HVAC equipment, ductwork, doors, electrical equipment, etc.) and are (in Tenants reasonable judgment) required to (i) properly convey the complete design intent for the building, (ii) allow Tenant to confirm all required functions and accessories are provided, and (iii) to ensure coordination of existing items with new equipment and installations. Omission of such items from the Landlord's Plans and Specifications shall be grounds for Tenant to reject the submittal and return without review.

## I.  Site Specifications

A. All parking areas and traffic drives in the Shopping Center are existing. The condition of these parking areas and traffic drives at the time of Delivery shall be consistent with that for a first class Shopping Center in the state of **CT**. Utilization of any portion of the parking field for above ground storm water retention/detention is prohibited.

B. All truck access drives in the Shopping Center are existing and to remain. The condition of these truck access drives at the time of Delivery shall be consistent with that for a first class Shopping Center in the state of **CT**. Landlord represents that grading of these areas does not exceed a slope of 3%.

C. Tenant's truck ramp, Trash Compactor Pad and Trash Container Pad shall consist of 12" compacted sub-base (95% compacted), 4" compacted granular base and 6" Portland cement concrete surface finish or equivalent. Tenant's truck ramp shall include #4 re-bars at 18" on center each direction. Tenant's recessed truck ramp shall not exceed slope of 6%. Tenant's truck ramp, currently exist and the grade at the truck dock shall be accepted as is by tenant, with the use of Wheel Risers. The existing height of the truck dock is at 48 inches above grade. Landlord to provide wheel risers in order to lower the dock height distance from 48" aff to 44" aff per tenants specifications and truck operations. The Landlord to have the General Contractor order the Wheel Risers from Bluff Manufacturing (1400 Everman Pkwy, Suite 156, Fort Worth, TX 76140 Toll Free: 800-433-2212) or National Account McGuire. The GC will need to schedule a survey to insure the Wheel Risers will accommodate our typical double wheel larger trucks along with the smaller delivery trucks. The Wheel Risers will be steel and anchored permanently per manufacturing recommendations.

D. If Landlord's geo-technical report for the Shopping Center recommends more stringent requirements, then the geo-technical report recommendations shall supersede the criteria stated in items A, B, and C above.

E. The minimum lighting level throughout the Shopping Center (parking areas, traffic drives, service drives, etc.) shall be two (2) foot-candles, measured 30" above grade. Landlord shall provide a photometric plan which confirms the existing lighting levels throughout the Shopping Center. Photometric measurements shall exclude illumination from building-mounted wall pack lights. Landlord shall clean / relamp all site lighting fixtures within the Critical Area (as shown on Exhibit B) and ensure they are in proper working order. Landlord shall provide low level security lighting (min. 1 foot-candle) throughout the Shopping Center that shall remain illuminated from dusk to dawn seven days a week.

F. Landlord shall provide a curb ramp and painted crosswalk directly in front of the Premises aligned with the center of the entry/exit doors as shown on Exhibit B. Such curb ramp shall be a minimum of 14'-0" wide and shall have a maximum slope of 1:12. Landlord shall provide architectural bollards per Tenant's Prototype requirements at main entry ramp.

G. Landlord shall patch (as required), reseal and re-stripe the existing parking lot.

## III.  Building Requirements

The following section (a) highlights elements of Landlords Work which are already outlined in "Tenant's Prototype Drawings & Specifications"; (b) identifies project-specific elements of Landlord's Work which are in addition to the scope detailed in "Tenant's Prototype Drawings & Specifications" and (c) describes items that may remain as-is if determined by Tenant (at Tenant's sole discretion) to be in good working order as well as in good condition and appearance.

A. Demolition: Landlord shall remove all existing obsolete miscellaneous items and equipment in their entirety throughout the Premises including (but not limited to) partitions, doors, frames, soffits, studs, furring, insulation, suspended ceiling systems, plumbing fixtures, mechanical equipment, electrical equipment, roof mounted equipment, devices, etc. unless specifically approved by Tenant in writing that such items may remain. Landlord shall repair and patch all surfaces which are to remain and coordinate all demolition work with new construction.

B. Clear Height: The clear heights are acceptable as-is. All Building Systems that are added during construction however shall be designed to allow for the maximum clear height possible. Various systems shall be designed to conform with the following criteria:
   1. 14'-3" clear height to underside of concrete ceiling slab.
   2. 13'-11" clear height to the underside of drop panels.
   3. 12'-1 ¼" clear height to the underside of column capitals.
   4. 12'-4 ½" to the underside of drop beams at the former escalator infill.
   5. 12'-1 ¼" to the underside of drop beams at the removed egress stair.
      9'-0" to the underside of gypsum board located at the new 2nd floor escalator pit.

   In the event the existing structural elements do not meet the prototypical clear height requirements,
   Landlord's architect to provide a coordination plan by 04/24/2017 showing; high pile area, lighting, duct work, diffusers,

sprinkler and any other items what will affect light locations, for the use of coordinating the light locations. Tenant to determine light heights/locations based on this accurate coordination plan.

C.  Utilities: Landlord shall ensure that all utilities serving the Premises (including but not limited to electric, gas, water, fire protection water, sanitary sewer & phone services) are properly sized in accordance with Tenant's Prototype and separately metered exclusive of all other tenants and occupants in the Shopping Center.  Tenant 's utility services shall be provided directly by the Utility company (sub-metering is prohibited).  If meter is located remote from the Premises, then Landlord shall install a shut-off control within the Premises at a mutually agreeable location.  Location of utility lines and equipment serving other Tenants in the Shopping Center shall be prohibited on, under, over, across or within the Premises unless they are existing at the time of Lease execution and/or Tenant approves.  To the extent that such existing utilities conflict with Tenant's ability to properly merchandise the store (i.e. – clear heights), Landlord shall relocate such utilities to a mutually agreed upon locationLandlord shall ensure that all utilities serving the Premises are active or are made active on or before the Delivery Date.  Landlord shall assist Tenant in transferring all utility accounts to Tenant so that Tenant may assume responsibility for utility costs commencing on the Delivery Date.  If Landlord and Tenant are unable to complete transfer at time of Delivery, then Tenant shall reimburse Landlord for utility costs from Delivery Date until transfer has been completed.

D.  Fire Protection: Landlord shall furnish and install both a fire alarm (FA) system and a fire sprinkler (FS) system in accordance with the criteria established in "Tenant's Prototype Drawings & Specifications", or more stringent criteria as may be applicable.

1.  Landlord shall issue one complete submittal each for: (a) the fire alarm system and (b) the fire sprinkler system (per Sections 01340, 15300 and 16720 of the "Tenant's Prototype Drawings & Specifications") to Tenant's National Fire Protection Consultant (listed below) for review and approval.  Each initial submittal must be received by Tenant's Consultant no later than (12) weeks prior to projected Delivery Date.  Prior to the commencement of Consultant's review, Landlord shall pay a fixed fee ($625 USD for Fire Alarm + $625 USD for Fire Sprinkler) directly to Tenant's Consultant.  If any submittal is "rejected" or noted as "amend and resubmit" by Tenant's Consultant, then Landlord shall revise the submittal to address all Consultant comments and resubmit.  Prior to the commencement of Consultant's review of any resubmittal, Landlord shall pay a fixed fee ($625 USD each) directly to Tenant's Consultant.

2.  Landlord shall be responsible for monitoring the fire alarm system up to 90 days following the Delivery Date.

3.  Landlord shall purchase all Fire Alarm equipment and devices thru Tenant's National Account Vendor:
   **FE Moran**
   **Phone: 217-366-2419**
   **Contact: Susan Hirstein**
   **E-mail: bbb@femoransecurity.com**

4.  The sprinkler system shall be designed to allow merchandise to be stored to within 24 inches of the underside of the roof deck.  The system shall comply with 2007 (or later) version of NFPA13, (high pile solid shelf storage) for class I-IV commodity and a limited amount of Group A plastics on solid shelves, minimum 4-foot aisles [typical requirement = 0.60 GPM/sf over a 2000 sf area].  The sprinkler system shall be separate, stand alone and dedicated to Tenant's premise.  Canopy FP system shall be installed in accordance with Tenant's Prototype criteria.

5.  The sprinkler system shall NOT utilize a fire pump.  If water pressure is inadequate and system cannot be designed to properly function without incorporating a fire pump, then Landlord shall locate any required Fire Pump outside of the Premises.  Landlord shall, at no cost to Tenant and for the full term of the Lease, routinely inspect, test, and maintain the Fire Pump in accordance with NFPA 25, Standard for the Inspection, Testing, and Maintenance of Water-based Fire Protection Systems (Chapter 8 of 2008 Edition), and shall otherwise maintain the fire pump.

6.  Consulting Services: If Tenant's National Fire Protection Consultant (listed below) is needed to assist Landlord with approvals from governmental authorities (i.e. - completing technical discussions with governmental authorities to explain/clarify design parameters, calculations, high pile storage commodity classifications, fire pump design, etc.), then Landlord shall directly pay Tenant's Consultant for all time and materials. If Landlord fails to pay Tenant's Consultant in a timely manner, then Tenant shall have the right to make said payment and, at Tenant's option, receive a credit against "Changes" under the lease or deduct the amount from Rent in order to satisfy outstanding invoice.

7.  Landlord shall pay a fixed fee ($2,500 USD) plus travel expenses to have Tenant's National Fire Protection Consultant (listed below) conduct a detailed field observation of the sprinkler system and fire alarm to confirm the systems have been installed in compliance with the approved shop drawing submittal.  Such field observation shall occur no later than ten days prior to the established Delivery Date.  Landlord shall pay the fixed fee directly to Tenant's Consultant prior to commencement of the site visit.

8.  Tenant's National Fire Protection Consultant:      Mr. Will Smith / Code Consultants, Inc. (CCI)
                                                        2043 Woodland Pkwy, Ste. 300
                                                        St. Louis, MO  63146-4136
                                                        (314) 991-2633 [ph]
                                                        (314) 991-4614 [fax]
                                                        wills@codeconsultants.com

E.  Sanitary Survey - Landlord shall perform two videographic, fiber optic camera surveys of the existing sanitary drainage system (one within 7 days of the start of construction + one 7 days prior to Delivery).  The survey shall include the entire sanitary line serving the Premises to a minimum of 50-feet outside the building.  Sanitary lines shall be "jetted" prior to starting the survey to remove any existing waste, construction debris or standing clogs.  Camera recording shall indicate the operating camera depth.  Camera recording shall include a verbal narrative by the technician (including technician's name, company name, store number, store address, starting location of survey, and a brief description of any problems, deficiencies or points of interest identified throughout the inspection).  Camera recording shall be submitted in DVD format and shall contain only the camera survey for this project.  Camera recording shall be clearly labeled with store number, store address, date of inspection, name of inspector and inspection company.  Camera recording shall be accompanied by a written evaluation report highlighting any problems, deficiencies or points of interest and shall include a schematic diagram of the sanitary line which indicates the size,

slope and material of the pipe and all cleanout locations. Landlord shall repair the sanitary sewer line as required to ensure proper function (i.e. – no standing water/waste).

F.  <u>Mechanical Equipment</u>: Landlord shall furnish and install all new HVAC equipment (RTU's, Air Curtain, Unit Heater, etc.) in accordance with Tenant's Prototype Drawings and Specifications. Landlord shall furnish and install new ductwork in accordance with Tenant's Prototypical Drawings and Specifications. Landlord shall Test & Balance all mechanical equipment in accordance with Tenant's Prototypical Drawings and Specifications.

G.  <u>Electrical System</u>: The electrical service shall be a minimum 800 amp / 480/277v / 3 phase / 4 wire service. Re-use of existing electrical system components within the Premises shall be prohibited. Power Wall Assembly shall be in the location shown on Tenant's Plans.

H.  <u>Roof</u>: Landlord shall remove the existing roof system in its entirety (i.e. - membrane, ballast, insulation, coping, flashing, etc.). Landlord shall properly repair all damaged roof deck and roof structure. Landlord shall provide a new roof system. Landlord shall provide new roof access hatch and ladder in accordance with Tenant's Prototypical criteria. Landlord shall install maintenance pads on the roof around all mechanical equipment and roof hatch consistent with Tenant's Prototype requirements.

I.  <u>Floor Slab</u>: Landlord shall provide Ardex SD-T with Diamond Quest (Ardex Version) over existing floor slab in all areas designated as CC-1 on Tenant's Plans. Slab prep / floor prep shall be in accordance with Tenant's Prototype Drawings and Specifications. Any areas of new concrete shall utilize 4,000 psi concrete, maintain a minimum thickness of 4 inches, and shall cure for a minimum 28-days prior to Delivery. The entire floor system (existing and new) shall be designed to accept a minimum 125 lbs. per square foot of live load. If rebar or pre-tensioned / post-tensioned steel is required, such reinforcement shall not be placed within the top 2 ½" of the concrete slab. Landlord shall core the existing floor slab and provide certification from a licensed structural engineer that the slab will support the minimum live load requirements plus the anticipated loads from an Office Mezzanine. Landlord shall confirm the existing concrete floor system is flat and level and shall not be below FF40/FL30 and be measured in accordance with ASTM E1155

J.  <u>Auto slider</u>: Landlord shall provide new auto slider doors in accordance with Tenant's Prototypical criteria at main entry and vestibule Common Entry "Shared Area".

K.  <u>Storefront</u>: Landlord shall be required to provide new elevation to include colors, material and design per Lease Exhibit D-1. In the event that any existing exterior finishes are designated to remain, then Landlord shall refurbish such existing finishes to "like new" condition (i.e. – clean, paint, etc.). Landlord shall power wash the entire exterior façade and sidewalk a minimum of two weeks prior to the Delivery Date. Landlord shall provide adequate access and ventilation for all concealed spaces (i.e. – above entry canopy soffit) in accordance with Tenant's Prototype. Landlord shall locate roof drain so water does not drain near our entry.

L.  <u>Vestibule</u>: Landlord shall provide and install a fully enclosed "Vestibule" as shown on Exhibit B Common Entry and detailed per Tenant's prototype documents. Vestibule shall conform to the following: Interior vestibule glazing/storefront system shall match exterior glazing/storefront system in height, color and finish, with metal stud and gypsum board walls (including any headers and/or diagonal bracing, etc.) above to deck. Bottom of vestibule gypsum board ceiling system shall match top of glazing/storefront system and contain prototype light fixtures per Tenant's plans, ducted HVAC supply and plenum return, as well as chrome recessed sprinkler heads and fire alarm devices as required by code or authority having jurisdiction.

M.  <u>Loading Dock</u>: Landlord shall provide dock and new equipment in accordance with Tenant's Prototypical criteria.

N.  <u>Freight Elevator (spec/warranty)</u>: The existing hydraulic freight elevator, with a 6,000-lb capacity and speed of a 100-FPM shall be modernized by Kone to meet current codes, as required by code, and shall be delivered in good working order with a minimum of one (1) year warranty and with a four (4) year maintenance contract. This elevator shall travel between Tenant's loading dock area and the Premises and shall be located as shown on Exhibit B.

