**STARK & STARK**
A Professional Corporation
Joseph H. Lemkin, Esquire
Thomas S. Onder, Esquire
PO Box 5315
Princeton, NJ 08543-5315
(609) 896-9060
*Attorneys for Springfield Plaza, LLC*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| BED BATH & BEYOND, INC., et al. | Case No. 23-13359 (VFP) |
| Debtors[1] | Judge: Hon. Vincent F. Papalia |

**PRELIMINARY OBJECTION OF SPRINGFIELD PLAZA, LLC TO**
**PROPOSED ASSUMPTION AND ASSIGNMENT OF**
**UNEXPIRED LEASE AND RESERVATION OF RIGHTS**

Springfield Plaza, LLC ("Springfield Plaza"), by and through its counsel, hereby

files this limited objection to the *Notice of Assumption and Assignment of Certain*

*Unexpired Leases* [Docket No. 1447] ("Notice"), and in support hereof states as follows:

**Background**

1.      On or about April 24, 2023 ("Petition Date"), each of the above-captioned

debtors ("Debtors") filed voluntary petitions under chapter 11 of title 11 of the United

States Code ("Bankruptcy Code") with this Court.

---

[1] The last four digits of Debtor Bed Bath & Beyond Inc.'s tax identification number are 0488. A complete list of the Debtors in these Chapter 11 Cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/bbby. The location of Debtor Bed Bath & Beyond Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 650 Liberty Avenue, Union, New Jersey 07083.

2.　　　Debtors are operating their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.　　　On July 21, 2023, the Debtors filed the Notice which states in part that, "pursuant to the Lease Sale Procedures Order and by this written notice …, the Debtors hereby notify you that they have determined, in the exercise of their business judgment, that each unexpired lease set forth on **Exhibit B** attached hereto is hereby assumed and assigned, including with respect to payment of any cure costs … in the amounts set forth on **Exhibit B** required to assume such unexpired lease..." Notice, p.2 (emphasis in original). The Notice further provides that any objection to the "proposed Cure Costs, proposed assumption and assignment, and/or to the Successful Bidder's or Backup Bidder's proposed form of adequate assurance of future performance" must be filed no later than July 25, 2023 at 5:00 p.m. (prevailing Eastern Time). *Id*., pp. 2-3.

4.　　　Exhibit B to the Notice includes a lease with Springfield Plaza for the premises located in the Springfield Plaza Shopping Center, Springfield, Virginia ("Premises"), described in the Notice as "Store Number 3008" and located at "6398 Springfield Plaza, Springfield, Virginia" ("Lease"). Exhibit B to the Notice identifies Springfield Plaza as the landlord and asserts that the "Proposed Cure Amount" for the Lease is $388.00.

**Preliminary Statement**

5.　　　Springfield Plaza is amenable to discussing a consensual resolution of the issues described herein with the Proposed Assignee (defined below) and the Debtors and is filing this Objection in case the parties are unable to reach agreement. The Court

2

should not approve the proposed assumption and assignment unless and until the issues described herein are fully remedied.

## <u>Preliminary Objection</u>

### a. Proposed Cure Cost

6.   Debtors set the proposed Cure Cost for Springfield Plaza at $388.00. Notice, Ex. B.

7.   If the Lease is to be assumed or assumed and assigned, the Debtors or the assignee should be required to pay Springfield Plaza the proposed Cure Cost in accordance with section 365(b) of the Bankruptcy Code, together with any other amounts accruing under the Lease (including without limitation any fixed rent or percentage rent, and applicable taxes, common areas charges, and insurance costs) in accordance with the terms of the Lease between the date of this filing and the date that the Lease is actually assumed or assumed and assigned (collectively, the "<u>Correct Cure Cost</u>").

### b. Adequate Assurance of Future Performance

8.   Additionally, Springfield Plaza is entitled to adequate assurance of future performance by any assignee under section 365(f)(2)(B) of the Bankruptcy Code. As a shopping center lease, this also requires satisfaction of the provisions of section 365(b)(3). Section 365(b)(3) specifically requires adequate assurance:

> (A) of the source of rent and other consideration due under such lease, and in the case of an assignment, that the financial condition and operating performance of the proposed assignee and its guarantors, if any, shall be similar to the financial condition and operating performance of the debtor and its guarantors, if any, as of the time the debtor became the lessee under the lease;

118942\000001\4887-8448-4466.v1

(B) that any percentage rent due under such lease will not decline substantially;

(C) that assumption or assignment of such lease is subject to all the provisions thereof, including (but not limited to) provisions such as radius, location, use, or exclusivity provision, and will not breach any such provision contained in any other lease, financing agreement, or master agreement related to such shopping center; and

(D) that assumption or assignment of such lease will not disrupt any tenant mix or balance in such shopping center.

*11 U.S.C. § 365(b)(3).*

9.      Springfield Plaza objects to the extent any proposed assignment of the Lease fails to comply with any of the foregoing requirements under section 365(b)(3) of the Bankruptcy Code, including, without limitation, section 365(b)(3)(A)'s required provision of adequate assurance that the financial condition and operating performance of the proposed assignee, BBBY Acquisition Co., LLC ("Proposed Assignee"), is similar to the financial condition and operating performance of the Debtor, Springfield Buy Buy Baby, Inc., and its Guarantor, Buy Buy Baby, Inc., as of the time the Debtor became the lessee under the Lease.

10.      As of the date of this filing, the Proposed Assignee has not provided adequate assurance that its financial condition and operating performance are similar to the financial condition and operating performance of the Debtor as of the time the Debtor became the lessee under the Lease. Indeed, the Proposed Assignee is a new entity with no operational history and no financial history. Moreover, the Proposed Assignee proposes to assume the Lease without a guarantor. Thus, Springfield Plaza has not been assured that the Proposed

4

Assignee's financial condition and operating performance are similar to the financial condition and operating performance of the Debtor as of the time the Debtor became the lessee under the Lease.[2]

11.     Springfield Plaza further objects to the extent that the proposed assignment of the Lease fails to comply with the "Permitted Use" and related provisions set out in Sections 201(c) and 5 and the "Prohibited Uses" set forth in Exhibit F of the Lease[3], as amended.

12.     Springfield Plaza reserves all rights to the extent that the use under the Lease will be changed by reason of any proposed assignment, result in a violation of any "Permitted Use" and "Prohibited Uses" provisions under the Lease, and/or result in a violation of "Existing Exclusives" granted by Springfield Plaza to other tenants on or at the Premises, all as set forth above.

13.     If the Lease is to be assumed or assumed and assigned, the Debtors or applicable assignee should also be required to pay Springfield Plaza a "deposit or other security for the performance of the [Debtors'] obligations under the lease substantially the same as would have been required by the landlord upon the initial leasing to a similar tenant" in accordance with section 365(l) of the Bankruptcy.

---

[2] While Springfield Plaza understands that a significant capital contribution will be made, it remains unclear what, if any, debt obligations the Proposed Assignee may have.

[3] A copy of the Lease, less the voluminous Lease Exhibits, is attached hereto as **Exhibit A**. The Debtors are in possession of each of the Lease Exhibits and such Exhibits are also available upon request.

118942\000001\4887-8448-4466.v1

## Reservation of Rights

14.     Springfield Plaza further reserves the right to amend and/or supplement this objection and the Correct Cure Amount. Springfield Plaza further reserves all rights with respect to the Lease Sale Procedures Order.

## Conclusion

**WHEREFORE**, Springfield Plaza respectfully requests that the Court sustain this preliminary objection by conditioning assumption and assignment of the Lease on the payment to Springfield Plaza of the Correct Cure Amount (to include any other amounts accruing under the Lease between the date of this filing and the date that the Lease is actually assumed or assumed and assigned), the provision of adequate assurance as required by sections 365(b)(3) and 365(f)(2)(B) of the Bankruptcy Code, and grant any other and further relief that the Court may deem appropriate.

118942\000001\4887-8448-4466.v1

Dated: July 25, 2023

Respectfully submitted,

**STARK & STARK**
**A Professional Corporation**

By: */s/ Joseph H. Lemkin*
       Joseph H. Lemkin, Esquire
and

By: */s/ Thomas S. Onder*
Thomas S. Onder, Esquire

P.O. Box 5315
Princeton, NJ 08543
(609) 791-7022 (direct)
(609) 896-9060 (main)
(609) 895-7395 (facsimile)
jlemkin@sstark-stark.com
tonder@stark-stark.com
*Attorneys for Springfield Plaza, LLC*

118942\000001\4887-8448-4466.v1

**EXHIBIT A**

<u>SHOPPING CENTER LEASE</u>

BY AND BETWEEN

SPRINGFIELD PLAZA, LLC
AS LANDLORD

AND

Buy Buy Baby of Springfield Inc., a Virginia corporation
AS TENANT

**TABLE OF CONTENTS**
**TO**
**SHOPPING CENTER LEASE**

| | |
|---|---|
| SECTION 1 | 1 |
| PARTIES | 1 |
| SECTION 2 | 1 |
| TERMS, CONDITIONS AND DEFINITIONS | 1 |
| SECTION 3 | 3 |
| IMPORTANT DATES AND ADDITIONAL DEFINITIONS | 3 |
| SECTION 4 | 4 |
| POSSESSION | 4 |
| SECTION 5 | 5 |
| USE | 5 |
| SECTION 6 | 6 |
| TERM | 6 |
| SECTION 7 | 6 |
| RENT | 6 |
| SECTION 8 | 7 |
| REAL ESTATE TAXES | 7 |
| SECTION 9 | 8 |
| INSURANCE | 8 |
| SECTION 10 | 10 |
| COMMON AREA MAINTENANCE | 10 |
| SECTION 11 | 11 |
| PROMOTIONAL FUND | 11 |
| SECTION 12 | 11 |
| SECTION 13 | 11 |
| COVENANTS OF TENANT | 11 |
| SECTION 14 | 11 |
| TENANT WORK | 11 |
| SECTION 15 | 12 |
| REPAIRS | 12 |
| SECTION 16 | 14 |
| SURRENDER OF PREMISES | 14 |
| SECTION 17 | 14 |
| UTILITIES AND TRASH | 14 |
| SECTION 18 | 16 |
| SIGNS | 16 |
| SECTION 19 | 16 |
| RIGHTS OF LANDLORD | 16 |
| SECTION 20 | 18 |
| DAMAGE TO PREMISES | 18 |
| SECTION 21 | 19 |
| CONDEMNATION | 19 |
| SECTION 22 | 20 |
| BANKRUPTCY | 20 |
| SECTION 23 | 21 |
| ASSIGNMENT AND SUBLET | 21 |

SECTION 24 ........................................................................... 23
  SUBORDINATION .................................................................... 23

SECTION 25 ........................................................................... 24
  RECORDATION ...................................................................... 24

SECTION 26 ........................................................................... 24
  DEFAULT .......................................................................... 24

SECTION 27 ........................................................................... 27
  LEGAL PROCEEDINGS AND NOTICES .................................................... 27

SECTION 28 ........................................................................... 27
  SUCCESSORS AND ASSIGNS ........................................................... 27

SECTION 29 ........................................................................... 29
  BROKERS AND AGENTS ............................................................... 29

SECTION 30 ........................................................................... 29
  PERSONAL PROPERTY ................................................................ 29

SECTION 31 ........................................................................... 29
  ENVIRONMENTAL COVENANTS AND PROHIBITED MATERIALS ................................. 29

SECTION 32 ........................................................................... 29
  APPROVALS ........................................................................ 29

SECTION 33 ........................................................................... 30
  LIABILITY OF LANDLORD ............................................................ 30

SECTION 34 ........................................................................... 30
  ENTIRE AGREEMENT AND MISCELLANEOUS ............................................... 30

SECTION 35 ........................................................................... 31
  WAIVER OF JURY TRIAL ............................................................. 31

## SECTION 1
### PARTIES

**101.**      THIS SHOPPING CENTER LEASE (this "Lease"), made this 10th day of
_____ May ____, 2004 by and between SPRINGFIELD PLAZA, LLC ("Landlord") whose address is
c/o The Rappaport Companies, 8405 Greensboro Drive, Suite 830, McLean, Virginia 22102-
5118, and BUY BUY BABY OF SPRINGFIELD INC., a Virginia corporation ("Tenant"), whose
address is 895 East Gate Boulevard, Garden City, New York, 11530.

## SECTION 2
### TERMS, CONDITIONS AND DEFINITIONS

**201(a).**      **Premises:**  Landlord leases to Tenant and Tenant leases from Landlord, for
the Term (as defined) and upon the terms and conditions set forth in this Lease, the
Premises situated and known as space number 3 (the "Premises") and located in Parcel C2
as shown on Exhibit "A", which the parties hereby stipulate and agree contains twenty
eight thousand (28,000) square feet of gross leasable area and is located in the
Springfield Plaza, Springfield, Virginia (the "Shopping Center") as depicted on Exhibit
A.  Tenant, at its sole cost and expense, shall have the right to construct a mezzanine
in the Premises having a size of approximately 5,000 square feet.  It is expressly
recognized and agreed that the mezzanine shall be used solely for administrative and/or
storage purposes, and in no event shall the mezzanine be used for the display of goods
for sale.  It is further recognized and agreed that the Minimum Rent amounts set forth in
Section 201(d) below includes the rent for the mezzanine space and that no separate
rental shall be charged for such mezzanine space.

Landlord and Tenant acknowledge that Springfield Plaza is presently comprised of various
parcels (hereinafter collectively "Parcels") owned by Landlord and two different entities
(collectively the "Adjacent Property Owners"); namely:

(i)   Those parcels described on Exhibit "A" as Lots 10A and 10C presently owned by
Springfield Plaza, Section II, Limited Partnership;

(ii)  The parcel described on Exhibit "A" as Lot 10B presently owned by The Ohio
State Teachers Pension Fund (together with its successors and assigns, "OTR");

(iii) The parcel described on Exhibit "A" as Lot 3 presently owned by an entity
affiliated with Landlord;

(iv)  The parcels described on Exhibit "A" as Parcel C1, C2, A, B1, E and F1 and F2
owned by Landlord.

Inasmuch as Landlord does not own those parcels described in (i), (ii) and (iii)
above, and its affiliate may hereafter either modify the use of the parcel described in
(iii) above from other than retail use or convey such parcel to another party or parties
not affiliated with or controlled by Landlord, all references herein to the "Shopping
Center" shall be deemed to refer solely to the parcels described in (iv) above, unless
otherwise expressly provided herein to the contrary.

Landlord and the Adjacent Property Owners, together with certain other parties
thereto (or their respective predecessors-in-interest) have entered into a certain
Reciprocal Easement Agreement, as heretofore amended, recorded in the land records of
Fairfax County, Virginia (the "REA"), which REA provides for certain non-exclusive
easements for parking and unobstructed pedestrian and vehicular passage over the common
areas of the parties' respective parcels described therein.  Landlord has caused to be
delivered to Tenant's counsel a true and complete copy of the REA.  Landlord covenants
not to terminate or consent to any modification of the REA which would affect in any
material adverse manner either (i) access to the Premises, (ii) visibility of the
Premises or Tenant's signage, or (iii) the Minimum Parking Ratio (below defined), without
the prior written consent of Tenant, which consent shall not be unreasonably withheld or
delayed.  The foregoing obligations of Landlord shall not limit any right of either
Landlord or Tenant under Section 1001 below.  To provide further protection to Tenant
that its right to use the Adjacent Property Owners' common areas for vehicular and
pedestrian ingress and egress and parking, Landlord agrees to use commercially reasonable
efforts to obtain from OTR the Deed of Easement attached hereto as Exhibit "J" (the "OTR
Amendment").

**201(b).**      **Term:**  The Term of this Lease shall be for ten (10) Lease Years commencing on
the Term Commencement Date (as defined), unless sooner terminated pursuant to the
provisions of this Lease.  See Exhibit I, Section 1 for Tenant's option to extend the
Term.

**201(c).**    **Permitted Use:** The sale (including the incidental rental), at retail of infant, juvenile and children's goods and services, including, but not limited to a variety (in Tenant's sole discretion as to the mix and proportions) of the following: infant's, juvenile's and children's furniture, furnishings, beds (including mattresses and bedding), changing tables, gliders and rockers (including coordinating ottomans), high chairs, lamps, walkers, play yards, swings, car seats, booster seats, strollers, cradles, playpens, cribs, toy or clothing chests, stuffed animals, games and toys, bedding accessories, clothing, apparel, shoes, bottles, pacifiers, baby safety items, diaper bags, nursing and bathing items, children's books, magazines, computer software, audio and video tapes, picture frames, party supplies, invitations, greeting cards, gift items, arts and crafts, stationery, teachers' and parents' resources, other educational and multi-media children's items and such other items which are sold in a majority of other buybuy Baby stores (or such other name then being used by Tenant for such stores) from time to time during the term of this Lease, and for no other purpose.

| **201(d).** | **Minimum Rent:** | Annually | Monthly |
|---|---|---|---|
| | Lease Years 1 through 5 | $441,000.00 | $36,750.00 |
| | Lease Years 6 through 10 | $493,920.00 | $41,160.00 |

**201(e).**    Lease Contingency. It is expressly recognized and agreed that this Lease is contingent upon Landlord obtaining thenondisturbance agreement referred to in the second paragraph of Section 2401 below. Landlord agrees to diligently and in good faith pursue receipt of such nondisturbance agreement promptly following execution of this Lease. In the event Landlord fails to obtain the nondisturbance agreement within thirty (30) days following execution of this Lease (the "Contingency Period"), the Fixturing Period shall be extended for up to a forty (40) day maximum for each day of delay beyond such 30 day period until the earlier of (i) the date the nondisturbance agreement has been obtained and delivered to Tenant, or (ii) the date the Contingency Termination Right has been deemed waived by Tenant as provided below. Notwithstanding anything in this Lease to the contrary, if despite Landlord's diligent and good faith efforts, Landlord is not able to obtain the nondisturbance agreement required under this Lease within the Contingency Period , Tenant shall be permitted to terminate this Lease (the "Contingency Termination Right") by delivering written notice to Landlord within thirty (30) days following expiration of the Contingency Period, time being of the essence, in which event this Lease shall terminate and both parties shall be relieved of all further liability hereunder, unless Landlord is able to procure the nondisturbance agreement within ten (10) days following Landlord's receipt of Tenant's termination notice. In the event Tenant fails to exercise its Contingency Termination Right within such thirty (30) day period following the Contingency Period, Tenant shall be deemed to have waived its Contingency Termination Right.

**201(f).**    Intentionally Deleted.

**201(g).**    Intentionally Deleted.

**201(h).**    Intentionally Deleted.

**201(i).**    Intentionally Deleted.

**201(j).**    **Monthly Real Estate Tax Charge:** $4,223.33, subject to adjustment pursuant to this Lease. Landlord represents that the aforesaid sum represents Tenant's Pro Rata Share of Real Estate Taxes assessed on the Shopping Center and Lot 3 as of the date of the Lease.

