Robert L. LeHane, Esq.
Jennifer Raviele, Esq. (*pro hac vice* pending)
Ravi Vohra, Esq.
**KELLEY DRYE & WARREN LLP**
3 World Trade Center
175 Greenwich Street
New York, NY 10007
Tel:  212-808-7800
Fax: 212-808-7897
Email:  rlehane@kelleydrye.com
          jraviele@kelleydrye.com
          rvohra@kelleydrye.com

-and-

One Jefferson Road
Parsippany, NJ 07054
Tel: 973-503-5900

*Counsel for HGREIT II Edmondson Road, LLC*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

--------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| BED BATH & BEYOND, INC., *et al.,* | : | Case No. 23-13359 (VFP) |
| | : | |
| Debtors | : | (Jointly Administered) |

--------------------------------------------------------------x

**DECLARATION OF CHRISTOPHER BUCHTIEN IN SUPPORT OF OBJECTION OF
HGREIT II EDMONDSON ROAD, LLC TO DEBTORS' MOTION FOR ORDER
AUTHORIZING DEBTORS TO ASSUME AND ASSIGN LEASE FOR STORE NO. 301**

I, Christopher Buchtien, declare the following:

**A.    Background**

1.      I am a Director for Hines Global REIT ("Hines").  Hines is the managing

agent of HGREIT II Edmondson Road, LLC (the "Landlord"), the landlord for the leased premises

commonly located at 2719 Edmondson Rd, Cincinnati, OH, 45209 (the "Leased Premises") in the

shopping center known as Rookwood Commons ("the Shopping Center"), designated by the above-captioned debtors (the "Debtors") as Store No. 301.

2.      I received a bachelor's degree in Business Administration and finance from the University of Texas in 2009.  I have been employed at Hines since 2010 and have over 13 years of combined experience in real estate and retail.  In connection with my role as Director, I manage certain real estate assets of Hines and review and approve leasing decisions, including leases at the Shopping Center.

3.      In connection with my role as Director, I am also one of the custodians of records of the Landlord's books, records, and files that relate to the use and occupancy of retail premises at Rookwood.  I am personally familiar with the (i) Shopping Center; (ii) Leased Premises; (iii) BBBY Lease (defined below); and (iv) the West Elm Lease (defined below).  If called upon to testify in this proceeding as to the matters set forth in this declaration, I could and would competently testify thereto, since the facts set forth herein are personally known to me to be true.

## B.  Rookwood & the BBBY Lease

4.      In 2017, Hines acquired Rookwood Pavilion and the Shopping Center, two contiguous shopping centers that operate as a single property consisting of approximately 596,171 square feet of floor area.  The Shopping Center has approximately 72 retail stores and restaurants, including household names such as Whole Foods, REI, Nordstrom Rack, HomeGoods, Joseph-Beth Booksellers, P.F. Chang's and J. Alexander's.  The Shopping Center is maintained and managed as a first-class shopping center comparable to other first-class shopping centers in Ohio.[1]

---

[1]      BBBY Lease, § 13.1.2.

5.      Debtor Bed Bath & Beyond, Inc. is the tenant of the Leased Premises pursuant to that certain written lease, dated February 15, 1999, as subsequently amended on August 25, 1999 and April 27, 2021, and by the exercise of two options to extend (the "BBBY Lease").[2] The BBBY Lease is currently set to expire on January 31, 2024, subject to options to extend the term in favor of Tenant.

6.      The tenant must use the Leased Premises in accordance with the Permitted Uses (as defined in the BBBY Lease) as laid out in Section 1.1.27 of the BBBY Lease.  The tenant and Landlord also agreed not to use the Leased Premises in contravention of Section 13.1.3, as modified by the Second Lease Modification, which lists the Prohibited Uses.  In exchange, the Landlord granted the tenant exclusive rights to operate within the Shopping Center as more fully described in Section 13.2 of the BBBY Lease.

7.      On June 30, 2023, the Debtors filed their *Notice of Assumption of Certain Unexpired Leases*, illustrating, *inter alia*, their intent to assume and assign the BBBY Lease (the "Proposed Assignment") to Dania, Incorporated d/b/a Scandinavian Designs ("Scandinavian Design").[3]

**C.  West Elm Lease and Exclusive Use**

8.      On or about May 29, 2019, the Landlord and Williams-Sonoma Stores, Inc., with an initial and current trade name West Elm ("West Elm"), entered into a written Lease Agreement for approximately 11,900 square feet of retail premises located in the Rookwood Commons shopping center (the "West Elm Lease").[4]

---

[2]      A true and correct copy of the BBBY Lease and the amendments and modifications are attached hereto as **Exhibit A**.

[3]      Docket No. 1157.

[4]      A true and correct copy of the West Elm Lease is attached hereto as **Exhibit B**.

9.      The West Elm Lease, at section 1.1.j.2, provides that::

During any time when Tenant is regularly operating in the Premises principally for the sale of lifestyle furniture, furnishings and accessories in accordance with the Permitted Use and no Event of Default exists and remains uncured, Landlord will not enter into a lease in the Shopping Center to any tenant whose use primarily consists of the sale of lifestyle furniture, furnishings and accessories, such as (by way of example) the manner in which stores are operated under the trade name CB2, EQ3, Room & Board, Bo Concepts, or Design Within Reach as of the date of this Lease.[5]

10.     The same section also provides explicit tenant remedies in the event the Landlord violates West Elm's exclusivity provision:

. . . for so long as such violation exists, Minimum Rent and Percentage Rental shall be reduced by one-half, but there shall be no adjustment to the Annual Breakpoint.  In addition, should such violation continue for a period in excess of twelve (12) consecutive months, Tenant shall have the right to terminate this Lease by written notice to Landlord at any time thereafter (but prior to cessation of such violation), in which event Landlord shall reimburse Tenant for its net book value of its leasehold improvements.[6]

11.     To the best of my knowledge, Scandinavian Design and its sister brand, Dania Furniture, are modern purveyors of a global network of modern furnishings[7] and is a direct competitor of West Elm.  Moreover, Scandinavian Design proposes to use the Leased Premises for the purposes of selling lifestyle furniture, furnishings and accessories.

12.     Based on the above, the Proposed Assignment, if approved, would violate Section 1.1.j.2. of the West Elm Lease, which would entitle West Elm to a fifty percent (50%) rent abatement throughout the time that Scandinavian Design occupies the Leased Premises as a co-tenant to West Elm, causing the Landlord significant financial harm.

---

[5]      *See* West Elm Lease, at § 1.1.j.2.

[6]      *Id.*

[7]      *See* https://scandinaviandesigns.com/pages/about-us-1.

**D.  Tenant Mix**

13.    In leasing out its retail space, it is the Landlord's customary practice to ensure that incoming tenants do not disrupt the carefully planned tenant mix and balance currently in place at the Shopping Center.  In my experience, landlords and tenants negotiate various use, exclusivity restrictions and prohibited use similar to the provisions at issue here. The tenants of the Shopping Center are contractually interdependent, and the leases contain various use, exclusivity restrictions and prohibitions to establish a specific tenant mix in the various shopping centers Hines owns and operates.

14.    To the best of my knowledge and belief, the addition of a second furniture store, such as Scandinavian Design, rather than a store that does not conflict with the primary use of the Shopping Center's existing tenants, would disrupt the carefully planned tenant mix and balance at the Shopping Center.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: Houston, TX
       July 17, 2023

Christopher Buchtien

## **Exhibit A**

BBBY Lease

Execution Copy
2/12/99



ORIGINAL

## LEASE AGREEMENT

Between

## JEFFREY R. ANDERSON REAL ESTATE, INC.

**Landlord**

and

## BED BATH & BEYOND INC.,
a New York corporation,

**Tenant**

## ROOKWOOD COMMONS
Cincinnati, Ohio

Dated: February 15 1999

\* \* \* \* \* \*

The mailing, delivery or negotiation of this Lease shall not be deemed an offer to enter into any
transaction or to enter into any relationship, whether on the terms contained herein or on any
other terms.  This Lease shall not be binding nor shall either party have any obligations or
liabilities or any rights with respect thereto, or with respect to the premises, unless and until
both parties have executed and delivered this Lease.  Until such execution and delivery of this
Lease, either party may terminate all negotiation and discussion of the subject matter hereof,
without causes and for any reason, without recourse or liability.

\* \* \* \* \* \*

**TABLE OF CONTENTS**

Page

ARTICLE 1
BASIC TERMS, EXHIBITS AND DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
Section 1.1    Basic Terms, Exhibits, and Definitions . . . . . . . . . . . . . . . . . . . . . . . . 1

ARTICLE 2
LEASE OF PREMISES; LEASE TERM; DELIVERY DATE . . . . . . . . . . . . . . . . . . . . . 4
Section 2.1    Lease of Premises . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
Section 2.2    Term . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
Section 2.3    Delivery Date . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
Section 2.4    Unseasonable Delivery; Blackout Period . . . . . . . . . . . . . . . . . . . . . 7
Section 2.5    Co-Tenancy Condition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

ARTICLE 3
IMPROVEMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
Section 3.1    Landlord's Work . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
Section 3.2    Plan Approvals; Tenant's Work . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
Section 3.3    Performance of Work . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
Section 3.4    Measurement:  Premises and Shopping Center . . . . . . . . . . . . . . . 11

ARTICLE 4
FIXED RENT AND TAXES: DETERMINATION AND PAYMENT . . . . . . . . . . . . . . . 12
Section 4.1    Fixed Rent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
Section 4.2    Real Estate and Other Taxes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

ARTICLE 5
COMMON AREAS, THEIR USE AND CHARGES . . . . . . . . . . . . . . . . . . . . . . . . . 13
Section 5.1    Common Areas: Maintenance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
Section 5.2    Common Areas: Restrictions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

ARTICLE 6
UTILITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

ARTICLE 7
SIGNS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
Section 7.1    Tenant's Building Signage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
Section 7.2    Signage Restrictions and Criteria . . . . . . . . . . . . . . . . . . . . . . . . . . 18
Section 7.3    Pylon/Monument Signage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
Section 7.4    Signage: Alteration/Removal/Allocation . . . . . . . . . . . . . . . . . . . . . 18
Section 7.5    Signage:  Compliance with Law . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

ARTICLE 8
ALTERATIONS AND IMPROVEMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
Section 8.1    Alterations and Improvements . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

ARTICLE 9
REPAIRS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
Section 9.1    Tenant's Repairs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
Section 9.2    Landlord's Repairs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
Section 9.3    Legal Compliance Work . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

ARTICLE 10
INDEMNIFICATION, INSURANCE AND WAIVER OF SUBROGATION . . . . . . . . . 22
Section 10.1   Mutual Release, Waiver of Subrogation and Mutual Indemnification . . 22
Section 10.2   Tenant's Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
Section 10.3   Landlord's Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
Section 10.4   General Insurance Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . 24

ARTICLE 11
FIRE AND OTHER CASUALTY; EMINENT DOMAIN . . . . . . . . . . . . . . . . . . . . . . 24
Section 11.1   Fire and Other Casualty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

        Section 11.2    Eminent Domain . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
        Section 11.3    Abatement of Rent Charges . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

ARTICLE 12
        COVENANTS, REPRESENTATIONS AND WARRANTIES  . . . . . . . . . . . . . . . . . 27
        Section 12.1    Quiet Enjoyment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
        Section 12.2    Authority. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
        Section 12.3    Landlord's Covenants. Warranties and Representations. . . . . . . . . . 27
        Section 12.4    Environmental Matters. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
             12.5      Purchase and Sale Contracts. . . . . . . . . . . . . . . . . . . . . . . . . . . 29

ARTICLE 13
        USES AND RESTRICTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
        Section 13.1    Permitted and Prohibited Uses . . . . . . . . . . . . . . . . . . . . . . . . . 30
        Section 13.2    Tenant's Exclusive in Center . . . . . . . . . . . . . . . . . . . . . . . . . . 32
        Section 13.3    Exclusives Which Tenant Must Honor . . . . . . . . . . . . . . . . . . . . . 32

ARTICLE 14
        CONDUCT OF BUSINESS OPERATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . 33

ARTICLE 15
        TENANT ASSIGNMENT AND SUBLETTING . . . . . . . . . . . . . . . . . . . . . . . . 34
        Section 15.1    Assignment and Subletting . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
        Section 15.2    Liability of Tenant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
        Section 15.3    Collateral Assignment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
        Section 15.4    Cure Rights of Original Tenant . . . . . . . . . . . . . . . . . . . . . . . . 34
        Section 15.5    Recognition Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

ARTICLE 16
        DEFAULT AND DISPUTE RESOLUTION . . . . . . . . . . . . . . . . . . . . . . . . . . 35
        Section 16.1    Tenant Default . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
        Section 16.2    Landlord Default . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
        Section 16.3    Payment under Protest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
        Section 16.4    Work Performed Under Protest . . . . . . . . . . . . . . . . . . . . . . . . 37
        Section 16.5    Arbitration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

ARTICLE 17
        RIGHT TO MORTGAGE AND NON-DISTURBANCE; ESTOPPEL CERTIFICATE . . . 37
        Section 17.1    Right to Mortgage and Non-Disturbance . . . . . . . . . . . . . . . . . . 37
        Section 17.2    Estoppel Certificate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

ARTICLE 18
        NOTICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

ARTICLE 19
        TENANT'S PROPERTY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

ARTICLE 20
        END OF TERM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
        Section 20.1    Surrender of Premises. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
        Section 20.2    Hold Over. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
        Section 20.3    Landlord's Entry. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

ARTICLE 21
        TENANT'S RIGHT OF FIRST OFFER . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

ARTICLE 22
        TENANT'S RIGHT OF TERMINATION . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

ARTICLE 23
        MISCELLANEOUS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
        Section 23.1    Loading Facilities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
        Section 23.2    Liens. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
        Section 23.3    Broker's Commission. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
        Section 23.4    Force Majeure. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
        Section 23.5    Consents. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Section 23.6    Costs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
Section 23.7    Attorneys' Fees. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
Section 23.8    Survival of Obligations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
Section 23.9    Non-Waiver. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
Section 23.10  Rights Cumulative. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
Section 23.11  Definition of Landlord. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
Section 23.12  Successors and Assigns. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
Section 23.13  Limitation of Landlord's Liability. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
Section 23.14  Limitation of Tenant's Liability. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
Section 23.15  Joint and Several Liability. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
Section 23.16  Severability. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
Section 23.17  Grammatical Usages and Construction . . . . . . . . . . . . . . . . . . . . . . . 41
Section 23.18  Table of Contents, Line Numbering and Paragraph Headings. . . . . . 41
Section 23.19  Definition of Hereunder, Herein, etc. . . . . . . . . . . . . . . . . . . . . . . . . . 41
Section 23.20  Short Form Lease. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
Section 23.21  Entire Agreement and Modification. . . . . . . . . . . . . . . . . . . . . . . . . . . 42
Section 23.22  No Joint Venture or Partnership Created by Lease. . . . . . . . . . . . . . 42
Section 23.23  Governing Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

## EXHIBITS

| | |
|---|---|
| Exhibit "A" | Legal Description of Shopping Center |
| Exhibit "B" | Site Plan |
| Exhibit "C" | Rent Commencement and Expiration Date Agreement |
| Exhibit "D" | Specifications for Landlord's Work |
| Exhibit "D-1" | Front Elevation of Premises [including Building Signage] and of Shopping Center |
| EXHIBIT "D-2" | Tenant's Conceptual Exterior Elevation |
| EXHIBIT "D-3" | Tenant's Conceptual North Wall Signage |
| Exhibit "E" | Permitted Encumbrances |
| Exhibit "F" | Pylon and Monument Signs [including colors and materials] |
| Exhibit "G" | Subordination, Non-Disturbance and Attornment Agreement |
| Exhibit "H" | Recognition Agreement |
| Exhibit "I" | Delivery Date Notice |
| Exhibit "J" | Delivery Date Certification |
| Exhibit "K-1" | Existing Exclusives |
| Exhibit "K-2" | Existing Leases |
| Exhibit "L" | Percentage Rent |
| Exhibit "M" | Purchase and Sale Contracts |

# LEASE AGREEMENT

THIS LEASE AGREEMENT (*"Lease"*) is entered into as of ~~February~~ *February* 15, 1999 by and between JEFFREY R. ANDERSON REAL ESTATE, INC., an Ohio corporation, having an office at 312 Walnut Street, Suite 1151, Cincinnati Ohio 45202, (*"Landlord"*), and BED BATH & BEYOND INC., a New York corporation, having an office at 650 Liberty Avenue, Union, New Jersey 07083 (*"Tenant"*).

## W I T N E S S E T H :

## ARTICLE 1
## BASIC TERMS, EXHIBITS AND DEFINITIONS

Section 1.1    Basic Terms, Exhibits, and Definitions.  The following terms shall have the meanings set forth in this Section 1.1 except as otherwise expressly provided herein.

1.1.1    Additional Rent:  Any monies which Tenant is required to pay to Landlord under the terms and conditions of this Lease, other than Fixed Rent.

1.1.2    Affiliate:  A corporation, partnership, person or other entity which is controlling, controlled by, or under common control with, Landlord, Tenant or such other entity named herein, as the case may be.  As used herein, *"control"* shall mean shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person or entity, whether through the ownership of voting securities or rights, by contract, or otherwise.

1.1.3    Alternate Rent:  Payment of Percentage Rent defined in and payable in the manner set forth in Exhibit L attached hereto, but  in no event shall the aggregate Percentage Rent payable during the Alternate Rent period exceed fifty percent (50%) of the amount of Fixed Rent which otherwise would have been payable during such period.  In the event that Tenant exercises any right under this Lease to pay Alternate Rent in lieu of Fixed Rent, any benefit which Tenant may realize thereby shall constitute a reimbursement to Tenant for certain pre-opening expenses incurred by Tenant in connection with this Lease.

1.1.4    Common Areas:  All areas which are, from time to time, available for the joint use and benefit of Tenant and other tenants and occupants of the Shopping Center, and their respective employees, agents, subtenants, concessionaires, licensees, customers and other invitees, including, but not limited to, any and all parking areas, parking spaces, driveways, truck serviceways, passageways, sidewalks, entrances, exits, lighting facilities, courts, landscaped areas, retention or detention areas, and common utility lines.

1.1.5    Common Areas Charges:  As defined in Section 5.1 hereof.

1.1.6    Delivery Date:  As defined in Section 2.3 hereof.

1.1.7    Effective Date:  The date hereof.

1.1.8    Event of Default:  As defined in Section 16.1 hereof.

1.1.9    Excused Periods:  Such periods of time during which Tenant's (or, as the case may be, another tenant's) failure to conduct the operations of its business or any other business: (x) resulted from alterations or renovations being performed in and to the Premises, (y) was caused by damage or destruction, eminent domain proceedings or actions, or Force Majeure, or (z) was caused by any act or omission of Landlord.

1.1.10    Exhibits.  The exhibits listed in the Table of Contents annexed to this Lease have been agreed to by the parties and attached hereto, it being the intention of the parties that they shall become a binding part of this Lease as if fully set forth herein.

1.1.11    Expiration Date:  The date on which the Term of this Lease expires, as established in Section 1.1.47 hereof.

1.1.12 <u>Fixed Rent</u>:  The following amounts for the periods indicated (subject to adjustment pursuant to Section 3.4 hereof, it being agreed, however, that for all purposes of this Lease, including, without limitation, the calculation of Fixed Rent under this Subsection 1.1.12, the Floor Area of the Premises shall be deemed not to exceed 31,250 square feet):

(a)     For the period commencing on the Rent Commencement Date and ending on the last day of the Initial Term (i.e. the first January 31 occurring after the tenth (10th) anniversary of the Rent Commencement Date), at the rate of Three Hundred Ninety Thousand Six Hundred Twenty Five and 00/100 ($390,625.00) Dollars per year [based on Twelve and 50/100 ($12.50) Dollars per square foot of Floor Area];

(b)     In the event Tenant exercises the first Renewal Option, for the first five (5) year Renewal Period, at the rate of Four Hundred Six Thousand Two Hundred Fifty and 00/100 ($406,250.00) Dollars per year [based on Thirteen and 00/100 ($13.00) Dollars per square foot of Floor Area];

(c)     In the event Tenant exercises the second Renewal Option, for the second five (5) year Renewal Period, at the rate of Four Hundred Twenty One Thousand Eight Hundred Seventy Five and 00/100 ($421,875.00) Dollars per year [based on Thirteen and 50/100 ($13.50) Dollars per square foot of Floor Area];

(d)     In the event Tenant exercises the third Renewal Option, for the third five (5) year Renewal Period, at the rate of Four Hundred Thirty Seven Thousand Five Hundred and 00/100 ($437,500.00) Dollars per year [based on Fourteen and 00/100 ($14.00) Dollars per square foot of Floor Area];

(e)     In the event Tenant exercises the fourth Renewal Option, for the fourth five (5) year Renewal Period, at the rate of Four Hundred Fifty Three Thousand One Hundred Twenty Five and 00/100 ($453,125.00) Dollars per year [based on Fourteen and 50/100 ($14.50) Dollars per square foot of Floor Area]; and

(f)     In the event Tenant exercises the fifth Renewal Option, for the fifth five (5) year Renewal Period, at the rate of Four Hundred Sixty Eight Thousand Seven Hundred Fifty and 00/100 ($468,750.00) Dollars per year [based on Fifteen and 00/100 ($15.00) Dollars per square foot of Floor Area].

1.1.13 <u>Floor Area</u>:  The actual number of square feet of space contained on all floors within any building area in the Shopping Center (including the Premises) and, with respect to exterior areas, including all exterior areas leased to or exclusively used by one or more tenants (other than exterior loading dock areas).  All measurements pursuant to this Subsection shall be from the exterior of outside walls or store front and/or to the centerline of any common walls, but in no event shall Floor Area within either the Premises or the remainder of the Shopping Center include any non-selling or storage space areas within any mezzanine, lower floor, second floor or, except as set forth above, any exterior areas.  Notwithstanding the foregoing, for all purposes of this Lease, including, without limitation, the calculation of Fixed Rent under Subsection 1.1.12 and the calculation of Tenant's Pro Rata Share under Subsection 1.1.42, the Floor Area of the Premises shall be deemed not to exceed 31,250 square feet.

1.1.14 <u>Force Majeure</u>:  As defined in Section 23.4 hereof.

1.1.15 <u>Ground Lessor</u>: The landlord under any existing or future ground or underlying leases encumbering or affecting all or any part of the Shopping Center.

1.1.16 <u>Intentionally Omitted</u>.

1.1.17 <u>Hazardous Substances</u>:  As defined in Subsection 12.4.1 hereof.

1.1.18 <u>Inducement Tenants</u>: As defined in Subsection 2.3.1 hereof.

1.1.19 <u>Institutional Mortgagee</u>:  Any commercial bank, federal or state savings and loan association, life insurance company, or pension fund, which is not an Affiliate of Landlord, holding a mortgage on the Shopping Center.

1.1.20 <u>Landlord</u>:  As defined in the preamble and Section 23.11 hereof.

1.1.21 <u>Landlord's Mailing Address:</u> 312 Walnut Street, Suite 1151, Cincinnati, Ohio 45202, or such other place and/or to the attention of such other person as Landlord may notify Tenant from time to time by notice given in accordance with the provisions of Article 18 hereof.

1.1.22 <u>Landlord's Work:</u>  As defined in Section 3.1 hereof.

1.1.23 <u>Lease Interest Rate:</u> The then effective prime rate as published from time to time in the "Money Rates" section of *The Wall Street Journal* (or any successor publication thereto) plus two (2%) percent.

1.1.24 <u>No Change Area:</u> As defined in Section 3.3.7 (a) hereto.

1.1.25 <u>Intentionally Omitted.</u>

1.1.26 <u>Percentage Rent:</u>  As defined in <u>Exhibit L</u> hereto.

1.1.27 <u>Permitted Use:</u>  The sale at retail of a variety of linens and domestics (including, but not limited to, sheets, bedspreads, comforters, duvets, pillows, pillow covers, chair pads, placemats, tablecloths, dish towels, oven mittens and aprons); bathroom items (including, but not limited to, towels, shower curtains, bathroom rugs, toilet seats, health and beauty aids, personal care products and other bathroom appliances and accessories); housewares (including, but not limited to, utensils, kitchen utensils, appliances and "gadgets," cleaning appliances and supplies, cookware, bakeware, dishes and china, glassware, garbage pails, ironing boards and other laundry items, mops and brooms, candles and candle holders, ready-to-assemble furniture and artificial flowers); frames and wall art; window treatments; closet, shelving and storage items; home furnishings; area rugs; wall and floor coverings; furniture; decorative accessories; photo albums; photo storage boxes; luggage; books; party supplies; cards and stationery; seasonal items; juvenile merchandise (including, but not limited to, toys, car seats and safety-proofing items); specialty food items; food and non-alcoholic beverage services; any and all other items sold or services provided from time to time in any store owned or operated by Tenant or its Affiliate(s) (the aforementioned items are hereinafter collectively referred to as the **"Permitted Items"**); and for any other lawful retail use not specifically prohibited by the provisions of Section 13.1.1 below.  In addition, Tenant shall be permitted to use portions of the Premises for storage and office uses incidental to the Permitted Use.

1.1.28 <u>Premises:</u> Being the area cross-hatched on <u>Exhibit B</u> hereto, having dimensions as shown on the Site Plan and containing approximately thirty one thousand five hundred fifty (31,550) square feet of Floor Area, and approximately one thousand three hundred (1,300) square feet of space on the mezzanine level for office purposes, subject to adjustment in accordance with the provisions of Section 3.4 below.  In no event shall such non-selling space result in any charge to Tenant by way of Fixed Rent or any Additional Rent, nor shall such non-selling space be included in the determination of Tenant's Pro Rata Share.

1.1.29 <u>Renewal Option:</u>  As defined in Section 2.2.2 hereof.

1.1.30 <u>Renewal Period(s):</u> Five (5) successive periods of five (5) years each, as provided in Section 2.2.2 hereof.

1.1.31 <u>Rent:</u>  Fixed Rent and/or Additional Rent.

1.1.32 <u>Rent Commencement Date:</u> As defined in Section 2.2 hereof.

1.1.33 <u>Intentionally Omitted.</u>

1.1.34 <u>Shopping Center:</u>  The shopping center to be known as Rockwood Commons, which when constructed, shall contain approximately two hundred sixty thousand (260,000) square feet of Floor Area, located off of Interstate 71 in Cincinnati, Ohio, and more particularly described in <u>Exhibit A</u> hereto.

1.1.35 <u>Intentionally Omitted.</u>

1.1.36 <u>Slack Period:</u> The period commencing on October 15 and ending on the March 31 next following.

1.1.37 <u>Substantially Completed or Substantial Completion:</u> The completion of specified work at the Shopping Center (including, without limitation, as applicable, Landlord's Work) to the extent that only so-called "punch list" items of such work (defined in Subsection 3.3.3 below) shall not be completed.

1.1.38 <u>Taxes:</u> As defined in Section 4.2 hereof.

1.1.39 <u>Tenant:</u> As defined in the preamble hereof.

1.1.40 <u>Tenant's Mailing Address:</u> 650 Liberty Avenue, Union, New Jersey 07083, Attn: Mr. Warren Eisenberg, or such other place and/or to the attention of such other person as Tenant may notify Landlord from time to time by notice given in accordance with the provisions of Article 18 hereof.

1.1.41 <u>Tenant's Property:</u> All of Tenant's personal property, including, without limitation, phone and alarm systems, satellite antennae, shelving, computers, furniture, cash registers and customer service counters, specialty lighting, track lighting, millwork, conveyor systems, storage racks and signage and any and all other personal property of Tenant which is capable of being removed from the Premises without material damage thereto, but which shall not include electrical systems, heating, ventilation and air conditioning systems, and other mechanical systems, flooring, carpet, elevators, standard lighting and wiring installed within the walls of the Premises.

1.1.42 <u>Tenant's Pro Rata Share:</u> A fraction whose numerator is the Floor Area of the Premises and whose denominator is the Floor Area of the Shopping Center as shall be re-determined any time a building (and/or Floor Area) is added to or removed from the Shopping Center, but in no event shall Tenant's Pro Rata Share be greater than 12%. Floor Area shall be deemed added to or removed from the Shopping Center on the earlier of (i) the date upon which the building or exterior area containing such Floor Area is completed, whether or not occupied or open for business, or (ii) at such time as an assessment for Taxes is made or removed, as the case may be, with respect to such Floor Area. Within ten (10) days following written request from Tenant, Landlord shall certify to Tenant in writing as to the then Floor Area of the Shopping Center.

1.1.43 <u>Tenant's Work:</u> As defined in Section 3.2 hereof.

1.1.44 <u>Term:</u> A period of approximately ten (10) years beginning on the Rent Commencement Date and ending at midnight on the last day of January following the tenth (10th) anniversary of the Rent Commencement Date (the *"Initial Term"*). As used herein, *"Term"* shall refer to the Initial Term, as the same may be extended by any Renewal Period exercised pursuant to Section 2.2.2 below.

## ARTICLE 2
## LEASE OF PREMISES; LEASE TERM; DELIVERY DATE

Section 2.1    <u>Lease of Premises.</u> Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the Premises together with any and all rights, benefits, privileges and easements, now or hereafter appurtenant to either or both of the Premises and the Shopping Center, arising out of any public or private grant or authority, including, without limitation, the non-exclusive right and easement to use the Common Areas in common with other tenants and occupants of the Shopping Center.

Section 2.2    <u>Term.</u>

2.2.1 <u>Initial Term.</u> Subject to the provisions of this Article 2 and Section 11.1(c) below, the Term of this Lease shall begin on the earlier of (such earlier date being referred to herein as the *"Rent Commencement Date"*): (a) the date (the *"Grand Opening Date"*) which Tenant shall establish in its published advertisement as its grand opening [but not later than the tenth (10th) day after the date upon which Tenant shall initially open the Premises to the general public for business], or (b) the sixtieth (60th) day following the Delivery Date. The Term shall expire on the Expiration Date, unless earlier terminated as herein provided. When the Rent Commencement Date has been determined, as provided in this Section, Landlord and Tenant shall execute, acknowledge and deliver, each to the other, a written statement in the form attached hereto as <u>Exhibit C</u> specifying the Rent Commencement Date. Notwithstanding the fact that the Term shall commence on the Rent Commencement Date, all the provisions of

this Lease, except for those setting forth the Rent, shall be in full force and effect commencing on the Effective Date.

2.2.2    Renewal Options. (a) Tenant shall have the right and option (hereinafter a *"Renewal Option"*) to extend the Initial Term from the date on which it would otherwise, expire for five (5) successive renewal periods of five (5) years each (individually, a *"Renewal Period"*, and collectively, the *"Renewal Periods"*) upon the same terms and conditions as are herein set forth, except that the Fixed Rent during such Renewal Periods shall be as set forth in the definition of "Fixed Rent" in Section 1.1.12 above. Each Renewal Option shall be exercisable by notice given to Landlord at least one hundred eighty (180) days prior to the commencement of the applicable Renewal Period(s).

(b) With respect to any applicable Renewal Period during the Term, Tenant may terminate this Lease by providing Landlord written notice of such intent at least (1) year prior to the termination date ("Tenant's Termination Notice"); provided, however, in no event shall the termination date be sooner than the second anniversary of the first day of the applicable Renewal Period.  On the termination date specified in Tenant's Termination Notice, Tenant shall vacate and surrender the Premises to Landlord in broom clean condition, in accordance with the terms of this Lease, and as though the Lease expired at the natural expiration of the Term, and Landlord and Tenant shall upon such termination be released from any and all liabilities thereafter accruing hereunder (except as otherwise specifically stated in this Lease).

Section 2.3    Delivery Date.

2.3.1    Definition. Subject to Landlord's delivery to Tenant of the Delivery Date Notice in accordance with the provisions of Subsection 2.3.2 below and Landlord's timely compliance therewith, Landlord shall be deemed to have delivered possession of the Premises to Tenant at 8:00 a.m. on the date (the *"Delivery Date"*) following the day on which all of the following conditions (the *"Delivery Date Conditions"*) shall have occurred and Tenant shall have received from Landlord the Delivery Date Certification in accordance with the provisions of Section 2.3.3 below, which shall constitute Landlord's written certification that all of the following shall have occurred:

(a)    Actual possession of the Premises shall have been delivered to Tenant free of all leases (other than this Lease) and occupants, and Landlord shall then be the owner of the fee simple estate in the Shopping Center free and clear of any liens and encumbrances, except for those described on Exhibit E hereto);

(b)    Landlord, at its sole cost and expense, shall have obtained (and delivered copies thereof to Tenant) all permits and approvals required from all applicable governmental authorities to enable: (i) Tenant to occupy and use the Premises for the conduct of its business (exclusive of any business licenses which Tenant may be required to obtain in order  to open and operate its specific business (and not a general retail business)) in the Premises, and (ii) the Common Areas to be developed, operated and used for the purposes hereunder contemplated, which permits and approvals shall include, without limitation, zoning, building code, curb cut and site plan approvals, all permits pertaining to pylon and/or monument signage and Tenant's panel(s) thereon, permits, construction, development and use permits, and a permanent certificate of occupancy for the Premises (unless a permanent certificate of occupancy for the Premises cannot be obtained solely as a result of the failure to complete Tenant's Work in the manner required hereunder, in which event: (1) the delivery of a permanent certificate of occupancy for the Premises shall not be a condition to the occurrence of the Delivery Date, (2) the obtaining of a temporary certificate of occupancy shall be a condition to the occurrence of the Delivery Date, and (3) Landlord shall obtain the permanent certificate of occupancy promptly following the correction or completion of Tenant's Work);

(c)    Landlord's Work shall have been Substantially Completed, which Substantial Completion shall be evidenced by a written certification by Landlord's architect to Tenant, the Premises shall have been delivered "broom clean", and Landlord shall have complied fully with the provisions of Section 12.4 (Environmental Matters) below;

(d)     The Common Areas, and all of the buildings and other improvements depicted on Exhibit B shall have been completed and operational; in addition, all street, storm drainage, traffic signalization, and other off-site improvements (including, but not limited to, all off-site improvements depicted on Exhibit B) required for the Shopping Center to open for business and for Tenant to receive a permanent certificate of occupancy shall be Substantially Completed;

(e)     There shall be no restrictions or other legal impediments imposed by any public or private instrument which would prevent: (i) the use of the Premises for the Permitted Use; (ii) the use of the parking facilities, access roads, and other Common Areas in the manner contemplated by this Lease; (iii) the lawful installation of the signage permitted pursuant to Article 7 below; or (iv) the performance of Tenant's Work;

(f)     Leases shall have been entered into with the following respective tenants named (hereinafter collectively referred to as the **"Inducement Tenants"**) for the following minimum square footage of Floor Area within the Shopping Center: (i) Old Navy (25,000 square feet); (ii) Wild Oats Market (27,000 square feet); (iii) Gap/ Gapkids (18,900 square feet); (iv) Banana Republic (10,080 square feet); and (v) additional Upscale Tenants (hereinafter defined) occupying at least 85,000 square feet in the aggregate (excluding the Premises leased to Tenant).  Each such lease shall have an initial term of not less than ten (10) years and shall not be cancelable by any of the Inducement Tenants, except for failure of Landlord to complete the Shopping Center, for injury to or loss of the premises thereby demised because of fire or other casualty, or for a taking or for other reasons similar to those for which this Lease is cancelable by Tenant; and the extent of construction then performed for each of the respective premises of all Inducement Tenants, whether by Landlord and/or such Inducement Tenant itself, shall not be materially less than that performed for the Premises.  For purposes hereof, "**Upscale Tenants**" shall mean first-class specialty retail tenants normally found in regional malls and primarily selling their respective merchandise under private labels (such as Eddie Bauer, Williams Sonoma, Talbots and Victoria's Secret); and

(g)     Landlord shall have delivered to Tenant (i) an agreement in the form attached hereto as Exhibit G executed by each holder of any mortgage or deed of trust encumbering or affecting the Shopping Center or any portion thereof, in recordable form, and (ii) an agreement in the form and content described in clause (b) of Section 17.1 hereof executed by any existing Ground Lessor, in recordable form; the provisions of this subsection (g) shall be in addition to, and not in limitation of, Section 12.3 (k) of this Lease.

(h)     Landlord shall have delivered to Tenant (i) a recent environmental report for the Shopping Center prepared by a reputable, licensed environmental company, which report indicates that the Shopping Center does not contain any Hazardous Substances which are in violation of Environmental Laws and is otherwise satisfactory to Tenant; and (ii) a title commitment (including, without limitation, copies of all instruments listed therein) from a reputable title company indicating that Landlord has good and marketable fee simple title to the entire Shopping Center (with no strips or gores), which title commitment and all easements, restrictions, liens, encumbrances, and the like listed therein shall be subject to Tenant's approval.

