Robert L. LeHane, Esq.
Jennifer Raviele, Esq. (*pro hac vice* pending)
Ravi Vohra, Esq.
**KELLEY DRYE & WARREN LLP**
3 World Trade Center
175 Greenwich Street
New York, NY 10007
Tel:  (212) 808-7800
Fax: (212) 808-7897
Email: rlehane@kelleydrye.com
        jraviele@kelleydrye.com
        rvohra@kelleydrye.com

-and-

One Jefferson Road
Parsippany, NJ 07054
Tel: 973-503-5900

*Counsel for Daly City Serramonte Center, LLC*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

-------------------------------------------------------------x
| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| BED BATH & BEYOND, INC., *et al.,* | : | Case No. 23-13359 (VFP) |
| | : | |
| Debtors | : | (Jointly Administered) |

-------------------------------------------------------------x

## DECLARATION OF ERNST A. BELL IN SUPPORT OF OBJECTION OF DALY CITY SERRAMONTE CENTER, LLC TO DEBTORS' MOTION FOR ORDER AUTHORIZING DEBTORS TO ASSUME AND ASSIGN LEASE FOR STORE NO. 301

I, Ernst A. Bell, declare the following:

**A.** **Background**

1.      I am Vice President, Associate General Counsel for Regency Centers L.P.

("Regency")  Regency is the owner of Daly City Serramonte Center, LLC (the "Landlord"), the

landlord for the leased premises commonly located at 149 Serramonte Center #150, Daly City,

California 94015 (the "Leased Premises") in the shopping center known as Serramonte Center

(the "Shopping Center"), designated by the above-captioned debtors (the "Debtors") as Store No. 3108.

2.    I received a B.A. in Political Science from the University of Florida in 1992 and a J.D. from the University of Florida College of Law in 1995.  I have been employed at Regency since 2009 and have over 14 years of combined experience in real estate and retail. In connection with my role as Vice President, Associate General Counsel, I manage a team of attorneys and paralegals responsible for all Regency litigation, including landlord-tenant matters, bankruptcies, construction issues, and business disputes.

3.    In connection with my role, I am also one of the custodians of records of the Landlord's books, records, and files that relate to the use and occupancy of retail premises at the Shopping Center.  I am personally familiar with the (i) Shopping Center; (ii) Leased Premises; (iii) BBBY Lease (defined below); and (iv) the Ross Lease (defined below).  If called upon to testify in this proceeding as to the matters set forth in this declaration, I could and would competently testify thereto, since the facts set forth herein are personally known to me to be true.

### B.  The Shopping Center & the BBBY Lease

4.    Serramonte Center is a highly trafficked shopping center with over 1 million square feet of floor area.  Serramonte Center has over 100 retail stores and restaurants, including well-known names such as Macy's, Crunch Fitness, TJ Maxx, Party City, Nordstrom Rack, Target, and Buffalo Wild Wings.  The Shopping Center is maintained and managed as a first-class shopping center comparable to other first-class shopping centers in California.[1]

---

[1]    BBBY Lease, § 13.1.2.

5.      Debtor Bed Bath & Beyond, Inc. is the tenant of the Leased Premises pursuant to that certain written lease, dated May 18, 2015 (the "BBBY Lease").[2]  The BBBY Lease is currently set to expire on January 31, 2028, subject to options to extend the term in favor of Tenant.

6.      The tenant must use the Leased Premises in accordance with the Permitted Uses (as defined in the BBBY Lease) as laid out in Section 1.1.25 of the BBBY Lease.  The tenant and Landlord also agreed not to use the Leased Premises in contravention of Section 13.1.1.  In exchange, the Landlord granted the tenant exclusive rights to operate within the Shopping Center as more fully described in Section 13.2 of the BBBY Lease.

7.      On June 30, 2023, the Debtors filed their *Notice of Assumption of Certain Unexpired Leases*, illustrating, *inter alia*, their intent to assume and assign the BBBY Lease (the "Proposed Assignment") to Burlington Coat Factory Warehouse Corporation ("Burlington").[3]

## C. **Burlington and Exclusive Use**

8.      On or about February 1, 2016, the Landlord and Ross Dress for Less, Inc. ("Ross") entered into a written Lease Agreement for approximately 27,178 square feet of retail premises located in Serramonte Center (the "Ross Lease").[4]

9.      The Ross Lease, at section 15.3(a), provides that, without the prior written consent of Ross, Landlord shall not lease space to nor allow any other tenant in the Southwest

---

[2]      A true and correct copy of the BBBY Lease and the amendments and modifications are attached hereto as **Exhibit A**.

[3]      Docket No. 1157.

[4]      A true and correct copy of the Ross Lease is attached hereto as **Exhibit B**.

Quadrant to use more than 15,000 square feet for the primary purpose of the off price sale of merchandise. The Ross Lease further lists Burlington as an example of an off price sale retailer.

10.    Section 15.3(b) of the Ross Lease provides explicit tenant remedies in the event Landlord violates Ross's exclusivity provision, which include, but are not limited to, the right to terminate the Ross Lease or to pay Substitute Rent (as defined in the Ross Lease).

11.    As reflected in the Ross Lease, Ross believes Burlington is a direct competitor. Moreover, upon information and belief, Burlington proposes to use the Leased Premises for the purposes of selling off price merchandise.

12.    Based on the above, the Proposed Assignment, if approved, would violate Section 15.3(a) of the Ross Lease, which would entitle Ross to terminate the Ross Lease or pay the Landlord Substitute Rent, causing the Landlord significant financial harm.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: Jacksonville, FL
        July 26, 2023

Ernst A. Bell

## Exhibit A

BBBY Lease

# LEASE AGREEMENT

Between

## DALY CITY SERRAMONTE CENTER, LLC,
## A DELAWARE LIMITED LIABILITY COMPANY

Landlord

and

## BED BATH & BEYOND INC.,
## a New York corporation,

Tenant

## SERRAMONTE CENTER
## DALY CITY, CALIFORNIA

Dated as of: May 18 , 2015

\* \* \* \* \* \*

The mailing, delivery or negotiation of this Lease shall not be deemed an offer to enter into any transaction or to enter into any relationship, whether on the terms contained herein or on any other terms. This Lease shall not be binding nor shall either party have any obligations or liabilities or any rights with respect thereto, or with respect to the premises, unless and until both parties have executed and delivered this Lease. Until such execution and delivery of this Lease, either party may terminate all negotiation and discussion of the subject matter hereof, without causes and for any reason, without recourse or liability.

\* \* \* \* \* \*

1854916.2\C061858\0372671
[bbBaby]

TABLE OF CONTENTS

Page

ARTICLE 1 BASIC TERMS AND DEFINITIONS ........................................................................1
    Section 1.1        Basic Terms and Definitions ........................................................1

ARTICLE 2 LEASE OF PREMISES; LEASE TERM; DELIVERY DATE..................................4
    Section 2.1        Lease of Premises ........................................................................4
    Section 2.2        Term. .............................................................................................4
    Section 2.3        Delivery Date. ..............................................................................5
    Section 2.4        Slack Period. ................................................................................7
    Section 2.5        Initial Co-Tenancy Condition. .....................................................7
    Section 2.6        Permits Contingency ....................................................................8

ARTICLE 3 IMPROVEMENTS ....................................................................................................9
    Section 3.1        Landlord's Work and Tenant's Work ...........................................9
    Section 3.2        Plan Approvals ...........................................................................10
    Section 3.3        Performance of Work. .................................................................11
    Section 3.4        Tenant's Leasehold Improvements .............................................12
    Section 3.5        Tenant's Trailer ..........................................................................13
    Section 3.6        Tenant Allowance .......................................................................13
    Section 3.7        Measurement; Adjustment of Rent .............................................14

ARTICLE 4 FIXED RENT, PERCENTAGE RENT AND TAXES: DETERMINATION AND
                        PAYMENT...................................................................................14
    Section 4.1        Fixed Rent ..................................................................................14
    Section 4.2        Payment of Rent .........................................................................14
    Section 4.3        Real Estate and Other Taxes. .....................................................14
    Section 4.4        Percentage Rent ..........................................................................15

ARTICLE 5 COMMON AREAS, THEIR USE AND CHARGES ...............................................16
    Section 5.1        Common Areas: Maintenance. ....................................................16
    Section 5.2        Common Areas: Restrictions. .....................................................17

ARTICLE 6 UTILITIES...............................................................................................................20
    Section 6.1        Utility Service .............................................................................20
    Section 6.2        Interruption .................................................................................20

ARTICLE 7 SIGNS  21
    Section 7.1        Tenant's Building Signage ..........................................................21
    Section 7.2        Pylon/Monument Signage ..........................................................21
    Section 7.3        Signage: Alteration/Removal/Allocation ...................................21
    Section 7.4        Cooperation ................................................................................21
    Section 7.5        Signage and Building Restrictions .............................................22

ARTICLE 8 ALTERATIONS AND IMPROVEMENTS ...........................................................22
    Section 8.1        Alterations and Improvements. ...................................................22

ARTICLE 9 REPAIRS .................................................................................................................24
    Section 9.1        Tenant's Repairs. ........................................................................24
    Section 9.2        Landlord's Repairs. ....................................................................24
    Section 9.3        Legal Compliance Work .............................................................25

ARTICLE 10 INDEMNIFICATION, INSURANCE AND WAIVER OF SUBROGATION .....25
    Section 10.1      Mutual Release, Waiver of Subrogation and Mutual Indemnification. .....25
    Section 10.2      Tenant's Insurance. .....................................................................26
    Section 10.3      Landlord's Insurance...................................................................26
    Section 10.4      General Insurance Requirements. ...............................................27

ARTICLE 11 FIRE AND OTHER CASUALTY; EMINENT DOMAIN ..................................27
    Section 11.1      Fire and Other Casualty..............................................................27
    Section 11.2      Eminent Domain. ........................................................................29
    Section 11.3      Abatement of Rent Charges ........................................................30

i

ARTICLE 12 COVENANTS, REPRESENTATIONS AND WARRANTIES ...........................30
    Section 12.1        Quiet Enjoyment ....................................................................30
    Section 12.2        Authority ...............................................................................30
    Section 12.3        Landlord's Covenants, Warranties and Representations.............31
    Section 12.4        Environmental Matters. ..........................................................32

ARTICLE 13 USES AND RESTRICTIONS..................................................................33
    Section 13.1        Permitted and Prohibited Uses. ...............................................33
    Section 13.2        Tenant's Exclusive in Center ....................................................34
    Section 13.3        Exclusives Which Tenant Must Honor. .......................................35

ARTICLE 14 CONDUCT OF BUSINESS OPERATIONS ...........................................35

ARTICLE 15 TENANT ASSIGNMENT AND SUBLETTING........................................36
    Section 15.1        Assignment and Subletting.......................................................36
    Section 15.2        Liability of Tenant...................................................................37
    Section 15.3        Collateral Assignment .............................................................37
    Section 15.4        Cure Rights of Original Tenant. ...............................................37
    Section 15.5        Recognition Agreement............................................................38

ARTICLE 16 DEFAULT AND DISPUTE RESOLUTION ...........................................38
    Section 16.1        Tenant Default.........................................................................38
    Section 16.2        Landlord Default .....................................................................39
    Section 16.3        Arbitration...............................................................................40

ARTICLE 17 RIGHT TO MORTGAGE AND NON-DISTURBANCE; ESTOPPEL
                    CERTIFICATE ..........................................................................40
    Section 17.1        Right to Mortgage and Non-Disturbance ...................................40
    Section 17.2        Estoppel Certificate .................................................................40
    Section 17.3        Mortgages and Ground Leases .................................................41

ARTICLE 18 NOTICE..............................................................................................41

ARTICLE 19 TENANT'S PROPERTY .......................................................................41

ARTICLE 20 END OF TERM ...................................................................................41
    Section 20.1        Surrender of Premises .............................................................41
    Section 20.2        Hold Over ...............................................................................41

ARTICLE 21 [INTENTIONALLY DELETED].............................................................42

ARTICLE 22 ONGOING CO-TENANCY ...................................................................42

ARTICLE 23 MISCELLANEOUS ...............................................................................42
    Section 23.1        Loading Facilities....................................................................42
    Section 23.2        Liens .......................................................................................42
    Section 23.3        Broker's Commission...............................................................42
    Section 23.4        Force Majeure .........................................................................43
    Section 23.5        Consents .................................................................................43
    Section 23.6        Costs.......................................................................................43
    Section 23.7        Attorneys' Fees ......................................................................43
    Section 23.8        Survival of Obligations ............................................................43
    Section 23.9        Non-Waiver..............................................................................43
    Section 23.10       Rights Cumulative ...................................................................43
    Section 23.11       Definition of Landlord .............................................................44
    Section 23.12       Successors and Assigns ..........................................................44
    Section 23.13       Limitation of Landlord's Liability ..............................................44
    Section 23.14       Limitation of Tenant's Liability .................................................44
    Section 23.15       Joint and Several Liability ........................................................44
    Section 23.16       Severability..............................................................................44
    Section 23.17       Grammatical Usages and Construction ......................................44
    Section 23.18       Table of Contents, Line Numbering and Paragraph Headings....44
    Section 23.19       Definition of Hereunder, Herein, etc........................................44
    Section 23.20       Short Form Lease ....................................................................45

Section 23.21    Entire Agreement and Modification....................................................45
Section 23.22    No Joint Venture or Partnership Created by Lease ......................................45
Section 23.23    Tenant's Tradename ....................................................................45
Section 23.24    Counterparts ..........................................................................45
Section 23.25    Waiver of Trial by Jury ................................................................45
Section 23.26    Ethical Conduct Policy ................................................................45
Section 23.27    Confidentiality........................................................................45
Section 23.28    Timely Billing of Charges..............................................................46
Section 23.29    USA Patriot Act .......................................................................46
Section 23.30    CASP Inspection Civil Code Section 1938................................................46
Section 23.31    Governing Law..........................................................................47

1854916.2\C061858\0372671
[bbBaby]

EXHIBITS

| | |
|---|---|
| Exhibit A | Legal Description of Shopping Center |
| Exhibit B | Site Plan |
| Exhibit C | Form of Rent Commencement and Expiration Date Agreement |
| Exhibit D | Specifications for Landlord's Work |
| Exhibit D-1 | Exterior Elevations of the Premises, and Sidewalk Plan |
| Exhibit E | Permitted Encumbrances |
| Exhibit F | Signage |
| Exhibit G | Form of Subordination, Non-Disturbance and Attornment Agreement |
| Exhibit H | Form of Subtenant Recognition Agreement |
| Exhibit I | Form of Delivery Date Notice |
| Exhibit J | Form of Delivery Date Certification |
| Exhibit K-1 | Existing Exclusives |
| Exhibit K-2 | Existing Leases |
| Exhibit L | Prohibited Uses |
| Exhibit M | Form of Mechanics' Lien Indemnification Agreement |
| Exhibit N | Existing Lease Limitations |

LEASE AGREEMENT

THIS LEASE AGREEMENT ("*Lease*") is entered into as of *May 18* , 2015 by and between DALY CITY SERRAMONTE CENTER, LLC, a Delaware limited liability company, having an office at 3 Serramonte Center, Daly City, California 94015 ("*Landlord*"), and BED BATH & BEYOND INC., a New York corporation, having an office at 650 Liberty Avenue, Union, New Jersey 07083 ("*Tenant*").

W I T N E S S E T H:

ARTICLE 1
BASIC TERMS AND DEFINITIONS

Section 1.1    Basic Terms and Definitions.  The following terms shall have the meanings set forth in this Section 1.1 except as otherwise expressly provided herein.

1.1.1    Additional Rent:  Any monies which Tenant is required to pay to Landlord under the terms and conditions of this Lease, other than Fixed Rent.

1.1.2    Affiliate:  A corporation, partnership, limited liability company, person or other entity which is controlling, controlled by, or under common control with, Landlord or Tenant, as the case may be.  As used herein, "*control*" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person or entity, whether through the ownership of voting securities or rights, by contract, or otherwise.

1.1.1    Alternate Rent:  Fifty percent (50%) of the amount of Fixed Rent which otherwise would have been payable under the Lease during the applicable period, it being agreed that Tenant shall pay any Additional Rent due and payable under the Lease during such period.

1.1.3    Common Areas:  All areas in the Shopping Center which are, from time to time, available for the joint use and benefit of Tenant and other tenants and occupants of the Shopping Center, and their respective employees, agents, subtenants, concessionaires, licensees, customers and other invitees, including, but not limited to, any and all parking areas, parking spaces, driveways, truck serviceways, passageways, sidewalks, entrances, exits, lighting facilities, courts, landscaped areas, retention or detention areas, fencing, directional or safety signs, and utility lines serving such common areas and facilities.

1.1.4    Common Areas Charges:  As defined in Section 5.1 hereof.

1.1.5    Delivery Date: As defined in Section 2.3 hereof.

1.1.6    Effective Date: The date hereof.

1.1.7    Event of Default:  As defined in Section 16.1 hereof.

1.1.8    Excused Periods:  Periods during which Tenant's failure to conduct the operations of its business or any other business: (x) resulted from alterations or renovations being performed in and to the Premises (not to exceed 120 days), (y) was caused by damage or destruction, eminent domain proceedings or actions, or *Force Majeure*, or (z) was caused by any act or omission of Landlord, or its employees, agents, or contractors.

1.1.9    Exhibits.  The exhibits listed in the Table of Contents annexed to this Lease have been agreed to by the parties and attached hereto, it being the intention of the parties that they shall become a binding part of this Lease as if fully set forth herein.

1.1.10    Fixed Rent:  The following amounts for the periods indicated (subject to adjustment pursuant to Section 3.4 hereof):

(a)    For the period commencing on the Rent Commencement Date and ending on the first January 31 occurring after the fifth (5th) anniversary of the Rent Commencement Date, at the rate of Five Hundred Four Thousand Seven Hundred Fifty Eight and 00/100 ($504,758.00) Dollars per year [based on Twenty Three and 00/100 ($23.00) Dollars per square foot of Floor Area in the Premises];

1             (b)    For the period commencing on the first February 1 occurring after
2 the fifth (5ᵗʰ) anniversary of the Rent Commencement Date and ending on the last day of the
3 "Initial Term" (defined in Subsection 1.1.41 below), at the rate of Five Hundred Fifty Five
4 Thousand Two Hundred Thirty Three and 80/100 ($555,233.80) Dollars per year [based on
5 Twenty Five and 30/100 ($25.30) Dollars per square foot of Floor Area in the Premises];

6             (c)    In the event Tenant exercises the first Renewal Option, for the
7 first five (5) year Renewal Period, at the rate of Six Hundred Ten Thousand Seven Hundred Fifty
8 Seven and 18/100 ($610,757.18) Dollars per year [based on Twenty Seven and 83/100 ($27.83)
9 Dollars per square foot of Floor Area in the Premises]; and

10             (d)    In the event Tenant exercises the second Renewal Option, for the
11 second five (5) year Renewal Period, at the rate of Six Hundred Eighty Three Thousand Eight
12 Hundred Thirty Seven and 36/100 ($683,837.36) Dollars per year [based on Thirty One and
13 16/100 ($31.16) Dollars per square foot of Floor Area in the Premises].

14         1.1.11   Floor Area: The actual number of square feet of space contained on all
15 floors within any building area in the Shopping Center (including the Premises). All
16 measurements pursuant to this Section shall be from the exterior of outside walls, doors,
17 windows or store front and/or to the centerline of any common walls, but in no event shall Floor
18 Area within either the Premises or the remainder of the Shopping Center include any non-selling
19 or storage space areas within any mezzanine, lower floor or second floor.

20         1.1.12   Force Majeure: As defined in Section 23.4 hereof.

21         1.1.13   Ground Lessor: The landlord under any existing or future ground or
22 underlying leases encumbering or affecting all or any part of the Shopping Center.

23         1.1.14   [Intentionally Deleted].

24         1.1.15   Hazardous Substances: As defined in Subsection 12.4.1 hereof.

25         1.1.16   [Intentionally Deleted].

26         1.1.17   Landlord: As defined in the preamble and Section 23.11 hereof

27         1.1.18   Landlord's Mailing Address: 1600 Northeast Miami Gardens Drive,
28 North Miami Beach, FL 33179, Attn: Legal Department, with a copy to: 3 Serramonte Center,
29 Daly City, CA 94015, Attn: Property Management, or such other place and/or to the attention of
30 such other person as Landlord may notify Tenant from time to time by notice given in
31 accordance with the provisions of Article 18 hereof. If the "Landlord" consists of more than one
32 person, then notices given to the entity listed in Landlord's Mailing Address will be deemed to
33 have been given automatically to all of the parties which constitute Landlord, and Tenant shall be
34 entitled to rely exclusively on any notice sent by said entity. Landlord's Address for the
35 Payment of Rent shall be: Daly City Serramonte Center, LLC, Dept. 3319, Los Angeles, CA
36 90084-3319.

37         1.1.19   Landlord's Work: As defined in Section 3.1 hereof.

38         1.1.20   Lease Interest Rate: The then effective prime rate as published from time
39 to time in the "Money Rates" section of The Wall Street Journal (or any successor publication
40 thereto) plus two (2%) percent.

41         1.1.21   Legal Requirements: All laws, statutes, codes, acts, ordinances,
42 judgments, decrees, authorizations, directions and requirements of, and agreements with, all
43 governmental departments, commissions, boards, courts, authorities, agencies, officials and
44 officers, which now or at any time hereafter may be applicable to the Premises, the Shopping
45 Center, or any part(s) thereof, including, without limitation, the American with Disabilities Act
46 and federal, state, and local governmental interpretations thereof.

47         1.1.22   Mortgagee: Any lender, which is not an Affiliate of Landlord, and which
48 holds a mortgage on the Shopping Center or is the beneficiary under a deed of trust encumbering
49 the Shopping Center.

2

1854916.2\C061858\0372671
[bbBaby]

1.1.23 [Intentionally Deleted]

1.1.24 Pad: A compacted graded building pad as more particularly set forth in Exhibit D attached hereto.

1.1.25 Permitted Use: the sale (including the incidental rental), at retail of infant, juvenile and children's goods and services, including, but not limited to, a variety (in Tenant's sole discretion as to the mix and proportions) of the following: infant's, juvenile's and children's furniture, furnishings, beds (including, without limitation, mattresses and bedding), changing tables, gliders and rockers (including coordinating ottomans), high chairs, lamps, walkers, play yards, swings, car seats, booster seats, carriages, strollers, cradles, playpens, cribs, toy or clothing chests, stuffed animals, games and toys, bedding accessories, maternity clothing and related items, clothing and accessories for infants, juveniles or children, apparel, layettes, shoes, toys, bottles, food or formula for infants, juveniles and children, feeding items, safety items, nursing items, health and beauty care items, food and beverages, drug remedies, diapers, wipes, bathroom and personal care devices and items, indoor or outdoor play and recreational equipment, pacifiers, baby safety items, diaper bags, nursing and bathing items, children's books, pregnancy books, magazines, computer software, audio and video cassettes or tapes, picture frames, portrait studio items and services, party supplies, invitations, greeting cards, gift items, arts and crafts, stationery, teachers' and parents' resources, other educational and multi-media children's items, hair cutting services, fitness center development and learning services, and any and all other items sold or services provided from time to time in any store owned or operated by Tenant or its Affiliate(s) (the aforementioned items are hereinafter collectively referred to as the "*Permitted Items*"); and for any other lawful retail use not specifically prohibited by the provisions of Subsection 13.1.1 below and provided that such other lawful retail use is consistent with the then existing character and quality of the Shopping Center. In addition, Tenant shall be permitted to use portions of the Premises for storage and office uses incidental to the Permitted Use.

1.1.26 Premises: Being the area cross-hatched on Exhibit B hereto, having dimensions as shown on Exhibit B and containing approximately Twenty One Thousand Nine Hundred Forty Six (21,946) square feet of Floor Area, subject to adjustment in accordance with the provisions of Section 3.4 below. In no event shall the building constructed by Tenant contain more than 23,000 square feet of Floor Area (excluding any mezzanine space). Tenant shall have the right, but not the obligation, to construct in the Premises a mezzanine level space containing no more than 1,000 square feet for office purposes. In no event shall Tenant be required to pay Rent on such non-selling mezzanine space, if any.

1.1.27 Renewal Option: As defined in Section 2.2.2 hereof.

1.1.28 Renewal Period(s): Two (2) successive periods of five (5) years each, as provided in Section 2.2.2 hereof.

1.1.29 Rent: Fixed Rent and/or Additional Rent.

1.1.30 Rent Commencement Date: As defined in Section 2.2 hereof.

1.1.31 [Intentionally Deleted].

1.1.32 Shopping Center: The shopping center commonly known as Serramonte Center, containing approximately 883,026 square feet of Floor Area as of the date hereof, on the property located at the intersection of Serramonte Boulevard, Callan Boulevard and Interstate 280 in Daly City, California and more particularly described in Exhibit A hereto. If Landlord elects to change the name of the Shopping Center, Landlord shall provide Tenant with at least thirty (30) days prior written notice thereof. For purposes of this Lease, the Shopping Center consists of (i) the enclosed interior mall (the "*Enclosed Mall*"), (ii) the departments stores adjacent to the Enclosed Mall and (iii) the Southwest Quadrant. As used herein, the "*Southwest Quadrant*" shall mean the area delineated on Exhibit B.

1.1.33 Substantially Completed or Substantial Completion: The completion of specified work at the Shopping Center (including, without limitation, as applicable, Landlord's Work or Tenant's Work) to the extent that only "Punch List Items" of such work (defined in Subsection 3.3.3 below) shall not be completed.

3

1    1.1.34 <mark>Taxes:</mark>  As defined in Section 4.3.3 hereof.

2    1.1.35 Tenant:  As defined in the preamble hereof.

3    1.1.36 Tenant's Mailing Address:  650 Liberty Avenue, Union, New Jersey
4    07083, Attn:  Mr. Warren Eisenberg, or such other place and/or to the attention of such other
5    person as Tenant may notify Landlord from time to time by notice given in accordance with the
6    provisions of Article 18 hereof.

7    1.1.37 Tenant's Permits:  As defined in Section 2.3.1(b) hereof.

8    1.1.38 Tenant's Property:  All of Tenant's personal property, including, without
9    limitation, phone and alarm systems, satellite antennae, shelving, computers, furniture, cash
10   registers and customer service counters, specialty lighting, track lighting, millwork, conveyor
11   systems, storage racks and signage and any and all other personal property of Tenant which is
12   capable of being removed from the Premises without material damage thereto, but which shall
13   not include electrical systems, heating, ventilation and air conditioning systems, and other
14   mechanical systems, flooring, carpet, elevators, standard lighting and wiring installed within the
15   walls of the Premises.

