**MORITT HOCK & HAMROFF LLP**
James P. Chou, Esq. (JC-2629)
Marshall O. Dworkin, Esq. (MD-5152)
1407 Broadway, Suite 3900
New York, NY 10018
Tel: (212) 239-2000
Facsimile: (212) 239-7277
Email: jchou@moritthock.com
mdworkin@moritthock.com

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| BED BATH & BEYOND INC., et al. | Case No.  23-13359 (VFP) |
| Debtor. | (Joint Administration Requested) |
| | Hearing Date: August 22, 2023 at 10:00am |

**CERTIFICATION OF MARA SIRHAL IN SUPPORT OF HER MOTION FOR RELIEF FROM THE AUTOMATIC STAY**

Mara Sirhal, of full age, hereby certifies as follows:

1. I am the defendant in a pre-petition action that Bed Bath & Beyond Inc. ("BBBY" or the "Company") commenced in the Law Division of the Superior Court of New Jersey, Union County, styled *Bed Bath & Beyond Inc. v. Mara Sirhal*, UNN-L-00129-23 (the "Action"). I respectfully submit this Certification in support of my Motion for Relief from the Automatic Stay. Unless otherwise stated, I either have personal knowledge of the facts set forth herein or knowledge of the facts based upon my review of documents.

2. Attached hereto as **Exhibit 1** is a true and accurate copy of the April 25, 2023, Complaint and attached exhibits that were filed against me by the Company in the Superior Court of New Jersey in Union County, Law Division.

3333477v2

3. On or about December 14, 2020, I agreed to join Harmon Face Values ("Harmon") as its Senior Vice President, General Manager. Harmon is a company that was owned by BBBY. Soon after, I was promoted and given dual roles: Senior Vice President, General Merchandise Manager, Health/Beauty/Consumables with Bed Bath & Beyond, Inc., and Senior Vice President, General Manager at Harmon.

4. Due to my success and loyalty to BBBY and Harmon, on May 16, 2022, I received a Recognition Award (the "Recognition Award") of $106,250.00, provided that, if I resigned within one year, I would be required to repay BBBY a prorated portion of the Recognition Award.

5. In and around June 2022, I signed a new employment agreement (the "Employment Agreement") with BBBY to become BBBY's Executive Vice President, Chief Merchandising Officer and General Manager, Harmon. Before executing the Employment Agreement, I had no opportunity to review BBBY's books and records and I did not have a full understanding of BBBY's financial situation at that time. This Employment Agreement was offered to me by BBBY's previous CEO, Mark Tritton. The Employment Agreement provided, in part, that I would receive a $220,000 lump sum cash payment as a signing bonus (the "Signing Bonus") and could retain the Signing Bonus if I did not resign prior to the first anniversary of the Employment Agreement's Effective Date (*i.e.* before June 28, 2023), or if I resigned prior to the first anniversary for "Good Reason." The Employment Agreement defined "Good Reason" as, among other things, a "material diminution in Executive's duties, authority or responsibilities of employment." BBBY did not initially offer me the Signing Bonus, but I negotiated the amount when I discovered that my predecessor to the role of Chief Merchandising Officer, Joe Hartsig, was compensated significantly more than the compensation BBBY was offering me for the same role. The Signing Bonus constituted the balance between BBBY's initial compensation offer and the amount Mr.

2

3333477v2

Hartsig was earning upon his departure. Had BBBY offered me compensation that was in parity with Mr. Hartsig's compensation, I never would have negotiated the Signing Bonus.

6. The Employment Agreement also stated that if I were to resign from the Company for Good Reason then, among other things, I would be entitled to a cash severance (the "Severance Provision") equal to, in the aggregate, one (1) times the sum of my Base Salary and target Annual Bonus, subject to all applicable tax and withholdings and payable in equal installments over twelve (12) months from the separation date.

7. The Employment Agreement was subsequently amended, effective August 31, 2022, by the First Amendment to Employment Agreement (the "First Amendment"), which promoted me to become the Company's Executive Vice President and Brand President for BBBY. As a result of this promotion, my base salary and annual bonus increased, and I began to report directly to BBBY's interim Chief Executive Officer, Susan Gove ("Gove").

8. Beginning in the Fall of 2022, BBBY began to face significant liquidity issues and other financial stresses. Though the First Amendment stated that I would report directly to Gove, BBBY's dire financial position diminished these opportunities and Gove began making executive decisions that significantly impacted my role and authority without my input or knowledge. By the end of 2022, I learned and began to express concern that Gove was using questionable assumptions and figures regarding the Company while seeking debt or equity financing from potential investors. As a result of these dire constraints, BBBY failed to timely pay discretionary bonuses to executives at the end of 2022.

9. In order to placate my and other executives' concerns about bonuses and BBBY's financial future, BBBY offered me and others a Retention Bonus (the "Retention Bonus"). The Retention Bonus was announced to me on February 7, 2023, but the executives at BBBY only

3333477v2

provided me a draft of the Retention Bonus agreement on the morning of February 8 and demanded I agree to the Retention Bonus agreement by February 8 at 1:00 p.m.—approximately 4 hours—or risk losing the bonus. This was not sufficient time to properly review the proposed Retention Bonus with an attorney and seek clarification or propose modifications to the offer; the rushed timeframe was likely intended by BBBY to lure executives into accepting the Retention Bonus agreement to hold them hostage to its terms and conditions.

