*Solicitation Version*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Emily E. Geier, P.C. (admitted *pro hac vice*)
Derek I. Hunter (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
joshua.sussberg@kirkland.com
emily.geier@kirkland.com
derek.hunter@kirkland.com

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com

*Co-Counsel for Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| BED BATH & BEYOND INC., *et al.*, | Case No. 23-13359 (VFP) |
| Debtors.[1] | (Jointly Administered) |

**AMENDED DISCLOSURE STATEMENT**
**RELATING TO THE AMENDED JOINT CHAPTER 11**
**PLAN OF BED BATH & BEYOND INC. AND ITS DEBTOR AFFILIATES**

---

[1] The last four digits of Debtor Bed Bath & Beyond Inc.'s tax identification number are 0488. A complete list of the Debtors in these Chapter 11 Cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/bbby. The location of Debtor Bed Bath & Beyond Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 650 Liberty Avenue, Union, New Jersey 07083.

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE AMENDED JOINT CHAPTER 11 PLAN OF BED BATH & BEYOND INC. AND ITS DEBTOR AFFILIATES. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE VIII HEREIN. IN THE EVENT OF ANY INCONSISTENCIES BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE PLAN SHALL GOVERN.

THE DEBTORS URGE EACH HOLDER OF A CLAIM TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN ANTICIPATED EVENTS IN THE DEBTORS' CHAPTER 11 CASES. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS, STATUTORY PROVISIONS, OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL, STATE, OR OTHER SECURITIES LAWS OR OTHER SIMILAR LAWS.

THE PLAN AND DISCLOSURE STATEMENT HAVE NEITHER BEEN FILED WITH, NOR APPROVED OR DISAPPROVED BY, THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY STATE SECURITIES COMMISSION OR OTHER SIMILAR REGULATORY BODY, AND NEITHER THE

SEC NOR ANY STATE SECURITIES COMMISSION OR OTHER REGULATORY BODY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR THE MERITS OF THE PLAN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES AND THEIR FUTURE RESULTS AND OPERATIONS. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT CONTAINS "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF UNITED STATES SECURITIES LAWS. SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD-LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE," OR "CONTINUE," OR THE NEGATIVE THEREOF, OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY. YOU ARE CAUTIONED THAT ALL FORWARD-LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD-LOOKING STATEMENTS. FORWARD-LOOKING STATEMENTS MAY INCLUDE, BUT ARE NOT LIMITED TO, STATEMENTS ABOUT THE DEBTORS':

- BUSINESS STRATEGY;

- FINANCIAL CONDITION, REVENUES, CASH FLOWS, AND EXPENSES;

- LEVELS OF INDEBTEDNESS, LIQUIDITY, AND COMPLIANCE WITH DEBT COVENANTS;

- FINANCIAL STRATEGY, BUDGET, PROJECTIONS, AND OPERATING RESULTS;

- SUCCESSFUL RESULTS FROM THE DEBTORS' OPERATIONS;

- GENERAL ECONOMIC AND BUSINESS CONDITIONS;

- COUNTERPARTY CREDIT RISK;

- **THE OUTCOME OF PENDING AND FUTURE LITIGATION;**

- **UNCERTAINTY REGARDING THE DEBTORS' FUTURE OPERATIONS; AND**

- **PLANS, OBJECTIVES, AND EXPECTATIONS.**

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER.  THE DEBTORS MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE.  HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED.  INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT.  THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.

CONFIRMATION AND CONSUMMATION OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED IN ARTICLE XI OF THE PLAN.  THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED OR, IF CONFIRMED, THAT SUCH MATERIAL CONDITIONS PRECEDENT WILL BE SATISFIED OR WAIVED.  YOU ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT IN ITS ENTIRETY, INCLUDING BUT NOT LIMITED TO THE PLAN AND ARTICLE VIII OF THIS DISCLOSURE STATEMENT ENTITLED "RISK FACTORS," BEFORE SUBMITTING YOUR BALLOT TO VOTE TO ACCEPT OR REJECT THE PLAN.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.  THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

**SUMMARIES OF THE PLAN AND STATEMENTS MADE IN THE DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN.  THE SUMMARIES OF THE FINANCIAL INFORMATION CONTAINED IN AND THE DOCUMENTS ANNEXED TO THIS DISCLOSURE STATEMENT OR OTHERWISE INCORPORATED HEREIN BY REFERENCE ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THOSE DOCUMENTS.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE OF THIS DISCLOSURE STATEMENT, AND THERE IS NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE.  EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR IN ACCORDANCE WITH APPLICABLE LAW, THE DEBTORS ARE UNDER NO DUTY TO UPDATE OR SUPPLEMENT THIS DISCLOSURE STATEMENT.**

**IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS AND INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE LIQUIDATION TRANSACTIONS CONTEMPLATED THEREBY.**

**THIS DISCLOSURE STATEMENT IS SUBJECT TO FURTHER REVISION AND MAY BE AMENDED, SUPPLEMENTED, OR OTHERWISE MODIFIED TO, AMONG OTHER THINGS, TAKE INTO ACCOUNT FURTHER SPECIFICS OF ANY LIQUIDATION TRANSACTION TO BE CONSUMMATED PURSUANT TO THE PLAN, AND TO ACCOMMODATE ADDITIONAL REQUESTS FOR DISCLOSURE.**

<u>**TABLE OF CONTENTS**</u>

<b>Page</b>

I.  INTRODUCTION ..................................................................................................1

II.  PRELIMINARY STATEMENT .............................................................................1

III.  QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE
STATEMENT AND PLAN..........................................................................................5

    A.  What is chapter 11?............................................................................5
    B.  Why are the Debtors sending me this Disclosure Statement? .....................5
    C.  Am I entitled to vote on the Plan? ..................................................6
    D.  What will I receive from the Debtors if the Plan is consummated? ...........6
    E.  What happens to my recovery if the Plan is not confirmed or does not go
effective?...............................................................................9
    F.  If the Plan provides that I get a distribution, do I get it upon Confirmation
or when the Plan goes effective, and what is meant by "Confirmation,"
"Effective Date," and "Consummation?" ..................................................10
    G.  What will I receive from the Debtors if I hold an Allowed Administrative
Claim, Priority Tax Claim, Professional Fee Claim, or a DIP Claim? ......10
    H.  Are any regulatory approvals required to consummate the Plan? .............13
    I.  Is there potential litigation related to Confirmation of the Plan?...............13
    J.  Will the final amount of Allowed General Unsecured Claims affect my
recovery under the Plan?.................................................................13
    K.  Will there be releases and exculpation granted to parties in interest as part
of the Plan? ..........................................................................14
    L.  What is the deadline to vote on the Plan?...................................................15
    M.  How do I vote for or against the Plan? .......................................................15
    N.  Why is the Bankruptcy Court holding a Combined Hearing? ...................16
    O.  When is the Combined Hearing set to occur?............................................16
    P.  What is the purpose of the Combined Hearing? ........................................16
    Q.  Who do I contact if I have additional questions with respect to this
Disclosure Statement or the Plan? ............................................................16
    R.  Do the Debtors recommend voting in favor of the Plan? ..........................17

IV.  THE DEBTORS' PLAN.............................................................................................17

    A.  Liquidation Transactions ...........................................................................17
    B.  Distributable Proceeds and Waterfall Recovery .......................................18
    C.  WARN Reserve and Combined Reserve ...................................................19
    D.  Cancellation of Existing Securities, Notes, Instruments, Certificates, and
Other Documents .....................................................................................20
    E.  General Settlement of Claims and Interests...............................................21
    F.  Means of Implementation .........................................................................21
    G.  Treatment of Executory Contracts and Unexpired Leases .......................31

H.     Exemption from Certain Transfer Taxes and Fees .....................................34
I.     Procedures for Resolving Contingent, Unliquidated and Disputed Claims.34
J.     Settlement, Release, Injunction, and Related Provisions.........................37
K.     Conditions Precedent to the Effective Date ..............................................43

V.    THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS
      OVERVIEW ........................................................................................................44

      A.     The Debtors' Corporate History .................................................................44
      B.     The Debtors' Business Operations..............................................................45
      C.     Prepetition Capital Structure......................................................................46

VI.   EVENTS LEADING TO THE CHAPTER 11 FILINGS.....................................49

      A.     Early Signs of Business Deterioration ........................................................49
      B.     New Leadership's Transformation Plan. .....................................................50
      C.     Holiday Season Default. ..............................................................................51
      D.     Exhaustive Exploration of Strategic Alternatives......................................52

VII.  EVENTS OF THE CHAPTER 11 CASES............................................................56

      A.     First Day and Second Day Relief.................................................................56
      B.     Retention of the Debtors' Professionals. ....................................................56
      C.     Schedules and Statements ...........................................................................56
      D.     Appointment of Official Committee ............................................................57
      E.     Sale Process and Bidding Procedures.........................................................57
      F.     Store Closing Process .................................................................................58
      G.     Treatment of Unexpired Leases. .................................................................58
      H.     Establishment of Claims Bar Dates. ...........................................................59
      I.     Final Approval of DIP Financing ...............................................................61
      J.     Litigation Matters. ......................................................................................61

VIII. RISK FACTORS ..................................................................................................61

      A.     Bankruptcy Law Considerations..................................................................61
      B.     Risks Related to the Wind-Down Debtors' Businesses...............................66

IX.   SOLICITATION AND VOTING PROCEDURES.................................................67

      A.     Holders of Claims Entitled to Vote on the Plan..........................................68
      B.     Voting Record Date .....................................................................................68
      C.     Voting on the Plan .......................................................................................68
      D.     Ballots Not Counted.....................................................................................69

X.    CONFIRMATION OF THE PLAN .......................................................................69

      A.     Requirements for Confirmation of the Plan.................................................69
      B.     Best Interests of Creditors...........................................................................70

|      |      |                                                                          |     |
| ---- | ---- | ------------------------------------------------------------------------ | --- |
|      | C.   | Feasibility                                                              | 71  |
|      | D.   | Acceptance by Impaired Classes                                           | 71  |
|      | E.   | Confirmation Without Acceptance by All Impaired Classes                  | 72  |

| XI.  | CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN | 73 |
| ---- | ---- | ------------------------------------------------------------------------ | --- |
|      | A.   | Introduction                                                             | 73  |
|      | B.   | Certain U.S. Federal Income Tax Consequences to the Debtors              | 74  |
|      | C.   | Certain U.S. Federal Income Tax Consequences to Certain U.S. Holders of Allowed Class 3, Class 4, Class 5, and Class 6 Claims | 75 |
|      | D.   | Certain U.S. Federal Income Tax Consequences to Certain Non-U.S. Holders of Allowed Class 3, Class 4, Class 5, and Class 6 Claims | 78 |
|      | E.   | Tax Matters Regarding the Liquidating Trust.                             | 80  |
|      | F.   | Information Reporting and Back-Up Withholding                            | 82  |

| XII. | RECOMMENDATION | 83 |
| ---- | -------------- | --- |

| Exhibit A | 85 |
| --------- | --- |

| Exhibit B | 86 |
| --------- | --- |

## **EXHIBITS**

EXHIBIT A    Plan

EXHIBIT B    Disclosure Statement Order

## I.    INTRODUCTION

Bed Bath & Beyond Inc. ("Bed Bath & Beyond" or "BBB") and its debtor affiliates, as debtors and debtors in possession (collectively, the "Debtors" or the "Company"), submit this disclosure statement (this "Disclosure Statement") pursuant to section 1125 of the Bankruptcy Code to Holders of Claims against and Interests in the Debtors in connection with the solicitation of acceptances with respect to the *Amended Joint Chapter 11 Plan of Bed Bath & Beyond Inc. and Its Debtor Affiliates* [Docket No. 1712] (as amended, supplemented, or modified from time to time, the "Plan"), dated August 1, 2023.[2]  A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for BBB and each of its affiliated Debtors.

ALL HOLDERS OF CLAIMS AND INTERESTS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

THE DEBTORS BELIEVE THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERY TO CLAIM HOLDERS.  AT THIS TIME, THE DEBTORS BELIEVE THIS IS THE BEST AVAILABLE ALTERNATIVE FOR COMPLETING THE CHAPTER 11 CASES.  THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.

## II.    PRELIMINARY STATEMENT

The Debtors were the largest home goods retailer in the United States, offering everything from bed linens to cookware to home organization, baby care, and more.  At their peak, the Debtors operated over 970 stores across all 50 states and had additional operations spanning Canada, Mexico, and Puerto Rico.  The past twelve months, however, have undoubtedly been the most difficult and turbulent in the Debtors' storied history.  From "meme stock" mania to credit agreement defaults and back again, the Debtors explored all potentially value-maximizing alternatives in an effort to turn around their business and stave off chapter 11.  All of this has come on the heels of the retail apocalypse and global pandemic that has permanently changed consumer behavior as the world knows it.

In response to both macroeconomic factors and more specific business challenges for Bed Bath & Beyond, leadership formulated and attempted to implement a turnaround plan that was designed to refocus the business on its founding principles and restore consumer confidence in this iconic retail giant.  Defying all expectations in the months prior to the filing, Bed Bath & Beyond secured credit agreement waivers and amendments and was able to access the equity markets in February and March in a last-ditch effort to avoid bankruptcy.  But, in store sales continued to decline—with fourth quarter sales falling by almost $1 billion dollars year over year—and strained vendor credit relationships which led to a lack of inventory.  And notwithstanding painstaking,

---

[2] Capitalized terms used but not otherwise defined in this Disclosure Statement will have the meaning ascribed to such terms in the Plan.  The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern.

creative, and exhaustive efforts to right the ship along the way, Bed Bath & Beyond was simply unable to service its funded debt obligations while simultaneously supplying sufficient inventory to its store locations.  All of which necessitated the filing of these chapter 11 cases.

On April 23, 2023 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  As of the Petition Date, the Debtors had approximately $1.8 billion in total funded debt obligations.  These obligations consisted of approximately (a) $80.3 million in aggregate principal amount outstanding under the Debtors' prepetition ABL facility (plus $102.6 million of outstanding letters of credit); (b) $547.1 million in aggregate principal amount outstanding under the Debtors' prepetition FILO term loan facility; (c) $1.03 billion in outstanding senior unsecured notes across three separate issuances with varying maturity dates and interest rates; and (d) $61.5 million of aggregate capital lease obligations.

For the last decade, multiple large brand store-front retailers have experienced distress attributed to the loss of crucial in-store foot traffic, declining in-store sales, the growth of e-commerce giants, and a younger generation of customers who are more inclined to order items on the internet with expedited shipping options that allow for same-day delivery of items.  Bed Bath & Beyond was another major retailer that succumbed to these pressures by failing to expeditiously adapt to changing consumer shopping behavior.  By 2018, the stock had fallen to $14 per share, erasing $15 billion in value.

In addition, Bed Bath & Beyond's costs steadily increased, leading operating margins to decline from 16.5% in fiscal 2011 to less than 4% in fiscal 2018.  In early 2019, the Company reported its seventh consecutive quarter of declining same-store sales and reported its first annual loss and sales decline in its nearly three decades as a public company, with profit plunging 48% year-over-year.  Furthermore, its supply chain and method of product development and selection were outdated and supported by old systems.

Bed Bath & Beyond made a concerted effort to revitalize its brand and regain status as the go-to bed and home superstore by bringing in new leadership who pursued the creation of private-label brands and implemented growth strategies.  The Debtors' efforts ultimately proved unsuccessful, and their already precarious position was further compounded by the onset of, among other things, a global pandemic, changes in macroeconomic and industry trends, and rising costs.  Eventually, the Debtors were forced to file these chapter 11 cases.  Immediately prior to these cases, the Debtors closed over 430 locations across the United States and Canada, implementing full scale winddowns of their Canadian business and the Harmon branded stores.  In commencing these cases, the Debtors initiated a full chain wind-down, while continuing to market their businesses as a going-concern, including the buybuy Baby business.

To facilitate this process, the Debtors secured a $240 million in debtor-in-possession financing from the FILO Agent, Sixth Street Specialty Lending, Inc. ("Sixth Street"), consisting of $40 million in new money financing.  With access to committed DIP financing, the Debtors commenced these Chapter 11 Cases with the goal to maximize enterprise value for the benefit of all stakeholders and to continue the wind-down process already underway.

The Debtors filed a motion to establish procedures to govern an efficient, public, and flexible auction process to realize the full value of existing assets, which the Bankruptcy Court

approved on April 25, 2023 [Docket No. 92] (the "Bidding Procedures Order").  The process has entailed an orderly winddown of the Debtors' business operations through a liquidation of the Debtors' brick-and-mortar stores in conjunction with a court-approved procedure to sell or otherwise dispose of the Debtors' remaining assets through a going-concern transaction or otherwise.  The Debtors' progress in advancing this dual-tracked process to date has been substantial and no small feat.

Following the U.S. Trustee's appointment of the official committee of unsecured creditors (the "Creditors' Committee") on May 5, 2023 [Docket No. 218], the Debtors promptly engaged in a robust diligence-sharing process with the Creditors' Committee and its advisors to educate them on the Debtors' business and bring them up to speed on the developments in these cases.  Not long thereafter, the Debtors, the Creditors' Committee, and the DIP Lenders reached a comprehensive, negotiated settlement on various issues relating to, among other things, the distribution of proceeds of the Debtors' assets, which was memorialized in the Final DIP Order [Docket No. 729] (the "DIP Settlement").  The DIP Settlement critically coalesced stakeholder consensus around the Debtors' expected path to confirmation and provided an avenue for potential recovery for the Debtors' general unsecured creditors.

On top of the DIP Settlement, the Debtors' sustained efforts to monetize their assets and recover estate property has proceeded rapidly and effectively.  Following a robust marketing process that began prepetition and continued postpetition, as well as an auction, the Debtors obtained approval on July 27, 2023 for a sale of certain intellectual property assets of the Bed Bath & Beyond banner to Overstock.com, Inc. for a purchase price of $21.5 million in cash consideration [Docket No. 1117].  Additionally, the Debtors obtained approval of a sale of the intellectual property assets of the buybuy BABY banner to Dream on Me Industries, Inc. ("Dream on Me") for approximately $15.5 million [Docket No. 1314].  Monetization of the valuable intellectual property assets of the Debtors' key business banners provides hope for the continued use and revitalization of the Debtors' storied brands.

On top of these substantial asset sales, the Debtors continue to monetize the value of their inventory pursuant to the relief granted in the Store Closing Order (as defined below) and their leasehold interests, including through the court-approved procedure to sell or dispose of their lease assets and designation rights related thereto.  Overall, the Debtors' sustained monetization of their assets and unwavering asset recovery efforts are proceeding rapidly with the paramount goal of maximizing value for the benefit of all of the Debtors' stakeholders.

Pursuant to Article III.B of the Plan, Holders of Claims will receive, except to the extent that a Holder of such Allowed Claim has agreed to less favorable treatment, the following treatment in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such Holders' Claims and Interests:

- Holders of Other Priority Claims will receive payment in full in Cash from the Combined Reserve or as otherwise provided for in the DIP Budget, or other treatment rendering such Claim Unimpaired.

- Holders of Other Secured Claims will receive, with the consent of the DIP Agent: (a) payment in full in Cash from the Combined Reserve or as otherwise provided for in the

DIP Budget; (b) delivery of the collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; (c) Reinstatement of such Claim; or (d) other treatment rendering such Claim Unimpaired.

- Each Holder of an Allowed DIP Claim shall receive Distributable Proceeds in accordance with the Waterfall Recovery (subject to the Sharing Mechanism) until such Claims are Paid in Full (as defined in the Final DIP Order). The Liens securing the DIP Claims shall not be released and discharged until Payment in Full of the DIP Claims.

- Holders of Allowed FILO Claims shall receive, to the extent such Allowed FILO Claims are not already indefeasibly paid in full in cash or "rolled up" or converted into DIP Obligations prior to the Effective Date, Distributable Proceeds in accordance with the Waterfall Recovery (subject to the Sharing Mechanism) until such Claims are Paid in Full (as defined in the Final DIP Order). The Liens securing the FILO Claims shall not be released and discharged until Payment in Full of the FILO Claims.

- Each Holder of an Allowed Junior Secured Claim shall receive its Pro Rata share of (i) the Shared Proceeds Pool, only if such proceeds are available after all senior Claims (other than the DIP Claims and FILO Claims) are paid in full and (ii) any remaining Distributable Proceeds available after payment in full of all senior Claims.

- Each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of (i) the Shared Proceeds Pool, only if such proceeds are available after all senior Claims (other than the DIP Claims and FILO Claims) are paid in full and (ii) any remaining Distributable Proceeds available after payment in full of all senior Claims.

- Each Allowed Intercompany Claim, unless otherwise provided for under the Plan, will either be Reinstated, distributed, contributed, set off, settled, canceled and released or otherwise addressed at the option of the Debtors; *provided*, that no distributions shall be made on account of any such Intercompany Claims.

- Intercompany Interests shall be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Intercompany Interests will not receive any distribution on account of such Intercompany Interests.

- Allowed Interests in BBB shall be canceled, released, and extinguished, and will be of no further force or effect and no Holder of Interests in BBB shall be entitled to any recovery or distribution under the Plan on account of such Interests.

- Section 510(b) Claims will be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and each Holder of a Section 510(b) Claim will not receive any distribution on account of such Section 510(b) Claim. The Debtors are not aware of any valid Section 510(b) Claims and believe that no such Section 510(b) Claims exist.

The Plan provides the best available alternative for the Debtors' Estates and creditor recoveries. If the Debtors' businesses were liquidated in a chapter 7 process, store closing

processes likely would halt, forcing locations to go dark and resulting in the termination of employees until a trustee could turn the lights back on. Even then, employees with critical institutional knowledge would have left, leaving behind a large and complex liquidation to be managed by new hires who are unfamiliar with the Debtors' businesses. The needless loss of value to creditors and the Debtors' Estates would be insurmountable. Creditors would receive lower recoveries in chapter 7 because the Debtors' Estates necessarily would bear additional costs associated with transitioning to chapter 7, retaining a chapter 7 trustee, counsel, and advisors, and administering a chapter 7 process.

The Debtors believe that the Plan maximizes stakeholder recoveries in these Chapter 11 Cases. The Debtors seek the Bankruptcy Court's approval of the Plan and urge all Holders of Claims entitled to vote to accept the Plan by returning their ballots so that the Notice and Claims Agent, Kroll Restructuring Administration LLC actually receives such ballots by the Voting Deadline, *i.e.*, September 1, 2023, at 4:00 p.m. (prevailing Eastern Time). Assuming the Plan receives the requisite acceptances, the Debtors will seek the Bankruptcy Court's approval of the Plan at the hearing scheduled for September 12, 2023 at 2:30 p.m. (prevailing Eastern Time) (the "Combined Hearing").

## III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND PLAN

### A.    What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a plan of reorganization is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the Debtors' liabilities in accordance with the terms of the confirmed plan.

### B.    Why are the Debtors sending me this Disclosure Statement?

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan. Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan. This Disclosure Statement is being submitted in accordance with these requirements.

**C.     Am I entitled to vote on the Plan?**

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold.  Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class."  Each Class's respective voting status is set forth below.

| Class | Claims and Interests | Status | Voting Rights |
|:---:|:---:|:---:|:---:|
| 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 3 | DIP Claims | Impaired | Entitled to Vote |
| 4 | FILO Claims | Impaired | Entitled to Vote |
| 5 | Junior Secured Claims | Impaired | Entitled to Vote |
| 6 | General Unsecured Claims | Impaired | Entitled to Vote |
| 7 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Reject / Accept) |
| 8 | Intercompany Interests | Unimpaired | Not Entitled to Vote (Deemed to Reject) |
| 9 | Interests in BBB | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 10 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

**D.     What will I receive from the Debtors if the Plan is consummated?**

The following chart provides a summary of the anticipated recovery to Holders of Claims and Interests under the Plan.  Any estimates of Claims and Interests in this Disclosure Statement may vary from the final amounts Allowed by the Bankruptcy Court.  Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE.  FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.**

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest[3] | Projected Amount of Claims | Projected Recovery Under the Plan |
| 1 | Other Priority Claims | In full and final satisfaction of each Allowed Other Priority Claim, except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, each Holder thereof will receive payment in full in Cash from the Combined Reserve or as otherwise provided for in the DIP Budget or other treatment rendering such Claim Unimpaired. | $8 million | 100% |
| 2 | Other Secured Claims | In full and final satisfaction of each Allowed Other Secured Claim, except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, each Holder thereof will receive, with the consent of the DIP Agent: (a) payment in full in Cash from the Combined Reserve or as otherwise provided for in the DIP Budget; (b) delivery of the collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; (c) Reinstatement of such Claim; or (d) other treatment rendering such Claim Unimpaired. | $7 million | 100% |
| 3 | DIP Claims | In full and final satisfaction, compromise, settlement, release, and discharge of its Claim, each Holder of an Allowed DIP Claim shall receive Distributable Proceeds in accordance with the Waterfall Recovery (subject to the Sharing Mechanism) until such Claims are Paid in Full (as defined in the Final DIP Order).  The Liens securing the DIP Claims shall not be released and discharged until Payment in Full of the DIP Claims. | $240 million[4] | 8% - 100% |

---

[3]  For the avoidance of doubt, Holders of Allowed FILO Claims or Allowed DIP Claims shall not receive any recovery from the Shared Proceeds Pool after Payment in Full (as defined in the Final DIP Order) of the DIP Claims and FILO Claims.

[4]  The projected amount of claims in Class 3 DIP Claims represents the principal amount of DIP Claims, exclusive of accrued and unpaid interest, fees, and other expenses and disbursements otherwise included in the DIP Claims, as of the date of entry of the Final DIP Order.  The projected amount of DIP Claims has decreased during the chapter 11 cases as a result of payment of the DIP Claims.

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest[3] | Projected Amount of Claims | Projected Recovery Under the Plan |
| 4 | FILO Claims | In full and final satisfaction, compromise, settlement, release, and discharge of its Claim (unless the applicable Holder agrees to a less favorable treatment), to the extent not already indefeasibly paid in full in cash or "rolled up" or converted into DIP Obligations prior to the Effective Date, each Holder of an Allowed FILO Claim shall receive Distributable Proceeds in accordance with the Waterfall Recovery (subject to the Sharing Mechanism) until such Claims are Paid in Full (as defined in the Final DIP Order).  The Liens securing the FILO Claims shall not be released and discharged until Payment in Full of the FILO Claims. | $349.6 million[5] | 42.2% - 100% |
| 5 | Junior Secured Claims | In full and final satisfaction, compromise, settlement, release, and discharge of its Claim (unless the applicable Holder agrees to a less favorable treatment), each Holder of an Allowed Junior Secured Claim shall receive its Pro Rata share of (i) the Shared Proceeds Pool, only if such proceeds are available after all senior Claims (other than the DIP Claims and FILO Claims) are paid in full and (ii) any remaining Distributable Proceeds available after payment in full of all senior Claims. | $100,000 | 0% - 2.5%[6] |
| 6 | General Unsecured Claims | In full and final satisfaction, compromise, settlement, release, and discharge of its Claim (unless the applicable Holder agrees to a less favorable treatment), each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of (i) the Shared Proceeds Pool, only if such proceeds are available after all senior Claims (other than the DIP Claims and FILO Claims) are paid in full and (ii) any remaining Distributable Proceeds available after payment in full of all senior Claims. | $1.8 billion - $2.4 billion | 0% - 2.5%[7] |

---

[5]   The projected amount of claims in Class 4 FILO Claims represents the principal amount of FILO Claims plus interest and fees following entry of the Interim DIP Order.  The projected amount of FILO Claims has decreased during the chapter 11 cases as a result of payment of FILO Claims.

[6]   The current estimated recovery for Class 5 Junior Secured Claims is an aggregate recovery for the Class based on Claims such Holders have against the Debtors, accounting for assumptions made with respect to collateral held by such Holders.  This estimate is based on information available as of the date hereof and subject to change.

[7]   The current projected recovery for Class 6 General Unsecured Claims is based on, and remains subject to, the expected proceeds generated by the Debtors' and Wind-Down Debtors', as applicable, efforts to monetize all remaining assets and property of the Debtors and Wind-Down Debtors.  Additionally, the current projected recovery for Class 6 General Unsecured Claims remains subject to the Sharing Mechanism, as that term is defined and described in the Plan.  This estimate is based on information available as of the date hereof and subject to change.

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest[3] | Projected Amount of Claims | Projected Recovery Under the Plan |
| 7 | Intercompany Claims | In full and final satisfaction of each Allowed Intercompany Claim, each Allowed Intercompany Claim, unless otherwise provided for under the Plan, will either be Reinstated, distributed, contributed, set off, settled, canceled and released or otherwise addressed at the option of the Debtors; *provided*, that no distributions shall be made on account of any such Intercompany Claims. | N/A | N/A |
| 8 | Intercompany Interests | Intercompany Interests shall be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Intercompany Interests will not receive any distribution on account of such Intercompany Interests. | N/A | N/A |
| 9 | Interests in BBB | Each Allowed Interest in BBB shall be canceled, released, and extinguished, and will be of no further force or effect and no Holder of Interests in BBB shall be entitled to any recovery or distribution under the Plan on account of such Interests. | N/A | 0% |
| 10 | Section 510(b) Claims | Section 510(b) Claims will be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and each Holder of a Section 510(b) Claim will not receive any distribution on account of such Section 510(b) Claim. The Debtors are not aware of any valid Section 510(b) Claims and believe that no such Section 510(b) Claims exist. | N/A | 0% |

**E.     What happens to my recovery if the Plan is not confirmed or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to implement the Liquidation Transactions. It is possible that any alternative may provide Holders of Claims or Interests with less than they would have received pursuant to the Plan. For a more detailed description of the consequences of an extended chapter 11 case, or of a liquidation scenario, *see* Article X of this Disclosure Statement, entitled "*Confirmation of the Plan*."

