**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Emily E. Geier, P.C. (admitted *pro hac vice*)
Derek I. Hunter (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
joshua.sussberg@kirkland.com
emily.geier@kirkland.com
derek.hunter@kirkland.com

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com

*Co-Counsel for Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| BED BATH & BEYOND INC., *et al.*, | Case No. 23-13359 (VFP) |
| Debtors.[1] | (Jointly Administered) |

**NOTICE OF REMOVAL**

Bed Bath & Beyond, Inc. ("BBB") files this Notice of Removal from the Superior Court

of New Jersey Law Division, Union County to the United States Bankruptcy Court for the District

---

[1]  The last four digits of Debtor Bed Bath & Beyond Inc.'s tax identification number are 0488. A complete list of the Debtors in these Chapter 11 Cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/bbby. The location of Debtor Bed Bath & Beyond Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 650 Liberty Avenue, Union, New Jersey 07083.

of New Jersey ("Bankruptcy Court") pursuant to 28 U.S.C. § 1452(a), Rule 9027 of the Federal

Rules of Bankruptcy Procedure ("Bankruptcy Rules"), and Local Rule 9027-1 of the Local Rules

of the United States Bankruptcy Court for the District of New Jersey ("Local Rules").  Under Local

Rule 9027-1(a), this pleading is filed with the Clerk of Court for the Bankruptcy Court.

## I.     BACKGROUND

### A.     The Parties

1.     BBB is incorporated under the laws of the State of New York.  Its principal place

of business is 650 Liberty Avenue, Union, New Jersey 07083.

2.     Mara Sirhal (the "Defendant") is an individual residing in South Orange, New

Jersey.  The Defendant was employed at BBB as Executive Vice President, Brand President, Bed

Bath & Beyond, until her voluntary resignation without good reason effective April 9, 2023.

### B.     Factual Summary

3.     The facts below have been summarized from the complaint (the "Complaint")

initiating the lawsuit filed on April 21, 2023 by Debtor Bed Bath & Beyond, Inc. against Mara

Sirhal in the Superior Court of New Jersey Law Division, Union County captioned *Bed Bath &*

*Beyond, Inc. v. Mara Sirhal*, Docket No. UNN-L-001291-23 ("Lawsuit").  A true and accurate

copy of the Complaint is attached hereto as **Exhibit A-2** and incorporated herein by reference.

4.     The Defendant began her employment with BBB on or about December 14, 2020.

Over the course of the Defendant's employment, BBB paid to the Defendant three bonuses that

form the basis for the damages sought in the Complaint:  (a) a recognition award in the amount of

$106,250 (the "Recognition Award") paid on May 26, 2022; (b) a sign-on bonus in the amount of

$220,000 paid on or about June 28, 2022; and (c) a retention bonus in the amount of $314,000

(the "Retention Bonus," and, together with the Recognition Award and the Sign-On Bonus, the

"Bonuses") paid on or around February 7, 2023.  The terms of each of the Bonuses provided that

the Defendant would be required to repay certain amounts thereof if she resigned her employment before certain milestones.  Specifically, the Defendant was required to repay the Sign-On Bonus in the event that she resigned from her employment with BBB without "Good Reason," as defined in the employment agreement between BBB and the Defendant.

5.        On March 10, 2023, the Defendant gave written notice to BBB of her resignation, asserting that such resignation was for "Good Reason."  On March 16, 2023, BBB's Chief Legal Counsel delivered correspondence to the Defendant stating BBB's disagreement with the Defendant's assertion of "Good Reason," accepting the Defendant's resignation effective April 9, 2023, and notifying the Defendant that her resignation without "Good Reason," paired with the timing of such resignation, triggered the obligation to repay portions of the bonuses totaling $353,768.16 to BBB.

6.        On March 20, 2023, counsel to the Defendant delivered correspondence to BBB denying that the Defendant owed any amounts to BBB and asserting the Defendant's entitlement to the payment of certain amounts allegedly due to her under the terms of the Employment Agreement.

7.        BBB filed the Complaint on April 21, 2023.

**C.        BBB's Chapter 11 Cases**

8.        On April 23, 2023 (the "Petition Date"), above-captioned debtors and debtors in possession (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code ("Bankruptcy Code") with the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court").  BBB was among the entities that filed for chapter 11.  *See* **Exhibit B-1** (*Voluntary Petition for Non-Individuals Filing for Bankruptcy*, *In re Bed Bath & Beyond, Inc.*, No. 23-13359 (Bankr. D. N.J. Apr. 23, 2023) [Docket No. 1]).  The Court consolidated the chapter 11 cases for procedural purposes and ordered their joint administration.

*See* **Exhibit B-2** (*Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 75]).

## II.    THE BANKRUPTCY COURT'S JURISDICTION AND BASIS FOR REMOVAL[2]

9.      Section 1452 allows a party to "remove any claim or cause of action in a civil action other than a proceeding before the United States Tax Court or a civil action by a governmental unit to enforce such governmental unit's police or regulatory power, to the district court for the district where such civil action is pending, if such district court has jurisdiction of such claim or cause of action under section 1334 of this title."  28 U.S.C. § 1452(a).  Section 1334 grants this court original jurisdiction over all civil proceedings "arising under title 11, or arising in or related to cases under title 11."  28 U.S.C. § 1334(b).

10.     A proceeding is "related to" a bankruptcy case if it is owned by the debtor and becomes property of the estate under section 541(a) of the Bankruptcy Code or "conceivably may have an effect on the bankruptcy estate."  *In re Combustion Eng'g*, 391 F.3d 190, 226 (3d Cir. 2018) (citation omitted).  "A cause of action is considered property of the estate if the claim existed at the commencement of the filing and the debtor could have asserted the claim on [its] own behalf under state law."  *Board of Trustees of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 169 n.5 (3d Cir. 2002) (citation omitted).  Further, the court's "related to" jurisdiction encompasses an action "if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate."  *Combustion Eng'g*, 391 F.3d at 226 (citation omitted).

---

[2]    A notice of removal must "contain a short and plain statement of the facts which entitle the party filing the notice to remove."  Fed. R. Bankr. P. 9027(a)(1).

The Supreme Court has held that "related to" jurisdiction under 28 U.S.C. § 1334(b) should be interpreted broadly. *Celotex Corp. v. Edwards*, 514 U.S. 300, 307–08 (1995).

11. The causes of action at issue are indisputably property of BBB's bankruptcy estate. All of the events giving rise to the causes of action in the Complaint occurred before the Petition Date. Likewise, BBB not only could have filed, but did file the Complaint before the Petition Date, on April 21, 2023. Accordingly, the causes of action asserted in the Complaint are property of BBB's bankruptcy estate and the Bankruptcy Court has "related to" jurisdiction over them under 28 U.S.C. § 1334(b).

12. Even if the causes of action asserted in the Complaint weren't property of BBB's bankruptcy estate, the Bankruptcy Court would nevertheless have "related to" jurisdiction over them because of their conceivable effect on BBB's estate. As discussed above, through the Complaint BBB seeks repayment of more than $350,000 from the Defendant on account of various bonuses paid to her before her resignation. If successful, those claims will generate value for BBB's estate that will be available for distribution to BBB's creditors once a chapter 11 plan is confirmed. As such, these causes of action fall squarely within the Bankruptcy Court's "related to" jurisdiction.

13. For these reasons, removal is permitted under 28 U.S.C. § 1452(a).

14. Removal is timely pursuant to Bankruptcy Rule 9027(a)(3) and the Bankruptcy Court's *Order Enlarging the Period Within Which the Debtors May Remove Actions and (II) Granting Related Relief* [Docket No. 1403] because this Notice of Removal is filed before November 21, 2023. *See* **Exhibit B-3**.

15.    Venue is proper in the District of New Jersey under 28 U.S.C. § 1452(a) because the New Jersey state court where the Lawsuit is pending is located in this district.  Venue is also proper in the Bankruptcy Court.

## III.    COMPLIANCE WITH RULE 9027 AND LOCAL RULE 9027

16.    Bankruptcy Rule 9027(a)(1) requires that this Notice of Removal contain a statement that, upon removal of the cause of action, the party filing the notice does or does not consent to the entry of final orders or judgment by the bankruptcy court.  BBB consents to the entry of final orders or judgments by the Bankruptcy Court.

17.    Local Rule 9027-1(c) requires the removing party to, within 14 days after the filing the Notice of Removal, "file with the clerk of the bankruptcy court a copy of the docket sheet and all pleadings from the original court."  **Exhibit A** contains copies of those papers.

18.    Contemporaneously herewith, a Notice of Removal will be filed with the Clerk of Court for the Superior Court of New Jersey Law Division, Union County and on the chapter 11 docket in the Bankruptcy Court.

Dated: August 3, 2023

/s/ *Michael D. Sirota*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone:  (201) 489-3000
Email:      msirota@coleschotz.com
            wusatine@coleschotz.com
            fyudkin@coleschotz.com


**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Emily E. Geier, P.C. (admitted *pro hac vice*)
Derek I. Hunter (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900
Email:      joshua.sussberg@kirkland.com
            emily.geier@kirkland.com
            derek.hunter@kirkland.com


*Co-Counsel for Debtors and*
*Debtors in Possession*

### Exhibit A

**State Court Docket Sheet and Pleadings**

**A-1.  Docket Sheet**

**A-2.  Complaint**

**A-3.  Answer**

## Exhibit A-1

**Docket Sheet**

8/3/23, 12:45 PM    Case 23-13359-VFP    Doc 1830    Filed 08/04/23    Entered 08/04/23 19:42:06    Desc Main
Document    Page 10 of 135
Judiciary eCourts System - Civil Part

Home    Help    Logout

**CASE JACKET**

User:MAXINE NEUHAUSER

## Docket Number:  UNN L 001291 - 23

| Back | | Create Summary Report |

**Case Caption:** Bed Bath & Beyond In C. Vs Sirhal Mara

| | | |
|---|---|---|
| **Court:** Civil Part | **Venue:** Union | **Case Initiation Date:** 04/21/2023 |
| **Case Type:** Employment (Other Than Cepa Or Lad) | **Case Status:** Active | **Jury Demand:** 12 Jurors |
| **Case Track:** 2 | **Judge:** Mark P Ciarrocca | **Team:** 1 |
| **# of Discovery Days:** 300 | **Age of Case:** 00 YR 03 MO | **Consolidated Case:** N |
| **Original Discovery End Date:** 03/10/2024 | **Current Discovery End Date:** 03/10/2024 | **# of DED Extensions:** 0 |
| **Original Arbitration Date:** | **Current Arbitration Date:** | **# of Arb Adjournments:** 0 |
| **Original Trial Date:** | **Current Trial Date:** | **# of Trial Date Adjournments:** 0 |
| **Disposition Date:** | **Case Disposition:** Open | **Statewide Lien:** |

| Plaintiffs (1) | Defendants (1) | ACMS Documents (6) | Fees (6) |

Bed Bath & Beyond Inc.

### Case Actions

| Filed Date | Filings | Docket Text | Transaction ID | Entry Date |
|---|---|---|---|---|
| 04/21/2023 | 📎 ✉️ | Complaint with Jury Demand for UNN-L-001291-23 submitted by NEUHAUSER, MAXINE H, EPSTEIN BECKER & GREEN PC on behalf of BED BATH & BEYOND INC. against MARA SIRHAL | LCV20231339301 | 04/21/2023 |
| 04/22/2023 | 📎 ✉️ | TRACK ASSIGNMENT Notice submitted by Case Management | LCV20231341327 | 04/22/2023 |
| 04/27/2023 | 📎 ✉️ | PROOF OF SERVICE submitted by NEUHAUSER, MAXINE, H of EPSTEIN BECKER & GREEN PC on behalf of BED BATH & BEYOND INC. against MARA SIRHAL | LCV20231385824 | 04/27/2023 |
| 05/15/2023 | 📎 ✉️ | NOTICE OF APPEARANCE (NOT THE FIRST PAPER) submitted by DWORKIN, MARSHALL, O of MORITT HOCK & HAMROFF LLP on behalf of MARA SIRHAL against BED BATH & BEYOND INC. | LCV20231550153 | 05/15/2023 |
| 05/15/2023 | 📎 ✉️ | NOTICE OF APPEARANCE (NOT THE FIRST PAPER) submitted by DWORKIN, MARSHALL, O of MORITT HOCK & HAMROFF LLP on behalf of MARA SIRHAL against BED BATH & BEYOND INC. | LCV20231550156 | 05/15/2023 |
| 05/29/2023 | 📎 ✉️ | STIPULATION TO EXTEND TIME FOR ANSWER submitted by DWORKIN, MARSHALL, O of MORITT HOCK & HAMROFF LLP on behalf of MARA SIRHAL against BED BATH & BEYOND INC. | LCV20231659469 | 05/29/2023 |
| 07/31/2023 | 📎 ✉️ | Answer W/Jury Demand submitted by DWORKIN, MARSHALL, O of MORITT HOCK & HAMROFF LLP on behalf of MARA SIRHAL against BED BATH & BEYOND INC. | LCV20232221561 | 07/31/2023 |

Showing 1 to 7 of 7 entries

## Exhibit A-2

**Complaint**

Jeremy M. Brown, Esq. (# 046951995)
Maxine H. Neuhauser, Esq. (# 026591983 )
EPSTEIN BECKER & GREEN, P.C.
One Gateway Center, 13th Floor
Newark, New Jersey 07102
(973) 642-1900
Attorneys for Plaintiff
Bed Bath & Beyond Inc.

| | |
|---|---|
| BED BATH & BEYOND INC., <br><br> Plaintiff, <br><br> v. <br><br> MARA SIRHAL, <br><br> Defendant. | SUPERIOR COURT OF NEW JERSEY <br> LAW DIVISION: <br> UNION COUNTY <br><br> Docket No. UNN-L- <br><br> CIVIL ACTION <br><br> **COMPLAINT** |

Plaintiff Bed Bath & Beyond Inc. files this Complaint against defendant Mara Sirhal, and in support thereof avers as follows:

## THE PARTIES

1. Bed Bath & Beyond Inc. ("BBB" or the "Company") is a New York corporation with a principal place of business located at 650 Liberty Avenue, Union, New Jersey.

2. Mara Sirhal ("Sirhal") is an individual residing in South Orange, New Jersey. Sirhal was employed by BBB as Executive Vice President, Brand President, Bed Bath & Beyond, until her voluntary resignation without good reason effective April 9, 2023.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over the controversy and personal jurisdiction over the parties.

4. Venue is proper in Union County under Rule 4:3-1, et seq.

## FACTUAL ALLEGATIONS

1

5.   BBB is a retailer that sells a wide assortment of merchandise, principally including domestic merchandise and home furnishings under two brands currently, Bed Bath and Beyond and buybuy Baby.

6.   Harmon Face Values (also known as Harmon Discount, Harmon Discount Health & Beauty, or simply Harmon) was a retail chain of stores that mainly sold healthcare and beauty supplies at a discounted price, and which was owned by BBB from March 2002 to its closure in January 2023.

7.   On or about December 14, 2020, BBB employed Sirhal as Senior Vice President, GM, Harmon Beauty. Soon after, she was promoted to Senior Vice President, GMM, Health/Beauty/Consumables at Bed Bath & Beyond and Senior Vice President, GM, Harmon Beauty.

8.   On May 16, 2022, Sirhal signed a Recognition Award Agreement with BBB pursuant to which she received a Recognition Award of $106,250.00, less applicable deductions and withholdings on May 26, 2022 (the "Pay Date"). (Ex. A). The Recognition Award Agreement provided that in the event Sirhal resigned within 12 months of the Pay Date (i.e., before May 26, 2023), she would be required to repay to the Company a prorated after-tax portion of the award on or before her last day of employment, equal to the percentage of time she would not work looking at the calendar days between the Pay Date and her termination date.

9.   The following month, Sirhal signed an Employment Agreement with BBB which became effective June 28, 2022 ("Employment Agreement"). (Ex. B).

10. Pursuant to the Employment Agreement Sirhal became Executive Vice President, Chief Merchandising Officer and General Manager, Harmon, reporting to BBB's Chief Executive Officer (CEO) and among other things:

    a.   received an annual Base Salary of $550,000.00 (Ex. B at ¶3(a)),

2

    b.   was eligible for an annual cash performance bonus ("Annual Bonus") up to 70%

of her base salary (Ex. B at ¶3(b)), and

    c.   received a lump sum cash payment in the gross amount of $220,000.00, subject to

taxes and withholdings, as a one-time Sign-On Bonus ("Sign-On Bonus"). (Ex. B

at ¶3(e)).

11. Sirhal agreed that in the event she resigned her employment without Good Reason prior

to the first anniversary of the Employment Agreement's Effective Date (i.e., before June 28,

2023), she would be obligated to repay the Sign-On Bonus, net of taxes. (Ex. B at ¶3(e)).

12.  "Good Reason" under the Employment Agreement includes, "without Executive's written

consent … a material diminution in Executive's duties, authority or responsibilities of

employment; <u>provided</u>, in each case, that Executive has given the Company written notice

detailing the specific circumstances alleged to constitute Good Reason within sixty (60) calendar

days after **the first occurrence** of such circumstances**,** and the Company shall have thirty (30)

calendar days following receipt of such notice to cure such circumstances in all material respects;

<u>provided further</u>, that no termination due to Good Reason shall occur after the one-hundred

twentieth (120th) calendar day following the first occurrence of any grounds for Good Reason."

(Ex. B at ¶5(f)(iv)) (emphasis added).

13. Effective August 31, 2022, the Employment Agreement was amended by the First

Amendment to Employment Agreement (the "Amendment"), pursuant to which Sirhal's

position, duties and responsibilities under Section 1(b) of the Employment Agreement were

changed from duties and responsibilities consistent with the position of "Executive Vice

President, Chief Merchandising Officer and General Manager, Harmon" to duties and

responsibilities consistent with the position of "Executive Vice President, Brand President, Bed

Bath & Beyond."  (Ex. C at ¶1).

14. Under the Amendment, Sirhal explicitly agreed to take on, and in fact did take on, substantially increased duties and higher level responsibilities including new responsibilities for running the BBB and Harmon brands, e.g., store operations, merchandising, and profit and loss (P&L).

15. By Sirhal's own description on her LinkedIn as of April 21, 2023, she stated that she had a "President role with full P&L ownership for both Bed, Bath & Beyond and Harmon Health & Beauty retail banners. Functional responsibility for Merchandising, Planning, Stores, Brand Marketing and Site Merchandising verticals. Full responsibility of end to end customer experience across all channels." (Ex. D)

16. Consistent with her new title and elevated duties and responsibilities, the Amendment increased Sirhal's Base Salary $50,000.00 to $600,000.00 and increased her Annual Bonus opportunity to 75% of her Base Salary, thereby increasing her potential bonus to $65,000.00 (i.e., from $385,000.00 to $450,000.00).

17. As Brand President, Sirhal reported to the Company's CEO, Susan Gove, who met with her for weekly one-on-one meetings. Sirhal would stop into Ms. Gove's office to talk at other times as well.

18. At the end of 2022, Sirhal asked Ms. Gove for an executive job coach and Ms. Gove agreed.

19. The Company engaged a job coach for Sirhal, who focused particularly on helping Sirhal develop leadership skills. Sirhal's job coach conducted a 360-assessment of Sirhal, which was completed in early 2023. Of note, although the job coach three-times scheduled a meeting with Sirhal to review the 360 report, and it was cancelled each time.

20. Sirhal knew of BBB's and Harmon's financial situation and the challenges within which she had to operate her brand. In fact, the businesses for which Sirhal had responsibility were the

4

Company's worst performing operations at that time. As Brand President, she was the one responsible for the business, and for driving the profitability of her brands. She was an integral part of the decision making regarding her brands and the closures. She was the one responsible for her brands' P&L. In January 2023, she continued to be intimately involved in BBB's planning and efforts to maintain the BBB brand.

21. In light of what the Company considered her critical contributions to this effort, on or around February 7, 2023, BBB offered and Sirhal accepted a Retention Bonus agreement to incentivize her to stay employed by BBB in order to help get the job done. (Ex. E). Toward this end, and pursuant to the Retention Bonus agreement, BBB paid Sirhal $314,000.00, which she would not be required to repay provided "you are employed by the Company on the Completion Date" of June 8, 2023.

22. Of note, she entered into the agreement and accepted the Retention Bonus *after* the plans for closure of Harmon and a number of BBB stores.

23. The unambiguous, irrefutable purpose of the **retention** agreement and substantial payment paid to Sirhal were intended, designed, and understood by both the Company and Sirhal to keep her talents and make sure she would remain part of BBB's "all hands on deck" efforts to save the Company.

24. Unfortunately, it soon became apparent that Sirhal harbored a different plan. During her discussions with BBB relating to the Retention Bonus, she did not advise the Company that if she signed the Retention Bonus it was her intention to resign anyway after receiving the bonus payment and not repay the Company. The timing of Sirhal's resignation makes it indisputably plain that she never had any intention to stay.

FIRM:58637153v5

25. No sooner had the ink dried on the Retention Bonus Agreement, Sirhal gave written notice that she was resigning her employment. (Ex. F). By letter dated March 10, 2023, Sirhal asserted that she was doing so for Good Reason citing three purported grounds:

    a.  First, Sirhal asserted, "there has been a material diminution of my duties, authority, and responsibilities due to the closure of the Harmon Health & Beauty business and the closing of all its 54 Harmon freestanding stores and web business[;]"

    b.  Second, she asserted, "There has also been a material diminution of my duties, authorities, and responsibilities with the subsequent closure or planned closure of an additional 149 Bed Bath & Beyond stores[;]" and

    c.  Third, she asserted, "There has also been a diminishment of my decision-making role and authority, particularly regarding inventory procurement and staff resources."

26. In fact, during the 60 days prior to Sirhal's resignation, no material diminution of Sirhal's duties, authority or critical responsibilities occurred. Sirhal's level of responsibility never diminished. She continued to be responsible for P&L. She continued to be responsible for BBB operations and merchandising. She continued to report to the CEO. She presented to the Board. She continued to have an executive job coach. As of March 10, 2023, Sirhal had continuing high level responsibilities with respect to BBB's global brand.

27. To the extent that Sirhal's duties and responsibilities with respect to Harmon diminished, the first occurrence of such diminishment began more than 60 days before March 10, 2023, and therefore cannot constitute Good Reason. Moreover, she was part of the decision making team.

28. Sirhal admitted as much in her resignation letter, in which she acknowledged that transitioning of her duties could take months, which was plainly inconsistent with her self-

6

serving claim to have resigned for Good Reason because of diminished duties. Furthermore, Sirhal accepted the $314,000.00 payment under her Retention Bonus agreement given to her for the purpose of retaining her to continue working through June 8, 2023.

29.  After she sent her letter, Sirhal essentially disengaged in a play to avoid repaying the Sign-On and Retention Bonuses BBB had paid to her in good faith, and to assert bogus entitlement to termination benefits.

30. Sirhal admittedly failed to provide the 30 days' notice required by the Employment Agreement to invoke resignation for Good Reason and denied BBB the opportunity to cure provided by the Employment Agreement by unilaterally declaring that any such opportunity to cure would be futile. Her breach of the notice and cure provisions of the Employment Agreement, bars Sirhal from invoking the Good Reason provision of the  agreement.

31. In short, Sirhal's resignation was voluntary and not for Good Reason.

32. On March 16, 2023, David M. Kastin, BBB's Executive Vice President – Chief Legal Counsel wrote a letter to Sirhal advising that "the Company does not agree that Good Reason exists" and accepting her voluntary resignation effective April 9, 2023, for other than Good Reason and explaining that her voluntary resignation for other than Good Reason triggered obligations for her to immediately repay BBB $353,768.16. (Ex. G).

33. As explained in Mr. Kastin's letter:

a.  because Sirhal resigned other than for Good Reason prior to the first anniversary of the effective date of her Employment Agreement, she was obligated to immediately repay the after-tax portion of her Sign-On Bonus;

b.  because Sirhal resigned prior to June 8, 2023, the completion date of the Retention Bonus agreement, she was required to immediately repay the after-tax portion of her Retention Bonus; and

7

    c. because she resigned before May 26, 2023, which would have been the twelve-month anniversary of the payment of the recognition award pursuant to the Recognition Award Agreement dated May 16, 2022, he requested immediate repayment of the prorated after-tax portion of Sirhal's Recognition Award.

34. By letter dated March 20, 2023, an attorney replied to Mr. Kastin's letter on behalf of Sirhal, denying that Sirhal owed BBB anything. (Ex. H). The letter reiterated Sirhal's assertion that her resignation was for Good Reason and claimed that Sirhal was therefore entitled to (i) $600,000.00 base salary and her target bonus of $450,000.00 over the 12-month period following her last day of employment, (ii) immediate vesting of her one-time RSU award and (iii) payment of her COBRA payments as benefits under her Employment Agreement.

35. Sirhal's last date of employment by BBB was April 9, 2023.

36. Sirhal has failed and refused to repay BBB the money she owes pursuant to the Sign-On Bonus agreement, Retention Bonus agreement and Recognition Award agreement.

## <u>COUNT ONE</u>
### (Breach of Contract – Employment Agreement and First Amendment to Employment Agreement)

37. As set forth above, Sirhal voluntarily resigned her employment for reasons other than Good Cause before June 28, 2023 (i.e., the first anniversary of the effective date of the Employment Agreement).

38. Accordingly, pursuant to the terms of the Employment Agreement and Amendment, Sirhal is obligated to repay BBB the after tax portion of the Sign-On Bonus of $220,000.00.

39. Sirhal has failed and refused to repay the bonus as required.

8

40. Sirhal's failure and refusal to repay the after-tax portion of the Sign-On Bonus and the prorated portion of the Recognition Award pursuant to her agreements with BBB constitutes breach of contract.

