```
                      UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF NEW JERSEY


IN RE:                      .      Case No. 23-13359-VFP
                            .
BED BATH & BEYOND, INC., .         M.L.K. Federal Building
et al.,                     .      50 Walnut Street, 3rd Floor
                            .      Newark, NJ 07102
            Debtors.        .
                            .      August 11, 2023
. . . . . . . . . . . .      .     10:09 a.m.


          TRANSCRIPT OF ZOOM HEARING ON DISCOVERY DISPUTE
               BEFORE HONORABLE VINCENT F. PAPALIA
               UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtors:            Kirkland & Ellis LLP
                            By:  ROSS J. FIEDLER, ESQ.
                            601 Lexington Avenue
                            New York, NY 10022

                            Cole Schotz, P.C.
                            By: WARREN A. USATINE, ESQ.
                            Court Plaza North, 25 Main Street
                            Hackensack, New Jersey 07601

For Various                 Kelley Drye & Warren LLP
Landlords:                  By:  ROBERT L. LeHANE, ESQ.
                            3 World Trade Center
                            175 Greenwich Street
                            New York, NY 10007


Audio Operator:             Mariela Primo

Proceedings recorded by electronic sound recording, transcript
               produced by transcription service.
```

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:   jjcourt@jjcourt.com**

**(609) 586-2311     Fax No. (609) 587-3599**

```
APPEARANCES (Cont'd):

For Pinnacle Hills,
LLC:                      Kelley Drye & Warren LLP
                          By:  WILLIAM S. GYVES, ESQ.
                          3 World Trade Center
                          175 Greenwich Street
                          New York, NY 10007

For Michaels Stores,      Lowenstein Sandler, LLP
Inc.:                     By:  PHILIP J. GROSS, ESQ.
                          One Lowenstein Drive
                          Roseland, New Jersey 07068

For DPEG Fountains, LP:   Porzio, Bromberg & Newman, P.C.
                          By: JOHN S. MAIRO, ESQ.
                          100 Southgate Parkway
                          P.O. Box 1997
                          Morristown, NJ 07962

                          Porzio, Bromberg & Newman, P.C.
                          BY: DEAN M. OSWALD, ESQ.
                          1675 Broadway, Suite 1810
                          New York, NY 10019

For Michaels Stores,      White & Case, LLP
Inc.:                     By:  SAMUEL P. HERSHEY, ESQ.
                          1221 Avenue of the Americas
                          New York, New York 10020
```

- - -

1              (Proceedings commenced at 10:09 a.m.)

2              THE COURT:  Okay.  Good morning.  It is Friday,

3     August 11th, 2023.  This is the United States Bankruptcy Court

4     for the District of New Jersey, and we are here in the case of

5     Bed Bath & Beyond, Inc., *et al.*, 23-13359.  And we're here to

6     resolve a discovery dispute that has arisen between the

7     landlord of the Pinnacle Shopping Center and Michaels, the

8     proposed assignee, from the debtor of a lease, a former Bed

9     Bath & Beyond lease in the shopping center.

10             I do see there's a number of people on the line.  I

11    guess maybe if one person from each party could indicate who is

12    there for that particular party, that might speed things up,

13    and then we can get into the merits.  I will --

14             MR. FIEDLER:  Good morning, Your Honor --

15             THE COURT:  Yeah, go ahead.

16             MR. FIEDLER:  Good morning, Your Honor, Ross Fiedler

17    of Kirkland & Ellis on behalf of the debtors.  I'm joined by

18    Warren Usatine from Cole Schotz, co-counsel to the debtors as

19    well.

20             THE COURT:  Okay, good morning.

21             MR. GYVES:  Good morning, Your Honor, it's Bill Gyves

22    at Kelley Drye & Warren for the landlord Pinnacle Hills, LLC

23             THE COURT:  Good morning.

24             MR. HERSHEY:  Good morning, Your Honor, Sam Hershey

25    from White & Case on behalf of Michaels Stores.

1              THE COURT:  Okay, good morning.

2              All right -- well, I guess I see there's a number of

3    other attorneys, but I think we can just reflect that in the

4    appearance sheets or whatever, to the extent that becomes

5    necessary.

6              And I just also want to note for the record, we're

7    here to try to resolve this discovery dispute in an informal

8    way without the necessity of motion practice, as I allow

9    pursuant to my chambers' procedures.  And I've reviewed the two

10   letter briefs, as well as some of the underlying objections and

11   responses.

12             And I guess I'd like to start off Mr. Hershey -- I'm

13   sorry, did I hear --

14             MR. HERSHEY:  Oh, yes, sure.  I'm happy to start,

15   Your Honor.

16             THE COURT:  All right.  So --

17             MR. HERSHEY:  Can you hear me okay?

18             THE COURT:  Yes, I hear you --

19             MR. HERSHEY:  Okay.

20             THE COURT:  -- just fine, yeah.  All right.  So you

21   say that the terms of the leases in the other 30-plus shopping

22   centers are not relevant to the tenant mix and balance, but I

23   read Mr. Powers' statement, of course, and it was that because

24   there are 30-plus other centers where Michaels and Hobby Lobby

25   coexist that it will not disrupt the tenant mix and balance.

