Robert L. LeHane, Esq.
William S. Gyves, Esq.
Kristin S. Elliott, Esq.
Jennifer D. Raviele, Esq. (admitted *pro hac vice*)
**KELLEY DRYE & WARREN LLP**
3 World Trade Center
175 Greenwich Street
New York, NY 10007
Tel:  212-808-7800
Fax: 212-808-7897
Email: rlehane@kelleydrye.com
            wgyves@kelleydrye.com
            kelliott@kelleydrye.com
            jraviele@kelleydrye.com

-and-

One Jefferson Road
Parsippany, NJ 07054
Tel: 973-503-5900
Fax: 973-503-5950

*Counsel for Landlord, Pinnacle Hills, LLC*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

```
-------------------------------------------------------------x
In re                                   :    Chapter 11
                                        :
BED BATH & BEYOND INC., et al.,         :    Case No. 23-13359 (VFP)
                                        :
              Debtors.                  :    (Jointly Administered)
-------------------------------------------------------------x
```

**PINNACLE HILLS, LLC'S SUR-REPLY IN FURTHER SUPPORT OF
ITS OBJECTION TO DEBTORS' MOTION FOR ORDER AUTHORIZING
<u>DEBTORS TO ASSUME AND ASSIGN LEASE FOR STORE NO. 1142</u>**

Pinnacle Hills, LLC (the "<u>Landlord</u>"), landlord to debtor Bed Bath & Beyond

Inc., files this sur-reply in further support of its *Objection to Debtors' Motion for Order*

*Authorizing Debtors to Assume and Assign Lease for Store No. 1142* (the "<u>Objection</u>"),[1] and

respectfully states:

---

[1]    Docket No. 1323.  Capitalized terms used but not defined in this sur-reply are defined in the Objection.

## PRELIMINARY STATEMENT

1.      The Debtors ask the Court to let Michaels force its way into Premises Michaels could never access outside of bankruptcy—for good reason.  Michaels is trying to place itself literally at its primary competitor's doorstep in a 12-store power center whose leases, including the BBBY Lease, the Hobby Lobby Lease and the Dollar Tree Lease (defined below), prohibit that result:



In bankruptcy, the expressed shopping center protections of section 365(b)(3) of the Bankruptcy Code do not allow Michaels to ignore the terms of existing tenant leases and elbow its way into the Premises, disrupting the tenant mix and balance that is critical to maximizing patronage and sales at the Power Center.

2.      Having litigated its right to maintain tenant mix and balance at other shopping centers by enforcing exclusive lease rights in its own shopping center leases, Michaels fully understands the importance of tenant mix and balance to a shopping center's (and its tenants') success.[2]  Given that Michaels must know that its tenancy at the Power Center will depress patronage, thereby reducing sales, it appears Michaels is targeting the Premises to further its ongoing rivalry with Hobby Lobby, its chief competitor.

---

[2]     *See, e.g., Regency Realty Grp., Inc. v. Michaels Stores, Inc.*, Case No. 2:12-cv-10594-VAR-PJK (E.D. Mich. 2012).

3.      Although Michaels is free to compete with Hobby Lobby, the Bankruptcy Code does not allow it do so at the Power Center.  Congress could not have been more clear, section 365(b)(3)(C) unequivocally prevents a shopping center lease assignment if the proposed assignee's use will breach an exclusive provision in another tenant's lease—which Michaels' tenancy undoubtedly will do.  Michaels attempts in vain to avoid the plain meaning of section 365(b)(3)(C), but it cannot evade Congress's clear intent to protect the Landlord and other tenants from a value damaging assignment by pointing to poorly decided and, in one instance, overturned, precedent from other jurisdictions.

4.      The proposed assignment also violates section 365(b)(3)(D) of the Bankruptcy Code.  Despite their burden to do so, the Debtors have offered no evidence to prove that Michaels' proposed tenancy will not disrupt the Power Center's tenant mix and balance.  Michaels originally submitted an anemic, four paragraph declaration in support of their proposed tenancy. That declaration stated that Michaels and Hobby Lobby 'co-exist' in at least 30 shopping centers throughout the country, but provided no detail regarding those locations.

5.      Once it learned the Landlord would actually test its declaration through discovery, Michaels retreated.  Michaels has advised it will not seek to enter its declaration into evidence, which is understandable:  the declaration is inaccurate and, at most, demonstrates that Michaels and Hobby Lobby 'co-exist' in only the rarest of circumstances, which do not exist here.  Without Michael's inaccurate declaration, the record is devoid of evidence (true or not) that a Michaels' tenancy will not disrupt tenant mix and balance at the Power Center.  The Debtors simply cannot meet their burden to assign the BBBY Lease to Michaels.

6.      If the Court approves a Michaels tenancy, the Landlord will be harmed in precisely the ways Congress sought to prevent when it enacted section 365(b)(3).  Among other things, at a minimum, the Landlord will incur ████████████ damages due to rent

3

abatements available to Hobby Lobby ████████████████████████████.[3]  The

Landlord (and other tenants) will face additional losses due to lower patronage and sales at the

Power Center.  While the proposed assignment may yield $100,000 in gross consideration to the

Debtors (which amount the Landlord has offered to offset), it comes at an unjustifiably high cost

to the Landlord.

       7.     Fortunately, Congress enacted 365(b)(3) of the Bankruptcy Code to

prevent such harm.  The proposed assignment must be denied.

