DocuSign Envelope ID: 4EE88141-A75F-4023-9B71-5C00969274FD

Robert L. LeHane, Esq.
William S. Gyves, Esq.
Kristin S. Elliott, Esq.
Jennifer D. Raviele, Esq. (admitted *pro hac vice*)
**KELLEY DRYE & WARREN LLP**
3 World Trade Center
175 Greenwich Street
New York, NY 10007
Tel:  212-808-7800
Fax: 212-808-7897
Email:  rlehane@kelleydrye.com
        wgyves@kelleydrye.com
        kelliott@kelleydrye.com
        jraviele@kelleydrye.com

-and-

One Jefferson Road
Parsippany, NJ 07054
Tel: 973-503-5900
Fax: 973-503-5950

*Counsel for Landlord, Pinnacle Hills, LLC*

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

-------------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| BED BATH & BEYOND INC., et al., | : | Case No. 23-13359 (VFP) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |

-------------------------------------------------------------x

**DECLARATION OF JEFFREY ARONOFF IN SUPPORT OF PINNACLE
HILLS, LLC'S SUR-REPLY IN FURTHER SUPPORT OF ITS
OBJECTION TO DEBTORS' MOTION FOR ORDER AUTHORIZING
<u>DEBTORS TO ASSUME AND ASSIGN LEASE FOR STORE NO. 1142</u>**

Jeffrey Aronoff, pursuant to 28 U.S.C. §1746, hereby declares as follows:

1.    I am the Senior Vice President of Box Leasing for Brookfield.[1]  A copy of

---

[1]    Capitalized terms used but not defined in this Declaration have the meanings ascribed to them in *Pinnacle Hills, LLC's Sur-Reply in Further Support of its Objection to Debtors' Motion for Order Authorizing Debtors to*

my curriculum vitae is attached as <u>Exhibit A</u> to this Declaration.  I have personal knowledge of the facts set forth below; am authorized to make this Declaration; and, if called to testify, would testify competently as to the facts set forth herein.

2.       Brookfield is the managing agent of the Landlord for the Premises, which are located in the shopping center known as Pinnacle Hills Power Center (the "<u>Power Center</u>") in Rogers, Arkansas.

3.       The Debtors lease the Premises from the Landlord pursuant to the BBBY Lease.  A true copy of the BBBY Lease is attached as <u>Exhibit B</u> to this Declaration.

4.       The Power Center is a stand-alone 12-store shopping center within the Promenade, which is a 152-acre shopping center with over a hundred stores.  I have visited the Power Center and Promenade.  I am familiar with both properties.

5.       Within the Power Center, the Premises are located next to TJ Maxx and one store away from Hobby Lobby.

6.       I have set forth below an excerpt from the site map of the Power Center to which I have identified and highlighted in yellow the location of the Premises relative to Hobby Lobby at the Power Center.  The excerpt is an accurate depiction of the location of the Premises relative to Hobby Lobby at the Power Center:



---

*Assume and Assign Lease for Store No. 1142* (the "<u>Sur-Reply</u>"), filed contemporaneously with this Declaration.

DocuSign Envelope ID: 4EE83141-A75E-4023-9B71-5C00969274ED

7.      The Premises are 150 linear feet away from Hobby Lobby.  I derive this calculation from the frontage measurement of the TJ Maxx store as reflected in lease plans for the Power Center.

8.      Hobby Lobby leases its space in the Power Center from the Landlord pursuant to a Lease Agreement dated as of January 5, 2021 between the Landlord and Hobby Lobby (the "Hobby Lobby Lease").  A true copy of the Hobby Lobby Lease is attached as Exhibit C to this Declaration.

9.      The Hobby Lobby Lease contains an exclusive provision that prohibits the Landlord from leasing space in the Power Center to [another arts and crafts retailer], except for certain exceptions identified in, and expressly authorized under, the Hobby Lobby Lease. Michaels is an arts and crafts retailer whose tenancy will breach the exclusive provision in the Hobby Lobby Lease.

10.     The BBBY Lease allows its tenant to assign the Premises on written notice to the Landlord, subject to the Landlord's right to terminate the Lease if it does not approve of the proposed assignee's use of the Premises.

11.     The Landlord also leases space at the Power Center to Dollar Tree Stores, Inc. pursuant to a Lease Agreement dated as of May 24, 2019 (the "Dollar Tree Lease").  A true copy of the Dollar Tree Lease is attached as Exhibit D to this Declaration.

12.     A true copy of the recorded memorandum of the Dollar Tree Lease, made as of May 24, 2019, is attached as Exhibit E to this Declaration.

13.     The Dollar Tree Lease contains use restrictions that, among other things, prohibit the Landlord from renting space in the Power Center to Michaels.

DocuSign Envelope ID: 4EE88141-A75F-4023-9871-5C00969274ED

14.     I have personal knowledge of Brookfield's leasing operations as well as its protocols for maintaining the business records pertaining to those operations.  The BBBY Lease, Hobby Lobby Lease, Dollar Tree Lease and the memorandum of the Dollar Tree Lease attached as Exhibits B-E are documents generated by employees and agents of Brookfield at the time of the transactions memorialized by those documents and they are so generated in the regular course of Brookfield's business operations.  Those documents are routinely maintained as part of what we refer to as the "legal records" pertaining to our lease transactions.  I regularly access these legal records, as I did in retrieving these four documents for purposes of this Declaration.

15.     Other stores within the Power Center and the Promenade are contractually authorized to devote limited square footage to the sale of items that may overlap with some merchandise that Hobby Lobby sells, including TJ Maxx, Dollar Tree, Haverty's Furniture, Pottery Barn, Target, Williams Sonoma, Dillards and JC Penney.

16.     The contractual use, exclusive use and assignment provisions of the leases of the various tenants of the Power Center, including the Hobby Lobby Lease, the BBBY Lease and the Dollar Tree Lease allow the Landlord to control the tenant mix and balance at the Power Center and the Promenade.  The tenant mix and balance of a shopping center is an issue I have dealt with regularly over the course of my career.

17.     A property's 'tenant mix' is essentially the group of tenants who make up the property's occupancy.  A "power center" brings together a group of large, powerful, retail businesses to attract a high volume of shopping traffic.   Property owners consider the competition both within the local market and within the center itself.  Some companies like to be located in close proximity to their competition. However, within a property itself, retailers generally do not

DocuSign Envelope ID: 4EE8341A-A75E-4023-9B71-5C00969274FD

like competition with other anchor tenants in the same center, as evidenced by the provisions in the Hobby Lobby Lease and the Dollar Tree Lease.  If approved, the assignment of the Premises to Michaels will disrupt the tenant mix and balance of the Power Center by placing these direct competitors too close to one another and overweighting the Power Center with craft focused retailers.  This could reduce sales to the stores at the Power Center such as Dollar Tree and Hobby Lobby who sell similar products as Michaels.

18.    I have attached as <u>Exhibit F</u> a chart reflecting my estimate of the damages Landlord will sustain if the proposed assignment of the Premises to Michaels is approved.  This chart, which my team at Brookfield created under my direction and supervision, is based on data drawn from the Hobby Lobby Lease and Dollar Tree Lease.  The ███████████████ ███ reflected in the chart is drawn from publicly available information regarding Dollar Tree's operations.  I personally reviewed the information reflected in this chart.  It is accurate.

19.    As reflected in Exhibit F, I estimate that the Landlord will potentially suffer approximately $██████ in ███████ damages due to rent reduction provisions under the Hobby Lobby and Dollar Tree Leases.

20.    The Landlord may also suffer additional damages due to a reduction in patronage and sales at the Power Center, including a reduction in percentage rent payable to the Landlord under certain leases at the Power Center.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: Chicago, Illinois
     August 18, 2023

DocuSigned by:

*Jeffrey Aronoff*

9CF933486A27419

Jeffrey Aronoff

**<u>Exhibit A</u>**

Curriculum Vitae

Jeffrey Aronoff
1635 Eastwood Ave
Highland Park, IL 60035
847-921-6407
Jaronoff52@gmail.com

## Professional Experience:

**Brookfield Properties/General Growth Properties- Chicago, IL March 2012-Present**
**Senior Vice President Big Box Leasing/Development-December 2019- Present**
Manage Big Box Leasing team
Provide strategic direction for asset redevelopments
Coordinate and identify opportunities with national retailers
Lead special projects

**Vice President-Big Box Leasing/Development March 2012-December 2019**
Identify and procure large format tenants for retail projects
Negotiate leases
Work with development and acquisitions teams to prepare pro formas
Communicate with partners/investors regarding potential leases
Completed multiple transactions with grocers, theaters, entertainment concepts
Developed relationships with international, national, regional and local retailers
Led redevelopment leasing of department stores

**Crate&Barrel- Northbrook, IL                                    Nov. 2007- Feb. 2012**
**Director- Real Estate**
Identify new store locations and negotiate transactions
Developed CB2 retail market strategy
Completed CB2 Canadian store expansion
Responsible for CB2 expansion throughout US and Canada, including site
selection, development and negotiation of leases
Directed CB2 brand from 3 stores to 13 stores. Most locations opened are in
major markets in urban locations
Brought Crate&Barrel to new markets in US and Canada
Relocated existing Crate&Barrel stores to new projects
Presented deals to President, CEO and Senior Management
Projects range from 15,000 to 35,000 sf in size and $2-$7 million in cost
Work with construction and design in new store implementation
Worked with The Land of Nod for its retail strategy

**General Growth Properties- Chicago, IL                    Sept. 1999-Oct. 2007**
**Senior Vice President- Power Retailing                      Dec. 2005-Oct. 2007**
Oversaw big box leasing and outparcel development for new and existing
Properties
Team completed more than 30 deals annually totaling in excess of 1 million sf

Worked with asset management, redevelopment and new development teams to
incorporate big box merchants into projects
Managed a team of six dealmakers
Developed relationships with national large format retail users
Managed leasing of company's strip center portfolio
Worked closely with construction on budgeting and scheduling goals
Served on company's senior leasing team

Vice President-Power Retailing                           Sept. 1999-Dec. 2005
Completed transactions to bring large format users to new and existing properties
Remerchandised vacant department stores into big box retail users
Leased vacant outparcels to freestanding restaurants and retailers
Completed transactions with at least five merchants new to GGP's portfolio

**Bradley Real Estate- Northbrook, IL**                  **March 1998-May 1999**
Senior Leasing Manager
Identified and leased space to small shops and big box users
Expanded large format users to appropriate sizes
Worked with development and acquisitions to identify opportunities

**PREIT/The Rubin Organization-Philadelphia, PA**        **Feb. 1997-March 1998**
Vice President Leasing
Responsible for leasing former Equity Properties strip center portfolio
Power Center leasing for new big box centers

**Equity Properties and Development Company- Chicago, IL**   **May 1989-Jan. 1997**
Vice President                                          May 1994-Jan. 1997
Managed leasing of power center portfolio
Hired brokers and managed disposition of power centers

Associate                                               May 1989-May 1994
Developed company peripheral land program
Leased space to large format users and outparcel tenants
Rotated through different parts of organization to learn business
**Lexecon, Inc.-Chicago, IL**                            **June 1988-May 1989**
Economist
Provided economic analysis for securities fraud litigation
Completed valuation analysis for litigation

# Education

**The University of Michigan-Ann Arbor, MI**             **May 1988**
Master's of Business Administration

**The Johns Hopkins University-Baltimore, MD**           **May 1984**
Bachelor of Arts in Economics

DocuSign Envelope ID: 4EE8314A-A75E-4023-9B71-5C00669274ED

## Exhibit B

BBBY Lease

LANDLORD COPY

# LEASE AGREEMENT

### Between

## PINNACLE SOUTH LLC
### a Delaware limited liability company,

### Landlord

### and

## BED BATH & BEYOND INC.,
### a New York corporation,

### Tenant

### Pinnacle Hills Promenade
### Rogers, Arkansas

Dated: June 1 , 2007

# TABLE OF CONTENTS

Page

ARTICLE 1 BASIC TERMS AND DEFINITIONS ........................................................1
    Section 1.1    Basic Terms and Definitions...............................................................1

ARTICLE 2 LEASE OF PREMISES; LEASE TERM; DELIVERY DATE ...............4
    Section 2.1    Lease of Premises...............................................................................4
    Section 2.2    Term................................................................................................4
    Section 2.3    Delivery Date......................................................................................5
    Section 2.4    Unseasonable Delivery: Slack Period ...............................................6
    Section 2.5    Initial Co-Tenancy Condition. ...........................................................7

ARTICLE 3 IMPROVEMENTS ....................................................................................8
    Section 3.1    Landlord's Work and Tenant's Work ................................................8
    Section 3.2    Plan Approvals....................................................................................8
    Section 3.3    Performance of Work..........................................................................9
    Section 3.4    Measurement: Adjustment of Rent. .................................................11

ARTICLE 4 FIXED RENT AND TAXES: DETERMINATION AND PAYMENT...................12
    Section 4.1    Fixed Rent ........................................................................................12
    Section 4.2    Payment of Rent ...............................................................................12
    Section 4.3    Real Estate and Other Taxes. ...........................................................12
    Section 4.4    Percentage Rent................................................................................13

ARTICLE 5 COMMON AREAS, THEIR USE AND CHARGES .............................15
    Section 5.1    Common Areas: Maintenance...........................................................15
    Section 5.2    Common Areas: Restrictions. ...........................................................17

ARTICLE 6 UTILITIES.................................................................................................19
    Section 6.1    Utility Service ...................................................................................19
    Section 6.2    Interruption.......................................................................................20

ARTICLE 7 SIGNS ........................................................................................................20
    Section 7.1    Tenant's Building Signage................................................................20
    Section 7.2    Signage in Common Areas ...............................................................20
    Section 7.3    Signage: Alteration/Removal/Allocation..........................................21
    Section 7.4    Cooperation......................................................................................21
    Section 7.5    Signage Restrictions and Criteria.....................................................21

ARTICLE 8    21

ALTERATIONS AND IMPROVEMENTS......................................................................21
    Section 8.1    Alterations and Improvements. .........................................................21

ARTICLE 9 REPAIRS ...................................................................................................23
    Section 9.1    Tenant's Repairs ...............................................................................23
    Section 9.2    Landlord's Repairs ...........................................................................23
    Section 9.3    Legal Compliance Work ..................................................................24

ARTICLE 10 INDEMNIFICATION, INSURANCE AND WAIVER OF
    SUBROGATION ...............................................................................24
    Section 10.1    Mutual Release, Waiver of Subrogation and Mutual Indemnification. 24
    Section 10.2    Tenant's Insurance. ..........................................................................25
    Section 10.3    Landlord's Insurance.........................................................................25
    Section 10.4    General Insurance Requirements. .....................................................26

ARTICLE 11 FIRE AND OTHER CASUALTY; EMINENT DOMAIN .................26
    Section 11.1    Fire and Other Casualty. ..................................................................26
    Section 11.2    Eminent Domain. ..............................................................................28
    Section 11.3    Abatement of Rent Charges .............................................................29

ARTICLE 12 COVENANTS, REPRESENTATIONS AND WARRANTIES ...........29
    Section 12.1    Quiet Enjoyment ..............................................................................29

-i-

Section 12.2   Authority ..................................................................................... 29
Section 12.3   Landlord's Covenants, Warranties and Representations ..................... 29
Section 12.4   Environmental Matters. ................................................................ 30
Section 12.5   OEA. ........................................................................................... 32

ARTICLE 13 USES AND RESTRICTIONS ........................................................ 33
Section 13.1   Permitted and Prohibited Uses. .................................................... 33
Section 13.2   Tenant's Exclusive in Center ....................................................... 33
Section 13.3   Exclusives Which Tenant Must Honor. ........................................ 35

ARTICLE 14 CONDUCT OF BUSINESS OPERATIONS ..................................... 35

ARTICLE 15 TENANT ASSIGNMENT AND SUBLETTING ................................ 36
Section 15.1   Assignment and Subletting. .......................................................... 36
Section 15.2   Liability of Tenant ...................................................................... 37
Section 15.3   Collateral Assignment ................................................................. 37
Section 15.4   Cure Rights of Original Tenant. ................................................... 37
Section 15.5   Recognition Agreement ............................................................... 38

ARTICLE 16 DEFAULT AND DISPUTE RESOLUTION ..................................... 38
Section 16.1   Tenant Default............................................................................. 38
Section 16.2   Landlord Default ......................................................................... 39
Section 16.3   Arbitration .................................................................................. 40

ARTICLE 17 RIGHT TO MORTGAGE AND NON-DISTURBANCE; ESTOPPEL
    CERTIFICATE ............................................................................................ 40
Section 17.1   Right to Mortgage and Non-Disturbance ...................................... 40
Section 17.2   Estoppel Certificate ..................................................................... 40
Section 17.3   Existing Mortgages ..................................................................... 40

ARTICLE 18 NOTICE ...................................................................................... 41

ARTICLE 19 TENANT'S PROPERTY ................................................................ 41

ARTICLE 20 END OF TERM ........................................................................... 41
Section 20.1   Surrender of Premises .................................................................. 41
Section 20.2   Hold Over ................................................................................... 41

ARTICLE 21 TENANT'S RIGHT OF FIRST OFFER .......................................... 42

ARTICLE 22 ONGOING CO-TENANCY ........................................................... 42

ARTICLE 23 MISCELLANEOUS ..................................................................... 42
Section 23.1   Loading Facilities ........................................................................ 42
Section 23.2   Liens ........................................................................................... 43
Section 23.3   Broker's Commission ................................................................... 43
Section 23.4   Force Majeure .............................................................................. 43
Section 23.5   Consents ...................................................................................... 43
Section 23.6   Costs ........................................................................................... 43
Section 23.7   Attorneys' Fees ............................................................................ 43
Section 23.8   Survival of Obligations ................................................................ 43
Section 23.9   Non-Waiver ................................................................................. 44
Section 23.10  Rights Cumulative ....................................................................... 44
Section 23.11  Definition of Landlord .................................................................. 44
Section 23.12  Successors and Assigns ................................................................ 44
Section 23.13  Limitation of Landlord's Liability ................................................. 44
Section 23.14  Limitation of Tenant's Liability..................................................... 44
Section 23.15  Joint and Several Liability ............................................................ 44
Section 23.16  Severability ................................................................................. 44
Section 23.17  Grammatical Usages and Construction ........................................... 44
Section 23.18  Table of Contents, Line Numbering and Paragraph Headings ........... 45
Section 23.19  Definition of Hereunder, Herein, etc .............................................. 45
Section 23.20  Short Form Lease ......................................................................... 45
Section 23.21  Entire Agreement and Modification ............................................... 45
Section 23.22  No Joint Venture or Partnership Created by Lease ........................... 45

Section 23.23   Tenant's Tradename ........................................................................45
Section 23.24   Counterparts ................................................................................45
Section 23.25   Waiver of Trial by Jury ................................................................45
Section 23.26   Governing Law ............................................................................45

C061858/0205454/1372981.7

## EXHIBITS

Exhibit A              Legal Description of Power Center
Exhibit A-1            Legal Description of Promenade
Exhibit B              Site Plan
Exhibit C              Rent Commencement and Expiration Date Agreement
Exhibit D              Specifications for Landlord's Work
Exhibit D-1            Exterior Elevations of the Premises, and Sidewalk Plan
Exhibit D-2            Exterior Elevations of the Power Center
Exhibit E              Permitted Encumbrances
Exhibit F              Signage
Exhibit G              Subordination, Non-Disturbance and Attornment Agreement
Exhibit H              Subtenant Recognition Agreement
Exhibit I              Intentionally Omitted
Exhibit J              Form of Delivery Date Certification
Exhibit K-1            Existing Exclusives
Exhibit K-2            Existing Leases
Exhibit L              Prohibited Uses

C061858/0205454/1372981.7

## LEASE AGREEMENT

THIS LEASE AGREEMENT (*"Lease"*) is entered into as of April 6, 2007, by and between PINNACLE SOUTH LLC, a Delaware limited liability company, having an office at 110 North Wacker, Chicago, Illinois 60606 (*"Landlord"*), and BED BATH & BEYOND INC., a New York corporation, having an office at 650 Liberty Avenue, Union, New Jersey 07083 (*"Tenant"*).

### W I T N E S S E T H:

### ARTICLE 1
### BASIC TERMS AND DEFINITIONS

Section 1.1     Basic Terms and Definitions.  The following terms shall have the meanings set forth in this Section 1.1 except as otherwise expressly provided herein.

1.1.1    Additional Rent:  Any monies which Tenant is required to pay to Landlord under the terms and conditions of this Lease, other than Fixed Rent.

1.1.2    Affiliate:  A corporation, partnership, person or other entity which is controlling, controlled by, or under common control with, Landlord or Tenant, as the case may be.  As used herein, *"control"* shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person or entity, whether through the ownership of voting securities or rights, by contract, or otherwise.

1.1.3    Alternate Rent:  Alternate Rent shall be payable within thirty (30) days after the end of the calendar month to which it pertains, and shall be payable in lieu of Fixed Rent and Percentage Rent normally payable under Article 4 below. Tenant shall continue to pay the costs and charges imposed on Tenant pursuant to Article 4.3, Article 6 and Article 10 of this Lease, regardless of whether those charges are paid to Landlord or a third party provider, and all other charges imposed on Tenant under this Lease except for Fixed Rent and Percentage Rent and except as may otherwise be specifically provided in this Lease.  If the Alternate Rent for a calendar month does not exceed the Cap, such payment shall be accompanied by a statement prepared by an officer of Tenant setting forth the amount of "Gross Sales" (hereinafter defined in Subsection 4.4.2) achieved during, and the amount of Alternate Rent payable for, such month.

1.1.4    [Intentionally Omitted.]

1.1.5    Common Areas:  All areas in the Power Center which are, from time to time, available for the joint use and benefit of Tenant and other tenants and occupants of the Power Center, and their respective employees, agents, subtenants, concessionaires, licensees, customers and other invitees, including, but not limited to, any and all parking areas, parking spaces, roadways, driveways, truck serviceways, passageways, sidewalks, entrances, exits, lighting facilities, landscaped areas, retention or detention areas and common utility lines.

1.1.6    Delivery Date: As defined in Section 2.3 hereof.

1.1.7    Effective Date: The date hereof.

1.1.8    Event of Default:  As defined in Section 16.1 hereof.

1.1.9    Excused Periods:  Periods during which Tenant's (or, as the case may be, another tenant's) failure to conduct the operations of its business or any other business: (x) resulted from alterations or renovations being performed in and to the Premises, (y) was caused by damage or destruction, eminent domain proceedings or actions, or *Force Majeure*, or (z) was caused by any act or omission of Landlord, or its employees, agents, or contractors.

1.1.10    Exhibits.  The exhibits listed in the Table of Contents annexed to this Lease have been agreed to by the parties and attached hereto, it being the intention of the parties that they shall become a binding part of this Lease as if fully set forth herein.

1



1.1.12 <u>Floor Area</u>: The actual number of square feet of space contained on all floors within any building area in the Shopping Center (including the Premises) and, with respect to exterior areas, including all exterior areas leased to or exclusively used by one or more tenants (other than exterior loading dock areas, trash compactor areas, and trash container areas). All measurements pursuant to this Subsection shall be from the exterior of outside walls or store front and/or to the centerline of any common walls, but in no event shall Floor Area within either the Premises or the remainder of the Shopping Center include such items as fire pump facilities; heating and ventilation facilities and telephone and electric rooms not exclusively serving the Premises; adjacent corridors and stairwells; common ducts and common shafts; elevators and escalators not exclusively serving the Premises and any non-selling or storage space areas within any mezzanine, lower floor, second floor or, except as set forth above, any exterior areas (including, without limitation, the Non-Sales Area and Additional Sales Area, as such terms are defined in Section 1.1.28).

1.1.13 <u>*Force Majeure*</u>:   As defined in Section 23.4 hereof.

1.1.14 <u>Ground Lessor</u>: The landlord under any existing or future ground or underlying leases encumbering or affecting all or any part of the Shopping Center.

1.1.15 [Intentionally Omitted.]

1.1.16 <u>Hazardous Substances</u>:  As defined in Subsection 12.4.1 hereof.

1.1.17 <u>[Intentionally Omitted.]</u>

1.1.18 <u>Landlord</u>:  As defined in the preamble and Section 23.11 hereof.

1.1.19 <u>Landlord's Mailing Address</u>:  110 North Wacker, Chicago, Illinois 60606, or such other place and/or to the attention of such other person as Landlord may notify Tenant from time to time by notice given in accordance with the provisions of Article 18 hereof.

1.1.20 <u>Landlord's Work</u>:  As defined in Section 3.1 hereof.

1.1.21 <u>Lease Interest Rate</u>: The then effective prime rate as published from time to time in the "Money Rates" section of *The Wall Street Journal* (or any successor publication thereto) plus two (2%) percent.

1.1.22 <u>Legal Requirements</u>: All laws, statutes, codes, acts, ordinances, judgments, decrees, authorizations, directions and requirements of, and agreements with, all governmental departments, commissions, boards, courts, authorities, agencies, officials and officers, which now or at any time hereafter may be applicable to the Premises, the Shopping Center, or any part(s) thereof.

2

1.1.23 <u>Mortgagee</u>: Any state or federally regulated: bank, savings and loan association, insurance company, pension fund, credit union, real estate investment trust, or other institutional lender, which is not an Affiliate of Landlord, and which holds a mortgage on the Shopping Center or is the beneficiary under a deed of trust encumbering the Shopping Center.

1.1.24 <u>Percentage Rent</u>: As defined in Section 4.4 hereof.

1.1.25 [Intentionally Omitted.]

1.1.26 [Intentionally Omitted].

1.1.27 <u>Permitted Use</u>: The sale at retail of a variety of linens and domestics (including, but not limited to, sheets, bedspreads, comforters, duvets, pillows, pillow covers, chair pads, placemats, tablecloths, dish towels, oven mittens and aprons); bathroom items (including, but not limited to, towels, shower curtains, bathroom rugs, toilet seats, health and beauty care items and cosmetics, personal care devices and other bathroom appliances and accessories); housewares (including, but not limited to, kitchen utensils, kitchen appliances and kitchen "gadgets," cleaning appliances and supplies, cookware, bakeware, dishes and china, glassware, garbage pails, ironing boards and other laundry items, mops and brooms, candles and candle holders, ready-to-assemble furniture and artificial flowers); frames and wall art; window treatments; closet, shelving and storage items; home furnishings; area rugs; wall and floor coverings; furniture (including, without limitation, mattresses, box springs, bed frames, and bedroom furniture); decorative accessories; photo albums; photo storage boxes; luggage; books; party supplies; cards and stationery; seasonal items; juvenile merchandise (including, but not limited to, toys, car seats and safety-proofing items); health and beauty aids; specialty food items; food and non-alcoholic beverage services; any and all other items sold or services provided from time to time in any store owned or operated by Tenant or its Affiliate(s) (the aforementioned items are hereinafter collectively referred to as the *"Permitted Items"*); and for any other lawful retail use not specifically prohibited by the provisions of Section 13.1.1 below. In addition, Tenant shall be permitted to use portions of the Premises for storage and office uses incidental to the Permitted Use.

1.1.28 <u>Premises</u>: Being the area cross-hatched on <u>Exhibit B</u> hereto, having dimensions as shown on <u>Exhibit B</u> and containing:



, subject to adjustment in accordance with the provisions of Section 3.4 below. In no event shall the Non-Sales Area and/or the Additional Sales Area result in any charge to Tenant by way of Fixed Rent or any Additional Rent, nor shall any such space be included in the determination of Tenant's Pro Rata Share.

1.1.29 <u>Renewal Option</u>: As defined in Section 2.2.2 hereof.

1.1.30 <u>Renewal Period(s)</u>: Three (3) successive periods of five (5) years each, as provided in Section 2.2.2 hereof.

1.1.31 <u>Rent</u>: Fixed Rent and/or Additional Rent.

1.1.32 <u>Rent Commencement Date</u>: As defined in Section 2.2 hereof.

1.1.33 [Intentionally Omitted].

1.1.34 <u>Shopping Center</u>: The shopping center known as Pinnacle Hills Promenade located in Rogers, Arkansas. The Shopping Center consists of two (2) retail shopping centers which shall be operated as a single, integrated shopping center: (i) the so-called "big box" center in which the Premises shall be located containing approximately 267,000 square feet of Floor Area and designated *"Power Center"* on <u>Exhibit B</u> and (ii) the regional outdoor mall anchored by Dillard's, Malco and JC Penney and designated *"Promenade"* on <u>Exhibit B</u>. The Power Center is more particularly described in the legal description attached hereto as <u>Exhibit A</u> hereto and the Promenade is more particularly described in the legal description attached hereto as <u>Exhibit A-1</u>. The Power Center and Promenade are hereinafter collectively referred to as the "Shopping Center". Landlord shall not change the name of the Shopping

3

Center without giving at least ninety (90) days prior notice to Tenant, and Landlord shall not include the name of any tenant (including Tenant) in the name of the Shopping Center.

      1.1.35  <u>Substantially Completed or Substantial Completion</u>: The completion of specified work at the Power Center (including, without limitation, as applicable, Landlord's Work) to the extent that only "Punch List Items" of such work (defined in Subsection 3.3.3 below) shall not be completed.

      1.1.36  <u>Taxes</u>: As defined in Section 4.3.3 hereof.

      1.1.37  <u>Tenant</u>: As defined in the preamble hereof.

      1.1.38  <u>Tenant's Mailing Address</u>:  650 Liberty Avenue, Union, New Jersey 07083, Attn: Mr. Warren Eisenberg, or such other place and/or to the attention of such other person as Tenant may notify Landlord from time to time by notice given in accordance with the provisions of Article 18 hereof.

      1.1.39  <u>Tenant's Permits</u>: As defined in Section 2.3.1(b) hereof.

      1.1.40  <u>Tenant's Property</u>: All of Tenant's personal property, including, without limitation, phone and alarm systems, satellite antennae, shelving, computers, furniture, cash registers and customer service counters, specialty lighting, track lighting, millwork, conveyor systems, storage racks and signage and any and all other personal property of Tenant which is capable of being removed from the Premises without material damage thereto, but which shall not include electrical systems, heating, ventilation and air conditioning systems, and other mechanical systems, flooring, carpet, elevators, standard lighting and wiring installed within the walls of the Premises.

      1.1.41  <u>Tenant's Pro Rata Share</u>:  A fraction whose numerator is 30,000 (subject to Sections 1.1.28 and 3.4) and whose denominator is the Floor Area of the Power Center as may be re-determined any time a building (and/or Floor Area) is added to or removed from the Power Center, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Floor Area shall be deemed added to or removed from the Power Center on the earlier of (i) the date upon which such Floor Area is Substantially Completed, or (ii) at such time as an assessment for Taxes is made or removed, as the case may be, with respect to such Floor Area.  Within thirty (30) days following written request from Tenant, Landlord shall certify to Tenant in writing as to the then Floor Area of the Power Center.

      1.1.42  <u>Tenant's Work</u>: As defined in Section 3.1 hereof.

      1.1.43  <u>Term</u>: A period (the "***Initial Term***") of approximately ten (10) years beginning on the Rent Commencement Date and ending at midnight on the last day of January following the tenth (10th) anniversary of the Rent Commencement Date (the "***Expiration Date***"), unless the Rent Commencement Date is February 1, in which event the Expiration Date shall be the day before the tenth (10th) anniversary of the Rent Commencement Date.  As used herein, "***Term***" shall refer to the Initial Term, as the same may be extended by any Renewal Period exercised pursuant to Section 2.2.2 below.

ARTICLE 2
LEASE OF PREMISES; LEASE TERM; DELIVERY DATE

      Section 2.1  <u>Lease of Premises</u>. Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the Premises together with any and all rights, benefits, privileges and easements, now or hereafter appurtenant to either or both of the Premises and the Shopping Center, arising out of any public or private grant or authority, including, without limitation, the non-exclusive right and easement to use the Common Areas in common with other tenants and occupants of the Shopping Center.

      Section 2.2  <u>Term</u>.

      2.2.1  <u>Initial Term</u>. Subject to the provisions of this Article 2, the Term of this Lease shall begin on the date (such date being referred to herein as the "***Rent Commencement Date***") which is the sixtieth (60th) day following the Delivery Date (as defined in Section 2.3.1). The Term shall expire on the Expiration Date, unless earlier terminated as herein provided.

4

When the Rent Commencement Date has been determined, as provided in this Section, Landlord and Tenant shall execute, acknowledge and deliver, each to the other, a written statement in the form attached hereto as Exhibit C specifying the Rent Commencement Date.

2.2.2   Renewal Options.  Tenant shall have the right and option (hereinafter a *"Renewal Option"*) to extend the Initial Term from the date on which it would otherwise expire for three (3) successive renewal periods of five (5) years each (individually, a *"Renewal Period"*, and collectively, the *"Renewal Periods"*) upon the same terms and conditions as are herein set forth.  Each Renewal Option shall be exercisable by notice given to Landlord at least one hundred eighty (180) days prior to the commencement of the applicable Renewal Period(s).

Section 2.3   Delivery Date.

2.3.1   Definition.  Landlord shall be deemed to have delivered possession of the Premises to Tenant at 8:00 a.m. on the date (the *"Delivery Date"*) following the day on which all of the following conditions (the *"Delivery Date Conditions"*) shall have occurred and Tenant shall have received from Landlord the Delivery Date Certification in accordance with the provisions of Section 2.3.3 below, which shall constitute Landlord's written certification that all of the following shall have occurred:

(a)   Actual possession of the Premises shall have been delivered to Tenant water-tight, free of Hazardous Substances, in a good, structurally sound condition, with all of Landlord's Work Substantially Completed, which Substantial Completion shall be evidenced by a written certification by Landlord's architect to Tenant;

(b)   Landlord shall have obtained (and delivered copies thereof to Tenant, upon request) all permits and approvals required from all applicable governmental authorities to enable Tenant to occupy and use the Premises for the conduct of its business in the Premises (exclusive of any business licenses which Tenant may be required to obtain in order to open and operate its specific business and not a general retail business or a building permit to perform Tenant's Work (collectively, *"Tenant's Permits"*)), which permits and approvals shall include, without limitation, a permanent certificate of occupancy for the Premises (unless a permanent certificate of occupancy for the Premises cannot be obtained solely as a result of Tenant's Work not having been commenced or completed, in which event (1) the delivery of a permanent certificate of occupancy for the Premises shall not be a condition to the occurrence of the Delivery Date; (2) the obtaining of a temporary certificate of occupancy shall be a condition to the occurrence of the Delivery Date; and (3) Landlord shall obtain the permanent certificate of occupancy promptly following the completion of Tenant's Work);

(c)   The Common Areas, and all of the improvements thereto shown on Exhibit B hereto shall have been Substantially Completed and operational, and all off-site improvements (including, without limitation, street, storm drainage, and traffic signalization improvements) required for the Shopping Center to open for business and for Tenant to receive a certificate of occupancy shall have been Substantially Completed; Landlord, at its sole cost and expense, shall have obtained (and delivered copies thereof to Tenant, upon request) all permits and approvals required from applicable governmental authorities to enable the Common Areas to be developed, operated, and used for the purposes herein contemplated, which permits and approvals shall include, without limitation, zoning, building code, environmental requirements, curb cut and site plan approvals, all permits pertaining to pylon and/or monument signage (and Tenant's panel(s) thereon), construction, and development and use permits;

(d)   The Initial Co-Tenancy Condition (as defined in Section 2.5) has been satisfied;

(e)   The representations and warranties of Landlord set forth in subparagraphs (a) through (j) of Section 12.3 below shall then be true and in effect; and

(f)   Landlord shall have delivered to Tenant, in recordable form: (i) a subordination, non-disturbance and attornment agreement in the form attached hereto as Exhibit G executed by each holder of any mortgage or deed of trust encumbering or

5

affecting the Power Center or any portion thereof, and (ii) a fee owner recognition agreement in the form and content described in clause (b) of Section 17.1 hereof executed by any existing Ground Lessor.  Landlord represents to Tenant that, as of the Effective Date, the Power Center is not encumbered by a mortgage or deed of trust or a ground lease held by a Ground Lessor.

2.3.2   Delivery Date.

(a)   Landlord shall cause the Delivery Date to occur on **September 1, 2007**. Notwithstanding any provision of this Lease to the contrary, in no event shall the Delivery Date be deemed to occur prior to September 1, 2007.  No event of *Force Majeure* occurring prior to the Effective Date shall serve to delay the Delivery Date hereby established.

(b)   Landlord acknowledges that if Landlord shall fail to satisfy all of the Delivery Date Conditions by the Delivery Date as established in subparagraph (a), Tenant will sustain substantial, additional costs and expenses, including, without limitation, storage costs for fixtures, equipment and inventory, employee costs during the waiting period, and additional advertising and promotional costs, the exact amount of which would be impracticable or extremely difficult to ascertain. If the Delivery Date does not occur by the date established therefor in subparagraph (a), then, in addition to any other remedies available to Tenant under this Lease, Landlord agrees to allow to Tenant a credit against the initial installment(s) of Rent hereunder equal to, as liquidated reimbursement to Tenant (and not as a penalty) for all of the aforesaid costs incurred by Tenant, the sum of: ████████████ ████████

████████████████████████████████████████ )
herein collectively referred to as *"Tenant's Liquidated Costs"*).  Tenant's Liquidated Costs represent the parties' good faith agreement as to an agreed upon amount which shall have been incurred by Tenant and which shall otherwise not be susceptible of exact ascertainment.

2.3.3   Delivery Date Certification.  Upon the satisfaction of all of the Delivery Date Conditions, Landlord shall so certify to Tenant, using the form of Delivery Date Certification attached hereto as Exhibit J.

2.3.4   No Waiver.  Neither Tenant's acceptance of physical possession of the Premises nor Tenant's opening of the Premises for business to the public prior to the Delivery Date shall: (i) be deemed a waiver by Tenant of any of the Delivery Date Conditions, or (ii) relieve Landlord of any obligation under this Lease, unless such condition or obligation is expressly waived in writing by Tenant.

Section 2.4   Unseasonable Delivery: Slack Period.  If, for any reason (including, without limitation, *Force Majeure*), the Delivery Date occurs during the period commencing on ████████████████████████████ (the *"Slack Period"*), then Tenant shall have, in addition to any other remedies, the right to:

(a)   accept delivery of physical possession of the Premises; or

(b)   defer its acceptance of delivery of physical possession of the Premises to a later date within the Slack Period, whereupon the Delivery Date shall be deemed to have occurred on the date that Tenant actually accepts physical possession of the Premises (subject to the other provisions of this Article 2 and the continuing satisfaction of the Delivery Date Conditions); and

6

in either event, if the Rent Commencement Date occurs during the Slack Period, Tenant shall be entitled to pay Alternate Rent in lieu of Fixed Rent and Percentage Rent (but Tenant shall continue to pay its Pro Rata Share of Taxes and Tenant's "Fixed Share" (as defined in Section 5.1.2(b)) of Common Areas Charges pursuant to the terms of this Lease) for the period commencing on the Rent Commencement Date and ending on the last day of the Slack Period; any benefit which Tenant may realize thereby shall constitute a reimbursement to Tenant for certain pre-opening expenses incurred by Tenant in connection with this Lease.

Section 2.5    Initial Co-Tenancy Condition.

2.5.1    As used herein, the *"Initial Co-Tenancy Condition"* shall mean that



are open for business to the public in the Power Center (or if not open, then the premises to be occupied by such tenants have been constructed and the tenants to occupy such premises shall then be actively and continuously engaged in the fixturing or merchandising therein).

2.5.2    If, on the Delivery Date, the Initial Co-Tenancy Condition has not been satisfied, Tenant shall have the right, at its sole option, to:

(a)    accept delivery of physical possession of the Premises; or

(b)    defer its acceptance of delivery of physical possession of the Premises to a later date (but not later than the date on which the Initial Co-Tenancy Condition is satisfied and Tenant receives notice from Landlord thereof), whereupon the Delivery Date shall be deemed to have occurred on the date that Tenant actually accepts physical possession of the Premises (subject to the other provisions of this Article 2 and the continuing satisfaction of the Delivery Date Conditions); and

in either event, if the Rent Commencement Date occurs before the satisfaction of the Initial Co-Tenancy Condition, Tenant shall be entitled to pay Alternate Rent in lieu of Fixed Rent and Percentage Rent (but Tenant shall continue to pay Tenant's Pro Rata Share of Taxes and Tenant's Fixed Share of Common Areas Charges) until the Initial Co-Tenancy Condition is satisfied and the Landlord gives Tenant notice thereof, subject to any other applicable provisions of this Article 2.

2.5.3    In addition to the provisions of Section 2.5.2 above, if the Initial Co-Tenancy Condition has not been satisfied by the first (1st) anniversary of the Delivery Date established pursuant to Section 2.3.2(a) above, then Tenant shall have the right, at any time prior to the satisfaction of the Initial Co-Tenancy Condition, upon giving Landlord at least one hundred twenty (120) days' prior notice, to terminate this Lease as of the date specified in said notice. Landlord may negate such termination by causing the Initial Co-Tenancy Condition to be satisfied within sixty (60) days after the date on which said termination notice is given. If this Lease is terminated hereunder, neither party shall have any further liability under this Lease, except for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease, and (ii) Landlord shall promptly reimburse Tenant for all of its reasonable third-party costs and expenses incurred in connection with this Lease, including, without limitation, costs associated with the preparation and review of plans and specifications, and the performance of Tenant's Work, not to exceed ██████████████. Notwithstanding the foregoing, if the Initial Co-Tenancy Condition has not been satisfied by the first (1st) anniversary of the Delivery Date established pursuant to Section 2.3.2 above, Landlord shall have the right to deliver a notice to Tenant inquiring whether Tenant shall elect to terminate this Lease. If Tenant does not so elect to terminate this Lease within one hundred twenty (120) days after receipt of Landlord's notice, Tenant shall be deemed to have waived its right to terminate this Lease under this Section 2.5.3 and, at the end of such 120-day period, Tenant shall commence payment of full Fixed Rent and Percentage Rent.

C061858/0205454/1372981.6

ARTICLE 3
IMPROVEMENTS

Section 3.1    Landlord's Work and Tenant's Work.  Landlord shall, at its sole cost and expense, perform the work and obligations described on Exhibit D, Exhibit D-1, and Exhibit F hereto, and the "Final Plans and Specifications" (hereinafter defined in Section 3.2) (collectively, *"Landlord's Work"*), and shall deliver possession of the Premises to Tenant in the condition described therein.  Except for Landlord's Work, Tenant shall, at its own cost and expense, do any and all work (hereinafter referred to as *"Tenant's Work"*) which Tenant desires to adapt the Premises to Tenant's use.

Section 3.2    Plan Approvals.

3.2.1    Preparation of Plans and Specifications.

(a)    Landlord has delivered to Tenant a floor plan (the *"LOD"*) showing the location of the interior structural grid (column layout), storefront opening, mezzanine and/or office core, the location and arrangement of the loading facilities, trash compactor and trash container pad(s), and interior clear dimensions, and Tenant has approved the LOD (as approved by Tenant, the *"Certified LOD"*).  Any further changes to the Certified LOD shall be subject to Tenant's prior written approval (which may be withheld in its sole discretion), provided that, as to changes required to conform to Legal Requirements, Tenant shall have reasonable approval rights within the confines of said Legal Requirements.  After Tenant approves the Certified LOD, Landlord shall be responsible for any and all reasonable costs incurred and delays experienced by Tenant in connection with any further changes to the Certified LOD required by Landlord.

(b)    Tenant has delivered to Landlord its Fixture Plan (F1); Floor Finish Plans Notes and Details (F2); Power/Specialty Lighting Plan and Notes (F3); Lighting Plans and Notes (F4); and High-Pile Storage Plan (F5) (collectively, *"Tenant's Plans"*), all of which are substantially consistent with the Certified LOD (as same may be reasonably modified by Tenant, as noted above).

(c)    Within thirty (30) days after receipt of Tenant's Plans, Landlord shall prepare and submit to Tenant, in a single submission, Landlord's preliminary plans and specifications (the *"Preliminary Plans"*) for Landlord's Work (which shall include, without limitation, mechanical, electrical, plumbing, fire protection and high-pile storage, structural, architectural and site plans [including, without limitation, a site lighting plan with photometrics]), and each of the plans which collectively constitute the Preliminary Plans shall be at least 85% complete, in Tenant's reasonable judgment.  The Preliminary Plans shall be substantially consistent with Tenant's Plans, the Certified LOD, and Exhibits B, D, D-1, and F hereto.

(d)    Within thirty (30) days after its receipt of the Preliminary Plans, Tenant shall give Landlord notice of the respects, if any, in which said Preliminary Plans fail to meet Tenant's reasonable approval and/or fail to conform to the Certified LOD, Tenant's Plans, and/or Exhibits B, D, D-1, and F hereto, and Landlord shall promptly make any revisions necessary to correct such matters and obtain Tenant's approval.

(e)    Within thirty (30) days after the date on which Landlord receives notice of Tenant's approval of the Preliminary Plans, Landlord shall prepare and deliver to Tenant, in a single submission, final plans and specifications (the *"Final Plans and Specifications"*), which shall be substantially consistent with the Preliminary Plans, as approved by Tenant.

(f)    Within fifteen (15) days after its receipt of the Final Plans and Specifications, Tenant shall notify Landlord of Tenant's approval thereof or the reasons why such approval cannot be granted, and Landlord shall, within fifteen (15) days after receiving such notice, make any revisions necessary to correct such matters and obtain Tenant's approval.  Upon Tenant's approval of the Final Plans and Specifications, any further changes thereto shall be subject to Tenant's prior written approval.  Unless specifically noted on a separate summary sheet attached to the Final Plans and Specifications, to the extent of a conflict between the terms and provisions of Tenant's Plans, Exhibit B, Exhibit D, Exhibit D-1, and/or Exhibit F hereto, and

8

the terms and provisions of the Final Plans and Specifications, then the terms and provisions of Tenant's Plans, <u>Exhibit B</u>, <u>Exhibit D</u>, <u>Exhibit D-1</u>, and <u>Exhibit F</u> shall govern and prevail.

(g)     All submissions by the parties of the Preliminary Plans, the Final Plans and Specifications, and the measurements required under Section 3.4.1 and 3.4.2 below shall be made (or accompanied) by the computer files thereof formatted in any version of *"Autocad"* up to *"Autocad 2002"*.

3.2.2   <u>Plan Changes</u>.

(a)     Tenant shall have the right to make changes from the standards and specifications set forth in "Tenant's Prototype Drawings and Specifications" and/or the "Project Manual", referred to in <u>Exhibit D</u> hereto, and/or to require Landlord to subsequently make changes to either or both of the Preliminary Plans and Specifications and/or the Final Plans and Specifications in accordance therewith (the *"Changes"*).  Within ten (10) business days after receiving Tenant's request for any Change, Landlord shall give Tenant notice of the cost or savings, and any delay, that may be occasioned by such Change.  If Tenant fails to authorize such Change within five (5) business days after receiving Landlord's notice, Tenant shall be deemed to have withdrawn its request to make the Change.

(b)     Tenant shall pay to Landlord the net reasonable additional third-party costs of Landlord's Work resulting directly and solely from the aggregate Changes (exclusive of any charges for overhead and profit, other than sums not exceeding ■ subcontractor profit and ■ general contractor profit thereon), taking into consideration any and all actual costs and savings resulting from all Changes, in the aggregate (including, without limitation, reasonable costs approved by Tenant in advance associated with any acceleration of the work schedule which Tenant, at its sole option, may require).  Such payment shall be due and payable within thirty (30) days after Tenant's receipt of backup information reasonably supporting all such costs, including, without limitation, invoices, receipts and lien waivers of subcontractors and materialmen, but in no event earlier than the Delivery Date.

(c)     Landlord shall pay to Tenant the net reasonable cost savings resulting from the aggregate Changes, taking into consideration all reasonable additional third-party costs of Landlord's Work directly and solely resulting from the Changes (exclusive of any charges for overhead and profit, other than sums not exceeding ■ subcontractor profit and ■ general contractor profit thereon).  At Tenant's request, Landlord shall deliver to Tenant backup information reasonably supporting all such additional costs, including, without limitation, invoices, receipts, and lien waivers of subcontractors and materialmen.  Such payment shall be due and payable within thirty (30) days after the Delivery Date.

(d)     If the Changes occur during the preparation of any of the plans described in Section 3.2.1 above, then the deadlines for preparation and delivery of the plans then being prepared shall be extended as reasonably necessary to incorporate such Changes.  If, despite Landlord's diligent efforts in performing Landlord's Work, the Changes cause a net delay in the Substantial Completion of Landlord's Work (taking into consideration any time reductions resulting from such changes), then: (i) the Rent Commencement Date shall be determined as if such delay had not occurred, (ii) the commencement of the Slack Period, and the dates set forth in clauses (a) and (b) of Section 3.3.2 below, shall be extended by the number of days of such net delay; and (iii) with respect to Changes requested after the Effective Date, for purposes of calculating Tenant's Liquidated Costs under Subsection 2.3.2(b) above, the Delivery Date shall be extended by the number of days of such net delay.

Section 3.3   <u>Performance of Work</u>.

3.3.1   Both Landlord's Work and Tenant's Work shall be performed in a good and workmanlike manner, in compliance with all applicable Legal Requirements and in accordance with all insurance company requirements, utilizing only new, first-class materials. Landlord shall perform Landlord's Work in a manner such that Tenant will be able to obtain Tenant's Permits.  Landlord shall pay all impact fees and related governmental charges in connection with Landlord's Work and all other work performed by or on behalf of Landlord in connection with the Shopping Center.  If Tenant's Permits cannot be obtained because Landlord's Work has not been completed or has been performed improperly or by reason of any then existing condition of the Shopping Center, Landlord shall remedy the situation so as to

9

enable Tenant to obtain Tenant's Permits, and the Delivery Date shall be deemed delayed, for Tenant's benefit only, on a day-for-day basis for each day of delay occasioned thereby.

3.3.2 (a) If Landlord's Work has not been commenced (*i.e.*, if Landlord has not yet constructed demising walls for the Premises) by June 1, 2007, or (b) if the Delivery Date shall not have occurred by November 1, 2007 (subject to *Force Majeure*, not to exceed thirty (30) days in the aggregate, and provided that Landlord shall have given Tenant notice of such event of *Force Majeure* promptly after its occurrence), Tenant may thereafter, during such time as Landlord's Work has not been commenced or the Delivery Date has not occurred, as the case may be, consider Landlord to be in default hereunder and, at Tenant's option in its sole discretion, elect to:

(i) terminate this Lease, if Landlord shall fail to fully cure such default within thirty (30) days after receiving Tenant's notice thereof, in which event neither party shall have any further liability hereunder, except: (i) for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease, and (ii) Landlord shall be obligated to promptly reimburse Tenant, as Tenant's sole monetary remedy by reason thereof, for all its reasonable third-party costs and expenses incurred in connection with this Lease (including, without limitation, costs associated with the preparation and review of plans and specifications, and the performance of Tenant's Work), not to exceed ▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮; and/or

(ii) avail itself of the remedies set forth in Section 16.2 below (provided, however, that the cure period set forth therein shall not be applicable and Landlord shall not be liable for damages thereunder other than for costs expended by Tenant in exercising its right to self help); and/or

(iii) extend one or more times the dates set forth in clauses (a) and/or (b) of this Subsection 3.3.2 to such future dates designated by Tenant in notice given to Landlord.

The election by Tenant of any one or more of the foregoing remedies shall not preclude the subsequent election of any alternative remedy provided in this Section, this Lease, at law, or in equity.

3.3.3 <u>Landlord's Work Performed After Delivery of Possession</u>. On or before the Delivery Date, Landlord's and Tenant's representatives together shall conduct a walk-through of the Premises to compile a punch list of the "Punch List Items" (hereinafter defined). Tenant shall deliver to Landlord a copy of said punch list within five (5) days after the walk-through. Landlord shall complete any Punch List Items within ten (10) days after it receives a copy of said punch list. If Landlord fails to complete any item on said punch list within said 10-day period, Tenant shall have the right to complete such item(s) using its own contractors and receive reimbursement from Landlord for the reasonable costs and expenses thereof upon demand. If reasonably required by Tenant, any portion of Landlord's Work which is performed after Tenant accepts physical possession of the Premises shall occur only "after hours", when neither Tenant nor any of its agents, contractors, employees and servants are working within the Premises, and Landlord shall reimburse Tenant for the reasonable costs and expenses incurred by Tenant by reason of such "after hours" performance of Landlord's Work. Within thirty (30) days following Substantial Completion of Landlord's Work, Landlord shall deliver to Tenant a duplicate copy of the "as built" plans for the building containing the Premises. As used herein, the term ***"Punch List Items"*** shall mean such minor items which, when considered as a whole, do not adversely affect either the performance of Tenant's Work or Tenant's ability to conduct its normal business operations in the Premises.

3.3.4 <u>Tenant's Right of Entry</u>. Prior to the Delivery Date, Tenant may enter upon the Premises for the purposes of inspecting the work, taking measurements, making plans, erecting temporary or permanent signs and doing such other work as may be appropriate or desirable without being deemed thereby to have taken possession or obligated itself to pay Rent, provided, however, that Tenant shall not, during the course of such work, materially interfere with the performance of Landlord's Work and shall indemnify and hold Landlord harmless from and against any and all claims or losses arising from Tenant's entry upon the Premises, except to the extent caused by Landlord, its agents, employees, or contractors.

10

3.3.5   Work Requirements After Delivery Date. Following the Delivery Date, any construction by Landlord or other tenants or occupants of the Shopping Center affecting any portion of the Shopping Center shall be subject to the following terms and conditions:

(a)   no staging and/or storage of materials and parking of construction vehicles shall be permitted within the portions of the Shopping Center designated as the *"No Staging Area"* on Exhibit B hereto (Landlord agrees that Tenant shall have the right to stage and store its construction materials and park its construction vehicles in the area designated as *"Tenant's Staging"* on Exhibit B);

(b)   [Intentionally Deleted]; and

(c)   Landlord shall maintain the Shopping Center in a clean, safe, and sightly condition, and shall use reasonable efforts to ensure that such construction shall not otherwise materially adversely interfere with the normal conduct of any business operations in the Premises.

3.3.6   Tenant's Interviews and Recruiting. Tenant shall have the right, subject to applicable Legal Requirements, to place a trailer on the Common Areas in an area immediately adjacent to the Premises, in the location shown on Exhibit B hereto, during the period commencing ███████████████ ██  █████████████████████████████ ███████████████████████████ ████████████████████ for the purpose of conducting employee interviews and recruiting. Landlord shall install, at Landlord's expense, utility hookups to the trailer in accordance with the specifications set forth in Exhibit D hereto. Alternatively, Landlord may elect, in lieu of granting Tenant the right to place a trailer in the Common Areas, to provide Tenant with the use of vacant space in a building in close proximity to the Premises for use in conducting employee interviews and recruiting, which space shall be delivered to Tenant in accordance with the provisions of Exhibit D (and the provisions of the project manual referred to in Exhibit D and incorporated therein by reference) hereto relating to a trailer, including, without limitation, utility hookups. Tenant shall not be required to pay any Rent therefor but shall be responsible for the payment of all utilities during the period of its occupancy and for any damage, beyond ordinary wear and tear, caused to the premises by its use and occupancy. Such vacant space shall be available for Tenant's use during the same period as set forth above that Tenant would have been able to have a trailer in the Common Areas.

Section 3.4   Measurement; Adjustment of Rent.

3.4.1   Measurement of Premises and Shopping Center. Within five (5) days after the installation of the bottom plates for the demising walls of the Premises (and at least thirty (30) days prior to the Delivery Date), Landlord shall deliver to Tenant a certification to Tenant by Landlord's licensed architect, surveyor or engineer of the interior clear dimensions and Floor Area of the Premises (which certification shall be accompanied by a drawing of the Floor Area of the Premises with applicable dimensions for such Floor Area indicated thereon including, without limitation, the Non-Sales Area and the Additional Sales Area) and the Floor Area of the Shopping Center, the measurements of which shall be subject to confirmation by Tenant's licensed architect, surveyor or engineer. If Landlord shall fail so to deliver such certification and drawing to Tenant, Tenant shall have the right to have any of such measurements made and certified to Landlord by Tenant's licensed architect, surveyor or engineer. If the interior clear dimensions and/or the Floor Area of the Premises vary from those shown on the Certified LOD (as may be modified by any applicable Changes), then, Landlord shall correct such work to conform the Certified LOD as may be modified by any applicable Changes.

3.4.2   [Intentionally Deleted];

3.4.3   Adjustment of Fixed Rent and Tenant's Pro Rata Share. Subject to the foregoing provisions of this Section 3.4, if the measurement of the Premises shall indicate a Floor Area less than ████ square feet of Floor Area, the Fixed Rent and any other applicable provision of this Lease (including, without limitation, Tenant's Pro Rata Share) shall be reduced to conform to the actual measurement less the actual square footage of the Non-Sales Area and the Additional Sales Area, and Tenant shall receive a proportional refund of any Rent theretofore paid to Landlord. If the measurement of the Premises indicates that the actual Floor Area of the Premises exceeds ████ square feet of Floor Area (as same may be increased due to Changes under Section 3.2 above), neither Fixed Rent nor Tenant's Pro Rata Share shall be increased by

11

reason thereof except, however, that if the Floor Area of the Premises (less the actual square footage of the Non-Sales Area and the Additional Sales Area) shown on Landlord's Final Plans and Specifications, as approved by Tenant (the "*Final Plan Floor Area*") is greater than ███ square feet of Floor Area, then (a) the Fixed Rent and Tenant's Pro Rata Share (and any other provisions of this Lease which relate to the amount of Floor Area, less the actual square footage of the Non-Sales Area and the Additional Sales Area, in the Premises) shall be increased to conform to the actual measurement of the Floor Area, less the actual square footage of the Non-Sales Area and the Additional Sales Area, but in no event greater than the Final Plan Floor Area exclusive of the Non-Sales Area and the Additional Sales Area, and (b) Tenant shall pay to Landlord, as Additional Rent, the amount of any deficiency in Rent with respect to installments of Rent theretofore paid by Tenant. Landlord and Tenant shall each promptly execute and deliver to the other an amendment memorializing any change to the Fixed Rent, Tenant's Pro Rata Share, or any other applicable provisions of this Lease, made pursuant to this Section 3.4. Any dispute between the parties with respect to the Floor Area of the Premises, the Non-Sales Area and/or Additional Sales Area or the Floor Area of the Shopping Center shall be resolved by arbitration in accordance with the provisions of Section 16.3 below.

ARTICLE 4
FIXED RENT AND TAXES: DETERMINATION AND PAYMENT

Section 4.1    Fixed Rent.  Commencing on the Rent Commencement Date and continuing throughout the Term, Tenant shall pay to Landlord the Fixed Rent, in equal successive monthly installments, in advance, on the first day of each and every calendar month throughout the Term, except that Fixed Rent payable for any partial calendar month during the Term shall be prorated based on a 365-day year. Fixed Rent shall be paid without deduction or set-off, except to the extent otherwise expressly provided herein.

Section 4.2    Payment of Rent.  All Rent shall be mailed or otherwise delivered to Landlord's Mailing Address above or, upon at least thirty (30) days' prior notice to Tenant, to such other address as Landlord may from time to time designate. Landlord acknowledges and agrees that for administrative purposes, Tenant has designated BBBY Management Corporation, a New York corporation (the "*Paying Agent*"), to make all Rent payments due to Landlord under this Lease. Said designation (which may be revoked by Tenant at any time) is not intended as, and shall not constitute, an assignment of any rights or obligations of Tenant to the Paying Agent, and Tenant shall remain primarily liable for payment of Rent under this Lease. All payments of Rent received by Landlord from the Paying Agent shall be credited to Tenant as if such payments of Rent had been made by Tenant directly to Landlord.

Section 4.3    Real Estate and Other Taxes.

4.3.1    Landlord shall pay on or before the due dates thereof all "Taxes" (defined in Subsection 4.3.3 below) other than personal property taxes levied against Tenant's Property. Throughout the Term, Landlord shall cause the Power Center to be maintained entirely within tax parcels and lots that exclude any property not a part of the Power Center.

4.3.2    (a)    Tenant shall pay to Landlord Tenant's Pro Rata Share of the Taxes which accrue during the Term with respect to the Power Center, subject to the provisions of this Section 4.3. Landlord estimates that Tenant's Pro Rata Share of Taxes for the first full calendar year shall be approximately ███████████████ per square foot of Floor Area of the Premises. Any Taxes for a real estate fiscal tax year, only a part of which is included within the Term, shall be adjusted between Landlord and Tenant on the basis of a 365-day year as of the Rent Commencement Date or the date on which the Term expires or earlier terminates, as the case may be, for the purpose of computing Tenant's Pro Rata Share of Taxes. If, by law, any Taxes may, at the option of the taxpayer, be paid in installments (whether or not interest shall accrue on the unpaid balance thereof), Landlord shall exercise such option so as to maximize the number of installments, and Landlord shall pay the same as they come due and before any fine, penalty, interest or cost may be added thereto for nonpayment thereof.

(b)    Landlord shall submit to Tenant a copy of the bill for Taxes issued by the applicable taxing authority, a computation of Tenant's Pro Rata Share of such Taxes and proof of the payment of Taxes for the previous payment period, as well as copies of all notices concerning assessments, tax rates, and changes thereto. Tenant shall pay Landlord in the amount required by this Subsection 4.3.2 within thirty (30) days after receipt of such bill (but in no event

12

earlier than the fifteenth (15th) day prior to the date on which such Taxes would become delinquent).

      4.3.3   As used herein, *"Taxes"* shall mean all general, *ad valorem* real estate taxes, and assessments for betterments and improvements that are levied or assessed by any lawful authority on the Power Center (general or special), including any substitution therefor, in whole or in part, due to a future change in the method of taxation. Landlord represents that Taxes are separately assessed on the Power Center and exclude any taxes or assessments attributable to the Promenade. Taxes shall be reduced by any deferral, abatement, or other tax-lowering adjustment received by Landlord from the taxing authorities. For purposes of computing Tenant's Pro Rata Share of Taxes, Taxes shall not include any: (1) income, excise, profits, estate, inheritance, succession, gift, transfer, franchise, capital, or other tax or assessment upon Landlord or upon the rentals payable under this Lease; (2) taxes on rents (other than to the extent that such taxes are customarily paid by retail tenants in the state in which the Shopping Center is located), gross receipts or revenues of Landlord from the Premises; (3) fine, penalty, cost or interest for any tax or assessment, or part thereof, which Landlord or its lender failed to timely pay (except if same are caused by an Event of Default); (4) assessment for a public improvement arising from the initial construction or expansion of the Shopping Center or the Premises (it being agreed that all assessments imposed during the Term which are permitted to be included within Taxes hereunder shall, for the purposes of computing Tenant's Pro Rata Share thereof, be deemed to have been paid in the maximum number of installments permitted by the applicable taxing authority); (5) Taxes resulting directly from an increase in the assessment caused by a sale or ground lease of all or any portion of the Shopping Center to an Affiliate of Landlord or more than once every five (5) years; or (6) fees imposed upon Landlord in connection with Landlord's development of the Shopping Center (including, without limitation, trip generation fees). All Taxes payable by Tenant pursuant to this Section 4.3 shall be determined as if the Power Center was the only property owned by Landlord. Landlord represents to Tenant that, as of the Effective Date and, to the best of Landlord's knowledge, as of the anticipated Delivery Date, no portion of the Shopping Center is or will be (i) subject to or the beneficiary of an abatement, exemption and/or phase-in of Taxes, (ii) subject to any special assessments or similar charges, or (iii) are included in any special improvement district(s) which would result in higher sales taxes or other similar impositions than would exist in the absence of such district(s).

      4.3.4   At Tenant's request and without expense to Landlord, Landlord shall contest the amount or validity of any assessed valuation or Taxes, failing which, Tenant shall have the right to contest the assessed valuation or Taxes by appropriate proceedings conducted in good faith, whereupon Landlord shall cooperate with Tenant, execute any and all documents required in connection therewith and, if required by any governmental authority having jurisdiction, join with Tenant in the prosecution thereof. If, as a result of any contest or otherwise, any rebate or refund of Taxes is received, Tenant shall be entitled to Tenant's Pro Rata Share thereof (after reasonable and customary expenses incurred by Landlord and/or Tenant in connection with such contest are paid to the party which incurred such expense).

     Section 4.4   <u>Percentage Rent.</u>

      4.4.1   <u>Payment.</u> During and for each full calendar year during the Term, Tenant shall pay annual percentage rent (*"Percentage Rent"*) equal to ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Within sixty (60) days after the close of each calendar year, Tenant shall furnish to Landlord a compilation prepared by an officer of Tenant setting forth the amount of Gross Sales during the preceding calendar year and showing the amount of Percentage Rent, if any, required to be paid by Tenant for such calendar year, provided, however, that Tenant shall not be required to provide such compilation if the amount of Gross Sales for such calendar year is less than ▇▇▇▇▇▇ The full amount of any Percentage Rent due shall be paid to Landlord simultaneously with the furnishing of said compilation. Notwithstanding the foregoing, no Percentage Rent shall be payable with respect to the period commencing on the Rent Commencement Date and ending on the December 31 next following the Rent Commencement Date, and Gross Sales generated during any period when Alternate Rent is payable under this Lease shall be excluded from the determination of Gross Sales for purposes of computing Percentage Rent hereunder.

13

### 4.4.2  Definition of Gross Sales.



Tenant shall record, at the time of each Gross Sale, all receipts from such sale, whether for cash, credit or otherwise, in a cash register or cash registers, or in such electronic or computer device which records sales in a manner which is generally acceptable by industry standards. The term *"Gross Sales"* shall exclude: (1) proceeds from any sales tax, gross receipts tax or similar tax, by whatever name called, which are separately stated and are in addition to the sales price, (2) *bona fide* transfers or exchanges of merchandise from the Premises to any other stores or warehouses of Tenant or any Affiliates of Tenant, and returns to shippers and manufacturers for credit, (3) refunds or credits given to customers for merchandise returned or exchanged at the Premises (regardless of where or how purchased), (4) sales of Tenant's fixtures and equipment not in the ordinary course of Tenant's business, (5) to the extent of prior inclusion in Gross Sales, bad debts when written off the books of Tenant, provided that any collections made on account of such bad debts shall be included in Gross Sales when received, (6) receipts from vending machines installed solely for the use of Tenant's employees and receipts from pay telephones, (7) sales to employees of Tenant at discount (which, for the purposes of determining Percentage Rent hereunder, shall not exceed ████████████ of Gross Sales per calendar year or pro rata portion thereof, as applicable), (8) fees paid to independent third party credit card, charge card, debit card, and check verification/guaranty companies in connection with sales charged to or debited from customers' credit cards, charge cards, or debit cards, or sales paid for by customers by checks, as applicable, (9) proceeds from delivery, gift-wrapping and check cashing charges (which, for the purposes of determining Percentage Rent hereunder, shall not exceed ██ ████████ of Gross Sales per calendar year or pro rata portion thereof, as applicable), (10) sums and credits received in settlement of claims for loss or damage to merchandise, (11) separately stated service, finance and interest charges, (12) the dollar value of coupons utilized by customers in the purchase of merchandise from the Premises, (13) close-out or bulk sales of inventory to jobbers or wholesalers, (14) sales of gift certificates and/or gift cards, and (15) forfeited deposits.

### 4.4.3  Books and Records.

Tenant shall maintain at the Premises or at its principal office, complete books and records reflecting all elements of Gross Sales. Tenant shall be allowed to maintain its books and records in a computerized form; provided, however, that (i) such computerized books and records provide the same level of information as the books and records described above, are retained for the full record retention period provided for herein, and (ii) promptly upon request, printed copies of any such books and records are made available at Tenant's principal office for inspection by Landlord's representatives who are engaged in inspecting and/or auditing Tenant's books and records as provided herein. Such books and records shall be kept in accordance with generally accepted accounting principles and practices consistently applied and shall be retained by Tenant for ████████████ following the end of the calendar year to which they refer.

### 4.4.4  Landlord's Right to Audit.

Landlord and/or Landlord's auditor shall have the right, upon at least ten (10) days prior notice to Tenant (but not more than once per annum), to inspect and/or audit the records of Tenant relating to Gross Sales. If any such audit discloses a deficiency in the Gross Sales reported by Tenant, Tenant shall pay any deficiency in Percentage Rent owing to Landlord on account of such deficiency. If such deficiency is in excess of three ████████ of the Gross Sales reported by Tenant and Percentage Rent is then payable, Tenant shall also pay Landlord's reasonable costs of the inspection and audit. Tenant has not and does not make any representation or warranty as to the amount of Gross Sales which are anticipated from the Premises.

### 4.4.5  Confidentiality.

Landlord shall not disclose to any third party Tenant's Gross Sales or the amount of Percentage Rent paid or payable by Tenant, provided, however, that (i) such information was not previously disclosed by Tenant to such third party or to the public generally, and (ii) nothing contained herein shall restrict Landlord from disclosing such information as may be required by applicable Legal Requirements or to its accountants, attorneys, *bona fide* prospective purchasers, or current or prospective Mortgagees or underlying lessors of all or any portion of Landlord's interest in the Shopping Center (provided that each of such recipients shall be bound to the same non-disclosure provisions as are imposed upon Landlord).

14

4.4.6   Licensees. If Tenant enters into any agreement(s) with any non-Affiliate person or entity (hereinafter, the *"Licensees"*) permitting the Licensees to operate businesses or concessions within the Premises, then, in lieu of including the Gross Sales actually achieved by such Licensee(s) from such licensed portion of the Premises, Tenant may elect to include in Gross Sales an amount equal to the product obtained by multiplying (i) the Floor Area of such licensed space, by (ii) the average Gross Sales per square foot of Floor Area for the remainder (*i.e.*, the unlicensed portion) of the Premises. The provisions of this Subsection 4.4.6 shall not apply to more than ▆▆▆▆▆▆▆▆ of Floor Area, in the aggregate, in the Premises at any one time. If more than ▆▆▆▆▆▆▆▆ of the Floor Area of the Premises is licensed to Licensees at any one time, then Tenant shall have the right to designate, from time to time, those portions of the Premises which will be entitled to the benefit of this Subsection 4.4.6.

4.4.7   Disputes. Any dispute between the parties relative to the provisions of this Section 4.4, including, without limitation, the amount of Percentage Rent payable by Tenant, shall be submitted to arbitration in accordance with the provisions of Section 16.3 of this Lease.

ARTICLE 5
COMMON AREAS, THEIR USE AND CHARGES

Section 5.1   Common Areas: Maintenance.

5.1.1   Maintenance of Common Areas. Landlord shall operate, maintain, repair and replace the Common Areas as required by this Lease and otherwise to the standard by which Common Areas of first-class shopping centers in the State in which the Shopping Center is located are operated, maintained, repaired and replaced, including, without limitation, snow, ice, rubbish and debris removal (including installation and maintenance of sidewalk refuse containers), landscaping (including, without limitation, the trimming and pruning of trees to avoid interference with the use or visibility of canopies or signs on the exterior of the Premises), adequate lighting, insurance, supervision, use, parking lot paving and striping, drainage, security (as reasonably required), and control of all Common Areas, and Landlord shall comply with all applicable Legal Requirements.

5.1.2   Payment of Common Area Maintenance Costs.

(a)   From the Rent Commencement Date through the end of the first full calendar year of the Term, Tenant shall pay to Landlord Tenant's Pro Rata Share of the reasonable costs (hereinafter referred to as the *"Common Areas Charges"*) paid by Landlord to operate, maintain, insure and repair the Common Areas. Tenant's Pro Rata Share of Common Areas Charges shall be paid in equal monthly installments on the first day of each calendar month, in advance, during each calendar year based on Landlord's reasonable budget.

(b)   Within sixty (60) days after the end of each calendar year, Landlord shall provide to Tenant a statement, in detail reasonably satisfactory to Tenant, of Common Areas Charges for such year, which statement shall be prepared in accordance with generally accepted accounting principles consistently applied (the *"CAC Reconciliation Statement"*). The CAC Reconciliation Statement shall be certified by Landlord as being accurate and shall be accompanied by a calculation of Tenant's Pro Rata Share of Common Areas Charges, and payment to Tenant in the amount of any overpayment made by Tenant during the preceding calendar year. If Tenant's Pro Rata Share of the actual Common Areas Charges for a calendar year shall exceed the aggregate monthly installments paid by Tenant during said calendar year, Tenant shall pay to Landlord the deficiency within sixty (60) days after receipt of such notice. Upon Tenant's request, Landlord shall promptly deliver to Tenant copies of relevant backup materials (including, but not limited to, contracts, correspondence and paid invoices) reasonably required by Tenant. Notwithstanding any provision hereof to the contrary, in no event shall the Tenant's Pro Rata Share of Common Areas Charges (inclusive of Tenant's Pro Rata Share of Landlord's insurance premiums payable pursuant to Section 10.3) with respect to the first full calendar year of the Term exceed ▆▆▆▆▆▆▆▆ of Floor Area (the *"First Year Cap"*). After the first full calendar year, Tenant shall thereafter pay to Landlord during the Term Tenant's Fixed Share (hereinafter defined) of Common Areas Charges. Tenant's Fixed Share of Common Areas Charges shall be paid in equal monthly installments on the first day of each calendar month, in advance, during each calendar year. As used herein, *"Fixed Share"* shall mean ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

15

Landlord acknowledges and agrees that Tenant shall have no obligation to pay to or reimburse Landlord for, any costs or expenses in connection with the repair, maintenance, insurance, operation or replacement of any Common Areas or other portions of the Shopping Center, all of which costs and expenses are included in Tenant's Fixed Share.

        5.1.3   Exclusions from Common Areas Charges.

        (a)   With respect to the calculation of Tenant's Pro Rata Share of Common Areas Charges for the first full calendar year, Common Areas Charges shall not include: (1) the capital cost of any additions to the Common Areas pursuant to an expansion of the Shopping Center; (2) the cost of any replacements or capital improvements to the Common Areas, except that the cost of repaving the parking areas of the Power Center may be included within Common Areas Charges so long as such cost is amortized on a straight-line basis over the useful life thereof under generally accepted accounting principles, and is not included (A) prior to the expiration of the ██████ full calendar year of the Term, or (B) more than once during each ██████████ of the Term; (3) the cost of investigating, monitoring or remedying any environmental condition or "Hazardous Substances" or any other "Compliance Costs" (both as hereinafter defined in Subsection 12.4.1); (4) any debt service (including principal and interest) or payments of any judgments or other liens against Landlord; (5) the cost of maintaining, repairing or providing security for interior portions of buildings; (6) Taxes or other taxes levied or assessed against Landlord or the Power Center; (7) the cost of compliance with applicable Legal Requirements (including, without limitation, the cost of curing violations or contesting such Legal Requirements); (8) any costs resulting from insurance deductibles or any payments made under any self-insurance policy maintained by Landlord; (9) any costs which would have been reimbursed or paid for by insurance proceeds had Landlord maintained the insurance required under Section 10.3 hereof and the amount of any judgment or other charge entered or costs assessed against Landlord in excess of the policy limits of the insurance maintained by Landlord under Section 10.3 hereof); (10) those portions of Landlord's insurance premiums which are reimbursed to Landlord by any other tenant in the Power Center other than through the payment of such tenant's proportionate share of insurance premiums otherwise includable as part of Common Areas Charges; (11) sums paid or owed by Landlord to any tenant in the Power Center; (12) costs incurred in connection with the negotiation of leases with, or construction of improvements for, any tenant in the Power Center (including, without limitation, brokerage commissions and legal fees); (13) costs incurred in connection with lawsuits or other legal actions (including, without limitation, arbitrations and mediations) instituted or defended by Landlord; (14) sums incurred as late payment fees, penalties or interest; (15) ground rent; (16) depreciation [except as expressly permitted pursuant to item 23 below]; (17) costs disproportionately incurred by or on behalf of any one or more of the tenants in the Power Center (including, without limitation, all costs relating to the operation of any food court or exterior dining area in the Power Center); (18) electricity costs for lighting Common Areas later than the "Normal Hours" [hereinafter defined in Section 5.2], other than low-level security lighting; (19) Landlord's advertising, entertainment and promotional costs for the Power Center (including, without limitation, holiday decorations); (20) costs of acquiring, leasing, restoring, insuring or displaying sculptures, paintings and other objects of art located within or outside the Power Center; (21) costs and expenses payable to Landlord or its Affiliate, to the extent that such costs and expenses exceed competitive costs and expenses for materials and services by unrelated persons or entities of similar skill and experience; (22) repairs resulting from defects in the original construction of the Power Center arising within one (1) year after the Rent Commencement Date; (23) the cost of mechanized equipment for the maintenance of the Common Areas (but not the straight-line depreciation thereof over its useful life, as determined in accordance with generally accepted accounting principles); (24) reserves for anticipated future expenses; (25) any cost or expense relating to the administration and management of the Common Areas (whether on-site or off-site) including, but not limited to, overhead, management fees, office salaries and benefits, office rental, office supplies, dues and subscriptions, office utility charges, telephone charges and automobile expenses; (26) costs incurred in connection with the monitoring, maintenance, inspection, or testing of fire alarm systems; (27) costs and expenses payable to Landlord, or its Affiliate or designee, for the provision of utility service(s) to the Common Areas, to the extent that such costs and expenses exceed competitive market rates; (28) except as specifically provided in Section 7.2 hereof, any costs relating to any pylon signs or other signage identifying tenants of the Power Cente; or (29) any costs related to the operation,

16

maintenance, repair and/or replacement of all or any portion of the Promenade or the common areas contained therein.

(b)      In addition, if any tenant or other occupant of the Power Center (i) maintains the Common Areas in whole or in part, or any facilities therein, (ii) provides any services the cost of which would otherwise be includable in Common Areas Charges, and/or (iii) pays directly for costs which would otherwise be included in the Common Areas Charges, then the costs associated with or attributable to any of the foregoing shall be excluded from Common Areas Charges, and the denominator used to determine Tenant's Pro Rata Share of such costs (and only such costs) shall be reduced by the Floor Area occupied by such tenant or other occupant. In applying the provisions hereof, Landlord shall act equitably, taking into account, for example, the relationship of the size of the Common Areas maintained by the other tenant or occupant to the size of its premises.

(c)      Common Areas Charges and the First Year Cap for any period during the Term which constitutes less than a full calendar year shall be equitably prorated.

5.1.4   **Tenant's Right to Audit.** With respect to the calculation of Tenant's Pro Rata Share of Common Areas Charges for the first full calendar year, Tenant shall have the right, within ▮▮▮▮▮▮▮▮ after receiving the CAC Reconciliation Statement for such first full calendar year (and not more than once annually) to audit Landlord's books and records to verify Landlord's calculation of Common Areas Charges as reflected therein and Tenant's Pro Rata Share thereof. Upon Tenant's request, Landlord shall promptly deliver to Tenant copies of relevant backup materials (including, but not limited to, contracts, correspondence and paid invoices) reasonably required by Tenant. In the event of an error in Landlord's favor, Landlord shall refund the overcharge to Tenant within thirty (30) days after Tenant's demand therefor, and if the overcharge exceeds ▮▮▮▮▮▮▮▮▮ of Tenant's Pro Rata Share of Common Areas Charges, Landlord shall pay to Tenant the reasonable expenses of the audit within thirty (30) days after Tenant's demand therefor, failing which, Tenant shall have the right (in addition to any rights and remedies to which it may be entitled under this Lease, at law, or in equity) to offset such amount from payments of Rent next becoming due hereunder, together with interest thereon at the Lease Interest Rate from the date such remittance is due until reimbursement or full satisfaction by credit. Landlord shall maintain all books and records pertaining to a calendar year for at least ▮▮▮▮▮▮▮ after it delivers to Tenant a CAC Reconciliation Statement for such calendar year. Tenant shall keep the results of any such audit confidential, provided that nothing contained herein shall restrict Tenant from disclosing such information as may be required by applicable Legal Requirements, or to its accountants, attorneys or bona fide prospective assignees or subtenants (provided that each of such recipients shall be bound by the same non-disclosure provisions as are imposed upon Tenant). Any dispute by Landlord with respect to an audit by Tenant shall be submitted to arbitration in accordance with the provisions of Section 16.3 below.

5.1.5   In no event shall Tenant be required to join, participate in or contribute to any promotional fund, marketing fund or merchants' association.

Section 5.2   Common Areas: Restrictions.

5.2.1   **Continuous Access.** No entrances, exits, approaches and means of ingress and egress to and from the Power Center or the Premises as shown on Exhibit B hereto, shall be interrupted or disturbed by any act or omission of Landlord during the Term, except in the event of an emergency or as may be otherwise required by applicable Legal Requirements, in which event Landlord shall use reasonable efforts to give Tenant advance notice of same and to minimize interference to Tenant's normal business operations in the Premises as a result thereof. Notwithstanding the foregoing, Landlord shall be permitted, upon at least thirty (30) days prior notice given to Tenant, to temporarily close portions (but not all) of the exterior Common Areas of the Power Center for the minimum time legally necessary to prevent a dedication thereof or an accrual of any rights in any person or the public generally therein; provided that such closure shall not occur during August, November or December of any calendar year.

5.2.2   **No Alterations.** Landlord shall not, without obtaining Tenant's prior written consent in each instance, which consent may be withheld in its sole discretion: (i) alter the area of the Power Center or the location, availability, or size of any building or Common Area improvement in the Power Center from that shown on Exhibit B hereto; (ii) materially change the number, location, or layout of parking spaces in the Power Center as shown on

17

Exhibit B hereto; (iii) construct or permit to be constructed any structures in the area designated as the *"No Build Area"* on Exhibit B ██████████████████████████████████ ██████████████████████████ other than as shown on Exhibit B hereto; or (iv) materially change the entrances or exits to and from the Power Center, or the curb cuts, roadways and sidewalks or other Common Areas in the Power Center, from those shown on Exhibit B hereto. Notwithstanding any provision herein to the contrary, Landlord shall neither perform nor permit to be performed, any construction, repairs, replacements or maintenance to any portion of the Power Center, including the Premises (other than emergency repairs to utilities and Common Areas) during the months of August, November and December of any year, without the prior consent of Tenant, which consent may be granted or denied in Tenant's sole and unfettered discretion, reasonably or unreasonably exercised.

   5.2.3 Outparcels. In addition to the provisions of Subsection 5.2.2 above, during the Term, the following restrictions shall encumber and bind the area designated on Exhibit B as *"Future Outparcel"*(which Future Outparcel shall, for all purposes of this Lease, be deemed to be part of the Power Center): (a) no more than one building shall be constructed on the Future Outparcel and such building shall not exceed ████████████████ of Floor Area; (b) such building shall not exceed one story in height; (c) such building shall not exceed a maximum height of twenty-eight feet (28') as measured from the finished floor level to the highest point on such building or structure, exclusive of the height of all types of projections or architectural treatments or embellishments thereon, such as, but without limitation, HVAC equipment, parapets, mansards, signs, satellite dishes and antennae (collectively, *"Projections"*), provided the Projections do not cause the height of the building, as measured from the finished floor level to the highest point of the Projections, to exceed thirty-one feet (31'); and (d) all Legal Requirements relative to parking requirements for the building constructed in the Future Outparcel shall be complied with by providing the requisite number of parking spaces solely within the boundaries of the Future Outparcel, without reduction in such number by virtue of the granting of a variance or special exception. For purposes of this Subsection 5.2.3, the Floor Area of any such building constructed within the Future Outparcel shall also be deemed to include outdoor balconies, patios or other outdoor areas utilized for retail sales or food or beverage service (exclusive of drive through or walk-up take-out food or beverage service).

   5.2.4 Parking Area. During the Term, Landlord shall maintain in the Power Center, at a minimum, the greater of (i) the number of parking spaces required by applicable Legal Requirements, without variance, or (ii) four and one-half (4.5) parking spaces per 1,000 square feet of Floor Area, with each such space being at least the minimum size required by Legal Requirements but in no event shall more than ten percent (10%) of such parking spaces be designated for compact cars and provided that such compact spaces shall be uniformly distributed throughout the parking areas and further provided that no such compact spaces shall be located within the No Build Area. Parking spaces shall at all times be clearly marked by painting, striping or otherwise. Landlord shall not designate specific parking spaces for use by other tenants or occupants of the Power Center nor shall Landlord permit any person or entity to use the parking areas other than Tenant, the other tenants and occupants of the Power Center, and their respective employees, agents, subtenants, concessionaires, licensees, customers, and invitees. There shall be no charge whatsoever levied for the use of any parking areas within the Power Center. Landlord shall not permit overnight parking in the Power Center.

   5.2.5 Lighting. Throughout the Term, Landlord shall keep the Common Areas fully lighted and open to the customers of the Power Center seven (7) days a week from dusk until 11:00 p.m. Monday through Saturday and until 7:00 p.m. on Sunday or for such longer hours as may be customary in first class shopping centers in the Rogers, Arkansas area which are similar to the Power Center. In addition to the foregoing, Landlord shall provide for low level security lighting from one (1) hour after the close of business in the Premises until dawn.

   5.2.6 Repairs. During the Term, any construction or repair by Landlord permitted or required under this Lease and undertaken in the Common Areas or in any other portion of the Shopping Center shall:

     (a) not be performed during the months of August, November, or December of any year, except in the event of an emergency or as may be otherwise required by applicable Legal Requirements;

(b)  be commenced only upon at least five (5) days' prior notice to Tenant (except in an emergency, in which event Landlord shall only be required to give such notice as is reasonable under the circumstances); and

(c)  be performed in accordance with the requirements of Section 3.3.5 above and in such a manner so as not to materially interfere with the normal conduct of any business operations in the Premises.

5.2.7  <u>Rules and Regulations</u>.  Tenant shall comply with the rules and regulations of the Shopping Center as established from time to time by Landlord, within sixty (60) days after Landlord notifies Tenant thereof, provided they: (i) are reasonable, (ii) do not adversely affect the normal conduct of any business operations in the Premises, (iii) do not adversely affect any of Tenant's rights under this Lease, and (iv) are uniformly enforced against all tenants of the Shopping Center and without prejudice against Tenant.  In the event of any conflict between the provisions of this Lease and any rules or regulations, the provisions of this Lease shall prevail and govern.

5.2.8  <u>Miscellaneous</u>.

(a)  <u>No Promotional Use</u>.  Landlord shall not use or permit the use of all or any portion of the Common Areas in the Power Center for retail sales or for promotional purposes. Notwithstanding the foregoing provision, tenants of the Power Center (including Tenant) shall be permitted to conduct sidewalk sales in front of their respective stores only, provided that such sales shall: (A) be conducted in a manner consistent with sidewalk sales in first-class shopping centers in the state in which the Power Center is located, (B) not materially interfere with normal pedestrian access over the sidewalks, and (C) not materially interfere with the normal business operations of Tenant in the Premises or materially impair the visibility of Tenant's signage.  Landlord shall not permit any solicitation, distribution of handbills, picketing, or other public demonstration in the Common Areas of the Power Center, except as otherwise may be mandated by applicable Legal Requirements.

(b)  <u>Trash Compactor and Containers</u>.  Tenant shall be permitted to maintain and operate, at no extra charge: (i) a trash compactor for Tenant's exclusive use in the portion of the Common Areas designated on <u>Exhibit B</u> hereto as *"Trash Compactor Pad"*; and (ii) a trash container(s) for Tenant's exclusive use in the portion(s) of the Common Areas designated on <u>Exhibit B</u> hereto as *"Trash Container Pad"*.  Tenant, at its sole cost and expense, shall keep the trash compactor and containers neat and clean and repair any damage caused by use and storage of such compactor and containers.

(c)  <u>Shopping Carts</u>.  Tenant shall be permitted to store its shopping carts in such exterior cart corrals as may be designated for Tenant's use on <u>Exhibits B and D-1</u> hereto.  If required by a governmental authority, Tenant's cart corrals shall be screened.  With respect to shopping carts provided by Tenant for the use of its customers, Tenant will use reasonable efforts to periodically remove same from the Common Areas.  Tenant shall be responsible for the maintenance and repair of the shopping carts and cart corrals.

(d)  <u>Cellular Towers</u>.  No transmission and/or reception towers for wireless telephone or internet communications shall be permitted within the No Build Area of the Shopping Center.

(e)  <u>Storage Trailers</u>.  Tenant shall be permitted to maintain temporary storage containers or trailers in the locations designated on <u>Exhibit B</u> hereto during the Term, subject to applicable Legal Requirements.

ARTICLE 6
UTILITIES

Section 6.1  <u>Utility Service</u>.  From and after the Delivery Date and continuing thereafter through the end of the Term, Tenant shall be solely responsible for and shall pay the cost of utilities services (including, without limitation, electricity, gas, water, sanitary sewer, alarm and telecommunications) consumed in the Premises by Tenant.  Tenant shall not be obligated to purchase utility service(s) directly from Landlord, or from any utility provider designated by Landlord, unless: (i) the quality of the service(s) so provided satisfies Tenant's specifications so as to permit the normal operations of Tenant's business in the Premises; (ii) the

19

cost of such service(s) shall not exceed the lesser of: (x) the cost of the same service if Tenant had obtained such service directly from its preferred utility service provider, or (y) the cost to Landlord for such service, and (iii) Landlord shall pay the costs of reconnection. Landlord shall provide separate utility meters exclusively serving the Premises, at its sole cost and expense (including, without limitation, all connection and hook-up fees). Tenant's entry upon the Premises prior to the Delivery Date shall not constitute a waiver by Tenant of Landlord's obligation to pay the costs of all utility charges incurred in the Premises prior to the Delivery Date. Landlord shall not permit the capacity of utility lines available for use at the Premises to be reduced or overloaded by any other persons or entities. Landlord shall permit Tenant and its telecommunications provider full and free access to, and use of, available telecommunications conduits in the Shopping Center for the provision of telecommunications service to the Premises, subject to such reasonable requirements as Landlord may impose and any third party consents, approvals or easements which may be required.

Section 6.2    Interruption. Notwithstanding any provision of this Lease to the contrary, in the event utilities serving the Premises are disrupted due to the acts or omissions of Landlord, its agents, contractors, servants or employees, Landlord shall promptly restore the affected utilities at Landlord's sole cost and expense. If the disrupted utilities are not restored within twenty-four (24) hours after the Landlord has knowledge of the disruption, and Tenant is unable to conduct its normal business in the Premises as a result thereof, Rent shall be equitably abated during the period of disruption.

ARTICLE 7
SIGNS

Section 7.1    Tenant's Building Signage. Landlord shall supply and install signage (and obtain all permits and approvals therefor) as part of Landlord's Work in accordance with Exhibits D, D-1, and F hereto, and with the additional provisions of this Lease. Landlord shall use best efforts to obtain all approvals required for Tenant to have the signage (including, without limitation, the number of signs and dimensions) as indicated on Exhibits D-1 and/or F hereto. If necessary, Landlord, at its sole cost and expense, shall apply for a variance to obtain Tenant's required signage and shall diligently and in good faith prosecute such application to completion. Upon Tenant's request, Landlord shall deliver to Tenant copies of the application and other supporting documentation submitted by Landlord to the applicable governmental authority for such variance. Tenant shall reasonably cooperate with Landlord in Landlord's efforts to obtain such variance. Thereafter, Tenant shall have the exclusive right during the Term, at its sole cost and expense, to erect, maintain, and replace on the storefront and exterior walls of the Premises, and on the side walls of any entrance design element, if any, signs (including, without limitation, under-canopy or blade signs), banners (including temporary banners placed on the storefront of the Premises and such other walls of the Premises as selected by Tenant), awnings, and flags of such size, design and color as Tenant, from time to time, may desire, subject to compliance with applicable Legal Requirements. Tenant may erect and maintain in the interior of the Premises any signs it may desire, provided that same are professionally prepared.

Section 7.2    Signage in Common Areas. . Landlord shall provide pylons and monuments at the locations shown on Exhibit B hereto during the entire Term, and obtain all permits and approvals therefor. Landlord, as part of Landlord's Work, shall obtain all governmental approvals and permits for, and shall procure and install, Tenant's sign panel(s) on all sides of such pylons and monuments, in accordance with the provisions of Article 3 and Exhibits D and F hereto. The dimensions and location of Tenant's pylon sign panel(s) shall be as indicated on Exhibit F. In addition, if Landlord constructs or makes available to any other tenant or tenants in the Shopping Center any other signage located in the Common Areas, Landlord shall also include on such signage Tenant's identification sign, as shown on Exhibit F hereto, which Tenant sign shall have a location determined by the Floor Area of the Premises as compared to the Floor Area of other tenants having panels on such sign (i.e. a tenant having greater Floor Area than Tenant shall have a panel above Tenant's panel) and Tenant's panel shall be at least as large as any other tenant having the same or less Floor Area as that of Tenant. Landlord shall maintain all pylons and monuments, and Tenant's signs thereon, in good order and repair, and allow Tenant access to replace its signs thereon, at Tenant's cost and expense. Landlord shall not change or alter the location, structure, height or general appearance of the pylons or monuments without obtaining Tenant's prior consent. The cost of maintaining all pylons and monuments bearing Tenant's sign panel(s) (but not the cost of individual tenants'

20

signs thereon or the cost of the construction of the pylons and monuments) and the cost of any electricity used to illuminate them, shall be includable in Common Areas Charges.

Section 7.3     Signage: Alteration/Removal/Allocation.  Tenant shall have the right, from time to time, without Landlord's approval, to change its signs on the storefront and exterior of the Premises, as well as on any pylon or monument, provided that the area of the new sign is no larger than the area of the sign which it replaces and that the method of construction and attachment is substantially the same.  Upon the expiration or earlier termination of the Lease, Tenant shall remove its signs from the fascia or other exterior walls of the Premises and from any pylon or monument, and shall repair any damage occasioned thereby.  The signage rights granted to Tenant pursuant to this Article 7 shall, at Tenant's option, be allocated to or between Tenant and/or any subtenant(s) of all or any portion of the Premises.  All signage installed by Landlord and Tenant hereunder shall comply with applicable Legal Requirements.

Section 7.4     Cooperation.  Landlord, upon request, shall execute any consents or applications which may be reasonably required by applicable Legal Requirements to permit the placement, installation, and/or replacement by Tenant of any signs on any part of the Premises or on any pylon or monument, to which Tenant may be entitled under this Lease.

Section 7.5     Signage Restrictions and Criteria.

7.5.1    During the Term, no exterior identification signs attached to any building of the Power Center shall be of the following type: **(i)** flashing, moving or audible signs; **(ii)** signs employing exposed raceways, exposed neon tubes, exposed ballast boxes, or exposed transformers, provided that Tenant shall have the right to employ any methods necessary for the installation of internally illuminated self-contained channel letters; or **(iii)** paper or cardboard signs other than professionally prepared interior window signs advertising special sales within the subject premises, temporary signs (exclusive of contractor signs), stickers or decals, provided, however, the foregoing shall not prohibit the placement at the entrance of each such premises of (A) small stickers or decals which  indicate hours of business, emergency telephone numbers, credit cards accepted, and other similar information, and/or (B) a sticker or decal which contains the phrase "no solicitation" or words of like import.  No billboard signs shall be permitted within the Power Center.  Landlord shall not permit any obstructions (including, without limitation, any trees, bushes or other landscaping, scaffolding or architectural details, or pylons, monuments or other freestanding signs) to obscure Tenant's storefront, storefront signs or other exterior wall signs.  Except as otherwise permitted under Existing Leases (hereinafter defined in Section 12.3(h)), no premises in the Power Center containing less Floor Area than the Floor Area of the Premises shall have: **(i)** building signage possessing more total square footage than the total square footage available for use by Tenant, or a maximum height greater than the maximum height of Tenant's building signage, as measured from the finished floor level to the highest point on such signage, or **(ii)** a building and entrance design element higher or wider than the height or width of the building and entrance design element of the Premises.

ALTERATIONS AND IMPROVEMENTS

Section 8.1     Alterations and Improvements.

(a)     Tenant shall not perform any structural alterations or structural improvements to the Premises (except to the extent same pertain to Tenant's Work) without the prior approval of Landlord; provided, however, that Tenant's alteration of the exterior of the Premises to conform to Tenant's then-current prototypical elevation shall not require Landlord's consent.  All work performed by Tenant in connection with structural and non-structural alterations or improvements shall be done at Tenant's sole cost and expense, in a good and workmanlike manner and in compliance with all applicable Legal Requirements.  The provisions of this Section 8.1 shall not apply to Tenant's building signage, which shall be governed by the applicable provisions of Article 7 above.

(b)     Notwithstanding anything contained herein, Tenant shall have the right at any time during the Term to construct an additional floor to be used for storage purposes, not to exceed ▇▇▇▇▇▇▇▇ (the *"Additional Floor"*) above all or any portion of the Premises, subject to the following terms and conditions:

21

(i)      Prior to commencing the construction of the Additional Floor (the *"Additional Floor Work"*), Tenant shall prepare and submit to Landlord for Landlord's approval Tenant's plans therefor (the *"Additional Floor Work Plans"*). Within thirty (30) days after receipt of the Additional Floor Work Plans (or any subsequent revisions by Tenant thereto), Landlord shall give notice as to whether it approves same, such approval not to be unreasonably withheld or delayed, provided the Additional Floor Work as depicted on the Additional Floor Work Plans (or such revisions) shall be approved if same: (I) is in compliance with all applicable Legal Requirements (and does not adversely affect the parking ratio required for the Power Center), and (II) following completion thereof, will not reduce the structural soundness of the building containing the Premises; should Landlord fail to notify Tenant within such 30-day period (or if Landlord notifies Tenant within such 30-day period that it does not approve the Additional Floor Work Plans (or revisions) but fails to state with reasonable specificity the reason for such disapproval), then Tenant shall give Landlord a five (5) day reminder notice and if Landlord fails to disapprove the Additional Floor Work Plans or fails to state with reasonable specificity the reason for such disapproval, in either case within such 5-day period, such approval by Landlord shall be deemed to have been given;

(ii)      In no event shall the Additional Floor result in any charge to Tenant by way of Fixed Rent or any Additional Rent, nor shall the Additional Floor be included in the determination of Tenant's Pro Rata Share; and

(iii)      The Additional Floor Work, together with any replacements thereof, shall be and remain the property of Tenant throughout the Term, and Tenant alone shall be entitled to the benefits of ownership thereof, including, but not limited to, depreciation of same as an asset for tax purposes.

8.1.2   Tenant may, from time to time, at its sole cost and expense, without the prior approval of Landlord, make non-structural alterations and non-structural improvements to the Premises as Tenant deems necessary or desirable, including, but not limited to, electrical systems, heating, ventilation and air conditioning and other mechanical systems, installation of fixtures and equipment, painting, and wall and floor coverings.

8.1.3   Tenant shall have the right to subdivide the Premises into not more than ▮▮▮▮▮▮ stores, each of which may have its own front entrance and access to the loading docks in the rear of the Premises, as well as separately sub-metered utilities.

8.1.4   Tenant shall have the right to erect and maintain an antenna and a satellite dish on the roof of the Premises, provided that Tenant: (i) obtains Landlord's prior approval of its plans for the installation of such equipment, (ii) uses a contractor designated or approved by Landlord for all roof penetrations so as not to violate or invalidate any roof warranties maintained by Landlord, (iii) maintains the area where roof penetrations are made while Tenant's equipment is present, (iv) repairs any damage to the roof caused by the making of the roof penetrations, including, but not limited to, the repair of the roof penetrations upon the removal of any equipment installed thereon, and (v) erects and maintains such equipment in accordance with applicable Legal Requirements.

8.1.5   Landlord shall execute and return to Tenant all appropriately completed building department or equivalent applications within ten (10) days after Tenant's request therefor, and will reasonably cooperate with Tenant in the permitting process.

8.1.6   If any violation of any applicable Legal Requirement which is noted against the Shopping Center or the Premises (other than a violation caused by Tenant) prevents Tenant from obtaining a building permit for any alterations or a certificate of occupancy, then, upon request by Tenant, Landlord shall promptly and diligently cause such violation to be removed of record to the extent required to permit Tenant to obtain its building permit or certificate of occupancy, as the case may be.

8.1.7   Landlord shall not make any alterations to the Premises (including, without limitation, changing the design, color or materials of the exterior of the Premises) nor shall Landlord construct an additional floor or floors above the Premises.  Landlord represents and warrants that Exhibit D-2 accurately depicts the dimensions and appearance of the exterior elevations of the Power Center.

22

ARTICLE 9
REPAIRS

Section 9.1    Tenant's Repairs.  Subject to the provisions of Articles 10 and 11 hereof, and except as otherwise provided in Section 9.2 below, Tenant shall maintain in good condition and repair, at its sole cost and expense: (i) the non-structural, interior elements of the Premises (including plate glass, and the electrical, plumbing, mechanical and/or alarm systems located in, or serving exclusively, the Premises); (ii) the heating, ventilation and air conditioning ("*HVAC*") units exclusively serving the Premises; and (iii) the improvements which constitute Tenant's Work.  All repairs and replacements on Tenant's part to be performed hereunder shall be at Tenant's sole cost and expense, and performed in a good and workmanlike manner in accordance with all applicable Legal Requirements.

Section 9.2    Landlord's Repairs.  Subject to the provisions of Articles 10 and 11 hereof, Landlord shall perform, as the same shall from time to time be necessary, all repairs and replacements to the following:

(a)    the buildings of the Shopping Center as necessary to maintain same in good condition and repair including, without limitation, repainting the exterior walls of the buildings of the Shopping Center (including, without limitation, the Premises) as same may be reasonably required from time to time during the Term;

(b)    the structural elements of the Premises, which shall be deemed to include, without limitation, the roof joists, columns, footings, foundation, exterior walls (including, without limitation, repainting, but excluding plate glass, storefront windows, doors, door closure devices, window and door frames, molding, locks and hardware, and painting or other treatment of interior walls), floor (but not the floor covering, unless the same is damaged as a result of a floor defect or settling), and the structural elements of any building of which the Premises may be a part;

(c)    the roof, gutters, flashings, downspouts and scuppers;

(d)    the electric, gas, water, sanitary sewer, and other public utility lines serving the Premises, to the point of connection to the Premises;

(e)    all electric, gas, water, sanitary sewer, and other public utility lines and ducts in or passing through the Premises which do not exclusively serve the Premises; and

(f)    the non-structural elements of the Premises (including, without limitation, the HVAC units and the electrical, plumbing, mechanical, and/or fire alarm systems located in or serving the Premises) until the first (1st) anniversary of the Delivery Date, and thereafter for such period of time and to the extent any such non-structural elements are covered by any contractors', manufacturers', vendors', or insurers' warranties or guarantees; and

(g)    any damage to the Premises or the Shopping Center which is occasioned by (A) the act or omission of Landlord, its employees, agents or contractors, or (B) any breach by Landlord of any provision of this Lease.

All repairs and replacements on Landlord's part to be performed hereunder shall be at Landlord's sole cost and expense, performed in a good and workmanlike manner in accordance with all applicable Legal Requirements, and without material interference with or disruption to the normal conduct of any business operations in the Premises.  Landlord shall give Tenant at least five (5) days' prior notice of any repairs or replacements to, or which would otherwise affect the normal conduct of any business operations in, the Premises (except in the case of an emergency posing imminent risk of material harm to persons or property, in which event Landlord shall only be required to give such notice as is reasonable under the circumstances).  If, in Tenant's reasonable judgment, Landlord's repairs would materially interfere with or disrupt the normal conduct of any business operations in the Premises, Landlord shall perform such repairs only after the regular hours of operation of Tenant and any other occupant of the Premises (or any portion thereof), and Landlord shall reimburse Tenant for the reasonable costs and expenses incurred by Tenant in connection with such "after hours" repairs, including, without limitation, utilities charges and security expenses.  In the event Landlord does not reimburse Tenant for any amounts payable to Tenant hereunder within ten (10) days after Tenant's demand therefor, Tenant shall have the right (in addition to any rights and remedies to which it may be entitled

23

under this Lease, at law, or in equity) to offset such amounts against Rent, together with interest thereon at the Lease Interest Rate from the date of outlay until reimbursement or full satisfaction by credit in the manner and subject to all the provisions set forth in Section 16.2 below.

Section 9.3   Legal Compliance Work. Except as hereinafter expressly provided, Landlord shall be responsible, at its sole cost and expense, for performing all "Legal Compliance Work" (hereinafter defined). Notwithstanding the foregoing, Tenant shall be responsible, at its sole cost and expense, for the performance of Legal Compliance Work: (a) pertaining to the interior elements of the Premises which are neither structural nor comprise the major building systems serving the Premises; or (b) required solely as a result of Tenant's specific manner of use of the Premises (*i.e.*, are not of general applicability to tenants and occupants of the Shopping Center); provided, however, that the foregoing shall not relieve Landlord of its obligations to perform: (x) Landlord's Work in accordance with all Legal Requirements, and (y) the repairs required in this Lease. As used herein, ***"Legal Compliance Work"*** shall mean any obligation, addition, alteration, improvement, or rebuilding, structural or otherwise, to or of the Premises, the Shopping Center, or any part thereof, as applicable, which may be required by reason of any Legal Requirement.

## ARTICLE 10
## INDEMNIFICATION, INSURANCE AND WAIVER OF SUBROGATION

Section 10.1   Mutual Release, Waiver of Subrogation and Mutual Indemnification.

10.1.1 Mutual Waiver of Claims. Landlord and Tenant, on their own behalf and on behalf of anyone claiming under or through either one by way of subrogation, hereby release and waive all rights of recovery and causes of action against each other from any and all liability for any loss or damage to property or resulting from damage to such property (and, in either case, any resulting loss of business or rental income), whether caused by the negligence or fault of the other party, which is normally insured under Special Form property insurance (formerly known as "All-Risk") and time element insurance required to be maintained hereunder. In the event either Landlord or Tenant is a self-insurer or maintains a deductible (as either may be permitted hereunder), then the self-insuring party or the party maintaining the deductible hereby releases the other party from any liability arising from any event which would have been covered had the required insurance been obtained and/or the deductible not been maintained.

10.1.2 Waiver of Subrogation. Landlord and Tenant shall cause each property insurance policy carried by either of them insuring the Premises, the contents thereof, or the Shopping Center, to provide that the insurer waives all rights of recovery by way of subrogation or otherwise against the other party hereto in connection with any loss or damage which is covered by such policy or that such policy shall otherwise permit, and shall not be voided by the releases provided above.

10.1.3 Mutual Indemnification.

(a)     Except as otherwise provided in Subsections 10.1.1 and 10.1.2 above, Tenant covenants to defend and indemnify Landlord and hold Landlord harmless from and against any and all claims, actions, damages, liability and expense, including reasonable attorneys' fees, (x) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon the Premises, or any part thereof, or (y) occasioned wholly or in part by any act or omission of Tenant, its agents, contractors, employees, servants, sublessees, concessionaires or licensees, except to the extent such claims, actions, damages, liability and expense are caused by the acts or omissions of Landlord, its agents, contractors, licensees, employees, or other tenants and occupants, or for which any of said parties may be statutorily liable.

(b)     Except as otherwise provided in Subsections 10.1.1 and 10.1.2 above, Landlord covenants to defend and indemnify Tenant and hold Tenant harmless from and against any and all claims, actions, damages, liability and expense, including reasonable attorneys' fees, (x) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon any portion(s) of the Shopping Center (excluding the Premises), or (y) occasioned wholly or in part by any act or omission of Landlord, its agents, contractors, employees, servants, tenants (other than Tenant), occupants or licensees, except to the extent such claims, actions, damages, liability and expense are caused by the acts or

24

omissions of Tenant, its agents, contractors, licensees, sublessees, concessionaires or employees, or for which any of said parties may be statutorily liable.

10.1.4 Exclusion. Anything contained in this Section 10.1 to the contrary notwithstanding, Landlord and Tenant agree that in the event there is any damage to Tenant's Property resulting from water infiltration from the roof of the Premises or any component thereof (excluding water infiltration caused by Tenant or its contractors), then Landlord will reimburse Tenant for the costs thereof. Landlord shall pay such reimbursement to Tenant within thirty (30) days after receipt of an invoice documenting such costs, failing which Tenant may offset such costs against the next installment(s) of Rent without the need for any further notice to Landlord.

Section 10.2    Tenant's Insurance.

10.2.1 Tenant's Insurance. Tenant, at its own cost and expense, shall maintain in full force and effect from and after the Delivery Date and throughout the Term: (i) commercial general liability insurance protecting and insuring Tenant, naming Landlord as "additional insured-lessor" for claims arising out of the use or occupancy of the Premises by Tenant and the obligations assumed by Tenant under this Lease, and having a combined single limit of liability of not less than ███████████████████ for bodily injury, death and property damage liability; and (ii) Special Form (formerly known as "All-Risk") property insurance, on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of all of Tenant's Property. Tenant may carry any of its insurance under "blanket policies" covering the Premises and other locations it or any Affiliate of Tenant owns or leases, provided that: (i) the amount of the total insurance available shall be at least the protection equivalent to separate policies in the amounts herein required, and (ii) in all other respects, any such policy or policies shall comply with the applicable provisions of this Article 10.

10.2.2 Self-Insurance. All insurance required to be maintained under this Section 10.2 may be provided under: (i) an individual policy covering this location; (ii) a blanket policy or policies which includes other liabilities, properties and locations of Tenant or its Affiliates; (iii) a plan of self-insurance, provided that Tenant or any guarantor of Tenant's obligations under this Lease maintains, during the period of such self-insurance, a net worth of at least ███ ███████████████████████ or (iv) a combination of any of the foregoing insurance programs. To the extent any deductible is permitted or allowed as a part of any insurance policy carried by Tenant in compliance with this Section 10.2, then Tenant shall be deemed to be covering the amount thereof under an informal plan of self-insurance; provided, however, that in no event shall any deductible exceed ███████████████████████████████ unless Tenant complies with the requirements regarding self-insurance pursuant to clause (iii) above.

Section 10.3    Landlord's Insurance.

10.3.1 Liability Insurance. Landlord shall maintain in full force and effect on and after the Effective Date and throughout the Term commercial general liability insurance with regard to the Common Areas protecting and insuring Landlord, naming Tenant as "additional insured-lessee", and having a combined single limit of liability of not less than ███████ ██████████████████ for bodily injury, death and property damage liability. Landlord shall have the right to carry its insurance under "blanket policies" covering the Shopping Center and other properties provided that: (i) the amount of the total insurance available shall be at least the protection equivalent to separate policies in the amounts herein required, and (ii) in all other respects, any such policy or policies shall comply with the applicable provisions of this Article 10.

10.3.2 Special Form Property Insurance. Landlord shall procure and maintain in full force and effect on and after the Effective Date and throughout the Term, Special Form (formerly known as "All-Risk") property insurance (including loss of rents for a minimum period of one (1) year) and endorsements for coverages for flood, earthquake, windstorm, earth movement [sinkholes], demolition, increased cost of construction and contingent operation of building laws coverages, on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of all of the buildings (including the Premises) and other insurable improvements in the Shopping Center including Landlord's Work; provided, however, in no event shall such insurance cover Tenant's Property. All policies required to be maintained by Landlord pursuant to this Subsection 10.3.2 shall provide that any proceeds thereof shall be deposited with Landlord's Mortgagee, or if none, to Landlord, in either event to be held in trust by such party and disbursed only in accordance with the provisions of, and for the purposes set

25

forth in, Section 11.1 hereof. The property insurance required to be maintained by Landlord pursuant to this Section shall not have deductibles exceeding ███████████████ ████ ████████ without Tenant's prior consent.

10.3.3 <u>Tenant's Share of Landlord's Insurance Premiums</u>. Except for Tenant's payment of its Pro Rata Share of Common Areas Charges for the first full calendar year, Landlord and Tenant agree that Tenant shall not be required to pay to Landlord or reimburse Landlord for, any of Landlord's insurance premiums maintained by Landlord pursuant to Section 10.3, it being agreed that such payment is included in Tenant's Fixed Share of Common Areas Charges.

Section 10.4    <u>General Insurance Requirements</u>.

10.4.1  All insurance required to be maintained by the parties under this Lease shall be maintained with insurance companies qualified to do business in the state in which the Shopping Center is located, and rated at least A-/VIII by the most current Best's Key Rating Guide (or its equivalent, if such Guide ceases to be published). Each party shall use its diligent efforts to have its insurers provide thirty (30) days [ten (10) days in the event of non-payment of premium] prior notice to the other party of cancellation or non-renewal of any policy required hereunder. Each party shall provide to the other duly executed certificates evidencing the insurance coverage described in Sections 10.2.1(ii) and 10.3 above.

10.4.2  The liability insurance requirements under Sections 10.2 and 10.3 above shall be reviewed by Landlord and Tenant every five (5) years for the purpose of mutually increasing (in consultation with their respective insurance advisors) the minimum limits of such insurance to limits which shall be reasonable and customary for similar facilities of like size and operation in accordance with generally accepted insurance industry standards. The replacement value of the buildings and other insurable improvements constituting the Shopping Center shall be re-evaluated from time to time at the request of either Landlord or Tenant.

<div align="center">

ARTICLE 11
FIRE AND OTHER CASUALTY; EMINENT DOMAIN

</div>

Section 11.1    <u>Fire and Other Casualty</u>.

11.1.1 (a)      Except as otherwise provided in this Section 11.1.1, if all or a portion of the Premises, the Common Areas or other buildings, including all improvements thereto, in the Shopping Center shall be damaged by fire or other casualty, Landlord shall promptly (x) rebuild and restore the Premises and the Common Areas to the condition existing immediately prior to such fire or other casualty (which restoration shall not include Tenant's Property), and (y) rebuild and restore all buildings and improvements located within the *"Primary Restoration Area"* (as designated on <u>Exhibit B</u> hereto) to substantially the condition in which same existed immediately prior to such fire or other casualty so that same shall be occupied or ready for occupancy following reconstruction (all of the foregoing work is hereinafter referred to as the *"Primary Restoration"*). With respect to buildings or improvements within the Shopping Center which are damaged by fire or other casualty but which are not required to be restored by Landlord as part of the Primary Restoration, Landlord shall promptly either (aa) rebuild and restore all or portions of the same to substantially the condition in which they existed immediately prior to such fire or other casualty, or (bb) raze the remaining portions of such buildings or improvements not rebuilt, remove all debris resulting therefrom, and pave such areas for parking or landscape such areas in a sightly manner (all of the foregoing work is hereinafter referred to as the *"Secondary Restoration"*). The proceeds of the policies required to be obtained and maintained by Landlord pursuant to Section 10.3 hereof shall, to the extent necessary, be used for the performance of the Primary Restoration and the Secondary Restoration (it being agreed that subject to the provisions of this Lease, such proceeds delivered to Landlord's Mortgagee may be disbursed in accordance with such Mortgagee's commercially reasonable disbursement requirements); in the event such insurance proceeds are insufficient to complete such work, Landlord shall provide the balance of the amount necessary to rebuild or restore the Shopping Center in the manner provided in this Section

(b)      Notwithstanding the foregoing, if any portion of the Premises are so damaged or destroyed, Tenant shall have the right to require Landlord to make changes to the Premises in the course of, and as part of, such rebuilding or restoration work. If the net cost and expense of such rebuilding or restoration work is increased solely as a result of such changes

<div align="center">26</div>

(taking into consideration any and all actual reduced and additional costs resulting from such changes and/or other cost savings arising therefrom), then Tenant shall pay to Landlord, as Additional Rent, the amount of such net increase, which amount shall be due and payable within ▆▆▆▆▆▆▆ after Landlord has delivered to Tenant backup information evidencing such increase (including, without limitation, receipted invoices) as may be reasonably required by Tenant (but in no event earlier than the occurrence of the date on which possession of the restored areas of the Premises are delivered to Tenant).  To the extent that Landlord's substantial completion of such rebuilding or restoration work is delayed solely as a result of such changes (taking into consideration any and all reasonable time savings to Landlord resulting from such changes), then the applicable period(s) specified in Section 11.1.2 below shall be appropriately adjusted to the extent of such net delay.

   (c) If, in Tenant's reasonable judgment, any damage to the Premises renders all or any portion of the Premises unusable for the conduct of Tenant's business or, in the case of damage to the Shopping Center, materially interferes with the normal conduct of any business operations in the Premises, the Rent shall be equitably reduced or totally abated based upon the extent to which the remaining portion of the Premises may, in Tenant's reasonable judgment, be utilized for its normal conduct of business.

  11.1.2  In the event that:

   (a) Landlord does not commence the repair and restoration work to the Premises, the Common Areas or other buildings and improvements in the Primary Restoration Area as required pursuant to this Section 11.1 within ▆▆▆▆▆▆▆ ▆▆▆▆▆▆ after the date of such destruction, or thereafter fails to diligently pursue the completion of such repair and restoration work (subject to such period as may be reasonably necessary for the adjustment of insurance proceeds, not to exceed thirty (30) days in the aggregate); or

   (b) the required repairs and restorations to the Premises, the Common Areas or other buildings and improvements in the Primary Restoration Area are not Substantially Completed by Landlord in accordance with the provisions of this Section 11.1 within ▆▆▆▆▆▆ after the date of the commencement of the work (which period may be extended by reason of an event of *Force Majeure*, not to exceed ninety (90) days in the aggregate, provided that Landlord shall have given Tenant notice thereof promptly after its occurrence),

then, in either of such events, Tenant shall have the right, at its sole discretion and option, to:

   (i) after giving ▆▆▆▆▆▆▆▆ prior notice to Landlord (and Landlord's continued failure to commence and diligently pursue such repairs and restoration work to completion), perform or complete, as the case may be, said work (or any portion thereof) on Landlord's behalf and at the sole cost of Landlord, which cost Landlord shall pay to Tenant during the course of such repairs within ▆▆▆▆▆▆ after Tenant's delivery to Landlord of an invoice therefor and, in default of any such payment, Tenant shall have the right to offset the amount thereof, together with interest at the Lease Interest Rate, against the Rent next accruing hereunder in the manner and subject to all the provisions set forth in Section 16.2 below (it being agreed, without limiting the foregoing provisions of this Subsection 11.1.2, that at Tenant's election all insurance proceeds paid or payable to Landlord or Landlord's Mortgagee pursuant to Subsection 10.3 hereof shall be paid (or, as applicable, in turn delivered) directly to Tenant, to be applied to such work by Tenant as same is being performed); or

   (ii) seek to obtain specific performance of Landlord's repair and restoration obligations pursuant to the laws of the state in which the Shopping Center is located; or

   (iii) terminate this Lease by ▆▆▆▆▆▆ notice to Landlord.

In addition to the foregoing, if, in the opinion of an independent licensed architect designated by Tenant (and reasonably acceptable to Landlord), the required repairs and restorations to the Premises, the Common Areas or other buildings and improvements in the Primary Restoration Area cannot be completed by Landlord in accordance with the provisions of this Section 11.1

27

within █████ ███ after the date of destruction, Tenant shall have the right, at its sole discretion and option, to terminate this Lease by giving Landlord at least ██████████ notice thereof.

       **11.1.3** If the Premises are substantially destroyed by fire or other casualty during the last ████████ of the Term to the extent of more than █████████ of the Floor Area thereof, Landlord or Tenant shall each have the right to terminate this Lease as of the date of such damage or destruction by giving notice within ███████████ following such damage or destruction, but Tenant may negate any termination by Landlord by agreeing to extend the Term for an additional ███████ period by exercising an option pursuant to Subsection 2.2.2 hereof, if available, within ██████████ after receipt of the termination notice from Landlord.

       **Section 11.2**   Eminent Domain.

       **11.2.1** As used in this Section 11.2, *"Taking"* or *"Taken"* shall mean a taking for any public or quasi-public use by any lawful power or authority by exercise of the right of condemnation or eminent domain or by agreement between Landlord and those having the authority to exercise such right.

       **11.2.2** If all of the Premises shall be Taken, this Lease shall terminate as of the date of vesting of title or transfer of possession, whichever is earlier, without further liability on the part of either Landlord or Tenant, except for an adjustment between the parties for the Rent payable by Tenant hereunder.

       **11.2.3** In the event that:

          (a)   any portion of the Premises shall be Taken so that it is commercially unreasonable or unfeasible for Tenant, in its reasonable judgment, to conduct its normal business in the Premises;

          (b)   as a consequence of any Taking: (i) portions of the Shopping Center shall be divided or separated in any manner that it materially interferes with parking, visibility, or access to the Premises from other portions of the Shopping Center, or (ii) the Shopping Center no longer has an entrance from 45 Street and Bellview Road, where shown on Exhibit B, and as a result, in either case, it is not commercially reasonable or feasible for Tenant, in its reasonable judgment, to conduct its normal business in the Premises;

          (c)   there occurs, in Tenant's reasonable judgment, a denial of adequate access to the Shopping Center at the grade of any street adjoining the Shopping Center or to any easement granted under this Lease, whether or not a Taking shall have occurred;

          (d)   any portion of the Shopping Center shall be Taken which materially interferes with parking, visibility or access to the Premises, and as a result of such taking it is commercially unreasonable or unfeasible for Tenant, in its reasonable judgment, to conduct its normal business in the Premises;

          (e)   more ██████████████████ of the total Floor Area of all of the buildings in the Shopping Center (other than the Premises) are Taken; or

          (f)   ████████████████████████ ████ located in the Common Areas are Taken, or if so many of the parking spaces in the Shopping Center are Taken such that there are fewer than (███████████████████████ ███████ █████████ Floor Area in the Shopping Center, or (ii) the number of parking spaces required by applicable Legal Requirements;

then, in any of such events, Tenant shall have the right to terminate this Lease by giving at least ████████████ prior notice to Landlord within ███ ████████ of any such event, in which event this Lease shall terminate without any further liability on the part of either Landlord or Tenant, except for an adjustment between the parties as of the date of the Taking for any prepaid or accrued Rent or other amounts due hereunder by one party to the other and for payment to Tenant for its share of the award for the taking pursuant to Subsection 11.2.5 below. Upon any partial Taking of the Premises, the Rent shall be equitably reduced or totally abated based upon the extent to which the remaining portion of the Premises may, in Tenant's reasonable judgment, be utilized for its normal conduct of business.

28

11.2.4  If this Lease is not terminated pursuant to this Section 11.2, Landlord, at its sole cost and expense, within a reasonable period of time after such Taking, shall repair and restore the area not so Taken to tenantable condition, similar in physical appearance to the condition of the area immediately prior to the Taking, pursuant to plans and specifications approved by Tenant (which repair and restoration shall, as applicable, include all Tenant's Work and all other leasehold improvements performed by Tenant; provided, however, that Landlord shall not be obligated to repair or restore Tenant's Property), and any and all amounts awarded to Landlord for any Taking shall be made available to and used by Landlord for any rebuilding or restoration which it is required to perform hereunder. During the period of such repairs and restoration, all Rent shall equitably be reduced or abated to the extent that the Premises may not, in Tenant's reasonable judgment, be used by Tenant for the normal conduct of its business.  Such reduction or abatement shall terminate in accordance with the terms of Section 11.3 below. Landlord shall give Tenant at ▮▮▮▮▮▮▮▮▮▮▮ prior notice of the date on which the restoration work to the Premises will be Substantially Completed.

11.2.5  In connection with any Taking or partial Taking of the Premises, Tenant shall be entitled to claim an award for loss of business, leasehold improvements, fixtures and equipment and removal and reinstallation costs; provided, however, that no award shall be payable to Tenant which reduces the award payable to Landlord for its fee interest in the Premises.

11.2.6  Any dispute between the parties with respect to this Section 11.2 shall be resolved by arbitration in accordance with the provisions of Section 16.3 below.

Section 11.3   Abatement of Rent Charges.  Notwithstanding any other provisions of this Lease, if the Fixed Rent and Additional Rent payable by Tenant hereunder shall be reduced or abated pursuant to Sections 11.1 or 11.2 above, such reduction or abatement shall terminate upon the first to occur of: (a) the date on which Tenant shall reopen the Premises to the general public for business; or (b) the expiration of the period which is ▮▮▮ ▮▮▮▮▮ after the date on which Landlord shall complete such repairs and restoration work as Landlord is obligated to perform hereunder.

## ARTICLE 12
## COVENANTS, REPRESENTATIONS AND WARRANTIES

Section 12.1   Quiet Enjoyment.  Tenant shall peaceably and quietly have, hold, occupy and enjoy the Premises for the Term, without hindrance from Landlord or any party claiming by, through, or under Landlord.

Section 12.2   Authority.  Tenant and Landlord each warrant and represent that the person(s) signing this Lease on their behalf has authority to enter into this Lease and to bind Tenant and Landlord, respectively, to the terms, covenants and conditions contained herein. The submission of this Lease to each party hereto shall be for examination and negotiation purposes only, and does not and shall not constitute a reservation of or an obligation of Tenant to lease, or otherwise create any interest of Tenant in, the Premises or any other premises situated in the Shopping Center unless and until the Lease is fully executed and delivered by Tenant and Landlord.

Section 12.3   Landlord's Covenants, Warranties and Representations.  To induce Tenant to execute this Lease, and in consideration thereof, Landlord covenants, warrants and represents to Tenant as follows:

(a)   As of the Effective Date, Landlord has, and as of the Delivery Date Landlord shall have, good and marketable fee simple title to the entire Shopping Center, free and clear of all easements, restrictions, liens, encumbrances, leases and the like, except for the encumbrances described on Exhibit E hereto;

(b)   In the event the legal description of the Shopping Center described in Exhibit A hereto indicates that the Shopping Center is composed of more than one parcel or lot, Landlord represents that there exist no strips or gores between such parcels or lots which are not owned by Landlord;

29

(c)     No third party consents or approvals are required in order for Landlord to enter into this Lease, or for the performance of Landlord's Work and Tenant's Work (excluding, as of the Effective Date, governmental permits and approvals);

(d)     Tenant's use of the Premises for sale of "Permitted Items" (defined in Section 1.1.27 above) will not violate any exclusive provision or prohibited use restriction granted to any other tenant or occupant in the Shopping Center;

(e)     The Shopping Center now has, and, on the Delivery Date, shall have, access to 45 Street and Bellview Road for the purpose of vehicular traffic;

(f)     This Lease does not violate the provisions of any instrument heretofore executed and/or binding on Landlord, or affecting or encumbering the Shopping Center, or the Premises, and no rights granted by Landlord to Tenant under the terms of this Lease conflict with any rights granted by Landlord to any tenant or occupant in the Shopping Center (including, without limitation, any rights of first offer or first refusal or the like);

(g)     There shall be no restrictions or other legal impediments imposed by any public or private instrument which would prevent: (i) the use of the Premises for the Permitted Use; (ii) the use of the parking facilities, access roads, and other Common Areas in the manner contemplated by this Lease; or (iii) the performance of Tenant's Work;

(h)     Attached hereto as Exhibit K-2 is a complete list of all fully executed and delivered leases and other occupancy agreements in effect on the Effective Date with respect to the Power Center (the *"Existing Leases"*) and Landlord represents to Tenant that with respect to the lease with Lifeway Christian Store, such lease provides that the tenant may use its premises as a Christian bookstore and for no other purpose (and Landlord agrees that in the event that the lease between Landlord and Lifeway Christian Store requires the consent of Landlord to (i) any assignment or subletting or to a change in the use of the premises and/or (ii) an expansion of the premises, in each case for the sale, rental, or distribution of the Exclusive Items (as defined in Section 13.2.1(I) hereof), Landlord shall withhold its consent thereto);

(i)     As of the Effective Date, there are no sign ordinances, restrictive covenants, uniform sign plans or other signage restrictions which would prevent the Premises from having the signage (including, without limitation, the square foot area and size of letters) as depicted on Exhibit D-1 and Exhibit F hereof;

(j)     As of the Effective Date, there is no "Related Land" (defined in 13.2.1 below) other than the Promenade; and

(k)     Landlord shall promptly forward to Tenant any notice or other communication received by Landlord from any owner of property adjoining or adjacent to the Shopping Center or from any municipal or other governmental authority, in connection with any hearing or other administrative proceeding relating to any proposed zoning, building code, signage, or related variance affecting the Shopping Center or any adjoining or adjacent property, which, if granted, could adversely affect Tenant's use or occupancy of the Premises, the conduct of Tenant's business therein, or Tenant's rights and benefits under this Lease. If requested by Tenant to do so, Landlord, at its sole cost and expense, shall appear in such proceeding and shall contest such proposed variance. If Landlord fails so to appear and contest such proposed variance after receiving five (5) days' prior notice from Tenant, then Tenant shall be entitled (but shall not be obligated to), in its own name and/or in the name of Landlord (if required by the governmental authority in question), appear in such proceeding, in which event Landlord shall fully cooperate with Tenant, provide such information, and execute any documents or other instruments as Tenant may reasonably request in connection with any such proceeding.

Section 12.4   Environmental Matters.

12.4.1   Definitions.

(a)     As used herein, the term *"Environmental Laws"* shall mean any and all Legal Requirements concerning the protection of the environment, human health or safety.

(b)     As used herein, the term *"Hazardous Substances"* shall mean each and every element, compound, material, mixture, substance, waste, hazardous substance, hazardous waste, hazardous material, toxic substance, pollutant or contaminant either as those terms are defined in any of the Environmental Laws or the presence of which may cause liability

30

at common law, including, without limitation, asbestos and/or asbestos-containing products, whether or not currently friable.

(c)     As used herein, the term *"Environmental Notice"* shall mean a summons, citation, directive, order, claim, notice, litigation, investigation, judgment, legal pleading, letter or other communication, written or oral, actual or threatened, from the United States Environmental Protection Agency or other federal, state or local governmental agency or authority, or any other private individual or entity concerning (i) any Hazardous Substances at, on, in, under or emanating from the Premises, the Shopping Center or any contiguous property; (ii) any violation or potential violation of Environmental Laws at the Premises, the Shopping Center or any contiguous property; or (iii) any underground storage tanks on the Premises or the Shopping Center.

(d)     As used herein, the term *"Releasing"* or *"Release"* shall mean releasing, spilling, leaking, discharging, disposing or dumping or otherwise introducing any substance into the environment or into any building or other improvements in violation of Environmental Laws.

(e)     As used herein, the term *"Compliance Costs"* shall mean any and all costs incurred by a party in complying with applicable Environmental Laws, including, without limitation, consultant's and engineer's fees; laboratory costs; contractor's and subcontractor's fees; application and filing fees; costs of investigation, monitoring or cleanup of soil or other substrate, surface water, groundwater, or buildings or other improvements; equipment costs; disposal fees; costs of operation and maintenance of equipment; legal fees; other governmental fees or costs; interest at the Lease Interest Rate from the date of expenditure until paid in full; and other similar or related costs.

(f)     As used herein, the term *"Tenant Related Parties"* shall mean Tenant's agents, servants, employees, contractors, sublessees, concessionaires or licensees.

12.4.2  Compliance with Environmental Laws.  Tenant shall comply with all applicable requirements of Environmental Laws governing its use of, and operations at, the Shopping Center and the Premises. Landlord shall comply with all applicable requirements of Environmental Laws relating to the Shopping Center and the Premises, except to the extent such requirements arise from Tenant's operations thereon or repairs which are Tenant's obligations under this Lease. Tenant shall comply with such requirements with respect to the foregoing excepted items.

12.4.3  Responsibility for Releases of Hazardous Substances.  Notwithstanding any other provision of this Lease, Tenant shall only be liable for any Release of Hazardous Substances at, on, in, under or emanating from the Premises or Shopping Center which were caused by Tenant or Tenant Related Parties (hereinafter *"Tenant Releases"*), including, without limitation, any Compliance Costs required to address Tenant Releases. Landlord shall be liable for any Hazardous Substances at, on, in, under or emanating from the Premises or Shopping Center, including, without limitation, any Compliance Costs attributable to such Hazardous Substances, unless the Hazardous Substances are caused by Tenant Releases. Except in the event of an emergency, any work performed by Landlord relating to Hazardous Substances shall be performed by Landlord at any time other than during the months of August, November and December, and shall be undertaken in such a manner so as to (i) not adversely affect ingress to or egress from the Shopping Center, (ii) have no adverse effect on the visibility of the Premises or any signs which contain Tenant's name, and (iii) not otherwise materially interfere with the normal conduct of any business operations in the Premises.

12.4.4  Standards.  Except as expressly provided herein, the parties agree that any investigation or remediation of Hazardous Substances, or cure of a violation of Environmental Laws, required to be conducted at the Premises or Shopping Center shall be no more stringent than necessary to meet the minimum standards of Environmental Laws applicable to properties used in the manner the Shopping Center is being used.

12.4.5  Landlord's Representations and Warranties.  Landlord represents and warrants that: (i) Landlord has received no Environmental Notices concerning the Shopping Center, the Premises or any contiguous properties; (ii) Landlord has no knowledge of, and has received no notice of, any violation, or potential or alleged violation, of any Legal Requirement, including, without limitation, Environmental Laws, affecting the Shopping Center, the Premises

31

or any contiguous properties, regardless of whether same has been cured; and (iii) to the best of Landlord's knowledge: (A) no Hazardous Substances are located at, on, in, under or emanating from the Shopping Center, the Premises or any contiguous properties; and (B) no underground storage tank exists at the Shopping Center or the Premises. The foregoing representations and warranties shall in no way serve to vitiate Landlord's obligations under this Article 12.

12.4.6 <u>Documents</u>. Each party shall immediately notify the other party of the notifying party's receipt of an Environmental Notice.

12.4.7 <u>Indemnity</u>. Each party to this Lease shall indemnify, defend and hold the other party, and its agents, servants, shareholders, directors, officers, partners, members and employees harmless from any and all claims, losses, expenses, costs, lawsuits, actions, administrative proceedings, damage, orders, judgments, penalties and liabilities of any nature whatsoever, including, without limitation, reasonable attorneys' fees (incurred to enforce this indemnity or for any other purpose) and Compliance Costs, arising from (i) the indemnifying party's breach of any of its representations, warranties, covenants or other obligations under this Section 12.4; (ii) Hazardous Substances for which the indemnifying party is liable under this Section 12.4; or (iii) violations of Environmental Laws for which the indemnifying party is liable under this Section 12.4.

12.4.8 <u>Survival</u>. The obligations of the parties under this Section 12.4 shall survive the renewal, expiration, breach or earlier termination of this Lease.

12.4.9 <u>Conflict</u>. In the event of any conflict between the provisions of this Section 12.4 and any other provision of this Lease, the provisions of this Section 12.4 shall control.

Section 12.5   <u>OEA</u>.

12.5.1 As used in this Lease, the term *"OEA"* shall mean that certain Construction, Operation and Reciprocal Easement Agreement, dated May 16, 2006, as recorded on May 19, 2006 in Book 2006 at Page 129634 in the County of Benton, State of Arkansas, whose current parties are Rogers Retail L.L.C. and Dillard's Dollars, Inc.

12.5.2 Landlord covenants, represents and warrants to Tenant that: (i) the OEA has not been modified, amended or terminated; (ii) the OEA is currently in full force and effect; (iii) to its actual knowledge as of the date hereof, no default under the OEA exists beyond any applicable notice and cure period; and (iv) the OEA is, and shall remain, superior in lien to all mortgages and related liens affecting the Shopping Center and all other land which is encumbered by the OEA. Landlord and Tenant each acknowledge that this Lease is made and shall continue to be subject and subordinate to the OEA, as same may be modified, supplemented or amended, subject to the provisions of this Section 12.5. Subject to the provision of this Section 12.5, Tenant shall comply with the terms and conditions of the OEA, as same may be modified, supplemented or amended, to the extent same affects the Premises (it being agreed that Tenant shall not be obligated to expend any sums in connection with the compliance by Landlord of its obligations under the OEA).

12.5.3 Landlord shall, during the Term: (i) perform and observe all of the terms, covenants, provisions and conditions of the OEA on Landlord's part to be performed and observed; (ii) defend, indemnify and hold harmless Tenant from and against any and all claims, demands, causes of action, suits, damages, liabilities, and expenses of any nature arising out of or in connection with the enforcement of, or a claimed breach by, Landlord of any covenant, term, condition, or provision of the OEA; and (iii) diligently enforce, at its sole expense, the covenants, agreements, and obligations of the OEA to the extent necessary to prevent an adverse affect upon Tenant's rights under this Lease, Tenant's Work, Tenant's use and occupancy of the Premises or the conduct of Tenant's business therein.

12.5.4 Whenever, pursuant to the OEA, the consent or approval of Landlord shall be required by or requested, and such consent or approval could diminish the rights or increase the obligations of Tenant thereunder or under this Lease in any material respect, or could adversely affect Tenant's use or occupancy of the Premises in any material respect, or the conduct of Tenant's business therein, such consent or approval shall not be granted without the prior consent of Tenant, which consent may be withheld in its sole and absolute discretion.

32

12.5.5  Landlord shall, promptly upon receipt, forward to Tenant and Tenant's leasehold mortgagee (provided that Landlord has been given notice of the name and address of such leasehold mortgagee), if any, a copy of any and all notices and/or demands received by Landlord under or pursuant to the OEA, which relate to, or could adversely affect, Tenant's use or occupancy of the Premises, the conduct of Tenant's business therein, or Tenant's rights pursuant to this Lease.

12.5.6  Landlord shall not amend, or modify the OEA if such amendment or modification could diminish the rights or increase the obligations of Tenant thereunder or under this Lease in any material respect, or could adversely affect Tenant's use or occupancy of the Premises in any material respect or the conduct of Tenant's business therein, nor shall Landlord terminate the OEA.

12.5.7  In the event Landlord defaults in the performance of any of its obligations under the OEA or fails to enforce the obligations of any other obligee under the OEA, and such default or failure to enforce could adversely affect Tenant's rights thereunder or under this Lease, Tenant's Work, Tenant's use or occupancy of the Premises or the conduct of Tenant's business therein, Tenant may, but shall not be obligated to, after thirty (30) days written notice (except in the event of emergency, in which case no notice shall be required) cure any default by Landlord under the OEA and/or enforce, in Landlord's name, at Landlord's expense, the obligations of any other obligee under the OEA.  Landlord shall, upon demand, reimburse Tenant for the costs incurred by Tenant in performing any of Landlord's obligations under the OEA or enforcing the obligations of any obligee under the OEA, together with interest thereon at the Lease Interest Rate, and failing such reimbursement, Tenant shall have the right (in addition to any rights and remedies to which it may be entitled under this Lease, at law, or in equity), upon ten (10) days' prior notice to Landlord, to offset such costs from the next succeeding payment or payments of any Rent due hereunder, together with interest thereon at the Lease Interest Rate from the date of outlay until reimbursement or full satisfaction by credit.

12.5.8  As between Landlord and Tenant, in the event of any conflict between either of the OEA and this Lease, this Lease shall in all respects control.

12.5.9  Landlord represents to Tenant that Landlord has obtained third-party approvals, if any, which may be required under the OEA for the performance of Landlord's Work (including, without limitation, Tenant's elevations and signage, as shown on Exhibit D-1 and Exhibit F hereto), and the operation of Tenant's business in the Premises.

ARTICLE 13
USES AND RESTRICTIONS

Section 13.1    Permitted and Prohibited Uses.

13.1.1  Tenant's Permitted Use.  The Premises may be used and occupied for the Permitted Use (defined in Subsection 1.1.27 above).  Tenant shall not use the Premises (a) for any of the "Prohibited Uses" (defined in Exhibit L hereto) or (b) in violation of any of the "Existing Exclusives" (hereinafter defined in Subsection 13.3.1), to the extent then applicable.

13.1.2  Prohibited Uses.  Landlord shall construct, lease, operate, maintain and manage the Shopping Center as a first-class shopping center comparable to other first-class shopping centers in the state in which the Shopping Center is located.  Landlord shall not lease, rent or occupy or permit any portion of the Power Center to be occupied (except to the extent otherwise permitted under any lease for space in the Power Center existing as of the Effective Date or otherwise permitted in Exhibit L) for any of the "Prohibited Uses" (defined in Exhibit L hereto annexed).

Section 13.2    Tenant's Exclusive in Center.  To induce Tenant to execute this Lease, and subject to all of the terms and provisions of this Section 13.2, Landlord covenants and agrees as follows.

13.2.1  (I)    Landlord shall not lease, rent or occupy or permit any other premises in the Power Center to be occupied, whether by a tenant, sublessee, assignee, licensee or other occupant or itself, for the sale, rental or distribution, either singly or in any combination, of items contained in any of the following respective categories of merchandise: (a) linens and domestics; (b) bathroom items (excluding plumbing hardware); (c) housewares (excluding

33

furniture, and major appliances or "white goods"); (d) frames and wall art (provided that a fine art gallery shall not be precluded); (e) window treatments; and/or (f) closet, shelving and storage items (which items, either singly or in any combination, are hereinafter referred to as the *"Exclusive Items"*). Notwithstanding the foregoing, (A) any tenant or subtenant in the Power Center shall have the right to utilize its respective premises for the incidental sale, rental and/or distribution of Exclusive Items within an aggregate area (which shall include an allocable portion of the aisle space adjacent to such sales, rental or distribution area) not to exceed the lesser of (x) ten percent (10%) of the Floor Area of such tenant's or subtenant's premises, or (y) two thousand (2,000) square feet of Floor Area within such tenant's or subtenant's premises (such lesser amount herein defined as the *"Incidental Sales Limitation"*). [For example only, a tenant occupying premises containing a total of five thousand (5,000) square feet of Floor Area could sell Exclusive Items (either singly or in any combination) so long as the aggregate area within its entire demised premises in which any and all Exclusive Items are sold shall not exceed five hundred (500) square feet.]

(II)    Subject to the rights of tenants in the Promenade under leases executed prior to the Effective Date, Landlord and Landlord's Affiliate (Rogers Retail LLC) shall not lease, rent or occupy or permit any other premises consisting of 10,000 square feet or more of Floor Area and located in the Promenade or on Related Land to be occupied, whether by a tenant, sublessee, assignee, licensee or other occupant or itself, as a store whose primary use is for the sale, rental or distribution, either singly or in any combination, of the Exclusive Items or is otherwise a "Direct Competitor" of Tenant. For purposes hereof, a *"Direct Competitor"* shall mean any retail operation that, as its primary use, sells goods and services that are substantially similar to all or substantially all of the Exclusive Items [such as, by way of illustration only, Linens 'n Things, TJ Maxx and More, Mega Marshalls and/or Home Goods]. As used herein, *"Related Land"* shall mean any land contiguous or adjacent to the Shopping Center (including, without limitation, any land that would be contiguous or adjacent to the Shopping Center but for any intervening road, street, alley or highway) now or hereafter owned or controlled by Landlord or its Affiliate(s). Existing tenants of the Promenade (and current or future assignees or sublessees of such tenants) shall nevertheless be subject to the restrictions contained in this Section 13.2.1 (II) in the event that: (i) the lease between Landlord or Landlord's Affiliate and any such existing tenant requires the consent of Landlord (or its Affiliate) to any assignment or subletting or to a change in the use of the applicable premises to permit the sale, rental or distribution of the Exclusive Items or (ii) Landlord or its Affiliate permits or agrees to an expansion of the applicable premises for the sale, rental, or distribution of the Exclusive Items and such expansion requires the consent of Landlord or its Affiliate.

13.2.2  The restrictions set forth in Subsection 13.2.1 above shall not apply to a full-line national or regional: (i) department store [for example, Dillards, Younkers, Wal-Mart, Macy's, or Target], (ii) discount club [for example, Costco, BJ's Wholesale Club, or Sam's Club], or (iii) home improvement center [for example, Home Depot or Lowe's], commonly located in first-class shopping centers in the state in which the Shopping Center is located, each occupying at least 65,000 square feet of Floor Area within the Shopping Center, as such stores are currently operated (as of the Effective Date). In addition, if Landlord enters into a lease for premises in the Shopping Center or Related Land with T.J. Maxx (but not Home Goods or T.J. Maxx & More or similar operations), Gordmans, Michaels, Ross Stores, or Steinmart within twelve (12) months of the Effective Date, then Tenant agrees, promptly following notice thereof from Landlord, to execute and deliver an agreement modifying the applicability of the provisions of Section 13.2.1 hereof with respect to such retailers, such agreement to be in the form, if any, then commonly used by Tenant with respect to such retailers.

13.2.3  The exclusive rights granted to Tenant in this Section 13.2 shall inure to the benefit of any assignee of Tenant's interest in this Lease and to any sublessee of at least fifty percent (50%) of the Floor Area of the Premises.

13.2.4  (a)    Upon breach of the aforesaid covenants and agreements by Landlord or Landlord's Affiliate (as the case may be)(which breach shall not include a situation in which the lease between Landlord or Landlord's Affiliate, as the case may be, and any tenant in the Shopping Center or in the Related Land prohibits the tenant therein from violating the exclusive rights granted to Tenant in this Section 13.2 and despite such prohibition, such tenant violates such exclusive rights, unless Landlord or Landlord's Affiliate fails to comply with any of the provisions of subparagraph (b) below), the Rent payable hereunder shall be reduced by ████████████ for so long as such violation shall continue, and Tenant shall have all remedies given to it at law and in equity, including, without limitation, the right to obtain injunctive relief, and/or to terminate this Lease, and/or to commence and prosecute an action against Landlord or Landlord's Affiliate or any other violator for damages.

34

(b)      If any person or entity other than Landlord or Landlord's Affiliate, as the case may be, shall violate any of the exclusive provisions herein set forth, or shall indicate in writing to Landlord or Landlord's Affiliate that it intends to violate any of said provisions, Landlord or Landlord's Affiliate, as the case may be, shall promptly commence appropriate legal proceedings, and vigorously prosecute the same, to enjoin and prohibit any such violation.  If Landlord or Landlord's Affiliate fails to promptly commence such proceedings, or shall fail thereafter to vigorously prosecute the same, then Tenant shall have the right (i) to conduct and prosecute such legal proceedings (including, without limitation, an action for injunctive relief) in its own name, at Landlord's or Landlord's Affiliate's expense, or (ii) in the event the right set forth in (i) above is not permitted to be exercised under applicable Legal Requirements, to conduct and prosecute such legal proceedings in the name of Landlord or Landlord's Affiliate, at Landlord's or Landlord's Affiliate's expense (as the case may be), and Landlord and/or Landlord's Affiliate (as the case may be) shall cooperate with Tenant with respect to such prosecution (including, without limitation, by executing any documentation or authorization reasonably required by Tenant in connection with such prosecution and by appearing at any hearing or trial with respect to such prosecution).

Section 13.3   Exclusives Which Tenant Must Honor.

13.3.1  Tenant shall honor only those exclusives granted by Landlord as set forth in Exhibit K-1 (hereinafter, *"Existing Exclusives"*) [a true and complete listing and description of such Existing Exclusives being attached hereto as Exhibit K-1], and shall not sublease, occupy or use all or any portion of the Premises, or permit all or any portion of the Premises to be occupied or used in violation of any such Existing Exclusive (except as may be specifically set forth on Exhibit K-1).  Landlord represents and warrants that no Existing Exclusive(s) exist other than those listed on Exhibit K-1 hereto and that Exhibit K-1 is true accurate and complete, and covenants to indemnify, defend and hold Tenant harmless from and against all loss, cost, liability or expense (including, without limitation, reasonable legal fees) incurred by Tenant by reason of the enforcement by any person or entity of such unlisted Existing Exclusive.  Notwithstanding the foregoing, (i) Tenant shall be entitled to enter into a separate agreement with any tenant or other occupant for whose benefit the Existing Exclusive is granted which nullifies or modifies the corresponding Existing Exclusive with regard to the Premises; and (ii) Tenant shall execute and deliver an agreement(s) in the form commonly used by Tenant as of the Effective Date of this Lease modifying the applicability of Tenant's exclusive relative to a retailer or retailers with whom Landlord enters into a lease at the Shopping Center within one (1) year after the Effective Date, provided Tenant has such an agreement with such retailer as of the Effective Date.

13.3.2  Except as expressly set forth in this Section 13.3, Tenant shall not be obligated to honor any exclusive granted by Landlord to any tenant in the Shopping Center.

ARTICLE 14
CONDUCT OF BUSINESS OPERATIONS

Subject to the other provisions of this Lease (including, without limitation, Articles 2 and 3 hereof) Tenant shall initially open its store for business to the public in the Premises as a typical Bed Bath & Beyond store for at least one (1) day, not later than the █████████████ after the Rent Commencement Date (which date shall, as applicable, be extended by reason of (A) damage or destruction, eminent domain proceedings or actions, or *Force Majeure*, or (B) the acts or omissions of Landlord).  Other than as expressly set forth in the preceding sentence, Tenant shall have no obligation to open or operate any business in the Premises, and shall have the right, at any time, to cease to conduct any business operations in the Premises, and Tenant shall incur no liability to Landlord or its Mortgagee by reason thereof (it being understood and agreed that all of Tenant's obligations under this Lease shall continue unless this Lease is terminated pursuant, *inter alia*, to the further provisions of this Article 14 or any other provision of this Lease [other than by reason of an Event of Default]).  In the event Tenant does not operate or cause to be operated any retail business in the Premises (other than prior to the Rent Commencement Date or during Excused Periods) for more than █████████████████ ████████████████ Landlord shall have the option to terminate this Lease, which option shall be exercisable by

(A)      giving notice thereof to Tenant by not later than the ninetieth (█ ███████████ ████████████████████████████████████, and

(B)      paying to Tenant, within thirty (30) days after such notice is given, all of Tenant's costs and expenses incurred in connection with the preparation and review of plans and specifications for, and the then unamortized costs (amortized on a straight-line basis over the

35

Initial Term) of, any alterations or improvements made by Tenant and permitted under this Lease,

whereupon this Lease shall terminate upon the sixtieth (60th) day (the *"Recapture Date"*) after the date on which Tenant receives Landlord's termination notice, as if the Recapture Date was originally set forth herein as the expiration date of the Term. Upon such termination, Landlord and Tenant shall each be released from any and all liabilities thereafter accruing hereunder, except for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease. All Rent payable by Tenant hereunder shall be apportioned as of the Recapture Date and Tenant shall promptly pay to Landlord any amounts so determined to be due and owing by Tenant to Landlord, and conversely Landlord shall promptly reimburse Tenant for any amounts prepaid by Tenant for periods subsequent to the Recapture Date.

## ARTICLE 15
## TENANT ASSIGNMENT AND SUBLETTING

Section 15.1   Assignment and Subletting.

15.1.1  Tenant shall have the right from time to time, without the consent of Landlord, to assign Tenant's interest in this Lease and/or to sublet, concession or license all or any portion of the Premises for retail uses (other than in the Non-Sales Area), subject to all of the terms and conditions of this Lease including, without limitation, the provisions of Section 13.1.1 above.

15.1.2  Except with respect to any transaction covered under Subsection 15.1.3 or Section 15.3 below, in the event Tenant proposes to assign this Lease or sublet, in a single transaction, the whole of the Premises, it shall first give notice thereof (the *"Assignment/Subletting Notice"*) to Landlord, which notice shall specify the name and address of the proposed assignee or sublessee and the proposed use of the Premises to be made by such assignee or sublessee, together with a statement certified by Tenant of the amount of the then unamortized costs (amortized on a straight-line basis over the Initial Term) of any alterations performed by Tenant to the Premises. Thereafter, Landlord shall have the option to terminate this Lease, which option shall be exercisable by

(a)   giving notice to Tenant (the *"Termination Notice"*) thereof within thirty (30) days after receipt of an Assignment/Subletting Notice from Tenant, and

(b)   paying to Tenant, within thirty (30) days after such notice is given, an amount equal to the sum of all of Tenant's costs and expenses incurred in connection the preparation of plans and specifications for, and the then unamortized costs (amortized on a straight-line basis over the Initial Term) of, any alterations performed by Tenant to the Premises,

in which event this Lease shall automatically terminate on the ninetieth (90th) day (the *"Termination Date"*) after the date on which Tenant receives Landlord's Termination Notice, with the same force and effect as if the Termination Date had been designated as the expiration date of this Lease. Upon the Termination Date, Landlord and Tenant shall each be released from any and all liabilities thereafter accruing hereunder, except for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease. All Rent payable by Tenant hereunder shall be apportioned as of the Termination Date and Tenant shall promptly pay to Landlord any amounts so determined to be due and owing by Tenant to Landlord, and conversely Landlord shall promptly reimburse Tenant for any amounts prepaid by Tenant for periods subsequent to the Termination Date. Notwithstanding the foregoing, Tenant shall have the right to avoid Landlord's termination by giving notice to Landlord (the *"Rescission Notice"*), within ten (10) days after receiving the Termination Notice, of its rescission of the Assignment/Subletting Notice, whereupon Landlord's Termination Notice shall be rendered null and void, and Tenant shall not assign this Lease or sublet the whole of the Premises as proposed in its Assignment/Subletting Notice. If Landlord does not give the Termination Notice within the aforesaid 30-day period, Landlord shall conclusively be deemed to have waived its termination rights hereunder with respect to such proposed assignment or subletting transaction, and Tenant may assign this Lease or sublet the entire Premises in accordance with its Assignment/Subletting Notice. Landlord shall not be bound by any such assignment until it receives an assumption agreement in which the assignee expressly agrees,

36

effective upon the date of such assignment, to perform and be bound by all of the obligations of this Lease to performed by Tenant hereunder.

15.1.3  In addition to, and not in limitation of, Tenant's other rights set forth in this Section 15.1, Tenant shall have the right from time to time, without the consent of Landlord, to assign Tenant's interest in this Lease and/or to sublet or license all or any portion of the Premises: (a) to an Affiliate of Tenant; (b) to any entity which purchases all or substantially all of the assets of Tenant or any of its Affiliates; (c) to any entity which purchases Tenant's interest in at least five (5) stores owned or operated by Tenant or its Affiliate(s) in the State of Arkansas; (d) in conjunction with any merger, acquisition, consolidation or public offering of stock or other interests involving Tenant or its Affiliate(s); and/or (e) as may be required by any Legal Requirement.

Section 15.2   <u>Liability of Tenant</u>.  Unless otherwise agreed to in writing by Landlord, no assignment, subletting, licensing or concessioning by Tenant shall reduce, diminish, or otherwise affect the liability of Bed Bath & Beyond Inc. (the *"Original Tenant"*).

Section 15.3   <u>Collateral Assignment</u>.  In addition to Tenant's other rights set forth in this Article 15, a collateral assignment of Tenant's interest in this Lease by Tenant to one or more "Lenders" (hereinafter defined), as collateral security for an indebtedness or other obligation of Tenant or its Affiliates shall be permitted provided that Landlord is given notice of the name and address of such Lender. Landlord shall execute all documentation reasonably requested by Tenant or any such Lender in connection therewith. In addition, Tenant shall have the right, without Landlord's consent, to grant to an Affiliate of Tenant a license to operate all of Tenant's business operations at the Premises, without such Affiliate having assumed any liability for the performance of Tenant's obligations under this Lease. As used herein, *"Lender"* shall mean a state or federally regulated: bank, savings and loan association, insurance company, pension fund, credit union, real estate investment trust, or other institutional lender.

Section 15.4   <u>Cure Rights of Original Tenant</u>.

15.4.1  If Tenant assigns Tenant's interest in this Lease pursuant to the provisions of Section 15.1, then Landlord, when giving notice to said assignee or any subsequent assignee in respect of any default, shall also give a copy of such notice to the Original Tenant, and no notice of default shall be effective until a copy thereof is so given to Original Tenant. Original Tenant shall have the same period after receipt of such notice to cure such default as is given to Tenant therefor under this Lease.

15.4.2  If this Lease is terminated because of: (a) an Event of Default of such assignee, or (b) the rejection, disaffirmance, or other termination of this Lease by or on behalf of the assignee pursuant to any proceeding in bankruptcy under any Legal Requirement of any State or of the United States, or any other Legal Requirements affecting creditors' rights, <u>then</u> Landlord shall promptly give to Original Tenant notice thereof, and Original Tenant shall have the right, exercisable by notice given to Landlord within fifteen (15) days after receipt by Original Tenant of Landlord's notice, to enter into a new lease of the Premises with Landlord (*"New Lease"*), <u>provided</u> that the Original Tenant shall have remedied all Events of Default of the assignee hereunder, unless such Events of Default are not reasonably susceptible of cure by the Original Tenant, in which event the Original Tenant shall not be obligated to cure such Events of Default as a condition to the exercise of its rights under this Subsection 15.4.2. Upon the Original Tenant's curing of any such Event of Default of the assignee as aforesaid, Landlord shall assign to the Original Tenant all of Landlord's rights against such assignee (whether arising as a result of bankruptcy court proceedings or otherwise). The term of said New Lease shall begin on the date of termination of this Lease and shall continue for the remainder of the Term (including any Renewal Periods). Such New Lease shall otherwise contain the same terms and conditions as those set forth herein, except for requirements which are no longer applicable or have already been performed. It is the intention of the parties hereto that such New Lease shall have the same priority relative to other rights or interests in or to the Premises as this Lease. The provisions of this Subsection 15.4.2 shall survive the termination of this Lease and shall continue in full force and effect thereafter to the same extent as if this Subsection 15.4.2 were a separate and independent contract between Landlord and the Original Tenant. From the date on which the Original Tenant shall serve Landlord with the aforesaid notice of the exercise of its right to a New Lease, the Original Tenant shall have quiet and undisturbed use and enjoyment of the Premises and all appurtenances thereto, as contemplated in this Lease.

37

Section 15.5   Recognition Agreement.   In the event Tenant subleases at least fifty percent (50%) of the Floor Area in the Premises for a term of at least five (5) years, then, notwithstanding any other provisions of this Lease, Landlord shall, upon Tenant's request, execute and deliver an agreement among Landlord, Tenant and each such subtenant in the form of Exhibit H hereto, in recordable form.

<div align="center">

ARTICLE 16
DEFAULT AND DISPUTE RESOLUTION

</div>

Section 16.1   Tenant Default.

16.1.1   If Tenant shall fail to: (i) pay any Rent when due, within ten (10) days after its receipt of notice thereof from Landlord specifying the amount and details of the unpaid Rent, or (ii) perform or observe any of the other covenants of this Lease on Tenant's part to be performed or observed within thirty (30) days after its receipt of notice thereof from Landlord specifying the nature of such default (or, if such default shall be of a nature that same cannot reasonably be cured within thirty (30) days and Tenant does not commence to cure such default on or before such thirtieth (30th) day and thereafter diligently prosecute said cure to completion), such circumstance shall constitute an *"Event of Default"*.

16.1.2   Upon an Event of Default, Landlord shall have all remedies given to it at law or in equity (except that Landlord hereby expressly waives any rights to accelerate any element of the Rent, and any right of distraint, which may be granted to it by law), including the following:

(a)   to bring suit for the collection of such unpaid Rent or for the performance of such other covenant of this Lease on Tenant's part to be performed; and/or

(b)   without waiving any non-monetary default, may (but shall not be obligated to) perform any covenant which is capable of being remedied by the performance of affirmative acts for the account and at the reasonable expense of Tenant (it being agreed that should Landlord require access to the Premises in order to perform such covenant as aforesaid, Landlord shall comply with the applicable provisions of Sections 9.2 hereof), in which event, Tenant shall pay to Landlord on demand, as Additional Rent, the reasonable cost or amount thereof, together with interest thereon at the Lease Interest Rate from the date of outlay of expense until payment; and/or

(c)   upon at least five (5) days' notice to Tenant, to terminate this Lease, whereupon Landlord shall have and retain full right to sue for and collect all unpaid Rent which shall have accrued up to the date of termination and any damages to Landlord by reason of any such breach, and Tenant shall surrender and deliver the Premises to Landlord, failing which, Landlord shall have the right to initiate summary proceedings to recover possession; and/or

(d)   upon at least five (5) days' notice to Tenant to terminate Tenant's right of possession, re-enter the Premises and take possession thereof by lawful means. If Landlord shall so elect to repossess the Premises without terminating the Lease, then Tenant shall be liable for and shall pay to Landlord all Rent payable to Landlord pursuant to the terms of this Lease which shall have accrued up to the date of repossession, as well as all Rent as and when same shall become due and payable pursuant to the terms of this Lease during the remainder of the Term, diminished by any net sums thereafter received by Landlord through reletting the Premises during said period (after deducting reasonable expenses incurred by Landlord in connection with such reletting). In no event shall Tenant be entitled to any excess of any rent obtained by such reletting over and above the Rent herein reserved. Landlord may bring actions to collect amounts due by Tenant under this Lease, from time to time, prior to the expiration of the Term.

16.1.3   Upon an Event of Default, Tenant shall be liable for and shall pay to Landlord, in addition to any sum provided to be paid above, brokers' fees incurred by Landlord in connection with reletting the whole or any part of the Premises for the remainder of the then unexpired Term (excluding any then unexercised Renewal Periods), the costs of removing and storing Tenant's or other occupant's property; the cost of repairs; and all other commercially reasonable expenses incurred by Landlord in enforcing or defending Landlord's rights and/or remedies, including reasonable attorneys' fees.

<div align="center">

38

</div>

16.1.4 Upon an Event of Default, any amounts paid by Landlord to cure said Event of Default and any Rent payments not paid after notice thereof is given shall bear interest at the Lease Interest Rate from and after the expiration of any applicable grace period until paid.

16.1.5 Landlord shall use reasonable efforts to mitigate Landlord's damages to which Landlord would otherwise be entitled to as a result of an Event of Default. In no event shall Tenant be liable to Landlord for any consequential damages suffered by Landlord as a result of an Event of Default by, or any other act of, Tenant.

Section 16.2   Landlord Default. If Landlord shall: (i) fail to perform or observe any of the covenants of this Lease on Landlord's part to be performed or observed within thirty (30) days after receiving notice from Tenant thereof (or, if same cannot reasonably be cured within thirty (30) days, if Landlord shall fail to promptly commence and diligently prosecute said cure to completion), or (ii) materially breach any warranty or representation under this Lease (either of (i) or (ii) above being hereinafter referred to as a *"Landlord's Default"*), then Tenant, in addition to such other rights and remedies as may be available under this Lease, or at law or in equity, may, in its sole discretion:

(a)   as applicable, perform such obligation(s) of Landlord in accordance with the provisions of this Lease on behalf of, and at the expense of Landlord; and/or

(b)   bring suit for the collection of any amounts for which Landlord is in default, seek injunctive relief, or seek specific performance for any other covenant or agreement of Landlord, without terminating this Lease; and/or

(c)   may, if within thirty (30) days following written demand from Tenant, Landlord has failed to reimburse Tenant for amounts due to Tenant from Landlord under this Lease, offset against the Rent payable by Tenant hereunder for such amounts including, without limitation, amounts reasonably expended by Tenant for self-help, and including costs and reasonable attorneys' fees, as well as with interest thereon at the Lease Interest Rate; provided, however, that in no event shall such offset exceed ███████████████ of each successive installment of Rent payable by Tenant hereunder (except (A) Tenant shall, as applicable, be entitled to offset against larger percentages of each successive installment of Rent if the aforesaid ██████████████████ is insufficient to reimburse Tenant in full, taking into account the then remaining number of installments of Rent due and payable by Tenant hereunder, and (B) such twenty-five (25%) percent limitation shall not apply to (I) Tenant's right of reimbursement pursuant to Sections 2.3.2(b) or 3.3.2(ii), or (II) Tenant's rights of offset pursuant to Section 11.1.2(b)(i) above). Notwithstanding the foregoing, in no event shall Tenant have such right to offset if and to the extent Landlord provides written notice to Tenant within ten (10) days after Tenant's demand for payment that Landlord, in good faith, disputes such costs and Landlord, thereafter, within the next following twenty (20) days, initiates an arbitration proceeding pursuant to Section 16.3 below to resolve such dispute, but if in such arbitration proceeding it is determined that Tenant is entitled to all or a portion of its claim, Tenant may then offset the same with interest as aforesaid plus Tenant's attorneys' fees and expenses , provided it gives Landlord ten (10) days prior notice of its intention to offset, during which period Landlord may negate Tenant's right of offset by paying Tenant for the full amount due including all accrued interest to the date of such payment; and/or

(d)   may terminate this Lease, without waiving its rights to damages for Landlord's Default, provided that: (1) Landlord's Default materially interferes with the normal conduct of any business operations in the Premises, (2) Landlord's Default is not reasonably capable of being cured by Tenant, and  (3) Tenant gives notice of Landlord's Default to any Mortgagee of whom Landlord shall have previously given Tenant notice (including its address), and such Mortgagee shall not have cured Landlord's Default within thirty (30) days after such notice is given (or, if such default cannot reasonably be cured within thirty (30) days, such Mortgagee fails to promptly commence and diligently prosecute said cure to completion).

Notwithstanding the foregoing, if, in Tenant's reasonable judgment, an emergency (i.e., a condition posing imminent risk of material harm to persons or property or material disruption to the normal conduct of any business operations in the Premises shall exist (it being agreed that

39

any water infiltration into the Premises from the roof or any component thereof shall be deemed to be a condition posing imminent risk of material harm to persons or property or material disruption to the normal conduct of any business operations in the Premises), Tenant may, at its election, and without prior notice to Landlord, exercise any or all of the remedies set forth in (a), (b) and (c) above. In no event shall Landlord be liable to Tenant for any consequential damages suffered by Tenant as a result of a default by, or any other act of, Landlord.

Section 16.3    Arbitration. In any case where this Lease expressly provides for submission of a dispute or matter to arbitration (but not otherwise), the same shall be settled by arbitration in Rogers, Arkansas before one arbitrator in accordance with the procedural rules then obtaining of the American Arbitration Association or any successor thereto. The decision of the arbitrator shall be final, conclusive and binding on the parties, but the powers of the arbitrator are hereby expressly limited to the determination of factual issues, and the arbitrator shall have no power to reform, supplement or modify this Lease. The arbitrator shall make only required findings of fact incident to an arbitrable dispute, which findings shall be set forth in reasonable detail in a written decision by the arbitrator. Landlord and Tenant shall share equally in the cost and expenses of such arbitration, and each shall separately pay its own attorneys' fees and expenses, unless the arbitrator finds that one of the parties did not act in good faith in connection with the dispute or the conduct of the arbitration proceeding, in which case the arbitrator may award all or part of said costs, expenses and fees to the other party.

ARTICLE 17
RIGHT TO MORTGAGE AND NON-DISTURBANCE; ESTOPPEL CERTIFICATE

Section 17.1    Right to Mortgage and Non-Disturbance. Landlord reserves the right to subject and subordinate this Lease at all times to the lien of any first mortgage or deed of trust for the benefit of any Mortgagee hereafter encumbering or affecting all or any portion of the Shopping Center, as well as to any future ground or underlying leases encumbering or affecting all or any part of the Shopping Center; provided, however, that (a) each Mortgagee shall first execute and deliver to Tenant a subordination, non-disturbance and attornment agreement in substantially the form attached as Exhibit G hereto, in recordable form, and (b) any Ground Lessor shall execute (and shall obtain the written consent of any holder of any mortgage, deed of trust or any other existing lien encumbering or affecting the Shopping Center or any portion thereof, as applicable) and deliver to Tenant a fee owner recognition agreement in a form reasonably satisfactory to Tenant, which shall include the following provisions: (i) the Ground Lessor will not, in the exercise of any of the rights arising or which may arise out of such lease, disturb or deprive Tenant in or of its possession or its rights to possession of the Premises or of any right or privilege granted to or inuring to the benefit of Tenant under this Lease; (ii) in the event of the termination of the ground or underlying lease, Tenant will not be made a party in any removal or eviction action or proceeding, nor shall Tenant be evicted or removed of its possession or its right of possession of the Premises, and this Lease shall continue in full force and effect as a direct lease between the Ground Lessor and Tenant for the remainder of the Term and on the same terms and conditions as contained herein, without the necessity of executing a new lease; and (iii) Landlord and Tenant shall have the right to execute any amendment to this Lease which is specifically required hereunder and the Ground Lessor shall recognize and be bound thereto.

Section 17.2    Estoppel Certificate. Upon written request of Landlord or Tenant, the other party, within thirty (30) days after the date of receipt of such request, shall execute and deliver to and only for the benefit of the requesting party or any Mortgagee, bona fide prospective purchaser, assignee, or sublessee of the requesting party, without charge, a written statement: (1) ratifying this Lease; (2) certifying, to such party's actual knowledge, that this Lease is in full force and effect, if such is the case, and has not been modified, assigned, supplemented or amended, except by such writings as shall be stated; (3) specifying the dates to which Fixed Rent and Additional Rent have been paid; (4) stating whether or not, to such party's actual, knowledge, the party requesting the estoppel is in default and, if so, stating the nature of such default, (5) stating the Rent Commencement Date, and (6) stating which options to extend the Lease Term have been exercised, if any.

Section 17.3    Existing Mortgages. Within thirty (30) days after the Effective Date, Landlord shall deliver to Tenant, in recordable form: (x) a subordination, non-disturbance and attornment agreement substantially in the form attached hereto as Exhibit G, in recordable form, executed by each and every holder of any mortgage, deed of trust or any other existing lien

40

encumbering or affecting the Shopping Center or any portion thereof, and (y) a fee owner recognition agreement in the form and content described in clause (b) of Section 17.1 hereof, in recordable form, executed by any Ground Lessor (and, as may be required, consented to by the holder of any mortgage, deed of trust or other existing lien as aforesaid). Should Landlord fail to so deliver such instrument(s) within said 30-day period, Tenant shall have the right by notice given to Landlord at any time prior to the date on which such instrument(s) are delivered, to terminate this Lease, in which event, neither party shall have any further liability hereunder, except (i) for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease, and (ii) Landlord shall be obligated to promptly reimburse Tenant for all its reasonable, third-party costs and expenses incurred in connection with this Lease, including, without limitation, the preparation and review of plans and specifications, and the performance of Tenant's Work, provided, however, that such reimbursement by Landlord shall not exceed the aggregate sum of ███████████████████

## ARTICLE 18
## NOTICE

Subject to the further provisions of this Article 18, whenever it is provided herein that any notice, demand, request, consent, approval or other communication (**"Notice"**) shall or may be given to either of the parties by the other, it shall be in writing and, any Legal Requirement to the contrary notwithstanding, shall not be effective for any purpose unless same shall be given by registered or certified mail, postage prepaid, return receipt requested, or by any recognized overnight mail carrier, with proof of delivery slip, addressed to Landlord at Landlord's Mailing Address (Attn: President), with a copy of all notices also addressed to Landlord at Landlord's Mailing Address (Attn: General Counsel), or to Tenant at Tenant's Mailing Address, with copies of notices to Tenant also given to: (i) Allan N. Rauch, Esq., c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, and (ii) Jeffrey H. Kaplan, Esq., c/o Bryan Cave LLP, 1290 Avenue of the Americas, New York, New York 10104, or to such other person or other address as may, from time to time, be specified by either party in a written notice to the other party. All notices given in accordance with the provisions of this Section shall be effective upon receipt (or refusal of receipt) at the address of the addressee. Notwithstanding the foregoing, Landlord shall instead send the following items to Tenant (Attention: Lease Administration) at Tenant's Mailing Address: (A) all bills, notices (but not notices of default) and related information pertaining to Tenant's Pro Rata Share of Taxes as described in Section 4.3 of this Lease, and (B) all statements, bills and related information pertaining to the payments required to be made by Tenant pursuant to Subsection 5.1.2 above.

## ARTICLE 19
## TENANT'S PROPERTY

All of Tenant's Property which may be installed or placed in or upon the Premises by Tenant shall remain the property of Tenant. Tenant may assign, hypothecate, encumber, mortgage or create a security interest in or upon Tenant's Property in the Premises without the consent of Landlord and may remove Tenant's Property at any time during the Term. Landlord waives any right it may have in Tenant's Property. To the extent Landlord may have a lien on or security interest in the Tenant's Property pursuant to this Lease, by law or otherwise, Landlord hereby waives, and agrees not to assert, such lien or security interest. Landlord shall provide to Tenant, within ten (10) days after Tenant's request therefor, a written waiver in form reasonably satisfactory to Tenant evidencing Landlord's waiver of any rights it has or may have in Tenant's Property.

## ARTICLE 20
## END OF TERM

Section 20.1   Surrender of Premises. At the expiration of the Term, Tenant will quit and surrender the Premises in good condition and repair, excepting, however, reasonable wear and tear, damage by fire or other casualty, damage by eminent domain, and repairs and replacements to be made by Landlord hereunder.

Section 20.2   Hold Over. If Tenant fails to deliver possession of the Premises to Landlord at the end of the Term, and unless Landlord and Tenant are, at such time, engaged in good faith negotiations to extend the Term, Tenant shall be a tenant at sufferance and shall be liable for Fixed Rent on a monthly basis (or, if applicable, on a prorated daily basis) in an

amount equal to ███████ ████ ███ of the amount thereof payable by Tenant for the month immediately preceding the last day of the Term as well as for all Additional Rent payable by Tenant hereunder.

## ARTICLE 21
### TENANT'S RIGHT OF FIRST OFFER

Provided an uncured Event of Default does not then exist under this Lease, Tenant shall have continuing rights of first offer to lease additional space in the Shopping Center which is contiguous to the Premises and which may become available on and after the date of this Lease. At such time that Landlord has knowledge that such space (*"Offered Space"*) is or will become available, Landlord will give Tenant notice (the *"Offering Notice"*) of the terms and conditions Landlord would be willing to accept with respect to the Offered Space (including, without limitation, the proposed rent, additional rent, scope of Landlord's proposed tenant improvements, location and Floor Area), and Tenant shall have thirty (30) days within which to respond to Landlord's offer. In the event Tenant elects to accept Landlord's offer, then Tenant shall notify Landlord of such election by giving notice to Landlord during such thirty (30) day period and Landlord and Tenant shall thereupon enter into an amendment to this Lease for the leasing of the Offered Space, which amendment shall (a) contain the terms and conditions set forth in the Offering Notice, (b) provide that the term thereunder shall expire or sooner terminate contemporaneously with the expiration or sooner termination of the Term hereof (subject to extension in accordance with Section 2.2.2 above), and (c) contain such other terms and provisions as either Landlord or Tenant may reasonably require in order to effectuate the incorporation of the Offered Space into the Premises and to otherwise effectuate the intent of this Article 21. Should Tenant decline Landlord's offer or fail to respond thereto, then, and in such event, Tenant shall have been deemed to have waived any prospective rights of first offer to the Offered Space (but Tenant shall not lose any prospective rights of first offer with respect to any space (including, without limitation, the Offered Space) which may in the future become vacant and available), and Landlord may lease the Offered Space to any other party upon substantially the same terms and conditions as that offered to Tenant, provided that such lease is executed within six (6) months after Tenant has declined (or has been deemed to have waived) Landlord's offer with respect to the Offered Space. As used herein, the phrase *"substantially the same terms and conditions as that offered to Tenant"* shall mean terms not materially different and/or a rent of not more than five (5%) percent below the rent requested by Landlord of Tenant. Any dispute between the parties with respect to this Article 21 (including, without limitation, any dispute as to the provisions of the amendment described in this Article 21) shall be resolved by arbitration in accordance with the provisions of Section 16.3 above.

## ARTICLE 22
### ONGOING CO-TENANCY



## ARTICLE 23
### MISCELLANEOUS

Section 23.1    Loading Facilities. Tenant shall have the exclusive right to utilize the loading facilities serving the Premises (shown on Exhibit B) on a "24 hour a day", "365 days a year" basis.

42

**Section 23.2    Liens.** Within thirty (30) days after notice of the filing thereof, Tenant shall discharge (either by payment or by filing of the necessary bond, or otherwise) any lien against the Premises and/or Landlord's interest therein, which may arise out of any payment due for, or purported to be due for, any labor, services, materials, supplies or equipment alleged to have been furnished to or for Tenant in, upon or about the Premises. Similarly, within thirty (30) days after notice of the filing thereof, Landlord shall discharge (either by payment or by filing of the necessary bond, or otherwise) any lien against the Premises and/or Landlord's interest therein, which may arise out of any payment due for, or purported to be due for, any labor, services, materials, supplies or equipment alleged to have been furnished to or for Landlord in, upon or about the Premises.

**Section 23.3    Broker's Commission.** Landlord and Tenant each warrant and represent to the other that they did not deal with any real estate broker in connection with the negotiation, execution and delivery of this Lease, except for The Retail Connection (the *"Broker"*). Landlord shall pay the Broker a commission pursuant to a separate agreement, subject to the terms and conditions set forth in such agreement. Each party agrees to indemnify, defend, and save the other harmless from and against any and all liabilities, costs, causes of action, damages and expenses, including, without limitation, attorneys' fees, with respect to or arising out of any claims made by any real estate broker (other than the Broker), agent or finder with respect to this Lease in breach of the foregoing representation. The provisions of this Section shall survive the expiration or earlier termination of this Lease.

**Section 23.4    *Force Majeure*.** Except as otherwise expressly set forth herein, in the event either party hereto shall be delayed or hindered in, or prevented from, the performance of any act required hereunder by reason of strikes, failure of power, riots, insurrection, war, earthquake, hurricane or tornado (or comparable weather conditions of unusual severity), or other reasons of a like nature which are beyond the reasonable control of the party (collectively referred to herein as *"Force Majeure"*), then the performance of any such act shall be excused for the period of the delay and the period of the performance of any such act shall be extended for a period equivalent to the period of such delay. Notwithstanding the foregoing provisions, the following shall not constitute Force Majeure: (i) the financial inability of a party to perform its obligations under this Lease; or (ii) delays occurring in the course of complying with applicable Legal Requirements that could have been avoided through the exercise of due diligence by a party hereto. A party wishing to invoke this Section shall give the other party notice of that intention within ten (10) days after the commencement of any event of Force Majeure and shall, at that time, specify the reasons therefor, the specific provision of this Lease which will be delayed as a result, and the period of such extension, if known, or if not known, a reasonable estimate thereof.

**Section 23.5    Consents.** Except as may be otherwise expressly set forth in this Lease, whenever under this Lease provision is made for either party's securing the consent or approval of the other party, (i) such consent or approval shall be in writing and shall not be unreasonably withheld, delayed or conditioned, and (ii) in all matters contained herein, both parties shall have an implied obligation of reasonableness.

**Section 23.6    Costs.** Whenever this Lease requires the performance of an act by a party, such party shall perform the act at its own cost and expense, unless expressly provided to the contrary.

**Section 23.7    Attorneys' Fees.** In any action or proceeding hereunder (whether to enforce the terms and provisions of an indemnity or otherwise), the prevailing party shall be entitled to recover from the other party the prevailing party's reasonable costs and expenses in such action or proceeding, including reasonable attorneys' fees, costs and expenses. Except as otherwise set forth herein, if either party is sued by a third party as a result of a violation of a covenant or warranty herein contained by the other party hereto, then the party who has violated the covenant or warranty shall be responsible for the reasonable costs and expenses in such action or proceeding against the non-violating party, including reasonable attorneys' fees, costs and expenses.

**Section 23.8    Survival of Obligations.** The obligation to pay any sums due to either party from the other that by the terms herein would not be payable, or are incapable of calculation, until after the expiration or sooner termination of this Lease shall survive and remain

43

a continuing obligation until paid. All indemnity obligations under this Lease shall survive the expiration or earlier termination of this Lease.

Section 23.9   Non-Waiver. The failure of Landlord or Tenant to insist upon the strict performance of, or to enforce, any provision, covenant or condition herein shall not be deemed to be a waiver thereof, nor void or affect the right of the aggrieved party to enforce the same covenant or condition on the occasion of any subsequent breach or default; nor shall the failure of either party to exercise any option in this Lease upon any occasion arising therefor be deemed or construed to be a waiver of the right to exercise that same kind of option upon any subsequent occasion.

Section 23.10   Rights Cumulative. Unless expressly provided to the contrary in this Lease, each and every one of the rights, remedies and benefits provided by this Lease shall be cumulative and shall not be exclusive of any other such rights, remedies and benefits allowed by applicable Legal Requirements.

Section 23.11   Definition of Landlord. The term *"Landlord"* shall mean only the person or entity which, from time to time, shall then own the Shopping Center, and in the event of the transfer by such owner of its interest in the Shopping Center, such owner shall (except to the extent of (1) claims made by Tenant against Landlord which arose prior to the effective date of the transfer of such ownership interest, and/or (2) judgments obtained by Tenant against Landlord, on or prior to the effective date of the transfer of such ownership interest) thereupon be released and discharged from all covenants and obligations of Landlord thereafter accruing, but such covenants and obligations shall be binding during the Term upon each new owner for the duration of such owner's ownership.

Section 23.12   Successors and Assigns. Subject to the applicable provisions, if any, of Article 15 above, the provisions of this Lease shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns.

Section 23.13   Limitation of Landlord's Liability. Except with respect to insurance proceeds or condemnation awards received by Landlord which are required by the terms of this Lease to be applied to the repair or restoration of the Premises or the Shopping Center, Tenant shall, on and after the Delivery Date, look only to Landlord's estate and property in the Shopping Center (or the proceeds from the sale of all or any portion thereof) and net income derived from the Shopping Center for the satisfaction of Tenant's remedies for the collection of a judgment (or other judicial process) requiring the payment of money by Landlord hereunder and no other property or assets of Landlord, its officers, directors, stockholders or partners shall be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies under or with respect to this Lease. Except with respect to the limitation on personal liability hereinabove set forth, the provisions of this Section 23.13 shall not be deemed or construed to limit Tenant's rights and remedies pursuant to this Lease or which may be available at law or in equity.

Section 23.14   Limitation of Tenant's Liability. Landlord, its successors and assigns, shall look solely to the assets, if any, of Tenant and its successors and assigns, for the satisfaction of any claim arising from or under this Lease and shall not seek to impose personal liability on any shareholder, officer, director or employee of Tenant or any of its Affiliates.

Section 23.15   Joint and Several Liability. If either party consists of more than one person, then the persons constituting such party shall be jointly and severally liable hereunder.

Section 23.16   Severability. If any term, covenant, condition or provision of this Lease is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions hereof shall remain in full force and effect and shall in no way be affected, impaired, or invalidated thereby.

Section 23.17   Grammatical Usages and Construction. In construing this Lease, feminine or neuter pronouns shall be substituted for those masculine in form and vice versa, and plural terms shall be substituted for singular and singular for plural in any place in which the context so requires. This Lease shall be construed without regard to the identity of the party who drafted the various provisions hereof. Moreover, each and every provision of this Lease shall be construed as though all parties hereto participated equally in the drafting thereof. As a result of the foregoing, any rule or construction that a document is to be construed against the drafting party shall not be applicable hereto.

44

Section 23.18  <u>Table of Contents, Line Numbering and Paragraph Headings</u>. The table of contents and line numbering, if any, and section headings are inserted only for convenience and in no way define, limit or describe the scope or intent of this Lease, nor in any way affect this Lease.

Section 23.19  <u>Definition of Hereunder, Herein, etc.</u>  Unless the context clearly indicates to the contrary, the words "herein," "hereof," "hereunder," "hereafter," and words of similar import refer to this Lease and all the Exhibits attached hereto as a whole and not to any particular section, subsection, or paragraph hereof.

Section 23.20  <u>Short Form Lease</u>. Upon the request of either party following the execution and delivery of this Lease, Landlord and Tenant shall execute a short form lease or memorandum for recording, which shall be in form and substance as either party shall reasonably request. In no event shall the amount of Fixed Rent reserved hereunder be included in any such short form lease or memorandum.

Section 23.21  <u>Entire Agreement and Modification</u>. This Lease constitutes the entire agreement of the parties hereto, and all prior agreements between the parties, whether written or oral, are merged herein and, except as may be specifically set forth herein, shall be of no force and effect. This Lease cannot be changed, modified or discharged orally, but only by an agreement in writing, signed by the party against whom enforcement of the change, modification or discharge is sought.

Section 23.22  <u>No Joint Venture or Partnership Created by Lease</u>. Nothing contained herein shall be deemed or construed as creating the relationship of principal and agent or of partnership or of joint venture between the parties hereto.

Section 23.23  <u>Tenant's Tradename</u>. Landlord shall not make use of Tenant's tradename [*i.e., "Bed Bath & Beyond"®*] in any advertising or marketing material, including, without limitation, on any internet website, without obtaining Tenant's prior written approval, which may be withheld in Tenant's sole and absolute discretion.

Section 23.24  <u>Counterparts</u>. This instrument may be executed in several counterparts, each of which shall be deemed an original. The signatures to this instrument may be executed and notarized on separate pages, and when attached to this instrument, shall constitute one complete document.

Section 23.25  <u>Waiver of Trial by Jury</u>. Landlord and Tenant hereby mutually waive any and all rights which either may have to request a jury trial in any proceeding between them at law or in equity.

Section 23.26  <u>Governing Law</u>. This Lease shall be governed by, construed, and enforced in accordance with the laws of the State in which the Premises are located.

[Signature Page to Follow]

C061858/0205454/1372981.6

IN WITNESS WHEREOF, the parties have executed this instrument under seal the day and year first-above written.

**LANDLORD OF THE POWER CENTER:**

PINNACLE SOUTH LLC

By:

Name:

Title:

**TENANT:**

**BED BATH & BEYOND INC.**, a New York corporation

By:

    Warren Eisenberg

    Co-Chairman

**LANDLORD OF THE PROMENADE:**
(but only as to those covenants and restrictions which are made binding on the Promenade pursuant to express provisions of this Lease)

ROGERS RETAIL LLC

By:

Name:

Title:

-46-

## INDEX OF EXHIBITS

| | |
|---|---|
| Exhibit A | Legal Description of Power Center |
| Exhibit A-1 | Legal Description of Promenade |
| Exhibit B | Site Plan |
| Exhibit C | Rent Commencement and Expiration Date Agreement |
| Exhibit D | Specifications for Landlord's Work |
| Exhibit D-1 | Exterior Elevations of the Premises, and Sidewalk Plan |
| Exhibit D-2 | Exterior Elevation Drawing of Power Center |
| Exhibit E | Permitted Encumbrances |
| Exhibit F | Signage |
| Exhibit G | Subordination, Non-Disturbance and Attornment Agreement |
| Exhibit H | Subtenant Recognition Agreement |
| Exhibit I | Intentionally Omitted |
| Exhibit J | Form of Delivery Date Certification |
| Exhibit K-1 | Existing Exclusives |
| Exhibit K-2 | Existing Leases |
| Exhibit L | Prohibited Uses |

C061858/0205454/1372981.6

EXHIBIT A

Legal Description of Power Center

A part of the NE1/4 NE1/4, a part of the SE1/4 NE1/4, a part of the NW1/4 NE1/4, and a part of the SW1/4 NE1/4 all in Section 21, T-19-N, R-30-W, Fifth Principal Meridian, City of Rogers, Benton County, Arkansas, more particularly described as follows, To Wit:

Commencing at a found rail road spike at the SE corner of the NE1/4 SE1/4 of said Section 21, Thence North 86° 51' 38" West along the South line of said NE1/4 SE1/4, a distance of 123.05 feet to a point; Thence leaving said South line, North 03° 08' 22" East, a distance of 66.81 feet to a 5/8 inch capped rebar (L.S. 1390) on the West Right of Way line of Proposed Bellview Road; Thence continuing along said proposed Right of Way, North 04° 41' 12" East a distance of 479.60 feet to a tangent point on a curve to the left and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 550.00 feet, an arc length of 377.12 feet, and a chord which bears North 14° 57' 24" West, a chord distance of 369.78 feet to a 5/8 inch capped rebar (L.S. 1390); Thence North 34° 35' 59" West, a distance of 17.16 feet to a tangent point a curve to the left and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 36.00 feet, an arc length of 57.48 feet, and a chord which bears North 80° 20' 32" West, a chord distance of 51.57 feet to a 5/8 inch capped rebar (L.S. 1390); Thence North 33° 27' 50" West, a distance of 94.12 feet to a point on a non tangent curve to the left and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 36.00 feet, an arc length of 55.62 feet, and a chord which bears North 09° 39' 28" East, a chord distance of 50.25 feet to a 5/8 inch capped rebar (L.S. 1390); Thence North 34° 35' 59" West, a distance of 20.86 feet to a tangent point on a curve to the right and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 650.00 feet, an arc length of 374.78 feet, and a chord which bears North 18° 04' 55" West, a chord distance of 369.61 feet to a 5/8 inch capped rebar (L.S. 1390); Thence North 01° 33' 50" West, a distance of 228.28 feet to a tangent point on a curve to the right and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 2050.00 feet, an arc length of 62.59 feet, and a chord which bears North 00° 41' 21" West, a chord distance of 62.59 feet to a point of reverse curve and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 36.00 feet, an arc length of 55.01 feet, and a chord which bears North 43° 35' 12" West, a chord distance of 49.81 feet to a 5/8 inch capped rebar (L.S. 1390); Thence North 01° 24' 32" East, a distance of 74.71 feet to a 5/8 inch capped rebar (L.S. 1390) for the Point of Beginning;

Thence North 01° 24' 32" East, a distance of 19.31 feet to a point on a non tangent curve to the left and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 36.00 feet, an arc length of 56.60 feet, and a chord which bears North 47° 36' 08" West, a chord distance of 50.95 feet to a 5/8 inch capped rebar (L.S. 1390); Thence North 02° 33' 48" East, a distance of 337.86 feet to a 5/8 inch capped rebar (L.S. 1390); Thence leaving said West Right-of-Way of proposed Belview Road, North 30° 41' 44" West, a distance of 174.34 feet to a 5/8 inch capped rebar (L.S. 1390); Thence North 37° 22' 48" West, a distance of 105.74 feet to a 5/8 inch capped rebar (L.S. 1390); Thence North 42° 53' 56" West, a distance of 197.34 feet to a 5/8 inch capped rebar (L.S. 1390); Thence North 27° 31' 00" West, a distance of 75.53 feet to a 5/8 inch capped rebar (L.S. 1390); Thence North 20° 40' 19" West, a distance of 86.04 feet to a 5/8 inch capped rebar (L.S. 1390); Thence North 87° 21' 31" West, a distance of 1447.02 feet to a point on the East Right-of-Way of proposed 45th Street and a 5/8 inch capped rebar (L.S. 1390);

Thence along said East Right-of-Way, South 00° 48' 09" West, a distance of 248.89 feet to a tangent point on a curve to the left and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 50.00 feet, an arc length of 76.94 feet, and a chord which bears South 43° 16' 41" East, a chord distance of 69.57 feet to a 5/8 inch capped rebar (L.S. 1390); Thence South 87° 21' 31" East, a distance of 5.97 feet to a 5/8 inch capped rebar (L.S. 1390); Thence South 02° 38' 29" West, a distance of 16.45 feet to a 5/8 inch capped rebar (L.S. 1390); Thence leaving said East Right-of-Way of proposed 45th Street, South 87° 21' 31" East, a distance of 10.87 feet to a tangent point on curve to the left and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 201.50 feet, an arc length of 37.07 feet, and a chord which bears North 87° 22' 16" East, a chord distance of 37.02 feet to a 5/8 inch capped rebar (L.S. 1390); Thence North 82° 06' 02" East, a distance of 80.85 feet to a tangent point on a curve to the right and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 448.50 feet, an arc length of 62.43 feet, and a chord which bears North 86° 05' 18" East, a chord distance of 62.38 feet to a point on a non tangent curve to the left and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 751.49 feet, an arc length of 368.46 feet, and a chord which bears South 07° 25' 43" East, a chord distance of 364.78 feet to a point of compound curve and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 21.50 feet, an arc length of 35.62 feet, and a chord which bears South 68° 56' 38" East, a chord distance of 31.69 feet to a point of reverse curve and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 528.50 feet, an arc length of 200.62 feet, and a chord which bears North 74° 27' 42" East, a chord distance of 199.41 feet to a 5/8 inch capped rebar (L.S. 1390); Thence North 88° 27' 54" East, a distance of 65.47 feet to a tangent point on a curve to the right and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 384.62 feet, an arc length of 211.09 feet, and a chord which bears South 73° 06' 24" East, a chord distance of 208.45 feet to a point of compound curve and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 921.89 feet, an arc length of 143.53 feet, and a chord which bears South 51° 14' 44" East, a chord distance of 143.39 feet to a 5/8 inch capped rebar (L.S. 1390); Thence South 53° 10' 18" East, a distance of 118.36 feet to a 5/8 inch capped rebar (L.S. 1390); Thence South 55° 43' 20" East, a distance of 56.82 feet to a tangent point on a curve to the left and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 669.53 feet, an arc length of 63.00 feet, and a chord which bears South 59° 51' 52" East, a chord distance of 62.98 feet to a point of compound curve and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 769.85 feet, an arc length of 73.81 feet, and a chord which bears South 64° 52' 02" East, a chord distance of 73.78 feet to a point of compound curve and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 683.99 feet, an arc length of 222.26 feet, and a chord which bears South 78° 02' 41" East, a chord distance of 221.28 feet to a 5/8 inch capped rebar (L.S. 1390); Thence South 87° 21' 31" East, a distance of 42.28 feet to a 5/8 inch capped rebar (L.S. 1390); Thence North 84° 38' 03" East, a distance of 26.80 feet to a 5/8 inch capped rebar (L.S. 1390); Thence North 84° 33' 59" East, a distance of 67.25 feet to a 5/8 inch capped rebar (L.S. 1390); Thence South 87° 23' 52" East, a distance of 244.88 feet to the Point of Beginning and containing (1,179,254.35 sq. ft. 27.0720 acres) more or less.

## EXHIBIT A-1

Legal Description of Promenade

C061858/0205454/1372981.6

Exhibit A-1

Legal Description of Promenade

A part of the S1/2 of the NE1/4, a part of the N1/2 of the SE1/4, and a part of the SE1/4 of the SE1/4 Quarter, all in Section 21, T-19-N, R-30-W, Fifth Principal Meridian, City of Rogers, Benton County, Arkansas, more particularly described as follows, To Wit:

Commencing at a found rail road spike at the SW corner of the NE1/4 of the SE1/4 of said Section 21, Thence N 02° 32' 17" E along the West line of said NE1/4, a distance of 99.61 feet to a 5/8 inch capped rebar (L.S. 1390) on the North Right-of-Way of the proposed relocated Perry Road, for the POINT OF BEGINNING;

Thence leaving said West line and continuing along said North Right-of-Way, North 56° 52' 51" West, a distance of 62.22 feet to a point on a non tangent curve to the right and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 1563.00 feet, an arc length of 87.01 feet, and a chord which bears North 60° 23' 57" West, a chord distance of 87.00 feet to a point of compound curve and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 50.00 feet, an arc length of 80.42 feet, and a chord which bears North 12° 43' 30" West, a chord distance of 72.03 feet to a 5/8 inch capped rebar (L.S. 1390); Thence leaving said North Right-of-Way of the proposed relocated Perry Road, North 58° 59' 45" West, a distance of 116.10 feet to a point on a non tangent curve to the right and a 5/8 inch capped rebar (L.S. 1390) located on the North Right-of-Way of the proposed 45th Street; Thence along said Right-of-Way of proposed 45th Street and along said curve having a radius of 50.00 feet, an arc length of 83.76 feet, and a chord which bears South 81° 20' 49" West, a chord distance of 74.31 feet to a point of compound curve and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 1575.00 feet, an arc length of 1002.38 feet, and a chord which bears North 32° 25' 41" West, a chord distance of 985.55 feet to a point of compound curve and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 50.00 feet, an arc length of 80.64 feet, and a chord which bears North 32° 00' 18" East, a chord distance of 72.18 feet to a 5/8 inch capped rebar (L.S. 1390); Thence North 78° 12' 21" East, a distance of 6.09 feet to a 5/8 inch capped rebar (L.S. 1390); Thence North 11° 47' 39" West, a distance of 112.00 feet to a point on a non tangent curve to the right and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 50.00 feet, an arc length of 83.40 feet, and a chord which bears North 54° 00' 25" West, a chord distance of 74.07 feet to a point of compound curve and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 1575.00 feet, an arc length of 193.04 feet, and a chord which bears North 02° 42' 31" West, a chord distance of 192.91 feet to a 5/8 inch capped rebar (L.S. 1390); Thence North 00° 48' 09" East, a distance of 770.67 feet to a tangent point on a curve to the right and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 50.00 feet, an arc length of 80.14 feet, and a chord which bears North 46° 43' 19" East, a chord distance of 71.84 feet to a 5/8 inch capped rebar (L.S. 1390); Thence North 02° 38' 29" East, a distance of 69.55 feet to a 5/8 inch capped rebar (L.S. 1390); Thence leaving said Right-of-Way of proposed 45th Street, South 87° 21' 31" East, a distance of 10.87 feet to a tangent point on a curve to the left and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 201.50 feet, an arc length of 37.07 feet, and a chord which bears North 87° 22' 16" East, a chord distance of 37.02 feet to a 5/8 inch capped rebar (L.S. 1390); Thence North 82° 06' 02" East, a distance of 80.85 feet to a tangent point on a curve to the right and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 448.50 feet, an arc length of 62.43 feet, and a chord which bears North 86° 05' 18" East, a chord distance of 62.38 feet to a non tangent point on a curve to the left and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 751.49 feet, an arc length of 368.46 feet, and a chord which bears South 07° 25' 43" East, a chord distance of 364.78 feet to a point of compound curve to the left and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 21.50 feet, an arc length of 35.62 feet, and a chord which bears South 68° 56' 38" East, a chord distance of 31.69 feet to a tangent point on a reverse curve to the right and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 528.50 feet, an arc length of 200.62 feet, and a chord which bears North 74° 27' 42" East, a chord distance of 199.41 feet to a 5/8 inch capped rebar (L.S. 1390); Thence North 88° 27' 54" East, a distance of 65.47 feet to a tangent point on a curve to the right and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 384.62 feet, an arc length of 211.09 feet, and a chord which bears South 73° 06' 24" East, a chord distance of 208.45 feet to a point of compound curve to the right and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 921.89 feet, an arc length of 143.53 feet, and a chord which bears South 51° 14' 44" East, a chord distance of 143.39 feet to a 5/8 inch capped

rebar (L.S. 1390); Thence South 53° 10' 18" East, a distance of 118.36 feet to a 5/8 inch capped rebar (L.S. 1390); Thence South 55° 43' 20" East, a distance of 56.82 feet to a tangent point on a curve to the left and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 669.53 feet, an arc length of 63.00 feet, and a chord which bears South 59° 51' 52" East, a chord distance of 62.98 feet to a point of compound curve and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 769.85 feet, an arc length of 73.81 feet, and a chord which bears South 64° 52' 02" East, a chord distance of 73.78 feet to a point of compound curve and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 683.99 feet, an arc length of 222.26 feet, and a chord which bears South 78° 02' 41" East, a chord distance of 221.28 feet to a 5/8 inch capped rebar (L.S. 1390); Thence South 87° 21' 31" East, a distance of 42.28 feet to a 5/8 inch capped rebar (L.S. 1390); Thence North 84° 35' 08" East, a distance of 94.06 feet to a 5/8 inch capped rebar (L.S. 1390); Thence South 87° 23' 52" East, a distance of 244.88 feet to a 5/8 inch capped rebar (L.S. 1390) on the West Right-of-Way of the propose Bellview Road; Thence South 01° 24' 32" West, a distance of 74.71 feet to a point on a non tangent curve to the right and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 36.00 feet, an arc length of 55.01 feet, and a chord which bears South 43° 35' 12" East, a chord distance of 49.81 feet to a point of reverse curve to the right and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 2050.00 feet, an arc length of 62.59 feet, and a chord which bears South 00° 41' 21" East, a chord distance of 62.59 feet to a 5/8 inch capped rebar (L.S. 1390); Thence South 01° 33' 50" East, a distance of 228.28 feet to a point on a tangent curve to the left and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 650.00 feet, an arc length of 374.78 feet, and a chord which bears South 18° 04' 55" East, a chord distance of 369.61 feet to a 5/8 inch capped rebar (L.S. 1390); Thence South 34°.35' 59" East, a distance of 20.86 feet to a tangent point on a curve to the right and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 36.00 feet, an arc length of 55.62 feet, and a chord which bears South 09° 39' 28" West, a chord distance of 50.25 feet to a 5/8 inch capped rebar (L.S. 1390); Thence South 33° 27' 50" East, a distance of 94.12 feet to a point on a non tangent curve to the right and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 36.00 feet, an arc length of 57.48 feet, and a chord which bears South 80° 20' 32" East, a chord distance of 51.57 feet to a 5/8 inch capped rebar (L.S. 1390); Thence South 34° 35' 59" East, a distance of 17.16 feet to a point on a tangent curve to the right and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 550.00 feet, an arc length of 377.12 feet, and a chord which bears South 14° 57' 24" East, a chord distance of 369.78 feet to a 5/8 inch capped rebar (L.S. 1390); Thence South 04° 41' 12" West, a distance of 479.60 feet to a tangent point on a curve to the right and a 5/8 inch capped rebar (L.S. 1390); Thence leaving said Right-of-Way of proposed Bellview Road, along said curve having a radius of 50.00 feet, an arc length of 72.53 feet, and a chord which bears South 46° 14' 36" West, a chord distance of 66.34 feet to a 5/8 inch capped rebar (L.S. 1390) on the North Right-of-Way of the proposed relocated Right-of-Way of Perry Road; Thence continuing along said Right-of-Way, South 87° 48' 00" West, a distance of 374.34 feet to a 5/8 inch capped rebar (L.S. 1390); Thence North 84° 36' 16" West, a distance of 102.90 feet to a non tangent point on a curve to the right and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 1563.00 feet, an arc length of 89.43 feet, and a chord which bears North 87° 58' 00" West, a chord distance of 89.42 feet to a point of compound curve and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 50.00 feet, an arc length of 77.81 feet, and a chord which bears North 41° 44' 41" West, a chord distance of 70.19 feet to a 5/8 inch capped rebar (L.S. 1390); Thence North 02° 50' 17" East, a distance of 4.09 feet to a non tangent curve to the right and a 5/8 inch capped rebar (L.S. 1390); Thence North 87° 09' 43" West, a distance of 100.00 feet to a point on a non tangent curve to the right and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 50.00 feet, an arc length of 85.85 feet, and a chord which bears South 52° 01' 26" West, a chord distance of 75.68 feet to a point of compound curve to the right and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 1575.00 feet, an arc length of 362.46 feet, and a chord which bears North 72° 11' 50" West, a chord distance of 361.67 feet to a 5/8 inch capped rebar (L.S. 1390); Thence North 56° 52' 51" West, a distance of 37.35 feet to the Point of Beginning, and subject to any and all Easements, Covenants, Restriction, or Right-of-Way of Record or Fact.

Having an area of 78.8794 acres (2,516,641.87 Sq. Ft.), more or less.

Exhibit B

Site Plan

EXHIBIT 'B'
SITE PLAN
ROGERS AR

**FLOOR PLAN**

THE ABOVE FLOOR PLAN REPRESENTS TENANT'S CRITICAL DIMENSIONS

**FLOOR PLAN LEGEND**

ADDITIONAL
1468 S.F.

ADDITIONAL TO SHOW SALES AREA

RESTROOM AREA

59.07

**SITE PLAN LEGEND**

PREMISES

NO BUILD AREA

PRIMARY RESTORATION AREA

POWER CENTER

CONSTRUCTION STAGING AREA FOR LANDLORD AND OTHER CO-TENANTS SHALL NOT BE WITHIN THE NO BUILD AREA, DIRECTLY IN FRONT OF TENANT'S PREMISES OR BLOCK ACCESS TO TENANT'S LOADING AREA.

TENANT SHALL HAVE THE RIGHT TO RELOCATED CART CORRALS IN THE PARKING FIELD DIRECTLY IN FRONT OF TENANT'S PREMISES.

EXIT DOOR LOCATIONS TO BE COORDINATED WITH TENANT'S PLANS.

SITE PLAN LAYOUT TO ADEQUATELY ACCOMODATE THE TURNING RADIUS OF A SEMI-TRAILER, FROM POINT OF ENTRY TO TENANT'S LOADING DOCK AND THEN EXIT.

PROPOSED HIRING TRAILER LOCATION IS SUBJECT TO REASONABLE RELOCATION BY LANDLORD IF APPLICABLE.

LANDLORD SHALL PROVIDE SITE SPECIFIC SIGNAGE IN FRONT OF TENANT'S PREMISES TO 'STOP FOR PEDESTRIANS CROSSWALK' TO MEET LOCAL AND FEDERAL REQUIREMENTS.

REAR DUMPSTER ACCESS DIAGRAM

RETAIL 'A'     RETAIL 'B'

Bed, Bath & Beyond
APPROX 30,000 S.F.

PROMENADE MALL

DILLARD'S
155,000 SF.

Bed, Bath & Beyond
APPROX 30,000 S.F.

RETAIL
17,578 S.F.

RETAIL
10,146 S.F.

RETAIL
20,863 S.F.

RETAIL
51,168 S.F.

POND 'C'

POND 'A'

POND 'B'

NORTH

Exhibit C

Rent Commencement and Expiration Date Agreement

THIS RENT COMMENCEMENT AND EXPIRATION DATE AGREEMENT, made as of the ____ day of _____, 200_, by and between _____ (*"Landlord"*) and BED BATH & BEYOND INC. (*"Tenant"*).

## W I T N E S S E T H :

WHEREAS, Landlord is the owner of a certain shopping center known as Pinnacle Hills Promenade (the *"Shopping Center"*), situated in Rogers, Arkansas;

WHEREAS, by that certain lease dated _____, 2007 (the *"Lease"*), Landlord leased a portion (the *"Premises"*) of the Shopping Center to Tenant;

WHEREAS, Tenant is in possession of the Premises and the Term of the Lease has commenced; and

WHEREAS, under Section 2.2 of the Lease, Landlord and Tenant agreed to enter into an agreement setting forth certain information in respect of the Premises and the Lease.

NOW, THEREFORE, Landlord and Tenant agree as follows:

1.     The Rent Commencement Date occurred on _____, 200___.

2.     The **Initial Term** of the Lease shall expire on January 31, 20___, unless Tenant exercises any option to extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

3.     The date of commencement of the **first Renewal Period** shall be February 1, 20___, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 20___, unless Tenant exercises any option to further extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

4.     The date of commencement of the **second Renewal Period** shall be February 1, 20___, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 20___, unless Tenant exercises any option to further extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

5.     The date of commencement of the **third Renewal Period** shall be February 1, 20___, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 20___, unless the Lease terminates earlier as provided in the Lease.

Capitalized terms used, but not defined, herein shall have the meanings ascribed to them in the Lease.

IN WITNESS WHEREOF, the parties hereto have caused this Rent Commencement and Expiration Date Agreement to be executed the date and year first above written.

[NAME OF LANDLORD]

By:_____
Name:
Title:

**TENANT:**

BED BATH & BEYOND INC.

By:_____
      Warren Eisenberg
      Co-Chairman

C061858/0205454/1372981.6

<u>Exhibit D</u>

<u>Specifications for Landlord's Work</u>

C061858/0205454/1372981.6

*Rogers, AR*

Exhibit D - Standard Landlord's Work

04/16/07

[All capitalized terms used, but not otherwise defined herein shall have the meanings ascribed to them in the Lease. The terms of the Lease regarding Landlord's Work shall be deemed to supplement the provisions of the Exhibit D, to the extent not inconsistent with the terms of this Exhibit D. It is specifically understood and agreed that all materials and supplies shall be installed in strict accordance with all manufacturers' specifications.]

<u>Landlord's Final Plans and Specifications</u>

Landlord shall provide one (1) complete full size set, one (1) complete ½ size set and one (1) copy of electronic file of the Final Plans and Specifications as well as each subsequent revision to Landlord's Plans for Tenant's use. Landlord shall develop project-specific Final Plans and Specifications in accordance with following documents:

A.    Tenant's Plans consist of the following: FIXTURE PLAN (F1); FLOOR FINISH PLANS, NOTES AND DETAILS (F2); POWER/SPECIALTY LIGHTING PLANS AND NOTES (F3); LIGHTING PLANS AND NOTES (F4); and HIGH PILE STORAGE PLAN (F5). Tenant's Plans are project-specific design-development documents. In the event of a conflict between Tenant's Plans and "Tenant's Prototype Drawings and Specifications"(defined below), then Tenant's Plans shall govern and prevail. Tenant's Plans shall be delivered to Landlord in accordance with Article 3 of the Lease.

B.    <u>Tenant's Prototype Drawings and Specifications</u> entitled "Bed Bath & Beyond Prototype Drawings and Specifications – version 1.2006, dated 03-31-06 developed by Casco Architects, comprise the following drawings and specifications:

At the time the Preliminary Plans are 85% complete, LL shall be obligated to issue Preliminary Plans to "BBBY Consultant" for review against "Quality Control Checklist". Project specific BBBY consultants to be determined by BBBY post lease execution

All site specific plans and specifications developed by Landlord and submitted to Tenant for review and approval must be in the same Format as Tenant's Prototypical Plans and Specifications as outlined within Item C. below of this Exhibit unless otherwise authorized in writing by Tenant.

Tenant shall not be obligated to review nor approve improperly formatted Landlord's Plans and/or specifications, nor shall said submission be deemed to be in compliance with Section 3.2 "Plan Approvals" of the Lease, unless said Format is complied with.

Tenant reserves the right to immediately disapprove and return improperly formatted plans to the Landlord and the Landlord shall be solely responsible for all costs and/or delays relating to revising/correcting and resubmitting the plans and/or specifications to Tenant for re-review and approval.

C.

| SHEET # | DRAWING TITLE | CURRENT ISSUE | DRAWING DATE |
|---|---|---|---|
| A0.1 | Code Data, Project Data and Responsibility Schedule | Prototype Version 1.2006 | 03/3/06 |
| A0.2 | Generic Site Requirements Plan | Prototype Version 1.2006 | 03/31/06 |
| A1.1 | Site Details | Prototype Version 1.2006 | 03/31/06 |
| A1.2 | Demolition Plan | Prototype Version 1.2006 | 03/31/06 |
| A2.1 | Store Fixture/Egress Path  Plan & Notes | Prototype Version 1.2006 | 03/31/06 |
| A2.2 | Floor Plan | Prototype Version 1.2006 | 03/31/06 |
| A2.3 | Floor Finish Plan | Prototype Version 1.2006 | 03/31/06 |
| A2.4 | Reflected Ceiling Plans & Notes | Prototype Version 1.2006 | 03/31/06 |
| A2.5 | Roof Plan Details & Notes | Prototype Version 1.2006 | 03/31/06 |
| A3.1 | Finish Schedule, Storefront Types & Vestibule Elevations | Prototype Version 1.2006 | 03/31/06 |
| A3.2 | Door Hardware, Door Schedule & Door Types | Prototype Version 1.2006 | 03/31/06 |
| A3.3 | BBB National Account Vendors & Specified Manufactures w/Distribution Schedule | Prototype Version 1.2006 | 03/31/06 |
| A4.1 | Exterior Elevations | Prototype Version 1.2006 | 03/31/06 |
| A5.1 | Building Sections, Interior Wall Sections | Prototype Version 1.2006 | 03/31/06 |
| A5.2 | Exterior Wall Sections | Prototype Version 1.2006 | 03/31/06 |
| A5.3 | Exterior Wall Sections | Prototype Version 1.2006 | 03/31/06 |
| A5.4 | Exterior Wall Sections | Prototype Version 1.2006 | 03/31/06 |
| A5.5 | Interior Wall Sections | Prototype Version 1.2006 | 03/31/06 |
| A5.6 | *Alternate* Scissor Lift Plan, Section, Specification & Notes | Prototype Version 1.2006 | 03/31/06 |
| A6.1 | Exterior Details | Prototype Version 1.2006 | 03/31/06 |
| A6.2 | Interior & Exterior Details | Prototype Version 1.2006 | 03/31/06 |
| A6.3 | Slatwall Details at Storefront | Prototype Version 1.2006 | 03/31/06 |

1

| | | | |
|---|---|---|---|
| A7.1 | Large Scale Plans & Partition Types | Prototype Version 1.2006 | 03/31/06 |
| A7.2 | Large Scale Plans & Partition Types | Prototype Version 1.2006 | 03/31/06 |
| A8.1 | Interior Details | Prototype Version 1.2006 | 03/31/06 |
| A8.2 | Interior Details | Prototype Version 1.2006 | 03/31/06 |
| A8.3 | Customer Service Desk | Prototype Version 1.2006 | 03/31/06 |
| A8.3a | *Alternate* Customer Service Desk (16FT. Version) Right Orientation | Prototype Version 1.2006 | 03/31/06 |
| A8.3b | *Alternate* Customer Service Desk (16FT. Version) Left Orientation | Prototype Version 1.2006 | 03/31/06 |
| A8.3c | *Alternate* Customer Service Desk (20FT. Version) Right Orientation | Prototype Version 1.2006 | 03/31/06 |
| A8.3d | *Alternate* Customer Service Desk (20FT. Version) Left Orientation | Prototype Version 1.2006 | 03/31/06 |
| A8.3e | *Alternate* Customer Service Desk (12FT. Version) Right Orientation | Prototype Version 1.2006 | 03/31/06 |
| A8.3f | *Alternate* Customer Service Desk (12FT. Version) Left Orientation | Prototype Version 1.2006 | 03/31/06 |
| A8.4 | Register Bays | Prototype Version 1.2006 | 03/31/06 |
| A8.4a | *Alternate* Register Bays (U-Shape Check-Out) | Prototype Version 1.2006 | 03/31/06 |
| A8.4b | *Alternate* Register Bays (Tandem Express Checkout) | Prototype Version 1.2006 | 03/31/06 |
| A8.5 | Remote Service Desks | Prototype Version 1.2006 | 03/31/06 |
| A9.1 | Interior Elevations | Prototype Version 1.2006 | 03/31/06 |
| A9.2a | Bridal Registry Installation Details - (Exterior Units) | Prototype Version 1.2006 | 03/31/06 |
| A9.2b | Bridal Registry Installation Details - (Interior Units) | Prototype Version 1.2006 | 03/31/06 |
| A9.2c | Bridal Registry Installation Details - (Hand Rail & Sign) | Prototype Version 1.2006 | 03/31/06 |
| A9.3 | *Alternate* Plans, Elevations & Details | Prototype Version 1.2006 | 03/31/06 |
| A9.4 | FTG Fixture Plan & Vendor Responsibility Schedule | Prototype Version 1.2006 | 03/31/06 |
| A9.6 | *Alternate* Awning Details | Prototype Version 1.2006 | 03/31/06 |
| A9.7 | *Alternate* Awning Details | Prototype Version 1.2006 | 03/31/06 |
| A9.8 | *Alternate* Wall Sections At Awning | Prototype Version 1.2006 | 03/31/06 |
| HP1.1 | High Pile Storage Plan & Fixture-Shelf Details | Prototype Version 1.2006 | 03/31/06 |
| S1.1 | Structural General Information & Typical Details | Prototype Version 1.2006 | 03/31/06 |
| S2.1 | Foundation Plan | Prototype Version 1.2006 | 03/31/06 |
| S2.2 | Roof Framing Plan | Prototype Version 1.2006 | 03/31/06 |
| S3.1 | Foundation Details | Prototype Version 1.2006 | 03/31/06 |
| S3.2 | Roof Framing Details | Prototype Version 1.2006 | 03/31/06 |
| P1.1 | Plumbing Riser Diagrams and Fixture Schedule | Prototype Version 1.2006 | 03/31/06 |
| P2.1 | Plumbing Floor Plan | Prototype Version 1.2006 | 03/31/06 |
| P3.1 | Plumbing Enlarged Plans & Details | Prototype Version 1.2006 | 03/31/06 |
| FP1.0 | Fire Sprinkler Plans, Notes & Details | Prototype Version 1.2006 | 03/31/06 |
| FP1.1 | Fire Sprinkler Notes and Details | Prototype Version 1.2006 | 03/31/06 |
| FA1.0a | Fire Alarm Plans & Notes Base System | Prototype Version 1.2006 | 03/31/06 |
| FA1.0b | *Alternate* Fire Alarm Plans & Notes Occupant Notification | Prototype Version 1.2006 | 03/31/06 |
| FA1.0c | *Alternate* Fire Alarm Plans & Notes Full Smoke Detection | Prototype Version 1.2006 | 03/31/06 |
| FA1.1a | Fire Alarm Details Base System | Prototype Version 1.2006 | 03/31/06 |
| FA.1.1b | *Alternate* Fire Alarm Details Occupant Notification | Prototype Version 1.2006 | 03/31/06 |
| FA1.1c | *Alternate* Fire Alarm Details Full Smoke Detection | Prototype Version 1.2006 | 03/31/06 |
| FA1.2a | Fire Alarm Device Lists & Calcs Base System | Prototype Version 1.2006 | 03/31/06 |
| FA1.2b | *Alternate* Fire Alarm Device Lists & Calcs Occupant Notification | Prototype Version 1.2006 | 03/31/06 |
| FA1.2c | *Alternate* Fire Alarm Device Lists & Calcs Full Smoke Detection | Prototype Version 1.2006 | 03/31/06 |
| M1.1 | Mechanical General Information | Prototype Version 1.2006 | 03/31/06 |
| M2.1 | Mechanical Floor Plan | Prototype Version 1.2006 | 03/31/06 |
| M3.1 | Mechanical Large Scale Plans & Details | Prototype Version 1.2006 | 03/31/06 |
| M4.1 | Mechanical Schedules & Details | Prototype Version 1.2006 | 03/31/06 |
| E1.1 | Electrical General Information & Schedules | Prototype Version 1.2006 | 03/31/06 |
| E2.1 | Power Plan | Prototype Version 1.2006 | 03/31/06 |
| E2.2 | Lighting Layout Plan | Prototype Version 1.2006 | 03/31/06 |
| E2.3 | Lighting Circuiting Plan | Prototype Version 1.2006 | 03/31/06 |
| E2.4 | Specialty Lighting Plans & Diagrams | Prototype Version 1.2006 | 03/31/06 |
| E2.5 | Specialty Lighting Elevations | Prototype Version 1.2006 | 03/31/06 |

| E3.1 | Electrical Large Scale Plans & Details | Prototype Version 1.2006 | 03/31/06 |
|------|---------------------------------------|--------------------------|----------|
| E3.2 | Lighting Sequencing | Prototype Version 1.2006 | 03/31/06 |
| E3.3 | Electrical Details | Prototype Version 1.2006 | 03/31/06 |
| E4.1 | Electrical Schedules | Prototype Version 1.2006 | 03/31/06 |
| E4.2 | Electrical Diagrams | Prototype Version 1.2006 | 03/31/06 |
| E4.3 | Electrical Schedules | Prototype Version 1.2006 | 03/31/06 |
| E4.4 | Novar Wiring Details | Prototype Version 1.2006 | 03/31/06 |
| E4.4a | *Alternate* Novar Wiring Details for RTU's Other Than Lennox | Prototype Version 1.2006 | 03/31/06 |
| E4.5 | ETM Details for Lennox RTU's | Prototype Version 1.2006 | 03/31/06 |
| E4.5a | *Alternate* ETM Wiring Details For Non-Lennox RTU's | Prototype Version 1.2006 | 03/31/06 |
| E5.1 | FTG Power, Lighting & Specialty Lighting | Prototype Version 1.2006 | 03/31/06 |
| E6.1 | *Bid Alternate:* Modular Wiring (Data Only) Plans & Details | Prototype Version 1.2006 | 03/31/06 |

Project Manual for Bed Bath & Beyond, dated March 31, 2006.

D.    Neither Tenant's Plans nor Tenant's Prototype Drawings and Specifications reflect regional or governmental requirements. Such regional/governmental requirements may include but not limited to the following: Stockroom/Sales Area partition between sales area and stockroom may be required including all openings through the partition be properly protected; Disability access to mezzanine level such as an ADA lift, limited use/limited application elevator, or elevator may be required including installation of phone lines to cab; The number of restroom fixtures, number of exit stairs, smoke purge and pressurization system, smoke/heat vents, draft curtains, fire rated walls, ceiling or floors required to meet high pile storage requirements, etc. may need to be modified to comply with all applicable Legal Requirements.

In addition, Landlord shall include the following items as part of the Final Plans and Specifications:

1.    All architectural elevations and construction details for all pylon, monument and directional signs located throughout the Shopping Center.

2.    All architectural elevations and partial sidewalk plans of all other tenants and occupants of the Shopping Center.

3.    Complete civil engineering documents that describe planned improvements to the Shopping Center, including geo-technical and stormwater design reports.

### Site Specifications

A.    

B.    All truck access drives in the Shopping Center shall consist of a minimum <u>12"</u> of compacted sub-base (95% compacted), 4" class 7 aggregate base course, and 6" Portland cement concrete paving. Grading of these areas are not to exceed a slope of 3%.

C.    All truck ramps and dumpster pads shall consist of 12" compacted sub-base (95% compacted), 4" class 7 aggregate and 7" Portland cement concrete surface finish. Reinforcement is WWM in lieu of rebar. Recessed truck ramps shall not exceed slope of 5%.

If Landlord's geo-technical report for the Shopping Center recommends more stringent requirements, then the geo-technical report recommendations shall supersede the criteria stated in items A, B, and C above.

D.    The minimum lighting level throughout the Shopping Center (parking areas, traffic drives, service drives, etc.) shall be at least two (2) foot-candles, measured 30" above grade. Landlord shall include a photometric plan, which shall confirm that the proposed lighting meets these requirements as part of the Final Plans and Specifications. Landlord shall not include illumination from building-mounted wall packs when calculating the required foot-candle level. Landlord shall provide low level security lighting min. (1) foot-candle throughout center that shall remain illuminated from dusk to dawn seven days a week.

### Building Requirements

The following describes project-specific elements of Landlord's Work in addition to the scope detailed in Tenant's Prototype Drawings and Specifications:

A.    Clear Height - Building systems (plumbing & electrical) shall be designed to allow Tenant to stock merchandise up to at least 16'-6" a.f.f. All plumbing and electrical elements shall be located at least 16'-6" a.f.f., except for Tenant's light fixtures. Mechanical shall be designed at a minimum of 17'-6" a.f.f. to bottom of duct. Maximum bottom of supply and return duct height shall not exceed 19'-0" a.f.f. Fire protection sprinkler piping (main and branch lines) shall be located at least 16'-6" a.f.f., sprinkler heads shall be located within 1" minimum and 6" maximum from the roof/floor deck. Bottom of all structural elements shall be located at least 18'-4" a.f.f.

B.    Fire Alarm System - Landlord shall furnish and install a fire alarm system in accordance with the minimum base standards set forth in Tenant's Prototypical Plans and Specifications, or more stringent requirements

as may be required by law. Landlord shall be responsible for monitoring the fire alarm system up to 90 days after the Delivery Date.

LL shall issue complete fire alarm system submittal consisting of site specific drawings and equipment cut sheets to CCI for their review and approval no later than (12) weeks prior to projected delivery date. The fixed cost to LL for this initial review is $600.00 which includes costs associated with printing and shipping. LL must pay this fee at time of plan review, the review will not commence without prepayment of fee. If subsequent reviews are required by CCI due to initial rejection, then fixed cost to LL for subsequent reviews shall be on a time and material basis. The hourly rate for these subsequent reviews shall be $125.00/hour plus reimbursables associated with printing and shipping. Fees for this work will be issued subsequent to the review. If LL fails to issue payment to CCI within 30 days, then Tenant has right to pay CCI direct and deduct cost from rent payment.

Mr. Will Smith
Code Consultants, INC.
Work:         (314) 991-2633
Fax:          (314) 991-4614
1804 Borman Circle Drive
St. Louis, Missouri 63146-4136

C.    1st Level Structure (sales/non-sales level) - Landlord shall provide a minimum 4000 psi concrete floor slab having a minimum thickness of 4". Structural system shall be rated to accept 125 lb. per square foot of live load. If rebar or pretensioned or post-tensioned steel is required, it shall not be placed within the top 2 ½" of the concrete slab. In lieu of rebar GGP is providing 6x6 welded wire fabric located in the center of the slab (2").

D.    Sprinkler System - The sprinkler system shall be designed to allow fixturing and storage to be within 18" of heads. System shall comply with 1999 or later version of NFPA13, (high pile solid shelf storage) for class I-IV commodity solid shelves, minimum 4 foot aisles. Typically, .486 GPM over 2000 sf will be required.

E.    Landlord shall provide sprinkler system sufficient to meet the requirements specified within Tenant's Prototype Drawings and Specifications without utilizing a fire pump if existing water pressure allows. If water pressure is inadequate and system cannot be designed to properly function without incorporating a fire pump, then Landlord shall include Fire Pump outside of Premises. Landlord shall maintain Fire Pump for the full term of the Lease without any cost to Tenant. Landlord shall, without any cost to Tenant and for the full term of the Lease, routinely inspect, test, and maintain the Fire Pump in accordance with NFPA 25, Standard for the Inspection, Testing, and Maintenance of Water-based Fire Protection Systems (Chapter 5 of 1998 Edition).

F.    LL shall issue complete fire protection submittal consisting of site specific head locations, hydraulic calculations and equipment cut sheets to CCI for their review and approval no later than (12) weeks prior to projected delivery date. The fixed cost to LL for this initial review is ▇▇▇▇▇▇ which includes costs associated with printing and shipping. LL must pay this fee at time of plan review, the review will not commence without prepayment of fee. If subsequent reviews are required by CCI due to initial rejection, then fixed cost to LL for subsequent reviews shall be on a time and material basis. The hourly rate for these subsequent reviews shall be ▇▇▇▇▇▇ plus reimbursables associated with printing and shipping. Fees for this work will be issued subsequent to the review. If LL fails to issue payment to CCI within 30 days, then Tenant has right to pay CCI direct and deduct cost from rent payment.

If BBBY national fire protection consultants are needed to assist LL with approvals from governmental authorities such as completing technical discussions with governmental authorities to explain/clarify design parameters, calculations, high pile storage commodity classifications, fire pump design, etc., then LL shall directly pay consultant for all time and materials. If LL fails to pay consultant, then Tenant shall have the right to receive a credit against "Changes" under the lease or deduct amount from Rent in order to satisfy outstanding invoice.

Mr. Will Smith
Code Consultants, INC.
Work:         (314) 991-2633
Fax:          (314) 991-4614
1804 Borman Circle Drive
St. Louis, Missouri 63146-4136

G.    If fire-proofing of structural elements is required, then Landlord shall use intumescent fire resistive coating. All edges of application shall be neat, clean and straight. All edges of material to be parallel to structural element being treated.

H.    If applicable, Landlord shall complete and make operational all vertical transportation equipment (passenger and freight elevators, escalators, cart conveyors, etc.) a minimum of (2) two weeks in advance of Delivery. Landlord shall continuously operate such equipment in accordance with manufacturers recommendations during this (2) week period in order to allow equipment to properly "Burn-In". "Burn-In" required in order to identify and repair any potential mechanical deficiencies that may exist with the equipment prior to Delivery.

I.    Landlord to contact APM to determine which vinyl strip flooring vendor to use:

Associated Carpet                    Gerbert Limited
18 Sidney Circle                     715 Fountain Avenue

4

Kenilworth, NJ 07033                              (P.O. Box 4944)
Attn: Damian Holder                               Lancaster, PA
Phone: 800-800-4320                               Attn: Simon Zimmerman
                                                  Phone: 800-828-9461 Ext. 16

## Construction Coordination Requirements

A.   Landlord shall provide Tenant with a critical path schedule prior to commencement of Landlord's Work, and shall provide to Tenant's construction project manager an updated critical path schedule every two weeks thereafter until Landlord's Work is completed

B.   Throughout the period during which Landlord's Work is being performed, Landlord shall provide to Tenant's construction project manager, on a weekly basis, then-current photographs of the interior and exterior of the Premises, and the Shopping Center site, showing the progression of Landlord's Work. All photographs shall be in a digital format, and transmitted to Tenant at e-mail address at BBB.2000photos@bedbath.com

## Building and Site Signs

A.   Building Signs – Landlord shall furnish and install all building signs shown on Exhibits D-1 and F utilizing Tenant's specified vendor only. Landlord is responsible to verify actual number of circuits required with Tenant's specified vendor. Conduit to be installed continuously from Tenant's panel in Premises to sign location(s). Landlord required to execute purchase order with Tenant's specified vendor within 10 weeks prior to Delivery Date. If Landlord fails to execute purchase order within this time frame, then at Tenant's option, Tenant may execute purchase order with Tenant's specified vendor and deduct all costs from rent, (or , at Tenant's option , receive a credit against "Changes" under the lease). If Tenant does not provide written notice to Landlord regarding Tenant's decision to execute purchase order with Tenant's specified vendor, then Landlord shall remain responsible to execute purchase order.

B.   Remote Building Signs -- (Building Sign not located on Premises) Landlord shall furnish and install all building signs shown on Exhibits D-1 and F utilizing Tenant's specified vendor only. Landlord is responsible to verify actual number of circuits required with sign manufacturer. Conduit to be installed continuously from Tenant's panel in Premises or other source to remote sign location(s).

C.   Pylon/Monument/Directional Signs – Landlord shall furnish and install all pylon /monument /directional signs (s) shown on Exhibit F to this Lease, complete (including, without limitation, sign structure, any required electrical service, sign panels, and Tenant's specified graphics).

D.   Temporary Signs -- commencing on the Effective Date, and continuing thereafter through the Rent Commencement Date, Landlord shall furnish, install and maintain, for such duration as Tenant may desire, and in accordance with Tenant's Prototype Drawings and Specifications [and Exhibit F to this Lease, as applicable]: (i) a temporary banner bearing the phrase "Coming Soon" on the storefront of the Premises, and (ii) a temporary sign near the site of the [future] main entrance to the Shopping Center, bearing the phrase "Bed Bath & Beyond Coming Soon". At Tenant's request, Landlord shall relocate Tenant's temporary signage, in the event the visibility thereof becomes obstructed. Landlord shall secure banners through the following vendor:

Corporate Identification Solutions
5308 N. Northwest Highway
Chicago, IL 60630
Attn: Sarah Glenn
P: 773.763.9600
F: 773.763.9606
C: 773.454.6069
sarah@corporateidsolutions.com
www.corporateidsolutions.com

E.   Landlord shall provide complete shop drawings of all Landlord-furnished signs to Tenant for Tenant's approval at least (12) weeks prior to delivery date.

## Permits and Approvals

A.   Landlord to secure all permits required to allow Tenant to fixture, merchandise (including without limitation permits for it's for prepackaged foods), and open for business to the public in the Premises.

If Seismic calculations, plans and details are required, then Landlord shall be obligated to contract with "Seizmic Inc." no later than (12) weeks prior to delivery. Seizmic Inc. shall provide the necessary services to assist Landlord in securing the fixture permit. These services include completion of all required submittal documents, required applications, responses to inquiries from the authority having jurisdiction and monitoring status of permit. Actual submission of the required documents to the AHJ shall be made only by Seizmic, Inc., or other vendor selected at Tenant's discretion.

Seizmic Inc.
Contact: Sal Fateen or Genie Fateen

5

161 Atlantic Street, Pomona, CA 91768
Ph. # 909 869 0989

Landlord shall be obligated to take possession of Fixture permit and transfer permit to Tenant's fixture installer. If fixture permit is required, then Landlord shall secure fixture permit no later than (2) weeks prior to delivery date.

B.    Sprinkler system design shall allow Landlord to obtain and secure "high pile storage" permit.

## Construction Closeout

A.    Landlord shall be obligated to forward (1) hard copy of all required documents outlined with Section 01700 – Contract Closeouts, of Tenant's Prototype Specifications / Project Manual to **Digital Reliance Incorporated (DRI), 386 Charmel Place, Columbus, OH 43235, (614) 430-5950, jg@digital-reliance.com**, for purpose of scanning to disk for Tenant's future use. All documents shall be delivered to DRI within thirty (30) days after the "Substantial Completion Date. The cost associated with this service is ██████ ███████

Prior to scanning, DRI will confirm submittal from Landlord meets base minimum requirements and shall inform Landlord directly if certain documents are missing. DRI will not review items for content. The content will be reviewed once electronic file has been received by Tenant's Construction Project Manager. Any need for resubmittal due to incorrect content, etc. will be communicated to Landlord from Tenant's Construction Project Manager. Landlord to resubmit amended document to DRI for scanning and incorporation into file until approved by Tenant's Construction Project Manager.

Once Electronic file has been completed, it shall be forwarded directly to Tenant's Construction Project Manager with transmittal copy to Landlord within sixty (60) days after the "Substantial Completion Date".

B.    Landlord shall cause its contractor(s) to instruct Tenant's Construction Project Manager in the operation of any equipment installed pursuant to these specifications. All of Landlord's Work shall be performed in a manner which will not void, impair or diminish any manufacturers', installers', or contractors' warranties which otherwise would have been provided by such manufacturer, installer, or contractor to either Landlord or Tenant. Two (2) months prior to the end of the warranty period, Landlord must forward a written report to Tenant on the condition of all warranty items.

C.    If Landlord fails to deliver any of the instruments and items (collectively, the "Close-out Documents") described in the immediately preceding paragraph A within the prescribed thirty (30) day period, then Tenant may provide Landlord with notice of such failure. ████████████████████████████████
█████████████████████████████████████████████████████████████████

D.    Itemized Budget - Landlord shall provide Tenant with its itemized "budget" and "final cost" within thirty (30) days after the Substantial Completion Date.

E.    Landlord shall be obligated to provide to Tenant within 30 days of Tenants request copies of manufactures invoice(s), manufactures cut sheets, Subcontractor invoices, etc. for any item or items described within Exhibit D - Standard Landlord's Work.

<u>Exhibit D-1</u>

<u>Exterior Elevations of Premises and Sidewalk Plan</u>

C061858/0205454/1372981.6



PARTIAL SIDEWALK PLAN

FRONT ELEVATION

SIDE ELEVATION

REAR ELEVATION

EXHIBIT D-1

EXTERIOR ELEVATIONS OF THE
PREMISES, AND SIDE WALK
PLAN

ROGERS, AR

GENERAL NOTES:
1. ENTRY MAY SHOW BASED ON TENANTS
   FINAL FIXTURE PLAN.
2. FENESTRATION INDICATED IS SCHEMATIC
   AND IS SUBJECT TO TENANTS PLANS.

## Exhibit D-2

### Exterior Elevations of Adjacent Premises

C061858/0205454/1372981.6



EXHIBIT D-2
EXTERIOR ELEVATIONS OF
THE SHOPPING CENTER
ROGERS, AR

## EXHIBIT E

### Permitted Encumbrances

1.  Reservations, Restrictions, Easements, Dedications, Right of Ways and Setback tines as may be shown upon the recorded plat of said Pinnacle Hills Promenade Subdivision, filed for record in Plat Record Book 2006 at Page 1356 and Final Plat recorded in Plat Book 2006 at Page 1356, of the Records of Benton County, Arkansas.

2.  Matters as set out on Surveys filed for record in Plat Book 2005 at Page 1150, Plat Book P3 at Page 395, and Plat Book 2005 at Page 73, among the records of Benton County, Arkansas.

3.  Restrictive Covenant Agreement filed for record October 10, 2005, as Land Document No. 2005-54722, among the land records of Benton County, Arkansas.

4.  Transmission Line Easement in favor of Carroll Electric Cooperative Corporation, a cooperative corporation, dated January 24, 1980, and filed for record January 24, 1980, in Record Book 558 at Page 625, among the land records of Benton County, Arkansas.

5.  Utility Easement in favor of the City of Rogers, Arkansas, a municipal corporation, dated April 6, 1995, and filed for record April 12, 1995, as Land Document No. 95-022015, among the land records of Benton County, Arkansas.

6.  Utility Easement in favor of the City of Rogers, Arkansas, a municipal corporation, dated April 10, 1995, and filed for record April 12, 1995, as Land Document No. 95-022047, among the land records of Benton County, Arkansas.

7.  Sanitary Sewer Utility Easement in favor of the City of Rogers, Arkansas, a municipal corporation, dated November 10, 2000, and filed for record November 30, 2000, as Land Document No. 00123891, among the land records of Benton County, Arkansas.

8.  Utility Easement in favor of the City of Rogers, Arkansas, a municipal corporation, dated February 1, 2001, and filed for record March 20, 2001, as Land Document No. 01033759, among the land records of Benton County, Arkansas.

9.  Transmission Line Easement in favor of Carroll Electric Cooperative Corporation, a cooperative corporation, dated January 24, 1980, and filed for record January 24, 1980, in Record Book 558 at Page 625, among the land records of Benton County, Arkansas.

10. Transmission Line Easement in favor of Carroll Electric Cooperative Corporation, a cooperative corporation, dated September 23, 1997, and filed for record May 15, 1998, as Land Document No. 98-050791, among the land records of Benton County, Arkansas.

11. Transmission Line Easement in favor of Carroll Electric Cooperative Corporation, a cooperative corporation, dated August 27, 1997, and filed for record May 15, 1998, as Land Document No. 98-050795, among the land records of Benton County, Arkansas.

12. Sewer Easement in favor of the City of Rogers, Arkansas, a municipal corporation, dated July 12, 2005, and filed for record July 13, 2005, as Land Document No. 2005-35369, among the land records of Benton County, Arkansas.

13. Sewer Easement in favor of the City of Rogers, Arkansas, a municipal corporation, dated October 25, 2005, and filed for record November 15, 2005, as Land Document No. 2005-62047, among the land records of Benton County, Arkansas.

14. Sewer Easement in favor of the City of Rogers, Arkansas, a municipal corporation, dated October 25, 2005, and filed for record November 15, 2005, as Land Document No. 2005-62052, among the land records of Benton County, Arkansas.

15. Detention Pond Maintenance Agreement, dated April 28, 2005 and filed for record May 9, 2005, as Land Document No. 2005-119180, among the land records of Benton County, Arkansas.

16. Restrictive Covenant Agreement, dated September 20, 2005, and filed for record October 10, 2005, as Land Document No. 2005-54722, among the land records of Benton County, Arkansas.

17. Memorandum of Option Agreement, dated September 30, 2005, and filed for record October 10, 2005, as Land Document No. 2005-279223, among the land records of Benton County, Arkansas.

18. Utility Easement in favor of the City of Rogers, Arkansas, a municipal corporation, dated June 15, 2005, and filed for record February 1, 2006, as Land Document No. 2006-6453, among the land records of Benton County, Arkansas.

19. Utility Easement in favor of the City of Rogers, Arkansas, a municipal corporation, dated March 30, 2005, and filed for record February 1, 2006, as Land Document No. 2006-6458, among the land records of Benton County, Arkansas.

20. Memorandum of Lease dated January 6, 2006, and filed for record February 8, 2006, as Land Document No. 2006-36047, among the land records of Benton County, Arkansas, showing J.C. Penney Properties, Inc., as Tenant and Rogers Retail, L.L.C., as Landlord.

21. Street Right of Way, Drainage and Utility Easement Deed in favor of the public, dated March 8, 2006, and filed for record March 9, 2006, as Land Document No. 2006-12579, among the land records of Benton County, Arkansas.

22. Street Right of Way, Drainage and Utility Easement Deed in favor of the public, dated March 8, 2006, and filed for record March 9, 2006, as Land Document No. 2006-12588, among the land records of Benton County, Arkansas.

23. Utility Easement in favor of the City of Rogers, Arkansas, a municipal corporation, dated March 8, 2006, and filed for record March 9, 2006, as Land Document No. 2006-12592, among the land records of Benton County, Arkansas.

24. Memorandum of Lease between Rogers Retail, LLC, (Landlord), and Michael A. Lightman, Sr. (Tenant) and Malco Theatres, Inc., (Guarantor), dated August 10th, 2005, and filed for record April 14, 2006, as Land Document No. 2006-19457 among the records of Benton County, Arkansas. Also, First Amendment to Memorandum of tease filed for record April 26, 2006, as Land Document No. 2006-106717, Benton County, Arkansas. Also, Memorandum of Amended and Restate Sublease and Ratification of Assignment, filed for record April 26, 2006, as Land Document No. 2006-21195, Benton County, Arkansas.

25. Construction, Operation and Reciprocal Easement Agreement, by and between Rogers Retail, LLC, and Dillard's Dollars, Inc., dated May 16, 2006, and filed for record May 19, 2006, as Land Document No. 2006-129634, among the land records of Benton County, Arkansas.

26. Utility Easement in favor of Southwestern Bell Telephone Company, a Texas limited partnership, d.b.a. AT&T Arkansas, dated June 13, 2006, and filed for record June 14, 2006, as Land Document No. 2006-29893, among the land records of Benton County, Arkansas.

27. Declaration of Covenants, conditions, restrictions, and easements, filed for record June 29, 2006, as Land Document No. 2006-32609, among the land records of Benton County, Arkansas.

28. Matters as shown in Survey recorded July 5, 2006, in Plat Book 2006 at Page 792, among the land records of Benton County, Arkansas.

29. Memorandum of Lease between Rogers Retail, LLC, (Landlord) and Borders, Inc., (Tenant), dated May 18, 2006, filed for record August 8, 2006, as Land Document No. 2006-205641, among the land records of Benton County, Arkansas.

30. Utility Easement in favor of Southwestern Telephone Company, filed for record August 16, 2006, as Land Document No. 2006-40320, among the land records of Benton County, Arkansas.

31. UCC Financing Statement showing Ozark Treats, Inc. and Dairy Queen and Orange Julius, as Debtor and Comerica Bank, as Secured Party, filed for record August 24, 2006, as Document No. 2006-1262, Benton County, Arkansas.

32. Assignment and Assumption of Construction, Operation and Reciprocal Easement Agreement by and between Rogers Retail, LLC and Pinnacle South, LLC, filed for record November 21, 2006 as Land Document No. 2006-55895 among the land records of Benton County, Arkansas.

33. Memorandum of Ground Lease between Rogers Retail LLC (Landlord) and Sullivan's of Arkansas, Inc. (Tenant) filed for record December 6, 2006, as Land Document No. 2006-312519 among the land records of Benton County, Arkansas.

Landlord represents and warrants that (i) none of the foregoing will interfere with or prevent Tenant from operating its Premises in accordance with the terms of this Lease, (ii) conflict with any right granted Tenant under this Lease, (iii) impose on Tenant any obligation(s) in excess of those set forth in this Lease, and (iv) none of the foregoing easements or rights of way (a) are located beneath the Premises, or (b) will interfere with Tenant's use and enjoyment of the Premises.

The inclusion of the foregoing memoranda of lease or other similar agreements as set forth in items 17, 20, 24, 29, 31 and 33 within these "Permitted Encumbrances" is for informational purposes only, and shall not be deemed to diminish any of Tenant's rights, or increase any of Tenant's obligations, under this Lease.

C061858/0205454/1372981.6

<u>Exhibit F</u>

<u>Signage</u>

C061858/0205454/1372981.6



**CROSS SECTION MOUNTING DETAIL**
SCALE: NTS

- .063 ALUM. RETURN
- 1" JEWELITE FACE
- TOGGLE SWITCH
- .090 ALUM. BACK STAPLED
- POWER SUPPLY
- ½" CARFLEX CONDUIT x 15' CARFLEX WHIP
- EQUIPMENT GROUND
- LED. GELCORE 2/ft. TETRA, (WHITE)
- GELCORE SPLICE CONNECTOR
- ⅜" NON-CORROSIVE LAG BOLTS OR THREADED ROD AS REQ'D.
- 1/4" WEEP HOLE w/LIGHT BAFFLE BEAD AROUND INTERIOR SEAM

## MATERIALS

| POWER WHITE | GEWHPTS2 | GELCLPSS | GELCLP88 | GELCLSC2 | GELCLSW1 | GELCLEC1 | N/A | N/A |
|---|---|---|---|---|---|---|---|---|
| WHITE | | SELF-CONTAINED POWER SUPPLIES | | SPLICE CONNCTR | SUPPLY WIRE | END CAP | LT. GUIDE CONNCTR | LIGHT GUIDE |
| 120" | Ft | In | Bank # | Bank # | Qty | Ft | Qty | Qty | Ft |
| | 32 | 0 | #101-4 | #1801 | 16 | 48 | 20 | | |
| B | 30 | 0 | #201-4 | #1801 | 16 | 48 | 20 | | |
| C | 30 | 0 | #201-4 | #2001 | 16 | 40 | 20 | | |
| D | 32 | 0 | #401-4 | #2101 | 16 | 40 | 20 | | |
| A | 31 | 0 | #701-4 | #2201 | 10 | 48 | 14 | | |
| T | 19 | 0 | #601-2 | | 6 | 24 | 12 | | |
| H | 37 | 0 | #401-4 | #2591 | 16 | 48 | 20 | | |
| A | 37 | 0 | #401-4 | #24B1#26B0 | 12 | 48 | 24 | | |
| B | 33 | 0 | #401-4 | #26B1 | 10 | 48 | 20 | | |
| B | 34 | 0 | #16B1-4 | #27B1 | 10 | 48 | 20 | | |
| Y | 39 | 0 | #15B1-4 | #28B1 | 10 | 48 | 20 | | |
| O | 28 | 0 | #12B1-4 | | 8 | 32 | 16 | | |
| | 18 | 0 | #13B1-3 | | 6 | 24 | 12 | | |
| N | 26 | 0 | #14B1-4 | | 8 | 32 | 16 | | |
| | 22 | 0 | #14B1-4 | | 8 | 32 | 16 | | |
| D | 28 | 0 | #16B1-4 | | 8 | 33 | 16 | | |
| | 29 | 0 | #17B1-4 | | 8 | 32 | 16 | | |
| | 9 | 0 | | #29B1 | 2 | 8 | 4 | | |
| **TOTAL** | 560 ft | 00 in | 17 | 12 | 168 | 624 | 312 | 0 | 0 |

TECHNICAL SUPPORT
216-586-6592
WWW.GELCORE.COM

Drawn By: D THRUSH
Date: 1/24/06
Rev: 00

**GELcore, LLC**
Tetra™ LED Systems

VALLEY VIEW, OH 44125
216-668-5555
PAGE  3  OF  3



GELCORE LED LAYOUT



|← 40'-0" →|

4'-9⅞"

10'-0"

3'-9⅞"

**ELEVATION**

COLOR NOTES:
RETURN: 6"x.063 WHITE
TRIM: TO MATCH RETURN
    LTRS UNDER 42" USE 1" WHITE JEWELITE
    LTRS 42" AND ABOVE USE L MOLD
    PAINTED WHITE
FACE: 2447 WHITE SG 41D LEXAN
LED: WHITE GELCORE TYPE-GEWHPTS2
INSIDE OF CAN TO BE PAINTED
    SEMI GLOSS WHITE

GENERAL NOTE:
    MINIMUM #8 SHEET METAL SCREWS
ARE TO BE USED FOR SECURING THE
FACE TO THE LETTER RETURN.
    THE MAXIMUM SPACING SHALL NOT
EXCEED 18" AND NO FEWER THAN
FOUR SCREWS ARE TO BE USED PER
FACE.

ELECTRICAL NOTE—Actual # of circuits to be
determined by a Licensed Electrical Contractor.
TOTAL AMPS— 31.50A
# OF CKTS— 2  20 AMP(RECOMMENDED)
VOLTS— 120
ALL SIGNAGE WILL BE (U.L.) LISTED. (U.L.) 2161
COMPLIANT AND CARRY (U.L.) LABELS.

 ON OFF

*NOTE:
INSTALL TOGGLE SWITCH TO OPERATE
(ON/OFF) IN THE HORIZONTAL POSITION.

| 1  SWITCH PER LETTER |
|---|

| IF NON-STANDARD PRODUCT CHECK APPROPRIATE BOX BELOW |
|---|
| ☐ – RED FACE |
| ☐ – BLACK RETURNS |
| ☐ – DARK BRONZE RETURNS |

5.9.07

# EXHIBIT 'F'
## BUILDING SIGN
ROGERS, AR
SHEET 1 of 4

## MATERIALS

| | POWER WHITE | GEWHITES2 | GECLPSS | GECLPS6 | GECLSC2 | GECLSW1 | GECLEC1 | N/A | N/A |
|---|---|---|---|---|---|---|---|---|---|
| | WHITE | 2FT. | SELF-CONTAINED POWER SUPPLIES | | SPLICE CONNCTR | SUPPLY WIRE | END CAP | LT. GUIDE CONNCTR | LIGHT GUIDE |
| 69" | Ft | In | Item # | Item # | Qty | Qty | Qty | Qty | Ft |
| B | 5 | 0 | | #1B1 | 3 | 6 | 6 | | |
| | 5 | 0 | | #2B1 | 3 | 6 | 6 | | |
| E | 4 | 0 | | #3B1 | 3 | 6 | 6 | | |
| | 5 | 0 | | #4B1 | 3 | 6 | 6 | | |
| D | 5 | 0 | | #5B1 | 2 | 6 | 4 | | |
| | 6 | 0 | | #6B1 | 3 | 6 | 6 | | |
| D | 6 | 0 | | #7B1 | 3 | 6 | 6 | | |
| | 6 | 0 | | #8B1 | 3 | 6 | 6 | | |
| A | 6 | 0 | | #9B1 | 3 | 6 | 6 | | |
| | 6 | 0 | | #10B1 | 3 | 6 | 6 | | |
| H | 5 | 0 | | #11B1 | 3 | 6 | 6 | | |
| | 5 | 0 | | #12B1 | 3 | 6 | 6 | | |
| A | 5 | 0 | | #13B1 | 3 | 6 | 6 | | |
| | 6 | 0 | | #14B1 | 3 | 6 | 6 | | |
| B | 6 | 0 | | #15B1 | 3 | 6 | 6 | | |
| | 6 | 0 | | #16B1 | 3 | 6 | 6 | | |
| E | 5 | 0 | | #17B1 | 2 | 6 | 4 | | |
| | 6 | 0 | | #18B1 | 2 | 6 | 4 | | |
| Y | 4 | 0 | | #19B1 | 2 | 6 | 4 | | |
| | 4 | 0 | | #20B1 | 2 | 6 | 4 | | |
| | 4 | 0 | | #21B1 | 2 | 6 | 4 | | |
| O | 6 | 0 | #22B1 | | 2 | 9 | 4 | | |
| | 6 | 0 | #23B1 | | 2 | 9 | 4 | | |
| | 6 | 0 | #24B1 | | 2 | 9 | 4 | | |
| N | 7 | 0 | | #25B1 | 3 | 9 | 6 | | |
| | 7 | 0 | | #26B1 | 3 | 6 | 6 | | |
| D | 7 | 0 | | #25B1 | 2 | 6 | 4 | | |
| | 7 | 0 | | #26B1 | 2 | 6 | 4 | | |
| | 7 | 0 | | #27B1 | 2 | 6 | 4 | | |
| **TOTAL:** | 163 ft | 0 in | 6 | 23 | 76 | 232 | 152 | 0 | 0 |

| TECHNICAL SUPPORT | Drawn By: | O.THRUSH | **GELcore, LLC** | | VALLEY VIEW, OH 44125 |
|---|---|---|---|---|---|
| 216-606-6923 | Date: | 1/24/06 | | | 216-606-6555 |
| WWW.GELCORE.COM | Rev: | 00 | Tetra™ LED Systems | | PAGE 2 OF 2 |



.063 ALUM. RETURN
1" JEWELITE FACE
TOGGLE SWITCH
.090 ALUM. BACK STAPLED
POWER SUPPLY
½" CARFLEX CONDUIT x 15' CARFLEX WHIP
EQUIPMENT GROUND
LED. GELCORE 2/lt. TETRA, (WHITE)
GELCORE SPLICE CONNECTOR
3" NON-CORROSIVE LAG BOLTS OR THREADED ROD AS REQ'D.
1/4" WEEP HOLE w/LIGHT BAFFLE BEAD AROUND INTERIOR SEAM

**CROSS SECTION MOUNTING DETAIL**
SCALE: NTS



GELCORE LED LAYOUT

|← 20'-0" →|

ELEVATION

2'-5"

5'-0"

1'-11½"



**COLOR NOTES:**
RETURN: 6"x.063 WHITE
TRIM: TO MATCH RETURN
   LTRS UNDER 42" USE 1" WHITE JEWELITE
   LTRS 42" AND ABOVE USE L MOLD PAINTED WHITE
FACE: 2447 WHITE SG 410 LEXAN
LED: WHITE GELCORE TYPE—GEWHPTS2
INSIDE OF CAN TO BE PAINTED SEMI GLOSS WHITE

**GENERAL NOTE:**
   MINIMUM #8 SHEET METAL SCREWS ARE TO BE USED FOR SECURING THE FACE TO THE LETTER RETURN.
   THE MAXIMUM SPACING SHALL NOT EXCEED 18" AND NO FEWER THAN FOUR SCREWS ARE TO BE USED PER FACE.

**ELECTRICAL NOTE**—Actual # of circuits to be determined by a Licensed Electrical Contractor.
TOTAL AMPS—  14.50A
# OF CKTS—  1  20 AMP(RECOMMENDED)
VOLTS—  120
ALL SIGNAGE WILL BE (U.L.) LISTED, (U.L.) 2161 COMPLIANT AND CARRY (U.L) LABELS.

**•NOTE:**
INSTALL TOGGLE SWITCH TO OPERATE (ON/OFF) IN THE HORIZONTAL POSITION.

| 1  SWITCH PER LETTER |
|---|

# EXHIBIT 'F'
(TYPICAL OF 2 SIGNS)
BUILDING SIGN
ROGERS, AR
SHEET 2 of 4

| IF NON-STANDARD PRODUCT CHECK APPROPRIATE BOX BELOW |
|---|
| ☐ — RED FACE |
| ☐ — BLACK RETURNS |
| ☐ — DARK BRONZE RETURNS |

5.9.07



2" PERIMETER
ACCENT BORDER
(COLOR WHITE)

PYLON PANEL WITH WHITE
BED BATH & BEYOND LOGO
WITH BLACK BACKGROUND

NOTE:
TENANT'S PYLON PANEL IS TO BE ON
BOTH SIDES OF THE PYLON STRUCTURE.

LANDLORD SHALL INSTALL PYLON PANELS
WITHIN 30 DAYS OF LEASE EXECUTION.

BED BATH & BEYOND
EXHIBIT      F
PYLON SIGN
ROGERS, AR
SHEET 3 OF 4





TEMPORARY SIGN (BUILDING OR BBB HIRING TRAILER)

TEMPORARY BUILDING SIGN

(REFER TO EXHIBIT D-1 FOR LOCATION ON BUILDING)

TEMPORARY SITE SIGNAGE

5.9.07

# EXHIBIT 'F

SITE PLAN

ROGERS, AR

SHEET 4 OF 4

<div align="center">Exhibit G</div>

<div align="center">Subordination, Non-Disturbance and Attornment Agreement</div>

THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT, made as of the _____ day of _____, 200__, by and between _____, a _____ [corporation] [limited] [general] [partnership] [national banking association], having an office at _____ (the *"Mortgagee"*) and Bed Bath & Beyond Inc., a New York corporation, having an office at 650 Liberty Avenue, Union, New Jersey 07083 (the *"Tenant"*).

<div align="center">W I T N E S S E T H :</div>

WHEREAS, Mortgagee is the holder of a mortgage (the *"Mortgage"*) covering a parcel of land owned by _____, a _____ corporation (the *"Landlord"*) together with the improvements [to be] erected thereon (said parcel of land and improvements thereon being hereinafter referred to as the *"Shopping Center"* and being more particularly described on Exhibit A attached hereto and made a part hereof); and

WHEREAS, by a certain lease heretofore entered into between Landlord and Tenant dated as of _____ (the *"Lease"*), Landlord leased to Tenant a portion of the Shopping Center, as more particularly described in the Lease (the *"Premises"*); and

WHEREAS, a copy of the Lease has been delivered to Mortgagee, the receipt of which is hereby acknowledged; and

**[For mortgages existing as of the date Lease is executed:** WHEREAS, as an inducement to Tenant to enter into the Lease, **[Section 2.3.1/Section 17.3]** thereof provides that the Lease is conditioned upon Landlord obtaining this Agreement from Mortgagee; and

WHEREAS, the parties desire to satisfy the foregoing condition and to provide for the non-disturbance of Tenant by the holder of the Mortgage; and]

**[For mortgages occurring after the Lease is executed:** WHEREAS, Section 17.1 of the Lease provides that the Lease shall become subject and subordinate to a mortgage encumbering the fee interest of Landlord in and to the Shopping Center if and when a non-disturbance agreement is entered into with respect to such mortgage; and

WHEREAS, the parties hereto desire to effect the subordination of the Lease to the Mortgage and to provide for the non-disturbance of Tenant by Mortgagee.]

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements herein contained, the parties hereto, intending to be legally bound hereby, agree as follows:

1. Mortgagee hereby consents to and approves the Lease and the term thereof, including the options to extend the term as set forth in the Lease, and covenants and agrees that the exercise by Tenant of any of the rights, remedies and options therein contained shall not constitute a default under the Mortgage.

2. Tenant covenants and agrees with Mortgagee that the Lease hereby is made and shall continue hereafter to be subject and subordinate to the lien of the Mortgage, and to all modifications and extensions thereof (and such subordination shall not lessen or diminish Tenant's rights under the Lease), subject, however, to the provisions of this Agreement.

3. Mortgagee agrees that so long as the Lease shall be in full force and effect, and so long as Tenant shall not be in default under the Lease beyond any applicable notice and grace period:

(a)     Tenant shall not be named or joined as a party or otherwise in any suit, action or proceeding for the foreclosure of the Mortgage or to enforce any rights under the Mortgage or the bond or note or other obligation secured thereby;

(b)     The possession by Tenant of the Premises and Tenant's rights thereto shall not be disturbed, affected or impaired by, nor will the Lease or the term thereof be terminated or otherwise affected by (i) any suit, action or proceeding brought upon the Mortgage or the bond or note or other obligation secured thereby, or for the foreclosure of the Mortgage or the enforcement of any rights under the Mortgage, or by any judicial sale or execution or other sale of the Premises or the Shopping Center, or any deed given in lieu of foreclosure, or by the exercise of any other rights given to any holder of the Mortgage or other documents as a matter of law, or (ii) any default under the Mortgage or the bond or note or other obligation secured thereby; and

(c)     All condemnation awards and insurance proceeds paid or payable with respect to the Premises or any other part of the Shopping Center shall be applied and paid in the manner set forth in the Lease.

4.     If Mortgagee or any future holder of the Mortgage shall become the owner of the Shopping Center by reason of foreclosure of the Mortgage or otherwise, or if the Shopping Center shall be sold as a result of any action or proceeding to foreclose the Mortgage, or transfer of ownership by deed given in lieu of foreclosure, the Lease shall continue in full force and effect, without necessity for executing any new lease, as a direct lease between Tenant and the then owner of the Shopping Center, as "landlord", upon all of the same terms, covenants and provisions contained in the Lease, and in such event:

(a)     Tenant shall be bound to such new owner under all of the terms, covenants and provisions of the Lease for the remainder of the term thereof (including the Renewal Periods, if Tenant elects or has elected to exercise its options to extend the term) and Tenant hereby agrees to attorn to such new owner and to recognize such new owner as "landlord" under the Lease; and

(b)     Such new owner shall be bound to Tenant under all of the terms, covenants and provisions of the Lease for the remainder of the term thereof (including the Renewal Periods, if Tenant elects or has elected to exercise its options to extend the term) which such new owner hereby agrees to assume and perform and Tenant shall, from and after the date such new owner succeeds to the interest of "landlord" under the Lease, have the same remedies against such new owner for the breach of any covenant contained in the Lease that Tenant might have had under the Lease against Landlord if such new owner had not succeeded to the interest of "landlord"; provided, however, that such new owner shall not be:

(i)     liable for any act or omission of any prior landlord (including Landlord) unless such act or omission continues from and after the date upon which the new owner succeeds to the interest of such prior landlord;

(ii)     subject to any defenses which Tenant may have against any prior landlord (including Landlord) unless resulting from any default or breach by such prior landlord which continues from and after the date upon which the new owner succeeds to the interest of such prior landlord;

(iii)     subject to any offsets which Tenant may have against any prior landlord, except to the extent such offsets are expressly provided under the Lease and Mortgagee has received notice thereof and the opportunity to cure within the applicable time periods set forth in the Lease (it being further agreed that offsets under the Lease that were deducted by Tenant prior to the date upon which the new owner succeeds to the interest of such prior landlord shall not be subject to challenge);

(iv)     bound by any fixed rent or additional rent which Tenant might have paid for more than one month in advance of its due date under the Lease to any prior landlord (including Landlord), unless such additional rent is paid in accordance with the applicable provisions of the Lease; or

G-2

(v)     bound by any amendment or modification of the Lease made without its consent; notwithstanding the foregoing, Mortgagee acknowledges that the Lease specifically provides for amendments thereof upon the occurrence of certain events described in the Lease (such as, for example, an amendment to the Lease confirming the measurement of the Premises), and, by its execution below, Mortgagee agrees to recognize such amendments as part of the Lease, and Mortgagee further agrees that such new owner shall also be bound by such amendment(s) to the Lease, without any consent on the part of Mortgagee or such new owner.

(c)     Tenant's obligations hereunder shall be effective only so long as Mortgagee is bound to Mortgagee's obligations hereunder.

5.     Tenant will notify Mortgagee of any default by Landlord under the Lease which would entitle Tenant to terminate the Lease or abate the rent payable thereunder and agrees that notwithstanding any provision of the Lease, no notice of termination thereof nor any abatement shall be effective unless Mortgagee has received the aforesaid notice and has failed to cure the subject default within the same time period allowed Landlord under the Lease.  It is understood that the abatement provisions of this Section relate to abatements by reason of Landlord's default and do not apply to provisions of the Lease whereby Tenant has the automatic right to abate rentals such as, for example, abatement upon casualty or condemnation.

6.     Neither the Mortgage nor any other security instrument executed in connection therewith shall encumber or be construed as subjecting in any manner to the lien thereof, any trade fixtures, signs or other personal property at any time furnished or installed by or for Tenant or its subtenants or licensees on the aforementioned property regardless of the manner or mode of attachment thereof.

7.     Any notices of communications given under this Agreement shall be in writing and shall be given by registered or certified mail, return receipt requested, postage prepaid or by any recognized overnight mail carrier, with proof of delivery slip, (a) if to Mortgagee, at the address of Mortgagee as hereinabove set forth or at such other address or persons as Mortgagee may designate by notice in the manner herein set forth, or (b) if to Tenant, at the address of Tenant as hereinabove set forth, with duplicate copies to  Allan N. Rauch, Esq., c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, and Jeffrey H. Kaplan, Esq. c/o Bryan Cave LLP, 1290 Avenue of the Americas, New York, New York 10104, or such other address or persons as Tenant may designate by notice in the manner herein set forth.  All notices given in accordance with the provisions of this Section shall be effective upon receipt (or refusal of receipt) at the address of the addressee.

8.     This Agreement shall bind and inure to the benefit of and be binding upon and enforceable by the parties hereto and their respective successors, assigns, and sublessees.

9.     This Agreement contains the entire agreement between the parties and cannot be changed, modified, waived or canceled except by an agreement in writing executed by the party against whom enforcement of such modification, change, waiver or cancellation is sought.  This Agreement and the covenants herein contained are intended to run with and bind all lands affected thereby.

IN WITNESS WHEREOF, the parties hereto have duly executed this Subordination, Non-Disturbance and Attornment Agreement as of the day and year first above written.

**MORTGAGEE:**

ATTEST:

[Corporate Seal]

_____             By:_____
(Assistant) Secretary                  Name:_____
                                       Title:_____

G-3

**TENANT:**

ATTEST:                                          BED BATH & BEYOND INC.

[Corporate Seal]

_____     By:_____
(Assistant) Secretary                          Warren Eisenberg
                                                      Co-Chairman

**[INSERT APPROPRIATE JURAT FOR MORTGAGEE]**

STATE OF NEW JERSEY    )
                        ) : ss.

COUNTY OF UNION        )s

        On this ___ day of _____, 200__, before me personally came Warren Eisenberg to me known, who being by me duly sworn, did depose and say that he is the Co-Chairman of Bed Bath & Beyond Inc., the corporation described in and which executed the above instrument and that he signed his name thereto by order of the Board of Directors of said corporation.

                                        _____
                                        Notary Public

My Commission Expires:

_____

C061858/0205454/1372981.6

Exhibit H

Subtenant Recognition Agreement

THIS RECOGNITION AGREEMENT, made as of the _____ day of _____, 200_, by and between _____, a _____ corporation, having an address at _____ ("*Landlord*"); Bed Bath & Beyond Inc., a New York corporation, having an address at 650 Liberty Avenue, Union, New Jersey 07083 ("*Tenant*"); and _____, a [_____] [corporation] [limited] [general] [partnership], having an address at _____ ("*Subtenant*").

# R E C I T A L S:

A.     Landlord and Tenant have entered into a certain lease (the "*Lease*") dated as of _____ __, 2007, a short form of which has been recorded in Book____ at Page____ in the office of the Recorder for Benton County, which demises certain premises (the "*Premises*") located in Pinnacle Hills Promenade (the "*Shopping Center*"), in Rogers, Arkansas, which Shopping Center is more particularly described on Exhibit A annexed hereto and made a part hereof.

B.     Section 15.5 of the Lease provides that in the event Tenant subleases fifty percent (50%) or more of the Floor Area in the Premises for a term of at least five (5) years, Landlord shall, upon Tenant's request, execute and deliver a Recognition Agreement among Landlord, Tenant and each such subtenant in the form attached to the Lease, in recordable form.

C.     Pursuant to a Sublease dated as of _____ (the "*Sublease*"), Tenant has subleased the Premises to Subtenant (the "*Subleased Premises*").

D.     The parties hereto desire to effectuate the provisions of Section 15.5 of the Lease with respect to the Sublease and the Subleased Premises.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereto, intending to be legally bound hereby, agree as follows:

1.     Landlord warrants and represents as follows:

(i)     that it is the fee owner of the Premises,

(ii)     that the Lease is unmodified (except as may be otherwise set forth in Exhibit B annexed hereto, if any) and is in full force and effect,

(iii)     that the term of the Lease expires on _____, but is subject to three renewal periods of five years each, and

(iv)     that Tenant is not in default under the Lease nor has any event occurred which would after notice to Tenant and the passage of time become a default of Tenant under the Lease.

2.     Landlord hereby acknowledges receipt of a copy of, and consents to and approves, the Sublease and all of the terms, covenants and provisions thereof, and agrees that the exercise by Subtenant of any of its rights, remedies and options contained therein shall not constitute a default under the Lease.

3.     Landlord agrees that whenever it has an obligation with respect to the Premises, or its consent or approval is required for any action of Tenant under the Lease, then, to the extent such obligation, consent or approval relates to the Subleased Premises or Subtenant's use and occupation thereof, it will perform such obligation in accordance with the terms and conditions of the Lease, and, subject to the applicable terms of the Lease, will not unreasonably withhold or unduly delay such consent or approval.

4.     Landlord shall not, in the exercise of any of the rights arising or which may arise out of the Lease or of any instrument modifying or amending the same or entered into in substitution or replacement thereof (whether as a result of Tenant's default or otherwise),

H-1

disturb or deprive Subtenant in or of its possession or its rights to possession of the Subleased Premises or of any right or privilege granted to or inuring to the benefit of Subtenant under the Sublease, provided that Subtenant is not in default under the Sublease beyond the expiration of any applicable notice and cure period.

5.    In the event of the termination of the Lease by reentry, notice, conditional limitation, surrender, summary proceeding or other action or proceeding, or otherwise, or, if the Lease shall terminate or expire for any reason before any of the dates provided in the Sublease for the termination of the initial or renewal terms of the Sublease and if immediately prior to such surrender, termination or expiration the Sublease shall be in full force and effect, Subtenant shall not be made a party in any removal or eviction action or proceeding nor shall Subtenant be evicted or removed of its possession or its right of possession of the Subleased Premises be disturbed or in any way interfered with, and the Sublease shall continue in full force and effect as a direct lease between Landlord and Subtenant (provided, that in such event, Subtenant shall, for the then remainder of the term of the Sublease, pay, on a pro rata basis based on the Floor Area of the Premises occupied by the Subtenant, fixed rent and additional rent in an amount equal to the greater of (x) the Fixed Rent and Additional Rent then payable under the Lease, or (y) the fixed rent and additional rent then payable under the Sublease).

6.    Landlord hereby waives and relinquishes any and all rights or remedies against Subtenant, pursuant to any lien, statutory or otherwise, that it may have against the property, goods or chattels of Subtenant in or on the Subleased Premises.

7.    Any notices, consents, approvals, submissions, demands or other communications (hereinafter collectively referred to as "Notice") given under this Agreement shall be in writing. Unless otherwise required by law or governmental regulation, Notices shall be deemed given if sent by registered or certified mail, return receipt requested, postage prepaid or by any recognized overnight mail carrier, with proof of delivery slip, (a) to Landlord, at the address of Landlord as hereinabove set forth or such other address or persons as Landlord may designate by Notice to the other parties hereto, (b) to Tenant, at the address of Tenant as hereinabove set forth, with duplicate copies to  Allan N. Rauch, Esq., c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, and Jeffrey H. Kaplan, Esq. c/o Bryan Cave LLP, 1290 Avenue of the Americas, New York, New York 10104, or such other address or persons as Tenant may designate by Notice to the other parties hereto, and (c) to Subtenant, at the address of Subtenant as hereinabove set forth or such other address or persons as Subtenant may designate by Notice to the other parties hereto.  During the period of any postal strike or other interference with the mails, personal delivery shall be substitute for registered or certified mail.  All Notices shall become effective only on the receipt or rejection of same by the proper parties.

8.    No modification, amendment, waiver or release of any provision of this Agreement or of any right, obligation, claim or cause of action arising hereunder shall be valid or binding for any purpose whatsoever unless in writing and duly executed by the party against whom the same is sought to be asserted.

9.    This Agreement shall be binding on and shall inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors, assigns and sublessees.

**[Signature Page Follows]**

IN WITNESS WHEREOF, the parties have caused this Recognition Agreement to be executed under seal the date first above written.

**LANDLORD:**

_____
By:_____

**TENANT:**

BED BATH & BEYOND INC.

By:_____
       Warren Eisenberg
       Co-Chairman

**SUBTENANT:**

_____
By:_____
Name:_____
Title:_____

C061858/0205454/1372981.6

**[INSERT APPROPRIATE JURATS FOR LANDLORD AND SUBTENANT]**

STATE OF NEW JERSEY     )
                             ) : ss.

COUNTY OF UNION         )s

        On this ___ day of _____, 200__, before me personally came Warren Eisenberg to me known, who being by me duly sworn, did depose and say that he is the Co-Chairman of Bed Bath & Beyond Inc., the corporation described in and which executed the above instrument and that he signed his name thereto by order of the Board of Directors of said corporation.

                                      _____
                                      Notary Public

My Commission Expires:

_____

C061858/0205454/1372981.6

## EXHIBIT I

## INTENTIONALLY OMITTED

Exhibit J

FORM OF DELIVERY DATE CERTIFICATION

[Letterhead of Landlord]

_____, 200__

[via Federal Express or other
recognized overnight delivery
service per Article 18 of the foregoing
lease]

Bed Bath & Beyond Inc.
650 Liberty Avenue
Union, NJ 07083
Attn: Warren Eisenberg

Re:     Agreement of Lease, dated _____, 2007 (the "Lease"), between _____, as
landlord ("Landlord"), and Bed Bath & Beyond Inc., as tenant ("Tenant"), with respect to
certain retail premises (the "Premises") located in _____, in _____,
_____.

Gentlemen:

In accordance with the provisions of Subsection 2.3.3 of the Lease, Landlord hereby
certifies to Tenant that, as of the date of this certification, all of the Delivery Date Conditions (as
defined in the Lease) have been satisfied, and that, as a result, the Delivery Date (as such term is
defined in the Lease) will be deemed to be _____, 200__ [INSERT THE DATE
WHICH IS TWO DAYS AFTER THE DATE OF THIS LETTER]. This notice shall constitute
the Delivery Date Certification referred to in Subsection 2.3.3 of the Lease.

_____

By:_____
, (Vice) President

cc:     Allan N. Rauch, Esq.

C061858/0205454/1372981.6

Exhibit K-1

Existing Exclusives

C061858/0205454/1372981.6

PINNACLE HILLS PROMENADE
BUILD-A-BEAR WORKSHOP



- *Part of 'Shopping Center' definition:*

. The Shopping Center includes all buildings, land, improvements, additions, extensions and deletions which may be made from time to time, and may include adjacent parcels of land not owned, leased or controlled by Landlord but which are operated as an integral part of the Shopping Center.

- *Build 'a' Bear extract:*

1.03   Permitted Use: Only for the display, assembly and retail sale of make-it-yourself plush bears and other animals, dolls, and accessories related to such bears and other animals and dolls including but not limited to clothes, books, shampoos, fragrances, jewelry, cards, gift-wrap, stickers, candy and similar types of products related to bears and dolls. As an incidental use, Tenant may display and sell apparel designed exclusively for Build-A-Bear Workshop which shall occupy no more than 20% of the Leased Premises or such other items as are sold in a majority of Tenant's other stores, and for no other use or purpose whatsoever.

- *Great American Cookie extract:*

1.03   Permitted Use: Only for the display, baking and retail sale of cookies, brownies, bakery items, and related dessert items, soft-serve frozen yogurt, non-alcoholic beverages, and other food products which Tenant may from time to time add to the product lines (with Landlord approval), and premium and promotional merchandise bearing Tenant's Trade Name and for no other use or purpose whatsoever. Tenant may also, as an incidental use, sell lemonade, fruit drinks and frozen drinks, such as "Icees" or "Breezers."

PINNACLE HILLS PROMENADE
GREAT AMERICAN COOKIE



**PINNACLE HILLS PROMENADE**
DAIRY QUEEN/ORANGE JULIUS



PINNACLE HILLS PROMENADE

FISH CITY GRILL



PINNACLE HILLS PROMENADE
GNC



PINNACLE HILLS PROMENADE

MALCO THEATRE

**USE RESTRICTION (EXCLUSIVE)**

ARTICLE XXVII - EXCLUSIVE USE
Provided that Tenant is not in material default hereunder beyond the expiration of any applicable cure period and Tenant (or its Guarantor under the sublease referenced in Section 13.02 hereof) is open for business to the public in the entire Demised Premises in accordance with this Lease for the Permitted Use and the Demised Premises have not ceased to be operated as a multi-screen first run movie theatre, subject to temporary closings on account of restoration, remodeling, or force majeure, Landlord shall neither enter into a contract for the sale or lease nor sell or lease any other space in the Shopping Center or the adjacent Power Center theatre, nor shall Landlord or General Growth Properties, Inc. directly or indirectly, sell, lease or be involved in any way with any other space for use as a motion picture theatre within seven (7) miles of the Shopping Center, provided, however, that the foregoing restriction regarding competing theatres within seven (7) miles of the Shopping Center shall not apply to any project acquired by either Landlord or General Growth Properties, Inc. (or any related entity) after the date of this Lease if such after-acquired project has an existing theatre operation at the time of such acquisition. Such exclusive right shall not preclude the operation by others of any food sales business or a video arcade with game machines within the Shopping Center and shall not preclude the operation of any virtual reality games or rides, or similar attractions, or any legitimate live theatre operation. In addition, such exclusive right shall not apply to Dillard's, JC Penney or any other department store, or any other tenant or occupant of the Shopping Center or any other project within the seven (7) mile restricted area provided for above with a lease or other occupancy agreement executed prior to the date of this Lease, and the leases or other occupancy agreements with such entities, including any extensions, renewals and assignments thereof, shall be exempt from the exclusive use rights set forth in this Article XXVII.

**PINNACLE HILLS PROMENADE**

P.F. CHANG'S CHINA BISTRO



PINNACLE HILLS PROMENADE
PICTURE PEOPLE, THE



**PINNACLE HILLS PROMENADE**

SULLIVAN'S RESTAURANT



*Best Buy exclusive*

Further, Landlord agrees that as long as Tenant is operating as a consumer electronics store from the Premises (and for the purposes of this Article 30.2, Tenant shall be considered to be operating as a consumer electronics store even during periods during which the Premises may be temporarily closed for the purposes of remodeling, repair, conducting inventory or similar temporary closures) and subject to all exceptions as hereinafter set forth, Landlord shall not lease or permit, directly or indirectly, any space in the area identified on Exhibit B as the "Extended Shopping Center" to any other multi-product line consumer electronics store in excess of six thousand (6,000) square feet, including, but not limited to: Circuit City, The Good Guys, Incredible Universe, WOW, Media Play, CompUSA or Computer City. Notwithstanding the foregoing, this restriction shall not be applicable within the Extended Shopping Center to full-line department or full-line discount department stores occupying in excess of 75,000 square feet (such as Dillard's, J.C. Penney, Sears, Costco or Wal-Mart).

*Best Buy*

## Description of Shopping Center

The premises and improvements and appurtenances constructed and to be constructed thereto, including the loading dock appendage (the "Premises") located in West Promenade Shopping Center (the "Shopping Center"). The legal description of the Shopping Center is attached hereto as Exhibit A and made a part hereof, and the Shopping Center is identified on the Site Plan attached hereto as Exhibit B and made a part hereof; provided that in the event of any conflict between Exhibit A and Exhibit B, Exhibit B shall control. The Premises contain



*Best Buy*



PROPOSED
TAX PARCEL

35' PYLON SIGN

⊠ Premises
▭ Shopping Center
▭ Retail 1 and Retail 2
▬ Tenant's Tax Parcel

▭ NO BUILD AREA

▭ Tenant's Protected Area and NoChange Area
(includes pylon and
monument signs)    SITE PLAN

| EXHIBIT B (page 1 of 2) | PINNACLE HILLS ROGERS, ARKANSAS | GENERAL GROWTH PROPERTIES, INC 110 N. WACKER DRIVE CHICAGO, IL 60606 |



Best Buy
EXTENDED SHOPPING CENTER

SITE PLAN

| EXHIBIT B (page 2 of 2) | PINNACLE HILLS ROGERS, ARKANSAS | GENERAL GROWTH PROPERTIES, INC. 110 N. WACKER DRIVE CHICAGO, IL 60606 |

<u>Exhibit K-2</u>

<u>Existing Leases</u>

1. LIFEWAY CHRISTIAN STORE

Exhibit L

Prohibited Uses

As used in this Lease, the term **"*Prohibited Uses*"** shall mean any of the following uses:

(1)     Any use which emits or results in strong, unusual or offensive odors, fumes, dust or vapors, is a public or private nuisance, emits noise or sounds which are objectionable due to intermittence, beat, frequency, shrillness or loudness, creates a hazardous condition, or is used, in whole or in part, as or for warehousing or the dumping or disposing of garbage or refuse;

(2)     Any operation primarily used as a storage facility and any assembling, manufacturing, distilling, refining, smelting, agricultural, or mining operation;

(3)     Any "second hand" store, "surplus" store;

(4)     Any mobile home park, trailer court, labor camp, junkyard, or stockyard (except that this provision shall not prohibit the temporary use of construction trailers during periods of construction, reconstruction, or maintenance);

(5)     Any dumping, disposing, incineration, or reduction of garbage (exclusive of trash compactors or trash containers located near the rear of any building);

(6)     Any fire sale, bankruptcy sale (unless pursuant to a court order), auction house operation, fictitious going-out-of-business sale, lost-our-lease sale or similarly advertised event;

(7)     Any central laundry, dry cleaning plant, or laundromat (except that a dry cleaner that performs all dry cleaning outside the Power Center shall be permitted, so long as its on-site premises are located more than 150 feet away from the Premises);

(8)     Any automobile, truck, trailer, boat, or recreational vehicle sales, leasing, display or body shop repair operation;

(9)     Any bowling alley or skating rink;

(10)     Any live performance theater, auditorium, meeting hall, sporting event, or other entertainment use;

(11)     Any living quarters, sleeping apartments, or lodging rooms;

(12)     Any veterinary hospital or animal raising or boarding facilities (except to the extent permitted below);

(13)     Any mortuary or funeral home;

(14)     Any "Pornographic Use", which shall include, without limitation: (x) a store displaying for sale or exhibition books, magazines or other publications containing any combination of photographs, drawings or sketches of a sexual nature, which are not primarily scientific or educational [provided, however, that the sale of books, magazines and other publications by a national bookstore of the type normally located in first-class shopping centers in the State in which the Power Center is located (such as, for example, Borders and Barnes & Noble, as said stores currently operate) shall not be deemed a "pornographic use" hereunder]; or (y) a store offering for exhibition, sale or rental video cassettes or other medium capable of projecting, transmitting or reproducing, independently or in conjunction with another device, machine or equipment, an image or series of images, the content of which has been rated or advertised generally as NC-17 or "X" or unrated by the Motion Picture Rating Association, or any successor thereto [provided, however, that the sale or rental of such videos by a national video store of the type normally located in first-class shopping centers in the State in which the Power Center is located (such as, for example, Blockbuster or West Coast Video, as said stores currently operate) shall not be deemed a "pornographic use" hereunder]; or massage parlor [except for therapeutic massages given in connection with the operation of a day spa or health club which may otherwise be permitted under this Exhibit L];

(15)     Any so-called "head shop", or other establishment primarily selling or exhibiting drug-related paraphernalia;

L-1

(16)    Any bar, tavern, or other establishment selling alcoholic beverages for on- or off-premises consumption except the foregoing shall not prohibit the sale of alcoholic beverages by a restaurant (to the extent such restaurant is permitted pursuant to item (35) below) as an incidental part of its business;

(17)    Any catering or banquet hall;

(18)    Any flea market, amusement or video arcade, pool or billiard hall, night club, discotheque, or dance hall;

(19)    Any training or education facility, including but not limited to:  beauty schools, barber colleges, reading rooms, places of instruction or other operations catering primarily to students or trainees rather than to customers; provided, however, this prohibition shall not be applicable to on-site employee training by an occupant incidental to the conduct of its business at the Power Center;

(20)    Any gambling facility or operation, including but not limited to:  off-track or sports betting parlor; table games such as black-jack or poker; slot machines; video poker/black-jack/keno machines or similar devices; or bingo hall.  Notwithstanding the foregoing, this prohibition shall not apply to governmental sponsored gambling activities, or charitable gambling activities, so long as such governmental and/or charitable activities are incidental to the business operation being conducted by the occupant;

(21)    Any unlawful use;

(22)    Any pawn shop, check-cashing store, gun shop, or tattoo parlor;

(23)    Any church or other place of religious worship;

(24)    Any car wash, automobile repair shop, or any business servicing motor vehicles in any respect, including, without limitation, any quick lube oil change service, tire center or gasoline or service station or facility

(25)    Any carnival, amusement park or circus;

(26)    Any medical clinics except medical offices (but not medical clinics) shall be permitted provided such medical offices are located at least 500 feet away from the Premises and the Floor Area of such medical offices does not exceed 7,000 square feet in the aggregate;

(27)    Any supermarket, except that an upscale, boutique-type food store of the type normally operated in the Rogers, Arkansas metropolitan area (such as, by way of example, Zagara's, Whole Foods, Fresh Fields, or Wild Oats), provided, that such store shall not occupy more than 27,000 square feet of Floor Area, and shall be located at least 200 feet away from the Premises (except that an upscale, boutique-type food store shall be permitted to be located within the Premises);

(28)    Any office use, other than: (x) office space used in connection with and ancillary to a permitted retail use hereunder; and (y) retail offices providing services commonly found in similar first-class shopping centers in the Rogers, Arkansas metropolitan area (for example, financial services, real estate brokerage, insurance agency, banking, travel agency), provided that such uses are located at least 250 feet away from the Premises, and not more than five thousand (5,000) square feet of Floor Area in the Power Center, in the aggregate, shall be devoted to such uses;

(29)    hotel/motel;

(30)    daycare center;

(31)    veterinary office, except as may be incidental to a permitted full-line pet and pet supply store operating in at least 15,000 square feet of Floor Area and located at least 100 feet away from the Premises (except that a full-line pet and pet supply store shall be permitted to be located within the Premises); such occupant shall use reasonable efforts to prevent its customers from allowing their pets to urinate or defecate in the Common Areas and will promptly remove any "dog dirt" from in front of the Premises;  no pet or pet supply store shall be located within 100 feet of the Premises;

L-2

(32)    children's entertainment or activity facility (such as "Discovery Zone", or "Chuck E. Cheese's");

(33)    karate center;

(34)    movie theater;

(35)    restaurant serving meals for on- or off-premises consumption, except (i) a restaurant located more than 500 feet away from the Premises or within the Future Outparcel shall be permitted and (ii) such permitted restaurant shall be permitted to sell alcoholic beverages as an incidental part of its business;

(36)    beauty parlor or nail salon except same shall be permitted if located at least 250 feet away from the Premises;

(37)    health spa, exercise facility or similar type business but the foregoing shall not prohibit a Curves or similar type exercise/fitness studio (provided it is located at least 500 feet away from the Premises and further provided that it does not contain more than 5,000 square feet of Floor Area); or

(38)    a store primarily selling merchandise which is classed as "odd lot," "close out," "clearance," "discontinued," "cancellation," "second," "factory reject," "sample," "floor model," "demonstrator," "obsolescent," "over stock," "distressed," "bankruptcy," "fire sale" or "damaged", such as, for example, "Grossman's Bargain Outlet", "Contractor's Warehouse", "Big Lots", "Liquidation World", or "Odd Job"; the retailer commonly known as "Christmas Tree Shops" shall be deemed not to violate the foregoing restriction.

L-3

DocuSign Envelope ID: 4EE8311A-A75E-4023-9B71-5C00969274ED

## **Exhibit C**

Hobby Lobby Lease

## LEASE AGREEMENT

This lease agreement (the **"Lease"**) is made this 5th day of January , 2021. (the **"Effective Date"**), by and between **Pinnacle Hills, LLC**, a Delaware limited liability company (the **"Landlord"**), and **Hobby Lobby Stores, Inc.**, an Oklahoma corporation (the **"Tenant"**).

## RECITALS

A.      Landlord is the sole owner of that certain real property commonly referred to as Pinnacle Hills Power Center, located in City of Rogers, County of Benton, State of Arkansas, which is legally described on **Exhibit A** of this Lease (the **"Shopping Center"**).

B.      Landlord desires to lease to Tenant, and Tenant desires to lease from Landlord, the Leased Premises (defined below), which includes approximately sixty-one thousand seven hundred fifty-one (61,751) square feet of ground floor space in the Shopping Center on the location designated as "Hobby Lobby" on the site plan set forth on **Exhibit B** of this Lease (the **"Floor Space"**), and as further depicted on the store plan set forth on **Exhibit B-1** (the **"Store Plan"**), provided that Tenant shall have the option to expand the Floor Space as set forth in Section 42 of the Lease.

C.      Landlord's address for the purpose of any Notice (defined below) required in this Lease is c/o Brookfield Properties, 350 N. Orleans Street, Suite 300, Chicago, Illinois 60654-1607, Attention: Law/Lease Administration, with a copy to c/o Pinnacle Hills Promenade, 2203 Promenade Boulevard, Suite 3200, Rogers, Arkansas 72758, Attention: General Manager, or such other address as Landlord may specify by Notice to Tenant (the **"Landlord's Notice Address"**).

D.      Tenant's address for the purpose of any Notice required in this Lease is 7707 Southwest 44th Street, Oklahoma City, Oklahoma 73179, Attention: Real Estate Department, or such other address as Tenant may specify by Notice to Landlord (the **"Tenant's Notice Address"**).

## TERMS AND CONDITIONS

For good and valuable consideration, Landlord and Tenant agree as follows:

1.      **Lease**. **"Leased Premises"** means the Floor Space together with all improvements, fixtures, components, and equipment on the Floor Space as of the Commencement Date (defined below), and any improvements, fixtures, components, and equipment added during the Term of this Lease, excepting only Tenant's Personal Property (defined below).  In consideration of the rents and agreements set forth in this Lease, Landlord does hereby demise and lease to Tenant, and Tenant does hereby lease from Landlord the Leased Premises.

    1.1.    License. Landlord grants to Tenant for the Term of this Lease a non-exclusive license for the use of all easements, entrances, exits, approaches, and appurtenances relating to the Leased Premises, and the non-exclusive right to use the Common Area (defined below).  The license and right granted in the preceding sentence cannot be revoked so long as this Lease is in effect, but automatically terminate when this Lease terminates.

2.      Site Preparation and Construction of Improvements.  An elevation drawing of the Leased Premises is included in **Exhibit C** of this Lease.  Landlord's obligations regarding site preparation and construction of improvements are set forth in **Exhibit D** of this Lease.  Tenant's obligations regarding the construction of improvements are set forth in **Exhibit E** of this Lease.

3.      Primary Term. '████████████████████████████████████████



5.    Rent. Tenant shall pay rent, by check sent to: Pinnacle Hills, LLC, Pinnacle Hills Power Center, PO Box 860066, Minneapolis, Minnesota 55486-0066, during the Term of this Lease as set forth in this section.

    5.1.    Definitions.

        5.1.1. **"Lease Year"**, with respect to the first Lease Year, means that period of time beginning on the Commencement Date and ending on the last day of the twelfth (12th) full calendar month thereafter; with respect to subsequent Lease Years, "Lease Year" means each period of twelve (12) consecutive months after the first Lease Year.

        5.1.2. **"Leasable Space"** means the total square footage of all areas used, available, or held exclusively by Landlord or others or by or for respective current or future tenants. The Leasable Space shall not include any mezzanines not designed or used for the display or sale of merchandise to retail customers. Leasable Space shall be measured from the exterior surface of exterior walls and from the center of interior demising walls.

        5.1.3. Intentionally Deleted.

        5.1.4. **"Pro Rata Taxes"** means Tenant's pro rata share of Taxes (defined below) payable to Landlord and calculated in the following manner: as of the Commencement Date, Landlord warrants to Tenant that the Shopping Center, including the Leased Premises, is assessed as tax parcel number 02-21256-000 (the **"Tax Parcel"**), and Tenant shall reimburse Landlord on an annual basis within sixty (60) days following Tenant's receipt of an invoice from Landlord, to include the billing statement from the taxing authority and calculation of Tenant's Pro Rata Taxes, for a pro rata share of the Taxes equal to the product of Taxes attributable to the building and land value of the Tax Parcel multiplied by a fraction, the numerator of which is the Floor Space and the denominator of which is the Leasable Space within the Tax Parcel, provided that the denominator shall not be less that two hundred fifty-three thousand two hundred sixty-eight (253,268). If the Leasable Space included in the Tax Parcel changes, the Landlord and Tenant shall affirm in writing the corresponding revision to the calculation set forth in this subsection. Notwithstanding the preceding sentence, however, nothing contained in this Lease shall be deemed or construed to require Tenant to pay any Taxes or increase thereof which may be levied as a result of any construction within the Tax Parcel other than at or for the Leased Premises including, without limitation, any construction related to the Expansion Space (hereinafter defined). If a taxing authority independently mandates anything that changes the calculation of Pro Rata Taxes, Landlord and Tenant shall amend this Lease to document an equitable re-calculation of Pro Rata Taxes.



6.      Leased Premises Use.  Tenant may use the Leased Premises for any legal retail purpose, subject to subsections 6.1 and 6.2 below (the **"Tenant's Use"**), subject to the restrictions set forth in that certain Construction, Operation and Reciprocal Easement Agreement by and between Rogers Retail L.L.C. and Dillard's Dollars, Inc., dated May 16, 2006 (the "**Operating Agreement**").   Landlord warrants to Tenant that (i) on the Commencement Date, the Leased Premises will be zoned to permit the retail sale of general merchandise; and (ii) none of the Existing Exclusives and Restrictions (defined below) prohibit the operation of a typical Hobby Lobby store, including Tenant's sale of the items included in Tenant's Exclusive (defined below), other than the existing exclusive for Bed, Bath & Beyond for which Landlord shall obtain a waiver (the "**BB&B Waiver**") by the Landlord Contingency Date and as necessary to allow for the operation of a typical Hobby Lobby store.

6.1.    Restrictions.  Tenant shall not use the Leased Premises (i) in violation of Law or (ii) in violation of the existing exclusive privileges or use restrictions encumbering the Shopping Center as set forth in **Exhibit G** of this Lease (the **"Existing Exclusives and Restrictions"**).

6.2.    Title Matters.  Tenant's Use is subject to those title matters of record set forth on **Exhibit F** to this Lease (the **"Title Matters"**), including the Operating Agreement. Notwithstanding the preceding sentence, unless otherwise specifically set forth in this Lease, if there is a conflict between the Title Matters and the terms and conditions of this Lease, the terms and conditions of this Lease shall apply as it relates to Tenant's rights and obligations as between Landlord and Tenant.  Landlord warrants to Tenant that as of the Effective Date, there are no encumbrances on the Leased Premises except the Title Matters.

3

6.3.    Amendment of Title Matters.  Landlord shall not make or permit changes or additions to the Title Matters that affect Tenant in an adverse manner without Tenant's prior written consent.  If Landlord violates the preceding sentence, Landlord and Tenant agree that Tenant's actual damages are difficult to ascertain and Tenant may, at Tenant's option at any time such violation exists, (i) terminate this Lease; provided however, Landlord shall have ninety (90) days after receipt of Notice of such violation to cure the same; or (ii) continue this Lease and abate and retain fifty percent (50%) of Minimum Rent for the time period the violation exists.  The word "adverse" as used in this subsection shall mean (a) a material and directly caused reduction in the gross sales of the store operated within the Leased Premises; (b) a change in the parking design or service drives of the Shopping Center; (c) a material reduction or adverse change of ingress and egress to the Shopping Center; (d) the erection of permanent barriers anywhere within accessways in the Shopping Center; (e) any change in permitted, exclusive, or prohibited uses set forth in the Title Matters that would be applicable to Tenant's rights under this Lease; (f) any change requiring Tenant to operate within the Leased Premises during days of the week and/or hours of the day other than those days and hours of operation of other Hobby Lobby stores; or (g) any other material restriction of Tenant's rights or expansion of Tenant's obligations under this Lease.

6.4.    Discontinuance of Use and Recapture.  Tenant may discontinue its use and vacate the Leased Premises without Landlord's consent.  If Tenant discontinues use of the Leased Premises for any period of one hundred twenty (120) consecutive days at any time after the Commencement Date (a **"Dark Period"**), Landlord may recapture possession of the Leased Premises and terminate this Lease by providing Tenant Notice of Landlord's election to do so within sixty (60) days following last day of the first Dark Period occurring during the Term of this Lease, in which event this Lease shall terminate sixty (60) days after the date of such Notice.  Landlord's right to recapture the Leased Premises under this subsection shall not apply (i) to Tenant's temporary discontinuance of use for remodeling; (ii) as a result of Force Majeure, Casualty, or Eminent Domain; or (iii) in the event of a sublease or assignment as provided for in this Lease.

6.5.    Outdoor Storage.  Subject to Tenant's compliance with all applicable Law and the Title Matters, Tenant may, at Tenant's election, place three (3) storage containers behind the Leased Premises within the area depicted as **"Outdoor Storage"** on **Exhibit B**.

7.    Shopping Center Use.  Subject to the Prohibited Uses (defined below), the Shopping Center shall be used for the sole purpose of promoting and operating a retail shopping center comprised solely of (i) retail stores selling, at retail, merchandise normally carried in other quality shopping centers; (ii) financial institutions; (iii) service shops; (iv) professional offices; (v) parking areas; (vi) restaurants that derive no more than forty percent (40%) of their gross annual sales from the sale of alcoholic beverages ( **"Permitted Restaurant"**), provided that sexually themed restaurants such as Hooters and Tilted Kilt shall be deemed to be Prohibited Uses hereunder; (vii) grocery stores; and (viii) and any other uses that are commonly found in first class retail power centers, unless expressly prohibited in subsection 7.2 below.

7.1.    Shopping Center Changes.  The following shall be prohibited within the Shopping Center (collectively the **"Shopping Center Change Restrictions"**):

(i)    the construction or demolition of any building other than the construction of any building in the Future Expansion Area (as defined below);

(ii)    the obstruction or modification of parking, aisles, walks, drives, entrances, exits, and service areas within the Shopping Center that have an adverse impact on Tenant's business, other than as required by Law; and

(iii)    the grant of entrances, cross easements, or parking rights of the Shopping Center to adjacent property owners or other third parties other than tenants and other occupants of the Shopping Center.

4

7.1.1   <u>Future Expansion Area Restrictions</u>.   Landlord shall have the right to develop an outparcel on the "**Future Expansion Area**" as depicted on **Exhibit B**, subject to the following restrictions: (a) any building constructed within the Future Expansion Area thirty-five (35) feet in height from the grade, including architectural elements and parapets; (b) the Future Expansion Area shall contain sufficient parking in accordance with the Law to self-serve the Future Expansion Area;  and (c) Landlord shall use commercially reasonable efforts to have the Future Expansion Area, once developed, separately assessed on its own tax parcel, but only if having the Future Expansion Area separately assessed is reasonable in Landlord's sole discretion for the intended use.   Landlord and Tenant further agree that the rights and restrictions granted herein shall be included in the Memorandum of Lease described in Section 40 below.

7.2.   <u>Prohibited Uses</u>.   Except for the existing permitted uses listed on **Exhibit H** of this Lease (the **"Existing Permitted Uses"**), the following uses are prohibited in the Shopping Center (collectively, the **"Prohibited Uses"**):

(i)    stores selling liquor, beer, or wine, other than (i) grocery stores, (ii) first class regional or national stores such as Total Wine and Bev Mo, or (iii) Permitted Restaurants;

(ii)   **FOR THIS LEASE ONLY**, bowling alley, billiard parlor, arcade, or other place of amusement or recreation, provided that first class operators such as Dave & Busters, Pin Stripes, Main Event, and Round 1 shall be allowed within the "Permitted Area" depicted on **Exhibit B**;

(iii)  second-hand store whose principal business is selling used or donated merchandise;

(iv)   pawn shop;

(v)    head shop, electronic cigarette shop, store primarily selling cannabidiol,  or store selling marijuana;

(vi)   payday loan or check cashing provider;

(vii)  child care centers; however, such use shall be allowed within the "Permitted Area" depicted on **Exhibit B**;

(viii) funeral home or mortuary;

(ix)   school;

(x)    church, or other place of worship;

(xi)   flea market;

(xii)  tattoo parlor or body piercing establishment;

(xiii) **FOR THIS LEASE ONLY**, movie theater;

(xiv)  adult video store and adult book store;

(xv)   adult entertainment club;

(xvi)  night club;

(xvii) **FOR THIS LEASE ONLY**, health club, gym, or exercise studio, however, such use shall be allowed within the "Permitted Area" depicted on **Exhibit B** and is no more than thirty-five thousand (35,000) square feet in size;

(xviii) spa, or massage parlor, other than a national, upscale therapeutic massage establishment such as "Massage Envy" or "Spa La La";

(xix)  place of betting, gambling, bingo, or other gaming;

(xx)   self service laundry facility;

(xxi)  on-site dry cleaner, other than a strictly "drop off" [no plant operation] dry-cleaner unless operating as a so-called "green" dry cleaner which excludes the use of so-called "perc" [perchloroethylene] or similarly environmentally harmful non-polar organic solvents as a cleaning solvent;

(xxii) hotel, motel, or other place of residence;

(xxiii) car wash, auto body shop, auto repair shop, auto tire shop, auto rental business, or junk yard, provided that an auto tire shop shall be allowed on the existing outparcel and not located in-line with the Leased Premises;

(xxiv) animal facility;

(xxv)  manufacturing operation;

5

(xxvi)  a government owned or operated healthcare clinic;
(xxvii)  abortion clinic, including Planned Parenthood;
(xxviii)  self-storage facility; or
(xxix)  anything constituting a public or private nuisance.

7.3.    <u>Tenant's Exclusive</u>.  Subject only to the Existing Permitted Uses, Tenant shall have the exclusive right within the Shopping Center to sell art supplies, craft supplies, fabrics, photo frames, frames, framed art, wall art, and wall decor (**"Tenant's Exclusive"**). Notwithstanding the previous sentence, tenants within the Shopping Center shall be permitted to sell items included in Tenant's Exclusive, provided the area from which such items are sold does not exceed, in the aggregate, the lesser of (i) ten percent (10%) of such tenant's floor space; or (ii) one thousand (1,000) square feet, in each instance measured from the center of the aisle.  Tenant's Exclusive shall not prohibit the operation of a Bed, Bath & Beyond, T.J. Maxx, Dollar Tree, and Haverty's Furniture (**"Permitted Tenant(s)"**), as such are operated as of the Effective Date.

7.4.    <u>Grandfathered Existing Permitted Uses</u>.  Any Existing Permitted Uses (excluding Permitted Tenants) that would otherwise constitute a Prohibited Use or violate Tenant's Exclusive shall not be allowed to continue for any renewals, extensions, subletting, or assignments for or by the respective existing tenants, and shall be deemed, as applicable, a Prohibited Use or violation of Tenant's Exclusive following the earlier expiration of the respective tenant's current term, tenancy, use, or occupancy unless Landlord does not have the right to approve such renewal, extension, subletting, or assignment.

7.5.    <u>Violations of Prohibited Uses or Tenant's Exclusive</u>.  If Landlord or other Shopping Center tenants violate the Prohibited Uses or Tenant's Exclusive (excluding Permitted Tenants), Landlord and Tenant agree that Tenant's actual damages are difficult to ascertain and Tenant may abate and retain fifty percent (50%) of Minimum Rent for the time period the violation exists.  Notwithstanding the preceding sentence, in the event another tenant of the Shopping Center violates the Prohibited Uses or Tenant's Exclusive (excluding Permitted Tenants) without Landlord's consent (referred to herein as a **"Rogue Tenant"**), Tenant shall not abate Minimum Rent provided Landlord, at Landlord's sole expense, promptly initiates and diligently pursues all commercially reasonable remedies, including without limitation legal action through final appeal, to evict the Rogue Tenant or otherwise cause the Rogue Tenant to cease violations of the Prohibited Uses or Tenant's Exclusive.

8.    <u>Common Area</u>.  **"Common Area"** shall mean all those areas of the Shopping Center for the common nonexclusive use by Landlord, Tenant, and all other tenants of the Shopping Center, and their respective agents, employees, licensees, and invitees, and shall include, but not be limited to, all parking areas, roadways, service areas, sidewalks, loading zones, and other improvements included within the Shopping Center, but shall not include any buildings within the Shopping Center, or any drive-through lanes, service areas, loading areas, outside sales areas, or other areas that are segregated from the rest of the Shopping Center or used exclusively by Landlord or any tenant(s.



9.



10.2.  <u>Landlord Access</u>.  Landlord and Landlord's agents may enter the Leased Premises upon ████████████████████ for the purpose of inspecting the same, showing the same to prospective purchasers or lenders, and performing Landlord's Maintenance; provided, however that such right of entry is at Tenant's sole discretion and

approval during that period of time commencing on Thanksgiving and ending on December 31, except in the event of (i) an emergency as contemplated in the following sentence; or (ii) upon the specific request of Tenant for the purposes set forth in such request. Notwithstanding the foregoing, in the event of an emergency requiring Landlord's entry into the Leased Premises, Landlord may give Tenant shorter notice in any manner that is practicable under the circumstances. When entering the Leased Premises or performing Landlord's Maintenance, Landlord, its agents, employees and/or contractors: (a) shall identify themselves to Tenant's personnel immediately upon entering the Leased Premises, and (b) shall not, in any way, unreasonably affect, interrupt or interfere with Tenant's use, business or operations on the Leased Premises or obstruct the visibility of, or access to, the Leased Premises. ███████████████████████████████████████



11. ████████████████████████████████████████████████████████████████████████████████████████████████████████████ Tenant shall pay all charges for Tenant's Utilities usage during Tenant's occupancy of the Leased Premises.

████████████████████████████████████████████████████████████████████████

**11.2.** <u>Fire Sprinkler System</u>.  If the fire sprinkler system only serves the Leased Premises, Tenant, at Tenant's expense, shall inspect and maintain the fire sprinkler system as required by Law.

**11.2.1.** <u>Shared Fire Sprinkler System Inspections</u>.  If the fire sprinkler system serving the Leased Premises also serves any area outside of the Leased Premises, then Landlord and Tenant agree (i) if the fire sprinkler system riser is located inside the Leased Premises, Tenant shall provide periodic inspections of the fire sprinkler system as required by Law, a████████████████████████████████████████████████████████████████████████████████████████████████████████████████ or (ii) if the fire sprinkler system riser is located outside the Leased Premises, Landlord shall provide periodic inspections of the fire sprinkler system as required by Law, and Tenant shall reimburse Landlord for Tenant's pro rata share for the expense of such inspections (with such pro rata share equaling a fraction, the numerator of which is the Floor Space, and the denominator of which is the total square footage of the area covered by the fire sprinkler system).  The applicable inspection expense reimbursements required under this subsection shall be made within twenty (20) days following receipt of a statement of such expenses including copies of the corresponding paid invoices and inspection reports.

**11.2.2.** <u>Shared Fire Sprinkler System Maintenance</u>.  If the fire sprinkler system serving the Leased Premises also serves any area outside of the Leased Premises, then Landlord and Tenant agree (i) Landlord, at Landlord's expense, shall be responsible for maintaining the portion of the fire sprinkler system located outside of the Leased Premises as required by Law; and (ii) Tenant, at Tenant's expense, shall be responsible for maintaining the portion of the fire sprinkler system located inside the Leased Premises as required by Law.

12.



12.2.  <u>Intentionally Omitted</u>.

12.3.  <u>Notice of Assessments</u>.  Landlord shall provide by Notice to Tenant copies of any special assessments or non-annual reassessments (excluding regular annual reassessments of the Tax Parcel) of Taxes promptly upon receipt but in no event later than five (5) business days prior to the deadline to dispute, contest, or appeal such assessment or reassessment.  If Landlord: (i) fails to provide the Notice and documents required in the previous sentence; and (ii) fails to initiate a Tax Proceeding and (iii) Tenant would have initiated a Tax Proceeding based on the reasonable written advice of its real estate tax consultant (a copy of which advice shall be provided to Landlord), then, Tenant shall have no obligation to pay for any increase in Taxes resulting from the assessment or reassessment, but only for the period to which the uncontested assessment or reassessment applies.

12.4.  <u>Contesting Taxes</u>.  Landlord shall have the right to dispute or contest the amount of Taxes by appropriate proceedings against the taxing authority (a **"Tax Proceeding"**).  If Landlord shall determine not to contest the amount of Taxes by way of a Tax Proceeding, then Tenant, acting reasonably and at Tenant's sole cost and expense, shall have such right, and Landlord shall reasonably cooperate with Tenant in any such Tax Proceeding and, in connection therewith, shall make available to Tenant such information in its files as Tenant may reasonably request.

12.5.  <u>Tax Proceeding Costs and Savings</u>.  The party who initiates a Tax Proceeding

shall be solely responsible for the expense of the Tax Proceeding, provided, if the Tax Proceeding results in a savings or reduction of any Taxes, then such savings or reduction will be used first to reimburse the party bringing the Tax Proceeding for the reasonable costs and expenses incurred in connection with the Tax Proceeding. Following the reimbursement of expenses under the previous sentence, Tenant shall promptly receive its pro rata share of any remaining balance of the savings or reduction of Taxes.

13. 

    13.1.  <u>Exclusions</u>.  Landlord's Property Insurance shall exclude property insurance for Tenant's Personal Property (defined below) and third parties' personal property located in the Shopping Center.  Subject to Section 15 below, Landlord shall not be liable for the theft or misappropriation of, or damage to Tenant's Personal Property unless caused by Landlord's willful misconduct.



15.   <u>Waiver of Subrogation</u>.  Landlord and Tenant each waive, and shall cause their respective insurers to waive, in favor of the other, all rights of recovery that either of them might have against the other for any and all damage or destruction of property resulting from perils ordinarily covered by all risk (special form) commercial property insurance and originating from any cause whatsoever, including negligence of Landlord or Tenant, so long as such waiver is available under standard forms of insurance coverage.

16.   <u>Indemnification</u>.  All indemnification obligations under this section shall survive the termination of this Lease.

    16.1.  <u>Indemnification of Landlord</u>.   Tenant shall indemnify, defend, and hold

harmless Landlord from and against any and all third-party claims, demands, liens, causes of action, suits, liabilities, damages, penalties, losses, costs, expenses, and reasonable attorneys' fees (as applicable, **"Claims"**), resulting from or related to (i) the operation of Tenant's business on the Leased Premises; or (ii) any condition existing on the Leased Premises under the control of Tenant.  Notwithstanding the preceding sentence, Tenant shall not be required to indemnify, defend, or hold harmless Landlord to the extent any Claims result from or relate to Landlord's negligence or Landlord's willful misconduct.



16.3.  <u>Maintenance Failures</u>.  Notwithstanding anything in this Lease to the contrary, (i) if Tenant fails to make a repair required under Tenant's Maintenance (for example, fails to repair damaged floor tiles, malfunctioning doors, or damaged shelving), then Tenant shall indemnify, defend, and hold harmless Landlord from and against any and all Claims resulting from or related, entirely or in part, to such failures; and (ii) if Landlord fails to make a repair to the Common Area or a repair required under Landlord's Maintenance (for example, fails to repair roof leaks, buckled sidewalks, or parking lot potholes), then Landlord shall indemnify, defend, and hold harmless Tenant from and against any and all Claims resulting from or related, entirely or in part, to such failures.

17.    <u>Casualty</u>.  If the Leased Premises or any part of the Leased Premises (including without limitation, any part of the HVAC system, plumbing system, electrical system, and fire sprinkler system), the Common Area or any part of the Common Area, or any entrances, exits, approaches or appurtenances to the Leased Premises (as applicable, the **"Damaged Property"**), are partially or totally damaged, destroyed, or rendered inoperable by fire (including the extinguishment of fire by emergency service providers, fire sprinkler system, or otherwise), wind, debris, flying objects, water, hail, flood, lightning, electrical power surge, storm, tornado, hurricane, storm surge, seismic event, accident, vandalism, theft, or any other peril whatsoever (as applicable, a **"Casualty"**), or any remediation following a Casualty, Landlord and Tenant shall perform as set forth in this section.

17.1.  <u>Insurance Proceeds</u>.  The proceeds from Landlord's Property Insurance shall always first be used to Repair the Damaged Property as required in this section, except for any Repair to Tenant's Personal Property for which the proceeds from Tenant's Personal Property Insurance shall always first be used.



17.3.  <u>Major Damage</u>.  Following a Casualty, if Repair of any Damaged Property cannot be reasonably made within three hundred sixty-five (365) days following the Casualty, then Tenant may terminate this Lease effective on the date of such Casualty by giving Notice of termination to Landlord within thirty (30) days of the Casualty.  If Tenant does not elect to terminate the Lease under this subsection, then Landlord shall, at Landlord's sole expense, promptly begin and complete with due diligence such Repair, and return the Damaged Property to at least as good a condition as existed prior to such Casualty as soon as possible.

17.4.  <u>Emergency Repairs</u>.  Following a Casualty, if emergency Repairs to the

11

Leased Premises are necessary to mitigate damages to the Leased Premises, and Tenant is in a position to initiate such emergency Repairs before Landlord, then Tenant shall have the right to initiate such Repairs of the Leased Premises on Landlord's behalf and at Landlord's sole expense, and Landlord shall reimburse Tenant for such amounts within twenty (20) days after written request from Tenant.



17.6.    <u>Repair Time Disputes</u>.    Following any Casualty, if Landlord and Tenant disagree as to whether the Damaged Property could be reasonably Repaired within the applicable time period set forth in this section, Landlord and Tenant shall each promptly obtain an analysis and report from a professional construction management consultant of their choosing and at their expense (the **"Consultants"**), setting forth whether the Damaged Property could have been reasonably Repaired within the applicable time period set forth in this section.    If the respective Consultants disagree, the Consultants shall choose a third independent professional construction management consultant, at Landlord's and Tenant's equal expense, to provide its analysis as to whether the Damaged Property could have been reasonably Repaired within the applicable time period set forth in this section, and such analysis shall be conclusive with regard to Landlord's and Tenant's obligations under this section.    The time periods within which Tenant may terminate this Lease under Sections 17.3 and 17.5 shall be extended day for day for the time required for the Consultants to determine the Repair time under this Section 17.6.



17.9.    <u>Repair to Tenant's Personal Property</u>.  Notwithstanding anything in this Section 17 to the contrary, in no event shall Landlord's Repair obligations under this Section 17

include any Repair of Tenant's Personal Property, which shall be performed by Tenant at Tenant's sole expense.

18.    Eminent Domain.  **"Eminent Domain"** means a third-party taking, condemnation, or impairment under the power of eminent domain or any other authority of (i) any portion of the Leased Premises; (ii) any portion of the Common Area or Shopping Center that is reasonably necessary to provide access to or visibility of the Leased Premises; or (iii) any portion of the Common Area that would reduce the number of parking spaces in the area shown as the **"Parking Field"** on **Exhibit B** by more than ten percent (10%).



18.3.    Awards.  Landlord hereby reserves to itself all rights to receive all awards for Eminent Domain, and Tenant hereby waives and releases to Landlord all of Tenant's rights to such awards.  However, nothing in this section shall be deemed to prohibit Tenant from seeking a separate award for its damages arising from such Eminent Domain.

19.    Hazardous Substances.  **"Hazardous Substances"** means any hazardous or toxic substance regulated by Law.  Landlord and Tenant shall not dispose of or place any Hazardous Substances in or about the Shopping Center in violation of Law during the Term of the Lease.

19.1.    Disposal By Tenant.  If Tenant, or any person or entity acting on behalf or under the direction of Tenant (the **"Tenant Parties"**), disposes or places any Hazardous Substances in or about the Shopping Center including, without limitation, the Leased Premises, in violation of Law, Tenant shall, at Tenant's sole expense, promptly provide Notice to Landlord and take such action required by Law to remove and remediate such Hazardous Substances from the Shopping Center, and Tenant shall indemnify, defend, and

hold Landlord harmless from any and all resulting Claims.

19.2.  Disposal By Parties Other Than Tenant.  If Hazardous Substances are found in or about the Shopping Center that were disposed or placed in the Shopping Center in violation of Law by persons other than Tenant or Tenant Parties, then Landlord shall, at Landlord's sole expense, promptly take such action required by Law to remove and remediate such Hazardous Substances from the Shopping Center, and Landlord shall indemnify, defend, and hold Tenant harmless from any resulting Claims.

20.    Legal Compliance.  Landlord and Tenant shall comply with all present and future federal, state, municipal, or other governmental laws, statutes, regulations, rules, codes, ordinances, or orders in effect where the Leased Premises are located (collectively, the **"Law"**) as follows:

20.1.  Tenant's Legal Compliance.    Except as included in Landlord's Legal Obligations (defined below), Tenant shall, at Tenant's sole expense, comply with the Law as it applies to the interior of the Leased Premises or Tenant's obligations under this Lease (the **"Tenant's Legal Obligations"**).  Tenant shall indemnify, defend, and hold Landlord harmless from and against any and all Claims resulting from or related to Tenant's failure to comply with the Law as required by Tenant's Legal Obligations.

20.2.  Landlord's Legal Compliance.    Except as included in Tenant's Legal Obligations, Landlord shall, at Landlord's sole expense, comply with the Law as it applies to the Shopping Center or Landlord's obligations under this Lease (the **"Landlord's Legal Obligations"**).  Landlord shall indemnify, defend, and hold Tenant harmless from and against any and all Claims resulting from or related to Landlord's failure to comply with the Law as required by Landlord's Legal Obligations.



22.    Alterations.  Tenant shall not make any alterations to the exterior or structural components of the Leased Premises without Landlord's written consent, which shall not be unreasonably withheld, conditioned, or delayed.  Any alterations or additions to the Leased Premises, excepting only Tenant's Personal Property (defined below), will become part of the Shopping Center, and shall not be removed by Tenant at termination of this Lease.

23.    <u>Assignment and Subletting</u>.  As long as there is not an uncured monetary or material Tenant Default (hereinafter defined), Tenant may assign this Lease or sublease the Leased Premises (or any part of the Leased Premises), without Landlord's consent; provided, however, Tenant shall remain responsible for all liabilities, obligations and duties hereunder during the Term.  Tenant shall not sublease the Leased Premises nor assign this Lease in violation of the Existing Exclusives and Restrictions.  If Tenant elects to assign this Lease or to sublease the entire Leased Premises to any party other than an affiliated company or franchisee, Tenant shall, at least sixty (60) days prior to the Transition Date, provide Notice to Landlord of Tenant's election and stating the date on which such action shall take effect (the **"Transition Date"**).  For thirty (30) days after receipt of the Notice of the Transition Date from Tenant, Landlord may terminate this Lease effective on the Transition Date by delivering Notice of such to Tenant. Notwithstanding the two previous sentences, if Tenant assigns or sublets the Leased Premises to an affiliated company or franchisee of Tenant, including, but not limited to Mardel, Inc., Landlord has no right to terminate this Lease.

24.    <u>Landlord Conveyance and Assignment</u>.  Landlord may convey its interest in the Leased Premises and assign this Lease without Tenant's consent.  If Landlord conveys its interest in the Leased Premises and assigns this Lease to any other person or entity (a **"Successor Landlord"**), Tenant has no obligation to pay Minimum Rent, Fixed CAM Expenses, or any other amounts under this Lease to the Successor Landlord until Tenant receives: (i) Notice of the conveyance and assignment to the Successor Landlord; (ii) documentation of the conveyance and assignment to Successor Landlord; (iii) the Successor Landlord's Notice Address; and (iv) the Successor Landlord's FEIN or social security number.  If Tenant continues to pay Minimum Rent, Fixed CAM Expenses, or other amounts due under the Lease to the prior Landlord following the conveyance of the Leased Premises and assignment of this Lease due to the Successor Landlord's failure to provide the Notice and information required in the preceding sentence, the Successor Landlord waives any right to collect such amounts from Tenant and shall look solely to the prior Landlord for payment.

25.    <u>Holding Over</u>.  If Tenant remains in possession of the Leased Premises, or any part of the Leased Premises, after the expiration of the Term of this Lease, then Tenant shall be deemed to be occupying the Leased Premises as a tenant from month-to-month, otherwise subject to all conditions, provisions, and obligations of this Lease insofar as the same are applicable to a month-to-month tenancy.  Either party may terminate such month-to-month tenancy by providing the other party thirty (30) days' Notice.

26.    <u>Surrender</u>.  Upon termination of Tenant's occupancy of the Leased Premises, Tenant shall surrender the Leased Premises in a broom clean condition similar to that which existed on the date of the grand opening of Tenant's store (Casualty, Eminent Domain, and reasonable wear and tear excepted).

27.    <u>Title and Quiet Enjoyment</u>.  Landlord warrants to Tenant that it is the owner of fee simple title to the Leased Premises and has the full right and authority to execute this Lease. Landlord shall defend Tenant's rights of possession and quiet enjoyment of the Leased Premises without disturbance during the Term of this Lease.

28.    <u>Subordination and Nondisturbance</u>.  At the option of Landlord, this Lease shall be subject and subordinate to any existing or future mortgage or ground lease covering the Leased Premises, provided that any mortgage, ground lease, or similar agreement shall contain a provision whereby the mortgagee or ground lessor agrees not to disturb Tenant's possession or quiet enjoyment of Leased Premises, nor terminate any interest or right of Tenant in the Leased Premises by foreclosure or otherwise.

        28.1.    <u>Estoppels & SNDAs</u>.  From time to time, within twenty (20) days after written request by Landlord, Tenant shall execute and deliver to Landlord or the holder of a mortgage encumbering the Shopping Center a tenant estoppel substantially in the form of **Exhibit I** of this Lease and/or a subordination, non-disturbance, and attornment agreement

15

(an **"SNDA"**) substantially in the form of **Exhibit J** of this Lease, provided Tenant shall not be required to expand any of its obligations nor reduce any of its rights under this Lease. Either party may, at its expense, record any SNDA relating to this Lease. Any party that records an SNDA shall, at its expense, file a corresponding release of the SNDA upon expiration of the party's respective interest or rights in the Leased Premises.

28.2. Existing Mortgages. Landlord shall, within thirty (30) days after the satisfaction of Landlord's Contingency, deliver to Tenant an SNDA consistent with the preceding paragraph executed by the current holder of that certain Mortgage, Assignment of Leases and Rents and Security Agreement dated December 8, 2014 (the **"Existing Mortgage"**). If Landlord fails to deliver the executed SNDA required in the preceding sentence, then Tenant shall have the right, at Tenant's sole option to (i) terminate this Lease; or (ii) suspend payment of any Minimum Rent and Fixed CAM Expenses due until such executed SNDA is received by Tenant, at which time Tenant shall pay all suspended Minimum Rent and Fixed CAM Expenses due within five (5) business days after Tenant receives the executed SNDA. Landlord warrants to Tenant that as of the Effective Date, there are no other mortgages, deeds of trust, or other similar encumbrances of the Leased Premises that would have priority over Tenant's interest in the Leased Premises except for the Existing Mortgage.

29.    Tenant's Personal Property and Landlord's Liens. **"Tenant's Personal Property"** means Tenant's furniture, furnishings, appliances, trade fixtures, trade equipment, merchandise inventory, chattels, signs, compactor, baler, storage containers, satellite, phone system, computers, building automation system control panel, and other personal property located on or in the Leased Premises. Landlord waives all statutory and contractual Landlord liens with respect to all of Tenant's Personal Property.

30.    Notice and Other Written Communications. **"Notice"** shall mean a written communication from one party to the other that must be delivered by overnight courier with tracking capabilities or personal delivery, to, as applicable, Landlord's Notice Address or Tenant's Notice Address. Notice shall be deemed made when received or refused. Landlord and Tenant may deliver all other written communications relating to this Lease by e-mail, first class mail, overnight courier, or certified mail, return receipt requested, or personal delivery, and shall address such communications to the appropriate respective party's representative(s).

31.    Tenant's Default. The following shall be deemed a default by Tenant under this Lease (a **"Tenant Default"**): (i) Tenant's failure to pay Minimum Rent, Fixed CAM Expenses, or any other undisputed charges as required in this Lease that continues for fifteen (15) days after Tenant receives Notice of non-payment from Landlord; (ii) the making by Tenant of a general assignment for the benefit of creditors; the filing by or against Tenant of a petition to have Tenant adjudged a bankrupt, or of a petition for reorganization or arrangement under any law relating to bankruptcy (unless a petition filed against Tenant is dismissed within 60 days); the appointment of a trustee or receiver to take possession of substantially all of Tenant's assets located at the Leased Premises or of Tenant's interest in this Lease if possession is not restored to Tenant within 30 days; or the attachment, execution or other judicial seizure of substantially all of Tenant's assets located at the Leased Premises, or of Tenant's interest in this Lease, if the seizure is not discharged within 30 days; and/or (iii) Tenant's failure to perform any of its other obligations under this Lease and to cure the same within thirty (30) days after Tenant receives Notice of non-performance from Landlord if the non-performance is of the type that can be reasonably cured within thirty (30) days (or for non-performance that is not of the type that can be reasonably cured within thirty (30) days, Tenant's failure to commence to cure such non-performance within thirty (30) days after Tenant receives Notice of non-performance from Landlord, and then diligently cures the non-performance in a commercially reasonable time).

31.1. Remedies. Following a Tenant Default, Landlord shall be entitled to exercise, upon obtaining legal process, all rights and remedies afforded Landlord in the State where the Leased Premises are located. Without limiting the preceding sentence, Landlord may,

at Landlord's option following a Tenant Default (i) terminate this Lease upon Notice to Tenant; or (ii) without such termination, obtain legal process to enter into the Leased Premises, remove Tenant's Personal Property, and re-let the Leased Premises, provided Landlord's re-entry shall not be deemed a forfeiture of the Minimum Rent and Fixed CAM Expenses to be paid or Tenant's other obligations under this Lease during the Term.

31.2.   Mitigation. Landlord shall use commercially reasonable efforts to mitigate its damages following a Tenant Default and dispossession of the Leased Premises from Tenant, including without limitation, re-letting all or a portion of the Leased Premises to another anchor tenant with any rents received by Landlord offsetting Tenant's liability under this section.

32.



y.

34.   Waiver. Each party to this Lease may waive any default by the other party of any of the terms or conditions contained in this Lease, provided however, that such waiver or waivers shall not be deemed or construed as a continuing waiver, and shall not extend to any subsequent default. No waiver shall be implied from any delay or failure by either party to take action following a default by the other party. No extension of time for performance of any obligations shall be deemed an extension of the time for performance of any other obligations under this Lease.

35.   Attorney Fees.   The prevailing party in any lawsuit or cause of action between Landlord and Tenant relating to this Lease shall be entitled to an award of court costs and reasonable attorneys' fees as determined by the court.

36.   Interest. Any amount not paid within ten (10) days after the date that it is due under the terms of this Lease shall bear interest from the date due until paid in full at the lesser of (i) the rate of twelve percent (12%) per annum; or (ii) the maximum annual rate allowed by Law ("Interest").

37.   Force Majeure. Whenever a period of time is prescribed for action by either party under this Lease, such party shall not be liable, penalized, or responsible for any delays due primarily to strikes, riots, acts of God, epidemic, pandemic, shortages of labor or materials, war, Laws, regulations, or restrictions, or any other causes of any kind whatsoever which are beyond the reasonable control of such party (but specifically excluding financial inability

of either party) ("**Force Majeure**"). If a party's performance under this Lease is delayed by Force Majeure, such performance shall be extended for a period equal to such Force Majeure delay provided such party gives Notice to the other party within ten (10) days of the beginning of the Force Majeure delay. Without limiting the foregoing, in the event Tenant is prevented from opening for business from the Leased Premises solely as a result of a Governmental Closure (as defined below) that continues in excess of thirty (30) days, then Tenant shall be permitted to retroactively defer payments of Minimum Rent until the earlier to occur of (i) the date the Governmental Closure has been lifted and (ii) three (3) months after the date the Governmental Closure was first initiated (the "**Rent Deferral Period**"). Tenant shall continue to make all payments of Fixed CAM Expenses as and when due hereunder during the Rent Deferral Period. In that event, Minimum Rent otherwise payable to Landlord during the Rent Deferral Period shall be repaid to Landlord in six (6) equal monthly installments (the "**Repayment Period**"), beginning on the first day of the first calendar month after the expiration of the Rent Deferral Period. If there is not a sufficient number of months remaining in the Term of this Lease for Landlord to be paid in full for the deferred Minimum Rent, then Tenant's monthly payments of deferred Minimum Rent shall increase in proportion to the Term of this Lease remaining so that Landlord is paid in full for the deferred Minimum Rent prior to the expiration of the Term of this Lease. If the Term of this Lease ends during the Rent Deferral Period, then the deferred Minimum Rent shall be due on the last day of the Term of this Lease. As used herein, "**Governmental Closure**" means that applicable governmental authorities issue governmental laws, rules, or regulations such as quarantine restrictions, work-from-home orders, shelter-in-place orders, stay-at-home orders, or isolation orders which legally mandate that Tenant close the Leased Premises for business.

38.    Construction. The administration, interpretation, and legal construction of this Lease shall be based on the following:

38.1.    Entire Agreement. This Lease, together with the Recitals and Exhibits, which are incorporated into and made part of this Lease, constitutes the entire agreement between Landlord and Tenant regarding the subject matter contained in this Lease. This Lease shall not be amended or supplemented except in a writing signed by the President or Vice President of Tenant and an authorized representative of Landlord. All prior oral or written communications, representations, promises, or agreements regarding the subject matter of this Lease and not expressly included in this Lease are null and void.

38.2.    Mutual Agreement. Landlord and Tenant acknowledge and agree: (i) this Lease was negotiated and agreed upon by both Landlord and Tenant, and shall not be construed as if it had been prepared only by one party, but rather that it was mutually prepared by both parties; (ii) Landlord and Tenant are sophisticated businesses experienced with retail leasing; (iii) Landlord and Tenant were represented by competent counsel during the negotiation of this Lease; (iv) the conditions, obligations, and remedies provided for in this Lease were the result of sophisticated negotiations and sufficient consideration; and (v) the conditions, obligations, and remedies provided in this Lease shall not in any event be deemed unconscionable or unenforceable.

38.3.    Binding Effect. This Lease is binding upon and shall inure to the benefit of Landlord and Tenant and their respective heirs, personal representatives, successors, and assigns.

38.4.    Severance.    If any term or condition of this Lease shall, at any time or to any extent, be deemed invalid or unenforceable by a court with competent jurisdiction, the remainder of this Lease, or the application of such term or condition other than those to which it is held invalid or unenforceable, shall not be affected, and each remaining term and condition of this Lease shall be valid and enforced to the fullest extent permitted by Law.

38.5.    Rights and Obligations. Except as otherwise expressly set forth in this Lease, Landlord's and Tenant's respective rights and obligations under this Lease are effective as of the Effective Date. No express right of a party under this Lease shall be deemed to create

an obligation on that party to exercise such right.

38.6.   Relationship of the Parties.  Nothing contained in this Lease shall be deemed or construed as creating the relationship of principal and agent, a partnership, or a joint venture between Landlord and Tenant.  Neither the method of computation of Minimum Rent or Fixed CAM Expenses, nor any other provisions set forth in this Lease, nor any acts of Landlord and Tenant, shall be deemed to create any relationship between the parties other than the relationship of landlord and tenant.

38.7.   Governing Law.  This Lease shall be construed, enforced, and governed in accordance with the laws of the State where the Leased Premises is located.

38.8.  Headings.  The descriptive section and subsection headings contained in this Lease are for convenience only and are not to be used for interpretation of this Lease.

38.9.  Defined Terms.  Capitalized terms in this Lease set forth in a bold font and within quotation marks are defined by the context of the respective term, and shall have the defined meaning when used in a capitalized form elsewhere in this Lease unless otherwise expressly indicated.

39.   Brokerage.  Tenant warrants to Landlord that it has not dealt with any real estate broker, salesman, or finder in connection with this transaction except Reggie Greer of RG Real Estate Service (the **"Broker"**).  Pursuant to a separate agreement between Landlord and Broker, Landlord shall be obligated to pay any commissions or fees owed to the Broker as a result of this transaction and agrees to indemnify, defend, and hold Tenant harmless from any claims of Broker.  Landlord and Tenant shall, indemnify, defend, and hold each other harmless from any other claim for brokerage fees or commissions asserted by any other person as a result of a party's dealings claimed to give rise to such commission.

40.   Memorandum of Lease.  This Lease shall not be recorded.  Landlord and Tenant shall, concurrent with the Effective Date, execute the memorandum of lease set forth in **Exhibit L** to this Lease.  Tenant shall record the memorandum of lease with the county clerk where the Leased Premises is located.  Tenant shall be responsible for any recording fees.

41.   Intentionally Omitted.



(ii) 

43.    <u>Landlord's Contingency</u>.  On or before sixty (60) days following the Effective Date of this Lease (the "**Landlord Contingency Date**"), Landlord shall obtain any approvals required by Landlord's lender(s) related to this Lease ("**Landlord's Contingency**") and shall obtain the BB&B Waiver.  Once Landlord's Contingency is satisfied or waived, Landlord will promptly provide written notice to Tenant.  Failure to satisfy the Landlord's Contingency will allow Landlord or Tenant to terminate this Lease at any point in time following the Landlord Contingency Date.

**[Signatures and acknowledgements follow on the next page(s).]**
**[The remainder of this page is intentionally blank.]**

This Lease shall bind Landlord and Tenant only upon the execution by both parties and each party's receipt of an original of this Lease signed and acknowledged by the other party. If either party fails to execute this Lease and deliver an executed original to the other party within ten (10) days of the Effective Date, this Lease shall be null and void at the election of Tenant.

**Landlord:** Pinnacle Hills, LLC

By: _Mark Shanahan_
Authorized Signatory

_Mark Shanahan_
Print Name

_1-5-21_
Date

**Landlord Acknowledgement**

_Cook_ County         )
                      )    SS.
State of _Illinois_   )

This Lease was acknowledged before me on this _5th_ day of _January_, 2021, by _Mark Shanahan_ in his/her capacity as _Authorized Signatory_ of _Pinnacle Hills LLC_

_Kathleen Fabre_                (seal)
Notary Public

OFFICIAL SEAL
KATHLEEN FABRE
NOTARY PUBLIC, STATE OF ILLINOIS
My Commission Expires June 1, 2021

**Tenant:** Hobby Lobby Stores, Inc.

By: _Randy Childers_
Randy Childers, Vice President

_10-30-20_
Date

**Tenant Acknowledgement**

Oklahoma County    )
                   )    SS.
State of Oklahoma  )

This Lease was acknowledged before me on this _30_ day of _December_, 20_20_, by Randy Childers in his capacity as Vice President of Hobby Lobby Stores, Inc.

_Sheryl McCullough_             (seal)
Notary Public

SHERYL McCULLOUGH
NOTARY
# 20008330
EXP. 07/10/24
STATE OF OKLAHOMA

21

**EXHIBIT A**
**Shopping Center Legal Description**

Lot 7 of the Pinnacle Hills Promenade Subdivision, filed for record November 8, 2006, Plat Book 2006, Page 1356, among the records of Benton County, Arkansas.

**EXHIBIT B**
**Site Plan**



LEGEND:
- HOBBY LOBBY
- EXPANSION SPACE
- OUTDOOR STORAGE
- FUTURE EXPANSION AREA
- PERMITTED AREA
- PARKING FIELD

PREMISES

POWER CENTER #3961

Brookfield Properties

PINNACLE HILLS PROMENADE
2203 PROMENADE BOULEVARD
ROGERS, ARKANSAS 72758

EXHIBIT B

EX B

23



**EXHIBIT B-1**
**Store Plan**

TENANT STORE PLAN

ALL DIMENSIONS ARE TO EXTERIOR FACE OF WALLS.

61,709 SQ. FT.
PROPOSED HOBBY LOBBY
ROGERS, AR.

RETAIL AREA

EXIT LOCATIONS ARE REQUIRED AS SHOWN. LOCATIONS MAY VARY AT HOBBY LOBBY DISCRETION DUE TO SITE LAYOUT/CONDITIONS. (TYPICAL)

NEW DOORS

EXISTING COMPACTOR PAD TO REMAIN. REPAIR AS REQUIRED
NEW COMPACTOR
EXISTING SANITARY ENTRY
EXISTING GAS ENTRY
EXISTING DEMARC
EXISTING ELEC. PANELS
ROOF HATCH LOCATED IN MEZZANINE ABOVE.
TNBB LOCATED IN MEZZ. ABOVE.
EXISTING TRUCK DOCK
BALE/SCISSOR LIFT AS REQIRED BY GRADE.
LANDLORD SPACE
ADJ. SPACE

242'-11 1/2"
212'-4"
30'-2 1/2"
226'-5"
32'
63'-11"
226'-5"
130'-6"
84'-1"
75'
83'-4"
60'-9"
303'-2"
15'
7'

SCALE: 1"=50'-0"

DATE: 7/10/2020

24



**EXHIBIT C**
**Leased Premises Elevation**

EXISTING FRONT ELEVATION

LEASE PREMISES ELEVATIONS      PROPOSED FRONT ELEVATION

DATE: 11/20/2020          SCALE: 1"=30'-0"        ROGERS, AR.

25

## EXHIBIT D
## Landlord's Work

D1.   <u>Construction Notices</u>.  For every Notice required in this Exhibit from Landlord to Tenant, Landlord shall also provide a Notice copy to Tenant's Construction Department at the following address: **Hobby Lobby Construction Department, ATTN: V.P. of Construction, 7707 SW 44th Street, Oklahoma City, OK 73179**.  Landlord agrees that it may not rely on, and Tenant shall not be bound by, any Notice made under this Exhibit unless a Notice copy is provided to Tenant's Construction Department as set forth in this section.  Landlord's additional address for delivery of Notice for construction items as set forth in this Exhibit is as follows:  **Brookfield Properties, 350 N. Orleans Street, Suite 300, Chicago, Illinois 60654-1607, Attention: Debra Contreras, Senior Director, Development**.

D2.   <u>Landlord's Plans</u>.  Prior to commencement of Landlord's Work (hereinafter defined), Landlord shall deliver to Tenant plans and specifications for Landlord's Work (the "**Landlord's Plans**").  Tenant shall then have fifteen (15) days to review Landlord's Plans and provide Landlord Notice of disapproval with a list of the reasons for the disapproval and the required corrections.  Landlord shall then make the required corrections and deliver revised Landlord's Plans to Tenant within fifteen (15) days.  Tenant shall then have an additional fifteen (15) days to review the revised Landlord's Plans and provide Landlord Notice of disapproval with a list of the reasons for the disapproval and the required corrections.  If Tenant does not provide Landlord Notice of disapproval of Landlord's Plans within fifteen (15) days of the original delivery of Landlord's Plans to Tenant or any subsequent delivery of revised Landlord's Plans to Tenant under this section, Landlord's Plans shall be deemed approved.  The process of delivery, Notice of disapproval, corrections, and re-delivery of Landlord's Plans set forth in this section shall continue until Landlord's Plans are deemed approved as set forth in the preceding sentence.  Tenant shall not unreasonably disapprove Landlord's Plans.  All Landlord deliveries of Landlord's Plans under this section may be sent to Tenant either digitally (which may be sent by email to realestate@hobbylobby.com) or to Tenant's Notice Address with a Notice copy to: **Hobby Lobby Construction, ATTN: V.P. of Construction, 7707 SW 44th Street, Oklahoma City, OK 73179**.

D3.   <u>Landlord's Work</u>.  Landlord shall, at Landlord's sole expense, in a good, professional, and workmanlike manner, consistent with the approved Landlord's Plans, and in accordance with applicable Law, complete the following work (collectively, the **"Landlord's Work"**):

    D3.1.  Intentionally omitted.

    D3.2.  <u>Fire Sprinkler System</u>.  Landlord shall ensure the fire sprinkler system is in good working order and condition.  The fire sprinkler system for entire building must remain complete, operational, in accordance with applicable Law, and in accordance with the requirements of the fire marshal for retail use.

    D3.3.  <u>Electrical</u>.  Landlord shall install, unless currently existing, a new electrical service house panel with separate meter.  This service shall control the Common Area lighting, including any exterior security wall lights not exclusively serving the Premises, pylon signs and the parking lot lights for the entire Shopping Center.  Provided (i) the existing electrical system meet's Tenant's requirements of 277/480v, 3 phase service at 1,200 amps; and (ii) the existing main distribution panel (the **"MDP"**) is located within the Leased Premises and is rated at least 1,200 amps (collectively, the **"Electric Service Requirements"**), Tenant will reuse the MDP.  If the existing service does not meet the Electrical Service Requirements, then Landlord shall, as applicable, (a) furnish and install a new 1,200 amp Carolina Products modular panel system with a lighting contactor panel in accordance with and at the location shown on Tenant's Plans; and/or (b) upgrade existing electrical service to 277/480 volt, 3 phase service.  Landlord shall ensure all necessary equipment, switches, transformers, panels, etc., are complete and provide an operating electrical system compliant with applicable Law and other requirements of the utility

26

provider(s). All electrical equipment and components for the Leased Premises shall remain in the Leased Premises. Landlord shall remove all disconnected and abandoned wiring. Landlord shall be responsible for relocating existing utility lines serving areas outside the Leased Premises if required by the respective utility provider, or if such existing utility lines interfere with the completion of Tenant's Work, as mutually agreed by Landlord and Tenant.

D3.4. <u>Water</u>. Landlord shall ensure water service for the Leased Premises includes a service line, valves, and a primary meter (no sub-meter), subject to utility company requirements.

D3.5. <u>Sanitary Sewer</u>.   Landlord shall ensure sanitary sewer for Leased Premises includes a 4" sewer line from main sewer line. Tenant's sewer service shall not be connected on the service side of the main sewer line to existing branch sewer line serving adjacent tenants. Landlord shall properly cap and seal off all abandoned piping.

D3.6. <u>Gas</u>. Landlord shall ensure natural gas service for Leased Premises includes a service line, separate meter (no sub-meter), valves, and piping to all rooftop HVAC units on the Leased Premises.

D3.7. <u>Parking Lot and Landscaping</u>. Landlord shall, in the Common Areas serving the Leased Premises, including all service drives, sidewalks, concrete pads, and exterior dock areas: (i) replace any concrete that, in the reasonable judgment of Landlord and Tenant, cannot be repaired; (ii) replace alligatored areas in asphalt or concrete; (iii) crack fill asphalt or concrete parking lot; (iii) restripe **Parking Repair Area** as shown on **Exhibit B**. Landlord shall also ensure that the parking lot lighting is fully operational and landscaping is up to code, that all dead vegetation is removed and replaced and the landscaping sprinkler system is fully operational.

D3.8. <u>Truck Dock</u>. Tenant acknowledges that it has had an opportunity to inspect the truck/receiving dock serving the Leased Premises and is satisfied with the condition of the truck dock, provided that Landlord shall ensure that the existing truck dock drains properly and that the doors, bumpers, levelers and railing are in good working order at the Delivery Date.

D3.9.<u>Telephone and Data Communications Lines</u>.  Tenant shall designate Tenant's telephone and data communications provider at Tenant's sole discretion and Landlord shall provide such provider reasonable access to the Leased Premises upon Tenant's request.

D3.10.<u>Roof</u>.  Landlord shall provide Tenant within fifteen (15) days of the Effective Date, a copy of the roof warranty, the name of the party holding the roof warranty and the name and contact information of Landlord's preferred roofing contractor. Tenant shall have the right, as a part of its construction inspection, to hire an independent roofing consultant to provide a roof report on the Leased Premises, such inspection shall potentially include a thermal scan, roof cores, etc. Tenant will use Landlord's preferred roofing contractor for any invasive testing of the roof. Landlord shall make all necessary repairs to the roof found during Tenant's inspection and ensure the roof is in a good, watertight condition.  If it is determined, in the commercially reasonable judgment of the Tenant, and as mutually agreed by Landlord and Tenant, that any obligation under the Lease that requires Tenant's presence on the roof (including, but not limited to HVAC replacement, repair, and maintenance) cannot be completed without causing additional damage to the roof or its components due to the age or condition of the roof, then Landlord shall promptly replace the roof.  Such new roof shall have a minimum fifteen (15) year warranty.

D3.11. <u>Americans With Disability Act ("ADA") Compliance</u>.  Landlord shall be solely responsible for all ADA compliance in those areas of the Shopping Center outside of the Leased Premises, including without limitation, any required modifications or remediation to the Common Area.

D3.12. <u>Environmental</u>. Landlord shall (i) provide Tenant no later than thirty (30) days after the Effective Date, with a qualified asbestos and lead inspection report for the Leased Premises completed by a state licensed inspector and a Phase I environmental assessment performed by a qualified state licensed environmental inspector (a Phase II shall be required if so recommended by the Phase I); (ii) be responsible for remediating or removing any Hazardous Substances, asbestos, lead, mold, or other adverse environmental conditions found on or about the Leased Premises existing on or prior to the Delivery Date; and (iii) indemnify, defend, and hold Tenant harmless from any claims, demands, causes of action, suits, liabilities, damages, penalties, losses, costs, expenses, and attorneys' fees arising out of or relating to any such Hazardous Substances, asbestos, lead, mold, or other adverse environmental conditions found on or about the Leased Premises.  Further, Landlord represents and warrants to Tenant that as of the Delivery Date to Landlord's knowledge: (i) there are no current or ongoing Hazardous Substance remediation activities in the Leased Premises or Shopping Center; and (iii) there are no conditions or restrictions relating to the past or current presence of Hazardous Substances in or under the Leased Premises or the Shopping Center that would impose additional permitting or Governmental Approval requirements for Tenant's Work.

D3.13. <u>Structure and Condition</u>. Landlord shall deliver the Leased Premises to Tenant in a sound condition with the existing structure, and all components, equipment, systems, and utilities compliant with the Law.  Landlord shall deliver the Leased Premises in a broom clean condition, free of trade fixtures, debris, and toxic or noxious substances (including without limitation mold and animal waste), with HVAC systems, electrical system and all utility systems in good operating condition. Landlord shall ensure that the slab of the building containing the Leased Premises meets the minimum standards for flatness and levelness for the operation of Tenant's business from the Leased Premises. Such minimum standards shall be a floor slab flatness (FF) number of 25 or greater along with a floor levelness (FL) number of 20 or greater.  Landlord shall also repair any heaving of the slab or slab cracks wider than ¼ inch. Landlord and Tenant acknowledge that there are two floor slab elevations within the Premises.

D3.14 <u>Access to Utilities</u>. The control panel for Common Area utilities or other tenant utilities, telecom, data, electrical panels or surveillance equipment <u>shall not</u> be accessed through the Leased Premises.  No roof access for other tenants shall be allowed through the Leased Premises.

D3.15. <u>Store Front</u>.  Tenant shall construct a new store front as shown on Tenant's Approved Plans.

D4.    <u>Fees and Permits</u>.  Landlord shall be responsible for paying all fees and other governmental charges, costs, and expenses associated with Landlord's Work and development of the Shopping Center, including without limitation, all development fees, impact fees, and utility tap fees.  Tenant shall be responsible solely for its building permits in connection with Tenant's Work.

D5.    <u>Delivery Date</u>.  Landlord shall complete Landlord's Work and deliver the Leased Premises to Tenant and provide Notice to Tenant of such completion and delivery on <u>November 1, 2021</u> (the **"Delivery Date"**) for occupancy by Tenant for the purpose of performing Tenant's Work as set forth in **Exhibit E**.  Landlord shall provide Notice to Tenant thirty (30) days prior to the Delivery Date (the **"Delivery Date Notice"**).

D5.1. <u>Delivery Blackout</u>. Notwithstanding the previous portion of this section, if Landlord completes Landlord's Work and is ready to deliver the Leased Premises to Tenant in the months of December, January, February or March, then Tenant shall have the right to (i) elect to delay the Delivery Date to the following April 1st; or (ii) commence performance of Tenant's Work, but in such event, the Delivery Date for all other purposes of the Lease shall be deemed to be the following April 1st.

D5.2. <u>Termination</u>. Notwithstanding any other provision of the Lease, if the Delivery Date of the Leased Premises has not occurred on or before <u>November 30, 2021</u> (the **"Termination Date"**), then Tenant shall have the right to terminate this Lease by Notice to Landlord. Should Tenant elect to terminate, both parties shall be released from any further obligation or liability under this Lease, except that Landlord shall refund to Tenant any amounts paid to Landlord by Tenant for any advance rent, and for Tenant's out of pocket expenses related to Tenant's Plans and Governmental Approvals (as defined in **Exhibit E**), not to exceed $80,000.00.

D6.    <u>Inspections.</u> Tenant shall have the right within fifteen (15) days of the Delivery Date to conduct inspections of Landlord's Work and provide Landlord Notice if Tenant finds Landlord's Work is incomplete, in which case Landlord shall promptly complete Landlord's Work and provide Tenant Notice when Landlord's Work is complete. Tenant shall notify Landlord of the date and time of any inspection intended to determine if Landlord's Work is complete. Tenant shall have fifteen (15) days to inspect and provide Landlord additional Notices of incomplete Landlord's Work following each Landlord Notice of completion under this section.  In such an event, the Delivery Date and Commencement Date shall be extended by the number of days Landlord takes to complete Landlord's Work.  If Tenant does not provide Landlord Notice of incomplete Landlord's Work within fifteen (15) days of the original Delivery Date or any subsequent Landlord's Notice of completion of Landlord's Work under this section, Landlord's Work shall be deemed complete.  Notwithstanding the previous sentence, Landlord warrants Landlord's Work shall be free of material defects in materials and workmanship for ninety (90) days after the Delivery Date.

D7.    <u>Late Delivery</u>.  Landlord acknowledges that Tenant will invest substantial resources based on the Delivery Date Notice (defined in **Exhibit E**), and that Landlord's failure to complete Landlord's Work by thirty (30) days after Delivery Date Notice will result in significant losses to Tenant.  If Landlord fails to complete Landlord's Work by the thirtieth (30th) day following the Delivery Date Notice, then Landlord shall pay Tenant a sum equal to two and one-half cents ($0.025) multiplied by the Floor Space per day until Landlord completes Landlord's Work and delivers the Leased Premises to Tenant as required in this Exhibit (the **"Late Delivery Damages"**).  Landlord shall pay the Late Delivery Damages within twenty (20) days following Tenant's written request for payment.  In addition to the Late Delivery Damages, Tenant shall have the right to complete Landlord's Work on Landlord's behalf.  Landlord shall reimburse Tenant for any of Landlord's Work completed by Tenant on Landlord's behalf under this section within twenty (20) days following Tenant's written request for payment.  If Landlord fails to pay Tenant any amounts due under this section, Tenant shall have the right to deduct and retain such amounts from any Minimum Rent due.  Tenant's entry upon the future site of Leased Premises shall not affect Landlord's obligations under this section.

## EXHIBIT E
### Tenant's Work

E1.    Construction Notices.  For every Notice required in this Exhibit from Landlord to Tenant, Landlord shall also provide a Notice copy to Tenant's Construction Department at the following address: **Hobby Lobby Construction Department, ATTN: V.P. of Construction, 7707 SW 44th Street, Oklahoma City, OK 73179.**  Landlord agrees that it may not rely on, and Tenant shall not be bound by, any Notice made under this Exhibit unless a Notice copy is provided to Tenant's Construction Department as set forth in this section.  Landlord's additional address for delivery of Notice for construction items as set forth in this Exhibit is as follows: **Brookfield Properties, 350 N. Orleans Street, Suite 300, Chicago, Illinois 60654-1607, Attention: Debra Contreras, Senior Director, Development.**

E2.    Tenant's Plans.  Tenant shall deliver to Landlord digital copies of plans and specifications for Tenant's Work (the **"Tenant's Plans"**) no later than seventy-five (75) days following acceptance of Landlord's Plans as set forth in **Exhibit D** of this Lease.  Landlord shall then have fifteen (15) days to review Tenant's Plans and provide Tenant Notice of disapproval with a list of the reasons for the disapproval and required corrections.  Tenant shall then make the required corrections and deliver revised digital copies of Tenant's Plans to Landlord within fifteen (15) days.  Landlord shall then have an additional fifteen (15) days to review the revised Tenant's Plans and provide Tenant Notice of disapproval with a list the reasons for the disapproval and the required corrections.  If Landlord does not provide Tenant Notice of disapproval of Tenant's Plans within fifteen (15) days of the original delivery of Tenant's Plans to Landlord or any subsequent delivery of revised digital copies of Tenant's Plans to Landlord under this section, Tenant's Plans shall be deemed approved.  The process of delivery, Notice of disapproval, corrections, and re-delivery of digital copies of Tenant's Plans set forth in this section above shall continue until Tenant's Plans are deemed approved as set forth in the preceding sentence.  Landlord shall not unreasonably disapprove Tenant's Plans.  All deliveries of digital copies of Tenant's Plans under this section shall be made to Debra Contreras, Senior Director, Development (Debra.Contreras@brookfieldpropertiesretail.com), Landlord's designated contact person for Tenant plan review.

E3.    Tenant's Work.  Tenant shall, in a good, professional, and workmanlike manner, consistent with the approved Tenant's Plans, and in accordance with applicable Law complete the following work (collectively, the **"Tenant's Work"**): (i) Tenant will renovate, if necessary, the Leased Premises interior to provide stockroom, offices, sales floor, and rest rooms typical of other Hobby Lobby buildings; (ii) install ¼" tempered pegboard floor to ceiling, painted off-white, semi-gloss enamel in sales area; (iii) install, repair, or replace, if required by Tenant, interior ceiling in stockroom, offices, and sales floor; (iv) install, repair, or replace, if required by Tenant, lighting in stockroom, offices, and sales floor; and (v) a new store front as shown on **Exhibit C**.

E4.    Commencement of Tenant's Work.  Upon receipt of the Delivery Date Notice, Tenant may enter upon the Leased Premises for the purpose of inspection of Landlord's Work. Landlord and Tenant agree that such entry by Tenant shall not constitute acceptance of the Leased Premises, and such date of entry shall not constitute the Delivery Date.  Tenant's presence on the Leased Premises shall not interfere with Landlord's performance of Landlord's Work and Landlord shall have no liability for damage or loss to Tenant's property placed on or about the Leased Premises unless caused by Landlord's negligence or willful misconduct.

E5.    Initial Building Permit.  If (i) Tenant has applied for its initial building permit for Tenant's Work (the **"Initial Building Permit"**) within a commercially reasonable time; (ii) Tenant has diligently pursued the Initial Building Permit in a commercially reasonable manner; but (iii) Tenant is unable to obtain the Initial Building Permit, then (a) Tenant shall be excused from commencing or continuing Tenant's Work until Tenant obtains the Initial

Building Permit; and (b) the Delivery Date shall be deemed the date Tenant obtains the Initial Building Permit.

E6.     Governmental Approvals.  Apart from the Initial Building Permit, if (i) Tenant has applied for any other required permit, certification, license, or other governmental approval of Tenant's Plans, Tenant's Work, or Tenant's operation of its business on the Leased Premises (collectively, a **"Governmental Approval"**) within a commercially reasonable time; (ii) Tenant has diligently pursued the Governmental Approval in a commercially reasonable manner; but (iii) Tenant is unable to obtain the Governmental Approval, then (a) Tenant shall be excused from commencing or continuing any remaining Tenant's Work until Tenant obtains the Governmental Approval; and (b) as applicable, the Delivery Date and/or Commencement Date shall be extended by a time period equal to the delay.



E8.     Inspections.   Tenant shall provide Landlord Notice upon completion of Tenant's Work.  Landlord shall have the right within fifteen (15) days of the Notice from Tenant to conduct inspections of Tenant's Work and provide Tenant Notice if Landlord finds Tenant's Work is incomplete, in which case Tenant shall promptly complete Tenant's Work and provide Landlord Notice when Tenant's Work is complete.  Landlord shall have fifteen (15) days to inspect and provide Tenant additional Notices of incomplete Tenant's Work following each Tenant Notice of completion under this section.  If Landlord does not provide Tenant Notice of incomplete Tenant's Work within fifteen (15) days of any Tenant's Notice of completion of Tenant's Work under this section, Tenant's Work shall be deemed complete.  Notwithstanding the previous sentence, Tenant warrants Tenant's Work shall be free of material defects in materials and workmanship for ninety (90) days after the Commencement Date.



31

E10.   This section intentionally deleted.

E11.   <u>Subcontractor Liens</u>.   Tenant will provide Landlord copies of all final lien waivers no later than twenty (20) days after the last lien waiver is received by Tenant.   Tenant shall indemnify, defend, and hold Landlord harmless from any liens filed on the Leased Premises by any of Tenant's subcontractors.  If Tenant is unable to secure the timely release of such liens, then Tenant shall secure a bond covering the amount of such liens.

E12.   <u>Re-Measurement of Floor Space</u>.  During Tenant's construction review Tenant will measure the Floor Space.  If Landlord disagrees with Tenant's measurement of the Floor Space, Landlord's architect shall then re-measure the Floor Space.   If Tenant's measurement and Landlord's re-measurement differ, the parties shall use good faith efforts to resolve such difference and agree upon an acceptable measurement of the Floor Space.  If the accepted measurement of the Floor Space under this section differs from the Floor Space set forth in the Recitals of this Lease, any provisions of this Lease based on the Floor Space, including without limitation Minimum Rent, Fixed CAM Expenses, and Tenant's Allowance, shall be revised according to such accepted measurement.  The Floor Space shall be measured from the outside face of all exterior walls and from the center of all party or interior walls.  The area of any basements, loading docks or mezzanines not used for retail purposes shall not be included in the Floor Space.

**EXHIBIT E-1**
**General Contractor's Lien Release/Waiver**

RE: Tenant's Work on <City>, <State> Hobby Lobby

I certify that:

1.      Tenant has substantially completed Tenant's Work on the referenced site;

2.      Tenant has paid all for all subcontractor materials and labor as required in the respective subcontracts;

3.      No liens have attached against the property and improvements of the owner;

4.      Tenant has received no notice of any lien claim; and

5.      There is no existing or pending subcontractor litigation relating to Tenant's Work.


_____          _____
  Signature                                          Print Name


_____          _____
  Title                                               Date


Acknowledgment

County of _____          )
                                             )   SS.
State of _____           )


    This   instrument   was   acknowledged   before   me   on   this   \_\_\_\_   day   of
_____,        20\_\_      by        _____,        as
_____ of _____.


_____          [SEAL]
Notary Public
My commission #:_____
My commission expires:_____

33

**EXHIBIT F**
**Title Matters**

1. Financing Statement showing Ozark Treats, Inc., Dairy Queen and Orange Julius as Debtor, and Comerica Bank as Secured Party, recorded in/as Book/Page 2006 1262, Continuation filed in Mortgage Book/Page 2011 41918 and Continuation filed in Mortgage Book/Page 2016 56564 of the Records of Benton County, AR.

2. Financing Statement showing Pinnacle Hills, LLC and Pinnacle Hills Promenade, LLC as Debtor, and German American Capital Corporation as Secured Party, recorded in/as Book/Page 2014 201366, Assignment to Wells Fargo Bank, National Association, as Trustee, for the benefit of the holders of Comm 2015-DC1 Mortgage Trust Commercial Mortgage Pass-Through Certificates, in/as Mortgage Book/Page 2015 141632, and Continuation filed of record November 21, 2019 in/as instrument No. L201962767, all in the records of Benton County, Arkansas.

3. Mortgage, Assignment of Leases and Rents and Security Agreement, dated December 8, 2014, and filed for record December 15, 2014, in/as Mortgage Book/Page 2014 201315, of the Records of Benton County, AR, executed by Pinnacle Hills, LLC d/b/a Pinnacle Hills Promenade, LLC and Pinnacle South, LLC, in favor of German American Capital Corporation, securing the original principal amount of $122,000,000.00. Said Mortgage was assigned to Wells Fargo Bank, National Association, as Trustee, for the benefit of the holders of Comm 2015-DC1 Mortgage Trust Commercial Mortgage Pass-Through Certificates, in/as Mortgage Book/Page 2015 141616, among the land records of Benton County, AR.

4. Assignment of Leases and Rents, dated December 8, 2014, and filed for record December 15, 2014, in/as Mortgage Book/Page 2014 201349, of the Records of Benton County, AR, executed by Pinnacle Hills, LLC d/b/a Pinnacle Hills Promenade, LLC and Pinnacle South, LLC, in favor of German American Capital Corporation, securing the original principal amount of $122,000,000.00. Said Mortgage was assigned to Wells Fargo Bank, National Association, as Trustee, for the benefit of the holders of Comm 2015-DC1 Mortgage Trust Commercial Mortgage Pass-Through Certificates, in/as Mortgage Book/Page 2015 141624, among the land records of Benton County, AR.

5. Terms, Provisions and Conditions contained in a Lease by and between Pinnacle Hills, LLC, as Lessor(s)/Landlord(s), and The Fresh Market, Inc., as Lessee(s)/Tenant(s), dated December 21, 2011, and reflected in Memorandum of Lease Agreement filed for record January 17, 2012, in/as Mortgage Book/Page 2012 7620, among the land records of Benton County, AR.

6. Reservations, Restrictions, Easements, Dedications, Right of Ways and Setback Lines as may be shown upon the recorded plat of said Subdivision/Addition, filed for record in/as Plat Record P3 at Page 395, Plat Record 2005 at Pages 73 to 78, Plat Record 2005 at Pages 1150 to 1152, Plat Record 2006 at Page 1356 to 1364 and Affidavit of Scrivener's Error filed in Document No. L20189482 of the records of Benton County, AR.

7. Terms, Provisions and Conditions contained in a Lease by and between Rogers 20. Retail, LLC, as Lessor(s)/Landlord(s), and Sullivan's of Arkansas, Inc., as Lessee(s)/Tenant(s), dated November 16, 2006, and reflected in Memo of Lease filed for record December 6, 2006, in/as Mortgage Book/Page 2006 312519, among the land records of Benton County, AR.

8. Terms and Conditions of Construction, Operation and Reciprocal Easement Agreement, by and between Rogers Retail LLC and Dillard's Dollars, Inc., filed May 19, 2006 in Mortgage Book/Page 2006 129634, Assignment and Assumption of Construction, Operation and Reciprocal Easement Agreement to Pinnacle South, LLC, filed in Deed Book/Page 2006 55895 and Assignment and Assumption of Construction, Operation

34

and Reciprocal Easement Agreement to Pinnacle Hills, LLC, filed in Book/Page 2012 44552, records of Benton County, AR.

9. Street Right of Way, Drainage and Utility Easement, in favor of the Public, filed March 9, 2006 in Deed Book/Page 2006 12579, among the land records of Benton County, AR.

10. Drainage Easement, in favor of the City of Rogers, filed November 22, 2005 in Deed Book/Page 2005 63716, among the land records of Benton County, AR.

11. Sewer Easement, in favor of the City of Rogers, filed November 15, 2005 in Deed Book/Page 2005 62052, among the land records of Benton County, AR.

12. Sewer Easement, in favor of the City of Rogers, filed November 15, 2005 in Deed Book/Page 2005 62047, among the land records of Benton County, AR.

13. Terms and Conditions of Restrictive Covenant Agreement by and between Rogers Retail, LLC, GGP-Rogers Retail, LLC, Hunt Schwyhart Graham VI, LLC, Great Northwest Development, LLC and HSG Holdings, LLC, filed October 10, 2005 in Deed Book/Page 2005 54722, among the land records of Benton County, AR, and First Amendment to Restrictive Covenant Agreement filed for record September 3, 2020 in/as Instrument No. L202055482, records of Benton County, Arkansas.

14. Transmission Line Easement, in favor of Carroll Electric Cooperative Corporation, 27. filed May 15, 1998 as Document No. 98-50795, among the land records of Benton County, AR.

15. Utility Easement, in favor of the City of Rogers, filed April 12, 1995 in Document No. 95-22047, among the land records of Benton County, AR.

16. Terms, Provisions and Conditions contained in a Lease by and between Pinnacle Hills, LLC, as Lessor(s)/Landlord(s), and Haverty Furniture Companies, Inc., as Lessee(s)/Tenant(s), dated November 19, 2014, and reflected in Memo of Lease filed for record February 9, 2015, in/as Book/Page 2015 19910, among the land records of Benton County, AR.

17. Terms, Provisions and Conditions contained in a Lease by and between Pinnacle South, LLC, as Lessor(s)/Landlord(s), and Ulta Salon, Cosmetics & Fragrance, Inc., as Lessee(s)/Tenant(s), dated June 28, 2010, and reflected in Memo of Lease filed for record August 6, 2010, in/as Mortgage Book/Page 2010 97946, among the land records of Benton County, AR.

18. Terms, Provisions and Conditions contained in a Lease by and between Pinnacle South, LLC, as Lessor(s)/Landlord(s), and Petsmart, Inc., as Lessee(s)/Tenant(s), dated November 15, 2007, and reflected in Memo of Lease filed for record January 4, 2008, in/as Mortgage Book/Page 2008 2470, among the land records of Benton County, AR.

**EXHIBIT G**
**Existing Exclusives and Restrictions**

| Tenant | Exclusive Use / Restrictions Listed in Tenant's Lease |
|---|---|
| Bed, Bath & Beyond | **Exclusive:**<br><br>Any of the following respective categories of merchandise: (a) linens and domestics; (b) bathroom items (excluding plumbing hardware); (c) housewares (excluding furniture and major appliances or "white goods"); (d) frames and wall art (provided that a fine art gallery shall not be precluded); (e) window treatments; and/or (f) closet, shelving and storage items.<br><br>**Restrictions:**<br><br>As used in this Lease, the term "Prohibited Uses" shall mean any of the following uses: (1) Any use which emits or results in strong, unusual or offensive odors, fumes, dust or vapors, is a public or private nuisance, emits noise or sounds which are objectionable due to intermittence, beat, frequency, shrillness or loudness, creates a hazardous condition, or is used, in whole or in part, as or for warehousing or the dumping or disposing of garbage or refuse; (2) Any operation primarily used as a storage facility and any assembling, manufacturing, distilling, refining, smelting, agricultural, or mining operation; (3) Any "second hand" store, "surplus" store; (4) Any mobile home park, trailer court, labor camp, junkyard, or stockyard (except that this provision shall not prohibit the temporary use of construction trailers during periods of construction, reconstruction, or maintenance); (5) Any dumping, disposing, incineration, or reduction of garbage (exclusive of trash compactors or trash containers located near the rear of any building); (6) Any fire sale, bankruptcy sale (unless pursuant to a court order), auction house operation, fictitious going-out-of-business sale, lost-our-lease sale or similarly advertised event; (7) Any central laundry, dry cleaning plant, or laundromat (except that a dry cleaner that performs all dry cleaning outside the Power Center shall be permitted, so long as its on-site premises are located more than 150 feet away from the Premises); (8) Any automobile, truck, trailer, boat, or recreational vehicle sales, leasing, display or body shop repair operation; (9) Any bowling alley or skating rink; (10) Any live performance theater, auditorium, meeting hall, sporting event, or other entertainment use; (11) Any living quarters, sleeping apartments, or lodging rooms; (12) Any veterinary hospital or animal raising or boarding facilities (except to the extent permitted below); (13) Any mortuary or funeral home; (14) Any "Pornographic Use", which shall include, without limitation: (x) a store displaying for sale or exhibition books, magazines or other publications containing any combination of photographs, drawings or sketches of a sexual nature, which are not primarily scientific or educational [provided, however, that the sale of books, magazines and other publications by a national bookstore of the type normally located in first-class shopping centers in the State in which the Power Center is located (such as, for example, Borders and Barnes & Noble, as said stores currently operate) shall not be deemed a "pornographic use" hereunder]; or (y) a store offering for exhibition, sale or rental video cassettes or other medium capable of projecting, transmitting or reproducing, independently or in conjunction with another device, machine or |

equipment, an image or series of images, the content of which has been rated or advertised generally as NC-17 or "X" or unrated by the Motion Picture Rating Association, or any successor thereto [provided, however, that the sale or rental of such videos by a national video store of the type normally located in first-class shopping centers in the State in which the Power Center is located (such as, for example, Blockbuster or West Coast Video, as said stores currently operate) shall not be deemed a "pornographic use" hereunder]; or massage parlor [except for therapeutic massages given in connection with the operation of a day spa or health club which may otherwise be permitted herein]; (15) Any so-called "head shop", or other establishment primarily selling or exhibiting drug-related paraphernalia; (16) Any bar, tavern, or other establishment selling alcoholic beverages for on or off premises consumption except the foregoing shall not prohibit the sale of alcoholic beverages by a restaurant (to the extent such restaurant is permitted pursuant to item (35) below) as an incidental part of its business; (17) Any catering or banquet hall; (18) Any flea market, amusement or video arcade, pool or billiard hall, night club, discotheque, or dance hall; (19) Any training or education facility, including but not limited to: beauty schools, barber colleges, reading rooms, places of instruction or other operations catering primarily to students or trainees rather than to customers; provided, however, this prohibition shall not be applicable to on-site employee training by an occupant incidental to the conduct of its business at the Power Center; (20) Any gambling facility or operation, including but not limited to: off-track or sports betting parlor; table games such as black-jack or poker; slot machines; video poker/blackjack/ keno machines or similar devices; or bingo hall. Notwithstanding the foregoing, this prohibition shall not apply to governmental sponsored gambling activities, or charitable gambling activities, so long as such governmental and/or charitable activities are incidental to the business operation being conducted by the occupant; (21) Any unlawful use; (22) Any pawn shop, check-cashing store, gun shop, or tattoo parlor; (23) Any church or other place of religious worship; (24) Any car wash, automobile repair shop, or any business servicing motor vehicles in any respect, including, without limitation, any quick lube oil change service, tire center or gasoline or service station or facility; (25) Any carnival, amusement park or circus; (26) Any medical clinics except medical offices (but not medical clinics) shall be permitted provided such medical offices are located at least 500 feet away from the Premises and the Floor Area of such medical offices does not exceed 7,000 square feet in the aggregate; (27) Any supermarket, except that an upscale, boutique-type food store of the type normally operated in the Rogers, Arkansas metropolitan area (such as, by way of example, Zagara's, Whole Foods, Fresh Fields, or Wild Oats), provided, that such store shall not occupy more than 27,000 square feet of Floor Area, and shall be located at least 200 feet away from the Premises (except that an upscale, boutique-type food store shall be permitted to be located within the Premises); (28) Any office use, other than: (x) office space used in connection with and ancillary to a permitted retail use hereunder; and (y) retail offices providing services commonly found in similar first-class shopping centers in the Rogers, Arkansas metropolitan area (for example, financial services, real estate brokerage, insurance agency, banking, travel agency), provided that such uses are located at least 250 feet away from the Premises, and not more than 5,000 square feet of Floor Area in the Power Center, in

37

| | |
|---|---|
| | the aggregate, shall be devoted to such uses; (29) hotel/motel; (30) daycare center; (31) veterinary office, except as may be incidental to a permitted full-line pet and pet supply store operating in at least 15,000 square feet of Floor Area and located at least 100 feet away from the Premises (except that a full-line pet and pet supply store shall be permitted to be located within the Premises); such occupant shall use reasonable efforts to prevent its customers from allowing their pets to urinate or defecate in the Common Areas arid will promptly remove any "dog dirt" from in front of the Premises; no pet or pet supply store shall be located within 100 feet of the Premises; (32) children's entertainment or activity facility (such as "Discovery Zone", or "Chuck B. Cheese's"); (33) karate center; (34) movie theater; (35) restaurant serving meals for on- or off-premises consumption, except (i) a restaurant located more than 500 feet away from the Premises or within the Future Outparcel shall be permitted and (ii) such permitted restaurant shall be permitted to sell alcoholic beverages as an incidental part of its business; (36) beauty parlor or nail salon except same shall be permitted if located at least 250 feet away from the Premises; (37) health spa, exercise facility or similar type business but the foregoing shall not prohibit a Curves or similar type exercise/fitness studio (provided it is located at least 500 feet away from the Premises and further provided that it does not contain more than 5,000 square feet of Floor Area); or (38) a store primarily selling merchandise which is classed as "odd lot," "close out," "clearance," "discontinued," "cancellation," "second," "factory reject," "sample," "floor model," "demonstrator," "obsolescent," "over stock," "distressed," "bankruptcy," "fire sale" or "damaged", such as, for example, "Grossman's Bargain Outlet", "Contractor's Warehouse", "Big Lots", "Liquidation World", or "Odd Job"; the retailer commonly known as "Christmas Tree Shops" shall be deemed not to violate the foregoing restriction. |
| Build-A-Bear | Exclusive:<br><br>"Exclusive Use" shall mean a business whose principal and primary use is the operation of an assembly and make-it-yourself plush bears, animals or toys store providing all of the following products and services provided by Tenant: make-it-yourself plush bears and other animals, dolls, and accessories related to such bears and other animals and dolls including but not limited to clothes, books, shampoos, fragrances, jewelry, cards, gift wrap, stickers, candy and similar types of products related to bears and dolls. |
| Dollar Tree | Exclusive:<br><br>The operation of a single price point variety retail store or any other retail store the Principal Business of which is the operation of a single price point variety retail store. A business is a "Principal Business" if the merchandise or categories of merchandise in question are sold in the aggregate in twenty-five percent (25%) or more of the sales floor area of the premises (including one-half [1/2] of the adjacent aisle space).<br><br>Restrictions:<br><br>Any one or more of the following uses: (i) a flea market or pawn shop; (ii) a bar, pub, nightclub, music hall or disco in which less |

| | |
|---|---|
| | than 50% of the space or 50% of the revenue is devoted to and derived from food service; (iii) a bowling alley, billiard, pool or bingo parlor; (iv) an arcade, pinball or computer game room (provided that retail facilities which are otherwise not prohibited or restricted may operate no more than six (6) such electronic games incident to their primary business) whose premises is closer than 150 feet from Tenant's Premises; (v) a facility for the sale or rental of used goods (including thrift shops, secondhand or consignment stores); (vi) training or educational facility (including, without limitation, a beauty school, barber college, reading room, driving school, or other facility catering primarily to students or trainees rather than customers); (vii) a massage parlor (which shall not be construed to mean a business of the type commonly referred to as a "day spa"); (viii) a funeral home; (ix) a gymnasium, sport or health club whose premises is closer than 150 feet from Tenant's Premises; (x) a facility for the sale of paraphernalia for use with illicit drugs; (xi) a retail store, dispensary, or any other facility where marijuana products are grown, manufactured, or distributed; (xii) a facility for the sale or display of pornographic material; (xiii) a lingerie bar, "go go" bar or other similar establishment; (xiv) a Laundromat; (xv) an off-track betting parlor; (xvi) a carnival, amusement park or circus; (xvii) a gas station, car wash or auto repair or body shop; (xviii) a facility for the sale of new or used motor vehicles, motorcycles, trailers or mobile homes; (xix) a skating rink; (xx) a banquet hall, auditorium or other place of public assembly; (xxi) a hotel or residential facility; (xxii) a theater of any kind whose premises is closer than 150 feet from Tenant's Premises; (xxiii) any use that creates reasonably objectionable or obnoxious odors; or (xxiv) other non-retail uses except for office or storage facilities incidental to a primary retail operation. |
| DSW | Restrictions:<br><br>The operation of a bingo parlor; an adult book or adult video store (defined for the purposes hereof as a store devoting 10% or more of its floor space to offering books and/or video materials for sale or for rent which are directed to or restricted to adult customers due to sexually explicit subject matter or for any other reason making it inappropriate for general use) or an adult theater or "strip-tease" establishment; a bowling alley within 200 feet of the Leased Premises; a warehouse; a car wash; a pawn shop; for industrial or manufacturing purposes; a carnival, circus or amusement park; a gas station; a facility for the sale of paraphernalia for use with illicit thugs; a funeral home or mortuary; a blood bank; a gambling establishment; a banquet hail, auditorium or other place of public assembly (other than a community meeting room not exceeding 10,000 square feet of area operated by Landlord or Landlord's management company); a second hand or surplus store (Second Hand Store shall not include the following a first-class retail establishment selling antiques, or a retail operation with at least 20 locations under the same trade name and that operates substantially like Play-it-Again Sports, Buy Backs, Game Slop, Half Price Books, Disc Go Round, Once Upon A Child, Plato's Closet, or Clothes Mentor); a gun range; an establishment selling fireworks; any veterinary hospital or animal raising facility (excluding any pet store); storage of goods not to be sold from the Power Center (Landlord shall be allowed to create storage space in the Power Center for lease to tenant's located in the Development provided that the total storage space in the Power |

| | Center shall not exceed 3,000 square feet); a gym, health club, health spa or studio larger than 4,000 square feet within 300 feet of the Leased Premises; a restaurant, bar, tavern or cocktail lounge, billiard or pool hall, game parlor or video arcade (which shall be defined as a store containing more than 5 electronic games) within 300 feet of the Leased Premises, a "training facility" (as hereinafter defined); an "entertainment or recreational facility" (as hereinafter defined) within three hundred (300) feet of the Leased Premises; an automotive maintenance or repair facility (except as an accessory use to another business operation such as, but not limited to, "Sears", "Costco", "Wal-Mart", etc., and such restriction shall not apply to the installation or repair of automotive audio systems); a flea market; a central laundry or dry cleaning plant; a facility for the sale or display of new or used boats, motor vehicles or trailers; or any facility which is illegal or dangerous, constitutes a nuisance, emits offensive odors, fumes, dust or vapors or loud noise or sounds or is inconsistent with a community oriented first-class shopping centers in the metropolitan area of the City and State where the Power Center is located. The term "training facility" shall refer to a beauty school, barber college, reading room (excluding book stores), place of instruction or any other operation catering primarily to students or trainees as opposed to customers located within 300 feet of the Leased Premises. An "entertainment or recreational facility" shall refer to a movie or live theater or cinema (other than the existing Malco Pinnacle Hills Theater currently operating at the Power Center), skating rink, dance hall or night club, massage parlor or any other similar facility operated solely for entertainment purposes (such as a "laser tag" or "virtual reality" theme operation) and located within 300 feet of the Leased Premises. In addition, the total square footage of all medical, dental, professional or business offices shall not exceed 10% of the gross leasable square footage of the Power Center. |
| Hallmark | Exclusive:<br><br>"Restricted Use" shall mean the operation of a store whose use exceeds 60 lineal feet collectively of greeting cards, gift wrap and party goods. "Competing Business" shall mean a business not affiliated with Tenant which uses its premises in the Shopping Center primarily for the Restricted Use.  A business shall be deemed to be using its premises primarily for the Restricted Use if more than 60 lineal feet of its premises are devoted to the Restricted Use, excluding; (i) any existing tenant in the Shopping Center operating under a lease or other written agreement in effect prior to the Commencement Date to the extent that such lease or written agreements permits the Restricted Use; (ii) a single retail tenant that consists of 25,000 or more contiguous square feet of floor area, operating under one trade name and anchor tenants; and (iii) a Barnes & Noble or Borders store(s) having an area of at least 18,000 square feet. |
| Haverty Furniture | Exclusive:<br><br>Any business or operation engaged primarily in the sale of furniture (including mattresses) and related accessories, including without limitation, any discount retail furniture store or any outlet-type furniture store or store engaged in the sale of furniture on a discount or clearance basis, any store or business engaged in the |

| | |
|---|---|
| | sale of bedding and/or mattresses, or a manufacturer direct or catalogue furniture store.<br><br>Restrictions:<br><br>(1) Manufacturing facility; (2) "Adults Only" Massage Parlor (Spas offering massages as part of a legitimate business are allowed); (3) X- rated/pornographic book shop or any offering of sexually explicit video material; (4) Dry Cleaner,(except facilities for drop off and pick up of clothing cleaned at another location); (5) Automobile repair shop or service station or any facility storing or selling gasoline or diesel fuel from tanks; (6) Used clothing or thrift store or liquidation outlet; (7) Church; (8) Coin operated laundry; (9) Cocktail lounge, bar, or tavern or sale or sale of alcoholic beverages whether or not packaged, except in conjunction with a restaurant permitted; (10) Night Club; (11) Cinema or Theater; (12) Drug Store/Pharmacy; (13) Place of Recreation/Entertainment including but not limited to. bowling alley, pool hall, skating rink, carnival, game arcade, swimming pool, laser tag facility, health club or exercise facility; (14) Off track betting; (15) Pawn Shop; (16) Meeting Hall, motel or motor inn; (17) Psychic, tarot card reading or any similar service; (18) Bailbondsman; (19) Funeral parlor/mortuary, flea market, junkyard; (20) Pet sales, animal training; (21) Warehouse; (22) Carwash; (23) Blood bank; (24) Gambling establishment; (25) Banquet Hall; (26) Gun Range; (27) Selling of Fireworks; (28) Training facility – defined as a beauty school, barber college, reading room, place of instruction or any other operation catering primarily to students or trainees as opposed to customers; (29) Mobile Home Park, trailer court; (30) Any living quarters; (31) "Head shop" or other establishment primarily selling or exhibiting drug related paraphernalia; (32) Check cashing or tattoo parlor; (33) Medical clinic; (34) Supermarket; (35) Daycare center; (36) Office exceeding 5,000 sf Children's entertainment facility such as Chuck E. Cheese; (37) Karate Center; (38) A store selling merchandise which is classes as "odd lot", close out", "clearance", "discontinued" such as for example "Big Lots", "Grossman's Bargain Outlet". |
| Petland | Exclusive:<br><br>The operation of a store whose primary use is the sale of dogs. |
| PetSmart | Exclusive:<br><br>The retail sale of (i) pets (including but not limited to fish, birds, reptiles, dogs, cats and other small animals), (ii) food, accessories and other products relating to pets and animals, including equestrian products and apparel related thereto, or (iii) services related to pets and animals, such as care, grooming, boarding, animal training and obedience classes, pet adoption and veterinary services.<br><br>Restrictions:<br><br>(1) Drive-throughs; (2) restaurants occupying more than 2,500 square feet of Gross Floor Area; (3) offices occupying more than 3,000 square feet of Gross Floor Area (except that an incidental office use as part of a retail business is permitted); (4) professional uses occupying more than 3,000 square feet of Gross Floor Area; |

| | and (5) any facility for the sale, lease or rental of automobiles, trucks, motorcycles, recreational vehicles, boats, or other vehicles, including a new car dealer showrooms (except for those retailers who sell or lease vehicles as an ancillary use, and which vehicles must be displayed within the store's premises only) within the Shopping Center. |
|---|---|
| Pure Barre | Exclusive:<br><br>The operation of a barre fitness studio. |
| TJ Maxx | Exclusive:<br><br>No individual premises in the Shopping Center shall contain more than 15,000 square feet of floor area therein used or occupied for, or devoted to, the sale or display of apparel and related accessories sold at off-price.<br><br>Restrictions:<br><br>(a) for any non-retail purposes (repairs, alterations and offices incidental to retailing, and banks and small loan offices, tax preparation offices, optical stores, and skin care salons (provided such skin care salons are limited to 7,000 square feet) shall be deemed retail purposes), or (b) for any entertainment purposes such as a bowling alley, skating rink, cinema, bar (except in restaurants where beer, wine and alcohol accounts for less than half of the gross sales), nightclub, discotheque, amusement gallery, poolroom, health club (except in Area G), massage parlor (except as part of a day spa), sporting event, sports or game facility (except on temporary basis, not more than five (5) days per event and not in Tenant's primary parking area), off-track betting club (c) or for any establishment which sells or displays pornographic materials or (d) for any establishment which sells or displays used merchandise or second hand goods. No restaurants or establishments selling food prepared on premises for consumption on or off premises (collectively "restaurant") shall be located within 150 feet of the Demised Premises and no restaurants in the Shopping Center shall exceed 7,500 square feet in each instance. |
| ULTA | Exclusive:<br><br>"Tenant's Protected Uses" shall mean (i) the retail sale of cosmetics, fragrances, health and beauty products, hair care products and accessories; personal care appliances; skin care products, and body care products; and (ii) the operation of a full service beauty salon with spa services. Notwithstanding the foregoing, Tenant's exclusive rights shall not apply to uses associated with (a) existing tenants in the Shopping Center (other than kiosk or similar operations) who are entitled to sell such products and/or provide the services that are covered by Tenant's exclusive rights pursuant to their respective leases, and replacements or renewals of such existing tenants so long as the uses, services and price points of each such replaced or renewed operation remains materially the same as the existing operation and the size and location of the premises of the replaced or renewed operation is not materially increased from, or moved materially closer to the Premises than, the existing premises, (b) |

any national or regional retail tenant in excess of 25,000 square feet that sells the goods and/or provides the services that are covered by Tenant's exclusive rights as a part of its national business operations, but not as its primary use, (c) family hair care operations such as Great Clips, Fantastic Sam's, or other similar value-oriented type operations, or (d) incidental sales (less than 250 square feet total of such tenant's premises is used to sell any of the products that comprise Tenant's Protected Uses) made in connection with the operation of another primary use. As used herein, a "regional retail tenant" shall mean a retail operator with 25 or more stores with active operations in 4 of the following states: Arkansas, Texas, Louisiana, Oklahoma, and Missouri.

Restrictions:

nuisance; use causing unreasonably loud noises or unreasonably offensive odors; any use that produces unreasonably loud noise and/or vibrations that can be heard and/or felt in the Premises; manufacturing facility; "adults only" massage parlor (spas offering massages as part of their legitimate businesses are not prohibited hereby); x-rated book shop or x-rated adult movie house; mortuary or funeral parlor; dry cleaner (except facilities for drop off and pick up of clothing cleaned at another location); automobile repair shop or service station or any facility storing or selling gasoline or diesel fuel in or from tanks; used clothing or thrift store or liquidation outlet; church; or coin operated laundry; cocktail lounge, bar or tavern or sale of alcoholic beverages, whether or not packaged, except in conjunction with a restaurant permitted hereunder; night club; cinema or theater; drug store/pharmacy; or place of recreation (including, but not limited to, bowling alley, skating rink, carnival, game arcade, swimming pool, hot tub, gym, health club or exercise facility)

**EXHIBIT H**
**Existing Permitted Uses**

| Tenant | Permitted Use Provision |
|---|---|
| Carter's | Only for the retail sale of apparel, footwear, accessories and other related merchandise for infants, toddlers and children and, ancillary to such use, such other related merchandise commonly sold in other stores of Tenant, and for no other and for no other use or purpose whatsoever. Such permitted use is not restricted by or in violation of any exclusive use or other covenant or restriction granted by Landlord or its predecessor to another tenant in the Shopping Center. |
| Dollar Tree | A retail variety store selling general merchandise including food and beverages. |
| DSW | A typically stocked and staffed "DSW Shoes" store. |
| Haverty Furniture | The operation of a home furniture, furnishings, bedding (including mattresses), and accessories store. |
| Kirkland's | The retail sale of gifts, decorative accessories, home furnishings, housewares and related items. |
| Old Navy | The sale of wearing apparel for men and/or women and, at Tenant's option, Tenant may sell wearing apparel for infants, toddlers and children. The Leased Premises may also be used for the sale of (i) shoes and other footwear; (ii) accessories such as, but not limited to bags, pocketbooks, luggage, belts, hats, scarves, bandannas, hair accessories, umbrellas, sunglasses, watches and pins; (iii) baby strollers, stuffed animals, toys and games, and other infants', toddlers' and children's items including children's furniture; (iv) cosmetics and other personal care and related items; (v) candles and sundries, linens, bedding, towels and bath items and other domestic products; and (vi) the sale of pre-packaged food, candy, gift food and other specialty food items. The Leased Premises may also be used for an operation for the sale (for on and off-premises consumption) of coffee, tea, juices and other non-alcoholic beverages, baked goods such as muffins, bagels and cookies, and other food items such as, without limitation, sandwiches, soups, snacks, salads, hot dogs, pretzels and pizza. In addition, up to 10% of the Leased Premises may be used for any other lawful retail purpose, carrying such merchandise or offering such services as is found in Tenant's other stores operating under the same trade name as is used by Tenant at the Leased Premises, and for no other purpose whatsoever. |
| PetSmart | The retail sale of (i) pets (including but not limited to fish, birds, reptiles, dogs, cats and other small animals), (ii) food, accessories and other products relating to pets and animals, including equestrian products and apparel related thereto, (iii) services related to pets and animals, |

| | |
|---|---|
| | such as care, grooming, boarding, animal training and obedience classes, pet adoption and veterinary services, (iv) products relating to nature and the environment, and (v) educational products and services related to any of the foregoing, and office and storage uses incidental to the foregoing. |
| ULTA | (i) the retail sale of cosmetics, fragrances, health and beauty products, hair care products and accessories; personal care appliances; skin care products, and body care products; and (ii) the operation of a full service beauty salon with spa services. |

**EXHIBIT I**
**Tenant Estoppel**

DATE:    _____ (the "**Effective Date**")

TO:        _____ (the "**Recipient**")

RE:        _____ (the "**Leased Premises**")

Hobby Lobby Stores, Inc.        (the "**Tenant**")

_____ (the "**Landlord**")

Tenant does hereby certify to Recipient as follows:

1.      Tenant and Landlord are parties to a certain lease agreement dated _____ for the Leased Premises, as amended by that certain amendment dated _____ (collectively, the "**Lease**"). The Lease has not been amended except as set forth in this section.

2.      The Lease represents the entire agreement between Landlord and Tenant regarding Tenant's leasehold interest in the Leased Premises.

3.      The Lease is valid and in full force and effect as of the Effective Date.

4.      There are no assignments or sub-leases with respect to the Lease except for the documents set forth in **Exhibit A** to this tenant estoppel.

5.      The Commencement Date (as defined in the Lease) is or was _____. The initial or primary term of the Lease will expire on _____. At the conclusion of the initial or primary term, Tenant has the right to renew the term of the Lease for ____ additional renewal terms of _____ years each.

6.      Minimum Rent (as defined in the Lease) as of the Effective Date is $_____ per month. Tenant has paid Minimum Rent through the month of _____. In addition to Minimum Rent, Tenant pays as Fixed CAM Expenses (as defined in the Lease and subject to any reconciliations, reductions, refunds, credits, and off-sets under the Lease) the following monthly amounts:

CAM: $_____; Taxes: $_____; Insurance: $_____

7.      Tenant has not paid a security deposit to Landlord under the Lease.

8.      To the best of Tenant's actual knowledge, and apart from the exceptions listed in this section below, on the Effective Date (i) Tenant has no claimed defenses against enforcement of the Lease by Landlord; (ii) no event has occurred and no condition exists that constitutes a default by Tenant or Landlord under the terms of the Lease; and (iii) Tenant is not entitled to any allowance or free rent for any period after the Effective Date;

Exceptions:

(a) Landlord has failed to provide documentation required under the Lease for Tenant's reconciliation of CAM, Taxes, and Insurance (all as defined under the Lease) for the calendar year(s) 20XX, 20YY, and 20ZZ.

(b) Tenant is due a credit, and right to off-set rent, in the following amounts: $_____.

9.      Tenant has no outstanding options, rights, or interests in or under any contract or agreement for the sale or transfer of the Leased Premises.

Hobby Lobby Stores, Inc.,
an Oklahoma corporation

By:      _____
Randy Childers, Vice President, President

**EXHIBIT J**
**Subordination, Non-Disturbance, and Attornment Agreement**

This subordination, non-disturbance, and attornment agreement (the **"Agreement"**) is made and entered into as of the __ day of _____, 20__ (the **"Effective Date"**), by and among Hobby Lobby Stores, Inc., an Oklahoma corporation, having a notice address of 7707 S.W. 44th Street, Oklahoma City, Oklahoma, 73179, Attn: Real Estate Department (**"Tenant"**), _____ (**"Landlord"**), having a notice address of _____, and _____ having a notice address of _____ (**"Lender"**).

RECITALS

A.      Landlord is the owner of certain real property which is more fully described in Exhibit A of this Agreement (the **"Premises"**);

B.      Lender is now or will be the owner and holder of a note (the **"Note"**) evidencing a loan (**"Loan"**) secured by a mortgage or deed of trust (as applicable, the **"Mortgage"**) securing the Loan, in each case executed by Landlord to Lender which Mortgage is to be recorded in the county in which the Premises is located;

C.      Tenant is the Lessee under a lease dated _____, between Tenant and Landlord (the lease and all lease amendments are collectively referred to as the **"Lease"**), demising to Tenant a portion of the Premises and improvements (described in the Lease and in this Agreement as the **"Leased Premises"**);

D.       The Mortgage constitutes or will constitute a first lien upon, among other things, the Premises and the current and future improvements, or a portion thereof; and

E.      The parties are entering into this Agreement as a condition precedent to Tenant's agreement to enter into the Lease and/or Lender's agreement to make the Loan to Landlord as evidenced by the Note.

TERMS AND CONDITIONS

For good and valuable consideration, the parties agree as follows:

1.      <u>Subordination</u>.  The Lease and all rights of Tenant in or to the Leased Premises are subordinated, and shall remain subordinate and junior, to the lien of the Mortgage and to the rights and interests of the holder of the Note and Mortgage as if the Mortgage had been duly executed, acknowledged, recorded, and the indebtedness secured thereby had been fully disbursed prior to the execution of the Lease or possession of the Leased Premises by Tenant.  Tenant warrants to Lender that there has been no assignment of Tenant's leasehold interest in the Leased Premises to any other person.

2.      <u>Attornment</u>.  If the interests of Landlord in the Premises shall be transferred to and owned by Lender or any other person or entity by reason of foreclosure or other proceedings brought by Lender in lieu of or pursuant to a foreclosure (as applicable, the **"Successor"**), or by any other manner prior to the expiration of the Lease, including any extensions and renewals of the Lease, and provided Successor assumes all of Landlord's obligations under the Lease, then:

(i)      Tenant shall attorn to and accept Successor and recognize Successor as Tenant's Landlord under the Lease;

(ii)      Successor shall recognize and accept Tenant as its tenant under the Lease;

(iii)      the Lease shall continue, without further agreement, in full force and effect as a direct lease between Successor and Tenant for the remaining term of the Lease, together

47

with all extensions and renewals now provided in the Lease, upon the same terms, covenants, and conditions as provided in the Lease; and

     (iv)    Successor shall thereafter assume and perform all of Landlord's obligations, as landlord under the Lease, and Tenant shall thereafter make all rent payments directly to Successor as set forth in the Lease.

3.    <u>Limitation of Liability</u>.  In the event of a foreclosure of or other execution on the Mortgage (by judicial process, power of sale or otherwise), or conveyance in lieu of foreclosure, Successor shall not:

     (i)    be liable to Tenant for any past acts, past omissions, or past defaults by prior Landlord unless such acts, omissions, or defaults are of a continuing nature or for which Successor was provided notice of such past acts, past omissions, or past defaults, and provided that nothing in this Agreement shall modify or reduce the obligation of Successor to perform all of the obligations of Landlord under the Lease once Successor succeeds to the interest of Landlord;

     (ii)    be liable to Tenant for any payment of rent made more than thirty (30) days in advance and not delivered to Successor; and

     (iii)    be bound by any amendment of the Lease entered into during the existence of Lender's lien under the Mortgage which (a) has the effect of reducing the rent payable by Tenant, reducing the term of the Lease, or materially increasing Landlord's obligation under the Lease, and (b) has not been consented to by Lender.

4.    <u>Tenant Allowance</u>.  Notwithstanding anything to the contrary in this Agreement, if Tenant is owed any tenant improvement allowance under the Lease, Tenant shall have the continuing right to abate and retain such amounts against rent until recouped in full as set forth in the Lease.

5.    <u>Cure by Lender of Landlord Defaults</u>.  On giving notice of any default to Landlord under the provisions of the Lease, Tenant agrees to also provide a copy of such notice to Lender.  If Landlord defaults under any provision of the Lease, Lender shall have the right, but not the obligation, to cure any such default in the same manner and within the same period of time as provided in the Lease, and Tenant agrees to accept such performance by Lender under the Lease as though the same had been performed by Landlord.  Such cure shall not reduce or otherwise limit any rights or remedies of Tenant under the Lease.

6.    <u>Lease Assignment</u>.  Tenant acknowledges that Landlord has assigned, or may assign, Landlord's interest in the Lease to Lender as additional security for its obligations under the Mortgage, and Landlord hereby irrevocably instructs Tenant to pay to Lender all rent and other sums due under the Lease immediately upon notice from Lender, provided Landlord agrees Tenant may rely on the notice from Lender under this section regardless of Landlord's dispute of the validity of such notice.

7.    <u>Non-Disturbance</u>.  So long as Tenant is not in default under the terms of the Lease (beyond any notice and period of time given Tenant to cure such default as provided in the Lease), Lender agrees, on behalf of itself and any other Successor that:

     (i)    Tenant shall not be made a party to any foreclosure, conveyance in lieu of foreclosure, conveyance, power of sale, sale, or other action or proceeding regarding or relating to the Mortgage occurring prior to the expiration of the Lease, including any extensions or renewals of the Lease;

     (ii)    Successor shall not affect the Lease, interfere with Tenant's possession of the Leased Premises, or Tenant's leasehold rights under the Lease;

     (iii)    Tenant shall not be disturbed in the quiet enjoyment and peaceful possession

of the Leased Premises, subject to the terms and conditions of the Lease; and

      (iv)    The lien of the Mortgage does not and shall not encumber any property of Tenant located in or about the Leased Premises.

8.    <u>Insurance and Condemnation Proceeds</u>.  In the event of an insured casualty, condemnation, or eminent domain, the Lease shall control with regard to the application of the proceeds from insurance, condemnation, or eminent domain.

9.    <u>Notice</u>. All notices permitted or required to be given under this Agreement shall be in writing, shall be deemed properly given if addressed to the parties at the respective addresses set forth in the initial paragraph of this Agreement, or at such other address as is specified by notice by any party by certified mail, postage prepaid, return receipt requested, by delivery or attempted delivery by a nationally recognized overnight courier service, or by personal delivery.

10.    <u>Successors and Assigns</u>. This Agreement shall be binding upon the parties and their respective heirs, executors, administrators, representatives, successors and assigns including, without limitation, each and every holder of the Note and Mortgage.

11.    <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, each of which will be an original and all of which taken together will constitute one original single agreement.

12.    <u>Modification</u>.  This Agreement may only be modified by an agreement signed by all parties.

13.    <u>Choice of Law</u>.  This Agreement shall be governed by the law in which the Premises are located.

      This Agreement shall bind the parties only upon the execution by all parties and each party's receipt of an original of this Agreement signed and acknowledged by the other parties. If any party fails to execute this Agreement and deliver an executed original to the other party within fifteen (15) days of the Effective Date, this Agreement shall be null and void.

**Tenant:**                    **Lender:**

Hobby Lobby Stores, Inc.      _____

By: _____      By: _____
      Randy Childers, Vice President      Signature

                                    _____
                                    Printed Name and Title

**Landlord:**

Pinnacle Hills, LLC

By: _____
      Authorized Signatory

      _____
      Printed Name

**EXHIBIT K**
**Signage**

# HOBBY LOBBY

## STORE #055R
## 2230 S Promenade Blvd
## Rogers, AR  72758

50

**JONES SIGN**
Your Vision. Accomplished.
WWW.JONESSIGN.COM

| JOB # 254664-R1 |
|---|
| DATE 11.24.2020 |
| DESIGNER M. HOLES |
| SALES REP S. BERRYMAN |
| FRONT/DR K. McCONNELL |

HOBBY LOBBY

HOBBY LOBBY
2230 S Promenade Blvd
Rogers, AR  72758

SHEET NUMBER
**1.0**

SITE PLAN



NTS

**CL1** NEW INTERNALLY-ILLUMINATED REMOTE CHANNEL LETTER SET (SECONDARY COPY NON-ILLUMINATED) (QTY. 1)

SQUARE FOOTAGE ALLOWED: TBD
SQUARE FOOTAGE: 306.7 ACTUAL
SQUARE FOOTAGE: 277.3 BOXED
SURVEY REQUIRED



**PROPOSED VIEW**
SCALE: NTS

**JONES SIGN**
Your Vision. Accomplished.
WWW.JONESSIGN.COM

JOB #: 254664-R1
DATE: 11.24.2020
DESIGNER: H. MOLES
SALES REP: S. BIDRIHAN
PROJ MGR: K. MCCONNELL

CLIENT APPROVAL          DATE

LANDLORD APPROVAL        DATE

**HOBBY LOBBY**

HOBBY LOBBY
2230 S Promenade Blvd
Rogers, AR 72758

SHEET NUMBER
**3.0**

52

**CL1** **NEW INTERNALLY-ILLUMINATED REMOTE CHANNEL LETTER SET (SECONDARY COPY NON-ILLUMINATED) (QTY. 1)**

SQUARE FOOTAGE ALLOWED: TBD
SQUARE FOOTAGE: 308.7 ACTUAL
SQUARE FOOTAGE: 277.3 BOXED
SQUARE FOOTAGE: 0



**Mfg. & Install (1) 60" "HOBBY LOBBY" REMOTE LED CHANNEL LETTER SET**
*NOTE: GOTHAM BLACK FONT - DO NOT TYPE or MODIFY*

FRONT VIEW
SCALE: 3/16"= 1'-0"

ELECTRICAL
TOWARDS BOTTOM

COLORS/FINISHES
■ P-1 BLACK
▨ M-1 #2119 ORANGE TUFF GLASS, HIGH IMPACT PLASTIC

SPECIFICATIONS
1. .040" X 5" PRE-FINISHED P-1 ALUMINUM COIL (WHITE INSIDE)
2. #8 - ½" PAN HEAD SCREWS
3. 1" X 1-1/2" RETAINER SYSTEM - SIDE DETAIL - CHEMICALLY BONDED TO FACE P-1
4. 3/16" ACRYLIC M-1,
5. GE TETRA MAX RED ORANGE LEDs
6. 3MM ACM BACKS RIVETED TO RETURNS - SEMI-GLOSS WHITE BOTH SIDES
7. MOUNTING HARDWARE - EIFS WALL - 3/8" TEK SCREW X TOTAL WALL THICKNESS +
1" MIN. INTO STEEL STUDS
8. 7/8" ELECTRICAL HOLE / 3/4" COUPLER WITH FLEXIBLE
CONDUIT TO POWER SUPPLY BOX
9. LED POWER SUPPLY INSIDE POWER SUPPLY BOX
10. TOGGLE SWITCH MOUNTED TO POWER SUPPLY BOX
11. 1/4" DIA. WEEP HOLES (EXTERIOR APPLICATIONS ONLY)
12. 1" X 1" ALUMINUM TUBE CROSS BRACING



REMOTE WIRED FACE LIT CHANNEL LETTERS
SCALE: NTS

RETAINER SYSTEM
NTS

ELECTRICAL SPECIFICATIONS

NOTE:
LABELS ARE TO BE OUT OF VIEW

**Intertek** ETL

| JOB #: 254664-R1 | | | | | CLIENT APPROVAL | DATE | | HOBBY LOBBY | SHEET NUMBER |
|---|---|---|---|---|---|---|---|---|---|
| DATE: 11.24.2020 | | | | | | | | 2230 S Promenade Blvd | **4.0** |
| DESIGNER: H. MOLES | | | | | LANDLORD APPROVAL | DATE | | Rogers, AR 72758 | |
| SALES REP: S. BERRYMAN | | | | | | | | | |
| PROVIDER: K. McCONNELL | | | | | | | | | |

**JONES SIGN**
Your Vision. Accomplished.
WWW.JONESSIGN.COM



**NEW NON-ILLUMINATED CHANNEL LETTER SETS (QTY. 4)**

**TOTAL SQUARE FOOTAGE:** 67.65

SURVEY REQUIRED



8'-9 5/8"

18" **CRAFTS**

14'-11 3/4"

18" **HOME DECOR**



12'-3"

18" **SEASONAL**

9'-1 1/4"

18" **FRAMES**

**Mfg. & Install (1EA.) 18" Non-Illuminated Channel Letters**

FRONT VIEW
SCALE: 1/4"= 1'-0"

COLORS/FINISHES
■ F-1  BLACK - SEMI GLOSS
■ H-2  #2114 BLUE ACRYLIC

SPECIFICATIONS
① .040" X 5" ALUMINUM COIL (WHITE INSIDE) F-1
② #8 - ½" PAN HEAD SCREWS
③ 1" F-1 TRIM CAP
④ .125" ACRYLIC H-2
⑤ ACM BACKS
⑥ MOUNTING HARDWARE (TBD BY WALL CONSTRUCTION)

NON LIT CHANNEL LETTERS
SCALE: NTS

| SIGN SIZES & SQUARE FOOTAGE | | |
|---|---|---|
| CRAFTS: | 1'-6" x 8'-9 5/8" | 13.2sf |
| HOME DECOR: | 1'-6" x 14'-11 3/4" | 22.45sf |
| SEASONAL: | 1'-6" x 12'-3" | 18.4sf |
| FRAMES: | 1'-6" x 9'-1 1/4" | 13.6sf |
| TOTAL | | 67.65 |

**JONES SIGN**
Your Vision. Accomplished.
WWW.JONESSIGN.COM

JOB #: **254664-R1**
DATE: 11.24.2020
DESIGNER: H. MOLES
SALESREP: S. BERRYMAN
PROJ. MGR: K. McCONNELL

CLIENT APPROVAL          DATE

LAND. ORD.APPROVAL       DATE

HOBBY LOBBY
2230 S Promenade Blvd
Rogers, AR  72758

SHEET NUMBER
**5.0**

54

This art, drawing, list, unpublished drawing by Jones Sign Co. Inc. is for your personal use in conjunction with its products by the placement of the sign for you by JONES SIGN. It is not to be shown or otherwise exposed to or reproduced to any other person or entity whatsoever. Use of this copyright elements of this design may in any way cause any company to be used in connection with permission of JONES SIGN is forbidden by law and names are not to be used up to 25% of the purchase price of the sign. JONES SIGN nor is there confidentially match colors, including PMS, where a uniform title cannot guarantee exact matches due to varying compatibility of surface materials and paints used. All cases and devices are also illustrate the client's conception of a typed and are not to be considered as being exact size or exact scale.

**NEW INTERNALLY-ILLUMINATED REMOTE CHANNEL LETTER SET  (QTY. 1)**

SQUARE FOOTAGE ALLOWED: TBD
SQUARE FOOTAGE: 176.8 BOXED
SURVEY REQUIRED



NOTE:
DETAILED MEASUREMENTS REQUIRED
TO AVOID EXISTING VERTICAL PIPE

EXISTING ELEVATION
SCALE: 3/32"= 1'-0"



EXISTING ELEVATION
SCALE: 3/32"= 1'-0"

55

**JONES SIGN**
Your Vision. Accomplished.
WWW.JONESSIGN.COM

JOB #: **254664-R1**
DATE: 11.24.2020
DESIGNER: H. MOLES
SALES REP: S. BERRYMAN
PROVIDER: K. McCONNELL

| CLIENT APPROVAL | DATE |
| LANDLORD APPROVAL | DATE |

HOBBY LOBBY
2230 S Promenade Blvd
Rogers, AR  72758

SHEET NUMBER
**6.0**

This is an original, unpublished drawing created by Jones Sign Co. Inc. It is for your personal use and presented with a permit. Neither the original nor any copy may be loaned to anyone outside your organization nor is it to be used, reproduced, copied or exhibited in any fashion that will create an enhancement of the design or any purpose by any other company without the express written permission of JONES SIGN is forbidden by law and is treated as a violation resulting up to 25% of the Jones total price of the sign. JONES SIGN will endeavor to closely match colors, including PMS, where possible. We cannot guarantee exact matches due to varying compatibility of surface materials and paints used. All sizes and illuminations are as illustrated. No charts conception of project and are not to be understood as being exact repeat reproduction.

**CL3** NEW INTERNALLY-ILLUMINATED REMOTE CHANNEL LETTER SET  (QTY. 1)

SQUARE FOOTAGE ALLOWED: TBD
SQUARE FOOTAGE: 176.8 BOXED
SURVEY REQUIRED



**Mtg. & Install (1) 48" "HOBBY LOBBY" REMOTE LED CHANNEL LETTER SET**
scale: 3/16"=1'-0"        *NOTE: GOTHAM BLACK FONT - DO NOT TYPE or MODIFY*

ELECTRICAL
TOWARDS BOTTOM

COLORS/FINISHES
■ P-1  BLACK
▨ H-1  #2119 ORANGE TUFF GLASS, HIGH IMPACT PLASTIC

SPECIFICATIONS
1. .040" X 5" PRE-FINISHED P-1 ALUMINIUM COIL (WHITE INSIDE)
2. #8 - ½" PAN HEAD SCREWS
3. 1" X 1-1/2" RETAINER SYSTEM - SEE DETAIL - CHEMICALLY BONDED TO FACE P-1
4. 3/16" ACRYLIC H-1,
5. GE TETRA MAX RED-ORANGE LEDs
6. 3MM ACM BACKS RIVETED TO RETURNS - SEMI-GLOSS WHITE BOTH SIDES
7. MOUNTING HARDWARE - EIPS WALL - 3/8" TEK SCREW X TOTAL WALL THICKNESS + 1" MIN. INTO STEEL STUDS
8. 7/8" ELECTRICAL HOLE / 3/4" COUPLER WITH FLEXIBLE CONDUIT TO POWER SUPPLY BOX
9. LED POWER SUPPLY INSIDE POWER SUPPLY BOX
10. TOGGLE SWITCH MOUNTED TO POWER SUPPLY BOX
11. 1/4" DIA. WEEP HOLES (EXTERIOR APPLICATIONS ONLY)
12. 1" X 1" ALUMINIUM TUBE CROSS BRACING



RETAINER SYSTEM
NTS

REMOTE WIRED FACE LIT CHANNEL LETTERS
SCALE: NTS

**ELECTRICAL SPECIFICATIONS**

NOTE:
LABELS ARE TO BE OUT OF VIEW

c ETL us
LISTED
Intertek

---

**JONES SIGN**
Your Vision. Accomplished.
WWW.JONESSIGN.COM

JOB #: **254664-R1**
DATE:  11.24.2020
DESIGNER:  H. MOLES
SALES REP: S. BERRYMAN
PRODUCTION: K. McCONNELL

| REV | DATE | BY | DESCRIPTION |
|---|---|---|---|

CLIENT APPROVAL            DATE

LANDLORD APPROVAL          DATE

HOBBY LOBBY

HOBBY LOBBY
2230 S Promenade Blvd
Rogers, AR  72758

SHEET NUMBER
**7.0**

This is an original unpublished drawing created by Jones Sign Co. It is for your personal use in connection with a project being planned for you by JONES SIGN. It is not to be shown to anyone outside of your organization nor is it to be used, reproduced, copied or exhibited in any fashion. Use of it as a group element or as part of the total elements of this design or any signs shown by any other company without the express written permission of JONES SIGN is forbidden and will constitute a verifiable claim up to 25% of the overall project that you by JONES SIGN on the project plan to study match colors, including PMS, where specified. We cannot guarantee exact matches due to varying compatibility of surface materials or different areas of paints used. All sizes and dimensions are as illustrated for this particular project and are all referenced as being exact same event made.

**TP1 PYLON TENANT PANELS (QTY 2)**

**TOTAL SQUARE FOOTAGE:** TBD

SURVEY REQUIRED



**EXISTING**
**SCALE: NTS**



**PROPOSED**
**SCALE: NTS**



**FRONT VIEW**
**SCALE: TBD**

**SPECIFICATIONS:**
1. WHITE LEXAN FACES W/ 1ST SURFACE VINYL APPLIED
   ORANGE BACKGROUND W/ WEEDED WHITE

**COLORS/FINISHES**
V-2   ARLON #2119 ORANGE

| JONES SIGN | JOB #: 254664-R1 | | | | | CLIENT APPROVAL | DATE | | HOBBY LOBBY | SHEET NUMBER |
| Your Vision. Accomplished. | DATE: 11.24.2020 | | | | | | | | 2230 S Promenade Blvd | **8.0** |
| WWW.JONESSIGN.COM | DESIGNER: H. MOLES | | | | | LANDLORD APPROVAL | DATE | | Rogers, AR  72758 | |
| | SALES REP: S. BERRYMAN | | | | | | | | | |
| | PROD. MGR: K. MCDONNELL | | | | | | | | | |

**PP1** NEW S/F NON-ILLUMINATED TEMPORARY POST & PANEL SIGN (QTY. 1)

SQUARE FOOTAGE: 32.0



NOW OPEN!

HOBBY LOBBY

HOBBYLOBBY.COM

FRONT VIEW
SCALE: 3/4" = 1'-0"

END VIEW
SCALE: 3/4" = 1'-0"

SIGN LOCATION
SCALE: NTS



COMING SOON!

REMOVABLE PANEL

SPECIFICATIONS
1. ACM PANEL PAINTED TO MATCH P-2
2. DIGITAL PRINT APPLIED DIRECT TO ACM PANEL DP-1  DP-2
3. QTY 4" X 4" X 8'-0" PRESSURE TREATED WOOD POSTS PAINTED P-2
   W/ 3'-0" DIRECT BURIAL
4. REMOVABLE PANEL: S/F ACM PANEL
   W/ DIGITAL PRINT APPLIED DIRECT TO ACM PANEL  DP-2

COLORS/FINISHES
P-2  WHITE
DP-1  ORANGE TO MATCH PMS 165
DP-2  BLUE TO MATCH PMS 2945

**JONES SIGN**
Your Vision. Accomplished.
WWW.JONESSIGN.COM

JOB #: 254664-R1
DATE: 11.24.2020
DESIGNER: H. MOLES
SALES REP: B. BERRYMAN
PROJ MGR: K. McDOWELL

| REV | DATE | BY | DESCRIPTION |
|---|---|---|---|
| 1 | | | ADDED FILTER/LOCATION |

CLIENT APPROVAL          DATE

LANDLORD APPROVAL        DATE

HOBBY LOBBY
2230 S Promenade Blvd
Rogers, AR  72758

SHEET NUMBER
**9.0**

This is a concept and, unless otherwise shown by you, James Sign Co. this is a for your personal use on our services with approval being given either you by JONES SIGN. It is not, nor shall any use any part of your organization: nor use to be used, reproduced, copied in connection. sold in any fashion. Use of this sign or on the full entire elements of this design or any sign done by any other company without the express written permission of JONES SIGN.

58

**EXHIBIT L**

After recording, return to:
James L. Scott, Esq.
Hobby Lobby Stores, Inc.
7707 Southwest 44th Street
Oklahoma City, Oklahoma 73179
Attention: Real Estate Department

**MEMORANDUM OF LEASE**

This memorandum of lease dated _____ _____, 20__ (the **"Memo"**), by and between **Pinnacle Hills, LLC**, a Delaware limited liability company (the **"Landlord"**), and Hobby Lobby Stores, Inc., an Oklahoma corporation (the **"Tenant"**).

1.      Lease Agreement.  Landlord and Tenant are parties to an agreement titled "Lease Agreement" dated _____ _____, 20__ (the **"Lease"**), in which Landlord leased to Tenant sixty-one thousand seven hundred fifty-one (61,751) square feet of improved retail space, as further defined in the Lease (the **"Leased Premises"**) within the Pinnacle Hills Power Center, located in City of Rogers, County of Benton, State of Arkansas, which is legally described on **Exhibit A** this Memo (the **"Shopping Center"**).

2.      Primary Lease Term.  The primary term of the Lease is ten (10) years beginning on the Commencement Date (as defined in the Lease).

3.      Renewal Terms. The Lease provides Tenant the right to extend the term of the Lease for (a) two (2) additional successive renewal periods of five (5) years, and (b) two (2) additional success renewal periods of five (5) years each if Tenant exercises its right to expand the Floor Space of the Leased Premises into the "Expansion Space" as defined in the Lease.

4.      Shopping Center Use.  Subject to the Prohibited Uses (defined below), the Shopping Center shall be used for the sole purpose of promoting and operating a retail shopping center comprised solely of (i) retail stores selling, at retail, merchandise normally carried in other quality shopping centers; (ii) financial institutions; (iii) service shops; (iv) professional offices; (v) parking areas; (vi) restaurants that derive no more than forty percent (40%) of their gross annual sales from the sale of alcoholic beverages ( **"Permitted Restaurant"**), provided that sexually themed restaurants such as Hooters and Tilted Kilt shall be deemed to be Prohibited Uses hereunder; (vii) grocery stores; and (viii) and any other uses that are commonly found in first class retail power centers, unless expressly prohibited in subsection 4.2 below.

    4.1.    Shopping Center Changes.  The following shall be prohibited within the Shopping Center (collectively the **"Shopping Center Change Restrictions"**):

        (i)     the construction or demolition of any building other than the construction of any building in the Future Expansion Area (as defined below);
        (ii)    the obstruction or modification of parking, aisles, walks, drives, entrances, exits, and service areas within the Shopping Center that have an adverse impact on Tenant's business, other than as required by Law; and
        (iii)   the grant of entrances, cross easements, or parking rights of the Shopping Center to adjacent property owners or other third parties other than tenants and other occupants of the Shopping Center.

        4.1.1   Future Expansion Area Restrictions.  Landlord shall have the right to develop an outparcel on the **"Future Expansion Area"** as defined in the Lease, subject to the following restrictions: (a) any building constructed within the Future Expansion Area thirty-five (35) feet in height from the grade, including architectural elements and parapets; (b) the Future Expansion Area shall contain sufficient parking in accordance with the Law to self-serve the Future Expansion Area; and (c) Landlord shall use commercially reasonable efforts to have the Future Expansion Area, once developed, separately assessed on its own tax parcel, but only if having the Future Expansion Area separately assessed is reasonable in Landlord's sole discretion for the intended use.

    4.2.    Prohibited Uses.  As set forth in the Lease, the following uses are prohibited in the Shopping Center (collectively, the **"Prohibited Uses"**):

        (i)     stores selling liquor, beer, or wine, other than (i) grocery stores, (ii) first class regional or national stores such as Total Wine and Bev Mo, or (iii) Permitted Restaurants;
        (ii)    **FOR THIS LEASE ONLY,** bowling alley, billiard parlor, arcade, or other place of amusement or recreation, provided that first class operators such as Dave & Busters, Pin Stripes, Main Event, and Round 1 shall be allowed within the "Permitted Area" as defined in the Lease;
        (iii)   second-hand store whose principal business is selling used or donated merchandise;
        (iv)    pawn shop;

| | |
|---|---|
| (v) | head shop, electronic cigarette shop, store primarily selling cannabidiol,  or store selling marijuana; |
| (vi) | payday loan or check cashing provider; |
| (vii) | child care centers; however, such use shall be allowed within the "Permitted Area" as defined in the Lease; |
| (viii) | funeral home or mortuary; |
| (ix) | school; |
| (x) | church, or other place of worship; |
| (xi) | flea market; |
| (xii) | tattoo parlor or body piercing establishment; |
| (xiii) | **FOR THIS LEASE ONLY**, movie theater; |
| (xiv) | adult video store and adult book store; |
| (xv) | adult entertainment club; |
| (xvi) | night club; |
| (xvii) | **FOR THIS LEASE ONLY**, health club, gym, or exercise studio, however, such use shall be allowed within the "Permitted Area" as defined in the Lease and is no more than thirty-five thousand (35,000) square feet in size; |
| (xviii) | spa, or massage parlor, other than a national, upscale therapeutic massage establishment such as "Massage Envy" or "Spa La La"; |
| (xix) | place of betting, gambling, bingo, or other gaming; |
| (xx) | self service laundry facility; |
| (xxi) | on-site dry cleaner, other than a strictly "drop off" [no plant operation] dry-cleaner unless operating as a so-called "green" dry cleaner which excludes the use of so-called "perc" [perchloroethylene] or similarly environmentally harmful non-polar organic solvents as a cleaning solvent; |
| (xxii) | hotel, motel, or other place of residence; |
| (xxiii) | car wash, auto body shop, auto repair shop, auto tire shop, auto rental business, or junk yard, provided that an auto tire shop shall be allowed on the existing outparcel and not located in-line with the Leased Premises; |
| (xxiv) | animal facility; |
| (xxv) | manufacturing operation; |
| (xxvi) | a government owned or operated healthcare clinic; |
| (xxvii) | abortion clinic, including Planned Parenthood; |
| (xxviii) | self-storage facility; or |
| (xxix) | anything constituting a public or private nuisance. |

5.      Hobby Lobby Exclusive Use.  As set forth in the Lease, Tenant shall have the exclusive right within the Shopping Center to sell art supplies, craft supplies, fabrics, photo frames, frames, framed art, wall art, and wall decor (**"Tenant's Exclusive"**).  Notwithstanding the previous sentence, tenants within the Shopping Center shall be permitted to sell items included in Tenant's Exclusive, provided the area from which such items are sold does not exceed, in the aggregate, the lesser of (i) ten percent (10%) of such tenant's floor space; or (ii) one thousand (1,000) square feet, in each instance measured from the center of the aisle.  Tenant's Exclusive shall not prohibit the operation of a Bed, Bath & Beyond, T.J. Maxx, Dollar Tree, and Haverty's Furniture (**"Permitted Tenant(s)"**), as such are operated as of the Effective Date of the Lease.

7.      Further Information.  Persons requiring additional information concerning the Lease may contact Landlord or Tenant at the following addresses:

Landlord:              c/o Brookfield Properties
                            350 N. Orleans Street, Suite 300
                            Chicago, Illinois 60654-1607
                            Attention: Law/Lease Administration

Tenant:                 Hobby Lobby Stores, Inc.
                            7707 SW 44th Street
                            Oklahoma City, Oklahoma 73179
                            Attention: Real Estate Department

8.      Termination, Release, and Conflicts.  This Memo shall automatically terminate without any further action upon the expiration or earlier termination of the Lease.  Tenant acknowledges that Landlord shall have the right and authority to execute and record a release of this Memo upon the expiration or termination of the Lease.  In the event of any conflict between the terms and conditions of this Memo and the terms and conditions of the Lease, the terms and conditions of the Lease shall supersede and control.

**[Signatures and acknowledgements follow on the next page(s).]**
**[The remainder of this page is intentionally blank.]**

The parties accept this Memo by their respective signatures below.

**Landlord: Pinnacle Hills, LLC**

By: _____
Authorized Signatory

_____
Print Name

_____
Date

### Landlord Acknowledgement

_____ County                    )
                                        )    SS.
State of _____                    )

    This Memo was acknowledged before me on _____, 20___, by _____    in
his/her capacity as _____ of _____.

_____
Notary Public              (seal)

**Tenant: Hobby Lobby Stores, Inc.**

By: _____
Randy Childers, Vice President

_____
Date

### Tenant Acknowledgement

Oklahoma County                         )
                                        )    SS.
State of Oklahoma                       )

    This Memo was acknowledged before me on this ___ day of _____, 20___, by Randy
Childers in his capacity of as Vice President of Hobby Lobby Stores, Inc.

_____
Notary Public              (seal)

DocuSign Envelope ID: 4EE8314A-A75E-4023-9B71-5C00969274ED

## **Exhibit D**

Dollar Tree Lease

LANDLORD COPY

# Dollar Tree Stores, Inc.

## at

## Pinnacle Hills Power Center

## 2203 Promenade Blvd., Suite 20310

## Rogers, AR 72758

## TABLE OF CONTENTS

*TABLE OF CONTENTS* ............................................................................................................ *i*

*LEASE AGREEMENT* ............................................................................................................ *1*

**A. CERTAIN DEFINITIONS** ................................................................................................. *1*

   **Additional Rent** ................................................................................................................ 1

   **Address** ............................................................................................................................ 1

   **Affiliate** ............................................................................................................................ 1

   **Alternate Rent** ................................................................................................................ 2

   **Anticipated Delivery Date** ............................................................................................ 2

   **Applicable Laws** ............................................................................................................ 2

   **Base Year Real Property Taxes** .................................................................................... 2

   **Basic Building Requirements** ...................................................................................... 2

   **Blackout Period** .............................................................................................................. 2

   **Building** ............................................................................................................................ 2

   **Commencement Date** .................................................................................................... 2

   **Common Areas** .............................................................................................................. 2

   **Default Rate** .................................................................................................................... 2

   **Delivery Conditions** ...................................................................................................... 2

   **Delivery Date** .................................................................................................................. 2

   **Delivery Inspection** ........................................................................................................ 2

   **Delivery Notice** .............................................................................................................. 2

   **Effective Date** ................................................................................................................ 2

   **Existing Exclusives** ........................................................................................................ 2

   **Force Majeure** ................................................................................................................ 2

   **Gross Rent** ...................................................................................................................... 3

   **Gross Sales** .................................................................................................................... 3

   **Hazardous Materials** .................................................................................................... 3

   **HVAC System** .................................................................................................................. 3

   **Land** ................................................................................................................................ 3

   **Landlord's Work** ............................................................................................................ 3

   **Late Fee** .......................................................................................................................... 3



Lease Term ........................................................................................................ 3

Lease Year ........................................................................................................ 3

Mortgage .......................................................................................................... 3

Mortgagee ........................................................................................................ 3

No Build Area .................................................................................................... 3

OEA .................................................................................................................. 3

Ongoing Co-Tenancy Requirement ................................................................... 3

Original Lease Term ........................................................................................... 4

Permit Contingency Date ................................................................................... 4

Permitted Use ................................................................................................... 4

Person .............................................................................................................. 4

Premises ........................................................................................................... 4

Premises GLA .................................................................................................... 4

Principal Business ............................................................................................. 4

Proportionate Share ......................................................................................... 4

Punch List Items ............................................................................................... 4

Real Property Taxes .......................................................................................... 4

Renegade Tenant .............................................................................................. 4

Renewal Terms .................................................................................................. 4

Rent .................................................................................................................. 4

Rent Commencement Date ................................................................................ 4

Restricted Uses ................................................................................................. 4

Shopping Center ............................................................................................... 4

Shopping Center GLA ........................................................................................ 4

Site Plan ........................................................................................................... 5

Substantially Complete ..................................................................................... 5

Tenant Allowance .............................................................................................. 5

Tenant's Permits ............................................................................................... 5

Tenant's Work ................................................................................................... 5

Use Protections ................................................................................................. 5

Waiver Contingency Date ................................................................................... 5

B.  PREMISES AND SHOPPING CENTER .......................................................... 5



1. Demise ............................................................................................................ 5

2. Access ........................................................................................................... 5

3. Right to Remeasure ...................................................................................... 6

4. No Build Area ............................................................................................... 6

C. TERM OF LEASE ............................................................................................ 6

1. Term .............................................................................................................. 6

2. Commencement Certificate .......................................................................... 6

3. Option to Renew ........................................................................................... 6

4. Early Termination ......................................................................................... 6

D. DELIVERY AND CONSTRUCTION ................................................................ 7

1. Delivery Dates. ............................................................................................. 7

2. Original HVAC .............................................................................................. 9

3. Signage ........................................................................................................ 9

4. Initial and Ongoing Code Compliance ....................................................... 10

5. Tenant Allowance ....................................................................................... 11

6. Tenant's Permit Contingency ..................................................................... 12

7. Prevailing Criteria ...................................................................................... 12

E. RENT ............................................................................................................. 12

1. Gross Rent ................................................................................................. 12

2. Alternate Rent ............................................................................................ 12

3. Overpayments ............................................................................................ 13

4. Intentionally Deleted .................................................................................. 13

5. Intentionally Deleted .................................................................................. 13

6. Free Rent ................................................................................................... 13

7. Opening Co-Tenancy ................................................................................. 13

8. Ongoing Co-Tenancy ................................................................................. 13

F. COMMON AREAS .......................................................................................... 14

1. Operation and Maintenance ...................................................................... 14

2. Common Area Maintenance Costs Included in Gross Rent ...................... 14

G. TAXES ........................................................................................................... 14

1. Real Property Taxes Defined ..................................................................... 14

2. Payment of Real Property Taxes ............................................................... 15



3. Separately Assessed Parcels ................................................................. 15

4. Personal Property Taxes ....................................................................... 15

5. Contests ................................................................................................ 15

6. Excess Transfers ................................................................................... 16

7. Intentionally Deleted ............................................................................. 16

H. USE OF PREMISES BY TENANT ............................................................ 16

1. Use of Premises .................................................................................... 16

2. Existing Exclusives ............................................................................... 16

3. Operation of Tenant's Business ............................................................ 16

4. Use Protections ..................................................................................... 17

I. LANDLORD ACCESS ............................................................................... 19

J. UTILITIES AND RUBBISH DISPOSAL .................................................... 19

1. Utilities .................................................................................................. 19

2. Rubbish Disposal .................................................................................. 20

3. No Landlord Liability ............................................................................. 20

4. Trash Compactor; Baler ........................................................................ 20

K. REPAIRS AND ALTERATIONS ................................................................ 20

1. Repairs by Landlord .............................................................................. 20

2. Landlord's Alterations ........................................................................... 21

3. Limitations ............................................................................................. 21

4. HVAC System Maintenance & Replacement ......................................... 22

5. Sign Maintenance ................................................................................. 22

6. Repairs by Tenant ................................................................................. 22

7. Alterations or Improvements by Tenant ................................................ 23

L. INSURANCE ............................................................................................. 23

1. Liability Insurance ................................................................................. 23

2. Property Insurance ................................................................................ 23

3. Self-insurance ....................................................................................... 24

4. Mutual Waiver of Subrogation .............................................................. 24

5. Insurance Costs Included in Gross Rent ............................................... 24

M. MUTUAL INDEMNITIES ........................................................................... 24

1. Indemnification by Tenant ..................................................................... 24



2. Indemnification by Landlord ........................................................................ 24

3. Survival ......................................................................................................... 25

**N. DAMAGE AND DESTRUCTION** ................................................................... 25

1. Partial Damage ............................................................................................. 25

2. Total Damage ............................................................................................... 26

3. Repair ........................................................................................................... 26

4. Abatement of Rent ....................................................................................... 26

**O. ASSIGNMENT AND SUBLETTING** ............................................................ 26

1. Consent of Landlord .................................................................................... 27

2. Affiliate Transfers ........................................................................................ 27

**P. EMINENT DOMAIN** ..................................................................................... 27

1. Condemnation Award ................................................................................... 27

2. Rights of Termination ................................................................................... 27

3. Restoration ................................................................................................... 27

4. Notice ........................................................................................................... 27

**Q. DEFAULT AND REMEDIES** ....................................................................... 28

1. Default by Tenant ......................................................................................... 28

2. Landlord Remedies ...................................................................................... 28

3. Default by Landlord ...................................................................................... 30

4. Failure to Exercise Rights ........................................................................... 31

5. Sums in Dispute ........................................................................................... 31

6. Interest Calculation ...................................................................................... 31

**R. NOTICES** ..................................................................................................... 31

1. Proper Notice ............................................................................................... 31

2. Change of Address ....................................................................................... 32

3. Service of Process ....................................................................................... 32

**S. SUBORDINATION, NON-DISTURBANCE AND ESTOPPELS** ................... 32

1. Mortgage Subordination .............................................................................. 32

2. Estoppels ..................................................................................................... 32

3. Mortgagee Consent ...................................................................................... 33

**T. COVENANT OF QUIET ENJOYMENT** ........................................................ 33

**U. LIABILITY OF LANDLORD** ......................................................................... 33



1. Judgments.................................................................................................... 33

2. Transfer of Title........................................................................................... 33

**V. ENVIRONMENTAL MATTERS** ...................................................................... 33

1. Acts............................................................................................................. 33

2. Asbestos and Other Hazardous Materials................................................ 34

3. Tenant's Operations................................................................................... 34

4. Indemnification .......................................................................................... 34

5. Limitation of Liability................................................................................. 34

**W. MISCELLANEOUS PROVISIONS**.................................................................. 35

1. Broker's Commissions............................................................................... 35

2. Surrender and Holding Over ..................................................................... 35

3. Storage Trailer............................................................................................ 36

4. Mechanic's, Judgment and Other Liens ................................................... 36

5. Recording ................................................................................................... 36

6. Severability ................................................................................................ 37

7. Attorneys' Fees.......................................................................................... 37

8. Jury Trial and Jurisdiction......................................................................... 37

9. Waiver of Punitive Damages ..................................................................... 37

10. Force Majeure ............................................................................................ 37

11. No Partnership............................................................................................ 38

12. Section Headings........................................................................................ 38

13. Lease Inures to the Benefit of Assignees; No Third Party Beneficiaries ..... 38

14. No Presumption Against Drafter................................................................ 38

15. Authority to Sign Lease.............................................................................. 38

16. Entire Agreement ....................................................................................... 38

17. Landlord's Form of Ownership .................................................................. 38

18. Radon Gas Disclosure ............................................................................... 38

19. Incorporation by Reference........................................................................ 38

20. Remedies.................................................................................................... 38

21. Ownership................................................................................................... 38

22. Waiver Contingency ................................................................................... 39

23. Waiver ........................................................................................................ 39



*EXHIBIT A - Site Plan*..................................................................................... *1*

*EXHIBIT A-1 – Protected Drive Aisles*........................................................... *2*

*EXHIBIT A-2  - Legal Description*.................................................................... *3*

*EXHIBIT B – Basic Building Requirements*..................................................... *1*

*EXHIBIT C –Landlord's Work*.......................................................................... *1*

*EXHIBIT D - Tenant's Sign Package*............................................................... *2*

*EXHIBIT E – Exclusives and Restrictions*...................................................... *1*

*EXHIBIT E-1 – Waiver Documents*.................................................................. *1*

*EXHIBIT F – Prohibited Uses*......................................................................... *2*

*EXHIBIT G – Memorandum of Lease*.............................................................. *1*

*EXHIBIT H – Rules and Regulations*............................................................... *3*

*EXHIBIT I – Subordination, Non-Disturbance and Attornment Agreement*.............. *4*



## LEASE AGREEMENT

THIS LEASE AGREEMENT ("Lease") is made as of the 24th day of May , 2019, between **PINNACLE HILLS, LLC**, a Delaware limited liability company ("Landlord") and **DOLLAR TREE STORES, INC.**, a Virginia corporation ("Tenant").

### W I T N E S S E T H:

THAT in consideration of the mutual covenants and agreements herein contained, Landlord and Tenant hereby agree as follows:

A.   CERTAIN DEFINITIONS

As used in this Lease, the following terms shall have the respective meanings assigned to them.

Additional Rent: Any amounts, other than Gross Rent, to be paid by Tenant to Landlord pursuant to the provisions of this Lease, whether such payments are to be periodic and recurring or not.

Address:

| | | |
|---|---|---|
| a. | Landlord | Pinnacle Hills, LLC, c/o Pinnacle Hills Power Center 350 North Orleans Street, Suite 300 Chicago, IL 60654 Attn: Law/Lease Administration Department Telephone: (312) 960-5000 **Reference:  Store # (to be furnished)** |
| | Landlord's Payment Address: | Pinnacle Hills, LLC Pinnacle Hills Power Center Po. Box 860066 Minneapolis, Minnesota 55486-0066 |
| b. | Tenant Notices to: | Dollar Tree Stores, Inc. Attn:  Lease Administration Department 500 Volvo Parkway Chesapeake, VA 23320 Telephone: (757) 321-5000 **Reference:  Store # (to be furnished)** |
| | Billing/Invoices to: | Dollar Tree Stores, Inc. 500 Volvo Parkway Department 300 Chesapeake, VA 23320 **Reference:  Store # (to be furnished)** |

Affiliate: With regard to any Person, and to the extent applicable, their: (a) direct and indirect parent companies and its and their direct and indirect subsidiaries and related and affiliated companies, including without limitation all companies directly or indirectly controlled by, or under common



control with, their parent companies, (b) officers, directors, employees, agents, and legal representatives, and (c) shareholders, members, constituent partners and beneficial owners; provided that with regard to any Person whose equity interests are traded on a recognized public exchange, the holders of such equity interests shall not be considered Affiliates solely by virtue of such ownership interests. In the case of an individual, an Affiliate shall be any Person in which such individual owns twenty percent (20%) or more of the equity interests or otherwise owns or holds the power to control.

Anticipated Delivery Date:  June 1, 2019.

Applicable Laws:  All applicable federal, state and local laws, rules, regulations, ordinances, codes and orders and all applicable industry codes, energy codes and standards.

Basic Building Requirements: The conditions described on Exhibit B.

Building:  The building in which the Premises are situated.

Commencement Date:   The earlier of (i) ninety (90) days after the Delivery Date or (ii) the date when Tenant opens for business to the public in the Premises.

Common Areas:  All Shopping Center sidewalks, parking areas, service areas, common loading dock and delivery areas, fire corridors, landscaping, traffic controls, and lighting; all means of pedestrian and vehicular ingress and egress to and from the Shopping Center; and all other areas or improvements on the Land which may be provided by Landlord from time to time for the common use of all of the tenants of the Shopping Center.

Default Rate:  Seven percent (7%) per annum.

Delivery Conditions: Collectively, the conditions described in Section D.1.b, all of which shall be satisfied by Landlord, at Landlord's sole cost and expense.

Delivery Date:  As defined in Section D.1.b.

Delivery Inspection:  As defined in Section D.1.c.

Delivery Notice:  As defined in Section D.1.c.

Effective Date:  The date when this Lease has been fully executed by both Landlord and Tenant (with all Exhibits completed and attached), and a fully executed copy hereof delivered to both parties.  On the Effective Date, this Lease shall be a binding and enforceable obligation of both Landlord and Tenant.

Existing Exclusives:  The existing exclusives and restrictions, if any, set forth on Exhibit E attached to this Lease.

Force Majeure:  As defined in Section W.10.





**Hazardous Materials**: As defined in Section V.1.

**HVAC System**: The heating, ventilation and air conditioning system servicing the Premises, including all of the equipment included in such system.

**Land**: The real property described on Exhibit A-2 attached hereto.

**Landlord's Work**: The work, if any, described on Exhibit C attached to this Lease to be completed by Landlord, at Landlord's sole cost and expense, prior to the Delivery Date.

**Late Fee**: As defined in Section D.1.e.

**Lease Term**: The Original Lease Term, together with each Renewal Term actually exercised by Tenant in accordance with Section C.3 of this Lease.

**Lease Year**: Each twelve (12)-month period commencing on the Commencement Date and ending on the date twelve (12) months thereafter, except that the last Lease Year of the Lease Term shall end on the last day of the calendar month in which such Lease Year ends.

**Mortgage**: A mortgage, deed of trust, deed to secure debt or other similar security instrument.

**Mortgagee**: Each holder or beneficiary of a Mortgage.

**No Build Area**: The area or areas identified on the Site Plan as "No-Build".

**OEA**: A reciprocal easement agreement, declaration, operating agreement or similar agreement, regardless of how such agreement may be titled, recorded in the real property records which either encumbers or benefits the Shopping Center, in whole or in part.





Original Lease Term: Ten (10) Lease Years.

Permit Contingency Date: Sixty (60) days following the Effective Date.

Permitted Use: A retail variety store selling general merchandise including food and beverages.

Person: An individual or a corporation, limited liability company, partnership, trust or other recognized form of organization.

Premises: The premises situated in the Shopping Center identified on the Site Plan and identified by the U.S. Postal Service as following street address: 2203 Promenade Blvd, Suite #20310, Rogers, AR 72758. The Premises contain approximately 89 linear feet of frontage and total square footage equal to the Premises GLA. Unless otherwise expressly provided, the Premises do not include any basement, balcony or mezzanine space in the Building, any service corridors in the Building or any allocated portion thereof.

Premises GLA: Approximately 10,386 square feet, subject to adjustment in accordance with Section B.3.

Principal Business: A business is a "Principal Business" if the merchandise or categories of merchandise in question are sold in the aggregate

Proportionate Share: Except as otherwise expressly provided or adjusted pursuant to this Lease, a fraction, the numerator of which is the Premises GLA and the denominator of which is the Shopping Center GLA. As of the Effective Date Tenant's Proportionate Share .

Punch List Items: Minor items of Landlord's Work which do not prevent Tenant from performing Tenant's Work or adversely affect Tenant's ability to open and operate its business.

Real Property Taxes: As defined in Section G.1.

Renegade Tenant: As defined in Section H.4.d.

Renewal Terms: Four (4) periods of five (5) years each.

Rent: Collectively, Gross Rent and Additional Rent.

Rent Commencement Date: The Commencement Date.

Restricted Uses: As defined in Section H.4.b.

Shopping Center: The Shopping Center located in Benton County, Arkansas, known generally as Pinnacle Hills Power Center, and depicted on the Site Plan. The Shopping Center is situated on the Land and has the following street address: 2203 Promenade Blvd, Rogers, AR 72758.

Shopping Center GLA: The gross leasable area of all buildings constituting the Shopping Center, including the square footage of outdoor space such as garden centers available for the exclusive use of a single tenant but excluding basement premises, above grade premises (including



mezzanines) not in the nature of rentable retail space and all storage space (other than rentable storage space). As of the Effective Date Shopping Center GLA is 253,268 square feet. Shopping Center GLA may be adjusted from time to time to reflect additional buildings constructed on the Land, changes in the use of exclusive outdoor space or the demolition of buildings currently situated on the Land.

Site Plan: The Site Plan of the Shopping Center attached hereto as Exhibit A.

Substantially Complete: Substantially Complete means the completion of Landlord's Work subject only to completion of Punch List Items.

Tenant Allowance:

Tenant's Permits: Any and all permits, approvals, licenses, authorizations and the like which are required under Applicable Laws to complete Tenant's Work and all other work necessary to enable Tenant to commence and complete construction, fixturing and stocking of the Premises, including installation of Tenant's required signage. Without limiting the foregoing, Tenant's Permits shall include all conditional use permits and special use or other permits which may be required to enable Tenant to operate in the Premises for the Permitted Use throughout the Lease Term.

Tenant's Work: All work other than Landlord's Work which in the opinion of Tenant is necessary to enable Tenant to open for business in the Premises and operate in accordance with Applicable Laws.

Use Protections: As defined in Section H.4.b.

Waiver Contingency Date: May 31, 2019.

B.    PREMISES AND SHOPPING CENTER

1.    Demise. Landlord does hereby lease and demise to Tenant, and Tenant does hereby lease and hire from Landlord, the Premises, together with all licenses, rights, privileges and easements appurtenant to the Premises, including but not limited to the non-exclusive right to use the Common Areas of the Shopping Center in common with all other tenants. To the extent the Premises are appurtenant to other real property or improvements made available to Landlord under an OEA, Landlord hereby grants to Tenant and its employees, invitees, agents, customers, concessionaires and licensees the nonexclusive right, in common with Landlord and others lawfully entitled thereto, to the benefits of the OEA, subject to the terms and conditions of the OEA. Landlord agrees that without the prior written consent of Tenant, which consent shall not be unreasonably withheld, conditioned or delayed, Landlord will not enter into, adopt, modify or amend any OEA during the Lease Term so as to have a material and adverse effect on Tenant and its use and enjoyment of the Premises.

2.    Access. Landlord represents, warrants and covenants to Tenant that as of the Effective Date and continuing throughout the Lease Term, there is and will be both (a) paved tractor-trailer access to and from within five feet (5') of the rear service door of the Premises sufficient to support Tenant's WB-67 tractor-trailer delivery and (b) waste-hauler truck ingress to and egress from the proposed location of Tenant's dumpster, both as shown on the Site Plan and Exhibit A-1. Landlord covenants and agrees that such access, as depicted on the Site Plan and Exhibit A-1, will not be altered or impaired at any time and Landlord will neither take any action nor allow any action which would deprive Tenant's WB-67 tractor-trailers or dumpster-trucks of such continued ingress and egress, including, without limitation, consenting to any modifications to the OEA. Landlord further covenants and agrees that it will not modify the Site Plan so as to limit or restrict customer access to



the Premises or otherwise limit or interfere with Tenant's ability to receive deliveries and trash pickup and customers' abilities to access the Premises.

3.  Right to Remeasure. Prior to the Rent Commencement Date, either Landlord or Tenant may measure the Premises to determine the Premises GLA. In the event this measurement discloses that the Premises GLA set forth in this Lease is incorrect, Landlord and Tenant shall execute an amendment to this Lease (a) reflecting the actual Premises GLA, (b) adjusting the Gross Rent based upon the revised square footage, (c) adjusting any other charges or payments under this Lease which are based on the actual Premises GLA, and (d) adjusting the Tenant Allowance, to the extent calculated based upon the Premises GLA. In the event of an adjustment, Tenant will pay any excess Rent owed to Landlord within thirty (30) days after receipt of a statement, or Tenant shall take a credit for any overpayment against the next monthly Rent payments until the credit is used in full. For purposes of this Lease, the Premises shall be measured from the exterior face of all exterior walls.

4.  No Build Area. Landlord agrees that it will not construct or allow any permanent or temporary improvements or obstructions to be built, placed or remain in the No Build Area, including, without limitation, any temporary or permanent improvements which would reduce the number of parking spaces within the No Build Area or impair the visibility of the Premises. Without limiting the foregoing, Landlord shall not allow promotional events, promotional tractor trailers, tent sales or other similar events in the No Build Area.

C.  TERM OF LEASE

1.  Term. This Lease shall remain in effect for the Lease Term. Notwithstanding anything to the contrary contained in this Lease, in no event shall the Lease Term expire during the months of October, November, or December and should the Lease Term otherwise be scheduled to expire during such months, the Lease Term shall be extended automatically, without the need for any further action on the part of Landlord or Tenant, to the last day of February following the date when this Lease would otherwise expire.

2.  Commencement Certificate. Following the Rent Commencement Date, Tenant shall prepare, at Tenant's sole cost, a certificate to be signed by Landlord and Tenant confirming the Commencement Date, the Rent Commencement Date, the Lease Term, and any other critical dates provided for in this Lease. Landlord agrees to execute and return such certificate to Tenant within thirty (30) days following Tenant's request and in the event Landlord fails to dispute such certificate within such thirty (30) day period, the information contained therein shall be deemed to be correct.

3.  Option to Renew. Landlord hereby grants to Tenant the option to renew this Lease for the Renewal Terms on the condition that at the time Tenant exercises each option to renew, Tenant is not in default under this Lease beyond the expiration of any applicable cure period. Each Renewal Term shall be based upon all of the terms and conditions contained in this Lease except that the amount of Gross Rent payable hereunder shall be adjusted as provided in the definition of Gross Rent. Tenant shall exercise its right to renew and extend the Lease Term by providing written notice of extension to Landlord at least twelve (12) months prior to the expiration of the Lease Term, but in no event later than six (6) months prior to the expiration of the Lease Term; provided, however, that if Tenant fails to deliver the notice of extension within said six (6) months period, Tenant shall have no further right to extend the Lease Term and the Lease shall expire as of the Expiration Date of the Lease or the last day of the Renewal Term in question.

4.  Early Termination. Intentionally Deleted.



D.    DELIVERY AND CONSTRUCTION

1.    <u>Delivery Dates</u>.

a.    <u>Anticipated Delivery Date</u>.  Landlord shall deliver the Premises to Tenant on the Anticipated Delivery Date with all Delivery Conditions satisfied at Landlord's sole cost and expense.  Landlord shall provide Tenant with prompt written notice of any anticipated change in the Anticipated Delivery Date; provided that such notice shall not relieve Landlord of any obligations set forth in this Lease with regard to the timing of delivery; and provided, further, that Tenant shall have the right to defer delivery for up to thirty (30) days if Tenant has not received at least thirty (30) days advance notice of any change of more than seven (7) days in the Anticipated Delivery Date.  In addition, and without limiting the foregoing, Tenant shall not be obligated to accept delivery of the Premises during the Blackout Period and any delivery which would otherwise be scheduled during the Blackout Period shall automatically be extended to the first business day immediately following the end of the Blackout Period unless another date is agreed to in writing by Landlord and Tenant.

Subject to the Blackout Period, during which Landlord shall not have the right to deliver the Premises, Landlord shall have the one time right to adjust or request adjustment of the original Anticipated Delivery Date to an earlier date.  In the event Landlord desires to deliver the Premises <u>prior</u> to the Anticipated Delivery Date, Landlord shall provide Tenant with a written request specifying the proposed advanced Anticipated Delivery Date no less than ninety (90) days prior to the proposed Anticipated Delivery Date.  Tenant shall have the right to approve or deny such request in Tenant's sole discretion, and if (and only if) Tenant approves such request in writing, the Anticipated Delivery Date shall be advanced as proposed by Landlord and Landlord shall be obligated to deliver the Premises on such advanced date with the Delivery Conditions satisfied.

b.    <u>Delivery Conditions</u>.  "Delivery Date" shall mean the date on which the last of the Delivery Conditions has been satisfied, Tenant and Landlord have confirmed that the Delivery Conditions are complete by the Delivery Inspection, and Landlord has delivered the keys to the Premises to Tenant.  The Delivery Conditions are as follows:

i.    The Basic Building Requirements have been satisfied;

ii.   Landlord's Work is Substantially Complete and the Premises are broom clean;

iii.  Landlord has delivered to Tenant a complete and executed current IRS Form W-9 in the name of Landlord;

iv.   Landlord has delivered to Tenant a current title report for the Shopping Center showing, among other things, that Landlord is the fee owner of the Shopping Center; that there are no exceptions or restrictions encumbering the Shopping Center which were not shown on the title report delivered to Tenant prior to the execution of this Lease and identifying each Mortgage encumbering the Shopping Center; and

v.    Within thirty (30) days after the Delivery Date, Landlord will deliver to Tenant an acceptable subordination and non-disturbance agreement, in a form substantially similar to that of Exhibit I, from each Mortgagee identified in the title report described above or of which Tenant has actual knowledge.



c.  Delivery Notice and Inspection; Delivery Date. Landlord shall notify Tenant in writing promptly when the Delivery Conditions are Substantially Complete or at the option of Landlord, in advance of such date, indicating the date when all such conditions will be satisfied (the "Delivery Notice"). As soon as practical following receipt of Landlord's Delivery Notice, Tenant will arrange an inspection of the Premises with Landlord ("Delivery Inspection") intended to verify that the condition of the Premises satisfies the applicable Delivery Conditions. As part of the Delivery Inspection, Tenant shall identify Punch List Items which will remain Landlord's obligation to complete; provided that Tenant's failure to identify any Punch List Items during the Delivery Inspection shall not relieve Landlord of its obligation to complete such Delivery Conditions. Unless otherwise agreed to by Tenant in writing, all Punch List Items shall be completed by Landlord within forty-five (45) days following the Delivery Inspection. Tenant may, but shall not be required to, conduct the Delivery Inspection prior to the Anticipated Delivery Date. If the Delivery Inspection confirms that the condition of the Premises satisfies the applicable Delivery Conditions (other than Punch List Items) and the additional Delivery Conditions have been satisfied as required, then Tenant will accept delivery of the Premises, and the Delivery Date shall conclusively be deemed to be the later of (i) (A) the date of Tenant's receipt of the Delivery Notice, or (ii) the Anticipated Delivery Date. If, however, the Delivery Inspection discloses that the condition of the Premises does not satisfy the applicable Delivery Conditions (other than Punch List Items), then delivery and the Delivery Date will be delayed until Landlord completes the outstanding conditions and corrects any deficiencies as required, and Landlord provides a subsequent Delivery Notice to Tenant, in which event the inspection procedures described above shall be repeated until the Delivery Date is confirmed. Notwithstanding the foregoing, if the Delivery Date is deemed to have occurred (whether as a result of inspection or otherwise) and Tenant subsequently determines that a Delivery Condition has not been satisfied, Landlord shall remain obligated to complete such Delivery Condition as originally required, and the parties shall make an equitable adjustment to the Delivery Date based upon the nature of the incomplete Delivery Condition and the date when such Delivery Condition is actually satisfied.

d.  Early Entry. Tenant shall have the right, but not the obligation, to enter upon the Premises for all purposes permitted under this Lease from and after the Anticipated Delivery Date. Notwithstanding anything to the contrary contained in this Lease, Tenant's occupation of the Premises for the purpose of inspecting Landlord's Work, commencing Tenant's Work or for fixturing and stocking prior to satisfaction of the Delivery Conditions shall not constitute a waiver or acceptance of, or relieve Landlord from, any of its obligations hereunder, including without limitation, the obligation to complete Landlord's Work and satisfy all Delivery Conditions. Notwithstanding anything contained herein to the contrary, if Tenant opens to the public for business prior to the satisfaction of the Delivery Conditions then the Delivery Date shall be deemed to have occurred as of the date Tenant opens to the public for business, provided, however, Landlord shall remain obligated to complete Landlord's Work and satisfy all Delivery Conditions.

e.  





2.    Original HVAC.  On the Delivery Date, Landlord shall deliver the existing HVAC System, if any, in its "as is, where is" condition.  Landlord makes no representation or warranty as to the existence or function of the HVAC System and Tenant shall be solely responsible to install, maintain and repair such system during the Lease Term, except that Landlord will be responsible for any repairs or replacement necessary due to Landlord's negligence or for damage caused by Landlord or Landlord's contractors.

3.    Signage.

   a.







b.   Landlord Approval. Exterior signage as shown on Exhibit D is hereby approved by Landlord, subject to compliance with Applicable Laws.

c.   Temporary Signage.  Tenant will have the right to place professionally prepared temporary signage, including professionally prepared pennants, in, on and about the outside of the Premises announcing the opening of the Premises and/or hiring for the Premises, provided said signage does not violate the OEA or Applicable Laws and further provided that said signage is not in place for more than forty-five (45) days.  From time to time, Tenant may display banners inside the Premises that may be visible from outside the Premises as long as such banners are professionally prepared.

d.   Pylons and Monuments.  Tenant shall have the right to place signage on each face of any existing or future pylon and monument signs at no additional cost to Tenant other than the cost of manufacturing and installing its panel.  Landlord shall be obligated to maintain all pylons and monuments in accordance with Section K.5 below and shall not remove (or allow removal of) any such signs or change or alter (or allow change or alteration of) any pylon or monument so as to adversely affect Tenant's position or the visibility of Tenant's panels on the pylon or monument. Tenant's panel on each face of the existing pylon(s) and/or monument sign(s) of the Shopping Center shall be as shown on Exhibit D attached hereto.

4.   Initial and Ongoing Code Compliance.

a.   Landlord represents and warrants that as of the Delivery Date, the Premises and the Common Areas will comply with Applicable Laws.  Subject to the terms and provisions contained in Section D.4.b of this Lease, in the event the Premises or the Common Area are found not to comply with Applicable Laws at any time after the Delivery Date, Landlord shall act promptly to correct the noncompliance at Landlord's sole cost and expense.  Landlord's obligation to keep the Premises and the Common Areas in compliance with Applicable Laws is subject to the terms and provisions contained in Section D.4.b of this Lease, and in addition to Landlord's delivery obligations under Section D.1 and Landlord's obligation to maintain and repair the Common Areas and the Premises as provided in Sections F and K of this Lease.  Subject to the terms and provisions contained in Section D.4.b of this Lease, in the event any structural modifications to the Building are required after the Delivery Date in order to comply with Applicable Laws or to cause the Building to be structurally sound or compliant with Applicable Laws, Landlord shall be responsible to perform all such modifications at Landlord's expense.

b.   Notwithstanding the foregoing, Landlord is not obligated to correct non-compliance with Applicable Laws in the Premises if the non-compliance arises solely as a result of Tenant's specific use or occupancy of the Premises (as opposed to a retail use in general, for which Landlord shall be responsible).  Tenant shall be responsible for causing Tenant's Work or any other alterations or renovations made by Tenant to the Premises to comply with Applicable Laws, and Tenant shall not make or cause to be made any alterations to the Premises which would cause the Premises not to comply with Applicable Laws.



c.   In the event (i) the Premises remain noncompliant with Applicable Laws as a result of Landlord's failure to correct any noncompliance as required by Section D.4.a above and (ii) such noncompliance limits or otherwise impairs Tenant's ability to operate from the Premises (including any noncompliance which limits or impairs Tenant's ability to obtain the licenses and permits necessary to commence and complete Tenant's Work and open for business and remain open for business), Tenant shall have the right to notify Landlord that Tenant intends to exercise self-help and perform the work necessary to bring the Premises into compliance unless Landlord corrects the noncompliance within forty-five (45) days following receipt of Tenant's notice (or such lesser period of time as may be necessary to avoid a closure of Tenant's business).   In the event Landlord fails to correct the noncompliance within such forty-five (45) day (or shorter) period and Tenant in fact exercises its right to self-help, Landlord shall be obligated to reimburse Tenant for all reasonable amounts expended for its work (both hard and soft costs), within thirty (30) days after receipt of Tenant's invoice identifying the costs incurred.  If Landlord fails to notify Tenant of its objections to the Tenant's costs or reimburse Tenant for the costs to which Landlord has not objected within thirty (30) days following Tenant's invoice for costs incurred, Tenant will have the right to offset the costs to which Landlord has not objected, together with interest at the Default Rate from the expiration of such 30-day period, by taking a credit against

of Rent commencing with the first installment of Rent after the expiration of such 30-day period and continuing until Tenant has been reimbursed in full.

d.   To facilitate compliance with their respective obligations under this Section, Landlord and Tenant each agree to execute such permit applications and related and similar documents as must be executed by the "landlord" or "tenant" of the Premises in order for such documents to be processed in accordance with Applicable Law.  This provision is not intended to re-allocate the responsibilities or liabilities otherwise set forth in this Lease but rather is intended to facilitate compliance with certain administrative requirements which may exist from time to time under Applicable Law.

e.   Nothing contained in this Section D.4 shall negate Landlord's or Tenant's right to challenge any requirements of Applicable Laws in any appropriate forum.

5.   Tenant Allowance. Landlord shall pay the Tenant Allowance to Tenant within thirty (30) days following satisfaction of all of the following conditions:

a.   Tenant's Work is substantially complete;

b.   Tenant has provided Landlord with a notarized General Contractor final payment affidavit;

c.   Tenant has provided Landlord with a notarized final lien waiver from Tenant's General Contractor;

d.   Tenant has provided Landlord with a copy of Tenant's certificate of occupancy, temporary certificate of occupancy, certificate of completion or their equivalent in the jurisdiction where the Premises are located;

e.   Tenant has opened for business in the Premises; and



f.      Tenant has made a written request of Landlord for the Tenant Allowance. Tenant's request shall include confirmation that all of the foregoing conditions have been satisfied.

If Landlord fails to pay the Tenant Allowance within the required 30-day period, Tenant will have the right to collect any or all of the Tenant Allowance, together with interest at the Default Rate from the expiration of such 30-day period, by taking a credit against ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ commencing with the first installment of Rent after the expiration of such 30-day period and continuing until the entire amount of the Tenant Allowance has been credited.

6.      Tenant's Permit Contingency.  Notwithstanding any provision contained in this Lease to the contrary, if by the Permit Contingency Date Tenant has not obtained Tenant's Permits without conditions which are acceptable to Tenant, in its sole discretion, and provided Tenant has used reasonable and diligent efforts to obtain Tenant's Permits by the Permit Contingency Date, then Tenant shall have the right to terminate this Lease by providing written notice to Landlord within five (5) business days following the Permit Contingency Date, failing which Tenant's right to terminate this Lease pursuant to this Section shall be deemed to be waived.  Tenant agrees to use reasonable and diligent efforts to obtain Tenant's Permits by the Permit Contingency Date; provided, however, that Tenant shall not be obligated to institute litigation or appellate administrative proceedings or agree to any condition imposed upon the issuance of any of Tenant's Permits which would have a material and adverse effect upon Tenant's construction or use of the Premises, including the design of the Premises, the operation of Tenant's business at the Premises, Tenant's required signage or the cost of constructing, fixturing or operating the Premises for Tenant's business; and provided, further, that Tenant shall not be deemed to have breached its obligation to use reasonable and diligent efforts to obtain Tenant's Permits when the failure to complete Landlord's Work or any failure of the Shopping Center to comply with Applicable Laws is directly or indirectly responsible for Tenant's failure to obtain Tenant's Permits.

7.      Prevailing Criteria.    In the event of conflict between the construction and delivery requirements set forth in this Section D and the construction and delivery requirements set forth on Exhibit C of this Lease, the more specific criteria shall prevail.

E.    RENT

1.      Gross Rent.  Commencing on the Rent Commencement Date and continuing for the Lease Term Tenant agrees to pay to Landlord, at Landlord's Address or at such other place as Landlord may from time to time designate in writing, Gross Rent in the amounts set forth in the definition of Gross Rent, in advance, on the first day of each calendar month, except as provided in Section E.2 below. Additional Rent, if any, shall be paid as otherwise set forth in this Lease. Notwithstanding the foregoing, Rent for the first full calendar month of the Lease Term, together with Rent for any initial partial calendar month of the Lease Term, shall be payable in arrears and shall be paid together with the Rent due and payable for the second full calendar month of the Lease Term.  The amounts to be paid by Tenant for Rent shall be pro-rated on a per diem basis for any partial month in the Lease Term.  Rent shall be payable to Landlord, which shall be one (1) person or one (1) business entity, with one (1) taxpayer identification number for which Tenant has been provided an executed form W-9 in the name of Landlord.

2.      Alternate Rent.  If at any time during the Lease Term Tenant is entitled to pay Alternate Rent in lieu of the Rent otherwise payable pursuant to this Lease, Tenant's payment of Alternate Rent shall be due and payable within fifteen (15) days following the end of each calendar month for the entire period for which the payment of Alternate Rent applies.  Tenant's payment of Alternate Rent shall be accompanied by a written statement signed by



Tenant and certified by it to be true and correct showing the amount of Gross Sales during the preceding calendar month.  Landlord agrees that all information provided to Landlord with regard to Gross Sales is confidential and proprietary information of Tenant and may not be disclosed to third parties or otherwise made public; provided, however, Landlord may disclose said information to its affiliates or its directors, officers, or employees. Notwithstanding the foregoing, Landlord may also disclose the information provided to Landlord with regard to Gross Sales as may be required by Applicable Laws or at the request of any federal or state regulatory or supervisory authority having jurisdiction over Landlord, whether governmental or quasi-governmental in nature.  Landlord shall be obligated to keep and maintain all Gross Sales information confidential and this obligation shall survive the expiration or termination of this Lease.

3.      Overpayments.  In the event Tenant exercises any termination right set forth in this Lease or in the event this Lease otherwise terminates prior to the expiration of a period for which Rent has been paid, Landlord shall promptly refund all unearned Rent.  If at any time Tenant has overpaid Rent, including either Gross Rent or Additional Rent, such overpayment shall be applied to the next installments of Rent due and payable under the Lease or if said overpayment occurs at the end of the Lease term or earlier termination of the Lease then said overpayment shall be refunded by Landlord to Tenant in cash.  If at any time when Tenant is entitled to pay Alternate Rent Tenant pays any amount in excess of the Alternate Rent due for such period, Tenant shall receive a credit against Rent equal to the amount of the excess actually paid.  Any overpayment of Rent during a period when Tenant is entitled to pay Alternate Rent shall not be deemed to be a waiver of Tenant's right to pay Alternate Rent during such period.  The provisions of this Section, including the repayment obligations set forth herein, shall survive the expiration or termination of this Lease.

4.      Intentionally Deleted.

5.      Intentionally Deleted.

6.      Free Rent.  Intentionally Deleted.

7.      Opening Co-Tenancy.  Intentionally Deleted.

8.      Ongoing Co-Tenancy.  Landlord shall use commercially reasonable, good faith efforts to notify Tenant of any date when the Ongoing Co-Tenancy Requirement is no longer satisfied; provided that Tenant's rights under this Section shall not be adversely affected by Landlord's failure to provide such notice nor shall Landlord be considered in default under this Lease, due to Landlord's failure to provide such notice.  In addition, promptly following a request from Tenant, Landlord shall provide such information as is reasonably necessary for Tenant to determine whether the Ongoing Co-Tenancy Requirement is then satisfied.  At any time when the Ongoing Co-Tenancy Requirement is not satisfied, and remains unsatisfied for                           dates, and provided Tenant is not in default beyond any applicable notice and cure period, Tenant shall have the right, beginning on the                        consecutive day that Ongoing Co-Tenancy Requirement is not satisfied, to pay Landlord Alternate Rent in lieu of the Gross Rent otherwise payable under this Lease.  Alternate Rent shall be payable monthly at the same time and in the same manner as Gross Rent is paid under this Lease.  In the event the Ongoing Co-Tenancy Requirement is again satisfied or if Tenant is in default of the Lease beyond the applicable notice and cure periods, then Tenant's right to pay Alternate Rent shall cease and Tenant shall resume paying full Gross Rent under the Lease.  If the Ongoing Co-Tenancy Requirement remains unsatisfied for                                              days ("Measuring Period"), Tenant shall have the right, per occurrence of an unsatisfied Ongoing Co-Tenancy, to terminate this Lease by providing written notice to Landlord within            days after the expiration of the Measuring Period, in which event this Lease shall



terminate ▮▮▮▮▮ days after the date Landlord receives Tenant's notice. In the event Tenant has not sent its termination notice within ▮▮▮▮▮ days after the expiration of the Measuring Period, then beginning on the ▮▮▮▮▮ day after the expiration of the Measuring Period, Tenant's right to pay Alternate Rent shall cease and Tenant shall resume paying full Gross Rent and may elect to continue to operate in the Premises. Notwithstanding the foregoing, Tenant agrees that the following occurrences shall not result in a breach of the Ongoing Co-Tenancy Requirement: (i) any good faith discontinuance not to exceed ▮ days occasioned by Force Majeure; (ii) cessation of retail operations not to exceed ▮ days in connection with a transfer of a co-tenant's leasehold to an assignee or subtenant; or (iii) any discontinuance not to exceed ▮ days in connection with a remodeling.

F.   COMMON AREAS

1.   Operation and Maintenance. Throughout the Lease Term Landlord, at its sole cost and expense, shall operate, maintain, repair, and replace the Common Areas so as to maintain a clean, safe and secure Shopping Center, consistent with the standards of operation and maintenance of a first class Shopping Center, and based on Landlord's actual knowledge the design and construction of all Common Areas are safe and secure for Tenant's customers and invitees. Without limiting the foregoing, Landlord shall be solely responsible for the maintenance, repair and replacement of the sidewalks, landscaping, parking areas, parking lot lighting, handicap ramps, speed bumps, access ways, common portions of all utility systems and connections located outside of the Premises and other Common Areas and for sweeping and clearing snow, ice and debris from the Common Areas. Tenant shall have no obligations with respect to such maintenance. Notwithstanding the foregoing, Landlord reserves the following rights with respect to the Common Areas:

   a.   Use. Landlord shall have the right at any time to redesignate, modify, alter, close, restrict, expand, reduce and change the Common Areas, subject to (i) Tenant's No Build Area and the protected drive aisles depicted on Exhibit A-1, (ii) Tenant's ability to deliver from the front access point of the Shopping Center to the rear delivery door with Tenant's WB67 tractor trailer, and (iii) Landlord's agreement not to erect additional stories above the building where Tenant's Premises are located. To use, or to permit or limit the use of the Common Areas for, promotional activities, provided, however, in no event shall any promotional activities be located within the No Build Area or interfere with Tenant's business operations, parking or customer access; and

   a.   Closings. Except during October, November or December of any year, to close all or any portion of the Common Areas as may be deemed necessary by Landlord or its counsel to prevent a dedication thereof or the accrual of any rights to any person or the public therein or as may be reasonably necessary to make required repairs.

2.   Common Area Maintenance Costs Included in Gross Rent. Tenant shall have no obligation to reimburse Landlord for any costs or expenses incurred by Landlord in operating and maintaining the Common Areas, it being expressly agreed that Tenant's Gross Rent incorporates Tenant's full obligation with respect to such costs and expenses.

G.   TAXES

1.   Real Property Taxes Defined; Base Year Real Property Taxes Defined. For purpose of this Lease, "Real Property Taxes" shall mean and include all ad valorem real estate taxes and assessments assessed or levied upon the Shopping Center, including the Land and the Building. Real Property Taxes shall not include, any federal, state or local (a) franchise, capital stock or similar taxes, if any, of Landlord, (b) income, excess profits or other taxes determined on the basis of or measured by the net income of Landlord (other than any



applicable sales tax on rent customarily paid by retail tenants in the County in which the Shopping Center is located), (c) any estate, inheritance, succession, gift, capital levy or similar taxes, (d) any fine, penalty, cost or interest for any tax or assessment, or part thereof which Landlord failed to pay timely prior to or at any time during the Lease Term, provided Tenant has made all Real Property Tax payments to Landlord in accordance with the terms and provisions contained in the Lease, (e) fees imposed upon Landlord in connection with Landlord's development of the Shopping Center, or (f) Real Property Taxes resulting directly from an increase in the assessment of the Shopping Center caused by a sale or ground lease of all or any portion of the Shopping Center to an Affiliate of Landlord; provided, however, the taxes described in clauses (a) and (b) shall be considered Real Property Taxes if under Applicable Laws such taxes are expressly imposed in lieu of or a substitute for any other tax or assessment upon or with respect to the Shopping Center which, if such other tax or assessment were in effect at the commencement of the Lease Term would be considered a Real Property Tax.

2.    Payment of Real Property Taxes. Landlord shall pay all Real Property Taxes as and when the same become due and payable, and in all events before the same become delinquent. Subject to the limitations set forth in this Lease, including without limitation the provisions of Sections G.5 regarding contests and Sections G.6 and G.7, commencing on the Rent Commencement Date and continuing through the first twelve (12) full calendar months following the Rent Commencement Date, Tenant's Proportionate Share of Real Property Taxes shall be included in Gross Rent. Beginning on the first anniversary of the Rent Commencement Date and continuing for the remainder of the Lease Term, Tenant shall pay to Landlord, on an annual basis, Tenant's Proportionate Share of Real Property Taxes over the Base Year Real Property Taxes. Tenant shall pay to Landlord, within sixty (60) days of receipt of Landlord's invoice, for the Real Property Tax increases over the Base Year Real Property Taxes. A copy of the official tax bill, if available, shall be submitted by Landlord to Tenant, upon request by Tenant, and shall be conclusive evidence of the amount         of         the         tax         assessed         or         levied.

Landlord's and Tenant's obligations under this Section G.2 shall survive the expiration of the Term. The Landlord of record as of December 31 of any calendar year shall be responsible for providing the actual tax bill(s) applicable to the full year.

3.    Separately Assessed Parcels. Notwithstanding the provisions of Sections G.1 and G.2., if on the Effective Date the Shopping Center contains one or more separately assessed tax parcels which are occupied by tenants who are solely responsible for payment of the Real Property Taxes attributable to such parcels ("Separately Assessed Parcels"), then for purposes of determining the Real Property Taxes to be paid by Tenant hereunder, "Real Property Taxes" shall exclude 100% of the Real Property Taxes attributable to the Separately Assessed Parcels and Tenant's Proportionate Share of Real Property Taxes shall be calculated as a fraction, the numerator of which is the Premises GLA and the denominator of which is the Shopping Center GLA *minus* the gross leasable area of all buildings located on the Separately Assessed Parcels.

4.    Personal Property Taxes. Tenant shall pay to the appropriate authorities, prior to delinquency, any and all taxes and assessments, license fees and public charges levied, assessed or imposed upon or against Tenant's fixtures, equipment, furnishings, furniture, appliances, inventory and other personal property installed or located on or within the Premises.

5.    Contests. Landlord shall have the right to contest, review or negotiate any tax or assessment upon the Shopping Center. At Tenant's request, Landlord shall contest the validity or amount of any assessed valuation or Real Property Tax on the Premises. Tenant agrees to pay its Proportionate Share of Landlord's expenses, whether third party or internal, including but not limited to legal, tax consultant and appraisal fees, for any such



contest requested by Tenant. Tenant's Proportionate Share of such expenses shall be calculated in the manner set forth in Section G.3 of the Lease. If any refund or rebate is received as a result of any contest or otherwise, Tenant shall be entitled to its Proportionate Share of such refund or rebate after deducting the reasonable and customary costs of such contest therefrom. If permitted under Applicable Laws Tenant shall have the right to defer payment of Real Property Taxes during any contest.

6.    Excess Transfers. Intentionally Deleted.

7.    Intentionally Deleted.

H.    USE OF PREMISES BY TENANT

1.    Use of Premises. Tenant shall initially use the Premises solely for the Permitted Use. During the Lease Term Tenant may, upon written notice to Landlord, change its use to any lawful retail use so long as Tenant's changed use does not violate any restrictions or exclusives in effect at the time Tenant changes its use. Upon request, Landlord shall provide Tenant with such information as is reasonably necessary to ensure that any change in use would not violate any then-existing restrictions or exclusives.

2.    Existing Exclusives. Landlord hereby represents and warrants to Tenant as follows with regard to the Existing Exclusives and the Permitted Use, it being expressly acknowledged by Landlord that such representations and warranties constitute a material inducement to Tenant to enter into this Lease and Tenant is relying upon such representations and warranties in making its decision to enter into this Lease:

a.    The Existing Exclusives constitute all of the recorded and unrecorded restrictions on use applicable to the Premises and include all exclusive uses previously granted by Landlord or its predecessors in interest to other existing tenants of the Shopping Center holding an executory lease, all restrictions contained in any OEA, all surviving exclusive uses granted by Landlord or its predecessors in interest to prior tenants of the Shopping Center and all other restrictions of which Landlord is aware;

b.    The Existing Exclusives do not prohibit Tenant's use of the Premises for the Permitted Use;

c.    Landlord has provided to Tenant true, correct and complete copies of the Existing Exclusives and except as set forth in the Existing Exclusives there are no restrictions on the type or quantity of merchandise or categories of merchandise that may be sold by Tenant in the Premises;

d.    Landlord has not received notice from any tenant of the Shopping Center or any third party that this Lease or the use of the Premises by Tenant for the Permitted Use will constitute or may constitute a breach of the Existing Exclusives; and

e.    The Premises are zoned to allow the Permitted Use without the need for any variance or special or conditional use permits.

3.    Operation of Tenant's Business.

a.    Discontinuance of Operations; Recapture Right. Notwithstanding any provision in this Lease which may imply the contrary, this Lease contains no implied or express covenant for Tenant to conduct business in the Premises, continuously or otherwise; provided, however, Tenant shall be obligated to open and operate its business in the Premises, as a typical Dollar Tree store, for one (1) day within ▮



██████████████ ) days of the Commencement Date. In the event Tenant discontinues operating in the Premises (excluding, however, an exempted discontinuance described in Section H.3.b below), and such discontinuance continues for ████████ ) consecutive days Landlord may, at any time thereafter during the Lease Term while such discontinuance continues, elect to terminate this Lease and recapture the Premises by delivering written notice to Tenant, in which event this Lease shall terminate as to all obligations of the parties ██████ ) days after delivery of Landlord's notice, excepting only those obligations which expressly survive the expiration or termination of this Lease. Unless Landlord elects to terminate this Lease and recapture the Premises as provided above, the Lease shall continue in full force and effect, Tenant shall remain obligated to pay Rent and otherwise comply with its obligations hereunder notwithstanding any discontinuance of operations, and Landlord shall similarly remain obligated under this Lease.

b.  Exempted Discontinuances. Notwithstanding the provisions of Section H.3.a above, the following discontinuances of operations shall not give rise to Landlord's right to recapture the Premises as provided in Section H.3.a: (i) any good faith discontinuance occasioned by Force Majeure; (ii) cessation of operations not to exceed ████████ days in connection with a transfer of possession resulting from a permitted assignment or sublet; (iii) any discontinuance not to exceed █████████ days in connection with a remodeling or other permitted alterations; and (iv) a period not to exceed ███████ days per year to conduct inventory.

c.  Stocking and Delivery. Tenant shall be permitted to stock the Premises at night. Tenant will be permitted to receive deliveries of merchandise sent directly from the vendor or supplier through the front door of the Premises.

d.  Exterior Vending Machines. Intentionally Deleted.

4.  Use Protections.







Notwithstanding the foregoing, the Use Protections shall not apply to any current occupant or tenant of the Shopping Center who is operating under their current use clause or trade name as of the Effective Date; provided, however, in the event Landlord consent is required for a change in permitted use or trade name or Landlord has the ability to challenge a change of permitted use or trade name, then Landlord shall not consent to a change of any tenant's use or trade name which would result in a violation of the Use Protections and Landlord shall enforce the Use Protections so that no violations occur.

Notwithstanding anything contained in this Lease to the contrary, so long as Tenant continues to operate the Premises as a variety store selling general merchandise including food products (which may include frozen and refrigerated food products) under the trade name "Dollar Tree" in a manner similar to the manner in which it operates other Dollar Tree stores in the state of Arkansas from time to time, Landlord will indemnify, defend and hold Tenant harmless from and against all loss, cost, expense and liability, including court costs and attorneys' fees, resulting or occurring by reason of any demand or claim by Hallmark, Inc., its direct or indirect affiliates, subsidiaries or related companies or its or their successors and assigns (individually or collectively, "Hallmark") that Tenant has violated, or the operation of a Dollar Tree will violate, Hallmark's exclusive use and restrictive uses set forth on Exhibit E attached hereto.  Landlord's indemnity set forth in this Section shall apply regardless of the remedies sought by Hallmark against Tenant or Landlord, including without limitation claims for injunctive relief and damages of any kind.

c.   Remedies. 





d.      Renegade Tenants. Notwithstanding the foregoing, if any tenant or occupant of the Shopping Center violates the Use Protections and such violation also constitutes a default under its lease with Landlord (a "Renegade Tenant"), then Tenant's right to pay Alternate Rent shall be tolled provided that Landlord shall have promptly commenced appropriate legal proceedings against the Renegade Tenant and thereafter diligently prosecutes such proceedings to completion. If Landlord fails to commence such proceedings promptly or thereafter fails to prosecute such proceedings diligently to completion, or if the violation does not cease within ▮▮▮▮▮▮▮▮▮▮ days after Landlord shall have been made aware of such violation (regardless of Landlord's efforts to stop it), then Tenant shall be entitled to pay Alternate Rent effective as of the date the violation first commenced and continuing for so long as such violation continues. If the violation has not been cured after ▮▮▮▮▮▮) months, Tenant shall have the ongoing option to terminate this Lease or continue to pay Alternate Rent until the violation is cured. If Tenant elects to terminate this Lease as a result of the violation of the Use Protections by a Renegade Tenant, Tenant shall provide Landlord with written notice of termination and this Lease shall terminate on the date ▮▮▮▮▮ days after the date of Tenant's notice. Landlord shall not be obligated to reimburse Tenant for the unamortized costs of Tenant's leasehold improvements in the event of any termination under this subsection d.

I.      LANDLORD ACCESS

Tenant agrees to permit Landlord free access to the Premises after reasonable prior notice to Tenant (except in the event of an emergency when no prior notice shall be required) for the purpose of examining the same or making alterations or repairs to the Premises that Landlord may deem necessary for the safety or preservation thereof. During the last ninety (90) days of the Lease Term Landlord or its agents shall also be entitled to enter upon the Premises for purposes of showing the Premises to potential tenants. In exercising its rights under this Section I Landlord shall use reasonable good faith efforts to avoid interfering with Tenant's ongoing business operations or Tenant's obligations to vacate the Premises as provided herein.

J.      UTILITIES AND RUBBISH DISPOSAL

1.      Utilities.

        a.      Maintenance. Commencing on the Delivery Date, Landlord shall provide and maintain all necessary pipes, mains, conduits, wires, and cables leading to the Premises for water, sewer, gas, electricity, and telephone service that are not otherwise provided and maintained by their respective service provider, including those that are in the parking areas, beneath the floors of tenant spaces, or in other portions of the Shopping Center.

        b.      Tenant's Responsibilities. Prior to opening the Premises for business, Tenant shall have all utilities serving the Premises (electric, natural gas, sewer, and telephone) placed in Tenant's name. Landlord represents and warrants that the Premises is already sub-metered at the former Famous Footwear premises, to determine



> Tenant's individual water utility usage. Upon receipt of an invoice from Landlord, Tenant shall pay Landlord for water charges for usage within the Premises. Tenant shall pay all utility bills with respect to utilities consumed in the Premises during the Lease Term directly to the appropriate service provider, or to Landlord with regard to water charges for Tenant's usage within the Premises. At the expiration of the Lease Term, to the extent necessary to comply with Applicable Laws or satisfy the requirements of any utility for getting service out of Tenant's name, utilities may be placed in Landlord's name and following a request therefor, Landlord will promptly take such actions as are necessary to put utilities in Landlord's name. Tenant shall have no liability for utility costs attributable to the period after the expiration of the Lease Term.

    c.    <u>Costs and Fees</u>. Tenant will not be responsible for the cost of any tax-based utility tap fees, the cost of meter installation or replacement or any other cost which may be levied by a utility or municipality other than those charges specifically related to Tenant's consumption of utilities. Tenant shall be responsible for any fee to establish service in Tenant's name for the Premises, or a deposit for service in Tenant's name for the Premises, or any other utility charge related to metering the Tenant's consumption at the Premises. All costs and fees other than those for which Tenant is responsible shall be the sole responsibility of Landlord.

2.    <u>Rubbish Disposal</u>. Tenant shall be responsible for Tenant's trash and refuse collection and disposal. Landlord shall be responsible for ensuring that all other trash and refuse from, on or about the Shopping Center is picked up and disposed of in a timely manner. Landlord will provide Tenant an area at the rear of the Premises for the location of Tenant's trash and refuse collection. If required by Applicable Laws at any time during the Lease Term, Landlord agrees to construct a trash enclosure sufficient for Tenant's dumpsters at Landlord's expense in the location identified on the Site Plan or if after the Commencement Date, at another location mutually acceptable to Landlord and Tenant. Tenant agrees to:

    a.    <u>Proper Containers</u>. Keep Tenant's refuse in proper containers until the same is removed from the Shopping Center and not to permit any of Tenant's refuse to accumulate around the exterior of the Premises; and

    b.    <u>Regulations</u>. Handle and dispose of all of Tenant's rubbish, garbage, and waste in accordance with reasonable regulations established by Landlord and not permit the accumulation (unless in sealed metal containers) or burning of any of Tenant's trash, rubbish, refuse, garbage, or waste materials in, on, or about any part of the Shopping Center.

3.    <u>No Landlord Liability</u>. Landlord shall not be liable for the quality, quantity, failure, or interruption of utility services to the Premises unless caused by Landlord's negligent or willful acts; provided that the foregoing shall not be construed to release Landlord from its maintenance and repair obligations under this Lease.

4.    <u>Trash Compactor; Baler</u>. Tenant reserves the right, at Tenant's sole cost and expense, to install a trash compactor and/or baler.

K.    REPAIRS AND ALTERATIONS

1.    <u>Repairs by Landlord</u>. In addition to Landlord's obligations to maintain and repair the Common Areas in accordance with Section F of this Lease, as of the Effective Date Landlord shall keep the foundations, roof, floor, floor slab, walls and other structural portions of the Premises in good repair, shall keep and maintain the fire protection systems serving the Premises (excluding the sprinkler heads located within the Premises) in good order and repair and in compliance with Applicable Laws, and shall keep the exterior of the



Building free of graffiti. Without limiting the foregoing, in order to minimize the damage and disruption which would result from roof leaks, Landlord shall perform regular inspections of the roof and perform such preventative maintenance as is necessary to ensure that the roof remains in good order and repair throughout the Lease Term. Tenant shall give Landlord written notice of the need for repairs coming to the attention of Tenant; provided that notice from Tenant shall not be a pre-condition of Landlord's obligations to maintain and repair the Premises as required. Within fifteen (15) days following receipt of notice from Tenant of the need for any required repairs or upon obtaining actual notice of the need for any required repairs, Landlord shall commence all needed repairs and thereafter diligently work to complete the needed repairs within a reasonable period of time not to exceed one hundred and eighty (180) days. The provisions of this Section K.1 shall not apply in the case of damage or destruction by fire or other casualty or in the case of a condemnation or other governmental taking, in which event either Section N or P shall control the obligations of Landlord with regard to restoration and repair.

    a.    <u>Emergency Repairs</u>. In the event of an emergency which would affect the health, safety or welfare of Tenant's employees or customers or result in the imposition of fines or penalties under Applicable Laws or the potential involuntary closure of Tenant's Premises, Tenant may, but shall not be required to, make such emergency repairs to the Premises as Tenant deems reasonably necessary to protect Tenant's employees, customers, property and business operations. Tenant will notify Landlord as soon as possible as to what repairs were made and the cost to complete such repairs.

    b.    <u>Reimbursement for Emergency Repairs</u>. Landlord shall reimburse Tenant for the reasonable out-of-pocket costs incurred by Tenant, within thirty (30) days after receipt of a breakdown of costs incurred. If Landlord fails to notify Tenant of its objections to the Tenant's costs or reimburse Tenant for any costs to which Landlord has not objected within such 30-day period, Tenant shall have the right to offset the costs to which Landlord has not objected, together with interest at the Default Rate from the expiration of such 30-day period, by taking a credit against ▉▉▉▉▉▉▉▉▉▉ of Rent commencing with the first installment after the expiration of such 30-day period and continuing until the entire amount of its costs has been credited. Tenant's election to make emergency repairs shall not be deemed a waiver of any rights or remedies otherwise available to Tenant under this Lease as a result of a Landlord default.

2.    <u>Landlord's Alterations</u>. Subject to the limitations and restrictions contained in this Lease, including but not limited to the provisions of Section B.2 and Section K.3 hereof, Landlord shall have the right to construct, remodel or otherwise alter the Shopping Center and Common Areas during the Lease Term. Landlord shall use reasonable good faith efforts to notify Tenant at its Address as early as possible of any planned alterations or construction activities. During any period that Landlord is performing alterations to the exterior of the Shopping Center, Landlord will take reasonable safety precautions to protect Tenant's customers and employees while they access the Premises and use the Common Areas.

3.    <u>Limitations</u>. Notwithstanding any term or condition of this Lease to the contrary, the following limitations shall apply to any construction, alteration or other work by Landlord during the Lease Term. The provisions of this Section K.3 shall control over any contrary provision in this Lease.

    a.    <u>Restricted Periods</u>. Landlord shall not perform construction or alterations to any exterior portion of the Shopping Center, including but not limited to the Common Areas, during the months of October, November or December without the prior written consent of Tenant, which consent shall not be unreasonably withheld,



conditioned or delayed. Notwithstanding the foregoing, in the event of an emergency affecting the health, safety or welfare of employees or customers of the Shopping Center or the potential closure of the Shopping Center, Landlord shall be entitled to perform such construction as is necessary to remove the emergency and the remainder of any required construction shall be completed after December and before October of any year. In the event Landlord breaches the provisions of this Section K.3.a, Tenant shall be entitled to pay Alternate Rent in lieu of Gross Rent for each day that such construction or alterations continue during the months of October, November or December.

b.  Restricted Access or Visibility. Landlord shall not perform construction or alterations in the Shopping Center which (i) would result in a breach of Landlord's obligations under Section B.2 of this Lease or (ii) would have a material and adverse impact on (A) Tenant's operation within the Premises, (B) customer or employee access to the Premises or to the Common Areas in front of and adjacent to the Premises, or (C) the visibility of the Premises from the Common Areas or main public streets providing access to the Shopping Center, without the prior written consent of Tenant, which consent shall not be unreasonably withheld, conditioned or delayed. In the event Landlord breaches its obligations under this Section K.3.b and such breach continues for a period of five (5) days, Tenant shall be entitled to pay Alternate Rent in lieu of Gross Rent for each day or part thereof which elapses between the date the breach commenced and the date the breach is cured.

c.  Alternate Rent. Tenant's rights to pay Alternate Rent under this Section K.3 are in addition to all other rights and remedies available to Tenant under this Lease upon the occurrence of a default by Landlord.

4.  HVAC System Maintenance & Replacement. The HVAC System is owned by and is the property of Landlord. During the Lease Term Tenant, at its sole cost and expense, shall maintain a service contract for and perform routine, standard HVAC System maintenance. Within fifteen (15) days of Landlord's written request, Tenant shall provide Landlord with a copy of the required service contracts to be maintained by Tenant.

5.  Sign Maintenance. Landlord shall be obligated to maintain, repair and replace all pylon and monument signs as necessary so that at all times during the Lease Term such signs are in good order and repair and in compliance with Applicable Laws. Tenant shall be obligated to maintain its signs, including its exterior Building signs and pylon sign panels in good order and repair and in compliance with Applicable Laws. Notwithstanding the foregoing, in the event Landlord performs maintenance or undertakes alterations or renovations of any area of the Shopping Center or Premises where Tenant's signs are located, Landlord shall be obligated, at Landlord's sole cost and expense, to store, protect, repair or replace if necessary any of Tenant's signs or sign areas which are damaged or required to be repaired or altered as a result of Landlord's work.

6.  Repairs by Tenant. Except as provided in Sections D.4, K.1, K.2 and K.4, Tenant shall keep the Premises and any fixtures, facilities or equipment contained therein in good condition and repair, including, but not limited to, the exterior and interior portions of all doors, windows, plate glass, and showcases surrounding the Premises; all electrical, plumbing (excluding any repair to the fire sprinkler system, fire alarm system, the monitoring panels, sub-panels and any other fire protection equipment; except for the sprinkler heads within the Premises which Tenant shall maintain) and sewer systems inside of the Premises; and all portions of the store front area which do not constitute Common Area. Tenant shall replace all broken and/or cracked plate and window glass during the Lease Term. Notwithstanding the foregoing, Tenant shall not be obligated to repair items of Landlord's original construction made necessary by reason of damage due to fire or



other casualty covered by standard fire and extended coverage insurance or other insurance or warranties of Landlord.

7.      Alterations or Improvements by Tenant.  After completing Tenant's Work, Tenant shall be permitted to make interior, nonstructural alterations and improvements to the Premises without Landlord's prior written consent provided that: (i) the interior alterations shall be completed in a good and workmanlike manner; (ii) the alterations do not affect the mechanical, plumbing, electrical, HVAC, life, safety, or other operating systems located in the Shopping Center, or the structural components of the building, or require penetration of the roof or the floor or ceiling of the Premises; (iii) the cost of any such interior alterations shall  not ▉▉▉▉▉▉▉ and (iv) such alterations, and the performance thereof, shall otherwise be in compliance with the terms and provisions contained in this Section K.7, except for the requirement of Landlord's consent.  Tenant shall obtain all necessary permits prior to commencing any alterations or improvements and shall complete all work in a good and workmanlike manner and in accordance with Applicable Laws.   Tenant agrees to indemnify, defend and hold Landlord harmless from and against any mechanic's lien or other liens or claims causes of action, damages and liabilities sustained by Landlord arising from Tenant's work and to repair any damage to the Premises or the Building resulting from such work.

## L.      INSURANCE

1.      Liability Insurance.

a.      Tenant's Liability Insurance.  During the Lease Term Tenant, at Tenant's sole expense, shall carry commercial general liability insurance covering the Premises and Tenant's use thereof, with a minimum limit ▉▉▉▉▉▉

▉▉▉▉▉▉▉▉ Tenant shall provide Landlord with certificates evidencing such coverage prior to the date Tenant uses or occupies the Premises.  These insurance coverages and each certificate shall name Landlord, Brookfield Property REIT Inc., Brookfield Properties Retail Inc., BPR REIT Services LLC, and if applicable, any Mortgagee, as an additional insureds.   Tenant shall use commercially reasonable efforts to have its insurers agree to notify Landlord not less than ten (10) days in advance of any substantial modification or cancellation thereof.

b.      Landlord's Liability Insurance.   Commencing as of the Effective Date and continuing during the Lease Term Landlord, at Landlord's sole expense, shall carry commercial general liability insurance covering the Shopping Center, including all Common Areas, with a minimum limit of ▉▉▉▉▉▉

▉▉▉▉▉▉▉ Landlord shall provide Tenant with certificates evidencing such coverage prior to the date Tenant uses or occupies the Premises.  Each certificate shall name Tenant as an additional insured, as its interest may appear.  Landlord shall use commercially reasonable efforts to have its insurers notify Tenant not less than ten (10) days in advance of any substantial modification or cancellation thereof.

2.      Property Insurance.



a.    Property Insurance. During the Lease Term Landlord, at Landlord's sole cost and expense, shall maintain policies of insurance insuring the Shopping Center, including all buildings, improvements and Common Areas, against fire and such other perils as are normally covered by special coverage endorsements in the County where the Premises are located, in an amount equal to at least ▮▮ ▮▮▮ of the insurable value of the Shopping Center. Tenant shall have no rights in or to said policies or the proceeds thereof and Landlord shall not be obligated to name Tenant as an additional insured thereunder. Upon request, Landlord shall provide Tenant with evidence of the policies maintained by Landlord to satisfy the requirements of this Section.

3.    Self-insurance. Tenant shall have the right to self-insure any property insurance obligation of Tenant under this Lease so long as Tenant has a net worth of at least ▮▮▮ ▮▮▮ At Landlord's written request, Tenant shall furnish Landlord with an Annual Report evidencing such net worth if Landlord cannot access the Annual Report and other financial data on Tenant's web site at www.dollartree.com.

4.    Mutual Waiver of Subrogation. Tenant hereby waives any claim against Landlord for property damage occurring in the Premises and the insurer providing Tenant's property insurance hereby waives its rights of subrogation against Landlord for property damage occurring in the Premises, and in consideration thereof, Landlord waives any claim against Tenant for property damage occurring in the Shopping Center and Common Areas and the insurer providing Landlord's property insurance shall waive its rights of subrogation against Tenant for property damage occurring in and to the Shopping Center and Common Areas. The waivers set forth herein shall take priority over any indemnity obligations, self-insurance rights and other allocation of liabilities and obligations set forth in this Lease.

5.    Insurance Costs Included in Gross Rent. Tenant shall have no obligation to reimburse Landlord for any premiums, costs or expenses incurred by Landlord in obtaining and maintaining the property, liability and other insurance required to be maintained by Landlord under this Lease, it being expressly agreed that Tenant's Gross Rent incorporates Tenant's full obligation with respect to such premiums, costs and expenses.

M.    MUTUAL INDEMNITIES

1.    Indemnification by Tenant. Tenant covenants to defend and indemnify Landlord and hold Landlord harmless from and against any and all claims, actions, damages, liabilities and expenses, including reasonable attorneys' fees, (a) for loss of life or personal injury or property damage occurring in or upon the Premises or any part thereof or arising from the negligent acts of Tenant, and Tenant's employees, agents and contractors, in the Shopping Center, during the period commencing on the Delivery Date and continuing through the end of the Lease Term, or (b) attributable in whole or in part to a breach of any representation or warranty made by Tenant in this Lease, except any matter arising out of or in connection with Section V of the Lease, except to the extent that any such claims, actions, damages, liabilities and expenses for which Landlord seeks indemnity (x) are caused by or arise from (i) the acts or omissions of Landlord, its agents, contractors, licensees and employees, whether negligent or not, or (ii) a breach of a representation, warranty or covenant made by Landlord under this Lease, or (y) are matters for which Landlord is liable under Applicable Law. Nothing contained herein Section M.1 of this Lease shall negate, relieve of limit Tenant's obligations under Section N of this Lease.

2.    Indemnification by Landlord. Landlord covenants to defend and indemnify Tenant and hold Tenant harmless from and against any and all claims, actions, damages, liabilities and expenses, including reasonable attorneys' fees, (a) for loss of life, personal injury or property damage occurring in or upon the Common Area of the Shopping Center or any part thereof (other than the Premises) or arising from the negligent acts of Landlord, and



Landlord's employees, agents and contractors, in the Premises, during the period commencing on the Delivery Date and continuing through the end of the Lease Term, or (b) attributable in whole or in part to a breach of any representation or warranty made by Landlord in this Lease, except any matter arising out of or in connection with Section V of the Lease, and except to the extent that any such claims, actions, damages, liabilities and expenses for which Tenant seeks indemnity (x) are caused by or arise from (i) the acts or omissions of Tenant, its agents, contractors, licensees and employees, whether negligent or not, or (ii) a breach of a representation, warranty or covenant made by Tenant under this Lease, or (y) are matters for which Tenant is liable under Applicable Law. Nothing contained herein Section M.2 of this Lease shall negate, relieve or limit, Landlord's obligations under Section N of this Lease.

3. Survival. The indemnities set forth in this Section M shall survive the expiration or other termination of this Lease.

## N. DAMAGE AND DESTRUCTION

1. Partial Damage.

   a. In the event the Premises are damaged due to a casualty or other event to an extent which is less than _____ of the cost of replacement of the Premises, Landlord shall promptly repair the damage of the Premises to at least as good condition as existed prior to the damage, (i.e., ready for Tenant to install its fixtures and merchandise), at Landlord's expense, using proceeds of Landlord's property and casualty insurance and other funds of Landlord required to complete such repairs. Landlord shall promptly apply for all permits and licenses necessary to complete the required repairs and shall commence all required repairs within _____ days after the date when the Premises are damaged and in all events complete its work within one hundred and _____ days following the date of damage. If Landlord does not complete the required repairs and deliver the Premises to Tenant in a repaired condition within _____ days after the date of damage, Tenant shall have the right to terminate this Lease by providing written notice to Landlord, in which event this Lease shall terminate (a) effective as of the date of Tenant's notice, in the event Tenant is not operating in the Premises, or (b) effective as of the date _____ days after delivery of Tenant's notice, in the event Tenant is operating in any portion of the Premises.

   b. Notwithstanding the provisions of Section N.1.a, in the event of a partial casualty or partial damage occurring during the last _____ months of the Lease Term, either Landlord or Tenant shall have the right to terminate this Lease, regardless of the cost to repair or time to complete.

      i. In the event Tenant elects to terminate this Lease under the provisions of Section N.1.b and Landlord can complete all required repairs and restoration so that there would be at _____ months remaining in the Lease Term after Tenant completes any required Tenant fit out and merchandising of the Premises, Landlord shall have the right to negate Tenant's notice of termination, in which event Tenant's termination shall be null and void so long as Landlord in fact delivers the repaired Premises to Tenant within the required timeline. In the event Landlord subsequently fails to deliver the Premises as and when required, the Lease shall terminate effective as of the date of Tenant's original notice of termination and Landlord shall be obligated to reimburse Tenant for all reasonable out of pocket costs, if any, incurred by Tenant in reliance upon Landlord's promise to repair and restore the Premises. In order to negate Tenant's notice of termination, Landlord must notify Tenant of such



election in writing within ▆▆▆ days following receipt of Tenant's notice of termination and include a date for delivery of the Premises in its notice.

ii. In the event Landlord elects to terminate this Lease under the provisions of Section N.1.b, Tenant shall have the right to negate Landlord's notice of termination by exercising early its next option to renew the Lease Term, provided there is at least one additional option remaining. In order to negate Landlord's notice, Tenant must notify Landlord in writing within ▆▆▆ days following receipt of Landlord's notice of termination. In the event Tenant timely notifies Landlord that it has elected to renew the Lease Term, Landlord shall be obligated to repair and restore the Premises within the timeframe set forth in Section N.1 and Tenant shall have the rights and remedies set forth therein if Landlord fails to do so.

2. Total Damage. In the event (a) the Premises are damaged due to a casualty or other event to the extent of fifty percent (50%) or more of the cost of replacement of the Premises or (b) the buildings in the Shopping Center are damaged to the extent of fifty percent (50%) or more of the cost of replacement, notwithstanding the extent of damage to the Premises, then either Landlord or Tenant may elect to terminate this Lease by giving notice of such election to the other in writing within thirty (30) days of the date of damage. If this Lease is not terminated as provided for above, Landlord shall promptly apply for all permits and licenses necessary to complete all required repairs and restoration of the Shopping Center, including the Premises, to at least as good condition as existed prior to the casualty, including with regard to the Premises (i.e., ready for Tenant to install its fixtures and merchandise). Landlord shall thereafter commence all required repairs upon receipt of all necessary permits and in all events complete all repair and restoration within three hundred and sixty-five (365) days following the date of damage. If Landlord does not complete the required repairs and restoration and deliver the Premises to Tenant as required within two hundred and forty (240) days after the date of damage, Tenant shall have the right to terminate this Lease by providing written notice to Landlord, in which event this Lease shall terminate (a) effective as of the date of Tenant's notice, in the event Tenant is not operating in the Premises, or (b) effective as of the date thirty (30) days after delivery of Tenant's notice, in the event Tenant is operating in any portion of the Premises. Notwithstanding anything to the contrary contained in the Lease, (i) Landlord shall not be required to repair or restore the Premises or any part of the Shopping Center as the result of an uninsured casualty, and (ii) Landlord shall not be required to expend more for repair or restoration of the Premises or the Shopping Center than the amount of insurance proceeds paid Landlord (or, if Landlord is self-insured, the amount of insurance proceeds which would have been paid Landlord if Landlord was not self-insured).

3. Repair. If Landlord is required to repair under Section N.1, or has elected to repair under Section N.2, and provided that this Lease has not been terminated pursuant to a right to do so, then promptly following delivery of the repaired or restored Premises by Landlord, Tenant shall repair or replace as needed its stock-in-trade, trade fixtures, furniture, furnishings, equipment, and personal property in a manner and to at least a condition equal to that prior to its damage or destruction.

4. Abatement of Rent. If the casualty, repairing, or rebuilding shall render the Premises untenable, in whole or in part, a proportionate abatement if a partial casualty or full abatement if a total casualty, of Rent shall be allowed until the date Landlord completes the repairs or rebuilding and Tenant has a reasonable time, not to exceed ninety (90) days from delivery by Landlord, to complete Tenant's required fit out and open for business.

O. ASSIGNMENT AND SUBLETTING



1.  Consent of Landlord.  Except as provided in Section O.2 below, Tenant shall not assign this Lease or sublet the Premises without Landlord's prior written consent, which consent shall not be unreasonably withheld or delayed.  Tenant agrees to pay Landlord ▮▮▮▮ to reimburse Landlord for attorneys' fees and administrative expense for the review, processing or preparation of any document in connection with a transfer, whether or not Landlord's consent to the transfer is required or obtained.

2.  Affiliate Transfers.  Notwithstanding anything to the contrary contained herein, Tenant may assign this Lease or sublet all or part of the Premises to an Affiliate without Landlord's consent, provided Tenant shall not be in default of this Lease beyond any applicable notice and cure period.  No such assignment or subletting shall release Tenant from liability hereunder.    Tenant shall provide Landlord with written notice of an assignment or sublet to an Affiliate within thirty (30) days following the transfer.

P.  EMINENT DOMAIN

1.  Condemnation Award.  In the event the Shopping Center or any part thereof is taken or condemned, either permanently or temporarily, by any authority with the power to take or condemn property (including any voluntary sale or transfer in lieu of condemnation), the entire compensation award attributable to the taking of the Land and improvements comprising the Shopping Center shall belong to Landlord, and Tenant hereby assigns to Landlord all of its right, title, and interest in and to any such award.  Notwithstanding the foregoing, Tenant shall have the right to recover from the taking authority such compensation as may be awarded on account of: (a) the leasehold improvements to the Premises made by Tenant, including Tenant's fixtures and equipment, (b) the leasehold estate of Tenant, (c) Tenant's displacement, relocation and moving costs, and (d) Tenant's business goodwill, business damages, business loss, business value, going-concern value and other similar compensation as may be awarded under Applicable Laws as a result of the loss of Tenant's business, and Landlord shall have no claim to such damages.

2.  Rights of Termination.  In the event of a taking or condemnation of (a) more than ▮▮▮ y-▮▮▮▮▮▮▮▮ of the Premises, (b) a sufficient portion of the Shopping Center so that after such taking less than ▮▮▮▮▮▮▮▮ of the Shopping Center GLA (as constituted prior to such taking) is occupied by retail tenants, or (c) a sufficient portion of the Shopping Center so that after such taking the parking ratio for the entire Shopping Center is reduced below 4.0 spaces per 1,000 square feet of Premises GLA or the tractor-trailer or dumpster truck access described in Section B.2 of this Lease is materially impaired, either Landlord or Tenant shall have the right to terminate this Lease by notice in writing given within thirty (30) days after the condemning authority takes possession or is scheduled to take possession, in which event the Lease shall terminate effective as of the date of possession without further liability on the part of either Landlord or Tenant except for those obligations which expressly survive the expiration or termination of the Lease.

3.  Restoration.  In the event of a taking of any portion of the Shopping Center which does not result in a termination of this Lease, Landlord shall use as much of the proceeds of Landlord's award as is required to restore the Premises and Shopping Center to a complete architectural unit with parking, tractor trailer access and means of ingress and egress sufficient to enable Tenant to operate in accordance with this Lease and this Lease shall continue in effect with respect to the balance of the Premises, with an equitable reduction of Rent in proportion to that portion of the Premises taken.

4.  Notice.  Landlord shall promptly notify Tenant in the event it receives notice (whether oral or written, formal or informal) of any threatened, proposed or pending condemnation or other taking affecting the Shopping Center, any part of the Shopping Center, or the roadways providing direct access to the Shopping Center.  Landlord hereby represents to Tenant that it is not currently aware of any threatened, proposed or pending condemnation



or other taking affecting the Shopping Center, any part of the Shopping Center, or the roadways providing direct access to the Shopping Center.

Q.    DEFAULT AND REMEDIES

1.    Default by Tenant. Tenant shall be in default under this Lease if:

   a.    Tenant fails to pay when due any installment of Rent as and when the same is due and payable and such failure continues for ten (10) business days after Tenant receives written notice from Landlord specifying its failure; or

   b.    Tenant breaches any other conditions, stipulations, or agreements contained herein on the part of Tenant to be kept and performed and such breach continues for thirty (30) days after Tenant receives written notice from Landlord specifying its breach. Notwithstanding the foregoing, Tenant shall not be deemed to be in default hereunder if Tenant in good faith commences performance requisite to cure its breach within thirty (30) days after receipt of Landlord's notice and thereafter continuously and with reasonable diligence proceeds to complete the performance required to cure such breach.

2.    Landlord's Remedies.

   a.    Available Remedies. In the event Tenant is in default beyond the expiration of all applicable notice and cure periods, Landlord, at its option may:

      i.    Terminate this Lease. If Landlord elects to terminate, Landlord shall have the right to recover from Tenant as damages:

         1)    The "worth at the time of the award" (defined below) of any unpaid Rent which has been earned prior to the time of termination; and

         2)    The "worth at the time of the award" of the amount by which the unpaid Rent which would have been earned after termination through the balance of the Lease Term until the time of award exceeds the amount of Rent loss Tenant proves could have been reasonably avoided; and;

         3)    Any other amount necessary to compensate Landlord for the detriment proximately caused by Tenant's failure to perform its obligations this Lease or which in the ordinary course of events would be likely to result therefrom; and

         4)    At Landlord's election, other amounts permitted by Applicable Laws.

      As used in this Section, the term, "worth at the time of the award," shall be computed by allowing simple interest at an accrual rate of at the Default Rate on the amount of the obligations payable on the date of such calculation. Efforts by Landlord to mitigate the damages caused by Tenant's default in this Lease shall not constitute a waiver of Landlord's right to recover damages hereunder, nor shall Landlord have any obligation to mitigate damages hereunder, except as hereafter provided. In the event this Lease shall be terminated as provided above, or by summary proceedings or otherwise, all right, title and interest of Tenant hereunder shall cease and expire, and Tenant shall then quit and surrender the Premises to Landlord, but Tenant shall remain liable as herein provided, and Landlord, its agents, servants or representatives may immediately or at any time thereafter lawfully reenter and resume possession of the Premises and remove all persons and property therefrom by summary dispossession proceedings. If Landlord shall



exercise its right to terminate this Lease, Landlord agrees to use commercially reasonable efforts to relet the Premises in order to minimize the damages suffered by Landlord, provided that Landlord shall be under no obligation to relet the Premises in a manner other than applied by Landlord to fill other vacancies in the Shopping Center, and provided further that nothing in this Section shall be construed to obligate Landlord to relet or attempt to relet the Premises as a condition precedent to leasing or attempting to lease any other space in the Shopping Center nor to relieve Tenant from payment of any installment of Base Rent or other charges which would be due under this Lease; or

ii.  To terminate Tenant's right to possession of the Premises (without terminating this Lease) and reenter the Premises and remove all persons and property from the Premises. The property may be stored at Tenant's cost. Landlord shall not be liable to Tenant for loss or damage resulting from an entry by Landlord. Tenant shall pay as Additional Rent, upon demand, expenses incurred or paid by Landlord because of Landlord's entry. If Landlord elects to enter upon the Premises without terminating this Lease Landlord may re-let the Premises in its own name for the account of Tenant for the remainder of the Lease Term and recover from Tenant any deficiency for the balance of the Lease Term between the amount for which the Premises were re-let, and the Rent provided hereunder as it becomes due. Any deficiency shall be calculated and paid monthly, as it becomes due. If Landlord elects to relet, Rent received by Landlord from reletting shall be applied: 1st, to the payment of indebtedness other than Rent due Landlord from Tenant; 2nd, to the payment of the cost of reletting; 3rd, to the payment of the cost of alterations and repairs to the Premises; 4th, to the payment of Rent due and unpaid; and the remainder, if any, shall be applied to the payment of future Rent that may become due. A reentry or taking possession of the Premises by Landlord shall not be construed to be an election to terminate this Lease, nor shall it cause a forfeiture of Rent remaining to be paid during the balance of the Lease Term, unless a written notice of that intention is given to Tenant or the termination is decreed by a court of competent jurisdiction. Notwithstanding a reletting without termination by Landlord because of default by Tenant, Landlord may at any time after reletting elect to terminate this Lease for any default.

iii.  If Landlord reasonably considers necessary any repairs, maintenance, renewals or replacements required by the provisions of this Lease to be made or provided by Tenant, Landlord may, but shall not be obligated to, request that Tenant make such repairs or perform such maintenance or provide such renewal or replacements, and diligently work to complete the needed repairs within a reasonable period of time not to exceed thirty (30) days and, upon Tenant's failure or refusal to do so promptly and complete said work within the maximum period provided above (and in any event in case of an emergency irrespective of whether Landlord shall have requested or obtained Tenant's prior consent), Landlord shall have the right (but shall not be obligated), either itself or through a third party contractor, to make such repair, to perform such maintenance or to provide such renewal or replacement (Tenant hereby waiving any damage caused thereby including, without limitation, any damage caused by any such third party contractors engaged by Landlord to perform such work, unless caused by the willful acts of Landlord or such contractors). Thereupon Tenant will, at Landlord's election, on demand pay (or reimburse Landlord for) the cost thereby incurred by Landlord; and in addition, Tenant shall pay Landlord upon demand interest at the Default Rate of ▮▮▮▮▮▮▮▮▮▮ per annum. For these purposes an "emergency" shall be deemed to exist if, in the good faith judgment of Landlord, prompt action is needed in order to prevent death, bodily injury or property damage. Any such sum which Tenant becomes liable to pay Landlord to or to

29



reimburse Landlord for hereunder may be treated by Landlord as a portion of the rental due and owing by Tenant to Landlord with the next succeeding installment of Minimum Rent due hereunder. If Landlord makes any such repairs, performs any such maintenance, or provides any such renewal or replacement, or undertakes to do so (or engages any third party contractors to do so), then Landlord shall not be liable to Tenant for (and Tenant shall indemnify and hold Landlord harmless with respect to) all loss or damage that may occur to Tenant's merchandise, fixtures or other property or to Tenant's business incident to such action by Landlord.

b.      Re-entry. In addition to all other rights granted to Landlord under this Lease or under prevailing law if Tenant shall be in default beyond any written notice and cure period, Landlord, its agents or employees may immediately or at any time thereafter re-enter the Premises and remove Tenant's agents, any subtenants, any licensees, any concessionaires and any invitees, and any of its or their property from the Premises, provided Landlord has an appropriate court order. Re-entry and removal may be effectuated by summary dispossession proceedings, by any suitable action or proceeding at law, by force, or otherwise. Landlord shall be entitled to the benefits of all provisions of law respecting the speedy recovery of lands and tenements held over by Tenant or proceedings in forcible entry and detainer. Tenant's liability under the terms of this Lease shall survive Landlord's re-entry, the institution of summary proceedings, and the issuance of any warrants with respect thereto.

c.      Third Party Allegations. Intentionally Deleted.

3.      Default by Landlord. Landlord shall be in default (a) if Landlord breaches any of Landlord's representations and warranties contained in this Lease and to the extent any such breach is capable of being cured, if Landlord fails to commence to cure such breach within thirty (30) days following receipt of written notice from Tenant, and thereafter fails to diligently pursue completion of such breach; or (b) if Landlord fails to commence needed repairs to the foundations, roof, floor, floor slab, walls or other structural portions of the Premises or the fire sprinkler systems serving the Premises (excluding the sprinkler heads within the Premises) within thirty (30) days following receipt of notice from Tenant pursuant to Section K.1 of the need for required repairs or if Landlord commences such repairs in a timely manner and thereafter fails to diligently pursue completion of such repairs within a reasonable period of time not to exceed one hundred and eighty (180) days, or (c) if Landlord fails to correct any noncompliance with Applicable Laws pursuant to its obligations under Section D.4 of this Lease within the timeframe afforded Landlord pursuant to Section D.4, or (d) if Landlord fails to perform any of Landlord's other obligations under this Lease and such failure is not commenced within sixty (60) days following receipt of notice from Tenant, or if the default is not capable of being cured within such sixty (60) day period, if Landlord fails to commence its cure within such sixty (60) day period or thereafter fails to diligently prosecute such cure to completion and complete the cure within one hundred eighty (180) days following receipt of Tenant's notice. For the avoidance of doubt, notice sent by Tenant to Landlord pursuant to Section K.1 is the same notice described in Section Q.3.(b) and Tenant shall not be obligated to send additional notice of default or potential default prior to the application of these default provisions.

i.      Available Remedies. Upon the occurrence of a default by Landlord, Tenant shall have all rights and remedies specified in this Lease in addition to any other remedies available to Tenant at law or in equity, including the self-help rights described below. Without limiting the foregoing, upon the occurrence of a default by Landlord Tenant may terminate this Lease by providing notice to Landlord, in which event this Lease shall terminate on the date thirty (30) days following receipt of Tenant's notice of termination. In the event Tenant elects to terminate this Lease



> pursuant to this Section, Landlord shall reimburse Tenant within thirty (30) days of Landlord's receipt of written notice of termination for the unamortized value of the cost of Tenant's improvements to the Premises (less the Tenant Allowance paid to Tenant) as well as all other amounts owing by Landlord to Tenant under this Lease (including any amounts which would have been credited against Rent had the Lease not been terminated).

ii.      Self-Help. If Landlord is in default under this Lease, then following the expiration of all cure periods afforded Landlord hereunder, Tenant shall have the right, but not the obligation, in addition to all other rights and remedies available to Tenant under this Lease and under Applicable Law, to perform Landlord's obligations to the Premises on behalf of, and at the expense of Landlord. If Tenant elects to perform any of Landlord's obligations, Landlord shall be obligated to reimburse Tenant, on demand, for all reasonable out of pocket fees and expenses incurred by Tenant, together with interest at the Default Rate from the date funds are expended by Tenant. In the event Landlord fails to notify Tenant of its objections to the Tenant's costs or reimburse Tenant for any costs to which Landlord has not objected within thirty (30) days following Tenant's demand, Tenant shall have the right to offset the costs to which Landlord has not objected, beginning with the first installment of Rent after the expiration of such 30-day period and continuing until Tenant has been reimbursed in full.

4.       Failure to Exercise Rights. No delay or omission by Landlord or Tenant to exercise any right or power accruing upon any noncompliance or default by Tenant or Landlord with respect to any of the terms hereof shall impair any such right or power or be construed to be a waiver thereof. A waiver by Landlord or Tenant of any of the covenants and agreements hereof to be performed by Tenant or Landlord shall not be construed to be a waiver of any subsequent breach thereof or of any covenant or agreement herein contained.

5.       Sums in Dispute. If any withholding, deduction, offset or non-payment of Rent is expressly authorized by the provisions of this Lease, then the failure to pay Rent by Tenant pursuant to a bona fide dispute between Landlord and Tenant shall not be deemed a default by Tenant under this Lease.

6.       Interest Calculation. Unless otherwise provided, in any instance when a party is entitled to charge interest following the other party's failure to pay or reimburse the aggrieved party within a specified period of time, interest shall accrue from the date funds are expended by the aggrieved party but no such interest shall be payable by the owing party so long as such party pays or reimburses the aggrieved party within the timeframe specified in this Lease.

R.    NOTICES

1.       Proper Notice. Any notice or consent required to be given by or on behalf of either party to the other must be given in writing to Landlord and Tenant at their respective Address and shall be deemed delivered, given and effective: (a) upon signed receipt if personally delivered; or (b) upon signed receipt of a notice (or refusal to sign or accept such notice) sent by certified or registered mail, return receipt requested and postage prepaid; or (c) upon signed receipt of a notice (or refusal to sign or accept such notice) sent by a nationally recognized overnight courier that provides verification of receipt. Landlord shall not mail or deliver any notice or consent to the Premises and notice delivered to the Premises shall not be effective notice under this Lease. Although Landlord's and Tenant's Address may contain facsimile information, such information is provided for informational purposes only and notice by facsimile shall not be effective notice.



2.      Change of Address.  Either party may change its Address at any time by providing written
        notice of its new Address in accordance with this Section.

3.      Service of Process.  Notwithstanding anything to the contrary in the Lease or Applicable
        Law, to the maximum extent permitted under Applicable Law, (a) service of process related
        to any action or proceeding under this Lease or related to the Premises shall not constitute
        valid service upon Tenant if made by serving Tenant at the Premises, and (b) service of
        process upon Tenant shall only be valid if such service is served upon Tenant through
        Tenant's Registered Agent for such service in the state in which the Shopping Center is
        located.  Tenant's current agent for service of process in the state of Arkansas is Corporate
        Creations Network Inc., 609 SW 8th Street, #600, Bentonville, AR, 72712 in Benton County,
        (501) 255-0832.

S.      SUBORDINATION, NON-DISTURBANCE AND ESTOPPELS

1.      Mortgage Subordination.  Landlord hereby represents to Tenant that (a) Landlord is the
        fee simple owner of the Premises, and (b) as of the date hereof, the Premises are not
        subject to a Mortgage other than that certain Mortgage dated December 18, 2014 for the
        benefit of Deutsche Bank as Mortgagee.  Notwithstanding the foregoing, this Lease is and
        shall at all times, unless Landlord shall otherwise elect, be subject and subordinate to the
        lien of all Mortgages hereafter affecting the fee title of the Premises and to the lien of all
        Mortgages which may hereafter be placed against or affect any or all of the Land or any or
        all of the building and improvements now or at any time hereafter constituting part of the
        Premises; provided, however, that as an express condition to such subordination each
        Mortgagee shall first execute and deliver to Tenant a subordination, non-disturbance and
        attornment agreement in recordable form in substantially similar form to that of Exhibit I.
        Any Mortgagee may elect to have this Lease deemed prior to the lien of its Mortgage and
        upon notification by such Mortgagee to Tenant to that effect, this Lease shall be deemed
        prior in lien to such Mortgage, whether this Lease is dated prior to or subsequent to the
        date of such Mortgage.  Tenant agrees that if Landlord's Mortgagee requests confirmation
        of such subordination, then within thirty (30) days after receipt of written request therefor,
        Tenant shall execute and deliver such instruments (including but not limited to a
        Memorandum of Lease and/or a Subordination, Non-Disturbance and Attornment
        Agreement in Tenant's standard recordable form) as may be reasonably required for such
        purposes to carry out the intent of this Section, provided that such instruments shall be on
        Tenant's then standard forms ███████████████████████████████████████████
        ████████████████████████████████████████████████████████████████████████
        ████████████████████████████████████████████████████████████████████████
        ████████████████████████████████████████████████████████████████████████
        ███████████████████████████████████

2.      Estoppels  At any time and from time to time, subject to the terms and conditions of this
        Section, within thirty (30) days after receipt of written request from Landlord at Tenant's
        Address, Tenant shall execute and deliver to Landlord for the benefit of such persons as
        Landlord designates, a statement in writing on a form provided by Tenant, certifying to the
        best of Tenant's knowledge the following, to the extent true:  (a) that this Lease constitutes
        the entire agreement between Landlord and Tenant and is unmodified and in full force and
        effect (or if there have been modifications, that the same is in full force and effect as
        modified and stating the modifications); (b) the dates to which Gross Rent has been paid;
        (c) that the Premises have been completed on or before the date of such statement and
        that all conditions precedent to this Lease taking effect have been carried out; (d) that
        Tenant has accepted possession, that the term of this Lease has commenced, that Tenant
        is occupying the Premises, that Tenant knows of no default under this Lease by Landlord
        and that there are no defaults or offsets which Tenant has against enforcement of this



Lease by Landlord; (e) the actual Rent Commencement Date and the expiration date of the Lease Term; and (f) that Tenant's store is open for business. ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

3.   Mortgagee Consent. Landlord represents that it has obtained consent to this Lease from all Mortgagees identified in Section S.1 above, or that such consent is not necessary, such that in either event this Lease will be binding upon such Mortgagees in the event they succeed to the interest of Landlord under this Lease. Upon request, Landlord shall provide evidence of such consent to Tenant, if Mortgagee's consent to this Lease is required under the Mortgage documents.

T.   COVENANT OF QUIET ENJOYMENT

Landlord hereby covenants that if Tenant shall perform all the covenants and agreements herein stipulated to be performed on Tenant's part, Tenant shall at all times during the continuance hereof have quiet enjoyment of the Premises without hindrance from any person.

U.   LIABILITY OF LANDLORD

1.   Judgments. Tenant shall look solely to Landlord's estate and interest in the Shopping Center (or the proceeds from the sale, financing or refinancing of all or any portion thereof) and net income derived from the Shopping Center and insurance proceeds or condemnation awards actually received by Landlord which are required by the terms of this Lease to be applied to the repair or restoration of the Shopping Center or the Premises, for the satisfaction of Tenant's remedies for the collection of a judgment or other judicial process requiring the payment of money by Landlord to Tenant under this Lease, and no other property or assets of Landlord, its officers, directors, stockholders, members or partners shall be subject to levy, execution or other enforcement procedure for satisfaction of Tenant's remedies under or with respect to this Lease. Except with respect to the limitations on personal liability set forth in this Section, the provisions of this Section shall not be deemed or construed to limit Tenant's rights and remedies under this Lease or the rights and remedies which may be available to Tenant at law or in equity or otherwise.

2.   Transfer of Title. Landlord shall provide Tenant with notice upon or immediately after any sale or transfer of Landlord's interest in the Premises, including a copy of the applicable deed and assignment of this Lease, updated notice, payment and contact information for the buyer or transferee and a complete and executed IRS form W-9 for such buyer or transferee. Tenant shall have no obligation to make payments to any transferee unless and until it has received such documentation, after which time accrued, unpaid payments shall be made with the next regularly scheduled payment of Rent. Landlord shall require the buyer or transferee to assume in writing all of the obligations of Landlord under this Lease. Notwithstanding any limitations on liability set forth elsewhere in this Lease, Landlord shall continue to remain liable for all of the obligations of Landlord under this Lease prior to the transfer unless the buyer or transferee expressly assumes in writing such obligations.

V.   ENVIRONMENTAL MATTERS – NO HAZARDOUS MATERIALS

1.   Acts. For the purposes of this Lease, the term "Hazardous Materials" shall include, without limitation, those substances, materials, or waste described in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended



(CERCLA), (42 U.S.C. 9601, *et seq.*); The Resource Conservation and Recovery Act, as amended (RCRA), (42 U.S.C. 6901, *et seq.*); Emergency Planning & Community Right-to-Know Act, as amended (EPCRA), (42 U.S.C. 11991, *et seq.*); Clean Water Act, as amended (CWA), (33 U.S.C. 1251, *et seq.*); Clean Air Act, as amended (CAA), (42 U.S.C. 7401, *et seq.*); Toxic Substances Control Act, as amended (TSCA), (15 U.S.C. 2601, *et seq.*); Safe Drinking Water Act, implementing regulations for such Acts, and as amended (SDWA), (42 U.S.C. 300(f) *et seq.*); and any other applicable federal, state, local laws or ordinances, and the regulations adopted thereunder, or any other substance, material or waste which has been determined by the United States Environmental Protection Agency, the Federal Occupational Health and Safety Administration, or any other federal or state agency, to be capable of posing significant risk of injury to human health or safety. Hazardous Materials shall not include ordinary household cleaning and maintenance products or those which are part of Tenant's inventory of items for retail sale, provided that such products and items are used with due care, and are used, stored and maintained in accordance with manufacturer's recommendations.

2. Asbestos and Other Hazardous Materials. Intentionally Deleted.

3. Tenant's Operations. Except as otherwise provided herein, Tenant shall not engage in operations at the Premises which involve the generation, manufacture, refining, transportation, treatment, storage, handling, or disposal of Hazardous Materials without the prior written consent of Landlord, which consent shall be at Landlord's sole discretion.

4. Indemnification. Tenant will defend, protect, indemnify, and hold Landlord harmless from and against any and all claims, causes of action and liabilities for abatement, removal or remediation arising from or in any way connected with Hazardous Materials introduced to the Premises by Tenant. Landlord will defend, protect, indemnify, and hold Tenant harmless from and against any and all claims, causes of action and liabilities for abatement, removal or remediation arising from or in any way connected with Hazardous Materials introduced to the Premises by Landlord, its predecessors in title, or any other current or former tenant of the Shopping Center other than Tenant. Landlord and Tenant agree that, in the performance of their respective work in the Premises, they shall not use or install, or permit their contractors or subcontractors to use or install, Hazardous Materials, as defined above. Should either party discover, during the Lease Term, Hazardous Materials in the Premises or materials it suspects are hazardous, then that party shall notify the other. Landlord will then retain an environmental consultant to test for the presence of the suspected Hazardous Material. If asbestos or other Hazardous Materials exist in any portion of the Premises or are hereafter identified within any portion of the Premises (whether before or after the Delivery Date), Landlord shall be solely responsible for their removal, and Landlord will restore the Premises to the same condition prior to such removal. Landlord acknowledges that on the Delivery Date, and as a condition to the occurrence of the Delivery Date, the Premises will be required to be free of asbestos and Hazardous Materials. If the asbestos or Hazardous Material was originally installed by Tenant, or its agents, employees, contractors or subcontractors, Tenant shall be liable for all costs of inspection, consultation, removal and/or disposal. If Tenant is required to close the Premises during the period the removal work is performed, Tenant will be entitled to an abatement of all rental and charges for the period of closure. If the asbestos or Hazardous Material was originally installed by Tenant, or its employees, agents, contractors or subcontractors, and Tenant is required to close the Premises during the period the removal work is performed, Tenant will not be entitled to any rental abatement. Tenant will promptly reopen for business after the removal work has been completed.

5. Limitation of Liability. Notwithstanding the provisions of this Section V, except for the absolute obligation of Landlord with regard to asbestos removal as set forth in subsection V.2, Landlord's and Tenant's liability hereunder will be limited to compliance with all federal and state environmental regulations dealing with release of Hazardous Materials by



Landlord or Tenant. Tenant's and Landlord's rights under this Section V shall not extend to requiring Landlord or Tenant to perform any duties in excess thereof, except for Landlord's absolute obligations with regard to asbestos removal.

## W.   MISCELLANEOUS PROVISIONS

1.   Broker's Commissions. Landlord and Tenant hereby agree to recognize $L^3$ Corporation d/b/a $L^3$ of Arkansas as Tenant's broker in connection with this Lease. Landlord shall be responsible to pay any commissions related to this Lease pursuant to a separate agreement with Tenant's broker. Landlord and Tenant hereby represent and warrant to each other that there are no other claims for brokers' commissions or finders' fees in connection with the execution of this Lease, and Landlord and Tenant agree to indemnify and save the other harmless from any liability that may arise from such claims, including reasonable attorneys' fees.

2.   Surrender and Holding Over.

   a.   Surrender. Subject to the provisions of this Section W.2 and the provisions of Sections N and P, Tenant shall deliver up and surrender to Landlord possession of the Premises upon the expiration of the Lease Term, or its prior termination for any reason, in good condition and repair, broom clean (damage by fire and other perils covered by standard fire and extended coverage insurance and ordinary wear and tear excepted).

   b.   Removal of Improvements. All items of Landlord's construction, the HVAC System, and all alterations, additions, wall coverings, and other improvements by Tenant shall become the property of Landlord at the termination of this Lease and shall not be removed from the Premises. All trade fixtures, furniture, furnishings, and signs installed in the Premises by Tenant and paid for by Tenant shall remain the property of Tenant and shall be removed upon the expiration of the Lease Term; provided that any of such items as are affixed to the Premises and require severance may be removed only if Tenant repairs any damage caused by such removal. Except for normal wear and tear, Tenant, at its sole expense, shall immediately repair damage to the Premises caused by Tenant vacating the Premises or by Tenant's removal of trade fixtures, signs and other personal property. With regard to removal of Tenant's exterior signs, Tenant's obligation shall be limited to patching any holes resulting from removal. If Tenant fails to remove such items from the Premises within ten (10) days of the expiration or earlier termination of this Lease, all such trade fixtures, furniture, furnishings, and signs shall become the property of Landlord. Tenant's failure to remove such items within such ten (10) day period shall not be construed as a hold over tenancy or a continuation of Tenant's occupancy. Landlord shall have the right to remove same and sell such trade fixtures, furniture, furnishings, and signs to pay for the cost of removal. Tenant's obligation to observe and perform the provisions of this Section W.2 shall survive the expiration of the Term or earlier termination of this Lease.

   c.   Holdover. If Tenant fails to surrender the Premises on the date that the Lease Term expires or terminates, Tenant's continued occupancy shall be deemed to be a tenancy from month-to-month and such tenancy shall be subject to all of the provisions of this Lease in effect at the time of holdover, except that the monthly Rent shall be                               of the monthly Rent payable to Landlord during the last twelve (12) month period of the Lease Term. The exercise of Landlord's rights shall not be interpreted to allow Tenant to continue in possession, nor shall it be deemed an election to extend the Term beyond a month-to-month basis. If Landlord, in its sole discretion, determines to permit Tenant to remain in



the Premises on a month-to-month basis, the month-to-month tenancy shall be terminable on 30 days prior written notice given by either party to the other party.

3. Storage Trailer. At no additional cost to Tenant, Tenant shall be permitted to place no more than ▮▮▮ storage trailer(s) at the rear of the Premises, subject to compliance with Applicable Laws, during the months of ▮▮▮▮▮▮▮▮▮▮▮▮ so long as such storage trailers do not impede access to the Shopping Center or other tenant's premises.

4. Mechanic's, Judgment and Other Liens. Should any mechanic's lien, judgment lien or other lien or affidavit claiming a lien be filed against the Premises or any portion thereof or interest therein for any reason whatsoever incident to the acts or omissions of Tenant, its agents or contractors, Tenant shall cause the same to be canceled and discharged of record by payment, bonding, or otherwise, within thirty (30) days after notice by Landlord. Should any mechanic's lien, judgment lien or other liens or affidavits claiming liens be filed against the Shopping Center or any portion thereof or interest therein for any reason whatsoever incident to the acts or omissions of Landlord, its agents or contractors or any other tenant of the Shopping Center which has a material and adverse effect upon Tenant's ability to operate in the Premises, and Tenant's rights under this Lease, Landlord shall promptly cause the same to be canceled and discharged of record by payment, bonding, or otherwise, and in all events within thirty (30) days after notice from Tenant. If Tenant, fails to discharge any such lien or claim of lien in accordance with the requirements of this Section (including payment or bonding) or if prior to the deadline for performance set forth herein Landlord in good faith determines that the failure to act could have a material and adverse effect upon its interests in the Shopping Center, , then Landlord shall have the right, but not the obligation, to take such actions as are reasonably necessary to avoid any material and adverse effect from the filed lien and all costs and expenses incurred in connection with such actions shall be charged to Tenant for failing to discharge the lien as required. Likewise, if Landlord fails to discharge any such lien or claim of lien, in accordance with the requirements of this Section (including payment or bonding), or if prior to the deadline for performance set forth herein, Tenant in good faith determines that the failure to act will have a material and adverse effect upon on Tenant's ability to operate in the Premises, then Tenant shall have the right, but not the obligation, to take such actions as are reasonably necessary to avoid any material and adverse effect on Tenant's ability to operate in the Premises from the filed lien and all costs and expenses incurred in connection with such actions shall be charged to Landlord for failing to discharge the lien as required. In addition, if either Landlord or Tenant is named in a lawsuit to foreclose any lien arising from the acts or omissions of the other party or following a failure by the other to discharge any lien as required by this Section, then Landlord or Tenant, as applicable, shall be entitled to recover all costs and expenses incurred in answering and defending such lawsuit.

5. Recording. Contemporaneously with the execution of this Lease, Landlord and Tenant shall execute a Memorandum of Lease in substantially the form of Exhibit G, with such changes as may be necessary under Applicable Law to enable such Memorandum to be recorded in the real property records of the County or other appropriate jurisdiction where the Land is located. The Memorandum may be recorded by Tenant, at Tenant's expense. If Tenant elects to record the Memorandum of Lease, Tenant does hereby agree that upon the expiration or early termination of this Lease, Tenant, at its sole cost and expense, shall have the Memorandum removed from the records. If Tenant fails to remove said Memorandum from the records, Landlord shall have the right to remove said Memorandum from property records, at Tenant's sole cost and expense. Tenant shall pay Landlord for the costs incurred by Landlord to remove the Memorandum from property records within thirty (30) day following Landlord's demand for payment. Tenant's obligation to observe and perform the provisions of this Section W.5 shall survive the expiration of the Term or earlier termination of this Lease.



6.    Severability. In the event that any provision or section of this Lease is rendered invalid by the decision of any court or by the enactment of any law, ordinance or regulation, such provision of this Lease shall be deemed to have never been included therein, and the balance of this Lease shall continue in effect in accordance with its terms.

7.    Attorneys' Fees. In the event of any legal proceeding arising out of a dispute among Landlord and Tenant with regard to enforcement of any provision of this Lease, the substantially prevailing party will be entitled to an award of its reasonable attorneys' fees, costs and expenses from the substantially non-prevailing party. In addition, in the event it shall be reasonably necessary for either Landlord or Tenant to appear in a bankruptcy, foreclosure or mechanics' lien proceeding affecting the Premises or the Shopping Center as a result of the circumstances, actions or inactions of the other party, the appearing party shall be entitled to recover its attorneys' fees, costs and expenses from the party whose circumstances, actions or inactions necessitated the appearance. To the extent any such attorneys' fees are not paid within thirty (30) days following receipt of an invoice therefor, the party incurring such costs shall be entitled to offset the fees, costs and expenses against Rent or other amounts owing by such party, by taking a credit against █████████ of Rent commencing with the next installment(s) of Rent which become due and continuing until the offset has been reimbursed in full.

8.    Jury Trial and Jurisdiction. In the event of a dispute, Landlord and Tenant agree to waive the right to jury trial. This Lease will be construed and enforceable in accordance with the laws of the State where the Premises are located. Any legal proceedings brought by Landlord or Tenant against the other must be filed in the highest court with general jurisdiction where the rules of civil procedure for the State where the Premises are located will apply.

9.    Waiver of Punitive Damages. Neither Landlord nor Tenant shall be liable to the other under any theory of tort, contract, strict liability, indemnity (including, but not limited to indemnity by contract) or other legal or equitable theory for any punitive or special damages, each of which is expressly waived and excluded by the parties regardless of whether or not any party has been advised of the possibility of such damages under any circumstances. The foregoing waiver is not intended to be a waiver of either party's right to be indemnified in accordance with Section M if any such damages are claimed by a third party.

10.   Force Majeure. Force Majeure shall mean unforeseeable and extraordinary delays caused by events over which the party claiming Force Majeure has no control, including shortages of materials, natural resources or labor; fire; natural catastrophe; labor strikes; civil commotion; riots; war; acts of God; governmental prohibitions or regulations or administrative delays that exceed the ordinary and foreseeable requirements for obtaining building permits, provided that Tenant has delivered its final plans to Landlord in accordance with the provisions contained in this Lease, and Tenant has filed for said permits within five (5) days following Landlord's approval of Tenant's final plans for the Premises and thereafter diligently pursues the issuance of said permits, certificates of occupancy or their equivalents; inability to obtain materials; or any and all other extraordinary causes (but not including financial inability). Therefore, if an event of Force Majeure occurs, neither party shall have any liability to the other for non-performance of the affected provision of this Lease. Neither party shall be in default under this Lease for failure to perform due to Force Majeure. If an event of Force Majeure occurs, the period of time Landlord or Tenant has for performance as provided in this Lease shall be extended one day for each day performance is delayed by such event of Force Majeure. The provisions of this Section shall apply to each and every provision of this Lease, regardless of whether any specific provision makes reference to Force Majeure delays.



11. No Partnership. Landlord and Tenant do not, in any way or for any purpose, become partners in the conduct of their respective businesses by virtue of this Lease.

12. Section Headings. Section headings are inserted only as a matter of convenience and for reference and in no other way define, limit, or describe the scope or intent of this Lease or in any way affect the meaning of this Lease.

13. Lease Inures to the Benefit of Assignees; No Third Party Beneficiaries. This Lease and all of the covenants, provisions, and conditions herein contained shall inure to the benefit of and be binding upon the heirs, personal representatives, successors, and assigns respectively, of the parties hereto, provided, however, that no assignment by, from, through, or under Tenant in violation of the provisions hereof shall vest in the assigns any right, title, or interest whatsoever, and no assignment by Landlord shall be valid unless such assignment is made to the then current fee simple owner of the Shopping Center. There are no intended third party beneficiaries of this Lease. This Lease shall not confer rights or benefits, including third-party beneficiary rights or benefits to anyone that is not a named party to this Lease,

14. No Presumption Against Drafter. Both parties have freely negotiated this Lease. In any controversy, dispute, or contest over the meaning, interpretation, validity, or enforceability of this Lease or any of its terms or conditions, there shall be no inference, presumption, or conclusion drawn whatsoever against either party by virtue of that party having drafted this Lease or any portion thereof.

15. Authority to Sign Lease. Landlord and Tenant each severally represents that this Lease has been duly authorized by all required corporate, partnership or limited liability company action, as applicable, and that the individuals executing this Lease on behalf of Landlord and Tenant, respectively, have been duly authorized to do so.

16. Entire Agreement. This Lease and the exhibits attached hereto set forth all the covenants, promises, agreements, conditions, and understandings between Landlord and Tenant concerning the Premises, and there are no covenants, promises, agreements, conditions, or understandings, either oral or written, between them other than as herein set forth. No subsequent alteration, amendment, change, or addition to this Lease shall be binding upon Landlord or Tenant unless reduced to writing and signed by duly authorized officers or other duly authorized representatives of both parties.

17. Landlord's Form of Ownership. Intentionally Deleted.

18. Radon Gas Disclosure. Intentionally Deleted.

19. Incorporation by Reference. All exhibits, schedules and attachments to this Lease referred to in this Lease are incorporated into this Lease by reference and made a part of this Lease.

20. Remedies. All rights and remedies of Landlord and Tenant under this Lease or at law are cumulative, and the exercise of one or more rights or remedies shall not exclude or waive the right to the exercise of any others. All rights and remedies may be exercised and enforced concurrently, whenever and as often as desirable.

21. Ownership. If the ownership of the Shopping Center is in a Real Estate Investment Trust, then Landlord and Tenant agree that Minimum Annual Rental, Percentage Rental and all additional rental paid to Landlord under this Lease (collectively referred to in this Article as "Rent") shall qualify as "rents from real property" within the meaning of Section 856(d) of the Internal Revenue Code of 1986, as amended (the "Code") and the U.S. Department of Treasury Regulations (the "Regulations"). Should the Code or the Regulations, or interpretations of them by the Internal Revenue Service contained in



Revenue Rulings, be changed so that any Rent no longer qualifies as "rent from real property" for the purposes of Section 856(d) of the Code and the Regulations, other than by reason of the application of Section 856(d)(2)(B) or 856(d)(5) of the Code or the Regulations, then Rent shall be adjusted so that it will qualify (provided however that any adjustments required pursuant to this Article shall be made so as to produce the equivalent Rent (in economic terms for the same applicable time periods) as payable prior to the adjustment).

22.  Waiver Contingency.   As of the date hereof, the Fresh Market and Ulta waiver letters, attached hereto as Exhibit E-1, (collectively, "Waiver Documents") are not executed. This Lease is contingent upon full execution of the Waiver Documents without any revisions that would impose adverse exclusives, easements or restrictions impacting Tenant's Premises or its Permitted Use except as already set forth in Exhibit E-1 attached hereto. Landlord shall diligently pursue such execution. Upon Tenant's receipt of the executed Waiver Documents, Landlord and Tenant shall execute an amendment to this Lease whereby this contingency shall be nullified and Exhibit E-1 shall be replaced by the executed Waiver Documents. If (i) the Waiver Documents are not executed and received by Tenant on or before the Waiver Contingency Date; or (ii) either or both of the Waiver Documents have been modified and Tenant, in its reasonable business judgment, deems that the modifications violate this contingency clause, then Tenant shall have the right to terminate this Lease. If this Lease is terminated as provided herein, the termination shall be effective thirty (30) days after the date of such notice and Landlord shall reimburse Tenant for all reasonable costs and expenses incurred by Tenant through the date of such termination. Such right to terminate shall be a continuous right until Tenant receives the satisfactory, executed Waiver Documents.

23.  Waiver.  The failure by Landlord or Tenant to insist upon strict performance by the other of any of the covenants, conditions, provisions, rules and regulations and agreements in this Lease, or to exercise a right, shall not be a waiver of any rights or remedies and shall not be a waiver of a subsequent breach or default. A surrender of the Premises shall not occur by Landlord's acceptance of Rent or by other means unless Landlord accepts the surrender in writing. A payment by Tenant or receipt by Landlord of an amount less than the monthly Rent shall not, nor shall the endorsement, statement, check, letter accompanying a check or payment of Rent, be an accord and satisfaction. Landlord may accept a check or payment without prejudice to its right to recover the balance of rental due and pursue any other remedy.

**-BALANCE OF PAGE INTENTIONALLY LEFT BLANK -**



IN WITNESS WHEREOF, Landlord and Tenant have caused this Lease to be signed as of the date and year first above written.

**LANDLORD**

**PINNACLE HILLS, LLC,**
a Delaware limited liability company

By: _____
　　　Authorized Signatory

FEIN # _____

Date _____May 24, 2019_____

APPROVAL

Landlord's Acknowledgment

STATE OF __Illinois__ )
　　　　　　　　　　 ) SS.
COUNTY __Cook__ )

The foregoing instrument was acknowledged before me, a Notary Public, this __24th__ day of __May__, 2019, by __Kristen N. Pate__, the __Authorized Signatory__ of __Pinnacle Hills, LLC__.

_____
NOTARY PUBLIC

OFFICIAL SEAL
KATHLEEN FABRE
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES JUN. 01, 2021



**TENANT**

**DOLLAR TREE STORES, INC.,**
a Virginia corporation

By _____

Name _____ Bruce A. Walters _____
        Chief Development Officer
Title _____

FEIN # 54-1387365

Date _____ May 16, 2019 _____


Tenant's Acknowledgment

STATE OF VIRGINIA

                                    ) SS.

CITY OF CHESAPEAKE

    The foregoing instrument was acknowledged before me, a Notary Public, this __16th__ day of
_____May_____, 2019, by _Bruce A. Walters_, the _Chief Development Officer_ of
Dollar Tree Stores, Inc.



_Jacqueline Davidson Paulsen_
NOTARY PUBLIC

**EXHIBIT A**

SITE PLAN









- - - - - - - EXIT TRUCK ROUTE

LOADING AREA

MALCO
42,860 SF

Brookfield
Properties

PINNACLE HILLS PROMENADE
2203 PROMENADE BOULEVARD
ROGERS, ARKANSAS 72758

SITE PLAN

SP1

**EXHIBIT A-1**

PROTECTED DRIVE AISLES



PERMANENT ACCESS DRIVE

NO BUILD AREA

PREMISES

**Brookfield Properties**

PINNACLE HILLS PROMENADE
2203 PROMENADE BOULEVARD
ROGERS, ARKANSAS 72758

DESCRIPTION
LEASE PLAN
POWER
CENTER

SHEET NO.
LP2

DATE: October 2018

## EXHIBIT A-2

### LEGAL DESCRIPTION

Tract 1:
Lots 7 of the Pinnacle Hills Promenade Subdivision, Rogers, Benton County, Arkansas, as shown on Plat Record 2006 at Pages 1356 to 1364.

**Beneficial Easements and Rights of First Refusal as contained in the following:**

Restrictive Covenant Agreement by and between Rogers Retail, LLC, a Delaware limited liability company, GGP-Rogers Retail LLC, a Delaware limited liability company, Hunt Schwyhart Graham VI, LLC, a Delaware limited liability company, Great Northwest Development, LLC, an Arkansas limited liability company and HSG Holdings, LLC, recorded October 10, 2005 in Deed Book/Page 2005 54722.

Construction, Operation and Reciprocal Easement Agreement by and between Rogers Retail, LLC and Dillard's Dollars, Inc., filed May 19, 2006 in Deed Book/Page 2006 129634, among the land records of Benton County, Arkansas, as assigned by Assignment and Assumption of Construction, Operation and Reciprocal Easement Agreement by and between Rogers Retail, LLC and Pinnacle Hills, LLC, filed November 21, 2006 in Deed Book/Page 2006 55885 (Lots 1, 3, 4), Assignment and Assumption of Construction, Operation and Reciprocal Easement Agreement by and between Rogers Retail, LLC and Pinnacle South, LLC, filed November 21, 2006 in Deed Book/Page 2006 55895 (Lot 7) and Assignment and Assumption of Construction, Operation and Reciprocal Easement Agreement by and between Pinnacle South, LLC and Pinnacle Hills, LLC, filed March 19, 2012 in Deed Book/Page 2012 44552 (Lot 7).



**EXHIBIT B**

<u>BASIC BUILDING REQUIREMENTS</u>

See Attached



*REVIEWED*

*By Debra B. Contreras AIA at 4:50 pm, Mar 19, 2019*

Page 9

## EXHIBIT B

### BASIC BUILDING REQUIREMENTS

i.      The building in which the Premises are situated is free of graffiti, **freshly painted** and has been cleaned;

*Existing panel will remain in place until tenant panel is available on site.*

ii.     Landlord has completed construction of the pylon sign(s) on the Land in accordance with the requirements of Exhibit D attached hereto or if there are existing pylon signs on which Tenant will install any panel, Landlord has completed such work, if any, as is necessary to enable Tenant to install and light its panels, including removing any existing panel in the space to be occupied by Tenant;

*Parking lot lights are existing and will not be altered.*

iii.    The parking lot and all drive aisles serving the Premises from public streets and adjacent property are complete, including (a) all paving and striping required to satisfy applicable laws, and (b) all required parking lot lighting. Parking lot lights shall be a minimum of five (5) foot candles. In order for the delivery date to occur, Landlord shall have installed adequate pole and wall lighting for night vision at all entries, parking areas and dumpster areas and all such lights shall be connected, tested and ready to energize. In addition, the paved surface of the rear drive aisle serving the building must be within five feet (5') of Tenant's delivery door;

iv.     The pedestrian walkways adjacent to the Premises and the walkways, if any, providing access to the Premises from the parking lot serving the Premises are complete, free of debris, clean and accessible;

v.      All utilities, including (A) water, (B) gas, (C) sewer, (D) electricity (600 amps), (E) telephone service, and (F) the fire sprinkler system, including monitoring panel, the fire alarm system, including the fire alarm monitoring panel, have been separated and brought to the Tenant's designated point of connection to the Premises and are in good working order, in compliance with current Applicable Law for retail use and of sufficient standards and capacity to enable Tenant to complete Tenant's Work without the need for modification or enhancement;

vi.     Landlord is not aware of any open permits or other conditions that would prevent Tenant from obtaining a permanent and unconditional certificate of occupancy for Tenant's intended use (or its equivalent) from the governmental authority having jurisdiction upon the completion of Tenant's Work, and if applicable, the Premises are zoned to enable Tenant to occupy the Premises for the operation of a Dollar Tree retail store;

vii.    The previous tenant's signs have been removed from the sign band on the exterior of the Premises and from the interior of the Premises with any resulting damage to the sign band or Premises repaired, including necessary patching and painting;

viii.   The following conditions have been satisfied:

(a)     The Premises are in compliance with all applicable laws and there are no pending violations with governmental authorities which have not been satisfied, "closed out" or otherwise resolved;

(b)     To the extent necessary to enable Tenant to obtain Tenant's Permits without delay, complete Tenant's Work and open and operate for the Permitted Use, the Shopping Center is in compliance with all Applicable Laws and there are no pending violations with governmental authorities which have not been satisfied, "closed out" or otherwise resolved;

(c)     The building and its foundations (including the walls and floor slab) are structurally sound, with floor load capacity of at least 100 pounds per square foot, and the floor slab and/or

Version 11/17/17

No changes

Page 10

floor decking of the Premises is smooth, level to industry standards and ready for covering and/or polishing;

(d)    The roof is structurally sound and water tight;

Item (e) note about
warranty is no longer (e)    The HVAC System is: ~~EXISTING AND OPERATIONAL,~~ AS IS *[handwritten notations]*
applicable.

(f)    No asbestos or Hazardous Materials exist within the Premises and Landlord has satisfied its obligations under Section V.2 of this Lease;

(g)    All doors and plate glass of the Premises are in good working order without cracks or holes;

(h)    If required by Applicable Law, Landlord has constructed a trash enclosure sufficient for Tenant's dumpsters in the location identified on the Site Plan; and

(i)    If Tenant is required to submit an engineered site plan in order to apply for and/or obtain Tenant's Permits, Landlord has delivered to Tenant an engineered site plan for the Shopping Center prepared in accordance with applicable governmental standards and criteria no later than (1) 60 days following the Effective Date or (2) 60 days prior to the Delivery Date. This site plan shall have included "WB-67" truck templates, to scale, at each turn or change in vehicle direction and such other matters as are required to satisfy applicable governmental requirements for submittal and review of an engineered site plan; and

(j)    There is access to the Premises.

*No Changes [handwritten]*

**EXHIBIT C**

<u>LANDLORD'S WORK</u>

"As Is"



**EXHIBIT D**

<u>TENANT'S SIGN PACKAGE</u>

See Attached



# DOLLAR TREE

## SITE PLAN



NTS

## WORK SCOPE

CL.1  42" CHANNEL LETTERS (QTY. 1)

TO.1  TENANT FACES (QTY. 2)

## CODE ALLOWANCE

2 sq. ft. of sign for every one linear ft.
of frontage not to exceed 400 sq. ft.
each lease space will be a min. of 25 sq. ft.

---

**JONES SIGN**
Your Vision. Accomplished.
WWW.JONESSIGN.COM

JOB #: 241253-R2
DATE: 03.11.2019
DESIGNER: J MILLER
SALES REP:
PROJ MGR: J. MARPLE

| REV | DATE | BY | DESCRIPTION |
|-----|------|----|-----|
| 2 | 03.27.19 | JF | CORRECT SITE PLAN AND MONUMENT |

CLIENT APPROVAL                    DATE

LANDLORD APPROVAL                  DATE

QC                    APPROVED

**DOLLAR TREE**

EXTERIOR SIGNAGE
Pinnacle Hills Plaza
2203 Promenade Blvd
Rogers, AR 72758 USA

DESIGN PHASE: CONCEPTUAL

SHEET NUMBER
1.0

This is an original, unpublished drawing by Jones Sign Co., Inc. It is for your personal use in conjunction with a project being planned for you by JONES SIGN. It is not to be shown to anyone outside of your organization, nor is it to be used, reproduced, copied or exhibited in any fashion. Use of this design or the salient elements of this design in any sign dome by any other company, without the express written permission of JONES SIGN, is forbidden by law and carries a civil forfeiture of up to 25% of the purchase price of the sign. JONES SIGN will endeavor to closely match colors, including PMS, where specified. We cannot guarantee exact matches due to varying compatibility of surface materials and paints used. All sizes and dimensions are illustrated for client's conception of project and are not to be understood as being exact size or exact scale.



PROPOSED ELEVATION

SCALE: 1/8"=1'

SW AESTHETIC WHITE
/ STO SMOKED PUTTY

| JONES SIGN<br>Your Vision, Accomplished.<br>WWW.JONESSIGN.COM | JOB # 241253-R2<br>DATE: 03.11.2019<br>DESIGNER: J MILLER<br>SALES REP:<br>PROJ. MGR: J. MARPLE | REV. 2 · DATE 03.27.19 · BY JP · DESCRIPTION CORRECT SITE PLAN AND MONUMENT | CLIENT APPROVAL / DATE<br>LANDLORD APPROVAL / DATE<br>QC APPROVED | DOLLAR TREE | EXTERIOR SIGNAGE<br>Pinnacle Hills Plaza<br>2203 Promenade Blvd<br>Rogers, AR 72758 USA<br>DESIGN PHASE: CONCEPTUAL | SHEET NUMBER<br>2.0 |
|---|---|---|---|---|---|---|

This is an original, unpublished drawing by Jones Sign Co., Inc. It is for your personal use in conjunction with a project being planned for you by JONES SIGN. It is not to be shown to anyone outside of your organization, nor is it to be used, reproduced, copied or exhibited in any fashion. Use of this design or the salient elements of this design in any sign done by any other company, without the express written permission of JONES SIGN, is forbidden by law and carries a civil forfeiture of up to 25% of the purchase price of the sign. JONES SIGN will endeavor to closely match colors, including PMS, where specified. We cannot guarantee exact matches due to varying compatibility of surface materials and paints used. All sizes and dimensions are illustrated for client's conception of project and are not to be understood as being exact size or exact scale.



## CL.1 42" FACE LIT CHANNEL LETTERS (DT1CL42-261-5LS) (Qty 1)

SQUARE FOOTAGE: 121.92
ALLOWABLE SQUARE FOOTAGE: 180.4
FIELD SURVEY REQUIRED



EXISTING ELEVATION                                    SCALE: N.T.S.



PROPOSED ELEVATION                                   SCALE: NTS



Scale: 3/16" = 1'-0"



ESTIMATED PRODUCT B.O.M. PER SIGN:
238    Each Prism Green Modules – 159'
PN:    701269–GRSJ1–MB
4       Each 60C1 (Damp/Dry locations) or Modular 60 (Wet location) 60W
        Power Supplies 12VDC
1       Each 100' Roll of Jacketed Cable

### SPECIFICATIONS

- LETTER FACES: WHITE ACRYLIC W/ APPLIED VINYL FIRST SURFACE
- RETURNS / TRIMCAP: DURANODIC BRONZE
- ILLUMINATION: GREEN L.E.D. MODULES

### MATERIALS/FINISHES

V-2  3M 3630-156 VIVID GREEN
      First Surface

F-1  BRONZE
      Returns and Trim Cap

M-1  WHITE ACRYLIC
      White Faces



EVENING VIEW                                         SCALE: N.T.S.

This is an original, unpublished drawing by Jones Sign Co., Inc. It is for your personal use in conjunction with a project being planned for you by JONES SIGN. It is not to be shown to anyone outside of your organization, nor is it to be used, reproduced, copied or exhibited in any fashion. Use of this design in any sign done by any other company, without the express written permission of JONES SIGN, is forbidden by law and carries a civil forfeiture of up to 25% of the purchase price of the sign. JONES SIGN will endeavor to closely match colors, including PMS, where specified. We cannot guarantee exact matches due to varying compatibility of surface materials and paints used. All sizes and dimensions are illustrated for client's conception of project and are not to be understood as being exact size or exact scale.



| JOB # 241253-R2 | | | | | CLIENT APPROVAL | DATE | | | EXTERIOR SIGNAGE | SHEET NUMBER |
|---|---|---|---|---|---|---|---|---|---|---|
| DATE 03.11.2019 | REV | DATE | BY | DESCRIPTION | | | | | Pinnacle Hills Plaza | |
| DESIGNER: J MILLER | | | | CORRECT SITE PLAN AND MONUMENT | LANDLORD APPROVAL | DATE | | | 2203 Promenade Blvd | 3.0 |
| SALESREP: | | | | | | | | | Rogers, AR 72758 USA | |
| PROJECT #: J MARPLE | | | | | QC | APPROVED | | | DESIGN PHASE: CONCEPTUAL | |

JONES SIGN
Your Vision. Accomplished.
WWW.JONESSIGN.COM

## CL.1 FACE LIT CHANNEL LETTERS



PREFINISHED .040" BRONZE ALUMINUM RETURNS

.125" X 1" PRE-FINISHED BRONZE TRIM CAP
CHEMICALLY BONDED TO FACES

3/16" 7328 WHITE ACRYLIC FACES W/
**3M 3630-156 VIVID GREEN VINYL**
1ST SURFACE APPLIED

SLOAN PRISM GREEN LED
MODULES: "DOLLAR TREE"

ACM BACKS

PRIMARY ELECTRICAL FEED IN ½"
WEATHER TIGHT FLEX CONNECTOR

U.L., MANUFACTURER, AND VOLTAGE/AMPERAGE
TAGS ON RETURNS

1/4" WEEP HOLE (ONE PER EACH LOW
SPOT IN LETTERS)

5"

MOUNTING HARDWARE TO SUIT
WALL (SEE MOUNTING TABLE)

### GENERAL NOTES:
-U.L. LISTED
-ALL ELECTRICAL WORK SHALL BE PERFORMED IN
ACCORDANCE WITH "NEC" REF. SECTION 600.4
-ALL ELECTRICAL SIGN SECTIONS TO HAVE U.L. LABEL
IN ACCORDANCE WITH "NEC" 600.4 AND MANUFACTURERS
LABEL LOCATED NEXT TO DISCONNECT SWITCH
-ALL NON-CURRENT CARRYING METAL PARTS OF SIGN
SHALL BE GROUNDED & BONDED IN ACCORDANCE WITH
"NEC" 250
-ALL WIRING CONTAINED IN ENCLOSED AREAS WITH
LAMPS SHALL BE FIXTURE RATED
-SPLICING OF CONDUCTORS SHALL BE MADE IN
JUNCTION BOXES OR SIMILAR METAL ENCLOSURES
-AT THE POINT THAT ELECTRICAL CABLE PASSES THRU
THE SIGN BOX, IT SHALL PASS THRU A U.L. LISTED
RUBBER GROMMET



U.L. LABELS REQUIRED

THIS SIGN IS INTENDED TO BE INSTALLED IN ACCORDANCE WITH THE
REQUIREMENTS OF ARTICLE 600 OF THE NATIONAL ELECTRICAL CODE
AND/OR OTHER APPLICABLE LOCAL CODES. THIS INCLUDES PROPER
GROUNDING AND BONDING OF SIGN.

NOTE:
A primary disconnect switch shall be externally located at east of sign
as stated in the national electric code section 600.6  (by sign fabricator)

### MOUNTING METHOD TABLE



| PREFERRED MOUNTING METHOD | ALTERNATE MOUNTING METHOD |
|---|---|
| 3/8" THRU BOLTS | MUST BE APPROVED BY JONES SIGN BEFORE USING |
| | 3/8" LAGS W/ EXPANSION SHIELDS (USE ONLY WHEN ACCESS IS NOT AVAILABLE FOR THRU BOLTING) |
| CONCRETE OR CMU | |
| CABINET FRAME OR RACEWAY BAR | 3/8" LAG w/ EXPANSION SHIELD (WHEN ACCESS IS NOT AVAILABLE FOR THRU BOLTING) |
| WASHER ON 2" BACK OF WALL | CONCRETE |
| ZIP SYSTEM | CABINET FRAME OR RACEWAY BAR |
| CABINET FRAME OR RACEWAY BAR | DEPTH OF EMBED |
| 2x4 BACKER ON BACK OF WALL | |



JONES SIGN
Your Vision. Accomplished.
WWW.JONESSIGN.COM



| JOB #: 241253-R2 |
| DATE: 03.11.2019 |
| DESIGNER: J MILLER |
| SALES REP: |
| PROGRAM MGR: J. MARPLE |

| REV. | DATE | BY | DESCRIPTION |
|---|---|---|---|
| 2 | 10.27.16 | JP | CORRECT SITE PLAN AND MOVED EDIT |



| CLIENT APPROVAL | | DATE |
|---|---|---|
| LANDLORD APPROVAL | | DATE |
| QC | | |
| | APPROVED | |



DOLLAR TREE

EXTERIOR SIGNAGE
Pinnacle Hills Plaza
2203 Promenade Blvd
Rogers, AR 72758 USA

DESIGN PHASE: CONCEPTUAL

SHEET NUMBER
**4.0**

This is an original, unpublished drawing by Jones Sign Co., Inc. it is for your personal use in conjunction with a project being planned for you by JONES SIGN. it is not to be shown to anyone outside of your organization, nor is it to be used, reproduced, copied or exhibited in any fashion. Use of this design or the salient elements of this design in any sign done by any other company, without the express written permission of JONES SIGN, is forbidden by law and carries a civil forfeiture of up to 25% of the purchase price of the sign. JONES SIGN will endeavor to closely match colors, including PMS, where specified. We cannot guarantee exact matches due to varying compatibility of surface materials and paints used. All sizes and dimensions are illustrated for client's conception of project and are not to be understood as being exact size or exact scale.



## CL.1 LOGO



PREFINISHED .040" BRONZE ALUMINUM RETURNS

.125" X 1" PRE-FINISHED BRONZE TRIM CAP CHEMICALLY BONDED TO FACES

#8 PAN HD SCREWS PAINTED BRONZE MIN. (1) @ 24" O.C. (TYP) AT ALL LETTERS.

120V 20 AMP SINGLE POLE DISCONNECT SWITCH WITH TOGGLE GUARD AND BOLT "LOCK". UL LABEL APPLIED ADJACENT TO SWITCH.

ACM BACKS

SLOAN PRISM WHITE LED MODULES: LOGO

MINIMUM 18 AWG. LOW VOLTAGE WIRES

PRIMARY ELECTRICAL FEED IN ½" WEATHER TIGHT FLEX CONNECTOR

60W VARIABLE VOLTAGE POWER SUPPLY WITH MINIMUM Ip67 RATING AND U.L. RECOGNIZED. HOUSED IN WATER PROOF "PAIGE" POWER SUPPLY BOX, (OR EQUIVALENT).

PRIMARY TAIL FROM ENCLOSURE MINIMUM 10'-0" LONG.

PRIMARY FEED JUNCTION BOX. POWER MUST BE WITHIN 6' OF SIGN'S FINAL PLACEMENT @ TIME OF INSTALL. FINAL HOOK-UP BY SIGN INSTALLER WHERE PERMITTED BY LOCAL CODE.

3/16" WHITE LEXAN FACES W/ 1ST SURFACE APPLIED VINYL GRAPHICS

3/8" Ø NON-CORROSIVE LAG BOLT AS REQUIRED

1/4" Ø WEEP HOLE (ONE PER EACH LOW SPOT IN LETTERS)

5"

### GENERAL NOTES:

-U.L. LISTED
-ALL ELECTRICAL WORK SHALL BE PERFORMED IN ACCORDANCE WITH "NEC" REF, SECTION 600.4
-ALL ELECTRICAL SIGN SECTIONS TO HAVE U.L. LABEL IN ACCORDANCE WITH "NEC" 600.4 AND MANUFACTURERS LABEL LOCATED NEXT TO DISCONNECT SWITCH
-ALL NON-CURRENT CARRYING METAL PARTS OF SIGN SHALL BE GROUNDED & BONDED IN ACCORDANCE WITH "NEC" 250.
-ALL WIRING CONTAINED IN ENCLOSED AREAS WITH LAMPS SHALL BE FIXTURE RATED
-SPLICING OF CONDUCTORS SHALL BE MADE IN JUNCTION BOXES OR SIMILAR METAL ENCLOSURES
-AT THE POINT THAT ELECTRICAL CABLE PASSES THRU THE SIGN BOX, IT SHALL PASS THRU A U.L. LISTED RUBBER GROMMET



U.L. LABELS REQUIRED
THIS SIGN IS INTENDED TO BE INSTALLED IN ACCORDANCE WITH THE REQUIREMENTS OF ARTICLE 600 OF THE NATIONAL ELECTRICAL CODE AND/OR OTHER APPLICABLE LOCAL CODES. THIS INCLUDES PROPER GROUNDING AND BONDING OF SIGN.

NOTE:
A primary disconnect switch shall be externally located at end of sign as stated in the national electric code section 600.5  (by sign fabricator)

### MOUNTING METHOD TABLE



| PREFERRED MOUNTING METHOD | ALTERNATE MOUNTING METHOD |
|---|---|
| 3/8" THRU BOLT S | MUST BE APPROVED BY JONES SIGN BEFORE USING |
| CONCRETE OR CMU | 3/8" LAGS W/ EXPANSION SHIELDS (USE ONLY WHEN ACCESS IS NOT AVAILABLE FOR THRU BOLTING) |
| CABINET FRAME OR RACEWAY BAR | |
| WASHER ON 2" BACK OF WALL | 3/8" LAG W/ EXPANSION SHIELD (WHEN ACCESS IS NOT AVAILABLE FOR THRU BOLTING) |
| WOOD OR STEEL FRAME | CONCRETE |
| CABINET FRAME OR RACEWAY BAR | CABINET FRAME OR RACEWAY BAR |
| 2x4 BACKER ON BACK OF WALL | DEPTH OF EMBED: |




This is an original, unpublished drawing by Jones Sign Co., Inc. It is for your personal use in conjunction with a project being planned for you by JONES SIGN. It is not to be shown to anyone outside of your organization, nor is it to be used, reproduced, copied or exhibited in any fashion. Use of this design or the salient elements of this design in any sign done by any other company, without the express written permission of JONES SIGN, is forbidden by law and carries a civil forfeiture of up to 25% of the purchase price of the sign. JONES SIGN will endeavor to closely match colors, including PMS, where specified. We cannot guarantee exact matches due to varying compatibility of surface materials and paints used. All sizes and dimensions are illustrated for client's conception of project and are not to be understood as being exact size or exact scale.

**JONES SIGN**
Your Vision. Accomplished.
WWW.JONESSIGN.COM

JOB #: 241253-R2
03.11.2019
J MILLER
J. MARPLE

| REV | DATE | BY | DESCRIPTION |
|---|---|---|---|
| 2 | 03.11.19 | JP | CORRECT SITE PLAN AND MONUMENT |

CLIENT APPROVAL    DATE
LANDLORD APPROVAL    DATE
QC    APPROVED

**DOLLAR TREE**

EXTERIOR SIGNAGE
Pinnacle Hills Plaza
2203 Promenade Blvd
Rogers, AR 72758 USA

DESIGN PHASE: CONCEPTUAL

SHEET NUMBER
5.0

## TO.1 ILLUM TENANT PANEL FACES (Qty 2)
SQUARE FOOTAGE: TBD
ALLOWABLE SQUARE FOOTAGE: N/A



EXISTING ELEVATION
SCALE: N.T.S.



PROPOSED ELEVATION
SCALE: N.T.S.



PROPOSED ELEVATION – NIGHT VIEW
SCALE: N.T.S.



FRONT VIEW
SCALE: TBD



EVENING VIEW
SCALE: N.T.S.

**SPECIFICATIONS**
· INSTALL NEW WHITE PAN FORMED TENANT PANEL WITH
  1ST SURFACE VINYL APPLIED TO FACE, EXACT PLACEMENT
  ON PYLON TO BE VERIFIED

**COLORS/MATERIALS**
- V-1 3M 3630-156 GREEN
  First Surface
- M-2 3/16" 7328 LEXAN
  White Faces



Your Vision. Accomplished.
WWW.JONESSIGN.COM

| JOB #: 241253-R2 |
| DATE: 03.11.2019 |
| DESIGNER: J MILLER |
| SALES REP: |
| PROJ MGR: J. MARPLE |

| REV | DATE | BY | DESCRIPTION |
| 2 | 03.27.19 | JP | CORRECT SIZE PLAN AND MONUMENT |

| CLIENT APPROVAL | DATE |
| LANDLORD APPROVAL | DATE |
| QC | APPROVED |



| EXTERIOR SIGNAGE |
| Pinnacle Hills Plaza |
| 2203 Promenade Blvd |
| Rogers, AR 72758 USA |
| DESIGN PHASE: CONCEPTUAL |

SHEET NUMBER
**6.0**

This is an original, unpublished drawing by Jones Sign Co., inc. it is for your personal use in conjunction with a project being planned for you by JONES SIGN. It is not to be shown to anyone outside of your organization, nor is it to be used, reproduced, copied or exhibited in any fashion. Use of this design or the salient elements of this design in any sign done by any other company, without the express written permission of JONES SIGN, is forbidden by law and carries a civil forfeiture of up to 25% of the purchase price of the sign. JONES SIGN will endeavor to closely match colors, including PMS when specified. We cannot guarantee exact matches due to varying compatibility of surface materials and paints used. All sizes and dimensions are illustrated for client's conception of project and are not to be understood as being exact size or exact scale.

**EXHIBIT E**

EXCLUSIVES and RESTRICTIONS





BEST BUY – Located in Pinnacle West:

**30.2 Exclusivity.** Landlord shall not permit any person or entity other than Tenant (or Tenant's parent company, affiliates, assignees, sublessees and assigns) in space leased directly or indirectly from Landlord within the Shopping Center, to sell, rent, service (including diagnostic testing, maintenance and repair) and/or warehouse (and, if applicable, install in motor vehicles) the Permitted Use Products without Tenant's prior written consent, which may be granted or withheld in Tenant's sole and absolute discretion. Further, Landlord agrees that as long as Tenant is operating as a consumer electronics store from the Premises (and for the purposes of this Article 30.2 , Tenant shall be considered to be operating as a consumer electronics store even during periods during which the Premises may be temporarily closed for the purposes of remodeling, repair, conducting inventory or similar temporary closures) and subject to all exceptions as hereinafter set forth, Landlord shall not lease or permit, directly or indirectly, any space in the area identified on Exhibit B as the "Extended Shopping Center" to any other multi-product line consumer electronics store in excess of six thousand (6,000) square feet, including, but not limited to: Circuit City, The Good Guys, Incredible Universe, WOW, Media Play, CompUSA or Computer City. Notwithstanding the foregoing, this restriction shall not be applicable within the Extended Shopping Center to full line department or full-line discount department stores occupying in excess of 75,000 square feet (such as Dillard 's, J.C. Penney, Sears, Costco or Wal-Mart). "Landlord," for purposes of this Article, shall be defined to include Landlord, and (i) if Landlord is a corporation, its principal shareholders; or (ii) if Landlord is a partnership, its partners and any principal shareholders or partners of any partner which is a corporation or shareholder; or (iii) if Landlord is a trust, the beneficiaries of any such trust, including the principal shareholders or partners of any beneficiary which is a corporation or trust, all of whom shall execute an agreement to be bound to this Article. In no event shall Tenant be bound by any exclusives granted by Landlord to any other party or occupant without Tenant's prior written consent, which may be granted or withheld in Tenant's sole and absolute discretion.





DSW:

37.02 To the fullest extent permitted by law and as a condition and inducement to Tenant to enter into this Lease, Landlord agrees that Landlord will not, subsequent to the date of this Lease, lease, rent, occupy or permit to be occupied any space in the Power Center (and any enlargement or expansion thereof) to be used for the following uses (any use which is prohibited, restricted or limited by the provisions of this Section 37.02 or Section 37.03 hereof shall herein be referred to as "Prohibited Uses"): the operation of a bingo parlor; an adult book or adult video store (defined for the purposes hereof as a store devoting ten percent (10%) or more of its floor space to offering books and/or video materials for sale or for rent which are directed to or restricted to adult customers due to sexually explicit subject matter or for any other reason making it inappropriate for general use) or an adult theater or "strip-tease" establishment; a bowling alley within two hundred (200) feet of the Leased Premises; a warehouse; a car wash; a pawn shop; for industrial or manufacturing purposes; a carnival, circus or amusement park; a gas station; a facility for the sale of paraphernalia for use with illicit drugs; a funeral home or mortuary; a blood bank; a gambling establishment; a banquet hall, auditorium or other place of public assembly (other than a community meeting room not exceeding ten thousand (10,000) square feet of area operated by Landlord or Landlord's management company); a second hand o surplus store (Second Hand Store shall not include the following a first-class retail establishment selling antiques, or a retail operation with at least twenty (20) locations under the same trade name and that operates substantially like Play-it-Again Sports, Buy Backs, Game Slop, Half Price Books, Disc Go Round, Once Upon A Child, Plato's Closet, or Clothes Mentor); a gun range; an establishment selling fireworks; any veterinary hospital or animal raising facility (excluding any pet store); storage of goods not to be sold from the Power Center (Landlord shall be allowed to create storage space in the Power Center for lease to tenant's located in the Development provided that the total storage space in the Power Center shall not exceed 3,000 square feet); a gym, health club, health spa or studio larger than four thousand (4,000) square feet within three hundred (300) feet of the Leased Premises; a restaurant, bar, tavern or cocktail lounge, billiard or pool hall, game parlor or video arcade (which shall be defined as a store containing more than five (5) electronic games) within three hundred (300) feet of the Leased Premises, a "**training facility**" (as hereinafter defined); an "**entertainment or recreational facility**" (as hereinafter defined) within three hundred (300) feet of the Leased Premises; an automotive maintenance or repair facility (except as an accessory use to another business operation such as, but not limited to, "Sears", "Costco", "Wal-Mart", etc., and such restriction shall not apply to the installation or repair of automotive audio systems); a flea market; a central laundry or thy cleaning plant; a facility for the sale or display of new or used boats, motor vehicles or trailers; or any facility which is illegal or dangerous, constitutes a nuisance, emits offensive odors, fumes, dust or vapors or loud noise or sounds or is inconsistent with a community oriented first-class shopping centers in the metropolitan area of the City and State where the Power Center is located. For purposes of this Section 37.02, the term "training facility" shall refer to a beauty school, barber college, reading room (excluding book stores), place of instruction or any other operation catering primarily to students or trainees as opposed to customers located within three hundred (300) feet of the Leased Premises. For purposes of this Section 37.02, an "entertainment or recreational facility" shall refer to a movie or live theater or cinema (other than the existing Malco Pinnacle Hills Theater currently operating at the Power Center), skating rink, dance hall or night club, massage parlor or any other similar facility operated solely for entertainment purposes (such as a "laser tag" or "virtual reality" theme operation) and located within three hundred (300) feet of the Leased Premises. In addition, the total square footage of all medical, dental, professional or business offices shall not exceed ten percent (10%) of the gross leasable square footage of the Power Center.







HAVERTYS:

9.1 Exclusive Use. So long as Tenant has not defaulted on any of the material terms, covenants or conditions of this Lease beyond any applicable notice and cure periods and Tenant is open and operating the exclusive use in the Space, Landlord hereby covenants and agrees that, without the prior written approval of Tenant, which Tenant may withhold in its sole discretion, Landlord will not lease, rent, occupy, or permit to be occupied, any space or premises in the Project (and any enlargement or expansion thereof) to any business or operation engaged primarily in the sale of furniture (including mattresses) and related accessories, including without limitation, any discount retail furniture store or any outlet-type furniture store or store engaged in the sale of furniture on a discount or clearance basis, any store or business engaged in the sale of bedding and/or mattresses, or a manufacturer direct or catalogue furniture store. Tenant acknowledges that Bed Bath & Beyond has an existing exclusive set forth in Exhibit G.

4.     Prohibited Uses. To the full extent permitted by law and as a condition and inducement to enter into the Lease, Landlord and Tenant agree that neither Landlord nor Tenant will lease, rent, occupy or permit to be occupied any premises in the Landlord's Parcel (and any enlargement or expansion thereof) to be used: in a manner that causes any nuisance, loud noises or offensive odors; as a manufacturing facility (except for the manufacture of such goods which are required as necessary incident to the conduct of a particular retail mercantile business); as a liquidation outlet, consignment store (excluding stores carrying incidental consignments), pawn shop, or second-hand store whose principal business is selling used merchandise, except for first-class consignment shops such as Plato's Closet, Game Stop, and Play-It-Again-Sports; as a massage parlor or modeling studio, except for first-class therapeutic massage providers, such as Massage Envy; as an adult book store or sexually-oriented shop or so-called "head shop"; as an adult entertainment club, nightclub, dance club/hall, or cocktail lounge; for the sale of alcoholic beverages, whether packaged or not, except in conjunction with a restaurant (i) deriving not more than forty percent (40%) of its gross revenues from the sale of liquor, beer and wine, and (ii) which does not promote itself as a sports bar, except that incidental sales of liquor, beer, and/or wine in full-line grocery stores shall be permitted; in the Parking Intensive Zone shown on Exhibit B, as a movie theater, bowling alley, skating rink, carnival, bingo parlor, arcade or any other business using loud speakers; as a coin operated laundry; as a church or similar use; for any fire, auction, lost lease, quitting business or bankruptcy sale, and any signage or advertisement for such (however, inventory liquidation sales are permitted); in the Parking Intensive Zone shown on Exhibit B, as a gymnasium, exercise studio, or fitness club/center; as a mobile home park, trailer camp or junkyard; for any dumping, disposing, incineration or reduction of garbage (other than dumpsters located in the rear of any building and otherwise properly screened from view); as a central laundry or any laundromat; for any automobile, truck, trailer or R.V. sales, leasing, display or repair; as a coin-operated car wash; as a full service carwash or gas station; as a flea market or establishment which sells used merchandise or second hand goods; in the Parking Intensive Zone shown on Exhibit B, as a "drive-through" fast-food restaurant; as a funeral parlor; in the Parking Intensive Zone shown on Exhibit B, as a sports bar or any "family entertainment" club or facility, such as Chuck-E-Cheese, Dave and Busters, Discovery Zone, or ESPN Zone.







## LONGHORN STEAKHOUSE – Located in Pinnacle Hills West:

Section 30.01. Steak Restaurant Exclusive. During the Term, provided that Tenant is constructing or operating a "LongHorn Steakhouse" restaurant on the Demised Premises, Landlord will not permit (unless Landlord's permission may not be legally withheld) any space in the Shopping Center, to be used or conveyed for use as a full-service, sit-down restaurant featuring or specializing in the sale, at retail, of steaks (hereinafter referred to as the "Exclusive Use"). For purposes of this paragraph, 31 "featuring or specializing" means that steak items comprise, or will comprise, twenty-five percent (25%) or more of the total number of appetizers and entrées listed on the menu at the subject restaurant. The foregoing restriction will not be applicable to (a) any holder of a possessory interest within the Shopping Center as of the Effective Date whose vesting instrument (i.e., deed or lease) permits the Exclusive Use and/or does not require consent by Landlord prior to any change in such holder's use of its space to the Exclusive Use, which interest may be renewed, extended, assigned or sublet, or (b) the sale of unprepared food items intended for off-premises consumption. The foregoing restriction will run with the land. For purposes hereof, temporary closures of TenanUs business in accordance with the terms and conditions of this Lease will not be deemed a failure to be operating. Section 30.02. Restaurant Exclusive. During the Term, provided that Tenant is constructing or operating a "LongHorn Steakhouse" restaurant on the Demised Premises, Landlord will not permit (unless Landlord's permission may not be legally withheld) any space on the Adjacent Parcel, to be used or conveyed for use as a restaurant of any type in excess of ten thousand (10,000) square feet of enclosed space. And, Landlord will not permit (unless Landlord's permission may not be legally withheld) any space on the Adjacent Parcel to be used or conveyed for use as a restaurant of any type unless there are no less than fifteen (15) parking spaces per one thousand (1,000) square feet of floor area for such use, excluding all parking spaces on the Demised Premises and excluding all parking spaces on the Best Buy Parcel.

## PETSMART:

2. Tenant's Primary Business. As used in the Lease, the term "Tenant's Primary Business" shall mean the retail sale of (i) pets (including but not limited to fish, birds, reptiles, dogs, cats and other small animals), (ii) food, accessories and other products relating to pets and animals, including equestrian products and apparel related thereto, (iii) services related to pets and animals, such as care, grooming, boarding, animal training and obedience classes, pet adoption and veterinary services, (iv) products relating to nature and the environment, and (v) educational products and services related to any of the foregoing, and office and storage uses incidental to the foregoing.







be certified to Landlord by Tenant's chief financial officer.

<u>THE FRESH MARKET – Located in Pinnacle Hills Promenade:</u>

**1.20** **Grocery Items** means foodstuffs and drinks including, without limitation, any or all of the following: (i) dairy products (including, without limitation, milk, yogurt, ice cream, cheese and/or any other items commonly found in a grocery store and/or supermarket dairy section), (ii) produce (including, without limitation, vegetables, fruits and/or any other items commonly found in a grocery store and/or supermarket produce section), (iii) coffee (including, without limitation, whole bean and ground, but not by the cup), tea and candies (including, without limitation, packaged, bulk, and full service chocolates, confections, and other items commonly found in a grocery store and/or supermarket candy section), (iv) nuts, snack mixes, and other bulk food items, (v) bakery products (including, without limitation, fresh breads, desserts and/or any other items commonly found in a grocery store and/or supermarket bakery section), (vi) meat (including, without limitation, beef, pork and poultry), (vii) seafood (including, without limitation, fish, shellfish, and crustaceans), (viii) liquor, beer, wine and/or other alcoholic beverages, (ix) sandwich, deli and convenient meal solution items (including, without limitation, sushi, deli meats, and deli cheeses), and (x) vitamins, herbs and supplements. The term Grocery Items also includes cut flowers, live plants, and pre-made or custom-made baskets containing any of the foregoing or any other fresh or packaged Grocery Items.

**1.23** **Incidental Sales** means the sale of Grocery Items for off-premises consumption, which (i) are incidental to a primary use otherwise permitted by this Lease, (ii) do not aggregately constitute more than ten percent (10%) of such user's total annual gross sales from such location, and (iii) are not aggregately conducted from more than the lesser of (a) five percent (5%) of such user's floor space or (b) five hundred (500) square feet of such user's floor space.

**1.46** **Permitted Nutrition Center** means a nutrition center located within the Permitted Area which (i) primarily sells vitamins, supplements and herbs for health purposes, (ii) occupies no more than two thousand five hundred (2,500) square feet of total floor area, and (iii) does not otherwise violate Tenant's Exclusives or otherwise engage in any Restricted Use or Prohibited Use.

**1.47** **Permitted Stores** means Permitted Food and Drink Establishments, Permitted Candy Stores, Permitted Coffee Shops and Permitted Nutrition Centers.



**1.50  Pre-Existing Tenants** means (i) those Shopping Center tenants (and their successors and assigns) listed as such on Exhibit E attached hereto who are operating only in the locations and for the uses expressly set forth in such Exhibit E, and (ii) with respect to the spaces in the Shopping Center being operated as of the Lease Date and shown on Exhibit A-2 as Restaurant Space #1, Restaurant Space #2, Restaurant Space #3, and Restaurant Space #4, any replacement tenant operating in such spaces as a Food or Drink Establishment (a) which primarily serves prepared food and/or drink from a menu listing or otherwise primarily for on premises consumption, (b) whose sale (excepting Incidental Sales) of Grocery Items for off-premises consumption is limited to carry-out food and/or drink prepared for immediate consumption, (c) whose gross sales of beer, wine, and liquor do not collectively exceed fifty percent (50%) of its total gross sales during any period, (d) which does not otherwise violate Tenant's Exclusives or otherwise engage in any Restricted Use or Prohibited Use, and (e) which occupies not more than seven thousand (7,000) square feet of total floor area, except that such seven thousand (7,000) square foot limitation shall not be applicable to the Restaurant Space #3 nor Restaurant Space #4, whose size limitations shall be not more than nine thousand (9,000) square feet and nine thousand eighty five (9,085) square feet, respectively.

**5.3  Exclusive Use.** On and after the Lease Date, to the extent not prohibited by applicable laws, and except for Pre-Existing Tenants, Permitted Stores, and Incidental Sales, Landlord covenants that no portion of the Shopping Center other than the Premises shall be used as a grocery store and/or supermarket, or for the sale of any Grocery Items for off-premises consumption (collectively hereinafter, "Tenant's Exclusives"). This covenant shall run with the land throughout the Term. Notwithstanding the exclusion of Pre-Existing Tenants from the foregoing covenant, however, to the extent that any such tenant's or occupant's lease provides a conditional right, subject to Landlord's prior approval, to operate for any use which would otherwise violate Tenant's Exclusives, Landlord shall not grant such approval. Notwithstanding the foregoing, however, Tenant's Exclusives shall not apply during any Lapse Period, nor shall Tenant's Exclusives prohibit any non-exclusive rights which Landlord grants to another tenant in writing during any Lapse Period and of which Tenant received prior written notice during such Lapse Period. Upon Tenant's resuming operations within the Premises for the sale of Grocery Items for off-premises consumption, any Lapse Period shall terminate and Tenant's Exclusives shall once again be applicable (subject to the limitations of the previous sentence).

TJ MAXX:

4. (A) Landlord agrees that the Shopping Center shall not be used (a) for any non-retail purposes (repairs, alterations and offices incidental to retailing, and banks and small loan offices, tax preparation offices, optical stores, and skin care salons (provided such skin care salons are limited to seven thousand (7,000) square feet) shall be deemed retail purposes), or (b) for any entertainment purposes such as a bowling alley, skating rink, cinema, bar (except in restaurants where beer, wine and alcohol accounts for less than half of the gross sales), nightclub, discotheque, amusement gallery, poolroom, health club (except in Area G), massage parlor (except as part of a day spa), sporting event, sports or game facility (except on temporary basis, not more than five (5) days per event and not in Tenant's primary parking area), off-track betting club (c) or for any establishment which sells or displays pornographic materials or (d) for any establishment which sells or displays used merchandise or second hand goods. No restaurants or establishments selling food prepared on premises for consumption on or off premises (collectively "restaurant") shall be located within one hundred fifty (150) feet of the Demised Premises and no restaurants in the Shopping Center shall exceed seven thousand five hundred (7,500) square feet in each instance. All restaurants shall be located in Area G. (Collectively the uses described herein are referred to as the "Prohibited Uses"). Provided the Landlord is not in default of this Section 4(A), Tenant shall not use the Demised Premises for any of the uses prohibited by this Section 4(A).

(B) Except for a tenant operating under the name Gordmans (or any trade name used by a related entity to Gordmans or an assignee or sublessee of Gordmans where Landlord's consent is not required), Landlord agrees that, from the date hereof until expiration of the term of this lease, no other individual premises in the Shopping Center (except for spaces currently leased, unless and until such spaces are recaptured by the Landlord) shall at any time contain more than fifteen thousand (15,000) square feet of floor area therein used or occupied for, or devoted to, the sale or display of apparel and related accessories sold at off-price. The computation of such floor area shall include one half (1/2) of all floor area in any aisles, corridors or similar spaces adjacent to or abutting any racks, gondolas, shelves, cabinets, counters or other fixtures or equipment containing or used for the sale or display of the apparel and related accessories. The provisions of this Section 4(B) shall not apply to the operation of any individual premises for the sale of accessories only, including, primarily, the sale of shoes.





ULTA:

5.4 Tenant's Exclusive Rights. Tenant shall have the exclusive right to conduct any portion of Tenant's Protected Uses in the Shopping Center, and all other tenants or other occupants of any portion of the Shopping Center ███████████████████████████████████████████████████████████

███████████████████████████████████████ Notwithstanding the foregoing, Tenant's exclusive rights shall not apply to uses associated with ████████████████████
████████████████████ who are entitled to sell such products and/or provide the services that are covered by Tenant's exclusive rights pursuant to their respective leases, and replacements or renewals of such existing tenants so long as the uses, services and price points of each such replaced or renewed operation remains materially the same as the existing operation and the size and location of the premises of the replaced or renewed operation is not materially increased from, or moved materially closer to the Premises than, the existing premises, (b) any national or regional retail tenant in excess of twenty-five thousand (25,000) square feet that sells the goods and/or provides the services that are covered by Tenant's exclusive rights as a part of its normal business operations, but not as its primary use, (c) family hair care operations such as Great Clips, Fantastic Sam's, or other similar value-oriented type operations, or (d) incidental sales (less than 250 square feet total of such tenant's premises is used to sell any of the products that comprise Tenant's Protected Uses) made in connection with the operation of another primary use. As used in this Section 5.4, a "regional retail tenant" shall mean a retail operator with 25 or more stores with active operations in four (4) of the following states: Arkansas, Texas, Louisiana, Oklahoma, and Missouri.

42.    "Tenant's Protected Uses" shall mean (i) the retail sale of cosmetics, fragrances, health and beauty products, hair care products and accessories; personal care appliances; skin care products, and body care products; and (ii) the operation of a full service beauty salon with spa services. "



Construction, Operation and Reciprocal Easement Agreement, by and between Rogers Retail L.L.C. and Dollard's Dollars, Inc. filed May 19, 2006, in Mortgage Book 2006, Page 129634, Assigned and Assumption of Construction, Operation and Reciprocal Easement Agreement to Pinnacle South, LLC, filed in Deed Book 2006, Page 55895 and Assignment and Assumption of Construction, Operation and Reciprocal Easement Agreement to Pinnacle Hills, LLC, filed in Book 2012, Page 44552, records of Benton County, Arkansas:

(b)     Prohibited Uses. No portion of the Power Center shall be used for any of the uses prohibited at the Shopping Center as provided in Section 9.01 hereof.

Section 9.01. Use and Operation of Shopping Center. Each of the Parties covenants and agrees with each other for the benefit of the Shopping Center Site that for so long as Dillard is operating a retail store on its Parcel or Developer is operating the Developer Buildings on its Parcel, during the Term, no part of its Parcel may be used for any purpose other than commercial or business compatible with the operation of a first-class open-air shopping center nor will any



use or operation that is obnoxious to or inconsistent with the development or operation of first-class open-air shopping center be made, conducted or permitted on or with respect to all or any part of its respective Parcel including but not limited to, the following:

        (a)      any public or private nuisance;

        (b)      any noise or sound that is objectionable due to intermittence, beat, frequency, shrillness or loudness;

        (c)      any obnoxious odor;

        (d)      any noxious, toxic, caustic or corrosive fuel or gas;

        (e)      any dust, dirt or fly ash in excessive quantities;

        (f)      any fire, explosion or other damaging or dangerous hazard (including the storage, display or sale of explosives or fireworks);

        (g)      any warehouse use (any area within a Building for the storage of goods intended to be sold at any retail establishment in such Building will not be deemed to be a warehouse use);

        (h)      assembling, manufacturing, distilling, refining, smelting, agriculture or mining operation or drilling for oil, gas or other minerals;

        (i)      any second hand store, flea market, fire sale, laundry, animal hospital, funeral establishment, living quarters (the operation of a hotel facility shall not be deemed to be living quarters restricted by this subsection);

        (j)      any distribution, sale, viewing or use of pornographic material (NC-17 movies shall not be deemed pornographic);

        (k)      any pet shop within 150 from the customer entrances to the Dillard Building;

        (l)      any manufacture, use, storage or release of any Hazardous Material except to the extent expressly permitted by Section 24.24 hereof;

        (m)      any emission of any substance, gas, particulate matter, audio, radio or infrared electromagnetic wave frequency or other form of radiation that materially interferes with the business of any Occupant;

        (n)      any mobile home or trailer court or storage trailer, labor camp (except that this provision shall not prohibit the temporary use of construction trailers during periods of construction, reconstruction or remodeling).



05-19-2006 09:25:31 AM

(o)   any dumping, disposing, incineration or reduction of garbage or storage of junk yard;

(p)   any dry cleaning processing plant;

(q)   any massage parlor (excluding massages that are offered in connection with a spa operation);

(r)   any tavern, bar, night club, discotheque or any establishment selling alcoholic beverages for on-premises consumption without a majority of its sales from food consumed on premises;

(s)   an off-track betting facility, bingo game facility, or other gambling venue;

(t)   any coin operated self-service laundry;

(u)   any outdoor sales or display of merchandise, other than ancillary to the operation of a business conducted on the Parcel;

(v)   any public health or welfare center;

(w)   any shooting gallery or target range unless indoors and ancillary to a permitted use; and

(x)   any storage trailers (accessory use).

Developer agrees that none of its leases with Occupants of the Developer Buildings will permit uses prohibited by this Section 9.01.



Operation and Easement Agreement by and between Target Corporation and Pinnacle South LLC filed June 9, 2008 in Mortgage Book 2008, Page 100558 and First Amendment to Operation and Easement Agreement by and between Target Corporation, Pinnacle South, L.L.C. and Cabela's Wholesale, Inc. in Mortgage Book 2011, Page 161044, records of Benton County, Arkansas:

5.1 Uses

5.1.1 The Shopping Center shall be used only for retail sales, offices, Restaurants or other permitted commercial purposes. "**Business Office**" shall mean an office which does not provide services directly to consumers; "**Retail Office**" shall mean an office which provides services directly to consumers, including but not limited to financial institutions, real estate, stock brokerage and title companies, travel and insurance agencies, business offices providing professional services directly to consumers, and medical, dental and legal clinics. No more than ten percent (10%) of the total Floor Area on the Developer Tract may be used for Retail Office and/or Business Office purposes; provided, however, that office space used by an Occupant for administrative purposes, and which is not open to the general public, shall not be considered Retail Office or Business Office for the purpose of this limitation.

5.1.2 No use shall be permitted within the Shopping Center which is inconsistent with the operation of a first-class retail shopping center. Without limiting the generality of the foregoing, the following uses shall not be permitted:

(A) Any use which emits an obnoxious odor, noise or sound which can be heard or smelled outside of any Building in the Shopping Center.



06/09/2008

(B) An operation primarily used as a storage warehouse operation and any assembling, manufacturing, distilling (excluding a micro-brewery restaurant), refining, smelting, agricultural or mining operation.

(C) Any "**second hand**" store, "**surplus**" store, or pawn shop.

(D) Any mobile home park, trailer court, labor camp, junkyard, or stockyard; provided, however, this prohibition shall not be applicable to the temporary use of construction trailers during periods of construction, reconstruction or maintenance.

(E) Any dumping, disposing, incineration or reduction of garbage; provided, however, this prohibition shall not be applicable to garbage compactors located near the rear of any Building, nor to garbage disposals or grease traps operated as part of any Restaurant.

(F) Any fire sale, bankruptcy sale (unless pursuant to a court order) or auction house operation.

(G) Any central laundry, dry cleaning plant or laundromat; provided, however, this prohibition shall not be applicable to nominal supportive facilities for on-site dry-cleaning service solely for pickup and drop off by the ultimate consumer, or for drop off and delivery by the dry-cleaning service, as the same may be found in retail shopping centers in the metropolitan area where the Shopping Center is located.

(H) Any automobile, truck, trailer or recreational vehicle sales, leasing, display or body shop repair operation.

(I) Any bowling alley or skating rink.

(J) Any movie theater or live performance theater.

(K) Any hotel, motel, short or long term residential use, including but not limited to: single family dwellings, townhouses, condominiums, other multi-family units, and other forms of living quarters, sleeping apartments or lodging rooms.

(L) Any veterinary hospital or animal raising or boarding facility; provided, however, this prohibition shall not be applicable to pet shops. Notwithstanding the forgoing exception, any veterinary or boarding services provided in connection with the operation of a pet shop shall only be incidental to such operation; the boarding of pets as a separate



06/09/2008

customer service shall be prohibited; all kennels, runs and pens shall be located inside the Building; and the combined incidental veterinary and boarding facilities shall occupy no more than fifteen percent (15%) of the Floor Area of the pet shop.

(M) Any mortuary or funeral home.

(N) Any establishment selling or exhibiting "**obscene**" material.

(O) Any establishment selling or exhibiting drug-related paraphernalia or which exhibits either live or by other means to any degree, nude or partially clothed dancers or wait staff.

(P) Any bar, tavern, Restaurant or other establishment whose reasonably projected annual gross revenues from the sale of alcoholic beverages for on-premises consumption exceeds thirty percent (30%) of the gross revenues of such business.

(Q) Any health spa, fitness center or workout facility; any massage parlors or similar establishments.

(R) Any flea market, amusement or video arcade, pool or billiard hall, car wash or dance hall.

(S) Any training or educational facility, including but not limited to: beauty schools, barber colleges, reading rooms, places of instruction or other operations catering primarily to students or trainees rather than to customers; provided, however, this prohibition shall not be applicable to on-site employee training by an Occupant incidental to the conduct of its business at the Shopping Center.

(T) Any gambling facility or operation, including but not limited to: off-track or sports betting parlor; table games such as blackjack or poker; slot machines, video poker/blackjack/keno machines or similar devices; or bingo hall. Notwithstanding the foregoing, this prohibition shall not be applicable to government sponsored gambling activities or charitable gambling activities, so long as such activities are incidental to the business operation being conducted by the Occupant.



8.    **Use Restrictions**.

(A)    The first sentence of Section 5.1.5 is hereby deleted in its entirety and replaced with the following: "The following use and occupancy restrictions shall be applicable to the Developer Tract and the Cabela's Tract:"

(B)    For so long as Cabela's operates a sporting goods store of at least 60,000 square feet of Floor Area on the Cabela's Tract, Cabela's (but not subtenants, assignees, or licensees of Cabela's) may display and sell merchandise including, but not limited to, boats, trailers and recreational vehicles within the building on the Cabela's Tract and within the area of the Cabela's Tract identified on the Site Plan as "Outside Sales Area". In no event shall the Outside Sales Area be used for bulk storage or display of merchandise or merchandise sold or displayed on pallets. The Outside Sales Area located on the Cabela's Tract shall be landscaped consistently with the remainder of the Cabela's Tract. Further, the sale of merchandise including but not limited to boats, trailers and recreational vehicles by Cabela's within the Outside Sales Area shall not be subject to the provisions of Section 5.1.4(J) of the OEA.

(C)    Notwithstanding Subsection 5.1.2(L) of the OEA, for so long as Cabela's (defined in Subparagraph (D) below) operates a sporting goods store of at least 60,000 square feet of Floor Area on the Cabela's Tract, Cabela's (but not subtenants, assignees, or licensees of Cabela's) may locate one fully enclosed dog kennel on the Cabela's Tract, in the area designated on the Site Plan as "Dog Kennel Area" for the temporary boarding of its customers' animals while they are shopping at the Cabela's store on the Cabela's Tract; provided, that the area in which such dog kennel is located shall be screened from public view with a landscaping buffer, which upon maturity will be at least six (6) feet in height and shall be maintained by the owner of the Cabela's Tract in a first class condition at such party's sole cost and expense. The design, location and landscape materials for the landscape buffer shall be subject to the prior written approval of the Approving Parties.    The owner of the Cabela's Tract shall perform, or cause to be performed, at its sole cost and expense, daily janitorial services sufficient to prevent the accumulation of pet stains, pet odors or pet droppings on the Cabela's Tract. In the event that such Party fails to perform such janitorial services (or to cause the same to be performed) following receipt of notice to such Party, Operator and Target shall each have the right (but in no event shall Target have the obligation) to perform such janitorial services (or cause the same to be performed), and the owner of the Cabela's Tract shall, within thirty (30) days following receipt of an invoice therefore or other reasonable evidence of the amount and purposes thereof, reimburse Operator or Target, as the case may be, in an amount equal to the greater of (i) one hundred ten percent (110%) of all reasonable costs paid or incurred for such purposes or (ii) $100.00.  Alternatively, Operator or Target may, in such party's sole discretion, pursue any other remedy available to it under the OEA or otherwise.  During any period of time the Dog Kennel Area is: (i) used for the purposes described in this paragraph, such area shall not be considered part of the Common Area, and (ii) not used for the purposes describe in this paragraph, such area shall be considered part of the Common Area; provided, however, if the Dog Kennel Area is located within a Building Area, such area may be used for the location of Buildings.

(D)    For purposes of Subparagraphs (A) through (E) of this Section 8, the term "Cabela's" means Cabela's Wholesale, Inc., a Nebraska corporation, or any Person that shall succeed in ownership to at least a majority of its stores having at least 60,000 square feet of Floor Area.



**EXHIBIT E-1**

<u>Waiver Documents</u>

See Attached





David G. Krueger
Senior Vice President
Growth & Development
Ulta Salon, Cosmetics & Fragrance, Inc.
1000 Remington Blvd., Suite 120
Bolingbrook, IL 60440
Tel: (630) 378-7203
E-mail: DKrueger@ulta.com

May 22, 2019

**Via E-Mail**

Patrick Cairns
Senior Director, Big Box Leasing
Development Retail
patrick.cairns@brookfieldpropertiesretail.com
Brookfield Properties
350 N. Orleans St., Suite 300
Chicago, Illinois 60654

### Re: Ulta Store #419 – Pinnacle Hills Plaza, located in Rogers, Arkansas – Conditional Waiver of Exclusive Use Provision

Dear Mr. Cairns:

Ulta Salon, Cosmetics & Fragrance, Inc., a Delaware corporation ("Ulta") entered into a Shopping Center Lease with Pinnacle South, LLC, a Delaware limited liability company ("Original Landlord") dated June 28, 2010 (the "Original Lease"), amended by that certain Commencement Date Certificate and First Amendment to Shopping Center Lease dated January 11, 2011 ("CDC"), (the Original Lease and CDC hereinafter referred to as the "Lease") for space in the Pinnacle Hills Plaza in Rogers, Arkansas ("Premises"), as more particularly described in the Lease. Pinnacle Hills, LLC a Delaware limited liability company ("Landlord") has succeeded to all right, title and interest to the Original Landlord under the Lease. All capitalized terms herein shall have the same meanings ascribed to them in the Lease.

Pursuant to Section 5.4 of the Lease, Ulta has certain exclusive rights with respect to the Shopping Center (collectively the "Ulta Exclusive"). Notwithstanding the Ulta Exclusive, Ulta hereby consents to allow Dollar Tree Stores, Inc. (the "Permitted Tenant") to operate as a typical Dollar Tree discount store in the Shopping Center, subject to the following conditions:

the *possibilities* are beautiful.™          Ulta Store #419
                                              Roger, Arkansas



1.　　The Permitted Tenant shall be operating under the trade name "Dollar Tree" at the Shopping Center and no other name;

2.　　The Permitted Tenant's premises shall consist of approximately 10,528 square feet but no more than 11,581 square feet of space in the location depicted as "Dollar Tree" on Exhibit A attached hereto and made a part hereof (the "Permitted Location"). Ulta's consent, subject to the terms and conditions set forth herein, to the operation of the Permitted Tenant at the Permitted Location shall not be deemed an approval of any other location at this Shopping Center or any other location;

3.　　Permitted Tenant shall use no more than 1,000 square feet of the sales area of the Permitted Location for sales of the following items: cosmetics, fragrances, health and beauty products, hair care products; personal care appliances; skin care products, and body care products;

4.　　Except as otherwise limited herein, the Permitted Tenant shall operate the Permitted Location as a discount variety store selling general merchandise including food products in substantially the same manner as the majority of other locations operating under the trade name "Dollar Tree" ("Permitted Use");

5.　　The Permitted Tenant shall not allow any licensee or concessionaire to operate within the Permitted Location in violation of any of the conditions listed herein;

6.　　This conditional waiver is for the benefit of the Permitted Tenant and shall extend to any successors, and/or assigns of the Permitted Tenant, provided that the Permitted Use remains the same and such successor and/or assign operates under the trade name "Dollar Tree"; and

7.　　This waiver expires upon the termination or expiration of the Permitted Tenant's lease with Landlord at the Shopping Center.

**(Remainder of page intentionally left blank; signature page follows)**

the *possibilities* are beautiful.™



In the event of a violation of any of the above conditions set forth herein, Ulta's consent shall be deemed immediately revoked and Ulta shall be entitled to all of its rights and remedies set forth under the Lease, at law or in equity.

Sincerely,

Ulta Salon, Cosmetics & Fragrance, Inc.

David G Krueger

By:_____
Name: David G. Krueger
Title:   Senior Vice President,
Growth & Development

cc:      C. Hartl
         C. Boyd

the *possibilities* are beautiful.™



## EXHIBIT A



Dollar Tree, 10,528 sq. ft., but no more than 11,581 square feet

the *possibilities* are beautiful.™

Ulta Store #419
Roger, Arkansas



VIA EMAIL

April 29, 2019

Pinnacle Hills, LLC
Pinnacle Hills Promenade
350 N. Orleans St., Ste. 300
Chicago, Illinois 60654-1607
Attention: Patrick Cairns
Email: Patrick.Cairns@brookfieldpropertiesretail.com

>    Re:  Lease Agreement dated December 21, 2011, as amended prior to the date of hereof
>    ("Lease") by and between The Fresh Market, Inc. ("Tenant") and Pinnacle Hills, LLC
>    ("Landlord") for certain space situated within Pinnacle Hills Promenade ("Shopping
>    Center") in Rogers, Arkansas, all as more particularly described in the Lease

Ladies and Gentlemen:

For good and valuable consideration, the receipt and sufficiency of which are acknowledged, the
parties hereby agree as follows:

1.  Subject to Landlord's timely payment of the fee set forth in Paragraph 2 below, Tenant
    hereby consents to the operation of a "Dollar Tree" branded, discount store within the
    Shopping Center, provided that (a) such store is located exclusively within the Shopping
    Center space identified as "Proposed Dollar Tree" on Exhibit A attached hereto and (b)
    such store operates as "Dollar Tree" stores typically operate as of the date hereof. The
    foregoing consent is limited to a "Dollar Tree" discount store and does not otherwise waive
    any rights or privileges Tenant has under the Lease.

2.  Within fifteen (15) days after the date hereof, Landlord shall pay to Tenant the sum of

    █████████

All capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the
Lease. Except as affected hereby, the Lease remains in full force and effect as previously drafted
and is hereby ratified and reaffirmed by the parties, subject to the agreement herein. This letter
agreement may be executed in several counterparts, each of which shall be deemed an original
instrument and all of which shall constitute a single letter agreement. The parties expressly agree
that, notwithstanding anything in the Lease to the contrary, delivery of an executed counterpart to
this letter agreement by portable document format (pdf) or other electronic means shall be as
effective as hand delivery of a manually executed counterpart.

*628 Green Valley Road, Suite 500, Greensboro, North Carolina 27408*

Sincerely,

THE FRESH MARKET, INC.

By: _____
David Sibert
VP of Real Estate and Development


**Accepted and agreed:**

PINNACLE HILLS, LLC

By: _____

Name: _____
Kristen N. Pate
Authorized Signatory

Title: _____

*628 Green Valley Road, Suite 500, Greensboro, North Carolina 27408*

## Exhibit A

Dollar Tree Location



*628 Green Valley Road, Suite 500, Greensboro, North Carolina 27408*

# Brookfield

Properties

---

VIA EMAIL

May 20, 2019

J&J Cards, Inc.
1212 S. Air Depot #27
Midwest City, OK 73110-4860
Attention: Jack Justice
Email: jjustice5214@hotmail.com

> Re: Letter Agreement amending the lease dated July 30, 2012, (the lease, with any and all
> amendments shall hereinafter, collectively, be referred to as the "Lease") by and between J&J
> Cards, Inc. ("Tenant") and Pinnacle Hills, LLC ("Landlord") for space# 1125 containing
> approximately 3,600 square feet (Leased Premises) situated within Pinnacle Hills Promenade
> ("Shopping Center") in Rogers, Arkansas, all as more particularly described in the Lease.

Ladies and Gentlemen:

For good and valuable consideration, the receipt and sufficiency of which are acknowledged, the
parties hereby agree as follows:

1. Reference provision 1.28 of the Lease restricts a certain use ("Restricted Use") within the Shopping
   Center. Notwithstanding the Restricted Use, Tenant hereby consents to and specifically allows a
   "Dollar Tree" branded, discount store ("Dollar Tree"") to operate within the Shopping Center,
   subject to the following conditions: (a) the Dollar Tree store shall be located exclusively within
   the space identified as "Proposed Dollar Tree" on Exhibit A attached hereto; and (b) the Dollar
   Tree store shall be operated in the same manner as a "Dollar Tree" store typically operates as of
   the date hereof, which shall include the sale of a greeting cards, gift wrap and party goods in more
   than 60 lineal feet of space; provided, however, Dollar Store does not: (i) display more than seventy
   (70) lineal feet of cards (to include counter cards, seasonal counter cards, Christmas Boxed Cards,
   Valentine Trays) at any time during the calendar year; (ii) display more than seventy-five (75) lineal
   feet of gift wrap inclusive of roll wrap, gift bags, bows, ribbons, etc., or (iii) sell collectible
   ornaments, provided that solid color ball ornaments shall not be considered collectible ornaments.

2. Tenant waives and releases any and all claims, actions, causes of action, judgements,
   expenses, fees, attorneys' fees, costs, damages, losses, and liabilities, including but not limited to
   those that may arise under Reference Provision 1.28 of the Lease, that relate to the Dollar Tree
   Lease and the operation of the Dollar Tree store.

---

Karen Ercoli  |  Brookfield Properties Retail  |  350 N. Orleans Street Suite 300  |  Chicago, Illinois 60654-1607  |



## Brookfield
Properties

3.      Within fifteen (15) days after the date this Letter Agreement is fully executed, Landlord shall pay to Tenant the sum of ██████.

4.      Landlord and Tenant agree to discuss a potential lease extension, upon terms to be agreed to by the parties, which discussions shall begin within 90 days following the full execution of this Letter Agreement.

All capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Lease. Except as specifically provided in this Letter Agreement, the Lease is not otherwise modified and remains ratified and confirmed and in full force and effect. This letter agreement may be executed in several counterparts, each of which shall be deemed an original instrument and all of which shall constitute a single letter agreement. The parties expressly agree that, notwithstanding anything in the Lease to the contrary, delivery of an executed counterpart to this letter agreement by portable document format (pdf) or other electronic means shall be as effective as hand delivery of a manually executed counterpart.

Tenant hereby warrants and certifies to Landlord that the person executing this Letter Agreement on behalf of Tenant is authorized and empowered to bind the Tenant to the terms of this Letter Agreement by his or her signature hereto.  Landlord hereby warrants and certifies to Tenant that the person executing this Letter Agreement on behalf of Landlord is authorized and empowered to bind the Landlord to the terms of this Letter Agreement by his or her signature hereto.

Landlord:                                             Tenant:

Pinnacle Hills, LLC,                                  J&J Cards, Inc.,
a Delaware limited liability company                 An Oklahoma corporation


By: _____               By: _____
        Authorized Signatory                     Its: _____


Date:  May 24, 2019                        Date:  5/23/19

# Brookfield
Properties







**EXHIBIT G**

Memorandum of Lease

See Attached



After Recording, Return to:

Dollar Tree Stores, Inc.
500 Volvo Parkway
Chesapeake, Virginia 23320
Attn: Lease Administration

_____

(The Above Space for Recorder's Use Only)

THIS MEMORANDUM OF LEASE, made as of _____, 2019, by and between **PINNACLE HILLS, LLC** a Delaware limited liability company having an office at 350 North Orleans Street, Suite 300, Chicago, IL 60654 ("Landlord"), and **DOLLAR TREE STORES, INC.,** a Virginia corporation having an office at 500 Volvo Parkway, Chesapeake, Virginia 23320 ("Tenant").

### Preliminary Statement

Landlord is the fee owner of certain real property and improvements situated in Benton County, Arkansas and more particularly described on Exhibit A attached hereto (the "Land") on which is situated a shopping center known generally as Pinnacle Hills Power Center (the "Shopping Center").

As of the date hereof Landlord and Tenant have entered into a lease agreement (the "Lease") pursuant to which Landlord has leased to Tenant a portion of the Shopping Center (the "Premises") more particularly described therein. In connection with the Lease, Landlord and Tenant have entered into this Memorandum to confirm the demise of the Premises and to provide notice to any interested party of such demise and of the terms and provisions of the Lease.

NOW, THEREFORE, the parties state as follows:

1.      All capitalized terms used in this Memorandum and not otherwise defined herein shall have the meanings ascribed to them in the Lease.

2.      The terms and conditions of the Lease are incorporated herein as though set forth in full, whereby Tenant may have and hold the Premises together with any and all licenses, rights, privileges and easements appurtenant thereto, at the rental and upon the terms and conditions therein stated, for an initial term of approximately ten (10) years commencing on the Commencement Date (the "Original Lease Term"). Under the terms of the Lease, Tenant has the right to extend the Original Lease Term for four (4) separate and additional periods of five (5) years each after the expiration of the Original Lease Term.

3.      This Memorandum of Lease is executed for the purpose of recordation in order to give notice of all of the terms, provisions and conditions of the Lease, including, without limitation:

> a.      Provisions set forth therein regarding Landlord's agreement not to lease, rent or occupy, or permit to be leased, rented or occupied, any portion of the Shopping Center other than the Premises for the operation of a single price point variety retail store or any other retail store the Principal Business of which is the operation of a single price point variety retail store;

> b.      



i. 

As used in the Lease, with regard to any premises, a business is a "Principal Business" if the merchandise or categories of merchandise in question are sold in the aggregate in twenty-five percent (25%) or more of the sales floor area of the premises (including one-half [1/2] of the adjacent aisle space);

c.   provisions set forth therein regarding Tenant's right to install and maintain signage upon the Premises and upon certain pylon signs of the Shopping Center;

d.   provisions set forth therein regarding certain areas of the Shopping Center in which no improvements are to be constructed and no alterations are to be made; and

e.   Provisions prohibiting construction or alterations to any exterior portion of the Shopping Center during the months of October, November and December.

4.     In addition to those terms set forth above, the Lease contains numerous other terms, covenants and conditions which likewise affect the Premises and the Shopping Center and notice is hereby given that reference should be had to the Lease directly with respect to the details of such terms, covenants and conditions. The Lease and exhibits thereto are hereby incorporated by reference in this Memorandum of Lease and the parties hereby ratify and confirm the Lease as if said Lease were being re-executed by them and recorded. In the event of any conflict between the provisions of this instrument and the Lease, the provisions of the Lease shall control.



IN WITNESS WHEREOF, Landlord and Tenant have caused this Memorandum of Lease to be signed as of the date and year first above written.

**LANDLORD**

**PINNACLE HILLS, LLC**
a Delaware limited liability company

By: _____

Name: _____

Title: _____

Landlord's Acknowledgment

STATE OF (_____)

                 ) SS.

COUNTY (_____)

The foregoing instrument was acknowledged before me, a Notary Public, this _____ day of _____, 2019, by _____, the _____ of _____.

_____
NOTARY PUBLIC



**TENANT**

**DOLLAR TREE STORES, INC.,**
a Virginia corporation

By:_____

Name: _____

Title: _____


Tenant's Acknowledgment

STATE OF VIRGINIA

       ) SS.

CITY OF CHESAPEAKE

The foregoing instrument was acknowledged before me, a Notary Public, this _____ day of
_____, 2019, by _____, the _____
_____ of Dollar Tree Stores, Inc.


_____
NOTARY PUBLIC

## EXHIBIT A

## LEGAL DESCRIPTION

Tract 1:
Lots 7 of the Pinnacle Hills Promenade Subdivision, Rogers, Benton County, Arkansas, as shown on Plat Record 2006 at Pages 1356 to 1364.

**Beneficial Easements and Rights of First Refusal as contained in the following:**

Restrictive Covenant Agreement by and between Rogers Retail, LLC, a Delaware limited liability company, GGP-Rogers Retail LLC, a Delaware limited liability company, Hunt Schwyhart Graham VI, LLC, a Delaware limited liability company, Great Northwest Development, LLC, an Arkansas limited liability company and HSG Holdings, LLC, recorded October 10, 2005 in Deed Book/Page 2005 54722.

Construction, Operation and Reciprocal Easement Agreement by and between Rogers Retail, LLC and Dillard's Dollars, Inc., filed May 19, 2006 in Deed Book/Page 2006 129634, among the land records of Benton County, Arkansas, as assigned by Assignment and Assumption of Construction, Operation and Reciprocal Easement Agreement by and between Rogers Retail, LLC and Pinnacle Hills, LLC, filed November 21, 2006 in Deed Book/Page 2006 55885 (Lots 1, 3, 4), Assignment and Assumption of Construction, Operation and Reciprocal Easement Agreement by and between Rogers Retail, LLC and Pinnacle South, LLC, filed November 21, 2006 in Deed Book/Page 2006 55895 (Lot 7) and Assignment and Assumption of Construction, Operation and Reciprocal Easement Agreement by and between Pinnacle South, LLC and Pinnacle Hills, LLC, filed March 19, 2012 in Deed Book/Page 2012 44552 (Lot 7).







2



## EXHIBIT H

### Rules and Regulations

Tenant agrees to comply with the following rules and regulations, so long as they are uniformly enforced among all of the tenants of the Shopping Center:

a) No loudspeakers, televisions, phonographs, radios, flashing lights, machinery or other devices shall be heard or seen outside of the Premises without the prior written consent of Landlord.

b) No auction, fire, bankruptcy or selling-out sales shall be conducted without the written consent of Landlord.

c) Tenant shall not place, nor permit obstructions, garbage, refuse, improvements, merchandise or displays in the area in front of the Premises.

d) Tenant shall store and stock in the Premises only for items that Tenant carries to conduct its business.

e) Tenant shall not use or permit the Premises to be used for living, sleeping, residential or lodging purposes.

f) Tenant shall not in the Common Areas:

   (i)     vend, peddle or solicit orders for sale or distribution of any merchandise, device, service, periodical, book, pamphlet or other matter;

   (iii)    distribute any circular, booklet, handbill, placard or other material;

   (iv)    solicit membership in any organization, group or association or contribution;

   (v)     parade, patrol, picket, demonstrate or engage in conduct that might interfere with or impede the use of the Common Areas by any customer, or employee, create a disturbance, attract attention or harass, annoy, disparage or be detrimental to the interest of any of the other tenants;

   (vi)    use the Common Areas for any purpose when none of the retail establishments within the Shopping Center are open for business;

   (vii)   panhandle, beg or solicit funds; nor

   (viii)  solicit business.

Landlord shall have the right, from time to time, to make additional rules regarding the operation of the Shopping Center and upon receipt of Tenant written consent, not to be unreasonably delayed, withheld or conditioned, agrees to comply with such new rules Landlord shall uniformly enforce said rules among all the tenant of the Shopping Center.



## **EXHIBIT I**

Subordination, Non-Disturbance and Attornment Agreement

See attached



**AFTER RECORDING, RETURN TO:**

Berkadia Commercial Mortgage LLC
323 Norristown Road, Suite 300
Ambler, PA 19002
Attn:  Client Relations Manager – Loan #010096657

---

*SPACE ABOVE THIS LINE RESERVED FOR RECORDER'S USE*

## SUBORDINATION, NON-DISTURBANCE
## AND ATTORNMENT AGREEMENT

This Subordination, Non-Disturbance and Attornment Agreement ("**Agreement**"), is made as of this day of

May 2, 2019 among Wells Fargo Bank, National Association, as Trustee, for the registered holders of COMM 2015-

DC1 Mortgage Trust Commercial Mortgage Pass-Through Certificates under that certain Pooling and Servicing

Agreement dated as of March 1, 2015 ("**Lender**"), by and through Berkadia Commercial Mortgage LLC, a Delaware

limited liability company, its Sub Servicer on behalf of KeyBank National Association,  pursuant to the Sub Servicing

Agreement dated as of  March 30, 2012, January 18, 2013 ("**Amended and Restated Sub Servicing Agreement**"), June

24, 2013 ("**First Amendment to Amended and Restated Sub Servicing Agreement**") January 06, 2014 ("**Second**

**Amendment to Amended and Restated Sub Servicing Agreement**"), April 03, 2015 ("**Amendment No. 3 to**

**Amended and Restated Sub Servicing Agreement**") and October 13, 2015 ("**Amendment No. 4 to Amended and**

**Restated Sub Servicing Agreement**") Pinnacle Hills, LLC, a Delaware limited liability company and Pinnacle South,

LLC, a Delaware limited liability company ("**Landlord**"), and Dollar Tree Stores, Inc., a Virginia corporation

("**Tenant**").

### Background

A.      Lender is the owner and holder of a deed of trust or mortgage or other similar security instrument
(either, the "**Security Instrument**"), covering, among other things, the real property commonly known and described as
Pinnacle Hills Promenade, and further described on Exhibit "A" attached hereto and made a part hereof for all purposes,
and the building and improvements thereon (collectively, the "**Property**").

B.      Tenant is the lessee under that certain lease agreement between Landlord and Tenant dated _____,
2019 ("**Lease**"), demising a portion of the Property described more particularly in the Lease ("**Leased Space**").

C.      Landlord, Tenant and Lender desire to enter into the following agreements with respect to the priority
of the Lease and Security Instrument.

NOW, THEREFORE, in consideration of the mutual promises of this Agreement, and intending to be legally
bound hereby, the parties hereto agree as follows:

Loan #010096657

5



     1.     Subordination. Tenant agrees that the Lease, and all estates, options and rights created under the Lease, hereby are subordinated and made subject to the lien and priority of the Security Instrument.

     2.     Nondisturbance. Lender agrees that no foreclosure (whether judicial or nonjudicial), deed-in-lieu of foreclosure, or other sale of the Property in connection with enforcement of the Security Instrument or otherwise in satisfaction of the underlying loan shall operate to terminate the Lease or Tenant's rights thereunder to possess and use the Leased Space provided, however, that (a) the term of the Lease has commenced, (b) Tenant is in possession of the Leased Space, and (c) the Lease is in full force and effect and no uncured default exists under the Lease, beyond any applicable notice and cure periods.

     3.     Attornment. Tenant agrees to attorn to and recognize as its landlord under the Lease each party acquiring legal title to the Property by foreclosure (whether judicial or nonjudicial) of the Security Instrument, deed-in-lieu of foreclosure, or other sale in connection with enforcement of the Security Instrument or otherwise in satisfaction of the underlying loan ("**Successor Owner**"). Provided that the conditions set forth in Section 2 above are met at the time Successor Owner becomes owner of the Property, Successor Owner shall perform all obligations of the landlord under the Lease arising from and after the date title to the Property was transferred to Successor Owner. In no event, however, will any Successor Owner be: (a) liable for any default, act or omission of any prior landlord under the Lease (except that Successor Owner shall not be relieved from the obligation to cure any defaults which are non-monetary and continuing in nature, and such that Successor Owner's failure to cure would constitute a continuing default under the Lease; for the avoidance of doubt, defaults which are non-monetary include repair and maintenance defaults even though curing such defaults may require the expenditure of money); (b) subject to any offset or defense which Tenant may have against any prior landlord under the Lease; (c) bound by any payment of rent or additional rent made by Tenant to Landlord more than 30 days in advance; (d) bound by any modification or supplement to the Lease, or waiver of Lease terms, which revise Tenant's or Landlord's monetary obligations under the Lease, modifies the term of the Lease, the parties' termination rights or the description of the Leased Space, made without Lender's written consent thereto; (e) liable for the return of any security deposit or other prepaid charge paid by Tenant under the Lease, except to the extent such amounts were actually received by Lender; (f) liable or bound by any right of first refusal or option to purchase all or any portion of the Property; or (g) liable for construction, completion or payment to Tenant for any improvements to the Property or as required under the Lease for Tenant's use and occupancy (whenever arising); provided, however, this clause (g) shall in no way modify, limit or impair any obligation of Successor Owner to perform maintenance and repair obligations to existing improvements and provided further, that if Successor Owner fails to perform any such maintenance and repair obligations, then Tenant shall have all rights and remedies available to it in the Lease, at law, and in equity. Although the foregoing provisions of this Agreement are self-operative, Tenant agrees to execute and deliver to Lender or any Successor Owner such further instruments as Lender or a Successor Owner may from time to time request in order to confirm this Agreement. If any liability of Successor Owner does arise pursuant to this Agreement, such liability shall be limited to Successor Owner's interest in the Property.

     4.     Rent Payments; Notice to Tenant Regarding Rent Payments. Tenant agrees not to pay rent more than one (1) month in advance unless otherwise specified in the Lease. After notice is given to Tenant by Lender that Landlord is in default under the Security Instrument and that the rentals under the Lease should be paid to Lender pursuant to the assignment of leases and rents granted by Landlord to Lender in connection therewith, Tenant shall thereafter pay to Lender all rent and all other amounts due or to become due to Landlord under the Lease, and Landlord hereby expressly authorizes Tenant to make such payments to Lender upon reliance on Lender's written notice (without any inquiry into the factual basis for such notice or any prior notice to or consent from Landlord) and hereby releases Tenant from all liability to Landlord in connection with Tenant's compliance with Lender's written instructions.

     5.     Lender Opportunity to Cure Landlord Defaults. Tenant agrees that, until the Security Instrument is satisfied of record by Lender, it will not exercise any remedies under the Lease following a Landlord default without having first given to Lender (a) written notice of the alleged Landlord default and (b) the opportunity to cure such default within the time periods provided for cure by Landlord, measured from the time notice is received by Lender. Tenant acknowledges that Lender is not obligated to cure any Landlord default, but if Lender elects to do so, Tenant agrees to accept cure by Lender as that of Landlord under the Lease and will not exercise any right or remedy under the Lease for a Landlord default. Performance rendered by Lender on Landlord's behalf is without prejudice to



Lender's rights against Landlord under the Security Instrument or any other documents executed by Landlord in favor of Lender in connection therewith.

     6.    Miscellaneous.

     (a)    Notices. All notices under this Agreement will be effective only if made in writing and addressed to the address for a party provided below such party's signature. A new notice address may be established from time to time by written notice given in accordance with this Section. All notices will be deemed received only upon actual receipt. Notice to outside counsel or parties other than the named Tenant, Lender and Landlord, now or hereafter designated by a party as entitled to notice, are for convenience only and are not required for notice to a party to be effective in accordance with this section.

     (b)    Entire Agreement; Modification. This Agreement is the entire agreement between the parties relating to the subordination and nondisturbance of the Lease, and supersedes and replaces all prior discussions, representations and agreements (oral and written) with respect to the subordination and nondisturbance of the Lease. This Agreement controls any conflict between the terms of this Agreement and the Lease. This Agreement may not be modified, supplemented or terminated, nor any provision hereof waived, unless by written agreement of Lender and Tenant, and then only to the extent expressly set forth in such writing.

     (c)    Binding Effect. This Agreement binds and inures to the benefit of each party hereto and their respective heirs, executors, legal representatives, successors and assigns, whether by voluntary action of the parties or by operation of law. If the Security Instrument is a deed of trust, this Agreement is entered into by the trustee of the Security Instrument solely in its capacity as trustee and not individually.

     (d)    Unenforceability. Any provision of this Agreement which is determined by a government body or court of competent jurisdiction to be invalid, unenforceable or illegal shall be ineffective only to the extent of such holding and shall not affect the validity, enforceability or legality of any other provision, nor shall such determination apply in any circumstance or to any party not controlled by such determination.

     (e)    Construction of Certain Terms. Defined terms used in this Agreement may be used interchangeably in singular or plural form, and pronouns cover all genders. Unless otherwise provided herein, all days from performance shall be calendar days, and a "**business day**" is any day other than Saturday, Sunday and days on which Lender is closed for legal holidays, by government order or weather emergency.

     (f)    Governing Law. This Agreement shall be governed by the laws of the State in which the Property is located (without giving effect to its rules governing conflicts of laws).

     (g)    **WAIVER OF JURY TRIAL. TENANT, AS AN INDUCEMENT FOR LENDER TO PROVIDE THIS AGREEMENT AND THE ACCOMMODATIONS TO TENANT OFFERED HEREBY, HEREBY WAIVES ITS RIGHT, TO THE FULL EXTENT PERMITTED BY LAW, AND AGREES NOT TO ELECT, A TRIAL BY JURY WITH RESPECT TO ANY ISSUE ARISING OUT OF THIS AGREEMENT.**

     (h)    Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which together constitute a fully executed agreement even though all signatures do not appear on the same document.

THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK

SIGNATURES AND NOTARIES APPEAR ON THE FOLLOWING PAGES

Loan #010096657

7

**IN WITNESS WHEREOF,** this Agreement is executed as of the date first above written.

**LENDER:**

**LENDER NOTICE ADDRESS:**

Wells Fargo Bank, National Association, as Trustee, for the registered holders of COMM 2015-DC1 Mortgage Trust, Commercial Mortgage Pass-Through Certificates

By: Berkadia Commercial Mortgage LLC, a Delaware limited liability company, its Sub Servicer

By:_____

Name:___Gary A. Routzahn_____

Title:___Authorized Representative_____

Wells Fargo Bank, National Association, as Trustee, for the registered holders of COMM 2015-DC1 Mortgage Trust, Commercial Mortgage Pass-Through Certificates

c/o Berkadia Commercial Mortgage LLC
323 Norristown Road, Suite 300
Ambler, PA 19002
Attn:    Client Relations Manager
           For Loan #010096657

*Notary Acknowledgment for Lender:*

COMMONWEALTH OF PENNSYLVANIA:
                                                      : ss
COUNTY OF MONTGOMERY_____s:

On _____, before me, _____, Notary Public, personally appeared Gary A. Routzahn, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument, the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the Commonwealth of Pennsylvania that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____
SIGNATURE OF NOTARY PUBLIC

{seal}

[Tenant's Signature and Acknowledgment continued on next page]



**TENANT:**

Dollar Tree Stores, INC., a Virginia corporation

**TENANT NOTICE ADDRESS:**

Dollar Tree Stores, Inc.
Attn: Lease Administration Department
500 Volvo Parkway
Chesapeake, VA 23320
Contact: (757) 321-5000

By:_____
Name:

*Notary Acknowledgment for Tenant:*

_____ :
                                                          : ss
_____ :

    On _____, before me, _____, Notary Public, personally appeared
_____, who proved to me on the basis of satisfactory evidence to be the
person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed
the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument, the person(s),
or the entity upon behalf of which the person(s) acted, executed the instrument.

    I certify under PENALTY OF PERJURY under the laws of the State of _____ that the
foregoing paragraph is true and correct.

    WITNESS my hand and official seal.

_____
SIGNATURE OF NOTARY PUBLIC

{seal}

[Landlord's Signature and Acknowledgment continued on next page]

Loan #010096657

9



**LANDLORD:**

**LANDLORD NOTICE ADDRESS:**

Pinnacle Hills, LLC, a Delaware limited liability company

Pinnacle Hills, LLC
Attn: Law/Lease Administration Department
C/o Towson Town Center
350 North Orleans Street, Suite 300
Chicago, IL 60654

By:_____
Name:

Pinnacle South, LLC, a Delaware limited liability company

By:_____
Name:

*Notary Acknowledgment for Landlord:*

_____:
                              : ss
_____:

On _____, before me, _____, Notary Public, personally appeared _____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument, the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of _____ that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____
SIGNATURE OF NOTARY PUBLIC

{seal}

Loan #010096657

10



## EXHIBIT A

## LEGAL DESCRIPTION

### PARCEL A

Real property in the City of Rogers, County of Benton, State of Arkansas, described as follows: Lots Numbered One (1), Three (3), Four (4), Five (5), Six (6) and Seven (7) of the Pinnacle Hills Promenade Subdivision, Rogers, Benton County, Arkansas as shown on final plat filed for record in Plat Book 2006 at page 1356.

LESS AND EXCEPT FROM LOT 6 that part deeded to the Arkansas State Highway Commission in deed recorded July 20, 2006, as Instrument No. 2006 35939, being further described as follows: Part of the Northwest Quarter of the Southeast Quarter of Section 21, Township 19 North, Range 30 West, Benton County, Arkansas, more particularly described as follows: Commencing at a railroad spike being used as the Southeast corner of the Northwest Quarter of the Southeast Quarter of Section 21; thence North 86°43'57" West along the South line of the Northwest Quarter of the Southeast Quarter of Section 21 a distance of 66.12 feet to a point on the Northerly right of way line of Interstate 540 as established by AHTD Job 090180 for the point of beginning; thence leaving said right of way line N 86°43'57" West along the South line of the said Northwest Quarter of the Southeast Quarter of Section 21 a distance of 500.20 feet to a point on said Northerly right of way line of Interstate 540; thence North 44°36'58" East along said Northerly right of way line a distance of 184.47 feet to a point; thence North 21°13'04" West along said Northerly right of way line a distance of 122.72 feet to a point; thence South 56°29'44" East along said Northerly right of way line a distance of 496.78 feet to the point of beginning and containing 1.20 acres, more or less, or 52,239 square feet, more or less, as shown on plans reference as AHTD Job 090180.

ALSO LESS AND EXCEPT that part deeded to the Arkansas State Highway Commission in deed recorded July 20, 2006, as Instrument No. 2006 35945, being further described as follows: Part of the Southwest Quarter of the Southeast Quarter and part of the Southeast Quarter of the Southwest Quarter of Section 21, Township 19 North, Range 30 West, Benton County, Arkansas, more particularly described as follows: Commencing at a Cotton Picker Spindle being used as the common section corner of Sections 21, 22, 27 & 28, Township 19 North, Range 30 West; thence North 86°52'56" West a distance of 1,321.95 feet along the South line of the Southeast Quarter of the Southeast Quarter of Section 21 to the Southeast corner of the Southwest Quarter of the Southeast Quarter of Section 21; thence North 02°34'57" East a distance of 220.46 feet along the East line of the said Southwest Quarter of the Southeast Quarter to a point on the Northeasterly right of way line of Interstate 540 as established by AHTD Job 1534-3 for the point of beginning; thence North 54°00'19" West along said Northeasterly right of way line a distance of 229.48 feet to a point; thence North 67°06'09" West along said Northeasterly right of way a distance of 283.43 feet to a point; thence North 69°25'17" West along said Northeasterly right of way line a distance of 145.77 feet to a point; thence North 52°52'30" West along said Northeasterly right of way line a distance of 430.82 feet to a point; thence North 43°48'10" West along said Northeasterly right of way line a distance of 383.91 feet to a point; thence North 36°02'21" West along said Northeasterly right of way line a distance of 288.46 feet to a point; thence North 42°56'09" East along said Northeasterly right of way line a

62418235

Loan #010096657

1



distance of 44.40 feet to a point; thence North 83°43'20" East along said Northeasterly right of way line a distance of 251.33 feet to a point; thence South 85°55'39" East along said Northeasterly right of way line a distance of 349.43 feet to a point; thence North 05°44'12" East along said Northeasterly right of way line a distance of 41.82 feet to a point on the Northerly right of way line of Interstate 540 as established by AHTD Job 090180; thence South 58°32'27" East a distance of 164.91 feet along the said Northerly right of way to a point; thence North 44°36'58" East along said Northerly right of way line of distance of 103.78 feet to a point on the North line of the said Southwest Quarter of the Southeast Quarter of Section 21; thence South 86°43'57" East along said North line a distance of 500.20 feet to a point on the said Northerly right of way; thence South 78°52'46" West along said Northerly right of way line a distance of 149.64 feet a point; thence South 37°21'41" West along said Northerly right of way line a distance of 233.26 feet to a point; thence South 01°55'09" West along said Northerly right of way line a distance of 47.65 feet to a point; thence South 45°13'29" East along said Northerly right of way line a distance of 464.31 feet to a point on the East line of the said Southwest Quarter of the Southeast Quarter of Section 21; thence South 02°34'57" West along said East line a distance of 514.42 feet to the point of beginning and containing 18.87 acres, more or less or 822,082 square feet, more or less, as shown on plans referenced as AHTD Job 090180.

**Beneficial Easements and Rights of First Refusal as contained in the following:**

Restrictive Covenant Agreement by and between Rogers Retail, LLC, a Delaware limited liability company, GGP-Rogers Retail LLC, a Delaware limited liability company, Hunt Schwyhart Graham VI, LLC, a Delaware limited liability company, Great Northwest Development, LLC, an Arkansas limited liability company and HSG Holdings, LLC, recorded October 10, 2005, in Deed Book #2005-54722.

Construction, Operation and Reciprocal Easement Agreement, by and between Rogers Retail, LLC and Dillard's Dollars, Inc., dated May 16, 2006, and filed for record May 19, 2006, as Land Document No. 2006-129634, among the land records of Benton County, Arkansas, as assigned by Assignment and Assumption of Construction, Operation and Reciprocal Easement Agreement by and between Rogers Retail, LLC and Pinnacle Hills, LLC, recorded November 21, 2006, as Instrument No. 2006-55885, and Assignment and Assumption of Construction, Operation and Reciprocal Easement Agreement by and between Rogers Retail, LLC and Pinnacle South, LLC, recorded November 21, 2006, as Instrument No. 2006-55895 in the records of Benton County, Arkansas.

## PARCEL B

Real property in the City of Rogers, County of Benton, State of Arkansas, described as follows:

Tracts 1A, 1C and 1D of a Tract Split recorded in Plat Book 2011, Page 522-523 recorded in the public records of Benton County, Arkansas.

**Together With Beneficial Easements as contained in the following:**

60418235                                           2

Non-Exclusive easements for the benefit of the land as set forth in that certain Easement Agreement dated November 6, 2007 by and between Great Northwest Development, LLC, an Arkansas limited liability company and Pinnacle South, LLC, a Delaware limited liability company, filed for record in Book 2007 at Page 46227 in the public records of Benton County, Arkansas.

Non-Exclusive easements pursuant to Operation and Easement Agreement dated June 4, 2008 between Great Target Corporation and Pinnacle South, LLC, filed for record in Book 2008 at Page 100558, as amended by First Amendment to Operating and Easement Agreement dated November 7, 2011 between Target Corporation, Pinnacle South, LLC and Cabela's Wholesale, Inc. filed for record November 21, 2011 in Book 2011 at Page 161044, aforesaid records.



DocuSign Envelope ID: 4EE8344C-A75E-4023-9B71-5C00962274ED

## **Exhibit E**

Memorandum of Dollar Tree Lease

LANDLORD COPY

After Recording, Return to:

Dollar Tree Stores, Inc.
500 Volvo Parkway
Chesapeake, Virginia 23320
Attn: Lease Administration

_____

(The Above Space for Recorder's Use Only)

THIS MEMORANDUM OF LEASE, made as of _____*May 24*_____, 2019, by and between **PINNACLE HILLS, LLC** a Delaware limited liability company having an office at 350 North Orleans Street, Suite 300, Chicago, IL 60654 ("Landlord"), and **DOLLAR TREE STORES, INC.,** a Virginia corporation having an office at 500 Volvo Parkway, Chesapeake, Virginia 23320 ("Tenant").

### Preliminary Statement

Landlord is the fee owner of certain real property and improvements situated in Benton County, Arkansas and more particularly described on Exhibit A attached hereto (the "Land") on which is situated a shopping center known generally as Pinnacle Hills Power Center (the "Shopping Center").

As of the date hereof Landlord and Tenant have entered into a lease agreement (the "Lease") pursuant to which Landlord has leased to Tenant a portion of the Shopping Center (the "Premises") more particularly described therein. In connection with the Lease, Landlord and Tenant have entered into this Memorandum to confirm the demise of the Premises and to provide notice to any interested party of such demise and of the terms and provisions of the Lease.

NOW, THEREFORE, the parties state as follows:

1.      All capitalized terms used in this Memorandum and not otherwise defined herein shall have the meanings ascribed to them in the Lease.

2.      The terms and conditions of the Lease are incorporated herein as though set forth in full, whereby Tenant may have and hold the Premises together with any and all licenses, rights, privileges and easements appurtenant thereto, at the rental and upon the terms and conditions therein stated, for an initial term of approximately ten (10) years commencing on the Commencement Date (the "Original Lease Term"). Under the terms of the Lease, Tenant has the right to extend the Original Lease Term for four (4) separate and additional periods of five (5) years each after the expiration of the Original Lease Term.

3.      This Memorandum of Lease is executed for the purpose of recordation in order to give notice of all of the terms, provisions and conditions of the Lease, including, without limitation:

> a.      Provisions set forth therein regarding Landlord's agreement not to lease, rent or occupy, or permit to be leased, rented or occupied, any portion of the Shopping Center other than the Premises for the operation of a single price point variety retail store or any other retail store the Principal Business of which is the operation of a single price point variety retail store;

> b.      Provisions set forth therein regarding Landlord's agreement not to permit any occupant of the Shopping Center other than Tenant to operate their premises for any of the following uses:

i.     Variety retail operations with the word "Dollar" or any derivation, abbreviation, slang, symbol or combination thereof (or their respective equivalents in any other language) in their trade name; or

ii.    A store occupying less than 8,000 square feet whose Principal Business is the sale of merchandise which is classified as "close-out", "odd lot", "clearance", "discontinued", "cancellation", "second", "floor model", "demonstrator", "obsolescent", "over stock", "distressed", "bankruptcy", "fire sale" or "damaged"; or Big Lots in any size (including in excess of 8,000 square feet); or

iii.   A store occupying less than 5,000 square feet whose Principal Business is selling a combination of gifts, cards, gift wrap and other party supplies; or Party City (including in excess of 5,000 square feet); or

iv.    Michaels; or

v.    A store occupying less than 30,000 square feet whose principal business is selling national or private-label pre-packaged food products and household items at prices that are generally below comparable items found in traditional supermarkets; or

vi.   A store selling a variety of general merchandise at a price not to exceed $5.00, provided that such limitation on price is a part of the regularly advertised attributes of such store; or

vii.  Any of the uses described on <u>Exhibit F</u> attached hereto.

As used in the Lease, with regard to any premises, a business is a "Principal Business" if the merchandise or categories of merchandise in question are sold in the aggregate in twenty-five percent (25%) or more of the sales floor area of the premises (including one-half [1/2] of the adjacent aisle space);

c.    provisions set forth therein regarding Tenant's right to install and maintain signage upon the Premises and upon certain pylon signs of the Shopping Center;

d.    provisions set forth therein regarding certain areas of the Shopping Center in which no improvements are to be constructed and no alterations are to be made; and

e.    Provisions prohibiting construction or alterations to any exterior portion of the Shopping Center during the months of October, November and December.

4.    In addition to those terms set forth above, the Lease contains numerous other terms, covenants and conditions which likewise affect the Premises and the Shopping Center and notice is hereby given that reference should be had to the Lease directly with respect to the details of such terms, covenants and conditions. The Lease and exhibits thereto are hereby incorporated by reference in this Memorandum of Lease and the parties hereby ratify and confirm the Lease as if said Lease were being re-executed by them and recorded. In the event of any conflict between the provisions of this instrument and the Lease, the provisions of the Lease shall control.

IN WITNESS WHEREOF, Landlord and Tenant have caused this Memorandum of Lease to be signed as of the date and year first above written.

**LANDLORD**

**PINNACLE HILLS, LLC**
a Delaware limited liability company

By: _____

Name: _____
Kristen N. Pate
Authorized Signatory

Title: _____

Landlord's Acknowledgment

STATE OF ( Illinois )

) SS.

COUNTY ( Cook )

The foregoing instrument was acknowledged before me, a Notary Public, this 24th day of May 2019, by Kristen N. Pate, the Authorized Signatory of Pinnacle Hills, LLC.

_____
NOTARY PUBLIC

OFFICIAL SEAL
KATHLEEN FABRE
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES JUN. 01, 2021

**TENANT**

**DOLLAR TREE STORES, INC.,**
a Virginia corporation

By: _____

Name: _____
           Bruce A. Walters
           Chief Development Officer
Title: _____


Tenant's Acknowledgment


STATE OF VIRGINIA

                          ) SS.

CITY OF CHESAPEAKE


The foregoing instrument was acknowledged before me, a Notary Public, this _16th_ day of _May_, 2019, by _Bruce A. Walters_, the _Chief Development Officer_ of Dollar Tree Stores, Inc.


_Jacqueline Davidson Paulsen_
NOTARY PUBLIC



<u>EXHIBIT A</u>

LEGAL DESCRIPTION

Tract 1:
Lots 7 of the Pinnacle Hills Promenade Subdivision, Rogers, Benton County, Arkansas, as shown on Plat Record 2006 at Pages 1356 to 1364.

**Beneficial Easements and Rights of First Refusal as contained in the following:**

Restrictive Covenant Agreement by and between Rogers Retail, LLC, a Delaware limited liability company, GGP-Rogers Retail LLC, a Delaware limited liability company, Hunt Schwyhart Graham VI, LLC, a Delaware limited liability company, Great Northwest Development, LLC, an Arkansas limited liability company and HSG Holdings, LLC, recorded October 10, 2005 in Deed Book/Page 2005 54722.

Construction, Operation and Reciprocal Easement Agreement by and between Rogers Retail, LLC and Dillard's Dollars, Inc., filed May 19, 2006 in Deed Book/Page 2006 129634, among the land records of Benton County, Arkansas, as assigned by Assignment and Assumption of Construction, Operation and Reciprocal Easement Agreement by and between Rogers Retail, LLC and Pinnacle Hills, LLC, filed November 21, 2006 in Deed Book/Page 2006 55885 (Lots 1, 3, 4), Assignment and Assumption of Construction, Operation and Reciprocal Easement Agreement by and between Rogers Retail, LLC and Pinnacle South, LLC, filed November 21, 2006 in Deed Book/Page 2006 55895 (Lot 7) and Assignment and Assumption of Construction, Operation and Reciprocal Easement Agreement by and between Pinnacle South, LLC and Pinnacle Hills, LLC, filed March 19, 2012 in Deed Book/Page 2012 44552 (Lot 7).

<u>EXHIBIT F</u>

Prohibited Uses

1.  A flea market or pawn shop;

2.  A bar, pub, nightclub, music hall or disco in which less than 50% of the space or 50% of the revenue is devoted to and derived from food service;

3.  A bowling alley, billiard, pool or bingo parlor;

4.  An arcade, pinball or computer game room (provided that retail facilities which are otherwise not prohibited or restricted may operate no more than six (6) such electronic games incident to their primary business) whose premises is closer than 150 feet from Tenant's Premises;

5.  A facility for the sale or rental of used goods (including thrift shops, secondhand or consignment stores);

6.  A training or educational facility (including, without limitation, a beauty school, barber college, reading room, driving school, or other facility catering primarily to students or trainees rather than customers);

7.  A massage parlor (which shall not be construed to mean a business of the type commonly referred to as a "day spa");

8.  A funeral home;

9.  A gymnasium, sport or health club whose premises is closer than 150 feet from Tenant's Premises;

10. A facility for the sale of paraphernalia for use with illicit drugs;

11. A retail store, dispensary, or any other facility where marijuana products are grown, manufactured, or distributed;

12. A facility for the sale or display of pornographic material;

13. A lingerie bar, "go go" bar or other similar establishment;

14. A Laundromat;

15. An off-track betting parlor;

16. A carnival, amusement park or circus;

17. A gas station, car wash or auto repair or body shop;

18. A facility for the sale of new or used motor vehicles, motorcycles, trailers or mobile homes;

19. A skating rink;

20. A banquet hall, auditorium or other place of public assembly;

21. A hotel or residential facility;

22. A theater of any kind whose premises is closer than 150 feet from Tenant's Premises;

23. Any use that creates reasonably objectionable or obnoxious odors; or

24.  Other non-retail uses except for office or storage facilities incidental to a primary retail operation.

**Exhibit F**

Summary of Estimated Damages

**Dollar Tree / Hobby Lobby Estimated Damages**

