Robert L. LeHane, Esq.
Kristin S. Elliott, Esq.
Ravi Vohra, Esq.
**KELLEY DRYE & WARREN LLP**
3 World Trade Center
175 Greenwich Street
New York, NY 10007
Tel:  212-808-7800
Fax: 212-808-7897
Email:  rlehane@kelleydrye.com
            kelliott@kelleydrye.com
            rvohra@kelleydrye.com

-and-

One Jefferson Road
Parsippany, NJ 07054
Tel: 973-503-5900

*Counsel for Regency Centers, L.P. and Daly City Serramonte Center, LLC*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

```
-------------------------------------------------------------x
In re                                   :    Chapter 11
                                        :
BED BATH & BEYOND INC., et al.,         :    Case No. 23-13359 (VFP)
                                        :
        Debtors                         :    (Jointly Administered)
-------------------------------------------------------------x
```

**DECLARATION OF ERNST A. BELL IN SUPPORT OF OPPOSITION OF DALY CITY
SERRAMONTE CENTER, LLC TO DEBTORS' MOTION FOR ORDER
AUTHORIZING DEBTORS TO ASSUME AND ASSIGN LEASE FOR STORE NO. 3108**

Ernst A. Bell, pursuant to 28 U.S.C. §1746, hereby declares as follows:

1.    I am Vice President, Associate General Counsel for Regency Centers L.P.

("Regency"), parent of Daly City Serramonte Center, LLC (the "Landlord"), owner of the

shopping center commonly known as Serramonte Center ("Serramonte Center" or the "Shopping

Center") where the  above-captioned debtors (the "Debtors") lease the premises designated as

Store No. 3108 located at 149 Serramonte Center #150, Daly City, California 94015 (the "Leased Premises").

2.       I received a B.A. in Political Science from the University of Florida in 1992 and a J.D. from the University of Florida College of Law in 1995.  I have been employed at Regency since 2009 and have over 14 years of combined experience in real estate and retail. In connection with my role as Vice President, Associate General Counsel, I manage a team of attorneys and paralegals responsible for all Regency litigation, including landlord-tenant matters, bankruptcies, construction issues, and business disputes.

3.       In connection with my role, I am also one of the custodians of records of the Landlord's books, records, and files that relate to the use and occupancy of retail premises at the Shopping Center.  I am personally familiar with (i) the Shopping Center; (ii) the Leased Premises; (iii) the BBBY Lease (defined below); and (iv) the Ross Lease (defined below).  If called upon to testify in this proceeding as to the matters set forth in this declaration, I could and would competently testify thereto, since the facts set forth herein are personally known to me to be true.

4.       Serramonte Center is a large, highly trafficked shopping center, with over 1 million square feet of floor area and over 110 retail stores and restaurants, including well-known names such as Macy's, Crunch Fitness, TJ Maxx, Party City, Nordstrom Rack, Target, and Buffalo Wild Wings.  Serramonte Center is maintained and managed as a first-class shopping center comparable to other first-class shopping centers in California.[1]

---

[1]       BBBY Lease, § 13.1.2.

5.      Debtor Bed Bath & Beyond Inc. is the tenant at the Leased Premises pursuant to a written lease, dated May 18, 2015 (the "BBBY Lease").[2]  The BBBY Lease is currently set to expire on January 31, 2028, subject to options to extend the term in favor of the tenant.

6.      The Leased Premises is within the Southwest Quadrant of the Shopping Center.

7.      On June 30, 2023, the Debtors filed their *Notice of Assumption of Certain Unexpired Leases*, demonstrating, *inter alia*, their intent to assume and assign the BBBY Lease (the "Proposed Assignment") to Burlington Coat Factory Warehouse Corporation ("Burlington").[3]

8.      On or about February 1, 2016, the Landlord and Ross Dress for Less, Inc. ("Ross") entered into a written Lease Agreement for approximately 27,178 square feet of retail premises located in the Shopping Center (the "Ross Lease").[4]

9.      The Ross Lease, at section 15.3(a), provides that, without the prior written consent of Ross, Landlord shall not lease space to nor allow any other tenant in the Southwest Quadrant of the Shopping Center to use more than 15,000 square feet for the primary purpose of the off price sale of merchandise.  The Ross Lease further lists Burlington as an example of an off price sale retailer.

10.      Section 15.3(b) of the Ross Lease provides explicit tenant remedies in the event the Landlord violates Ross's exclusivity provision, which include, but are not limited to, the right to terminate the Ross Lease or to pay Substitute Rent, which is the lesser of the:  (i) Minimum

---

[2]      A true and correct copy of the BBBY Lease is attached hereto as **Exhibit A**.

[3]      Docket No. 1157.

[4]      A true and correct copy of the redacted Ross Lease is attached hereto as **Exhibit B**.

DocuSign Envelope ID: 3D6A5B83-3CF2-4903-ADB6-4E9B9DFD4EC4

Rent (as defined in the Ross Lease); and (ii) two percent (2%) of Ross's Gross Sales (as defined in the Ross Lease) during the preceding month.

11.    As reflected in the Ross Lease, Ross and Burlington are direct competitors. Moreover, upon information and belief, Burlington proposes to use the Leased Premises for the purposes of selling off price merchandise.

12.    If the proposed assignment of the Leased Premises to Burlington is approved and Ross elects to pay "Substitute Rent" in the amount of 2% of "Gross Sales" in the previous month, Regency conservatively estimates, based on available data, that the Landlord will suffer a minimum of approximately ███████ in damages through the current term of the Lease as a result of the reduction in rent payments under the Ross Lease.

13.    If Ross exercises its option to terminate the Ross Lease, the Landlord would suffer additional damages in the costs and expense of locating a new tenant, lost rent during the period of time it takes for the Landlord to find a replacement tenant, as well as overall reduction in patronage and sales at the Shopping Center.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: Jacksonville, FL
    August 18, 2023

Ernst A. Bell

DocuSign Envelope ID: 3D6A5B83-3CE2-4903-ADB6-4E9B9DFD4EC4

## **Exhibit A**

BBBY Lease

# LEASE AGREEMENT

### Between

## DALY CITY SERRAMONTE CENTER, LLC,
## A DELAWARE LIMITED LIABILITY COMPANY

### Landlord

### and

## BED BATH & BEYOND INC.,
## a New York corporation,

### Tenant

## SERRAMONTE CENTER
## DALY CITY, CALIFORNIA

**Dated as of:** May 18 , 2015

* * * * * *

The mailing, delivery or negotiation of this Lease shall not be deemed an offer to enter into any transaction or to enter into any relationship, whether on the terms contained herein or on any other terms. This Lease shall not be binding nor shall either party have any obligations or liabilities or any rights with respect thereto, or with respect to the premises, unless and until both parties have executed and delivered this Lease. Until such execution and delivery of this Lease, either party may terminate all negotiation and discussion of the subject matter hereof, without causes and for any reason, without recourse or liability.

* * * * * *

## TABLE OF CONTENTS

Page

ARTICLE 1 BASIC TERMS AND DEFINITIONS ...................................................................1
    Section 1.1    Basic Terms and Definitions .........................................................1

ARTICLE 2 LEASE OF PREMISES; LEASE TERM; DELIVERY DATE...............................4
    Section 2.1    Lease of Premises.........................................................................4
    Section 2.2    Term. ...........................................................................................4
    Section 2.3    Delivery Date. ..............................................................................5
    Section 2.4    Slack Period.................................................................................7
    Section 2.5    Initial Co-Tenancy Condition......................................................7
    Section 2.6    Permits Contingency ...................................................................8

ARTICLE 3 IMPROVEMENTS .................................................................................................9
    Section 3.1    Landlord's Work and Tenant's Work ..........................................9
    Section 3.2    Plan Approvals ..........................................................................10
    Section 3.3    Performance of Work. ................................................................11
    Section 3.4    Tenant's Leasehold Improvements ............................................12
    Section 3.5    Tenant's Trailer .........................................................................13
    Section 3.6    Tenant Allowance ......................................................................13
    Section 3.7    Measurement; Adjustment of Rent .............................................14

ARTICLE 4 FIXED RENT, PERCENTAGE RENT AND TAXES: DETERMINATION AND
        PAYMENT...........................................................................................14
    Section 4.1    Fixed Rent .................................................................................14
    Section 4.2    Payment of Rent ........................................................................14
    Section 4.3    Real Estate and Other Taxes. ....................................................14
    Section 4.4    Percentage Rent .........................................................................15

ARTICLE 5 COMMON AREAS, THEIR USE AND CHARGES ............................................16
    Section 5.1    Common Areas: Maintenance. ...................................................16
    Section 5.2    Common Areas: Restrictions. ....................................................17

ARTICLE 6 UTILITIES............................................................................................................20
    Section 6.1    Utility Service ...........................................................................20
    Section 6.2    Interruption................................................................................20

ARTICLE 7 SIGNS  21
    Section 7.1    Tenant's Building Signage .........................................................21
    Section 7.2    Pylon/Monument Signage .........................................................21
    Section 7.3    Signage: Alteration/Removal/Allocation ...................................21
    Section 7.4    Cooperation ...............................................................................21
    Section 7.5    Signage and Building Restrictions .............................................22

ARTICLE 8 ALTERATIONS AND IMPROVEMENTS............................................................22
    Section 8.1    Alterations and Improvements. ..................................................22

ARTICLE 9 REPAIRS ..............................................................................................................24
    Section 9.1    Tenant's Repairs........................................................................24
    Section 9.2    Landlord's Repairs ....................................................................24
    Section 9.3    Legal Compliance Work ............................................................25

ARTICLE 10 INDEMNIFICATION, INSURANCE AND WAIVER OF SUBROGATION .....25
    Section 10.1    Mutual Release, Waiver of Subrogation and Mutual Indemnification. ......25
    Section 10.2    Tenant's Insurance. ...................................................................26
    Section 10.3    Landlord's Insurance. ................................................................26
    Section 10.4    General Insurance Requirements. ..............................................27

ARTICLE 11 FIRE AND OTHER CASUALTY; EMINENT DOMAIN ..................................27
    Section 11.1    Fire and Other Casualty.............................................................27
    Section 11.2    Eminent Domain. .......................................................................29
    Section 11.3    Abatement of Rent Charges .......................................................30

1854916.2\C061858\0372671
[bbBaby]

ARTICLE 12 COVENANTS, REPRESENTATIONS AND WARRANTIES ...........................30
    Section 12.1    Quiet Enjoyment .....................................................................30
    Section 12.2    Authority ................................................................................30
    Section 12.3    Landlord's Covenants, Warranties and Representations..............31
    Section 12.4    Environmental Matters.............................................................32

ARTICLE 13 USES AND RESTRICTIONS ................................................................33
    Section 13.1    Permitted and Prohibited Uses. ................................................33
    Section 13.2    Tenant's Exclusive in Center ...................................................34
    Section 13.3    Exclusives Which Tenant Must Honor. .....................................35

ARTICLE 14 CONDUCT OF BUSINESS OPERATIONS .............................................35

ARTICLE 15 TENANT ASSIGNMENT AND SUBLETTING.........................................36
    Section 15.1    Assignment and Subletting.......................................................36
    Section 15.2    Liability of Tenant..................................................................37
    Section 15.3    Collateral Assignment ............................................................37
    Section 15.4    Cure Rights of Original Tenant.................................................37
    Section 15.5    Recognition Agreement ...........................................................38

ARTICLE 16 DEFAULT AND DISPUTE RESOLUTION ..............................................38
    Section 16.1    Tenant Default.........................................................................38
    Section 16.2    Landlord Default ....................................................................39
    Section 16.3    Arbitration .............................................................................40

ARTICLE 17 RIGHT TO MORTGAGE AND NON-DISTURBANCE; ESTOPPEL
             CERTIFICATE ......................................................................40
    Section 17.1    Right to Mortgage and Non-Disturbance ...................................40
    Section 17.2    Estoppel Certificate ................................................................40
    Section 17.3    Mortgages and Ground Leases .................................................41

ARTICLE 18 NOTICE ..........................................................................................41

ARTICLE 19 TENANT'S PROPERTY.....................................................................41

ARTICLE 20 END OF TERM .................................................................................41
    Section 20.1    Surrender of Premises .............................................................41
    Section 20.2    Hold Over ..............................................................................41

ARTICLE 21 [INTENTIONALLY DELETED]............................................................42

ARTICLE 22 ONGOING CO-TENANCY ..................................................................42

ARTICLE 23 MISCELLANEOUS ............................................................................42
    Section 23.1    Loading Facilities...................................................................42
    Section 23.2    Liens.....................................................................................42
    Section 23.3    Broker's Commission..............................................................42
    Section 23.4    *Force Majeure* .....................................................................43
    Section 23.5    Consents ...............................................................................43
    Section 23.6    Costs.....................................................................................43
    Section 23.7    Attorneys' Fees .....................................................................43
    Section 23.8    Survival of Obligations ...........................................................43
    Section 23.9    Non-Waiver ...........................................................................43
    Section 23.10   Rights Cumulative..................................................................43
    Section 23.11   Definition of Landlord ............................................................44
    Section 23.12   Successors and Assigns...........................................................44
    Section 23.13   Limitation of Landlord's Liability ...........................................44
    Section 23.14   Limitation of Tenant's Liability ...............................................44
    Section 23.15   Joint and Several Liability.......................................................44
    Section 23.16   Severability............................................................................44
    Section 23.17   Grammatical Usages and Construction......................................44
    Section 23.18   Table of Contents, Line Numbering and Paragraph Headings.......44
    Section 23.19   Definition of Hereunder, Herein, etc.........................................44
    Section 23.20   Short Form Lease ...................................................................45

1854916.2\C061858\0372671
[bbBaby]

Section 23.21    Entire Agreement and Modification..............................................................45
Section 23.22    No Joint Venture or Partnership Created by Lease ....................................45
Section 23.23    Tenant's Tradename...................................................................................45
Section 23.24    Counterparts ..............................................................................................45
Section 23.25    Waiver of Trial by Jury ............................................................................45
Section 23.26    Ethical Conduct Policy..............................................................................45
Section 23.27    Confidentiality...........................................................................................45
Section 23.28    Timely Billing of Charges.........................................................................46
Section 23.29    USA Patriot Act ........................................................................................46
Section 23.30    CASP Inspection Civil Code Section 1938...............................................46
Section 23.31    Governing Law..........................................................................................47

1854916.2\C061858\0372671
[bbBaby]

EXHIBITS

| | |
|---|---|
| Exhibit A | Legal Description of Shopping Center |
| Exhibit B | Site Plan |
| Exhibit C | Form of Rent Commencement and Expiration Date Agreement |
| Exhibit D | Specifications for Landlord's Work |
| Exhibit D-1 | Exterior Elevations of the Premises, and Sidewalk Plan |
| Exhibit E | Permitted Encumbrances |
| Exhibit F | Signage |
| Exhibit G | Form of Subordination, Non-Disturbance and Attornment Agreement |
| Exhibit H | Form of Subtenant Recognition Agreement |
| Exhibit I | Form of Delivery Date Notice |
| Exhibit J | Form of Delivery Date Certification |
| Exhibit K-1 | Existing Exclusives |
| Exhibit K-2 | Existing Leases |
| Exhibit L | Prohibited Uses |
| Exhibit M | Form of Mechanics' Lien Indemnification Agreement |
| Exhibit N | Existing Lease Limitations |

1854916.2\C061858\0372671
[bbBaby]

LEASE AGREEMENT

THIS LEASE AGREEMENT (*"Lease"*) is entered into as of May 18, 2015 by and between DALY CITY SERRAMONTE CENTER, LLC, a Delaware limited liability company, having an office at 3 Serramonte Center, Daly City, California 94015 (*"Landlord"*), and BED BATH & BEYOND INC., a New York corporation, having an office at 650 Liberty Avenue, Union, New Jersey 07083 (*"Tenant"*).

WITNESSETH:

ARTICLE 1
BASIC TERMS AND DEFINITIONS

Section 1.1   Basic Terms and Definitions.  The following terms shall have the meanings set forth in this Section 1.1 except as otherwise expressly provided herein.

1.1.1   Additional Rent:   Any monies which Tenant is required to pay to Landlord under the terms and conditions of this Lease, other than Fixed Rent.

1.1.2   Affiliate:  A corporation, partnership, limited liability company, person or other entity which is controlling, controlled by, or under common control with, Landlord or Tenant, as the case may be.  As used herein, *"control"* shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person or entity, whether through the ownership of voting securities or rights, by contract, or otherwise.

1.1.1   Alternate Rent:  Fifty percent (50%) of the amount of Fixed Rent which otherwise would have been payable under the Lease during the applicable period, it being agreed that Tenant shall pay any Additional Rent due and payable under the Lease during such period.

1.1.3   Common Areas:  All areas in the Shopping Center which are, from time to time, available for the joint use and benefit of Tenant and other tenants and occupants of the Shopping Center, and their respective employees, agents, subtenants, concessionaires, licensees, customers and other invitees, including, but not limited to, any and all parking areas, parking spaces, driveways, truck serviceways, passageways, sidewalks, entrances, exits, lighting facilities, courts, landscaped areas, retention or detention areas, fencing, directional or safety signs, and utility lines serving such common areas and facilities.

1.1.4   Common Areas Charges:  As defined in Section 5.1 hereof.

1.1.5   Delivery Date: As defined in Section 2.3 hereof.

1.1.6   Effective Date: The date hereof.

1.1.7   Event of Default:  As defined in Section 16.1 hereof.

1.1.8   Excused Periods:  Periods during which Tenant's failure to conduct the operations of its business or any other business: (x) resulted from alterations or renovations being performed in and to the Premises (not to exceed 120 days), (y) was caused by damage or destruction, eminent domain proceedings or actions, or *Force Majeure*, or (z) was caused by any act or omission of Landlord, or its employees, agents, or contractors.

1.1.9   Exhibits.  The exhibits listed in the Table of Contents annexed to this Lease have been agreed to by the parties and attached hereto, it being the intention of the parties that they shall become a binding part of this Lease as if fully set forth herein.

1.1.10 Fixed Rent:  The following amounts for the periods indicated (subject to adjustment pursuant to Section 3.4 hereof):

(a)   For the period commencing on the Rent Commencement Date and ending on the first January 31 occurring after the fifth (5th) anniversary of the Rent Commencement Date, at the rate of Five Hundred Four Thousand Seven Hundred Fifty Eight and 00/100 ($504,758.00) Dollars per year [based on Twenty Three and 00/100 ($23.00) Dollars per square foot of Floor Area in the Premises];

(b)     For the period commencing on the first February 1 occurring after the fifth (5th) anniversary of the Rent Commencement Date and ending on the last day of the "Initial Term" (defined in Subsection 1.1.41 below), at the rate of Five Hundred Fifty Five Thousand Two Hundred Thirty Three and 80/100 ($555,233.80) Dollars per year [based on Twenty Five and 30/100 ($25.30) Dollars per square foot of Floor Area in the Premises];

(c)     In the event Tenant exercises the first Renewal Option, for the first five (5) year Renewal Period, at the rate of Six Hundred Ten Thousand Seven Hundred Fifty Seven and 18/100 ($610,757.18) Dollars per year [based on Twenty Seven and 83/100 ($27.83) Dollars per square foot of Floor Area in the Premises]; and

(d)     In the event Tenant exercises the second Renewal Option, for the second five (5) year Renewal Period, at the rate of Six Hundred Eighty Three Thousand Eight Hundred Thirty Seven and 36/100 ($683,837.36) Dollars per year [based on Thirty One and 16/100 ($31.16) Dollars per square foot of Floor Area in the Premises].

1.1.11  Floor Area:  The actual number of square feet of space contained on all floors within any building area in the Shopping Center (including the Premises).  All measurements pursuant to this Section shall be from the exterior of outside walls, doors, windows or store front and/or to the centerline of any common walls, but in no event shall Floor Area within either the Premises or the remainder of the Shopping Center include any non-selling or storage space areas within any mezzanine, lower floor or second floor.

1.1.12  *Force Majeure*:   As defined in Section 23.4 hereof.

1.1.13  Ground Lessor:  The landlord under any existing or future ground or underlying leases encumbering or affecting all or any part of the Shopping Center.

1.1.14  [Intentionally Deleted].

1.1.15  Hazardous Substances:  As defined in Subsection 12.4.1 hereof.

1.1.16  [Intentionally Deleted].

1.1.17  Landlord:  As defined in the preamble and Section 23.11 hereof

1.1.18  Landlord's Mailing Address:  1600 Northeast Miami Gardens Drive, North Miami Beach, FL 33179, Attn: Legal Department, with a copy to: 3 Serramonte Center, Daly City, CA 94015, Attn: Property Management, or such other place and/or to the attention of such other person as Landlord may notify Tenant from time to time by notice given in accordance with the provisions of Article 18 hereof.  If the "Landlord" consists of more than one person, then notices given to the entity listed in Landlord's Mailing Address will be deemed to have been given automatically to all of the parties which constitute Landlord, and Tenant shall be entitled to rely exclusively on any notice sent by said entity.  Landlord's Address for the Payment of Rent shall be: Daly City Serramonte Center, LLC, Dept. 3319, Los Angeles, CA 90084-3319.

1.1.19  Landlord's Work:  As defined in Section 3.1 hereof.

1.1.20  Lease Interest Rate:  The then effective prime rate as published from time to time in the "Money Rates" section of *The Wall Street Journal* (or any successor publication thereto) plus two (2%) percent.

1.1.21  Legal Requirements:  All laws, statutes, codes, acts, ordinances, judgments, decrees, authorizations, directions and requirements of, and agreements with, all governmental departments, commissions, boards, courts, authorities, agencies, officials and officers, which now or at any time hereafter may be applicable to the Premises, the Shopping Center, or any part(s) thereof, including, without limitation, the American with Disabilities Act and federal, state, and local governmental interpretations thereof.

1.1.22  Mortgagee:  Any lender, which is not an Affiliate of Landlord, and which holds a mortgage on the Shopping Center or is the beneficiary under a deed of trust encumbering the Shopping Center.

2

1.1.23 [Intentionally Deleted]

1.1.24 Pad: A compacted graded building pad as more particularly set forth in Exhibit D attached hereto.

1.1.25 Permitted Use: the sale (including the incidental rental), at retail of infant, juvenile and children's goods and services, including, but not limited to, a variety (in Tenant's sole discretion as to the mix and proportions) of the following: infant's, juvenile's and children's furniture, furnishings, beds (including, without limitation, mattresses and bedding), changing tables, gliders and rockers (including coordinating ottomans), high chairs, lamps, walkers, play yards, swings, car seats, booster seats, carriages, strollers, cradles, playpens, cribs, toy or clothing chests, stuffed animals, games and toys, bedding accessories, maternity clothing and related items, clothing and accessories for infants, juveniles or children, apparel, layettes, shoes, toys, bottles, food or formula for infants, juveniles and children, feeding items, safety items, nursing items, health and beauty care items, food and beverages, drug remedies, diapers, wipes, bathroom and personal care devices and items, indoor or outdoor play and recreational equipment, pacifiers, baby safety items, diaper bags, nursing and bathing items, children's books, pregnancy books, magazines, computer software, audio and video cassettes or tapes, picture frames, portrait studio items and services, party supplies, invitations, greeting cards, gift items, arts and crafts, stationery, teachers' and parents' resources, other educational and multi-media children's items, hair cutting services, fitness center development and learning services, and any and all other items sold or services provided from time to time in any store owned or operated by Tenant or its Affiliate(s) (the aforementioned items are hereinafter collectively referred to as the "***Permitted Items***"); and for any other lawful retail use not specifically prohibited by the provisions of Subsection 13.1.1 below and provided that such other lawful retail use is consistent with the then existing character and quality of the Shopping Center.  In addition, Tenant shall be permitted to use portions of the Premises for storage and office uses incidental to the Permitted Use.

1.1.26 Premises: Being the area cross-hatched on Exhibit B hereto, having dimensions as shown on Exhibit B and containing approximately Twenty One Thousand Nine Hundred Forty Six (21,946) square feet of Floor Area, subject to adjustment in accordance with the provisions of Section 3.4 below.  In no event shall the building constructed by Tenant contain more than 23,000 square feet of Floor Area (excluding any mezzanine space). Tenant shall have the right, but not the obligation, to construct in the Premises a mezzanine level space containing no more than 1,000 square feet for office purposes.  In no event shall Tenant be required to pay Rent on such non-selling mezzanine space, if any.

1.1.27 Renewal Option: As defined in Section 2.2.2 hereof.

1.1.28 Renewal Period(s): Two (2) successive periods of five (5) years each, as provided in Section 2.2.2 hereof.

1.1.29 Rent:  Fixed Rent and/or Additional Rent.

1.1.30 Rent Commencement Date: As defined in Section 2.2 hereof.

1.1.31 [Intentionally Deleted].

1.1.32 Shopping Center:  The shopping center commonly known as Serramonte Center, containing approximately 883,026 square feet of Floor Area as of the date hereof, on the property located at the intersection of Serramonte Boulevard, Callan Boulevard and Interstate 280 in Daly City, California and more particularly described in Exhibit A hereto. If Landlord elects to change the name of the Shopping Center, Landlord shall provide Tenant with at least thirty (30) days prior written notice thereof.  For purposes of this Lease, the Shopping Center consists of (i) the enclosed interior mall (the "***Enclosed Mall***"), (ii) the departments stores adjacent to the Enclosed Mall and (iii) the Southwest Quadrant.  As used herein, the "***Southwest Quadrant***" shall mean the area delineated on Exhibit B.

1.1.33 Substantially Completed or Substantial Completion:  The completion of specified work at the Shopping Center (including, without limitation, as applicable, Landlord's Work or Tenant's Work) to the extent that only "Punch List Items" of such work (defined in Subsection 3.3.3 below) shall not be completed.

1854916.2\C061858\0372671
[bbBaby]

1    1.1.34 <mark>Taxes:</mark>  As defined in Section 4.3.3 hereof.

2    1.1.35  Tenant:  As defined in the preamble hereof.

3    1.1.36  Tenant's Mailing Address:  650 Liberty Avenue, Union, New Jersey
4    07083, Attn:  Mr. Warren Eisenberg, or such other place and/or to the attention of such other
5    person as Tenant may notify Landlord from time to time by notice given in accordance with the
6    provisions of Article 18 hereof.

7    1.1.37  Tenant's Permits:  As defined in Section 2.3.1(b) hereof.

8    1.1.38  Tenant's Property:  All of Tenant's personal property, including, without
9    limitation, phone and alarm systems, satellite antennae, shelving, computers, furniture, cash
10   registers and customer service counters, specialty lighting, track lighting, millwork, conveyor
11   systems, storage racks and signage and any and all other personal property of Tenant which is
12   capable of being removed from the Premises without material damage thereto, but which shall
13   not include electrical systems, heating, ventilation and air conditioning systems, and other
14   mechanical systems, flooring, carpet, elevators, standard lighting and wiring installed within the
15   walls of the Premises.

16   1.1.39  [Intentionally Deleted].

17   1.1.40 <mark>Tenant's Work:</mark>  As defined in Section 3.1 hereof.

18   1.1.41  Term:  A period  (the "***Initial Term***") of approximately ten (10) years
19   beginning on the Rent Commencement Date and expiring at midnight on the last day of January
20   following the tenth (10th) anniversary of the Rent Commencement Date, unless the Rent
21   Commencement Date is February 1, in which event the Expiration Date shall be the day before
22   the tenth (10th) anniversary of the Rent Commencement Date.  As used herein: (i) "***Term***" shall
23   refer to the Initial Term, as the same may be extended by any Renewal Period exercised pursuant
24   to Section 2.2.2 below; and (ii) "***Expiration Date***" shall mean the date on which the Term
25   expires.

26   ARTICLE 2
27   LEASE OF PREMISES; LEASE TERM; DELIVERY DATE

28   Section 2.1    Lease of Premises.  Landlord hereby leases to Tenant, and Tenant
29   hereby leases from Landlord, the Premises together with any and all rights, benefits, privileges
30   and easements, now or hereafter appurtenant to either or both of the Premises and the Shopping
31   Center, arising out of any public or private grant or authority, including, without limitation, the
32   non-exclusive right and easement to use the Common Areas in common with other tenants and
33   occupants of the Shopping Center. Landlord acknowledges that following the Effective Date,
34   Tenant intends (but shall not be obligated) to sublease the entire Premises to its wholly owned
35   subsidiary, Buy Buy Baby, Inc., a Delaware corporation ("***Baby***"), and Landlord agrees to accept
36   performance of Tenant's obligations hereunder by Baby.

37   Section 2.2    Term.

38   2.2.1    Initial Term.  Subject to the provisions of this Article 2, the Term of this
39   Lease shall begin on the one hundred eightieth (180th) day following the later of (i) the Delivery
40   Date (hereinafter defined in Section 2.3.1) or (ii) the "Permit Contingency Date" (hereinafter
41   defined in Section 2.6) (the "***Rent Commencement Date***").  The Term shall expire on the
42   Expiration Date, unless earlier terminated as herein provided.  When the Rent Commencement
43   Date has been determined, as provided in this Section, Landlord and Tenant shall execute,
44   acknowledge and deliver, each to the other, a written statement in the form attached hereto as
45   Exhibit C specifying the Rent Commencement Date, and Landlord shall deliver to Tenant a
46   completed and signed IRS Form W-9 contemporaneously therewith; the delivery of the Form W-
47   9 shall be a condition precedent to the payment of Rent.  Except as otherwise set forth in Section
48   3.2.3 below, this Lease shall be effective and in full force as of the Effective Date, and Tenant
49   shall be responsible for the performance of all terms, covenants and conditions contained in this
50   Lease to be performed during any period that the Tenant is in possession of the Premises before
51   the Rent Commencement Date save and except for the payment of any items of Rent.

4

2.2.2  Renewal Options. Provided no Event of Default then exists either on the date that Tenant exercises its Renewal Option or at the commencement of the applicable Renewal Period, Tenant shall have the right and option (hereinafter a *"Renewal Option"*) to extend the Initial Term from the date on which it would otherwise expire for two (2) successive renewal periods of five (5) years each (individually, a *"Renewal Period"*, and collectively, the *"Renewal Periods"*) upon the same terms and conditions as are herein set forth except that the Fixed Rent shall be as set forth in Section 1.1.10 and any rent free periods, rental concessions, inducements, allowances, Landlord Work and other similar items applicable during the Initial Term will not apply during any Renewal Period. Each Renewal Option shall be exercisable by notice given to Landlord at least one hundred eighty (180) days prior to the commencement of the applicable Renewal Period(s), provided, however, that the Term of this Lease shall not expire unless and until Tenant fails to exercise a Renewal Option within fifteen (15) days after receiving notice from Landlord that the Renewal Option in question has not been exercised (Landlord's notice shall not be given prior to the 180th day prior to the Expiration Date), or unless and until Tenant gives notice to Landlord that it will not be exercising any remaining Renewal Options. If Landlord fails to give Tenant such notice prior to the Expiration Date, and Tenant occupies the Premises after the Expiration Date, then Tenant shall remain in possession subject to the provisions of this Lease but without the application of Article 20 hereof. If Landlord then gives Tenant such notice and Tenant exercises its Renewal Option, then the effective date of such exercise shall be retroactive to the Expiration Date.

Section 2.3    Delivery Date.

2.3.1  Definition. Subject to Landlord's delivery to Tenant of the Delivery Date Notice in accordance with the provisions of Subsection 2.3.2 below and Landlord's timely compliance therewith, Landlord shall be deemed to have delivered possession of the Pad to Tenant at 8:00 a.m. on the date (the *"Delivery Date"*) following the day on which all of the following conditions (the *"Delivery Date Conditions"*) shall have occurred and Tenant shall have received from Landlord the Delivery Date Certification in accordance with the provisions of Section 2.3.3 below, which shall constitute Landlord's written certification that all of the following shall have occurred:

(a)    Actual possession of the Pad shall have been delivered to Tenant free of Hazardous Substances and with all of the Phase A Work (as depicted on Exhibit B and as defined in Exhibit D) Substantially Completed, which Substantial Completion shall be evidenced by a written certification by Landlord's architect to Tenant;

(b)    Landlord shall have obtained (and delivered copies thereof to Tenant, upon request) all site plan and land use approvals required from all applicable third parties and governmental authorities to enable Tenant to construct the improvements on the Pad and to occupy and use the Premises for the conduct of its business in the Premises, which permits and approvals shall include, without limitation, zoning and building code approvals and any environmental requirements (but exclusive of building permits which may be necessary for the performance of Tenant's Work and any business licenses and certificates of occupancy which Tenant may be required to obtain in order to open and operate its business (collectively *"Tenant's Permits"*)),

(c)    The Common Areas, and, except for the Quadrant Development Work (as hereinafter defined in Section 5.2.2 below), all of the improvements thereto shown on Exhibit B and any site work described in Exhibit D hereto, shall have been Substantially Completed and operational, it being agreed that, subject to Landlord performing any site work as set forth in Exhibit D, if the Common Areas are substantially in the same condition on the Delivery Date as they exist on the Effective Date, Landlord shall be deemed to have satisfied the requirements of this Section 2.3.1(c);

(d)    The representations and warranties of Landlord set forth in subparagraphs (a) through (j) of Section 12.3 below shall then be true and in effect;

(e)    Landlord shall have delivered to Tenant, in recordable form: (i) a subordination, non-disturbance and attornment agreement substantially in the form attached hereto as Exhibit G executed by each holder of any mortgage or deed of trust encumbering or affecting Landlord's fee interest in and to the Shopping Center or any portion thereof (it being understood and agreed that this Subsection 2.3.1(e) is not intended to extend the date by which

5

Landlord is to deliver to Tenant any document(s) required pursuant to Section 17.3 hereof), and (ii) a fee owner recognition agreement in the form and content described in clause (b) of Section 17.1 hereof executed by any existing Ground Lessor; and

(f)     Landlord shall have delivered to Tenant the written consent from Dick's and any other applicable party having consent or approval rights to permit Tenant (i) to have shopping cart corrals pursuant to Section 5.2.8(c) hereof and (ii) to have the staging areas for Tenant's Work pursuant to Section 3.3.1 and designated as "*Tenant's Staging*" on Exhibit B (it being understood and agreed that this Subsection 2.3.1 (f) is not intended to extend the date by which Landlord is to deliver to Tenant the consents required pursuant to Sections 3.3.1 and 5.2.8(c) hereof).

2.3.2   Delivery Date.

(a)     Landlord shall give Tenant at least thirty (30) days prior notice of the Delivery Date, using the form of Delivery Date Notice attached hereto as Exhibit I (the "*Delivery Date Notice*"). Landlord's delivery of the Delivery Date Notice shall be a condition precedent to the Rent Commencement Date. Notwithstanding any provision of this Lease to the contrary, in no event shall the Delivery Date be deemed to occur prior to the Delivery Date established in the Delivery Date Notice. No event of Force Majeure occurring prior to the giving of the Delivery Date Notice shall serve to delay the Delivery Date thereby established.

(b)     Landlord acknowledges that if it shall fail to satisfy all of the Delivery Date Conditions by the Delivery Date as established in the Delivery Date Notice, Tenant will sustain substantial, additional costs and expenses, including, without limitation, costs incurred in connection with contractors and subcontractors hired to perform Tenant's Work, the exact amount of which would be impracticable or extremely difficult to ascertain. If the Delivery Date does not occur by the Delivery Date as established in the Delivery Date Notice (subject to, and to the extent of, any net delays ["*Tenant Delay*"] caused by Tenant's acts or omissions and any net delays caused by *Force Majeure*, each occurring after the giving of the Delivery Date Notice), then, in lieu of any other remedies available to Tenant for monetary damages under this subparagraph (b) by reason of Landlord's failure to satisfy all of the Delivery Date Conditions by the Delivery Date as established in the Delivery Date Notice, Tenant shall be entitled to a credit against the initial installment(s) of Rent hereunder, as liquidated reimbursement (and not as a penalty) for all of the aforesaid costs incurred by Tenant, an amount equal to One Thousand Two Hundred Fifty Dollars ($1,250) for each day that the Delivery Date established in the Delivery Date Notice is delayed (the "*Liquidated Reimbursement*"). The foregoing Liquidated Reimbursement represents the parties' good faith agreement as to an agreed upon amount which shall have been incurred by Tenant and which shall otherwise not be susceptible of exact ascertainment.

(c)     Tenant shall deliver to Landlord written notice (the "*Vacate Notice*") of the date on which Tenant shall have removed all of its trucks, trailers and other construction equipment and materials from the area in which Landlord shall perform the work designated as the "Phase B Work" on Exhibit B and as defined on Exhibit D (the "*Phase B Work*"). Landlord shall complete the Phase B Work within sixty (60) days after receipt of Tenant's Vacate Notice (the "*Phase B Completion Date*"). The completion of the Phase B Work shall be subject to a "walk-through" inspection and compilation of Punch List Items as set forth in Section 3.3.3. Landlord acknowledges that if it shall fail to complete the Phase B Work by the Phase B Completion Date, Tenant will sustain substantial, additional costs and expenses, the exact amount of which would be impracticable or extremely difficult to ascertain. Tenant shall be entitled to a credit against the initial installment(s) of Rent hereunder, as liquidated reimbursement (and not as a penalty) for all of the aforesaid costs incurred by Tenant, an amount equal to One Thousand Two Hundred Fifty Dollars ($1,250) for each day that the Phase B Work is not completed by the Phase B Completion Date. The foregoing reimbursement represents the parties' good faith agreement as to an agreed upon amount which shall have been incurred by Tenant and which shall otherwise not be susceptible of exact ascertainment.

(d)     Landlord shall complete the work designated as the "Phase C Work" on Exhibit B and as defined on Exhibit D (the "*Phase C Work*") at some future date as determined by Landlord provided that until the completion of the Phase C Work, Landlord shall maintain appropriate fences or barricades around those unbuilt areas to prevent wind-blown

6

debris and otherwise to maintain the balance of the Shopping Center in a clean and slightly condition.

2.3.3   Delivery Date Certification.  Upon the satisfaction of all of the Delivery Date Conditions, Landlord shall so certify to Tenant, using the form of Delivery Date Certification attached hereto as Exhibit J.

2.3.4   No Waiver.  Subject to Punch List Items as contemplated by Section 3.3.3, and Landlord's obligation to correct any latent defects in Landlord's Work of which Tenant has given Landlord notice thereof prior to the first (1st) anniversary of the Delivery Date, Tenant's acceptance of physical possession of the Pad shall be deemed to be an acknowledgment by Tenant that the Delivery Date Conditions have been satisfied (even if, in fact, they have not been satisfied); provided, however, that if an item of Landlord's Work which was not apparent on the Delivery Date is incomplete or incorrect or any other of the Delivery Date Conditions is unsatisfied (as the case may be, a "**Delivery Failure**"), and such Delivery Failure prevents Tenant from commencing and/or completing Tenant's Work, then the Rent Commencement Date shall be extended one (1) day for each day that Tenant is unable to commence and/or complete Tenant's Work solely due to the Delivery Failure until the Delivery Failure no longer exists and Tenant is able to commence or resume Tenant's Work.

Section 2.4   Slack Period.  If the Rent Commencement Date occurs during the months of December, January and February (the "**Slack Period**"), then Tenant shall have the right to (i) not open for business during such Slack Period in which event Tenant shall not be obligated to pay any Rent or Percentage Rent until the end of such Slack Period or (ii) open for business in which event Tenant shall be entitled to pay Alternate Rent in lieu of Fixed Rent for the period commencing on the Rent Commencement Date and ending on the expiration of the Slack Period (but Tenant shall continue to pay all Additional Rent to the extent required to be paid by Tenant hereunder).

Section 2.5   Initial Co-Tenancy Condition.

2.5.1   As used herein, the "**Initial Co-Tenancy Condition**" shall mean that (i) two (2) of the Anchor Tenants (as defined below) are not open for business or (ii) less than sixty five percent (65%) of the Floor Area of the Shopping Center (excluding the Floor Area of the Premises, any premises leased to Tenant or any of its Affiliates, the Anchor Tenants, and any new expansion area not built as of the Effective Date) is open and operating by tenants typically found in similar shopping centers in California. As used herein, an "**Anchor Tenant**" shall mean Macy's, Target, Dick's Sporting Goods and JC Penney or a national or regional replacement tenant therefor typically found in similar shopping centers in California which operates at least 85% of the Floor Area occupied by such named tenants as of the Effective Date (or in the case of Macy's, at least 100,000 square feet of Floor Area, and in the case of Dick's, at least 40,000 square feet of Floor Area).

2.5.2   If, on the Delivery Date, the Initial Co-Tenancy Condition has not been satisfied, Tenant shall have the right, at its sole option, to:

(a)   accept delivery of physical possession of the Pad; or

(b)   defer its acceptance of delivery of physical possession of the Pad to a later date (but not later than the date on which the Initial Co-Tenancy Condition is satisfied and Tenant receives notice from Landlord thereof), whereupon the Delivery Date shall be deemed to have occurred on the earlier of the date on which Landlord tenders delivery of the Pad in compliance with the terms of this Lease or Tenant actually accepts physical possession of the Pad (subject to the other provisions of this Article 2 and the continuing satisfaction of the Delivery Date Conditions), it being agreed, however, that if Tenant elects to defer its acceptance of delivery of the Pad for more than one (1) year, Landlord shall thereafter have the right to terminate this Lease upon thirty (30) days' notice to Tenant, except Tenant may nullify Landlord's termination right by accepting delivery of the Pad within such thirty (30) day period; and

in either event, if the Rent Commencement Date occurs before the satisfaction of the Initial Co-Tenancy Condition, Tenant shall be entitled to pay Alternate Rent in lieu of Fixed Rent until the

7

1   Initial Co-Tenancy Condition is satisfied and the Landlord gives Tenant notice thereof, subject to
2   any other applicable provisions of this Article 2.

3           2.5.3   In addition to the provisions of Section 2.5.2 above, if the Initial Co-
4   Tenancy Condition has not been satisfied by the first (1st) anniversary of the Delivery Date
5   established pursuant to Section 2.3.2(a) above, then Tenant shall have the right, within one
6   hundred twenty (120) days after such one (1) year anniversary, upon giving Landlord at least
7   sixty (60) days' prior notice, to terminate this Lease as of the date specified in said notice.
8   Landlord may negate such termination by causing the Initial Co-Tenancy Condition to be
9   satisfied within thirty (30) days after the date on which said termination notice is given. If this
10  Lease is terminated hereunder, neither party shall have any further liability under this Lease,
11  except: (i) for those obligations which survive the expiration or other termination of this Lease
12  pursuant to the express terms of this Lease, and (ii) Landlord shall promptly reimburse Tenant
13  for all of its reasonable third-party costs and expenses incurred in connection with this Lease,
14  including, without limitation, costs associated with the preparation and review of plans and
15  specifications, attorney's fees, and the performance of Tenant's Work, not to exceed Thirty
16  Seven Thousand Five Hundred Dollars ($37,500). If Tenant does not terminate this Lease
17  pursuant to this Section 2.5.3, then commencing on the expiration of the aforesaid 120-day
18  period, Tenant shall resume paying full Rent.

19          Section 2.6    Permits Contingency.

20          2.6.1   Tenant shall make application for Tenant's Permits (defined in Section
21  2.3.1(b) above) within thirty (30) days after the later to occur of (i) the date upon which Landlord
22  has approved (or has been deemed to have approved) Tenant's Plans pursuant to the provisions
23  of Section 3.2 hereof and (ii) Tenant's receipt of notice from Landlord that the Land Use
24  Approvals Contingency Date (as defined in Section 3.1 below) shall have occurred and Tenant
25  shall thereafter diligently prosecute such application(s) until approved. Tenant shall keep
26  Landlord reasonably apprised of the status of its application and agrees to promptly notify
27  Landlord upon obtaining Tenant's Permits. Notwithstanding the provisions of this Article 2 to
28  the contrary, if, despite Tenant's diligent efforts, all Tenant's Permits have not been obtained
29  within one hundred eighty (180) days after the date on which Tenant filed such application (the
30  "*Application Date*"), Tenant shall have the right, upon notice given to Landlord prior to the
31  unconditional grant of all of Tenant's Permits, to: (a) delay its acceptance of physical possession
32  of the Premises to the date on which all of the Tenant's Permits have been obtained, whereupon
33  the Delivery Date shall be deemed to have occurred on such date (subject to the other provisions
34  of this Article 2 and the continuing satisfaction of the Delivery Date Conditions); or (b) subject
35  to Landlord's right to seek Tenant's Permits on Tenant's behalf pursuant to Section 2.6.2 below,
36  terminate this Lease. Tenant's exercise of its rights under (a) above shall not preclude the
37  subsequent exercise of its rights under (b) above. The date on which all Tenant's Permits are
38  unconditionally granted is referred to herein as the "*Permit Contingency Date*" and Tenant shall
39  give Landlord written notice of such date. For purposes of defining whether Tenant's Permits
40  are "unconditional, " Tenant acknowledges that Tenant's Permits shall be deemed to be without
41  condition (i.e. unconditional) if the only conditions or requirements that are imposed on Tenant
42  are those that are routinely and customarily imposed on all tenants that are issued such permits.

43          2.6.2   If Tenant elects to terminate this Lease pursuant to section 2.6.1 above or
44  if all Tenant's Permits have not been obtained within two hundred seventy (270) days after the
45  Application Date, Landlord shall have the right, for a period of ninety (90) days, to obtain
46  Tenant's Permits at Landlord's cost and expense, provided Landlord obtains Tenant's prior
47  written consent to any submission or application and neither such submission or application
48  and/or subsequent meetings or correspondence with applicable governmental authorities changes
49  Tenant's Plans without Tenant's prior consent, which consent may be withheld in Tenant's sole
50  discretion. In addition, if all of Tenant's Permits have not been obtained within three hundred
51  sixty-five (365) days after the Application Date for any reason other than Landlord's failure to
52  perform or observe any of its obligations under this Lease, then Landlord shall have the option,
53  upon notice given to Tenant prior to the unconditional grant of all Tenant's Permits, to terminate
54  this Lease, *provided, however*, that Tenant shall have the right to avoid Landlord's termination
55  by giving notice to Landlord, within fifteen (15) days after receiving Landlord's termination
56  notice, of Tenant's waiver of its rights under Section 2.6.1 above, whereupon Landlord's
57  termination notice shall be rendered null and void.

1854916.2\C061858\0372671
[bbBaby]

2.6.3   In the event Tenant or Landlord elects to terminate this Lease pursuant to this Section 2.6, this Lease shall cease and be deemed canceled and terminated as of the date set forth in Tenant's or Landlord's notice of such termination and upon such termination, Tenant and Landlord shall be relieved of any and all further liability hereunder, except for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease.

## ARTICLE 3
## IMPROVEMENTS

Section 3.1   Landlord's Work and Tenant's Work.  (a)    Landlord is in the process of seeking the site plan and land use approvals required from all applicable third parties and governmental authorities to enable Landlord to perform Landlord's Work and to enable Tenant to construct the improvements on the Pad and to occupy and use the Premises for the conduct of its business in the Premises, which permits and approvals shall include, without limitation, zoning and building code approvals and any environmental requirements (the *"Required Land Use Approvals"*).  Landlord shall keep Tenant reasonably apprised of the status of obtaining the Required Land Use Approvals and agrees to promptly notify Tenant upon its receipt of same.  If, despite Landlord's diligent efforts, the Required Land Use Approvals have not been obtained by July 1, 2016, either Landlord or Tenant shall have the right, upon notice given to the other prior to the receipt of the Required Land Use Approvals to terminate this Lease in which event Landlord shall promptly pay to Tenant an amount not to exceed $25,000 (based upon Tenant's documented out of pocket expenses) for Tenant to prepare shell footprint and elevation drawings in connection with Landlord's application for the Required Land Use Approvals and an additional amount not to exceed $50,000 (based upon Tenant's documented out of pocket expenses) if Landlord shall have requested Tenant in writing to prepare Tenant's Plans (as defined in Section 3.2 hereof) prior to Landlord's receipt of the Required Land Use Approvals.  The date on which the Required Land Use Approvals are obtained is referred to herein as the *"Land Use Approval Contingency Date"*.  Subject to the receipt of the Required Land Use Approvals and Landlord's receipt of any building permits which may be necessary for the performance of Landlord's Work, Landlord shall, at its sole cost and expense, perform the work and obligations described on Exhibit D (*"Landlord's Work"*), and shall deliver possession of the Pad to Tenant in the condition described therein. Except for Landlord's Work, Tenant shall, at its own cost and expense, do any and all work (hereinafter referred to as *"Tenant's Work"*) which Tenant desires to adapt the Pad to Tenant's use, including, without limitation, installing final utility connections and utility meters. Landlord has advised Tenant of the existence of certain limitations contained in Existing Leases, as more particularly set forth in Exhibit N (the *"Existing Lease Limitations"*).  Subject to Landlord obtaining the consent from Dick's pursuant to Section 2.3.1(g) above, Tenant hereby agrees to abide by and comply with the Existing Lease Limitations in connection with its performance of Tenant's Work provided, however, that notwithstanding the foregoing, Exhibit B attached to this Lease shall control over the Dick's site plan attached to Exhibit N.  Notwithstanding anything to the contrary contained in this Section 3.1(a), if the Required Land Use Approvals change or alter, except to an immaterial degree, Exhibit B, Exhibit D-1 (including, without limitation, the height or dimensions of the Premises as shown on the LOD or Tenant's signage as indicated thereon), Exhibit F, the Critical Access Ways (as defined in Section 5.2.2 hereof), the number, location or layout of parking within the Critical Area (as defined in Section 5.2.2 hereof) or access to, or configuration of, Tenant's truck loading or trash removal facilities, then Tenant shall have the right to terminate this Lease.

(b)    In the event (A) this Lease has terminated pursuant to Section 3.1(a) above, and (B) Landlord or any Affiliate of Landlord actually commences to construct the Southwest Quadrant on or before the date which is three (3) years after the effective date of the termination of this Lease pursuant to Section 3.1(a) above, then Landlord shall be obligated to offer to Tenant, at the time of the commencement of the construction, the option to lease a portion of the Southwest Quadrant substantially equivalent in size to the Premises upon all the terms and conditions of this Lease (including, without limitation, the amount of Fixed Rent which is not greater than [but which may be less than] the Fixed Rent set forth herein); provided, however, that all dates set forth in the Lease shall be extended.  In the event Tenant elects, within thirty (30) days after such offer, to exercise such option, Landlord and Tenant shall promptly execute a lease upon substantially the same terms and provisions of this Lease.  In the event Tenant does not elect, within thirty (30) days after such offer, to exercise such option, Landlord shall be free to lease such premises to any other person or entity and on any terms agreed to

9

1    between Landlord and another tenant. The provisions of this Section 3.1(b) shall survive the
2    expiration or earlier termination of this Lease.
3
4                Section 3.2    Plan Approvals. Within ninety (90) days after the Effective Date,
5    Landlord shall deliver to Tenant the "Civil/Site Drawings" (hereinafter defined). As used herein,
6    the term *"Civil/Site Drawings"* shall include all of the following drawings, with appropriate
7    details, for the parcel of land on which the Premises shall be constructed: (i) site plan; (ii)
8    grading, drainage, and erosion control plan; (iii) utility plan; (iv) landscaping and irrigation plan,
9    (v) photometric plan, and (vi) geotechnical report. The Civil/Site Drawings shall be consistent
10   with the provisions of Exhibits B and D attached hereto. Tenant acknowledges that Landlord
11   may require certain information from Tenant in connection with its seeking the Required Land
12   Use Approvals and/or in connection with the preparation of the Civil/Site Drawings and Tenant
13   agrees to reasonably cooperate with Landlord's requests with respect thereto, including without
14   limitation, providing a preliminary layout of the Premises. Within fifteen (15) business days
15   after its receipt of the Civil/Site Drawings, Tenant shall notify Landlord of Tenant's approval
16   thereof or the reasons why such approval cannot be granted. If Tenant fails to respond within
17   such fifteen (15) business day period, Landlord shall give Tenant a five (5) business day written
18   reminder notice expressly stating that Tenant's consent to the Civil/Site Drawings shall be
19   deemed to have been given unless Tenant responds within five (5) business days after receipt of
20   Landlord's reminder notice, failing which Tenant's consent shall be deemed given. In the event
21   that Landlord's submittal of the Civil/Site Drawings is not approved by Tenant, then Landlord
22   shall revise the Civil/Site Drawings to address all of Tenant's comments and re-submit them to
23   Tenant for Tenant's review and approval. The re-submittal described in the preceding sentence
24   shall be delivered to Tenant by Landlord within fifteen (15) days of receipt of Tenant's notice
25   that the previous submittal has not been approved. The process described above shall be
26   repeated until Landlord has secured Tenant's approval of the Civil/Site Drawings. Within ninety
27   (90) days after the later of (a) written notice to Tenant that the Land Use Approval Contingency
28   Date has occurred and (b) Tenant's receipt and approval (or deemed approval) of the Civil/Site
29   Drawings, Tenant shall deliver to Landlord Tenant's plans (*"Tenant's Plans"*) depicting
30   Tenant's Work. Landlord shall have twenty (20) days from its receipt of Tenant's Plans to
31   approve or disapprove Tenant's Work depicted thereon, which plans and work shall be approved
32   so long as they: (x) comply with all Legal Requirements, and (y) are substantially consistent with
33   Exhibits B, D, D-1, and F attached hereto, it being agreed that Landlord shall have no approval
34   rights with respect to Tenant's Plans unless Tenant's Plans fail to comply with the requirements
35   of clauses (x) and (y). If Landlord shall fail to disapprove Tenant's Plans (to the extent that
36   Landlord has an approval right pursuant to the immediately preceding sentence) with reasonable
37   specificity within said 20-day period, Tenant shall give Landlord a five (5) business day written
38   reminder notice expressly stating that Landlord's consent to Tenant's Plans shall be deemed to
39   have been given unless Landlord responds within five (5) business days after receipt of Tenant's
40   reminder notice, failing which Landlord's consent to Tenant's Plans shall be deemed given. In
41   the event that Tenant's submittal of Tenant's Plans is not approved by Landlord (if such approval
42   right is applicable), then Tenant shall revise Tenant's Plans to address Landlord's comments and
43   re-submit them to Landlord for Landlord's review and approval. The re-submittal described in
44   the preceding sentence shall be delivered to Landlord by Tenant within fifteen (15) days of
45   receipt of Landlord's notice that the previous submittal has not been approved. The process
46   described above shall be repeated until Tenant has secured Landlord's approval of Tenant's
47   Plans.

48                3.2.1    Plan Changes.

49                (a)    After Tenant approves the Civil/Site Drawings, Tenant shall have
50   the right to require Landlord to subsequently make changes thereto (the "*Changes*"), provided
51   that such Changes do not require approval by any governmental authority. Within ten (10)
52   business days after receiving Tenant's request for any Change, Landlord shall give Tenant notice
53   of the cost or savings, and any delay, that may be occasioned by such Change, which notice shall
54   be accompanied by all back-up supporting the cost increases or delays. If Tenant fails to
55   authorize such Change within five (5) business days after receiving Landlord's notice, Tenant
56   shall be deemed to have disapproved such Change.

57                (b)    Tenant shall pay to Landlord the net reasonable additional third-
58   party costs of Landlord's Work resulting directly and solely from the aggregate Changes
59   (exclusive of any charges for overhead and profit, other than sums not exceeding 7%
60   subcontractor profit and 7% general contractor profit thereon), taking into consideration any and

10

1  all actual costs and savings resulting from all Changes, in the aggregate (including, without
2  limitation, reasonable costs approved by Tenant in advance associated with any acceleration of
3  the work schedule which Tenant, at its sole option, may require).  Such payment shall be due and
4  payable within thirty (30) days after Tenant's receipt of backup information reasonably
5  supporting all such costs, including, without limitation, invoices, but in no event earlier than the
6  Delivery Date.

7                    (c)    [Intentionally Deleted].

8                    (d)    If, despite Landlord's diligent efforts in performing Landlord's
9  Work, the Changes cause a net delay in the Substantial Completion of Landlord's Work (taking
10  into consideration any time reductions resulting from such Changes), then: (i) the Rent
11  Commencement Date shall be determined as if such delay had not occurred; (ii) the dates set
12  forth in clauses (a) and (b) of Section 3.3.2 below shall be extended by the number of days of
13  such net delay; and (iii) with respect to Changes requested after the Delivery Date Notice is
14  given, for purposes of calculating liquidated damages under Subsection 2.3.2(b) above, the
15  Delivery Date shall be extended by the number of days of such net delay.

16          Section 3.3    Performance of Work.

17          3.3.1    Both Landlord's Work and Tenant's Work shall be performed in a good
18  and workmanlike manner, in compliance with all applicable Legal Requirements, utilizing only
19  new, first-class materials.  Landlord shall pay any and all impact fees and related governmental
20  charges in connection with bringing utility lines to the Pad except Tenant shall be responsible for
21  deposits and similar hook-up fees for connecting Tenant's utilities to the lines provided by
22  Landlord and establishing accounts with the local utility company.  Within ninety (90) days after
23  the Effective Date, Landlord shall deliver to Tenant the written consent from Dick's and any
24  other applicable party having consent or approval rights to permit Tenant to have the staging
25  areas for Tenant's Work as designated as *"Tenant's Staging"* on Exhibit B.  If Landlord shall be
26  unable to deliver such consent within such 90-day period, Tenant shall have the right, but not the
27  obligation, to obtain Dick's consent for a period of thirty (30) days and if Tenant is unable to
28  obtain such consent (or elects not to obtain same) within such 30-day period, Tenant shall have
29  the right, by notice to Landlord given not later than the tenth (10th) day after the expiration of
30  such 30-day period, to terminate this Lease or if not so terminated, the condition for Landlord to
31  obtain such consent shall be deemed waived. If Tenant terminates this Lease as aforesaid, then
32  neither party shall have any further liability hereunder except for those provisions that expressly
33  survive the expiration or earlier termination of this Lease, including, without limitation,
34  Landlord's reimbursement of Tenant-produced plans to the extent required pursuant to Section
35  3.1 above.

36          3.3.2    If: (a)  Landlord's Work has not been commenced within thirty (30) days
37  after the later to occur of (i) the Land Use Approval Contingency Date, (ii) the date on which
38  Landlord obtains building permits for Landlord's Work, and (iii) the Permit Contingency Date
39  (provided Tenant shall have given Landlord written notice of such date) (the later of clause (i),
40  (ii) and (iii) herein referred to as the *"Pad Commencement Date"*), or (b)  the Delivery Date
41  shall not have occurred within one hundred twenty (120) days after the Pad Commencement
42  Date (subject to *Force Majeure*, not to exceed sixty (60) days in the aggregate, and provided that
43  Landlord shall have given Tenant notice of such event of *Force Majeure* promptly after its
44  occurrence), Tenant may thereafter, during such time as Landlord's Work has not been
45  commenced or the Delivery Date has not occurred, as the case may be, consider Landlord to be
46  in default hereunder and, at Tenant's option in its sole discretion, elect to:

47                    (i)    terminate this Lease, if Landlord shall fail to fully cure
48  such default within thirty (30) days after receiving Tenant's notice thereof, in which event
49  neither party shall have any further liability hereunder, except: (y) for those obligations which
50  survive the expiration or other termination of this Lease pursuant to the express terms of this
51  Lease, and (z) Landlord shall be obligated to promptly reimburse Tenant, as Tenant's sole
52  monetary remedy by reason thereof, for all its reasonable third-party costs and expenses incurred
53  in connection with this Lease (including, without limitation, costs associated with the preparation
54  and review of plans and specifications, attorney's fees, and the performance of Tenant's Work),
55  not to exceed Fifty Thousand Dollars ($50,000; and/or

11

(ii)     avail itself of the remedies set forth in Section 16.2 below (provided, however, that the cure period set forth therein shall not be applicable); and/or

(iii)     extend one or more times the dates set forth in clauses (a) and/or (b) of this Subsection 3.3.2 to such future dates designated by Tenant in notice given to Landlord, and as to any extension granted with respect to the clause 3.3.2(b) above, in addition to any other rights and remedies to which Tenant may be entitled, the Rent Commencement Date shall be postponed by two (2) days for each day of the extension granted as to clause 3.3.2(b) above.

The election by Tenant of any one or more of the foregoing remedies shall not preclude the subsequent election of any alternative remedy provided in this Section, this Lease, at law, or in equity. If Tenant fails to complete construction of the Premises within eighteen (18) months from the Delivery Date and such failure is due solely by reason of Tenant's intentional and/or willful acts or omission, then Landlord shall have the right to terminate this Lease upon thirty (30) days' notice to Tenant but Tenant shall have the right to nullify Landlord's termination right by completing such construction within such thirty (30) day period.

3.3.3   Landlord's Work Performed After Delivery of Possession.  On or before the Delivery Date, Landlord's and Tenant's representatives together shall conduct a walk-through of the Pad to compile a punch list of the "Punch List Items" (hereinafter defined). Tenant shall deliver to Landlord a copy of said punch list within five (5) days after the walk-through. Landlord shall complete any Punch List Items within ten (10) days after it receives a copy of said punch list. If Landlord fails to complete any item on said punch list within said 10-day period, Tenant shall have the right to complete such item(s) using its own contractors and receive reimbursement from Landlord for the reasonable costs and expenses thereof within thirty (30) days of demand. As used herein, the term *"Punch List Items"* shall mean such minor items which, when considered as a whole, do not adversely affect either the performance of Tenant's Work or Tenant's ability to conduct its normal business operations in the Premises.

3.3.4   Tenant's Right of Entry.  Prior to the Delivery Date, Tenant may enter upon the Pad for the purposes of inspecting the work, taking measurements and making plans, without being deemed thereby to have taken possession or obligated itself to pay Rent, provided, however, that Tenant shall not, during the course of such work, materially interfere with the performance of Landlord's Work and shall indemnify and hold Landlord harmless from and against any and all claims or losses arising from Tenant's entry upon the Premises, except to the extent caused by Landlord, its agents, employees, or contractors.

3.3.5   Work Requirements After Delivery Date.  Following the Delivery Date, any construction by Landlord (including the Quadrant Development Work) or by other tenants or occupants of the Shopping Center (to the extent that Landlord has the right to enforce the provisions of this Section 3.3.5 in Existing Leases) affecting any portion of the area designated as "Critical Area" on Exhibit B hereto (the *"Critical Area"*), shall be subject to the following terms and conditions:

(a)     staging and storage of materials and parking of construction vehicles shall occur only within those areas designated as *"Landlord Staging"* in Exhibit D;

(b)     from and after Tenant's opening for business to the public, Landlord shall use commercially reasonable efforts to cause any construction, delivery and related vehicles engaged in the performance of such work or other construction activities to not materially interfere with Tenant's business operations; and

(c)     Landlord shall maintain the Shopping Center in a clean, safe, and sightly condition, and shall use reasonable efforts to ensure that such construction shall not materially adversely interfere with the normal conduct of any business operations in the Premises.

Section 3.4   Tenant's Leasehold Improvements.  Subject to Section 3.6 below, Tenant's Work and all other improvements erected by Tenant with respect to the Premises, together with any replacements thereof, shall be and remain the property of Tenant throughout the Term, and Tenant alone shall be entitled to the benefits of ownership thereof, including, but not limited to, depreciation of same as an asset for tax purposes.

12

Section 3.5    Tenant's Trailer. Tenant shall have the right, subject to applicable Legal Requirements, to place a trailer in an area immediately adjacent to the Premises, in the location shown on Exhibit B hereto, during the period commencing on the forty-fifth (45th) day prior to date on which Tenant has scheduled for the commencement of its fixturing in the Premises, until the twentieth (20th) day after said fixturing date (but not later than the date Tenant opens for business in the Premises), for the purpose of conducting employee interviews and recruiting. Tenant shall be responsible, at its sole cost and expense, for making arrangements for any required utilities to the trailer, as well as paying for any such utilities consumed.

Section 3.6    ==Tenant Allowance==.  Landlord shall pay Tenant the liquidated sum of One Hundred Twenty Five Dollars ($125.00) per square foot of Floor Area of the Premises (the *"Tenant Allowance"*) in consideration for Tenant's construction of "Landlord's Special Improvements" (defined below).  Landlord and Tenant hereby acknowledge and agree that the Tenant Allowance shall be in addition to Landlord's Work.  Landlord shall pay the Tenant Allowance to Tenant within thirty (30) days after Tenant requests such payment after the satisfaction of all of the following:

(i)    Substantial Completion of Tenant's Work in accordance with the Tenant's Plans, as certified by Tenant's architect,

(ii)    Landlord's receipt of a lien waiver from Tenant's general contractor and lien waivers from subcontractors and materialmen performing Tenant's Work; provided that (x) no waivers shall be required for amounts less than $25,000, and (y) Landlord will pay the portion of the Tenant Allowance for which lien waivers are provided (notwithstanding that some lien waivers may not be forthcoming due to disputes, etc.) or (z) in lieu of such lien waivers from subcontractors and materialmen, an agreement executed by Tenant regarding mechanics' and materialman's liens in the form attached hereto as Exhibit M;

(iii)    Landlord's receipt of a copy of a fully executed standard form of contractor's requisition indicating substantial completion of Tenant's Work and completed AIA forms 702 and 703 (with schedule of values) (or substantially similar documents); and

(iv)    Landlord's receipt of a temporary or permanent certificate of occupancy (or its local equivalent), unless such certificate is not available for any reason other than Tenant's failure to perform Tenant's Work in compliance with all Legal Requirements.

Tenant acknowledges that the Tenant Allowance shall be used for leasehold improvements to the Premises and that no portion of the Tenant Allowance shall be used to pay for any of Tenant's furniture, trade fixtures, equipment or inventory.  If Landlord fails to provide Tenant with the Tenant Allowance within thirty (30) days of Landlord's receipt of the applicable documentation or occurrence of all of the events set forth above and such failure continues for five (5) business days after Landlord's receipt of a second notice notifying Landlord of such failure, then in addition to the rights and remedies under Section 16.2 of this Lease, Tenant shall have the right to deduct from Rent any unpaid portion of the Tenant Allowance, together with interest thereon at the Lease Interest Rate.  The Tenant Allowance is an offset (and not an inducement) for Tenant's construction, on behalf of Landlord, of Tenant's Work (the *"Landlord's Special Improvements"*) (which Landlord's Special Improvements, together with any replacements thereof, when completed shall be the property of Landlord, subject to use by Tenant of same during the Term of, and in accordance with, this Lease).  Landlord alone shall be entitled to depreciate the Landlord's Special Improvements as an asset for tax purposes, and Tenant shall not recognize income with respect to the Tenant Allowance.  Tenant shall be responsible for and herewith agrees to pay all costs of Tenant's Work in excess of the Tenant's Allowance, and Tenant's Work (except for Landlord's Special Improvements), together with any replacements thereof, shall be and remain the property of Tenant throughout the Term, and Tenant alone shall be entitled to the benefits of ownership thereof, including, without limitation, depreciation of same as an asset for tax purposes.  Upon expiration or sooner termination of this Lease, all improvements and additions to the Premises (other than Tenant's Personal Property) shall be deemed the property of the Landlord, and all other alterations, decorations, additions, equipment and improvements made by Tenant to the Premises, shall be deemed attached to the fee interest in the property and shall be Landlord's property and Tenant shall have no right to alter or remove said improvements.  Within sixty (60) days after the later of (i) Tenant's receipt of written notice from Landlord requesting same and (ii) Tenant opening for business in the

13

Premises, Tenant shall deliver to Landlord final "as-built" plans for the improvements constructed by Tenant (as well as copies of all warranties obtained by Tenant in connection with Tenant's Work to the extent such warranties cover repairs to the Premises for which Landlord is responsible hereunder), operating manuals and paid invoices for Tenant's Work.

Section 3.7      Measurement; Adjustment of Rent.

3.7.1    Measurement of Premises and Shopping Center. Tenant shall deliver to Landlord a certification by Tenant's licensed architect, surveyor or engineer of the Floor Area (with the dimensions on which it is based) of the Premises, the measurements of which shall be subject to confirmation by Landlord's licensed architect, surveyor or engineer. If Tenant shall fail so to deliver such certification to Landlord, Landlord shall have the right to have any of such measurements made and certified to Tenant by Landlord's licensed architect, surveyor or engineer.

3.7.2    Adjustment of Fixed Rent. If the measurement of the Premises shall indicate a Floor Area more or less than the Floor Area of the Premises set forth in Section 1.1.26, the Fixed Rent and any other applicable provision of this Lease (including, without limitation, the Tenant Allowance) shall be adjusted to conform to the actual measurement, and Tenant shall receive a proportional refund of any Rent overpaid to Landlord or shall pay any deficiency in Rent as a result thereof, provided that in no event shall the final measurement be deemed to be less than 21,000 square feet of Floor Area unless Landlord delivers to Tenant a Pad that shall not accommodate a building having the dimensions indicated on Exhibit B. Landlord and Tenant shall each promptly execute and deliver to the other an amendment memorializing any change to the Fixed Rent or any other applicable provisions of this Lease, made pursuant to this Section 3.7. Any dispute between the parties with respect to the Floor Area of the Premises shall be resolved by arbitration in accordance with the provisions of Section 16.3 below.".

ARTICLE 4
FIXED RENT, PERCENTAGE RENT AND TAXES: DETERMINATION AND PAYMENT

Section 4.1      Fixed Rent. Commencing on the Rent Commencement Date and continuing throughout the Term, Tenant shall pay to Landlord the Fixed Rent, in equal successive monthly installments, in advance, on the first day of each and every calendar month throughout the Term, except that Fixed Rent payable for any partial calendar month during the Term shall be prorated based on a 365-day year. Fixed Rent shall be paid without deduction or set-off, except to the extent otherwise expressly provided herein.

Section 4.2      Payment of Rent. All Rent shall be mailed or otherwise delivered to Landlord at Landlord's Mailing Address as specified in Section 1.1.18 or, upon at least thirty (30) days' prior notice to Tenant, to such other address as Landlord may from time to time designate. Landlord acknowledges and agrees that for administrative purposes, Tenant may designate a corporation or other entity to act as a paying agent (the *"Paying Agent"*) to make all Rent payments due to Landlord under this Lease. Said designation (which may be revoked by Tenant at any time) is not intended as, and shall not constitute, an assignment of any rights or obligations of Tenant to the Paying Agent, and Tenant shall remain primarily liable for payment of Rent under this Lease. All payments of Rent received by Landlord from the Paying Agent shall be credited to Tenant as if such payments of Rent had been made by Tenant directly to Landlord. If any payment of Rent is not paid when due under this Lease, then, in addition to the payment then due, Tenant shall pay Landlord, as Additional Rent, a late charge ("*Late Rent Charge*"), which shall be the greater of (i) One Hundred and 00/100 Dollars ($100.00), or (ii) five percent (5%) of the amount then due but no such Late Rent Charge shall be payable for the first two (2) delinquencies in which Rent is not paid when due during any 12 month period. Any payment of Rent which is not paid after notice thereof is given pursuant to Section 16.1.1 shall also bear interest on the payable amount from the date when due until paid at the Lease Interest Rate.

Section 4.3      Real Estate and Other Taxes.

4.3.1    Landlord shall pay on or before the due dates thereof all "Taxes" (defined in Subsection 4.3.3 below) other than personal property taxes levied against tenants. Throughout the Term, Landlord shall cause the Shopping Center to be maintained entirely within tax parcels and lots that exclude any property not a part of the Shopping Center.

14

4.3.2   As used herein, *"Taxes"* shall mean all general real estate taxes, and assessments for betterments and improvements that are levied or assessed by any lawful authority on the Shopping Center (general or special), including any substitution therefor, in whole or in part, due to a future change in the method of taxation. Landlord acknowledges and agrees that Tenant shall not be responsible for any payment to Landlord of any Taxes in connection with the Shopping Center and/or the Premises, which payments are deemed to be included in Common Area Charges.

Section 4.4   Percentage Rent.

4.4.1   Payment. During and for each full calendar year during the Term, Tenant shall pay annual percentage rent (*"Percentage Rent"*) as follows: (i) an amount equal to three percent (3%) of all "Gross Sales" (hereinafter defined in Subsection 4.4.2) resulting from business conducted in, on or from the Premises during such calendar year in excess Twelve Million Dollars ($12,000,000) up to Fifteen Million Dollars ($15,000,000). No Percentage Rent shall be payable on Gross Sales that exceed $15,000,000. The aforesaid amount of $12,000,000 and $15,000,000 are herein referred to as *"Breakpoints"* and such Breakpoints shall each increase at the same time and by the same percentage as Fixed Rent increases under this Lease. Within sixty (60) days after the close of each calendar year, Tenant shall furnish to Landlord a compilation prepared by an officer of Tenant setting forth the amount of Gross Sales during the preceding calendar year and showing the amount of Percentage Rent, if any, required to be paid by Tenant for such calendar year; provided, however, that Tenant shall not be required to provide such compilation if the amount of Gross Sales for such calendar year is less than ninety percent (90%) of the Breakpoint applicable for such year. The full amount of any Percentage Rent due shall be paid to Landlord simultaneously with the furnishing of said compilation. Notwithstanding the foregoing, no Percentage Rent shall be payable with respect to the period commencing on the Rent Commencement Date and ending on the December 31 next following the Rent Commencement Date.

4.4.2   Definition of Gross Sales. As used herein, the term *"Gross Sales"* shall mean the total amount of all sales of merchandise or services fulfilled from the Premises by Tenant or any sublessee, licensee or concessionaire of Tenant (subject, however, to Section 4.4.6) and any other person or entity operating in the Premises (for purposes of this Subsection 4.4.2 only, collectively, *"Tenant"*), whether for cash, credit or otherwise, including redemption of gift certificates and gift cards. Tenant shall record, at the time of each Gross Sale, all receipts from such sale, whether for cash, credit or otherwise, in a cash register or cash registers, or in such electronic or computer device which records sales in a manner which is generally acceptable by industry standards. The term *"Gross Sales"* shall exclude: (1) proceeds from any sales tax, gross receipts tax or similar tax, by whatever name called, which are separately stated and are in addition to the sales price, (2) *bona fide* transfers or exchanges of merchandise from the Premises to any other stores or warehouses of Tenant or any Affiliates of Tenant, and returns to shippers and manufacturers for credit, (3) refunds or credits given to customers for merchandise returned or exchanged at the Premises (but only to the extent the original sale was included in Gross Sales hereunder), (4) sales of Tenant's fixtures and equipment not in the ordinary course of Tenant's business, (5) to the extent of prior inclusion in Gross Sales, bad debts when written off the books of Tenant, provided that any collections made on account of such bad debts shall be included in Gross Sales when received, (6) receipts from vending machines installed solely for the use of Tenant's employees and receipts from pay telephones, (7) sales to employees of Tenant at discount (which, for the purposes of determining Percentage Rent hereunder, shall not exceed two percent (2%) of Gross Sales per calendar year or pro rata portion thereof, as applicable), (8) fees paid to independent third party credit card, charge card, debit card, and check verification/guaranty companies in connection with sales charged to or debited from customers' credit cards, charge cards, or debit cards, or sales paid for by customers by checks, as applicable, (9) proceeds from delivery, gift-wrapping and check cashing charges (which, for the purposes of determining Percentage Rent hereunder, shall not exceed two percent (2%) of Gross Sales per calendar year or pro rata portion thereof, as applicable), (10) sums and credits received in settlement of claims for loss or damage to merchandise, (11) separately stated service, finance and interest charges, (12) the dollar value of coupons utilized by customers in the purchase of merchandise from the Premises, (13) close-out or bulk sales of inventory to jobbers or wholesalers, and (14) sales of gift certificates and/or gift cards (until redeemed).

4.4.3   Books and Records. Tenant shall maintain at the Premises or at its principal office, complete books and records reflecting all elements of Gross Sales. Tenant shall

15

be allowed to maintain its books and records in a computerized form; provided, however, that (i) such computerized books and records provide the same level of information as the books and records described above, are retained for the full record retention period provided for herein, and (ii) promptly upon request, printed copies of any such books and records are made available at Tenant's principal office for inspection by Landlord's representatives who are engaged in inspecting and/or auditing Tenant's books and records as provided herein. Such books and records shall be kept in accordance with generally accepted accounting principles (or successor accounting standards) and practices consistently applied and shall be retained by Tenant for at least three (3) years following the end of the calendar year to which they refer.

4.4.4    Landlord's Right to Audit.  Landlord and/or Landlord's auditor shall have the right, upon at least thirty (30) days prior notice to Tenant (but not more than once per annum), to inspect and/or audit the records of Tenant relating to Gross Sales. If any such audit discloses a deficiency in the Gross Sales reported by Tenant, Tenant shall pay any deficiency in Percentage Rent owing to Landlord on account of such deficiency, together with interest thereon at the Lease Interest Rate.  If such deficiency is in excess of three (3%) percent of the Gross Sales reported by Tenant and Percentage Rent is then payable, Tenant shall also pay Landlord's reasonable costs of the inspection and audit.  Tenant has not and does not make any representation or warranty as to the amount of Gross Sales which are anticipated from the Premises.

4.4.5    Confidentiality.  Landlord shall not disclose to any third party Tenant's Gross Sales or the amount of Percentage Rent paid or payable by Tenant, provided, however, that (i) such information was not previously disclosed by Tenant to such third party or to the public generally, and (ii) nothing contained herein shall restrict Landlord from disclosing such information as may be required by applicable Legal Requirements or to its accountants, attorneys, *bona fide* prospective purchasers, or current or prospective Mortgagees or underlying lessors of all or any portion of Landlord's interest in the Shopping Center (provided that each of such recipients shall be bound to the same non-disclosure provisions as are imposed upon Landlord).

4.4.6    Any dispute between the parties relative to the provisions of this Section 4.4, including, without limitation, the amount of Percentage Rent payable by Tenant, shall be submitted to arbitration in accordance with the provisions of Section 16.3 of this Lease

ARTICLE 5
COMMON AREAS, THEIR USE AND CHARGES

Section 5.1    Common Areas: Maintenance.

5.1.1    Maintenance of Common Areas.  Landlord shall operate, maintain, repair and replace the Common Areas as required by this Lease and otherwise to the standard by which Common Areas of first-class shopping centers in the state in which the Shopping Center is located are operated, maintained, repaired and replaced, including, without limitation, snow, ice, rubbish and debris removal (including installation and maintenance of sidewalk refuse containers), landscaping (including, without limitation, the trimming and pruning of trees to avoid interference with the use or visibility of canopies or signs on the exterior of the Premises), adequate lighting, insurance, supervision, parking lot paving and striping, drainage, security (as reasonably required), and control of all Common Areas, and Landlord shall comply with all applicable Legal Requirements.

5.1.2    Tenant's Fixed Share of CAM.  During the Term, Tenant shall pay to Landlord a fixed share ("**Fixed Share**") of the costs (hereinafter referred to as the "**Common Areas Charges**") paid by Landlord to operate, maintain, insure and repair the Common Areas, which shall include the premiums for insurance required to be maintained by Landlord under Section 10.3 below and Taxes for the Shopping Center.  Tenant's Fixed Share of such Common Areas Charges from the Rent Commencement Date through the end of the first full calendar year of the Term (i.e. the period from the Rent Commencement Date through the December 31st after the first anniversary of the Rent Commencement Date) shall equal Six and 00/100 Dollars ($6.00) per square foot of Floor Area in the Premises (the "**First Year Cap**"). Thereafter, Tenant's Fixed Share shall increase by three percent (3%) in each subsequent calendar year (the "**Fixed Increases**").  Tenant's Fixed Share shall be paid in equal monthly installments on the first day of each calendar month, in advance, during each calendar year.  Notwithstanding the

16

1    foregoing, if the period from the Rent Commencement Date through the end of the calendar year
2    in which the Rent Commencement Date occurs is greater than 180 days (the "***Partial Year***"),
3    then the First Year Cap shall pertain only to such Partial Year and not to the period from the
4    Rent Commencement Date through the December 31st after the first anniversary of the Rent
5    Commencement Date, provided that the foregoing shall not affect the Fixed Increases.

6        5.1.3   In no event shall Tenant be required to join, participate in or contribute to
7    any promotional fund, marketing fund or merchants' association.

8        Section 5.2    Common Areas: Restrictions.

9        5.2.1   Continuous Access. No entrances, exits, approaches and means of ingress
10   and egress to, from, and/or within the Shopping Center or the Premises as designated on Exhibit
11   B hereto as "***Critical Access Way***" shall be interrupted or disturbed by any act or omission of
12   Landlord during the Term, except: (i) in the event of an emergency, to make repairs which
13   Landlord is obligated to perform pursuant to the terms of any lease at the Shopping Center or as
14   may be otherwise required by other leases in the Shopping Center or applicable Legal
15   Requirements, in which event Landlord shall use reasonable efforts to give Tenant advance
16   notice of same and to minimize interference to Tenant's normal business operations in the
17   Premises as a result thereof; or (ii) in the event that Landlord is required to temporarily close the
18   Common Areas, for the minimum time legally necessary to prevent a dedication thereof or an
19   accrual of any rights in any person or the public generally therein; provided that such closure
20   shall not occur during August (through Labor Day), November or December of any calendar
21   year, and Landlord shall give Tenant at least thirty (30) days' prior notice thereof.

22       5.2.2   No Alterations. Landlord has advised Tenant that Landlord is
23   redeveloping the Southwest Quadrant (hereinafter defined) of the Shopping Center, which
24   redevelopment includes (I) adding Retail A, A-2, B and C as shown on Exhibit B; (II)
25   constructing a new 2 story building between Target and the Shopping Center's Food Court in
26   approximately the area indicated on Exhibit B, which Landlord currently contemplates housing
27   Dave & Busters and a not yet determined junior anchor tenant; (III) performing certain site/civil
28   and utility trenching work in connection with (I) and (II) above; and (IV) modifying the parking
29   configuration in the Southwest Quadrant as shown on Exhibit B (items I – IV above the
30   "***Quadrant Development Work***"). Notwithstanding the foregoing, Landlord covenants that none
31   of the Quadrant Development Work shall, from and after the date Tenant opens for business in
32   the Premises, be performed so as to adversely affect that portion of the Critical Area (as defined
33   below) bounded by the most westerly wall of Retail B and the most easterly wall of Retail C (as
34   shown on Exhibit B) and extending north to the end of the Critical Area. Notwithstanding the
35   foregoing, Landlord shall have the right to perform utility trenching and other site work in the
36   Critical Area provided such work is performed only after the Premises is closed for business and
37   the area affected by such work is restored and operational by the time Tenant opens for business
38   the next day. Landlord shall erect customary screening or construction barricades around the
39   areas affected by the Quadrant Development Work to safeguard pedestrians. Except as may be
40   required to comply with Legal Requirements or to perform repairs and subject to certain changes
41   to the extent permitted or agreed to by Tenant pursuant to the last sentence of Section 3.1(a),
42   Landlord shall not, without obtaining Tenant's prior written consent in each instance, which
43   consent may be withheld in its reasonable discretion (except as otherwise indicated below):
44   **(i)** alter the location, availability or size of any Common Area improvement located within the
45   Critical Area from that shown on Exhibit B hereto; **(ii)** construct or permit to be constructed any
46   structures in the Critical Area of the Shopping Center (including, without limitation, any
47   buildings, kiosks, booths, signs or similar structures in the Critical Area) or construct any
48   buildings or other structures in the Southwest Quadrant, other than as shown on Exhibit B hereto;
49   or **(iii)** materially change the entrances or exits to and from the Southwest Quadrant designated
50   "***Critical Access Ways***" on Exhibit B; **(iv)** materially alter the curb cuts, roadways, drive aisles,
51   sidewalks or other elements of the Common Areas in the Southwest Quadrant, or **(v)** alter the
52   number, location or layout of parking spaces located within the Critical Area from those shown
53   on Exhibit B hereto; it being agreed, however, that Tenant withhold its consent in its sole
54   discretion without any reasonableness standard with respect to (i) any reduction in the number of
55   parking spaces in the Critical Area; (ii) the construction of any new building in the Critical Area
56   and/or (iii) any alteration to the Critical Area that would adversely affect pedestrian and/or truck
57   access to the Premises or Tenant's loading dock areas or adversely impact the visibility of the
58   Premises and Tenant's exterior signs. If Tenant is then operating its business in the Premises,
59   Landlord shall neither perform nor permit to be performed, any construction, repairs,

17

1  replacements or maintenance to any portion of the Southwest Quadrant including the Premises
2  (other than emergency repairs to utilities and Common Areas) during the months of August
3  (through Labor Day), November and December of any year, without the prior consent of Tenant,
4  which consent may be withheld in Tenant's sole discretion. Tenant agrees that (x) all of the
5  restrictions set forth in this Section 5.2.2 only apply to the Southwest Quadrant and (y) except as
6  expressly provided in this Lease, Landlord shall have the right to make whatever changes,
7  removals, additions, reconfigurations and/or alterations as Landlord desires in and to the
8  Shopping Center provided none of the foregoing adversely affects the accessibility to, or the
9  visibility of, the Premises, Tenant's signage and loading and trash removal facilities.

10          5.2.3   [Intentionally Deleted].

11          5.2.4   Parking Area. During the Term, Landlord shall maintain in the Shopping
12  Center, at a minimum, the greater of (i) the number of parking spaces required by applicable
13  Legal Requirements, without variance, or (ii) four (4.0) parking spaces for every one thousand
14  (1,000) square feet of Floor Area in the Shopping Center (the "*Minimum Parking
15  Requirement*"), provided that all of the parking in the Southwest Quadrant shall be surface
16  parking as opposed to multi-tiered parking decks. All parking spaces in the Critical Area shall
17  be at least nine (9) feet in width and eighteen (18) feet in length. Parking spaces shall at all times
18  be clearly marked by painting, striping or otherwise. Tenant and its employees, agents,
19  subtenants, concessionaires, licensees, customers, and invitees ("*Permitted Users*") shall have
20  the exclusive right to use six (6) parking spaces in the area located in front of the Premises and
21  identified as the "Expectant Mother Parking Area" on Exhibit B hereto ("*Expectant Mother
22  Parking Spaces*"). Landlord shall have no obligation to enforce the use of the Expectant Mother
23  Parking Spaces. Without limiting the foregoing, Tenant and its Permitted Users shall have
24  unrestricted access to the Expectant Mother Parking Spaces for the exclusive use of expectant
25  mothers and/or parents with infants who are customers of Baby. The Expectant Mother Parking
26  Spaces shall be prominently marked and/or signed as reserved for customers and invitees of
27  Tenant and as otherwise may be required by Exhibit F. Landlord may designate specific parking
28  spaces for use by other tenants or occupants of the Shopping Center (including granting Dave &
29  Busters the right to have valet parking) provided each tenant's designated spaces (including such
30  valet parking area) shall not be in the Critical Area (other than the Customer Pick Up Area for
31  the benefit of Cost Plus World Market). Landlord shall not permit any person or entity to use the
32  parking areas other than Tenant, the other tenants and occupants of the Shopping Center, and
33  their respective Permitted Users. Landlord shall have the right to impose parking fees for the
34  Shopping Center provided Tenant's employees shall not be required to pay any fee and further
35  provided that Tenant's customers shall be permitted to validate any such parking fees, all tenants
36  of the Shopping Center are likewise required to participate in such program and no tenant of the
37  Shopping Center is given greater rights or preferential treatment than what is imposed upon or
38  offered to Tenant. Landlord shall not permit overnight parking in the Shopping Center.
39  Notwithstanding the foregoing, if Landlord receives a written notice from a tenant under an
40  Existing Lease stating that Tenant's Expectant Mother Parking Spaces violates its lease with
41  respect to Tenant's reserved or designated parking, then Landlord shall give Tenant a copy of
42  such letter and, subject to Tenant agreeing to comply with any confidentiality provision in the
43  Existing Lease, the applicable provision of such Existing Lease that is claimed to have been
44  violated. Landlord shall use good faith commercially reasonable efforts to obtain the consent of
45  such tenant to Tenant's Expectant Mother Parking Spaces provided Landlord shall not be
46  required to incur any costs or grant concessions to such tenant. Tenant shall have the right to
47  attempt to obtain the consent from such tenant and Landlord shall reasonably cooperate with
48  Tenant. If neither Landlord nor Tenant shall be able to obtain such consent and no other tenant in
49  the Southwest Quadrant has reserved or designated parking spaces, then Tenant shall remove the
50  signage that designates the Expectant Mother Parking Spaces or make such Expectant Mother
51  Parking Spaces non-exclusive.

52          5.2.5   Lighting. Throughout the Term, Landlord shall keep the Common Areas
53  fully lighted and open to the customers of the Shopping Center seven (7) days a week from dusk
54  until 11:00 p.m. Monday through Saturday and until 7:00 p.m. on Sunday ("*Normal Hours*").
55  Upon request of Tenant, Landlord shall keep the Common Areas lighted for as long after Normal
56  Hours as Tenant shall request, provided Tenant shall pay for a share of the reasonable cost of
57  said requested lighting, which share shall be equal to the product of (x) such cost, and (y) a
58  fraction, the numerator of which shall be the number of square feet of Floor Area within the
59  Premises and the denominator of which shall be the aggregate number of square feet of Floor
60  Area of all premises within the Shopping Center (including the Premises) open later than Normal

18

Hours (excluding, however, those tenants and occupants who separately control and pay for their own Common Area lighting). In addition to the foregoing, Landlord shall provide for low level security lighting from one (1) hour after the close of business in the Premises until dawn.

5.2.6   Repairs. During the Term any construction or repair by Landlord permitted or required under this Lease and undertaken in the Critical Area shall:

(a)   except for the Quadrant Development Work, not be performed during the months of August (through Labor Day), November, or December of any year, except in the event of an emergency or as may be otherwise required by applicable Legal Requirements;

(b)   be commenced only upon at least five (5) days' prior notice to Tenant (except in an emergency, in which event Landlord shall only be required to give such notice as is reasonable under the circumstances); and

(c)   be performed in accordance with the requirements of Section 3.3.5 above and in such a manner so as not to materially interfere with the normal conduct of any business operations in the Premises.

5.2.7   Rules and Regulations. Tenant shall comply with the rules and regulations of the Shopping Center as established from time to time by Landlord, within thirty (30) days after Landlord notifies Tenant thereof, provided they: (i) are reasonable, (ii) do not adversely affect the normal conduct of any business operations in the Premises, (iii) do not adversely affect any of Tenant's rights under this Lease, and (iv) are uniformly enforced against all tenants of the Shopping Center and without prejudice against Tenant. In the event of any conflict between the provisions of this Lease and any rules or regulations, the provisions of this Lease shall prevail and govern.

5.2.8   Miscellaneous.

(a)   No Promotional Use. Landlord shall not use or permit the use of all or any portion of the Common Areas in the Southwest Quadrant for retail sales or for promotional purposes provided, however, that tenants of the Shopping Center (including Tenant) shall be permitted to display seasonal merchandise and conduct sidewalk sales in front of their respective stores only ("*Sidewalk Sales*"), provided that such Sidewalk Sales shall: (A) be conducted in a manner consistent with sidewalk sales in first-class shopping centers in the state in which the Shopping Center is located, (B) not materially interfere with normal pedestrian access over the sidewalks, and (C) not materially interfere with the normal business operations of Tenant in the Premises or materially impair the visibility of Tenant's signage. Notwithstanding the foregoing, if Landlord receives a written notice from a tenant under an Existing Lease stating that Tenant's use of the sidewalk for Sidewalk Sales violates its lease, then Landlord shall give Tenant a copy of such letter and, subject to Tenant agreeing to comply with any confidentiality provision in the Existing Lease, the applicable provision of such Existing Lease that is claimed to have been violated. Landlord shall use good faith commercially reasonable efforts to obtain the consent of such tenant to Tenant's Sidewalk Sales provided Landlord shall not be required to incur any costs or grant concessions to such tenant. Tenant shall have the right to attempt to obtain the consent from such tenant and Landlord shall reasonably cooperate with Tenant. If neither Landlord nor Tenant shall be able to obtain such consent, then Tenant shall not conduct any such Sidewalk Sales. To the extent that Landlord has the legal right to prohibit same, Landlord shall use commercially reasonable efforts to prevent any solicitation, distribution of handbills, picketing, or other public demonstration in the Common Areas, except as otherwise may be mandated by applicable Legal Requirements.

(b)   Trash Compactor and Containers. Tenant shall be permitted to maintain and operate, at no extra charge: (i) a trash compactor in the portion of the Common Areas designated on Exhibit B hereto as "*Trash Compactor Pad*"; and (ii) a trash container(s) in the portion(s) of the Common Areas designated on Exhibit B hereto as "*Trash Container Pad*". Tenant, at its sole cost and expense, shall keep the trash compactor and containers neat and clean and repair any damage caused by use and storage of such compactor and containers.

(c)   Shopping Carts. Tenant, at its sole cost and expense, shall be permitted to store its shopping carts in such exterior cart corrals as may be reflected on Exhibits B and D-1 hereto. With respect to shopping carts provided by Tenant for the use of its

19

customers, Tenant will use reasonable efforts to retrieve promptly all shopping carts removed
from the Premises consistent with the maintenance and operation of a first-class shopping center.
Landlord shall not have any responsibility for damage to Tenant's shopping cart corrals or any
damage to Tenant's shopping carts, all of which shall be maintained by Tenant at its sole cost
and expense. Within ninety (90) days after the Effective Date, Landlord shall deliver to Tenant
the written consent from Dick's and any other applicable party having consent or approval rights
to permit Tenant to have shopping cart corrals as indicated on Exhibit B. If Landlord shall be
unable to deliver such consent within such 90-day period, Tenant shall have the right, but not the
obligation, to obtain Dick's consent for a period of thirty (30) days and if Tenant is unable to
obtain such consent (or elects not to obtain same) within such 30-day period, Tenant shall have
the right, by notice to Landlord given not later than the tenth (10th) day after the expiration of
such 30-day period, to terminate this Lease or if not so terminated, the condition for Landlord to
obtain Dick's consent shall be deemed waived. If Tenant terminates this Lease as aforesaid, then
neither party shall have any further liability hereunder except for those provisions that expressly
survive the expiration or earlier termination of this Lease, including, without limitation,
Landlord's reimbursement of Tenant-produced plans to the extent required pursuant to Section
3.1 above.

(d)     Cellular Towers. No transmission and/or reception towers for
wireless telephone or internet communications shall be permitted within the Southwest Quadrant
except the foregoing shall not prohibit dish or satellite antennas used solely and in an ancillary
manner in connection with Tenant's (or other tenant's) business.

(e)     Temporary Storage Containers. Subject to applicable Legal
Requirements and the availability of space, Tenant shall have the right to maintain storage
containers or trailers from time to time in locations to be agreed upon by Landlord and Tenant.
If and to the extent that Tenant has a container or trailer pursuant to the immediately preceding
sentence, Landlord shall have the right, upon reasonable prior notice to Tenant sufficient to
permit Tenant time to remove its merchandise from the container or trailer, to temporarily
relocate Tenant's containers and/or trailers, at Landlord's sole cost, to an area mutually
satisfactory to Landlord and Tenant if such relocation is reasonably required because of an
emergency situation or to enable Landlord to make repairs, it being agreed that (i) if no area is
available in the Shopping Center in which to relocate Tenant's container or trailer, then Tenant
shall agree that it shall not have a trailer or container in the Shopping Center during such
emergency or repair period so long as no other tenant has a trailer or container in the Shopping
Center during such period; and (ii) Landlord's work shall be done in a diligent and expeditious
manner so as to minimize the time period in which Tenant's trailers and/or containers are
relocated or are not located in the Shopping Center.

ARTICLE 6

UTILITIES

Section 6.1     Utility Service. From and after the Delivery Date, and continuing
thereafter through the end of the Term, Tenant shall be solely responsible for and shall pay the
cost of utilities services (including, without limitation, electricity, gas, water, sanitary sewer,
alarm and telecommunications) consumed in the Premises by Tenant. Tenant shall not be
obligated to purchase utility service(s) directly from Landlord, or from any utility provider
designated by Landlord. Tenant shall provide separate utility meters exclusively serving the
Premises, as part of Tenant's Work (including, without limitation, all connection and hook-up
fees but excluding impact fees or other related governmental charges). Tenant's entry upon the
Premises prior to the Delivery Date shall not constitute a waiver by Tenant of Landlord's
obligation to pay the costs of all utility charges incurred in the Premises prior to such date.
Landlord shall not permit the capacity of utility lines available for use at the Premises to be
reduced or overloaded by any other persons or entities.

Section 6.2     Interruption. Landlord shall not be liable in damages or otherwise
for any loss, damage or expense that Tenant may sustain or incur by reason of any change,
failure, interference, interruption or defect in the utility services provided to the Premises,
provided, that if the utilities serving the Premises are disrupted due to the acts or omissions of
Landlord, its agents, contractors, servants or employees, Landlord shall promptly restore the
affected utilities at Landlord's sole cost and expense. If the utilities disrupted by Landlord are
not restored within twenty-four (24) hours after the Landlord has knowledge of the disruption,

20

1   and Tenant is unable to conduct its normal business in the Premises as a result thereof, Rent shall
2   be equitably abated during the period of disruption.

3                               ARTICLE 7
4                                 SIGNS

5           Section 7.1    Tenant's Building Signage.  Subject to compliance with applicable
6   Legal Requirements, Tenant shall have the exclusive right, as part of Tenant's Work, and
7   thereafter during the Term, at its sole cost and expense, to erect, maintain, and replace on the
8   storefront and exterior walls of the Premises, and on the side walls of any entrance design
9   element, if any, signs (including, without limitation, under-canopy (*e.g.*, blade) signs); banners
10  (including temporary banners placed on the storefront of the Premises and such other walls of the
11  Premises as selected by Tenant), such banners not to exceed a maximum of 60 days per year;
12  awnings; and flags, all of which being of such size, design and color as Tenant, from time to
13  time, may desire provided same are Tenant's or Tenant's subtenant's then prototypical signage
14  and if not such prototypical signage, then Landlord's consent shall not be unreasonably withheld
15  or delayed.  Tenant shall also be entitled, at Tenant's sole cost and expense, to install and
16  maintain, during the period commencing on the Effective Date and ending on the day prior to the
17  Rent Commencement Date, a temporary sign or signs in the area designated on Exhibit B which
18  states "Buy Buy Baby Coming Soon" (which signs are more particularly shown in Exhibit F
19  hereto).  Tenant may erect and maintain in the interior of the Premises any signs it may desire,
20  provided same are professionally prepared.  Notwithstanding the foregoing, Landlord hereby
21  approves Tenant's signage as shown on Exhibits D-1 and/or F (subject to compliance with Legal
22  Requirements).

23          Section 7.2    Pylon/Monument Signage.  Landlord shall provide pylons and
24  monuments at the locations shown on Exhibit B hereto during the entire Term, and obtain all
25  permits and approvals therefor.  Tenant shall have the right, at its sole cost and expense, to erect
26  and maintain its identification sign, as shown on Exhibit F hereto (and having colors as shown on
27  Exhibit F hereto).  The dimensions and location of Tenant's pylon sign panel(s) shall be as
28  shown on Exhibit F.  Landlord shall maintain all pylons and monuments in good order and
29  repair, and allow Tenant access to replace its signs thereon, at Tenant's cost and expense.
30  Tenant shall maintain its sign panels on any pylon or monument in good order and repair at
31  Tenant's sole cost and expense.  Subject to changes required by applicable Legal Requirements,
32  Landlord shall not change or alter the location, structure, height or general appearance of the
33  pylons or monuments without obtaining Tenant's prior consent, such consent not to be
34  unreasonably withheld, conditioned or delayed.  Landlord shall be responsible for the cost of
35  maintaining all pylons and monuments bearing Tenant's sign panel(s) and the cost of any
36  electricity used to illuminate them  Tenant shall have the right to place its sign panel on certain
37  directional signs to be located in the parking areas of the Shopping Center, the number and
38  location of such directional signs to be mutually agreed to by Landlord and Tenant.  Tenant's
39  name shall be listed on all Shopping Center directories, websites, maps, pamphlets and similar
40  materials (including directories and maps, if any, located in the Enclosed Mall portion of the
41  Shopping Center).

42          Section 7.3    Signage: Alteration/Removal/Allocation.  Tenant shall have the
43  right, from time to time, without Landlord's approval and at Tenant's sole cost and expense, to
44  change its signs on the storefront and exterior of the Premises, as well as on any pylon or
45  monument, provided that the area of the new sign is no larger than the area of the sign which it
46  replaces, the method of construction and attachment is substantially the same and such sign(s)
47  represent Tenant's or Tenant's subtenant's then prototypical signage and if not Tenant's or such
48  subtenant's then prototypical signage, then Landlord's consent shall not be unreasonably
49  withheld or delayed.  Upon the expiration or earlier termination of the Lease, Tenant shall
50  remove its signs from the fascia or other exterior walls of the Premises and from any pylon or
51  monument, and shall repair any damage occasioned thereby.  The signage rights granted to
52  Tenant pursuant to this Article 7 shall, at Tenant's option, be allocated to or between Tenant
53  and/or any subtenant(s) (but there may not be more than two (2) occupants on any such pylon
54  panel) of all or any portion of the Premises.  All signage installed by Landlord and Tenant
55  hereunder shall comply with applicable Legal Requirements.

56          Section 7.4    Cooperation.  Landlord, upon request, shall execute any consents
57  or applications which may be required by applicable Legal Requirements to permit the

                                        21

1   placement, installation, and/or replacement by Tenant of any signs on any part of the Premises or
2   on any pylon or monument, to which Tenant may be entitled under this Lease.

3           Section 7.5   <u>Signage and Building Restrictions</u>. Except for any structures or
4   trees existing in the Shopping Center as of the Effective Date, and any construction barricades or
5   fencing that may be temporarily erected as part of Landlord's Quadrant Development Work,
6   Landlord shall not permit any obstructions (including, without limitation, any trees, bushes or
7   other landscaping, scaffolding or architectural details) to obscure Tenant's storefront, storefront
8   signs or other exterior wall signs or any pylons, monuments or other freestanding signs and
9   Landlord shall trim any trees, bushes or other landscaping to eliminate such obstruction.

10                             ARTICLE 8
11                 ALTERATIONS AND IMPROVEMENTS

12           Section 8.1   <u>Alterations and Improvements</u>.

13           8.1.1   Tenant shall not perform any alterations or improvements which are
14   structural or which change the exterior of the Premises (except to the extent same pertain to
15   Tenant's Work) without the prior approval of Landlord, not to be unreasonably withheld or
16   delayed, provided, however, that Tenant's alterations of the exterior of the Premises to conform
17   to Tenant's then-current prototypical elevation shall not require Landlord's consent provided that
18   such exterior alterations or improvements (a) are architecturally harmonious with the balance of
19   the Shopping Center, (b) do not increase Landlord's repair and maintenance costs under Section
20   9.2 (unless Tenant agrees to pay for such increases) and (c) do not increase the Floor Area of the
21   Premises. Prior to the commencement of construction of the proposed structural alterations or
22   improvements described in the preceding sentence, Tenant shall provide Landlord with copies of
23   the plans therefor, which delivery of plans shall be for Landlord's consent to the extent such
24   consent is required pursuant to this Section 8.1.1. All work performed by Tenant in connection
25   with structural and non-structural alterations or improvements shall be done at Tenant's sole cost
26   and expense, in a good and workmanlike manner and in compliance with all applicable Legal
27   Requirements. The provisions of this Section 8.1 shall not apply to Tenant's building signage,
28   which shall be governed by the applicable provisions of Article 7 above. Any alterations or
29   improvements undertaken by Tenant shall comply with the Existing Lease Limitations.

30           8.1.2   Subject to the restrictions contained in Section 8.1.1 above with respect to
31   alterations to the exterior of the Premises, Tenant may, from time to time, at its sole cost and
32   expense, without the prior approval of Landlord, make non-structural alterations and non-
33   structural improvements to the interior and/or exterior of the Premises as Tenant deems
34   necessary or desirable, including, but not limited to, electrical systems, heating, ventilation and
35   air conditioning and other mechanical systems, installation of fixtures and equipment, painting, and
36   and wall and floor coverings.

37           8.1.3   Tenant shall have the right to subdivide the Premises into no more than
38   two (2) separate stores, each of which must contain at least 5,000 square feet of Floor Area and
39   shall have its own front entrance and access to the loading docks in the rear of the Premises, as
40   well as separately sub-metered utilities.

41           8.1.4   Tenant shall have the exclusive right to erect and maintain an antenna and
42   a satellite dish, and/or such other equipment as Tenant shall reasonably desire, on the roof of the
43   Premises, provided that Tenant: (i) obtains Landlord's prior approval of its plans for the
44   installation of such equipment, (ii) uses a contractor designated or approved by Landlord for all
45   roof penetrations so as not to violate or invalidate any roof warranties maintained by Landlord, if
46   any, (iii) maintains the area where roof penetrations are made while Tenant's equipment is
47   present, (iv) repairs any damage to the roof caused by the making of the roof penetrations,
48   including, but not limited to, the repair of the roof penetrations upon the removal of any
49   equipment installed thereon, and (v) erects and maintains such equipment in accordance with
50   applicable Legal Requirements. Landlord shall have the right to require Tenant to relocate any
51   such antenna, satellite dish and/or such other equipment and Landlord shall reimburse Tenant for
52   the relocation costs and expenses incurred by Tenant, including costs and expenses incurred by
53   Tenant in connection with "after hours" work if reasonably required.

54           8.1.5   Landlord shall execute and return to Tenant all appropriately completed
55   building department or equivalent applications reasonably necessary for Tenant to perform its

22

1854916.2\C061858\0372671
[bbBaby]

1   alterations within ten (10) days after Tenant's request therefor, and will reasonably cooperate
2   with Tenant in the permitting process, provided such cooperation imposes no costs or liability on
3   Landlord.

4          8.1.6   If any violation of any applicable Legal Requirement which is noted
5   against the Shopping Center or the Premises (other than a violation caused by Tenant) prevents
6   Tenant from obtaining a building permit for any alterations or a certificate of occupancy, then,
7   upon request by Tenant, Landlord shall promptly and diligently cause such violation to be
8   removed of record to the extent required to permit Tenant to obtain its building permit or
9   certificate of occupancy, as the case may be.

10          8.1.7   Landlord shall not make any alterations to the Premises (including,
11  without limitation, changing the design, color or materials of the exterior of the Premises) nor
12  shall Landlord construct an additional floor or floors above the Premises. Landlord shall neither
13  make nor permit to be made any alterations to the exterior architectural theme of the remainder
14  of the Southwest Quadrant which would be inconsistent with a first-class shopping center in the
15  state in which the Shopping Center is located (exclusive of other tenants' entrance features)
16  without the prior consent of Tenant. Landlord covenants and agrees that with respect to the
17  buildings to be constructed in the areas designated as Retail A and Retail A-2, the highest point
18  of the roof shall not exceed twenty nine (29) feet and the height of any architectural feature shall
19  not exceed forty one (41) feet, in each case as measured from the finished floor level.

20          8.1.8   Tenant shall have the exclusive right to erect and maintain on the roof of
21  the Premises, a passive solar array for the production of electricity (the *"System"*), provided that
22  Tenant: (i) obtains Landlord's prior approval of its plans for the installation of the System,
23  (ii) uses a contractor designated or approved by Landlord for all roof penetrations so as not to
24  violate or invalidate any roof warranties maintained by Landlord, if any, (iii) maintains the area
25  where roof penetrations are made while the System is present, (iv) repairs any damage to the roof
26  caused by the making of the roof penetrations, including, but not limited to, the repair of the roof
27  penetrations upon the removal of any component of the System, (v) erects and maintains the
28  System in accordance with applicable Legal Requirements, (vi) the installed System is not
29  visible to customers in the Shopping Center, (vii) uses the System solely for supplementing
30  Tenant's own energy needs in the Premises and not for the resale of energy to third parties, and
31  (viii) indemnifies Landlord and holds Landlord harmless from and against any and all claims,
32  actions, damages, liability and expense, including reasonable attorneys' fees, in connection with
33  loss of life, personal injury and/or damage to property arising from or out of the System, except
34  to the extent such claims, actions, damages, liability and expense are caused by the acts or
35  omissions of Landlord, its agents, contractors, licensees or employees, or for which any of said
36  parties may be statutorily liable to third parties. The System shall be deemed to be part of
37  Tenant's Property. Landlord acknowledges and agrees that Tenant or its Affiliate or transferee
38  shall be the exclusive owner and operator of the System and Landlord shall have no right, title or
39  interest in such equipment or any component thereof, notwithstanding that any such equipment
40  may be physically mounted or adhered to the Premises. Landlord acknowledges and agrees that,
41  notwithstanding the System's presence as a fixture on the Premises, Tenant or its Affiliate or
42  transferee is the sole and exclusive owner of: (i) the electricity generated by the System, (ii) the
43  environmental attributes of the System, and (iii) any and all credits (including tax credits),
44  rebates, benefits, reductions, offsets, and allowances and entitlements of any kind, howsoever
45  entitled, resulting from the environmental or related attributes of the System. Without the
46  express written consent of Tenant, Landlord shall not make or publish any public statement or
47  notice regarding any environmental incentive relating to the System or any environmental
48  attribute of the System or the energy output from the System.

49          8.1.9   Landlord and Tenant agree that in the event that Tenant shall perform or
50  cause to be performed any alterations or improvements (including without limitation Tenant's
51  Work) to, or within, the Premises which would cause an owner or occupant of the Premises to be
52  entitled to an "Energy Rebate" (hereinafter defined), then Tenant shall be solely entitled to the
53  benefit of such Energy Rebate. As used herein, an *"Energy Rebate"* shall be deemed to be any
54  rebate, refund, voucher, credit, tax relief, abatement, or other monetary inducement (such as, for
55  examples only, energy efficiency incentives, property tax abatements, sales tax refunds, tax
56  credits, governmental grants, utility rebates or refunds) given by a governmental, non-
57  governmental, private or public utility, or other entity as a result of efforts to conserve energy or
58  other utilities or cause property or processes to be more environmentally friendly. In addition to
59  the foregoing, Tenant shall be entitled to receive any and all other incentives which Tenant may

1854916.2\C061858\0372671
[bbBaby]

negotiate with state and local officials pertaining to construction and/or remodeling of the Premises, hiring of employees, property tax abatements, sales tax refunds and/or any other "Incentives" (hereinafter defined) secured. The term *"Incentive"* is to include, but is not limited to, any cost reduction, rebate, or any other benefit negotiated by Tenant and obtained by Landlord that may directly or indirectly benefit Tenant. If any such Energy Rebate and/or Incentive is required to be paid or credited directly to Landlord, then: (i) Landlord shall elect to take the Energy Rebate and/or Incentive in a lump sum, or if that is not permitted, then in the shortest number of installments possible, so as to permit Tenant to recoup the full amount of the Energy Rebate and/or Incentive during the Term of this Lease, and (ii) within thirty (30) days after Landlord's receipt of the Energy Rebate and/or Incentive, Landlord shall deliver a check to Tenant for such amount, or in the alternative, Tenant shall be entitled to offset the full amount of such Energy Rebate and/or Incentive against the next succeeding installment(s) of Rent then payable under the Lease.

ARTICLE 9

REPAIRS

Section 9.1    Tenant's Repairs. Subject to the provisions of Articles 10 and 11 hereof, and except as otherwise provided in Section 9.2 below, Tenant shall maintain in good condition and repair, at its sole cost and expense: (i) the non-structural, interior elements of the Premises (including plate glass, storefront windows, doors, door closure, window and door frames, molding, locks and hardware and the electrical, plumbing, mechanical, and/or alarm systems located in, or serving exclusively the Premises); (ii) the heating, ventilation and air conditioning ("*HVAC*") units exclusively serving the Premises; (iii) during the first twelve (12) calendar months only after the Rent Commencement Date (the "*Tenant Repair Period*"), the improvements which constitute Tenant's Work, including, without limitation, the roof and structural components of the Premises; (iv) the fixtures within the Premises; and (v) any damage to the Premises or the Shopping Center which is occasioned by (A) the act or omission of Tenant, its employees, agents or contractors, or (B) any breach by Tenant of any provision of this Lease. All repairs and replacements on Tenant's part to be performed hereunder shall be at Tenant's sole cost and expense, and performed in a good and workmanlike manner in accordance with all applicable Legal Requirements.

Section 9.2    Landlord's Repairs. Subject to the provisions of Articles 10 and 11 hereof and except as otherwise provided in Section 9.1 above, Landlord shall perform, as the same shall from time to time be necessary, all repairs and replacements to the following:

(a)    the buildings of the Shopping Center as necessary to maintain same in good condition and repair (including, without limitation, repainting the exterior walls of the buildings of the Shopping Center (including, without limitation, the Premises)) as same may be reasonably required from time to time during the Term;

(b)    after the Tenant Repair Period, the structural elements of the Premises, which shall be deemed to include, without limitation, the roof joists, columns, footings, foundation, exterior walls (including, without limitation, repainting, but excluding plate glass, storefront windows, doors, door closure devices, window and door frames, molding, locks and hardware, and painting or other treatment of interior walls), floor (but not the floor covering, unless the same is damaged as a result of a floor defect or settling), and the structural elements of any building of which the Premises may be a part;

(c)    after the Tenant Repair Period, the roof, gutters, flashings, downspouts and scuppers;

(d)    the electric, gas, water, sanitary sewer, and other public utility lines serving the Premises, to the point of connection to the Premises (including, without limitation, any fire pump facilities or electrical switch gear serving the Premises);

(e)    all electric, gas, water, sanitary sewer, and other public utility lines and ducts in or passing through the Premises which do not exclusively serve the Premises; and

(f)    any damage to the Premises or the Shopping Center which is occasioned by (A) the act or omission of Landlord, its employees, agents or contractors, or (B) any breach by Landlord of any provision of this Lease.

24

All repairs and replacements on Landlord's part to be performed hereunder shall be at Landlord's sole cost and expense, performed in a good and workmanlike manner in accordance with all applicable Legal Requirements, and without material interference with or disruption to the normal conduct of any business operations in the Premises. Landlord shall give Tenant at least three (3) business days' prior notice of any repairs or replacements to, or which would otherwise affect the normal conduct of any business operations in, the Premises (except in the case of an emergency posing imminent risk of material harm to persons or property, in which event Landlord shall only be required to give such notice as is reasonable under the circumstances). If, in Tenant's reasonable judgment, Landlord's repairs would materially interfere with or disrupt the normal conduct of any business operations in the Premises, Landlord shall perform such repairs only after the regular hours of operation of Tenant and any other occupant of the Premises (or any portion thereof), and Landlord shall reimburse Tenant for the reasonable costs and expenses incurred by Tenant for utility charges in connection with such "after hours" repairs, and in the event any such repairs are required during the one year period following the Delivery Date, security expenses and over-time payments to Tenant's employees. In the event Landlord does not reimburse Tenant for any amounts payable to Tenant hereunder within thirty (30) days after Tenant's demand therefor, Tenant shall have the right (in addition to any rights and remedies to which it may be entitled under this Lease, at law, or in equity) to offset such amounts against Rent, together with interest thereon at the Lease Interest Rate from the date of outlay until reimbursement or full satisfaction by credit.

Section 9.3    Legal Compliance Work. Except as hereinafter expressly provided, Landlord shall be responsible, at its sole cost and expense (and not includable in Common Areas Charges), for performing all "Legal Compliance Work" (hereinafter defined). Notwithstanding the foregoing, Tenant shall be responsible, at its sole cost and expense, for the performance of Legal Compliance Work: (a) pertaining to the interior elements of the Premises which are not structural; or (b) required solely as a result of Tenant's specific manner of use of the Premises (i.e., are not of general applicability to tenants and occupants of the Shopping Center); provided, however, that the foregoing shall not relieve Landlord of its obligations to perform: (x) Landlord's Work in accordance with all Legal Requirements, and (y) the repairs required in this Lease. As used herein, *"Legal Compliance Work"* shall mean any obligation, addition, alteration, improvement, or rebuilding, structural or otherwise, to or of the Premises, the Shopping Center, or any part thereof, as applicable, which may be required by reason of any Legal Requirement.

## ARTICLE 10
## INDEMNIFICATION, INSURANCE AND WAIVER OF SUBROGATION

Section 10.1    Mutual Release, Waiver of Subrogation and Mutual Indemnification.

10.1.1    Mutual Waiver of Claims. Landlord and Tenant, on their own behalf and on behalf of anyone claiming under or through either one by way of subrogation, hereby release and waive all rights of recovery and causes of action against each other and their respective Affiliates from any and all liability for any loss or damage to property or resulting from damage to such property (and, in either case, any resulting loss of business or rental income), whether caused by the negligence or fault of the other party, which is normally insured under Special Form property insurance (so-called "All-Risk") and time element insurance required to be maintained hereunder. In the event either Landlord or Tenant is a self-insurer or maintains a deductible (as either may be permitted hereunder), then the self-insuring party or the party maintaining the deductible hereby releases the other party from any liability arising from any event which would have been covered had the required insurance been obtained and/or the deductible not been maintained.

10.1.2    Waiver of Subrogation. Landlord and Tenant shall cause each property insurance policy carried by either of them insuring the Premises, the contents thereof, or the Shopping Center, to provide that the insurer waives all rights of recovery by way of subrogation or otherwise against the other party hereto (and all of such other party's Affiliates) in connection with any loss or damage which is covered by such policy or that such policy shall otherwise permit, and shall not be voided by the releases provided above.

25

10.1.3  Mutual Indemnification.

(a)  Except as otherwise provided in Subsections 10.1.1 and 10.1.2 above, Tenant covenants to defend and indemnify Landlord and hold Landlord harmless from and against any and all claims, actions, damages, liability and expense, including reasonable attorneys' fees, (x) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon the Premises, or any part thereof, or (y) occasioned wholly or in part by any act or omission of Tenant, its agents, contractors, employees, servants, or licensees, except to the extent such claims, actions, damages, liability and expense are caused by the acts or omissions of Landlord, its agents, contractors, licensees, employees, or other tenants and occupants, or for which any of said parties may be statutorily liable.

(b)  Except as otherwise provided in Subsections 10.1.1 and 10.1.2 above, Landlord covenants to defend and indemnify Tenant and hold Tenant harmless from and against any and all claims, actions, damages, liability and expense, including reasonable attorneys' fees, (x) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon any portion(s) of the Shopping Center (excluding the Premises), or (y) occasioned wholly or in part by any act or omission of Landlord, its agents, contractors, employees, servants, tenants (other than Tenant), occupants or licensees, except to the extent such claims, actions, damages, liability and expense are caused by the acts or omissions of Tenant, its agents, contractors, licensees or employees, or for which any of said parties may be statutorily liable.

Section 10.2  Tenant's Insurance.

10.2.1  Tenant's Insurance.  Tenant, at its own cost and expense, shall maintain in full force and effect from and after the Delivery Date, and throughout the Term: (i) commercial general liability insurance protecting and insuring Tenant, naming Landlord as "additional insured-lessor" for claims arising out of the use or occupancy of the Premises by Tenant and the obligations assumed by Tenant under this Lease, and having a combined single limit of liability of not less than Ten Million Dollars ($10,000,000) for bodily injury, death and property damage liability; and (ii) Special Form (so-called "All-Risk") property insurance, on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of all of Tenant's Property and, after completion of Tenant's Work, subsequent leasehold improvements performed by Tenant (excluding Tenant's Work).  At any time that Tenant sells liquor, Tenant's commercial general liability insurance shall include coverage for liquor liability.

10.2.2  Self-Insurance.  All insurance required to be maintained under this Section 10.2 may be: (i) insured under an individual policy covering this location, or a blanket policy or policies which includes other liabilities, properties and locations of Tenant or its Affiliates; (ii) self-insured by Tenant via a deductible, a formal plan of self-insurance, or otherwise, provided that Tenant or any guarantor of Tenant's obligations under this Lease maintains, during the period of such self-insurance, a net worth of at least Fifty Million Dollars ($50,000,000); or (iii) insured or self-insured by Tenant through a combination of any of the foregoing insurance programs.

Section 10.3  Landlord's Insurance.

10.3.1  Liability Insurance.  Landlord shall maintain in full force and effect from and after the Effective Date and throughout the Term the commercial general liability insurance with regard to the Shopping Center protecting and insuring Landlord, naming Tenant as "additional insured-lessee", and having a combined single limit of liability of not less than Ten Million Dollars ($10,000,000) for bodily injury, death and property damage liability.

10.3.2  Special Form Property Insurance.  Landlord shall procure and maintain in full force and effect from and after the Effective Date and throughout the Term Special Form (so-called "All-Risk") property insurance (including loss of rents for a minimum period of one (1) year), endorsements for coverages for flood for the Southwest Quadrant only (if the Southwest Quadrant is located in a flood zone), earthquake and earth movement [sinkholes] (if customarily carried by landlords of first-class shopping centers in the Daly City metropolitan area), windstorm, and Ordinance or Law coverage, on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of all of the buildings (including the

26

Premises and Tenant's Work) and other insurable improvements in the Shopping Center; provided, however, in no event shall such insurance cover Tenant's Property or any subsequent improvements made to the Premises by Tenant after completion of Tenant's Work. All property insurance policies required to be maintained by Landlord pursuant to this Subsection 10.3.2 shall provide that any proceeds thereof shall be deposited with Landlord's Mortgagee, or if none, to Landlord, in either event to be held in trust by such party and disbursed only in accordance with the provisions of, and for the purposes set forth in, Section 11.1 hereof. The property insurance required to be maintained by Landlord pursuant to this Section (excluding coverage for windstorm, flood and earthquake) shall not have deductibles exceeding One Hundred Thousand Dollars ($100,000) without Tenant's prior consent, provided that the deductibles carried by Landlord for windstorm, flood and earthquake are commercially reasonable.

       10.3.3 Tenant's Share of Insurance Premiums.  Landlord acknowledges and agrees that Tenant shall not be responsible for any payment to Landlord of any insurance premiums in connection with the Shopping Center and/or the Premises, which payments are deemed to be included in Common Area Charges.

### Section 10.4   General Insurance Requirements.

       10.4.1  All insurance required to be maintained by the parties under this Lease shall be maintained with insurance companies qualified to do business in the state in which the Shopping Center is located, and rated at least A-/VIII by the most current Best's Key Rating Guide (or its equivalent, if such Guide ceases to be published). Each party shall use its diligent efforts to have its insurers provide thirty (30) days (ten (10) days in the event of non-payment of premium) prior notice to the other party of cancellation or non-renewal of any policy required hereunder. Each policy carried by either party shall be written as a primary policy not contributing with, and not in excess of, coverage carried by the other. Each party shall provide to the other duly executed certificates evidencing the insurance coverage described in Sections 10.2.1 and 10.3 above. Any insurance policies in favor of Landlord shall name Equity One Realty & Management CA, Inc., as an additional insured. Tenant shall deliver these insurance policies or certificates thereof, reasonably satisfactory to Landlord, issued by the insurance company to Landlord prior to the Delivery Date and thereafter prior to the expiration date of each policy.

       10.4.2  The liability insurance requirements under Sections 10.2 and 10.3 above shall be reviewed by Landlord and Tenant every five (5) years for the purpose of mutually increasing (in consultation with their respective insurance advisors) the minimum limits of such insurance to limits which shall be reasonable and customary for similar facilities of like size and operation in accordance with generally accepted insurance industry standards. The replacement value of the buildings and other insurable improvements constituting the Shopping Center shall be re-evaluated from time to time at the request of either Landlord or Tenant.

ARTICLE 11

FIRE AND OTHER CASUALTY; EMINENT DOMAIN

### Section 11.1   Fire and Other Casualty.

       11.1.1  (a)      Except as otherwise provided in this Section 11.1, if all or a portion of the Premises, the Common Areas (including all improvements thereto), the Enclosed Mall or the Southwest Quadrant (collectively, the "**Restoration Area**")shall be damaged by fire or other casualty, Landlord shall promptly rebuild and restore the same to the condition existing on the date immediately prior to such fire or other casualty, which restoration shall exclude all of Tenant's leasehold improvements performed by Tenant after the completion of Tenant's Work and Tenant's Property. The proceeds of the policies required to be obtained and maintained by Landlord pursuant to Subsection 10.3.2 hereof shall, to the extent necessary, be used for the performance of such rebuilding and restoration work. Landlord shall give Tenant at least sixty (60) days' prior notice of the date on which the restoration work to the Premises will be Substantially Completed. In the event Landlord's insurance proceeds are insufficient to complete such work, Landlord shall provide the balance of the amount necessary to rebuild or restore the Shopping Center in the manner provided in this Section 11.1.1.

       (b)      Notwithstanding the foregoing, if any portion of the Premises are so damaged or destroyed, Tenant shall have the right to require Landlord to make changes to the

27

Premises in the course of, and as part of, such rebuilding or restoration work, which changes are in excess of Landlord's rebuilding and restoration obligations set forth in Section 11.1.1(a) above. If the net cost and expense of such rebuilding or restoration work is increased solely as a result of such changes (taking into consideration any and all actual reduced and additional costs resulting from such changes and/or other cost savings arising therefrom), then Tenant shall pay to Landlord, as Additional Rent, the amount of such net increase, which amount shall be due and payable within thirty (30) days after Landlord has delivered to Tenant invoices evidencing such increase and other supporting documentation as may be reasonably required by Tenant (but in no event earlier than the occurrence of the date on which possession of the restored areas of the Premises are delivered to Tenant). To the extent that Landlord's substantial completion of such rebuilding or restoration work is delayed solely as a result of such changes (taking into consideration any and all reasonable time savings to Landlord resulting from such changes), then the applicable period(s) specified in Section 11.1.2 below shall be appropriately adjusted to the extent of such net delay.

(c)   If, in Tenant's reasonable judgment, any damage to the Premises renders all or any portion of the Premises unusable for the conduct of Tenant's business or, in the case of any damage to the Shopping Center, materially interferes with the normal conduct of any business operations in the Premises, the Rent shall be equitably reduced or totally abated based upon the extent to which the remaining portion of the Premises may, in Tenant's reasonable judgment, be utilized for its normal conduct of business.

11.1.2  In the event that:

(a)   Landlord does not commence the repair and restoration work to the Restoration Area as required pursuant to this Section 11.1 within one hundred eighty (180) days after the date of such destruction (subject to the Restoration Extension, as defined below), or thereafter fails to diligently pursue the completion of such repair and restoration work (subject to Force Majeure or such period as may be reasonably necessary for the adjustment of insurance proceeds, not to exceed sixty (60) days in the aggregate); or

(b)   the required repairs and restorations to the Restoration Area are not Substantially Completed by Landlord in accordance with the provisions of this Section 11.1 within one (1) year after the date of destruction (which period may be extended by reason of an event of *Force Majeure*, not to exceed ninety (90) days in the aggregate, provided that Landlord shall have given Tenant notice thereof promptly after its occurrence and subject to the Restoration Extension, as defined below),

then, in either of such events, Tenant shall have the right, at its sole discretion and option, to:

(i)   after giving thirty (30) days' prior notice to Landlord (and Landlord's continued failure to commence and diligently pursue such repairs and restoration work to completion), perform or complete, as the case may be, said work (or any portion thereof) on Landlord's behalf and at the sole cost of Landlord, which cost Landlord shall pay to Tenant during the course of such repairs within thirty (30) days after Tenant's delivery to Landlord of an invoice therefor and, in default of any such payment, Tenant shall have the right to offset the amount thereof, together with interest at the Lease Interest Rate, against the Rent next accruing hereunder; provided, however, that Tenant's right to make such repairs and restoration on Landlord's behalf shall be limited to the Premises, access routes to Tenant's loading dock, Tenant's signage and trash facilities, and the Critical Areas (it being agreed, without limiting the foregoing provisions of this Subsection 11.1.2, that at Tenant's election all insurance proceeds paid or payable to Landlord or Landlord's Mortgagee pursuant to Section 10.3 hereof shall be paid (or, as applicable, in turn delivered) directly to Tenant, to be applied to such work by Tenant as same is being performed); or

(ii)   seek to obtain specific performance of Landlord's repair and restoration obligations pursuant to the laws of the state in which the Shopping Center is located; provided, however, that Tenant's right to seek specific performance shall be limited to repair and restoration of the Premises, the Critical Area, and Tenant's loading and trash removal facilities and Tenant's signage; or

(iii)   terminate this Lease by thirty (30) days' notice to Landlord.

28

1    In addition to the foregoing, if, in the opinion of an independent licensed architect designated by
2    Tenant (and reasonably acceptable to Landlord), the required repairs and restorations to the
3    Restoration Area cannot be completed by Landlord in accordance with the provisions of this
4    Section 11.1 within one (1) year after the date of destruction, Tenant shall have the right, at its
5    sole discretion and option, to terminate this Lease by giving Landlord at least thirty (30) days'
6    notice thereof, which notice shall be given no later than the date which is ninety (90) days after
7    the date of the casualty, after which 90-day period Tenant shall be deemed to have waived its
8    termination right.  If Tenant has not waived its termination right within thirty (30) days after the
9    date of the casualty, then the 180 day period referred to in Section 11.1.2(a) above and the one
10    (1) year period referred to in Section 11.1.2(b) above shall each be extended one (1) day for each
11    day that Tenant has not waived its termination right after such thirty (30) day period (the
12    "*Restoration Extension*").

13          11.1.3  If the Premises are substantially destroyed by fire or other casualty during
14    the last two (2) years of the Term to the extent of more than one-third (1/3) of the Floor Area
15    thereof, Landlord or Tenant shall each have the right to terminate this Lease as of the date of
16    such damage or destruction by giving notice within thirty (30) days following such damage or
17    destruction, but Tenant may negate any termination by Landlord by agreeing to extend the Term
18    for an additional five (5) year period by exercising an option pursuant to Subsection 2.2.2 hereof,
19    if available, within ten (10) days after receipt of the termination notice from Landlord.

20          Section 11.2   Eminent Domain.

21          11.2.1  As used in this Section 11.2, "*Taking*" or "*Taken*" shall mean a taking for
22    any public or quasi-public use by any lawful power or authority by exercise of the right of
23    condemnation or eminent domain or by agreement between Landlord and those having the
24    authority to exercise such right.

25          11.2.2  If all of the Premises shall be Taken, this Lease shall terminate as of the
26    date of vesting of title or transfer of possession, whichever is earlier, without further liability on
27    the part of either Landlord or Tenant, except for an adjustment between the parties for the Rent
28    payable by Tenant hereunder.

29          11.2.3  In the event that:

30               (a)    any portion of the Premises shall be Taken so that it is
31    commercially unreasonable or unfeasible for Tenant, in its reasonable judgment, to conduct its
32    normal business in the Premises;

33               (b)    as a consequence of any Taking: (i) portions of the Shopping
34    Center shall be divided or separated in any manner that it materially interferes with parking,
35    visibility, or access to the Premises from other portions of the Shopping Center, or (ii) the
36    Shopping Center no longer has all of the entrances designated Critical Access Ways on Exhibit
37    B, and as a result, it is not commercially reasonable or feasible for Tenant, in its reasonable
38    judgment, to conduct its normal business in the Premises;

39               (c)    there occurs, in Tenant's reasonable judgment, a denial of adequate
40    access to the Shopping Center at the grade of any street adjoining the Shopping Center or to any
41    easement granted under this Lease, whether or not a Taking shall have occurred;

42               (d)    any portion of the Shopping Center shall be Taken which
43    materially interferes with parking, visibility or access to the Premises, and as a result of such
44    taking it is commercially unreasonable or unfeasible for Tenant, in its reasonable judgment, to
45    conduct its normal business in the Premises;

46               (e)    more than twenty-five (25%) percent of the total Floor Area of all
47    of the buildings in the Restoration Area (other than the Premises) are Taken; or

48               (f)    five (5%) percent or more of the parking spaces located in the
49    Critical Area are Taken, or if so many of the parking spaces in the Shopping Center are Taken
50    such that there are fewer than (i) 4.0 parking spaces for every one thousand (1,000) square feet of
51    Floor Area in the Shopping Center, or (ii) the number of parking spaces required by applicable
52    Legal Requirements;

1854916.2\C061858\0372671
[bbBaby]

1   then, in any of such events, Tenant shall have the right to terminate this Lease by giving at least
2   sixty (60) days' prior notice to Landlord within sixty (60) days of any such event, in which event
3   this Lease shall terminate without any further liability on the part of either Landlord or Tenant,
4   except for an adjustment between the parties for the Rent payable by Tenant hereunder and for
5   payment to Tenant for its share of the award for the taking pursuant to Subsection 11.2.5 below.
6   Upon any partial Taking of the Premises, the Rent shall be equitably reduced or totally abated
7   based upon the extent to which the remaining portion of the Premises may, in Tenant's
8   reasonable judgment, be utilized for its normal conduct of business.

9   If the Premises are reduced by twenty five percent (25%) or more, or a material portion of the
10  Restoration Area is taken by condemnation so as to render, in Landlord's reasonable judgment,
11  the remainder unsuitable for use as a retail shopping center then, in either of such events,
12  provided Landlord terminates all of the leases in the Restoration Area, Landlord shall have the
13  right to terminate this Lease by giving at least sixty (60) days' prior notice to Tenant within sixty
14  (60) days of any such event, in which event this Lease shall terminate without any further
15  liability on the part of either Landlord or Tenant, except for an adjustment between the parties
16  for the Rent payable by Tenant hereunder and for payment to Tenant for its share of the award
17  for the taking pursuant to Subsection 11.2.5 below.

18          11.2.4  If this Lease is not terminated pursuant to this Section 11.2, Landlord, at
19  its sole cost and expense, within a reasonable period of time after such Taking, shall repair and
20  restore the area not so Taken to tenantable condition, similar in physical appearance to the
21  condition of the area immediately prior to the Taking, pursuant to plans and specifications
22  reasonably approved by Tenant (which repair and restoration shall, as applicable, exclude
23  leasehold improvements performed by Tenant subsequent to the completion of Tenant's Work
24  and Tenant's Property), and any and all amounts awarded to Landlord for any Taking shall be
25  made available to and used by Landlord for any rebuilding or restoration which it is required to
26  perform hereunder.  During the period of such repairs and restoration, all Rent shall abate to the
27  extent that the Premises may not, in Tenant's reasonable judgment, be used by Tenant for the
28  normal conduct of its business.  Such abatement shall terminate in accordance with the terms of
29  Section 11.3 below.  Landlord shall give Tenant at least sixty (60) days' prior notice of the date
30  on which the restoration work to the Premises will be Substantially Completed.  In connection
31  with any Taking or partial Taking of the Premises, Tenant shall be entitled to claim an award for
32  loss of business, leasehold improvements, fixtures and equipment and removal and reinstallation
33  costs; provided, however, that no award shall be payable to Tenant which reduces the award
34  payable to Landlord for its fee interest in the Premises.

35          11.2.5  Any dispute between the parties with respect to this Section 11.2 shall be
36  resolved by arbitration in accordance with the provisions of Section 16.3 below.

37          Section 11.3    Abatement of Rent Charges.  Notwithstanding any other provisions
38  of this Lease, if the Fixed Rent and Additional Rent payable by Tenant hereunder shall be abated
39  pursuant to Sections 11.1 or 11.2 above, such abatement shall terminate upon the first to occur
40  of: (a) the date on which Tenant shall reopen the Premises to the general public for business; or
41  (b) the expiration of the period which is ninety (90) days after Landlord shall have completed
42  such repairs and restoration work as Landlord is obligated to perform hereunder and the
43  interference with the operation of business in the Premises has ceased.

44                          ARTICLE 12
45          COVENANTS, REPRESENTATIONS AND WARRANTIES

46          Section 12.1    Quiet Enjoyment.  Tenant shall peaceably and quietly have, hold,
47  occupy and enjoy the Premises for the Term, without hindrance from Landlord or any party
48  claiming by, through, or under Landlord.

49          Section 12.2    Authority.  Tenant and Landlord each warrant and represent that
50  the person(s) signing this Lease on their behalf has authority to enter into this Lease and to bind
51  Tenant and Landlord, respectively, to the terms, covenants and conditions contained herein.  The
52  submission of this Lease to each party hereto shall be for examination and negotiation purposes
53  only, and does not and shall not constitute a reservation of or an obligation of Tenant to lease, or
54  otherwise create any interest of Tenant in, the Premises or any other premises situated in the
55  Shopping Center unless and until the Lease is fully executed and delivered by Tenant and
56  Landlord.

30

Section 12.3   <u>Landlord's Covenants, Warranties and Representations</u>. To induce Tenant to execute this Lease, and in consideration thereof, Landlord covenants, warrants and represents to Tenant as follows:

(a)   As of the Effective Date, Landlord has, and as of the Delivery Date shall have, fee simple title to the entire Shopping Center, free and clear of all easements, restrictions, liens, encumbrances, leases and the like, except for the encumbrances and restrictions described on <u>Exhibits E, K-1, L</u> and <u>N</u> hereto.

(b)   In the event the legal description of the Shopping Center described in <u>Exhibit A</u> hereto indicates that the Shopping Center is composed of more than one parcel or lot, Landlord represents that there exist no strips or gores between such parcels or lots which are not owned by Landlord;

(c)   No third party consents or approvals are required in order for Landlord to enter into this Lease or for the performance of Landlord's Work (excluding, as of the Effective Date, governmental permits and approvals such as, without limitation, the Required Land Use Approvals);

(d)   [Intentionally Deleted];

(e)   The Shopping Center now has, and on the Delivery Date shall have access to and from Serramonte Boulevard, as shown on <u>Exhibit B</u> hereto, for the passage of vehicular traffic;

(f)   Excluding any matters disclosed in <u>Exhibit K-1</u>, this Lease does not violate the provisions of any instrument heretofore executed and/or binding on Landlord, or affecting or encumbering the Shopping Center, or the Premises, and no rights granted by Landlord to Tenant under the terms of this Lease conflict with any rights granted by Landlord to any other tenant or occupant in the Shopping Center (including, without limitation, any rights of first offer or first refusal or the like);

(g)   As of the Effective Date, except for Landlord obtaining the Required Land Use Approvals, there are no restrictions or other legal impediments imposed by any public or private instrument which would prevent: (i) the use of the Premises for the Permitted Use; (ii) the use of the parking facilities, access roads, and other Common Areas in the manner contemplated by this Lease; or (iii) subject to compliance with applicable Legal Requirements and Tenant obtaining Tenant's Permits, the performance of Tenant's Work;

(h)   As of the Effective Date, there are no restrictive covenants, uniform sign plans or other signage restrictions (except for governmental sign ordinances, if any) which would prevent the Premises from having the signage (including, without limitation, the square foot area and size of letters) as depicted on <u>Exhibit D-1</u> and <u>Exhibit F</u> hereof.

(i)   [Intentionally Deleted];

(j)   Attached hereto as <u>Exhibit K-2</u> is a complete list of all fully executed and delivered leases in effect on the Effective Date with respect to the Shopping Center (the "***Existing Leases***"); and

(k)   Landlord shall reasonable efforts to forward to Tenant any notice or other communication (a "***Hearing Notice***") received by Landlord from any owner of property adjoining or adjacent to the Shopping Center or from any municipal or other governmental authority, in connection with any hearing or other administrative proceeding relating to any proposed zoning, building code, signage, or related variance affecting the Shopping Center or any adjoining or adjacent property, which, if granted, could materially and adversely affect Tenant's use or occupancy of the Premises, the conduct of Tenant's business therein, or Tenant's rights and benefits under this Lease. If Landlord fails to deliver such Hearing Notice and Tenant learns of such events that are the subject of the Hearing Notice, then Tenant shall request Landlord to deliver a copy of the Hearing Notice and if Landlord fails to do so within ten (10) days after receipt of Tenant's written request, Landlord shall be in default hereof (but except for such failure to deliver the Hearing Notice within such 10-day period, Landlord shall not otherwise be in default under this Section 12.3(k)). Landlord, at its sole cost and expense, shall appear in such proceeding and shall contest such proposed variance. If Landlord fails so to

31

appear and contest such proposed variance after receiving five (5) days' notice from Tenant (or such shorter notice as may be practicable under the circumstances), then Tenant shall be entitled (but shall not be obligated to), in its own name and/or in the name of Landlord, to appear in such proceeding, in which event Landlord shall fully cooperate with Tenant, provide such information, and execute any documents or other instruments as Tenant may reasonably request in connection with any such proceeding.

Section 12.4    Environmental Matters.

12.4.1    Definitions.

(a)    As used herein, the term "***Environmental Laws***" shall mean any and all Legal Requirements concerning the protection of the environment, human health or safety.

(b)    As used herein, the term "***Hazardous Substances***" shall mean each and every element, compound, material, mixture, substance, waste, hazardous substance, hazardous waste, hazardous material, toxic substance, pollutant or contaminant either as those terms are defined in any of the Environmental Laws or the presence of which may cause liability at common law, including, without limitation, asbestos and/or asbestos-containing products, whether or not currently friable.

(c)    As used herein, the term "***Environmental Notice***" shall mean a summons, citation, directive, order, claim, notice, litigation, investigation, judgment, legal pleading, letter or other communication, written or oral, actual or threatened, from the United States Environmental Protection Agency or other federal, state or local governmental agency or authority, or any other private individual or entity concerning (i) any Hazardous Substances at, on, in, under or emanating from the Premises or the Shopping Center (including, without limitation, the Southwest Quadrant); (ii) any violation or potential violation of Environmental Laws at the Premises or the Shopping Center; or (iii) any underground storage tanks on the Premises or the Shopping Center.

(d)    As used herein, the term "***Releasing***" or "***Release***" shall mean releasing, spilling, leaking, discharging, disposing or dumping or otherwise introducing any substance into the environment or into any building or other improvements in violation of Environmental Laws.

(e)    As used herein, the term "***Compliance Costs***" shall mean any and all costs incurred by a party in complying with applicable Environmental Laws, including, without limitation, consultant's and engineer's fees; laboratory costs; contractor's and subcontractor's fees; application and filing fees; costs of investigation, monitoring or cleanup of soil or other substrate, surface water, groundwater, or buildings or other improvements; equipment costs; disposal fees; costs of operation and maintenance of equipment; legal fees; other governmental fees or costs; interest at the Lease Interest Rate from the date of expenditure until paid in full; and other similar or related costs.

(f)    As used herein, the term "***Tenant Related Parties***" shall mean Tenant's agents, servants, employees, contractors or licensees.

12.4.2    Compliance with Environmental Laws.  Tenant shall comply with all applicable requirements of Environmental Laws governing its use of, and operations at, the Shopping Center and the Premises.  Landlord shall comply with all applicable requirements of Environmental Laws relating to the Shopping Center and the Premises, except to the extent such requirements arise from Tenant's operations thereon.

12.4.3    Responsibility for Releases of Hazardous Substances.  Notwithstanding any other provision of this Lease, Tenant shall only be liable for any Release of Hazardous Substances at, on, in, under or emanating from the Premises or Shopping Center which were introduced by Tenant or Tenant Related Parties (hereinafter "***Tenant Releases***"), including, without limitation, any Compliance Costs required to address Tenant Releases.  Landlord shall be liable for any Hazardous Substances at, on, in, under or emanating from the Premises or Shopping Center, including, without limitation, any Compliance Costs attributable to such Hazardous Substances, unless the Hazardous Substances are caused by Tenant Releases.  Except

32

in the event of an emergency or if compelled by applicable governmental authority and provided that Landlord does not incur any additional expense on account thereof (including without limitation, fines and penalties), any work performed by Landlord relating to Hazardous Substances shall be performed by Landlord at any time other than during the months of August (through Labor Day), November and December, and shall be undertaken in such commercially reasonable manner so as to (i) not adversely affect ingress to or egress from the Shopping Center, (ii) have no adverse effect on the visibility of the Premises or any signs which contain Tenant's name, and (iii) not otherwise materially interfere with the normal conduct of any business operations in the Premises. If the presence of Hazardous Substances, or Landlord's remediative work relative thereto, interferes with Tenant's normal business operations in the Premises, then Tenant shall be entitled to an equitable abatement of Rent for so long as such condition persists.

12.4.4 <u>Standards</u>. Except as expressly provided herein, the parties agree that any investigation or remediation of Hazardous Substances, or cure of a violation of Environmental Laws, required to be conducted at the Premises or Shopping Center shall be no more stringent than necessary to meet the minimum standards of Environmental Laws applicable to properties used in the manner the Shopping Center is being used.

12.4.5 <u>Landlord's Representations and Warranties</u>. Landlord represents and warrants that: (i) Landlord has received no Environmental Notices concerning the Shopping Center or the Premises; (ii) Landlord has no knowledge of, and has received no notice of, any violation, or potential or alleged violation, of any Legal Requirement, including, without limitation, Environmental Laws, affecting the Shopping Center or the Premises which remains uncured; and (iii) to the best of Landlord's knowledge: (A) no Hazardous Substances are located at, on, in, under or emanating from the Shopping Center or the Premises; and (B) no underground storage tank exists at the Shopping Center or the Premises. The foregoing representations and warranties shall in no way serve to vitiate Landlord's obligations under this Article 12.

12.4.6 <u>Documents</u>. Each party shall immediately notify the other party of the notifying party's receipt of an Environmental Notice.

12.4.7 <u>Indemnity</u>. Each party to this Lease shall indemnify, defend and hold the other party, and its agents, servants, shareholders, directors, officers, partners, members and employees harmless from any and all claims, losses, expenses, costs, lawsuits, actions, administrative proceedings, damage, orders, judgments, penalties and liabilities of any nature whatsoever, including, without limitation, reasonable attorneys' fees (incurred to enforce this indemnity or for any other purpose) and Compliance Costs, arising from (i) the indemnifying party's breach of any of its representations, warranties, covenants or other obligations under this Section 12.4; (ii) Hazardous Substances for which the indemnifying party is liable under this Section 12.4; or (iii) violations of Environmental Laws for which the indemnifying party is liable under this Section 12.4.

12.4.8 <u>Survival</u>. The obligations of the parties under this Section 12.4 shall survive the renewal, expiration, breach or earlier termination of this Lease.

12.4.9 <u>Conflict</u>. In the event of any conflict between the provisions of this Section 12.4 and any other provision of this Lease, the provisions of this Section 12.4 shall control.

ARTICLE 13

USES AND RESTRICTIONS

Section 13.1    <u>Permitted and Prohibited Uses</u>.

13.1.1 <u>Tenant's Permitted Use</u>. The Premises may be used and occupied for the Permitted Use (defined in Subsection 1.1.25 above). Tenant shall not use the Premises for any of the "Prohibited Uses" (defined in <u>Exhibit L</u> hereto annexed) or the "Existing Exclusives" (hereinafter defined in Subsection 13.3.1), to the extent then applicable.

13.1.2 <u>Prohibited Uses</u>. Landlord shall construct, lease, operate, maintain and manage the Shopping Center as a first-class shopping center comparable to other first-class shopping centers in the state in which the Shopping Center is located. Landlord shall not lease,

33

rent or occupy or permit to be occupied any portion of the Southwest Quadrant for any of the "Prohibited Uses" (as set forth in Exhibit L hereto annexed).

Section 13.2 <u>Tenant's Exclusive in Center</u>. To induce Tenant to execute this Lease, and subject to all of the terms and provisions of this Section 13.2, Landlord covenants and agrees as follows.

13.2.1 Landlord shall not lease, rent or occupy or permit any other premises in the Southwest Quadrant to be occupied, whether by a tenant, sublessee, assignee, licensee or other occupant or itself, for the storage, sale, rental or distribution, at retail or at wholesale, either singly or in any combination, of items contained in any of the following respective categories of merchandise: (i) infant, juvenile and children's furniture and equipment (including, without limitation, infant, juvenile and children's: cribs, beds, mattresses, bedding, changing tables, gliders, rockers (including coordinating ottomans), high chairs, lamps, walkers, play yards, play pens, car seats, booster seats, cradles, carriages, strollers, toy and clothing chests, swings, or any other furniture or equipment similar to the foregoing enumerated items) (collectively, ***"Restricted Furniture"***); (ii) clothing, layettes, apparel, shoes and/or accessories for infants, juveniles and children 0-4 years in age; and maternity clothing; and (iii) merchandise, products and services targeted for use by or for infants, juveniles and children 0-4 years in age (including, without limitation, infant, juvenile and children's: toys, books, food, formula, indoor and/or outdoor play and recreational equipment, audio and video cassettes or equipment, safety items, feeding items, nursing items, health and beauty care items, drug remedies, diapers, wipes, bathroom items (including, without limitation, personal care devices and other bathroom appliances, accessories and toiletries)) (which items in clauses (i), (ii) and (iii) above, either singly or in any combination, are hereinafter referred to as the ***"Exclusive Items"***). Notwithstanding the foregoing, any tenant or subtenant in the Southwest Quadrant shall have the right to utilize its respective premises for the sale, rental and/or distribution of the Exclusive Items within an aggregate area (which shall include an allocable portion of the aisle space adjacent to such sales, rental and/or distribution area) not to exceed one thousand (1,000) square feet of Floor Area within such tenant's or subtenant's premises. In addition to the foregoing, Landlord shall not lease, rent or occupy or permit any other tenant or occupant of the Southwest Quadrant to operate a (x) hair cutting salon specializing primarily to a clientele of infants, juveniles or children; (y) photo studio specializing primarily to a clientele of infants, juveniles or children; and/or (z) development, learning or fitness center specializing primarily to a clientele of infants, juveniles and children 0-4 years in age similar to a Gymboree, My Gym or Little Gym. The exclusive rights granted to Tenant with respect to any individual item comprising the Exclusive Items (but not any other Exclusive Items) shall be null and void if Tenant fails to use portions of the Premises for the sale, rental or distribution of such item (other than during "Excused Periods," as defined in Section 1.1.8 above) for a period of time exceeding six (6) consecutive months, provided Landlord shall have given Tenant notice of such failure and Tenant shall have at least thirty (30) days to cure such failure prior to the expiration of such six (6) consecutive month period.

13.2.2 The restrictions set forth in Subsection 13.2.1 above shall not apply to a full-line national: (i) department store [for example, Wal-Mart, Macy's, Target or Kohl's]; (ii) discount club [for example, Costco, BJ's Wholesale Club, or Sam's Club]; (iii) home improvement center [for example, Home Depot or Lowe's]; clauses (i), (ii) & (iii) all as commonly located in first-class shopping centers in the state in which the Shopping Center is located, each occupying at least 60,000 square feet of Floor Area within the Shopping Center as such stores are currently operated (as of the Effective Date); and (iv) drug store;. In addition, the restrictions set forth in Subsection 13.2.1 with respect to the Southwest Quadrant shall not apply to (a) the tenant operating under the trade name "Floor and Décor" and "Michael's" (as such retailers operate as of the Effective Date) but shall apply to "Hobby Lobby" and (b) a store that operates primarily as a full-line furniture store, primarily as a mattress store, primarily as a hardware and paint store similar to Ace Hardware., or the juvenile department of a full-line shoe store. Tenant agrees that the foregoing restriction shall not prevent the operation of a typical Ross Dress for Less or similar stores.

13.2.3 The exclusive rights granted to Tenant in this Section 13.2 shall inure to the benefit of any assignee of Tenant's interest in this Lease and to any sublessee of at least fifty percent (50%) of the Floor Area of the Premises.

34

1              13.2.4  (a)     Upon breach of the aforesaid covenant and agreement by Landlord
2  (which breach shall not include a situation in which the lease between Landlord and any tenant in
3  the Shopping Center prohibits the tenant therein from violating the exclusive rights granted to
4  Tenant in this Section 13.2 and despite such prohibition, such tenant violates such exclusive
5  rights, unless Landlord fails to comply with any of the provisions of subparagraph (b) below),
6  the Rent payable hereunder shall be reduced by fifty percent (50%) for so long as such violation
7  shall continue, and Tenant shall have all remedies given to it at law and in equity, including,
8  without limitation, the right to obtain injunctive relief and/or to terminate this Lease and/or to
9  commence and prosecute an action against Landlord or any other violator for damages.

10              (b)     If any person or entity (other than Landlord) shall violate any of
11  the exclusive provisions herein set forth, then upon Landlord's receipt of Tenant's notice stating
12  that such person or entity is violating Tenant's exclusive rights, Landlord shall promptly deliver
13  to such person or entity a letter (with a copy to Tenant) demanding that such person or entity
14  cease operating in violation of Tenant's exclusive rights. Notwithstanding the foregoing,
15  Landlord shall not be obligated to commence legal proceedings against such person or entity if
16  Tenant shall have the right (i) to conduct and prosecute such legal proceedings (including,
17  without limitation, an action for injunctive relief) in its own name, at Tenant's expense, or (ii) in
18  the event the right set forth in (i) above is not permitted to be exercised under applicable Legal
19  Requirements, to conduct and prosecute such legal proceedings in the name of Landlord, at
20  Tenant's expense, and Landlord shall cooperate with Tenant with respect to such prosecution
21  (including, without limitation, by executing any documentation or authorization reasonably
22  required by Tenant in connection with such prosecution and by appearing at any hearing or trial
23  with respect to such prosecution). If Tenant prevails in such legal proceedings, Landlord shall
24  reimburse Tenant for its actual out-of-pocket reasonable attorney's fees and court costs.

25         Section 13.3   <u>Exclusives Which Tenant Must Honor.</u>

26            13.3.1  Tenant shall honor certain exclusives granted by Landlord to certain other
27  tenants in the Shopping Center pursuant to the terms of leases which have been executed prior to
28  the Effective Date and/or pursuant to any other public or private instrument affecting the
29  Shopping Center (hereinafter, ***"Existing Exclusives"***) [a true and complete listing and
30  description of such Existing Exclusives being attached hereto as <u>Exhibit K-1</u>], and shall not
31  sublease, occupy or use all or any portion of the Premises, or permit all or any portion of the
32  Premises to be occupied or used in violation of any such Existing Exclusive (except as may be
33  specifically set forth on <u>Exhibit K-1</u>). Landlord represents and warrants that no Existing
34  Exclusive(s) exist other than those listed on <u>Exhibit K-1</u> hereto and that <u>Exhibit K-1</u> is true
35  accurate and complete, and covenants to indemnify, defend and hold Tenant harmless from and
36  against all loss, cost, liability or expense (including, without limitation, reasonable legal fees)
37  incurred by Tenant by reason of the enforcement by any person or entity of such unlisted
38  Existing Exclusive. Notwithstanding the foregoing, (i) Tenant shall be entitled to enter into a
39  separate agreement with any tenant or other occupant for whose benefit the Existing Exclusive is
40  granted which nullifies or modifies the corresponding Existing Exclusive with regard to the
41  Premises; and (ii) Tenant shall not be subject to the exclusive for the benefit of Starbucks on and
42  after August 1, 2016.

43            13.3.2  Except as expressly set forth in this Section 13.3, Tenant shall not be
44  obligated to honor any exclusive granted by Landlord to any tenant in the Shopping Center.

45                       ARTICLE 14
46                CONDUCT OF BUSINESS OPERATIONS

47        Subject to the other provisions of this Lease (including, without limitation, Articles 2 and
48  3 and Section 12.4.3 hereof), Tenant shall initially open its store for business to the public in the
49  Premises for at least one (1) day, not later than the one hundred eightieth (180th) day after the
50  Rent Commencement Date (which date shall, as applicable, be extended by reason of (A)
51  damage or destruction, eminent domain proceedings or actions, or *Force Majeure*, or (B) the acts
52  or omissions of Landlord). Other than as expressly set forth in the preceding sentence, Tenant
53  shall have no obligation to open or operate any business in the Premises, and shall have the right,
54  at any time, to cease to conduct any business operations in the Premises, and Tenant shall incur
55  no liability to Landlord or its Mortgagee by reason thereof (it being understood and agreed that
56  all of Tenant's obligations under this Lease shall continue unless this Lease is terminated
57  pursuant, *inter alia*, to the further provisions of this Article 14 or any other provision of this

35

Lease [other than by reason of an Event of Default]). In the event that Tenant does not operate or cause to be operated any retail business in the Premises (other than prior to the Rent Commencement Date or during Excused Periods) for more than one hundred eighty (180) consecutive days, Landlord shall have the option to terminate this Lease, which option shall be exercisable by giving notice thereof to Tenant by not later than the ninetieth (90th) day after the date on which said 180-day period expires, whereupon this Lease shall terminate upon the sixtieth (60th) day (the "***Recapture Date***") after the date on which Tenant receives Landlord's termination notice, as if the Recapture Date was originally set forth herein as the expiration date of the Term. Notwithstanding the foregoing, Tenant shall have the right to nullify Landlord's termination by giving notice to Landlord (the "***Reopening Notice***"), within ten (10) days after receiving the Landlord's termination notice, of its decision to reopen the Premises for business (and in fact Tenant reopens for business fully stocked and staffed within thirty (30) days), whereupon Landlord's termination notice shall be rendered null and void. Upon such termination, Landlord and Tenant shall each be released from any and all liabilities thereafter accruing hereunder, except for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease. All Rent payable by Tenant hereunder shall be apportioned as of the Recapture Date and Tenant shall promptly pay to Landlord any amounts so determined to be due and owing by Tenant to Landlord, and conversely Landlord shall promptly reimburse Tenant for any amounts prepaid by Tenant for periods subsequent to the Recapture Date.

ARTICLE 15

TENANT ASSIGNMENT AND SUBLETTING

Section 15.1   <u>Assignment and Subletting</u>.

15.1.1   Tenant shall have the right from time to time, without the consent of Landlord, to assign Tenant's interest in this Lease and/or to sublet, concession or license all or any portion of the Premises, subject to all of the terms and conditions of this Lease (including, without limitation, Section 13.1) and provided the proposed tenant is a tenant typically found in similar shopping centers in California whose use is a retail use that is consistent with the then-existing character and quality of the Shopping Center.

15.1.2   Except with respect to any transaction covered under Subsection 15.1.3 or Section 15.3 below, in the event Tenant proposes to assign this Lease or sublet, in a single transaction, the whole of the Premises, it shall first give notice thereof (the "***Assignment/Subletting Notice***") to Landlord, which notice shall specify the name and address of the proposed assignee or sublessee and the proposed use of the Premises to be made by such assignee or sublessee. Thereafter, Landlord shall have the option to terminate this Lease, which option shall be exercisable by giving notice to Tenant (the "***Termination Notice***") thereof within twenty (20) days after receipt of an Assignment/Subletting Notice from Tenant, in which event this Lease shall automatically terminate on the ninetieth (90th) day (the "***Termination Date***") after the date on which Tenant receives Landlord's Termination Notice, with the same force and effect as if the Termination Date had been designated as the expiration date of this Lease. Upon the Termination Date, Landlord and Tenant shall each be released from any and all liabilities thereafter accruing hereunder, except for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease. All Rent payable by Tenant hereunder shall be apportioned as of the Termination Date and Tenant shall promptly pay to Landlord any amounts so determined to be due and owing by Tenant to Landlord, and conversely Landlord shall promptly reimburse Tenant for any amounts prepaid by Tenant for periods subsequent to the Termination Date. Notwithstanding the foregoing, Tenant shall have the right to avoid Landlord's termination by giving notice to Landlord (the "***Rescission Notice***"), within ten (10) days after receiving the Termination Notice, of its rescission of the Assignment/Subletting Notice, whereupon Landlord's Termination Notice shall be rendered null and void, and Tenant shall not assign this Lease or sublet the whole of the Premises as proposed in its Assignment/Subletting Notice. If Landlord does not give the Termination Notice within the aforesaid 20-day period, Landlord shall conclusively be deemed to have waived its termination rights hereunder with respect to such proposed assignment or subletting transaction, and Tenant may assign this Lease or sublet the entire Premises in accordance with its Assignment/Subletting Notice.

15.1.3   In addition to, and not in limitation of, Tenant's other rights set forth in this Section 15.1, Tenant shall have the right from time to time, without the consent of Landlord,

36

1854916.2\C061858\0372671
[bbBaby]

1    to assign Tenant's interest in this Lease and/or to sublet or license all or any portion of the
2    Premises: (a) to an Affiliate of Tenant; (b) to any entity which purchases all or substantially all
3    of the assets of Tenant or any of its Affiliates; (c) to any entity which purchases Tenant's
4    interest in the majority of stores owned or operated by Tenant or its Affiliate(s) in the State of
5    California; (d) in conjunction with any merger, acquisition, consolidation or public offering of
6    stock or other interests involving Tenant or its Affiliate(s); and/or (e) as may be required by any
7    Legal Requirement.

8            Section 15.2    Liability of Tenant.  Unless otherwise agreed to in writing by
9    Landlord, no assignment, subletting, licensing or concessioning by Tenant shall reduce,
10   diminish, or otherwise affect the liability of Tenant hereunder; provided, however, that in the
11   event of an assignment by the Tenant originally named herein or its Affiliate (collectively, the
12   "*Original Tenant*") of its interest in this Lease to a Major Assignee or to a tenant whose
13   obligations under this Lease are guaranteed by a Major Guarantor, all liability of the Original
14   Tenant under this Lease accruing from and after the effective date of such assignment, shall
15   terminate.  For purposes of this Section 15.2, the term *"Major Assignee"* or *"Major
16   Guarantor"*, as the case may be, shall mean a person or entity which has, as of the effective date
17   of such assignment, a tangible net worth of at least Seventy Five Million ($75,000,000) Dollars.

18           Section 15.3    Collateral Assignment.  In addition to Tenant's other rights set
19   forth in this Article 15, a collateral assignment of Tenant's interest in this Lease by Tenant to one
20   or more "Lenders" (hereinafter defined), as collateral security for an indebtedness or other
21   obligation of Tenant or its Affiliates shall be permitted and Landlord shall execute all
22   documentation reasonably requested by Tenant or any such Lender in connection therewith,
23   provided that such collateral assignment complies with all of the terms of this Lease including,
24   without limitation, the Permitted Use set forth in Section 1.1.25 hereof.  In addition, Tenant shall
25   have the right, without Landlord's consent, to grant to an Affiliate of Tenant a license to operate
26   all of Tenant's business operations at the Premises, without such Affiliate having assumed any
27   liability for the performance of Tenant's obligations under this Lease.  As used herein, *"Lender"*
28   shall mean a state or federally regulated: bank, savings and loan association, insurance company,
29   pension fund, credit union, real estate investment trust, or other institutional lender. .
30   Notwithstanding anything contained in this Section 15.3 to the contrary, in no event shall
31   Landlord's interest in the Shopping Center or the interest of a Mortgagee be subordinate to any
32   interest of any Tenant Lender.

33           Section 15.4    Cure Rights of Original Tenant.

34           15.4.1  Unless Tenant is then released from liability pursuant to Section 15.2
35   above, if Tenant assigns Tenant's interest in this Lease, then Landlord, when giving notice to
36   said assignee or any future assignee in respect of any default, shall also give a copy of such
37   notice to the Original Tenant, and no notice of default shall be effective until a copy thereof is so
38   given to Original Tenant.  Original Tenant shall have the same period after receipt of such notice
39   to cure such default as is given to Tenant therefor under this Lease.

40           15.4.2  If this Lease is terminated because of: (a) an Event of Default of such
41   assignee, or (b) the rejection, disaffirmation, or other termination of this Lease by or on behalf of
42   the assignee pursuant to any proceeding in bankruptcy under any Legal Requirement of any State
43   or of the United States, or any other Legal Requirements affecting creditors' rights, then
44   Landlord shall promptly give to Original Tenant notice thereof, and Original Tenant shall have
45   the right, exercisable by notice given to Landlord within fifteen (15) days after receipt by
46   Original Tenant of Landlord's notice, to enter into a new lease of the Premises with Landlord
47   (*"New Lease"*), provided that the Original Tenant shall have remedied all Events of Default of
48   the assignee hereunder, unless such Events of Default are personal to the assignee and/or not
49   reasonably susceptible of cure by the Original Tenant, in which event the Original Tenant shall
50   not be obligated to cure such Events of Default as a condition to the exercise of its rights under
51   this Subsection 15.4.2.  Upon the Original Tenant's curing of any such Event of Default of the
52   assignee as aforesaid, Landlord shall assign to the Original Tenant all of Landlord's rights
53   against such assignee (whether arising as a result of bankruptcy court proceedings or otherwise).
54   The term of said New Lease shall begin on the date of termination of this Lease and shall
55   continue for the remainder of the Term (including any Renewal Periods).  Such New Lease shall
56   otherwise contain the same terms and conditions as those set forth herein, except for
57   requirements which are no longer applicable or have already been performed.  It is the intention
58   of the parties hereto that such New Lease shall have the same priority relative to other rights or

37

interests in or to the Premises as this Lease. The provisions of this Subsection 15.4.2 shall survive the termination of this Lease and shall continue in full force and effect thereafter to the same extent as if this Subsection 15.4.2 were a separate and independent contract between Landlord and the Original Tenant. From the date on which the Original Tenant shall serve Landlord with the aforesaid notice of the exercise of its right to a New Lease, the Original Tenant shall have quiet and undisturbed use and enjoyment of the Premises and all appurtenances thereto, as contemplated in this Lease.

Section 15.5   Recognition Agreement. In the event Tenant subleases all or any portion of the Premises to an Affiliate, or to a third party for a term of at least five (5) years and which sublease otherwise satisfies the requirements of Section 8.1.3 hereof, then, notwithstanding any other provisions of this Lease, Landlord shall, upon Tenant's request, execute and deliver an agreement among Landlord, Tenant and each such subtenant in the form of Exhibit H hereto, in recordable form.

# ARTICLE 16
# DEFAULT AND DISPUTE RESOLUTION

Section 16.1   Tenant Default.

16.1.1  (i) If Tenant shall fail to pay any Rent when due, within ten (10) days after its receipt of notice thereof from Landlord specifying the amount and details of the unpaid Rent, or (ii) if Tenant shall fail to perform or observe any of the other covenants of this Lease on Tenant's part to be performed or observed within thirty (30) days after its receipt of notice thereof from Landlord specifying the nature of such default (or, if such default shall be of a nature that same cannot reasonably be cured within thirty (30) days and Tenant does not commence to cure such default on or before such thirtieth (30th) day and thereafter diligently prosecute said cure to completion), or (iii) if Tenant shall (x) file or acquiesce to a petition in any court in any bankruptcy, reorganization, composition, extension, arrangement or insolvency proceedings, (y) make an application in any such proceedings for or acquiesce to the appointment of a trustee or receiver for it or for all or any portion of its property or (z) make an assignment for the benefit of creditors in connection with any of the proceedings specified in (x) or (y) above, or (iv) if any petition shall be filed against Tenant to which Tenant shall not acquiesce in any court in any bankruptcy, reorganization, composition, extension, arrangement or insolvency proceedings, and (a) Tenant shall thereafter be adjudicated a bankrupt, (b) such petition shall be approved by any such court, or (c) such proceedings shall not be dismissed, discontinued or vacated within 120 days, or (v) if, in any proceeding, pursuant to the application of any person other than Tenant, to which Tenant does not acquiesce, a receiver or trustee shall be appointed for Tenant, for all or any portion of the property of Tenant and such receivership or trusteeship shall not be set aside within 120 days after such appointment, any of the foregoing circumstances, after the expiration of any applicable notice and cure period, shall constitute an ***"Event of Default"***.

16.1.2  Upon an Event of Default, Landlord shall have all remedies given to it at law or in equity (except that Landlord hereby expressly waives any rights to accelerate any element of the Rent, and any right of distraint, which may be granted to it by law), including the following:

(a)   to bring suit for the collection of such unpaid Rent or for the performance of such other covenant of this Lease on Tenant's part to be performed; and/or

(b)   without waiving any non-monetary default, may (but shall not be obligated to) perform any covenant which is capable of being remedied by the performance of affirmative acts for the account and at the reasonable expense of Tenant (it being agreed that should Landlord require access to the Premises in order to perform such covenant as aforesaid, Landlord shall comply with the applicable provisions of Sections 9.2 hereof), in which event, Tenant shall pay to Landlord on demand, as Additional Rent, the reasonable cost or amount thereof, together with interest thereon at the Lease Interest Rate from the date of outlay of expense until payment; and/or

(c)   upon at least five (5) days' notice to Tenant, to terminate this Lease, whereupon Landlord shall have and retain full right to sue for and collect all unpaid Rent which shall have accrued up to the date of termination and any damages to Landlord by reason of

1854916.2\C061858\0372671
[bbBaby]

1    any such breach as provided in Section 16.1.3 below, and Tenant shall surrender and deliver the
2    Premises to Landlord, failing which, Landlord shall have the right to initiate summary
3    proceedings to recover possession; and/or

4            (d)    upon at least five (5) days' notice to Tenant to terminate Tenant's
5    right of possession, re-enter the Premises and take possession thereof by lawful means. If
6    Landlord shall so elect to repossess the Premises without terminating the Lease, then Tenant
7    shall be liable for and shall pay to Landlord all Rent payable to Landlord pursuant to the terms of
8    this Lease which shall have accrued up to the date of repossession, as well as all Rent as and
9    when same shall become due and payable pursuant to the terms of this Lease during the
10   remainder of the Term, diminished by any net sums thereafter received by Landlord through
11   reletting the Premises during said period (after deducting reasonable expenses incurred by
12   Landlord in connection with such reletting). In no event shall Tenant be entitled to any excess of
13   any rent obtained by such reletting over and above the Rent herein reserved. Landlord may bring
14   actions to collect amounts due by Tenant under this Lease, from time to time, prior to the
15   expiration of the Term.

16          16.1.3 Upon an Event of Default, Tenant shall be liable for and shall pay to
17   Landlord, in addition to any sum provided to be paid above, brokers' fees incurred by Landlord
18   in connection with reletting the whole or any part of the Premises for the remainder of the then
19   unexpired Term (excluding any then unexercised Renewal Periods), the costs of removing and
20   storing Tenant's or other occupant's property; the cost of repairs; and all other commercially
21   reasonable expenses incurred by Landlord in enforcing or defending Landlord's rights and/or
22   remedies, including reasonable attorneys' fees.

23          16.1.4 Upon an Event of Default, any amounts paid by Landlord to cure said
24   Event of Default and any Rent payments not paid after notice thereof is given shall bear interest
25   at the Lease Interest Rate from and after the expiration of any applicable grace period until paid.

26          16.1.5 Landlord shall use all reasonable efforts to relet the Premises or any
27   portion thereof to mitigate Landlord's damages to which Landlord would otherwise be entitled to
28   as a result of an Event of Default; provided, however, that if there are other vacancies in the
29   Shopping Center at that time or in other shopping centers owned by Landlord or an Affiliate
30   within the Daly City, California metropolitan area, Landlord may give preference to reletting the
31   other vacant spaces. In no event shall Tenant be liable to Landlord for any consequential
32   damages suffered by Landlord as a result of an Event of Default by, or any other act of, Tenant.

33          Section 16.2   <u>Landlord Default</u>. If Landlord shall: (i) fail to perform or observe
34   any of the covenants of this Lease on Landlord's part to be performed or observed within thirty
35   (30) days after receiving notice from Tenant thereof (or, if same cannot reasonably be cured
36   within thirty (30) days, if Landlord shall fail to promptly commence and diligently prosecute said
37   cure to completion), or (ii) materially breach any warranty or representation under this Lease
38   (either of (i) or (ii) above being hereinafter referred to as a "***Landlord's Default***"), then Tenant,
39   in addition to such other rights and remedies as may be available under this Lease, or at law or in
40   equity, may, in its sole discretion:

41            (a)    as applicable, perform such obligation(s) that are Landlord's
42   express responsibility in this Lease and in accordance with the provisions of this Lease on behalf
43   of, and at the expense of, Landlord, provided Tenant's right to perform such obligations of
44   Landlord shall be limited to the Premises, the Critical Area, Tenant's loading facility (including,
45   without limitation, Tenant's trash container and/or compactor) and the sidewalk in front of
46   Tenant's Premises; and/or

47            (b)    bring suit for the collection of any amounts for which Landlord is
48   in default, seek injunctive relief, or seek specific performance for any other covenant or
49   agreement of Landlord, without terminating this Lease; and/or

50            (c)    offset against the Rent payable by Tenant hereunder for amounts
51   owed by Landlord to Tenant and/or for the amounts reasonably expended by Tenant performing
52   Landlord's obligations hereunder, including costs and reasonable attorneys' fees, together with
53   interest thereon at the Lease Interest Rate from the date of the outlay until paid; and/or

39

1         (d)    terminate this Lease, without waiving its rights to damages for
2 Landlord's Default, provided that: (1) Landlord's Default materially interferes with the normal
3 conduct of any business operations in the Premises, (2) Landlord's Default is not reasonably
4 capable of being cured by Tenant, and (3) Tenant gives notice of Landlord's Default to any
5 Mortgagee of whom Landlord shall have previously given Tenant notice (including its address),
6 and such Mortgagee shall not have cured Landlord's Default within thirty (30) days after such
7 notice is given (or, if such default cannot reasonably be cured within thirty (30) days, such
8 Mortgagee fails to promptly commence and diligently prosecute said cure to completion).

9         Notwithstanding the foregoing, if, in Tenant's reasonable judgment, a condition posing
10 imminent risk of liability or material harm to persons or property or material disruption to the
11 normal conduct of any business operations in the Premises shall exist which is Landlord's
12 responsibility to repair, Tenant may, at its election, and with reasonable prior notice to Landlord,
13 exercise any or all of the remedies set forth in (a), (b) and (c) above. In no event shall Landlord
14 be liable to Tenant for any consequential damages suffered by Tenant as a result of a default by,
15 or any other act of, Landlord.

16         Section 16.3   Arbitration. In any case where this Lease expressly provides for
17 submission of a dispute or matter to arbitration (but not otherwise), the same shall be settled by
18 arbitration in Daly City, California, before one arbitrator in accordance with the procedural rules
19 of the American Arbitration Association (or any successor thereto) then in effect. The decision
20 of the arbitrator shall be final, conclusive and binding on the parties, but the powers of the
21 arbitrator are hereby expressly limited to the determination of factual issues, and the arbitrator
22 shall have no power to reform, supplement or modify this Lease. The arbitrator shall make only
23 required findings of fact incident to an arbitrable dispute, which findings shall be set forth in
24 reasonable detail in a written decision by the arbitrator. Landlord and Tenant shall share equally
25 in the cost and expenses of such arbitration, and each shall separately pay its own attorneys' fees
26 and expenses, unless the arbitrator finds that one of the parties did not act in good faith in
27 connection with the dispute or the conduct of the arbitration proceeding, in which case the
28 arbitrator may award all or part of said costs, expenses and fees to the other party.

29         ARTICLE 17
30 RIGHT TO MORTGAGE AND NON-DISTURBANCE; ESTOPPEL CERTIFICATE

31         Section 17.1   Right to Mortgage and Non-Disturbance. Landlord reserves the
32 right to subject and subordinate this Lease at all times to the lien of any first mortgage or deed of
33 trust for the benefit of any Mortgagee hereafter encumbering or affecting all or any portion of the
34 Shopping Center, as well as to any future ground or underlying leases encumbering or affecting
35 all or any part of the Shopping Center; provided, however, that (a) each Mortgagee shall first
36 execute and deliver to Tenant a subordination, non-disturbance and attornment agreement in
37 substantially the form attached as Exhibit G hereto, in recordable form, and (b) any Ground
38 Lessor shall execute (and shall obtain the written consent of any holder of any mortgage, deed of
39 trust or any other existing lien encumbering or affecting the Shopping Center or any portion
40 thereof, as applicable) and deliver to Tenant a fee owner recognition agreement in a form
41 reasonably satisfactory to Tenant, which shall include the following provisions: (i) the Ground
42 Lessor will not, in the exercise of any of the rights arising or which may arise out of such lease,
43 disturb or deprive Tenant in or of its possession or its rights to possession of the Premises or of
44 any right or privilege granted to or inuring to the benefit of Tenant under this Lease; (ii) in the
45 event of the termination of the ground or underlying lease, Tenant will not be made a party in
46 any removal or eviction action or proceeding, nor shall Tenant be evicted or removed of its
47 possession or its right of possession of the Premises, and this Lease shall continue in full force
48 and effect as a direct lease between the Ground Lessor and Tenant for the remainder of the Term
49 and on the same terms and conditions as contained herein, without the necessity of executing a
50 new lease; and (iii) Landlord and Tenant shall have the right to execute any amendment to this
51 Lease which is specifically required hereunder and the Ground Lessor shall recognize and be
52 bound thereto.

53         Section 17.2   Estoppel Certificate. Upon written request of Landlord or Tenant,
54 the other party, within thirty (30) days after the date of receipt of such request, shall execute and
55 deliver to and only for the benefit of the requesting party or any Mortgagee, bona fide
56 prospective purchaser, assignee, or sublessee of the requesting party, without charge, a written
57 statement: (1) ratifying this Lease; (2) certifying, to such party's actual knowledge, that this
58 Lease is in full force and effect, if such is the case, and has not been modified, assigned,

40

supplemented or amended, except by such writings as shall be stated; (3) specifying the dates to which Fixed Rent and Additional Rent have been paid; (4) stating whether or not, to such party's actual knowledge, the party requesting the estoppel is in default and, if so, stating the nature of such default, (5) stating the Rent Commencement Date, and (6) stating which options to extend the Lease Term have been exercised, if any.

Section 17.3   Mortgages and Ground Leases.  Landlord represents and warrants to Tenant that no mortgage, deed of trust, security instrument or ground or underlying lease encumbers the Shopping Center or any portion thereof as of the Effective Date.

ARTICLE 18

NOTICE

Subject to the further provisions of this Article 18, whenever it is provided herein that any notice, demand, request, consent, approval or other communication (*"Notice"*) shall or may be given to either of the parties by the other, it shall be in writing and, any Legal Requirement to the contrary notwithstanding, shall not be effective for any purpose unless same shall be given by registered or certified mail, postage prepaid, return receipt requested, or by any recognized overnight mail carrier, with proof of delivery slip, addressed to Landlord at Landlord's Mailing Address, with copies of notices to Landlord also given to: Equity One Realty & Management CA, Inc., 410 Park Avenue, Suite 1220, New York, New York 10022, Attn: Property Management or to Tenant at Tenant's Mailing Address, with copies of notices to Tenant also given to: (i) Allan N. Rauch, Esq., c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, and (ii) Jeffrey H. Kaplan, Esq., c/o Bryan Cave LLP, 1290 Avenue of the Americas, New York, New York 10104, or to such other person or other address as may, from time to time, be specified by either party in a written notice to the other party.  If Landlord shall consist of more than one person or entity, notices delivered by Tenant to Landlord's Mailing Address shall be deemed to be delivered to, and effective notice to, all such persons or entities comprising Landlord.  All notices given in accordance with the provisions of this Section shall be effective upon receipt (or refusal of receipt) at the address of the addressee, provided, however, that if a deadline for the giving of any notice under this Lease occurs on Saturday, Sunday, or a legal holiday, then such deadline shall be extended to the next business day thereafter occurring.  Notwithstanding the foregoing, Landlord shall instead send the following items to Tenant (Attention: Lease Administration) at Tenant's Mailing Address: all bills, notices (but not notices of default) and related information pertaining to Tenant's Fixed Share of Common Areas Charges as described in Section 5.1.2 of this Lease.

ARTICLE 19

TENANT'S PROPERTY

All of Tenant's Property which may be installed or placed in or upon the Premises by Tenant shall remain the property of Tenant.  Tenant may assign, hypothecate, encumber, mortgage or create a security interest in or upon Tenant's Property in the Premises without the consent of Landlord and may remove Tenant's Property at any time during the Term.  Landlord waives any right it may have in Tenant's Property.  To the extent Landlord may have a lien on or security interest in the Tenant's Property pursuant to this Lease, by law or otherwise, Landlord hereby waives, and agrees not to assert, such lien or security interest.  Landlord shall provide to Tenant, within ten (10) days after Tenant's request therefor, a written waiver in form reasonably satisfactory to Landlord and Tenant evidencing Landlord's waiver of any rights it has or may have in Tenant's Property.

ARTICLE 20

END OF TERM

Section 20.1   Surrender of Premises.  At the expiration of the Term, Tenant will quit and surrender the Premises in good condition and repair, excepting, however, reasonable wear and tear, damage by fire or other casualty, damage by eminent domain, and repairs and replacements to be made by Landlord hereunder.

Section 20.2   Hold Over.  If Tenant fails to deliver possession of the Premises to Landlord at the end of the Term, Tenant shall be a tenant at sufferance and shall be liable for Holdover Rent.  As used herein, *"Holdover Rent"* shall be an amount equal to (i) one hundred percent (100%) of the monthly Fixed Rent payable by Tenant immediately prior to the end of the

41

Term for any month or portion thereof (with no proration for the actual number of days that Tenant holdsover) during which Tenant fails to deliver possession of the Premises to Landlord at the end of the Term and (ii) fifty percent (50%) of the amount payable pursuant to clause (i) above and (iii) one hundred fifty percent (150%) of all Additional Rent, except the amounts payable in clauses (ii) and (iii) shall be prorated based upon the number of days in the applicable month that Tenant has failed to deliver possession of the Premises to Landlord. By way of illustration, if the monthly Fixed Rent at the end of the Term is $15,000, Tenant would owe Landlord such amount on a monthly basis, regardless of the number of days in such month that Tenant has failed to deliver possession of the Premises to Landlord, and in addition, Tenant would owe Landlord $7,500 and all Additional Rent then due for such month but the amount of $7,500 and the Additional Rent would be prorated on a daily basis depending upon when Tenant delivers possession of the Premises to Landlord.

## ARTICLE 21
## [INTENTIONALLY DELETED]

## ARTICLE 22
## ONGOING CO-TENANCY

If (i) two (2) of the Anchor Tenants (as defined in Section 2.5.1) are not open for business or (ii) less than sixty five percent (65%) of the Floor Area of the Shopping Center (excluding the Floor Area of the Premises, any other space occupied by Tenant or any of its Affiliates, the Anchor Tenants and any new expansion areas not built as of the Effective Date) is open and operating by tenants typically found in similar shopping centers in California and such condition continues for a period of more than three (3) consecutive months (such condition being hereinafter referred to as an *"Ongoing Excess Vacancy"*), then in such event, Tenant shall have the right to pay Alternate Rent in lieu of Fixed Rent during the period of such Excess Vacancy, and/or if the Excess Vacancy continues for a period in excess of twelve (12) continuous months, to terminate this Lease, exercisable by giving Landlord, within one hundred twenty (120) days after the expiration of such 12-month period, at least sixty (60) days' prior notice, in which event this Lease shall terminate on the date set forth in Tenant's notice of termination without further liability accruing after the date of such termination on the part of either Landlord or Tenant. If Tenant does not terminate this Lease pursuant to this Article 22, then commencing on the expiration of the aforesaid 120-day period, Tenant shall resume paying full Rent without regard to the foregoing provisions of this Article 22, provided, however, that Tenant shall retain all of its rights under this Article 22 with respect to any future condition of Ongoing Excess Vacancy thereafter occurring. Notwithstanding the foregoing, if Tenant ceases to operate any business in the Premises and such cessation occurs more than one year before the Excess Vacancy occurs, then Tenant shall not have the right to pay Alternate Rent but Tenant shall still retain its termination right pursuant to terms of this Article 22.

## ARTICLE 23
## MISCELLANEOUS

Section 23.1    Loading Facilities. Tenant shall have the exclusive right to utilize the loading facilities serving the Premises (shown on Exhibit B) on a "24 hour a day", "365 days a year" basis.

Section 23.2    Liens. Within thirty (30) days after notice of the filing thereof, Tenant shall discharge (either by payment or by filing of the necessary bond, or otherwise) any lien against the Premises and/or Landlord's interest therein, which may arise out of any payment due for, or purported to be due for, any labor, services, materials, supplies or equipment alleged to have been furnished to or for Tenant in, upon or about the Premises. Similarly, within thirty (30) days after notice of the filing thereof, Landlord shall discharge (either by payment or by filing of the necessary bond, or otherwise) any lien against the Premises and/or Landlord's interest therein, which may arise out of any payment due for, or purported to be due for, any labor, services, materials, supplies or equipment alleged to have been furnished to or for Landlord in, upon or about the Premises.

Section 23.3    Broker's Commission. Landlord and Tenant each warrant and represent to the other that they did not deal with any real estate broker in connection with the negotiation, execution and delivery of this Lease, except for Terranomics (the *Broker"*). Landlord shall pay the Broker a commission pursuant to a separate agreement. Each party agrees

42

to indemnify, defend, and save the other party harmless from and against any and all liabilities, costs, causes of action, damages and expenses, including, without limitation, attorneys' fees, with respect to or arising out of any claims made by any real estate broker (other than the Broker), agent or finder with respect to this Lease in breach of the foregoing representation.  The provisions of this Section shall survive the expiration or earlier termination of this Lease.

Section 23.4  *Force Majeure*.  Except as otherwise expressly set forth herein, in the event either party hereto shall be delayed or hindered in, or prevented from, the performance of any act required hereunder by reason of strikes, failure of power, riots, insurrection, war, earthquake, hurricane or tornado (or comparable weather conditions of unusual severity), or other reasons of an extraordinary nature which are beyond the reasonable control of the party, and which could not have been avoided through the exercise of due diligence by a party (collectively referred to herein as "*Force Majeure*"), then the performance of any such act shall be excused for a period equal to the period of the delay.  Notwithstanding the foregoing provisions, the following shall not constitute Force Majeure: (i) the financial inability of a party to perform its obligations under this Lease; or (ii) delays occurring in the course of complying with applicable Legal Requirements that could have been avoided through the exercise of due diligence by a party hereto.  A party wishing to invoke this Section shall give the other party notice of that intention within ten (10) days of the commencement of any event of *Force Majeure* and shall, at that time, specify the reasons therefor, the specific provision of this Lease which will be delayed as a result, and the period of such extension, if known, or if not known, a reasonable estimate thereof.

Section 23.5  Consents.  Except as may be otherwise expressly set forth in this Lease, whenever under this Lease provision is made for either party's securing the consent or approval of the other party, (i) such consent or approval shall be in writing and shall not be unreasonably withheld, delayed or conditioned, and (ii) in all matters contained herein, both parties shall have an implied obligation of reasonableness.

Section 23.6  Costs.  Whenever this Lease requires the performance of an act by a party, such party shall perform the act at its own cost and expense, unless expressly provided to the contrary.

Section 23.7  Attorneys' Fees.  In any action or proceeding hereunder (whether to enforce the terms and provisions of an indemnity or otherwise), the prevailing party shall be entitled to recover from the other party the prevailing party's reasonable costs and expenses in such action or proceeding, including reasonable attorneys' fees, costs and expenses.  Except as otherwise set forth herein, if either party is sued by a third party as a result of a violation of a covenant or warranty herein contained by the other party hereto, then the party who has violated the covenant or warranty shall be responsible for the reasonable costs and expenses in such action or proceeding against the non-violating party, including reasonable attorneys' fees, costs and expenses.

Section 23.8  Survival of Obligations.  The obligation to pay any sums due to either party from the other that by the terms herein would not be payable, or are incapable of calculation, until after the expiration or sooner termination of this Lease shall survive and remain a continuing obligation until paid.  All indemnity obligations under this Lease shall survive the expiration or earlier termination of this Lease.

Section 23.9  Non-Waiver.  The failure of Landlord or Tenant to insist upon the strict performance of, or to enforce, any provision, covenant or condition herein shall not be deemed to be a waiver thereof, nor void or affect the right of the aggrieved party to enforce the same covenant or condition on the occasion of any subsequent breach or default; nor shall the failure of either party to exercise any option in this Lease upon any occasion arising therefor be deemed or construed to be a waiver of the right to exercise that same kind of option upon any subsequent occasion.

Section 23.10  Rights Cumulative.  Unless expressly provided to the contrary in this Lease, each and every one of the rights, remedies and benefits provided by this Lease shall be cumulative and shall not be exclusive of any other such rights, remedies and benefits allowed by applicable Legal Requirements.

43

Section 23.11 <u>Definition of Landlord</u>. The term ***"Landlord"*** shall mean only the person or entity which, from time to time, shall then own the Shopping Center, and in the event of the transfer by such owner of its interest in the Shopping Center, such owner shall (<u>except</u> to the extent of (1) claims made by Tenant against Landlord which arose prior to the effective date of the transfer of such ownership interest, and/or (2) judgments obtained by Tenant against Landlord, on or prior to the effective date of the transfer of such ownership interest) thereupon be released and discharged from all covenants and obligations of Landlord thereafter accruing, but such covenants and obligations shall be binding during the Term upon each new owner for the duration of such owner's ownership.

Section 23.12 <u>Successors and Assigns</u>. The provisions of this Lease shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns.

Section 23.13 <u>Limitation of Landlord's Liability</u>. Except with respect to the payment of the Tenant Allowance and insurance proceeds or condemnation awards received by Landlord which are required by the terms of this Lease to be applied to the repair or restoration of the Premises or the Shopping Center, Tenant shall, on and after the Delivery Date, look only to Landlord's estate and property in the Shopping Center (or the proceeds from the sale of all or any portion thereof) and net income derived from the Shopping Center for the satisfaction of Tenant's remedies for the collection of a judgment (or other judicial process) requiring the payment of money by Landlord hereunder and no other property or assets of Landlord, its officers, directors, stockholders, members or partners shall be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies under or with respect to this Lease. Except with respect to the limitation on personal liability hereinabove set forth, the provisions of this Section 23.13 shall not be deemed or construed to limit Tenant's rights and remedies pursuant to this Lease or which may be available at law or in equity.

Section 23.14 <u>Limitation of Tenant's Liability</u>. Landlord, its successors and assigns, shall look solely to the assets, if any, of Tenant and its successors and assigns, for the satisfaction of any claim arising from or under this Lease and shall not seek to impose personal liability on any shareholder, officer, director, member or employee of Tenant or any of its Affiliates.

Section 23.15 <u>Joint and Several Liability</u>. If either party consists of more than one person, then the persons constituting such party shall be jointly and severally liable hereunder.

Section 23.16 <u>Severability</u>. If any term, covenant, condition or provision of this Lease is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions hereof shall remain in full force and effect and shall in no way be affected, impaired, or invalidated thereby.

Section 23.17 <u>Grammatical Usages and Construction</u>. In construing this Lease, feminine or neuter pronouns shall be substituted for those masculine in form and vice versa, and plural terms shall be substituted for singular and singular for plural in any place in which the context so requires. This Lease shall be construed without regard to: (i) the identity of the party who drafted the various provisions hereof, and (ii) the addition or deletion of text made during the negotiation of this Lease. Moreover, each and every provision of this Lease shall be construed as though all parties hereto participated equally in the drafting thereof. As a result of the foregoing, any rule or construction that a document is to be construed against the drafting party shall not be applicable hereto.

Section 23.18 <u>Table of Contents, Line Numbering and Paragraph Headings</u>. The table of contents and line numbering, if any, and section headings are inserted only for convenience and in no way define, limit or describe the scope or intent of this Lease, nor in any way affect this Lease.

Section 23.19 <u>Definition of Hereunder, Herein, etc.</u>. Unless the context clearly indicates to the contrary, the words "herein," "hereof," "hereunder," "hereafter," and words of similar import refer to this Lease and all the Exhibits attached hereto as a whole and not to any particular section, subsection, or paragraph hereof.

44

Section 23.20 <u>Short Form Lease</u>. Upon the request of either party following the execution and delivery of this Lease, Landlord and Tenant shall execute a short form lease or memorandum, which shall be in recordable form, and in such form and having such substance as either party shall reasonably request. Landlord and Tenant shall cooperate with each other in effecting the recordation thereof. In no event shall the amount of Fixed Rent reserved hereunder be included in any such short form lease or memorandum.

Section 23.21 <u>Entire Agreement and Modification</u>. This Lease constitutes the entire agreement of the parties hereto, and all prior agreements between the parties, whether written or oral, are merged herein and, except as may be specifically set forth herein, shall be of no force and effect. This Lease cannot be changed, modified or discharged orally, but only by an agreement in writing, signed by the party against whom enforcement of the change, modification or discharge is sought.

Section 23.22 <u>No Joint Venture or Partnership Created by Lease</u>. Nothing contained herein shall be deemed or construed as creating the relationship of principal and agent or of partnership or of joint venture between the parties hereto.

Section 23.23 <u>Tenant's Tradename</u>. Except as a nominative fair use (e.g. to show the location of the Premises in the Shopping Center, to indicate that Tenant is a tenant in the Shopping Center, to announce the "Grand Opening" and "Coming Soon" of Tenant and the listing of Tenant's name on site plans, promotional materials and internet shopping center directories), Landlord shall not make use of the tradenames "Bed Bath & Beyond"® or "Buy Buy Baby"® in any advertising or marketing material, including, without limitation, on any internet website, without obtaining Tenant's prior written approval, which may be withheld in Tenant's sole and absolute discretion.

Section 23.24 <u>Counterparts</u>. This instrument may be executed in several counterparts, each of which shall be deemed an original. The signatures to this instrument may be executed and notarized on separate pages, and when attached to this instrument, shall constitute one complete document.

Section 23.25 <u>Waiver of Trial by Jury</u>. Landlord and Tenant hereby mutually waive any and all rights which either may have to request a jury trial in any proceeding between them at law or in equity.

Section 23.26 <u>Ethical Conduct Policy</u>. It is the policy of Tenant and its subsidiaries and affiliates (collectively, *"the Company"*) to conduct all its business transactions in accordance with the highest ethical standards and all applicable laws (including, but not limited to, the U.S. Foreign Corrupt Practices Act). No individual who is employed by or who represents the Company, and no individual or entity that contracts with the Company or otherwise performs services on behalf of the Company, is permitted to solicit, accept, offer, promise or pay any bribe, kickback or any other improper payment of money, products or services. This includes, but is not limited to, any improper payment in exchange for (i) the Company's execution of this Lease, (ii) any action taken by such individual on behalf of the Company, or (iii) any action taken by a third party. Any individual or entity having a business relationship with the Company shall require any subcontractor (of any level) to adhere to the same standards and are expected to appropriately monitor their subcontractors to ensure such adherence. If any such improper actions are observed, please contact the Tenant's Legal Department (Attention: General Counsel) at 908-688-0888 so that the incident may be fully investigated and appropriate remedial action taken.

Section 23.27 <u>Confidentiality</u>. Landlord shall not reveal to anyone, or otherwise make or publish any public statement or notice regarding the economic or other business terms of this Lease (including, without limitation, the Term and the Rent), except as required by Legal Requirements or for disclosure to Landlord's accountants, attorneys, bona fide prospective purchasers, or current or prospective Mortgagees or underlying lessors of all or any portion of Landlord's interest in the Shopping Center, provided that each of such recipients shall be bound to the same non-disclosure provisions as are imposed upon Landlord. Tenant shall not reveal to anyone, or otherwise make or publish any public statement or notice regarding the economic or other business terms of this Lease (including, without limitation, the Term and the Rent), except as required by Legal Requirements or for disclosure to Tenant's accountants, attorneys, bona fide prospective purchasers, assignees or sublessees, provided that each of such recipients shall be

45

1    bound to the same non-disclosure provisions as are imposed upon Tenant and except the
2    foregoing shall not prohibit Tenant from recording a memorandum of this Lease and for
3    Landlord, Tenant and Tenant's subtenant entering into a Subtenant Recognition Agreement in
4    the form of Exhibit H attached hereto.

5           Section 23.28  Timely Billing of Charges.  Except if the reason for the delay in
6    billing is outside of Landlord's control, all charges due from Tenant to Landlord for which
7    Tenant must be billed by Landlord must be billed within three (3) years after the close of the
8    calendar year in which the charge is incurred by, or otherwise payable to, Landlord or Landlord
9    will have waived its right to reimbursement which may have been established in any section of
10   this Lease.

11          Section 23.29  USA Patriot Act.  Pursuant to *Executive Order 13224,* signed by
12   President George W. Bush on September 24, 2001, Landlord and Tenant hereby certify to each
13   other that: (i) it is not acting, directly or indirectly, for or on behalf of any person, group, entity,
14   or nation named by any Executive Order or the United States Treasury Department as a terrorist,
15   "Specially Designated National and Blocked Person," or other banned or blocked person, entity,
16   nation, or transaction pursuant to any law, order, rule, or regulation that is enforced or
17   administered by the Office of Foreign Assets Control; and (ii) it is not engaged in this
18   transaction, directly or indirectly on behalf of, or instigating or facilitating this transaction
19   directly or indirectly on behalf of, any such person, group, entity, or nation.  Landlord and
20   Tenant hereby agree to defend, indemnify and hold harmless the other from and against any and
21   all claims, damages, losses, risks, liabilities and expenses (including reasonable attorneys' fees
22   and costs) arising from or related to any breach of the foregoing certification.  Notwithstanding
23   anything to the contrary contained herein, the parties recognize that Landlord and Tenant's
24   parent company are both publicly traded companies with multiple shareholders, many of whose
25   identities are unknown to each of them.
26
27          Section 23.30  CASP Inspection Civil Code Section 1938.  The Premises has not
28   undergone inspection by a Certified Access Specialist (CASp).  The foregoing verification is
29   included herein solely for the purpose of complying with California Civil Code Section 1938 and
30   shall not in any manner affect the parties' respective responsibilities for compliance with
31   construction-related accessibility standards as provided under this Lease.

32

33                              [Signature page follows]

1854916.2\C061858\0372671
[bbBaby]

1

2          Section 23.31 <u>Governing Law</u>. This Lease shall be governed by, construed, and

3   enforced in accordance with the laws of the State in which the Premises are located.

4          IN WITNESS WHEREOF, the parties have executed this instrument under seal the day

5   and year first-above written.

**LANDLORD:**

WITNESS:                                    DALY CITY SERRAMONTE CENTER,
                                            LLC, a Delaware limited liability company

_____                     By: Equity One Realty & Management CA,
                                            Inc.

                                            By: _____
                                            Name:  Michael Makinen
                                            Title:   Chief Operating Officer

**TENANT:**

WITNESS:                                    BED BATH & BEYOND INC., a New York
                                            corporation

_____                     By: _____
Name: Alan M. Freeman                       Name:  Warren Eisenberg
Title:  Assistant Secretary                 Title:   Co-Chairman

[bbBaby]

1                              INDEX OF EXHIBITS

2      Exhibit A -        Legal Description of Shopping Center
3      Exhibit B -        Site Plan
4      Exhibit C -        Form of Rent Commencement and Expiration Date Agreement
5      Exhibit D -        Specifications for Landlord's Work
6      Exhibit D-1        Exterior Elevations of the Premises, and Sidewalk Plan
7      Exhibit E -        Permitted Encumbrances
8      Exhibit F -        Signage
9      Exhibit G -        Form of Subordination, Non-Disturbance and Attornment Agreement
10     Exhibit H -        Form of Subtenant Recognition Agreement
11     Exhibit I -        Form of Delivery Date Notice
12     Exhibit J -        Form of Delivery Date Certification
13     Exhibit K-1        Existing Exclusives
14     Exhibit K-2        Existing Leases
15     Exhibit L          Prohibited Uses
16     Exhibit M          Form of Mechanics' Lien Indemnification Agreement
17     Exhibit N          Existing Lease Limitations

1854916.2\C061858\0372671
[bbBaby]

Exhibit A

Legal Description of Shopping Center

All that certain real property situated in the County of San Mateo, State
of California, described as follows:

City of Daly City

TRACT ONE:

COMMENCING AT THE MOST WESTERLY TERMINUS OF THAT CERTAIN
CURVE HAVING A RADIUS OF 2151.17 FEET; A CENTRAL ANGLE OF
10°11'45", AN ARC DISTANCE OF 382.80 FEET AS SAID CURVE FORMS A
PORTION OF THE SOUTHERLY BOUNDARY LINE OF BLOCK 36, IN
SERRAMONTE, UNIT NO. 7, DALY CITY, CALIFORNIA, FILED FOR RECORD
JANUARY 25, 1967 IN BOOK 66 OF MAPS AT PAGES 8 TO 11 INCLUSIVE,
SAN MATEO COUNTY RECORDS; THENCE NORTH 28°55'53" EAST 921.22
FEET TO THE POINT OF BEGINNING OF THE PARCEL TO BE DESCRIBED;
THENCE NORTH 84°45' WEST 224.00 FEET; THENCE NORTH 5°15' EAST
335.00 FEET; THENCE SOUTH 84°45' EAST 224.00 FEET; THENCE SOUTH
5°15' WEST 335.00 FEET TO THE POINT OF BEGINNING.

JOINT PLANT NO. 091-024-240-25A
ASSESSOR'S PARCEL NO. 091-240—250

TRACT TWO:

ALL OF BLOCK 36, AS SHOWN ON THE MAP OF SERRAMONTE UNIT NO. 7,
AS FILED JANUARY 25, 1967, IN BOOK 66 OF MAPS, AT PAGES 8, 9, 10
AND 11, SAN MATEO COUNTY RECORDS.

EXCEPTING THEREFROM THE PARCEL AT THE NORTHEAST CORNER OF
SERRAMONTE BOULEVARD AND GELLERT BOULEVARD (EXTENDING
NORTH), CONVEYED TO UNION OIL COMPANY OF CALIFORNIA, BY DEED
RECORDED NOVEMBER 10, 1970, IN BOOK 5857, AT PAGE 227
(60535AD), OFFICIAL RECORDS OF SAN MATEO COUNTY, DESCRIBED AS
FOLLOWS:

BEGINNING AT A POINT ON THE NORTHERLY LINE OF SERRAMONTE
BOULEVARD AS SHOWN ON THE ABOVE MENTIONED MAP, SAID POINT
BEING DISTANT THEREON SOUTH 80° 56' 33" WEST, 25.72 FEET FROM
THE EASTERLY EXTREMITY OF THE NORTHERLY LINE OF SERRAMONTE
BOULEVARD; THENCE FROM SAID POINT OF BEGINNING, NORTH 05° 15'
WEST, 135.64 FEET ; THENCE NORTH 84° 45' WEST, 152.56 FEET;
THENCE SOUTH 05° 15' EAST, 130.67 FEET; THENCE ALONG THE ARC OF
A CURVE TO THE LEFT, TANGENT TO THE PRECEDING COURSE, HAVING A
RADIUS OF 40 FEET, A CENTRAL ANGLE OF 93° 48' 27", AN ARC
DISTANCE OF 65.49 FEET TO THE NORTHERLY LINE OF SERRAMONTE
BOULEVARD; THENCE ALONG SAID LINE, NORTH 80° 56' 33" EAST,
107.58 FEET TO THE POINT OF BEGINNING.

FURTHER EXCEPTING THEREFROM, ALL THAT PORTION OF THE ABOVE
DESCRIBED PROPERTY CONVEYED BY DEED RECORDED JULY 22, 2005,
INSTRUMENT NO. 2005-123837, OFFICIAL RECORDS WITHIN THE
FOLLOWING DESCRIPTION:

PARCEL 1 OF THAT CERTAIN PARCEL MAP RECORDED ON MAY 19, 2005
AS INSTRUMENT NO. 2005-900082, IN BOOK 76 OF PARCEL MAPS AT
PAGES 24 AND 25, SAN MATEO COUNTY RECORDS.

FURTHER EXCEPTING THEREFROM ANY PORTION LYING WITHIN TRACT

1    ONE DESCRIBED ABOVE.

2

3    JOINT PLANT NOS.:

4

5    091-024-240-07A

6    091-024-240-09A

7    091-024-240-32A

8    091-024-240-31A

9    091-024-240-12A

10   091-024-240-13A

11   091-024-240-30A

12   091-024-240-16A

13   091-024-240-17A

14   091-024-240-18A

15   091-024-240-19A

16   091-024-240-21A

17   091-024-240-22A

18   091-024-240-23A

19   091-024-240-26A

20   091-024-240-27A

21   091-024-240-28A

22   091-024-240-29A

23   091-024-240-08.01A

24   091-024-240-08.02A

25

26   APN: 091-240-070, 091-240-090, 091-240-100, 091-240-110, 091-240-

27   120, 091-240-130, 091-240-150, 091-240-160, 091-240-170, 091-240-

28   180, 091-240-190, 091-240-210, 091-240-220, 091-240-260, 091-240-

29   270, 091-240-280, 091-240-300, 091-240-330, 091-240-230

A-2

1                                               <u>Exhibit B</u>

2                                               Site Plan

1854916.2\C061858\0372671
[bbBaby]



LEGEND

| | PREMISES |
| | CRITICAL AREA |
| | PROPERTY LINE |
| EM | EXPECTANT MOTHER PARKING |
| | BIO RETENTION AREA |
| | SW QUADRANT LINE |
| | TENANT'S STAGING AREA |

CONSTRUCTION DRIVE EXTENDS TO CALLAN BLVD EXIT

NOTE:
LOCATION OF PEDESTRIAN CROSSWALKS MAY BE REQUIRED AT A FUTURE DATE BY GOVERNING AGENCIES HAVING JURISDICTION.

SW QUADRANT LINE

TEMPORARY STORAGE CONTAINER FINAL LOCATION TO BE DETERMINED BY TENANT AND LANDLORD.

RETAIL A

TENANT'S TRAILER

(4) EXPECTANT MOTHER PARKING SPACES.

CART CORRALS

RETAIL A2

PREMISES RETAIL B

CPWM RETAIL C

TRASH COMPACTOR PAD
LOADING FACILITIES
ELECTRICAL & TELCOM STUB IN
DOMESTIC WATER & FIRE RISER STUB IN

GAS SERVICE
SANITARY LINE STUB IN

TRASH CONTAINER PAD / AREA. FINAL LOCATION DETERMINED BY TENANT.

ACCESSIBLE PARKING SPACE

STRIPING AT PEDESTRIAN CROSSWALK WITH PEDESTRIAN SIGN AND "STOP" PAINTED AT TENANTS OPTION PER PROTOTYPE AND AS ALLOWED BY CODE

NEW PARKING SPACES TO BE LOCATED PER THE CIVIL DRAWINGS.

TENANT TO PROVIDE SIDEWALK IN FRONT OF PREMISES, LL TO PROVIDE CURB AND PARKING AREA BEYOND

BIO RETENTION AREA

FUTURE VEHICULAR DIRECTIONAL SIGNAGE

NORTH

PYLON SIGN PER TENANT SIGN EXHIBIT

NOTE:
1) CONSTRUCTION STAGING AREA FOR LANDLORD AND OTHER CO-TENANTS SHALL NOT BE DIRECTLY IN FRONT OF TENANT'S PREMISES OR BLOCK ACCESS TO TENANTS LOADING FACILITIES
2) TENANT TO HAVE THE RIGHT TO RELOCATE CART CORRALS ON THE SIDEWALK IN FRONT OF PREMISES AND IN THE PARKING FIELD WITHIN TENANT'S CRITICAL AREA AND AS ALLOWED BY CODE
3) EXIT DOOR LOCATIONS TO BE LOCATED PER TENANT'S FINAL FIXTURE PLANS.

4) NOT USED
5) PARKING LAYOUT, SERVICE DRIVE, AND SITE PLAN ARE PRELIMINARY AND CONTINGENT UPON FINAL DESIGN AND APPROVAL FROM THE CITY OF DALY CITY.

buybuyBABY PROTOTYPICAL "TEMPORARY SIGN" LOCATION. REFER TO EXHIBIT F FOR INFORMATION. LOCATION OF SIGN TO BE COORDINATED SO AS NOT TO BLOCK EXISTING SIGNAGE

SCALE
0    50'-0"        200'-0"
    25'-0"   100'-0"

buy buy BABY
DALY CITY, CA
SW QUADRANT
EXHIBIT B: (2 OF 2)
DATE: 05-08-15

5·13·15



LEGEND

SW QUADRANT LINE

PREMISES

CRITICAL AREA

DAVE AND BUSTERS

buy buy BABY
DALY CITY, CA
EXHIBIT B: (1 OF 2)
DATE: 03-25-15

NOTE:
LOCATION OF PEDESTRIAN CROSSWALKS MAY
BE REQUIRED AT A FUTURE DATE BY
GOVERNING AGENCIES HAVING JURISDICTION.



5·13·15

## **Exhibit B**

Redacted Ross Lease

# LEASE

## ROSS DRESS FOR LESS, INC.
### SERRAMONTE CENTER
### DALY CITY, CA

_____

## TABLE OF CONTENTS

1. SALIENT LEASE TERMS ...................................................................................1
  1.1.   Effective Date............................................................................................ 1
  1.2.   Parties/Addresses..................................................................................... 1
  1.3.   Location Information. ............................................................................... 2
  1.4.   Critical Dates............................................................................................. 3
  1.5.   Lease Term................................................................................................. 3
  1.6.   Minimum Rent. ......................................................................................... 4
  1.7.   Required Co-Tenancy.............................................................................. 4
  1.8.   Reimbursement Contribution. ................................................................ 5
  1.9.   Title Report. .............................................................................................. 5
  1.10.  Contents of Lease..................................................................................... 5

2. DEFINITIONS OF GENERAL APPLICATION..........................................................6

3. GRANTS OF LEASE, COMMON AREA USE, EASEMENTS AND ACCESS.........13
  3.1.   Lease......................................................................................................... 13
  3.2.   Nature of the Shopping Center............................................................. 13
  3.3.   Grant of Common Area Use.................................................................. 15
  3.4.   Grant of Utility Easements.................................................................... 15
  3.5.   Utility Rooms. .......................................................................................... 16
  3.6.   Site Plan or Shopping Center Alterations.......................................... 16
  3.7.   Dimensions. ............................................................................................. 19

4. LEASE TERM ...........................................................................................................19
  4.1.   Term.......................................................................................................... 19
  4.2.   Commencement Date. ............................................................................ 19
  4.3.   Acknowledgment of Commencement. ................................................. 20
  4.4.   Option Periods. ....................................................................................... 20

5. CONSTRUCTION AND ACCEPTANCE .................................................................20
  5.1.   Landlord's Construction Obligations................................................... 20
  5.2.   Construction Commencement. .............................................................. 21
  5.3.   Completion of Construction. ................................................................. 22
  5.4.   Construction Completion Notice. ......................................................... 22
  5.5.   Rollover. ................................................................................................... 23
  5.6.   Remedies Cumulative. ........................................................................... 24
  5.7.   Construction Completion Cancel Date. .............................................. 24

"Serramonte (Relo #396)"
Serramonte Center
Daly City, CA
Store No. 1940
6061.1348/913576.6

- 1 -

12/23/15
FINAL

| | 5.8. | Automatic Termination. | 24 |
| | 5.9. | Entry Prior to Delivery Date. | 24 |
| | 5.10. | Walk-Through Inspection and Punchlist. | 24 |
| | 5.11. | Intentionally Deleted. | 25 |
| | 5.12. | Additional Delivery Requirements. | 25 |
| 6. | **RENT** | | **26** |
| | 6.1. | Minimum Rent. | 26 |
| | 6.2. | Reimbursements. | 31 |
| | 6.3. | Other Payment Provisions. | 31 |
| | 6.4. | Gross Sales Statement for Purposes of Calculating Substitute Rent. | 32 |
| 7. | **COMMON AREA MAINTENANCE** | | **32** |
| | 7.1. | Landlord's Obligation to Maintain Common Areas. | 32 |
| | 7.2. | Reimbursement Contribution. | 32 |
| | 7.3. | Reimbursements. | 33 |
| | 7.4. | No Audit of Reimbursements. | 33 |
| 8. | **REAL ESTATE TAXES AND ASSESSMENTS** | | **33** |
| | 8.1. | Obligation to Pay. | 33 |
| | 8.2. | Reimbursement Contribution. | 33 |
| 9. | **INSURANCE** | | **34** |
| | 9.1. | Property Insurance. | 34 |
| | 9.2. | Liability Insurance. | 34 |
| | 9.3. | Evidence of Insurance. | 35 |
| | 9.4. | Waiver of Subrogation. | 35 |
| | 9.5. | Tenant's Right to Self-Insure. | 36 |
| 10. | **UTILITIES SERVICES** | | **36** |
| 11. | **MAINTENANCE/REPAIR/ENVIRONMENTAL COMPLIANCE** | | **37** |
| | 11.1. | Maintenance and Repair by Tenant. | 37 |
| | 11.2. | Maintenance and Repair by Landlord. | 37 |
| | 11.3. | Repairs Required by Governmental Authorities. | 39 |
| | 11.4. | Hazardous Material. | 40 |
| 12. | **ALTERATIONS** | | **43** |
| | 12.1. | Permitted Alterations. | 43 |
| | 12.2. | Communication Equipment. | 45 |
| 13. | **NON-DISTURBANCE AND SUBORDINATION/ ESTOPPEL CERTIFICATES** | | **46** |
| | 13.1. | Non-Disturbance and Subordination. | 46 |
| | 13.2. | Estoppel Certificates. | 46 |
| | 13.3. | Processing Fees for Non-Disturbance Agreements and Estoppel Certificates. | 46 |
| 14. | **INDEMNIFICATION** | | **47** |

| | | |
|---|---|---|
| 14.1. | Tenant Indemnity. | 47 |
| 14.2. | Landlord Indemnity. | 47 |
| **15. USE** | | **47** |
| 15.1. | Tenant's Business. | 47 |
| 15.2. | Operation. | 47 |
| 15.3. | Protection. | 48 |
| 15.4. | Exclusive Uses. | 49 |
| 15.5. | Other Exclusives Not Binding on Tenant | 49 |
| 15.6. | Go Dark. | 49 |
| **16. SURRENDER** | | **50** |
| 16.1. | Condition of Store. | 50 |
| 16.2. | Continuance of Possession. | 51 |
| **17. LANDLORD'S COVENANTS** | | **51** |
| 17.1. | Landlord's Warranty. | 51 |
| 17.2. | Landlord's Title. | 51 |
| 17.3. | Remedies. | 51 |
| **18. QUIET ENJOYMENT** | | **52** |
| **19. ASSIGNMENT/SUBLETTING** | | **52** |
| 19.1. | General. | 52 |
| 19.2. | Related Entity. | 52 |
| 19.3. | Stock. | 52 |
| 19.4. | Release of Liability. | 52 |
| 19.5. | Landlord Notice to Assignee. | 53 |
| 19.6. | Intentionally Deleted. | 53 |
| **20. DEFAULTS/DISPUTE RESOLUTION/ATTORNEYS' FEES** | | **53** |
| 20.1. | Defaults. | 53 |
| 20.2. | Alternative Dispute Resolution Process. | 57 |
| 20.3. | Unlawful Detainer. | 58 |
| 20.4. | Attorneys' Fees. | 58 |
| **21. CASUALTY** | | **59** |
| 21.1. | Definitions. | 59 |
| 21.2. | Insured Casualty. | 59 |
| 21.3. | Uninsured Casualty. | 59 |
| 21.4. | End of Term Casualty. | 60 |
| 21.5. | Shopping Center Casualty | 60 |
| 21.6. | Insurance Proceeds. | 61 |
| 21.7. | Tenant Restoration. | 61 |
| 21.8. | Waiver of Statute. | 62 |
| 21.9. | Laws. | 62 |
| 21.10. | Tolling of Term. | 62 |

|   |   |   |   |
|---|---|---|---|
| 1 | 21.11. | Effect of Termination. | 63 |
| 2 | 21.12. | Tenant's Right of First Offer. | 63 |
| 3 | **22. CONDEMNATION** | | **63** |
| 4 | 22.1. | Taking. | 63 |
| 5 | 22.2. | Right to Terminate. | 63 |
| 6 | 22.3. | Claims. | 64 |
| 7 | 22.4. | Waiver. | 64 |
| 8 | **23. MECHANIC'S LIENS** | | **64** |
| 9 | **24. SIGNS** | | **65** |
| 10 | 24.1. | Governmental Approval and Compliance. | 65 |
| 11 | 24.2. | Building Signs. | 65 |
| 12 | 24.3. | Pylon or Directional Signs. | 65 |
| 13 | 24.4. | Temporary Signs. | 65 |
| 14 | 24.5. | Visibility of Tenant's Store and Signs. | 66 |
| 15 | **25. NOTICE** | | **66** |
| 16 | **26. GENERAL CONDITIONS** | | **67** |
| 17 | 26.1. | Partial Invalidity. | 67 |
| 18 | 26.2. | Relationship of Parties. | 67 |
| 19 | 26.3. | Time. | 67 |
| 20 | 26.4. | Waiver. | 67 |
| 21 | 26.5. | Partial Months. | 67 |
| 22 | 26.6. | Consent. | 67 |
| 23 | 26.7. | Intentionally Deleted. | 67 |
| 24 | 26.8. | Governing Law. | 67 |
| 25 | 26.9. | Due Authority. | 68 |
| 26 | 26.10. | No Prior Agreements. | 68 |
| 27 | 26.11. | Entry by Landlord. | 68 |
| 28 | 26.12. | Neutral Interpretation. | 68 |
| 29 | 26.13. | Force Majeure. | 68 |
| 30 | 26.14. | Successors in Interest. | 69 |
| 31 | 26.15. | Memorandum of Lease. | 69 |
| 32 | 26.16. | Real Estate Brokers. | 69 |
| 33 | 26.17. | Confidentiality Agreement. | 69 |
| 34 | 26.18. | No Offer. | 70 |
| 35 | 26.19. | Inspection by CASp in Accordance with California Civil Code Section 1938. | 70 |
| 36 | | | |

1    **THIS LEASE** (the "Lease") is made as of the Effective Date by and between Landlord and
2    Tenant who are designated in Section 1.2 hereof.  Landlord and Tenant hereby agree as follows:

3                                    **1.  SALIENT LEASE TERMS**

4    **1.1.**    **Effective Date.**

5    ~~February 1~~ , 2016.

6    **1.2.**    **Parties/Addresses.**

7          **1.2.1.**    Landlord:        **DALY CITY SERRAMONTE CENTER, LLC,**
8                                          a Delaware limited liability company

9                       Address:        1600 N.E. Miami Gardens Drive
10                      City/State/Zip:  North Miami Beach, FL 33179
11                      Attention:       Legal Department

12                      Facsimile #:     (305) 947-1734
13                      Phone #:         (305) 947-1664

14                      Initial Contact Name:  Will Heidel

15                      Landlord's Taxpayer I.D. #:  68-0490105

16                      **With a copy to:**

17                                       Equity One Realty & Management CA, Inc.
18                      Address:         3 Serramonte Center
19                      City/State/Zip:  Daly City, CA 94015
20                      Attention:       Property Management

21                      Facsimile #:     (650) 992-8687
22                      Phone #:         (650) 992-1945

23                      **Address for payment to Landlord of Rent and Reimbursements due under**
24                      **this Lease:**

25                                       Daly City Serramonte Center, LLC
26                      Address:         Dept. 3319
27                      City/State/Zip:  Los Angeles, CA 90084-3319

1.2.2.    Tenant:    **ROSS DRESS FOR LESS, INC.,**
a Virginia corporation

(a)    **Address for all invoices for Rent and Reimbursements due under this Lease, and change of Landlord or Payee, or change of Landlord's or Payee's address:**

| | |
|---|---|
| Address: | 5130 Hacienda Drive |
| City/State/Zip: | Dublin, CA 94568-7579 |
| Attention: | **Property Management Department** |
| Facsimile #: | (925) 965-4865 |
| Phone #: | (925) 965-4400 |

(b)    **Address for all notices (other than invoices), including notices of default and notices pertaining to disputed invoices:**

| | |
|---|---|
| Address: | 5130 Hacienda Drive |
| City/State/Zip: | Dublin, CA  94568-7579 |
| Attention: | **Real Estate Law Department** |
| Facsimile #: | (925) 965-4174 |
| Phone #: | (925) 965-4400 |

**With a copy to:**

| | |
|---|---|
| Name: | Bartko, Zankel, Bunzel & Miller |
| Address: | One Embarcadero Center, Suite 800 |
| City/State/Zip: | San Francisco, CA  94111 |
| Attention: | **Ross Notices** |
| Facsimile #: | (415) 956-1152 |
| Phone #: | (415) 956-1900 |

(c)    Initial Contact Name:  Michael Udekwu

(d)    Tenant's Taxpayer I.D. #:  20-0594333

**1.3.    Location Information.**

1.3.1.    ==Shopping Center== Name:    Serramonte Center
Location:    Southwest Quadrant of Serramonte Center, located at NEC of Interstate 280 (Junipero Serra Freeway) and Highway 1 (Cabrillo Freeway), Daly City, San Mateo County, California

**1.3.2.**    Minimum Leasable Floor Area for
Co-Tenancy Denominator:                     846,445 square feet.

The foregoing amount of square feet of Leasable Floor Area reflects the
exclusion of the Store Agreed Size, as required by Section 1.7.2 below.

(Section 6.1.3)

**1.3.3.**    Store Agreed Size:    The Store size ("Store Agreed Size") is twenty-seven thousand one hundred seventy-eight (27,178) square feet of Leasable Floor Area, including a minimum of one hundred sixty (160) feet of frontage (over two (2) exterior walls) on that portion of the Common Areas that contain the principal parking area for Tenant's customers, subject to adjustment of the Leasable Floor Area pursuant to the provisions of Section 3.7. Tenant's Store frontage shall be linear, shall not include any indentations, and shall not be set back from the storefront of adjacent tenants. The Store Agreed Size includes the Building only unless the loading dock is both enclosed and exclusive to Tenant. The Store Agreed Size does not include the pad area for Tenant's trash compactor or Tenant's trash bin enclosure area. Tenant has the right to expand the Store pursuant to the provisions of Section 12.1.3.

**1.4.    Critical Dates.**



**1.5.1.**    Initial Term:    From the Commencement Date through the January 31 next following the expiration of one hundred twenty (120) months after the Commencement Date. As a hypothetical example and for illustration purposes only, if the Commencement Date is September 15, 2016, then the expiration of the Initial Term shall be January 31, 2027.

**1.5.2.**    Option Periods:

(Section 4.4)

1   **1.6.    Minimum Rent.**



2        The Minimum Rent amounts listed above may be adjusted to reflect the actual Leasable
3   Floor Area of the Store calculated in accordance with the provisions of Section 3.7.

4   **1.7.    <mark>Required Co-Tenancy.</mark>**

5        **1.7.1.**    Three (3) of the following four (4) Co-Tenants ("Required Co-Tenants")
6   operating in no less than eighty percent (80%) of the Required Leasable Floor Area indicated below,
7   in the location for such Required Co-Tenant designated on **Exhibit B**, as follows:

| Co-Tenant's Name | Required Leasable Floor Area (minimum sq. ft.) |
|---|---|
| (a)   Cost Plus | 17,900 |
| (b)   Buy Buy Baby | 19,800 |
| (c)   Dick's Sporting Goods | 40,000 |
| (d)   Target | 90,000 |

8                                                                      (Section 6.1.3)

"Serramonte (Relo #396)"
Serramonte Center
Daly City, CA
Store No. 1940
6061.1348/913576.6

- 4 -

12/23/15
FINAL

1    office), a use by a "High Intensity Parking User," and any use which constitutes a Ross Prohibited
2    Use or a Landlord's Prohibited Use, as those terms are hereinafter defined in this Lease.

3        **1.7.2.**        Required percentage of Leasable Floor Area of the Shopping Center to be
4    occupied by operating retailers (as defined in Section 1.7.1): Sixty-five percent (65%), excluding the
5    Leasable Floor Area of the Store from the numerator and denominator of such calculation.
6                                                                                          (Section 6.1.3)

7    **1.8.    Reimbursement Contribution.**

8        Tenant's Reimbursement Contribution shall be Six Dollars ($6) per square foot of the Store
9    Agreed Size (subject to adjustment pursuant to the provisions of Section 3.7) per annum for the first
10   (1st) Lease Year, payable in equal monthly installments, subject to the annual increases as provided
11   in Section 7.2.
12                                                                                          (Section 7.2)

13   **1.9.    Title Report.**

14       That certain report on the state of Landlord's title to the Shopping Center or the Store
15   issued by Commonwealth Land Title Insurance Company, dated January 6, 2015, and numbered
16   08040376.
17                                                                                          (Section 17.2)

18   **1.10.    Contents of Lease.**

19       **1.10.1.**        Pages:  1 - 72

20       **1.10.2.**        Sections:  1.1 - 26.19

21       **1.10.3.**        Exhibits:

22               A        Legal Description of the Shopping Center

23               B        Site Plan

24               C        Construction Obligations of Landlord

25               D        Landlord's Prohibited Uses

26               E        Acknowledgment of Commencement

27               F        Non-Disturbance Agreement

28               **F-1**      Sublease Non-Disturbance Agreement

29               G        Construction Completion Notice

30               H        Exclusive Uses

31               **H-1**      Dick's Sporting Goods Waiver

32               I        Permitted Title Exceptions

1  J  Tenant's Signs

2  K  Existing Tenants

3  L  Guaranty

4  M  Existing Lease Construction Limitations

5  ## 2. DEFINITIONS OF GENERAL APPLICATION

6  **Abatement Work.** See Section 11.4.3.

7  **Building.** The structure in which the Store is located.

8  **Business Days.**  Business Days shall mean Mondays through Fridays excluding the
9  following holidays: New Year's Day, Martin Luther King, Jr. Day, President's Day, Memorial Day,
10  July 4th, Labor Day, Thanksgiving Day, the Friday following Thanksgiving Day, and Christmas. If
11  any of the foregoing holidays falls on a Saturday, then the Friday before shall constitute the holiday
12  and if any of the foregoing holidays falls on a Sunday, then the Monday following shall constitute
13  the holiday.

14  **Casualty.** See Section 21.1.1.

15  **Commencement Date.** See Sections 1.4.1 and 4.2.

16  **Common Area(s).** Those portions of, and facilities within the Shopping Center which are
17  intended solely for the common use of the occupants, their customers, agents, employees and
18  suppliers, such as the parking areas, driveways, walkways, loading zones and loading areas (whether
19  or not such loading zones or loading areas are available for common use), and landscaping, but
20  specifically excluding the whole or any portion of any building located within the Shopping Center.
21  Any area which is not enclosed by demising walls, but which is substantially used for the benefit of
22  one tenant or group of tenants such as, for example, those areas sometimes referred to in the
23  shopping center industry as "food courts," shall not be considered Common Areas. A "food court"
24  is an open area of the Shopping Center which accommodates a common seating, serving or service
25  area for the patrons of two or more retailers of prepared food whose premises are proximate to such
26  seating, serving or service area.

27  **Communication Equipment.** See Section 12.2.1.

28  **Control Area.**  The area so designated on **Exhibit B** which may not be altered except as
29  expressly set forth in this Lease.

30  **Co-Tenancy Audit.** See Section 6.1.3(g).

31  **Co-Tenancy Report.** See Section 6.1.3(f).

32  **Co-Tenants.** See Sections 1.7.1 and 6.1.3.

"Serramonte (Relo #396)"
Serramonte Center
Daly City, CA
Store No. 1940
6061.1348/913576.6

- 6 -

12/23/15
FINAL

1          **Delivery Date.** The Delivery Date is the first Permitted Delivery Day after the last of the
2    following conditions is satisfied (hereinafter "deliver" or "delivery"). Each of the conditions set
3    forth in clauses (a) through (m) below are conditions of delivery and in the aggregate are the
4    "Delivery Conditions." All documents and other written evidence required below to be submitted
5    to satisfy the Delivery Conditions (the "Delivery Evidence") shall be delivered to Tenant at the
6    address specified in Section 1.2.2(b).

7          (a)    Landlord has completed the Store in compliance with the terms of this
8    Lease, except for the Punchlist as specified in Section 5.10; however, the Punchlist items must be
9    completed and/or corrected to the extent required in Section 5.10, and Tenant is otherwise able
10   legally to conduct its normal retail operations;

11         (b)    Landlord has completed (or caused to be completed) all of the Common
12   Areas in the Southwest Quadrant and Off-Site Improvements, and Landlord has completed the
13   buildings depicted on **Exhibit B** consisting of at least fifty thousand (50,000) square feet of Leasable
14   Floor Area in the area depicted on the Site Plan as the "Southwest Quadrant" (the "Minimum
15   Building LFA"), and Landlord has fulfilled all construction obligations imposed by this Lease
16   (including **Exhibit C**) and applicable governmental authorities, including obtaining any requisite
17   governmental authorizations and approvals relating to any construction obligations imposed on
18   Landlord by this Lease to permit Tenant to open for business, subject to Tenant's completion of
19   Tenant's Work;

20         (c)    Receipt by Tenant of written evidence that Landlord's Construction
21   Obligations have passed final inspection by the authority by whom the building permit for
22   Landlord's Construction Obligations was issued and Tenant receives a temporary or permanent
23   certificate of occupancy (or equivalent), which permits Tenant to occupy and fixture the Store and,
24   subject to completion of Tenant's Work, open for business;

25         (d)    If the Store is a new Building to be constructed, Landlord's delivery to
26   Tenant of a Phase 1 or comparable environmental report, dated not more than twelve (12) months
27   prior to the Delivery Date, from a licensed environmental consultant certifying that the Store and
28   the Support Systems are free of Hazardous Materials, and identifying any Hazardous Materials in the
29   Southwest Quadrant ("Environmental Report");

30         (e)    Intentionally Deleted;

31         (f)    Receipt by Tenant of at least one (1) fully executed original of this Lease, and
32   a Memorandum of Lease signed by Landlord and Tenant and notarized so that such Memorandum
33   of Lease may be recorded;

34         (g)    Delivery to Tenant of exclusive possession of the Store in broom clean
35   condition with Landlord's and its contractors' agents and employees' tools, equipment and materials
36   removed from the Store;

37         (h)    Receipt of approval by governmental authorities of all of Tenant's Store signs
38   and Tenant's signage on the pylon and monument and directional sign structures as depicted on
39   **Exhibit J** (other than the permits for installation of Tenant's sign panels on such sign structures),

1    provided that (i) Tenant shall diligently pursue obtaining such approval; and (ii) if, despite Tenant's
2    diligent efforts, Tenant has not obtained such approval by governmental authorities on or before the
3    date that is one hundred eighty (180) days after the Effective Date, Tenant shall elect, by written
4    notice to Landlord given within ten (10) Business Days after the expiration of such one hundred
5    eighty (180) day period, to either (A) terminate this Lease effective as of the date of such notice, or
6    (B) waive the requirement for approval by governmental authorities of all of Tenant's Store signs
7    and Tenant's signage on the pylon and monument and directional sign structure (and Tenant's
8    failure to so notify Landlord within such ten (10) Business Day period shall be deemed Tenant's
9    election under clause (B)); and Landlord shall ensure that the pylon and monument and directional
10   sign structures in the Shopping Center as shown on **Exhibit B** shall be in good condition and repair
11   so that Tenant may at any time install its sign panels thereon as depicted on **Exhibit J**;

12          (i)    Landlord has installed permanent power to the Store;

13          (j)    The Store has been secured by Landlord from unauthorized entry by persons
14   without a key (an adjacent premises without a store front or store rear or which has any unlocked
15   opening in its exterior walls shall be deemed to render the Store insecure);

16          (k)    Landlord has delivered to Tenant all certificates of insurance required to be
17   maintained by Landlord pursuant to this Lease; and

18          (l)    Intentionally Deleted; and

19          (m)    Landlord has completed the Refurbishment.

20          Notwithstanding anything to the contrary contained in this Lease, and notwithstanding any
21   delays in completion of Landlord's Construction Obligations due to Force Majeure, unless Tenant in
22   its sole discretion elects to take delivery on a day other than a Permitted Delivery Day, the Delivery
23   Date will not be on a day other than a Permitted Delivery Day.  If a Force Majeure event occurs and
24   Landlord complies with the notice provisions of Section 26.13, the Delivery Date will be, at
25   Tenant's option, either (a) the date Landlord tenders delivery of the Store to Tenant with all
26   Delivery Conditions satisfied, or (b) the next Permitted Delivery Day which occurs after the date
27   Landlord tenders delivery of the Store to Tenant with all Delivery Conditions satisfied, and the
28   Commencement Date shall be determined in accordance with Section 1.4.1.  Notwithstanding the
29   foregoing, if a Tenant Delay occurs, the Delivery Date shall be deemed to be the date that the
30   Delivery Date would have occurred but for such Tenant Delay, even if it results in  actual delivery of
31   the Store on a day other than a Permitted Delivery Day.

32          **Environmental Regulations.**  See Section 11.4.1.

33          **Exempted Discontinuances.**  See Section 6.1.3(e).

34          **Final Plans.**  See **Exhibit C.**

35          **Force Majeure.**  See Section 26.13.

1    **Gross Sales.** This definition applies to the calculation of Substitute Rent only.  Gross Sales
2    are revenue received by Tenant from the selling price of all merchandise or services contracted to be
3    sold in or from the Store by Tenant, its subtenants, licensees and concessionaires, whether for cash
4    or for credit, excluding, however, the following:  (a) the sales price of all merchandise returned and
5    accepted for full credit or the amount of the cash refund or allowance made thereon; (b) the sums
6    and credits received in settlement of claims for loss or damage to merchandise; (c) the consideration
7    received in connection with a sale of inventory which occurs other than in the ordinary course of
8    Tenant's business, including, but not limited to, a sale in bulk or to a jobber, liquidator or assignee;
9    (d) sales taxes, so-called luxury taxes, excise taxes, gross receipt taxes, and other taxes now or
10   hereafter imposed upon the sale or value of merchandise or services, whether added separately to
11   the selling price of the merchandise or services and collected from customers or included in the
12   retail selling price; (e) receipts from public telephones, vending machines, sales of money orders, and
13   the collection of public Utility bills; (f) bank card discounts or fees (e.g., Visa, MasterCard, etc.),
14   interest, carrying charges, or other finance charges in respect of sales made on credit; (g) sales of
15   fixtures, trade fixtures, or personal property that are not merchandise held for sale at retail; (h) sales
16   to employees and senior citizens at discount, in the aggregate not to exceed four percent (4%) of
17   Gross Sales; (i) revenue received from mailing, alterations, delivery or other services performed on a
18   non-profit basis for the benefit of customers; (j) Tenant's accounts receivable, not to exceed two
19   percent (2%) of Gross Sales, which have been determined to be uncollectible for federal income tax
20   purposes during the Lease Year; provided, however, that if such accounts are actually collected in a
21   later Lease Year, the amount shall be included in the Gross Sales for such later Lease Year; (k) rents,
22   subrents or other consideration received in connection with an assignment, sublease, license,
23   concession or other transfer of any portion of the Store; (l) amounts received for merchandise
24   transferred to any other place of business of Tenant (or its subtenants, concessionaires and/or
25   licensees) or to any business organization affiliated with Tenant wherever located; provided such
26   merchandise is not used to complete a sale originated in the Store; and (m) any Internet or other sale
27   contracted on a telecommunications network whether or not the sale item is delivered to the
28   customer at the Store.

29   **Hazardous Materials.**  See Section 11.4.1.

30   **HVAC.**  See Section 11.1.

31   **Inline Building.**  The Building in the Southwest Quadrant in which the Store is situated
32   and any other building in the Southwest Quadrant.

33   **Intended Delivery Date.**  The date specified in Section 1.4.2.

34   **Invitee(s).**  An Invitee shall mean any agent, employee, customer or other entity or
35   individual who comes upon the Shopping Center property for business or retail consumption
36   purposes, or to perform services for the occupants of the Shopping Center, by the invitation of any
37   party who is entitled to grant access to the Shopping Center such as Landlord, Tenant or any other
38   occupant of the Shopping Center.

39   **Landlord's Construction Obligations.**  The construction obligations imposed on
40   Landlord by Section 5.1 and described in **Exhibit C** and including the Refurbishment, also referred
41   to herein as "Landlord's Work."

1   **Leasable Floor Area.**  All areas available, or held for the exclusive use and occupancy of
2   occupants or future occupants of the Shopping Center, measured from the exterior surface of
3   exterior walls and from the center of interior demising partitions excepting that:

4       (a)  Any mezzanines or basement space not intended to be used for distribution,
5   sale or display of merchandise to retail customers shall be excluded in the computation of Leasable
6   Floor Area.

7       (b)  Any areas ("Outdoor Areas") which are located wholly or partially outside of
8   a building, or which, although located substantially inside of a building, are not bounded on all sides
9   by exterior walls or a roof, such as outdoor sales, seating, garden or storage areas, or enclosed truck
10  docks, shall be included in Leasable Floor Area if and to the extent that such Outdoor Areas are
11  available or held for the exclusive use and occupancy of occupants or future occupants of the
12  Shopping Center, whether or not such Outdoor Areas are clearly delineated and whether or not any
13  rental or other charges are paid by tenants with respect to such Outdoor Areas.  Outdoor Areas
14  shall, to the extent that they are bounded by walls, be measured in the same manner as provided
15  above; otherwise, they shall be measured along lines which reasonably delineate the boundaries of
16  such Outdoor Areas.

17      (c)  Kiosks shall be includable in Leasable Floor Area. A "kiosk" is a structure of
18  no more than one hundred (100) square feet, set within the Common Areas and completely
19  surrounded by pedestrian walkways or driveways.

20      (d)  Any square footage contained in any hotel facilities constructed at the
21  Shopping Center outside of the Southwest Quadrant shall not be considered Leasable Floor Area.

22  **Lease Year.**  The first Lease Year shall extend from the Commencement Date to the first
23  January 31 thereafter.  Each subsequent Lease Year shall consist of twelve (12) complete calendar
24  months commencing on February 1 and terminating on the ensuing January 31 and may be referred
25  to herein as a "Full Lease Year."

26  **Legal Rate.**  In the event any rental or other payment due from one party to the other is
27  not paid when due, or in the event interest is required to be paid under the terms of this Lease, such
28  rental or payment amount shall bear interest at the rate of the lesser of (a) ten percent (10%) per
29  annum, or (b) the prime rate per annum quoted by Bank of America (or its successor) for short
30  term, unsecured commercial loans to its most creditworthy corporate borrowers, plus one percent
31  (1%) per annum, but not in any event exceeding the highest rate permissible by law which is not
32  usurious.

33  **LFA Minimums.**  Solely for purposes of calculating Co-Tenancy, the minimum amount of
34  Leasable Floor Area in the Shopping Center agreed by the parties and set forth in Section 1.3.2.

35  **Minimum Rent.**  See Sections 1.6 and 6.1.

36  **Off-Site Improvements.**  Public improvements not located within the Shopping Center,
37  without which the Shopping Center could not reasonably be used for its intended purpose, such as,
38  without limitation, roadways, offramps, Utility lines and turning lanes.

1       **Option.** See Section 4.4.

2       **Option Periods.** See Section 4.4.

3       **Permitted Delivery Day(s).** Permitted Delivery Days are the second Monday of February,
4 the third Monday of June, and the last Monday of August only, which next follows the actual date
5 Landlord tenders possession of the Store to Tenant with all Delivery Conditions satisfied, provided
6 that it is no earlier than the Intended Delivery Date.

7       **Prohibited Uses.** See Section 3.2.2.

8       **Property Insurance.** See Section 9.1.1.

9       **Punchlist.** See Section 5.10.

10       **Recommencement Date.** See Section 21.2.

11       **Redelivery Date.** The last of the following to occur after a Casualty or Taking:  (a) the date
12 on which Landlord's architect, or contractor having charge of the Restoration, certifies by written
13 notice to the parties that the Restoration has been completed; and (b) Tenant receives from all
14 applicable governmental agencies all necessary written approvals to reopen the Store for business.

15       **Reduced Occupancy Period.** See Section 6.1.3.

16       **Refurbishment.** The completion of new slurry-sealing and restriping of the parking lot in
17 the Southwest Quadrant and the installation of lighting in the Common Areas of the Southwest
18 Quadrant with fixtures producing an average of not less than five (5) foot candle illumination.

19       **Reimbursements.** Tenant's obligation to reimburse Landlord for the Reimbursement
20 Contribution under the provisions of Section 7.2.

21       **Rent.** The terms "Rent" or "Rental" shall mean all Minimum Rent and Reimbursements
22 which may be due from Tenant to Landlord pursuant to this Lease.

23       **Requirements.** See Section 11.3.2.

24       **Restoration.** See Section 21.1.4.

25       **Roof Repairs.** See Section 12.2.2.

26       **Section Numbers.** In this Lease, all references to "Section" shall mean the section
27 numbers of this Lease, unless otherwise indicated.

28       **Shopping Center.** That certain real property development with all appurtenances generally
29 described in Section 1.3 above, which is constructed or is to be constructed on the property
30 described in **Exhibit A.**

"Serramonte (Relo #396)"
Serramonte Center          - 11 -          12/23/15
Daly City, CA                         FINAL
Store No. 1940
6061.1348/913576.6

1       **Site Plan.** The Site Plan is the plan attached hereto as **Exhibit B**. Landlord represents and
2  warrants that the Site Plan depicts the Shopping Center described on **Exhibit A** and that the
3  boundaries thereof are delineated thereon with substantial accuracy. The Inline Buildings in the
4  Southwest Quadrant depicted thereon contain or shall contain no more than one (1) story (but
5  mezzanines having Leasable Floor Area not in excess of one-third (1/3) of the occupant's ground
6  floor Leasable Floor Area, when not used for selling purposes, shall be permitted). Further, the
7  height (including any architectural features and rooftop equipment) of any portion of the Inline
8  Buildings in the Southwest Quadrant shall not exceed the height of the exterior elevation of the
9  Store on the Final Plans described in **Exhibit C**.

10      **Special Form Policy.** See Section 9.1.1.

11      **Store.** The Store is that portion of the Shopping Center designated on **Exhibit B**, having
12  the dimensions and containing the Leasable Floor Area specified in Section 1.3, including the use of
13  the roof as specified in Section 12.2. For the avoidance of doubt, the "Store" shall not include any
14  soils or land below the slab.

15      **Substitute Rent.** Substitute Rent shall mean the lesser of (a) Minimum Rent, or (b) two
16  percent (2%) of Tenant's Gross Sales during the preceding month. Substitute Rent, where
17  applicable in this Lease, shall be paid in lieu of Minimum Rent and Reimbursements.

18      **Support Systems.** See Section 11.4.2.

19      **Taking.** See Section 22.1.

20      **Tax or Taxes.** See Section 8.1.

21      **Tax Bill.** See Section 8.1.

22      **Tenant Delay.** A delay in the performance by Landlord of any obligation it is to perform
23  under **Exhibit C** to this Lease as a result of: (a) Tenant's failure to approve, consent, comment
24  upon or otherwise respond to a request for plan approval within the express time provisions of
25  **Exhibit C**; or (b) Tenant's request for a change order to Landlord's Construction Obligations which
26  directly results in a delay in Landlord's ability to perform its obligations under this Lease; or (c) the
27  interference by Tenant or Tenant's contractors in the performance by Landlord or Landlord's
28  contractors of Landlord's Construction Obligations; provided, however, in order for there to be a
29  valid "Tenant Delay" Landlord must first have given Tenant written notice within three (3) Business
30  Days of the event forming the basis for the claim of the Tenant Delay and provided Tenant with at
31  least three (3) Business Days to rectify the problem causing the delay. Notwithstanding the
32  foregoing, if (i) a delay of the nature set forth in clauses (a), (b) or (c) above occurs, and (ii) allowing
33  Tenant three (3) Business Days to rectify the problem causing the delay would cause Landlord to
34  miss delivering the Store on a Permitted Delivery Day, then such delay shall be deemed a Tenant
35  Delay without the need to allow Tenant three (3) Business Days to rectify the problem causing the
36  delay, and Landlord will be deemed to have delivered to Store to Tenant on the Permitted Date if
37  would have delivered but for such delay.

"Serramonte (Relo #396)"
Serramonte Center
Daly City, CA
Store No. 1940
6061.1348/913576.6

- 12 -

12/23/15
FINAL

**Tenant's Work.** The work to the Store by Tenant necessary for Tenant to open the Store for business to the general public; or performed at any time during the Term for the purpose of improving the Store.

**Term.** References to the Term of this Lease shall include the initial term described in Section 1.5.1 ("Initial Term") and any extension of such Term ("Option Period").

**Termination Notice.** A notice provided by Tenant to Landlord in which Tenant notifies Landlord of its election to terminate this Lease if permitted to do so under any provision of this Lease.

**Unamortized Cost.** The remaining balance of any amount expended by Tenant for leasehold improvements to the Store (not including any allowance paid by Landlord to Tenant for Tenant's leasehold improvements as specified in **Exhibit C**), as amortized over the Initial Term according to generally accepted accounting principles ("GAAP") in the books and records of Tenant for public reporting purposes.

**Utilities.** Utilities are electricity, gas, power, steam, sanitary sewer, storm sewer, telecommunications (audio, video or data bit streams, whether terrestrial, over the air or satellite), and water supplied by public or private entities.

**Utility Room.** See Section 3.5.

## 3.   GRANTS OF LEASE, COMMON AREA USE, EASEMENTS AND ACCESS

**3.1.    Lease.**

Landlord hereby leases to Tenant and Tenant hereby leases from Landlord the Store depicted on the Site Plan, together with all easements, rights and privileges appurtenant thereto, on the terms and conditions set forth herein. As a material inducement and in consideration for Landlord entering into this Lease, Ross Stores, Inc. shall execute a Guaranty in the form attached hereto as **Exhibit L.**

**3.2.    Nature of the Shopping Center.**

**3.2.1.**      <mark>Retail Use.</mark>

(a)    <u>General</u>.    Tenant has entered into this Lease in reliance upon representations by Landlord that the Southwest Quadrant of the Shopping Center is and shall remain retail in character, and, further, no part of the Southwest Quadrant of the Shopping Center shall be used for office or residential purposes or as a theater, auditorium, meeting hall, school, church or other place of public assembly, "flea market," mortuary or funeral home, veterinary services or pet vaccination clinic or overnight stay pet facilities (except as an incidental use in conjunction with the operation of a national or regional pet store retailer, such as Petco or PetSmart), gymnasium or health club, dance hall, billiard or pool hall, massage parlor, video game arcade, bowling alley, skating rink, car wash, facility for the sale, display, leasing or repair of motor vehicles, on-premises consumption of alcoholic beverages except as incidental to a primarily restaurant use, including any night club, bar,

1    sports bar, or any restaurant where the on-premises consumption of alcohol exceeds forty percent
2    (40%) of gross sales (and which shall include Buffalo Wild Wings, Elephant Bar and BJ's Brewhouse
3    regardless of the percentage sale of alcohol, and other similar establishments), facility offering gambling
4    to the public (including any so-called Internet café that offers gambling to the public, off track betting
5    facility, casino or gaming facility), provided that the incidental sale of lottery tickets shall be permitted,
6    the sale of adult products or adult bookstores or adult audio/video products stores (which are defined
7    as stores in which at least ten percent (10%) of the inventory is not available for sale or rental to
8    children under the age of majority in the state in which the Store is located because such inventory
9    explicitly deals with or depicts human sexuality).  No ATM or similar machine shall be permitted in the
10   Shopping Center within one hundred (100) feet of the front and side perimeter walls of the Store,
11   except if located wholly within the interior of another tenant's or occupant's premises.  No tenant or
12   occupant of the Southwest Quadrant of the Shopping Center, other than Tenant, shall be permitted to
13   use one thousand five hundred (1,500) square feet or more of Leasable Floor Area of its premises
14   primarily for the rental or sale of prerecorded audio or video merchandise or electronic games software
15   and technological evolutions thereof.  Landlord shall not permit the sale of whole bean or ground
16   coffee in the Southwest Quadrant of the Shopping Center by a nationally known specialty coffee
17   retailer, having two thousand (2,000) stores or more in the United States; provided that the foregoing
18   shall not prohibit the sale of packaged whole bean or ground coffee by (i) Existing Tenants (as defined
19   in Section 3.2.1(b)(iii) below, (ii) any grocery stores and supermarkets, (iii) any drug stores, department
20   stores or so-called "dollar stores" (such as CVS, Target, 99 Cents Only Store and Dollar Tree), (iv) fast
21   food restaurants (such as McDonald's, Burger King and Wendy's), (v) Dunkin' Donuts, Winchell's
22   Donuts, Noah's Bagels, Einstein's Bagels and similar retailers operating primarily for the sale of donuts,
23   bagels or pastries, (vi) Coffee Bean & Tea, Caribou Coffee, Gloria Jean's or Tully's, (vii) full table
24   service restaurants and quick service restaurants (such as Panera Bread and Grain D'Or), and (viii) big
25   box retailers (such as Costco and Sam's Club).  Landlord shall not lease space nor allow space to be
26   occupied in the Southwest Quadrant of the Shopping Center by any occupant other than Tenant,
27   whose use of the space shall be (A) for a store primarily selling merchandise at one price or set prices
28   such as 99 Cents Only Store, as they are operated as of the Effective Date, or (B) for a discount
29   department store under twenty thousand (20,000) square feet of Leasable Floor Area, such as, Family
30   Dollar store, as they are operated as of the Effective Date, and other such types of operations.
31   Further, no restaurant or other "High Intensity Parking User" (as hereinafter defined) shall be
32   permitted in the Shopping Center within two hundred (200) feet of the front and side perimeter walls
33   of the Store.  A "High Intensity Parking User" is a tenant or occupant whose use requires more than
34   five (5) parking spaces per one thousand (1,000) square feet of Leasable Floor Area in accordance with
35   governmental regulations.  The foregoing use restrictions are referred to herein as the "Ross Prohibited
36   Uses."

37           (b)    Exceptions.

38                   (i)    Notwithstanding the prohibition on massage parlors set forth in
39   Section 3.2.1(a) above, one (1) facility offering therapeutic massage services, such as "Massage Envy,"
40   or massage services provided in a beauty salon, cosmetics store, health club or day spa, shall be
41   permitted in the Southwest Quadrant of the Shopping Center provided that no such facility exceeds
42   three thousand five hundred (3,500) square feet of Leasable Floor Area.

43                   (ii)    Notwithstanding the prohibition on restaurants located within two
44   hundred (200) feet of the front and side perimeter walls of the Store set forth in Section 3.2.1(a) above,

1    Landlord shall have the right to lease space to up to two (2) restaurants within two hundred (200) feet
2    of the front and side perimeter walls of the Store so long as no such restaurant individually (A) exceeds
3    three thousand (3,000) square feet of Leasable Floor Area, or (B) provides table service.

4              (iii)      The Ross Prohibited Uses set forth in Section 3.2.1(a) above shall
5    not apply to those tenants or occupants of the Shopping Center set forth on **Exhibit K** attached
6    hereto who, in accordance with the terms of existing leases or occupancy agreements in effect on the
7    Effective Date, including any extensions, assignments or subleases thereof ("Existing Tenants"),
8    cannot be prohibited from so operating.  Landlord covenants and agrees that if Landlord has the right
9    to deny its consent to a change in use of the premises occupied by any such Existing Tenant, Landlord
10   shall not consent to a change in use of the premises which violates the Ross Prohibited Uses.

11       **3.2.2.**    Further Prohibited Uses.  Landlord agrees that the Ross Prohibited Uses set
12   forth in Section 3.2.1 and the "Landlord's Prohibited Uses" which are listed in **Exhibit D** (which
13   prohibited uses listed in **Exhibit D** shall only be deemed to be "Landlord's Prohibited Uses" so
14   long as the applicable lease or agreement that contains such prohibited uses is still in force and
15   effect) shall not be permitted in the Southwest Quadrant of the Shopping Center.  (The Ross
16   Prohibited Uses and the Landlord's Prohibited Uses are collectively, the "Prohibited Uses.")  If
17   Landlord sells the Southwest Quadrant of the Shopping Center, or any portion thereof, Landlord
18   shall attach and incorporate into the deed or other instrument of conveyance the Ross Prohibited
19   Uses and the provisions of Section 15.3.  Tenant agrees that it will not violate the Prohibited Uses.

20   **3.3.**    **Grant of Common Area Use.**

21       Tenant, as well as its agents, employees, customers and Invitees, shall have and is granted
22   nonexclusive and undisturbed access to, and use of all Common Areas (hereinafter "easement"),
23   which easement shall be appurtenant to the Store until the expiration or earlier termination of this
24   Lease. The preceding sentence shall not be deemed to limit Landlord's right to control and manage
25   the Common Areas in its reasonable discretion, subject to the limitations set forth in this Lease.
26   Landlord shall use commercially reasonable efforts to prevent (a) Southwest Quadrant Common
27   Area use by other than the Shopping Center's occupants and their Invitees, and (b) other Shopping
28   Center's occupants and their employees and officers from parking within one hundred (100) feet of
29   the Store's front doors.  In no event shall Tenant or Tenant's Invitees' use of the Southwest
30   Quadrant Common Areas be conditioned upon payment of parking or other charges by Tenant.

31   **3.4.**    **Grant of Utility Easements.**

32       (a)     Subject to the reasonable approval of Landlord as to location and applicable
33   Requirements, Landlord hereby grants to Tenant and its employees, agents, contractors and
34   vendors, the nonexclusive right by easement to install, replace, maintain and use Utilities of Tenant's
35   choice serving the Store within the Shopping Center, and in connection therewith, to use existing
36   Utility conduits and to tie into existing Utility lines.

37       (b)     Upon prior notice to Landlord and subject to the rights of Existing Tenants and to
38   Landlord's approval as to location and the scheduling of any installation, which approval shall not
39   be unreasonably withheld, delayed, or conditioned, Tenant, at Tenant's election, shall have the right
40   to install, at Tenant's expense: (i) a cart retention system within the parking lot, utilizing wires or

"Serramonte (Relo #396)"
Serramonte Center              - 15 -                 12/23/15
Daly City, CA                                      FINAL
Store No. 1940
6061.1348/913576.6

other embedded objects as a means of perimeter control, provided that Tenant shall, at Tenant's expense, repair any damage caused by such installation and maintain such cart retention system; and (ii) bollards in front of the Store. Tenant shall use commercially reasonable efforts to minimize any disruption to the operation of any other tenants at the Southwest Quadrant during its installation of any cart retention system. Tenant shall regularly remove Tenant's shopping carts taken into the Common Areas on an ongoing, regular as needed basis during and at least one-half (1/2) hour after Tenant's hours of operation from the Store in accordance with good regional shopping center management practices. Tenant may not store Tenant's shopping carts in the Common Areas at any time. Tenant's shopping carts shall be clearly identified as belonging to Tenant. Tenant's indemnity of Landlord contained in this Lease shall be applicable to claims arising from or as the result of (A) the use of the cart retention system, or (B) Tenant's failure to perform its obligations to maintain the cart retention system or collect and store Tenant's shopping carts as required by this paragraph. Tenant shall be solely responsible, at its cost and expense, for keeping and maintaining the cart retention system in good condition and repair. If Tenant installs a cart retention system, Tenant's commercial general liability insurance policy as required under this Lease shall include Tenant's indemnity obligations set forth in this Section 3.4(b) and liability for damage caused by the use of Tenant's shopping carts in the Common Areas. Tenant's property insurance for its fixtures, furnishing and equipment as required under this Lease shall include the cart retention system and Tenant's shopping carts.

## 3.5.    Utility Rooms.

In the event any meters, controls or conduits for any Utility system serving the Store are at any time situated outside the Store (the "Utility Room"), Tenant shall at all times have access to the Utility Room and to controls and other conduits therein in common with Landlord and other tenants affected by such Utility systems. No other parties (other than Landlord and the other tenants affected by such Utility systems) shall have access to the Utility Room at any time without the consent of Tenant. Landlord shall provide adequate heat and security for the Utility Room and shall cause the Utility Room to be kept locked at all times.

## 3.6.    Site Plan or Shopping Center Alterations.

**3.6.1.**    Control Area and Inline Buildings. The Site Plan is a material consideration for Tenant entering into this Lease. No change, alteration, deletion, or addition (including, but not limited to, landscaping, benches, seating, trash cans, light poles, directional signage or other structures or obstructions) (collectively, "Obstructions") shall be made to the Control Area on the Site Plan nor shall any change in the location of a front wall of any premises in any Inline Building in the Southwest Quadrant be made, in each case, without the prior written consent of Tenant, which consent shall not be unreasonably withheld by Tenant. Notwithstanding the foregoing, Tenant's consent shall not be required for the like-kind replacement of any Obstructions.

**3.6.2.**    Common Areas.

(a)    No change or alteration or addition (including, but not limited to, the addition of any Obstructions) shall be made in the Southwest Quadrant of the Shopping Center (to the extent Landlord has the legal ability to control such changes or alterations) which materially and adversely affects any one or more of the following, without the prior written consent of Tenant (which

"Serramonte (Relo #396)"
Serramonte Center
Daly City, CA
Store No. 1940
6061.1348/913576.6

- 16 -

12/23/15
FINAL

consent shall not be unreasonably withheld by Tenant if the change is not materially adverse to Tenant): (i) the configuration of the Southwest Quadrant Common Areas; (ii) methods of ingress and egress, direction of traffic, lighting, parking, or curbing in the Southwest Quadrant Common Areas; (iii) visibility of the Store or of any of Tenant's Signs; or (iv) access to Tenant's loading dock and loading area. Notwithstanding the foregoing, Tenant desires that Landlord construct a pedestrian pathway or sidewalk (the "Pedestrian Pathway") across the area depicted on the Site Plan as the "Potential Customer Walking Pathway" for the purpose of facilitating the access of the Invitees of the Southwest Quadrant between the parking lot and the Store and other tenant spaces in the Southwest Quadrant. In connection therewith, Landlord shall, promptly after the Effective Date, use commercially reasonable efforts to obtain the consent of those Existing Tenants that have approval rights with respect to changes in that portion of the Common Areas that includes the Potential Customer Walking Pathway to allow Landlord to construct the Pedestrian Pathway over the Potential Customer Walking Pathway. If Landlord obtains such necessary consents, Landlord shall, at Landlord's sole cost and expense, construct the Pedestrian Pathway over the Potential Customer Walking Pathway.

(b)    Landlord shall not permit any other occupant of the Shopping Center and/or any other person and/or entity to use the Common Areas (including Common Areas within the Control Area) for sales areas, whether or not temporary or permanent sales areas (it being understood that the foregoing shall not prohibit outdoor sales by any tenant on the sidewalk in front of such tenant's premises), nor for any parking of vehicles such as rental vehicles or delivery trucks whereby such vehicles are stored or displayed (it being understood that the foregoing shall not apply to customer parking). Landlord shall also maintain appropriate and enforceable non-solicitation policies with respect to the Common Areas. Tenant acknowledges that the preceding shall not preclude the occasional temporary exclusive use of certain Common Areas outside of the Southwest Quadrant by Landlord or other tenants (e.g., food trucks, temporary Halloween or Christmas trees sales, promotions, etc.), so long as such use is not located in the Control Area, and does not materially adversely affect (i) Tenant's operation of the Store, pedestrian or vehicular access to the Store and the parking lot, (ii) visibility of the Store or of any of Tenant's Signs, and (iii) access to Tenant's loading dock and loading area. Tenant acknowledges that (A) Cost Plus has the right to display seasonal merchandise and conduct sidewalk sales in front of its premises in the space described on the Site Plan as the "Cost Plus Sidewalk Sales Area," (B) Buy Buy Baby has the right to display seasonal merchandise and conduct sidewalk sales in front of its premises in the space described on the Site Plan as the "Buy Buy Baby Sidewalk Sales Area," and (C) Dick's Sporting Goods has the right to use that portion of the Common Area described on the Site Plan as the "Dick's Outside Sales Area" for seasonal and promotional sales and other sales customary to its business operations.

**3.6.3.**    No Build Area. No construction of any building or Obstruction shall occur in the area described on the Site Plan as the "No Build Area," provided that Landlord may undertake the remodeling of any building within the No Build Area without Tenant's consent, so long as the footprint of such building does not expand into the No Build Area from its prior configuration. Subject to the rights of Existing Tenants, no storefront, storefront architectural feature and/or canopy of any building in the Southwest Quadrant, other than the Store, may extend into any sidewalk, drive aisle or parking field beyond what exists as of the Effective Date as depicted on **Exhibit B**.

"Serramonte (Relo #396)"
Serramonte Center
Daly City, CA
Store No. 1940
6061.1348/913576.6

- 17 -

12/23/15
FINAL

1    **3.6.4.**    Store Exterior; Building Exteriors. The use of the exterior walls of the Store
2    shall be subject to the exclusive control of Tenant. Further, Landlord may not alter the exterior of
3    the Store, including, but not limited to, the color of the exterior of the Store, without the prior
4    written consent of Tenant, which consent may be granted or denied in Tenant's sole and absolute
5    discretion. Subject to the rights of Existing Tenants, no alteration or change in the color or design
6    of any exterior wall, including storefront, storefront architectural features and/or canopy of any
7    building in the Southwest Quadrant may be made without the prior written consent of Tenant,
8    which consent shall not be unreasonably withheld, delayed or conditioned. Notwithstanding the
9    preceding sentence, Tenant's consent shall not be required with respect to alterations of the exterior
10   of any premises leased to a national Anchor Tenant, which changes are consistent with the
11   prototype and design requirements of such Anchor Tenant, so long as (a) such Anchor Tenant is an
12   Existing Tenant and has the right under its lease to make such alterations that would otherwise be
13   subject to the consent of Tenant, or (b) any such alterations are (i) architecturally harmonious with
14   the remainder of the Southwest Quadrant, and (ii) do not violate the express height and building
15   limitations set forth in this Lease, including, without limitation, the restrictions set forth in Section
16   3.6.3 above.

17   **3.6.5.**    Intentionally Deleted.

18   **3.6.6.**    Tenant's Loading Dock and Loading Area. Landlord covenants and agrees that
19   Tenant shall have undisturbed access to and use of its loading dock and loading area. If access to
20   and/or use of Tenant's loading dock and/or loading area is disturbed or interfered with in any
21   material respect for any reason, and such disturbance or interference is not cured by Landlord within
22   three (3) Business Days following Landlord's receipt of written notice from Tenant, then, in addition
23   to availing itself of any other remedies available at law or in equity or under this Lease, Tenant shall
24   pay, in lieu of Rent, Substitute Rent until such disturbance or interference is cured. Notwithstanding
25   the foregoing, if such disturbance or interference is caused by a third party that is not affiliated with
26   any of Landlord (including its Invitees, employees, agents, contractors or vendors), any other tenant
27   or occupant of the Shopping Center (including such tenant's or occupant's Invitees, employees,
28   agents, contractors or vendors), or any governmental agency with jurisdiction over the Shopping
29   Center, Tenant shall not have the right to pay Substitute Rent in lieu of Rent, but Landlord shall use
30   commercially reasonable efforts to cure such disturbance or interference.

31   **3.6.7.**    Governmentally Mandated Alterations. Notwithstanding the prohibitions set
32   forth in Sections 3.6.1 through 3.6.6 above, Landlord may make changes, alterations, deletions, or
33   additions to the extent they are required to be made by any governmental agency with jurisdiction
34   over the Shopping Center, provided that (a) if Landlord has any discretion over the location of such
35   change, alteration, deletion, or addition, Landlord shall consult with Tenant, and Landlord and
36   Tenant shall reasonably approve the location of such change, alteration, deletion, or addition,
37   provided that it shall be reasonable for Tenant to refuse its approval for any such change, alteration,
38   deletion, or addition that adversely impacts the Control Area or Tenant's storefront if a reasonable
39   alternative is available, and (b) if Landlord has any discretion over the timing of such change,
40   alteration, deletion, or addition, Landlord shall use commercially reasonable efforts to prevent such
41   change, alteration, deletion, or addition from being undertaken during the period from October 1 of
42   any year to January 2 of the ensuing year. In any event, Landlord shall avoid any unreasonable
43   interference with the operation of Tenant's business in the Store, including access to drive aisles,

1    parking and loading areas by Tenant's Invitees, employees, agents, contractors and vendors in
2    making such change, alteration, deletion, or addition.

3    **3.7.    Dimensions.**

4            Immediately following the completion of Landlord's Construction Obligations, Landlord
5    shall cause the Store to be measured and shall deliver to Tenant an architect's certificate stating the
6    Leasable Floor Area thereof.  In the event that the Leasable Floor Area of the Store is less than the
7    Leasable Floor Area set forth in the Final Plans described in **Exhibit C** (the "Agreed Size"), then,
8    unless such decrease in size was due to Tenant's request to reduce the Leasable Floor Area of the
9    Store during the construction of the Store (but not including any such request due to governmental
10   requirements, conditions of permit approval or other matters outside of Tenant's control), Minimum
11   Rent and all other charges shall be proportionately reduced and the parties shall set forth the actual
12   Leasable Floor Area of the Store, the adjusted Minimum Rent and other corrections necessitated by
13   the adjustment in Store size in the Acknowledgment of Commencement in **Exhibit E** hereto.  If
14   such decrease in size was due to Tenant's request to reduce the Leasable Floor Area of the Store
15   during the construction of the Store (but not including any such request due to governmental
16   requirements, conditions of permit approval or other matters outside of Tenant's control), Minimum
17   Rent and all other charges shall not be proportionately reduced but shall be based on the Store
18   Agreed Size.  In the event that the Leasable Floor Area of the Store is more than the Agreed Size,
19   unless such increase in size was due to Tenant's request to expand the Leasable Floor Area of the
20   Store during the construction of the Store (but not including any such request due to governmental
21   requirements, conditions of permit approval or other matters outside of Tenant's control), Minimum
22   Rent and all other charges shall be based upon the Agreed Size.  Nothing herein shall be construed
23   as permitting a material variance in dimensions or area.  For purposes of this Section 3.7, a material
24   variance is any decrease in the amount of Store frontage set forth in Section 1.3.3 or any decrease in
25   the Agreed Size by more than one percent (1%) of the amount of square feet of Leasable Floor
26   Area.  Landlord shall simultaneously provide to Tenant a certificate from the project architect as to
27   the total Leasable Floor Area in the Shopping Center depicted on **Exhibit B**.  Tenant shall have the
28   right to dispute through its own licensed architect the amounts so represented and, if so, any
29   unresolved dispute shall be resolved as provided in Section 20.2.  Until the amounts of Leasable
30   Floor Area in the Store and in the Shopping Center have been finally determined, Tenant may defer
31   payment of Minimum Rent (to the extent of the disputed amount) and the disputed portion of the
32   Reimbursement Contribution or any other charges which require the use of Leasable Floor Area for
33   computational purposes under the terms of this Lease.

34                              4.  LEASE TERM

35   **4.1.    Term.**

36           The Term of this Lease shall commence on the Commencement Date and shall expire as
37   specified in Section 1.5.

38   **4.2.    Commencement Date.**

39           The Commencement Date shall be the date as set forth in Section 1.4.1.

1  4.3.   **Acknowledgment of Commencement.**

2      Within ninety (90) days after the Commencement Date, Landlord and Tenant shall execute a
3  written acknowledgment in the form attached hereto as **Exhibit E**, and by this reference it is hereby
4  incorporated herein.

5  4.4.   <mark>Option Periods.</mark>

6      Provided Tenant is not in default of this Lease beyond any applicable notice and cure
7  periods, Tenant shall have the right to extend the Term of this Lease (an "Option") for the number
8  of separate, consecutive additional periods ("Option Periods") which are specified in Section 1.5.2,
9  on the terms and conditions set forth herein, except that the number of Option Periods remaining
10  to be exercised shall, in each case, be reduced by one.



20          **5.  CONSTRUCTION AND ACCEPTANCE**

21  **5.1.**   <mark>**Landlord's Construction Obligations.**</mark>

22      **5.1.1.**   <u>Current.</u>

23          (a)   Landlord shall provide to Tenant, for Tenant's review and approval, the
24  exterior elevations of all buildings in the Southwest Quadrant in order for Tenant to prepare and/or
25  review and approve the exterior elevations for the Store.  Landlord shall construct (or cause to be
26  constructed) the Southwest Quadrant in conformity with the exterior elevations as so approved by
27  Tenant.  Landlord acknowledges that Tenant's approval of the exterior Store elevations is contingent
28  upon Landlord constructing (or causing to be constructed) the buildings in the Southwest Quadrant
29  substantially in conformity with the building elevations approved by Tenant.  If, prior to the Delivery
30  Date, such elevations are modified, Landlord shall promptly notify Tenant and shall provide Tenant
31  with the modified elevations.  If Tenant reasonably determines that the modified elevations require a
32  modification to the exterior Store elevations, Tenant shall notify Landlord of Tenant's requested
33  modifications to the exterior Store elevations and Landlord shall make such modifications to the
34  exterior Store elevations, at Landlord's sole cost and expense.  Notwithstanding the foregoing, Tenant
35  will not require Landlord to modify Tenant's exterior Store elevations if Landlord modifies the building
36  elevations to accommodate the storefronts of national and regional retailers which are consistent with
37  such retailers' prototypical storefront designs, provided Tenant maintains its dominant storefront
38  presence comparable to that shown on the approved building elevations.  Landlord acknowledges and
39  agrees that any modifications to the approved building elevations shall be subject to the other express

provisions of this Lease, including the provisions of the Article 2 – Site Plan definition and the provisions of Section 3.6.



## 5.2.    Construction Commencement.

If Landlord fails to commence to perform Landlord's Construction Obligations, including the construction of the Store prior to the Construction Commencement Cancel Date specified in Section 1.4.3 of this Lease, then at any time thereafter, but prior to Landlord's commencement of construction of the Store, Tenant shall have the right to terminate this Lease by notifying Landlord in writing. If the Store is a new Building to be constructed, "Commencement of Construction" means to commence pouring the foundation for the Store. However, if the Store is to be constructed in an existing Building, Commencement of Construction means the day that the

1   contractor's workers commence the Work in the Store for the interior improvements to the Store
2   specifically for use by Tenant and other elements of Landlord's Work as described in **Exhibit C**.

3   **5.3.   Completion of Construction.**

4         Landlord shall use commercially reasonable efforts to complete Landlord's Construction
5   Obligations and deliver possession of the Store to Tenant on the Intended Delivery Date.  In the
6   event that Landlord has previously delivered to Tenant a Construction Completion Notice and is
7   thereafter delayed by Force Majeure or Tenant Delay in delivering the Store, or for any other reason
8   is unable to deliver the Store by the Delivery Date as specified in the Construction Completion
9   Notice, Landlord shall continue to diligently complete and deliver Landlord's Work in compliance
10   with this Lease.

11   **5.4.   Construction Completion Notice.**

12         (a)   The parties acknowledge the necessity for Landlord to provide Tenant with the
13   Construction Completion Notice specified in this Section 5.4 in order that (i) Tenant shall have
14   adequate time to, among other things, order fixtures and equipment, order and stock in season
15   merchandise, move and hire employees and arrange for advertising, computer and distribution support,
16   perform Tenant's improvements and fixturization of the Store and enter into other commitments
17   required to timely occupy and conduct business within the Store, and (ii) the Shopping Center shall be
18   perceived by the public as a completed, fully functional and operating retail center.  Not less than one
19   hundred twenty (120) calendar days prior to the Delivery Date, Landlord must notify Tenant in writing
20   as to when the Delivery Date will occur (the "Construction Completion Notice") in the form set forth
21   in **Exhibit G** (a Delivery Date must be on a Permitted Delivery Day).  Landlord shall undertake all due
22   diligence and necessary efforts to complete Landlord's Construction Obligations, and satisfy the
23   Delivery Conditions, and deliver the Store on the Delivery Date specified in the Construction
24   Completion Notice.  In the event Landlord does not timely satisfy all the Delivery Conditions by the
25   Delivery Date stated in the Construction Completion Notice (subject to delays caused by events of
26   Force Majeure or Tenant Delay), Tenant will suffer damages arising from Tenant's need for adequate
27   and proper advance notice of delivery.  It would be impractical or extremely difficult to fix actual
28   damages in the event of Landlord's breach under this Section 5.4.  Therefore, in the event of a breach
29   by Landlord of its obligations under this Section 5.4, the parties acknowledge that the damages to be
30   suffered by Tenant in such event are difficult to ascertain.  Landlord acknowledges that such damages
31   include, but are not limited to, the loss of, or need to, relocate employees hired for the Store, costs to
32   reallocate and/or to discount seasonal merchandise ordered for the Store, and costs to reschedule
33   Tenant's improvements and fixturization of the Store.  However, after negotiation the parties have
34   made their best reasonable estimate of such damage and have agreed that Landlord shall pay to Tenant,
35   as liquidated damages (the "Liquidated Damages"), the sum of One Hundred Fifty Thousand Dollars
36   ($150,000) which sum shall be paid to Tenant in a lump sum by Landlord to Tenant within thirty (30)
37   days of demand at any time following a breach by Landlord of its obligations under this Section 5.4.
38   Nothing herein shall prohibit Tenant, in addition to claiming the Liquidated Damages, from
39   postponing occupancy and the commencement of payment of Rent as specified in Section 5.5 hereof.
40   In the event Landlord fails to pay to Tenant the Liquidated Damages as required by this Section 5.4(a),
41   Tenant may, at its option, deduct the full amount of the Liquidated Damages from the Rent or other
42   charges coming due until Tenant has fully recovered the full amount of Liquidated Damages.  In
43   addition to Landlord's obligation to pay the Liquidated Damages, Landlord shall remain obligated to

"Serramonte (Relo #396)"
Serramonte Center
Daly City, CA
Store No. 1940
6061.1348/913576.6

- 22 -

12/23/15
FINAL

1    diligently complete Landlord's Construction Obligations and to satisfy the Delivery Conditions.  If
2    Landlord fails to deliver the Store on the date stated in the Construction Completion Notice due to a
3    delay caused by an event of Force Majeure or a Tenant Delay, Landlord's obligation to pay the
4    Liquidated Damages shall be excused for the period of the Force Majeure delay or Tenant Delay
5    (subject to the provisions of Section 26.13), provided Landlord gives Tenant the notice required by
6    Section 26.13, and provided Landlord uses diligent efforts to complete Landlord's Construction
7    Obligations and satisfy the Delivery Conditions.    If Landlord does not deliver a Construction
8    Completion Notice, there shall be no Liquidated Damages, but Tenant shall have the remedies
9    specified in Sections 5.5 and 5.6.

10        (b)    Intentionally Deleted.

11        (c)    If Landlord tenders possession of the Store to Tenant prior to Landlord's satisfaction
12    of the Delivery Conditions, Tenant may take possession of the Store and Tenant may occupy and
13    conduct business in the Store.  In such event, the parties' respective insurance obligations set forth in
14    Article 9 shall commence on the date Tenant occupies the Store pursuant to this Section 5.4(c).
15    Tenant's occupancy and use of the Store shall not constitute delivery of the Store or waive Landlord's
16    obligations to satisfy the Delivery Conditions nor shall it constitute acceptance of Landlord's Work or
17    relieve Landlord of responsibility for any warranty or maintenance obligations of Landlord under this
18    Lease.  Tenant's obligation to pay Rent shall not commence until the Commencement Date occurs, as
19    determined in accordance with Section 1.4.1, subject to the other express provisions of this Lease.

20        (d)    If, after the Delivery Date, Tenant is materially delayed or disrupted in performing
21    Tenant's Work due to Landlord's performance of its maintenance and/or repair obligations under this
22    Lease, then the Delivery Date shall, at Tenant's election, be deemed to be the next Permitted Delivery
23    Day which follows the completion of such Landlord maintenance and/or repair obligations.

24    **5.5.    Rollover.**

25        Notwithstanding any other provisions of this Lease, Tenant shall not be obligated to accept
26    delivery of the Store at any time other than on a Permitted Delivery Day.  If (a) Landlord offers to
27    deliver the Store to Tenant on a date other than a Permitted Delivery Day, or (b) Landlord fails to
28    deliver a timely Construction Completion Notice to Tenant, then, in either event, the Delivery Date
29    shall, at Tenant's option, be deferred until the next Permitted Delivery Day which occurs after the one
30    hundred twentieth (120th) day following the actual date Landlord satisfies all Delivery Conditions and
31    tenders possession of the Store to Tenant.  If Landlord delivers a Construction Completion Notice to
32    Tenant and thereafter Landlord fails to timely deliver the Store to Tenant on the date specified in the
33    Construction Completion Notice, then, unless Tenant agrees in writing to accept delivery of the Store
34    on an earlier date, the Delivery Date shall be deferred until the next Permitted Delivery Day which
35    occurs after the actual date Landlord satisfies all Delivery Conditions and tenders possession of the
36    Store to Tenant.  Tenant's rights to defer the Delivery Date pursuant to this Section 5.5 are referred to
37    herein as the "Rollover" remedy and are in addition to Tenant's rights to recover Liquidated Damages
38    pursuant to Section 5.4 above, if applicable.

1  **5.6.    Remedies Cumulative.**

2      The Rollover remedy described in Section 5.5 above shall apply in addition to all other
3  remedies at law, or in equity, or under the terms of this Lease.

4  **5.7.    Construction Completion Cancel Date.**

5      If for any reason Landlord has not completed Landlord's Construction Obligations, or the
6  Store is not delivered to Tenant prior to the Construction Completion Cancel Date specified in
7  Section 1.4.4 of this Lease, Tenant may, at its sole option, cancel this Lease by written notice to
8  Landlord.

9  **5.8.    Automatic Termination.**

10     This Lease shall be automatically terminated if the Delivery Date does not occur on or
11 before the Automatic Termination Date specified in Section 1.4.5 of this Lease notwithstanding any
12 Force Majeure events.  Notwithstanding the foregoing, this Lease shall not terminate if Tenant is
13 occupying the Store as of the Automatic Termination Date.

14 **5.9.    Entry Prior to Delivery Date.**

15     Subject to reasonable coordination of same with Landlord, Tenant shall have the right,
16 without any obligation to pay Rent, to enter the Store to perform work of preparation, but not
17 operation of its business prior to the Delivery Date; however, such exception regarding operation
18 shall not apply subsequent to the Delivery Date specified in any Construction Completion Notice.
19 Tenant agrees that it shall diligently seek to avoid impeding the progress of Landlord's Work by such
20 entry and shall indemnify Landlord from any damage or liability caused by Tenant's entry.  No such
21 entry by Tenant shall be deemed an acceptance of delivery of the Store, nor shall it constitute
22 acceptance of Landlord's Work.  Tenant may use such Utilities as are available during the course of
23 such period at no charge or cost to Tenant.  Tenant shall have in effect the insurance required by
24 Section 9.2.1 prior to any entry to the Store by Tenant prior to the Delivery Date.

25 **5.10.    Walk-Through Inspection and Punchlist.**

26     ███████████████████████ after Landlord notifies Tenant of the completion of
27 Landlord's Construction Obligations, Landlord's construction representative and Tenant's
28 construction representative shall meet at and do a complete walk through inspection
29 ("Walk-Through Inspection") of the Store to (a) reasonably identify any uncompleted Landlord's
30 Work as required herein, and (b) reasonably identify any incomplete or noncomplying items of
31 Landlord's Work.  At the Walk-Through Inspection, Landlord and Tenant shall prepare a list
32 ("Punchlist") containing all items described in clauses (a) and (b) above which were identified during
33 the Walk-Through Inspection as not having been completed (i) to the extent necessary to permit
34 Tenant to commence and complete Tenant's Work without delay or interference from the
35 incomplete nature of Landlord's Work and/or from Landlord's contractor performing Landlord's
36 Work, and (ii) to sufficiently allow Tenant's retail operations to commence in the Store without
37 impediment to the conduct thereof by the incomplete nature of Landlord's Work, and (iii) including
38 completion of the Common Areas to the extent required in this Lease.  Landlord shall promptly and

1  diligently complete or correct such items ███████████████████████  In any event, the
2  Delivery Date shall not be deemed to have occurred until the listed items are completed and/or
3  corrected to the extent necessary to (x) permit Tenant to commence and complete Tenant's Work
4  without delay or interference from Landlord's contractor performing Landlord's Work and/or
5  caused by the incomplete nature of Landlord's Work, and (y) to permit Tenant's retail operations to
6  commence in the Store without impediment to the conduct thereof.  A sum equal to the amount of
7  Minimum Rent for one (1) full month may be withheld by Tenant pending completion by Landlord
8  of the Punchlist.

9  **5.11.    Intentionally Deleted.**

10  **5.12.    Additional Delivery Requirements.**

11  **5.12.1.**    <u>On the Delivery Date</u>.  Tenant's occupancy of the Store on or after the Delivery
12  Date shall not constitute an acceptance of Landlord's Work, or relieve Landlord of responsibility for
13  any warranty or maintenance obligations under this Lease.  On the Delivery Date, Landlord shall
14  deliver the following to Tenant:

15  (a)    A copy of all signed building permits (or equivalents), if any, for Landlord's
16  Construction Obligations, showing that Landlord's Construction Obligations have passed final
17  inspection; and

18  (b)    All certificates of insurance required of Landlord by this Lease.

19  ████████████████████████████████████████████████████████  after the Delivery
20  Date, Landlord shall deliver all of the following to Tenant:

21  (a)    All fully executed and dated warranties and guarantees applying to the
22  Store from the date of completion of Landlord's Construction Obligations.  If such warranties or
23  guarantees are given after the date of completion, they shall be dated as of the actual date that the
24  equipment and/or item was placed in service, but in no event shall execution of any warranty and
25  guaranty occur prior to the date of completion unless authorized in writing by Tenant;

26  (b)    A list of all contractors and subcontractors, each of which provided labor
27  or services in excess of Twenty-Five Thousand Dollars ($25,000) ("Major Contractors") for the
28  construction of the Store.  Said list shall contain the following information about each contractor or
29  subcontractor: name, business address, phone number (including area code), facsimile number and
30  e-mail address, contact person for the project, and state license number if required for the execution of
31  work on the Store;

32  (c)    Equipment operation manuals, catalogue data sheets and material safety
33  data sheets on all major equipment and/or fixtures used in the Store;

34  (d)    For maintenance use, one percent (1%) of the floor and wall covering
35  material installed of each color and pattern required for the Store; a one (1) gallon container of paint
36  for each color and surface texture used; and each container, box or roll shall be labeled with color,
37  texture and room location in addition to manufacturer's label;

1        (e)    Completed Punchlist properly signed and dated by Landlord or its general
2    contractor indicating that all items have been completed;

3        (f)    One (1) copy of final project record documents for the Store including,
4    without limitation, record specifications noted to indicate actual as-built conditions and as-built
5    AutoCAD record drawings developed from red-lined project stick sets indicating actual as-built
6    conditions; and

7    **5.12.3.** ████████████████████████████████████ after the Delivery
8    Date, Landlord shall deliver copies of unconditional lien waivers and releases from all Major
9    Contractors to Tenant.

10    **5.12.4.**    Until the foregoing items specified in Sections 5.12.1, 5.12.2 and 5.12.3 have
11    been furnished to Tenant, Tenant may defer payment of one (1) month's installment of Rent due
12    under this Lease.

13                                    **6.  RENT**

14    6.1.    Minimum Rent.

15    **6.1.1.**    Payment and Amount.    Commencing on the Commencement Date and
16    continuing through the Term of this Lease (except as otherwise expressly set forth in this Lease),
17    without demand or set off except as otherwise specified in this Lease, Tenant shall pay Minimum
18    Rent to Landlord in equal monthly installments at the rates specified in Section 1.6 (the "Minimum
19    Rent"). Minimum Rent shall be payable in advance on or before the first (1st) day of each calendar
20    month. If this Lease commences other than on the first day of a calendar month, the first month's
21    Minimum Rent shall be prorated accordingly and paid with the Minimum Rent for the first full
22    month.

23    **6.1.2.**    Place of Payment. All Minimum Rent and other payments to be made by Tenant
24    to Landlord shall be sent to the address set forth therefor in Section 1.2.1, unless otherwise directed
25    by Landlord in writing.

26    **6.1.3.**    Required Co-Tenancy.

27        (a)    Co-Tenancy Requirements. A "Reduced Occupancy Period" shall occur
28    unless all of the following requirements are satisfied on the Commencement Date and thereafter
29    throughout the Term: (i) the Required Co-Tenants specified in Section 1.7.1, shall be open in the
30    Shopping Center every day for retail business at least from 10:00 a.m. to 6:00 p.m., except public
31    holidays; (ii) the Required Co-Tenants are operating in at least the Required Leasable Floor Area for
32    each Required Co-Tenant specified in Section 1.7.1 under bona fide leases of a minimum initial term of
33    three (3) years' duration; and (iii) retail tenants (as defined in Section 1.7.1) of the  Shopping Center,
34    including the Required Co-Tenants, are open and operating under bona fide leases of a minimum
35    initial term of three (3) years'  duration in at least the percentage of the Leasable Floor Area  of the
36    Shopping Center indicated in Section 1.7.2 (which percentage shall be calculated as set forth in
37    Section 1.7.2). Landlord shall promptly notify Tenant of any Reduced Occupancy Period.  For

1    purposes of calculating the percentages in this paragraph, the denominator of the fraction may not be
2    less than the LFA Minimum described in Section 1.3.2.

3               (b)    Commencement Date Reduced Occupancy Period.    If a Reduced
4    Occupancy Period exists on the Commencement Date ("Commencement Date Reduced Occupancy
5    Period"), Tenant shall not be required to open the Store for business (notwithstanding any contrary
6    provision in this Lease), and if Tenant does not open for business in the Store, no Rent shall be due or
7    payable whatsoever until and unless the Commencement Date Reduced Occupancy Period is cured.
8    Notwithstanding the preceding sentence, if Tenant elects to open for business during a
9    Commencement Date Reduced Occupancy Period, then Tenant's total obligation for Rent shall be
10   replaced by Substitute Rent which shall be payable within fifteen (15) days after the close of each
11   calendar month during the Commencement Date Reduced Occupancy Period and continuing until the
12   expiration of the Commencement Date Reduced Occupancy Period (or earlier if Tenant terminates
13   this Lease as hereinafter provided in this Section 6.1.3(b)).    If the Commencement Date Reduced
14   Occupancy Period continues for a period of twelve (12) consecutive calendar months, then Tenant
15   shall elect, by written notice to Landlord given within thirty (30) days after the expiration of such
16   twelve (12) month period ("Tenant's Commencement Date ROP Notice") to (i) terminate this Lease
17   (provided Tenant's Commencement Date ROP Notice is given prior to the expiration of the
18   Commencement Date Reduced Occupancy Period), or (ii) commence or resume payment of full Rent
19   from the expiration of such twelve (12) month period.    In the event that Tenant fails to timely send
20   Tenant's Commencement Date ROP Notice to Landlord, then it shall be deemed that Tenant has
21   elected to commence or resume the payment of full Rent as provided in the preceding sentence.

22              (c)    Secondary Reduced Occupancy Period.    If a Reduced Occupancy Period
23   occurs at any time after the Commencement Date and after the satisfaction of the Required
24   Co-Tenancy set forth in Section 1.7.1 and Section 1.7.2, and such Reduced Occupancy Period is not
25   the result of an Exempted Discontinuance as hereinafter defined ("Secondary Reduced Occupancy
26   Period"), and such Secondary Reduced Occupancy Period continues for a period of three (3)
27   consecutive calendar months (the "Cure Period"), then Tenant's total obligation for Rent shall be
28   replaced by Substitute Rent (plus the payment of Reimbursements) which shall be payable within
29   fifteen (15) days after the close of each calendar month following the Cure Period and continuing until
30   the expiration of the Secondary Reduced Occupancy Period (or earlier if Tenant terminates this Lease
31   as hereinafter provided in this Section 6.1.3(c)); provided, however, that if Tenant is in a Go Dark
32   Period for any period of time during which Tenant has the right to pay Substitute Rent pursuant to the
33   foregoing, Tenant shall pay, in lieu of Substitute Rent, fifty percent (50%) of the Minimum Rent due
34   for such Go Dark Period (and Tenant shall continue to pay Reimbursements), which shall be payable
35   within fifteen (15) days after the close of each calendar month during the Secondary Reduced
36   Occupancy Period and continuing until the expiration of the Secondary Reduced Occupancy Period
37   (or earlier if Tenant terminates this Lease as hereinafter provided in this Section 6.1.3(c)).    If the
38   Secondary Reduced Occupancy Period continues thereafter for a period of twelve (12) consecutive
39   calendar months following the end of the Cure Period, Tenant shall elect, by written notice to
40   Landlord given within thirty (30) days after the expiration of such twelve (12) month period ("Tenant's
41   Secondary ROP Notice") to (i) terminate this Lease (provided Tenant's Secondary ROP Notice is
42   given prior to the expiration of the Secondary Reduced Occupancy Period), or (ii) resume payment of
43   full Rent from the expiration of such twelve (12) month period.    In the event that Tenant fails to timely
44   send Tenant's Secondary ROP Notice to Landlord, then it shall be deemed that Tenant has elected to

1  resume the payment of full Rent as provided in the preceding sentence. The provisions of this Section
2  6.1.3(c) shall apply to any subsequent Secondary Reduced Occupancy Period.

3          (d)    Landlord's Termination Right; Unamortized Cost of Leasehold
4  Improvements.

5          (i)    If a Commencement Date Reduced Occupancy Period continues
6  for a total period of eighteen (18) consecutive calendar months and only in the event Tenant has not
7  opened for business, and Tenant has not exercised its right to terminate this Lease pursuant to
8  Section 6.1.3(b) above, Landlord shall thereafter have the ongoing option, upon thirty (30) days'
9  written notice to Tenant ("Landlord's Reduced Occupancy Termination Notice") to elect to terminate
10 this Lease, provided Landlord's Reduced Occupancy Termination Notice is given prior to the
11 expiration of the Commencement Date Reduced Occupancy Period. Notwithstanding the preceding
12 sentence, in the event Landlord elects to terminate this Lease, Tenant may notify Landlord at any time
13 within thirty (30) days after receiving Landlord's Reduced Occupancy Termination Notice ("Vitiation
14 Notice") that Tenant (commencing with the next full calendar month following the date of the
15 Vitiation Notice) will resume payment of the regular scheduled Rent pursuant to this Lease. If Tenant
16 provides a Vitiation Notice to Landlord, then Landlord's Reduced Occupancy Termination Notice
17 shall automatically become void and have no force or effect. If Tenant does not provide a Vitiation
18 Notice within the time period required above, this Lease shall terminate thirty (30) days following the
19 date of Landlord's Reduced Occupancy Termination Notice.

20         (ii)   In the event Tenant terminates this Lease pursuant to
21 Sections 6.1.3(b) or (c) above or in the event Landlord terminates this Lease pursuant to this
22 Section 6.1.3(d), Landlord shall pay to Tenant the Unamortized Cost of Tenant's leasehold
23 improvements in an amount not to exceed Five Hundred Thousand Dollars ($500,000), which sum
24 shall be due and payable to Tenant (A) within thirty (30) days following the date of Tenant's Reduced
25 Occupancy Termination Notice, or (B) if Landlord has issued Landlord's Reduced Occupancy
26 Termination Notice and Tenant has not provided Landlord with a Vitiation Notice, then within thirty
27 (30) days following the termination of this Lease. If the Unamortized Cost of Tenant's leasehold
28 improvements is not timely paid, Tenant may deduct the amount due from any payments due to
29 Landlord, if any hereunder, in addition to and cumulative with any other remedies available to Tenant
30 at law, in equity, or under the terms of this Lease. Landlord's obligation for payment of the
31 Unamortized Cost of Tenant's leasehold improvements shall survive the termination of this Lease.

32         (e)    Exempted Discontinuance. An Exempted Discontinuance shall mean the
33 closure of a retail tenant's store because of Casualty, condemnation, repairs or remodeling for a period
34 not to exceed ninety (90) days. Notwithstanding the preceding sentence, an Exempted Discontinuance
35 shall not include repairs or remodeling or construction of leasehold improvements performed by or on
36 behalf of (i) an Anchor Tenant replacing a Required Co-Tenant (if and to the extent permitted by
37 Section 1.7.1) prior to the date said replacement Anchor Tenant initially opens for business in the
38 premises previously occupied by the Required Co-Tenant being replaced, or (ii) any retail tenant
39 replacing another retail tenant for purposes of satisfying the required percentage of the Shopping
40 Center to be occupied by operating retailers as required by Section 1.7.2, prior to the date said
41 replacement retail tenant initially opens for business. A retail tenant's store which is closed due to an
42 Exempted Discontinuance shall not be considered closed for purposes of determining whether a
43 Secondary Reduced Occupancy Period is in effect (and the Leasable Floor Area of such retail tenant's

1    store shall not be calculated in the numerator or the denominator of the fraction specified in
2    Section 1.7.2) from the commencement of the Exempted Discontinuance until the earlier of: (i) the
3    expiration of such ninety (90) day period; or (ii) the expiration of the Exempted Discontinuance.



36            (g)      Co-Tenancy Audit. Tenant shall have the right to audit all of Landlord's or
37    Landlord's agent's records pertaining to the Co-Tenancy Requirements, Landlord's Co-Tenancy
38    Certification, the Co-Tenancy Report and any Reduced Occupancy Period (collectively "Co-Tenancy
39    Records") with a representative of Tenant's choice ("Co-Tenancy Audit"), provided that no
40    Co-Tenancy Audit may be conducted more frequently than once per calendar year. Landlord shall
41    retain its Co-Tenancy Records for a period of at least three (3) years following the end of each calendar
42    year during the Term. Landlord covenants and agrees that in the event Landlord assigns this Lease in
43    connection with a transfer of the Shopping Center, Landlord shall deliver to the assignee all of the
44    Co-Tenancy Records required to be retained by Landlord pursuant to this Lease. In the event

"Serramonte (Relo #396)"
Serramonte Center
Daly City, CA
Store No. 1940
6061.1348/913576.6

- 29 -

12/23/15
FINAL

1    Landlord fails to retain its records as required by this Section 6.1.3(g), Landlord's failure shall constitute
2    a default by Landlord under this Lease and Tenant shall have the following remedies, in addition to all
3    other remedies available to Tenant at law or in equity:

4                    (i)      If Landlord fails to maintain Co-Tenancy Records as required by
5    the terms of this Lease, Landlord acknowledges and agrees that it will be deemed that a Reduced
6    Occupancy Period was (or is) in effect for the entire period that the Co-Tenancy Records were not
7    maintained and made available to Tenant, and Tenant will have the remedies set forth in Section 6.1.3
8    with respect to a Commencement Date Reduced Occupancy Period or a Secondary Reduced
9    Occupancy Period, as applicable, including, but not limited to, Tenant's right to pay no Rent and/or
10   Substitute Rent, as applicable.   If Tenant previously paid Rent during any period that a
11   Commencement Date Reduced Occupancy Period or a Secondary Reduced Occupancy Period was in
12   effect (or was deemed to have been in effect) and as a result thereof, Tenant overpaid any Rent,
13   Landlord shall reimburse Tenant for such overpaid Rent within thirty (30) days following receipt of
14   Tenant's written demand therefor, and if Landlord fails to do so, Tenant shall have the right to deduct
15   the amount of such overpaid Rent from the Rent due under this Lease until Tenant is fully reimbursed.

16                   (ii)     At any time during the three (3) year period following the end of
17   each calendar year during the Term, upon at least thirty (30) days' advance notice to Landlord, Tenant
18   may conduct a Co-Tenancy Audit. The Co-Tenancy Audit shall commence on a date (the "Audit
19   Date") of which Tenant has notified Landlord not less than thirty (30) days in advance. In the event of
20   a cancellation of a Co-Tenancy Audit by Landlord, Tenant may defer payment of all Rent until the
21   Co-Tenancy Audit is performed and completed.   In addition, in the event of cancellation of a
22   Co-Tenancy Audit by Landlord, the three (3) year period set forth above shall be extended until the
23   Co-Tenancy Audit is performed and completed.   In addition, in the event Landlord cancels the
24   Co-Tenancy Audit less than fifteen (15) days prior to the scheduled Audit Date, Landlord shall
25   reimburse Tenant for all costs incurred by Tenant, such as, for example, the cost of nonrefundable
26   airfares, resulting from Landlord's cancellation of the Co-Tenancy Audit. Landlord shall reimburse
27   such costs to Tenant within ten (10) days following receipt of Tenant's invoice therefor and if Landlord
28   fails to do so, Tenant may deduct the full amount of such costs from any subsequent Rents coming
29   due under this Lease.

30                   (iii)    Any overpayment of Rent discovered in the course of a
31   Co-Tenancy Audit ("Overbilled Amount") shall be refunded to Tenant (together with interest at the
32   Legal Rate) within thirty (30) days following the date that Landlord is provided with a copy of Tenant's
33   Co-Tenancy Audit (the "Refund Date"). In the event a Co-Tenancy Audit discloses the occurrence or
34   existence of a Reduced Occupancy Period, then Landlord shall also reimburse Tenant for all
35   reasonable expenses of the Co-Tenancy Audit by the Refund Date. On or before the Refund Date,
36   Landlord shall:  (a) refund any Overbilled Amount (together with interest at the Legal Rate) and the
37   Co-Tenancy Audit expenses, if applicable; or (b) provide Tenant with (i) the reasons for any
38   disagreement by Landlord with the findings of Tenant's Co-Tenancy Audit, (ii) together with any
39   supporting documentation, and (iii) accompanied by cash payment in the amount of any undisputed
40   Overbilled Amount. In the event Landlord fails to respond by either of the foregoing methods, the
41   Co-Tenancy Audit shall be deemed conclusive. In such event, Landlord shall refund to Tenant the
42   Overbilled Amount within thirty (30) days following the Refund Date. In addition, if Landlord does
43   not refund to Tenant the Overbilled Amount within such thirty (30) day period, then Tenant may, in
44   addition to its other remedies, deduct the Overbilled Amount from the Rent due under this Lease. In

1  the event Landlord disputes the Co-Tenancy Audit and provides the reasons and documentation
2  supporting such claim, the parties shall diligently, within ten (10) Business Days thereafter, attempt to
3  resolve their differences, and, in failing to do so, the matter may be submitted by either party for
4  Arbitration under the provisions of Section 20.2.3 hereof.  In the event Landlord fails to pay Tenant
5  the Overbilled Amount (together with interest at the Legal Rate) as well as Co-Tenancy Audit
6  expenses, if applicable, within thirty (30) days of a final Arbitration award/court order if Landlord
7  disputes the Co-Tenancy Audit, Tenant shall have the right to deduct all unpaid amounts from the
8  Rent due under this Lease until Tenant is fully paid.

9  **6.2.    Reimbursements.**

10      In addition to the Minimum Rent described in Section 6.1, Tenant shall be responsible to
11  pay the Reimbursement Contribution as described in Section 7.2.

12  **6.3.    Other Payment Provisions.**

13      **6.3.1.    Late Payment.**  Any sum including Rent accruing to Landlord or Tenant under
14  the provisions of this Lease which is not paid within ten (10) Business Days following written notice
15  that such sum is past due ("Payment Notice Period"), shall bear interest at the Legal Rate from the
16  expiration of the Payment Notice Period to the date paid unless the past due sum is disputed
17  pursuant to Section 6.3.3.

18      **6.3.2.    Timely Billing of Charges.**  All charges due from Tenant to Landlord or Landlord
19  to Tenant, as the case may be, for which one party must bill the other, must be billed by within
20  twelve (12) months after the close of the calendar year in which the charge is incurred by, or the
21  party owed charges shall have waived its right to reimbursement as otherwise provided in this Lease.
22  The foregoing shall not be deemed to limit Tenant's right to reimbursement pursuant to a
23  Co-Tenancy Audit or Landlord's obligation to pay Tenant any Unamortized Costs of Tenant's
24  leasehold improvements, as set forth herein.

25      **6.3.3.    Disputed Sums.**  In the event that at any time during the Term a bona fide
26  dispute arises with respect to the amount due for any charges claimed by a party to be due, or with
27  respect to Tenant's payment of Substitute Rent or Tenant's non-payment of Rent pursuant to
28  Tenant's right to pay Substitute Rent or to defer, withhold, deduct or offset Rent in accordance with
29  this Lease, including, but not limited to, pursuant to Section 6.1.3(f), Section 11.2 and
30  Section 20.1.2(b), the party claiming a dispute shall notify the other party in writing of the basis for
31  the dispute.  Pending the resolution of the dispute between the parties by litigation or otherwise, any
32  undisputed portion of any charges, Substitute Rent, or Rent, as applicable, shall be paid by Tenant
33  or Landlord, as the case may be, and the disputed portion of any charges, Substitute Rent, or Rent,
34  as the case may be, may be withheld pending resolution of the dispute.  Landlord's or Tenant's, as
35  the case may be, withholding of the disputed amount, or offsetting of an amount previously paid in
36  the event of a bona fide dispute with regard to the foregoing shall not be deemed a default by
37  Landlord or Tenant under the terms of this Lease.  Upon resolution of any dispute, the obligated
38  party shall pay to the other the remaining sum liquidated as due (if any) with interest thereupon at
39  the Legal Rate.

1  **6.4.    Gross Sales Statement for Purposes of Calculating Substitute Rent.**

2    **6.4.1.**    Gross Sales Statement.  In the event Tenant pays Substitute Rent pursuant to
3  clause (b) of the Substitute Rent definition in Article 2, within fifteen (15) days after the close of
4  each calendar month, Tenant shall submit to Landlord a statement indicating the amount of its
5  Gross Sales for the previous month.  Landlord covenants to keep such information confidential.

6    **6.4.2.**    Maintenance of Records.  In the event Tenant pays Substitute Rent during any
7  Lease Year, Tenant shall maintain adequate records for a period of one (1) year after the close of
8  each such Lease Year for the purpose of allowing Landlord to verify the reported Gross Sales for
9  such Lease Year.  At any time within said one (1) year period, Landlord or its agents may inspect
10  such records at Tenant's main office specified in Section 1.2.2 hereinabove during Tenant's normal
11  business hours.

12    **6.4.3.**    No Representation.    Landlord acknowledges that Tenant has made no
13  representation as to the Gross Sales which may be generated from the Store.

14              **7.   COMMON AREA MAINTENANCE**

15  **7.1.    Landlord's Obligation to Maintain Common Areas.**

16    **7.1.1.**    Maintain Common Areas.  Landlord shall maintain all Common Areas in first
17  class condition, repair and cleanliness, including ice and snow removal, and sidewalk steam cleaning
18  and shall keep the Common Areas free of any impediments and open for easy and safe movement
19  within the Common Areas.  Landlord shall keep the Common Areas well lighted until 11:00 p.m.
20  each night and thereafter shall maintain security lighting in the Common Areas as required by
21  applicable Requirements or, if there are no applicable Requirements, then in accordance with
22  customary shopping center management practices for comparable shopping centers in the vicinity of
23  the Shopping Center, and Landlord shall otherwise keep such Common Areas safe and secure.
24  After the Commencement Date, no construction or construction-related activity shall be permitted
25  in the Common Areas of the Southwest Quadrant, except for emergency repairs diligently pursued,
26  during the period from October 1 of any year to January 2 of the ensuing year, without the prior
27  written consent of Tenant, which consent may include conditions designed to eliminate interference
28  with the operation of the Shopping Center or the effect of such activity upon Tenant's business.
29  Notwithstanding the foregoing, if Tenant has accepted delivery of the Store, then the foregoing
30  restriction on construction during the period from October 1 of any year to January 2 of the ensuing
31  year shall not apply to the initial construction (and construction-related activity) of other tenant
32  spaces in the Southwest Quadrant.

33    **7.1.2.**    Intentionally Deleted.

34  **7.2.    Reimbursement Contribution.**

35
36
37
38



### 7.3.  Reimbursements.

Except for the Reimbursement Contribution, Tenant has no obligation to pay any charges on account of Landlord's operation, maintenance, repair and/or replacement of the Common Areas or the Shopping Center (including the costs of Landlord's repair and maintenance obligations for the Store set forth in this Lease), any insurance premiums paid by landlord in connection with the Shopping Center, or any Taxes payable by Landlord in connection with the Shopping Center. Tenant shall not be obligated to contribute to any marketing fund or merchants' association, or to pay any management or supervision fees.

### 7.4.  No Audit of **Reimbursements.**

As the amount of the Reimbursement Contribution is fixed and predetermined and not subject to adjustment except as a function of the fixed increases as provided in Section 7.2, Tenant will have no express or implied right to examine, inspect or audit Landlord's records pertaining to the costs of Common Area operation, maintenance, repair and/or replacement, Taxes or insurance.

## 8.  ==REAL ESTATE TAXES AND ASSESSMENTS==

### 8.1.  Obligation to Pay.

Landlord shall pay all real property taxes and assessments ("Tax" or "Taxes") levied by a government agency against the Shopping Center or smaller Tax parcel which includes the Store (the "Tax Bill") on or before the last day that such Taxes may be paid without penalty, commission, interest or other charge. A "Tax parcel" is a single parcel of land for which the relevant taxing authority renders a separate billing.

### 8.2.  Reimbursement Contribution.

Except for the Reimbursement Contribution, as provided in Section 7.2 above, Tenant has no obligation to pay any charges on account of Taxes assessed against the Shopping Center. As the amount of the Reimbursement Contribution is fixed and predetermined and not subject to adjustment except as a function of the fixed increases as provided in Section 7.2, Tenant will have no express or implied right to examine, inspect or audit Landlord's records pertaining to Taxes or the Tax Bill.

1                                    **9. INSURANCE**

2    **9.1.    Property Insurance.**

3            **9.1.1.**    Special Form Policy.  A policy of fire and Property Insurance in the form of the
4    Insurance Services Offices' ISO Property form 1030 - Causes of Loss Special Form or equivalent
5    ("Special Form Policy").  The term "Property Insurance" means insurance covering damage to
6    tangible real and personal property.

7            **9.1.2.**    Landlord Insurance.  Commencing on the Delivery Date, as defined in Article 2
8    hereof, and at all times during the Term, Landlord shall maintain a Special Form Policy insuring
9    against damage to the Shopping Center, excluding Tenant's leasehold improvements and alterations,
10   trade fixtures, trade equipment and other personal property in the Store.  Further, upon completion
11   of construction of the Southwest Quadrant (exclusive of any phase of development to be completed
12   at a later date) the Special Form Policy shall be obtained with an owner's rating for the Shopping
13   Center based upon a completed project as opposed to a property under development.  All Special
14   Form Policy(ies) shall be in the amount of the full replacement cost of the insured improvements,
15   including demolition cost less a deductible of not less than Ten Thousand Dollars ($10,000).
16   Landlord shall, on the Delivery Date and thereafter upon request of Tenant, provide Tenant with a
17   certificate of such insurance coverage from an insurer authorized to do business within the state in
18   which the Store is located, and which insurer is rated at least A- and X in Best's Insurance Reports,
19   or equivalent.

20           **9.1.3.**    Intentionally Deleted.

21           **9.1.4.**    Reimbursement Contribution.  Except for the Reimbursement Contribution, as
22   provided in Section 7.2 above, Tenant has no obligation to pay any charges on account of
23   Landlord's Special Form Policy or any other insurance carried by Landlord in connection with the
24   Shopping Center.  As the amount of the Reimbursement Contribution is fixed and predetermined
25   and not subject to adjustment except as a function of the fixed increases as provided in Section 7.2,
26   Tenant will have no express or implied right to examine, inspect or audit Landlord's records
27   pertaining to Landlord's Special Form Policy or any other insurance.

28   **9.2.    Liability Insurance.**

29           **9.2.1.**    Tenant.  Tenant shall, at its sole cost and expense, commencing on the Delivery
30   Date, and at all times during the Term, keep in force a policy or policies of commercial general
31   liability insurance, or an endorsement on a blanket commercial general liability insurance policy or
32   policies, naming Landlord and Equity One Realty & Management CA, Inc. as additional insureds, as
33   their interests may appear, protecting against any and all claims and liabilities arising out of injuries
34   to or the death of any persons in the Store, or for property damage in the Store, in the minimum
35   amount of One Million Dollars ($1,000,000) per occurrence and an excess liability policy in an
36   amount of at least Five Million Dollars ($5,000,000), the coverage of which includes the Store.
37   Tenant's policy or policies shall include contractual liability insurance recognizing the indemnity
38   obligations assumed by Tenant under the provisions of this Lease, including, but not limited to,
39   Section 14.1, and shall be with an insurer which is rated at least A- and X in Best's Insurance
40   Reports, or equivalent.

1       9.2.2.     Landlord. Commencing on the Delivery Date, and at all times during the Term,
2    Landlord shall at all times keep (or cause to be kept) in force a policy or policies of commercial
3    general liability insurance for the Common Areas, or an endorsement on a blanket commercial
4    general liability insurance policy or policies, naming Tenant as an additional insured, protecting
5    against any and all claims and liabilities arising out of injuries to or the death of any persons in the
6    Common Area or for property damage in the Common Area, in the minimum amount of Five
7    Million Dollars ($5,000,000) per occurrence with a deductible not less than Ten Thousand Dollars
8    ($10,000).  Said policy or policies shall include contractual liability insurance recognizing the
9    indemnity obligations assumed by Landlord under the provisions of this Lease, including, but not
10   limited to, Section 14.2, and shall be with an insurer which is rated at least A- and X in Best's
11   Insurance Reports, or equivalent.

12   **9.3.**    **Evidence of Insurance.**

13       Landlord and Tenant agree to deliver to the other certificates of insurance evidencing the
14   existence in force of the policies of insurance described in Sections 9.1.1, 9.1.2, 9.2.1 and 9.2.2,
15   together with endorsements showing that the parties have been named as additional insureds as
16   required by Sections 9.2.1 and 9.2.2. Landlord's and Tenant's insurers shall each use reasonable
17   efforts to provide the party designated on the certificate of insurance as the holder thereof, with at
18   least twenty (20) days' prior written notice of cancellation or of a material change to the insurance
19   policy.

20   **9.4.**    **Waiver of Subrogation.**

21       On and after the Delivery Date and throughout the Term, Landlord and Tenant hereby
22   waive and release any and all right to maintain a direct action to recover against the other, including
23   the employees, officers, directors and agents of Landlord and Tenant, for damages and any and all
24   loss (including loss of Rent) to any property located within the Store or the Shopping Center, which
25   damage or loss occurs during a period which is covered or could be covered by a Special Form
26   Policy required under this Lease, and which arises out of the other party's negligence or otherwise
27   tortious acts or omissions, but only to the extent that the cost of repairing such damage or loss is
28   covered by insurance required under this Lease, or would have been covered by insurance proceeds
29   payable under any policy required to be maintained under this Lease, but not so maintained. Each
30   policy of such insurance shall either, (a) contain a waiver of subrogation by the insurer against
31   Tenant and Landlord, as the case may be, or (b) include the name of Landlord or Tenant, as the case
32   may be, as an additional insured, but not as a party to whom any loss shall be made payable. In the
33   event a party is unable to obtain such a waiver, it shall immediately notify the other of this inability.
34   In the absence of such notification, each party shall be deemed to have obtained such waiver of
35   subrogation.  Further, Tenant's agreement to indemnify Landlord, and Landlord's agreement to
36   indemnify Tenant under this Lease, are not intended and shall not relieve any insurance carrier of its
37   obligations under policies required to be carried by Tenant or Landlord pursuant to the provisions
38   of this Lease, to the extent such policies cover, or if carried would have covered the matters subject
39   to the parties' respective indemnification obligations; nor shall they supersede any inconsistent
40   agreement of the parties set forth in any other provision of this Lease. This mutual waiver is in
41   addition to any other waiver or release contained in this Lease. The provisions of this Section 9.4
42   shall not apply to Landlord's obligation to repair and replace any portion of the Store and Tenant's
43   merchandise damaged by roof leaks as specified in Section 11.2.1.

"Serramonte (Relo #396)"
Serramonte Center                 - 35 -                   12/23/15
Daly City, CA                                         FINAL
Store No. 1940
6061.1348/913576.6

1   **9.5.    Tenant's Right to Self-Insure.**

2       Notwithstanding anything to the contrary herein contained, provided the Tenant described
3   in Section 1.2.2 (the "Signatory Tenant") maintains a tangible net worth of at least Fifty Million
4   Dollars ($50,000,000), then the Signatory Tenant shall have the option, either alone or in
5   conjunction with the parent of Signatory Tenant, to maintain self-insurance and/or provide or
6   maintain any insurance required by Signatory Tenant under this Lease under blanket and/or broad
7   form insurance policies maintained by Signatory Tenant or by the parent of Signatory Tenant,
8   provided the same does not thereby decrease the insurance coverage or limits set forth in this Lease.
9   Any self-insurance shall be deemed to contain all of the terms and conditions applicable to such
10  insurance as required in this Lease, including, without limitation, a full waiver of subrogation. If
11  Signatory Tenant elects to so self-insure, then with respect to any claims which may result from
12  incidents occurring during the Lease Term, such self-insurance obligation shall survive the
13  expiration or earlier termination of this Lease to the same extent as the insurance required would
14  survive.

15                          **10. UTILITIES SERVICES**

16      Landlord agrees to make available for Tenant's use at the Store all necessary Utilities and
17  other necessary Utility lines and a separate sprinkler riser and sewerage lines all sufficient to service
18  Tenant's operations, and having no less capacity than specified in the Final Plans (as defined in
19  **Exhibit C**). All Utility lines (including sprinkler lines) that run through the Store shall exclusively
20  serve the Store and Landlord shall remove any Utility lines (including sprinkler lines) that run
21  through the Store that do not exclusively serve the Store. The Utilities shall be registered by Tenant
22  in Tenant's name. Tenant agrees to pay all use charges for all such Utilities provided to the Store
23  commencing on the Delivery Date and throughout the Term. If Landlord or an affiliated company
24  of Landlord provides some or all of such Utility services, Tenant's obligation to pay for such
25  services shall not exceed the rate that Tenant would have paid had Tenant obtained such Utility
26  service from a Utility provider selected by Tenant. At all times during the Term, Tenant shall have
27  the right to contract with any third party of Tenant's choice to provide some or all of the Utility
28  services for the Store. Landlord shall, at Landlord's sole cost and expense, pay for all Utility
29  hookup, connection or impact fees and permits. Landlord shall separate out all Utilities and install
30  separate meters for the Store. In the event that Landlord is prohibited by Requirements to install
31  separate meters for any specific Utility including water, Landlord shall promptly notify Tenant in
32  writing and provide evidence of the Requirement. If Tenant agrees that installation of a separate
33  meter for a specific Utility is prohibited by such Requirement and so notifies Landlord, Landlord
34  shall install a submeter for such Utility and shall cause such submeter to be read on a monthly basis,
35  billing Tenant for its proper share. Each such bill shall be accompanied by such supporting
36  information as Tenant may reasonably request and shall be payable within thirty (30) days after
37  Tenant's receipt of the bill (with Tenant to have the right to check the submeters at any time).
38  However, Landlord shall permit Tenant to read each submeter and to bill Landlord an amount equal
39  to the charges not attributable to Tenant, which sum shall be paid by Landlord to Tenant within
40  thirty (30) days after Landlord's receipt of each bill. No administrative or management charge or fee
41  shall be payable by Tenant related to any Utility charges emanating from a meter used in common
42  by Tenant with any other party. Further, in the event of a meter-sharing arrangement, Tenant may
43  require that the charges emanating from any common meter be allocated, by a reputable Utility

1    engineer reasonably approved by Tenant, among the common users thereof in accordance with
2    usage.  Neither party shall have the right to charge the other party any administrative, service or
3    other fee in connection with the reading of the submeters.  If Requirements prohibit the installation
4    in the Store of a separate water meter or submeter, Landlord shall provide to Tenant the calculation
5    of Tenant's water usage as prepared by or compiled by the Utility agency which provides water
6    service so as to calculate Tenant's share of the sewer service charges without consideration of the
7    use of water by any other tenant in the Shopping Center.  In no event shall Tenant's share of any
8    submetered Utility calculated or allocated as provided above, exceed the rate that Tenant would
9    have paid had Tenant obtained such Utility service from a Utility provider selected by Tenant.
10   Tenant shall be entitled to collect, and Landlord shall cooperate with Tenant in collecting, any rebate
11   which is made available by a Utility company for the installation of energy efficient lighting by
12   Tenant.

13           11. MAINTENANCE/REPAIR/ENVIRONMENTAL COMPLIANCE

14   **11.1.**   Maintenance and Repair by Tenant.

15           Except for Landlord's interior maintenance obligations under Section 11.2, and subject to
16   the terms of Articles 21 and 22, Tenant shall maintain the interior of the Store, the interior and
17   exterior doors of the Store and plate glass, in good repair and condition, reasonable wear and tear
18   excepted.  Tenant shall, at its expense, perform or cause to be performed all routine maintenance
19   and servicing and any repairs of the heating, ventilating, and air conditioning system serving the
20   Store (the "HVAC") in accordance with the terms of a customary air conditioning service contract
21   as performed by reputable service companies in the state in which the Shopping Center is located.
22   Landlord shall assign to Tenant prior to the Commencement Date, in form reasonably satisfactory
23   to Tenant's counsel, all warranties which are available from subcontractors, suppliers,
24   manufacturers, and materialmen for construction of that portion of the Store which is Landlord's
25   responsibility under **Exhibit C**, but which will be Tenant's maintenance responsibility under this
26   Section 11.1.  If for any reason such an assignment is not possible, Landlord agrees to enforce the
27   terms of any such warranties at Tenant's request on Tenant's behalf.

28   **11.2.   Maintenance and Repair by Landlord.**

29           **11.2.1.**    (a)    Landlord's Obligations.  Landlord shall, at its sole cost and expense, be
30   responsible for correcting all defects in Landlord's (or Landlord's contractor's) construction of the
31   Store.  Further, subject to the Waiver of Subrogation provisions of Section 9.4, Landlord, at
32   Landlord's sole cost and expense, shall maintain, repair and replace, in good and sightly condition
33   consistent with first class shopping centers in the county in which the Store is located, the
34   foundation, floor slab [including maintaining moisture vapor emissions at or below five (5) pounds
35   per one thousand (1,000) square feet per twenty-four (24) hours using the calcium chloride method,
36   and including any flooring impacted by Landlord's maintenance of the floor slab or damaged by
37   moisture vapor emissions or subterranean water infiltration (but excluding maintenance, repair and
38   replacement of any flooring required due to Tenant's alterations or Tenant's negligence or willful
39   misconduct), provided that in the event of a failure of the moisture vapor emissions to meet the
40   foregoing standards, Tenant shall cooperate with Landlord to determine a reasonable solution to
41   curing such failure], roof (including all structural elements and waterproofing membrane), roofing

1  (including the interior ceiling, walls, floors and merchandise damaged from leaking), roof drainage
2  system, including gutters and downspouts, exterior walls (including any wallpack or other lighting
3  fixtures located thereon), storefronts (including canopy), all structural portions of the Store,
4  sprinkler system (including the fire detection monitoring panel and the regular testing and inspection
5  thereof and Landlord shall provide Tenant with copies of all testing and inspection reports), all
6  Utility systems to the main point of connection to the Store, as well as all portions of the Store
7  which are not specifically Tenant's obligation under Section 11.1 above. Subject to the Waiver of
8  Subrogation provisions of Section 9.4, Landlord shall maintain and repair any damage or defects in
9  any part of the Store caused by the acts or omissions of Landlord, its agents or contractors
10 regardless of which party has the maintenance obligation under this Article 11.

11            (b)    Notice for Repair.  Tenant may give Landlord notice of the need for
12 those repairs as may be required under the terms of Section 11.2.1(a) above, and Landlord shall
13 proceed forthwith to effect the necessary repairs with reasonable diligence, but in no event later than
14 thirty (30) days after having received Tenant's notice, provided if the nature of the repair is such that
15 it cannot reasonably be completed within such thirty (30) day period, Landlord shall have such
16 additional time as is reasonably necessary to complete the repair, provided Landlord commences the
17 repairs within the initial thirty (30) day period and completes the repairs with diligence and
18 continuity.  If Landlord fails to repair or maintain the Store within the time period set forth in the
19 preceding sentence, Tenant may, in addition to Tenant's other remedies available at law, in equity or
20 under the terms of this Lease, perform the repairs, maintenance or replacements and deduct the cost
21 thereof, plus an administrative fee to reimburse Tenant for, among other things, the cost of
22 arranging, supervising, financing, and/or advancing the costs for the repairs or replacements, equal
23 to seven percent (7%) of the cost of the repairs or replacements (the "Repair Supervision Fee"), from
24 the subsequent Rent payment(s) thereafter coming due.  In the event of an emergency, Tenant may
25 undertake immediate repairs (without the need for advance notice) which are Landlord's
26 responsibility.  If Landlord shall fail to reimburse Tenant for the repair costs incurred by Tenant
27 within thirty (30) days after receipt of Tenant's billing, Tenant may deduct the cost, plus the Repair
28 Supervision Fee, from the subsequent installments of Rent payment(s) thereafter coming due.

29        **11.2.2.**    Earth Movement.  Landlord shall perform, at its sole cost and expense, without
30 reimbursement from Tenant, whether directly or through Reimbursements, any maintenance,
31 repairs, alterations or replacements that shall be required by governmental authority, or insurance
32 requirements, or by the ordinary exercise of due care at any time during the Term as a result of
33 movement or threatened movement or settlement affecting the land under (a) the Store, or (b) any
34 buildings within the Shopping Center, or (c) any portion of the Common Areas in the Shopping
35 Center.  Notwithstanding the foregoing, if the earth movement is due to an earthquake, the
36 provisions of Article 21 shall apply.

37        **11.2.3.**    First Year Repairs.  Notwithstanding the foregoing provisions of Sections 11.1
38 and 11.2.1 above, Landlord shall make all repairs, alterations and replacements of Landlord's Work
39 (other than those required as the result of repairs, alterations, replacements, other improvements or
40 installations by Tenant or any subtenant or concessionaire of Tenant or the agents of any of them)
41 to the Store which may become necessary for any cause except for Tenant's negligence or willful
42 acts or omissions on or after the Delivery Date and during the first twelve (12) months of the Term.

"Serramonte (Relo #396)"
Serramonte Center
Daly City, CA
Store No. 1940
6061.1348/913576.6                          - 38 -                          12/23/15
FINAL

1        **11.2.4.**   <u>Shopping Center Maintenance</u>. Landlord shall, at no cost or expense to Tenant,
2 maintain and repair (or cause to be maintained and repaired) all buildings within the Shopping
3 Center in good condition, consistent with the standards for first class shopping centers in the county
4 in which the Shopping Center is located, including the painting of exterior walls of the buildings on
5 a periodic basis.

6   **11.3.**   **Repairs Required by Governmental Authorities.**

7        **11.3.1.**   <u>Store</u>. After completion of Landlord's Construction Obligations, any repairs,
8 alterations or other improvements to the Store required by governmental authority or insurance
9 rating bureau having jurisdiction because of the particular type of retail use of the Store by Tenant
10 shall be performed by Tenant at its sole cost and expense. Any such work, however, which is
11 required to the Shopping Center in general, or to all similar buildings or uses in the area of the
12 Shopping Center, shall be done at the sole cost and expense of Landlord.

13        **11.3.2.**   <u>Shopping Center</u>. Landlord warrants that the construction of the Common
14 Areas and buildings of the Southwest Quadrant, including the Store, shall comply with all laws,
15 ordinances, regulations and standards of governmental authorities and insurance rating bureaus
16 having jurisdiction, including, without limitation, Environmental Regulations, as hereinafter defined,
17 and zoning and building codes (all of the foregoing being hereinafter collectively referred to as the
18 "Requirements"). Further, Landlord warrants that to the best of its knowledge, the proposed use of
19 the Store for retail purposes shall comply with all Requirements.

20        **11.3.3.**   <u>Non-Compliance</u>. Landlord agrees that if, at any time on or after the Delivery
21 Date, any governmental authorities or insurance rating bureau having jurisdiction shall determine
22 that Landlord's Work to the Store or that the Shopping Center was constructed, or is being
23 operated, in violation of, any Requirement and shall request compliance, with any Requirement or,
24 absent such a request from the governmental authority, if the Store or the Shopping Center is
25 otherwise not in compliance with or is in violation of any Requirement (and provided the violation
26 is not due to Tenant's Work), and if failure to comply shall in any way adversely affect the use of the
27 Store by Tenant or adversely affect any other rights of Tenant under this Lease or impose any
28 obligation upon Tenant not contained in this Lease or shall increase the obligation of Tenant (such
29 as, by way of example, increased insurance costs), Landlord shall, upon receipt of notice thereof, at
30 Landlord's sole cost and expense, cause such repairs, alterations or other work to be done or action
31 to be taken so as to bring about the compliance, or to effect the Requirement requested. If by
32 reason of such failure of compliance or by reason of such repairs, alterations or other work done by
33 Landlord, Tenant shall be deprived of the use or enjoyment of the whole or any part of the Store or
34 the Common Areas, Rent shall abate and in lieu thereof Tenant shall pay Substitute Rent on a per
35 diem basis until compliance with the Requirement is completed.

36        **11.3.4.**   <u>Zoning</u>. If at any time the applicable zoning shall not permit the retail sale in the
37 Store of the types of merchandise customarily sold in Tenant's other similarly merchandised full line
38 retail department stores, Tenant may terminate this Lease by giving Landlord one hundred twenty
39 (120) days' prior written notice thereof and this Lease shall terminate at the expiration of such one
40 hundred twenty (120) day period unless, Landlord, at Landlord's sole discretion and at Landlord's
41 sole expense, elects to pursue a zoning variance, amendment, or special use permit which permits
42 Tenant to sell such merchandise. If Landlord timely obtains such a zoning variance, amendment or

"Serramonte (Relo #396)"
Serramonte Center
Daly City, CA
Store No. 1940
6061.1348/913576.6

- 39 -

12/23/15
FINAL

1    special use permit which permits Tenant to sell such merchandise, then Tenant's Termination
2    Notice shall be void. Notwithstanding the foregoing, however, Tenant may not exercise Tenant's
3    rights to terminate this Lease under this Section 11.3.4 due to Tenant's inability to sell (a) any
4    merchandise which Tenant would not be permitted to sell because it violates a Prohibited Use, or
5    (b) any specific item of merchandise not listed in Section 15.1 which Tenant would not be permitted
6    to sell under zoning and other governmental restrictions in effect on the Delivery Date (e.g.,
7    firearms, alcoholic beverages, as hypothetical examples). Tenant's Termination Notice shall include
8    a written specification of the Unamortized Cost of any leasehold improvements made to the Store
9    by Tenant. Landlord shall pay such Unamortized Cost of Tenant's leasehold improvements in an
10   amount not to exceed Five Hundred Thousand Dollars ($500,000) to Tenant, within thirty (30) days
11   following the date of termination.

12   **11.4.    Hazardous Material.**

13        **11.4.1.**    Definition. As used herein, the term "Hazardous Material" or "Hazardous
14   Materials" shall mean (a) any waste, material or substance (whether in the form of a liquid, a solid, or
15   a gas and whether or not air-borne), which is or is deemed by governmental authority to be a
16   pollutant or a contaminant, or which is or is deemed by governmental authority to be hazardous,
17   toxic, ignitable, reactive, corrosive, dangerous, harmful or injurious, or which presents a risk, to
18   public health or to the environment, or which is or may become regulated by or under the authority
19   of any applicable local, state or federal laws, judgments, ordinances, orders, rules, regulations, codes
20   or other governmental restrictions, guidelines or requirements, any amendments or successor(s)
21   thereto, replacements thereof or publications promulgated pursuant thereto ("Environmental
22   Regulations"); (b) petroleum, including crude oil or any fraction thereof; (c) any asbestos or asbestos
23   containing material ("ACM"); (d) any polychlorinated biphenyl; (e) any radioactive material;
24   (f) radon gas; (g) urea formaldehyde; and (h) mold. Hazardous Materials shall not include the
25   foregoing materials to the extent such materials are in compliance with Environmental Regulations
26   and do not require monitoring by applicable governmental authorities; provided, however, that with
27   respect to the Southwest Quadrant only (as opposed to the Store and Support Systems), if a
28   Hazardous Material requires ongoing monitoring but is otherwise in compliance with
29   Environmental Regulations, such Hazardous Materials shall only be deemed to be "present" in the
30   Southwest Quadrant if and to the extent that the presence of such Hazardous Materials in the
31   Southwest Quadrant creates a public health and safety risk to Tenant or its employees or Invitees or
32   would otherwise have a material adverse effect on Tenant's business or use of the Store.
33   Notwithstanding the preceding sentence, ACM, lead paint and mold shall constitute Hazardous
34   Materials regardless of the condition and regardless of whether such ACM and/or lead paint and/or
35   mold is/are at levels in compliance with Environmental Regulations. Notwithstanding the
36   preceding sentence, Landlord's representations, covenants and obligations in this Section 11.4 with
37   respect to mold shall only apply to mold caused by Landlord or Landlord's agents or by any third
38   party or from sources exterior to the Store such as mold arising from water leakage from the exterior
39   of the Store into the Store as opposed to mold that is naturally occurring in the environment.
40   Tenant shall be responsible to remediate or remove mold caused by Tenant or Tenant's agents or
41   from sources inside the Store (unless caused by Landlord, Landlord's agents or third parties).

1        **11.4.2.**    <u>Landlord's Warranties and Representations</u>.  Landlord expressly represents and
2    warrants that:

3                (a)    The Store and any Support Systems will be free of Hazardous Material as
4    of the Delivery Date and throughout the Lease Term.

5                (b)    Landlord shall not use or knowingly permit any Hazardous Materials to be
6    used in the construction of the Store or in connection with the installation of any Utility system or
7    other facility which serves the Store (whether located in the Store or in other portions of the Southwest
8    Quadrant) including by way of example, but not by limitation, the interior of any partition or demising
9    walls, whether structural or otherwise, columns or beams, and all Utility lines, shafts and ducts, HVAC
10   or other equipment.  Such Utility systems and other facilities as hereinabove described, whether located
11   in the Store or other portions of the Building or the Southwest Quadrant, shall be collectively referred
12   to as "Support Systems."

13       **11.4.3.**    <u>Landlord's Responsibilities Prior to the Delivery Date to Tenant</u>.  On or prior to
14   the Delivery Date, Landlord shall have delivered to Tenant the Environmental Report as required by
15   clause (d) of the Article 2 - Delivery Date definition.  If, prior to the Delivery Date, Hazardous
16   Materials are found to be present in the Store, Support Systems and/or the Southwest Quadrant,
17   then Landlord, at its sole cost and expense, shall cause such Hazardous Materials to be removed
18   from the Store or Southwest Quadrant (hereinafter referred to as the "Abatement Work"), and
19   Landlord shall complete such removal prior to the Delivery Date.  Upon completion of the
20   Abatement Work, Landlord shall furnish Tenant evidence of removal of the Hazardous Material,
21   including copies of the final inspection report together with a clearance certificate or other
22   document of release or approval from a licensed environmental consultant, and if applicable from
23   other applicable governmental authority such as health department or Environmental Protection
24   Agency (a "Clearance Certificate") certifying that the Store, all Support Systems and other portions
25   of the Southwest Quadrant are free of Hazardous Materials.

26       **11.4.4.**    <u>Landlord's Responsibilities After the Delivery Date</u>.  If Hazardous Materials are
27   found to be present in the Store, Support Systems and/or the Southwest Quadrant at any time after
28   delivery of possession of the Store to Tenant, then Tenant shall have the right to vacate the Store, at
29   which time all Rent shall abate, unless the presence of such Hazardous Materials was a result of the
30   acts of Tenant or Tenant's agents, employees or contractors.  Landlord shall, at its sole cost and
31   expense, complete such Abatement Work as soon as practicable after the discovery of such
32   Hazardous Materials.  Upon completion of the Abatement Work, Landlord shall furnish Tenant
33   with a copy of the Clearance Certificate. During such Abatement Work, Tenant's fixturization or
34   construction period, if applicable (as provided for elsewhere in this Lease), shall be tolled until the
35   Abatement Work is complete and a Clearance Certificate is issued.  In the event Landlord is required
36   to undertake Abatement Work, it is understood and agreed that Landlord shall be responsible for
37   the cost of the replacement of all of Tenant's improvements and alterations damaged or destroyed
38   as a result of such Abatement Work.

39       **11.4.5.**    <u>Tenant's and Landlord's Rights</u>.

40                (a)    <u>Awareness of Hazardous Materials</u>.  If, at any time, Tenant becomes aware
41   of the presence of Hazardous Materials in the Store, Support Systems and/or the Southwest Quadrant,

1    Tenant may give Landlord written notice to remove and/or abate same and to restore the Store,
2    Support Systems and/or the Southwest Quadrant to a condition which is free of Hazardous Materials,
3    unless the presence of such Hazardous Materials was a result of the acts of Tenant or Tenant's agents,
4    employees or contractors.  If within thirty (30) days of receipt of such notice Landlord has not
5    completed the Abatement Work (which thirty (30) day period may be extended for such period of time
6    as may be reasonably required to perform the obligation (not to exceed three hundred sixty-five (365)
7    days), Tenant may either (i) terminate this Lease upon thirty (30) days' written notice to Landlord, or
8    (ii) undertake all necessary Abatement Work, including the hiring of any contractors and experts
9    Tenant reasonably deems necessary to effect and supervise the Abatement Work, and Landlord shall
10   reimburse Tenant for Tenant's costs and expenses incurred pursuant to this Section 11.4.5(a) within
11   thirty (30) days after Landlord's receipt of Tenant's paid invoices or documentation.  If, at any time,
12   Landlord becomes aware of the presence of Hazardous Materials in the Store, Support Systems and/or
13   the Southwest Quadrant, brought upon, introduced or generated by Tenant, its employees, contractors
14   or agents, Landlord may, at Tenant's sole cost and expense, perform the Abatement Work on the
15   Store, Support Systems and/or the Southwest Quadrant to a condition which is free of Hazardous
16   Materials.  Tenant shall reimburse Landlord for Landlord's costs and expenses incurred pursuant to
17   this Section 11.4.5(a) within thirty (30) days after Tenant's receipt of Landlord's paid invoices or
18   documentation.

19          (b)    Claim Against Landlord.  Tenant shall be entitled to claim from Landlord
20   all damages (but excluding consequential damages and lost profits) arising out of Landlord's breach of
21   any of the provisions of this Section 11.4.  Furthermore, if Landlord or Tenant effects Abatement
22   Work that was the other party's obligation to perform, the curing party shall be entitled to claim from
23   the defaulting party all costs and expenses associated therewith, including, but not limited to, (i) the
24   Abatement Work, (ii) disposal of Hazardous Materials, (iii) air quality and materials testing, (iv) related
25   consultants' and experts' fees, and (v) fines, fees or costs of any nature whatsoever charged or assessed
26   by any governmental authority or agency regulating and/or supervising such Abatement Work and/or
27   disposal of Hazardous Materials.

28          (c)    Reimbursement of Tenant.  Landlord shall promptly reimburse Tenant for
29   Tenant's costs and expenses incurred pursuant to Section 11.4.5(b) above within thirty (30) days after
30   Landlord's receipt of copies of Tenant's paid invoices or documentation.  In addition to any other
31   remedy which Tenant may have under this Lease, at law or in equity, in the event of Landlord's breach
32   of any of the provisions of this Section 11.4, Tenant shall be entitled (i) to claim from Landlord and to
33   deduct from Rent payable to Landlord hereunder all damages (but excluding consequential damages
34   and lost profits), expenses, costs, fees and fines incurred by it as a result of such breach, and (ii) to
35   extend the Term hereof by a period equal to the time elapsed from the date of Tenant's initial notice to
36   Landlord to the date that the Abatement Work is completed, and during such period, all Rent and
37   other charges payable hereunder shall abate.

38          **11.4.6.**    Landlord's Indemnity.  Excepting Hazardous Materials existing solely as a result
39   of the acts of Tenant or Tenant's agents, employees or contractors, Landlord hereby indemnifies
40   Tenant and its successors and assigns, and agrees to hold Tenant and its successors and assigns
41   harmless from and against any and all losses, liabilities, damages, injuries, penalties, fines, costs,
42   expenses and claims of any and every kind whatsoever, including, without limitation, attorneys' and
43   consultants' fees and costs, and the costs of cleanup, remediation, Abatement Work, paid, incurred
44   or suffered by, or asserted against, Tenant and/or its successors and/or assigns as a result of any

1    claim, demand or judicial or administrative action by any person or entity (including governmental
2    or private entities) for, with respect to, or as a direct or indirect result of, the presence on or under,
3    or the escape, seepage, leakage, spillage, discharge, emission, release or disposal on, under or from
4    the Southwest Quadrant or the improvements thereon of any Hazardous Material, or the breach of
5    any Environmental Regulations to which Landlord or any portion of the Southwest Quadrant is
6    subject. Landlord shall be solely responsible for and shall comply with all laws, rules, ordinances or
7    regulations of any governmental authority having jurisdiction over the Store and the Southwest
8    Quadrant with respect to the presence or removal of Hazardous Materials, unless the presence of
9    such Hazardous Materials is the result of the acts of Tenant or Tenant's agents, employees or
10   contractors.

11       **11.4.7.**   <u>Tenant's Indemnity</u>. Tenant hereby indemnifies Landlord and its successors and
12   assigns, and agrees to hold Landlord and its successors and assigns harmless from and against any
13   and all losses, liabilities, damages, injuries, penalties, fines, costs, expenses and claims of any and
14   every kind whatsoever, including, without limitation, attorneys' and consultants' fees and costs, and
15   the costs of cleanup, remediation, Abatement Work, paid, incurred or suffered by, or asserted
16   against, Landlord and/or its successors and/or assigns as a result of any claim, demand or judicial or
17   administrative action by any person or entity (including governmental or private entities) for, with
18   respect to, or as a direct or indirect result of, the presence on or under, or the escape, seepage,
19   leakage, spillage, discharge, emission, release or disposal on, under or from the Store of any
20   Hazardous Material, or the breach of any Environmental Regulations to which Tenant or any
21   portion of the Store is subject which are solely the result of the acts of Tenant or Tenant's agents,
22   employees or contractors. Tenant shall not cause any Hazardous Materials to be released or
23   discharged on, under or from the Store.

24       **11.4.8.**   <u>Survival</u>. The representations, warranties and indemnities contained in this
25   Article 11 shall survive the termination of this Lease.

26                           **12. ALTERATIONS**

27   **12.1.**   **Permitted Alterations.**

28       **12.1.1.**   Tenant may make non-structural alterations or improvements to the interior of
29   the Store (including interior roll down security grills), and signage on the exterior of the Store and
30   Tenant's signage on the Shopping Center pylon and monument signs in accordance with Article 24,
31   provided Tenant shall make all such alterations or improvements in a good and workmanlike
32   manner, and in conformity with all laws, ordinances and regulations of public authorities having
33   jurisdiction. Tenant shall not make any alterations to the exterior of the Store (other than any
34   interior roll down security grills), foundation, roof, or any structural portions of the Store without
35   first obtaining the written approval of Landlord, except as specified in Section 12.2. Such approval
36   by Landlord may not be unreasonably withheld, conditioned or delayed and shall be deemed granted
37   if Tenant is not notified in writing of a reasonable basis for withholding such approval within five
38   (5) days after a second (2nd) notice by Tenant requesting approval (which second (2nd) notice may
39   not be given any earlier than ten (10) days following Tenant's initial request for approval), which
40   second (2nd) notice must contain a legend in all caps and bold on the face thereof that states that
41   Landlord's failure to respond to such notice within five (5) days shall be deemed Landlord's

"Serramonte (Relo #396)"
Serramonte Center                     - 43 -                   12/23/15
Daly City, CA                                             FINAL
Store No. 1940
6061.1348/913576.6

1   approval of the alterations set forth therein, in order to be effective.  Any disapproval shall be
2   supported by a written statement of reasons and suggested revisions to the proposed work that, if
3   incorporated by Tenant, shall constitute the plans as approved without further review by Landlord.
4   Notwithstanding the foregoing, Tenant agrees that it shall not build any mezzanine in the Store
5   containing more than one thousand (1,000) square feet.  Subject to Section 12.1.2 following, all
6   alterations and improvements made to the Store by Landlord or Tenant (other than Store furniture,
7   trade fixtures, equipment and personal property installed by Tenant), shall, at the end of the Term,
8   become Landlord's property, and, at the end of the Term, shall remain in the Store without
9   compensation to Tenant, unless otherwise stated in this Lease to the contrary.  Tenant will use
10  commercially reasonable efforts to minimize any interference with the operations of any other
11  tenants of the Southwest Quadrant in performing any alterations.  Any Tenant alterations, including,
12  without limitation, any alterations made in the Store Expansion Area, shall be subject to the
13  construction limitations set forth in the Existing Leases, as more particularly set forth on **Exhibit M**
14  attached hereto (the "Existing Lease Construction Limitations").  Landlord represents that it has
15  obtained the consent of any tenants under any Existing Lease for Landlord's Work and Tenant's
16  Work, to the extent that Landlord's Work or Tenant's Work conflicts with any provisions of the
17  Existing Lease Construction Limitations.

18       **12.1.2.**     It is further agreed that upon termination of this Lease, Tenant may remove its
19  furniture, fixtures, equipment and personal property, and Landlord will accept the Store, with all
20  alterations made by Tenant, without any obligation upon Tenant to restore the Store to its former
21  condition.

22       **12.1.3.**     After the Delivery Date and during the remainder of the Term, Tenant shall have
23  the right, in Tenant's sole discretion, to expand the size of the Store by up to three thousand (3,000)
24  square feet of Leasable Floor Area within the "Expansion Area" designated on **Exhibit B**.  If
25  Tenant elects to expand the Store, Tenant shall notify Landlord of Tenant's election and Tenant's
26  notice shall specify the approximate size and configuration of Tenant's proposed Store expansion
27  area (the "Store Expansion Area") within the Expansion Area.  Following the completion of
28  construction of the Store Expansion Area, the terms of this Lease shall apply to the Store Expansion
29  Area, and Tenant shall be obligated to pay Reimbursements with respect to the Store Expansion
30  Area, but Tenant shall have no obligation to pay Minimum Rent with respect to the Store
31  Expansion Area.  Landlord acknowledges and agrees that Minimum Rent shall be based upon the
32  Store Agreed Size without inclusion of the Leasable Floor Area of the Store Expansion Area.
33  Tenant shall perform the Tenant's Work necessary to complete the build-out of the Store Expansion
34  Area at Tenant's sole cost and expense.

35       Landlord acknowledges that the Store Expansion Area, once constructed by Tenant, will not
36  be removed by Tenant at the termination of the Term.  Landlord agrees to cooperate with Tenant in
37  the submission of plans for the Store Expansion Area to the local public authorities.  Landlord or its
38  representative shall, if necessary to secure approval of the Store Expansion Area from the local
39  public authorities, attend any hearings, meetings or the like which may be necessary to secure such
40  approval.  Landlord shall have a reasonable right of approval over Tenant's plans for the Store
41  Expansion Area and Landlord shall provide Tenant with any comments Landlord may have on such
42  plans within twenty (20) days of receipt of such plans from Tenant.

1    Landlord represents to Tenant that the local parking ratios currently permit the construction
2    of the Store Expansion Area without any additional parking being added to the Shopping Center.
3    Landlord further agrees that it shall not permit the construction of the Shopping Center or the
4    construction of any additional buildings or building areas in the Shopping Center which, in the
5    aggregate, would prohibit the Store Expansion Area from being constructed due to insufficient
6    parking. Landlord shall not make or enter into any agreement with any other tenant or occupant of
7    the Shopping Center or with the owner or occupant of any adjacent property or with any other
8    person or entity, whereby such person or entity is granted any approval rights over the construction
9    or placement of the Store Expansion Area.

10    **12.2.    Communication Equipment.**

11    **12.2.1.**    At any time subsequent to the Delivery Date (or such earlier date that Tenant
12    occupies the Store pursuant to Section 5.4(c)), Tenant shall have the right to place upon the Store
13    (so long as such placement does not violate or otherwise compromise the roof warranty) one or
14    more so-called "satellite dish(es)" or other similar device(s) and/or one or more mounted cameras
15    and to replace, remove, and repair any such device(s), such as antenna, for the purpose of receiving
16    and sending radio, television, computer, telephone, or other communication signals (collectively, the
17    "Communication Equipment").    Any such installation shall be in accordance with plans and
18    specifications previously approved by Landlord. Such equipment shall be installed in a location or
19    locations substantially shielded from visibility from the principal frontages of the Shopping Center.
20    Tenant shall be responsible for any damage to the Store caused by installing, removing, replacing, or
21    repairing any such device(s) and in connection therewith Tenant shall maintain the area where roof
22    penetrations are made while the device(s) is present, and repair any damage to the roof caused by
23    the making of the roof penetrations, including, but not limited to, the repair of the roof penetrations
24    upon the removal of the device(s), all at Tenant's sole cost and expense.  The device(s) shall be
25    solely for Tenant's own communication needs in the Store and not for the resale of communications
26    services to third parties.  Tenant will reasonably cooperate with Landlord and take commercially
27    reasonable efforts to prevent Tenant's operation of the device(s) and related equipment from
28    interfering with the transmitting and receiving equipment of other tenants or occupants of the
29    Shopping Center, or with Landlord's ability to obtain access to the roof. This Section 12.2 shall be
30    subject to Tenant's indemnity set forth in Section 14.1 of this Lease.

31    **12.2.2.**    In the event Landlord desires to perform roof repairs and/or roof replacements
32    to the Store and/or the Building or its rooftop equipment in which the Store is located (the "Roof
33    Repairs"), Landlord shall give Tenant at least twenty (20) days' prior written notice of the date
34    Landlord intends to commence such Roof Repairs. Tenant shall, within twenty (20) days following
35    receipt of such notice, undertake such measures as it deems suitable to protect its Communication
36    Equipment from interference by Landlord, its agents, contractors or employees, in the course of any
37    Roof Repairs. Nothing herein shall relieve Landlord of its obligation not to cause any interference
38    with, or damage to, the Communication Equipment, and Landlord shall remain fully responsible for
39    any loss, cost, or claim resulting from any damage to any part of the Communication Equipment
40    arising as a result of the Roof Repairs.

## 13. NON-DISTURBANCE AND SUBORDINATION/
## ESTOPPEL CERTIFICATES

**13.1.    Non-Disturbance and Subordination.**

**13.1.1.**    <u>Existing Loans/Master Lease(s)</u>.  Landlord warrants and represents that there is neither a lessor whose interest in the Shopping Center is paramount to Landlord's, nor a loan encumbering the Store or the Shopping Center as of the Effective Date.  If Landlord breaches said representation, Tenant may terminate this Lease by written notice to Landlord at any time prior to Tenant's receipt of an executed agreement ("Non-Disturbance Agreement"), in the form set forth in **Exhibit F** from any lender, or an executed agreement ("Sublease Non-Disturbance Agreement") from any lessor whose interest in the Shopping Center is paramount to Landlord's, if any, within thirty (30) days after the Effective Date, in the form set forth in **Exhibit F-1**, or if Tenant has not terminated this Lease, Rent shall abate pending delivery of said Non-Disturbance Agreement or Sublease Non-Disturbance Agreement, as applicable.

**13.1.2.**    <u>Future Loans</u>.  Tenant shall, within twenty (20) Business Days after Tenant's receipt of Landlord's request, subordinate this Lease in the future to any first mortgage or deed of trust placed by Landlord upon the Store, the Shopping Center or the Building, with an insurance company, bank or any other lender which customarily provides financing for shopping centers, provided that such lender executes a Non-Disturbance Agreement substantially in the form set forth in **Exhibit F.**

**13.2.    Estoppel Certificates.**

Within twenty (20) Business Days after the last to occur of (a) receipt of request therefor, and (b) receipt of the fee described in Section 13.3 below, either party shall deliver to the other a written statement ("Estoppel Certificate") acknowledging (i) the Commencement Date and termination date of this Lease, (ii) that this Lease is in full force and effect (if true), (iii) that this Lease has not been modified (or if it has, stating the dates of such modifications), and (iv) any such other pertinent information which is customary to supply to such a requesting party for purposes of financing or sale (in the case of Landlord's request) or financing, assignment or sublease, or sale (in the case of Tenant's request).  In no event shall Tenant be estopped, as a result of Tenant's execution of such certificate, as between Tenant and Landlord or Landlord's affiliates.  In no event shall Landlord be estopped, as a result of Landlord's execution of such certificate, as between Landlord and Tenant or Tenant's affiliates.

**13.3.    Processing Fees for Non-Disturbance Agreements and Estoppel Certificates.**

At the time of each request for a Non-Disturbance Agreement under Section 13.1.2 or an Estoppel Certificate under Section 13.2, the requesting party shall pay to the other, to defray the expenses of processing, the sum of One Thousand Dollars ($1,000) for each such Non-Disturbance Agreement or Estoppel Certificate, which sum shall be increased from time to time in direct proportion to increases in Minimum Rent over the amount of Minimum Rent as of the Commencement Date.

1          ## 14. INDEMNIFICATION

2     **14.1.    Tenant Indemnity.**

3          Tenant agrees to hold Landlord harmless from and indemnify and defend Landlord against
4     any and all injury, loss, damage, liability (or any claims related to the foregoing), costs or expenses
5     (including, without limitation, attorneys' fees, reasonable investigation and discovery costs), of
6     whatever nature, to any person or property caused or claimed to be caused by or resulting from any
7     occurrence within the Store on and after the Delivery Date (or such earlier date that Tenant
8     occupies the Store pursuant to Section 5.4(c)) and during the Term, provided nothing contained
9     herein shall require Tenant to indemnify Landlord against matters resulting from the negligence or
10    willful acts or omissions of Landlord or Landlord's employees, agents, or contractors, except to the
11    extent Tenant has waived a claim against Landlord pursuant to Section 9.4 hereof.

12    **14.2.    Landlord Indemnity.**

13         Landlord agrees to hold Tenant harmless from and indemnify and defend Tenant against any
14    and all injury, loss, damage, liability (or any claims related to the foregoing), costs or expenses
15    (including, without limitation, attorneys' fees, reasonable investigation and discovery costs), of
16    whatever nature, to any person or property caused or claimed to be caused by or resulting from any
17    occurrence within the Common Area, or any portion of the Shopping Center, on and after the
18    Effective Date of this Lease and during the Term, provided nothing contained herein shall require
19    Landlord to indemnify Tenant against matters resulting from the negligence or willful acts or
20    omissions of Tenant or Tenant's employees, agents or contractors, except to the extent Landlord
21    has waived a claim against Tenant pursuant to Section 9.4 hereof.

22         ## 15. USE

23    **15.1.    Tenant's Business.**

24         Tenant's intended use of the Store shall be as a full line department store including, at its
25    option, the sale of soft goods merchandise, including men's, women's and children's apparel, shoes,
26    accessories, such as jewelry and cosmetics, health and beauty aids and related sundries, domestics
27    and linens, housewares, art, pictures, posters, frames, artificial flora, office supplies, sporting goods,
28    furniture and lamps, window and floor coverings, electronics, prerecorded audio and video
29    merchandise and electronic games software and technological evolutions thereof, books, toys, party
30    goods, pet supplies, luggage, packaged foods, including whole bean and ground coffee and packaged
31    teas and tea leaves, and such other items as are sold in Tenant's similarly merchandised stores, all
32    except as may be limited by any Exclusive Uses set forth in **Exhibit H**, as the same may be
33    modified by the waiver from Dick's Sporting Goods attached hereto as **Exhibit H-1** (the "Dick's
34    Sporting Goods Waiver").

35    **15.2.    Operation.**

36         Notwithstanding any provision in this Lease to the contrary, it is expressly acknowledged by
37    Landlord that this Lease contains no express or implied covenant for Tenant to conduct business in
38    the Store, continuously or otherwise, or (when conducting business in the Store) to operate during

1  any particular hours or to conduct its business in any particular manner. Tenant has the sole right in
2  its unrestricted discretion to decide whether or not to operate in the Store and in what manner to
3  conduct operations, if any, and if the Store has more than one (1) customer door ("Excess Customer
4  Doors"), Tenant may, at its option, close any such Excess Customer Doors and operate with only
5  one (1) customer door.

6  **15.3.  Protection.**

7  (a)  Without the prior written consent of Tenant, which consent may be withheld in the
8  absolute and sole discretion of Tenant, Landlord shall not lease space to nor allow any other tenant
9  or occupant in the Southwest Quadrant to: (i) use more than fifteen thousand (15,000) square feet of
10  Leasable Floor Area of its premises for the primary purpose of the Off Price Sale (as hereinafter
11  defined) of merchandise, or (ii) use in excess of one thousand five hundred (1,500) square feet of
12  Leasable Floor Area of its premises primarily for the rental or sale of prerecorded audio or video
13  merchandise or electronic games software and technological evolutions thereof. For purposes of
14  this Section 15.3, "Off Price Sale" shall mean the retail sale of merchandise on an everyday basis at
15  prices reduced from those charged by full price retailers, such as full price department stores;
16  provided, however, this definition shall not prohibit sales events by a retailer at a price discounted
17  from that retailer's everyday price. (As of the Effective Date, examples of Off Price Sale retailers
18  include such retailers as T.J. Maxx, Marshalls, Fallas Paredes, Nordstrom Rack, Factory 2U,
19  Burlington Coat, Steinmart, Filene's Basement, Gordmans and Beall's Outlet.)

20  (b)  If any of the provisions of Section 15.3(a) above is violated ("Protection Violation"),
21  commencing on the first day of the Protection Violation and continuing throughout the period of
22  the Protection Violation, Tenant, in lieu of all other remedies available at law or in equity (except for
23  injunctive relief), shall have the ongoing right, exercisable by written notice to Landlord, either to
24  terminate this Lease or to pay Substitute Rent within fifteen (15) days after the close of each
25  calendar month. The parties agree that the monetary damages to be suffered by Tenant as a result
26  of a breach by Landlord (or Landlord's tenant(s)) of the provisions of this Section 15.3 are difficult
27  to ascertain and that the payment of Substitute Rent, after negotiation, constitutes the best estimate
28  by the parties of the amount of such damage, and Tenant's payment of Substitute Rent shall
29  therefore be in lieu of damages. If Tenant elects to terminate this Lease as provided in this Section
30  15.3, this Lease shall terminate on a date indicated by Tenant in its notice of termination, which in
31  no event shall be sooner than thirty (30) nor later than ninety (90) days after the date of Tenant's
32  notice of termination. In the event of termination, Landlord shall be obligated to pay Tenant for the
33  Unamortized Cost of Tenant's leasehold improvements in the Store in an amount not to exceed
34  One Hundred Fifty Thousand Dollars ($150,000), which costs Tenant agrees to specify in its notice
35  of termination. If Tenant elects to pay Substitute Rent, (i) such payment of Substitute Rent shall be
36  retroactive to the date any such Protection Violation commenced, and Tenant shall deduct any
37  overpayments of Rent from Rent coming due under this Lease, and (ii) at such time as all such
38  Protection Violations cease (the "Cure Date"), Rent shall resume at the rate which would have
39  pertained at the Cure Date had the Protection Violation not occurred. The provisions of this
40  Section 15.3 shall apply to any subsequent Protection Violation. Notwithstanding the foregoing, if a
41  Protection Violation is not due to Landlord's act or omission (but is due to the act of another tenant
42  or occupant of the Shopping Center) and provided that Landlord diligently pursues all rights and
43  remedies available to Landlord to cause such a Protection Violation to cease (including the
44  commencement of litigation), then in such event, Tenant shall defer exercising its right to pay

1    Substitute Rent for a period of not to exceed one hundred eighty (180) days and shall defer
2    exercising its right to terminate this Lease for a period of one (1) year after the date the Protection
3    Violation commences.  If Landlord fails to cure the Protection Violation prior to the expiration of
4    the applicable one hundred eighty (180) day or one (1) year period, then Tenant shall be permitted
5    to immediately exercise its remedies hereunder.

6          (c)    The restrictions of this Section 15.3 shall not apply to the Existing Tenants set forth
7    on **Exhibit K** attached hereto who, in accordance with the terms of existing leases or occupancy
8    agreements in effect on the Effective Date, including any extensions, assignments or subleases
9    thereof, cannot be prohibited from so operating.  Landlord covenants and agrees that if Landlord
10   has the right to deny its consent to a change in use of the premises occupied by any such Existing
11   Tenant, Landlord shall not consent to a change in use of the premises which violates the restrictions
12   of this Section 15.3.

13   **15.4.   Exclusive Uses.**

14         Subject to the Dick's Sporting Goods Waiver, Tenant shall not use the Store for any use or
15   use restriction which is listed on **Exhibit H** (the "Exclusive Use"), as modified by the Dick's
16   Sporting Goods Waiver attached hereto as **Exhibit H-1**, so long as the Exclusive Use is in existence
17   in the Shopping Center.  Any exclusive granted by Landlord which is not listed on **Exhibit H** (the
18   "Unauthorized Exclusive") shall be null and void as against Tenant and any assignee or sublessee of
19   Tenant.  Landlord shall indemnify, defend and hold harmless Tenant and any assignee or sublessee
20   against any and all claims by any other occupant of the Shopping Center that Tenant and/or an
21   assignee or sublessee has violated an Unauthorized Exclusive.  With respect to the Exclusive Use in
22   favor of Dick's Sporting Goods set forth on **Exhibit H**, Tenant has received the Dick's Sporting
23   Goods Waiver attached hereto as **Exhibit H-1**.

24   **15.5.   Other Exclusives Not Binding on Tenant.**

25         Except for those Exclusive Uses specifically set forth in **Exhibit H**, as modified by the
26   Dick's Sporting Goods Waiver attached hereto as **Exhibit H-1**, neither Tenant nor any Related
27   Entity nor any of its subtenants, licensees, assignees, or other Transferees, or the use of the Store
28   shall be subject to any exclusives or restrictions granted to or for the benefit of any other tenants or
29   occupants in the Shopping Center or adjacent parcel owned by Landlord.  Except for those
30   Exclusive Uses specifically set forth in **Exhibit H**, Landlord agrees that it has not entered into a
31   lease or other occupancy agreement with nor shall it lease to or permit occupancy in the Shopping
32   Center by any tenant, subtenant, assignee or other occupant, which has imposed or proposes to
33   impose a restriction on Tenant or Tenant's business.  Landlord shall hold Tenant harmless from any
34   claims or damages suffered or claimed to be suffered by Tenant as a result of any breach or alleged
35   breach of Landlord's representation and warranty set forth in this Section 15.5.

36   **15.6.   Go Dark.**

37         (a)    As specified in Section 15.2, Tenant is not required to operate its Store or otherwise
38   conduct retail operations within the Store.  However, if Tenant discontinues retail operations in the
39   Store (other than an Exempted Discontinuance of Retail Operations as hereinafter defined) for a
40   period in excess of one hundred eighty (180) consecutive calendar days (such period in excess of one

"Serramonte (Relo #396)"
Serramonte Center               - 49 -                    12/23/15
Daly City, CA                                       FINAL
Store No. 1940
6061.1348/913576.6

1   hundred eighty (180) consecutive calendar days, the "Go Dark Period"), Landlord shall have the
2   ongoing right during the continuance of a Go Dark Period, to elect to terminate this Lease by notifying
3   Tenant thereof (the "Go Dark Termination Notice"), in which event this Lease shall terminate as to all
4   obligations thereafter accruing thirty (30) days after receipt by Tenant of the Go Dark Termination
5   Notice ("Termination Date"). In the event of Lease termination pursuant to this Section 15.6, and
6   provided that Tenant has timely vacated the Store in accordance with the terms of this Lease, Landlord
7   shall reimburse Tenant for the Unamortized Cost of Tenant's leasehold improvements to the Store in
8   an amount not to exceed Five Hundred Thousand Dollars ($500,000) within thirty (30) days after
9   receipt from Tenant of a statement of the Unamortized Cost, which statement shall be delivered to
10  Landlord within fifteen (15) days after Tenant's receipt of the Go Dark Termination Notice. Landlord
11  may have access to Tenant's relevant books and records for a period of ten (10) days after receipt of
12  Tenant's statement of Unamortized Costs to verify the amount thereof. Landlord's obligation for
13  reimbursement shall survive the termination of this Lease.

14          (b)     The following shall constitute Exempted Discontinuances of Retail Operations: (i) any
15  discontinuance occasioned by an event of Force Majeure (as defined in this Lease); (ii) the temporary
16  cessation of retail operations in connection with an assignment or sublet (provided that the assignee or
17  subtenant commences retail operations within one (1) year after Tenant discontinues such operations);
18  (iii) a temporary discontinuance in connection with remodeling (not to exceed six (6) months); or
19  (iv) any other temporary discontinuance, provided that such other temporary discontinuance does not
20  exceed sixty (60) days in length.

21          (c)     Notwithstanding the foregoing, Tenant may notify Landlord at any time within fifteen
22  (15) days after receipt of Landlord's Go Dark Termination Notice that (i) Tenant intends to resume
23  retail operations, or (ii) Tenant is in negotiation with another retailer for an assignment of this Lease or
24  a sublease of the Store (the "Go Dark Withdrawal Notice"). If Tenant so notifies Landlord, and if
25  within one hundred twenty (120) days thereafter Tenant either resumes retail operations or enters into
26  such assignment or sublease, then Landlord's Go Dark Termination Notice shall automatically become
27  void and of no force or effect (a "Go Dark Withdrawal Event"). If a Go Dark Withdrawal Event does
28  not timely occur, this Lease shall terminate on the later of (A) the Termination Date, or (B) the one
29  hundred twenty-first (121st) day after Tenant's Go Dark Withdrawal Notice.

30                                      16. SURRENDER

31  **16.1.   Condition of Store.**

32          Upon the expiration or earlier termination of this Lease, Tenant shall surrender possession
33  of the Store to Landlord in broom clean condition, and in good order and repair, reasonable wear
34  and tear and damage by Casualty or condemnation excepted, and with all of Tenant's alterations and
35  leasehold improvements in place. Tenant may remove from the Store Tenant's furniture, fixtures,
36  equipment and personal property. However, Tenant shall have no obligation to remove from the
37  Store or to demolish any alterations or leasehold improvements made to the Store nor to restore the
38  Store to its condition prior to Tenant's use and occupancy thereof.

1    **16.2.    Continuance of Possession.**

2    If Tenant shall remain in possession of the Store or any portion thereof after the expiration
3    of the Term, then in the absence of an agreement in writing between the parties, Tenant shall be
4    deemed a tenant at sufferance.  Landlord and Tenant recognize and agree that the damage to
5    Landlord resulting from any failure by Tenant timely to surrender possession of the Store as
6    aforesaid will exceed the amount of the Minimum Rent theretofore payable hereunder, and accurate
7    measurement will be impossible. Tenant therefore agrees that if Tenant or anyone claiming under
8    Tenant remains in possession of the Store after the expiration of the Lease Term, during such
9    holding over, Minimum Rent shall be one hundred twenty-five percent (125%) of the rate which
10    was in effect immediately prior to the expiration of the Term of this Lease.

11                              17. LANDLORD'S COVENANTS

12    **17.1.    Landlord's Warranty.**

13    Landlord warrants to Tenant that to the best of its knowledge (a) Tenant, while operating in
14    the Store for the use stated in Section 15.1 (subject to any Exclusive Uses set forth on **Exhibit H**
15    (as modified by the Dick's Sporting Goods Waiver attached hereto as **Exhibit H-1**)) will not be in
16    violation of any exclusives, restrictions or other agreements which Landlord may have with other
17    lessees, lenders, governmental authorities or any other parties, and (b) the use stated in Section 15.1
18    is not a violation of any restrictions imposed by any governmental body or authority.  Landlord shall
19    hold Tenant harmless from any claims or damages suffered or claimed to be suffered by Tenant as a
20    result of any breach or alleged breach of Landlord's warranties.

21    **17.2.    Landlord's Title.**

22    Landlord has provided Tenant with the Title Report.  Landlord represents and warrants that:
23    (a) Landlord has lawful title to the Shopping Center and full right to make and execute this Lease;
24    (b) at the time of recording of the Memorandum of Lease, the Shopping Center will be free from all
25    other liens, title exceptions and other encumbrances of any kind whatsoever, except those set forth
26    in **Exhibit I** attached hereto and incorporated by this reference ("Permitted Title Exceptions");
27    (c) none of the Permitted Title Exceptions, including, but not limited to, any easements (i) adversely
28    affect Tenant's access to, or use of the Store, or (ii) alter the boundaries or the configuration of the
29    Common Areas, including, but not limited to, the methods of ingress and egress, from that depicted
30    on the Site Plan; and (d) no other party is required to consent to this Lease as a condition to the
31    effectiveness of this Lease or any of the provisions hereof, including, but not limited to, the consent
32    of any lender or ground lessor relating to the Shopping Center.

33    **17.3.    Remedies.**

34    In the event of any violation of any of the covenants made by Landlord in this Article 17,
35    Tenant may give Landlord notice of the violation.  If Landlord fails to cure the violation within
36    thirty (30) days of such notice, and if such violation has a material and adverse effect upon Tenant's
37    business operations in the Store or Tenant's interest in this Lease, Tenant may exercise its remedies
38    available at law and in equity, including the right to terminate this Lease by written notice to
39    Landlord.

## 18. QUIET ENJOYMENT

Landlord represents and warrants that it has full authority to execute and perform this Lease and to grant the subject leasehold estate to Tenant, and that Tenant, provided Tenant is not in default beyond any applicable notice and cure periods, shall peaceably and quietly have, hold and enjoy the Store with all appurtenances without any manner of hindrance or interference with its quiet enjoyment, possession and use.

## 19. ASSIGNMENT/SUBLETTING

**19.1.   General.**

Tenant shall have the right to assign this Lease, or sublet the Store, or any portion thereof (a "Transfer" and the assignee or sublessee thereof is herein a "Transferee") without the prior written consent of Landlord, provided that Tenant shall not be permitted to Transfer less than twenty-five percent (25%) of the Store without the prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed.   Tenant shall have the right to operate departments within the Store by means of subleases, licenses or concession agreements.  Except in the event of an assignment or other transfer of this Lease or a sublease to a "Related Entity," Tenant agrees to notify Landlord in writing within thirty (30) days following any Transfer specifying the Transferee, its address, and contact person.

**19.2.   Related Entity.**

An assignment or other transfer of this Lease or any sublease of all or any portion of the Store to a "Related Entity" shall not constitute a Transfer under the terms of this Lease.  The term "Related Entity" means:  a corporation or other entity with which Tenant may merge or consolidate; or to which Tenant sells at least ten (10) stores; or any parent, affiliate or subsidiary of Tenant; or an affiliate or subsidiary of Tenant's parent.

**19.3.   Stock.**

The sale of stock by Tenant or by any shareholder of Tenant shall not constitute a Transfer under the terms of this Lease.

**19.4.   Release of Liability.**

In the event of a Transfer of this Lease, Tenant and Tenant's guarantor, if any, shall remain liable; provided, however, if Tenant's assignee (or any subsequent assignee) has at the time of the Transfer, or at any time after the Transfer attains, a "Net Worth" (as hereinafter defined) of at least Fifty Million Dollars ($50,000,000), Tenant and Tenant's guarantor, if any, shall thereafter and forever be released from further liability under this Lease.  "Net Worth" shall mean the book tangible net worth of the assignee determined from the audited statement of the most recent fiscal year balance sheet immediately preceding the Transfer.

"Serramonte (Relo #396)"
Serramonte Center
Daly City, CA
Store No. 1940
6061.1348/913576.6

- 52 -

12/23/15
FINAL

1  **19.5.  Landlord Notice to Assignee.**

2      Landlord, when giving notice to any Transferee of this Lease related to any default
3  hereunder, shall simultaneously give notice thereof to Tenant, who may cure said default at any time
4  during the notice period; and in the event that Tenant shall cure the default, Tenant shall be
5  subrogated to all rights and remedies of Landlord as against the Transferee related to the default and
6  shall have the right at its election to recover possession of the Store from the defaulting Transferee,
7  to cancel and revoke the Transfer, and to be restored by Landlord to its leasehold estate hereunder.

8  **19.6.  Intentionally Deleted.**

9              **20. DEFAULTS/DISPUTE RESOLUTION/ATTORNEYS' FEES**

10  **20.1.  Defaults.**

11          **20.1.1.  Tenant's Default.**

12          (a)    Breach.  The occurrence of either of the following shall constitute a default
13  by Tenant pursuant to this Lease:  (i) a failure by Tenant to pay Rent within seven (7) Business Days
14  after Tenant's receipt of written notice from Landlord specifying such failure; or (ii) a failure by Tenant
15  to perform obligations pursuant to this Lease, other than as specified in (i) above, within thirty (30)
16  days after Tenant's receipt of written notice from Landlord specifying such failure; however, such thirty
17  (30) day period may be extended for such period of time as may be reasonably required to perform the
18  obligation provided:  (A) such obligation cannot be reasonably performed within thirty (30) days after
19  such notice; (B) Tenant commences efforts to cure the default within thirty (30) days after receipt of
20  Landlord's  notice of default; and (C) Tenant diligently pursues completion of the obligation.  Tenant's
21  bona fide withholding, deducting or offsetting of amounts in dispute, or failure to pay Rent (or the
22  disputed portion thereof) pursuant to a bona fide dispute between Landlord and Tenant with respect
23  to with respect to the amount due for any charges claimed by a party to be due, or with respect to
24  Tenant's payment of Substitute Rent or Tenant's non-payment of Rent pursuant to Tenant's right to
25  pay Substitute Rent or to defer, withhold, deduct or offset Rent in accordance with this Lease,
26  including, but not limited to, pursuant to Section 6.1.3(f), Section 11.2 and Section 20.1.2(b), shall not
27  be deemed a default by Tenant under the provisions of this Lease.

28          (b)    Insolvency.  If Tenant makes an assignment for the benefit of creditors, or
29  if any proceedings are commenced under the provisions of the Bankruptcy Act whereby Tenant seeks
30  to be, or would be, discharged of its debts, or the payment of its debts are sought to be delayed, this
31  Lease shall be governed by the provisions of the Federal Bankruptcy Act.

32          (c)    Prohibition Against Landlord Accelerating Rent.  Except as provided in
33  Section 20.1.1(f) below, and whether or not Landlord terminates this Lease, Tenant shall have no
34  obligation to pay Rent until the date it would otherwise be due in the absence of Tenant's default.
35  Landlord shall have no right to accelerate Rent which would become due except as provided hereafter.

36          (d)    Personal Property Waiver.  Landlord waives such liens, if any, to which it
37  may have a right with respect to the merchandise, furniture, trade fixtures and other personal property

1  of Tenant located on or about the Store, and Landlord shall from time to time execute such documents
2  as Tenant may reasonably request to acknowledge such waiver.

3          (e)    Landlord's Remedy for Improper Offset.  Certain provisions of this Lease
4  grant to Tenant the right to offset specified amounts against, or to deduct such amounts from, Rent or
5  other charges payable under this Lease.  The exercise by Tenant of any such right or Tenant's
6  withholding of any disputed amount of Rent or other sum shall not constitute a default under this
7  Lease by Tenant unless and until (i) an arbitrator per Section 20.2.3 or a court, if the matter is litigated,
8  shall determine by means of a final award that such right to offset, deduct, or refusal to pay has been
9  exercised improperly by Tenant, and (ii) following the entry of such award, and within thirty (30) days
10  after receipt by Tenant from Landlord of a bill in the amount determined by such award to have been
11  improperly offset, deducted, or withheld by Tenant, Tenant shall fail to pay such amount to Landlord,
12  together with interest thereon at the Legal Rate retroactive to the date that the offset or deduction was
13  taken by Tenant.

14          (f)    Landlord Remedies Upon Tenant Default.  Upon the occurrence of any
15  default by Tenant pursuant to the terms of Section 20.1.1(a), above, Landlord shall have, in addition to
16  any other remedies available to Landlord at law or in equity (all of which remedies shall be distinct,
17  separate and cumulative), the option to pursue any one or more of the following remedies, each and all
18  of which shall be cumulative and nonexclusive.

19              (i)    Terminate this Lease, in which event Tenant shall immediately
20  surrender the Store to Landlord, and if Tenant fails to do so, Landlord may, without prejudice to any
21  other remedy which it may have for possession or arrearages in rent, lawfully enter upon and take
22  possession of the Store and lawfully expel or remove Tenant and any other person who may be
23  occupying the Store or any part thereof, without being liable for prosecution or any claim or damages
24  therefor; and Landlord may recover from Tenant the following:

25                  (A)    The worth at the time of award of any unpaid rent which
26  has been earned at the time of such termination; plus

27                  (B)    The worth at the time of award of the amount by which
28  the unpaid rent which would have been earned after termination until the time of award exceeds the
29  amount of such rental loss that Tenant proves could have been reasonably avoided; plus

30                  (C)    The worth at the time of award of the amount by which
31  the unpaid rent for the balance of the Lease Term after the time of award exceeds the amount of such
32  rental loss that Tenant proves could have been reasonably avoided; plus

33                  (D)    Any other amount necessary to compensate Landlord for
34  all the detriment proximately caused by Tenant's failure to perform its obligations under this Lease or
35  which in the ordinary course of things would be likely to result therefrom, specifically including, but
36  not limited to, brokerage commissions and advertising expenses incurred, expenses of remodeling the
37  Store or any portion thereof for a new tenant, whether for the same or a different use, and any
38  commercially reasonable special concessions made to obtain a new tenant; and

(E)    At Landlord's election, such other amounts in addition to or in lieu of the foregoing as may be permitted from time to time by applicable law.

The term "rent" as used in this Section 20.1.1(f) shall be deemed to be and to mean all sums of every nature required to be paid by Tenant pursuant to the terms of this Lease, whether to Landlord or to others. As used in Sections 20.1.1(f)(i)(A) and (B), above, the "worth at the time of award" shall be computed by allowing interest at the Legal Rate. As used in Section 20.1.1(f)(i)(C), above, the "worth at the time of award" shall be computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of award plus one percent (1%).

(ii)    Landlord shall have the remedy described in California Civil Code § 1951.4 (lessor may continue lease in effect after lessee's breach and abandonment and recover rent as it becomes due, if lessee has the right to sublet or assign, subject only to reasonable limitations). Accordingly, if Landlord does not elect to terminate this Lease on account of any default by Tenant, Landlord may, from time to time, without terminating this Lease, enforce all of its rights and remedies under this Lease, including the right to recover all rent as it becomes due.

(iii)    Landlord shall at all times have the rights and remedies (which shall be cumulative with each other and cumulative and in addition to those rights and remedies available under Sections 20.1.1(f)(i) and (ii), above, or any law or other provision of this Lease), without prior demand or notice except as required by applicable law, to seek any declaratory, injunctive or other equitable relief, and specifically enforce this Lease, or restrain or enjoin a violation or breach of any provisions hereof.

(iv)    In the event that Landlord elects to terminate this Lease on account of any default by Tenant, as set forth in this Section 20.1.1(f), Landlord shall have the right to terminate any and all subleases, licenses, concessions or other consensual arrangements for possession entered into by Tenant and affecting the Store or may, in Landlord's sole discretion, succeed to Tenant's interest in such subleases, licenses, concessions or arrangements. In the event of Landlord's election to succeed to Tenant's interest in any such subleases, licenses, concessions or arrangements, Tenant shall, as of the date of notice by Landlord of such election, have no further right to or interest in the rent or other consideration receivable thereunder.

(v)    No re-entry or repossession, repairs, maintenance, changes, alterations and additions, reletting, appointment of a receiver to protect Landlord's interest hereunder, or any other action or omission by Landlord shall be construed as an election by Landlord to terminate this Lease or Tenant's right to possession, or to accept a surrender of the Store, nor shall same operate to release Tenant in whole or in part from any of Tenant's obligations hereunder, unless express written notice of such intention is sent by Landlord to Tenant.

(g)    Inaccurate Default Notices.    If during the Term, either party sends the other more than two (2) default notices which are determined to be false or inaccurate, then thereafter the following procedures shall apply.  If either party sends the other a subsequent default notice which the receiving party contends is false or inaccurate, the receiving party may send written notice to the sending party, objecting to the sending party's default notice and setting forth the basis for the receiving party's objection ("Objection Notice").  If the sending party does not rescind its default notice by written notice to the receiving party within five (5) Business Days following receipt of the

"Serramonte (Relo #396)"
Serramonte Center
Daly City, CA
Store No. 1940
6061.1348/913576.6

- 55 -

12/23/15
FINAL

1    Objection Notice, then, if the sending party's subsequent default notice is determined to be false or
2    inaccurate, then the sending party shall be obligated to pay the receiving party a One Thousand Dollar
3    ($1,000) processing fee to defray the receiving party's costs incurred in processing and responding to
4    the sending party's default notice, whether or not litigation or an Alternative Dispute Resolution
5    proceeding is commenced in connection with the sending party's default notice. The sending party
6    shall reimburse the receiving party such processing fee within ten (10) days following receipt of the
7    receiving party's invoice therefor. If the sending party is Landlord and Landlord fails to reimburse
8    Tenant within such ten (10) day period, Tenant may deduct the processing fee from the Rent due
9    under this Lease. In such event, the sending party and the receiving party shall each adjust their
10    accounting records to reflect the payment of the processing fee to the receiving party. Nothing in this
11    Section 20.1.1(g) shall limit the receiving party's right to recover its attorneys' fees and costs under any
12    other provision of this Lease, including, but not limited to, the provisions of Section 20.4.

13        20.1.2.    Landlord's Default.

14                (a)    Breach. Except for a violation by Landlord of express provisions of this
15    Lease which require specific notice provisions which are shorter or longer than thirty (30) days (which
16    notice provisions shall control over the provisions of this Section 20.1.2(a)), the occurrence of the
17    following shall constitute a default by Landlord pursuant to this Lease: Landlord's failure to perform
18    any of its obligations under this Lease, which default continues for a period of more than thirty (30)
19    days after receipt of written notice from Tenant specifying such default; however, such thirty (30) day
20    period may be extended for such period of time as may be reasonably required to perform the
21    obligation, provided: (i) such obligation cannot be reasonably performed within thirty (30) days after
22    such notice; (ii) Landlord commences efforts to cure the default within thirty (30) days after receipt of
23    Tenant's notice of default; and (iii) Landlord diligently pursues completion of the obligation.

24                (b)    Remedies.

25                    (i)    General. In the event of Landlord's default beyond any applicable
26    notice and cure period, in addition to availing itself of any other remedies available at law and in equity,
27    Tenant may, at its election, upon written notice to Landlord, terminate this Lease, or may incur any
28    expense necessary to perform the obligation of Landlord specified in such notice and deduct such
29    expense from the Rent or other charges coming due.

30                    (ii)    Interruption of Utility Service. In addition to the remedies
31    described above, in the event Tenant is prevented from using the Store, or any material portion
32    thereof, to conduct its normal retail operations for a period exceeding three (3) consecutive Business
33    Days as a result of the interruption of any Utility service ("Utility Interruption") to the Store which is
34    required to be provided by the terms of this Lease, then the provisions of this Section 20.1.2(b)(ii) shall
35    apply. Tenant shall promptly deliver to Landlord notice of the interruption (the "Interruption Notice")
36    of such condition. If the Utility Interruption was caused by Landlord, Landlord shall have five (5) days
37    after receipt of the Interruption Notice to cure the Utility Interruption caused by Landlord. If
38    Landlord fails to cure the Utility Interruption caused by Landlord within five (5) days after delivery to it
39    of the Interruption Notice, then Rent applicable to the Store shall be abated from the date of the
40    Interruption Notice until the date when such failure is cured, unless such interruption was caused by
41    Tenant's negligence or misconduct. If the Utility Interruption was not caused by Landlord, Landlord
42    shall have thirty (30) days after receipt of the Interruption Notice to cure the Utility Interruption and if

"Serramonte (Relo #396)"
Serramonte Center                - 56 -                  12/23/15
Daly City, CA                                          FINAL
Store No. 1940
6061.1348/913576.6

1  Landlord fails to cure the Utility Interruption within thirty (30) days after the Interruption Notice,
2  regardless of whether Landlord did or did not cause the Utility Interruption, then Rent shall be abated
3  from the date of the Interruption Notice until the date such failure is cured. If the Utility Interruption
4  shall not be cured within ninety (90) days after Landlord's receipt of the Interruption Notice, then
5  Tenant, regardless of whether Landlord did or did not cause the Utility Interruption, upon notice to
6  Landlord after expiration of such period, may terminate this Lease, which termination shall be deemed
7  effective upon Tenant's vacation of the Store, unless such interruption was caused by Tenant's
8  negligence or misconduct. In the event Tenant terminates this Lease because of a Utility Interruption
9  caused by Landlord, Landlord shall pay Tenant the Unamortized Cost of Tenant's leasehold
10  improvements within thirty (30) days of Tenant's Termination Notice. Notwithstanding the foregoing,
11  if the Utility Interruption is caused by a Casualty, the provisions of Article 21 shall apply.

12  **20.2.    Alternative Dispute Resolution Process.**

13  **20.2.1.**    <u>Means of Resolution</u>.  In the event that any controversy or dispute ("Dispute")
14  shall arise under this Lease and in the event that the parties have been unable to resolve such
15  Dispute within thirty (30) days, the Dispute shall be resolved as provided in this Section 20.2. All
16  Disputes, the monetary value of which exceeds Fifty Thousand Dollars ($50,000), or which involve
17  an equitable remedy, shall first require the utilization of Mediation as provided in Section 20.2.2
18  below. All Disputes, the monetary value of which is Fifty Thousand Dollars ($50,000) or less shall
19  be settled by Arbitration as provided in Section 20.2.3 below.

20  **20.2.2.**    <u>Mediation</u>.  The parties shall first try in good faith to settle the Dispute by
21  Mediation pursuant to the provisions as set forth below. Either party may initiate Mediation. The
22  party commencing the Mediation shall first give a written notice (a "Mediation Notice") to the other
23  party setting forth the nature of the Dispute. The Mediation shall be administered by the American
24  Arbitration Association under its Commercial Mediation Rules, except to the extent that this
25  Section 20.2.2 is inconsistent therewith, in which event this Section 20.2.2 shall govern and prevail.
26  If the parties cannot agree on the selection of a Mediator within twenty (20) days after receipt of the
27  Mediation Notice, the Mediator shall be selected in accordance with the American Arbitration
28  Association procedure. If the Dispute or any part thereof has not been resolved by Mediation as
29  provided above within sixty (60) days after receipt of the Mediation Notice, or if a party fails to
30  participate in Mediation, then at the election of either party by written notice, the Dispute shall be
31  determined by suit or action in court, unless it is a matter for Arbitration as described in
32  Section 20.2.1 above. The costs of the Mediator and the Mediation service shall be shared equally
33  by the parties; each party shall otherwise bear its own costs incurred in connection with the
34  Mediation, including its own attorneys' fees.

35  **20.2.3.**    <u>Arbitration</u>.  Either or both parties may initiate the Arbitration process. The
36  party initiating the Arbitration process shall first give a written notice (an "Arbitration Notice") to
37  the other party setting forth the nature of the Dispute and proposing three (3) neutral Arbitrators
38  associated with Judicial Arbitration Mediation Services ("JAMS") in San Francisco, California. The
39  responding party may then select one (1) of the proposed neutral Arbitrators within five (5) Business
40  Days of receipt of the Arbitration Notice. If the responding party fails to timely select a proposed
41  Arbitrator, the initiating party may submit the matter to JAMS or to the court of general jurisdiction
42  to select the Arbitrator. The Arbitration shall be administered by JAMS in San Francisco, California
43  in accordance with its Streamlined Arbitration Rules, except to the extent that this Section 20.2.3 is

1    inconsistent therewith, in which event this Section 20.2.3 shall govern and prevail. Judgment upon
2    the award rendered by the Arbitrator may be entered in any court of competent jurisdiction. Unless
3    otherwise agreed to by the parties, the matter shall be submitted to one (1) Arbitrator (selected as
4    provided above) and shall be heard in San Francisco, California. The parties shall use diligent good
5    faith efforts to conclude the Arbitration within sixty (60) days following delivery of the Arbitration
6    Notice. The Arbitrator shall resolve the controversy in accordance with applicable law and the
7    terms and conditions of this Lease. There shall be no right of appeal from the Arbitration award.
8    The Arbitrator shall allow the parties reasonable opportunities for pre-hearing document exchange
9    but no other discovery shall be permitted.

10    **20.2.4.**    Confidentiality. Except as otherwise required by law, the parties, Mediator
11    and/or Arbitrator agree to keep confidential and not disclose to third parties any information or
12    documents obtained in connection with the Mediation and/or Arbitration process, including the
13    resolution of the Dispute.

14    **20.3.  Unlawful Detainer.**

15    Landlord agrees not to initiate (including the service of any notice to pay rent or quit or
16    comparable notice), file, prosecute, or maintain any proceeding for eviction, unlawful detainer, or
17    termination of this Lease against Tenant (and any such proceeding shall be null and void) during the
18    Alternative Dispute Resolution process as set forth in Section 20.2 and/or in the event of a bona
19    fide dispute between the parties with respect to any alleged default by Tenant of any provision of
20    this Lease, including, without limitation, Tenant's non-payment of Rent pursuant to Tenant's right
21    to withhold, deduct or offset Rent in accordance with this Lease.

22    **20.4.  Attorneys' Fees.**

23    **20.4.1.**    Third Party Litigation. If either party becomes a party to any litigation (including
24    Arbitration) concerning this Lease, the Store or the Shopping Center by reason of any act or
25    omission of the other party or its authorized representatives, and not by its own act or omission or
26    that of its authorized representatives, the other party shall be liable to that party for reasonable
27    attorneys' fees, court costs, investigation expenses, discovery costs and costs of appeal incurred by it
28    in the litigation.

29    **20.4.2.**    Actions Between the Parties. If either party commences an action against the
30    other party arising out of or in connection with this Lease, or in the event of an Arbitration
31    proceeding between the parties relating to this Lease, the prevailing party shall be entitled to have
32    and recover from the losing party reasonable attorneys' fees, costs of suit, investigation costs,
33    discovery costs, and expert witness fees and costs, including costs of appeal. When this Lease
34    imposes upon a party an obligation to indemnify the other, the indemnification obligation shall
35    include the obligation to pay the indemnitee's reasonable attorneys' fees, costs and disbursements,
36    whether the indemnitee be the plaintiff or defendant.

1                            21. CASUALTY

2    **21.1.    Definitions.**

3        **21.1.1.**    Casualty.    An event, or act of God, such as fire, windstorm, flood or earthquake,
4    riot, civil commotion, perils or other matters which are unforeseen and unpredictable, whether
5    insured or uninsured, which causes damage or destruction to the Store or the Shopping Center.

6        **21.1.2.**    Casualty Date.    The date of the occurrence of a Casualty.

7        **21.1.3.**    Permitted Repair Period.    A period of two hundred seventy (270) days following
8    the Casualty Date.

9        **21.1.4.**    Restoration (sometimes referred to herein as "Restore").    Restoration, rebuilding
10    or repairs due to a Casualty under Section 21.2 of this Lease or due to a Taking under Section 22.1
11    of this Lease.

12    **21.2.    Insured Casualty.**

13        If the Store is damaged or destroyed by a Casualty insured against or that Landlord is
14    obligated to insure against under this Lease, to the extent that Restoration cannot reasonably be
15    completed within the Permitted Repair Period, as reasonably determined by Landlord (and Landlord
16    shall deliver notice to Tenant of such determination within thirty (30) days of the Casualty Date),
17    Tenant may, at its election, terminate this Lease as of the Casualty Date by notice to Landlord within
18    forty-five (45) days after the Casualty Date.    If Tenant does not so terminate this Lease, or if
19    Restoration to the Store may be completed within the Permitted Repair Period, then this Lease shall
20    not terminate, and Landlord shall diligently proceed to Restore the Store to substantially the
21    condition as existed on the Delivery Date, and Landlord shall diligently pursue such Restoration to
22    completion.    If the Restoration is not completed within the Permitted Repair Period, Tenant may
23    terminate this Lease by written notice to Landlord at any time prior to the Redelivery Date.    All Rent
24    payable hereunder shall abate from the Casualty Date to the earlier of (a) sixty (60) days following
25    the Redelivery Date (but only if the Redelivery Date falls on a Permitted Delivery Day, and if the
26    Redelivery Date does not fall on a Permitted Delivery Day, the sixtieth (60th) day following the next
27    Permitted Delivery Day); or (b) the date on which Tenant again opens for business in the Store (in
28    either case the "Recommencement Date"); provided that if Tenant continues to do business in the
29    Store during the period of Restoration, Tenant's total obligation for Rent shall be to pay Substitute
30    Rent within fifteen (15) days after the close of each calendar month.

31    **21.3.    Uninsured Casualty.**

32        If the Store is damaged or destroyed by a peril not covered by the standard form of Special
33    Form Policy or not covered by any other insurance maintained by Landlord (hereinafter collectively
34    referred to as an "Uninsured Casualty") and the cost of the Restoration of the Store as reasonably
35    determined by Landlord exceeds by more than Two Hundred Fifty Thousand Dollars ($250,000)
36    ("Threshold Amount") the amount of insurance proceeds available (i.e., net of any applicable
37    deductible) to Landlord, Landlord may elect not to Restore the Store and to terminate this Lease on
38    at least ninety (90) days' prior written notice to Tenant.    If only the Store and no other part of the

1    Building is damaged, Tenant may elect to pay the difference between the cost of Restoration (less
2    available insurance proceeds) and the Threshold Amount (which amount Landlord shall be required
3    to contribute for purposes of Restoration) (the "Difference") by delivering written notice of such
4    election, together with payment of such Difference to a Stakeholder as defined in Section 21.6
5    hereof, if any, to Landlord within sixty (60) days after delivery of Landlord's notice of election to
6    terminate this Lease.  Upon receipt of such notice and confirmation of payment by Tenant of the
7    Difference to the Stakeholder, if any, the Landlord termination shall be deemed rescinded and
8    Landlord shall pay the Threshold Amount to the Stakeholder and shall proceed with the Restoration
9    of the Store.  If Landlord elects to terminate this Lease under this Section 21.3 and Tenant does not
10   elect to pay the Difference, this Lease shall terminate as of the date set forth in Landlord's notice of
11   election to terminate this Lease.  If this Lease is not terminated under this Section 21.3, all Rent
12   payable hereunder shall abate from the Casualty Date to the Recommencement Date; provided that
13   if Tenant continues to do business in the Store during the period of Restoration, Tenant's total
14   obligation for Rent shall be to pay Substitute Rent within fifteen (15) days after the close of each
15   calendar month.

16   **21.4.   End of Term Casualty.**

17         Notwithstanding any provision in this Article 21 to the contrary, Landlord shall not be
18   required to Restore any Casualty to the Store occurring during the final eighteen (18) months of the
19   Term if the cost of such Restoration is greater than One Hundred Fifty Thousand Dollars
20   ($150,000) unless, within thirty (30) days after receipt of Landlord's notice to Tenant that it intends
21   not to effect Restoration, Tenant exercises in writing any next immediately succeeding Option to
22   extend the Term given Tenant hereunder.  If Tenant does not elect to exercise the next immediately
23   succeeding Option so as to extend the Term, Tenant shall so notify Landlord within thirty (30) days
24   of Landlord's notice of election not to Restore, and, thereupon, this Lease shall terminate effective
25   as of the Casualty Date.

26   **21.5.   Shopping Center Casualty.**

27         In the event that the Store is not damaged or destroyed by a Casualty, but other buildings in
28   the Southwest Quadrant, or the Building, excluding the Store, or if any of the Common Areas in the
29   Southwest Quadrant, are damaged or destroyed by a Casualty, whether or not insured against
30   (collectively a "Shopping Center Casualty"), Landlord shall promptly remove (or cause to be
31   removed) all rubble and debris resulting from such damage or destruction, and Landlord shall
32   promptly Restore (or cause to be Restored) such damaged buildings as well as such Common Areas
33   as nearly as possible to the condition the same were in immediately prior to such damage or
34   destruction.  Notwithstanding anything to the contrary contained herein, and regardless of the
35   extent of damage, Landlord shall promptly remove (or cause to be removed) all rubble and debris so
36   that the Southwest Quadrant Common Areas are usable.  Except as otherwise expressly stated in
37   this Section 21.5, the provisions of Sections 21.1 through 21.4 shall apply to a Shopping Center
38   Casualty.  If the damage to the Southwest Quadrant Common Areas shall render the whole or any
39   part of the Store unsuitable for Tenant's use, all Rent payable hereunder shall abate from the
40   Casualty Date to the Recommencement Date; provided that if Tenant continues to do business in
41   the Store during the period of Restoration, Tenant's total obligation for Rent shall be to pay
42   Substitute Rent within fifteen (15) days after the close of each calendar month.

21.6.   **Insurance Proceeds.**

Insurance proceeds for damage or destruction to the Store ("Proceeds"), if under One Hundred Thousand Dollars ($100,000), shall be paid directly to Landlord, subject to the terms of any applicable Non-Disturbance Agreement. If in excess of such amount, all of the Proceeds shall be deposited with Lender (as hereinafter defined), provided Lender agrees to apply the Proceeds in the manner described herein. As used in this Section 21.6, the term "Lender" means the holder of indebtedness secured by a first lien upon the Shopping Center, whether the interest creating such lien be denominated as a mortgage, deed of trust, security agreement, vendor's lien or otherwise, but only if Lender is a financial institution, such as a bank, savings and loan, insurance company, or other entity regularly engaged in making loans secured by shopping center real property. If Lender does not so agree, or there is no Lender, then the Proceeds shall be deposited with a bank, trust company, or title insurance company designated by Tenant and approved by Landlord, for the use of the Proceeds as provided in this Section 21.6. The Lender, if it agrees, or such other qualified party so designated to hold and disburse the proceeds is herein referred to as the "Stakeholder." Stakeholder shall disburse the Proceeds to the party performing Restoration upon certification by the architect in charge of Restoration that the amounts requested have been paid in connection with such Restoration or shall be due to contractor, subcontractors, materialmen, architects, suppliers or other persons who have rendered services or have furnished materials for such Restoration, and upon completion of such Restoration, the remaining balance of any Proceeds shall be paid to Landlord upon demand.

21.7.   **Tenant Restoration.**

If Landlord is obligated to Restore the Store under the terms of this Article 21 but does not commence Restoration as soon as practicable after the Casualty, or does not continue the Restoration of the Store thereafter with reasonable dispatch, Tenant, upon thirty (30) days' prior notice to Landlord, subject to the terms of any applicable Non-Disturbance Agreement, shall have the right to Restore the Store at Landlord's sole cost and expense. If Tenant elects to Restore, subject to the terms of any applicable Non-Disturbance Agreement, Landlord shall promptly pay to Tenant any insurance proceeds relating to the Casualty and shall assign to Tenant all Proceeds held by Stakeholder as provided in Section 21.6 and shall so instruct the Stakeholder in writing. In addition, all Rent shall abate as described in Section 21.2 above; provided that if Tenant continues to do business in the Store during the period of Restoration, Tenant's total obligation for Rent shall be to pay Substitute Rent within fifteen (15) days after the close of each calendar month. Further, Landlord shall reimburse Tenant upon demand for any cost or expense incurred by Tenant for such Restoration (not including any amount by which the cost and expense of Restoration is increased by any change or changes made by Tenant) in excess of Proceeds received by Tenant plus interest at the Legal Rate. Until Tenant has been fully reimbursed for such costs and expenses, Tenant may deduct the same from any payments of Rent or other charges due hereunder to Landlord. If at the expiration of the Term, Tenant has not been fully reimbursed, Tenant shall have the right to extend the Term for any period of time (but not in excess of twenty-one (21) years) selected by Tenant which is less than or equal to the period which shall enable Tenant to recover such cost and expense plus interest at the Legal Rate from Rent due hereunder. During such extension, Rent shall be imputed as being that in effect in the month immediately preceding such extension. The remedy stated hereinabove shall be cumulative with any other remedy available to Tenant at law or in equity

1   or under the terms of this Lease, including the right to collect the full amount of any such advance
2   from Landlord immediately.

3   **21.8.  Waiver of Statute.**

4        The parties waive such rights of Lease termination as are granted to them under the laws of
5   the state wherein the Store is located, it being their agreement that the rights of termination in the
6   event of Casualty, as set forth herein, shall be exclusive.

7   **21.9.  Laws.**

8        If applicable governmental laws and regulations prohibit the Restoration of the Store or
9   Common Areas to substantially the condition as existed immediately prior to the Casualty, either
10  party may elect to terminate this Lease effective thirty (30) days after the delivery to the other party
11  of written notice of the election to terminate. Notwithstanding the foregoing, if Landlord elects to
12  terminate this Lease pursuant to this Section 21.9, Tenant may void Landlord's termination by
13  notifying Landlord in writing, within thirty (30) days following receipt of Landlord's Termination
14  Notice, that Tenant will accept Landlord's Restoration of the Store and/or the Common Areas, as
15  applicable, to the extent permitted by applicable governmental laws and regulations, even if such
16  Restoration of the Store and/or the Common Areas, as applicable, will not be to substantially the
17  condition as existed immediately prior to the Casualty.

18  **21.10.  Tolling of Term.**

19       During the period between Landlord's completion of Landlord's Restoration obligations and
20  the Recommencement Date, Tenant and Tenant's employees, agents and contractors shall have the
21  right to enter upon the Store for the purpose of erecting, constructing, or installing such
22  improvements, alterations, fixtures, equipment and furniture as Tenant deems necessary for
23  resuming business in the Store. In the event Rent shall completely abate for any period pursuant to
24  the provisions of this Article 21, the Term shall toll for the period of such abatement, in which
25  event, the monthly installments of Rent following the end of the period of such abatement shall
26  recommence and thereafter continue at the same Rent rate that was in effect at the time of such
27  abatement; the remaining scheduled increases of Minimum Rent shall be postponed for the period
28  of such abatement to reflect such tolling, the expiration date of the then applicable Term (whether
29  the Initial Term or any Option Period) and the commencement and expiration dates of any
30  subsequent Option Periods shall be extended for the period of such abatement, as shall be the
31  deadline dates for notices exercising Option Periods. Any period of tolling shall be added to the
32  calculation of the Initial Term (or any then current Option Period, as the case may be) for purposes
33  of the calculation of the Expiration Date. For example, if the Term of this Lease is tolled under the
34  provisions of this Section 21.10 for a period of four (4) months, and the tolling occurs during the
35  Initial Term, then the definition of Initial Term in Section 1.5.1 shall be:  "From the
36  Commencement Date through the January 31 next following the expiration of one hundred
37  twenty-four (124) months thereafter."

"Serramonte (Relo #396)"
Serramonte Center                      - 62 -                      12/23/15
Daly City, CA                                                   FINAL
Store No. 1940
6061.1348/913576.6

1    **21.11.  Effect of Termination.**

2    Upon termination of this Lease pursuant to this Article 21, (a) each of the parties shall be
3    thereby released from all further obligations and duties to the other party as of the Casualty Date,
4    except for items and liabilities which have theretofore accrued and be then unpaid, and (b) Landlord
5    shall promptly refund to Tenant all unearned Rent and other amounts prepaid by Tenant under this
6    Lease.

7    **21.12.  Tenant's Right of First Offer.**

8    The provisions of this Article 21 to the contrary notwithstanding, if this Lease is terminated
9    in accordance with this Article 21, and Landlord elects to rebuild the Store or a substantially similar
10   building in the Shopping Center within two (2) years after the Casualty Date, Landlord shall, before
11   marketing space in such building to any person or entity, first offer space in such building to Tenant
12   on terms no less favorable than those for which Landlord will market such space on the open
13   market.

14                               **22. CONDEMNATION**

15   **22.1.  Taking.**

16   A "Taking" means any governmental act, condemnation proceeding, moratorium, initiative,
17   or referendum whereby Landlord or Tenant is divested of ownership or any of the incidents thereof,
18   or any transfer in lieu thereof, and physical possession is taken by the governmental or condemning
19   authority.  In the event Tenant does not terminate this Lease as provided in Section 22.2 following,
20   Landlord shall promptly and diligently Restore the Store, Common Areas, or other space, as the case
21   may be, to as near their condition as existed prior to such Taking as is reasonably possible.  During
22   the course of such Restoration, if Tenant is not operating in the Store, all Rent shall abate from the
23   date of the Taking to the Recommencement Date.  If Tenant continues to do business in the Store
24   during the period of Restoration, Tenant's total obligation for Rent shall be to pay Substitute Rent
25   within fifteen (15) days after the close of each calendar month.  When Restoration is complete,
26   Tenant's total obligation for Minimum Rent shall be adjusted as provided in Section 3.7 in the event
27   the size of the Store is reduced.  When Restoration is complete, if the size of the Store is not
28   reduced, but the size of the Common Areas is reduced, Minimum Rent shall thereafter be reduced
29   to an amount calculated by multiplying the Minimum Rent stated in this Lease by a fraction the
30   numerator of which is the fair market rental value of the Store immediately following the Taking and
31   the denominator of which is the fair market rental value of the Store immediately prior to the
32   Taking.

33   **22.2.  Right to Terminate.**

34   Tenant may terminate this Lease upon written notice to Landlord in the event of any one or
35   more of the following Takings:

36   **22.2.1.**    A Taking of any portion of or interest in the Store;

1    **22.2.2.**    Any Taking of the Southwest Quadrant Common Areas if the number of
2    parking spaces is reduced, or access to the Store is impaired, or access to the Shopping Center is
3    impaired;

4    **22.2.3.**    Any Taking of any portion of the Shopping Center which impairs the operation
5    of Tenant's business; or

6    **22.2.4.**    Any Taking of twenty percent (20%) or more of the Leasable Floor Area of the
7    Southwest Quadrant (not including the Store in either the numerator or denominator of such
8    calculation).

9    **22.2.5.**    Landlord shall promptly notify Tenant of any Taking. Tenant's termination must
10   be exercised by written notice to Landlord given within sixty (60) days following the date of
11   Tenant's receipt of Landlord's notice of the occurrence of such Taking (as defined in Section 22.1).

12   **22.3.   Claims.**

13   Nothing herein contained shall prevent Landlord and Tenant from prosecuting claims in any
14   condemnation proceedings or otherwise for the value of their respective interests, as well as any
15   damages. Notwithstanding anything to the contrary contained herein, if this Lease is terminated,
16   Landlord shall pay to Tenant from any Landlord award an amount equal to the Unamortized Cost
17   of any leasehold improvements to the Store in an amount not to exceed Five Hundred Thousand
18   Dollars ($500,000), and Tenant's moving expenses (less any amount recovered by Tenant with
19   respect to same). If this Lease is not terminated pursuant to a Taking, Landlord shall pay to Tenant
20   the amount of the Unamortized Cost of any leasehold improvements made to the Store by Tenant
21   in an amount not to exceed Five Hundred Thousand Dollars ($500,000) which shall have been taken
22   or rendered unusable, and not restored (less any amount recovered by Tenant with respect to same).

23   **22.4.   Waiver.**

24   The parties waive such rights of Lease termination as may be granted them in the event of
25   condemnation by the laws of the state wherein the Store is located, it being their agreement that the
26   rights of termination set forth in this Lease shall be exclusive.

27                               **23. MECHANIC'S LIENS**

28   Landlord and Tenant shall prevent any mechanic's, materialman's or other liens against the
29   Store or the Shopping Center in connection with any labor, materials or services furnished or
30   claimed to have been furnished. If any such lien shall be filed against the Store or the Shopping
31   Center, the party through whom the lien arose will cause the same to be discharged within thirty (30)
32   days of the filing of the lien, provided, however, that either party may contest any such lien, so long
33   as the enforcement thereof is stayed by bonding or otherwise expunging the lien from the official
34   property records in the jurisdiction.

1                                    24. SIGNS

2    **24.1.  Governmental Approval and Compliance.**

3           All exterior signs shall be subject to approval by local governmental authority.  Landlord
4    shall cooperate fully with Tenant and assist Tenant in Tenant's efforts to obtain approval for
5    Tenant's signs as shown on **Exhibit J** ("Tenant's Signs") and made a part hereof, from the local
6    governmental authority and from any other occupants in the Shopping Center, whose approval is
7    required.  Landlord's approval for a change to Tenant's signage on the exterior of the Store or
8    Tenant's sign panels on the Shopping Center's pylon or directional signs shall not be required if such
9    change is in connection with a corporate-wide and/or multi-store signage change program by
10   Tenant, however, such change shall be subject to the approval of the local governmental authority.
11   Tenant shall have the right to install Tenant's signage within the Store without Landlord's approval.
12   Landlord approves of all Tenant's Signs shown on **Exhibit J**.

13   **24.2.  Building Signs.**

14          Tenant may erect and maintain Tenant's Signs upon the exterior walls of the Store, as
15   specified on **Exhibit J**.  Tenant's Signs, including Tenant's signage on any sign structure(s) provided
16   by Landlord, shall be fabricated, installed and maintained by Tenant at its sole cost and expense.  In
17   no event shall Tenant's storefront Signs be configured with less than a seventy-two (72) inch "Ross"
18   and a forty-two (42) inch "Dress for Less."  Tenant shall have the right, but not the obligation, to
19   install under-canopy signs if permitted by local governmental authority.  Tenant shall have the right
20   to approve any such under-canopy sign prior to such under-canopy sign's installation.

21   **24.3.  Pylon or Directional Signs.**

22          Landlord shall, at its sole cost and expense, construct, maintain and repair the pylon and
23   directional sign structure(s) specified in the Site Plan and **Exhibit J** upon which Tenant may install
24   and maintain Tenant's sign panels as set forth on **Exhibit J**.  Landlord shall cooperate fully with
25   Tenant and assist Tenant in obtaining all permits to install Tenant's sign panels on Landlord's
26   pylon/directional sign structure(s) as specified on **Exhibit J**.  Tenant's sign panels on the pylon sign
27   structure shall be as set forth on **Exhibit J**.  Landlord shall provide, at Landlord's sole cost and
28   expense, blank panels for Tenant's pylon signage, with panel faces made of the material Landlord
29   requires on all pylon signs at the Shopping Center (e.g., acrylic, aluminum or other material
30   reasonably specified by Landlord for such sign panels).  Tenant shall have the right to decorate such
31   blank panels with Tenant's logo and/or trade name in format and color typically used or adopted by
32   Tenant.  Tenant shall pay for the expense of installing and maintaining its sign panels on the
33   pylon/directional sign structure(s).  Utility charges for the pylon sign(s) on which Tenant places its
34   sign panels shall be included in the Reimbursement Contribution.

35   **24.4.  Temporary Signs.**

36          Subject to approval by governmental authority, if required, during the period of construction
37   described in Section 5.1, Tenant shall have the right to construct temporary signage on the Store
38   indicating the anticipated opening of the Store for business and Tenant may, through the thirtieth

1   (30th) day following the opening of the Store for business, advertise such new business by means of
2   banners, flags and other signage attached to the Store.

3   **24.5.   Visibility of Tenant's Store and Signs.**

4           Landlord covenants and agrees that no landscaping, structures or other improvements shall
5   be installed or permitted in the Shopping Center which interfere with or obstruct the visibility of the
6   Store or any of Tenant's Signs. Landlord further covenants and agrees that it shall regularly prune
7   landscaping in the Shopping Center so that such landscaping does not interfere with or obstruct the
8   visibility of the Store or any of Tenant's Signs. If any landscaping, structures or other improvements
9   interfere with or obstruct the visibility of the Store or any of Tenant's Signs, Tenant may give
10  Landlord written notice thereof and Landlord shall have ten (10) days from the date of Tenant's
11  notice to remove or alter the structures or other improvements or to remove or prune the
12  landscaping to eliminate the interference with or obstruction of the visibility of Tenant's Store or
13  any of Tenant's Signs ("Corrective Measures"). If Landlord fails to complete the Corrective
14  Measures prior to the expiration of the ten (10) day period, then Tenant shall have the right, at its
15  election, to take such Corrective Measures as Tenant deems reasonably necessary to eliminate the
16  interference or obstruction, and Tenant may deduct the cost of such Corrective Measures from Rent
17  due under this Lease.

18                                    **25. NOTICE**

19          Any notice to be given in connection with this Lease shall be in writing and shall reference
20  (a) this Lease, (b) the store number which has been assigned to the Store by Tenant (if known to
21  Landlord), and (c) the location of the Store. The notice shall be served (i) personally, or (ii) by
22  certified mail, return receipt requested, or (iii) by reputable courier service which provides written
23  evidence of delivery, addressed to Landlord as specified in Section 1.2.1 and addressed to Tenant as
24  specified in Section 1.2.2 (or to such other address as requested by either party in writing), or (iv) by
25  telephone facsimile upon which the date and time of transmission is machine imprinted to the
26  number specified in Section 1.2.1 as to Landlord and as specified in Section 1.2.2 as to Tenant,
27  provided that a copy of the notice is concurrently sent by reputable courier service in accordance
28  with clause (iii) above. Copies of any notices sent to Tenant (addressed to Tenant as specified in
29  Section 1.2.2) shall also be sent to Bartko, Zankel, Bunzel & Miller, One Embarcadero Center,
30  Suite 800, San Francisco, CA 94111, Attention: Ross Notices. All notices given in the manner
31  specified herein shall be effective upon actual receipt or upon refusal to accept delivery.

32          Either party, by written notice to the other, may designate two (2) additional parties to
33  receive copies of notices. Any notice party to this Lease may change its address or location for
34  service of notices, for themselves or any of their respective designees by written notice.

1       ## 26. GENERAL CONDITIONS

2       26.1.   Partial Invalidity.

3               If any term, covenant, condition, provision or restriction of this Lease is held by a Court of
4       competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions hereof
5       shall remain in full force and effect and shall in no way be affected, impaired, or invalidated thereby.

6       **26.2.   Relationship of Parties.**

7               Nothing contained in this Lease shall be deemed or construed by the parties hereto or by
8       any third person to create the relationship of principal and agent, or of partnership, or of joint
9       venture, or of any other association between the parties other than Landlord and Tenant, or to
10      prevent Landlord or Tenant from entering into ventures in direct competition with the Shopping
11      Center, or the Store.

12      **26.3.   Time.**

13              Time is of the essence in the performance of each provision of this Lease.

14      **26.4.   Waiver.**

15              The waiver of the performance of any term, covenant, condition, provision or restriction of
16      this Lease by Landlord or Tenant shall not be construed as a waiver of any subsequent breach of the
17      same term, covenant, condition, provision or restriction.  The various rights, options, elections,
18      powers and remedies of the parties contained in this Lease shall be construed as cumulative and no
19      one of them exclusive of any other or of any legal or equitable remedy which either party might
20      otherwise have in the event of a breach by the other, and the exercise of one right or remedy by a
21      party shall not in any way impair its right to any other right or remedy.

22      **26.5.   Partial Months.**

23              For purposes of computing dates for expirations, Option Periods, Rent adjustments or
24      cancellations (except for those dates specifically designated herein), any partial month at the
25      commencement of the Term shall be disregarded.

26      **26.6.   Consent.**

27              Unless a different standard is otherwise specifically stated, wherever in this Lease Landlord
28      or Tenant is required to give its consent or approval to any action on the part of the other, such
29      consent or approval shall not be unreasonably withheld, conditioned or delayed.

30      26.7.   **Intentionally Deleted.**

31      26.8.   **Governing Law.**

32              This Lease shall be construed in accordance with and governed by the laws of the state
33      wherein the Store is located, except as otherwise required by mandatory provisions of law.

1   26.9.   **Due Authority.**

2       If Tenant or Landlord is a corporation, partnership, limited liability company, trustee or
3   other entity, each individual executing this Lease on behalf of said entity (in his/her representative
4   capacity only) represents and warrants that he or she is duly authorized to execute and deliver this
5   Lease on behalf of the entity and that this Lease is binding upon the entity.

6   **26.10.   No Prior Agreements.**

7       It is understood that there are no oral agreements or representations between the parties
8   hereto affecting this Lease, and this Lease supersedes and cancels any and all previous negotiations,
9   arrangements, brochures, agreements or representations and understandings, if any, between the
10  parties hereto or displayed by Landlord to Tenant with respect to the subject matter thereof, and
11  none thereof shall be used to interpret or construe this Lease. There are no other representations or
12  warranties between the parties, and all reliance with respect to representations is solely upon the
13  representations and agreements contained in this Lease. This Lease may be modified or amended
14  only by an agreement in writing signed by the parties hereto.

15  **26.11.   Entry by Landlord.**

16      Upon reasonable prior notice, in no event to be less than ten (10) Business Days (except in
17  the case of a bona fide emergency, in which event, no prior written notice shall be required, but
18  prior verbal notice shall be required and promptly confirmed in writing thereafter), Landlord may
19  enter the Store during Tenant's business hours for purposes of inspection, to show the Store to
20  prospective purchasers and lenders, or to perform maintenance and repair obligations imposed upon
21  Landlord by this Lease. All maintenance, repairs or replacements by Landlord to the interior of the
22  Store or using the interior of the Store or maintenance, repairs or replacements to any portion of the
23  Shopping Center that will create dust, noise, vibration or other disturbance of Tenant's use of the
24  Store shall be performed only during hours that the Store is not open to the public. Should
25  Landlord unreasonably interfere with Tenant's business by such entry, Rent shall equitably abate in
26  an amount reasonably determined with reference to the nature, extent and duration of the
27  deprivation of Tenant's business in connection with Landlord's entry into the Store.

28  26.12.   Neutral Interpretation.

29      Landlord and Tenant agree that this Lease has been freely negotiated and that in the event a
30  dispute arises with respect to the meaning or interpretation of any provision of this Lease, no
31  presumption, inference or conclusion shall be drawn against the party that drafted the provision in
32  question.

33  **26.13.   Force Majeure.**

34      As used in this Lease, the term "Force Majeure" means delay resulting from the following
35  causes beyond a party's reasonable control:  acts of God such as fire, windstorm, flood or
36  earthquake; industry wide inability to obtain materials or merchandise; war; riot or civil commotion;
37  governmental laws or regulations, including a building moratorium (hereinafter "governmental
38  matters"), provided that "governmental matters" shall exclude planning and building permits,

1   governmental inspections, permanent or temporary certificates of occupancy (or their equivalent in
2   the applicable local jurisdiction) and similar governmental approvals.  The party obliged to perform
3   shall give notice to the other as soon as reasonably possible after the onset of such delay stating the
4   cause and an estimate of the duration thereof.  If, as a result of an event of Force Majeure, either
5   party shall be delayed or hindered or prevented from the performance of any act required hereunder
6   (other than the making of payments) within the time period set forth herein, the performance of
7   such act shall be excused for the period of delay not to exceed sixty (60) days, and the period of
8   performance of such act shall be extended for a period equivalent to the period of such delay, not to
9   exceed sixty (60) days, unless a provision of this Lease expressly states that Force Majeure is not
10  applicable.  Financial inability to perform shall not constitute an event of Force Majeure.

11  **26.14.  Successors in Interest.**

12          The terms, conditions and covenants herein contained shall inure to the benefit of and be
13  binding upon the heirs, assigns and other successors in interest to the parties hereto, except as
14  otherwise provided in this Lease.

15  **26.15.  Memorandum of Lease.**

16          This Lease shall not be recorded.  However, a Memorandum of Lease shall be executed, in
17  recordable form, by both parties concurrently herewith.  Either party may record the same at its own
18  cost and expense.

19  **26.16.  Real Estate Brokers.**

20          Landlord and Tenant each represents and warrants to the other party that it has not
21  authorized or employed, or acted by implication to authorize or employ, any real estate broker or
22  salesman to act for it in connection with this Lease.  Tenant shall have no obligation to pay any
23  leasing commission in connection with this Lease.  Landlord and Tenant shall each indemnify,
24  defend and hold the other party harmless from and against any and all claims by any real estate
25  broker or salesman whom the indemnifying party authorized or employed, or acted by implication
26  to authorize or employ, to act for the indemnifying party in connection with this Lease.

27  **26.17.  Confidentiality Agreement.**

28          Except as required by a subpoena, court order, in connection with litigation between the
29  parties, or as otherwise required by law, rule or regulation, or as required for any SEC filing by
30  Landlord, Landlord agrees to keep the terms of this Lease confidential and not to disclose any
31  information with regard to this Lease, including, but not limited to, any information regarding Rent,
32  Store opening dates, Tenant's sales figures or estimated sales figures, except that Landlord may
33  release such information to its accountants, professional advisors, attorneys, investors, lenders and
34  prospective purchasers of the Shopping Center to the extent reasonably necessary for Landlord's
35  business purposes, provided such recipients are instructed to keep such information confidential,
36  pursuant to the terms of this Section 26.17 ("Confidentiality Agreement").  Further, except as set
37  forth herein, Landlord shall not disclose to any person not a party to this Lease any terms of this
38  Lease or issue any press releases or make any public disclosure about Tenant's anticipated
39  occupancy, opening and/or other lease terms, nor shall Landlord post the terms of this Lease or any

1   part thereof on the Internet or in any mailing, or provide a copy to third parties via electronic mail,
2   or release any information in connection with this Lease to the media or other third parties without
3   the prior written consent of Tenant, which consent can be withheld, delayed, conditioned or denied,
4   in Tenant's sole discretion.   Notwithstanding the foregoing, Landlord may disclose    the Ross
5   Prohibited Uses set forth in Section 3.2.1 and the Protection clause set forth in Section 15.3 of this
6   Lease to tenants and prospective tenants of the Shopping Center without Tenant's prior consent.
7   Landlord shall cause its employees and agents to adhere to this Confidentiality Agreement.

8   **26.18.  No Offer.**

9       The submission of this Lease for examination and negotiation does not constitute an offer to
10   lease, or a reservation of, or option for, the Store, and this Lease shall not become effective or
11   binding until this Lease has been fully executed by both Landlord and Tenant and an executed
12   original of this Lease has been delivered to each party.

13   **26.19.  Inspection by CASp in Accordance with California Civil Code Section 1938.**

14       The Store has not undergone inspection by a Certified Access Specialist (CASp).   The
15   foregoing verification is included herein solely for the purpose of complying with California Civil Code
16   Section 1938 and shall not in any manner affect the parties' respective responsibilities for compliance
17   with construction-related accessibility standards as provided under this Lease.

**LANDLORD:**
**DALY CITY SERRAMONTE CENTER,**
**LLC, a Delaware limited liability company**

By:   Equity One Realty & Management CA,
      Inc.

By:_____
Name:  Michael Makinen
Its:      Chief Operating Officer

**TENANT:**
**ROSS DRESS FOR LESS, INC.,**
**a Virginia corporation**

By:_____
    James Fassio
Its:  President and Chief Development Officer

By:_____
    Gregg McGillis
Its:  Group Senior Vice President, Property Development

18

"Serramonte (Relo #396)"
Serramonte Center
Daly City, CA
Store No. 1940
6061.1348/913576.6

- 70 -

12/23/15
FINAL

1

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

2

State of California            )
                               )
County of Alameda              )

3
4
5  On February 1, 2016 before me, ___Michelle Owings___,
6  a Notary Public, personally appeared James Fassio and Gregg McGillis, who proved to me on the basis
7  of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument
8  and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies),
9  and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of
10 which the person(s) acted, executed the instrument.
11
12 I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing
13 paragraph is true and correct.
14
15 WITNESS my hand and official seal.
16
                                        _____
                                               Notary Public
17
18

> **MICHELLE OWINGS**
> Commission # 2023784
> Notary Public - California
> Alameda County
> My Comm. Expires May 10, 2017

1

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

2

State of _California_ )

County of _San Mateo_ )

3

4

5 On _2/2/16_ before me, _Teresa A. Martinez_, a Notary Public,

6 personally appeared _Michael Makinen_, who proved to me on the basis of

7 satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and

8 acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and

9 that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which

10 the person(s) acted, executed the instrument.

11

12 I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing

13 paragraph is true and correct.

14

15 WITNESS my hand and official seal.

16



Notary Public

17

"Serramonte (Relo #396)"
Serramonte Center
Daly City, CA
Store No. 1940
6061.1348/913576.6

- 72 -

12/23/15
FINAL

## EXHIBIT A

### LEGAL DESCRIPTION OF THE SHOPPING CENTER

**All that certain real property situated in the County of San Mateo, State of California, described as follows:**

**City of Daly City**

**TRACT ONE:**

**COMMENCING AT THE MOST WESTERLY TERMINUS OF THAT CERTAIN CURVE HAVING A RADIUS OF 2151.17 FEET; A CENTRAL ANGLE OF 10°11'45", AN ARC DISTANCE OF 382.80 FEET AS SAID CURVE FORMS A PORTION OF THE SOUTHERLY BOUNDARY LINE OF BLOCK 36, IN SERRAMONTE, UNIT NO. 7, DALY CITY, CALIFORNIA, FILED FOR RECORD JANUARY 25, 1967 IN BOOK 66 OF MAPS AT PAGES 8 TO 11 INCLUSIVE, SAN MATEO COUNTY RECORDS; THENCE NORTH 28°55'53" EAST 921.22 FEET TO THE POINT OF BEGINNING OF THE PARCEL TO BE DESCRIBED; THENCE NORTH 84°45' WEST 224.00 FEET; THENCE NORTH 5°15' EAST 335.00 FEET; THENCE SOUTH 84°45' EAST 224.00 FEET; THENCE SOUTH 5°15' WEST 335.00 FEET TO THE POINT OF BEGINNING.**

**JOINT PLANT NO. 091-024-240-25A**
**ASSESSOR'S PARCEL NO. 091-240—250**

**TRACT TWO:**

**ALL OF BLOCK 36, AS SHOWN ON THE MAP OF SERRAMONTE UNIT NO. 7, AS FILED JANUARY 25, 1967, IN BOOK 66 OF MAPS, AT PAGES 8, 9, 10 AND 11, SAN MATEO COUNTY RECORDS.**

**EXCEPTING THEREFROM THE PARCEL AT THE NORTHEAST CORNER OF SERRAMONTE BOULEVARD AND GELLERT BOULEVARD (EXTENDING NORTH), CONVEYED TO UNION OIL COMPANY OF CALIFORNIA, BY DEED RECORDED NOVEMBER 10, 1970, IN BOOK 5857, AT PAGE 227 (60535AD), OFFICIAL RECORDS OF SAN MATEO COUNTY, DESCRIBED AS FOLLOWS:**

**BEGINNING AT A POINT ON THE NORTHERLY LINE OF SERRAMONTE BOULEVARD AS SHOWN ON THE ABOVE MENTIONED MAP, SAID POINT BEING DISTANT THEREON SOUTH 80° 56' 33" WEST, 25.72 FEET FROM THE EASTERLY EXTREMITY OF THE NORTHERLY LINE OF SERRAMONTE BOULEVARD; THENCE FROM SAID POINT OF BEGINNING, NORTH 05° 15' WEST, 135.64 FEET ; THENCE NORTH 84° 45' WEST, 152.56 FEET; THENCE SOUTH 05° 15' EAST, 130.67 FEET; THENCE ALONG THE ARC OF A CURVE TO THE LEFT, TANGENT TO THE PRECEDING COURSE, HAVING A RADIUS OF 40 FEET, A CENTRAL ANGLE OF 93° 48' 27", AN ARC DISTANCE OF 65.49 FEET TO THE NORTHERLY LINE OF SERRAMONTE BOULEVARD; THENCE ALONG SAID LINE, NORTH 80° 56' 33" EAST, 107.58 FEET TO THE POINT OF BEGINNING.**

**FURTHER EXCEPTING THEREFROM, ALL THAT PORTION OF THE ABOVE DESCRIBED PROPERTY CONVEYED BY DEED RECORDED JULY 22, 2005, INSTRUMENT NO. 2005-123837, OFFICIAL RECORDS WITHIN THE FOLLOWING DESCRIPTION:**

**PARCEL 1 OF THAT CERTAIN PARCEL MAP RECORDED ON MAY 19, 2005 AS INSTRUMENT NO. 2005-900082, IN BOOK 76 OF PARCEL MAPS AT PAGES 24 AND 25, SAN MATEO COUNTY RECORDS.**

**FURTHER EXCEPTING THEREFROM ANY PORTION LYING WITHIN TRACT ONE DESCRIBED ABOVE.**

**JOINT PLANT NOS.:**

**091-024-240-07A**
**091-024-240-09A**
**091-024-240-32A**
**091-024-240-31A**
**091-024-240-12A**
**091-024-240-13A**
**091-024-240-30A**
**091-024-240-16A**
**091-024-240-17A**
**091-024-240-18A**
**091-024-240-19A**
**091-024-240-21A**
**091-024-240-22A**
**091-024-240-23A**
**091-024-240-26A**
**091-024-240-27A**
**091-024-240-28A**
**091-024-240-29A**
**091-024-240-08.01A**
**091-024-240-08.02A**

**APN: 091-240-070, 091-240-090, 091-240-100, 091-240-110, 091-240-120, 091-240-130, 091-240-150, 091-240-160, 091-240-170, 091-240-180, 091-240-190, 091-240-210, 091-240-220, 091-240-260, 091-240-270, 091-240-280, 091-240-300, 091-240-330, 091-240-230**



POTENTIAL CUSTOMER WALKING PATHWAY
(SUBJECT TO APPROVAL FROM EXISTING TENANTS AS FURTHER OUTLINED IN THE LEASE)

CONTROL AREA

DICK'S OUTSIDE SALES AREA

NO BUILD AREA

STORE

FUTURE EXPANSION AREA

CONTROL AREA

BUY BUY BABY SIDEWALK SALE AREA

COST PLUS SIDEWALK SALE AREA

MONUMENT SIGNAGE

MONUMENT SIGNAGE

MONUMENT SIGNAGE

MONUMENT SIGNAGE

PYLON SIGNAGE

MONUMENT SIGNAGE



## NOTES

1. THIS EXHIBIT IS A STUDY LEASE OUTLINE AND IS CONCEPTUAL
2. COLUMN LOCATIONS ARE NOT SHOWN AND ARE TO BE DETERMINED
3. DIMENSIONS SHOWN INDICATE LINE OF LEASED PREMISES
4. LEASE LINE IS LOCATED AS FOLLOWS:
   4.1 LEASE LINE BETWEEN TENANTS INDICATES CENTERLINE OF DEMISING WALL
   4.2 LEASE LINE BETWEEN TENANT AND LANDLORD SPACES INDICATES FACE OF FINISH OF LANDLORD SIDE WALL
   4.3 LEASE LINE AT EXTERIOR WALL OR MALL CORRIDOR INDICATES FACE OF FINISH OF EXTERIOR /    MALL SIDE OF WALL
5. PARKING LAYOUT, SERVICE DRIVE, LANDSCAPE, HARDSCAPE, AND SITE PLAN ARE PRELIMINARY AND CONTINGENT UPON FINAL DESIGN AND APPROVAL FROM THE CITY OF DALY CITY
6. LFA AS SHOWN ON FUTURE BUILDINGS ARE APPROXIMATE

## LEGEND

| | |
|---|---|
|  | CONTROL AREA |
|  | PYLON SIGNAGE / MONUMENT SIGNAGE |
|  | STORE |
|  | NO BUILD AREA |
|  | SW QUADRANT |
|  | SIDEWALK SALE ZONE |
|  | POTIENTIAL CUSTOMER WALKING PATHWAY |

TOTAL SW QUADRANT LFA
75,595 SF

TOTAL SHOPPING CENTER LFA
846,445 SF (INCLUDES TARGET AND DICK'S SPORTING GOODS)



NORTH

# SERRAMONTE CENTER    DALY CITY, CA 94015

ROSS SITE PLAN EXHIBIT

EQUITY ONE, INC.    PROJECT NO:
92043-D-50

01.15.2016

Exhibit B
Page 1 of 2

SGPA ARCHITECTURE AND PLANNING
207 Pela Street, Studio 500, San Francisco, California 94104
www.sgpa.com    Copyright SGPA 2015

P1B



BIO RETENTION AREA

STORE

FUTURE EXPANSION AREA

A

27,178 SF

A2

BIO RETENTION AREA

BUY BUY BABY
SIDEWALK SALE AREA

EXPECTANT MOTHER (EM)

buy buy BABY

CART CORRALS

COST PLUS

COST PLUS SIDEWALK
SALE AREA

CUSTOMER PICKUP (CP)

POTENTIAL CUSTOMER WALKING PATHWAY
(SUBJECT TO APPROVAL FROM EXISTING TENANTS AS FURTHER OUTLINED IN THE LEASE)

NOTES
1.   THIS EXHIBIT IS A STUDY LEASE OUTLINE AND IS CONCEPTUAL
2.   COLUMN LOCATIONS ARE NOT SHOWN AND ARE TO BE DETERMINED
3.   DIMENSIONS SHOWN INDICATE LINE OF LEASED PREMISES
4.   LEASE LINE IS LOCATED AS FOLLOWS:
     4.1 LEASE LINE BETWEEN TENANTS INDICATES CENTERLINE OF DEMISING WALL
     4.2 LEASE LINE BETWEEN TENANT AND LANDLORD SPACES INDICATES FACE OF FINISH OF
     LANDLORD SIDE WALL
     4.3 LEASE LINE AT EXTERIOR WALL OR MALL CORRIDOR INDICATES FACE OF FINISH OF
     EXTERIOR /    MALL SIDE OF WALL
5.   PARKING LAYOUT, SERVICE DRIVE, LANDSCAPE, HARDSCAPE, AND SITE PLAN ARE
PRELIMINARY AND     CONTINGENT UPON FINAL DESIGN AND APPROVAL FROM THE CITY OF
DALY CITY

LEGEND

 STORE

 FUTURE EXPANSION AREA

 SIDEWALK SALE ZONE

 EXPECTANT MOTHER (EM)

 CUSTOMER PICKUP (CP)

 CART CORRALS

 BIO RETENTION AREA

 TREE

• PEDESTRIAN LIGHTING

 POTIENTIAL CUSTOMER WALKING PATHWAY

NORTH

# SERRAMONTE CENTER    DALY CITY, CA 94015

# RETAIL A-C SITE PLAN EXHIBIT

EQUITY ONE, INC.     PROJECT NO:
92043-D-50

01.15.2016

Exhibit B
Page 2 of 2



SGPA ARCHITECTURE AND PLANNING
2180 Pine Street, Studio 500, San Francisco, California 94104
www.sgpa.com    Copyright SGPA 2016

P2B

## EXHIBIT C

## CONSTRUCTION OBLIGATIONS OF LANDLORD (TURNKEY)





"Serramonte (Relo #396)"                          EXHIBIT C                          12/23/15
Serramonte Center                                  Page 2                            FINAL
Daly City, CA
Store No. 1940
6061.1348/913881.4





"Serramonte (Relo #396)"
Serramonte Center
Daly City, CA
Store No. 1940
6061.1348/913881.4

EXHIBIT C
Page 4

12/23/15
FINAL

## EXHIBIT D

## LANDLORD'S PROHIBITED USES

**Macy's**
Landlord Restriction:

Landlord will not use or permit the use of, any portion of the Shopping Center (i) for the
operation of a discount house, as that term is presently understood in the retail business, (ii) for
the operation of any business regularly engaged in the practice of selling "surplus," "second
hand" or distress merchandise; and (iii) as living quarters or lodging rooms.
Landlord's obligations under paragraph (a), paragraph (c) and paragraph (d) through (1) of this
subsection (1) shall cease when Tenant ceases to operate a Department Store on Parcel A of the
Demised Land, except for such reasonable interruptions as may be incident to the conduct of a
similar business and to events of the character included in the definition of Excusable Delays.

**JC Penney**
Landlord Restriction:

(b) Landlord will:

(iii) Not locate a restaurant or other establishment principally engaged in food service within the
area labeled as the "Restaurant Exclusion Area" on Exhibit F-1 hereto or in Tenant's Protected
Area, other than in locations at which a restaurant or other food service establishment is operated
as of the Effective Date, except with the prior written consent of Tenant in its discretion;

(iv) Not locate a theater within the area labeled as the "Fitness Center and Theater Exclusion
Area" on Exhibit F-1 hereto or in Tenant's Protected Area, except with the prior written consent
of Tenant in its discretion;

(v) Not locate a fitness club, gym or exercise facility within the area labeled as the "Fitness
Center and Theater Exclusion Area" on Exhibit F-1 hereto or in Tenant's Protected Area, except
with the prior written consent of Tenant in its discretion;

(d) (a) During the term of this Lease, Landlord will (i) not enter into any new lease or other
occupancy arrangement pursuant to which the tenant or other occupant is permitted to operate for
any of the uses listed on Exhibit E hereto (the "Prohibited Uses"); (ii) not agree to any
amendment of a lease or other occupancy arrangement, or grant any waiver or consent
thereunder, pursuant to which the tenant or other occupant is permitted to operate for any of the
Prohibited Uses; and (iii) use commercially reasonable and good faith efforts to enforce the
provisions of leases and other occupancy arrangements so that no tenant or other occupancy
operates for any of the Prohibited Uses.

## PROHIBITED USES

1. Any industrial or manufacturing uses which under local zoning regulations are permitted
solely in industrial districts, or any facilities principally engaged in oil refining, drilling for the
extraction of oil, gas or other similar resources, smelting, dumping or mining operations;

2. Any tattoo parlor;

3. Any establishment engaged in the sale, rental or exhibition of matter that has been determined to constitute "obscene matter" as defined in California Penal Code 311 (a) (or applicable successor statutes) pursuant to a final, non-appealable and effective adjudication of a California court of competent jurisdiction;

4. Any mobile home park, trailer court, prison or forced labor camp, junkyard, stockyard;

5. Any livestock or other facility raising animals for commercial meat, dairy or egg production purposes, or any stockyard or slaughterhouse, or any farm engaged in growing crops;

6. Any pawn shop;

7. Any mortuary, funeral home, or crematory;

8. Any garbage dump or waste disposal facility engaged in the collection, disposal, incineration or processing of garbage and refuse generated off site;

9. Any commercial laundry or dry cleaning facility that is authorized to perform laundering or dry cleaning operations on-site (which shall not include a facility for the drop-off and pick-up of laundry or dry cleaning or other facility.not performing such on-site work);

10. A shooting range or other facility for the firing of live ammunition or the explosion of other weapons of deadly force; or

11. Any use which is illegal or unlawful

### Target
Landlord Restriction:

Excepting the current tenants of the Shopping Center as listed on Exhibit D attached hereto and incorporated herein and notwithstanding anything in the Lease to the contrary, Landlord covenants that no portion of the Shopping Center, excepting the premises as defined in the Lease, may be used for or occupied by any of the following:

(A) Any grocery store, supermarket, convenience store or other store, or department within a store, in each case containing more than 60,000 square feet, which sells food and/or beverages for off-premises human consumption.

(B) Not more than one (1) "dollar" (or increment of a dollar) store or other similar variety discount type store such as those operated on the date of this Lease under the trade name Dollar Tree, Family Dollar, 99 Cents Only, and Five Below is permitted.

(C) Excepting Macy's and JC Penney (or any replacements thereof within the existing buildings occupied by Macy's and JC Penney), any department store or junior department store containing

more than 60,000 square feet.

(D) Any Membership Wholesale Club (as hereafter defined) containing more than 60,000 square feet. "Membership Wholesale Club" means a general merchandise store that sells merchandise in bulk and limits sales to individuals, businesses, or organizations that have purchased a membership in order to shop at the store, such as those operated on the date of this Amendment under the trade name Costco, Sam's Club and BJ's Wholesale Club.

(E) Any store, department, or operation of any size that is:
(i) owned, managed, or operated by Wal-Mart Stores, Inc., or a parent, subsidiary, or other affiliate of Wal-Mart Stores, Inc. ("Wal-Mart"), or
(ii) branded or marketed as a Wal-Mart, Sam's Club, Neighborhood Market, Wal-Mart Express, or any other concept that identifies Wal-Mart or any Wal-Mart brand in its name, signage, or advertising.

## Daly City Optometry
Landlord Restriction:

Landlord shall not enter into any agreement to allow any kiosk located in front of the storefront of the Premises to sell sunglasses and shall terminate any such existing agreement prior to the Commencement Date.

## Dick's Sporting Goods
Landlord Restriction:

During the term of this Lease, Landlord will (i) not enter into any new lease or other occupancy arrangement pursuant to which the Occupant is permitted to operate for any of the uses listed as items 1 through 11, inclusive, in Part II(3) of the on Exhibit I hereto (collectively, the "Prohibited Uses"); (ii) not agree to any amendment of a lease or other occupancy arrangement, or grant any waiver or consent thereunder, pursuant to which the tenant or other occupant is permitted to operate for any of the Prohibited Uses; and (iii) use commercially reasonable and good faith efforts to enforce the provisions of leases and other occupancy arrangements so that no Occupant operates for any of the Prohibited Uses.

In addition to the foregoing, as long as any retail sales activity shall be conducted in the Demised Premises excluding interruptions (x) not exceeding one hundred eighty (180) consecutive days, or (y) due to alterations, restoration, casualty, taking and a Force Majeure Event, which shall be deemed to be the conduct of retail sales activity for purposes of this section, Landlord will (i) not enter into any new lease or other occupancy arrangement and (ii) not agree to any amendment of a lease or other occupancy arrangement, or grant any waiver or consent thereunder for any of the following uses within the Shopping Center (collectively, "Tenant Prohibited Uses"):

(i) [Intentionally omitted]

(ii) [Intentionally omitted]

(iii) for any establishment engaged in the sale, rental or exhibition of matter that has been

determined to constitute "obscene matter" as defined in California Penal Code 311 (a) (or applicable successor statues) pursuant to a final, non-appealable and effective adjudication of a California court of competent jurisdiction;

(iv) for any establishment which principally sells or displays used merchandise or second hand goods that is not otherwise typically found in first-class regional shopping centers; or

(v) for any office, restaurant and/or entertainment use within the area labeled "No Entertainment/Office Area" on the Lease Plan, excluding, however, the existing "McDonald's" restaurant premises located within such area, and any replacements thereof, and excluding the existing food court of the Shopping Center.

Landlord shall use commercially reasonable and good faith efforts to enforce the provisions of leases and other occupancy arrangements so that no Occupant operates for any of the Tenant Prohibited Uses.

1: Any industrial or manufacturing uses which under local zoning regulations are permitted solely in industrial districts, or any facilities principally engaged in oil refining, drilling for the extraction of oil, gas or other similar resources, smelting, dumping or mining operations;

2. Any tattoo parlor;

3. Any establishment engaged in the sale, rental or exhibition or matter that has been determined to constitute "obscene matter" as defined in California Penal Code 311 (a) (or applicable successor statutes) pursuant to a final, non-appealable and effective adjudication of a California court of competent jurisdiction;

4. Any mobile home park, trailer court, prison or forced labor camp, junkyard, stockyard;

5. Any livestock or other facility raising animals for commercial meat, dairy or egg production purposes, or any stockyard or slaughterhouse, or any farm engaged in growing crops;

6. Any pawn shop;

7. Any mortuary, funeral home, or crematory;

8. Any garbage dump or waste disposal facility engaged in the collection, disposal, incineration or processing of garbage and refuse generated off site;

9. Any commercial laundry or dry cleaning facility that is authorized to perform laundering or dry cleaning operations on-site (which shall not include a facility for the drop-off and pick-up of laundry or dry cleaning or other facility not performing such on-site work);

10. A shooting range or other facility for the firing of live ammunition or the explosion of other weapons of deadly force; or

11. Any use which is illegal or unlawful.

**Buy Buy Baby (Bed Bath & Beyond)**
Landlord Restriction:

Landlord shall not lease, rent or occupy or permit to be occupied any portion of the Southwest Quadrant for any of the "Prohibited Uses" (as set forth in Exhibit L hereto annexed).

Exhibit L "Prohibited Uses":

As used in this Lease, the term *"**Prohibited Uses**"* shall mean any of the following uses:

(1)     Any use which emits or results in strong, unusual or offensive odors, fumes, dust or vapors, is a public or private nuisance, emits noise or sounds which are objectionable due to intermittence, beat, frequency, shrillness or loudness, creates a hazardous condition, or is used, in whole or in part, as or for warehousing or the dumping or disposing of garbage or refuse;

(2)     Any operation primarily used as a storage facility and any assembling, manufacturing, distilling, refining, smelting, agricultural, or mining operation;

(3)     Any "second hand" store, "surplus" store such as Good Will or Salvation Army (it being agreed that stores such as Ross Dress for Less and TJ Maxx shall not be prohibited);

(4)     Any mobile home park, trailer court, labor camp, junkyard, or stockyard (except that this provision shall not prohibit the temporary use of construction trailers during periods of construction, reconstruction, or maintenance);

(5)     Any dumping, disposing, incineration, or reduction of garbage (exclusive of trash compactors or trash containers located near the rear of any building);

(6)     Any fire sale, bankruptcy sale (unless pursuant to a court order), auction house operation, fictitious going-out-of-business sale, lost-our-lease sale or similarly advertised event;

(7)     Any central laundry, dry cleaning plant, or laundromat (except that a dry cleaner that performs all dry cleaning outside the Shopping Center shall be permitted, so long as its on-site premises are located more than 150 feet away from the Premises);

(8)     Any automobile, truck, trailer, boat, or recreational vehicle sales, leasing, display or body shop repair operation;

(9)     Any bowling alley or skating rink;

(10)     Any live performance theater, auditorium, meeting hall or sporting event;

(11)     Any living quarters, sleeping apartments, or lodging rooms;

(12)     Any veterinary hospital or animal raising or boarding facilities (except to the extent located in a full service pet store to the extent permitted below);

(13)    Any mortuary or funeral home;

(14)    Any "Pornographic Use", which shall include, without limitation: (x) a store displaying for sale or exhibition books, magazines or other publications containing any combination of photographs, drawings or sketches of a sexual nature, which are not primarily scientific or educational [provided, however, that the sale of books, magazines and other publications by a national bookstore of the type normally located in first-class shopping centers in the State in which the Shopping Center is located (such as, for example, Borders and Barnes & Noble, as said stores currently operate) shall not be deemed a "pornographic use" hereunder]; or (y) a store offering for exhibition, sale or rental video cassettes or other medium capable of projecting, transmitting or reproducing, independently or in conjunction with another device, machine or equipment, an image or series of images, the content of which has been rated or advertised generally as NC-17 or "X" or unrated by the Motion Picture Rating Association, or any successor thereto [provided, however, that the sale or rental of such videos by a national video store of the type normally located in first-class shopping centers in the State in which the Shopping Center is located (such as, for example, Blockbuster or West Coast Video, as said stores currently operate) shall not be deemed a "pornographic use" hereunder]; or massage parlor [except for therapeutic massages given in connection with the operation of a cosmetic store, day spa or health club which may otherwise be permitted under this Exhibit L];

(15)    Any so-called "head shop", or other establishment primarily selling or exhibiting drug-related paraphernalia;

(16)    Any bar, tavern, or other establishment selling alcoholic beverages for on- or off-premises consumption except as incidental to an establishment selling food, provided, however, that Tenant shall be permitted to sell, on an incidental basis, alcoholic beverages for off-premises consumption and/or on-site tastings, subject to applicable Legal Requirements;

(17)    Any catering or banquet hall;

(18)    Any flea market, amusement or video arcade (except for video games incidental to a primary permitted use such as Gamestop), pool or billiard hall, night club, discotheque, or dance hall;

(19)    Any training or education facility, including but not limited to:  beauty schools, barber colleges, reading rooms, places of instruction or other operations catering primarily to students or trainees rather than to customers; provided, however, this prohibition shall not be applicable to on-site employee training by an Occupant incidental to the conduct of its business at the Shopping Center;

(20)    Any gambling facility or operation, including but not limited to:  off-track or sports betting parlor; table games such as black-jack or poker; slot machines; video poker/black-jack/keno machines or similar devices; or bingo hall.  Notwithstanding the foregoing, this prohibition shall not apply to governmental sponsored gambling activities, or charitable gambling activities, so long as such governmental and/or charitable activities are incidental to the business operation being conducted by the Occupant;

(21)    Any unlawful use;

(22)    Any pawn shop, check-cashing store, gun shop, or tattoo parlor;

(23)    Any church or other place of religious worship;

(24)    Except as part of a warehouse club or similar store, Any car wash, automobile repair shop, or any business servicing motor vehicles in any respect, including, without limitation, any quick lube oil change service, tire center or gasoline or service station or facility

(25)    Any carnival, amusement park or circus;

(26)    Any medical clinics or medical offices (and, without limiting the generality of the foregoing, expressly prohibiting any controversial treatment centers that may be disruptive to the operation of the Shopping Center), provided, however, family service medical offices commonly found in similar first-class shopping centers in the San Mateo metropolitan area such as a dentist's office and a vision store offering the services of an eye doctor shall be permitted but only in the area designated on Exhibit B as Retail A and Retail A-2; provided that any such individual office shall not exceed 3,000 square feet of Floor Area and the Floor Area of such medical offices (together with the retail offices permitted in item 28 below), shall not exceed 5,000 square feet in the aggregate;

(27)    Any supermarket or food store except if located only in the space designated as Retail A on Exhibit B and having an entrance only facing North;

(28)    Any office use, other than: (x) office space used in connection with and ancillary to a permitted retail use hereunder; and (y) retail offices providing services commonly found in similar first-class shopping centers in the San Mateo metropolitan area (for example, financial services, real estate brokerage, insurance agency, banking, travel agency), and further provided that the uses set forth in clauses (x) and (y) shall only be permitted in the area designated on Exhibit B as Retail A and Retail A-2; provided that any such individual office shall not exceed 3,000 square feet of Floor Area and the Floor Area of such offices (together with the retail offices permitted in item 26 above), shall not exceed 5,000 square feet in the aggregate;

(29)    hotel/motel;

(30)    daycare center;

(31)    veterinary office, except as may be incidental to a permitted full-line pet and pet supply store operating in at least 15,000 square feet of Floor Area and not located adjacent to the Premises (except that a full-line pet and pet supply store shall be permitted to be located within the Premises); such occupant shall use reasonable efforts to prevent its customers from allowing their pets to urinate or defecate in the Common Areas and will promptly remove any "dog dirt" from in front of the Premises;

(32)    children's entertainment or activity facility (such as "Discovery Zone", or "Chuck E. Cheese's");

(33)    karate center;

(34)    movie theater;

(35)    restaurant serving meals for on- or off-premises consumption except for a "quick serve" or "fast casual" restaurant (i.e. one that does not provide for table service) and only in the space designated as Retail A-2 on Exhibit B;

(36)    beauty parlor or nail salon;

(37)    health spa, exercise facility or similar type business;

(38)  a store primarily selling merchandise which is classed as "odd lot," "close out," "clearance," "discontinued," "cancellation," "second," "factory reject," "sample," "floor model," "demonstrator," "obsolescent," "over stock," "distressed," "bankruptcy," "fire sale" or "damaged", such as, for example, "Grossman's Bargain Outlet", "Contractor's Warehouse", "Big Lots", "Liquidation World", or "Odd Job"; the retailer commonly known as "Christmas Tree Shops", "Ross Dress for Less" and "TJ Maxx" shall be deemed not to violate the foregoing restriction; or

(39)    any use, the presence of which may jeopardize the validity of the right to sell alcohol from the Premises (*e.g.*, in some jurisdictions, educational facilities, medical facilities, churches, and schools).

## Cost Plus (Bed, Bath & Beyond)

Landlord Restriction:

Landlord shall not lease, rent or occupy or permit to be occupied any portion of the Southwest Quadrant for any of the "Prohibited Uses" (as set forth in Exhibit L hereto annexed).

Exhibit L Prohibited Uses:

As used in this Lease, the term *"Prohibited Uses"* shall mean any of the following uses:

(1)    Any use which emits or results in strong, unusual or offensive odors, fumes, dust or vapors, is a public or private nuisance, emits noise or sounds which are objectionable due to intermittence, beat, frequency, shrillness or loudness, creates a hazardous condition, or is used, in whole or in part, as or for warehousing or the dumping or disposing of garbage or refuse;

(2)    Any operation primarily used as a storage facility and any assembling, manufacturing, distilling, refining, smelting, agricultural, or mining operation;

(3)    Any "second hand" store, "surplus" store such as Good Will or Salvation Army (it being agreed that stores such as Ross Dress for Less and TJ Maxx shall not be prohibited);

(4)    Any mobile home park, trailer court, labor camp, junkyard, or stockyard (except that this provision shall not prohibit the temporary use of construction trailers during periods of construction, reconstruction, or maintenance);

(5)    Any dumping, disposing, incineration, or reduction of garbage (exclusive of trash compactors or trash containers located near the rear of any building);

(6)    Any fire sale, bankruptcy sale (unless pursuant to a court order), auction house operation, fictitious going-out-of-business sale, lost-our-lease sale or similarly advertised event;

(7)    Any central laundry, dry cleaning plant, or laundromat (except that a dry cleaner that performs all dry cleaning outside the Shopping Center shall be permitted, so long as its on-site premises are located more than 150 feet away from the Premises);

(8)    Any automobile, truck, trailer, boat, or recreational vehicle sales, leasing, display or body shop repair operation;

(9)    Any bowling alley or skating rink;

(10)    Any live performance theater, auditorium, meeting hall or sporting event;

(11)    Any living quarters, sleeping apartments, or lodging rooms;

(12)    Any veterinary hospital or animal raising or boarding facilities (except to the extent located in a full service pet store to the extent permitted below);

(13)    Any mortuary or funeral home;

(14)    Any "Pornographic Use", which shall include, without limitation: (x) a store displaying for sale or exhibition books, magazines or other publications containing any combination of photographs, drawings or sketches of a sexual nature, which are not primarily scientific or educational [provided, however, that the sale of books, magazines and other publications by a national bookstore of the type normally located in first-class shopping centers in the State in which the Shopping Center is located (such as, for example, Borders and Barnes & Noble, as said stores currently operate) shall not be deemed a "pornographic use" hereunder]; or (y) a store offering for exhibition, sale or rental video cassettes or other medium capable of projecting, transmitting or reproducing, independently or in conjunction with another device, machine or equipment, an image or series of images, the content of which has been rated or advertised generally as NC-17 or "X" or unrated by the Motion Picture Rating Association, or any successor thereto [provided, however, that the sale or rental of such videos by a national video store of the type normally located in first-class shopping centers in the State in which the Shopping Center is located (such as, for example, Blockbuster or West Coast Video, as said stores currently operate) shall not be deemed a "pornographic use" hereunder]; or massage parlor [except for therapeutic massages given in connection with the operation of a cosmetic store, day spa or health club which may otherwise be permitted under this Exhibit L];

(15)    Any so-called "head shop", or other establishment primarily selling or exhibiting drug-related paraphernalia;

(16)    Any bar, tavern, or other establishment selling alcoholic beverages for on- or off-premises consumption except as incidental to an establishment selling food, provided, however, that Tenant shall be permitted to sell, on an incidental basis, alcoholic beverages for off-premises consumption and/or on-site tastings, subject to applicable Legal Requirements;

(17)    Any catering or banquet hall;

(18)    Any flea market, amusement or video arcade (except for video games incidental to a primary permitted use such as Gamestop), pool or billiard hall, night club, discotheque, or dance hall;

(19)    Any training or education facility, including but not limited to:  beauty schools, barber colleges, reading rooms, places of instruction or other operations catering primarily to students or trainees rather than to customers; provided, however, this prohibition shall not be applicable to on-site employee training by an Occupant incidental to the conduct of its business at the Shopping Center;

(20)    Any gambling facility or operation, including but not limited to:  off-track or sports betting parlor; table games such as black-jack or poker; slot machines; video poker/black-jack/keno machines or similar devices; or bingo hall.  Notwithstanding the foregoing, this prohibition shall not apply to governmental sponsored gambling activities, or charitable gambling activities, so long as such governmental and/or charitable activities are incidental to the business operation being conducted by the Occupant;

(21)    Any unlawful use;

(22)    Any pawn shop, check-cashing store, gun shop, or tattoo parlor;

(23)    Any church or other place of religious worship;

(24)    Except as part of a warehouse club or similar store, Any car wash, automobile repair shop, or any business servicing motor vehicles in any respect, including, without limitation, any quick lube oil change service, tire center or gasoline or service station or facility

(25)    Any carnival, amusement park or circus;

(26)    Any medical clinics or medical offices (and, without limiting the generality of the foregoing, expressly prohibiting any controversial treatment centers that may be disruptive to the operation of the Shopping Center), provided, however, family service medical offices commonly found in similar first-class shopping centers in the San Mateo metropolitan area such as a dentist's office and a vision store offering the services of an eye doctor shall be permitted but only in the area designated on Exhibit B as Retail A and Retail A-2; provided that any such individual office shall not exceed 3,000 square feet of Floor Area and the Floor Area of such medical offices (together with the retail offices permitted in item 28 below), shall not exceed 5,000 square feet in the aggregate;

(27)    Any supermarket or food store except if located only in the space designated as Retail A on Exhibit B and having an entrance only facing North;

(28)    Any office use, other than: (x) office space used in connection with and ancillary to a permitted retail use hereunder; and (y) retail offices providing services commonly found in similar first-class shopping centers in the San Mateo metropolitan area (for example, financial services, real estate brokerage, insurance agency, banking, travel agency), and further provided that the uses set forth in clauses (x) and (y) shall only be permitted in the area designated on Exhibit B as Retail A and Retail A-2; provided that any such individual office shall not exceed 3,000 square feet of Floor Area and the Floor Area of such offices (together with the medical offices permitted in item 26 above), shall not exceed 5,000 square feet in the aggregate;

(29)    hotel/motel;

(30)    daycare center;

(31)    veterinary office, except as may be incidental to a permitted full-line pet and pet supply store operating in at least 15,000 square feet of Floor Area and not located adjacent to the Premises (except that a full-line pet and pet supply store shall be permitted to be located within the Premises); such occupant shall use reasonable efforts to prevent its customers from allowing their pets to urinate or defecate in the Common Areas and will promptly remove any "dog dirt" from in front of the Premises;

(32)    children's entertainment or activity facility (such as "Discovery Zone", or "Chuck E. Cheese's");

(33)    karate center;

(34)    movie theater;

(35)    restaurant serving meals for on- or off-premises consumption except for a "quick serve" or "fast casual" restaurant (i.e. one that does not provide for table service) and only in the space designated as Retail A-2 on Exhibit B;

(36)    beauty parlor or nail salon;

(37)    health spa, exercise facility or similar type business;

(38)  a store primarily selling merchandise which is classed as "odd lot," "close out," "clearance," "discontinued," "cancellation," "second," "factory reject," "sample," "floor model," "demonstrator," "obsolescent," "over stock," "distressed," "bankruptcy," "fire sale" or "damaged", such as, for example, "Grossman's Bargain Outlet", "Contractor's Warehouse", "Big Lots", "Liquidation World", or "Odd Job"; the retailer commonly known as "Christmas Tree Shops", "Ross Dress for Less" and "TJ Maxx" shall be deemed not to violate the foregoing restriction; or

(39)    any use, the presence of which may jeopardize the validity of the right to sell alcohol from the Premises (e.g., in some jurisdictions, educational facilities, medical facilities, churches, and schools).

**Nordstrom Rack**
Landlord Restriction:

Neither the Shopping Center, nor any part thereof, shall be used, and no building or other improvement shall be constructed, maintained or used for any purpose other than the following: retail, office, and service establishments of the type common to a first-class promotional shopping center, including, without limitation, financial institutions, brokerage offices, restaurants, and travel and other agencies; provided that so long as Tenant is operating as a retail outlet store upon the Premises, office uses and service establishments (excluding theaters and restaurants) shall not, as to those areas within the Shopping Center over which Landlord has control (excluding the Future Hotel Site), exceed ten percent (10%) of the Floor Area of the Shopping Center. All businesses conducted within the Shopping Center shall be conducted in a lawful manner.

For so long as Tenant is Operating the Premises, no use or operation will be made, conducted or permitted on or with respect to all or any part of the Shopping Center, by either Landlord (or its tenants) or Tenant, which use or operation is obnoxious to or out of harmony with the development or operation of a first-class promotional shopping center, including, but not limited to, the following:

(1)     Any public or private nuisance.
(2)     Any noise or sound that is objectionable due to intermittence, beat, frequency, shrillness or loudness.
(3)     Any obnoxious odor.
(4)     Use, storage, transportation, handling, manufacture, or emission of any noxious, toxic, caustic or corrosive fuel or gas or other hazardous or toxic substance or Hazardous Material unless such materials are handled in accordance with applicable governmental laws, regulations and codes.
(5)     Emission of microwave, radio wave, or other similar electronic, light or noise radiation at levels which are dangerous to health or which interfere with the proper operation of electronic, telephone, computer or other business equipment of tenants of the Shopping Center.
(6)     Any dust, dirt or fly ash in excessive quantities.
(7)     Any unusual fire, explosion or other damaging or dangerous hazard, including the storage, display or sale of explosives or fireworks.
(8)     Any warehouse (but any area for the storage of goods intended to be sold at any retail establishment in the Shopping Center shall not be deemed to be a warehouse), assembly, manufacture, distillation, refining, smelting, agriculture or mining operations. The foregoing shall not prohibit Costco or a similar warehouse wholesale retailer.
(9)     Any mobile home or trailer court, labor camp, junk yard, stock yard or animal raising.
(10)    Any drilling for and/or removal of subsurface substances.
(11)    Any dumping of garbage or refuse (other than in dumpsters or compactors designed for such purpose).
(12)    Any commercial laundry or dry cleaning plant, laundromat, veterinary hospital car washing establishment, bowling alley located within 300 feet of the Premises, mortuary or similar service establishment. Notwithstanding the foregoing, pet shops or veterinary which

include boarding shall be permitted within the Shopping Center (but not within the No-Change Area [defined in Section 18A]) under the name Petco, Petsmart, Pet Supermarket or a pet store of similar quality (which similar quality pet store shall be determined in Tenant's reasonable discretion).

(13)     Any automobile body and fender repair work other than automobile services provided by any department store in connection with its operations as a retail department store.

(14)     No kiosk, pushcarts, temporary sales booths or other forms of so-called remote merchandising units ("**RMUs**") shall be allowed within the No-Change Area (defined in Section 18A). Additionally, no space contiguous to the Premises shall primarily be used for the sale of food or as an entertainment use without Tenant's prior approval, which approval may be withheld in Tenant's sole discretion.

(15)     Sidewalk sales located outside of the No-Change Area shall not unreasonably interfere with pedestrian or vehicular access within the Shopping Center.

(16)     The operation of a "head shop," so-called, or other business devoted to the sale of articles or merchandise normally used or associated with illegal or unlawful activities, such as but not limited to the sale of paraphernalia used in connection with marijuana, cocaine or other controlled drugs or substances.

(17)     A massage parlor or the business of the sale of so-called "adult" materials such as, without limitation, magazines, books, movies and photographs; provided, however, that a national bookstore of equal or better quality than Barnes & Noble shall be permitted to sell sexually explicit material (excluding videos or DVDs rated "X" under the Motion Picture Association of America) as an incidental part of its business provided that no more than five percent (5%) of the leaseable floor area of any such user shall be devoted to such material. The foregoing restriction shall not apply to massage services administered by licensed massage therapists in a medical or health care setting or a spa or salon or retail establishment (including, without limitation, therapeutic massage services being offered by retail establishments such as or similar to Massage Envy).

(18)     Automotive sales (selling new or used cars, trailers or mobile homes) and service.

(19)     Factory.

(20)     Industrial usage.

(21)     Processing or rendering plant.

(22)     Any carnivals or flea markets.

"Serramonte (Relo #396)"
Serramonte Center
Daly City, CA
Store No. 1940
6061.1348/935939.1

EXHIBIT D
13

12/23/15
FINAL

1

## EXHIBIT E

2

## ACKNOWLEDGMENT OF COMMENCEMENT

3
4
5
6

      This Acknowledgment is made as of _____, 20___ with reference to that certain lease (hereinafter referred to as the "Lease") dated _____, 20____, between **DALY CITY SERRAMONTE CENTER, LLC,** as "Landlord" therein, and **ROSS DRESS FOR LESS, INC.,** as "Tenant."

7

      The undersigned hereby confirms the following:

8

    1.    The Delivery Date (as described in said Lease) occurred on _____.

9
10
11

    2.    In accordance with the provisions of said Lease the commencement date of the term is _____, and that, unless sooner terminated, the original term thereof expires on _____.

12

    3.    The Agreed Size is _____ square feet.

13
14

    4.    The notice date for the exercise of the first option is on or before _____, 20___.

**LANDLORD:**
**DALY CITY SERRAMONTE CENTER,**
**LLC, a Delaware limited liability company**

**TENANT:**
**ROSS DRESS FOR LESS, INC.,**
**a Virginia corporation**

By:  Equity One Realty & Management CA,
     Inc.

By:_____
     Gregg McGillis
     Its: Group Senior Vice President, Property Development

By:_____
Name: Michael Makinen
Its:   Chief Operating Officer

"Serramonte (Relo #396)"
Serramonte Center
Daly City, CA
Store No. 1940
6061.1348/913885.1

EXHIBIT E

12/23/15
FINAL

# EXHIBIT F

RECORDING REQUESTED BY

Ross Dress For Less, Inc.

PREPARED BY AND WHEN RECORDED MAIL TO:

Bartko, Zankel, Bunzel & Miller
One Embarcadero Center, Suite 800
San Francisco, CA 94111
Attn.: Theani C. Louskos, Esq.

---

SPACE ABOVE THIS LINE RESERVED FOR RECORDER'S USE

## SUBORDINATION, NONDISTURBANCE AND ATTORNMENT AGREEMENT

### LOCATION:  Daly City, CA

1    APN:_____.
2
3            This Subordination, Nondisturbance and Attornment Agreement (the "Agreement") is
4    effective as of this ____ day of _____, 20__, by and between _____ (the "Lender"),
5    ROSS DRESS FOR LESS, INC., a Virginia corporation (the "Tenant") and DALY CITY SERRAMONTE
6    CENTER, LLC, a Delaware limited liability company (the "Landlord").
7
8                                           RECITALS
9
10          A.      Lender is the holder of indebtedness secured by a lien or liens upon, the real property
11   described in Exhibit "A" attached hereto and by this reference incorporated herein.  The Exhibit "A"
12   property and improvements thereon is hereinafter referred to as the "Shopping Center."  The instruments
13   creating such lien or liens whether they be denominated as being "mortgage," "deed of trust," "deed to
14   secure debt," "security agreement," "vendor's lien," "ground lease," or otherwise, and any instruments
15   modifying or amending the same, or entered into in substitution or replacement thereof, are hereinafter
16   collectively referred to as being the "Mortgage," recorded in the Official Records of _____
17   County as Document No. _____.
18
19          B.      Tenant has executed, or will execute, a certain lease with Landlord, dated for reference
20   purposes on _____, for all or a portion of the Shopping Center, which portion (the
21   "Premises") is more particularly set forth in said lease.  Said lease and all amendments and modifications
22   thereto are herein collectively referred to as the "Lease."
23

C.    Tenant has requested that Lender agree not to disturb Tenant's possessory rights under the Lease in the event that Lender should foreclose on the Mortgage, provided that Tenant is not in default of the Lease.

D.    The parties desire to establish certain rights and obligations with respect to their respective interests by means of this Agreement.

## AGREEMENTS

NOW, THEREFORE, the parties hereto in consideration of the mutual covenants herein contained, and intending to be legally bound by hereby agree as follows:

1.    Subject to the terms and conditions of this Agreement, and for so long as this Agreement remains binding upon Lender, the Lease shall be, in accordance with the terms and conditions hereof, subordinate to the lien of the Mortgage and all voluntary and involuntary advances made thereunder.

2.    Lender approves of the Lease.

3.    Provided that Tenant is not in default so as to permit the Landlord to terminate the Lease or Tenant's right to possession of the Premises, Lender or the purchaser at a foreclosure sale pursuant to any action or proceeding to foreclose the Mortgage, whether judicial or non-judicial, or Lender pursuant to acceptance of a deed in lieu of foreclosure or any assignment of Landlord's interest under the Lease, in the exercise of any of the rights arising, or which may arise, out of the Mortgage or in any other manner: (i) shall not disturb or deprive Tenant in or of its use, quiet enjoyment and possession (or its right to use, quiet enjoyment and possession) of the Premises, or of any part thereof, or any right, benefit or privilege granted to or inuring to the benefit of Tenant under the Lease (including any right of renewal or extension thereof); (ii) shall not terminate or affect the Lease;  (iii) shall recognize Tenant's rights, benefits and privileges under the Lease; and, (iv) shall recognize the leasehold estate of Tenant under all of the terms, covenants, and conditions of the Lease for the remaining balance of the term of the Lease with the same force and effect as if Lender were the Landlord under the Lease.  Lender hereby covenants that any sale by it of the Shopping Center pursuant to the exercise of any rights and remedies under the Mortgage or otherwise, shall be made subject to the Lease and the rights of Tenant thereunder. However, in no event shall Lender be:

(a)    Liable for any act or omission of Landlord arising prior to the date Lender takes possession of Landlord's interest in the Lease or becomes a mortgagee in possession, except to the extent such act or omission is of a continuing nature, such as, for example, a repair obligation;

(b)      Liable for any offsets or deficiencies which the Tenant might be entitled to assert against the Landlord arising prior to the date Lender takes possession of Landlord's interest in the Lease or becomes a mortgagee in possession, except to the extent that Lender has received the benefit of the act of the Tenant giving rise to the right of deduction, such as, for example, relief of an obligation that would otherwise have been paid by Lender as Landlord;

(c)      Bound by any payment of rent or additional rent made by Tenant to Landlord for more than one month in advance, which payment was not required under the terms of the Lease;

(d)      Bound by any amendment or modification of the Lease executed after the date of this Agreement which: (i) increases Landlord's obligations or reduces Tenant's obligations under the Lease; and, (ii) is made without Lender's prior written consent (except to the extent that the Lease may specifically contemplate any amendment or modification thereof).

4.      In the event of the termination of the Mortgage by foreclosure, summary proceedings or otherwise, and if Tenant is not in default under the terms and conditions of the Lease so as to permit the Landlord thereunder to terminate the Lease, then, and in any such event, Tenant shall not be made a party in the action or proceeding to terminate the Mortgage unless not to do so would be disadvantageous procedurally to Lender, in which case, such joinder of Tenant as a party shall not extinguish or interfere with any rights of Tenant under the Lease, nor shall Tenant be evicted or moved or its possession or right to possession under the terms of the Lease be disturbed or in any way interfered with, and, subject to the provisions of this Agreement, Tenant will attorn to Lender or any other party which obtains title to the Shopping Center pursuant to any remedy provided for by the Mortgage or otherwise, such attornment to be effective and self-operative without the execution of any other instruments on the part of any party, and the Lease shall continue in full force and effect as a direct Lease from Lender or such party to Tenant under all the terms and provisions of the Lease (including any rights to renew or extend the term thereof).  In the event of such attornment, Lender shall be deemed to have assumed and shall assume the performance of all of the affirmative covenants of Landlord occurring under the Lease from and after the time Lender becomes Landlord and until such time as such obligations are assumed by a bona fide purchaser.

5.      Tenant hereby confirms that the Lease is in full force and effect.

6.      Nothing contained in this Agreement shall be deemed to reduce or abrogate any rights of Tenant to cure any default of the Landlord under the Lease in accordance with and subject to the provisions of the Lease and/or to deduct from rental such amounts which Tenant may be entitled to so deduct under the provisions of the Lease.

7.      Unless and until Lender or any subsequent purchaser succeeds to the interest of Landlord under the Lease, Landlord shall continue to perform Landlord's obligations and duties under the Lease.

8.    If Landlord executes and delivers to Lender an Assignment of Leases and Rents conveying the rent under the Lease upon an event of default by Landlord under the Mortgage, after receipt of notice from Lender to Tenant (at the address set forth below) that rents under the Lease should be paid to Lender, Tenant shall thereafter pay to Lender all monies thereafter due to Landlord under the Lease. In such event, Tenant shall be entitled to rely solely upon such notice, and Landlord and Lender hereby indemnify and agree to defend and hold Tenant harmless from and against any and all expenses, losses, claims, damages or liabilities arising out of Tenant's compliance with such notice or performance of the obligations under the Lease by Tenant made in good faith in reliance on and pursuant to such notice. Tenant shall be entitled to full credit under the Lease for any rents paid to Lender in accordance with the provisions hereof. Any dispute between Lender (or any other purchaser) and Landlord as to the existence of a default by Landlord under the provisions of the Mortgage, shall be dealt with and adjusted solely between Lender (or any other purchaser) and Landlord, and Tenant shall not be made a party thereto.

9.    Lender shall use the proceeds of any insurance recovery or condemnation award for the purposes stated in the Lease.

10.    No modification, amendment, waiver or release of any provision of this Agreement or of any right, obligation, claim or cause of action arising thereunder shall be valid or binding for any purpose whatsoever unless in writing and duly executed by the party against which the same is brought to be asserted.

11.    This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors and assigns, including without limitation, the covenants of Lender herein shall be specifically binding upon any purchaser of the Shopping Center at foreclosure or at a sale under power of sale.

12.    In the event any one or more of the provisions contained in this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, said provision(s) shall be void and of no further force or effect.

13.    This Agreement shall be governed and construed according to the laws of the state where the Shopping Center is located.

14.    Provided that Tenant is not in default under the Lease, Lender shall not institute any litigation naming Tenant as a defendant for the purpose of foreclosing or otherwise terminating Tenant's leasehold interest in the Shopping Center or the Premises unless Tenant is required to be named in such litigation by law, and then only for the purpose of complying with the applicable foreclosure statute and so long as Tenant's failure to defend against any such action shall not result in a waiver of its rights to continued possession under the Lease as set forth in this Agreement. The term "Lender" as used herein shall include any successor-in-interest to the Lender (including a purchaser at foreclosure or sale in lieu thereof).

"Serramonte (Relo #396)"         EXHIBIT F         12/23/15
Serramonte Center         Page 4         FINAL
Daly City, CA
Store No. 1940
6061.1348/913891.1

15.    To be effective, any notice or other communication given pursuant to this Agreement must be in writing and sent postage paid by United States registered or certified mail with return receipt requested. Rejection or other refusal to accept, or inability to deliver because of changed address of which no notice has been given, will constitute receipt of the notice or other communication. For purposes hereof, Lender's address is:

Attn.:_____

and Tenant's address is:

        Ross Dress For Less, Inc.
        5130 Hacienda Drive
        Dublin, CA  94568-7579
        Attn.:  Real Estate Legal Notice Department

and Landlord's address is:

        Daly City Serramonte Center, LLC
        c/o Equity One
        3 Serramonte Center
        Daly City, CA  94015
        Attn.:  Will Heidel

        At any time(s), each party may change its address for the purposes hereof by giving the other party a change of address notice in the manner stated above.

16.    This Agreement (a) contains the entire understanding of Lender and Tenant regarding matters dealt with herein (any prior written or oral agreements between them as to such matters being superseded hereby), (b) can be modified or waived in whole or in part only by a written instrument signed on behalf of the party against whom enforcement of the modification or waiver is sought, and (c) will bind and inure to the benefit of the parties hereto and their respective successors and assigns.

17.    In the event of any litigation arising out of the enforcement or interpretation of any of the provisions of this Agreement, the unsuccessful party shall pay to the prevailing party its reasonable

1   attorneys' fees, including costs of suit, discovery and appeal.  The "prevailing party" shall be that party who
2   obtains substantially the relief sought in the action.

3

4        18.    In the event the Lease is terminated as a result of Landlord's bankruptcy or reorganization,
5   whereby Lender obtains fee title to the Shopping Center (or in the case Lender is the ground lessor, retains
6   fee title without the encumbrance of the ground lease), Lender agrees that the Lease shall remain in effect as
7   between Lender (as Landlord) and Tenant, subject to the terms of this Agreement, and, upon Tenant's
8   written request, Lender and Tenant agree to execute a reinstatement agreement documenting that the Lease
9   has been reinstated as between Lender (as Landlord) and Tenant and that the terms and conditions thereof
10  shall be as stated in the Lease, subject to the provisions of this Agreement.

11       IN WITNESS WHEREOF, the parties have caused this instrument to be executed as of the
12  day and year first written above.

TENANT:                                          LENDER:
ROSS DRESS FOR LESS, INC.,                       _____,
a Virginia corporation                           a_____


By:_____             By:_____
   Gregg McGillis
Its: Group Senior Vice President, Property Development    Its:_____


LANDLORD:
DALY CITY SERRAMONTE CENTER, LLC, a
Delaware limited liability company

By:   Equity One Realty & Management CA, Inc.


By:_____
Name:  Michael Makinen
Its:    Chief Operating Officer

13

1

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

2

State of California      )
               )
County of Alameda    )

3
4
5   On _____ before me, _____, a
6   Notary Public, personally appeared Gregg McGillis, who proved to me on the basis of satisfactory evidence
7   to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that
8   he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their
9   signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted,
10  executed the instrument.
11
12  I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing
13  paragraph is true and correct.
14
15  WITNESS my hand and official seal.
16

                                            Notary Public

17
18

"Serramonte (Relo #396)"                  EXHIBIT F                  12/23/15
Serramonte Center                      Page 7                    FINAL
Daly City, CA
Store No. 1940
6061.1348/913891.1

1

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

2

State of_____ )
)
County of_____ )

3
4
5    On _____ before me, _____, a Notary Public,
6    personally appeared _____, who proved to me on the basis of
7    satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and
8    acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that
9    by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the
10   person(s) acted, executed the instrument.
11
12   I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing
13   paragraph is true and correct.
14
15   WITNESS my hand and official seal.
16

_____
Notary Public

17
18

"Serramonte (Relo #396)"                      EXHIBIT F                          12/23/15
Serramonte Center                               Page 8                            FINAL
Daly City, CA
Store No. 1940
6061.1348/913891.1

1

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

2

State of_____ )
                                   )
County of_____ )

3
4
5    On _____ before me, _____, a Notary Public,
6    personally appeared _____, who proved to me on the basis of
7    satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and
8    acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that
9    by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the
10   person(s) acted, executed the instrument.
11
12   I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing
13   paragraph is true and correct.
14
15   WITNESS my hand and official seal.
16

                              _____
                                        Notary Public
17
18
19


"Serramonte (Relo #396)"              EXHIBIT F                     12/23/15
Serramonte Center                      Page 9                        FINAL
Daly City, CA
Store No. 1940
6061.1348/913891.1

**EXHIBIT F-1**

RECORDING REQUESTED BY

Ross Dress For Less, Inc.

AND WHEN RECORDED MAIL TO:

Bartko, Zankel, Bunzel & Miller
One Embarcadero Center, Suite 800
San Francisco, CA 94111
Attn.: Theani C. Louskos, Esq.

SPACE ABOVE THIS LINE RESERVED FOR RECORDER'S USE

## SUBORDINATION, NONDISTURBANCE AND ATTORNMENT AGREEMENT
### [MASTER LESSOR]
### LOCATION: Daly City, CA

1  APN:_____.
2
3         This Subordination, Nondisturbance and Attornment Agreement (the "Agreement")
4  is   effective   this   ____   day   of   _____, 20____,   by   and   between
5  _____, a _____ _____ (the "Master
6  Lessor"), ROSS DRESS FOR LESS, INC., a Virginia corporation ("Tenant") and DALY CITY
7  SERRAMONTE CENTER, LLC, a Delaware limited liability company ("Landlord").

8                                    **RECITALS**

9         A.     Under that certain Lease Agreement, dated _____ (the "Master
10 Lease"), Master Lessor is the lessor and Landlord is the lessee with respect to the real property
11 described in Exhibit "A" attached hereto and by this reference incorporated herein. The Exhibit
12 "A" property and improvements thereon are hereinafter collectively referred to as the "Shopping
13 Center."

14        B.     Tenant has executed, or will execute, a certain lease with Landlord, dated for
15 reference purposes on _____, for all or a portion of the Shopping Center, which
16 portion (the "Premises") is more particularly set forth in said lease. Said lease and all amendments
17 and modifications thereto are herein collectively referred to as the "Lease." Capitalized terms used
18 herein without definition shall have the meaning ascribed to them in the Lease.

19        C.     Tenant has requested that Master Lessor agree not to disturb Tenant's possessory
20 rights under the Lease in the event that Landlord defaults under the Master Lease and Master Lessor
21 becomes the landlord under the Lease, provided that Tenant is not in default under the Lease.

22        D.     The parties desire to establish certain rights and obligations with respect to their
23 respective interests by means of this Agreement.

1                                    **AGREEMENTS**

2              NOW, THEREFORE, the parties hereto in consideration of the mutual covenants
3      herein contained, hereby agree as follows:

4

5              1.      Subject to the terms and conditions of this Agreement, the Lease shall be, in
6      accordance with the terms and conditions hereof, subordinate to the Master Lease.

7

8              2.      Master Lessor represents and warrants to Tenant that:  (i) Master Lessor is the
9      "Landlord" or "Lessor" under the Master Lease; (ii) Master Lessor is the sole holder of fee simple
10     title to the Shopping Center; (iii) Master Lessor has the full right and authority to enter into this
11     Agreement; (iv) the Master Lease is in full force and effect and represents a valid lease of the entire
12     Shopping Center; (v) a copy of the fully executed Master Lease and each of the amendments thereto
13     referred to above in the Recitals hereto are true and correct, and there are no other amendments,
14     modifications or additions to the Master Lease, written or oral; (vi) neither Master Lessor nor
15     Landlord are in default under any terms or conditions of the Master Lease; (vii) the current term of
16     the Master Lease expires by its own terms on **[TBD]**; and (viii) Landlord currently has **[TBD]**
17     options of **[TBD]** years each to extend the term of the Master Lease.

18

19             3.      Master Lessor consents to the Lease and the leasing of the Premises to Tenant.
20     Further, Master Lessor:  (i) consents to Tenant's construction of the improvements reflected in
21     Exhibit C of the Lease and all alterations and modifications required in connection therewith;
22     (ii) consents to Tenant's erection and maintenance, at its sole expense (except as otherwise provided
23     in the Lease), of all signage reflected in Exhibit J of the Lease, including the locations thereof as
24     depicted in such Exhibit; (iii) consents to Tenant's installation of Communication Equipment
25     pursuant to Section 12.2 of the Lease and agrees to the terms of Section 12.2.2 of the Lease relating
26     to roof repairs and Tenant's Communication Equipment.

27

28             4.      Master Lessor and Tenant agree that neither of them has any liability to the other by
29     reason of any default by Landlord under the Master Lease, and that their only liability to each other
30     with respect to Tenant's use of the Premises is as expressly provided herein.  Furthermore, Tenant
31     has no liability to Master Lessor under the Lease or otherwise until the expiration or earlier
32     termination of the Master Lease and Master Lessor's assumption of the Lease, pursuant to
33     Paragraph 5 of this Agreement.  Nothing contained herein or in the Lease shall release Landlord
34     from its obligations under the Master Lease.

35

36             5.      Provided that Tenant is not in default so as to permit Landlord to terminate the
37     Lease or Tenant's right to possession of the Premises, and notwithstanding any contrary provisions
38     in the Master Lease, Master Lessor (i) shall not disturb or deprive Tenant in or of its use, quiet
39     enjoyment and possession (or its right to use, quiet enjoyment and possession) of the Premises, or of
40     any part thereof, or any right, benefit or privilege granted to or inuring to the benefit of Tenant

1   under the Lease (including any right of renewal or extension thereof); (ii) shall not terminate or
2   affect the Lease; (iii) shall recognize Tenant's rights, benefits and privileges under the Lease; and,
3   (iv) shall recognize the leasehold estate of Tenant under all of the terms, covenants, and conditions
4   of the Lease for the remaining balance of the Term of the Lease with the same force and effect as if
5   Master Lessor were the Landlord under the Lease.  Master Lessor hereby covenants that any sale by
6   Master Lessor of the Shopping Center pursuant to the exercise of any rights and remedies under the
7   Master Lease or otherwise, shall be made subject to the Lease and the rights of Tenant thereunder.
8   However, in no event shall Master Lessor be:

9           (a)    Liable for any act or omission of Landlord arising prior to the date Master
10  Lessor takes possession of Landlord's interest in the Lease except to the extent such act or omission
11  is of a continuing nature, such as, for example, a repair obligation;

12          (b)    Liable for any offsets or deficiencies which Tenant might be entitled to assert
13  against Landlord arising prior to the date Master Lessor takes possession of Landlord's interest in
14  the Lease, except to the extent that Master Lessor has received the benefit of the act of Tenant
15  giving rise to the right of deduction, such as, for example, relief of an obligation that would
16  otherwise have been paid by Master Lessor as Landlord;

17          (c)    Bound by any payment of rent or additional rent made by Tenant to
18  Landlord for more than one (1) month in advance, which payment was not required under the terms
19  of the Lease;

20          (d)    Bound by any amendment or modification of the Lease executed after the
21  date of this Agreement which: (i) increases Landlord's obligations or reduces Tenant's obligations
22  under the Lease; and, (ii) is made without Master Lessor's prior written consent (except to the extent
23  that the Lease may specifically contemplate any amendment or modification thereof).

24

25          6.     In the event of the termination or expiration of the term of the Master Lease for any
26  reason whatsoever, and if Tenant is not in default under the terms and conditions of the Lease so as
27  to permit the Landlord thereunder to terminate the Lease, Tenant shall not be made a party in the
28  action or proceeding to terminate the Master Lease.  Further, Tenant shall not be evicted or moved
29  or its possession or right to possession of the Premises under the terms of the Lease be disturbed or
30  in any way interfered with.  Subject to the provisions of this Agreement, Tenant will attorn to
31  Master Lessor or any other party which retains or obtains title to the Shopping Center (without the
32  encumbrance of the Master Lease) pursuant to any remedy provided for by the Master Lease or
33  otherwise.  Such attornment shall be effective and self-operative without the execution of any other
34  instruments on the part of any party, provided that Master Lessor notifies Tenant thereof, and, in all
35  events, the Lease shall continue in full force and effect, subject to the terms of this Agreement, as a
36  direct Lease between Master Lessor (or such party) and Tenant under all of the exact and verbatim
37  terms and provisions of the Lease (including any rights of Tenant to renew or extend the Term
38  thereof), without the necessity for executing any new lease.  In the event of such attornment, Master
39  Lessor shall be deemed to have assumed and shall assume the performance of all of the affirmative
40  covenants of Landlord occurring under the Lease from and after the time Master Lessor becomes
41  the landlord and until such time as such obligations are assumed by a bona fide purchaser, if any.

7.      Tenant hereby confirms that the Lease is in full force and effect. The parties hereto agree that, as between Landlord and Tenant, all of the provisions of the Lease shall be superior and paramount to the Master Lease. In the event of any inconsistency between the provisions of the Master Lease and the provisions of the Lease, as between Landlord and Tenant, the provisions of the Lease shall supersede and prevail. In the event of any conflict or inconsistency between the terms of this Agreement and the terms of the Master Lease, the terms of this Agreement shall supersede and prevail and, accordingly, the provisions of the Master Lease as they apply to the Premises, are amended to the extent necessary to reconcile such conflicts or inconsistencies. Notwithstanding anything to the contrary elsewhere in this Agreement, the terms and provisions of the Lease are not to be incorporated herein except as expressly provided in this Agreement.

8.      Nothing contained in this Agreement shall be deemed to reduce or abrogate any rights of Tenant to cure any default of Landlord under the Lease in accordance with and subject to the provisions of the Lease and/or to deduct from rental such amounts which Tenant may be entitled to so deduct under the provisions of the Lease.

9.      Unless and until Master Lessor or any subsequent purchaser succeeds to the interest of Landlord under the Lease, Landlord shall continue to perform Landlord's obligations and duties under the Lease. Landlord shall also perform Landlord's obligations and duties and shall comply with all of the terms, covenants and conditions of the Master Lease which are binding upon Landlord. Master Lessor, Landlord and Tenant agree that, in the event of a default by Landlord under the Master Lease, Tenant shall have the right, but not the obligation, to cure Landlord's default under the Master Lease, and to pursue against Landlord any remedies available under the Lease, and at law or in equity.

10.     If, under the provisions of the Master Lease or the Lease, Master Lessor is entitled to receive rent due under the Lease in the event of a default by Landlord under the Master Lease, after receipt of notice from Master Lessor to Tenant (at the address set forth below) that rents under the Lease should be paid to Master Lessor, Tenant shall thereafter pay to Master Lessor all monies thereafter due to Landlord under the Lease. In such event, Tenant shall be entitled to rely solely upon such notice, and Landlord and Master Lessor hereby indemnify and agree to defend and hold Tenant harmless from and against any and all expenses, losses, claims, damages or liabilities arising out of Tenant's compliance with such notice or performance of the obligations under the Lease by Tenant made in good faith in reliance on and pursuant to such notice. Tenant shall be entitled to full credit under the Lease for any rents paid to Master Lessor in accordance with the provisions hereof. Any dispute between Master Lessor (or any other purchaser) and Landlord as to the existence of a default by Landlord under the provisions of the Master Lease, shall be dealt with and adjusted solely between Master Lessor (or any subsequent purchaser) and Landlord, and Tenant shall not be made a party thereto.

11.     Master Lessor shall use the proceeds of any insurance recovery or condemnation award for the purposes stated in the Lease.

1    12.    On and after the date of the Lease, and throughout the Term of the Lease, Master
2  Lessor and Landlord shall not enter into any cancellation, termination, amendment or modification
3  of the Master Lease (a "Master Lease Amendment") without Tenant's prior written consent, which
4  consent shall not be unreasonably withheld.  However, Tenant's withholding of such consent shall
5  be deemed reasonable, among other reasons, if the proposed Master Lease Amendment will:
6  (i) conflict with the provisions of the Lease; or (ii) increase Tenant's obligations and/or reduce
7  Landlord's obligations under the Lease; or (iii) reduce Tenant's rights and/or increase Landlord's
8  rights under the Lease; (iv) reduce Tenant's rights under the Master Lease which Tenant is privileged
9  to enjoy by reason of its tenancy and rights under the Lease; or (v) materially and adversely affect
10  Tenant's use of the Store or Tenant's use of the Common Areas of the Shopping Center.

11
12    13.    No modification, amendment, waiver or release of any provision of this Agreement
13  or of any right, obligation, claim or cause of action arising hereunder shall be valid or binding for
14  any purpose whatsoever unless in writing and duly executed by the party against which the same is
15  brought to be asserted.

16
17    14.    This Agreement shall be binding upon and shall inure to the benefit of the parties
18  hereto and their respective heirs, legal representatives, successors and assigns, including, without
19  limitation, the covenants of Master Lessor herein shall be specifically binding upon any purchaser of
20  the Shopping Center.

21
22    15.    In the event any one or more of the provisions contained in this Agreement shall for
23  any reason be held to be invalid, illegal or unenforceable in any respect, said provision(s) shall be
24  void and of no further force or effect.

25
26    16.    This Agreement shall be governed and construed according to the laws of the state
27  where the Shopping Center is located.

28
29    17.    Provided that Tenant is not in default under the Lease, Master Lessor shall not
30  institute any litigation naming Tenant as a defendant or otherwise terminating Tenant's leasehold
31  interest in the Shopping Center or the Premises unless Tenant is required to be named in such
32  litigation by law, and only so long as Tenant's failure to defend against any such action shall not
33  result in a waiver of its rights to continued possession under the Lease as set forth in this
34  Agreement.  The term "Master Lessor" as used herein shall include any successor-in-interest to
35  Master Lessor.

36
37    18.    To be effective, any notice or other communication given pursuant to this
38  Agreement must be in writing and sent by postage paid by United States registered or certified mail
39  with return receipt requested.  Rejection or other refusal to accept, or inability to deliver because of
40  a changed address of which no notice has been given, will constitute receipt of the notice or other
41  communication.  For purposes hereof, Master Lessor's address is:

```
 1              _____
 2              _____
 3              _____
 4              _____
 5
 6
 7  and Tenant's address is:

 8              Ross Dress For Less, Inc.
 9              5130 Hacienda Drive
10              Dublin, CA  94568-7579
11              Attn.:  Real Estate Legal Notice Department
12
13
14  and Landlord's address is:

15              Daly City Serramonte Center, LLC
16              c/o Equity One
17              3 Serramonte Center
18              Daly City, CA  94015
19              Attn.:  Will Heidel
20
21
22              At any time(s), each party may change its address for the purposes hereof by giving
23  the other party a change of address notice in the manner stated above.

24

25      19.     If Master Lessor or Landlord delivers a notice to the other party of the other party's
26  default under the Master Lease, the notifying party shall also concurrently deliver a copy of such
27  notice to Tenant.

28
29      20.     This Agreement (a) contains the entire understanding of Master Lessor, Landlord
30  and Tenant regarding the matters dealt with herein (any prior written or oral agreements between
31  them as to such matters being superseded hereby), (b) can be modified or waived in whole or in part
32  only by a written instrument signed on behalf of the party against whom enforcement of the
33  modification or waiver is sought, and (c) will bind and inure to the benefit of the parties hereto and
34  their respective successors and assigns.

35
36      21.     In the event of any litigation arising out of the enforcement or interpretation of any
37  of the provisions of this Agreement, the unsuccessful party shall pay to the prevailing party its
38  reasonable attorneys' fees, including costs of suit, discovery and appeal.  The "prevailing party" shall
39  be that party who obtains substantially the relief sought in the action.

40
```

1      22.    In the event the Lease is terminated as a result of Landlord's bankruptcy or
2    reorganization, whereby Master Lessor retains or obtains fee title to the Shopping Center (without
3    the encumbrance of the Master Lease), Master Lessor agrees that the Lease shall remain in effect as
4    between Master Lessor (as landlord) and Tenant, subject to the terms of this Agreement, and, upon
5    Tenant's written request, Master Lessor and Tenant agree to execute a reinstatement agreement
6    documenting that the Lease has been reinstated as between Master Lessor (as landlord) and Tenant
7    and that the terms and conditions thereof shall be as stated in the Lease, subject to the provisions of
8    this Agreement.

9
10      23.    The parties hereto covenant and agree that they shall execute such other and further
11    documents as are or may become necessary to carry out the objectives of this Agreement.

12         IN WITNESS WHEREOF, the parties have caused this Agreement to be executed
13    as of the day and year first written above.

**TENANT:**                MASTER LESSOR:
**ROSS DRESS FOR LESS, INC.,**
**a Virginia corporation**                 ,
                                            a _____

By:_____    By:_____
    Gregg McGillis
Its: Group Senior Vice President, Property Development    Its:_____

**LANDLORD:**
**DALY CITY SERRAMONTE CENTER, LLC,**
**a Delaware limited liability company**

By:    Equity One Realty & Management CA, Inc.

By:_____
Name: Michael Makinen
Its:    Chief Operating Officer

14

"Serramonte (Relo #396)"           EXHIBIT F-1           12/23/15
Serramonte Center               Page 7           FINAL
Daly City, CA
Store No. 1940
6061.1348/913899.1

1

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

2

State of California                              )
                                                )
County of Alameda                               )

3
4
5    On _____ before me, _____,
6    a Notary Public, personally appeared Gregg McGillis, who proved to me on the basis of satisfactory
7    evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and
8    acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies),
9    and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of
10   which the person(s) acted, executed the instrument.
11
12   I certify under PENALTY OF PERJURY under the laws of the State of California that the
13   foregoing paragraph is true and correct.
14
15   WITNESS my hand and official seal.
16

                                    _____
                                                Notary Public
17
18

1

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

2

State of_____ )
                                                              )
County of_____ )

3
4
5   On _____ before me, _____, a Notary Public,
6   personally appeared _____, who proved to me on the basis
7   of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within
8   instrument and acknowledged to me that he/she/they executed the same in his/her/their
9   authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or
10  the entity upon behalf of which the person(s) acted, executed the instrument.
11
12  I certify under PENALTY OF PERJURY under the laws of the State of California that the
13  foregoing paragraph is true and correct.
14
15  WITNESS my hand and official seal.
16

                                            _____
                                                         Notary Public

17
18

1

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

2

State of_____)
                                                               )
County of_____)

3
4
5   On _____ before me, _____, a Notary Public,
6   personally appeared _____, who proved to me on the basis
7   of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within
8   instrument and acknowledged to me that he/she/they executed the same in his/her/their
9   authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or
10  the entity upon behalf of which the person(s) acted, executed the instrument.
11
12  I certify under PENALTY OF PERJURY under the laws of the State of California that the
13  foregoing paragraph is true and correct.
14
15  WITNESS my hand and official seal.
16

                                              _____
                                                          Notary Public

17
18
19
20

## EXHIBIT G
## CONSTRUCTION COMPLETION NOTICE

1.   The "Lease"
     Landlord:    Daly City Serramonte Center, LLC
     Tenant:     Ross Dress For Less, Inc.
     Location:    Daly City, CA
     Lease Dated:  _____

2.   All terms used herein shall be as defined in the Lease.

3.   Date of this Notice:  _____

4.   Ross Store #:    1940
     Project Address:  Southwest Quadrant of Serramonte Center, located at NEC
                 of Interstate 280 (Junipero Serra Freeway) and Highway 1

5.   Pursuant to Section 5.4 of the Lease, this shall constitute the "Construction Completion Notice":

    (a)  The "Delivery Date," shall occur on: _____ .

    (b)  Landlord acknowledges that all the requirements specified in Article 2, "Delivery Date," will be satisfied by the date specified in subparagraph (a), above.

    (c)  Landlord has a fully executed contract for Landlord's Construction Obligations, with [Insert name of Landlord's General Contractor and contact person for General Contractor]: _____ , Contact Person: _____ .

    (d)  Attached hereto as **Schedule 1** is a construction schedule with respect to Landlord's Construction Obligations, initialed by Landlord's contractor, which confirms that all of Landlord's Construction Obligations will be completed by the Delivery Date set forth in subparagraph (a), above.

    (e)  Landlord has obtained all building permits for Landlord's Construction Obligations, a copy of which is/are attached hereto as **Schedule 2**.

**DALY CITY SERRAMONTE CENTER,
LLC, a Delaware limited liability company**

By:    Equity One Realty & Management CA, Inc.


By:_____
Name:    Michael Makinen
Its:      Chief Operating Officer

Dated: _____

"Serramonte (Relo #396)"          EXHIBIT G          12/23/15
Serramonte Center                                      FINAL
Daly City, CA
Store No. 1940
6061.1348/913900.1

SCHEDULE 1

EXHIBIT G

SCHEDULE 2

## EXHIBIT H

### EXCLUSIVE USES

**Target**
Exclusive:
Landlord covenants that Tenant, so long as Tenant operates or causes to be operated a retail
Department Store on the Demised Land, shall have the exclusive rights (except to the extent
hereinafter otherwise provided) during the Lease Term within the Shopping. Center (a) to
operate an Auto Service Store and Facility, (b) to sell gasoline, oil, automobile and truck tires
and tubes, and automobile and truck batteries, and (c) to operate a Catalog Order Desk, for the
purpose of making Catalog Desk Sales (as defined in Section 4.7), subject, however, to the
following qualifications:

(1) Nothing contained in this Section shall be construed to prevent or preclude the operation by a
cotenant of a Gasoline Filling Station in that area of the Shopping Center designated as "Future
Service Station" on the Site Plan, including the right of the operator of such Gasoline Filling
Station to sell gas, oil, and tires incidental to its operation of a typical gasoline filling station;

(2) Nothing contained in this Section shall be construed to prevent or preclude the sale by other
lessees in the Shopping Center of merchandise through special catalogs such as Christmas,
Easter and Back-to-School catalogs incidental to their regular operation of retail stores within the
Shopping Center wherein merchandise identical to the catalog merchandise is displayed and stocked for
sale and sold within the retail store;

(3) Nothing contained in this Section shall be construed to prevent or preclude (a) Macy's and (b)
one other department store (in addition to Macy's and Tenant) from operating (i) an auto service
store and facility or (ii) catalog mail order desk if and when Macy's and such other department
store tenant operates catalog mail order desks as part of its normal business operations in the San
Francisco-Bay Area.

**Crunch Gym**
Exclusive:
Landlord and Tenant acknowledge that Tenant is willing to make this Lease only on the
condition that Landlord agree not to enter into a new lease of premises for a fitness or health club
or similar related facility, such as a yoga or martial arts studio (and, a "Health Club").
Accordingly, Landlord covenants and agrees that it shall not enter into a new lease of premises in
the Center pursuant to which the use clause specifically provides for the operation of a Health
Club, or to the extent that Landlord has the right to withhold consent for such use, will not
consent to the use of any part of the Center for a Health Club.

**Dave & Buster's**
Exclusive:
Tenant acknowledges that the Permitted Use is nonexclusive, and that other tenants may sell
items identical or similar to those sold by Tenant, except as expressly set forth below.
Notwithstanding anything contained in the Lease to the contrary, provided Dave & Buster's of
California, Inc., a California corporation, or a successor entity pursuant to the terms of Section
10.02 or 10.03 below, is the Tenant under this Lease, Landlord agrees that from the date of this
Lease it will not enter into a lease with any future tenant within the Center or sell any portion of

the Center to a user or other entity or person that with the Center utilizes or dedicates more than
500 square feet of its premises for the operation of amusement/entertainment games, such as
arcade, simulation, electronic video games, "carnival" type games, redemption games or billiards
(collectively, "Games"). Tenant's right to the Exclusive Use will expire on the earlier of: (i) the
date Tenant is in default under this Lease beyond any applicable cure period; (ii) the date Tenant
ceases to operate in the Premises (except for closings due to casualty or Unavoidable Delays);
and (iii) 6 months after the date Tenant ceases to operate Games from more than 500 square feet
of floor area of the Premises (whether or not later reinstated) unless the entire Premises is closed
to Unavoidable Delay or remodeling. Tenant's rights as set forth in this Section 7.01 will not
apply to any of the following: (a) existing tenants or other occupants of the Center and their
respective renewals, replacements, successors and assigns, or (b) the operation of Games from
less than 500 square feet of floor area in any premises.

## Classy Nails

Exclusive:
Notwithstanding anything contained in the Lease to the contrary, provided and Classy Nails,
Inc., a California corporation is the Tenant under this Lease, Landlord agrees that from the date
of this Lease it will not enter into a lease with any future tenant within the enclosed mall of the
Center with an entrance onto such enclosed mall whose primary use of its premises would be for
the operation of a nail salon offering manicures and pedicures (a "Similar nail Salon"). Tenant's
right to the Exclusive Use will expire on the earlier of: (i) the date Tenant is in default under this
Lease beyond any applicable cure period; (ii) the date Tenant ceases to operate in the Premises
(except for closings due to casualty or Unavoidable Delays); (iii) the date Tenant violates the
radius restriction set forth in Section 7.03 of this Lease. The Exclusive Use will not apply to any
of the following: (a) Major Tenant, (b) any tenant or other occupant of the Center with a floor
area in excess of 10,000 square feet, (c) expansion areas of the Center that are constructed
subsequent to the date of this Lease, ( d) strip centers or convenience centers adjacent to or part of
the center, (e) outparcels, (f) existing tenants or other occupants of the Center and their
respective renewals, replacements, successors and assigns, or (g) providing manicures and/or
pedicures as a secondary or incidental part of a tenant's business.

## Lids

Exclusive:
Notwithstanding anything contained in the Lease to the contrary, provided HAT WORLD, INC.,
a Minnesota corporation, is the Tenant under this Lease, Landlord agrees that from the date of
this Lease it will not enter into a lease with any future tenant within the enclosed mall of the
Center whose primary use of its premises would be for the sale of headwear with athletic team,
name brands, sports, blank, cartoon and/or themed logos (the "Exclusive Use"). Tenant's right to
the Exclusive Use will expire on the earlier of: (i) the date Tenant is in default under this Lease
beyond any applicable cure period; (ii) the date Tenant ceases to operate in the Premises (except
for closings due to casualty or Unavoidable Delays); (iii) the date Tenant ceases to sell hats as its
primary use (whether or not later reinstated); and (iv) the date Tenant violates the radius
restriction set forth in Section 7.03 of this Lease. The sale of headwear with athletic team, name
brands, sports, blank, cartoon and/or themed logos as a primary use shall mean a permanent
tenant displaying for sale at least 150 of such headwear items or a temporary tenant displaying
for sale at least 25 of such headwear items. The Exclusive Use will not apply to any of the
following: (a) Major Tenant, (b) any tenant or other occupant of the Center with a floor area in
excess of 10,000 square feet, (c) expansion areas of the Center that are constructed subsequent to
the date of this Lease, (d) strip centers or convenience centers adjacent to or part of the Center,

(e) outparcels, (f) existing tenants or other occupants of the Center and their respective renewals, replacements, successors and assigns, (g) sales of head wear with athletic team, name brands, sports, blank, cartoon and/or themed logos as a secondary or incidental part of a tenant's business, or (h) any sale of headwear from the premises operated as of the date hereof under the trade name "Hat Club" or the premises operated as of the date hereof under the trade name "Sports City".

## Buffalo Wild Wings Grill & Bar

Exclusive:

(i) Notwithstanding anything to the contrary contained in this Lease, provided (A) no Event of Default has occurred and is continuing, and (B) Tenant is operating a business in the Premises in accordance with the Permitted Use (except that Excused Closures not to exceed 120 consecutive days shall not affect Tenant's rights under this Section 7.01), but in all events as a restaurant which would, itself, qualify as a Competing Business for each category for which protection is sought, Landlord agrees not to lease any portion of the Center as a "Competing Business." A Competing Business is hereby defined as any business which primarily operates as a full-service or fast-casual sit-down restaurant which business either:

(I) is a "sports bar" (the "Sports Protection"), with a "sports bar" hereby defined as a restaurant and/or bar that both (a) frequently and on a continuing basis advertises itself to the public on television or radio or in print media as a venue for the viewing of sporting events and (b) has seven (7) or more televisions for primarily viewing sporting events. It is agreed that an establishment that runs sports-oriented promotions and/or occasionally markets particular sporting events and/or displays sports paraphernalia within its premises shall not be violative of the Sports Protection.

- or-

(II) serves bone-in or boneless chicken wings and both (a) provides four (4) or more sauces (condiments such as ketchup and mustard and dressing such as "ranch" or "blue cheese" are not considered sauces for purposes of the foregoing restriction) for the chicken wings and (b) derives more than seven percent (7%) of its food sales therefrom (the "Wing Protection").
By way of example the following restaurants, as the same are operated as of the date hereof, would be deemed "Competing Businesses:" Champps, Hooters, Wing Stop, Wings & Rings, Paradox Grill, Raising Cane's and Quaker Steak and Lube.
(ii) Notwithstanding anything to the contrary in the foregoing, this provision shall not be applicable to (i) any tenants in the Center who currently have leases in effect which permit such tenants to operate a Competing Business and, subject to the provision below regarding consent from Landlord, the successors or assigns under such leases; or (ii) any Major Tenant. In addition, the Competing Business protection shall not be applicable to (1) fast food restaurants or so called "quick service" restaurants, or (2) casual dining restaurants, including, but not limited to, the following restaurants (to the extent that the following named restaurants are operated in a manner consistent with their operation as of the date hereof): TGIFriday's, Ruby Tuesdays, Bennigan's, Ground Round, Chili's or Applebee's. In the case of successors and assigns under any lease currently in effect, Landlord agrees that it will, to extent reasonably permissible pursuant to such lease, decline to consent to or approve any change in the permitted use thereunder that would authorize a successor or assign to operate as a Competing Business, and this provision shall be applicable to any operations authorized or permitted by such consent or approval.

**Zumiez**
Exclusive:
(Landlord and Tenant acknowledge that Tenant is willing to make this Lease only on the
condition that Landlord agrees not to enter into a new lease of premises in the Center or approve
of the operation of any premises in the Center as or for a "Similar Store" (as defined below).
Accordingly, Landlord covenants and agrees that it shall not enter into a new lease of premises in
the Center pursuant to which the use clause specifically provides for or otherwise allows,
expressly or otherwise, the operation of a Similar Store and, where Landlord has the right to do
so, Landlord shall not approve of the premises under an existing lease being used as a Similar
Store. A "Similar Store" is a store engaged in the sale of skateboards, wakeboards, snowboards
and/or surfboards. Notwithstanding the foregoing, "Similar Store" shall not include or apply to
any of the following: (a) any store with more than 25,000 square feet of floor area, (b) any store
that (i) devotes less than 5% of its floor area to the sale of skateboards, wake boards, snowboards
and/or surfboards, (ii) devotes less than 5% of its wall display area to the sale of skateboards,
wakeboards, snowboards and/or surfboards, and (iii) derives less than 3% of its gross sales from
the sale of skateboards, wakeboards, snowboards and/or surfboards, and (c) tenants or other
occupants open for business in the Center on February 8, 2012, pursuant to a lease or other
agreement that specifically provides for or allows the operation of a Similar Store and their
respective successors and assigns. Tenant shall have no further rights under this Section 7.01 (b)
if such Similar Store operating as a Similar Store unless that or another Similar Store
subsequently opens in the Center. Tenant rights under this Section 7.01 (b) will expire on the
earlier of: (i) the date Tenant ceases to operate in the Premises (except for closings permitted
under this Lease or for a limited period of time with Landlord's prior written consent, such as for
remodeling); and (ii) the date Tenant ceases to sell skateboards, wake boards, snow boards
and/or surfboards (whether or not later reinstated).

**Ziba Beauty**
Exclusive:
Notwithstanding anything contained in the Lease to the contrary, provided Ziba, Inc., a
California corporation, or a Franchisee approved pursuant to the terms of Section 10.04 below, is
the Tenant under this Lease, except for such assignments or sublets as are allowed under Section
10.02 or 10.03 below without Landlord's consent, Landlord agrees that from the date of this
Lease it will not enter into a lease with any future tenant within the enclosed mall of the Center
whose use of its premises includes the beauty service known as threading (the "Exclusive Use").
Tenant's right to the Exclusive Use will expire on the earlier of: (i) the date Tenant is in
monetary or other material default under this Lease beyond any applicable notice and cure
period; (ii) the date Tenant ceases to operate in the Premises (except for closings due to casualty,
Unavoidable Delays or otherwise as expressly allowed under the Lease); (iii) the date Tenant
ceases to perform threading (whether or not later reinstated) during times that Tenant is
otherwise operating; and (iv) the date Tenant violates the radius restriction set forth in Section
7.03 of this Lease. The Exclusive Use will not apply to any of the following: (a) Major Tenant,
(b) expansion areas of the Center that are constructed subsequent to the date of this Lease, ( c)
strip centers or convenience centers adjacent to or part of the Center, (d) outparcels, or (e)
existing tenants or other occupants of the Center and their respective renewals, replacements,
successors and assigns, provided (i) such parties have an existing right (prior to the date of this
Lease) to perform threading pursuant to their leases and (ii) if Landlord consent is required for
any renewals, replacements, successors and assigns and Landlord is able to reasonably withhold
or condition consent to such threading use, Landlord shall withhold consent.

**Starbucks Coffee**

Exclusive:

Except as set forth below, Landlord will not sell or permit any party, other than Tenant, to sell in the Shopping Center (a) whole or freshly ground coffee beans; (b) espresso, espresso-based coffee drinks or coffee-based drinks; ( c) tea or tea-based drinks; or ( d) gourmet, brand-identified brewed coffee, but excluded from the foregoing are full-service, sit-down, restaurants serving breakfast, lunch or dinner menu, which may sell brewed coffee or hot espresso drinks for on-premises
consumption. Only five percent (5%) of coffee, espresso, or espresso-based coffee
drink sales are permitted for off-premises consumption in restaurants, and also excluded from the foregoing exclusive granted Tenant are anchor or retail tenants over 20,000 square feet of Floor Area and all Food-Court tenants.

**Life Uniform**

Exclusive:

During the term of the Lease, Landlord shall not lease additional area in the Shopping Center to a lessee who has as its primary business the retail sale of medical uniforms. Should Landlord violate this provision, then Tenant would have the right to terminate the Lease.

**Jamba Juice**

Exclusive:

Landlord and Tenant acknowledge that Tenant is willing to make this Lease only on the condition that Landlord agree not to enter into a new lease of premises for a "Similar Juice Store" (as defined below) in any location marked on Exhibit "A" hereto as a "Restricted Location". Accordingly, Landlord covenants and agrees that it shall not enter into a new lease of premises in a Restricted Location pursuant to which the use clause specifically provides for the operation of a Similar Juice Store or expressly permit a change in use for the operation of a Similar Juice Store where Landlord has the right to deny such change in use so long as Jamba Juice Company, a California corporation or an assignee as allowed under Section 10.02 or 10.03 below is Tenant under this Lease and has made no assignment of the Lease or sublet of the Premises pursuant to Article 10 hereof except as allowed under Sections 10.02 and 10.03 below. The term "Similar Juice Store" shall mean a retail, over the counter for immediate consumption restaurant that offers juice drinks and blended juice smoothies as more than five percent (5%) of its menu offerings or devotes more than five percent (5%) of its sales floor area to the sale of smoothie products.

**Barracuda**

Exclusive:

Landlord and Tenant acknowledge that Tenant is willing to make this Lease only on the condition that Landlord agree not to enter into a new lease of premises for a "Similar Japanese Restaurant" (as defined below). Accordingly, Landlord covenants and agrees that it shall not enter into a new lease of premises with an entrance on the exterior of the main building of the Center pursuant to which the use clause specifically provides for the operation of a Similar Japanese Restaurant. The term "Similar Japanese Restaurant" shall mean a restaurant operated under a lease entered into by Landlord following the date hereof in which the use clause specifically provides for the premises to be used for the operation of a sit-down restaurant which is primarily engaged in the sale of Japanese food, excluding: (i) any lease with a tenant existing in the Center as of the date hereof or an affiliate or successor of such and existing tenant; (ii) any

Major Tenant; (iii) any tenant or other occupant of the Center with a floor area in excess of 10,000 square feet; (iv) expansion areas of the Center that are constructed subsequent to the date of this Lease; (v) strip centers or convenience centers adjacent to or part of the center; (vi) outparcels; (vii) any tenant or other occupant of the food court; (viii) any tenant or other occupant of the Center with an entrance only onto the interior mall of the main building of the Center; and (ix) sales of Japanese food as a secondary or incidental part of a tenant's business.

### Betty Boop's Diner (Pho-Garden)
Exclusive:
Landlord after the date of this Lease [shall not enter] into a new lease of premises in the Center in which the use clause specifically provides that the premises covered by such new lease will be used for the operation of a sitdown, table service diner primarily serving burgers, French fries and milkshakes (the business operated from any such premises, subject to the exclusions set forth below, being referred to in this Lease as a "Similar Diner");

The term "Similar Diner" shall exclude each and all of the following; (i) any store operated by Tenant or by any corporation or entity owned by or under common ownership with Tenant or any licensee or licensor of Tenant; (ii) any Major Tenant; (iii) any tenant occupying more than 10,000 square feet of floor area; (iv) strip centers or convenience centers adjacent to the Center; (v) outparcels; or (vi) any fast food restaurant.

### Villa Fresh Italian Kitchen
Exclusive:
Landlord and Tenant acknowledge that Tenant is willing to make this Lease only on the condition that Landlord agree not to enter into a new lease of premises in the Food Court of the Center for a restaurant serving pizza by the slice over the counter or for a fast service restaurant that primarily sells pasta dishes (either a "Pizza or Pasta Restaurant"). Accordingly, Landlord covenants and agrees that it shall not enter into a new lease of premises in the Food Court of the Center pursuant to which the use clause specifically provides for the operation of a Pizza or Pasta Restaurant.

### Sleep Number
Exclusive:
[Landlord shall not allow a "Similar Store" to operate at the Shopping Center.]

The term "Similar Store" shall mean a store operated under a lease entered into by Landlord following the date hereof in which the use clause specifically provides for the premises to be used for the operation of a store which is engaged in the sale of air-controlled sleep mattress systems excluding; (i) any lease with a tenant existing in the Center as of the date hereof or an affiliate or successor of such an existing tenant; (ii) any Major Tenant; (iii) any tenant or other occupant of the center with a floor area in excess of 10,000 square feet; (iv) expansion areas of the Center that are constructed subsequent to the date of this Lease; (v) strip centers or convenience centers adjacent to or part of the Center; and (vi) outparcels.

### Things Remembered, Inc.
Exclusive:
Notwithstanding anything contained in the Lease to the contrary, provided Things Remembered, Inc., a Delaware corporation, or a the transferee to which Landlord shall not have the right to consent under the terms of Section 124.1 of the Lease (a "Permitted Transferee"), is the Tenant

under this Lease, Landlord agrees that during the Extension Term it will not enter into a lease or otherwise authorize or permit any cart, RMU or kiosk located within one hundred (100) feet of the Premises in the common areas of the Shopping Center to provide on-premises engraving or monogramming services on any merchandise, or on-premises personalizing services on merchandise similar to that sold by Tenant (the "Exclusive Use"). Tenant's right to the Exclusive Use will expire on the earliest of: (i) the date Tenant is in default under the Lease beyond any applicable cure period; (ii) the date Tenant ceases to operate in the Premises (except for closings due to casualty or Unavoidable Delays); and (iii) the date Tenant ceases to operate the Premises for the Permitted Use set forth in the Lease (whether or not later reinstated).

## Dick's Sporting Goods
Exclusive:

(a) Landlord warrants and agrees that, during the term of this Lease, it will not, nor will any entity under common control with Landlord, enter into any lease, license agreement or other similar agreement permitting the use of any premises in the Shopping Center (other than the Demised Premises) (the "Restricted Property") for the Precluded Use Activity(ies) (as defined below), or otherwise transfer or allow a possessory interest in the Restricted Property to an Occupant to be used for the Precluded Use Activity(ies). "Precluded Use Activity(ies )"shall mean the sale, rental and/or distribution, either singly or in any combination of (i) health, fitness and/or exercise equipment; (ii) sporting goods and sporting equipment (including, but not limited to, golf equipment and accessories); (iii) hunting, camping and fishing equipment and accessories; and/or (iv) athletic footwear.

(b) Notwithstanding the foregoing, this Section 1.5 shall not apply to, and Precluded Use Activity(ies) shall not include, any of the following:

(i) The sale, rental and/or distribution of sporting goods and sporting equipment (including, but not limited to, golf equipment and accessories) in the lesser of (i) five percent ( 5%) in the aggregate of any such Occupant's GLA (which shall include an allocable portion of the aisle space adjacent to such sales floor area of such use) or (ii) one thousand (1,000) square feet in the aggregate of such Occupant's GLA (which shall include an allocable portion of the aisle space adjacent to such sales floor area of such use).

(ii) Any business operating under a lease of premises in the Shopping Center in effect as of the Effective Date as listed on Exhibit M attached hereto and made a part hereof ("Existing Lease(s)") or any substitution or replacement of a business so operating with a business offering a range and types of merchandise generally comparable to that of the business for which it is a substitute or replacement ("Like-Kind Replacement(s)"), subject in each case to the provisions of Subsection ( e) below.

(iii) Any store containing at least fifty thousand (50,000) square feet or more of GLA (a "Major Tenant") operating as a Department Store (as defined below), which shall not, in any event, be a Sporting Goods Store (as defined below). "Department Store" means a retail store carrying a variety of merchandise and organized into various departments or sections offering a range and types of merchandise generally comparable to the range of types of merchandise carried by any of the stores operated as of the date of this Lease under the trade names Bloomingdale's, Dillard's, JCPenney, Kmart, Kohl's, Macy's, Nordstrom, WalMart, Sears, Target, Ross, T.J. Maxx, Sam's Club, Costco, Loehmann's or Nordstrom Rack Price Club (the parties

acknowledging that the foregoing list is illustrative only and not an exhaustive list of Department Stores, which shall include all other stores of the character and type described above). "Sporting Goods Store" shall mean sporting goods stores offering a range and types of merchandise generally comparable to the range and types of merchandise carried by any of the stores operated as of the date of this Lease under the trade names Dick's Sporting Goods, Sports Authority, Sports Chalet, REI, or Academy (the parties acknowledging that the foregoing list is illustrative only and not an exhaustive list of Sporting Goods Stores, which shall include all other stores of the character and type described above).

**Naan N Curry**
Exclusive (Sec. 7.08):

Provided that Tenant is then timely performing, and has theretofore timely performed, all of its obligations under this Lease in a manner acceptable to Landlord, as determined by Landlord in its sole, absolute and unfettered discretion ("Tenant's Exclusive Use Obligations"), then Landlord hereby agrees that it shall not hereinafter lease space in the food court of the Shopping Center to a tenant who shall be authorized by its lease to carry on, as its primary principal business, the operation of an Indian Restaurant where "primary principal business" means that greater than fifty percent (50%) of such other tenant's gross sales are derived from the sale of such items. The foregoing restriction shall not apply to (a) any tenant now or hereafter leasing or occupying in excess of 10,000 square feet of Rentable Area in the Shopping Center, or (b) any existing tenant of the Shopping Center (or any such existing tenant's successors, assignees or sublessees), or (c) any tenant who shall at any time replace any such existing tenant (or any such existing tenant's successors, assignees or sublessees) for substantially the same permitted use as such existing tenant, whether such replacement tenant shall occupy the same or different premises in the Shopping Center, or ( d) to any existing or future tenant or other occupant of any outparcel which may from time to time be located in or adjacent to the Shopping Center. The foregoing restriction shall expire automatically and shall cease to have any force or effect upon the occurrence of any of the following: (1) the expiration or sooner termination of this Lease, (2) the occurrence of any event of default by Tenant under this Lease, (3) the determination by Landlord, acting reasonably, that Tenant has breached any of Tenant's Exclusive Use Obligations, (4) the discontinuance of the use by Tenant of the Leased Premises for the Permitted Use set forth in Section I (j) of this Lease, (5) any assignment of this Lease, subletting of the Leased Premises (or any part thereof) or other transfer within the meaning of Article 10 of this Lease, or (6) any holdover by Tenant in the Leased Premises. It is hereby acknowledged between Landlord and Tenant that the foregoing restriction has been included in this Lease at the sole request of Tenant.

**Cost Plus (Bed, Bath & Beyond)**
Exclusive:
Landlord shall not lease, rent or occupy or permit any other premises in the Southwest Quadrant to be occupied, whether by a tenant, sublessee, assignee, licensee or other occupant or itself, for the display and/or sale of pre-packaged, non-perishable gourmet foods, beer, wine and spirits for off-premises consumption and/or domestic or imported home décor products (which items, either singly or in any combination, are hereinafter referred to as the *"Exclusive Items"*). Notwithstanding the foregoing, any tenant or subtenant in the Southwest Quadrant shall have the right to utilize its respective premises for the sale, rental and/or distribution of Exclusive Items (other than beer, wine and spirits for off-premises consumption, which shall not be permitted)

within an aggregate area (which shall include an allocable portion of the aisle space adjacent to such storage, sales, rental and/or distribution area) not to exceed one thousand (1,000) square feet of Floor Area within such tenant's or subtenant's premises.

The restrictions set forth in Subsection 13.2.1 above shall not apply to a full-line national: (i) department store [for example, Wal-Mart, Macy's, Target or Kohl's]; (ii) discount club [for example, Costco, BJ's Wholesale Club, or Sam's Club]; and (iii) home improvement center [for example, Home Depot or Lowe's]; commonly located in first-class shopping centers in the state in which the Shopping Center is located, each occupying at least 60,000 square feet of Floor Area within the Shopping Center as such stores are currently operated (as of the Effective Date). In addition, the restrictions set forth in Subsection 13.2.1 with respect to the Southwest Quadrant shall not apply to (a) the tenant operating under the trade name "Floor and Décor" and "Michael's" (as such retailers operate as of the Effective Date) but shall apply to "Hobby Lobby" and (b) a store that operates primarily as a full-line furniture store, primarily as a mattress store or primarily as a hardware and paint store similar to Ace Hardware. Tenant agrees that Tenant's exclusive for pre-packaged, non-perishable gourmet foods and/or domestic or imported home décor products shall not apply to the operation of a typical Starbucks or typical Ross Dress for Less or similar stores.

**Buy Buy Baby**
Exclusive:
Landlord shall not lease, rent or occupy or permit any other premises in the Southwest Quadrant to be occupied, whether by a tenant, sublessee, assignee, licensee or other occupant or itself, for the storage, sale, rental or distribution, at retail or at wholesale, either singly or in any combination, of items contained in any of the following respective categories of merchandise: (i) infant, juvenile and children's furniture and equipment (including, without limitation, infant, juvenile and children's: cribs, beds, mattresses, bedding, changing tables, gliders, rockers (including coordinating ottomans), high chairs, lamps, walkers, play yards, play pens, car seats, booster seats, cradles, carriages, strollers, toy and clothing chests, swings, or any other furniture or equipment similar to the foregoing enumerated items) (collectively, ***"Restricted Furniture')***; (ii) clothing, layettes, apparel, shoes and/or accessories for infants, juveniles and children 0-4 years in age; and maternity clothing; and (iii) merchandise, products and services targeted for use by or for infants, juveniles and children 0-4 years in age (including, without limitation, infant, juvenile and children's: toys, books, food, formula, indoor and/or outdoor play and recreational equipment, audio and video cassettes or equipment, safety items, feeding items, nursing items, health and beauty care items, drug remedies, diapers, wipes, bathroom items (including, without limitation, personal care devices and other bathroom appliances, accessories and toiletries)) (which items in clauses (i), (ii) and (iii) above, either singly or in any combination, are hereinafter referred to as the ***"Exclusive Items")***. Notwithstanding the foregoing, any tenant or subtenant in the Southwest Quadrant shall have the right to utilize its respective premises for the sale, rental and/or distribution of the Exclusive Items within an aggregate area (which shall include an allocable portion of the aisle space adjacent to such sales, rental and/or distribution area) not to exceed one thousand (1,000) square feet of Floor Area within such tenant's or subtenant's premises. In addition to the foregoing, Landlord shall not lease, rent or occupy or permit any other tenant or occupant of the Southwest Quadrant to operate a (x) hair cutting salon specializing primarily to a clientele of infants, juveniles or children; (y) photo studio specializing

primarily to a clientele of infants, juveniles or children; and/or (z) development, learning or fitness center specializing primarily to a clientele of infants, juveniles and children 0-4 years in age similar to a Gymboree, My Gym or Little Gym.

The restrictions set forth in Subsection 13.2.1 above shall not apply to a full-line national: (i) department store [for example, Wal-Mart, Macy's, Target or Kohl's]; (ii) discount club [for example, Costco, BJ's Wholesale Club, or Sam's Club]; (iii) home improvement center [for example, Home Depot or Lowe's]; clauses (i), (ii) & (iii) all as commonly located in first-class shopping centers in the state in which the Shopping Center is located, each occupying at least 60,000 square feet of Floor Area within the Shopping Center as such stores are currently operated (as of the Effective Date); and (iv) drug store. In addition, the restrictions set forth in Subsection 13 .2.1 with respect to the Southwest Quadrant shall not apply to (a) the tenant operating under the trade name "Floor and Decor" and "Michael's" (as such retailers operate as of the Effective Date) but shall apply to "Hobby Lobby" and (b) a store that operates primarily as a full-line furniture store, primarily as a mattress store, primarily as a hardware and paint store similar to Ace Hardware., or the juvenile department of a full-line shoe store. Tenant agrees that the foregoing restriction shall not prevent the operation of a typical Ross Dress for Less or similar stores.

## EXHIBIT H-1
## DICK'S SPORTING GOODS WAIVER



345 Court Street, Coraopolis, PA 15108

December 21, 2015

Daly City Serramonte Center, LLC
Serramonte Center
3 Serramonte Center
Daly City, CA 94105

> **Re: Consent to Operation – Ross Dress for Less**
> **Lease dated August 15, 2012, as amended, (the "Lease") between Dick's Sporting**
> **Goods, Inc. ("Tenant") and Daly City Serramonte Center, LLC ("Landlord")**
> **for premises located in the shopping center known as Serramonte Center in Daly**
> **City, CA ("Shopping Center") - Store No. 1092**

To Whom It May Concern:

This letter shall confirm that the use by Ross Dress For Less as shown on the attached site plan ("Ross") for the operation of an off-price full line department store to include the sale of brand-name apparel, accessories and footwear for women, men, youths and children (the "Use") will not violate the exclusive provided in Section 1.5 of the Lease as long as (a) the Use is substantially the same as Ross' operations of its other locations throughout the United States, (b) Ross does not devote more than two thousand (2,000) square feet to the display and sale of athletic footwear which the aggregate of such LFA shall include an allocable portion of the aisle space adjacent to such sales floor area, (c) the Ross premises does not exceed approximately thirty thousand five hundred (30,500) square feet, and (d) the Ross premises is substantially located in the Shopping Center as indicated on the attached site plan.

The confirmation in this letter is limited as expressly provided herein and this letter (i) does not change the exclusive provided in Section 1.5 of the Lease (the "Restriction"), (ii) shall not be deemed a consent or approval of any other use that violates the Restriction, and (iii) shall not be deemed a consent to any other matter set forth on the attached site plan that is not expressly provided for in this letter or in the Lease.

Very truly yours,

DICK'S SPORTING GOODS, INC.

By: _____

Name: _____Joseph R Oliver_____

Title: ____SVP & Chief Acct Officer____    MDL

"Serramonte (Relo #396)"
Serramonte Center
Daly City, CA
Store No. 1940
6061.1348/945944.1

Exhibit H-1

12/23/15
FINAL

"Serramonte (Relo #390)"
Serramonte Center
Daly City, CA
Store No. 1940
6061 1348/945944.1

Exhibit H-1

12/23/15
FINAL



NOTES:
1.   THIS EXHIBIT IS A STUDY LEASE OUTLINE AND IS CONCEPTUAL.
2.   COLUMN LOCATIONS ARE NOT SHOWN AND ARE TO BE DETERMINED
3.   DIMENSIONS SHOWN INDICATE LINE OF LEASED PREMISES
4.   LEASE LINE IS LOCATED AS FOLLOWS:
     4.1 LEASE LINE BETWEEN TENANTS INDICATES CENTERLINE OF DEMISING WALL
     4.2 LEASE LINE BETWEEN TENANT AND LANDLORD SPACES INDICATES FACE OF FINISH OF
     LANDLORD SIDE WALL
     4.3 LEASE LINE AT EXTERIOR WALL OR MALL CORRIDOR INDICATES FACE OF FINISH (EXTERIOR /
     MALL SIDE OF WALL
5.   PARKING LAYOUT, SERVICE DRIVE, LANDSCAPE, HARDSCAPE, AND SITE PLAN ARE PRELIMINARY AND
     CONTINGENT UPON FINAL DESIGN AND APPROVAL FROM THE CITY OF DALY CITY

LEGEND
⊖        SIGNAGE PYLON / MONUMENT SIGN
▨▨▨      AREA TO BE LEASED
▨▨▨      FUTURE EXPANSION AREA

**SERRAMONTE CENTER**     DALY CITY, CA 94015                    **DICK'S EXHIBIT**

EQUITY ONE, INC.    PROJECT NO:        09.25.2015         SGPA ARCHITECTURE AND PLANNING        P3
                    92043-D-50

# EXHIBIT I

## PERMITTED TITLE EXCEPTIONS

ROSS DRESS FOR LESS, INC. ("Tenant") agrees to take its leasehold interest subject only to the following Permitted Title Exceptions:

(a) the following exceptions stated in the Commitment for Title Insurance issued by Commonwealth Land Title Insurance Company, with an effective date of January 6, 2015, and numbered 08040376 for the subject location in Daly City, California:

From Schedule B – Section II:

Exceptions numbered 2 through 15.

However, with respect to the leases referred to in Exceptions 9, 14 and 15, Tenant does not accept or agree to be subject to any provisions of such leases, except to the extent expressly set forth in the Lease between Tenant and DALY CITY SERRAMONTE CENTER, LLC ("Landlord").

and

(b) the leases between Landlord and (i) Bed Bath & Beyond Inc. (dba Cost Plus) as evidenced by the recorded Memorandum of Lease dated May 18, 2015 and recorded June 23, 2015 as Document No. 2015-065410, and (ii) Bed Bath & Beyond Inc. (dba Buy Buy Baby) as evidenced by the recorded Memorandum of Lease dated May 18, 2015 and recorded June 23, 2015 as Document No. 2015-065411; provided, however, that Tenant does not accept or agree to be subject to any provisions of said leases, except to the extent expressly set forth in the Lease between Tenant and Landlord.







**VICINITY MAPS**
NOT TO SCALE





**SITE PLAN**
NOT TO SCALE











| EXHIBIT J | bill moore & associates | 1057 solano ave. p.o. box 6153 albany, ca 94706-0153 510/526-0296 fax 526-6092 www.billmoore.com | ROSS DRESS FOR LESS | **#1940 SERRAMONTE** (Relocation of #396 Serramonte) Serramonte Center NWC Serramonte Blvd. & Interstate 280) Daly City, CA | drawn 07/10/15 Exhibit J 09/14/15 M2 changed to M1 09/29/15 | SHEET **K** |
| PAGE 1 OF 11 | | | | | | |

Notes:

LANDLORD TO PROVIDE:
- ADEQUATE ACCESS BEHIND LOGO LETTERS FOR INSTALLATION AND MAINTENANCE, PER ARTICLE 600 OF THE N.E.C.
- ONE (1) 20 AMP 120V ISOLATED SIGN CIRCUIT AND JUNCTION BOX TO AREA BEHIND SIGN LETTERS CONNECTED TO THE ENERGY MANAGEMENT SYSTEM
- AT LEAST 1/2" THICK PLYWOOD BACKING BEHIND ALL E.I.F.S. WALL SYSTEMS FOR SIGN AND BANNER SUPPORT

SIGN FASCIA TO BE FREE OF JOINTS & REVEALS, AND OF A LIGHT COLOR (MINIMUM 80% L.R.V.) TO PROVIDE HIGH CONTRAST AND VISIBILITY FOR THE SIGN.

ALL COLORS ARE SUBJECT TO ROSS STORES, INC. REVIEW AND APPROVAL. COLOR APPEARANCE MAY BE ALTERED BY PRINTING, SEE APPROVED FINAL CONSTRUCTION DRAWINGS FOR COLOR SPECIFICATIONS.

IF ANY SIGNAGE PROPOSED IN THIS EXHIBIT IS ALTERED BY LOCAL GOVERNMENT AUTHORITIES, ROSS STORES INC. RESERVES THE RIGHT TO, AT NO COST, ADJUST ARCHITECTURAL FEATURES TO BEST ACCOMMODATE THE ALTERED SIGNAGE.

(A) 72"H INDIVIDUAL "ROSS" PAN CHANNEL LETTER-LOK LOGO LETTERS:
FACES: TUF-GLAS 5G 21210-E4 MATTE BLUE
RETURNS: 5"D ALUM. W/ WHITE FINISH
TRIM CAP: 2" WHITE JEWELITE
LETTER BACKS: ALUMINUM
LEDS: INSEM S5-KDL2CL-RW 9000K WHITE
MOUNTING: 1/4"-20 GALV. THRU BOLTS
PEG OFF: 1/2" SPACERS

(B) 42"H INDIVIDUAL "DFL" LOGO LETTERS:
ALL CALLOUTS SAME AS "ROSS" EXCEPT:
RETURNS: 5"D ALUM. W/ WHITE FINISH
TRIM CAP: 1" WHITE JEWELITE

(C) 23"H X 46"W X 10"D DOUBLE-FACE INTERNALLY ILLUMINATED UNDER-CANOPY SIGN, SEE SHEET UC FOR DETAILS.

(D) 24"H X 48"W X 1"D SINTRA OVAL "ROSS" LOGO WALL PLAQUE ONE (1) REQUIRED AS SHOWN, SEE SHEET EL FOR DETAILS.

1. SIGN FASCIA BY LANDLORD, SEE NOTES
2. TYPICAL ARCHITECTURAL LIGHTING BY LANDLORD
3. TYPICAL ROSS BLUE IDENTITY BANDS BY LANDLORD
4. CLEAR ANODIZED ALUMINUM STOREFRONT & DOORS BY LANDLORD
5. FROSTED FILM BY LANDLORD
6. SET OF FIVE (5) EYE-BOLTS FOR BANNER ATTACHMENT BY LANDLORD. TWO (2) SETS REQUIRED AS SHOWN.
7. ADJACENT PARAPET MAY NOT BE HIGHER THAN THE ROSS BASE BUILDING
8. RECESSED ILLUMINATED NICHE BY LANDLORD



① STOREFRONT · NORTH · CALLAN BLVD. · ELEVATION

SCALE: 3/32" = 1'-0"

TK-N



EXHIBIT J
PAGE 2 OF 11

bill moore & associates
1057 solano ave.
p.o. box 6153
albany, ca 94706-0153
510/526-0294 fax 526-6092
www.billmoore.com
MEMBER CSA ISA

ROSS DRESS FOR LESS

#1940 SERRAMONTE
(Relocation of #396 Serramonte)
Serramonte Center
NWC Serramonte Blvd. & Interstate 280)
Daly City, CA

drawn — 06/12/15
Exhibit J — 09/14/15

SHEET
S1

**Notes:**

LANDLORD TO PROVIDE:
- ADEQUATE ACCESS BEHIND LOGO LETTERS FOR INSTALLATION AND MAINTENANCE, PER ARTICLE 600 OF THE N.E.C.
- ONE (1) 20 AMP 120V ISOLATED SIGN CIRCUIT AND JUNCTION BOX TO AREA BEHIND SIGN LETTERS CONNECTED TO THE ENERGY MANAGEMENT SYSTEM
- AT LEAST 1/2" THICK PLYWOOD BACKING BEHIND ALL E.I.F.S. WALL SYSTEMS FOR SIGN AND BANNER SUPPORT

SIGN FASCIA TO BE FREE OF JOINTS & REVEALS, AND OF A LIGHT COLOR (MINIMUM 80% L.R.V.) TO PROVIDE HIGH CONTRAST AND VISIBILITY FOR THE SIGN.

ALL COLORS ARE SUBJECT TO ROSS STORES, INC. REVIEW AND APPROVAL. COLOR APPEARANCE MAY BE ALTERED BY PRINTING, SEE APPROVED FINAL CONSTRUCTION DRAWINGS FOR COLOR SPECIFICATIONS.

IF ANY SIGNAGE PROPOSED IN THIS EXHIBIT IS ALTERED BY LOCAL GOVERNMENT AUTHORITIES, ROSS STORES INC. RESERVES THE RIGHT TO, AT NO COST, ADJUST ARCHITECTURAL FEATURES TO BEST ACCOMMODATE THE ALTERED SIGNAGE.

(A) 72"H INDIVIDUAL "ROSS" PAN CHANNEL LETTER-LOK LOGO LETTERS:
FACES: TUF-GLAS SG 21210-E4 MATTE BLUE
RETURNS: 8"D ALUM. W/ WHITE FINISH
TRIM CAP: 2" WHITE JEWELITE
LETTER BACKS: ALUMINUM
LEDS: INSEM SS-KD12CL-RW 8000K WHITE
MOUNTING: 1/4"-20 GALV. THRU BOLTS
PEG OFF: 1/2" SPACERS

(B) 42"H INDIVIDUAL "DFL" LOGO LETTERS:
ALL CALLOUTS SAME AS "ROSS" EXCEPT:
RETURNS: 8"D ALUM. W/ WHITE FINISH
TRIM CAP: 1" WHITE JEWELITE

(C) 23"H X 46"W X 10"D DOUBLE-FACE INTERNALLY ILLUMINATED UNDER-CANOPY SIGN, SEE SHEET UC FOR DETAILS.

(D) 24"H X 48"W X 1"D SINTRA OVAL "ROSS" LOGO WALL PLAQUE TWO (2) REQUIRED AS SHOWN, SEE SHEET EL FOR DETAILS.

1. SIGN FASCIA BY LANDLORD, SEE NOTES

2. TYPICAL ARCHITECTURAL LIGHTING BY LANDLORD

3. TYPICAL ROSS BLUE IDENTITY BANDS BY LANDLORD

4. CLEAR ANODIZED ALUMINUM STOREFRONT & DOORS BY LANDLORD

5. FROSTED FILM BY LANDLORD

6. SET OF FIVE (5) EYE-BOLTS FOR BANNER ATTACHMENT BY LANDLORD, ONE (1) SET REQUIRED AS SHOWN.



 STOREFRONT · WEST · CALLAN BLVD. · ELEVATION

SCALE: 3/32" = 1'-0"    TK-N

EXHIBIT J
PAGE 3 OF 11

1057 solano ave.
p.o. box 6153
albany, ca 94706-0153
510/526-0294 fax 526-6092
www.billmoore.com
bill moore & associates

**#1940 SERRAMONTE**
(Relocation of #396 Serramonte)
Serramonte Center
NWC Serramonte Blvd. & Interstate 280)
Daly City, CA

drawn          06/12/15
Exhibit J       09/14/15

SHEET
**S2**

(A) TENANT FACE DECORATION BY ROSS STORES, INC.:
4'-0"H X 16'-10"W ALUMINUM PANEL WITH 38"H ROUTED "ROSS"

PRIME & PAINT WITH MATTHEWS "CAPRI BLUE" AND BACK UP FACE
WITH ACRYLITE WM30 TRANSLUCENT WHITE ACRYLIC.
ACRYLIC TO BE MECHANICALLY FASTENED TO BACK OF ALUMINUM PANEL.

TWO (2) FACES REQUIRED: ONE (1) ON EACH SIDE OF DOUBLE-FACE PYLON
SIGN IN TENANT POSITION AS SHOWN.

1  PYLON STRUCTURE, FOOTINGS, CABINETS,
   FINISHES, LIGHTING AND ELECTRICAL SERVICE
   PROVIDED AND MAINTAINED BY LANDLORD

2  NEW BLANK TENANT FACES PROVIDED BY LANDLORD

3  OTHER TENANT FACES SHOWN FOR REFERENCE ONLY

Installation Instructions:
• FIELD VERIFY AND CONFIRM TO BMA EXACT FACE DIMENSIONS,
  STRUCTURE AND LIGHTING CONDITIONS
• PROVIDE BMA WITH LOGO PLOT (PROOF) PRIOR TO FABRICATION
• PROVIDE BMA WITH PHOTOS OF FINISHED DISPLAY

INTERSTATE 280    PARKING LOT



ROSS TENANT FACE DETAIL

16'-10"
12'-8"
EQ          EQ
EQ
4'-0"   38"
EQ

(2)  **ROSS TENANT FACE DETAIL**
     SCALE: 3/8" = 1'-0"







(1)  **PYLON ELEVATION · NORTH**
     INTERSTATE 280: SEE SHEET K FOR LOCATION     SCALE: 1/8" = 1'-0"

EXHIBIT  J
PAGE  4  OF  11

bma
1057 solano ave.
p.o. box 6153
albany, ca 94706-0153
510/526-0296 fax 526-6092
www.billmoore.com
bill moore & associates

CSA

ROSS
DRESS FOR LESS

#1940 SERRAMONTE
(Relocation of #396 Serramonte)
Serramonte Center
NWC Serramonte Blvd. & Interstate 280)
Daly City, CA

drawn       08/03/15
Exhibit J    09/14/15

SHEET
P1

(A) TENANT FACE DECORATION BY ROSS STORES, INC.:
12"H X 5'-0"W ALUMINUM PANEL WITH 7 1/2"H ROUTED "ROSS"
AND 3 1/8"H ROUTED "DRESS FOR LESS" COPY.

PRIME & PAINT WITH MATTHEWS "CAPRI BLUE" AND BACK UP FACE
WITH ACRYLITE WM30 TRANSLUCENT WHITE ACRYLIC.
ACRYLIC TO BE MECHANICALLY FASTENED TO BACK OF ALUMINUM PANEL.

TWO (2) FACES REQUIRED: ONE (1) ON EACH SIDE OF DOUBLE-FACE MONUMENT
SIGN IN TENANT POSITION AS SHOWN.

[1] MONUMENT STRUCTURE, FOOTINGS, CABINETS,
FINISHES, LIGHTING AND ELECTRICAL SERVICE
PROVIDED AND MAINTAINED BY LANDLORD

[2] NEW BLANK TENANT FACES PROVIDED BY LANDLORD

[3] OTHER TENANT FACES SHOWN FOR REFERENCE ONLY

INSTALLATION INSTRUCTIONS:
- FIELD VERIFY AND CONFIRM TO BMA EXACT FACE DIMENSIONS,
  STRUCTURE AND LIGHTING CONDITIONS
- PROVIDE BMA WITH LOGO PLOT (PROOF) PRIOR TO FABRICATION
- PROVIDE BMA WITH PHOTOS OF FINISHED DISPLAY

SERRAMONTE BLVD     PARKING LOT



**① MONUMENT ELEVATION · EAST**
SERRAMONTE **BLVD: SEE SHEET** K FOR LOCATION          SCALE: 1/2" = 1'-0"



**② ROSS TENANT FACE DETAIL**
SCALE: 1" = 1'-0"

EXHIBIT __J__
PAGE _5_ OF _11_


1057 solano ave.
p.o. box 6153
albany, ca 94706-0153
510/526-0296 fax 526-6092
www.billmoore.com
bill moore & associates




**#1940 SERRAMONTE**
(Relocation of #396 Serramonte)
Serramonte Center
NWC Serramonte Blvd. & Interstate 280)
Daly City, CA

| | |
|---|---|
| drawn | 08/03/15 |
| Exhibit J | 09/14/15 |
| M2 changed to M1 | 09/29/15 |

SHEET

**M1**

**Notes:**

SEE SHEET 51 FOR PLAQUE LOCATIONS.

GENERAL CONTRACTOR TO PROVIDE:
- VERIFICATION AND PREPARATION OF WALL SURFACE -
  IF WALL SURFACE IS UNEVEN (EXAMPLE: SPLIT-FACE CMU OR
  STONE VENEER), GENERAL CONTRACTOR TO KNOCK DOWN
  ROUGH SURFACE 2" BEYOND EDGE OF PLAQUE SO IT WILL
  SIT FLUSH AGAINST THE WALL. SEE SECTION A-A BELOW.

BMA TO PROVIDE:
- PLAQUES, HARDWARE AND INSTALLATION PATTERNS
  TO SIGN INSTALLER
- FULL-SIZED OVAL TEMPLATE TO GENERAL CONTRACTOR
  TO FACILITATE RESURFACING OF WALL AREA BEHIND
  PLAQUES. BMA TO VERIFY FINISH BEFORE
  SENDING PATTERN

SIGN INSTALLER TO PROVIDE:
- GE CONSTRUCTION SCS1200 SILICONE SEALANT

(A) 24"H X 48"W X 1"D SINTRA OVAL "ROSS" LOGO
    WALL PLAQUE; SEE SHEET 51 FOR LOCATION(S).

(B) DIGITALLY PRINTED 3M CONTROL TAC GRAPHIC:
    9.6"H x 35"W WHITE "ROSS" COPY
    .25" PMS #296C DARK BLUE COPY OUTLINE
    PMS #2945C  BLUE BACKGROUND
    .25" PMS #296C DARK BLUE 1ST OUTLINE,
    .625" WHITE 2ND OUTLINE
    .875" PMS #2945C BLUE 3RD OUTLINE

(C) CLEAR "TEDLAR" GRAFFITI GUARD FILM
    OVERLAY

(D) 2" DRESSED AREA (IF NECESSARY)

**Installation Instructions:**
- DRILL FIVE (5) 5/16" DIA. X 3" DEEP HOLES INTO WALL AS PER PATTERN.
- SCREW 3" X 1/4-20 MACHINE-THREAD END OF GALV. FURNITURE BOLTS
  INTO EMPTY T-NUTS INTO BACK OF PLAQUE UNTIL THEY CONTACT THE PVC.
  (DO NOT OVER-TIGHTEN).
- USING GE CONSTRUCTION SCS 1200 SILICONE SEALANT, FILL HOLES IN
  WALL, COAT SCREW-THREAD ENDS OF FURNITURE BOLTS AND APPLY
  HEAVY BEAD TO BACK OF PLAQUE
- MOUNT PLAQUE ONTO WALL BY PUSHING BOLTS INTO HOLES UNTIL
  PLAQUE IS FLUSH AGAINST WALL SURFACE.



**② SECTION A-A' AT MOUNT**
SCALE: 1-1/2" = 1'-0"

**① OVAL ENTRANCE LOGO PLAQUE ELEVATION**
SCALE: 1-1/2" = 1'-0"



EXHIBIT ___J___

PAGE __6__ OF __11__



1057 solano ave.
p.o. box 6153
albany, ca 94706-0153
510/526-0296 fax 526-6092
www.billmoore.com
**bill moore & associates**



**#1940 SERRAMONTE**
(Relocation of #396 Serramonte)
Serramonte Center
NWC Serramonte Blvd. & Interstate 280)
Daly City, CA

| drawn | 09/14/15 |
|-------|----------|
| Exhibit J | 09/14/15 |

SHEET
**EL**



**Notes:**

SEE SHEET S1 FOR UNDER-CANOPY SIGN LOCATION.

GENERAL CONTRACTOR TO PROVIDE:
- ACCESS ABOVE CEILING FOR SIGN INSTALLATION.
- 120V ELECTRICAL SERVICE
- J-BOX WITHIN FIVE (5) FEET OF SIGN LOCATION (CONNECTED TO ENERGY MANAGEMENT SYSTEM).

BMA TO PROVIDE:
- DOUBLE-FACED ALUMINUM CABINET
- ESCUTCHEON PLATES AT CEILING

SIGN INSTALLER TO PROVIDE:
- WOOD OR STEEL ANGLE CROSS MEMBER (AND WOOD BLOCKING IF NECESSARY); SEE LETTER "B"
- 2 SCREWS FOR ESCUTCHEON PLATE; PRIME AND PAINT PLATES AND SCREW HEADS TO MATCH CEILING; SEE LETTER "C"
- 1-1/2" DIA. GAVANIZED STEEL PIPE SUPPORTS (TYP. OF TWO); THREAD ENDS TO SECURE INSIDE CABINET AND ABOVE CEILING. PRIME AND PAINT TO MATCH CEILING. SEE LETTER "D"

(A) WOOD OR STEEL ANGLE CROSS MEMBER (AND WOOD BLOCKING IF NECESSARY) ANCHORED TO CANOPY JOISTS.

(B) 2" DIA. HOLE FOR PIPE SUPPORTS; FASTEN PIPES WITH FENDER WASHERS AND LOCK NUTS AS REQUIRED

(C) ESCUTCHEON PLATE AT CEILING; SECURE WITH 2 SCREWS, PRIME AND PAINT PLATES AND SCREW HEADS TO MATCH CEILING

(D) 1 1/2" DIA. GALVANIZED STEEL PIPE SUPPORTS (TYP. OF TWO) CUT TO LENGTH FOR FINISH CABINET HEIGHT

(E) DISCONNECT SWITCH; INSTALL CABINET SO SWITCH AND U.L. LABEL FACE STORE

(F) CABINET: 23" X 46" X 10" DOUBLE-FACED ALUMINUM PRIMED W/ ZINC CHROMATE; CABINET EDGE AND 1" RETAINERS PAINTED TO MATCH SULTAN BLUE (PMS 286).

(G) 1/4" DIA. DRAINHOLE AT BOTTOM OF CABINET (TYP.)

(H) WEATHERPROOF SILICONE SEAL AROUND PIPE PENETRATIONS INTO CABINET (TYP.)

(I) FACES: 0.177 (3/16") WHITE LEXAN FACE WITH 9 1/4"H "ROSS" COPY AND 3/4"W WHITE IN-LINE REVERSED OUT OF 3M 3630-157 SULTAN BLUE TRANSLUCENT VINYL OVERLAY

**Installer to:**
- DRILL 2" DIA. HOLES FOR PIPE SUPPORTS; FASTEN PIPES WITH FENDER WASHERS AND LOCK NUTS AS REQUIRED.
- PROVIDE AND CUT TO LENGTH: 1-1/2" DIA. GALVANIZED STEEL PIPE SUPPORTS; THREAD ENDS TO SECURE INSIDE CABINET AND ABOVE CEILING. PRIME AND PAINT TO MATCH CEILING.
- PROVIDE AND USE TWO (2) SCREWS TO SECURE ESCUTCHEON PLATES; PRIME AND PAINT PLATES AND SCREW HEADS TO MATCH CEILING



Section A-A' labels:
- TWO-LAMP BALAST
- 1" X 1" METAL RETAINER PAINTED TO MATCH SULTAN BLUE
- 1-1/2" PIPE FLANGE
- 1" X 4" 'C' CHANNEL WELDED TO CABINET EDGE
- 2" X 2" 'C' CHANNEL LAMP SUPPORT WELDED TO CABINET EDGE
- F36-T12-DHO FLUORESCENT LAMP; TYPICAL OF TWO (2)
- CABINET EDGE PAINTED TO MATCH SULTAN BLUE
- FOG INSIDE OF CABINET WHITE
- LAMPS AT 9" O.C.
- 10"



- 120V PRIMARY ELECTRICAL SERVICE AND J-BOX ABOVE CEILING WITHIN FIVE (5) FEET OF SIGN
- 48" MAX. PIPE LENGTH; VERIFY BY FIELD CHECK
- 46"
- EQ  24" O.C.  EQ
- A→
- 23"
- ←A'
- 8'-0" MIN. A.F.F.



- 3/4"
- 1"
- 3/4"
- 1"
- EQ  33 1/2" COPY  EQ
- 3/4" OUTLINE
- 1" RETAINER
- EQ
- 9 1/4"
- EQ
- 1" RETAINER
- 3/4" OUTLINE

(3) **SECTION A-A'**
SCALE: 3/4" = 1'- 0"

(2) **D/F UNDER-CANOPY FRAMING ELEVATION**
SCALE: 3/4" = 1'- 0"

(1) **D/F UNDER-CANOPY FACE DETAIL**
SCALE: 3/4" = 1'- 0"





EXHIBIT __J__
PAGE __7__ OF __11__

1057 solano ave.
p.o. box 6153
albany, ca 94706-0153
510/526-0296 fax 526-6092
www.billmoore.com
bill moore & associates



**#1940 SERRAMONTE**
(Relocation of #396 Serramonte)
Serramonte Center
NWC Serramonte Blvd. & Interstate 280)
Daly City, CA

| drawn | 09/14/15 |
| Exhibit J | 09/14/15 |

SHEET

**UC**



ROSS STORES, INC. REQUIRES AND WILL PROVIDE:

At least one (1) double-faced temporary site sign per street frontage.

Sign installer to confirm location with landlord's contractor prior to installation.

8'-0"

## NOW OPEN

1'-0" X 8'-0" RED
SINGLE FACED BANNER
(WITH HEMS AND GROMMETS)
TWO (2) BANNERS REQUIRED.

WHITE "NOW OPEN" COPY

NOTE:
ON DATE OF STORE OPENING
SECURE 1'-0" X 8'-0" "NOW OPEN"
BANNERS OVER "COMING SOON"
WORDING

③ "NOW OPEN" BANNER

8'-0"

## ROSS
DRESS FOR LESS
## COMING SOON
Discover us! www.rossstores.com

4'-0" X 8'-0" X 3/8" MEDEX SIGN PANEL
W/ WHITE ENAMEL FINISH. EDGES PAINTED WHITE.
TWO (2) PANELS REQUIRED INSTALLED BACK TO BACK
ON TWO (2) POSTS USING LAG BOLTS AND WASHERS

WHITE "ROSS DRESS FOR LESS" LOGO
REVERSED OUT OF BLUE BACKGROUND VINYL

RED "COMING SOON" COPY

BLUE "DISCOVER US! WWW.ROSSSTORES.COM" COPY

12"

1'-6"

4'-0"

8 1/2 IN.

4" X 4" X 10'-0" ROUGH SAWN POSTS PAINTED WHITE
(SEE FOOTING DETAIL AT LEFT)
MAY BE 12'-0" POSTS IF ADDITIONAL HEIGHT
IS NECESSARY FOR THE NOW HIRING PANELS

| | BLUE VINYL | 3M 7725-17 VIVID BLUE |
| | RED VINYL | 3M 7725-53 CARDINAL RED |

GRADE

3'-0" DEEP X 1'-0" DIAMETER POST
HOLES (TYPICAL) BACKFILLED WITH
COMPRESSED NATURAL SOIL

② TYP. SECTION W/ FTG.

① D/F TEMPORARY SITE SIGN ELEVATION

0'    1'    2'

EXHIBIT    J
PAGE    8    OF    11

1057 solano ave.
p.o. box 6153
albany, ca 94706-0153
510/526-0296 fax 526-6092
www.billmoore.com
bill moore & associates

CSA

ROSS
DRESS FOR LESS

PROTOTYPE STANDARD SITE SIGN
AND "NOW OPEN" BANNER
GRAPHIC REQUIREMENTS

issued    01/17/07
revised    05/15/08

SHEET
SS

**ROSS STORES, INC. REQUIRES AND WILL PROVIDE:**

Temporary "Opening Soon" construction banner package consisting of the following elements on storefront:

(A) 6'-0" x 24'-0" Temporary "Ross Dress For Less Opening Soon, Discover Us! www.rossstores.com" banner. Banner to be installed as soon as wall is complete.

(B) 40" x 50" "Ross Dress For Less Opening Soon" window banners (2 min.)

(C) Two (2) sets of five (5) Threaded Eye-Bolts at 4'-0" high x 18'-0" wide for banner attachment as shown.

- BANNERS MUST NEVER BE ATTACHED DIRECTLY TO E.I.F.S. WALLS (CONCRETE, CMU, STUCCO, MASONRY VENEER ARE OK).
- IF SIGN FASCIA IS E.I.F.S., EYE-BOLTS MUST BE PRESENT.
- IF EYE-BOLTS ARE PRESENT, INSTALL BANNER AS SHOWN.
- IF EYE-BOLTS ARE NOT PRESENT ON SIGN FASCIA, BANNER MAY BE INSTALLED ON BASE BUILDING (ONLY IF NOT E.I.F.S.).
- IF BASE BUILDING IS NOT E.I.F.S., BANNER MAY BE INSTALLED ON BASE BUILDING WALLS.
- IF NO EYE-BOLTS ARE PRESENT AND NO NON-E.I.F.S. SURFACES ARE AVAILABLE, DO NOT INSTALL BANNERS. NOTIFY BMA IMMEDIATELY FOR NEW INSTRUCTIONS.




**(A) "ROSS DFL OPENING SOON" BANNER DETAIL**



**(B) WINDOW BANNER DETAIL**



TILE TYP.
TILE SETTING BED
GALV. METAL COMPRESSION SLEEVE
CONTINUOUS SEALANT, COLOR TO MATCH TILE
GALVANIZED METAL, STANDARD #10, 2" THREADED EYE BOLT (PAINT TO MATCH TILE BEHIND)
GALVANIZED METAL WASHERS (PAINT FINISH SURFACE WASHER TO MATCH TILE BEHIND)
PLYWOOD SUBSTRATE, TYP.

**(C) EYE-BOLT DETAIL**
FOR TILE NICHE                                    N.T.S.



**(1) TYPICAL STOREFRONT ELEVATION**

0'    8'    16'

**NOTES:**

Specific conditions and codes will vary by location. BMA to provide site-specific plans prior to installation.

If storefront canopy is E.I.F.S., then Landlord is to provide plywood backing for sign & banner installation.

"Opening Soon" construction banner package to be provided and installed by BMA, using existing eye-bolts for attachments; see notes, above.

Banners not to be installed on drivit (E.I.F.S.) wall(s). BMA to seal, patch and touch-up all other wall penetrations upon removal of banners.

Ross Stores, Inc. reserves the right to install any other temporary opening promotional material or element they deem appropriate.

EXHIBIT    J
PAGE  9  OF  11


1057 solano ave.
p.o. box 6153
albany, ca 94706-0153
510/526-0296 fax 526-6092
www.billmoore.com
**bill moore & associates**





**PROTOTYPE STOREFRONT WITH STANDARD "OPENING SOON" CONSTRUCTION BANNER REQ'MENTS**

| | issued | 01/17/07 |
| revised per SM | | 05/13/11 |
| new proto | | 05/02/14 |

SHEET
**01a**

ROSS STORES, INC. REQUIRES AND WILL PROVIDE:

Temporary "Opening Soon / Now Open" banner package consisting of the following elements on storefront:

(A) 3'-0" x 16'-0"  "Opening Soon / Grand Opening" New Markets only)
Install banner along with the installation of the building signs.
Tie off to eyebolts at tile niche (by Landlord)

(B) 40" x 50" "Ross Dress For Less Opening Soon" window banners (2 min.)

(C) 3'-0" x 15'-0" "Now Hiring" banner

(D) Two (2) sets of five (5) Threaded Eye-Bolts at 4'-0" high x 18'-0" wide
for banner attachment as shown (see Sheet 01a).

• BANNERS MUST NEVER BE ATTACHED DIRECTLY TO E.I.F.S.
  WALLS (CONCRETE, CMU, STUCCO, MASONRY VENEER ARE OK).

• IF SIGN FASCIA IS E.I.F.S., EYE-BOLTS MUST BE PRESENT.

• IF EYE-BOLTS ARE PRESENT, INSTALL BANNER AS SHOWN.

• IF EYE-BOLTS ARE NOT PRESENT ON SIGN FASCIA, BANNER MAY
  BE INSTALLED ON BASE BUILDING (ONLY IF NOT E.I.F.S.).

• IF BASE BUILDING IS NOT E.I.F.S., BANNER MAY BE INSTALLED
  ON BASE BUILDING WALLS.

• IF NO EYE-BOLTS ARE PRESENT AND NO NON-E.I.F.S. SURFACES
  ARE AVAILABLE, DO NOT INSTALL BANNERS.
  NOTIFY BMA IMMEDIATELY FOR NEW INSTRUCTIONS.





(A) "OPENING SOON" BANNER DETAIL    0'  2'  4'

(B) "NOW HIRING" BANNER DETAIL    0'  2'  4'



(1) TYPICAL STOREFRONT ELEVATION    0'  8'  16'

NOTES:
Specific conditions and codes will vary by location.
BMA to provide site-specific plans prior to installation.

If storefront canopy is E.I.F.S., then Landlord is to
provide plywood backing for sign & banner installation.

"Opening Soon/Now Open" banner package to be provided
and installed by BMA, using existing eye-bolts for
attachment; see notes, above.

Banners not to be installed on dryvit (E.I.F.S.) wall(s).
BMA to seal, patch and touch-up all other wall
penetrations upon removal of banners.

Ross Stores, Inc. reserves the right to install any other
temporary opening promotional material or element they
deem appropriate.

EXHIBIT ___J___

PAGE _10_ OF _11_



bill moore & associates
1057 solano ave.
p.o. box 6153
albany, ca 94706-0153
510/526-0296 fax 526-6092
www.billmoore.com

PROTOTYPE STOREFRONT
WITH STANDARD "OPENING SOON"
"NOW HIRING" BANNER REQ'MENTS

issued  01/17/07
new Now Hiring bnr.  05/15/08
revised per SM  05/02/14

SHEET
01b

ROSS STORES, INC. REQUIRES AND WILL PROVIDE:

Temporary "Now Open" banner package consisting of the following elements on storefront:

(A) 3'-0" x 16'-0" "Now Open" ("Grand Opening" at New Markets only)
Installation of the building signs (see Sheet 01b). Tie off to eye-bolts (by landlord).
Remove "opening soon" to reveal "Now Open" or "Grand Opening" banner on the day of store opening.

(B) 3'-0" x 15'-0" "Now Hiring" banner to remain at discretion of store manager.

(C) Two (2) sets of five (5) Threaded Eye-Bolts at 4'-0" high x 18'-0" wide
for banner attachment as shown (see Sheet 01a).

(D) Multicolor pennant flags to be installed where applicable.

(E) Remove Window Banners

- BANNERS MUST NEVER BE ATTACHED DIRECTLY TO E.I.F.S.
  WALLS (CONCRETE, CMU, STUCCO, MASONRY VENEER ARE OK).
- IF SIGN FASCIA IS E.I.F.S. EYE-BOLTS MUST BE PRESENT.
- IF EYE-BOLTS ARE PRESENT, INSTALL BANNER AS SHOWN.
- IF EYE-BOLTS ARE NOT PRESENT ON SIGN FASCIA, BANNER MAY
  BE INSTALLED ON BASE BUILDING (ONLY IF NOT E.I.F.S.).
- IF BASE BUILDING IS NOT E.I.F.S., BANNER MAY BE INSTALLED
  ON BASE BUILDING WALLS.
- IF NO EYE-BOLTS ARE PRESENT AND NO NON-E.I.F.S. SURFACES
  ARE AVAILABLE, DO NOT INSTALL BANNERS.
  NOTIFY BMA IMMEDIATELY FOR NEW INSTRUCTIONS.



(A) "NOW OPEN" BANNER DETAIL    0'    2'    4'

Grand OPENING

NEW MARKET ONLY
ALTERNATE BASE    N.T.S.

ROSS
DRESS FOR LESS
Now OPEN

ROSS  NOW HIRING

(1) TYPICAL STOREFRONT ELEVATION    0'    8'    16'

NOTES:

Specific conditions and codes will vary by location.
BMA to provide site-specific plans prior to installation.

If storefront canopy is E.I.F.S. then Landlord is to
provide plywood backing for sign & banner installation.

"Now Open" banner package to be provided and installed
by BMA, using existing eye-bolts for attachments; see
notes, above.

"Now Open" banner package to be installed immediately
prior to store opening and to remain for a minimum of
thirty (30) days.

Banners not to be installed on dryvit (E.I.F.S.) wall(s).
BMA to seal, patch and touch-up all other wall
penetrations upon removal of banners.

Ross Stores, Inc. reserves the right to install any other
temporary opening promotional material or element they
deem appropriate.

EXHIBIT ___J___
PAGE _11_ OF _11_

bma
1057 solano ave.
p.o. box 6153
albany, ca 94706-0153
510/526-0296 fax 526-6092
www.billmoore.com
bill moore & associates

CSA MEMBER

ROSS
DRESS FOR LESS

PROTOTYPE STOREFRONT
WITH STANDARD "NOW OPEN"
CONSTRUCTION BANNER REQ'MENTS

issued    01/17/07
new Now Hiring bnr.    05/15/08
revised per SM    05/02/14

SHEET
N01

## EXHIBIT K

### EXISTING TENANTS

| STORE |
|---|
| 59B Dental |
| 85C Bakery |
| Adapt |
| Andersen Bakery |
| AT&T |
| Auntie Anne's Pretzels |
| Barracuda |
| Bath & Body Works |
| Bench |
| Best Buy Mobile |
| Buffalo Wild Wings |
| Buy Buy Baby |
| Cathy Jean |
| Charlotte Russe |
| Chicken & Waffles |
| Children's Place, The |
| Claire's Boutique |
| Classy Nails |
| Cost Plus |
| Crazy 8 |
| Crunch |
| Daiso |
| Daly City Optometry |
| Dave & Buster's |
| Denny's |
| Dick's Sporting Goods |
| Disney Store, The |
| Elephant Bar |
| Finishline |
| Firestone |
| Foot Action USA |
| Foot Locker |
| Forever XXI |
| Forlove 21 |
| Game Stop |
| Giants Dugout |
| GNC |
| Great Steak |
| H&M |
| Hat Club, The |

"Serramonte (Relo #396)"
Serramonte Center
Daly City, CA
Store No. 1940
6061.1348/943377.1

EXHIBIT K
1

12/23/15
FINAL

| |
|---|
| Hawaiian BBQ |
| Hidden Hype |
| Hollister Co. |
| Hot Dog on a Stick |
| Hot Topic |
| Ike's Sandwich Shop |
| Jamba Juice |
| JCPenney |
| Jewelry Exchange Expo |
| Journeys |
| Kay Jewelers |
| Kid's Footlocker |
| Lids |
| Life Uniform |
| Macy*s |
| Manila Bay Cuisine |
| Maze Watch & Jewelry |
| Motherhood Maternity |
| Mrs. Fields |
| MW Tux |
| Naan-N-Curry |
| New York & Company |
| Nina's |
| Nordstrom Rack |
| Orange Julius |
| Oui Oui Macaron |
| Pac Sun |
| Panda Express |
| Payless Shoe Source |
| Perfumania |
| Pho Garden |
| Piercing Pagoda |
| Planet Yogurt |
| Quickly |
| Reflection Shoes |
| Regis Salon |
| Rubio's |
| Select Comfort |
| Serramonte Music Center |
| Shoe Palace |
| Silver&Gold Connections |
| Site for Sore Eyes |
| Sports City |
| Sprint |
| Starbucks Coffee |

"Serramonte (Relo #396)"
Serramonte Center
Daly City, CA
Store No. 1940
6061.1348/943377.1

EXHIBIT K
2

12/23/15
FINAL

| |
|---|
| Subway |
| Sunglass Hut |
| Surf City Squeeze |
| Taco Bell |
| Target |
| Things Remembered |
| T-Mobile |
| Tokyo Grill |
| UNIQLO |
| Valliani Jewelers |
| Victoria's Secret |
| Villa Kitchen Pizza |
| Wells Fargo Bank |
| Zales Jewelers |
| Ziba Beauty |
| Zumiez |
| Art of Massage |
| As Seen on TV |
| Best Phone Repair |
| Cricket Wireless |
| Divano Home |
| Eco Atm |
| Evolution/Salon Leon |
| Frames & Keys |
| Fun Time |
| Grandpa Kevin's Pumpkin Patch |
| iCruze |
| iPod Accessories |
| Jadel Jewelers |
| Metro PCS |
| Mini Melts |
| Phone Depot |
| Pica Pica |
| Proactiv |
| Silver Spot |
| Spirit Halloween |
| T-Mobile/Mobile One |
| Upper Case |

"Serramonte (Relo #396)"
Serramonte Center
Daly City, CA
Store No. 1940
6061.1348/943377.1

EXHIBIT K
3

12/23/15
FINAL

## EXHIBIT L

## GUARANTY

As a material inducement to and in consideration of **DALY CITY SERRAMONTE CENTER, LLC**, a Delaware limited liability company ("Landlord"), entering into a written lease (the "Lease") with **ROSS DRESS FOR LESS, INC.**, a Virginia corporation ("Tenant"), dated the same date as this Guaranty, pursuant to which Landlord leased to Tenant and Tenant leased from Landlord premises located in the City of Daly City, County of San Mateo, State of California, **ROSS STORES, INC.**, a Delaware corporation ("Guarantor"), whose address is 5130 Hacienda Drive, Dublin, CA 94568-7579, guarantees and promises to and for the benefit of Landlord the performance of all obligations of Tenant under the Lease.

The provisions of the Lease may be amended by agreement between Landlord and Tenant at any time; provided, however, Guarantor shall not be bound by any amendment to which it has not consented in writing. Assignment of the Lease (as permitted by the Lease) shall not affect this Guaranty, except as specifically set forth in the Lease.

If Tenant defaults with respect to any payment obligation under the Lease, Landlord shall have the right to proceed immediately against Guarantor and/or Tenant, and to enforce against Guarantor and/or Tenant any rights that Landlord may have under the Lease or pursuant to applicable laws with respect to such default. If the Lease terminates and Landlord has any right(s) that it is entitled to enforce against Tenant after termination, Landlord shall have the right to enforce such right(s) against Guarantor.

Guarantor waives the right to require Landlord to (1) proceed against Tenant; (2) proceed against or exhaust any security that Landlord holds from Tenant; or (3) pursue any other remedy in Landlord's power. Guarantor waives any defense by reason of any disability of Tenant. Until all of Tenant's monetary obligations to Landlord under the Lease have been discharged in full, Guarantor has no right of subrogation against Tenant. Guarantor waives its right to enforce any remedies that Landlord now has, or later may have, against Tenant. Guarantor waives any right to participate in any security now or later held by Landlord.

If Landlord is required to enforce Guarantor's obligations by legal proceedings, Guarantor shall pay to Landlord all costs incurred, including, without limitation, reasonable attorneys' fees.

Guarantor's obligations under this Guaranty shall be binding on Guarantor's successors, but shall be no greater than Tenant's or as otherwise set forth in this Lease.

Dated: _____          **ROSS STORES, INC.,**
                                   **a Delaware corporation**


                                   By:_____
                                      James Fassio
                                   Its:  President and Chief Development Officer

"Serramonte (Relo #396)"          EXHIBIT L                    12/23/15
Serramonte Center                                              FINAL
Daly City, CA
Store No. 1940
6061.1348/935025.1

## EXHIBIT M

### EXISTING LEASE CONSTRUCTION LIMITATIONS

**Tenant acknowledges that for purposes of this Exhibit M, the Store is located within "Retail A," as described below.**

The height of any building or other structure shall not exceed two stories or forty-one (41) feet in height above grade.

All rooftop equipment shall be screened from ground level view in all directions.

The uses of such buildings shall be limited to recreational, entertainment, restaurant, retail or service trades.

During construction, there shall be erected and maintained, at such time, for such period and in such manner as is required by good construction practice, an adequate and attractive barricade or other protective device providing adequate protection to, and attractive screening from, the public.

There shall not be any sign on the roof of any building or any so-called "flashing" or "animated" sign, or sign which otherwise consists of periodic variations in the intensity of illumination.

Any construction, delivery and related vehicles engaged in the performance of work or other construction activities shall not materially interfere with [Cost Plus' or Buy Buy Baby's] business operations.

The Shopping Center shall be maintained in a clean, safe, and sightly condition, and construction shall not materially adversely interfere with the normal conduct of any business operations in the Premises.

No entrances, exits, approaches and means of ingress and egress to, from, and/or within the Shopping Center or the Premises as designated on Exhibit B hereto as *"Critical Access Way"* shall be interrupted or disturbed.

Construction shall not be performed during the months of August (through Labor Day), November, or December of any year, except in the event of an emergency or as may be otherwise required by applicable Legal Requirements.

Landlord shall neither make nor permit to be made any alterations to the exterior architectural theme of the remainder of the Southwest Quadrant which would be inconsistent with a first-class shopping center in the state in which the Shopping Center is located (exclusive of other tenants' entrance features) without the prior consent of [Cost Plus or Buy Buy Baby]. Landlord covenants and agrees that with respect to the buildings to be constructed in the areas designated as Retail A and Retail A-2, the highest point of the roof shall not exceed twenty nine (29) feet and the height of any architectural feature shall not exceed forty one (41) feet, in each case as measured from the finished floor level.

The following is from the lease between Landlord and Dick's Sporting Goods:

[Dick's] acknowledges that Landlord is contemplating the following development and construction work in the vicinity of the Demised Premises: (A) redeveloping the area depicted on the Lease Plan as "**Permitted Development Area**" into a Dave & Buster's (the "**D&B Development**"); and (B) the development, construction and build-out of Retail A, Retail B and Retail C as shown on the Lease Plan (the "**Retail A/B/C Development**", and together with the D&B Development, collectively, the "**Subsequent Construction**"). A copy of the Lease Plan is attached hereto.

The right to perform the Subsequent Construction is conditioned upon the satisfaction of all of the following:

Prior to the commencement of any Subsequent Construction, Landlord shall deliver to Dick's at least twenty (20) days' prior written notice of such commencement.

Subject to Section 3.3.1 of this Lease, the staging area for construction of the Permitted Development Area shall be located in the "**Staging Area for Permitted Development Area**" as shown on the Lease Plan; the staging area for construction of Retail A shall be located in the "**Retail A Staging Area**" as shown on the Lease Plan; and the staging area for construction of Retail B and Retail C shall be located in the "**Retail B & C Staging Area**" as shown on the Lease Plan. A copy of the Lease Plan is attached hereto.

The Subsequent Construction areas shall be maintained in a neat and tidy condition.

All construction debris shall be placed in construction dumpsters on a weekly basis, which shall be emptied as needed.

Construction vehicles and trucks shall access the Subsequent Construction areas at times and in a manner that will minimize disruption to the Southwest Quadrant. If delivery vehicles or customers' access are blocked at any time via the Southwest Quadrant, upon oral request such blockage shall be immediately removed.

Once Subsequent Construction has commenced, such construction shall be diligently and continuously pursued to completion.