# <u>Exhibit A</u>

**BBBY Lease**

**REDACTED VERSION**

# LEASE AGREEMENT

### Between

## PINNACLE SOUTH LLC
## a Delaware limited liability company,

### Landlord

### and

## BED BATH & BEYOND INC.,
## a New York corporation,

### Tenant

### Pinnacle Hills Promenade
### Rogers, Arkansas

Dated: June 1 , 2007

# TABLE OF CONTENTS

Page

ARTICLE 1 BASIC TERMS AND DEFINITIONS ....................................................................1
    Section 1.1    Basic Terms and Definitions.......................................................................1

ARTICLE 2 LEASE OF PREMISES; LEASE TERM; DELIVERY DATE ...............................4
    Section 2.1    Lease of Premises......................................................................................4
    Section 2.2    Term.........................................................................................................4
    Section 2.3    Delivery Date............................................................................................5
    Section 2.4    Unseasonable Delivery: Slack Period .......................................................6
    Section 2.5    Initial Co-Tenancy Condition....................................................................7

ARTICLE 3 IMPROVEMENTS ...............................................................................................8
    Section 3.1    Landlord's Work and Tenant's Work .........................................................8
    Section 3.2    Plan Approvals..........................................................................................8
    Section 3.3    Performance of Work.................................................................................9
    Section 3.4    Measurement: Adjustment of Rent...........................................................11

ARTICLE 4 FIXED RENT AND TAXES: DETERMINATION AND PAYMENT...................12
    Section 4.1    Fixed Rent ...............................................................................................12
    Section 4.2    Payment of Rent......................................................................................12
    Section 4.3    Real Estate and Other Taxes....................................................................12
    Section 4.4    Percentage Rent.......................................................................................13

ARTICLE 5 COMMON AREAS, THEIR USE AND CHARGES ............................................15
    Section 5.1    Common Areas: Maintenance...................................................................15
    Section 5.2    Common Areas: Restrictions....................................................................17

ARTICLE 6 UTILITIES..........................................................................................................19
    Section 6.1    Utility Service .........................................................................................19
    Section 6.2    Interruption.............................................................................................20

ARTICLE 7 SIGNS ................................................................................................................20
    Section 7.1    Tenant's Building Signage........................................................................20
    Section 7.2    Signage in Common Areas .......................................................................20
    Section 7.3    Signage: Alteration/Removal/Allocation..................................................21
    Section 7.4    Cooperation.............................................................................................21
    Section 7.5    Signage Restrictions and Criteria.............................................................21

ARTICLE 8    21

ALTERATIONS AND IMPROVEMENTS.................................................................................21
    Section 8.1    Alterations and Improvements..................................................................21

ARTICLE 9 REPAIRS ............................................................................................................23
    Section 9.1    Tenant's Repairs .....................................................................................23
    Section 9.2    Landlord's Repairs ..................................................................................23
    Section 9.3    Legal Compliance Work ..........................................................................24

ARTICLE 10 INDEMNIFICATION, INSURANCE AND WAIVER OF
        SUBROGATION ...............................................................................24
    Section 10.1    Mutual Release, Waiver of Subrogation and Mutual Indemnification. 24
    Section 10.2    Tenant's Insurance..................................................................................25
    Section 10.3    Landlord's Insurance................................................................................25
    Section 10.4    General Insurance Requirements...............................................................26

ARTICLE 11 FIRE AND OTHER CASUALTY; EMINENT DOMAIN ...................................26
    Section 11.1    Fire and Other Casualty...........................................................................26
    Section 11.2    Eminent Domain......................................................................................28
    Section 11.3    Abatement of Rent Charges .....................................................................29

ARTICLE 12 COVENANTS, REPRESENTATIONS AND WARRANTIES ...........................29
    Section 12.1    Quiet Enjoyment .....................................................................................29

Section 12.2    Authority ................................................................29
Section 12.3    Landlord's Covenants, Warranties and Representations ..........29
Section 12.4    Environmental Matters. ............................................30
Section 12.5    OEA. ..................................................................32

ARTICLE 13 USES AND RESTRICTIONS .......................................33
Section 13.1    Permitted and Prohibited Uses. ...............................33
Section 13.2    Tenant's Exclusive in Center ..................................33
Section 13.3    Exclusives Which Tenant Must Honor. .......................35

ARTICLE 14 CONDUCT OF BUSINESS OPERATIONS .......................35

ARTICLE 15 TENANT ASSIGNMENT AND SUBLETTING .................36
Section 15.1    Assignment and Subletting. ..................................36
Section 15.2    Liability of Tenant .............................................37
Section 15.3    Collateral Assignment .........................................37
Section 15.4    Cure Rights of Original Tenant. .............................37
Section 15.5    Recognition Agreement .......................................38

ARTICLE 16 DEFAULT AND DISPUTE RESOLUTION ......................38
Section 16.1    Tenant Default. ..................................................38
Section 16.2    Landlord Default ...............................................39
Section 16.3    Arbitration .......................................................40

ARTICLE 17 RIGHT TO MORTGAGE AND NON-DISTURBANCE; ESTOPPEL
CERTIFICATE .....................................................................40
Section 17.1    Right to Mortgage and Non-Disturbance ..................40
Section 17.2    Estoppel Certificate ............................................40
Section 17.3    Existing Mortgages ............................................40

ARTICLE 18 NOTICE .............................................................41

ARTICLE 19 TENANT'S PROPERTY ............................................41

ARTICLE 20 END OF TERM ......................................................41
Section 20.1    Surrender of Premises .........................................41
Section 20.2    Hold Over ........................................................41

ARTICLE 21 TENANT'S RIGHT OF FIRST OFFER ...........................42

ARTICLE 22 ONGOING CO-TENANCY .........................................42

ARTICLE 23 MISCELLANEOUS ..................................................42
Section 23.1    Loading Facilities. ..............................................42
Section 23.2    Liens. ..............................................................43
Section 23.3    Broker's Commission ..........................................43
Section 23.4    *Force Majeure.* .................................................43
Section 23.5    Consents. .........................................................43
Section 23.6    Costs. ..............................................................43
Section 23.7    Attorneys' Fees .................................................43
Section 23.8    Survival of Obligations .......................................43
Section 23.9    Non-Waiver. .....................................................44
Section 23.10    Rights Cumulative. ............................................44
Section 23.11    Definition of Landlord .......................................44
Section 23.12    Successors and Assigns. ......................................44
Section 23.13    Limitation of Landlord's Liability ..........................44
Section 23.14    Limitation of Tenant's Liability. ............................44
Section 23.15    Joint and Several Liability ....................................44
Section 23.16    Severability ......................................................44
Section 23.17    Grammatical Usages and Construction. .....................44
Section 23.18    Table of Contents, Line Numbering and Paragraph Headings ..........45
Section 23.19    Definition of Hereunder, Herein, etc .......................45
Section 23.20    Short Form Lease. ..............................................45
Section 23.21    Entire Agreement and Modification ........................45
Section 23.22    No Joint Venture or Partnership Created by Lease. ..........45

-ii-

Section 23.23 Tenant's Tradename............................................................................45
Section 23.24 Counterparts...................................................................................45
Section 23.25 Waiver of Trial by Jury......................................................................45
Section 23.26 Governing Law ................................................................................45

C061858/0205454/1372981.7

# EXHIBITS

| | |
|---|---|
| Exhibit A | Legal Description of Power Center |
| Exhibit A-1 | Legal Description of Promenade |
| Exhibit B | Site Plan |
| Exhibit C | Rent Commencement and Expiration Date Agreement |
| Exhibit D | Specifications for Landlord's Work |
| Exhibit D-1 | Exterior Elevations of the Premises, and Sidewalk Plan |
| Exhibit D-2 | Exterior Elevations of the Power Center |
| Exhibit E | Permitted Encumbrances |
| Exhibit F | Signage |
| Exhibit G | Subordination, Non-Disturbance and Attornment Agreement |
| Exhibit H | Subtenant Recognition Agreement |
| Exhibit I | Intentionally Omitted |
| Exhibit J | Form of Delivery Date Certification |
| Exhibit K-1 | Existing Exclusives |
| Exhibit K-2 | Existing Leases |
| Exhibit L | Prohibited Uses |

C061858/0205454/1372981.7

## LEASE AGREEMENT

THIS LEASE AGREEMENT (*"Lease"*) is entered into as of April 6, 2007, by and between PINNACLE SOUTH LLC, a Delaware limited liability company, having an office at 110 North Wacker, Chicago, Illinois 60606 (*"Landlord"*), and BED BATH & BEYOND INC., a New York corporation, having an office at 650 Liberty Avenue, Union, New Jersey 07083 (*"Tenant"*).

### W I T N E S S E T H:

### ARTICLE 1
### BASIC TERMS AND DEFINITIONS

Section 1.1    Basic Terms and Definitions.  The following terms shall have the meanings set forth in this Section 1.1 except as otherwise expressly provided herein.

1.1.1    Additional Rent:  Any monies which Tenant is required to pay to Landlord under the terms and conditions of this Lease, other than Fixed Rent.

1.1.2    Affiliate: A corporation, partnership, person or other entity which is controlling, controlled by, or under common control with, Landlord or Tenant, as the case may be.  As used herein, *"control"* shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person or entity, whether through the ownership of voting securities or rights, by contract, or otherwise.

1.1.3    Alternate Rent:  Alternate Rent shall be payable within thirty (30) days after the end of the calendar month to which it pertains, and shall be payable in lieu of Fixed Rent and Percentage Rent normally payable under Article 4 below. Tenant shall continue to pay the costs and charges imposed on Tenant pursuant to Article 4.3, Article 6 and Article 10 of this Lease, regardless of whether those charges are paid to Landlord or a third party provider, and all other charges imposed on Tenant under this Lease except for Fixed Rent and Percentage Rent and except as may otherwise be specifically provided in this Lease.  If the Alternate Rent for a calendar month does not exceed the Cap, such payment shall be accompanied by a statement prepared by an officer of Tenant setting forth the amount of "Gross Sales" (hereinafter defined in Subsection 4.4.2) achieved during, and the amount of Alternate Rent payable for, such month.

1.1.4    [Intentionally Omitted.]

1.1.5    Common Areas:  All areas in the Power Center which are, from time to time, available for the joint use and benefit of Tenant and other tenants and occupants of the Power Center, and their respective employees, agents, subtenants, concessionaires, licensees, customers and other invitees, including, but not limited to, any and all parking areas, parking spaces, roadways, driveways, truck serviceways, passageways, sidewalks, entrances, exits, lighting facilities, landscaped areas, retention or detention areas and common utility lines.

1.1.6    Delivery Date: As defined in Section 2.3 hereof.

1.1.7    Effective Date: The date hereof.

1.1.8    Event of Default: As defined in Section 16.1 hereof.

1.1.9    Excused Periods:  Periods during which Tenant's (or, as the case may be, another tenant's) failure to conduct the operations of its business or any other business: (x) resulted from alterations or renovations being performed in and to the Premises, (y) was caused by damage or destruction, eminent domain proceedings or actions, or *Force Majeure*, or (z) was caused by any act or omission of Landlord, or its employees, agents, or contractors.

1.1.10    Exhibits.  The exhibits listed in the Table of Contents annexed to this Lease have been agreed to by the parties and attached hereto, it being the intention of the parties that they shall become a binding part of this Lease as if fully set forth herein.

1



1.1.12 <u>Floor Area</u>: The actual number of square feet of space contained on all floors within any building area in the Shopping Center (including the Premises) and, with respect to exterior areas, including all exterior areas leased to or exclusively used by one or more tenants (other than exterior loading dock areas, trash compactor areas, and trash container areas). All measurements pursuant to this Subsection shall be from the exterior of outside walls or store front and/or to the centerline of any common walls, but in no event shall Floor Area within either the Premises or the remainder of the Shopping Center include such items as fire pump facilities; heating and ventilation facilities and telephone and electric rooms not exclusively serving the Premises; adjacent corridors and stairwells; common ducts and common shafts; elevators and escalators not exclusively serving the Premises and any non-selling or storage space areas within any mezzanine, lower floor, second floor or, except as set forth above, any exterior areas (including, without limitation, the Non-Sales Area and Additional Sales Area, as such terms are defined in Section 1.1.28).

1.1.13 <u>*Force Majeure*</u>:   As defined in Section 23.4 hereof.

1.1.14 <u>Ground Lessor</u>: The landlord under any existing or future ground or underlying leases encumbering or affecting all or any part of the Shopping Center.

1.1.15 [Intentionally Omitted.]

1.1.16 <u>Hazardous Substances</u>:  As defined in Subsection 12.4.1 hereof.

1.1.17 <u>[Intentionally Omitted.]</u>

1.1.18 <u>Landlord</u>:  As defined in the preamble and Section 23.11 hereof.

1.1.19 <u>Landlord's Mailing Address</u>:  110 North Wacker, Chicago, Illinois 60606, or such other place and/or to the attention of such other person as Landlord may notify Tenant from time to time by notice given in accordance with the provisions of Article 18 hereof.

1.1.20 <u>Landlord's Work</u>:  As defined in Section 3.1 hereof.

1.1.21 <u>Lease Interest Rate</u>: The then effective prime rate as published from time to time in the "Money Rates" section of *The Wall Street Journal* (or any successor publication thereto) plus two (2%) percent.

1.1.22 <u>Legal Requirements</u>: All laws, statutes, codes, acts, ordinances, judgments, decrees, authorizations, directions and requirements of, and agreements with, all governmental departments, commissions, boards, courts, authorities, agencies, officials and officers, which now or at any time hereafter may be applicable to the Premises, the Shopping Center, or any part(s) thereof.

2

1.1.23 <u>Mortgagee</u>: Any state or federally regulated: bank, savings and loan association, insurance company, pension fund, credit union, real estate investment trust, or other institutional lender, which is not an Affiliate of Landlord, and which holds a mortgage on the Shopping Center or is the beneficiary under a deed of trust encumbering the Shopping Center.

1.1.24 <u>Percentage Rent</u>: As defined in Section 4.4 hereof.

1.1.25 [Intentionally Omitted.]

1.1.26 [Intentionally Omitted].

1.1.27 <u>Permitted Use</u>: The sale at retail of a variety of linens and domestics (including, but not limited to, sheets, bedspreads, comforters, duvets, pillows, pillow covers, chair pads, placemats, tablecloths, dish towels, oven mittens and aprons); bathroom items (including, but not limited to, towels, shower curtains, bathroom rugs, toilet seats, health and beauty care items and cosmetics, personal care devices and other bathroom appliances and accessories); housewares (including, but not limited to, kitchen utensils, kitchen appliances and kitchen "gadgets," cleaning appliances and supplies, cookware, bakeware, dishes and china, glassware, garbage pails, ironing boards and other laundry items, mops and brooms, candles and candle holders, ready-to-assemble furniture and artificial flowers); frames and wall art; window treatments; closet, shelving and storage items; home furnishings; area rugs; wall and floor coverings; furniture (including, without limitation, mattresses, box springs, bed frames, and bedroom furniture); decorative accessories; photo albums; photo storage boxes; luggage; books; party supplies; cards and stationery; seasonal items; juvenile merchandise (including, but not limited to, toys, car seats and safety-proofing items); health and beauty aids; specialty food items; food and non-alcoholic beverage services; any and all other items sold or services provided from time to time in any store owned or operated by Tenant or its Affiliate(s) (the aforementioned items are hereinafter collectively referred to as the *"Permitted Items"*); and for any other lawful retail use not specifically prohibited by the provisions of Section 13.1.1 below. In addition, Tenant shall be permitted to use portions of the Premises for storage and office uses incidental to the Permitted Use.

1.1.28 <u>Premises</u>: Being the area cross-hatched on <u>Exhibit B</u> hereto, having dimensions as shown on <u>Exhibit B</u> and containing:



, subject to adjustment in accordance with the provisions of Section 3.4 below. In no event shall the Non-Sales Area and/or the Additional Sales Area result in any charge to Tenant by way of Fixed Rent or any Additional Rent, nor shall any such space be included in the determination of Tenant's Pro Rata Share.

1.1.29 <u>Renewal Option</u>: As defined in Section 2.2.2 hereof.

1.1.30 <u>Renewal Period(s)</u>: Three (3) successive periods of five (5) years each, as provided in Section 2.2.2 hereof.

1.1.31 <u>Rent</u>: Fixed Rent and/or Additional Rent.

1.1.32 <u>Rent Commencement Date</u>: As defined in Section 2.2 hereof.

1.1.33 [Intentionally Omitted].

1.1.34 <u>Shopping Center</u>: The shopping center known as Pinnacle Hills Promenade located in Rogers, Arkansas. The Shopping Center consists of two (2) retail shopping centers which shall be operated as a single, integrated shopping center: (i) the so-called "big box" center in which the Premises shall be located containing approximately 267,000 square feet of Floor Area and designated *"Power Center"* on <u>Exhibit B</u> and (ii) the regional outdoor mall anchored by Dillard's, Malco and JC Penney and designated *"Promenade"* on <u>Exhibit B</u>. The Power Center is more particularly described in the legal description attached hereto as <u>Exhibit A</u> hereto and the Promenade is more particularly described in the legal description attached hereto as <u>Exhibit A-1</u>. The Power Center and Promenade are hereinafter collectively referred to as the "Shopping Center". Landlord shall not change the name of the Shopping

3

Center without giving at least ninety (90) days prior notice to Tenant, and Landlord shall not include the name of any tenant (including Tenant) in the name of the Shopping Center.

1.1.35 <u>Substantially Completed or Substantial Completion</u>: The completion of specified work at the Power Center (including, without limitation, as applicable, Landlord's Work) to the extent that only "Punch List Items" of such work (defined in Subsection 3.3.3 below) shall not be completed.

1.1.36 <u>Taxes</u>: As defined in Section 4.3.3 hereof.

1.1.37 <u>Tenant</u>: As defined in the preamble hereof.

1.1.38 <u>Tenant's Mailing Address</u>: 650 Liberty Avenue, Union, New Jersey 07083, Attn: Mr. Warren Eisenberg, or such other place and/or to the attention of such other person as Tenant may notify Landlord from time to time by notice given in accordance with the provisions of Article 18 hereof.

1.1.39 <u>Tenant's Permits</u>: As defined in Section 2.3.1(b) hereof.

1.1.40 <u>Tenant's Property</u>: All of Tenant's personal property, including, without limitation, phone and alarm systems, satellite antennae, shelving, computers, furniture, cash registers and customer service counters, specialty lighting, track lighting, millwork, conveyor systems, storage racks and signage and any and all other personal property of Tenant which is capable of being removed from the Premises without material damage thereto, but which shall not include electrical systems, heating, ventilation and air conditioning systems, and other mechanical systems, flooring, carpet, elevators, standard lighting and wiring installed within the walls of the Premises.

1.1.41 <u>Tenant's Pro Rata Share</u>: A fraction whose numerator is 30,000 (subject to Sections 1.1.28 and 3.4) and whose denominator is the Floor Area of the Power Center as may be re-determined any time a building (and/or Floor Area) is added to or removed from the Power Center, ███████████ ████████████████████ Floor Area shall be deemed added to or removed from the Power Center on the earlier of (i) the date upon which such Floor Area is Substantially Completed, or (ii) at such time as an assessment for Taxes is made or removed, as the case may be, with respect to such Floor Area. Within thirty (30) days following written request from Tenant, Landlord shall certify to Tenant in writing as to the then Floor Area of the Power Center.

1.1.42 <u>Tenant's Work</u>: As defined in Section 3.1 hereof.

1.1.43 <u>Term</u>: A period (the "***Initial Term***") of approximately ten (10) years beginning on the Rent Commencement Date and ending at midnight on the last day of January following the tenth (10th) anniversary of the Rent Commencement Date (the "***Expiration Date***"), unless the Rent Commencement Date is February 1, in which event the Expiration Date shall be the day before the tenth (10th) anniversary of the Rent Commencement Date. As used herein, "***Term***" shall refer to the Initial Term, as the same may be extended by any Renewal Period exercised pursuant to Section 2.2.2 below.

## ARTICLE 2
## LEASE OF PREMISES; LEASE TERM; DELIVERY DATE

Section 2.1     <u>Lease of Premises</u>. Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the Premises together with any and all rights, benefits, privileges and easements, now or hereafter appurtenant to either or both of the Premises and the Shopping Center, arising out of any public or private grant or authority, including, without limitation, the non-exclusive right and easement to use the Common Areas in common with other tenants and occupants of the Shopping Center.

Section 2.2     <u>Term</u>.

2.2.1     <u>Initial Term</u>. Subject to the provisions of this Article 2, the Term of this Lease shall begin on the date (such date being referred to herein as the "***Rent Commencement Date***") which is the sixtieth (60th) day following the Delivery Date (as defined in Section 2.3.1). The Term shall expire on the Expiration Date, unless earlier terminated as herein provided.

4

When the Rent Commencement Date has been determined, as provided in this Section, Landlord and Tenant shall execute, acknowledge and deliver, each to the other, a written statement in the form attached hereto as <u>Exhibit C</u> specifying the Rent Commencement Date.

2.2.2   <u>Renewal Options</u>. Tenant shall have the right and option (hereinafter a *"Renewal Option"*) to extend the Initial Term from the date on which it would otherwise expire for three (3) successive renewal periods of five (5) years each (individually, a *"Renewal Period"*, and collectively, the *"Renewal Periods"*) upon the same terms and conditions as are herein set forth. Each Renewal Option shall be exercisable by notice given to Landlord at least one hundred eighty (180) days prior to the commencement of the applicable Renewal Period(s).

Section 2.3   <u>Delivery Date</u>.

2.3.1   <u>Definition</u>. Landlord shall be deemed to have delivered possession of the Premises to Tenant at 8:00 a.m. on the date (the *"Delivery Date"*) following the day on which all of the following conditions (the *"Delivery Date Conditions"*) shall have occurred <u>and</u> Tenant shall have received from Landlord the Delivery Date Certification in accordance with the provisions of Section 2.3.3 below, which shall constitute Landlord's written certification that all of the following shall have occurred:

(a)   Actual possession of the Premises shall have been delivered to Tenant water-tight, free of Hazardous Substances, in a good, structurally sound condition, with all of Landlord's Work Substantially Completed, which Substantial Completion shall be evidenced by a written certification by Landlord's architect to Tenant;

(b)   Landlord shall have obtained (and delivered copies thereof to Tenant, upon request) all permits and approvals required from all applicable governmental authorities to enable Tenant to occupy and use the Premises for the conduct of its business in the Premises (<u>exclusive</u> of any business licenses which Tenant may be required to obtain in order to open and operate its specific business and not a general retail business or a building permit to perform Tenant's Work (collectively, *"Tenant's Permits"*)), which permits and approvals shall include, without limitation, a permanent certificate of occupancy for the Premises (unless a permanent certificate of occupancy for the Premises cannot be obtained solely as a result of Tenant's Work not having been commenced or completed, in which event (1) the delivery of a permanent certificate of occupancy for the Premises shall not be a condition to the occurrence of the Delivery Date; (2) the obtaining of a temporary certificate of occupancy shall be a condition to the occurrence of the Delivery Date; and (3) Landlord shall obtain the permanent certificate of occupancy promptly following the completion of Tenant's Work);

(c)   The Common Areas, and all of the improvements thereto shown on <u>Exhibit B</u> hereto shall have been Substantially Completed and operational, and all off-site improvements (including, without limitation, street, storm drainage, and traffic signalization improvements) required for the Shopping Center to open for business and for Tenant to receive a certificate of occupancy shall have been Substantially Completed; Landlord, at its sole cost and expense, shall have obtained (and delivered copies thereof to Tenant, upon request) all permits and approvals required from applicable governmental authorities to enable the Common Areas to be developed, operated, and used for the purposes herein contemplated, which permits and approvals shall include, without limitation, zoning, building code, environmental requirements, curb cut and site plan approvals, all permits pertaining to pylon and/or monument signage (and Tenant's panel(s) thereon), construction, and development and use permits;

(d)   The Initial Co-Tenancy Condition (as defined in Section 2.5) has been satisfied;

(e)   The representations and warranties of Landlord set forth in subparagraphs (a) through (j) of Section 12.3 below shall then be true and in effect; and

(f)   Landlord shall have delivered to Tenant, in recordable form: (i) a subordination, non-disturbance and attornment agreement in the form attached hereto as <u>Exhibit G</u> executed by each holder of any mortgage or deed of trust encumbering or

5

affecting the Power Center or any portion thereof, and (ii) a fee owner recognition agreement in the form and content described in clause (b) of Section 17.1 hereof executed by any existing Ground Lessor.  Landlord represents to Tenant that, as of the Effective Date, the Power Center is not encumbered by a mortgage or deed of trust or a ground lease held by a Ground Lessor.

2.3.2   Delivery Date.

(a)   Landlord shall cause the Delivery Date to occur on **September 1, 2007**.  Notwithstanding any provision of this Lease to the contrary, in no event shall the Delivery Date be deemed to occur prior to September 1, 2007.  No event of *Force Majeure* occurring prior to the Effective Date shall serve to delay the Delivery Date hereby established.

(b)   Landlord acknowledges that if Landlord shall fail to satisfy all of the Delivery Date Conditions by the Delivery Date as established in subparagraph (a), Tenant will sustain substantial, additional costs and expenses, including, without limitation, storage costs for fixtures, equipment and inventory, employee costs during the waiting period, and additional advertising and promotional costs, the exact amount of which would be impracticable or extremely difficult to ascertain.  If the Delivery Date does not occur by the date established therefor in subparagraph (a), then, in addition to any other remedies available to Tenant under this Lease, Landlord agrees to allow to Tenant a credit against the initial installment(s) of Rent hereunder equal to, as liquidated reimbursement to Tenant (and not as a penalty) for all of the aforesaid costs incurred by Tenant, the sum of: ██████████████ ██████████ ████████████████████████████ ██████████ ████████████████████████████████████████████) herein collectively referred to as *"Tenant's Liquidated Costs"*).  Tenant's Liquidated Costs represent the parties' good faith agreement as to an agreed upon amount which shall have been incurred by Tenant and which shall otherwise not be susceptible of exact ascertainment.

2.3.3   Delivery Date Certification.  Upon the satisfaction of all of the Delivery Date Conditions, Landlord shall so certify to Tenant, using the form of Delivery Date Certification attached hereto as Exhibit J.

2.3.4   No Waiver.  Neither Tenant's acceptance of physical possession of the Premises nor Tenant's opening of the Premises for business to the public prior to the Delivery Date shall: (i) be deemed a waiver by Tenant of any of the Delivery Date Conditions, or (ii) relieve Landlord of any obligation under this Lease, unless such condition or obligation is expressly waived in writing by Tenant.

Section 2.4   Unseasonable Delivery: Slack Period.  If, for any reason (including, without limitation, *Force Majeure*), the Delivery Date occurs during the period commencing on ████████████████████████████████ (the *"Slack Period"*), then Tenant shall have, in addition to any other remedies, the right to:

(a)   accept delivery of physical possession of the Premises; or

(b)   defer its acceptance of delivery of physical possession of the Premises to a later date within the Slack Period, whereupon the Delivery Date shall be deemed to have occurred on the date that Tenant actually accepts physical possession of the Premises (subject to the other provisions of this Article 2 and the continuing satisfaction of the Delivery Date Conditions); and

C061858/0205454/1372981.6

in either event, if the Rent Commencement Date occurs during the Slack Period, Tenant shall be entitled to pay Alternate Rent in lieu of Fixed Rent and Percentage Rent (but Tenant shall continue to pay its Pro Rata Share of Taxes and Tenant's "Fixed Share" (as defined in Section 5.1.2(b)) of Common Areas Charges pursuant to the terms of this Lease) for the period commencing on the Rent Commencement Date and ending on the last day of the Slack Period; any benefit which Tenant may realize thereby shall constitute a reimbursement to Tenant for certain pre-opening expenses incurred by Tenant in connection with this Lease.

Section 2.5    Initial Co-Tenancy Condition.

2.5.1    As used herein, the ***"Initial Co-Tenancy Condition"*** shall mean that



are open for business to the public in the Power Center (or if not open, then the premises to be occupied by such tenants have been constructed and the tenants to occupy such premises shall then be actively and continuously engaged in the fixturing or merchandising therein).

2.5.2    If, on the Delivery Date, the Initial Co-Tenancy Condition has not been satisfied, Tenant shall have the right, at its sole option, to:

(a)    accept delivery of physical possession of the Premises; or

(b)    defer its acceptance of delivery of physical possession of the Premises to a later date (but not later than the date on which the Initial Co-Tenancy Condition is satisfied and Tenant receives notice from Landlord thereof), whereupon the Delivery Date shall be deemed to have occurred on the date that Tenant actually accepts physical possession of the Premises (subject to the other provisions of this Article 2 and the continuing satisfaction of the Delivery Date Conditions); and

in either event, if the Rent Commencement Date occurs before the satisfaction of the Initial Co-Tenancy Condition, Tenant shall be entitled to pay Alternate Rent in lieu of Fixed Rent and Percentage Rent (but Tenant shall continue to pay Tenant's Pro Rata Share of Taxes and Tenant's Fixed Share of Common Areas Charges) until the Initial Co-Tenancy Condition is satisfied and the Landlord gives Tenant notice thereof, subject to any other applicable provisions of this Article 2.

2.5.3    In addition to the provisions of Section 2.5.2 above, if the Initial Co-Tenancy Condition has not been satisfied by the first (1st) anniversary of the Delivery Date established pursuant to Section 2.3.2(a) above, then Tenant shall have the right, at any time prior to the satisfaction of the Initial Co-Tenancy Condition, upon giving Landlord at least one hundred twenty (120) days' prior notice, to terminate this Lease as of the date specified in said notice. Landlord may negate such termination by causing the Initial Co-Tenancy Condition to be satisfied within sixty (60) days after the date on which said termination notice is given. If this Lease is terminated hereunder, neither party shall have any further liability under this Lease, except for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease, and (ii) Landlord shall promptly reimburse Tenant for all of its reasonable third-party costs and expenses incurred in connection with this Lease, including, without limitation, costs associated with the preparation and review of plans and specifications, and the performance of Tenant's Work, not to exceed ████████████████ ████████████ Notwithstanding the foregoing, if the Initial Co-Tenancy Condition has not been satisfied by the first (1st) anniversary of the Delivery Date established pursuant to Section 2.3.2 above, Landlord shall have the right to deliver a notice to Tenant inquiring whether Tenant shall elect to terminate this Lease. If Tenant does not so elect to terminate this Lease within one hundred twenty (120) days after receipt of Landlord's notice, Tenant shall be deemed to have waived its right to terminate this Lease under this Section 2.5.3 and, at the end of such 120-day period, Tenant shall commence payment of full Fixed Rent and Percentage Rent.

7

ARTICLE 3
IMPROVEMENTS

Section 3.1    Landlord's Work and Tenant's Work.  Landlord shall, at its sole cost and
expense, perform the work and obligations described on Exhibit D, Exhibit D-1, and Exhibit F
hereto, and the "Final Plans and Specifications" (hereinafter defined in Section 3.2) (collectively,
*"Landlord's Work"*), and shall deliver possession of the Premises to Tenant in the condition
described therein.  Except for Landlord's Work, Tenant shall, at its own cost and expense, do any
and all work (hereinafter referred to as *"Tenant's Work"*) which Tenant desires to adapt the
Premises to Tenant's use.

Section 3.2    Plan Approvals.

3.2.1    Preparation of Plans and Specifications.

(a)    Landlord has delivered to Tenant a floor plan (the *"LOD"*)
showing the location of the interior structural grid (column layout), storefront opening,
mezzanine and/or office core, the location and arrangement of the loading facilities, trash
compactor and trash container pad(s), and interior clear dimensions, and Tenant has approved the
LOD (as approved by Tenant, the *"Certified LOD"*).  Any further changes to the Certified LOD
shall be subject to Tenant's prior written approval (which may be withheld in its sole discretion),
provided that, as to changes required to conform to Legal Requirements, Tenant shall have
reasonable approval rights within the confines of said Legal Requirements.  After Tenant
approves the Certified LOD, Landlord shall be responsible for any and all reasonable costs
incurred and delays experienced by Tenant in connection with any further changes to the
Certified LOD required by Landlord.

(b)    Tenant has delivered to Landlord its Fixture Plan (F1); Floor
Finish Plans Notes and Details (F2); Power/Specialty Lighting Plan and Notes (F3); Lighting
Plans and Notes (F4); and High-Pile Storage Plan (F5) (collectively, *"Tenant's Plans"*), all of
which are substantially consistent with the Certified LOD (as same may be reasonably modified
by Tenant, as noted above).

(c)    Within thirty (30) days after receipt of Tenant's Plans, Landlord
shall prepare and submit to Tenant, in a single submission, Landlord's preliminary plans and
specifications (the *"Preliminary Plans"*) for Landlord's Work (which shall include, without
limitation, mechanical, electrical, plumbing, fire protection and high-pile storage, structural,
architectural and site plans [including, without limitation, a site lighting plan with
photometrics]), and each of the plans which collectively constitute the Preliminary Plans shall be
at least 85% complete, in Tenant's reasonable judgment.  The Preliminary Plans shall be
substantially consistent with Tenant's Plans, the Certified LOD, and Exhibits B, D, D-1, and F
hereto.

(d)    Within thirty (30) days after its receipt of the Preliminary Plans,
Tenant shall give Landlord notice of the respects, if any, in which said Preliminary Plans fail to
meet Tenant's reasonable approval and/or fail to conform to the Certified LOD, Tenant's Plans,
and/or Exhibits B, D, D-1, and F hereto, and Landlord shall promptly make any revisions
necessary to correct such matters and obtain Tenant's approval.

(e)    Within thirty (30) days after the date on which Landlord receives
notice of Tenant's approval of the Preliminary Plans, Landlord shall prepare and deliver to
Tenant, in a single submission, final plans and specifications (the *"Final Plans and
Specifications"*), which shall be substantially consistent with the Preliminary Plans, as approved
by Tenant.

(f)    Within fifteen (15) days after its receipt of the Final Plans and
Specifications, Tenant shall notify Landlord of Tenant's approval thereof or the reasons why
such approval cannot be granted, and Landlord shall, within fifteen (15) days after receiving such
notice, make any revisions necessary to correct such matters and obtain Tenant's approval.
Upon Tenant's approval of the Final Plans and Specifications, any further changes thereto shall
be subject to Tenant's prior written approval.  Unless specifically noted on a separate summary
sheet attached to the Final Plans and Specifications, to the extent of a conflict between the terms
and provisions of Tenant's Plans, Exhibit B, Exhibit D, Exhibit D-1, and/or Exhibit F hereto, and

8

the terms and provisions of the Final Plans and Specifications, then the terms and provisions of Tenant's Plans, <u>Exhibit B</u>, <u>Exhibit D</u>, <u>Exhibit D-1</u>, and <u>Exhibit F</u> shall govern and prevail.

