**LOWENSTEIN SANDLER LLP**
Kenneth A. Rosen, Esq.
Mary E. Seymour, Esq.
Philip Gross, Esq.
One Lowenstein Drive
Roseland, NJ 07068
Telephone: (973) 597-2500
Email: krosen@lowenstein.com
Email: mseymour@lowenstein.com
Email: pgross@lowenstein.com

*Co-Counsel to Michaels Stores, Inc*

**WHITE & CASE LLP**
Gregory F. Pesce, Esq. *(admitted pro hac vice)*
Laura E. Baccash, Esq. *(admitted pro hac vice)*
111 South Wacker Drive, Suite 5100
Chicago, IL 60606-4302
Telephone: (312) 881-5400
Email: gregory.pesce@whitecase.com
Email:  laura.baccash@whitecase.com

-and-

Samuel P. Hershey, Esq. *(admitted pro hac vice)*
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Email: sam.hershey@whitecase.com

-and-

Devin J. Rivero, Esq. *(admitted pro hac vice)*
Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, FL 33131-2352
Telephone: (305) 371-2700
Email:  devin.rivero@whitecase.com

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| BED BATH & BEYOND INC., *et al.,* | Case No. 23-13359 (VFP) |
| Debtors.[1] | (Jointly Administered) |

---

[1] The last four digits of Debtor Bed Bath & Beyond Inc.'s tax identification number are 0488. A complete list of the Debtors in these Chapter 11 Cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/bbby. The location of Debtor Bed Bath & Beyond Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 650 Liberty Avenue, Union, New Jersey 07083.

**MICHAELS STORES, INC.'S FURTHER
REPLY TO OBJECTION AND SUR-REPLY OF
PINNACLE HILLS, LLC TO DEBTORS' MOTION FOR ORDER
AUTHORIZING DEBTORS TO ASSUME AND ASSIGN LEASE FOR STORE NO. 1142**

Michaels Stores, Inc. ("**Michaels**") respectfully states as follows (this "**Sur-Sur-Reply**") in further support of *Michaels Stores, Inc.'s Reply to Objection of Pinnacle Hills, LLC to Debtors' Motion For Order Authorizing Debtors to Assume and Assign Lease For Store No. 1142* [Docket No. 1383] (the "**Reply**") and in response to the *Objection of Pinnacle Hills, LLC to Debtors' Motion for Order Authorizing Debtors to Assume and Assign Lease for Store No. 1142* [Docket No. 1323] (the "**Objection**") and *Pinnacle Hills, LLC's Sur-Reply in Further Support of its Objection of Pinnacle Hills, LLC to Debtors' Motion for Order Authorizing Debtors to Assume and Assign Lease for Store No. 1142* [Docket No. 1926] (the "**Sur-Reply**"), both submitted by Pinnacle Hills, LLC (the "**Landlord**"):[2]

**Preliminary Statement**

1. The further round of briefing that the Landlord requested has clarified the following points of law and fact:

    a. Virtually every written decision regarding the issues in dispute—including decisions that the Landlord acknowledges involve "similar facts to those presented here" (Sur-Reply ¶ 19)—favors Michaels.

    b. The Landlord has not cited (and Michaels is not aware of) a single case in which a court has considered the terms of any lease other than the debtor's to determine whether a proposed lease assignment complies with section 365(b)(3)(C) of the Bankruptcy Code. Rather, every court that has addressed this issue has relied solely upon the terms of the debtor's lease.

    c. The Landlord has cited only one, non-binding case from 1991 in which a court considered the purported elements of a shopping center to determine whether a proposed lease assignment complies with section 365(b)(3)(D). Every other

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Objection or the Landlord Sur-Reply, as applicable.

2

        case on this issue cited by either party solely considered and analyzed the bargained-for terms of the debtor's lease when determining compliance with section 365(b)(3)(D).

    d. Likewise, the legislative history reflects that Congress's intent with regard to section 365 of the Bankruptcy Code was to focus exclusively on agreements to which the debtor is a party, such as the debtor's lease and any applicable master agreement.

    e. Michaels was the sole bidder for the BBBY Lease at the court-approved auction.[3] The Landlord did not bid on the BBBY Lease even though it had notice of the auction and the ability to participate.[4]

    f. The BBBY Lease contains no terms prohibiting the assignment to Michaels. The Debtors are not a party to the third-party leases (the Hobby Lobby Lease and the Dollar Tree Lease) that the Landlord identifies as purportedly prohibiting the assignment of the BBBY Lease to Michaels. Both of these third-party leases were executed more than 10 years after the effective date of the BBBY Lease. The Debtors are also not parties to any master agreement containing purported restrictions that prohibit an assignment of the BBBY Lease to Michaels.

