**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Emily E. Geier, P.C. (admitted *pro hac vice*)
Derek I. Hunter (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
joshua.sussberg@kirkland.com
emily.geier@kirkland.com
derek.hunter@kirkland.com

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com

*Co-Counsel for Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| BED BATH & BEYOND INC., *et al.*, | Case No. 23-13359 (VFP) |
| Debtors.[1] | (Jointly Administered) |

**DEBTORS' OMNIBUS REPLY IN**
**SUPPORT OF DEBTORS' MOTION FOR ENTRY**
**OF AN ORDER (I) ESTABLISHING PROCEDURES TO**
**SELL CERTAIN LEASES, (II) APPROVING THE SALE OF**
**CERTAIN LEASES, AND (III) GRANTING RELATED RELIEF**

---

[1]   The last four digits of Debtor Bed Bath & Beyond Inc.'s tax identification number are 0488. A complete list of the Debtors in these Chapter 11 Cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/bbby.  The location of Debtor Bed Bath & Beyond Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 650 Liberty Avenue, Union, New Jersey 07083.

1

TO: THE HONORABLE JUDGE VINCENT F. PAPALIA UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEW JERSEY:

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file this omnibus reply (this "Reply")[2] in support of the Debtors' *Notice of Successful and Backup Bidder with Respect to the Phase 1 Auction of Certain of the Debtors' Lease Assets and Assumption and Assignment of Certain Unexpired Leases* [Docket No. 1114] (the "Successful Bidder Notice"), the *Notice of Assumption of Certain Unexpired Leases* [Docket No. 1157] (the "Assumption and Assignment Notice" and together with the Successful Bidder Notice, the "Notices"), and the *Debtors' Motion for Entry of an Order (I) Establishing Procedures to Sell Certain Leases, (II) Approving the Sale of Certain Leases, and (III) Granting Related Relief* [Docket No. 193] (the "Motion"), and in response to:[3]

(i)     Pinnacle Hills, LLC's ("Pinnacle Hills") *Objection of Pinnacle Hills, LLC to Debtors' Motion for Order Authorizing Debtors to Assume and Assign Lease for Store No. 1142* [Docket No. 1323] (the "Pinnacle Hills Objection"), *Pinnacle Hills, LLC's Sur-Reply in Further Support of Its Objection to Debtors' Motion for Order Authorizing Debtors to Assume and Assign Lease for Store No. 1142* [Docket No. 1926] (the "Pinnacle Hills Sur-Reply"), *Declaration of Jeffrey Aronoff in Support of Pinnacle Hills, LLC's Sur-Reply in Further Support of Its Objection to*

---

[2]     Capitalized terms used but not otherwise defined in this Motion shall have the meanings ascribed to them in the *Declaration of Holly Etlin, Chief Restructuring Officer and Chief Financial Officer of Bed Bath & Beyond Inc., in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 10] (the "First Day Declaration") or the Amendola Declaration (as defined herein). A detailed description of the Debtors, their businesses, and the facts and circumstances supporting the Debtors' Chapter 11 Cases is set forth in greater detail in the First Day Declaration and Amendola Declaration and incorporated by reference herein.

[3]     The Debtors have resolved the *Objection of Landlord, Edison TOCA001 LLC to Debtors' Motion for Order Authorizing Debtors to Assume and Assign Unexpired Non-Residential Real Property Lease for Store No. 3076* [Docket No. 1320] with regard to the assumption and assignment of the retail premises located at 3700 West Torrance Boulevard, Torrance California, subject only to final documentation. Further, at the landlord's request, the Debtors agreed to adjourn the *Opposition of HBREIT II Edmondson Road, LLC to Debtors' Motion for Order Authorizing Debtors to Assume and Assign Unexpired Non-Residential Real Property Lease for Store No. 301* [Docket No. 1326] to a later date while the landlord and the proposed assignee continue to negotiate a consensual resolution regarding the proposed assignment. In so doing, the landlord, HBREIT II Edmondson Road, LLC, agreed to waive its right to rent and other obligations for the month of September in order to facilitate a consensual resolution. The Debtors are working to finalize a resolution with the landlord with respect to the assignment of Store 301 located in Cincinnati, OH.

*Debtors' Motion for Order Authorizing Debtors to Assume and Assign Lease for Store No. 1142* [Docket No. 1927] (the "Aronoff Declaration"), and *Declaration Of Kristin S. Elliott, Esq. In Support of Pinnacle Hills, LLC's Sur-Reply in Further Support of Its Objection to Debtors' Motion for Order Authorizing Debtors to Assume and Assign Lease for Store No. 1142* [Docket No. 1928] (the "Elliot Declaration");

(ii)     Daly City Serramonte Center, LLC's and Regency Centers, L.P.'s ("Serramonte") *Limited Objection and Joinder of Regency Centers L.P. and Daly City Serramonte Center, LLC to Debtors' Motion for Order Authorizing Debtors to Assume and Assign Unexpired Non-Residential Real Property Leases for Store Nos. 3108 and 385* [Docket No. 1328] (the "Serramonte Objection"), *Supplemental Objection in Further Support of Opposition of Daly City Serramonte Center, LLC to Debtors' Motion for Order Authorizing Debtors to Assume and Assign Lease for Store No. 3108* [Docket No. 1929] (the "Serramonte Supplemental Objection"), and *Declaration Of Ernst A. Bell in Support of Opposition of Daly City Serramonte Center, LLC to Debtors' Motion for Order Authorizing Debtors to Assume and Assign Lease for Store No. 3108* [Docket No. 1930] (the "Serramonte Declaration"); and

(iii)    DPEG Fountains, L.P.'s ("Fountains") *Objection By Landlord DPEG Fountains, LP to Debtors' Proposed Assumption and Assignment of Lease [Docket No. 1340] and Amended Objection By Landlord DPEG Fountains, LP to Debtors' Proposed Assumption and Assignment of Lease* [Docket No. 1344] (the "Fountains Objection"), *Certification of Nikhil Dhanani in Support of DPEG Fountains LP's Objection to the Notice of Assumption of Certain Unexpired Leases* [Docket No. 1573] (the "Fountains Declaration"), and *Supplemental Objection and Joinder by DPEG Fountains, LP in Further Support of Its Objection to Debtors' Motion for Order Authorizing Debtors to Assume and Assign Lease for Store No. 126* [Docket No. 1933] (the "Fountains Supplemental Objection" and together with the Pinnacle Hills Objection, Pinnacle Hills Sur-reply, Serramonte Objection, Serramonte Supplemental Objection, and Fountains Objection, collectively, the "Objections").[4]

In support of this Reply and in further support of the Motion and Notices, the Debtors submit the *Declaration of Emilio Amendola in Support of Debtors' Reply in Support of Debtors' Motion for Entry of an Order (I) Establishing Procedures to Sell Certain Leases, (II) Approving the Sale of Certain Leases, and (III) Granting Related Relief* filed contemporaneously herewith (the "Amendola Declaration") and respectfully state as follows:

---

[4]    Pinnacle Hills, Serramonte, and Fountains shall collectively be referred to as the "Objecting Landlords."

**Background**

1.      On May 3, 2023, the Debtors filed the Motion seeking Court authorization to establish procedures to facilitate an expeditious and orderly process for the sale or other disposition of the Debtors' unexpired leases of non-residential real property (the "Lease Sale Procedures"). This Court approved the Lease Sale Procedures on May 22, 2023 [Docket No. 422] (the "Lease Sale Procedures Order").   On May 25, 2023, pursuant to the Lease Sale Procedures Order, the Debtors filed a notice informing parties in interest of the "phase 1" lease sale auction (the "Phase 1 Lease Auction"), which would take place on June 26, 2023 [Docket No. 456]. The Debtors filed supplemental notices on June 23 and June 24 further detailing the lease assets to be auctioned at the Phase 1 Lease Auction.

