**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Emily E. Geier, P.C. (admitted *pro hac vice*)
Derek I. Hunter (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
joshua.sussberg@kirkland.com
emily.geier@kirkland.com
derek.hunter@kirkland.com

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com

*Co-Counsel for Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| BED BATH & BEYOND INC., *et al.*, | Case No. 23-13359 (VFP) |
| Debtors.[1] | (Jointly Administered) |

**DEBTORS' REPLY IN**
**SUPPORT OF DEBTORS' MOTION**
**FOR ENTRY OF AN ORDER (I) AUTHORIZING**
**(A) REJECTION OF CERTAIN UNEXPIRED LEASES AND**
**(B) ABANDONMENT OF ANY PERSONAL PROPERTY, EFFECTIVE**
**AS OF THE REJECTION DATE AND (II) GRANTING RELATED RELIEF**

---

[1] The last four digits of Debtor Bed Bath & Beyond Inc.'s tax identification number are 0488. A complete list of the Debtors in these Chapter 11 Cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/bbby. The location of Debtor Bed Bath & Beyond Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 650 Liberty Avenue, Union, New Jersey 07083.

TO: THE HONORABLE JUDGE VINCENT F. PAPALIA UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEW JERSEY:

The Debtors file this reply (this "Reply")[2] in support of the *Debtors' Motion for Entry of an Order (I) Authorizing (A) Rejection of Certain Unexpired Leases and (B) Abandonment of Any Personal Property, Effective as of the Rejection Date and (II) Granting Related Relief* [Docket No. 1613] (the "Motion") and in response to *Ikea Property, Inc.'s Objection to the Debtors' Motion for Entry of an Order (I) Authorizing (A) Rejection of Certain Unexpired Leases and (B) Abandonment of Any Personal Property, Effective as of the Rejection Date and (II) Granting Related Relief* [Docket No. 1879] (the "Objection"), and respectfully state as follows.

**Preliminary Statement**

1. Ikea Property, Inc. ("Ikea") cynically seeks to extract additional funds from the Debtors' estates after already receiving a windfall, having received over $400,000 in rent payments since the Petition Date and asserting an entitlement to nearly $600,000[3] more in rent payments for a property that the Debtors never occupied during the pendency of these chapter 11 cases. This Court should not countenance Ikea's current attempt to accrue an additional windfall from the estates of wind-down Debtors. Simply put, Ikea stands firmly on both the wrong side of the law and of equity.

2. At the outset of these chapter 11 cases, the Debtors moved swiftly to safeguard estate resources by filing a motion to reject the leases of real property that the Debtors had already

---

[2] Capitalized terms used but not otherwise defined in this Reply shall have the meanings ascribed to them in the *Declaration of Holly Etlin, Chief Restructuring Officer and Chief Financial Officer of Bed Bath & Beyond Inc., in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 10] (the "First Day Declaration"), the First Lease Rejection Order, the Motion, or the Objection, as applicable. A detailed description of the Debtors, their businesses, and the facts and circumstances supporting the Debtors' Chapter 11 Cases is set forth in greater detail in the First Day Declaration and incorporated by reference herein.

[3] Inclusive of the $219,260.87 in August rent payment which Ikea seeks. Objection at ¶ 44.

2

vacated. Unfortunately, with respect to one such lease, the Debtors' subtenant, Christmas Tree Shops, LLC ("CTS"), filed for bankruptcy in its own right.[4] As a result, the Debtors faced a thorny legal issue regarding whether or how to terminate a sublease with a subtenant who itself benefited from the protections of the automatic stay. Subsequently, CTS did not pay the Debtors any of its owed portion of rent for May and its chapter 11 case has been converted to chapter 7.[5]

3. The Debtors have attempted to navigate the competing demands of the Debtors, Ikea, and CTS, but the result has now been that Ikea has received roughly $440,000 from the Debtors directly, while the Debtors did not see any benefit. This is counter to the clear intent of section 365(d)(3) of the Bankruptcy Code, which is to require a debtor to pay its landlord for the *benefit* of using the property. Here, of course, there is no benefit to the Debtors' estates at all.

4. The premises of the lease at issue here is partitioned such that CTS only owes rent to the Debtors on the portion that it occupies. Since June, CTS has paid its portion of the rent, forcing the Debtors to carry the remainder of the rent for the unoccupied portion of the lease, which the Debtors have vacated. Ikea, for its part, had rejected any attempt by CTS to pay its half of the rent directly to Ikea, requiring the Debtors to bear the burden of acting as an intermediary while they pursued an orderly and value maximizing wind down. However, this month, Ikea did an about-face and accepted CTS's direct payment for its half of the August rent. This alone should end any indulgence of Ikea's demand for further payment from the Debtors. In other words, Ikea has received, and is holding, a rent payment it received directly from CTS for their portion of the

---

[4]  CTS's bankruptcy case is currently pending in the United States Bankruptcy Court for the District of Delaware and is styled as *In re Christmas Tree Shops, LLC*, No. 23-10576 (TMH) (Bankr. D. Del.).