O.  <u>Passenger elevator (spec/warranty):</u> Landlord shall install a pair of Kone Ecospace 16.1Passenger elevators for Tenant's dedicated use. This elevator shall travel between Tenant's Common entry area and the Premises and shall be located as shown on Exhibit B and D1. The Tenant's Passenger elevator is to be burned-in inspected and fully operational on or before the Delivery Date for the Premises to allow it to be used during Tenant's Fixturing. The new Kone Ecospace 16.1 Passenger elevators shall meet the minimum requirements of the Passenger/Freight elevators spec section 14255 unless otherwise agree to my Tenant in writing. .

P.  <u>Escalators Common Entry (spec/warranty):</u> Landlord shall install a pair of Kone TravelMaster 110 escalators for Tenant's dedicated use. The escalators shall travel between Tenant's Common entry area and the Premises and shall be located as shown on Exhibit B and D1. The Tenant's escalator is to be burned-in inspected and fully operational on or before the Delivery Date for the Premises to allow it to be used during Tenant's Fixturing. The new Kone TravelMaster 110 Passenger escalator shall meet the minimum requirements of the Passenger & Shopping Cart Escalators spec section 14305 unless otherwise agree to my Tenant in writing. A shopping cart escalator is not required for this location.

Q.  <u>Pre-sales roll up door/delivery doors</u>: Landlord to provide as required by Tenant additional roll up / delivery doors as required by Tenant at the pre-sales area from Freight elevator to premises.

R.  <u>Common entry – Shared Area (Lobby & entry design/finishes):</u> Landlord shall be required to provide new colors, Finishes lighting, material and design per Lease Exhibit B and D-1 and as required by Tenant. Landlord to work with Tenant on the final design of the Common Entry first floor and lower level areas. Landlord shall provide adequate access and ventilation for all concealed spaces (i.e. – above canopy, soffit, machine rooms) in accordance with Tenant's Prototype.

S.  <u>Common Loading Area – Shared Area ( design/finishes):</u> Landlord shall be required to provide new lighting, material Finishes and design for Tenant 1A/ 1B Common Loading Areas and as required by Tenant. Refer to lease Exhibit B for area. Landlord to work with Tenant on the final design of the Common Loading Areas. Landlord shall provide adequate access and ventilation for all concealed spaces (i.e. – above canopy, soffit, machine rooms) in accordance with Tenant's Prototype.

T.  <u>Exterior Finishes</u>: Landlord shall modify the building exterior as required to be in accordance with Exhibit D-1 elevations. In the event that any existing exterior finishes are designated to remain, then Landlord shall refurbish such existing finishes to "like new" condition (i.e. — clean, paint, etc.). Landlord shall power wash the entire exterior façade and sidewalk a minimum of two weeks prior to the Delivery Date. Landlord shall provide adequate access and ventilation for all concealed spaces (i.e. – above entry canopy soffit) in accordance with Tenant's Prototype.

U.  Intumescent Paint: In the event that fire-proofing of exposed structural elements is required, then Landlord shall use intumescent fire resistant coating to achieve the required fire rating. Application shall be neat & clean and in accordance with manufacturer's recommendations.

V.  Temporary Banners: Landlord shall provide eyehooks on the building facade for temporary banners as detailed on Tenant's prototype or as mutually agreed to by Landlord and Tenant. Locations for banners to be determined in the field by Tenant.

W. Exit Signs: Landlord (at Landlord's cost) shall remove any existing Self Luminous Exit Signs containing Tritium Gas.

X.  New HVAC and ductwork provided by Landlord. High efficiency, electric cooling and heating shall be by Lennox Industries Inc. (no substitutions) and shall be T-Class Condenser units (model TSA048S4-230-2) and split system Air Handlers (model CBX27UH-048). Landlord shall provide RTU's and design per Tenant's prototype and Specs for the Common entry First floor, Lower level, and Tenant 1A/1B Common Loading Areas or as required by Tenant. Common Area entry and Lower Common Area to be conditioned to prototype criteria of 325 sf/ton and mechanical equipment such as RTU's shall not be exposed in these areas unless approved by Tenant. Loading area to be conditioned to prototype criteria for storage area.

Y.  New Compactor provided by Landlord per Tenant's Prototype and specs.

Z.  Security Equipment: Landlord shall provide and install new security equipment (including Electronic Article Surveillance [EAS] and Closed Circuit Television [CCTV]) in accordance with Tenant requirements. Landlord shall purchase such EAS equipment directly from Tenant's National Account Vendor (WG Security Products, Inc. / Attn: Tim Gates / 704-232-8891 / tgates@wgspl.com)   Landlord shall purchase such CCTV equipment directly from Tenant's National Account Vendor (Sensormatic / Attn: Doug Thomas / 804-739-8144 / douglasthomas@adt.com).

AA. Restrooms : Landlord shall provide restrooms in the location(s) depicted on Tenant's Plans. All existing restroom fixtures and associated fittings (including counters, sinks, faucets, toilets, urinals, floor drains, clean out covers, access plates, toilet partitions, HVAC diffusers & grilles, etc.) shall be removed and replaced with new items in accordance with Tenant's Prototypical criteria. Landlord shall provide all new restroom finishes and accessories (soap dispenser, toilet tissue dispenser, toilet seat cover dispenser, electric hand dryers, sanitary napkin vendor, sanitary napkin disposal, coat hook and bumper, etc.) in accordance with Tenant's Prototype Documents.

BB. Existing Rooms/Spaces : Not applicable since all new construction.

CC. Slat wall : In the event that there is existing slat wall, drywall or other sheathing in those areas designated on Tenant's Plans to receive slat wall, Landlord shall remove such sheathing to allow for the proper anchoring of the sub-structure and fastening of the new slat wall in accordance with Tenant's Prototype Drawings and Specifications.

DD. Leak Mitigation: Landlord shall  install a water proofing membrane in all janitor's closets and restrooms located above the Premises in order to mitigate leaks. All piping to the Premises will be air tested and/or water tested, as applicable for any leakage prior to delivery of the Premises..

## III.  Construction Coordination Requirements

A.  Schedule: Landlord shall provide Tenant with a critical path construction schedule prior to commencement of Landlord's Work. Following the commencement of Landlord's Work, Landlord shall provide an updated critical path construction schedule to Tenant's Construction Project Manager every two weeks until Landlord's Work is complete.

B.  Photographs: Throughout the period during which Landlord's Work is being performed, Landlord shall provide to Tenant's Construction Project Manager, on a weekly basis, then-current photographs of the interior and exterior of the Premises, and the Shopping Center site, showing the progression of Landlord's Work. All photographs shall be in a digital format, and transmitted to Tenant at the following e-mail address : BBB.2000photos@bedbath.com

C.  Vendor Coordination: Landlord shall be responsible for contracting, coordinating and scheduling directly with Tenant's Specified National Account Vendors.

D.  Certification: Whenever testing, certification, or verification is required in Tenant's Prototype Drawings & Specifications, Landlord shall, at Tenant's request, provide Tenant with copies of tests, certifications, or verifications, and shall otherwise cooperate with Tenant's reasonable informational requests.

## IV.  Building and Site Signs

At a minimum, all signage rights granted to previous tenant shall be granted to Tenant. Building signs and pylon/monument signs shall be provided by Landlord in accordance with Tenants prototype details and specifications.

A.  Building Signs — Landlord shall furnish and install all building signs shown on Exhibits D-1 and F of this Lease using Tenant's specified vendor only.  Landlord shall verify actual number of circuits required for each sign with Tenant's specified vendor. Landlord shall install conduit continuously from Tenant's panel in Premises to all sign locations.  Landlord shall execute a purchase order with Tenant's specified vendor no later than ten (10) weeks prior to Delivery Date. If Landlord fails to execute a purchase order prior to the established deadline, then Tenant (at its option) may execute a purchase order with Tenant's specified vendor and (at its option) deduct all costs from rent or receive a credit against "Changes" as defined in the Lease. If Tenant does not provide written notice to Landlord regarding Tenant's decision to execute a purchase order with Tenant's specified vendor, then Landlord shall remain responsible to execute the purchase order.

B.  Remote Building Sign(s) – [Building Sign(s) not located on Premises] Landlord shall furnish and install all remote building signs shown on Exhibits D-1 and F of this Lease using Tenant's specified vendor only.  Landlord shall verify actual number of circuits required for each sign with Tenant's specified vendor.  Landlord shall install conduit continuously from Tenant's panel in Premises to all remote sign locations.  Landlord shall execute a purchase order with Tenant's specified vendor no later than ten (10) weeks prior to Delivery Date.  If Landlord fails to execute a purchase order prior to the established deadline, then Tenant (at its option) may execute a purchase order with Tenant's specified vendor and (at its option) deduct all costs from rent or receive a credit against "Changes" as defined in the Lease.  If Tenant does not provide written notice to Landlord regarding

Tenant's decision to execute a purchase order with Tenant's specified vendor, then Landlord shall remain responsible to execute the purchase order.

C.  Lower level Interior Entry sign: Refer to Exhibits D-1, D-2, and F of the Lease. Landlord shall furnish and install all Interior entry building signs shown on Exhibits D-1, D-2 and F of this Lease using Tenant's specified vendor only.  Landlord shall verify actual number of circuits required for each sign with Tenant's specified vendor.  Landlord shall install conduit continuously from Tenant's panel in Premises to all remote sign locations.   Landlord shall execute a purchase order with Tenant's specified vendor no later than ten (10) weeks prior to Delivery Date. If Landlord fails to execute a purchase order prior to the established deadline, then Tenant (at its option) may execute a purchase order with Tenant's specified vendor and (at its option) deduct all costs from rent or receive a credit against "Changes" as defined in the Lease.  If Tenant does not provide written notice to Landlord regarding Tenant's decision to execute a purchase order with Tenant's specified vendor, then Landlord shall remain responsible to execute the purchase order.

D.  Common entry – Shared Area ( signage /Graphics): Refer to Exhibits D-1, D-2 and F of the Lease. Landlord shall furnish and install all Common entry signage and graphics shown on Exhibits D-1, D-2 and F of this Lease using Tenant's specified vendor only.  Landlord shall verify actual number of circuits required for each sign with Tenant's specified vendor.  Landlord shall install conduit continuously from Tenant's panel in Premises to all remote sign locations.   Landlord shall execute a purchase order with Tenant's specified vendor no later than ten (10) weeks prior to Delivery Date.  If Landlord fails to execute a purchase order prior to the established deadline, then Tenant (at its option) may execute a purchase order with Tenant's specified vendor and (at its option) deduct all costs from rent or receive a credit against "Changes" as defined in the Lease.  If Tenant does not provide written notice to Landlord regarding Tenant's decision to execute a purchase order with Tenant's specified vendor, then Landlord shall remain responsible to execute the purchase order.

E.  Pylon/Monument Signs -- Landlord shall furnish and install all pylon /monument /directional signs (s) shown on Exhibit F to this Lease, complete (including, without limitation, sign structure, any required electrical service, sign panels, and Tenant's specified graphics).   Landlord to furnish, install and remove (at Tenant's request) temporary non-stick vinyl graphics as detailed in Exhibit F.

F.  Temporary Signs -- Commencing on the Effective Date, and continuing thereafter through the Rent Commencement Date, Landlord shall furnish, install and maintain (for such duration as Tenant may desire) all temporary signs as detailed in Exhibit F to the Lease and listed below.  Temporary signage shall be in accordance with Tenant's Prototype Drawings & Specifications :
1.  Two double-sided temporary banners mounted to the Premises bearing the phrase :
    a)  Banner #1 - "Coming Soon" (side a) and "Grand Opening" (side b).
    b)  Banner #2 - "Why Wait? Shop Online" (side a) and "Now Open" (side b).
2.  Four single-sided banners at the temporary site sign located per Exhibit B to the Lease, bearing the phrase:
    a)  Banners #1 & #2 – "Coming Soon"
    b)  Banners #3 & #4 - "Now Open"
3.  One double sided banner sign mounted to Tenant's Hiring Trailer bearing the phrase :
    a)  "Now Hiring" (side a) and "Now Open" (side b).
4.  At Tenant's request, Landlord shall relocate Tenant's temporary signage should the signage visibility become obstructed.

5.  Landlord shall secure banners through the following vendor:
    Auna Foote / Corporate Identification Solutions
    5563 North Elston Avenue
    Chicago, IL 60630
    (773) 763-9600 [ph]
    (773) 763-9606 [fax]
    afoote@corporateidsolutions.com
    www.corporateidsolutions.com

G.  Shop Drawings: Landlord shall provide complete shop drawings of all Landlord-furnished signs to Tenant for Tenant's approval no later than twelve (12) weeks prior to the Delivery Date.

## V.  Permits and Approvals

A.  Landlord shall be obligated to secure all permits required to allow Tenant to fixture, merchandise and open for business to the public in the Premises.  Such permits may include (but shall not be limited to) the following: Building Permit, Health Permit [for the sale of prepackaged foods], Fixture Permit, Seismic Permit, High Pile Storage Permit [for storage of merchandise above 12'-0-"] and Signage Permits ]

B.  If seismic calculations, plans and details are required, then Landlord shall be obligated to contract with "Seizmic Inc." no later than twelve (12) weeks prior to the Delivery Date. Seizmic Inc. shall provide all necessary services to assist Landlord in securing the Fixture Permit. These services include completion of all required submittal documents, required applications, responses to inquiries from the authority having jurisdiction and monitoring status of the permit application.  Actual submission of the required documents to the Authority Having Jurisdiction shall be made only by Seizmic, Inc. (or other vendor selected at Tenant's discretion).
    Seizmic Inc.
    Sal Fateen /  Genie Fateen / Keri Putnam
    161 Atlantic Street, Pomona, CA 91768
    (909) 869-0989 [ph]

C.  Landlord shall be obligated to take possession of fixture permit and transfer the permit to Tenant's fixture Installer. If fixture permit is required, then Landlord shall secure fixture permit no later than (2) weeks prior to Delivery Date.

## VI. Construction Closeout

A.  Electronic Format : Within thirty (30) days following the "Substantial Completion" date, Landlord shall be responsible for uploading all required documents (01700) to the Digital Reliance Inc. (DRI) website [http//www.closeoutassistant.com].  For additional information or assistance contact DRI at 614-430-5950.  Special software is not required.  All documents shall be uploaded in pdf.  Landlord shall pay the mandatory $725 USD service fee to DRI prior to uploading files.  DRI will confirm submittal meets base requirements and shall inform Landlord or Landlord's Contractor if certain documents are missing.  DRI will not review items for content.  The content will be reviewed by the BBB Construction Manager after posting of all documents

is complete.  Any need for resubmittal due to incorrect content, etc. will be communicated to Landlord or Landlord's Contractor from BBB's Construction Manager.  Landlord shall resubmit amended document(s) to DRI until approved by BBB's Construction Manager.  Closeout Documents shall be in accordance with those requirements outlined in "Tenant's Prototype Drawings & Specifications" Project Manual Section 01700.

B.  Warranties: Landlord shall cause its contractor(s) to instruct Tenant's Construction Project Manager in the operation of any equipment installed as part of Landlord's Work.  All of Landlord's Work shall be performed in a manner which will not void, impair or diminish any manufacturers', installers', or contractors' warranties which otherwise would have been provided by such manufacturer, installer, or contractor to either Landlord or Tenant.  Two (2) months prior to the end of the warranty period, Landlord shall forward a written report to Tenant outlining the condition of all warranty items.