**201(k).**    **Monthly Insurance Charge:** $443.33, subject to adjustment pursuant to this Lease.

**201(l).**    **Monthly Common Area Maintenance Charge:** $3,920.00, subject to adjustment pursuant to this Lease.

**201(m).**    **Monthly Promotional Fund Charge:** $50.00.

**201(n).**    **Estimated Delivery Date:** March _, 2004

**201(o).**    **Fixturing Period:** One hundred eighty (180) calendar days after Notice of Possession (as defined).

**201(p).**    **Landlord's Agent:** The Rappaport Companies

**201(q).**    **Tenant's Trade Name:** buybuyBaby

**201(r).**    Intentionally Deleted.

**201(s).      Store Plans:** Tenant shall provide Landlord with four (4) copies of store plans as described in Section 1401 herein, within sixty (60) days of the execution of this Lease.

**201(t).      Sign Plans:** Tenant shall provide Landlord with four (4) copies of sign plans as described in Section 1803 herein, within sixty (60) days of the execution of this Lease.  In addition, Tenant shall provide Landlord with the name to appear on the under-canopy sign as described in Section 1805 herein, within thirty (30) days of the execution of this Lease.

**201(u).      Insurance Liability Requirements:** Tenant shall keep in full force and effect during the Term insurance policies in the amount specified below.  See Section 9 "Insurance," Paragraphs 902, 903, and 904, herein, for further detail.  See Paragraph 906, herein, for additional insurance specifications.

| Policy | Minimum Amount |
|---|---|
| Commercial Property | Replacement Cost |
| Plate Glass | Replacement Cost |
| General Accident & Public Liability | $1,000,000.00 |

**201(v).      Certificate of Occupancy:** Within ten (10) days after the date that Tenant opens for business in the Premises, Tenant shall provide Landlord with a copy of a temporary or permanent Certificate of Occupancy and/or such other document as may be required by the applicable governmental agency in order for Tenant to operate in the Premises.  In the event Tenant provides a temporary Certificate of Occupancy, Tenant shall obtain and provide Landlord a copy of a permanent Certificate of Occupancy for the Premises promptly following procurement of the same.

<u>**EXHIBITS**</u>

Attached to this Lease and made a part hereof are the following exhibits:

**EXHIBIT A:**  Site Plan
**EXHIBIT B:**  Certificate Specifying Term of Lease
**EXHIBIT C:**  Landlord's Work
**EXHIBIT D:**  Sign Plans
**EXHIBIT D(1):** Sign Criteria
**EXHIBIT E:**  Tenant's Plans
**EXHIBIT F:**  Prohibited Uses
**EXHIBIT G:**  Rules and Regulations
**EXHIBIT H:**  Guaranty
**EXHIBIT I:**  Riders
**EXHIBIT J:**  **Tenant's Exterior Sign**
EXHIBIT K: OTR AMENDMENT (DEED OF EASEMENT)
EXHIBIT L: SUBORDINATION, NON-DISTURBANCE AGREEMENT

**SECTION 3**
**IMPORTANT DATES AND ADDITIONAL DEFINITIONS**

**301.      Additional Rent.** All payments of money from Tenant to Landlord required to be paid under this Lease other than Minimum Rent.

**302.      Date of Lease.**  The date set forth in Paragraph 101 above.  On such date, all rights and obligations of the parties under this Lease shall commence other than Tenant's obligation to pay Minimum Rent, Monthly Common Area Maintenance Charges, Monthly Insurance Charges, Monthly Real Estate Tax Charges and Monthly Promotional Fund Charges.

**303.      Expiration Date.**  The last day of the Term.

**304.      Fixturing Period.**  The number of days specified in Paragraph 201(o) above, commencing with the Notice of Possession, within which Tenant is obligated to fixture and equip the Premises in accordance with the plans set forth on Exhibit E (the "Tenant's Plans").  Notwithstanding the foregoing, in the event Tenant is not able to obtain its construction permits or its certificate of occupancy solely by reason of either (i) a violation existing in any part of the Shopping Center (other than the Premises), or (ii) Landlord's acts or omissions(items (i) and (ii) each being referred to herein as a "Violation"), Tenant shall promptly advise Landlord of such Violation, and the Fixturing Period shall be extended on a day for day basis for each day of delay after the third (3rd) day of Landlord's receipt of Tenant's notice of such Violation until the first to occur of (i) Landlord curing such Violation, or (ii) Tenant receiving its requisite construction permits or certificate of occupancy (as the case may be).

**305.      Lease Year.**  The first Lease Year shall begin on the Rental Commencement Date and shall end twelve (12) full calendar months after the Term Commencement Date.

3

Thereafter, each Lease Year shall commence on the day following the expiration of the preceding Lease Year and shall end at the expiration of twelve (12) calendar months thereafter or, if earlier, the Expiration Date.

**306.    Notice of Possession.**  The date of Landlord's notice to Tenant that the Premises is ready for Tenant's use and that Landlord has completed the work listed on Exhibit C (the "Landlord's Work"), except as otherwise provided on Exhibit "C".  On such date, the utilities shall become Tenant's sole responsibility and the Fixturing Period (as defined) begins.

**307.    Pro Rata Share.**  Tenant's Pro Rata Share shall be a fraction, the numerator of which shall be the gross leasable area of the Premises and the denominator of which shall be the sum of the gross leasable area of the Shopping Center and the gross leasable area of Lot 3.  Tenant's Pro Rata Share for Real Estate Tax purposes shall be subject to increases in the event the area within Tenant's mezzanine space shall be taken into consideration by the local tax authorities in the Shopping Center tax assessment.  In the event the owner of Lot 3 shall substantially change the use of Lot 3 from the use presently conducted thereon or if Lot 3 shall be conveyed to a party or parties not affiliated with or controlled by Landlord, Tenant's Pro Rata Share shall be determined solely based on the ratio that the gross leasable area of the Premises bears to the gross leasable area of the Shopping Center (without regard to Lot 3).

**308.    Rent.**  All amounts required to be paid by Tenant under this Lease, including, without limitation, Minimum Rent, Monthly Real Estate Tax Charges, Monthly Insurance Charges, Monthly Common Area Maintenance Charges, Monthly Promotional Fund Charges and all other payments deemed to be Additional Rent pursuant to this Lease.

**309.    Rental Commencement Date.**  The next day after the last day of the Fixturing Period or the date Tenant opens for business, whichever is earlier, shall be the commencement date of Tenant's obligations to pay monthly Minimum Rent, Monthly Common Area Maintenance Charges, Monthly Insurance Charges, Monthly Real Estate Tax Charges and Monthly Promotional Fund Charges.

**310.    Term Commencement Date.**  The first day of the calendar month immediately following the Rental Commencement Date or the Rental Commencement Date if it shall be the first day of the month.

**SECTION 4**
**POSSESSION**

**401.**    Tenant accepts the Premises in its present, "as is" condition, except as may be expressly set forth in Exhibit C.  Tenant expressly acknowledges that Landlord makes no representations or warranties regarding the suitability of the Premises for Tenant's business, except Landlord represents to Tenant that (i) current zoning permits retail use in the Premises, (ii) there are no restrictions contained in other leases in the Shopping Center that would prohibit or limit Tenant's use of the Premises for the Permitted Use, and (iii) to the best of its actual knowledge, there are no covenants and restrictions of record that would prohibit or limit Tenant's use of the Premises for the Permitted Use.

**402.**    Upon the date of the Notice of Possession from Landlord, Tenant shall with due diligence proceed to install such fixtures and equipment and to perform all other work as shall be required pursuant to Exhibit E or otherwise necessary or appropriate in order to prepare the Premises for the opening and continued operation of Tenant's business.  Within one hundred twenty (120) days following the expiration of the Fixturing Period, subject to delays for events of force majeure, Tenant covenants and agrees to open a fully fixtured, staffed and stocked buybuy Baby in the Premises for business to the public for a period of at least one (1) day.Tenant agrees not to commence any work upon any portion of the Premises until Landlord has approved Tenant's Plans (as defined in Paragraph 1401 below) in writing (such approval not to be unreasonably withheld or delayed) and Tenant has otherwise complied with the requirements set forth in Exhibit E. There shall be no changes to Tenant's Plans unless the same are approved by Landlord in writing.

**403.**    Intentionally omitted.

**404.**    Tenant shall have the right to use the existing sidewalk immediately in front of, but not extending beyond, the Premises, for storage of its shopping carts, designated as the "Cart Corral" on Exhibit A.

Tenant shall not commence construction upon or otherwise use the Cart Corral without first delivering to Landlord detailed plans and specifications for the installation of the Cart Corral and obtaining Landlord's written consent thereto, which consent shall not be unreasonably withheld, conditioned or delayed. In addition, Tenant

shall be required to obtain all necessary permits or licenses to install the Cart Corral prior to commencing construction of such Cart Corral.

Tenant shall indemnify and hold Landlord, the Indemnitees (as defined in Section 907 below) harmless from and against any and all liabilities, obligations, damages, judgments, penalties, claims, costs, charges and expenses, including, without limitation, reasonable attorneys' fees, arising by reason of the installation or use of the Cart Corral.

Tenant shall: (i) maintain the Cart Corral in a good, clean and safe condition and shall make any necessary repairs within thirty (30) days after receipt of written notice from Landlord (or if the condition of the Cart Corral poses a risk of harm to pedestrians, such repairs shall be made within five (5) days after receipt of written notice from Landlord); (ii) cause its employees to police the parking areas of the Shopping Center and Parcel 10B on a regular basis each day in order to keep all carts cleared from the parking areas and the drive aisles in the Shopping Center and in Parcel 10B; and (iii) assure that pedestrian access to the sidewalk shall not be impaired by reason of the use of the Cart Corral.

On or prior to the expiration or earlier termination of this Lease, Tenant shall remove the Cart Corral and repair the location where such Cart Corral was located to the extent necessary to return such area to the condition existing prior to the installation of the Cart Corral, ordinary wear and tear and damage by casualty excepted.

### SECTION 5
### USE

**501.**    Tenant shall use and occupy the Premises solely for the Permitted Use, only under the Tenant's Trade Name and only in accordance with applicable zoning and other applicable governmental regulations and requirements. Notwithstanding the foregoing, Tenant may operate under another trade name provided such other trade name is the same tradename being used by not less than seven (7) stores operating in the United States and by all of the other buybuy Baby stores then operating in the Washington, D.C. metropolitan area. Furthermore, and without limiting the generality of the preceding sentence, Tenant shall not use the Premises for any of the purposes prohibited in Exhibit F.

**502.**    Upon Tenant taking possession of the Premises and at all times thereafter during the Term, Tenant shall continuously and uninterruptedly operate its business from the Premises for the Permitted Use. Tenant agrees that while it is in operation at the Shopping Center, it shall remain open for business in the Premises during the hours of 9:30 a.m. to 9:30 p.m. Monday through Saturday and 11:00 a.m. to 6:00 p.m. Sunday, or such hours as a majority of Tenant's buybuyBaby stores operate, with the exception of holidays required by the United States Government or the Commonwealth of Virginia. Tenant agrees, at such time it is operating its business in the Demised Premises, to conduct its business in a first-class manner, consistent with reputable business standards and practices. Tenant shall conduct no distress sales, such as "going-out-of-business", "lost-our-lease", fire or bankruptcy sales on the Premises or elsewhere in the Shopping Center. In the event Tenant ceases its business operations at the Premises for sixty (60) or more consecutive days (excepting temporary store closing for remodeling, alterations, restoration work or on account of a force majeure or due to Tenant's impending subletting of the Premises or assignment of its interest in this Lease pursuant to an executed agreement, collectively, an "Excused Temporary Closing") ), then Landlord shall have the right, but not the obligation, to recapture the Premises and terminate this Lease by giving Tenant not less than thirty (30) days prior written notice thereof, which written notice may be given at any time prior to the Premises being reopened for business to the public. There shall be no necessity of any fee or payment to Tenant in consideration of such termination.

**503.**    Landlord hereby agrees that from and after the date hereof, Landlord shall not lease any space within three hundred (300) feet of the demising walls of the Premises as (i) a movie theater, (ii) any so-called "head shop", or other establishment primarily selling or exhibiting drug-related paraphernalia, or (iii) any store primarily displaying, selling, or exhibiting pornographic material (a store shall be deemed to be "primarily" displaying, selling or exhibiting pornographic material if and only if at least ten percent (10%) of the inventory is not available for sale or rental to children under 18 years old because such inventory explicitly deals with or depicts human sexuality). In addition, Landlord hereby agrees that from and after the date hereof, Landlord shall not lease any space within two hundred (200) feet of the main customer entrance of the Premises to a health spa or gymnasium occupying more than 5,000 square feet of space.

**504.**    Provided that Tenant is not in default under the Lease beyond the expiration of any applicable cure period and is continuously operating its business in the Premises for the Permitted Use (or is not continuously operating by reason of an Excused Temporary

Closing), subsequent to the date hereof, except as expressly provided below, Landlord shall not lease any space in the Shopping Center, or authorize (in those instances where Landlord is entitled to reasonably withhold its consent) any occupancy in the Shopping Center, for the sale of either (a) Restricted Furniture (defined below), or (b) clothing for infants and children 0-4 years of age (collectively, the "Restricted Clothing").. Restricted Furniture shall mean (i) cribs (mattresses and bedding), (ii) changing tables, (iii) gliders and rockers, (iv) high chairs, (v) car seats, (vi) strollers, and (vii) indoor swings.  Notwithstanding the foregoing, it is expressly recognized and agreed that any tenant in the Shopping Center may sell Restricted Clothing in its premises without violating the exclusive granted hereunder provided such tenant either (x) sells its own proprietary clothing line such as those presently operating under the trade name Gap Kids, Baby Gap, Children's Place, and Lily Marlenes) or (y) devotes for display of Restricted Clothing less than the greater of (i) ten percent (10%) of the actual floor area of its premises, or (ii) 1,000 square feet of space.  In addition, it is expressly recognized and agreed that any tenant in the Shopping Center may sell Restricted Furniture in its premises without violating the exclusive granted hereunder provided such tenant devotes for display of Restricted Furniture less than 1,000 square feet of space.

## SECTION 6
### TERM

**601.**       The Term of this Lease shall commence on the Term Commencement Date and shall end at midnight on the Expiration Date without the necessity of any notice from either party to the other to terminate the same.  Tenant hereby waives notice to vacate the Premises and agrees that Landlord shall be entitled to the benefit of all provisions of law respecting summary recovery of possession from a tenant holding over to the same extent as if any statutory notice had been given.  Tenant's obligations with respect to the payment of Rent and all other obligations of Tenant hereunder shall survive the expiration or earlier termination of this Lease.  If requested by Landlord, Tenant hereby agrees to execute, within thirty (30) days after the Rental Commencement Date, a certificate, in the form attached hereto as Exhibit B (the "Certificate Specifying Term of Lease"), confirming the Rental Commencement Date and Term Commencement Date and stating, among other things, that this Lease is in full force and effect.  If Tenant shall fail to execute the Certificate Specifying Term of Lease within ten (10) days after receipt of such certificate from Landlord, and Landlord sends a second ten (10) day notice requesting Tenant to execute such certificate (which notice shall advise Tenant of the consequences of failing to execute such certificate) the Rental Commencement Date and Term Commencement Date shall be conclusively deemed to be those dates as set forth by Landlord in such certificate.

## SECTION 7
### RENT

**701.**       Tenant shall pay to Landlord the Minimum Rent in the sums set forth in Paragraph 201(d) above and in Exhibit I, Paragraph 1, payable in advance on the first day of each calendar month during the Term, without offset or notice or demand therefore, except as expressly set forth in this Lease.  If on more than one (1) occasion during the Term any check for Rent shall not be honored by the bank on which it is drawn, Landlord may thereafter require that all future payments from Tenant be made by certified check.

The Minimum Rent shall commence to accrue on the Rental Commencement Date.  The first payment of Rent shall be due on the Term Commencement Date for a pro-rated amount of the Minimum Rent and Additional Rent applicable to the period from the Rental Commencement Date to the Term Commencement Date.

**702.**       Intentionally Deleted.

**703.**       Intentionally Deleted.

**704.**       Intentionally Deleted.

**705.**       Intentionally Deleted.

**706.**       Intentionally Deleted.

**707.**       Intentionally Deleted.

**708.**       Intentionally Deleted.

**709.**       Intentionally Deleted.

**710.**       Intentionally Deleted.

**711.**       Tenant shall promptly pay, to the entity and at the location directed by Landlord, all Rent and other payments called for herein when and as the same shall become

due and payable, without offset, notice or demand therefore, except as expressly set forth in this Lease. If Landlord shall pay any monies, or incur any expenses in connection with any violation or breach of Tenant's covenants and obligations set forth in this Lease, the amounts so paid or incurred shall, at Landlord's option, be considered Additional Rent payable by Tenant and may be collected and enforced by Landlord as Rent. Any payments of Rent or other charges by Tenant or acceptance by Landlord of a lesser amount than shall be due from Tenant to Landlord shall be treated as a payment on account. The acceptance by Landlord of a payment for a lesser amount with an endorsement or statement thereon, or upon any letter accompanying such payment, that such lesser amount is payment in full, shall be given no effect, and Landlord may accept such payment without prejudice to any rights or remedies which Landlord may have.

**712.**      In the event any payment of Rent in this Lease is not received by the Landlord by the tenth (10th) day of the month in which said payment is due, then Tenant agrees to pay to Landlord, upon demand, a late charge in accordance with Paragraph 2605 below. The provisions of this Section 7 are cumulative and shall in no way restrict the other remedies available to Landlord in the event of Tenant's default under this Lease.

**713.**      Intentionally Deleted.

**SECTION 8**
**REAL ESTATE TAXES**

**801.**      Tenant agrees to pay to Landlord Tenant's Pro Rata Share of the real estate taxes of the Shopping Center ("Real Estate Taxes"). Real Estate Taxes shall include, but not be limited to, ad valorem taxes, sewer taxes, front-foot benefit charges, school taxes, special assessments, rental occupancy taxes, and gross receipt taxes or other such taxes levied directly upon the Shopping Center and shall also include the cost to review, initiate and/or prosecute the appeal or contest of any such taxes. If the system of real estate taxation shall be altered or varied and any new tax or levy shall be levied or imposed on said land, buildings and improvements, and/or Landlord in substitution for real estate taxes presently levied or imposed on immovables in the jurisdiction where the Premises is located, then any such new tax or levy shall be included within the term "Real Estate Taxes". Should any governmental taxing authority levy, assess, or impose a tax, excise and/or assessment, however described (other than an income or franchise tax) upon, against, on account of, or measured by, in whole or in part, the rent expressly reserved hereunder, or upon the rent expressly reserved under any other leases (other than ground leases) or leasehold interests in the Shopping Center, as a substitute (in whole or in part) or in addition to any existing Real Estate Taxes on land and buildings and otherwise, such tax or excise on rents shall be included within the term "Real Estate Taxes". Landlord's reasonable costs in minimizing or otherwise reducing or contesting the Real Estate Taxes shall be included as part of the Real Estate Taxes. With respect to any assessments for Real Estate Taxes which may be paid in installments, only the amount of such installments and interest due thereon (with appropriate proration for any partial year) which become due during the Term shall be included in the definition of "Real Estate Taxes." Real Estate Taxes shall not include net income taxes assessed against Landlord nor any taxes assessed against any leasehold interest or personal property of any kind owned or placed in, upon or about the Premises by the Tenant. Upon receipt of all tax bills and assessments attributed to any calendar year during the Term, Landlord shall furnish Tenant with a written statement of the actual amount of Tenant's proportionate share of the Real Estate Taxes for such year or part thereof, together with legible copies of such tax bills and assessments.