2.3.2   Delivery Date Notice.

(a)     Landlord shall give Tenant at least forty-five (45) days prior notice of the Delivery Date, using the form of Delivery Date Notice attached hereto as Exhibit I. Landlord acknowledges that such Delivery Date Notice is essential to the coordination and timing of Tenant's Work and pre-opening activities, including, without limitation, the ordering and delivery of long lead-time fixtures and equipment and inventory.  Landlord's delivery of the Delivery Date Notice shall be a condition precedent to the Rent Commencement Date.

(b)     Landlord acknowledges that if it shall fail to satisfy all of the Delivery Date Conditions by the Delivery Date as established in the Delivery Date Notice, Tenant will sustain substantial, additional costs and expenses, including, without limitation, storage costs for fixtures, equipment, and inventory, and additional advertising and promotional costs, the exact amount of which would be impracticable or extremely difficult to ascertain.

Subject to the provisions of subparagraph (c) below, if the Delivery Date does not occur by the date established therefor in the Delivery Date Notice, then, in addition to any other remedies available to Tenant under this Lease, Landlord agrees to allow to Tenant a credit against the initial installment(s) of Rent hereunder equal to:

(A)     Three Thousand Dollars ($3,000) per day for each of the first fourteen (14) days commencing on the (and including) the day after the date established in the Delivery Date Notice as the Delivery Date and thereafter, Five Thousand Dollars ($5,000) per day through (and including) the date on which the Delivery Date actually occurs (**"Tenant's Liquidated Costs"**), such amount being deemed as reimbursement to Tenant for all of the aforesaid costs incurred by Tenant, and

(B)     Five Thousand Dollars ($5,000) in reimbursement for costs and expenses (**"Tenant's Administrative Costs"**) incurred by Tenant by reason of additional work performed by Tenant's employees at its corporate offices as a result thereof,

it being acknowledged and agreed by Landlord and Tenant that the liquidated sums referred to in this sentence represent the parties' good faith agreement as to an amount which shall have been incurred by Tenant and which shall otherwise not be susceptible of exact ascertainment. Notwithstanding any provision of this Lease to the contrary, in no event shall the Delivery Date be deemed to occur prior to the Delivery Date established in the Delivery Date Notice.

(c)     Notwithstanding the provisions of subparagraphs (a) and (b) above, Landlord may postpone a Delivery Date from that previously established in a Delivery Date Notice by delivering to Tenant a revised Delivery Date Notice at least thirty (30) days prior to the Delivery Date established in the previous Delivery Date Notice, which revised notice shall set forth the date to which the Delivery Date will be postponed. Each time that a revised Delivery Date Notice is timely given hereunder, Tenant's Liquidated Costs, if any, shall only be deemed to accrue after the new Delivery Date established in the revised Delivery Date Notice, but Tenant shall nevertheless be entitled to offset Tenant's Administrative Costs on each occasion from Rent first becoming due hereunder. Revised Delivery Date Notices not given prior to the aforesaid 30-day period shall not serve to avoid the accrual of Tenant's Liquidated Costs as provided in subparagraph (b) above.

(d)     Without limiting the other rights and remedies available to Tenant under this Lease, if the Delivery Date does not take place by June 30, 2000, then Landlord agrees to allow Tenant a credit against the installment(s) of Rent hereunder equal to the following: Three Thousand Dollars ($3,000) per day from July 1, 2000 to July 14, 2000 and thereafter, Five Thousand Dollars ($5,000) per day through (and including) the date on which the Delivery Date actually occurs, such amount being deemed as reimbursement to Tenant for all of the aforesaid costs incurred by Tenant, it being acknowledged and agreed by Landlord and Tenant that such credit represents the parties' good faith agreement as to an amount which shall have been incurred by Tenant by reason of the failure of the Deliver Date to occur by June 30, 2000 and which shall otherwise not be susceptible of exact ascertainment. The foregoing provisions of this Subsection 2.3.2 (d) shall be subject to the following terms and conditions: (A) nothing contained herein shall lessen or diminish in any manner Landlord's obligation to deliver to Tenant the Delivery Date Notice in accordance with the preceding provisions of Subsection 2.3.2 (a) and to timely comply therewith, and (B) any credit against Rent which would otherwise accrue to Tenant pursuant to this Subsection 2.3.2 (d) shall not apply only during any specific period that any of Tenant's Liquidated Costs are simultaneously accruing under this Lease.

2.3.3   Delivery Date Certification.   Upon the satisfaction of all of the Delivery Date Conditions, Landlord shall so certify to Tenant, using the form of Delivery Date Certification attached hereto as Exhibit J.

2.3.4   No Waiver.   Neither Tenant's acceptance of physical possession of the Premises nor Tenant's opening of the Premises for business to the public prior to the Delivery Date shall: (i) be deemed a waiver by Tenant of any of the Delivery Date Conditions, or (ii) relieve Landlord of any obligation under this Lease, unless such condition or obligation is expressly waived in writing by Tenant.

Section 2.4    Unseasonable Delivery: Blackout Period.

2.4.1   If, for any reason (including, without limitation, Force Majeure), the Delivery Date occurs during the period commencing on August 15 and ending on the January 31 next following (the **"Blackout Period"**), then Tenant shall have the right to:

(a)    accept physical possession of the Premises and, if the Rent Commencement Date occurs before the April 1 next following, to pay Alternate Rent in lieu of Fixed Rent and Additional Rent for the period from the Rent Commencement Date until the April 1 next following, subject, in any event, to the other provisions of this Article 2; or.

(b)    delay its acceptance of physical possession of the Premises to a date not later than the day after the Blackout Period expires, whereupon the Delivery Date shall be deemed to have occurred on the date that Tenant actually accepts physical possession of the Premises (subject to the other provisions of this Article 2 and the continuing satisfaction of the Delivery Date Conditions); if the Rent Commencement Date occurs before the April 1 next following, Tenant shall be entitled to pay Alternate Rent in lieu of Fixed Rent for the period from the Rent Commencement Date until the April 1 next following.

2.4.2   If, for any reason (including, without limitation, Force Majeure), the Delivery Date occurs during the sixty (60)-day period immediately following the Blackout Period and the Rent Commencement Date occurs before the April 1 next following, then Tenant shall have the right to pay Alternate Rent in lieu of Fixed Rent for the period from the Rent Commencement Date until the April 1 next following.

Section 2.5    Co-Tenancy Condition.

2.5.1   As used herein, the **"Co-Tenancy Condition"** shall mean that all Inducement Tenants are Fixturing and Merchandising (hereinafter defined) their respective premises, and Landlord shall have given Tenant notice thereof.

2.5.2   As used herein, the phrase **"Fixturing and Merchandising"** shall mean that each Inducement Tenant shall have accepted possession of its entire premises, such premises have been substantially completed and each Inducement Tenant is actively and continuously engaged in the fixturing and merchandising therein.

2.5.3   If, on the date on which Tenant is ready to commence Fixturing and Merchandising the Premises for business to the general public, the Co-Tenancy Condition has not been satisfied, Tenant shall have the right, at its sole option, to:

(a)    not open the Premises for business to the general public, in which event, the Rent Commencement Date shall be delayed until the sixtieth (60th) day after the date (the **"Inducement Date"**) on which the Co-Tenancy Condition is satisfied, or, if such 60th day occurs during the Slack Period, then the Rent Commencement Date shall be delayed until the end of the Slack Period, subject, in any event, to any applicable provisions of this Article 2; or

(b)    open the Premises for business to the general public, in which event, subject to any applicable provisions of this Article 2, the Rent Commencement Date shall occur on the Grand Opening Date, and thereafter, Tenant shall be entitled to pay Alternate Rent in lieu of Fixed Rent and Additional Rent until the Inducement Date occurs (or, if the Inducement Date occurs during the Slack Period, then until the end of the Slack Period).

2.5.4   In addition to the provisions of Section 2.5.3 above, if the Co-Tenancy Condition has not been satisfied within one hundred eighty (180) days after Tenant either shall have been ready to commence Fixturing and Merchandising or shall have opened the Premises to the general public for business, Tenant shall have the right, at any time prior to the satisfaction of the Co-Tenancy Condition, upon giving Landlord at least sixty (60) days' prior notice, to terminate this Lease as of the date specified in said notice. Landlord may negate such termination by causing the Co-Tenancy Condition to be satisfied within thirty (30) days after the date on which the foregoing termination notice is given. If this Lease is terminated pursuant to this Subsection 2.5.4, neither party shall have any further liability hereunder, except: (i) as set forth in Section 23.3 below, and (ii) Landlord shall promptly reimburse Tenant

for all of its reasonable third-party costs and expenses incurred in connection with this Lease, including, without limitation, costs associated with the preparation and review of plans and specifications, and the performance of Tenant's Work.

ARTICLE 3
IMPROVEMENTS

Section 3.1    Landlord's Work.  Landlord shall, at its sole cost and expense, perform the work and obligations described on Exhibits D and D-1 hereto, and the "Final Plans and Specifications" (hereinafter defined in Section 3.2) (collectively, **"Landlord's Work")**, and shall deliver possession of the Premises to Tenant in the condition described therein.  Within ten (10) days after the Effective Date, Landlord shall deliver to Tenant, for Tenant's approval, a color rendering of Tenant's exterior facade consistent with Tenant's conceptual exterior elevation drawing annexed hereto as Exhibit D-2.  If Landlord fails to so deliver the color rendering within such 10 day period or Tenant disapproves of such color rendering, Tenant shall deliver to Landlord Tenant's own color rendering, Landlord shall be deemed to have accepted same and Landlord and Tenant are hereby authorized to attach to their respective counterparts of this Lease Tenant's own color rendering, which shall replace and supersede Exhibit D-2 and Landlord shall perform the work set forth thereon as part of Landlord's Work.

Section 3.2    Plan Approvals; Tenant's Work.

3.2.1    Preparation of Preliminary Plans.

(a)    Within ninety (90) days after the Effective Date, Landlord shall deliver to Tenant the "Shell Drawings" (hereinafter defined), which Shell Drawings shall be subject to reasonable modifications indicated by Tenant in Tenant's Plans.  As used herein, the term **"Shell Drawings"** shall include all of the following: (i) a dimensioned building floor plan for the Premises which shall denote egress, ingress, vertical transportation, receiving area (truck access), and compactor locations; (ii) building elevations for all buildings in the Shopping Center; (iii) exterior wall sections of the Premises; (iv) a sidewalk plan showing improvements located within the area from the back of the front curb to the front wall of the Premises and any adjacent premises (including, without limitation, sidewalks, depressed curbing, cart corral locations, and planters); (v) roof plan of the Premises (including, without limitation, roof construction, location of heating, ventilation and air conditioning units, drainage, and penetrations); (vi) dimensioned structural drawing showing interior layout and exterior facade column layout of the Premises (including, without limitation, column sizes for each); and (vii) landscape and grading plans for the Shopping Center (and the then current site plan).

(b)    Within thirty (30) days after Tenant's receipt of the Shell Drawings, Tenant shall deliver to Landlord its fixture plan, reflected ceiling plan and office plan (collectively, **"Tenant's Plans")**, all of which shall conform to the Shell Drawings (as same may be reasonably modified by Tenant, as noted above).

(c)    Within thirty (30) days after receipt of Tenant's Plans, Landlord shall prepare and submit to Tenant, in a single submission (which, in Tenant's reasonable opinion, shall be at least 85% complete), Landlord's preliminary plans and specifications (the **"Preliminary Plans")** for Landlord's Work, which shall include, without limitation, mechanical, electrical, plumbing, structural, architectural and site plans.

(d)    Within thirty (30) days after its receipt of the Preliminary Plans, Tenant shall give Landlord notice of the respects, if any, in which said Preliminary Plans fail to meet Tenant's reasonable approval and/or fail to conform to the Shell Drawings (as the same may have been modified by Tenant), Tenant's Plans, and/or Exhibits D and D-1 hereto, and Landlord shall promptly make any revisions necessary to correct such matters and obtain Tenant's approval.

3.2.2    Preparation of Final Plans and Specifications.  Within thirty (30) days after the date on which Landlord receives notice of Tenant's approval of the Preliminary Plans, Landlord shall prepare and deliver to Tenant, in a single submission, final plans and specifications (the **"Final Plans and Specifications")** based upon the approved Preliminary Plans.  Within fifteen (15) days after its receipt of the Final Plans and Specifications, Tenant shall notify Landlord of Tenant's approval thereof or the reasons why such approval cannot be granted, and Landlord shall promptly make any revisions necessary to correct such matters and

obtain Tenant's approval.  Upon Tenant's approval of the Final Plans and Specifications, any further changes thereto shall be subject to Tenant's prior written approval.  Unless specifically noted on a separate summary sheet attached to the Final Plans and Specifications, to the extent of a conflict between the terms and provisions of the Shell Drawings, Exhibit D, and Exhibit D-1 hereto, and the terms and provisions of the Final Plans and Specifications, then the terms and provisions of the Shell Drawings, Exhibit D, and Exhibit D-1 shall govern and prevail. Tenant's approval of the Preliminary Plans and the Final Plans and Specifications shall not constitute an opinion or agreement by Tenant that the Premises or the Common Areas are structurally sufficient or that the Preliminary Plans and the Final Plans and Specifications comply with law or other applicable requirements of governmental or quasi-governmental authorities.

After Tenant approves either or both of the Preliminary Plans and Specifications or the Final Plans and Specifications, it shall have the right to require Landlord to subsequently make changes to either or both of the Preliminary Plans and Specifications or the Final Plans and Specifications, in which event:

(a)    Tenant shall pay to Landlord the net reasonable additional cost (together with overhead and profit thereon, not to exceed five percent (5%) of such net reasonable additional cost) of Landlord's Work resulting from such changes, taking into consideration any and all actual reduced and added costs resulting from all such changes (including, without limitation, reasonable costs approved by Tenant in advance associated with any acceleration of the work schedule which Tenant, at its sole option, may require) and/or other costs savings that Tenant may provide to Landlord; such payment by Tenant shall be due and payable on or before the later of: (i) the thirtieth (30th) day after the Delivery Date, or (ii) the fifteenth (15th) day after Landlord shall have delivered to Tenant backup information in support of such net reasonable additional cost (including, without limitation, receipted invoices) as Tenant may reasonably require; and

(b)    if, despite Landlord's diligent efforts in performing Landlord's Work (including, without limitation, any acceleration of the work schedule which Tenant, at its sole option, may require), such changes cause a net delay in the Substantial Completion of Landlord's Work (taking into consideration any time reductions and extensions resulting from such changes and/or other time savings that Tenant may provide to Landlord), then the Rent Commencement Date shall be determined as if such net delay had not occurred.

Except for Landlord's Work, Tenant shall, at its own cost and expense, do any and all work (hereinafter referred to as *"Tenant's Work"*) which Tenant desires to adapt the Premises to Tenant's use.  Landlord shall perform Landlord's Work in a manner required by applicable governmental or quasi-governmental regulations, ordinances and codes so that Tenant will be able to obtain all required permits and approvals from applicable governmental and quasi-governmental authorities to enable Tenant to perform Tenant's Work and to open and conduct its business in the Premises.  Landlord shall pay all impact fees and related governmental charges in connection with Landlord's Work and all other work performed by or on behalf of Landlord in connection with the Shopping Center.  If such permits and approvals cannot be obtained because Landlord's Work has not been completed or has been performed improperly or by reason of any then existing condition of the Shopping Center, Landlord shall remedy the situation so as to enable Tenant to obtain such permits and approvals for Tenant's Work, and the Delivery Date shall be deemed delayed, for Tenant's benefit only, on a day-for-day basis for each day of delay occasioned thereby.

Section 3.3    Performance of Work.

3.3.1  Both Landlord's Work and Tenant's Work shall be performed in a good and workmanlike manner, in compliance with all applicable law, utilizing only new, first-class materials, and in accordance with all insurance company requirements.

3.3.2  If: (a)  Landlord's Work has not been commenced *(i.e., if Landlord has not yet poured foundation footings for the Premises)* by January 15, 2000, or (b)  the Delivery Date shall not have occurred by June 30, 2000 (subject to Force Majeure, not to exceed thirty (30) days), Tenant may thereafter, during such time as Landlord's Work has not been commenced or the Delivery Date has not occurred, as the case may be, consider Landlord to be in default hereunder and, at Tenant's option in its sole discretion, elect to:

(i) terminate this Lease, if Landlord shall fail to fully cure such default within thirty (30) days after receiving Tenant's notice thereof, in which event neither party shall have any further liability hereunder (other than as set forth in Section 23.3 below), except that Landlord shall be obligated to promptly reimburse Tenant for all its reasonable third-party costs and expenses incurred in connection with this Lease, including, without limitation, costs associated with the preparation and review of plans and specifications, and the performance of Tenant's Work (not to exceed, in the aggregate, $75,000); and/or

(ii) avail itself of the remedies set forth in Section 16.2 below (provided, however, that the cure period set forth therein shall not be applicable); and/or

(iii) extend one or more times the dates set forth in clauses (a) and/or (b) of this Subsection 3.3.2 to such future dates designated by Tenant in notice given to Landlord.

The election by Tenant of any one or more of the foregoing remedies shall not preclude the subsequent election of any alternative remedy provided in this Section, this Lease, at law, or in equity.

3.3.3  Landlord's Work Performed After Delivery of Possession.  Landlord shall complete any "punch list items" (hereinafter defined) within ten (10) days after Landlord receives notice thereof.  If Landlord fails to timely complete any punch list item, Tenant shall have the right to complete the same using its own contractors, in which event, Landlord shall reimburse Tenant for the reasonable costs and expenses thereof upon demand.  Any portion of Landlord's Work which is performed after Tenant accepts physical possession of the Premises shall occur only "after hours", when neither Tenant nor any of its agents, contractors, employees and servants are working within the Premises, and Landlord shall reimburse Tenant for the reasonable costs and expenses incurred by Tenant by reason of such "after hours" performance of Landlord's Work, including, without limitation, utilities charges and security expenses.  If Landlord fails to reimburse Tenant for any amounts payable to Tenant under this Subsection 3.3.3 within thirty (30) days after Tenant's demand therefor, then Tenant shall have the right to offset such amounts from Rent next becoming due hereunder, together with interest thereon at the Lease Interest Rate from the tenth (10th) day after Landlord receives Tenant's demand until paid.  Within thirty (30) days following Substantial Completion of Landlord's Work, Landlord shall deliver to Tenant a duplicate copy of the "as built" plans for the building containing the Premises.  As used herein, the term *"punch list items"* shall mean such minor items of a cosmetic nature which, when considered as a whole, do not adversely affect either the performance of Tenant's Work or Tenant's ability to conduct its normal business operations in the Premises.

3.3.4  No other consents or approvals required.  Landlord represents and warrants to Tenant, and Tenant has relied on such representation and warranty as a material inducement for Tenant entering into this Lease, that no consents or approvals (other than those which may be required by governmental authorities) are necessary or required to be obtained in order for Landlord to commence and complete Landlord's Work or other work required to be performed by Landlord hereunder, or for Tenant to commence and complete Tenant's Work

3.3.5  Tenant's Right of Entry.  Prior to the Delivery Date, Tenant may enter upon the Premises for the purposes of inspecting the work, taking measurements, making plans, erecting temporary or permanent signs and doing such other work as may be appropriate or desirable without being deemed thereby to have taken possession or obligated itself to pay Rent, provided, however, that Tenant shall not, during the course of such work, materially interfere with the performance of Landlord's Work and shall indemnify and hold Landlord harmless from and against any and all claims or losses arising from Tenant's entry upon the Premises, except to the extent caused by Landlord, its agents, employees, or contractors.

3.3.6  Tenant's Leasehold Improvements.  Tenant's Work and all other improvements erected by Tenant with respect to the Premises, together with any replacements thereof, shall be and remain the property of Tenant throughout the Term, and Tenant alone shall be entitled to the benefits of ownership thereof, including, but not limited to, depreciation of same as an asset for tax purposes.

3.3.7   <u>Work Requirements After Delivery Date</u>.   Following the Delivery Date, any construction by Landlord affecting any portion of the Shopping Center shall be subject to the following terms and conditions:

(a)      all staging and storage of materials and parking of construction vehicles shall at all times occur only within the portions of the Shopping Center designated as "Staging" on <u>Exhibit B</u> or if no such "Staging" areas are indicated on <u>Exhibit B</u>, then in no event shall such areas be located in those portions of the Shopping Center indicated by hatching and designated as the "No Change Area" on <u>Exhibit B</u> (the "*No Change Area*").

(b)      during the course of any such construction, Landlord, at its sole cost and expense, shall construct and at all times maintain such safety barricading as Tenant may reasonably require, and, as necessary, a silt fence around all then "unstabilized areas" of any such work (*i.e.*, those areas from which silt and sediment deposits could run to any  portion of the Premises or any then developed portion of the Shopping Center);

(c)      Landlord shall at all times proceed diligently to ensure that from and after Tenant's opening for business to the public, no ingress, egress or passage of any construction, delivery and related vehicles engaged in the performance of such work or other construction activities shall take place except through the entrance/exit drive designated as the "Construction Drive" on <u>Exhibit B</u>; and

(d)      Landlord shall maintain the Shopping Center in a clean, safe, and sightly condition.

Section 3.4     <u>Measurement: Premises and Shopping Center</u>.   Contemporaneously with the Delivery Date Notice, Landlord shall deliver to Tenant a certification to Tenant by Landlord's licensed architect, surveyor or engineer of the Floor Area of the Premises, the square footage of the non-selling space of the Premises and the Floor Area of the Shopping Center, the measurements of which shall be subject to confirmation by Tenant's licensed architect, surveyor or engineer.  If Landlord shall fail so to deliver such certification to Tenant, Tenant shall have the right to have any of such measurements made and certified to Landlord by Tenant's licensed architect, surveyor or engineer, at Landlord's expense (not to exceed Two Thousand Five Hundred Dollars ($2,500)), which shall be credited to Tenant against Fixed Rent first becoming due hereunder.  If the measurement of any non-selling space on the mezzanine level indicates a deficiency of more than fifty (50) square feet less than the square footage for such space(s) as set forth in Subsection 1.1.28 above, then the Floor Area of the Premises shall be deemed to be reduced by one square foot for each square foot of such deficiency in excess of fifty (50) square feet, and the Fixed Rent and any other applicable provision of this Lease (including, without limitation, Tenant's Pro Rata Share shall be reduced accordingly.  If (i) the Floor Area of the Premises (exclusive of the Special Loading Dock Area, as designated on <u>Exhibit B</u>) is determined to be less than thirty one thousand fifty (31,050) square feet, or (ii) the square footage of the non-selling space on the office mezzanine is determined to be less than the Floor Area shown therefor on the Final Plans and Specifications or (iii) the square footage of the Special Loading Dock Area is determined to be at least ten (10) square feet less than the Floor Area shown therefor on <u>Exhibit B</u>, then Tenant shall have the right to terminate this Lease upon notice to Landlord given within fifteen (15) days after Tenant's receipt of the final measurement determination and to receive a refund from Landlord of all amounts theretofore paid to Landlord pursuant to the terms of this Lease and all reasonable, third-party costs and expenses incurred by Tenant in connection with Tenant's Work (including, without limitation, plan preparation and review).  If the measurement of the Premises shall indicate a Floor Area less than the Floor Area of the Premises set forth in Subsection 1.1.28 above, the Fixed Rent and any other applicable provision of this Lease (including, without limitation, Tenant's Pro Rata Share) shall be reduced to conform to the actual measurement, and Tenant shall receive a proportional refund of any Rent theretofore paid to Landlord.  If the measurement of the Premises indicates that the actual Floor Area of the Premises exceeds the Floor Area of the Premises set forth in Section 1.1.28 hereof, neither Fixed Rent nor Tenant's Pro Rata Share shall be increased by reason thereof.  Landlord and Tenant shall each promptly execute and deliver to the other an amendment memorializing any change to the Fixed Rent, Tenant's Pro Rata Share, or any other applicable provisions of this Lease, made pursuant to the provisions of this Section 3.4.  During the Term, the Floor Area of the Premises and of the Shopping Center shall be adjusted, from time to time, as walls which previously constituted outside walls become common walls (and vice versa).  Any dispute between the parties with respect to the Floor Area

of the Premises, the square footage of said non-selling space or the Floor Area of the Shopping Center shall be resolved by arbitration in accordance with the provisions of Section 16.5 below.

## ARTICLE 4
## FIXED RENT AND TAXES: DETERMINATION AND PAYMENT

Section 4.1    <u>Fixed Rent.</u>    Commencing on the Rent Commencement Date and continuing throughout the Term, Tenant shall pay to Landlord the Fixed Rent, in equal successive monthly installments, in advance, on the first day of each and every calendar month throughout the Term, except that Fixed Rent payable for any partial calendar month during the Term shall be prorated. Fixed Rent shall be paid without deduction or set-off, except to the extent otherwise expressly provided herein. All Rent shall be mailed or otherwise delivered to Landlord's Mailing Address above or to such other address as Landlord may from time to time designate, upon at least thirty (30) days' prior notice to Tenant. All Rent shall be paid in lawful money of the United States which shall be legal tender for the payment of all debts and dues, public and private, at the time of payment. Landlord acknowledges and agrees that for administrative purposes, Tenant has designated BBBY Management Corporation, a New York corporation (the *"Paying Agent"*), to make all Rent payments due to Landlord under this Lease. Said designation (which may be revoked by Tenant at any time) is not intended as, and shall not constitute, an assignment of any rights of Tenant to the Paying Agent, and Tenant shall remain primarily liable for payment of Rent under this Lease. Landlord shall have no right to bring any actions against the Paying Agent, and the Paying Agent shall have no liability to Landlord for any obligation whatsoever (including, without limitation, the obligation to pay Rent). All payments of Rent received by Landlord from the Paying Agent shall be credited to Tenant as if such payments of Rent had been made by Tenant directly to Landlord.

Section 4.2    <u>Real Estate and Other Taxes.</u>

4.2.1    Landlord shall pay on or before the due dates thereof all "Taxes" (defined in Subsection 4.2.3 below) other than personal property taxes levied against tenants. Landlord estimates that Taxes for the first twelve (12) months occurring after the Rent Commencement Date shall be approximately $1.40 per square foot of Floor Area of the Premises. Throughout the Term, Landlord shall cause the Shopping Center to be maintained entirely within tax parcels and lots that exclude any property not a part of the Shopping Center.

4.2.2    (a)    Tenant shall pay to Landlord Tenant's Pro Rata Share of the Taxes which accrue during the Term, subject to the provisions of this Section 4.2. Any Taxes for a real estate fiscal tax year, only a part of which is included within the Term, shall be adjusted between Landlord and Tenant on the basis of a 365-day year as of the Rent Commencement Date or the date on which the Term expires or earlier terminates, as the case may be, for the purpose of computing Tenant's Pro Rata Share of Taxes. If, by law, any Taxes may, at the option of the taxpayer, be paid in installments (whether or not interest shall accrue on the unpaid balance thereof), Landlord shall exercise such option so as to maximize the number of installments, and Landlord shall pay the same as they come due and before any fine, penalty, interest or cost may be added thereto for nonpayment thereof. Only installments becoming due during, or attributable to a real estate fiscal tax year falling partially within, the Term (regardless of when paid) shall be included in Taxes for computation of Tenant's Pro Rata Share of Taxes.

(b)    Landlord shall submit to Tenant a copy of the bill for Taxes issued by the applicable taxing authority, a computation of Tenant's Pro Rata Share of such Taxes and proof of the payment of Taxes for the previous payment period, as well as copies of all notices concerning assessments, tax rates, and changes thereto. Tenant shall pay Landlord in the amount required by this Subsection 4.2.2 within thirty (30) days after receipt of such bill (but in no event earlier than the fifteenth (15th) day prior to the date on which such Taxes would become delinquent).

4.2.3    As used herein, *"Taxes"* shall mean all general, *ad valorem* real estate taxes, and assessments for betterments and improvements that are levied or assessed by any lawful authority on the Shopping Center (general or special), including any substitution therefor, in whole or in part, due to a future change in the method of taxation. For purposes of computing Tenant's Pro Rata Share of Taxes, Taxes shall not include any: (1) income, excise, profits, estate, inheritance, succession, gift, transfer, franchise, capital, or other tax or assessment upon Landlord or upon the rentals payable under this Lease; (2) taxes on rents, gross receipts or revenues of Landlord from the Premises; (3) fine, penalty, cost or interest for

any tax or assessment, or part thereof, which Landlord or its lender failed to timely pay (except if same are caused by an Event of Default); (4) assessment for a public improvement arising from the initial construction or expansion of the Shopping Center or the Premises (it being agreed that all assessments imposed during the Term which are permitted to be included within Taxes hereunder shall, for the purposes of computing Tenant's Pro Rata Share thereof, be deemed to have been paid in the maximum number of installments permitted by the applicable taxing authority); (5) Taxes resulting directly from an increase in the assessment caused by a sale or ground lease of all or any portion of the Shopping Center to an Affiliate of Landlord or more than once every five (5) years; and (6) fees imposed upon Landlord in connection with Landlord's development of the Shopping Center (including, without limitation, trip generation fees). All Taxes payable by Tenant pursuant to this Section 4.2 shall be determined as if the Shopping Center was the only property owned by Landlord. Landlord represents to Tenant that (i) as of the Effective Date and, to the best of Landlord's knowledge, as of the anticipated Delivery Date, no portion of the Shopping Center is or will be subject to or the beneficiary of an abatement of Taxes, and (ii) as of the Effective Date, no portion of the Shopping Center is subject to any special assessments or similar charges.

       4.2.4    At Tenant's request, Landlord shall contest the amount or validity of any assessed valuation or Taxes, failing which, Tenant shall have the right to contest the assessed valuation or Taxes by appropriate proceedings conducted in good faith, whereupon Landlord shall cooperate with Tenant, execute any and all reasonable documents required in connection therewith and, if required by any governmental authority having authority, join with Tenant in the prosecution thereof.  If, as a result of any contest or otherwise, any rebate or refund of Taxes is received, Tenant shall be entitled to Tenant's Pro Rata Share thereof (after reasonable and customary expenses incurred by Landlord and/or Tenant in connection with such contest are paid to the party which incurred such expense).

ARTICLE 5
COMMON AREAS, THEIR USE AND CHARGES

Section 5.1    Common Areas: Maintenance.

       5.1.1    Maintenance of Common Areas.  Landlord shall operate, maintain, repair and replace the Common Areas as required by this Lease and otherwise to the standard by which Common Areas of first-class shopping centers in the State of Ohio are operated, maintained, repaired and replaced, including, without limitation, snow, ice, rubbish and debris removal, landscaping (including, without limitation, the trimming and pruning of trees to avoid interference with the use or visibility of canopies or signs on the exterior of the Premises), adequate lighting, insurance, supervision, use, parking lot paving and striping, drainage, repair of retaining walls, security and control of all Common Areas, and Landlord shall comply with all laws, ordinances, orders, rules and regulations applicable thereto.

       5.1.2    Tenant's Pro Rata Share of Common Areas Charges.

       (a)    During the Term, Tenant shall pay to Landlord Tenant's Pro Rata Share of the reasonable costs (hereinafter referred to as the *"Common Areas Charges"*) incurred by Landlord to operate, maintain, insure and repair the Common Areas provided that tenants occupying at least ninety percent (90%) of the Floor Area of the Shopping Center are required pursuant to the terms of their respective leases to pay a proportionate share of Common Area Charges. Within twenty (20) days after Tenant's written request, Landlord shall deliver to Tenant a written certification signed by an officer of Landlord certifying that the condition set forth in the immediately preceding sentence has been satisfied. Tenant's Pro Rata Share of Common Areas Charges shall be paid in equal monthly installments on the first day of each calendar month, in advance, during each calendar year based on Landlord's reasonable budget.  Landlord's budget for the first full calendar year during the Term shall be in an amount equal to One Dollar ($1.00) per square foot of Floor Area of the Premises.  Thereafter, Landlord's budget for any calendar year shall not exceed one hundred five percent (105%) of the actual Common Areas Charges for the immediately preceding calendar year (exclusive of extraordinary non-recurring expenses during such prior calendar year), and Landlord shall provide Tenant, upon Tenant's request, with reasonable backup documentation and applicable evidence of prior bills and payments.

(b)    Within sixty (60) days after the end of each calendar year, Landlord shall provide to Tenant a statement, in detail reasonably satisfactory to Tenant, of Common Areas Charges for such year, which statement shall be prepared in accordance with generally accepted accounting principles consistently applied (the **"CAC Reconciliation Statement"**).  The CAC Reconciliation Statement shall be certified by Landlord as being accurate and shall be accompanied by a calculation of Tenant's Pro Rata Share of Common Areas Charges, and payment to Tenant in the amount of any overpayment made by Tenant during the preceding calendar year.  If Tenant's Pro Rata Share of the actual Common Areas Charges for a calendar year shall exceed the aggregate monthly installments paid by Tenant during said calendar year, Tenant shall pay to Landlord the deficiency within thirty (30) days after receipt of such notice.  Upon Tenant's request, Landlord shall promptly deliver to Tenant copies of relevant backup materials (including, but not limited to, contracts, correspondence and paid invoices) reasonably required by Tenant.  If Landlord fails to timely remit to Tenant the amount of any overpayment hereunder, Tenant shall have the right to offset such amount from payments of Rent next becoming due hereunder, together with interest thereon at the Lease Interest Rate from the date such remittance is due until reimbursement or full satisfaction by credit. Notwithstanding any provision hereof to the contrary, in no event shall the Tenant's Pro Rata Share of the actual Common Areas Charges with respect to the first full calendar year occurring after the Rent Commencement Date exceed One Dollar ($1.00) per square foot of Floor Area of the Premises  (exclusive of snow removal costs) and with respect to any calendar year thereafter exceed one hundred five percent (105%) of the Tenant's Pro Rata Share of the actual Common Areas Charges for the immediately preceding calendar year (exclusive of snow removal costs incurred during such immediately preceding calendar year).

5.1.3   Exclusions from Common Areas Charges.

(a)    Common Areas Charges shall not include: (1)  the capital cost of any additions to the Common Areas pursuant to an expansion of the Shopping Center; (2)  the cost of any replacements or capital improvements to the Common Areas (for example, the cost of repaving the parking areas as opposed to patching); (3) the cost of investigating, monitoring or remedying any environmental condition or "Hazardous Substances" or any other "Compliance Costs" (both as hereinafter defined in Subsection 12.4.1); (4) any debt service (including principal and interest) or payments of any judgments or other liens against Landlord; (5) the cost of maintaining, repairing or providing security for interior portions of buildings; (6) Taxes or other taxes levied or assessed against Landlord or the Shopping Center; (7) the cost of compliance with laws (including, without limitation, the cost of curing violations or contesting such laws or violations); (8) any costs resulting from insurance deductibles or any payments made under any self-insurance policy maintained by Landlord; (9) any costs which would have been reimbursed or paid for by insurance proceeds had Landlord maintained the insurance required under Section 10.3 hereof and the amount of any judgment or other charge entered or costs assessed against Landlord in excess of the policy limits of the insurance maintained by Landlord under Section 10.3 hereof); (10) those portions of Landlord's insurance premiums which are reimbursed to Landlord by any other tenant in the Shopping Center other than  through the payment of such tenant's proportionate share of insurance premiums otherwise includable as part of Common Areas Charges; (11) sums paid or owed by Landlord to any tenant in the Shopping Center; (12) costs incurred in connection with the negotiation of leases with, or construction of improvements for, any tenant in the Shopping Center (including, without limitation, brokerage commissions and legal fees); (13) costs incurred in connection with lawsuits or other legal actions (including, without limitation, arbitrations and mediations) instituted or defended by Landlord; (14) sums incurred as late payment fees, penalties or interest; (15) ground rent; (16) depreciation; (17) costs disproportionately incurred by or on behalf of any one or more of the tenants in the Shopping Center (including, without limitation, all costs relating to the operation of any food court in the Shopping Center); (18) electricity costs for lighting Common Areas later than Normal Hours (hereinafter defined in Section 5.2.4) (other than low-level security lighting); (19) Landlord's advertising, entertainment and promotional costs for the Shopping Center (including, without limitation, holiday decorations); (20) costs of acquiring, leasing, restoring, insuring or displaying sculptures, paintings and other objects of art located within or outside the Shopping Center; (21) costs and expenses payable to Landlord or to an Affiliate of Landlord to the extent that such costs and expenses exceed competitive costs and expenses for materials and services by unrelated persons or entities of similar skill and experience; (22) repairs resulting from defects in the original construction of the Shopping Center arising within one (1) year after the Rent Commencement Date; (23) the cost of mechanized equipment (but not the straight-line depreciation thereof over its useful life, as determined in accordance with generally accepted accounting principles); (24) reserves for anticipated future expenses; (25) any cost or expense relating to the administration and management of the Common Areas (whether on-site or off-site) including, but not limited to,

overhead, management fees, office salaries and benefits, office rental, office supplies, dues and subscriptions, office utility charges, telephone charges and automobile expenses or (26) costs incurred in connection with the monitoring, maintenance, inspection, or testing of fire alarm systems.