16   1.1.39 [Intentionally Deleted].

17   1.1.40 <mark>Tenant's Work:</mark>  As defined in Section 3.1 hereof.

18   1.1.41 Term:  A period  (the "*Initial Term*") of approximately ten (10) years
19   beginning on the Rent Commencement Date and expiring at midnight on the last day of January
20   following the tenth (10th) anniversary of the Rent Commencement Date, unless the Rent
21   Commencement Date is February 1, in which event the Expiration Date shall be the day before
22   the tenth (10th) anniversary of the Rent Commencement Date.  As used herein: (i) "*Term*" shall
23   refer to the Initial Term, as the same may be extended by any Renewal Period exercised pursuant
24   to Section 2.2.2 below; and (ii) "*Expiration Date*" shall mean the date on which the Term
25   expires.

26                                    ARTICLE 2
27              LEASE OF PREMISES; LEASE TERM; DELIVERY DATE

28   Section 2.1    Lease of Premises.  Landlord hereby leases to Tenant, and Tenant
29   hereby leases from Landlord, the Premises together with any and all rights, benefits, privileges
30   and easements, now or hereafter appurtenant to either or both of the Premises and the Shopping
31   Center, arising out of any public or private grant or authority, including, without limitation, the
32   non-exclusive right and easement to use the Common Areas in common with other tenants and
33   occupants of the Shopping Center. Landlord acknowledges that following the Effective Date,
34   Tenant intends (but shall not be obligated) to sublease the entire Premises to its wholly owned
35   subsidiary, Buy Buy Baby, Inc., a Delaware corporation ("*Baby*"), and Landlord agrees to accept
36   performance of Tenant's obligations hereunder by Baby.

37   Section 2.2    Term.

38   2.2.1    Initial Term.  Subject to the provisions of this Article 2, the Term of this
39   Lease shall begin on the one hundred eightieth (180th) day following the later of (i) the Delivery
40   Date (hereinafter defined in Section 2.3.1) or (ii) the "Permit Contingency Date" (hereinafter
41   defined in Section 2.6) (the "*Rent Commencement Date*").  The Term shall expire on the
42   Expiration Date, unless earlier terminated as herein provided.  When the Rent Commencement
43   Date has been determined, as provided in this Section, Landlord and Tenant shall execute,
44   acknowledge and deliver, each to the other, a written statement in the form attached hereto as
45   Exhibit C specifying the Rent Commencement Date, and Landlord shall deliver to Tenant a
46   completed and signed IRS Form W-9 contemporaneously therewith; the delivery of the Form W-
47   9 shall be a condition precedent to the payment of Rent.  Except as otherwise set forth in Section
48   3.2.3 below, this Lease shall be effective and in full force as of the Effective Date, and Tenant
49   shall be responsible for the performance of all terms, covenants and conditions contained in this
50   Lease to be performed during any period that the Tenant is in possession of the Premises before
51   the Rent Commencement Date save and except for the payment of any items of Rent.

4

2.2.2 **Renewal Options**. Provided no Event of Default then exists either on the date that Tenant exercises its Renewal Option or at the commencement of the applicable Renewal Period, Tenant shall have the right and option (hereinafter a *"Renewal Option"*) to extend the Initial Term from the date on which it would otherwise expire for two (2) successive renewal periods of five (5) years each (individually, a *"Renewal Period"*, and collectively, the *"Renewal Periods"*) upon the same terms and conditions as are herein set forth except that the Fixed Rent shall be as set forth in Section 1.1.10 and any rent free periods, rental concessions, inducements, allowances, Landlord Work and other similar items applicable during the Initial Term will not apply during any Renewal Period. Each Renewal Option shall be exercisable by notice given to Landlord at least one hundred eighty (180) days prior to the commencement of the applicable Renewal Period(s), provided, however, that the Term of this Lease shall not expire unless and until Tenant fails to exercise a Renewal Option within fifteen (15) days after receiving notice from Landlord that the Renewal Option in question has not been exercised (Landlord's notice shall not be given prior to the 180th day prior to the Expiration Date), or unless and until Tenant gives notice to Landlord that it will not be exercising any remaining Renewal Options. If Landlord fails to give Tenant such notice prior to the Expiration Date, and Tenant occupies the Premises after the Expiration Date, then Tenant shall remain in possession subject to the provisions of this Lease but without the application of Article 20 hereof. If Landlord then gives Tenant such notice and Tenant exercises its Renewal Option, then the effective date of such exercise shall be retroactive to the Expiration Date.

Section 2.3     Delivery Date.

2.3.1 Definition. Subject to Landlord's delivery to Tenant of the Delivery Date Notice in accordance with the provisions of Subsection 2.3.2 below and Landlord's timely compliance therewith, Landlord shall be deemed to have delivered possession of the Pad to Tenant at 8:00 a.m. on the date (the *"Delivery Date"*) following the day on which all of the following conditions (the *"Delivery Date Conditions"*) shall have occurred and Tenant shall have received from Landlord the Delivery Date Certification in accordance with the provisions of Section 2.3.3 below, which shall constitute Landlord's written certification that all of the following shall have occurred:

(a)     Actual possession of the Pad shall have been delivered to Tenant free of Hazardous Substances and with all of the Phase A Work (as depicted on Exhibit B and as defined in Exhibit D) Substantially Completed, which Substantial Completion shall be evidenced by a written certification by Landlord's architect to Tenant;

(b)     Landlord shall have obtained (and delivered copies thereof to Tenant, upon request) all site plan and land use approvals required from all applicable third parties and governmental authorities to enable Tenant to construct the improvements on the Pad and to occupy and use the Premises for the conduct of its business in the Premises, which permits and approvals shall include, without limitation, zoning and building code approvals and any environmental requirements (but exclusive of building permits which may be necessary for the performance of Tenant's Work and any business licenses and certificates of occupancy which Tenant may be required to obtain in order to open and operate its business (collectively *"Tenant's Permits"*)),

(c)     The Common Areas, and, except for the Quadrant Development Work (as hereinafter defined in Section 5.2.2 below), all of the improvements thereto shown on Exhibit B and any site work described in Exhibit D hereto, shall have been Substantially Completed and operational, it being agreed that, subject to Landlord performing any site work as set forth in Exhibit D, if the Common Areas are substantially in the same condition on the Delivery Date as they exist on the Effective Date, Landlord shall be deemed to have satisfied the requirements of this Section 2.3.1(c);

(d)     The representations and warranties of Landlord set forth in subparagraphs (a) through (j) of Section 12.3 below shall then be true and in effect;

(e)     Landlord shall have delivered to Tenant, in recordable form: (i) a subordination, non-disturbance and attornment agreement substantially in the form attached hereto as Exhibit G executed by each holder of any mortgage or deed of trust encumbering or affecting Landlord's fee interest in and to the Shopping Center or any portion thereof (it being understood and agreed that this Subsection 2.3.1(e) is not intended to extend the date by which

1854916.2\C061858\0372671
[bbBaby]

Landlord is to deliver to Tenant any document(s) required pursuant to Section 17.3 hereof), and (ii) a fee owner recognition agreement in the form and content described in clause (b) of Section 17.1 hereof executed by any existing Ground Lessor; and

(f)    Landlord shall have delivered to Tenant the written consent from Dick's and any other applicable party having consent or approval rights to permit Tenant (i) to have shopping cart corrals pursuant to Section 5.2.8(c) hereof and (ii) to have the staging areas for Tenant's Work pursuant to Section 3.3.1 and designated as "*Tenant's Staging*" on Exhibit B (it being understood and agreed that this Subsection 2.3.1 (f) is not intended to extend the date by which Landlord is to deliver to Tenant the consents required pursuant to Sections 3.3.1 and 5.2.8(c) hereof).

2.3.2    Delivery Date.

(a)    Landlord shall give Tenant at least thirty (30) days prior notice of the Delivery Date, using the form of Delivery Date Notice attached hereto as Exhibit I (the "*Delivery Date Notice*"). Landlord's delivery of the Delivery Date Notice shall be a condition precedent to the Rent Commencement Date. Notwithstanding any provision of this Lease to the contrary, in no event shall the Delivery Date be deemed to occur prior to the Delivery Date established in the Delivery Date Notice. No event of Force Majeure occurring prior to the giving of the Delivery Date Notice shall serve to delay the Delivery Date thereby established.

(b)    Landlord acknowledges that if it shall fail to satisfy all of the Delivery Date Conditions by the Delivery Date as established in the Delivery Date Notice, Tenant will sustain substantial, additional costs and expenses, including, without limitation, costs incurred in connection with contractors and subcontractors hired to perform Tenant's Work, the exact amount of which would be impracticable or extremely difficult to ascertain. If the Delivery Date does not occur by the Delivery Date as established in the Delivery Date Notice (subject to, and to the extent of, any net delays ["*Tenant Delay*"] caused by Tenant's acts or omissions and any net delays caused by *Force Majeure*, each occurring after the giving of the Delivery Date Notice), then, in lieu of any other remedies available to Tenant for monetary damages under this subparagraph (b) by reason of Landlord's failure to satisfy all of the Delivery Date Conditions by the Delivery Date as established in the Delivery Date Notice, Tenant shall be entitled to a credit against the initial installment(s) of Rent hereunder, as liquidated reimbursement (and not as a penalty) for all of the aforesaid costs incurred by Tenant, an amount equal to One Thousand Two Hundred Fifty Dollars ($1,250) for each day that the Delivery Date established in the Delivery Date Notice is delayed (the "*Liquidated Reimbursement*"). The foregoing Liquidated Reimbursement represents the parties' good faith agreement as to an agreed upon amount which shall have been incurred by Tenant and which shall otherwise not be susceptible of exact ascertainment.

(c)    Tenant shall deliver to Landlord written notice (the "*Vacate Notice*") of the date on which Tenant shall have removed all of its trucks, trailers and other construction equipment and materials from the area in which Landlord shall perform the work designated as the "Phase B Work" on Exhibit B and as defined on Exhibit B (the "*Phase B Work*"). Landlord shall complete the Phase B Work within sixty (60) days after receipt of Tenant's Vacate Notice (the "*Phase B Completion Date*"). The completion of the Phase B Work shall be subject to a "walk-through" inspection and compilation of Punch List Items as set forth in Section 3.3.3. Landlord acknowledges that if it shall fail to complete the Phase B Work by the Phase B Completion Date, Tenant will sustain substantial, additional costs and expenses, the exact amount of which would be impracticable or extremely difficult to ascertain. Tenant shall be entitled to a credit against the initial installment(s) of Rent hereunder, as liquidated reimbursement (and not as a penalty) for all of the aforesaid costs incurred by Tenant, an amount equal to One Thousand Two Hundred Fifty Dollars ($1,250) for each day that the Phase B Work is not completed by the Phase B Completion Date. The foregoing reimbursement represents the parties' good faith agreement as to an agreed upon amount which shall have been incurred by Tenant and which shall otherwise not be susceptible of exact ascertainment.

(d)    Landlord shall complete the work designated as the "Phase C Work" on Exhibit B and as defined on Exhibit D (the "*Phase C Work*") at some future date as determined by Landlord provided that until the completion of the Phase C Work, Landlord shall maintain appropriate fences or barricades around those unbuilt areas to prevent wind-blown

6

1     debris and otherwise to maintain the balance of the Shopping Center in a clean and slightly
2     condition.

3          2.3.3   <u>Delivery Date Certification</u>.  Upon the satisfaction of all of the Delivery
4     Date Conditions, Landlord shall so certify to Tenant, using the form of Delivery Date
5     Certification attached hereto as <u>Exhibit J</u>.

6          2.3.4   <u>No Waiver</u>.  Subject to Punch List Items as contemplated by Section 3.3.3,
7     and Landlord's obligation to correct any latent defects in Landlord's Work of which Tenant has
8     given Landlord notice thereof prior to the first (1st) anniversary of the Delivery Date, Tenant's
9     acceptance of physical possession of the Pad shall be deemed to be an acknowledgment by
10    Tenant that the Delivery Date Conditions have been satisfied (even if, in fact, they have not be
11    satisfied); provided, however, that if an item of Landlord's Work which was not apparent on the
12    Delivery Date is incomplete or incorrect or any other of the Delivery Date Conditions is
13    unsatisfied (as the case may be, a "***Delivery Failure***"), and such Delivery Failure prevents
14    Tenant from commencing and/or completing Tenant's Work, then the Rent Commencement Date
15    shall be extended one (1) day for each day that Tenant is unable to commence and/or complete
16    Tenant's Work solely due to the Delivery Failure until the Delivery Failure no longer exists and
17    Tenant is able to commence or resume Tenant's Work.

18          Section 2.4   <u>Slack Period</u>.  If the Rent Commencement Date occurs during the
19    months of December, January and February (the "***Slack Period***"), then Tenant shall have the
20    right to (i) not open for business during such Slack Period in which event Tenant shall not be
21    obligated to pay any Rent or Percentage Rent until the end of such Slack Period or (ii) open for
22    business in which event Tenant shall be entitled to pay Alternate Rent in lieu of Fixed Rent for
23    the period commencing on the Rent Commencement Date and ending on the expiration of the
24    Slack Period (but Tenant shall continue to pay all Additional Rent to the extent required to be
25    paid by Tenant hereunder).

26          Section 2.5   <mark>Initial Co-Tenancy Condition</mark>.

27          2.5.1   As used herein, the "***Initial Co-Tenancy Condition***" shall mean that (i)
28    two (2) of the Anchor Tenants (as defined below) are not open for business or (ii) less than sixty
29    five percent (65%) of the Floor Area of the Shopping Center (excluding the Floor Area of the
30    Premises, any premises leased to Tenant or any of its Affiliates, the Anchor Tenants, and any
31    new expansion area not built as of the Effective Date) is open and operating by tenants typically
32    found in similar shopping centers in California. As used herein, an "***Anchor Tenant***" shall mean
33    Macy's, Target, Dick's Sporting Goods and JC Penney or a national or regional replacement
34    tenant therefor typically found in similar shopping centers in California which operates at least
35    85% of the Floor Area occupied by such named tenants as of the Effective Date (or in the case of
36    Macy's, at least 100,000 square feet of Floor Area, and in the case of Dick's, at least 40,000
37    square feet of Floor Area).

38          2.5.2   If, on the Delivery Date, the Initial Co-Tenancy Condition has not been
39    satisfied, Tenant shall have the right, at its sole option, to:

40               (a)      accept delivery of physical possession of the Pad; or

41               (b)      defer its acceptance of delivery of physical possession of
42    the Pad to a later date (but not later than the date on which the Initial Co-Tenancy Condition is
43    satisfied and Tenant receives notice from Landlord thereof), whereupon the Delivery Date shall
44    be deemed to have occurred on the earlier of the date on which Landlord tenders delivery of the
45    Pad in compliance with the terms of this Lease or Tenant actually accepts physical possession of
46    the Pad (subject to the other provisions of this Article 2 and the continuing satisfaction of the
47    Delivery Date Conditions), it being agreed, however, that if Tenant elects to defer its acceptance
48    of delivery of the Pad for more than one (1) year, Landlord shall thereafter have the right to
49    terminate this Lease upon thirty (30) days' notice to Tenant, except Tenant may nullify
50    Landlord's termination right by accepting delivery of the Pad within such thirty (30) day period;
51    and

52    in either event, if the Rent Commencement Date occurs before the satisfaction of the Initial Co-
53    Tenancy Condition, Tenant shall be entitled to pay Alternate Rent in lieu of Fixed Rent until the

Initial Co-Tenancy Condition is satisfied and the Landlord gives Tenant notice thereof, subject to any other applicable provisions of this Article 2.

2.5.3    In addition to the provisions of Section 2.5.2 above, if the Initial Co-Tenancy Condition has not been satisfied by the first (1st) anniversary of the Delivery Date established pursuant to Section 2.3.2(a) above, then Tenant shall have the right, within one hundred twenty (120) days after such one (1) year anniversary, upon giving Landlord at least sixty (60) days' prior notice, to terminate this Lease as of the date specified in said notice. Landlord may negate such termination by causing the Initial Co-Tenancy Condition to be satisfied within thirty (30) days after the date on which said termination notice is given. If this Lease is terminated hereunder, neither party shall have any further liability under this Lease, except: (i) for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease, and (ii) Landlord shall promptly reimburse Tenant for all of its reasonable third-party costs and expenses incurred in connection with this Lease, including, without limitation, costs associated with the preparation and review of plans and specifications, attorney's fees, and the performance of Tenant's Work, not to exceed Thirty Seven Thousand Five Hundred Dollars ($37,500). If Tenant does not terminate this Lease pursuant to this Section 2.5.3, then commencing on the expiration of the aforesaid 120-day period, Tenant shall resume paying full Rent.

Section 2.6    Permits Contingency.

2.6.1    Tenant shall make application for Tenant's Permits (defined in Section 2.3.1(b) above) within thirty (30) days after the later to occur of (i) the date upon which Landlord has approved (or has been deemed to have approved) Tenant's Plans pursuant to the provisions of Section 3.2 hereof and (ii) Tenant's receipt of notice from Landlord that the Land Use Approvals Contingency Date (as defined in Section 3.1 below) shall have occurred and Tenant shall thereafter diligently prosecute such application(s) until approved. Tenant shall keep Landlord reasonably apprised of the status of its application and agrees to promptly notify Landlord upon obtaining Tenant's Permits. Notwithstanding the provisions of this Article 2 to the contrary, if, despite Tenant's diligent efforts, all Tenant's Permits have not been obtained within one hundred eighty (180) days after the date on which Tenant filed such application (the "*Application Date*"), Tenant shall have the right, upon notice given to Landlord prior to the unconditional grant of all of Tenant's Permits, to: (a) delay its acceptance of physical possession of the Premises to the date on which all of the Tenant's Permits have been obtained, whereupon the Delivery Date shall be deemed to have occurred on such date (subject to the other provisions of this Article 2 and the continuing satisfaction of the Delivery Date Conditions); or (b) subject to Landlord's right to seek Tenant's Permits on Tenant's behalf pursuant to Section 2.6.2 below, terminate this Lease. Tenant's exercise of its rights under (a) above shall not preclude the subsequent exercise of its rights under (b) above. The date on which all Tenant's Permits are unconditionally granted is referred to herein as the "*Permit Contingency Date*" and Tenant shall give Landlord written notice of such date. For purposes of defining whether Tenant's Permits are "unconditional," Tenant acknowledges that Tenant's Permits shall be deemed to be without condition (i.e. unconditional) if the only conditions or requirements that are imposed on Tenant are those that are routinely and customarily imposed on all tenants that are issued such permits.

2.6.2    If Tenant elects to terminate this Lease pursuant to section 2.6.1 above or if all Tenant's Permits have not been obtained within two hundred seventy (270) days after the Application Date, Landlord shall have the right, for a period of ninety (90) days, to obtain Tenant's Permits at Landlord's cost and expense, provided Landlord obtains Tenant's prior written consent to any submission or application and neither such submission or application and/or subsequent meetings or correspondence with applicable governmental authorities changes Tenant's Plans without Tenant's prior consent, which consent may be withheld in Tenant's sole discretion. In addition, if all of Tenant's Permits have not been obtained within three hundred sixty-five (365) days after the Application Date for any reason other than Landlord's failure to perform or observe any of its obligations under this Lease, then Landlord shall have the option, upon notice given to Tenant prior to the unconditional grant of all Tenant's Permits, to terminate this Lease, provided, however, that Tenant shall have the right to avoid Landlord's termination by giving notice to Landlord, within fifteen (15) days after receiving Landlord's termination notice, of Tenant's waiver of its rights under Section 2.6.1 above, whereupon Landlord's termination notice shall be rendered null and void.

8

1    2.6.3   In the event Tenant or Landlord elects to terminate this Lease pursuant to
2    this Section 2.6, this Lease shall cease and be deemed canceled and terminated as of the date set
3    forth in Tenant's or Landlord's notice of such termination and upon such termination, Tenant
4    and Landlord shall be relieved of any and all further liability hereunder, except for those
5    obligations which survive the expiration or other termination of this Lease pursuant to the
6    express terms of this Lease.

7    ARTICLE 3
8    IMPROVEMENTS

9    Section 3.1   Landlord's Work and Tenant's Work. (a)   Landlord is in the
10    process of seeking the site plan and land use approvals required from all applicable third parties
11    and governmental authorities to enable Landlord to perform Landlord's Work and to enable
12    Tenant to construct the improvements on the Pad and to occupy and use the Premises for the
13    conduct of its business in the Premises, which permits and approvals shall include, without
14    limitation, zoning and building code approvals and any environmental requirements (the
15    "*Required Land Use Approvals*"). Landlord shall keep Tenant reasonably apprised of the status
16    of obtaining the Required Land Use Approvals and agrees to promptly notify Tenant upon its
17    receipt of same. If, despite Landlord's diligent efforts, the Required Land Use Approvals have
18    not been obtained by July 1, 2016, either Landlord or Tenant shall have the right, upon notice
19    given to the other prior to the receipt of the Required Land Use Approvals to terminate this
20    Lease in which event Landlord shall promptly pay to Tenant an amount not to exceed $25,000
21    (based upon Tenant's documented out of pocket expenses) for Tenant to prepare shell footprint
22    and elevation drawings in connection with Landlord's application for the Required Land Use
23    Approvals and an additional amount not to exceed $50,000 (based upon Tenant's documented
24    out of pocket expenses) if Landlord shall have requested Tenant in writing to prepare Tenant's
25    Plans (as defined in Section 3.2 hereof) prior to Landlord's receipt of the Required Land Use
26    Approvals. The date on which the Required Land Use Approvals are obtained is referred to
27    herein as the "*Land Use Approval Contingency Date*". Subject to the receipt of the Required
28    Land Use Approvals and Landlord's receipt of any building permits which may be necessary for
29    the performance of Landlord's Work, Landlord shall, at its sole cost and expense, perform the
30    work and obligations described on Exhibit D ("*Landlord's Work*"), and shall deliver possession
31    of the Pad to Tenant in the condition described therein. Except for Landlord's Work, Tenant
32    shall, at its own cost and expense, do any and all work (hereinafter referred to as "*Tenant's
33    Work*") which Tenant desires to adapt the Pad to Tenant's use, including, without limitation,
34    installing final utility connections and utility meters. Landlord has advised Tenant of the
35    existence of certain limitations contained in Existing Leases, as more particularly set forth in
36    Exhibit N (the "*Existing Lease Limitations*"). Subject to Landlord obtaining the consent from
37    Dick's pursuant to Section 2.3.1(g) above, Tenant hereby agrees to abide by and comply with the
38    Existing Lease Limitations in connection with its performance of Tenant's Work provided,
39    however, that notwithstanding the foregoing, Exhibit B attached to this Lease shall control over
40    the Dick's site plan attached to Exhibit N. Notwithstanding anything to the contrary contained in
41    this Section 3.1(a), if the Required Land Use Approvals change or alter, except to an immaterial
42    degree, Exhibit B, Exhibit D-1 (including, without limitation, the height or dimensions of the
43    Premises as shown on the LOD or Tenant's signage as indicated thereon), Exhibit F, the Critical
44    Access Ways (as defined in Section 5.2.2 hereof), the number, location or layout of parking
45    within the Critical Area (as defined in Section 5.2.2 hereof) or access to, or configuration of,
46    Tenant's truck loading or trash removal facilities, then Tenant shall have the right to terminate
47    this Lease.

48    (b)   In the event (A) this Lease has terminated pursuant to Section 3.1(a)
49    above, and (B) Landlord or any Affiliate of Landlord actually commences to construct the
50    Southwest Quadrant on or before the date which is three (3) years after the effective date of the
51    termination of this Lease pursuant to Section 3.1(a) above, then Landlord shall be obligated to
52    offer to Tenant, at the time of the commencement of the construction, the option to lease a
53    portion of the Southwest Quadrant substantially equivalent in size to the Premises upon all the
54    terms and conditions of this Lease (including, without limitation, the amount of Fixed Rent
55    which is not greater than [but which may be less than] the Fixed Rent set forth herein); provided,
56    however, that all dates set forth in the Lease shall be extended. In the event Tenant elects, within
57    thirty (30) days after such offer, to exercise such option, Landlord and Tenant shall promptly
58    execute a lease upon substantially the same terms and provisions of this Lease. In the event
59    Tenant does not elect, within thirty (30) days after such offer, to exercise such option, Landlord
60    shall be free to lease such premises to any other person or entity and on any terms agreed to

9

1  between Landlord and another tenant.  The provisions of this Section 3.1(b) shall survive the
2  expiration or earlier termination of this Lease.
3
4          Section 3.2    Plan Approvals.  Within ninety (90) days after the Effective Date,
5  Landlord shall deliver to Tenant the "Civil/Site Drawings" (hereinafter defined).  As used herein,
6  the term **"Civil/Site Drawings"** shall include all of the following drawings, with appropriate
7  details, for the parcel of land on which the Premises shall be constructed: (i) site plan; (ii)
8  grading, drainage, and erosion control plan; (iii) utility plan; (iv) landscaping and irrigation plan,
9  (v) photometric plan, and (vi) geotechnical report.  The Civil/Site Drawings shall be consistent
10  with the provisions of Exhibits B and D attached hereto.  Tenant acknowledges that Landlord
11  may require certain information from Tenant in connection with its seeking the Required Land
12  Use Approvals and/or in connection with the preparation of the Civil/Site Drawings and Tenant
13  agrees to reasonably cooperate with Landlord's requests with respect thereto, including without
14  limitation, providing a preliminary layout of the Premises.  Within fifteen (15) business days
15  after its receipt of the Civil/Site Drawings, Tenant shall notify Landlord of Tenant's approval
16  thereof or the reasons why such approval cannot be granted.  If Tenant fails to respond within
17  such fifteen (15) business day period, Landlord shall give Tenant a five (5) business day written
18  reminder notice expressly stating that Tenant's consent to the Civil/Site Drawings shall be
19  deemed to have been given unless Tenant responds within five (5) business days after receipt of
20  Landlord's reminder notice, failing which Tenant's consent shall be deemed given.  In the event
21  that Landlord's submittal of the Civil/Site Drawings is not approved by Tenant, then Landlord
22  shall revise the Civil/Site Drawings to address all of Tenant's comments and re-submit them to
23  Tenant for Tenant's review and approval.  The re-submittal described in the preceding sentence
24  shall be delivered to Tenant by Landlord within fifteen (15) days of receipt of Tenant's notice
25  that the previous submittal has not been approved.  The process described above shall be
26  repeated until Landlord has secured Tenant's approval of the Civil/Site Drawings.  Within ninety
27  (90) days after the later of (a) written notice to Tenant that the Land Use Approval Contingency
28  Date has occurred and (b) Tenant's receipt and approval (or deemed approval) of the Civil/Site
29  Drawings, Tenant shall deliver to Landlord Tenant's plans (**"Tenant's Plans"**) depicting
30  Tenant's Work.  Landlord shall have twenty (20) days from its receipt of Tenant's Plans to
31  approve or disapprove Tenant's Work depicted thereon, which plans and work shall be approved
32  so long as they: (x) comply with all Legal Requirements, and (y) are substantially consistent with
33  Exhibits B, D, D-1, and F attached hereto, it being agreed that Landlord shall have no approval
34  rights with respect to Tenant's Plans unless Tenant's Plans fail to comply with the requirements
35  of clauses (x) and (y).  If Landlord shall fail to disapprove Tenant's Plans (to the extent that
36  Landlord has an approval right pursuant to the immediately preceding sentence) with reasonable
37  specificity within said 20-day period, Tenant shall give Landlord a five (5) business day written
38  reminder notice expressly stating that Landlord's consent to Tenant's Plans shall be deemed to
39  have been given unless Landlord responds within five (5) business days after receipt of Tenant's
40  reminder notice, failing which Landlord's consent to Tenant's Plans shall be deemed given.  In
41  the event that Tenant's submittal of Tenant's Plans is not approved by Landlord (if such approval
42  right is applicable), then Tenant shall revise Tenant's Plans to address Landlord's comments and
43  re-submit them to Landlord for Landlord's review and approval.  The re-submittal described in
44  the preceding sentence shall be delivered to Landlord by Tenant within fifteen (15) days of
45  receipt of Landlord's notice that the previous submittal has not been approved.  The process
46  described above shall be repeated until Tenant has secured Landlord's approval of Tenant's
47  Plans.