10. In any event, the Retention Bonus agreement stated that I would receive a cash lump sum payment of $314,000.00, and I would only be required to repay this amount if my employment with BBBY terminated (1) by "the Company, for a reason other than Cause" or (2) due to death or disability, in each case before June 8, 2023.

11. I agreed to and signed the Retention Bonus agreement, which was also reviewed and signed by Gove, a seasoned executive.

12. In and around this time, however, BBBY's financial situation worsened, leading Gove to take drastic measures without including or consulting me. By the beginning of February 2023, Gove decided, without my consultation, to close all Harmon beauty product stores in the United States, as well as hundreds of additional Bed Bath & Beyond stores across the United States.

13. Gove began reformulating BBBY's business plans and strategy without my involvement or knowledge to entice potential investors to provide capital to the Company—plans that directly impacted my role as Brand President.

14. In early February 2023, Gove decided to lay off approximately 1,300 employees in New Jersey to avoid complying with a change in New Jersey law, which would have become effective in April, mandating increased notice requirements and severance payments for laid-off

4

3333477v2

employees. At this time, I voiced my concerns and objection to this policy decision to several BBBY executives.

15. Nevertheless, Gove tasked me with notifying the employees of their termination and that BBBY would not be providing severance payments to them. I also had to inform Harmon employees that the entire Harmon business would be closing immediately. As a result, I became the face of the mass reduction in force and began to receive threatening emails from store managers and other former employees who were casualties of the layoffs.

16. This caused significant emotional distress for me, though I was not responsible for BBBY's financial situation or the decision to layoff these employees to avoid compliance with the new law. When I raised concerns about these threats with BBBY's executives, I was questioned about my emotional stability and capability to perform my role under the stress.

17. At this point, BBBY had few employees and even fewer stores for which I could coordinate and provide merchandise. In light of the continued diminution of the scope of my responsibilities, on March 10, 2023, I informed BBBY that I would be resigning from my employment with BBBY for Good Reason. The basis for my resignation was, among other things, (1) the closing of 54 Harmon freestanding stores and web business, (2) the closure of approximately 149 Bed Bath & Beyond stores, and (3) the resulting diminishment of my decision-making role and authority, particularly regarding inventory procurement and staff resources, which Gove and other executives had been usurped.

18. While I had agreed to become Chief Merchandising Officer in June 2022 for a large, international retailer, by March 2023, BBBY had closed most of its stores—the focal point of my duties and responsibilities. This was a complete material change in the scope of BBBY's business

5

3333477v2

and my work. Since the store closings and mass layoffs would not be rectifiable and BBBY was nearing bankruptcy, it would have been impossible for BBBY to cure this material change in scope.

19. In response to my resignation, I received a letter from BBBY on March 16, 2023 (the "March 16 Letter"), disagreeing that I resigned for Good Reason and demanding that I repay BBBY $353,768.16, which consisted of the Retention Bonus and a portion of the Signing Bonus. BBBY did not offer to pay me the amount owed under the Severance Provision. Throughout March and April 2023, my counsel and I attempted to resolve this matter amicably and fairly with BBBY and its counsel to avoid needless and expensive litigation. Despite our diligent efforts, the Company did not engage us in good faith, and never proposed or set forth a formal settlement offer to my counsel or me during this time.

20. On April 21, 2023 at 5:40 p.m., two days before Debtor filed its Chapter 11 Voluntary Petition on April 23, 2023, BBBY filed a Complaint against me in Union County Superior Court. Notably, BBBY's counsel reached out to my counsel at approximately 3:30 p.m. on August 21—two hours before they filed the Complaint—and sent a non-negotiable settlement offer that I would be forced to accept within one (1) hour or face litigation. Like the Retention Bonus agreement, this was another attempt by BBBY to pressure me into accepting an agreement and/or was a contrived attempt to claim I refused their eleventh-hour settlement offer. This was not sufficient time to review the settlement offer with counsel, much less to engage in any negotiations. I was not served with the Complaint until April 26, 2023. The Complaint alleges that I violated the Employment Agreement, the agreement which provided me the Recognition Award, and the Retention Bonus agreement, as well as the covenant of good faith and fair dealing inherent in the Employment Agreement, the First Amendment, and the Retention Bonus agreement.

3333477v2

21. In another baseless attempt to intimidate and harass me, BBBY also alleged that I committed fraud in relation to the Retention Bonus and sought $314,000.00, plus punitive damages.

22. In answering the Complaint, I intend to assert counterclaims alleging that BBBY violated my Employment Agreement by failing to pay me the amount contemplated in the Severance Provision. This amount, which is over $1 million, dwarfs the amount that the Company seeks and would serve as a complete setoff of BBBY's claims. Should I be awarded damages, I am prepared to enforce my judgment through the bankruptcy process or as otherwise permitted under the law.

3333477v2

      I hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me is willfully false, I am subject to punishment.

                                              MARA SIRHAL

Dated: 7/31/23

3333477v2