The Debtors believe that liquidation under chapter 7 of the Bankruptcy Code—a very possible event if the Plan is not confirmed—would result in significantly reduced creditor recoveries as compared to the Plan. As set forth in Article X.B of this Disclosure Statement, smaller recoveries would result under a chapter 7 because of, among other things, significant additional administrative expenses associated with the appointment of a chapter 7 trustee and administration of a chapter 7 liquidation, including additional claims that may be entitled to administrative priority.

**F.**    **If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court. Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After Confirmation of the Plan by the Bankruptcy Court, there are conditions that must be satisfied or waived so that the Plan can "go effective." Distributions to Holders of Allowed Claims can only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as reasonably practicable thereafter, as specified in the Plan. *See* Article IV.K of this Disclosure Statement, entitled "*Conditions Precedent to the Effective Date*," for a discussion of the conditions precedent to consummation of the Plan.

"Consummation" refers to "substantial consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code, and means: (1) the transfer of all or substantially all of the property proposed by the Plan to be transferred; (2) assumption by the Debtors or by the successors to the Debtors under the Plan of the business or of the management of all or substantially all of the property dealt with by the Plan; and (3) commencement of distributions under the Plan. Note that Holders of certain types of Claims, such as General Unsecured Claims, may not receive any distributions until the Debtors or Wind-Down Debtors have reconciled all such Claims, which could take several months or longer following the Effective Date.

**G.**    **What will I receive from the Debtors if I hold an Allowed Administrative Claim, Priority Tax Claim, Professional Fee Claim, or a DIP Claim?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

1.    <u>Administrative Claims and Priority Tax Claims</u>

Except as otherwise provided in Article II.A of the Plan and except with respect to Administrative Claims that are Professional Fee Claims, DIP Claims, or subject to 11 U.S.C. § 503(b)(1)(D), requests for payment of Allowed Administrative Claims must be made by the Administrative Claims Bar Date or in compliance with the Bar Date Order (as defined below). **Holders of Administrative Claims that are required to, but do not timely request payment on account of Administrative Claims as set forth in the Bar Date Order or by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their estates, and such Administrative Claims shall be deemed satisfied, settled, and released as of the Effective Date**. Objections to such requests, if any, must be filed in compliance with the Bar Date Order.

Except with respect to Administrative Claims that are Professional Fee Claims or Allowed DIP Claims, and except to the extent that an Administrative Claim has already been paid during the Chapter 11 Cases or a Holder of an Allowed Administrative Claim and the applicable Debtor(s) agree to less favorable treatment, each Holder of an Allowed Administrative Claim shall be paid the unpaid portion of its Allowed Administrative Claim from the Combined Reserves on the latest

of:  (a) the Effective Date if such Administrative Claim is Allowed as of the Effective Date; (b) the date such Administrative Claim is Allowed or as soon as reasonably practicable thereafter; and (c) the date such Allowed Administrative Claim becomes due and payable, or as soon thereafter as is reasonably practicable; *provided* that Allowed Administrative Claims that arise in the ordinary course of the Wind-Down Debtors' businesses that are required for the Wind Down shall be paid in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements and/or arrangements governing, instruments evidencing, or other documents relating to such transactions (and no requests for payment of such Administrative Claims must be filed or served).  Notwithstanding the foregoing, no request for payment of an Administrative Claim need be filed with respect to an Administrative Claim Allowed by Final Order.  Holders of Allowed Administrative Claims shall receive payment in full from (a) *first*, the Combined Reserve; (ii) *second*, the Shared Proceeds Pool; and (iii) *third*, any remaining Distributable Proceeds after payment in full of all Allowed DIP Claims and Allowed FILO Claims.

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with section 1129(a)(9)(C) of the Bankruptcy Code.

Objections to requests for payment of such Administrative Claims, if any, must be filed with the Bankruptcy Court and served on the Wind-Down Debtors and the requesting Holder no later than the Claims Objection Bar Date for Administrative Claims.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior Bankruptcy Court orders, the Allowed amounts, if any, of Administrative Claims shall be determined by, and satisfied in accordance with, an order that becomes a Final Order of the Bankruptcy Court.

2.    Professional Compensation

(a)    Final Fee Applications and Payment of Professional Fee Claims

All final requests for payment of Professional Fee Claims incurred during the period from the Petition Date through the Confirmation Date shall be filed no later than forty-five (45) days after the Effective Date.  All such final requests will be subject to approval by the Bankruptcy Court after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior orders of the Bankruptcy Court, including the Administrative Fee Order, and once approved by the Bankruptcy Court, shall be promptly paid from the Professional Fee Escrow Account up to the full Allowed amount.  Notwithstanding anything to the contrary in the Plan, to the extent that funds held in the Professional Fee Escrow Account are insufficient to satisfy the amount of Professional Fee Claims owing to the Professionals, such Professionals shall have an Allowed Administrative Claim for any such deficiency, and the

Wind-Down Debtors and the Plan Administrator, as applicable, shall pay the full unpaid amount of such Allowed Administrative Claim in Cash.

(b)     Professional Fee Escrow Account

On the Effective Date, the Wind-Down Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Reserve Amount plus the amount of $600,000 for payment of professional fees for the 2014 Senior Unsecured Notes Trustee (the "2014 Notes Indenture Professional Fee Reserve Amount"). The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and the 2014 Notes Indenture Professional Fee Reserve Amount shall be maintained in trust solely for the professionals retained by the 2014 Senior Unsecured Notes Trustee. Such funds shall not be considered property of the Estates or the Plan Administrator. The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Wind-Down Debtors as soon as reasonably practicable after such Professional Fee Claims are Allowed. The amount of fees and expenses incurred by the 2014 Senior Unsecured Notes Trustee outstanding on the Effective Date shall be paid in Cash to the 2014 Senior Unsecured Notes Trustee by the Wind-Down Debtors as soon as reasonably practicable after the Effective Date. When all Allowed amounts owing to the Professionals and the professionals for the 2014 Senior Unsecured Notes Trustee have been paid in full, any amount remaining in the Professional Fee Escrow Account shall promptly be paid to the Wind-Down Debtors for distribution in accordance with the Waterfall Recovery without any further action or order of the Bankruptcy Court.

(c)     Professional Fee Reserve Amount

Professionals shall reasonably estimate their unpaid Professional Fee Claims and shall deliver such estimate to the Debtors no later than five (5) days before the Effective Date; *provided* that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Professional Fee Claims. If a Professional does not provide an estimate, the Debtors or Wind-Down Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.

(d)     Post-Confirmation Date Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses incurred by the Professionals. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Wind-Down Debtors or the Plan Administrator, as applicable, may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

3.     Statutory Fees

All fees due and payable pursuant to section 1930 of Title 28 of the United States Code before the Effective Date shall be paid by the Debtors. On and after the Effective Date, the

12

Wind-Down Debtors shall pay any and all such fees when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee. Each Wind-Down Debtor shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of the applicable Debtor's Chapter 11 Case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

### 4.    Lender Professional Fees

From and after the entry of the Confirmation Order, the Debtors or Wind-Down Debtors, as applicable, shall, without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the legal, professional, and other fees and expenses of the Prepetition Agents, Predecessor ABL Agent, and DIP Agent (the "Lender Fees") within three (3) business days of such parties' delivery of an invoice to the Debtors or Wind-Down Debtors, and such parties shall not be required to comply with the procedures set forth in paragraph 37 of the Final DIP Order.

### H.    Are any regulatory approvals required to consummate the Plan?

There are no known regulatory approvals that are required to consummate the Plan. However, to the extent any such regulatory approvals or other authorizations, consents, rulings, or documents are necessary to implement and effectuate the Plan, it is a condition precedent to the Effective Date that they be obtained.

### I.    Is there potential litigation related to Confirmation of the Plan?

Parties in interest may object to Confirmation of the Plan, which objections potentially could give rise to litigation. See Article VIII.A of this Disclosure Statement, entitled "*Bankruptcy Law Considerations*."

If it becomes necessary to confirm the Plan over the rejection of certain Classes, the Debtors may seek confirmation of the Plan notwithstanding the dissent of such rejecting Classes. The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code. *See id.*

### J.    Will the final amount of Allowed General Unsecured Claims affect my recovery under the Plan?

The Debtors estimate that Allowed General Unsecured Claims total approximately $1.8 billion - $2.4 billion. Holders of General Unsecured Claims will receive their *Pro Rata* share of (i) the Shared Proceeds Pool, *only if* such proceeds are available after all senior Claims (other than the DIP Claims and FILO Claims) and are paid in full and (ii) any remaining Distributable Proceeds available after payment in full of all senior Claims.

In addition, Holders of General Unsecured Claims that vote to accept the Plan shall be deemed a Released Party for all purposes under the Plan. Although the Debtors' estimate of General Unsecured Claims is the result of the Debtors' and their advisors' careful analysis of available information, General Unsecured Claims actually asserted against the Debtors may be

Case 23-13359-VFP    Doc 1713    Filed 08/01/23    Entered 08/01/23 22:18:02    Desc Main
Document    Page 23 of 131

higher or lower than the Debtors' estimate provided in the Plan, which difference could be material.

Moreover, the Debtors may, in the future, reject certain Executory Contracts and Unexpired Leases, which may result in additional rejection damages claims not accounted for in this estimate. Furthermore, the Debtors may object to certain proofs of claim, and any such objections could ultimately cause the total amount of General Unsecured Claims to change.

Further, as of the Petition Date, the Debtors were parties to certain litigation matters that arose in the ordinary course of operating their businesses and could become parties to additional litigation in the future as a result of conduct that occurred prior to the Petition Date. Although the Debtors have disputed, are disputing, or will dispute the amounts asserted by such litigation counterparties, to the extent these parties are ultimately entitled to a higher amount than is reflected in the amounts estimated by the Debtors in the Plan, the value of recoveries to Holders of Allowed General Unsecured Claims could change as well, and such changes could be material.

Finally, the Debtors, the Plan Administrator, the Creditors' Committee, or other parties in interest may object to certain proofs of claim, and any such objections ultimately could cause the total amount of Allowed General Unsecured Claims to change. These changes could affect recoveries to Holders of Allowed General Unsecured Claims, and such changes could be material.

### K. Will there be releases and exculpation granted to parties in interest as part of the Plan?

Yes, Article X of the Plan proposes to release the Released Parties and to exculpate the Exculpated Parties. The Debtors' releases, third-party releases, and exculpation provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts and were an essential element of the negotiations between the Debtors, the DIP Lenders, and the Prepetition Secured Parties in obtaining their support for the Plan.

All of the Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan, which will maximize value of the Debtors for the benefit of all parties in interest. Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

**IMPORTANTLY, THE FOLLOWING PARTIES ARE "RELEASED PARTIES": (A) THE ABL LENDERS; (B) THE PREDECESSOR ABL AGENT; (C) THE CREDITORS' COMMITTEE; (D) THE RETAINED PROFESSIONALS; AND (E) WITH RESPECT TO EACH OF THE FOREGOING ENTITIES IN CLAUSES (A) THROUGH (D), EACH SUCH ENTITY'S CURRENT AND FORMER AFFILIATES, AND SUCH ENTITIES' AND THEIR CURRENT AND FORMER AFFILIATES' CURRENT AND FORMER DIRECTORS, MANAGERS, OFFICERS, CONTROL PERSONS, EQUITY HOLDERS (REGARDLESS OF WHETHER SUCH INTERESTS ARE HELD DIRECTLY OR INDIRECTLY), AFFILIATED INVESTMENT FUNDS OR INVESTMENT VEHICLES, PARTICIPANTS, MANAGED ACCOUNTS OR FUNDS, FUND ADVISORS, PREDECESSORS, SUCCESSORS, ASSIGNS, SUBSIDIARIES, PRINCIPALS,**

**MEMBERS, EMPLOYEES, AGENTS, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, PARTNERS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, INVESTMENT MANAGERS, AND OTHER PROFESSIONALS, EACH IN THEIR CAPACITY AS SUCH; AND (F) THE D&O PARTIES; *PROVIDED* THAT NO PARTY, INCLUDING A D&O PARTY, SHALL BE A RELEASED PARTY WITH RESPECT TO ANY NON-RELEASED CLAIMS. NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN, (I) THE DEBTORS DO NOT RELEASE THE D&O PARTIES, AND (II) THE TERM "RELEASED PARTY" DOES NOT INCLUDE: (A) THE DEBTORS OR THE WIND-DOWN DEBTORS; (B) THE DIP AGENT; (C) THE DIP LENDERS; (D) THE ABL AGENT; (E) THE FILO LENDERS; OR (F) THE FILO AGENT.**

**BASED ON THE FOREGOING, THE DEBTORS BELIEVE THAT THE RELEASES AND EXCULPATIONS IN THE PLAN ARE NECESSARY AND APPROPRIATE AND MEET THE REQUISITE LEGAL STANDARD PROMULGATED BY THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT. MOREOVER, THE DEBTORS WILL PRESENT EVIDENCE AT THE COMBINED HEARING TO DEMONSTRATE THE BASIS FOR AND PROPRIETY OF THE RELEASE AND EXCULPATION PROVISIONS. THE RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS THAT ARE CONTAINED IN THE PLAN ARE COPIED IN ARTICLE IV.J OF THIS DISCLOSURE STATEMENT, ENTITLED "SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS."**

**L.      What is the deadline to vote on the Plan?**

The Voting Deadline is September 1, 2023, at 4:00 p.m. (prevailing Eastern Time).

**M.      How do I vote for or against the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims who are entitled to vote on the Plan. For your vote to be counted, your ballot containing your vote must be completed and signed so that it is **actually received** by the Debtors' Notice and Claims Agent by September 1, 2023, at 4:00 p.m. (prevailing Eastern Time). To ensure that your electronic ballot is counted, please visit the Notice and Claims Agent's online voting portal at https://restructuring.ra.kroll.com/bbby (the "E-Ballot Portal"), click on the "Submit E-Ballot" section of the website, and follow the instructions to submit your ballot; *provided*, *however*, that Holders of 2014 Senior Unsecured Notes Claims in Class 6 (the "Class 6 2014 Senior Unsecured Notes Claims") or their Nominee may only submit the respective ballot or master ballot via hard copy or electronic mail submission, as further described in the instructions on the applicable ballot and master ballot.

Holders of all other Claims will need to enter their unique ballot identification number, as indicated on each ballot. The E-Ballot Portal is the sole manner in which ballots, other than the ballots or master ballots for Holders of Class 6 2014 Senior Unsecured Notes Claims, will be accepted. **For the avoidance of doubt, hard copy ballots and electronic ballots will not be accepted by facsimile or electronic means (other than the online portal) for all Claims other than the Class 6 2014 Senior Unsecured Notes Claims.** *See* Article IX of this Disclosure

15

Statement entitled "*Solicitation and Voting Procedures*" and the Disclosure Statement Order attached hereto as **Exhibit B**.

If a Class of Claims is eligible to vote, and no Holder of Claims in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by such Class.

**N.      Why is the Bankruptcy Court holding a Combined Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan.

**O.      When is the Combined Hearing set to occur?**

The Bankruptcy Court has scheduled the Combined Hearing for September 12, 2023 at 2:30 p.m. (prevailing Eastern Time).  The Combined Hearing may be adjourned from time to time without further notice.

Objections to Confirmation of the Plan or final approval of the adequacy of the Disclosure Statement must be filed and served on the Debtors, and certain other parties, by no later than September 1, 2023, at 4:00 p.m. (prevailing Eastern Time) in accordance with the notice of the Combined Hearing that accompanies this Disclosure Statement and the Disclosure Statement Order attached hereto as **Exhibit B** and incorporated herein by reference.

The Debtors will publish the notice of the Combined Hearing, which will contain the deadline for objections to the Plan and the date and time of the Combined Hearing, in the national editions of the *New York Times* (National Edition) to provide notification to those persons who may not receive notice by mail.  The Debtors may also publish the notice of the Combined Hearing in such trade or other publications as the Debtors may choose.

**P.      What is the purpose of the Combined Hearing?**

The confirmation of a plan of reorganization by a bankruptcy court binds the Debtors, any issuer of securities under a plan of reorganization, any person acquiring property under a plan of reorganization, any creditor or equity interest holder of a Debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges the Debtors from any debt that arose before the confirmation of such plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

**Q.      Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Notice and Claims Agent:

*By regular mail, hand delivery, or overnight mail at:*
Bed Bath & Beyond, Inc. Ballot Processing Center
c/o Kroll Restructuring Administration LLC
850 3rd Avenue, Suite 412
Brooklyn, New York 11232

*By electronic mail at:*
BBBYInfo@ra.kroll.com
(please reference "In re: Bed Bath & Beyond Inc. - Solicitation Inquiry" in the
subject line)

*By telephone at:*
**(833) 570-5355 (Toll Free)**
**(646) 440-4806 (International)**

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in the Chapter 11 Cases are available upon written request to the Debtors' Notice and Claims Agent at the address above or by downloading the exhibits and documents from the website of the Debtors' Notice and Claims Agent at https://restructuring.ra.kroll.com/bbby (free of charge) or the Bankruptcy Court's website at www.njb.uscourts.gov (for a fee).

**R.      Do the Debtors recommend voting in favor of the Plan?**

Yes.  The Debtors believe that the Plan provides for a larger distribution to the Debtors' creditors than would otherwise result from any other available alternative.  The Debtors believe that the Plan is in the best interest of all Holders of Claims or Interests, and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Plan.

**IV.      THE DEBTORS' PLAN**

As discussed in Article II of this Disclosure Statement, the Plan contemplates a  wind down of the Debtors' operations.  The Debtors, the DIP Lenders, and the Creditors' Committee negotiated a value-maximizing transaction to effectuate an orderly Wind Down as set forth in the Plan.  As discussed in Article IV of the Plan, the Plan contemplates, among other things, distributions to Holders of Allowed Claims in accordance with its terms, followed by the Wind Down of the Wind-Down Debtors.

**A.      Liquidation Transactions**

On the Effective Date, or as soon as reasonably practicable thereafter, the Wind-Down Debtors shall take all actions as may be necessary or appropriate to effectuate the Liquidation Transactions, each of which shall be subject to the consent of the DIP Agent, FILO Agent, and Creditors' Committee, including, without limitation:  (a) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on

terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (c) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (d) such other transactions that are required to effectuate the Liquidation Transactions; (e) all transactions necessary to provide for the purchase of some or all of the assets of, or Interests in, any of the Debtors which purchase may be structured as a taxable transaction for United States federal income tax purposes; and (f) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

## B.    Distributable Proceeds and Waterfall Recovery

On or after the Effective Date, the Debtors shall make distributions on account of Allowed Claims in accordance with Article III.B of the Plan using the Distributable Proceeds.   In accordance with the Final DIP Order, (a) Distributable Proceeds of Prepetition Collateral shall be paid to Holders of Allowed Claims until paid in full from time to time in the following priority: (i) *first*, on account of Allowed FILO Claims; (ii) *second*, on account of DIP Claims; (iii) *third*, on account of Allowed Administrative Claims (other than DIP Claims) and Priority Tax Claims; (iv) *fourth*, on account of Allowed Other Secured Claims; (v) *fifth*, on account of Allowed Other Priority Claims; (vi) *sixth*, on account of any Allowed Junior Secured Claims; and (vii) *seventh*, on account of any Allowed General Unsecured Claims; and (b) Distributable Proceeds of DIP Collateral that does not constitute Prepetition Collateral shall be paid to Holders of Allowed Claims until paid in full from time to time in the following priority: (i) *first*, on account of Allowed DIP Claims; (ii) *second*, on account of Allowed FILO Claims; (iii) *third*, on account of Allowed Administrative Claims (other than DIP Claims) and Priority Tax Claims; (iv) *fourth*, on account of Allowed Other Secured Claims; (v) *fifth*, on account of Allowed Other Priority Claims; (vi) *sixth*, on account of any Allowed Junior Secured Claims; and (vii) *seventh*, on account of any Allowed General Unsecured Claims (collectively, the "Waterfall Recovery"); *provided* that the foregoing shall be subject to paragraph 60 of the Final DIP Order, which provides that: (x) prior to the Initial Sharing Threshold, 100% of the proceeds of DIP Collateral and Prepetition Collateral shall be distributed to holders of Allowed DIP Claims or Allowed FILO Claims, as applicable; (y); whereupon the Initial Sharing Threshold is reached and until the Secondary Sharing Threshold is reached, (i) 80% of the proceeds of the Shipping and Price Gouging Claims shall be distributed to Holders of Allowed FILO Claims or Allowed DIP Claims, as applicable, and 20% of the proceeds of the Shipping and Price Gouging Claims shall be distributed to the Debtors or the applicable Successor Entity, as applicable; (ii) 60% of the proceeds of the D&O Claims shall be distributed to Holders of Allowed FILO Claims or Allowed DIP Claims, as applicable, and 40% of the proceeds of the D&O Claims shall be distributed to the Debtors or the applicable Successor Entity, as applicable, (iii) 50% of the proceeds of the Other Liability Claims shall be distributed to Holders of Allowed FILO Claims or Allowed DIP Claims, as applicable, and 50% of the proceeds of the Other Liability Claims shall be distributed to the Debtors or the applicable Successor Entity, as applicable; (iv) 50% of the proceeds of the Interchange Claims shall be distributed to Holders of Allowed FILO Claims or Allowed DIP Claims, as applicable, and 50% of the proceeds of the Interchange Claims shall be distributed to the Debtors or the applicable Successor Entity, as applicable; (v) 100% of the proceeds of the Preference Actions shall be distributed to the Debtors or the applicable Successor Entity, as applicable; and (vi) 100% of the proceeds of Prepetition Collateral and DIP Collateral not enumerated in clauses (i)-(vi) of the foregoing shall be distributed to Holders of Allowed FILO Claims or Allowed DIP Claims, as applicable; and (z) whereupon the

Secondary Sharing Threshold is reached, (i) 65% of the proceeds of the Shipping and Price Gouging Claims shall be distributed to Holders of Allowed FILO Claims or Allowed DIP Claims, as applicable, and 35% of the proceeds of the Shipping and Price Gouging Claims shall be distributed to the Debtors or the applicable Successor Entity, as applicable; (ii) 50% of the proceeds of the D&O Claims shall be distributed to Holders of Allowed FILO Claims or Allowed DIP Claims, as applicable, and 50% of the proceeds of the D&O Claims shall be distributed to the Debtors or the applicable Successor Entity, as applicable, (iii) 50% of the proceeds of the Other Liability Claims shall be distributed to Holders of Allowed FILO Claims or Allowed DIP Claims, as applicable, and 50% of the proceeds of the Other Liability Claims shall be distributed to the Debtors or the applicable Successor Entity, as applicable; (iv) 50% of the proceeds of the Interchange Claims shall be distributed to Holders of Allowed FILO Claims or Allowed DIP Claims, as applicable, and 50% of the proceeds of the Interchange Claims shall be distributed to the Debtors or the applicable Successor Entity, as applicable; (v) 100% of the proceeds of the Preference Actions shall be distributed to the Debtors or the applicable Successor Entity, as applicable; and (vi) 80% of the proceeds of Prepetition Collateral and DIP Collateral not enumerated in clauses (i)-(vi) of the foregoing shall be distributed to Holders of Allowed FILO Claims or Allowed DIP Claims, as applicable, and 20% of the proceeds of such claims shall be distributed to the Debtors or the applicable Successor Entity, as applicable (the foregoing clauses (x) and (y), the "Sharing Mechanism"); *provided*, *further*, that pursuant to the Plan, Allowed Other Priority Claims, Allowed Priority Tax Claims, Allowed Administrative Claims (other than Professional Fee Claims or Allowed DIP Claims), and Allowed Other Secured Claims shall, unless otherwise provided for in the DIP Budget, be paid exclusively from (a) the Combined Reserve or WARN Reserve as applicable, and (b) Distributable Proceeds to the extent available from the Waterfall Recovery. For the avoidance of doubt, Holders of Allowed FILO Claims or Allowed DIP Claims shall not receive any recovery from the Shared Proceeds Pool after Payment in Full (as defined in the Final DIP Order) of the DIP Claims and FILO Claims.

### C.    WARN Reserve and Combined Reserve

On and after the Effective Date, the Plan Administrator shall administer the Combined Reserve and the WARN Reserve.

In accordance with the Final DIP Order, all funds in the Combined Reserve constitute property of the Estate, and are free and clear of all liens, claims, or encumbrances. The Combined Reserve shall be used to pay Holders of all Allowed Other Priority Claims, Allowed Priority Tax Claims, Allowed Administrative Claims (other than Professional Fee Claims or Allowed DIP Claims), and Allowed Other Secured Claims their respective Pro Rata share of the Combined Reserve, to the extent that such Other Priority Claims, Priority Tax Claims, Administrative Claims (other than Professional Fee Claims or Allowed DIP Claims), and Allowed Other Secured Claims have not been paid in full on or before the Effective Date. If all or any portion of an Other Priority Claim, Priority Tax Claim, Administrative Claim (other than Professional Fee Claims or Allowed DIP Claims), or Allowed Other Secured Claim shall become a Disallowed Claim, then the amounts on deposit in the Combined Reserve attributable to such surplus or such Disallowed Claim, including the interest that has accrued on said amount while on deposit in the Combined Reserve, shall remain in the Combined Reserve to the extent that the Plan Administrator determines necessary to ensure that the Cash remaining in the Combined Reserve is sufficient to ensure that all Allowed Other Priority Claims, Allowed Priority Tax Claims, Allowed Administrative Claims,

and Allowed Other Secured Claims will be paid in accordance with the Plan, and shall otherwise promptly be transferred to the General Account to be distributed in accordance with the Plan without any further action or order of the Bankruptcy Court.

The Combined Reserve shall also be used by the Plan Administrator to satisfy the expenses of Wind-Down Debtors, and the Plan Administrator as set forth in the Plan and Wind-Down Budget; *provided* that all costs and expenses associated with the winding up of the Wind-Down Debtors and the storage of records and documents shall constitute expenses of the Wind-Down Debtors and shall be paid from the Combined Reserve to the extent set forth in the Wind-Down Budget.  In no event shall the Plan Administrator be required or permitted to use its personal funds or assets for such purposes.  Any amounts remaining in the Combined Reserve after payment of all expenses of the Wind-Down Debtors and the Plan Administrator, and all Allowed Other Priority Claims, Allowed Priority Tax Claims, Allowed Administrative Claims, and Allowed Other Secured Claims (or any amount in excess of that reasonably needed to be reserved for any Disputed Claims) shall promptly be transferred to the General Account and shall be distributed according to the priority set forth in the Waterfall Recovery without any further action or order of the Bankruptcy Court.

The WARN Reserve shall be used to pay WARN Costs, and, to the extent such Claims are not paid in full from the Combined Reserve, Allowed Priority Tax Claims.  After payment in full of all WARN Costs and Allowed Priority Tax Claims, any amounts remaining in the WARN Reserve shall be transferred to the General Account and shall be distributed according to the priority set forth in the Waterfall Recovery, subject to the Sharing Mechanism, without any further action or order of the Bankruptcy Court.

Any contrary provision hereof notwithstanding, Allowed Other Priority Claims, Allowed Priority Tax Claims, Allowed Administrative Claims (other than Professional Fee Claims or Allowed DIP Claims), and Allowed Other Secured Claims shall, unless otherwise provided for in the DIP Budget, be paid exclusively from (i) the Combined Reserve or WARN Reserve as applicable, and (ii) Distributable Proceeds to the extent available from the Waterfall Recovery.

D.    **Cancellation of Existing Securities, Notes, Instruments, Certificates, and Other Documents**

On the later of the Effective Date and the date on which distributions are made pursuant to the Plan (if not made on the Effective Date), except for the purpose of evidencing a right to and allowing Holders of Claims and Interests to receive a distribution under the Plan, allowing the 2014 Senior Unsecured Notes Trustee to exercise its charging lien in accordance with the 2014 Notes Indenture, or to the extent otherwise specifically provided for in the Plan, the Confirmation Order, or any agreement, instrument, or other document entered into in connection with or pursuant to the Plan or the Liquidation Transactions, all notes, bonds, indentures, certificates, Securities, shares, purchase rights, options, warrants, collateral agreements, subordination agreements, intercreditor agreements, or other instruments or documents directly or indirectly evidencing, creating, or relating to any indebtedness or obligations of, or ownership interest in, the Debtors, giving rise to any Claims against or Interests in the Debtors or to any rights or obligations relating to any Claims against or Interests in the Debtors shall be deemed canceled without any need for a Holder to take further action with respect thereto, and the duties and obligations of the Debtors or

the Wind-Down Debtors, as applicable, any non-Debtor affiliates shall be deemed satisfied in full, canceled, released, discharged, and of no force or effect; *provided* that notwithstanding anything to the contrary in the Plan, the Liens securing the DIP Claims and FILO Claims shall not be released and such Liens shall remain in full force and effect until Payment in Full (as defined in the Final DIP Order) of the DIP Claims or FILO Claims, as applicable, and the Liens securing the DIP Claims and FILO Claims shall continue with the same validity and priority set forth in the Final DIP Order.