WHEREFORE BBB demands judgment against Sirhal as follows:

(a)     compensatory damages in the amount of $220,000.00 net taxes, plus pre- and post-judgment interest;

(b)     punitive damages;

(c)     costs of suit and attorney's fees; and

(d)     such other relief as the Court deems just and equitable.

## COUNT TWO
(Breach of Contract – Retention Bonus)

41. BBB repeats the allegations set forth in paragraphs 1 through 40 as if set forth at length herein.

42. Sirhal voluntarily resigned her employment before June 8, 2023, and has failed and refused to repay her after-tax portion of the bonus in breach of her contractual agreement to do so.

WHEREFORE BBB demands judgment against Sirhal as follows:

(a)     compensatory damages in the amount of $314,000.00 net taxes, plus pre- and post-judgment interest;

(b)     punitive damages;

(c)     costs of suit and attorney's fees; and

(d)     such other relief as the Court deems just and equitable.

## COUNT THREE
(Breach of Contract – Recognition Award Agreement )

9

43. BBB repeats the allegations set forth in paragraphs 1 through 42 as if set forth at length herein.

44. Sirhal voluntarily resigned her employment before May 16, 2023, i.e., within 12 months of the Pay Date of the Recognition Award. Accordingly, she was contractually required to repay BBB the prorated after-tax portion of the Recognition Award, i.e., $8,997.89, on or before her last day of employment.

45. In breach of the Recognition Award Agreement Sirhal has failed and refused to remit the payment.

WHEREFORE BBB demands judgment against Sirhal as follows:

a. compensatory damages in the amount of $8,997.89 plus pre- and post-judgment interest;

b. punitive damages;

c. costs of suit and attorney's fees; and

d. such other relief as the Court deems just and equitable.

## **COUNT FOUR**
(Breach of the Covenant of Good Faith and Fair Dealing)

46. BBB repeats the allegations set forth in paragraphs 1 through 45 as if set forth at length herein.

47. The purpose of the Retention Bonus agreement with Sirhal and the reason that BBB paid her $314,000.00 was for her to remain employed by BBB until at least June 8, 2023. By resigning before that date, Sirhal destroyed BBB's rights to receive the agreed upon fruits of the Retention Bonus agreement.

48. By signing the agreement and accepting payment with full knowledge of what was going on at BBB with regard to its continuing viability and then turning around and walking out the

FIRM:58637153v5

door with the money paid to her in good faith still in her pocket, Sirhal's conduct breached her duty of good faith and fair dealing to BBB.

49. Sirhal's falsely asserting that she was resigning for Good Reason and falsely asserting entitlement to termination benefits similarly constitutes breach of her duty of good faith and fair dealing under the Employment Agreement and Amendment.

WHEREFORE BBB demands judgment against Sirhal as follows:

(a)     compensatory damages in the amount of $354,768.16, plus pre- and post-judgment interest;

(b)     punitive damages;

(c)     costs of suit and attorney's fees; and

(d)     such other relief as the Court deems just and equitable.

## COUNT FIVE
(Fraud – Retention Bonus)

50. BBB repeats the allegations set forth in paragraphs 1 through 49 as if set forth at length herein.

51. Sirhal engaged in discussions with BBB, signed the Retention Bonus Agreement and accepted payment of the bonus without ever disclosing to BBB that she had plans to resign and had no intention of remaining in BBB's employ through June 8, 2023.

52. Her failure to disclose her intentions when entering into the **Retention** Bonus agreement constituted material misrepresentation by omissions on which she expected BBB to rely and on which the Company in fact did rely.

53. Sirhal's disingenuously couched resignation letter with its many false assertions submitted on the very heels of signing the Retention Bonus agreement and receiving payment abundantly demonstrates her scheming.

54. Sirhal actions in signing the Retention Bonus Agreement and accepting the retention bonus under false pretenses constitutes fraud.

WHEREFORE, BBB demands judgment against Sirhal as follows:

(a)    compensatory damages in the amount of $314,000.00, plus pre- and post-judgment interest;

(b)    punitive damages;

(c)    costs of suit and attorney's fees; and

(d)    such other relief as the Court deems just and equitable.

## DEMAND FOR TRIAL BY JURY

Plaintiff, Bed Bath & Beyond Inc., demands trial by jury.

## DESIGNATION OF TRIAL COUNSEL

In accordance with <u>R.</u> 4:25-4, Jeremy Brown, Esq. is designated as trial counsel in this case.

EPSTEIN BECKER & GREEN, P.C.
Attorneys for Plaintiff
Bed Bath & Beyond Inc.

By:   /s/ Jeremy M. Brown

By:   /s/ Maxine H. Neuhauser
                    For the Firm

Dated:  April 21, 2023

## CERTIFICATION PURSUANT TO RULE 4:5-1

The undersigned hereby certifies that the within matter in controversy is not the subject of any other pending or contemplated court action or arbitration proceeding and knows of no additional parties who should be joined in this action.

EPSTEIN BECKER & GREEN, P.C.
Attorneys for Plaintiff
Bed Bath & Beyond Inc.

Dated:  April 21, 2023


By: */s/ Jeremy  M. Brown*
Jeremy M. Brown

FIRM:58637153v5

## <u>CERTIFICATION</u>

I hereby certify, in accordance with Rule 4:5-1, that to the best of my knowledge, information and belief that the instant matter in controversy is not the subject of any other action pending in any court or of a pending proceeding, nor is any other action or arbitration proceeding contemplated. I am not aware of the name of any other party who should be joined in the action.

<u>*/s/ Jeremy M. Brown*</u>
Jeremy M. Brown

Dated: April 21, 2023

14

## <u>CERTIFICATION OF COMPLIANCE WITH RULE 1:38-7</u>

I certify that confidential personal identifiers have been redacted from documents now submitted to the Court and will be redacted from all documents submitted in the future in accordance with <u>R</u>. 1:38-7(b).

*/s/ Jeremy  M. Brown*
Jeremy M. Brown

Dated: April 21, 2023



New Jersey Judiciary
Civil Practice Division

# Civil Case Information Statement (CIS)

Use for initial Law Division Civil Part pleadings (not motions) under Rule 4:5-1.
Pleading will be rejected for filing, under Rule 1:5-6(c), if information above the
black bar is not completed, or attorney's signature is not affixed.

### For Use by Clerk's Office Only

| Payment type ☐ check ☐ charge ☐ cash | Charge/Check Number | Amount $ | Overpayment $ | Batch Number |
|---|---|---|---|---|

| Attorney/Pro Se Name | Telephone Number | County of Venue |
|---|---|---|
| Jeremy M. Brown, Esq. | (973)642-1900  ext. | Union |

| Firm Name (if applicable) | Docket Number (when available) |
|---|---|
| Epstein Becker & Green P.C. | |

| Office Address - Street | City | State | Zip |
|---|---|---|---|
| One Gateway Center, 13th Floor | Newark | NJ | 07102 |

| Document Type | Jury Demand |
|---|---|
| Complaint | ■ Yes   ☐ No |

| Name of Party (e.g., John Doe, Plaintiff) | Caption |
|---|---|
| Plaintiff | Bed Bath & Beyond Inc. v. Mara Sirhal |

Case Type Number (See page 3 for listing)  509

Are sexual abuse claims alleged?  ☐ Yes   ■ No

Does this case involve claims related to COVID-19?  ☐ Yes   ■ No

Is this a professional malpractice case?  ☐ Yes   ■ No

   If "Yes," see N.J.S.A. 2A:53A-27 and applicable case law
   regarding your obligation to file an affidavit of merit.

Related Cases Pending?  ☐ Yes   ■ No

   If "Yes," list docket numbers

Do you anticipate adding any parties (arising out of same
transaction or occurrence)?  ☐ Yes   ■ No

Name of defendant's primary insurance company (if known)  ☐ None   ■ Unknown

| **The Information Provided on This Form Cannot be Introduced into Evidence.** |
|---|

Case Characteristics for Purposes of Determining if Case is Appropriate for Mediation

Do parties have a current, past or recurrent relationship?       ■ Yes       □ No
   If "Yes," is that relationship:
   ■ Employer/Employee       □ Friend/Neighbor       □ Familial       □ Business
   □ Other (explain) _____

Does the statute governing this case provide for payment of fees       ■ Yes       □ No
by the losing party?

Use this space to alert the court to any special case characteristics that may warrant individual
management or accelerated disposition.

   Do you or your client need any disability accommodations?       □ Yes       ■ No
     If yes, please identify the requested accommodation:

   Will an interpreter be needed?       □ Yes       ■ No
     If yes, for what language?

**I certify that confidential personal identifiers have been redacted from documents now
submitted to the court and will be redacted from all documents submitted in the future in
accordance with Rule 1:38-7(b).**

Attorney/Self-Represented Litigant Signature:   Jeremy Brown, Esq.

# EXHIBIT A

# RECOGNITION AWARD AGREEMENT

Mara Sirhal
General Management Group

As a people powered and performance-driven organization, we appreciate all of your hard work and effort. In recognition of your contribution, dedication and demonstration of our practices, we are pleased to provide you a Recognition Award of $ 106,250 . You will receive this award on May 26, 2022 ("Pay Date"), less applicable deductions and withholdings.

If you resign your employment with the Company or are terminated with Cause within 12 months of the Pay Date, you will repay to the Company a prorated portion of the Award on or before your last day of employment. The prorated portion shall be equal to the percentage of time you will not work looking at the calendar days between the Pay Date and your termination date. This will be based on the net amount of the Award (meaning that paid to you after deductions and withholdings).

Cause means, as determined by the Company in its sole discretion, insubordination, dishonesty, fraud, moral turpitude, willful misconduct, refusal to perform your duties or responsibilities for any reason other than illness or incapacity or materially unsatisfactorily performing your duties for the Company.

This Recognition Award Agreement is the only agreement between you and Bed Bath & Beyond, Inc. (the "Company") regarding this Recognition Award. The Agreement replaces all other agreements about this Award and cannot be changed except in writing signed by an authorized representative of the Company. Any legal interpretation of this will be governed by the law of New Jersey.

Thank you for your contribution to our transformation and success.

I have read and agree to the foregoing.

Dated:                        5/16/2022

Associate Name (Print):     Mara Sirhal

Associate Signature:        *Mara Sirhal*

# EXHIBIT B

EXECUTION COPY

# EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (this "Agreement"), dated as of June 28, 2022, is made by and between Bed Bath & Beyond Inc., a New York corporation (the "Company"), and Mara Sirhal ("Executive"). This Agreement shall govern the continued relationship between Executive and the Company, with the terms and conditions hereunder applicable from and after June 28, 2022 (the "Effective Date"); provided, however, that for all periods during which Executive was employed by the Company or any of its Affiliates prior to the Effective Date, such employment shall be governed by the terms and conditions of the offer letter by and between Executive and Company, dated as of December 14, 2020 (the "Prior Agreement") and applicable Company plans and policies, including, without limitation, any applicable restricted covenants (which shall survive following the Effective Date for so long as necessary to give effect thereto).

WHEREAS, Executive has been employed by the Company as Senior Vice President, GMM & General Manager, Harmon Face Values;

WHEREAS, the Company now desires to continue to employ Executive as its Executive Vice President, Chief Merchandising Officer and General Manager, Harmon effective as of the Effective Date pursuant to the terms and conditions set forth in this Agreement; and

WHEREAS, Executive is willing and able to continue to be employed by the Company and desires to do so on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the above recitals incorporated herein and the mutual covenants and promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby expressly acknowledged, the parties agree as follows:

1. **Retention and Duties**.

(a)     The Company hereby engages and employs Executive for the Term (as defined in  Section 2) on the terms and conditions expressly set forth in this Agreement. Executive hereby accepts and agrees to such engagement and employment, on the terms and conditions expressly set forth in this Agreement.

(b)     During the Term, Executive shall serve as the Executive Vice President, Chief Merchandising Officer and General Manager, Harmon of the Company, and shall perform such duties and have such responsibilities as are consistent with such position and as may from time to time be assigned to Executive by the Company's Chief Executive Officer ("CEO"). As Executive Vice President, Chief Merchandising Officer and General Manager, Harmon of the Company, Executive shall report to the CEO. In addition, the CEO may from time to time, in his or her sole discretion, assign to Executive such other duties, authorities and responsibilities that are not inconsistent with Executive's position as the Executive Vice President, Chief Merchandising Officer and General Manager, Harmon of the Company, including without limitation, service as an officer and/or on the boards of directors and committees of one or more of the Company's subsidiaries, in each case, without additional compensation.

(c)     Executive shall be located and perform her principal duties hereunder at the Company's principal headquarters located in Union, New Jersey. Executive acknowledges and agrees that she will be expected to comply with Company policies regarding remote or hybrid work as Company may establish from time to time. Notwithstanding the foregoing, Executive agrees and acknowledges that significant travel may be part of the performance of her services hereunder.

(d)      During the Term, Executive shall devote her entire working time, attention, and energies to the Company and shall not be engaged in any other business activity, whether or not such business activity is pursued for gain, profit or other pecuniary advantage, without the consent of the Company's Board of Directors (the "Board"). While Executive serves as Executive Vice President, Chief Merchandising Officer and General Manager, Harmon of the Company, the foregoing is not intended to restrict Executive's ability to (i) serve on the boards of civic or charitable organizations, or (ii) serve on up to one (1) other board with the consent of the Board or a duly authorized committee thereof, which consent will not be unreasonably withheld (subject in any event to compliance with the Company's Corporate Governance Guidelines); provided, that the foregoing activities are not competitive with the business of the Company and do not interfere or conflict with Executive's duties and obligations on behalf of the Company or create a potential business or fiduciary conflict of interest. Executive agrees to use her best efforts to perform her duties and responsibilities within, and agrees to abide by, the Company's written general employment policies and practices and such other reasonable policies, practices and restrictions as the Company shall from time to time establish and maintain for its executives, including, without limitation, the Company's Corporate Governance Guidelines and Policy of Ethical Standards for Business Conduct.

(e)      For the avoidance of doubt, and notwithstanding anything herein to the contrary, prior to the date on which the Company makes a public announcement regarding Executive's appointment as Chief Merchandising Officer , Executive agrees and acknowledges that she shall treat the existence and terms of this Agreement as confidential and shall not disclose or discuss this Agreement with anyone, other than with her spouse, her legal and/or financial advisors for purposes of seeking professional advice therefrom.

**2.**      **Term.**  The "Term" shall be the period commencing on the Effective Date and ending at the close of business on the day before the third (3rd) anniversary of the Effective Date, unless Executive's employment with the Company terminates earlier pursuant to Section 5. The Term shall be extended automatically by successive one (1) year periods unless either party provides the other party with written notice of an intention not to renew the Term at least thirty (30) days prior to such renewal date. The "Term" shall include any such automatic one (1) year extensions. The Term may be further modified only by a written agreement between the parties and in such case, the term "Term" shall be deemed to mean the Term as so modified. Notwithstanding anything to the contrary in this Agreement, Executive's employment with the Company shall be "at will."

**3.**      **Compensation and Reimbursement of Expenses.**

(a)      **Base Salary.** During the Term, Executive's annual base salary (the "Base Salary") shall be $550,000, payable in accordance with the Company's regular payroll practices in effect from time to time and subject to all applicable taxes and withholdings, but no less frequently than in semi-monthly installments. The Base Salary may be adjusted by the People, Culture and Compensation Committee of the Board (the "Compensation Committee") in its sole discretion. The parties acknowledge and agree that a portion of Executive's Base Salary shall constitute consideration for Executive's compliance with the restrictions and covenants set forth in Section 6 of this Agreement.

(b)      **Annual Bonus.** Beginning with respect to fiscal year 2022 and for each completed fiscal year thereafter during the Term, Executive shall be eligible to receive, with respect to periods from and after the Effective Date, an annual cash performance bonus (the "Annual Bonus"), with a target Annual Bonus opportunity equal to seventy (70%) of her Base Salary; provided, that the Annual Bonus with respect to fiscal year 2022 shall be prorated for the portion of fiscal year 2022 during which Executive was employed by the Company as the Chief Merchandising Officer (it being understood that Executive will also be eligible to receive an annual cash bonus payment with respect to the applicable bonus plan, and terms and conditions related thereto, in which she participated in fiscal year 2022 prior to the Effective Date, prorated for the portion of fiscal year 2022 prior to the Effective Date during which she served as

Senior Vice President, General Manager, Harmon, for the Company). The Annual Bonus earned, if any, with respect to a fiscal year will be subject to the performance of Executive and the Company during such year, relative to performance goals established for such fiscal year by the Compensation Committee, and may, for the avoidance of doubt, be less than the target Annual Bonus opportunity with respect to such year. The Compensation Committee shall determine the level of attainment of performance goals and the amount of the Annual Bonus following the end of each fiscal year, and the Company shall pay the Annual Bonus, to the extent payable in accordance with this Section 3(b), on or before the date that is two and one-half (2½) months following the end of the fiscal year with respect to which it is earned, provided that Executive's employment with the Company has not terminated on or prior to such date (except as expressly provided in Section 5(c) below).

(c)     **Long-Term Equity Incentive Awards.** In fiscal year 2023 and subject to all necessary approvals by the Compensation Committee, the Company shall grant Executive a long-term equity incentive award(s) under the Company's 2012 Incentive Compensation Plan, as amended from time to time or any successor plan (the "2012 Plan") or the Company's 2018 Incentive Compensation Plan, as amended from time to time or any successor plan (the "2018 Plan"), as determined by the Compensation Committee in its sole discretion (the "2023 Equity Award"). The 2023 Equity Award will have a target value at grant no less than 175% of base salary or $962,500, as determined by the Compensation Committee in its sole discretion. The target award value of equity-based awards hereunder in respect of fiscal years after 2023 will be reviewed annually for adjustment by the Compensation Committee in its sole discretion. The form, vesting criteria and forfeiture provisions, and other terms and conditions with respect to the 2023 Equity Award and any other future long-term equity incentive awards to be granted to Executive will be determined by the Compensation Committee in its sole discretion, and such awards will be subject to the terms and conditions of the 2012 Plan or 2018 Plan (or other plan as may be adopted from time to time) under which such awards are granted, as applicable, and any applicable award agreements thereunder. The determination of the number of shares subject to the 2023 Equity Award based on the value set forth above and any other long-term equity incentive awards granted hereunder, and the timing for such grants, will be made in accordance with the Compensation Committee Procedures for Equity Grants as in effect from time to time.

(d)     **One-Time Long-Term Equity Incentive Award.** As soon as reasonably practicable after the Effective Date and subject to all necessary approvals by the Compensation Committee, the Company shall grant to you a one-time award comprised 60% of performance stock units (the "One-Time PSU Award") and 40% of time-vesting restricted stock units (the "One-Time RSU Award"), subject to and in accordance with the terms of the 2012 Plan or the 2018 Plan, as determined by the Compensation Committee in its sole discretion and the applicable award agreements thereunder. The total value of the One-Time RSU Award and One-Time PSU Award at the date of grant will be $430,000, as determined by the Compensation Committee in its sole discretion. The One-Time RSU Award will vest in substantially equal installments on each of the first, second and third anniversaries of the grant date, subject to your continued employment with the Company from the Effective Date through the applicable vesting date, and the One-Time PSU Award will vest following completion of the applicable three-year performance period and based on achievement of the applicable performance goals, in each case, and subject to the terms of the 2012 Plan or the 2018 Plan, as applicable, and the applicable award agreements. The Company expects that the One-Time RSU Award and the One-Time PSU Award will be substantially consistent with the terms and conditions of such awards made to similarly situated executives in 2022.

(e)     **Signing Bonus.** On the Company's first payroll payment date following thirty (30) days after the Effective Date, the Company shall pay to Executive a lump-sum cash payment of $220,000, subject to all applicable taxes and withholdings as a one-time cash bonus (the "Sign-On Bonus"). Notwithstanding anything herein to the contract, in the event that Executive resigns her employment without Good Reason or if Executive is terminated involuntarily by the Company for Cause, in each case prior to the first (1st) anniversary of the Effective Date, Executive shall repay the Sign-On-Bonus to the Company, net of taxes.

In such case, Executive (i) expressly agrees and authorizes the Company to deduct such net amount from Executive's final paycheck and any other amounts that the Company might otherwise pay Executive upon termination and (ii) agrees to cooperate with the Company to facilitate the Company's recoupment of taxes withheld and remitted to the applicable taxing authorities with respect to the Sign-On Bonus.

(f)  **Reimbursement of Business Expenses.** Executive is authorized to incur reasonable expenses in carrying out her duties hereunder and shall, upon receipt by the Company of proper documentation with respect thereto (setting forth the amount, business purpose and establishing payment) be reimbursed for all such reasonable business expenses incurred during the Term, subject to the Company's written expense reimbursement policies and any written pre-approval policies in effect from time to time.

(g)  **Reimbursement of Legal Expenses.** The Company shall pay or reimburse Executive for her reasonable out-of-pocket legal expenses incurred in connection with the negotiation and execution of this Agreement, up to a maximum of $10,000.00. Executive shall provide the Company with such receipts or invoices as the Company deems reasonably necessary to verify the amount of such expenses.

4.  **Employee Benefits.**

(a)  **Company Employee Benefit Plans.** During the Term, Executive shall be provided the opportunity to participate in all standard employee benefit programs made available by the Company to the Company's senior executive employees generally, in accordance with the terms and conditions of such plans, including the eligibility and participation provisions of such plans and programs, as such plans or programs may be in effect from time to time. The Company reserves the right to amend any employee benefit plan, policy, program or arrangement from time to time, or to terminate such plan, policy, program or arrangement, consistent with the terms thereof at any time and for any reason without providing Executive with notice.

(b)  **Financial Planning Benefit.** During the Term, and without duplication of benefits payable in respect of periods prior to the Effective Date, upon presentation of appropriate documentation, the Company will reimburse Executive for up to $10,000.00 annually for assistance with tax preparation and financial planning.

(c)  **Automobile Allowance.** During the Term, and without duplication of benefits payable in respect of periods prior to the Effective Date, the Company will provide Executive with an automobile allowance of $1,000.00 per month on an after-tax basis, which may be applied toward the cost of leasing or purchasing an automobile, or toward the cost of a car service or other similar transportation service.

(d)  **Vacation and Other Leave.** During the Term, and without duplication of benefits payable in respect of periods prior to the Effective Date, Executive shall be entitled to take time off consistent with our Flexible Time Off Policy, or similar policy that may be in effect from time to time. Executive shall also be eligible for all other holiday and leave pay generally available to other executives of the Company.

5.  **Termination of Employment.**

(a)  **Termination by the Company; Termination Due to Death.** Executive's employment with the Company, and the Term, may be terminated by the Company immediately upon notice to Executive for an involuntary termination of employment for Cause (as defined in Section 5(f)(ii)), without Cause or

due to Executive's Disability (as defined in Section 5(f)(iii)). Executive's employment with the Company, and the Term, shall automatically terminate upon Executive's death.

(b)      **Termination by Executive.** Executive's employment with the Company, and the Term, may be terminated by Executive for any reason with no less than thirty (30) calendar days' advance written notice to the Company.

(c)      **Benefits Upon Termination.** If Executive's employment with the Company is terminated during the Term for any reason by the Company or by Executive, the Company shall have no further obligation to make or provide to Executive, and Executive shall have no further right to receive or obtain from the Company, any payments or benefits except as follows:

(i)      <u>Any Termination</u>.  The Company shall pay Executive (or, in the event of her death, Executive's estate) any Accrued Obligations (as defined in Section 5(f)(i)) within the thirty (30) day period (or such earlier or later period as required by law or the applicable governing documents) following the date Executive's employment terminates (the "<u>Separation Date</u>"), and Executive shall receive any vested accrued benefits for which Executive remains eligible under the Company's employee welfare benefit and defined contribution retirement plans, payable according to the terms of such plans.

(ii)      <u>Non-Renewal by the Company; Without Cause; For Good Reason.</u>  If Executive's employment with the Company ends as a result of a non-renewal of the Term by the Company (and conditions for a Cause termination do not otherwise exist), an involuntary termination by the Company without Cause or due to Executive's resignation for Good Reason, then, in addition to the amounts payable under Section 5(c)(i), subject to Executive's execution, delivery, and non-revocation of the general release described in Section 5(e) (the "<u>General Release</u>") on the timing and terms contemplated in Section 5(e) and the other conditions and limitations herein, the Company shall pay or provide Executive with the following benefits:

(A)      Cash severance equal to, in the aggregate, one (1) times the sum of (x) Executive's Base Salary (at the rate in effect immediately prior to the Separation Date), and (y) Executive's target Annual Bonus (at the rate in effect with respect to the fiscal year in which the Separation Date occurs), subject to all applicable taxes and withholdings (collectively, the "<u>Severance Payment</u>"), payable in substantially equal installments over the twelve (12) months following the Separation Date in accordance with the Company's regular payroll payment schedule; <u>provided</u>, that no installment or portion of the Severance Payment shall be payable or paid prior to the expiration of the applicable revocation period for the General Release; and <u>provided further</u>, that if the Severance Payment is subject to Section 409A (as defined in Section 5(f)(v)) and the timing of Executive's execution and delivery of the General Release could affect the calendar year in which any amount of the Severance Payment is paid because the Separation Date occurred toward the end of a calendar year, then no portion of the Severance Payment shall be paid until the Company's first payroll payment date in the year following the year in which the Separation Date occurs, and any amount that is not paid prior to such date due to such restriction shall be paid (subject to the applicable conditions) along with the installment scheduled to be paid on that date; and

(B)      Any earned but unpaid Annual Bonus for a fiscal year ending prior to the fiscal year in which the Separation Date occurs, which will be paid when otherwise payable under Section 3(b) even though Executive's employment had terminated on or prior to that date, or, if later, and to the extent consistent with Section 409A, as soon as reasonably

practicable following the expiration of the applicable revocation period for the General Release.

(C)     As of the Separation Date, full and immediate acceleration of the vesting of the One-Time RSU Award.