1          So isn't the configuration and tenancies at the --

2   and aren't the tenancies and the configurations at the other 30

3   shopping centers relevant in at least some sense or it wouldn't

4   have been part of Michaels' response, really kind of front and

5   center?

6          MR. HERSHEY:  Yeah.  Well, I have a few responses to

7   that, Your Honor.  The first is that that was a response to an

8   argument that the landlord had made.  The landlord argued in

9   its objection that Michaels, being a competitor of Hobby Lobby,

10  would disrupt the tenant mix and balance of the shopping

11  center.  Our point in response was simply that that is

12  disproven by the fact that there are over 30 Michaels Stores

13  that coexist with Hobby Lobby.  So it can't naturally be the

14  case that a Hobby Lobby and a Michaels cannot coexist because

15  they do coexist in more than 30 instances.

16          And, further to that, we were citing publicly

17  available information; in other words, this is information

18  available on all of these shopping centers' website.  Your

19  Honor could go online, go to the shopping center website, and

20  see for yourself that there are Michaels Stores coexisting with

21  Hobby Lobby.  So we weren't citing any proprietary information

22  or private information, confidential information, this is

23  public information, of which the Court could take judicial

24  notice.  It's out there in the public realm.  We were just

25  bringing it to the Court's attention in response to an argument

1  the landlord had made.

2         The other point I'll make, Your Honor, is that even

3  if it is relevant to consider the makeup of those other

4  shopping centers -- and, by the way, we don't think it is --

5  like I said, we were just responding to the landlord's point --

6  we would be happy to ignore all of those other shopping centers

7  and focus just on this shopping center and just on the terms of

8  this Michaels lease.  But even if we were going to look to

9  those other shopping centers, nothing in what the landlord

10  argued that we were responding to implicates those leases.  In

11  other words, the landlord didn't say, if you look at the leases

12  of these other -- if you look at other shopping centers, you'll

13  see terms that have an impact on tenant mix and balances.

14         They weren't talking about leases or their terms,

15  they were just talking about the composition of those shopping

16  centers and the coexistence of Michaels -- or of any shopping

17  center and the coexistence of Michaels and Hobby Lobby, and we

18  were doing the same.  We said, look, it's not the case that

19  Michaels and Hobby Lobby can't coexist, there are other

20  shopping centers where they do, that's not relevant to the

21  terms of the leases.  There's no argument that those other

22  leases and those other 30 shopping centers were acquired out of

23  bankruptcy and we have to look at the terms of those leases.

24  We never made any argument like that that would make the lease

25  terms relevant to this dispute, nor did the landlord.  The only

1  question was are there instances where Michaels and Hobby Lobby

2  coexist, and they do.

3  　　　　　And I'll note, Your Honor, that the landlord has not

4  identified any other case where a court has considered the

5  terms of other leases in determining whether a specific lease

6  assignment complies with Section 365(b)(2)(D).  It has simply,

7  to our knowledge, never been done, and the landlord hasn't

8  identified any case where it's done because those lease terms

9  are irrelevant.

10  　　　　　So I don't think, Your Honor, that we have put the

11  lease terms for those shopping centers at issue by responding

12  to the landlord's argument with publicly available information

13  to contradict it.

14  　　　　　THE COURT:  All right.  So I want to just focus on a

15  couple of things that you said.  And you said you were citing

16  publicly available information and anyone can look it up, but,

17  you know, Mr. Powers' statement was a kind of summary ones with

18  30-plus centers.  Have those 30-plus centers been identified to

19  Pinnacle?

20  　　　　　MR. HERSHEY:  Yes, they have, Your Honor.

21  　　　　　THE COURT:  In some kind of exchange of

22  correspondence relating to the discovery dispute or otherwise?

23  　　　　　MR. HERSHEY:  That's right, Your Honor, and we're

24  happy -- I mean, it's public information, we're happy to -- as

25  Your Honor is aware, the parties are going to undertake further

1  briefing, we're happy to put that list in our brief and it's

2  public information.  But, yes, it has been identified to the

3  landlord as well.

4          THE COURT:  Okay.  And then, in other words, the

5  shopping centers are identified and each of the shopping

6  centers has a website or whatever that tells you what all the

7  other stores are in those shopping centers?

8          MR. HERSHEY:  That's our understanding, Your Honor;

9  that's what's typically done.  For example, the Pinnacle Hills

10 Shopping Center has a website where stores are listed.

11 Shopping centers generally want consumers to be aware of what

12 stores occupy the shopping centers.  So, yes, that's our

13 understanding.

14          THE COURT:  Okay.  All right.  Thank you.

15          So now I'm going to turn to the landlord and Mr.

16 Gyves.  As I read your letter, there's basically two things

17 that you identify that make the leases themselves, the whole

18 leases relevant to this dispute, and then one of them is the

19 term of the Michaels tenancy and the other is the use

20 restrictions in place.

21          So I want to try to understand, because I really

22 don't at this moment, is what is the relevance of the term of

23 the Michaels lease in another shopping center where Michaels

24 and Hobby Lobby are currently tenants at the same time.  So, by

25 definition, their terms overlap.