**SUR-REPLY**

**I.**      **THE PROPOSED ASSIGNMENT PLAINLY VIOLATES SECTION 365(b)(3)(C)**

      **A.**     **Legal Standards**

       8.     As discussed in the Objection, a debtor must provide adequate assurance

of an assignee's future performance to assign an executory contract or unexpired lease to a third

party in bankruptcy.  11 U.S.C § 365(f)(2).  When a lease is for real property in a shopping

center, a debtor bears the burden to prove adequate assurance exists, and that burden is high.  *In*

*re Joshua Slocum, Ltd.*, 922 F.2d 1081, 1086 (3d Cir. 1990).  Specifically, a debtor must

establish each of the following four elements to meet its burden and assign a shopping center

lease over a landlord's objection:

> (A) . . . that the financial condition and operating performance of
> the proposed assignee . . . shall be similar to the financial condition
> and operating performance of the debtor . . . as of the time the
> debtor became the lessee under the lease;
>
> (B) that any percentage rent due under such lease will not decline
> substantially;
>
> (C) that . . . assignment of such lease is subject to all the provisions
> thereof, including (but not limited to) provisions such as a radius,
> location, use, or exclusivity provision, and will not breach any

---

[3]   Dollar Tree ████████████████████████████, would increase the Landlord's
damages significantly.

4

such provision contained in any other lease, financing agreement, or master agreement relating to such shopping center; and

(D) that assumption or assignment of such lease will not disrupt any tenant mix or balance in such shopping center.

11 U.S.C. § 365(b)(3).  *See also MOAC Mall Holdings LLC v. Transform Holdco LLC* (*In re Sears Holdings Corp.*) ("*Sears*"), 613 B.R. 51, 76–77 (S.D.N.Y. 2020), *vacated on other grounds*, 143 S. Ct. 927 (2023) (recognizing a debtor must meet each requirement to assign an unexpired shopping center lease).

9.     Courts must interpret statutes according to their plain meaning.  *See In re Visteon*, 612 F.3d 210, 219 (3d Cir. 2010) (recognizing that "all cases of statutory construction . . . begin[] with the statute's plain language").  "Courts must presume that a legislature says in a statute what it means and means in a statute what it says there."  *In re Phila. Newspapers, LLC*, 599 F.3d 298, 304 (3d Cir. 2010).  If "the words of a statute are unambiguous, . . . judicial inquiry is complete."  *Id.*; *see also Hackler v. Arianna Holdings Co., LLC* (*In re Hackler*), 938 F.3d 473, 478 (3d Cir. 2019) (refusing to go beyond plain meaning to interpret section 547(b) of the Bankruptcy Code).

10.     Courts are not free to read language into a statute that Congress did not intend.  *See Gen. Motors Corp. v. United States*, 496 U.S. 530, 537 (1990) (refusing to read limiting language into the Clean Air Act).  "[W]he[n] Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposefully in the disparate inclusion or exclusion."  *Russello v. United States*, 464 U.S. 16, 23 (1983) (quoting *United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir. 1972)).

4887-9892-6967v.12

B.    **The Plain Meaning of Section 365(b)(3)(C)**

11.    Section 365(b)(3)(C) is clear:  an assignment of a shopping center lease "is *subject to all the provisions thereof* [*i.e.* all the provisions of the debtor's lease], including (but not limited to) provisions such as a radius, location, use, or exclusivity provision, *and will not breach any such provision* [*i.e.* a radius, location, use, or exclusivity provision] *contained in any other lease*, financing agreement, or master agreement *relating to such shopping center*[.]" 11 U.S.C. § 365(b)(3)(C) (emphasis added).

12.    Unlike section 365(b)(3)(A), which addresses a proposed assignee's financial condition, section 365(b)(3)(C) contains no temporal limitation.  *Compare* 11 U.S.C. § 365(b)(3)(A) (requiring a proposed assignee's current financial condition to be similar to that of the debtor when the debtor first entered into the lease) *with* 11 U.S.C. § 365(b)(3)(C) (providing no temporal limitation on its application).  Therefore, section 365(b)(3)(C) requires compliance with use provisions in a non-debtor lease regardless of whether the non-debtor lease pre- or postdates the debtor's lease being assigned.  *See Russello*, 464 U.S. at 23.

13.    Section 365(b)(3)(C) was not always so clear.  Until 1984, the provision did not state expressly that an assignment was subject to the radius, use and exclusivity provisions in the debtor's lease; it only referred to such provisions in other non-debtor leases at the shopping center, requiring:

> (C) that assumption or assignment of such lease will not breach substantially any provision, such as a radius, location, use, or exclusivity provision, in any other lease, financing agreement, or master agreement relating to such shopping center[.]

11 U.S.C. § 365(b)(3)(C) (1978).

14.    As a result, some "[d]ebtors [] argued incorrectly that [section 365(b)(3)(C)] only require[d] adequate assurance[] that the provisions of such 'other' leases and agreements would not be breached, but that it would not require such assurance[] regarding the

provisions of the lease being assigned." S. Rep. No. 97-527, at 19–20 (1982); *see also Trak Auto*

*Corp. v. West Town Ctr. LLC* (*In re Trak Auto Corp.*) ("*Trak Auto*"), 367 F.3d 237, 243–244 (4th

Cir. 2004) (recognizing some debtors made this type of incorrect argument); *In re Tech Hifi,*

*Inc.*, 49 B.R. 876, 879–80 (Bankr. D. Mass. 1985) (applying the pre-1984 version of section

365(b)(3)(C) and approving an assignment that violated a debtor's lease because it did not breach

any other lease related to the shopping center). In 1984, Congress cured that ambiguity by

amending section 365(b)(3)(C) as follows:

> (C) that assumption or assignment of such lease ~~will not breach~~
> ~~substantially any~~<u>is subject to all the provisions thereof, including</u>
> <u>(but not limited to) </u>provisions~~,~~ such as a radius, location, use, or
> exclusivity provision, <u>and will not breach any such provision</u>
> <u>contained </u>in any other lease, financing agreement, or master
> agreement relating to such shopping center;

11 U.S.C. § 365(b)(3)(C) (1984).

15.    Section 365(b)(3)(C) is unchanged today and plainly requires that

shopping center lease assignments respect the radius, use and exclusive provisions in both the

debtor's lease and other, non-debtor leases at the shopping center. *See* 11 U.S.C. § 365(b)(3)(C);

*see also* S. Rep. No. 97-527, at 1, 2, 5, 7, 9, 10, 13, 16–17, and 19 (all reflecting that section

365(b)(3)(C) is concerned about, *inter alia*, a proposed assignment's effect on non-debtor tenants

in a shopping center).

### C.    The Proposed Assignment Unequivocally Violates Section 365(b)(3)(C)

16.    Viewed under section 365(b)(3)(C)'s unambiguous, plain meaning, the

Debtors cannot assign the BBBY Lease to Michaels. The Hobby Lobby Lease (i) is an "other

lease" that (ii) "relates to" the Power Center, and (iii) includes an exclusivity provision, (iv) that

Michaels' proposed use will breach. The same is true of the Landlord's lease (the "<u>Dollar Tree</u>

<u>Lease</u>") with another Power Center tenant, Dollar Tree Stores, Inc. ("<u>Dollar Tree</u>"), which

expressly prohibits a Michaels tenancy.[4]  On these facts alone, the Debtors cannot meet their mandatory burden to satisfy section 365(b)(3)(C) with respect to Michaels.  *See Sears*, 613 B.R. at 76–77 (debtor must establish all four elements of section 365(b)(3) to prove adequate assurance and thereby assign a shopping center lease).  The proposed assignment must be denied.

### D.    <u>Attempts to Evade the Plain Meaning of Section 365(b)(3)(C) Fail</u>

17.    Michaels raises several arguments to attempt to avoid the plain meaning of section 365(b)(3)(C).  The Court should reject each of Michaels' arguments because they (i) rely on overturned, non-binding and/or wrongly decided caselaw from other jurisdictions, (ii) misstate key facts, or (iii) attempt to read words into the Bankruptcy Code Congress intended to omit.

#### i.    <u>*Toys "R" Us* is Not Binding and Was Wrongly Decided</u>

18.    Michaels encourages the Court to follow a decision from the Eastern District of Virginia, *In re Toys "R" Us*, 587 B.R. 304 (Bankr. E.D. Va. 2018) ("*Toys*"), to hold that section 365(b)(3)(C) only restricts a shopping center lease assignment that would breach a use or exclusivity provision in a lease to which the debtor is a party.  *See* Michaels Reply at ¶¶ 14–15.  The Court should not follow *Toys*, which is not binding on this Court and was wrongly decided.

19.    In *Toys*, a bankruptcy judge faced similar facts to those presented here:  a contested shopping center lease assignment where the proposed assignee would violate an exclusive use provision in a separate, later non-debtor lease at the shopping center.  The judge held the proposed assignment did not violate section 365(b)(3)(C) because the exclusive use restriction did not appear in the debtor's earlier lease being assigned.  *See Toys*, 587 B.R. at 310.[5]

---

[4]    Aronoff Decl. (defined below), Ex. D.

[5]    The *Toys* decision has not been upheld on appeal, and no court outside of the Eastern District of Virginia has followed its interpretation of section 365(b)(3)(C).  *See Brea Union Plaza I, LLC v. Toys "R" Us, Inc.*, 2018

### a.    *Toys* Got it Wrong

20.    The judge in *Toys* did not examine the plain meaning of section 365(b)(3)(C) to make his decision.  Instead, he relied on a single sentence in the Fourth Circuit's 2004 opinion in *Trak Auto*, to describe the legislative purpose of section 365(b)(3)(C).  *See Toys*, 587 B.R. at 309 (quoting *Trak Auto* to hold that the purpose of section 365(b)(3)(C) "is to preserve the landlord's bargained-for protections with respect to premises use and other matters that are spelled out *in the lease with the debtor-tenant*") (emphasis in original).

21.    The judge's failure to follow the statute's plain meaning is reason alone for this Court to reject *Toys.  See Phila. Newspapers*, 599 F.3d at 304 (stating, if "the words of a statute are unambiguous, . . . judicial inquiry is complete").  There is another reason to jettison *Toys*: *Trak Auto* actually got the legislative purpose of section 365(b)(3)(C) wrong.

22.    *Trak Auto* addresses one issue:  whether section 365(b)(3)(C)'s specific limitations on assigning a shopping center lease controlled over then-section 365(f)(1)'s general invalidation of anti-assignment provisions in bankruptcy.[6]  *Trak Auto* held that section 365(b)(3)(C), the more specific provision, controlled.  *See Trak Auto*, 367 F.3d at 243–44 (applying the basic principle of statutory construction that a specific provision controls over a more general provision of a statute).  In fact, *Trak Auto* held nothing about the purpose of section 365(b)(3)(C), and the Fourth Circuit's one sentence commentary about the purpose of that section—on which the entire *Toys* decision is based—is dicta.