(g)    All submissions by the parties of the Preliminary Plans, the Final Plans and Specifications, and the measurements required under Section 3.4.1 and 3.4.2 below shall be made (or accompanied) by the computer files thereof formatted in any version of *"Autocad"* up to *"Autocad 2002"*.

3.2.2    <u>Plan Changes.</u>

(a)    Tenant shall have the right to make changes from the standards and specifications set forth in "Tenant's Prototype Drawings and Specifications" and/or the "Project Manual", referred to in <u>Exhibit D</u> hereto, and/or to require Landlord to subsequently make changes to either or both of the Preliminary Plans and Specifications and/or the Final Plans and Specifications in accordance therewith (the *"Changes"*).  Within ten (10) business days after receiving Tenant's request for any Change, Landlord shall give Tenant notice of the cost or savings, and any delay, that may be occasioned by such Change.  If Tenant fails to authorize such Change within five (5) business days after receiving Landlord's notice, Tenant shall be deemed to have withdrawn its request to make the Change.

(b)    Tenant shall pay to Landlord the net reasonable additional third-party costs of Landlord's Work resulting directly and solely from the aggregate Changes (exclusive of any charges for overhead and profit, other than sums not exceeding ██ subcontractor profit and ██ general contractor profit thereon), taking into consideration any and all actual costs and savings resulting from all Changes, in the aggregate (including, without limitation, reasonable costs approved by Tenant in advance associated with any acceleration of the work schedule which Tenant, at its sole option, may require).  Such payment shall be due and payable within thirty (30) days after Tenant's receipt of backup information reasonably supporting all such costs, including, without limitation, invoices, receipts and lien waivers of subcontractors and materialmen, but in no event earlier than the Delivery Date.

(c)    Landlord shall pay to Tenant the net reasonable cost savings resulting from the aggregate Changes, taking into consideration all reasonable additional third-party costs of Landlord's Work directly and solely resulting from the Changes (exclusive of any charges for overhead and profit, other than sums not exceeding ██ subcontractor profit and ██ general contractor profit thereon).  At Tenant's request, Landlord shall deliver to Tenant backup information reasonably supporting all such additional costs, including, without limitation, invoices, receipts, and lien waivers of subcontractors and materialmen.  Such payment shall be due and payable within thirty (30) days after the Delivery Date.

(d)    If the Changes occur during the preparation of any of the plans described in Section 3.2.1 above, then the deadlines for preparation and delivery of the plans then being prepared shall be extended as reasonably necessary to incorporate such Changes.  If, despite Landlord's diligent efforts in performing Landlord's Work, the Changes cause a net delay in the Substantial Completion of Landlord's Work (taking into consideration any time reductions resulting from such changes), then: (i) the Rent Commencement Date shall be determined as if such delay had not occurred, (ii) the commencement of the Slack Period, and the dates set forth in clauses (a) and (b) of Section 3.3.2 below, shall be extended by the number of days of such net delay; and (iii) with respect to Changes requested after the Effective Date, for purposes of calculating Tenant's Liquidated Costs under Subsection 2.3.2(b) above, the Delivery Date shall be extended by the number of days of such net delay.

Section 3.3    <u>Performance of Work.</u>

3.3.1    Both Landlord's Work and Tenant's Work shall be performed in a good and workmanlike manner, in compliance with all applicable Legal Requirements and in accordance with all insurance company requirements, utilizing only new, first-class materials. Landlord shall perform Landlord's Work in a manner such that Tenant will be able to obtain Tenant's Permits.  Landlord shall pay all impact fees and related governmental charges in connection with Landlord's Work and all other work performed by or on behalf of Landlord in connection with the Shopping Center.  If Tenant's Permits cannot be obtained because Landlord's Work has not been completed or has been performed improperly or by reason of any then existing condition of the Shopping Center, Landlord shall remedy the situation so as to

9

enable Tenant to obtain Tenant's Permits, and the Delivery Date shall be deemed delayed, for Tenant's benefit only, on a day-for-day basis for each day of delay occasioned thereby.

3.3.2   (a)  If Landlord's Work has not been commenced (*i.e.*, if Landlord has not yet constructed demising walls for the Premises) by June 1, 2007, or (b) if the Delivery Date shall not have occurred by November 1, 2007 (subject to *Force Majeure*, not to exceed thirty (30) days in the aggregate, and provided that Landlord shall have given Tenant notice of such event of *Force Majeure* promptly after its occurrence), Tenant may thereafter, during such time as Landlord's Work has not been commenced or the Delivery Date has not occurred, as the case may be, consider Landlord to be in default hereunder and, at Tenant's option in its sole discretion, elect to:

(i)  terminate this Lease, if Landlord shall fail to fully cure such default within thirty (30) days after receiving Tenant's notice thereof, in which event neither party shall have any further liability hereunder, except: (i) for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease, and (ii) Landlord shall be obligated to promptly reimburse Tenant, as Tenant's sole monetary remedy by reason thereof, for all its reasonable third-party costs and expenses incurred in connection with this Lease (including, without limitation, costs associated with the preparation and review of plans and specifications, and the performance of Tenant's Work), not to exceed ███████████████ ███████; and/or

(ii)  avail itself of the remedies set forth in Section 16.2 below (provided, however, that the cure period set forth therein shall not be applicable and Landlord shall not be liable for damages thereunder other than for costs expended by Tenant in exercising its right to self help); and/or

(iii)  extend one or more times the dates set forth in clauses (a) and/or (b) of this Subsection 3.3.2 to such future dates designated by Tenant in notice given to Landlord.

The election by Tenant of any one or more of the foregoing remedies shall not preclude the subsequent election of any alternative remedy provided in this Section, this Lease, at law, or in equity.

3.3.3   Landlord's Work Performed After Delivery of Possession.  On or before the Delivery Date, Landlord's and Tenant's representatives together shall conduct a walk-through of the Premises to compile a punch list of the "Punch List Items" (hereinafter defined). Tenant shall deliver to Landlord a copy of said punch list within five (5) days after the walk-through. Landlord shall complete any Punch List Items within ten (10) days after it receives a copy of said punch list. If Landlord fails to complete any item on said punch list within said 10-day period, Tenant shall have the right to complete such item(s) using its own contractors and receive reimbursement from Landlord for the reasonable costs and expenses thereof upon demand. If reasonably required by Tenant, any portion of Landlord's Work which is performed after Tenant accepts physical possession of the Premises shall occur only "after hours", when neither Tenant nor any of its agents, contractors, employees and servants are working within the Premises, and Landlord shall reimburse Tenant for the reasonable costs and expenses incurred by Tenant by reason of such "after hours" performance of Landlord's Work. Within thirty (30) days following Substantial Completion of Landlord's Work, Landlord shall deliver to Tenant a duplicate copy of the "as built" plans for the building containing the Premises. As used herein, the term ***Punch List Items"*** shall mean such minor items which, when considered as a whole, do not adversely affect either the performance of Tenant's Work or Tenant's ability to conduct its normal business operations in the Premises.

3.3.4   Tenant's Right of Entry.  Prior to the Delivery Date, Tenant may enter upon the Premises for the purposes of inspecting the work, taking measurements, making plans, erecting temporary or permanent signs and doing such other work as may be appropriate or desirable without being deemed thereby to have taken possession or obligated itself to pay Rent, provided, however, that Tenant shall not, during the course of such work, materially interfere with the performance of Landlord's Work and shall indemnify and hold Landlord harmless from and against any and all claims or losses arising from Tenant's entry upon the Premises, except to the extent caused by Landlord, its agents, employees, or contractors.

10

3.3.5    Work Requirements After Delivery Date. Following the Delivery Date, any construction by Landlord or other tenants or occupants of the Shopping Center affecting any portion of the Shopping Center shall be subject to the following terms and conditions:

(a)    no staging and/or storage of materials and parking of construction vehicles shall be permitted within the portions of the Shopping Center designated as the "*No Staging Area*" on Exhibit B hereto (Landlord agrees that Tenant shall have the right to stage and store its construction materials and park its construction vehicles in the area designated as "*Tenant's Staging*" on Exhibit B);

(b)    [Intentionally Deleted]; and

(c)    Landlord shall maintain the Shopping Center in a clean, safe, and sightly condition, and shall use reasonable efforts to ensure that such construction shall not otherwise materially adversely interfere with the normal conduct of any business operations in the Premises.

3.3.6    Tenant's Interviews and Recruiting. Tenant shall have the right, subject to applicable Legal Requirements, to place a trailer on the Common Areas in an area immediately adjacent to the Premises, in the location shown on Exhibit B hereto, during the period commencing ███████████████ ██ ██████████████████████████████████████ ████████████████████████ ████████████████████████ for the purpose of conducting employee interviews and recruiting. Landlord shall install, at Landlord's expense, utility hookups to the trailer in accordance with the specifications set forth in Exhibit D hereto. Alternatively, Landlord may elect, in lieu of granting Tenant the right to place a trailer in the Common Areas, to provide Tenant with the use of vacant space in a building in close proximity to the Premises for use in conducting employee interviews and recruiting, which space shall be delivered to Tenant in accordance with the provisions of Exhibit D (and the provisions of the project manual referred to in Exhibit D and incorporated therein by reference) hereto relating to a trailer, including, without limitation, utility hookups. Tenant shall not be required to pay any Rent therefor but shall be responsible for the payment of all utilities during the period of its occupancy and for any damage, beyond ordinary wear and tear, caused to the premises by its use and occupancy. Such vacant space shall be available for Tenant's use during the same period as set forth above that Tenant would have been able to have a trailer in the Common Areas.

Section 3.4    Measurement; Adjustment of Rent.

3.4.1    Measurement of Premises and Shopping Center. Within five (5) days after the installation of the bottom plates for the demising walls of the Premises (and at least thirty (30) days prior to the Delivery Date), Landlord shall deliver to Tenant a certification to Tenant by Landlord's licensed architect, surveyor or engineer of the interior clear dimensions and Floor Area of the Premises (which certification shall be accompanied by a drawing of the Floor Area of the Premises with applicable dimensions for such Floor Area indicated thereon including, without limitation, the Non-Sales Area and the Additional Sales Area) and the Floor Area of the Shopping Center, the measurements of which shall be subject to confirmation by Tenant's licensed architect, surveyor or engineer. If Landlord shall fail so to deliver such certification and drawing to Tenant, Tenant shall have the right to have any of such measurements made and certified to Landlord by Tenant's licensed architect, surveyor or engineer. If the interior clear dimensions and/or the Floor Area of the Premises vary from those shown on the Certified LOD (as may be modified by any applicable Changes), then, Landlord shall correct such work to conform the Certified LOD as may be modified by any applicable Changes.

3.4.2    [Intentionally Deleted];

3.4.3    Adjustment of Fixed Rent and Tenant's Pro Rata Share. Subject to the foregoing provisions of this Section 3.4, if the measurement of the Premises shall indicate a Floor Area less than ██████ square feet of Floor Area, the Fixed Rent and any other applicable provision of this Lease (including, without limitation, Tenant's Pro Rata Share) shall be reduced to conform to the actual measurement less the actual square footage of the Non-Sales Area and the Additional Sales Area, and Tenant shall receive a proportional refund of any Rent theretofore paid to Landlord. If the measurement of the Premises indicates that the actual Floor Area of the Premises exceeds ██████ square feet of Floor Area (as same may be increased due to Changes under Section 3.2 above), neither Fixed Rent nor Tenant's Pro Rata Share shall be increased by

11

reason thereof except, however, that if the Floor Area of the Premises (less the actual square footage of the Non-Sales Area and the Additional Sales Area) shown on Landlord's Final Plans and Specifications, as approved by Tenant (the "***Final Plan Floor Area***") is greater than ▇▇▇ square feet of Floor Area, then (a) the Fixed Rent and Tenant's Pro Rata Share (and any other provisions of this Lease which relate to the amount of Floor Area, less the actual square footage of the Non-Sales Area and the Additional Sales Area, in the Premises) shall be increased to conform to the actual measurement of the Floor Area, less the actual square footage of the Non-Sales Area and the Additional Sales Area, but in no event greater than the Final Plan Floor Area exclusive of the Non-Sales Area and the Additional Sales Area, and (b) Tenant shall pay to Landlord, as Additional Rent, the amount of any deficiency in Rent with respect to installments of Rent theretofore paid by Tenant.  Landlord and Tenant shall each promptly execute and deliver to the other an amendment memorializing any change to the Fixed Rent, Tenant's Pro Rata Share, or any other applicable provisions of this Lease, made pursuant to this Section 3.4.  Any dispute between the parties with respect to the Floor Area of the Premises, the Non-Sales Area and/or Additional Sales Area or the Floor Area of the Shopping Center shall be resolved by arbitration in accordance with the provisions of Section 16.3 below.

## ARTICLE 4
### FIXED RENT AND TAXES: DETERMINATION AND PAYMENT

Section 4.1    <u>Fixed Rent</u>.  Commencing on the Rent Commencement Date and continuing throughout the Term, Tenant shall pay to Landlord the Fixed Rent, in equal successive monthly installments, in advance, on the first day of each and every calendar month throughout the Term, except that Fixed Rent payable for any partial calendar month during the Term shall be prorated based on a 365-day year.  Fixed Rent shall be paid without deduction or set-off, except to the extent otherwise expressly provided herein.

Section 4.2    <u>Payment of Rent</u>.  All Rent shall be mailed or otherwise delivered to Landlord's Mailing Address above or, upon at least thirty (30) days' prior notice to Tenant, to such other address as Landlord may from time to time designate.  Landlord acknowledges and agrees that for administrative purposes, Tenant has designated BBBY Management Corporation, a New York corporation (the "***Paying Agent***"), to make all Rent payments due to Landlord under this Lease.  Said designation (which may be revoked by Tenant at any time) is not intended as, and shall not constitute, an assignment of any rights or obligations of Tenant to the Paying Agent, and Tenant shall remain primarily liable for payment of Rent under this Lease.  All payments of Rent received by Landlord from the Paying Agent shall be credited to Tenant as if such payments of Rent had been made by Tenant directly to Landlord.

Section 4.3    <u>Real Estate and Other Taxes</u>.

4.3.1    Landlord shall pay on or before the due dates thereof all "Taxes" (defined in Subsection 4.3.3 below) other than personal property taxes levied against Tenant's Property.  Throughout the Term, Landlord shall cause the Power Center to be maintained entirely within tax parcels and lots that exclude any property not a part of the Power Center.

4.3.2    (a)    Tenant shall pay to Landlord Tenant's Pro Rata Share of the Taxes which accrue during the Term with respect to the Power Center, subject to the provisions of this Section 4.3.  Landlord estimates that Tenant's Pro Rata Share of Taxes for the first full calendar year shall be approximately ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ per square foot of Floor Area of the Premises.  Any Taxes for a real estate fiscal tax year, only a part of which is included within the Term, shall be adjusted between Landlord and Tenant on the basis of a 365-day year as of the Rent Commencement Date or the date on which the Term expires or earlier terminates, as the case may be, for the purpose of computing Tenant's Pro Rata Share of Taxes.  If, by law, any Taxes may, at the option of the taxpayer, be paid in installments (whether or not interest shall accrue on the unpaid balance thereof), Landlord shall exercise such option so as to maximize the number of installments, and Landlord shall pay the same as they come due and before any fine, penalty, interest or cost may be added thereto for nonpayment thereof.

(b)    Landlord shall submit to Tenant a copy of the bill for Taxes issued by the applicable taxing authority, a computation of Tenant's Pro Rata Share of such Taxes and proof of the payment of Taxes for the previous payment period, as well as copies of all notices concerning assessments, tax rates, and changes thereto.  Tenant shall pay Landlord in the amount required by this Subsection 4.3.2 within thirty (30) days after receipt of such bill (but in no event

12

earlier than the fifteenth (15th) day prior to the date on which such Taxes would become delinquent).

4.3.3   As used herein, *"Taxes"* shall mean all general, *ad valorem* real estate taxes, and assessments for betterments and improvements that are levied or assessed by any lawful authority on the Power Center (general or special), including any substitution therefor, in whole or in part, due to a future change in the method of taxation. Landlord represents that Taxes are separately assessed on the Power Center and exclude any taxes or assessments attributable to the Promenade. Taxes shall be reduced by any deferral, abatement, or other tax-lowering adjustment received by Landlord from the taxing authorities. For purposes of computing Tenant's Pro Rata Share of Taxes, Taxes shall not include any: (1) income, excise, profits, estate, inheritance, succession, gift, transfer, franchise, capital, or other tax or assessment upon Landlord or upon the rentals payable under this Lease; (2) taxes on rents (other than to the extent that such taxes are customarily paid by retail tenants in the state in which the Shopping Center is located), gross receipts or revenues of Landlord from the Premises; (3) fine, penalty, cost or interest for any tax or assessment, or part thereof, which Landlord or its lender failed to timely pay (except if same are caused by an Event of Default); (4) assessment for a public improvement arising from the initial construction or expansion of the Shopping Center or the Premises (it being agreed that all assessments imposed during the Term which are permitted to be included within Taxes hereunder shall, for the purposes of computing Tenant's Pro Rata Share thereof, be deemed to have been paid in the maximum number of installments permitted by the applicable taxing authority); (5) Taxes resulting directly from an increase in the assessment caused by a sale or ground lease of all or any portion of the Shopping Center to an Affiliate of Landlord or more than once every five (5) years; or (6) fees imposed upon Landlord in connection with Landlord's development of the Shopping Center (including, without limitation, trip generation fees). All Taxes payable by Tenant pursuant to this Section 4.3 shall be determined as if the Power Center was the only property owned by Landlord. Landlord represents to Tenant that, as of the Effective Date and, to the best of Landlord's knowledge, as of the anticipated Delivery Date, no portion of the Shopping Center is or will be (i) subject to or the beneficiary of an abatement, exemption and/or phase-in of Taxes, (ii) subject to any special assessments or similar charges, or (iii) are included in any special improvement district(s) which would result in higher sales taxes or other similar impositions than would exist in the absence of such district(s).

4.3.4   At Tenant's request and without expense to Landlord, Landlord shall contest the amount or validity of any assessed valuation or Taxes, failing which, Tenant shall have the right to contest the assessed valuation or Taxes by appropriate proceedings conducted in good faith, whereupon Landlord shall cooperate with Tenant, execute any and all documents required in connection therewith and, if required by any governmental authority having jurisdiction, join with Tenant in the prosecution thereof. If, as a result of any contest or otherwise, any rebate or refund of Taxes is received, Tenant shall be entitled to Tenant's Pro Rata Share thereof (after reasonable and customary expenses incurred by Landlord and/or Tenant in connection with such contest are paid to the party which incurred such expense).

Section 4.4   Percentage Rent.

4.4.1   Payment. During and for each full calendar year during the Term, Tenant shall pay annual percentage rent (*"Percentage Rent"*) equal to ███████████████████

████████████████████████████████████████████

████████████████████████████████████████████

Within sixty (60) days after the close of each calendar year, Tenant shall furnish to Landlord a compilation prepared by an officer of Tenant setting forth the amount of Gross Sales during the preceding calendar year and showing the amount of Percentage Rent, if any, required to be paid by Tenant for such calendar year, provided, however, that Tenant shall not be required to provide such compilation if the amount of Gross Sales for such calendar year is less than ██████████ The full amount of any Percentage Rent due shall be paid to Landlord simultaneously with the furnishing of said compilation. Notwithstanding the foregoing, no Percentage Rent shall be payable with respect to the period commencing on the Rent Commencement Date and ending on the December 31 next following the Rent Commencement Date, and Gross Sales generated during any period when Alternate Rent is payable under this Lease shall be excluded from the determination of Gross Sales for purposes of computing Percentage Rent hereunder.

13

**4.4.2   Definition of Gross Sales.**



Tenant shall record, at the time of each Gross Sale, all receipts from such sale, whether for cash, credit or otherwise, in a cash register or cash registers, or in such electronic or computer device which records sales in a manner which is generally acceptable by industry standards. The term *"Gross Sales"* shall exclude: (1) proceeds from any sales tax, gross receipts tax or similar tax, by whatever name called, which are separately stated and are in addition to the sales price, (2) *bona fide* transfers or exchanges of merchandise from the Premises to any other stores or warehouses of Tenant or any Affiliates of Tenant, and returns to shippers and manufacturers for credit, (3) refunds or credits given to customers for merchandise returned or exchanged at the Premises (regardless of where or how purchased), (4) sales of Tenant's fixtures and equipment not in the ordinary course of Tenant's business, (5) to the extent of prior inclusion in Gross Sales, bad debts when written off the books of Tenant, provided that any collections made on account of such bad debts shall be included in Gross Sales when received, (6) receipts from vending machines installed solely for the use of Tenant's employees and receipts from pay telephones, (7) sales to employees of Tenant at discount (which, for the purposes of determining Percentage Rent hereunder, shall not exceed ▮▮▮▮▮▮▮▮ of Gross Sales per calendar year or pro rata portion thereof, as applicable), (8) fees paid to independent third party credit card, charge card, debit card, and check verification/guaranty companies in connection with sales charged to or debited from customers' credit cards, charge cards, or debit cards, or sales paid for by customers by checks, as applicable, (9) proceeds from delivery, gift-wrapping and check cashing charges (which, for the purposes of determining Percentage Rent hereunder, shall not exceed ▮▮▮ of Gross Sales per calendar year or pro rata portion thereof, as applicable), (10) sums and credits received in settlement of claims for loss or damage to merchandise, (11) separately stated service, finance and interest charges, (12) the dollar value of coupons utilized by customers in the purchase of merchandise from the Premises, (13) close-out or bulk sales of inventory to jobbers or wholesalers, (14) sales of gift certificates and/or gift cards, and (15) forfeited deposits.

**4.4.3   Books and Records.** Tenant shall maintain at the Premises or at its principal office, complete books and records reflecting all elements of Gross Sales. Tenant shall be allowed to maintain its books and records in a computerized form; provided, however, that (i) such computerized books and records provide the same level of information as the books and records described above, are retained for the full record retention period provided for herein, and (ii) promptly upon request, printed copies of any such books and records are made available at Tenant's principal office for inspection by Landlord's representatives who are engaged in inspecting and/or auditing Tenant's books and records as provided herein. Such books and records shall be kept in accordance with generally accepted accounting principles and practices consistently applied and shall be retained by Tenant for ▮▮▮▮▮▮▮▮▮ following the end of the calendar year to which they refer.

**4.4.4   Landlord's Right to Audit.** Landlord and/or Landlord's auditor shall have the right, upon at least ten (10) days prior notice to Tenant (but not more than once per annum), to inspect and/or audit the records of Tenant relating to Gross Sales. If any such audit discloses a deficiency in the Gross Sales reported by Tenant, Tenant shall pay any deficiency in Percentage Rent owing to Landlord on account of such deficiency. If such deficiency is in excess of three ▮▮▮▮▮▮▮ of the Gross Sales reported by Tenant and Percentage Rent is then payable, Tenant shall also pay Landlord's reasonable costs of the inspection and audit. Tenant has not and does not make any representation or warranty as to the amount of Gross Sales which are anticipated from the Premises.

**4.4.5   Confidentiality.** Landlord shall not disclose to any third party Tenant's Gross Sales or the amount of Percentage Rent paid or payable by Tenant, provided, however, that (i) such information was not previously disclosed by Tenant to such third party or to the public generally, and (ii) nothing contained herein shall restrict Landlord from disclosing such information as may be required by applicable Legal Requirements or to its accountants, attorneys, *bona fide* prospective purchasers, or current or prospective Mortgagees or underlying lessors of all or any portion of Landlord's interest in the Shopping Center (provided that each of such recipients shall be bound to the same non-disclosure provisions as are imposed upon Landlord).

14

4.4.6 <u>Licensees</u>. If Tenant enters into any agreement(s) with any non-Affiliate person or entity (hereinafter, the **"Licensees"**) permitting the Licensees to operate businesses or concessions within the Premises, then, in lieu of including the Gross Sales actually achieved by such Licensee(s) from such licensed portion of the Premises, Tenant may elect to include in Gross Sales an amount equal to the product obtained by multiplying (i) the Floor Area of such licensed space, by (ii) the average Gross Sales per square foot of Floor Area for the remainder (*i.e.*, the unlicensed portion) of the Premises. The provisions of this Subsection 4.4.6 shall not apply to more than ▉▉▉▉▉▉▉ of Floor Area, in the aggregate, in the Premises at any one time. If more than ▉▉▉▉▉▉▉ of the Floor Area of the Premises is licensed to Licensees at any one time, then Tenant shall have the right to designate, from time to time, those portions of the Premises which will be entitled to the benefit of this Subsection 4.4.6.

4.4.7 <u>Disputes</u>. Any dispute between the parties relative to the provisions of this Section 4.4, including, without limitation, the amount of Percentage Rent payable by Tenant, shall be submitted to arbitration in accordance with the provisions of Section 16.3 of this Lease.

## ARTICLE 5
## COMMON AREAS, THEIR USE AND CHARGES

Section 5.1    <u>Common Areas: Maintenance</u>.

5.1.1 <u>Maintenance of Common Areas</u>. Landlord shall operate, maintain, repair and replace the Common Areas as required by this Lease and otherwise to the standard by which Common Areas of first-class shopping centers in the State in which the Shopping Center is located are operated, maintained, repaired and replaced, <u>including, without limitation</u>, snow, ice, rubbish and debris removal (including installation and maintenance of sidewalk refuse containers), landscaping (including, without limitation, the trimming and pruning of trees to avoid interference with the use or visibility of canopies or signs on the exterior of the Premises), adequate lighting, insurance, supervision, use, parking lot paving and striping, drainage, security (as reasonably required), and control of all Common Areas, and Landlord shall comply with all applicable Legal Requirements.

5.1.2 <u>Payment of Common Area Maintenance Costs</u>.

(a)    From the Rent Commencement Date through the end of the first full calendar year of the Term, Tenant shall pay to Landlord Tenant's Pro Rata Share of the reasonable costs (hereinafter referred to as the **"Common Areas Charges"**) paid by Landlord to operate, maintain, insure and repair the Common Areas. Tenant's Pro Rata Share of Common Areas Charges shall be paid in equal monthly installments on the first day of each calendar month, in advance, during each calendar year based on Landlord's reasonable budget.

(b)    Within sixty (60) days after the end of each calendar year, Landlord shall provide to Tenant a statement, in detail reasonably satisfactory to Tenant, of Common Areas Charges for such year, which statement shall be prepared in accordance with generally accepted accounting principles consistently applied (the **"CAC Reconciliation Statement"**). The CAC Reconciliation Statement shall be certified by Landlord as being accurate and shall be accompanied by a calculation of Tenant's Pro Rata Share of Common Areas Charges, and payment to Tenant in the amount of any overpayment made by Tenant during the preceding calendar year. If Tenant's Pro Rata Share of the actual Common Areas Charges for a calendar year shall exceed the aggregate monthly installments paid by Tenant during said calendar year, Tenant shall pay to Landlord the deficiency within sixty (60) days after receipt of such notice. Upon Tenant's request, Landlord shall promptly deliver to Tenant copies of relevant backup materials (including, but not limited to, contracts, correspondence and paid invoices) reasonably required by Tenant. Notwithstanding any provision hereof to the contrary, in no event shall the Tenant's Pro Rata Share of Common Areas Charges (inclusive of Tenant's Pro Rata Share of Landlord's insurance premiums payable pursuant to Section 10.3) with respect to the first full calendar year of the Term exceed ▉▉▉▉▉▉▉ of Floor Area (the **"First Year Cap"**). After the first full calendar year, Tenant shall thereafter pay to Landlord during the Term Tenant's Fixed Share (hereinafter defined) of Common Areas Charges. Tenant's Fixed Share of Common Areas Charges shall be paid in equal monthly installments on the first day of each calendar month, in advance, during each calendar year. As used herein, **"Fixed Share"** shall mean ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

15

███████████████████████████████ ███ ████████████

Landlord acknowledges and agrees that Tenant shall have no obligation to pay to or reimburse Landlord for, any costs or expenses in connection with the repair, maintenance, insurance, operation or replacement of any Common Areas or other portions of the Shopping Center, all of which costs and expenses are included in Tenant's Fixed Share.

### 5.1.3   Exclusions from Common Areas Charges.

(a)      With respect to the calculation of Tenant's Pro Rata Share of Common Areas Charges for the first full calendar year, Common Areas Charges shall not include: (1) the capital cost of any additions to the Common Areas pursuant to an expansion of the Shopping Center; (2) the cost of any replacements or capital improvements to the Common Areas, except that the cost of repaving the parking areas of the Power Center may be included within Common Areas Charges so long as such cost is amortized on a straight-line basis over the useful life thereof under generally accepted accounting principles, and is not included (A) prior to the expiration of the ██████ full calendar year of the Term, or (B) more than once during each ████████████ of the Term; (3) the cost of investigating, monitoring or remedying any environmental condition or "Hazardous Substances" or any other "Compliance Costs" (both as hereinafter defined in Subsection 12.4.1); (4) any debt service (including principal and interest) or payments of any judgments or other liens against Landlord; (5) the cost of maintaining, repairing or providing security for interior portions of buildings; (6) Taxes or other taxes levied or assessed against Landlord or the Power Center; (7) the cost of compliance with applicable Legal Requirements (including, without limitation, the cost of curing violations or contesting such Legal Requirements); (8) any costs resulting from insurance deductibles or any payments made under any self-insurance policy maintained by Landlord; (9) any costs which would have been reimbursed or paid for by insurance proceeds had Landlord maintained the insurance required under Section 10.3 hereof and the amount of any judgment or other charge entered or costs assessed against Landlord in excess of the policy limits of the insurance maintained by Landlord under Section 10.3 hereof); (10) those portions of Landlord's insurance premiums which are reimbursed to Landlord by any other tenant in the Power Center other than through the payment of such tenant's proportionate share of insurance premiums otherwise includable as part of Common Areas Charges; (11) sums paid or owed by Landlord to any tenant in the Power Center; (12) costs incurred in connection with the negotiation of leases with, or construction of improvements for, any tenant in the Power Center (including, without limitation, brokerage commissions and legal fees); (13) costs incurred in connection with lawsuits or other legal actions (including, without limitation, arbitrations and mediations) instituted or defended by Landlord; (14) sums incurred as late payment fees, penalties or interest; (15) ground rent; (16) depreciation [except as expressly permitted pursuant to item 23 below]; (17) costs disproportionately incurred by or on behalf of any one or more of the tenants in the Power Center (including, without limitation, all costs relating to the operation of any food court or exterior dining area in the Power Center); (18) electricity costs for lighting Common Areas later than the "Normal Hours" [hereinafter defined in Section 5.2], other than low-level security lighting; (19) Landlord's advertising, entertainment and promotional costs for the Power Center (including, without limitation, holiday decorations); (20) costs of acquiring, leasing, restoring, insuring or displaying sculptures, paintings and other objects of art located within or outside the Power Center; (21) costs and expenses payable to Landlord or its Affiliate, to the extent that such costs and expenses exceed competitive costs and expenses for materials and services by unrelated persons or entities of similar skill and experience; (22) repairs resulting from defects in the original construction of the Power Center arising within one (1) year after the Rent Commencement Date; (23) the cost of mechanized equipment for the maintenance of the Common Areas (but not the straight-line depreciation thereof over its useful life, as determined in accordance with generally accepted accounting principles); (24) reserves for anticipated future expenses; (25) any cost or expense relating to the administration and management of the Common Areas (whether on-site or off-site) including, but not limited to, overhead, management fees, office salaries and benefits, office rental, office supplies, dues and subscriptions, office utility charges, telephone charges and automobile expenses; (26) costs incurred in connection with the monitoring, maintenance, inspection, or testing of fire alarm systems; (27) costs and expenses payable to Landlord, or its Affiliate or designee, for the provision of utility service(s) to the Common Areas, to the extent that such costs and expenses exceed competitive market rates; (28) except as specifically provided in Section 7.2 hereof, any costs relating to any pylon signs or other signage identifying tenants of the Power Cente; or (29) any costs related to the operation,

16

Document    Page 23 of 111

maintenance, repair and/or replacement of all or any portion of the Promenade or the common areas contained therein.

(b)    In addition, if any tenant or other occupant of the Power Center (i) maintains the Common Areas in whole or in part, or any facilities therein, (ii) provides any services the cost of which would otherwise be includable in Common Areas Charges, and/or (iii) pays directly for costs which would otherwise be included in the Common Areas Charges, then the costs associated with or attributable to any of the foregoing shall be excluded from Common Areas Charges, and the denominator used to determine Tenant's Pro Rata Share of such costs (and only such costs) shall be reduced by the Floor Area occupied by such tenant or other occupant. In applying the provisions hereof, Landlord shall act equitably, taking into account, for example, the relationship of the size of the Common Areas maintained by the other tenant or occupant to the size of its premises.

(c)    Common Areas Charges and the First Year Cap for any period during the Term which constitutes less than a full calendar year shall be equitably prorated.

5.1.4    Tenant's Right to Audit. With respect to the calculation of Tenant's Pro Rata Share of Common Areas Charges for the first full calendar year, Tenant shall have the right, within ▇▇▇▇▇▇ after receiving the CAC Reconciliation Statement for such first full calendar year (and not more than once annually) to audit Landlord's books and records to verify Landlord's calculation of Common Areas Charges as reflected therein and Tenant's Pro Rata Share thereof. Upon Tenant's request, Landlord shall promptly deliver to Tenant copies of relevant backup materials (including, but not limited to, contracts, correspondence and paid invoices) reasonably required by Tenant. In the event of an error in Landlord's favor, Landlord shall refund the overcharge to Tenant within thirty (30) days after Tenant's demand therefor, and if the overcharge exceeds ▇▇▇▇▇▇▇▇ of Tenant's Pro Rata Share of Common Areas Charges, Landlord shall pay to Tenant the reasonable expenses of the audit within thirty (30) days after Tenant's demand therefor, failing which, Tenant shall have the right (in addition to any rights and remedies to which it may be entitled under this Lease, at law, or in equity) to offset such amount from payments of Rent next becoming due hereunder, together with interest thereon at the Lease Interest Rate from the date such remittance is due until reimbursement or full satisfaction by credit. Landlord shall maintain all books and records pertaining to a calendar year for at least ▇▇▇▇▇▇ after it delivers to Tenant a CAC Reconciliation Statement for such calendar year. Tenant shall keep the results of any such audit confidential, provided that nothing contained herein shall restrict Tenant from disclosing such information as may be required by applicable Legal Requirements, or to its accountants, attorneys or bona fide prospective assignees or subtenants (provided that each of such recipients shall be bound by the same non-disclosure provisions as are imposed upon Tenant). Any dispute by Landlord with respect to an audit by Tenant shall be submitted to arbitration in accordance with the provisions of Section 16.3 below.