2.     These undisputed points demonstrate that there is no basis for denying the Debtors' proposed assignment of the BBBY Lease to Michaels. Rather, such assignment complies with all applicable provisions of the Bankruptcy Code and should be approved.

3.     The Landlord's proposed interpretation of sections 365(b)(3)(C) and (D) of the Bankruptcy Code stands the Code on its head. Under the Landlord's proposed reading, far from facilitating a debtor's ability to maximize the value of its estate for the benefit of its stakeholders, section 365 of the Bankruptcy Code would, in many cases, make it more difficult, if not impossible, for retail debtors to assume and assign their leases and successfully restructure. According to the Landlord, so long as any one of the leases of the other tenants in a shopping center prohibits a debtor's proposed assignment for reasons "including (but not limited to) provisions such as a

---

[3] *See* Docket No. 1397, June 26, 2023 Auction Tr. at 106:10-107:10.

[4] *See id.* at 3:9 (reflecting that Landlord's present counsel attended the auction).

radius, location, use, or exclusivity provision" (11 U.S.C. § 365(b)(3)(C)), then the assignment could not be approved under the Bankruptcy Code. Notably, a debtor would not be aware of provisions in a lease to which it is not a party and to which it lacks access. Here, the Debtors propose assignments of leases in dozens of shopping centers, and, under the Landlord's proposed interpretation of section 365, would likely be subject to the restrictive terms contained in hundreds (if not more) of leases negotiated by other tenants in those shopping centers. That position is contrary to prevailing law and plainly unworkable.

4. The Landlord also asserts, without basis, that the Court must conduct its own evidentiary analysis of the "tenant mix" in a shopping center—including tenant make-up, distance between stores, and alleged degrees of competitiveness between stores—to determine assignability under section 365(b)(3)(D) of the Bankruptcy Code. That position is also contrary to the law, which looks solely to the terms of the lease between a debtor and its landlord. It is, moreover, also unworkable, as it effectively requires courts to conduct full-blown trials in connection with every proposed lease assignment—an untenable result that would impede all debtors', and particularly retail debtors', ability to restructure.

5. For these reasons, and as set forth herein, this Court should respectfully overrule the Objection and Sur-Reply and authorize the assumption by the Debtors and assignment to Michaels of the BBBY Lease.[5]

---

[5] Michaels also relies upon and incorporates by reference any brief or declaration submitted by the Debtors in support of the assignment to Michaels.

## Argument

I. **The Authority That Has Been Cited by Both Parties Supports the Proposed Assignment of the BBBY Lease to Michaels**

    **A. The Plain Language of Section 365(b)(3)(C) Supports the Lease Assignment**

6. Section 365(b)(3)(C) of the Bankruptcy Code provides that, when a debtor assumes and assigns an unexpired lease, "assumption or assignment of *such lease* is subject to *all the provisions thereof*, including (but not limited to) provisions such as a radius, location, use, or exclusivity provision, and will not *breach* any such provision contained in any other lease, financing agreement, or master agreement relating to such shopping center." 11 U.S.C. § 365(b)(3)(C) (emphasis added). This language makes clear that courts must look to the terms of the lease at issue, and any other agreement regarding the shopping center to which the debtor is party, in determining whether the lease is assignable.

7. Here, the terms of the BBBY Lease permit the assignment to Michaels. The BBBY Lease authorizes the Debtors to use the leased premises for any "Permitted Use", a broadly defined term that includes *any* lawful use that is not a specifically identified as a "Prohibited Use" under Section 13.1.1. *See* BBBY Lease § 1.1.27. Operation of a Michaels store is not an enumerated "Prohibited Use". Rather, "Prohibited Use" includes things like non-retail uses (*e.g.*, houses of worship or medical centers) and certain unsightly or unseemly uses that could impede the operation of the Pinnacle Hills Promenade (*e.g.*, discount stores, pawn shops, or tattoo parlors). BBBY Lease § 13.1.1, Ex. L. Accordingly, "Permitted Use" encompasses the operation of a Michaels store, and the Landlord has not argued otherwise.