2.      The Debtors held the Phase 1 Lease Auction on June 26, 2023 where over 150 leases were placed up for bidding.  Following the Phase 1 Lease Auction, the Debtors filed the Successful Bidder Notice and subsequently the Assumption and Assignment Notice. The Notices identified Burlington Coat Factory Warehouse Corporation ("Burlington") as the successful bidder for the Serramonte Lease and the Fountains Lease, and Michaels Stores, Inc. ("Michaels" and together with Burlington, the "Proposed Assignees") as the successful bidder for the Pinnacle Hills Lease (together with the Serramonte Lease and the Fountains Lease, the "Subject Leases").  The Notices provided all interested parties sufficient and adequate notice of the successful bidders and backup bidders, the deadline to file written objections to the proposed lease assignments, and the hearing date scheduled for approval of the assignments to the successful bidders.

3.      The Court thereafter approved the sale or other disposition of the leases subject to the Phase 1 Lease Auction, save for six proposed lease assignments, three of which are discussed

in this Reply.[5]   The landlords to the Subject Leases each object to the Debtors' proposed

assumption   and   assignment   of   the   Subject   Leases   to   the   Proposed   Assignees

(the "Proposed Assignments").   No other parties, including any of the Objecting Landlords'

tenants, object to the Proposed Assignments.

**Preliminary Statement**

4.      The Debtors filed these chapter 11 cases in dire financial straits with the paramount

goal of maximizing the value of their assets for the benefit of ***all*** stakeholders.   An integral

component   of   that   goal   has   been   to   extract   the   substantial   value   inherent   to   the   Debtors'

under-market lease portfolio.   The Bankruptcy Code affords the Debtors broad latitude (and

protection)   to   capitalize   on   that   goal—namely   through   the   assumption   and   assignment   of

unexpired leases for retail premises that the Debtors no longer wish to operate.   Accordingly, and

as this Court is well aware, a cornerstone of the Debtors' asset monetization efforts during these

cases has centered around the assignment of leases.   That is evident by the Lease Sale Procedures,

the dual phase lease sale auctions, various Court hearings to approve of the disposition of leases,

and more.   These efforts have produced nearly 200 lease dispositions to date, generating nearly

$65 million in cash proceeds for the estate.   A substantial portion of those proceeds stems from

Burlington's package bid for 44 retail locations for approximately $12 million.   This Court

approved 41 of those lease assignments [Docket Nos. 1746, 1747]; the Debtors withdrew one

lease; and two proposed lease assignments remain subject to the Objections.   If approved,

the Proposed Assignments, which include the two lease assignments to Burlington and one lease

assignment   to   Michaels,   will   result   in   over   $1.5   million   in   cash   proceeds   for   the   estates.

---

[5]      The Debtors continue to seek consensual resolution of certain objections and cure disputes related to the balance
of the proposed lease assignments.

It is imperative that the Court bless these transactions for what they are—valid and reasonable exercises of the Debtors' prudent business judgment. Any impediment to the Debtors' ability to monetize the full value of their leases—including the Subject Leases—stands to deplete key stakeholder recoveries.

5.       Despite losing or failing to participate at the Phase 1 Lease Auction, the Objecting Landlords turn to distinct legal arguments to block the Proposed Assignments. They principally rely on two arguments, each purportedly grounded in the adequate assurance requirements of section 365(b)(3) of the Bankruptcy Code: *first*, that the Proposed Assignments violate "use" restrictions in *subsequent-in-time* lease agreements between the Objecting Landlord and an unrelated, non-debtor third party;[6] and *second*, that the Proposed Assignees will disrupt the tenant mix and balance in the shopping centers underlying the Subject Leases. The Objecting Landlords lodge these last-ditch Objections with the same motivation—to recapture below market leases and profit from higher rents, all to the detriment of the Debtors' estates. None of the Objections can survive legal scrutiny, much less available evidence.

6.       *First*, the plain language of the Subject Leases specifically provide the Debtors with the right to freely assign the Debtors' interest in the Subject Leases, subject only to certain non-permitted uses and pre-existing exclusivity provisions granted to other tenants in the underlying shopping centers. Those other tenants do not include Hobby Lobby or Dollar Tree (as it relates to

---

[6]     With respect to the Pinnacle Hills Lease, the Objecting Landlord cites a lease (the "Hobby Lobby Lease") it maintains with Hobby Lobby Stores, Inc. ("Hobby Lobby") and a lease (the "Dollar Tree Lease") it maintains with Dollar Tree Stores, Inc. ("Dollar Tree"). With respect to the Serramonte Lease, the Objecting Landlord cites a lease (the "Ross 1.0 Lease") it maintains with Ross Dress for Less, Inc. ("Ross") And with respect to the Fountains Lease, the Objecting Landlord cites a lease (the "Ross 2.0 Lease") it maintains with Ross.

the Pinnacle Hills Lease) or Ross (as it relates to the Serramonte Lease or the Fountains Lease).[7]

Neither the Pinnacle Hills Lease nor the Serramonte Lease obligate the Debtor to honor any other

exclusivity provision that might be granted by the Objecting Landlord to any tenant in the

underlying shopping center, either at the time of execution of the Subject Leases or in the future.

And while the Fountains Lease imposes a future exclusive on the Debtors, there is an express

carveout to that future exclusive for businesses engaged in the sale of apparel, thereby rendering

the future exclusive inapplicable to the Proposed Assignment of the Fountains Lease to

Burlington.  *See* Fountains Lease § 23(d)(iii).  Put simply, the Subject Leases contain no terms

prohibiting their assignments to Michaels and Burlington.

7.       ***Second***, the Objecting Landlords' interpretation of the reach of section 365 of the

Bankruptcy Code would lead to absurd and illogical results if applied in this case and all chapter 11

cases.  That interpretation is unsupported by existing caselaw and the legislative history.  Under

the Objecting Landlords' proposed readings, debtors would be unable to assume and assign leases

in shopping centers if such assignments allegedly violated a provision not in the lease between the

debtor-tenant and landlord, but rather in any other tenant's lease.  Rather than protect the status

quo of their "bargained-for protections" as Congress intended, *see In re Trak Auto Corp.*, 367 F.3d

237, 244 (4th Cir. 2004), the Objecting Landlords seek to impermissibly broaden their lease rights

*vis-à-vis* the proposed assignment of the Subject Leases in chapter 11 than otherwise would be

outside the confines of chapter 11.  Their reading of section 365 turns it on its head, rendering a

key tool in the Debtors' assumption and assignment toolbox ineffectual.  It simply cannot be the

result, and Congress did not intend it to be the result, that a debtor is bound by a provision in a

---

[7]    In fact, Hobby Lobby exists in the shopping center today because the Debtor consented to Pinnacle Hills' entry
into its lease agreement with Hobby Lobby back in 2021, notwithstanding certain exclusivity provisions in the
Pinnacle Hills Lease

lease in which it *is not a party*, never agreed to, and is unaware of, as such lease *came after*

execution of the Debtor's lease.  The Objecting Landlords fail to cite any case where a court

considered the terms of any lease other than the debtor's to determine whether a proposed lease

assignment complies with section 365(b)(3)(C) of the Bankruptcy Code.  Rather, every court that

has addressed this issue, including the bankruptcy court in the *Toys "R" Us* case, has relied solely

upon the terms of the debtor's lease.  This Court should do the same.