[5]  *See* Order (I) Converting the Debtors' Chapter 11 Cases to Cases Under Chapter 7 of the Bankruptcy Code Pursuant to 11 U.S.C. § 1112(b); (II) Approving the Conversion Procedures; (III) Authorizing the Transfer of the Professional Fee Funding Amount into a Segregated Attorney Trust Account Maintained by Debtors' Counsel; (IV) Limiting Notice of the Motion and (V) Granting Related Relief, *In re Christmas Tree Shops, LLC*, No. 23-10576 (TMH) (Bankr. D. Del. Aug. 16, 2023) [Docket No. 545].

3

August rent that would otherwise be due under the rejected lease. To be clear, this sublease payment from CTS constitutes property of the Debtors' estates. This contravenes historical practice under the exiting tenant-subtenant relationship and bedrock principles of landlord-tenant law and privity. It also underscores the inequity Ikea seeks to perpetuate here. In short, Ikea is demanding that the Debtors pay rent on a premises they vacated months ago *despite having rent in-hand* for the very space they contend is still occupied. Moreover, at this point, CTS has also confirmed to the Debtors that it has also vacated the premises.

5. This Court has been vigilant in ensuring that estate resources are not wasted on rent payments for vacant stores, noting that waiver of August rent "seems like a reasonable, practical, and in some sense necessary way to address the issue." *July 19, 2023* Hr'g Tr. 35:10-14. The Debtors agree and further submit that Ikea cannot recover twice. The Debtors have no interest in this property, nor have they for many months. The Debtors' agreement to continue to pay rent in order to respect CTS's automatic stay was subject to the terms of the DIP Orders, an understanding that they would derive at least the benefits of the Debtors' role as a sublessor pursuant to section 365(d)(3) of the Bankruptcy Code, and an expectation and understanding that CTS and Ikea would reach an agreement directly. Ikea has, instead, taken advantage of Bankruptcy Code provisions that were never designed to address dueling debtors. The Court should overrule Ikea's Objection as the only equitable result to a bad situation, and may do so under any number of legal bases.

6. While Ikea frames the Debtors' motion as a procedurally improper motion to reconsider, the legal standard Ikea seeks to force upon the Debtors is inapplicable to the relief the Debtors request by their Motion. Federal Rule of Civil Procedure 60(b) does not apply as the Debtors have not requested reconsideration of the First Lease Rejection Order—nor is there any need to.

7. The Debtors—in line with their repeated representations to this Court, to Ikea, and to all stakeholders that they are seeking to winddown their estates in a value maximizing and expeditious manner—filed the Motion seeking relief that is (a) procedurally proper, (b) necessary and appropriate for the value-maximizing wind-down of these estates, and (c) consistent with the First Lease Rejection Order—especially when factoring in paragraph 16 of the First Lease Rejection Order and the limitations on the relief granted thereunder. Assuming, *arguendo*, that the Motion is inconsistent with the First Lease Rejection Order (it is not), the Court has authority to clarify the First Lease Rejection Order to resolve all parties' doubts that the Motion is proper in favor of the Debtors.

8. For these reasons, and as more fully set forth herein the Debtors respectfully request that this Court overrule the Objection and grant the Motion.

## Reply

**I. THE MOTION IS CONSISTENT WITH THE FIRST LEASE REJECTION ORDER, WHICH IS BOUND BY THE DIP ORDER.**

9. Ikea contends that the First Lease Rejection Order is either a collateral attack or a covert motion to reconsider under Federal Rule 60(b). Neither is true. The Motion is not a motion for reconsideration and requests relief that aligns with the First Lease Rejection Order, which is expressly limited by the DIP Order and thus the two must be read together.

10. Ikea's interpretation of First Lease Rejection Order ignores its plain and unambiguous text: "Notwithstanding anything to the contrary contained in the Motion or in this Order, any payment to be made, obligation incurred, or relief or authorization granted hereunder shall not be inconsistent with, and shall be subject to and in compliance with, the requirements imposed on the Debtors under the terms of [the DIP Order]." First Lease Rejection Order ¶ 16. Further, this Court ordered that such compliance includes "compliance with any budget or cash

5

flow forecast in connection therewith and any other terms and conditions thereof. Nothing herein is intended to modify, alter, or waive in any way, any terms, provisions, requirements, or restrictions of the DIP Orders." *Id*.