C.  Late Closeouts : If Landlord fails to deliver any of the instruments and items (collectively, the "Close-out Documents") described in paragraph A above within the prescribed thirty (30) day period, then Tenant may provide Landlord with notice of such failure. If Landlord has not remedied such failure within fifteen (15) days after Tenant's delivery of such notice, then Tenant shall be entitled to abatement in Rent in the amount of One Hundred ($100.00) dollars for each day that Landlord has not so delivered all of the Close-out Documents.

D.  Energy Rebate Information : Landlord shall be obligated to provide to Tenant (within 30 days of Tenants request) copies of manufacturer invoice(s), manufacturer cut sheets, subcontractor invoices, etc. for any item or items described within this Exhibit for Tenant's pursuit of energy rebate programs that are in force by the Authority Having Jurisdiction and/or the utility provider.

1

Exhibit D-1

2

Exterior Elevations of Premises and Sidewalk Plan

3





EXHIBIT D-1 (2 of 3)
UPPER LEVEL LOBBY ELEVATIONS
BUY BUY BABY
WEST HARTFORD, CT
3/24/2017



NOTES:

A. FINISHES:
FINAL FINISHES TO BE DETERMINED BY TENANT PRIOR TO START OF CDS

WALL FINISHES WILL CONSIST OF A COMBINATION OF PAINTED GYPSUM BOARD, STONE VENEER, THIN BRICK, REAL & COMPOSITE WOOD, WOOD PANELS, METAL PANEL AND DISPLAY BOXES

FLOOR FINISH: CERAMIC TILE - COLOR TBD BY TENANT

CEILING FINISH: EXISTING CONCRETE SLAB AND GYP. BD.
COLOR TBD BY TENANT

B. GRAPHICS:
ALL GRAPHICS WILL BE DETERMINED BY THE TENANT.

C. LIGHTING:
GENERAL LIGHTING TO BE SUSPENDED LINEAR LIGHTING AT CONCRETE DECK.
RECESSED LINEAR LIGHTING AT GYP. BD. CEILING. LIGHTS TBD AND APPROVED
BY TENANT

ACCENT LIGHTING TO BE USED BEHIND SIGN PANELS AS REQUIRED BY TENANT

D. HVAC:
AIR DISTRIBUTION AND VENTILATION WITHIN THE TENANT LOBBY SPACES TO
MATCH REQUIREMENTS.

E. SIGNAGE:
LANDLORD TO PROVIDE ALL REQUIRED CODE SIGNAGE

F. SPEAKER SYSTEM:
SPEAKER SYSTEM WITHIN THE TENANT LOBBY SPACES TO MATCH
REQUIREMENTS.

EXHIBIT D-1 (3 of 3)
LOWER LEVEL LOBBY ELEVATIONS
BUY BUY BABY
WEST HARTFORD, CT
3/24/2017

1

Exhibit D-2

2

Exterior Elevations of the Shopping Center

3

4



1                                  Exhibit E

2                             Permitted Encumbrances

1.   Easement in favor of The Hartford Electric Light Company dated November 7, 1960 and recorded in Volume 334, Page 34 of the WHLR, and as shown on Map Number 1142 filed in the Office of the West Hartford Town Clerk.

2.   Terms and conditions of an agreement by and between Five City Plaza, Incorporated and Sears, Roebuck and Co. dated as of April 12, 1961 and recorded in Volume 345, Page 36 of the WHLR.

3.   Waiver and relinquishment of rights of access to and from New Britain Avenue and to and from Interstate Route #84 as set forth in Certificate of Condemnation by the State of Connecticut dated August 2, 1963 and recorded in Volume 369, Page 308 of the WHLR, and in Quit-Claim Deed from Sears, Roebuck and Co. to the State of Connecticut dated July 17, 1964 and recorded in Volume 388, Page 75 of the WHLR, and as shown on Map Numbers 1352 and 1353 filed in the Office of the West Hartford Town Clerk.

4.   Easement for Traffic Signal Maintenance Purposes in favor of the State of Connecticut dated August 1, 1997 and recorded in Volume 2264, Page 35 of the WHLR, and as shown on Map Number 5992 filed in the Office of the West Hartford Town Clerk.

5.   Such state of facts as is shown on Map Numbers 3048 and 5689-5692 filed in the Office of the West Hartford Town Clerk.

6.   Matters shown on ALTA/ACSM Land Title Survey dated September 5, 2003 prepared by BL Companies entitled "Portion of Land of Sears Roebuck and Company 1445 New Britain Avenue, West Hartford, Connecticut" Project Number 03C538 are as follows:

     a) 12 inch concrete pipe encroaches on and off property at the southern corner of the property.

7.   Traffic Investigation Report by the Connecticut State Traffic Commission dated August 17, 2004 and recorded in Volume 3602, Page 68 of the WHLR. See also Certificate No. 493-A dated October 18, 2004 and recorded in Volume 3628, Page 322 of the WHLR.

8.   Terms, conditions and provisions contained in a lease by and between Sears, Roebuck and Co. and GMRI, Inc. dated November 5, 2003, as evidenced by a Memorandum of Lease recorded December 16, 2004 in Volume 3654, Page 104 of the WHLR. See also Address Assignment by the Town of West Hartford dated March 3, 2005 and recorded in Volume 3694, Page 97 of the WHLR.

9.   Terms and provisions of a lease from Seritage KMT Finance LLC and Seritage SRC Finance LLC to Kmart Operations LLC and Sears Operations LLC, a memorandum of which is dated as of July 7, 2015 and recorded in Volume 4931, Page 389 of the WHLR.

3         Note: See also Map Nos. 9276 and 9287 filed in the West Hartford Town Clerk's Office.

4    **NOTE:**  Subject only to the specific terms and conditions of this Lease pertaining to the Existing
5    Leases, the inclusion of the foregoing memorandum of lease in Items 8 and 9 above within these
6    "Permitted Encumbrances" shall not diminish any of Tenant's rights, or increase any of Tenant's
7    obligations, in each case in other than a strictly de minimis manner, under this Lease.

8    10.       Open-End Mortgage, Assignment of Rents and Leases, Collateral Assignment of
9    Property Agreements, Security Agreement and Fixture Filing from Seritage SRC Finance LLC in
10   favor of JPMorgan Chase Bank, National Association and H/S SO III Funding I LLC dated as of
11   July 7, 2015 and recorded July 14, 2015 in Volume 4931, Page 399 of the WHLR, as assigned to
12   Wells Fargo Bank, National Association, as Trustee by Assignment dated as of September 30,
13   2015 and recorded in Volume 4953, Page 100 of the WHLR.
14
15   **NOTE:**  The inclusion of the foregoing mortgage within these "Permitted Encumbrances" is
16   made subject to the provisions of Subsection 2.3.1(f) and Section 17.3 of the Lease.
17
18   11.       Terms and provisions of a lease between Seritage SRC Finance LLC and Recreational
19   Equipment, Inc., as evidenced by a Memorandum of Lease dated October 31, 2016 to be
20   recorded.
21
22   **NOTE:**  Subject only to the specific terms and conditions of this Lease pertaining to the Existing
23   Leases, the inclusion of the foregoing memorandum of lease within these "Permitted

1    Encumbrances" shall not diminish any of Tenant's rights, or increase any of Tenant's
2    obligations, in each case in other than a strictly de minimis manner, under this Lease.
3
4    12.    Terms and provisions of a lease between Seritage SRC Finance LLC and Saks Fifth
5    Avenue LLC, as evidenced by a Memorandum of Lease dated November 7, 2016 and recorded
6    on December 14, 2016 at Document ID 005891980011 in Book 5031, page 195 of the WHLR.
7
8    **NOTE:** Subject only to the specific terms and conditions of this Lease pertaining to the Existing
9    Leases, the inclusion of the foregoing memorandum of lease within these "Permitted
10   Encumbrances" shall not diminish any of Tenant's rights, or increase any of Tenant's
11   obligations, in each case in other than a strictly de minimis manner, under this Lease.
12
13   13. Terms and provisions of a lease between Seritage SRC Finance LLC and Shake Shack
14   Connecticut LLC, as evidenced by a Memorandum of Lease dated November 9, 2016 to be
15   recorded.
16
17   **NOTE:** Subject only to the specific terms and conditions of this Lease pertaining to the Existing
18   Leases, the inclusion of the foregoing memorandum of lease within these "Permitted
19   Encumbrances" shall not diminish any of Tenant's rights, or increase any of Tenant's
20   obligations, in each case in other than a strictly de minimis manner, under this Lease.
21
22
23
24
25

Exhibit F

Signage



EXHIBIT F (1 OF 8)
BUYBUY BABY
EXTERIOR FRONT SIGN
WEST HARTFORD, CT
DATE:02/24/2017

INTERIOR MALL CHANNEL LETTER SIGN
LOCATED ON BABY FACADE
SCALE: NTS

buybuyBABY

INTERNALLY ILLUMINATED
CHANNEL LETTERS REFER TO F1 FOR
MORE DETAILS
RED & BLUE LETTERS ON STRUCTURE,
POWER, BY LANDLORD.

NOTES:
- CHANNEL LETTER SIGN REFER TO F1
- FINAL SIGN DESIGN, SIZE AND COLORS AS
  APPROVED BY BUYBUY BABY APM
- LANDLORD TO PROVIDE ALL MOUNTING,
  ELECTRICAL AND SUPPORT AS REQUIRED BY
  SIGN COMPANY.

EXHIBIT F (2 OF 8)
buybuy Baby INTERIOR MALL
WEST HARTFORD, CT
DATE:  03/28/2017

INTERIOR MALL CHANNEL LETTER SIGN
(REFER TO EXHIBIT D1 FOR LOCATION)
SCALE: NTS

ILLUMINATED SIGN AREA.
FINAL DESIGN, SIZE AND
LOCATION TIED BY TENANT.
REFER TO EXHIBIT F.

BABY SIGN LOCATION.
SEE SIGN DETAIL THIS
SHEET

buybuyBABY

WOOD PANEL
(MP-1)

STONE VENEER:
TBD

PAINTED GYP.
SW 7118 FRENCH VANILLA

PAINTED GYP. BD:
COLOR: TBD

FRAMELESS GLASS
WITH SILICON
SEALANT

ESCALATOR 1 & 2

ENTRY
PULL DOWN GATE

INTERIOR ELEVATION

PAINTED GYP. BD:
COLOR: TBD

DOORS TO
EGRESS STAIR #2
COLOR TO MATCH
ADJ. SURFACE

BASE

FIRST
FLOOR

ELEVATOR DOOR
ALUM. FINISH

INTERIOR ELEVATION

NOTES:
A. FINISHES:
FINAL FINISHES TO BE DETERMINED BY TENANT PRIOR TO START OF CDS

WALL FINISHES: WILL CONSIST OF A COMBINATION OF PAINTED GYPSUM
BOARD, STONE VENEER, THIN BRICK, REAL & COMPOSITE WOOD
PANELS, METAL PANELS AND DISPLAY BOXES

FLOOR FINISH: CERAMIC TILE - COLOR TBD BY TENANT

CEILING FINISH: EXISTING CONCRETE SLAB AND GYP. BD.
COLOR TBD BY TENANT

B. GRAPHICS:
ALL GRAPHICS WILL BE DETERMINED BY THE TENANT.

C. LIGHTING:
GENERAL LIGHTING TO BE SUSPENDED LINEAR LIGHTING AT CONCRETE DECK,
RECESSED LINEAR LIGHTING AT GYP. BD. CEILING. LIGHTS TBD AND APPROVED
BY TENANT

ACCENT LIGHTING TO BE USED BEHIND SIGN PANELS AS REQUIRED BY TENANT

D. HVAC:
AIR DISTRIBUTION AND VENTILATION WITHIN THE TENANT LOBBY SPACES TO
MATCH REQUIREMENTS.

E. SIGNAGE:
LANDLORD TO PROVIDE ALL REQUIRED CODE SIGNAGE

F. SPEAKER SYSTEM:
SPEAKER SYSTEM WITHIN THE TENANT LOBBY SPACES TO MATCH
REQUIREMENTS



NOTES:

- LANDLORD TO PROVIDE ALL CODE/LEGAL REQUIRED DIRECTIONAL, ELEVATOR, ESCALATOR OR CODE REQUIRED SIGNAGE FOR BOTH LEVELS.
- LANDLORD TO PROVIDE ALL TENANT REQUIRED GRAPHICS FOR BOTH LEVELS. TENANT TO PROVIDE DESIGN AND NATIONAL ACCOUNT VENDOR FOR LANDLORD TO USE.
- LANDLORD TO PROVIDE ALL TENANT REQUIRED LOBBY SIGNAGE FOR BOTH LEVELS. SOME OF THESE SIGNS WILL BE ILLUMINATED CHANNEL LETTERS AND OTHER ILLUMINATED SIGNAGE AS DETERMINED BY TENANT. LANDLORD TO PROVIDE ALL WHIPS AND POWER AS REQUIRED.
- LANDLORD TO PROVIDE ALL MOUNTING, ELECTRICAL AND SUPPORT AS REQUIRED BY SIGN COMPANY.

INTERIOR LOBBY SIGNAGE LOWER LEVEL
(REFER TO EXHIBIT D1 FOR LOCATION)
SCALE: NTS

INTERIOR LOBBY SIGNAGE UPPER
(REFER TO EXHIBIT D1 FOR LOCATION)
SCALE: NTS

EXHIBIT F (3 OF 8)
BUYBUYBABY LOBBY SIGNAGE
WEST HARTFORD, CT
DATE: 03/29/2017



BABY PANEL
LOCATED ON BUILDING (2 LOCATIONS)
SCALE: NTS

- FINAL VISIBLE OPENING TO BE CONFIRMED
  AND LOGO ADJUSTED AS REQUIRED AND
  APPROVED BY BUYBUY BABY APM
- SIGN STRUCTURE BY LANDLORD
- TENANT TO HAVE RIGHT TO SWITCH PANEL
  LOCATIONS WITH COST PLUS / WORLD MARKET
  PANEL PRIOR TO INSTALL
- FINAL SIGN/PANEL DESIGN AS APPROVED BY
  TENANT.

EXHIBIT F (4 OF 8)
buybuy Baby DIRECTORY
WEST HARTFORD, CT
DATE: 03/27/2017

**buybuyBABY**

INTERNALLY ILLUMINATED PYLON PANEL.
RED & BLUE LETTERS ON A WHITE BACKGROUND.
STRUCTURE, POWER, PANEL & GRAPHICS BY LANDLORD.

BABY PANEL
LOCATED ON MONUMENT SIGN A
SCALE: NTS

- PANEL BOTH SIDES OF MONUMENT
- FINAL VISIBLE OPENING TO BE CONFIRMED AND LOGO ADJUSTED AS REQUIRED AND APPROVED BY BUYBUY BABY APM
- PYLON STRUCTURE BY LANDLORD
- TENANT TO HAVE RIGHT TO SWITCH PANEL LOCATIONS WITH COST PLUS / WORLD MARKET PANEL PRIOR TO INSTALL
- FINAL PANEL DESIGN AS APPROVED BY TENANT.