**802.**      Tenant shall pay to Landlord the Monthly Real Estate Tax Charge at the same time as Minimum Rent is payable hereunder, without offset, notice or demand. Upon receipt of all tax bills and assessments attributed to any calendar year during the Term, Landlord shall furnish Tenant with a written statement of the actual amount of Tenant's proportionate share of the Real Estate Taxes for such year or part thereof. If such statement reflects that Tenant's Pro Rata Share of the actual Real Estate Taxes exceeds the real estate charges paid by Tenant for such period, Tenant shall pay such amount shown to be due by said statement as Additional Rent within thirty (30) days following the date Tenant receives such statement. If such statement reflects that Tenant's Pro Rata Share of the actual Real Estate Taxes is less than the aggregate Monthly Real Estate Tax Charges paid by Tenant for such period, then subject to the Credit Application (below defined), Tenant shall receive a credit against Rent for any such overpayment (or refunded to Tenant at the expiration of this Lease). Landlord's and Tenant's obligations under this Section 802 shall survive the expiration or earlier termination of this Lease. It is expressly recognized that Landlord shall be entitled to deduct from any refund otherwise payable to Tenant those sums, if any, then due and owing to Landlord, except payments of fixed rent and/or additional rent not past due beyond any applicable cure period provided under this Lease (the "Credit Application"). If at any time the Real Estate Taxes increase, Landlord may increase the Monthly Real Estate Tax Charge accordingly to reflect Tenant's Pro Rata Share of such increase. If Landlord receives a rebate or Real Estate Taxes are reduced by reason of a tax contest or otherwise, Tenant

7

shall receive its proportionate share of the net rebate received by Landlord after deduction of all costs and expenses incurred in obtaining the same, unless such costs and expenses were previously billed to Tenant and paid by Tenant as part of Real Estate Taxes.

## SECTION 9
### INSURANCE

**901.**      Landlord agrees to carry, or cause to be carried, on the Shopping Center, during the Term hereof, Commercial General Liability Insurance (hereinafter, "Landlord's Liability Insurance") on the Common Areas, providing coverage of not less than Two Million Dollars ($2,000,000.00) in combined Bodily Injury and Property Damage Liability, together with an umbrella policy of not less than Ten Million Dollars ($10,000,000.00). Landlord also agrees to carry, during the Term hereof, special causes of loss property coverage (hereinafter, "Landlord's Property Insurance") insuring the buildings located at the Shopping Center, including the Premises and all appurtenances thereto (excluding Tenant's Property) for not less than ninety percent (90%) of the full replacement value thereof written on an agreed value basis to avoid co-insurance provisions, which insurance may also include both (x) rent interruption coverage for a period of at least one (1) year but in no event less than Landlord's first mortgagee may require as well as (y) such other coverages or policies which may be now or hereafter maintained by Landlord with respect to the Shopping Center or the rents therefrom which are then carried by prudent landlords of similar commercial projects. Landlord's insurance obligations hereunder shall be subject to revision from time to time to reflect deductibles and/or exclusions typically maintained by other landlords of similar commercial projects and limitations imposed by reason of changes in insurance requirements or coverages then in effect in the Washington, D.C. metropolitan area. Landlord represents to Tenant that the Shopping Center is not located in an area presently designated as a flood area.

Tenant shall pay to Landlord the Monthly Insurance Charge specified in Section 201(k) at the same time as Minimum Rent is payable hereunder, without offset, notice or demand. Upon receipt of all insurance bills attributed to any calendar year during the Term, Landlord shall furnish Tenant with a written statement of the actual amount of Tenant's proportionate share of the insurance costs for such year or part thereof. If such statement reflects that Tenant's Pro Rata Share of the actual insurance costs exceeds the insurance charges paid by Tenant for such period, Tenant shall pay such amount shown to be due by such statement as Additional Rent within thirty (30) days following the date Tenant receives such statement. If such statement reflects that Tenant's Pro Rata Share of the actual insurance costs is less than the aggregate Monthly Insurance Charges paid by Tenant for such period, then subject to the Credit Application, Tenant shall receive a credit against Rent for any such overpayment (or refunded to Tenant at the expiration of this Lease). If at any time Landlord receives notice of an increase in the insurance costs with respect to the Shopping Center, Landlord may increase the Monthly Insurance Charge accordingly to reflect Tenant's Pro Rata Share of such increase. Landlord's agreement to provide a statement as provided for in this Section 901 is not a condition to the Tenant's obligation to make payment of the insurance charges.

**902.**      (a) Tenant shall be responsible for the maintenance of the plate glass in or on the Premises.

        (b) Tenant shall be responsible for maintaining during the Term causes of loss-special form property insurance, insuring Tenant's inventory, furniture, fixtures, equipment, personal property, and all other contents in the Premises in an amount not less than the full replacement cost thereof. Such property insurance shall also include builders' risk coverage during the course of any construction in or affecting the Premises. Tenant shall promptly order replacement glass for any damaged glass with glass of like-kind and quality at Tenant's expense so that replacement occurs as soon as possible. Tenant shall also maintain business automobile liability insurance on all vehicles which Tenant garages on the Premises and shall carry hired and non-owned liability insurance, all of which shall be subject to a limit of One Million Dollars ($1,000,000.00). Tenant shall also maintain statutory workers compensation insurance on Tenant's employees, including employer's liability with split limits of $100,000.00/$500,000.00/$100,000.00. Any such workers compensation insurance policy shall contain an express waiver of subrogation provision in favor of Landlord and its agents, including, without limitation, its management agent, and employees, if any.

**903.**      From and after Notice of Possession through the Expiration Date, Tenant shall keep in full force and effect a policy of commercial general accident and public liability insurance with respect to the Premises, the areas adjacent to the Premises (including, but not limited to, the sidewalk and loading dock) and the business operated by Tenant with a combined single limit for bodily injury, including death, to any person or persons, and for property damages, of not less than Ten Million Dollars ($10,000,000.00). Such insurance shall include products and completed operations, personal and advertising injury, contractual liability and fire legal liability with a limit of no less than Five Hundred Thousand Dollars ($500,000.00). Tenant agrees to

require similar coverages from any contractor or subcontractor providing services on or to the Premises.

**904.**       Tenant shall keep in full force and effect during the Term business interruption insurance in an amount equal to the annual Rent for a twelve (12) month period.

**905.**       Tenant shall keep in full force and effect during the Term such other insurance coverages against other insurable hazards as are from time to time reasonably requested by Landlord.

**906.**       Upon Landlord's written request, Tenant shall furnish Landlord with certificates of insurance at all times from and after Notice of Possession through and including the Expiration Date, except Tenant shall furnish such certificates after receipt of the Notice of Possession without any written request from Landlord.  All certificates of insurance shall evidence that Tenant's insurance policies required pursuant to the provisions of this Lease (i) name both Landlord and Landlord's Agent and Landlord's Mortgagee(s) as additional insureds with respect to liability insurance only and that an endorsement be attached providing for this coverage, (ii) contain a standard mortgagee endorsement satisfactory to Landlord and Landlord's Mortgagee(s) with respect to liability insurance only, and (iii) provide that the policies evidenced thereby may not be canceled without at least thirty (30) days' prior written notice to Landlord (and Landlord's Mortgagee(s)) of such termination.  All insurance carriers providing insurance required by this Section 9 must have an A.M. Best's A-XII rating.  If such certificates of insurance are not received by Landlord on or before Notice of Possession, (i) Tenant shall not be permitted to perform any work on the Premises or otherwise use or occupy the Premises until such certificates are received by Landlord, and (ii) Landlord shall have no obligation to deliver the keys to the Premises to Tenant until such certificates are received by Landlord;  provided, however, the Notice of Possession date shall not be affected and the Fixturing Period shall be deemed to begin on the date of Landlord's Notice of Possession.  If such certificates of insurance are not received by Landlord within five (5) days after Notice of Possession and at least fifteen (15) days prior to the expiration of any insurance policy, and Tenant fails to provide such certificates within five (5) days after written notice from Landlord, Landlord shall have the right to acquire such insurance, and Tenant shall be obligated to pay Landlord, as Additional Rent, the amount of the premium applicable thereto within five (5) days following notice from Landlord.

**907.**       Subject to Section 909 below, Tenant hereby indemnifies, defends and holds Landlord and Landlord's lessors, its partners, officers, shareholders, trustees, principals, agents, property managers, employees and any Mortgagee(s) (collectively, the "Indemnitees") harmless from and against all liabilities, obligations, damages, judgments, penalties, claims, costs, charges and expenses, including, without limitation, reasonable architects' fees, which may be imposed upon, incurred by, or asserted against any of the Indemnitees and arising, directly or indirectly, out of or in connection with (i) Tenant's breach of its obligations under this Lease, (ii) the acts or negligence of Tenant, its agents, contractors, and employees, (iii) any loading platform area permitted to be used by Tenant, and/or (iv) the use or occupancy of the Premises or the Shopping Center by Tenant's invitees while within the Premises, and by Tenant, its agents, servants, employees, and contractors, except if any of the foregoing are due to Landlord's willful misconduct or negligence.  If any action or proceeding is brought against any of the Indemnitees by reason of any of the foregoing, Tenant shall reimburse to Indemnitee the cost of defending such action or proceeding or, upon Indemnitee's written request and at Tenant's sole cost and expense, resist and defend such action and proceeding by counsel approved by Indemnitee.  Any such cost, damage, claim, liability or expense incurred by Indemnitee for which Tenant is obligated to reimburse Indemnitee hereunder or under this Lease shall be deemed Additional Rent due and payable within five (5) days after notice to Tenant that payment is due.

       Subject to Section 909 below, Landlord hereby indemnifies and holds Tenant harmless from and against any and all liabilities, obligations, damages, judgments, penalties, claims, costs, charges and expenses, including, without limitation, reasonable architects' and attorneys' fees, which may be imposed upon, incurred by, or asserted against Tenant and arising out of or in connection with (i) Landlord's breach of its obligations under this Lease, or (ii) the use, operation or maintenance of the Shopping Center, except to the extent either (a) caused by the willful misconduct or negligence of Tenant, its agents, contractors or employees, or (b) required to be indemnified by Tenant under Section 907 above.

**908.**       It is understood and agreed that all property kept, stored or maintained in the Premises shall be so kept, stored or maintained at the sole risk of Tenant.  Landlord shall not be liable to Tenant for any loss of business or other consequential loss or damage from any cause whatsoever.

**909.**    Each party releases and waives on behalf of itself and on behalf of the insurers of such party's property, any and all claims and any rights of subrogation of any such insurer against the other party, its employees and agents for loss sustained from any peril to property that is covered under a standard all-risk or Special Form - Causes of Loss policy, or any peril that is required to be insured against herein, whether or not such insurance is actually in force, or from any peril to property actually insured against, though not required to be under this Lease.    All insurance policies of Landlord and Tenant required by this Lease shall contain a clause or endorsement pursuant to which the insurance companies waive subrogation and consent to a waiver of right of recovery.  Upon written request, Landlord and Tenant shall provide each other with a copy of the endorsement providing for the aforesaid release and waiver of subrogation.

**910.**    Tenant shall comply with all requirements and recommendations of Landlord's Insurance carriers.  In case of breach of this covenant, in addition to all other remedies of Landlord hereunder, Tenant shall pay to Landlord, as Additional Rent, any and all increases in premiums for Insurance carried by Landlord where such increases were caused in any way by the occupancy or use of Tenant or the condition of the Premises.

### SECTION 10
### COMMON AREA MAINTENANCE

**1001.** Landlord grants to Tenant, in common with others, the right to use the common areas and facilities of the Shopping Center and, subject to the REA, the common areas of the Parcels (described in Section 201(a) above) (collectively, the "Common Areas").  Tenant agrees that (i) the Shopping Center is under the complete control of Landlord; (ii) the parking lot is provided primarily for the convenience of customers, and in the case of the commuter area designated on the Site Plan, commuters; and (iii) that any employee parking area may be designated by Landlord in its sole and absolute discretion.  Tenant shall use its best efforts to ensure that (i) Tenant, its employees and agents shall, at all times, use the parking area designated by Landlord, and (ii) Tenant, its employees and agents shall not under any circumstances use the area designated for customer parking in the Shopping Center.  Landlord may change the area designated for Tenant parking, from time to time, by giving notice to Tenant. Tenant shall (i) conspicuously post the Parking Regulations within the Premises at its sole cost and expense, (ii) notify Tenant's employees and agents of the Parking Regulations at its sole cost and expense, and (iii) permit Landlord to notify Tenant's employees and agents of the Parking Regulations. Landlord agrees that it shall maintain, or cause to be maintained, the Common Areas of the Shopping Center in good order and repair.

Landlord agrees that, except as expressly provided in this paragraph or in Section 19 below, Landlord will not make nor consent to any change, alteration or addition to the cross-hatched portions of the (i) Parcel identified on Exhibit "A" as Parcel C2, and (ii) the Parcel identified on Exhibit "A" as Parcel B1 (such cross-hatched portions being collectively referred to herein as the "No Change Area").  It is expressly recognized and agreed that with respect to the  portions of Parcel B1 and C2 which are not part of the No Change Area, Landlord may construct alterations, additions and/or improvements thereto without Tenant's consent, provided that in all such events, Tenant's access to its loading dock from Commerce Street shall be preserved.    Notwithstanding the foregoing, Tenant agrees that Landlord shall have the right to perform construction in the No Change Area as a result of casualty, condemnation or force majeure, provided that in the event Tenant is conducting business operations from the Premises during such construction, Landlord shall use reasonable efforts to assure that the accessibility to the Premises from the parking areas or from the public streets and roadways bordering the No Change Area, or the visibility of the Premises or Tenant's signs shall not be materially adversely affected, without Tenant's prior written consent in each instance.

**1002.**    In lieu of paying the actual pass-throughs of common area maintenance costs, on or before the first day of each calendar month of the Term, Tenant shall pay to Landlord a stipulated and agreed monthly sum, which sum shall be subject to annual increases as described below (such monthly sum is referred to herein as the "Monthly Common Area Maintenance Charge").  During the first full Lease Year, the Monthly Common Area Maintenance Charge shall be $3,920.00.  On the first day of each Lease Year thereafter (including any extension periods) the Monthly Common Area Maintenance Charge shall increase to an amount equal to one hundred three percent of the prior Lease Year's Monthly Common Area Maintenance Charge.  By way of example, the Monthly Common Area Maintenance Charge for the second, third and fourth Lease Years shall be $4,037.60, $4,158.73, and $4,283.49, respectively.  Landlord agrees that other than the Monthly Common Area Maintenance Charge, Tenant shall not be required to pay any other sums toward common area maintenance costs.  It is expressly recognized and agreed that Tenant shall not be billed for its proportionate share of actual common area maintenance costs; accordingly, Tenant shall have no right to audit or review in any manner Landlord's calculation of the annual Shopping Center common area maintenance costs.  If pursuant to the Deed of Easement between OTR and Tenant, Tenant is required to pay OTR for the

lighting of the OTR Property pursuant to the terms of the Deed of Easement, Landlord shall pay to OTR such costs and Tenant shall reimburse Landlord for Tenant's Pro Rata Share of such costs within fifteen (15) days after written demand.

**1003.**      Landlord agrees to provide adequate lighting of the Common Areas of the Shopping Center, including the parking lot from dusk until 11:00 p.m., Monday through Saturday, and until 7:00 p.m. on Sunday.

**1004.**      Landlord shall provide for the non-exclusive use of all tenants or other occupants of the Shopping Center, and their respective employees, customers and other invitees, the greater of (the "Minimum Parking Ratio"):  (a) the number of currently existing parking spaces within the portion of the Shopping Center located in Parcel B-1 as described on Exhibit "A" attached hereto; or (b) the number of parking spaces imposed by any local code requirements.

### SECTION 11
### PROMOTIONAL FUND

**1101.**      Commencing on the Rental Commencement Date, Tenant covenants and agrees to participate in the promotional fund established by Landlord to furnish and maintain advertising, marketing and sales promotions for the benefit of the Shopping Center (the "Promotional Fund").

**1102.**      During the Term, Tenant shall pay to Landlord on a monthly basis, the Monthly Promotional Fund Charge and Tenant shall not be required to contribute any additional sums to the Promotional Fund or otherwise be required to perform any other activities in connection therewith.

**1103.**      The funds contributed by Tenant as provided herein shall be used by Landlord for the promotion and benefit of the Shopping Center in such manner as Landlord shall from time to time determine.  Landlord, at its option, may pay any part of the amount received hereunder to the Merchants Association which has been or may be formed in the Shopping Center, and any such payment shall be deemed to be an expenditure of such sums for the promotion and benefit of the Shopping Center.

**1104.**      Intentionally Deleted.

### SECTION 12
Intentionally Deleted.

### SECTION 13
### COVENANTS OF TENANT

**1301.**      Tenant, its agents, employees, contractors, invitees and licensees shall at all times abide by and observe the rules and regulations set forth in Exhibit G, and such other reasonable rules and regulations as may be promulgated by Landlord from time to time (the "Rules and Regulations") provided (i) such rules and regulations do not conflict with the terms of this Lease, and (ii) such rules and regulations do not materially increase Tenant's obligations or materially diminish Tenant's rights under this Lease.  Nothing contained in this Lease shall be construed to impose upon Landlord any duty or obligation to enforce such Rules and Regulations, or the terms, conditions or covenants contained in any other lease, as against any other tenant, and Landlord shall not be liable to Tenant for violation of the same by any other tenant, its employees, agents, contractors, invitees, licensees, customers, clients, family members or guests.  The failure of Landlord to enforce any of such Rules and Regulations against Tenant and/or any other tenant in the Shopping Center shall not be deemed a waiver of any such Rules and Regulations.  If there is any inconsistency between this Lease and any current or future Rules and Regulations, this Lease shall govern.

### SECTION 14
### TENANT WORK

**1401.**      Pursuant to section 201(s), Tenant shall submit to Landlord its store layout plans and specifications, showing in reasonable detail any and all interior alterations or improvements that Tenant proposes to make to the Premises (the "Tenant's Plans").  The Tenant Plans submitted shall provide for the installation of trade fixtures having a quality and finish substantially similar to the trade fixtures installed in the "buybuy Baby" store in Rockville, Maryland (the "Comparable Fixtures").  In the event Landlord reasonably believes that either the Tenant's Plans (i) do not meet local building code, or (ii) do not contain Comparable Fixtures, Landlord shall have ten (10) days following receipt of the Tenant Plans to reject such Tenant Plans, and if Landlord shall reject the same then Landlord shall provide its reasonable basis for such rejection and proposed alterations to the Tenant Plans in writing.  In the event Landlord fails to approve or disapprove the Tenant Plans within such ten (10) day period, the Tenant Plans shall be deemed approved.  After approval by Landlord, which approval shall not be unreasonably

withheld or delayed, Tenant's Plans shall be marked "Approved", dated, signed by Landlord, marked Exhibit E and attached to and made a part of this Lease.  (Tenant shall furnish, a minimum of four (4) such copies for approval).  Tenant shall not commence any work in the Premises prior to obtaining Landlord's approval of Tenant's Plans.  Neither Landlord's approval nor Landlord's failure to disapprove of the Tenant Plans shall constitute a representation or warranty by Landlord that the Tenant Plans comply with applicable insurance requirements, building codes, ordinances, laws or regulations or that the alterations, additions and improvements constructed in accordance with such Tenant Plans will be adequate for Tenant's use.