(b)     In addition, if any tenant or other occupant of the Shopping Center (i) maintains the Common Areas in whole or in part, or any facilities therein, (ii) provides any services the cost of which would otherwise be includable in Common Areas Charges, and/or (iii) pays directly for costs which would otherwise be included in the Common Areas Charges, then the costs associated with or attributable to any of the foregoing shall be excluded from Common Areas Charges.

(c)     Common Areas Charges for any period during the Term which constitutes less than a full calendar year shall be equitably prorated.

(d)     The cost of such repainting the exterior walls of the buildings of the Shopping Center (including, without limitation, the Premises), as provided in Section 9.2 hereof, shall be includable in Common Areas Charges only with respect to repainting performed after the fifth (5th) anniversary of the Rent Commencement Date, and not more frequently than once every five (5) years thereafter.

5.1.4   Tenant's Right to Audit.  Tenant shall have the right to audit Landlord's books and records to verify Landlord's calculation of Common Areas Charges and Tenant's Pro Rata Share thereof.  Upon Tenant's request, Landlord shall promptly deliver to Tenant copies of relevant backup materials (including, but not limited to, contracts, correspondence and paid invoices) reasonably required by Tenant.  In the event of an error in Landlord's favor, Landlord shall immediately refund the overcharge to Tenant, and if the overcharge exceeds four (4%) percent of Tenant's Pro Rata Share of Common Areas Charges, Landlord shall pay to Tenant the reasonable expenses of the audit within thirty (30) days after Tenant's demand therefor, failing which, Tenant shall have the right to offset such amount from payments of Rent next becoming due hereunder, together with interest thereon at the Lease Interest Rate from the date such remittance is due until reimbursement or full satisfaction by credit.  Tenant shall keep the results of any such audit confidential, provided that nothing contained herein shall restrict Tenant from disclosing such information as may be required by law, or to its accountants, attorneys or *bona fide* prospective assignees or subtenants (provided that each of such recipients shall be bound by the same non-disclosure provisions as are imposed upon Tenant). Any dispute by Landlord with respect to an audit by Tenant shall be submitted to arbitration in accordance with the provisions of Section 16.5 below.

5.1.5   In no event shall Tenant be required to join, participate in or contribute to any promotional fund, marketing fund or merchants' association.

Section 5.2    Common Areas: Restrictions.

5.2.1   Continuous Access.  The locations and size of the Premises and other buildings in the Shopping Center, and the layout of the parking and service areas and access and service roads and other Common Areas are designated on Exhibit B.  No entrances, exits, approaches and means of ingress and egress to and from the Shopping Center as shown on Exhibit B shall be interrupted or disturbed by any act or omission of Landlord during the Term. Notwithstanding the foregoing, Landlord shall be permitted, upon at least thirty (30) days prior notice given to Tenant, to temporarily close the Common Areas for the minimum time legally necessary to prevent a dedication thereof or an accrual of any rights in any person or the public generally therein; provided that such closure shall not occur during August, November or December of any calendar year.  Notwithstanding anything to the contrary contained in this Lease, Tenant acknowledges and agrees that access to the Shopping Center shall be provided exclusively from Arbor Place and Edmondson Road, dedicated public streets, provided, however, that if any other tenant of the Shopping Center is permitted to have or is in fact using any other means of ingress or egress into or out of the Shopping Center, Tenant shall likewise to be able to use such ingress and/or egress for its customers and employees.

5.2.2   No Alterations.  Landlord shall not, without obtaining Tenant's prior written consent in each instance, which consent may be withheld in its sole discretion: (i) alter the area of the Shopping Center or the location or size of any building or improvement shown on Exhibit B, subject to any expansion areas as may be indicated thereon; (ii) subject to the provisions of Subsection 5.2.3, change the number, location, or layout of parking spaces within

the No Change Area as shown on Exhibit B; (iii) construct any structures or buildings in the Shopping Center (including, without limitation, any kiosks, booths, signs or similar structures in the Common Areas other than those shown on Exhibit B); or (iv) change the entrances or exits to and from the Shopping Center, or the curb cuts and roadways or other Common Areas from those as shown on Exhibit B. In the event Tenant consents to any such change, alteration, construction or work, it shall not be performed during August, November and December of any year, and shall be undertaken in such a manner so as not to: (x) adversely affect ingress to or egress from the Shopping Center, (y) adversely affect the visibility of the Premises or any signs which contain Tenant's name, and (z) otherwise materially interfere with the normal conduct of Tenant's business in the Premises. Except as set forth in this Section 5.2.2, Landlord may make changes or revisions to Exhibit B without Tenant's consent, provided such work does not violate the provisions of clauses (x), (y) and/or (z) of the immediately preceding sentence.

5.2.3    Parking Area. During the Term, Landlord shall maintain in the Shopping Center, at a minimum, the greater of (i) the number of parking spaces required by law, without variance, or (ii) four and one-half (4.5) ground-level parking spaces for every one thousand (1,000) square feet of Floor Area in the Shopping Center, with each such space being at least nine (9) feet in width and eighteen (18) feet in length. Parking spaces shall at all times be clearly marked by painting, striping or otherwise. Landlord shall not designate specific parking spaces for use by any tenant or other occupant of the Shopping Center. There shall be no charge whatsoever levied for the use of any parking areas within the Shopping Center (other than costs incurred in maintaining Common Areas, as provided in Section 5.1 above).

5.2.4    Lighting. Throughout the Term, Landlord shall keep the Common Areas fully lighted and open to the customers of the Shopping Center seven (7) days a week at all times during normal retail shopping center hours, which shall include until 11:00 p.m. Monday through Saturday and until 7:00 p.m. on Sunday (*"Normal Hours"*). Upon request of Tenant, Landlord shall keep the Common Areas lighted until midnight (or such shorter period as Tenant may request) and Tenant may request the Common Areas to be lighted after midnight but such request shall be subject to Landlord's approval, not to be unreasonably withheld, provided, in each case, Tenant shall pay for a share of the reasonable cost of said requested lighting, which share shall be equal to the product of (x) such cost, and (y) a fraction, the numerator of which shall be the number of square feet of Floor Area within the Premises and the denominator of which shall be the aggregate number of square feet of Floor Area of all premises within the Shopping Center (including the Premises) open later than Normal Hours (excluding, however, those tenants and occupants who separately control and pay for their own Common Area lighting). In addition to the foregoing, Landlord shall provide for low level security lighting from one (1) hour after the close of business in the Premises until dawn.

5.2.5    Repairs. During the Term, any construction or repair permitted or required under this Lease and undertaken in the Common Areas or in any other portion of the Shopping Center shall:

(a)    not be performed during the months of August, November or December of any year, except such construction or repair may be performed in the event of an emergency or if same is situated in a portion of the Common Areas that is not within the No Change Area;

(b)    be commenced only upon at least five (5) days' prior notice to Tenant (except in an emergency, in which event Landlord shall only be required to give such notice as is reasonable under the circumstances);

(c)    be performed in accordance with the requirements of Section 3.3.7 above and in such a manner so as not to: (i) adversely affect ingress to or egress from the Shopping Center, (ii) adversely affect the visibility of the Premises or any signs which contain Tenant's name, and (iii) otherwise materially interfere with the normal conduct of Tenant's business in the Premises.

5.2.6    Rules and Regulations. Tenant shall comply with the rules and regulations of the Shopping Center as established from time to time by Landlord, within sixty (60) days after Landlord notifies Tenant thereof, provided they: (i) are reasonable, (ii) do not adversely affect the operations of Tenant's, or its sublessee's, business(es) on the Premises, (iii) do not adversely affect any of Tenant's rights under this Lease, and (iv) are uniformly enforced against all tenants of the Shopping Center and without prejudice against Tenant. In

the event of any conflict between the provisions of this Lease and any rules or regulations, the provisions of this Lease shall prevail and govern.

5.2.7  No Promotional Use.  Landlord shall not use or permit the use of all or any portion of the Common Areas for retail sales or for promotional purposes.  Notwithstanding the foregoing, Tenant shall have the right, subject to applicable law, to place a trailer on the Common Areas in an area immediately adjacent to the Premises for the purpose of conducting employee interviews and recruiting, which trailer shall be removed within ten (10) days after the Delivery Date.

5.2.8  Trash Compactor.  Tenant shall be permitted to maintain and operate, at no extra charge, its trash compactor in the portion of the Common Areas designated on Exhibit B as "Trash Compactor".

5.2.9  Shopping Carts.  Tenant shall have the right to store its shopping carts in a cart corral in the area located on Exhibit B or if Exhibit B does not specify such area, in such area selected by Tenant provided the area is located on the sidewalk in front of the Premises. With respect to shopping carts provided by Tenant for the use of its customers, Tenant will use reasonable efforts to periodically remove same from the Common Areas.

ARTICLE 6
UTILITIES

Section 6.1.    From and after the Delivery Date and continuing thereafter through the end of the Term, Tenant shall be solely responsible for and shall pay the cost of utilities services (including, without limitation, electricity, gas, water, and sanitary sewer) consumed in the Premises by Tenant.  Landlord shall provide separate utility meters exclusively serving the Premises, at its sole cost and expense (including, without limitation, all connection and hook-up fees).  Tenant's entry upon the Premises prior to the Delivery Date shall not constitute a waiver by Tenant of Landlord's obligation to pay the costs of all utility charges incurred in the Premises prior to the Delivery Date.  Landlord shall not permit the capacity of utility lines available for use at the Premises to be reduced or overloaded by other tenants of the Shopping Center.

Section 6.2.    Notwithstanding any provision of this Lease to the contrary, in the event utilities serving the Premises are disrupted due to the acts or omissions of Landlord, its agents, contractors, servants or employees, Landlord shall promptly restore the affected utilities at Landlord's sole cost and expense.  If the disrupted utilities are not restored within twenty-four (24) hours after the Landlord has knowledge of the disruption, and Tenant is unable to conduct its normal business in the Premises as a result thereof, Rent shall be abated during the period of disruption.

ARTICLE 7
SIGNS

Section 7.1    Tenant's Building Signage.

Tenant shall have the exclusive right, at its sole cost and expense,  to erect, maintain, and replace on the storefront and exterior walls of the Premises, and on the side walls of any entrance design element, if any, banners (including temporary banners placed on the storefront of the Premises and such other walls of the Premises as selected by Tenant), awnings, flags and signs (including, without limitation, under-canopy (e.g., blade) signs) of such size, design and color as Tenant, from time to time, may desire.  Landlord acknowledges and agrees that Tenant shall have the exclusive right to have a sign on the north side of the Premises as shown on Exhibit D-3, which sign shall be supplied and installed as part of Tenant's Work in accordance with the provisions of this Lease.  Landlord acknowledges and agrees that Tenant's storefront sign shall be at least ten (10) feet in width and forty (40) feet in length.  Tenant shall at its sole cost and expense: (i) install and maintain on the storefront of the Premises a temporary banner announcing "Coming Soon" at such time, and for such duration prior to the Rent Commencement Date, as Tenant shall desire, and (ii) install and maintain, commencing on or before the tenth (10th) day after Landlord acquires fee title to the Shopping Center, and ending on the day prior to the Rent Commencement Date, a temporary sign near the site of the future main entrance to the Shopping Center which states "Bed Bath & Beyond Coming Soon". Tenant may erect and maintain in the interior of the Premises any signs it may desire, provided that same are professionally prepared.

Section 7.2    Signage Restrictions and Criteria.

7.2.1    During the Term, no exterior identification signs attached to any building of the Shopping Center shall be of the following type: (i) flashing, moving or audible signs; (ii) signs employing exposed raceways, exposed neon tubes, exposed ballast boxes, or exposed transformers, provided that Tenant shall have the right to employ any methods necessary for the installation of internally illuminated self-contained channel letters; or (iii) paper or cardboard signs other than professionally prepared interior window signs advertising special sales within the subject premises,  temporary signs (exclusive of contractor signs), stickers or decals, provided, however, the foregoing shall not prohibit the placement at the entrance of each such premises of (A) small stickers or decals which  indicate hours of business, emergency telephone numbers, credit cards accepted, and other similar information, and/or (B) a sticker or decal which contains the phrase "no solicitation" or words of like import.

7.2.2    No sign or logo utilized by any other tenant in the Shopping Center shall include the words "bed", "bedroom", "bath", "bathroom", "linens," "sheets", "towels", "beyond", or "housewares".  Landlord shall not permit any obstructions (including, without limitation, any trees, bushes or other landscaping, scaffolding or architectural details) to obscure Tenant's storefront, storefront signs or other exterior wall signs or any pylons, monuments or other freestanding signs.  Except as may be otherwise permitted under leases or occupancy agreements existing as of the Effective Date, Landlord shall not permit any tenant or occupant in the Shopping Center to erect or maintain building signage having an "area of the sign" (as defined by applicable codes) larger than the "area of the sign" utilized by Tenant. In no event shall the height or width of any other tenant's or occupant's building and entrance design element in the Shopping Center (including, without limitation, the height and width of any sign (or any sign letters) or logo which is utilized by such other tenant or occupant) exceed that of Tenant's building and Tenant's entrance design element (except that any single premises which occupies Floor Area which is greater than the Floor Area of the Premises may have a larger building and entrance design element).

Section 7.3    Pylon/Monument Signage.  Landlord shall during the entire Term, use best efforts and diligently proceed to provide at least one (1) pylon along Interstate 71 at the location shown on Exhibit B at Landlord's sole cost. Without limiting Landlord's obligation to supply and install building signage as part of Landlord's Work in accordance with Exhibits D and Exhibit D-1 hereto, and with the additional provisions of this Lease,  Tenant shall have the right following the Substantial Completion of Landlord's Work, at its sole cost and expense, to erect and maintain its identification sign, as shown on Exhibit F hereto (and having colors as selected by Tenant), on both sides of such pylons in the top position thereon and Tenant's sign thereon shall be at least as large as that of any other tenant or occupant whose sign is on such pylon. Landlord represents that only those restaurants located on the outparcels designated "Restaurant Outparcels" on Exhibit B shall be permitted to have monument signs (and no other tenant) and Tenant agrees that Tenant shall not have the right to have its sign panel on any monument sign, provided, however, that if any other tenant (other than a restaurant on a r Restaurant Outparcel) shall have its sign panel on any monument, then Tenant shall likewise have the right to place its panel on such monument in the top position and Tenant's sign thereon shall be at least as large as that of any other tenant's sign. Except as otherwise set forth in the immediately preceding sentence, if Landlord constructs or makes available to any other tenant or tenants in the Shopping Center any other signage (including, without limitation, directional signs) located in the Common Areas or on any "Related Land" (defined in Subsection 13.1.2 above) or otherwise, such signage shall also include Tenant's identification sign as selected by Tenant or as shown on Exhibit F hereto (and having colors as selected by Tenant), which shall be higher and at least as large as the largest sign made available to such other tenant or tenants.  Landlord shall maintain all pylons and monuments in good order and repair, and allow Tenant access to maintain, repair and replace its signs thereon, at Tenant's cost and expense.  Landlord shall not change or alter the location, structure, height or general appearance of the pylons (and if applicable, monuments) without obtaining Tenant's prior consent.  The cost of maintenance of all pylons  (but not individual tenants' signs unless Tenant's sign panel is on such signs), and of the cost of any electricity used to illuminate them, shall be included in Common Areas Charges.

Section 7.4    Signage: Alteration/Removal/Allocation.  Tenant shall have the right, from time to time, without Landlord's approval, to change its signs on the storefront and exterior of the Premises, as well as on any pylon or, if applicable, monument, provided that the area of the new sign is no larger than the area of the sign which it replaces and that the method of construction and attachment is substantially the same.  Landlord, upon request, shall execute any consents or applications which may be required by law to permit the placement or

installation of any signs by Tenant on any part of the Premises or on any pylon or (to the extent permitted pursuant to Section 7.3 above) on any monument.  Upon the expiration or earlier termination of the Lease, Tenant shall remove its signs and patch up any holes on the fascia or other exterior walls of the Premises or on any pylon or monument caused by the prior installation or the removal of such signs.  The signage rights granted to Tenant pursuant to this Article 7 shall, at Tenant's option, be allocated to or between Tenant and/or any subtenant(s) of all or any portion of the Premises.

Section 7.5    Signage:  Compliance with Law.  No signs permitted under this Article 7 shall be installed on the Premises or on the pylons or monuments until all governmental approvals and permits required therefor are first obtained and all fees pertaining thereto have been paid.  Tenant shall comply with all laws and ordinances of applicable governmental authorities with respect to the installation and maintenance of all of its signs.

ARTICLE 8
ALTERATIONS AND IMPROVEMENTS

Section 8.1    Alterations and Improvements.

8.1.1    (a) Tenant shall not perform any structural alterations or structural improvements to the Premises  without the prior approval of Landlord.  All work performed in connection with structural and non-structural alterations or improvements shall be done at Tenant's sole cost and expense, in a good and workmanlike manner and in compliance with all applicable governmental requirements.  The provisions of this Section 8.1 shall not apply to Tenant's building signage, which shall be governed by the applicable provisions of Article 7 above.

(b)  Notwithstanding anything contained herein, Tenant shall have the right, at its sole cost and expense and at any time during the Term,  to construct up to 6,000 square feet of an additional floor (the *"Additional Floor"*) above all or any portion of the Premises, subject to the following terms and conditions:

(i)    Prior to commencing the construction of the Additional Floor (the *"Additional Floor Work"*), Tenant shall prepare and submit to Landlord for Landlord's approval Tenant's plans therefor (the *"Additional Floor Work Plans"*).  Within thirty (30) days after receipt of the Additional Floor Work Plans (or any subsequent revisions by Tenant thereto), Landlord shall give notice of approval of the Additional Floor Work Plans (or such revisions), provided the Additional Floor Work as depicted on the  Additional Floor Work Plans (or such revisions): (I) is in compliance with all applicable laws, (II) is performed by a reputable contractor, in good and workmanlike manner, with new materials and is reasonably architectually harmonious with the existing Premises, and (III) following completion thereof, will not materially reduce the structural soundness of the building containing the Premises; should Landlord fail to notify Tenant within such 30-day period (or if Landlord notifies Tenant within such 30-day period that it does not approve the Additional Floor Work Plans (or revisions) but fails to state with reasonable specificity the reason for such disapproval), then such approval by Landlord shall be deemed to have been given;

(ii)    Notwithstanding the use which Tenant engages in within the Additional Floor, in no event shall same result in any charge to Tenant by way of Fixed Rent or any Additional Rent, nor shall the Additional Floor be included in the determination of Tenant's Pro Rata Share (it being agreed, however, that so long as the "pro rata share" of Taxes and Common Areas Charges paid by all other tenants of the Shopping Center is calculated by including all retail selling space of the Shopping Center within both the numerator and denominator thereof, then, for so long as and to the extent Tenant utilizes the  Additional Floor for retail sales purposes, then the square foot area of the Additional Floor (and all space of other tenants of the Shopping Center) which is used for retail sales purposes shall be utilized in the computation of "Tenant's Pro Rata Share" under this Lease (but in no event shall any Fixed Rent whatsoever be payable with respect to the Additional Floor); and

(iii)   The Additional Floor Work, together with any replacements thereof, shall be and remain the property of Tenant throughout the Term, and Tenant alone shall be entitled to the benefits of ownership thereof, including, but not limited to, depreciation of same as an asset for tax purposes.

8.1.2   Tenant may, from time to time, at its sole cost and expense, without the prior approval of Landlord, make non-structural alterations and non-structural improvements to the Premises as Tenant deems necessary or desirable, including, but not limited to, electrical systems, heating, ventilation and air conditioning and other mechanical systems, installation of fixtures and equipment, painting, and wall and floor coverings, provided that the structural integrity of the Premises shall not be adversely affected thereby. Such alterations and improvements shall comply with all applicable laws and shall be performed by a reputable contractor, in good and workmanlike manner, with new materials.

8.1.3   Tenant shall have the right to subdivide the Premises into two (2) or more separate stores, each of which may have its own front entrance and access to the loading docks in the rear of the Premises, as well as separately sub-metered utilities. At the expiration or earlier termination of this Lease, Tenant shall demolish any demising walls which were erected to subdivide the Premises.

8.1.4   Tenant shall have the right to erect and maintain an antenna and a satellite dish on the roof of the Premises, provided that Tenant: (i) obtains Landlord's prior approval of its plans for the installation of such equipment, (ii) uses a contractor designated or approved by Landlord for all roof penetrations, (iii) maintains the area where roof penetrations are made while Tenant's equipment is present, (iv) repairs any damage to the roof caused by the making of the roof penetrations, including, but not limited to, the repair of the roof penetrations upon the removal of any equipment installed thereon, and (v) obtains any governmental permits or licenses required for installation of a satellite dish or antenna.

8.1.5   Upon the request of Tenant, Landlord shall fully, promptly and diligently cooperate with Tenant and its architects and designers in obtaining any permits, approvals and certificates required to be obtained by Tenant in connection with any alteration or improvement described in this Article 8, and shall execute all applications, documents and other instruments reasonably required for such purpose, provided that Landlord shall not be obligated to incur any costs or expenses, including, without limitation, attorneys' fees and disbursements, or suffer any liability in connection therewith.  Landlord shall execute and return to Tenant all appropriately completed building department or equivalent applications within ten (10) days after Tenant's request therefor.

8.1.6   If any violation of any applicable legal requirement which is noted against the Shopping Center or the Premises (other than a violation caused by Tenant) prevents Tenant from obtaining a building permit for any alterations or a certificate of occupancy, then, upon request by Tenant, Landlord shall promptly and diligently cause such violation to be removed of record to the extent required to permit Tenant to obtain its building permit or certificate of occupancy, as the case may be.

8.1.7   Landlord shall not make any alterations to the Premises (including, without limitation, changing the design, color or materials of the exterior of the Premises) nor shall Landlord construct an additional floor or floors above the Premises.  Landlord shall not refurbish, renovate and/or paint (or repaint) the exterior of other portions of the Shopping Center unless Landlord also refurbishes, renovates and/or paints (or repaints) the exterior of the Premises, which refurbishment, renovation and/or painting shall (i) be performed at Landlord's sole cost and expense, and (ii) with respect to the Premises, be subject to Tenant's prior approval.  The provisions of the immediately preceding sentence shall not apply to refurbishment, renovation or painting that Landlord performs in connection with the leasing of space in the Shopping Center to a new tenant. Landlord shall neither make nor permit to be made any alterations to the exterior "architectural theme" of the remainder of the Shopping Center unless such alterations are consistent with the general appearance and architectual standards of other first class shopping centers in Cincinnati, Ohio.

8.1.8   Upon the expiration or sooner termination of this Lease, all alterations and improvements made by Tenant shall become the property of, and shall be surrendered to, Landlord, and Tenant shall have no obligation to remove alterations or improvements; provided, however, that this provision shall not apply to Tenant's Property.

ARTICLE 9
REPAIRS

Section 9.1  <u>Tenant's Repairs.</u>  Subject to the provisions of Article 10.1 and Article 11 hereof, and except as otherwise provided in Section 9.2 below, Tenant shall maintain in good condition and repair, at its sole cost and expense: (i) the non-structural, interior elements of the Premises (including plate glass, and the electrical, plumbing, mechanical and/or fire alarm systems located in, or serving, exclusively the Premises); (ii) the heating, ventilation and air conditioning (*"HVAC"*) units exclusively serving the Premises; and (iii) any repairs necessitated by the negligence or intentional misconduct of Tenant, its employees, contractors or agents. Landlord hereby grants Tenant license to enter upon the roof, the exterior of the Premises, and/or the Common Areas to perform work with respect to the HVAC units in a commercially reasonable manner.  In the event Tenant replaces the HVAC units exclusively serving the Premises within five (5) years of the expiration or earlier termination of the Term, then Landlord shall pay to Tenant, upon Tenant's surrender of possession of the Premises to Landlord, the then unamortized cost of such HVAC units (utilizing the estimated useful life of the HVAC units as established by the Internal Revenue Code of the United States). The provisions of the immediately preceding sentence shall survive the expiration or earlier termination of this Lease. By way of illustration only, if the HVAC units are replaced, two (2) years remain in the Term and the useful life of such HVAC units is five (5) years, then Landlord shall pay to Tenant 3/5ths of the total cost of such HVAC units. Tenant shall deliver to Landlord a paid invoice or invoices or other evidence reasonably satisfactory to Landlord indicating the date upon which the new HVAC units were installed and the cost thereof. All repairs and replacements on Tenant's part to be performed hereunder shall be at Tenant's sole cost and expense, and performed in a good and workmanlike manner in accordance with all applicable legal requirements

Section 9.2  <u>Landlord's Repairs.</u>  Subject to the provisions of Article 11 hereof, Landlord shall perform, as the same shall from time to time be necessary, all repairs and replacements to the following:

(a)  the buildings of the Shopping Center as necessary to maintain same in good condition and repair (including, without limitation, repainting the exterior walls of the buildings of the Shopping Center (including, without limitation, the Premises) as same may be reasonably required from time to time during the Term;

(b)  the structural elements of the Premises, which shall be deemed to include, without limitation, the roof joists, sprinkler system, foundation, exterior walls (including, without limitation, repainting, but excluding plate glass, storefront windows, doors, door closure devices, window and door frames, molding, locks and hardware, and painting or other treatment of interior walls), floor (but not the floor covering, unless the same is damaged as a result of a floor defect or settling), and the structural elements of any building of which the Premises may be a part;

(c)  the roof, gutters, flashings, downspouts and scuppers;

(d)  the electric, gas, water, sanitary sewer, and other public utility lines serving the Premises, to the point of connection to the Premises;

(e)  all utility lines and ducts in or passing through the Premises which do not exclusively serve the Premises;

(f)  the non-structural elements of the Premises (including, without limitation, the HVAC units and the electrical, plumbing and/or mechanical systems located in or serving the Premises) until the later of: (A) the expiration of any contractors', manufacturers', vendors', or insurers' warranties or guarantees, or (B) the first (1st) anniversary of the Delivery Date; and

(g)  any damage to the Premises or the Shopping Center which is occasioned by (A) the act or omission of Landlord, its employees, agents or contractors, or (B) any breach by Landlord of any provision of this Lease.

All repairs and replacements on Landlord's part to be performed hereunder shall be at Landlord's sole cost and expense (and not includable in Common Areas Charges), performed in a good and workmanlike manner in accordance with all applicable legal requirements,  in accordance with the requirements of Section 3.3.7 above, and without material interference with or disruption to the normal business operations of Tenant or any subtenant, concessionaire or

licensee of Tenant.  Landlord shall give Tenant at least five (5) days' prior notice of any repairs or replacements to, or which would otherwise affect the normal operation of Tenant's business in, the Premises (except in the case of an emergency posing imminent material harm to persons or property, in which event Landlord shall only be required to give such notice as is reasonable under the circumstances).  If, in Tenant's sole but reasonable judgment, Landlord's repairs would materially interfere with or disrupt the normal business operations of Tenant or any subtenant, concessionaire or licensee of Tenant, Landlord shall perform such repairs only after the regular hours of operation of Tenant and any other occupant of the Premises (or any portion thereof), and Landlord shall reimburse Tenant for the reasonable out of pocket costs and expenses incurred by Tenant in connection with such "after hours" repairs, including, without limitation, utilities charges and security expenses.  In the event Landlord does not reimburse Tenant for any amounts payable to Tenant hereunder within ten (10) days after Tenant's demand therefor, Tenant shall have a right to offset such amounts against Rent, together with interest thereon at the Lease Interest Rate from the date of outlay until reimbursement or full satisfaction by credit.

Section 9.3  Legal Compliance Work.  Subject to Section 9.2 above, Tenant shall be responsible, at its sole cost and expense, for the performance of all "Legal Compliance Work" (hereinafter defined) required: (a) solely due to Tenant's specific use of the Premises (*i.e.*, is not of general applicability to tenants and occupants of the Shopping Center), or (b) with respect to non-structural, interior elements of the Premises.  Landlord shall be responsible, at its sole cost and expense (and not includable in Common Areas Charges) for performing all other Legal Compliance Work.  As used herein, **"Legal Compliance Work"** shall mean any obligation, addition, alteration, improvement, or rebuilding, structural or otherwise, to or of the Premises, the Shopping Center, or any part thereof, as applicable, which may be required by reason of any law, rule, regulation or order promulgated by competent governmental authority and in effect on the date of this Lease or hereafter imposed.  Notwithstanding the foregoing, if it is determined that the Landlord's Work does not comply with The Americans with Disabilities Act, Landlord shall bear all costs of effecting such compliance, whether or not the same is required as a result of Tenant's specific use of the Premises.

ARTICLE 10
INDEMNIFICATION, INSURANCE AND WAIVER OF SUBROGATION

Section 10.1  Mutual Release. Waiver of Subrogation and Mutual Indemnification.

10.1.1  Mutual Waiver of Claims.  Landlord and Tenant, on their own behalf and on behalf of anyone claiming under or through either one by way of subrogation, hereby release and waive all rights of recovery and causes of action against each other from any and all liability for any loss or damage to property or resulting from damage to such property (and, in either case, any resulting loss of business or rental income), whether caused by the negligence or fault of the other party, which is normally insured under "All-Risk" property and time element insurance required to be maintained hereunder.  In the event either Landlord or Tenant is a self-insurer or maintains a deductible (as either may be permitted hereunder), then the self-insuring party or the party maintaining the deductible hereby releases the other party from any liability arising from any event which would have been covered had the required insurance been obtained and/or the deductible not been maintained.

10.1.2  Waiver of Subrogation.  Landlord and Tenant shall cause each property insurance policy carried by either of them insuring the Premises, the contents thereof, or the Shopping Center, to provide that the insurer waives all rights of recovery by way of subrogation or otherwise against the other party hereto in connection with any loss or damage which is covered by such policy or that such policy shall otherwise permit, and shall not be voided by the releases provided for in Section 10.1.1 above.  If any additional charge or increase in premium is required by an insurer because of this waiver of subrogation, then the party whose insurance company requires such additional charge or increase in premium shall pay for same.

10.1.3  Mutual Indemnification.

(a)  Except as otherwise provided in Subsections 10.1.1 and 10.1.2 above, Tenant covenants to defend and indemnify Landlord and hold Landlord harmless from and against any and all claims, actions, damages, liability and expense, including reasonable attorneys' fees, (x) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon the Premises, or any part thereof, or (y)

occasioned wholly or in part by any act or omission of Tenant, its agents, contractors, employees, servants, or licensees, except to the extent such claims, actions, damages, liability and expense are caused by the acts or omissions of Landlord, its agents, contractors, licensees, employees, or other tenants and occupants, or for which any of said parties may be statutorily liable.

(b)      Except as otherwise provided in Subsections 10.1.1 and 10.1.2 above, Landlord covenants to defend and indemnify Tenant and hold Tenant harmless from and against any and all claims, actions, damages, liability and expense, including reasonable attorneys' fees, (x) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon any portion(s) of the Shopping Center (excluding the Premises), or (y) occasioned wholly or in part by any act or omission of Landlord, its agents, contractors, employees, servants, tenants (other than Tenant), occupants or licensees, except to the extent such claims, actions, damages, liability and expense are caused by the acts or omissions of Tenant, its agents, contractors, licensees or employees, or for which any of said parties may be statutorily liable.

Section 10.2   Tenant's Insurance.

10.2.1 Tenant's Insurance.   Tenant, at its own cost and expense, shall maintain in full force and effect from and after the Delivery Date and throughout the Term: (i) commercial general liability insurance protecting and insuring Tenant, naming Landlord as "additional insured-lessor" for claims arising out of the use or occupancy of the Premises by Tenant and the obligations assumed by Tenant under this Lease, and having a combined single limit of liability of not less than Ten Million Dollars ($10,000,000) for bodily injury, death and property damage liability; and (ii) standard "All-Risk" property insurance, on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of all fixtures, equipment and other items of personal property of Tenant located on or within the Premises. Tenant may carry any of its insurance under "blanket policies" covering the Premises and other locations it or any Affiliate of Tenant owns or leases, provided that: (i) the amount of the total insurance available shall be at least the protection equivalent to separate policies in the amounts herein required, and (ii) in all other respects, any such policy or policies shall comply with the applicable provisions of this Article 10.

10.2.2 Self-Insurance.   Tenant shall be permitted to self-insure the risks which would otherwise have been covered under the insurance policies required to be maintained by Tenant pursuant to the provisions of this Subsection 10.2, provided that either Tenant or any guarantor of Tenant's obligations under this Lease maintains, during the period of such self-insurance, a net worth of at least Fifty Million Dollars ($50,000,000).

Section 10.3   Landlord's Insurance.

10.3.1 Liability Insurance.   Landlord shall maintain in full force and effect on and after the Effective Date and throughout the Term commercial general liability insurance with regard to the Common Areas protecting and insuring Landlord, naming Tenant as  "additional insured-lessee", and having a combined single limit of liability of not less than Five Million Dollars ($5,000,000) for bodily injury, death and property damage liability.  Landlord shall have the right to carry its insurance under "blanket policies" covering the Shopping Center and other properties provided that: (i) the amount of the total insurance available shall be at least the protection equivalent to separate policies in the amounts herein required, and (ii) in all other respects, any such policy or policies shall comply with the applicable provisions of this Article 10.

10.3.2 "All-Risk" Property Insurance.   Landlord shall procure and maintain in full force and effect on and after the Effective Date and throughout the Term standard "All-Risk" property insurance (including loss of rents for a minimum period of one (1) year) and endorsements for coverages for flood, earthquake, windstorm, earth movement [sinkholes], demolition, increased cost of construction and contingent operation of building laws coverages, on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of all of the buildings (including the Premises) and other insurable improvements in the Shopping Center; provided, however, in no event shall such insurance cover Tenant's Property. All policies required to be maintained by Landlord pursuant to this Subsection 10.3.2 shall provide that any proceeds thereof shall be deposited with Landlord's Institutional Mortgagee, or if none, to Landlord, in either event to be held in trust by such party and disbursed only in accordance with reasonable disbursement procedures customarily used by Institutional Mortgagees provided, however, that nothing contained herein shall lessen or diminish

1    Landlord's obligations under Article 11 of this Lease to restore and/or rebuild the Premises, the
2    Common Areas and other buildings in the Shopping Center or lessen or diminish Tenant's
3    rights under the agreement attached hereto as Exhibit G.
4
5          10.3.3  Tenant's Pro Rata Share of Insurance Premiums.  Tenant shall reimburse
6    Landlord for Tenant's Pro Rata Share of the reasonable insurance premiums attributable to the
7    policies required to be maintained by Landlord pursuant to this Subsection 10.3 as part of
8    Common Areas Charges.  Notwithstanding any provision hereof to the contrary, in no event
9    shall the Tenant's Pro Rata Share of the insurance maintained by Landlord pursuant to
10   Subsection 10.3 exceed $.10 per square foot of Floor Area of the Premises with respect to the
11   first full calendar year occurring after the Rent Commencement Date and with respect to any
12   calendar year thereafter, shall not exceed one hundred five percent (105%) of the Tenant's Pro
13   Rata Share of Landlord's insurance premiums for the immediately preceding calendar year.
14   If the rates for any insurance Landlord is required to carry hereunder are increased as a result
15   of the use or other activity of any other occupant of the Shopping Center, the amount of such
16   increase shall be excluded from Common Areas Charges.  To the extent that Landlord receives
17   a dividend, credit, rebate or other return of a premium which had previously been included in
18   Common Areas Charges, Landlord shall promptly refund Tenant's Pro Rata Share of such
19   dividend, credit, rebate, or return to Tenant.  Tenant's Pro Rata Share of any insurance
20   premium for any period during the Term which constitutes less than a full calendar year shall be
21   equitably prorated.  The provisions of this Subsection 10.3.3 shall survive the expiration or
22   earlier termination of this Lease.
23
24       Section 10.4    General Insurance Requirements.
25
26         10.4.1  All insurance required to be maintained by the parties under this Lease
27   shall be maintained with insurance companies qualified to do business in the state in which the
28   Shopping Center is located, and rated at least A-/VIII by the most current Best's Key Rating
29   Guide (or its equivalent, if such Guide ceases to be published).  Each party shall use its diligent
30   efforts to have its insurers provide thirty (30) days [ten (10) days in the event of non-payment of
31   premium] prior notice to the other party of cancellation or non-renewal of any policy required
32   hereunder.  Each party shall provide to the other duly executed certificates evidencing the
33   insurance coverage described in Sections 10.2.1(ii) and 10.3 above.  The property insurance
34   required to be maintained by the parties pursuant to this Article 10 shall not have deductibles
35   exceeding One Hundred Thousand Dollars ($100,000) without the other party's prior consent.
36
37         10.4.2  The liability insurance requirements under Sections 10.2 and 10.3 above
38   and the replacement value of the buildings and other insurable improvements constituting the
39   Shopping Center shall reviewed by Landlord and Tenant every five (5) years for the purpose of
40   mutually increasing (in consultation with their respective insurance advisors) the minimum limits
41   of such insurance to limits which shall be reasonable and customary for similar facilities of like
42   size and operation in accordance with generally accepted insurance industry standards.  The
43   replacement value of the buildings and other insurable improvements constituting the Shopping
44   Center shall be re-evaluated from time to time at the request of either Landlord or Tenant.
45
46
47                       ARTICLE 11
48             FIRE AND OTHER CASUALTY; EMINENT DOMAIN
49
50       Section 11.1    Fire and Other Casualty.
51
52         11.1.1  (a)    Except as otherwise provided in this Section 11.1, if all or a
53   portion of the Premises, the Common Areas (including all improvements thereto) or other
54   buildings in the Shopping Center shall be damaged by fire or other casualty, Landlord shall
55   promptly rebuild and restore the same to the condition existing immediately prior to such fire or
56   other casualty, which restoration shall include all Tenant's Work and all other leasehold
57   improvements performed by Tenant, and shall not include any of Tenant's Property.  The
58   proceeds of the policies required to be obtained and maintained by Landlord pursuant to
59   Subsection 10.3.2 hereof shall, to the extent necessary, be used for the performance of such
60   rebuilding and restoration work.  In the event such insurance proceeds are insufficient to
61   complete such work, Landlord shall provide the balance of the amount necessary to rebuild or
62   restore the Shopping Center in the manner provided in this Section 11.1.
63
64         (b)    Notwithstanding the foregoing, if any portion of the Premises are
65   so damaged or destroyed, Tenant shall have the right to require Landlord to make changes to
66   the Premises in the course of, and as part of, such rebuilding or restoration work.  If the net cost

and expense of such rebuilding or restoration work is increased solely as a result of such changes (taking into consideration any and all actual reduced and additional costs resulting from such changes and/or other cost savings arising therefrom), then Tenant shall pay to Landlord, as Additional Rent, the amount of such net increase, which amount shall be due and payable within thirty (30) days after Landlord has delivered to Tenant backup information evidencing such increase (including, without limitation, receipted invoices) as may be reasonably required by Tenant (but in no event earlier than the occurrence of the Delivery Date).