48          3.2.1    Plan Changes.

49          (a)    After Tenant approves the Civil/Site Drawings, Tenant shall have
50  the right to require Landlord to subsequently make changes thereto (the **"Changes"**), provided
51  that such Changes do not require approval by any governmental authority.  Within ten (10)
52  business days after receiving Tenant's request for any Change, Landlord shall give Tenant notice
53  of the cost or savings, and any delay, that may be occasioned by such Change, which notice shall
54  be accompanied by all back-up supporting the cost increases or delays.  If Tenant fails to
55  authorize such Change within five (5) business days after receiving Landlord's notice, Tenant
56  shall be deemed to have disapproved such Change.

57          (b)    Tenant shall pay to Landlord the net reasonable additional third-
58  party costs of Landlord's Work resulting directly and solely from the aggregate Changes
59  (exclusive of any charges for overhead and profit, other than sums not exceeding 7%
60  subcontractor profit and 7% general contractor profit thereon), taking into consideration any and

10

1854916.2\C061858\0372671
[bbBaby]

1  all actual costs and savings resulting from all Changes, in the aggregate (including, without
2  limitation, reasonable costs approved by Tenant in advance associated with any acceleration of
3  the work schedule which Tenant, at its sole option, may require).  Such payment shall be due and
4  payable within thirty (30) days after Tenant's receipt of backup information reasonably
5  supporting all such costs, including, without limitation, invoices, but in no event earlier than the
6  Delivery Date.

7          (c)    [Intentionally Deleted].

8          (d)    If, despite Landlord's diligent efforts in performing Landlord's
9  Work, the Changes cause a net delay in the Substantial Completion of Landlord's Work (taking
10  into consideration any time reductions resulting from such Changes), then: (i) the Rent
11  Commencement Date shall be determined as if such delay had not occurred; (ii) the dates set
12  forth in clauses (a) and (b) of Section 3.3.2 below shall be extended by the number of days of
13  such net delay; and (iii) with respect to Changes requested after the Delivery Date Notice is
14  given, for purposes of calculating liquidated damages under Subsection 2.3.2(b) above, the
15  Delivery Date shall be extended by the number of days of such net delay.

16          Section 3.3    <u>Performance of Work</u>.

17          3.3.1    Both Landlord's Work and Tenant's Work shall be performed in a good
18  and workmanlike manner, in compliance with all applicable Legal Requirements, utilizing only
19  new, first-class materials.  Landlord shall pay any and all impact fees and related governmental
20  charges in connection with bringing utility lines to the Pad except Tenant shall be responsible for
21  deposits and similar hook-up fees for connecting Tenant's utilities to the lines provided by
22  Landlord and establishing accounts with the local utility company.  Within ninety (90) days after
23  the Effective Date, Landlord shall deliver to Tenant the written consent from Dick's and any
24  other applicable party having consent or approval rights to permit Tenant to have the staging
25  areas for Tenant's Work as designated as "***Tenant's Staging***" on <u>Exhibit B</u>.  If Landlord shall be
26  unable to deliver such consent within such 90-day period, Tenant shall have the right, but not the
27  obligation, to obtain Dick's consent for a period of thirty (30) days and if Tenant is unable to
28  obtain such consent (or elects not to obtain same) within such 30-day period, Tenant shall have
29  the right, by notice to Landlord given not later than the tenth (10th) day after the expiration of
30  such 30-day period, to terminate this Lease or if not so terminated, the condition for Landlord to
31  obtain such consent shall be deemed waived. If Tenant terminates this Lease as aforesaid, then
32  neither party shall have any further liability hereunder except for those provisions that expressly
33  survive the expiration or earlier termination of this Lease, including, without limitation,
34  Landlord's reimbursement of Tenant-produced plans to the extent required pursuant to Section
35  3.1 above.

36          3.3.2    If: (a)  Landlord's Work has not been commenced within thirty (30) days
37  after the later to occur of (i) the Land Use Approval Contingency Date, (ii) the date on which
38  Landlord obtains building permits for Landlord's Work, and (iii) the Permit Contingency Date
39  (provided Tenant shall have given Landlord written notice of such date) (the later of clause (i),
40  (ii) and (iii) herein referred to as the "***Pad Commencement Date***"), or (b)  the Delivery Date
41  shall not have occurred within one hundred twenty (120) days after the Pad Commencement
42  Date (subject to *Force Majeure*, not to exceed sixty (60) days in the aggregate, and provided that
43  Landlord shall have given Tenant notice of such event of *Force Majeure* promptly after its
44  occurrence), Tenant may thereafter, during such time as Landlord's Work has not been
45  commenced or the Delivery Date has not occurred, as the case may be, consider Landlord to be
46  in default hereunder and, at Tenant's option in its sole discretion, elect to:

47          (i)    terminate this Lease, if Landlord shall fail to fully cure
48  such default within thirty (30) days after receiving Tenant's notice thereof, in which event
49  neither party shall have any further liability hereunder, except: (y) for those obligations which
50  survive the expiration or other termination of this Lease pursuant to the express terms of this
51  Lease, and (z) Landlord shall be obligated to promptly reimburse Tenant, as Tenant's sole
52  monetary remedy by reason thereof, for all its reasonable third-party costs and expenses incurred
53  in connection with this Lease (including, without limitation, costs associated with the preparation
54  and review of plans and specifications, attorney's fees, and the performance of Tenant's Work),
55  not to exceed Fifty Thousand Dollars ($50,000; and/or

11

(ii)    avail itself of the remedies set forth in Section 16.2 below (provided, however, that the cure period set forth therein shall not be applicable); and/or

(iii)    extend one or more times the dates set forth in clauses (a) and/or (b) of this Subsection 3.3.2 to such future dates designated by Tenant in notice given to Landlord, and as to any extension granted with respect to the clause 3.3.2(b) above, in addition to any other rights and remedies to which Tenant may be entitled, the Rent Commencement Date shall be postponed by two (2) days for each day of the extension granted as to clause 3.3.2(b) above.

The election by Tenant of any one or more of the foregoing remedies shall not preclude the subsequent election of any alternative remedy provided in this Section, this Lease, at law, or in equity. If Tenant fails to complete construction of the Premises within eighteen (18) months from the Delivery Date and such failure is due solely by reason of Tenant's intentional and/or willful acts or omission, then Landlord shall have the right to terminate this Lease upon thirty (30) days' notice to Tenant but Tenant shall have the right to nullify Landlord's termination right by completing such construction within such thirty (30) day period.

3.3.3    Landlord's Work Performed After Delivery of Possession.  On or before the Delivery Date, Landlord's and Tenant's representatives together shall conduct a walk-through of the Pad to compile a punch list of the "Punch List Items" (hereinafter defined). Tenant shall deliver to Landlord a copy of said punch list within five (5) days after the walk-through.  Landlord shall complete any Punch List Items within ten (10) days after it receives a copy of said punch list.  If Landlord fails to complete any item on said punch list within said 10-day period, Tenant shall have the right to complete such item(s) using its own contractors and receive reimbursement from Landlord for the reasonable costs and expenses thereof within thirty (30) days of demand.  As used herein, the term *"Punch List Items"* shall mean such minor items which, when considered as a whole, do not adversely affect either the performance of Tenant's Work or Tenant's ability to conduct its normal business operations in the Premises.

3.3.4    Tenant's Right of Entry.  Prior to the Delivery Date, Tenant may enter upon the Pad for the purposes of inspecting the work, taking measurements and making plans, without being deemed thereby to have taken possession or obligated itself to pay Rent, provided, however, that Tenant shall not, during the course of such work, materially interfere with the performance of Landlord's Work and shall indemnify and hold Landlord harmless from and against any and all claims or losses arising from Tenant's entry upon the Premises, except to the extent caused by Landlord, its agents, employees, or contractors.

3.3.5    Work Requirements After Delivery Date.  Following the Delivery Date, any construction by Landlord (including the Quadrant Development Work) or by other tenants or occupants of the Shopping Center (to the extent that Landlord has the right to enforce the provisions of this Section 3.3.5 in Existing Leases) affecting any portion of the area designated as "Critical Area" on Exhibit B hereto (the *"Critical Area"*), shall be subject to the following terms and conditions:

(a)    staging and storage of materials and parking of construction vehicles shall occur only within those areas designated as *"Landlord Staging"* in Exhibit D;

(b)    from and after Tenant's opening for business to the public, Landlord shall use commercially reasonable efforts to cause any construction, delivery and related vehicles engaged in the performance of such work or other construction activities to not materially interfere with Tenant's business operations; and

(c)    Landlord shall maintain the Shopping Center in a clean, safe, and sightly condition, and shall use reasonable efforts to ensure that such construction shall not materially adversely interfere with the normal conduct of any business operations in the Premises.

Section 3.4    Tenant's Leasehold Improvements.  Subject to Section 3.6 below, Tenant's Work and all other improvements erected by Tenant with respect to the Premises, together with any replacements thereof, shall be and remain the property of Tenant throughout the Term, and Tenant alone shall be entitled to the benefits of ownership thereof, including, but not limited to, depreciation of same as an asset for tax purposes.

12

Section 3.5    Tenant's Trailer.  Tenant shall have the right, subject to applicable Legal Requirements, to place a trailer in an area immediately adjacent to the Premises, in the location shown on Exhibit B hereto, during the period commencing on the forty-fifth (45th) day prior to date on which Tenant has scheduled for the commencement of its fixturing in the Premises, until the twentieth (20th) day after said fixturing date (but not later than the date Tenant opens for business in the Premises), for the purpose of conducting employee interviews and recruiting.  Tenant shall be responsible, at its sole cost and expense, for making arrangements for any required utilities to the trailer, as well as paying for any such utilities consumed.

Section 3.6    Tenant Allowance.  Landlord shall pay Tenant the liquidated sum of One Hundred Twenty Five Dollars ($125.00) per square foot of Floor Area of the Premises (the *"Tenant Allowance"*) in consideration for Tenant's construction of "Landlord's Special Improvements" (defined below).  Landlord and Tenant hereby acknowledge and agree that the Tenant Allowance shall be in addition to Landlord's Work.  Landlord shall pay the Tenant Allowance to Tenant within thirty (30) days after Tenant requests such payment after the satisfaction of all of the following:

(i)    Substantial Completion of Tenant's Work in accordance with the Tenant's Plans, as certified by Tenant's architect,

(ii)    Landlord's receipt of a lien waiver from Tenant's general contractor and lien waivers from subcontractors and materialmen performing Tenant's Work; provided that (x) no waivers shall be required for amounts less than $25,000, and (y) Landlord will pay the portion of the Tenant Allowance for which lien waivers are provided (notwithstanding that some lien waivers may not be forthcoming due to disputes, etc.) or (z) in lieu of such lien waivers from subcontractors and materialmen, an agreement executed by Tenant regarding mechanics' and materialman's liens in the form attached hereto as Exhibit M;

(iii)    Landlord's receipt of a copy of a fully executed standard form of contractor's requisition indicating substantial completion of Tenant's Work and completed AIA forms 702 and 703 (with schedule of values) (or substantially similar documents); and

(iv)    Landlord's receipt of a temporary or permanent certificate of occupancy (or its local equivalent), unless such certificate is not available for any reason other than Tenant's failure to perform Tenant's Work in compliance with all Legal Requirements.

Tenant acknowledges that the Tenant Allowance shall be used for leasehold improvements to the Premises and that no portion of the Tenant Allowance shall be used to pay for any of Tenant's furniture, trade fixtures, equipment or inventory.  If Landlord fails to provide Tenant with the Tenant Allowance within thirty (30) days of Landlord's receipt of the applicable documentation or occurrence of all of the events set forth above and such failure continues for five (5) business days after Landlord's receipt of a second notice notifying Landlord of such failure, then in addition to the rights and remedies under Section 16.2 of this Lease, Tenant shall have the right to deduct from Rent any unpaid portion of the Tenant Allowance, together with interest thereon at the Lease Interest Rate.  The Tenant Allowance is an offset (and not an inducement) for Tenant's construction, on behalf of Landlord, of Tenant's Work (the *"Landlord's Special Improvements"*) (which Landlord's Special Improvements, together with any replacements thereof, when completed shall be the property of Landlord, subject to use by Tenant of same during the Term of, and in accordance with, this Lease).  Landlord alone shall be entitled to depreciate the Landlord's Special Improvements as an asset for tax purposes, and Tenant shall not recognize income with respect to the Tenant Allowance.  Tenant shall be responsible for and herewith agrees to pay all costs of Tenant's Work in excess of the Tenant's Allowance, and Tenant's Work (except for Landlord's Special Improvements), together with any replacements thereof, shall be and remain the property of Tenant throughout the Term, and Tenant alone shall be entitled to the benefits of ownership thereof, including, without limitation, depreciation of same as an asset for tax purposes.  Upon expiration or sooner termination of this Lease, all improvements and additions to the Premises (other than Tenant's Personal Property) shall be deemed the property of the Landlord, and all other alterations, decorations, additions, equipment and improvements made by Tenant to the Premises, shall be deemed attached to the fee interest in the property and shall be Landlord's property and Tenant shall have no right to alter or remove said improvements.  Within sixty (60) days after the later of (i) Tenant's receipt of written notice from Landlord requesting same and (ii) Tenant opening for business in the

13

1  Premises, Tenant shall deliver to Landlord final "as-built" plans for the improvements
2  constructed by Tenant (as well as copies of all warranties obtained by Tenant in connection with
3  Tenant's Work to the extent such warranties cover repairs to the Premises for which Landlord is
4  responsible hereunder), operating manuals and paid invoices for Tenant's Work.

5          Section 3.7    Measurement; Adjustment of Rent.

6          3.7.1    Measurement of Premises and Shopping Center.  Tenant shall deliver to
7  Landlord a certification by Tenant's licensed architect, surveyor or engineer of the Floor Area
8  (with the dimensions on which it is based) of the Premises, the measurements of which shall be
9  subject to confirmation by Landlord's licensed architect, surveyor or engineer.  If Tenant shall
10  fail so to deliver such certification to Landlord, Landlord shall have the right to have any of such
11  measurements made and certified to Tenant by Landlord's licensed architect, surveyor or
12  engineer.

13          3.7.2    Adjustment of Fixed Rent.  If the measurement of the Premises shall
14  indicate a Floor Area more or less than the Floor Area of the Premises set forth in Section 1.1.26,
15  the Fixed Rent and any other applicable provision of this Lease (including, without limitation,
16  the Tenant Allowance) shall be adjusted to conform to the actual measurement, and Tenant shall
17  receive a proportional refund of any Rent overpaid to Landlord or shall pay any deficiency in
18  Rent as a result thereof, provided that in no event shall the final measurement be deemed to be
19  less than 21,000 square feet of Floor Area unless Landlord delivers to Tenant a Pad that shall not
20  accommodate a building having the dimensions indicated on Exhibit B.  Landlord and Tenant
21  shall each promptly execute and deliver to the other an amendment memorializing any change to
22  the Fixed Rent or any other applicable provisions of this Lease, made pursuant to this Section
23  3.7.  Any dispute between the parties with respect to the Floor Area of the Premises shall be
24  resolved by arbitration in accordance with the provisions of Section 16.3 below.".

25                    ARTICLE 4
26  FIXED RENT, PERCENTAGE RENT AND TAXES: DETERMINATION AND PAYMENT

27          Section 4.1    Fixed Rent.  Commencing on the Rent Commencement Date and
28  continuing throughout the Term, Tenant shall pay to Landlord the Fixed Rent, in equal
29  successive monthly installments, in advance, on the first day of each and every calendar month
30  throughout the Term, except that Fixed Rent payable for any partial calendar month during the
31  Term shall be prorated based on a 365-day year.  Fixed Rent shall be paid without deduction or
32  set-off, except to the extent otherwise expressly provided herein.

33          Section 4.2    Payment of Rent.  All Rent shall be mailed or otherwise delivered
34  to Landlord at Landlord's Mailing Address as specified in Section 1.1.18 or, upon at least thirty
35  (30) days' prior notice to Tenant, to such other address as Landlord may from time to time
36  designate.  Landlord acknowledges and agrees that for administrative purposes, Tenant may
37  designate a corporation or other entity to act as a paying agent (the "***Paying Agent***") to make all
38  Rent payments due to Landlord under this Lease.  Said designation (which may be revoked by
39  Tenant at any time) is not intended as, and shall not constitute, an assignment of any rights or
40  obligations of Tenant to the Paying Agent, and Tenant shall remain primarily liable for payment
41  of Rent under this Lease.  All payments of Rent received by Landlord from the Paying Agent
42  shall be credited to Tenant as if such payments of Rent had been made by Tenant directly to
43  Landlord.  If any payment of Rent is not paid when due under this Lease, then, in addition to the
44  payment then due, Tenant shall pay Landlord, as Additional Rent, a late charge ("***Late Rent***
45  ***Charge***"), which shall be the greater of (i) One Hundred and 00/100 Dollars ($100.00), or (ii)
46  five percent (5%) of the amount then due but no such Late Rent Charge shall be payable for the
47  first two (2) delinquencies in which Rent is not paid when due during any 12 month period.  Any
48  payment of Rent which is not paid after notice thereof is given pursuant to Section 16.1.1 shall
49  also bear interest on the payable amount from the date when due until paid at the Lease Interest
50  Rate.

51          Section 4.3    ==Real Estate and Other Taxes.==

52          4.3.1    Landlord shall pay on or before the due dates thereof all "Taxes" (defined
53  in Subsection 4.3.3 below) other than personal property taxes levied against tenants.  Throughout
54  the Term, Landlord shall cause the Shopping Center to be maintained entirely within tax parcels
55  and lots that exclude any property not a part of the Shopping Center.

1854916.2\C061858\0372671
[bbBaby]

1       4.3.2   As used herein, *"Taxes"* shall mean all general real estate taxes, and
2   assessments for betterments and improvements that are levied or assessed by any lawful
3   authority on the Shopping Center (general or special), including any substitution therefor, in
4   whole or in part, due to a future change in the method of taxation. Landlord acknowledges and
5   agrees that Tenant shall not be responsible for any payment to Landlord of any Taxes in
6   connection with the Shopping Center and/or the Premises, which payments are deemed to be
7   included in Common Area Charges.

8       Section 4.4    Percentage Rent.

9       4.4.1   Payment.   During and for each full calendar year during the Term, Tenant
10  shall pay annual percentage rent (*"Percentage Rent"*) as follows: (i) an amount equal to three
11  percent (3%) of all "Gross Sales" (hereinafter defined in Subsection 4.4.2) resulting from
12  business conducted in, on or from the Premises during such calendar year in excess Twelve
13  Million Dollars ($12,000,000) up to Fifteen Million Dollars ($15,000,000). No Percentage Rent
14  shall be payable on Gross Sales that exceed $15,000,000. The aforesaid amount of $12,000,000
15  and $15,000,000 are herein referred to as *"Breakpoints"* and such Breakpoints shall each
16  increase at the same time and by the same percentage as Fixed Rent increases under this Lease.
17  Within sixty (60) days after the close of each calendar year, Tenant shall furnish to Landlord a
18  compilation prepared by an officer of Tenant setting forth the amount of Gross Sales during the
19  preceding calendar year and showing the amount of Percentage Rent, if any, required to be paid
20  by Tenant for such calendar year; provided, however, that Tenant shall not be required to provide
21  such compilation if the amount of Gross Sales for such calendar year is less than ninety percent
22  (90%) of the Breakpoint applicable for such year. The full amount of any Percentage Rent due
23  shall be paid to Landlord simultaneously with the furnishing of said compilation.
24  Notwithstanding the foregoing, no Percentage Rent shall be payable with respect to the period
25  commencing on the Rent Commencement Date and ending on the December 31 next following
26  the Rent Commencement Date.

27      4.4.2   ==Definition of Gross Sales==.   As used herein, the term *"Gross Sales"* shall
28  mean the total amount of all sales of merchandise or services fulfilled from the Premises by
29  Tenant or any sublessee, licensee or concessionaire of Tenant (subject, however, to Section
30  4.4.6) and any other person or entity operating in the Premises (for purposes of this Subsection
31  4.4.2 only, collectively, "*Tenant*"), whether for cash, credit or otherwise, including redemption
32  of gift certificates and gift cards. Tenant shall record, at the time of each Gross Sale, all receipts
33  from such sale, whether for cash, credit or otherwise, in a cash register or cash registers, or in
34  such electronic or computer device which records sales in a manner which is generally
35  acceptable by industry standards. The term *"Gross Sales"* shall exclude: (**1**) proceeds from any
36  sales tax, gross receipts tax or similar tax, by whatever name called, which are separately stated
37  and are in addition to the sales price, (**2**) *bona fide* transfers or exchanges of merchandise from
38  the Premises to any other stores or warehouses of Tenant or any Affiliates of Tenant, and returns
39  to shippers and manufacturers for credit, (**3**) refunds or credits given to customers for
40  merchandise returned or exchanged at the Premises (but only to the extent the original sale was
41  included in Gross Sales hereunder), (**4**) sales of Tenant's fixtures and equipment not in the
42  ordinary course of Tenant's business, (**5**) to the extent of prior inclusion in Gross Sales, bad
43  debts when written off the books of Tenant, provided that any collections made on account of
44  such bad debts shall be included in Gross Sales when received, (**6**) receipts from vending
45  machines installed solely for the use of Tenant's employees and receipts from pay telephones,
46  (**7**) sales to employees of Tenant at discount (which, for the purposes of determining Percentage
47  Rent hereunder, shall not exceed two percent (2%) of Gross Sales per calendar year or pro rata
48  portion thereof, as applicable), (**8**) fees paid to independent third party credit card, charge card,
49  debit card, and check verification/guaranty companies in connection with sales charged to or
50  debited from customers' credit cards, charge cards, or debit cards, or sales paid for by customers
51  by checks, as applicable, (**9**) proceeds from delivery, gift-wrapping and check cashing charges
52  (which, for the purposes of determining Percentage Rent hereunder, shall not exceed two percent
53  (2%) of Gross Sales per calendar year or pro rata portion thereof, as applicable), (**10**) sums and
54  credits received in settlement of claims for loss or damage to merchandise, (**11**) separately stated
55  service, finance and interest charges, (**12**) the dollar value of coupons utilized by customers in
56  the purchase of merchandise from the Premises, (**13**) close-out or bulk sales of inventory to
57  jobbers or wholesalers, and (**14**) sales of gift certificates and/or gift cards (until redeemed).

58      4.4.3   Books and Records.   Tenant shall maintain at the Premises or at its
59  principal office, complete books and records reflecting all elements of Gross Sales. Tenant shall

be allowed to maintain its books and records in a computerized form; provided, however, that (i) such computerized books and records provide the same level of information as the books and records described above, are retained for the full record retention period provided for herein, and (ii) promptly upon request, printed copies of any such books and records are made available at Tenant's principal office for inspection by Landlord's representatives who are engaged in inspecting and/or auditing Tenant's books and records as provided herein. Such books and records shall be kept in accordance with generally accepted accounting principles (or successor accounting standards) and practices consistently applied and shall be retained by Tenant for at least three (3) years following the end of the calendar year to which they refer.

4.4.4    Landlord's Right to Audit. Landlord and/or Landlord's auditor shall have the right, upon at least thirty (30) days prior notice to Tenant (but not more than once per annum), to inspect and/or audit the records of Tenant relating to Gross Sales. If any such audit discloses a deficiency in the Gross Sales reported by Tenant, Tenant shall pay any deficiency in Percentage Rent owing to Landlord on account of such deficiency, together with interest thereon at the Lease Interest Rate. If such deficiency is in excess of three (3%) percent of the Gross Sales reported by Tenant and Percentage Rent is then payable, Tenant shall also pay Landlord's reasonable costs of the inspection and audit. Tenant has not and does not make any representation or warranty as to the amount of Gross Sales which are anticipated from the Premises.

4.4.5    Confidentiality. Landlord shall not disclose to any third party Tenant's Gross Sales or the amount of Percentage Rent paid or payable by Tenant, provided, however, that (i) such information was not previously disclosed by Tenant to such third party or to the public generally, and (ii) nothing contained herein shall restrict Landlord from disclosing such information as may be required by applicable Legal Requirements or to its accountants, attorneys, bona fide prospective purchasers, or current or prospective Mortgagees or underlying lessors of all or any portion of Landlord's interest in the Shopping Center (provided that each of such recipients shall be bound to the same non-disclosure provisions as are imposed upon Landlord).

4.4.6    Any dispute between the parties relative to the provisions of this Section 4.4, including, without limitation, the amount of Percentage Rent payable by Tenant, shall be submitted to arbitration in accordance with the provisions of Section 16.3 of this Lease

ARTICLE 5
COMMON AREAS, THEIR USE AND CHARGES

Section 5.1    Common Areas: Maintenance.