### E.    General Settlement of Claims and Interests

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their respective Estates, and holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Wind-Down Debtors may compromise and settle Claims against the Debtors and their respective Estates and Causes of Action against other Entities.

### F.    Means of Implementation

Any Asset Sale Transaction will be either (a) conducted pursuant to the Bidding Procedures or Lease Sale Procedures, (b) approved by the Bankruptcy Court prior to the Effective Date, or (c) otherwise authorized by the Plan.

#### 1.    Sources of Consideration for Plan Distributions

The Plan Administrator, subject to the Sharing Mechanism, will fund distributions under the Plan from (a) the Combined Reserve; (b) the WARN Reserve; and (c) Distributable Proceeds in accordance with the Waterfall Recovery, unless, as it relates to each of the foregoing, such distributions are provided for in the DIP Budget. Distributable Proceeds will be created by, among other things, the prosecution and monetization of Non-Released Claims.

#### 2.    Vesting of Assets

Except as otherwise provided in the Plan, or any agreement, instrument, or other document incorporated herein or therein, on the Effective Date, all property of the Estates shall vest in the Wind-Down Debtors for the purpose of liquidating the Estates, free and clear of all Liens, Claims, charges, or other encumbrances; *provided* that notwithstanding anything to the contrary in the Plan, the Liens securing the DIP Claims and FILO Claims shall not be released, and such Liens shall remain in full force and effect until Payment in Full (as defined in the Final DIP Order) of the DIP Claims or FILO Claims, as applicable. On and after the Effective Date, the Debtors and the Wind-Down Debtors may (at the direction of the Plan Administrator) use, acquire, or dispose of

property, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

### 3.    Wind-Down Debtors

On and after the Effective Date, if applicable, the Wind-Down Debtors shall continue in existence for purposes of (a) winding down the Debtors' business and affairs as expeditiously as reasonably possible, (b) resolving Disputed Claims, (c) making distributions on account of Allowed Claims as provided in the Plan, (d) establishing and, to the extent not already funded, funding the Distribution Reserve Accounts, (e) enforcing and prosecuting claims, interests, rights, and privileges under all Causes of Action in an efficacious manner and only to the extent the benefits of such enforcement or prosecution are reasonably believed to outweigh the costs associated therewith, (f) filing appropriate tax returns, (g) complying with its continuing obligations under the Purchase Agreements, if any, (h) liquidating all assets of the Wind-Down Debtors, and (i) otherwise administering the Plan in an efficacious manner consistent with the Plan.  The Wind-Down Debtors shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (i) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court and (ii) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Plan Administrator to file motions or substitutions of parties or counsel in each such matter.

### 4.    Plan Administrator

The Plan Administrator shall act for the Wind-Down Debtors in the same fiduciary capacity as applicable to a president and chief executive officer (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same) and retain and have all the rights, powers, and duties necessary to carry out his or her responsibilities under the Plan in accordance with the Wind-Down and as otherwise provided in the Confirmation Order.  On the Effective Date, the authority, power, and incumbency of the persons acting as managers, directors, and officers of the Wind-Down Debtors shall be deemed to have resigned, and the Plan Administrator shall be appointed as the sole officer of the Wind-Down Debtors, and shall succeed to the rights, powers, duties, and privileges of the Wind-Down Debtors' officers.  Subject only to the authority delegated to the Oversight Committee (as defined below), the Plan Administrator will replace all officers of each Debtor and will report to the Oversight Committee.  Subject to the terms of the Plan, among other duties normal and customary of a director and officer responsible for winding down the affairs of a business, the Plan Administrator shall have the right and duty to investigate, prosecute, and compromise any and all of the Debtors' and Wind Down Debtors' Claims and Causes of Action.

From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Wind-Down Debtors as further described in Article VII of the Plan.  The powers of the Plan Administrator shall include any and all powers and authority to implement the Plan and to administer and distribute the Distribution Reserve Accounts and wind down the business and affairs of the Debtors and Wind-Down Debtors, including (all without further order of the Bankruptcy Court):    (1) liquidating, receiving, holding, investing, supervising, and

protecting the assets of the Wind-Down Debtors; (2) taking all steps to execute all instruments and documents necessary to effectuate the distributions to be made under the Plan from the Distribution Reserve Accounts; (3) making distributions from the Distribution Reserve Accounts as contemplated under the Plan; (4) establishing and maintaining bank accounts in the name of the Wind-Down Debtors; (5) subject to the terms set forth in the Plan, employing, retaining, terminating, or replacing professionals to represent it with respect to its responsibilities or otherwise effectuating the Plan to the extent necessary; (6) paying all reasonable fees, expenses, debts, charges, and liabilities of the Wind-Down Debtors; (7) administering and paying taxes of the Wind-Down Debtors, including filing tax returns; (8) representing the interests of the Wind-Down Debtors or the Estates before any taxing authority in all matters, including any action, suit, proceeding, or audit; (9) investigating, commencing, prosecuting, or settling the Non-Released Claims; and (10) exercising such other powers as may be vested in it pursuant to order of the Bankruptcy Court or pursuant to the Plan, or as it reasonably deems to be necessary and proper to carry out the provisions of the Plan.

The Plan Administrator may resign at any time upon 30 days' written notice delivered to the Wind-Down Debtors and the Bankruptcy Court; provided that such resignation shall only become effective upon the appointment of a permanent or interim successor Plan Administrator, to be mutually agreed by the DIP Agent and the Oversight Committee. Upon its appointment, the successor Plan Administrator, without any further act, shall become fully vested with all of the rights, powers, duties, and obligations of its predecessor and all responsibilities of the predecessor Plan Administrator relating to the Wind-Down Debtors shall be terminated.

(a)    Plan Administrator Rights and Powers

The Plan Administrator shall retain and have all the rights, powers, and duties of a trustee in bankruptcy including without limitation the powers necessary to carry out his or her responsibilities under the Plan in accordance with the Combined Reserve, and as otherwise provided in the Confirmation Order. The Plan Administrator shall be the exclusive trustee of the assets of the Wind-Down Debtors for the purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estates appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code.

(b)    Retention of Professionals

The Plan Administrator shall have the right to retain the services of attorneys, accountants, and other professionals that, in the discretion of the Plan Administrator, are necessary to assist the Plan Administrator in the performance of his or her duties. The reasonable fees and expenses of such professionals shall be paid by the Wind-Down Debtors from the Combined Reserve upon the monthly submission of statements to the Plan Administrator to the extent set forth in the Combined Reserve. The payment of the reasonable fees and expenses of the Plan Administrator's retained professionals shall be made in the ordinary course of business from the Combined Reserve and shall not be subject to the approval of the Bankruptcy Court.

(c)      Compensation of the Plan Administrator

The Plan Administrator's compensation, on a post-Effective Date basis, shall be as described in the Plan Supplement and paid out of the Combined Reserve.  Except as otherwise ordered by the Bankruptcy Court, the fees and expenses incurred by the Plan Administrator on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement Claims (including attorney fees and expenses) made by the Plan Administrator in connection with such Plan Administrator's duties shall be paid without any further notice to, or action, order, or approval of, the Bankruptcy Court in Cash from the Combined Reserve if such amounts relate to any actions taken under the Plan.  Notwithstanding anything to the contrary in the Plan, all fees, expenses, and disbursements of the Plan Administrator, including the compensation of the Plan Administrator and the payment of fees and expenses of any professionals engaged by the Plan Administrator, shall be subject to the Wind-Down Budget.

(d)      Plan Administrator Expenses

All costs, expenses and obligations incurred by the Plan Administrator in administering the Plan, the Wind-Down Debtors, or in any manner connected, incidental or related thereto, in effecting distributions from the Wind-Down Debtors thereunder (including the reimbursement of reasonable expenses) shall be incurred and paid from the Combined Reserve as set forth in the Plan Supplement.

The Debtors and the Plan Administrator, as applicable, shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  However, in the event that the Plan Administrator is so ordered after the Effective Date, all costs and expenses of procuring any such bond or surety shall be paid for with Cash from the Combined Reserve.

5.      <u>Wind-Down</u>

On and after the Effective Date, the Plan Administrator will be authorized to implement the Plan and any applicable orders of the Bankruptcy Court, and the Plan Administrator shall have the power and authority to take any action necessary to wind down and dissolve the Debtors' Estates.

As soon as practicable after the Effective Date, the Plan Administrator shall:  (1) cause the Debtors and the Wind-Down Debtors, as applicable, to comply with, and abide by, the terms of the Purchase Agreements and any other documents contemplated thereby; (2) to the extent applicable, file a certificate of dissolution or equivalent document, together with all other necessary corporate and company documents, to effect the dissolution of the Debtors under the applicable laws of their state of incorporation or formation (as applicable); and (3) take such other actions as the Plan Administrator may determine to be necessary or desirable to carry out the purposes of the Plan.  Any certificate of dissolution or equivalent document may be executed by the Plan Administrator without need for any action or approval by the shareholders or board of directors or managers of any Debtor.  From and after the Effective Date, except with respect to Wind-Down Debtors as set forth in the Plan, the Debtors (1) for all purposes shall be deemed to have withdrawn their business operations from any state in which the Debtors were previously conducting, or are

24

registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (2) shall be deemed to have canceled pursuant to the Plan all Interests, and (3) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date.  For the avoidance of doubt, notwithstanding the Debtors' dissolution, the Debtors shall be deemed to remain intact solely with respect to the preparation, filing, review, and resolution of applications for Professional Fee Claims.

The filing of the final monthly report (for the month in which the Effective Date occurs) and all subsequent quarterly reports shall be the responsibility of the Plan Administrator.

### 6.    Liquidating Trust

Notwithstanding anything to the contrary in the Plan, the Plan Administrator may, with the consent of the DIP Agent, the FILO Agent, and the Creditors' Committee, or (following the Effective Date) with the consent of the DIP Agent, FILO Agent and Oversight Committee transfer all or any portion of the assets of the Wind-Down Debtors to a trust (the "Liquidating Trust"), which shall be a "liquidating trust" as that term is used under section 301.7701-4(d) of the Treasury Regulations.  For the avoidance of doubt, in the event of a Permitted Transfer, the provisions set forth in Article IV.F.7 of the Plan shall continue to govern all matters associated with the prosecution, settlement, or collection upon any Non-Released Claims transferred to the Liquidating Trust.  The Liquidating Trust shall be established for the primary purpose of liquidating the Liquidating Trust's assets, reconciling claims asserted against the Wind-Down Debtors, and distributing the proceeds thereof in accordance with the Plan, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the purpose of the Liquidating Trust.  Upon the transfer of the Wind-Down Debtors' assets to the Liquidating Trust, the Wind-Down Debtors will have no reversionary or further interest in or with respect to the assets of the Liquidating Trust.  To the extent beneficial interests in the Liquidating Trust are deemed to be "securities" as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable state securities laws, the Debtors intend that the exemption provisions of section 1145 of the Bankruptcy Code will apply to such beneficial interests.  Prior to any Permitted Transfer, the Plan Administrator may designate trustee(s) for the Liquidating Trust, with the consent of the DIP Agent, the FILO Agent, and the Creditors' Committee, for the purposes of administering the Liquidating Trust.  The reasonable costs and expenses of the trustee(s) shall be paid from the Liquidating Trust.  For a more detailed description of the treatment of the Liquidating Trust, *see* Article XI.E of this Disclosure Statement, entitled "*Tax Matters Regarding the Liquidating Trust.*"

### 7.    Exculpation, Indemnification, Insurance & Liability Limitation

The Plan Administrator and all professionals retained by the Plan Administrator, each in their capacities as such, shall be deemed exculpated and indemnified, except for fraud, willful misconduct, or gross negligence, in all respects by the Wind-Down Debtors.  The Plan Administrator may obtain, at the expense of the Wind-Down Debtors and with funds from the Combined Reserve, commercially reasonable liability or other appropriate insurance with respect to the indemnification obligations of the Wind-Down Debtors.  The Plan Administrator may rely upon written information previously generated by the Debtors.

For the avoidance of doubt, notwithstanding anything to the contrary contained in the Plan, the Plan Administrator in its capacity as such, shall have no liability whatsoever to any party for the liabilities and/or obligations, however created, whether direct or indirect, in tort, contract, or otherwise, of the Debtors.

8.    Tax Returns

After the Effective Date, the Plan Administrator shall complete and file all final or otherwise required federal, state, and local tax returns for each of the Debtors, and, pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

9.    Dissolution of the Wind-Down Debtors

Upon a certification to be filed with the Bankruptcy Court by the Plan Administrator of all distributions having been made and completion of all its duties under the Plan and entry of a final decree closing the last of the Chapter 11 Cases, the Wind-Down Debtors shall be deemed to be dissolved without any further action by the Wind-Down Debtors, including the filing of any documents with the secretary of state for the state in which each Debtor is formed or any other jurisdiction.  The Plan Administrator, however, shall have authority to take all necessary actions to dissolve the Wind-Down Debtors in and withdraw the Wind-Down Debtors from applicable state(s).

10.    Budget and Reporting

Unless otherwise agreed to in writing by the DIP Agent, the FILO Agent, and the Debtors or Wind-Down Debtors, as applicable, commencing the second Thursday following the Effective Date and every two weeks thereafter (each such two-week period, a "Reporting Period"), until Payment in Full (as defined in the Final DIP Order) of the DIP Claims and FILO Claims, the Plan Administrator shall deliver to the DIP Agent and FILO Agent (i) an updated Wind-Down Budget; (ii) a variance report comparing actual receipts and disbursements against those forecast in the applicable Wind-Down Budget; (iii) a report on amounts distributed from the Combined Reserve and WARN Reserve during such Reporting Period; (iv) a report on the status of all claims and causes of action that the Plan Administrator, and/or Wind-Down Debtors have commenced or are authorized to commence pursuant to the Plan; and (v) a report on the claims reconciliation and objection process.  At the conclusion of each Reporting Period, or more frequently if requested, the Plan Administrator shall meet with the DIP Agent, FILO Agent, and counsel thereto to discuss the reporting set forth in Article VII.G of the Plan.  Any Reporting Period may be adjusted with the consent of the DIP Agent and FILO Agent.

11.    Distribution Reserve Accounts

(a)    Combined Reserve and WARN Reserve

On and after the Effective Date, the Plan Administrator shall administer the Combined Reserve and the WARN Reserve.

In accordance with the Final DIP Order, all funds in the Combined Reserve constitute property of the Estate, and are free and clear of all liens, claims, or encumbrances. The Combined Reserve shall be used to pay Holders of all Allowed Other Priority Claims, Allowed Priority Tax Claims, Allowed Administrative Claims (other than Professional Fee Claims or Allowed DIP Claims), and Allowed Other Secured Claims their respective Pro Rata share of the Combined Reserve, to the extent that such Other Priority Claims, Priority Tax Claims, Administrative Claims (other than Professional Fee Claims or Allowed DIP Claims), and Allowed Other Secured Claims have not been paid in full on or before the Effective Date. If all or any portion of an Other Priority Claim, Priority Tax Claim, Administrative Claim (other than Professional Fee Claims or Allowed DIP Claims), or Allowed Other Secured Claim shall become a Disallowed Claim, then the amounts on deposit in the Combined Reserve attributable to such surplus or such Disallowed Claim, including the interest that has accrued on said amount while on deposit in the Combined Reserve, shall remain in the Combined Reserve to the extent that the Plan Administrator determines necessary to ensure that the Cash remaining in the Combined Reserve is sufficient to ensure that all Allowed Other Priority Claims, Allowed Priority Tax Claims, Allowed Administrative Claims, and Allowed Other Secured Claims will be paid in accordance with the Plan, and shall otherwise promptly be transferred to the General Account to be distributed in accordance with the Plan without any further action or order of the Bankruptcy Court.

The Combined Reserve shall also be used by the Plan Administrator to satisfy the expenses of Wind-Down Debtors and the Plan Administrator as set forth in the Plan and Wind-Down Budget; *provided* that all costs and expenses associated with the winding up of the Wind-Down Debtors and the storage of records and documents shall constitute expenses of the Wind-Down Debtors and shall be paid from the Combined Reserve to the extent set forth in the Wind-Down Budget. In no event shall the Plan Administrator be required or permitted to use its personal funds or assets for such purposes. Any amounts remaining in the Combined Reserve after payment of all expenses of the Wind-Down Debtors and the Plan Administrator, and all Allowed Other Priority Claims, Allowed Priority Tax Claims, Allowed Administrative Claims, and Allowed Other Secured Claims (or any amount in excess of that reasonably needed to be reserved for any Disputed Claims) shall promptly be transferred to the General Account and shall be distributed according to the priority set forth in the Waterfall Recovery without any further action or order of the Bankruptcy Court.

The WARN Reserve shall be used to pay WARN Costs, and, to the extent such Claims are not paid in full from the Combined Reserve, Administrative Claims, Allowed Other Secured Claims, Allowed Other Priority Claims, and Allowed Priority Tax Claims. After payment in full of all Administrative Claims, Allowed Other Secured Claims, Allowed Other Priority Claims, and Allowed Priority Tax Claims, any amounts remaining in the WARN Reserve shall be used to pay Allowed General Unsecured Claims.

(b)    The General Account and Distribution Reserve Account Adjustments

Beginning on the two-month anniversary of the Effective Date or at such other times as the Plan Administrator shall determine as appropriate, and thereafter, on each two-month interval thereafter, the Plan Administrator shall determine the amount of Cash required to adequately maintain each of the Distribution Reserve Accounts. If after making and giving effect to any

determination referred to in the immediately preceding sentence, the Plan Administrator determines that any Distribution Reserve Account contains Cash in an amount in excess of the amount then required to adequately maintain such Distribution Reserve Account, then at any such time the Plan Administrator shall transfer such surplus Cash to the General Account to be used or distributed according to the priority set forth in Article IV.B of the Plan.  Neither the Plan Administrator nor any other party shall transfer Cash to any Distribution Reserve Account.

12.      Board of the Debtors

As of the Effective Date, the existing board of directors or managers, as applicable, of the Debtors shall be dissolved without any further action required on the part of the Debtors or the Debtors' officers, directors, managers, shareholders, or members, and any remaining officers, directors, managers, or managing members of any Debtor shall be deemed to have resigned without any further action required on the part of any such Debtor, the equity holders of the Debtors, the officers, directors, or managers, as applicable, of the Debtors, or the members of any Debtor.  Subject in all respects to the terms of the Plan, the Debtors shall be dissolved as soon as practicable on or after the Effective Date, but in no event later than the closing of the Chapter 11 Cases.

As of the Effective Date, subject to the authority of the Oversight Committee, the Plan Administrator shall act as the sole officer of the Debtors with respect to its affairs.  Subject in all respects to the terms of the Plan, the Plan Administrator shall have the power and authority to take any action necessary to wind down and dissolve any of the Debtors, and shall: (a) file a certificate of dissolution for any of the Debtors, together with all other necessary corporate and company documents, to effect the dissolution of any of the Debtors under the applicable laws of each applicable Debtor's state of formation; (b) complete and file all final or otherwise required federal, state, and local tax returns and shall pay taxes required to be paid for any of the Debtors, and pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of any of the Debtors or their Estates for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws; and (c) represent the interests of the Debtors or the Estates before any taxing authority in all tax matters, including any action, suit, proceeding, or audit.

The filing by the Plan Administrator of any of the Debtors' certificate of dissolution shall be authorized and approved in all respects without further action under applicable law, regulation, order, or rule, including any action by the stockholders, members, board of directors, or board of managers of BBB or any of its affiliates.

13.      Release of Liens

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Debtors' Estates shall be fully released, settled, and compromised, and the holder of such mortgages, deeds of trust, Liens, pledges, or other security interest against any property of the

Debtors' Estates shall be authorized to take such actions as may be reasonably requested by the Debtors to evidence such releases; *provided* that notwithstanding anything to the contrary in the Plan, the Liens securing the DIP Claims and FILO Claims shall not be released, and such Liens shall remain in full force and effect until Payment in Full (as defined in the Final DIP Order) of the DIP Claims or FILO Claims, as applicable.

14.     Preservation of Causes of Action

Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, in accordance with section 1123(b) of the Bankruptcy Code, on the Effective Date, all Causes of Action shall automatically vest in the Wind-Down Debtors, and the Plan Administrator shall have the right and authority to investigate, commence, prosecute, or settle, as appropriate, any and all the Non-Released Claims, whether arising before or after the Petition Date.

The Non-Released Claims consist of all Claims and Causes of Action, including without limitation:

i.    D&O Claims, consisting of any and all Claims or Causes of Action of the Debtors or Wind-Down Debtors, as applicable, against all current and former directors, officers, or managers of the Debtors, in their respective capacities as such;

ii.   Avoidance Actions, consisting of any and all avoidance, recovery, subordination, or other claims, actions, or remedies which any of the Debtors, the Estates, or other appropriate parties in interest have asserted or may assert under sections 502, 510, 542, 544, 545, or 547 through 553 of the Bankruptcy Code or under similar or related state or federal statutes and common law including, for the avoidance of doubt, any actions to recover preferential payments made to non-insiders of the Debtors within 90 days prior to the Petition Date;

iii.  Other Liability Claims, consisting of any Claims or Causes of Action of the Debtors against professionals, excluding any professionals retained by the Debtors in their chapter 11 cases;

iv.   Shipping and Price Gouging Claims, consisting of any Claims or Causes of Action of the Debtors, their Affiliates, and any successors or assigns (a) relating to the failure to establish, observe, and enforce just and reasonable regulations and practices relating to or connected with receiving, handling, storing, or delivering property, including practices in accordance with 46 U.S.C. § 41102(c) and/or (b) brought under federal maritime law including, without limitation, the Shipping Act of 1984, 46 U.S.C. §§ 40101–41309, the Ocean Shipping Reform Act of 2022, and any similar laws, and in accordance with 46 C.F.R. §§ 500–599;

v.    Interchange Claims, consisting of any Claims or Causes of Action held by a Debtor, a Debtor's Affiliate, and any successors or assigns relating to the payment card interchange fee and merchant discount antitrust litigation, a United States class action lawsuit against major credit card issuers alleging they engaged in a conspiracy to fix interchange fees; and

vi.     Securities Claims, consisting of any Claims or Causes of Action arising in connection with the issuance, redemption, purchase, or sale of the Debtors' debt or equity securities, including without limitation claims arising under state or federal securities laws, including without limitation the Securities Act of 1933 and the Securities Act of 1934.

The Plan Administrator will investigate and determine the relative merit and value of each Non-Released Claim. Thereafter, the Plan Administrator will have the authority to prosecute, settle, monetize, and otherwise dispose of the Non-Released Claims, with the oversight of the Oversight Committee (as defined herein) and subject to the limitations on settlement authority described below.

The Plan Administrator shall report to and be overseen by a four-member oversight committee (the "Oversight Committee"). Each member of the Oversight Committee shall have a fiduciary obligation to the Wind Down Debtors and Holders of Allowed Claims. The Oversight Committee shall initially consist of four members to be appointed: (a) two by the Creditors' Committee; (b) one by the FILO Agent (the "FILO Appointee"); and (c) one by the FILO Agent and Creditors' Committee, which appointee shall be acceptable to the Debtors in their sole discretion (the "Fourth Member"); *provided* that, upon Payment in Full (as defined in the Final DIP Order) including payment of all accrued and unpaid Lender Fees, the FILO Appointee shall be replaced by a new member selected by the Creditors' Committee. For the avoidance of doubt, the Fourth Member shall not be replaced.

The Plan Administrator shall have the authority to release or settle any Claim or Cause of Action without the approval of the Oversight Committee where (i) the amount in controversy is equal to or less than $10 million without approval of the Oversight Committee; or (ii) the amount in controversy is more than $10 million and the settlement amount is at least 70% of the amount in controversy. For any Claim or Cause of Action where the amount in controversy is greater than $10 million and the settlement amount is less than 70%, the Plan Administrator shall have the authority to release or settle such Claims or Causes of Action upon an affirmative vote of two members of the Oversight Committee; *provided* that decisions of the Plan Administrator related to the release or settlement of, or judgment in any D&O Claim, including decisions related to any appeal thereof, shall be made by a unanimous vote of the Oversight Committee.

No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Plan Administrator will not pursue any and all available Causes of Action against them. No preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Debtors preserve the Causes of Action (including all Non-Released Claims) notwithstanding the assumption or rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, on the Effective Date, any Causes of Action that a Debtor (or its Estate) may hold against any Entity shall automatically vest in and become property of the Wind Down Debtors. The Wind Down Debtors and the Plan Administrator, as applicable, through their

authorized agents or representatives, shall retain and may exclusively enforce any and all Causes of Action vested, transferred, or assigned to such entity.  The Debtors or the Plan Administrator as applicable shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

In the event that the Initial Sharing Threshold has not been achieved within 12 months after the Petition Date (and before the expiration of any applicable statute of limitations), the Plan Administrator shall investigate, analyze, and to the extent appropriate in the business judgment of the Plan Administrator, pursue all Preference Actions.

**G.    Treatment of Executory Contracts and Unexpired Leases**

1.    Assumption and Rejection of Executory Contracts and Unexpired Leases

On the Effective Date, except as otherwise provided in the Plan, each Executory Contract and Unexpired Lease not previously rejected, assumed, assumed and assigned, or included in a Rejection Notice shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease:  (1) is specifically described in the Plan as to be assumed in connection with confirmation of the Plan, or is specifically scheduled to be assumed or assumed and assigned pursuant to the Plan or the Plan Supplement; (2) is subject to a pending motion to assume such Unexpired Lease or Executory Contract as of the Confirmation Date; (3) is to be assumed by the Debtors or assumed by the Debtors and assigned to another third party, as applicable, in connection with any sale transaction that is the subject of a pending motion as of the Confirmation Date; (4) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; (5) is a D&O Liability Insurance Policy; or (6) is listed on the Schedule of Rejected Executory Contracts and Unexpired Leases as of the Confirmation Date for rejection effective on a date that occurs after the Effective Date.  Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions, assignments, and rejections, including the assumption of the Executory Contracts or Unexpired Leases as provided in the Plan Supplement, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

2.    Claims Based on Rejection of Executory Contracts or Unexpired Leases

Counterparties to Executory Contracts or Unexpired Leases listed on the Schedule of Rejected Executory Contracts and Unexpired Leases or otherwise Rejected pursuant to the Plan shall be served with a notice of rejection of Executory Contracts and Unexpired Leases substantially in the form approved by the Bankruptcy Court pursuant to the Bankruptcy Court order approving the Disclosure Statement as soon as reasonably practicable following the filing of the Plan Supplement.  The notice of the Plan Supplement shall also be deemed appropriate notice of rejection when served on applicable parties.  Proofs of Claims with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be filed with the Notice and Claims Agent by the later of the date that is thirty (30) days after (1) the entry of an

order of the Bankruptcy Court (including the Confirmation Order) approving such rejection; (2) the Effective Date; and (3) the effective date of any rejection that occurs after the Effective Date.  **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease that are not filed within such time shall be barred from asserting such claims against the Debtors and precluded from voting on any plans of reorganization filed in these Chapter 11 Cases and/or receiving distributions from the Debtors on account of such claims in these Chapter 11 Cases.  The Debtors or the Wind-Down Debtors, as applicable, shall be authorized to update the Claims Register to remove any Claims not timely filed; *provided* that the Debtors will provide notice to such Claimant at the address or email address on the Proof of Claim, to the extent such information is provided, informing such Claimant that its Claim will be removed from the Claims Register as a result of being untimely filed.**  Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III of the Plan.

3.      <u>Cure of Default for Assumed Executory Contracts and Unexpired Leases</u>

Any Cure Obligations under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by performance or payment of the Cure Obligation in Cash on or after the Effective Date, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  In the event of a dispute regarding (1) the Cure Obligation, (2) the ability of the Wind-Down Debtors or any assignee, as applicable, to provide "adequate assurance of future performance" (with the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the Cure Obligations shall be made following the entry of a Final Order resolving the dispute and approving the assumption.

At least eight (8) days before the Voting Deadline, the Debtors shall distribute, or cause to be distributed, Cure Notices to the applicable third parties and their counsel (if known).  **<u>Any objection by a counterparty to an Executory Contract or Unexpired Lease to the proposed assumption, assumption and assignment, or related Cure amount must be filed by the Cure/Assumption Objection Deadline.</u>**  Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption, assumption and assignment, or Cure Notice will be deemed to have assented to such assumption or assumption and assignment, and Cure amount.  To the extent that the Debtors seek to assume and assign an Unexpired Lease pursuant to the Plan, the Debtors will identify the assignee in the applicable Cure Notice and/or Schedule and provide "adequate assurance of future performance" for such assignee (within the meaning of section 365 of the Bankruptcy Code) under the applicable Executory Contract or Unexpired Lease to be assumed and assigned, which adequate assurance information will be provided with the Cure Notice.