(D)     If Executive elects continued health coverage pursuant to the Consolidated Omnibus Budget Reconciliation Act ("COBRA"), Executive will only be responsible for paying a portion of the COBRA premium that is equal to Executive's contribution rate in effect immediately prior to the Separation Date for Executive's applicable Medical, Dental, and Vision coverage under the Company's group health plan for herself, her spouse, and her dependents for the first fifty-two (52) weeks of COBRA. If Executive elects COBRA and does not pay the applicable portion of the COBRA premium within the time frame stipulated under COBRA, Executive's coverage will be cancelled beginning after the period covered by the last COBRA premium paid, subject to the terms of the governing documents for the applicable group health plan, and all costs incurred will be the responsibility of Executive. Following the aforementioned fifty-two (52)-week period, any continued health coverage pursuant to COBRA shall solely be at Executive's cost.

(iii)     Change In Control.  Executive shall be entitled to participate in the Bed Bath & Beyond Inc. Executive Change in Control Severance Plan, to the extent such Plan is in effect and as the same may be modified from time to time.

(d)     **Cooperation Upon Termination.** Upon Executive's termination of employment for any reason, Executive shall cooperate as reasonably requested by the Board to effect an orderly transition.

(e)     **Release; No Other Severance Benefits.**

(i)     This Section 5(e) shall apply notwithstanding anything else in this Agreement to the contrary. As a condition precedent to any Company obligation pursuant to Section 5(c)(ii) (collectively, the "Severance Benefits"), Executive shall provide the Company with a valid, executed General Release in substantially the form attached hereto as Exhibit A (as reasonably revised by the Company to comply with applicable law changes or interpretations or as otherwise necessary to ensure or bolster enforceability or tax effectiveness), and not revoke such General Release prior to the expiration of any revocation rights afforded under applicable law. The Company shall provide Executive with the General Release prior to the Separation Date, and Executive must deliver the executed General Release to the Company within twenty-one (21) calendar days (or, if greater, the minimum period required by applicable law) after the Separation Date, failing which Executive will forfeit all rights to the Severance Benefits.

(ii)     Executive agrees that the Severance Benefits shall be in lieu of any other severance benefit or other right or remedy to which Executive would otherwise be entitled under the Company's plans, policies or programs in effect on the Effective Date or thereafter except to the extent expressly agreed in writing by the Company and Executive; provided that, for the avoidance of doubt, upon a termination of Executive's employment, any equity awards held by her will, subject to the accelerated vesting provision provided above, be treated in accordance with the terms of the 2012 Plan or 2018 Plan, or any successor plan, as applicable, and the award agreements governing such awards. Executive acknowledges and agrees that in the event Executive breaches any provision of Section 6 or the General Release, her right to receive the Severance Benefits shall automatically terminate and Executive shall repay, return and restore any and all Severance Benefits received.

(f)      **Certain Defined Terms.** As used in this Agreement:

(i)      "Accrued Obligations" means (A) any Base Salary that had accrued but had not been paid (including any amount for accrued and unused vacation time payable in accordance with Section 4(d) or applicable law) on or before the Separation Date, (B) any reimbursement due to Executive pursuant to Sections 3 or 4 for expenses incurred by Executive on or before the Separation Date and (C) any other vested benefits or vested amounts due and owed to Executive under the terms of any plan, program or arrangement of the Company.

(ii)      "Cause" means (A) Executive's indictment for or plea of *nolo contendere* to a felony or commission of an act involving moral turpitude; (B) Executive's commission of fraud, theft, embezzlement, self-dealing, misappropriation or other malfeasance against the business of the Company, its subsidiaries or affiliates (individually, a "Company Group Member" and collectively, the "Company Group"); (C) Executive's indictment for or plea of *nolo contendere* to any serious offense that results in or would reasonably be expected to result in material financial harm, materially negative publicity or other material harm to any Company Group Member; (D) Executive's failure to perform any material aspect of her lawful duties or responsibilities for the Company or the Company Group (other than by reason of Disability), and if curable, fails to cure, in all material aspects, within thirty (30) calendar days after receiving written notice from the Company identifying such failure; (E) Executive's failure to comply with any lawful written policy of the Company (including, without limitation, the Company's Corporate Governance Guidelines or Policy of Ethical Standards for Business Conduct) or reasonable directive of the CEO or the Board, and in either case, if curable, fails to cure, in all material aspects, within thirty (30) calendar days after receiving written notice from the Company identifying such failure; (F) Executive's commission of acts or omissions constituting gross negligence or gross misconduct in the performance of any aspect of her lawful duties or responsibilities; (G) Executive's breach of any fiduciary duty owed to the Company Group; (H) Executive's violation or breach of any Restrictive Covenant (as defined in Section 7(a)) or any material term of the Agreement (including, without limitation, Section 7(b) hereof), and, if curable, fails to cure such violation or breach within thirty (30) calendar days after receiving written notice from the Company identifying such violation or breach; or (I) Executive's commission of any act or omission that damages or is reasonably likely to damage the financial condition or business of the Company or materially damages or is reasonably likely to materially damage the reputation, public image, goodwill, assets or prospects of the Company. In addition, Executive's employment shall be deemed to have terminated for "Cause" if, on the date Executive's employment terminates, facts and circumstances exist that would have justified a termination for Cause, even if such facts and circumstances are discovered following such termination.

(iii)      "Disability" means a physical or mental impairment that renders Executive unable to perform the essential functions of her employment with the Company, even with reasonable accommodation that does not impose an undue hardship on the Company, for more than ninety (90) calendar days, whether consecutive or not consecutive, in any consecutive twelve (12) month period, unless a longer period is required by federal or state law, in which case that longer period would apply.

(iv)      "Good Reason" means, subject to Section 11(b), without Executive's written consent, (A) a material reduction in the Base Salary, other than a reduction of less than ten percent (10%) in connection with a comparable decrease applicable to all senior executives of the Company; (B) a requirement by the Company that Executive relocate her primary place of employment more than thirty-five (35) miles from its location as of the Effective Date; or (C) a material diminution

in Executive's duties, authority or responsibilities of employment; <u>provided</u>, in each case, that Executive has given the Company written notice detailing the specific circumstances alleged to constitute Good Reason within sixty (60) calendar days after the first occurrence of such circumstances, and the Company shall have thirty (30) calendar days following receipt of such notice to cure such circumstances in all material respects; _provided further_, that no termination due to Good Reason shall occur after the one-hundred twentieth (120th) calendar day following the first occurrence of any grounds for Good Reason.

(v)    "Section 409A" means Section 409A of the Internal Revenue Code of 1986, as amended (the "Code") and the regulations, rules and other guidance promulgated thereunder.

(g)    **Officer/Board/Committee Resignations.**    Upon the termination of Executive's employment for any reason, Executive will be deemed to have resigned, without any further action by Executive, from any and all positions (including, but not limited to, any officer and/or director positions or positions as a fiduciary of any of the Company Group's employee benefit plans) that Executive, immediately prior to such termination, (i) held within the Company Group and (ii) held with any other entities at the direction of, or as a result of Executive's affiliation with, the Company Group.  If, for any reason, this Section 5(g) is deemed to be insufficient to effectuate such resignations, then Executive will, upon the Company's request, execute any documents or instruments that the Company may deem necessary or desirable to effectuate such resignations.

(h)    **Section 409A.**

(i)    It is intended that any amounts payable under this Agreement shall be exempt from and avoid the imputation of any tax, penalty or interest under Section 409A to the fullest extent permissible under applicable law; provided that if any such amount is or becomes subject to the requirements of Section 409A, it is intended that those amounts shall comply with such requirements. This Agreement shall be construed and interpreted consistent with that intent. In furtherance of that intent, if payment or provision of any amount or benefit hereunder that is subject to Section 409A at the time specified herein would subject such amount or benefit to any additional tax under Section 409A, the payment or provision of such amount or benefit shall be postponed to the earliest commencement date on which the payment or provision of such amount or benefit could be made without incurring such additional tax. In no event, however, shall the Company be liable for any tax, interest or penalty imposed on Executive under Section 409A or any damages for failing to comply with Section 409A.

(ii)    A termination of employment shall not be deemed to have occurred for purposes of any provision of this Agreement providing for the payment of any amounts or benefits upon or following a termination of employment that are considered "nonqualified deferred compensation" under Section 409A unless such termination is also a "separation from service" within the meaning of Section 409A and, for purposes of any such provision of this Agreement, references to a "termination," "termination of employment" or like terms shall mean "separation from service." If Executive is a "specified employee" within the meaning of Treasury Regulation Section 1.409A-1(i) as of the Separation Date, Executive shall not be entitled to any payment or benefit pursuant to this Agreement that constitutes nonqualified deferred compensation for purposes of Section 409A and that is payable upon a separation from service (within the meaning of Section 409A) until the earlier of (A) the date which is six (6) months after her separation from service for any reason other than death, or (B) the date of Executive's death; provided that this paragraph shall only apply if, and to the extent, required to avoid the imputation of any tax, penalty or interest pursuant to Section 409A. Any amounts otherwise payable to Executive upon or in the six (6) month period following Executive's separation from service that are not so paid by reason of this Section 5(h)(ii) shall be

paid (without interest) as soon as practicable (and in any event within thirty (30) calendar days) after the date that is six (6) months after Executive's separation from service (provided that in the event of Executive's death after such separation from service but prior to payment, then such payment shall be made as soon as practicable, and in all events within thirty (30) calendar days, after the date of Executive's death).

(iii)     Any reimbursement payment or in-kind benefit due to Executive pursuant to Sections 3 or 4, to the extent that such reimbursements or in-kind benefits are taxable to her, shall be paid on or before the last day of Executive's taxable year following the taxable year in which the related expense was incurred. Executive agrees to provide prompt notice to the Company of any such expenses (and any other documentation that the Company may reasonably require to substantiate such expenses) in order to facilitate the Company's timely reimbursement of the same. Reimbursements and in-kind benefits pursuant to Sections 3 or 4 are not subject to liquidation or exchange for another benefit and the amount of such benefits that Executive receives in one taxable year shall not affect the amount of such reimbursements or benefits that Executive receives in any other taxable year.

(iv)     For purposes of Section 409A, Executive's right to receive any installment payments hereunder shall be treated as a right to receive a series of separate and distinct payments. Whenever a payment under this Agreement specifies a payment period with reference to a number of days (e.g., payment shall be made within thirty (30) calendar days following the Separation Date), the actual date of payment within the specified period shall be within the sole discretion of the Company.

(i)     **Section 280G.** Notwithstanding anything to the contrary in this Agreement, in the event that any compensation, payment or distribution by the Company and all affiliates to or for the benefit of Executive, whether paid or payable or distributed or distributable pursuant to the terms of this Agreement or otherwise, including but not limited to the acceleration of the exercisability and/or vesting of any equity awards (the "Severance Amounts"), would, but for this Section 5(i), constitute an "excess parachute payment" as defined in Section 280G of the Code, the following provisions shall apply: (A) if the Severance Amounts, reduced by the sum of (I) the Excise Tax (as defined below) and (II) the total of the federal, state, and local income and employment taxes payable by Executive on the amount of the Severance Amounts which are in excess of the Threshold Amount (as defined below), are greater than or equal to the Threshold Amount, Executive shall be entitled to the full benefits payable under this Agreement, and (ii) if the Threshold Amount is less than (A) the Severance Amounts, but greater than (B) the Severance Amounts reduced by the sum of (1) the Excise Tax and (2) the total of the federal, state, and local income and employment taxes on the amount of the Severance Amounts which are in excess of the Threshold Amount, then the benefits payable under this Agreement shall be reduced (but not below zero) to the extent necessary so that the maximum Severance Amounts shall not exceed the Threshold Amount. For the purposes of this Section 5(i), "Threshold Amount" shall mean three (3) times Executive's "base amount" within the meaning of Section 280G(b)(3) of the Code and the regulations promulgated thereunder less one dollar ($1.00), and "Excise Tax" shall mean the excise tax imposed by Section 4999 of the Code, and any interest or penalties incurred by Executive with respect to such excise tax. The determination as to which of the alternative provisions of this Section 5(i) shall apply to Executive shall be made by a nationally recognized accounting firm selected by the Company or one of its affiliates (the "Accounting Firm"). For purposes of determining which of the alternative provisions of this Section 5(i) shall apply, Executive shall be deemed to pay federal income taxes at the highest marginal rate of federal income taxation applicable to individuals for the calendar year in which the determination is to be made, and state and local income taxes at the highest marginal rates of individual taxation in the state and locality of Executive's residence on the Separation Date, net of the maximum reduction in federal income taxes which could be obtained from deduction of such state and local taxes. Any determination by the Accounting Firm shall be binding upon the Company

and Executive, absent fraud or manifest error. In addition, notwithstanding anything herein to the contrary, in the event any payments are to be reduced, the reduction shall take place in a manner that produces the greatest economic advantage to Executive (and if reduction of two or more payments produce the same economic advantage they shall be reduced proportionally) but taking into account, as applicable, compliance with Section 409A. In no event shall the Company be liable or responsible for any Excise Tax imposed on Executive; provided, however, that this Section 5(i) shall not be construed to limit the remedies available to Executive in the event that Executive becomes subject to any Excise Tax, in a material amount, as a result of any fraud or error by the Accounting Firm.

### 6. **Restrictive Covenants**.

(a)      **Non-Disclosure and Non-Use of Confidential Information.**

(i)      Executive shall not use or disclose to any individual or natural person, partnership (including a limited liability partnership), corporation, limited liability company, association, joint stock company, trust, joint venture, unincorporated organization or governmental authority (each, a "Person"), either during her employment with the Company, the Term or thereafter, any Confidential Information (as defined below) of which Executive is or becomes aware, whether or not such information is developed by her, for any reason or purpose whatsoever, nor shall she make use of any of the Confidential Information for her own purposes or for the benefit of any Person except for the Company Group, except (A) to the extent that such disclosure or use is directly related to and required by Executive's performance in good faith of duties assigned to Executive by the Company or (B) to the extent required to do so by a law or legal process, including a court of competent jurisdiction. Executive shall not modify, reverse engineer, decompile, create other works from or disassemble any software programs contained in the Confidential Information of the Company unless permitted in writing by the Company. Executive will, at the sole expense of the Company, take all reasonable steps to safeguard Confidential Information and to protect it against disclosure, misuse, espionage, loss and theft.

(ii)      For purposes of this Agreement, "Confidential Information" means information that is not generally known to the public and that is used, developed or obtained by any Company Group Member in connection with its business, including, but not limited to, information, observations and data obtained by Executive during the Term concerning (A) the business or affairs of the Company Group (or any predecessor thereof) and (B) products, services, fees, costs, pricing structures, analyses, drawings, photographs and reports, computer software (including operating systems, applications and program listings), data bases, accounting and business methods, inventions, devices, new developments, methods and processes (whether patentable or unpatentable and whether or not reduced to practice), customers and clients and customer and client lists, information on current and prospective independent sales agents, software vendors or partners and sponsor banks, all technology and trade secrets, and all similar and related information in whatever form. Notwithstanding the foregoing, "Confidential Information" will not include any information that has been published in a form generally available to the public prior to the date Executive proposes to disclose or use such information (except where such public disclosure was made by Executive without authorization).

(iii)      For the avoidance of doubt, this Section 6(a) does not prohibit or restrict Executive (or Executive's attorney) from responding to any inquiry about this Agreement or its underlying facts and circumstances by the Securities and Exchange Commission, the Financial Industry Regulatory Authority, or any other self-regulatory organization or governmental entity, or making other disclosures that are protected under the whistleblower provisions of federal law or regulation. Executive understands and acknowledges that she does not need the prior authorization of the

Company to make any such reports or disclosures and that she is not required to notify the Company that she has made such reports or disclosures.

(iv)    Under the Defend Trade Secrets Act of 2016, Executive shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that is (A) made in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and solely for the purpose of reporting or investigating a suspected violation of law; or (B) in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. Further, an individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the employer's trade secrets to the attorney and use the trade secret information in the court proceeding if the individual: (x) files any document containing the trade secret under seal; and (y) does not disclose the trade secret, except pursuant to court order. Notwithstanding anything herein to the contrary and for the avoidance of doubt, nothing herein shall preclude the Company from disclosing the existence and/or terms and conditions of this Agreement, including without limitation, to the extent required by applicable law (including, without limitation, under applicable securities laws) or by judicial or administrative process.

(b)    **Intellectual Property Rights.**

(i)    Executive hereby assigns, transfers and conveys to the Company all of Executive's right, title and interest in and to all Work Product (as defined below). Executive agrees that all Work Product belongs in all instances to the Company. Executive will promptly disclose such Work Product to the Company and perform all actions reasonably requested by the Company (whether during or after the Term) to establish and confirm the Company's ownership of such Work Product (including, without limitation, the execution and delivery of assignments, consents, powers of attorney and other instruments) and to provide reasonable assistance to the Company (whether during or after the Term) in connection with the prosecution of any applications for patents, trademarks, trade names, service marks or reissues thereof or in the prosecution or defense of interferences relating to any Work Product. Executive recognizes and agrees that the Work Product, to the extent copyrightable, constitutes works for hire under the copyright laws of the United States.

(ii)    For purposes of this Agreement, "Work Product" means all inventions, innovations, improvements, technical information, systems, software developments, methods, designs, analyses, drawings, reports, service marks, trademarks, trade dress, logos and all similar or related information (whether patentable or unpatentable) which relates to the actual or anticipated business, operations, research and development of existing or future products or services of the Company Group and which are conceived, developed or made by Executive (whether or not during usual business hours and whether or not alone or in conjunction with any other Person) during the Term together with all patent applications, letters patent, trademark, trade name and service mark applications or registrations, copyrights and reissues thereof that may be granted for or upon any of the foregoing. Notwithstanding the foregoing, "Work Product" shall not include the patents and other assets set forth on Exhibit B hereto. Executive hereby represents and warrants that the patents and other assets owned by Executive set forth on Exhibit B are not related in any way to the Company Group, except as stated therein.

(c)    **Non-Competition.** During the Term and for twelve (12) months following the termination of Executive's employment for any reason, whether or not Executive is entitled to severance (the "Restricted Period"), Executive shall not, and shall cause her controlled affiliates not to, directly or indirectly, through or in association with any third party, engage or be interested in any Competitive Business in the United States as a shareholder, director, officer, employee, agent, broker, partner, individual

proprietor, lender, consultant or in any other capacity (provided, that nothing herein contained will prevent Executive from owning less than one percent (1%) of any class of equity or debt securities of any publicly traded company). For purposes of this Agreement, "Competitive Business" means (i) any business or enterprise that includes the operation of any retail store which utilizes (or intends to utilize) more than thirty percent (30%) of the selling space of the store for the sale of any combination of: giftware; housewares; linens and domestics; home furnishings; and/or health and beauty care products; and/or products for infants and young children (including, without limitation, cribs and juvenile furniture, toys and games, infant's and young children's clothing, strollers, car seats, carriers, bedding, bath and safety accessories, and feeding and eating accessories); and/or (ii) any business or enterprise that includes the operation of any non-traditional retail format (such as, but not limited to, any online, internet, catalog or television format) which allocates (or intends to allocate) more than thirty percent (30%) of such format's listing space or time slots to the sale of any combination of: giftware; housewares; linens and domestics; home furnishings; and/or health and beauty care products; and/or products for infants and young children (including, without limitation, cribs and juvenile furniture, toys and games, infant's and young children's clothing, strollers, car seats, carriers, bedding, bath and safety accessories, and feeding and eating accessories); and/or (iii) any other material business or enterprise of the Company Group; provided, however, that to the extent that, at the time of determination, health and beauty care products represent less than fifteen percent (15%) of the gross revenues of the Company Group, "Competitive Business" shall not include a health and beauty care product specialty retailer substantially all the gross revenues of which are generated by health and beauty care products.

(d)      **Non-Solicitation and Non-Interference.** During the Restricted Period, Executive shall not, and shall cause her controlled affiliates not to, directly or indirectly, through or in association with any third party, (i) call on, solicit or service, engage or contract with or take any action which may interfere with, impair, subvert, disrupt or alter the relationship, contractual or otherwise, between any Company Group Member and any current or prospective customer, supplier, distributor, developer, service provider, licensor or licensee, or other material business relation of such Company Group Member, (ii) solicit, induce, recruit or encourage any employees of or consultants to the Company Group to terminate their relationship with the Company Group or take away or hire such employees or consultants, (iii) divert or take away the business or patronage (with respect to products or services of the kind or type developed, produced, marketed, furnished or sold by the Company Group) of any of the clients, customers or accounts, or prospective clients, customers or accounts, of the Company Group or (iv) attempt to do any of the foregoing, either for Executive's own purposes or for any other third party.

(e)      **Non-Disparagement.** Executive shall not, in any manner, directly or indirectly, make any oral or written statement to any Person that disparages or places any Company Group Member or any of their respective officers, shareholders, members or advisors, any member of the Board, or any agents or others with whom the Company has business relationships, in a false or negative light; provided, however, that Executive shall not be required to make any untruthful statement or to violate any law.

**7.      Acknowledgment and Enforcement of Covenants; Representations.**

(a)      **Acknowledgment.** Executive acknowledges that she has become familiar, or will become familiar with the Company Group Members' trade secrets and with other confidential and proprietary information concerning the Company Group Members and their respective predecessors, successors, customers and suppliers, and that her services are of special, unique and extraordinary value to the Company. Executive acknowledges and agrees that the Company would not enter into this Agreement, providing for compensation and other benefits to Executive on the terms and conditions set forth herein, but for Executive's agreements herein (including those set forth in Section 6). Furthermore, Executive acknowledges and agrees that the Company will be providing Executive with additional special knowledge after the Effective Date, with such special knowledge to include additional Confidential Information and

trade secrets. Executive agrees that the covenants set forth in Section 6 (collectively, the "Restrictive Covenants") are reasonable and necessary to protect the Company Group's trade secrets and other Confidential Information, proprietary information, good will, stable workforce and customer relations.

(b)    **Representations.**

(i)    Without limiting the generality of Executive's agreement with the provisions of Section 7(a), Executive (A) represents that she is familiar with and has carefully considered the Restrictive Covenants; (B) represents that she is fully aware of her obligations hereunder; (C) agrees to the reasonableness of the length of time, scope and geographic coverage, as applicable, of the Restrictive Covenants; and (D) agrees that the Restrictive Covenants will continue in effect for the applicable periods set forth above regardless of whether Executive is then entitled to receive severance pay or benefits from the Company. Executive understands that the Restrictive Covenants may limit her ability to earn a livelihood in a business similar to the business of the Company Group, but she nevertheless believes that she has received and will receive sufficient consideration and other benefits as an employee of the Company and as otherwise provided hereunder or as described in the recitals hereto to clearly justify such restrictions which, in any event (given her education, skills and ability), Executive does not believe would prevent her from otherwise earning a living. Executive agrees that the Restrictive Covenants do not confer a benefit upon the Company disproportionate to the detriment of Executive.

(ii)    Executive hereby represents and warrants to the Company that: (A) the information that Executive provided to the Company regarding her background is truthful and accurate; (B) the execution and delivery of this Agreement and the performance by Executive of her duties hereunder do not and shall not constitute a breach of, conflict with, or otherwise contravene or cause a default under, the terms of any other agreement or policy to which Executive is a party or otherwise bound or any judgment, order or decree to which Executive is subject; (C) Executive has no information (including, without limitation, confidential information and trade secrets) relating to any other person or entity that would prevent Executive under the terms of any other agreement or arrangement from entering into this Agreement or carrying out her duties hereunder, or would give rise to a violation of such other agreement or arrangement; (D) Executive is not bound by any employment, consulting, non-competition, confidentiality, trade secret or similar agreement (other than this Agreement) with any other person or entity that would prevent Executive under the terms of any other agreement or arrangement from entering into this Agreement or carrying out her duties hereunder, or would give rise to a violation of such other agreement or arrangement; (E) Executive is not currently and has never been the subject of any allegation or complaint of harassment, discrimination, retaliation, or sexual or other misconduct in connection with any prior employment or otherwise, and has never been a party to any settlement agreement or nondisclosure agreement relating to such matters; and (F) Executive understands the Company will rely upon the accuracy and truth of the representations and warranties of Executive set forth herein and Executive consents to such reliance.

(c)    **Enforcement.** Executive agrees that a breach by Executive of any of the Restrictive Covenants may cause immediate and irreparable harm to the Company or another Company Group Member that would be difficult or impossible to measure, and that damages to the Company or the Company Group Member for any such injury may therefore be an inadequate remedy for any such breach. Therefore, Executive agrees that in the event of any breach or threatened breach of any provision of the Restrictive Covenants, the Company shall be entitled, in addition to and without limitation upon all other remedies the Company may have under this Agreement at law or otherwise, to seek to obtain from any court of competent jurisdiction specific performance, injunctive relief and/or other appropriate relief (without posting any bond or deposit) in order to enforce or prevent any violations of the Restrictive Covenants, or require Executive

13

to account for and pay over to the Company all compensation, profits, moneys, accruals, increments or other benefits derived from or received as a result of any transactions constituting a breach of the Restrictive Covenants if and when final judgment of a court of competent jurisdiction is so entered against Executive.

(d)     **Severability.** If, at the time of enforcement of the Restrictive Covenants, a court or arbitrator holds that the Restrictive Covenants are unreasonable under the circumstances then existing, the parties agree that the maximum period, scope or geographical area reasonable under such circumstances shall be substituted for the stated period, scope or area determined to be reasonable under the circumstances by such court or arbitrator, as applicable. Executive covenants and agrees that Executive shall not assert as a defense to any action seeking enforcement of the Restrictive Covenants (including an action seeking injunctive relief) that such provisions are not enforceable due to lack of sufficient consideration received by Executive.

(e)     **Tolling.** In the event of any violation of the provisions of Section 6, Executive acknowledges and agrees that the post-termination restrictions contained in Section 6 shall be extended by a period of time equal to the period of such violation, it being the intention of the parties hereto that the running of the applicable post-termination restriction period shall be tolled during any period of such violation.