1        MR. GYVES:  Well, thanks, Your Honor, but we don't

2   know.  And, again, as is typically the case or frequently the

3   case in discovery, you don't know what you're looking to find

4   out.  But, for example, if the Michaels term doesn't commence

5   until after, hypothetically, a Hobby Lobby's lease terminates,

6   then this notion that they're coexisting peacefully with

7   Kumbaya going on is nonsense.  We don't know if that's the

8   case, but that's the purpose of discovery.

9        And really --

10        THE COURT:  But wait --

11        MR. GYVES:  -- what we're going -- I'm sorry.

12        THE COURT:  But wait one second.  I asked a little

13   bit of a different question.  The terms are, by definition,

14   coextensive right now because they're both tenants there, so

15   there's some overlap of the tenancies.  So what -- so, in other

16   words, if you found out that the Michaels lease was ending in a

17   year from now and the Hobby Lobby lease was ending five years

18   from now, what difference does that make?  They've been there

19   at the same time.

20        MR. GYVES:  I guess what I was trying to say, Your

21   Honor, wasn't clear.  I apologize.  But if, for example, work

22   has to be done at the Bed Bath & Beyond space for Michaels to

23   take tenancy and commence operations, that time may be sometime

24   in the future and during that period of time the Hobby Lobby

25   may cease to operate.  We don't know, but we think we're

1  entitled to find out.

2      THE COURT:  All right.  And then I guess I have the

3  same kind of question with regard to the use restrictions.  In

4  other words, whatever use restrictions there are, they don't

5  seem to apply there because they're there at the same time.

6      MR. GYVES:  But the point we're trying to make, Your

7  Honor, is that this notion that Michaels and Hobby Lobby stores

8  can coexist in a shopping center, there may be lease terms that

9  make that possible; we don't know, that's what we're trying to

10 find out.  If those lease terms that make that coexistence

11 possible don't exist here, it undercuts, in our view, Michaels'

12 argument in response to our objection and it bolsters our

13 objection because, if you don't have those terms that make it

14 work elsewhere, it's likely that it ain't going to work here.

15     THE COURT:  But I guess I'm having a bit of a hard

16 time with it, as you can tell, because, for example in this

17 situation, as I understand it, the Bed Bath & Beyond lease

18 allows reassignment and Hobby Lobby came in more than ten years

19 later with a -- you know, with knowledge of whoever else was

20 there, and certainly Hobby Lobby and Bed Bath & Beyond sell

21 some of the same things.  And I believe a memorandum of lease

22 was recorded and all that.  So I'm having some trouble with it,

23 I have to say.

24      And, besides that, the leases that I've seen here

25 with exhibits are typically over a hundred, 150 pages, and 30-

1 plus leases -- I don't whether if it's 31 or 35 or whatever --

2 that's a pretty significant task, and my understanding is this

3 assignment is for $100,000; is that right, Mr. Fiedler?

4          MR. FIEDLER:  That's right, Your Honor.

5          THE COURT:  Okay.  All right.  And I see Mr. LeHane

6 has his hand up, so I'm going to -- okay, Mr. LeHane?

7          MR. LEHANE:  Thank you, Your Honor, Robert LeHane,

8 Kelley Drye, for the landlord.

9          I guess I'd like to back out and say that with

10 respect to the 30 -- with respect to the 30 locations, we have

11 started the due diligence on those, but in the course of that

12 diligence we're struggling to determine whether or not the

13 Hobby Lobby and the Michaels are actually in the same shopping

14 centers, and the only way to really determine the information

15 as to who the owners are and the terms of those leases will

16 help us answer that question.

17          But with respect to Your Honor's point that the Bed

18 Bath & Beyond lease was freely assignable, you know, inside

19 bankruptcy, obviously, anti-assignment provisions are

20 unenforceable, but there were provisions in the Bed Bath &

21 Beyond lease which gave the landlord specific control over an

22 assignment and the landlord could terminate the lease in

23 connection with that assignment.

24          And I would just follow by saying, Your Honor,

25 several of the arguments that Mr. Hershey is making

1  characterize what really the courts do look at and should be

2  looking at in connection with what it means to disrupt the

3  tenant mix and balance, and whether it's solely the terms of

4  the debtor's lease with the tenant or the composition of the

5  shopping center and the other leases in that shopping center.

6  And the argument that the 30 locations where Hobby Lobby and

7  Michaels coexist there's no disruption in tenant mix and

8  balance, the only real way to determine that is to know what

9  those leases say.

10        And although it may seem like a significant request,

11  we've agreed to accept these leases on a professional's-eyes-

12  only basis and to make sure that we're only looking at those

13  provisions which would help us answer the questions as to

14  whether or not there are exclusive use or prohibited use

15  provisions in those leases, and whether in fact those 30

16  shopping centers, the leases of Hobby Lobby and Michaels are

17  actually owned by the same landlord, tenants with the same

18  landlord, and there is -- what the placement of those leases

19  are.

20        So, Your Honor, I just want to try and help answer

21  the questions and point out that they're outside of bankruptcy.

22  The landlord did certainly have the right to control the

23  assignment of this; this Bed Bath & Beyond lease was not freely

24  assignable.  So there is specific tenant mix and balance issues

25  at -- with respect to the Bed Bath lease and these other 30

1    leases.  We believe the terms are specifically relevant given

2    that Michaels has put them into evidence as evidence of

3    peaceful coexistence.