---

U.S. Dist. LEXIS 123049 (E.D. Va. 2018) (denying a motion to stay the *Toys* decision pending appeal, without oral argument, finding in part that the appellant was unlikely to prevail on the merits of its appeal); *In re Toys "R" us Prop. Co.,* 2019 Bankr. LEXIS 440, at *11 (Bankr. E.D. Va. 2019) (*Toys'* judge followed his own decision); *Sears*, 613 B.R. at 61 n.9 (citing *Toys* for unrelated purposes).

[6]    *Trak Auto* was decided before BAPCPA was enacted in 2005.  Pre-BAPCPA, courts were split about whether section 365(f)(1)'s general invalidation of anti-assignment provisions controlled over section 365(b)(3)'s requirements for establishing adequate assurance to assign a shopping center lease.  *See, e.g., Trak Auto*, 367 F.3d at 241–42.  As part of BAPCPA, Congress codified the holding in *Trak Auto* by making section 365(f)(1) expressly subordinate to section 365(b)(3).  *See* 11 U.S.C. § 365(f)(1) (currently stating that it applies "[e]xcept as provided in subsection[] (b) [of section 365]").

23.    Even as dicta, *Trak Auto's* statement about the purpose of section

365(b)(3)(C) is incorrect.  The Fourth Circuit relied on *In re Ames Dep't Stores, Inc.* ("*Ames*"),

121 B.R. 160, 165 n.4 (Bankr. S.D.N.Y. 1990) to support its statement that, "Congress's purpose

in § 365(b)(3)(C) is to preserve the landlord's bargained-for protections with respect to premises

use and other matters that are spelled out in the lease with the debtor-tenant."  *Trak Auto*, 367

F.3d at 244.  *Ames*, however, is a case about tenant mix under section 365(b)(3)(D), not the

requirement to honor use, exclusivity and radius provisions in shopping center leases under

section 365(b)(3)(C).  *See Ames*, 121 B.R. at 165 (analyzing whether a proposed assignment

satisfies section 365(b)(3)(D)).  Although *Ames* refers to section 365(b)(3)(C) in a footnote, it

does so in passing to highlight a change Congress made to sections 365(b)(3)(C) and

365(b)(3)(D) in 1984 to strengthen a landlord's ability to protect itself against a harmful

assignment in bankruptcy.  *See id.* at 165 n.4.[7]  *Ames* does not address the legislative purpose of

the portion of section 365(b)(3)(C) in controversy here, *i.e.* that assignment of a shopping center

lease must not breach the use, exclusivity and radius restrictions in other leases at the shopping

center.  Congress has addressed that purpose squarely, stating that section 365(b)(3)(C) is

intended to is to protect the interests of landlords and other non-debtor tenants in a shopping

center.  *See, e.g.*, S. REP. NO. 97-527 at 1, 2, 5, 7, 9, 10, 13, 16–17, and 19.

24.    In short, by relying on *Trak Auto's* flawed dicta instead of section

365(b)(3)(C)'s plain meaning, the *Toys* judge simply got it wrong.[8]

---

[7]    Specifically, in 1984, Congress made clear that to assign a shopping center lease:  (i) a debtor must honor all
use, exclusive and radius restrictions in all leases at the shopping center, and (ii) a proposed assignment cannot
disrupt the tenant mix and balance at a shopping center at all.  *See* S. REP. NO. 97-527, at 22 (deleting the word
"substantially" from the requirements to (i) comply with use, radius and exclusive lease provisions under
section 365(b)(3)(C), and (ii) not disrupt tenant mix and balance under section 365(b)(3)(D)).

[8]    Michaels also cites (i) *In re Martin Paint Stores* ("*Martin Paint*"*),* 199 B.R. 258, 266 (Bankr. S.D.N.Y. 1996),
and (ii) *In re Ames Dep't Stores* ("*Ames II*"), 127 B.R. 744,753 (Bankr. S.D.N.Y. 1991), to argue that a non-
debtor exclusivity provision should not prevent a lease assignment.  Michaels Reply at fn. 12.  Neither case
speaks to the issue at hand.  *Martin Paint* did not involve a shopping center and, therefore, it says nothing about

### b.    The Court Should Follow *Sears*, Not *Toys*

25.    This Court should not make the same mistake.  Instead, the Court should follow the Southern District of New York's recent guidance in *Sears*, which reminds bankruptcy judges to follow section 365(b)(3)'s plain meaning when deciding contested shopping center lease assignments.  *See Sears*, 613 B.R. at 77–78.

26.    In *Sears*, a bankruptcy judge evaluated, *inter alia*, whether a debtor satisfied section 365(b)(3)(A) with respect to a proposed shopping center lease assignment.  *See id.* at 61–63.  Section 365(b)(3)(A) requires that, to assign a shopping center lease, a debtor prove the proposed assignee's financial condition and operating performance are similar to the debtor when it entered the lease.  *See* 11 U.S.C. § 365(b)(3)(A).  Sears did not prove that its proposed assignee met that standard, but it did prove the assignee satisfied a minimum financial condition provision in the lease that would have allowed Sears to assign the lease to the proposed assignee outside of bankruptcy.  *See Sears*, 613 B.R. at 62–63.  The bankruptcy judge held that compliance with the lease satisfied section 365(b)(3)(A) because some courts look only to lease terms to decide issues of tenant mix under section 365(b)(3)(D).[9]  *See id.* at 65–67.