5.1.5    In no event shall Tenant be required to join, participate in or contribute to any promotional fund, marketing fund or merchants' association.

Section 5.2    Common Areas: Restrictions.

5.2.1    Continuous Access. No entrances, exits, approaches and means of ingress and egress to and from the Power Center or the Premises as shown on Exhibit B hereto, shall be interrupted or disturbed by any act or omission of Landlord during the Term, except in the event of an emergency or as may be otherwise required by applicable Legal Requirements, in which event Landlord shall use reasonable efforts to give Tenant advance notice of same and to minimize interference to Tenant's normal business operations in the Premises as a result thereof. Notwithstanding the foregoing, Landlord shall be permitted, upon at least thirty (30) days prior notice given to Tenant, to temporarily close portions (but not all) of the exterior Common Areas of the Power Center for the minimum time legally necessary to prevent a dedication thereof or an accrual of any rights in any person or the public generally therein; provided that such closure shall not occur during August, November or December of any calendar year.

5.2.2    No Alterations. Landlord shall not, without obtaining Tenant's prior written consent in each instance, which consent may be withheld in its sole discretion: (i) alter the area of the Power Center or the location, availability, or size of any building or Common Area improvement in the Power Center from that shown on Exhibit B hereto; (ii) materially change the number, location, or layout of parking spaces in the Power Center as shown on

17

Exhibit B hereto; (iii) construct or permit to be constructed any structures in the area designated as the *"No Build Area"* on Exhibit B ███████████████████████████████████ ███████████████████████ other than as shown on Exhibit B hereto; or (iv) materially change the entrances or exits to and from the Power Center, or the curb cuts, roadways and sidewalks or other Common Areas in the Power Center, from those shown on Exhibit B hereto. Notwithstanding any provision herein to the contrary, Landlord shall neither perform nor permit to be performed, any construction, repairs, replacements or maintenance to any portion of the Power Center, including the Premises (other than emergency repairs to utilities and Common Areas) during the months of August, November and December of any year, without the prior consent of Tenant, which consent may be granted or denied in Tenant's sole and unfettered discretion, reasonably or unreasonably exercised.

       5.2.3   Outparcels.   In addition to the provisions of Subsection 5.2.2 above, during the Term, the following restrictions shall encumber and bind the area designated on Exhibit B as *"Future Outparcel"*(which Future Outparcel shall, for all purposes of this Lease, be deemed to be part of the Power Center): (a) no more than one building shall be constructed on the Future Outparcel and such building shall not exceed ███████████████ of Floor Area; (b)such building shall not exceed one story in height; (c) such building shall not exceed a maximum height of twenty-eight feet (28') as measured from the finished floor level to the highest point on such building or structure, exclusive of the height of all types of projections or architectural treatments or embellishments thereon, such as, but without limitation, HVAC equipment, parapets, mansards, signs, satellite dishes and antennae (collectively, *"Projections"*), provided the Projections do not cause the height of the building, as measured from the finished floor level to the highest point of the Projections, to exceed thirty-one feet (31'); and (d) all Legal Requirements relative to parking requirements for the building constructed in the Future Outparcel shall be complied with by providing the requisite number of parking spaces solely within the boundaries of the Future Outparcel, without reduction in such number by virtue of the granting of a variance or special exception. For purposes of this Subsection 5.2.3, the Floor Area of any such building constructed within the Future Outparcel shall also be deemed to include outdoor balconies, patios or other outdoor areas utilized for retail sales or food or beverage service (exclusive of drive through or walk-up take-out food or beverage service).

       5.2.4   Parking Area.   During the Term, Landlord shall maintain in the Power Center, at a minimum, the greater of (i) the number of parking spaces required by applicable Legal Requirements, without variance, or (ii) four and one-half (4.5) parking spaces per 1,000 square feet of Floor Area, with each such space being at least the minimum size required by Legal Requirements but in no event shall more than ten percent (10%) of such parking spaces be designated for compact cars and provided that such compact spaces shall be uniformly distributed throughout the parking areas and further provided that no such compact spaces shall be located within the No Build Area. Parking spaces shall at all times be clearly marked by painting, striping or otherwise. Landlord shall not designate specific parking spaces for use by other tenants or occupants of the Power Center nor shall Landlord permit any person or entity to use the parking areas other than Tenant, the other tenants and occupants of the Power Center, and their respective employees, agents, subtenants, concessionaires, licensees, customers, and invitees. There shall be no charge whatsoever levied for the use of any parking areas within the Power Center. Landlord shall not permit overnight parking in the Power Center.

       5.2.5   Lighting.   Throughout the Term, Landlord shall keep the Common Areas fully lighted and open to the customers of the Power Center seven (7) days a week from dusk until 11:00 p.m. Monday through Saturday and until 7:00 p.m. on Sunday or for such longer hours as may be customary in first class shopping centers in the Rogers, Arkansas area which are similar to the Power Center. In addition to the foregoing, Landlord shall provide for low level security lighting from one (1) hour after the close of business in the Premises until dawn.

       5.2.6   Repairs.   During the Term, any construction or repair by Landlord permitted or required under this Lease and undertaken in the Common Areas or in any other portion of the Shopping Center shall:

            (a)   not be performed during the months of August, November, or December of any year, except in the event of an emergency or as may be otherwise required by applicable Legal Requirements;

(b)    be commenced only upon at least five (5) days' prior notice to Tenant (except in an emergency, in which event Landlord shall only be required to give such notice as is reasonable under the circumstances); and

(c)    be performed in accordance with the requirements of Section 3.3.5 above and in such a manner so as not to materially interfere with the normal conduct of any business operations in the Premises.

5.2.7    <u>Rules and Regulations</u>.  Tenant shall comply with the rules and regulations of the Shopping Center as established from time to time by Landlord, within sixty (60) days after Landlord notifies Tenant thereof, provided they: (i) are reasonable, (ii) do not adversely affect the normal conduct of any business operations in the Premises, (iii) do not adversely affect any of Tenant's rights under this Lease, and (iv) are uniformly enforced against all tenants of the Shopping Center and without prejudice against Tenant.  In the event of any conflict between the provisions of this Lease and any rules or regulations, the provisions of this Lease shall prevail and govern.

5.2.8    <u>Miscellaneous</u>.

(a)    <u>No Promotional Use</u>.  Landlord shall not use or permit the use of all or any portion of the Common Areas in the Power Center for retail sales or for promotional purposes. Notwithstanding the foregoing provision, tenants of the Power Center (including Tenant) shall be permitted to conduct sidewalk sales in front of their respective stores only, provided that such sales shall: (A) be conducted in a manner consistent with sidewalk sales in first-class shopping centers in the state in which the Power Center is located, (B) not materially interfere with normal pedestrian access over the sidewalks, and (C) not materially interfere with the normal business operations of Tenant in the Premises or materially impair the visibility of Tenant's signage. Landlord shall not permit any solicitation, distribution of handbills, picketing, or other public demonstration in the Common Areas of the Power Center, except as otherwise may be mandated by applicable Legal Requirements.

(b)    <u>Trash Compactor and Containers</u>.  Tenant shall be permitted to maintain and operate, at no extra charge: (i) a trash compactor for Tenant's exclusive use in the portion of the Common Areas designated on <u>Exhibit B</u> hereto as ***"Trash Compactor Pad"***; and (ii) a trash container(s) for Tenant's exclusive use in the portion(s) of the Common Areas designated on <u>Exhibit B</u> hereto as ***"Trash Container Pad"***. Tenant, at its sole cost and expense, shall keep the trash compactor and containers neat and clean and repair any damage caused by use and storage of such compactor and containers.

(c)    <u>Shopping Carts</u>.  Tenant shall be permitted to store its shopping carts in such exterior cart corrals as may be designated for Tenant's use on <u>Exhibits B and D-1</u> hereto.  If required by a governmental authority, Tenant's cart corrals shall be screened.  With respect to shopping carts provided by Tenant for the use of its customers, Tenant will use reasonable efforts to periodically remove same from the Common Areas.  Tenant shall be responsible for the maintenance and repair of the shopping carts and cart corrals.

(d)    <u>Cellular Towers</u>.  No transmission and/or reception towers for wireless telephone or internet communications shall be permitted within the No Build Area of the Shopping Center.

(e)    <u>Storage Trailers</u>.  Tenant shall be permitted to maintain temporary storage containers or trailers in the locations designated on <u>Exhibit B</u> hereto during the Term, subject to applicable Legal Requirements.

ARTICLE 6
UTILITIES

Section 6.1    <u>Utility Service</u>.  From and after the Delivery Date and continuing thereafter through the end of the Term, Tenant shall be solely responsible for and shall pay the cost of utilities services (including, without limitation, electricity, gas, water, sanitary sewer, alarm and telecommunications) consumed in the Premises by Tenant.  Tenant shall not be obligated to purchase utility service(s) directly from Landlord, or from any utility provider designated by Landlord, unless: (i) the quality of the service(s) so provided satisfies Tenant's specifications so as to permit the normal operations of Tenant's business in the Premises; (ii) the

19

cost of such service(s) shall not exceed the lesser of: (x) the cost of the same service if Tenant had obtained such service directly from its preferred utility service provider, or (y) the cost to Landlord for such service, and (iii) Landlord shall pay the costs of reconnection. Landlord shall provide separate utility meters exclusively serving the Premises, at its sole cost and expense (including, without limitation, all connection and hook-up fees). Tenant's entry upon the Premises prior to the Delivery Date shall not constitute a waiver by Tenant of Landlord's obligation to pay the costs of all utility charges incurred in the Premises prior to the Delivery Date. Landlord shall not permit the capacity of utility lines available for use at the Premises to be reduced or overloaded by any other persons or entities. Landlord shall permit Tenant and its telecommunications provider full and free access to, and use of, available telecommunications conduits in the Shopping Center for the provision of telecommunications service to the Premises, subject to such reasonable requirements as Landlord may impose and any third party consents, approvals or easements which may be required.

Section 6.2   Interruption. Notwithstanding any provision of this Lease to the contrary, in the event utilities serving the Premises are disrupted due to the acts or omissions of Landlord, its agents, contractors, servants or employees, Landlord shall promptly restore the affected utilities at Landlord's sole cost and expense. If the disrupted utilities are not restored within twenty-four (24) hours after the Landlord has knowledge of the disruption, and Tenant is unable to conduct its normal business in the Premises as a result thereof, Rent shall be equitably abated during the period of disruption.

ARTICLE 7
SIGNS

Section 7.1   Tenant's Building Signage. Landlord shall supply and install signage (and obtain all permits and approvals therefor) as part of Landlord's Work in accordance with Exhibits D, D-1, and F hereto, and with the additional provisions of this Lease. Landlord shall use best efforts to obtain all approvals required for Tenant to have the signage (including, without limitation, the number of signs and dimensions) as indicated on Exhibits D-1 and/or F hereto. If necessary, Landlord, at its sole cost and expense, shall apply for a variance to obtain Tenant's required signage and shall diligently and in good faith prosecute such application to completion. Upon Tenant's request, Landlord shall deliver to Tenant copies of the application and other supporting documentation submitted by Landlord to the applicable governmental authority for such variance. Tenant shall reasonably cooperate with Landlord in Landlord's efforts to obtain such variance. Thereafter, Tenant shall have the exclusive right during the Term, at its sole cost and expense, to erect, maintain, and replace on the storefront and exterior walls of the Premises, and on the side walls of any entrance design element, if any, signs (including, without limitation, under-canopy or blade signs), banners (including temporary banners placed on the storefront of the Premises and such other walls of the Premises as selected by Tenant), awnings, and flags of such size, design and color as Tenant, from time to time, may desire, subject to compliance with applicable Legal Requirements. Tenant may erect and maintain in the interior of the Premises any signs it may desire, provided that same are professionally prepared.

Section 7.2   Signage in Common Areas. . Landlord shall provide pylons and monuments at the locations shown on Exhibit B hereto during the entire Term, and obtain all permits and approvals therefor. Landlord, as part of Landlord's Work, shall obtain all governmental approvals and permits for, and shall procure and install, Tenant's sign panel(s) on all sides of such pylons and monuments, in accordance with the provisions of Article 3 and Exhibits D and F hereto. The dimensions and location of Tenant's pylon sign panel(s) shall be as indicated on Exhibit F. In addition, if Landlord constructs or makes available to any other tenant or tenants in the Shopping Center any other signage located in the Common Areas, Landlord shall also include on such signage Tenant's identification sign, as shown on Exhibit F hereto, which Tenant sign shall have a location determined by the Floor Area of the Premises as compared to the Floor Area of other tenants having panels on such sign (i.e. a tenant having greater Floor Area than Tenant shall have a panel above Tenant's panel) and Tenant's panel shall be at least as large as any other tenant having the same or less Floor Area as that of Tenant. Landlord shall maintain all pylons and monuments, and Tenant's signs thereon, in good order and repair, and allow Tenant access to replace its signs thereon, at Tenant's cost and expense. Landlord shall not change or alter the location, structure, height or general appearance of the pylons or monuments without obtaining Tenant's prior consent. The cost of maintaining all pylons and monuments bearing Tenant's sign panel(s) (but not the cost of individual tenants'

20

signs thereon or the cost of the construction of the pylons and monuments) and the cost of any electricity used to illuminate them, shall be includable in Common Areas Charges.

Section 7.3    Signage: Alteration/Removal/Allocation.  Tenant shall have the right, from time to time, without Landlord's approval, to change its signs on the storefront and exterior of the Premises, as well as on any pylon or monument, provided that the area of the new sign is no larger than the area of the sign which it replaces and that the method of construction and attachment is substantially the same.  Upon the expiration or earlier termination of the Lease, Tenant shall remove its signs from the fascia or other exterior walls of the Premises and from any pylon or monument, and shall repair any damage occasioned thereby.  The signage rights granted to Tenant pursuant to this Article 7 shall, at Tenant's option, be allocated to or between Tenant and/or any subtenant(s) of all or any portion of the Premises.  All signage installed by Landlord and Tenant hereunder shall comply with applicable Legal Requirements.

Section 7.4    Cooperation.  Landlord, upon request, shall execute any consents or applications which may be reasonably required by applicable Legal Requirements to permit the placement, installation, and/or replacement by Tenant of any signs on any part of the Premises or on any pylon or monument, to which Tenant may be entitled under this Lease.

Section 7.5    Signage Restrictions and Criteria.

7.5.1    During the Term, no exterior identification signs attached to any building of the Power Center shall be of the following type: **(i)** flashing, moving or audible signs; **(ii)** signs employing exposed raceways, exposed neon tubes, exposed ballast boxes, or exposed transformers, provided that Tenant shall have the right to employ any methods necessary for the installation of internally illuminated self-contained channel letters; or **(iii)** paper or cardboard signs other than professionally prepared interior window signs advertising special sales within the subject premises, temporary signs (exclusive of contractor signs), stickers or decals, provided, however, the foregoing shall not prohibit the placement at the entrance of each such premises of (A) small stickers or decals which  indicate hours of business, emergency telephone numbers, credit cards accepted, and other similar information, and/or (B) a sticker or decal which contains the phrase "no solicitation" or words of like import.  No billboard signs shall be permitted within the Power Center.  Landlord shall not permit any obstructions (including, without limitation, any trees, bushes or other landscaping, scaffolding or architectural details, or pylons, monuments or other freestanding signs) to obscure Tenant's storefront, storefront signs or other exterior wall signs. Except as otherwise permitted under Existing Leases (hereinafter defined in Section 12.3(h)), no premises in the Power Center containing less Floor Area than the Floor Area of the Premises shall have: **(i)** building signage possessing more total square footage than the total square footage available for use by Tenant, or a maximum height greater than the maximum height of Tenant's building signage, as measured from the finished floor level to the highest point on such signage, or **(ii)** a building and entrance design element higher or wider than the height or width of the building and entrance design element of the Premises.

## ALTERATIONS AND IMPROVEMENTS

Section 8.1    Alterations and Improvements.

(a)    Tenant shall not perform any structural alterations or structural improvements to the Premises (except to the extent same pertain to Tenant's Work) without the prior approval of Landlord; provided, however, that Tenant's alteration of the exterior of the Premises to conform to Tenant's then-current prototypical elevation shall not require Landlord's consent.  All work performed by Tenant in connection with structural and non-structural alterations or improvements shall be done at Tenant's sole cost and expense, in a good and workmanlike manner and in compliance with all applicable Legal Requirements.  The provisions of this Section 8.1 shall not apply to Tenant's building signage, which shall be governed by the applicable provisions of Article 7 above.

(b)    Notwithstanding anything contained herein, Tenant shall have the right at any time during the Term to construct an additional floor to be used for storage purposes, not to exceed ▮▮▮▮▮▮▮▮▮ (the "**Additional Floor**") above all or any portion of the Premises, subject to the following terms and conditions:

21

(i)    Prior to commencing the construction of the Additional Floor (the *"Additional Floor Work"*), Tenant shall prepare and submit to Landlord for Landlord's approval Tenant's plans therefor (the *"Additional Floor Work Plans"*). Within thirty (30) days after receipt of the Additional Floor Work Plans (or any subsequent revisions by Tenant thereto), Landlord shall give notice as to whether it approves same, such approval not to be unreasonably withheld or delayed, provided the Additional Floor Work as depicted on the Additional Floor Work Plans (or such revisions) shall be approved if same: (I) is in compliance with all applicable Legal Requirements (and does not adversely affect the parking ratio required for the Power Center), and (II) following completion thereof, will not reduce the structural soundness of the building containing the Premises; should Landlord fail to notify Tenant within such 30-day period (or if Landlord notifies Tenant within such 30-day period that it does not approve the Additional Floor Work Plans (or revisions) but fails to state with reasonable specificity the reason for such disapproval), then Tenant shall give Landlord a five (5) day reminder notice and if Landlord fails to disapprove the Additional Floor Work Plans or fails to state with reasonable specificity the reason for such disapproval, in either case within such 5-day period, such approval by Landlord shall be deemed to have been given;

(ii)    In no event shall the Additional Floor result in any charge to Tenant by way of Fixed Rent or any Additional Rent, nor shall the Additional Floor be included in the determination of Tenant's Pro Rata Share; and

(iii)    The Additional Floor Work, together with any replacements thereof, shall be and remain the property of Tenant throughout the Term, and Tenant alone shall be entitled to the benefits of ownership thereof, including, but not limited to, depreciation of same as an asset for tax purposes.

8.1.2    Tenant may, from time to time, at its sole cost and expense, without the prior approval of Landlord, make non-structural alterations and non-structural improvements to the Premises as Tenant deems necessary or desirable, including, but not limited to, electrical systems, heating, ventilation and air conditioning and other mechanical systems, installation of fixtures and equipment, painting, and wall and floor coverings.

8.1.3    Tenant shall have the right to subdivide the Premises into not more than ▮▮▮▮ stores, each of which may have its own front entrance and access to the loading docks in the rear of the Premises, as well as separately sub-metered utilities.

8.1.4    Tenant shall have the right to erect and maintain an antenna and a satellite dish on the roof of the Premises, provided that Tenant: (i) obtains Landlord's prior approval of its plans for the installation of such equipment, (ii) uses a contractor designated or approved by Landlord for all roof penetrations so as not to violate or invalidate any roof warranties maintained by Landlord, (iii) maintains the area where roof penetrations are made while Tenant's equipment is present, (iv) repairs any damage to the roof caused by the making of the roof penetrations, including, but not limited to, the repair of the roof penetrations upon the removal of any equipment installed thereon, and (v) erects and maintains such equipment in accordance with applicable Legal Requirements.

8.1.5    Landlord shall execute and return to Tenant all appropriately completed building department or equivalent applications within ten (10) days after Tenant's request therefor, and will reasonably cooperate with Tenant in the permitting process.

8.1.6    If any violation of any applicable Legal Requirement which is noted against the Shopping Center or the Premises (other than a violation caused by Tenant) prevents Tenant from obtaining a building permit for any alterations or a certificate of occupancy, then, upon request by Tenant, Landlord shall promptly and diligently cause such violation to be removed of record to the extent required to permit Tenant to obtain its building permit or certificate of occupancy, as the case may be.

8.1.7    Landlord shall not make any alterations to the Premises (including, without limitation, changing the design, color or materials of the exterior of the Premises) nor shall Landlord construct an additional floor or floors above the Premises.  Landlord represents and warrants that Exhibit D-2 accurately depicts the dimensions and appearance of the exterior elevations of the Power Center.

22

ARTICLE 9
REPAIRS

Section 9.1    Tenant's Repairs.  Subject to the provisions of Articles 10 and 11 hereof, and except as otherwise provided in Section 9.2 below, Tenant shall maintain in good condition and repair, at its sole cost and expense: (i) the non-structural, interior elements of the Premises (including plate glass, and the electrical, plumbing, mechanical and/or alarm systems located in, or serving exclusively, the Premises); (ii) the heating, ventilation and air conditioning ("*HVAC*") units exclusively serving the Premises; and (iii) the improvements which constitute Tenant's Work.  All repairs and replacements on Tenant's part to be performed hereunder shall be at Tenant's sole cost and expense, and performed in a good and workmanlike manner in accordance with all applicable Legal Requirements.

Section 9.2    Landlord's Repairs.  Subject to the provisions of Articles 10 and 11 hereof, Landlord shall perform, as the same shall from time to time be necessary, all repairs and replacements to the following:

(a)      the buildings of the Shopping Center as necessary to maintain same in good condition and repair including, without limitation, repainting the exterior walls of the buildings of the Shopping Center (including, without limitation, the Premises) as same may be reasonably required from time to time during the Term;

(b)      the structural elements of the Premises, which shall be deemed to include, without limitation, the roof joists, columns, footings, foundation, exterior walls (including, without limitation,  repainting, but excluding plate glass, storefront windows, doors, door closure devices, window and door frames, molding, locks and hardware, and painting or other treatment of interior walls), floor (but not the floor covering, unless the same is damaged as a result of a floor defect or settling), and the structural elements of any building of which the Premises may be a part;

(c)      the roof, gutters, flashings, downspouts and scuppers;

(d)      the electric, gas, water, sanitary sewer, and other public utility lines serving the Premises, to the point of connection to the Premises;

(e)      all electric, gas, water, sanitary sewer, and other public utility lines and ducts in or passing through the Premises which do not exclusively serve the Premises; and

(f)      the non-structural elements of the Premises (including, without limitation, the HVAC units and the electrical, plumbing, mechanical, and/or fire alarm systems located in or serving the Premises) until the first (1st) anniversary of the Delivery Date, and thereafter for such period of time and to the extent any such non-structural elements are covered by any contractors', manufacturers', vendors', or insurers' warranties or guarantees; and

(g)      any damage to the Premises or the Shopping Center which is occasioned by (A) the act or omission of Landlord, its employees, agents or contractors, or (B) any breach by Landlord of any provision of this Lease.

All repairs and replacements on Landlord's part to be performed hereunder shall be at Landlord's sole cost and expense, performed in a good and workmanlike manner in accordance with all applicable Legal Requirements, and without material interference with or disruption to the normal conduct of any business operations in the Premises.  Landlord shall give Tenant at least five (5) days' prior notice of any repairs or replacements to, or which would otherwise affect the normal conduct of any business operations in, the Premises (except in the case of an emergency posing imminent risk of material harm to persons or property, in which event Landlord shall only be required to give such notice as is reasonable under the circumstances).  If, in Tenant's reasonable judgment, Landlord's repairs would materially interfere with or disrupt the normal conduct of any business operations in the Premises, Landlord shall perform such repairs only after the regular hours of operation of Tenant and any other occupant of the Premises (or any portion thereof), and Landlord shall reimburse Tenant for the reasonable costs and expenses incurred by Tenant in connection with such "after hours" repairs, including, without limitation, utilities charges and security expenses.  In the event Landlord does not reimburse Tenant for any amounts payable to Tenant hereunder within ten (10) days after Tenant's demand therefor, Tenant shall have the right (in addition to any rights and remedies to which it may be entitled

23

under this Lease, at law, or in equity) to offset such amounts against Rent, together with interest thereon at the Lease Interest Rate from the date of outlay until reimbursement or full satisfaction by credit in the manner and subject to all the provisions set forth in Section 16.2 below.

Section 9.3    Legal Compliance Work. Except as hereinafter expressly provided, Landlord shall be responsible, at its sole cost and expense, for performing all "Legal Compliance Work" (hereinafter defined). Notwithstanding the foregoing, Tenant shall be responsible, at its sole cost and expense, for the performance of Legal Compliance Work: (a) pertaining to the interior elements of the Premises which are neither structural nor comprise the major building systems serving the Premises; or (b) required solely as a result of Tenant's specific manner of use of the Premises (*i.e.*, are not of general applicability to tenants and occupants of the Shopping Center); provided, however, that the foregoing shall not relieve Landlord of its obligations to perform: (x) Landlord's Work in accordance with all Legal Requirements, and (y) the repairs required in this Lease. As used herein, *"Legal Compliance Work"* shall mean any obligation, addition, alteration, improvement, or rebuilding, structural or otherwise, to or of the Premises, the Shopping Center, or any part thereof, as applicable, which may be required by reason of any Legal Requirement.

## ARTICLE 10
## INDEMNIFICATION, INSURANCE AND WAIVER OF SUBROGATION

Section 10.1    Mutual Release, Waiver of Subrogation and Mutual Indemnification.

10.1.1 Mutual Waiver of Claims. Landlord and Tenant, on their own behalf and on behalf of anyone claiming under or through either one by way of subrogation, hereby release and waive all rights of recovery and causes of action against each other from any and all liability for any loss or damage to property or resulting from damage to such property (and, in either case, any resulting loss of business or rental income), whether caused by the negligence or fault of the other party, which is normally insured under Special Form property insurance (formerly known as "All-Risk") and time element insurance required to be maintained hereunder. In the event either Landlord or Tenant is a self-insurer or maintains a deductible (as either may be permitted hereunder), then the self-insuring party or the party maintaining the deductible hereby releases the other party from any liability arising from any event which would have been covered had the required insurance been obtained and/or the deductible not been maintained.

10.1.2 Waiver of Subrogation. Landlord and Tenant shall cause each property insurance policy carried by either of them insuring the Premises, the contents thereof, or the Shopping Center, to provide that the insurer waives all rights of recovery by way of subrogation or otherwise against the other party hereto in connection with any loss or damage which is covered by such policy or that such policy shall otherwise permit, and shall not be voided by the releases provided above.

10.1.3 Mutual Indemnification.

(a)    Except as otherwise provided in Subsections 10.1.1 and 10.1.2 above, Tenant covenants to defend and indemnify Landlord and hold Landlord harmless from and against any and all claims, actions, damages, liability and expense, including reasonable attorneys' fees, (x) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon the Premises, or any part thereof, or (y) occasioned wholly or in part by any act or omission of Tenant, its agents, contractors, employees, servants, sublessees, concessionaires or licensees, except to the extent such claims, actions, damages, liability and expense are caused by the acts or omissions of Landlord, its agents, contractors, licensees, employees, or other tenants and occupants, or for which any of said parties may be statutorily liable.

(b)    Except as otherwise provided in Subsections 10.1.1 and 10.1.2 above, Landlord covenants to defend and indemnify Tenant and hold Tenant harmless from and against any and all claims, actions, damages, liability and expense, including reasonable attorneys' fees, (x) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon any portion(s) of the Shopping Center (excluding the Premises), or (y) occasioned wholly or in part by any act or omission of Landlord, its agents, contractors, employees, servants, tenants (other than Tenant), occupants or licensees, except to the extent such claims, actions, damages, liability and expense are caused by the acts or

24

omissions of Tenant, its agents, contractors, licensees, sublessees, concessionaires or employees, or for which any of said parties may be statutorily liable.

10.1.4 <u>Exclusion</u>. Anything contained in this Section 10.1 to the contrary notwithstanding, Landlord and Tenant agree that in the event there is any damage to Tenant's Property resulting from water infiltration from the roof of the Premises or any component thereof (excluding water infiltration caused by Tenant or its contractors), then Landlord will reimburse Tenant for the costs thereof. Landlord shall pay such reimbursement to Tenant within thirty (30) days after receipt of an invoice documenting such costs, failing which Tenant may offset such costs against the next installment(s) of Rent without the need for any further notice to Landlord.

Section 10.2    <u>Tenant's Insurance</u>.

10.2.1 <u>Tenant's Insurance</u>. Tenant, at its own cost and expense, shall maintain in full force and effect from and after the Delivery Date and throughout the Term: (i) commercial general liability insurance protecting and insuring Tenant, naming Landlord as "additional insured-lessor" for claims arising out of the use or occupancy of the Premises by Tenant and the obligations assumed by Tenant under this Lease, and having a combined single limit of liability of not less than ████████████████████ for bodily injury, death and property damage liability; and (ii) Special Form (formerly known as "All-Risk") property insurance, on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of all of Tenant's Property. Tenant may carry any of its insurance under "blanket policies" covering the Premises and other locations it or any Affiliate of Tenant owns or leases, <u>provided</u> that: (i) the amount of the total insurance available shall be at least the protection equivalent to separate policies in the amounts herein required, and (ii) in all other respects, any such policy or policies shall comply with the applicable provisions of this Article 10.

10.2.2 <u>Self-Insurance</u>. All insurance required to be maintained under this Section 10.2 may be provided under: (i) an individual policy covering this location; (ii) a blanket policy or policies which includes other liabilities, properties and locations of Tenant or its Affiliates; (iii) a plan of self-insurance, provided that Tenant or any guarantor of Tenant's obligations under this Lease maintains, during the period of such self-insurance, a net worth of at least ████ ████████████████████ or (iv) a combination of any of the foregoing insurance programs. To the extent any deductible is permitted or allowed as a part of any insurance policy carried by Tenant in compliance with this Section 10.2, then Tenant shall be deemed to be covering the amount thereof under an informal plan of self-insurance; provided, however, that in no event shall any deductible exceed ████████████████████████ unless Tenant complies with the requirements regarding self-insurance pursuant to clause (iii) above.

Section 10.3    <u>Landlord's Insurance</u>.

10.3.1 <u>Liability Insurance</u>. Landlord shall maintain in full force and effect on and after the Effective Date and throughout the Term commercial general liability insurance with regard to the Common Areas protecting and insuring Landlord, naming Tenant as "additional insured-lessee", and having a combined single limit of liability of not less than ████████ ████████████████ for bodily injury, death and property damage liability. Landlord shall have the right to carry its insurance under "blanket policies" covering the Shopping Center and other properties <u>provided</u> that: (i) the amount of the total insurance available shall be at least the protection equivalent to separate policies in the amounts herein required, and (ii) in all other respects, any such policy or policies shall comply with the applicable provisions of this Article 10.

10.3.2 <u>Special Form Property Insurance</u>. Landlord shall procure and maintain in full force and effect on and after the Effective Date and throughout the Term, Special Form (formerly known as "All-Risk") property insurance (including loss of rents for a minimum period of one (1) year) and endorsements for coverages for flood, earthquake, windstorm, earth movement [sinkholes], demolition, increased cost of construction and contingent operation of building laws coverages, on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of all of the buildings (including the Premises) and other insurable improvements in the Shopping Center including Landlord's Work; <u>provided, however</u>, in no event shall such insurance cover Tenant's Property. All policies required to be maintained by Landlord pursuant to this Subsection 10.3.2 shall provide that any proceeds thereof shall be deposited with Landlord's Mortgagee, or if none, to Landlord, in either event to be held in trust by such party and disbursed only in accordance with the provisions of, and for the purposes set

25

forth in, Section 11.1 hereof. The property insurance required to be maintained by Landlord pursuant to this Section shall not have deductibles exceeding ████████████ ████ ████ without Tenant's prior consent.

10.3.3 <u>Tenant's Share of Landlord's Insurance Premiums</u>. Except for Tenant's payment of its Pro Rata Share of Common Areas Charges for the first full calendar year, Landlord and Tenant agree that Tenant shall not be required to pay to Landlord or reimburse Landlord for, any of Landlord's insurance premiums maintained by Landlord pursuant to Section 10.3, it being agreed that such payment is included in Tenant's Fixed Share of Common Areas Charges.

Section 10.4   <u>General Insurance Requirements</u>.

10.4.1 All insurance required to be maintained by the parties under this Lease shall be maintained with insurance companies qualified to do business in the state in which the Shopping Center is located, and rated at least A-/VIII by the most current Best's Key Rating Guide (or its equivalent, if such Guide ceases to be published). Each party shall use its diligent efforts to have its insurers provide thirty (30) days [ten (10) days in the event of non-payment of premium] prior notice to the other party of cancellation or non-renewal of any policy required hereunder. Each party shall provide to the other duly executed certificates evidencing the insurance coverage described in Sections 10.2.1(ii) and 10.3 above.

10.4.2 The liability insurance requirements under Sections 10.2 and 10.3 above shall be reviewed by Landlord and Tenant every five (5) years for the purpose of mutually increasing (in consultation with their respective insurance advisors) the minimum limits of such insurance to limits which shall be reasonable and customary for similar facilities of like size and operation in accordance with generally accepted insurance industry standards. The replacement value of the buildings and other insurable improvements constituting the Shopping Center shall be re-evaluated from time to time at the request of either Landlord or Tenant.

<div align="center">

ARTICLE 11
FIRE AND OTHER CASUALTY; EMINENT DOMAIN

</div>

Section 11.1   <u>Fire and Other Casualty</u>.