8. Moreover, as previously noted, the BBBY Lease obligates the Debtors to honor only those "Existing Exclusives" granted by the Landlord to eight tenants as of the execution of

the BBBY Lease, each as expressly enumerated in the lease.[6] Other than the Existing Exclusives, the BBBY Lease expressly *disclaims* any obligation by the Debtors to honor any other exclusivity provisions—including those subsequently granted to Hobby Lobby and Dollar Tree. *See* BBBY Lease § 13.3.2 ("Except as expressly set forth [herein], Tenant shall not be obligated to honor any exclusive granted by Landlord to any tenant in the Shopping Center.").

9. Additionally, section 365(b)(3)(C) of the Bankruptcy Code requires that an assignment "will not *breach* any such provision contained in any other lease." 11 U.S.C. § 365(b)(3)(C) (emphasis added). It is a fundamental principle of statutory interpretation that words should be given their plain meaning. *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989) (citing *Caminetti v. United States*, 242 U.S. 470, 485 (1917)). "Breach" is defined by Black's Law Dictionary as "a violation or infraction of a law, obligation, or agreement." *Black's Law Dictionary* (11th ed. 2019). Accordingly, consistent with elementary tenets of contract law, a breach can be committed only by a party to a contract or agreement. Where, as here, the debtor is a party to only one agreement, a "breach" of any other agreement is not possible.

10. Of course, one can easily imagine a scenario in which a debtor's assignment of a lease agreement could breach another lease agreement. For example, a debtor may be party to multiple lease agreements with the same landlord. In such a situation, the debtor should not be allowed to use the Bankruptcy Code to assign one of its lease agreements in breach of the others. Alternatively, a debtor may be party not just to a lease agreement, but may also be party or subject

---

[6] Hobby Lobby and Dollar Tree are not among the eight enumerated tenants. Rather, the enumerated tenants are: (i) Build-a-Bear, (ii) Dairy Queen/Orange Julius, (iii) Fish City Grill, (iv) GNC, (v) Great American Cookie, (vi) Malco Theatre, (vii) P.F. Chang's China Bistro, and (viii) The Picture People. BBBY Lease § 13.1.1, Exh. K-1.

to a master agreement, which might be breached by a proposed assignment.[7] Indeed, the legislative history reflects that this was the exact situation that Congress contemplated when drafting section 365(b)(3)(C) of the Bankruptcy Code:

> Thus, in order to assure a landlord of his bargained for exchange, the court would have to consider such factors as . . . whether that business complies with the requirements of any ***master agreement*** . . . and whether the business proposed to be conducted would result in a breach of other clauses in ***master agreements*** . . . .

H.R. Rep. No. 595, 95th Cong., 1st Sess. 349 (1977), 1978 U.S. Code Cong. & Admin. News 5963 (emphasis added). Accordingly, while a cross-breach of the kind Congress contemplated is certainly conceivable, there can be no dispute that a "breach" by the Debtors of any other Promenade lease agreement—particularly one that was entered into nearly 14 years after the BBBY Lease was executed—is not possible here. *See In re Toys "R" Us,* 587 B.R. 304, 310 (Bankr. E.D. Va. 2018) ("The Lease was executed in 1996, long before the [other] Lease came into existence, and it contains no provision that requires compliance with the [other] Lease use restrictions. . . . [landlord's] 'plain language' argument that the proposed assignment must not breach a restriction in any other lease, 'regardless of whether that other lease is referred to in the lease sought to be assigned,' is misplaced.").

11. The Landlord acknowledges that "only a party to a contract can breach it." Sur-Reply ¶ 35. However, the Landlord argues that the Debtors' assignment of the BBBY Lease to Michaels somehow constitutes a breach ***by the Landlord*** of the exclusive use provisions in the

---

[7] For example, *In re Three A's Holdings, LLC*, on which the Landlord purports to rely, involved an owner's association that sought to prevent a debtor from assigning its lease in breach of certain general covenants and restrictions applicable to the municipal development in which the debtor's lease was located. *See generally In re Three A's Holdings, L.L.C.*, 364 B.R. 550 (Bankr. D. Del. 2007).