8.    ***Third***, consistent with the Bankruptcy Code's predisposition to the free

assignability a debtor's contracts, courts generally find use restrictions in leases to be

unenforceable restrictions on assignment.  Courts, including those in this district, acknowledge

that section 365(b)(3) is not meant to be read in isolation. *LaSalle Nat'l Tr., N.A. v. Trak Auto

Corp.*, 288 B.R. 114, 122 (E.D. Va. 2003).  Rather, section 365(b)(3) must be read in conjunction

with section 365(f), which it cross references.  *Id.*; *see also In re Rickel Home Centers, Inc.*, 240

B.R. 826, 831 (D. Del. 1998).  "In interpreting [s]ection 365(f), courts and commentators alike

have construed the terms to not only render unenforceable lease provisions which prohibit

assignment outright, but also lease provisions that are so restrictive that they constitute de facto

anti-assignment provisions."  *See id.* at 831–32 (citing *In re Joshua Slocum Ltd.*, 922 F.2d 1081,

1090 (3d Cir. 1990) (recognizing that "[e]ven under the tightly drawn definition of 'adequate

assurance' in the shopping center context, Congress did not envision literal compliance with all

lease provisions")).  As such, imposing exclusivity provisions in non-debtor tenant leases upon the

proposed assignment of debtor-tenant leases constitute *de facto* anti-assignment provisions in

blatant violation of section 365(f) of the Bankruptcy Code.

9.      ***Fourth***, as set forth in the Amendola Declaration and the Powers Declaration,[8] the Proposed Assignments would not disrupt the tenant mix and balance in the shopping centers underlying the Subject Leases.  Quite the contrary, as the tenants of the Objecting Landlords stand to benefit from the cross-patronage traffic to be gained from the installment of two large, revenue-generating retailers such as Michaels and Burlington.  More importantly, and conveniently absent from the Objections, the retail locations of both Hobby Lobby and Dollar Tree coexist with those of Michaels in numerous shopping centers across the country, as do those of Burlington and Ross.

10.      Overall, if sustained, the Objections will have the negative effect of chilling the Debtors' ability to monetize their assets to the detriment of the Debtors' stakeholders.  The Debtors must be able to rely on the central protections of the Bankruptcy Code—specifically, the ability to assume and assign their leases under section 365—as they proceed with finalizing the final chapter of their lease monetization efforts.    Accepting the Objecting Landlords' fundamental misapprehension of sections 365(b)(3) and (f) of the Bankruptcy Code risks upending all debtors', and particularly retail debtors', ability to restructure in chapter 11.

11.      For these reasons, and as more fully set forth herein, and in the Motion and Amendola Declaration, the Debtors respectfully request that this Court overrule the Objections and approve the Proposed Assignments.

---

[8]    *Declaration of Todd Powers in Support of Michaels Stores, Inc.'s Reply to Objection of Pinnacle Hills, LLC to Debtors' Motion for Order Authorizing Debtors to Assume and Assign Lease for Store No. 1142* [Docket No. 1384].

## Argument

I.    **The Debtors Are Authorized to Assign the Subject Leases to the Proposed Assignees Under the Plain Terms of the Subject Leases.**

12.    ***The Pinnacle Hills Lease***.  The Proposed Assignment complies with the terms of the Pinnacle Hills Lease.  Under the terms of the Pinnacle Hills Lease, the tenant is permitted to use the premises to sell retail items and "for any other lawful retail use not specifically prohibited by the provisions of Section 13.1.1."  Pinnacle Hills Lease, § 1.1.27.  The provisions of section 13.1.1, in turn, prohibit the tenant from using the premises for "Prohibited Uses" or in violation of "Existing Exclusives."  The "Existing Exclusive" comprise eight prior tenants who had entered into leases with Pinnacle Hills prior to the execution of the Pinnacle Hills Lease.  Hobby Lobby and Dollar Tree are not listed in the Pinnacle Hills Lease "Existing Exclusives."  *See* Pinnacle Hills Lease §§ 13.1.1, 13.3.1, <u>Exhibit K-1</u>.  They are not listed because Pinnacle Hills entered into leases with Hobby Lobby and Dollar Tree over ten years after the effective date of the Pinnacle Hills Lease.  The Prohibited Use section of the Pinnacle Hills Lease, in turn, fails to prohibit the use of the premises in the manner Michaels would operate them.  *See* Michaels Reply, ¶ 10, n.6 (incorporated here by reference).  Moreover, the Pinnacle Hills Lease is excruciatingly clear:

> Tenant shall honor only those exclusives granted by Landlord as set forth in Exhibit K-1 . . . and Landlord . . . covenants to indemnify, defend and hold Tenant harmless against all loss, cost, liability or expense (including, without limitation, reasonable legal fees) incurred by reason of the enforcement by any person or entity of such unlisted Existing Exclusive.

> Except as expressly set forth [herein], Tenant shall not be obligated to honor ***any*** exclusive granted by Landlord to any tenant in the Shopping Center.

Pinnacle Hills Lease § 13.3.1, 13.3.2 (emphasis added).

13.    Accordingly, neither the "Prohibited Uses" nor the "Existing Exclusives" sections prohibit the assignment of the Pinnacle Hills Lease to Michaels, and the Debtors are permitted

10

under the terms of the Pinnacle Hills Lease to assign it to Michaels.  Conversely, Pinnacle Hills's

Objection and Sur-Reply violate sections 13.3 and 12.3(d) of the Pinnacle Hills Lease, entitling

the Debtors to all reasonable legal costs associated with the Pinnacle Hills-related objections.

*See* Pinnacle Hills Lease § 12.3 ("Tenant's use of the Premises for sale of "Permitted Items"

(defined in Section 1.1.27 above) will not violate any exclusive provision or prohibited use

restriction ***granted to any other tenant or occupant in the Shopping Center***." (emphasis added));

*compare with* § 1.1.27 (defining "Permitted Use" to include "any other lawful retail use not

specifically prohibited . . . .").

14.    Pinnacle Hills contends that if the Debtors were not in bankruptcy, Pinnacle Hills

could seek to terminate the Pinnacle Hills Lease.  *See* Pinnacle Hills Lease § 15.1.2 (providing that

after notice, the "Landlord shall have the option to terminate this lease, which option shall be

exercisable by" giving Debtor notice within 30 days after receipt of an assignment notice and

paying Debtor certain costs).  Were, however, Pinnacle Hills to terminate the Lease on account of

the Debtors' proposed assignee outside of bankruptcy, Pinnacle Hills would owe to the tenant what

Michael's appropriately called "substantial damages."  *See* Michael's Reply at ¶ 11 n.8 (describing

the termination provisions and noting that Pinnacle Hills acknowledges that this termination right

is unenforceable in these chapter 11 cases under section 365(f)(1)).  Regardless, such "recapture

provisions" are inapplicable in bankruptcy as impermissible anti-assignment clauses.  11 U.S.C. §

365(f)(1); *see 6711 Glen Burnie Retail, LLC v. Toys "R" Us, Inc.*, No. 3:18-CV-491-JAG, 2018

WL 6787942, at *1 (E.D. Va. Dec. 26, 2018) (finding "that the recapture provision in the lease"—

which is nearly identical to the Hobby Lobby Lease's termination provisions—"constituted an

impermissible anti-assignment clause under 11 U.S.C. § 365(f)(1)").[9]

---

[9]    The same reasoning applies to the subsequent "recapture provisions" described herein.

15.    Accordingly, as the Court surmised, under the terms of the Pinnacle Hills Lease, the Debtors are in no way restricted from assigning the Pinnacle Hills Lease to Michaels.[10] Pinnacle Hill's Objection to the Proposed Assignment—based on provisions in the Hobby Lobby Lease (entered into in 2021) and the Dollar Tree Lease (entered into in 2019) to which leases the Debtors are not party, and which leases were entered into well-after the Pinnacle Hills Lease (entered into in 2007)—is contrary to (a) Pinnacle Hill's original bargain with the Debtors, (b) Pinnacle Hill's rights under applicable nonbankruptcy law, and (c) the plain meaning of section 365(b)(3)(C) (as discussed further below).