11.  Given the First Lease Rejection Order's express deference to the requirements of the DIP Orders, it bears reiterating that failure to comply with any of the milestones (the "Milestones") is an event of default and a termination event under the DIP facility and of the DIP Orders. Final DIP Order ¶¶ 3, 27. The amount of money available to pay administrative fees is further subject to the budget under the DIP Orders (the "DIP Budget"). Indeed, the Milestones have been a driving force of the Debtors' efforts to effectuate the wind-down process while preserving and maximizing the value of the estates for the benefit of all stakeholders as expeditiously as possible. These restrictions, alongside the other applicable DIP-related terms and conditions, expressly limit the initial relief granted in the First Lease Rejection Order, by its own terms. Accordingly, the relief requested in the Motion is consistent with the relief available under the First Lease Rejection Order.

12.  Because the relief sought by the Motion is fully consonant with the relief granted in the First Lease Rejection Order, as limited by the DIP Orders, any assertion that the Debtors have improperly sought reconsideration of the First Lease Rejection Order is inaccurate and unpersuasive.

## II.    THE COURT HAS AUTHORITY TO CLARIFY ITS OWN ORDERS.

13.  The Debtors, as noted above, do not believe that there is any ambiguity: the First Lease Rejection Order stands as constrained by the DIP Orders. Ikea disagrees. And were Ikea's interpretation to prevail, an absurd result would be reached. The Court has inherent, statutory, and explicit authority to clarify that the First Lease Rejection Order does not prohibit the relief requested in the Motion and proposed form of order. In *Travelers*, the Supreme Court (a) upheld

6

a bankruptcy court's order clarifying certain final orders, and (b) reversed the Second Circuit's determination that the clarifying order erroneously expanded the prior orders—because, in part, the bankruptcy court: (1) "plainly had jurisdiction to interpret and enforce its own prior orders" and (2) "explicitly retained jurisdiction" over them. *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009). Federal Rule 60(a) provides statutory authority for a court to correct "on motion or on its own, with or without notice" "a mistake arising from oversight or omission whenever one is found in a . . . order." Fed. R. Civ. Pro. 60(a). Further, paragraph 26 of the First Lease Rejection Order provides that the Court with explicit authority to interpret, implement, and enforce the First Lease Rejection Order.

14. While the Debtors believe the relief sought and the First Lease Rejection Order are consistent, assuming, *arguendo*, that there is a need to clarify that fact, the Court is authorized to so clarify. The Court can properly clarify the portions of the First Lease Rejection Order by acknowledging the drop-dead Rejection Date of July 31, 2023; in accordance with the DIP Orders' terms and conditions, including the DIP Budget and Milestones. Such an interpretation is not only legally sound, it is required under the facts and circumstances of these cases.[6]

15. In the alternative, this Court could also find that the First Lease Rejection Order was not final as to the Lease in question here because of the uncertain rejection date listed therein. Were that the case, then there would be no issue pursuant to Federal Rule 60 or otherwise for this Court to fix a date for rejection on certain terms. However, given the equities at play here, even if the First Lease Rejection Order were final as to the subject lease, Federal Rule 60(b)(6) would provide this Court with the ability to clarify the First Lease Rejection Order.

---

[6] As explained in the Motion, the *nunc pro tunc* relief requested is appropriate. The Debtors have repeatedly reiterated their intention to make no lease payments after the end of July. There is no just reason to pay Ikea August rent to the detriment of all other stakeholders, including other landlords.

7

16. Accordingly, to the extent there is any ambiguity in the First Lease Rejection Order, this Court has more than ample authority to so clarify by granting the relief requested by the Motion.

### III. THE FACTS AND CIRCUMSTANCES OF THESE CHAPTER 11 CASES COMPEL APPROVAL OF THE RELIEF REQUESTED IN THE MOTION.

17. These cases are proceeding toward a complete and final wind-down. After July 31, 2023, the Debtors occupy no real property other than their flagship lease and certain leases subject to assignment litigation, as the Court is aware. The subtenants of the subject lease noted in the Objection are now chapter 7 debtors barreling towards a liquidation, from whom the Debtors' do not anticipate receiving a single dollar for August rent. In fact, CTS paid Ikea directly for their portion of the August rent despite past practice, which was for CTS to pay the Debtors as sublessor. In the ordinary course, Ikea would have returned such sub-rent to the Debtors because it is the Debtors' property, not Ikea's.