EXHIBIT F (5 OF 8)
buybuy Baby
WEST HARTFORD, CT
DATE: 02/24/2017

BABY PANEL
POSITION. SEE PANEL
DETAIL THIS SHEET

MONUMNET SIGN A
(REFER TO EXHIBIT B FOR LOCATION)
SCALE: NTS

**buybuyBABY**

INTERNALLY ILLUMINATED
PYLON PANEL.
RED & BLUE LETTERS ON A WHITE
BACKGROUND.
STRUCTURE, POWER, PANEL &
GRAPHICS BY LANDLORD.

BABY PANEL
LOCATED ON MONUMENT SIGN B
SCALE: NTS

- PANEL BOTH SIDES OF MONUMENT
- FINAL VISIBLE OPENING TO BE CONFIRMED
  AND LOGO ADJUSTED AS REQUIRED AND
  APPROVED BY BUYBUY BABY APM
- PYLON STRUCTURE BY LANDLORD
- TENANT TO HAVE RIGHT TO SWITCH PANEL
  LOCATIONS WITH COST PLUS / WORLD MARKET
  PANEL PRIOR TO INSTALL
- FINAL PANEL DESIGN AS APPROVED BY
  TENANT.

EXHIBIT F (6 OF 8)
buybuy Baby
WEST HARTFORD, CT
DATE: 02/24/2017

BABY PANEL
POSITION. SEE PANEL
DETAIL THIS SHEET

REI
LOGO

Saks
OFF
5TH

TENANT 1F

buybuyBABY

WORLD MARKET

TENANT 1E

THE CORBIN COLLECTION

3" WIDE METAL
CABINET FRAME
FINISH:
RYM1/500- BLACK

COLOUR:
METRICO CLADDING
- RENWWOOD

6" INDIVIDUAL LETTERS,
BLACK, BLADE 6F

6" CAST CONCRETE STILL

SMOOTH FACED MASONRY
TREM/STONE - ALARD

MONUMNET SIGN B
(REFER TO EXHIBIT B FOR LOCATION)
SCALE: NTS



EXPECTANT MOTHER
PARKING SIGN
(LOCATED IN TENANT'S PARKING FIELD REFER TO EXHIBIT B)

EXHIBIT F (7 OF 8)
BUY BUY BABY
WEST HARTFORD, CT
DATE: 02/24/2017

**buybuy BABY. COMING SOON!**

**buybuy BABY. NOW OPEN!**

VERSION A

VERSION B

TEMPORARY SITE BANNERS

PLAN VIEW

LOCATION SHOWN ON EXHIBIT B.

TEMPORARY SITE SIGNAGE

TEMPORARY CONSTRUCTION SIGN
(AS SPEC'D 10300)

**buybuy BABY. COMING SOON!**
CORNER STYLE TEMPORARY VINYL

CORNER STYLE

BANNER STYLE TEMPORARY VINYL

BANNER STYLE

NOTE:
- VINYL TO BE RED (PMS 187 OR EQUIVALENT) BACKGROUND WITH WHITE LETTERS IN A SIMILAR FONT AS SHOWN.
- TENANT'S DESIGNATED VENDOR TO PROVIDE, INSTALL AND REMOVE AS REQUIRED BY buBABY.
- TENANT TO APPROVE THE STYLE (BANNER, CORNER, ETC) AND LANDLORD PROVIDED RENDERING FOR EACH PANEL LOCATED ON PYLON, MONUMENT OR OTHER SIGN PANEL STRUCTURE.
- TENANT TO DETERMINE PHRASE (COMING SOON, NOW OPEN, ETC) ON TEMPORARY VINYL.
- VINYL TO BE 3M NON STICK VINYL, OR EQUIVALENT. NO LASTING RESIDUE OR MARKS AFTER THE VINYL IS REMOVED.

TEMPORARY NON STICK VINYL GRAPHIC

TEMPORARY SIGNAGE AS ALLOWED BY CODE.

**buybuy BABY. COMING SOON!**
You don't have to wait 9 months
SIDE A
12'-0" x 8'-0" DOUBLE SIDED BANNER

**buybuy BABY. GRAND OPENING!**
SIDE B

TEMPORARY BUILDING SIGN
(REFER TO EXHIBIT D-1 FOR LOCATION ON BUILDING)

**buybuy BABY. SHOP ON-LINE @** buybuybaby.com
SIDE A
12'-0" x 8'-0" DOUBLE SIDED BANNER

**buybuy BABY. NOW OPEN!**
SIDE B

TEMPORARY BUILDING SIGN
(REFER TO EXHIBIT D-1 FOR LOCATION ON BUILDING)

**buybuy BABY. NOW HIRING** 1-888-GO-BABY-9
12'-0" x 8'-0" DOUBLE SIDED BANNER

TEMPORARY SIGN
(TENANT'S HIRING TRAILER)

COLORS:

RED = Pantone 166C
BLUE = Pantone 281C
GRAY = Pantone 30% Black

EXHIBIT F (8 OF 8)
buy buy BABY
WEST HARTFORD, CT
DATE: 02/24/2017

Exhibit G

Subordination, Non-Disturbance and Attornment Agreement

**THIS   SUBORDINATION,   NON-DISTURBANCE   AND   ATTORNMENT AGREEMENT** (this "**Agreement**") is made as of the [___] day of [_____], 201[__] by and between Wells Fargo Bank, National Association (i) as trustee for the holders of J.P. Morgan Chase Commercial Mortgage Securities Trust 2015-SGP, Commercial Mortgage Pass-Through Certificates, Series 2015-SGP (as successor-in-interest to JPMorgan Chase Bank, National Association, a national banking association ("**JPM**")) and (ii) as collateral agent for JPM and H/2 SO III Funding I LLC, a Delaware limited liability company ("**H/2 SO III**"), as co-lenders (together with their respective successors and assigns, the "**Co-Lenders**") pursuant to the Co-Lender Agreement dated as of July 7, 2015 (as amended from time to time, the "**Co-Lender Agreement**") (together with its successors and assigns, including any party that acquires the Property by foreclosure, conveyance in lieu of foreclosure or similar transaction and any subsequent owner of the Property, "**Lender**"), Seritage SRC Finance LLC (**"Landlord"**) and Bed Bath & Beyond Inc., having an address at 650 Liberty Avenue, Union, New Jersey 07039 ("**Tenant**").

## RECITALS:

A.     Lender has agreed to make a loan in the approximate amount of $[_____] to Landlord, which Loan will be given pursuant to the terms and conditions of a Loan Agreement between Lender and Landlord (the "**Loan Agreement**") and will be evidenced by certain promissory notes given by Landlord to Lender (collectively, the "**Note**") and secured by a certain mortgage, deed of trust or similar security instrument given by Landlord to Lender (the "**Mortgage**"), encumbering the fee estate of Landlord in certain premises described in Exhibit A attached hereto (the "**Property**") (the Loan Agreement, Note, Mortgage and other documents securing the loan, the "**Loan Documents**");

B.     Tenant occupies a portion of the Property under and pursuant to the provisions of a certain lease dated [_____, ___] between Landlord, as landlord, and Tenant, as tenant (the "**Lease**"); and

C.     Tenant has agreed to subordinate the Lease to the Mortgage and to the lien thereof and Lender has agreed to grant non-disturbance to Tenant under the Lease on the terms and conditions hereinafter set forth.

## AGREEMENT:

For good and valuable consideration, Tenant and Lender agree as follows:

1.     Subordination.   Subject to the terms and conditions of this Agreement, Tenant agrees that the Lease and all of the terms, covenants and provisions thereof and all rights, remedies and options of Tenant thereunder are and shall at all times continue to be subject and subordinate in all respects to the Mortgage and to the lien thereof and all terms, covenants and conditions set forth in the Mortgage and the other Loan Documents including without limitation all renewals, increases, modifications, spreaders, consolidations, replacements and extensions thereof and to all sums secured thereby with the same force and effect as if the Mortgage and the other Loan Documents had been executed, delivered and (in the case of the Mortgage) recorded prior to the execution and delivery of the Lease.

2.     Non-Disturbance.   Lender agrees that if any action or proceeding is commenced by Lender for the foreclosure of the Mortgage or the sale of the Property, Tenant shall not be named as a party therein unless such joinder shall be required by law, provided, however, such joinder shall not result in the termination of the Lease or disturb the Tenant's possession or use of the premises demised thereunder, and the sale of the Property in any such action or proceeding shall be made subject to all rights of Tenant under the Lease except as set forth in Section 3 below, provided that at the time of the commencement of any such action or proceeding or at the time of any such sale or exercise of any such other rights (a) the Lease shall be in full force and effect and (b) Tenant shall not then be in default under any of the terms,

covenants or conditions of the Lease or of this Agreement on Tenant's part to be observed or performed beyond the expiration of any applicable notice or grace periods.

3.       Attornment. Lender and Tenant agree that upon the conveyance of the Property by reason of the foreclosure of the Mortgage or the acceptance of a deed or assignment in lieu of foreclosure or otherwise, the Lease shall not be terminated or affected thereby (at the option of the transferee of the Property (the "**Transferee**") only if the conditions set forth in Section 2 above have not been met at the time of such transfer) but shall continue in full force and effect as a direct lease between the Transferee and Tenant upon all of the terms, covenants and conditions set forth in the Lease and in that event, Tenant agrees to attorn to the Transferee and the Transferee shall accept such attornment and be bound to Tenant under the Lease; however, the Transferee shall not be (a) obligated to complete any construction work required to be done by Landlord pursuant to the provisions of the Lease or to reimburse Tenant for any construction work done by Tenant, provided that Tenant shall have all of its rights and remedies under the Lease by reason of such non-completion or failure to reimburse, (b) liable (i) for Landlord's failure to perform any of its obligations under the Lease which have accrued prior to the date on which the Transferee shall become the owner of the Property, unless such failure continues from and after the date upon which the Transferee becomes owner of the Property, (ii) for any act or omission of Landlord, whether prior to or after such foreclosure or sale, unless such act or omission continues from and after the date upon which the Transferee becomes owner of the Property, (c) required to make any repairs to the Property or to the premises demised under the Lease required as a result of fire, or other casualty or by reason of condemnation unless the "Landlord" under the Lease shall be obligated to make such repairs, (d) subject to any offsets, defenses, abatements or counterclaims which shall have accrued to Tenant against Landlord prior to the date upon which the Transferee shall become the owner of the Property, provided that (A) the foregoing shall not lessen or diminish Tenant's rights  as to offsets, defenses, abatements or counterclaims which accrue to Tenant from and after the date upon which the Transferee becomes owner of the Property, and (B) offsets under the Lease that were deducted by Tenant prior to the date upon which the Transferee succeeds to the interest of Landlord shall not be subject to challenge); (f) liable for the return of rental security deposits, if any, paid by Tenant to Landlord in accordance with the Lease unless such sums are actually received by the Transferee, (g) bound by any payment of rents, additional rents or other sums which Tenant may have paid more than one (1) month in advance to any prior Landlord (except that the foregoing shall not apply to the extent such additional rent is paid in accordance with the applicable provisions of the Lease) unless (i) such sums are actually received by the Transferee or (ii) such prepayment shall have been expressly approved of by the Transferee, (h) bound by any agreement amending, modifying or terminating the Lease made without the Lender's prior written consent prior to the time the Transferee succeeded to Landlord's interest; notwithstanding the foregoing, Lender acknowledges that the Lease specifically provides for amendments thereof upon the occurrence of certain events described in the Lease (such as, for example, an amendment to the Lease confirming the measurement of the Premises), and, by its execution below, Lender agrees to recognize such amendments as part of the Lease, and Lender further agrees that such Transferee shall also be bound by such amendment(s) to the Lease, without any consent on the part of Mortgagee or such Transferee; or (j) bound by any assignment of the Lease or sublease of the Property, or any portion thereof, made prior to the time the Transferee succeeded to Landlord's interest other than if pursuant to the provisions of the Lease. Notwithstanding anything contained in this Agreement, all condemnation awards and insurance proceeds paid or payable with respect to the Property or any other part of the Shopping Center shall be applied and paid in the manner set forth in the Lease.

4.       Notice to Tenant. After notice is given to Tenant by Lender that the Landlord is in default under the Loan Documents and that the rentals under the Lease should be paid to Lender pursuant to the terms of the assignment of leases and rents executed and delivered by Landlord to Lender in connection therewith, Tenant shall thereafter pay to Lender or as directed by the Lender, all rentals and all other monies due or to become due to Landlord under the Lease and Landlord hereby expressly authorizes Tenant to make such payments to Lender and hereby releases and discharges Tenant from any liability to Landlord on account of any such payments.

5.       Lender's Consent. Tenant shall not, without obtaining the prior written consent of Lender, (a) enter into any agreement amending, modifying or terminating the Lease, unless such amendment, modification or termination is otherwise permitted under the terms and

conditions of the Lease, (b) prepay any of the rents, additional rents or other sums due under the Lease for more than one (1) month in advance of the due dates thereof, unless such additional rent is paid in accordance with the applicable provisions of the Lease; or (c) voluntarily surrender the premises demised under the Lease or terminate the Lease without cause or shorten the term thereof, or (d) assign the Lease or sublet the premises demised under the Lease or any part thereof other than pursuant to the provisions of the Lease; and any such amendment, modification, termination, prepayment, voluntary surrender, assignment or subletting not otherwise permitted under the terms and conditions of the Lease that is effected without Lender's prior consent shall not be binding upon Lender.

6.      Lender to Receive Notices.  Tenant shall provide Lender with copies of all written notices sent to Landlord pursuant to the Lease simultaneously with the transmission of such notices to the Landlord. Tenant shall notify Lender of any default by Landlord under the Lease which would entitle Tenant to cancel the Lease or to an abatement of the rents, additional rents or other sums payable thereunder, and agrees that, notwithstanding any provisions of the Lease to the contrary, no notice of cancellation thereof or of such an abatement shall be effective unless Lender shall have received notice of default giving rise to such cancellation or abatement and shall have failed to cure such default within ten (10) days following expiration of the applicable notice and cure period applicable to Landlord in accordance with the terms and conditions of the Lease.

7.      Notices.  Any notices of communications given under this Agreement shall be in writing and shall be given by registered or certified mail, return receipt requested, or by any recognized overnight mail carrier, with proof of delivery slip, postage prepaid, as follows:

If to Tenant:    [ _____ ]
[ _____ ]
[ _____ ]
Attention:  [ _____ ]
Facsimile No.:  [ _____ ]

If to Lender:   Wells Fargo Bank, N.A.
9062 Old Annapolis Road
Columbia, Maryland 21045
Attention: Corporate Trust Services – JPMorgan Chase, 2015-SGP
Facsimile: 410-715-2380
Email: trustadministrationgroup@wellsfargo.com and
cts.cmbs.bond.admin@wellsfargo.com

and     Berkadia Commercial Mortgage LLC
323 Norristown Road, Suite 300
Ambler, Pennsylvania 19002
Attention: Executive Vice President – Servicing Operations
Facsimile: (215) 328-3478

and:    Strategic Asset Services LLC
375 Park Avenue, 20th Floor
New York, New York 10152
Attention: Primary Servicing Operations – JPM 2015-SGP
Telephone: (212) 671-6300
Facsimile: (212) 671-6368

or addressed as such party may from time to time designate by written notice to the other parties. All notices given in accordance with the provisions of this Section shall be effective upon receipt (or refusal of receipt) at the address of the addressee.