**1402.**        Tenant shall not alter the exterior of the Premises and shall not make any (i) structural alterations, or (ii) non-structural alterations to the interior of the Premises costing in excess of One Hundred Thousand Dollars ($100,000.00) in the aggregate with respect to any particular project, without in each such instance first obtaining Landlord's prior written approval of such alterations.  With respect to structural alterations and non-structural alterations requiring Landlord's written approval, Landlord shall not unreasonably withhold its consent to any such alterations provided that (i) all trade fixtures installed in connection with interior alterations are Comparable Fixtures, (ii) Tenant has provided Landlord with a copy of its plans for such alterations, (iii) such alterations do not diminish the size or structural integrity of the building which contains the Premises, (iv) such alterations or construction do not diminish the value of the building which contains the Premises or alter its general use, and (iv) Tenant, at its expense, shall be responsible for necessary governmental approvals and permits.  Tenant agrees that all improvements and fixtures, other than trade fixtures made or installed by it, shall become the property of Landlord at the expiration or earlier termination of this Lease and shall remain upon the Premises.  Tenant shall not be compensated for any alteration or improvements left in the Premises at the end of the Term.  On or prior to the expiration of this Lease, Tenant shall remove its trade fixtures, equipment and other items of personal property, together with its permitted signs and identification marks (collectively, the "Tenant's Property").  Tenant shall promptly repair at its own expense any damage to the Premises caused by the removal of said Tenant's Property.  Notwithstanding anything in this Section 1402 to the contrary, Tenant shall have the right to make alterations to the interior of the Premises strictly of a cosmetic nature without the consent of Landlord.

**1403.**        Tenant shall not suffer, permit or give cause for the filing of a lien against the Premises.  In the event that any mechanic's or materialmen's lien or notice of lien shall at any time be filed against the Premises by reason of work, labor, services or materials performed or furnished to Tenant or to anyone holding the Premises through or under Tenant, Tenant shall promptly cause the same to be bonded or discharged of record.  If Tenant shall fail to cause such lien or notice of lien to be discharged or bonded within thirty (30) days after notice of the filing thereof, then, in addition to any other rights and remedies available to Landlord at law, in equity or under this Agreement, Landlord may, but shall not be obligated to, discharge or bond off the same by paying the amount claimed to be due or posting a bond, and the amounts so paid by Landlord and all costs and expenses, including reasonable attorneys' fees, incurred by Landlord in paying, bonding off or procuring the discharge of such lien, shall be due and payable by Tenant to Landlord as Additional Rent within thirty (30) days of Landlord's demand therefor.

**1404.**        Subject to Landlord's payment of the Construction Allowance in accordance with the provisions of Exhibit C-1 of this Lease, all construction in the Premises shall be performed at Tenant's sole cost and expense in strict accordance with Exhibit E.  Contractors must be licensed and carry such insurance in amounts, with coverages and issued by insurers reasonably satisfactory to Landlord.

**SECTION 15**
**REPAIRS**

**1501.**        Tenant shall repair promptly at its sole expense any damage to the Premises or any other improvement within the Shopping Center caused by bringing into the Premises any property for Tenant's use, or by the installation or removal of such property, regardless of fault or by whom such damage shall be caused, unless caused by the gross negligence or wilful misconduct of Landlord, its agents or employees.

**1502.**        Tenant shall be solely responsible for keeping the Premises in good condition and repair from Notice of Possession until the Expiration Date of the Lease, including, but not limited to, all required and necessary repairs and replacements to the doors, windows, glass, ceiling, mechanical, electrical, plumbing, heating, ventilating and air-conditioning equipment as well as any fire protection system serving solely the Premises.  Tenant shall not cause the roof of the Premises to be penetrated without first obtaining Landlord's written consent, and, upon obtaining such consent, Tenant agrees that any such work shall be performed by Landlord's roofing contractor at Tenant's sole expense, provided the fees charged by Landlord's roofing contractor are commercially competitive,

and such contractor is available to perform such work so as not to unreasonably delay the progress of Tenant's Work, provided Tenant has given such contractor reasonable prior notice of the need for its services.

**1503.** Tenant shall obtain and maintain, at Tenant's sole cost, service contracts with reputable, licensed mechanical contractors to carry out a program of regular maintenance and repair of the heating, ventilating and air-conditioning systems.

**1504.** If any repairs required to be made by Tenant hereunder are not made within thirty (30) days after written notice thereof by Landlord to Tenant, such failure shall constitute an event of default under this Lease, and Landlord may (but shall not be obligated), at its option, make such repairs without liability to Tenant for any loss or damage which may result to Tenant's business by reason of such repairs (including, without limitation, damage to Tenant's business) provided, however, if Tenant is unable to cure the default within such thirty (30) day period, Tenant shall have such longer period as may be reasonably required, provided Tenant commence to cure within such thirty (30) day period and continuously, diligently and in good faith proceeds to cure. Notwithstanding the foregoing, repairs which if required of Tenant which if not immediately made may likely damage other premises or the common areas of the Shopping Center shall be made as soon as practicable, and Landlord shall be entitled to perform such activities on behalf of Tenant to protect the other premises or common areas. In the event Landlord undertakes any repairs in the Premises, absent Emergency Circumstances (below defined), Landlord agrees to use reasonable efforts to minimize any disruption to Tenant's business operations. Tenant shall pay Landlord, within thirty (30) days of demand therefor, the documented cost of such repairs plus a repair fee in the sum of ten percent (10%) of the amount thereof.

**1505.** Landlord shall have the right, but not the obligation, to enter upon the Premises at all reasonable hours for the purpose of inspecting the same, or for making repairs, additions or alterations to the Premises or any property owned or controlled by Landlord. With the exception of circumstances ("Emergency Circumstances") believed by Landlord to pose an immediate danger to persons or property, Landlord agrees to provide reasonable prior notice with respect to such entries and to use reasonable efforts to minimize interference with Tenant's operations therein to the extent practicable under the circumstances.

**1506.** Landlord covenants and agrees, at its expense without reimbursement or contribution by Tenant, except if resulting from the neglect or default of Tenant or any employee, agent, contractor or invitee of Tenant, to keep, maintain and replace, if necessary, (i) the structural systems including, without limitation, the roof (and keeping same free from leaks), load-bearing walls and floor slabs and masonry walls and foundations (excluding plate glass, windows, doors, door closure devices, window and door frames, molding, locks, and hardware, and painting or treatment of interior walls), (ii) the exterior paint of exterior walls, (iii) the plumbing lines to the point of entry to the Premises (exclusive of fixtures), (iv) the electrical lines to the point of entry to the Demised Premises, (v) the utility lines and connections to the Premises, and (vi) the sprinkler mains, if any, and (vii) all fire protection systems (except for a fire protection system that solely serves the Premises), in good condition and repair. Notwithstanding the foregoing, any revisions to the fire protection system servicing the Premises required as a result of any of installations, alterations, modifications, or improvements made in the Premises by Tenant or any of its invitees shall be performed by Landlord's contractors at Tenant's sole cost and expense, provided the fees charged by Landlord's contractors are commercially competitive, and such contractors are available to perform such work so as not to unreasonably delay any such required revisions. In the event the Premises become or are out of repair and not in good condition due to the failure of Landlord to comply with the terms of this Article, then Landlord shall perform or cause to be performed any and all repairs necessary to restore the Premises to a state of good condition and repair. If such repairs are not completed within thirty (30) days after Landlord has received written notice from Tenant of such state of disrepair or if such repairs cannot reasonably be completed within such thirty (30) day period and Landlord shall fail to commence such repairs within such thirty (30) day period and proceed diligently thereafter then Tenant may prosecute such repairs itself, and obtain repayment thereof from Landlord, which repayment shall include a repair fee equal to ten percent (10%) of Tenant's third party out of pocket expenses in effectuating such repair. Should Landlord fail to reimburse Tenant for the costs of the repair within thirty (30) days after notice, Tenant shall be entitled to apply the cost of such repairs against the next maturing monthly installment or installments of Rent due hereunder. Notwithstanding the foregoing in the case of an emergency (such as without limitation a leaky roof), Tenant shall have the right to immediately prosecute any and all necessary repairs and shall deliver contemporaneous notification to Landlord of the emergency and related repairs, and offset the cost of such repairs against the next maturing monthly installment or installments of Rent due hereunder; provided further that if contemporaneous notice is not practicable, as determined by Tenant in its sole judgment, then Tenant shall provide such notice as soon thereafter as reasonably practicable.

Notwithstanding any provision within this Section 1506 to the contrary, however, Tenant shall not deduct more than fifteen percent (15%) of the Rent from any monthly installment of Rent and in no event shall Tenant deduct in the aggregate over any three Lease Year period more than Fifty Thousand Dollars ($50,000.00).

**SECTION 16**
**SURRENDER OF PREMISES**

**1601.**     Tenant, on the Expiration Date, shall peaceably surrender to Landlord the Premises in broom-clean condition and in good repair.  Tenant hereby waives any and all notices to vacate.

**1602.**     All trade fixtures owned by Tenant and installed in the Premises shall remain the property of Tenant and shall be removable from time to time and also at the expiration of the Term, or any renewal or extension thereof, or other termination thereof, provided Tenant shall not at such time be in default beyond the expiration of any applicable cure period provided hereunder under any covenant, agreement or obligation contained herein; and, if in default beyond the expiration of any applicable cure period provided hereunder, Landlord shall have a lien on such trade fixtures as security against loss or damage resulting from any such default by Tenant, and said fixtures shall not be removable by Tenant until such default is cured or Landlord notifies Tenant to remove such trade fixtures (or any items thereof) from the Premises.

**1603.**     It shall be an event of default under this Lease if Tenant remains in possession of the Premises after the Expiration Date without the written permission of Landlord, and without the execution and delivery of a new lease.  In the event of such default by Tenant, Landlord, at its option, may (i) in addition to any other remedies available to Landlord at law, in equity or under this Lease, immediately re-enter and take possession of the Premises without process, or by any legal process in force in the jurisdiction in which the Shopping Center is located and hold Tenant liable for any and all damages incurred as a result of such holdover (including, without limitation, consequential damages in the event such holdover is for a period in excess of sixty (60) days), and for the reasonable value of the use of the Premises which is hereby agreed to be one hundred fifty percent (150%) of the monthly Minimum Rent plus the other Rent required under this Lease during the last month of the Term for the initial thirty (30) days of such holdover and an amount equal to two (2) times the monthly Minimum Rent plus the other Rent required under this Lease for all periods thereafter, or (ii) treat the Tenant as occupying the Premises as a tenant on a month-to-month basis, subject to all the conditions, provisions and obligations of this Lease, including, without limitation, Tenant's obligation to pay pass throughs of Insurance, Real Estate Taxes and Monthly Common Area Maintenance Charges (to the extent provided in this Lease) (but without any right of Tenant hereunder to extend the Term) insofar as the same are applicable to a month-to-month tenancy, except that the monthly Minimum Rent during any such holdover period shall increase to an amount equal to one hundred fifty percent (150%) of the Minimum Rent due during the month immediately preceding such holdover.

**SECTION 17**
**UTILITIES AND TRASH**

**1701.**     Tenant shall, at its sole cost and expense, pay promptly all charges when due for water, gas, electricity, trash, heat, sewer rentals or service charges, and any other utility charges incurred by Tenant in its use and occupancy of the Premises commencing upon the Notice of Possession.  If Landlord is required to supply water, gas, electricity, heat or sewer rentals, or any other utility service, for the Shopping Center and/or the Premises, then Tenant agrees to purchase the same from Landlord at the then-prevailing local rates and charges (but without profit or surcharge by Landlord), and to pay promptly the charges therefor when bills are rendered to Tenant.  Tenant shall use reasonable diligence in conservation of these utilities.

**1702.**     Landlord shall not be liable to Tenant in damages or otherwise if the said utilities or services are interrupted or terminated because of necessary repairs, installations, or improvements, or any cause beyond the Landlord's reasonable control, nor shall any such interruption or termination relieve Tenant of the performance of any of its obligations hereunder, unless Tenant is unable to operate its business by reason of a matter within Landlord's reasonable control for more than two (2) days, in which event there shall be an abatement of all Rent hereunder commencing on the third (3rd) day of such disruption, while Tenant is unable to operate its business in the Premises.  Tenant's abatement of Rent shall constitute the sole and exclusive remedy available to Tenant by reason of any interruption or termination of utilities or services hereunder.

## SECTION 18
### SIGNS

**1801.**    Tenant shall, at its own expense and by the end of the Fixturing Period, install and at all times thereafter maintain in good condition and repair an exterior sign of such size, color, design, illumination and location, all as reasonably approved by Landlord.  The sign must also conform to all governmental requirements.  Exterior sign(s) shall be kept illuminated from dusk until at least 10:00 p.m. every day of the Term.

**1802.**    Except as provided below, Tenant shall not display any sign, lettering or lights on or adjacent to the exterior walls of the Premises, including, without limitation, both interior and exterior surfaces of windows and all surfaces of the Premises, unless first approved by Landlord in writing, which approval shall not be unreasonably withheld.  No rights are granted to Tenant to use the outer walls or the roof of the Premises without Landlord's prior written consent.  Tenant shall have the right to display any professional prepared signs in the interior of the Premises and in the interior surfaces of windows within the Premises without the written consent of Landlord.

**1803.**    Tenant's sign plan must conform to Landlord's sign criteria as per Exhibit D(1), which Landlord may modify from time to time, but such modifications shall not apply to Tenant's then existing signs.  Tenant agrees to keep its sign in conformity with Landlord's sign criteria as it exists on the date of Landlord's approval of Tenant's signs.  Within the number of days specified in section 201(t), Tenant shall submit to Landlord its sign plans and specifications, showing in complete detail the proposed construction and installation of Tenant's sign (the "Sign Plans").  After approval by Landlord, the Sign Plan shall be marked "Approved", dated, signed by Landlord, marked Exhibit D and attached to and made a part of this Lease.  Tenant shall furnish, a minimum of four (4) such copies for approval.  Notwithstanding anything to the contrary contained in Exhibit D(1), Landlord hereby approves Tenant's prototypical exterior sign annexed hereto as Exhibit "J", ~~including the dimensions indicated thereon, subject to compliance with local sign ordinances.~~

**1804.**    Intentionally deleted.

**1805.**    Within the number of days specified in section 201(t), Tenant shall furnish to Landlord the name to appear on the under-canopy sign.  Landlord shall install such under-canopy sign which shall be substantially similar to the other under-canopy signs presently installed in Parcel C-2and thereafter maintain such sign, all at the sole cost of Tenant (presently approximately $500 for the under-canopy sign).

**1806.**    Prior to the Expiration Date, Tenant, at its sole cost and expense, shall remove its façade sign and shall repair any damage, including the filling of holes caused by the installation or removal of the façade sign, and repairing and returning the facade to its original condition.

**1807.**    It is expressly recognized that Tenant shall be entitled, at its sole cost and expense, to have its logo panel sign pylon sign erected at the main Shopping Center entrance on Old Keene Mill Road within the Shopping Center.  Tenant's panel shall be installed by Tenant in the one (1) blank space presently existing on such pylon sign as of the date of this Lease.

## SECTION 19
### RIGHTS OF LANDLORD

**1901.**    Landlord reserves the following rights with respect to the Premises:

(i)    Landlord, any party with a security interest in the Shopping Center, or any portion thereof, or the interest of Landlord therein, and any lessor under any ground lease or underlying lease, and their representatives, to have free and unrestricted access to, and to enter upon, the Premises at all reasonable hours for the purposes of inspecting the Premises, or of making repairs, replacements or improvements in or to the Premises or the building or equipment (including, without limitation, sanitary, electrical, heating, air-conditioning or other systems), or of complying with all laws, orders and requirements of any governmental or other quasi-governmental authority, or of exercising any right reserved to Landlord under this Lease (including the right during the progress of any repairs, replacements, improvements or other work permitted or required by this Lease to keep and store within the Premises all necessary materials, tools and equipment, unless a staging area is otherwise available); absent Emergency Circumstances, Landlord agrees in connection with any such entries to (a) provide reasonable prior notice, and (b) use commercially reasonable efforts to minimize any disruption to Tenant's business operations; and

(ii)  To show, at reasonable times, the Premises during ordinary business hours to any existing or prospective lender, ground lessor, tenant, purchaser, assignee of any loan secured by the Shopping Center, or any portion thereof, or assignee of any interest in Landlord, and/or to any person contemplating the leasing of the Premises or any part thereof.  If Tenant shall not be personally present to open and permit an entry into the Premises, in Emergency Circumstances Landlord or Landlord's agents may enter the same by a master key, or may forcibly enter the same, without rendering Landlord or such agents liable therefor, and without any abatement of Rent or in any manner affecting the obligations and covenants of this Lease.  Landlord shall exercise its rights of access to the Premises permitted under any of the provisions of this Lease in such manner as to minimize, to the extent practicable, interference with Tenant's use and occupancy of the Premises, provided that Landlord shall incur no additional expense thereby.

(iii)  To display a "For Sale" sign at any time (but not on the façade of the Premises), and also, after notice from either party of intention to terminate this Lease, or at any time within sixty (60) days prior to the Expiration Date, a "For Rent" sign, or both "For Rent" and "For Sale" signs, but not on the outside of the Premises. Prospective purchasers or tenants authorized by Landlord may inspect the Premises at reasonable hours;

(iv)  To install or place upon, or affix to, the roof and exterior walls of the Premises equipment, antenna, and any other object or structure of any kind (but in no event shall Landlord place any tenant signs or advertisements on the roof or exterior walls of the Premises), provided the same shall not be visible from the front of the store, materially impair the structural integrity of the building in which the Premises are located, or interfere with Tenant's occupancy in any unreasonable manner;

(v)   Intentionally deleted

(vi)  Intentionally deleted

(vii)  At any time, and from time to time, in connection with maintenance or alterations to the building in which the Premises is located (as opposed to Shopping Center wide renovations which shall be governed by the provisions of subsection xiii below), to erect scaffolds, protective barriers and other aids to construction on, around and about the exterior of the Premises, but only so long as necessary, provided that reasonable access to the Premises shall be provided at all times and the visibility of Tenant's signage shall not be materially impaired for more than a period of seven (7) consecutive days and further provided that in the event the visibility of Tenant's signage is materially impaired, Landlord shall erect temporary illuminated signage reasonably satisfactory to Tenant, on such scaffolding, barrier or other aids to construction; to install, maintain, use, repair, inspect and replace pipes, ducts, conduits and wires leading through the Premises and serving other parts of the Shopping Center in locations which do not materially interfere with Tenant's use thereof. Tenant further agrees that Landlord may make any use it desires of the side or rear walls of the Premises, provided that there shall be no encroachment upon the interior of the Premises;

(viii)  If an excavation shall be made or authorized to be made upon land adjacent to the Premises, Tenant shall afford to the person causing or authorized to cause such excavation license to enter upon the Premises for the purpose of doing such work as Landlord shall deem necessary to preserve the wall or the building of which the Premises form a part from injury or damage and to support the same by proper foundations, without any claim for damages or indemnification against Landlord or diminution or abatement of rent;

(ix)  Provided Landlord has complied with its obligations under this Section 1901, Landlord shall not be liable in any such case for any inconvenience, disturbance, loss of business or any other losses or annoyance arising from the exercise of any or all of the rights of Landlord under this Paragraph 1901;

(x)  The purpose of the plan annexed hereto as Exhibit A is solely to show the approximate location of the Premises.  Subject to the terms and provisions of Section 1001 of the Lease (which Section 1001 shall control in the event of any conflict with the terms of this paragraph (x)), Landlord hereby reserves the right at any time, and from time to time, to make changes or revisions in such plan, including, but not limited to, additions to, subtractions from, and/or relocations or rearrangements of, the buildings, parking areas, and other Common Areas shown on such plan; provided only that the size of the Premises shall not be changed, and reasonable access thereto shall not be impaired;

(xi)  Landlord reserves the right to sever the ownership of or title to the various sections of the Shopping Center and/or to place separate mortgages on such sections, in which case the right of Tenant and other tenants in the Shopping Center will be preserved by a written declaration or agreement, to be executed by Landlord and duly recorded, creating mutual, reciprocal and interdependent rights to use the parking and

16

other Common Areas of the Shopping Center and the utilities and facilities needed for the full use and enjoyment of the Premises by Tenant and other tenants or occupants in the Shopping Center without impairing any of the duties and obligations of Landlord to Tenant under this Lease. Tenant shall execute from time to time such instruments reasonably required by Landlord and its mortgagee(s) to effectuate the provisions of this Paragraph 1901(x); and

(xii)  Intentionally omitted

(xiii)  Landlord has the right, at Landlord's sole and absolute discretion (and without obtaining Tenant's consent), at any time during the Term, to remodel or change the roof and/or other exterior surfaces of the Premises in connection with a Shopping Center wide renovation. However, any structural alterations to the exterior of the Premises shall not be made by Landlord without Tenant's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed. Tenant understands that, during such remodeling, it might be necessary to remove Tenant's existing sign(s) and that such sign(s) may not be suitable for reinstallation after the remodeling is completed. Landlord agrees to pay all costs and expenses in connection with the removal and reinstallation of any such signs. During any such remodeling, Tenant agrees to cooperate with Landlord and execute any documentation required or desirable to facilitate the remodeling process. Tenant understands that it may be necessary to erect scaffolds or other construction equipment during the remodeling, but access to the Premises shall not be unreasonably impaired.