(c)    If, in Tenant's sole but reasonable judgment, any damage to the Premises renders all or any portion of the Premises unusable for the conduct of Tenant's business or, in the case of damage to the Shopping Center, materially interferes with the normal conduct of Tenant's business in the Premises, the Rent shall be equitably reduced or totally abated based upon the extent to which the remaining portion of the Premises may, in Tenant's sole but reasonable judgment, be utilized for its normal conduct of business. Such abatement shall continue until terminated in accordance with the provisions of Section 11.3 below. If such fire or other casualty occurs after the Delivery Date but before the Rent Commencement Date, then, notwithstanding any other provision of this Lease (but subject, however, to the provisions of Sections 2.3, 2.4 and 2.5 above), the Rent Commencement Date shall be deemed delayed by one day for each day which elapses between the occurrence of such fire or other casualty and the date upon which the damaged or destroyed area(s) are fully rebuilt and restored.

11.1.2 In the event that:

(a)    Landlord does not commence the repair and restoration work to the Premises, the Common Areas, or other buildings in the Shopping Center as required pursuant to this Section 11.1 within ninety (90) days after the date of such destruction, or thereafter fails to diligently pursue the completion of such repair and restoration work (subject to force majeure and such periods as may be reasonably necessary for the adjustment of insurance proceeds, not to exceed thirty (30) days in the aggregate); or

(b)    the required repairs and restorations to the Premises, the Common Areas, or other buildings in the Shopping Center are not Substantially Completed by Landlord in accordance with the provisions of this Section 11.1 within one (1) year after the date of destruction (which period may be extended by up to ninety (90) days by reason of Force Majeure, provided that Landlord gives Tenant notice of its claim of Force Majeure within five (5) days after the occurrence of the event of Force Majeure),

then, in either of such events, Tenant shall have the right, at its sole discretion and option, to:

(i)    after giving thirty (30) days' prior notice to Landlord, perform or complete, as the case may be, the required repairs and restoration work (or any portion thereof) on Landlord's behalf and at the sole cost of Landlord, which cost Landlord shall pay to Tenant during the course of such repairs within ten (10) days after Tenant's delivery to Landlord of an invoice therefor and, in default of any such payment, Tenant shall have the right to (i) offset the amount thereof (if such amount due is $250,000 or less), together with interest at the Lease Interest Rate, against fifty percent (50%) of the installments of Fixed Rent next payable by Tenant hereunder, and (ii) offset the amount thereof (if such amount due is in excess of $250,000), together with interest at the Lease Interest Rate, against 100% of the installments of Fixed Rent next payable by Tenant hereunder (it being agreed, without limiting the foregoing provisions of this Subsection 11.1.2, that at Tenant's election all insurance proceeds paid or payable to Landlord or Landlord's Institutional Mortgagee pursuant to Subsection 10.3 hereof shall be paid (or, as applicable, in turn delivered) directly to Tenant, to be applied to such work by Tenant as same is being performed); or

(ii)    seek to obtain specific performance of Landlord's repair and restoration obligations pursuant to the laws of the state in which the Shopping Center is located; or

(iii)      terminate this Lease by thirty (30) days' notice to Landlord.

In addition to the foregoing, if, in the opinion of an independent licensed architect designated by Tenant, the required repairs and restorations to the Premises, the Common Areas or other buildings in the Shopping Center cannot be completed by Landlord in accordance with the provisions of this Section 11.1 within one (1) year after the date of destruction, Tenant shall have the right, at its sole discretion and option, to terminate this Lease by giving Landlord at least thirty (30) days' notice thereof.

11.1.3  If the Premises are substantially destroyed by fire or other casualty during the last two (2) years of the Term to the extent of more than one-third (1/3) of the Floor Area thereof, Landlord or Tenant shall each have the right to terminate this Lease as of the date of such damage or destruction by giving notice within thirty (30) days following such damage or destruction, but Tenant may negate any termination by Landlord by agreeing to extend the Term for an additional five (5) year period by exercising an option pursuant to Subsection 2.2.2 hereof, if available, within ten (10) days after receipt of the termination notice from Landlord.

Section 11.2    Eminent Domain.

11.2.1  As used in this Section 11.2, *"Taking"* or *"Taken"* shall mean a taking for any public or quasi-public use by any lawful power or authority by exercise of the right of condemnation or eminent domain or by agreement between Landlord and those having the authority to exercise such right.

11.2.2  If all of the Premises shall be Taken, this Lease shall terminate as of the as of the date of vesting of title or transfer of possession, whichever is earlier, without further liability on the part of either Landlord or Tenant, except for an adjustment between the parties for the Rent payable by Tenant hereunder.

11.2.3  In the event that:

(a)      any portion of the Premises shall be Taken so that it is commercially unreasonable or unfeasible for Tenant, in its sole but reasonable judgment, to conduct its normal business in the Premises;

(b)      as a consequence of any Taking: (i) portions of the Shopping Center shall be divided or separated in any manner that it materially interferes with parking, visibility, or access to the Premises from other portions of the Shopping Center, or (ii) the Shopping Center no longer has an entrance from Arbor Place and/or Edmondson Road and as a result, in either case, it is not commercially reasonable or feasible for Tenant, in its sole but reasonable judgment, to conduct its normal business in the Premises;

(c)      there occurs, in Tenant's sole but reasonable judgement, a denial of adequate access to the Shopping Center at the grade of any street adjoining the Shopping Center or to any easement granted under this Lease, whether or not a Taking shall have occurred;

(d)      any portion of the Shopping Center shall be Taken which materially interferes with parking, visibility or access to the Premises, and as a result of such taking it is commercially unreasonable or unfeasible for Tenant, in its sole but reasonable judgment, to conduct its normal business in the Premises;

(e)      more than twenty-five (25%) percent of the total Floor Area of all of the buildings in the Shopping Center (other than the Premises) are Taken;

(f)      five (5%) percent or more of the parking spaces shown on Exhibit B are Taken, or if so many of the parking spaces in the Shopping Center are Taken such that there are fewer than (i) four and one-half (4.5) parking spaces for every one thousand (1,000) square feet of Floor Area in the Shopping Center, or (ii) the number of parking spaces required by law; or

(g)      a Taking occurs which results in a prohibition of use of the Demised Premises for retail purposes;

then, in any of such events, Tenant shall have the right to terminate this Lease by giving at least sixty (60) days' prior notice to Landlord within sixty (60) days of any such event, in which event this Lease shall terminate without any further liability on the part of either Landlord or Tenant, except for an adjustment between the parties for the Rent payable by Tenant hereunder and for payment to Tenant for its share of the award for the taking pursuant to Subsection 11.2.5 below. Upon any partial Taking of the Premises, the Rent shall be equitably reduced or totally abated based upon the extent to which the remaining portion of the Premises may, in Tenant's sole but reasonable judgment, be utilized for its normal conduct of business.

11.2.4  If this Lease is not terminated pursuant to this Section 11.2, Landlord, at its sole cost and expense, within a reasonable period of time after such Taking, shall repair and restore the area not so Taken to tenantable condition, similar in physical appearance to the condition of the area immediately prior to the Taking, pursuant to plans and specifications approved by Tenant (which repair and restoration to the Premises shall include all Tenant's Work and all other leasehold improvements performed by Tenant; provided, however, that Landlord shall not be obligated to repair or restore Tenant's Property). During the period of such repairs and restoration, all Rent shall abate to the extent that the Premises may not, in Tenant's sole but reasonable judgment, be used by Tenant for the normal conduct of its business. Such abatement shall terminate in accordance with the terms of Section 11.3 below.

11.2.5  In connection with any Taking or partial Taking of the Premises, Tenant shall be entitled to claim an award for loss of business, leasehold improvements, fixtures and equipment and removal and reinstallation costs; provided, however, that no award shall be payable to Tenant which reduces the award payable to Landlord for its fee interest in the Premises.

11.2.6  Any dispute between the parties with respect to this Section 11.2 shall be resolved by arbitration in accordance with the provisions of Section 16.5 below.

Section 11.3  Abatement of Rent Charges.  Notwithstanding any other provisions of this Lease, if the Fixed Rent and Additional Rent payable by Tenant hereunder shall be abated pursuant to Sections 11.1 or 11.2 above, such abatement shall terminate upon the first to occur of: (a) the date on which Tenant shall reopen the Premises to the public for business and shall be able to engage in the normal conduct of such business; or (b) the expiration of the period which is sixty (60) days after Landlord shall have completed such repairs and restoration work as Landlord is obligated to perform hereunder and the interference with the operation of business in the Premises has ceased.

ARTICLE 12
COVENANTS, REPRESENTATIONS AND WARRANTIES

Section 12.1  Quiet Enjoyment.  Tenant shall peaceably and quietly have, hold, occupy and enjoy the Premises for the Term, without hindrance from Landlord or any party claiming by, through, or under Landlord.

Section 12.2  Authority.  Tenant and Landlord each warrant and represent that the person(s) signing this Lease on their behalf has authority to enter into this Lease and to bind Tenant and Landlord, respectively, to the terms, covenants and conditions contained herein. The submission of this Lease to each party hereto shall be for examination and negotiation purposes only, and does not and shall not constitute a reservation of or an obligation of Tenant to lease, or otherwise create any interest of Tenant in, the Premises or any other premises situated in the Shopping Center unless and until the Lease is fully executed and delivered by Tenant and Landlord.

Section 12.3  Landlord's Covenants, Warranties and Representations.  To induce Tenant to execute this Lease, and in consideration thereof, Landlord covenants, warrants and represents to Tenant as follows:

(a)  As of the Delivery Date, Landlord shall have good and marketable fee simple title to the entire Shopping Center, free and clear of all easements, restrictions, liens, encumbrances, leases and the like, except for the encumbrances described on Exhibit E hereto;

(b)  In the event the legal description of the Shopping Center described in Exhibit A hereto indicates that the Shopping Center is composed of more than one

parcel or lot, Landlord represents that there exist no strips or gores between such parcels or lots which are not owned by Landlord;

(c)    No third party consents are required in order for Landlord to enter into this Lease;

(d)    Tenant's use of the Premises for sale of Permitted Items (defined in Section 1.1.27 above) will not violate any exclusive provision or prohibited use restriction granted to any other tenant or occupant in the Shopping Center;

(e)    The Shopping Center shall have on the Delivery Date curb cuts providing both ingress and egress to and from Arbor Place and Edmondson Road for the purpose of vehicular traffic;

(f)    Except as required by law, Landlord shall (i) not reveal to anyone the economic or other business terms of this Lease (including, without limitation, the amount of Rent set forth herein), and (ii) use all commercially reasonable efforts to cause any broker retained by Landlord in connection with this Lease to abide by the confidentiality requirement described in (i) above, provided, however, that Landlord shall be permitted to disclose such information to its accountants, attorneys, agents or other consultants, any *bona fide* prospective purchasers of the Shopping Center, or any current or prospective Institutional Mortgagees or "Ground Lessors" (defined in Subsection 1.1.15 above) of all or any portion of Landlord's interest in the Shopping Center;

(g)    This Lease does not violate the provisions of any instrument heretofore executed and binding on Landlord, or affecting or encumbering the Shopping Center, or the Premises, and no rights granted by Landlord to Tenant under the terms of this Lease conflict with any rights granted by Landlord to any other tenant or occupant in the Shopping Center;

(h)    Attached hereto as Exhibit K-2 is a complete list of all fully executed and delivered leases in effect on the Effective Date with respect to the Shopping Center; and

(i)    Landlord shall not change the name of the Shopping Center without giving at least ninety (90) days prior notice to Tenant, and Landlord shall not include the name of any tenant (other than Tenant) in the name of the Shopping Center.

(j)    Landlord shall promptly forward to Tenant any notice or other communication received by Landlord from any owner of property adjoining or adjacent to the Shopping Center or from any municipal or other governmental authority, in connection with any hearing or other administrative proceeding relating to any proposed zoning, building code, signage, or related variance affecting the Shopping Center or any adjoining or adjacent property, which, if granted, could adversely affect Tenant's use or occupancy of the Premises, the conduct of Tenant's business therein, or Tenant's rights and benefits under this Lease. Landlord, at its sole cost and expense, shall appear in such proceeding and shall contest such proposed variance.  If Landlord fails so to appear and contest such proposed variance after receiving five (5) days' notice from Tenant (provided, however, that no notice shall be required if reasonably necessary to enable Tenant to timely appear in such proceeding), then Tenant shall be entitled (but shall not be obligated) to, at Landlord's cost and expense, in its own name and/or in the name of Landlord, appear in such proceeding, in which event Landlord shall fully cooperate with Tenant, provide such information, and execute any documents or other instruments as Tenant may reasonably request in connection with any such proceeding.

(k)    Within fifteen (15) days after Landlord acquires fee simple title to the Shopping Center (the "SNDA Delivery Date"), Landlord shall deliver to Tenant (x) an agreement in the form attached hereto as Exhibit G, executed by each and every holder of any mortgage, deed of trust or any other existing lien encumbering or affecting the Shopping Center or any portion thereof and in form suitable for recording, and (y) an agreement in the form and content described in clause (b) of Section 17.1 hereof executed by any Ground Lessor (and, as may be required, consented to by the holder of any mortgage, deed of trust or other existing lien as aforesaid), in recordable form.  Should Landlord fail to so deliver such instrument(s) in the aforesaid manner by the SNDA Delivery Date, Tenant shall have the right by notice given to Landlord at any time prior to the date on which such instrument(s) are delivered, to terminate this Lease, in which event, neither party shall have any further liability hereunder (other than as set forth in Section 23.3 below), except that Landlord shall be obligated to promptly reimburse

Tenant for all its reasonable, third-party costs and expenses incurred in connection with this Lease, including, without limitation, the preparation and review of plans and specifications, and the performance of Tenant's Work.  The provisions of this Section 12.3(k) shall be in addition to, and not in limitation of, Section 3.2 of this Lease.

Section 12.4  Environmental Matters.

12.4.1 Definitions.

(a)    As used herein, the term **"Environmental Laws"** shall mean any and all federal, state, county, municipal or other governmental statutes, laws, ordinances, rules, regulations and legally enforceable policies concerning the protection of the environment, human health or safety.

(b)    As used herein, the term **"Hazardous Substances"** shall mean each and every element, compound, material, mixture, substance, waste, hazardous substance, hazardous waste, hazardous material, toxic substance, pollutant or contaminant either as those terms are defined in any of the Environmental Laws or the presence of which may cause liability at common law.

(c)    As used herein, the term **"Environmental Notice"** shall mean a summons, citation, directive, order, claim, notice, litigation, investigation, judgment, legal pleading, letter or other communication, written or oral, actual or threatened, from the United States Environmental Protection Agency or other federal, state or local governmental agency or authority, or any other private individual or entity concerning (i) any Hazardous Substances at, on, in, under or emanating from the Premises, the Shopping Center or any contiguous property; (ii) any violation or potential violation of Environmental Laws at the Premises, the Shopping Center or any contiguous property; or (iii) any underground storage tanks on the Premises or the Shopping Center.

(d)    As used herein, the term **"Releasing"** or **"Release"** shall mean releasing, spilling, leaking, discharging, disposing or dumping or otherwise introducing any substance into the environment or into any building or other improvements.

(e)    As used herein, the term **"Compliance Costs"** shall mean consultant's and engineer's fees; laboratory costs; contractor's and subcontractor's fees; application and filing fees; costs of investigation, monitoring or cleanup of soil or other substrate, surface water, groundwater, or buildings or other improvements; equipment costs; disposal fees; costs of operation and maintenance of equipment; legal fees; other governmental fees or costs; interest at the Lease Interest Rate from the date of expenditure until paid in full; and other similar or related costs.

(f)    As used herein, the term **"Tenant Related Parties"** shall mean Tenant's agents, servants, employees, contractors or licensees.

12.4.2 Compliance with Environmental Laws.  Tenant shall comply with all the requirements of Environmental Laws governing its use of, and operations at, the Shopping Center and the Premises. Landlord shall comply with all the requirements of Environmental Laws relating to the Shopping Center and the Premises, except to the extent such requirements arise from Tenant's operations thereon.

12.4.3 Responsibility for Releases of Hazardous Substances.  Notwithstanding any other provision of this Lease, Tenant shall only be liable for any Release of Hazardous Substances at, on, in, under or emanating from the Premises or Shopping Center which were caused by Tenant or Tenant Related Parties (hereinafter **"Tenant Releases"**), including, without limitation, any Compliance Costs required to address Tenant Releases.  Landlord shall be liable for any Hazardous Substances at, on, in, under or emanating from the Premises or Shopping Center, including, without limitation, any Compliance Costs attributable to such Hazardous Substances, unless the Hazardous Substances are caused by Tenant Releases. Except in the event of an emergency, any work performed by Landlord relating to Hazardous Substances shall be performed by Landlord at any time other than during the months of August, November and December, and shall be undertaken in such a manner so as to (i) not adversely affect ingress to or egress from the Shopping Center, (ii) have no adverse effect on the visibility of the Premises or any signs which contain Tenant's name, and (iii) not otherwise materially interfere with the normal conduct of Tenant's business in the Premises.

12.4.4 _Standards._ Except as expressly provided herein, the parties agree that any investigation or remediation of Hazardous Substances, or cure of a violation of Environmental Laws, required to be conducted at the Premises or Shopping Center shall be no more stringent than necessary to meet the minimum standards of Environmental Laws applicable to properties used in the manner the Shopping Center is being used.

12.4.5 _Landlord's Representations and Warranties._ Landlord represents and warrants that, as of the Delivery Date, (A) no Hazardous Substances shall be located at, on, in, under or emanating from the Shopping Center, the Premises or any contiguous properties in violation of Environmental Laws; and (B) no underground storage tank shall exist at the Shopping Center or the Premises.

12.4.6 _Documents._ Each party shall immediately notify the other party of the notifying party's receipt of an Environmental Notice.

12.4.7 _Indemnity._ Each party to this Lease shall indemnify, defend and hold the other party, and its agents, servants, shareholders, directors, officers and employees harmless from any and all claims, losses, expenses, costs, lawsuits, actions, administrative proceedings, damage, orders, judgments, penalties and liabilities of any nature whatsoever, including, without limitation, reasonable attorneys' fees (incurred to enforce this indemnity or for any other purpose) and Environmental Costs, arising from (i) the indemnifying party's breach of any of its representations, warranties, covenants or other obligations under this Section 12.4; (ii) Hazardous Substances for which the indemnifying party is liable under this Section 12.4; or (iii) violations of Environmental Laws for which the indemnifying party is liable under this Section 12.4.

12.4.8 _Survival._ The obligations of the parties under this Section 12.4 shall survive the renewal, expiration, breach or earlier termination of this Lease.

12.4.9 _Conflict._ In the event of any conflict between the provisions of this Section 12.4 and any other provision of this Lease, the provisions of this Section 12.4 shall control.

12.5    _Purchase and Sale Contracts._

12.5.1 Landlord represents and warrants to Tenant that: (a) it (or an Affiliate) is the vendee under those certain purchase contracts listed as "executed" on _Exhibit M_ annexed hereto to acquire various parcels which will constitute the Shopping Center (the **"Contracts"**); (b) the Contracts have not been amended or modified and, as of the Effective Date, are in full force and effect; (c) a true, accurate, and complete list of the Contracts is attached hereto as _Exhibit M;_ and (d) it has not delivered or received any notice of default, and has no knowledge of any condition or circumstance which with notice or the lapse of time, or both, could become a default, under the Contracts.

12.5.2 Landlord represents and warrants to Tenant that the land being purchased pursuant to the Contracts (both executed and pending) consists of the entire Shopping Center only.

12.5.3 Landlord shall proceed diligently and in good faith to acquire fee title to the Shopping Center under the executed and pending Contracts in the manner required under this Lease.

12.5.4 In the event that Landlord has not acquired fee title to the entire Shopping Center in full accordance with the terms and conditions of this Lease on or before July 1, 1999, then Tenant may, at its election, upon notice to Landlord given at any time after said date (and prior to Landlord's acquisition of fee title as aforesaid), elect to terminate this Lease and if Landlord has not acquired fee title to the entire Shopping Center in full accordance with the terms and conditions of this Lease on or before December 31, 1999, then Landlord may, at its election, upon notice to Tenant given at any time after said date (and prior to Landlord's acquisition of fee title as aforesaid), elect to terminate this Lease. Should Tenant terminate this Lease as aforesaid, Landlord shall be obligated to promptly reimburse Tenant for all reasonable, third party costs and expenses incurred by Tenant in connection with this Lease, including, without limitation, architectural, engineering and legal fees, it being agreed that so long as Landlord's failure to acquire such fee title is not attributable to Landlord's default or breach under this Lease, such reimbursement by Landlord shall not exceed the aggregate sum of $75,000.

12.5.5 If this Lease is terminated pursuant to Subsection 12.5.4, and Landlord or its Affiliate acquires title to the Shopping Center within two (2) years after the date on which the Lease termination becomes effective hereunder, then Landlord shall offer to Tenant, at the time of Landlord's (or its Affiliate's) acquisition of title to the Shopping Center, the option to lease the Premises upon the terms and conditions of this Lease; provided, however, that all dates set forth in this Lease shall be appropriately extended. In the event Tenant elects, within thirty (30) days after its receipt of such offer, to exercise such option, Landlord and Tenant shall promptly execute a lease upon substantially the same terms and provisions of this Lease. In the event Tenant does not elect, within thirty (30) days after its receipt of such offer, to exercise such option, Landlord shall be free to lease the Premises to any other person or entity, upon economic terms which are not materially more favorable to the tenant than those contained in this Lease. The provisions of this Subsection 12.5.5 shall survive the termination of this Lease and shall be included in a memorandum of this Lease to be recorded pursuant to Section 23.20 hereof.

## ARTICLE 13
## USES AND RESTRICTIONS

Section 13.1  Permitted and Prohibited Uses.

13.1.1 Tenant's Permitted Use. The Premises may be used and occupied for the Permitted Use (defined in Subsection 1.1.27 above). Tenant shall not use the Premises for (i) any of the "Prohibited Uses" (hereinafter defined in Subsection 13.1.3(a)) or (ii) the "Existing Exclusives" (hereinafter defined in Subsection 13.3.1), to the extent then applicable.

13.1.2 Prohibited Uses. Landlord shall construct, lease, operate, maintain and manage the Shopping Center as a first-class shopping center comparable to other first-class shopping centers in the state in which the Shopping Center is located. Landlord shall not lease, rent or occupy or permit any other premises in the Shopping Center or on any land (the "Related Land") contiguous or adjacent to the Shopping Center (including, without limitation, any land that would be contiguous or adjacent to the Shopping Center but for any intervening road, street, alley or highway) now or hereafter owned by Landlord or its Affiliate(s), to be occupied (except to the extent otherwise permitted under any lease for space in the Shopping Center or the Related Land existing as of the Effective Date) for any of the "Prohibited Uses" (defined in Subsection 13.1.3 below), provided, however, that the foregoing provisions of this Subsection 13.1.2 shall be subject to Section 23.11 below.

13.1.3 Definitions.

(a)    As used herein, the term "Prohibited Uses" shall mean any of the following uses: unlawful use; "pornographic use" (hereinafter defined); "second-hand" or "surplus" store; laundry or dry cleaners; pawn shop; daycare center; veterinary office (except as may be incidental to a full-line pet and pet supply store operating in at least 15,000 square feet of Floor Area located at least 150 feet away from the perimeter of the Premises); living quarters; hotel/motel; manufacturing; bowling alley; off-track betting parlor or other gambling establishment; bingo hall; funeral parlor; skating rink; nightclub, discotheque or dance hall; so-called "head shop"; tattoo or piercing parlor; catering or banquet hall; children's entertainment or activity facility (but specifically excluding Zany Brainy or a similar store to the extent they are engaged primarily in the sale of children's educational material and do not conduct children's educational or entertainment programs or activities ("Children's Programs"), it being agreed, however, that Children's Programs which (i) are either free or cost a nominal fee to the customer to cover the cost of products distributed in conjunction with the event, (ii) are for the benefit of Zany Brainy customers only and (iii) involve an aggregate area, at any one time, of less than 300 square feet, shall be permitted ("Permitted Programs"); video rental or viewing; meeting hall; auction hall; place of religious worship; sporting event; karate center; auditorium; warehouse; theater; automobile repair shop, or any business servicing motor vehicles in any respect, including, without limitation, any quick lube oil change service, tire center or gasoline or service station or facility; supermarket (but specifically excluding the store operating under the trade name "Wild Oats" in the location indicated on Exhibit B); restaurant serving meals for on or off premises consumption except that (i) a "coffee bar" shall be permitted to be located within the Premises and in other premises of the Shopping Center, provided that with respect to such other premises only, such "coffee bar" shall be an incidental part of, but integrated with, the business conducted therein, shall not permit the sale of alcoholic beverages, shall not exceed

500 square feet of Floor Area (but Children's Concepts, Inc. or any other entity that at the time owns the retail chain doing business under the tradename "Zany Brainy" shall be permitted to have a "coffee bar" up to 1,000 square feet of Floor Area) and shall have no separate sign or separate entrance) and (ii) restaurants located on the "Restaurant Outparcels" and within the "Additional Restaurant Location" as designated on <u>Exhibit B</u> shall each be permitted, provided same are family style, full service, sit down restaurants and are typically located in first class shopping centers in Cincinnati, Ohio; beauty parlor and/or nail salon provided same are located only in Building B as designated on <u>Exhibit B</u> and operate in a manner that does not detract from the operation of the Shopping Center as a first class shopping center commonly found in Cincinnati, Ohio; billiard parlor or pool hall; sales office or showroom for automobiles, boats, or other vehicles; an establishment serving alcoholic beverages for on or off premises consumption; massage parlor; office (excluding office space used in connection with and ancillary to a permitted retail use hereunder); health spa, exercise facility or similar type business; car wash; a so-called "flea market"; carnival, amusement park or circus; video/pinball arcade or game room; entertainment or educational uses but specifically excluding Zany Brainy or a similar store to the extent they are engaged primarily in the sale of educational material and do not conduct Children's Programs (other than Permitted Programs); any use generally deemed to be "obnoxious or a nuisance" (hereinafter defined); medical clinics or offices; or any other non-retail uses.

(b)    As used herein, the term *"pornographic use"* shall include, without limitation, a store displaying for sale or exhibition books, magazines or other publications containing any combination of photographs, drawings or sketches of a sexual nature, which are not primarily scientific or educational, or a store offering for exhibition, sale or rental video cassettes or other medium capable of projecting, transmitting or reproducing, independently or in conjunction with another device, machine or equipment, an image or series of images, the content of which has been rated or advertised generally as NC-17 or "X" or unrated by the Motion Picture Rating Association, or any successor thereto.

(c)    As used herein, the term *"educational uses"* shall include, without limitation, a beauty school, barber school, reading room, place of instruction, or any other activity, facility, school or program catering primarily to students or trainees as opposed to shoppers.

(d)    As used herein, the term *"obnoxious or a nuisance"* shall include, without limitation, a use which emits or results in strong, unusual or offensive odors, fumes, dust or vapors, is a public or private nuisance, emits noise or sounds which are objectionable due to intermittence, beat, frequency, shrillness or loudness, creates a hazardous condition, or is used, in whole or in part, as or for warehousing or the dumping or disposing of garbage or refuse.

Section 13.2    <u>Tenant's Exclusive in Center.</u>  To induce Tenant to execute this Lease, and subject to all of the terms and provisions of this Section 13.2, Landlord covenants and agrees as follows.

13.2.1  Landlord will not lease, rent or occupy or permit any other premises in the Shopping Center or on any Related Land (to the extent such Related Land is owned by Landlord or its Affiliate) to be occupied, whether by a tenant, sublessee, assignee, licensee or other occupant or itself, by a Primary Competitor (hereinafter defined) and Landlord will not lease, rent or occupy or permit any other premises in the Shopping Center to be occupied, whether by a tenant, sublessee, assignee, licensee or other occupant or itself, by a Secondary Competitor (hereinafter defined).  In addition, Landlord will not lease, rent or occupy or permit any other premises in the shopping center adjacent to the Shopping Center known as Rookwood Pavilions to be occupied, whether by a tenant, sublessee, assignee, licensee or other occupant or itself, by a Rookwood Pavilions Competitor (hereinafter defined).  For purposes hereof, a *"Primary Competitor"* shall mean a value home store such as, by way of illustration, Home Place and Linens 'n Things whose primary use is the sale of all or substantially all of the following items (*"Exclusive Items"*): linens and domestics, bathroom items, housewares, frames and wall art, window treatments and closet, shelving and storage items; a *"Secondary Competitor"* shall mean a store occupying more than three thousand (3,000) square feet of Floor Area whose primary use is the sale either singly or in any combination of the foregoing Exclusive Items, provided, however, that any Upscale Tenant (as such term is defined in Section 2.3.1 hereof) shall not be deemed to be a Secondary Competitor; and a *"Rookwood Pavilions Competitor"* shall mean a store occupying twenty

thousand (20,000) square feet of Floor Area or more whose primary use is the sale either singly or in any combination of the Exclusive Items.

13.2.2  Intentionally omitted.

13.2.3  The exclusive rights granted to Tenant with respect to any respective category listed in Subsection 13.2.1 above shall be conditioned upon Tenant using portions of the Premises for the sale, rental or distribution of items contained in such category (other than during "Excused Periods" [defined in Section 1.1.9 above] and for periods of time not exceeding six (6) consecutive months).  The exclusive rights granted to Tenant in this Section 13.2 shall inure to the benefit of any assignee of Tenant's interest in this Lease and to any sublessee of a Floor Area of at least fifteen thousand (15,000) square feet of the Premises.

13.2.4  (a)    Upon breach of the aforesaid covenant and agreement by Landlord (which breach shall not include a situation in which Landlord has included in the lease between Landlord and any tenant in the Shopping Center or in the Related Land a provision which effectuates the exclusive rights granted to Tenant in this Section 13.2 and, despite such inclusion, such tenant has violated said exclusive right unless Landlord fails to promptly commence appropriate legal proceedings pursuant to Subsection 13.2.4 (b) below), the Rent payable hereunder shall be reduced by fifty percent (50%) for so long as such violation shall continue, and Tenant shall have all remedies given to it at law and in equity, including, without limitation, the right to obtain injunctive relief, and/or to terminate this Lease, and/or to commence and prosecute an action against Landlord for damages.

(b)    If any person or entity other than Landlord shall violate any of the exclusive provisions herein set forth, or shall indicate in writing to Landlord that it intends to violate any of said provisions, Landlord shall promptly commence appropriate legal proceedings, and vigorously prosecute the same, to enjoin and prohibit any such violation.  If Landlord fails to promptly commence such proceedings, or shall fail thereafter to vigorously prosecute the same, Tenant shall, in addition to the remedy provided in Subsection 13.2.4 (a) above) have the right (a) to conduct and prosecute such legal proceedings (including, without limitation, an action for injunctive relief) in its own name, at Landlord's expense, or (b) in the event the right set forth in (a) above is not permitted to be exercised under applicable law, to conduct and prosecute such legal proceedings in the name of Landlord, at Landlord's expense, and Landlord shall cooperate with Tenant with respect to such prosecution (including, without limitation, by executing any documentation or authorization reasonably required by Tenant in connection with such prosecution and by appearing at any hearing or trial with respect to such prosecution).

Section 13.3   Exclusives Which Tenant Must Honor.

13.3.1  Tenant shall honor only those certain exclusives granted by Landlord to certain other tenants in the Shopping Center pursuant to the terms of leases which have been executed prior to the Effective Date or which Landlord anticipates will be executed shortly after the Effective Date (hereinafter, *"Existing Exclusives"*) but only if such Existing Exclusives are listed on Exhibit K-1 annexed hereto. Landlord represents that Exhibit K-1 is a true and complete listing and description of such Existing Exclusives. Tenant shall not sublease, occupy or use all or any portion of the Premises, or permit all or any portion of the Premises to be occupied or used in violation of any such Existing Exclusive (except as may be specifically set forth on Exhibit K-1) or in violation of subsection 13.1.1, provided, however, that if a lease containing such Existing Exclusive as listed on Exhibit K-1 is not executed within six (6) months after the Effective Date, such exclusive use provision shall not be considered an Existing Exclusive and shall be deemed deleted from Exhibit K-1.  Landlord represents and warrants that no Existing Exclusive(s) exist other than those listed on Exhibit K-1 hereto and that Exhibit K-1 is true accurate and complete, and covenants to indemnify, defend and hold Tenant harmless from and against all loss, cost, liability or expense (including, without limitation, reasonable legal fees) incurred by Tenant by reason of the enforcement by any person or entity of such unlisted Existing Exclusive.  Tenant's honoring of any Existing Exclusive shall be conditioned upon the use, by the tenant or occupant for whose benefit the Existing Exclusive is granted, of its premises in the Shopping Center for the sale, rental or distribution of the item or items covered by its Existing Exclusive (other than during Excused Periods and for periods of time not to exceed six (6) consecutive months).  Notwithstanding the foregoing, Tenant shall be entitled to enter into a separate agreement with any tenant or other occupant for whose benefit the existing Exclusive is granted which nullifies or modifies the corresponding Existing Exclusive with regard to the Premises.

13.3.2  Intentionally Omitted.

13.3.3  Except as expressly set forth in this Section 13.3, Tenant shall not be obligated to honor any exclusive granted by Landlord to any tenant in the Shopping Center.

## ARTICLE 14
## CONDUCT OF BUSINESS OPERATIONS

Subject to the other provisions of this Lease (including, without limitation, Section 5 hereof), Tenant shall initially open its store for business to the public in the Premises for at least one (1) day, not later than the first (1st) anniversary of the Rent Commencement Date (which date shall, as applicable, be extended by reason of (A) damage or destruction, eminent domain proceedings or actions, or Force Majeure, or (B) the acts or omissions of Landlord).  Other than as expressly set forth in the preceding sentence, Tenant shall have no obligation to open or operate any business in the Premises, and shall have the right, at any time, to cease to conduct any business operations in the Premises, and Tenant shall incur no liability to Landlord or its mortgagee by reason thereof (it being understood and agreed that all of Tenant's obligations under this Lease shall continue unless this Lease is terminated pursuant, *inter alia*, to the further provisions of this Article 14 or any other provision of this Lease [other than Section 16.1 below]).  In the event that Tenant does not operate or cause to be operated any retail business in the Premises (other than prior to the Delivery Date or during Excused Periods) for more than three hundred sixty five (365) consecutive days, Landlord shall have the option to terminate this Lease, which option shall be exercisable by:

(a)  giving notice thereof to Tenant by not later than the ninetieth (90th) day after the date on which said 365-day period expires, and

(b)  paying to Tenant, within thirty (30) days after such notice is given, all of Tenant's costs and expenses incurred in connection the preparation and review of plans and specifications for, and the then unamortized costs (amortized on a straight-line basis over the Initial Term) of, Tenant's Work and any alterations or improvements made by Tenant and permitted under this Lease,

whereupon this Lease shall terminate upon the sixtieth (60th) day (the **"Recapture Date"**) after the date on which Tenant receives Landlord's termination notice, as if the Recapture Date was originally set forth herein as the expiration date of the Term.  Upon such termination, Landlord and Tenant shall each be released from any and all liabilities thereafter accruing hereunder, except as set forth in Section 23.3 below.  All Rent payable by Tenant hereunder shall be apportioned as of the Recapture Date and Tenant shall promptly pay to Landlord any amounts so determined to be due and owing by Tenant to Landlord, and conversely Landlord shall promptly reimburse Tenant for any amounts prepaid by Tenant for periods subsequent to the Recapture Date.  Notwithstanding the foregoing, Tenant shall have the right to avoid Landlord's termination by: (i) giving notice to Landlord within ten (10) days it receives Landlord's termination notice, of Tenant's intention to open or cause to be opened the Premises for the operations of its business or any other business, and (ii) in fact so opening or causing to be opened the Premises for the operations of its business or any other business within sixty (60) days after Tenant's notice is given (which 60-day period shall, as applicable, be extended by reason of (A) damage or destruction, eminent domain proceedings or actions, or Force Majeure, or (B) the acts or omissions of Landlord), in which event the termination notice previously given by Landlord shall be deemed null and void.