5.1.1    Maintenance of Common Areas. Landlord shall operate, maintain, repair and replace the Common Areas as required by this Lease and otherwise to the standard by which Common Areas of first-class shopping centers in the state in which the Shopping Center is located are operated, maintained, repaired and replaced, including, without limitation, snow, ice, rubbish and debris removal (including installation and maintenance of sidewalk refuse containers), landscaping (including, without limitation, the trimming and pruning of trees to avoid interference with the use or visibility of canopies or signs on the exterior of the Premises), adequate lighting, insurance, supervision, parking lot paving and striping, drainage, security (as reasonably required), and control of all Common Areas, and Landlord shall comply with all applicable Legal Requirements.

5.1.2    Tenant's Fixed Share of CAM. During the Term, Tenant shall pay to Landlord a fixed share ("Fixed Share") of the costs (hereinafter referred to as the "Common Areas Charges") paid by Landlord to operate, maintain, insure and repair the Common Areas, which shall include the premiums for insurance required to be maintained by Landlord under Section 10.3 below and Taxes for the Shopping Center. Tenant's Fixed Share of such Common Areas Charges from the Rent Commencement Date through the end of the first full calendar year of the Term (i.e. the period from the Rent Commencement Date through the December 31st after the first anniversary of the Rent Commencement Date) shall equal Six and 00/100 Dollars ($6.00) per square foot of Floor Area in the Premises (the "First Year Cap"). Thereafter, Tenant's Fixed Share shall increase by three percent (3%) in each subsequent calendar year (the "Fixed Increases"). Tenant's Fixed Share shall be paid in equal monthly installments on the first day of each calendar month, in advance, during each calendar year. Notwithstanding the

foregoing, if the period from the Rent Commencement Date through the end of the calendar year in which the Rent Commencement Date occurs is greater than 180 days (the "***Partial Year***"), then the First Year Cap shall pertain only to such Partial Year and not to the period from the Rent Commencement Date through the December 31st after the first anniversary of the Rent Commencement Date, provided that the foregoing shall not affect the Fixed Increases.

       5.1.3    In no event shall Tenant be required to join, participate in or contribute to any promotional fund, marketing fund or merchants' association.

       Section 5.2    <u>Common Areas: Restrictions</u>.

       5.2.1    <u>Continuous Access</u>. No entrances, exits, approaches and means of ingress and egress to, from, and/or within the Shopping Center or the Premises as designated on <u>Exhibit B</u> hereto as "***Critical Access Way***" shall be interrupted or disturbed by any act or omission of Landlord during the Term, except: (i) in the event of an emergency, to make repairs which Landlord is obligated to perform pursuant to the terms of any lease at the Shopping Center or as may be otherwise required by other leases in the Shopping Center or applicable Legal Requirements, in which event Landlord shall use reasonable efforts to give Tenant advance notice of same and to minimize interference to Tenant's normal business operations in the Premises as a result thereof; or (ii) in the event that Landlord is required to temporarily close the Common Areas, for the minimum time legally necessary to prevent a dedication thereof or an accrual of any rights in any person or the public generally therein; <u>provided</u> that such closure shall not occur during August (through Labor Day), November or December of any calendar year, and Landlord shall give Tenant at least thirty (30) days' prior notice thereof.

       5.2.2    <u>No Alterations</u>.  Landlord has advised Tenant that Landlord is redeveloping the Southwest Quadrant (hereinafter defined) of the Shopping Center, which redevelopment includes (I) adding Retail A, A-2, B and C as shown on <u>Exhibit B</u>; (II) constructing a new 2 story building between Target and the Shopping Center's Food Court in approximately the area indicated on <u>Exhibit B</u>, which Landlord currently contemplates housing Dave & Busters and a not yet determined junior anchor tenant; (III) performing certain site/civil and utility trenching work in connection with (I) and (II) above; and (IV) modifying the parking configuration in the Southwest Quadrant as shown on <u>Exhibit B</u> (items I – IV above the "***Quadrant Development Work***").  Notwithstanding the foregoing, Landlord covenants that none of the Quadrant Development Work shall, from and after the date Tenant opens for business in the Premises, be performed so as to adversely affect that portion of the Critical Area (as defined below) bounded by the most westerly wall of Retail B and the most easterly wall of Retail C (as shown on <u>Exhibit B</u>) and extending north to the end of the Critical Area.  Notwithstanding the foregoing, Landlord shall have the right to perform utility trenching and other site work in the Critical Area provided such work is performed only after the Premises is closed for business and the area affected by such work is restored and operational by the time Tenant opens for business the next day.  Landlord shall erect customary screening or construction barricades around the areas affected by the Quadrant Development Work to safeguard pedestrians.  Except as may be required to comply with Legal Requirements or to perform repairs and subject to certain changes to the extent permitted or agreed to by Tenant pursuant to the last sentence of Section 3.1(a), Landlord shall not, without obtaining Tenant's prior written consent in each instance, which consent may be withheld in its reasonable discretion (except as otherwise indicated below): **(i)** alter the location, availability or size of any Common Area improvement located within the Critical Area from that shown on <u>Exhibit B</u> hereto; **(ii)** construct or permit to be constructed any structures in the Critical Area of the Shopping Center (including, without limitation, any buildings, kiosks, booths, signs or similar structures in the Critical Area) or construct any buildings or other structures in the Southwest Quadrant, other than as shown on <u>Exhibit B</u> hereto; or **(iii)** materially change the entrances or exits to and from the Southwest Quadrant designated "***Critical Access Ways***" on <u>Exhibit B</u>; **(iv)** materially alter the curb cuts, roadways, drive aisles, sidewalks or other elements of the Common Areas in the Southwest Quadrant, or **(v)** alter the number, location or layout of parking spaces located within the Critical Area from those shown on <u>Exhibit B</u> hereto; it being agreed, however, that Tenant withhold its consent in its sole discretion without any reasonableness standard with respect to (i) any reduction in the number of parking spaces in the Critical Area; (ii) the construction of any new building in the Critical Area and/or (iii) any alteration to the Critical Area that would adversely affect pedestrian and/or truck access to the Premises or Tenant's loading dock areas or adversely impact the visibility of the Premises and Tenant's exterior signs.  If Tenant is then operating its business in the Premises, Landlord shall neither perform nor permit to be performed, any construction, repairs,

17

1    replacements or maintenance to any portion of the Southwest Quadrant including the Premises
2    (other than emergency repairs to utilities and Common Areas) during the months of August
3    (through Labor Day), November and December of any year, without the prior consent of Tenant,
4    which consent may be withheld in Tenant's sole discretion. Tenant agrees that (x) all of the
5    restrictions set forth in this Section 5.2.2 only apply to the Southwest Quadrant and (y) except as
6    expressly provided in this Lease, Landlord shall have the right to make whatever changes,
7    removals, additions, reconfigurations and/or alterations as Landlord desires in and to the
8    Shopping Center provided none of the foregoing adversely affects the accessibility to, or the
9    visibility of, the Premises, Tenant's signage and loading and trash removal facilities.

10         5.2.3   [Intentionally Deleted].

11         5.2.4   Parking Area.  During the Term, Landlord shall maintain in the Shopping
12    Center, at a minimum, the greater of (i) the number of parking spaces required by applicable
13    Legal Requirements, without variance, or (ii) four (4.0) parking spaces for every one thousand
14    (1,000) square feet of Floor Area in the Shopping Center (the "**Minimum Parking**
15    **Requirement**"), provided that all of the parking in the Southwest Quadrant shall be surface
16    parking as opposed to multi-tiered parking decks.  All parking spaces in the Critical Area shall
17    be at least nine (9) feet in width and eighteen (18) feet in length.  Parking spaces shall at all times
18    be clearly marked by painting, striping or otherwise.  Tenant and its employees, agents,
19    subtenants, concessionaires, licensees, customers, and invitees (**"Permitted Users"**) shall have
20    the exclusive right to use six (6) parking spaces in the area located in front of the Premises and
21    identified as the "Expectant Mother Parking Area" on Exhibit B hereto (**"Expectant Mother**
22    **Parking Spaces"**).  Landlord shall have no obligation to enforce the use of the Expectant Mother
23    Parking Spaces.  Without limiting the foregoing, Tenant and its Permitted Users shall have
24    unrestricted access to the Expectant Mother Parking Spaces for the exclusive use of expectant
25    mothers and/or parents with infants who are customers of Baby.  The Expectant Mother Parking
26    Spaces shall be prominently marked and/or signed as reserved for customers and invitees of
27    Tenant and as otherwise may be required by Exhibit F.  Landlord may designate specific parking
28    spaces for use by other tenants or occupants of the Shopping Center (including granting Dave &
29    Busters the right to have valet parking) provided each tenant's designated spaces (including such
30    valet parking area) shall not be in the Critical Area (other than the Customer Pick Up Area for
31    the benefit of Cost Plus World Market).  Landlord shall not permit any person or entity to use the
32    parking areas other than Tenant, the other tenants and occupants of the Shopping Center, and
33    their respective Permitted Users.  Landlord shall have the right to impose parking fees for the
34    Shopping Center provided Tenant's employees shall not be required to pay any fee and further
35    provided that Tenant's customers shall be permitted to validate any such parking fees, all tenants
36    of the Shopping Center are likewise required to participate in such program and no tenant of the
37    Shopping Center is given greater rights or preferential treatment than what is imposed upon or
38    offered to Tenant.  Landlord shall not permit overnight parking in the Shopping Center.
39    Notwithstanding the foregoing, if Landlord receives a written notice from a tenant under an
40    Existing Lease stating that Tenant's Expectant Mother Parking Spaces violates its lease with
41    respect to Tenant's reserved or designated parking, then Landlord shall give Tenant a copy of
42    such letter and, subject to Tenant agreeing to comply with any confidentiality provision in the
43    Existing Lease, the applicable provision of such Existing Lease that is claimed to have been
44    violated. Landlord shall use good faith commercially reasonable efforts to obtain the consent of
45    such tenant to Tenant's Expectant Mother Parking Spaces provided Landlord shall not be
46    required to incur any costs or grant concessions to such tenant. Tenant shall have the right to
47    attempt to obtain the consent from such tenant and Landlord shall reasonably cooperate with
48    Tenant. If neither Landlord nor Tenant shall be able to obtain such consent and no other tenant in
49    the Southwest Quadrant has reserved or designated parking spaces, then Tenant shall remove the
50    signage that designates the Expectant Mother Parking Spaces or make such Expectant Mother
51    Parking Spaces non-exclusive.

52         5.2.5   Lighting.  Throughout the Term, Landlord shall keep the Common Areas
53    fully lighted and open to the customers of the Shopping Center seven (7) days a week from dusk
54    until 11:00 p.m. Monday through Saturday and until 7:00 p.m. on Sunday (**"Normal Hours"**).
55    Upon request of Tenant, Landlord shall keep the Common Areas lighted for as long after Normal
56    Hours as Tenant shall request, provided Tenant shall pay for a share of the reasonable cost of
57    said requested lighting, which share shall be equal to the product of (x) such cost, and (y) a
58    fraction, the numerator of which shall be the number of square feet of Floor Area within the
59    Premises and the denominator of which shall be the aggregate number of square feet of Floor
60    Area of all premises within the Shopping Center (including the Premises) open later than Normal

18

1854916.2\C061858\0372671
[bbBaby]

Hours (excluding, however, those tenants and occupants who separately control and pay for their own Common Area lighting). In addition to the foregoing, Landlord shall provide for low level security lighting from one (1) hour after the close of business in the Premises until dawn.

5.2.6   Repairs. During the Term any construction or repair by Landlord permitted or required under this Lease and undertaken in the Critical Area shall:

(a)   except for the Quadrant Development Work, not be performed during the months of August (through Labor Day), November, or December of any year, except in the event of an emergency or as may be otherwise required by applicable Legal Requirements;

(b)   be commenced only upon at least five (5) days' prior notice to Tenant (except in an emergency, in which event Landlord shall only be required to give such notice as is reasonable under the circumstances); and

(c)   be performed in accordance with the requirements of Section 3.3.5 above and in such a manner so as not to materially interfere with the normal conduct of any business operations in the Premises.

5.2.7   Rules and Regulations. Tenant shall comply with the rules and regulations of the Shopping Center as established from time to time by Landlord, within thirty (30) days after Landlord notifies Tenant thereof, provided they: (i) are reasonable, (ii) do not adversely affect the normal conduct of any business operations in the Premises, (iii) do not adversely affect any of Tenant's rights under this Lease, and (iv) are uniformly enforced against all tenants of the Shopping Center and without prejudice against Tenant. In the event of any conflict between the provisions of this Lease and any rules or regulations, the provisions of this Lease shall prevail and govern.

5.2.8   Miscellaneous.

(a)   No Promotional Use. Landlord shall not use or permit the use of all or any portion of the Common Areas in the Southwest Quadrant for retail sales or for promotional purposes provided, however, that tenants of the Shopping Center (including Tenant) shall be permitted to display seasonal merchandise and conduct sidewalk sales in front of their respective stores only ("*Sidewalk Sales*"), provided that such Sidewalk Sales shall: (A) be conducted in a manner consistent with sidewalk sales in first-class shopping centers in the state in which the Shopping Center is located, (B) not materially interfere with normal pedestrian access over the sidewalks, and (C) not materially interfere with the normal business operations of Tenant in the Premises or materially impair the visibility of Tenant's signage. Notwithstanding the foregoing, if Landlord receives a written notice from a tenant under an Existing Lease stating that Tenant's use of the sidewalk for Sidewalk Sales violates its lease, then Landlord shall give Tenant a copy of such letter and, subject to Tenant agreeing to comply with any confidentiality provision in the Existing Lease, the applicable provision of such Existing Lease that is claimed to have been violated. Landlord shall use good faith commercially reasonable efforts to obtain the consent of such tenant to Tenant's Sidewalk Sales provided Landlord shall not be required to incur any costs or grant concessions to such tenant. Tenant shall have the right to attempt to obtain the consent from such tenant and Landlord shall reasonably cooperate with Tenant. If neither Landlord nor Tenant shall be able to obtain such consent, then Tenant shall not conduct any such Sidewalk Sales. To the extent that Landlord has the legal right to prohibit same, Landlord shall use commercially reasonable efforts to prevent any solicitation, distribution of handbills, picketing, or other public demonstration in the Common Areas, except as otherwise may be mandated by applicable Legal Requirements.

(b)   Trash Compactor and Containers. Tenant shall be permitted to maintain and operate, at no extra charge: (i) a trash compactor in the portion of the Common Areas designated on Exhibit B hereto as "*Trash Compactor Pad*"; and (ii) a trash container(s) in the portion(s) of the Common Areas designated on Exhibit B hereto as "*Trash Container Pad*". Tenant, at its sole cost and expense, shall keep the trash compactor and containers neat and clean and repair any damage caused by use and storage of such compactor and containers.

(c)   Shopping Carts. Tenant, at its sole cost and expense, shall be permitted to store its shopping carts in such exterior cart corrals as may be reflected on Exhibits B and D-1 hereto. With respect to shopping carts provided by Tenant for the use of its

19

1854916.2\C061858\0372671
[bbBaby]

1  customers, Tenant will use reasonable efforts to retrieve promptly all shopping carts removed
2  from the Premises consistent with the maintenance and operation of a first-class shopping center.
3  Landlord shall not have any responsibility for damage to Tenant's shopping cart corrals or any
4  damage to Tenant's shopping carts, all of which shall be maintained by Tenant at its sole cost
5  and expense. Within ninety (90) days after the Effective Date, Landlord shall deliver to Tenant
6  the written consent from Dick's and any other applicable party having consent or approval rights
7  to permit Tenant to have shopping cart corrals as indicated on Exhibit B. If Landlord shall be
8  unable to deliver such consent within such 90-day period, Tenant shall have the right, but not the
9  obligation, to obtain Dick's consent for a period of thirty (30) days and if Tenant is unable to
10  obtain such consent (or elects not to obtain same) within such 30-day period, Tenant shall have
11  the right, by notice to Landlord given not later than the tenth (10th) day after the expiration of
12  such 30-day period, to terminate this Lease or if not so terminated, the condition for Landlord to
13  obtain Dick's consent shall be deemed waived. If Tenant terminates this Lease as aforesaid, then
14  neither party shall have any further liability hereunder except for those provisions that expressly
15  survive the expiration or earlier termination of this Lease, including, without limitation,
16  Landlord's reimbursement of Tenant-produced plans to the extent required pursuant to Section
17  3.1 above.

18  (d)  Cellular Towers. No transmission and/or reception towers for
19  wireless telephone or internet communications shall be permitted within the Southwest Quadrant
20  except the foregoing shall not prohibit dish or satellite antennas used solely and in an ancillary
21  manner in connection with Tenant's (or other tenant's) business.

22  (e)  Temporary Storage Containers. Subject to applicable Legal
23  Requirements and the availability of space, Tenant shall have the right to maintain storage
24  containers or trailers from time to time in locations to be agreed upon by Landlord and Tenant.
25  If and to the extent that Tenant has a container or trailer pursuant to the immediately preceding
26  sentence, Landlord shall have the right, upon reasonable prior notice to Tenant sufficient to
27  permit Tenant time to remove its merchandise from the container or trailer, to temporarily
28  relocate Tenant's containers and/or trailers, at Landlord's sole cost, to an area mutually
29  satisfactory to Landlord and Tenant if such relocation is reasonably required because of an
30  emergency situation or to enable Landlord to make repairs, it being agreed that (i) if no area is
31  available in the Shopping Center in which to relocate Tenant's container or trailer, then Tenant
32  shall agree that it shall not have a trailer or container in the Shopping Center during such
33  emergency or repair period so long as no other tenant has a trailer or container in the Shopping
34  Center during such period; and (ii) Landlord's work shall be done in a diligent and expeditious
35  manner so as to minimize the time period in which Tenant's trailers and/or containers are
36  relocated or are not located in the Shopping Center.

37  ARTICLE 6
38  UTILITIES

39  Section 6.1  Utility Service. From and after the Delivery Date, and continuing
40  thereafter through the end of the Term, Tenant shall be solely responsible for and shall pay the
41  cost of utilities services (including, without limitation, electricity, gas, water, sanitary sewer,
42  alarm and telecommunications) consumed in the Premises by Tenant. Tenant shall not be
43  obligated to purchase utility service(s) directly from Landlord, or from any utility provider
44  designated by Landlord. Tenant shall provide separate utility meters exclusively serving the
45  Premises, as part of Tenant's Work (including, without limitation, all connection and hook-up
46  fees but excluding impact fees or other related governmental charges). Tenant's entry upon the
47  Premises prior to the Delivery Date shall not constitute a waiver by Tenant of Landlord's
48  obligation to pay the costs of all utility charges incurred in the Premises prior to such date.
49  Landlord shall not permit the capacity of utility lines available for use at the Premises to be
50  reduced or overloaded by any other persons or entities.

51  Section 6.2  Interruption. Landlord shall not be liable in damages or otherwise
52  for any loss, damage or expense that Tenant may sustain or incur by reason of any change,
53  failure, interference, interruption or defect in the utility services provided to the Premises,
54  provided, that if the utilities serving the Premises are disrupted due to the acts or omissions of
55  Landlord, its agents, contractors, servants or employees, Landlord shall promptly restore the
56  affected utilities at Landlord's sole cost and expense. If the utilities disrupted by Landlord are
57  not restored within twenty-four (24) hours after the Landlord has knowledge of the disruption,

20

1    and Tenant is unable to conduct its normal business in the Premises as a result thereof, Rent shall
2    be equitably abated during the period of disruption.

3                                    ARTICLE 7
4                                      SIGNS

5         Section 7.1    Tenant's Building Signage.  Subject to compliance with applicable
6    Legal Requirements, Tenant shall have the exclusive right, as part of Tenant's Work, and
7    thereafter during the Term, at its sole cost and expense, to erect, maintain, and replace on the
8    storefront and exterior walls of the Premises, and on the side walls of any entrance design
9    element, if any, signs (including, without limitation, under-canopy (e.g., blade) signs); banners
10   (including temporary banners placed on the storefront of the Premises and such other walls of the
11   Premises as selected by Tenant), such banners not to exceed a maximum of 60 days per year;
12   awnings; and flags, all of which being of such size, design and color as Tenant, from time to
13   time, may desire provided same are Tenant's or Tenant's subtenant's then prototypical signage
14   and if not such prototypical signage, then Landlord's consent shall not be unreasonably withheld
15   or delayed.  Tenant shall also be entitled, at Tenant's sole cost and expense, to install and
16   maintain, during the period commencing on the Effective Date and ending on the day prior to the
17   Rent Commencement Date, a temporary sign or signs in the area designated on Exhibit B which
18   states "Buy Buy Baby Coming Soon" (which signs are more particularly shown in Exhibit F
19   hereto).  Tenant may erect and maintain in the interior of the Premises any signs it may desire,
20   provided same are professionally prepared.  Notwithstanding the foregoing, Landlord hereby
21   approves Tenant's signage as shown on Exhibits D-1 and/or F (subject to compliance with Legal
22   Requirements).

23        Section 7.2    Pylon/Monument Signage.  Landlord shall provide pylons and
24   monuments at the locations shown on Exhibit B hereto during the entire Term, and obtain all
25   permits and approvals therefor.  Tenant shall have the right, at its sole cost and expense, to erect
26   and maintain its identification sign, as shown on Exhibit F hereto (and having colors as shown on
27   Exhibit F hereto).  The dimensions and location of Tenant's pylon sign panel(s) shall be as
28   shown on Exhibit F.  Landlord shall maintain all pylons and monuments in good order and
29   repair, and allow Tenant access to replace its signs thereon, at Tenant's cost and expense.
30   Tenant shall maintain its sign panels on any pylon or monument in good order and repair at
31   Tenant's sole cost and expense.  Subject to changes required by applicable Legal Requirements,
32   Landlord shall not change or alter the location, structure, height or general appearance of the
33   pylons or monuments without obtaining Tenant's prior consent, such consent not to be
34   unreasonably withheld, conditioned or delayed.  Landlord shall be responsible for the cost of
35   maintaining all pylons and monuments bearing Tenant's sign panel(s) and the cost of any
36   electricity used to illuminate them  Tenant shall have the right to place its sign panel on certain
37   directional signs to be located in the parking areas of the Shopping Center, the number and
38   location of such directional signs to be mutually agreed to by Landlord and Tenant.  Tenant's
39   name shall be listed on all Shopping Center directories, websites, maps, pamphlets and similar
40   materials (including directories and maps, if any, located in the Enclosed Mall portion of the
41   Shopping Center).

42        Section 7.3    Signage: Alteration/Removal/Allocation.  Tenant shall have the
43   right, from time to time, without Landlord's approval and at Tenant's sole cost and expense, to
44   change its signs on the storefront and exterior of the Premises, as well as on any pylon or
45   monument, provided that the area of the new sign is no larger than the area of the sign which it
46   replaces, the method of construction and attachment is substantially the same and such sign(s)
47   represent Tenant's or Tenant's subtenant's then prototypical signage and if not Tenant's or such
48   subtenant's then prototypical signage, then Landlord's consent shall not be unreasonably
49   withheld or delayed.  Upon the expiration or earlier termination of the Lease, Tenant shall
50   remove its signs from the fascia or other exterior walls of the Premises and from any pylon or
51   monument, and shall repair any damage occasioned thereby.  The signage rights granted to
52   Tenant pursuant to this Article 7 shall, at Tenant's option, be allocated to or between Tenant
53   and/or any subtenant(s) (but there may not be more than two (2) occupants on any such pylon
54   panel) of all or any portion of the Premises.  All signage installed by Landlord and Tenant
55   hereunder shall comply with applicable Legal Requirements.

56        Section 7.4    Cooperation.  Landlord, upon request, shall execute any consents
57   or applications which may be required by applicable Legal Requirements to permit the

                                        21

1　placement, installation, and/or replacement by Tenant of any signs on any part of the Premises or
2　on any pylon or monument, to which Tenant may be entitled under this Lease.

3　　　　　Section 7.5　　Signage and Building Restrictions.  Except for any structures or
4　trees existing in the Shopping Center as of the Effective Date, and any construction barricades or
5　fencing that may be temporarily erected as part of Landlord's Quadrant Development Work,
6　Landlord shall not permit any obstructions (including, without limitation, any trees, bushes or
7　other landscaping, scaffolding or architectural details) to obscure Tenant's storefront, storefront
8　signs or other exterior wall signs or any pylons, monuments or other freestanding signs and
9　Landlord shall trim any trees, bushes or other landscaping to eliminate such obstruction.

10　　　　　　　　　　　　　　　ARTICLE 8
11　　　　　　　　　　　ALTERATIONS AND IMPROVEMENTS

12　　　　　Section 8.1　　Alterations and Improvements.

13　　　　　8.1.1　Tenant shall not perform any alterations or improvements which are
14　structural or which change the exterior of the Premises  (except to the extent same pertain to
15　Tenant's Work) without the prior approval of Landlord, not to be unreasonably withheld or
16　delayed, provided, however, that Tenant's alterations of the exterior of the Premises to conform
17　to Tenant's then-current prototypical elevation shall not require Landlord's consent provided that
18　such exterior alterations or improvements (a) are architecturally harmonious with the balance of
19　the Shopping Center, (b) do not increase Landlord's repair and maintenance costs under Section
20　9.2 (unless Tenant agrees to pay for such increases) and (c) do not increase the Floor Area of the
21　Premises.  Prior to the commencement of construction of the proposed structural alterations or
22　improvements described in the preceding sentence, Tenant shall provide Landlord with copies of
23　the plans therefor, which delivery of plans shall be for Landlord's consent to the extent such
24　consent is required pursuant to this Section 8.1.1.  All work performed by Tenant in connection
25　with structural and non-structural alterations or improvements shall be done at Tenant's sole cost
26　and expense, in a good and workmanlike manner and in compliance with all applicable Legal
27　Requirements.  The provisions of this Section 8.1 shall not apply to Tenant's building signage,
28　which shall be governed by the applicable provisions of Article 7 above.  Any alterations or
29　improvements undertaken by Tenant shall comply with the Existing Lease Limitations.

30　　　　　8.1.2　Subject to the restrictions contained in Section 8.1.1 above with respect to
31　alterations to the exterior of the Premises, Tenant may, from time to time, at its sole cost and
32　expense, without the prior approval of Landlord, make non-structural alterations and non-
33　structural improvements to the interior and/or exterior of the Premises as Tenant deems
34　necessary or desirable, including, but not limited to, electrical systems, heating, ventilation and
35　air conditioning and other mechanical systems, installation of fixtures and equipment, painting,
36　and wall and floor coverings.