Assumption or assumption and assignment of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise, and the satisfaction of the Cure Obligations, shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition

32

or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date that the Debtors assume or assume and assign such Executory Contract or Unexpired Lease.  Any Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned shall be barred from asserting such claims against the Debtors and precluded from voting on any plans of reorganization filed in these Chapter 11 Cases and/or receiving distributions from the Debtors on account of such claims in these Chapter 11 Cases.  The Debtors or the Wind-Down Debtors, as applicable, shall be authorized to update the Claims Register to remove any claims filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned; *provided* that the Debtors will provide notice to such Claimant at the address or email address on the Proof of Claim, to the extent such information is provided, informing such Claimant that its Claim will be removed from the Claims Register.  For the avoidance of doubt, with respect to any asserted non-monetary Cure Obligations, such Cure obligations may be cured (or resolved) by the assignee and the applicable counterparty in the ordinary course of business following the assumption and all parties reserve all rights with respect to any such asserted Cure obligations.

4.    <u>Insurance Policies</u>

All of the Debtors' insurance policies (including, for the avoidance of doubt, the D&O Liability Insurance Policies) and any agreements, documents, or instruments relating thereto, are treated as and deemed to be Executory Contracts under the Plan.  On the Effective Date, the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments related thereto.  After the Effective Date, the Plan Administrator shall not terminate or otherwise reduce the coverage under the D&O Liability Insurance Policies in effect on the Effective Date, with respect to conduct occurring prior thereto, and all officers, directors, trustee, managers, and members of the Debtors who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such officers, directors, trustees, managers, or members remain in such position after the Effective Date.  For the avoidance of doubt, (i) nothing in this paragraph shall in any way affect the Plan Administrator's ability to assert the Non-Released Claims or any other applicable claims that are not otherwise released pursuant to the Plan and are properly asserted against the D&O Liability Insurance Policies or (ii) access the proceeds of the D&O Liability Insurance Policies for any losses on account of such Non-Released Claims or such other claims.

5.    <u>Modifications, Amendments, Supplements, Restatements, or Other Agreements</u>

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed (or assumed and assigned) shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

6.    Reservation of Rights

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Rejected Executory Contracts and Unexpired Leases or the Schedule of Assumed Executory Contracts and Unexpired Leases, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor has any liability thereunder.

7.    Nonoccurrence of Effective Date

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting any Executory Contract or Unexpired Lease pursuant to section 365(d)(4) of the Bankruptcy Code.

8.    Contracts and Leases Entered into after the Petition Date

Contracts and leases entered into in the ordinary course of business after the Petition Date by any Debtor, including any Executory Contracts and/or Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or Wind-Down Debtor in the ordinary course of its business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) that have not been rejected under the Plan will survive and remain unaffected by entry of the Confirmation Order, except as provided therein.

**H.    Exemption from Certain Transfer Taxes and Fees**

To the maximum extent provided by section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto, including the Asset Sale Transaction, or the issuance, transfer or exchange of any security under the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers of property without the payment of any such tax, recordation fee, or governmental assessment.

**I.    Procedures for Resolving Contingent, Unliquidated and Disputed Claims**

1.    Allowance of Claims

After the Effective Date, the Plan Administrator or each of the Wind-Down Debtors, as applicable, shall have and retain any and all rights and defenses the applicable Debtor had with respect to any Claim immediately before the Effective Date. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the

Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim.

2.    Claims Administration Responsibilities

Except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Plan Administrator or the Wind-Down Debtors, as applicable, in consultation with the DIP Agent or FILO Agent, shall have the sole authority to File and prosecute objections to Claims, and the Wind-Down Debtors shall have the sole authority, in consultation with the DIP Agent or FILO Agent, to (1) settle, compromise, withdraw, litigate to judgment, or otherwise resolve objections to any and all Claims, regardless of whether such Claims are in a Class or otherwise; (2) settle, compromise, or resolve any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

3.    Estimation of Claims

Before, on, or after the Effective Date, the Debtors, Plan Administrator or the Wind-Down Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Claim pursuant to applicable law, including, without limitation, pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any such Claim, including during the litigation of any objection to any Claim or during the pendency of any appeal relating to such objection. Notwithstanding any provision to the contrary in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any Claim, such estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions and discharge) and may be used as evidence in any supplemental proceedings, and the Debtors, Plan Administrator, or Wind-Down Debtors may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has filed a motion requesting the right to seek such reconsideration on or before seven (7) days after the date on which such Claim is estimated. Each of the foregoing Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

4.      Adjustment to Claims Without Objection

The Debtors or the Wind-Down Debtors, as applicable, shall be authorized to update the Claims Register to adjust or remove any Claim that has been paid in full or satisfied, or any Claim that has been amended or superseded; *provided* that the Debtors will provide notice to such Claimant at the address or email address on the Proof of Claim, to the extent such information is provided, informing such Claimant that its Claim will be adjusted or removed from the Claims Register.

5.      Time to File Objections to Claims

Any objections to Claims shall be filed on or before the Claims Objection Bar Date.

6.      Disallowance of Claims

Any Claims held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors, the Plan Administrator or the Wind-Down Debtors, as applicable.  All Proofs of Claim filed on account of an Indemnification Obligation shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such Indemnification Obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

Pursuant to the terms of the Bar Date Order, if Proofs of Claim are not received by the Notice and Claims Agent on or before the Prepetition Claims Bar Date, the Administrative Claims Bar Date (as required), or the Governmental Bar Date, as applicable, and except in the case of certain exceptions explicitly set forth in the Bar Date Order, the Holders of the underlying Claims shall be barred from asserting such claims against the Debtors and precluded from voting on any plans of reorganization filed in these Chapter 11 Cases and/or receiving distributions from the Debtors on account of such claims in these Chapter 11 Cases.  The Debtors or the Wind-Down Debtors, as applicable, shall be authorized to update the Claims Register to remove any claims not received by the Notice and Claims Agent before the Prepetition Claims Bar Date, Administrative Claims Bar Date or the Governmental Bar Date, as applicable, and not subject to an exception as set forth above; *provided* that the Debtors will provide notice to such Claimant at the address or email address on the Proof of Claim, to the extent such information is provided, informing such Claimant that its Claim will be removed from the Claims Register as a result of being untimely filed.

7.      Amendments to Claims

On or after the Effective Date, a Claim (other than a Claim arising from the rejection of an Executory Contract or Unexpired Lease or a Claim filed by the Administrative Claims Bar Date)

may not be filed or amended without the prior authorization of the Bankruptcy Court, the Plan Administrator, or the Wind-Down Debtors, as applicable, and the Plan Administrator and the Wind-Down Debtors shall be authorized to update the Claims Register to remove any such new or amended Claim filed; *provided* that the Debtors will provide notice to such Claimant at the address or email address on the Proof of Claim, to the extent such information is provided, informing such Claimant that its Claim will be adjusted or removed from the Claims Register.

8.    No Distributions Pending Allowance

If an objection to a Claim or portion thereof is filed, no payment or distribution provided under the Plan shall be made on account of such Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim, unless otherwise determined by the Plan Administrator or Wind-Down Debtors, as applicable.

9.    Distributions After Allowance

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Wind-Down Debtors shall provide to the Holder of such Claim the distribution to which such Holder is entitled under the Plan as of the Effective Date, less any previous distribution (if any) that was made on account of the undisputed portion of such Claim, without any interest, dividends, or accruals to be paid on account of such Claim unless required under applicable bankruptcy law or as otherwise provided in the Plan.

**J.    Settlement, Release, Injunction, and Related Provisions**

1.    Discharge of Claims and Termination of Interests

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete settlement, compromise, and release, effective as of the Effective Date, of Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors before the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim or Proof of Interest based upon such debt, right, or Interest is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the

Holder of such a Claim or Interest has accepted the Plan. The Confirmation Order shall be a judicial determination of the settlement, compromise, and release of all Claims and Interests subject to the Effective Date occurring. In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Plan Administrator, or Wind-Down Debtors, as applicable, may compromise and settle any Claims and Causes of Action against other Entities.

2.     <u>Release of Liens</u>

**Except as otherwise specifically provided in the Plan, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Wind-Down Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors or Wind-Down Debtors;** *provided* **that notwithstanding anything to the contrary in the Plan, the Liens securing the DIP Claims and FILO Claims shall not be released and such Liens shall remain in full force and effect until Payment in Full (as defined in the Final DIP Order) of the DIP Claims or FILO Claims, as applicable, and the Liens securing the DIP Claims and FILO Claims shall continue with the same validity and priority set forth in the Final DIP Order. The Prepetition Agents shall execute and deliver all documents reasonably requested by the Wind-Down Debtors or the Plan Administrator to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the Wind-Down Debtors to file UCC-3 termination statements (to the extent applicable) with respect thereto.**

3.     <u>Releases by the Debtors</u>

**Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party other than the D&O Parties is deemed released and discharged by and on behalf of the Debtors and their respective Estates, and any and all other entities who may purport to assert any cause of action, by, through, for, or because of the foregoing entities, from any and all claims and Causes of Action, whether known or unknown, liquidated or unliquidated, fixed or contingent, matured or unmatured, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, including any derivative claims asserted or assertable on behalf of the Debtors or their respective Estates, that the Debtors or their respective Estates would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in the Debtors based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), any securities issued by the Debtors and the ownership thereof, the Debtors' in- or out-of-court restructuring efforts, any intercompany transaction, the ABL Claims, the ABL Obligations, the FILO Claims, the FILO Obligations, the Prepetition Credit Agreement, the Prepetition Credit Facility Documents, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the**

38

Disclosure Statement, the DIP Facility, the Plan, the Plan Supplement or the Asset Sale Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the ABL Claims, the ABL Obligations, the DIP Facility, the FILO Claims, the FILO Obligations, the Prepetition Credit Agreement, the Prepetition Credit Facility Documents, the Plan, the Plan Supplement, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the Liquidation Documents, solicitation of votes on the Plan, the prepetition negotiation and settlement of Claims, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, the Asset Sale Transaction, or any document, instrument, or agreement (including the Liquidation Documents, and other documents, instruments and agreements set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor release is: (a) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the restructuring and implementing the Plan; (b) a good faith settlement and compromise of the Claims released by the Debtor release; (c) in the best interests of the Debtors and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors, Wind-Down Debtors, or the Debtors' respective Estates asserting any claim or Cause of Action released pursuant to the Debtor release

Any contrary provision hereof notwithstanding, nothing contained in the Plan, including the foregoing Debtor release will release, compromise, impair, or in any way affect any Non-Released Claims, including the D&O Claims.

4.      Release by Holders of Claims or Interests

As of the Effective Date, and to the fullest extent allowed by applicable law, each Releasing Party is deemed to have released and discharged each of the Debtors and Released Parties from any and all Claims and Causes of Action, whether known or unknown, including waiving any and all rights any of the foregoing parties may have under any applicable statute, including but not limited to California Civil Code § 1542, which provides: "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY," or any doctrine or principle of law restricting the release of claims that a releasor does not know or suspect to exist at the time of executing a release, which claims, if known, may have materially affected the releasor's decision to give the release, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part,

the Debtors (including the management, ownership or operation thereof), any securities issued by the Debtors and the ownership thereof, the Debtors' in- or out-of-court restructuring efforts, any intercompany transaction, the ABL Claims, the ABL Obligations, the FILO Claims, the FILO Obligations,  the Prepetition Credit Agreement, the Prepetition Credit Facility Documents, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the DIP Facility, the Plan, the Plan Supplement, or the Asset Sale Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the DIP Facility, the Plan, the Plan Supplement, the ABL Claims, the ABL Obligations, the FILO Claims, the FILO Obligations,  the Prepetition Credit Agreement, the Prepetition Credit Facility Documents, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the Liquidation Documents, solicitation of votes on the Plan, the prepetition negotiation and settlement of Claims, the pursuit of Confirmation, the pursuit of Consummation or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for Claims and Causes of Action related to any act or omission that is determined in a final order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  Notwithstanding anything to the contrary in the foregoing, the "third party release" set forth above does not release any post-Effective Date obligations of any party or Entity under the Plan, any Liquidation Transaction, or any Asset Sale Transaction, or any document, instrument, or agreement (including the Liquidation Documents and other documents, instruments, and agreements set forth in the Plan Supplement) executed to implement the Plan or any Asset Sale Transaction.

Without limiting the foregoing, from and after the Effective Date, any Entity (other than the DIP Agent, the DIP Lenders, the ABL Agent, the FILO Lenders, or the FILO Agent) that is given the opportunity to opt out of the releases contained in Article X.D of the Plan and does not exercise such opt out may not assert any claim or other Cause of Action against any Released Party based on or relating to, or in any manner arising from, in whole or in part, the Debtors.  From and after the Effective Date, any Entity (other than the DIP Agent, the DIP Lenders, the ABL Agent, the FILO Lenders, or the FILO Agent) that opted out of (or otherwise did not participate in) the releases contained in Article X.D of the Plan may not assert any claim or other Cause of Action against any Released Party for which it is asserted or implied that such claim or Cause of Action is not subject to the releases contained in Article X.C of the Plan without first obtaining a Final Order from the Bankruptcy Court (a) determining, after notice and a hearing, that such claim or Cause of Action is not subject to the releases contained in Article X.C of the Plan and (b) specifically authorizing such Person or Entity to bring such claim or Cause of Action against any such Released Party. For the avoidance of doubt, the terms of this paragraph shall not apply to the Plan Administrator.  The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or Cause of Action constitutes a direct or derivative claim, is colorable and, only to the extent legally permissible and as provided for in Article XIII of the Plan, the Bankruptcy Court shall have jurisdiction to adjudicate the underlying claim or Cause of Action.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the third-party release, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding that the third-party release is: (a) consensual; (b) essential to the confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating any Asset Sale Transaction and implementing the Plan; (d) a good faith settlement and compromise of the Claims released by the third-party release; (e) in the best interests of the Debtors and their respective Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the third-party release.

Any contrary provision in the Plan notwithstanding, nothing contained in the Plan, including the foregoing release shall release, compromise, impair or in any way affect any Non-Released Claims, including the D&O Claims.

5.   <u>Exculpation</u>

No Exculpated Party shall have or incur liability for, and each Exculpated Party is released and exculpated from, any Cause of Action or any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the DIP Facility, the Disclosure Statement, the Plan, the Plan Supplement and the Asset Sale Transactions, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of debt, and/or securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for Claims related to any act or omission that is determined in a final order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

The Exculpated Parties have, and upon confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes on, and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. Notwithstanding anything to the contrary in the foregoing, the exculpation set forth above does not release or exculpate any Claim relating to any post-Effective Date obligations of any party or Entity under the Plan, the Asset Sale Transaction, or any document, instrument, or agreement (including the Liquidation Documents, and other documents, instruments and agreements set forth in the Plan Supplement) executed to implement the Plan.

Any contrary provision hereof notwithstanding, nothing contained in the Plan, including the foregoing exculpation shall release, compromise, impair, exculpate or in any way affect any Non-Released Claims, including the D&O Claims.

6.      <u>Injunction</u>

Except as otherwise provided in the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims, Interests, Causes of Action, or liabilities that: (a) are subject to compromise and settlement pursuant to the terms of the Plan; (b) have been released by the Debtors pursuant to the Plan; (c) have been released by third parties pursuant to the Plan; (d) are subject to exculpation pursuant to the Plan; or (e) are otherwise discharged, satisfied, stayed or terminated pursuant to the terms of the Plan, are permanently enjoined and precluded, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, Wind-Down Debtors, the Released Parties, or the Exculpated Parties: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Causes of Action or liabilities; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action or liabilities; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or Estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action or liabilities; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action or liabilities unless such Entity has timely asserted such setoff right in a document filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a Claim or Interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Causes of Action or liabilities discharged, released, exculpated, or settled pursuant to the Plan.

For the avoidance of doubt, and notwithstanding the foregoing, nothing in this section shall release, compromise, impair, exculpate, or in any way affect any Non-Released Claims, including the D&O Claims.

7.      <u>SEC</u>

Notwithstanding any language to the contrary herein, in the Plan, and/or in the Plan Confirmation Order, no provision shall (i) preclude the SEC from enforcing its police or regulatory powers; or, (ii) enjoin, limit, impair or delay the SEC from commencing or continuing any claims, causes of action, proceeding or investigations against any non-debtor person or non-debtor entity in any forum.

8.      Protection Against Discriminatory Treatment

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Wind-Down Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Wind-Down Debtors, or another Entity with whom the Wind-Down Debtors have been associated, solely because the Debtors have been debtors under chapter 11 of the Bankruptcy Code, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases), or have not paid a debt that is dischargeable in the Chapter 11 Cases.

9.      Recoupment

In no event shall any Holder of a Claim be entitled to recoup against any claim, right, or Cause of Action of the Debtors or the Wind-Down Debtors, as applicable, unless such Holder actually has provided notice of such recoupment in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

10.      Subordination Rights

Any distributions under the Plan shall be received and retained free from any obligations to hold or transfer the same to any other Holder and shall not be subject to levy, garnishment, attachment, or other legal process by any Holder by reason of claimed contractual subordination rights. Any such subordination rights shall be waived, and the Confirmation Order shall constitute an injunction enjoining any Entity from enforcing or attempting to enforce any contractual, legal, or equitable subordination rights to property distributed under the Plan, in each case other than as provided in the Plan.

**K.      Conditions Precedent to the Effective Date**

1.      Conditions Precedent to the Effective Date of the Plan

It shall be a condition to Consummation of the Plan that the following conditions shall have been satisfied (or waived pursuant to the provisions of Article XI.B of the Plan):

(a)      The Confirmation Order shall have been duly entered and in full force and effect;

(b)      The Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan and each of the other transactions contemplated by the Liquidation;

(c)      The final version of the schedules, documents, and exhibits contained in the Plan Supplement, and all other schedules, documents, supplements, and exhibits to the Plan, shall have been

43

executed or filed, as applicable, in form and substance consistent in all respects with the Plan, shall be acceptable to the DIP Agent, FILO Agent, and Creditors' Committee, and shall not have been modified in a manner inconsistent therewith;

(d) The Professional Fee Escrow Account shall have been established and funded with Cash in accordance with Article II.B.2 of the Plan;

(e) All accrued and unpaid Lender Fees shall have been paid; and

(f) The Debtors shall have implemented the Liquidation Transactions in a manner consistent in all material respects with the Plan.

2.    Waiver of Conditions

The Debtors, with the consent of the DIP Agent, FILO Agent, and Creditors' Committee, may waive any of the conditions to the Effective Date set forth in Article XI.A of the Plan at any time, without any notice to any other parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than proceeding to confirm and consummate the Plan.

3.    Substantial Consummation

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

4.    Effect of Nonoccurrence of Conditions to the Effective Date

If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims or Interests; (2) prejudice in any manner the rights of the Debtors, any Holders of a Claim or Interest, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders, or any other Entity in any respect.

## V.    THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW

### A.    The Debtors' Corporate History

The Bed Bath & Beyond story originates with Leonard Feinstein and Warren Eisenberg and a small chain of specialty linen and bath shops known as Bed 'n Bath. Lenny and Warren's philosophy was simple: offer name brands at a discount. With one store in Springfield, New Jersey and another store in Cedarhurst, New York, the two friends embarked on a more than 50-year-long journey to develop the ultimate American titan in specialty retail.

Beginning in the 1970s and continuing through the 1980s, Warren and Lenny rode the wave of American consumerism and new retail economics. In 1985, Bed 'n Bath opened its first

superstore, paving the road for other American big-box retailers to follow suit. The new superstore, a 20,000-square-foot outlet, offered wide-ranging inventory options and low prices across a litany of product lines, standing in stark contrast with the select offerings of department store chains. Lenny and Warren recognized that consumers preferred a wider range of merchandise at comparably low prices.

Lenny and Warren took the Company public in June 1992, which began trading on the NASDAQ exchange under the ticker BBBY. Bed Bath & Beyond quickly became a Wall Street sweetheart. Bed Bath & Beyond's affordable prices, warehouse merchandising style, and conservative advertising budgets helped to secure record earnings and profits for the Company.

Bed Bath & Beyond became well known for its then-unique store philosophy of "pile it high, let it fly," with product stocked floor to ceiling throughout its stores; consumers flocked to its stores, never knowing what they may come across during their expedition through the store's aisles, ever-searching for that perfect "treasure." Bed Bath & Beyond's philosophy focused on getting customers into their stores to drive in-person sales and revenue, even creating what has been heralded as one of the greatest retail coupons of all time. This strategy led to financial success and propelled Bed Bath & Beyond to become one of the first superstores in the United States.

As of the Petition Date, Bed Bath & Beyond was a leading specialty home retailer in North America with 360 stores in the United States, offering customers a wide assortment of domestic merchandise and home furnishings. Bed Bath & Beyond has been the preferred destination in the home space, particularly in key product categories, including bedding, bath, kitchen food prep, home organization, and indoor décor, and offers high quality and differentiated products, services, and solutions for the home and heart-felt life events. These included certain life events that evoke strong emotional connections such as getting married, moving to a new home, having a baby, going to college, and decorating a room—which Bed Bath & Beyond supported through its wedding registries and mover and student life programs.

### B.    The Debtors' Business Operations

Headquartered in Union, New Jersey, the Debtors were the largest home goods retailer in the United States, offering everything from bed linens to cookware to home organization, baby care, and more. As of the Petition Date, the Debtors employed approximately 14,000 non-seasonal employees and operated 360 stores.

The Debtors offer merchandise through their Bed Bath & Beyond stores and their buy buy BABY stores across North America. In addition to its flagship in-store presence, Bed Bath & Beyond sells products through its website, BedBathandBeyond.com. A portion of any items exclusively sold online includes products that Bed Bath & Beyond does not keep in stock and has "drop-shipped" from vendors directly to customers when ordered. Aside from drop-shipped merchandise, Bed Bath & Beyond fulfills approximately 70% of online orders from the Company's fulfillment centers and fulfills approximately 30% from its stores.

### C.    Prepetition Capital Structure

The below chart depicts the Debtors' current corporate structure.  Bed Bath & Beyond has 78 wholly-owned subsidiary entities, 73 of which are Debtors in these Chapter 11 Cases, including 60 real estate special purpose subsidiaries, and four joint-venture entities that are non-Debtors.



As of the Petition Date, the Debtors had approximately $1.8 billion in total funded debt obligations consisting of approximately (a) $80.3 million in aggregate principal amount outstanding under the ABL Facility (*plus* $102.6 million of outstanding letters of credit), (b) $547.1 million in aggregate principal amount outstanding under the FILO Facility, (c) $1.03 billion in outstanding Senior Unsecured Notes spread across three separate issuances with varying maturity dates and interest rates, and (d) $61.5 million of aggregate capital lease obligations:

| ($ in millions) | Maturity | Principal |
|---|---|---|
| **Secured Debt Facilities** | | |
| ABL Facility | August 9, 2026 | $80.3 |
| FILO Facility | August 31, 2027 | $547.1 |
| Letters of Credit | — | $102.6 |
| Finance Leases | — | $61.5 |
| **Total Secured Debt** | | **$791.5** |
| **Unsecured Notes** | | |
| 3.749% Senior Notes due 2024 | August 1, 2024 | $215.4 |
| 4.915% Senior Notes due 2034 | August 1, 2034 | $209.7 |
| 5.165% Senior Notes due 2044 | August 1, 2044 | $604.8 |
| **Total Unsecured Debt** | | **$1,029.9** |
| **Total Funded Debt** | | **$1,821.4** |

1.      ABL and FILO Facilities

Bed Bath & Beyond Inc., as parent borrower, certain of its United States and Canadian subsidiaries, JPMorgan Chase Bank, N.A., as the prepetition ABL agent, Sixth Street, as the FILO Agent, and certain lenders, are parties to that certain Amended and Restated Credit Agreement, dated as of August 9, 2021.[8]  Over the course of the several amendments, the Prepetition Credit Agreement and the aggregate revolving commitments are permanently reduced from $1.13 billion to $300 million.  The Prepetition Credit Agreement also provides for a "first-in, last-out" term loan facility of $475 million.  The ABL Facility matures on August 9, 2026 (or on May 1, 2024 if the 2024 Notes (as defined below) are outstanding on such date).  The FILO Facility matures on August 31, 2027 (or May 1, 2024 if the 2024 Notes (as defined below) are outstanding on such date).

The Prepetition Credit Facilities are secured on a first priority basis (subject to customary exceptions) on substantially all assets (other than certain real property or equipment located in the United States that is owned by, or leased to, the Company or any of its subsidiaries exceeding a certain threshold) of Bed Bath & Beyond and its subsidiaries that are borrowers or guarantors under the Prepetition Credit Facilities.   Amounts available to be drawn from under the ABL Facility (including, in part, in the form of the issuance of letters of credit) are equal to the lesser of (i) outstanding revolving commitments under the Prepetition Credit Agreement and (ii) a borrowing base.  The term loans under the FILO Facility are also subject to a borrowing base.

---

[8]      As amended by the First Amendment to the Amended and Restated Credit Agreement, dated as of August 31, 2022, as further amended by the Second Amendment to the Amended and Restated Credit Agreement, dated as of February 7, 2023, as further amended by the Third Amendment to the Amended and Restated Credit Agreement and Waiver, dated as of March 6, 2023, as further amended by the Fourth Amendment to the Amended and Restated Credit Agreement and Waiver, dated as of March 30, 2023, as further amended by the Fifth Amendment to the Amended and Restated Credit Agreement, dated as of April 6, 2023, as further amended by the Sixth Amendment to the Amended and Restated Credit Agreement, dated as of April 20, 2023 and as may otherwise be amended, restated, supplemented, or otherwise modified from time to time (the "Prepetition Credit Agreement").

As of the Petition Date, $547.1 million in borrowings remained outstanding under the FILO Facility. Upon entry of the Interim DIP Order, $200 million in amounts outstanding under the FILO Facility were "rolled up" and converted to DIP Obligations.

### 2.    Unsecured Bonds

Bed Bath & Beyond, Inc. is also obligated under the following three tranches of unsecured debt securities:

- **3.479% senior notes due 2024 (the "2024 Notes")**. On July 17, 2014, Bed Bath & Beyond issued $300 million of 3.478% senior unsecured notes due August 1, 2024 (approximately $215.4 million of which remains outstanding as of the Petition Date). No other Debtor guarantees or is otherwise obligated under the notes.

- **4.915% senior notes due 2034 (the "2034 Notes")**. On July 17, 2014, Bed Bath & Beyond issued $300 million of 4.915% senior unsecured notes due August 1, 2034 (approximately $209.7 million of which remains outstanding as of the Petition Date). No other Debtor guarantees or is otherwise obligated under the senior notes.

- **5.165% senior notes due 2044 (the "2044 Notes")**. On July 17, 2014, Bed Bath & Beyond issued $900 million of 5.165% senior unsecured notes due August 1, 2044 (approximately $604.8 million of which remains outstanding as of the Petition Date). No other Debtor guarantees or is otherwise obligated under the notes.

### 3.    Finance Leases

The Company executed the Dedicated Warehousing Agreement, dated as of July 2021, by and between Bed Bath & Beyond Inc. and Ryder and that Service Agreement, dated as of July 9, 2021 and any corresponding Statement of Works (the "DWA") to provide the Company with warehousing and logistics services at warehouse locations specific to the Frackville, Pennsylvania location.

The Company executed that certain Industrial Lease Agreement, dated as of April 2021, by and between Bed Bath & Beyond Inc. and NP New Castle, LLC (the "ILA" and together with the DWA, the "Finance Leases") for the lease of the premises with all of the related improvements, all located in Frackville, Pennsylvania for distribution, warehousing, and general office use. As of the Petition Date, approximately $61.5 million remains outstanding under the Finance Leases.

### 4.    Equity Interests

As of the Petition Date, Bed Bath & Beyond has 180 shares of Preferred Stock. Shares of Bed Bath & Beyond's common stock have traded on Nasdaq exchange under the symbol "BBBY." As of the Petition Date, approximately 739,056,836 shares of voting common shares were outstanding.

## VI.    EVENTS LEADING TO THE CHAPTER 11 FILINGS

### A.    Early Signs of Business Deterioration

In January 2014, Bed Bath & Beyond's stock hit an all-time high of $80 per share.  That zenith, however, was quickly followed by a volatile period.  By 2018, the stock had fallen to $14 per share, erasing $15 billion in value.  Much of this diminution came as Bed Bath & Beyond struggled to keep up with its rivals, who previously invested heavily in both stores and e-commerce capabilities.  In addition, Bed Bath & Beyond's costs steadily increased, leading operating margins to decline from 16.5% in fiscal 2011 to less than 4% in fiscal 2018.  In early 2019, the Company reported its seventh consecutive quarter of declining same-store sales and reported its first annual loss and sales decline in its nearly three decades as a public company, with profit plunging 48% year-over-year.  Furthermore, its supply chain and method of product development and selection were outdated and supported by old systems.

Like many other major retailers, Bed Bath & Beyond also succumbed to macroeconomic and industry pressures, failing to expeditiously adapt to changing consumer shopping behavior.  In March 2019, in response to voiced dissatisfaction by a group of activist investors, Bed Bath & Beyond overhauled its board of directors, and CEO Steven Temares stepped down, ending his 16-year tenure.  The Company hired 30-year retail veteran Mark Tritton as CEO in 2019 and attempted to implement strategies for developing private-label brands.  Bed Bath & Beyond's new vision was a digital-first, customer-focused omnichannel retailer with a more curated, inspirational, and differentiated product collection across categories.