(f)     **Survival of Provisions**. The obligations contained in Sections 6, 7, 9, 10 and 11 hereof shall survive any termination of Executive's employment with the Company and shall be fully enforceable thereafter.

**8.     Withholding Taxes/Authorized Deductions.** Notwithstanding anything herein to the contrary, the Company may withhold (or cause to be withheld) from any amounts otherwise due or payable under or pursuant to this Agreement such federal, state and local income, social security, employment or other taxes as may be required to be withheld pursuant to any applicable law or regulation, and make such deductions as may be applicable pursuant to the Company's policies and employee benefit plans.

**9.     Cooperation.** During and after the Term, Executive shall cooperate fully with any investigation or inquiry by the Company, or any governmental or regulatory agency or body concerning the Company or any other member of the Company Group; provided, that the Company shall reimburse Executive's reasonable expenses incurred in providing such cooperation subject to Executive's delivery of written notice to the Company prior to the time such expenses are incurred.

**10.     Clawback.** To the extent required by applicable law or regulation, any applicable stock exchange listing standards or any clawback policy adopted by the Company pursuant to any such law, regulation or stock exchange listing standards, or to comport with good corporate governance practices, the Annual Bonus and any other incentive compensation granted to Executive (whether pursuant to this Agreement or otherwise) shall be subject to the provisions of any applicable clawback policies or procedures, which may provide for forfeiture and/or recoupment of such amounts paid or payable under this Agreement or otherwise, including the incentive equity awards granted or to be granted to Executive under Section 3(c) and/or 3(d) of this Agreement or any other incentive equity awards granted to Executive.

**11.     Miscellaneous.**

(a)     **Insurance.** The Company may, at its option and for its benefit, obtain insurance with respect to Executive's death, disability or injury. Executive agrees to submit to such physical examinations and supply such information as may be reasonably required in order to permit the Company to obtain such insurance.

(b)      **Governing Law.** This Agreement shall be construed and enforced in accordance with the internal laws of the State of New York, without regard to principles of conflicts of laws. Notwithstanding anything herein or otherwise to the contrary, Executive agrees and acknowledges that all compensation and benefits provided to Executive by the Company, whether under this Agreement or otherwise, shall be subject to all applicable requirements under law or regulation, including without limitation, the Coronavirus Aid, Relief, and Economic Security Act, and any actions taken by the Company to comply with any such laws or regulations shall not be a breach of this Agreement or constitute Good Reason under this Agreement or any other agreements between the Company and Executive.

(c)      **Consent to Jurisdiction.** All actions or proceedings arising out of or relating to this Agreement shall be tried and litigated only in the New York State or Federal courts located in the County of New York, State of New York. The parties hereto hereby irrevocably submit to the exclusive jurisdiction of such courts for the purpose of any such action or proceeding. Notwithstanding the foregoing, either party may seek injunctive or equitable relief to enforce the terms of this Agreement in any court of competent jurisdiction.

(d)      **Intentionally Omitted.**

(e)      **Severability.** It is the desire and intent of the parties hereto that the provisions of this Agreement be enforced to the fullest extent permissible under the laws and public policies applied in each jurisdiction in which enforcement is sought. Accordingly, if any particular provision of this Agreement shall be adjudicated by a court of competent jurisdiction to be invalid, prohibited or unenforceable under applicable law, such provision, as to such jurisdiction, shall be ineffective without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.

(f)      **Entire Agreement; Amendment.** This Agreement embodies the entire agreement of the parties hereto respecting the matters within its scope and, except as expressly contemplated herein, supersedes all prior agreements (including, without limitation, any offer letters, term sheets and correspondence relating thereto), whether written or oral, that directly or indirectly bear upon the subject matter hereof. This Agreement may not be amended, modified or changed (in whole or in part), except by written agreement executed by both of the parties hereto.

(g)      **Offsets.** To the extent not prohibited under applicable law, the Company, in its sole and absolute discretion, has the right to set off (or cause to be set off) any amounts otherwise due to Executive from the Company in satisfaction of any repayment obligation of Executive under this Agreement or otherwise, provided that any such amounts are exempt from, or set off in a manner intended to comply with, the requirements of Section 409A.

(h)      **Waiver.** No waiver of any of any provision of this Agreement will constitute or be deemed to constitute a waiver of any other provision of this Agreement, nor will any such waiver constitute a continuing waiver unless otherwise expressly provided in a writing executed by the party against whom it is sought to be enforced.

(i)      **Successors and Assigns.** Neither party hereto may assign its rights or delegate its duties hereunder, except that the Company may assign its rights hereunder to any person that (i) acquires substantially all of the business and assets of the Company (whether by merger, consolidation, purchase of assets or other acquisition transaction), and (ii) agrees in writing to assume the obligations of the Company hereunder. This Agreement shall be binding on the successors and assigns of the Company. Nothing in this Agreement shall create, or be deemed to create, any third party beneficiary rights in any Person, including, without limitation, any employee of the Company, other than Executive.

(j)        **Notices.** Any notice or other communication required or permitted to be given hereunder shall be deemed to have been duly given when personally delivered or when sent by registered mail, return receipt requested, postage prepaid, as follows:

If to the Company, at:

> Bed Bath & Beyond Inc. 650 Liberty Avenue
> Union, NJ 07083
> Attention: Chief Legal Officer and Corporate Secretary

If to Executive, at:

> Executive's home address on file with the Company

Either party hereto may change its or her address for the purpose of this paragraph by written notice similarly given.

(k)        **Legal Counsel; Mutual Drafting.** Each party recognizes that this is a legally binding contract and acknowledges and agrees that they have had the opportunity to consult with legal counsel of their choice. Each party has cooperated in the drafting, negotiation and preparation of this Agreement. Hence, in any construction to be made of this Agreement, the same shall not be construed against either party on the basis of that party being the drafter of such language. Executive agrees and acknowledges that she has read and understands this Agreement, is entering into it freely and voluntarily, and has been advised to seek counsel prior to entering into this Agreement and has had ample opportunity to do so.

(l)        **Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be deemed an original as against any party whose signature appears thereon, and all of which together shall constitute one and the same instrument. Signatures delivered as a "pdf" attachment to an email to the other party shall be sufficient for all purposes.

*[Signatures on Following Page]*

16

**IN WITNESS WHEREOF**, the Company and Executive have executed this Agreement as of the date first written above.

COMPANY

BED BATH & BEYOND INC.

By:   *Lynda Markoe*

Name:   Lynda Markoe

Title:   Chief People and Culture Officer

EXECUTIVE

Mara Sirhal

[*Signature Page to Employment Agreement*]

17

## EXHIBIT A

### FORM OF AGREEMENT AND GENERAL RELEASE

THIS AGREEMENT AND GENERAL RELEASE (the "Agreement and General Release") is made and entered into on _____, 20_ by and between Mara Sirhal ("Executive") and Bed Bath & Beyond Inc., a New York corporation (the "Company").

WHEREAS, Executive has been employed by the Company and the parties wish to resolve all outstanding claims and disputes between them relating to such employment;

NOW, THEREFORE, in consideration of the mutual promises, covenants and agreements set forth in this Agreement and General Release, the sufficiency of which the parties acknowledge, it is agreed as follows:

1. In consideration for Executive's promises, covenants and agreements in this Agreement and General Release, the Company agrees to provide the Severance Benefits set forth in Section 5(c)(ii) of that certain employment agreement between Executive and the Company, dated as of June 28, 2022 (the "Employment Agreement"), in accordance with the terms and subject to the conditions of such Employment Agreement. Executive would not otherwise be entitled to such payments but for her promises, covenants and agreements in this Agreement and General Release.

2. The parties agree that the payments described in Section 1 of this Agreement and General Release are in full, final and complete settlement of all Claims (as defined below) Executive, and Executive's heirs, beneficiaries, personal representatives, executors, administrators, successors and assigns (collectively, the "Releasors") may have against the Company, its past and present affiliates, parents, subsidiaries, divisions, joint ventures and/or partnerships, their predecessors, successors and assigns, and all of their past and present respective officers, directors, owners, shareholders, members, managers, supervisors, employees, agents, advisors, consultants, insurers, attorneys, representatives, and employee benefit or pension plans or funds (and the trustees, administrators, fiduciaries and insurers of such programs) as well as any predecessors, successors and/or assigns of each of the foregoing (collectively, the "Releasees"), arising out of or in any way connected with Executive's employment with the Company or any of its affiliates or the termination of such employment. Executive understands and acknowledges that except for the Accrued Obligations (as defined in the Employment Agreement) and except as otherwise specifically provided under this Agreement and General Release, Executive is entitled to no payments or any other benefits from Company. Except for the Accrued Obligations and the benefits otherwise payable in accordance with Section 1 of this Agreement and General Release, Executive acknowledges that Executive has received all wages for work performed, overtime compensation, bonuses, commissions, vacation pay and all other benefits and compensation due to Executive by virtue of Executive's employment with and termination of employment with the Company up through the effective date of this Agreement and General Release.

3. Nothing in this Agreement and General Release shall be construed as an admission of liability by the Company or any other Releasee, and the Company specifically disclaims liability to or wrongful treatment of Executive on the part of itself and all other Releasees. Executive expressly acknowledges and agrees that Executive has not asserted and does not have, the basis for asserting any claim, the factual foundation of which involves sexual harassment or sexual abuse, against the Company, and as such no portion of the consideration paid to Executive as part of this Agreement and General Release is attributable to any such claims; thus, Executive acknowledges and agrees

that this Agreement and General Release does not constitute the settlement of a sexual harassment or sexual abuse claim.

4.  Executive hereby represents and warrants to Company that (a) Executive has not filed, caused or permitted to be filed any pending proceeding (nor has Executive lodged a complaint with any governmental or quasi-governmental authority) against Company, nor has Executive agreed to do any of the foregoing, (b) Executive has not assigned, transferred, sold, encumbered, pledged, hypothecated, mortgaged, distributed, or otherwise disposed of or conveyed to any third party any right or Claim against Company which has been released in this Agreement and General Release, and (c) Executive has not directly or indirectly encouraged or assisted any third party in filing, causing or assisting to be filed, any Claim against Company. In addition, Executive hereby represents and warrants to Company that Executive shall not encourage or solicit or voluntarily assist or participate in any way in the filing, reporting or prosecution by Executive or any third party of a proceeding or Claim against Company based upon or relating to any Claim released by Executive in this Agreement and General Release, unless expressly allowed by Section 7. If any court has or assumes jurisdiction of any action against the Company or any of its affiliates on behalf of Executive, Executive will request that court to withdraw from or dismiss the matter with prejudice.

5.  Executive represents that she has not filed any complaints or charges against the Company or any of its affiliates with the Equal Employment Opportunity Commission ("EEOC"), or with any other federal, state or local agency or court, and covenants that she will not seek to recover on any claim released in this Agreement and General Release. Executive further represents that she has reported to the Company in writing any and all work-related injuries that she has suffered or sustained during her employment with the Company or its affiliates.

6.  Executive, on her behalf and on behalf of each of the Releasors, hereby covenants not to sue, and fully and forever releases and discharges the Company and all other Releasees from any and all legally waivable Claims which Executive may have against any of the Releasees, arising on or prior to the date hereof, including those of which Executive is not aware and those not mentioned in this Agreement and General Release up to the effective date of this Agreement and General Release. "Claims" means any and all actions, controversies, demands, causes of action, suits, rights, and/or claims whatsoever for debts, sums of money, wages, salary, severance pay, vacation pay, sick pay, fees and costs, attorneys' fees, losses, penalties, damages, including damages for pain and suffering and emotional harm, arising, directly or indirectly, out of Executive's employment with the Company, the terms and conditions of such employment, the termination of such employment and/or any of the events relating directly or indirectly to or surrounding the termination of that employment, including, but not limited to, Claims arising directly, or indirectly, from any promise, agreement, offer letter, contract, understanding, common law, tort, the laws, statutes, and/or regulations of the State of New Jersey, or any other state, and the United States, including, but not limited to, federal, state and local wage and hour laws, federal, state and local whistleblower laws, federal, state and local fair employment laws, federal, state and local anti-discrimination laws, federal, state and local labor laws, Section 1981 of the Civil Rights Act of 1866, Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1991, the Equal Pay Act, the Americans with Disabilities Act, the Employment Retirement Income Security Act of 1974 ("ERISA"), the Vietnam Era Veterans Readjustment Assistance Act, the Fair Credit Reporting Act, the Fair Labor Standards Act, the Age Discrimination in Employment Act ("ADEA"), as amended by the Older Workers Benefit Protection Act, the Worker Adjustment and Retraining Notification Act of 1988, the Occupational Safety and Health Act, the Sarbanes-Oxley Act of 2002, the Family and Medical Leave Act, the Genetic Information Nondiscrimination Act of 2008, the New Jersey Law Against Discrimination, the New Jersey Family Leave Act, the New Jersey Civil Rights Act, the New Jersey

Wage Payment Law, the New Jersey Conscientious Employee Protection Act, the New Jersey Millville Dallas Airmotive Plant Loss Job Notification Act, the New Jersey Paid Sick Leave Act, the New Jersey Equal Pay Act, and the New Jersey Workers' Compensation Anti-Retaliation Law, as each has been or may be amended from time to time, and Claims premised on any other legal theory, whether arising directly or indirectly from any act or omission, whether intentional or unintentional. Executive acknowledges that she is releasing claims based on age, race, color, sex, sexual orientation or preference, marital status, religion, national origin, citizenship, veteran status, disability and other legally protected categories. This provision is intended to constitute a general release of all of each Releasor's presently existing covered claims against the Releasees, to the maximum extent permitted by law.

7.  Nothing in this Agreement and General Release shall be construed to: (a) waive any rights or claims of Executive that arise after Executive signs this Agreement and General Release; (b) waive any rights or claims of Executive to enforce the terms of this Agreement and General Release; (c) waive any claim for worker's compensation or unemployment benefits; (d) waive any rights or claims for the provision of accrued benefits conferred to Executive or her beneficiaries under the terms of the Company's medical, dental, life insurance or defined contribution retirement benefit plans; € waive or affect any claim that cannot be released by an agreement voluntarily entered into between private parties; (f) limit Executive's ability to file a charge or complaint with the EEOC, the National Labor Relations Board, the Occupational Safety and Health Administration, the Securities and Exchange Commission or any other federal, state or local governmental agency or commission ("Government Agencies"); (g) limit Executive's ability to communicate with any Government Agencies or otherwise participate in any investigation or proceeding that may be conducted by any Government Agency, including providing documents or other information, without notice to the Company; (h) release claims challenging the validity of this Agreement under the ADEA; (i) disclose any allegations relating to a claim under the New Jersey Law against Discrimination; (j) release the Releasees or any of them from any claim that by law cannot be waived or released; (k) release any existing rights that Executive may have to indemnification pursuant to the Company's or an affiliate's governing documents and/or any directors' and officers' insurance policy of the Company for acts committed during the course of Executive's employment; or (l) waive any rights of Executive with respect to vested equity held by her in the Company. Executive expressly waives and agrees to waive any right to recover monetary damages for personal injuries in any charge, complaint or lawsuit filed by Executive or anyone else on behalf of Executive for any released claims. This Agreement and General Release does not limit Executive's right to receive an award for information provided to any Government Agencies.

8.  Executive acknowledges that (a) she has been given at least twenty-one (21)[1] calendar days to consider this Agreement and General Release and that modifications hereof which are mutually agreed upon by the parties hereto, whether material or immaterial, do not restart the twenty-one (21) day period; (b) she has been advised to, and has had the opportunity to, consult Executive's independent counsel with respect to this Agreement and General Release; (c) she has seven (7) calendar days from the date she executes this Agreement and General Release in which to revoke it; (d) she executes this Agreement and General Release freely and voluntarily and that she understands the significance of this Agreement and General Release; and (e) this Agreement and General Release will not be effective or enforceable, nor the Severance Benefits paid, unless the seven-day revocation period ends without revocation by Executive.  Revocation can be made by delivery and receipt of a written notice of revocation to Bed Bath & Beyond, 650 Liberty Avenue, Union, NJ 07083, Attention: Chief People & Culture Officer, by midnight on or before the seventh calendar day after Executive signs this Agreement and General Release.

---

[1] To be extended to 45 days in the event of a group termination under the ADEA.

9. This Agreement and General Release shall be binding on the Company and Executive and upon their respective heirs, representatives, successors and assigns, and shall run to the benefit of the Releasees and each of them and to their respective heirs, representatives, successors and assigns.

10. This Agreement and General Release (and, to the extent explicitly provided herein, the Employment Agreement) sets forth the entire agreement between Executive and the Company, and fully supersede any and all prior agreements or understandings among them regarding its subject matter; provided, however, that nothing in this Agreement and General Release is intended to or shall be construed to limit, impair or terminate any obligation of Executive pursuant to any non-competition, non-solicitation, confidentiality or intellectual property agreements that have been signed by Executive where such agreements by their terms continue after Executive's employment with the Company terminates (including, but not limited to, the Restrictive Covenants in the Employment Agreement). This Agreement and General Release may only be modified by written agreement signed by both parties.

11. The Company and Executive agree that in the event any provision of this Agreement and General Release is deemed to be invalid or unenforceable by any court or administrative agency of competent jurisdiction, or in the event that any provision cannot be modified so as to be valid and enforceable, then that provision shall be deemed severed from the Agreement and General Release and the remainder of the Agreement and General Release shall remain in full force and effect.

12. This Agreement and General Release shall be construed and enforced in accordance with the internal laws of the State of New York, without regard to principles of conflicts of laws.

13. All actions or proceedings arising out of or relating to this Agreement and General Release shall be tried and litigated only in the New York State or Federal courts located in the County of New York, State of New York. The parties hereto hereby irrevocably submit to the exclusive jurisdiction of such courts for the purpose of any such action or proceeding. Notwithstanding the foregoing, either party may seek injunctive or equitable relief to enforce the terms of this Agreement and General Release in any court of competent jurisdiction.

14. Each of the parties hereto hereby irrevocably waives all right to trial by jury in any action, proceeding or counterclaim arising out of or relating to this Agreement and General Release.

15. The language of all parts of this Agreement and General Release in all cases shall be construed as a whole, according to its fair meaning, and not strictly for or against any of the parties.

*[Signature Page Follows]*

**PLEASE READ CAREFULLY. THIS
AGREEMENT AND GENERAL RELEASE INCLUDES A
RELEASE OF ALL KNOWN AND UNKNOWN CLAIMS.**

**COMPANY**

**Bed Bath & Beyond Inc.**

By: *Lynda Markoe*

Name: _Lynda Markoe_

Title: _Chief People & Culture Officer_

**EXECUTIVE**

Mara Sirhal

Date: _6/28/22_

450001_3

**EXHIBIT B**

**EXCLUDED WORK PRODUCT**

I have no inventions.

_____

The following is a complete list of all Work Product relative to the subject matter of my employment with the Company that have been created by me, alone or jointly with others, prior to the Effective Date, which might relate to the Company Group's present business:

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____ Additional sheets attached.

Executive Signature: _____     Date: ___6/28/22___

450001_3

B-1

# EXHIBIT C

# FIRST AMENDMENT TO
# EMPLOYMENT AGREEMENT

This First Amendment (this "Amendment") is made and entered into as of August 31, 2022 (the "Effective Date"), by and between Bed Bath & Beyond Inc., a New York corporation (the "Company"), and Mara Sirhal ("Executive").

**WHEREAS,** the Company and the Executive are parties to that certain Employment Agreement, dated as of June 28, 2022 (the "Employment Agreement");

**WHEREAS**, Executive has been employed by the Company as the Executive Vice President, Chief Merchandising Officer and General Manager, Harmon of the Company, pursuant to the terms and conditions of the Employment Agreement;

**WHEREAS**, the Company now desires to continue to employ Executive as Executive Vice President, Brand President, Bed Bath & Beyond effective as of the Effective Date pursuant to the terms and conditions of the Employment Agreement, as amended by the terms and conditions set forth in this Amendment; and

**WHEREAS**, Executive is willing and able to continue to be employed by the Company and desires to do so on the terms and conditions set forth herein.

**NOW, THEREFORE,** for good and valuable consideration, receipt of which is hereby acknowledged, the parties hereto agree as follows:

1.      Section 1(b) of the Employment Agreement is hereby amended and restated in its entirety to read as follows:

> "(b)      During the Term, Executive shall serve as the Executive Vice President, Brand President, Bed Bath & Beyond of the Company, and shall perform such duties and have such responsibilities as are consistent with such position and as may from time to time be assigned to Executive by the Company's Chief Executive Officer ("CEO"). As the Executive Vice President, Brand President, Bed Bath & Beyond of the Company, Executive shall report to the CEO.  In addition, the CEO may from time to time, in his or her sole discretion, assign to Executive such other duties, authorities and responsibilities that are not inconsistent with Executive's position as the Executive Vice President, Brand President, Bed Bath & Beyond of the Company, including without limitation, service as an officer and/or on the boards of directors and committees of one or more of the Company's subsidiaries, in each case, without additional compensation."

2.      Section 3(a) of the Employment Agreement is hereby amended and restated in its entirety to read as follows:

1

"(a)    **Base Salary.** During the Term, Executive's annual base salary (the "Base Salary") shall be $600,000, payable in accordance with the Company's regular payroll practices in effect from time to time and subject to all applicable taxes and withholdings, but no less frequently than in semi-monthly installments. The Base Salary may be adjusted by the People, Culture and Compensation Committee of the Board (the "Compensation Committee") in its sole discretion. The parties acknowledge and agree that a portion of Executive's Base Salary shall constitute consideration for Executive's compliance with the restrictions and covenants set forth in Section 6 of this Agreement."

3.     Section 3(b) of the Employment Agreement is hereby amended and restated in its entirety to read as follows:

"(b)    **Annual Bonus**. Beginning with respect to fiscal year 2022 and for each completed fiscal year thereafter during the Term, Executive shall be eligible to receive, with respect to periods from and after August 31, 2022, an annual cash performance bonus (the "Annual Bonus"), with a target Annual Bonus opportunity equal to seventy-five percent (75%) of her Base Salary; provided, that the Annual Bonus with respect to fiscal year 2022 shall be prorated for the portion of fiscal year 2022 during which Executive was employed by the Company as the Executive Vice President, Brand President, Bed Bath & Beyond (it being understood that Executive will also be eligible to receive an annual cash bonus payment with respect to the applicable bonus plan, and terms and conditions related thereto, in which she participated in fiscal year 2022 prior to August 31, 2022, prorated for the portion of fiscal year 2022 prior to August 31, 2022 during which she served as an employee). The Annual Bonus earned, if any, with respect to a fiscal year will be subject to the performance of Executive and the Company during such year, relative to performance goals established for such fiscal year by the Compensation Committee, and may, for the avoidance of doubt, be less than the target Annual Bonus opportunity with respect to such year. The Compensation Committee shall determine the level of attainment of performance goals and the amount of the Annual Bonus following the end of each fiscal year, and the Company shall pay the Annual Bonus, to the extent payable in accordance with this Section 3(b), on or before the date that is two and one-half (2½) months following the end of the fiscal year with respect to which it is earned, provided that Executive's employment with the Company has not terminated on or prior to such date (except as expressly provided in Section 5(c) below)."

4.     Except as expressly set forth herein, all of the terms and conditions of the Employment Agreement shall remain in full force and effect.  In the event and to the extent there is an inconsistency between any of the terms and provisions of the Employment Agreement and the terms and provisions of this Amendment, the terms and provisions of this Amendment shall govern.

     5.     This Amendment shall be governed, enforced, performed and construed in accordance with the provisions of Sections 7 and 11 of the Employment Agreement.

     6.     This Amendment may be executed in one or more original, facsimile or electronic counterparts, each of which shall constitute an original, but all of which, when taken together, shall constitute but one instrument.

**[Remainder of Page Intentionally Left Blank]**

**IN WITNESS WHEREOF,** the parties hereto have executed this Amendment as of the day and year first written above.

COMPANY:

BED BATH & BEYOND INC.

By: _____
          F2042DAA7C7445F...
      Name: Lynda Markoe
      Title: Chief People and Culture Officer

EXECUTIVE:

_____
          44AE07EE019D4D5...
Mara Sirhal

4

[First Amendment to Sirhal Employment Agreement]

# EXHIBIT D

4/21/23, 1:... Mara Sirhal - Brand President, Bed Bath & Beyond & Harmon Beauty - Bed Bath & Beyond | LinkedIn

UNN-L-001291-23   04/21/2023 5:40:34 PM   Pg 2 of 9   Trans ID: LCV20231339301
Case 23-13359-VFP   Doc 1036   Filed 08/04/23   Entered 08/04/23 19:42:06   Desc Main
Document      Page 61 of 135







## Mara Sirhal

EVP - Brand President, Bed Bath & Beyond and Harmon Beauty

New York, New York, United States

2K followers · 500+ connections

Join to view profile

Bed Bath & Beyond

**S** Syracuse University

## About

A retail executive with extensive Omni channel Merchant and Product Development experience; Assortment Planning and New Business Development accomplishments; Exceptional and wide ranging relationships with vendor community, internal and external executives; Excellent employee development/engagement/retention track record; Highly strategic and vision focused.

## Activity

UNN-L-001291-23   04/21/2023 5:40:34 PM   Pg 3 of 9   Trans ID: LCV20231339301

4/21/23, 10:45 Case 23-13359-VFP Mara Sirhal, ΙΟΟ ΟΙ030 Grand Filed 08/04/23 & Beyond Doc Chief Judy, Sales Entered 08/04/23 19:42:06 Beyond | LinkedIn Desc Main
Document       Page 62 of 135







Sharing for my impacted #bedbathandbeyond colleagues! A great opportunity to work for an incredible leader Lourdes Fino-Sanchez. Check it out!