4            Thank you, Your Honor.

5            THE COURT:  Yeah, and I agree with you.  I'm really

6    not buying either that the -- that the coexistence of the

7    tenants is not at all relevant because, you know, quite

8    frankly, otherwise it wouldn't have been in Mr. Powers'

9    declaration.  So somebody thought it was relevant.  And,

10   frankly, I think it's a fact that is something that, you know,

11   the Court should be aware of and I understand why they brought

12   it up.

13           And, Mr. LeHane, I was with you when you said whether

14   those tenants -- whether those parties actually exist as co-

15   tenants in the same shopping center, I was with you and I agree

16   that that's relevant, but, again, I'm struggling with why the

17   specific terms of those leases are relevant because you added

18   that at the end.  And I don't even think 365 talks about -- it

19   talks about such lease, which is, you know, the lease that

20   we're looking at here, and such shopping center, which is the

21   shopping center we're looking at here, and, you know, whatever

22   those leases say, they say, but they're different centers.

23           I think you're right and you do have the ability to

24   pursue discovery as to whether those -- whether they really

25   coexist in those 30 shopping centers or not, but if it's -- you

1  know, I'm a New Jersey person and there's a lot of malls in New

2  Jersey, and one famous one is the Garden State Plaza, which is

3  a huge mall, but if Hobby Lobby and Michaels are tenants in

4  that same huge mall and there's different landlord entities for

5  some of them -- for even either of them, for both -- they both

6  have a different, for whatever reason, legal landlord, I don't

7  understand why that matters or -- what matters is -- or the

8  specific terms of the lease -- what matters is, when they

9  publicly put out the shopping center information, does it show

10  that, here, you look at -- here's the map of our shopping

11  center, Hobby Lobby is at this end and Michaels is at the other

12  end.  That's relevant -- or it's really not.  This is an out-

13  parcel that is somewhere, you know, far away and completely --

14  you know, not easily -- not easily reachable or something like

15  that.

16         But I think it's -- you know, I do think it's a

17  relevant fact because that's why it was there, but -- and

18  that's why it was put there, and I do think you have the right

19  to take discovery as to the factual realities of the situation.

20  There's a broad, sweeping statement that they coexist at 30-

21  plus shopping centers and, if that's not true, you certainly

22  have the right to test it, but if the lease says the term of --

23  the term of one lease is five years and another one is ten

24  years, it doesn't matter, they still are coexisting at the

25  moment and, if there were use restrictions, it doesn't matter

1  because they were coexisting at the moment.

2          The issue is whether they really were coexisting and
3  I think you should have the ability to take discovery on those
4  points, but I -- you know, I know that discovery is broad and
5  there's a number of cases that were cited to me -- well, let me
6  ask -- let me ask -- let me ask if anyone else wishes to be
7  heard, the debtor or Michaels wishes to respond and --

8          MR. LEHANE:  Your Honor, this is Mr. LeHane.  Can I
9  just follow up on your point?

10         THE COURT:  Yes.

11         MR. LEHANE:  So we understand that it's a lot of
12 leases and we have tried to figure out the way that the 30
13 other centers are located.  Based on the maps and the website
14 diligence that we've done, we still can't determine at a number
15 of these locations where Michaels may be and where Hobby Lobby
16 may be.  And if there is another way for Michaels to produce
17 this information, if they have abstracts, if they have
18 summaries of these leases and they can say, hey, with respect
19 to these 30, it turns out these are not in the same shopping
20 center, a couple are across the street from each other, that
21 may be helpful as well.

22         I do think that whether or not there are exclusive
23 use provisions that Michaels and the landlord and Hobby Lobby
24 have done a workaround in these other 30 centers is directly
25 relevant to the statement that they're coexisting.  Well, they

1   may be coexisting because the parties reached an agreement that

2   otherwise amends exclusive use or prohibited use provisions in

3   those shopping centers, which explains why they're able to

4   coexist.  And I do believe that's relevant if you're trying to

5   say there's no disruption in the tenant mix and balance in this

6   shopping center because, look at these other 30, they're all

7   getting along there.

8            So that gets to the terms of those leases in those

9   shopping centers are relevant if those 30 shopping centers and

10  the coexistence of Michaels and Hobby Lobby is evidence that

11  there's no disruption at this one.

12           We're certainly open to another means to getting this

13  information, whether it's the debtors providing specific

14  summaries or abstracts or something that's less burdensome than

15  30 leases, but, honestly, at an organization the size of

16  Michaels and these large REIT, they have great tracking of

17  their leases, it's not that difficult for them to be able to

18  pull up 30 leases and, you know, determine the specific

19  provisions.  And if there's a way to narrow the scope, I'm sure

20  Mr. Gyves and ourselves and the folks at White & Case could

21  narrow exactly what we're looking for.