27.    The district court vacated the bankruptcy court ruling, holding that the bankruptcy judge erred in failing to follow the plain meaning of section 365(b)(3)(A).  Specifically, the district court found that section 365(b)(3)(A) is clear on its face and, unlike section 365(b)(3)(D), "does not use a phrase that requires resort to the lease to give it definition and context." *Id.* at 77.  As a result, the bankruptcy judge improperly "read § 365(b)(3)(A) out of the statute, effectively rewriting it and overriding the express wishes of the legislature." *Id.*

---

the meaning of any of the provisions of section 365(b)(3).  *Ames II* is a case about section 365(b)(3)(D) that says nothing about the plain meaning of section 365(b)(3)(C).  These inapposite cases do not refute the plain meaning of section 365(b)(3)(C).

[9]    Some courts look to lease terms to decide issues under section 365(b)(3)(D) because the Bankruptcy Code does not define the phrase "tenant mix and balance" used in that section.  *See, e.g.*, *In re Trak Auto Corp.*, 277 B.R. 655, 672 (Bankr. E.D. Va. 2002); *Ames*, 121 B.R. at 164–65.

28.    Respectfully, following *Toys* would yield the same result here:  if the Court limits section 365(b)(3)(C) to debtor leases only, it will effectively rewrite section 365(b)(3)(C) and override the express wishes of Congress.  As in *Sears*, that decision would not withstand scrutiny.  *See id.* at 78–79 (reversing bankruptcy judge's decision to ignore the plain meaning of section 365(b)(3)(A)).   The Court should heed *Sears* and enforce section 365(b)(3)(C) exactly as written.

ii.    <u>**Applying Section 365(b)(3)(C) as Written Does Not Yield Absurd Results**</u>

29.    Michaels argues the plain meaning of section 365(b)(3)(C) yields absurd results because the Debtors will have fewer rights to assign the BBBY Lease in bankruptcy than they had outside of bankruptcy.   *See* Michaels Reply at ¶ 16.   Not so.   Applying section 365(b)(3)(C) as written gives the Debtors more, not fewer, rights to assign the BBBY Lease than they enjoyed outside of bankruptcy.

30.    Outside of bankruptcy, the BBBY Lease clearly conditions assignment on the Landlord's consent to the assignee's proposed use of the Premises.   Section 15.1.2 of the BBBY Lease states:

> Except with respect to any transaction covered under Subsection 15.1.3 [assignment to an affiliate] or Section 15.3 [collateral assignment] [], in the event Tenant proposes to assign this Lease or sublet, in a single transaction, the whole of the Premises, it shall first give notice thereof (the "***Assignment/Subletting Notice***") to Landlord, which notice shall specify the name and address of the proposed assignee or sublessee and the proposed use of the Premises to be made by such assignee or sublessee, together with a statement certified by Tenant of the amount of the then unamortized costs . . . of any alterations performed by Tenant to the Premises.   **Thereafter, Landlord shall have the option to terminate this Lease**, which option shall be exercisable by
>
> > (a)    giving notice to Tenant . . . thereof within thirty (30) days after receipt of an Assignment/Subletting Notice from Tenant, and

4887-9892-6967v.12

> (b) paying to Tenant, within thirty (30) days after such
> notice is given, an amount equal to the sum of all of
> Tenant's costs and expenses incurred in connection [sic]
> the preparation of plans and specifications for, and the then
> unamortized costs . . . of, any alterations performed by
> Tenant to the Premises[.]

BBBY Lease at § 15.1.2 (emphasis added).[10]

31.     This provision makes perfect sense, because the proposed use of premises
in a shopping center is critically important to a landlord.  *See* S. Rep. No. 97-527, at 5 (stating,
"[a] shopping center is often a carefully planned enterprise, and though it consists of numerous
individual tenants, the center is planned as a single unit").  Prepetition, the Landlord could have
prevented any assignment if it did not approve of the proposed use for the Premises.[11]

32.     As acknowledged in the Objection, the Landlord's unfettered rights under
Section 15.1.2 are curtailed in bankruptcy.  *See* Objection at ¶ 29; 11 U.S.C. § 365(f)(1).  While
the Landlord is no longer able to effectively block an assignment based on *any* proposed use for
the Premises, section 365(b)(3)(C) expressly conditions assignment on compliance with
contracted-for use restrictions in effect at the Power Center.  The statute expands the Debtors'
contractual ability to assign the BBBY Lease, while protecting the Landlord and non-debtor
tenants by requiring compliance with current use and exclusive provisions in any other leases in
the Power Center.

33.     Congress's decision to require compliance with use and exclusive
provisions in other, non-debtor leases does not prevent the Debtors from monetizing the BBBY
Lease.  It is not the case, as Michaels argues, that enforcing section 365(b)(3)(C) will subject the
Debtors "to the myriad assignment-related provisions in more than 100 other leases entered into

---

[10]    A true copy of the BBBY Lease is attached as <u>Exhibit B</u> to the *Declaration of Jeffrey Aronoff in Support of
Pinnacle Hills, LLC's Sur-Reply in Further Support of Its Objection to Debtors' Motion for Order Authorizing
Debtors to Assume and Assign Lease for Store No. 1142* (the "<u>Aronoff Decl.</u>") filed contemporaneously
herewith.

[11]    *See* Aronoff Decl. at ¶ 10.

between the Landlord and other tenants." Michaels Objection at ¶ 16. The use restrictions with
which the Debtors must comply relate to the Power Center, a 12-store shopping center within the
Promenade.[12]  *See* Hobby Lobby Lease at Recital A, § 7.3;[13] Dollar Tree Memorandum of
Lease[14] (each prohibiting a Michaels tenancy at the Power Center). The Debtors' obligation to
avoid conflict with exclusive provisions in certain other leases at the Power Center is not
unreasonable. In these cases alone, the Debtors have assigned over 115 shopping center leases to
third parties,[15] with only a handful of objections to be litigated based on an asserted violation of
section 365(b)(3)(C). The misleading parade of horribles Michaels attempts to paint has not, and
will not, come to pass. Applying section 365(b)(3)(C) faithfully will not yield absurd results.