11.1.1 (a)      Except as otherwise provided in this Section 11.1.1, if all or a portion of the Premises, the Common Areas or other buildings, including all improvements thereto, in the Shopping Center shall be damaged by fire or other casualty, Landlord shall promptly (x) rebuild and restore the Premises and the Common Areas to the condition existing immediately prior to such fire or other casualty (which restoration shall not include Tenant's Property), and (y) rebuild and restore all buildings and improvements located within the *"Primary Restoration Area"* (as designated on <u>Exhibit B</u> hereto) to substantially the condition in which same existed immediately prior to such fire or other casualty so that same shall be occupied or ready for occupancy following reconstruction (all of the foregoing work is hereinafter referred to as the *"Primary Restoration"*). With respect to buildings or improvements within the Shopping Center which are damaged by fire or other casualty but which are not required to be restored by Landlord as part of the Primary Restoration, Landlord shall promptly either (aa) rebuild and restore all or portions of the same to substantially the condition in which they existed immediately prior to such fire or other casualty, or (bb) raze the remaining portions of such buildings or improvements not rebuilt, remove all debris resulting therefrom, and pave such areas for parking or landscape such areas in a sightly manner (all of the foregoing work is hereinafter referred to as the *"Secondary Restoration"*). The proceeds of the policies required to be obtained and maintained by Landlord pursuant to Section 10.3 hereof shall, to the extent necessary, be used for the performance of the Primary Restoration and the Secondary Restoration (it being agreed that subject to the provisions of this Lease, such proceeds delivered to Landlord's Mortgagee may be disbursed in accordance with such Mortgagee's commercially reasonable disbursement requirements); in the event such insurance proceeds are insufficient to complete such work, Landlord shall provide the balance of the amount necessary to rebuild or restore the Shopping Center in the manner provided in this Section

(b)      Notwithstanding the foregoing, if any portion of the Premises are so damaged or destroyed, Tenant shall have the right to require Landlord to make changes to the Premises in the course of, and as part of, such rebuilding or restoration work. If the net cost and expense of such rebuilding or restoration work is increased solely as a result of such changes

<div align="center">26</div>

(taking into consideration any and all actual reduced and additional costs resulting from such changes and/or other cost savings arising therefrom), then Tenant shall pay to Landlord, as Additional Rent, the amount of such net increase, which amount shall be due and payable within ▆▆▆▆▆▆▆ after Landlord has delivered to Tenant backup information evidencing such increase (including, without limitation, receipted invoices) as may be reasonably required by Tenant (but in no event earlier than the occurrence of the date on which possession of the restored areas of the Premises are delivered to Tenant).  To the extent that Landlord's substantial completion of such rebuilding or restoration work is delayed solely as a result of such changes (taking into consideration any and all reasonable time savings to Landlord resulting from such changes), then the applicable period(s) specified in Section 11.1.2 below shall be appropriately adjusted to the extent of such net delay.

(c)     If, in Tenant's reasonable judgment, any damage to the Premises renders all or any portion of the Premises unusable for the conduct of Tenant's business or, in the case of damage to the Shopping Center, materially interferes with the normal conduct of any business operations in the Premises, the Rent shall be equitably reduced or totally abated based upon the extent to which the remaining portion of the Premises may, in Tenant's reasonable judgment, be utilized for its normal conduct of business.

11.1.2  In the event that:

(a)     Landlord does not commence the repair and restoration work to the Premises, the Common Areas or other buildings and improvements in the Primary Restoration Area as required pursuant to this Section 11.1 within ▆▆▆▆▆▆▆ after the date of such destruction, or thereafter fails to diligently pursue the completion of such repair and restoration work (subject to such period as may be reasonably necessary for the adjustment of insurance proceeds, not to exceed thirty (30) days in the aggregate); or

(b)     the required repairs and restorations to the Premises, the Common Areas or other buildings and improvements in the Primary Restoration Area are not Substantially Completed by Landlord in accordance with the provisions of this Section 11.1 within ▆▆▆▆▆ after the date of the commencement of the work (which period may be extended by reason of an event of *Force Majeure*, not to exceed ninety (90) days in the aggregate, provided that Landlord shall have given Tenant notice thereof promptly after its occurrence),

then, in either of such events, Tenant shall have the right, at its sole discretion and option, to:

(i)     after giving ▆▆▆▆▆▆▆ prior notice to Landlord (and Landlord's continued failure to commence and diligently pursue such repairs and restoration work to completion), perform or complete, as the case may be, said work (or any portion thereof) on Landlord's behalf and at the sole cost of Landlord, which cost Landlord shall pay to Tenant during the course of such repairs within ▆▆▆▆▆ after Tenant's delivery to Landlord of an invoice therefor and, in default of any such payment, Tenant shall have the right to offset the amount thereof, together with interest at the Lease Interest Rate, against the Rent next accruing hereunder in the manner and subject to all the provisions set forth in Section 16.2 below (it being agreed, without limiting the foregoing provisions of this Subsection 11.1.2, that at Tenant's election all insurance proceeds paid or payable to Landlord or Landlord's Mortgagee pursuant to Subsection 10.3 hereof shall be paid (or, as applicable, in turn delivered) directly to Tenant, to be applied to such work by Tenant as same is being performed); or

(ii)     seek to obtain specific performance of Landlord's repair and restoration obligations pursuant to the laws of the state in which the Shopping Center is located; or

(iii)     terminate this Lease by ▆▆▆▆▆▆ notice to Landlord.

In addition to the foregoing, if, in the opinion of an independent licensed architect designated by Tenant (and reasonably acceptable to Landlord), the required repairs and restorations to the Premises, the Common Areas or other buildings and improvements in the Primary Restoration Area cannot be completed by Landlord in accordance with the provisions of this Section 11.1

27

within ▐▁▁▁▁▐ after the date of destruction, Tenant shall have the right, at its sole discretion and option, to terminate this Lease by giving Landlord at least ▐▁▁▁▁▁▐ notice thereof.

11.1.3  If the Premises are substantially destroyed by fire or other casualty during the last ▐▁▁▁▁▐ of the Term to the extent of more than ▐▁▁▁▁▐ of the Floor Area thereof, Landlord or Tenant shall each have the right to terminate this Lease as of the date of such damage or destruction by giving notice within ▐▁▁▁▁▐ following such damage or destruction, but Tenant may negate any termination by Landlord by agreeing to extend the Term for an additional ▐▁▁▁▐ period by exercising an option pursuant to Subsection 2.2.2 hereof, if available, within ▐▁▁▁▐ after receipt of the termination notice from Landlord.

Section 11.2   Eminent Domain.

11.2.1  As used in this Section 11.2, *"Taking"* or *"Taken"* shall mean a taking for any public or quasi-public use by any lawful power or authority by exercise of the right of condemnation or eminent domain or by agreement between Landlord and those having the authority to exercise such right.

11.2.2  If all of the Premises shall be Taken, this Lease shall terminate as of the date of vesting of title or transfer of possession, whichever is earlier, without further liability on the part of either Landlord or Tenant, except for an adjustment between the parties for the Rent payable by Tenant hereunder.

11.2.3  In the event that:

(a)  any portion of the Premises shall be Taken so that it is commercially unreasonable or unfeasible for Tenant, in its reasonable judgment, to conduct its normal business in the Premises;

(b)  as a consequence of any Taking: (i) portions of the Shopping Center shall be divided or separated in any manner that it materially interferes with parking, visibility, or access to the Premises from other portions of the Shopping Center, or (ii) the Shopping Center no longer has an entrance from 45 Street and Bellview Road, where shown on Exhibit B, and as a result, in either case, it is not commercially reasonable or feasible for Tenant, in its reasonable judgment, to conduct its normal business in the Premises;

(c)  there occurs, in Tenant's reasonable judgment, a denial of adequate access to the Shopping Center at the grade of any street adjoining the Shopping Center or to any easement granted under this Lease, whether or not a Taking shall have occurred;

(d)  any portion of the Shopping Center shall be Taken which materially interferes with parking, visibility or access to the Premises, and as a result of such taking it is commercially unreasonable or unfeasible for Tenant, in its reasonable judgment, to conduct its normal business in the Premises;

(e)  more ▐▁▁▁▁▁▁▐ of the total Floor Area of all of the buildings in the Shopping Center (other than the Premises) are Taken; or

(f)  ▐▁▁▁▁▁▁▁▁▁▐ located in the Common Areas are Taken, or if so many of the parking spaces in the Shopping Center are Taken such that there are fewer than (▐▁▁▁▁▁▁▁▁▁▁▐ ▐▁▁▁▁▐ Floor Area in the Shopping Center, or (ii) the number of parking spaces required by applicable Legal Requirements;

then, in any of such events, Tenant shall have the right to terminate this Lease by giving at least ▐▁▁▁▁▐ prior notice to Landlord within ▐▁▐ ▐▁▁▁▐ of any such event, in which event this Lease shall terminate without any further liability on the part of either Landlord or Tenant, except for an adjustment between the parties as of the date of the Taking for any prepaid or accrued Rent or other amounts due hereunder by one party to the other and for payment to Tenant for its share of the award for the taking pursuant to Subsection 11.2.5 below.  Upon any partial Taking of the Premises, the Rent shall be equitably reduced or totally abated based upon the extent to which the remaining portion of the Premises may, in Tenant's reasonable judgment, be utilized for its normal conduct of business.

28

11.2.4 If this Lease is not terminated pursuant to this Section 11.2, Landlord, at its sole cost and expense, within a reasonable period of time after such Taking, shall repair and restore the area not so Taken to tenantable condition, similar in physical appearance to the condition of the area immediately prior to the Taking, pursuant to plans and specifications approved by Tenant (which repair and restoration shall, as applicable, include all Tenant's Work and all other leasehold improvements performed by Tenant; provided, however, that Landlord shall not be obligated to repair or restore Tenant's Property), and any and all amounts awarded to Landlord for any Taking shall be made available to and used by Landlord for any rebuilding or restoration which it is required to perform hereunder. During the period of such repairs and restoration, all Rent shall equitably be reduced or abated to the extent that the Premises may not, in Tenant's reasonable judgment, be used by Tenant for the normal conduct of its business. Such reduction or abatement shall terminate in accordance with the terms of Section 11.3 below. Landlord shall give Tenant at ▮▮▮▮▮▮▮▮▮▮▮▮▮ prior notice of the date on which the restoration work to the Premises will be Substantially Completed.

11.2.5 In connection with any Taking or partial Taking of the Premises, Tenant shall be entitled to claim an award for loss of business, leasehold improvements, fixtures and equipment and removal and reinstallation costs; provided, however, that no award shall be payable to Tenant which reduces the award payable to Landlord for its fee interest in the Premises.

11.2.6 Any dispute between the parties with respect to this Section 11.2 shall be resolved by arbitration in accordance with the provisions of Section 16.3 below.

Section 11.3    Abatement of Rent Charges. Notwithstanding any other provisions of this Lease, if the Fixed Rent and Additional Rent payable by Tenant hereunder shall be reduced or abated pursuant to Sections 11.1 or 11.2 above, such reduction or abatement shall terminate upon the first to occur of: (a) the date on which Tenant shall reopen the Premises to the general public for business; or (b) the expiration of the period which is ▮▮▮ ▮▮▮▮▮▮ after the date on which Landlord shall complete such repairs and restoration work as Landlord is obligated to perform hereunder.

ARTICLE 12
COVENANTS, REPRESENTATIONS AND WARRANTIES

Section 12.1    Quiet Enjoyment. Tenant shall peaceably and quietly have, hold, occupy and enjoy the Premises for the Term, without hindrance from Landlord or any party claiming by, through, or under Landlord.

Section 12.2    Authority. Tenant and Landlord each warrant and represent that the person(s) signing this Lease on their behalf has authority to enter into this Lease and to bind Tenant and Landlord, respectively, to the terms, covenants and conditions contained herein. The submission of this Lease to each party hereto shall be for examination and negotiation purposes only, and does not and shall not constitute a reservation of or an obligation of Tenant to lease, or otherwise create any interest of Tenant in, the Premises or any other premises situated in the Shopping Center unless and until the Lease is fully executed and delivered by Tenant and Landlord.

Section 12.3    Landlord's Covenants, Warranties and Representations. To induce Tenant to execute this Lease, and in consideration thereof, Landlord covenants, warrants and represents to Tenant as follows:

(a)    As of the Effective Date, Landlord has, and as of the Delivery Date Landlord shall have, good and marketable fee simple title to the entire Shopping Center, free and clear of all easements, restrictions, liens, encumbrances, leases and the like, except for the encumbrances described on Exhibit E hereto;

(b)    In the event the legal description of the Shopping Center described in Exhibit A hereto indicates that the Shopping Center is composed of more than one parcel or lot, Landlord represents that there exist no strips or gores between such parcels or lots which are not owned by Landlord;

29

(c)    No third party consents or approvals are required in order for Landlord to enter into this Lease, or for the performance of Landlord's Work and Tenant's Work (excluding, as of the Effective Date, governmental permits and approvals);

(d)    Tenant's use of the Premises for sale of "Permitted Items" (defined in Section 1.1.27 above) will not violate any exclusive provision or prohibited use restriction granted to any other tenant or occupant in the Shopping Center;

(e)    The Shopping Center now has, and, on the Delivery Date, shall have, access to 45 Street and Bellview Road for the purpose of vehicular traffic;

(f)    This Lease does not violate the provisions of any instrument heretofore executed and/or binding on Landlord, or affecting or encumbering the Shopping Center, or the Premises, and no rights granted by Landlord to Tenant under the terms of this Lease conflict with any rights granted by Landlord to any tenant or occupant in the Shopping Center (including, without limitation, any rights of first offer or first refusal or the like);

(g)    There shall be no restrictions or other legal impediments imposed by any public or private instrument which would prevent: (i) the use of the Premises for the Permitted Use; (ii) the use of the parking facilities, access roads, and other Common Areas in the manner contemplated by this Lease; or (iii) the performance of Tenant's Work;

(h)    Attached hereto as Exhibit K-2 is a complete list of all fully executed and delivered leases and other occupancy agreements in effect on the Effective Date with respect to the Power Center (the *"Existing Leases"*) and Landlord represents to Tenant that with respect to the lease with Lifeway Christian Store, such lease provides that the tenant may use its premises as a Christian bookstore and for no other purpose (and Landlord agrees that in the event that the lease between Landlord and Lifeway Christian Store requires the consent of Landlord to (i) any assignment or subletting or to a change in the use of the premises and/or (ii) an expansion of the premises, in each case for the sale, rental, or distribution of the Exclusive Items (as defined in Section 13.2.1(I) hereof), Landlord shall withhold its consent thereto);

(i)    As of the Effective Date, there are no sign ordinances, restrictive covenants, uniform sign plans or other signage restrictions which would prevent the Premises from having the signage (including, without limitation, the square foot area and size of letters) as depicted on Exhibit D-1 and Exhibit F hereof;

(j)    As of the Effective Date, there is no "Related Land" (defined in 13.2.1 below) other than the Promenade; and

(k)    Landlord shall promptly forward to Tenant any notice or other communication received by Landlord from any owner of property adjoining or adjacent to the Shopping Center or from any municipal or other governmental authority, in connection with any hearing or other administrative proceeding relating to any proposed zoning, building code, signage, or related variance affecting the Shopping Center or any adjoining or adjacent property, which, if granted, could adversely affect Tenant's use or occupancy of the Premises, the conduct of Tenant's business therein, or Tenant's rights and benefits under this Lease. If requested by Tenant to do so, Landlord, at its sole cost and expense, shall appear in such proceeding and shall contest such proposed variance. If Landlord fails so to appear and contest such proposed variance after receiving five (5) days' prior notice from Tenant, then Tenant shall be entitled (but shall not be obligated to), in its own name and/or in the name of Landlord (if required by the governmental authority in question), appear in such proceeding, in which event Landlord shall fully cooperate with Tenant, provide such information, and execute any documents or other instruments as Tenant may reasonably request in connection with any such proceeding.

Section 12.4    Environmental Matters.

12.4.1    Definitions.

(a)    As used herein, the term *"Environmental Laws"* shall mean any and all Legal Requirements concerning the protection of the environment, human health or safety.

(b)    As used herein, the term *"Hazardous Substances"* shall mean each and every element, compound, material, mixture, substance, waste, hazardous substance, hazardous waste, hazardous material, toxic substance, pollutant or contaminant either as those terms are defined in any of the Environmental Laws or the presence of which may cause liability

30

at common law, including, without limitation, asbestos and/or asbestos-containing products, whether or not currently friable.

(c)     As used herein, the term *"Environmental Notice"* shall mean a summons, citation, directive, order, claim, notice, litigation, investigation, judgment, legal pleading, letter or other communication, written or oral, actual or threatened, from the United States Environmental Protection Agency or other federal, state or local governmental agency or authority, or any other private individual or entity concerning (i) any Hazardous Substances at, on, in, under or emanating from the Premises, the Shopping Center or any contiguous property; (ii) any violation or potential violation of Environmental Laws at the Premises, the Shopping Center or any contiguous property; or (iii) any underground storage tanks on the Premises or the Shopping Center.

(d)     As used herein, the term *"Releasing"* or *"Release"* shall mean releasing, spilling, leaking, discharging, disposing or dumping or otherwise introducing any substance into the environment or into any building or other improvements in violation of Environmental Laws.

(e)     As used herein, the term *"Compliance Costs"* shall mean any and all costs incurred by a party in complying with applicable Environmental Laws, including, without limitation, consultant's and engineer's fees; laboratory costs; contractor's and subcontractor's fees; application and filing fees; costs of investigation, monitoring or cleanup of soil or other substrate, surface water, groundwater, or buildings or other improvements; equipment costs; disposal fees; costs of operation and maintenance of equipment; legal fees; other governmental fees or costs; interest at the Lease Interest Rate from the date of expenditure until paid in full; and other similar or related costs.

(f)     As used herein, the term *"Tenant Related Parties"* shall mean Tenant's agents, servants, employees, contractors, sublessees, concessionaires or licensees.

12.4.2  Compliance with Environmental Laws.  Tenant shall comply with all applicable requirements of Environmental Laws governing its use of, and operations at, the Shopping Center and the Premises.  Landlord shall comply with all applicable requirements of Environmental Laws relating to the Shopping Center and the Premises, except to the extent such requirements arise from Tenant's operations thereon or repairs which are Tenant's obligations under this Lease.  Tenant shall comply with such requirements with respect to the foregoing excepted items.

12.4.3  Responsibility for Releases of Hazardous Substances.  Notwithstanding any other provision of this Lease, Tenant shall only be liable for any Release of Hazardous Substances at, on, in, under or emanating from the Premises or Shopping Center which were caused by Tenant or Tenant Related Parties (hereinafter *"Tenant Releases"*), including, without limitation, any Compliance Costs required to address Tenant Releases.  Landlord shall be liable for any Hazardous Substances at, on, in, under or emanating from the Premises or Shopping Center, including, without limitation, any Compliance Costs attributable to such Hazardous Substances, unless the Hazardous Substances are caused by Tenant Releases.  Except in the event of an emergency, any work performed by Landlord relating to Hazardous Substances shall be performed by Landlord at any time other than during the months of August, November and December, and shall be undertaken in such a manner so as to (i) not adversely affect ingress to or egress from the Shopping Center, (ii) have no adverse effect on the visibility of the Premises or any signs which contain Tenant's name, and (iii) not otherwise materially interfere with the normal conduct of any business operations in the Premises.

12.4.4  Standards.  Except as expressly provided herein, the parties agree that any investigation or remediation of Hazardous Substances, or cure of a violation of Environmental Laws, required to be conducted at the Premises or Shopping Center shall be no more stringent than necessary to meet the minimum standards of Environmental Laws applicable to properties used in the manner the Shopping Center is being used.

12.4.5  Landlord's Representations and Warranties.  Landlord represents and warrants that: (i) Landlord has received no Environmental Notices concerning the Shopping Center, the Premises or any contiguous properties; (ii) Landlord has no knowledge of, and has received no notice of, any violation, or potential or alleged violation, of any Legal Requirement, including, without limitation, Environmental Laws, affecting the Shopping Center, the Premises

31

or any contiguous properties, regardless of whether same has been cured; and (iii) to the best of Landlord's knowledge: (A) no Hazardous Substances are located at, on, in, under or emanating from the Shopping Center, the Premises or any contiguous properties; and (B) no underground storage tank exists at the Shopping Center or the Premises. The foregoing representations and warranties shall in no way serve to vitiate Landlord's obligations under this Article 12.

12.4.6 Documents. Each party shall immediately notify the other party of the notifying party's receipt of an Environmental Notice.

12.4.7 Indemnity. Each party to this Lease shall indemnify, defend and hold the other party, and its agents, servants, shareholders, directors, officers, partners, members and employees harmless from any and all claims, losses, expenses, costs, lawsuits, actions, administrative proceedings, damage, orders, judgments, penalties and liabilities of any nature whatsoever, including, without limitation, reasonable attorneys' fees (incurred to enforce this indemnity or for any other purpose) and Compliance Costs, arising from (i) the indemnifying party's breach of any of its representations, warranties, covenants or other obligations under this Section 12.4; (ii) Hazardous Substances for which the indemnifying party is liable under this Section 12.4; or (iii) violations of Environmental Laws for which the indemnifying party is liable under this Section 12.4.

12.4.8 Survival. The obligations of the parties under this Section 12.4 shall survive the renewal, expiration, breach or earlier termination of this Lease.

12.4.9 Conflict. In the event of any conflict between the provisions of this Section 12.4 and any other provision of this Lease, the provisions of this Section 12.4 shall control.

Section 12.5    OEA.

12.5.1 As used in this Lease, the term *"OEA"* shall mean that certain Construction, Operation and Reciprocal Easement Agreement, dated May 16, 2006, as recorded on May 19, 2006 in Book 2006 at Page 129634 in the County of Benton, State of Arkansas, whose current parties are Rogers Retail L.L.C. and Dillard's Dollars, Inc.

12.5.2 Landlord covenants, represents and warrants to Tenant that: (i) the OEA has not been modified, amended or terminated; (ii) the OEA is currently in full force and effect; (iii) to its actual knowledge as of the date hereof, no default under the OEA exists beyond any applicable notice and cure period; and (iv) the OEA is, and shall remain, superior in lien to all mortgages and related liens affecting the Shopping Center and all other land which is encumbered by the OEA. Landlord and Tenant each acknowledge that this Lease is made and shall continue to be subject and subordinate to the OEA, as same may be modified, supplemented or amended, subject to the provisions of this Section 12.5. Subject to the provision of this Section 12.5, Tenant shall comply with the terms and conditions of the OEA, as same may be modified, supplemented or amended, to the extent same affects the Premises (it being agreed that Tenant shall not be obligated to expend any sums in connection with the compliance by Landlord of its obligations under the OEA).

12.5.3 Landlord shall, during the Term: (i) perform and observe all of the terms, covenants, provisions and conditions of the OEA on Landlord's part to be performed and observed; (ii) defend, indemnify and hold harmless Tenant from and against any and all claims, demands, causes of action, suits, damages, liabilities, and expenses of any nature arising out of or in connection with the enforcement of, or a claimed breach by, Landlord of any covenant, term, condition, or provision of the OEA; and (iii) diligently enforce, at its sole expense, the covenants, agreements, and obligations of the OEA to the extent necessary to prevent an adverse affect upon Tenant's rights under this Lease, Tenant's Work, Tenant's use and occupancy of the Premises or the conduct of Tenant's business therein.

12.5.4 Whenever, pursuant to the OEA, the consent or approval of Landlord shall be required by or requested, and such consent or approval could diminish the rights or increase the obligations of Tenant thereunder or under this Lease in any material respect, or could adversely affect Tenant's use or occupancy of the Premises in any material respect, or the conduct of Tenant's business therein, such consent or approval shall not be granted without the prior consent of Tenant, which consent may be withheld in its sole and absolute discretion.

32

12.5.5 Landlord shall, promptly upon receipt, forward to Tenant and Tenant's leasehold mortgagee (provided that Landlord has been given notice of the name and address of such leasehold mortgagee), if any, a copy of any and all notices and/or demands received by Landlord under or pursuant to the OEA, which relate to, or could adversely affect, Tenant's use or occupancy of the Premises, the conduct of Tenant's business therein, or Tenant's rights pursuant to this Lease.

12.5.6 Landlord shall not amend, or modify the OEA if such amendment or modification could diminish the rights or increase the obligations of Tenant thereunder or under this Lease in any material respect, or could adversely affect Tenant's use or occupancy of the Premises in any material respect or the conduct of Tenant's business therein, nor shall Landlord terminate the OEA.

12.5.7 In the event Landlord defaults in the performance of any of its obligations under the OEA or fails to enforce the obligations of any other obligee under the OEA, and such default or failure to enforce could adversely affect Tenant's rights thereunder or under this Lease, Tenant's Work, Tenant's use or occupancy of the Premises or the conduct of Tenant's business therein, Tenant may, but shall not be obligated to, after thirty (30) days written notice (except in the event of emergency, in which case no notice shall be required) cure any default by Landlord under the OEA and/or enforce, in Landlord's name, at Landlord's expense, the obligations of any other obligee under the OEA. Landlord shall, upon demand, reimburse Tenant for the costs incurred by Tenant in performing any of Landlord's obligations under the OEA or enforcing the obligations of any obligee under the OEA, together with interest thereon at the Lease Interest Rate, and failing such reimbursement, Tenant shall have the right (in addition to any rights and remedies to which it may be entitled under this Lease, at law, or in equity), upon ten (10) days' prior notice to Landlord, to offset such costs from the next succeeding payment or payments of any Rent due hereunder, together with interest thereon at the Lease Interest Rate from the date of outlay until reimbursement or full satisfaction by credit.

12.5.8 As between Landlord and Tenant, in the event of any conflict between either of the OEA and this Lease, this Lease shall in all respects control.

12.5.9 Landlord represents to Tenant that Landlord has obtained third-party approvals, if any, which may be required under the OEA for the performance of Landlord's Work (including, without limitation, Tenant's elevations and signage, as shown on Exhibit D-1 and Exhibit F hereto), and the operation of Tenant's business in the Premises.

ARTICLE 13
USES AND RESTRICTIONS

Section 13.1   Permitted and Prohibited Uses.

13.1.1 Tenant's Permitted Use. The Premises may be used and occupied for the Permitted Use (defined in Subsection 1.1.27 above). Tenant shall not use the Premises (a) for any of the "Prohibited Uses" (defined in Exhibit L hereto) or (b) in violation of any of the "Existing Exclusives" (hereinafter defined in Subsection 13.3.1), to the extent then applicable.

13.1.2 Prohibited Uses. Landlord shall construct, lease, operate, maintain and manage the Shopping Center as a first-class shopping center comparable to other first-class shopping centers in the state in which the Shopping Center is located. Landlord shall not lease, rent or occupy or permit any portion of the Power Center to be occupied (except to the extent otherwise permitted under any lease for space in the Power Center existing as of the Effective Date or otherwise permitted in Exhibit L) for any of the "Prohibited Uses" (defined in Exhibit L hereto annexed).

Section 13.2   Tenant's Exclusive in Center. To induce Tenant to execute this Lease, and subject to all of the terms and provisions of this Section 13.2, Landlord covenants and agrees as follows.

13.2.1 (I)   Landlord shall not lease, rent or occupy or permit any other premises in the Power Center to be occupied, whether by a tenant, sublessee, assignee, licensee or other occupant or itself, for the sale, rental or distribution, either singly or in any combination, of items contained in any of the following respective categories of merchandise: (a) linens and domestics; (b) bathroom items (excluding plumbing hardware); (c) housewares (excluding

33

furniture, and major appliances or "white goods"); (d) frames and wall art (provided that a fine art gallery shall not be precluded); (e) window treatments; and/or (f) closet, shelving and storage items (which items, either singly or in any combination, are hereinafter referred to as the *"Exclusive Items"*). Notwithstanding the foregoing, (A) any tenant or subtenant in the Power Center shall have the right to utilize its respective premises for the incidental sale, rental and/or distribution of Exclusive Items within an aggregate area (which shall include an allocable portion of the aisle space adjacent to such sales, rental or distribution area) not to exceed the lesser of (x) ten percent (10%) of the Floor Area of such tenant's or subtenant's premises, or (y) two thousand (2,000) square feet of Floor Area within such tenant's or subtenant's premises (such lesser amount herein defined as the *"Incidental Sales Limitation"*). [For example only, a tenant occupying premises containing a total of five thousand (5,000) square feet of Floor Area could sell Exclusive Items (either singly or in any combination) so long as the aggregate area within its entire demised premises in which any and all Exclusive Items are sold shall not exceed five hundred (500) square feet.]

(II)    Subject to the rights of tenants in the Promenade under leases executed prior to the Effective Date, Landlord and Landlord's Affiliate (Rogers Retail LLC) shall not lease, rent or occupy or permit any other premises consisting of 10,000 square feet or more of Floor Area and located in the Promenade or on Related Land to be occupied, whether by a tenant, sublessee, assignee, licensee or other occupant or itself, as a store whose primary use is for the sale, rental or distribution, either singly or in any combination, of the Exclusive Items or is otherwise a "Direct Competitor" of Tenant. For purposes hereof, a *"Direct Competitor"* shall mean a retail operation that, as its primary use, sells goods and services that are substantially similar to all or substantially all of the Exclusive Items [such as, by way of illustration only, Linens 'n Things, TJ Maxx and More, Mega Marshalls and/or Home Goods]. As used herein, *"Related Land"* shall mean any land contiguous or adjacent to the Shopping Center (including, without limitation, any land that would be contiguous or adjacent to the Shopping Center but for any intervening road, street, alley or highway) now or hereafter owned or controlled by Landlord or its Affiliate(s). Existing tenants of the Promenade (and current or future assignees or sublessees of such tenants) shall nevertheless be subject to the restrictions contained in this Section 13.2.1 (II) in the event that: (i) the lease between Landlord or Landlord's Affiliate and any such existing tenant requires the consent of Landlord (or its Affiliate) to any assignment or subletting or to a change in the use of the applicable premises to permit the sale, rental or distribution of the Exclusive Items or (ii) Landlord or its Affiliate permits or agrees to an expansion of the applicable premises for the sale, rental, or distribution of the Exclusive Items and such expansion requires the consent of Landlord or its Affiliate.

13.2.2 The restrictions set forth in Subsection 13.2.1 above shall not apply to a full-line national or regional: (i) department store [for example, Dillards, Younkers, Wal-Mart, Macy's, or Target], (ii) discount club [for example, Costco, BJ's Wholesale Club, or Sam's Club], or (iii) home improvement center [for example, Home Depot or Lowe's], commonly located in first-class shopping centers in the state in which the Shopping Center is located, each occupying at least 65,000 square feet of Floor Area within the Shopping Center, as such stores are currently operated (as of the Effective Date). In addition, if Landlord enters into a lease for premises in the Shopping Center or Related Land with T.J. Maxx (but not Home Goods or T.J. Maxx & More or similar operations), Gordmans, Michaels, Ross Stores, or Steinmart within twelve (12) months of the Effective Date, then Tenant agrees, promptly following notice thereof from Landlord, to execute and deliver an agreement modifying the applicability of the provisions of Section 13.2.1 hereof with respect to such retailers, such agreement to be in the form, if any, then commonly used by Tenant with respect to such retailers.

13.2.3 The exclusive rights granted to Tenant in this Section 13.2 shall inure to the benefit of any assignee of Tenant's interest in this Lease and to any sublessee of at least fifty percent (50%) of the Floor Area of the Premises.

13.2.4 (a)    Upon breach of the aforesaid covenants and agreements by Landlord or Landlord's Affiliate (as the case may be)(which breach shall not include a situation in which the lease between Landlord or Landlord's Affiliate, as the case may be, and any tenant in the Shopping Center or in the Related Land prohibits the tenant therein from violating the exclusive rights granted to Tenant in this Section 13.2 and despite such prohibition, such tenant violates such exclusive rights, unless Landlord or Landlord's Affiliate fails to comply with any of the provisions of subparagraph (b) below), the Rent payable hereunder shall be reduced by ███████████████ for so long as such violation shall continue, and Tenant shall have all remedies given to it at law and in equity, including, without limitation, the right to obtain injunctive relief, and/or to terminate this Lease, and/or to commence and prosecute an action against Landlord or Landlord's Affiliate or any other violator for damages.

(b)    If any person or entity other than Landlord or Landlord's Affiliate, as the case may be, shall violate any of the exclusive provisions herein set forth, or shall indicate in writing to Landlord or Landlord's Affiliate that it intends to violate any of said provisions, Landlord or Landlord's Affiliate, as the case may be, shall promptly commence appropriate legal proceedings, and vigorously prosecute the same, to enjoin and prohibit any such violation.  If Landlord or Landlord's Affiliate fails to promptly commence such proceedings, or shall fail thereafter to vigorously prosecute the same, then Tenant shall have the right (i) to conduct and prosecute such legal proceedings (including, without limitation, an action for injunctive relief) in its own name, at Landlord's or Landlord's Affiliate's expense, or (ii) in the event the right set forth in (i) above is not permitted to be exercised under applicable Legal Requirements, to conduct and prosecute such legal proceedings in the name of Landlord or Landlord's Affiliate, at Landlord's or Landlord's Affiliate's expense (as the case may be), and Landlord and/or Landlord's Affiliate (as the case may be) shall cooperate with Tenant with respect to such prosecution (including, without limitation, by executing any documentation or authorization reasonably required by Tenant in connection with such prosecution and by appearing at any hearing or trial with respect to such prosecution).

Section 13.3    Exclusives Which Tenant Must Honor.

13.3.1    Tenant shall honor only those exclusives granted by Landlord as set forth in Exhibit K-1 (hereinafter, *"Existing Exclusives"*) [a true and complete listing and description of such Existing Exclusives being attached hereto as Exhibit K-1], and shall not sublease, occupy or use all or any portion of the Premises, or permit all or any portion of the Premises to be occupied or used in violation of any such Existing Exclusive (except as may be specifically set forth on Exhibit K-1). Landlord represents and warrants that no Existing Exclusive(s) exist other than those listed on Exhibit K-1 hereto and that Exhibit K-1 is true accurate and complete, and covenants to indemnify, defend and hold Tenant harmless from and against all loss, cost, liability or expense (including, without limitation, reasonable legal fees) incurred by Tenant by reason of the enforcement by any person or entity of such unlisted Existing Exclusive. Notwithstanding the foregoing, (i) Tenant shall be entitled to enter into a separate agreement with any tenant or other occupant for whose benefit the Existing Exclusive is granted which nullifies or modifies the corresponding Existing Exclusive with regard to the Premises; and (ii) Tenant shall execute and deliver an agreement(s) in the form commonly used by Tenant as of the Effective Date of this Lease modifying the applicability of Tenant's exclusive relative to a retailer or retailers with whom Landlord enters into a lease at the Shopping Center within one (1) year after the Effective Date, provided Tenant has such an agreement with such retailer as of the Effective Date.