Hobby Lobby Lease. *Id.* This argument is meritless. It is the Debtors, not the Landlord, who are making the proposed assignment to Michaels. Indeed, the Landlord is working hard to prevent it. Just as, in the Landlord's words, "only a party to a contract can breach it," so too can only a party making an assignment commit a breach in connection with that assignment.

12. Straining to find support in the BBBY Lease, the Landlord argues that "Section 15 of the Lease provides the Landlord with the right to terminate the Lease in the event of an unacceptable proposed assignment." Obj. ¶ 4 (citing BBBY Lease § 15.1.2). However, the Landlord also acknowledges that "[i]n the Chapter 11 context, this provision would operate as an unenforceable anti-assignment provision and cannot be taken at face value." Obj. ¶ 29. The Landlord is correct, and Section 15 should be disregarded. Moreover, the BBBY Lease also gives the Debtors "the right from time to time, **without the consent of Landlord**, to assign Tenant's interest in this Lease and/or to sublet, concession or license **all or any portion** of the Premises for retail uses[.]" BBBY Lease § 15.1.1 (emphasis added). Accordingly, the plain language of the BBBY Lease supports the Debtors' ability to assign the BBBY Lease to Michaels.

13. The Landlord also appears to argue that Congress drafted section 365(b) of the Bankruptcy Code to counterbalance the prohibition against anti-assignment provisions under the Bankruptcy Code. Sur-Reply ¶ 32. The Landlord offers no support for this assertion, and it makes no sense that Congress would seek to bolster rights in one statutory provision that it expressly disallowed in another.

### B. Case Law Supports the Lease Assignment

14. The cases cited by both parties support Michaels. The best example is *Toys "R" Us*, which the Landlord acknowledges is directly on point (Sur-Reply ¶ 19). Here, as in *Toys "R" Us*, the Debtors are owners of a national retail chain. Here, as in *Toys "R" Us*, the Debtors

8

are seeking to assign one of their leases to the successful bidder (in fact, the sole bidder) at a court-approved auction and preserve valuable lease rights for the benefit of the Debtors' estates. Here, as in *Toys "R" Us*, nothing in the applicable lease agreement between the Landlord and the Debtors prohibits the assignment. And here, as in *Toys "R" Us*, the Landlord seeks to block the proposed assignment based on exclusive use provisions contained not in the Debtors' lease, but in a lease subsequently executed with another tenant in the shopping center.

15. The Landlord urges this Court to reject *Toys* because the *Toys* court allegedly "fail[ed] to follow the statute's plain meaning[.]" Sur-Reply ¶ 21. This argument is wrong for at least two reasons. First, the holding of the *Toys* court **is** consistent with the plain meaning of the statute—section 365(b)(3)(C) of the Bankruptcy Code expressly requires courts to look to the terms of the lease at issue in determining the assignability of the lease under the subsection. *See* 11 U.S.C. 365(b)(3)(C) (requiring that "assumption or assignment **of such lease** is subject to all the provisions **thereof**"). Second, the *Toys "R" Us* holding aligns with similar rulings by other courts. *See*, *e.g.*, *In re Martin Paint Stores*, 199 B.R. 258, 266 (Bankr. S.D.N.Y. 1996), *aff'd sub nom. S. Blvd., Inc. v. Martin Paint Stores*, 207 B.R. 57 (S.D.N.Y. 1997) ("[W]hen all of the other factors point toward permitting the assignment, the exclusivity provision in another tenant's lease cannot stand in the way."); *In re Ames Dep't Stores*, 127 B.R. 744, 753 (Bankr. S.D.N.Y. 1991) ("Where there is no indication of any intention by Congress to do anything other than hold a shopping center debtor tenant to its bargain with a landlord and to leave intact the property interests of debtor and landlord as set forth in that bargain, the courts should not imply an additional non-bargained-for term."). Indeed, the United States District Court for the Eastern District of Virginia denied a request to stay the *Toys* decision on appeal because "no indication exists that [appellant] would prevail on its argument that the Bankruptcy Court erred in its interpretation and application

of 11 U.S.C. § 365(b)(3)(C)." *Brea Union Plaza I, LLC v. Toys R Us, Inc.*, No. 3:18CV419, 2018 WL 3543056, at *3 (E.D. Va. July 23, 2018).