16.    ***The Serramonte Lease***.  The Serramonte Lease provides the Debtors with the "right from time to time, without the consent of Landlord, to assign [the Debtors'] interest in this Lease . . . subject to all of the terms and conditions of this Lease . . . ."  Serramonte Lease § 15.1.1. For the similar reasons to those established in the Pinnacle Hills Lease (above), any challenge of the Serramonte Lease on the basis of exclusivity is in direct violation section 13.3 and the Landlord is obligated to cover all of Debtors' reasonable legal fees associated in defending this assignment. *See* Serramonte Lease §§ 13.3.2, 13.3.1.

17.    Serramonte asserts that the Proposed Assignment of the Serramonte Lease to Burlington would violate section 15.3(b) of the Ross lease (the "<u>Ross 1.0 Lease</u>").  This is incorrect.  The Ross 1.0 Lease excepts certain "Existing Tenants" from application of Ross 1.0 Lease § 15.3, which include the Debtors.  *See* Ross 1.0 Lease § 15.3(c) ("The restrictions of this Section 15.3 shall not apply to the Existing Tenants set forth on Exhibit K attached hereto who, in

---

[10]    Tr. H'rg at 10:17-23, No. 23-13359 (VFP) (Bankr. D. Del. Aug. 11, 2023) ("[A]s I understand it, the Bed Bath & Beyond lease allows reassignment and Hobby Lobby came in more than ten years later with a -- you know, with knowledge of whoever else was there, and certainly Hobby Lobby and Bed Bath & Beyond sell some of the same things.  And I believe a memorandum of lease was recorded and all that.  So I'm having some trouble with it, I have to say.").

accordance with the terms of existing leases or occupancy agreements in effect on the Effective

Date, including any extensions, assignments or subleases thereof, cannot be prohibited from so

operating.  Landlord covenants and agrees that if Landlord has the right to deny its consent to a

change in use of the premises occupied by any such Existing Tenant, Landlord shall not consent

to a change in use of the premises which violates the restrictions of this Section 15.3.”); *see also*

*id.* Exhibit K (listing Buy Buy Baby and Cost Plus); *cf.* Ross 1.0 Lease § 3.2.1 (“The Ross

Prohibited Uses set forth in Section 3.2.1(a) above shall not apply to those tenants or occupants of

the Shopping Center set forth on **Exhibit K** attached hereto . . . .”).

18.     Accordingly, the Serramonte Lease explicitly authorizes the Debtors’ Proposed

Assignment of the Serramonte Lease to Burlington, notwithstanding Serramonte’s assertions to

the contrary.

19.     ***The Fountains Lease***.  Under the terms of the Fountains Lease, the Debtors are

authorized to assign the Fountains Lease for certain “Permitted Uses.”  Fountains Lease § 25(b)

(“[I]n the event Tenant proposes to assign this Lease . . . it shall first give notice thereof . . . to

Landlord”).  The Fountains Lease further provides as follows:

> Tenant’s assignees and sublessees shall be permitted to use the Premises (or the
> applicable portion thereof) for the uses permitted in Section 25 hereof.[11]
>
> All assignees and sublessees shall be permitted to use the Premises . . . for any retail
> purpose not specifically prohibited by the provisions of sections 7(c) or 23(d) of
> this Lease.[12]
>
> Tenant agrees, that in the event Tenant assigns this Lease . . . other than an
> assignment or sublease referred to in Section 25(c) hereof, Tenant shall not, in the
> case of an assignment of this Lease, permit the Premises . . . to be used for any use
> or purpose which violate any exclusive granted by Landlord to other tenants in the
> Shopping Center pursuant to the terms a lease which is executed from and after the

---

[11]   Fountains Lease § 1(i).

[12]   Fountains Lease § 25(e).

date hereof (hereinafter, "Future Exclusive(s)") provided, and on the condition that . . . such Future Exclusive shall not relate to the sale, rental, or distribution of apparel or apparel accessories . . . .[13]

Tenant covenants and agrees the Premises shall not be used for any of the Prohibited Uses.[14]

The "Prohibited Uses," in turn, fail to prohibit the operation of the Fountains Lease premises as contemplated by Burlington.  Moreover, similar to the Pinnacle Hills violation, the landlord is in violation of warranties and representations made that "the use of the Premises for sale of Permitted Items will not violate any exclusive provision granted to any other tenant or tenants in the Shopping Center."  Fountains Lease § 53(a)(ii).

20.    Notwithstanding the Fountains Lease's authorization of such assignment, Fountains alleges that the assignment of the Fountains Lease to Burlington will violate exclusives in a non-debtor tenant's—Ross—lease (the "Ross 2.0 Lease").  Fountains is mistaken.  In fact, the provision of the Ross 2.0 Lease that Fountains contends precludes Debtors' assignment of the Fountains Lease to Burlington, explicitly carves out from the Ross 2.0 Lease any application of such preclusive provisions as to the Fountains Lease.  *See* Ross 2.0 Lease, § 15.3(b) (providing that section 15.3(a) is inapplicable to leases listed on Exhibit K), s*ee* Ross 2.0 Lease Exhibit K (listing "Bed Bath & Beyond, Inc." as an exception to the exclusives).  The Existing Tenant exemption applies not only to the Debtors, but also their assignees as it (i) is not limited to current or existing tenants and occupants, (ii) uses the modifier "under the Existing Leases," as a temporal limitation on the existing leases, such as the Fountains Lease, which permits assignment, and (iii) contemplates a change in use under an existing lease as it requires the Landlord *not* to consent

---

[13]    Fountains Lease § 23(d).

[14]    Fountains Lease § 7(c).

to any use that violates the use restrictions "***if Landlord has the right of consent to any change in use*** of the premises occupied by a tenant or occupant ***operating under an Existing Lease***." Ross 2.0 Lease 15.3(b)(i) (emphasis added).

21.    Fountains' assertions that Ross 2.0 Lease § 15.3(a) precludes this assignment are unfounded.

## II.    Section 365(b)(3)(C) Does Not Afford the Objecting Landlords Greater Rights in Bankruptcy Than Otherwise Entitled to Outside the Confines of Bankruptcy; and the Objecting Landlords' Interpretation to the Contrary Would Lead to Absurd Results.

### A.    Principles of Statutory Interpretation and Basic Contract Principles Proscribe the Objecting Landlords' Interpretation That 365(B)(3) Applies to Leases to Which the Debtors Are Not Party.

22.    The Objecting Landlords assert that section 365(b)(3)(C) precludes the assignment of a lease if another lease between a non-debtor tenant and the landlord ***to which a debtor is not party*** contains some term prohibiting such assignment.  As explained below, however, the Objecting Landlords' interpretation is critically flawed and should be rejected in its entirety.[15]

---

[15]    The legislative history supports the interpretation that only contracts to which the debtor is party to are applicable to section 365(b)(3)(C).

A shopping center is often a carefully planned enterprise, and though it consists of numerous individual tenants, the center is planned as a single unit, often subject to a master lease or financing agreement.  Under these agreements, the tenant mix in a shopping center may be as important to the lessor as the actual promised rental payments, because certain mixes will attract higher patronage of the stores in the center, and thus a higher rental for the landlord from those stores that are subject to a percentage of gross receipts rental agreement.  Thus, in order to assure a landlord of his bargained for exchange, the court would have to consider such factors as the nature of the business to be conducted by the trustee or his assignee, whether that business complies with the requirements of any master agreement, whether the kind of business proposed will generate gross sales in an amount such that the percentage rent specified in the lease is substantially the same as what would have been provided by the debtor, ***and whether the business proposed to be conducted would result in a breach of other clauses in master agreements relating, for example, to tenant mix and location***.

S. Rep. No. 98-65, at 30 (1983) (emphasis added).

23.     Any analysis of section 365(b)(3) begins "where all such inquiries must begin:  with

the language of the statute itself." *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752, 1759

(2018).  Section 365(b)(3) provides, in relevant part:

> For the purposes of paragraph (1) of this subsection and paragraph (2)(B) of
> subsection (f), adequate assurance of future performance of a lease of real property
> in a shopping center includes adequate assurance . . . that assumption or
> **assignment of such lease** is subject to all the provisions thereof . . . and **will not
> breach** any such provision contained in any other lease . . . relating to such
> shopping center . . . .