18. The Debtors vacated their portion of the subject premises months ago. It is the Debtors' understanding based on correspondence received that the relevant subtenants vacated the subject premises as of the date of filing of this Reply. The Debtors received no value from the subject premises after July 31, 2023—the Debtors did not conduct their own GOB Sales and the relevant subtenants did not pay any sub-rent—despite which the Debtors had to pay the full amount of rent due for the months of April through July. In essence, the Debtors and subtenants have nothing left to give and Ikea, while unfortunate, is the sole party to this dispute not shuttering its windows.

19. Moreover, Ikea, by receiving and accepting rent payment directly from CTS, has accepted contractual performance by CTS thus excusing the Debtors of any further performance obligations. The amount that Ikea received from CTS will more than cover the prorated amount

8

of rent that could be due on account of the period ending August 11, 2023—the date on which CTS represented to the Debtors that it had vacated the premises.  If Ikea is to insist on August rent from the Debtors, it must at minimum transfer the rent it received from CTS to the Debtors estates in the first instance.

20. As well-explained in the Motion, rejection should be effective, *nunc pro tunc*, to July 31, 2023.  The DIP Orders and related terms and conditions, including the Milestones related to the GOB Sales require this.  Moreover, the Court is well aware that the Debtors have consistently noted the intention to avoid incurring August rent obligations under its leases they no longer occupy.  *See, e.g.*, July 18, 2023, Tr. H'rg. 35:10-14 (recognizing that Debtors' demand for landlords to waive August rent under leases that will not be occupied after July 31 "seems like a reasonable, practical, and in some sense necessary way to address the issue . . . I think reasonableness sometimes is even better than strictly adhering to some legal precept, and maybe this is one of those cases").

21. Further, Ikea previously informed the Debtors that it had received and is holding a rent payment from the subtenant for the month of August.  Not only is this payment in contravention of historical practice under the existing tenant-subtenant relationship (and the purported lack of privity of contract between Ikea and the subtenant), it underscores the inequity of the Objection, which amounts to a demand for rent on space the Debtors vacated months ago.  The administrative burn Ikea seeks to preserve through its Objection would be an unnecessary drain on funds otherwise available for distribution from the Debtors' estates.

22. While Ikea cites to *Chi-Chi's* and *Amicus* for the proposition that the subtenant must have relinquished its portion of the leased premises for the rejection of a lease to be effective, such cases are inapposite to the facts at issue.  Objection at ¶ 37.  Both cases hold, without citing

9

any binding law (or creating any binding law of their own) that the appropriate rejection date is the date at which the landlord and sublessee were able to enter into separate agreements due to a purported lack of privity absent such an agreement. *See In re Chi-Chi's, Inc.*, 305 B.R. 396, 399 (Bankr. D. Del. 2004); *In re Amicus Wind Down Corp.*, 2012 WL 604143, at *2 (Bankr. D. Del. Feb. 24, 2012). It also bears mentioning that, unlike here, in *Amicus*, the debtor-tenant had neither surrendered keys nor security code to the landlord party to the prime lease. *In re Amicus Wind Down Corp.*, 2012 WL 604143, at *2.

23. This case, however, is very different. As noted previously, Ikea *did* accept rent payment directly from CTS in contravention of its privity argument. By providing notice to Ikea of the rejection of the lease by filing the Motion and vacating the premises the Debtors have done everything possible to surrender the premises. *Chatlos Systems, Inc. v. Kaplan*, 147 B.R. 96, 100 (D. Del. 1992) *aff'd sub nom. In re TIE Commc'ns*, 998 F.2d 1005 (3d Cir. 1993). Following the rejection, the Debtors no longer have any interest in the leased premises and the sublease has accordingly terminated. *Chatlos v. Kaplan*, 147 B.R. at 101. Therefore, at present, CTS is a tenant at sufferance due to the Debtors' rejection of the sublease. Accordingly, the Debtors' timely and well-noticed rejection of the Lease acted to terminate the sublease leaving CTS as a tenant at sufferance to Ikea. Thus, under the facts of these chapter 11 cases and the law in this circuit, the presence of CTS does not impede a prior-effective rejection.

## Conclusion

24. For all of these reasons—and for the reasons set forth in the Motion—the Objection should be overruled, and the Motion granted.

[*Remainder of page intentionally left blank.*]

Dated: August 26, 2023

/s/ *Michael D. Sirota*
**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
Email:    msirota@coleschotz.com
          wusatine@coleschotz.com
          fyudkin@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Emily E. Geier, P.C. (admitted *pro hac vice*)
Derek I. Hunter (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Email:    joshua.sussberg@kirkland.com
          emily.geier@kirkland.com
          derek.hunter@kirkland.com

*Co-Counsel for Debtors and*
*Debtors in Possession*