Either party by notice to the other may designate additional or different addresses for subsequent notices or communications.

8.      Joint and Several Liability.  If Tenant consists of more than one person, the obligations and liabilities of each such person hereunder shall be joint and several. This Agreement shall be binding upon and inure to the benefit of Lender and Tenant and their respective successors and assigns.

9.      Definitions.    The term "Lender" as used herein shall include the successors and assigns of Lender and any person, party or entity which shall become the owner of the Property by reason of a foreclosure of the Mortgage or the acceptance of a deed or assignment in lieu of foreclosure or otherwise.  The term "Landlord" as used herein shall mean and include the present landlord under the Lease and such landlord's predecessors and successors in interest under the Lease, but shall not mean or include Lender unless Lender succeeds to the right, title and interest of Landlord under the Lease.  The term "Property" as used herein shall mean the Property, the improvements now or hereafter located thereon and the estates therein encumbered by the Mortgage.

10.      No Oral Modifications.   This Agreement may not be modified in any manner or terminated except by an instrument in writing executed by the parties hereto.

11.      Governing Law.   This Agreement shall be deemed to be a contract entered into pursuant to the laws of the State where the Property is located and shall in all respects be governed, construed, applied and enforced in accordance with the laws of the State where the Property is located.

12.      Inapplicable Provisions.    If any term, covenant or condition of this Agreement is held to be invalid, illegal or unenforceable in any respect, this Agreement shall be construed without such provision.

13.      Duplicate Originals; Counterparts.   This Agreement may be executed in any number of duplicate originals and each duplicate original shall be deemed to be an original. This Agreement may be executed in several counterparts, each of which counterparts shall be deemed an original instrument and all of which together shall constitute a single Agreement. The failure of any party hereto to execute this Agreement, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

14.      Number and Gender.   Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

15.      Transfer of Loan.   Lender may sell, transfer and deliver the Note and assign the Mortgage, this Agreement and the other documents executed in connection therewith to one or more investors in the secondary mortgage market ("**Investors**"). In connection with such sale, Lender may retain or assign responsibility for servicing the loan, including the Note, the Mortgage, this Agreement and the other documents executed in connection therewith, or may delegate some or all of such responsibility and/or obligations to a servicer including, but not limited to, any subservicer or master servicer, on behalf of the Investors.  All references to Lender herein shall refer to and include any such servicer to the extent applicable.

16.      Further Acts.   Tenant will, at the cost of Tenant, and without expense to Lender, do, execute, acknowledge and deliver all and every such further acts and assurances as Lender shall, from time to time, reasonably require, for the better assuring and confirming unto Lender the property and rights hereby intended now or hereafter so to be, or for carrying out the intention or facilitating the performance of the terms of this Agreement or for filing, registering or recording this Agreement, or for complying with all applicable laws, subject to the terms and conditions of the Lease.

17.      Limitations on Lender's Liability.  Tenant acknowledges that Lender is obligated only to Landlord to make the Loan upon the terms and subject to the conditions set forth in the Loan Documents.  In no event shall Lender or any purchaser of the Property at foreclosure sale or any grantee of the Property named in a deed-in-lieu of foreclosure, nor any heir, legal representative, successor, or assignee of Lender or any such purchaser or grantee (collectively the Lender, such purchaser, grantee, heir, legal representative, successor or assignee, the "**Subsequent Landlord**") have any personal liability for the obligations of Landlord under the Lease and should the Subsequent Landlord succeed to the interests of the

Landlord under the Lease, Tenant shall look only to the estate and property of any such Subsequent Landlord in the Property for the satisfaction of Tenant's remedies for the collection of a judgment (or other judicial process) requiring the payment of money in the event of any default by any Subsequent Landlord as landlord under the Lease, and no other property or assets of any Subsequent Landlord shall be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies under or with respect to the Lease; provided, however, that the Tenant may exercise any other right or remedy provided thereby or by law in the event of any failure by Subsequent Landlord to perform any such material obligation.

**IN WITNESS WHEREOF**, Lender and Tenant have duly executed this Agreement as of the date first above written.

**LENDER:**

**WELLS FARGO BANK, NATIONAL ASSOCIATION, (i) AS TRUSTEE FOR THE HOLDERS OF J.P. MORGAN CHASE COMMERCIAL MORTGAGE SECURITIES TRUST 2015-SGP, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2015- SGP and (ii) AS COLLATERAL AGENT FOR THE CO-LENDERS UNDER THE CO-LENDER AGREEMENT**

By:     Strategic Asset Services LLC, as Primary Servicer

By: _____
Name:
Title:

By: _____
Name:
Title:

**TENANT:**

**BED BATH & BEYOND INC., a New York corporation**

By: _____
Name:
Title:

The undersigned accepts and agrees to the provisions of Section 4 hereof:

**LANDLORD:**

**SERITAGE SRC FINANCE LLC,
a Delaware limited liability company**

By: _____
Name:
Title:

## ACKNOWLEDGMENTS

STATE OF        )
                    ) SS.
COUNTY OF     )

On _____, 20__, before me, _____, personally appeared _____ personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Signature_____

FOR NOTARY STAMP

_____
          Notary Public

My Commission Expires:

STATE OF                    )
                           )    SS.
COUNTY OF                  )

On _____, 20__, before me, _____, personally
appeared _____ personally known to me (or proved to
me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to
the within instrument and acknowledged to me that he/she/they executed the same in
his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the
person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Signature_____

FOR NOTARY STAMP

_____
             Notary Public

My Commission Expires:

STATE OF                )
                        )   SS.
COUNTY OF               )

On _____, 20__, before me, _____, personally
appeared _____ personally known to me (or proved to
me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to
the within instrument and acknowledged to me that he/she/they executed the same in
his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the
person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Signature_____

FOR NOTARY STAMP

_____
            Notary Public

My Commission Expires:

1
2
3
4

5

6

7

<u>EXHIBIT A</u>
LEGAL DESCRIPTION

1        Exhibit H

2        Recognition Agreement

3        THIS RECOGNITION AGREEMENT, made as of the _____ day of _____, 201__, by and
4        between _____, a [_____] [corporation] [limited] [general]
5        [partnership], having an address at _____
6        ("*Landlord*"); BED BATH & BEYOND INC., a New York corporation, having an address at
7        650 Liberty Avenue, Union, New Jersey 07083 ("*Tenant*"); and
8        _____, a [_____] [corporation] [limited] [general]
9        [partnership], having an address at _____
10       ("*Subtenant*").

11                        R E C I T A L S:

12       A.        Landlord and Tenant have entered into a certain lease (the "*Lease*") dated as of
13       _____ __, 201__, a short form of which has been recorded in _____,
14       which demises certain premises (the "Premises") located in the _____ Shopping
15       Center, West Hartford, Connecticut, which Shopping Center is more particularly described on
16       Exhibit A annexed hereto and made a part hereof.

17       B.        Section 15.5 of the Lease provides that in the event Tenant subleases all or a portion of
18       the Premises for a term of at least five (5) years, Landlord shall, upon Tenant's request, execute
19       and deliver a Recognition Agreement among Landlord, Tenant and each such subtenant in the
20       form attached to the Lease, in recordable form.

21       C.        Pursuant to a Sublease dated as of _____ (the "*Sublease*"), Tenant has
22       subleased [a portion of] the Premises to Subtenant (the "*Subleased Premises*").

23       D.        The parties hereto desire to effectuate the provisions of Section 15.5 of the Lease with
24       respect to the Sublease and the Subleased Premises.

25       NOW, THEREFORE, in consideration of the mutual covenants and agreements herein
26       contained, the parties hereto, intending to be legally bound hereby, agree as follows:

27       1.        Landlord warrants and represents as follows:

28       (a)       that it is the fee owner of the Premises,

29       (b)       that the Lease is unmodified (except as may be otherwise set forth in Exhibit B annexed
30       hereto, if any) and is in full force and effect,

31       (c)       that the term of the Lease expires on _____, but is subject to [four] renewal
32       periods of [five] years each and

33       (d)       that Tenant is not in default under the Lease nor has any event occurred which would
34       after notice to Tenant and the passage of time become a default of Tenant under the Lease.

35       2.        Landlord hereby acknowledges receipt of a copy of, and consents to and approves, the
36       Sublease and all of the terms, covenants and provisions thereof, and agrees that the exercise by
37       Subtenant of any of its rights, remedies and options contained therein shall not constitute a
38       default under the Lease.

39       3.        Landlord agrees that whenever it has an obligation with respect to the Premises, or its
40       consent or approval is required for any action of Tenant under the Lease, then, to the extent such
41       obligation, consent or approval relates to the Subleased Premises or Subtenant's use and
42       occupation thereof, it will perform such obligation in accordance with the terms and conditions
43       of the Lease, and, subject to the applicable terms of the Lease, will not unreasonably withhold or
44       unduly delay such consent or approval.

45       4.        Landlord shall not, in the exercise of any of the rights arising or which may arise out of
46       the Lease or of any instrument modifying or amending the same or entered into in substitution or
47       replacement thereof (whether as a result of Tenant's default or otherwise), disturb or deprive
48       Subtenant in or of its possession or its rights to possession of the Subleased Premises or of any

H-1

right or privilege granted to or inuring to the benefit of Subtenant under the Sublease, provided
that Subtenant is not in default under the Sublease beyond the expiration of any applicable notice
and cure period.

5.      In the event of the termination of the Lease by reentry, notice, conditional limitation,
surrender, summary proceeding or other action or proceeding, or otherwise, or, if the Lease shall
terminate or expire for any reason before any of the dates provided in the Sublease for the
termination of the initial or renewal terms of the Sublease and if immediately prior to such
surrender, termination or expiration the Sublease shall be in full force and effect, Subtenant shall
not be made a party in any removal or eviction action or proceeding nor shall Subtenant be
evicted or removed of its possession or its right of possession of the Subleased Premises be
disturbed or in any way interfered with, and the Sublease shall continue in full force and effect as
a direct lease between Landlord and Subtenant (provided, that in such event, Subtenant shall, for
the then remainder of the term of the Sublease, pay fixed rent and additional rent in an amount
equal to the greater of (x) the Fixed Rent and additional rent then payable under the Lease,
prorated on the basis of the ratio which the Floor Area of the Subleased Premises bears to the
Floor Area of the Premises, or (y) the fixed rent and additional rent then payable under the
Sublease).

6.      Landlord hereby waives and relinquishes any and all rights or remedies against
Subtenant, pursuant to any lien, statutory or otherwise, that it may have against the property,
goods or chattels of Subtenant in or on the Subleased Premises.

7.      Any notices, consents, approvals, submissions, demands or other communications
(hereinafter collectively referred to as "Notice") given under this Agreement shall be in writing.
Unless otherwise required by law or governmental regulation, Notices shall be deemed given if
sent by registered or certified mail, return receipt requested, or by any recognized overnight mail
carrier, with proof of delivery slip, postage prepaid (a) to Landlord, at the address of Landlord as
hereinabove set forth or such other address or persons as Landlord may designate by Notice to
the other parties hereto, (b) to Tenant, at the address of Tenant as hereinabove set forth, with
duplicate copies to General Counsel, c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union,
New Jersey 07083, and Thomas J. Phillips, Esq., Brown Rudnick LLP, One Financial Center,
Boston, Massachusetts 02111or such other address or persons as Tenant may designate by Notice
to the other parties hereto, and (c) to Subtenant, at the address of Subtenant as hereinabove set
forth or such other address or persons as Subtenant may designate by Notice to the other parties
hereto.  During the period of any postal strike or other interference with the mails, personal
delivery shall be substitute for registered or certified mail.  All Notices shall become effective
only on the receipt or rejection of same by the proper parties.

8.      No modification, amendment, waiver or release of any provision of this Agreement or of
any right, obligation, claim or cause of action arising hereunder shall be valid or binding for any
purpose whatsoever unless in writing and duly executed by the party against whom the same is
sought to be asserted.

[Signature Page Follows]

1    9.     This Agreement shall be binding on and shall inure to the benefit of the parties hereto and
2    their respective heirs, legal representatives, successors, assigns and sublessees.

3    IN WITNESS WHEREOF, the parties have caused this Recognition Agreement to be executed
4    under seal the date first above written.

**LANDLORD:**

SERITAGE SRC FINANCE LLC, a Delaware
limited liability company

By:_____
Name:_____
Title:_____

**TENANT:**

BED BATH & BEYOND INC., a New York
corporation

By:_____
Name:  Steven H. Temares
Title:    Chief Executive Officer

**SUBTENANT:**

_____

By:_____
Name:_____
Title:_____

5

1    **[INSERT APPROPRIATE JURATS FOR <u>LANDLORD</u> AND <u>SUBTENANT</u>]**

2    STATE OF NEW JERSEY          )
3                                 ) : ss.
4    COUNTY OF UNION              )

5    On this ___ day of _____, 201__, before me personally came Steven H. Temares to me
6    known, who being by me duly sworn, did depose and say that he is the Chief Executive Officer
7    of Bed Bath & Beyond Inc., the corporation described in and which executed the above
8    instrument and that he signed his name thereto by order of the Board of Directors of said
9    corporation.

10   _____
11   Notary Public
12   My Commission Expires:
13
14
15   _____

Exhibit I

DELIVERY DATE NOTICE

[Letterhead of Landlord]

_____, 201__

[via Federal Express or other
recognized overnight delivery
service per Article 18 of the foregoing
lease]

BED BATH & BEYOND INC.
650 Liberty Avenue
Union, NJ 07083
Attn: Warren Eisenberg

Re:    Agreement of Lease, dated _____, 201__ (the "*Lease*"), between SERITAGE SRC
FINANCE LLC, as landlord ("*Landlord*"), and BED BATH & BEYOND INC., as tenant
("*Tenant*"), with respect to certain retail premises (the "*Premises*") located in West Hartford,
Connecticut.

Gentlemen:

In accordance with the provisions of Subsection 2.3.2 of the Lease, the Landlord hereby informs
the Tenant that the Delivery Date shall take place at 8:00 A.M. on _____, 201__.  This
notice shall constitute the Delivery Date Notice referred to in Subsection 2.3.2 of the Lease.

SERITAGE SRC FINANCE LLC


By:_____

cc:    [Thomas J. Phillips, Esq.]
[General Counsel]

I-1

1      Exhibit J

2      DELIVERY DATE CERTIFICATION

3      [Letterhead of Landlord]

4      _____, 201__

5      [via Federal Express or other
6      recognized overnight delivery
7      service per Article 18 of the foregoing
8      lease]

9      BED BATH & BEYOND INC.
10      650 Liberty Avenue
11      Union, NJ 07083
12      Attn: Warren Eisenberg

13      Re:    Agreement of Lease, dated _____, 201__ (the "**Lease**"), between SERITAGE SRC
14      FINANCE LLC, as landlord ("**Landlord**"), and BED BATH & BEYOND INC., as tenant
15      ("**Tenant**"), with respect to certain retail premises (the "**Premises**") located in the
16      _____ Shopping Center, West Hartford, Connecticut.

17      Gentlemen:

18      In accordance with the provisions of Subsection 2.3.3 of the Lease, Landlord hereby certifies to
19      Tenant that, as of the date of this certification, all of the Delivery Date Conditions (as defined in
20      the Lease) have been satisfied, and that, as a result, the Delivery Date (as such term is defined in
21      the Lease) will be deemed to be _____, 20__. This notice shall constitute the Delivery
22      Date Certification referred to in Subsection 2.3.3 of the Lease.