### SECTION 20
### DAMAGE TO PREMISES

**2001.**    If the Premises shall be partially damaged by fire or other cause, insured or which should have been insured under the coverage Landlord is obligated to carry pursuant to Article 9 of this Lease this Lease shall not be terminated and Landlord shall proceed with diligence, subject to the then applicable statutes, building codes, zoning ordinances, and regulations of any governmental authority, and as soon as practicable after such damage occurs (taking into account the time necessary to effectuate a satisfactory settlement with any insurance company involved and for such other delays as may result from government restrictions, controls on construction, if any, and strikes, emergencies, and other conditions beyond the control of Landlord), to repair such damage, at the expense of Landlord, and notwithstanding any provision to the contrary, Landlord shall not be required to expend for such repair or restoration an amount in excess of the insurance proceeds recovered as a result of the damage, or in the event Landlord shall fail to have maintained insurance as required under this Lease, the amount of insurance proceeds which would have been recovered had Landlord maintained the insurance required to be maintained by Landlord under this Lease; provided, however, that if the Premises are damaged by fire or other cause to such extent that the damage cannot be fully repaired within one hundred eighty (180) days from the date of the casualty, Tenant, upon written notice to Landlord given within sixty (60) days of the date of such casualty, may terminate this Lease, in which event the Rent shall be apportioned and paid to the date of such damage.

If the Premises is destroyed or rendered untenantable by fire or other casualty to the extent of more than one-third (1/3) of its replacement cost during the last year of the initial term, or any Extended Term of this Lease, then Landlord or Tenant shall have right to terminate this Lease effective as of the date of the casualty, by giving written notice of termination to the other within thirty (30) days of such casualty; provided, however, Tenant shall have the right to nullify any Landlord termination by exercising an option to extend this Lease (if available) within fifteen (15) days after its receipt of Landlord's termination notice. If said notice of termination is given within this thirty-day period and Tenant does not exercise any renewal option, as aforesaid, this Lease shall terminate and Rent and all other charges shall abate as aforesaid from the date of such casualty.

If the Shopping Center is damaged to the extent of more than fifty percent (50%) of the replacement cost thereof, then Landlord shall have the right to terminate this Lease effective as of the date of the casualty by giving written notice of termination to Tenant within sixty (60) days after the date of such casualty; provided, however, in such event, Landlord shall have the right to terminate this Lease only in the event that Landlord also terminates all other then existing leases in the Shopping Center located in Parcels A, B1 and C2 as identified on <u>Exhibit "A"</u>.

**2002.**    During the period that Tenant is deprived of the use of the damaged portion of the Premises, Tenant shall be required to pay Rent adjusted in the manner described below to cover only that part of the Premises that Tenant is able to occupy for the conduct of its business, and the Rent for such space shall be that portion of the total Rent which the amount of the gross leasable area of the Premises remaining that can be occupied by Tenant bears to the total gross leasable area of the Premises. If such

damage is caused in part by the fault or neglect of Tenant, or its employees, agents, contractors, invitees, licensees, customers, clients, family members or guests, then, Rent shall abate solely to the extent that Landlord's rent interruption coverage covers the loss of Tenant's Rent.  Landlord shall not be liable for delays in making of any such repairs which are due to government regulation, casualties, strikes, unavailability of labor and materials, and/or other causes beyond the reasonable control of Landlord.

**2003.**     Tenant shall give Landlord prompt written notice of any accident, fire or damage occurring on or to the Premises or the Shopping Center.

### SECTION 21
### CONDEMNATION

**2101.**     If all of the Premises (or all rights of use or occupancy of the Premises) shall be taken or condemned by any governmental or quasigovernmental authority for any public or quasi-public use or purpose, or purchased by such authority under threat of such taking (collectively, a "Taking"), the Term of this Lease shall cease and terminate as of the date when title vests in such governmental or quasi-governmental authority and the Rent shall be abated on the date when such title vests in such governmental or quasi-governmental authority.

If as a result of any condemnation of the Shopping Center or any portion thereof, the Premises is no longer reasonably suited for the conduct of Tenant's usual business in Tenant's reasonable business judgment, or more than twenty percent (20%) of the parking spaces in the portion of the Shopping Center located in Parcels C-2 and that portion owned by an Adjacent Property Owner and designated on Exhibit "A" as Lot 10B are taken under the power of eminent domain by any public or quasi-public authority, then Tenant shall have the right to terminate this Lease as of the date of the taking.  If less than twenty percent (20%) of the applicable parking is so taken by eminent domain, then Landlord shall use reasonable efforts to provide adequate substitute parking to Tenant that is reasonably satisfactory to Tenant.

If a condemnation of thirty percent (30%) or more of the Shopping Center renders the Shopping Center unsuitable for use as a retail shopping center in Landlord's reasonable business judgment, then Landlord may terminate this Lease upon thirty (30) days written notice to Tenant; provided, however, Landlord shall have the right to terminate this Lease only in the event that Landlord also terminates all other then existing leases for premises within the Shopping Center located in Parcels A, C2 and B1 as identified on Exhibit "A" attached hereto.

If less than all of the Premises is the subject of a Taking and the Lease is not terminated as set forth above, the Rent shall be equitably adjusted on the date when title vests in such governmental or quasi-governmental authority and the Lease shall otherwise continue in full force and effect.  Tenant shall have no claim against Landlord (or otherwise) for any portion of the amount that may be awarded as damages as a result of any Taking, or for the value of any unexpired portion of the Term, or for loss of profits.  Tenant shall have the right to make a separate claim against the condemning authority for moving expenses, loss of business, the unamortized cost to Tenant (after deduction of the Construction Allowance) of Tenant's leasehold improvements, and any other awards to which it may be entitled separately from any award due to Landlord as long as such award to Tenant does not diminish Landlord's award.  If the award is a "lump sum", Landlord and Tenant shall use good faith efforts to apportion the award on the basis of the provisions set forth above, and if the parties cannot agree on such apportionment, the matter shall be submitted to binding arbitration.

### SECTION 22
### BANKRUPTCY

**2201.**     The following shall be "Events of Bankruptcy" under this Lease:

(i)   Tenant's becoming insolvent, as that term is defined in Title 11 of the United States Code, entitled Bankruptcy, 11 U.S.C. §101 et seq. (the "Bankruptcy Code"), or under the insolvency laws of any State, District, Commonwealth, or Territory of the United States (the "Insolvency Laws");

(ii)   the appointment of a receiver or custodian for all or a substantial portion of Tenant's property or assets, or the institution of a foreclosure action upon all or a substantial portion of Tenant's real or personal property;

(iii)   the filing of a voluntary petition under the provisions of the Bankruptcy Code or Insolvency Laws;

(iv)   the filing of an involuntary petition against Tenant as the subject debtor under the Bankruptcy Code or Insolvency Laws, which is either not dismissed within

ninety (90) days of filing, or results in the issuance of an order for relief against the debtor, whichever is later; or

       (v)   Tenant's making or consenting to an assignment for the benefit of creditors or a common law composition of creditors.

**2202.**      To the extent enforceable under applicable laws, Landlord's remedies upon the occurrence of an event of Bankruptcy shall be as follows:

       (i)   Landlord shall have the right to terminate this Lease and/or any services being provided to Tenant under this Lease by giving notice to Tenant, whereupon Tenant shall be immediately obligated to quit the Premises.  Any other notice to quit or notice of Landlord's intention to re-enter is hereby expressly waived.  If Landlord elects to terminate this Lease, everything contained in this Lease on the part of Landlord to be done and performed shall cease without prejudice, subject, however, to the right of Landlord to recover from Tenant all Rent and any other sums accrued up to the time of termination or recovery of possession of the Premises by Landlord, whichever is later, and any other monetary damages or loss of Rent sustained by Landlord; provided, however, and notwithstanding the foregoing or any remedies set forth in this Paragraph 2202, Landlord shall not have the right to terminate this Lease while a case in which Tenant is the subject debtor under the Bankruptcy Code is pending, unless Tenant or Tenant's trustee in bankruptcy (the "Trustee") is unable to comply with the provisions of Paragraphs 2202(v),(vi) and (vii) below.

       (ii)   Upon termination of this Lease pursuant to Paragraph 2202(i), Landlord may proceed to recover possession under and by virtue of the provisions of the laws of the jurisdiction in which the Shopping Center is located, or by such other proceedings, including re-entry and possession, as may be applicable.

       (iii)   Upon termination of this Lease pursuant to Paragraph 2202(i), Landlord shall have the option to relet the Premises for such rent and upon such terms as are not unreasonable under the circumstances and, if the full Rent reserved under this Lease (and any of the costs, expenses, or damages indicated below) shall not be realized by Landlord, Tenant shall be liable for all damages sustained by Landlord, including, without limitation, deficiency in Rent, reasonable attorneys' fees, brokerage fees, and expenses of placing the Premises in first-class rentable condition.  Landlord, in putting the Premises in good order or preparing the same for re-rental, may, at Landlord's option, make such alterations, repairs or replacements in and to the Premises as Landlord, in its sole discretion, considers advisable and necessary for the purpose of reletting the Premises, and the making of such alterations, repairs or replacements shall not operate or be construed to release Tenant from liability under this Lease.  Landlord shall in no event be liable in any way whatsoever for failure to relet the Premises, or in the event that the Premises are relet, for failure to collect the rent under such reletting, and in no event shall Tenant be entitled to receive the excess, if any, of such net rent collected over the sums payable by Tenant to Landlord hereunder.

       (iv)   Any damage or loss of Rent sustained by Landlord as a result of an Event of Bankruptcy may be recovered by Landlord, at Landlord's option, at the time of the reletting, or in separate actions, from time to time, as said damage shall have been made more easily ascertainable by successive relettings, or in a single proceeding deferred until the Expiration Date (in which event Tenant hereby agrees that the cause of action shall not be deemed to have accrued until the Expiration Date), or in a single proceeding prior to either the time of reletting or the Expiration Date, in which event Tenant agrees to pay Landlord the difference, if any, between the present value of the Rent reserved under this Lease on the date of breach, discounted at eight percent (8%) per annum, and the fair market value of the Lease on the date of breach.  In the event Tenant becomes the subject debtor in a case under the Bankruptcy Code, the provisions of this Paragraph 2202(iv) may be limited by the limitations of damage provisions of the Bankruptcy Code.  In addition, Tenant shall reimburse Landlord for its reasonable attorneys' fees incurred in enforcing or interpreting the provisions of this Section 22, including, but not limited to, any and all costs incurred in consulting with its attorneys with respect to any suit or dispute under this Lease, whether or not suit is brought, and any and all costs of litigation with respect to such enforcement or interpretation (which, with regard to any suit or dispute whereby Landlord is seeking a monetary recovery, are hereby stipulated to be fifteen percent (15%) of the monies awarded to Landlord).

       (v)   In the event Tenant becomes the subject debtor in a case pending under the Bankruptcy Code, Landlord's right to terminate this Lease pursuant to this Section 22 shall be subject to the rights of Tenant or the Trustee to assume or assign this Lease.  Tenant or the Trustee shall not have the right to assume or assign this Lease unless Tenant or the Trustee, within thirty (30) days of the Event of Bankruptcy (a) cures all defaults under this Lease, (b) compensates Landlord for monetary damages incurred as a result of such default, (c) provides "adequate assurance of future performance" (as

defined in Paragraph 2202(vi) below) and (d) complies with all provisions of Paragraph 2202 of this Lease.

(vi)    Landlord and Tenant hereby agree in advance that the phrase "adequate assurance of future performance", as used in this Paragraph 2202, includes adequate assurance (a) of the source of Rent and other consideration due under this Lease, and, in the case of an assignment, that the financial condition and operating performance of the proposed assignee and its guarantors, if any, shall be similar to the financial condition and operating performance of the Tenant and its guarantors, if any, as of the time the Tenant became the Tenant under this Lease; (b) that any assumption or assignment of this Lease is subject to all the provisions hereof, including, but not limited to, location, use and exclusivity, and will not breach any such provisions contained in any other lease or financing agreement; and (c) that any assumption or assignment of this Lease will not disrupt or adversely affect the tenant mix or balance in the Shopping Center.

(vii)   In the event Tenant is unable (a) to cure its defaults, (b) to reimburse Landlord for its monetary damages, (c) to pay when due the Rent due under this Lease, or any other payments required of Tenant under this Lease or (d) to meet the criteria and obligations imposed by Paragraph 2202(vi) above, then Tenant agrees in advance that it has not met its burden to provide adequate assurance of future performance, and this Lease may be terminated by Landlord in accordance with Paragraph 2202(i) above.

## SECTION 23
### ASSIGNMENT AND SUBLET

**2301.**    Except as set forth in Section 2302 below, Tenant shall not assign, mortgage, pledge, encumber or otherwise transfer, voluntarily, by operation of law, or otherwise, this Lease or the Premises nor any interest herein or therein, and that neither the Premises, nor any part thereof, will be used, occupied or managed, or permitted to be used, occupied or managed, by anyone other than Tenant, without the prior written consent of Landlord, which consent in the case of a proposed assignment of the Lease or subletting of all or any part of the Premises shall not be unreasonably withheld, conditioned or delayed.  Notwithstanding any assignment or sublease requiring Landlord's consent, Tenant and the Guarantors shall remain fully liable under this Lease (except to the extent the Guarantor's liability under this Lease is limited or terminated pursuant to the express provisions hereof or the Guaranty) and shall not be released from performing any of the terms, covenants, conditions and obligations under this Lease.

**2302.**    Except as expressly provided below, neither Tenant nor Buy Buy Baby, Inc. (the "Parent Company"), a Delaware corporation, shall permit or allow any transfers of substantially all of the assets or stock or interests in Tenant or Parent Company (as the case may be) by assignment, mortgage, pledge, encumbrance, merger, consolidation or other transfer, voluntarily or by operation of law, or otherwise, which would result in a change in the present effective control of Tenant or Parent Company (as the case may be) by the person or persons, entity or entities possessing a controlling interest in Tenant or Parent Company on the Date of Lease (any such transfer being referred to herein as a "Stock Transfer"), without the prior written consent of Landlord, which consent may be granted, denied and/or conditioned in Landlord's sole and absolute discretion.    In the event Landlord considers an assignment, sublease or other transfer referenced above upon Tenant's request, Tenant and any proposed successor entity shall execute, acknowledge and deliver to Landlord, as one of the conditions precedent to obtaining Landlord's consent, an agreement in form and substance satisfactory to Landlord whereby such proposed successor shall expressly agree to be independently bound by all of the covenants, agreements, terms, provisions and conditions set forth in this Lease (if an assignment or sublease, as of the effective date of such assignment or sublease), including this Section 23 which shall be binding upon it with respect to all future assignments and transfers of this Lease.

Notwithstanding the foregoing, Parent Company or any assignee of Tenant shall have the right to enter into a Stock Transfer without Landlord's consent to any person or corporation or other entity ("Acquiring Entity") acquiring all or substantially all of the Parent Company's stock or assets in the United States, by purchase, merger, consolidation, or otherwise, provided Tenant and the Guarantors shall not be released of any liability hereunder (except as otherwise provided in the Guaranty annexed hereto). In addition, so long as Tenant is not entering into an assignment with an Affiliated Party (defined below) for the purpose of avoiding or otherwise circumventing the restrictions contained in this Section 2302, Tenant may assign its entire interest under this Lease or sublease all or a portion of the Premises, without the consent of Landlord, to an affiliate, subsidiary, or parent of Tenant or Parent Company, or a corporation, partnership or other legal entity wholly owned by Tenant (collectively, an "Affiliated Entity"), provided that all of the following conditions are satisfied: (i) Tenant is not

in default under this Lease beyond the expiration of any applicable cure period, and (ii) Tenant shall give Landlord written notice at least thirty (30) days prior to the effective date of the proposed commencement of the assignment (except in any such instances where such prior notice would violate any applicable laws, particularly those promulgated by the Securities and Exchange Commission, in which case notice shall be given as soon as permissible after such public notice is permissible).

**2303.**      Intentionally deleted.

**2304.**      Landlord and Tenant expressly agree that some of the reasonable factors that may be considered by Landlord in determining whether to consent to a proposed assignment or sublet include, but are not limited to, (i) the business experience and reputation of such proposed assignee or subtenant (and the partners, officers and principals thereof) (ii) the financial capability or creditworthiness of such proposed assignee or subtenant (and the partners, officers and principals thereof), (iii) the proposed assignee or subtenant shall use the Premises (x) with respect to the initial ten (10) year term, solely for the Permitted Use, and (y) with respect to any Extension Period, for the Permitted Use or a use typically found in shopping centers comparable to the then quality and character of the Shopping Center, and which use does not either conflict with the principal use of any other tenants at the Shopping Center occupying 10,000 square feet of rentable area or more, or violate any exclusive use restrictions in written leases between Landlord and other tenants located in the Shopping Center,  as set forth on Exhibit "F" attached hereto (in the case of those exclusives presently in effect and still in effect on the date Tenant seeks Landlord's consent) or of which Tenant shall have received written notice (in the case of exclusives hereafter granted by Landlord), recognizing that any assignee of Tenant shall be subject to the prior written approval of OTR, and (iv) the express agreement and ability of such proposed assignee or tenant to comply with the terms of this Lease, including, without limitation, the provisions contained in Section 31 below.  Tenant agrees to pay Landlord's reasonable attorney's fees for the review and documentation of any proposed assignment or sublet, whether or not Landlord ultimately approves or disapproves such proposed assignment or sublet. The consent by Landlord to any assignment or subletting shall not constitute a waiver of the necessity for such consent to any subsequent assignment or subletting. Prior to any assignment or sublet of the Premises, each prospective assignee or subtenant must expressly agree in writing to pay any and all Rent or other charges accruing under this Lease  from and after the effective date of any such assignment or sublease. If this Lease be assigned, or if the Premises or any part thereof be sublet or occupied by anybody other than Tenant, Landlord may collect rent from the assignee, subtenant or occupant, and apply the net amount collected to the Rent herein reserved, but no such assignment, subletting, occupancy or collection shall be deemed a waiver of this covenant, or acceptance of the assignee, subtenant or occupant as tenant, or a release of Tenant from the further performance by Tenant of the provisions on its part to be observed or performed under this Lease. Notwithstanding any assignment or sublease, Tenant and the Guarantors shall remain fully liable under this Lease and shall not be released from performing any of the terms, covenants, conditions and obligations under this Lease.