## ARTICLE 15
## TENANT ASSIGNMENT AND SUBLETTING

Section 15.1  Assignment and Subletting.

15.1.1  Tenant shall have the right from time to time, without the consent of Landlord, to assign Tenant's interest in this Lease and/or to sublet, concession or license all or any portion of the Premises, in each case only to a retail tenant, subject to all of the terms and conditions of this Lease.

Section 15.2  <u>Liability of Tenant.</u>  Unless otherwise agreed to in writing by Landlord, no assignment, subletting, licensing or concessioning by Tenant shall reduce, diminish, or otherwise affect the liability of Tenant hereunder; <u>provided, however,</u> that in the event of an assignment of Tenant's interest in this Lease to a Major Assignee or in the event of an assignment of Tenant's interest in this Lease to a tenant whose obligations under this Lease are guaranteed by a Major Guarantor, all liability of Tenant hereunder, accruing from and after the effective date of such assignment, shall terminate. For purposes of this Section 15.2, the term **"Major Assignee"** or **"Major Guarantor"**, as the case may be, shall mean a person or entity which has, as of the effective date of such assignment, a net worth of at least Fifty Million ($50,000,000) Dollars.

Section 15.3  <u>Collateral Assignment.</u>  In addition to Tenant's other rights set forth in this Article 15, a collateral assignment of Tenant's interest in this Lease by Tenant to one or more "Institutional Lenders" (hereinafter defined), as collateral security for an indebtedness or other obligation of Tenant or its Affiliates shall be permitted and Landlord shall execute all documentation reasonably requested by Tenant or any such Institutional Lender in connection therewith.  In addition, Tenant shall have the right, without Landlord's consent, to grant to an Affiliate of Tenant a license to operate all of Tenant's business operations at the Premises, without such Affiliate having assumed any liability for the performance of Tenant's obligations under this Lease.  As used herein, **"Institutional Lender"** shall mean a state or federally regulated bank, savings and loan association, insurance company, pension fund, credit union, real estate investment trust, a state or federally regulated lender or any other recognized lender.

Section 15.4  <u>Cure Rights of Original Tenant.</u>

15.4.1  If Tenant assigns Tenant's interest in this Lease, then Landlord, when giving notice to said assignee or any future assignee in respect of any default, shall also give a copy of such notice to the Tenant originally named herein (the **"Original Tenant"**), and no notice of default shall be effective until a copy thereof is so given to Original Tenant.  Original Tenant shall have the same period after receipt of such notice to cure such default as is given to Tenant therefor under this Lease.

15.4.2  If this Lease is terminated because of: (a) an Event of Default of such assignee, or (b) the rejection, disaffirmation, or other termination of this Lease by or on behalf of the assignee pursuant to any proceeding in bankruptcy under any law, rule or regulation of any State or of the United States, or any other law affecting creditors' rights, then Landlord shall promptly give to Original Tenant notice thereof, and Original Tenant shall have the right, exercisable by notice given to Landlord within thirty (30) days after receipt by Original Tenant of Landlord's notice, to enter into a new lease of the Premises with Landlord (**"New Lease"**), provided that the Original Tenant shall have remedied all Events of Default of the assignee hereunder, unless such Events of Default are not reasonably susceptible of cure by the Original Tenant, in which event the Original Tenant shall not be obligated to cure such Events of Default as a condition to the exercise of its rights under this Subsection 15.4.2.  Upon the Original Tenant's curing of any such Event of Default of the assignee as aforesaid, Landlord shall assign to Tenant all of Landlord's rights against such assignee (whether arising as a result of bankruptcy court proceedings or otherwise).  The term of said New Lease shall begin on the date of termination of this Lease and shall continue for the remainder of the Term (including any Renewal Periods).  Such New Lease shall otherwise contain the same terms and conditions as those set forth herein, except for requirements which are no longer applicable or have already been performed.  It is the intention of the parties hereto that such New Lease shall have the same priority relative to other rights or interests in or to the Premises as this Lease.  The provisions of this Subsection 15.4.2 shall survive the termination of this Lease and shall continue in full force and effect thereafter to the same extent as if this Section 15.4.2 were a separate and independent contract between Landlord and the Original Tenant.  From the date on which the Original Tenant shall serve Landlord with the aforesaid notice of the exercise of its right to a New Lease, the Original Tenant shall have quiet and undisturbed use and enjoyment of the Premises and all appurtenances thereto, as contemplated in this Lease.

Section 15.5  <u>Recognition Agreement.</u>  In the event Tenant subleases all or a portion of the Premises for a term of at least five (5) years, then, notwithstanding any other provisions of this Lease, and so long as (x) such sublet premises contain approximately the same consistent depth as that applicable to the Premises generally, subject, however, to such sublessee's reasonable loading, storage, ingress/egress and corridor requirements, (y) the then balance of the Premises (i,e. the space not being so subleased) is not rendered unmarketable by reason of

such sublease, utilizing commercially reasonable standards, and (z) the term of such sublease (as same may be renewed) does not extend beyond the duration of the Term (including the Renewal Periods), Landlord shall, upon Tenant's request, execute and deliver an agreement among Landlord, Tenant and each such subtenant in the form of Exhibit H hereto, in recordable form.

## ARTICLE 16
## DEFAULT AND DISPUTE RESOLUTION

Section 16.1   Tenant Default.

16.1.1   The following circumstances shall constitute an "*Event of Default*": (i) if Tenant shall fail to pay any Rent when due, within ten (10) days after its receipt of notice thereof from Landlord specifying the amount and details of the unpaid Rent, or (ii) if Tenant shall fail to perform or observe any of the other covenants of this Lease on Tenant's part to be performed or observed within thirty (30) days after its receipt of notice thereof from Landlord specifying the nature of such default (or, if such default shall be of a nature that same cannot reasonably be cured within thirty (30) days and Tenant does not commence to cure such default on or before such thirtieth (30th) day and thereafter diligently prosecute said cure to completion), or (iii) if there is filed by or against Tenant a petition in bankruptcy, which petition is not dismissed within one hundred twenty (120) days from the filing thereof, or if Tenant makes an assignment for the benefit of its creditors or if there is an appointment by any court of a receiver, trustee or other court officer of all or substantially all of Tenant's property, which receivership is not dismissed within one hundred twenty (120) days from the date of such appointment.

16.1.2   Upon an Event of Default, Landlord shall have all remedies given to it at law or in equity (except that Landlord hereby expressly waives any rights to accelerate any element of the Rent, and any right of distraint, which may be granted to it by law), including the following:

(a)     to bring suit for the collection of such unpaid Rent or for the performance of such other covenant of this Lease on Tenant's part to be performed; and/or

(b)     without waiving any non-monetary default, may (but shall not be obligated to) perform any of covenant which is capable of being remedied by the performance of affirmative acts for the account and at the reasonable expense of Tenant (it being agreed that should Landlord require access to the Premises in order to perform such covenant as aforesaid, Landlord shall comply with the applicable provisions of Sections 9.2 and 20.3 hereof), in which event, Tenant shall pay to Landlord on demand, as Additional Rent, the reasonable cost or amount thereof, together with interest thereon at the Interest Rate from the date of outlay of expense until payment; and/or

(c)     upon at least five (5) days' notice to Tenant, to terminate this Lease, or to terminate Tenant's right of possession, re-enter the Premises and take possession thereof by lawful means.  If Landlord shall so elect to terminate this Lease, Landlord shall have and retain full right to sue for and collect all such unpaid Rent and all damages to Landlord by reason of any such breach, and Tenant shall surrender and deliver the Premises to Landlord, failing which, Landlord shall have the right to initiate summary proceedings to recover possession.  If Landlord elects to repossess the Premises without terminating the Lease, then Tenant shall be liable for and shall pay to Landlord all Rent payable to Landlord pursuant to the terms of this Lease which have accrued to the date of repossession, as well as all Rent which becomes due and payable pursuant to the terms of this Lease when and as required to be paid by Tenant to Landlord during the remainder of the Term (with no acceleration), diminished by any net sums thereafter received by Landlord through reletting the Premises during said period (after deducting reasonable expenses incurred by Landlord in connection with such reletting). In no event shall Tenant be entitled to any excess of any rent obtained by such reletting over and above the Rent herein reserved.  Landlord may bring actions to collect amounts due by Tenant under this Lease, from time to time, prior to the expiration of the Term.

16.1.3   Upon an Event of Default, Tenant shall be liable for and shall pay to Landlord, in addition to any sum provided to be paid above, brokers' fees incurred by Landlord in connection with reletting the whole or any part of the Premises for the remainder of the then unexpired Term (excluding any then unexercised Renewal Periods), the costs of removing and storing Tenant's or other occupant's property; the cost of repairs; and all other commercially

reasonable expenses incurred by Landlord in enforcing or defending Landlord's rights and/or remedies, including reasonable attorneys' fees.

16.1.4 Upon an Event of Default, any amounts paid by Landlord to cure said Event of Default and any Rent payments not paid after notice thereof is given shall bear interest at the Lease Interest Rate from and after the expiration of any applicable grace period until paid.

16.1.5 Landlord shall use all reasonable efforts to relet the Premises or any portion thereof to mitigate Landlord's damages to which Landlord would otherwise be entitled to as a result of an Event of Default. In no event shall Tenant be liable to Landlord for any consequential damages suffered by Landlord as a result of an Event of Default by, or any other act of, Tenant.

Section 16.2  Landlord Default. If Landlord shall: (i) fail to perform or observe any of the other covenants of this Lease on Landlord's part to be performed or observed within thirty (30) days after its receipt of notice thereof from Tenant specifying the nature of such default (or, if such default shall be of a nature that same cannot reasonably be cured within thirty (30) days and Landlord does not commence to cure such default on or before such thirtieth (30th) day and thereafter diligently prosecute said cure to completion), or (ii) materially breach any warranty or representation under this Lease (either of (i) or (ii) above being hereinafter referred to as a *"Landlord's Default"*), then Tenant, in addition to such other rights and remedies as may be available under this Lease, or at law or in equity, may, in its sole discretion:

(a)     make such repairs or perform such work in accordance with the provisions of this Lease on behalf of, and at the expense of Landlord; and/or

(b)     bring suit for the collection of any amounts for which Landlord is in default, seek injunctive relief, or seek specific performance for any other covenant or agreement of Landlord, without terminating this Lease; and/or

(c)     offset against the Rent payable by Tenant hereunder for amounts owed by Landlord to Tenant and/or for the amounts reasonably expended by Tenant performing Landlord's obligations hereunder, including costs and reasonable attorneys' fees, together with interest thereon at the Lease Interest Rate from the date of the outlay until paid; and/or

(d)     may terminate this Lease, without waiving its rights to damages for Landlord's Default, provided and on condition that (1) Landlord's Default materially interferes with the normal conduct of Tenant's business in the Premises, (2) Landlord's Default is not capable of being cured or being rendered irrelevant by any actions of Tenant despite commercially reasonable efforts on the part of Tenant, and (3) Tenant shall have delivered notice of Landlord's Default to any mortgagee of Landlord (provided Landlord shall have previously notified Tenant of the name and address of such mortgagee), and such mortgagee has not cured Landlord's Default within thirty (30) days following its receipt of such notice (or, if Landlord's Default requires more than thirty (30) days to cure in the exercise of due diligence, such mortgagee has not commenced to cure same within said thirty (30) day period and thereafter diligently prosecuted the same to completion).

Notwithstanding the foregoing, if, in Tenant's reasonable judgment, an emergency (*i.e.*, posing imminent material harm to persons or property or material disruption to the normal operation of Tenant's business) shall exist, Tenant may, at its election, and without prior notice to Landlord, exercise any or all of the remedies set forth in (a), (b) and (c) above. In no event shall Landlord be liable to Tenant for any consequential damages suffered by Tenant as a result of a default by, or any other act of, Landlord.

Section 16.3  Payment under Protest. If, at any time, a dispute shall arise as to any amount to be paid by one party to the other party under the provisions hereof, the party against whom the obligation to pay the money is asserted shall have the right to make payment "under protest", which payment shall not be regarded as voluntary payment, and there shall survive the right on the part of such party to institute suit for recovery of such sum. If it shall be adjudged that there was no legal obligation on the part of such party to pay such sum or any part thereof, such party shall be entitled to recover from the other party such sum or so much thereof as it was not legally required to pay under the provisions of this Lease, together with interest thereon at the Lease Interest Rate.

Section 16.4  Work Performed Under Protest.  If at any time a dispute shall arise between the parties hereto as to any work to be performed by either of them under the provisions hereof, the party against whom the obligation to perform the work is asserted may perform such work and pay the cost thereof "under protest", performance of such work in no event to be regarded as a voluntary performance, and there shall survive the right on the part of such party to institute suit for recovery of the cost of such work.  If it shall be adjudged that there was no legal obligation on the part of such party to perform such work or any part thereof, such party shall be entitled to recover from the other party the cost of such work or the cost of so much thereof as such party was not legally required to perform under the provisions of this Lease, together with interest thereon at the Lease Interest Rate.

Section 16.5  Arbitration.  In any case where this Lease expressly provides for submission of a dispute or matter to arbitration (but not otherwise), the same shall be settled by arbitration in Cincinnati, Ohio before one arbitrator in accordance with the procedural rules then obtaining of the American Arbitration Association or any successor thereto.  The decision of the arbitrator shall be final, conclusive and binding on the parties, but the powers of the arbitrator are hereby expressly limited to the determination of factual issues, and the arbitrator shall have no power to reform, supplement or modify this Lease.  The arbitrator shall make only required findings of fact incident to an arbitrable dispute, which findings shall be set forth in reasonable detail in a written decision by the arbitrator.  Landlord and Tenant shall share equally in the cost and expenses of such arbitration, and each shall separately pay its own attorneys' fees and expenses, unless the arbitrator finds that one of the parties did not act in good faith in connection with the dispute or the conduct of the arbitration proceeding, in which case the arbitrator may award all or part of said costs, expenses and fees to the other party.

ARTICLE 17
RIGHT TO MORTGAGE AND NON-DISTURBANCE; ESTOPPEL CERTIFICATE

Section 17.1  Right to Mortgage and Non-Disturbance.  Landlord reserves the right to subject and subordinate this Lease at all times to any first mortgage or deed of trust for the benefit of any Institutional Mortgagee now or hereafter encumbering or affecting all or any portion of the Shopping Center, as well as to any future ground or underlying leases encumbering or affecting all or any part of the Shopping Center; provided, however, that (a) each Institutional Mortgagee shall first execute and deliver to Tenant an agreement in the form attached as Exhibit G hereto, in recordable form, and (b) any Ground Lessor shall execute and deliver to Tenant a fee owner recognition agreement in a form reasonably satisfactory to Tenant (and, as may be required, consented to by any Institutional Mortgagee), which shall include the following provisions: (i) the Ground Lessor will not, in the exercise of any of the rights arising or which may arise out of such lease, disturb or deprive Tenant  in or of its possession or its rights to possession of the Premises or of any right or privilege granted to or inuring to the benefit of Tenant under this Lease; (ii) in the event of the termination of the ground or underlying lease, Tenant will not be made a party in any removal or eviction action or proceeding, nor shall  r Tenant be evicted or removed of its possession or its right of possession of the Premises, and this Lease shall continue in full force and effect as a direct lease between the Ground Lessor and Tenant for the remainder of the Term and on the same terms and conditions as contained herein, without the necessity of executing a new lease; and (iii) Landlord and Tenant shall have the right to execute any amendment to this Lease which is specifically required hereunder and the Ground Lessor shall recognize and be bound thereto.

Section 17.2  Estoppel Certificate.  Upon written request of Landlord or Tenant, the other party, within thirty (30) days of the date of such request, shall execute and deliver to and only for the benefit of the requesting party or any Institutional Mortgagee, bona fide prospective purchaser, assignee, or sublessee of the requesting party, without charge, a written statement: (1) ratifying this Lease; (2) certifying, to such party's actual knowledge, that this Lease is in full force and effect, if such is the case, and has not been modified, assigned, supplemented or amended, except by such writings as shall be stated; (3) certifying, to such party's actual knowledge, that all conditions and agreements under this Lease to be satisfied and performed have been satisfied and performed, except as shall be stated; and (4) reciting the amount of advance Rent, if any, paid by Tenant and the date to which Rent has been paid.

ARTICLE 18
NOTICE

Subject to the further provisions of this Article XVIII, whenever it is provided herein that any notice, demand, request, consent, approval or other communication (*"Notice"*) shall or may be given to either of the parties by the other, it shall be in writing and, any law or statute to the contrary notwithstanding, shall not be effective for any purpose unless same shall be given by registered or certified mail, postage prepaid, return receipt requested, or by any recognized overnight mail carrier, with proof of delivery slip, addressed to Landlord at Landlord's Mailing Address or to Tenant at Tenant's Mailing Address, with copies of notices to Tenant also given to: (i) Allan N. Rauch, Esq., c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, and (ii) Jeffrey H. Kaplan, Esq., c/o Robinson Silverman Pearce Aronsohn & Berman LLP, 1290 Avenue of the Americas, New York, New York 10104, or to such other person or other address as may, from time to time, be specified by either party in a written notice to the other party.  All notices given in accordance with the provisions of this Section shall be effective upon receipt (or refusal of receipt) at the address of the addressee. Notwithstanding the foregoing, Landlord shall instead send the following items to Tenant (Attention: Lease Administration) at Tenant's Mailing Address: (A) all bills, notices (but not notices of default) and related information pertaining to Tenant's Pro Rata Share of Taxes as described in Section 4.2 of this Lease, and (B) all budgetary information, notices (but not notices of default), statements, bills and related information pertaining to Tenant's Pro Rata Share of Common Areas Charges as described in Section 5.1 of this Lease.

ARTICLE 19
TENANT'S PROPERTY

All of Tenant's Property  which may be installed or placed in or upon the Premises by Tenant shall remain the property of Tenant.  Tenant may assign, hypothecate, encumber, mortgage or create a security interest in or upon Tenant's Property in the Premises without the consent of Landlord and may remove Tenant's Property at any time during the Term.  Landlord waives any right it may have in Tenant's Property.  To the extent Landlord may have a lien on or security interest in the Tenant's Property pursuant to this Lease, by law or otherwise, Landlord hereby waives, and agrees not to assert, such lien or security interest.  Landlord shall provide to Tenant, within ten (10) days after Tenant's request therefor, a written waiver in form reasonably satisfactory to Tenant evidencing Landlord's waiver of any rights it has or may have in Tenant's Property.  Upon the expiration or earlier termination of this Lease, Tenant shall have the right (but not the obligation, except as otherwise expressly provided herein) to remove from the Premises all or any part of Tenant's Property.

ARTICLE 20
END OF TERM

Section 20.1  Surrender of Premises.  At the expiration of the Term, Tenant will quit and surrender the Premises in good condition and repair, excepting, however, reasonable wear and tear, damage by fire or other casualty, damage by eminent domain, and repairs and replacements to be made by Landlord hereunder, and further, subject to the provisions of Subsection 8.1.8 above.

Section 20.2  Hold Over.  If Tenant fails to deliver possession of the Premises to Landlord at the end of the Term, and unless Landlord and Tenant are, at such time, engaged in good faith negotiations to extend the Term, Tenant shall be a tenant at sufferance and shall be liable for Fixed Rent on a monthly basis (or, if applicable, on a prorated daily basis) in an amount equal to one hundred twenty-five (125%) percent of the amount thereof payable by Tenant for the month immediately preceding the last day of the Term as well as for all Additional Rent payable by Tenant hereunder.

Section 20.3  Landlord's Entry.  Tenant shall permit Landlord to enter upon the Premises during Tenant's business hours, upon at least five (5) days prior notice to Tenant, to exhibit same to prospective *bona fide* purchasers and Institutional Mortgagees of the Shopping Center, and during the last six (6) months of the Term, to exhibit same to prospective *bona fide* tenants; provided, however, that Landlord's employees, agents and contractors shall identify themselves to the store manager upon entering the Premises.

ARTICLE 21
TENANT'S RIGHT OF FIRST OFFER

Provided an uncured Event of Default does not then exist under this Lease, Tenant shall have continuing rights of first offer to lease additional space in the Shopping Center which is contiguous to the Premises and which may become available on and after the first anniversary of the date of this Lease.  At such time that Landlord has knowledge that such space (*"Offered Space"*) is or will become available, Landlord will give Tenant notice (the *"Offering Notice"*) of the terms and conditions Landlord would be willing to accept with respect to the Offered Space (including, without limitation, the proposed rent, additional rent, scope of Landlord's proposed tenant improvements, location and Floor Area), and Tenant shall have fifteen (15) days within which to respond to Landlord's offer.  In the event Tenant elects to accept Landlord's offer, then Tenant shall notify Landlord of such election by giving notice to Landlord during such fifteen (15) day period and Landlord and Tenant shall thereupon enter into an amendment to this Lease for the leasing of the Offered Space, which amendment shall contain (a) the terms and conditions set forth in the Offering Notice, (b) provide that the term thereunder shall expire or sooner terminate contemporaneously with the expiration or sooner termination of the Term hereof (subject to extension in accordance with Section 2.2.2 above), and (c) contain such other terms and provisions as either Landlord or Tenant may reasonably require in order to effectuate the incorporation of the Offered Space into the Premises and to otherwise effectuate the intent of this Article 21.  Should Tenant decline Landlord's offer or fail to respond thereto, then, and in such event, Tenant shall have been deemed to have waived any prospective rights of first offer to the Offered Space (but Tenant shall not lose any prospective rights of first offer with respect to any space (including, without limitation, the Offered Space) which may in the future become vacant and available), and Landlord may lease the Offered Space to any other party upon substantially the same terms and conditions as that offered to Tenant, provided that such lease is executed within six (6) months after Tenant has declined (or has been deemed to have waived) Landlord's offer with respect to the Offered Space.  As used herein, the phrase *"substantially the same terms and conditions as that offered to Tenant"* shall mean terms not materially different and/or a rent of not more than five (5%) percent below the rent requested by Landlord of Tenant.  Any dispute between the parties with respect to this Article 21 (including, without limitation, any dispute as to the provisions of the amendment described in this Article 21) shall be resolved by arbitration in accordance with the provisions of Section 16.5 above.

ARTICLE 22
TENANT'S RIGHT OF TERMINATION

If, at any time during the Term of this Lease, Old Navy, Gap/Gapkids (or an Affiliate of The Gap, Inc., which Affiliate is operating a so-called concept store such as Old Navy, Banana Republic or Gap/Gapkids, in which case each such concept store may replace Old Navy or Gap/Gapkids) and at least 85,000 square feet of Floor Area in the Shopping Center leased to Upscale Tenants (as such term is defined in Section 2.3.1 (f) hereof) are not all open in their respective premises for business to the general public (such condition being hereinafter referred to as an *"Excess Vacancy"*), then in such event Tenant shall have the right to: (i) pay Alternate Rent in lieu of Fixed Rent and Additional Rent during the period of such Excess Vacancy, and (ii) if the Excess Vacancy continues for a period in excess of three hundred sixty-five (365) continuous days, to terminate this Lease upon at least thirty (30) days prior notice given to Landlord, in which event this Lease shall terminate on the date set forth in Tenant's notice of termination without further liability on the part of either Landlord or Tenant, except: (i) as set forth in Section 23.3 below, and (ii) Landlord, promptly after receiving a statement from Tenant showing the costs and expenses of Tenant's Work and any other alterations performed by Tenant to the Premises, shall reimburse Tenant for the unamortized portion of such costs and expenses based upon the unexpired portion of the Term.

ARTICLE 23
MISCELLANEOUS

Section 23.1  Loading Facilities.  Tenant shall have the exclusive right to use the loading area designated on Exhibit B as the "Exclusive Tenant Loading Area" without charge or other payment and no other tenant may use or block the Exclusive Tenant Loading Area. The other tenants in Building D (as shown on Exhibit B) shall have the right to use only the loading area designated as the "Small Tenant Loading Zone" on Exhibit B to the extent same is adjacent to such tenants' respective premises.  Tenant shall have the exclusive right to utilize

the Exclusive Tenant Loading Area and other loading facilities serving the Premises on a "24 hour a day", "365 days a year" basis.

Section 23.2   Liens.  Within thirty (30) days after notice of the filing thereof, Tenant shall discharge (either by payment or by filing of the necessary bond, or otherwise) any lien against the Premises and/or Landlord's interest therein, which may arise out of any payment due for, or purported to be due for, any labor, services, materials, supplies or equipment alleged to have been furnished to or for Tenant in, upon or about the Premises.  Similarly, within thirty (30) days after notice of the filing thereof, Landlord shall discharge (either by payment or by filing of the necessary bond, or otherwise) any lien against the Premises and/or Landlord's interest therein, which may arise out of any payment due for, or purported to be due for, any labor, services, materials, supplies or equipment alleged to have been furnished to or for Landlord in, upon or about the Premises.

Section 23.3   Broker's Commission.  Landlord and Tenant each warrant and represent to the other that they did not deal with any real estate broker in connection with the negotiation, execution and delivery of this Lease.  Each party agrees to indemnify, defend, and save the other harmless from and against any and all liabilities, costs, causes of action, damages and expenses, including, without limitation, attorneys' fees, with respect to or arising out of any claims made by any real estate broker, agent or finder with respect to this Lease in breach of the foregoing representation.  The provisions of this Section shall survive the expiration or earlier termination of this Lease.

Section 23.4   Force Majeure.  Except as otherwise expressly set forth herein, in the event either party hereto shall be delayed or hindered in, or prevented from, the performance of any act required hereunder by reason of strikes, inability to procure materials, failure of power, restrictive governmental laws or regulations, riots, insurrection, war or other reasons of a like nature which are beyond the reasonable control of the party (except the inability to pay a monetary sum shall not be excused hereunder) (collectively referred to herein as *"Force Majeure"*), then the performance of any such act shall be excused for the period of the delay and the period of the performance of any such act shall be extended for a period equivalent to the period of such delay, provided that the party claiming an event of Force Majeure gives the other party notice thereof within five (5) days after the occurrence of said event.

Section 23.5   Consents.  Except as may be otherwise expressly set forth in this Lease, whenever under this Lease provision is made for either party's securing the consent or approval of the other party, (i) such consent or approval shall be in writing and shall not be unreasonably withheld, delayed or conditioned, and (ii) in all matters contained herein, both parties shall have an implied obligation of reasonableness.

Section 23.6   Costs.  Whenever this Lease requires the performance of an act by a party, such party shall perform the act at its own cost and expense, unless expressly provided to the contrary.

Section 23.7   Attorneys' Fees.  In any action or proceeding hereunder (whether to enforce the terms and provisions of an indemnity or otherwise), the prevailing party shall be entitled to recover from the other party the prevailing party's reasonable costs and expenses in such action or proceeding, including reasonable attorneys' fees, costs and expenses.  Except as otherwise set forth herein, if either party is sued by a third party as a result of a violation of a covenant or warranty herein contained by the other party hereto, then the party who has violated the covenant or warranty shall be responsible for the reasonable costs and expenses in such action or proceeding against the non-violating party, including reasonable attorneys' fees, costs and expenses.

Section 23.8   Survival of Obligations.  The obligation to pay any sums due to either party from the other that by the terms herein would not be payable, or are incapable of calculation, until after the expiration or sooner termination of this Lease shall survive and remain a continuing obligation until paid.  All indemnity obligations under this Lease shall survive the expiration or earlier termination of this Lease.

Section 23.9   Non-Waiver.  The failure of Landlord or Tenant to insist upon the strict performance of, or to enforce, any provision, covenant or condition herein shall not be deemed to be a waiver thereof, nor void or affect the right of the aggrieved party to enforce the same covenant or condition on the occasion of any subsequent breach or default; nor shall the failure of either party to exercise any option in this Lease upon any occasion arising therefor be

deemed or construed to be a waiver of the right to exercise that same kind of option upon any subsequent occasion.

Section 23.10 Rights Cumulative. Unless expressly provided to the contrary in this Lease, each and every one of the rights, remedies and benefits provided by this Lease shall be cumulative and shall not be exclusive of any other such rights, remedies and benefits allowed by law.

Section 23.11 Definition of Landlord. Subject to the provisions of Section 23.13 hereof, the term "Landlord" shall mean only the owner, for the time being, of the Shopping Center, and in the event of the transfer by such owner of its interest in the Shopping Center, such owner shall (except to the extent of (1) claims made by Tenant against Landlord which arose prior to the effective date of the transfer of such ownership interest, and/or (2) judgments obtained by Tenant against Landlord, on or prior to the effective date of the transfer of such ownership interest) thereupon be released and discharged from all covenants and obligations of Landlord thereafter accruing, but such covenants and obligations shall be binding during the Term upon each new owner for the duration of such owner's ownership.

Section 23.12 Successors and Assigns.     Provided any assignee of Landlord assumes in writing all of Landlord's obligations under this Lease arising subsequent to the effective date of such transfer and Tenant receives notice of such transfer and a copy of the instrument pursuant to which such assignee assumes the obligations of Landlord as aforesaid, Landlord may assign its interest in this Lease during the Term hereof, and Landlord shall thereupon be released from all obligations under this Lease with respect to events occurring or other matters arising after such transfer to the extent provided in Section 23.11 hereof. The provisions of this Lease shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns.

Section 23.13 Limitation of Landlord's Liability. Except with respect to insurance proceeds or condemnation awards received by Landlord which are required by the terms of this Lease to be applied to the repair or restoration of the Premises or the Shopping Center, Tenant shall, on and after the Delivery Date, look only to Landlord's estate and property in the Shopping Center (or the proceeds thereof) and income derived from the Shopping Center for the satisfaction of Tenant's remedies for the collection of a judgment (or other judicial process) requiring the payment of money by Landlord hereunder and no other property or assets of Landlord, its officers, directors, stockholders or partners shall be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies under or with respect to this Lease. Except with respect to the limitation on personal liability hereinabove set forth, the provisions of this Section 23.13 shall not be deemed or construed to limit Tenant's rights and remedies pursuant to this Lease or which may be available at law or in equity.

Section 23.14 Limitation of Tenant's Liability. Landlord, its successors and assigns, shall look solely to the assets, if any, of Tenant and its successors and assigns, for the satisfaction of any claim arising from or under this Lease and shall not seek to impose personal liability on any shareholder, officer, director or employee of Tenant or any of its Affiliates.

Section 23.15 Joint and Several Liability. If either party consists of more than one person, then the persons constituting such party shall be jointly and severally liable hereunder.

Section 23.16 Severability. If any term, covenant, condition or provision of this Lease is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions hereof shall remain in full force and effect and shall in no way be affected, impaired, or invalidated thereby.

Section 23.17 Grammatical Usages and Construction. In construing this Lease, feminine or neuter pronouns shall be substituted for those masculine in form and vice versa, and plural terms shall be substituted for singular and singular for plural in any place in which the context so requires. This Lease shall be construed without regard to the identity of the party who drafted the various provisions hereof. Moreover, each and every provision of this Lease shall be construed as though all parties hereto participated equally in the drafting thereof. As a result of the foregoing, any rule or construction that a document is to be construed against the drafting party shall not be applicable hereto.

Section 23.18 Table of Contents, Line Numbering and Paragraph Headings. The table of contents and line numbering, if any, and section headings are inserted only for convenience

and in no way define, limit or describe the scope or intent of this Lease, nor in any way affect this Lease.

Section 23.19 <u>Definition of Hereunder, Herein, etc.</u>   Unless the context clearly indicates to the contrary, the words "herein," "hereof," "hereunder," "hereafter," and words of similar, import refer to this Lease and all the Exhibits attached hereto as a whole and not to any particular section, subsection, or paragraph hereof.

Section 23.20 <u>Short Form Lease.</u>   Upon the request of either party following the execution and delivery of this Lease, Landlord and Tenant shall execute a short form lease or memorandum for recording, which shall be in form and substance as either party shall reasonably request and shall refer to such provisions of this Lease which may survive the expiration or sooner termination hereof.  In no event shall the amount of Fixed Rent reserved hereunder be included in any such short form lease or memorandum.

Section 23.21 <u>Entire Agreement and Modification.</u>   This Lease constitutes the entire agreement of the parties hereto, and all prior agreements between the parties, whether written or oral, are merged herein and, except as may be specifically set forth herein, shall be of no force and effect.  This Lease cannot be changed, modified or discharged orally, but only by an agreement in writing, signed by the party against whom enforcement of the change, modification or discharge is sought.

Section 23.22 <u>No Joint Venture or Partnership Created by Lease.</u>   Nothing contained herein shall be deemed or construed as creating the relationship of principal and agent or of partnership or of joint venture between the parties hereto.

Section 23.23 <u>Governing Law.</u>  This Lease shall be governed by, construed, and enforced in accordance with the laws of the State in which the Premises are located.

1
2        IN WITNESS WHEREOF, the parties have executed this instrument under seal the day
3   and year first-above written.
4
5                                                    **LANDLORD:**
6
7   WITNESSES:                                       JEFFREY R. ANDERSON REAL ESTATE, INC.
8
9
10
11                                                   By:
12                                                   Name:
13                                                   Title:
14
15
16
17                                                   **TENANT:**
18
19  WITNESSES:                                       BED BATH & BEYOND INC., a New York
20                                                   corporation
21
22
23
24                                                   By:                                    AMF
25                                                         Warren Eisenberg
26                                                         Co-Chief Executive Officer
27
28

STATE OF NEW JERSEY   )
                      ) : ss.
COUNTY OF UNION       )

On this 15th day of February, 1999, before me personally came Warren Eisenberg to me known, who being by me duly sworn, did depose and say that he is the Co-Chief Executive Officer of Bed Bath & Beyond Inc., the corporation described in and which executed the above instrument and that he signed his name thereto by order of the Board of Directors of said corporation.

_Nicole A. Schettino_
Notary Public

My Commission Expires:
NICOLE A. SCHETTINO
NOTARY PUBLIC OF NEW JERSEY
Commission Expires 7/22/2003

STATE OF OHIO         )
                      ) : ss.
COUNTY OF Hamilton    )

On this 12th day of February, 1999, before me personally came Kenton Randerson to me known, who being by me duly sworn, did depose and say that he is the President of Jeffrey R. Anderson Real Estate, Inc., the corporation described in and which executed the above instrument and that he signed his name thereto by order of the Board of Directors of said corporation.