37　　　　　8.1.3　Tenant shall have the right to subdivide the Premises into no more than
38　two (2) separate stores, each of which must contain at least 5,000 square feet of Floor Area and
39　shall have its own front entrance and access to the loading docks in the rear of the Premises, as
40　well as separately sub-metered utilities.

41　　　　　8.1.4　Tenant shall have the exclusive right to erect and maintain an antenna and
42　a satellite dish, and/or such other equipment as Tenant shall reasonably desire, on the roof of the
43　Premises, provided that Tenant: (i) obtains Landlord's prior approval of its plans for the
44　installation of such equipment, (ii) uses a contractor designated or approved by Landlord for all
45　roof penetrations so as not to violate or invalidate any roof warranties maintained by Landlord, if
46　any, (iii) maintains the area where roof penetrations are made while Tenant's equipment is
47　present, (iv) repairs any damage to the roof caused by the making of the roof penetrations,
48　including, but not limited to, the repair of the roof penetrations upon the removal of any
49　equipment installed thereon, and (v) erects and maintains such equipment in accordance with
50　applicable Legal Requirements.  Landlord shall have the right to require Tenant to relocate any
51　such antenna, satellite dish and/or such other equipment and Landlord shall reimburse Tenant for
52　the relocation costs and expenses incurred by Tenant, including costs and expenses incurred by
53　Tenant in connection with "after hours" work if reasonably required.

54　　　　　8.1.5　Landlord shall execute and return to Tenant all appropriately completed
55　building department or equivalent applications reasonably necessary for Tenant to perform its

1    alterations within ten (10) days after Tenant's request therefor, and will reasonably cooperate
2    with Tenant in the permitting process, provided such cooperation imposes no costs or liability on
3    Landlord.

4        8.1.6    If any violation of any applicable Legal Requirement which is noted
5    against the Shopping Center or the Premises (other than a violation caused by Tenant) prevents
6    Tenant from obtaining a building permit for any alterations or a certificate of occupancy, then,
7    upon request by Tenant, Landlord shall promptly and diligently cause such violation to be
8    removed of record to the extent required to permit Tenant to obtain its building permit or
9    certificate of occupancy, as the case may be.

10        8.1.7    Landlord shall not make any alterations to the Premises (including,
11    without limitation, changing the design, color or materials of the exterior of the Premises) nor
12    shall Landlord construct an additional floor or floors above the Premises. Landlord shall neither
13    make nor permit to be made any alterations to the exterior architectural theme of the remainder
14    of the Southwest Quadrant which would be inconsistent with a first-class shopping center in the
15    state in which the Shopping Center is located (exclusive of other tenants' entrance features)
16    without the prior consent of Tenant. Landlord covenants and agrees that with respect to the
17    buildings to be constructed in the areas designated as Retail A and Retail A-2, the highest point
18    of the roof shall not exceed twenty nine (29) feet and the height of any architectural feature shall
19    not exceed forty one (41) feet, in each case as measured from the finished floor level.

20        8.1.8    Tenant shall have the exclusive right to erect and maintain on the roof of
21    the Premises, a passive solar array for the production of electricity (the *"System"*), provided that
22    Tenant: (i) obtains Landlord's prior approval of its plans for the installation of the System,
23    (ii) uses a contractor designated or approved by Landlord for all roof penetrations so as not to
24    violate or invalidate any roof warranties maintained by Landlord, if any, (iii) maintains the area
25    where roof penetrations are made while the System is present, (iv) repairs any damage to the roof
26    caused by the making of the roof penetrations, including, but not limited to, the repair of the roof
27    penetrations upon the removal of any component of the System, (v) erects and maintains the
28    System in accordance with applicable Legal Requirements, (vi) the installed System is not
29    visible to customers in the Shopping Center, (vii) uses the System solely for supplementing
30    Tenant's own energy needs in the Premises and not for the resale of energy to third parties, and
31    (viii) indemnifies Landlord and holds Landlord harmless from and against any and all claims,
32    actions, damages, liability and expense, including reasonable attorneys' fees, in connection with
33    loss of life, personal injury and/or damage to property arising from or out of the System, except
34    to the extent such claims, actions, damages, liability and expense are caused by the acts or
35    omissions of Landlord, its agents, contractors, licensees or employees, or for which any of said
36    parties may be statutorily liable to third parties. The System shall be deemed to be part of
37    Tenant's Property. Landlord acknowledges and agrees that Tenant or its Affiliate or transferee
38    shall be the exclusive owner and operator of the System and Landlord shall have no right, title or
39    interest in such equipment or any component thereof, notwithstanding that any such equipment
40    may be physically mounted or adhered to the Premises. Landlord acknowledges and agrees that,
41    notwithstanding the System's presence as a fixture on the Premises, Tenant or its Affiliate or
42    transferee is the sole and exclusive owner of: (i) the electricity generated by the System, (ii) the
43    environmental attributes of the System, and (iii) any and all credits (including tax credits),
44    rebates, benefits, reductions, offsets, and allowances and entitlements of any kind, howsoever
45    entitled, resulting from the environmental or related attributes of the System. Without the
46    express written consent of Tenant, Landlord shall not make or publish any public statement or
47    notice regarding any environmental incentive relating to the System or any environmental
48    attribute of the System or the energy output from the System.

49        8.1.9    Landlord and Tenant agree that in the event that Tenant shall perform or
50    cause to be performed any alterations or improvements (including without limitation Tenant's
51    Work) to, or within, the Premises which would cause an owner or occupant of the Premises to be
52    entitled to an "Energy Rebate" (hereinafter defined), then Tenant shall be solely entitled to the
53    benefit of such Energy Rebate. As used herein, an *"Energy Rebate"* shall be deemed to be any
54    rebate, refund, voucher, credit, tax relief, abatement, or other monetary inducement (such as, for
55    examples only, energy efficiency incentives, property tax abatements, sales tax refunds, tax
56    credits, governmental grants, utility rebates or refunds) given by a governmental, non-
57    governmental, private or public utility, or other entity as a result of efforts to conserve energy or
58    other utilities or cause property or processes to be more environmentally friendly. In addition to
59    the foregoing, Tenant shall be entitled to receive any and all other incentives which Tenant may

1  negotiate with state and local officials pertaining to construction and/or remodeling of the
2  Premises, hiring of employees, property tax abatements, sales tax refunds and/or any other
3  "Incentives" (hereinafter defined) secured.  The term *"Incentive"* is to include, but is not limited
4  to, any cost reduction, rebate, or any other benefit negotiated by Tenant and obtained by
5  Landlord that may directly or indirectly benefit Tenant.  If any such Energy Rebate and/or
6  Incentive is required to be paid or credited directly to Landlord, then: (i) Landlord shall elect to
7  take the Energy Rebate and/or Incentive in a lump sum, or if that is not permitted, then in the
8  shortest number of installments possible, so as to permit Tenant to recoup the full amount of the
9  Energy Rebate and/or Incentive during the Term of this Lease, and (ii) within thirty (30) days
10 after Landlord's receipt of the Energy Rebate and/or Incentive, Landlord shall deliver a check to
11 Tenant for such amount, or in the alternative, Tenant shall be entitled to offset the full amount of
12 such Energy Rebate and/or Incentive against the next succeeding installment(s) of Rent then
13 payable under the Lease.

14                                        ARTICLE 9
15                                         REPAIRS

16        Section 9.1    Tenant's Repairs.  Subject to the provisions of Articles 10 and 11
17 hereof, and except as otherwise provided in Section 9.2 below, Tenant shall maintain in good
18 condition and repair, at its sole cost and expense: (i) the non-structural, interior elements of the
19 Premises (including plate glass, storefront windows, doors, door closure, window and door
20 frames, molding, locks and hardware and the electrical, plumbing, mechanical, and/or alarm
21 systems located in, or serving exclusively the Premises); (ii) the heating, ventilation and air
22 conditioning ("*HVAC*") units exclusively serving the Premises; (iii) during the first twelve (12)
23 calendar months only after the Rent Commencement Date (the "***Tenant Repair Period***"), the
24 improvements which constitute Tenant's Work, including, without limitation, the roof and
25 structural components of the Premises; (iv) the fixtures within the Premises; and (v) any damage
26 to the Premises or the Shopping Center which is occasioned by (A) the act or omission of
27 Tenant, its employees, agents or contractors, or (B) any breach by Tenant of any provision of this
28 Lease.  All repairs and replacements on Tenant's part to be performed hereunder shall be at
29 Tenant's sole cost and expense, and performed in a good and workmanlike manner in accordance
30 with all applicable Legal Requirements.

31        Section 9.2    Landlord's Repairs.  Subject to the provisions of Articles 10 and
32 11 hereof and except as otherwise provided in Section 9.1 above, Landlord shall perform, as the
33 same shall from time to time be necessary, all repairs and replacements to the following:

34           (a)    the buildings of the Shopping Center as necessary to maintain
35 same in good condition and repair (including, without limitation, repainting the exterior walls of
36 the buildings of the Shopping Center (including, without limitation, the Premises)) as same may
37 be reasonably required from time to time during the Term;

38           (b)    after the Tenant Repair Period, the structural elements of the
39 Premises, which shall be deemed to include, without limitation, the roof joists, columns,
40 footings, foundation, exterior walls (including, without limitation,  repainting, but excluding
41 plate glass, storefront windows, doors, door closure devices, window and door frames, molding,
42 locks and hardware, and painting or other treatment of interior walls), floor (but not the floor
43 covering, unless the same is damaged as a result of a floor defect or settling), and the structural
44 elements of any building of which the Premises may be a part;

45           (c)    after the Tenant Repair Period, the roof, gutters, flashings,
46 downspouts and scuppers;

47           (d)    the electric, gas, water, sanitary sewer, and other public utility lines
48 serving the Premises, to the point of connection to the Premises (including, without limitation,
49 any fire pump facilities or electrical switch gear serving the Premises);

50           (e)    all electric, gas, water, sanitary sewer, and other public utility lines
51 and ducts in or passing through the Premises which do not exclusively serve the Premises; and

52           (f)    any damage to the Premises or the Shopping Center which is
53 occasioned by (A) the act or omission of Landlord, its employees, agents or contractors, or (B)
54 any breach by Landlord of any provision of this Lease.

All repairs and replacements on Landlord's part to be performed hereunder shall be at Landlord's sole cost and expense, performed in a good and workmanlike manner in accordance with all applicable Legal Requirements, and without material interference with or disruption to the normal conduct of any business operations in the Premises. Landlord shall give Tenant at least three (3) business days' prior notice of any repairs or replacements to, or which would otherwise affect the normal conduct of any business operations in, the Premises (except in the case of an emergency posing imminent risk of material harm to persons or property, in which event Landlord shall only be required to give such notice as is reasonable under the circumstances). If, in Tenant's reasonable judgment, Landlord's repairs would materially interfere with or disrupt the normal conduct of any business operations in the Premises, Landlord shall perform such repairs only after the regular hours of operation of Tenant and any other occupant of the Premises (or any portion thereof), and Landlord shall reimburse Tenant for the reasonable costs and expenses incurred by Tenant for utility charges in connection with such "after hours" repairs, and in the event any such repairs are required during the one year period following the Delivery Date, security expenses and over-time payments to Tenant's employees. In the event Landlord does not reimburse Tenant for any amounts payable to Tenant hereunder within thirty (30) days after Tenant's demand therefor, Tenant shall have the right (in addition to any rights and remedies to which it may be entitled under this Lease, at law, or in equity) to offset such amounts against Rent, together with interest thereon at the Lease Interest Rate from the date of outlay until reimbursement or full satisfaction by credit.

Section 9.3   Legal Compliance Work. Except as hereinafter expressly provided, Landlord shall be responsible, at its sole cost and expense (and not includable in Common Areas Charges), for performing all "Legal Compliance Work" (hereinafter defined). Notwithstanding the foregoing, Tenant shall be responsible, at its sole cost and expense, for the performance of Legal Compliance Work: (a) pertaining to the interior elements of the Premises which are not structural; or (b) required solely as a result of Tenant's specific manner of use of the Premises (i.e., are not of general applicability to tenants and occupants of the Shopping Center); provided, however, that the foregoing shall not relieve Landlord of its obligations to perform: (x) Landlord's Work in accordance with all Legal Requirements, and (y) the repairs required in this Lease. As used herein, *"Legal Compliance Work"* shall mean any obligation, addition, alteration, improvement, or rebuilding, structural or otherwise, to or of the Premises, the Shopping Center, or any part thereof, as applicable, which may be required by reason of any Legal Requirement.

## ARTICLE 10
## INDEMNIFICATION, INSURANCE AND WAIVER OF SUBROGATION

Section 10.1   Mutual Release, Waiver of Subrogation and Mutual Indemnification.

10.1.1   Mutual Waiver of Claims. Landlord and Tenant, on their own behalf and on behalf of anyone claiming under or through either one by way of subrogation, hereby release and waive all rights of recovery and causes of action against each other and their respective Affiliates from any and all liability for any loss or damage to property or resulting from damage to such property (and, in either case, any resulting loss of business or rental income), whether caused by the negligence or fault of the other party, which is normally insured under Special Form property insurance (so-called "All-Risk") and time element insurance required to be maintained hereunder. In the event either Landlord or Tenant is a self-insurer or maintains a deductible (as either may be permitted hereunder), then the self-insuring party or the party maintaining the deductible hereby releases the other party from any liability arising from any event which would have been covered had the required insurance been obtained and/or the deductible not been maintained.

10.1.2   Waiver of Subrogation. Landlord and Tenant shall cause each property insurance policy carried by either of them insuring the Premises, the contents thereof, or the Shopping Center, to provide that the insurer waives all rights of recovery by way of subrogation or otherwise against the other party hereto (and all of such other party's Affiliates) in connection with any loss or damage which is covered by such policy or that such policy shall otherwise permit, and shall not be voided by the releases provided above.

25

10.1.3 <u>Mutual Indemnification</u>.

(a)    Except as otherwise provided in Subsections 10.1.1 and 10.1.2 above, Tenant covenants to defend and indemnify Landlord and hold Landlord harmless from and against any and all claims, actions, damages, liability and expense, including reasonable attorneys' fees, (x) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon the Premises, or any part thereof, or (y) occasioned wholly or in part by any act or omission of Tenant, its agents, contractors, employees, servants, or licensees, <u>except</u> to the extent such claims, actions, damages, liability and expense are caused by the acts or omissions of Landlord, its agents, contractors, licensees, employees, or other tenants and occupants, or for which any of said parties may be statutorily liable.

(b)    Except as otherwise provided in Subsections 10.1.1 and 10.1.2 above, Landlord covenants to defend and indemnify Tenant and hold Tenant harmless from and against any and all claims, actions, damages, liability and expense, including reasonable attorneys' fees, (x) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon any portion(s) of the Shopping Center (excluding the Premises), or (y) occasioned wholly or in part by any act or omission of Landlord, its agents, contractors, employees, servants, tenants (other than Tenant), occupants or licensees, <u>except</u> to the extent such claims, actions, damages, liability and expense are caused by the acts or omissions of Tenant, its agents, contractors, licensees or employees, or for which any of said parties may be statutorily liable.

Section 10.2    <u>Tenant's Insurance</u>.

10.2.1 <u>Tenant's Insurance</u>.  Tenant, at its own cost and expense, shall maintain in full force and effect from and after the Delivery Date**,** and throughout the Term: (i) commercial general liability insurance protecting and insuring Tenant, naming Landlord as "additional insured-lessor" for claims arising out of the use or occupancy of the Premises by Tenant and the obligations assumed by Tenant under this Lease, and having a combined single limit of liability of not less than Ten Million Dollars ($10,000,000) for bodily injury, death and property damage liability; and (ii) Special Form (so-called "All-Risk") property insurance, on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of all of Tenant's Property and, after completion of Tenant's Work, subsequent leasehold improvements performed by Tenant (excluding Tenant's Work).  At any time that Tenant sells liquor, Tenant's commercial general liability insurance shall include coverage for liquor liability.

10.2.2 <u>Self-Insurance</u>.  All insurance required to be maintained under this Section 10.2 may be: (i) insured under an individual policy covering this location, or  a blanket policy or policies which includes other liabilities, properties and locations of Tenant or its Affiliates; **(ii)** self-insured by Tenant via a deductible, a formal plan of self-insurance, or otherwise, provided that Tenant or any guarantor of Tenant's obligations under this Lease maintains, during the period of such self-insurance, a net worth of at least Fifty Million Dollars ($50,000,000); or **(iii)** insured or self-insured by Tenant through a combination of any of the foregoing insurance programs.

Section 10.3    <u>Landlord's Insurance</u>.

10.3.1 <u>Liability Insurance</u>.  Landlord shall maintain in full force and effect from and after the Effective Date and throughout the Term commercial general liability insurance with regard to the Shopping Center protecting and insuring Landlord, naming Tenant as "additional insured-lessee", and having a combined single limit of liability of not less than Ten Million Dollars ($10,000,000) for bodily injury, death and property damage liability.

10.3.2 <u>Special Form Property Insurance</u>.  Landlord shall procure and maintain in full force and effect from and after the Effective Date and throughout the Term Special Form (so-called "All-Risk") property insurance (including loss of rents for a minimum period of one (1) year), endorsements for coverages for flood for the Southwest Quadrant only (if the Southwest Quadrant is located in a flood zone), earthquake and earth movement [sinkholes] (if customarily carried by landlords of first-class shopping centers in the Daly City metropolitan area), windstorm, and Ordinance or Law coverage, on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of all of the buildings (including the

26

Premises and Tenant's Work) and other insurable improvements in the Shopping Center; provided, however, in no event shall such insurance cover Tenant's Property or any subsequent improvements made to the Premises by Tenant after completion of Tenant's Work. All property insurance policies required to be maintained by Landlord pursuant to this Subsection 10.3.2 shall provide that any proceeds thereof shall be deposited with Landlord's Mortgagee, or if none, to Landlord, in either event to be held in trust by such party and disbursed only in accordance with the provisions of, and for the purposes set forth in, Section 11.1 hereof. The property insurance required to be maintained by Landlord pursuant to this Section (excluding coverage for windstorm, flood and earthquake) shall not have deductibles exceeding One Hundred Thousand Dollars ($100,000) without Tenant's prior consent, provided that the deductibles carried by Landlord for windstorm, flood and earthquake are commercially reasonable.

10.3.3 Tenant's Share of Insurance Premiums. Landlord acknowledges and agrees that Tenant shall not be responsible for any payment to Landlord of any insurance premiums in connection with the Shopping Center and/or the Premises, which payments are deemed to be included in Common Area Charges.

Section 10.4   General Insurance Requirements.

10.4.1 All insurance required to be maintained by the parties under this Lease shall be maintained with insurance companies qualified to do business in the state in which the Shopping Center is located, and rated at least A-/VIII by the most current Best's Key Rating Guide (or its equivalent, if such Guide ceases to be published). Each party shall use its diligent efforts to have its insurers provide thirty (30) days (ten (10) days in the event of non-payment of premium) prior notice to the other party of cancellation or non-renewal of any policy required hereunder. Each policy carried by either party shall be written as a primary policy not contributing with, and not in excess of, coverage carried by the other. Each party shall provide to the other duly executed certificates evidencing the insurance coverage described in Sections 10.2.1 and 10.3 above. Any insurance policies in favor of Landlord shall name Equity One Realty & Management CA, Inc., as an additional insured. Tenant shall deliver these insurance policies or certificates thereof, reasonably satisfactory to Landlord, issued by the insurance company to Landlord prior to the Delivery Date and thereafter prior to the expiration date of each policy.

10.4.2 The liability insurance requirements under Sections 10.2 and 10.3 above shall be reviewed by Landlord and Tenant every five (5) years for the purpose of mutually increasing (in consultation with their respective insurance advisors) the minimum limits of such insurance to limits which shall be reasonable and customary for similar facilities of like size and operation in accordance with generally accepted insurance industry standards. The replacement value of the buildings and other insurable improvements constituting the Shopping Center shall be re-evaluated from time to time at the request of either Landlord or Tenant.

ARTICLE 11
FIRE AND OTHER CASUALTY; EMINENT DOMAIN

Section 11.1   Fire and Other Casualty.

11.1.1 (a)   Except as otherwise provided in this Section 11.1, if all or a portion of the Premises, the Common Areas (including all improvements thereto), the Enclosed Mall or the Southwest Quadrant (collectively, the "**Restoration Area**")shall be damaged by fire or other casualty, Landlord shall promptly rebuild and restore the same to the condition existing on the date immediately prior to such fire or other casualty, which restoration shall exclude all of Tenant's leasehold improvements performed by Tenant after the completion of Tenant's Work and Tenant's Property. The proceeds of the policies required to be obtained and maintained by Landlord pursuant to Subsection 10.3.2 hereof shall, to the extent necessary, be used for the performance of such rebuilding and restoration work. Landlord shall give Tenant at least sixty (60) days' prior notice of the date on which the restoration work to the Premises will be Substantially Completed. In the event Landlord's insurance proceeds are insufficient to complete such work, Landlord shall provide the balance of the amount necessary to rebuild or restore the Shopping Center in the manner provided in this Section 11.1.1.

(b)   Notwithstanding the foregoing, if any portion of the Premises are so damaged or destroyed, Tenant shall have the right to require Landlord to make changes to the

27

Premises in the course of, and as part of, such rebuilding or restoration work, which changes are in excess of Landlord's rebuilding and restoration obligations set forth in Section 11.1.1(a) above. If the net cost and expense of such rebuilding or restoration work is increased solely as a result of such changes (taking into consideration any and all actual reduced and additional costs resulting from such changes and/or other cost savings arising therefrom), then Tenant shall pay to Landlord, as Additional Rent, the amount of such net increase, which amount shall be due and payable within thirty (30) days after Landlord has delivered to Tenant invoices evidencing such increase and other supporting documentation as may be reasonably required by Tenant (but in no event earlier than the occurrence of the date on which possession of the restored areas of the Premises are delivered to Tenant). To the extent that Landlord's substantial completion of such rebuilding or restoration work is delayed solely as a result of such changes (taking into consideration any and all reasonable time savings to Landlord resulting from such changes), then the applicable period(s) specified in Section 11.1.2 below shall be appropriately adjusted to the extent of such net delay.

(c)    If, in Tenant's reasonable judgment, any damage to the Premises renders all or any portion of the Premises unusable for the conduct of Tenant's business or, in the case of any damage to the Shopping Center, materially interferes with the normal conduct of any business operations in the Premises, the Rent shall be equitably reduced or totally abated based upon the extent to which the remaining portion of the Premises may, in Tenant's reasonable judgment, be utilized for its normal conduct of business.

11.1.2 In the event that:

(a)    Landlord does not commence the repair and restoration work to the Restoration Area as required pursuant to this Section 11.1 within one hundred eighty (180) days after the date of such destruction (subject to the Restoration Extension, as defined below), or thereafter fails to diligently pursue the completion of such repair and restoration work (subject to Force Majeure or such period as may be reasonably necessary for the adjustment of insurance proceeds, not to exceed sixty (60) days in the aggregate); or

(b)    the required repairs and restorations to the Restoration Area are not Substantially Completed by Landlord in accordance with the provisions of this Section 11.1 within one (1) year after the date of destruction (which period may be extended by reason of an event of *Force Majeure*, not to exceed ninety (90) days in the aggregate, provided that Landlord shall have given Tenant notice thereof promptly after its occurrence and subject to the Restoration Extension, as defined below),

then, in either of such events, Tenant shall have the right, at its sole discretion and option, to:

(i)    after giving thirty (30) days' prior notice to Landlord (and Landlord's continued failure to commence and diligently pursue such repairs and restoration work to completion), perform or complete, as the case may be, said work (or any portion thereof) on Landlord's behalf and at the sole cost of Landlord, which cost Landlord shall pay to Tenant during the course of such repairs within thirty (30) days after Tenant's delivery to Landlord of an invoice therefor and, in default of any such payment, Tenant shall have the right to offset the amount thereof, together with interest at the Lease Interest Rate, against the Rent next accruing hereunder; provided, however, that Tenant's right to make such repairs and restoration on Landlord's behalf shall be limited to the Premises, access routes to Tenant's loading dock, Tenant's signage and trash facilities, and the Critical Areas (it being agreed, without limiting the foregoing provisions of this Subsection 11.1.2, that at Tenant's election all insurance proceeds paid or payable to Landlord or Landlord's Mortgagee pursuant to Section 10.3 hereof shall be paid (or, as applicable, in turn delivered) directly to Tenant, to be applied to such work by Tenant as same is being performed); or

(ii)    seek to obtain specific performance of Landlord's repair and restoration obligations pursuant to the laws of the state in which the Shopping Center is located; provided, however, that Tenant's right to seek specific performance shall be limited to repair and restoration of the Premises, the Critical Area, and Tenant's loading and trash removal facilities and Tenant's signage; or

(iii)    terminate this Lease by thirty (30) days' notice to Landlord.

28

In addition to the foregoing, if, in the opinion of an independent licensed architect designated by Tenant (and reasonably acceptable to Landlord), the required repairs and restorations to the Restoration Area cannot be completed by Landlord in accordance with the provisions of this Section 11.1 within one (1) year after the date of destruction, Tenant shall have the right, at its sole discretion and option, to terminate this Lease by giving Landlord at least thirty (30) days' notice thereof, which notice shall be given no later than the date which is ninety (90) days after the date of the casualty, after which 90-day period Tenant shall be deemed to have waived its termination right.  If Tenant has not waived its termination right within thirty (30) days after the date of the casualty, then the 180 day period referred to in Section 11.1.2(a) above and the one (1) year period referred to in Section 11.1.2(b) above shall each be extended one (1) day for each day that Tenant has not waived its termination right after such thirty (30) day period (the "**Restoration Extension**").

11.1.3  If the Premises are substantially destroyed by fire or other casualty during the last two (2) years of the Term to the extent of more than one-third (1/3) of the Floor Area thereof, Landlord or Tenant shall each have the right to terminate this Lease as of the date of such damage or destruction by giving notice within thirty (30) days following such damage or destruction, but Tenant may negate any termination by Landlord by agreeing to extend the Term for an additional five (5) year period by exercising an option pursuant to Subsection 2.2.2 hereof, if available, within ten (10) days after receipt of the termination notice from Landlord.

Section 11.2    Eminent Domain.

11.2.1  As used in this Section 11.2, "***Taking***" or "***Taken***" shall mean a taking for any public or quasi-public use by any lawful power or authority by exercise of the right of condemnation or eminent domain or by agreement between Landlord and those having the authority to exercise such right.

11.2.2  If all of the Premises shall be Taken, this Lease shall terminate as of the date of vesting of title or transfer of possession, whichever is earlier, without further liability on the part of either Landlord or Tenant, except for an adjustment between the parties for the Rent payable by Tenant hereunder.