Unfortunately, this strategy proved to be unsuccessful.  Traffic, market share, and important customer programs, such as loyalty and registry, were impacted as the Company's infrastructure failed to support the pace of change, and the transformation strategy overwhelmed Bed Bath & Beyond's supply chain.  This self-inflicted internal disruption coincided with the unprecedented disruption of the COVID-19 pandemic, which was wreaking havoc on brick-and-mortar retailers across the globe.  In addition to imposing health and safety issues, the pandemic further exacerbated the Company's supply chain problems, serving as the driving force behind inflationary pressures that led to higher inventory costs and reductions in consumer discretionary spending.  Bed Bath & Beyond's massive shift towards private-label brands resulted in longer lead times to produce and ship to stores when compared to the more easily accessible national brands.

Despite these headwinds, in late 2020, Bed Bath & Beyond announced plans to buy back $675 million of its common stock, which included an immediate $225 million accelerated share repurchase program (the "ASR Program") and additional buybacks of up to $450 million.  The Company became increasingly aggressive about its share buyback plans and increased its total buyback target from $675 million to $825 million in December 2020, and again to $1 billion in April 2021, even though Bed Bath & Beyond's finances and overall economic trends among retail companies were weakened by the pandemic.  In November 2021, the Company confirmed that it would complete the full $1 billion ASR Program by the end of fiscal 2021, rather than over the proposed three-year period.  Bed Bath & Beyond's accelerated ASR Program caused some concerns amongst its merchandise suppliers, with vendors fearing the Company would not have

enough cash on hand to pay them in full, resulting in some vendors scaling back their business with Bed Bath & Beyond.

Around this time, Bed Bath & Beyond became part of the "meme-stock" movement started on Reddit boards and social media websites and fueled by disclosure of investment firm RC Ventures LLC's 9.8% stake in Bed Bath & Beyond. Ryan Cohen, known "meme investor" and head of RC Ventures LLC, sought to turn Bed Bath & Beyond into another GameStop or AMC meme-stock beneficiary. RC Ventures LLC sent a letter criticizing the Company's strategy, pushing for strategic changes, including selling off its buy buy BABY banner, and exploring a sale of the entire company. Weeks later, Bed Bath & Beyond came to an agreement with the activist firm, agreeing to add three directors of RC Ventures LLC's choosing to the Board.

While lower traffic affected Bed Bath & Beyond's ability to capture in-store sales, the Company was also operating under the unprecedented supply chain conditions that impacted global trade in 2021 and early 2022. The Company also implemented changes to its domestic distribution strategy—the network through which product is delivered to stores. The distribution strategy was not equipped for these changes to the upstream supply chain, nor resilient in the face of the pandemic-related issues that occurred at the Port of Los Angeles, which severely affected many companies. As a result, Bed Bath & Beyond was unable to achieve sufficient levels of inventory to meet demand over the important 2021 holiday season, leading to frustrated customers and sharp declines in sales. During the third quarter of 2021, an estimated $100 million of sales were not fulfilled due to out-of-stocks and in the fourth quarter of 2021, an estimated $175 million of sales were not delivered. By the end of 2021, Bed Bath & Beyond reported net losses of $559.6 million, a decrease of approximately 14.8% compared to fiscal year 2020.

Vendors and licensees grew concerned by the pace and scale of changes the Company was undergoing. The Company's cash position forced management to limit the "open-to-buy"—which enables merchandisers to replenish inventory. After successive quarters of earnings misses and failing to meet targets, continuing share price decreases, and spiraling expenses, Mark Tritton was excused on June 29, 2022, and board member Sue Gove was named the interim CEO and subsequently appointed as permanent CEO.

## B.    New Leadership's Transformation Plan.

Under Gove's leadership, Bed Bath & Beyond realigned its executive leadership team to reflect a pivot in strategic priorities and completed a 20% reduction of its corporate and supply chain operations workforce. The Company took swift actions in its efforts to rebalance and improve inventory, including adjusting merchandise allocations to lead with customer preference, bringing back popular national brands, and introducing new, emerging direct-to-consumer brands. Bed Bath & Beyond exited one-third of its private-label brands and substantially reduced the breadth and depth of inventory across the remaining two-thirds private-label brands. The Company worked closely with supplier and vendor partners to ensure customers had access to a strong assortment of their favorite brands across both store and digital channels, even hosting a supplier event in Fall 2022 to both build new relationships and reinforce existing ones.

The Company initiated incremental store closures in its Bed Bath & Beyond banner with the ultimate goal of operating approximately 360 profitable stores, in addition to the approximately

120 buy buy BABY stores across the United States.  The Company closed unprofitable and marginally profitable stores and exited out of the Canadian market.  Furthermore, the Company began implementing significant selling, general, and administrative expense reductions to right-size its cost structure and took steps to further reduce its capital spending.

In the midst of implementing these transformation plans, in August 2022, a little over five (5) months after taking a stake in the company, RC Ventures LLC took advantage of a rally in Bed Bath & Beyond's stock price and announced the sale of its 9.5 million shares (or approximately 11.8% of then-outstanding shares).  The share value decreased 20% after Cohen revealed his plan to sell his stake and plummeted an additional 35% in after-hours trading once securities filings confirmed RC Ventures LLC's divesture.[9]

C.    **Holiday Season Default.**

By December 2022, the Company's stores were nearly 35% out of stock, and sales fell nearly 50% from the same period one year prior.  As a result, Bed Bath & Beyond triggered multiple events of default under its financing facilities, and, in December 2022, JPMorgan, in its capacity as prepetition ABL agent, delivered two notices to the Company that added additional reserve amounts, lowered the advance rate (the "Reserve Notices"), and required the Company to provide weekly certifications of its borrowing base.

In January 2023, due to the "roll-forward" of the Company's inventory base following the holiday sales season, the Debtors had borrowed in excess of the permitted borrowing base under the Prepetition Credit Agreement.  As the Company worked through this issue, in mid-January, the Company failed to timely deliver the weekly borrowing base certificates and other related deliverables required under the Prepetition Credit Agreement and failed to comply with a fixed charge coverage ratio for the four-fiscal-quarter period ended November 26, 2022 (the "Events of Default").  Because of the liquidity situation and the continued decline in inventory level, the Company found itself in the position of a nearly $200 million overadvance under its Prepetition ABL Facility.

On January 23, 2023, advisors to JPMorgan informed the Debtors that, as a result of the ongoing Events of Default, a cash dominion period (the "Cash Dominion Period") had occurred, and JPMorgan delivered the applicable dominion notices.  On January 25, 2023, JPMorgan sent a notice of acceleration and default interest (the "Acceleration Notice") to the Debtors as a result of the ongoing Events of Default.  The Acceleration Notice notified the Debtors that:  (i) the principal amount of the Prepetition Credit Facilities, together with accrued interest thereon, a FILO premium and all fees and other obligations under the Prepetition Credit Agreement, were due and payable immediately, (ii) the Debtors were required to cash collateralize letters of credit, and (iii) the interest rates under the Prepetition Credit Agreement were raised by 2%.

---

[9]    Later, Bed Bath & Beyond, Cohen, and the late CFO Gustavo Arnal were named in a $1.2 billion shareholder class-action securities fraud complaint.  The complaint alleged the defendants "engaged in a fraudulent scheme to artificially inflate the price of BBBY publicly traded stock" by "blatantly" misrepresenting "the value and profitability of BBBY" and making false and misleading Securities and Exchange Commission filings.

### D.    Exhaustive Exploration of Strategic Alternatives

#### 1.    Early Efforts:  FILO Facility, Exchange Offer, and August ATM

On August 31, 2022, Bed Bath & Beyond secured financing commitments for more than $500 million, including its newly expanded $1.13 billion Prepetition ABL Facility and the new $375 million FILO Facility.  The FILO Facility was part of Bed Bath & Beyond's strategy to increase its liquidity to re-engage with former vendors and suppliers.  To implement Bed Bath & Beyond's refocus on national brands and win back lost customers, the Company needed to repair the strained relationships with its vendors.

On October 18, 2022, Bed Bath & Beyond developed a series of prospective debt exchange transactions designed to strengthen its balance sheet by addressing a 2024 debt maturity and seeking to delever its long-term unsecured debt.  The Company believed these transactions would provide a comprehensive solution that offered the best path forward for the future of the Company.

Bed Bath & Beyond offered to exchange its 2024 Notes, 2034 Notes, and 2044 Notes (collectively, the "Existing Notes") for New Secured Notes[10] (collectively, the "Exchange Offers").  Holders of the 2024 Notes would have the option to exchange their 2024 Notes for New Second Lien Non-Convertible Notes, or New Second Lien Convertible Notes while Holders of the 2034 Notes and the 2044 Notes would have the option to exchange for New Third Lien Convertible Notes.

The original deadline for participating in the Exchange Offers was November 15, 2022, which was extended multiple times.  Ultimately, after failing to satisfy certain applicable conditions, Bed Bath & Beyond terminated the Exchange Offers on January 5, 2023.  None of the tendered Existing Notes were accepted, no consideration was paid, and all Existing Notes were promptly returned or credited back to their respective holders.

In August 2022, the Company also entered into an open market sale agreement with Jefferies LLC, as sales agent, to offer and sell up to 12,000,000 shares of common stock in an at-the-market (or "ATM") offering program generating aggregate gross proceeds of approximately $115 million from the program, which were used for general corporate purposes, including to drive immediate strategic priorities such as rebalancing the Company's assortment and inventory and reducing debt.

#### 2.    Heightened Corporate Governance

The Company appointed one independent and disinterested director—Carol Flaton—as disinterested director to Bed Bath & Beyond Inc. and two independent and disinterested directors—Pamela Corrie and Jonathan Foster—as disinterested directors or managers, as applicable, to the boards of directors or managers, as applicable, of certain of its direct and indirect

---

[10]    The New Secured Notes include 3.693% Senior Second Lien Secured Non-Convertible Notes due 2027 (the "New Second Lien Non-Convertible Notes"), new 8.821% Senior Second Lien Secured Convertible Notes due 2027 (the "New Second Lien Convertible Notes"), and new 12.000% Senior Third Lien Secured Convertible Notes due 2029 (the "New Third Lien Convertible Notes" or the "New Third Lien Secured Notes" and, together with the New Second Lien Non-Convertible Notes and the New Second Lien Convertible Notes, collectively the "New Secured Notes").

subsidiaries (the "Subsidiary Disinterested Directors" and together with Carol Flaton, the "Disinterested Directors"). The Board and each subsidiary board appointed the Disinterested Directors and vested them with the authority to, among other things: (i) review and act upon any matters pertaining to the restructuring in which a conflict exists between the Company and its shareholders, creditors, affiliates, or the Company's directors and officers (the "Conflict Matters"); (ii) investigate and determine whether any matter arising in the restructuring constitutes a Conflict Matter; and (iii) conduct all investigations and analyses related to the Conflict Matters.

### 3.    Prepetition Marketing Efforts

Beginning in December 2022, Lazard Frères & Co. LLC ("Lazard") commenced a process to solicit interest in a going concern sale transaction that could be effectuated in chapter 11, as well as to solicit interest in providing postpetition financing. Lazard initially reached out to a group of potential financial and strategic investors who are experienced in investing in the retail sector, operational turnarounds and/or distressed situations and held meetings with certain of those investors in late December 2022. This initial group was comprised of approximately twenty (20) investors, nine of which had executed nondisclosure agreements ("NDAs") by the second week of January 2023. Those parties included various financial sponsors, strategic buyers, and money center banks. Several of the parties contacted could have potentially been acquirors of some or all of the Company's businesses, as well as providers of postpetition financing to fund a going concern reorganization.

In mid-January 2023, efforts to identify a potential plan sponsor and investors to provide postpetition financing intensified, the universe of potential investors that Lazard engaged with expanded, and diligence continued. The Company also received unsolicited inbounds from potential third-party financing sources who had some level of interest in potentially providing postpetition financing. By the end of the month, it became apparent that the process was unlikely to yield a plan sponsor that would facilitate a going-concern reorganization. By that time, Lazard had engaged with approximately sixty (60) potential investors to solicit interest in serving as a plan sponsor, acquiring some or all of the Debtors' assets or businesses, or providing postpetition financing, and thirty (30) of those parties had executed NDAs.

### 4.    February 2023 Equity Raise

In connection with the Debtors' evaluation of strategic and financial alternatives, Hudson Bay Capital Management, LP ("Hudson Bay") expressed interest in providing the Debtors with substantial equity financing in light of the Company's depressed share price and continued trading volatility. After extensive and difficult negotiations with Hudson Bay and the Prepetition Secured Lenders, the Debtors closed an underwritten public offering of (i) shares of the Series A convertible preferred stock (the "Preferred Stock"), (ii) warrants to purchase shares of Series A Convertible Preferred Stock (the "Preferred Stock Warrants") and (iii) warrants to purchase Common Stock on February 7, 2023 (collectively, the "Offering").

The Company received gross proceeds of approximately $225 million on the closing date of the Offering and had the opportunity to receive up to an additional approximately $800 million of gross proceeds upon the forced exercise of the Preferred Stock Warrants. Between February 7, 2023 and March 27, 2023, holders of the Preferred Stock Warrants exercised their

rights for aggregate gross proceeds to the Company of $135,014,000. In total, the Company received approximately $360,000,000 of aggregate gross proceeds in connection with the Offering.

Concurrently, the Debtors and the Prepetition Secured Lenders entered into a waiver and amendment to the Amended Credit Agreement (the "Second Amended Credit Agreement"), pursuant to which the Prepetition Secured Lenders agreed to (i) waive the outstanding Events of Default under the credit facilities; and (ii) rescind the implementation of Acceleration Notice and the default interest owed on outstanding obligations. The Second Amended Credit Agreement also extended the Cash Dominion Period until all obligations were paid in full and all outstanding commitments were terminated and decreased the total revolving commitment from approximately $1.13 billion to $565 million and provided for an increase of $100 million in the FILO facility (the "FILO Upsize") from $375 million to $475 million.

While the Company had viewed the amount of potential proceeds from the Offering as sufficient to implement its transformation plan, unfortunately, under the terms of the Second Amended Credit Agreement, the Debtors were required to use the net proceeds from the initial closing of the Offering and the FILO Upsize to repay outstanding revolving loans under the Debtors' Prepetition ABL Facility, including repayment of the nearly $200 million overadvance. At this point, the Company's sales had dropped 60% on a comparable store basis, resulting in substantial ongoing losses from operation. Therefore, the remaining Offering proceeds went to cover operational losses rather than to restoring inventory levels.

The Company needed real runway to turn around its inventory and liquidity position, which the Offering ultimately did not provide. The Offering had the effect of diluting the Company's common stock and reducing the share price, quickly jeopardizing the Company's ability to meet the conditions, including maintaining a minimum share price, to force the exercise of the Preferred Stock Warrants in the future and continue to raise capital per the terms of the Preferred Stock Warrants. In an effort to maintain access to the liquidity provided by the Preferred Stock Warrants, on March 14, 2023, the Debtors amended its Preferred Stock Warrants to temporarily adjust the minimum price threshold to $1.00 until April 3, 2023. This amendment was intended to further facilitate up to $100 million of additional funding in April 2023, for a cumulative total of $460 million. But the stock continued to slide, and the Debtors had no certainty they would continue to maintain access to the liquidity provided by the Preferred Stock Warrant. In response, on March 30, 2023—after raising an aggregate of $360 million in connection with the Offering—the Debtors terminated the Offering.

## 5.   B. Riley ATM Offering

Concurrently with the exchange of the remaining Preferred Stock Warrants, the Company entered into a sales agreement with B. Riley Securities, Inc., as sales agent, to offer and sell up to $300 million of shares of its common stock from time to time through an ATM (the "B. Riley ATM Program"). In addition to the B. Riley ATM Program, B. Riley Principal Capital II, LLC entered into a common-stock purchase agreement and a registration rights agreement (collectively, the "Committed Equity Facility") with the Company for the offer and sale of additional shares of common stock. The net proceeds from the B. Riley ATM Program were used to prepay outstanding revolving loans under the Debtors' Prepetition ABL Facility and to cash

collateralize outstanding letters of credit, which resulted in new credit under the Debtors' Prepetition ABL Facility.

Additionally, on April 5, 2023, the Debtors entered into a new vendor consignment program (the "Consignment Program") with ReStore Capital ("ReStore").    Under the Consignment Program, ReStore agreed to purchase up to $120 million, on a revolving basis at any given time, of prearranged merchandise from the Debtors' key suppliers to supplement inventory levels already sold at Bed Bath & Beyond and buy buy BABY.    The Debtors hoped this capital-light solution would help them to strengthen their merchandise availability and fulfill their customer demands.    Unfortunately, this Consignment Program was not implemented due to additional lender constraints.

While the Offering and the B. Riley ATM Program provided much-needed cash infusions to temporarily avert a chapter 11 filing in February and March 2023, the Debtors' cash burn prevented them from implementing their anticipated long-term operational restructuring while satisfying their restrictive debt obligations.    The Debtors once again found themselves in an untenable liquidity position, necessitating the commencement of these Chapter 11 Cases.

6.    DIP Financing and Administration of the Wind-Down Process

The Debtors' management team and advisors determined that it was appropriate to close and wind down all 475 then-remaining brick-and-mortar stores.    To fund the additional costs associated with the administration of an orderly wind down, the Debtors recommenced a marketing process to solicit proposals for debtor-in-possession financing.    These efforts culminated in the DIP Facility, which funds the Debtors' working capital needs and the chapter 11 process.

Sixth Street, together with any other parties that may become a party to the DIP Credit Agreement, agreed to provide the DIP Facility.    While the Debtors approached numerous potential providers of debtor-in-possession financing, no viable third-party postpetition financing sources were available to the Debtors.    In the absence of workable third-party financing proposals, and in light of the requirement under the Prepetition Credit Agreement to secure the support of both Sixth Street and the ABL Lenders for any postpetition financing, the Debtors pushed the DIP Lenders to reach consensus on a combined proposal.    Following round-the-clock, hard-fought negotiations, the Debtors and the DIP Lenders agreed upon the terms of a debtor-in-possession financing in the form of senior secured postpetition financing on a superpriority basis under (1) a new money single draw term loan facility consisting of $40 million, and (2) a roll-up of Prepetition FILO Secured Obligations in the amount of $200 million.

Critically, the liquidity provided by the DIP Facility provided the Debtors' customers, vendors, and employees with comfort that the Debtors will continue to operate in the ordinary course of business during these Chapter 11 Cases.    Moreover, the DIP Facility provides for several reserves that will be used to fund costs associated with (a) allowed undisputed and unpaid administrative expense claims; (b) the orderly wind-down of the Debtors' businesses; and (c) obligations arising under the Worker Adjustment and Retraining Notification Act and state law equivalents.    Absent the creation of such funds, the Debtors' pathway to a successful emergence from the Chapter 11 Cases would be uncertain.

## VII.    EVENTS OF THE CHAPTER 11 CASES

### A.    First Day and Second Day Relief.

On the Petition Date, after each Debtor filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "Petitions"), the Debtors filed various motions (the "First Day Motions") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations, by, among other things, easing the strain on the Debtors' relationships with employees, vendors, and customers following the commencement of the Chapter 11 Cases.  A brief description of each of the First Day Motions and the evidence in support thereof is set forth in the *Declaration of Holly Etlin, Chief Restructuring Officer and Chief Financial Officer of Bed Bath & Beyond Inc., in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 10], filed on the Petition Date.  As of the date hereof, the Bankruptcy Court has entered final orders authorizing the relief sought in each of the First Day Motions.

The First Day Motions, Petitions, and all entered orders for relief in the Chapter 11 Cases, can be viewed free of charge at https://restructuring.ra.kroll.com/bbby.

### B.    Retention of the Debtors' Professionals.

To assist the Debtors in carrying out their duties as debtors in possession and to otherwise represent the Debtors' interests in the Chapter 11 Cases, the Debtors filed applications requesting that the Bankruptcy Court authorize the Debtors to retain and employ the following advisors pursuant to sections 327, 328, and 363 of the Bankruptcy Code, as applicable:  (a) Kirkland & Ellis, LLP and Kirkland & Ellis International LLP, as co-counsel to the Debtors; (b) Cole Schotz P.C., as co-counsel to the Debtors; (c) Lazard Frères & Co. LLC, as investment banker to the Debtors; (d) AP Services, LLC, as restructuring advisor to the Debtors; (e) A&G Realty Partners, LLC, as real estate consultant and advisor to the Debtors; (f) Jones Lang LaSalle Americas, Inc., as real estate advisors and consultant to the Debtors; and (g) Kroll Restructuring Administration, LLC, as administrative advisor to the Debtors.  Concurrently with the application requesting authorization to retain AP Services, LP, the Debtors sought entry of an order designating Holly F. Etlin, Partner and Managing Director of AlixPartners, LLP, as the Debtors' Chief Restructuring Officer and Chief Financial Officer.  The Bankruptcy Court entered orders approving the retention of these advisors from June 2, 2023 through June 15, 2023 [Docket Nos. 605, 606, 615–617, 676, 730].

### C.    Schedules and Statements

On April 23, 2023, the Debtors filed a motion [Docket No. 9] seeking entry of an order granting an extension of time through and including May 30, 2023, to file their schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "Schedules and Statements").  On April 25, 2023, the Bankruptcy Court entered a final order approving this extension motion [Docket No. 99].  On May 30, 2023, the Debtors filed their Schedules and Statements [Dockets No. 499–568; 570–73].

D.      **Appointment of Official Committee**

On May 5, 2023, the U.S. Trustee filed the *Notice of Appointment of Official Committee of Unsecured Creditors* [Docket No. 218], notifying parties in interest that the U.S. Trustee had appointed a statutory committee of unsecured creditors in the Chapter 11 Cases. The Debtor held a meeting of creditors pursuant to section 341 of the Bankruptcy Code on June 5, 2023. The Creditors' Committee selected Pachulski Stang Ziehl & Jones LLP to serve as its legal counsel and Alvarez and Marsal North America LLC as financial advisor. The Creditors' Committee currently consists of seven members: Ryder Integrated Logistics, Inc.; Bank of New York Mellon; Intersoft Data Labs Inc.; KDM P.O.P. Solutions Group; Shark Ninja Operating LLC; Lenox Corporation; and SITE Centers Corp.

E.      **Sale Process and Bidding Procedures**

The Debtors, with the assistance of Lazard, conducted a marketing process for all or substantially all of their assets that began in December 2022. In total, Lazard contacted approximately 100 potential investors, over 50 of which executed NDAs. These selected counterparties included various financial sponsors, strategic buyers, and money center banks that could have become potential acquirers of some or all of the Debtors' businesses and/or providers of postpetition financing. Ultimately, however, the Debtors found themselves in an untenable liquidity position that necessitated the commencement of these Chapter 11 Cases.

Pursuant to the Bidding Procedures Order, the Debtors filed a notice on June 13, 2023, selecting Overstock.com, Inc. as the Stalking Horse Bidder (as defined in the Bidding Procedures). The deadline for interested parties to submit binding Qualified Bids (as defined in the Bidding Procedures) to participate in the Auction (as defined in the Bidding Procedures) was June 16, 2023 at 12:00 p.m. (prevailing Eastern Time). The Auction (as defined in the Bidding Procedures) for the intellectual property assets associated with the Debtors' Wamsutta brand (the "Wamsutta Asset") and the ownership rights in and to the domain name BEYOND.com (the "Beyond.com Asset") took place on June 21, 2023 at 10:00 a.m. (prevailing Eastern Time) at the offices of Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York, 10022. The Debtors subsequently filed a notice identifying Overstock.com, Inc. as the Successful Bidder for the Wamsutta Asset and the Beyond.com Asset on June 22, 2023 and announced their intention to seek approval of the sale transaction with Overstock.com, Inc. at a sale hearing before the Honorable Judge Papalia at the United States Bankruptcy Court for the District of New Jersey on June 27, 2023 at 2:30 p.m. (prevailing Eastern Time). At the hearing, the Bankruptcy Court considered approval of the winning bid and consummation of the sale and, on June 28, 2023, entered an order approving the sale transaction [Docket No. 1117].

On June 28, 2023, the Debtors conducted an Auction (the "BABY IP Auction") at the offices of Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York, 10022, solely with respect to the intellectual property assets related to the Debtors' buy buy BABY brand (the "BABY IP Assets"). On June 29, 2023, the Debtors filed a notice, which provided for, among other things, (a) the selection of Dream on Me as the initial winning bidder of the BABY IP Assets, (b) the execution of an asset purchase agreement, attached thereto, between the Debtors and Dream on Me, and (c) the date of a sale hearing at which the Bankruptcy Court would examine the contemplated sale of BABY IP Assets to Dream on Me. On July 11, 2023, the Bankruptcy Court

approved the sale BABY IP Assets to Dream on Me for approximately $15.5 million [Docket No. 1314].

On July 19, 2023, the Debtors filed a notice, disclosing entry into an asset purchase agreement with Harmon Retail Holdings, LLC (the "Harmon APA"), which contemplates the sale of the intellectual property, customer lists, goodwill, royalties, and general intangible assets relating to the Debtors' Harmon and Face Values brands (the "Harmon Assets") for $200,000 in cash [Docket No. 1415].  On July 26, 2023, the Bankruptcy Court entered an order authorizing the Debtors' entry into the Harmon APA [Docket No. 1531].

## F.    Store Closing Process

On June 7, 2023, the Bankruptcy Court granted the Debtors' store closing motion on a final basis and approved a continuance of store closures in accordance with customary store-closing procedures, subject to the auction and sale process, assumption of the consulting agreements, customary store closing bonuses up to $1.6 million, and modifications to certain customer programs [Docket No. 641] (the "Store Closing Order").   On the Petition Date, the Debtors announced their intention to close the 473 stores (or "Wave 5") identified on Exhibit A attached to the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Assume the Consulting Agreements, (II) Authorizing and Approving the Conduct of Story Closing Sales, with Such Sales to be Free and Clear of All Liens, Claims, and Encumbrances, (III) Authorizing Customary Bonuses to Employees of Closing Stores, and (IV) Granting Related Relief* [Docket No. 28].

## G.    Treatment of Unexpired Leases.

In the period leading up to the Petition Date, the Debtors determined that it was appropriate to close and wind down any remaining brick-and-mortar stores and, accordingly, began to analyze their unexpired leases to determine how best to maximize value from such leases.   On May 17, 2023, the Bankruptcy Court entered an order authorizing the rejection of approximately 476 unexpired leases [Docket No. 373].   Additionally, on May 17, 2023, the Bankruptcy Court entered an order approving certain procedures solely for the rejection of executory contracts and unexpired leases [Docket No. 382] (the "Rejection Procedures").  Pursuant to the Rejection Procedures and certain other individual motions, the Debtors have, as of the date hereof, rejected an additional 807 unexpired leases.

On May 22, 2023, the Bankruptcy Court entered an order establishing procedures (the "Lease Sale Procedures") whereby the Debtors could sell certain of their non-residential real property lease assets (the "Lease Assets") through an auction process [Docket No. 422] (the "Lease Sale Procedures Order").   The Lease Sale Procedures authorized the Debtors to conduct two separate auctions for Lease Assets, the Phase 1 Lease Auction and Phase 2 Lease Auction, respectively.   The Debtors, with the assistance of A&G, marketed hundreds of Lease Assets for the Phase 1 Lease Auction and negotiated with countless potentially interested parties.

Pursuant to the Lease Sale Procedures Order and related materials, the deadline by which the Debtors could select a Stalking Horse Bidder (as defined in the Lease Sale Procedures) was June 20, 2023 at 5:00 p.m. (prevailing Eastern Time) for the Phase 1 Lease Auction and was

July 10, 2023 at 5:00 p.m. (prevailing Eastern Time) for the Phase 2 Lease Auction. The deadline for interested parties to submit binding Qualified Bids (as defined in the Lease Sale Procedures) was June 22, 2023 at 5:00 p.m. (prevailing Eastern Time) to participate in the Phase 1 Lease Auction and was July 13, 2023 at 5:00 p.m. (prevailing Eastern Time) to participate in the Phase 2 Lease Auction. The Phase 1 Lease Auction took place on June 26, 2023 at 10:00 a.m. (prevailing Eastern Time), and the Phase 2 Lease Auction took place on July 19, 2023 at 10:00 a.m. (prevailing Eastern Time) at the offices of Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York, 10022. The Debtors filed a notice on June 24, 2023 reflecting their decision to proceed with the auction of certain lease assets associated with the Debtors' "buy buy BABY" banner (the "BABY Lease Assets") at the Phase 1 Lease Auction. The Debtors reserved their rights to condition the sale of any BABY Lease Asset on the outcome of the auction for "buy buy BABY" assets, which took place on June 28, 2023 at the offices of Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York, 10022. On June 27, 2023, the Debtors filed a notice identifying the Successful Bidder and Backup Bidder (both as defined in the Lease Sale Procedures) with respect to certain Lease Assets included in the Phase 1 Lease Auction [Docket No. 1114]. Hearings before the Bankruptcy Court to consider approval of any proposed Lease Sale (as defined in the Lease Sale Procedures) took place on July 18, 2023, July 28, 2023, and July 31, 2023 with respect to the Phase 1 Lease Auction.

On July 20, 2023, the Debtors filed a notice identifying the Successful Bidder and Backup Bidder (both as defined in the Lease Sale Procedures) with respect to certain Lease Assets included in the Phase 2 Lease Auction [Docket No. 1428]. A hearing to consider approval of any proposed Lease Sale with respect to the Phase 2 Lease Auction took place July 28, 2023.