Shared by Mara Sirhal



Randy Madison is a passionate, committed and hard working professional who always identifies solutions to challenges and executes with precision. He...

Shared by Mara Sirhal







Shared by Mara Sirhal

[ Join now to see all activity ]

---

# Experience



### Bed Bath & Beyond
2 years 4 months

### EVP - Brand President, Bed Bath & Beyond and Harmon Beauty
Sep 2022 - Present · 8 months

Union, New Jersey, United States

President role with full P&L ownership for both Bed, Bath & Beyond and Harmon Health & Beauty retail banners. Functional responsibility for Merchandising, Planning, Stores, Brand Marketing and Site Merchandising verticals. Full responsibility of end to end customer experience across all channels.

### EVP - Chief Merchandising Officer @ Bed Bath & Beyond and GM - Harmon Beauty
Jul 2022 - Sep 2022 · 3 months

Chief Merchandising Officer for Bed Bath & Beyond with responsibilities for Category Management, Owned Brands/Product Development, Planning, Inventory Planning, Transformation, Integrated Merchandising and Merchandising Operations. Ownership of end to end Omni Merchandising Strategy, implementation, execution and transformation. Also serve as General Manager - Harmon Health & Beauty banner, with full P&L ownership, Store Teams, Distribution Centers and Operations.

### SVP/GMM Health/Beauty/Consumables @ Bed Bath & Beyond and SVP GM Harmon Beauty
May 2021 - Jul 2022 · 1 year 3 months

Union, New Jersey, United States

### Senior Vice President, GM - Harmon Beauty
Jan 2021 - May 2021 · 5 months




### Macy's

8 years 3 months

### Vice President, Leased, Retail as a Service & Retail Diversity Strategy

Dec 2019 - Jan 2021 · 1 year 2 months

### Vice President, Divisional Business Manager - Fragrances

Sep 2017 - Dec 2019 · 2 years 4 months

Greater New York City Area

Business lead for the Macy's Fragrance Division with responsibility for Omnichannel Buying, Merchandise Planning, Inventory Planning and Digital.

### Vice President, DMM Contemporary Women's Apparel

Feb 2016 - Sep 2017 · 1 year 8 months

### Senior Director, Leased Merchandising

Jan 2015 - Jan 2016 · 1 year 1 month

### Buyer, Men's Fragrances & Skincare

Nov 2012 - Jan 2015 · 2 years 3 months

Herald Square, New York, NY

### macys.com

3 years 3 months

### Buyer - Fashion Bedding & Sheets

Jul 2011 - Nov 2012 · 1 year 5 months

New York, NY

### Buyer - Kitchen Electrics, Floor Care & Personal Care

Sep 2009 - Jul 2011 · 1 year 11 months

New York, NY

UNN-L-001291-23   04/21/2023 5:40:34 PM   Pg 6 of 9   Trans ID: LCV20231339301

4/21/23, 10:00 AM Case 23-13359-VFP Mara Sirhal Doc 1036rand Filed 06/04/23 & Beyond Holdings Company Entered 06/04/23, 19:42:06 Beyond, Inc. Desc Main
Document      Page 65 of 135





Jul 2008 - Sep 2009 · 1 year 3 months

New York, NY

### Product Manager - Men's INC
Macy's Merchandising Group

Apr 2007 - Jul 2008 · 1 year 4 months

New York, NY

### Associate Product Manager - Men's INC
Macy's Merchandising Group[

Apr 2006 - Apr 2007 · 1 year 1 month

New York, NY

# Education

### Syracuse University
Bachelor of Science (B.S.) · Retail Management

1999 - 2003

Activities and Societies: Alpha Phi

B.S. Retail Management

### St. Ignatius College Prep, Chicago, IL
-

1995 - 1999

Activities and Societies: Track & Field

# Organizations

                                                

Feb 2015 - Present

---

## More activity by Mara

**Sharing to my impacted #bedbathandbeyond colleagues, check this out!**

Shared by Mara Sirhal

---

### View Mara's full profile

See who you know in common

Get introduced

Contact Mara directly

( Join to view full profile )

## People also viewed

**Neil Lick**

Senior Vice President, Owned Brands at Bed Bath & Beyond

New York, NY

**David Thomasson**

VP Store Operations at Bed Bath & Beyond

New York City Metropolitan Area





New York City Metropolitan Area

### Alex Ogof

SVP/GMM Bed Bath and Beyond

New York City Metropolitan Area

### Laura Crossen

VP Financial Mgt at Bed Bath & Beyond

Summit, NJ

### Kelly Westbay

Director of Owned Brands- Product Development, Packaging & Operations at Bed Bath & Beyond

Springfield, NJ

### Anu Gupta

EVP, Chief Growth Officer Bed Bath & Beyond, Board of Directors H&R Block, SVP Target, Fortune Most Powerful Women 2019

San Francisco Bay Area

### Mark Danzig

Experienced Marketing Creative Executive for Premier Brands | ex J.Crew, Gap, L.L.Bean, Walmart

Madison, NJ

### Shawn Hummell

Senior Vice President | The Ohio State University - The Max M. Fisher College of Business MBA Candidate | Operations Executive | Transformation Specialist | Servant Leader | Performance Coach | #theBESTisyettocome

Columbus, Ohio Metropolitan Area

### Leif Todd Johnson

Chief Merchandising Officer at Bed Bath & Beyond

Norwell, MA

[ Show more profiles ⌄ ]

---


### Looking for career advice?

Visit the Career Advice Hub to see tips on accelerating your career.

View Career Advice Hub

---





 **Retail Customer Service**

 **Customer Service at Your First Retail Job**

 **Animating in 2D: Hair and Clothing**

See all courses

# Mara's public profile badge

Include this LinkedIn profile on other websites

 **Mara Sirhal**

EVP - Brand President, Bed Bath & Beyond and Harmon Beauty

EVP - Brand President, Bed Bath & Beyond and Harmon Beauty at Bed Bath & Beyond

Syracuse University

View profile

View profile badges

© 2023

Accessibility

Privacy Policy

Cookie Policy

Brand Policy

Community Guidelines

About

User Agreement

Your California Privacy Choices

Copyright Policy

Guest Controls

Language

# EXHIBIT E



**Personal and Confidential**

February 7, 2023

Re:     Retention Bonus

Dear Mara:

On behalf of Bed, Bath & Beyond Inc. (the "**Company**"), I am pleased to offer you the opportunity to receive a retention bonus if you agree to the terms and conditions contained in this letter agreement (this "**Agreement**"), which shall be effective as of the date you execute and return a copy of this Agreement (such date, the "**Effective Date**"). To be effective, you must execute and return a copy of this Agreement as soon as possible, but in any event no later than 1:00 p.m. on February 8, 2023.

(a)     Retention Bonus.  Subject to the terms and conditions set forth herein, you will receive a cash lump sum payment in the amount of $314,000 (the "**Retention Bonus**") as soon as practicable following the Effective Date.  You agree that in the event that your employment with the Company terminates (i) by the Company, for a reason other than Cause or (ii) due to your death or Disability, in each case before June 8, 2023 (the "**Completion Date**"), you will be required to repay to the Company within ten (10) calendar days of such termination one hundred percent (100%) of the After-Tax Value of the Retention Bonus.  For the sake of clarity, you will not be required to repay any portion of the Retention Bonus if you are employed by the Company on the Completion Date.

2.     Definitions.  For purposes of this Agreement:

(a)     "**After-Tax Value of the Retention Bonus**" means the aggregate amount of the Retention Bonus net of any taxes withheld from the Retention Bonus.  The Company shall determine in good faith the After-Tax Value of the Retention Bonus, which determination shall be final, conclusive and binding.

(b)     "**Cause**" means your (i) material breach of your duties and responsibilities, which is not remedied promptly after the Company gives you written notice specifying such breach, (ii) commission of a felony, (iii) commission of or engaging in any act of fraud, embezzlement, theft, a material breach of trust or any material act of dishonesty involving the Company or its subsidiaries, or (iv) significant violation of the code of conduct of the Company or its subsidiaries or of any statutory or common law duty of loyalty to the Company or its subsidiaries.

(c)     "**Disability**" means your inability, due to physical or mental incapacity, to perform the essential functions of your job, for two hundred seventy (270) consecutive days.

1

3.      Withholding Taxes.  The Company may withhold from any and all amounts payable to you hereunder such federal, state and local taxes as the Company determines in its sole discretion may be required to be withheld pursuant to any applicable law or regulation.

4.      No Right to Continued Employment.  Nothing in this Agreement will confer upon you any right to continued employment with the Company (or its subsidiaries or their respective successors) or to interfere in any way with the right of the Company (or its subsidiaries or their respective successors) to terminate your employment at any time.

5.      Other Benefits.  The Retention Bonus is a special payment to you and will not be taken into account in computing the amount of salary or compensation for purposes of determining any bonus, incentive, pension, retirement, death or other benefit under any other bonus, incentive, pension, retirement, insurance or other employee benefit plan of the Company, unless such plan or agreement expressly provides otherwise.

6.      Governing Law.  This Agreement will be governed by, and construed under and in accordance with, the internal laws of the State of New Jersey, without reference to rules relating to conflicts of laws.

7.      Counterparts.  This Agreement may be executed in one or more counterparts (including by facsimile or portable document format (.pdf)), each of which shall be deemed to be an original but all of which together shall constitute one and the same instrument.

8.      Entire Agreement; Amendment.  This Agreement constitutes the entire agreement between you and the Company with respect to the Retention Bonus and supersedes any and all prior agreements or understandings between you and the Company with respect to the Retention Bonus, whether written or oral.  This Agreement may be amended or modified only by a written instrument executed by you and the Company.

9.      Section 409A Compliance.  The intent of the parties is that the Retention Bonus be exempt from the requirements of Section 409A of the Internal Revenue Code of 1986, as amended, and the regulations and guidance promulgated thereunder, and accordingly, to the maximum extent permitted, this Agreement shall be interpreted in a manner consistent therewith.

This Agreement is intended to be a binding obligation on you and the Company.  If this Agreement accurately reflects your understanding as to the terms and conditions of the Retention Bonus, please sign, date, and return to me one copy of this Agreement no later than 1:00 p.m. on February 8, 2023.  You should make a copy of the executed Agreement for your records.

Very truly yours,

**BED, BATH & BEYOND INC.**

By: _____

Name: Sue Gove
Title: Chief Executive Officer

The above terms and conditions accurately reflect our understanding regarding the terms and conditions of the Retention Bonus, and I hereby confirm my agreement to the same.

Dated:

_____
Mara Sirhal

3

# EXHIBIT F

**MARA SIRHAL**
**58 Crest Drive**
**South Orange, NJ 07079**

March 10, 2023

**Via Registered Mail, Return Receipt Requested**
**and Hand Delivery**

David M. Kastin
Chief Legal Officer and Corporate Secretary
Bed Bath and Beyond Inc.
650 Liberty Avenue
Union, New Jersey  07083

Dear Mr. Kastin:

Pursuant to Sections 5(b), 5(c)(ii)(A), and 5(f)(iv) of my Employment Agreement with the Company dated June 28, 2022, I am providing notice that I am terminating my employment with the company for "Good Reason." Specifically, there has been a material diminution of my duties, authority, and responsibilities due to the closure of the Harmon Health & Beauty business and the closing of all its 54 Harmon freestanding stores and web business. There has also been a material diminution of my duties, authorities, and responsibilities with the subsequent closure or planned closure of an additional 149 Bed Bath & Beyond stores. There has also been a diminishment of my decision-making role and authority, particularly regarding inventory procurement and staff resources. Although Section 5(f)(iv) provides the Company with thirty calendar days to cure the circumstances in all material respects, that would be futile here given the nature of these corporate moves that have materially diminished my duties, authority and responsibilities of employment. Nevertheless, I am available to continue working with the Company over the next weeks or months to ensure an orderly transition.

Very truly yours,

Mara Sirhal

cc:  Sue E. Gove

471559

# EXHIBIT G



March 16, 2023


<u>Via Hand Delivery</u>
Mara Sirhal
58 Crest Drive
South Orange, NJ 07979


Dear Ms. Sirhal:

We are in receipt of your letter, dated March 10, 2023, in which you informed Bed, Bath & Beyond, Inc. (the "**Company**") of your intent to resign pursuant to Sections 5(b), 5(c)(ii) and 5(f)(iv) of your Employment Agreement, dated June 28, 2022 (the "**Employment Agreement**"). You have indicated your termination is for "Good Reason" under the Employment Agreement by reason of the closure of the Harmon business and planned closures of several of the Company's Bed Bath & Beyond ("**BBB**") locations and have asserted that these circumstances are not curable. As further discussed herein, the Company does not agree that Good Reason exists and hereby accepts your voluntary resignation effective April 9, 2023.

As you are aware, your Employment Agreement was amended under the First Amendment to Employment Agreement, effective August 31, 2022 (the "**Amendment**"), pursuant to which your position, duties and responsibilities under Section 1(b) of the Employment Agreement were changed from duties and responsibilities consistent with the position of "Executive Vice President, Chief Merchandising Officer and General Manager, Harmon" to duties and responsibilities consistent with the position of "Executive Vice President, Brand President, Bed Bath & Beyond."

Under the Amendment, you explicitly agreed to take on increased duties and responsibilities for the BBB brand in a role that substituted your authority and responsibilities from the Harmon brand to the entire BBB global brand. Accordingly, your duties, authority and responsibilities for the Company and its business are not diminished and the Company does not agree that Good Reason exists.

Section 5(b) of the Employment Agreement provides that your resignation other than for Good Reason will be effective upon at least thirty (30) days advance written notice. The Company hereby accepts your voluntary resignation effective April 9, 2023 (30 days after your March 10, 2023, resignation letter).

In accordance with the terms of your Employment Agreement, you are required to perform the duties and responsibilities of your position and cooperate in the transition of your responsibilities; however, the Company may ask that you perform such services remotely.

Given that you have resigned other than for Good Reason prior to the first anniversary of the effective date of the Employment Agreement, the Company requests immediate repayment of the after-tax portion of your sign-on bonus in the amount of $144,650. In addition, given that you have resigned prior to June 8, 2023, the completion date under the retention bonus agreement, dated February 7, 2023, the Company requests immediate repayment of the after-tax portion of your retention payment in the amount of $200,120.27. Further, given that you resigned prior to May 26, 2023, which is the twelve-month anniversary of the payment of the recognition award pursuant to the Recognition Award Agreement, dated May 16, 2022, the Company requests immediate repayment of the prorated, after-tax portion of your sign-on bonus in the amount of $8,997.89. Accordingly, you are required to repay to the Company an aggregate amount of $353,768.16, which amount may be paid by personal check.

Very truly yours,

David M. Kastin
Executive Vice President - Chief Legal Officer

# EXHIBIT H



KIENBAUM|HARDY
VIVIANO|PELTON|FORREST

280 N. Old Woodward
Suite 400
Birmingham, MI 48009
248.645.0000

48 S. Main Street
Suite 2
Mt. Clemens, MI 48043
586.469.1580
www.khvpf.com

March 20, 2023

**Via Email: david.kastin@bedbath.com**

David M. Kastin
Executive Vice President-Chief Legal Officer
Bed Bath & Beyond Inc.
650 Liberty Avenue
Union, New Jersey 07083

Dear Mr. Kastin:

We represent Mara Sirhal, and I am writing in response to your letter of March 16, 2023 to Ms. Sirhal. There is no good faith reading of her amended employment agreement that takes her reasons for resigning out of the agreement's definition of Good Reason. And her decision to resign, whether for Good Reason under the employment agreement or not, is not one of the conditions requiring repayment of her Retention Bonus under the terms of the February 7, 2023 letter agreement.

At the time Ms. Sirhal signed the June 28, 2022 Employment Agreement, responsibility for Harmon was roughly 20% of her duties. This did not change when she assumed the title Executive Vice President, Brand President, Bed Bath & Beyond on August 31, 2022. The Harmon retail business, including Stores and web, still reported to Ms. Sirhal and it still constituted 20% of her duties. There can be no dispute the closure of the Harmon brand and stores materially diminished her duties, authority and responsibilities. On top of this, the company's announced store closures in January 2023 resulted in 236 fewer stores for which Ms. Sirhal had responsibility for operating, making a material difference in size and scope of business. These changes, and others, were not planned at the time she assumed the Executive Vice President Brand President position. The store base for which Ms. Sirhal had responsibility has literally declined by almost half since she assumed the role. Your letter does not address the fact Ms. Sirhal's decision-making authority was substantially diminished in most other areas of her responsibilities, including inventory procurement and staff resources. This also includes liquidation of the Bed Bath & Beyond Canada business for which Ms. Sirhal had responsibilities and for which she was a Director.

March 20, 2023
Page 2

Under the terms of Section 3(e) of her agreement, Ms. Sirhal is not required to return her $220,000 signing bonus. In addition, Ms. Sirhal's Good Reason resignation triggers several payments under Section 5(c)(ii) of her agreement. The company is, therefore, obligated to pay her $600,000 base salary and her target annual bonus of $450,000 over the 12-month period following her last day of employment. Her one-time RSU award also immediately vests and the company will be responsible for COBRA payments.

The February 7 Retention Bonus agreement, by its express terms, only requires repayment of the bonus by her in the event her employment with the company terminates prior to June 8 either "(i) by the company for a reason other than Cause or (ii) due to your death or Disability." Neither of these contingencies occurred. Ms. Sirhal, therefore, is entitled to keep the Retention Bonus.

As Ms. Sirhal previously advised the CEO, she is committed to ensuring a smooth transition and, therefore, agrees to work through April 9, 2023; the suggested date in your letter.

Very truly yours,

Eric J. Pelton

EJP/mrb

476195

# Civil Case Information Statement

**Case Details: UNION | Civil Part Docket# L-001291-23**

**Case Caption:** BED BATH & BEYOND IN C.  VS SIRHAL
MARA

**Case Initiation Date:** 04/21/2023

**Attorney Name:** MAXINE H NEUHAUSER

**Firm Name:** EPSTEIN BECKER & GREEN PC

**Address:** ONE GATEWAY CTR 13TH FL

NEWARK NJ 07102

**Phone:** 9736421900

**Name of Party:** PLAINTIFF : Bed Bath & Beyond Inc.

**Name of Defendant's Primary Insurance Company**
(if known): Unknown

**Case Type:** EMPLOYMENT (OTHER THAN CEPA OR LAD)

**Document Type:** Complaint with Jury Demand

**Jury Demand:** YES - 12 JURORS

**Is this a professional malpractice case?** NO

**Related cases pending:** NO

**If yes, list docket numbers:**

**Do you anticipate adding any parties (arising out of same
transaction or occurrence)?** NO

**Does this case involve claims related to COVID-19?** NO

**Are sexual abuse claims alleged by: Bed Bath & Beyond Inc.?** NO

**THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE**
CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

**Do parties have a current, past, or recurrent relationship?** YES

**If yes, is that relationship:** Employer/Employee

**Does the statute governing this case provide for payment of fees by the losing party?** NO

**Use this space to alert the court to any special case characteristics that may warrant individual
management or accelerated disposition:**

**Do you or your client need any disability accommodations?** NO
       **If yes, please identify the requested accommodation:**

**Will an interpreter be needed?** NO
       **If yes, for what language:**

**Please check off each applicable category: Putative Class Action?** NO  **Title 59?** NO  **Consumer Fraud?** NO

I certify that confidential personal identifiers have been redacted from documents now submitted to the
court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b)

04/21/2023                                                      /s/ MAXINE H NEUHAUSER
Dated                                                          Signed

## **Exhibit A-3**

**Answer**

James P. Chou, Esq. (No. 051951996)
Marshall O. Dworkin, Esq. (No. 057772013)
MORITT HOCK & HAMROFF, LLP
1407 Broadway, 39th Floor
New York, NY 10018
Tel: 212 239-2000
*Attorneys for Defendant Mara Sirhal*

| | |
|---|---|
| BED BATH & BEYOND INC., <br><br> Plaintiff, <br><br> vs. <br><br><br> MARA SIRHAL, <br><br> Defendant. | SUPERIOR COURT OF NEW JERSEY <br> LAW DIVISION: UNION COUNTY <br><br> DOCKET NO.:  UNN-L-01291-23 <br><br> Civil Action <br><br> **DEFENDANT MARA SIRHAL'S ANSWER TO PLAINTIFF'S COMPLAINT** |

Defendant Mara Sirhal ("Sirhal" or "Defendant"), through her attorneys, Moritt Hock & Hamroff LLP, hereby answers Plaintiff Bed Bath & Beyond, Inc.'s ("BBBY" or "Plaintiff") Complaint as follows:

## THE PARTIES

1.      Defendant denies knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 1 of the Complaint.

2.      Defendant admits that she is an individual residing in New Jersey and formerly served as the Executive Vice President, Brand President of Bed Bath & Beyond, Inc., but denies the remaining allegations contained in Paragraph 2 of the Complaint.

## JURISDICTION AND VENUE

3.      The allegations contained in Paragraph 3 of the Complaint contain a legal conclusion to which no response is required.

4.      The allegations contained in Paragraph 4 of the Complaint contain a legal

conclusion to which no response is required.

## FACTUAL ALLEGATIONS

5.      Defendant denies the allegations contained in Paragraph 5 of the Complaint

because subsequent to the commencement of this action, Bed Bath & Beyond, Inc. ("BBBY")

has filed for Chapter 11 bankruptcy.

6.      Defendant admits the allegations contained in Paragraph 6 of the Complaint.

7.      Defendant denies the allegations contained in Paragraph 7 of the Complaint that

she began actively working for BBBY on December 14, 2020 because she only began working at

BBBY on or about January 19, 2021, but admits the remainder of Paragraph 7 of the Complaint.

8.      To the extent Paragraph 8 of the Complaint refers to the text of the Recognition

Award Agreement, the Recognition Award Agreement provides the best evidence of its terms

and no further response to the allegations contained in Paragraph 8 is required.

9.      To the extent Paragraph 9 of the Complaint refers to the text of the Employment

Agreement, the Employment Agreement provides the best evidence of its terms and no further

response to the allegations contained in Paragraph 9 is required.

10.     To the extent Paragraph 10 of the Complaint and its subparts refer to the text of

the Employment Agreement, the Employment Agreement provides the best evidence of its terms

and no further response to the allegations contained in Paragraph 10 is required.

11.     To the extent Paragraph 11 of the Complaint refers to the text of the Employment

Agreement, the Employment Agreement provides the best evidence of its terms and no further

response to the allegations contained in Paragraph 11 is required.  If a further response is

required, Defendant denies the allegations contained in Paragraph 11 of the Complaint.

3337789v1

12.     To the extent Paragraph 12 of the Complaint refers to the text of the Employment

Agreement, the Employment Agreement provides the best evidence of its terms and no response

to the allegations contained in Paragraph 12 is required.  If a further response is required,

Defendant denies the allegations contained in Paragraph 12 of the Complaint.

13.     To the extent Paragraph 13 of the Complaint refers to the text of the First

Amendment to the Employment Agreement (the "Amendment"), the Amendment provides the

best evidence of its terms and no response to such allegations is required.

14.     To the extent Paragraph 14 of the Complaint refers to the text of the Amendment,

the Amendment provides the best evidence of its terms and no further response to the allegations

contained in Paragraph is required.  If a further response is required, Defendant denies the

allegations contained in Paragraph 14 of the Complaint.

15.     Defendant denies the allegations contained in Paragraph 15 of the Complaint.

16.     To the extent Paragraph 16 of the Complaint refers to the text of the Amendment,

the Amendment provides the best evidence of its terms and no further response to such the

allegations contained in Paragraph 16 is required.

17.     Defendant denies the allegations contained in Paragraph 17 of the Complaint.

18.     Defendant denies the allegations contained in Paragraph 18 of the Complaint.

19.     Defendant denies the allegations contained in Paragraph 19 of the Complaint.

20.     Defendant denies the allegations contained in Paragraph 20 of the Complaint.

21.     To the extent Paragraph 21 of the Complaint refers to the text of the Retention

Bonus Agreement ("RBA"), the RBA provides the best evidence of its terms and no further

response to the allegations contained in Paragraph 21 is required.  If a further response is

required, Defendant denies the allegations contained in Paragraph 21 of the Complaint, except

admits that she was paid $314,0000.00 pursuant to RBA.

22.     Defendant admits that she entered into the Retention Bonus Agreement, but

denies the remaining allegations contained in Paragraph 22 of the Complaint because BBBY had

promised Defendant and other executives the Retention Bonus since at least the beginning of

January, long before BBBY finalized plans to close Harmon or BBBY stores and certainly

before Defendant was aware of those closure plans.

23.     Defendant denies the allegations contained in Paragraph 23 of the Complaint.

24.     Defendant denies the allegations contained in Paragraph 24 of the Complaint.

25.     To the extent Paragraph 25 and subparts 25(a), (b) and (c) of the Complaint refers

to the text of the March 10, 2023, letter ("March 10 Letter"), the March 10 Letter provides the

best evidence of its text and no further response to the allegations contained in Paragraph 25 is

required.

26.     Defendant denies the allegations contained in Paragraph 26 of the Complaint.

27.     Defendant denies the allegations contained in Paragraph 27 of the Complaint.

28.     Defendant denies the allegations contained in Paragraph 28 of the Complaint.

29.     Defendant denies the allegations contained in Paragraph 29 of the Complaint.

30.     Defendant denies the allegations contained in Paragraph 30 of the Complaint.

31.     Defendant denies the allegations contained in Paragraph 31 of the Complaint.

32.     To the extent Paragraph 32 of the Complaint refers to the March 16, 2023, letter

("March 16 Letter"), the March 16 Letter provides the best evidence of its text and no further

response to the allegations contained in Paragraph 32 is required.

33.     To the extent Paragraph 33 and subparts 33(a), (b) and (c) of the Complaint refers to the March 16 Letter, the March 16 Letter provides the best evidence of its text and no further response to the allegations contained in Paragraph 33 is required.