22           We're not looking for the confidential proprietary

23  information, we're looking for the information that will help

24  us discern whether or not there really is peaceful coexistence

25  at those and whether the 30 they've identified are in fact

1 shopping centers owned by the same landlord and what the layout

2 and how close to those locations the Michaels and the Hobby

3 Lobby truly are at those 30 centers.

4       THE COURT:  Well, I guess I'm taking you up on that

5 because, again, I understand your point and even what you just

6 said sounds -- you know, to take out certain provisions of 30-

7 plus leases sounds still burdensome to me and for minimal

8 purpose, minimal relevance, but, you know, I think we're -- now

9 we're kind of off the term in terms of time, how long the lease

10 is, but that maybe there's use restrictions that show that they

11 agreed to coexist, but that was my point earlier.  Whatever

12 they say, they agreed to coexist, so that's what they said, you

13 know, it doesn't -- whether they agreed to -- what the specific

14 agreement was in that particular shopping center, I'm just not

15 sure why it's relevant or proportional.

16       That said, I'm going to turn to Mr. Hershey again

17 because I think Mr. LeHane said that the debtor can provide,

18 but maybe that was just misspeaking and he meant Michaels that

19 -- does Michaels have maps, for example, of these shopping

20 centers, the 30 that are attached as exhibits to the leases

21 that identify where the stores are or from which -- you know,

22 the location of the Hobby Lobby and Michaels Stores can be

23 easily identified?

24       MR. HERSHEY:  Yes, thank you, Your Honor.  Sam

25 Hershey again from White & Case for Michaels.

1          Yeah, I'd like to -- I'll respond to that point

2    first, Your Honor, but I would like an opportunity to respond

3    to some of the other points that have come up.

4          The answer to Your Honor's question is, frankly, I

5    don't know -- I mean, I don't know.  I don't know if we have

6    anything different from what's available on the shopping

7    center's website.  I would tend to think what's on the shopping

8    center's website is more up to date than whatever we have

9    because we -- and this is, again, speculation, but we might

10   have a map from the time we entered into the lease, presumably

11   that map has changed.  I don't know when the Hobby Lobby store

12   entered the lease versus when we entered the lease -- or the

13   shopping center, rather, and what other changes have been made.

14   So I would assume the best information is on the shopping

15   center -- and the most up-to-date information is on the

16   shopping center website, but, you know, off the top of my head,

17   I don't know.

18          I'm happy to engage in conversations with Mr. LeHane

19   and Mr. Gyves about this and see if there's an easy way to try

20   to get them more information that is not publicly available

21   than what they might have now, I just don't know.  It may not

22   be possible, but, look, I mean, we've produced over a thousand

23   pages of discovery so far, we've searched our clients' emails,

24   our attorneys' emails, our records.  We've been very

25   accommodating, we'll certainly continue to be that way, and,

1  you know, we'll try to work this out, but I can't promise that

2  we will be able to.  I just don't know what's out there and if

3  it's better than what's publicly available.  So that's point

4  one, Your Honor.

5        Point two is this -- you know, what I hear Mr. LeHane

6  and Mr. Gyves saying is we made this argument and we've opened

7  ourselves to this sort of massive discovery of our leases and

8  their terms, and I agree with Your Honor, I don't see how those

9  terms are relevant.  And look, at the end of the day, if they

10 do their research and they can't confirm what we said is there

11 are 30-plus shopping centers where Michaels and Hobby Lobby

12 share space and they can only confirm 20, that's an argument

13 they can make to Your Honor.  They can come in and say they're

14 wrong, it's only 20, it's only 22, whatever it is, right?  We

15 can only confirm that.  And then the burden is on us, I guess,

16 to rebut that and prove that it's 31.  But they don't need the

17 terms of the shopping center to do that work -- or the terms of

18 the leases rather to do that work.

19       I also have concerns that if we start looking at

20 these Bed Bath & Beyond leases in all these shopping centers to

21 see how it is that they coexist with Hobby Lobby leases, I

22 don't know how we can do that analysis without also looking at

23 the Hobby Lobby leases and their terms.  And so are we going to

24 have to serve 30-plus subpoenas on Hobby Lobby to get their

25 leases and say what they say about the right of Bed Bath &

1  Beyond to exist in their shopping center and other restrictive

2  terms that might exist?

3          And, you know, I mean, the landlords are likely going

4  to object to that and the landlords, frankly, might object to

5  Bed Bath & Beyond producing their 30 leases.

6          So it's just going to create a mess and there's no

7  need for it given the fact that it's just not really relevant,

8  it's just not.  And so for those reasons, Your Honor, we're

9  happy to talk to the landlord and see, you know, what we can

10  get them that's relatively un-burdensome to provide, if there

11  is such a thing, and we're happy to do that.  And if we need

12  further assistance from Your Honor, of course, we'll come back

13  before Your Honor.

14          THE COURT:  Okay.  Well, what I'm really saying is

15  that the underlying facts as to the statement that there's 31

16  leases -- 31 shopping centers where Michaels and Hobby Lobby

17  coexist, as opposed to Bed Bath & Beyond and Hobby Lobby

18  coexist because that's obviously --

19          MR. HERSHEY:  Yes, Your Honor.  I apologize -- I

20  misspoke, I misspoke -- I meant Michaels.  Sorry, I apologize.

21          THE COURT:  No, no, because the same thing happened

22  with Mr. LeHane and I was concerned about expanding it.  And I

23  do understand the point about if you -- if we're using the

24  whatever it is, analogy or metaphor, opening the door, there's

25  no doubt that if the door is opened to the Michaels leases at

1  the 30 centers, then it's going to be open to the Hobby Lobby

2  leases at the 30 centers, and it just kind of cascades and

3  expands beyond where it needs to go, I think.