### iii.    The Proposed Assignment Will "Breach" a Lease Under the Statute

34.    Michaels makes another argument why section 365(b)(3)(C) should not
apply to non-debtor leases: because Congress used the word "breach," as opposed to "violation"
(which word the Landlord used periodically in the Objection), Congress only intended to prevent
shopping center lease assignments that violated terms of a lease or other agreement to which the
debtor is a party. *See* Michaels Reply at ¶ 18. This argument fails because it requires the Court
to read language into section 365(b)(3)(C) that does not exist. *See Gen. Motors Corp.*, 496 U.S.
at 537 (holding that courts may not read language into statutes that Congress did not intend).

35.    The Landlord does not quibble with Michaels' definition of "breach," (*i.e.*
"a violation or infraction of a law, obligation, or agreement") or the "elementary tenet of contract
law" that only a party to a contract can breach it. Michaels Reply at ¶ 18. When a proposed

---

[12]   *Id.* at ¶ 4.

[13]   A true copy of the Hobby Lobby Lease is attached as Exhibit C to the Aronoff Decl.

[14]   A true copy of the Dollar Tree Lease is attached as Exhibit D to the Aronoff Decl. A true copy of the Dollar
Tree Memorandum of Lease is attached as Exhibit E to the Aronoff Decl.

[15]   *See* Docket Nos. 731, 1099, 1408, 1409, 1420, 1425, 1481, 1483-1486, 1489, 1496, 1612, 1674, 1694, 1695,
1700, 1702-1705, 1707, 1708, 1710, 1746, 1747, 1804, and 1833–1835.

4887-9892-6967v.12

assignment violates a use, radius or exclusive provision in another lease at a shopping center, (i) a *breach* of the other lease occurs (*e.g.,* the landlord's *agreement* to honor the tenant's exclusivity rights is *violated*), (ii) by a party to it, *i.e.*, the landlord (who is, necessarily, also a party to the debtor's lease being assigned).  Whether called a "violation" (as in the Objection) or a "breach," the result is the same.

36.    If Congress intended to limit section 365(b)(3)(C) to the breach of leases to which the debtor is a party, it would have said so, including when it amended section 365(b)(3)(C) in 1984.  Congress could have, for instance, added the words "of the debtor" or "to which the debtor is a party" after the words "other lease."[16]  Congress did not do that.  By choosing not to include such language, Congress clearly expressed its intent that section 365(b)(3)(C) applies to non-debtor leases at the shopping center.  *See Gen. Motors Corp.*, 496 U.S. at 537.

### iv.    The *De Facto* Anti-Assignment Provision Argument is Frivolous

37.    Michaels makes one last argument why the Debtors should not have to honor the exclusive provision in the Hobby Lobby Lease or, presumably, the Dollar Tree Lease: those exclusive provisions operate as impermissible *de facto* anti-assignment provisions under section 365(f)(1) of the Bankruptcy Code.  *See* Michaels Reply at ¶¶ 20–22.  This argument is the weakest of all.

38.    To support its argument, Michaels asserts that "section 365(b)(3) must be read in conjunction with section 365(f), which it cross references," and cites *LaSalle Nat'l Tr., N.A. v. Trak Auto Corp.* ("<u>*LaSalle Trak Auto*</u>"), 288 B.R. 114, 122 (E.D. Va. 2003) for that

---

[16]    Had Congress intended to make that change, section 365(b)(3)(C) would read:

> (C) that assumption or assignment of such lease is subject to all the provisions thereof, including (but not limited to) provisions such as a radius, location, use, or exclusivity provision, and will not breach any such provision contained in any other lease of the debtor/to which the debtor is a party, financing agreement, or master agreement relating to such shopping center;

4887-9892-6967v.12

proposition. *LaSalle Trak Auto*, however, is no longer good law. It was overturned by *Trak Auto*,[17] which held that the specific provisions of section 365(b)(3) govern over the more general anti-assignment provisions of section 365(f)(1).

39. As indicated above, *see* fn. 3*, supra*, Congress codified the holding of *Trak Auto* in 2005, and section 365(f)(1) is now expressly subordinate to section 365(b)(3). Therefore, compliance with section 365(b)(3)(C) can never run afoul of section 365(f)(1), and requiring the Debtors to honor the exclusivity provisions in other Power Center leases could never "be tantamount to an impermissible anti-assignment provision" under the Bankruptcy Code. Michaels Reply at ¶ 22. This frivolous argument rests on overturned authority and must be rejected.[18]

## III.   THE PROPOSED ASSIGNMENT WILL UPEND TENANT MIX AND BALANCE

40. If approved, the proposed assignment will place Michaels, "the largest specialty arts and crafts retailer in North America,"[19] one storefront away from Hobby Lobby, "the largest privately owned arts-and-crafts retailer in the world,"[20] in the 12-store Power Center:[21]



---

[17]    Michaels does not acknowledge that *LaSalle Trak Auto* was overturned. *See* Michaels Reply at ¶ 20.

[18]    It bears noting that Michaels also quoted the outdated version of section 365(f)(1) in its argument. *See* Michaels Reply at ¶ 21.

[19]    https://www.michaelspressroom.com/news/detail/4863/say-hello-to-the-new-michaels-credit-card-and-earn-9-in, last visited on August 18, 2023.