13.3.2    Except as expressly set forth in this Section 13.3, Tenant shall not be obligated to honor any exclusive granted by Landlord to any tenant in the Shopping Center.

ARTICLE 14
CONDUCT OF BUSINESS OPERATIONS

Subject to the other provisions of this Lease (including, without limitation, Articles 2 and 3 hereof) Tenant shall initially open its store for business to the public in the Premises as a typical Bed Bath & Beyond store for at least one (1) day, not later than the ▮▮▮▮▮▮▮▮ after the Rent Commencement Date (which date shall, as applicable, be extended by reason of (A) damage or destruction, eminent domain proceedings or actions, or *Force Majeure*, or (B) the acts or omissions of Landlord). Other than as expressly set forth in the preceding sentence, Tenant shall have no obligation to open or operate any business in the Premises, and shall have the right, at any time, to cease to conduct any business operations in the Premises, and Tenant shall incur no liability to Landlord or its Mortgagee by reason thereof (it being understood and agreed that all of Tenant's obligations under this Lease shall continue unless this Lease is terminated pursuant, *inter alia*, to the further provisions of this Article 14 or any other provision of this Lease [other than by reason of an Event of Default]).  In the event Tenant does not operate or cause to be operated any retail business in the Premises (other than prior to the Rent Commencement Date or during Excused Periods) for more than ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ Landlord shall have the option to terminate this Lease, which option shall be exercisable by

(A)    giving notice thereof to Tenant by not later than the ninetieth (9▮▮ ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, and

(B)    paying to Tenant, within thirty (30) days after such notice is given, all of Tenant's costs and expenses incurred in connection with the preparation and review of plans and specifications for, and the then unamortized costs (amortized on a straight-line basis over the

35

Initial Term) of, any alterations or improvements made by Tenant and permitted under this Lease,

whereupon this Lease shall terminate upon the sixtieth (60th) day (the *"Recapture Date"*) after the date on which Tenant receives Landlord's termination notice, as if the Recapture Date was originally set forth herein as the expiration date of the Term. Upon such termination, Landlord and Tenant shall each be released from any and all liabilities thereafter accruing hereunder, except for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease. All Rent payable by Tenant hereunder shall be apportioned as of the Recapture Date and Tenant shall promptly pay to Landlord any amounts so determined to be due and owing by Tenant to Landlord, and conversely Landlord shall promptly reimburse Tenant for any amounts prepaid by Tenant for periods subsequent to the Recapture Date.

ARTICLE 15
TENANT ASSIGNMENT AND SUBLETTING

Section 15.1   <u>Assignment and Subletting</u>.

15.1.1   Tenant shall have the right from time to time, without the consent of Landlord, to assign Tenant's interest in this Lease and/or to sublet, concession or license all or any portion of the Premises for retail uses (other than in the Non-Sales Area), subject to all of the terms and conditions of this Lease including, without limitation, the provisions of Section 13.1.1 above.

15.1.2   Except with respect to any transaction covered under Subsection 15.1.3 or Section 15.3 below, in the event Tenant proposes to assign this Lease or sublet, in a single transaction, the whole of the Premises, it shall first give notice thereof (the *"Assignment/Subletting Notice"*) to Landlord, which notice shall specify the name and address of the proposed assignee or sublessee and the proposed use of the Premises to be made by such assignee or sublessee, together with a statement certified by Tenant of the amount of the then unamortized costs (amortized on a straight-line basis over the Initial Term) of any alterations performed by Tenant to the Premises. Thereafter, Landlord shall have the option to terminate this Lease, which option shall be exercisable by

(a)   giving notice to Tenant (the *"Termination Notice"*) thereof within thirty (30) days after receipt of an Assignment/Subletting Notice from Tenant, and

(b)   paying to Tenant, within thirty (30) days after such notice is given, an amount equal to the sum of all of Tenant's costs and expenses incurred in connection the preparation of plans and specifications for, and the then unamortized costs (amortized on a straight-line basis over the Initial Term) of, any alterations performed by Tenant to the Premises,

in which event this Lease shall automatically terminate on the ninetieth (90th) day (the *"Termination Date"*) after the date on which Tenant receives Landlord's Termination Notice, with the same force and effect as if the Termination Date had been designated as the expiration date of this Lease. Upon the Termination Date, Landlord and Tenant shall each be released from any and all liabilities thereafter accruing hereunder, except for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease. All Rent payable by Tenant hereunder shall be apportioned as of the Termination Date and Tenant shall promptly pay to Landlord any amounts so determined to be due and owing by Tenant to Landlord, and conversely Landlord shall promptly reimburse Tenant for any amounts prepaid by Tenant for periods subsequent to the Termination Date. Notwithstanding the foregoing, Tenant shall have the right to avoid Landlord's termination by giving notice to Landlord (the *"Rescission Notice"*), within ten (10) days after receiving the Termination Notice, of its rescission of the Assignment/Subletting Notice, whereupon Landlord's Termination Notice shall be rendered null and void, and Tenant shall not assign this Lease or sublet the whole of the Premises as proposed in its Assignment/Subletting Notice. If Landlord does not give the Termination Notice within the aforesaid 30-day period, Landlord shall conclusively be deemed to have waived its termination rights hereunder with respect to such proposed assignment or subletting transaction, and Tenant may assign this Lease or sublet the entire Premises in accordance with its Assignment/Subletting Notice. Landlord shall not be bound by any such assignment until it receives an assumption agreement in which the assignee expressly agrees,

36

effective upon the date of such assignment, to perform and be bound by all of the obligations of this Lease to performed by Tenant hereunder.

15.1.3   In addition to, and not in limitation of, Tenant's other rights set forth in this Section 15.1, Tenant shall have the right from time to time, without the consent of Landlord, to assign Tenant's interest in this Lease and/or to sublet or license all or any portion of the Premises: (a) to an Affiliate of Tenant; (b) to any entity which purchases all or substantially all of the assets of Tenant or any of its Affiliates; (c) to any entity which purchases Tenant's interest in at least five (5) stores owned or operated by Tenant or its Affiliate(s) in the State of Arkansas; (d) in conjunction with any merger, acquisition, consolidation or public offering of stock or other interests involving Tenant or its Affiliate(s); and/or (e) as may be required by any Legal Requirement.

Section 15.2   Liability of Tenant.   Unless otherwise agreed to in writing by Landlord, no assignment, subletting, licensing or concessioning by Tenant shall reduce, diminish, or otherwise affect the liability of Bed Bath & Beyond Inc. (the *"Original Tenant"*).

Section 15.3   Collateral Assignment.   In addition to Tenant's other rights set forth in this Article 15, a collateral assignment of Tenant's interest in this Lease by Tenant to one or more "Lenders" (hereinafter defined), as collateral security for an indebtedness or other obligation of Tenant or its Affiliates shall be permitted provided that Landlord is given notice of the name and address of such Lender. Landlord shall execute all documentation reasonably requested by Tenant or any such Lender in connection therewith. In addition, Tenant shall have the right, without Landlord's consent, to grant to an Affiliate of Tenant a license to operate all of Tenant's business operations at the Premises, without such Affiliate having assumed any liability for the performance of Tenant's obligations under this Lease. As used herein, *"Lender"* shall mean a state or federally regulated: bank, savings and loan association, insurance company, pension fund, credit union, real estate investment trust, or other institutional lender.

Section 15.4   Cure Rights of Original Tenant.

15.4.1   If Tenant assigns Tenant's interest in this Lease pursuant to the provisions of Section 15.1, then Landlord, when giving notice to said assignee or any subsequent assignee in respect of any default, shall also give a copy of such notice to the Original Tenant, and no notice of default shall be effective until a copy thereof is so given to Original Tenant. Original Tenant shall have the same period after receipt of such notice to cure such default as is given to Tenant therefor under this Lease.

15.4.2   If this Lease is terminated because of: (a) an Event of Default of such assignee, or (b) the rejection, disaffirmation, or other termination of this Lease by or on behalf of the assignee pursuant to any proceeding in any bankruptcy under any Legal Requirement of any State or of the United States, or any other Legal Requirements affecting creditors' rights, then Landlord shall promptly give to Original Tenant notice thereof, and Original Tenant shall have the right, exercisable by notice given to Landlord within fifteen (15) days after receipt by Original Tenant of Landlord's notice, to enter into a new lease of the Premises with Landlord (*"New Lease"*), provided that the Original Tenant shall have remedied all Events of Default of the assignee hereunder, unless such Events of Default are not reasonably susceptible of cure by the Original Tenant, in which event the Original Tenant shall not be obligated to cure such Events of Default as a condition to the exercise of its rights under this Subsection 15.4.2. Upon the Original Tenant's curing of any such Event of Default of the assignee as aforesaid, Landlord shall assign to the Original Tenant all of Landlord's rights against such assignee (whether arising as a result of bankruptcy court proceedings or otherwise). The term of said New Lease shall begin on the date of termination of this Lease and shall continue for the remainder of the Term (including any Renewal Periods). Such New Lease shall otherwise contain the same terms and conditions as those set forth herein, except for requirements which are no longer applicable or have already been performed. It is the intention of the parties hereto that such New Lease shall have the same priority relative to other rights or interests in or to the Premises as this Lease. The provisions of this Subsection 15.4.2 shall survive the termination of this Lease and shall continue in full force and effect thereafter to the same extent as if this Subsection 15.4.2 were a separate and independent contract between Landlord and the Original Tenant. From the date on which the Original Tenant shall serve Landlord with the aforesaid notice of the exercise of its right to a New Lease, the Original Tenant shall have quiet and undisturbed use and enjoyment of the Premises and all appurtenances thereto, as contemplated in this Lease.

37

Section 15.5    Recognition Agreement. In the event Tenant subleases at least fifty percent (50%) of the Floor Area in the Premises for a term of at least five (5) years, then, notwithstanding any other provisions of this Lease, Landlord shall, upon Tenant's request, execute and deliver an agreement among Landlord, Tenant and each such subtenant in the form of Exhibit H hereto, in recordable form.

<div align="center">

ARTICLE 16
DEFAULT AND DISPUTE RESOLUTION

</div>

Section 16.1    Tenant Default.

16.1.1 If Tenant shall fail to: (i) pay any Rent when due, within ten (10) days after its receipt of notice thereof from Landlord specifying the amount and details of the unpaid Rent, or (ii) perform or observe any of the other covenants of this Lease on Tenant's part to be performed or observed within thirty (30) days after its receipt of notice thereof from Landlord specifying the nature of such default (or, if such default shall be of a nature that same cannot reasonably be cured within thirty (30) days and Tenant does not commence to cure such default on or before such thirtieth (30th) day and thereafter diligently prosecute said cure to completion), such circumstance shall constitute an *"Event of Default"*.

16.1.2 Upon an Event of Default, Landlord shall have all remedies given to it at law or in equity (except that Landlord hereby expressly waives any rights to accelerate any element of the Rent, and any right of distraint, which may be granted to it by law), including the following:

(a)      to bring suit for the collection of such unpaid Rent or for the performance of such other covenant of this Lease on Tenant's part to be performed; and/or

(b)      without waiving any non-monetary default, may (but shall not be obligated to) perform any covenant which is capable of being remedied by the performance of affirmative acts for the account and at the reasonable expense of Tenant (it being agreed that should Landlord require access to the Premises in order to perform such covenant as aforesaid, Landlord shall comply with the applicable provisions of Sections 9.2 hereof), in which event, Tenant shall pay to Landlord on demand, as Additional Rent, the reasonable cost or amount thereof, together with interest thereon at the Lease Interest Rate from the date of outlay of expense until payment; and/or

(c)      upon at least five (5) days' notice to Tenant, to terminate this Lease, whereupon Landlord shall have and retain full right to sue for and collect all unpaid Rent which shall have accrued up to the date of termination and any damages to Landlord by reason of any such breach, and Tenant shall surrender and deliver the Premises to Landlord, failing which, Landlord shall have the right to initiate summary proceedings to recover possession; and/or

(d)      upon at least five (5) days' notice to Tenant to terminate Tenant's right of possession, re-enter the Premises and take possession thereof by lawful means. If Landlord shall so elect to repossess the Premises without terminating the Lease, then Tenant shall be liable for and shall pay to Landlord all Rent payable to Landlord pursuant to the terms of this Lease which shall have accrued up to the date of repossession, as well as all Rent as and when same shall become due and payable pursuant to the terms of this Lease during the remainder of the Term, diminished by any net sums thereafter received by Landlord through reletting the Premises during said period (after deducting reasonable expenses incurred by Landlord in connection with such reletting). In no event shall Tenant be entitled to any excess of any rent obtained by such reletting over and above the Rent herein reserved. Landlord may bring actions to collect amounts due by Tenant under this Lease, from time to time, prior to the expiration of the Term.

16.1.3 Upon an Event of Default, Tenant shall be liable for and shall pay to Landlord, in addition to any sum provided to be paid above, brokers' fees incurred by Landlord in connection with reletting the whole or any part of the Premises for the remainder of the then unexpired Term (excluding any then unexercised Renewal Periods), the costs of removing and storing Tenant's or other occupant's property; the cost of repairs; and all other commercially reasonable expenses incurred by Landlord in enforcing or defending Landlord's rights and/or remedies, including reasonable attorneys' fees.

<div align="center">38</div>

16.1.4  Upon an Event of Default, any amounts paid by Landlord to cure said Event of Default and any Rent payments not paid after notice thereof is given shall bear interest at the Lease Interest Rate from and after the expiration of any applicable grace period until paid.

16.1.5  Landlord shall use reasonable efforts to mitigate Landlord's damages to which Landlord would otherwise be entitled to as a result of an Event of Default. In no event shall Tenant be liable to Landlord for any consequential damages suffered by Landlord as a result of an Event of Default by, or any other act of, Tenant.

Section 16.2  <u>Landlord Default</u>.  If Landlord shall: (i) fail to perform or observe any of the covenants of this Lease on Landlord's part to be performed or observed within thirty (30) days after receiving notice from Tenant thereof (or, if same cannot reasonably be cured within thirty (30) days, if Landlord shall fail to promptly commence and diligently prosecute said cure to completion), <u>or</u> (ii) materially breach any warranty or representation under this Lease (either of (i) or (ii) above being hereinafter referred to as a *"Landlord's Default")*, then Tenant, in addition to such other rights and remedies as may be available under this Lease, or at law or in equity, may, in its sole discretion:

(a)    as applicable, perform such obligation(s) of Landlord in accordance with the provisions of this Lease on behalf of, and at the expense of Landlord; and/or

(b)    bring suit for the collection of any amounts for which Landlord is in default, seek injunctive relief, or seek specific performance for any other covenant or agreement of Landlord, without terminating this Lease; and/or

(c)    may, if within thirty (30) days following written demand from Tenant, Landlord has failed to reimburse Tenant for amounts due to Tenant from Landlord under this Lease, offset against the Rent payable by Tenant hereunder for such amounts including, without limitation, amounts reasonably expended by Tenant for self-help, and including costs and reasonable attorneys' fees, as well as with interest thereon at the Lease Interest Rate; provided, however, that in no event shall such offset exceed ██████████████████ of each successive installment of Rent payable by Tenant hereunder (except (A) Tenant shall, as applicable, be entitled to offset against larger percentages of each successive installment of Rent if the aforesaid ████████████████████ is insufficient to reimburse Tenant in full, taking into account the then remaining number of installments of Rent due and payable by Tenant hereunder, and (B) such twenty-five (25%) percent limitation shall not apply to (I) Tenant's right of reimbursement pursuant to Sections 2.3.2(b) or 3.3.2(ii), or (II) Tenant's rights of offset pursuant to Section 11.1.2(b)(i) above). Notwithstanding the foregoing, in no event shall Tenant have such right to offset if and to the extent Landlord provides written notice to Tenant within ten (10) days after Tenant's demand for payment that Landlord, in good faith, disputes such costs and Landlord, thereafter, within the next following twenty (20) days, initiates an arbitration proceeding pursuant to Section 16.3 below to resolve such dispute, but if in such arbitration proceeding it is determined that Tenant is entitled to all or a portion of its claim, Tenant may then offset the same with interest as aforesaid plus Tenant's attorneys' fees and expenses , provided it gives Landlord ten (10) days prior notice of its intention to offset, during which period Landlord may negate Tenant's right of offset by paying Tenant for the full amount due including all accrued interest to the date of such payment; and/or

(d)    may terminate this Lease, without waiving its rights to damages for Landlord's Default, <u>provided</u> that:  (1) Landlord's Default materially interferes with the normal conduct of any business operations in the Premises, (2) Landlord's Default is not reasonably capable of being cured by Tenant, and  (3) Tenant gives notice of Landlord's Default to any Mortgagee of whom Landlord shall have previously given Tenant notice (including its address), and such Mortgagee shall not have cured Landlord's Default within thirty (30) days after such notice is given (or, if such default cannot reasonably be cured within thirty (30) days, such Mortgagee fails to promptly commence and diligently prosecute said cure to completion).

Notwithstanding the foregoing, if, in Tenant's reasonable judgment, an emergency (i.e., a condition posing imminent risk of material harm to persons or property or material disruption to the normal conduct of any business operations in the Premises shall exist (it being agreed that

39

any water infiltration into the Premises from the roof or any component thereof shall be deemed to be a condition posing imminent risk of material harm to persons or property or material disruption to the normal conduct of any business operations in the Premises), Tenant may, at its election, and without prior notice to Landlord, exercise any or all of the remedies set forth in (a), (b) and (c) above. In no event shall Landlord be liable to Tenant for any consequential damages suffered by Tenant as a result of a default by, or any other act of, Landlord.

Section 16.3    Arbitration. In any case where this Lease expressly provides for submission of a dispute or matter to arbitration (but not otherwise), the same shall be settled by arbitration in Rogers, Arkansas before one arbitrator in accordance with the procedural rules then obtaining of the American Arbitration Association or any successor thereto. The decision of the arbitrator shall be final, conclusive and binding on the parties, but the powers of the arbitrator are hereby expressly limited to the determination of factual issues, and the arbitrator shall have no power to reform, supplement or modify this Lease. The arbitrator shall make only required findings of fact incident to an arbitrable dispute, which findings shall be set forth in reasonable detail in a written decision by the arbitrator. Landlord and Tenant shall share equally in the cost and expenses of such arbitration, and each shall separately pay its own attorneys' fees and expenses, unless the arbitrator finds that one of the parties did not act in good faith in connection with the dispute or the conduct of the arbitration proceeding, in which case the arbitrator may award all or part of said costs, expenses and fees to the other party.

ARTICLE 17
RIGHT TO MORTGAGE AND NON-DISTURBANCE; ESTOPPEL CERTIFICATE

Section 17.1    Right to Mortgage and Non-Disturbance. Landlord reserves the right to subject and subordinate this Lease at all times to the lien of any first mortgage or deed of trust for the benefit of any Mortgagee hereafter encumbering or affecting all or any portion of the Shopping Center, as well as to any future ground or underlying leases encumbering or affecting all or any part of the Shopping Center; provided, however, that (a) each Mortgagee shall first execute and deliver to Tenant a subordination, non-disturbance and attornment agreement in substantially the form attached as Exhibit G hereto, in recordable form, and (b) any Ground Lessor shall execute (and shall obtain the written consent of any holder of any mortgage, deed of trust or any other existing lien encumbering or affecting the Shopping Center or any portion thereof, as applicable) and deliver to Tenant a fee owner recognition agreement in a form reasonably satisfactory to Tenant, which shall include the following provisions: (i) the Ground Lessor will not, in the exercise of any of the rights arising or which may arise out of such lease, disturb or deprive Tenant in or of its possession or its rights to possession of the Premises or of any right or privilege granted to or inuring to the benefit of Tenant under this Lease; (ii) in the event of the termination of the ground or underlying lease, Tenant will not be made a party in any removal or eviction action or proceeding, nor shall Tenant be evicted or removed of its possession or its right of possession of the Premises, and this Lease shall continue in full force and effect as a direct lease between the Ground Lessor and Tenant for the remainder of the Term and on the same terms and conditions as contained herein, without the necessity of executing a new lease; and (iii) Landlord and Tenant shall have the right to execute any amendment to this Lease which is specifically required hereunder and the Ground Lessor shall recognize and be bound thereto.

Section 17.2    Estoppel Certificate. Upon written request of Landlord or Tenant, the other party, within thirty (30) days after the date of receipt of such request, shall execute and deliver to and only for the benefit of the requesting party or any Mortgagee, bona fide prospective purchaser, assignee, or sublessee of the requesting party, without charge, a written statement: (1) ratifying this Lease; (2) certifying, to such party's actual knowledge, that this Lease is in full force and effect, if such is the case, and has not been modified, assigned, supplemented or amended, except by such writings as shall be stated; (3) specifying the dates to which Fixed Rent and Additional Rent have been paid; (4) stating whether or not, to such party's actual, knowledge, the party requesting the estoppel is in default and, if so, stating the nature of such default, (5) stating the Rent Commencement Date, and (6) stating which options to extend the Lease Term have been exercised, if any.

Section 17.3    Existing Mortgages. Within thirty (30) days after the Effective Date, Landlord shall deliver to Tenant, in recordable form: (x) a subordination, non-disturbance and attornment agreement substantially in the form attached hereto as Exhibit G, in recordable form, executed by each and every holder of any mortgage, deed of trust or any other existing lien

40

encumbering or affecting the Shopping Center or any portion thereof, and (y) a fee owner recognition agreement in the form and content described in clause (b) of Section 17.1 hereof, in recordable form, executed by any Ground Lessor (and, as may be required, consented to by the holder of any mortgage, deed of trust or other existing lien as aforesaid). Should Landlord fail to so deliver such instrument(s) within said 30-day period, Tenant shall have the right by notice given to Landlord at any time prior to the date on which such instrument(s) are delivered, to terminate this Lease, in which event, neither party shall have any further liability hereunder, except (i) for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease, and (ii) Landlord shall be obligated to promptly reimburse Tenant for all its reasonable, third-party costs and expenses incurred in connection with this Lease, <u>including</u>, without limitation, the preparation and review of plans and specifications, and the performance of Tenant's Work, provided, however, that such reimbursement by Landlord shall not exceed the aggregate sum of ███████████████

## ARTICLE 18
## NOTICE

Subject to the further provisions of this Article 18, whenever it is provided herein that any notice, demand, request, consent, approval or other communication (***"Notice"***) shall or may be given to either of the parties by the other, it shall be in writing and, any Legal Requirement to the contrary notwithstanding, shall not be effective for any purpose unless same shall be given by registered or certified mail, postage prepaid, return receipt requested, or by any recognized overnight mail carrier, with proof of delivery slip, addressed to Landlord at Landlord's Mailing Address (Attn: President), with a copy of all notices also addressed to Landlord at Landlord's Mailing Address (Attn: General Counsel), or to Tenant at Tenant's Mailing Address, with copies of notices to Tenant also given to: (i) Allan N. Rauch, Esq., c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, and (ii) Jeffrey H. Kaplan, Esq., c/o Bryan Cave LLP, 1290 Avenue of the Americas, New York, New York 10104, or to such other person or other address as may, from time to time, be specified by either party in a written notice to the other party. All notices given in accordance with the provisions of this Section shall be effective upon receipt (or refusal of receipt) at the address of the addressee. Notwithstanding the foregoing, Landlord shall instead send the following items to Tenant (Attention: Lease Administration) at Tenant's Mailing Address: (A) all bills, notices (but not notices of default) and related information pertaining to Tenant's Pro Rata Share of Taxes as described in Section 4.3 of this Lease, and (B) all statements, bills and related information pertaining to the payments required to be made by Tenant pursuant to Subsection 5.1.2 above.

## ARTICLE 19
## TENANT'S PROPERTY

All of Tenant's Property which may be installed or placed in or upon the Premises by Tenant shall remain the property of Tenant. Tenant may assign, hypothecate, encumber, mortgage or create a security interest in or upon Tenant's Property in the Premises without the consent of Landlord and may remove Tenant's Property at any time during the Term. Landlord waives any right it may have in Tenant's Property. To the extent Landlord may have a lien on or security interest in the Tenant's Property pursuant to this Lease, by law or otherwise, Landlord hereby waives, and agrees not to assert, such lien or security interest. Landlord shall provide to Tenant, within ten (10) days after Tenant's request therefor, a written waiver in form reasonably satisfactory to Tenant evidencing Landlord's waiver of any rights it has or may have in Tenant's Property.

## ARTICLE 20
## END OF TERM

Section 20.1   <u>Surrender of Premises</u>. At the expiration of the Term, Tenant will quit and surrender the Premises in good condition and repair, <u>excepting</u>, <u>however</u>, reasonable wear and tear, damage by fire or other casualty, damage by eminent domain, and repairs and replacements to be made by Landlord hereunder.

Section 20.2   <u>Hold Over</u>. If Tenant fails to deliver possession of the Premises to Landlord at the end of the Term, and unless Landlord and Tenant are, at such time, engaged in good faith negotiations to extend the Term, Tenant shall be a tenant at sufferance and shall be liable for Fixed Rent on a monthly basis (or, if applicable, on a prorated daily basis) in an

41

amount equal to ███████████ ██████ ████ of the amount thereof payable by Tenant for the month immediately preceding the last day of the Term as well as for all Additional Rent payable by Tenant hereunder.

<div align="center">

ARTICLE 21
TENANT'S RIGHT OF FIRST OFFER
</div>

Provided an uncured Event of Default does not then exist under this Lease, Tenant shall have continuing rights of first offer to lease additional space in the Shopping Center which is contiguous to the Premises and which may become available on and after the date of this Lease.  At such time that Landlord has knowledge that such space (*"Offered Space"*) is or will become available, Landlord will give Tenant notice (the *"Offering Notice"*) of the terms and conditions Landlord would be willing to accept with respect to the Offered Space (including, without limitation, the proposed rent, additional rent, scope of Landlord's proposed tenant improvements, location and Floor Area), and Tenant shall have thirty (30) days within which to respond to Landlord's offer.  In the event Tenant elects to accept Landlord's offer, then Tenant shall notify Landlord of such election by giving notice to Landlord during such thirty (30) day period and Landlord and Tenant shall thereupon enter into an amendment to this Lease for the leasing of the Offered Space, which amendment shall (a) contain the terms and conditions set forth in the Offering Notice, (b) provide that the term thereunder shall expire or sooner terminate contemporaneously with the expiration or sooner termination of the Term hereof (subject to extension in accordance with Section 2.2.2 above), and (c) contain such other terms and provisions as either Landlord or Tenant may reasonably require in order to effectuate the incorporation of the Offered Space into the Premises and to otherwise effectuate the intent of this Article 21.  Should Tenant decline Landlord's offer or fail to respond thereto, then, and in such event, Tenant shall have been deemed to have waived any prospective rights of first offer to the Offered Space (but Tenant shall not lose any prospective rights of first offer with respect to any space (including, without limitation, the Offered Space) which may in the future become vacant and available), and Landlord may lease the Offered Space to any other party upon substantially the same terms and conditions as that offered to Tenant, provided that such lease is executed within six (6) months after Tenant has declined (or has been deemed to have waived) Landlord's offer with respect to the Offered Space.  As used herein, the phrase *"substantially the same terms and conditions as that offered to Tenant"* shall mean terms not materially different and/or a rent of not more than five (5%) percent below the rent requested by Landlord of Tenant.  Any dispute between the parties with respect to this Article 21 (including, without limitation, any dispute as to the provisions of the amendment described in this Article 21) shall be resolved by arbitration in accordance with the provisions of Section 16.3 above.

<div align="center">

ARTICLE 22
ONGOING CO-TENANCY
</div>



<div align="center">

ARTICLE 23
MISCELLANEOUS
</div>

Section 23.1   Loading Facilities.  Tenant shall have the exclusive right to utilize the loading facilities serving the Premises (shown on Exhibit B) on a "24 hour a day", "365 days a year" basis.

<div align="center">

42
</div>

Section 23.2    Liens. Within thirty (30) days after notice of the filing thereof, Tenant shall discharge (either by payment or by filing of the necessary bond, or otherwise) any lien against the Premises and/or Landlord's interest therein, which may arise out of any payment due for, or purported to be due for, any labor, services, materials, supplies or equipment alleged to have been furnished to or for Tenant in, upon or about the Premises. Similarly, within thirty (30) days after notice of the filing thereof, Landlord shall discharge (either by payment or by filing of the necessary bond, or otherwise) any lien against the Premises and/or Landlord's interest therein, which may arise out of any payment due for, or purported to be due for, any labor, services, materials, supplies or equipment alleged to have been furnished to or for Landlord in, upon or about the Premises.

Section 23.3    Broker's Commission. Landlord and Tenant each warrant and represent to the other that they did not deal with any real estate broker in connection with the negotiation, execution and delivery of this Lease, except for The Retail Connection (the "*Broker*"). Landlord shall pay the Broker a commission pursuant to a separate agreement, subject to the terms and conditions set forth in such agreement. Each party agrees to indemnify, defend, and save the other harmless from and against any and all liabilities, costs, causes of action, damages and expenses, including, without limitation, attorneys' fees, with respect to or arising out of any claims made by any real estate broker (other than the Broker), agent or finder with respect to this Lease in breach of the foregoing representation. The provisions of this Section shall survive the expiration or earlier termination of this Lease.

Section 23.4    *Force Majeure*. Except as otherwise expressly set forth herein, in the event either party hereto shall be delayed or hindered in, or prevented from, the performance of any act required hereunder by reason of strikes, failure of power, riots, insurrection, war, earthquake, hurricane or tornado (or comparable weather conditions of unusual severity), or other reasons of a like nature which are beyond the reasonable control of the party (collectively referred to herein as "*Force Majeure*"), then the performance of any such act shall be excused for the period of the delay and the period of the performance of any such act shall be extended for a period equivalent to the period of such delay. Notwithstanding the foregoing provisions, the following shall not constitute Force Majeure: (i) the financial inability of a party to perform its obligations under this Lease; or (ii) delays occurring in the course of complying with applicable Legal Requirements that could have been avoided through the exercise of due diligence by a party hereto. A party wishing to invoke this Section shall give the other party notice of that intention within ten (10) days after the commencement of any event of Force Majeure and shall, at that time, specify the reasons therefor, the specific provision of this Lease which will be delayed as a result, and the period of such extension, if known, or if not known, a reasonable estimate thereof.

Section 23.5    Consents. Except as may be otherwise expressly set forth in this Lease, whenever under this Lease provision is made for either party's securing the consent or approval of the other party, (i) such consent or approval shall be in writing and shall not be unreasonably withheld, delayed or conditioned, and (ii) in all matters contained herein, both parties shall have an implied obligation of reasonableness.

Section 23.6    Costs. Whenever this Lease requires the performance of an act by a party, such party shall perform the act at its own cost and expense, unless expressly provided to the contrary.

Section 23.7    Attorneys' Fees. In any action or proceeding hereunder (whether to enforce the terms and provisions of an indemnity or otherwise), the prevailing party shall be entitled to recover from the other party the prevailing party's reasonable costs and expenses in such action or proceeding, including reasonable attorneys' fees, costs and expenses. Except as otherwise set forth herein, if either party is sued by a third party as a result of a violation of a covenant or warranty herein contained by the other party hereto, then the party who has violated the covenant or warranty shall be responsible for the reasonable costs and expenses in such action or proceeding against the non-violating party, including reasonable attorneys' fees, costs and expenses.

Section 23.8    Survival of Obligations. The obligation to pay any sums due to either party from the other that by the terms herein would not be payable, or are incapable of calculation, until after the expiration or sooner termination of this Lease shall survive and remain

43

a continuing obligation until paid. All indemnity obligations under this Lease shall survive the expiration or earlier termination of this Lease.

Section 23.9   Non-Waiver.  The failure of Landlord or Tenant to insist upon the strict performance of, or to enforce, any provision, covenant or condition herein shall not be deemed to be a waiver thereof, nor void or affect the right of the aggrieved party to enforce the same covenant or condition on the occasion of any subsequent breach or default; nor shall the failure of either party to exercise any option in this Lease upon any occasion arising therefor be deemed or construed to be a waiver of the right to exercise that same kind of option upon any subsequent occasion.

Section 23.10   Rights Cumulative.  Unless expressly provided to the contrary in this Lease, each and every one of the rights, remedies and benefits provided by this Lease shall be cumulative and shall not be exclusive of any other such rights, remedies and benefits allowed by applicable Legal Requirements.

Section 23.11   Definition of Landlord.  The term *"Landlord"* shall mean only the person or entity which, from time to time, shall then own the Shopping Center, and in the event of the transfer by such owner of its interest in the Shopping Center, such owner shall (except to the extent of (1) claims made by Tenant against Landlord which arose prior to the effective date of the transfer of such ownership interest, and/or (2) judgments obtained by Tenant against Landlord, on or prior to the effective date of the transfer of such ownership interest) thereupon be released and discharged from all covenants and obligations of Landlord thereafter accruing, but such covenants and obligations shall be binding during the Term upon each new owner for the duration of such owner's ownership.

Section 23.12   Successors and Assigns.  Subject to the applicable provisions, if any, of Article 15 above, the provisions of this Lease shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns.

Section 23.13   Limitation of Landlord's Liability.  Except with respect to insurance proceeds or condemnation awards received by Landlord which are required by the terms of this Lease to be applied to the repair or restoration of the Premises or the Shopping Center, Tenant shall, on and after the Delivery Date, look only to Landlord's estate and property in the Shopping Center (or the proceeds from the sale of all or any portion thereof) and net income derived from the Shopping Center for the satisfaction of Tenant's remedies for the collection of a judgment (or other judicial process) requiring the payment of money by Landlord hereunder and no other property or assets of Landlord, its officers, directors, stockholders or partners shall be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies under or with respect to this Lease.  Except with respect to the limitation on personal liability hereinabove set forth, the provisions of this Section 23.13 shall not be deemed or construed to limit Tenant's rights and remedies pursuant to this Lease or which may be available at law or in equity.

Section 23.14   Limitation of Tenant's Liability.  Landlord, its successors and assigns, shall look solely to the assets, if any, of Tenant and its successors and assigns, for the satisfaction of any claim arising from or under this Lease and shall not seek to impose personal liability on any shareholder, officer, director or employee of Tenant or any of its Affiliates.

Section 23.15   Joint and Several Liability.  If either party consists of more than one person, then the persons constituting such party shall be jointly and severally liable hereunder.

Section 23.16   Severability.  If any term, covenant, condition or provision of this Lease is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions hereof shall remain in full force and effect and shall in no way be affected, impaired, or invalidated thereby.