16. Grasping for support, the Landlord seeks to rely on *MOAC Mall Holdings LLC v. Transform Holdco LLC* (*In re Sears Holdings Corp.*) ("**Sears**"), 613 B.R. 51 (S.D.N.Y. 2020), *vacated on other grounds,* 143 S. Ct. 927 (2023). That decision, however, has no bearing on arguments regarding section 365(b)(3)(C) of the Bankruptcy Code, which the *Sears* court acknowledged "are not at issue in this case." *Id.* at 60. Notably, however, *Sears* does address section 365(b)(3)(D)—and finds that tenant mix and balance must be determined by reference solely to the debtor's lease. *Id.* at 64–68.[8]

17. Indeed, the Landlord cites only one case—*In re Federated Dept. Stores, Inc.*, 135 B.R. 941, 944 (Bankr. S.D. Ohio 1991)—where the court considered "procedural, contractual, equitable, and policy issues" in determining that a proposed lease assignment would disrupt the tenant mix and balance in the shopping center. This case is more than 30 years old, is non-binding and was decided before Congress clarified the meaning of section 365(b) of the Bankruptcy Code with the BAPCPA amendments, as discussed below. It is also the only decision that the Landlord has cited (and that Michaels is aware of) that supports a court looking outside the terms of a debtor's lease to assess whether a proposed lease assignment complies with section 365(b)(3)(D) of the Bankruptcy Code. Rather, every other case addressing this issue looks solely to the terms

---

[8] Although the *Sears* decision interpreted section 365(b)(3)(A) of the Bankruptcy Code by comparing the financial condition of the proposed assignee with that of the debtor (and thus looked to evidence outside the lease), this application is specific to the language and standards imposed by section 365(b)(3)(A) and has no bearing on how a court should interpret sections 365(b)(3)(C) and (D). Indeed, the *Sears* court explained that "the more stringent requirements of § 365(b)(3)(A) . . . differ substantially from how a 'use clause' or restriction on assignment addresses the landlord's ability to control the look and feel of its property – or why the absence of such clauses (as is the case here) might preclude the landlord's ability to control the re-letting of a debtor's premises in bankruptcy." *See Sears*, 613 B.R. at 78-79.

of the debtor's lease. *See*, *e.g.*, *In re Ames Department Stores*, 127 B.R. 744 (Bankr. S.D.N.Y. 1991); *In re Ames Department Stores*, 121 B.R. 160 (Bankr. S.D.N.Y. 1990); *In re TSW Stores of Nanuet, Inc.*, 34 B.R. 299 (Bankr. S.D.N.Y. 1983); *In re Lafayette Radio Electronics*, 12 B.R. 302 (Bankr. E.D.N.Y. 1981).

18. In any case, even if the Court were to consider evidence outside the BBBY Lease (it should not), that evidence shows that Michaels and Hobby Lobby can co-exist without disruption to tenant mix and balance. Indeed, the Landlord has confirmed, based on its own analysis, that Michaels and Hobby Lobby co-exist in at least 19 to 25 shopping centers, with several stores right next to each other. *See Declaration of Kristin S. Elliot, Esq. In Support of Pinnacle Hills, LLC's Sur-Reply in Further Support of Its Objection to Debtors' Motion For Order Authorizing Debtors to Assume and Assign Lease for Store No. 1142* [Docket No. 1928].

19. Despite affirming the central assertions in the Powers Declaration submitted with Michaels' Reply, the Landlord claims that Michaels "retreated" from the Powers Declaration "[o]nce it learned that the Landlord would actually test its declaration through discovery." Sur-Reply ¶ 5. But the Landlord knows that is simply wrong—first, because Michaels produced substantial discovery in support of the Powers Declaration, and second, because Michaels advised the Landlord that the Debtors would be submitting an expert report from Emilio Amendola of A&G Real Estate Partners, and there is no need to present duplicative evidence to the Court.