11 U.S.C. § 365(b)(3).

24.     In determining what it means for the assignment of a lease to "breach" a "provision

contained in any other lease," the ordinary meaning of the term "breach" must be examined.  *See,

e.g.*, *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752, 1759 (2018) (looking to the

ordinary meaning of certain terms that were not defined in the Bankruptcy Code).

25.     A breach of contract is defined as a "[v]iolation of a contractual obligation by

failing to perform one's own promise." *Breach of Contract*, Black's Law Dictionary (11th ed.

2019).  Moreover, it is axiomatic that "[a] person who is not a party to a contract, i.e., is not named

in the contract and has not executed it, is not bound by its terms."  17B C.J.S. Contracts § 862.;

*c.f. Smith v. Eisen*, 97 Ark. App. 130, 139 (Ark. Ct. App. 2006) (*citing Rabalaias v. Barnett*, 683

S.W.2d 919 (1985)).  Thus, the Debtors' assignment of a lease cannot breach such "other lease"

absent circumstances not applicable here.[16]

26.     Accordingly, the Objecting Landlords fail to provide an adequate interpretation of

section 365(b)(3) that explains how a debtor's assignment—which does not breach the

---

[16]    *See, e.g.*, Michaels Reply at ¶ 19 (providing plausible scenarios where an assignment could result in the breach
of "other leases"; providing legislative history in support thereof).

lease-to-be-assigned nor any other lease to which such debtor is a party—violates

section 365(b)(3).[17]

> **B.**      **The Purpose of the Bankruptcy Code Mandates Interpreting Section 365(b)(3) in Accordance with a Debtor and Landlord's Bargained-for Rights—Not the Landlord's Bargained-for Rights That Are Nonbinding upon a Debtor Under Applicable Nonbankruptcy Law.**

27.      Section 365(b)(3) was enacted to preserve for contracting parties "the full benefit

of [their] bargain." *In re Kiwi Int'l Air Lines, Inc.*, 344 F.3d 311, 318 (3d Cir. 2003); *Matter of*

*Superior Toy & Mfg. Co., Inc.*, 78 F.3d 1169, 1174 (7th Cir. 1996) ("If the trustee is to assume a

contract or lease, the court will have to insure that the trustee's performance under the contract or

lease gives the other contracting party the full benefit of his bargain."); *In re ANC Rental Corp.,*

*Inc.*, 277 B.R. 226, 232 (Bankr. D. Del. 2002) ("Section 365 is designed to protect the rights of

parties with whom debtors have contractual relationships."); *In re Rickel Home Centers, Inc.*, 209

F.3d 291, 299 (3d Cir. 2000) (finding that adequate assurance under section 365(b)(3) is required

"to ensure that the essential terms of a ***debtor's*** lease in a shopping center are not changed in order

to facilitate assignment" (emphasis added)) (internal citations and quotation marks omitted).

28.      These bargained-for benefits "are spelled out in the lease with the debtor-tenant."

*In re Trak Auto Corp.*, 367 F.3d 237, 244 (4th Cir. 2004) (emphasis added); *see also S. Blvd., Inc.*

---

[17]    The legislative history further supports this interpretation.

> Unfortunately, experience with these provisions [sic] indicates that they have not functioned as originally intended by Congress.  Under the Bankruptcy Code, the shopping center and its solvent tenants may suffer serious economic harm or even business failure if a bankruptcy tenant does [sic] its store for an extended period of time or assigns its lease to a business which does not conform to ***the lease's use clause*** thus disrupting the shopping center's tenant mix. These problems are compounded when the bankrupt tenant is a major store in the shopping center . . . (cont'd).

> The assignment of a lease to a business that does not conform to ***the use clause of that lease***, especially in the case of a major store lease, can affect the other tenants much in the same way as the closing of the store.

S. Rep. No. 98-65, at 35, 39 (1983) (emphasis added).

*v. Martin Paint Stores*, 207 B.R. 57, 62 (S.D.N.Y. 1997) ("A lease held by a third party and stranger to the bankruptcy is not encompassed by [section 365].").

29.    Moreover, any interpretation that would "require the courts to look beyond the terms of the original bargain . . . is demonstrably at odds with Congress' intention and is not to be followed." *In re Ames Dep't Stores, Inc.*, 127 B.R. 744, 752–53 (Bankr. S.D.N.Y. 1991) (*citing Federal Deposit Ins. Corp. v. Tremaine,* 133 F.2d 827, 830 (2d Cir. 1943) (L. Hand, J.)). Consequently, in determining the original bargain between the landlord and debtor-tenant, "courts should not imply an additional non-bargained-for term." *Id.* at 753.[18]

30.    The Objecting Landlords seek to restrict the Proposed Assignments with no support under applicable nonbankruptcy law.   While the Objecting Landlords assert that the Proposed Assignments violate the rights of certain non-debtor tenants under leases to which the Debtors are not party, the Objecting Landlords ignore the general rule that restricted use provisions granted to a subsequent tenant do *not* restrict a *prior* tenant's bargained-for rights.  *See, e.g.*, *Danish Maid,*

---

[18]   As provided in the legislative history:

> Prior to the enactment of the Code, the interests of the nonbankrupt tenants and the landlord were protected **by the contractual power of the lessor to terminate the lease in the case of a tenant bankruptcy**.  When Congress eliminated this power in the 1978 Act, it sought to establish other protections.  Unfortunately, these protections have not carried out the Congressional intent.  As a result, in the years since the enactment of the 1978 Act, it has become possible for the trustee in bankruptcy, or the bankrupt himself:
>
> > (1) To fail to decide whether he wishes to assume or reject the lease for an extended period of time, and to leave the premises unused or partially unused to the detriment of the surrounding businesses and the landlord;
> >
> > (2) To fail to perform his obligations under the lease when due, including the payment of rent and other charges; and
> >
> > (3) To fail to assign his lease, when he does assign it, to an assignee who will use the premises **as the lease requires**.
>
> When any one or more of **these three situations** occur, the economic health of the entire shopping center is threatened. S. 445 strengthens the protections in the 1978 Act against **these three situations** to make their occurrence less likely and deals with other more technical problems with the 1978 Act.

S. Rep. No. 98-65, at 29 (1983) (emphasis added).

*Inc. v. S. Bay Ctr., Inc.*, 11 A.D.2d 768, 768 (1960) (finding the restrictive covenant of a subsequent tenant to not prohibit a prior tenant from engaging in uses permitted under such prior tenant's lease); *City Best Insurance Services v Corona Towne Center, LLC*, No. RIC 519231 (Supr. Ct. Cal. 2011) (holding in favor of an assignor notwithstanding a subsequent exclusive use and noting "[f]or all the reasons I stated in my tentative, mainly that the ***lease itself does control***, and the lease itself speaks to a situation where Cardenas gets to sublease." (emphasis added)).[19]  Consequently, the Objecting Landlords have no basis for arguing that the leases of subsequent tenants (such as Hobby Lobby or Ross) could prohibit the Debtors' from assigning their Subject Leases under the terms of their original bargain.[20]

31.    Of concern, is that the Objecting Landlords' interpretation of section 365(b)(3)(C) elicits an inexplicable conundrum—that a debtor's right to assign a lease within bankruptcy could be more restrictive than such debtor's rights to assign the lease under the terms of the lease outside of bankruptcy. *See, e.g.*, *In re Bon Ton Restaurant & Pastry Shop, Inc.*, 53 B.R. 789, 804 (Bankr. N.D. Ill. 1985) ("It is not intended that a non-debtor party should acquire greater rights in a case under the Code than he has outside the Code. . . A Lessor cannot insist that bankruptcy law gives

---

[19]    Even the legislative history of section 365(b)(3)(C) recognized the policy protected ***pre-existing*** stores, not ***subsequent*** stores.