23      SERITAGE SRC FINANCE LLC
24
25
26      By:_____
27
28

29      cc:    [Thomas J. Phillips, Esq.]
30      [General Counsel]

Exhibit K-1

Existing Exclusives and Existing Use Restrictions

Capitalized terms below have the meanings ascribed thereto in the applicable leases and may not match the definitions of this Lease.

**EXISTING EXCLUSIVES:**

SHAKE SHACK EXCLUSIVE:

Provided (i) this Lease is in full force and effect, (ii) Tenant is in possession of the Demised Premises and, from and after the Rent Commencement Date, is open and operating same principally for the sale of hamburgers, hot dogs, French fries and custard, and (iii) Tenant is not in Default under this Lease beyond any applicable notice and cure period, then and in such event Landlord agrees that, from and after the execution of this Lease, it will not enter into a lease or other occupancy right of other space within the Landlord's Parcel which expressly authorizes or permits as a primary use the sale of hamburgers, hot dogs, French fries and custard within a single tenant premises (the "Exclusive Covenant"). For purposes of the foregoing, the term "primary use" shall mean forty percent (40%) or more of Gross Sales, in the aggregate, for the sale of hamburgers, hot dogs, French fries and custard within a single tenant premises. Furthermore, Landlord agrees that the Exclusive Covenant shall include a prohibition by Landlord not to lease space or give any occupancy right within the Landlord Parcel to directly competing concepts, such as but not limited to 5 Napkin Burger, Better Burger, BLT Burger, Bobby's Burger Palace, Burger Joint, The Habit, Umami Burger, Five Guys, In-N-Out, Johnny Rockets, Hopdoddy, Burger Fi, Zinburger, Smashburger, Tasty Made and The Stand. The Exclusive Covenant shall be subject to the rights of tenants under existing leases at the Landlord's Parcel as set forth on Exhibit E-1 annexed hereto.

[Capitalized terms used in the above shall have the meanings given in that certain Lease dated as of November 9, 2016 (as amended, the "**Shake Shack Lease**") between Landlord and Shake Shack Connecticut LLC ("**Shake Shack**").]

REI EXISTING EXCLUSIVE:

During the Term of this Lease, Landlord covenants that it shall not permit any tenant in the Landlord Parcel, other than [REI], to operate any business primarily engaged in the sale of outdoor gear, equipment, footwear or clothing associated with hiking, camping, climbing, cycling, skiing, snowboarding and/or paddling ("Exclusive Use"). Notwithstanding the preceding to the contrary, Tenant's Exclusive Use rights shall not apply to (i) the general retail sale of footwear and/or men's, women's and children's apparel by other occupants of the Landlord Parcel so long as any such occupant is not primarily engaged in the sale of apparel and/or footwear associated with hiking, camping, climbing, cycling, skiing/snowboarding and/or paddling; or (ii) existing occupants under existing leases set forth in Exhibit M attached hereto and such occupants' successors and assigns (the "Existing Occupants").

2

[Capitalized terms used in the above shall have the meanings given in that certain Lease dated as of October 31, 2016 (as amended, the "**REI Lease**") between Landlord and Recreational Equipment, Inc. ("**REI**").]

OLIVE GARDEN EXISTING EXCLUSIVE:

During the Term of this Lease, Landlord will not permit any property owned by Landlord within the area identified on Exhibit A attached hereto as the Protected Area to be used or conveyed for use as a restaurant that features Italian food. Features, for the purpose of this provision, means that such items are identifiable as major menu items in terms of sales volume or public identification. This covenant will run with land and may be recorded as necessary to provide notice to others. This restriction will not apply to the following circumstances:

(a)     the sale of unprepared foods intended for off premises consumption; or
(b)     if the Tenant under the Olive Garden Lease is in default beyond any applicable cure period; or
(c)     if the Tenant under the Olive Garden Lease shall cease operating its restaurant on the Premises for a continuous period of 18 consecutive months.

During the Term of this Lease, the portion of the Development Property identified on Exhibit C attached hereto, and identified as the "Protected Area' on Exhibit A attached hereto, shall not be modified or used for the construction of any building or other structure without the prior written consent of the Tenant under the Olive Garden Lease, which consent may be withheld by the Tenant under the Olive Garden Lease to the extent the Tenant under the Olive Garden Lease, in its reasonable discretion reasonably believes that such modification or construction shall materially adversely affect access to, parking for or the visibility of the Permitted Use (as defined in the Olive Garden Lease), or which shall for some other reason materially adversely affect the Permitted Use.

[Capitalized terms used in the above shall have the meanings given in that certain Ground Lease dated as of November 5, 2003 (as amended, the "**Olive Garden Lease**"), between Landlord (as successor in interest) and GMRI, Inc. ("**Olive Garden**")]

EXHIBIT A TO EXHIBIT D
(as referenced in the Olive Garden Existing Exclusive)

3



**OVERALL SITE DETAIL**
SCALE: 1"=150'

*Exhibit A*

EXHIBIT C TO EXHIBIT D
(as referenced in the Olive Garden Existing Exclusive)

4

BEGINNING at a point '' the southerly line of New Britain Avenue
t the intersection t. .eof with the division line between the
ands now or formerly of Maude Chatfield Gerth, on the east,
nd the premises herein described; running thence westerly and
outherly along the southerly, southeasterly and easterly sides
f said New Britain Avenue as follows:

esterly along New Britain Avenue on a course to the left, the
adius of which is 1166.6 feet, the central angle of which is 10
egrees 00 minutes 07 seconds and the chord of which is 203.39
eet a distance of 203.65 feet, said chord making an interior
ngle with the last mentioned course herein of 57 degrees 34 minutes
0 seconds to a West Hartford Highway boundstone;

unning thence westerly still along New Britain Avenue, at an interior
ngle of 174 degrees 59 minutes 57 seconds with the last described
hord, a distance of 624.98 feet to a West Hartford Highway bound-
tone;

unning thence westerly still along New Britain Avenue on a curve
o the left, the radius of which is 912.47 feet, the central
ngle of which is 3 degrees 0, minutes .. seconds and the chord
f which is 49.29 feet, a distance of 49.29 feet, said chord
aking an interior angle with the last described course of 178
egrees 27 minutes 10 seconds, t. a West Hartford Highway bound-
tone;

unning thence westerly still along New Britain Avenue at an
nterior angle of 178 degrees 27 minutes 10 seconds with the
ast described chord, a distance of 44.33 feet to a highway
arker;

unning thence southwesterly still along New Britain Avenue at
n interior angle of 145 degrees 08 minutes 20 seconds with the
ast described course a distance of 141.87 feet to a highway
arker;

unning thence southwesterly still along New Britain Avenue on
 curve to the right, the radius of which is 200 feet, a distance

 236 feet to a highway marker;
nning thence southwesterly still along New Britain Avenue 142.10
et to a highway marker;
nning thence southerly still along New Britain Avenue on a curve
 the left, the radius of which is 912.47 feet, the central angle
 which is 9 degrees 11 minutes 34 seconds a distance of 146.40
et, the chord of which makes an interior angle of 145 degrees 25
nutes with the last mentioned course, to a highway marker;
nning thence southerly still along New Britain Avenue at an
terior angle of 166 degrees 48 minutes with the chord of the last
scribed line, a distance of 193.35 feet;
nning thence easterly along other land of the grantor on a straight
e forming an interior angle of 88 degrees 33 minutes 32 seconds
th the last mentioned course a distance of 583.44 feet;
nning thence northerly along said other land of the grantor on a
aight line forming an interior angle of 91 degrees 45 minutes
 seconds with the last mentioned course a distance of 95 feet;
ning thence easterly along said other land of the grantor at
ght angles to the last mentioned course a distance of 415.67 feet;
ning thence northerly along land now or formerly of Suburban
elopment Corp. along a line forming an interior angle of 97
rees 02 minutes 51 seconds with the last mentioned course a
tance of 366.84 feet;
ning thence still northerly along land now or formerly of
de Chatfield Gerth along a line forming an interior angle of
 degrees 14 minutes 53 seconds with the last mentioned course
tance of 126.26 feet;                RECEIVED DEC 16 20..
ning thence still northerly along land now or formerly of Maude
tfield Gerth along a line forming an interior angle of 86 degrees
minutes .. seconds with the last mentioned course a distance of

5

**EXISTING USE RESTRICTIONS:**

**REI PROHIBITED USES:**

Neither the [REI] Premises nor any portion of or premises in the Landlord Parcel shall be used for the operation of the following:

1. bowling alley or skating rink, provided, however, the foregoing shall not prohibit a quality bowling alley or entertainment facility featuring bowling as one of its uses, such as, by way of example and not of limitation, Lucky Strike or Bowlmor, so long as the main customer entrance to any such facility is located at least one hundred twenty-five (125) lineal feet from the main customer entrance to the [REI] Premises (as measured along the outside wall of the Building) or within the current location of the Sears Auto Center;

2. pool hall, sports or entertainment facility, bingo parlor, off track betting or other gambling facility; provided, however, the foregoing shall not prohibit a children's fitness and recreational center or quality entertainment facilities, such as, by way of example and not of limitation, Dave and Busters or Jillian's, so long as the main customer entrance to any such facility is located at least one hundred twenty-five (125) lineal feet from the main customer entrance to the [REI] Premises (as measured along the outside wall of the Building) or within the current location of the Sears Auto Center;

3. video or pinball arcade, or amusement arcades or game rooms, or amusement centers; provided, however, the foregoing shall not prohibit such uses within quality entertainment facilities and bowling facilities, so long as the main customer entrance to such facility is located at least one hundred twenty-five (125) lineal feet from the main customer entrance to the [REI] Premises (as measured along the outside wall of the Building) or within the current location of the Sears Auto Center, and retail facilities may operate video games incidentally to their primary use;

4. carnivals or fairs;

5. any tavern or bar (except as incidental to a restaurant, the primary business of which is the sale of food for on premises consumption), or any establishment whose primary business purpose is the sale or dispensing of alcoholic beverages (but the sale of alcoholic beverages incidental to the operation of another retail business is not prohibited by this restriction); provided, however, the foregoing shall not prohibit quality liquor stores such as, by way of example and not of limitation, BevMo! or Total Wine & More, so long as the main customer entrance to any such facility is located at least one hundred twenty-five (125) lineal feet from the main customer entrance to the [REI] Premises (as measured along the outside wall of the Building) or within the current location of the Sears Auto Center;

6. any karate, health club, fitness facility, spa or gymnasium larger than 35,000 square feet (except climbing gym);

7. any night club, discotheque or dance hall;

8. any flea market, secondhand or surplus store, but a store selling antiques or estate jewelry in a first class manner shall be permitted;

9. any mobile home park or trailer court, or any living quarters, sleeping apartments or lodging rooms;

10. any dumping, disposing, incineration or reduction of garbage (exclusive of appropriate screened dumpsters or trash compactors);

11. any fire sale, going out of business sale, bankruptcy sale (unless pursuant to a court order) or auction house operation;

12. any central laundry or dry cleaning plant or laundromat (except that this prohibition shall not be applicable to onsite service provided solely for pick up and delivery by a retail customer, including nominal supporting facilities);

13. any automobile, truck, trailer or recreational vehicle sales, leasing, display servicing or

repair, or car wash, other than automobile services provided by any department store in connection with its operations as a retail department store; provided, however, the foregoing shall not prohibit a vehicle sales center similar to the type currently operated by Tesla in similar shopping centers;

14. any veterinary hospital or animal raising or boarding facilities, but the furnishing of veterinarian services (but not boarding of animals) in conjunction with a retail store primarily selling pets, pet food, supplies, accessories, and other pet products shall not be prohibited;

15. any funeral home or mortuary;

16. any establishment selling, renting or exhibiting pornographic materials, adult books, films, video tapes, compact discs, or computer software (which are defined as stores in which a material portion of the inventory is not available for sale or rental to children under eighteen (18) years old because such inventory deals with or depicts human sexuality), provided, this restriction shall in no event restrict the sale of any compact discs and books which are customarily sold by retail music and book stores of a type and quality typically located in first class family oriented centers in the metropolitan area in which the [REI] Premises is located;

17. the performance of any illicit sexual activity, lewd or obscene performance, including by way of illustration, but not by way of limitation, prostitution, peep shows, topless restaurants or performances and the like;

18. a news stand (but the sale of newspapers, magazines or books incidental to the operation of another business is not prohibited by this restriction);

19. any use which is illegal or a public or private nuisance, or any use which emits odors, fumes, dust, vapors, noises or sounds outside of the premises in which they are created (excluding normal venting of a food service operation), or any use which creates a fire or explosion hazard, a gun range, or any establishment which stocks, displays, sells, rents or offers, for sale or rent any merchandise or material commonly used or intended for use with or in consumption of any narcotic, dangerous drug, or other controlled substance (except for prescription drugs commonly sold by pharmacies);

20. a church, school, day care center or related religious or educational facility (provided, the foregoing shall not prohibit a learning or education facility, not to exceed 5,000 square feet, such as, by way of example and not of limitation, Kumon, Kaplan or Sylvan) or religious reading room (but the use of class rooms incidental to the operation of a permitted retail business is not prohibited by this restriction), or an auditorium, meeting hall or other place of public assembly (which restriction shall not prohibit a movie theater or cinema, presentations, book readings, puppet shows and similar activities which are incidental to a use otherwise permitted hereunder);

21. any manufacturing facility (except as incidental to the operation of a permanent retail business; i.e., a bakery or frame manufacturing shop);

22. any warehousing (except incidental to a retail operation);

23. any storage or for any assembling, distilling (provided the foregoing shall not prohibit a brew pub), refining, smelting, agricultural or mining operation; a labor camp, junk yard, or stock yard (except that this provision shall not prohibit the temporary use of construction trailers during any periods of construction, reconstruction or maintenance); or

24. any establishment selling, distributing or dispensing medical marijuana or marijuana paraphernalia.

[Capitalized terms used in the above shall have the meanings given in the REI Lease.]