**2305.**      Any assignment or subletting of this Lease or the Premises, or any portion thereof, shall be void in the absence of the approval of Landlord to the extent required hereunder.

**2306.**      Landlord shall have the option, in its sole discretion, to terminate this Lease, if Tenant requests Landlord's consent for a subletting of fifty percent or more of the Premises for substantially the remaining portion of the Term or assignment of the Lease.  The option shall be exercised by Landlord giving Tenant written notice within thirty (30) days following Landlord's receipt of Tenant's written notice of Transfer as required by this Article 23.  The Term shall end on the date stated in Tenant's notice as the effective date for the Transfer as if that date had been originally fixed in this Lease for the expiration of the Term.

**2307.**      In the event the rental or other consideration to be received by Tenant as a result of either any assignment of this Lease or subletting of all or any portion of the Premises shall exceed the Minimum Rent and/or pass-throughs of Monthly Real Estate Charge, Monthly Insurance Charge and Monthly Common Area Maintenance Charge payable by Tenant under this Lease with respect to the particular portion (or, if applicable, all) of the Premises sublet by Tenant with respect to the portion of the Term coinciding with such assignment or subletting, as the case may be, then Tenant shall pay to Landlord, on demand, one-half (1/2) of the entire amount of such excess, within fifteen (15) days from the date when received by Tenant, which excess shall be deemed additional rental hereunder, after deducting the reasonable costs incurred by Tenant in effectuating such assignment or sublease (including, without limitation, brokerage commissions, construction allowances and construction/alteration costs).

## SECTION 24
### SUBORDINATION

**2401.**     This Lease shall be subordinate to any and all mortgages and deeds of trust currently existing or that may hereafter be placed upon the Shopping Center, or any portion thereof, and to any and all renewals, modifications, participations, consolidations, replacements and extensions thereof provided only however that the lender enters into an agreement (an "SNDA") with Tenant for recordation in form and content reasonably satisfactory to Tenant whereby said lender (or a purchaser of the Shopping Center and/or this Lease) agrees not to disturb Tenant's occupancy of the Premises except for an event of default.  Any SNDA obtained by Landlord under this Section 2401 shall include recognition by Tenant that any such lienholder (or successor-in-interest thereto) shall not be  (a) be bound by any prepayment of Rent (other than the first month's Rent paid by Tenant upon execution hereof) or Additional Rent for more than one month in advance or which Tenant might have paid for more than the current month to any prior lessor (including Landlord); (so that Rent shall be payable after such foreclosure or termination, as the case may be, in accordance with the terms of this Lease as if such prepayment of rent for more than one month in advance had not been made), nor (b) be bound by any amendment or modification to this Lease or by any waiver or forbearance on the part of any prior landlord (including Landlord) made or given without the written consent of Landlord's first mortgagee; nor (c) be liable for any act or omission of any prior landlord (including Landlord) except for those which arise out of Landlord's default under this Lease which are of a continuing nature and of which such mortgage received written notice and then within a reasonable time after the occurrence or discovery thereof; nor (d) be subject to any offsets or defenses which Tenant might have against any prior landlord (including Landlord) except those which are expressly provided herein or which arose out of the Landlord's default under the Lease and accrued after Tenant has notified such mortgagee and given such party a reasonable opportunity to cure; and furthermore, Landlord's mortgagee shall be discharged of any responsibility hereunder to Tenant which may have arisen (by reason of the mortgagee becoming a mortgagee in possession, a lessor or otherwise) after such mortgagee disposes of its interest in the Premises.

On or before thirty (30) days from the date of this Lease, Landlord agrees to use commercially reasonable efforts to obtain from each lender the security for whose loan encumbers the Premises or the Shopping Center (and each lessor whose interest in the Shopping Center is paramount to Landlord's ("Overlessor")) at the time of execution hereof, an executed nondisturbance agreement in the form attached hereto as Exhibit "K".

**2402.**     Tenant agrees that at any time and from time to time, within twenty (20) days after the request of Landlord, Tenant shall promptly execute, acknowledge and deliver to Landlord (or any other person designated by Landlord) any written statement containing substantially the following provisions: (i)  provided Tenant has received an SNDA, a statement confirming the subordination of this Lease to any and all mortgages and deeds of trust on or affecting the Shopping Center, or any portion thereof,  (ii) a statement that this Lease is unmodified and in full force and effect (or if there have been modifications, that the Lease is in full force and effect as modified and stating the modifications), (iii) a statement of the dates to which the Rent and any other charges hereunder have been paid by Tenant, (iv) a statement, to the best of Tenant's knowledge, of whether or not Landlord is in default in the performance of any covenant, agreement, condition or obligation contained in this Lease, and if so, specifying each such default, (v) a statement of the address to which notices to Tenant should be sent, (vi) a statement that Tenant accepts the Premises and the improvements therein, and (vii) such other statement or statements as may be reasonably requested by Landlord, any prospective purchaser of the Shopping Center, or any portion thereof, any lender or prospective lender with a security interest in the Shopping Center, or any portion thereof, or of Landlord's interest in either, any lessor or prospective lessor thereof, any lessee or prospective lessee thereof, and/or any prospective assignee of any of the foregoing.  Any such statement delivered pursuant hereto may be relied upon by any owner of the Shopping Center, or any portion thereof, any prospective purchaser of the Shopping Center, or any portion thereof, any lender or prospective lender with a security interest in the Shopping Center, or any portion thereof, or of Landlord's interest in either, any lessor or prospective lessor thereof, any lessee or prospective lessee thereof, or any prospective assignee of any of the foregoing.

**2403.**     Provided Tenant receives the SNDA, Tenant agrees that it will attorn to and recognize any purchaser of the Shopping Center, or any portion thereof, at a foreclosure sale under any mortgage or deed of trust, any transferee who acquires the Shopping Center, or any portion thereof, by deed in lieu of foreclosure, and the successor and assigns of such purchasers, as its Landlord for the unexpired balance of the Term of this Lease upon the same terms and conditions set forth in this Lease.

**2404.**     Intentionally deleted.

22

**2405.**    Tenant agrees to execute, acknowledge and deliver any and all documents deemed necessary to effectuate the provisions of Paragraphs 2401-2404 above.

**2406.**    Intentionally deleted.

**2407.**    Tenant agrees to give any mortgagee or deed of trust holder with an interest in the Shopping Center, or any portion thereof, a copy of any notice of default served upon the Landlord, provided that prior to such notice Tenant has been notified, in writing (by way of notice of assignment of rents and leases, or otherwise) of the address of such mortgagees or deed of trust holders.  Tenant further agrees that if Landlord shall have failed to cure such default within the time provided for in this Lease, then the mortgagee(s) or deed of trust holder(s) shall have an additional thirty (30) days within which to cure such default or, if such default cannot be cured within that time, such additional time as may be necessary if, within such thirty (30) days, any such mortgagee(s) or deed of trust holder(s) has commenced and is diligently pursuing the remedies necessary to cure such default (including, but not limited to, commencement of foreclosure proceedings, if necessary to effect such cure), in which event this Lease shall not be terminated so long as such remedies are being diligently pursued.

### SECTION 25
### RECORDATION

**2501.**    It is agreed that Tenant shall not record this Lease and/or its Exhibits, but Tenant shall have the right, at Tenant's sole cost and expense, to record a Memorandum of Lease ("MOL") provided such MOL does not recite any of the rent or other economic terms hereof; and provided further that Tenant shall provide Landlord's attorneys with a signed termination thereof at the time of recordation, to be held in escrow, for Landlord to release same from escrow and to record at such time as the Lease terminates.  In addition, Tenant further covenants to promptly execute and deliver to Landlord such additional documents evidencing the termination of the Lease in recordable form as may reasonably be required by Landlord following expiration or termination of the Lease, which obligations shall expressly survive any termination or expiration hereof.  Any violation of this clause shall be deemed a material event of default on the part of Tenant, and Landlord shall have the right to cancel this Lease and take those steps necessary to remove the Lease and/or its Exhibits from any records.  In the event of this action on the part of Landlord, Tenant agrees to bear any and all costs and expenses in connection therewith, including, but not limited to, Landlord's attorneys' fees.  In the event that Landlord's mortgagee(s) or deed of trust holder(s) requires that a memorandum of this lease be recorded, Landlord shall have the right to record the same, and, in such event, Landlord agrees to bear such recordation charges.

### SECTION 26
### DEFAULT

**2601.**    The occurrence of any of the following shall constitute an event of default under this Lease:

    (i)    Failure of Tenant to pay when due any installment of Rent hereunder and such failure is not cured within ten (10) days following written notice from Landlord;

    (ii)    Failure of Tenant to commence business within one hundred twenty (120) days of the expiration of the Fixturing Period, subject to force majeure;

    (iii)    An Event of Bankruptcy;

    (iv)    Tenant's removal of Tenant's Property from or out of the Premises otherwise than in the ordinary and usual course of business without having first paid and satisfied all obligations to Landlord for all Rent which may become due during the entire Term of this Lease; and

    (v)    Tenant's failure to perform any covenant, condition or obligation under this Lease (other than those set forth in Paragraphs 2601(i) through (iv) above) within thirty (30) days after written notice and demand by Landlord, except that this thirty (30) day period shall be extended for a reasonable period of time not to exceed one hundred twenty (120) days (which 120 day period includes the initial 30 day cure period)_if the alleged default is not reasonably capable of cure within said thirty (30) day period and Tenant proceeds to diligently cure such failure.

**2602.**    Upon the occurrence of an event of default, subject to the laws of the jurisdiction in which the Shopping Center is located:

    (i)    Landlord may terminate this Lease by giving notice of such termination to Tenant, whereupon this Lease shall automatically cease and terminate, and Tenant shall

23

be obligated to immediately quit the Premises.  Any other notice to quit or notice of Landlord's intention to re-enter the Premises is hereby expressly waived.  If Landlord elects to terminate this Lease, everything contained in this Lease on the part of Landlord to be done and performed shall cease, without prejudice, however, to the right of Landlord to recover from Tenant all Rent accrued up to the time of termination or recovery of possession by Landlord, whichever is later, and any other monetary damages or loss of Rent sustained by Landlord.

(ii)   Whether or not this lease is terminated pursuant to Paragraph 2602(i), Landlord may proceed to recover possession of the Premises under and by virtue of the provisions of the laws of the jurisdiction in which the Shopping Center is located, or by such other proceedings, including re-entry and possession, as may be applicable.

(iii)   Should this Lease be terminated pursuant to Paragraph 2602(i), Landlord shall have the option to relet the Premises for such rent and upon such terms as are not unreasonable under the circumstances and, if the full Rent reserved under this Lease (and any of the costs, expenses, or damages indicated below) shall not be realized by Landlord, Tenant shall be liable for the deficiency in Rent, which amount shall be equal to the difference between (i) the rent received by Landlord in reletting the Premises (after consideration of all allowances and other concessions provided to the relet tenant) less all costs incurred by Landlord in obtaining possession of the Premises and reletting the Premises, including, without limitation, attorneys' fees, brokerage fees, and expenses of placing the Premises in first-class rentable condition, and (ii) the Rent reserved under this Lease.  Landlord, in putting the Premises in good order or preparing the same for re-rental, may, at Landlord's option, make such alterations, repairs or replacements in and to the Premises as Landlord, in its sole discretion, considers advisable and necessary for the purpose of reletting the Premises, and the making of such alterations, repairs or replacements shall not operate or be construed to release Tenant from liability under this Lease.  Landlord shall in no event be liable in any way whatsoever for failure to relet the Premises or, in the event that the Premises are relet, for failure to collect the rent under such reletting, and in no event shall Tenant be entitled to receive the excess, if any, of such net rent collected over the sums payable by Tenant to Landlord.

(iv)  Intentionally deleted.

(v)  Any damage or loss of Rent sustained by Landlord may be recovered by Landlord, at Landlord's option:  (i) in one (1) or more separate actions, at any time and from time to time, as and to the extent that said damages and/or loss of Rent shall have accrued; or (ii) in a single action deferred until on or after the Expiration Date (in which event Tenant hereby agrees that the cause of action shall not be deemed to have accrued until the Expiration Date), or (iii) in a single proceeding prior to either the time of reletting or the Expiration Date, in which event Tenant agrees to pay Landlord the difference, if any, between (a) the present value of the Rent reserved under this Lease on the date of breach, discounted at eight percent (8%) per annum, and (b) the fair market value of the Lease on the date of the breach, the remedy set forth in item (iii)_ hereby acknowledged to be a fair estimation of Landlord's damages and not an unenforceable penalty.

(vi)  Nothing contained herein shall prevent the enforcement of any claim Landlord may have against Tenant for anticipatory breach of the unexpired Term.  In the event of a breach or anticipatory breach by Tenant of any of the covenants or provisions hereof, Landlord shall have the right of injunction, the right to specific performance, and the right to invoke any remedy allowed at law or in equity or under this Lease.

(vii)  Intentionally deleted.

2603.   If, under the provisions hereof, Landlord shall institute proceedings against Tenant and a compromise or settlement thereof shall be made, the same shall not constitute a waiver of any other covenant, condition, agreement or obligation contained in this Lease, nor of any of Landlord's rights under this Lease.  No waiver by Landlord of any breach of any covenant, condition or agreement contained in this Lease and the Rules and Regulations promulgated hereunder shall operate as a waiver of such covenant, condition, agreement or rule or regulation itself, or of any subsequent breach thereof. No provision of this Lease shall be deemed to have been waived by Landlord unless such waiver is in writing and signed by Landlord.  No endorsement or statement on any check or letter accompanying a check for payment of Rent shall be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such Rent or to pursue any other remedy provided in this Lease.

2604.   If Tenant defaults in the making of any payment or in the doing of any act under this Lease required to be made or done by Tenant, then Landlord may, but shall not be required to, make such payment or do such act, and charge the amount of the expense thereof, if made or done by Landlord, with interest thereon at the lesser of (a) the

maximum rate allowed by law or (b) five percent (5%) in excess of the prime rate of interest published in the Wall Street Journal (or similar publication if such rate ceases to be published) (the "Default Rate"), from the date paid by Landlord to the date of payment thereof by Tenant.  Such payment and interest shall constitute Additional Rent hereunder due and payable within thirty (30) days of Landlord's demand therefor, but the making of such payment or the taking of such action by Landlord shall not operate to cure such default or to estop Landlord from the pursuit of any remedy to which Landlord would otherwise be entitled at law, in equity or under this Lease.

2605.      If Tenant fails to pay any installment or payment of Rent in accordance with the provisions of this Lease when such installment or payment becomes due and payable as specified in Section 712, Tenant shall pay to Landlord a late charge of three percent (3%) of the unpaid installment or payment as Additional Rent, and, in addition, such unpaid installment shall bear interest at the Default Rate from the date such installment became due and payable to the date of payment thereof by Tenant; provided however, that nothing herein contained shall be construed or implemented in such a manner as to allow Landlord to charge or receive interest in excess of the maximum legal rate then allowed by law. Such late charge and interest shall constitute Additional Rent hereunder due and payable within thirty (30) days of Landlord's demand therefor.  Notwithstanding anything in this Section 2605 to the contrary, on the first two such occurrences in any Lease Year, such late charge and interest charge shall not be due unless Tenant fails to pay the installment or payment due within ten (10) days after receipt of a written notice from Landlord advising that the installment is past due.

2606.      To the extent permitted under applicable law, Landlord shall have a lien upon all the personal property of Tenant in the Premises, as and for security for the Rent and other obligations of Tenant herein provided.  In order to perfect and enforce said lien, Landlord may, at any time after default by Tenant in the payment of Rent or of other obligations to be performed or complied with by Tenant under this Lease, seize and take possession of any and all trade fixtures and personal property belonging to Tenant which may be found in and upon the Premises.  If Tenant fails to redeem the trade fixtures and personal property so seized, by payment of whatever sum may be due Landlord under and by virtue of the provisions of this Lease, then, and in that event, Landlord shall have the right, after five (5) days' written notice to Tenant of its intention to do so, to sell such personal property so seized at public or private sale and upon such terms and conditions as to Landlord may appear advantageous, and, after the payment of all proper charges incident to such sale, apply the proceeds thereof to the payment of any balance due to Landlord on account of Rent or other obligations of Tenant pursuant to this Lease.  In the event there shall then remain in the hands of Landlord any balance realized from the sale of said personal property as aforesaid, the same shall be paid over to Tenant.  The exercise of the foregoing remedy by Landlord shall not relieve or discharge Tenant from any deficiency owed to Landlord which Landlord has the right to enforce pursuant to any other provision of this Lease.

2607.      Tenant hereby waives and surrenders all rights and privileges which it might have under or by reason of any present or future law to redeem the Premises, or to have a continuance of this Lease for the remainder of the Term after being dispossessed or ejected therefrom by process of law, or under the terms of this Lease, or after the termination of this Lease as herein provided.

2608.      The specified remedies to which Landlord may resort hereunder are cumulative and are not intended to be exclusive of any remedies or means of redress to which Landlord may at any time be lawfully entitled at law, in equity or under this Lease, and Landlord may invoke any remedy (including the remedy of specific performance) allowed at law, in equity or under this Lease as if specific remedies were not provided for herein.

2609.      Landlord shall have the right to apply any payments made by Tenant to the satisfaction of any debt or obligation of Tenant to Landlord according to Landlord's sole and absolute discretion and regardless of the instructions of Tenant as to application of any such sum, whether such instructions are endorsed upon Tenant's check or otherwise.

2610.      Intentionally deleted.

### SECTION 27
### LEGAL PROCEEDINGS AND NOTICES

2701.      Should either party file suit against the other for any reason, including, but not limited to, a suit for possession of the Premises, payment of Rent, damages, or to enforce or interpret the provisions of this Lease, the non-prevailing party shall reimburse the prevailing party for its reasonable attorneys' fees and cost of litigation.

2702.      This Lease is made pursuant to, and shall be governed by, and construed in accordance with the laws of the jurisdiction which the Shopping Center is located and any applicable local or county rules, regulations, and ordinances.  Should any provision of

this Lease require judicial interpretation, it is agreed that the court interpreting or considering same shall not apply the presumption that the terms hereof shall be more strictly construed against a party by reason of the rule or conclusion that a document should be construed more strictly against the party who itself or though its agent prepared the same.