_Christine Louise Gregorio_
Notary Public

My Commission Expires:

CHRISTINE LOUISE GREGORIO
Notary Public, State of Ohio
My Commission Expires 10/21/01

1

## INDEX OF EXHIBITS

2
3
4          Exhibit A -      Legal Description of Shopping Center
5
6          Exhibit B -      Site Plan
7
8          Exhibit C -      Rent Commencement and Expiration Date Agreement
9
10         Exhibit D -      Specifications for Landlord's Work
11
12         Exhibit D-1      Front Elevation of Premises [including building signage] and of
13                          Shopping Center
14
15         Exhibit E -      Permitted Encumbrances
16
17         Exhibit F -      Pylon and Monument Signs [including colors and materials]
18
19         Exhibit G -      Form of Subordination, Non-Disturbance and Attornment
20                          Agreement
21
22         Exhibit H -      Form of Recognition Agreement
23
24         Exhibit I -      Form of Delivery Date Notice
25
26         Exhibit J -      Form of Delivery Date Certification
27
28         Exhibit K-1      Existing Exclusives
29
30         Exhibit K-2      Existing Leases
31
32         Exhibit L        Percentage Rent
33
34         Exhibit M        Purchase and Sale Contracts

PAGE.002

FEB 9 '99 16:10



**engineers   planners   surveyors**

bayer
becker
engineers

EXHIBIT A

14 east eighth street
covington, ky 41011
(606) 261-1113
fax (606) 261-1710

DESCRIPTION:                    Shopping Center Site

LOCATION:                       City of Norwood

DATE:                           January 22, 1999

Situated in Section 33, Town 4, Fractional Range 2 of the Miami Purchase, Columbia Township, City of Norwood, Hamilton County, Ohio and being all of Lots 2-10 and part of Lots 1 and 11 of LeBlond's Subdivision as recorded in P.B. 23, Pg. 20 of the Hamilton County Recorders Office and also all of Lot 23 and all of Lots 13-23 and part of Lot 12 of the Redivision of Lots 21 to 39 LeBlonds Subdivision as recorded in P.B. 29, Pg. 77 of the above mentioned records and also part of Arbor Place as shown on said plats and also part of the property conveyed in D.B. 6113, Pg. 1181, D.B. 4193, Pg. 929, D.B. 4279, Pg. 917, D.B. 4334, Pg. 325, D.B. 4327 Pg. 680 and all of the property conveyed in D.B. 1390, Pg. 68, D.B. 1118, Pg. 210 and D.B. 4331, Pg. 1861 and more particularly described as follows:

Begin at the Northeast corner of said Section 33; thence with the centerline of Edwards Road, the same being in the East Corporation line of the City of Norwood, South 01°38'22" West, approximately 1,615 feet to the intersection of the original centerline of Edwards Road (Original 60' R/W) with the Eastward projection of the North right-of-way of Arbor Place (50'R/W); thence with the North right-of-way of Arbor Place and Eastward projection of the North right-of-way of Arbor Place (50' R/W); thence with the North right-of-way of Arbor Place and Eastward projection thereof North 88°21'38" West 282.27 feet; thence North 70°16'38" West 281.24 feet to the TRUE POINT OF BEGINNING:

thence from the TRUE POINT OF BEGINNING and and continuing with the North right-of-way of Arbor Place North 70°16'38" West, 140.25 feet;

thence with a new division line through Arbor Place and Rookwood Pavilion Limited Partnership (D.B. 6113, Pg. 1171) South 46°32'59" West, 373.13 feet to a point in the East line of BBH Group (D.B. 4279, Pg. 917);

thence with the East line of BBH Group and The Hyde Park Lumber Company (D.B. 1390, Pg. 68 and D.B. 1118, Pg. 210), the same being the West line of Rookwood Pavilion Limited Partnership South 01°33'22" West, 926.57 feet to a found stone monument with cross notch in the North line of the Norfolk and Western Railroad;

thence with the North line of said Railroad and South line of The Hyde Park Lumber Company North 88°43'06" West, 510.38 feet to a point in the East line of Martin M. Logan (D.B. 4334, Pg. 325);

thence with said East line South 01°39'11" West 0.24 feet;

thence continuing with the North line of the above mentioned Railroad North 88°38'00" West, 161.00 feet;

thence North 37°56'00" West, 92.00 feet;

thence North 75°05'00" West, passing the Southeast corner of Carr Tool Company (D.B. 4331, Pg. 1861) at 30.06 feet, a total distance of 64.06 feet;

thence continuing with the North line of the above mentioned Railroad South 84°53'00" West, 88.50 feet to a found 5/8" iron pin (bent);

thence South 63°10'00" West, 38.84 feet to the Southwest corner of Carr Tool Company;

PAGE.003                                                        10:91 66, 6  83ᖵ

Description:    Shopping Center Site
Location:       City of Norwood
Date:           January 22, 1999
Page 2 of 3

thence with the West line of Carr Tool Company and East line of Grove Park Second Subdivision (P.B. 37, Pg. 66) North 10°46'00" East, passing a found 5/8" iron pin at the Southwest corner of Vincent C. & L. Jeanette Caruso (D.B. 4327, Pg. 680) at 328.84 feet, a total distance of 418.52 feet;

thence with the West line of Caruso North 18°58'00" East, 210.85 feet;

thence with a new division line through Caruso South 88°38'00" East, passing the West line of Martin M. Logan at 124.37, a total distance of 274.92 feet to a point in the West line of the Hyde Park Lumber Company;

thence with the West line of the Hyde Park Lumber Company and BBH Group North 01°39'00" East, passing the Southwest corner of BBH Group at 100.00 feet, a total distance of 403.10 feet to a found iron pin;

thence with the South line of BBH Group North 88°55'00" West, 171.14 feet to a found spike in the East line of Grove Park Second Subdivision;

thence with the West line of BBH Group and said Subdivision North 03°17'00" East, 72.61 feet to a point in the South limited access right-of-way of I-71;

thence with the North line of BBH Group and said South limited access right-of-way North 62°13'07" East, 73.35 feet;

thence North 57°53'58" East, passing the South line of Alan D. & Shirley M. Bicknaver (D.B. 4193, Pg. 929) at 171.08 feet, a total distance of 202.26 feet;

thence with the North line of Bicknaver and South limited access right-of-way North 48°57'11" East, 98.43 feet;

thence North 22°57'12" West, 30.00 feet;

thence along a curve to the right having a radius of 1517.89 feet, an arc length of 174.05 feet and a chord bearing North 70°19'54" East, and chord distance of 173.96 feet;

thence South 78°52'17" East, 140.71 feet;

thence North 71°24'51" East, passing the West line of the Rookwood Pavilion Limited Partnership at 89.83 feet, a total distance of 130.10 feet;

thence North 35°18'26" East, 69.27 feet to the Northmost corner of Rookwood Pavilion Limited Partnership, said point also being in the North line of Lot 1 of LeBlond's Subdivision;

thence with the North line of Lot 1 South 79°43'12" East, 27.82 feet;

thence with the North line of Lots 1-8 of LeBlond's Subdivision, the same being the South right-of-way of Edmondson Road, South 64°38'38" East, 266.20 feet;

thence with the North line of Lots 8-11 and said South right-of-way South 70°16'38" East, 131.09 feet;

98k124/502

2 of 4

PAGE.004

FEB  9 '99 16:02

| | |
|---|---|
| Description: | Shopping Center Site |
| Location: | City of Norwood |
| Date: | January 22, 1999 |
| Page 3 of 3 | |

thence leaving said right-of-way and with the line parallel to and 15.50 feet West of the Common lines of Lots 11 and 12 of LeBlond's Subdivision and 19.40 feet West of the common lines of Lots 11 and 12 of the Redivision of Lots 21 to 39 Le Blonds Subdivision South 19°43'22" West, 240.00 feet to the TRUE POINT OF BEGINNING.

Containing 25.52 acres of land and subject to all easements and rights-of-way of record.

The above description was prepared under the direction of Jay F. Bayer, Registered Land Surveyor #7268 in the State of Ohio, January 1999, for zoning purposes only. Monuments will not be set.

| Prior Instrument Reference: | Plat Book 23, Page 20 | Deed Book 4279, Page 917 |
|---|---|---|
| | Plat Book 29, Page 77 | Deed Book 4327, Page 680 |
| | Deed Book 6113, Page 1171 | Deed Book 4193, Page. 929 |
| | Deed Book 4334, Page 325 | Deed Book 1390, Page 68 |
| | Deed Book 1118, Page 210 | Deed Book 4331, Page 1861 |

3 of 4

98k124/502



EXHIBIT DRAWING
ROOKWOOD COMMONS
EDMONDSON ROAD          NORWOOD
HAMILTON COUNTY          OHIO

1                                    **Exhibit B**
2
3                                    **Site Plan**

## Exhibit C

### Rent Commencement and Expiration Date Agreement

THIS RENT COMMENCEMENT AND EXPIRATION DATE AGREEMENT, made as of the _____ day of _____, 199___, by and between JEFFREY R. ANDERSON REAL ESTATE, INC. (*"Landlord"*) and BED BATH & BEYOND  INC. (*"Tenant"*).

### W I T N E S S E T H :

WHEREAS, Landlord is the owner of a certain shopping center known as Rockwood Commons  (the *"Shopping Center"*), situated in _____, _____ ;

WHEREAS, by that certain lease dated _____ __, 199_ (the *"Lease"*), Landlord leased a portion (the *"Premises"*) of the Shopping Center to Tenant;

WHEREAS, Tenant is in possession of the Premises and the Term of the Lease has commenced; and

WHEREAS, under Section 2.2 of the Lease, Landlord and Tenant agreed to enter into an agreement setting forth certain information in respect of the Premises and the Lease.

NOW, THEREFORE, Landlord and Tenant agree as follows:

1.       The Rent Commencement Date occurred on _____, 199___.

2.       The **Initial Term** of the Lease shall expire on January 31, 20___, unless Tenant exercises any option to extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

3.       The date of commencement of the **first Renewal Period** shall be February 1, 20___, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 20___, unless Tenant exercises any option to further extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

4.       The date of commencement of the **second Renewal Period** shall be February 1, 20___, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 20___, unless Tenant exercises any option to further extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

5.       The date of commencement of the **third Renewal Period** shall be February 1, 20___, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 20___, unless the Lease terminates earlier as provided in the Lease.

6.       The date of commencement of the **fourth Renewal Period** shall be February 1, 20___, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 20___, unless the Lease terminates earlier as provided in the Lease.

7.       The date of commencement of the **fifth Renewal Period** shall be February 1, 20___, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 20___, unless the Lease terminates earlier as provided in the Lease.

8.    Capitalized terms used, but not defined, herein shall have the meanings ascribed to them in the Lease.

IN WITNESS WHEREOF, the parties hereto have caused this Rent Commencement and Expiration Date Agreement to be executed the date and year first above written.

**LANDLORD:**

JEFFREY R. ANDERSON REAL ESTATE, INC.

By:    _____
Name:    _____
Title:    _____

**TENANT:**

BED BATH & BEYOND  INC.

By:    _____
            Warren Eisenberg
            Co-Chief Executive Officer

1
2
3
4
5
6
7
8

**Exhibit D**

**Specifications for Landlord's Work**

# BED BATH &
# BEYOND

### Beyond any store of its kind.™

**Corporate Office**
650 Liberty Avenue
Union, NJ 07083
908/688-0888

**EXHIBIT D**

✓B 2-12-99

**Rookwood Commons - Cincinnati, OH**
**STANDARD LANDLORD'S WORK**
**(revision 06/11/98)**

**[All terms not otherwise defined herein shall have the meaning ascribed thereto in the
Lease. To the extent not inconsistent with the terms of this Exhibit D, the terms of the
Lease regarding Landlord's Work shall be deemed to supplement the provisions of this
Exhibit D. It is specifically understood and agreed that (I) all materials and supplies shall
be installed in strict accordance with all manufacturers' specifications, and (II) more
detailed specifications regarding this Exhibit D are set forth in the specification package
previously delivered to Landlord.]**

1.    **Plans** - Landlord to provide the following drawings for the Tenant's use.
      A.  Three (3) complete sets of all required architectural and engineering
           drawings to complete the Landlord's Work, including tenants fixture plan
           on permit set of drawings.
      B.  Architectural elevations of all sides of tenant building to include
           permanent signage locations and temporary signage locations.
      C.  Architectural elevations of all pylon signs.
      D.  Architectural elevations of all other tenants.
      E.  2 sets of as-built drawings with close out books and all warranty
           information. One set shall remain in the store, one set shall be sent to the
           construction project manager.

2.    **Flooring** - Landlord shall grade, excavate and place structural fill on site in conformance
with the recommendations of Landlord's geotechnical engineer to meet the floor slab
requirements.  Landlord to provide a concrete floor slab minimum 4" thick, with a minimum
3000 psi rating.  Concrete finish to be clean and smooth , with a slope not more than 1/8" per
every 10'-0" in any direction and shall be free of pocketing and spalling.  The moisture content of
the slab must not exceed 3 lbs. Per 1000 square foot over 24 hours using the RMA (Rubber
Manufacturers Association) quantitive testing method.  A minimum of two test shall be performed
per each 1000 square feet of floor area. Landlord to provide test results to Tenant. Floor should
be ready to accept Tenant's specified finish. Combination carpet and wood floor to cover all sales
area, layout per Tenant's floorplan.  Type of carpet and wood per spec below, substitution only
with Tenant's approval.

a)  "Snap-T" or like molding to be installed wherever carpet meets wood flooring.  Color of
molding to match carpet.  Cove base in White-White to be installed on all exposed walls of selling
floor and office.

b) Steps to mezzanine office to have rubber stair treads and risers.

c) Stockroom and Janitors closet floor to be sealed concrete (using clear concrete sealer).

d) Lunchroom floor to be vinyl composition tile, spec below.  Size and location of lunchroom per
Tenant's drawings.

e) Vestibule flooring (spec below).

f) Bathroom flooring, full ceramic tile floors and walls (spec. below).

**Specifications:**

© Bed Bath & Beyond Inc. and its subsidiaries, 1998.     page 1

Carpet -mfg.: J& J Industries; style: 992-05007-1A-E.
Wood - mfg.: Hartco; style: Patterns Plus 5000 series; color: Honey or Natural Maple.
(As dictated by Tenant); size: 36" lengths to be installed on a 45-degree angle as per
tenant plans.
Adhesive- mfg.:Hartco #40.
Transition-mfg.:Mercer Products; style: #970 Track, #930 Snap down T; color: #204
Vinyl - mfg.: Armstrong; style: Imperial Texture; color: 51904 Sterling
Vestibule flooring- mfg.:Interface Walk Off tile; color: charcoal
Ceramic Tile- Walls mfg: Dal Tile 4 1/4 x 4 1/4; color: D-700 Mellow White
Floors -mfg: Dal Tile- 2 x 2; colors: DK-156 Brownstone Range
Bathroom Partitions- mfg: Bobrick #1042 Color: #891- Desert Sand
Bathroom Fixtures- mfg: American Standard. Color: Bone
Bathroom Counter laminate- mfg: Pionite. Color: ST 606 (Taupe)

**3.**    **Stockroom/Sales Area Partition** - If required by local code, provide code approved wall
between sales area and stockroom. Provide high impact self closing double action swing doors
with window to fit within 48" opening at all areas from stock room to sales floor, color: black,
mfg: Chase-Durus style: ABS 5000, per Tenant's plan.

**4.**    **Insulation-** Provide an R-19 Factor insulation between exterior roof membrane and
decking. Provide an R-11 Factor insulation on all exterior walls.

**5.**    **Ceiling-** Underside of roof shall be open and exposed, painted with two coats of white
paint (see #7 below). All ceilings located within the upper and lower levels of the mezzanine to
have drop ceilings.

**6.**    **Ceiling Clearance-** 18" clearance between slab and all structure including sprinkler heads.
Sprinkler system should be designed to allow fixturing and storage to be within 18" of heads, and
comply with NFPA 231-C, (High rack storage), and class 4 commodity.

**7.**    **Painting-**
Paint specs for ceiling and including all pipes, ductwork, steel and decking - 1 coat Benjamin
Moore acrylic metal primer and two coats Sweep Up Spray Latex Flat #M530-01 white.
Interior drywall walls and columns- Benjamin Moore: Prime-Regal First Coat Latex #216-white,
Finish Coat- 2 coats Regal Aqua Pearl #310-01 white.
Interior Block Walls- Benjamin Moore: Moorcraft Block Filler #173 white, finish 2 coats - Regal
Aqua Pearl #310-01- white.
Interior Concrete Walls- Benjamin Moore: Regal First Coat latex primer #216-white, finish 2
coats- Regal Aqua Pearl #310-01-white.
Bridal Room Walls - Benjamin Moore: White Coffee

**8.**    **Exposed Columns-** No. 1 Columns (carpeted areas) - to be "boxed out" as tight to steel
as possible. No. 2 Columns (wood floor) - to be 26" outside dimension. Provide and install white
low pressure laminate (melamine) 3" O.C. slatwall (with aluminum inserts) up to 14'A.F.F.
Provide and install 1" x 1" mill finish aluminum corner guards to 14' A.F.F.
Slatwall- Model: #100418; Description: Slatwall- MDF/melamine, Frosty White, with aluminum
inserts, 3" O.C. 4' x 8', 8' Grooves- One side white. 1" x 1" mill finish aluminum corner guards.
Orders to: New Directions 4550 Mariott Drive, Charleston, SC 29406. Contact: Gary
Diamond/Marty, phone: (800) 945-4637 Fax: (803) 566-9540. All columns to have a
Convenience Duplex outlet facing rear of store mounted at 18" A.F.F.

**9.**    **Lighting-** Fixtures to be provided as a combination of the following, per Tenant's layout.
All offices, cash room, conference rooms, bathrooms and lunchroom to have occupancy sensors
to control lighting (see #22-25 below).

- 4' octron and 8' octron tandem light fixture, w/electronic ballast- T8 lamps, (F032/841), with
reflector that has a 10% aperture option and pendant mounted at a height of 15'6" above finished
floor to bottom of reflector. Fluorescent lighting to be mounted on unistrut pendent mounted to
ceiling structure to enable Tenant to adjust spacing between rows of lighting as necessary. All
lights to be controlled by switches located in customer service per tenants contractor schedule.

**Specifications-**

8' octron tandem 4 light fixture w/ electronic ballast- **mfg.**: Metalux; **style**: ; BED-5;
(with emergency battery back-up, add to above- **style**: EL4)
4' octron 2 light fixture w/electronic ballast- **mfg.**: Metalux; **style**: BED-6;
with emergency battery back-up, add to above- **style**: EL4)
dual voltage emergency light; wall pack- **mfg.**: Sure-Lite; **style**: BED-11
universal exit sign, emergency Led lamps- **mfg.**: Sure-Lite; **style**: BED-21
2' x 4' lay-in troffer 4' octron 3 light w/electronic ballast- **mfg.**: Metalux; **style**: BED-7
(with emergency battery back-up, add to above- **style**: EL4)

**Specialty Lighting**- Up to 136 ft. Juno single circuit Trackmaster lighting track, mounted on
unistrut and pendant mounted to ceiling structure, 72 Juno style T397-WH ,and 8 Juno style
V689 track light fixtures with 75PAR30 lamps, (10) BED-13; with (1) FO25/41k octron lamp
TL7, (100) BED-14 with (2) F025/35k octron lamp TL7, 110 (BED-15, BED -16, BED - 17,
BED - 18) as needed, and up to 52 ft. of wire mold #2200 plug mold painted per section #7, to
be distributed throughout the store per Tenant's final layout.

Landlord to provide and install above items per local code. Landlord to provide and
install electric to tenants supplied showcase lighting and bedding displays per local code.

Tenant reserves the right to install all or any part of specialty lighting package described
above, and to be reimbursed for the reasonable costs thereof.

Electrical contractor to furnish and install four white twin chamber power poles (from floor to
deck), up to 40 drops for speciality lighting requirements and up to 41 duplex receptacles hung at
16'-6" A.F.F. (the conceptual layout for which will be included in the construction documents for
bidding purposes).
**NOTE:** Landlord will provide Tenant 2 weeks notice of rough-in date. The actual
installation locations of the drops, poles and quads will be done in accordance with Tenant's
finished layout which shall be specified by Tenant to Landlord at least 1 week prior to electrical
rough-in. Rough- in date shall be 6 weeks prior to turn over.
Contact Cooper National Account #NA20232, call Dave Best at (800) 682-1242 for        pricing.

10.    **Exit/Emergency Lights**- Per code as needed per Tenant's fixture layout. Emergency
lights integrated into Tenant's fluorescent lighting plan. Exit lights to be pendant mounted so as
not to interfere with tenant fixture plan.

11.    **Outlets**- Standard duplex wall outlets provided per Tenant's plan. Outlets (unless I.G.)
and outlet covers to be white. Outlets on columns and stockrooms to be white, outlet covers to be
metal. Electrical covers in Bridal room to match "White Coffee" paint.

All register bays , and Customer Service area to include 2 quad receptacles (Hubbell 1G5362) or
equivalent. Island-type service desks to have 1 quad receptacle. For additional information see
"Addendum A," also see #12 below.

Sensor Matic- provide power as shown on Tenant's plans for Tenant provided Sensor Matic
security.

12.    **Phone/Electric Conduits**- To Cash Room (designated on floor plan) provide 2" conduit
with drawstring from local telephone company demarcation point. To register bays provide
Walker duct complete with drawstrings. To island-type service desks provide dual-chamber
power poles (white) isolating phone from electric service (Wiremold no. SP80N620-2-[size](20-
1012) T39923). Power poles must be extended to underside of deck and provide drawstring
looped from top to bottom. To Cash Room provide 3/4" conduit with drawstring from
"Employee Entrance" door (header), and door box location for control of electric door strike.
Provide 3/4" conduit with drawstring for pay phone location to cashroom (see #16 below).
From rear loading dock man door provide 3/4" conduit from exterior of building to bottom of
joist on interior of building with drawstring for Tenant supplied intercom unit.

13.    **P.O.S.-Computer Conduit**- Standard duplex wall outlets provided per
Tenant's plan to "Cash Room" (designated on floor plan). Also see #12 above.

14.    **Fixtures**- Landlord is responsible to unload and install Tenant supplied Cashwraps and

remote Service Desk(s) as per Tenants final fixture plan. Landlord must supply and install all Built-in Counters and Customer service desk as shown on Tenants site specific plans.

**15.**    **Sign(s)-** Landlord to provide and install up to 6 circuits per sign, and to verify actual number of circuits with sign manufacturer. Conduit to be installed from panel box to outdoor sign location(s). Also, include all necessary circuiting and wiring to location per tenant's plan, along with photocell(s) (for sign "on") and 24 hour time clock(s) (for sign "off"). Landlord to provide final connection to Sign.

**16.**    **Vestibule-** Interior or exterior vestibule to consist of glass in clear anodized metal frames, and automatic doors (see #18 below). Flooring in vestibule to be Tenant specified walk-off tiles (see #2 above). Stanley Sentrex Bumper molding to be provided on all walls including glass at Tenant specified height. Stanley Sentrex Bumper molding to consist of aluminum channel with rubber or vinyl insert. (color: black) Any Dry-wall surface to be paneled in marlite #5454: S2V Gun Metal.

**17.**    **Pay Phone-** Landlord to provide all conduit needed for Tenant supplied pay phone.

**18.**    **Automatic Doors-** All sets to be Stanley's Dura Glide 3000 complete package, in windload required areas landlord to provide and install a complete "high impact" door package in compliance with local code. (Shutters are not acceptable) - complete with full breakaway function of doors and sidelights. (1) each Bi-Part (16' pkg) with threshold, model no.BB3-1. (2) each-4' single slide (9' pkg) with threshold, model no. BB3-2, and BB3-S3. Doors should have Best cylinders to accept Best core (see # 23 below). Landlord to provide an electric carriage lock on one door, designated by Tenant as the "Employee Entrance" door. All doors to be installed a minimum of 10 days prior to Tenant occupancy.

**19.**    **Cart Corral-** Landlord to provide a cart corral for up to 100 shopping carts within and alongside the exterior storefront area. The pipe rail to be constructed of brushed aluminum, or in a finish consistent with the storefront design as per BBB approved drawings.

**20.**    **Loading Dock-** Landlord to provide a trenched loading dock **34' wide** minimum and 4' high to store level that will accommodate two truck bays, bumpers, seals, canopy, and drains. Landlord to provide two dock seals, two electrically operated sectional dock doors with slide locks and interlocks, one 7' x 8' dock leveler, and one edge - 0- dock leveler as shown on Tenants plans, and per Tenant's specifications. Doors, seals, bumpers, and levelers provided by Arbon Equipment Corporation. "Exclusive Tenant Loading Area" to be a minimum of 35'-0" wide not including adjacent 10'-0" wide "Small Tenant Loading Zone" as depicted on Exhibit B- Site Plan.

**21.**    **Waste Removal-** Provide Marathon model # BBB-5 compactor, with controls and pressure gauge, suitable pad (11' wide for compactor and 5' walkway), exterior disconnect per code and opening with lockable door for chute. In addition, provide additional and/or special sprinkler protection in the area in front of the chute opening to satisfy local codes. For compactor pricing contact Phillip Crossley (800) 633-8974 or (205) 695-9105.

**22.**    **Receiving Area-** Office layout as per Tenant's plans (approximately 120 sq. ft.) to include painted walls and vinyl floor (see # 2 above) and two electrically operated 8' wide x 10' high sectional doors. Receiving office to have built in counters per Tenant's floorplan. Provide Reznor or similar type heater(s) for receiving area. Also, include heat curtain or similar heater at each door opening. Provide conduit with drawstring from the man door to bottom of joist for Tenant installed doorbell/intercom system.

**23.**    **Mezzanine Office-** Elevated mezzanine office to be built above customer service, bridal/gift registry room and bathrooms. Furnish and install code-required limited use/limited application elevator or passenger elevator and stairs from main selling floor to mezzanine office. Minimum size of mezzanine office to be 1300 sq. ft. and to be constructed per Tenant's plans, and specifications. Slatwall (with aluminum inserts) to be installed from selling floor to 14' A.F.F. as indicated on Tenant's drawings. Included should be up to four private offices as well as a general work area (as indicated on Tenant's plans). All walls to be sound insulated. "Cash Room" door to have automatic closure, peep hole, and Storeroom function keyset. All offices must have Best Lock Corp. hardware purchased through Best Locking Systems of New York, 31 Field Lane, North Salem, New York 10560, contact: Jim Russell (914)277-4600. General Office area, Asst. Office, Rec. Office, and Cash Room to have built-in counters per

Tenant's floorplan.  Mezzanine to be completed minimum 10 days prior to turn over to Tenant.

All handrails and pipe rails to be a brushed aluminum finish.  Lighting in all private rooms must have RAB LOS1000 occupancy sensors (except as noted), RAB Electric Manufacturing, 170 Ludlow Ave., Northvale, NJ. 07847, 201/784-8600.

24.    **Bridal Gift Registry-** Layout as per Tenant's plan to include:
Paint-  (Benjamin Moore - White Coffee, Aqua pearl)
Wood Floor-  (Hartco Pattern Plus 5000, **color:** Natural or Honey Maple)
Wood base molding-  Superior Molding (818-376-1415) **style:** Colonial Style #B18-32
Cornice molding-   Superior Molding (818-376-1415) **style:** Colonial Style #1022
Molding should be stained to match wood floor.
Electrical cover plates to match "White Coffee" paint.
Lights to be operated by salesfloor lighting contactor.

25.    **Lunch Room-** Layout as per Tenant's plan, to include painted walls, vinyl floor (see #2 above), cabinets, counters and sink.  There should be 4 dedicated duplex outlets installed for: refrigerator, microwave oven and vending machine(s) located per Tenant's specifications. Lunch Room lighting to be operated by RAB LOS1000 occupancy sensor (see #23 above for address).

26.    **Locker Room-** Provide four (4) sets of box lockers, Republic model #753893, 18 lockers per set, 6 high x 3 wide, box size: 12", x 15", grey, with number plates, model #700405. Contact Ford & Ulrich, (Terry ford - 203-239-4451) for pricing.

27.    **Bathrooms-** As per code (proportioned to size of store) with power-Flush (tankless type) toilets.  Each rest room to include a wall mounted infant changing table (JBJ Industries Koala Bear Care) and a C-fold towel dispenser with an in-wall mounted stainless steel trash receptacle, soap dispenser and Tenant's specified accessories.  Bathroom entrance to have "Men" and "Women" graphic braille signs on door or at entrance and accessible route signs if required by law.  Floor and walls to be full ceramic tile (see #2 for spec.).  Bathroom lighting to be operated by RAB LOS2400 occupancy sensor (see #23 above for address).

28.    **Mechanical System-** See Addendum "B."

29.    **Refrigerated Water Fountain-** With filter located per Tenant's floorplan, as per BBB spec.

30.    **Fire Exits and Rear Man -Door-** All to be equipped with local audible alarm "Protex" locking panic device, door closer, and best cylinder.  Protex model #250. Rear Man-Door to include peep hole, Protex model 250 panic device, Protex model 707 exterior door pull, with best cylinder, and closer. Equipment and doors mounted and operational a minimum of 10 days prior to turn over to Tenant.

31.    **Fire Extinguisher-** Landlord to provide and install all fire extinguishers as required per local code.

32.    **Fire Protection/Sprinkler-** Landlord shall provide a sprinkler and fire alarm system, which will provide the necessary sprinkler heads and fire alarm for the Premises, as required by local authorities.   In the event local authorities do not require a fire alarm system, the same shall be specified by Tenant (using commercially reasonable discretion).
Sprinkler system should be designed to allow for solid shelf storage of class 4 commodities, with limited plastics in accordance with NFPA 13 (standard for the installation of sprinkler systems), NFPA 231C (standard for high pile storage), all state and local code requirements relative to high pile storage,  and Tenants fixture plan consisting of 12'-4' high wire fixtures with stacking up to 16'-6" and up to 8'-0" high laminate fixtures with 4'-0" minimum aisle spacing (typ).  Fixturing and storage to be within 18" of sprinkler heads, without the need for in-rack sprinklers.  Sprinklers to be located 18'-0" minimum A.F.F.  In addition, if required, provide a smoke purge and pressurization system or any other similar code required system. Landlord is responsible for the monitoring of the system (includes securing phone lines).  Sprinkler plans and calculations are to be provided to Tenant, and Tenant's insurance carrier for approval prior to fabrication.  Landlord to provide any fire-rated walls, ceiling or floor required by law (including, without limitation, any of the same which are required by law to be installed within the Premises [such as within or about

the office mezzanine or any storage level]). Fire Protection/ Sprinkler system to be completed 10 days prior to delivery.

33.   **Disability Access**- Provide limited use/limited application lift or elevator to mezzanine area if required per Federal guidelines. Provide mechanized handicap access through mezzanine area per all requirements of local, state, and federal law. Landlord is responsible for the securing and monitoring of phone lines as per local code requirements. Equipment to be installed 10 prior to delivery.

34.   **Utility Services**- See Addendum "C"

35.   **Itemized Budget**- At Tenant's request, Landlord shall provide its itemized budget for Landlord's Work.

36.   **Seismic**- Landlord is responsible for securing fixture permits as required by local code, to include seismic calculations and to provide seismic information to Tenant.

37.   **Unistrut**- Contractor to provide pendant mounted unistrut as manufactured by Versabar (painted white per spec), 16' O.C. and 16' wide at wood walkway around the store, and across the front of the store per Tenant's Layout at 16'-6" A.F.F. Orders to Wesco Distribution, Dave Best (800) 682-1242.

38.   **Site**- All parking lots and traffic drives shall consist of a minimum 12" of compacted sub-grade (95% compacted) 3" asphalt base and 2" asphalt surface finish, grading of these areas not to exceed a slope of 2%. All truck access and drives shall consist of 12" of compacted sub-grade (95% compacted) 6" asphalt base and 3" asphalt surface finish, to have no greater than a 3% grade change. All truck ramps and dumpster pads to consist of 12" compacted sub-grade (95% compacted), 4" compacted granular base and 5" portland cement concrete surface finish. All truck ramps shall consist of #3 rebars, 18" o.c. each direction. Storefront sidewalk to have a minimum of one ADA curb cut within 6' of each entrance door, and in compliance with ADA standard requirements. If soil report reflects more stringent requirements, the report shall supersede the above criteria.

39.   **Site Lighting**- Provide "Wall Packs" on building in areas described by BBB. Minimum lighting level should be 2 footcandles, measured 30" above adjacent ground including entire parking, service and drive areas. "Wall Packs"should not be calculated to include the min. lighting level.

40.   **Roofing**- All roof work to accommodate Tenant's satellite installation. To include a 1 1/4" I.D. conduit from point of entry to cashroom with a drawstring and a duplex outlet at tenant indicated location on roof.

41.   **Storefront**- Landlord to supply and install up to 80 ft. Wide "tempered" storefront glass or "high impact" storefront glass (if required to meet windload requirements) to height above bulkhead or other approved base as shown on exhibit D-2. Low emissivity glass must be used if there is no canopy or overhang. Landlord to provide sample board for Tenant's approval showing examples of both color and materials proposed for use on storefront and other exterior elevations.

42.   [Intentionally Omitted]

43.   **Warranties**- Landlord shall provide a list of contractors' and subcontractors' contacts and addresses, and a guarantee, including parts and labor, for a period of at least one (1) year after the commencement date (see Addendum B regarding extended warranty on compressor parts and labor). Send all warranties of equipment, service manuals, and As-built drawings to Tenant's corporate office within thirty (30) days of Delivery Date. Landlord to cause contractor to instruct Tenant's representative in operation of any equipment installed pursuant to these specifications. All of Landlord's Work shall be performed in a manner which will not void or diminish any manufacturer's, installer's or contractor's warranties which would otherwise have been provided by such manufacturer, installer or contractor to either Landlord or Tenant. Two (2) months prior to the end of the warranty period the landlord must forward a written report to the tenant on the condition of all warranty items.

**ADDENDUM "A"**

**Items Provided By General Contractor**

1.     Contractor to provide a 4' x 8' x 3/4" plywood backboard in the electric room for the local
telephone company demarcation point (coordinate with local telephone company); and all
other necessary structures and/or accesses (e.g. conduits) for local telephone company
use to bring phone trunks to the Tenant's space, if not already provided.  This requirement
must be met at least one (1) month prior to Tenant occupancy and must be coordinated
with the local telephone company.

2.     A second plywood backboard, supported by vertical unistrut, 8'H x 8'W  x 3/4", in the
Cash Room for a wiring wallfield, extending 3" above the finished ceiling.  The plywood
must be painted fire-retardant white prior to the installation of any Contractor or
telephone company wiring equipment.  This requirement must be met at least ten (10) days
prior to Tenant occupancy.

There should be approximately 3" of clearance between the  plywood and the sheetrock
wall.  Provide up to 8 I.G. dedicated  receptacles mounted flush with the front of the
plywood.

3.     Cash room must be secured- finished walls, ceiling, lockable doors and all outlets
working  at least ten (10) days prior to Tenant occupancy.

4.     Four (4) shelves in Cash Room.  Approximately 6' W x 15" D.  Please refer to Cash Room
drawing for the placement of the shelves, and slatwall.

**Items Provided By Electrical Contractor**

1.     AC CIRCUITS

All POS equipment must be on I.G. circuits dedicated to POS equipment only.  Electrician must
use 1 circuit for every 2 terminals so that if 1 circuit is lost the remainder of the system will
function.  POS equipment must be on a separate panel.  It MUST NOT be on a panel that supplies
power to electric motors, machines, or any inductively coupled load.  All outlets must be surge
suppressed by a main surge suppressor attached to the panel.

2.     AC RECEPTACLES

All POS terminals, peripherals, or equipment that communicate MUST be plugged into
insulated/isolated ground outlets.  Use Hubbell IG5362 Duplex receptacles beneath each POS
terminal.  Every bay with 2 POS terminals will have 2 duplex receptacles.  In addition, each bay
must have 2 duplex outlets on a separate circuit and panel for non-POS equipment power,
including power poles.

3.     GROUNDING

All insulated/isolated ground wiring for Hubbel IG5362 outlets must be run in conduit and
grounded to the panel.  DO NOT ground to the electrical conduit.

4.     SWITCHGEAR

Switchgear components should be purchased through GE Electrical Distribution & Control.
Contact: Kelly Kearney 203-949-7532.

Note: Electrical engineer should coordinate layout  through Kelly Kearney, no other brands will
be accepted without prior approval.

**ADDENDUM "B"**

MECHANICAL

HEATING AND AIR CONDITIONING: BED BATH & BEYOND has a national account agreement with Lennox Industries.  Contact national account administrator, David Carey (800) 367-6285 for all inquires.  Units shall be manufactured by Lennox.  No other manufacturer will be accepted.  Tenant's entire demised space shall be provided with a new fully distributed, insulated, balance ducted and individually controlled refrigerated air conditioning and heating system sufficient to maintain an inside temperature of 74 degrees Fahrenheit @ 50% RH in the cooling mode and 68 degrees Fahrenheit for heating on a design day for the specific geographical area.  These conditions shall be in accordance with design criteria established by ASHRAE for the local area for a dry goods retail space.  HVAC ductwork, diffuses, plenums, or return locations are not to conflict with the site specific fixture plan.  Units shall be electric cooling/gas heating per Tenant requirements, and have the capacity to handle space exterior skinload, outside air ventilation load, plus an internal heat load of 4.5 watts/sq.ft.  Design shall be no less than one ton of conditioned air per 350 sq.ft. of gross usable area.  Units 8 ton and above to be of the highest efficiency available and have an EER of no less than 11.0 and a IPLV of no less than 11.5.  All accessories such as economizers, exhaust dampers, smoke detectors, disconnect switches, power exhaust, and 115V GFI outlets are to be factory installed and tested.  A manufacturer's provided "Equipment Operational Check" (EOC) shall be performed on all units after start up.  Thermostats shall consist of Honeywell T7300 programmable type with remote sensors.  Thermostats are to be located in the cashroom for control, programmed and locked out prior to store opening; remote temperature sensors located as required for optimum efficiency and in an areas that do not interfere with Tenant's fixtures. Landlord shall submit mechanical drawings and unit specifications to Tenant for review and approval.  Landlord to provide a filter change using pleated filters three (3) days prior to store opening. The entire system shall be balanced and Landlord shall have the air balance certified, with proof of certification provided to Tenant in writing.  Landlord shall provide a ten (10) year extended warranty on compressor-parts and labor.  Manufacturer will provide one year warranty on all parts, five years on all compressors, and 10 years on all heat exchangers, less labor.