11.2.3  In the event that:

(a)    any portion of the Premises shall be Taken so that it is commercially unreasonable or unfeasible for Tenant, in its reasonable judgment, to conduct its normal business in the Premises;

(b)    as a consequence of any Taking: (i) portions of the Shopping Center shall be divided or separated in any manner that it materially interferes with parking, visibility, or access to the Premises from other portions of the Shopping Center, or (ii) the Shopping Center no longer has all of the entrances designated Critical Access Ways on Exhibit B, and as a result, it is not commercially reasonable or feasible for Tenant, in its reasonable judgment, to conduct its normal business in the Premises;

(c)    there occurs, in Tenant's reasonable judgment, a denial of adequate access to the Shopping Center at the grade of any street adjoining the Shopping Center or to any easement granted under this Lease, whether or not a Taking shall have occurred;

(d)    any portion of the Shopping Center shall be Taken which materially interferes with parking, visibility or access to the Premises, and as a result of such taking it is commercially unreasonable or unfeasible for Tenant, in its reasonable judgment, to conduct its normal business in the Premises;

(e)    more than twenty-five (25%) percent of the total Floor Area of all of the buildings in the Restoration Area (other than the Premises) are Taken; or

(f)    five (5%) percent or more of the parking spaces located in the Critical Area are Taken, or if so many of the parking spaces in the Shopping Center are Taken such that there are fewer than (i) 4.0 parking spaces for every one thousand (1,000) square feet of Floor Area in the Shopping Center, or (ii) the number of parking spaces required by applicable Legal Requirements;

29

then, in any of such events, Tenant shall have the right to terminate this Lease by giving at least
sixty (60) days' prior notice to Landlord within sixty (60) days of any such event, in which event
this Lease shall terminate without any further liability on the part of either Landlord or Tenant,
except for an adjustment between the parties for the Rent payable by Tenant hereunder and for
payment to Tenant for its share of the award for the taking pursuant to Subsection 11.2.5 below.
Upon any partial Taking of the Premises, the Rent shall be equitably reduced or totally abated
based upon the extent to which the remaining portion of the Premises may, in Tenant's
reasonable judgment, be utilized for its normal conduct of business.

If the Premises are reduced by twenty five percent (25%) or more, or a material portion of the
Restoration Area is taken by condemnation so as to render, in Landlord's reasonable judgment,
the remainder unsuitable for use as a retail shopping center then, in either of such events,
provided Landlord terminates all of the leases in the Restoration Area, Landlord shall have the
right to terminate this Lease by giving at least sixty (60) days' prior notice to Tenant within sixty
(60) days of any such event, in which event this Lease shall terminate without any further
liability on the part of either Landlord or Tenant, except for an adjustment between the parties
for the Rent payable by Tenant hereunder and for payment to Tenant for its share of the award
for the taking pursuant to Subsection 11.2.5 below.

        11.2.4  If this Lease is not terminated pursuant to this Section 11.2, Landlord, at
its sole cost and expense, within a reasonable period of time after such Taking, shall repair and
restore the area not so Taken to tenantable condition, similar in physical appearance to the
condition of the area immediately prior to the Taking, pursuant to plans and specifications
reasonably approved by Tenant (which repair and restoration shall, as applicable, exclude
leasehold improvements performed by Tenant subsequent to the completion of Tenant's Work
and Tenant's Property), and any and all amounts awarded to Landlord for any Taking shall be
made available to and used by Landlord for any rebuilding or restoration which it is required to
perform hereunder.  During the period of such repairs and restoration, all Rent shall abate to the
extent that the Premises may not, in Tenant's reasonable judgment, be used by Tenant for the
normal conduct of its business.  Such abatement shall terminate in accordance with the terms of
Section 11.3 below.  Landlord shall give Tenant at least sixty (60) days' prior notice of the date
on which the restoration work to the Premises will be Substantially Completed.  In connection
with any Taking or partial Taking of the Premises, Tenant shall be entitled to claim an award for
loss of business, leasehold improvements, fixtures and equipment and removal and reinstallation
costs; provided, however, that no award shall be payable to Tenant which reduces the award
payable to Landlord for its fee interest in the Premises.

        11.2.5  Any dispute between the parties with respect to this Section 11.2 shall be
resolved by arbitration in accordance with the provisions of Section 16.3 below.

        Section 11.3  Abatement of Rent Charges.  Notwithstanding any other provisions
of this Lease, if the Fixed Rent and Additional Rent payable by Tenant hereunder shall be abated
pursuant to Sections 11.1 or 11.2 above, such abatement shall terminate upon the first to occur
of: (a) the date on which Tenant shall reopen the Premises to the general public for business; or
(b) the expiration of the period which is ninety (90) days after Landlord shall have completed
such repairs and restoration work as Landlord is obligated to perform hereunder and the
interference with the operation of business in the Premises has ceased.

ARTICLE 12
COVENANTS, REPRESENTATIONS AND WARRANTIES

        Section 12.1  Quiet Enjoyment.  Tenant shall peaceably and quietly have, hold,
occupy and enjoy the Premises for the Term, without hindrance from Landlord or any party
claiming by, through, or under Landlord.

        Section 12.2  Authority.  Tenant and Landlord each warrant and represent that
the person(s) signing this Lease on their behalf has authority to enter into this Lease and to bind
Tenant and Landlord, respectively, to the terms, covenants and conditions contained herein.  The
submission of this Lease to each party hereto shall be for examination and negotiation purposes
only, and does not and shall not constitute a reservation of or an obligation of Tenant to lease, or
otherwise create any interest of Tenant in, the Premises or any other premises situated in the
Shopping Center unless and until the Lease is fully executed and delivered by Tenant and
Landlord.

30

1          Section 12.3    <u>Landlord's Covenants, Warranties and Representations</u>.  To induce
2   Tenant to execute this Lease, and in consideration thereof, Landlord covenants, warrants and
3   represents to Tenant as follows:

4              (a)     As of the Effective Date, Landlord has, and as of the Delivery Date
5   shall have, fee simple title to the entire Shopping Center, free and clear of all easements,
6   restrictions, liens, encumbrances, leases and the like, except for the encumbrances and
7   restrictions described on <u>Exhibits E, K-1, L</u> and <u>N</u> hereto.

8              (b)     In the event the legal description of the Shopping Center described
9   in <u>Exhibit A</u> hereto indicates that the Shopping Center is composed of more than one parcel or
10  lot, Landlord represents that there exist no strips or gores between such parcels or lots which are
11  not owned by Landlord;

12            (c)     No third party consents or approvals are required in order for
13  Landlord to enter into this Lease or for the performance of Landlord's Work (excluding, as of the
14  Effective Date, governmental permits and approvals such as, without limitation, the Required
15  Land Use Approvals);

16            (d)     [Intentionally Deleted];

17            (e)     The Shopping Center now has, and on the Delivery Date shall have
18  access to and from Serramonte Boulevard, as shown on <u>Exhibit B</u> hereto, for the passage of
19  vehicular traffic;

20            (f)     Excluding any matters disclosed in <u>Exhibit K-1</u>, this Lease does
21  not violate the provisions of any instrument heretofore executed and/or binding on Landlord, or
22  affecting or encumbering the Shopping Center, or the Premises, and no rights granted by
23  Landlord to Tenant under the terms of this Lease conflict with any rights granted by Landlord to
24  any other tenant or occupant in the Shopping Center (including, without limitation, any rights of
25  first offer or first refusal or the like);

26            (g)     As of the Effective Date, except for Landlord obtaining the
27  Required Land Use Approvals, there are no restrictions or other legal impediments imposed by
28  any public or private instrument which would prevent: (i) the use of the Premises for the
29  Permitted Use; (ii) the use of the parking facilities, access roads, and other Common Areas in the
30  manner contemplated by this Lease; or (iii) subject to compliance with applicable Legal
31  Requirements and Tenant obtaining Tenant's Permits, the performance of Tenant's Work;

32            (h)     As of the Effective Date, there are no restrictive covenants,
33  uniform sign plans or other signage restrictions (except for governmental sign ordinances, if any)
34  which would prevent the Premises from having the signage (including, without limitation, the
35  square foot area and size of letters) as depicted on <u>Exhibit D-1</u> and <u>Exhibit F</u> hereof.

36            (i)     [Intentionally Deleted];

37            (j)     Attached hereto as <u>Exhibit K-2</u> is a complete list of all fully
38  executed and delivered leases in effect on the Effective Date with respect to the Shopping Center
39  (the "***Existing Leases***"); and

40            (k)     Landlord shall reasonable efforts to forward to Tenant any notice
41  or other communication (a "***Hearing Notice***") received by Landlord from any owner of property
42  adjoining or adjacent to the Shopping Center or from any municipal or other governmental
43  authority, in connection with any hearing or other administrative proceeding relating to any
44  proposed zoning, building code, signage, or related variance affecting the Shopping Center or
45  any adjoining or adjacent property, which, if granted, could materially and adversely affect
46  Tenant's use or occupancy of the Premises, the conduct of Tenant's business therein, or Tenant's
47  rights and benefits under this Lease. If Landlord fails to deliver such Hearing Notice and Tenant
48  learns of such events that are the subject of the Hearing Notice, then Tenant shall request
49  Landlord to deliver a copy of the Hearing Notice and if Landlord fails to do so within ten (10)
50  days after receipt of Tenant's written request, Landlord shall be in default hereof (but except for
51  such failure to deliver the Hearing Notice within such 10-day period, Landlord shall not
52  otherwise be in default under this Section 12.3(k)).  Landlord, at its sole cost and expense, shall
53  appear in such proceeding and shall contest such proposed variance.  If Landlord fails so to

<div align="center">31</div>

appear and contest such proposed variance after receiving five (5) days' notice from Tenant (or such shorter notice as may be practicable under the circumstances), then Tenant shall be entitled (but shall not be obligated to), in its own name and/or in the name of Landlord, to appear in such proceeding, in which event Landlord shall fully cooperate with Tenant, provide such information, and execute any documents or other instruments as Tenant may reasonably request in connection with any such proceeding.

Section 12.4    Environmental Matters.

12.4.1 Definitions.

(a)    As used herein, the term *Environmental Laws* shall mean any and all Legal Requirements concerning the protection of the environment, human health or safety.

(b)    As used herein, the term *Hazardous Substances* shall mean each and every element, compound, material, mixture, substance, waste, hazardous substance, hazardous waste, hazardous material, toxic substance, pollutant or contaminant either as those terms are defined in any of the Environmental Laws or the presence of which may cause liability at common law, including, without limitation, asbestos and/or asbestos-containing products, whether or not currently friable.

(c)    As used herein, the term *Environmental Notice* shall mean a summons, citation, directive, order, claim, notice, litigation, investigation, judgment, legal pleading, letter or other communication, written or oral, actual or threatened, from the United States Environmental Protection Agency or other federal, state or local governmental agency or authority, or any other private individual or entity concerning (i) any Hazardous Substances at, on, in, under or emanating from the Premises or the Shopping Center (including, without limitation, the Southwest Quadrant); (ii) any violation or potential violation of Environmental Laws at the Premises or the Shopping Center; or (iii) any underground storage tanks on the Premises or the Shopping Center.

(d)    As used herein, the term *Releasing* or *Release* shall mean releasing, spilling, leaking, discharging, disposing or dumping or otherwise introducing any substance into the environment or into any building or other improvements in violation of Environmental Laws.

(e)    As used herein, the term *Compliance Costs* shall mean any and all costs incurred by a party in complying with applicable Environmental Laws, including, without limitation, consultant's and engineer's fees; laboratory costs; contractor's and subcontractor's fees; application and filing fees; costs of investigation, monitoring or cleanup of soil or other substrate, surface water, groundwater, or buildings or other improvements; equipment costs; disposal fees; costs of operation and maintenance of equipment; legal fees; other governmental fees or costs; interest at the Lease Interest Rate from the date of expenditure until paid in full; and other similar or related costs.

(f)    As used herein, the term *Tenant Related Parties* shall mean Tenant's agents, servants, employees, contractors or licensees.

12.4.2 Compliance with Environmental Laws. Tenant shall comply with all applicable requirements of Environmental Laws governing its use of, and operations at, the Shopping Center and the Premises. Landlord shall comply with all applicable requirements of Environmental Laws relating to the Shopping Center and the Premises, except to the extent such requirements arise from Tenant's operations thereon.

12.4.3 Responsibility for Releases of Hazardous Substances. Notwithstanding any other provision of this Lease, Tenant shall only be liable for any Release of Hazardous Substances at, on, in, under or emanating from the Premises or Shopping Center which were introduced by Tenant or Tenant Related Parties (hereinafter *Tenant Releases*), including, without limitation, any Compliance Costs required to address Tenant Releases. Landlord shall be liable for any Hazardous Substances at, on, in, under or emanating from the Premises or Shopping Center, including, without limitation, any Compliance Costs attributable to such Hazardous Substances, unless the Hazardous Substances are caused by Tenant Releases. Except

32

in the event of an emergency or if compelled by applicable governmental authority and provided that Landlord does not incur any additional expense on account thereof (including without limitation, fines and penalties), any work performed by Landlord relating to Hazardous Substances shall be performed by Landlord at any time other than during the months of August (through Labor Day), November and December, and shall be undertaken in such commercially reasonable manner so as to (i) not adversely affect ingress to or egress from the Shopping Center, (ii) have no adverse effect on the visibility of the Premises or any signs which contain Tenant's name, and (iii) not otherwise materially interfere with the normal conduct of any business operations in the Premises. If the presence of Hazardous Substances, or Landlord's remediative work relative thereto, interferes with Tenant's normal business operations in the Premises, then Tenant shall be entitled to an equitable abatement of Rent for so long as such condition persists.

12.4.4 <u>Standards</u>. Except as expressly provided herein, the parties agree that any investigation or remediation of Hazardous Substances, or cure of a violation of Environmental Laws, required to be conducted at the Premises or Shopping Center shall be no more stringent than necessary to meet the minimum standards of Environmental Laws applicable to properties used in the manner the Shopping Center is being used.

12.4.5 <u>Landlord's Representations and Warranties</u>. Landlord represents and warrants that: (i) Landlord has received no Environmental Notices concerning the Shopping Center or the Premises; (ii) Landlord has no knowledge of, and has received no notice of, any violation, or potential or alleged violation, of any Legal Requirement, including, without limitation, Environmental Laws, affecting the Shopping Center or the Premises which remains uncured; and (iii) to the best of Landlord's knowledge: (A) no Hazardous Substances are located at, on, in, under or emanating from the Shopping Center or the Premises; and (B) no underground storage tank exists at the Shopping Center or the Premises. The foregoing representations and warranties shall in no way serve to vitiate Landlord's obligations under this Article 12.

12.4.6 <u>Documents</u>. Each party shall immediately notify the other party of the notifying party's receipt of an Environmental Notice.

12.4.7 <u>Indemnity</u>. Each party to this Lease shall indemnify, defend and hold the other party, and its agents, servants, shareholders, directors, officers, partners, members and employees harmless from any and all claims, losses, expenses, costs, lawsuits, actions, administrative proceedings, damage, orders, judgments, penalties and liabilities of any nature whatsoever, including, without limitation, reasonable attorneys' fees (incurred to enforce this indemnity or for any other purpose) and Compliance Costs, arising from (i) the indemnifying party's breach of any of its representations, warranties, covenants or other obligations under this Section 12.4; (ii) Hazardous Substances for which the indemnifying party is liable under this Section 12.4; or (iii) violations of Environmental Laws for which the indemnifying party is liable under this Section 12.4.

12.4.8 <u>Survival</u>. The obligations of the parties under this Section 12.4 shall survive the renewal, expiration, breach or earlier termination of this Lease.

12.4.9 <u>Conflict</u>. In the event of any conflict between the provisions of this Section 12.4 and any other provision of this Lease, the provisions of this Section 12.4 shall control.

## ARTICLE 13
## USES AND RESTRICTIONS

Section 13.1    <u>Permitted and Prohibited Uses</u>.

13.1.1 <u>Tenant's Permitted Use</u>. The Premises may be used and occupied for the Permitted Use (defined in Subsection 1.1.25 above). Tenant shall not use the Premises for any of the "Prohibited Uses" (defined in <u>Exhibit L</u> hereto annexed) or the "Existing Exclusives" (hereinafter defined in Subsection 13.3.1), to the extent then applicable.

13.1.2 <u>Prohibited Uses</u>. Landlord shall construct, lease, operate, maintain and manage the Shopping Center as a first-class shopping center comparable to other first-class shopping centers in the state in which the Shopping Center is located. Landlord shall not lease,

1854916.2\C061858\0372671
[bbBaby]

1    rent or occupy or permit to be occupied any portion of the Southwest Quadrant for any of the
2    "Prohibited Uses" (as set forth in Exhibit L hereto annexed).

3           Section 13.2    Tenant's Exclusive in Center.  To induce Tenant to execute this
4    Lease, and subject to all of the terms and provisions of this Section 13.2, Landlord covenants and
5    agrees as follows.

6           13.2.1 Landlord shall not lease, rent or occupy or permit any other premises in
7    the Southwest Quadrant to be occupied, whether by a tenant, sublessee, assignee, licensee or
8    other occupant or itself, for the storage, sale, rental or distribution, at retail or at wholesale, either
9    singly or in any combination, of items contained in any of the following respective categories of
10   merchandise: (i) infant, juvenile and children's furniture and equipment (including, without
11   limitation, infant, juvenile and children's:  cribs, beds, mattresses, bedding, changing tables,
12   gliders, rockers (including coordinating ottomans), high chairs, lamps, walkers, play yards, play
13   pens, car seats, booster seats, cradles, carriages, strollers, toy and clothing chests, swings, or any
14   other furniture or equipment similar to the foregoing enumerated items) (collectively,
15   ***Restricted Furniture"***); (ii)  clothing, layettes, apparel, shoes and/or accessories for infants,
16   juveniles and children 0-4 years in age; and maternity clothing; and (iii) merchandise, products
17   and services targeted for use by or for infants, juveniles and children 0-4 years in age (including,
18   without limitation, infant, juvenile and children's:  toys, books, food, formula, indoor and/or
19   outdoor play and recreational equipment, audio and video cassettes or equipment, safety items,
20   feeding items, nursing items, health and beauty care items, drug remedies, diapers, wipes,
21   bathroom items (including, without limitation, personal care devices and other bathroom
22   appliances, accessories and toiletries)) (which items in clauses (i), (ii) and (iii) above, either
23   singly or in any combination, are hereinafter referred to as the ***Exclusive Items"***).
24   Notwithstanding the foregoing, any tenant or subtenant in the Southwest Quadrant shall have the
25   right to utilize its respective premises for the sale, rental and/or distribution of the Exclusive
26   Items within an aggregate area (which shall include an allocable portion of the aisle space
27   adjacent to such sales, rental and/or distribution area) not to exceed one thousand (1,000) square
28   feet of Floor Area within such tenant's or subtenant's premises. In addition to the foregoing,
29   Landlord shall not lease, rent or occupy or permit any other tenant or occupant of the Southwest
30   Quadrant to operate a (x) hair cutting salon specializing primarily to a clientele of infants,
31   juveniles or children; (y) photo studio specializing primarily to a clientele of infants, juveniles or
32   children; and/or (z) development, learning or fitness center specializing primarily to a clientele of
33   infants, juveniles and children 0-4 years in age similar to a Gymboree, My Gym or Little Gym.
34   The exclusive rights granted to Tenant with respect to any individual item comprising the
35   Exclusive Items (but not any other Exclusive Items) shall be null and void if Tenant fails to use
36   portions of the Premises for the sale, rental or distribution of such item (other than during
37   "Excused Periods," as defined in Section 1.1.8 above) for a period of time exceeding six (6)
38   consecutive months, provided Landlord shall have given Tenant notice of such failure and
39   Tenant shall have at least thirty (30) days to cure such failure prior to the expiration of such six
40   (6) consecutive month period.

41           13.2.2  The restrictions set forth in Subsection 13.2.1 above shall not apply to a
42   full-line national: (i) department store [for example, Wal-Mart, Macy's, Target or Kohl's];
43   (ii) discount club [for example, Costco, BJ's Wholesale Club, or Sam's Club]; (iii) home
44   improvement center [for example, Home Depot or Lowe's]; clauses (i), (ii) & (iii) all as
45   commonly located in first-class shopping centers in the state in which the Shopping Center is
46   located, each occupying at least 60,000 square feet of Floor Area within the Shopping Center as
47   such stores are currently operated (as of the Effective Date); and (iv) drug store;. In addition, the
48   restrictions set forth in Subsection 13.2.1 with respect to the Southwest Quadrant shall not apply to
49   (a) the tenant operating under the trade name "Floor and Décor" and "Michael's" (as such
50   retailers operate as of the Effective Date) but shall apply to "Hobby Lobby" and (b) a store that
51   operates primarily as a full-line furniture store, primarily as a mattress store, primarily as a
52   hardware and paint store similar to Ace Hardware., or the juvenile department of a full-line shoe
53   store.  Tenant agrees that the foregoing restriction shall not prevent the operation of a typical
54   Ross Dress for Less or similar stores.

55           13.2.3  The exclusive rights granted to Tenant in this Section 13.2 shall inure to
56   the benefit of any assignee of Tenant's interest in this Lease and to any sublessee of at least fifty
57   percent (50%) of the Floor Area of the Premises.

1854916.2\C061858\0372671
[bbBaby]

13.2.4 (a)    Upon breach of the aforesaid covenant and agreement by Landlord (which breach shall not include a situation in which the lease between Landlord and any tenant in the Shopping Center prohibits the tenant therein from violating the exclusive rights granted to Tenant in this Section 13.2 and despite such prohibition, such tenant violates such exclusive rights, unless Landlord fails to comply with any of the provisions of subparagraph (b) below), the Rent payable hereunder shall be reduced by fifty percent (50%) for so long as such violation shall continue, and Tenant shall have all remedies given to it at law and in equity, including, without limitation, the right to obtain injunctive relief and/or to terminate this Lease and/or to commence and prosecute an action against Landlord or any other violator for damages.

(b)    If any person or entity (other than Landlord) shall violate any of the exclusive provisions herein set forth, then upon Landlord's receipt of Tenant's notice stating that such person or entity is violating Tenant's exclusive rights, Landlord shall promptly deliver to such person or entity a letter (with a copy to Tenant) demanding that such person or entity cease operating in violation of Tenant's exclusive rights.  Notwithstanding the foregoing, Landlord shall not be obligated to commence legal proceedings against such person or entity if Tenant shall have the right (i) to conduct and prosecute such legal proceedings (including, without limitation, an action for injunctive relief) in its own name, at Tenant's expense, or (ii) in the event the right set forth in (i) above is not permitted to be exercised under applicable Legal Requirements, to conduct and prosecute such legal proceedings in the name of Landlord, at Tenant's expense, and Landlord shall cooperate with Tenant with respect to such prosecution (including, without limitation, by executing any documentation or authorization reasonably required by Tenant in connection with such prosecution and by appearing at any hearing or trial with respect to such prosecution).  If Tenant prevails in such legal proceedings, Landlord shall reimburse Tenant for its actual out-of-pocket reasonable attorney's fees and court costs.

Section 13.3    Exclusives Which Tenant Must Honor.

13.3.1 Tenant shall honor certain exclusives granted by Landlord to certain other tenants in the Shopping Center pursuant to the terms of leases which have been executed prior to the Effective Date and/or pursuant to any other public or private instrument affecting the Shopping Center (hereinafter, *"Existing Exclusives"*) [a true and complete listing and description of such Existing Exclusives being attached hereto as Exhibit K-1], and shall not sublease, occupy or use all or any portion of the Premises, or permit all or any portion of the Premises to be occupied or used in violation of any such Existing Exclusive (except as may be specifically set forth on Exhibit K-1).  Landlord represents and warrants that no Existing Exclusive(s) exist other than those listed on Exhibit K-1 hereto and that Exhibit K-1 is true accurate and complete, and covenants to indemnify, defend and hold Tenant harmless from and against all loss, cost, liability or expense (including, without limitation, reasonable legal fees) incurred by Tenant by reason of the enforcement by any person or entity of such unlisted Existing Exclusive.  Notwithstanding the foregoing, (i) Tenant shall be entitled to enter into a separate agreement with any tenant or other occupant for whose benefit the Existing Exclusive is granted which nullifies or modifies the corresponding Existing Exclusive with regard to the Premises; and (ii) Tenant shall not be subject to the exclusive for the benefit of Starbucks on and after August 1, 2016.

13.3.2 Except as expressly set forth in this Section 13.3, Tenant shall not be obligated to honor any exclusive granted by Landlord to any tenant in the Shopping Center.

ARTICLE 14
CONDUCT OF BUSINESS OPERATIONS

Subject to the other provisions of this Lease (including, without limitation, Articles 2 and 3 and Section 12.4.3 hereof), Tenant shall initially open its store for business to the public in the Premises for at least one (1) day, not later than the one hundred eightieth (180th) day after the Rent Commencement Date (which date shall, as applicable, be extended by reason of (A) damage or destruction, eminent domain proceedings or actions, or *Force Majeure*, or (B) the acts or omissions of Landlord).  Other than as expressly set forth in the preceding sentence, Tenant shall have no obligation to open or operate any business in the Premises, and shall have the right, at any time, to cease to conduct any business operations in the Premises, and Tenant shall incur no liability to Landlord or its Mortgagee by reason thereof (it being understood and agreed that all of Tenant's obligations under this Lease shall continue unless this Lease is terminated pursuant, *inter alia*, to the further provisions of this Article 14 or any other provision of this

1  Lease [other than by reason of an Event of Default]).  In the event that Tenant does not operate
2  or cause to be operated any retail business in the Premises (other than prior to the Rent
3  Commencement Date or during Excused Periods) for more than one hundred eighty (180)
4  consecutive days, Landlord shall have the option to terminate this Lease, which option shall be
5  exercisable by giving notice thereof to Tenant by not later than the ninetieth (90th) day after the
6  date on which said 180-day period expires, whereupon this Lease shall terminate upon the
7  sixtieth (60th) day (the "***Recapture Date***") after the date on which Tenant receives Landlord's
8  termination notice, as if the Recapture Date was originally set forth herein as the expiration date
9  of the Term.  Notwithstanding the foregoing, Tenant shall have the right to nullify Landlord's
10  termination by giving notice to Landlord (the "***Reopening Notice***"), within ten (10) days after
11  receiving the Landlord's termination notice, of its decision to reopen the Premises for business
12  (and in fact Tenant reopens for business fully stocked and staffed within thirty (30) days),
13  whereupon Landlord's termination notice shall be rendered null and void.  Upon such
14  termination, Landlord and Tenant shall each be released from any and all liabilities thereafter
15  accruing hereunder, except for those obligations which survive the expiration or other
16  termination of this Lease pursuant to the express terms of this Lease.  All Rent payable by
17  Tenant hereunder shall be apportioned as of the Recapture Date and Tenant shall promptly pay to
18  Landlord any amounts so determined to be due and owing by Tenant to Landlord, and conversely
19  Landlord shall promptly reimburse Tenant for any amounts prepaid by Tenant for periods
20  subsequent to the Recapture Date.