The Debtors have also sought to assign certain unexpired leases outside the scope of the Lease Sale Procedures. On May 23, 2023, the Debtors filed the *Debtors' Motion for Entry of an Order Authorizing the Debtors to Assume and Assign Certain Unexpired Leases* [Docket No. 428], seeking to assign nine unexpired leases to World Market, LLC, which the Bankruptcy Court approved on June 15, 2023 [Docket No. 731]. On June 7, 2023, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Authorizing the Sale of Certain Unexpired Leases Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Approving Assumption and Assignment of Unexpired Leases; and (III) Granting Related Relief* [Docket No. 644], seeking to sell seven (7) unexpired leases to Burlington Coat Factory Warehouse Corporation and certain of its affiliates, which the Bankruptcy Court approved on June 27, 2023 [Docket No. 1099].[11]

### H.    Establishment of Claims Bar Dates.

On May 31, 2023, the Bankruptcy Court entered the *Order (I) Setting Bar Dates for Submitting Proofs of Claim, Including Requests for Payment Under Section 503(B)(9), (II) Establishing Amended Schedules Bar Date, Rejection Damages Bar Date, and Administrative Claims Bar Date, (III) Approving the Form, Manner, and Procedures for Filing Proofs of Claim, (IV) Approving Notice Thereof, and (V) Granting Related Relief* [Docket No. 584] (the "Bar Date Order"). The Bar Date Order sets forth bar dates by which certain entities holding Claims against

---

[11]    The Debtors sought to assign one of the eight leases to Burlington Coat Factory Warehouse Corporation through the *Debtors' Application in Lieu of Motion in Support of Entry of Stipulation and Consent Order (I) Modifying Lease Rejection Order, (II) Reinstating Lease, and (III) Approving Assumption and Assignment of Lease* [Docket No. 646].

Debtors that arose (or that are deemed to have arisen) prior to the Petition Date must file Proofs of Claim. The Bar Date Order established the following bar dates:

- **Claims Bar Date**: establishing **July 7, 2023** as the last date for each entity, except as otherwise provided in the Bar Date Order, to file a Proof of Claim based on a prepetition claim, including requests for payment under section 503(b)(9) of the Bankruptcy Code against any Debtor (the "Claims Bar Date");

- **Governmental Bar Date**: establishing **October 20, 2023** as the last date or each governmental unit to file a Proof of Claim against any Debtor (the "Governmental Bar Date");

- **Rejection Damages Bar Date**: solely as to claims arising from the Debtors' rejection of executory contracts and unexpired leases, **establishing the later of (a) the Claims Bar Date or the Governmental Bar Date**, as applicable; **(b) any date the Bankruptcy Court may set in the applicable order authorizing rejection of any executory contract or unexpired lease, and if no such date is provided, the date that is thirty (30) days following the date of entry of an order authorizing such rejection; and (c) the date that is thirty (30) days following the effective date of such rejection of the applicable executory contract or unexpired lease of the Debtors** as the last date by which each claimant holding a claim based upon such rejection must file a Proof of Claim against any Debtor (the "Rejection Damages Bar Date");

- **Amended Schedules Bar Date**: in the event that the Debtors amend their Schedules, **establishing the later of (a) the Claims Bar Date or the Governmental Bar Date, as applicable, and (b) the date that is thirty (30) days from the date on which the Debtors serve notice of the amendment to the Schedules,** as the last date by which each claimant holding a claim affected by such amendment must file a Proof of Claim against any Debtor (such later date, the "Amended Schedules Bar Date"); and

- **Administrative Claims Bar Date**: solely as to administrative expense claims asserted against the Debtors pursuant to section 503(b) of the Bankruptcy Code (the "Administrative Claims"), other than Professional Fee Claims, DIP Claims, and Administrative Claims arising pursuant to sections 503(b)(9) or 507(a)(2) of the Bankruptcy Code, **establishing the earlier of (a) (i) July 7, 2023, if such Administrative Claim was incurred through June 27, 2023; (ii) the fifteenth (15th) day of the month following the month in which an Administrative Claim arose, if such Administrative Claim was incurred after June 27, 2023; and (iii) July 21, 2023, solely for Administrative Claims asserted by counterparties to unexpired leases of non-residential real property, which leases have not been assumed, assumed and assigned, or rejected, whether such Administrative Claims were incurred before or after June 27, 2023, and (b) fourteen (14) days following the Effective Date** as the last date by which each claimant holding such Administrative Claim must

file a Proof of Claim against any Debtors (such applicable date, the "Administrative Claims Bar Date").

## I.    Final Approval of DIP Financing

On June 15, 2023, the Bankruptcy Court entered an order [Docket No. 729] approving, on a final basis, the relief requested in the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief.*

On June 26, 2023, an ad hoc group of bondholders filed a motion to reconsider and vacate the DIP Orders (the "Motion to Reconsider") [Docket No. 982] pursuant to rule 60(b) of the Federal Rules of Civil Procedure.  The DIP Lenders filed a letter opposing the Motion to Reconsider [Docket No. 1053], and the Debtors filed an objection to the Motion to Reconsider [Docket No. 1081].  In response, the Bankruptcy Court agreed to conduct an evidentiary hearing on June 28, 2023, at which the Bankruptcy Court would hear testimony and consider the arguments of counsel.  Following an all-day hearing, the Bankruptcy Court issued its ruling denying the Motion to Reconsider with prejudice [Docket No. 1131].

## J.    Litigation Matters

In the ordinary course of business, the Debtors are parties to certain lawsuits, legal proceedings, collection proceedings, and claims arising out of their business operations.  The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims.

With certain exceptions, the filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases.  In addition, the Debtors' liability with respect to litigation stayed by the commencement of the Chapter 11 Cases generally is subject to discharge, settlement, and release upon confirmation of a plan under chapter 11, with certain exceptions.  Therefore, certain litigation Claims against the Debtors may be subject to discharge in connection with the Chapter 11 Cases.

## VIII.  RISK FACTORS

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan.  Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.

## A.    Bankruptcy Law Considerations

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

1.      Parties in Interest May Object to the Plan's Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

2.      The Conditions Precedent to the Effective Date of the Plan May Not Occur

As more fully set forth in Article XII of the Plan, the Effective Date is subject to a number of conditions precedent.  If such conditions precedent are not met or waived, the Effective Date will not take place.

3.      The Debtors May Fail to Satisfy Vote Requirements

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek to pursue another strategy to wind down the Estates.  There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Plan.

4.      The Debtors May Not Be Able to Secure Confirmation of the Plan

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting Holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such Holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met.  If a chapter 11 plan is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize

their business and what, if anything, Holders of Allowed Claims against them would ultimately receive on account of such Allowed Claims.

Confirmation of the Plan is also subject to certain conditions as described in Article XII of the Plan. If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims will receive on account of such Allowed Claims.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting Class, as well as any Class junior to such non-accepting Class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

5.    Nonconsensual Confirmation

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the Proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the Bankruptcy Court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

6.    Continued Risk Upon Confirmation

There is no guarantee that a chapter 11 plan reflecting the Plan will achieve the Debtors' stated goals. In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code will give the Debtors the exclusive right to propose the Plan and will prohibit creditors and others from proposing a plan. The Debtors will have retained the exclusive right to propose the Plan upon filing their petitions for chapter 11 relief. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan in order to achieve the Debtors' stated goals.

Furthermore, even if the Debtors' debts are reduced and/or discharged through the Plan, the Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtors' business after the completion of the proceedings related to the Chapter 11 Cases. Adequate funds may not be available when needed or may not be available on favorable terms.

7.      The Chapter 11 Cases May Be Converted to Cases Under Chapter 7 of the Bankruptcy Code

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code.  In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time rather than reorganizing or selling in a controlled manner affecting the business as a going concern, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, and including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

8.      The Chapter 11 Cases Could Result in a "Structured Dismissal"

If the Confirmation or Consummation of the Plan does not occur, (a) the Plan shall be null and void in all respects other than as set forth in the Plan, (b) the Plan shall be deemed a motion seeking dismissal of these Chapter 11 Cases in accordance with the applicable provisions and priority scheme of the Bankruptcy Code, and (c) nothing contained in the Plan or this Disclosure Statement shall:  (1) constitute a waiver or release of any Claims by the Debtors, any Holders, or any other Entity; (2) prejudice in any manner the rights of the Debtors, any Holders, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders, or any other Entity in any respect.

9.      The Debtors May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection.  Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

10.     Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

11.     Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims.  The occurrence of any and

all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates.  Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement.  Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed.  Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

12.    Releases, Injunctions, and Exculpations Provisions May Not Be Approved

Article X of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, Wind-Down Debtors, or Released Parties, as applicable.  The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved.  If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

The releases provided to the Released Parties and the exculpation provided to the Exculpated Parties is necessary to the success of the Debtors' reorganization because the Released Parties and Exculpated Parties have made significant contributions to the Debtors' reorganizational efforts and have agreed to make further contributions, but only if they receive the full benefit of the Plan's release and exculpation provisions.  The Plan's release and exculpation provisions are an inextricable component of the Plan and the significant deleveraging and financial benefits that they embody.

13.    The Total Amount of Allowed Unsecured Claims May Be Higher than Anticipated by the Debtors

With respect to Holders of Allowed General Unsecured Claims, the claims filed against the Debtors' estates may be materially higher than the Debtors have estimated.

14.    The Total Amount of Allowed Administrative and Priority Claims May Be Higher than Anticipated by the Debtors

The amount of Cash the Debtors ultimately receive prior to and following the Effective Date may be lower than anticipated.  Additionally Allowed Administrative Claims and Allowed Priority Claims may be higher than anticipated.  Accordingly, there is a risk that the Debtors will not be able to pay in full in cash all Administrative Claims and Priority Claims on the Effective Date as is required to confirm a chapter 11 plan of reorganization.

65

15.    <u>Certain Tax Implications of the Plan</u>

Holders of Allowed Claims should carefully review Article XI of this Disclosure Statement, entitled "*Certain United States Federal Income Tax Consequences of the Plan*," to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Wind-Down Debtors and Holders of certain Claims.

**B.    Risks Related to the Wind-Down Debtors' Businesses**

1.    <u>The Debtors May Not Be Able to Generate Sufficient Cash to Service All of Their Indebtedness</u>

The Debtors' ability to make scheduled payments depends on the Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Debtors' control.  The Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit the Debtors to pay the principal, premium, if any, and interest on their indebtedness.

2.    <u>The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases</u>

For the duration of the Chapter 11 Cases, the Debtors' ability to continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy.  These risks include the following:  (a) the ability to develop, confirm, and consummate the liquidation transactions specified in the Plan or an alternative transaction; (b) the ability to obtain Bankruptcy Court approval with respect to motions filed in the Chapter 11 Cases from time to time; (c) the ability to maintain relationships with suppliers, service providers, customers, employees, vendors, and other third parties; (d) the ability to maintain contracts that are critical to the Debtors' operations; (e) the ability of third parties to seek and obtain Bankruptcy Court approval to terminate contracts and other agreements with the Debtors; (f) the ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways.  For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition.  Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities.  Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

3.      <u>The Wind-Down Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases</u>

The Debtors are currently subject to or interested in certain legal proceedings, which may adversely affect the Debtors.  In the future, the Wind-Down Debtors may become party to litigation.  In general, litigation can be expensive and time-consuming to bring or defend against.  Such litigation could result in settlements or judgments that could significantly affect the Wind-Down Debtors' financial results.  It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan.  It is not possible to predict the potential litigation that the Wind-Down Debtors may become party to, nor the final resolution of such litigation.  The impact of any such litigation on the Wind-Down Debtors' businesses and financial stability, however, could be material.

4.      <u>The Loss of Key Personnel Could Adversely Affect the Debtors' Operations</u>

The Debtors' operations are dependent on a relatively small group of key management personnel, including the Debtors' executive officers.  The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees.  As a result, the Debtors may experience increased levels of employee attrition.  The Debtors may be unable to find acceptable replacements with comparable skills and experience, and the loss of such key management personnel could adversely affect the Debtors' ability to operate their businesses.  In addition, a loss of key personnel or material erosion of employee morale could have a material adverse effect on the Debtors' ability to meet customer and counterparty expectations, thereby adversely affecting the Debtors' businesses and the results of operations.

5.      <u>Results of Wind-Down Sales May Not Meet Projections</u>

The Wind-Down sales may fail to meet projections due to the uncertainty of consumer demand and various macroeconomic conditions.  Decreased demand for retail and consumer goods during the Wind Down and over the next month would impact sales at the Debtors' remaining stores, which, in turn, would negatively impact the ability of the Debtors to sell inventory and complete the Wind Down.

## IX.    SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement is being distributed to the Holders of Claims in those Classes that are entitled to vote to accept or reject the Plan.  The procedures and instructions for voting and related deadlines are set forth in the exhibits annexed to the Disclosure Statement Order, which is attached hereto as **Exhibit B**.

**THE DISCLOSURE STATEMENT ORDER IS INCORPORATED HEREIN BY REFERENCE AND SHOULD BE READ IN CONJUNCTION WITH THIS DISCLOSURE STATEMENT AND IN FORMULATING A DECISION TO VOTE TO ACCEPT OR REJECT THE PLAN.**

> **THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS
> SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY**.
>
> PLEASE REFER TO THE DISCLOSURE STATEMENT
> ORDER ATTACHED HERETO FOR A MORE COMPREHENSIVE
> DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

### A.    Holders of Claims Entitled to Vote on the Plan

Under the provisions of the Bankruptcy Code, not all Holders of Claims and Interests against a Debtor are entitled to vote on a chapter 11 plan.  The table in Article III.D of this Disclosure Statement provides a summary of the status and voting rights of each Class (and, therefore, of each Holder within such Class absent an objection to the Holder's Claim or Interest) under the Plan.

As shown in the table, the Debtors are soliciting votes to accept or reject the Plan only from Holders of Claims in Classes 3, 4, 5, and 6 (the "Voting Classes").  The Holders of Claims in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan.  Accordingly, Holders of Claims in the Voting Classes have the right to vote to accept or reject the Plan.

The Debtors are *not* soliciting votes from Holders of Claims and Interests in Classes 1, 2, 7, 8, 9, or 10.  Additionally, the Disclosure Statement Order provides that certain Holders of Claims in the Voting Classes, such as those Holders whose Claims have been disallowed or are subject to a pending objection, are not entitled to vote to accept or reject the Plan.

### B.    Voting Record Date

**The Voting Record Date is July 28, 2023**.  The Voting Record Date (as defined in the Disclosure Statement Order) is the date on which it will be determined which Holders of Claims in the Voting Classes are entitled to vote to accept or reject the Plan and whether Claims have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the Holder of a Claim.

### C.    Voting on the Plan

**The Voting Deadline is September 1, 2023, at 4:00 p.m. (prevailing Eastern Time)**.  In order to be counted as votes to accept or reject the Plan, all ballots must be properly executed, completed, and delivered in accordance with the instructions on your ballot so that the ballots are **actually received** by the Debtors' Notice and Claims Agent on or before the Voting Deadline:

---

**DELIVERY OF BALLOTS**

**To submit your ballot[12] via the Notice and Claims Agent's online portal, please visit
https://restructuring.ra.kroll.com/bbby.  Click on the "Submit E-Ballot" section of the
website and follow the instructions to submit your ballot.  Hard copy ballots will not be
accepted, and electronic ballots will not be accepted by facsimile or electronic means (other
than the online portal) for all Claims other than the Class 6 2014 Senior Unsecured Notes
Claims.**

**Holders of Class 6 2014 Senior Unsecured Notes Claims, or their Nominees, may only submit
the respective ballot or master ballot via hard copy or electronic mail submission, as further
described in the instructions on the applicable ballot and master ballot.**

---

      **D.**     **Ballots Not Counted**

      **No ballot will be counted toward Confirmation if, among other things**:  (1) any ballot
that is illegible or contains insufficient information to permit the identification of the Holder of
such Claim; (2) any ballot cast by any Entity that does not hold a Claim in a Voting Class; (3) any
ballot cast for a Claim scheduled as unliquidated, contingent, or disputed for which no Proof of
Claim was timely filed by the Voting Record Date (unless the applicable bar date has not yet
passed, in which case such Claim shall be entitled to vote in the amount of $1.00); (4) any unsigned
ballot or ballot lacking an original signature (for the avoidance of doubt, a ballot submitted via the
Notice and Claims Agent online balloting portal shall be deemed an original signature); (5) any
ballot not marked to accept or reject the Plan or marked both to accept and reject the Plan; and
(6) any ballot submitted by any Entity not entitled to vote pursuant to the procedures described
herein.  **Please refer to the Disclosure Statement Order for additional requirements with
respect to voting to accept or reject the Plan.**

---

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING
PROCESS, PLEASE CONTACT THE NOTICE AND CLAIMS AGENT AT**

**(833) 570-5355 (Toll Free)
(646) 440-4806 (International)**

**ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE
NOT IN COMPLIANCE WITH THE SOLICITATION ORDER WILL <u>NOT</u> BE
COUNTED.**

---

**X.**     **CONFIRMATION OF THE PLAN**

      **A.**     **Requirements for Confirmation of the Plan**

      Among the requirements for Confirmation of the Plan pursuant to section 1129 of the
Bankruptcy Code are:  (1) the Plan is accepted by all Impaired Classes of Claims, or if rejected by

---

[12]    Beneficial Holders of Claims must follow the instructions provided to them by their Nominees on how to submit their ballots.

an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of Holders of Claims and Interests.

At the Combined Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that:  (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11; and (3) the Plan has been proposed in good faith.

### B.    Best Interests of Creditors

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or an equity interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtors liquidated under chapter 7.

The Debtors believe that the Plan will satisfy the best interests test because, among other things, the recoveries expected to be available to Holders of Allowed Claims and Interests under the Plan will be greater than the recoveries expected to be available in a chapter 7 liquidation, as discussed more fully below.

In a typical chapter 7 case, a trustee is elected or appointed to liquidate a debtor's assets and to make distributions to creditors in accordance with the priorities established in the Bankruptcy Code.  Generally, secured creditors are paid first from the proceeds of sales of their collateral.  If any assets remain in the bankruptcy estate after satisfaction of secured creditors' claims from their collateral, administrative expenses are next to be paid.  After accounting for administrative expenses, unsecured creditors (including any secured creditor deficiency claims) are paid from the sale proceeds of any unencumbered assets and any remaining sale proceeds of encumbered assets in excess of any secured claims, according to their respective priorities. Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the total amount of allowed claims held by all unsecured creditors with the same priority.  Finally, interest holders receive the balance that remains, if any, after all creditors are paid.

All or substantially all of the assets of the Debtors' business will be liquidated through the Asset Sale Transaction, and the Plan effects a Wind Down of the Debtors' remaining assets not otherwise acquired in the Asset Sale Transaction.  Although a chapter 7 liquidation would achieve the same goal, the Debtors believe that the Plan provides a greater recovery to Holders of Claims than a chapter 7 liquidation would.  Liquidating the Debtors' Estates under the Plan likely provides Holders of Claims with a larger, more timely recovery, primarily due to expected materially lower realized sale proceeds in chapter 7.

A chapter 7 liquidation beginning on what would have been the Effective Date would provide less recovery for creditors than the Plan.  The delay of the chapter 7 trustee becoming

familiar with the assets could easily cause bids already obtained to be lost, and the chapter 7 trustee will not have the technical expertise and knowledge of the Debtors' businesses that the Debtors had when they proposed to sell their assets and commence the Wind Down. Moreover, the distributable proceeds under a chapter 7 liquidation will be lower because of the chapter 7 trustee's fees and expenses.

Sale proceeds in chapter 7 would likely be significantly lower particularly in light of the time delay associated with the chapter 7 trustee's learning curve for these assets. In addition to the expected material reduction in sale proceeds, recoveries would be further reduced (in comparison with the Plan) due to the expenses that would be incurred in a chapter 7 liquidation, including added expenses for wind down costs and costs incurred by the chapter 7 trustee and any retained professionals in familiarizing themselves with the Debtors' assets, and these specific Chapter 11 Cases, in order to complete the administration of the Estates. *See, e.g.*, 11 U.S.C. § 326(a) (providing for compensation of a chapter 7 trustee up to three percent of the value of the assets); 11 U.S.C. 503(b)(2) (providing administrative expense status for compensation and expenses of a chapter 7 trustee and such trustee's professionals).

The Debtors' Estates would continue to be obligated to pay all unpaid expenses incurred by the Debtors during the Chapter 11 Cases (such as compensation for Professionals), which may constitute Allowed Claims in any chapter 11 case. Moreover, the conversion to chapter 7 would also require entry of a new bar date for filing claims that would be more than ninety (90) days following conversion of the case to chapter 7. See Fed. R. Bankr. P. 1019(2); 3002(c). Thus, the amount of Claims ultimately filed and Allowed against the Debtors could materially increase, thereby further reducing creditor recoveries versus those available under the Plan.

In light of the foregoing, the Debtors submit that a chapter 7 liquidation would result in materially reduced sale proceeds, increased expenses, delayed distributions, and the prospect of additional claims that were not asserted in the Chapter 11 Cases. Accordingly, the Debtors believe that the Plan provides an opportunity to bring the highest return for creditors.

### C.    Feasibility

The Bankruptcy Code requires that a chapter 11 plan provide for payment in full of all administrative and priority claims unless holders of such claim consent to other treatment. Each Holder of an Allowed Other Priority Claim will receive payment in full in Cash or other treatment rendering such claim Unimpaired, unless such Holder agrees to less favorable treatment. The Debtors therefore believe that the Plan is feasible.

### D.    Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[13]

---

[13] A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the holder of such claim or equity

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by Holders of at least two-thirds in a dollar amount and more than one-half in a number of Allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually cast their ballots in favor of acceptance.

### E.      Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided*, *however*, the plan has been accepted by at least one (1) impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan Proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors will request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

### 1.      No Unfair Discrimination

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same or equivalent, but that treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. A plan could treat two (2) classes of unsecured creditors differently without unfairly discriminating against either class.

### 2.      Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in the class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and

---

interest or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

satisfies the "fair and equitable" requirement.  With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank.  The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

## XI.     CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.     Introduction

The following discussion summarizes certain United States ("U.S.") federal income tax consequences of the implementation of the Plan to the Debtors, the Wind-Down Debtors, and certain Holders of Claims.  This summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions and published administrative rules, and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof (collectively, "Applicable Tax Law").  Changes in the rules or new interpretations of the rules may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below.  Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below.  The Debtors have not requested, and do not intend to request, any ruling or determination from the IRS or any other taxing authority with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or the courts.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This summary does not address foreign, state, local, or non-income tax consequences of the Plan (*e.g.*, U.S. federal gift or estate tax or the 3.8% Medicare tax on net investment income), nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a Holder in light of its individual circumstances or to a Holder that may be subject to special tax rules (such as Persons who are related to the Debtors within the meaning of the Tax Code, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, pass-through entities, beneficial owners of pass-through entities, trusts, governmental authorities or agencies, dealers and traders in securities, subchapter S corporations, persons using a mark-to-market method of accounting, and Holders of Claims who are themselves in bankruptcy).  Furthermore, this summary assumes that a Holder of a Claim holds only Claims in a single Class and holds a Claim only as a "capital asset" (within the meaning of section 1221 of the Tax Code).  This summary also assumes that the various debt and other arrangements to which any of the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form, and that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the Tax Code.  This summary does not discuss differences in tax consequences to Holders of Claims that act or receive consideration in a capacity other than any other Holder of a Claim of the same Class or Classes, and the tax consequences for such Holders may differ materially from that described below.  This summary also does not address the U.S. federal income tax consequences to Holders that are not Holders of Class 3, Class 4, Class 5, or Class 6 Claims.

For purposes of this discussion, a "U.S. Holder" is a Holder of a Claim that is: (1) an individual who is a citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (A) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one (1) or more United States persons have authority to control all substantial decisions of the trust or (B) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person.  For purposes of this discussion, a "non-U.S. Holder" is any Holder of a Claim that is not a U.S. Holder and not a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder of a Claim, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity.  Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders of Claims should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST.  ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE FEDERAL, STATE, LOCAL, AND NON-U.S. INCOME, ESTATE, AND OTHER TAX CONSEQUENCES OF THE PLAN.**

**B.      Certain U.S. Federal Income Tax Consequences to the Debtors**

1.      Asset Sale Transaction

The Plan provides for an Asset Sale Transaction.  Pursuant to an Asset Sale Transaction, Debtors would recognize gain or loss upon the transfer in an amount equal to the difference between the fair market value of the assets sold and the Debtors' tax basis in such assets.  To the extent any gains are recognized, such gains may be able to be offset, in whole or in part, by the Debtors' available tax attributes.  As of the end of the 2022 fiscal year, the Debtors had approximately $1.6 billion of U.S. federal net operating losses (the "NOLs") and $143 million of disallowed business interest carryovers under section 163(j) of the Tax Code (the "163(j) Carryovers").  If the Debtors were to recognize gain in connection with an Asset Sale Transaction and such gain could not be entirely offset with available NOLs, 163(j) Carryovers, and other tax attributes, a cash tax liability could arise.  The Debtors do not currently anticipate that a cash tax liability is likely to arise in connection with an Asset Sale Transaction, but that expectation depends on, among other things, the Debtors' determination that their tax attributes, and ability to claim losses in connection with sales of specific assets for an amount less than their tax basis, is not subject to limitation pursuant to section 382 of the Tax Code.

2.     Cancellation of Debt and Reduction of Tax Attributes

In general, absent an exception, a taxpayer will realize and recognize cancellation of indebtedness income ("CODI") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness.  The amount of CODI, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (i) the amount of any cash (*i.e.*, the Distribution Proceeds) and (ii) the fair market value of any consideration (*i.e.*, the Liquidating Trust Assets underlying the Liquidating Trust Units), in each case, given in satisfaction of such indebtedness at the time of the exchange.

Under section 108 of the Tax Code, however, a Debtor will not be required to include any amount of CODI in gross income if the Debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a result of such exclusion, the Debtor must reduce its tax attributes by the amount of CODI excluded from gross income pursuant to section 108 of the Tax Code.  Such reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined.  In general, tax attributes will be reduced in the following order:  (a) NOLs and NOL carryovers; (b) general business credit carryovers; (c) capital loss carryovers; (d) tax basis in assets (but not below the amount of liabilities to which the Debtor will remain subject immediately after the discharge); (e) passive activity loss and credit carryovers; and (f) foreign tax credit carryovers. Alternatively, the Debtor may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the Tax Code.  Any excess CODI over the amount of available tax attributes will generally not give rise to U.S. federal income tax and will generally have no other U.S. federal income tax impact.

**C.     Certain U.S. Federal Income Tax Consequences to Certain U.S. Holders of Allowed Class 3, Class 4, Class 5, and Class 6 Claims**

The following discussion assumes that the transactions contemplated by the Plan will occur.  Holders of Claims and Interests are urged to consult their tax advisors regarding the tax consequences of the Plan.

1.     U.S. Federal Income Tax Consequences for Holders of Allowed Class 3, Class 4, Class 5, and Class 6 Claims

Pursuant to the Plan, in exchange for full and final satisfaction, settlement, release and discharge of the Allowed Class 3, Class 4, Class 5, and Class 6 Claims, each Holder thereof will receive Cash and/or beneficial interests in the Liquidating Trust formed pursuant to Article VII.C of the Plan (such interests, the "Liquidating Trust Units").

Additionally, as further discussed below in Section E, the Debtors expect (and the Liquidating Trust documents shall provide) that the trustee(s) of the Liquidating Trust(s) will treat any Liquidating Trust as a grantor trust of which the applicable Holders of Allowed Claims, among others, are the grantors.  Each U.S. Holder of an Allowed Claim receiving Liquidating Trust Units should accordingly be treated as having (a) received its share of the Liquidating Trust Assets from the Debtors and (b) contributed such assets to the Liquidating Trust in exchange for Liquidating Trust Units.

75

Each such U.S. Holder will be treated as exchanging such Allowed Class 3, Class 4, Class 5, or Class 6 Claim in a taxable exchange under section 1001 of the Tax Code for Cash and/or Liquidating Trust Units. Accordingly, subject to the rules regarding accrued but untaxed interest as discussed below, each U.S. Holder of such Claim should recognize gain or loss equal to the difference between (1) the amount of Cash and/or the fair market value of the Liquidating Trust Assets underlying the Liquidating Trust Units received, as applicable, in exchange for such Allowed Claim, and (2) such Holder's adjusted basis, if any, in such Allowed Claim.

Generally, the gain or loss recognized by a U.S. Holder with respect to an Allowed Class 3, Class 4, Class 5, or Class 6 Claim will be a capital gain or loss unless the Allowed Claim was acquired at a market discount (as discussed below) and depending on whether and the extent to which the Holder previously claimed a bad debt deduction. Any such capital gain or loss generally should be long-term if the U.S. Holder's holding period in the Allowed Claim is more than one (1) year and otherwise should be short-term. Under current U.S. federal income tax law, certain non-corporate U.S. Holders are eligible for preferential rates of U.S. federal income tax on long-term capital gains.

A U.S. Holder of an Allowed Class 3, Class 4, Class 5, or Class 6 Claim who recognizes capital losses as a result of the distributions under the Plan will be subject to limits on the use of such capital losses. For a non-corporate U.S. Holder, capital losses may be used to offset any capital gains (without regard to holding periods) and ordinary income to the extent of the lesser of (x) $3,000 ($1,500 for married individuals filing separate returns) or (y) the excess of the capital losses over the capital gains. A non-corporate U.S. Holder may carry over unused capital losses and apply them against future capital gains and a portion of their ordinary income in later years. For corporate U.S. Holders, capital losses may only be used to offset capital gains. A corporate U.S. Holder that has more capital losses than may be used in a tax year may carry back unused capital losses to the three (3) years preceding the capital loss year or may carry over unused capital losses for the five (5) years following the capital loss year.