34.     To the extent Paragraph 34 of the Complaint refers to the March 20, 2023, letter (the "March 20 Letter"), the March 20 Letter provides the best evidence of its text and no further response to the allegations contained in Paragraph 34 is required.

35.     Defendant denies the allegations contained in Paragraph 35 of the Complaint.

36.     Defendant denies the allegations contained in Paragraph 36 of the Complaint.

## COUNT ONE
(Breach of Contract – Employment Agreement and First Amendment to Employment Agreement)

37.     Defendant denies the allegations contained in Paragraph 37 of the Complaint.

38.     Defendant denies the allegations contained in Paragraph 38 of the Complaint.

39.     Defendant denies the allegations contained in Paragraph 39 of the Complaint.

40.     Defendant denies the allegations contained in Paragraph 40 of the Complaint.

**WHEREFORE**, Defendant respectfully requests that Plaintiff take nothing by this action; that judgment be entered in favor of Defendant and against Plaintiff on all Causes of Action; that Defendant be awarded her costs and/or attorneys' fees herein incurred pursuant to applicable law should she prevail in this lawsuit; and that the Court award Defendant such other and further relief as it deems proper.

## COUNT TWO
(Breach of Contract – Retention Bonus)

41.     Defendant repeats and realleges her responses set forth in Paragraphs 1 through 40 of the Answer as if set forth at length herein.

42. Defendant denies the allegations contained in Paragraph 42 of the Complaint.

3337789v1

**WHEREFORE**, Defendant respectfully requests that Plaintiff take nothing by this action; that judgment be entered in favor of Defendant and against Plaintiff on all Causes of Action; that Defendant be awarded her costs and/or attorneys' fees herein incurred pursuant to applicable law should she prevail in this lawsuit; and that the Court award Defendant such other and further relief as it deems proper.

## COUNT THREE
(Breach of Contract – Recognition Award Agreement)

43.     Defendant repeats and realleges her responses set forth in Paragraphs 1 through 42 of the Answer as if set forth at length herein.

44.     Defendant denies the allegations contained in Paragraph 44 of the Complaint.

45.     Defendant denies the allegations contained in Paragraph 45 of the Complaint.

**WHEREFORE**, Defendant respectfully requests that Plaintiff take nothing by this action; that judgment be entered in favor of Defendant and against Plaintiff on all Causes of Action; that Defendant be awarded her costs and/or attorneys' fees herein incurred pursuant to applicable law should she prevail in this lawsuit; and that the Court award Defendant such other and further relief as it deems proper.

## COUNT FOUR
(Breach of the Covenant of Good Faith and Fair Dealing)

46.     Defendant repeats and realleges her responses set forth in Paragraphs 1 through 45 of the Answer as if set forth at length herein.

47.     Defendant denies the allegations contained in Paragraph 47 of the Complaint.

48.     Defendant denies the allegations contained in Paragraph 48 of the Complaint.

49.     Defendant denies the allegations contained in Paragraph 49 of the Complaint.

**WHEREFORE**, Defendant respectfully requests that Plaintiff take nothing by this action; that judgment be entered in favor of Defendant and against Plaintiff on all Causes of Action; that Defendant be awarded her costs and/or attorneys' fees herein incurred pursuant to applicable law should she prevail in this lawsuit; and that the Court award Defendant such other and further relief as it deems proper.

<u>**COUNT FIVE**</u>
(Fraud – Retention Bonus)

50.     Defendant repeats and realleges her responses set forth in Paragraphs 1 through 49 of the Answer as if set forth at length herein.

51.     Defendant denies the allegations contained in Paragraph 51 of the Complaint.

52.     Defendant denies the allegations contained in paragraph 52 of the Complaint.

53.     Defendant denies the allegations contained in Paragraph 53 of the Complaint.

54.     Defendant denies the allegations contained in Paragraph 54 of the Complaint.

**WHEREFORE**, Defendant respectfully requests that Plaintiff take nothing by this action; that judgment be entered in favor of Defendant and against Plaintiff on all Causes of Action; that Defendant be awarded her costs and/or attorneys' fees herein incurred pursuant to applicable law should she prevail in this lawsuit; and that the Court award Defendant such other and further relief as it deems proper.

<u>**AFFIRMATIVE DEFENSES**</u>

1.     The Complaint fails to state a claim upon which relief may be granted.

2.     The Complaint is barred, in whole or in part, by the doctrine of unclean hands.

3.     The Complaint is barred, in whole or in part, by impossibility of performance.

4.     The Complaint is barred, in whole or in part, by the doctrine of economic duress.

5.      Plaintiff has engaged in conduct or activities sufficient to constitute a waiver of any claims or causes of action which Plaintiff may otherwise have had against Defendant.

6.      Plaintiff is estopped from pursuing the Complaint, in whole or in part, by virtue of its conduct.

7.      The Complaint is barred, in whole or in part, because Defendant's actions were taken in good faith.

8.      The Complaint is barred, in whole or in part, by the doctrine of laches and/or applicable statute of limitations.

9.      The Complaint, in whole or in part, is barred by Plaintiff's failure to avoid consequences or mitigate alleged damages.

10.     Plaintiff's Complaint and each cause of action contained therein are barred, in whole or in part, by Plaintiff's fraudulent conduct.

11.     Defendant reserves the right to assert additional affirmative defenses upon the discovery of facts not presently known.

## **DEMAND FOR TRIAL BY JURY**

Defendant Mara Sirhal demands trial by jury.

## <u>DESIGNATION OF TRIAL COUNSEL</u>

In accordance with <u>R</u>. 4:25-4, James P. Chou, Esq. is designated as trial counsel in this

case.


Dated:  New York, New York
July 31, 2023

MORITT HOCK & HAMROFF LLC


By:  <u>/s/ James P. Chou</u>
James P. Chou, Esq.
Marshall O. Dworkin, Esq.
1407 Broadway, 39th Floor
New York, New York 10018
Tel: 212 239-2000

*Attorneys for Defendant*

3337789v1

# Civil Case Information Statement

| Case Details: UNION | Civil Part Docket# L-001291-23 |
| --- |

**Case Caption:** BED BATH & BEYOND IN C.  VS SIRHAL MARA

**Case Initiation Date:** 04/21/2023

**Attorney Name:** MARSHALL O DWORKIN

**Firm Name:** MORITT HOCK & HAMROFF LLP

**Address:** 1407 BROADWAY 39TH FL

NEW YORK NY 10018

**Phone:** 2122392000

**Name of Party:** DEFENDANT : SIRHAL, MARA

**Name of Defendant's Primary Insurance Company**

(if known): None

**Case Type:** EMPLOYMENT (OTHER THAN CEPA OR LAD)

**Document Type:** Answer W/Jury Demand

**Jury Demand:** YES - 12 JURORS

**Is this a professional malpractice case?** NO

**Related cases pending:** NO

**If yes, list docket numbers:**

**Do you anticipate adding any parties (arising out of same transaction or occurrence)?** NO

**Does this case involve claims related to COVID-19?** NO

**Are sexual abuse claims alleged by: BED BATH & BEYOND INC.?** NO

| THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE |
| --- |

CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

**Do parties have a current, past, or recurrent relationship?** YES

**If yes, is that relationship:** Employer/Employee

**Does the statute governing this case provide for payment of fees by the losing party?** NO

**Use this space to alert the court to any special case characteristics that may warrant individual management or accelerated disposition:**

**Do you or your client need any disability accommodations?** NO

  **If yes, please identify the requested accommodation:**

**Will an interpreter be needed?** NO

  **If yes, for what language:**

**Please check off each applicable category: Putative Class Action?** NO  **Title 59?** NO  **Consumer Fraud?** NO

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b)

07/31/2023                                                                 /s/ MARSHALL O DWORKIN

Dated                                                                          Signed

**Exhibit B**

**Bankruptcy Court Pleadings**

**B-1.  Voluntary Petition for Non-Individuals Filing for Bankruptcy**

**B-2.  Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief [Docket No. 75]**

**B-3.  Order Enlarging the Period Within Which the Debtors May Remove Actions and (II) Granting Related Relief [Docket No. 1403]**

**<u>Exhibit B-1</u>**

**Voluntary Petition for Non-Individuals Filing for Bankruptcy**

<table>
<tr><td colspan="2"><strong>Fill in this information to identify the case:</strong></td></tr>
<tr><td colspan="2">United States Bankruptcy Court for the:<br><br> <strong>District of New Jersey</strong> (State) </td></tr>
<tr><td>Case number <em>(if known)</em>: _____</td><td>Chapter __11__</td></tr>
</table>

☐ Check if this is an
amended filing

## Official Form 201

# Voluntary Petition for Non-Individuals Filing for Bankruptcy

06/22

If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and the case number (if known). For more information, a separate document, *Instructions for Bankruptcy Forms for Non-Individuals*, is available.

| | | |
|---|---|---|
| 1. | **Debtor's Name** | **Bed Bath & Beyond Inc.** |

| | | |
|---|---|---|
| 2. | **All other names debtor used in the last 8 years**<br><br>Include any assumed names, trade names, and *doing business as* names | **N/A** |

| | | |
|---|---|---|
| 3. | **Debtor's federal Employer Identification Number** (EIN) | **1 1 – 2 2 5 0 4 8 8** |

| | | |
|---|---|---|
| 4. | **Debtor's address** | **Principal place of business**<br><br>**650 Liberty Avenue**<br>Number        Street<br><br>**Union, New Jersey 07083**<br>City                    State    Zip Code<br><br>**Union County**<br>County | **Mailing address, if different from principal place of business**<br><br>Number        Street<br><br>P.O. Box<br><br>City            State    Zip Code<br><br>**Location of principal assets, if different from principal place of business**<br><br>Number        Street<br><br>City            State    Zip Code |

| | | |
|---|---|---|
| 5. | **Debtor's website** (URL) | **https://www.bedbathandbeyond.com/** |

| | | |
|---|---|---|
| 6. | **Type of debtor** | ☒ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP))<br><br>☐ Partnership (excluding LLP)<br><br>☐ Other. Specify: _____ |

| Debtor | **Bed Bath & Beyond Inc.** | Case number *(if known)* | |
|---|---|---|---|
| | Name | | |

**7. Describe debtor's business**

A. *Check One:*

☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))

☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))

☐ Railroad (as defined in 11 U.S.C. § 101(44))

☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))

☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))

☐ Clearing Bank (as defined in 11 U.S.C. § 781(3))

☒ None of the above

B. *Check all that apply:*

☐ Tax-exempt entity (as described in 26 U.S.C. § 501)

☐ Investment company, including hedge fund or pooled investment vehicle (as defined in 15 U.S.C. § 80a-3)

☐ Investment advisor (as defined in 15 U.S.C. § 80b-2(a)(11))

C. NAICS (North American Industry Classification System) 4-digit code that best describes debtor. See http://www.uscourts.gov/four-digit-national-association-naics-codes .

**4422 (Home Furnishings Stores)**

**8. Under which chapter of the Bankruptcy Code is the debtor filing?**

A debtor who is a "small business debtor" must check the first sub- box. A debtor as defined in § 1182(1) who elects to proceed under subchapter V of chapter 11 (whether or not the debtor is a "small business debtor") must check the second sub-box

*Check One:*

☐ Chapter 7

☐ Chapter 9

☒ Chapter 11. *Check all that apply:*

☐ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D), and its aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $3,024,725. If this sub-box is selected, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

☐ The debtor is a debtor as defined in 11 U.S.C. § 1182(1), its aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $7,500,000, and it chooses to proceed under Subchapter V of Chapter 11. If this sub-box is selected, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return, or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

☐ A plan is being filed with this petition.

☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).

☒ The debtor is required to file periodic reports (for example, 10K and 10Q) with the Securities and Exchange Commission according to § 13 or 15(d) of the Securities Exchange Act of 1934. File the *Attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11* (Official Form 201A) with this form.

☐ The debtor is a shell company as defined in the Securities Exchange Act of 1934 Rule 12b-2.

☐ Chapter 12

**9. Were prior bankruptcy cases filed by or against the debtor within the last 8 years?**

If more than 2 cases, attach a separate list.

☒ No

☐ Yes.

| | District | | When | MM/DD/YYYY | Case number | |
|---|---|---|---|---|---|---|
| | District | | When | MM/DD/YYYY | Case number | |

| Debtor | **Bed Bath & Beyond Inc.** | | Case number *(if known)* | |
|---|---|---|---|---|
| | Name | | | |

**10. Are any bankruptcy cases pending or being filed by a business partner or an affiliate of the debtor?**

List all cases. If more than 1, attach a separate list.

☐ No
☒ Yes.

| Debtor | **See Rider 1** | Relationship | **Affiliate** |
|---|---|---|---|
| District | **District of New Jersey** | When | **04/23/2023** |
| Case number, if known | | | MM / DD / YYYY |

**11. Why is the case filed in *this* district?**

*Check all that apply:*

☒ Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district.

☐ A bankruptcy case concerning debtor's affiliate, general partner, or partnership is pending in this district.

**12. Does the debtor own or have possession of any real property or personal property that needs immediate attention?**

☒ No
☐ Yes. Answer below for each property that needs immediate attention. Attach additional sheets if needed.

**Why does the property need immediate attention?** (*Check all that apply.*)

☐ It poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety.

What is the hazard?

☐ It needs to be physically secured or protected from the weather.

☐ It includes perishable goods or assets that could quickly deteriorate or lose value without attention (for example, livestock, seasonal goods, meat, dairy, produce, or securities-related assets or other options).

☐ Other

**Where is the property?**

| | |
|---|---|
| Number | Street |
| City | State     Zip Code |

**Is the property insured?**

☐ No
☐ Yes.     Insurance agency

Contact name

Phone

---

| | **Statistical and administrative information** |
|---|---|

**13. Debtor's estimation of available funds**

*Check one:*

☒ Funds will be available for distribution to unsecured creditors.
☐ After any administrative expenses are paid, no funds will be available for distribution to unsecured creditors.

**14. Estimated number of creditors (on a consolidated basis)**

| | | |
|---|---|---|
| ☐ 1-49 | ☐ 1,000-5,000 | ☒ 25,001-50,000 |
| ☐ 50-99 | ☐ 5,001-10,000 | ☐ 50,001-100,000 |
| ☐ 100-199 | ☐ 10,001-25,000 | ☐ More than 100,000 |
| ☐ 200-999 | | |

| Debtor | **Bed Bath & Beyond Inc.** | | | Case number *(if known)* | |
| | Name | | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| **15. Estimated assets (on a consolidated basis)** | ☐ | $0–$50,000 | ☐ | $1,000,001–$10 million | ☐ | $500,000,001–$1 billion |
| | ☐ | $50,001–$100,000 | ☐ | $10,000,001–$50 million | ☒ | $1,000,000,001–$10 billion |
| | ☐ | $100,001–$500,000 | ☐ | $50,000,001–$100 million | ☐ | $10,000,000,001–$50 billion |
| | ☐ | $500,001–$1 million | ☐ | $100,000,001–$500 million | ☐ | More than $50 billion |

| | | | | | | |
|---|---|---|---|---|---|---|
| **16. Estimated liabilities (on a consolidated basis)** | ☐ | $0–$50,000 | ☐ | $1,000,001–$10 million | ☐ | $500,000,001–$1 billion |
| | ☐ | $50,001–$100,000 | ☐ | $10,000,001–$50 million | ☒ | $1,000,000,001–$10 billion |
| | ☐ | $100,001–$500,000 | ☐ | $50,000,001–$100 million | ☐ | $10,000,000,001–$50 billion |
| | ☐ | $500,001–$1 million | ☐ | $100,000,001–$500 million | ☐ | More than $50 billion |

| | **Request for Relief, Declaration, and Signatures** |
|---|---|

**WARNING --**  Bankruptcy fraud is a serious crime.  Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both.  18 U.S.C. §§ 152, 1341, 1519, and 3571.

| **17. Declaration and signature of authorized representative of debtor** | The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition. |
|---|---|
| | I have been authorized to file this petition on behalf of the debtor. |
| | I have examined the information in this petition and have a reasonable belief that the information is true and correct. |

I declare under penalty of perjury that the foregoing is true and correct.

Executed on    **04/23/2023**
MM/ DD / YYYY

**✗** /s/ Holly Etlin                              **Holly Etlin**
Signature of authorized representative of debtor    Printed name

Title    **Chief Financial Officer and Chief Restructuring Officer**

| **18. Signature of attorney** | **✗** /s/ *Michael D. Sirota* | Date | **04/23/2023** |
|---|---|---|---|
| | Signature of attorney for debtor | | MM/DD/YYYY |

**Michael D. Sirota**
Printed name

**Cole Schotz P.C.**
Firm name

**Court Plaza North, 25 Main Street**
Number                    Street

**Hackensack**                                **New Jersey**    **07601**
City                                          State          ZIP Code

**(201) 489-3000**                            msirota@coleschotz.com
Contact phone                                 Email address

**014321986**                                 **New Jersey**
Bar number                                    State

Official Form 201A (12/15)

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| BED BATH & BEYOND INC., | ) Case No. 23-_____(___) |
| | ) |
| Debtor. | ) |
| | ) |

## Attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11

1.   If any of the debtor's securities are registered under Section 12 of the Securities Exchange Act of 1934, the SEC file number is   **0-20214**

2.   The following financial data is the latest available information and refers to the debtor's condition on **August 27, 2022/November 26, 2022**

| | | | |
|---|---|---|---|
| (a) | Total assets | $ | **4,401,426,000** |
| (b) | Total debts (including debts listed in 2.c., below) | $ | **5,200,069,000** |
| (c) | Debt securities held by more than 500 holders | | **3** |

| | | | | | Approximate number of holders: |
|---|---|---|---|---|---|
| secured ☐ | unsecured ☐ | subordinated ☒ | $ | **284,391,000** | **3,650** |
| secured ☐ | unsecured ☐ | subordinated ☒ | $ | **225,000,000** | **4,125** |
| secured ☐ | unsecured ☐ | subordinated ☒ | $ | **675,010,000** | **2,175** |
| secured ☐ | unsecured ☐ | subordinated ☐ | $ | | |
| secured ☐ | unsecured ☐ | subordinated ☐ | $ | | |

| | | |
|---|---|---|
| (d) | Number of shares of preferred stock | **180** |
| (e) | Number of shares of common stock | **739,056,836[1]** |

Comments, if any:   **Debt securities in section 2(c) are as of August 27, 2022. All other information is as of November 26, 2022, the date of the Company's last quarterly filing.**

3.   Brief description of debtor's business:   **An omni-channel retailer offering a wide assortment or merchandise in the home, baby, beauty and wellness markets and operates under the names Bed Bath & Beyond, buybuy BABY and Harmon, Harmon Face Values or Face Values.**

4.   List the names of any person who directly or indirectly owns, controls, or holds, with power to vote, 5% or more of the voting securities of debtor:
**N/A**

---

[1]   Total outstanding preferred stock in section 2(d) and common stock in section 2(e) reflects the latest available, unaudited information and is based solely on the Debtor's records.

| Fill in this information to identify the case: |
| --- |
| United States Bankruptcy Court for the: |
| **District of New Jersey** |
| (State) |
| Case number *(if known)*: _____    Chapter    11 |

☐ Check if this is an
amended filing

## Rider 1
## Pending Bankruptcy Cases Filed by the Debtor and Affiliates of the Debtor

On the date hereof, each of the entities listed below (collectively, the "Debtors") filed a petition in the United States Bankruptcy Court for the District of New Jersey for relief under chapter 11 of title 11 of the United States Code. The Debtors have moved for joint administration of these cases under the case number assigned to the chapter 11 case of Bed Bath & Beyond Inc.

- Bed Bath & Beyond Inc.
- Alamo Bed Bath & Beyond Inc.
- BBB Canada LP Inc.
- BBB Value Services Inc.
- BBBY Management Corporation
- BBBYCF LLC
- BBBYTF LLC
- Bed Bath & Beyond of Annapolis, Inc.
- Bed Bath & Beyond of Arundel Inc.
- Bed Bath & Beyond of Baton Rouge Inc.
- Bed Bath & Beyond of Birmingham Inc.
- Bed Bath & Beyond of Bridgewater Inc.
- Bed Bath & Beyond of California Limited Liability Company
- Bed Bath & Beyond of Davenport Inc.
- Bed Bath & Beyond of East Hanover Inc.
- Bed Bath & Beyond of Edgewater Inc.
- Bed Bath & Beyond of Falls Church, Inc.
- Bed Bath & Beyond of Fashion Center, Inc.
- Bed Bath & Beyond of Frederick, Inc.
- Bed Bath & Beyond of Gaithersburg Inc.
- Bed Bath & Beyond of Gallery Place L.L.C.
- Bed Bath & Beyond of Knoxville Inc.
- Bed Bath & Beyond of Lexington Inc.
- Bed Bath & Beyond of Lincoln Park Inc.
- Bed Bath & Beyond of Louisville Inc.
- Bed Bath & Beyond of Mandeville Inc.

- Bed Bath & Beyond of Manhattan, Inc.
- Bed Bath & Beyond of Opry Inc.
- Bed Bath & Beyond of Overland Park Inc.
- Bed Bath & Beyond of Palm Desert Inc.
- Bed Bath & Beyond of Paradise Valley Inc.
- Bed Bath & Beyond of Pittsford Inc.
- Bed Bath & Beyond of Portland Inc.
- Bed Bath & Beyond of Rockford Inc.
- Bed Bath & Beyond of Towson Inc.
- Bed Bath & Beyond of Virginia Beach Inc.
- Bed Bath & Beyond of Waldorf Inc.
- Bed Bath & Beyond of Woodbridge Inc.
- bed 'n bath Stores Inc.
- Buy Buy Baby of Rockville, Inc.
- Buy Buy Baby of Totowa, Inc.
- Buy Buy Baby, Inc.
- BWAO LLC
- Chef C Holdings LLC
- Decorist, LLC
- Deerbrook Bed Bath & Beyond Inc.
- Harmon of Brentwood, Inc.
- Harmon of Caldwell, Inc.
- Harmon of Carlstadt, Inc.
- Harmon of Franklin, Inc.
- Harmon of Greenbrook II, Inc.
- Harmon of Hackensack, Inc.

- Harmon of Hanover, Inc.
- Harmon of Hartsdale, Inc.
- Harmon of Manalapan, Inc.
- Harmon of Massapequa, Inc.
- Harmon of Melville, Inc.
- Harmon of New Rochelle, Inc.
- Harmon of Newton, Inc.
- Harmon of Old Bridge, Inc.
- Harmon of Plainview, Inc.
- Harmon of Raritan, Inc.
- Harmon of Rockaway, Inc.
- Harmon of Shrewsbury, Inc.
- Harmon of Totowa, Inc.
- Harmon of Wayne, Inc.
- Harmon of Westfield, Inc.
- Harmon of Yonkers, Inc.
- Harmon Stores, Inc.
- Liberty Procurement Co. Inc.
- Of a Kind, Inc.
- One Kings Lane LLC
- San Antonio Bed Bath & Beyond Inc.
- Springfield Buy Buy Baby, Inc.

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| In re: | ) |
|  | ) Chapter 11 |
| BED BATH & BEYOND INC., | ) |
|  | ) Case No. 23-_____(___) |
| Debtor. | ) |
|  | ) (Joint Administration Requested) |

### LIST OF EQUITY SECURITY HOLDERS[1]

| Equity Holder | Address of Equity Holder | Type of Equity Security[2] | Percentage of Equity Held |
|---|---|---|---|
| N/A | N/A | N/A | N/A |

---

[1] This list serves as the disclosure required to be made by the debtor pursuant to Rule 1007 of the Federal Rules of Bankruptcy Procedure. All equity positions listed indicate the record holder of such equity as of the date of commencement of the chapter 11 case. By the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) File A Consolidated List of the Debtors' 30 Largest Unsecured Creditors (B) File A Consolidated List of Creditors in Lieu of Submitting A Separate Mailing Matrix for Each Debtor, (C) Redact Certain Personally Identifiable Information, (D) Waiving the Requirement to File A List of Equity Holders and Provide Notices Directly to Equity Security Holders, and (II) Granting Related Relief* filed contemporaneously herewith, the Debtor is requesting a waiver of the requirement under Bankruptcy Rule 1007 to file a list of all of its equity security holders.

[2] Outstanding warrants are not reflected in ownership.

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| BED BATH & BEYOND INC., | Case No. 23-_____(___) |
| Debtor. | (Joint Administration Requested) |

<u>**CORPORATE OWNERSHIP STATEMENT**</u>

Pursuant to rules 1007(a)(1) and 7007.1 of the Federal Rules of Bankruptcy Procedure, there are no corporations, other than a government unit, that directly or indirectly own 10% or more of any class of the debtor's equity interests.

**Fill in this information to identify the case:**

Debtor name: ___**Bed Bath & Beyond Inc, et al.**___

United States Bankruptcy Court for the ___**District of New Jersey**___
(State)

Case number (*If known*): _____

☐ Check if this is an
amended filing

## Official Form 204

## Chapter 11 or Chapter 9 Cases: Consolidated List of Creditors Who Have the 30 Largest Unsecured Claims and Are Not Insiders[1]

12/15

A list of creditors holding the 50 largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case. Include claims which the debtor disputes. Do not include claims by any person or entity who is an insider, as defined in 11 U.S.C. § 101(31). Also, do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 30 largest unsecured claims.