4         So, Mr. Fiedler, do you have anything you want to

5  add?

6         MR. FIEDLER:  Nothing from the debtors, Your Honor.

7         THE COURT:  Okay.  All right.  Anything else?  Anyone

8  else wish to be heard?  I'm not sure if there's anything left,

9  anyone left that hasn't been heard.

10        All right.  This matter arises from a discovery

11 dispute between the landlord Pinnacle Hills, LLC. and Michaels

12 with respect to the proposed assignment of the debtors' lease

13 with the landlord for Store Number 1142 located in the Pinnacle

14 Hills Power Center -- called Pinnacle Hills or the shopping

15 center in Rogers, Arkansas.  The landlord objects to the

16 proposed assignment, arguing that it would violate the

17 exclusive use clause in landlord's existing lease with Hobby

18 Lobby, and would disrupt the tenant mix and balance in the

19 shopping center.

20        The landlord served a subpoena Michaels with various

21 discovery demands.  All but one of those disputes -- there were

22 some disputes that arose and all but one of them were resolved

23 by the parties, which I appreciate -- and I understand, you

24 know, sometimes you can't reach agreement on everything and

25 that's what the Court is here for to decide.  So I appreciate

1  the effort to get there and that this one issue was open is not

2  a problem in terms of any kind of burden on the Court or

3  otherwise.

4  So this issue is based on a statement made by

5  Michaels' real executive Todd Powers in his reply to the

6  landlord's objection where Mr. Powers indicated that, quote,

7  "Michaels and Hobby Lobby locations coexist in over 30 shopping

8  centers across the country."

9  And without getting into the opening-the-door analogy

10 or metaphor, it doesn't matter.  It was raised and it was

11 raised by Pinnacle Hills in the sense that they're saying that

12 the use -- there was a disruption of the tenant mix, and it was

13 responded to, as is all appropriate.  So I'm not putting any

14 weight on who opened the door, it doesn't really matter to me.

15 But in response to the objection of Michaels, and I guess on

16 behalf of the debtor as well, that the statement is that the

17 leases will provide information that may demonstrate why these

18 30 co-tenancies have no relevance to the proposed assignment

19 here, including information regarding the terms of Michaels'

20 tenancy and the use restrictions in place at each of the

21 shopping centers in question, and we explored each of those

22 points in oral argument.

23 And as far as the term, which I understood to mean

24 the temporal term of Michaels' tenancy, I just don't understand

25 how that matters at all because there is some period of time

1  where they're both at the same shopping center, according to

2  Mr. Powers, and, therefore, I'm not sure what producing 30

3  leases that say they have coextensive lease terms or different

4  lease terms or anything matter because there's some period of

5  time where they're coextensive.

6         And then also the use restrictions in place at each

7  of the shopping centers in question, again, it's really the

8  same analysis, from the Court's point of view.  Whatever the

9  use restrictions were at those centers, they were dealt with

10 and they're, according to Mr. Powers, still coexisting or,

11 another way of stating it, they're both tenants in what is

12 considered to be one shopping center.

13        Now, if that's not true or accurate, or not

14 completely true and completely accurate, I think that certainly

15 Pinnacle Hills has every right to explore that -- and I guess

16 maybe there's a deposition of Mr. Powers or other discovery

17 that they want to take certainly.

18        And I also think the focus -- I think the focus has

19 shifted in kind of the wrong direction on this discovery

20 dispute because the focus is whether in fact there are 31, or

21 whatever the number is, shopping centers where there are a

22 Hobby Lobby and Michaels store that are tenants at the same

23 time.  And if it's not true or it's partially true, then you

24 have the right to challenge that for sure.

25        And then even this whole discussion is of somewhat

1  tenuous relevance to me because of the language of 365, which

2  says -- 365(b)(3)(B), that the assumption and assignment of

3  such lease is subject to all the provisions thereof, including

4  the use and exclusivity, et cetera, and then if there's any

5  master agreement relating to the shopping center.  I haven't

6  been pointed to a master agreement, but I do rely on the

7  language that is -- and certainly, if there were such a master

8  agreement, that might be relevant, but -- or would be relevant,

9  but I don't -- the words are such lease, not every lease in the

10  shopping center.

11        And then in (D) it's the assumption or assignment of

12  such lease will not disrupt the tenant mix or balance in such

13  shopping center, not every other shopping center in -- you

14  know, in which there are the stores that are in dispute.

15        And then I get into -- certainly I'm aware of the

16  discovery rules that are generally to be broadly construed, but

17  -- and there's a number of cases that have been cited to me,

18  especially on behalf of Pinnacle, about the broad discovery,

19  but as I know everyone on this call knows, Rule 26 was amended

20  in December of 2015 to require that discovery be proportional

21  to the needs of the case and take into account the burdens

22  created by the discovery proceedings.  That's Williams v. BASF

23  Catalysts, LLC, 2017 WL 3317295 *4 (D.N.J. 83 2017), and the

24  Federal Rules Committee's comments.

25        So the cases that were cited, many of the cases, if

1  not all of them, cited as to the broad discovery predated that

2  amendment, which really courts have said there was always that,

3  but now this makes it kind of -- this makes it very clear and

4  explicit.  And the Williams court that I just cited said, in

5  addressing the scope of the discovery, the Court must consider

6  the following factor, the importance of the issues at stake in

7  this action.