[20]    https://www.hobbylobby.com/about-us/our-story, last visited on August 18, 2023.

[21]    *See* Aronoff Decl. at ¶¶ 4, 6.

41.    Adding Michaels to the tenant mix at the Power Center will not increase patronage.[22]  *See Joshua Slocum*, 922 F.2d at 1086, 1089 (recognizing that section 365(b)(3)(D) seeks to protect tenant mix, which is critically important to driving patronage at a shopping center).  Rather, Michaels and Hobby Lobby will attract and compete for the same set of patrons (*i.e.* arts and crafts shoppers) and cannibalize each other's business.[23]  That such cannibalization will occur within 150 linear feet of each other makes matters even worse.[24]  *See Matter of Federated Dept. Stores, Inc.*, 135 B.R. 941, 943 (S.D. Ohio 1991) (recognizing that tenant balance is all about "[l]ocation, location, location").

42.    By any measure, an assignment to Michaels will set the tenant mix and balance at the Power Center on their heads.  While Michaels may want to force its way into the Power Center for its own competitive reasons, section 365(b)(3)(D) prohibits Michaels from exploiting the Debtors' bankruptcy to park itself practically right next to Hobby Lobby and thereby disrupt the Power Center's carefully managed tenant mix and balance.[25]  Neither the Debtors nor Michaels offer anything to rebut this.

43.    Michaels claims its tenancy will not disrupt the tenant mix and balance because Michaels and Hobby Lobby "co-exist in more than 30 shopping centers across the country."  Michaels Reply at ¶ 25.[26]  Even if that statement was true (it is not, and Michaels is walking away from the declaration it filed to support it), the fact that the two stores co-exist in only 31 shopping centers actually proves their coexistence rarely preserves tenant mix and

---

[22]   *Id.* at ¶¶ 17, 20.

[23]   *Id.* at ¶ 17.

[24]   *Id.* at ¶¶ 7, 17.

[25]   *Id.* at ¶ 17.

[26]   Michaels identified 31 locations in discovery.  *See Declaration of Kristin S. Elliott, Esq. in Support of Pinnacle Hills, LLC's Sur-Reply in Further Support of its Objection to Debtors' Motion for Order Authorizing Debtors to Assume and Assign Lease for Store No. 1142* (the "Elliott Decl."), ¶ 5, Ex. A, filed contemporaneously herewith.

17

balance.  As of January 15, 2023, there were 116,000 shopping centers in the United States.[27]  If Hobby Lobby and Michaels are able to co-exist at only 31 (*i.e.* 0.026%), the circumstances under which their coexistence does not disrupt tenant mix and balance are exceedingly rare.[28]  Michaels' own statistics demonstrate that the two stores are fundamentally incompatible.

44.    Michaels' statistics are also misleading.  Michaels and Hobby Lobby do not co-exist in over 30 shopping centers, as Michaels argues.  Of the 31 locations Michaels identified through discovery:

- 9 involve premises that are owned by different landlords, are located in different shopping centers or involve a shopping center in which the Hobby Lobby store has closed;[29] and

- 13 involve premises that, while in the same shopping center, are located more than five stores apart.[30]

As a result, Michaels "co-exists" in close proximity to Hobby Lobby in no more than nine shopping centers, approximately 0.77% of the shopping centers in which Michaels operates.  No wonder Michaels no longer seeks to admit its witness's testimony into evidence.

45.    Michaels' other arguments about why their tenancy would not disrupt the tenant mix and balance at the Power Center also fail to justify assigning the BBBY Lease to Michaels.  Michaels argues at length that their tenancy will not disrupt the tenant mix and balance at the Promenade because other stores in the Promenade and Power Center sell some of the same products as Hobby Lobby.  Michaels Reply at ¶ [7, 24–28].  It is true that certain stores within the Power Center and Promenade sell similar items to Hobby Lobby, including TJ Maxx,

---

[27]   https://www.malls.com/news/news/the-number-of-malls-in-the-u-s-will-decline-to-200-in-10-15-years.shtml, last visited on August 18, 2023.

[28]   Even expressed as a percentage of Michaels' own lease portfolio (1,168 stores), Hobby Lobby and Michaels are only able to co-exist in approximately 2.6% of the shopping centers in which Michaels operates.  *See* https://www.scrapehero.com/location-reports/Michaels-USA/, last visited on July 27, 2023.

[29]   *See* Elliott Decl. at ¶¶ 9–12, 19–22, 27–28, 29–34, 56–60, 74–78, 85–91, and 94–103.

[30]   *Id.* at ¶¶ 25–26, 35–36, 43–44, 49–55, 61–64, 68–73, 79–84, and 92–93.

Dollar Tree, Haverty's Furniture, Pottery Barn, Target, Williams Sonoma, Dillards and JC Penny.  None of those stores, however, is a specialty arts and crafts retailer, and each is contractually authorized to devote limited square footage to the sale of items that may overlap with Hobby Lobby, the Power Center and Promenade's incumbent arts and crafts retailer.[31]  If anything, the careful, express and limited authorization for those stores to sell discrete items that may overlap with Hobby Lobby underscores the Landlord's efforts to preserve the tenant mix and balance within the Power Center and the Promenade.