Section 23.17   Grammatical Usages and Construction.  In construing this Lease, feminine or neuter pronouns shall be substituted for those masculine in form and vice versa, and plural terms shall be substituted for singular and singular for plural in any place in which the context so requires.  This Lease shall be construed without regard to the identity of the party who drafted the various provisions hereof.  Moreover, each and every provision of this Lease shall be construed as though all parties hereto participated equally in the drafting thereof.  As a result of the foregoing, any rule or construction that a document is to be construed against the drafting party shall not be applicable hereto.

44

Section 23.18  <u>Table of Contents, Line Numbering and Paragraph Headings</u>.  The table of contents and line numbering, if any, and section headings are inserted only for convenience and in no way define, limit or describe the scope or intent of this Lease, nor in any way affect this Lease.

Section 23.19  <u>Definition of Hereunder, Herein, etc.</u>  Unless the context clearly indicates to the contrary, the words "herein," "hereof," "hereunder," "hereafter," and words of similar import refer to this Lease and all the Exhibits attached hereto as a whole and not to any particular section, subsection, or paragraph hereof.

Section 23.20  <u>Short Form Lease</u>.  Upon the request of either party following the execution and delivery of this Lease, Landlord and Tenant shall execute a short form lease or memorandum for recording, which shall be in form and substance as either party shall reasonably request.  In no event shall the amount of Fixed Rent reserved hereunder be included in any such short form lease or memorandum.

Section 23.21  <u>Entire Agreement and Modification</u>.  This Lease constitutes the entire agreement of the parties hereto, and all prior agreements between the parties, whether written or oral, are merged herein and, except as may be specifically set forth herein, shall be of no force and effect.  This Lease cannot be changed, modified or discharged orally, but only by an agreement in writing, signed by the party against whom enforcement of the change, modification or discharge is sought.

Section 23.22  <u>No Joint Venture or Partnership Created by Lease</u>.  Nothing contained herein shall be deemed or construed as creating the relationship of principal and agent or of partnership or of joint venture between the parties hereto.

Section 23.23  <u>Tenant's Tradename</u>.  Landlord shall not make use of Tenant's tradename [*i.e.*, "*Bed Bath & Beyond*"®] in any advertising or marketing material, including, without limitation, on any internet website, without obtaining Tenant's prior written approval, which may be withheld in Tenant's sole and absolute discretion.

Section 23.24  <u>Counterparts</u>.  This instrument may be executed in several counterparts, each of which shall be deemed an original.  The signatures to this instrument may be executed and notarized on separate pages, and when attached to this instrument, shall constitute one complete document.

Section 23.25  <u>Waiver of Trial by Jury</u>.  Landlord and Tenant hereby mutually waive any and all rights which either may have to request a jury trial in any proceeding between them at law or in equity.

Section 23.26  <u>Governing Law</u>.  This Lease shall be governed by, construed, and enforced in accordance with the laws of the State in which the Premises are located.

[Signature Page to Follow]

C061858/0205454/1372981.6

IN WITNESS WHEREOF, the parties have executed this instrument under seal the day and year first-above written.

**LANDLORD OF THE POWER CENTER:**

PINNACLE SOUTH LLC

By:
Name:
Title:

**TENANT:**

**BED BATH & BEYOND INC.**, a New York corporation

By:
    Warren Eisenberg
    Co-Chairman

**LANDLORD OF THE PROMENADE:**
(but only as to those covenants and restrictions which are made binding on the Promenade pursuant to express provisions of this Lease)

ROGERS RETAIL LLC

By:
Name:
Title:

-46-

## INDEX OF EXHIBITS

| | |
|---|---|
| Exhibit A | Legal Description of Power Center |
| Exhibit A-1 | Legal Description of Promenade |
| Exhibit B | Site Plan |
| Exhibit C | Rent Commencement and Expiration Date Agreement |
| Exhibit D | Specifications for Landlord's Work |
| Exhibit D-1 | Exterior Elevations of the Premises, and Sidewalk Plan |
| Exhibit D-2 | Exterior Elevation Drawing of Power Center |
| Exhibit E | Permitted Encumbrances |
| Exhibit F | Signage |
| Exhibit G | Subordination, Non-Disturbance and Attornment Agreement |
| Exhibit H | Subtenant Recognition Agreement |
| Exhibit I | Intentionally Omitted |
| Exhibit J | Form of Delivery Date Certification |
| Exhibit K-1 | Existing Exclusives |
| Exhibit K-2 | Existing Leases |
| Exhibit L | Prohibited Uses |

C061858/0205454/1372981.6

EXHIBIT A

Legal Description of Power Center

A part of the NE1/4 NE1/4, a part of the SE1/4 NE1/4, a part of the NW1/4 NE1/4, and a part of the SW1/4 NE1/4 all in Section 21, T-19-N, R-30-W, Fifth Principal Meridian, City of Rogers, Benton County, Arkansas, more particularly described as follows, To Wit:

Commencing at a found rail road spike at the SE corner of the NE1/4 SE1/4 of said Section 21, Thence North 86° 51' 38" West along the South line of said NE1/4 SE1/4, a distance of 123.05 feet to a point; Thence leaving said South line, North 03° 08' 22" East, a distance of 66.81 feet to a 5/8 inch capped rebar (L.S. 1390) on the West Right of Way line of Proposed Bellview Road; Thence continuing along said proposed Right of Way, North 04° 41' 12" East a distance of 479.60 feet to a tangent point on a curve to the left and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 550.00 feet, an arc length of 377.12 feet, and a chord which bears North 14° 57' 24" West, a chord distance of 369.78 feet to a 5/8 inch capped rebar (L.S. 1390); Thence North 34° 35' 59" West, a distance of 17.16 feet to a tangent point a curve to the left and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 36.00 feet, an arc length of 57.48 feet, and a chord which bears North 80° 20' 32" West, a chord distance of 51.57 feet to a 5/8 inch capped rebar (L.S. 1390); Thence North 33° 27' 50" West, a distance of 94.12 feet to a point on a non tangent curve to the left and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 36.00 feet, an arc length of 55.62 feet, and a chord which bears North 09° 39' 28" East, a chord distance of 50.25 feet to a 5/8 inch capped rebar (L.S. 1390); Thence North 34° 35' 59" West, a distance of 20.86 feet to a tangent point on a curve to the right and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 650.00 feet, an arc length of 374.78 feet, and a chord which bears North 18° 04' 55" West, a chord distance of 369.61 feet to a 5/8 inch capped rebar (L.S. 1390); Thence North 01° 33' 50" West, a distance of 228.28 feet to a tangent point on a curve to the right and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 2050.00 feet, an arc length of 62.59 feet, and a chord which bears North 00° 41' 21" West, a chord distance of 62.59 feet to a point of reverse curve and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 36.00 feet, an arc length of 55.01 feet, and a chord which bears North 43° 35' 12" West, a chord distance of 49.81 feet to a 5/8 inch capped rebar (L.S. 1390); Thence North 01° 24' 32" East, a distance of 74.71 feet to a 5/8 inch capped rebar (L.S. 1390) for the Point of Beginning;

Thence North 01° 24' 32" East, a distance of 19.31 feet to a point on a non tangent curve to the left and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 36.00 feet, an arc length of 56.60 feet, and a chord which bears North 47° 36' 08" East, a chord distance of 50.95 feet to a 5/8 inch capped rebar (L.S. 1390); Thence North 02° 33' 48" East, a distance of 337.86 feet to a 5/8 inch capped rebar (L.S. 1390); Thence leaving said West Right-of-Way of proposed Belview Road, North 30° 41' 44" West, a distance of 174.34 feet to a 5/8 inch capped rebar (L.S. 1390); Thence North 37° 22' 48" West, a distance of 105.74 feet to a 5/8 inch capped rebar (L.S. 1390); Thence North 42° 53' 56" West, a distance of 197.34 feet to a 5/8 inch capped rebar (L.S. 1390); Thence North 27° 31' 00" West, a distance of 75.53 feet to a 5/8 inch capped rebar (L.S. 1390); Thence North 20° 40' 19" West, a distance of 86.04 feet to a 5/8 inch capped rebar (L.S. 1390); Thence North 87° 21' 31" West, a distance of 1447.02 feet to a point on the East Right-of-Way of proposed 45th Street and a 5/8 inch capped rebar (L.S. 1390);

Thence along said East Right-of-Way, South 00° 48' 09" West, a distance of 248.89 feet to a tangent point on a curve to the left and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 50.00 feet, an arc length of 76.94 feet, and a chord which bears South 43° 16' 41" East, a chord distance of 69.57 feet to a 5/8 inch capped rebar (L.S. 1390); Thence South 87° 21' 31" East, a distance of 5.97 feet to a 5/8 inch capped rebar (L.S. 1390); Thence South 02° 38' 29" West, a distance of 16.45 feet to a 5/8 inch capped rebar (L.S. 1390); Thence leaving said East Right-of-Way of proposed 45th Street, South 87° 21' 31" East, a distance of 10.87 feet to a tangent point on curve to the left and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 201.50 feet, an arc length of 37.07 feet, and a chord which bears North 87° 22' 16" East, a chord distance of 37.02 feet to a 5/8 inch capped rebar (L.S. 1390); Thence North 82° 06' 02" East, a distance of 80.85 feet to a tangent point on a curve to the right and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 448.50 feet, an arc length of 62.43 feet, and a chord which bears North 86° 05' 18" East, a chord distance of 62.38 feet to a point on a non tangent curve to the left and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 751.49 feet, an arc length of 368.46 feet, and a chord which bears South 07° 25' 43" East, a chord distance of 364.78 feet to a point of compound curve and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 21.50 feet, an arc length of 35.62 feet, and a chord which bears South 68° 56' 38" East, a chord distance of 31.69 feet to a point of reverse curve and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 528.50 feet, an arc length of 200.62 feet, and a chord which bears North 74° 27' 42" East, a chord distance of 199.41 feet to a 5/8 inch capped rebar (L.S. 1390); Thence North 88° 27' 54" East, a distance of 65.47 feet to a tangent point on a curve to the right and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 384.62 feet, an arc length of 211.09 feet, and a chord which bears South 73° 06' 24" East, a chord distance of 208.45 feet to a point of compound curve and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 921.89 feet, an arc length of 143.53 feet, and a chord which bears South 51° 14' 44" East, a chord distance of 143.39 feet to a 5/8 inch capped rebar (L.S. 1390); Thence South 53° 10' 18" East, a distance of 118.36 feet to a 5/8 inch capped rebar (L.S. 1390); Thence South 55° 43' 20" East, a distance of 56.82 feet to a tangent point on a curve to the left and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 669.53 feet, an arc length of 63.00 feet, and a chord which bears South 59° 51' 52" East, a chord distance of 62.98 feet to a point of compound curve and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 769.85 feet, an arc length of 73.81 feet, and a chord which bears South 64° 52' 02" East, a chord distance of 73.78 feet to a point of compound curve and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 683.99 feet, an arc length of 222.26 feet, and a chord which bears South 78° 02' 41" East, a chord distance of 221.28 feet to a 5/8 inch capped rebar (L.S. 1390); Thence South 87° 21' 31" East, a distance of 42.28 feet to a 5/8 inch capped rebar (L.S. 1390); Thence North 84° 38' 03" East, a distance of 26.80 feet to a 5/8 inch capped rebar (L.S. 1390); Thence North 84° 33' 59" East, a distance of 67.25 feet to a 5/8 inch capped rebar (L.S. 1390); Thence South 87° 23' 52" East, a distance of 244.88 feet to the Point of Beginning and containing (1,179,254.35 sq. ft. 27.0720 acres) more or less.

## EXHIBIT A-1

Legal Description of Promenade

Exhibit A-1

Legal Description of Promenade

A part of the S1/2 of the NE1/4, a part of the N1/2 of the SE1/4, and a part of the SE1/4 of the SE1/4 Quarter, all in Section 21, T-19-N, R-30-W, Fifth Principal Meridian, City of Rogers, Benton County, Arkansas, more particularly described as follows, To Wit:

Commencing at a found rail road spike at the SW corner of the NE1/4 of the SE1/4 of said Section 21, Thence N 02° 32' 17" E along the West line of said NE1/4, a distance of 99.61 feet to a 5/8 inch capped rebar (L.S. 1390) on the North Right-of-Way of the proposed relocated Perry Road, for the POINT OF BEGINNING;

Thence leaving said West line and continuing along said North Right-of-Way, North 56° 52' 51" West, a distance of 62.22 feet to a point on a non tangent curve to the right and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 1563.00 feet, an arc length of 87.01 feet, and a chord which bears North 60° 23' 57" West, a chord distance of 87.00 feet to a point of compound curve and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 50.00 feet, an arc length of 80.42 feet, and a chord which bears North 12° 43' 30" West, a chord distance of 72.03 feet to a 5/8 inch capped rebar (L.S. 1390); Thence leaving said North Right-of-Way of the proposed relocated Perry Road, North 58° 59' 45" West, a distance of 116.01 feet to a point on a non tangent curve to the right and a 5/8 inch capped rebar (L.S. 1390) located on the North Right-of-Way of the proposed 45th Street; Thence along said Right-of-Way of proposed 45th Street and along said curve having a radius of 50.00 feet, an arc length of 83.76 feet, and a chord which bears South 81° 20' 49" West, a chord distance of 74.31 feet to a point of compound curve and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 1575.00 feet, an arc length of 1002.38 feet, and a chord which bears North 32° 25' 41" West, a chord distance of 985.55 feet to a point of compound curve and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 50.00 feet, an arc length of 80.64 feet, and a chord which bears North 32° 00' 18" East, a chord distance of 72.18 feet to a 5/8 inch capped rebar (L.S. 1390); Thence North 78° 12' 21" East, a distance of 6.09 feet to a 5/8 inch capped rebar (L.S. 1390); Thence North 11° 47' 39" West, a distance of 112.00 feet to a point on a non tangent curve to the right and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 50.00 feet, an arc length of 83.40 feet, and a chord which bears North 54° 00' 25" West, a chord distance of 74.07 feet to a point of compound curve and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 1575.00 feet, an arc length of 193.04 feet, and a chord which bears North 02° 42' 31" West, a chord distance of 192.91 feet to a 5/8 inch capped rebar (L.S. 1390); Thence North 00° 48' 09" East, a distance of 770.67 feet to a tangent point on a curve to the right and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 50.00 feet, an arc length of 80.14 feet, and a chord which bears North 46° 43' 19" East, a chord distance of 71.84 feet to a 5/8 inch capped rebar (L.S. 1390); Thence North 02° 38' 29" East, a distance of 69.55 feet to a 5/8 inch capped rebar (L.S. 1390); Thence leaving said Right-of-Way of proposed 45th Street, South 87° 21' 31" East, a distance of 10.87 feet to a tangent point on a curve to the left and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 201.50 feet, an arc length of 37.07 feet, and a chord which bears North 87° 22' 16" East, a chord distance of 37.02 feet to a 5/8 inch capped rebar (L.S. 1390); Thence North 82° 06' 02" East, a distance of 80.85 feet to a tangent point on a curve to the right and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 448.50 feet, an arc length of 62.43 feet, and a chord which bears North 86° 05' 18" East, a chord distance of 62.38 feet to a non tangent point on a curve to the left and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 751.49 feet, an arc length of 368.46 feet, and a chord which bears South 07° 25' 43" East, a chord distance of 364.78 feet to a point of compound curve to the left and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 21.50 feet, an arc length of 35.62 feet, and a chord which bears South 68° 56' 38" East, a chord distance of 31.69 feet to a tangent point on a reverse curve to the right and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 528.50 feet, an arc length of 200.62 feet, and a chord which bears North 74° 27' 42" East, a chord distance of 199.41 feet to a 5/8 inch capped rebar (L.S. 1390); Thence North 88° 27' 54" East, a distance of 65.47 feet to a tangent point on a curve to the right and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 384.62 feet, an arc length of 211.09 feet, and a chord which bears South 73° 06' 24" East, a chord distance of 208.45 feet to a point of compound curve to the right and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 921.89 feet, an arc length of 143.53 feet, and a chord which bears South 51° 14' 44" East, a chord distance of 143.39 feet to a 5/8 inch capped

rebar (L.S. 1390); Thence South 53° 10' 18" East, a distance of 118.36 feet to a 5/8 inch capped rebar (L.S. 1390); Thence South 55° 43' 20" East, a distance of 56.82 feet to a tangent point on a curve to the left and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 669.53 feet, an arc length of 63.00 feet, and a chord which bears South 59° 51' 52" East, a chord distance of 62.98 feet to a point of compound curve and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 769.85 feet, an arc length of 73.81 feet, and a chord which bears South 64° 52' 02" East, a chord distance of 73.78 feet to a point of compound curve and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 683.99 feet, an arc length of 222.26 feet, and a chord which bears South 78° 02' 41" East, a chord distance of 221.28 feet to a 5/8 inch capped rebar (L.S. 1390); Thence South 87° 21' 31" East, a distance of 42.28 feet to a 5/8 inch capped rebar (L.S. 1390); Thence North 84° 35' 08" East, a distance of 94.06 feet to a 5/8 inch capped rebar (L.S. 1390); Thence South 87° 23' 52" East, a distance of 244.88 feet to a 5/8 inch capped rebar (L.S. 1390) on the West Right-of-Way of the propose Bellview Road; Thence South 01° 24' 32" West, a distance of 74.71 feet to a point on a non tangent curve to the right and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 36.00 feet, an arc length of 55.01 feet, and a chord which bears South 43° 35' 12" East, a chord distance of 49.81 feet to a point of reverse curve to the right and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 2050.00 feet, an arc length of 62.59 feet, and a chord which bears South 00° 41' 21" East, a chord distance of 62.59 feet to a 5/8 inch capped rebar (L.S. 1390); Thence South 01° 33' 50" East, a distance of 228.28 feet to a point on a tangent curve to the left and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 650.00 feet, an arc length of 374.78 feet, and a chord which bears South 18° 04' 55" East, a chord distance of 369.61 feet to a 5/8 inch capped rebar (L.S. 1390); Thence South 34° 35' 59" East, a distance of 20.86 feet to a tangent point on a curve to the right and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 36.00 feet, an arc length of 55.62 feet, and a chord which bears South 09° 39' 28" West, a chord distance of 50.25 feet to a 5/8 inch capped rebar (L.S. 1390); Thence South 33° 27' 50" East, a distance of 94.12 feet to a point on a non tangent curve to the right and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 36.00 feet, an arc length of 57.48 feet, and a chord which bears South 80° 20' 32" East, a chord distance of 51.57 feet to a 5/8 inch capped rebar (L.S. 1390); Thence South 34° 35' 59" East, a distance of 17.16 feet to a point on a tangent curve to the right and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 550.00 feet, an arc length of 377.12 feet, and a chord which bears South 14° 57' 24" East, a chord distance of 369.78 feet to a 5/8 inch capped rebar (L.S. 1390); Thence South 04° 41' 12" West, a distance of 479.60 feet to a tangent point on a curve to the right and a 5/8 inch capped rebar (L.S. 1390); Thence leaving said Right-of-Way of proposed Bellview Road, along said curve having a radius of 50.00 feet, an arc length of 72.53 feet, and a chord which bears South 46° 14' 36" West, a chord distance of 66.34 feet to a 5/8 inch capped rebar (L.S. 1390) on the North Right-of-Way of the proposed relocated Right-of-Way of Perry Road; Thence continuing along said Right-of-Way, South 87° 48' 00" West, a distance of 374.34 feet to a 5/8 inch capped rebar (L.S. 1390); Thence North 84° 36' 16" West, a distance of 102.90 feet to a non tangent point on a curve to the right and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 1563.00 feet, an arc length of 89.43 feet, and a chord which bears North 87° 58' 00" West, a chord distance of 89.42 feet to a point of compound curve and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 50.00 feet, an arc length of 77.81 feet, and a chord which bears North 41° 44' 41" West, a chord distance of 70.19 feet to a 5/8 inch capped rebar (L.S. 1390); Thence North 02° 50' 17" East, a distance of 4.09 feet to a non tangent curve to the right and a 5/8 inch capped rebar (L.S. 1390); Thence North 87° 09' 43" West, a distance of 100.00 feet to a point on a non tangent curve to the right and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 50.00 feet, an arc length of 85.85 feet, and a chord which bears South 52° 01' 26" West, a chord distance of 75.68 feet to a point of compound curve to the right and a 5/8 inch capped rebar (L.S. 1390); Thence along said curve having a radius of 1575.00 feet, an arc length of 362.46 feet, and a chord which bears North 72° 11' 50" West, a chord distance of 361.67 feet to a 5/8 inch capped rebar (L.S. 1390); Thence North 56° 52' 51" West, a distance of 37.35 feet to the Point of Beginning, and subject to any and all Easements, Covenants, Restriction, or Right-of-Way of Record or Fact.

Having an area of 78.8794 acres (2,516,641.87 Sq. Ft.), more or less.

Exhibit B

Site Plan

C061858/0205454/1372981.6

EXHIBIT 'B'
SITE PLAN
ROGERS AR

FLOOR PLAN

THE ABOVE FLOOR PLAN REPRESENTS TENANT'S CRITICAL DIMENSIONS

FLOOR PLAN LEGEND

ADDITIONAL
14460 S.F.

RETAIL 'B'

RETAIL 'A'

Bed, Bath
& Beyond
APPROX 30,000
S.F.

REAR DUMPSTER ACCESS DIAGRAM

PROMENADE MALL

DILLARD'S
135,000 S.F.
P.C. Store

POND 'A'

POND 'B'

NORTH

SITE PLAN LEGEND

PREMISES

NO BUILD AREA

PRIMARY
RESTORATION
AREA

POWER CENTER

CONSTRUCTION STAGING AREA FOR LANDLORD AND OTHER
CO-TENANTS SHALL NOT BE WITHIN THE NO BUILD AREA, DIRECTLY
IN FRONT OF TENANT'S PREMISES OR BLOCK ACCESS TO TENANT'S
LOADING AREA.

TENANT SHALL HAVE THE RIGHT TO RELOCATED CART CORRALS IN
THE PARKING FIELD DIRECTLY IN FRONT OF TENANT'S PREMISES.

EXIT DOOR LOCATIONS TO BE COORDINATED WITH TENANT'S PLANS.

SITE PLAN LAYOUT TO ADEQUATELY ACCOMODATE THE TURNING
RADIUS OF A 65' TRAILER, FROM POINT OF ENTRY TO TENANT'S
LOADING DOCK AND THEN EXIT.

PROPOSED HIRING TRAILER LOCATION IS SUBJECT TO REASONABLE
RELOCATION BY LANDLORD IF APPLICABLE.

LANDLORD SHALL PROVIDE SITE SPECIFIC SIGNAGE IN FRONT OF
TENANT'S PREMISES TO 'STOP FOR PEDESTRIANS CROSSING' TO
MEET LOCAL AND FEDERAL REQUIREMENTS.

Exhibit C

Rent Commencement and Expiration Date Agreement

THIS RENT COMMENCEMENT AND EXPIRATION DATE AGREEMENT, made as of the ____ day of _____, 200_, by and between _____ (*"Landlord"*) and BED BATH & BEYOND INC. (*"Tenant"*).

## WITNESSETH:

WHEREAS, Landlord is the owner of a certain shopping center known as Pinnacle Hills Promenade (the *"Shopping Center"*), situated in Rogers, Arkansas;

WHEREAS, by that certain lease dated _____, 2007 (the *"Lease"*), Landlord leased a portion (the *"Premises"*) of the Shopping Center to Tenant;

WHEREAS, Tenant is in possession of the Premises and the Term of the Lease has commenced; and

WHEREAS, under Section 2.2 of the Lease, Landlord and Tenant agreed to enter into an agreement setting forth certain information in respect of the Premises and the Lease.

NOW, THEREFORE, Landlord and Tenant agree as follows:

1.      The Rent Commencement Date occurred on _____, 200___.

2.      The **Initial Term** of the Lease shall expire on January 31, 20___, unless Tenant exercises any option to extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

3.      The date of commencement of the **first Renewal Period** shall be February 1, 20___, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 20___, unless Tenant exercises any option to further extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

4.      The date of commencement of the **second Renewal Period** shall be February 1, 20___, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 20___, unless Tenant exercises any option to further extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

5.      The date of commencement of the **third Renewal Period** shall be February 1, 20___, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 20___, unless the Lease terminates earlier as provided in the Lease.

Capitalized terms used, but not defined, herein shall have the meanings ascribed to them in the Lease.

IN WITNESS WHEREOF, the parties hereto have caused this Rent Commencement and
Expiration Date Agreement to be executed the date and year first above written.

[NAME OF LANDLORD]

By:_____
Name:
Title:

**TENANT:**

BED BATH & BEYOND INC.

By:_____
Warren Eisenberg
Co-Chairman

## Exhibit D

### Specifications for Landlord's Work

*Rogers, AR*

Exhibit D - Standard Landlord's Work

04/16/07

[All capitalized terms used, but not otherwise defined herein shall have the meanings ascribed to them in the Lease. The terms of the Lease regarding Landlord's Work shall be deemed to supplement the provisions of this <u>Exhibit D</u>, to the extent not inconsistent with the terms of this <u>Exhibit D</u>. It is specifically understood and agreed that all materials and supplies shall be installed in strict accordance with all manufacturers' specifications.]

<u>Landlord's Final Plans and Specifications</u>

Landlord shall provide one (1) complete full size set, one (1) complete ½ size set and one (1) copy of electronic file of the Final Plans and Specifications as well as each subsequent revision to Landlord's Plans for Tenant's use. Landlord shall develop project-specific Final Plans and Specifications in accordance with following documents:

A.    Tenant's Plans consist of the following: FIXTURE PLAN (F1); FLOOR FINISH PLANS, NOTES AND DETAILS (F2); POWER/SPECIALTY LIGHTING PLANS AND NOTES (F3); LIGHTING PLANS AND NOTES (F4); and HIGH PILE STORAGE PLAN (F5). Tenant's Plans are project-specific design-development documents. In the event of a conflict between Tenant's Plans and "Tenant's Prototype Drawings and Specifications"(defined below), then Tenant's Plans shall govern and prevail. Tenant's Plans shall be delivered to Landlord in accordance with Article 3 of the Lease.

B.    <u>Tenant's Prototype Drawings and Specifications</u> entitled "Bed Bath & Beyond Prototype Drawings and Specifications – version 1.2006, dated 03-31-06 developed by Casco Architects, comprise the following drawings and specifications:

At the time the Preliminary Plans are 85% complete, LL shall be obligated to issue Preliminary Plans to "BBBY Consultant" for review against "Quality Control Checklist". Project specific BBBY consultants to be determined by BBBY post lease execution

All site specific plans and specifications developed by Landlord and submitted to Tenant for review and approval must be in the same Format as Tenant's Prototypical Plans and Specifications as outlined within Item C. below of this Exhibit unless otherwise authorized in writing by Tenant.

Tenant shall not be obligated to review nor approve improperly formatted Landlord's Plans and/or specifications, nor shall said submission be deemed to be in compliance with Section 3.2 "Plan Approvals" of the Lease, unless said Format is complied with.

Tenant reserves the right to immediately disapprove and return improperly formatted plans to the Landlord and the Landlord shall be solely responsible for all costs and/or delays relating to revising/correcting and resubmitting the plans and/or specifications to Tenant for re-review and approval.

C.

| SHEET # | DRAWING TITLE | CURRENT ISSUE | DRAWING DATE |
|---|---|---|---|
| A0.1 | Code Data, Project Data and Responsibility Schedule | Prototype Version 1.2006 | 03/3/06 |
| A0.2 | Generic Site Requirements Plan | Prototype Version 1.2006 | 03/31/06 |
| A1.1 | Site Details | Prototype Version 1.2006 | 03/31/06 |
| A1.2 | Demolition Plan | Prototype Version 1.2006 | 03/31/06 |
| A2.1 | Store Fixture/Egress Path  Plan & Notes | Prototype Version 1.2006 | 03/31/06 |
| A2.2 | Floor Plan | Prototype Version 1.2006 | 03/31/06 |
| A2.3 | Floor Finish Plan | Prototype Version 1.2006 | 03/31/06 |
| A2.4 | Reflected Ceiling Plans & Notes | Prototype Version 1.2006 | 03/31/06 |
| A2.5 | Roof Plan Details & Notes | Prototype Version 1.2006 | 03/31/06 |
| A3.1 | Finish Schedule, Storefront Types & Vestibule Elevations | Prototype Version 1.2006 | 03/31/06 |
| A3.2 | Door Hardware, Door Schedule & Door Types | Prototype Version 1.2006 | 03/31/06 |
| A3.3 | BBB National Account Vendors & Specified Manufactures w/Distribution Schedule | Prototype Version 1.2006 | 03/31/06 |
| A4.1 | Exterior Elevations | Prototype Version 1.2006 | 03/31/06 |
| A5.1 | Building Sections, Interior Wall Sections | Prototype Version 1.2006 | 03/31/06 |
| A5.2 | Exterior Wall Sections | Prototype Version 1.2006 | 03/31/06 |
| A5.3 | Exterior Wall Sections | Prototype Version 1.2006 | 03/31/06 |
| A5.4 | Exterior Wall Sections | Prototype Version 1.2006 | 03/31/06 |
| A5.5 | Interior Wall Sections | Prototype Version 1.2006 | 03/31/06 |
| A5.6 | *Alternate* Scissor Lift Plan, Section, Specification & Notes | Prototype Version 1.2006 | 03/31/06 |
| A6.1 | Exterior Details | Prototype Version 1.2006 | 03/31/06 |
| A6.2 | Interior & Exterior Details | Prototype Version 1.2006 | 03/31/06 |
| A6.3 | Slatwall Details at Storefront | Prototype Version 1.2006 | 03/31/06 |

1

| | | | |
|---|---|---|---|
| A7.1 | Large Scale Plans & Partition Types | Prototype Version 1.2006 | 03/31/06 |
| A7.2 | Large Scale Plans & Partition Types | Prototype Version 1.2006 | 03/31/06 |
| A8.1 | Interior Details | Prototype Version 1.2006 | 03/31/06 |
| A8.2 | Interior Details | Prototype Version 1.2006 | 03/31/06 |
| A8.3 | Customer Service Desk | Prototype Version 1.2006 | 03/31/06 |
| A8.3a | *Alternate* Customer Service Desk (16FT. Version) Right Orientation | Prototype Version 1.2006 | 03/31/06 |
| A8.3b | *Alternate* Customer Service Desk (16FT. Version) Left Orientation | Prototype Version 1.2006 | 03/31/06 |
| A8.3c | *Alternate* Customer Service Desk (20FT. Version) Right Orientation | Prototype Version 1.2006 | 03/31/06 |
| A8.3d | *Alternate* Customer Service Desk (20FT. Version) Left Orientation | Prototype Version 1.2006 | 03/31/06 |
| A8.3e | *Alternate* Customer Service Desk (12FT. Version) Right Orientation | Prototype Version 1.2006 | 03/31/06 |
| A8.3f | *Alternate* Customer Service Desk (12FT. Version) Left Orientation | Prototype Version 1.2006 | 03/31/06 |
| A8.4 | Register Bays | Prototype Version 1.2006 | 03/31/06 |
| A8.4a | *Alternate* Register Bays (U-Shape Check-Out) | Prototype Version 1.2006 | 03/31/06 |
| A8.4b | *Alternate* Register Bays (Tandem Express Checkout) | Prototype Version 1.2006 | 03/31/06 |
| A8.5 | Remote Service Desks | Prototype Version 1.2006 | 03/31/06 |
| A9.1 | Interior Elevations | Prototype Version 1.2006 | 03/31/06 |
| A9.2a | Bridal Registry Installation Details - (Exterior Units) | Prototype Version 1.2006 | 03/31/06 |
| A9.2b | Bridal Registry Installation Details - (Interior Units) | Prototype Version 1.2006 | 03/31/06 |
| A9.2c | Bridal Registry Installation Details - (Hand Rail & Sign) | Prototype Version 1.2006 | 03/31/06 |
| A9.3 | *Alternate* Plans, Elevations & Details | Prototype Version 1.2006 | 03/31/06 |
| A9.4 | FTG Fixture Plan & Vendor Responsibility Schedule | Prototype Version 1.2006 | 03/31/06 |
| A9.6 | *Alternate* Awning Details | Prototype Version 1.2006 | 03/31/06 |
| A9.7 | *Alternate* Awning Details | Prototype Version 1.2006 | 03/31/06 |
| A9.8 | *Alternate* Wall Sections At Awning | Prototype Version 1.2006 | 03/31/06 |
| HP1.1 | High Pile Storage Plan & Fixture-Shelf Details | Prototype Version 1.2006 | 03/31/06 |
| S1.1 | Structural General Information & Typical Details | Prototype Version 1.2006 | 03/31/06 |
| S2.1 | Foundation Plan | Prototype Version 1.2006 | 03/31/06 |
| S2.2 | Roof Framing Plan | Prototype Version 1.2006 | 03/31/06 |
| S3.1 | Foundation Details | Prototype Version 1.2006 | 03/31/06 |
| S3.2 | Roof Framing Details | Prototype Version 1.2006 | 03/31/06 |
| P1.1 | Plumbing Riser Diagrams and Fixture Schedule | Prototype Version 1.2006 | 03/31/06 |
| P2.1 | Plumbing Floor Plan | Prototype Version 1.2006 | 03/31/06 |
| P3.1 | Plumbing Enlarged Plans & Details | Prototype Version 1.2006 | 03/31/06 |
| FP1.0 | Fire Sprinkler Plans, Notes & Details | Prototype Version 1.2006 | 03/31/06 |
| FP1.1 | Fire Sprinkler Notes and Details | Prototype Version 1.2006 | 03/31/06 |
| FA1.0a | Fire Alarm Plans & Notes Base System | Prototype Version 1.2006 | 03/31/06 |
| FA1.0b | *Alternate* Fire Alarm Plans & Notes Occupant Notification | Prototype Version 1.2006 | 03/31/06 |
| FA1.0c | *Alternate* Fire Alarm Plans & Notes Full Smoke Detection | Prototype Version 1.2006 | 03/31/06 |
| FA1.1a | Fire Alarm Details Base System | Prototype Version 1.2006 | 03/31/06 |
| FA.1.1b | *Alternate* Fire Alarm Details Occupant Notification | Prototype Version 1.2006 | 03/31/06 |
| FA1.1c | *Alternate* Fire Alarm Details Full Smoke Detection | Prototype Version 1.2006 | 03/31/06 |
| FA1.2a | Fire Alarm Device Lists & Calcs Base System | Prototype Version 1.2006 | 03/31/06 |
| FA1.2b | *Alternate* Fire Alarm Device Lists & Calcs Occupant Notification | Prototype Version 1.2006 | 03/31/06 |
| FA1.2c | *Alternate* Fire Alarm Device Lists & Calcs Full Smoke Detection | Prototype Version 1.2006 | 03/31/06 |
| M1.1 | Mechanical General Information | Prototype Version 1.2006 | 03/31/06 |
| M2.1 | Mechanical Floor Plan | Prototype Version 1.2006 | 03/31/06 |
| M3.1 | Mechanical Large Scale Plans & Details | Prototype Version 1.2006 | 03/31/06 |
| M4.1 | Mechanical Schedules & Details | Prototype Version 1.2006 | 03/31/06 |
| E1.1 | Electrical General Information & Schedules | Prototype Version 1.2006 | 03/31/06 |
| E2.1 | Power Plan | Prototype Version 1.2006 | 03/31/06 |
| E2.2 | Lighting Layout Plan | Prototype Version 1.2006 | 03/31/06 |
| E2.3 | Lighting Circuiting Plan | Prototype Version 1.2006 | 03/31/06 |
| E2.4 | Specialty Lighting Plans & Diagrams | Prototype Version 1.2006 | 03/31/06 |
| E2.5 | Specialty Lighting Elevations | Prototype Version 1.2006 | 03/31/06 |

| E3.1 | Electrical Large Scale Plans & Details | Prototype Version 1.2006 | 03/31/06 |
|------|----------------------------------------|--------------------------|----------|
| E3.2 | Lighting Sequencing | Prototype Version 1.2006 | 03/31/06 |
| E3.3 | Electrical Details | Prototype Version 1.2006 | 03/31/06 |
| E4.1 | Electrical Schedules | Prototype Version 1.2006 | 03/31/06 |
| E4.2 | Electrical Diagrams | Prototype Version 1.2006 | 03/31/06 |
| E4.3 | Electrical Schedules | Prototype Version 1.2006 | 03/31/06 |
| E4.4 | Novar Wiring Details | Prototype Version 1.2006 | 03/31/06 |
| E4.4a | *Alternate* Novar Wiring Details for RTU's Other Than Lennox | Prototype Version 1.2006 | 03/31/06 |
| E4.5 | ETM Details for Lennox RTU's | Prototype Version 1.2006 | 03/31/06 |
| E4.5a | *Alternate* ETM Wiring Details For Non-Lennox RTU's | Prototype Version 1.2006 | 03/31/06 |
| E5.1 | FTG Power, Lighting & Specialty Lighting | Prototype Version 1.2006 | 03/31/06 |
| E6.1 | *Bid Alternate:* Modular Wiring (Data Only) Plans & Details | Prototype Version 1.2006 | 03/31/06 |

Project Manual for Bed Bath & Beyond, dated March 31, 2006.