20. Moreover, it is the Landlord who appears to be "retreating" from evidence. As the Court is aware, Michaels produced more than a thousand pages of emails and documents in response to the Landlord's broad discovery requests—and the Landlord still argued Michaels' production was insufficient and came to this Court to compel further productions. By contrast, the day before this brief was due, the Landlord produced only ***nine pages*** of documents to Michaels.

11

Notably, the Landlord failed to produce a single email between the Landlord and either the Debtors or Hobby Lobby, as Michaels requested. When Michaels demanded an explanation for the Landlord's failure to meet its discovery obligations, the Landlord replied that it would supplement its production. Michaels has not yet received whatever supplemental materials the Landlord may produce, and thus cannot address them in this brief. Michaels reserves the right to seek a negative inference against the Landlord in connection with the Landlord's failure to produce discovery. *See Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326 (3d Cir. 1995) ("When the contents of a document are relevant to an issue in a case, the trier of fact generally may receive the fact of the document's nonproduction or destruction as evidence that the party that has prevented production did so out of the well-founded fear that the contents would harm him."); *see also 3M Innovative Props. Co. v. Tomar Elecs.*, No. 05-756 MJD/AJB, 2006 U.S. Dist. LEXIS 80571 at *2 (D. Minn. July 21, 2006) (*aff'd sub nom 3M Innovative Props. Co. v. Tomar Elecs.*, No. 05-756 (MJD/AJB), 2006 U.S. Dist. LEXIS 66840 (D. Minn. Sep. 18, 2006)) (ordering a negative inference for, among other things, failure to conduct a "reasonable investigation" for requested materials).

### C. The Legislative History of Sections 365(b)(3) and (f) Supports the Lease Assignment

21. "Congress's purpose in § 365(b)(3)(C) is to preserve the **landlord's bargained-for protections** with respect to premises use and other matters **that are spelled out in the lease with the debtor-tenant**." *In re Trak Auto Corp.*, 367 F.3d 237, 244 (4th Cir. 2004) (emphasis added). Indeed, the legislative history of section 365(b)(3)(C) demonstrates that Congress sought to preserve the landlord's rights in respect of its lease with the debtor and any other applicable agreements, such as a master agreement, that the landlord and the debtor had entered into:

> "Thus, in order to assure a landlord of his bargained for exchange, the court would have to consider such factors as . . . whether that business complies with the requirements of any ***master agreement*** . . . and whether the business proposed to be conducted would result in a breach of other clauses in ***master agreements*** . . . ."

H.R. Rep. No. 595, 95th Cong., 1st Sess. 349 (1977), 1978 U.S. Code Cong. & Admin. News 5963 (emphasis added).

22. Additionally, the legislative history of section 365(f)(1) of the Bankruptcy Code sheds further light on how Congress viewed section 365(b)(3)(C). In 2005, Congress enacted the Bankruptcy Abuse Prevention and Consumer Protection Act (BAPCPA), which amended certain provisions of the Bankruptcy Code. In explaining the modifications to section 365(f)(1) of the Bankruptcy Code, Senator Hatch referenced the intended meaning of section 365(b):

> The bill helps clarify that an owner should be able to retain control over the mix of retail uses in a shopping center. When an owner enters into a use clause with a retail tenant forbidding assignments of the lease for a use different than ***that specified in the lease***, that clause should be honored. Congress has so intended already, but bankruptcy judges have sometimes ignored the law.

151 Cong. Rec. S. 2459, 2461 (daily ed. March 10, 2005) (emphasis added). As Senator Hatch's statement makes clear, Congress's focus was on enforcing those restrictive provisions ***to which a debtor-tenant had agreed***.

23. Senator Hatch further explained Congress's intent as follows:

> Congress decided that use or similar restrictions ***in a retail lease***, which the retailer cannot evade under non-bankruptcy law, should not be evaded in bankruptcy: It is my understanding that some bankruptcy judges have not followed this mandate. Under another provision of the Code, Section 365(f), a number of bankruptcy judges have misconstrued the Code and allowed the assignment of a lease even though ***terms of the lease*** are not being followed.

*Id.* (emphasis added).