> ***Pre-existing stores*** also are disadvantaged if the rental payments of the assignee are lower than those of the ***pre-existing stores*** . . . *Use clauses and other lease provisions favorable to the landlord and other tenants are accepted as part of the lease by these tenants only because of the granting by the landlord of concessions in other terms of the lease*.  In the words of Nathan B. Feinstein, "[Use clauses] are almost always carefully drawn and extensively negotiated.  More important, ***they are relied upon by other tenants in the shopping center***."

S. Rep. No. 98-65, at 40 (1983) (emphasis added).

[20]    *See Toys "R" Us*, 587 B.R. at 310 ("The Lease was executed in 1996, long before the [other] Lease came into existence, and it contains no provision that requires compliance with the [other] Lease use restrictions. . . . [landlord's] 'plain language' argument that the proposed assignment must not breach a restriction in any other lease, 'regardless of whether that other lease is referred to in the lease sought to be assigned,' is misplaced.").

him what the lease itself does not.").  And such an interpretation would do violence to the original

bargain between the debtor and landlord in violation of the policy and terms of section 365(b)(3).

### C.    Sections 365(b)(1) and 365(f)(1) Trump Any Anti-Assignment Provisions; and More Specifically, Prohibit Any Clauses Extraneous to the Specific Lease a Debtor Is Seeking to Assign That Condition or Restrict Such Ability to Assign.

32.    Despite the Objecting Landlords' contentions to the contrary, it is clear that "other

leases" exclusivity provisions are prohibited as *de facto* anti-assignment provisions pursuant to

section 365(f)(1) of the Bankruptcy Code.[21]  *C.f. In re Rickel Home Centers, Inc.*, 240 B.R. 826,

831-32 (D. Del. 1998) (finding that "[s]ection 365(b)(3)(C) is not meant to be read in

isolation . . . [r]ather, Section 365(b)(3) must be read in conjunction with the section that it

cross-references, Section 365(f)(1)" and determining certain use restrictions in violation of

365(f)(1)).

33.    Under section 365 of the Bankruptcy Code, the general rule is that a debtor can

assign an unexpired lease regardless of any anti-assignment provision prohibiting, restricting, or

conditioning such assignment if the debtor provides to the lease counterparty "adequate assurance

of future performance under such . . . lease." 11 U.S.C. §§ 365(b)(1)(C) (emphasis added),

365(f)(1).    Section 365(b)(3)(C), while specific to shopping center-leases, incorporates

section 365(b)(1)(C) by explicit reference.  Compare 11 U.S.C. § 365(b)(1)(C) (requiring a debtor

provide "adequate assurance of future performance under such . . . lease.") with § 365(b)(3)(C)

("For the purposes of paragraph (1) of this subsection . . . .").  Thus, even for purposes of

section 365(b)(3)(C), a debtor need only provide adequate assurance of future performance of the

assignee "under such . . . lease."  11 U.S.C. § 365(b)(1)(C). *See also* S. Rep. No. 98-65, at 27

---

[21]    *See, e.g.*, S. Rep. No. 98-65, at 41 (1983) ("Any attempt to preclude assignment by drafting a use clause which would apply only to the original tenant would be de facto prohibitions of assignment and, therefore, would be unenforceable under section 365(f)(1).").

(1983) ("The purpose of these provisions is to ensure that an unexpired shopping center lease is assumed by the trustee only if the trustee provides adequate assurance of future adherence ***to the lease***." (emphasis added)).

34.    Understanding that the provisions of section 365 limit adequate assurance to the terms of the lease at issue is foundational—both in contract law (as explained above) and as a matter of fundamental fairness.  It would, for instance, stretch the bounds of credulity to require a debtor provide adequate assurance of a future performance under a lease to which the debtor is not subject.  Nonetheless, the Objecting Landlords contend that section 365(b)(3) somehow bestows upon them powers surpassing those available to the Objecting Landlords under nonbankruptcy law (i.e., the ability to require the Debtors to comply with the terms of certain leases to which the Debtors are not party).  It does not.  Rather, section 365(f)(1) explicitly nullifies "a provision in ***applicable law***, that prohibits, restricts, or conditions the assignment" of a lease under section 365. 11 U.S.C. § 365(f)(1) (emphasis added).  It reads then, that section 365(f)(1)'s explicit annulment of provisions ***extraneous*** to the subject lease, that prohibit, restrict, or condition a debtor's proposed assignment of such lease remains in full force and effect.

35.    Likewise, section 365(f)(1) remains in full-force and effect and trumps any ***contractual provision*** (of the subject lease or otherwise) that seeks to ***prohibit*** the assignment of the lease at issue.  Under the *ejusdem generis* canon,[22] section 365(b)(3)(C) is limited to types of provisions which seek to subject the debtor's use of the lease within certain limits—not those which seek to *prohibit* (*i.e.*, "forbid by law") assignment of the lease.  *Compare Restriction*, Black's Law Dictionary (11th ed. 2019) ("Confinement within bounds or limits; a limitation or

---

[22]    *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 225 (2008) (describing the ejusdem generis canon as the inference "that Congress remained focused on the common attribute when it used the catchall phrase").

qualification.") *and Condition*, Black's Law Dictionary (11th ed. 2019) ("A condition forbidding

a party from doing a certain thing, such as prohibiting a tenant from subletting leased property; a

promise not to do something, usually as part of a larger agreement." (emphasis in original)), *with*

*Prohibit*, Black's Law Dictionary (11th ed. 2019) ("1. To forbid by law. 2. To prevent, preclude,

or severely hinder.").  In short, while the terms of a particular lease (including a master lease or

financing agreement, if incorporated) might subject a debtor's ability to assign that lease to certain

bounds pursuant to section 365(b)(3)(C), such provisions are nullified to the extent they seek to

***prohibit*** the assignment of such lease.

36.    Despite the Objecting Landlords' assertions to the contrary, *In re Toys "R" Us, Inc.*,

587 B.R. 304, 307 (Bankr. E.D. Va. 2018) ("*Toys*") is well-reasoned.  And the fact that *Toys* is not

binding does not limit the adage that "one well-reasoned non-binding opinion will always carry

more weight than ten non-binding opinions with minimal or erroneous reasoning."   *In re*

*Citimortgage, Inc. Home Affordable Modification Program (HAMP) Litig.*, No. ML 11-2274 DSF

PLAX, 2012 WL 1931030, at *1 (C.D. Cal. Apr. 17, 2012).

37.    *Toys* should be followed because it implemented a well-reasoned approach when

faced with nearly identical circumstances to the issues currently before the Court.  The Debtors

and Toys "R" Us share eerily identical prepetition fact patterns—both were national retail stores

and household names.  Both conducted lease sales by which they sought to assign certain unexpired

leases to well-qualified, successful bidders.  In the *Toys* case, as here, the contracts between the

applicable debtors and the applicable shopping center landlords did not prohibit the assignment of

the applicable leases to the proposed assignees.  Notwithstanding no binding contractual provision

to the contrary, in both *Toys* and here, landlords objected to the proposed assignments on (among

others) the basis that the assignment was contrary to section 365(b)(3)(C) due to the term

"other leases." It is absurd to believe that Congress intended any one of hundreds of provisions in dozens of leases, to which a debtor is not party (and which are not binding upon the debtor under nonbankruptcy law), to prohibit the debtor from assigning such lease based on the inclusion of the term "other lease" in section 365(b)(3)(C).[23]

38.    Here, the Court should follow the ruling of the *Toys* court and hold that a plain reading of section 365 prohibits the interpretation of section 365(b)(3)(C) that the landlords seek—which interpretation would result in the absurdity of landlords having more power in bankruptcy than a debtor would have without.[24] As discussed above, in following *Toys*, the Court will position itself to reconcile (a) the terms of the Subject Leases, (b) applicable nonbankruptcy principles of contract law, (c) the plain meaning of section 365(b)(3)(C) in an interpretation that harmonizes it with section 365(f)(1) and 365(b)(1)(C), and (d) the purpose of the shopping center provisions as elucidated from caselaw and the legislative history. In rejecting *Toys*, the Court would be left with the unenviable task of seeking to reconcile such considerations armed only with the Objecting Landlords' arguments and left with a veritable dearth of caselaw addressing the facts before the Court.