**SAKS PROHIBITED USES:**

No portion of the Landlord Parcel (and only to the extent of Landlord's Contractual

Rights to control or cause to be controlled the use of the Adjacent Parcel (provided that Tenant acknowledges that Landlord does not have any such Landlord's Contractual Rights to control or cause to be controlled the use of the Adjacent Parcel as of the date hereof), no portion of the Adjacent Parcel) may be used or operated for any uses or operations which produce or are accompanied by the following characteristics:

(1) Any use causing loud noise, or obnoxious odor or other activity which shall constitute a public or private nuisance and is inconsistent with those typically found in a multi-use shopping center similar to the quality of the Shopping Center;

(2) Any unusual firing, explosion or other damaging or dangerous hazards;

(3) Any assembly, manufacturer, distillation, refining, smelting, industrial, agriculture, drilling or mining operation except that a brew pub (so long as it is an integrated part of a restaurant) shall not be prohibited by the foregoing;

(4) Any trailer court, mobile home park, lot for sale of new or used motor vehicles, labor camp, junk yard, stock yard or animal raising (other than pet shops and veterinarians);

(5) Any dumping, disposal, incineration or reduction of garbage or refuse other than handling or reducing such waste if produced in the Landlord Parcel from authorized uses and if handled in accordance with applicable Requirements;

(6) Any provision of social services;

(7) Any governmental use (including embassy or consulate use but excluding United States Post Office);

(8) Intentionally omitted;

(9) Any studios for radio, television or other media;

(10) Any amusement arcade, "bingo" parlor, game center, pool hall or billiard parlor except that Landlord shall be permitted to lease or otherwise demise space in the Landlord Parcel to operations such as a Dave and Busters which are typical to a first-class Shopping Center (subject, however, to such other limitations as are provided herein for such operations);

(11) Any tavern, brew pub, bar, or other similar establishment selling alcoholic beverages for on premises consumption unless same is an integrated part of a restaurant;

(12) Any pornographic use, which shall include, without limitation: (i) a store displaying for sale or exhibition books, magazines or other publications containing any combination of photographs, drawings or sketches of a sexual nature, which are not primarily scientific or educational; or (ii) a store offering for exhibition, sale or rental DVD's, video cassettes or other media capable of projecting, transmitting or reproducing, independently or in conjunction with another device, machine or equipment, an image or series of images, the content of which has been rated or advertised generally as NC-17 or "X" or unrated by the Motion Picture Rating Association, or any similar industry-wide rating system (it being agreed, however, that a book department selling a variety of book genres within a larger national or regional bookstore or bookstore chain shall not be deemed to be a business selling pornographic materials or a pornographic use if such book department constitutes a first-class retail establishment, but nevertheless stocks books, magazines or other materials which, viewed alone, may constitute pornography or obscene material, as long as a reasonable customer would not consider the inventory of such bookstore as a whole, as pornographic or obscene);

K-1-3

(13)    Any second-hand or surplus store, pawn shop, check-cashing store, gun shop or tattoo parlor;

(14)    Any fire sale, bankruptcy sale (unless pursuant to a court order) auction house operation, fictitious going-out-of-business sale, lost-our-lease sale or similarly advertised event;

(15)    Any hotel, motel, living quarters, sleeping apartment or lodging rooms;

(16)    Any veterinary office or hospital, animal raising or boarding facilities except if incidental to a national or regional pet store;

(17)    Any mortuary or funeral home;

(18)    Any dry cleaning or laundry plant (except for an establishment which receives and dispenses items for launder and/or dry cleaning, but the processing of such items is done elsewhere);

(19)    Any bowling alley, except that Landlord shall be permitted to lease or otherwise demise space in the Landlord Parcel for an operation such as Lucky Strike or Bowlmor which are typical to a first class Shopping Center, in the Building provided that (a) such space is located in the below grade lower level of the Building, (b) such space is not greater than 35,000 square feet in the aggregate, (c) the primary entrance to such space shall be east of the northwest corner of the Building, and (d) no entrances and/or exits (other than emergency exits to the extent they are required by a Requirement, and then such exit(s) may only be used for such emergency purposes) may be located on the west side/elevation of the Building;

(20)    Any "head shop" or other establishment featuring the sale or exhibition of drug-related paraphernalia;

(21)    Any live performance theater, movie theater or theater of any kind, except that Landlord shall be permitted to lease or otherwise demise space in the Landlord Parcel for a movie theater use (i) in the second floor of the Building provided that (a) such movie theater space is not greater than 39,990 square feet in the aggregate, (b) the primary entrance and exit to such space shall be east of the northwest corner of the Building (e.g., between the common wall and the space identified as 1C on Exhibit B-1 and in no event closer than twenty-six (26) feet to the northwest corner of the Building), and (c) any and all exits (other than the primary entrance and exit described above) to such space must go out the back of the Building by the loading docks; provided, however, emergency exits on the west elevation/side of the Building, to the extent they are required by a Requirement, shall be permitted provided such exit(s) are only used for emergency exiting or (ii) in the former auto center building (not to exceed 25,000 square feet of rentable area);

(22)    Any auditorium, meeting hall, sporting event, night club, dance hall, discotheque, amusement center, carnival or other entertainment facility, or like place of public assembly, except that Landlord shall be permitted to lease or otherwise demise space in the Landlord Parcel for any entertainment uses which are typical to a first-class Shopping Center provided there may only be one entertainment use in the Building and the entrance must be located at least 26 feet east of the northwest corner of the Building (except with respect to the bowling alley described above that may also have its entrance on the northwest corner of the Building);

(23)    Any factories;

(24)    Any industrial usage;

(25)    Any facility used primarily for storage, or any warehouse, processing or rendering plant;

(26)    Any flea market or store with multiple vendors;

(27)    Any establishment where men or women are engaged in salacious activities or sexually oriented business including, without limitation, mud wrestling, table dancing, or topless, bottomless or nude servers, waitresses, waiters, dancers, hostesses or hosts;

(28)    Any gaming facility or operation, including but not limited to: off-track or sports betting parlor; casino operations including but not limited to table games such as black-jack or poker or gaming devices such as slot machines, video poker/black-jack/keno machines, or other similar or related businesses (but entertainment uses/restaurants such as Dave & Busters, Lucky Strike and Bowlmor to the extent same are otherwise permitted may operate video games, and retail facilities may operate video games incidentally to their primary use);

(29)    Any auto repair shop, a vehicle body and fender shop, a vehicle repair shop (mechanical or otherwise) or any business servicing motor vehicles, including, without limitation, any quick lube oil change services, tire centers, or any business selling gasoline or diesel fuel at retail or wholesale (but excluding automotive services provided by any department store at the Landlord Parcel in excess of 60,000 sq. ft. in connection with its operations as a retail department store);

(30)    Any clothing rental (except that clothing rental shall be permitted as an incidental use to retail clothing sales);

(31)    Any catering or banquet facility or restaurant [provided that Landlord shall be permitted to lease or otherwise demise space in the Landlord Parcel for a restaurant use (but not catering and/or banquet) (i) in the former auto center building, (ii) in the area currently leased to GMRI, Inc. pursuant to the Olive Garden Lease) and/or (iii) in any space in the Building that has its entrance on the north elevation of the Building (e.g., the space identified as Tenant 1C and/or Tenant 1E on Exhibit B-1);

(32)    Any church, synagogue, mosque or other religious place of worship;

(33)    Any health clinic; a medical rehabilitative facility or other medical clinic [provided that Landlord shall be permitted to lease or otherwise demise up to 5,000 square feet of rentable area in the former auto center building on the Landlord Parcel for a first class regional or national dental and/or urgent care type facility (e.g., a CityMD or Aspen Dental); provided, however, such use shall be subject to the following: (i) there shall not be more than one such clinic/facility in the Landlord Parcel, (ii) such clinic/facility shall not be operated as a primary care or specialty care physician's office, ambulatory, same day or other surgery Center or emergency room or abortion clinic and shall not be a place that regularly receives patients at and/or transport's patients by ambulance;

K-1-5

(34)   Any furniture store (excluding first class furniture stores such as Ashley Furniture or Thomasville);

(35)   Any close out retailer or deep discount retailer, such as, without limitation, Christmas Tree Shops, Big Lots, Odd Lots, and Tuesday Morning (excluding discount department stores such as those currently operated as TJ Maxx, Marshalls and Ross); and

(36)   Any Dollar Tree, Dollar Wave, Dollar General, Five Below and similar single price-point retailers.

[Capitalized terms used in the above shall have the meanings given in that certain Lease dated as of November 7, 2016 (as amended, the "**Saks Lease**") between Landlord and Saks Fifth Avenue LLC ("**Saks**").]

**SEARS PROHIBITED USES:**

* • A flea market;
* • A pawn shop;
* • A mortuary, funeral home or crematorium;
* • Any use which is a public or private nuisance;
* • Any use which produces: (A) noise or sound that is objectionable due to intermittence, high frequency, shrillness or loudness (except as otherwise permitted), (B) noxious odors, (C) noxious, toxic, caustic or corrosive fumes, fuel or gas, (D) dust, dirt or fly ash in excessive quantities, or (E) fire, explosion or other damaging or dangerous hazard, excluding in all cases the normal operations of SACs;
* • Any assembling, manufacturing, industrial, distilling, refining, smelting, agriculture or mining operation;
* • Junk yard or dump;
* • A massage parlor, or the sale, rental or display of "adult" or pornographic materials, including, without limitation, magazines, books, movies, videos, and photographs, or any pornographic display of any nature, excepting massages offered by a spa;
* • A "head shop" or other business selling drug paraphernalia.

[Capitalized terms used in the above shall have the meanings given in that certain Master Lease dated as of July 7, 2015 (as amended, the "**Sears Lease**") between Seritage KMT Finance LLC and Landlord and Kmart Operations LLC and Sears Operations LLC ("**Sears**").

1

## Exhibit K-2

2

## Existing Leases

3  1. Olive Garden Lease
4  2. Master Lease dated as of April 4, 2014 (as amended, the **"Lands' End Lease"**) between
5     Landlord (as successor in interest) and Lands' End, Inc.
6  3. Sears Lease
7  4. REI Lease
8  5. Saks Lease
9  6. Shake Shack Lease

10

11

## EXHIBIT L-1

## LANDLORD IMPOSED PROHIBITED USES

Tenant shall not use any portion of the Premises for any of the following uses:

1. "flea market" or "swap meet";

2. the sale used clothing or other used merchandise or a thrift store or liquidation outlet; provided, however, that a Ross Dress for Less or a similar type of off-price retailer and a Christmas Tree Shops (And That!) are permitted; any fire sale, bankruptcy sale (unless pursuant to a court order), auction house operation or similarly advertised event; and any uses classed as "odd lot," "close out," "clearance," or with words of similar import;

3. veterinary services or pet vaccination clinic or overnight stay pet facilities (except as part of a national pet retailer such as PetSmart or Petco);

4. gymnasium or health club; massage parlor or spa;

5. dance hall, billiard or pool hall, video game arcade, bowling alley, skating rink;

6. office, medical and/or professional uses (such as tax preparation, mortgage brokers, eye doctors, dental offices);

7. facility offering gambling to the public (including any so-called Internet café that offers gambling to the public, off track betting facility, casino or gaming facility), provided that the incidental sale of lottery tickets shall be permitted;

8. the sale of adult products or adult bookstores or adult audio/video products stores (which are defined as stores in which at least ten percent (10%) of the inventory is not available for sale or rental to children under the age of majority in the state in which the Store is located because such inventory explicitly deals with or depicts human sexuality);

9. a restaurant or hotel/lodging facility;

10. Dollar Store. As used herein, "Dollar Store" and or "Convenience Store "would mean a discount, 99 cents store or "dollar" store which sells general merchandise at one price or set prices, including, by way of example and not in limitation, stores such as "Fred's", "Big Lots", "99 Cent Only", "Dollar Store", "Dollar General", or "Family Dollar" or "Maxway", "Allied Stores", or "Bills Dollar;

11. Mobile home park, trailer court, labor camp, junkyard or stockyard;

12. Dumping, disposing, incineration or reduction of garbage (excluding the placement of dumpsters or garbage compactors for the temporary storage of garbage the contents of which, in each case are removed not less than once weekly);

13. Facility for the sale of paraphernalia for use with illicit drugs;

14. Animal raising facilities;

15. Primarily as a warehouse (including mini-warehouses but excluding storage incidental or accessory to a primary use permitted hereunder), or for assembling, manufacturing, distilling, refining, smelting, agricultural, or mining;

16. Carnival, amusement park, indoor or outdoor recreational facility (except as associated with fitness center or gym) or circus;

17. cocktail lounge, bar or tavern or sale of alcoholic beverages to be consumed on-premises, excluding the sale of alcoholic beverages from the Premises only expressly as permitted pursuant to Section 1.1.28 of this Lease, subject to applicable Legal Requirements;

18. Gas station, car wash; automobile shop or service station;

19. DMV, Social Security Office, or satellite City Hall;

20. a firearms shooting range or any other use which creates or causes excessive noise; and

21. a facility which performs on-site dry cleaning;

1    22. day-care facility, educational facility or School.  "School" means a beauty school, barber
2    college, reading room, place of instruction or any other operation serving primarily
3    students or trainees rather than retail customers and specifically excludes animal training
4    or obedience training classes associated with Tenant's primary business.

5

1    EXHIBIT L-2

2    TENANT IMPOSED PROHIBITED USES

3    The following uses are prohibited in any portion of the Shopping Center and Related Land,
4    including, without limitation, the Premises:

5       a.  any use causing unreasonably loud or offensive noises (including any business
6           using exterior loud speakers, provided that the foregoing shall not prohibit
7           occupants from playing music at customary sound levels within any outdoor
8           seating area of restaurants);

9       b.  Primarily as a warehouse (including mini-warehouses but excluding storage
10          incidental or accessory to a primary use permitted hereunder), or for
11          assembling, manufacturing, distilling, refining, smelting, agricultural, or
12          mining; however, subject to the further provisions of this Exhibit L-2, the
13          foregoing shall not apply to the operation of a single microbrewery by
14          Landlord or a tenant or occupant operating under a lease with Landlord (other
15          than Tenant), provided that such use shall (i) not have an entrance located on
16          the westerly side of the Building and (ii) not be located on the lower level or
17          ground floor of the Building, except for the spaces shown as "1E" and "REI
18          Tenant 1C" on Exhibit B hereto;

19      c.  dry cleaner; excluding (as applicable to Landlord or a tenant or occupant
20          operating under a lease with Landlord (other than Tenant) only):  [i] a single
21          dry cleaner which does not use perchloroethylene or any other Hazardous
22          Substances provided such business is not located on the lower level or ground
23          floor of the Building and/or [ii] a single facility for drop off and pick up of
24          clothing cleaned at another location;

25      d.  any facility for the sale, lease or rental of automobiles, trucks, motorcycles,
26          recreational vehicles, boats or other vehicles (excluding, as applicable to
27          Landlord or a tenant or occupant operating under a lease with Landlord (other
28          than Tenant) only,  (i) a single establishment for the sale of boats and kayaks
29          by an outdoor equipment or sporting goods store such as by way of example,
30          LL Bean, Dick's Sporting Goods or REI, and (ii) a single Tesla-type sales
31          center typically found at other retail centers, provided no more than 10
32          vehicles are stored at the rear of such sales center and in no event within the
33          Critical Area);

34      e.  automobile repair shop or service station or any facility storing or selling
35          gasoline or diesel fuel in or from tanks, provided that the foregoing shall not
36          prohibit the operation of a single first class auto service company such as Jiffy
37          Lube by Landlord or a tenant or occupant operating under a lease with
38          Landlord (other than Tenant), as long as such facility is not located within the
39          Building;

40      f.  the sale of used clothing or other used merchandise or a thrift store or
41          liquidation outlet (provided, however, that a Ross Dress for Less or a similar
42          type of off-price retailer and a Christmas Tree Shops (And That!) are
43          permitted);  any fire sale, bankruptcy sale (unless pursuant to a court order),
44          auction house operation or similarly advertised event; and any uses classed as
45          "odd lot," "close out," "clearance," or with words of similar import;

46      g.  massage parlor (excluding, as applicable to Landlord or a tenant or occupant
47          operating under a lease with Landlord (other than Tenant) only,  a single
48          "Massage Envy" or similar therapeutic massage retailer operating in a first-
49          class manner, provided such business shall not have an entrance on the
50          westerly side of the Building;