**2703.**     If any provision of this Lease or the application thereof to any person or circumstance shall to any extent be invalid or unenforceable, the remainder of this Lease, or the application of such provision to persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby, and each provision of this Lease shall be valid and be enforced to the fullest extent permitted by law.

**2704.**     Tenant hereby waives all rights of redemption granted by any present or future laws.

**2705.**     All notices required or permitted under this Lease shall be in writing and deemed to be properly served if sent by registered or certified mail or Federal Express or similar courier service with overnight delivery or via professional messenger service (which provides for an acknowledgment of receipt) to the addresses stipulated in Paragraph 101 or such other address as either party may designate in writing in accordance with this Paragraph 2705, and shall be deemed effective when received, refused or returned as undeliverable.  All notices sent by certified or registered mail, return receipt requested, first-class postage prepaid shall be deemed effective when received, refused or returned as undeliverable, and notices sent by any other method of delivery specified in this Paragraph 2705, shall be effective upon receipt.  All requests, consents and approvals required or permitted under this Lease shall be in writing. Notices of default to Tenant shall simultaneously be sent to:  Jeffrey H. Kaplan, Esq., c/o Bryan Cave LLP, 1290 Avenue of the Americas, New York, New York 10104.

**2706.**     Intentionally Deleted.

**2707.**     Any headings preceding the text of the several Paragraphs and subparagraphs hereof are inserted solely for convenience of reference and shall not constitute a part of this Lease, nor shall they affect its meaning, construction or effect.

### SECTION 28
### SUCCESSORS AND ASSIGNS

**2801.**     If in connection with or as a consequence of the sale, transfer or other disposition of the Shopping Center, or any portion thereof, Landlord ceases to be the owner of the reversionary interest in the Premises, Landlord shall be entirely freed and relieved from the performance and observance thereafter of all covenants and obligations under this Lease on the part of Landlord to be performed and observed, it being understood and agreed in such event (and it shall be deemed and construed as a covenant running with the land) that the person succeeding to Landlord's ownership of said reversionary interest in the Premises shall thereupon and thereafter assume, and perform and observe, any and all of such covenants and obligations of Landlord.  Any Deposits or other security given by Tenant to secure performance of Tenant's obligations hereunder may be assigned and transferred by Landlord to its successor in interest, and Landlord shall thereby be discharged of any further obligation relating thereto.

**2802.**     If there shall be more than one party constituting Tenant, they shall all be bound jointly and severally by the terms, covenants, agreements and obligations under this Lease and the word "Tenant" shall be deemed and taken to mean each and every person or party mentioned as a Tenant herein, be the same one or more; and if there shall be more than one party constituting Tenant, any notice required or permitted by the terms of this Lease may be given by or to any one thereof and shall have the same force and effect as if given by or to all thereof.  No rights, however, shall inure to the benefit of any assignee of Tenant unless the assignment to such assignee has been approved by Landlord in writing in accordance with this Lease.

**2803.**     This Lease and the covenants and conditions herein contained shall inure to the benefit of and be binding upon Landlord, Tenant and their respective successors and assigns; provided, however, no rights shall inure to the benefit of any assignee or successor of Tenant to the extent such assignee or successor acquired any purported interest herein in violation of Article 23.  Upon any sale or other transfer by Landlord of its interest in the Premises, and assumption of possession of the Premises by the transferee, such transferee shall be solely responsible for all obligations of Landlord under this Lease accruing thereafter and Landlord shall be fully and forever released of its obligations hereunder accruing after such transfer and assumption.

26

## SECTION 29
### BROKERS AND AGENTS

**2901.**      Each of the parties hereto represents and warrants that, other than the brokerage commission payable by Landlord to the Landlord's Agent and Earl Goodman of Divaris Real Estate pursuant to a separate agreement, there are no other brokerage commissions or finders' fees of any kind due in connection with this Lease, and each of the parties hereto agrees to indemnify the other against, and hold it harmless from, any and all liabilities, damages, costs, claims and obligations arising from any such claim (including, without limitation, the cost of attorneys' fees in connection therewith).

**2902.**      The Agent(s) listed in Section 201(p) are acting as Landlord's Agent only and shall not in any event be held liable to Landlord or to Tenant for the fulfillment or non-fulfillment of any of the terms, covenants, conditions or obligations of this Lease or for any action or proceedings that may be taken by Landlord against Tenant, or by Tenant against Landlord, including, but not limited to, any such action arising out of, in connection with or in any manner relating to, the performance or nonperformance by Landlord's Agent of any act pursuant to this Lease or Landlord's direction.  Any waiver by Tenant of Landlord's liability hereunder, including, but not limited to, any waiver of subrogation rights, shall apply with equal force and effect to Landlord's Agent.

## SECTION 30
### PERSONAL PROPERTY

**3001.**      Intentionally deleted.

## SECTION 31
### ENVIRONMENTAL COVENANTS AND PROHIBITED MATERIALS

**3101.**      Tenant covenants that during the term of this Lease the Premises shall at all times be free from the presence of any pollutants, contamination, toxic or hazardous waste, or any other substances, the removal of which is required or the use or presence of which is restricted, prohibited or penalized by any Federal, State or local law or regulation relating to pollution or protection of the environment (generally, "Hazardous Substances").  Tenant will not permit any Hazardous Substances to be brought onto the Premises and if so brought or found located thereon the same shall be immediately removed with proper disposal, and all required clean-up procedures shall be diligently undertaken pursuant to all applicable laws.  If, at any time during or after the term of this Lease, the Premises are found to be so contaminated or subject to said conditions, Tenant agrees to indemnify, defend and hold Landlord harmless from all claims, demands, actions, liabilities, costs, expenses, damages and obligations of any nature arising from or as a result of the use of the Premises by Tenant, unless the presence of such Hazardous Substances results from the acts of Landlord or its agents.  The foregoing indemnification shall survive the expiration or earlier termination of this Lease.

**3102.**      Landlord represents to the best of its knowledge, without independent inquiry, that it does not know of any Hazardous Substances in or on the Premises or the Shopping Center. If at any time during this Lease, Hazardous Substances are found to be present in or on the Premises in violation of any environmental law (other than Hazardous Substances introduced by Tenant, its agents, employees, contractors or invitees) as a result of any use of the Premises prior to the date hereof ("Environmental Violation"), Landlord shall, upon written notice of same from Tenant, remediate the same, as and to the extent required by law.

## SECTION 32
### APPROVALS

**3201.**      Intentionally deleted.

**3202.**      Neither Landlord's approval of the Tenant's Plans and Sign Plans, nor any other inspections or approvals of the improvements on the Property or plans for construction thereof by Landlord's employees, agents or inspecting engineers, shall constitute a warranty or representation as to the technical sufficiency, adequacy or safety of the plans, structures, any of their component parts, or any other physical condition or feature pertaining to the improvements, it being acknowledged by Tenant that Landlord has made such approvals solely as a landlord in determining and protecting the value of its property for internal purposes, and not as an expert in construction-related matters.

## SECTION 33
### LIABILITY OF LANDLORD

**3301.**      Notwithstanding anything to the contrary contained in this Lease, Tenant

27

acknowledges  and agrees that Landlord is not and shall not be liable to Tenant, its employees, agents, contractors, business invitees, licensees, customers, clients, family members, guests, or any other person claiming under or through Tenant, for any damage, compensation or claim arising by reason of the destruction of the Premises or the Shopping Center, or from any fire, and/or any other casualty, robbery, or theft. Further, in no event shall Landlord or its agents or employees have any liability to Tenant for any damage caused by any other tenants or occupants of the Premises or the Shopping Center or any other person claiming under or through Tenant, or their agents or employees, or for any damage caused by governmental or quasi-governmental authorities or public or private utilities or their agents or employees.  Tenant shall not be entitled to any abatement or diminution of Rent as a result of any of the foregoing occurrences, nor shall the same release Tenant from its obligations under this Lease or constitute an eviction.  Any goods, property or personal effects of Tenant, its employees, agents, contractors, business invitees, licensees, customers, clients, family members or guests, stored or placed in or about the Premises shall be at their sole risk, and Landlord shall not in any manner be held responsible therefor.  Tenant acknowledges that Landlord is not under any obligation to carry insurance on the Tenant's furniture, furnishings, fixtures, equipment and/or improvements in or to the Premises.  It is expressly understood and agreed that Tenant shall look solely to its business interruption and property damage insurance policies, and not to Landlord or its agents or employees, for reimbursement for any damages or losses incurred as a result of any of the foregoing occurrences, and that said policies must contain waiver of subrogation clauses.

**3302.**      Tenant shall neither assert nor seek to enforce any claim, and hereby waives any and all rights to assert or claim, for breach of this Lease against any of Landlord's assets other than Landlord's interest in the Shopping Center, or any portion thereof (such interest to include the net income derived by Landlord from the Shopping Center and the proceeds from the sale of all or any portion thereof), and Tenant shall look solely to such interest for the satisfaction of any liability of Landlord under this Lease, it being specifically agreed that in no event shall Landlord (or any of the officers, trustees, directors, partners, beneficiaries, joint venturers, members, stockholders, or other principals or representatives, disclosed or undisclosed) ever be personally liable for any such liability.  This section shall not limit any right that Tenant might otherwise have to obtain injunctive relief against Landlord.  In no event shall Landlord (or any of the officers, trustees, directors, partners, beneficiaries, joint venturers, members, stockholders, or other principals or representatives, disclosed or undisclosed) ever be liable for consequential damages.

**3303.** In the event of a default by Tenant under this Lease, Landlord shall look solely to the assets of Tenant and, subject to the limitations contained in the Guaranty, the assets of the Guarantors, for the satisfaction of any claim arising from or under this Lease and except to the extent required to enforce its rights under the Guaranty against any one or more of the guarantors, shall not seek to impose personal liability on any shareholder, officer, director or employee of Tenant, the Parent Company or any of their respective affiliates, successors, and/or assigns, provided, however, that nothing contained herein shall be deemed to limit the liability of the Guarantors under the Guaranty and Landlord shall be permitted to look to the assets of the Guarantors notwithstanding that such Guarantors may be either shareholders, officers, directors or employees of Tenant or the Parent Company.

**SECTION 34**
**ENTIRE AGREEMENT AND MISCELLANEOUS**

**3401.**      The submission of this Lease for examination does not constitute a reservation of, or option for, the Premises, and this Lease shall become effective only upon execution and delivery by all parties hereto.  There are no oral agreements between the parties hereto affecting this Lease and/or the Premises, and this Lease supersedes and cancels any and all previous negotiations, arrangements, letters of intent, lease proposals, brochures, agreements, representations, promises, warranties and understandings between the parties hereto or displayed by Landlord to Tenant with respect to the subject matter thereof, and none thereof shall be used to interpret or construe this Lease.  Tenant hereby expressly acknowledges that Landlord or Landlord's employees or agents (including Landlord's Agent) have made no representations, warranties, inducements or promises with respect to the Shopping Center or the Premises or this Lease except as herein expressly set forth.  Except as expressly set forth in Section 504 above, Tenant acknowledges that it does not have any exclusive rights in the Shopping Center with respect to the sale of its merchandise or the provision of its services.

**3402.**      Nothing contained in this Lease shall be deemed or construed to create a partnership or joint venture of or between Landlord and Tenant, or to create any other relationship between the parties hereto other than that of Landlord and Tenant.

**3403.**      Time shall be of the essence in the performance of all obligations under this Lease.

**3404.**      The Exhibits attached hereto (or will be contemplated to be completed and attached to this Lease within the time periods specified in this Lease) are hereby made a part of this Lease as fully as if set forth in the text of this Lease.

**3405.**      Tenant, at its sole expense, shall comply with all laws, rules, orders and regulations, including without limitation, all energy-related requirements, of Federal, state, county, and municipal authorities and with any direction of any public officer or officers, pursuant to law, regarding the interior, non-structural portions of the Premises and Tenant Work. Landlord agrees, at its sole cost and expense, to comply with all laws, ordinances, orders and regulations regarding access to the Premises, and the structural portions of the Premises (including the roof) with the exception of any such compliance necessitated solely by reason of either (i) the particular type of retail operation being (or intended to be) conducted by Tenant, or by any of it invitees, or any change of use subsequent to the Permitted Use, or (ii) the particular renovations, alterations, modifications, replacements, installations or improvements being made at the Premises by Tenant or any of its invitees.  Tenant shall reimburse and compensate Landlord for all expenditures made by, or damages or fines sustained or incurred by, Landlord due to nonperformance or noncompliance with or breach or failure to observe an item, covenant, or condition of this Lease upon Tenant's part to be kept, observed, performed or complied with. If Tenant receives notice of any violation of law, ordinance, order or regulation applicable to the Premises, it shall give prompt notice thereof to Landlord.

**3406.**      Notwithstanding any provision in this Lease to the contrary, if the Lease Term has not commenced within twenty-one (21) years after the Date of Lease, this Lease shall automatically terminate on the 21st anniversary of the Date of Lease.  The sole purpose of this provision is to avoid any possible interpretation of this Lease as violating the Rule Against Perpetuities or other rule of law against restraints on alienation.

**3407.**      Masculine, feminine or neuter pronouns shall be substituted for one another, and the plural shall be substituted for the singular number, in any place or places herein in which the context may require such substitution.

**3408.**      This Lease shall be governed exclusively by the provisions hereof and by the laws of the state in which the Premises is located.  If this Lease shall be for a term of more than five years, this Lease shall be deemed to satisfy the provisions of Virginia law that a lease of more than five years be conveyed by a deed of Lease.

**3409.**      If Tenant is a corporation, the individual(s) executing this Lease on behalf of Tenant hereby covenant(s) and warrant(s) that:  Tenant is a duly formed corporation qualified to do business and in good standing in the state in which the Shopping Center is located; Tenant will remain qualified to do business and in good standing in said state throughout the Term.

### SECTION 35
### WAIVER OF JURY TRIAL

**3501. TO INDUCE LANDLORD AND TENANT TO ENTER INTO THIS LEASE, LANDLORD AND TENANT EACH HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY OF ANY OR ALL ISSUES ARISING IN ANY ACTION OR PROCEEDING BETWEEN LANDLORD AND TENANT OR THEIR SUCCESSORS, ASSIGNS, PERSONAL OR LEGAL REPRESENTATIVES AND HEIRS UNDER OR IN CONNECTION WITH THIS LEASE OR ANY OF ITS PROVISIONS.  THIS WAIVER IS KNOWINGLY, INTENTIONALLY AND VOLUNTARILY MADE BY LANDLORD AND TENANT, AND LANDLORD AND TENANT EACH ACKNOWLEDGE THAT NEITHER LANDLORD NOR TENANT NOR ANY PERSON ACTING ON BEHALF OF LANDLORD OR TENANT HAS MADE ANY REPRESENTATIONS OF FACT TO INDUCE THIS WAIVER OF TRIAL BY JURY OR IN ANY WAY TO MODIFY OR NULLIFY ITS EFFECT.  LANDLORD AND TENANT EACH FURTHER ACKNOWLEDGE THAT HE, SHE OR IT HAS HAD THE OPPORTUNITY TO DISCUSS THIS LEASE WITH LEGAL COUNSEL.**

### SECTION 36
### FORCE MAJEURE

If either party hereto shall be delayed, hindered in, or prevented from, the performance of its obligations hereunder by reason of strikes, governmentally-imposed building moratoriums, failure of power, riots, insurrection, war, acts of God, or other similar matters(it being expressly recognized and agreed that delays in obtaining governmental approvals for

reasons other than Violations (as defined in Section 304 above) shall not be deemed events of force majeure) not the fault of such party (hereinafter, "Permitted Delay" or "Permitted Delays"), such party shall be excused for the period of time equivalent to the delay caused by such Permitted Delay. Notwithstanding the foregoing, any extension of time for a Permitted Delay shall be conditioned upon the party seeking an extension of time by delivering written notice of such Permitted Delay to the other party within ten (10) days of the event causing the Permitted Delay.  In no event shall either party assert an entitlement to postpone the due date or making of any payment of monies to the other by reason of this Article 37, except for the occurrence of the Rent Commencement Date due to the occurrence of events of force majeure during the Fixturing Period, in which event the Rent Commencement Date may be delayed for a period of no more than thirty (30) days in the aggregate provided Tenant notifies Landlord of the event of force majeure within five (5) days of the date such event first occurs, it being the express intent of the parties that in no event shall any Permitted Delay apply to the performance of any monetary obligations hereunder.

**SECTION 37**
**GUARANTY**

Parent Company (as defined in Section 23 above) and Jeffrey Feinstein and Richard Feinstein (collectively, the "Guarantors") have joined in the execution and delivery to Landlord of that certain Guaranty in the form attached hereto and made a part hereof being designated as Exhibit H (herein the "Guaranty"), for the purpose of guaranteeing all of the obligations, duties and covenants of the Tenant under this Lease, subject to the limitations set forth in such Guaranty.  The parties recognize and agree that Landlord has materially relied upon such Guaranty and the financial statement of Guarantor heretofore delivered to Landlord in its execution and delivery of this Lease.  Tenant hereby represents and warrants to Landlord that such financial statement is true and correct in all material respects as of the date designated therein and that to its knowledge, no change has occurred to the assets or liabilities of the Guarantor since the date of such statement which would render such statement to be misleading in any material respect.

IN WITNESS WHEREOF, the parties hereto have executed this Shopping Center Lease under their respective seals as of the day and year first above written.

WITNESS:

**LANDLORD:**
SPRINGFIELD PLAZA, LLC

By: Springfield Plaza Limited Partnership,
    its sole member

By: The Corby Corporation, a General Partner

By: _____ (SEAL)
    Karl W. Corby III, President

By: Kneessi Corporation, a General Partner

By: _____ (SEAL)
    Carl H. Kneessi, President

ATTEST:

**TENANT:**
Buy Buy Baby of Springfield, Inc.,
a Virginia corporation

By: _____
Name: Richard Feinston
Title: President

By: _____ (SEAL)
Name: JEFFREY FEINSTEIN
Title: VICE PRES
Federal Tax ID # _____

[Corporate Seal]

## LEASE AMENDMENT AND EXTENSION OF LEASE

THIS LEASE AMENDMENT AND EXTENSION OF LEASE ("Amendment") is entered as of the 21st day of _August_, 2019, by and among SPRINGFIELD PLAZA, LLC, a Delaware limited liability company, hereinafter referred to as "Landlord", SPRINGFIELD BUY BUY BABY, INC., a Virginia corporation, hereinafter referred to as "Tenant", and BUY BUY BABY, INC., a Delaware corporation, hereinafter referred to as "Guarantor".

### RECITALS:

A.      Landlord and Buy Buy Baby of Springfield, Inc., a Virginia corporation ("BBBS"), Tenant's predecessor-in-interest, entered into a Shopping Center Lease dated May 10, 2004 (the "Original Lease"), to which certain documents relate including that certain letter dated June 26, 2014 in which Tenant exercised its option to extend the Term, whereby said Tenant let those certain premises, containing approximately 28,000 square feet ("Premises") (known in Landlord's internal records as space 3) located in the Springfield Plaza, Springfield, Virginia ("Shopping Center"), for a period expiring on November 30, 2019. As used in this Amendment, the term "Lease" shall mean the "Original Lease, as amended hereby," unless its context expressly requires it to mean the Original Lease; and

B.      Guarantor executed that certain Guaranty dated April 28, 2004  as an inducement for Landlord to execute the Original Lease; and

C.      Tenant hereby acknowledges that Tenant succeeded to all of the rights, title and interest of BBBS in the Lease and assumed all of Tenant's obligations and liabilities thereunder.