Settings:
        Occupied Cooling: 74 degrees - 7:30am Mon. thru Sat., 8:00am Sun
        Unoccupied Cooling: 84 degrees - 10:00pm Mon. thru Sat., 6:00pm Sun
        Occupied Heating: 68 degrees - 7:30am Mon. thru Sat., 8:00am Sun
        Unoccupied Heating: 58 degrees - 10:00pm Mon. thru Sat., 6:00pm Sun

Provisions shall be made for exhaust systems to the outdoors as follows:

           1. Toilet exhaust
           2. Lunchroom exhaust
           3. Electrical Room exhaust
           4. Cashroom exhaust
           5. Machine Room exhaust
           6. Janitors Closet exhaust

## ADDENDUM "C"

<u>PLUMBING</u>

Provide the following to premises in agreed location-

1. 2" valved and metered water service.

2. 6" plugged sanitary line with cleanouts. Sanitary line not to run under sales floor.

3. Hot water line.

4. 2", or as needed, valved metered natural gas service capable of providing a minimum of 3000 cfh at 8" gas pressure.

<u>ELECTRICAL</u>

Provide a minimum of 800 amp, 277/480V, 3 phase-4 wire electrical service with main disconnect, main service switch and separate utility metering sized to handle a 4.5 watts per square foot load for lighting and miscellaneous power and a 1750 watts per ton load for air conditioning to the premises in agreed location.

Provide 20% useable spare capacity above the Landlord's electrical engineers calculations, within each panel no more than 80% of breakers may be used.

All utility service metering to be set up for the best possible rate. Consult Tenant.

© Bed Bath & Beyond Inc. and its subsidiaries, 1998.    page 10

1
2
3                                    Exhibit D-1
4
5     Front Elevation of Premises [including building signage] and of Shopping Center
6
7

1
2
3
4

<u>Exhibit D-2</u>
Tenant's Conceptual Exterior Elevation

10' X 40' BUILDING SIGN

BED BATH & BEYOND

25'-0"
40'-0"
34'-0"
50'-0"
50'-0"

JB Z-17-58

EXHIBIT D-2  TENANTS CONCEPTUAL EXTERIOR ELEVATION

1
2
3

<u>Exhibit D-3</u>
Tenant's Conceptual North Wall Signage

6' X 24' BUILDING SIGN

BED BATH &
BEYOND

EXHIBIT D-3 NORTH WALL SIGNAGE



1
2
3                              Exhibit E
4
5                     Permitted Encumbrances
6
7
8                              NONE.
9
10
11
12

# ROOKWOOD
## COMMONS

*ROOKWOOD* COPY

*COMMONS* COPY

| | |
|---|---|
| WILD OATS | BED BATH & BEYOND |
| THE GAP | OLD NAVY |
| BANANA REPUBLIC | Anthropologie |
| TALBOTS | ZANY BRAINY |
| TENANT | TENANT |
| TENANT | TENANT |
| TENANT | TENANT |

4' X 9' PYLON SIGN PANEL

*ALL TENANT GRAPHICS TO BE RED

## DESIGN

☐ APPROVED AS SUBMITTED
_____ Date ____

☐ APPROVED WITH CHANGES NOTED
_____ Date ____

☐ UNAPPROVED — TO BE RESUBMITTED WITH CHANGES NOTED
_____ Date ____

**FABRICATE AND INSTALL:**
(1) D/F PYLON SIGN. TO BE INTERNALLY ILLUMINATED, ALL COLORS AND TENANT ARTWORK TO BE DETERMINED.

**PROPOSED CONCEPTUAL DESIGN**         **SUBJECT TO REVISION**

## United Signs, Inc.
513-681-6600
1030 Straight Street   Cincinnati, Ohio 45214   FAX 681-0818

THIS DESIGN PROPOSAL IS THE EXCLUSIVE PROPERTY OF THIS COMPANY, WITH REPRODUCTION RIGHTS RESERVED. COPYRIGHT JAN. 1996

| CUSTOMER | ROOKWOOD COMMONS | |
|---|---|---|
| LOCATION | NORWOOD | |
| SALESMAN | DON WALTERS | DATE 2-9-99 |
| DRAWN BY | GREG EBBERT | SCALE 1/4  DRAWING NO. 27744 |

EXHIBIT F

JB 2-12-99

## Exhibit G

### Subordination, Non-Disturbance and Attornment Agreement

THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT, made as of the _____ day of _____, 19___, by and between _____, a _____ [corporation] [limited] [general] [partnership] [national banking association], having an office at _____ _ (the *"Mortgagee"*) and Bed Bath & Beyond Inc., a New York corporation, having an office at 650 Liberty Avenue, Union, New Jersey 07083 (the *"Tenant"*).

W I T N E S S E T H :

WHEREAS, Mortgagee is the holder of a mortgage (hereinafter called the *"Mortgage"*) covering a parcel of land owned by _____, a _____ [corporation], [limited] [general] [partnership] (hereinafter called *"Landlord"*) together with the improvements [to be] erected thereon (said parcel of land and improvements thereon being hereinafter referred to as the *"Shopping Center"* and being more particularly described on Exhibit A attached hereto and made a part hereof); and

WHEREAS, by a certain lease heretofore entered into between Landlord and Tenant dated as of _____ (the *"Lease"*), Landlord leased to Tenant a portion of the Shopping Center, to wit, the premises designated the "Premises" on Exhibit B annexed hereto and made a part hereof, together with the building or portion thereof located thereon (said premises and the improvements thereon being hereinafter referred to as the *"Premises"*); and

WHEREAS, a copy of the Lease has been delivered to Mortgagee, the receipt of which is hereby acknowledged; and

WHEREAS, as an inducement to Tenant to enter into the Lease, Section 2.3.1 thereof provides that the Lease is conditioned upon Landlord obtaining this Agreement from Mortgagee; and

WHEREAS, the parties desire to satisfy the foregoing condition and to provide for the non-disturbance of Tenant by the holder of the Mortgage.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements herein contained, the parties hereto, intending to be legally bound hereby, agree as follows:

1.    Mortgagee hereby consents to and approves the Lease and the term thereof, including the options to extend the term as set forth in the Lease, and covenants and agrees that the exercise by Tenant of any of the rights, remedies and options therein contained shall not constitute a default under the Mortgage.

2.    Tenant covenants and agrees with Mortgagee that the Lease hereby is made and shall continue hereafter to be subject and subordinate to the lien of the Mortgage, and to all modifications and extensions thereof (and such subordination shall not lessen or diminish Tenant's rights under the Lease), subject, however, to the provisions of this Agreement.

3.    Mortgagee agrees that so long as the Lease shall be in full force and effect, and so long as Tenant shall not be in default under the Lease beyond any applicable notice and grace period:

(a)    Tenant shall not be named or joined as a party or otherwise in any suit, action or proceeding for the foreclosure of the Mortgage or to enforce any rights under the Mortgage or the bond or note or other obligation secured thereby;

(b)    The possession by Tenant of the Premises and Tenant's rights thereto shall not be disturbed, affected or impaired by, nor will the Lease or the term thereof be terminated or otherwise affected by (i) any suit, action or proceeding brought upon the Mortgage or the bond or note or other obligation secured thereby, or for the foreclosure of the Mortgage or the enforcement of any rights under the Mortgage, or by any judicial sale or execution or other sale of the Premises or the Shopping Center, or any deed given in lieu of

foreclosure, or by the exercise of any other rights given to any holder of the Mortgage or other documents as a matter of law, or (ii) any default under the Mortgage or the bond or note or other obligation secured thereby; and

(c)    All condemnation awards and insurance proceeds paid or payable with respect to the Premises or any other part of the Shopping Center shall be applied and paid in the manner set forth in the Lease.

5.    If Mortgagee or any future holder of the Mortgage shall become the owner of the Shopping Center by reason of foreclosure of the Mortgage or otherwise, or if the Shopping Center shall be sold as a result of any action or proceeding to foreclose the Mortgage, or transfer of ownership by deed given in lieu of foreclosure, the Lease shall continue in full force and effect, without necessity for executing any new lease, as a direct lease between Tenant and the then owner of the Shopping Center, as "landlord", upon all of the same terms, covenants and provisions contained in the Lease, and in such event:

(a)    Tenant shall be bound to such new owner under all of the terms, covenants and provisions of the Lease for the remainder of the term thereof (including the Renewal Periods, if Tenant elects or has elected to exercise its options to extend the term) and Tenant hereby agrees to attorn to such new owner and to recognize such new owner as "landlord" under the Lease; and

(b)    Such new owner shall be bound to Tenant under all of the terms, covenants and provisions of the Lease for the remainder of the term thereof (including the Renewal Periods, if Tenant elects or has elected to exercise its options to extend the term) which such new owner hereby agrees to assume and perform and Tenant shall, from and after the date such new owner succeeds to the interest of "landlord" under the Lease, have the same remedies against such new owner for the breach of any covenant contained in the Lease that Tenant might have had under the Lease against Landlord if such new owner had not succeeded to the interest of "landlord"; provided, however, that such new owner shall not be:

(i)    liable for any act or omission of any prior landlord (including Landlord) unless such act or omission continues from and after the date upon which the new owner succeeds to the interest of such prior landlord;

(ii)    subject to any defenses which Tenant may have against any prior landlord (including Landlord) unless resulting from any default or breach by such prior landlord which continues from and after the date upon which the new owner succeeds to the interest of such prior landlord;

(iii)    subject to any offsets which Tenant may have against any prior landlord, except to the extent such offsets are expressly provided under the Lease and Mortgagee has received notice thereof and the opportunity to cure within the applicable time periods set forth in the Lease (it being further agreed that offsets under the Lease that were deducted by Tenant prior to the date upon which the new owner succeeds to the interest of such prior landlord shall not be subject to challenge);

(iv)    bound by any fixed rent which Tenant might have paid for more than one month in advance of its due date under the Lease to any prior landlord (including Landlord), unless such additional rent is paid in accordance with the applicable provisions of the Lease; or

(v)    bound by any amendment or modification of the Lease made without its consent; notwithstanding the foregoing, Mortgagee acknowledges that the Lease specifically provides for amendments thereof upon the occurrence of certain events described in the Lease (such as, for example, an amendment to the Lease confirming the measurement of the Premises), and, by its execution below, Mortgagee agrees to recognize such amendments as part of the Lease, and Mortgagee further agrees that such new owner shall also be bound by such amendment(s) to the Lease, without any consent on the part of Mortgagee or such new owner.

(c)    Tenant's obligations hereunder shall be effective only so long as Mortgagee is bound to Mortgagee's obligations hereunder.

6.      Tenant will notify Mortgagee of any default by Landlord under the Lease which would entitle Tenant to terminate the Lease or abate the rent payable thereunder and agrees that notwithstanding any provision of the Lease, no notice of termination thereof nor any abatement shall be effective unless Mortgagee has received the aforesaid notice and has failed to cure the subject default within the same time period allowed Landlord under the Lease. , It is understood that the abatement provisions of this paragraph relate to abatements by reason of Landlord's default and do not apply to provisions of the Lease whereby Tenant has the automatic right to abate rentals such as, for example, abatement upon casualty or condemnation.

7.      Neither the Mortgage nor any other security instrument executed in connection therewith shall encumber or be construed as subjecting in any manner to the lien thereof, any trade fixtures, signs or other personal property at any time furnished or installed by or for Tenant or its subtenants or licensees on the aforementioned property regardless of the manner or mode of attachment thereof.

8.      Any notices of communications given under this Agreement shall be in writing and shall be given by registered or certified mail, return receipt requested, postage prepaid, (a) if to Mortgagee, at the address of Mortgagee as hereinabove set forth or at such other address or persons as Mortgagee may designate by notice in the manner herein set forth, or (b) if to Tenant, at the address of Tenant as hereinabove set forth, with duplicate copies to  Allan N. Rauch, Esq., c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, and Jeffrey H. Kaplan, Esq., c/o Robinson Silverman Pearce Aronsohn & Berman, 1290 Avenue of the Americas, New York, New York 10104, or such other address or persons as Tenant may designate by notice in the manner herein set forth.  All notices given in accordance with the provisions of this Section shall be effective upon receipt (or refusal of receipt) at the address of the addressee.

9.      This Agreement shall bind and inure to the benefit of and be binding upon and enforceable by the parties hereto and their respective successors and assigns.

10.     This Agreement contains the entire agreement between the parties and cannot be changed, modified, waived or canceled except by an agreement in writing executed by the party against whom enforcement of such modification, change, waiver or cancellation is sought.

11.    This Agreement and the covenants herein contained are intended to run with and bind all lands affected thereby.

**[to add if Tenant's memorandum of lease has been recorded prior to the subject mortgage]** NOTE: THIS AGREEMENT BY TENANT SHALL NOT BE EFFECTIVE UNLESS AND UNTIL ANY PRIOR MORTGAGES ON THIS PROPERTY HAVE BEEN SATISFIED SO THAT TENANT'S PRIOR AGREEMENTS TO ATTORN TO SAID MORTGAGES AND/OR TO SUBORDINATE ITS LEASE TO SAID MORTGAGES SHALL HAVE BEEN EXTINGUISHED.

IN WITNESS WHEREOF, the parties hereto have duly executed this Subordination, Non-Disturbance and Attornment Agreement as of the day and year first above written.

**MORTGAGEE:**

ATTEST:

_____

[Corporate Seal]

_____        By: _____
(Assistant) Secretary                  Name: _____
                                       Title: _____

**TENANT:**

ATTEST:                                BED BATH & BEYOND INC.

[Corporate Seal]

_____        By: _____
(Assistant) Secretary                       Warren Eisenberg
                                            Co-Chief Executive Officer

**[INSERT APPROPRIATE JURAT FOR MORTGAGEE]**

_____

**[JURAT FOR TENANT:]**

STATE OF NEW JERSEY    )
                       ) : ss.
COUNTY OF UNION        )

    On this ___ day of _____, 199__, before me personally came Warren Eisenberg to me know, who being by me duly sworn, did depose and say that he is the Co-Chief Executive Officer of Bed Bath & Beyond Inc., the corporation described in and which executed the above instrument and that he signed his name thereto by order of the Board of Directors of said corporation.

_____
                                 Notary Public

My Commission Expires:

_____

<u>Exhibit H</u>

<u>Recognition Agreement</u>

THIS RECOGNITION AGREEMENT, made as of the _____ day of _____, 199_, by and between JEFFREY R. ANDERSON REAL ESTATE, INC., a [_____] corporation having an office at 312 Walnut Street, Suite 1151, Cincinnati, Ohio 45202 (**"Landlord"**); Bed Bath & Beyond Inc., a New York corporation, having an address at 650 Liberty Avenue, Union, New Jersey 07083 (**"Tenant"**); and _____, a [_____] **[corporation] [limited] [general] [partnership]**, having an address at _____ _____ (**"Subtenant"**).

<u>R E C I T A L S</u>:

A.     Landlord and Tenant have entered into a certain lease (the **"Lease"**) dated as of _____ ____, 199_, a short form of which has been recorded in _____, which demises certain premises (the **"Premises"**) located in the _____ Shopping Center, **[City], [State]**, which Shopping Center is more particularly described on <u>Exhibit A</u> annexed hereto and made a part hereof.

B.     Section 15.4 of the Lease provides that in the event Tenant subleases all or a portion of the Premises for a term of at least five (5) years, Landlord shall, upon Tenant's request, execute and deliver a Recognition Agreement among Landlord, Tenant and each such subtenant in the form attached to the Lease, in recordable form.

C.     Pursuant to a Sublease dated as of _____ (the **"Sublease"**), Tenant has subleased **[a portion of]** the Premises to Subtenant, which **[portion]** is designated as "Subleased Premises" on <u>Exhibit B</u> annexed hereto and made a part hereof (the **"Subleased Premises"**).

D.     The parties hereto desire to effectuate the provisions of Section 15.4 of the Lease with respect to the Sublease and the Subleased Premises.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereto, intending to be legally bound hereby, agree as follows:

1.     Landlord warrants and represents as follows:

(i)     that it is the fee owner of the Premises,

(ii)    that the Lease is unmodified (except as may be otherwise set forth in <u>Exhibit B</u> annexed hereto, if any) and is in full force and effect,

(iii)   that the term of the Lease expires on _____, but is subject to [three] renewal periods of [five] years each and

(iv)    that Tenant is not in default under the Lease nor has any event occurred which would after notice to Tenant and the passage of time become a default of Tenant under the Lease.

2.     Landlord hereby acknowledges receipt of a copy of, and consents to and approves, the Sublease and all of the terms, covenants and provisions thereof, and agrees that the exercise by Subtenant of any of its rights, remedies and options contained therein shall not constitute a default under the Lease.

3.     Landlord agrees that whenever it has an obligation with respect to the Premises, or its consent or approval is required for any action of Tenant under the Lease, then, to the extent such obligation, consent or approval relates to the Subleased Premises or Subtenant's use and occupation thereof, it will perform such obligation in accordance with the terms and conditions of the Lease, and, subject to the applicable terms of the Lease, will not unreasonably withhold or unduly delay such consent or approval.

4.      Landlord shall not, in the exercise of any of the rights arising or which may arise out of the Lease or of any instrument modifying or amending the same or entered into in substitution or replacement thereof (whether as a result of Tenant's default or otherwise), disturb or deprive Subtenant in or of its possession or its rights to possession of the Subleased Premises or of any right or privilege granted to or inuring to the benefit of Subtenant under, the Sublease, provided that Subtenant is not in default under the Sublease beyond the expiration of any applicable notice and cure period.

5.      In the event of the termination of the Lease by reentry, notice, conditional limitation, surrender, summary proceeding or other action or proceeding, or otherwise, or, if the Lease shall terminate or expire for any reason before any of the dates provided in the Sublease for the termination of the initial or renewal terms of the Sublease and if immediately prior to such surrender, termination or expiration the Sublease shall be in full force and effect, Subtenant shall not be made a party in any removal or eviction action or proceeding nor shall Subtenant be evicted or removed of its possession or its right of possession of the Subleased Premises be disturbed or in any way interfered with, and the Sublease shall continue in full force and effect as a direct lease between Landlord and Subtenant provided that in such event Subtenant shall, for the then remainder of the term of the Sublease, (i) pay fixed rent and additional rent in an amount equal to the greater of (x) the fixed rent and additional rent then payable under the Lease, or (y) the fixed rent and additional rent then payable under the Sublease, prorated on a per square foot basis to reflect the portion of the Premises occupied by Subtenant except that Subtenant's payment of percentage rent, if any, shall in any event continue to be governed by the applicable provisions of the Sublease and (ii) perform, with respect to the Subleased Premises, the repair, maintenance and other non-monetary obligations which Tenant is obligated to perform pursuant to the Lease.

6.      Landlord hereby waives and relinquishes any and all rights or remedies against Subtenant, pursuant to any lien, statutory or otherwise, that it may have against the property, goods or chattels of Subtenant in or on the Subleased Premises.

7.      Any notices, consents, approvals, submissions, demands or other communications (hereinafter collectively referred to as "Notice") given under this Agreement shall be in writing.  Unless otherwise required by law or governmental regulation, Notices shall be deemed given if sent by registered or certified mail, return receipt requested, postage prepaid (a) to Landlord, at the address of Landlord as hereinabove set forth or such other address or persons as Landlord may designate by Notice to the other parties hereto, (b) to Tenant, at the address of Tenant as hereinabove set forth, with duplicate copies to Allan N. Rauch, Esq., c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, and Jeffrey H. Kaplan, Esq., c/o Robinson Silverman Pearce Aronsohn & Berman, 1290 Avenue of the Americas, New York, New York 10104, or such other address or persons as Tenant may designate by Notice to the other parties hereto, and (c) to Subtenant, at the address of Subtenant as hereinabove set forth or such other address or persons as Subtenant may designate by Notice to the other parties hereto.  During the period of any postal strike or other interference with the mails, personal delivery shall be substitute for registered or certified mail. All Notices shall become effective only on the receipt or rejection of same by the proper parties.

8.      No modification, amendment, waiver or release of any provision of this Agreement or of any right, obligation, claim or cause of action arising hereunder shall be valid or binding for any purpose whatsoever unless in writing and duly executed by the party against whom the same is sought to be asserted.

[Signature Page Follows]

4.      Landlord shall not, in the exercise of any of the rights arising or which may arise out of the Lease or of any instrument modifying or amending the same or entered into in substitution or replacement thereof (whether as a result of Tenant's default or otherwise), disturb or deprive Subtenant in or of its possession or its rights to possession of the Subleased Premises or of any right or privilege granted to or inuring to the benefit of Subtenant under the Sublease, provided that Subtenant is not in default under the Sublease beyond the expiration of any applicable notice and cure period.

5.      In the event of the termination of the Lease by reentry, notice, conditional limitation, surrender, summary proceeding or other action or proceeding, or otherwise, or, if the Lease shall terminate or expire for any reason before any of the dates provided in the Sublease for the termination of the initial or renewal terms of the Sublease and if immediately prior to such surrender, termination or expiration the Sublease shall be in full force and effect, Subtenant shall not be made a party in any removal or eviction action or proceeding nor shall Subtenant be evicted or removed of its possession or its right of possession of the Subleased Premises be disturbed or in any way interfered with, and the Sublease shall continue in full force and effect as a direct lease between Landlord and Subtenant provided that in such event Subtenant shall, for the then remainder of the term of the Sublease, (i) pay fixed rent and additional rent  in an amount equal to the greater of (x) the fixed rent and additional rent then payable under the Lease, or (y) the fixed rent and additional rent then payable under the Sublease, prorated on a per square foot basis to reflect the portion of the Premises occupied by Subtenant except that Subtenant's payment of percentage rent, if any, shall in any event continue to be governed by the applicable provisions of the Sublease and (ii) perform, with respect to the Subleased Premises, the repair, maintenance and other non-monetary obligations which Tenant is obligated to perform pursuant to the Lease.

6.      Landlord hereby waives and relinquishes any and all rights or remedies against Subtenant, pursuant to any lien, statutory or otherwise, that it may have against the property, goods or chattels of Subtenant in or on the Subleased Premises.

7.      Any notices, consents, approvals, submissions, demands or other communications (hereinafter collectively referred to as "Notice") given under this Agreement shall be in writing.  Unless otherwise required by law or governmental regulation, Notices shall be deemed given if sent by registered or certified mail, return receipt requested, postage prepaid (a) to Landlord, at the address of Landlord as hereinabove set forth or such other address or persons as Landlord may designate by Notice to the other parties hereto, (b) to Tenant, at the address of Tenant as hereinabove set forth, with duplicate copies to  Allan N. Rauch, Esq., c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, and Jeffrey H. Kaplan, Esq., c/o Robinson Silverman Pearce Aronsohn & Berman, 1290 Avenue of the Americas, New York, New York 10104, or such other address or persons as Tenant may designate by Notice to the other parties hereto, and (c) to Subtenant, at the address of Subtenant as hereinabove set forth or such other address or persons as Subtenant may designate by Notice to the other parties hereto.  During the period of any postal strike or other interference with the mails, personal delivery shall be substitute for registered or certified mail. All Notices shall become effective only on the receipt or rejection of same by the proper parties.

8.      No modification, amendment, waiver or release of any provision of this Agreement or of any right, obligation, claim or cause of action arising hereunder shall be valid or binding for any purpose whatsoever unless in writing and duly executed by the party against whom the same is sought to be asserted.

[Signature Page Follows]

9.    This Agreement shall be binding on and shall inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors, assigns and sublessees.

IN WITNESS WHEREOF, the parties have caused this Recognition Agreement to be executed under seal the date first above written.

**LANDLORD:**

JEFFREY R. ANDERSON REAL ESTATE, INC.

By:      _____
Name:  _____
Title:    _____

**TENANT:**

BED BATH & BEYOND  INC.

By:      _____
             Warren Eisenberg
             Co-Chief Executive Officer

**SUBTENANT:**

_____

By:      _____
Name:  _____
Title:    _____

**[INSERT APPROPRIATE JURATS FOR <u>LANDLORD</u> AND <u>SUBTENANT</u>]**

_____    _____

**[JURAT FOR TENANT:]**

STATE OF NEW JERSEY    )
                       ) : ss.
COUNTY OF UNION        )

On this ___ day of _____, 199__, before me personally came Warren Eisenberg to me know, who being by me duly sworn, did depose and say that he is the Co-Chief Executive Officer of Bed Bath & Beyond Inc., the corporation described in and which executed the above instrument and that he signed his name thereto by order of the Board of Directors of said corporation.

_____
                    Notary Public

My Commission Expires:

_____

**Exhibit I**

**DELIVERY DATE NOTICE**

[Letterhead of Landlord]

_____, 199__

VIA CERTIFIED MAIL,
RETURN RECEIPT REQUESTED
Bed Bath & Beyond  Inc.
650 Liberty Avenue
Union, NJ 07083
Attn: Warren Eisenberg

Re:    Agreement of Lease, dated _____, 199__ (the "Lease"), between [name of
        Landlord], as landlord ("Landlord"), and Bed Bath & Beyond  Inc., as tenant ("Tenant"),
        with respect to certain retail premises (the "Premises") located in the _____
        Shopping Center,_____[City], [State]_____.

Gentlemen:

        In accordance with the provisions of Subsection 2.3.2 of the Lease, the Landlord hereby
informs the Tenant that the Delivery Date shall take place at 8:00 A.M. on _____,
199__.  This notice shall constitute the Delivery Date Notice referred to in Subsection 2.3.2 of
the Lease.

        In accordance with the provisions of Section 3.4 of the Lease, attached hereto please
find the certification to you by our licensed **[architect] [surveyor] [engineer]** of the Floor Area
of the Premises, the square footage of the non-selling space of the Premises, and the Floor
Area of the Shopping Center.

                                                [NAME OF LANDLORD]


                                                By:_____
                                                                , (Vice) President


cc:    [Jeffrey H. Kaplan, Esq.]
        [Allan N. Rauch, Esq.]

<u>Exhibit J</u>

<u>DELIVERY DATE CERTIFICATION</u>

[Letterhead of Landlord]

_____, 199__

[via Federal Express or other
recognized overnight delivery
service per Article 18 of the foregoing
lease]

Bed Bath & Beyond Inc.
650 Liberty Avenue
Union, NJ 07083
Attn: Warren Eisenberg

Re:    Agreement of Lease, dated _____, 199__ (the "Lease"), between [name of
       Landlord], as landlord ("Landlord"), and Bed Bath & Beyond Inc., as tenant ("Tenant"),
       with respect to certain retail premises (the "Premises") located in the _____
       Shopping Center, ____ [City], [State]_____

Gentlemen:

       In accordance with the provisions of Subsection 2.3.3 of the Lease, Landlord hereby
certifies to Tenant that, as of the date of this certification, all of the Delivery Date Conditions (as
defined in the Lease) have been satisfied, and that, as a result, the Delivery Date (as such term
is defined in the Lease) will be deemed to be _____, 199__ [INSERT THE DATE
WHICH IS TWO DAYS AFTER THE DATE OF THIS LETTER].  This notice shall constitute the
Delivery Date Certification referred to in Subsection 2.3.3 of the Lease.

                                         [NAME OF LANDLORD]


                                         By:_____
                                                    , (Vice) President


cc:    [Jeffrey H. Kaplan, Esq.]
       [Allan N. Rauch, Esq.]

9.    This Agreement shall be binding on and shall inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors, assigns and sublessees.

IN WITNESS WHEREOF, the parties have caused this Recognition Agreement to be executed under seal the date first above written.

**LANDLORD:**

JEFFREY R. ANDERSON REAL ESTATE, INC.

By:     _____
Name:   _____
Title:  _____

**TENANT:**

BED BATH & BEYOND  INC.

By:     _____
            Warren Eisenberg
            Co-Chief Executive Officer

**SUBTENANT:**
_____

By:     _____
Name:   _____
Title:  _____

**[INSERT APPROPRIATE JURATS FOR <u>LANDLORD</u> AND <u>SUBTENANT</u>]**

_____

**[JURAT FOR TENANT:]**

STATE OF NEW JERSEY    )
                       ) : ss.
COUNTY OF UNION        )

On this ___ day of _____, 199__, before me personally came Warren Eisenberg to me know, who being by me duly sworn, did depose and say that he is the Co-Chief Executive Officer of Bed Bath & Beyond Inc., the corporation described in and which executed the above instrument and that he signed his name thereto by order of the Board of Directors of said corporation.

_____
Notary Public

My Commission Expires:

_____

**Exhibit I**

**DELIVERY DATE NOTICE**

[Letterhead of Landlord]

_____, 199__

VIA CERTIFIED MAIL,
RETURN RECEIPT REQUESTED
Bed Bath & Beyond  Inc.
650 Liberty Avenue
Union, NJ 07083
Attn: Warren Eisenberg

Re:    Agreement of Lease, dated _____, 199__ (the "Lease"), between [name of
Landlord], as landlord ("Landlord"), and Bed Bath & Beyond  Inc., as tenant ("Tenant"),
with respect to certain retail premises (the "Premises") located in the _____
Shopping Center,_____[City], [State] _____.

Gentlemen:

        In accordance with the provisions of Subsection 2.3.2 of the Lease, the Landlord hereby
informs the Tenant that the Delivery Date shall take place at 8:00 A.M. on _____,
199__.  This notice shall constitute the Delivery Date Notice referred to in Subsection 2.3.2 of
the Lease.

        In accordance with the provisions of Section 3.4 of the Lease, attached hereto please
find the certification to you by our licensed **[architect] [surveyor] [engineer]** of the Floor Area
of the Premises, the square footage of the non-selling space of the Premises, and the Floor
Area of the Shopping Center.

                                        [NAME OF LANDLORD]


                                        By:_____

                                                  , (Vice) President


cc:    [Jeffrey H. Kaplan, Esq.]
       [Allan N. Rauch, Esq.]

Exhibit J

DELIVERY DATE CERTIFICATION

[Letterhead of Landlord]

_____, 199__

[via Federal Express or other
recognized overnight delivery
service per Article 18 of the foregoing
lease]

Bed Bath & Beyond Inc.
650 Liberty Avenue
Union, NJ 07083
Attn: Warren Eisenberg

Re:    Agreement of Lease, dated _____, 199__ (the "Lease"), between [name of
       Landlord], as landlord ("Landlord"), and Bed Bath & Beyond Inc., as tenant ("Tenant"),
       with respect to certain retail premises (the "Premises") located in the _____
       Shopping Center, _____ [City]. [State] _____

Gentlemen:

       In accordance with the provisions of Subsection 2.3.3 of the Lease, Landlord hereby
certifies to Tenant that, as of the date of this certification, all of the Delivery Date Conditions (as
defined in the Lease) have been satisfied, and that, as a result, the Delivery Date (as such term
is defined in the Lease) will be deemed to be _____, 199__ [INSERT THE DATE
WHICH IS TWO DAYS AFTER THE DATE OF THIS LETTER].  This notice shall constitute the
Delivery Date Certification referred to in Subsection 2.3.3 of the Lease.

                                        [NAME OF LANDLORD]

                                        By:_____

                                                , (Vice) President

cc:    [Jeffrey H. Kaplan, Esq.]
       [Allan N. Rauch, Esq.]

## Exhibit K-1

### Existing Exclusives

Wild Oats Exclusive:

Tenant (i.e. Wild Oats) shall have the exclusive right in the Shopping Center to (a) operate a grocery store, convenience store or natural or health food store (b) offer for sale those items normally sold in a grocery store, including but not limited to produce, meat, dairy, frozen foods, groceries, but not including candy or ice cream, (c) offer for sale natural cosmetics, natural health and beauty products (but specifically excluding body care items sold by Bath & Body and Victoria's Secret), vitamins or supplements (except to the extent such is an incidental part (less than 5%) of another tenant's business and does not include the sale of natural vitamins) and (d) to the extent Tenant obtains a liquor license sell beer and wine for off-premises consumption. No other tenant shall operate a full service bakery or bread/bagel bakery or delicatessen (defined as any operation primarily selling sandwiches, carry out foods prepared salads or side dishes for on or off premises consumption).

Buca Di Beppo Exclusive:

Landlord will not lease, sublease or otherwise operate or contract, by conveyance or otherwise on premises owned or leased by Landlord within the Shopping Center Area, for a full service, family style Italian restaurant. Notwithstanding the foregoing, the incidental sale of "Italian" food within the Shopping Center Area by other tenants, subtenants or otherwise shall not constitute a breach of Landlord's covenant contained in the preceding sentence.

Finish Line Exclusive:

During the term of this Lease and provided Tenant shall not be in default hereunder, Landlord agrees that Landlord (i) will not lease space in the Shopping Center, and (ii) will use reasonable efforts to cause the landlord owning the Rookwood Pavilion to not lease space in Rookwood Pavilion, to another tenant leasing in excess of 3,000 square feet of space for the primary purpose of display and sale at retail of athletic Footwear such as Just for Feet ("Tenant's Exclusive Use").

P. F. Changs Exclusive:

Landlord agrees not to rent or sell property within the Center to or for, and to prohibit anyone else from operating within the Center, any business primarily involved in the sale of prepared Asian cuisine as a full service sit down restaurant without Tenant's prior written consent, which consent may be withheld in Tenant's sole and absolute discretion.

<u>Exhibit K-2</u>

<u>Existing Leases</u>

1. Lease by and between Jeffrey R. Anderson Real Estate, Inc., an Ohio corporation ("Landlord") and Wild Oats Markets, Inc., a Delaware corporation ("Tenant") dated January 5, 1999 affecting Building C as shown on the Site Plan.

2. Lease by and between Jeffrey R. Anderson Real Estate, Inc., an Ohio corporation ("Landlord") and Anthropologie, Inc. ("Tenant") dated February 2, 1999 affecting Building A as shown on the Site Plan.

3. Lease by and between Jeffrey R. Anderson Real Estate, Inc., an Ohio corporation ("Landlord") and P. F. Changs, a _____ ("Tenant") dated _____ affecting Building __ as shown on the Site Plan.

## Exhibit L

### Percentage Rent

1.    During the applicable period described within Sections 2.4 and/or 2.5 and/or Article 22 of the Lease, Tenant shall pay percentage rent (*"Percentage Rent"*) equal to three (3%) percent of all Gross Sales (as hereinafter defined) resulting from business conducted in, on or from the Premises.  As used herein, the term *"Gross Sales"* shall mean the total amount of all sales of merchandise or services arising out of or payable on account of all the business conducted in, on or from the Premises by or on account of Tenant and any sublessee, licensee or concessionaire of Tenant and any other person or entity operating in the Premises, whether for cash, credit or otherwise, including all orders for merchandise taken from or filled at or from the Premises and all deposits not refunded to customers.  A sale shall be deemed to have been consummated for purposes of this Lease, and the entire amount of the sales price shall be included in Gross Sales, at such time as (A)  the transaction is initially reflected in the books or records of Tenant, or any sublessee, licensee or concessionaire of Tenant, or any other person or entity operating its business in the Premises, (B) Tenant or any other person or entity operating its business in the Premises receives all or any portion of the sales price, or (C) the applicable goods or services are delivered to the customer, whichever of (1), (2) or (3) first occurs, irrespective of whether payment is made in installments, the sale is for cash or credit or otherwise, or all or any portion of the sales price has actually been paid at the time of inclusion in Gross Sales or at any other time.  Tenant and the other persons and entities operating their business in the Premises shall record, at the time of each sale, all receipts from such sale, whether for cash, credit or otherwise, in a cash register or cash registers, or in such electronic or computer device which records sales in a manner which is generally acceptable by industry standards.  The term *"Gross Sales"* shall exclude (i) proceeds from any sales tax, gross receipts tax or similar tax, by whatever name called, which are separately stated and are in addition to the sales price, (ii) *bona fide* transfers or exchanges of merchandise from the Premises to any other stores or warehouses of Tenant or any Affiliates of Tenant, and returns to shippers and manufacturers for credit, (iii) refunds or credits  given to customers for merchandise purchased at the Premises and returned or exchanged, (iv) sales of Tenant's fixtures and equipment not in the ordinary course of Tenant's business, (v)  to the extent of prior inclusion in Gross Sales, bad debts when written off the books of Tenant, provided that any collections made on account of such bad debts shall be included in Gross Sales when received, (vi)  receipts from vending machines installed solely for the use of Tenant's employees and receipts from pay telephones, (vii) sales to employees of Tenant at discount, (viii) fees paid to independent third party credit card companies in connection with sales charged to customers' credit cards, (ix) proceeds from delivery, wrapping and check cashing charges, (x) sums and credits received in settlement of claims for loss or damage to merchandise, (xi)  separately stated service, finance and interest charges, (xii) the dollar value of Tenant coupons utilized by customers in the purchase of merchandise from the Premises, (xiii) close out or bulk sales of inventory to jobbers or wholesalers, and (xiv) sales of gift certificates.