21                                   ARTICLE 15
22                        TENANT ASSIGNMENT AND SUBLETTING

23             Section 15.1   Assignment and Subletting.

24             15.1.1  Tenant shall have the right from time to time, without the consent of
25  Landlord, to assign Tenant's interest in this Lease and/or to sublet, concession or license all or
26  any portion of the Premises, subject to all of the terms and conditions of this Lease (including,
27  without limitation, Section 13.1) and provided the proposed tenant is a tenant typically found in
28  similar shopping centers in California whose use is a retail use that is consistent with the then-
29  existing character and quality of the Shopping Center.

30             15.1.2  Except with respect to any transaction covered under Subsection 15.1.3 or
31  Section 15.3 below, in the event Tenant proposes to assign this Lease or sublet, in a single
32  transaction, the whole of the Premises, it shall first give notice thereof (the
33  "***Assignment/Subletting Notice***") to Landlord, which notice shall specify the name and address
34  of the proposed assignee or sublessee and the proposed use of the Premises to be made by such
35  assignee or sublessee.  Thereafter, Landlord shall have the option to terminate this Lease, which
36  option shall be exercisable by giving notice to Tenant (the "***Termination Notice***") thereof within
37  twenty (20) days after receipt of an Assignment/Subletting Notice from Tenant,  in which event
38  this Lease shall automatically terminate on the ninetieth (90th) day (the "***Termination Date***")
39  after the date on which Tenant receives Landlord's Termination Notice, with the same force and
40  effect as if the Termination Date had been designated as the expiration date of this Lease.  Upon
41  the Termination Date, Landlord and Tenant shall each be released from any and all liabilities
42  thereafter accruing hereunder, except for those obligations which survive the expiration or other
43  termination of this Lease pursuant to the express terms of this Lease.  All Rent payable by
44  Tenant hereunder shall be apportioned as of the Termination Date and Tenant shall promptly pay
45  to Landlord any amounts so determined to be due and owing by Tenant to Landlord, and
46  conversely Landlord shall promptly reimburse Tenant for any amounts prepaid by Tenant for
47  periods subsequent to the Termination Date.  Notwithstanding the foregoing, Tenant shall have
48  the right to avoid Landlord's termination by giving notice to Landlord (the "***Rescission Notice***"),
49  within ten (10) days after receiving the Termination Notice, of its rescission of the
50  Assignment/Subletting Notice, whereupon Landlord's Termination Notice shall be rendered null
51  and void, and Tenant shall not assign this Lease or sublet the whole of the Premises as proposed
52  in its Assignment/Subletting Notice.  If Landlord does not give the Termination Notice within
53  the aforesaid 20-day period, Landlord shall conclusively be deemed to have waived its
54  termination rights hereunder with respect to such proposed assignment or subletting transaction,
55  and Tenant may assign this Lease or sublet the entire Premises in accordance with its
56  Assignment/Subletting Notice.

57             15.1.3  In addition to, and not in limitation of, Tenant's other rights set forth in
58  this Section 15.1, Tenant shall have the right from time to time, without the consent of Landlord,

                                        36

1   to assign Tenant's interest in this Lease and/or to sublet or license all or any portion of the
2   Premises: (a) to an Affiliate of Tenant; (b) to any entity which purchases all or substantially all
3   of the assets of Tenant or any of its Affiliates; (c) to any entity which purchases Tenant's
4   interest in the majority of stores owned or operated by Tenant or its Affiliate(s) in the State of
5   California; (d) in conjunction with any merger, acquisition, consolidation or public offering of
6   stock or other interests involving Tenant or its Affiliate(s); and/or (e) as may be required by any
7   Legal Requirement.

8           Section 15.2   Liability of Tenant.  Unless otherwise agreed to in writing by
9   Landlord, no assignment, subletting, licensing or concessioning by Tenant shall reduce,
10   diminish, or otherwise affect the liability of Tenant hereunder; provided, however, that in the
11   event of an assignment by the Tenant originally named herein or its Affiliate (collectively, the
12   "*Original Tenant*") of its interest in this Lease to a Major Assignee or to a tenant whose
13   obligations under this Lease are guaranteed by a Major Guarantor, all liability of the Original
14   Tenant under this Lease accruing from and after the effective date of such assignment, shall
15   terminate.  For purposes of this Section 15.2, the term "*Major Assignee*" or "*Major
16   Guarantor*", as the case may be, shall mean a person or entity which has, as of the effective date
17   of such assignment, a tangible net worth of at least Seventy Five Million ($75,000,000) Dollars.

18           Section 15.3   Collateral Assignment.  In addition to Tenant's other rights set
19   forth in this Article 15, a collateral assignment of Tenant's interest in this Lease by Tenant to one
20   or more "Lenders" (hereinafter defined), as collateral security for an indebtedness or other
21   obligation of Tenant or its Affiliates shall be permitted and Landlord shall execute all
22   documentation reasonably requested by Tenant or any such Lender in connection therewith,
23   provided that such collateral assignment complies with all of the terms of this Lease including,
24   without limitation, the Permitted Use set forth in Section 1.1.25 hereof.  In addition, Tenant shall
25   have the right, without Landlord's consent, to grant to an Affiliate of Tenant a license to operate
26   all of Tenant's business operations at the Premises, without such Affiliate having assumed any
27   liability for the performance of Tenant's obligations under this Lease.  As used herein, "*Lender*"
28   shall mean a state or federally regulated: bank, savings and loan association, insurance company,
29   pension fund, credit union, real estate investment trust, or other institutional lender. .
30   Notwithstanding anything contained in this Section 15.3 to the contrary, in no event shall
31   Landlord's interest in the Shopping Center or the interest of a Mortgagee be subordinate to any
32   interest of any Tenant Lender.

33           Section 15.4   Cure Rights of Original Tenant.

34           15.4.1  Unless Tenant is then released from liability pursuant to Section 15.2
35   above, if Tenant assigns Tenant's interest in this Lease, then Landlord, when giving notice to
36   said assignee or any future assignee in respect of any default, shall also give a copy of such
37   notice to the Original Tenant, and no notice of default shall be effective until a copy thereof is so
38   given to Original Tenant.  Original Tenant shall have the same period after receipt of such notice
39   to cure such default as is given to Tenant therefor under this Lease.

40           15.4.2  If this Lease is terminated because of: (a) an Event of Default of such
41   assignee, or (b) the rejection, disaffirmation, or other termination of this Lease by or on behalf of
42   the assignee pursuant to any proceeding in bankruptcy under any Legal Requirement of any State
43   or of the United States, or any other Legal Requirements affecting creditors' rights, then
44   Landlord shall promptly give to Original Tenant notice thereof, and Original Tenant shall have
45   the right, exercisable by notice given to Landlord within fifteen (15) days after receipt by
46   Original Tenant of Landlord's notice, to enter into a new lease of the Premises with Landlord
47   ("*New Lease*"), provided that the Original Tenant shall have remedied all Events of Default of
48   the assignee hereunder, unless such Events of Default are personal to the assignee and/or not
49   reasonably susceptible of cure by the Original Tenant, in which event the Original Tenant shall
50   not be obligated to cure such Events of Default as a condition to the exercise of its rights under
51   this Subsection 15.4.2.  Upon the Original Tenant's curing of any such Event of Default of the
52   assignee as aforesaid, Landlord shall assign to the Original Tenant all of Landlord's rights
53   against such assignee (whether arising as a result of bankruptcy court proceedings or otherwise).
54   The term of said New Lease shall begin on the date of termination of this Lease and shall
55   continue for the remainder of the Term (including any Renewal Periods).  Such New Lease shall
56   otherwise contain the same terms and conditions as those set forth herein, except for
57   requirements which are no longer applicable or have already been performed.  It is the intention
58   of the parties hereto that such New Lease shall have the same priority relative to other rights or

37

1854916.2\C061858\0372671
[bbBaby]

interests in or to the Premises as this Lease.  The provisions of this Subsection 15.4.2 shall survive the termination of this Lease and shall continue in full force and effect thereafter to the same extent as if this Subsection 15.4.2 were a separate and independent contract between Landlord and the Original Tenant. From the date on which the Original Tenant shall serve Landlord with the aforesaid notice of the exercise of its right to a New Lease, the Original Tenant shall have quiet and undisturbed use and enjoyment of the Premises and all appurtenances thereto, as contemplated in this Lease.

Section 15.5    Recognition Agreement.  In the event Tenant subleases all or any portion of the Premises to an Affiliate, or to a third party for a term of at least five (5) years and which sublease otherwise satisfies the requirements of Section 8.1.3 hereof, then, notwithstanding any other provisions of this Lease, Landlord shall, upon Tenant's request, execute and deliver an agreement among Landlord, Tenant and each such subtenant in the form of Exhibit H hereto, in recordable form.

ARTICLE 16
DEFAULT AND DISPUTE RESOLUTION

Section 16.1    Tenant Default.

16.1.1  (i) If Tenant shall fail to pay any Rent when due, within ten (10) days after its receipt of notice thereof from Landlord specifying the amount and details of the unpaid Rent, or (ii) if Tenant shall fail to perform or observe any of the other covenants of this Lease on Tenant's part to be performed or observed within thirty (30) days after its receipt of notice thereof from Landlord specifying the nature of such default (or, if such default shall be of a nature that same cannot reasonably be cured within thirty (30) days and Tenant does not commence to cure such default on or before such thirtieth (30th) day and thereafter diligently prosecute said cure to completion), or (iii) if Tenant shall (x) file or acquiesce to a petition in any court in any bankruptcy, reorganization, composition, extension, arrangement or insolvency proceedings, (y) make an application in any such proceedings for or acquiesce to the appointment of a trustee or receiver for it or for all or any portion of its property or (z) make an assignment for the benefit of creditors in connection with any of the proceedings specified in (x) or (y) above, or (iv) if any petition shall be filed against Tenant to which Tenant shall not acquiesce in any court in any bankruptcy, reorganization, composition, extension, arrangement or insolvency proceedings, and (a) Tenant shall thereafter be adjudicated a bankrupt, (b) such petition shall be approved by any such court, or (c) such proceedings shall not be dismissed, discontinued or vacated within 120 days, or (v) if, in any proceeding, pursuant to the application of any person other than Tenant, to which Tenant does not acquiesce, a receiver or trustee shall be appointed for Tenant, for all or any portion of the property of Tenant and such receivership or trusteeship shall not be set aside within 120 days after such appointment, any of the foregoing circumstances, after the expiration of any applicable notice and cure period, shall constitute an *"Event of Default"*.

16.1.2  Upon an Event of Default, Landlord shall have all remedies given to it at law or in equity (except that Landlord hereby expressly waives any rights to accelerate any element of the Rent, and any right of distraint, which may be granted to it by law), including the following:

(a)    to bring suit for the collection of such unpaid Rent or for the performance of such other covenant of this Lease on Tenant's part to be performed; and/or

(b)    without waiving any non-monetary default, may (but shall not be obligated to) perform any covenant which is capable of being remedied by the performance of affirmative acts for the account and at the reasonable expense of Tenant (it being agreed that should Landlord require access to the Premises in order to perform such covenant as aforesaid, Landlord shall comply with the applicable provisions of Sections 9.2 hereof), in which event, Tenant shall pay to Landlord on demand, as Additional Rent, the reasonable cost or amount thereof, together with interest thereon at the Lease Interest Rate from the date of outlay of expense until payment; and/or

(c)    upon at least five (5) days' notice to Tenant, to terminate this Lease, whereupon Landlord shall have and retain full right to sue for and collect all unpaid Rent which shall have accrued up to the date of termination and any damages to Landlord by reason of

38

1  any such breach as provided in Section 16.1.3 below, and Tenant shall surrender and deliver the
2  Premises to Landlord, failing which, Landlord shall have the right to initiate summary
3  proceedings to recover possession; and/or

4              (d)    upon at least five (5) days' notice to Tenant to terminate Tenant's
5  right of possession, re-enter the Premises and take possession thereof by lawful means. If
6  Landlord shall so elect to repossess the Premises without terminating the Lease, then Tenant
7  shall be liable for and shall pay to Landlord all Rent payable to Landlord pursuant to the terms of
8  this Lease which shall have accrued up to the date of repossession, as well as all Rent as and
9  when same shall become due and payable pursuant to the terms of this Lease during the
10 remainder of the Term, diminished by any net sums thereafter received by Landlord through
11 reletting the Premises during said period (after deducting reasonable expenses incurred by
12 Landlord in connection with such reletting). In no event shall Tenant be entitled to any excess of
13 any rent obtained by such reletting over and above the Rent herein reserved. Landlord may bring
14 actions to collect amounts due by Tenant under this Lease, from time to time, prior to the
15 expiration of the Term.

16        16.1.3  Upon an Event of Default, Tenant shall be liable for and shall pay to
17 Landlord, in addition to any sum provided to be paid above, brokers' fees incurred by Landlord
18 in connection with reletting the whole or any part of the Premises for the remainder of the then
19 unexpired Term (excluding any then unexercised Renewal Periods), the costs of removing and
20 storing Tenant's or other occupant's property; the cost of repairs; and all other commercially
21 reasonable expenses incurred by Landlord in enforcing or defending Landlord's rights and/or
22 remedies, including reasonable attorneys' fees.

23        16.1.4  Upon an Event of Default, any amounts paid by Landlord to cure said
24 Event of Default and any Rent payments not paid after notice thereof is given shall bear interest
25 at the Lease Interest Rate from and after the expiration of any applicable grace period until paid.

26        16.1.5  Landlord shall use all reasonable efforts to relet the Premises or any
27 portion thereof to mitigate Landlord's damages to which Landlord would otherwise be entitled to
28 as a result of an Event of Default; provided, however, that if there are other vacancies in the
29 Shopping Center at that time or in other shopping centers owned by Landlord or an Affiliate
30 within the Daly City, California metropolitan area, Landlord may give preference to reletting the
31 other vacant spaces. In no event shall Tenant be liable to Landlord for any consequential
32 damages suffered by Landlord as a result of an Event of Default by, or any other act of, Tenant.

33        Section 16.2  Landlord Default.  If Landlord shall: (i) fail to perform or observe
34 any of the covenants of this Lease on Landlord's part to be performed or observed within thirty
35 (30) days after receiving notice from Tenant thereof (or, if same cannot reasonably be cured
36 within thirty (30) days, if Landlord shall fail to promptly commence and diligently prosecute said
37 cure to completion), or (ii) materially breach any warranty or representation under this Lease
38 (either of (i) or (ii) above being hereinafter referred to as a *"Landlord's Default"*), then Tenant,
39 in addition to such other rights and remedies as may be available under this Lease, or at law or in
40 equity, may, in its sole discretion:

41              (a)    as applicable, perform such obligation(s) that are Landlord's
42 express responsibility in this Lease and in accordance with the provisions of this Lease on behalf
43 of, and at the expense of Landlord, provided Tenant's right to perform such obligations of
44 Landlord shall be limited to the Premises, the Critical Area, Tenant's loading facility (including,
45 without limitation, Tenant's trash container and/or compactor) and the sidewalk in front of
46 Tenant's Premises; and/or

47              (b)    bring suit for the collection of any amounts for which Landlord is
48 in default, seek injunctive relief, or seek specific performance for any other covenant or
49 agreement of Landlord, without terminating this Lease; and/or

50              (c)    offset against the Rent payable by Tenant hereunder for amounts
51 owed by Landlord to Tenant and/or for the amounts reasonably expended by Tenant performing
52 Landlord's obligations hereunder, including costs and reasonable attorneys' fees, together with
53 interest thereon at the Lease Interest Rate from the date of the outlay until paid; and/or

1854916.2\C061858\0372671
[bbBaby]

1        (d)   terminate this Lease, without waiving its rights to damages for
2    Landlord's Default, provided that: (1) Landlord's Default materially interferes with the normal
3    conduct of any business operations in the Premises, (2) Landlord's Default is not reasonably
4    capable of being cured by Tenant, and  (3) Tenant gives notice of Landlord's Default to any
5    Mortgagee of whom Landlord shall have previously given Tenant notice (including its address),
6    and such Mortgagee shall not have cured Landlord's Default within thirty (30) days after such
7    notice is given (or, if such default cannot reasonably be cured within thirty (30) days, such
8    Mortgagee fails to promptly commence and diligently prosecute said cure to completion).

9        Notwithstanding the foregoing, if, in Tenant's reasonable judgment, a condition posing
10   imminent risk of liability or material harm to persons or property or material disruption to the
11   normal conduct of any business operations in the Premises shall exist which is Landlord's
12   responsibility to repair, Tenant may, at its election, and with reasonable prior notice to Landlord,
13   exercise any or all of the remedies set forth in (a), (b) and (c) above.  In no event shall Landlord
14   be liable to Tenant for any consequential damages suffered by Tenant as a result of a default by,
15   or any other act of, Landlord.

16       Section 16.3   Arbitration.  In any case where this Lease expressly provides for
17   submission of a dispute or matter to arbitration (but not otherwise), the same shall be settled by
18   arbitration in Daly City, California, before one arbitrator in accordance with the procedural rules
19   of the American Arbitration Association (or any successor thereto) then in effect.  The decision
20   of the arbitrator shall be final, conclusive and binding on the parties, but the powers of the
21   arbitrator are hereby expressly limited to the determination of factual issues, and the arbitrator
22   shall have no power to reform, supplement or modify this Lease.  The arbitrator shall make only
23   required findings of fact incident to an arbitrable dispute, which findings shall be set forth in
24   reasonable detail in a written decision by the arbitrator.  Landlord and Tenant shall share equally
25   in the cost and expenses of such arbitration, and each shall separately pay its own attorneys' fees
26   and expenses, unless the arbitrator finds that one of the parties did not act in good faith in
27   connection with the dispute or the conduct of the arbitration proceeding, in which case the
28   arbitrator may award all or part of said costs, expenses and fees to the other party.

29               ARTICLE 17
30   RIGHT TO MORTGAGE AND NON-DISTURBANCE; ESTOPPEL CERTIFICATE

31       Section 17.1   Right to Mortgage and Non-Disturbance.  Landlord reserves the
32   right to subject and subordinate this Lease at all times to the lien of any first mortgage or deed of
33   trust for the benefit of any Mortgagee hereafter encumbering or affecting all or any portion of the
34   Shopping Center, as well as to any future ground or underlying leases encumbering or affecting
35   all or any part of the Shopping Center; provided, however, that (a) each Mortgagee shall first
36   execute and deliver to Tenant a subordination, non-disturbance and attornment agreement in
37   substantially the form attached as Exhibit G hereto, in recordable form, and (b) any Ground
38   Lessor shall execute (and shall obtain the written consent of any holder of any mortgage, deed of
39   trust or any other existing lien encumbering or affecting the Shopping Center or any portion
40   thereof, as applicable) and deliver to Tenant a fee owner recognition agreement in a form
41   reasonably satisfactory to Tenant, which shall include the following provisions: (i) the Ground
42   Lessor will not, in the exercise of any of the rights arising or which may arise out of such lease,
43   disturb or deprive Tenant  in or of its possession or its rights to possession of the Premises or of
44   any right or privilege granted to or inuring to the benefit of Tenant under this Lease; (ii) in the
45   event of the termination of the ground or underlying lease, Tenant will not be made a party in
46   any removal or eviction action or proceeding, nor shall Tenant be evicted or removed of its
47   possession or its right of possession of the Premises, and this Lease shall continue in full force
48   and effect as a direct lease between the Ground Lessor and Tenant for the remainder of the Term
49   and on the same terms and conditions as contained herein, without the necessity of executing a
50   new lease; and (iii) Landlord and Tenant shall have the right to execute any amendment to this
51   Lease which is specifically required hereunder and the Ground Lessor shall recognize and be
52   bound thereto.

53       Section 17.2   Estoppel Certificate.  Upon written request of Landlord or Tenant,
54   the other party, within thirty (30) days after the date of receipt of such request, shall execute and
55   deliver to and only for the benefit of the requesting party or any Mortgagee, bona fide
56   prospective purchaser, assignee, or sublessee of the requesting party, without charge, a written
57   statement:  (1) ratifying this Lease; (2) certifying, to such party's actual knowledge, that this
58   Lease is in full force and effect, if such is the case, and has not been modified, assigned,

1854916.2\C061858\0372671
[bbBaby]

supplemented or amended, except by such writings as shall be stated; (3) specifying the dates to which Fixed Rent and Additional Rent have been paid; (4) stating whether or not, to such party's actual knowledge, the party requesting the estoppel is in default and, if so, stating the nature of such default, (5) stating the Rent Commencement Date, and (6) stating which options to extend the Lease Term have been exercised, if any.

Section 17.3    Mortgages and Ground Leases. Landlord represents and warrants to Tenant that no mortgage, deed of trust, security instrument or ground or underlying lease encumbers the Shopping Center or any portion thereof as of the Effective Date.

ARTICLE 18
NOTICE

Subject to the further provisions of this Article 18, whenever it is provided herein that any notice, demand, request, consent, approval or other communication (*"Notice"*) shall or may be given to either of the parties by the other, it shall be in writing and, any Legal Requirement to the contrary notwithstanding, shall not be effective for any purpose unless same shall be given by registered or certified mail, postage prepaid, return receipt requested, or by any recognized overnight mail carrier, with proof of delivery slip, addressed to Landlord at Landlord's Mailing Address, with copies of notices to Landlord also given to: Equity One Realty & Management CA, Inc., 410 Park Avenue, Suite 1220, New York, New York 10022, Attn: Property Management or to Tenant at Tenant's Mailing Address, with copies of notices to Tenant also given to: (i) Allan N. Rauch, Esq., c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, and (ii) Jeffrey H. Kaplan, Esq., c/o Bryan Cave LLP, 1290 Avenue of the Americas, New York, New York 10104, or to such other person or other address as may, from time to time, be specified by either party in a written notice to the other party.  If Landlord shall consist of more than one person or entity, notices delivered by Tenant to Landlord's Mailing Address shall be deemed to be delivered to, and effective notice to, all such persons or entities comprising Landlord.  All notices given in accordance with the provisions of this Section shall be effective upon receipt (or refusal of receipt) at the address of the addressee, provided, however, that if a deadline for the giving of any notice under this Lease occurs on Saturday, Sunday, or a legal holiday, then such deadline shall be extended to the next business day thereafter occurring.  Notwithstanding the foregoing, Landlord shall instead send the following items to Tenant (Attention: Lease Administration) at Tenant's Mailing Address: all bills, notices (but not notices of default) and related information pertaining to Tenant's Fixed Share of Common Areas Charges as described in Section 5.1.2 of this Lease.

ARTICLE 19
TENANT'S PROPERTY

All of Tenant's Property  which may be installed or placed in or upon the Premises by Tenant shall remain the property of Tenant.  Tenant may assign, hypothecate, encumber, mortgage or create a security interest in or upon Tenant's Property in the Premises without the consent of Landlord and may remove Tenant's Property at any time during the Term.  Landlord waives any right it may have in Tenant's Property.  To the extent Landlord may have a lien on or security interest in the Tenant's Property pursuant to this Lease, by law or otherwise, Landlord hereby waives, and agrees not to assert, such lien or security interest.  Landlord shall provide to Tenant, within ten (10) days after Tenant's request therefor, a written waiver in form reasonably satisfactory to Landlord and Tenant evidencing Landlord's waiver of any rights it has or may have in Tenant's Property.

ARTICLE 20
END OF TERM

Section 20.1    Surrender of Premises. At the expiration of the Term, Tenant will quit and surrender the Premises in good condition and repair, excepting, however, reasonable wear and tear, damage by fire or other casualty, damage by eminent domain, and repairs and replacements to be made by Landlord hereunder.

Section 20.2    Hold Over. If Tenant fails to deliver possession of the Premises to Landlord at the end of the Term, Tenant shall be a tenant at sufferance and shall be liable for Holdover Rent. As used herein, *"Holdover Rent"* shall be an amount equal to (i) one hundred percent (100%) of the monthly Fixed Rent payable by Tenant immediately prior to the end of the

41

1    Term for any month or portion thereof (with no proration for the actual number of days that
2    Tenant holdover) during which Tenant fails to deliver possession of the Premises to Landlord at
3    the end of the Term and (ii) fifty percent (50%) of the amount payable pursuant to clause (i)
4    above and (iii) one hundred fifty percent (150%) of all Additional Rent, except the amounts
5    payable in clauses (ii) and (iii) shall be prorated based upon the number of days in the applicable
6    month that Tenant has failed to deliver possession of the Premises to Landlord.  By way of
7    illustration, if the monthly Fixed Rent at the end of the Term is $15,000, Tenant would owe
8    Landlord such amount on a monthly basis, regardless of the number of days in such month that
9    Tenant has failed to deliver possession of the Premises to Landlord, and in addition, Tenant
10    would owe Landlord $7,500 and all Additional Rent then due for such month but the amount of
11    $7,500 and the Additional Rent would be prorated on a daily basis depending upon when Tenant
12    delivers possession of the Premises to Landlord.

13                                          ARTICLE 21
14                                  [INTENTIONALLY DELETED]

15                                          ARTICLE 22
16                                  ONGOING CO-TENANCY

17            If (i) two (2) of the Anchor Tenants (as defined in Section 2.5.1) are not open for
18    business or (ii) less than sixty five percent (65%) of the Floor Area of the Shopping Center
19    (excluding the Floor Area of the Premises, any other space occupied by Tenant or any of its
20    Affiliates, the Anchor Tenants and any new expansion areas not built as of the Effective Date) is
21    open and operating by tenants typically found in similar shopping centers in California and such
22    condition continues for a period of more than three (3) consecutive months (such condition being
23    hereinafter referred to as an *"Ongoing Excess Vacancy"*), then in such event, Tenant shall have
24    the right to pay Alternate Rent in lieu of Fixed Rent during the period of such Excess Vacancy,
25    and/or if the Excess Vacancy continues for a period in excess of twelve (12) continuous months,
26    to terminate this Lease, exercisable by giving Landlord, within one hundred twenty (120) days
27    after the expiration of such 12-month period, at least sixty (60) days' prior notice, in which event
28    this Lease shall terminate on the date set forth in Tenant's notice of termination without further
29    liability accruing after the date of such termination on the part of either Landlord or Tenant.  If
30    Tenant does not terminate this Lease pursuant to this Article 22, then commencing on the
31    expiration of the aforesaid 120-day period, Tenant shall resume paying full Rent without regard
32    to the foregoing provisions of this Article 22, provided, however, that Tenant shall retain all of
33    its rights under this Article 22 with respect to any future condition of Ongoing Excess Vacancy
34    thereafter occurring.  Notwithstanding the foregoing, if Tenant ceases to operate any business in
35    the Premises and such cessation occurs more than one year before the Excess Vacancy occurs,
36    then Tenant shall not have the right to pay Alternate Rent but Tenant shall still retain its
37    termination right pursuant to terms of this Article 22.