A U.S. Holder of such Allowed Claims should obtain a tax basis in its share of each of the Liquidating Trust Assets received (if any) equal to the fair market value of such U.S. Holder's share of each of the Liquidating Trust Assets as of the date such property is treated as having been distributed to the U.S. Holder pursuant to the Plan. The holding period for the beneficial interest in these assets should begin on the day following the Effective Date.

## 2.    Accrued but Untaxed Interest

To the extent that any amount received by a U.S. Holder of a surrendered Allowed Class 3, Class 4, Class 5, or Class 6 Claim is attributable to accrued but untaxed interest on the debt instruments constituting the surrendered Allowed Claim, the receipt of such amount should be taxable to the U.S. Holder as ordinary interest income (to the extent not already taken into income by the U.S. Holder). Conversely, a U.S. Holder of an Allowed Claim may be able to recognize a deductible loss (or, possibly, a write off against a reserve for worthless debts) to the extent that any accrued interest previously was included in the U.S. Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

If the fair value of the consideration is not sufficient to fully satisfy all principal and interest on an Allowed Class 3, Class 4, Class 5, or Class 6 Claim, the extent to which such consideration will be attributable to accrued interest is unclear.  Under the Plan, the aggregate consideration to be distributed to U.S. Holders of Allowed Class 3, Class 4, Class 5, and Class 6 Claims will be allocated first to the principal amount of such Allowed Claims, with any excess allocated to unpaid interest that accrued on these Allowed Claims, if any.  Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but unpaid interest.  The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Plan.  U.S. Holders of Allowed Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

**HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE ALLOCATION OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR CLAIMS AND THE FEDERAL INCOME TAX TREATMENT OF ACCRUED BUT UNTAXED INTEREST.**

3.    Market Discount

Under the "market discount" provisions of the Tax Code, some or all of any gain realized by a U.S. Holder of an Allowed Class 3, Class 4, Class 5, or Class 6 Claim who exchanges the Allowed Claim for an amount on the Effective Date may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Allowed Claim.  In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if the U.S. Holder's adjusted tax basis in the debt instrument immediately after such acquisition is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount, its adjusted issue price, by at least a de minimis amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of an Allowed Class 3, Class 4, Class 5, or Class 6 Claim that had been acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Claim was considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued).

To the extent that the Allowed Claims that were acquired with market discount are exchanged in a tax-free transaction for other property, any market discount that accrued on the Allowed Claims (*i.e.*, up to the time of the exchange) but was not recognized by the U.S. Holder is carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption, or other disposition of the property is treated as ordinary income to the extent of the accrued, but not recognized, market discount with respect to the exchanged debt instrument.

4.    Ownership of Liquidating Trust Units

The U.S. federal income tax obligations of U.S. Holders of Allowed Claims receiving Liquidating Trust Units are not dependent on the Liquidating Trust distributing any Cash or other proceeds.  U.S. Holders of such Claims will be required to report on their U.S. federal income tax returns their proper share of the Liquidating Trust's items of income, gain, loss, deduction, and credit in the year recognized by the Liquidating Trust.  This requirement may result in such U.S. Holders being subject to tax on their allocable share of the Liquidating Trust's taxable income prior to receiving any cash distributions from the Liquidating Trust.  In general, a distribution of Cash by the Liquidating Trust will not be separately taxable to a holder of a beneficial interest in the Liquidating Trust since the beneficiary is already regarded for U.S. federal income tax purposes as owning the underlying assets (and was taxed at the time the Cash was earned or received by the Liquidating Trust).

5.    Distribution Reserve Accounts and Delayed Distributions

The Plan provides that certain distributions may be delayed while contingent, unliquidated, or disputed Claims are addressed.  Pending the resolution of such Claims, a portion of the property to be received by Holders of Claims or Interests may be deposited into the various Claim distribution accounts and "liquidating trusts" as described in the Plan (including the Combined Reserve, the WARN Reserve, and the General Account).  The property that is subject to delayed distribution will be subject to "disputed ownership fund" treatment under section 1.468B-9 of the Treasury Regulations as further discussed below in Section E.

**D.    Certain U.S. Federal Income Tax Consequences to Certain Non-U.S. Holders of Allowed Class 3, Class 4, Class 5, and Class 6 Claims**

The following discussion includes only certain U.S. federal income tax consequences of the Plan to non-U.S. Holders.  The discussion does not include any non-U.S. tax considerations. The rules governing the U.S. federal income tax consequences to non-U.S. Holders are complex. Each non-U.S. Holder should consult its own tax advisor regarding the U.S. federal, state, local and non-U.S. tax consequences of the consummation of the Plan to such non-U.S. Holder.

Whether a non-U.S. Holder realizes gain or loss on the exchange and the amount of such gain or loss is generally determined in the same manner as set forth above in connection with U.S. Holders.

1.    Gain Recognition

Other than with respect to any amounts received that are attributable to accrued but untaxed interest (or OID, if any), any gain realized by a non-U.S. Holder on the exchange of its Allowed Class 3, Class 4, Class 5, or Class 6 Claim pursuant to the Plan generally will not be subject to U.S. federal income taxation unless (a) the non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the transactions contemplated by the Plan occur and certain other conditions are met or (b) such gain is effectively connected with the conduct by such non-U.S. Holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such non-U.S. Holder in the United States).

If the first exception applies, to the extent that any gain is taxable, the non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange.  If the second exception applies, the non-U.S. Holder generally will be subject to U.S. federal income tax (and possibly withholding tax) with respect to any gain realized on the exchange if such gain is effectively connected with the non-U.S. Holder's conduct of a trade or business in the United States in the same manner as a U.S. Holder.  In order to claim an exemption from withholding tax, such non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates).  In addition, if such a non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30% (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

2.    Accrued Interest

Subject to the discussion of FATCA below, payments to a non-U.S. Holder that are attributable to accrued but untaxed interest with respect to Claims generally will not be subject to U.S. federal income or withholding tax, *provided* that the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the non-U.S. Holder is not a U.S. person, unless:

(a)    the non-U.S. Holder actually or constructively owns 10% or more of the total combined voting power of all classes of the applicable Debtor's stock entitled to vote;

(b)    the non-U.S. Holder is a "controlled foreign corporation" that is a "related person" with respect to the applicable Debtor (each, within the meaning of the Tax Code);

(c)    the non-U.S. Holder is a bank receiving interest described in section 881(c)(3)(A) of the Tax Code; or

(d)    such interest is effectively connected with the conduct by the non-U.S. Holder of a trade or business within the United States (in which case, provided the non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a non U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued interest at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

A non-U.S. Holder that does not qualify for the exemption from withholding tax with respect to accrued but untaxed interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30% rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on any payments that are attributable to accrued but untaxed interest.  For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.  As described above in more detail under the heading "*Accrued but Untaxed Interest*," the aggregate consideration to be distributed to holders of Allowed Class 3, Class 4, Class 5, and Class 6 Claims will be allocated first to the principal amount of such Allowed Claims, with any excess allocated to unpaid interest that accrued on these Claims, if any.

3.   FATCA

Under the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30% on the receipt of "withholdable payments."  For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income.  FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding.

Withholding with respect to the gross proceeds of a disposition of any stock, debt instrument, or other property that can produce U.S.-source dividends or interest has been eliminated under proposed Treasury Regulations, which can be relied on until final Treasury Regulations become effective.

Each non-U.S. Holder should consult its own tax advisor regarding the possible impact of these rules on such non-U.S. Holder's exchange of its Claim.

**E.    Tax Matters Regarding the Liquidating Trust.**

The Plan provides that, among other things, under certain circumstances, assets may be transferred by the Debtors to a Liquidation Trust in order to facilitate the sale of such assets and the disposition of the proceeds thereof to Holders of Claims.  Such assets may either be subject to:

1.   Liquidating Trust Treatment

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, the Debtors expect to treat the Liquidating Trust as a "liquidating trust" under section 301.7701-4(d) of the Treasury Regulations and a grantor trust under section 671 of the Tax Code, and the trustee of any Liquidating Trust will take a position on the Liquidating Trust's tax return accordingly.  For U.S. federal income tax purposes, the transfer of assets to the Liquidating Trust will be deemed to occur as (a) a first-step transfer of the Liquidating Trust Assets to the

Holders of the applicable Claims, and (b) a second-step transfer by such Holders to the Liquidating Trust.

No request for a ruling from the IRS will be sought on the classification of the Liquidating Trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Liquidating Trust. If the IRS were to challenge successfully the classification of the Liquidating Trust as a grantor trust, the federal income tax consequences to the Liquidating Trust and the Liquidating Trust beneficiaries could vary from those discussed in the Plan (including the potential for an entity-level tax). For example, the IRS could characterize the Liquidating Trust as a so-called "complex trust" subject to a separate entity-level tax on its earnings, except to the extent that such earnings are distributed during the taxable year.

As soon as possible after the transfer of the Liquidating Trust Assets to the Liquidating Trust, the trustee(s) of the Liquidating Trust shall make a good faith valuation of the Liquidating Trust Assets. This valuation will be made available from time to time, as relevant for tax reporting purposes. Each of the Debtors, the trustee(s) of the Liquidating Trust, and the holders of Claims receiving interests in the Liquidating Trust shall take consistent positions with respect to the valuation of the Liquidating Trust Assets, and such valuations shall be utilized for all U.S. federal income tax purposes.

Allocations of taxable income of the Liquidating Trust among the Liquidating Trust beneficiaries shall be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (were such cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Liquidating Trust had distributed all its assets (valued at their tax book value) to the Liquidating Trust beneficiaries, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Liquidating Trust. Similarly, taxable loss of the Liquidating Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining Liquidating Trust Assets. The tax book value of the Liquidating Trust Assets shall equal their fair market value on the date of the transfer of the Liquidating Trust Assets to the Liquidating Trust, adjusted in accordance with tax accounting principles prescribed by the Tax Code, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

The Liquidating Trust shall in no event be dissolved later than five (5) years from the creation of such Liquidating Trust unless the Bankruptcy Court, upon motion within the six (6) month period prior to the fifth (5th) anniversary (or within the six (6) month period prior to the end of an extension period), determines that a fixed period extension (not to exceed five (5) years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the trustee(s) of the Liquidating Trust that any further extension would not adversely affect the status of the trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Assets.

The Liquidating Trust will file annual information tax returns with the IRS as a grantor trust pursuant to section 1.671-4(a) of the Treasury Regulations that will include information concerning certain items relating to the holding or disposition (or deemed disposition) of the

Liquidating Trust Assets (e.g., income, gain, loss, deduction and credit).  Each Liquidating Trust beneficiary holding a beneficial interest in the Liquidating Trust will receive a copy of the information returns and must report on its federal income tax return its share of all such items.  The information provided by the Liquidating Trust will pertain to Liquidating Trust beneficiaries who receive their interests in the Liquidating Trust in connection with the Plan.

## 2.     Disputed Ownership Fund Treatment

With respect to any of the assets of the Liquidating Trust that are subject to potential disputed claims of ownership or uncertain distributions, or to the extent "liquidating trust" treatment is otherwise unavailable or not elected to be applied with respect to the Liquidating Trust, the Debtors intend that such assets will be subject to disputed ownership fund treatment under section 1.468B-9 of the Treasury Regulations, that any appropriate elections with respect thereto shall be made, and that such treatment will also be applied to the extent possible for state and local tax purposes.  Under such treatment, a separate federal income tax return shall be filed with the IRS for any such account.  Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).

## F.     Information Reporting and Back-Up Withholding

The Debtors and Wind-Down Debtors will withhold all amounts required by law to be withheld from any distributions made under the Plan.  The Debtors and Wind-Down Debtors will comply with all applicable reporting requirements of the Tax Code.  In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim under the Plan.  Additionally, under the backup withholding rules, a Holder of a Claim may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan unless, in the case of a U.S. Holder, such U.S. Holder provides a properly executed IRS Form W-9 and, in the case of Non-U.S. Holder, such Non-U.S. Holder provides a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption). Backup withholding is not an additional tax but is, instead, an advance payment that may entitle the Holder to a refund from the IRS to the extent it results in an overpayment of tax, *provided* that the required information is timely provided to the IRS.

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.  THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND**

**INCOME TAX SITUATION AND DOES NOT ADDRESS THE U.S. FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS THAT ARE NOT HOLDERS OF CLASS 3, CLASS 4, CLASS 5, OR CLASS 6 CLAIMS.  ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## XII.    RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario.  Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Respectfully submitted, as of the date first set forth above,

BED BATH & BEYOND INC.
(on behalf of itself and all other Debtors)

Dated:  August 1, 2023

/s/ *Holly Etlin*
Holly Etlin
Chief Restructuring Officer
Bed Bath & Beyond Inc.

Prepared by:

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone:  (201) 489-3000
Email:      msirota@coleschotz.com
            wusatine@coleschotz.com
            fyudkin@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Emily E. Geier, P.C. (admitted *pro hac vice*)
Derek I. Hunter (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900
Email:      joshua.sussberg@kirkland.com
            emily.geier@kirkland.com
            derek.hunter@kirkland.com

*Co-Counsel for Debtors and*
*Debtors in Possession*

**<u>Exhibit A</u>**

**Plan of Reorganization**

**[Filed at Docket No. 1712]**

**<u>Exhibit B</u>**

**Disclosure Statement Order**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Emily E. Geier, P.C. (admitted *pro hac vice*)
Derek I. Hunter (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
joshua.sussberg@kirkland.com
emily.geier@kirkland.com
derek.hunter@kirkland.com

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com

*Co-Counsel for Debtors and Debtors in Possession*

| | |
|---|---|
| In re: | Chapter 11 |
| BED BATH & BEYOND INC., *et al.*, | Case No. 23-13359 (VFP) |
| Debtors.[1] | (Jointly Administered) |

---

[1] The last four digits of Debtor Bed Bath & Beyond Inc.'s tax identification number are 0488. A complete list of the Debtors in these Chapter 11 Cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/bbby. The location of Debtor Bed Bath & Beyond Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 650 Liberty Avenue, Union, New Jersey 07083.

**ORDER (I) (A) CONDITIONALLY
APPROVING THE ADEQUACY OF THE
DISCLOSURE STATEMENT, (B) APPROVING
THE SOLICITATION AND NOTICE PROCEDURES
WITH RESPECT TO CONFIRMATION OF THE PLAN,
(C) APPROVING THE FORMS OF BALLOTS AND NOTICES
IN CONNECTION THEREWITH, (D) SCHEDULING A COMBINED
DISCLOSURE STATEMENT APPROVAL AND PLAN CONFIRMATION
HEARING AND CERTAIN DATES AND DEADLINES WITH RESPECT
THERETO, AND (E) GRANTING RELATED RELIEF, AND (II) (A) EXTENDING
THE DEBTORS' EXCLUSIVE PERIODS TO FILE A CHAPTER 11 PLAN
AND SOLICIT ACCEPTANCES THEREOF PURSUANT TO SECTION 1121
OF THE BANKRUPTCY CODE AND (B) GRANTING RELATED RELIEF**

The relief set forth on the following pages, numbered five (5) through twenty-one (21), is

**ORDERED**.

(Page | 3)

| | |
|---|---|
| Debtors: | BED BATH & BEYOND INC., *et al*. |
| Case No. | 23-13359 (VFP) |
| Caption of Order: | ORDER (I) (A) CONDITIONALLY APPROVING THE ADEQUACY OF THE DISCLOSURE STATEMENT, (B) APPROVING THE SOLICITATION AND NOTICE PROCEDURES WITH RESPECT TO CONFIRMATION OF THE PLAN, (C) APPROVING THE FORMS OF BALLOTS AND NOTICES IN CONNECTION THEREWITH, (D) SCHEDULING A COMBINED DISCLOSURE STATEMENT APPROVAL AND PLAN CONFIRMATION HEARING AND CERTAIN DATES AND DEADLINES WITH RESPECT THERETO, AND (E) GRANTING RELATED RELIEF, AND (II) (A) EXTENDING THE DEBTORS' EXCLUSIVE PERIODS TO FILE A CHAPTER 11 PLAN AND SOLICIT ACCEPTANCES THEREOF PURSUANT TO SECTION 1121 OF THE BANKRUPTCY CODE AND (B) GRANTING RELATED RELIEF |

Upon the *Debtors' Motion for Entry of an Order (I) (A) Conditionally Approving the Adequacy of the Disclosure Statement, (B) Approving the Solicitation and Notice Procedures with Respect to Confirmation of the Plan, (C) Approving the Forms of Ballots and Notices in Connection Therewith, (D) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing and Certain Dates and Deadlines with Respect Thereto, and (E) Granting Related Relief, and (II) (A) Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code and (B) Granting Related Relief* (the "Motion"),[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors"), for entry of an order (this "Order") pursuant to sections 105, 1125, 1126, and 1128 of the Bankruptcy Code, Bankruptcy Rules 2002, 3001, 3016, 3017, 3018, 3020, 6004, and 9006, and Local Rules 3018-1 and 9013-1:    (a) approving: (i) the adequacy of the *Amended Disclosure Statement Relating to the Amended Joint Chapter 11 Plan of Bed Bath & Beyond Inc. and Its Debtor Affiliates* (the "Disclosure Statement") on a conditional basis; (ii) the Solicitation and Voting Procedures; (iii) the Non-Voting Status Notices,

---

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion, the Disclosure Statement, or Plan as applicable.

(Page | 4)

| Debtors: | BED BATH & BEYOND INC., *et al.* |
|---|---|
| Case No. | 23-13359 (VFP) |
| Caption of Order: | ORDER (I) (A) CONDITIONALLY APPROVING THE ADEQUACY OF THE DISCLOSURE STATEMENT, (B) APPROVING THE SOLICITATION AND NOTICE PROCEDURES WITH RESPECT TO CONFIRMATION OF THE PLAN, (C) APPROVING THE FORMS OF BALLOTS AND NOTICES IN CONNECTION THEREWITH, (D) SCHEDULING A COMBINED DISCLOSURE STATEMENT APPROVAL AND PLAN CONFIRMATION HEARING AND CERTAIN DATES AND DEADLINES WITH RESPECT THERETO, AND (E) GRANTING RELATED RELIEF, AND (II) (A) EXTENDING THE DEBTORS' EXCLUSIVE PERIODS TO FILE A CHAPTER 11 PLAN AND SOLICIT ACCEPTANCES THEREOF PURSUANT TO SECTION 1121 OF THE BANKRUPTCY CODE AND (B) GRANTING RELATED RELIEF |

including the Opt-Out Form; (iv) the Ballots; (v) the Cover Letter; (vi) the Combined Hearing Notice; (vii) the Plan Supplement Notice; (viii) the Assumption and Rejection Notices; (ix) the Certification of Balloting; (x) the manner and form of the Solicitation Packages and the materials contained therein; (xi) shortening notice periods and requirements; and (xii) the dates and deadlines related thereto, including, but not limited to, the Publication Deadline, the Solicitation Deadline, the Plan Supplement Filing Date, the Combined Objection Deadline, the Voting Deadline, the deadline to file the Certification of Balloting, the Confirmation Brief Deadline, the Combined Reply Deadline, and the Combined Hearing Date; (b) extending the Debtors' exclusive right to file a chapter 11 plan by ninety days through and including November 20, 2023 (the "Filing Exclusivity Period"), and to solicit votes thereon by ninety days through and including January 18, 2024 (the "Soliciting Exclusivity Period," and together with the Filing Exclusivity Period, the "Exclusivity Periods"), without prejudice to the Debtors' right to seek further extensions to the Exclusivity Periods; and (c) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declaration; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference to the Bankruptcy Court Under Title 11* of the United States District Court for the

(Page | 5)

| | |
|---|---|
| Debtors: | BED BATH & BEYOND INC., *et al.* |
| Case No. | 23-13359 (VFP) |
| Caption of Order: | ORDER (I) (A) CONDITIONALLY APPROVING THE ADEQUACY OF THE DISCLOSURE STATEMENT, (B) APPROVING THE SOLICITATION AND NOTICE PROCEDURES WITH RESPECT TO CONFIRMATION OF THE PLAN, (C) APPROVING THE FORMS OF BALLOTS AND NOTICES IN CONNECTION THEREWITH, (D) SCHEDULING A COMBINED DISCLOSURE STATEMENT APPROVAL AND PLAN CONFIRMATION HEARING AND CERTAIN DATES AND DEADLINES WITH RESPECT THERETO, AND (E) GRANTING RELATED RELIEF, AND (II) (A) EXTENDING THE DEBTORS' EXCLUSIVE PERIODS TO FILE A CHAPTER 11 PLAN AND SOLICIT ACCEPTANCES THEREOF PURSUANT TO SECTION 1121 OF THE BANKRUPTCY CODE AND (B) GRANTING RELATED RELIEF |

District of New Jersey, entered July 23, 1984, and amended on September 18, 2012 (Simandle, C.J.); and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion was appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor **IT IS HEREBY ORDERED THAT**:

1.      The Motion is **GRANTED** as set forth herein.

**I.      Conditional Approval of the Disclosure Statement.**

2.      The Disclosure Statement, attached hereto as **Exhibit 1**, is conditionally approved as providing Holders of Claims entitled to vote on the Plan with adequate information to make an informed decision as to whether to vote to accept or reject the Plan in accordance with

(Page | 6)

| | |
|---|---|
| Debtors: | BED BATH & BEYOND INC., *et al*. |
| Case No. | 23-13359 (VFP) |
| Caption of Order: | ORDER (I) (A) CONDITIONALLY APPROVING THE ADEQUACY OF THE DISCLOSURE STATEMENT, (B) APPROVING THE SOLICITATION AND NOTICE PROCEDURES WITH RESPECT TO CONFIRMATION OF THE PLAN, (C) APPROVING THE FORMS OF BALLOTS AND NOTICES IN CONNECTION THEREWITH, (D) SCHEDULING A COMBINED DISCLOSURE STATEMENT APPROVAL AND PLAN CONFIRMATION HEARING AND CERTAIN DATES AND DEADLINES WITH RESPECT THERETO, AND (E) GRANTING RELATED RELIEF, AND (II) (A) EXTENDING THE DEBTORS' EXCLUSIVE PERIODS TO FILE A CHAPTER 11 PLAN AND SOLICIT ACCEPTANCES THEREOF PURSUANT TO SECTION 1121 OF THE BANKRUPTCY CODE AND (B) GRANTING RELATED RELIEF |

section 1125(a)(1) of the Bankruptcy Code.  Any objections to the adequacy of the information contained in the Disclosure Statement are expressly reserved for consideration at the Combined Hearing.

3.     The Disclosure Statement (including all applicable exhibits thereto) provides Holders of Claims and Interests and other parties in interest with sufficient notice of the injunction, exculpation, and release provisions contained in Article X of the Plan, in satisfaction of the requirements of Bankruptcy Rules 2002(c)(3) and 3016(b) and (c).

**II.     Approval of the Timeline and Materials for Soliciting Votes.**

**A.     Approval of Certain Dates and Deadlines with Respect to the Plan and Disclosure Statement.**

4.     The Confirmation Timeline is hereby approved (subject to modification as necessary):

| Event or Deadline | Date and Time | Description |
|---|---|---|
| Voting Record Date | July 28, 2023 | The date for determining (i) which Holders of Claims in the Voting Classes are entitled to vote to accept or reject the Plan and receive Solicitation Packages in connection therewith and (ii) whether Claims have been properly assigned or transferred to any assignees pursuant to Bankruptcy Rule 3001(e) such that an assignee can vote as the Holder of a respective Claim. |

(Page | 7)

| | |
|---|---|
| Debtors: | BED BATH & BEYOND INC., *et al.* |
| Case No. | 23-13359 (VFP) |
| Caption of Order: | ORDER (I) (A) CONDITIONALLY APPROVING THE ADEQUACY OF THE DISCLOSURE STATEMENT, (B) APPROVING THE SOLICITATION AND NOTICE PROCEDURES WITH RESPECT TO CONFIRMATION OF THE PLAN, (C) APPROVING THE FORMS OF BALLOTS AND NOTICES IN CONNECTION THEREWITH, (D) SCHEDULING A COMBINED DISCLOSURE STATEMENT APPROVAL AND PLAN CONFIRMATION HEARING AND CERTAIN DATES AND DEADLINES WITH RESPECT THERETO, AND (E) GRANTING RELATED RELIEF, AND (II) (A) EXTENDING THE DEBTORS' EXCLUSIVE PERIODS TO FILE A CHAPTER 11 PLAN AND SOLICIT ACCEPTANCES THEREOF PURSUANT TO SECTION 1121 OF THE BANKRUPTCY CODE AND (B) GRANTING RELATED RELIEF |

| Event or Deadline | Date and Time | Description |
|---|---|---|
| Publication Deadline | Five (5) business days following entry of the Order (or as soon as reasonably practicable thereafter) | The last date by which the Debtors will submit the Combined Hearing Notice in a format modified for publication. |
| Solicitation Deadline | Three (3) business days following entry of the Order (or as soon as reasonably practicable thereafter) | The deadline for distributing Solicitation Packages, including Ballots, to Holders of Claims entitled to vote to accept or reject the Plan. |
| Plan Supplement Filing Deadline | The date that is no later than fourteen (14) days prior to the Voting Deadline | The date by which the Debtors shall file the Plan Supplement. |
| Combined Objection Deadline | September 1, 2023 at 4:00 p.m., prevailing Eastern Time | The deadline by which objections to confirmation of the Plan or final approval of the adequacy of the Disclosure Statement must be filed with the Court and served so as to be **actually received** by the appropriate notice parties. |
| Voting Deadline | September 1, 2023 at 4:00 p.m., prevailing Eastern Time | The deadline by which all Ballots and opt-out forms (the "Opt-Out Forms") must be properly executed, completed, and electronically submitted (or mailed as applicable) so that they are **actually received** by Kroll Restructuring Administration LLC (the "Notice and Claims Agent"). |
| Confirmation Brief Deadline | September 7, 2023 | The deadline by which the Debtors shall file their brief in support of confirmation of the Plan. |
| Combined Reply Deadline | September 7, 2023 | The deadline by which replies to objections to confirmation of the Plan or final approval of the adequacy of the Disclosure Statement must be filed with the Court. |
| Deadline to File Certification of Balloting | September 8, 2023 | The date by which the report tabulating the voting on the Plan (the "Certification of Balloting") shall be filed with the Court. |

(Page | 8)

| | |
|---|---|
| Debtors: | BED BATH & BEYOND INC., *et al.* |
| Case No. | 23-13359 (VFP) |
| Caption of Order: | ORDER (I) (A) CONDITIONALLY APPROVING THE ADEQUACY OF THE DISCLOSURE STATEMENT, (B) APPROVING THE SOLICITATION AND NOTICE PROCEDURES WITH RESPECT TO CONFIRMATION OF THE PLAN, (C) APPROVING THE FORMS OF BALLOTS AND NOTICES IN CONNECTION THEREWITH, (D) SCHEDULING A COMBINED DISCLOSURE STATEMENT APPROVAL AND PLAN CONFIRMATION HEARING AND CERTAIN DATES AND DEADLINES WITH RESPECT THERETO, AND (E) GRANTING RELATED RELIEF, AND (II) (A) EXTENDING THE DEBTORS' EXCLUSIVE PERIODS TO FILE A CHAPTER 11 PLAN AND SOLICIT ACCEPTANCES THEREOF PURSUANT TO SECTION 1121 OF THE BANKRUPTCY CODE AND (B) GRANTING RELATED RELIEF |

| Event or Deadline | Date and Time | Description |
|---|---|---|
| Combined Hearing Date | September 12, 2023, 2:30 p.m., prevailing Eastern Time | The date of the hearing at which the Court will consider confirmation of the Plan and final approval of the Disclosure Statement (the "Combined Hearing Date"). |

5.      The Solicitation Deadline provides sufficient time for Holders of Claims entitled to vote on the Plan to make informed decisions with respect to voting on the Plan.  The Debtors may adjourn the Combined Hearing Date and any related dates and deadlines from time to time, without notice to the parties-in-interest other than announcement of such adjournment in open court and/or filing a notice of adjournment with the Court and serving such notice on the 2002 List.