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 1 | BNY MELLON 500 ROSS ST 12TH FLOOR PITTSBURGH, PA 15262 | CLAYTON COLQUITT (412)-236-5807 CLAYTON.COLQUITT@BNYMELLON.COM | UNSECURED BONDS | | | | $1,184,694,000.00 |
| 2 | PERSONALIZATIONMALL 51 SHORE DR BURR RIDGE, IL 60527 | ROBERT TURNER (630)-910-6000 ROBERTT@PMALL.COM | TRADE PAYABLE | | | | $11,095,721.42 |
| 3 | INTERSOFT DATA LABS INC 1330 W FULTON MARKET CHICAGO, IL 60607 | RALPH LIUZZO (410)-461-4723 RALPH.LIUZZO@INTSOF.COM | TRADE PAYABLE | | | | $6,836,763.63 |
| 4 | FEDERAL HEATH SIGN COMPANY LLC P.O. BOX 678203 TAMPA, FL 33626 | SUSAN ALDRIDGE (800)-342-2597 SALDRIDGE@FEDERALHEATH.COM | TRADE PAYABLE | | | | $6,770,268.26 |
| 5 | KDM POPSOLUTIONS GROUP 10450 MEDALLION CINCINNATI, OH 45241 | BILL ZIMMERMAN (513)-769-3500 B.ZIMMERMAN@KDMPOP.COM | TRADE PAYABLE | | | | $6,641,012.24 |
| 6 | COMMISSION JUNCTION INC 530 E. MONTECITO STREET #106 SANTA BARBARA, CA 93103 | SOPHIE RAMOS (805)-971-3037 CJAR@CJ.COM | TRADE PAYABLE | | | | $6,162,076.79 |
| 7 | IDX 101 RIVER RIDGE JEFFERSONVILLE, IN 47130 | ROBERT GIOVINO (800)-939-4170 ROBERT.GIOVINO@IDXCORPORATION.COM | TRADE PAYABLE | | | | $4,920,884.34 |

---

[1] On a consolidated basis. The information herein shall not constitute an admission of liability by, nor is it binding on, and Debtors with respect to all or any portion of the claims listed below. Moreover, nothing herein shall affect any Debtor's right to challenge the amount or characterization of any claim at a later date.

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim<br>If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 8 | NATIONAL TREE COMPANY<br>2 COMMERCE DRIVE<br>CRANFORD, NJ 07016 | DONNA CYRIL<br>(800)-280-8733<br>DONNA@NATIONALTREE.COM | TRADE PAYABLE | | | $4,527,134.54 |
| 9 | NORTH AMERICAN CORPORATION<br>2101 CLAIRE COURT<br>GLENVIEW, IL 60025 | KRISTIE SCHNIER<br>(847)-832-4000<br>KSCHNIER@NA.COM | TRADE PAYABLE | | | $4,384,027.43 |
| 10 | KEECO LLC<br>30736 WIEGMAN ROAD<br>HAYWARD, CA 94544 | ANDREA GRASSI<br>(212)-685-9077<br>ANDREAG@GRASSIASSOCIATESINC.COM | TRADE PAYABLE | | | $4,231,687.55 |
| 11 | FEDEX<br>P.O. BOX 371461<br>PITTSBURGH, PA 15250 | GREGORY DI SESSA<br>(201)-787-0091<br>GJDISESSA@FEDEX.COM | TRADE PAYABLE | | | $3,884,415.89 |
| 12 | TEMPUR-PEDIC<br>2 COMMERCE DRIVE<br>CRANFORD, NJ 07016 | CINDY TREAGER<br>(859)-455-2483<br>CINDY.TREAGER@TEMPURSEALY.COM | TRADE PAYABLE | | | $3,733,616.10 |
| 13 | FACEBOOK, INC.<br>15161 COLLECTIONS CENTER DRIVE<br>CHICAGO, IL 60693 | MARVIN ROBLES<br>(512)-543-2942<br>IDOAN@FACEBOOK.COM | TRADE PAYABLE | | | $3,428,867.98 |
| 14 | ARTSANA USA INC<br>1826 WILLIAM PENN WAY<br>LANCASTER, PA 17601 | STEVE RUBIN<br>(877)-424-4226<br>STEVE.RUBIN@ARTSANA.COM | TRADE PAYABLE | | | $3,323,738.80 |
| 15 | LIFETIME BRANDS INC<br>150 EAST 58TH STREET<br>NEW YORK, NY 10155 | CAROL MARKS<br>(609)-241-7321<br>CAROL.MARKS@LIFETIMEBRANDS.COM | TRADE PAYABLE | | | $3,279,438.28 |
| 16 | KEPLER GROUP LLC<br>P O BOX 419271<br>BOSTON, MA 02241 | HANNAH GROBMYER<br>(646)-524-6896<br>HGROBMYER@KEPLERGRP.COM | TRADE PAYABLE | | | $3,260,123.50 |
| 17 | WILLIAM CARTER CO.<br>3438 PEACHTREE ROAD NE<br>ATLANTA, GA 30326 | VANNESCIA WATKINS-BANKS<br>(646)-677-0866<br>VANNESCIA.WATKINS-BANKS@CARTERS.COM | TRADE PAYABLE | | | $3,143,426.77 |
| 18 | TESTRITE PRODUCTS CORP.<br>1900 S BURGUNDY PLACE<br>ONTARIO, CA 91761 | CLAUDIA VEGA<br>(909)-605-9899<br>CLAUDIA.V@TESTRITE-USA.COM | TRADE PAYABLE | | | $3,051,808.69 |
| 19 | VERIZON BUSINESS NETWORK<br>ONE VERIZON WAY<br>BASKING RIDGE, NJ 07920 | NORMA MCEWAN<br>(866)-925-0077<br>NORMA.MCEWAN@VERIZON.COM | TRADE PAYABLE | | | $2,962,792.95 |
| 20 | Pinterest, Inc.<br>651 BRANNAN ST<br>SAN FRANCISCO, CA 94107 | COLE REUTTER<br>(415)-62-7100<br>AR@PINTEREST.COM | TRADE PAYABLE | | | $2,839,480.57 |

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 21 BRIDGETREE LLC 133 NORTH MAIN STREET MOORESVILLE, NC 28115 | MICHELE BOVE (704)-604-8708 MBOVE@BRIDGETREE.COM | TRADE PAYABLE | | | | $2,658,031.85 |
| 22 CITRUS AD INTERNATIONAL INC P.O. BOX 7410138 Chicago, IL 60674 | STEPHANIE RICHMOND (813)-451-4794 STEPHANIE.RICHMOND@CITRUSAD. COM | TRADE PAYABLE | | | | $2,639,065.54 |
| 23 KEURIG GREEN MOUNTAIN INC. PO BOX 414159 BOSTON, MA 02241 | ANDREW ARCHAMBAULT (781)-460-4507 ARCHAMBAULT@KEURIG.COM | TRADE PAYABLE | | | | $2,637,919.04 |
| 24 THE KNOT WORLDWIDE INC PO BOX 32177 NEW YORK, NY 10087 | ASHLEY BERGEN (877)-331-7752 ABERGEN@THEKNOTWW.COM | TRADE PAYABLE | | | | $2,628,538.02 |
| 25 SHARKNINJA SALES COMPANY 89 A STREET NEEDHAM, MA 02494 | CAROL WEINBERG (855)-427-5127 CWEINBERG@SHARKNINJA.COM | TRADE PAYABLE | | | | $2,622,349.48 |
| 26 LENOX CORPORATION 1414 RADCLIFFE STREET BRISTOL, PA 19007 | CYNTHIA LAFFERTY (732)-642-7332 CYNTHIA_LAFFERTY@LENOX.COM | TRADE PAYABLE | | | | $2,578,451.71 |
| 27 BLUE YONDER INC 15059 N SCOTTSDALE RD SCOTTSDALE, AZ 85254 | DEBORAH COLEY (480)-308-3000 DEBORAH.COLEY@BLUEYONDER.CO M | TRADE PAYABLE | | | | $2,483,355.00 |
| 28 F 3 METALWORX INC 12069 EAST MAIN ROAD NORTH EAST, PA 16428 | LORENA UNTALAN (716)-439-8771 LUNTALAN@F3METALWORX.COM | TRADE PAYABLE | | | | $2,480,004.13 |
| 29 MADIX INC. 500 AIRPORT RD TERRELL, TX 75160 | SCOTT SCHERBAK (800)-527-2129 SSCHERBA@MADIXINC.COM | TRADE PAYABLE | | | | $2,453,870.05 |
| 30 GRANITE TELECOMMUNICATIONS LLC P.O. BOX 983119 BOSTON, MA 02298 | LISA BURTON (866)-847-5500 LMARIEBURTON@GRANITENET.CO M | TRADE PAYABLE | | | | $2,413,661.88 |

# OMNIBUS RESOLUTION OF THE
## BOARD OF DIRECTORS, OF BED BATH & BEYOND INC.

### April 22, 2023

The requisite members of the board of directors (the "**Board**") of Bed Bath & Beyond Inc., a New York corporation ("**Bed Bath & Beyond**" or the "**Company**"), organized and existing under the internal laws of New York, as set forth in the Company's charter of incorporation, hereby take the following actions and adopt the following resolutions pursuant to the Company's bylaws and the applicable laws of the state or country of incorporation of the Company.

1.    Resolutions

**WHEREAS**, the Board, having reviewed and considered (i) the filing of a voluntary petition for relief for the Company under the provisions of chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (as amended, the "**Bankruptcy Code**") pursuant to applicable law and in accordance with the requirements of the Company's governing documents and applicable law (the "**Restructuring Matters**"); and (ii) to the extent applicable, authorizing entry into and performance under the DIP Facility Documents as defined herein,

**WHEREAS**, on February 2, 2023, pursuant to Article IV, Section 1 of the Bylaws of the Company, the Board previously appointed Holly Etlin as Interim Chief Financial Officer of the Company,

**WHEREAS**, pursuant to Article IV, Section 1 of the Bylaws of the Company, the Board deems it advisable and in the best interests of the Company and its shareholders to appoint Holly Etlin as Chief Financial Officer,

**WHEREAS**, the Board having reviewed and considered the materials presented by the management of the Company and the Company's financial and legal advisors, and having had adequate opportunity to consult such persons regarding the materials presented, obtain additional information, and to fully consider each of the strategic alternatives available to the Company,

**NOW, THEREFORE, IT IS HEREBY RESOLVED**, that, pursuant to the articles of incorporation and applicable governing documents of the Company, the undersigned do hereby adopt the following resolutions:

### *Chapter 11 Filing*

**RESOLVED**, in the business judgment of the Board it is desirable and in the best interest of the Company, the stakeholders, the creditors, and other parties in interest, that the Company files or causes to be filed voluntary petitions for relief (the "**Bankruptcy Petitions**") under the provisions of chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of New Jersey, and any other petition for relief or recognition or other order that may be desirable under applicable law in the United States, and, in accordance with the requirements in the Company's governing documents and applicable law, hereby consents to, authorizes and approves, the filing of the Bankruptcy Petitions;

**RESOLVED**, any director or other duly appointed officer of the Company (collectively, the "**Authorized Persons**"), which shall include the Chief Restructuring Officer, the Chief Executive Officer, Chief Financial Officer, General Counsel, any Executive Vice President, or any Senior Vice President, shall be, and each of them individually hereby is, authorized and directed for and on behalf of the Company to take all actions (including, without limitation, to negotiate and execute any documents, certificates, supplemental agreements, and instruments) to act as signatory and attorney on behalf of the Company in respect of the Restructuring Matters and/or any persons to whom such Authorized Persons and/or officers delegate certain responsibilities, be, and hereby are, authorized to execute and file on behalf of the Company all petitions, schedules, lists, and other motions, papers, or documents, and to take any and all action that they deem necessary or proper to obtain such relief, including, but not limited to, any action necessary or proper to maintain the ordinary course operations of the Company's or any of its subsidiary's businesses.

### *Appointment of Chief Restructuring Officer*

**RESOLVED**, that Holly Etlin be, and hereby is, appointed to serve as the Chief Restructuring Officer of each Company;

**RESOLVED**, the Chief Restructuring Officer shall have such authority with respect to the Companies as is described in that certain engagement letter dated as of April 21, 2023, by and among the Company and AP Services, LLC (the "**Engagement Letter**");

**RESOLVED**, that Ms. Etlin shall be and is hereby authorized to manage the chapter 11 cases and court-supervised liquidation and sale process, and shall report directly to and serve at the direction of an ad hoc committee of the following directors of the Boards, Carol Flaton, Pamela Corrie, Jonathan Foster, and Joshua Schechter, in accordance with the terms and conditions of the Engagement Letter and these resolutions;

**RESOLVED,** that the Engagement Letter is hereby approved, and any Authorized Person, acting alone or with one or more Authorized Persons, be, and each of them hereby is, authorized, empowered, and directed to execute, deliver, and perform each Company's obligations under the Engagement Letter on behalf of the Companies and in its name with such changes therein or additions, deletions, or modifications thereto as the Authorized Person signing the same may approve, such approval may be conclusively evidenced by such Authorized Person's execution and delivery of the Engagement Letter.

### *Appointment of Chief Financial Officer*

**RESOLVED**, that Holly Etlin be, and hereby is, appointed and elected to serve as an officer of the Company and to hold the position of Chief Financial Officer;

**RESOLVED**, that Ms. Etlin shall serve in accordance with the Bylaws, as shall be in effect from time to time, with such other authority and responsibility as is customary for such position and title and shall act in such capacity until her successor is duly elected and qualified or, if earlier, until her successor has been duly elected or until her death, resignation or removal; and

**RESOLVED**, that, as an officer of the Company, Ms. Etlin is authorized to sign and deliver any agreement in the name of the Company and to otherwise obligate the Company in any respect relating to matters of the business of the Company, and to delegate such authority

in her discretion, within the policies of the Company as approved from time to time by the
Board.

### *Retention of Professionals*

**RESOLVED**, each of the Authorized Persons, be, and hereby are, authorized,
empowered, and directed to employ on behalf of the Company: (i) the law firm of Kirkland &
Ellis LLP and Kirkland & Ellis International LLP (together, "**Kirkland**") as bankruptcy
counsel; (ii) the law firm of Cole Schotz as local bankruptcy counsel; (iii) Lazard as investment
banker; (iv) AlixPartners LLP as restructuring advisor; (v) Deloitte as tax advisor; (vi) Kroll
Restructuring Administration as claims and noticing agent; and (vii) any other legal counsel,
accountants, financial advisors, restructuring advisors or other professionals the Authorized
Persons deem necessary, appropriate or advisable; each to represent and assist the Company in
carrying out its duties and responsibilities and exercising its rights under the Bankruptcy Code
and any applicable law (including, but not limited to, the law firms filing any pleadings or
responses); and in connection therewith, the Authorized Persons, be, and hereby are authorized,
empowered and directed, in accordance with the terms and conditions hereof, to execute
appropriate retention agreements, pay appropriate retainers, and to cause to be filed appropriate
applications for authority to retain such services; and

**RESOLVED**, each of the Authorized Persons, be, and hereby are, authorized,
empowered and directed to execute and file all petitions, schedules, motions, lists, applications,
pleadings, and other papers, and to perform such further actions and execute such further
documentation that the Authorized Persons in their absolute discretion deem necessary,
appropriate or desirable in accordance with these resolutions.

### *Use of Cash Collateral, Debtor-in-Possession Financing, and Adequate Protection*

**RESOLVED**, to the extent applicable to the Companies, in the business judgment of
the Authorizing Bodies it is desirable and in the best interest of the Companies, their
stakeholders, their creditors, and other parties in interest to obtain the benefits of (i) the use of
cash collateral, as such term is defined in section 363(a) of the Bankruptcy Code ("**Cash
Collateral**"), which is security for certain of the Companies' prepetition secured lenders (the
"**Prepetition Secured Lenders**") under certain credit facilities by and among the Companies,
the guarantors party thereto, and the lenders party thereto; and (ii) the incurrence of debtor-in-
possession financing obligations ("**DIP Financing**") by entering into that certain Superpriority
Senior Secured Debtor-in-Possession Term Loan Credit Agreement (together with all exhibits,
schedules, and annexes thereto, as amended, amended and restated, supplemented, or otherwise
modified from time to time, the "**DIP Credit Agreement**") by and among Bed Bath & Beyond,
certain of the Companies, the financial institutions from time to time party thereto and their
successors and assigns (collectively the "**DIP Lenders**"), Sixth Street Specialty Lending, Inc.
in its capacity as administrative agent for the DIP Lenders (in such capacity and together with
any successor or assigns, the "**DIP Agent**") on the terms set forth therein;

**RESOLVED**, in order to use and obtain the benefits of DIP Financing and the Cash
Collateral, and in accordance with section 363 of the Bankruptcy Code, each Company will
provide certain adequate protection to the Prepetition Secured Lenders (the "**Adequate
Protection Obligations**") as documented in proposed interim and final orders (collectively, the
"**Financing Orders**") to be submitted for approval of the Bankruptcy Court, and, to the extent
that each Company is required to obtain consent from the Prepetition Secured Lenders to enter

into any of the DIP Facility Documents, as defined herein, such consent has been (or will be) obtained from the Consenting Creditors;

**RESOLVED**, in the business judgment of the Authorizing Bodies, the form, terms, and provisions of the DIP Credit Agreements and such other agreements, certificates, instruments, receipts, petitions, motions, or other papers or documents required to consummate the transaction considered by the Financing Orders (collectively, the "**DIP Facility Documents**"), substantially in the forms circulated to the Authorizing Bodies, and each Company's execution, delivery and performance of its obligations under the DIP Facility Documents, including without limitation the grant of security interests under the DIP Facility Documents, and any borrowings or guaranty therewith, be, and hereby are, in all respects, authorized and approved:

**RESOLVED**, each Company will obtain benefits from the incurrence of the borrowings under the DIP Credit Agreement and the other obligations under the DIP Credit Agreement and the other Loan Documents (as defined in the DIP Credit Agreement) which are necessary and convenient to the conduct, promotion, and attainment of the business of such Company;

**RESOLVED**, to the extent applicable, each Company shall be, and is hereby, authorized to enter into the DIP Facility Documents and incur the obligations thereunder (the "**DIP Obligations**"), including the borrowing of the loans under the DIP Credit Agreement, and other obligations related to the DIP Financing and to undertake any and all related transactions on substantially the same terms as contemplated under the DIP Facility Documents, including granting liens on and security interests in its assets, including the Collateral (as defined in the DIP Credit Agreement), to the DIP Agent, and each of the Authorized Persons be, and hereby are, authorized, empowered, and directed in the name of, and on behalf of, each Company to execute deliver, and perform all of the obligations and the transactions contemplated under each of the DIP Facility Documents in the name and on behalf of each Company, with such changes, additions, and modifications thereto as such Authorized Person shall approve, with such approval to be conclusively evidenced by such Authorized Person's execution and delivery thereof;

**RESOLVED**, each of the Authorized Persons be, and hereby are, authorized, in the name and on behalf of each Company, to take all such further actions, or cause all such further actions to be taken and to execute and deliver all such further agreements, documents, instruments, certificates recordings, and filings, in the name and on behalf of each Company, as in the determination of such Authorized Person shall be necessary, proper, or advisable in order to fully carry out the intent and accomplish the purposes of the foregoing resolutions and to consummate the transactions contemplated thereby, such authority to be conclusively evidenced by the execution of any document or the taking of any such action by such Authorized Person;

**RESOLVED**, each of the Authorized Persons be, and hereby are, authorized, in the name and on behalf of each Company, to enter into any guarantees as described or contemplated by the DIP Facility Documents or any other documents, certificates, instruments, agreements, intercreditor agreements, any extension amendment, any incremental agreement, or any other amendment required to consummate the transactions contemplated by the DIP Facility Documents and perform its obligations thereunder and to guarantee the payment and performance of the DIP Obligations of the Companies and any other guarantor thereunder;

**RESOLVED**, each of the Authorized Persons be, and hereby are, authorized, empowered, and directed in the name of, and on behalf of, each Company to seek authorization to incur the DIP Obligations and approval to use Cash Collateral pursuant to the Financing

Orders, and any Authorized Person be, and hereby is, authorized, empowered, and directed to negotiate, execute, and deliver any and all agreements, instruments, or documents, by or on behalf of the Company, necessary to implement the postpetition financing, including the Adequate Protection Obligations to the Prepetition Secured Lenders in accordance with section 363 of the Bankruptcy Code, as well as any additional or further agreements for entry into the DIP Facility Documents and the use of Cash Collateral in connection with the chapter 11 case, which agreements may require the Companies to grant adequate protection and liens to the Prepetition Secured Lenders and each other agreement, instrument, or document to be executed and delivered in connection therewith, by or on behalf of the Companies pursuant thereto or in connection therewith, all with such changes therein and additions thereto as any Authorized Person approves, such approval to be conclusively evidenced by the taking of such action or by the execution and delivery thereof;

**RESOLVED**, each of the Authorized Persons be, and hereby are, authorized, directed, and empowered, in the name of, and on behalf of, the Company to take such actions and negotiate or cause to be prepared and negotiated and to execute, deliver, perform, and cause the performance of, each of the transactions contemplated by the DIP Facility Documents and such other agreements, certificates, instruments, receipts, petitions, motions, or other papers or required documents to which the Company is or will be party or any order entered into in connection with the chapter 11 case (together with the DIP Facility Documents and the Financing Orders, collectively, the "**Financing Documents**") and to incur and pay or cause to be paid all related fees and expenses, with such changes, additions and modifications thereto as an Authorized Person executing the same shall approve;

**RESOLVED**, the Company, as debtors and debtors-in-possession under the Bankruptcy Code be, and hereby are, authorized, empowered, and directed to incur any and all obligations and to undertake any and all related transactions on substantially the same terms as contemplated under the Financing Documents, including granting liens on its assets to secure such obligations; and

**RESOLVED**, each of the Authorized Persons, be, and hereby are, authorized, empowered, and directed in the name of, and on behalf of, the Company, to execute and deliver any amendments, supplements, modifications, renewals, replacements, consolidations, substitutions, and extensions of the postpetition financing or any of the Financing Documents or to do such other things which shall in his or her sole business judgment be necessary, desirable, proper, or advisable in order to perform the DIP Obligations and to give effect to the foregoing resolutions, which determination shall be conclusively evidenced by his or her or their execution thereof.

### *Further Actions and Prior Actions*

**RESOLVED**, the Company is hereby authorized to authorize (and the Company hereby authorizes) any direct or indirect subsidiary of the Company or any entity of which such Company or any subsidiary of such Company is the sole member, general partner, managing member, or equivalent manager, as applicable, to take each of the actions described in these resolutions or any of the actions authorized in these resolutions, and none of the resolutions contained herein, or action taken in furtherance hereto, shall have or cause an adverse effect on any such subsidiary or such Company's interest therein (including without limitation, any automatic dissolution, divestiture, dissociation, or like event under applicable law).

**RESOLVED**, in addition to the specific authorizations heretofore conferred upon the Authorized Persons, the Authorized Persons, either individually or as otherwise required by the Company's governing documents and applicable law, be, and each of them hereby is, authorized to execute, acknowledge, deliver, and file any and all agreements, certificates, instruments, powers of attorney, letters, forms, transfer, deeds and other documents on behalf of the Company relating to the Restructuring Matters.

**RESOLVED**, each of the Authorized Persons (and their designees and delegates) be, and hereby is, authorized and empowered, in the name of and on behalf of the Company, to take or cause to be taken any all such other and further action, and to execute, acknowledge, deliver, and file any and all such agreements, certificates, instruments, and other documents and to pay all expenses, including but not limited to filing fees, in each case as in such Authorized Person's or Authorized Persons' absolute discretion, shall be necessary, appropriate, or desirable in order to fully carry out the intent and accomplish the purposes of the resolution adopted herein.

**RESOLVED**, the Board has received sufficient notice of the actions and transactions relating to the matters contemplated by the foregoing resolutions, as may be required by the governing documents of the Company, or hereby waives any right to have received such notice.

**RESOLVED**, all acts, actions, and transactions relating to the matters contemplated by the foregoing resolutions done in the name of and on behalf of the Company, which acts would have been approved by the foregoing resolutions except that such acts were taken before the adoption of these resolutions, are hereby in all respects approved, confirmed and ratified as the true acts and deeds of the Company with the same force and effect as if each such act, transaction, agreement, or certificate had been specifically authorized in advance by resolution of the Board.

**RESOLVED**, any Authorized Person be, and each of them hereby is, authorized to do all such other acts, deeds and other things as the Company itself may lawfully do, in accordance with its governing documents and applicable law, howsoever arising in connection with the matters above, or in furtherance of the intentions expressed in the foregoing resolutions, including, but not limited to, the negotiation, finalization, execution and delivery of any other agreements, certificates, instruments, powers of attorney, letters, forms, transfer, deeds and other documents whatsoever as the individual acting may in his/her absolute and unfettered discretion approve, deem or determine necessary, appropriate or advisable, such approval, deeming or determination to be conclusively evidenced by said individual taking such action or the execution thereof.

*       *       *       *       *

| Fill in this information to identify the case and this filing: |
|---|
| Debtor Name      **Bed Bath & Beyond Inc.** |
| United States Bankruptcy Court for the:      **District of New Jersey** |
| Case number (If known):      (State) |

# Official Form 202
## Declaration Under Penalty of Perjury for Non-Individual Debtors      12/15

An individual who is authorized to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that requires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual's position or relationship to the debtor, the identity of the document, and the date. Bankruptcy Rules 1008 and 9011.