8         I do think that this is a significant issue in the

9  case because it was brought up by Mr. Powers in response to the

10  objection to the assignment, and, obviously, someone thinks

11  it's relevant.  So I think the discovery as to the facts as to

12  whether these two entities are tenants at the same time at

13  other shopping centers has some relevance, potential relevance

14  to this litigation, but not to the extent of producing 30-plus

15  leases and redacting 30-plus leases, which I will note that

16  also Hobby Lobby redacted its lease in -- I'm sorry, the other

17  party redacted the -- that Pinnacle redacted the lease with

18  Hobby Lobby, and that's what's going to be required and that's

19  just -- it's not proportionate, in my mind.

20         The amount in controversy is $100,000 for the sale of

21  the lease and, you know, this -- I could tell that this

22  controversy has probably already come close to, if not exceeded

23  that amount.

24         The parties' relative access to the relevant

25  information, that's what I was getting at before.  I think the

1  parties have almost -- have very good access to the information

2  independently of the terms of the leases and I agree that the

3  parties should explore less burdensome and cumbersome ways of

4  determining whether, you know, the factual issue, whether Mr.

5  Powers is right.  And maybe it's relevant how far apart they

6  are from each other or they're across some kind of street or

7  something like that, but it would be tangentially relevant.

8          The parties' resources, it looks like the parties

9  have pretty significant resources here.  So that cuts against

10  the proportionality issue.

11          The importance of the discovery in resolving the

12  issues, and in that one I cited the C&D because -- and it's why

13  I say limited potential relevance is because I think the focus

14  is on this lease that's being assigned and this shopping

15  center.  The fact that there might be 30 others where they

16  coexist is something I will consider, but I'm not sure how much

17  weight I will put on it.

18          So in terms -- and then the other thing is that I am

19  certain that if I were to order the production of these 30

20  leases or even ten of them, whatever it would be, there would

21  be a reciprocal request the other way, and it would expand the

22  inquiry and expand the cost and expense and delay.  So that it

23  is not proportional, it is quite burdensome, and I think

24  there's much less intrusive ways of getting to the same

25  arguably relevant information.

1          So that's the Court's ruling.  I'm denying the

2   request for the 30 leases, but I an encouraging the parties to

3   continue to do as they have done in pursuing less intrusive and

4   burdensome ways of getting to the same arguably relevant

5   information as to whether these stores coexist in the same

6   shopping center.

7          Do we need an order for that or is that good enough?

8          MR. HERSHEY:  Sam Hershey, Your Honor, White & Case,

9   for Michaels.  It's good enough for Michaels, if it's good

10  enough for the landlord.

11          MR. GYVES:  Agreed, Your Honor.  Bill Gyves of Kelley

12  Drye.

13          THE COURT:  Yeah, I have no problem entering an

14  order, if you want, but I tried to be clear.  And I continue to

15  rely on the good faith of the parties that's been exhibited

16  throughout this case in general and in this instance in

17  particular, but if there's more disputes, just raise it the

18  same way and we'll try to deal with it as quickly as we can.

19          MR. LEHANE:  Your Honor, this is Bob LeHane.  Perhaps

20  if you could just so order the transcript.

21          THE COURT:  Okay, done.

22          MR. LEHANE:  Thank you, sir.

23          THE COURT:  Thank you.

24          All right, is there anything we need to talk about,

25  scheduling or anything like that?

1          MR. FIEDLER:  Your Honor, it's Ross Fiedler for the

2   debtors.  I believe we've been in contact with your chambers on

3   setting a hearing on these contested lease matters for August

4   30th.  I just want to confirm that that date works for you.  It

5   works for -- I understand it works for Michaels and for

6   Pinnacle Hills, but I'll let them speak if otherwise.

7          THE COURT:  I was aware of that and I just had, you

8   know, a concern.  I thought this should be done in a day, but I

9   just didn't want it -- because it wouldn't work for it to bleed

10  over into Thursday for me, okay?  That's what I wanted the

11  parties to be aware of and that we could, you know, start maybe

12  even on the 28th.  But if the 30th works for everyone and

13  everyone is pretty convinced -- or firmly convinced that we can

14  get it done in that day, then that's fine as well.

15         MR. MAIRO:  Your Honor, this is John Mairo, may I

16  just be heard?

17         THE COURT:  Okay.

18         MR. MAIRO:  So, on behalf of DPEG Fountains landlord,

19  I just want to, I guess, raise the question or just confirm,

20  you know, we have an issue with one of our leases and it's

21  unclear to me from whether the August 30 date is also for our

22  lease dispute, is that the intention of the debtors?

23         MR. FIEDLER:  Yes, that's right.  So --

24         THE COURT:  Go ahead.  That's the first I've heard of

25  it, Mr. Mairo, but I'll let Mr. Fiedler speak.

1            MR. FIEDLER:  Yeah, let me clarify, Your Honor.  So

2    the 30th would be for the remaining leases that are in dispute.

3    My understanding is that the only disputed lease that requires

4    an evidentiary hearing really is this Pinnacle Hills assignment

5    to Michaels.  So I think we can get it done in a day, but, yes,

6    the 30th would be for the other contested matters as well.