46.    It is not correct that the BBBY Lease is silent regarding tenant mix.  *See* Michaels Reply at ¶ 27.  As discussed above, section 15.1.2 of the BBBY Lease expressly allows the Landlord to prevent any assignment whose assignee's proposed use conflicts with the tenant mix and balance in effect at the Power Center when the BBBY Lease is assigned.  *See supra* ¶¶ 30–31.  The Landlord's bargained-for ability to control an assignee's use of the Premises speaks directly to tenant mix and balance.  *See e.g.*, S. REP. NO. 97-527, at 15 (recognizing that restrictive use clauses are necessary to define and protect the relationships between stores in shopping centers).[32]  Both the BBBY Lease and section 365(b)(3)(D) expressly protect tenant mix and balance at the Power Center against an improper assignment—in or outside bankruptcy.

47.    The proposed Michaels tenancy will disrupt tenant mix and balance at the Power Center.  The Debtors cannot meet their burden to assign the lease to Michaels under section 365(b)(3)(D).  The Debtors' request to assign the BBBY Lease to Michaels must be denied.

---

[31]    *See* Aronoff Decl. at ¶ 15.

[32]    *See also* Aronoff Decl. at ¶ 17.

4887-9892-6967v.12

## IV.    The Landlord's Risk of Harm is Not Illusory

48.    If the BBBY Lease is assigned to Michaels in violation of section 365(b)(3), the Landlord will be harmed in ways section 365(b)(3) is intended to prevent.  And, Michaels is wrong again, as the harm the Landlord will suffer is not illusory.[33]  *See* Michaels Reply at ¶ 23.  Among other things, the Landlord:

- Will be caught between a rock and hard place:  suffer a 50% rent abatement under the Hobby Lobby Lease (totaling approximately ████████) or incur substantial legal fees to litigate the proposed assignment through final appeal to avoid such abatement, *see* Hobby Lobby Lease at § 7.5;[34]

- Will suffer at least a ████████ under the Dollar Tree Lease (totaling approximately ████ ███), and substantially more if ████████████ ████████, *see* Dollar Tree Lease at § H.4(c);[35]

- May suffer a reduction in percentage rent under the BBBY Lease in violation of section 365(b)(3)(B):[36] the BBBY Lease provides for percentage rent, BBBY Lease at § 4.4.  Juxtaposing two retailers that draw the same patrons will depress (or possibly eliminate) the percentage rent the Landlord otherwise would earn under the BBBY Lease if it is assigned to an assignee that is consistent with Power Center's tenant mix and balance;[37] and

- Will suffer an overall reduction in patronage at the Power Center due to the disruption in tenant mix and

---

[33]    For example, courts in Arkansas, where the Power Center is located, have recognized the intrinsic harm a disruption to tenant mix can cause a landlord and other shopping center tenants.  *See, e.g.*, *Warmack v. Merchs. Nat'l Bank of Ft. Smith*, 272 Ark. 166, 170–171, 612 S.W.2d 733, 735 (1981) (finding shopping center landlord reasonably rejected a proposed sub-tenant that disrupted tenant mix, even though the sub-tenant's payment obligations were fully guaranteed).

[34]    *See* summary chart attached as Exhibit F to the Aronoff Decl; s*ee also* Aronoff Decl. at ¶¶ 18, 19.

[35]    *See* summary chart attached as Exhibit F to the Aronoff Decl; *see also* Aronoff Decl. at ¶¶ 18, 19.

[36]    Section 365(b)(3)(B) prohibits a shopping center lease assignment if percentage rent under the lease being assigned will decline substantially.  *See* 11 U.S.C. § 365(b)(3)(B).

[37]    *See* Aronoff Decl. at ¶ 17.

Case 23-13359-VFP    Doc 1926    Filed 08/18/23    Entered 08/18/23 16:48:11    Desc Main
Document    Page 21 of 22

balance that having two specialty retailers located
practically next door to each other will cause.[38]

## V.  Other Issues

49.    The Objection and Michaels Reply address other issues the Court may be required to decide, depending on whether the Objection is sustained.  Specifically, issues of cure amount, unbilled amounts and attorney fees under the BBBY Lease are unresolved, and the Landlord reserves all of its rights regarding any open issues that remain once the Objection is decided.

## RESERVATION OF RIGHTS

50.    The Landlord reserves the right to make such other and further objections as may be appropriate based upon any new information provided by the Debtors or Michaels, including requests for adequate protection under section 363(e) of the Bankruptcy Code.[39]

---

[38]    *Id.* at ¶ 19.

[39]    Section 363(e) of the Bankruptcy Code provides as follows:

Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use sale, or lease as is necessary to provide adequate protection of such interest.

11 U.S.C. § 363(e).

4887-9892-6967v.12

      **WHEREFORE**, the Landlord requests that the Court enter an order denying the

proposed assignment of the BBBY Lease to Michaels and granting such other relief as the Court

deems just and proper.

Dated: August 18, 2023              Respectfully submitted,

                        */s/ Robert L. LeHane*
                        Robert L. LeHane, Esq.
                        William S. Gyves, Esq.
                        Kristin S. Elliott, Esq.
                        Jennifer D. Raviele, Esq. (admitted *pro hac vice*)
                        **KELLEY DRYE & WARREN LLP**
                        3 World Trade Center
                        175 Greenwich Street
                        New York, NY 10007
                        Tel:  212-808-7800
                        Fax: 212-808-7897
                        Email:  rlehane@kelleydrye.com
                                    wgyves@kelleydrye.com
                                    kelliott@kelleydrye.com
                                    jraviele@kelleydrye.com

                        -and-

                        One Jefferson Road
                        Parsippany, NJ 07054
                        Tel: 973-503-5900
                        Fax: 973-503-5950

                        *Counsel for Landlord, Pinnacle Hills, LLC*