D.      Neither Tenant's Plans nor Tenant's Prototype Drawings and Specifications reflect regional or governmental requirements. Such regional/governmental requirements may include but not limited to the following: Stockroom/Sales Area partition between sales area and stockroom may be required including all openings through the partition be properly protected; Disability access to mezzanine level such as an ADA lift, limited use/limited application elevator, or elevator may be required including installation of phone lines to cab; The number of restroom fixtures, number of exit stairs, smoke purge and pressurization system, smoke/heat vents, draft curtains, fire rated walls, ceiling or floors required to meet high pile storage requirements, etc. may need to be modified to comply with all applicable Legal Requirements.

In addition, Landlord shall include the following items as part of the Final Plans and Specifications:

1.      All architectural elevations and construction details for all pylon, monument and directional signs located throughout the Shopping Center.

2.      All architectural elevations and partial sidewalk plans of all other tenants and occupants of the Shopping Center.

3.      Complete civil engineering documents that describe planned improvements to the Shopping Center, including geo-technical and stormwater design reports.

## Site Specifications

A.      A

B.      All truck access drives in the Shopping Center shall consist of a minimum 12" of compacted sub-base (95% compacted), 4" class 7 aggregate base course, and 6" Portland cement concrete paving. Grading of these areas are not to exceed a slope of 3%.

C.      All truck ramps and dumpster pads shall consist of 12" compacted sub-base (95% compacted), 4" class 7 aggregate and 7" Portland cement concrete surface finish. Reinforcement is WWM in lieu of rebar. Recessed truck ramps shall not exceed slope of 5%.

If Landlord's geo-technical report for the Shopping Center recommends more stringent requirements, then the geo-technical report recommendations shall supersede the criteria stated in items A, B, and C above.

D.      The minimum lighting level throughout the Shopping Center (parking areas, traffic drives, service drives, etc.) shall be at least two (2) foot-candles, measured 30" above grade. Landlord shall include a photometric plan, which shall confirm that the proposed lighting meets these requirements as part of the Final Plans and Specifications. Landlord shall not include illumination from building-mounted wall packs when calculating the required foot-candle level. Landlord shall provide low level security lighting min. (1) foot-candle throughout center that shall remain illuminated from dusk to dawn seven days a week.

## Building Requirements

The following describes project-specific elements of Landlord's Work in addition to the scope detailed in Tenant's Prototype Drawings and Specifications:

A.      Clear Height - Building systems (plumbing & electrical) shall be designed to allow Tenant to stock merchandise up to at least 16'-6" a.f.f. All plumbing and electrical elements shall be located at least 16'-6" a.f.f., except for Tenant's light fixtures. Mechanical shall be designed at a minimum of 17'-6" a.f.f. to bottom of duct. Maximum bottom of supply and return duct height shall not exceed 19'-0" a.f.f. Fire protection sprinkler piping (main and branch lines) shall be located at least 16'-6" a.f.f., sprinkler heads shall be located within 1" minimum and 6" maximum from the roof/floor deck. Bottom of all structural elements shall be located at least 18'-4" a.f.f.

B.      Fire Alarm System - Landlord shall furnish and install a fire alarm system in accordance with the minimum base standards set forth in Tenant's Prototypical Plans and Specifications, or more stringent requirements

3

as may be required by law. Landlord shall be responsible for monitoring the fire alarm system up to 90 days after the Delivery Date.

LL shall issue complete fire alarm system submittal consisting of site specific drawings and equipment cut sheets to CCI for their review and approval no later than (12) weeks prior to projected delivery date. The fixed cost to LL for this initial review is $600.00 which includes costs associated with printing and shipping. LL must pay this fee at time of plan review, the review will not commence without prepayment of fee. If subsequent reviews are required by CCI due to initial rejection, then fixed cost to LL for subsequent reviews shall be on a time and material basis. The hourly rate for these subsequent reviews shall be $125.00/hour plus reimbursables associated with printing and shipping. Fees for this work will be issued subsequent to the review. If LL fails to issue payment to CCI within 30 days, then Tenant has right to pay CCI direct and deduct cost from rent payment.

Mr. Will Smith
Code Consultants, INC.
Work:        (314) 991-2633
Fax:         (314) 991-4614
1804 Borman Circle Drive
St. Louis, Missouri 63146-4136

C.  1st Level Structure (sales/non-sales level) - Landlord shall provide a minimum 4000 psi concrete floor slab having a minimum thickness of 4". Structural system shall be rated to accept 125 lb. per square foot of live load. If rebar or pretensioned or post-tensioned steel is required, it shall not be placed within the top 2 ½" of the concrete slab. In lieu of rebar GGP is providing 6x6 welded wire fabric located in the center of the slab (2").

D.  Sprinkler System - The sprinkler system shall be designed to allow fixturing and storage to be within 18" of heads. System shall comply with 1999 or later version of NFPA13, (high pile solid shelf storage) for class I-IV commodity solid shelves, minimum 4 foot aisles. Typically, .486 GPM over 2000 sf will be required.

E.  Landlord shall provide sprinkler system sufficient to meet the requirements specified within Tenant's Prototype Drawings and Specifications without utilizing a fire pump if existing water pressure allows. If water pressure is inadequate and system cannot be designed to properly function without incorporating a fire pump, then Landlord shall locate Fire Pump outside of Premises. Landlord shall maintain Fire Pump for the full term of the Lease without any cost to Tenant. Landlord shall, without any cost to Tenant and for the full term of the Lease, routinely inspect, test, and maintain the Fire Pump in accordance with NFPA 25, Standard for the Inspection, Testing, and Maintenance of Water-based Fire Protection Systems (Chapter 5 of 1998 Edition).

F.  LL shall issue complete fire protection submittal consisting of site specific head locations, hydraulic calculations and equipment cut sheets to CCI for their review and approval no later than (12) weeks prior to projected delivery date. The fixed cost to LL for this initial review is ▮▮▮▮▮▮which includes costs associated with printing and shipping. LL must pay this fee at time of plan review, the review will not commence without prepayment of fee. If subsequent reviews are required by CCI due to initial rejection, then fixed cost to LL for subsequent reviews shall be on a time and material basis. The hourly rate for these subsequent reviews shall be ▮▮▮▮▮▮ plus reimbursables associated with printing and shipping. Fees for this work will be issued subsequent to the review. If LL fails to issue payment to CCI within 30 days, then Tenant has right to pay CCI direct and deduct cost from rent payment.

If BBBY national fire protection consultants are needed to assist LL with approvals from governmental authorities such as completing technical discussions with governmental authorities to explain/clarify design parameters, calculations, high pile storage commodity classifications, fire pump design, etc., then LL shall directly pay consultant for all time and materials. If LL fails to pay consultant, then Tenant shall have the right to receive a credit against "Changes" under the lease or deduct amount from Rent in order to satisfy outstanding invoice.

Mr. Will Smith
Code Consultants, INC.
Work:        (314) 991-2633
Fax:         (314) 991-4614
1804 Borman Circle Drive
St. Louis, Missouri 63146-4136

G.  If fire-proofing of structural elements is required, then Landlord shall use intumescent fire resistive coating. All edges of application shall be neat, clean and straight. All edges of material to be parallel to structural element being treated.

H.  If applicable, Landlord shall complete and make operational all vertical transportation equipment (passenger and freight elevators, escalators, cart conveyors, etc.) a minimum of (2) two weeks in advance of Delivery. Landlord shall continuously operate such equipment in accordance with manufacturers recommendations during this (2) week period in order to allow equipment to properly "Burn-In". "Burn-In" required in order to identify and repair any potential mechanical deficiencies that may exist with the equipment prior to Delivery.

I.  Landlord to contact APM to determine which vinyl strip flooring vendor to use:

Associated Carpet                    Gerbert Limited
18 Sidney Circle                     715 Fountain Avenue

4

Kenilworth, NJ 07033                      (P.O. Box 4944)
Attn: Damian Holder                       Lancaster, PA
Phone: 800-800-4320                       Attn: Simon Zimmerman
                                          Phone: 800-828-9461 Ext. 16

## Construction Coordination Requirements

A.   Landlord shall provide Tenant with a critical path schedule prior to commencement of Landlord's Work, and shall provide to Tenant's construction project manager an updated critical path schedule every two weeks thereafter until Landlord's Work is completed

B.   Throughout the period during which Landlord's Work is being performed, Landlord shall provide to Tenant's construction project manager, on a weekly basis, then-current photographs of the interior and exterior of the Premises, and the Shopping Center site, showing the progression of Landlord's Work. All photographs shall be in a digital format, and transmitted to Tenant at e-mail address at BBB.2000photos@bedbath.com

## Building and Site Signs

A.   Building Signs – Landlord shall furnish and install all building signs shown on Exhibits D-1 and F utilizing Tenant's specified vendor only. Landlord is responsible to verify actual number of circuits required with Tenant's specified vendor. Conduit to be installed continuously from Tenant's panel in Premises to sign location(s). Landlord required to execute purchase order with Tenant's specified vendor within 10 weeks prior to Delivery Date. If Landlord fails to execute purchase order within this time frame, then at Tenant's option, Tenant may execute purchase order with Tenant's specified vendor and deduct all costs from rent, (or , at Tenant's option , receive a credit against "Changes" under the lease). If Tenant does not provide written notice to Landlord regarding Tenant's decision to execute purchase order with Tenant's specified vendor, then Landlord shall remain responsible to execute purchase order.

B.   Remote Building Signs – (Building Sign not located on Premises) Landlord shall furnish and install all building signs shown on Exhibits D-1 and F utilizing Tenant's specified vendor only. Landlord is responsible to verify actual number of circuits required with sign manufacturer. Conduit to be installed continuously from Tenant's panel in Premises or other source to remote sign location(s).

C.   Pylon/Monument/Directional Signs – Landlord shall furnish and install all pylon /monument /directional signs (s) shown on Exhibit F to this Lease, complete (including, without limitation, sign structure, any required electrical service, sign panels, and Tenant's specified graphics).

D.   Temporary Signs – commencing on the Effective Date, and continuing thereafter through the Rent Commencement Date, Landlord shall furnish, install and maintain, for such duration as Tenant may desire, and in accordance with Tenant's Prototype Drawings and Specifications [and Exhibit F to this Lease, as applicable]: (i) a temporary banner bearing the phrase "Coming Soon" on the storefront of the Premises, and (ii) a temporary sign near the site of the [future] main entrance to the Shopping Center, bearing the phrase "Bed Bath & Beyond Coming Soon". At Tenant's request, Landlord shall relocate Tenant's temporary signage, in the event the visibility thereof becomes obstructed. Landlord shall secure banners through the following vendor:

Corporate Identification Solutions
5308 N. Northwest Highway
Chicago, IL 60630
Attn: Sarah Glenn
P: 773.763.9600
F: 773.763.9606
C: 773.454.6069
sarah@corporateidsolutions.com
www.corporateidsolutions.com

E.   Landlord shall provide complete shop drawings of all Landlord-furnished signs to Tenant for Tenant's approval at least (12) weeks prior to delivery date.

## Permits and Approvals

A.   Landlord to secure all permits required to allow Tenant to fixture, merchandise (including without limitation permits for it's for prepackaged foods), and open for business to the public in the Premises.

If Seismic calculations, plans and details are required, then Landlord shall be obligated to contract with "Seizmic Inc." no later than (12) weeks prior to delivery. Seizmic Inc. shall provide the necessary services to assist Landlord in securing the fixture permit. These services include completion of all required submittal documents, required applications, responses to inquiries from the authority having jurisdiction and monitoring status of permit. Actual submission of the required documents to the AHJ shall be made only by Seizmic, Inc., or other vendor selected at Tenant's discretion.

Seizmic Inc.
Contact: Sal Fateen or Genie Fateen

5

161 Atlantic Street, Pomona, CA 91768
Ph. # 909 869 0989

Landlord shall be obligated to take possession of Fixture permit and transfer permit to Tenant's fixture installer. If fixture permit is required, then Landlord shall secure fixture permit no later than (2) weeks prior to delivery date.

B.    Sprinkler system design shall allow Landlord to obtain and secure "high pile storage" permit.

## Construction Closeout

A.    Landlord shall be obligated to forward (1) hard copy of all required documents outlined with Section 01700 – Contract Closeouts, of Tenant's Prototype Specifications / Project Manual to **Digital Reliance Incorporated (DRI), 386 Charmel Place, Columbus, OH 43235, (614) 430-5950, jg@digital-reliance.com,** for purpose of scanning to disk for Tenant's future use. All documents shall be delivered to DRI within thirty (30) days after the "Substantial Completion Date. The cost associated with this service is ▓▓▓▓ ▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

Prior to scanning, DRI will confirm submittal from Landlord meets base minimum requirements and shall inform Landlord directly if certain documents are missing. DRI will not review items for content. The content will be reviewed once electronic file has been received by Tenant's Construction Project Manager. Any need for resubmittal due to incorrect content, etc. will be communicated to Landlord from Tenant's Construction Project Manager. Landlord to resubmit amended document to DRI for scanning and incorporation into file until approved by Tenant's Construction Project Manager.

Once Electronic file has been completed, it shall be forwarded directly to Tenant's Construction Project Manager with transmittal copy to Landlord within sixty (60) days after the "Substantial Completion Date".

B.    Landlord shall cause its contractor(s) to instruct Tenant's Construction Project Manager in the operation of any equipment installed pursuant to these specifications. All of Landlord's Work shall be performed in a manner which will not void, impair or diminish any manufacturers', installers', or contractors' warranties which otherwise would have been provided by such manufacturer, installer, or contractor to either Landlord or Tenant. Two (2) months prior to the end of the warranty period, Landlord must forward a written report to Tenant on the condition of all warranty items.

C.    If Landlord fails to deliver any of the instruments and items (collectively, the "Close-out Documents") described in the immediately preceding paragraph A within the prescribed thirty (30) day period, then Tenant may provide Landlord with notice of such failure. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

D.    Itemized Budget - Landlord shall provide Tenant with its itemized "budget" and "final cost" within thirty (30) days after the Substantial Completion Date.

E.    Landlord shall be obligated to provide to Tenant within 30 days of Tenants request copies of manufactures invoice(s), manufactures cut sheets, Subcontractor invoices, etc. for any item or items described within Exhibit D - Standard Landlord's Work.

Exhibit D-1

Exterior Elevations of Premises and Sidewalk Plan



PARTIAL SIDEWALK PLAN

FRONT ELEVATION

SIDE ELEVATION

REAR ELEVATION

GENERAL NOTES:
1. ENTRY MAY SHOW BASED ON TENANTS FINAL FIXTURE PLAN.
2. FENESTRATION INDICATED IS SCHEMATIC AND IS SUBJECT TO TENANTS PLANS.

# EXHIBIT D-1

**EXTERIOR ELEVATIONS OF THE PREMISES, AND SIDE WALK PLAN**

ROGERS, AR

5.9.07

Exhibit D-2

Exterior Elevations of Adjacent Premises

C061858/0205454/1372981.6



EXHIBIT D-2
EXTERIOR ELEVATIONS OF
THE SHOPPING CENTER
ROGERS, AR

## **EXHIBIT E**

### Permitted Encumbrances

1.  Reservations, Restrictions, Easements, Dedications, Right of Ways and Setback tines as may be shown upon the recorded plat of said Pinnacle Hills Promenade Subdivision, filed for record in Plat Record Book 2006 at Page 1356 and Final Plat recorded in Plat Book 2006 at Page 1356, of the Records of Benton County, Arkansas.

2.  Matters as set out on Surveys filed for record in Plat Book 2005 at Page 1150, Plat Book P3 at Page 395, and Plat Book 2005 at Page 73, among the records of Benton County, Arkansas.

3.  Restrictive Covenant Agreement filed for record October 10, 2005, as Land Document No. 2005-54722, among the land records of Benton County, Arkansas.

4.  Transmission Line Easement in favor of Carroll Electric Cooperative Corporation, a cooperative corporation, dated January 24, 1980, and filed for record January 24, 1980, in Record Book 558 at Page 625, among the land records of Benton County, Arkansas.

5.  Utility Easement in favor of the City of Rogers, Arkansas, a municipal corporation, dated April 6, 1995, and filed for record April 12, 1995, as Land Document No. 95-022015, among the land records of Benton County, Arkansas.

6.  Utility Easement in favor of the City of Rogers, Arkansas, a municipal corporation, dated April 10, 1995, and filed for record April 12, 1995, as Land Document No. 95-022047, among the land records of Benton County, Arkansas.

7.  Sanitary Sewer Utility Easement in favor of the City of Rogers, Arkansas, a municipal corporation, dated November 10, 2000, and filed for record November 30, 2000, as Land Document No. 00123891, among the land records of Benton County, Arkansas.

8.  Utility Easement in favor of the City of Rogers, Arkansas, a municipal corporation, dated February 1, 2001, and filed for record March 20, 2001, as Land Document No. 01033759, among the land records of Benton County, Arkansas.

9.  Transmission Line Easement in favor of Carroll Electric Cooperative Corporation, a cooperative corporation, dated January 24, 1980, and filed for record January 24, 1980, in Record Book 558 at Page 625, among the land records of Benton County, Arkansas.

10. Transmission Line Easement in favor of Carroll Electric Cooperative Corporation, a cooperative corporation, dated September 23, 1997, and filed for record May 15, 1998, as Land Document No. 98-050791, among the land records of Benton County, Arkansas.

11. Transmission Line Easement in favor of Carroll Electric Cooperative Corporation, a cooperative corporation, dated August 27, 1997, and filed for record May 15, 1998, as Land Document No. 98-050795, among the land records of Benton County, Arkansas.

12. Sewer Easement in favor of the City of Rogers, Arkansas, a municipal corporation, dated July 12, 2005, and filed for record July 13, 2005, as Land Document No. 2005-35369, among the land records of Benton County, Arkansas.

13. Sewer Easement in favor of the City of Rogers, Arkansas, a municipal corporation, dated October 25, 2005, and filed for record November 15, 2005, as Land Document No. 2005-62047, among the land records of Benton County, Arkansas.

14. Sewer Easement in favor of the City of Rogers, Arkansas, a municipal corporation, dated October 25, 2005, and filed for record November 15, 2005, as Land Document No. 2005-62052, among the land records of Benton County, Arkansas.

15. Detention Pond Maintenance Agreement, dated April 28, 2005 and filed for record May 9, 2005, as Land Document No. 2005-119180, among the land records of Benton County, Arkansas.

16. Restrictive Covenant Agreement, dated September 20, 2005, and filed for record October 10, 2005, as Land Document No. 2005-54722, among the land records of Benton County, Arkansas.

17. Memorandum of Option Agreement, dated September 30, 2005, and filed for record October 10, 2005, as Land Document No. 2005-279223, among the land records of Benton County, Arkansas.

18. Utility Easement in favor of the City of Rogers, Arkansas, a municipal corporation, dated June 15, 2005, and filed for record February 1, 2006, as Land Document No. 2006-6453, among the land records of Benton County, Arkansas.

19. Utility Easement in favor of the City of Rogers, Arkansas, a municipal corporation, dated March 30, 2005, and filed for record February 1, 2006, as Land Document No. 2006-6458, among the land records of Benton County, Arkansas.

20. Memorandum of Lease dated January 6, 2006, and filed for record February 8, 2006, as Land Document No. 2006-36047, among the land records of Benton County, Arkansas, showing J.C. Penney Properties, Inc., as Tenant and Rogers Retail, L.L.C., as Landlord.

21. Street Right of Way, Drainage and Utility Easement Deed in favor of the public, dated March 8, 2006, and filed for record March 9, 2006, as Land Document No. 2006-12579, among the land records of Benton County, Arkansas.

22. Street Right of Way, Drainage and Utility Easement Deed in favor of the public, dated March 8, 2006, and filed for record March 9, 2006, as Land Document No. 2006-12588, among the land records of Benton County, Arkansas.

23. Utility Easement in favor of the City of Rogers, Arkansas, a municipal corporation, dated March 8, 2006, and filed for record March 9, 2006, as Land Document No. 2006-12592, among the land records of Benton County, Arkansas.

24. Memorandum of Lease between Rogers Retail, LLC, (Landlord), and Michael A. Lightman, Sr. (Tenant) and Malco Theatres, Inc., (Guarantor), dated August 10th, 2005, and filed for record April 14, 2006, as Land Document No. 2006-19457 among the records of Benton County, Arkansas. Also, First Amendment to Memorandum of tease filed for record April 26, 2006, as Land Document No. 2006-106717, Benton County, Arkansas. Also, Memorandum of Amended and Restate Sublease and Ratification of Assignment, filed for record April 26, 2006, as Land Document No. 2006-21195, Benton County, Arkansas.

25. Construction, Operation and Reciprocal Easement Agreement, by and between Rogers Retail, LLC, and Dillard's Dollars, Inc., dated May 16, 2006, and filed for record May 19, 2006, as Land Document No. 2006-129634, among the land records of Benton County, Arkansas.

26. Utility Easement in favor of Southwestern Bell Telephone Company, a Texas limited partnership, d.b.a. AT&T Arkansas, dated June 13, 2006, and filed for record June 14, 2006, as Land Document No. 2006-29893, among the land records of Benton County, Arkansas.

27. Declaration of Covenants, conditions, restrictions, and easements, filed for record June 29, 2006, as Land Document No. 2006-32609, among the land records of Benton County, Arkansas.

28. Matters as shown in Survey recorded July 5, 2006, in Plat Book 2006 at Page 792, among the land records of Benton County, Arkansas.

29. Memorandum of Lease between Rogers Retail, LLC, (Landlord) and Borders, Inc., (Tenant), dated May 18, 2006, filed for record August 8, 2006, as Land Document No. 2006-205641, among the land records of Benton County, Arkansas.

30. Utility Easement in favor of Southwestern Telephone Company, filed for record August 16, 2006, as Land Document No. 2006-40320, among the land records of Benton County, Arkansas.

31.   UCC Financing Statement showing Ozark Treats, Inc. and Dairy Queen and Orange Julius, as Debtor and Comerica Bank, as Secured Party, filed for record August 24, 2006, as Document No. 2006-1262, Benton County, Arkansas.

32.   Assignment and Assumption of Construction, Operation and Reciprocal Easement Agreement by and between Rogers Retail, LLC and Pinnacle South, LLC, filed for record November 21, 2006 as Land Document No. 2006-55895 among the land records of Benton County, Arkansas.

33.   Memorandum of Ground Lease between Rogers Retail LLC (Landlord) and Sullivan's of Arkansas, Inc. (Tenant) filed for record December 6, 2006, as Land Document No. 2006-312519 among the land records of Benton County, Arkansas.

Landlord represents and warrants that (i) none of the foregoing will interfere with or prevent Tenant from operating its Premises in accordance with the terms of this Lease, (ii) conflict with any right granted Tenant under this Lease, (iii) impose on Tenant any obligation(s) in excess of those set forth in this Lease, and (iv) none of the foregoing easements or rights of way (a) are located beneath the Premises, or (b) will interfere with Tenant's use and enjoyment of the Premises.

The inclusion of the foregoing memoranda of lease or other similar agreements as set forth in items 17, 20, 24, 29, 31 and 33 within these "Permitted Encumbrances" is for informational purposes only, and shall not be deemed to diminish any of Tenant's rights, or increase any of Tenant's obligations, under this Lease.

C061858/0205454/1372981.6

Exhibit F

Signage



### MATERIALS

| | POWER WHITE / GEWHPTS2 | | GELCLPSS / GELCLP88 | | GELCLSC2 | GELCLSW1 | GELCLEC1 | N/A | N/A |
|---|---|---|---|---|---|---|---|---|---|
| | WHITE | | SELF-CONTAINED POWER SUPPLIES | | SPLICE CONNCTR | SUPPLY WIRE | END CAP | LT. GUIDE CONNCTN | LIGHT GUIDE |
| | Ft | In | Bank # | Bank # | Qty | Ft | Qty | Qty | Ft |
| 120" | | | | #1SB1 | 10 | 48 | 20 | | |
| B | 32 | 0 | #2B1-4 | #1SB1 | 10 | 40 | 20 | | |
| E | 30 | 0 | #2B1-4 | #1SB1 | 10 | 40 | 20 | | |
| D | 30 | 0 | #4B1-4 | #2B1 | 10 | 40 | 20 | | |
| B | 32 | 0 | #4B1-4 | #2B1 | 10 | 40 | 20 | | |
| A | 31 | 0 | #2B1-4 | #2B1 | 10 | 48 | 24 | | |
| T | 19 | 0 | #6B1-3 | | 8 | 24 | 12 | | |
| H | 37 | 0 | #2B1-4 | #2SB1 | 10 | 48 | 20 | | |
| A | 37 | 0 | #2B1-4 | #24B1/#2SB | 12 | 48 | 24 | | |
| E | 31 | 0 | #2B1-4 | #2SB1 | 10 | 48 | 20 | | |
| F | 34 | 0 | #1SB1-4 | #2B1 | 10 | 48 | 20 | | |
| V | 39 | 0 | #1SB1-4 | #2B1 | 10 | 40 | 20 | | |
| O | 26 | 0 | #12B1-3 | | 8 | 32 | 16 | | |
| | 18 | 0 | #2B1-3 | | 6 | 24 | 12 | | |
| N | 26 | 0 | #4B1-4 | | 8 | 32 | 16 | | |
| | 22 | 0 | #1SB1-4 | | 8 | 32 | 16 | | |
| D | 26 | 0 | #4B1-4 | | 8 | 32 | 16 | | |
| | 29 | 0 | #1TB1-4 | | 8 | 32 | 16 | | |
| | 9 | 0 | | #2SB1 | 2 | 8 | 4 | | |
| TOTAL: | 560 ft | 0 in | 17 | 12 | 150 | 624 | 312 | 0 | 0 |

TECHNICAL SUPPORT  
216-898-9982  
WWW.GELCORE.COM

Drawn By: D.THRUSH  
Date: 1/04/06  
Rev: 00

**GELcore, LLC**

Tetra™ LED Systems

VALLEY VIEW, OH 44125  
216-898-8336

PAGE 3 OF 3





GELCORE LED LAYOUT

| | .063 ALUM. RETURN |
| | 1" JEWELITE FACE |
| | TOGGLE SWITCH |
| | .090 ALUM. BACK STAPLED |
| | POWER SUPPLY |
| | ½" CARFLEX CONDUIT x 15' CARFLEX WHIP |
| | EQUIPMENT GROUND |
| | LED. GELCORE 2/ft. TETRA, (WHITE) |
| | GELCORE SPLICE CONNECTOR |
| | ⅜" NON-CORROSIVE LAG BOLTS OR THREADED ROD AS REQ'D. |
| | 1/4" WEEP HOLE w/LIGHT BAFFLE BEAD AROUND INTERIOR SEAM |

CROSS SECTION MOUNTING DETAIL  
SCALE: NTS

— 40'–0" —

4'–9⅞"

10'–0"

3'–9⅞"

ELEVATION

ELECTRICAL NOTE—Actual # of circuits to be determined by a Licensed Electrical Contractor.  
TOTAL AMPS— 31.50A  
# OF CKTS— 2  20 AMP(RECOMMENDED)  
VOLTS— 120  
ALL SIGNAGE WILL BE (U.L.) LISTED, (U.L.) 2161 COMPLIANT AND CARRY (U.L.) LABELS.



*NOTE:  
INSTALL TOGGLE SWITCH TO OPERATE (ON/OFF) IN THE HORIZONTAL POSITION.

| 1  SWITCH PER LETTER |

| IF NON-STANDARD PRODUCT CHECK APPROPRIATE BOX BELOW |
|---|
| ☐ – RED FACE |
| ☐ – BLACK RETURNS |
| ☐ – DARK BRONZE RETURNS |

COLOR NOTES:  
RETURN: 6"x.063 WHITE  
TRIM: TO MATCH RETURN  
  LTRS UNDER 42" USE 1" WHITE JEWELITE  
  LTRS 42" AND ABOVE USE L MOLD  
  PAINTED WHITE  
FACE: 2447 WHITE SG 41D LEXAN  
LED: WHITE GELCORE TYPE-GEWHPTS2  
INSIDE OF CAN TO BE PAINTED  
  SEMI GLOSS WHITE

GENERAL NOTE:  
  MINIMUM #8 SHEET METAL SCREWS ARE TO BE USED FOR SECURING THE FACE TO THE LETTER RETURN.  
  THE MAXIMUM SPACING SHALL NOT EXCEED 18" AND NO FEWER THAN FOUR SCREWS ARE TO BE USED PER FACE.

5.9.07

# EXHIBIT 'F'
## BUILDING SIGN
ROGERS, AR  
SHEET 1 of 4

## MATERIALS

| POWER WHITE | GEWHITES2 | GELCLPSS | GELCLPS6 | GELSC2 | GELSW1 | GECLEC1 | N/A | N/A |
|---|---|---|---|---|---|---|---|---|
| WHITE | 28FT | SELF-CONTAINED POWER SUPPLIES | | SPLICE CONNCTR | SUPPLY WIRE | LT. GUIDE CONNCTR | END CAP | LIGHT GUIDE |
| 69" | Ft | In | Item # | Item # | Qty | Ft | Qty | Qty | Ft |
| B | 5 | 0 | | #1B1 | 3 | 6 | 6 | | |
| | 5 | 0 | | #2B1 | 3 | 6 | 6 | | |
| E | 4 | 0 | | #2B1 | 3 | 6 | 6 | | |
| | 5 | 0 | | #4B1 | 3 | 6 | 6 | | |
| D | 6 | 0 | | #5B1 | 2 | 6 | 4 | | |
| | 6 | 0 | | #6B1 | 3 | 6 | 6 | | |
| D | 6 | 0 | | #7B1 | 3 | 6 | 6 | | |
| | 6 | 0 | | #8B1 | 3 | 6 | 6 | | |
| A | 6 | 0 | | #9B1 | 3 | 6 | 6 | | |
| | 6 | 0 | | #10B1 | 3 | 6 | 6 | | |
| H | 5 | 0 | | #11B1 | 3 | 6 | 6 | | |
| | 5 | 0 | | #12B1 | 3 | 6 | 6 | | |
| A | 5 | 0 | | #13B1 | 3 | 6 | 6 | | |
| | 6 | 0 | | #14B1 | 3 | 6 | 6 | | |
| B | 6 | 0 | | #15B1 | 3 | 6 | 6 | | |
| | 6 | 0 | | #16B1 | 3 | 6 | 6 | | |
| E | 5 | 0 | | #17B1 | 3 | 6 | 4 | | |
| | 6 | 0 | | #18B1 | 2 | 6 | 4 | | |
| Y | 4 | 0 | | #19B1 | 2 | 6 | 4 | | |
| | 4 | 0 | | #20B1 | 2 | 6 | 4 | | |
| | 4 | 0 | | #21B1 | 2 | 6 | 4 | | |
| O | 6 | 0 | #22B1 | | 2 | 9 | 4 | | |
| | 6 | 0 | #23B3 | | 2 | 9 | 4 | | |
| | 6 | 0 | #24B3 | | 2 | 9 | 4 | | |
| N | 7 | 0 | | #25B1 | 2 | 6 | 6 | | |
| | 7 | 0 | #24B1 | | 3 | 9 | 6 | | |
| D | 7 | 0 | #25B1 | | 2 | 9 | 4 | | |
| | 7 | 0 | #26B2 | | 2 | 9 | 4 | | |
| | 7 | 0 | #26B1 | | 2 | 9 | 4 | | |
| **TOTAL** | 163 | 0 In | 6 | 23 | 75 | 232 | 152 | 0 | 0 |

| TECHNICAL SUPPORT | Drawn By: G THRUSH | GELcore, LLC | VALLEY VIEW, OH 44125 |
|---|---|---|---|
| 216-606-6993 | Date: 1/24/06 | | 216-606-6555 |
| WWW.GELCORE.COM | Rev: 00 | Tetra™ LED Systems | PAGE 2 OF 2 |



.063 ALUM. RETURN

1" JEWELITE FACE

TOGGLE SWITCH

.090 ALUM. BACK STAPLED

POWER SUPPLY

½" CARFLEX CONDUIT x 15' CARFLEX WHIP

EQUIPMENT GROUND

LED. GELCORE 2/lt. TETRA, (WHITE)

GELCORE SPLICE CONNECTOR

3" NON-CORROSIVE LAG BOLTS OR THREADED ROD AS REQ'D.