24.  This legislative history is reinforced by the House Report on the BAPCPA amendments to section 365(f)(1), which also notes that the "provisions of the lease"—meaning the debtor's lease to be assigned—are paramount:

> Section 404(b) [of the 2005 Act] amends section 365(f)(1) to assure that section 365(f) does not override any part of section 365(b) . . . Therefore, for example, assumption or assignment of a lease of real property in a shopping center must be subject to ***the provisions of the lease***, such as use clauses.

House Rep. No. 109-31, Pt. 1, 109th Cong. 1st Sess. 87 (2005) (emphasis added).

25.  Tellingly, the Landlord asserts that "[a]s part of BAPCPA, Congress . . . ma[de] section 365(f)(1) expressly subordinate to section 365(b)(3)," but fails to recount any of the legislative history discussed above, which makes clear that Congress's purpose was to protect the landlord's rights under its agreement with the debtor, not third parties.[9]

## II.  The Relief the Landlord Seeks Is Unprecedented and Would Lead to Absurd Results

26.  The Landlord asks the Court to apply sections 365(b)(3)(C) and (D) of the Bankruptcy Code in ways that are unprecedented and would lead to absurd results. They should therefore be rejected. *See United States v. Fontaine*, 697 F. 3d 221, 227 (3d Cir. 2012) (courts must "construe statutes sensibly and avoid constructions which yield absurd or unjust results").

---

[9] While the Third Circuit "has declined to employ legislative history if a statute is clear on its face," it has "allowed recourse to legislative history in the face of ambiguity." *Bruesewitz v. Wyeth, Inc.*, 561 F.3d 233, 244 (3d Cir. 2009) (Smith, J.), *aff'd sub nom. Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 242, 131 S.Ct. 1068, 179 L.Ed.2d 1 (2011) (Scalia, J.) (noting that "legislative history is persuasive to some because it is thought to shed light on what legislators understood an ambiguous statutory text to mean" (citation omitted)). Thus, to the extent the Court finds ambiguity in the phrase "any other lease, financing agreement, or master agreement relating to such shopping center," the legislative history clarifies that Congress focused solely on agreements to which the debtor is party.

27.     ***First***, in connection with section 365(b)(3)(C) of the Bankruptcy Code, the Landlord asks this Court to consider not just the terms of the BBBY Lease, but every other lease in the Pinnacle Hills Promenade shopping center. The Landlord does not cite a single case in which any court has undertaken such an analysis. As discussed above, section 365(b)(3)(C) (like section 365(b)(3)(D)) refers to "such lease" to be assigned, and the legislative history reflects a focus solely on the debtor's lease. Under the Landlord's interpretation, debtors would be bound by the terms of all of the leases for all of the tenants in the shopping center, even though the debtors (i) did not agree to those other leases and (ii) do not (and cannot) know their terms, as such contracts are commercially sensitive and confidential legal documents. This framework would lead to the absurd result of giving debtors fewer rights and restructuring options in bankruptcy than out of it, subverting the entire purpose of the Bankruptcy Code.

28.     Recognizing this problem, the Landlord seeks to minimize the consequences of its position by arguing, in conclusory fashion, that the Debtors are bound by the terms of the other leases in only the Power Center, which is a 12-store subset of the 100+ stores in the Pinnacle Hills Promenade. Sur-Reply ¶ 33. Even if that were true, the Debtors would still be subject to the myriad terms—"including (but not limited to) provisions such as a radius, location, use, or exclusivity provision" (11 U.S.C. 365(b)(3)(C))—of at least a dozen leases and other agreements that the Debtors did not agree to and cannot know.

29.     ***Second***, in connection with section 365(b)(3)(D) of the Bankruptcy Code, the Landlord asks this Court to consider not just the BBBY Lease, but factors such as tenant make-up, distance between tenants, and levels of alleged competition between tenants. This proposition would require bankruptcy courts to conduct full trials in connection with each routine lease assignment, then weigh a multitude of factors to determine whether section 365(c)(3)(D) of the

15

Bankruptcy Code has been met. There is no basis in the Bankruptcy Code or legislative history for that sort of time- and resource-consuming process, which would impede all retail debtor reorganizations.