---

[23]    *United States v. Fontaine*, 697 F.3d 221, 227 (3d Cir. 2012) ("In determining legislative intent, the plain meaning of legislation should be conclusive, except in rare cases in which the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters . . . In those rare cases, we are obligated to construe statutes sensibly and avoid constructions which yield absurd or unjust results." (internal quotation marks and citations omitted)).

[24]    The Toys "R" Us holding also comports with similar rulings by other courts. *See, e.g.*, *In re Martin Paint Stores*, 199 B.R. 258, 266 (Bankr. S.D.N.Y. 1996), *aff'd sub nom. S. Blvd., Inc. v. Martin Paint Stores*, 207 B.R. 57 (S.D.N.Y. 1997) ("[W]hen all of the other factors point toward permitting the assignment, the exclusivity provision in another tenant's lease cannot stand in the way."); *In re Ames Dep't Stores*, 127 B.R. 744, 753 (Bankr. S.D.N.Y. 1991) ("Where there is no indication of any intention by Congress to do anything other than hold a shopping center debtor tenant to its bargain with a landlord and to leave intact the property interests of debtor and landlord as set forth in that bargain, the courts should not imply an additional non-bargained-for term."); *cf. In re Lapiana*, 909 F.2d 221, 223 (7th Cir. 1990) ("[B]ankruptcy, despite its equity pedigree, is a procedure for enforcing pre-bankruptcy entitlements under specified terms and conditions").

### III.    The Proposed Assignments Will Not Disrupt the Tenant Mix and Balance.

39.    The Objecting Landlords' assertions that the Proposed Assignments would disrupt the applicable shopping center's tenant mix and balance in violation of section 365(b)(3)(D) lack merit and are at odds with all available evidence.

40.    The terms of section 365(b)(3) provide, in relevant part:

> [A]dequate assurance of future performance of a lease of real property in a shopping center includes adequate assurance . . . that assumption or assignment of such lease will not disrupt any tenant mix or balance in such shopping center.

11 U.S.C. § 365(b)(3)(D).

41.    As explained in the Amendola Declaration, customers purchasing items such as clothing, shoes, home décor, and arts and craft materials often prefer to shop in areas with other similar offerings so they can view multiple offerings in one outing.  It is often by design that shopping centers with tens, often hundreds of store locations, comprise businesses that sell many of the same items.  For example, the Serramonte shopping center directory reflects that it contains two department stores, twelve shoe stores, ten jewelry stores, four electronic stores, nine women's clothing stores, and more.  *See* https://www.serramontecenter.com/directory/.  Similarly, as made clear in the Michaels Reply, the Pinnacle Hills shopping center website reflects that it contains five stores selling children's clothing, five department stores, six electronics stores, nine beauty stores, seven jewelry stores, seven sports and fitness stores and 28 women's clothing stores. *See* https://www.pinnaclehillspromenade.com/en/directory/.        The   Objecting   Landlords' conclusory assertions that a "second retailer" selling "primarily 'off price sale' goods" or "primarily arts and crafts supplies" will disrupt the tenant mix and balance in their shopping centers has no basis.

42.    What is more, there are hundreds of Ross stores across the country within a quarter of a mile from a Burlington store.  The majority of those are in the same shopping center.  *See*

Amendola Declaration ¶ 10.  Additionally, Michaels co-exists with Hobby Lobby in approximately

30 shopping centers across the country.  Even accounting for the statements in the Elliot

Declaration, it is uncontested that there are multiple locations where Michaels and Hobby Lobby

co-exist.

43.     Additionally, courts agree that tenant mix and balance are determined by reference

to contractual protections within the debtor's lease.  *See In re Ames Dept. Stores, Inc.*, 121 B.R.

160, 165 (Bankr. S.D.N.Y. 1990) ("It is, nevertheless, clear that section 365(b)(3)(D) must be

interpreted to refer to contractual protections and not undefined notion of tenant mix."); *see also*

*Toys "R" Us*, 587 B.R. at 310-311 n.4 (tenant mix intent must be established in reference to the

lease between the debtor and landlord); *MOAC Mall Holdings LLC v. Transform Holdco LLC (In*

*re Sears Holdings Corp.)*, 613 B.R. 64-68 (S.D.N.Y. 2020) (same).[25]  Moreover, where the terms

of a lease do not preclude a proposed assignment, "regardless of impact on tenant mix," "it would

be anomalous to interpret section 365(b)(3)(D) to preclude" the debtor from assigning such lease.

*In re Ames Dept. Stores, Inc.*, 121 B.R. 160, 164 (Bankr. S.D.N.Y. 1990); *cf. In re Serv. Merch.*

*Co., Inc.,* 297 B.R. 675 (Bankr. M.D. Tenn. 2002), *aff'd sub nom. Ramco-Gershenson Properties,*

*L.P. v. Serv. Merch. Co.*, 293 B.R. 169 (M.D. Tenn. 2003) (finding that Section 365(b)(3)(D) "is

protection for the landlord, not other shopping center tenants").

44.     As discussed above, the Subject Leases permit the assignment to the Proposed

Assignees.  They (almost uniformly) provide that "[e]xcept as expressly set forth in this

Section 13.3, Tenant shall not be obligated to honor any exclusive granted by Landlord to any

---

[25]   As the Court recognizes, it is only the terms of the Subject Leases that inform as to the existence or not of any
tenant balance.  Tr. H'rg at 13:13–22, No. 23-13359 (VFP) (Bankr. D. Del. Aug. 11, 2023) ("I'm struggling with
why the specific terms of those leases are relevant because you added that at the end.  And I don't even think 365
talks about – it talks about such lease, which is, you know, the lease that we're looking at here, and such shopping
center, which is the shopping center we're looking at here, and, you know, whatever those leases say, they say,
but they're different centers.").

tenant in the Shopping Center."  *See* Serramonte Lease § 13.3; Fountains Lease § 48 (similar);

Pinnacle Hills Lease § 13.3 (similar).  Rather than reference their bargained-for exchanges in the

Subject Leases, the Objecting Landlords turn to provisions in non-debtor tenant leases to argue

fatal imbalances that would befall their shopping centers if the Proposed Assignments were to

proceed.  This Court should reject those arguments, as the bankruptcy court did in *Toys*.  *See Toys*

*"R" Us*, 587 B.R. 304 (overruling landlord's objection because landlord "pointed to no provisions

in the Lease or any applicable master agreement relating to tenant mix and balance that would

prohibit the assignment of the Lease").

## IV.    The Proposed Assignees Provide Sufficient Adequate Assurance of Future Performance Pursuant to Section 365(b)(3)(A).

45.    Section 365(b)(3)(A) provides, in relevant part:

[A]dequate assurance of future performance of a lease of real property in a shopping center includes adequate assurance . . . that the financial condition and operating performance of the proposed assignee and its guarantors, if any, shall be similar to the financial condition and operating performance of the debtor and its guarantors, if any, as of the time the debtor became the lessee under the lease . . . .

11 U.S.C. § 365(b)(3)(A).

46.    The Objecting Landlords contend, without identifying any specific concerns, that

the Debtors failed to satisfy section 365(b)(3)(A) based on the financial condition of the Debtors

at the time of each of the Subject Leases were executed.