51      h.  the sale of adult products or adult bookstores or adult audio/video products
52          stores (which are defined as stores in which at least ten percent (10%) of the
53          inventory is not available for sale or rental to children under the age of

1  majority in the state in which the Store is located because such inventory
2  explicitly deals with or depicts human sexuality);

i.  mortuary or funeral parlor;

j.  coin operated laundry;

k.  cocktail lounge, bar or tavern or sale of alcoholic beverages to be consumed on- or off-premises (excluding (1) as applicable to Landlord or a tenant or occupant operating under a lease with Landlord (other than Tenant) only, [i] the sale of alcoholic beverages in conjunction with the operation of a restaurant not prohibited under this Lease, [ii] retail sales for off-premises consumption from a supermarket/grocery store allowed under this Lease, "Bevmo", "Total Wine," or a similar retailer, and [iii] the operation of a microbrewery, subject to the further provisions of this Exhibit L-2, (2)  as applicable to Landlord or a tenant or occupant operating under a lease with Landlord (other than Tenant), the sale of alcoholic beverages for off-premises consumption only, except for conducting incidental on-premises sampling and tastings, it being further agreed that in no event shall the sale of alcoholic beverages by such tenant or occupant exceed the lesser of 2,500 square feet or 10% of the total Floor Area of its subject premises, subject in each case to applicable Legal Requirements, and (3) as applicable to Tenant, the sale of alcoholic beverages from the Premises only expressly as permitted pursuant to Section 1.1.28 of this Lease, subject to applicable Legal Requirements);

l.  night club, discotheque or dance hall;

m.  cinema or theater, except that Landlord shall be permitted to lease or otherwise demise space in the second floor of the Building for a movie theatre provided that (a) such movie theater space is not greater than 39,990 square feet in the aggregate, (b) there are no more than 800 seats in the theater, (c) the primary entrance and exit to such space shall be east of the northwest corner of the Building and (d) at Tenant's request, Landlord shall install prominent signage in the "No Employee Parking Area" shown on Exhibit B hereto stating "No Movie Theater Parking Allowed" (or signage of similar import);

n.  spa, except that a single day spa operated by Landlord or a tenant or occupant operating under a lease with Landlord (other than Tenant) shall be permitted provided such business shall (i) not have an entrance located on the westerly side of the Building and (ii) not be located on the lower level or ground floor of the Building (except for the spaces shown as "1E" and "REI Tenant 1C" on Exhibit B hereto);

o.  health club, gym or exercise facility, except (i) that such business may be located on the second floor of the Building provided the entrance to such business is not located on the westerly side of the Building and (ii) one (1) "boutique" type health club may be located in the spaces shown as "1E" and "REI Tenant 1C" on Exhibit B hereto  provided Landlord shall use all necessary measures to ensure that no noise from such health club may be heard in the Premises;

p.  bowling alley, children's recreational facility, pool or billiard hall, skating rink, amusement center, virtual reality, laser tag, jump/trampoline facility or game arcade shall not have an entrance located on the westerly side of the Building; provided, however, in no event shall a bowling alley be located immediately above the Premises on the ground floor level of the Building;

q.  hotels or lodging facilities or living quarters intended for human use;

r.  church or other places of worship;

s.  gun shop or range or shooting club;

t. day-care facility, educational facility or School (defined below) (excluding, as applicable to Landlord or a tenant or occupant operating under a lease with Landlord (other than Tenant) only, a single "Sylvan," "Kumon" or similar tenant operating in a first-class manner, provided such business (i) may not occupy more than 5,000 square feet of Floor Area, (ii) shall not be located on the lower level of the Building and (iii) shall not have an entrance located on the westerly side of the Building). "School" means a beauty school, barber college, reading room, place of instruction or any other operation serving primarily students or trainees rather than retail customers and specifically excludes animal training or obedience training classes associated with PetSmart or Petco and/or Tenant employee training associated with the use of the Premises , subject to compliance with clause "a" of this Exhibit L-2;

u. Restaurants may be allowed at the Shopping Center provided such use shall (i) not have an entrance located on the westerly side of the Building and (ii) not be located on the lower level or ground floor of the Building except for the spaces shown as "1E" and "REI Tenant 1C" on Exhibit B hereto ;

v. (i) office, medical and/or professional uses (such as tax preparation, mortgage brokers, eye doctors, dental offices) with an entrance located on the westerly side of the Building ; (ii) office, medical, and/or professional uses occupying, collectively, more than 15% of the Floor Area of the Shopping Center; (iii) any single office, medical, and/or professional use occupying more than 5,000 square feet of Floor Area (iv) any office, medical, and/or professional use occupying space on the lower level of the Building; and (v) notwithstanding the foregoing, any medical uses not typically found in shopping centers of similar quality to that of the Shopping Center on the Effective Date in the States of Connecticut, Massachusetts or New York, including without limitation a drug rehabilitation center, a family planning clinic or a governmentally operated health clinic. Notwithstanding the preceding clauses (i), (ii), (iii) and (iv) (but subject to the preceding clause (v)):  (1) in no event shall Tenant have the right to use the Premises for office, medical and/or professional uses (except as expressly permitted pursuant to Section 1.1.28 of this Lease and subject to the limitations set forth therein), and (2) Landlord or a tenant or occupant operating under a lease with Landlord (other than Tenant) shall be permitted to operate, a single urgent care clinic, retail health center providing walk-in, non-traumatic medical services such as the Minute Clinic presently operated by CVS, dialysis treatment center, or facility offering MRIs provided such business (i) does not have an entrance located on the westerly side of the Building and (ii) shall not be located on the lower level or ground floor of the Building except for the spaces shown as "1E" and "REI Tenant 1C" on Exhibit B hereto.

w. Uses causing strong, unusual or offensive odors, fumes, dusts or vapors in (i) the Premises (as applicable to Tenant) and (ii) any space located immediately adjacent to the Premises (as applicable to Landlord).

x. Catering/banquet halls.

y. Pawn shop or check cashing facility.

z. Any supermarket/grocery store, except that one supermarket/grocery store of the type typically found in shopping centers of similar quality to that of the Shopping Center on the Effective Date and located within the States of Connecticut, Massachusetts or New York (such as, by way of example and not limitation, Whole Foods, Trader Joe's, Sprouts and Fresh Market) may be allowed provided (i) such supermarket/grocery store occupies no more than 30,000 square feet of Floor Area, (ii) all customer access/egress points of any type (other than egress solely used for emergency egress) to and from such supermarket/grocery store are located at least one hundred (100) feet away from the entrance shown as "Tenant 1A / 1B Common Entry" on the Site Plan attached hereto as Exhibit B, and (iii) such supermarket/grocery store is not

located on the lower level of the Building of which the Premises is a part. Notwithstanding the foregoing, in no event shall Tenant have the right to use the Premises for a supermarket use, Landlord hereby acknowledging and agreeing that Tenant's sale of food and beverages at the Premises, in a manner reasonably consistent with the sale of such items at other buy buy Baby stores as of the Effective Date, shall not be deemed a supermarket use.

aa. veterinary services or hospital or pet vaccination clinic or overnight stay pet facilities (except as part of a national pet retailer such as PetSmart or Petco, subject to compliance with clause "a" of this Exhibit L-2 and provided further that no stores selling pets (other than birds, reptiles, rodents and other small mammals typically found in a PetSmart or Petco store) shall be located immediately above the Premises on the ground floor of the Building nor on the lower level of the Building);

bb. facility offering gambling to the public (including any so-called Internet café that offers gambling to the public, off track betting facility, casino or gaming facility), provided that both (i) the incidental sale of lottery tickets, and (ii) as applicable to Landlord or a tenant or occupant operating under a lease with Landlord (other than Tenant) only, the strictly incidental use of gambling machines for patrons of restaurants permitted within the Shopping Center, shall be permitted;

cc. Dollar Store.  As used herein, "Dollar Store" and or "Convenience Store "would mean a discount, 99 cents store or "dollar" store which sells general merchandise at one price or set prices, including, by way of example and not in limitation, stores such as "Fred's", "Big Lots", "99 Cent Only", "Dollar Store", "Dollar General", or "Family Dollar" or "Maxway", "Allied Stores", or "Bills Dollar;

dd. Mobile home park, trailer court, labor camp, junkyard or stockyard;

ee. Dumping, disposing, incineration or reduction of garbage (excluding the placement of dumpsters or garbage compactors for the temporary storage of garbage the contents of which, in each case are removed not less than once weekly);

ff. Facility for the sale of paraphernalia for use with illicit drugs;

gg. Animal raising facilities;

hh. Without limiting the specific uses permitted pursuant to the foregoing clause "p" of this Exhibit L-2, carnival, amusement park, indoor or outdoor recreational facility or circus;

ii. DMV, Social Security Office, satellite City Hall or other governmental office;

jj. Without limiting the specific uses permitted pursuant to the foregoing clause "p" of this Exhibit L-2, live performance theater, auditorium, meeting hall, sporting event, or other entertainment use;

kk. Flea market or "swap meet".

<u>Exhibit M</u>

<u>Permissible Common Area Retail/Promotional Uses per Existing Leases</u>

Capitalized terms below have the meanings ascribed thereto in the applicable leases and may not match the definitions of this Lease.

**SHAKE SHACK:**

(a) Subject to compliance with applicable legal requirements and if permitted by the REA and existing leases, Tenant may, but is not required to, utilize a portion of the Landlord's Parcel Common Area in the area labeled "Outdoor Seating Area" on the Site Plan as an outdoor seating area for the patrons of its restaurant, provided Tenant complies with the following conditions:

(i) Tenant shall at its sole cost and expense, obtain all necessary permits and approvals, including an updated certificate of occupancy or certificate of compliance, required for the Outdoor Seating Area.

(ii) Tenant shall submit to Landlord along with a copy of Tenant's Proposed Specifications as set forth in Section 3.04 herein, proposed detailed specifications and working drawings for the Outdoor Seating Area. Such specifications and drawings shall include the number, location, design, style, material, and color of the proposed outdoor furnishings. The outdoor furnishings shall be limited to tables, chairs, table umbrellas (including freestanding), and trash bins (collectively, the "Outdoor Furnishings"), provided, however, that the number of seats in the Outdoor Seating Area shall not exceed the maximum amount permitted by applicable legal requirements. Such specifications and drawings shall be subject to the prior written approval of Landlord, which approval shall not be unreasonably withheld. The tables and chairs shall not be placed in a manner which would in any way obstruct the flow of pedestrian traffic in the Landlord's Parcel.

(iii) Tenant shall keep the Outdoor Furnishings clean and in good condition and repair. Tenant shall, at Tenant's cost and expense, be solely responsible for all maintenance, repair, replacement, cleaning, and security of the Outdoor Furnishings and the Landlord's Parcel Common Area.

(iv) Tenant shall keep the Landlord's Parcel Common Area clean of any debris or trash. Such cleaning shall be completed hourly and at the end of each day that the outdoor seating area is used, and at such other times as is reasonably necessary to maintain a first class standard of operation. Tenant shall also be solely responsible for the cleaning, power washing and, if necessary, replacement of concrete stone surfaces damaged or stained by spills.

(v) Tenant shall remove the tabletop and freestanding umbrellas and secure the tables and chairs and other Outdoor Furnishings with a cable at the end of each day that the Outdoor Seating Area is used, or earlier in the event of hazardous outdoor conditions including foul weather or other dangerous conditions, and shall store the umbrellas in the Demised Premises.

(b) Tenant agrees that, except for payment of Minimum Rent or additional rent, for all purposes under this Lease, including insurance and indemnity obligations, the Outdoor Seating Area shall be deemed a part of the Demised Premises. In addition, the Gross Sales generated in or from the

O-1

1  Outdoor Seating Area shall be included in Tenant's Gross Sales generated from the Demised
2  Premises and shall be considered in calculating Percentage Rent.

3

4  Exhibit A-1 (Site Plan) from the Shake Shack Lease

5



EXHIBIT A-1

6
7
8

9  [Capitalized terms used in the above shall have the meanings given in the Shake Shack Lease.]

10

11  Sears

12

13  Except in Tenant's year-round and/or seasonal ordinary course of business (including in parking
14  areas and/or sidewalks), Tenant shall not suffer or permit outside displays or advertising, storage
15  or sales of materials or, merchandise, or storage equipment or commercial vehicles (other than
16  vehicles of the Home Services Affiliate of Tenant and/or other Tenant vehicles and other than in
17  the Environmental Ordinary Course of Business), or overnight outside parking of vehicles in
18  connection with Tenant's activities at the Demised Premises (other than parking of vehicles of
19  the Home Services Affiliate of Tenant and/or other Tenant vehicles, and with the exception of
20  parking in areas designated by Tenant for "early-bird" or other customers dropping off or picking
21  up vehicles left for service at any SAC, or with respect to any vehicles in connection with any
22  vehicle rental business, including customer cars, in each case prior to or after normal business
23  hours).

24

25  Subject to the provisions of any applicable Encumbrances, Legal Requirements and Insurance
26  Requirements and the terms and conditions set forth in this Section 10.2(a)(ii), subsequent to the
27  Multi-Tenant Occupancy Date with respect to a Demised Premises, Tenant, Landlord and
28  Landlord's Related Users shall have the right to (A) to utilize portions of the Common Areas for
29  outdoor events, activities, shows, displays, temporary special promotional events, including sales
30  from temporary facilities, and including carnivals, automobile and boat shows and sales, sales of

1   rugs, cars, spas, plants and antiques, tent sales, and National Safety Weekend events and other
2   charity events (including charity walks); or (B) to utilize the lighting standards and other areas in
3   the parking lot for advertising purposes ((A) and (B) collectively, the "Promotional Rights"),
4   subject to Landlord's reasonable rules and regulations applicable to all tenants of the Property
5   with respect to the manner of the exercise of such Promotional Rights; provided, that (x)
6   Tenant's Promotional Rights shall include, and Tenant shall exercise Promotional Rights in a
7   manner described in Section 10.2(a)(ii)(A) that is consistent with, the historical practices of
8   Tenant at that Store or that may be conducted on a regional basis with respect to an affected
9   Store (including, without limitation, outdoor garden and/or patio shops), and such other uses in
10  connection with the natural evolution of Tenant's generally permitted use of the Demised
11  Premises (subject to Landlord's reasonable approval of such other uses), and (y) Tenant shall not
12  exercise any Promotional Rights in a manner (as opposed to the nature of the use) that would
13  reasonably be expected to have a material adverse impact on Landlord or any third party tenant
14  to whom Landlord has leased or licensed all or any portion of the Property other than the
15  Demised Premises ("Third Party Tenant"). Landlord shall have the right to grant Promotional
16  Rights to any Third Party Tenant, provided, that, no such Promotional Rights shall be exercisable
17  in a manner that would reasonably be expected to have a material adverse impact on Tenant,
18  Landlord or any other Third Party Tenant. Tenant, Landlord and Third-Party Tenants shall work
19  cooperatively and in good faith to coordinate the exercise of the Promotional Rights in
20  accordance with the foregoing provisions.

21

22  [Capitalized terms used in the above shall have the meanings given in the Sears Lease.]

23  62631428 v8

O-3