D.      Landlord and Tenant desire to extend the Term and amend said Lease in certain respects as hereinafter provided.

NOW, THEREFORE, in consideration of the mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby reciprocally acknowledged, Landlord and Tenant agree as set forth below.

1.      <u>Recitals</u>.  The foregoing recitals and representations form a material part of this Amendment and are incorporated herein by this reference.

2.      <u>Term</u>.  The Term is hereby extended and revised so that the Expiration Date shall be November 30, 2024 instead of November 30, 2019.  The period from December 1, 2019 through November 30, 2024 is hereafter referred to as the "Second Extension Period".  Except as provided in Paragraph 4 below, any provision in the Lease, whether express or implied, which could be construed as providing Tenant a further right to extend the Term past the Expiration Date of the Second Extension Period set forth in the preceding sentence shall no longer be applicable.

3.      <u>Minimum Rent</u>.  During the Second Extension Period, Minimum Rent shall be as follows:

| <u>Period</u> | <u>Annually</u> | <u>Monthly</u> | <u>Per Square Foot</u> |
|---|---|---|---|
| 12/1/2019-11/30/2024 | $490,560.00 | $40,880.00 | $17.52 |

4.      <u>**Third Extension Period**</u>. Tenant shall retain its option to extend the Term for one (1) additional period of five (5) years (the "Third Extension Period") as set forth in Paragraph 1 of <u>**Exhibit I**</u> to the Original Lease. All terms, requirements and conditions precedent set forth in Paragraph 1 of <u>**Exhibit I**</u> to the Original Lease shall remain in effect with regards to the Third Extension Period, except that subsection (i) shall be modified to provide that Tenant shall give Landlord written notice of Tenant's exercise of the third option to extend not later than March 31, 2024, nor earlier than December 1, 2023.

5.      <u>Guarantor</u>.  Guarantor hereby expressly agrees that Guarantor shall continue to be liable for the performance of all covenants and conditions of the Lease and any amendments, modifications, and renewals of the Lease (including, specifically, those made hereby) to be performed by Tenant, including, specifically, the payment of Rent and all other charges and payments to be made under the Lease, as modified herein.  Guarantor joins in the execution hereof to evidence Guarantor's consent hereto and continuing obligations with regard to the Lease.

6.      <u>Broker</u>.  Each of the parties hereto represents and warrants that, other than the brokerage commission payable by Landlord to Rappaport Management Company pursuant to a separate agreement, there are no other brokerage commissions or finders' fees of any kind due in connection with this Amendment, and each of the parties hereto agrees to indemnify the other against, and hold it harmless from, any and all liabilities, damages, costs, claims and obligations arising from any such claim (including, without limitation, the cost of attorneys' fees in connection therewith).

7.      <u>Notices</u>.

A.      The Lease is hereby modified to provide that notices and payments of Rent shall be sent to Landlord at the address set forth below:

SPRINGFIELD PLAZA, LLC
c/o Rappaport Management Company
8405 Greensboro Drive, 8th Floor
McLean, Virginia 22102-5121

1

B.     The Lease is hereby modified to provide that notices shall be sent to Tenant and Guarantor at the address set forth below:

SPRINGFIELD BUY BUY BABY, INC.
BUY BUY BABY, INC.
650 Liberty Avenue
Union, New Jersey 07083
Attention:  General Counsel

8.     <u>Defined Terms</u>.  Terms that are defined in the Lease shall have the same meanings when such terms are used in this Amendment.

9.     <u>Confirmation of Terms</u>.  All of the terms, covenants and conditions of the Lease, except as are herein specifically modified and amended, shall remain in full force and effect and are hereby adopted and reaffirmed by the parties hereto.

10.     <u>Landlord's Agent</u>. Section 201(p) of the Original Lease is hereby modified to provide that Landlord's Agent is Rappaport Management Company.

11.     <u>Counterparts</u>.  This Amendment may be executed in counterparts, each of which shall be deemed an original but all of which shall constitute one and the same document.  This Amendment may also be executed in duplicate, each of which shall be deemed an original.  Facsimile or email copies of signatures will be binding on the parties as if they were original signatures.  The executed counterparts together shall be considered an original and shall be binding on the parties.  The parties will cooperate in exchanging original (non-facsimile) signature pages with each other.

12.     <u>Ethical Standards</u>.  It is the policy of Tenant and its subsidiaries and affiliates (collectively, "the Company") to conduct all its business transactions in accordance with the highest ethical standards and all applicable laws (including but not limited to the U.S. Foreign Corrupt Practices Act).  No individual who is employed by or who represents the Company, and no individual or entity that contracts with the Company or otherwise performs services on behalf of the Company, is permitted to solicit, accept, offer, promise or pay any bribe, kickback or any other improper payment of money, products or services.  This includes, but is not limited to, any improper payment in exchange for (i) the Company's execution of this Amendment, (ii) any action taken by such individual on behalf of the Company, or (iii) any action taken by a third party.  If any such improper actions are observed, contact Tenant's Legal Department (Attention: General Counsel) at Tenant's notification address and/or by telephone at 908-688-0888, so that the incident may be fully investigated.

13.     <u>No Recordation</u>.  Neither Landlord nor Tenant shall record this Amendment among the land records of Fairfax County, Virginia.



*(SIGNATURE PAGE(S) TO FOLLOW)*

IN WITNESS WHEREOF, the parties hereto, intending to be legally bound, have executed this Lease Amendment and Extension of Lease under their respective seals on the day and year first above written.

**WITNESS:**

**LANDLORD:**

SPRINGFIELD PLAZA, LLC, a Delaware limited liability company

By: Springfield Plaza Limited Partnership, a Virginia limited partnership, its sole member

By:  The Corby Corporation, a Virginia corporation, a General Partner

By: _Constance Tompkins_ (SEAL)
Constance Tompkins, President

By: Dodge Springfield Plaza, Inc., a Virginia corporation, a General Partner

By: _John T. Beaty_ (SEAL)
John T. Beaty Jr., President

**TENANT:**

SPRINGFIELD **BUY** BUY BABY, INC., a Virginia corporation

By: _____ (SEAL)
Typed Name: Allan N. Rauch
Title: Vice President
Federal Tax ID #: 26-2198387

## ACKNOWLEDGMENT BY TENANT

STATE OF NEW JERSEY
COUNTY OF UNION  SS:

I, Kathleen Currie, a Notary Public in and for the county and state aforesaid, DO HEREBY CERTIFY that Allan N. Rauch of SPRINGFIELD BUY BUY BABY, INC., a Virginia corporation, who is personally known to me to be the same person whose name is subscribed to the foregoing instrument appeared before me this day in person and acknowledged that (she) (he) signed, sealed and delivered the said instrument as (her) (his) free and voluntary act for the uses and purposes therein set forth.

Given under my hand and notarial seal, this __31__ day of __July__, 2019.

_____
Notary Public

My commission expires _____

Kathleen P Currie
Notary Public .
New Jersey
My Commission Expires 11-02-2023
No. 17737

**GUARANTOR:**

BUY BUY BABY, INC., a Delaware corporation

By: _____    (SEAL)

Typed Name: Glen P. Cary

Title: President

Federal Tax ID #: 52-1942-010

## ACKNOWLEDGMENT BY GUARANTOR

STATE OF NEW JERSEY

COUNTY OF UNION    SS:

I, Kathleen Currie, a Notary Public in and for the county and state aforesaid, DO HEREBY CERTIFY that Glen P. Cary of BUY BUY BABY, INC., a Delaware corporation, who is personally known to me to be the same person whose name is subscribed to the foregoing instrument appeared before me this day in person and acknowledged that (she) (he) signed, sealed and delivered the said instrument as (her) (his) free and voluntary act for the uses and purposes therein set forth.

Given under my hand and notarial seal, this ___31___ day of ___July___, 2019.

_____
Notary Public

My commission expires: _____

Kathleen P Currie
Notary Public
New Jersey
My Commission Expires 11-02-2023
No. 17737

4

## SECOND AMENDMENT TO LEASE AGREEMENT

THIS SECOND AMENDMENT TO LEASE AGREEMENT ("**Amendment**") is made as of 4/21/2022            , 2022, but deemed retroactively effective as of March 31, 2022, ("**Effective Date**") by and between SPRINGFIELD PLAZA, LLC, a Delaware limited liability company ("**Landlord**"), SPRINGFIELD BUY BUY BABY, INC., a Virginia corporation ("**Tenant**") and BUY BUY BABY, INC., a Delaware corporation ("**Guarantor**").

W I T N E S S E T H\

WHEREAS, Landlord and Tenant, as successor-in-interest to Buy Buy Baby of Springfield, Inc., a Virginia corporation, entered into that certain Shopping Center Lease dated May 10, 2004 (the "Original Lease"), to which certain documents relate including that certain letter dated June 26, 2014 in which Tenant exercised its option to extend the Term as modified by that certain Lease Amendment and Extension of Lease dated August 21, 2019 ("First Amendment"), whereby Tenant leases from Landlord those certain premises, containing approximately 28,000 square feet of gross leasable area located at 6398 Springfield Plaza, Springfield, Virginia 22150 (known in Landlord's internal records as space 3) ("Premises") located in the Springfield Plaza ("Shopping Center"); and

WHEREAS, Guarantor executed that certain Guaranty dated April 28, 2004  as an inducement for Landlord to execute the Original Lease; and

WHEREAS, as used in this Amendment, the term "Lease" shall mean the "Original Lease, as amended hereby," unless its context expressly requires it to mean the Original Lease or the First Amendment; and

WHEREAS Landlord and Tenant desire to amend the Lease as set forth below.

NOW, THEREFORE, for good and valuable consideration, the sufficiency of which the parties hereby acknowledge, the parties agree to amend the Lease as follows:

1.      The foregoing recitals are incorporated herein as acknowledgements and agreements of the parties. Unless otherwise defined herein, capitalized terms in the Amendment shall have the meanings set forth in the Lease.  The parties confirm that in all other respects, the terms, covenants and conditions of the Lease remain unchanged, and in full force and effect, except as amended by this Amendment.  Any conflict between the terms and provisions of this Amendment and the Lease shall be resolved in favor of this Amendment.

2.      The Term of the Lease is currently set to expire on November 30, 2024. Tenant hereby exercises its third extension option to extend the Term of the Lease for five (5) years and two (2) months which Term will now expire January 31, 2030 (the "Third Extension Period"). Except as provided in Paragraph 4 below, any provision in the Lease, whether express or implied, which could be construed as providing Tenant a further right to extend the Term past the Expiration Date of the Third Extension Period set forth in the preceding sentence shall no longer be applicable.

3.      Section 1 of Exhibit I to the Original Lease and Paragraph 3 of the First Amendment are hereby modified to reflect that Minimum Rent for the balance of the Second Extension Period and for the Third Extension Period shall be as set forth below:

| Period | Annually | Monthly | PSF |
|---|---|---|---|
| Balance of the Second Extension Period | 4/1/22-11/30/24 | $447,999.96 | $37,333.33 | $16.00 |
| Third Extension Period | 12/1/24-1/31/26 | $447,999.96 | $37,333.33 | $16.00 |
| | 2/1/26-1/31/30 | $463,400.04 | $38,616.67 | $16.55 |

4.     Landlord hereby grants to Tenant the conditional right, exercisable at Tenant's option, to further extend the Term of the Lease for one (1) period of five (5) years ("Fourth Extension Period"), exercisable as hereinafter provided.  Tenant shall exercise the fourth extension option by giving written notice to Landlord of Tenant's exercise of the fourth extension option by no later than May 31, 2029 and no earlier than February 1, 2029.   In no event shall Tenant have the right to extend the Term of the Lease beyond the expiration of the Fourth Extension Period, except in the event of a written and signed mutual agreement between Landlord and Tenant.

During the Fourth Extension Period, all of the terms, conditions, covenants and agreements set forth in the Lease shall continue to apply and be binding upon Landlord and Tenant, except that Minimum Rent shall be as follows:

| | Period | Annually | Monthly | PSF |
|---|---|---|---|---|
| Fourth Extension Period | 2/1/30- 1/31/35 | $509,880.00 | $42,490.00 | $18.21 |

5.     Landlord hereby represents and warrants that as of the date hereof, there is no existing monetary default by Tenant, including all late fees, interest charges, attorneys' fees or other charges associated with or resulting from any such monetary default.

6.     It is the policy of Tenant (together with its subsidiaries and affiliates, collectively, the **"Company"**) to conduct all its business transactions in accordance with the highest ethical standards and all applicable laws (including but not limited to the U.S. Foreign Corrupt Practices Act).  Neither party shall, directly or indirectly, solicit or accept from, or offer, promise or pay any individual or entity (including, but not limited, to any government official) any bribe, kickback or any other improper payment of money, products, services or anything else of value.  This includes, but is not limited to, any improper payment in exchange for (i) the execution of this Amendment, (ii) any action taken by such individual on behalf of either party.  If any such improper actions are observed, Landlord shall inform the Company's Legal Department (Attention: General Counsel) by (i) notice to the address set forth in the Lease, as amended hereby or (ii) by telephoning 908-688-0888, so that the incident may be fully investigated.

7.     Guarantor hereby expressly agrees that Guarantor shall continue to be liable for the performance of all covenants and conditions of the Lease and any amendments, modifications, and renewals of the Lease (including, specifically, those made hereby) to be performed by Tenant, including, specifically, the payment of Rent and all other charges and payments to be made under the Lease, as modified herein.  Guarantor joins in the execution hereof to evidence Guarantor's consent hereto and continuing obligations with regard to the Lease.

8.     Landlord and Tenant each warrant and represent to the other that they did not deal with any real estate broker in connection with the negotiation, execution and delivery of this Amendment except for Rappaport Management Company, the Landlord's broker, who will be paid a commission by Landlord pursuant to a separate agreement. Each party agrees to indemnify, defend, and save the other harmless from and against any and all liabilities, costs, causes of action, damages and expenses, including, without limitation, attorneys' fees, with respect to or arising out of any claims made by any real estate broker, agent or finder with respect to this Amendment in breach of the foregoing representation or claiming to have worked with the indemnifying party in connection with the Lease.  The provisions of this Section shall survive the expiration or earlier termination of the Lease.

9.     Each party represents and warrants to the other that, as of the date hereof, all consents or approvals, that may be required by third-parties, including lenders, in order for the parties to enter into this Amendment have been obtained.

10.     This Agreement will inure to the benefit of and be binding upon the parties to this Agreement the successors and assigns of the Landlord and the permitted successors and permitted assigns of the Tenant.

11.     This Agreement may be executed electronically and in one or more counterparts, each of which shall be an original for all purposes but all of which taken together shall constitute only one agreement. The execution and transmission of an image of any signed document or document signed by DocuSign (or a similar application) shall have the same binding effect as an original bearing an original signature.

*[Signature page immediately follows]*

IN WITNESS WHEREOF, the parties hereto have executed this Lease Amendment as of the day and year first above written.

**LANDLORD:**

**SPRINGFIELD PLAZA, LLC,**
an Delaware limited liability company

By: Springfield Plaza Limited Partnership, its sole member

By:   The   Corby   Corporation,   a General            Partner



By: _Constance Corby Tompkins_
Constance Corby Tompkins
President

By: Dodge Springfield Plaza, Inc., a General Partner

By: _John T. Beaty Jr_
John T. Beaty Jr., President

**TENANT:**

**SPRINGFIELD BUY BUY BABY, INC.**
a Virginia corporation

By: _John Hartmann_
Name: John Hartmann
Title:  President

**GUARANTOR:**

**BUY BUY BABY, INC.**
a Delaware corporation

By: _John Hartmann_
Name: John Hartmann
Title:  Chief Operating Officer and President

EXHIBIT F
TO
LEASE

Prohibited Uses

Springfield Plaza

Tenant shall not use or permit the use of the Premises for any other business or purpose, except as set forth in Paragraph 201(c) or Section 2304 of this Lease and in strict accordance with the Rules and Regulations. Without in any way limiting the generality of the foregoing, Tenant shall not use the Premises for the sale, distribution, use or provision of sexually-oriented goods, merchandise or services, or any of the following uses:

Fried chicken restaurant.  (1100)

Self service family shoe store.(1400)

Supermarket, drugstore, the sale of groceries, meats, seafood, poultry, dairy products, produce, flowers, bakery products or health and beauty aids. (1600)

A restaurant or an amusement center, carnival or flea market.  (1600)

Store selling home furnishing décor and carpets, carpeting, interior decorating, design services, flooring and similar services.  (1800)

Burger King, Roy Rogers, Taco Bell or Wendy's.  (2300)

The service and repair of computer hardware equipment, and the sale and rental of personal computer hardware and software as well as related and complementary products and services (such related and complementary products include, but are not limited to, computer printers, video display systems, audio sound systems and communication and telephony devices, and any substitutes for, or items which are a technological evolution of any of the foregoing products or services) provided that all such related or complementary products must be customarily intended to be installed onto or accessed from computer hardware products (as opposed to products such as (1) telephones, including also cellular phones, (2) music CD's, videos and/or video games which are customarily intended to be viewed/played on stereo equipment and/or television screens as opposed to computer hardware devices, and (3) any substitutes for, or items which are technological evolution of any of the foregoing products described in (1) or (2).  The foregoing does not apply to a primary use as a bookstore, music store, the sale or rental of audio and/or video products or the operation of a copy type shop (of a type currently operated by Kinko's) who engage in the sale of computer software or technological evolutions of such computer software and/or the sale of hardware which is primarily intended to reproduce, broadcast, enhance or amplify audio and/or video items (except no tenant shall be permitted to engage in the sale of custom build/made to order computers or computer related products).  The foregoing shall also not apply to a tenant operating primarily as a general retail catalogue operations (e.g. Sear's Catalogue operation) from selling any product other than custom build/made to order computers) contained within its catalogue. (2600)

Veterinary clinic.  (2700)

Sign company.  (3100)

No tenant in the Shopping Center shall (i) sell and/or rent men's formal wear (e.g. tuxedos and accessories) from twenty percent (20%) or more of the gross leasable area of such tenant's premises, and/or (ii) sell traditional bridal gowns from the lesser of (a) 5% of the gross leasable area of such tenant's premises, or (b) 500 square feet. (3300)

Indian, Afghan, Pakistani, Bahgladesh, or West Indies style restaurant. (3700)

Pizza Hut, Subway, Dominos, Shakeys or similar store.  (4200)

Bank.  (4500)

Optical center and office for the practice of optometry.  (4800)

Chinese Restaurant. [Spr-2]

The sale at retail of rotisserie chicken. The foregoing shall not apply to new leases with national or regional tenants operating a full service restaurant with a liquor license or to a grocery store. [Spr-20]

A pool parlor.  (Fast Eddie's)

The retail operation of a travel agency. (Liberty Travel)

No tenant within 1,000 feet of the Charles Russell Hairstylist premises shall have a primary business as a woman's hair salon. (Charles Russell Hairstylist)

Chiropractic services. (Mankoeei Chiropractic Center)