2.    Tenant shall maintain at the Premises or at its principal office, complete books and records reflecting all elements of Gross Sales.  Tenant shall be permitted to maintain its books and records in a computerized form; provided, however, that (A) such computerized books and records provide the same level of information as the books and records described above and are retained for the full record retention period provided for herein, and (B) promptly upon request, printed copies of any such books and records shall be made available at Tenant's principal office for inspection by Landlord's representatives who are engaged in inspecting and/or auditing Tenant's books and records as provided herein.  Such books and records shall be kept in accordance with generally accepted accounting principles and practices consistently applied and shall be retained by Tenant for not less than one (1) year following the end of the calendar year to which they refer.  Within thirty (30) days after the close of each calendar month during which Percentage Rent is payable hereunder, Tenant shall deliver to Landlord a statement prepared by an officer of Tenant setting forth the amount of Gross Sales achieved during, and the amount of Percentage Rent payable for, the preceding calendar month, together with payment of such Percentage Rent.  Landlord and/or its auditor shall have the right, upon at least ten (10) days prior notice to Tenant, to inspect and/or audit Tenant's records relating solely to Gross Sales achieved in the Premises.

3.    Landlord shall not disclose to any third party Tenant's Gross Sales or the amount of Percentage Rent paid or payable by Tenant, provided, however, that (A) such information

1    was not previously disclosed by Tenant to such third party or to the public generally, and (B)

2    nothing contained herein shall restrict Landlord from disclosing such information as may be

3    required by law, or to its accountants, attorneys, *bona-fide* prospective purchasers, or current or

4    prospective Institutional Mortgagees or Ground Lessor(s) of all or any portion of Landlord's

5    interest in the Shopping Center (provided that each of such recipients shall be bound to the

6    same non-disclosure provisions as are imposed upon Landlord).

7

8

1
2

**EXHIBIT "M"**
**Purchase and Sale Contracts**

02/08/99    00:05                                                          NO.574    002

**EXHIBIT M**

**To:**      Jeffrey Kaplan
**From:**    J.R. Anderson                                    **MEMORANDUM**
**Subject:** Rookwood Commons - Cincinnati, Ohio
            Properties and Effective Contracts to Purchase
**Date:**    February 5, 1999

Jeff:

As per our discussions today, I have included the properties encompassing our development
along with the status of the contract. I first must preface this by stating that this entire area is
part of an urban renewal district adopted and accepted by the City of Norwood on
December 22, therefore we have the power of eminent domain over any parcel. There are
approximately 50 parcels in this shopping center and there are only a few that remain. The
final parcels to acquire are required by law to sell their property to us and we are merely
finalizing the deal. The parcels within the shopping center are as follows:

Residential Properties:

| | |
|---|---|
| 2624 Arbor Place - Wanda Tassinger | Under Contract |
| 2628 Arbor Place - Sheryl Aitken | Under Contract |
| 2630 Arbor Place - Robert Grant | Purchased |
| 2632 Arbor Place - David & Patricia Robinson | Under Contract |
| 2636 Arbor Place - Jewel Rossman | Under Contract |
| 2640 Arbor Place - Pamela & Bradford Bowers | Under Contract |
| 2644 Arbor Place - Kevin York | Under Contract |
| 2654 Arbor Place - Allen & Shirley Witt | Under Contract |
| 2656 Arbor Place - William Grigsby | Under Contract |
| 2660 Arbor Place - Philip & Hazel Boyd | Under Contract |
| 2662 Arbor Place - Lloyd & Ruth Patton | Under Contract |
| 2664 Arbor Place - Cecil & Mary Lou Moore | Under Contract |
| 2666 Arbor Place - Opal Fore | Under Contract |
| 2668 Arbor Place - Charles & Louise Douglas | Under Contract |
| 2670 Arbor Place - Steven Arnold | Under Contract |
| 2672 Arbor Place - Donald Richardson II | Under Contract |
| 2674 Arbor Place - Aubrey & Lois Huey | Under Contract |
| 2680 Arbor Place - Richard & Lois Taylor | Under Contract |
| 2686 Arbor Place - Leo & Freda Hays | Under Contract |
| 2688 Arbor Place - Michael & Nancy Kaaz | Under Contract |
| 2690 Arbor Place - Arbor Place LTD | Under Contract |
| 2629 Edmondson Rd - Thomas Molimari | Under Contract |
| 2635 Edmondson Rd - Harry Lehman Jr | Under Contract |
| 2637 Edmondson Rd - Anthony Romeo | Under Contract |
| 2641 Edmondson Rd - Edmund Quick | Under Contract |
| 2645 Edmondson Rd - Clyde & Eudell King | Under Contract |
| 2649 Edmondson Rd - Esther Schoner | Under Contract |

02/08/99    00:05                                                    NO.574    003

Jeffrey Kaplan
Page 2
February 5, 1999

| | |
|---|---|
| 2653 Edmondson Rd - Robin Vogelsong | Under Contract |
| 2657 Edmondson Rd - Seldon & Arbutus Palmer | Under Contract |
| 2661 Edmondson Rd - Geno & Mary Pierani | Contract Pending |
| 2665 Edmondson Rd - Bev Pierani | Contract Pending |
| 2667 Edmondson Rd - John & Nancy Conlon | Under Contract |
| 2673 Edmondson Rd - Laura Glahn | Under Contract |
| 2677 Edmondson Rd - Mary Ellen Imm | Under Contract |
| 2703 Edmondson Rd - John Lagrange | Under Contract |
| 2705 Edmondson Rd - Sarah Mable | Under Contract |
| 2711 Edmondson Rd - Gary & Peter Aniskovich | Under Contract |
| 2713 Edmondson Rd - Kelli Curran | Under Contract |
| 2715 Edmondson Rd - Jay Pearce | Under Contract |
| 2717 Edmondson Rd - Edward Rothenberg Trustee | Under Contract |
| 3801 Edwards Road - Arbor Place LTD | Under Contract |

Industrial Properties:

| | |
|---|---|
| 2600 Arbor Place - Bix Box Industry | Under Contract |
| 2601 Arbor Place - BBH Warehouse | Under Contract |
| 3700 Burch Avenue - Hyde Park Lumber | Under Contract |
| 3812 Hires Lane - Logan Industries | Under Contract |
| 3810 Hires Lane - James Smith | Contract Pending |
| 3817 Hires Lane - Vincent Carouso | Under Contract |

I hope that this gives you some clarity on this matter. Again, these owners are required by
Ohio law to sell to us and we are currently finalizing our deals with those few owners who
have been slow to make a decision on terms.

Please feel free to call with any questions.

J.R. Anderson

**FIRST AMENDMENT OF LEASE AGREEMENT**

THIS FIRST AMENDMENT TO LEASE AGREEMENT dated as of August 25, 1999, between JEFFREY R. ANDERSON REAL ESTATE, INC., an Ohio corporation, having an office at 312 Walnut Street, Suite 1151, Cincinnati, Ohio 45202 (*"Landlord"*), and BED BATH & BEYOND INC., a New York corporation, having an office at 650 Liberty Avenue, Union, New Jersey 07083 (*"Tenant"*).

## R E C I T A L S :

A.    Pursuant to that certain Lease Agreement dated as of February 15, 1999 by and between Landlord and Tenant (the *"Lease"*), Landlord leased to Tenant certain premises (the *"Premises"*) located in the shopping center known or to be known as Rookwood Commons Shopping Center, in Norwood (Cincinnati), Ohio (the *"Shopping Center"*).

B.    Tenant and Landlord desire to amend the Lease, as hereinafter set forth.

NOW, THEREFORE, in consideration of the promises in this agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    Capitalized terms used, but not otherwise defined herein shall have the meanings ascribed to them in the Lease.

2.    ==Exhibit B to the Lease is hereby deleted in its entirety and the Exhibit B attached hereto is hereby inserted in lieu thereof.==

3.    Section 1.1.28 of the Lease is hereby amended by deleting the words, *"thirty one thousand five hundred fifty (31,550)"*, and inserting the following words in lieu thereof: *"thirty-three thousand three hundred seventy-five (33,375)"*.

4.    Section 1.1.12 of the Lease is hereby deleted in its entirety, and the following language is inserted in lieu thereof:

*"1.1.12    Fixed Rent:  The following amounts for the periods indicated (subject to adjustment pursuant to Section 3.4 hereof), it being agreed, however, that for all purposes of this Lease, including, without limitation, the calculation of Fixed Rent under this Subsection 1.1.12, the Floor Area of the Premises shall be deemed not to exceed 33,375 square feet:*

*(a)    For the period commencing on the Rent Commencement Date and ending on the last day of the Initial Term (i.e., the first January 31 occurring after the tenth (10th) anniversary of the Rent Commencement Date), at the rate of Three Hundred Ninety Thousand Four Hundred Eighty-seven Dollars ($390,487.00) per year [based on Eleven and 70/100 Dollars ($11.70) per square foot of Floor Area];*

*(b)    In the event Tenant exercises the first Renewal Option, for the first five (5) year Renewal Period, at the rate of Four Hundred Seven Thousand One Hundred Seventy-five Dollars ($407,175.00) per year [based on Twelve and 20/100 Dollars ($12.20) per square foot of Floor Area];*

*(c)    In the event Tenant exercises the second Renewal Option, for the second five (5) year Renewal Period, at the rate of Four Hundred Twenty-three Thousand Eight Hundred Sixty-two and 50/100 Dollars ($423,862.50) per year [based on Twelve and 70/100 Dollars ($12.70) per square foot of Floor Area];*

*(d)    In the event Tenant exercises the third Renewal Option, for the third five (5) year Renewal Period, at the rate of Four Hundred Forty Thousand Five Hundred Fifty Dollars ($440,550.00) per year [based on Thirteen and 20/100 Dollars ($13.20) per square foot of Floor Area];*

*(e)    In the event Tenant exercises the fourth Renewal Option, for the fourth five (5) year Renewal Period, at the rate of Four Hundred Fifty-seven Thousand Two Hundred Thirty-seven and 50/100 Dollars ($457,237.50)*

(handwritten margin notes: 32,540.59 ; 33,931.25 ; 35,321.88)

*per year [based on Thirteen and 70/100 Dollars ($13.70) per square foot of Floor
Area]; and*

> *(f)      In the event Tenant exercises the fifth Renewal Option, for
> the fifth five (5) year Renewal Period, at the rate of Four Hundred Seventy-three
> Thousand Nine Hundred Twenty-five Dollars ($473,925.00) per year [based on
> Fourteen and 20/100 Dollars ($14.20) per square foot of Floor Area]."*

5.      Section 1.1.13 of the Lease is hereby amended by deleting the words, *"31,250
square feet"*, and inserting in lieu thereof the words, *"33,375 square feet"*.

6.      The first sentence of Section 3.2.1(a) of the Lease is hereby deleted in its
entirety, and the following sentence is inserted in lieu thereof: *"By not later than **September 24,
1999**, Landlord shall deliver to Tenant the "Shell Drawings" (hereinafter defined), which Shell
Drawings shall be subject to reasonable modifications indicated by Tenant in Tenant's Plans."*

7.      As amended herein, the Lease is hereby ratified and shall continue in full force
and effect.

IN WITNESS WHEREOF, the parties have executed this First Amendment to Lease
Agreement as of the date first above written.

JEFFREY R. ANDERSON REAL ESTATE, INC.,
an Ohio corporation

By:  _____
     Jeffrey R. Anderson
     President

BED BATH & BEYOND INC.,
a New York corporation

By:  _____
     Steven H. Temares
     President - Chief Operating Officer

## SECOND LEASE MODIFICATION

THIS SECOND LEASE MODIFICATION (**"Second Modification"**), executed on April 27, 2021 and dated to be effective as of the 31st day of January, 2021 (**"Modification Date"**) by and between HGREIT II EDMONDSON ROAD LLC, a Delaware limited liability company (**"Landlord"**), having an office c/o Hines Advisors Limited Partnership, 2800 Post Oak Boulevard, Suite 4800, Houston, Texas 77056, Attn: Kevin McMeans; with a copy to c/o Hines Advisors Limited Partnership, 2800 Post Oak Boulevard, Suite 4800, Houston, Texas 77056, Attn: Jason Maxwell, Esq. – General Counsel; and BED BATH & BEYOND INC., a New York corporation (**"Tenant"**), having an office at 650 Liberty Avenue, Union, New Jersey 07083.

### W I T N E S S E T H :

WHEREAS, Landlord, as successor-in-interest to Jeffrey R. Anderson Real Estate, Inc., and Tenant are parties to that certain Lease Agreement dated as of February 15, 1999 (as amended and/or modified thereafter, the **"Lease"**), with respect to premises (**"Premises"**) located at the Rookwood Commons in Cincinnati (Norwood), Ohio (**"Shopping Center"**);

WHEREAS, the Lease would have expired on January 31, 2021, without this Second Modification; and

WHEREAS, Landlord and Tenant desire to extend and modify the Lease on the terms and conditions hereinafter set forth, retroactively.

NOW, THEREFORE, in consideration of the mutual covenants and promises set forth in this Second Modification and other valuable consideration, receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1. The recitals hereinabove set forth are incorporated into this Second Modification by this reference. Capitalized terms used, but not defined herein, shall have the meanings ascribed them in the Lease.

2. Notwithstanding anything contained in the Lease to the contrary, Landlord and Tenant hereby agree that the modifications to the Term, Renewal Periods and/or Rent that are outlined in Schedule A hereto shall govern and control from and after the Modification Date.

3. Notwithstanding anything contained in the Lease to the contrary, Landlord and Tenant hereby agree that the modifications to certain other terms and provisions of the Lease to the extent outlined in Schedule B hereto shall govern and control from and after the Modification Date.

4. It is the policy of Tenant and its subsidiaries and affiliates (collectively, **"the Company"**) to conduct all its business transactions in accordance with the highest ethical standards and all applicable laws (including but not limited to the U.S. Foreign Corrupt Practices

1

DocuSign Envelope ID: 6B49FA55-D4BD-494B-994B-418DB327D5D2
DocuSign Envelope ID: 920D8CEE-C2EB-4EA1-A7C8-9DA33EF09939

Act).  No individual who is employed by or who represents the Company, and no individual or entity that contracts with the Company or otherwise performs services on behalf of the Company, is permitted to solicit, accept, offer, promise or pay any bribe, kickback or any other improper payment of money, products or services.  This includes, but is not limited to, any improper payment in exchange for (i) the Company's execution of this Second Modification, (ii) any action taken by such individual on behalf of the Company, or (iii) any action taken by a third party.  If any such improper actions are observed, contact our Legal Department (Attention: General Counsel) at Tenant's notification address and/or by telephone at 908-688-0888, so that the incident may be fully investigated.

5.    Landlord and Tenant each warrant and represent to the other that they did not deal with any real estate broker in connection with the negotiation, execution and delivery of this Second Modification, except for Retail Consulting Services (**"Tenant's Broker"**).  Tenant shall pay any commission due to Tenant's Broker in connection with this Second Modification pursuant to a separate written agreement between Tenant and Tenant's Broker.  Each party agrees to indemnify, defend, and save the other harmless from and against any and all liabilities, costs, causes of action, damages and expenses, including, without limitation, attorneys' fees, with respect to or arising out of any claims made by any real estate broker, agent or finder (other than Tenant's Broker) with respect to this Second Modification in breach of the foregoing representation or claiming to have worked with the indemnifying party in connection with the Lease.  The provisions of this Section shall survive the expiration or earlier termination of the Lease.

6.    Landlord represents and warrants to Tenant that, as of the date hereof, no third-party consents or approvals (including, without limitation, with respect to easement agreements and/or any lender or beneficiary of a deed of trust) are required in order for the terms and provisions of this Second Modification to be in full force and effect or, if any such consent is required, Landlord has obtained same prior to its execution hereof.  Tenant represents and warrants to Landlord that, as of the date hereof, no third-party consents or approvals are required in order for the terms and provisions of this Second Modification to be in full force and effect or, if any such consent is required, Tenant has obtained same prior to its execution hereof.  The parties represent and warrant to each other that the person signing on behalf of either Landlord or Tenant, as the case may be, has the authority to do so and for this Second Modification to be deemed in full force and effect.

7.    The terms and conditions of this Second Modification shall be binding upon, and inure to the benefit of Landlord and Tenant and their respective heirs, executors, administrators, successors and assigns.  Except as specifically amended hereby, the Lease is unmodified, is hereby ratified by the parties hereto and remains in full force and effect.  In the event of any conflict or inconsistency between the terms and provisions of the Lease and this Second Modification, the terms and provisions of this Second Modification shall govern and control.

8.    This Second Modification may be executed in one or more counterparts, each of which shall be an original for all purposes, but all of which taken together shall constitute only one Second Modification.  The execution and transmission of an image of any signed document

or document signed by DocuSign (or a similar application) will have the same binding effect as an original bearing an original signature. No party may raise the use of an image transmission device or method or the fact that any signature was transmitted as an image as a defense to the enforcement of such document.

9.      All late fees/interest charges/attorney fees occurring prior to the date of this Second Modification are waived and Landlord hereby acknowledges that there is no Tenant monetary default under the Lease as of the date of this Second Modification.

[Remainder of Page Left Intentionally Blank – Signature Page to Follow]

IN WITNESS WHEREOF, the parties hereto have executed this Second Lease Modification as of the day and year first above written.

**LANDLORD:**

HGREIT II EDMONDSON ROAD LLC,
a Delaware limited liability company

By: _____
Name:   **Kenton McKeehan**
Title:   **Authorized Agent**

**TENANT:**

BED BATH & BEYOND INC.,
a New York corporation

By: _____
Name:   John Hartmann
Title:   EVP, Chief Operating Officer

4

DocuSign Envelope ID: 6849F A55-D4BD-494B-994B-418DB327D5D2
DocuSign Envelope ID: 920D8CEE-CEE4-4DBE-ADB3-DF5F6CE6838F

## SCHEDULE A

The Lease is hereby amended to reflect that:

1.      The Term is hereby extended for the period commencing on February 1, 2021 and ending on January 31, 2024 (the ***"Extension Term"***).

2.      Tenant shall pay Fixed Rent during the Extension Term at the rate of Twenty-Four Thousand Thirty and 00/100 Dollars ($24,030.00) per annum, payable in monthly installments of Two Thousand Two and 50/100 Dollars ($2,002.50).  Tenant will receive credit for any Fixed Rent paid prior to the execution of this Second Modification in excess of amounts owed pursuant to this paragraph.

3.      Tenant shall continue to have the right to extend the Term (beyond the Extension Term) for the three (3) remaining Renewal Options of five (5) years each, subject to the terms and conditions contained in the Lease, including, without limitation, Section 2.2.2 of the Lease. Fixed Rent payable during each remaining Renewal Period shall be as specified in Section 1.1.12(d), (e) and (f) of the Lease.

DocuSign Envelope ID: 6849FA55-D4BD-494B-994B-418DB327D5D2
DocuSign Envelope ID: 920D8CEE-CED4-45C1-A3A9-1CFC8593930F

## SCHEDULE B

The Lease is hereby amended to reflect the following:

     1.     Notwithstanding anything contained in the Lease to the contrary, Section 13.1.3 of the Lease (Definitions) is hereby modified to reflect the following:

    (a)  Grocery or supermarket stores are permitted in the Shopping Center, provided however, any such store shall not be located within 100 linear feet of the Premises.

    (b)  Spa and massage studios, such as Massage Envy, Hand & Stone, LaVida Massage and other similar concepts, as well as hair and nail salons, and beauty parlors (including those that also offer similar services) shall be permitted.

    (c)  Health spas and/or exercise facilities and/or gyms shall be permitted provided however, no such businesses in a premises containing 5,000 square feet of Floor Area or more shall be located within 100 linear feet of the Premises.

    (d)  The sale of used goods in stores such as Plato's Closet, Once Upon a Child, Play It Again Sports, 2nd & Charles and other similar concepts typically found in first class shopping centers shall be permitted in the Shopping Center.

    (e)  Daycare and/or children's educational uses shall be permitted in the Shopping Center.

    (f)  Restaurants (including both restaurants that sell, and restaurants that do not sell, alcoholic beverages for on premises consumption in addition to full food menus) and coffee bars each of the type commonly found in first class shopping centers shall be permitted, provided, however, such tenants occupying more than 4,000 square feet of Floor Area shall not be located adjacent to the Premises.

    (g)  Restaurants, grocery stores and coffee bars permitted under the Lease (including this Schedule B) may sell alcoholic beverages for off-premises consumption on an ancillary basis.

    (h)  "Retail Office" may comprise of up to 30% of the Floor Area of the Shopping Center.

    (i)  Medical service uses, including medical clinics and medical offices, typically found in first class shopping centers (e.g., optometry, dental, orthodontic, urgent care, chiropractic physical/occupational therapy, dialysis, weight loss/control centers, and other similar concepts) shall be permitted (it being understood that such use may not offer services [such as, but not limited to, abortions or methadone] which adversely affect the Shopping Center), provided that if such use is over 4,000

6

DocuSign Envelope ID: 6849FA55-D4BD-494B-994B-418DB327D5D2
DocuSign Envelope ID: 920D8CEE-CB0F-4BB1-AD9E-9BEE6C16A30F

square feet of Floor Area then such use shall not be located within 100 linear feet of the Premises.

(j) Veterinary facility uses are permitted in the Shopping Center, provided such uses shall not be located adjacent to, or contiguous to, the Premises.

(k) TJ Maxx, Marshalls, Ross Stores and Burlington Stores as same are currently known to operate shall be permitted.

(l) Bowling alleys, skating rinks, and movie theaters of the type commonly found in first class shopping centers shall be permitted to operate in the Shopping Center provided that such uses shall not be located within 250 feet of the Premises.

To the extent that any of the uses described above were permitted under Section 13.1.3 of the Lease, then this Section 1, Schedule B, of this Second Modification will not be deemed to prohibit those uses.

2. The following sentence shall be added to the end of Section 11.1.1(a) of the Lease:

"Notwithstanding the foregoing, in the event of any rebuilding or restoration by Landlord pursuant to this paragraph, Landlord may reconfigure: (i) the portions of the Common Areas that are outside of the No Change Area and (ii) the buildings identified on Exhibit B of the Lease (attached hereto) as "Building A", "Building B", "Building C" and "Building E" provided such reconfiguration does not adversely affect access to the Premises or Tenant's business operations and Landlord shall perform such reconfiguration work in compliance with all requirements under the Lease, including, but not limited to, Section 5.2."

3. Section 11.1.3 of the Lease is hereby amended to delete the phrase "two (2) years" and replace it with "three (3) years".

4. Article 14 of the Lease is hereby deleted in its entirety and replaced with the following:

"Tenant shall have no obligation to open or operate any business in the Premises, and shall have the right, at any time, to cease to conduct any business operations in the Premises, and Tenant shall incur no liability to Landlord or its mortgagee by reason thereof (it being understood and agreed that all of Tenant's obligations under this Lease shall continue unless this Lease is terminated pursuant, *inter alia*, to the further provisions of this Article 14 or any other provision of this Lease [other than by reason of an Event of Default]). In the event that Tenant does not operate or cause to be operated any retail business in the Premises (other than prior to the Rent Commencement Date or during Excused Periods), Landlord shall have the option to terminate this Lease, which option shall be exercisable by giving notice thereof to Tenant by not later than the ninetieth (90th) day after the date on which Tenant does not operate or cause to be operated any retail business in the Premises (other than prior to the Rent Commencement Date or during Excused Periods), whereupon this Lease shall terminate upon the one

7

DocuSign Envelope ID: 6849FA55-D4BD-494B-994B-418DB327D5D2
DocuSign Envelope ID: 920D8CEE-CEFC-4AED-ADD9-43DB9DD00BF3

hundred twentieth (120th) day (the "***Recapture Date***") after the date on which Tenant receives Landlord's termination notice, as if the Recapture Date was originally set forth herein as the expiration date of the Term.  Upon such termination, Landlord and Tenant shall each be released from any and all liabilities thereafter accruing hereunder, except for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease. Notwithstanding the foregoing, Tenant shall have the right to avoid Landlord's termination notice by operating a retail business in the Premises within ninety (90) days after receiving Landlord's termination notice, whereupon Landlord's termination notice shall be rendered null and void, and Landlord shall have no right to recapture the Premises pursuant to the foregoing.  All Rent payable by Tenant hereunder shall be apportioned as of the Recapture Date and Tenant shall promptly pay to Landlord any amounts so determined to be due and owing by Tenant to Landlord, and conversely Landlord shall promptly reimburse Tenant for any amounts prepaid by Tenant for periods subsequent to the Recapture Date."

5.  Section 15.1 of the Lease is hereby deleted in its entirety and replaced with the following:

"15.1.1  Tenant shall have the right from time to time, without the consent of Landlord, to assign Tenant's interest in this Lease and/or to sublet, concession or license all or any portion of the Premises, subject to all of the terms and conditions of this Lease.

15.1.2   Except with respect to any transaction covered under Subsection 15.1.3 or Section 15.3 below, in the event Tenant proposes to assign this Lease or sublet, in a single transaction, more than fifty percent (50%) of the Premises, it shall first give notice thereof (the "***Assignment/Subletting Notice***") to Landlord, which notice shall specify the name and address of the proposed assignee or sublessee and the proposed use of the Premises to be made by such assignee or sublessee.  Thereafter, Landlord shall have the option to terminate this Lease, which option shall be exercisable by giving notice to Tenant (the "***Termination Notice***") thereof within fifteen (15) days after receipt of an Assignment/Subletting Notice from Tenant,  in which event this Lease shall automatically terminate on the ninetieth (90th) day (the "***Termination Date***") after the date on which Tenant receives Landlord's Termination Notice, with the same force and effect as if the Termination Date had been designated as the expiration date of this Lease. Upon the Termination Date, Landlord and Tenant shall each be released from any and all liabilities thereafter accruing hereunder, except for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease. All Rent payable by Tenant hereunder shall be apportioned as of the Termination Date and Tenant shall promptly pay to Landlord any amounts so determined to be due and owing by Tenant to Landlord, and conversely Landlord shall promptly reimburse Tenant for any amounts prepaid by Tenant for periods subsequent to the Termination Date. Notwithstanding the foregoing, Tenant shall have the right to avoid Landlord's termination by giving notice to Landlord (the "***Rescission Notice***"), within ten (10) days after receiving the Termination Notice, of its rescission of the Assignment/Subletting Notice, whereupon Landlord's Termination Notice shall be rendered null and void, and Tenant shall not assign this Lease or sublet more than fifty percent (50%) of the Premises

8

as proposed in its Assignment/Subletting Notice. If Landlord does not give the Termination Notice within the aforesaid 15-day period, Landlord shall conclusively be deemed to have waived its termination rights hereunder with respect to such proposed assignment or subletting transaction, and Tenant may assign this Lease or sublet the Premises in accordance with its Assignment/Subletting Notice. If Landlord terminates the Lease hereunder, then, for a period of two (2) years after the Termination Date, Landlord shall not lease, rent or occupy or permit the Premises or any portion thereof to be occupied as a store which operates primarily as a home furnishings, linens and/or domestics store; the foregoing shall survive the termination of this Lease.

15.1.3  In addition to, and not in limitation of, Tenant's other rights set forth in this Section 15.1, Tenant shall have the right from time to time, without the consent of Landlord, to assign Tenant's interest in this Lease and/or to sublet or license all or any portion of the Premises:  (a) to an Affiliate of Tenant;  (b) to any entity which purchases all or substantially all of the assets of Tenant or any of its Affiliates;  (c) to any entity which purchases Tenant's interest in substantially all of the stores in the United States then operating under the 'Bed Bath & Beyond' trade name; and/or (d) in conjunction with any merger, acquisition, consolidation or public offering of stock or other interests involving Tenant or its Affiliate(s), so long as the Premises (immediately after the transaction) is owned in common with substantially all of the stores in the United States which (immediately prior to the transaction) had been operating under the 'Bed Bath & Beyond' trade name."

6.  The text of Article 22 of the Lease is hereby deleted in its entirety and replaced with the following:

"If, at any time during the Term of this Lease, less than seventy percent (70%) of the Shopping Center (excluding the Premises and any premises occupied by an Affiliate of Tenant from the numerator and denominator) is leased to Qualifying Occupants of the type commonly found in first class shopping centers in the State of Ohio (such condition being hereinafter referred to as an "*Excess Vacancy*"), then in such event Tenant shall have the right to: (i) pay Alternate Rent in lieu of Fixed Rent and Additional Rent during the period of such Excess Vacancy, and (ii) if the Excess Vacancy continues for a period in excess of three hundred sixty-five (365) continuous days, to terminate this Lease upon at least thirty (30) days prior notice given to Landlord, in which event this Lease shall terminate on the date set forth in Tenant's notice of termination without further liability on the part of either Landlord or Tenant, <u>except</u> as set forth in Section 23.3 below. A "Qualifying Occupant" means retailers, restaurants, financial institutions operating for walk-in customers (such as branches of banks, savings and loans, and credit unions); but excludes the following (except to the extent expressly provided below): (a) office uses, insurance companies, travel agents, brokerage firms, medical clinics and other similar service businesses ("Service Tenants"), provided, however, Service Tenants occupying, in the aggregate, up to ten percent (10%) of the Floor Area of the Shopping Center shall be counted as Qualifying Occupants; (b) health clubs, health spas, fitness centers, yoga or pilates centers, weight rooms, gymnasiums or the like shall be Qualifying Occupants up

9

DocuSign Envelope ID: 6849FA55-D4BD-494B-994B-418DB327D5D2
DocuSign Envelope ID: 920D8CEE-CBE5-4DBB-9FD1-B46AE91B9B88

to a collective maximum of 11,500 square feet of Floor Area; and (c) salons (or other business) that provides hair treatments (haircuts, hair coloring, permanents, etc.), manicures, facials, massages or similar services shall be Qualifying Occupants up to a collective maximum of 8,000 square feet of Floor Area. [Cosmetics retail stores such as ULTA, Sephora, Blue Mercury or other similar types of cosmetics oriented retail tenants shall not be considered to be salons or subject to the limit, even if they provide hair treatments (haircuts, hair coloring, permanents, etc.), manicures, facials, massages or similar service) within their premises.]"

7.    Article 22 of the Lease (as modified in Section 6 above) is hereby suspended for the period commencing on April 1, 2020 and ending on the earlier of the expiration of the Term and December 31, 2021.

8.    All black-out dates set forth in Section 5.2 of the Lease with respect to construction, repairs, replacements or maintenance to any portion of the Shopping Center shall be suspended through the earlier of the expiration of the Term and December 31, 2021 provided no construction, repairs, replacements or maintenance shall materially interfere with the normal conduct of Tenant's business operations at the Premises.

9.    Notwithstanding anything in the Lease to the contrary, Tenant hereby consents to (a) Landlord redeveloping the portion of the Shopping Center generally located between the buildings labelled "PF Changs" and "J. Alexander's" on Exhibit B of the Lease (attached hereto), including without limitation staging areas ancillary to such redevelopment, which may include the addition of up to six thousand three hundred (6,300) square feet of Floor Area; and/or (b) the addition of up to two thousand five hundred (2,500) square feet of Floor Area on the rear elevation of the premises identified on Exhibit B of the Lease as "Wild Oats" (the work described in (a) and (b) is collectively, the *"Redevelopment Work"*) subject to the following: (i) there shall be no changes to the No Change Area and (ii) Landlord shall perform the Redevelopment Work in compliance with all requirements under the Lease, including, but not limited to, Section 5.2 (as amended hereby). Landlord shall provide Tenant with at least thirty (30) days' prior notice of the commencement of the Redevelopment Work. Upon Landlord commencing the Redevelopment Work, Landlord shall diligently and in good faith proceed with and complete such work. Except as expressly provided herein, nothing herein shall be deemed a waiver of any restrictions, terms or conditions governing any construction at or alterations to the Shopping Center.

10. Attached Exhibit B is agreed, acknowledged and confirmed to be 'Exhibit B' (Site Plan) of the Lease.

11. Subject to applicable Legal Requirements (defined hereafter) and other tenants' leases in the Shopping Center as of the Modification Date (each a *"Current Tenant"*), Landlord hereby consents to Tenant: (a) using no more than four (4) parking stalls in the area outlined in red on Exhibit B-1 attached hereto for pickup for Tenant's customers (*"Pickup Area"*); and (b) installing signs designating the Pickup Area (*"Pickup Signs"*) which signs shall be substantially similar to the signage depicted on Exhibit B-2 attached hereto. In the event that Tenant's use of

10

DocuSign Envelope ID: 6B49FA55-D4BD-494B-994B-418DB327D5D2
DocuSign Envelope ID: 920D8CEE-CBC7-486F-A9EC-DD3FE4C69986

the Pickup Area and/or the installation of the Pickup Signs violates a Current Tenant's lease and Landlord is advised of such violation by the applicable Current Tenant, then Landlord shall use commercially reasonable efforts to obtain such Current Tenant's consent to same. In the event Landlord is unable to obtain such consent after using such commercially reasonable efforts, then Tenant shall promptly discontinue its use of the Pickup Area and/or remove any Pickup Signs, as applicable. So long as Tenant has the right to use the Pickup Area and install the Pickup Signs as described herein, Landlord may permit similar signage in other areas of the Common Areas for use by other Shopping Center tenants; provided, however, during the remainder of the Term, the Pickup Area shall be, at all times, at least as large as the pickup area of any other tenant (other than a grocery store or supermarket). Landlord shall have no obligation to monitor or enforce short-term or pickup parking or parking for particular tenants in such spaces.

12. The following shall be added to the end of Section 5.2.7 of the Lease:

"Notwithstanding the foregoing, Landlord may use the portion of the Shopping Center identified on Exhibit B-3 as "Landlord Event Area" for retail sales or promotional purposes of the type commonly conducted in first class shopping centers in the State of Ohio as more particularly described hereafter. Landlord will provide written notice to Tenant at least two (2) weeks before the occurrence of any such event, and Tenant may elect to participate in, or provide sponsorship for, the event to the extent reasonably within the control of Landlord. Landlord may allow no more than twelve (12) of the aforesaid events in any ten (10) month period from January through October, no such event shall be held in November or December and no single event may last longer than two (2) consecutive days.

In addition, Landlord or a grocery store or supermarket tenant which operates in any part of the premises identified on Exhibit B as "Wild Oats" (*"Supermarket Tenant"*) shall each have the right to use the portion of the Shopping Center identified on Exhibit B-3 as "NCA Event Area" for the following: (a) farmers markets, charitable events, and/or other festivals and events sponsored (such as, without limitation, health fairs and customer appreciation events) of the type commonly conducted in first class shopping centers in the State of Ohio, and (b) a customer experience and delivery vehicle to host customer entertainment and sales events of the type commonly conducted in first class shopping centers in the State of Ohio. (For avoidance of doubt: the Supermarket Tenant might further operate in or occupy additional premises areas adjacent to the premises identified on Exhibit B as "Wild Oats".) Landlord and Supermarket Tenant, as applicable, may have no more than twelve (12) events, in the aggregate, in any ten (10) month period from January through October, no such event shall be held in November or December, and no single event may last longer than two (2) consecutive days. Supermarket Tenant also shall have the right from time to time to park a food and beverage truck in the NCA Event Area of a type commonly conducted in first class shopping centers in the State of Ohio and to sell food and beverages (including, without limitation, tacos and barbecue) out of such truck.

> For the avoidance of doubt, an event that occurs over a period of two (2) consecutive days will be considered a single event for the purpose of this limitation. Events permitted pursuant to the foregoing may include temporary booths or kiosks, notwithstanding Section 5.2.2(iii)."

13. Landlord shall not reveal to anyone, or otherwise make or publish any public statement or notice regarding the economic or other business terms of this Second Modification, except as required by applicable laws, rules, regulations, ordinances and orders (***"Legal Requirements"***); or for disclosure to Landlord's accountants, agents, attorneys, bona fide prospective purchasers, or current or prospective mortgagees, provided that each of such recipients shall be bound to the same non-disclosure provisions contained herein as are imposed upon Landlord. Tenant shall not reveal to anyone, or otherwise make or publish any public statement or notice regarding the economic or other business terms of this Second Modification, except as required by applicable Legal Requirements; or for disclosure to Tenant's accountants, agents, attorneys, bona fide prospective purchasers, or current or prospective mortgagees, provided that each of such recipients shall be bound to the same non-disclosure provisions contained herein as are imposed upon Tenant.

DocuSign Envelope ID: 6849FA55-D4BD-494B-994B-418DB327D5D2
DocuSign Envelope ID: 920D8CEE-CBFD-4B47-A41B-C0A30F4533CF

# EXHIBIT B

## (Site Plan)



13

DocuSign Envelope ID: 6849FA55-D4BD-494B-994B-4180B327D5D2
DocuSign Envelope ID: 920D8CEE-CB7A-4BA0-B1FC-7265F56A30F8

## EXHIBIT B-1

### (Pickup Area)



14

## EXHIBIT B-2



DocuSign Envelope ID: 6849FA55 D4BD 484B 994B 418DB327D5D2
DocuSign Envelope ID: 920D8CEE CB

Case 23-13359-VFP Doc 1520-1 Filed 07/25/23 Entered 07/25/23 17:07:20 Desc
Exhibit Declaration of Chris Buchtien Page 123 of 124

## EXHIBIT B-3



## **Exhibit B**

West Elm Lease

## **FILED UNDER SEAL**