38                                          ARTICLE 23
39                                       MISCELLANEOUS

40            Section 23.1    Loading Facilities.  Tenant shall have the exclusive right to utilize
41    the loading facilities serving the Premises (shown on Exhibit B) on a "24 hour a day", "365 days
42    a year" basis.

43            Section 23.2    Liens.  Within thirty (30) days after notice of the filing thereof,
44    Tenant shall discharge (either by payment or by filing of the necessary bond, or otherwise) any
45    lien against the Premises and/or Landlord's interest therein, which may arise out of any payment
46    due for, or  purported to be due for, any labor, services, materials, supplies or equipment alleged
47    to have been furnished to or for Tenant in, upon or about the Premises.  Similarly, within thirty
48    (30) days after notice of the filing thereof, Landlord shall discharge (either by payment or by
49    filing of the necessary bond, or otherwise) any lien against the Premises and/or Landlord's
50    interest therein, which may arise out of any payment due for, or purported to be due for, any
51    labor, services, materials, supplies or equipment alleged to have been furnished to or for
52    Landlord in, upon or about the Premises.

53            Section 23.3    Broker's Commission.  Landlord and Tenant each warrant and
54    represent to the other that they did not deal with any real estate broker in connection with the
55    negotiation, execution and delivery of this Lease, except for Terranomics (the *Broker"*).
56    Landlord shall pay the Broker a commission pursuant to a separate agreement.  Each party agrees

1854916.2\C061858\0372671
[bbBaby]

1  to indemnify, defend, and save the other harmless from and against any and all liabilities, costs,
2  causes of action, damages and expenses, including, without limitation, attorneys' fees, with
3  respect to or arising out of any claims made by any real estate broker (other than the Broker),
4  agent or finder with respect to this Lease in breach of the foregoing representation. The
5  provisions of this Section shall survive the expiration or earlier termination of this Lease.

6      Section 23.4  *Force Majeure*. Except as otherwise expressly set forth herein, in
7  the event either party hereto shall be delayed or hindered in, or prevented from, the performance
8  of any act required hereunder by reason of strikes, failure of power, riots, insurrection, war,
9  earthquake, hurricane or tornado (or comparable weather conditions of unusual severity), or
10  other reasons of an extraordinary nature which are beyond the reasonable control of the party,
11  and which could not have been avoided through the exercise of due diligence by a party
12  (collectively referred to herein as "*Force Majeure*"), then the performance of any such act shall
13  be excused for a period equal to the period of the delay. Notwithstanding the foregoing
14  provisions, the following shall not constitute Force Majeure: (i) the financial inability of a party
15  to perform its obligations under this Lease; or (ii) delays occurring in the course of complying
16  with applicable Legal Requirements that could have been avoided through the exercise of due
17  diligence by a party hereto. A party wishing to invoke this Section shall give the other party
18  notice of that intention within ten (10) days of the commencement of any event of *Force
19  Majeure* and shall, at that time, specify the reasons therefor, the specific provision of this Lease
20  which will be delayed as a result, and the period of such extension, if known, or if not known, a
21  reasonable estimate thereof.

22      Section 23.5  Consents. Except as may be otherwise expressly set forth in this
23  Lease, whenever under this Lease provision is made for either party's securing the consent or
24  approval of the other party, (i) such consent or approval shall be in writing and shall not be
25  unreasonably withheld, delayed or conditioned, and (ii) in all matters contained herein, both
26  parties shall have an implied obligation of reasonableness.

27      Section 23.6  Costs. Whenever this Lease requires the performance of an act by
28  a party, such party shall perform the act at its own cost and expense, unless expressly provided to
29  the contrary.

30      Section 23.7  Attorneys' Fees. In any action or proceeding hereunder (whether
31  to enforce the terms and provisions of an indemnity or otherwise), the prevailing party shall be
32  entitled to recover from the other party the prevailing party's reasonable costs and expenses in
33  such action or proceeding, including reasonable attorneys' fees, costs and expenses. Except as
34  otherwise set forth herein, if either party is sued by a third party as a result of a violation of a
35  covenant or warranty herein contained by the other party hereto, then the party who has violated
36  the covenant or warranty shall be responsible for the reasonable costs and expenses in such
37  action or proceeding against the non-violating party, including reasonable attorneys' fees, costs
38  and expenses.

39      Section 23.8  Survival of Obligations. The obligation to pay any sums due to
40  either party from the other that by the terms herein would not be payable, or are incapable of
41  calculation, until after the expiration or sooner termination of this Lease shall survive and remain
42  a continuing obligation until paid. All indemnity obligations under this Lease shall survive the
43  expiration or earlier termination of this Lease.

44      Section 23.9  Non-Waiver. The failure of Landlord or Tenant to insist upon the
45  strict performance of, or to enforce, any provision, covenant or condition herein shall not be
46  deemed to be a waiver thereof, nor void or affect the right of the aggrieved party to enforce the
47  same covenant or condition on the occasion of any subsequent breach or default; nor shall the
48  failure of either party to exercise any option in this Lease upon any occasion arising therefor be
49  deemed or construed to be a waiver of the right to exercise that same kind of option upon any
50  subsequent occasion.

51      Section 23.10  Rights Cumulative. Unless expressly provided to the contrary in
52  this Lease, each and every one of the rights, remedies and benefits provided by this Lease shall
53  be cumulative and shall not be exclusive of any other such rights, remedies and benefits allowed
54  by applicable Legal Requirements.

43

Section 23.11 _Definition of Landlord_. The term *"Landlord"* shall mean only the person or entity which, from time to time, shall then own the Shopping Center, and in the event of the transfer by such owner of its interest in the Shopping Center, such owner shall (except to the extent of (1) claims made by Tenant against Landlord which arose prior to the effective date of the transfer of such ownership interest, and/or (2) judgments obtained by Tenant against Landlord, on or prior to the effective date of the transfer of such ownership interest) thereupon be released and discharged from all covenants and obligations of Landlord thereafter accruing, but such covenants and obligations shall be binding during the Term upon each new owner for the duration of such owner's ownership.

Section 23.12 _Successors and Assigns_. The provisions of this Lease shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns.

Section 23.13 _Limitation of Landlord's Liability_. Except with respect to the payment of the Tenant Allowance and insurance proceeds or condemnation awards received by Landlord which are required by the terms of this Lease to be applied to the repair or restoration of the Premises or the Shopping Center, Tenant shall, on and after the Delivery Date, look only to Landlord's estate and property in the Shopping Center (or the proceeds from the sale of all or any portion thereof) and net income derived from the Shopping Center for the satisfaction of Tenant's remedies for the collection of a judgment (or other judicial process) requiring the payment of money by Landlord hereunder and no other property or assets of Landlord, its officers, directors, stockholders, members or partners shall be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies under or with respect to this Lease. Except with respect to the limitation on personal liability hereinabove set forth, the provisions of this Section 23.13 shall not be deemed or construed to limit Tenant's rights and remedies pursuant to this Lease or which may be available at law or in equity.

Section 23.14 _Limitation of Tenant's Liability_. Landlord, its successors and assigns, shall look solely to the assets, if any, of Tenant and its successors and assigns, for the satisfaction of any claim arising from or under this Lease and shall not seek to impose personal liability on any shareholder, officer, director, member or employee of Tenant or any of its Affiliates.

Section 23.15 _Joint and Several Liability_. If either party consists of more than one person, then the persons constituting such party shall be jointly and severally liable hereunder.

Section 23.16 _Severability_. If any term, covenant, condition or provision of this Lease is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions hereof shall remain in full force and effect and shall in no way be affected, impaired, or invalidated thereby.

Section 23.17 _Grammatical Usages and Construction_. In construing this Lease, feminine or neuter pronouns shall be substituted for those masculine in form and vice versa, and plural terms shall be substituted for singular and singular for plural in any place in which the context so requires. This Lease shall be construed without regard to: (i) the identity of the party who drafted the various provisions hereof, and (ii) the addition or deletion of text made during the negotiation of this Lease. Moreover, each and every provision of this Lease shall be construed as though all parties hereto participated equally in the drafting thereof. As a result of the foregoing, any rule or construction that a document is to be construed against the drafting party shall not be applicable hereto.

Section 23.18 _Table of Contents, Line Numbering and Paragraph Headings_. The table of contents and line numbering, if any, and section headings are inserted only for convenience and in no way define, limit or describe the scope or intent of this Lease, nor in any way affect this Lease.

Section 23.19 _Definition of Hereunder, Herein, etc._. Unless the context clearly indicates to the contrary, the words "herein," "hereof," "hereunder," "hereafter," and words of similar import refer to this Lease and all the Exhibits attached hereto as a whole and not to any particular section, subsection, or paragraph hereof.

44

1           Section 23.20  <u>Short Form Lease</u>.  Upon the request of either party following the
2 execution and delivery of this Lease, Landlord and Tenant shall execute a short form lease or
3 memorandum, which shall be in recordable form, and in such form and having such substance as
4 either party shall reasonably request.  Landlord and Tenant shall cooperate with each other in
5 effecting the recordation thereof.  In no event shall the amount of Fixed Rent reserved hereunder
6 be included in any such short form lease or memorandum.

7           Section 23.21  <u>Entire Agreement and Modification</u>.  This Lease constitutes the
8 entire agreement of the parties hereto, and all prior agreements between the parties, whether
9 written or oral, are merged herein and, except as may be specifically set forth herein, shall be of
10 no force and effect.  This Lease cannot be changed, modified or discharged orally, but only by an
11 agreement in writing, signed by the party against whom enforcement of the change, modification
12 or discharge is sought.

13           Section 23.22  <u>No Joint Venture or Partnership Created by Lease</u>.  Nothing
14 contained herein shall be deemed or construed as creating the relationship of principal and agent
15 or of partnership or of joint venture between the parties hereto.

16           Section 23.23  <u>Tenant's Tradename</u>.  Except as a nominative fair use (e.g. to
17 show the location of the Premises in the Shopping Center, to indicate that Tenant is a tenant in
18 the Shopping Center, to announce the "Grand Opening" and "Coming Soon" of Tenant and the
19 listing of Tenant's name on site plans, promotional materials and internet shopping center
20 directories), Landlord shall not make use of the tradenames "Bed Bath & Beyond"® or "Buy
21 Buy Baby"® in any advertising or marketing material, including, without limitation, on any
22 internet website, without obtaining Tenant's prior written approval, which may be withheld in
23 Tenant's sole and absolute discretion.

24           Section 23.24  <u>Counterparts</u>. This instrument may be executed in several
25 counterparts, each of which shall be deemed an original.  The signatures to this instrument may
26 be executed and notarized on separate pages, and when attached to this instrument, shall
27 constitute one complete document.

28           Section 23.25  <u>Waiver of Trial by Jury</u>.  Landlord and Tenant hereby mutually
29 waive any and all rights which either may have to request a jury trial in any proceeding between
30 them at law or in equity.

31           Section 23.26  <u>Ethical Conduct Policy</u>.  It is the policy of Tenant and its
32 subsidiaries and affiliates (collectively, ***"the Company"***) to conduct all its business transactions
33 in accordance with the highest ethical standards and all applicable laws (including, but not
34 limited to, the U.S. Foreign Corrupt Practices Act). No individual who is employed by or who
35 represents the Company, and no individual or entity that contracts with the Company or
36 otherwise performs services on behalf of the Company, is permitted to solicit, accept, offer,
37 promise or pay any bribe, kickback or any other improper payment of money, products or
38 services. This includes, but is not limited to, any improper payment in exchange for (i) the
39 Company's execution of this Lease, (ii) any action taken by such individual on behalf of the
40 Company, or (iii) any action taken by a third party. Any individual or entity having a business
41 relationship with the Company shall require any subcontractor (of any level) to adhere to the
42 same standards and are expected to appropriately monitor their subcontractors to ensure such
43 adherence. If any such improper actions are observed, please contact the Tenant's Legal
44 Department (Attention: General Counsel) at 908-688-0888 so that the incident may be fully
45 investigated and appropriate remedial action taken.

46           Section 23.27  <u>Confidentiality</u>.  Landlord shall not reveal to anyone, or otherwise
47 make or publish any public statement or notice regarding the economic or other business terms
48 of this Lease (including, without limitation, the Term and the Rent), except as required by Legal
49 Requirements or for disclosure to Landlord's accountants, attorneys, bona fide prospective
50 purchasers, or current or prospective Mortgagees or underlying lessors of all or any portion of
51 Landlord's interest in the Shopping Center, provided that each of such recipients shall be bound
52 to the same non-disclosure provisions as are imposed upon Landlord.  Tenant shall not reveal to
53 anyone, or otherwise make or publish any public statement or notice regarding the economic or
54 other business terms of this Lease (including, without limitation, the Term and the Rent), except
55 as required by Legal Requirements or for disclosure to Tenant's accountants, attorneys, bona fide
56 prospective purchasers, assignees or sublessees, provided that each of such recipients shall be

45

1    bound to the same non-disclosure provisions as are imposed upon Tenant and except the
2    foregoing shall not prohibit Tenant from recording a memorandum of this Lease and for
3    Landlord, Tenant and Tenant's subtenant entering into a Subtenant Recognition Agreement in
4    the form of Exhibit H attached hereto.

5        Section 23.28  Timely Billing of Charges.  Except if the reason for the delay in
6    billing is outside of Landlord's control, all charges due from Tenant to Landlord for which
7    Tenant must be billed by Landlord must be billed within three (3) years after the close of the
8    calendar year in which the charge is incurred by, or otherwise payable to, Landlord or Landlord
9    will have waived its right to reimbursement which may have been established in any section of
10   this Lease.

11       Section 23.29  USA Patriot Act.  Pursuant to *Executive Order 13224,* signed by
12   President George W. Bush on September 24, 2001, Landlord and Tenant hereby certify to each
13   other that: (i) it is not acting, directly or indirectly, for or on behalf of any person, group, entity,
14   or nation named by any Executive Order or the United States Treasury Department as a terrorist,
15   "Specially Designated National and Blocked Person," or other banned or blocked person, entity,
16   nation, or transaction pursuant to any law, order, rule, or regulation that is enforced or
17   administered by the Office of Foreign Assets Control; and (ii) it is not engaged in this
18   transaction, directly or indirectly on behalf of, or instigating or facilitating this transaction
19   directly or indirectly on behalf of, any such person, group, entity, or nation.  Landlord and
20   Tenant hereby agree to defend, indemnify and hold harmless the other from and against any and
21   all claims, damages, losses, risks, liabilities and expenses (including reasonable attorneys' fees
22   and costs) arising from or related to any breach of the foregoing certification.  Notwithstanding
23   anything to the contrary contained herein, the parties recognize that Landlord and Tenant's
24   parent company are both publicly traded companies with multiple shareholders, many of whose
25   identities are unknown to each of them.
26
27       Section 23.30  CASP Inspection Civil Code Section 1938.  The Premises has not
28   undergone inspection by a Certified Access Specialist (CASp).  The foregoing verification is
29   included herein solely for the purpose of complying with California Civil Code Section 1938 and
30   shall not in any manner affect the parties' respective responsibilities for compliance with
31   construction-related accessibility standards as provided under this Lease.

32

33                         [Signature page follows]

1854916.2\C061858\0372671
[bbBaby]

1
2          Section 23.31  <u>Governing Law</u>.  This Lease shall be governed by, construed, and
3   enforced in accordance with the laws of the State in which the Premises are located.

4          IN WITNESS WHEREOF, the parties have executed this instrument under seal the day
5   and year first-above written.

**LANDLORD:**

WITNESS:                                    DALY CITY SERRAMONTE CENTER,
                                            LLC, a Delaware limited liability company

_____            By: Equity One Realty & Management CA,
                                            Inc.

                                            By:_____
                                            Name:  Michael Makinen
                                            Title:    Chief Operating Officer

**TENANT:**

WITNESS:                                    BED BATH & BEYOND INC., a New York
                                            corporation

_____            By:_____
Name:  Alan M. Freeman                      Name:  Warren Eisenberg
Title:  Assistant Secretary                 Title:    Co-Chairman

[bbBaby]

1                           INDEX OF EXHIBITS

2       Exhibit A -        Legal Description of Shopping Center
3       Exhibit B -        Site Plan
4       Exhibit C -        Form of Rent Commencement and Expiration Date Agreement
5       Exhibit D -        Specifications for Landlord's Work
6       Exhibit D-1        Exterior Elevations of the Premises, and Sidewalk Plan
7       Exhibit E -        Permitted Encumbrances
8       Exhibit F -        Signage
9       Exhibit G -        Form of Subordination, Non-Disturbance and Attornment Agreement
10      Exhibit H -        Form of Subtenant Recognition Agreement
11      Exhibit I -        Form of Delivery Date Notice
12      Exhibit J -        Form of Delivery Date Certification
13      Exhibit K-1        Existing Exclusives
14      Exhibit K-2        Existing Leases
15      Exhibit L          Prohibited Uses
16      Exhibit M          Form of Mechanics' Lien Indemnification Agreement
17      Exhibit N          Existing Lease Limitations

1    Exhibit A

2    Legal Description of Shopping Center

3    All that certain real property situated in the County of San Mateo, State
4    of California, described as follows:
5
6    City of Daly City
7
8    TRACT ONE:
9
10   COMMENCING AT THE MOST WESTERLY TERMINUS OF THAT CERTAIN
11   CURVE HAVING A RADIUS OF 2151.17 FEET; A CENTRAL ANGLE OF
12   10°11'45", AN ARC DISTANCE OF 382.80 FEET AS SAID CURVE FORMS A
13   PORTION OF THE SOUTHERLY BOUNDARY LINE OF BLOCK 36, IN
14   SERRAMONTE, UNIT NO. 7, DALY CITY, CALIFORNIA, FILED FOR RECORD
15   JANUARY 25, 1967 IN BOOK 66 OF MAPS AT PAGES 8 TO 11 INCLUSIVE,
16   SAN MATEO COUNTY RECORDS; THENCE NORTH 28°55'53" EAST 921.22
17   FEET TO THE POINT OF BEGINNING OF THE PARCEL TO BE DESCRIBED;
18   THENCE NORTH 84°45' WEST 224.00 FEET; THENCE NORTH 5°15' EAST
19   335.00 FEET; THENCE SOUTH 84°45' EAST 224.00 FEET; THENCE SOUTH
20   5°15' WEST 335.00 FEET TO THE POINT OF BEGINNING.
21
22   JOINT PLANT NO. 091-024-240-25A
23   ASSESSOR'S PARCEL NO. 091-240—250
24
25   TRACT TWO:
26
27   ALL OF BLOCK 36, AS SHOWN ON THE MAP OF SERRAMONTE UNIT NO. 7,
28   AS FILED JANUARY 25, 1967, IN BOOK 66 OF MAPS, AT PAGES 8, 9, 10
29   AND 11, SAN MATEO COUNTY RECORDS.
30
31   EXCEPTING THEREFROM THE PARCEL AT THE NORTHEAST CORNER OF
32   SERRAMONTE BOULEVARD AND GELLERT BOULEVARD (EXTENDING
33   NORTH), CONVEYED TO UNION OIL COMPANY OF CALIFORNIA, BY DEED
34   RECORDED NOVEMBER 10, 1970, IN BOOK 5857, AT PAGE 227
35   (60535AD), OFFICIAL RECORDS OF SAN MATEO COUNTY, DESCRIBED AS
36   FOLLOWS:
37
38   BEGINNING AT A POINT ON THE NORTHERLY LINE OF SERRAMONTE
39   BOULEVARD AS SHOWN ON THE ABOVE MENTIONED MAP, SAID POINT
40   BEING DISTANT THEREON SOUTH 80° 56' 33" WEST, 25.72 FEET FROM
41   THE EASTERLY EXTREMITY OF THE NORTHERLY LINE OF SERRAMONTE
42   BOULEVARD; THENCE FROM SAID POINT OF BEGINNING, NORTH 05° 15'
43   WEST, 135.64 FEET ; THENCE NORTH 84° 45' WEST, 152.56 FEET;
44   THENCE SOUTH 05° 15' EAST, 130.67 FEET; THENCE ALONG THE ARC OF
45   A CURVE TO THE LEFT, TANGENT TO THE PRECEDING COURSE, HAVING A
46   RADIUS OF 40 FEET, A CENTRAL ANGLE OF 93° 48' 27", AN ARC
47   DISTANCE OF 65.49 FEET TO THE NORTHERLY LINE OF SERRAMONTE
48   BOULEVARD; THENCE ALONG SAID LINE, NORTH 80° 56' 33" EAST,
49   107.58 FEET TO THE POINT OF BEGINNING.
50
51   FURTHER EXCEPTING THEREFROM, ALL THAT PORTION OF THE ABOVE
52   DESCRIBED PROPERTY CONVEYED BY DEED RECORDED JULY 22, 2005,
53   INSTRUMENT NO. 2005-123837, OFFICIAL RECORDS WITHIN THE
54   FOLLOWING DESCRIPTION:
55
56   PARCEL 1 OF THAT CERTAIN PARCEL MAP RECORDED ON MAY 19, 2005
57   AS INSTRUMENT NO. 2005-900082, IN BOOK 76 OF PARCEL MAPS AT
58   PAGES 24 AND 25, SAN MATEO COUNTY RECORDS.
59
60   FURTHER EXCEPTING THEREFROM ANY PORTION LYING WITHIN TRACT

A-1

1     ONE DESCRIBED ABOVE.

2

3     JOINT PLANT NOS.:

4

5     091-024-240-07A

6     091-024-240-09A

7     091-024-240-32A

8     091-024-240-31A

9     091-024-240-12A

10    091-024-240-13A

11    091-024-240-30A

12    091-024-240-16A

13    091-024-240-17A

14    091-024-240-18A

15    091-024-240-19A

16    091-024-240-21A

17    091-024-240-22A

18    091-024-240-23A

19    091-024-240-26A

20    091-024-240-27A

21    091-024-240-28A

22    091-024-240-29A

23    091-024-240-08.01A

24    091-024-240-08.02A

25

26    APN: 091-240-070, 091-240-090, 091-240-100, 091-240-110, 091-240-

27    120, 091-240-130, 091-240-150, 091-240-160, 091-240-170, 091-240-

28    180, 091-240-190, 091-240-210, 091-240-220, 091-240-260, 091-240-

29    270, 091-240-280, 091-240-300, 091-240-330, 091-240-230

A-2

1                                                    <u>Exhibit B</u>

2                                                    Site Plan

1854916.2\C061858\0372671
[bbBaby]



LEGEND
PREMISES
CRITICAL AREA
PROPERTY LINE
EM EXPECTANT MOTHER PARKING
BIO RETENTION AREA
SW QUADRANT LINE
TENANT'S STAGING AREA
ACCESSIBLE PARKING SPACE
STRIPING AT PEDESTRIAN CROSSWALK WITH PEDESTRIAN SIGN AND "STOP" PAINTED AT TENANTS OPTION PER PROTOTYPE AND AS ALLOWED BY CODE
NEW PARKING SPACES TO BE LOCATED PER THE CIVIL DRAWINGS.
TENANT TO PROVIDE SIDEWALK IN FRONT OF PREMISES, LL TO PROVIDE CURB AND PARKING AREA BEYOND
BIO RETENTION AREA
NORTH
PYLON SIGN PER TENANT SIGN EXHIBIT
buy buy BABY
DALY CITY, CA
SW QUADRANT
EXHIBIT B: (2 OF 2)
DATE: 05-08-15
5.13.15
FUTURE VEHICULAR DIRECTIONAL SIGNAGE
RELOCATED TRANSIT CENTER
CPWM
RETAIL C
GAS SERVICE
SANITARY LINE STUB IN
PREMISES
RETAIL B
CLEAR INTERIOR DIM
CART CORRALS
RETAIL A2
RETAIL A
TENANT'S TRAILER
(4) EXPECTANT MOTHER PARKING SPACES.
TRASH CONTAINER PAD / AREA. FINAL LOCATION DETERMINED BY TENANT
buybuyBABY PROTOTYPICAL "TEMPORARY SIGN" LOCATION. REFER TO EXHIBIT F FOR INFORMATION. LOCATION OF SIGN TO BE COORDINATED SO AS NOT TO BLOCK EXISTING SIGNAGE
SCALE
0 25'-0" 50'-0" 100'-0" 200'-0"
TRASH COMPACTOR PAD
LOADING FACILITIES
ELECTRICAL & TELCOM STUB IN
DOMESTIC WATER & FIRE RISER STUB IN
CONSTRUCTION DRIVE EXTENDS TO CALLAN BLVD EXIT
NOTE: LOCATION OF PEDESTRIAN CROSSWALKS MAY BE REQUIRED AT A FUTURE DATE BY GOVERNING AGENCIES HAVING JURISDICTION.
SW QUADRANT LINE
TEMPORARY STORAGE CONTAINER FINAL LOCATION TO BE DETERMINED BY TENANT AND LANDLORD.
NOTE:
1) CONSTRUCTION STAGING AREA FOR LANDLORD AND OTHER CO-TENANTS SHALL NOT BE DIRECTLY IN FRONT OF TENANT'S PREMISES OR BLOCK ACCESS TO TENANTS LOADING FACILITIES
2) TENANT TO HAVE THE RIGHT TO RELOCATE CART CORRALS ON THE SIDEWALK IN FRONT OF PREMISES AND IN THE PARKING FIELD WITHIN TENANT'S CRITICAL AREA AND AS ALLOWED BY CODE
3) EXIT DOOR LOCATIONS TO BE LOCATED PER TENANT'S FINAL FIXTURE PLANS.
4) NOT USED
5) PARKING LAYOUT, SERVICE DRIVE, AND SITE PLAN ARE PRELIMINARY AND CONTINGENT UPON FINAL DESIGN AND APPROVAL FROM THE CITY OF DALY CITY.



## **Exhibit B**

Ross Lease

## **FILED UNDER SEAL**