**B.      Approval of the Form of, and Distribution of, Solicitation Packages to Parties Entitled to Vote on the Plan.**

6.      The Solicitation Packages to be transmitted on or before the Solicitation Deadline to those Holders of Claims in the Voting Classes entitled to vote on the Plan as of the Voting Record Date, shall include the following, the form of each of which is hereby approved:

a.      the conditionally approved Disclosure Statement (and exhibits thereto, including the Plan), substantially in the form attached hereto as **Exhibit 1**;

b.      the Combined Hearing Notice, substantially in the form attached hereto as **Exhibit 2**;

c.      this Order (without exhibits, except for the Solicitation and Voting Procedures, substantially in the form attached hereto as **Exhibit 3**);

(Page | 9)

| | |
|---|---|
| Debtors: | BED BATH & BEYOND INC., *et al.* |
| Case No. | 23-13359 (VFP) |
| Caption of Order: | ORDER (I) (A) CONDITIONALLY APPROVING THE ADEQUACY OF THE DISCLOSURE STATEMENT, (B) APPROVING THE SOLICITATION AND NOTICE PROCEDURES WITH RESPECT TO CONFIRMATION OF THE PLAN, (C) APPROVING THE FORMS OF BALLOTS AND NOTICES IN CONNECTION THEREWITH, (D) SCHEDULING A COMBINED DISCLOSURE STATEMENT APPROVAL AND PLAN CONFIRMATION HEARING AND CERTAIN DATES AND DEADLINES WITH RESPECT THERETO, AND (E) GRANTING RELATED RELIEF, AND (II) (A) EXTENDING THE DEBTORS' EXCLUSIVE PERIODS TO FILE A CHAPTER 11 PLAN AND SOLICIT ACCEPTANCES THEREOF PURSUANT TO SECTION 1121 OF THE BANKRUPTCY CODE AND (B) GRANTING RELATED RELIEF |

> d.     the applicable forms of Ballot, substantially in the forms of the Ballots attached to hereto as **Exhibit 5A**, **Exhibit 5B**, **Exhibit 5C**, **Exhibit 5D**, and **Exhibit 5E**, as applicable, together with detailed voting instructions and instructions on how to submit or return the Ballot;
>
> e.     the Cover Letter, substantially in the form attached hereto as **Exhibit 6**; and
>
> f.     any additional documents that the Court has ordered to be made available.

7.     The Solicitation Packages provide the Holders of Claims entitled to vote on the Plan with adequate information to make informed decisions with respect to voting on the Plan in accordance with Bankruptcy Rules 2002(b) and 3017(d), the Bankruptcy Code, and the Local Rules.

8.     The Debtors shall distribute Solicitation Packages to all Holders of Claims entitled to vote on the Plan on or before the Solicitation Deadline, or as soon as reasonably practicable thereafter. Such service shall satisfy the requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

9.     The Debtors are authorized to cause the Solicitation Packages to be distributed in electronic format by e-mail through the Notice and Claims Agent to Holders of Claims in the Voting Classes; *provided*, *however*, that the Debtors are authorized to cause the Solicitation

(Page | 10)

| | |
|---|---|
| Debtors: | BED BATH & BEYOND INC., *et al.* |
| Case No. | 23-13359 (VFP) |
| Caption of Order: | ORDER (I) (A) CONDITIONALLY APPROVING THE ADEQUACY OF THE DISCLOSURE STATEMENT, (B) APPROVING THE SOLICITATION AND NOTICE PROCEDURES WITH RESPECT TO CONFIRMATION OF THE PLAN, (C) APPROVING THE FORMS OF BALLOTS AND NOTICES IN CONNECTION THEREWITH, (D) SCHEDULING A COMBINED DISCLOSURE STATEMENT APPROVAL AND PLAN CONFIRMATION HEARING AND CERTAIN DATES AND DEADLINES WITH RESPECT THERETO, AND (E) GRANTING RELATED RELIEF, AND (II) (A) EXTENDING THE DEBTORS' EXCLUSIVE PERIODS TO FILE A CHAPTER 11 PLAN AND SOLICIT ACCEPTANCES THEREOF PURSUANT TO SECTION 1121 OF THE BANKRUPTCY CODE AND (B) GRANTING RELATED RELIEF |

Packages to be distributed in paper format through the Notice and Claims Agent to Holders of Class 6 2014 Senior Unsecured Notes Claims.

10.     Notwithstanding anything to the contrary in the Disclosure Statement or this Order, the Debtors shall cause a Ballot for Class 6 General Unsecured Claims to be served on any landlord counterparty subject to a rejected lease (or lease subject to a pending rejection motion).  Any such party shall be eligible to vote to accept or reject the Plan by the Voting Deadline on account of Claims in an amount equal to the greater of (a) $1.00 and (b) the amount asserted on any Proof of Claim filed no later than twelve (12) business days before the Voting Deadline (subject to the Debtors' ability to object to the asserted amount).

11.     The form of letter (the "Cover Letter"), attached hereto as **Exhibit 6**, describing the contents of the Solicitation Packages and detailing how Holders of Claims entitled to vote to accept or reject the Plan may access electronic versions or request hard copies of each of the Solicitation Packages and how a Ballot is approved.

12.     The Debtors are authorized to cause the Non-Voting Status Notices to be distributed in electronic format by e-mail through the Notice and Claims Agent to Holders of Claims and Interests in the Non-Voting Classes.

(Page | 11)

| | |
|---|---|
| Debtors: | BED BATH & BEYOND INC., *et al.* |
| Case No. | 23-13359 (VFP) |
| Caption of Order: | ORDER (I) (A) CONDITIONALLY APPROVING THE ADEQUACY OF THE DISCLOSURE STATEMENT, (B) APPROVING THE SOLICITATION AND NOTICE PROCEDURES WITH RESPECT TO CONFIRMATION OF THE PLAN, (C) APPROVING THE FORMS OF BALLOTS AND NOTICES IN CONNECTION THEREWITH, (D) SCHEDULING A COMBINED DISCLOSURE STATEMENT APPROVAL AND PLAN CONFIRMATION HEARING AND CERTAIN DATES AND DEADLINES WITH RESPECT THERETO, AND (E) GRANTING RELATED RELIEF, AND (II) (A) EXTENDING THE DEBTORS' EXCLUSIVE PERIODS TO FILE A CHAPTER 11 PLAN AND SOLICIT ACCEPTANCES THEREOF PURSUANT TO SECTION 1121 OF THE BANKRUPTCY CODE AND (B) GRANTING RELATED RELIEF |

13.    The Debtors are authorized to cause the Cover Letter, Ballot, and Combined Hearing Notice, or a Non-Voting Status Notice to be mailed through the Notice and Claims Agent to a Holder of a Claim or Interest in a Voting Class or Non-Voting Class, as applicable, to the extent the e-mail addresses for such Holders are unavailable as of the date the Debtors file the Motion.

14.    Any party that receives any materials in electronic format but would prefer paper format may contact the Notice and Claims Agent to request paper copies of the corresponding materials previously received in electronic format (to be provided at the Debtors' expense).

15.    The Notice and Claims Agent is authorized to assist the Debtors in: (a) distributing the Solicitation Packages; (b) receiving, tabulating, and reporting on Ballots cast to accept or reject the Plan by Holders of Claims against the Debtors; (c) responding to inquiries from Holders of Claims or Interests and other parties in interest relating to the conditionally approved Disclosure Statement, the Plan, the Ballots, the Solicitation Packages, and all other related documents and matters related thereto, including the procedures and requirements for voting to accept or reject the Plan and for objecting to confirmation of the Plan; (d) soliciting votes on the

(Page | 12)

| | |
|---|---|
| Debtors: | BED BATH & BEYOND INC., *et al.* |
| Case No. | 23-13359 (VFP) |
| Caption of Order: | ORDER (I) (A) CONDITIONALLY APPROVING THE ADEQUACY OF THE DISCLOSURE STATEMENT, (B) APPROVING THE SOLICITATION AND NOTICE PROCEDURES WITH RESPECT TO CONFIRMATION OF THE PLAN, (C) APPROVING THE FORMS OF BALLOTS AND NOTICES IN CONNECTION THEREWITH, (D) SCHEDULING A COMBINED DISCLOSURE STATEMENT APPROVAL AND PLAN CONFIRMATION HEARING AND CERTAIN DATES AND DEADLINES WITH RESPECT THERETO, AND (E) GRANTING RELATED RELIEF, AND (II) (A) EXTENDING THE DEBTORS' EXCLUSIVE PERIODS TO FILE A CHAPTER 11 PLAN AND SOLICIT ACCEPTANCES THEREOF PURSUANT TO SECTION 1121 OF THE BANKRUPTCY CODE AND (B) GRANTING RELATED RELIEF |

Plan; and (e) if necessary, contacting creditors or interest Holders regarding the Plan and/or the conditionally approved Disclosure Statement.

16.    On or before the Solicitation Deadline, the Debtors (through the Notice and Claims Agent) shall provide complete Solicitation Packages (other than Ballots) to the U.S. Trustee and to all parties on the 2002 List as of the Voting Record Date.

17.    The Notice and Claims Agent is authorized to accept Ballots and Opt-Out Forms via electronic online transmissions through an online balloting portal maintained by the Notice and Claims Agent on the Debtors' case website (the "E-Ballot Portal"). The Debtors also request authorization to collect Opt-Out Forms from holders of publicly traded securities through a separate online portal (the "Public Securities Opt-Out Portal"). The encrypted data and audit trail created by such electronic submission shall become part of the record of any Ballot or Opt-Out Form submitted in this manner and the creditor's electronic signature will be deemed to be immediately legally valid and effective. Ballots and Opt-Out Forms submitted via the E-Ballot Portal or the Public Securities Opt-Out Portal shall be deemed to contain a signature. E-Ballots shall be the sole method by which a creditor may submit a Ballot. Ballots submitted by mail, hand delivery, overnight courier, e-mail, facsimile, or other electronic means shall be deemed invalid.

(Page | 13)

| | |
|---|---|
| Debtors: | BED BATH & BEYOND INC., *et al.* |
| Case No. | 23-13359 (VFP) |
| Caption of Order: | ORDER (I) (A) CONDITIONALLY APPROVING THE ADEQUACY OF THE DISCLOSURE STATEMENT, (B) APPROVING THE SOLICITATION AND NOTICE PROCEDURES WITH RESPECT TO CONFIRMATION OF THE PLAN, (C) APPROVING THE FORMS OF BALLOTS AND NOTICES IN CONNECTION THEREWITH, (D) SCHEDULING A COMBINED DISCLOSURE STATEMENT APPROVAL AND PLAN CONFIRMATION HEARING AND CERTAIN DATES AND DEADLINES WITH RESPECT THERETO, AND (E) GRANTING RELATED RELIEF, AND (II) (A) EXTENDING THE DEBTORS' EXCLUSIVE PERIODS TO FILE A CHAPTER 11 PLAN AND SOLICIT ACCEPTANCES THEREOF PURSUANT TO SECTION 1121 OF THE BANKRUPTCY CODE AND (B) GRANTING RELATED RELIEF |

18.    All votes to accept or reject the Plan must be cast through the E-Ballot Portal except for votes from Nominees and Beneficial Holders of 2014 Senior Unsecured Notes Claims in Class 6.  All Ballots must be properly executed, completed, and submitted according to their applicable voting instructions so that the Ballots are **actually received** by the Notice and Claims Agent no later than the Voting Deadline; *provided*, *however*, that the Beneficial Holder Ballot and Master Ballot may be returned by mail or by e-mail as described on the Ballots.  Hard copy Ballots and Opt-Out Forms will not be accepted for any Ballots except for hard copy Beneficial Holder Ballots and Master Ballots.  In addition, electronic Ballots and Opt-Out Forms will not be accepted by facsimile or other electronic means (other than through the E-Ballot Portal and Public Securities Opt-Out Portal).

### C.    Approval of the Combined Hearing Notice.

19.    The Combined Hearing Notice, substantially in the form attached hereto as **Exhibit 2**, filed by the Debtors and served upon parties in interest in these Chapter 11 Cases on or before the Solicitation Deadline constitutes adequate and sufficient notice of the hearing to consider final approval of the adequacy of the Disclosure Statement, approval of the Plan, the manner in which a copy of the Plan could be obtained, and the time fixed for filing objections

(Page | 14)

| | |
|---|---|
| Debtors: | BED BATH & BEYOND INC., *et al.* |
| Case No. | 23-13359 (VFP) |
| Caption of Order: | ORDER (I) (A) CONDITIONALLY APPROVING THE ADEQUACY OF THE DISCLOSURE STATEMENT, (B) APPROVING THE SOLICITATION AND NOTICE PROCEDURES WITH RESPECT TO CONFIRMATION OF THE PLAN, (C) APPROVING THE FORMS OF BALLOTS AND NOTICES IN CONNECTION THEREWITH, (D) SCHEDULING A COMBINED DISCLOSURE STATEMENT APPROVAL AND PLAN CONFIRMATION HEARING AND CERTAIN DATES AND DEADLINES WITH RESPECT THERETO, AND (E) GRANTING RELATED RELIEF, AND (II) (A) EXTENDING THE DEBTORS' EXCLUSIVE PERIODS TO FILE A CHAPTER 11 PLAN AND SOLICIT ACCEPTANCES THEREOF PURSUANT TO SECTION 1121 OF THE BANKRUPTCY CODE AND (B) GRANTING RELATED RELIEF |

thereto, in satisfaction of the requirements of the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

20.     The Debtors shall publish the Combined Hearing Notice (in a format modified for publication) one time in the *New York Times* (National Edition) by no later than five (5) business days following entry of this Order (or as soon as reasonably practicable thereafter).

**D.     Approval of Notice of Filing of the Plan Supplement.**

21.     The Debtors are authorized to send notice of the filing of the Plan Supplement substantially in the form attached hereto as **Exhibit 7** on the Plan Supplement Filing Deadline or as soon as reasonably practicable thereafter.

**E.     Approval of the Form of Notices to Non-Voting Classes.**

22.     Except to the extent the Debtors determine otherwise, the Debtors are not required to provide Solicitation Packages to Holders of Claims or Interests in the Non-Voting Classes, as such Holders are not entitled to vote on the Plan.  Instead, on or before the Solicitation Deadline, or as soon as reasonably practicable thereafter, the Notice and Claims Agent shall e-mail (to the extent that email addresses are available) a Non-Voting Status Notice, including the Opt-Out Form

(Page | 15)

| | |
|---|---|
| Debtors: | BED BATH & BEYOND INC., *et al.* |
| Case No. | 23-13359 (VFP) |
| Caption of Order: | ORDER (I) (A) CONDITIONALLY APPROVING THE ADEQUACY OF THE DISCLOSURE STATEMENT, (B) APPROVING THE SOLICITATION AND NOTICE PROCEDURES WITH RESPECT TO CONFIRMATION OF THE PLAN, (C) APPROVING THE FORMS OF BALLOTS AND NOTICES IN CONNECTION THEREWITH, (D) SCHEDULING A COMBINED DISCLOSURE STATEMENT APPROVAL AND PLAN CONFIRMATION HEARING AND CERTAIN DATES AND DEADLINES WITH RESPECT THERETO, AND (E) GRANTING RELATED RELIEF, AND (II) (A) EXTENDING THE DEBTORS' EXCLUSIVE PERIODS TO FILE A CHAPTER 11 PLAN AND SOLICIT ACCEPTANCES THEREOF PURSUANT TO SECTION 1121 OF THE BANKRUPTCY CODE AND (B) GRANTING RELATED RELIEF |

attached to each notice, in lieu of Solicitation Packages, the form of each of which is hereby

approved, to those parties, outlined below, who are not entitled to vote on the Plan:

| Class | Status | Treatment |
|---|---|---|
| Class 1 and Class 2 | Unimpaired—Deemed to Accept | Will receive a notice, substantially in the form attached hereto as **Exhibit 4A**, in lieu of a Solicitation Package. |
| Class 9 and Class 10 | Impaired—Deemed to Reject | Will receive a notice, substantially in the form attached hereto as **Exhibit 4B**, in lieu of a Solicitation Package. |
| N/A | Disputed Claims | Holders of Claims or Interests that are subject to a pending objection filed by the Debtors are not entitled to vote the disputed portion of their Claim or Interest.  As such, Holders of such Claims or Interests will receive a notice, substantially in the form attached hereto as **Exhibit 4C**. |

23.    The Debtors are not required to distribute Solicitation Packages, other solicitation

materials, or a Non-Voting Status Notice to:  (i) Holders of Claims that have already been paid in

full during these Chapter 11 Cases or that are authorized to be paid in full in the ordinary course

of business pursuant to an order previously entered by this Court; or (ii) any party to whom notice

of the Motion was sent but was subsequently returned as undeliverable without a forwarding

address by the Voting Record Date; or (c) the Holders in Class 7 (Intercompany Claims) or

(Page | 16)

| | |
|---|---|
| Debtors: | BED BATH & BEYOND INC., *et al.* |
| Case No. | 23-13359 (VFP) |
| Caption of Order: | ORDER (I) (A) CONDITIONALLY APPROVING THE ADEQUACY OF THE DISCLOSURE STATEMENT, (B) APPROVING THE SOLICITATION AND NOTICE PROCEDURES WITH RESPECT TO CONFIRMATION OF THE PLAN, (C) APPROVING THE FORMS OF BALLOTS AND NOTICES IN CONNECTION THEREWITH, (D) SCHEDULING A COMBINED DISCLOSURE STATEMENT APPROVAL AND PLAN CONFIRMATION HEARING AND CERTAIN DATES AND DEADLINES WITH RESPECT THERETO, AND (E) GRANTING RELATED RELIEF, AND (II) (A) EXTENDING THE DEBTORS' EXCLUSIVE PERIODS TO FILE A CHAPTER 11 PLAN AND SOLICIT ACCEPTANCES THEREOF PURSUANT TO SECTION 1121 OF THE BANKRUPTCY CODE AND (B) GRANTING RELATED RELIEF |

Class 8 (Intercompany Interests). For purposes of serving the Solicitation Packages, Non-Voting Notices, and the Combined Hearing Notices, the Notice and Claims Agent is authorized to rely on the address information maintained by the Debtors and provided to the Notice and Claims Agent as of the Voting Record Date. The Debtors also request a waiver of (i) any requirement to re-mail undeliverable Solicitation Packages or other undeliverable solicitation-related notices that were returned marked "undeliverable," "moved—no forwarding address," or otherwise returned; and (ii) any obligation for the Debtors or the Notice and Claims Agent to conduct any additional research for updated addresses based on undeliverable Solicitation Packages or other undeliverable solicitation-related notices.

**F.      Approval of Notices to Contract and Lease Counterparties.**

24.      The Debtors are authorized to mail a notice of rejection or assumption of any Executory Contracts or Unexpired Leases, in the forms attached hereto as **Exhibit 8** and **Exhibit 9** respectively, to the applicable counterparties to Executory Contracts and Unexpired Leases that will be rejected or assumed pursuant to the Plan, within the time periods specified in the Plan.

(Page | 17)

| | |
|---|---|
| Debtors: | BED BATH & BEYOND INC., *et al.* |
| Case No. | 23-13359 (VFP) |
| Caption of Order: | ORDER (I) (A) CONDITIONALLY APPROVING THE ADEQUACY OF THE DISCLOSURE STATEMENT, (B) APPROVING THE SOLICITATION AND NOTICE PROCEDURES WITH RESPECT TO CONFIRMATION OF THE PLAN, (C) APPROVING THE FORMS OF BALLOTS AND NOTICES IN CONNECTION THEREWITH, (D) SCHEDULING A COMBINED DISCLOSURE STATEMENT APPROVAL AND PLAN CONFIRMATION HEARING AND CERTAIN DATES AND DEADLINES WITH RESPECT THERETO, AND (E) GRANTING RELATED RELIEF, AND (II) (A) EXTENDING THE DEBTORS' EXCLUSIVE PERIODS TO FILE A CHAPTER 11 PLAN AND SOLICIT ACCEPTANCES THEREOF PURSUANT TO SECTION 1121 OF THE BANKRUPTCY CODE AND (B) GRANTING RELATED RELIEF |

### III.   Approval of the Solicitation and Voting Procedures.

25.   The Debtors are authorized to solicit, receive, and tabulate votes to accept the Plan in accordance with the Solicitation and Voting Procedures attached hereto as **Exhibit 3**, which are hereby approved in their entirety.

### IV.   Approval of Procedures for Confirming the Plan.

#### A.   Approval of the Procedures for Filing Objections to the Final Approval of the Adequacy of the Disclosure Statement or Confirmation of the Plan.

26.   Objections to the final approval of the adequacy of the Disclosure Statement or confirmation of the Plan will not be considered by the Court unless such objections are timely filed and properly served in accordance with this Order and the *Order (I) Establishing Certain Notice, Case Management, and Administrative Procedures, and (II) Granting Related Relief* [Docket No. 98] (the "Case Management Order").  Specifically, all objections to the final hearing on the adequacy of the Disclosure Statement or confirmation of the Plan or requests for modifications to the Plan, if any, **must**:  (a) be in writing; (b) conform to the Bankruptcy Rules, the Local Rules, and any orders of this Court; (c) state, with particularity, the legal and factual basis for the objection and, if practicable, a proposed modification to the Plan (or related materials) that would resolve such objection; and (d) be filed with the Court (contemporaneously with a proof of service)

(Page | 18)

| | |
|---|---|
| Debtors: | BED BATH & BEYOND INC., *et al.* |
| Case No. | 23-13359 (VFP) |
| Caption of Order: | ORDER (I) (A) CONDITIONALLY APPROVING THE ADEQUACY OF THE DISCLOSURE STATEMENT, (B) APPROVING THE SOLICITATION AND NOTICE PROCEDURES WITH RESPECT TO CONFIRMATION OF THE PLAN, (C) APPROVING THE FORMS OF BALLOTS AND NOTICES IN CONNECTION THEREWITH, (D) SCHEDULING A COMBINED DISCLOSURE STATEMENT APPROVAL AND PLAN CONFIRMATION HEARING AND CERTAIN DATES AND DEADLINES WITH RESPECT THERETO, AND (E) GRANTING RELATED RELIEF, AND (II) (A) EXTENDING THE DEBTORS' EXCLUSIVE PERIODS TO FILE A CHAPTER 11 PLAN AND SOLICIT ACCEPTANCES THEREOF PURSUANT TO SECTION 1121 OF THE BANKRUPTCY CODE AND (B) GRANTING RELATED RELIEF |

and served upon the notice parties so as to be **actually received** on or before the Combined Objection Deadline by each of the notice parties identified in the Combined Hearing Notice.

**B.    Approval of Consequences of Not Confirming or Consummating the Plan.**

27.    If the Debtors revoke or withdraw the Plan, or if the Disclosure Statement is not finally approved, or if Confirmation or the Effective Date does not occur, then:  (i) the Plan will be null and void in all respects; (ii) any settlement or compromise not previously approved by Final Order of the Court embodied in the Plan (including the fixing or limiting to an amount certain of the Claims or Interests or Classes of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effectuated by the Plan, and any document or agreement executed pursuant to the Plan will be null and void in all respects; and (iii) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims, Interests, or Causes of Action by any Entity,

(Page | 19)

| | |
|---|---|
| Debtors: | BED BATH & BEYOND INC., *et al*. |
| Case No. | 23-13359 (VFP) |
| Caption of Order: | ORDER (I) (A) CONDITIONALLY APPROVING THE ADEQUACY OF THE DISCLOSURE STATEMENT, (B) APPROVING THE SOLICITATION AND NOTICE PROCEDURES WITH RESPECT TO CONFIRMATION OF THE PLAN, (C) APPROVING THE FORMS OF BALLOTS AND NOTICES IN CONNECTION THEREWITH, (D) SCHEDULING A COMBINED DISCLOSURE STATEMENT APPROVAL AND PLAN CONFIRMATION HEARING AND CERTAIN DATES AND DEADLINES WITH RESPECT THERETO, AND (E) GRANTING RELATED RELIEF, AND (II) (A) EXTENDING THE DEBTORS' EXCLUSIVE PERIODS TO FILE A CHAPTER 11 PLAN AND SOLICIT ACCEPTANCES THEREOF PURSUANT TO SECTION 1121 OF THE BANKRUPTCY CODE AND (B) GRANTING RELATED RELIEF |

(b) prejudice in any manner the rights of any Debtor or any other Entity, or (c) constitute an admission, acknowledgment, offer, or undertaking of any sort by any Debtor or any other Entity.

**V.      Approval of Extension of the Exclusivity Periods.**

28.    Pursuant to section 1121(d) of the Bankruptcy Code, the Debtors' Filing Exclusivity Period pursuant to section 1121(b) of the Bankruptcy Code is hereby extended 90 days through and including November 20, 2023.

29.    Pursuant to section 1121(d) of the Bankruptcy Code, the Debtors' Soliciting Exclusivity Period pursuant to section 1121(c) of the Bankruptcy Code is hereby extended 90 days through and including January 18, 2024.

30.    Nothing herein shall prejudice (a) the Debtors' rights to seek further extensions of the Exclusivity Periods consistent with section 1121(d) of the Bankruptcy Code, or (b) the rights of any party in interest to object to any further extension requests.

**VI.      Miscellaneous.**

31.    The Debtors are authorized to make non-substantive changes to the Disclosure Statement, Plan, Combined Hearing Notice, Solicitation Packages, Non-Voting Status Notices, Ballots, Publication Notice, Cover Letter, Solicitation and Voting Procedures, Plan Supplement

(Page | 20)

| Debtors: | BED BATH & BEYOND INC., *et al.* |
|---|---|
| Case No. | 23-13359 (VFP) |
| Caption of Order: | ORDER (I) (A) CONDITIONALLY APPROVING THE ADEQUACY OF THE DISCLOSURE STATEMENT, (B) APPROVING THE SOLICITATION AND NOTICE PROCEDURES WITH RESPECT TO CONFIRMATION OF THE PLAN, (C) APPROVING THE FORMS OF BALLOTS AND NOTICES IN CONNECTION THEREWITH, (D) SCHEDULING A COMBINED DISCLOSURE STATEMENT APPROVAL AND PLAN CONFIRMATION HEARING AND CERTAIN DATES AND DEADLINES WITH RESPECT THERETO, AND (E) GRANTING RELATED RELIEF, AND (II) (A) EXTENDING THE DEBTORS' EXCLUSIVE PERIODS TO FILE A CHAPTER 11 PLAN AND SOLICIT ACCEPTANCES THEREOF PURSUANT TO SECTION 1121 OF THE BANKRUPTCY CODE AND (B) GRANTING RELATED RELIEF |

Notice, Assumption and Rejection Notices, and any related documents after the entry of this Order without further order of the Court, including changes to correct typographical and grammatical errors, if any, and to make conforming changes to the Disclosure Statement, the Plan and related documents (including the appendices thereto), and any other materials in the Solicitation Packages.

32.    The Debtors' rights are reserved to modify the Plan in accordance with Article XII thereof, including the right to withdraw the Plan as to any or all Debtors at any time before the Confirmation Date.

33.    Nothing in this Order shall be construed as a waiver of the right of the Debtors or any other party in interest, as applicable, to object to a proof of claim after the Voting Record Date.

34.    This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

35.    All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

36.    The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

(Page | 21)

| | |
|---|---|
| Debtors: | BED BATH & BEYOND INC., *et al.* |
| Case No. | 23-13359 (VFP) |
| Caption of Order: | ORDER (I) (A) CONDITIONALLY APPROVING THE ADEQUACY OF THE DISCLOSURE STATEMENT, (B) APPROVING THE SOLICITATION AND NOTICE PROCEDURES WITH RESPECT TO CONFIRMATION OF THE PLAN, (C) APPROVING THE FORMS OF BALLOTS AND NOTICES IN CONNECTION THEREWITH, (D) SCHEDULING A COMBINED DISCLOSURE STATEMENT APPROVAL AND PLAN CONFIRMATION HEARING AND CERTAIN DATES AND DEADLINES WITH RESPECT THERETO, AND (E) GRANTING RELATED RELIEF, AND (II) (A) EXTENDING THE DEBTORS' EXCLUSIVE PERIODS TO FILE A CHAPTER 11 PLAN AND SOLICIT ACCEPTANCES THEREOF PURSUANT TO SECTION 1121 OF THE BANKRUPTCY CODE AND (B) GRANTING RELATED RELIEF |

37.     Notwithstanding Bankruptcy Rule 6004(h), to the extent applicable, this Order shall be effective and enforceable immediately upon entry hereof.

38.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rules and the Local Rules are satisfied by such notice.

39.     The requirement set forth in Local Rule 9013-1(a)(3) that any motion be accompanied by a memorandum of law is hereby deemed satisfied by the contents of the Motion or otherwise waived.

## **Exhibit 1**

### **Disclosure Statement Order**

*[Omitted]*

## Exhibit 2

### Combined Hearing Notice

*[Omitted]*

## **Exhibit 3**

**Solicitation and Voting Procedures**

*[Omitted]*

**<u>Exhibit 4A</u>**

**Unimpaired Non-Voting Status Notice**

*[Omitted]*

## **Exhibit 4B**

**Impaired Non-Voting Status Notice**

*[Omitted]*

## **Exhibit 4C**

### **Notice to Disputed Claim Holders**

*[Omitted]*

**Exhibit 5A**

**Form of Ballot for Holders of
Class 3 DIP Claims and Class 4 FILO Claims**

*[Omitted]*

## <u>Exhibit 5B</u>

**Form of Ballot for Holders of
Class 5 Junior Secured Claims**

*[Omitted]*

## **Exhibit 5C**

**Form of Ballot for Holders of
Class 6 General Unsecured Claims**

*[Omitted]*

**<u>Exhibit 5D</u>**

**Class 6 – 2014 Senior Unsecured Notes Claims (Beneficial Holder Ballot)**

*[Omitted]*

## Exhibit 5E

**Class 6 2014 Senior Unsecured Notes Claims (Master Ballot)**

*[Omitted]*

## **Exhibit 6**

**Cover Letter**

*[Omitted]*

## **Exhibit 7**

**Plan Supplement Notice**

*[Omitted]*

## **Exhibit 8**

**Notice of Assumption of Executory Contracts and Unexpired Leases**

*[Omitted]*

## __Exhibit 9__

**Notice of Rejection of Executory Contracts and Unexpired Lease**

*[Omitted]*