WARNING -- Bankruptcy fraud is a serious crime. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

### Declaration and signature

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

☐   *Schedule A/B: Assets-Real and Personal Property (Official Form 206A/B)*

☐   *Schedule D: Creditors Who Have Claims Secured by Property (Official Form 206D)*

☐   *Schedule E/F: Creditors Who Have Unsecured Claims (Official Form 206E/F)*

☐   *Schedule G: Executory Contracts and Unexpired Leases (Official Form 206G)*

☐   *Schedule H: Codebtors (Official Form 206H)*

☐   *Summary of Assets and Liabilities for Non-Individuals (Official Form 206Sum)*

☐   Amended Schedule

☒   *Chapter 11 or 9 Cases: List of Creditors Who Have the 30 Largest Unsecured Claims and Are Not Insiders (Official Form 204)*

☒   Other document that requires a declaration **List of Equity Security Holders, Corporate Ownership Statement, and Certification of Creditor Matrix**

I declare under penalty of perjury that the foregoing is true and correct.

| Executed on | **04/23/2023**<br>MM/ DD/YYYY | ☒ /s/ *Holly Etlin* |
|---|---|---|
| | | Signature of individual signing on behalf of debtor |
| | | **Holly Etlin** |
| | | Printed name |
| | | **Chief Financial Officer and Chief Restructuring Officer"** |
| | | Position or relationship to debtor |

**Official Form 202**          **Declaration Under Penalty of Perjury for Non-Individual Debtors**

## **Exhibit B-2**

**Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related
Relief [Docket No. 75]**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Emily E. Geier, P.C. (*pro hac vice* pending)
Derek I. Hunter (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
joshua.sussberg@kirkland.com
emily.geier@kirkland.com
derek.hunter@kirkland.com

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com

*Proposed Co-Counsel for Debtors and Debtors in Possession*

**Order Filed on April 24, 2023
by Clerk
U.S. Bankruptcy Court
District of New Jersey**

|  |  |
|---|---|
| In re:<br><br>Bed Bath & Beyond Inc.,<br><br>              Debtor. [1]<br><br>Tax I.D. No. 11-2250488 | Chapter 11<br><br>Case No. 23-13359 (VFP) |

---

[1]   The last four digits of Debtor Bed Bath & Beyond Inc.'s tax identification number are 0488. A complete list of the Debtors in these Chapter 11 Cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/bbby.   The location of Debtor Bed Bath & Beyond Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 650 Liberty Avenue, Union, New Jersey 07083.

| | |
|---|---|
| In re:<br><br>Alamo Bed Bath & Beyond Inc.,<br><br>          Debtor.<br>Tax I.D. No. 22-3520408 | Chapter 11<br><br>Case No. 23-13360 (VFP) |
| In re:<br><br>BBB Canada LP Inc.,<br>          Debtor.<br>Tax I.D. No. 26-1607777 | Chapter 11<br><br>Case No. 23-13361 (VFP) |
| In re:<br><br>BBB Value Services Inc.,<br>          Debtor.<br>Tax I.D. No. 45-1775809 | Chapter 11<br><br>Case No. 23-13362 (VFP) |
| In re:<br><br>BBBY Management Corporation,<br>          Debtor.<br>Tax I.D. No. 22-3259534 | Chapter 11<br><br>Case No. 23-13363 (VFP) |
| In re:<br><br>BBBYCF LLC,<br>          Debtor.<br>Tax I.D. No. 81-0835533 | Chapter 11<br><br>Case No. 23-13364 (VFP) |
| In re:<br><br>BBBYTF LLC,<br>          Debtor.<br>Tax I.D. No. 81-1726838 | Chapter 11<br><br>Case No. 23-13365 (VFP) |
| In re:<br><br>Bed Bath & Beyond of Annapolis, Inc.,<br><br>          Debtor.<br>Tax I.D. No. 22-3048488 | Chapter 11<br><br>Case No. 23-13366 (VFP) |

2

| | |
|---|---|
| In re:<br><br>Bed Bath & Beyond of Arundel Inc.,<br><br>    Debtor.<br>Tax I.D. No. 22-3732626 | Chapter 11<br><br>Case No. 23-13367 (VFP) |
| In re:<br><br>Bed Bath & Beyond of Baton Rouge Inc.,<br><br>    Debtor.<br>Tax I.D. No. 22-3694076 | Chapter 11<br><br>Case No. 23-13368 (VFP) |
| In re:<br><br>Bed Bath & Beyond of Birmingham Inc.,<br><br>    Debtor.<br>Tax I.D. No. 22-3520327 | Chapter 11<br><br>Case No. 23-13369 (VFP) |
| In re:<br><br>Bed Bath & Beyond of Bridgewater Inc.,<br><br>    Debtor.<br>Tax I.D. No. 22-3665533 | Chapter 11<br><br>Case No. 23-13370 (VFP) |
| In re:<br><br>Bed Bath & Beyond of California Limited Liability Company,<br><br>    Debtor.<br>Tax I.D. No. 22-3612362 | Chapter 11<br><br>Case No. 23-13371 (VFP) |
| In re:<br><br>Bed Bath & Beyond of Davenport Inc.,<br><br>    Debtor.<br>Tax I.D. No. 22-3694074 | Chapter 11<br><br>Case No. 23-13372 (VFP) |
| In re:<br><br>Bed Bath & Beyond of East Hanover Inc.,<br><br>    Debtor.<br>Tax I.D. No. 22-3531176 | Chapter 11<br><br>Case No. 23-13373 (VFP) |

3

| | |
|---|---|
| In re:<br><br>Bed Bath & Beyond of Edgewater Inc.,<br>        Debtor.<br>Tax I.D. No. 22-3463618 | Chapter 11<br><br>Case No. 23-13374 (VFP) |
| In re:<br><br>Bed Bath & Beyond of Falls Church, Inc.,<br>        Debtor.<br>Tax I.D. No. 22-3282908 | Chapter 11<br><br>Case No. 23-13375 (VFP) |
| In re:<br><br>Bed Bath & Beyond of Fashion Center, Inc.,<br>        Debtor.<br>Tax I.D. No. 22-3207852 | Chapter 11<br><br>Case No. 23-13376 (VFP) |
| In re:<br><br>Bed Bath & Beyond of Frederick, Inc.,<br>        Debtor.<br>Tax I.D. No. 22-3590889 | Chapter 11<br><br>Case No. 23-13377 (VFP) |
| In re:<br><br>Bed Bath & Beyond of Gaithersburg Inc.,<br>        Debtor.<br>Tax I.D. No. 22-3366406 | Chapter 11<br><br>Case No. 23-13378 (VFP) |
| In re:<br><br>Bed Bath & Beyond of Gallery Place L.L.C.,<br>        Debtor.<br>Tax I.D. No. 26-2188791 | Chapter 11<br><br>Case No. 23-13379 (VFP) |
| In re:<br><br>Bed Bath & Beyond of Knoxville Inc.,<br>        Debtor.<br>Tax I.D. No. 22-3520403 | Chapter 11<br><br>Case No. 23-13380 (VFP) |

4

| | |
|---|---|
| In re:<br><br>Bed Bath & Beyond of Lexington Inc.,<br><br>               Debtor.<br><br>Tax I.D. No. 22-3590888 | Chapter 11<br><br>Case No. 23-13381 (VFP) |
| In re:<br><br>Bed Bath & Beyond of Lincoln Park Inc.,<br><br>               Debtor.<br><br>Tax I.D. No. 22-3308893 | Chapter 11<br><br>Case No. 23-13382 (VFP) |
| In re:<br><br>Bed Bath & Beyond of Louisville Inc.,<br><br>               Debtor.<br><br>Tax I.D. No. 22-3732624 | Chapter 11<br><br>Case No. 23-13383 (VFP) |
| In re:<br><br>Bed Bath & Beyond of Mandeville Inc.,<br><br>               Debtor.<br><br>Tax I.D. No. 22-3665531 | Chapter 11<br><br>Case No. 23-13384 (VFP) |
| In re:<br><br>Bed Bath & Beyond of Opry Inc.,<br><br>               Debtor.<br><br>Tax I.D. No. 22-3700264 | Chapter 11<br><br>Case No. 23-13385 (VFP) |
| In re:<br><br>Bed Bath & Beyond of Overland Park Inc.,<br><br>               Debtor.<br><br>Tax I.D. No. 22-3366404 | Chapter 11<br><br>Case No. 23-13386 (VFP) |
| In re:<br><br>Bed Bath & Beyond of Palm Desert Inc.,<br><br>               Debtor.<br><br>Tax I.D. No. 22-3320152 | Chapter 11<br><br>Case No. 23-13387 (VFP) |

| | |
|---|---|
| In re:<br><br>Bed Bath & Beyond of Paradise Valley Inc.,<br> Debtor. <br>Tax I.D. No. 22-3386576 | Chapter 11<br><br>Case No. 23-13388 (VFP) |
| In re:<br><br>Bed Bath & Beyond of Pittsford Inc.,<br> Debtor. <br>Tax I.D. No. 22-3476881 | Chapter 11<br><br>Case No. 23-13389 (VFP) |
| In re:<br><br>Bed Bath & Beyond of Portland Inc.,<br> Debtor. <br>Tax I.D. No. 22-3518153 | Chapter 11<br><br>Case No. 23-13390 (VFP) |
| In re:<br><br>Bed Bath & Beyond of Rockford Inc.,<br> Debtor. <br>Tax I.D. No. 22-3451065 | Chapter 11<br><br>Case No. 23-13391 (VFP) |
| In re:<br><br>Bed Bath & Beyond of Towson Inc.,<br> Debtor. <br>Tax I.D. No. 22-3321854 | Chapter 11<br><br>Case No. 23-13392 (VFP) |
| In re:<br><br>Bed Bath & Beyond of Virginia Beach Inc.,<br> Debtor. <br>Tax I.D. No. 22-3452326 | Chapter 11<br><br>Case No. 23-13393 (VFP) |
| In re:<br><br>Bed Bath & Beyond of Waldorf Inc.,<br> Debtor. <br>Tax I.D. No. 22-3590890 | Chapter 11<br><br>Case No. 23-13394 (VFP) |

| | |
|---|---|
| In re:<br><br>Bed Bath & Beyond of Woodbridge Inc.,<br><br>        Debtor.<br>Tax I.D. No. 22-3531179 | Chapter 11<br><br>Case No. 23-13395 (VFP) |
| In re:<br><br>bed 'n bath Stores Inc.,<br><br>        Debtor.<br>Tax I.D. No. 22-2732034 | Chapter 11<br><br>Case No. 23-13396 (VFP) |
| In re:<br><br>Bed Bath & Beyond of Manhattan, Inc.,<br><br>        Debtor.<br>Tax I.D. No. 22-3152956 | Chapter 11<br><br>Case No. 23-13397 (VFP) |
| In re:<br><br>Buy Buy Baby of Rockville, Inc.,<br><br>        Debtor.<br>Tax I.D. No. 52-1966272 | Chapter 11<br><br>Case No. 23-13398 (VFP) |
| In re:<br><br>Buy Buy Baby of Totowa, Inc.,<br><br>        Debtor.<br>Tax I.D. No. 26-2198098 | Chapter 11<br><br>Case No. 23-13399 (VFP) |
| In re:<br><br>Buy Buy Baby, Inc.,<br><br>        Debtor.<br>Tax I.D. No. 52-1942010 | Chapter 11<br><br>Case No. 23-13400 (VFP) |
| In re:<br><br>BWAO LLC,<br><br>        Debtor.<br>Tax I.D. No. 45-5291562 | Chapter 11<br><br>Case No. 23-13401 (VFP) |

| | | |
|---|---|---|
| In re:<br><br>Chef C Holdings LLC,<br><br>          Debtor.<br><br>Tax I.D. No. 81-5106069 | | Chapter 11<br><br>Case No. 23-13402 (VFP) |
| In re:<br><br>Decorist, LLC,<br><br>          Debtor.<br><br>Tax I.D. No. 46-1344917 | | Chapter 11<br><br>Case No. 23-13403 (VFP) |
| In re:<br><br>Deerbrook Bed Bath & Beyond Inc.,<br><br>          Debtor.<br><br>Tax I.D. No. 22-3590895 | | Chapter 11<br><br>Case No. 23-13404 (VFP) |
| In re:<br><br>Harmon of Brentwood, Inc.,<br><br>          Debtor.<br><br>Tax I.D. No. 22-3044214 | | Chapter 11<br><br>Case No. 23-13405 (VFP) |
| In re:<br><br>Harmon of Caldwell, Inc.,<br><br>          Debtor.<br><br>Tax I.D. No. 22-2971648 | | Chapter 11<br><br>Case No. 23-13406 (VFP) |
| In re:<br><br>Harmon of Carlstadt, Inc.,<br><br>          Debtor.<br><br>Tax I.D. No. 51-0459065 | | Chapter 11<br><br>Case No. 23-13407 (VFP) |
| In re:<br><br>Harmon of Franklin, Inc.,<br><br>          Debtor.<br><br>Tax I.D. No. 30-0109738 | | Chapter 11<br><br>Case No. 23-13408 (VFP) |

| | |
|---|---|
| In re: | |
| Harmon of Greenbrook II, Inc., | Chapter 11 |
| Debtor. | Case No. 23-13409 (VFP) |
| Tax I.D. No. 30-0109743 | |

| | |
|---|---|
| In re: | |
| Harmon of Hackensack, Inc., | Chapter 11 |
| Debtor. | Case No. 23-13410 (VFP) |
| Tax I.D. No. 22-3124535 | |

| | |
|---|---|
| In re: | |
| Harmon of Hanover, Inc., | Chapter 11 |
| Debtor. | Case No. 23-13411 (VFP) |
| Tax I.D. No. 22-2985485 | |

| | |
|---|---|
| In re: | |
| Harmon of Hartsdale, Inc., | Chapter 11 |
| Debtor. | Case No. 23-13412 (VFP) |
| Tax I.D. No. 16-1622588 | |

| | |
|---|---|
| In re: | |
| Harmon of Manalapan, Inc., | Chapter 11 |
| Debtor. | Case No. 23-13413 (VFP) |
| Tax I.D. No. 22-2717942 | |

| | |
|---|---|
| In re: | |
| Harmon of Massapequa, Inc., | Chapter 11 |
| Debtor. | Case No. 23-13414 (VFP) |
| Tax I.D. No. 22-3819949 | |

| | |
|---|---|
| In re: | |
| Harmon of Melville, Inc., | Chapter 11 |
| Debtor. | Case No. 23-13415 (VFP) |
| Tax I.D. No. 22-3785648 | |

9

| | |
|---|---|
| In re: | |
| Harmon of New Rochelle, Inc. | Chapter 11 |
| Debtor. | Case No. 23-13416 (VFP) |
| Tax I.D. No. 32-0114673 | |
| In re: | |
| Harmon of Newton, Inc., | Chapter 11 |
| Debtor. | Case No. 23-13417 (VFP) |
| Tax I.D. No. 30-0119775 | |
| In re: | |
| Harmon of Old Bridge, Inc., | Chapter 11 |
| Debtor. | Case No. 23-13418 (VFP) |
| Tax I.D. No. 22-2822762 | |
| In re: | |
| Harmon of Plainview, Inc., | Chapter 11 |
| Debtor. | Case No. 23-13419 (VFP) |
| Tax I.D. No. 30-0244515 | |
| In re: | |
| Harmon of Raritan, Inc., | Chapter 11 |
| Debtor. | Case No. 23-13420 (VFP) |
| Tax I.D. No. 22-3785646 | |
| In re: | |
| Harmon of Rockaway, Inc., | Chapter 11 |
| Debtor. | Case No. 23-13421 (VFP) |
| Tax I.D. No. 22-2822765 | |
| In re: | |
| Harmon of Shrewsbury, Inc., | Chapter 11 |
| Debtor. | Case No. 23-13422 (VFP) |
| Tax I.D. No. 22-3248849 | |

| | |
|---|---|
| In re:<br><br>Harmon of Totowa, Inc.,<br><br>    Debtor.<br><br>Tax I.D. No. 22-3044269 | Chapter 11<br><br>Case No. 23-13423 (VFP) |
| In re:<br><br>Harmon of Wayne, Inc.,<br><br>    Debtor.<br><br>Tax I.D. No. 22-3044316 | Chapter 11<br><br>Case No. 23-13424 (VFP) |
| In re:<br><br>Harmon of Westfield, Inc.,<br><br>    Debtor.<br><br>Tax I.D. No. 20-0002851 | Chapter 11<br><br>Case No. 23-13425 (VFP) |
| In re:<br><br>Harmon of Yonkers, Inc.,<br><br>    Debtor.<br><br>Tax I.D. No. 56-6620371 | Chapter 11<br><br>Case No. 23-13426 (VFP) |
| In re:<br><br>Harmon Stores, Inc.,<br><br>    Debtor.<br><br>Tax I.D. No. 22-2036555 | Chapter 11<br><br>Case No. 23-13427 (VFP) |
| In re:<br><br>Liberty Procurement Co. Inc.,<br><br>    Debtor.<br><br>Tax I.D. No. 52-2279383 | Chapter 11<br><br>Case No. 23-13428 (VFP) |
| In re:<br><br>Of a Kind, Inc.,<br><br>    Debtor.<br><br>Tax I.D. No. 27-2056492 | Chapter 11<br><br>Case No. 23-13429 (VFP) |

11

|  |  |
|---|---|
| In re:<br><br>One Kings Lane LLC,<br><br>                Debtor.<br><br>Tax I.D. No. 27-1434759 | Chapter 11<br><br>Case No. 23-13430 (VFP) |
| In re:<br><br>San Antonio Bed Bath & Beyond Inc.,<br><br>                Debtor.<br><br>Tax I.D. No. 22-3504701 | Chapter 11<br><br>Case No. 23-13431 (VFP) |
| In re:<br><br>Springfield Buy Buy Baby, Inc.,<br><br>                Debtor.<br><br>Tax I.D. No. 26-2198387 | Chapter 11<br><br>Case No. 23-13432 (VFP)<br><br>(Jointly Administered) |

## ORDER (I) DIRECTING JOINT ADMINISTRATION OF
## CHAPTER 11 CASES AND (II) GRANTING RELATED RELIEF

The relief set forth on the following pages, numbered thirteen (13) through fifteen (15), is

**ORDERED.**

**DATED: April 24, 2023**

                        _____
                        **Honorable Vincent F. Papalia**
                        **United States Bankruptcy Judge**

(Page | 13)

| | |
|---|---|
| Debtors: | BED BATH & BEYOND INC., *et al.* |
| Case No. | 23-13359 (VFP) |
| Caption of Order: | Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief |

Upon the *Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* (the "Motion"),[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors"), for entry of an order (this "Order") (a) authorizing the Debtors to direct the joint administration of the Debtors' Chapter 11 Cases for procedural purposes only and (b) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declaration; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference to the Bankruptcy Court Under Title 11* of the United States District Court for the District of New Jersey, entered July 23, 1984, and amended on September 18, 2012 (Simandle, C.J.); and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion was appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor,

---

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

(Page | 14)
Debtors:              BED BATH & BEYOND INC., *et al.*
Case No.              23-13359 (VFP)
Caption of Order:     Order (I) Directing Joint Administration of Chapter 11 Cases and
                      (II) Granting Related Relief

## IT IS HEREBY ORDERED THAT:

1.      The Motion is **GRANTED** as set forth herein.

2.      The above–captioned cases hereby are jointly administered by this Court for procedural purposes only.

3.      Nothing contained in the Motion or this Order shall be deemed or construed as directing or otherwise effecting a substantive consolidation of these Chapter 11 Cases, and this Order shall be without prejudice to the rights of the Debtors to seek entry of an order substantively consolidating their respective cases.

4.      The Debtors shall maintain, and the Clerk of the United States Bankruptcy Court for the District of New Jersey shall keep, one consolidated docket, one file, and one consolidated service list for these Chapter 11 Cases.

5.      All pleadings, papers, and documents filed in the Lead Case shall bear the caption as shown in **Exhibit 1** attached hereto.

6.      The caption shown in **Exhibit 1** attached hereto satisfies the requirements set forth in section 342(c)(1) of the Bankruptcy Code.

7.      All lists, schedules, and statements shall be filed and docketed in the specific Debtor's case to which they are applicable.

8.      Any party in interest may request joint hearings on matters pending in any of these Chapter 11 Cases.

9.      If pleadings, papers, or documents have been filed in any of the above–captioned cases other than the Lead Case prior to the entry of this Order, and those matters have not yet been

14

(Page | 15)

| | |
|---|---|
| Debtors: | BED BATH & BEYOND INC., *et al.* |
| Case No. | 23-13359 (VFP) |
| Caption of Order: | Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief |

heard and decided, the party who filed the pleading, paper, or document shall (i) refile the pleading, paper, or document in the Lead Case within three (3) business days of the entry of this Order, (ii) set the pleading, paper, or document for hearing before the judge assigned to the Lead Case, and (iii) notice the hearing to all appropriate parties.

10. The Clerk shall file a copy of this order in the Lead Case and each of the affiliated Debtor cases.

11. The Debtors shall file individual monthly operating reports for each Debtor and such reports shall be docketed in the Lead Case.

12. The requirement set forth in Local Rule 9013-1(a)(3) that any motion be accompanied by a memorandum of law is hereby deemed satisfied by the contents of the Motion or otherwise waived.

13. Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of the Local Rules are satisfied by such notice.

14. Any party may move for modification of this Order in accordance with Local Rule 9013-5(e).

15. A true copy of this Order shall be served on all required parties pursuant to Local Rule 9013-5(f).

16. This Order shall be effective immediately upon entry.

17. The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, and/or enforcement of this Order.

## Exhibit 1

**Case Caption**

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Emily E. Geier, P.C. (*pro hac vice* pending)
Derek I. Hunter (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
joshua.sussberg@kirkland.com
emily.geier@kirkland.com
derek.hunter@kirkland.com

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
(201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com

*Proposed Co-Counsel for Debtors and*
*Debtors in Possession*

## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | Chapter 11 |
| BED BATH & BEYOND INC., *et al.*, | Case No. 23-13359 (VFP) |
| Debtors.[1] | (Jointly Administered) |

---

[1] The last four digits of Debtor Bed Bath & Beyond Inc.'s tax identification number are 0488. A complete list of the Debtors in these Chapter 11 Cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/bbby. The location of Debtor Bed Bath & Beyond Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 650 Liberty Avenue, Union, New Jersey 07083.

**<u>Exhibit B-3</u>**

**Order Enlarging the Period Within Which the Debtors May Remove Actions and (II)
Granting Related Relief [Docket No. 1403]**

<table>
<tr><td>

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP** Joshua
A. Sussberg, P.C. (admitted *pro hac vice*) Emily E. Geier,
P.C. (admitted *pro hac vice*)
Derek I. Hunter (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
joshua.sussberg@kirkland.com
emily.geier@kirkland.com
derek.hunter@kirkland.com

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com

*Co-Counsel for Debtors and Debtors in Possession*

</td></tr>
</table>

Order Filed on July 18, 2023
by Clerk
U.S. Bankruptcy Court
District of New Jersey

In re:

BED BATH & BEYOND INC., *et al.*,

Debtors.[1]

Chapter 11

Case No. 23-13359 (VFP)

(Jointly Administered)

## ORDER (I) ENLARGING THE PERIOD WITHIN WHICH THE DEBTORS MAY REMOVE ACTIONS AND (II) GRANTING RELATED RELIEF

The relief set forth on the following pages, numbered three (3) through four (4), is

**ORDERED.**

**DATED: July 18, 2023**

_____
**Honorable Vincent F. Papalia**
**United States Bankruptcy Judge**

---

[1]   The last four digits of Debtor Bed Bath & Beyond Inc.'s tax identification number are 0488. A complete list of the Debtors in these Chapter 11 Cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/bbby.  The location of Debtor Bed Bath & Beyond Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 650 Liberty Avenue, Union, New Jersey 07083.

(Page | 2)

| | |
|---|---|
| Debtors: | BED BATH & BEYOND INC., *et al*. |
| Case No. | 23-13359-VFP |
| Caption of Order: | ORDER (I) ENLARGING THE PERIOD WITHIN WHICH THE DEBTORS MAY REMOVE ACTIONS AND (II) GRANTING RELATED RELIEF |

Upon the *Debtors' Motion for Entry of an Order (I) Enlarging The Period Within Which the Debtors May Remove Actions and (II) Granting Related Relief* (the "Motion"),[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors"), for entry of an order (this "Order") (a) authorizing the Debtors to enlarge the Removal Period for filing notices of removal of the Actions by 120 days, up to and including November 21, 2023, without prejudice to the Debtors' right to seek further extensions, and (b) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declaration; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference to the Bankruptcy Court Under Title 11* of the United States District Court for the District of New Jersey, entered July 23, 1984, and amended on September 18, 2012 (Simandle, C.J.); and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion was appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted

---

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

| Debtors: | BED BATH & BEYOND INC., *et al*. |
| Case No. | 23-13359-VFP |
| Caption of Order: | ORDER (I) ENLARGING THE PERIOD WITHIN WHICH THE DEBTORS MAY REMOVE ACTIONS AND (II) GRANTING RELATED RELIEF |

herein; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor **IT IS HEREBY ORDERED THAT**:

1.      The Motion is **GRANTED** on a basis as set forth herein.

2.      The period within which the Debtors may file a notice of removal with respect to any proceeding related to these Chapter 11 Cases is extended through and including November 21, 2023.

3.      The extension granted by this Order is without prejudice to the Debtors' right to seek further extensions of time to file notices of removal with respect to proceedings related to these Chapter 11 Cases.

4.      This Order shall be without prejudice to any position the Debtors may take regarding whether section 362 of the Bankruptcy Code applies to stay any Action.

5.      Nothing in this Order shall be construed as modifying or terminating any stay applicable to any act, action or proceeding pursuant to section 362 of the Bankruptcy Code, or any order entered by this Court pursuant to section 105 of the Bankruptcy Code.

6.      All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

7.      The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

8.      Notwithstanding Bankruptcy Rule 6004(h), to the extent applicable, this Order shall be effective and enforceable immediately upon entry hereof.

(Page | 4)

| | |
|---|---|
| Debtors: | BED BATH & BEYOND INC., *et al*. |
| Case No. | 23-13359-VFP |
| Caption of Order: | ORDER (I) ENLARGING THE PERIOD WITHIN WHICH THE DEBTORS MAY REMOVE ACTIONS AND (II) GRANTING RELATED RELIEF |

9.      Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion.

10.      The requirement set forth in Local Rule 9013-1(a)(3) that any motion be accompanied by a memorandum of law is hereby deemed satisfied by the contents of the Motion or otherwise waived.

11.      This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.