7            THE COURT:  So -- but what does that mean as to Mr.

8    Mairo's client?

9            MR. FIEDLER:  That would be going forward on the 30th

10   as well.

11           THE COURT:  Well, just on the papers or on --

12           MR. FIEDLER:  I believe --

13           THE COURT:  -- oral argument?

14           MR. FIEDLER:  Correct, Your Honor.

15           THE COURT:  All right.  And I'm sorry, I'm not

16   exactly familiar with what the issue is there, can either one

17   of you just tell me what it is and how long it will take

18   approximately?

19           MR. FIEDLER:  It's substantially similar to the

20   issues raised in the Michaels and Pinnacle Hills dispute, Your

21   Honor, but there -- here we've stipulated to the facts that,

22   you know, the lease at issue is in a shopping center and I

23   don't believe the landlord intends to seek discovery or

24   depositions on this matter.

25           THE COURT:  So, in other words, the way I call the

1  issue on whether the adequate assurance on the shopping center

2  requirement is met will -- on the Michaels proposed assignment

3  will determine what happens with the proposed assignment to

4  your client, Mr. Mairo?

5          MR. MAIRO:  That's what I'm hearing, Your Honor, from

6  Mr. Fiedler.  With respect to the stipulation of the facts, Mr.

7  Fiedler sent me an email this morning I guess on that, and I

8  need to review that with my client, but that -- I would hope

9  that that could be sufficient, but I need to review that with

10  my client on that.

11          THE COURT:  Okay.  All right.  Well, you know, you

12  know where I'm headed with this is, if this is a different

13  issue, that's going to take up more of a day, right?

14          MR. MAIRO:  Sure --

15          THE COURT:  That's pretty straightforward.

16          MR. MAIRO:  -- I get it.

17          THE COURT:  All right.  Okay.

18          MR. LEHANE:  Your Honor, this is Robert LeHane again.

19          THE COURT:  Yes.

20          MR. LEHANE:  Just to confirm, we believe that this

21  certainly could be handled within a day.  There is one other

22  location, Serramonte Centers, a different landlord, but in

23  exactly the same position as Mr. Mairo's client, as just

24  described.  It's a shopping center, there's a proposed

25  assignment of the lease to Burlington that would breach an

1 exclusive use provision of the Ross lease in the same shopping

2 center, and exactly the same legal issue under 365(b)(3)(C),

3 you know, the statute that says that the assignment cannot

4 breach any exclusive use or other provisions in leases in the

5 same shopping center, in other leases.

6         So it's the same legal issue as the Rogers, Arkansas

7 Michaels assignment, and we believe it can all be handled,

8 including the fact issues at Rogers and the legal argument at

9 these other locations, they're directly on top of each other,

10 with the exception that the Rogers, Arkansas has the tenant mix

11 and balance in the fact issues.

12        THE COURT:  But so, in other words, was there -- it

13 was like Bed Bath & Beyond in the centers before the other --

14 the lease that's being -- you know, the lease that's allegedly

15 being -- the restriction that's being violated and they're the

16 same facts, essentially, with Bed Bath & Beyond having the

17 right to assign?

18        MR. LEHANE:  I believe they are -- look, I haven't

19 seen the lease in Mr. Mairo's client's, but my understanding is

20 they're probably all similar leases in similar time frames, not

21 all exactly the same.  So there might be that temporal issue,

22 but the threshold legal issue really is whether or not that

23 matters, right?  Whether 365(b)(3)(C) says on its face that it

24 can't breach any other lease in such shopping center, full

25 stop.

1           THE COURT:  Right, I got it, but, you know, it

2  wouldn't be appropriate for me to comment on that issue --

3           MR. LEHANE:  Right.

4           THE COURT:  -- today, right?

5           MR. LEHANE:  Understood.

6           THE COURT:  All right.  So I'm going to rely on the

7  parties and I'm going to go ahead and schedule it for the 30th

8  at 10 o'clock.  And we will be in touch with you because the

9  way -- we don't like to have surprises really for anyone, the

10 parties and the Court, and we normally require -- and there's

11 some flexibility in the timing -- a witness list and exhibit

12 list to be -- a witness list and exhibit list to be exchanged

13 so that everybody is on equal and fair footing.  Okay?

14          MR. FIEDLER:  Understood.  Thank you, Your Honor.

15          THE COURT:  Thank you.

16          All right, I think that's it for today.  We'll -- I

17 know we have other Bed Bath & Beyond hearings next week and we

18 will hear or see from every -- you know, some or all of you

19 again then.  Okay?

20          ALL:  Thank you, Your Honor.

21          THE COURT:  Thank you.  Have a good day and a good

22 weekend.  Bye-bye.

23          (Proceedings adjourned at 10:58 a.m.)

24                          * * * * *

25

# **C E R T I F I C A T I O N**

        I, TRACEY WILLIAMS, court-approved transcriber,
certify that the foregoing is a correct transcript from the
official electronic sound recording of the proceedings in the
above-entitled matter, and to the best of my ability.


/s/ Tracey Williams
_____

TRACEY WILLIAMS, CET-914

J&J COURT TRANSCRIBERS, INC.     DATE:  August 14, 2023