1/4" WEEP HOLE w/LIGHT BAFFLE BEAD AROUND INTERIOR SEAM

**CROSS SECTION MOUNTING DETAIL**
SCALE: NTS

**GELCORE LED LAYOUT**

— 20'-0" —

2'-5"

5'-0"

1'-11½"

**ELEVATION**

5.9.07

**COLOR NOTES:**
RETURN: 6"x.063 WHITE
TRIM: TO MATCH RETURN
   LTRS UNDER 42" USE 1" WHITE JEWELITE
   LTRS 42" AND ABOVE USE L MOLD PAINTED WHITE
FACE: 2447 WHITE SG 410 LEXAN
LED: WHITE GELCORE TYPE—GEWHPTS2
INSIDE OF CAN TO BE PAINTED SEMI GLOSS WHITE

**GENERAL NOTE:**
   MINIMUM #8 SHEET METAL SCREWS ARE TO BE USED FOR SECURING THE FACE TO THE LETTER RETURN.
   THE MAXIMUM SPACING SHALL NOT EXCEED 18" AND NO FEWER THAN FOUR SCREWS ARE TO BE USED PER FACE.

**ELECTRICAL NOTE**—Actual # of circuits to be determined by a Licensed Electrical Contractor.
TOTAL AMPS— 14.50A
# OF CKTS— 1  20 AMP(RECOMMENDED)
VOLTS— 120
ALL SIGNAGE WILL BE (U.L.) LISTED, (U.L.) 2161 COMPLIANT AND CARRY (U.L) LABELS.

**•NOTE:**
INSTALL TOGGLE SWITCH TO OPERATE (ON/OFF) IN THE HORIZONTAL POSITION.

| 1 SWITCH PER LETTER |
|---|

## EXHIBIT 'F'
(TYPICAL OF 2 SIGNS)
BUILDING SIGN
ROGERS, AR
SHEET 2 of 4

| IF NON-STANDARD PRODUCT CHECK APPROPRIATE BOX BELOW |
|---|
| ☐ — RED FACE |
| ☐ — BLACK RETURNS |
| ☐ — DARK BRONZE RETURNS |







TEMPORARY SIGN (BUILDING OR BBB HIRING TRAILER)

TEMPORARY BUILDING SIGN
(REFER TO EXHIBIT D-1 FOR LOCATION ON BUILDING)

TEMPORARY SITE SIGNAGE

4' x 8' - TYVEK
*(2 banners of a single version per box)*

TEMPORARY SITE SIGNAGE
VINYL COLORS

PMS 187 RED
BLACK

5.9.07

# EXHIBIT 'F'
## SITE PLAN
## ROGERS, AR
SHEET 4 OF 4

Exhibit G

Subordination, Non-Disturbance and Attornment Agreement

THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT, made as of the _____ day of _____, 200__, by and between _____, a _____ [corporation] [limited] [general] [partnership] [national banking association], having an office at _____ (the "*Mortgagee*") and Bed Bath & Beyond Inc., a New York corporation, having an office at 650 Liberty Avenue, Union, New Jersey 07083 (the "*Tenant*").

W I T N E S S E T H :

WHEREAS, Mortgagee is the holder of a mortgage (the "*Mortgage*") covering a parcel of land owned by _____, a _____ corporation (the "*Landlord*") together with the improvements [to be] erected thereon (said parcel of land and improvements thereon being hereinafter referred to as the "*Shopping Center*" and being more particularly described on Exhibit A attached hereto and made a part hereof); and

WHEREAS, by a certain lease heretofore entered into between Landlord and Tenant dated as of _____ (the "*Lease*"), Landlord leased to Tenant a portion of the Shopping Center, as more particularly described in the Lease (the "*Premises*"); and

WHEREAS, a copy of the Lease has been delivered to Mortgagee, the receipt of which is hereby acknowledged; and

_____

**[For mortgages existing as of the date Lease is executed:** WHEREAS, as an inducement to Tenant to enter into the Lease, **[Section 2.3.1/Section 17.3]** thereof provides that the Lease is conditioned upon Landlord obtaining this Agreement from Mortgagee; and

WHEREAS, the parties desire to satisfy the foregoing condition and to provide for the non-disturbance of Tenant by the holder of the Mortgage; and]

_____

**[For mortgages occurring after the Lease is executed:** WHEREAS, Section 17.1 of the Lease provides that the Lease shall become subject and subordinate to a mortgage encumbering the fee interest of Landlord in and to the Shopping Center if and when a non-disturbance agreement is entered into with respect to such mortgage; and

WHEREAS, the parties hereto desire to effect the subordination of the Lease to the Mortgage and to provide for the non-disturbance of Tenant by Mortgagee.]

_____

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements herein contained, the parties hereto, intending to be legally bound hereby, agree as follows:

1.     Mortgagee hereby consents to and approves the Lease and the term thereof, including the options to extend the term as set forth in the Lease, and covenants and agrees that the exercise by Tenant of any of the rights, remedies and options therein contained shall not constitute a default under the Mortgage.

2.     Tenant covenants and agrees with Mortgagee that the Lease hereby is made and shall continue hereafter to be subject and subordinate to the lien of the Mortgage, and to all modifications and extensions thereof (and such subordination shall not lessen or diminish Tenant's rights under the Lease), subject, however, to the provisions of this Agreement.

3.     Mortgagee agrees that so long as the Lease shall be in full force and effect, and so long as Tenant shall not be in default under the Lease beyond any applicable notice and grace period:

(a)     Tenant shall not be named or joined as a party or otherwise in any suit, action or proceeding for the foreclosure of the Mortgage or to enforce any rights under the Mortgage or the bond or note or other obligation secured thereby;

(b)     The possession by Tenant of the Premises and Tenant's rights thereto shall not be disturbed, affected or impaired by, nor will the Lease or the term thereof be terminated or otherwise affected by (i) any suit, action or proceeding brought upon the Mortgage or the bond or note or other obligation secured thereby, or for the foreclosure of the Mortgage or the enforcement of any rights under the Mortgage, or by any judicial sale or execution or other sale of the Premises or the Shopping Center, or any deed given in lieu of foreclosure, or by the exercise of any other rights given to any holder of the Mortgage or other documents as a matter of law, or (ii) any default under the Mortgage or the bond or note or other obligation secured thereby; and

(c)     All condemnation awards and insurance proceeds paid or payable with respect to the Premises or any other part of the Shopping Center shall be applied and paid in the manner set forth in the Lease.

4.     If Mortgagee or any future holder of the Mortgage shall become the owner of the Shopping Center by reason of foreclosure of the Mortgage or otherwise, or if the Shopping Center shall be sold as a result of any action or proceeding to foreclose the Mortgage, or transfer of ownership by deed given in lieu of foreclosure, the Lease shall continue in full force and effect, without necessity for executing any new lease, as a direct lease between Tenant and the then owner of the Shopping Center, as "landlord", upon all of the same terms, covenants and provisions contained in the Lease, and in such event:

(a)     Tenant shall be bound to such new owner under all of the terms, covenants and provisions of the Lease for the remainder of the term thereof (including the Renewal Periods, if Tenant elects or has elected to exercise its options to extend the term) and Tenant hereby agrees to attorn to such new owner and to recognize such new owner as "landlord" under the Lease; and

(b)     Such new owner shall be bound to Tenant under all of the terms, covenants and provisions of the Lease for the remainder of the term thereof (including the Renewal Periods, if Tenant elects or has elected to exercise its options to extend the term) which such new owner hereby agrees to assume and perform and Tenant shall, from and after the date such new owner succeeds to the interest of "landlord" under the Lease, have the same remedies against such new owner for the breach of any covenant contained in the Lease that Tenant might have had under the Lease against Landlord if such new owner had not succeeded to the interest of "landlord"; provided, however, that such new owner shall not be:

(i)     liable for any act or omission of any prior landlord (including Landlord) unless such act or omission continues from and after the date upon which the new owner succeeds to the interest of such prior landlord;

(ii)     subject to any defenses which Tenant may have against any prior landlord (including Landlord) unless resulting from any default or breach by such prior landlord which continues from and after the date upon which the new owner succeeds to the interest of such prior landlord;

(iii)     subject to any offsets which Tenant may have against any prior landlord, except to the extent such offsets are expressly provided under the Lease and Mortgagee has received notice thereof and the opportunity to cure within the applicable time periods set forth in the Lease (it being further agreed that offsets under the Lease that were deducted by Tenant prior to the date upon which the new owner succeeds to the interest of such prior landlord shall not be subject to challenge);

(iv)     bound by any fixed rent or additional rent which Tenant might have paid for more than one month in advance of its due date under the Lease to any prior landlord (including Landlord), unless such additional rent is paid in accordance with the applicable provisions of the Lease; or

G-2

(v)    bound by any amendment or modification of the Lease made without its consent; notwithstanding the foregoing, Mortgagee acknowledges that the Lease specifically provides for amendments thereof upon the occurrence of certain events described in the Lease (such as, for example, an amendment to the Lease confirming the measurement of the Premises), and, by its execution below, Mortgagee agrees to recognize such amendments as part of the Lease, and Mortgagee further agrees that such new owner shall also be bound by such amendment(s) to the Lease, without any consent on the part of Mortgagee or such new owner.

(c)    Tenant's obligations hereunder shall be effective only so long as Mortgagee is bound to Mortgagee's obligations hereunder.

5.    Tenant will notify Mortgagee of any default by Landlord under the Lease which would entitle Tenant to terminate the Lease or abate the rent payable thereunder and agrees that notwithstanding any provision of the Lease, no notice of termination thereof nor any abatement shall be effective unless Mortgagee has received the aforesaid notice and has failed to cure the subject default within the same time period allowed Landlord under the Lease.  It is understood that the abatement provisions of this Section relate to abatements by reason of Landlord's default and do not apply to provisions of the Lease whereby Tenant has the automatic right to abate rentals such as, for example, abatement upon casualty or condemnation.

6.    Neither the Mortgage nor any other security instrument executed in connection therewith shall encumber or be construed as subjecting in any manner to the lien thereof, any trade fixtures, signs or other personal property at any time furnished or installed by or for Tenant or its subtenants or licensees on the aforementioned property regardless of the manner or mode of attachment thereof.

7.    Any notices of communications given under this Agreement shall be in writing and shall be given by registered or certified mail, return receipt requested, postage prepaid or by any recognized overnight mail carrier, with proof of delivery slip, (a) if to Mortgagee, at the address of Mortgagee as hereinabove set forth or at such other address or persons as Mortgagee may designate by notice in the manner herein set forth, or (b) if to Tenant, at the address of Tenant as hereinabove set forth, with duplicate copies to  Allan N. Rauch, Esq., c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, and Jeffrey H. Kaplan, Esq. c/o Bryan Cave LLP, 1290 Avenue of the Americas, New York, New York 10104, or such other address or persons as Tenant may designate by notice in the manner herein set forth.  All notices given in accordance with the provisions of this Section shall be effective upon receipt (or refusal of receipt) at the address of the addressee.

8.    This Agreement shall bind and inure to the benefit of and be binding upon and enforceable by the parties hereto and their respective successors, assigns, and sublessees.

9.    This Agreement contains the entire agreement between the parties and cannot be changed, modified, waived or canceled except by an agreement in writing executed by the party against whom enforcement of such modification, change, waiver or cancellation is sought.  This Agreement and the covenants herein contained are intended to run with and bind all lands affected thereby.

IN WITNESS WHEREOF, the parties hereto have duly executed this Subordination, Non-Disturbance and Attornment Agreement as of the day and year first above written.

**MORTGAGEE:**

ATTEST:

[Corporate Seal]

_____
(Assistant) Secretary

By:_____
Name:_____
Title:_____

G-3

**TENANT:**

ATTEST:                                          BED BATH & BEYOND INC.

[Corporate Seal]


_____    By:_____
(Assistant) Secretary                         Warren Eisenberg
                                              Co-Chairman

**[INSERT APPROPRIATE JURAT FOR MORTGAGEE]**

STATE OF NEW JERSEY    )
                          ) : ss.

COUNTY OF UNION       )s

      On this ___ day of _____, 200__, before me personally came Warren Eisenberg to me known, who being by me duly sworn, did depose and say that he is the Co-Chairman of Bed Bath & Beyond Inc., the corporation described in and which executed the above instrument and that he signed his name thereto by order of the Board of Directors of said corporation.

                                       _____

My Commission Expires:                Notary Public

_____

C061858/0205454/1372981.6

Exhibit H

Subtenant Recognition Agreement

THIS RECOGNITION AGREEMENT, made as of the _____ day of _____, 200_, by and between _____, a _____ corporation, having an address at _____ (“**Landlord**”); Bed Bath & Beyond Inc., a New York corporation, having an address at 650 Liberty Avenue, Union, New Jersey 07083 (“**Tenant**”); and _____, a [_____] [**corporation**] [**limited**] [**general**] [**partnership**], having an address at _____ (“**Subtenant**”).

## R E C I T A L S:

A.     Landlord and Tenant have entered into a certain lease (the “**Lease**”) dated as of _____, 2007, a short form of which has been recorded in Book___ at Page___ in the office of the Recorder for Benton County, which demises certain premises (the “**Premises**”) located in Pinnacle Hills Promenade (the “**Shopping Center**”), in Rogers, Arkansas, which Shopping Center is more particularly described on Exhibit A annexed hereto and made a part hereof.

B.     Section 15.5 of the Lease provides that in the event Tenant subleases fifty percent (50%) or more of the Floor Area in the Premises for a term of at least five (5) years, Landlord shall, upon Tenant's request, execute and deliver a Recognition Agreement among Landlord, Tenant and each such subtenant in the form attached to the Lease, in recordable form.

C.     Pursuant to a Sublease dated as of _____ (the “**Sublease**”), Tenant has subleased the Premises to Subtenant (the “**Subleased Premises**”).

D.     The parties hereto desire to effectuate the provisions of Section 15.5 of the Lease with respect to the Sublease and the Subleased Premises.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereto, intending to be legally bound hereby, agree as follows:

1.     Landlord warrants and represents as follows:

(i)     that it is the fee owner of the Premises,

(ii)     that the Lease is unmodified (except as may be otherwise set forth in Exhibit B annexed hereto, if any) and is in full force and effect,

(iii)     that the term of the Lease expires on _____, but is subject to three renewal periods of five years each, and

(iv)     that Tenant is not in default under the Lease nor has any event occurred which would after notice to Tenant and the passage of time become a default of Tenant under the Lease.

2.     Landlord hereby acknowledges receipt of a copy of, and consents to and approves, the Sublease and all of the terms, covenants and provisions thereof, and agrees that the exercise by Subtenant of any of its rights, remedies and options contained therein shall not constitute a default under the Lease.

3.     Landlord agrees that whenever it has an obligation with respect to the Premises, or its consent or approval is required for any action of Tenant under the Lease, then, to the extent such obligation, consent or approval relates to the Subleased Premises or Subtenant's use and occupation thereof, it will perform such obligation in accordance with the terms and conditions of the Lease, and, subject to the applicable terms of the Lease, will not unreasonably withhold or unduly delay such consent or approval.

4.     Landlord shall not, in the exercise of any of the rights arising or which may arise out of the Lease or of any instrument modifying or amending the same or entered into in substitution or replacement thereof (whether as a result of Tenant's default or otherwise),

disturb or deprive Subtenant in or of its possession or its rights to possession of the Subleased Premises or of any right or privilege granted to or inuring to the benefit of Subtenant under the Sublease, provided that Subtenant is not in default under the Sublease beyond the expiration of any applicable notice and cure period.

5.      In the event of the termination of the Lease by reentry, notice, conditional limitation, surrender, summary proceeding or other action or proceeding, or otherwise, or, if the Lease shall terminate or expire for any reason before any of the dates provided in the Sublease for the termination of the initial or renewal terms of the Sublease and if immediately prior to such surrender, termination or expiration the Sublease shall be in full force and effect, Subtenant shall not be made a party in any removal or eviction action or proceeding nor shall Subtenant be evicted or removed of its possession or its right of possession of the Subleased Premises be disturbed or in any way interfered with, and the Sublease shall continue in full force and effect as a direct lease between Landlord and Subtenant (provided, that in such event, Subtenant shall, for the then remainder of the term of the Sublease, pay, on a pro rata basis based on the Floor Area of the Premises occupied by the Subtenant, fixed rent and additional rent in an amount equal to the greater of (x) the Fixed Rent and Additional Rent then payable under the Lease, or (y) the fixed rent and additional rent then payable under the Sublease).

6.      Landlord hereby waives and relinquishes any and all rights or remedies against Subtenant, pursuant to any lien, statutory or otherwise, that it may have against the property, goods or chattels of Subtenant in or on the Subleased Premises.

7.      Any notices, consents, approvals, submissions, demands or other communications (hereinafter collectively referred to as "Notice") given under this Agreement shall be in writing. Unless otherwise required by law or governmental regulation, Notices shall be deemed given if sent by registered or certified mail, return receipt requested, postage prepaid or by any recognized overnight mail carrier, with proof of delivery slip, (a) to Landlord, at the address of Landlord as hereinabove set forth or such other address or persons as Landlord may designate by Notice to the other parties hereto, (b) to Tenant, at the address of Tenant as hereinabove set forth, with duplicate copies to Allan N. Rauch, Esq., c/o Bed Bath & Beyond Inc., 650 Liberty Avenue, Union, New Jersey 07083, and Jeffrey H. Kaplan, Esq. c/o Bryan Cave LLP, 1290 Avenue of the Americas, New York, New York 10104, or such other address or persons as Tenant may designate by Notice to the other parties hereto, and (c) to Subtenant, at the address of Subtenant as hereinabove set forth or such other address or persons as Subtenant may designate by Notice to the other parties hereto. During the period of any postal strike or other interference with the mails, personal delivery shall be substitute for registered or certified mail. All Notices shall become effective only on the receipt or rejection of same by the proper parties.

8.      No modification, amendment, waiver or release of any provision of this Agreement or of any right, obligation, claim or cause of action arising hereunder shall be valid or binding for any purpose whatsoever unless in writing and duly executed by the party against whom the same is sought to be asserted.

9.      This Agreement shall be binding on and shall inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors, assigns and sublessees.

**[Signature Page Follows]**

IN WITNESS WHEREOF, the parties have caused this Recognition Agreement to be executed under seal the date first above written.

**LANDLORD:**

By:_____

**TENANT:**

BED BATH & BEYOND INC.

By:_____
       Warren Eisenberg
       Co-Chairman

**SUBTENANT:**

By:_____
Name:_____
Title:_____

H-3

**[INSERT APPROPRIATE JURATS FOR LANDLORD AND SUBTENANT]**

STATE OF NEW JERSEY      )
                                ) : ss.
COUNTY OF UNION          )s

         On this ___ day of _____, 200__, before me personally came Warren Eisenberg to me known, who being by me duly sworn, did depose and say that he is the Co-Chairman of Bed Bath & Beyond Inc., the corporation described in and which executed the above instrument and that he signed his name thereto by order of the Board of Directors of said corporation.

                                           _____

                                           Notary Public

My Commission Expires:

_____

## EXHIBIT I

## INTENTIONALLY OMITTED

Exhibit J

FORM OF DELIVERY DATE CERTIFICATION

[Letterhead of Landlord]

_____, 200__

[via Federal Express or other
recognized overnight delivery
service per Article 18 of the foregoing
lease]

Bed Bath & Beyond Inc.
650 Liberty Avenue
Union, NJ 07083
Attn: Warren Eisenberg

Re:     Agreement of Lease, dated _____, 2007 (the "Lease"), between _____, as
        landlord ("Landlord"), and Bed Bath & Beyond Inc., as tenant ("Tenant"), with respect to
        certain retail premises (the "Premises") located in _____, in _____,
        _____.

Gentlemen:

        In accordance with the provisions of Subsection 2.3.3 of the Lease, Landlord hereby
certifies to Tenant that, as of the date of this certification, all of the Delivery Date Conditions (as
defined in the Lease) have been satisfied, and that, as a result, the Delivery Date (as such term is
defined in the Lease) will be deemed to be _____, 200__ [INSERT THE DATE
WHICH IS TWO DAYS AFTER THE DATE OF THIS LETTER]. This notice shall constitute
the Delivery Date Certification referred to in Subsection 2.3.3 of the Lease.

                                 _____

                        By:_____
                                          , (Vice) President

cc:     Allan N. Rauch, Esq.

C061858/0205454/1372981.6

<u>Exhibit K-1</u>

<u>Existing Exclusives</u>

C061858/0205454/1372981.6

PINNACLE HILLS PROMENADE
BUILD-A-BEAR WORKSHOP



● *Part of 'Shopping Center' definition :*

. The Shopping Center includes all buildings, land, improvements, additions, extensions and deletions which may be made from time to time, and may include adjacent parcels of land not owned, leased or controlled by Landlord but which are operated as an integral part of the Shopping Center.

● *Build 'a' Bear extract:*

1.03    Permitted Use: Only for the display, assembly and retail sale of make-it-yourself plush bears and other animals, dolls, and accessories related to such bears and other animals and dolls including but not limited to clothes, books, shampoos, fragrances, jewelry, cards, gift wrap, stickers, candy and similar types of products related to bears and dolls. As an incidental use, Tenant may display and sell apparel designed exclusively for Build-A-Bear Workshop which shall occupy no more than 20% of the Leased Premises or such other items as are sold in a majority of Tenant's other stores, and for no other use or purpose whatsoever.

● *Great American Cookie extract:*

1.03    Permitted Use: Only for the display, baking and retail sale of cookies, brownies, bakery items, and related dessert items, soft-serve frozen yogurt, non-alcoholic beverages, and other food products which Tenant may from time to time add to the product lines (with Landlord approval), and premium and promotional merchandise bearing Tenant's Trade Name and for no other use or purpose whatsoever. Tenant may also, as an incidental use, sell lemonade, fruit drinks and frozen drinks, such as "Icees" or "Breezers."

PINNACLE HILLS PROMENADE
GREAT AMERICAN COOKIE



**PINNACLE HILLS PROMENADE**
DAIRY QUEEN/ORANGE JULIUS



**PINNACLE HILLS PROMENADE**

FISH CITY GRILL



PINNACLE HILLS PROMENADE
GNC



**PINNACLE HILLS PROMENADE**

MALCO THEATRE

---

*USE RESTRICTION (EXCLUSIVE)*

ARTICLE XXVII - EXCLUSIVE USE
Provided that Tenant is not in material default hereunder beyond the expiration of any applicable cure period and Tenant (or its Guarantor under the sublease referenced in Section 13.02 hereof) is open for business to the public in the entire Demised Premises in accordance with this Lease for the Permitted Use and the Demised Premises have not ceased to be operated as a multi-screen first run movie theatre, subject to temporary closings on account of restoration, remodeling, or force majeure, Landlord shall neither enter into a contract for the sale or lease nor sell or lease any other space in the Shopping Center or the adjacent Power Center theatre, nor shall Landlord or General Growth Properties, Inc. directly or indirectly, sell, lease or be involved in any way with any other space for use as a motion picture theatre within seven (7) miles of the Shopping Center, provided, however, that the foregoing restriction regarding competing theatres within seven (7) miles of the Shopping Center shall not apply to any project acquired by either Landlord or General Growth Properties, Inc. (or any related entity) after the date of this Lease if such after-acquired project has an existing theatre operation at the time of such acquisition. Such exclusive right shall not preclude the operation by others of any food sales business or a video arcade with game machines within the Shopping Center and shall not preclude the operation of any virtual reality games or rides, or similar attractions, or any legitimate live theatre operation. In addition, such exclusive right shall not apply to Dillard's, JC Penney or any other department store, or any other tenant or occupant of the Shopping Center or any other project within the seven (7) mile restricted area provided for above with a lease or other occupancy agreement executed prior to the date of this Lease, and the leases or other occupancy agreements with such entities, including any extensions, renewals and assignments thereof, shall be exempt from the exclusive use rights set forth in this Article XXVII.

**PINNACLE HILLS PROMENADE**

P.F. CHANG'S CHINA BISTRO



**PINNACLE HILLS PROMENADE**

PICTURE PEOPLE, THE



PINNACLE HILLS PROMENADE
SULLIVAN'S RESTAURANT



Best Buy exclusive

Further, Landlord agrees that as long as Tenant is operating as a consumer electronics store from the Premises (and for the purposes of this Article 30.2, Tenant shall be considered to be operating as a consumer electronics store even during periods during which the Premises may be temporarily closed for the purposes of remodeling, repair, conducting inventory or similar temporary closures) and subject to all exceptions as hereinafter set forth, Landlord shall not lease or permit, directly or indirectly, any space in the area identified on Exhibit B as the "Extended Shopping Center" to any other multi-product line consumer electronics store in excess of six thousand (6,000) square feet, including, but not limited to: Circuit City, The Good Guys, Incredible Universe, WOW, Media Play, CompUSA or Computer City. Notwithstanding the foregoing, this restriction shall not be applicable within the Extended Shopping Center to full-line department or full-line discount department stores occupying in excess of 75,000 square feet (such as Dillard's, J.C. Penney, Sears, Costco or Wal-Mart).

*Best Buy*

## Description of Shopping Center

The premises and improvements and appurtenances constructed and to be constructed thereto, including the loading dock appendage (the "Premises") located in West Promenade Shopping Center (the "Shopping Center"). The legal description of the Shopping Center is attached hereto as <u>Exhibit A</u> and made a part hereof, and the Shopping Center is identified on the Site Plan attached hereto as <u>Exhibit B</u> and made a part hereof; provided that in the event of any conflict between <u>Exhibit A</u> and <u>Exhibit B</u>, <u>Exhibit B</u> shall control. The Premises contain



*Best Buy*



PROPOSED
TAX PARCEL

35' PYLON SIGN

⬜ Premises
⬜ Shopping Center
⬜ Retail 1 and Retail 2
▬ Tenant's Tax Parcel

▦ NO BUILD AREA

▦ Tenant's Protected Area and NoChange Area
(includes pylon and
monument signs)        SITE PLAN

| EXHIBIT B· (page 1 of 2) | PINNACLE HILLS ROGERS, ARKANSAS | GENERAL GROWTH PROPERTIES, INC. 110 N. WACKER DRIVE CHICAGO, IL 60606 |



*Best Buy*
EXTENDED SHOPPING CENTER

SITE PLAN

| EXHIBIT B (page 2 of 2) | PINNACLE HILLS ROGERS, ARKANSAS | GENERAL GROWTH PROPERTIES, INC 110 N. WACKER DRIVE CHICAGO, IL 60606 |

Exhibit K-2

Existing Leases

1. LIFEWAY CHRISTIAN STORE

Exhibit L

Prohibited Uses

As used in this Lease, the term ***Prohibited Uses*** shall mean any of the following uses:

(1)    Any use which emits or results in strong, unusual or offensive odors, fumes, dust or vapors, is a public or private nuisance, emits noise or sounds which are objectionable due to intermittence, beat, frequency, shrillness or loudness, creates a hazardous condition, or is used, in whole or in part, as or for warehousing or the dumping or disposing of garbage or refuse;

(2)    Any operation primarily used as a storage facility and any assembling, manufacturing, distilling, refining, smelting, agricultural, or mining operation;

(3)    Any "second hand" store, "surplus" store;

(4)    Any mobile home park, trailer court, labor camp, junkyard, or stockyard (except that this provision shall not prohibit the temporary use of construction trailers during periods of construction, reconstruction, or maintenance);

(5)    Any dumping, disposing, incineration, or reduction of garbage (exclusive of trash compactors or trash containers located near the rear of any building);

(6)    Any fire sale, bankruptcy sale (unless pursuant to a court order), auction house operation, fictitious going-out-of-business sale, lost-our-lease sale or similarly advertised event;

(7)    Any central laundry, dry cleaning plant, or laundromat (except that a dry cleaner that performs all dry cleaning outside the Power Center shall be permitted, so long as its on-site premises are located more than 150 feet away from the Premises);

(8)    Any automobile, truck, trailer, boat, or recreational vehicle sales, leasing, display or body shop repair operation;

(9)    Any bowling alley or skating rink;

(10)    Any live performance theater, auditorium, meeting hall, sporting event, or other entertainment use;

(11)    Any living quarters, sleeping apartments, or lodging rooms;

(12)    Any veterinary hospital or animal raising or boarding facilities (except to the extent permitted below);

(13)    Any mortuary or funeral home;

(14)    Any "Pornographic Use", which shall include, without limitation: (x) a store displaying for sale or exhibition books, magazines or other publications containing any combination of photographs, drawings or sketches of a sexual nature, which are not primarily scientific or educational [provided, however, that the sale of books, magazines and other publications by a national bookstore of the type normally located in first-class shopping centers in the State in which the Power Center is located (such as, for example, Borders and Barnes & Noble, as said stores currently operate) shall not be deemed a "pornographic use" hereunder]; or (y) a store offering for exhibition, sale or rental video cassettes or other medium capable of projecting, transmitting or reproducing, independently or in conjunction with another device, machine or equipment, an image or series of images, the content of which has been rated or advertised generally as NC-17 or "X" or unrated by the Motion Picture Rating Association, or any successor thereto [provided, however, that the sale or rental of such videos by a national video store of the type normally located in first-class shopping centers in the State in which the Power Center is located (such as, for example, Blockbuster or West Coast Video, as said stores currently operate) shall not be deemed a "pornographic use" hereunder]; or massage parlor [except for therapeutic massages given in connection with the operation of a day spa or health club which may otherwise be permitted under this Exhibit L];

(15)    Any so-called "head shop", or other establishment primarily selling or exhibiting drug-related paraphernalia;

L-1

(16)    Any bar, tavern, or other establishment selling alcoholic beverages for on- or off-premises consumption except the foregoing shall not prohibit the sale of alcoholic beverages by a restaurant (to the extent such restaurant is permitted pursuant to item (35) below) as an incidental part of its business;

(17)    Any catering or banquet hall;

(18)    Any flea market, amusement or video arcade, pool or billiard hall, night club, discotheque, or dance hall;

(19)    Any training or education facility, including but not limited to:  beauty schools, barber colleges, reading rooms, places of instruction or other operations catering primarily to students or trainees rather than to customers; provided, however, this prohibition shall not be applicable to on-site employee training by an occupant incidental to the conduct of its business at the Power Center;

(20)    Any gambling facility or operation, including but not limited to:  off-track or sports betting parlor; table games such as black-jack or poker; slot machines; video poker/black-jack/keno machines or similar devices; or bingo hall.  Notwithstanding the foregoing, this prohibition shall not apply to governmental sponsored gambling activities, or charitable gambling activities, so long as such governmental and/or charitable activities are incidental to the business operation being conducted by the occupant;

(21)    Any unlawful use;

(22)    Any pawn shop, check-cashing store, gun shop, or tattoo parlor;

(23)    Any church or other place of religious worship;

(24)    Any car wash, automobile repair shop, or any business servicing motor vehicles in any respect, including, without limitation, any quick lube oil change service, tire center or gasoline or service station or facility

(25)    Any carnival, amusement park or circus;

(26)    Any medical clinics except medical offices (but not medical clinics) shall be permitted provided such medical offices are located at least 500 feet away from the Premises and the Floor Area of such medical offices does not exceed 7,000 square feet in the aggregate;

(27)    Any supermarket, except that an upscale, boutique-type food store of the type normally operated in the Rogers, Arkansas metropolitan area (such as, by way of example, Zagara's, Whole Foods, Fresh Fields, or Wild Oats), provided, that such store shall not occupy more than 27,000 square feet of Floor Area, and shall be located at least 200 feet away from the Premises (except that an upscale, boutique-type food store shall be permitted to be located within the Premises);

(28)    Any office use, other than: (x) office space used in connection with and ancillary to a permitted retail use hereunder; and (y) retail offices providing services commonly found in similar first-class shopping centers in the Rogers, Arkansas metropolitan area (for example, financial services, real estate brokerage, insurance agency, banking, travel agency), provided that such uses are located at least 250 feet away from the Premises, and not more than five thousand (5,000) square feet of Floor Area in the Power Center, in the aggregate, shall be devoted to such uses;

(29)    hotel/motel;

(30)    daycare center;

(31)    veterinary office, except as may be incidental to a permitted full-line pet and pet supply store operating in at least 15,000 square feet of Floor Area and located at least 100 feet away from the Premises (except that a full-line pet and pet supply store shall be permitted to be located within the Premises); such occupant shall use reasonable efforts to prevent its customers from allowing their pets to urinate or defecate in the Common Areas and will promptly remove any "dog dirt" from in front of the Premises;  no pet or pet supply store shall be located within 100 feet of the Premises;

L-2

(32)    children's entertainment or activity facility (such as "Discovery Zone", or "Chuck E. Cheese's");

(33)    karate center;

(34)    movie theater;

(35)    restaurant serving meals for on- or off-premises consumption, except (i) a restaurant located more than 500 feet away from the Premises or within the Future Outparcel shall be permitted and (ii) such permitted restaurant shall be permitted to sell alcoholic beverages as an incidental part of its business;

(36)    beauty parlor or nail salon except same shall be permitted if located at least 250 feet away from the Premises;

(37)    health spa, exercise facility or similar type business but the foregoing shall not prohibit a Curves or similar type exercise/fitness studio (provided it is located at least 500 feet away from the Premises and further provided that it does not contain more than 5,000 square feet of Floor Area); or

(38)    a store primarily selling merchandise which is classed as "odd lot," "close out," "clearance," "discontinued," "cancellation," "second," "factory reject," "sample," "floor model," "demonstrator," "obsolescent," "over stock," "distressed," "bankruptcy," "fire sale" or "damaged", such as, for example, "Grossman's Bargain Outlet", "Contractor's Warehouse", "Big Lots", "Liquidation World", or "Odd Job"; the retailer commonly known as "Christmas Tree Shops" shall be deemed not to violate the foregoing restriction.

L-3