### III.    The Court Should Not Consider Alleged Losses That the Landlord May Suffer as a Result of the Assignment

30.    The Landlord argues that the proposed assignment should be denied because "[i]f the BBBY Lease is assigned to Michaels . . . the Landlord will be harmed in ways section 365(b)(3) is intended to prevent" by having to pay certain rent abatements to Hobby Lobby under the terms of its lease. *See* Sur-Reply at ¶¶ 6, 48. The Landlord is incorrect for at least four reasons.

31.    *First*, the Landlord offers no authority for the proposition that in determining whether a lease assignment complies with section 365(b)(3) of the Bankruptcy Code, bankruptcy courts should consider a landlord's alleged losses from other leases in the shopping center. Rather, case law provides the opposite. *See Toys "R" Us*, 587 B.R. at 311 n.5 ("§ 365's intended purpose [is to allow for the] maximizing [of] the value of the bankruptcy estate.") (*citing In re Ames Department Stores, Inc*, 348 B.R. 91, 98 (Bankr. S.D.N.Y. 2006) ("Congress has determined that, subject only to certain statutory safeguards, the value of a debtor's leases should go to the debtor's creditors, and that leases can be sold to achieve that end—with or without landlord consent.")).

32.    *Second*, the Landlord has provided no basis for impairing the Debtors' restructuring based on purported harms arising from terms of non-debtor leases that the Landlord agreed to without the Debtors' knowledge or consent more than a decade after the Debtors' lease was executed.

33.    *Third*, section 7.5 of the Hobby Lobby Lease provides that, if another tenant violates the exclusive use provision contained in the Hobby Lobby lease absent the Landlord's

consent, Hobby Lobby may not abate rent if the Landlord promptly initiates and diligently pursues all commercially reasonable remedies. *See* Hobby Lobby Lease § 7.5. The Landlord has followed this requirement, and therefore will not be subject to any rent abatement under the Hobby Lobby Lease.

34. **Fourth**, as the *Toys "R" Us* court found, "a court order approving the assumption and assignment of a lease is a judicial action that may render the Landlord unable to comply with a restriction contained in another lease[]" and such order excuses the Landlord's performance with respect to the exclusive use restrictions contained in that lease. *See Toys "R" Us*, 587 B.R. at 310.

### Reservation of Rights

35. Michaels reserves the right to amend or supplement this Sur-Sur-Reply and to assert any other rights, arguments, and remedies under and relating to the BBBY Lease, the Bankruptcy Code, or other applicable law, including the right to raise additional arguments or objections at the hearing and to interpose amended or further replies at a later date as may be warranted by the attendant facts and circumstances. Michaels further reserves the right to seek payment of its attorneys' fees from the Landlord in connection with this dispute. *See* BBBY Lease § 23.7.

### Conclusion

For the reasons stated above, Michaels respectfully requests that the Court (i) overrule the Objection and Sur-Reply, (ii) approve the assumption and assignment of the BBBY Lease to Michaels, and (iii) grant such other and further relief as is the Court deems just and proper.

Dated:  August 25, 2023

**LOWENSTEIN SANDLER LLP**

By: /s/ *Kenneth A. Rosen*
Kenneth A. Rosen, Esq.
Mary E. Seymour, Esq.
Philip J. Gross, Esq.
One Lowenstein Drive
Roseland, NJ 07068
Telephone (973) 597-2500
E-mail: krosen@lowenstein.com
Email: mseymour@lowenstein.com
E-mail: pgross@lowenstein.com

-and-

**WHITE & CASE LLP**
Gregory F. Pesce, Esq. *(*admitted *pro hac vice)*
Laura E. Baccash, Esq. *(*admitted *pro hac vice)*
111 South Wacker Drive, Suite 5100
Chicago, IL 60606-4302
Telephone: (312) 881-5400
Email: gregory.pesce@whitecase.com
Email:  laura.baccash@whitecase.com
-and-

Samuel P. Hershey, Esq. *(*admitted *pro hac vice)*
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Email: sam.hershey@whitecase.com

-and-

Devin J. Rivero, Esq. *(*admitted *pro hac vice)*
Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, FL 33131-2352
Telephone: (305) 371-2700
Email:  devin.rivero@whitecase.com

*Co-Counsel to Michaels Stores, Inc.*