47.    The terms of the Bankruptcy Code do not define "similar."  Nevertheless, it is

commonsense that to be "similar" is not to be "identical."  As section 365(b)(3)(A) serves to

preserve the bargained-for benefits between the landlord and a debtor, it would be inconsistent for

courts to not consider subsequent amendments to the lease at issue.  And an assignee's ability to

meet its rent obligation should be judged on a reasonableness standard.  *Service Merchandise Co.*

293 B.R. at 177 ("Adequate assurance is to be evaluated on a commercially reasonable standard based on information available at the time of the parties decision.").[26]

48.    Regardless of the exact similitude the Proposed Assignees must bear in relation to the past operational performance and financial condition of the Debtor, here such similarities are abundantly clear.  The Debtors' entered into the:  (a) Pinnacle Hills Lease in 2007, as amended in 2021; (b) Serramonte Lease in 2015; and (c) Fountains Lease in 1996, as last amended in 2021.  The Debtors' performance during these periods are publicly available at:  https://www.sec.gov/edgar/browse/?CIK=0000886158.  Regardless of the time period, it is the Debtors' understanding that the Proposed Assignees' abilities today are reasonably comparable to the Debtors' abilities to meet the rent obligations under the applicable Subject Leases when originally entered or subsequently amended.

49.    Burlington, a public company,[27] provided the respective landlords Burlington's 10-Q and 10-K as adequate assurance of future performance.  Burlington's most recent 10-Q, in addition to its robust financial performance, states that "[a]s of April 29, 2023, Burlington Stores, Inc., a Delaware corporation . . . through its indirect subsidiary Burlington Coat Factory Warehouse Corporation (BCFWC), operated 933 retail stores."  *See* Burlington Stores, Inc., Quarterly Report (Form 10-Q) (May 25, 2023).

---

[26]   The legislative history confirms that the use of the word "similar" was intentionally selected to avoid arguments that an assignee must be "exactly the same" as a debtor at the relevant time.

> This provision was amended by the full Judiciary Committee to ensure that it would ***not*** be interpreted to mean that the assignee must have exactly the same financial posture as the assignor. ***Instead***, the assignee should have a similar operating and financial performance when all factors, including advertising aggressiveness, profit margins, growth potential, and other financial indicia, are weighed.

S. Rep. No. 98-65, at 42 (1983) (emphasis added).

[27]   The financial performance of Burlington's is available at:  https://www.sec.gov/edgar/browse/?CIK=1579298.

50.     It is the Debtors' understanding that Michaels, a private company and "the largest arts and crafts retail chain in North America"[28] provided detailed financials for the fiscal year ending January 28, 2023.  Michaels has extensive operational experience, noting it has been operating since 1973 and currently operates over 1,200 retail stores in the U.S. and Canada, with approximately 18,000 square feet of selling space per store, the vast majority of which are located in a shopping center.

51.     To the extent the Objecting Landlords are requesting more information than already provided them, such requests are unwarranted.  The Proposed Assignees have provided sufficient information to meet the standard for adequate assurance.

## V.     The Remedies and Potential Monetary Damages Asserted by Non-Debtor Tenants Against the Objecting Landlords Are Irrelevant.

52.     The Objecting Landlords argue that approving the Proposed Assignments would inflict upon them substantial economic harm—as they would be in breach of certain of their non-Debtor tenant's leases.  Yet the Objecting Landlords offer no authority for this position.  And caselaw provides the opposite.  *See Toys "R" Us*, 587 B.R. at 311 n.5 ("§ 365's intended purpose [is] to allow for the maximizing the value of the bankruptcy estate.") (*citing In re Ames Department Stores, Inc*, 348 B.R. 91, 98 (Bankr. S.D.N.Y. 2006) ("Congress has determined that, subject only to certain statutory safeguards, the value of a debtor's leases should go to the debtor's creditors, and that leases can be sold to achieve that end—with or without landlord consent.")).  The Debtors, moreover, do not miss the irony that the Objecting Landlords are willing to openly breach the Subject Leases and are requesting permission to not only continue these breaches but recover their expenses in doing so.

---

[28]    Operational information about Michaels is available at:  https://www.michaelspressroom.com/about.

53.     Furthermore, the Objecting Landlords provide no basis for impairing the Debtors' restructuring based on purported harms arising from terms that the Landlord agreed to without the Debtors' knowledge or consent **after** (more than **10 years** after, in some instances) the Subject Leases were executed.

54.     In addition, section 7.5 of the Hobby Lobby Lease provides that if another tenant violates the exclusive use provision contained in the Hobby Lobby lease absent Pinnacle Hill's consent, Hobby Lobby may not abate rent if the Pinnacle Hill's promptly initiates and diligently pursues all commercially reasonable remedies.  *See* Hobby Lobby Lease § 7.5.  Pinnacle Hills has followed this requirement, and therefore will not be subject to any rent abatement under the Hobby Lobby Lease.

55.     Moreover, any alleged resulting damages to the Objecting Landlords from their other lease arrangements are not the responsibility of the Debtors and are irrelevant to the Court's inquiry under 365(b)(3)(C).  In any case, as the *Toys* court found, "a court order approving the assumption and assignment of a lease is a judicial action that may render the Landlord unable to comply with a restriction contained in another lease[]" and such order excuses the Landlord's performance with respect to the exclusive use restrictions contained in the later lease between the landlord and the non-debtor tenant.  *See Toys "R" Us*, 587 B.R. at 310.  Accordingly, the "significant harm" that the Landlord invokes is illusory.

A.      **The Subject Leases Grant Attorneys' Fees to the Prevailing Party.**

56.     The Objecting Landlords are only entitled to attorneys' fees to the extent they succeed on their Objections under the terms of the Subject Leases, and not as a matter of statute. *See* Serramonte Lease §§ 13.3, 23.7 ("In any action or proceeding hereunder (whether to enforce the terms and provisions of an indemnity or otherwise), the prevailing party shall be entitled to recover from the other party the prevailing party's reasonable costs and expenses in such action or

proceeding, including reasonable attorneys' fees, costs and expenses."); Fountains Lease § 48 (similar); Pinnacle Hills Lease §§ 13.3, 23.7 (similar).  However, should the Debtors prevail, they are entitled to recover from the Objecting Landlords their attorney's fees, costs, and expenses.

57.     Accordingly, the Debtors request that the Court deny the Objections, declare the Debtors to be prevailing parties, and award the Debtors attorneys' fees, costs, and expenses.

**B.     Payment for Accrued but Not yet Billed Amounts Is Provided For**.

58.     The Objecting Landlords assert that they require adequate assurance for payments that have accrued but are not yet billed and indemnification obligations.  *See, e.g.*, Pinnacle Hills Objection at ¶ 33.  This is incorrect.  The Debtors' will pay Cure Costs to each of the Objecting Landlords on account of all amounts accrued prior to the Court's entry of the proposed sale order; and for amounts accrued after such entry, the Proposed Assignees have agreed to be responsible. *See, e.g.*, Michaels Designation Rights Agreement ¶ 5; Burlington Assumption and Assignment Agreement, ¶ 4 ("Assignee shall assume all obligations with respect to the Assigned Assets arising from and after the Closing Date.").

**VI.     Conclusion.**

59.     For the reasons set forth herein, in the Amendola Declaration, and in the Motion, the Debtors' respectfully request the Court deny the Objections and grant the Motion.

*[Remainder of page intentionally left blank.]*

Dated: August 25, 2023

/s/ Michael D. Sirota

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone:  (201) 489-3000
Email:      msirota@coleschotz.com
            wusatine@coleschotz.com
            fyudkin@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Emily E. Geier, P.C. (admitted *pro hac vice*)
Derek I. Hunter (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900
Email:      joshua.sussberg@kirkland.com
            emily.geier@kirkland.com
            derek.hunter@kirkland.com

*Co-Counsel for Debtors and*
*Debtors in Possession*