```
                    UNITED STATES BANKRUPTCY COURT
                       DISTRICT OF NEW JERSEY

                              .      Case No. 23-13359-VFP
IN RE:                        .      Ch. 11
                              .
BED BATH & BEYOND, INC.,      .      M.L.K. Federal Building
et al.,                       .      50 Walnut Street, 3rd Floor
                              .      Newark, NJ 07102
            Debtors.          .
                              .      August 1, 2023
. . . . . . . . . . . .  .            2:54 p.m.


    TRANSCRIPT OF HEARING ON APPROVAL OF DISCLOSURE STATEMENT AND
        RELIEF FOR AN EXTENSION OF THE EXCLUSIVITY PERIOD
            BEFORE HONORABLE VINCENT F. PAPALIA
            UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:          Kirkland & Ellis, LLP
                          By:  ROSS J. FIEDLER, ESQ.
                               EMILY E. GEIER, ESQ.
                          601 Lexington Avenue
                          New York, NY 10022

                          Cole Schotz, P.C.
                          By:  FELICE R. YUDKIN, ESQ.
                          Court Plaza North, 25 Main Street
                          Hackensack, NJ 07601

For the U.S. Trustee:     Office of the U.S. Trustee
                          By:  FRAN B. STEELE, ESQ.
                          Suite 2100
                          One Newark Center
                          Newark, NJ 07102-5504
```

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311     Fax No. (609) 587-3599**

TELEPHONIC APPEARANCES (Cont'd):

For the Committee:          Pachulski Stang Ziehl & Jones
                            By:  BRADFORD J. SANDLER, ESQ.
                            919 N. Market Street, 17th Floor
                            Wilmington, DE 19801

                            - - -

1          THE COURT:  Okay.  Good afternoon.  It is Tuesday,

2    August 1st, 2023, and we are here in the case of Bed, Bath &

3    Beyond, Inc., et al., 23-13359.  And we're here on the debtors'

4    motion for conditional approval of a disclosure statement and a

5    combined hearing on final approval of the disclosure statement

6    and confirmation of a plan, approval of solicitation and voting

7    procedures, notices, forms of ballots, form of cover letter,

8    solicitation packages, plan supplement notice, assumption and

9    rejection notices, notice periods, and confirmation timeline,

10   as well as an extension of the exclusivity period.  Good

11   afternoon.

12          MR. FIEDLER:  Good afternoon, Your Honor.  For the

13   record, Ross Fiedler, of Kirkland and Ellis, on behalf of the

14   debtors.  I'm joined in the courtroom by my partner, Emily

15   Geier, as well as co-counsel, Felice Yudkin, of Cole Schotz.

16          THE COURT:  Okay.  Good afternoon, good afternoon.

17          MR. FIEDLER:  Do you want to take appearances?

18          THE COURT:  We could take -- we haven't been doing

19   that, except when people speak, and they want to speak, so I

20   think we stick with that program.

21          MR. FIEDLER:  Okay, great.  Well, it's nice to see

22   you again, Your Honor, in what will be our third consecutive

23   hearing in a row, and I promise, hopefully, this is as quick as

24   the last one, and you'll get some reprieve from us in August.

25          THE COURT:  I don't need any reprieve, and it's fine,

1    and we're making progress, and I'm all for it, so --

2          MR. FIEDLER:  Great.  Well, we did file an agenda

3    late last night at Docket Number 1693.  As you noted, we're

4    just going forward today on one critical matter, that's

5    approval of the disclosure statement --

6          THE COURT:  Right.

7          MR. FIEDLER:  -- on a conditional basis, which also

8    includes the relief for a modest extension of the exclusivity

9    periods.

10         I'll get to the motion in the form of order in just a

11   moment, but I'd like to give the Court an update on where we

12   started in these cases and where we are today.  Your Honor, we

13   filed these cases just over three months ago, after extensive

14   pre-petition efforts to stave off a Chapter 11 filing.  We

15   filed with two hundred and forty million dollars of committed

16   post-petition financing from the pre-petition FILO lenders, a

17   portion of which was rolled up on the interim order, and a

18   portion of which was new money.

19         That financing has funded what we viewed as a dual

20   track process, an immediate wind down of the debtors'

21   businesses in conjunction with a process, which was a

22   continuation of our pre-petition marketing process, to market

23   the assets on a going concern basis.  The financing has also

24   funded critical reserves to fund the payment of priority

25   claims, WARN related payments, and the cost of attendant to the

1  wind down process.  Those reserves are in large part what

2  allowed us to file this plan and put before you the plan and DS

3  today.

4        Our mandate throughout these cases has been to

5  salvage and maximize value for the debtors' estates as much as

6  possible.  And I believe we've been successful in prosecuting

7  that mandate to date.  It's truly been a Herculean effort by

8  the debtors' management team, their employees, our CRO, Holly

9  Etlin, her whole AlixPartners team, and the other advisors in

10 the courtroom and on the line today.

11        As Your Honor's aware, while the going concern

12 process did not result in a viable buyer, we were able to sell

13 the IP assets of our Bed, Bath & Buy Buy Baby banners,

14 generating nearly 40 million dollars in cash proceeds.  And

15 we're hopeful that the storied brands will continue to exist

16 even after these cases.

17        In conjunction with the sale process, we also engaged

18 in a robust lease optimization process, which Your Honor is

19 very well aware of.  We implemented this strategy pre-petition,

20 closing a number of stores, our Harmon brand, and our Canadian

21 operations.  And, as of the petition date, we had about a

22 thousand leases remaining in our portfolio.  Several hundred of

23 those were rejected on day one, and throughout the case, to

24 relieve the debtors of their ongoing 365(d)(3) obligations.

25 And as Your Honor was made aware in these prior hearings, we've

1   reached, you know, an agreement on two hundred, nearly two

2   hundred, leases that have generated nearly 70 million dollars

3   in cash proceeds.

4           On the GOB process, as of yesterday, we've completed

5   all of our store closures and going out of business sales.

6   That has involved liquidating all the inventory, fixtures, and

7   other assets in our stores, which has generated substantial

8   value.  Approximately five hundred and eighty five million in

9   net proceeds, on account of the GOB sales, and nearly two

10  hundred million in net proceeds on account of augment and FF&E

11  sales.  So, on top of all --

12          THE COURT:  When you say -- you said, net sales?

13          MR. FIEDLER:  Net proceeds.

14          THE COURT:  Net proceeds?

15          MR. FIEDLER:  So, net of cost incurred in conjunction

16  with the liquidation process.

17          THE COURT:  So, that means that five hundred and

18  eighty five million, plus two hundred million, went into the

19  estate?

20          MR. FIEDLER:  Correct, Your Honor.

21          THE COURT:  Okay.  So then, just with rough math on

22  the -- that's seven hundred and eighty five with a hundred and

23  ten, is about eight hundred and ninety five in proceeds to the

24  estate at -- eight hundred and ninety five million, I should

25  say, in proceeds that actually came into the estate, and is now

1    subject just to the ongoing admin expenses?

2          MR. FIEDLER:  That's right, Your Honor.  Among other

3    asset realization efforts that we've undertaken.  But, on top

4    of all of that, we have been running down every other ground

5    ball in trying to realize the full value of the estate's

6    assets, that includes pursuing tax refunds, recovering LCs,

7    cash reserves from credit card processors that are property of

8    the estate.  As well as pursuing viable claims and cause of

9    action that the estate has against other parties, including

10   shipping claims that Your Honor may have seen.

11         So, all of that work will continue.  It will continue

12   post-confirmation, it will continue post-effective date, and

13   it's in large part what, you know, we will seek to get

14   stakeholder recoveries based off of.  All the while, Your

15   Honor, we've worked round the clock to develop and negotiate a

16   Chapter 11 plan and disclosure statement with the committee and

17   the DIP lenders to bring these cases to their final stage.

18         As you'll recall, we've reached an agreement with the

19   committee and the DIP lenders, as part of the final DIP order,

20   which related to the distribution of proceeds of the estate's

21   assets.  That agreement coalesced critical support across the

22   capital structure, and it's reflected in the terms of the

23   revised plan that we filed last night.

24         For your benefit, we did file the revised disclosure

25   statement and plan last night at Docket Number 1687 and 1690,

8

1  respectively.  Red lines were also filed to show the changes

2  from the initially filed versions, and we also filed a revised

3  proposed form of order approving the adequacy of the disclosure

4  statement on a conditional basis at Docket Number 1692.

5          As Your Honor's aware, the order shortening time on

6  the motion entered at Docket 1473, set an objection deadline

7  with respect to the motion of yesterday, July 31st, at noon

8  Eastern time.  And we're pleased to report that no objections

9  were filed.  We have been in discussions with the Trustee's

10  Office, counsel to the SCC, and counsel to two landlords.  And

11  a few of the changes reflected in the revised documents resolve

12  some of the concerns that were raised by those parties.

13          As a result, we believe we're proceeding today on a

14  fully uncontested basis.  I will caveat that with the

15  understanding that party's rights with respect to confirmation

16  issues, like the release and exculpation provisions in the

17  plan, are reserved to the confirmation hearing, which we have

18  tentatively set for September 7th.

19          THE COURT:  And the final approval of the disclosure?

20          MR. FIEDLER:  That's right, Your Honor.  So, with all

21  of that said, Your Honor, the plan and the DS are the product

22  of extensive good faith negotiations between the debtors, the

23  committee and the DIP lenders, and other key constituents.  We

24  believe the plan represents the best currently available path

25  forward to the ultimate conclusion of these cases, and it

1   critically enjoys broad support of our key constituents in

2   these cases.

3        The debtors submit that the disclosure statement

4   contains adequate information as required by Section 1125 of

5   the Bankruptcy Code, which will allow parties in interest who

6   have claims to make an informed decision as to whether to

7   except or reject the plan.  Moving forward with soliciting

8   votes on the plan at this time is unquestionably in the best

9   interest of the debtors and their estates.  And aligns with the

10  debtors' overall duty to maximize value, as I explained before.

11       Additionally, Your Honor, out of abundance of

12  caution, we're seeking a modest extension to the debtors'

13  exclusive right to file a plan, by 90 days, through and

14  including November 20th, and to solicit votes on the plan,

15  through and including January 18th, 2024.  We believe the

16  confirmation process should play out with the debtors in

17  exclusive control, and that is something that both the DIP

18  lenders and the committee both agree with as well.

19       So, unless Your Honor has any questions about what I

20  said about anything in the revised proposed form of order, we

21  would respectfully request entry of the order.

22       THE COURT:  Well, I do have one general comment that

23  -- about an unsigned objection that came in just -- well, I

24  just received it this afternoon.  It looks like it might have

25  been submitted to the clerk's office yesterday afternoon, but

1 it wasn't signed, and it wasn't -- there was no service

2 indicated that I could see.

3       And it appears to be on behalf of equity interest

4 holders.  It appears to be done, at least with the assistance

5 of an attorney, but I did not see it until just before this

6 hearing.  And it wasn't timely filed, but even more

7 significantly, it wasn't signed, and there's no one that we can

8 attribute it to other than the person that was on the e-mail,

9 who is indicated as Neelay.Das@gmail.com.  And, Ms. Steele --

10       MS. STEELE:  Your Honor --

11       THE COURT:  I guess --

12       MS. STEELE:  Yes.

13       THE COURT:  -- Ms. Steele received that, so she's

14 going to jump up and help me out, I think.

15       MS. STEELE:  Yes, Your Honor.  Good afternoon.  Fran

16 Steele, on behalf of the U.S. Trustee.  Yes, Your Honor, the

17 U.S. Trustee received an e-mail with that objection, requesting

18 that the U.S. Trustee e-file the objection for the person in

19 the e-mail.  And we are unable to do that, as Your Honor knows.

20 So, we forwarded it to Mr. Heim of the Bankruptcy Court

21 yesterday, informing him that we had received it in an e-mail,

22 and that we were not able to file it.  Just so you know that we

23 received it.

24       THE COURT:  Yeah.  And it appears that that's what we

25 -- that's what the Court advised.  The Court is in receipt of

1  the attached document that was forwarded to the -- by the

2  United States Trustee's Office, as submitted that the Court

3  cannot accept this objection.  While I understand Bed, Bath &

4  Beyond common stock equity interest holders is not represented

5  by counsel, the document still needs signatures of who is

6  submitting the document, and at present the document has no

7  signature.  Please correct and attach as a reply to this e-mail

8  for filing.  That's an e-mail from Diane Troznowski (phonetic)

9  from the clerk's office to the Neelay Das today at 12:07 p.m.

10          We don't have anything on that, but I did review

11 briefly.  It seems to -- it's pretty complicated in a way, but

12 -- and difficult to understand, but also much of it appears to

13 go to the extent that it relates to the plan processes to

14 confirmation rather than disclosure.  In any event, it seems

15 like they have a lot of disclosure.  Whoever wrote this, has a

16 lot of information.  So, I can't deal with it, because it

17 wasn't properly filed.  I don't know who filed it, but I do

18 have it.  And to the extent anyone from that group, because it

19 appears to be a group of people, then is listening, you know,

20 they need to get it -- they need to have it done properly,

21 otherwise it won't be considered, so --

22          MS. STEELE:  Thank you, Your Honor.

23          THE COURT:  That's where we are now.

24          MR. FIEDLER:  Thank you, Your Honor.

25          THE COURT:  All right.  And then, on just a couple of

12

1   more, on the disclosure statements.  So, Mr. Fiedler, so I'm on

2   Page -- on, you know, on the header, it's Page 16 of 136, Page

3   7 of the black line disclosure statement, 1691.  Is that the

4   black line?

5           MR. FIEDLER:  Page 7, Your Honor?

6           THE COURT:  Yeah.  Where it says, you know, summary

7   of expected recoveries.

8           MR. FIEDLER:  Yes.  I'm there, Your Honor.

9           THE COURT:  So, to me, in some ways the -- this is

10  the most important and significant aspect of the disclosure

11  statement in all its many pages, to many of the people who will

12  be reading it, and who won't be reading all of it, but will be

13  reading -- trying to figure out what they get or don't get.

14  And I'm just wondering, is this -- this doesn't have really any

15  substitive black lining to it.  So, it was unchanged by the

16  report that you just gave me as to the net proceeds that have

17  been received thus far?

18          MR. FIEDLER:  Well, Your Honor, that's generally

19  right, based on some of the footnotes that we've caveated here.

20  So, some of the claim amounts are as of a certain date, that

21  even predated the day we filed the DS.  The projected

22  recoveries have remained the same.  This was based on

23  projections that had been made by the company prior to filing

24  this, which hold today.

25          THE COURT:  Which hold today, even -- well, so, okay.

1  Even though, for example, if you do the math, and I'm not sure

2  of the claims, you know, other than the unsecured claims, it

3  looks like the first, one, two, three, and I'm just going by

4  math, five, four, five add up to, you know, far less than what

5  you've just told me.

6       MR. FIEDLER:  Ms. Geier reminds me, the ABL has been

7  fully paid off, which is not actually reflected in the summary

8  of expected recoveries.

9       THE COURT:  But the ABL was how much?

10      MR. FIEDLER:  I believe it was two hundred million,

11 around there.  We can double check that figure for you.

12      THE COURT:  Yeah.  Okay.  Well, that's what -- all

13 I'm saying is, that's important information, and I just wanted

14 to -- especially based on the presentation that you just made,

15 I want to make sure -- it just jumped to my mind immediately

16 when you said it, as to how that affects, if at all, that

17 chart.

18      MR. FIEDLER:  A portion of the proceeds that we

19 discussed earlier have been used in -- consistent with the

20 final DIP order in paying down the ABL as well as the FILO

21 claims.  And that's why you're seeing numbers on this chart

22 that are less than what we spoke about before.

23      THE COURT:  Okay.  I got it.  All right.  So, in

24 other words, it doesn't need to be changed, is what you're

25 saying?

1          MR. FIEDLER:  Correct, Your Honor.

2          THE COURT:  Okay.  All right.  And then on the

3     release section, I'd just like the, you know, that to be as

4     clear as possible, and opt-out sections to be as clear as

5     possible.  And, if I'm looking at particularly Article IV(J)(4)

6     of the amended disclosure statement, which is Pages 42 to 43 --

7     let's see.  No, it's not exactly -- yeah, this one is -- it

8     doesn't have page numbers on it actually at the bottom, but the

9     black line that I have, but --

10          MR. FIEDLER:  I'm there, Your Honor.

11          THE COURT:  Yeah, all right.

12          MR. FIEDLER:  Forty two and forty three?

13          THE COURT:  Yeah.  So, in the IV(J)(4), and it's the

14     new language, without limiting the foregoing from and after the

15     effective date, do you see that?

16          MR. FIEDLER:  Yes.

17          THE COURT:  Yeah.  So, then the claim and interest

18     holders, and the interest holders are getting nothing as I

19     understand it.  Their claims are being extinguished, right?

20          MR. FIEDLER:  That's correct.

21          THE COURT:  They -- this says that in -- somewhere it

22     says, in full and final satisfaction of their claims, but

23     they're receiving nothing, right?  So, I guess I'm not clear on

24     -- that's actually not in this section.  I'm sorry.  That's in

25     another section I was reviewing.  But -- and this part is the

1  -- for example, do the interest holders, that's my question on

2  this part, do the interest holders, if they -- even though

3  they're getting nothing, they have to opt-out as I understand

4  this.  And, that then, they have to obtain an order doing all

5  this -- doing all these things, is that -- am I reading that

6  correctly?

7          MR. FIEDLER:  That is correct.  So, interest holders

8  will get an opt-out form, and will be given the opportunity to

9  opt-out.  That is the notice --

10         THE COURT:  Because they're not entitled to vote, so

11  they're going to get a ballot of -- or an opt-out form?

12         MR. FIEDLER:  It'll be a notice of nonvoting status,

13  which will include an opt-out form attached to it.

14         THE COURT:  Okay.

15         MR. FIEDLER:  This provision basically is just saying

16  that, to the extent there is a claim or cause of action that

17  has been released by the releases in the plan, and a party is

18  contesting whether that claim or cause of action was actually

19  released, they have to come to the Bankruptcy Court first to

20  get Your Honor to sign off on whether that claim or cause of

21  action was actually released under the plan, before taking

22  action in another forum.

23         THE COURT:  Okay.  Ms. Geier's coming up.

24         MS. GEIER:  Good afternoon, Your Honor.

25         THE COURT:  Ms. Geier.

16

1          MS. GEIER:  Sorry to interrupt.  Emily Geier, from

2    Kirkland and Ellis, on behalf of the debtors.  Just exactly

3    what Mr. Fiedler said, I just wanted to clarify one tiny point.

4    There's sort of two categories of people here, Your Honor, and

5    you're actually correct that the equity holders will receive an

6    opt-out form.  If they elect not to opt-out, they are part of

7    the releasing parties, and there's really nothing more to do

8    through that provision, in the sense that they will be

9    precluded from bringing claims on account of the release

10   provided.

11         Now, if they do opt-out of the release, or other

12   parties opt-out of the release, or otherwise are not

13   participating in the releases, because obviously that has not

14   been decided by this Court as to what the effective -- what the

15   releases are that are going to be approved, at that point, if

16   they are not participating in the releases, this is just simply

17   to say that that party comes to this Court, for this Court to

18   determine whether or not that claim is a direct claim that can

19   indeed be brought.  Or, is perhaps, a derivative claim actually

20   belonging to the estate.  And thus is in the estate's control

21   to pursue and recover on.

22         The reason for this is the critical nature of those

23   claims and cause of action that belong to the debtor's estate,

24   that will be continued to be pursued, and therefore we can't

25   have, you know, a hundred claimants that actually aren't

1  entitled bringing those sort of claims when they actually

2  belong to the debtor.  So, simply to say, we want to bring it

3  back to this Court to say whether or not they have that claim,

4  we included this similar language in BlockFi, also not yet

5  confirmed, but --

6           THE COURT:  Okay.  But, so not --

7           MS. GEIER:  -- you may recognize from there.

8           THE COURT:  So, in other words, whether it belongs to

9  the estate or not, but if it doesn't belong to the estate,

10  you're -- whether it belongs to --

11           MS. GEIER:  Correct, yes.

12           THE COURT:  -- the estate or not, you're asking me to

13  make that determination?

14           MS. GEIER:  Correct.  If it belongs to the estate,

15  then they would be precluded from bringing it simply because as

16  a matter of law, that belongs to the estate.  If it's a direct

17  claim, then they're at that point, free to bring the claim.

18  It's simply just to --

19           THE COURT:  And if they opt-out?

20           MS. GEIER:  Exactly.  If they've opted out, they're

21  not participating in the releases, it's not to stand in the way

22  of that party bringing a direct claim, it's simply to say,

23  please come to the Court to check and make sure this isn't an

24  estate claim.

25           THE COURT:  So I'm a first step before those --

1            MS. GEIER:  You are indeed the first step.

2            THE COURT:  Okay.  Well, that's the way I understood

3    it, so I think it's --

4            MS. GEIER:  Thank you, Your Honor.

5            THE COURT:  -- the disclosure is good.  And then, I

6    don't know who answers this, but the -- on the, I guess it's

7    for the -- it relates also to the releases and interest holders

8    and whatnot.  On the effective date, in full and final

9    satisfaction of each allowed interest in BBB, so that's the

10   part I'm struggling with.  Is it full and final satisfaction of

11   the allowed interest, but they -- their claims are being

12   extinguished.  So, what is the full and final satisfaction?

13           MR. FIEDLER:  Where are you looking, Your Honor?

14   Just for my benefit.

15           THE COURT:  Let's see.  I have to get my notes on

16   that and --

17           MR. FIEDLER:  So, I think -- are you referring to the

18   beginning of the third party release paragraph?

19           THE COURT:  I think so.

20           MR. FIEDLER:  On Page 42?

21           THE COURT:  I'm having trouble putting my finger on

22   it right this second, but it's where the treatment of interest

23   holders is.  I mean, it says it right in --

24           MR. FIEDLER:  Your Honor, I think you're --

25           THE COURT:  -- I think -- it says it everywhere

1  actually.  In -- it's right -- I'm sorry, it's right at the --

2  even in the summary, Class 9, interest in BBB, in full and

3  final satisfaction of each allowed interest in BBB.

4       MR. FIEDLER:  Yeah, Your Honor, we'll make that

5  change throughout, all interest are being extinguished and

6  discharged until -- we'll reflect that throughout the plan and

7  disclosure statement.

8       THE COURT:  Yeah.  I mean, you understand what I'm

9  saying?  I don't get how extinguishing something is in full and

10  final satisfaction.  It feels like the opposite.

11      MR. FIEDLER:  Understood, Your Honor.  We will --

12      THE COURT:  Yeah.

13      MR. FIEDLER:  -- make that change throughout.

14      THE COURT:  All right.  Okay.  All right.  All right.

15  You know, the other -- I think you highlighted that, you know,

16  the release and opt-out issues, if people have those issues,

17  they're going to -- they are confirmation issues.  It's not

18  like they aren't being disclosed here.  They're being disclosed

19  in, you know, the substance is what is on for confirmation, and

20  we'll deal with that at that time.

21      MR. FIEDLER:  Understood, Your Honor.

22      THE COURT:  So -- and as far as extending the

23  exclusivity period for 90 days and -- this case is moving at an

24  extremely rapid pace, and I think you've fulfilled if not to

25  the day, it substantially and substitively all the timelines

20

1  that were in the DIP order, and which seemed very aggressive to

2  me to start, but it looks like you're doing everything you can

3  to get there.  So, another 90 days of exclusivity on both, you

4  know, filing and soliciting acceptances satisfies all the

5  criteria for extending exclusivity as set forth in your motion.

6       And, you know, and then the forms and the notices and

7  the procedures has all been vetted by the lenders and the

8  committee and other parties in interest, as you've indicated,

9  for the consensual plan by the principal parties in interest.

10 So, I am not -- I'm not going to comment any further on those,

11 other than to say, I think the -- there is definitely adequate

12 disclosure here and at least -- and certainly on a conditional

13 basis, I will approve the disclosure statement, the related

14 procedures, and extend the exclusivity deadlines as requested.

15      But, that does lead to the proposed order, and I --

16 you know what, I didn't get a chance to look at the revised

17 proposed order in detail and the schedule that you're setting

18 forth.  But, we do need to get to that, right?

19      MR. FIEDLER:  Yes, Your Honor.  I can walk through --

20 walk you through the schedule.

21      THE COURT:  It's 1692, right?  The docket number.

22 I'm sorry.  Does anyone else wish to be heard on the disclosure

23 statement and other aspects of the motion?  I see Mr. Sandler

24 is on the screen, but I don't know if he wants to be heard.

25      MR. SANDLER:  Your Honor, can you hear me?

1           THE COURT:  I can.

2           MR. SANDLER:  All right.  Well, since you mentioned

3  my name -- I was going to sit here quietly and not say

4  anything, but since you mentioned my name, I will say

5  something.  Your Honor, as you can imagine, look, there is

6  still wood to chop here, as I think you've alluded to.  But the

7  disclosure statement and the plan in front of you represents a

8  tremendous amount of hard work, good faith, intensive

9  negotiations among the debtors, the committee, and the lenders,

10  and is certainly a major milestone in these cases, and the

11  committee supports the entry of this order.

12          THE COURT:  Okay.  I figured you might want to say

13  something if I called on you.  But, yeah, I agree with all

14  that, and we'll hopefully continue to move forward in this

15  positive, mostly, or almost completely I should say, consensual

16  fashion.  I appreciate it.  So, anyone else?  I think that's

17  it.  I don't have any other indications of people wanting to

18  speak.  So, I'm on Page -- of 1692, I'm on Page 6 of the order.

19  Is that where you are, Mr. Fiedler?

20          MR. FIEDLER:  The chart, Your Honor?

21          THE COURT:  On the chart, yeah --

22          MR. FIEDLER:  Yeah.

23          THE COURT:  -- (indiscernible)

24          MR. FIEDLER:  I have that in front of me.

25          THE COURT:  Event to deadline.  So, disclosure

22

1  statement objection deadline actually was yesterday at 1:00

2  p.m., yeah.

3          MR. FIEDLER:  Yeah.

4          THE COURT:  Right?  At 12 noon, or so?  Or -- I can't

5  remember, the close of business?  So, just whatever that is, I

6  guess.

7          MR. FIEDLER:  Yes, Your Honor.  We'll remove that.

8          THE COURT:  And then the voting record date, do you

9  need to change that, because of --

10          MR. FIEDLER:  The voting record date, I believe,

11  we're going to keep that date.

12          THE COURT:  Okay.  Then the conditional hearing, we

13  had -- so the next date that is of significance to me is the

14  very last one.  And that afternoon is actually not good for me

15  for a number of reasons, September 7th, at 2:30.  I do -- I did

16  talk to my courtroom deputy about some alternate dates, and

17  keeping in mind that the 4th is Labor Day, could do the 11th or

18  12th, which is the, you know, following Monday or Tuesday.

19  Tuesday would be in the afternoon.  Or -- I hesitate to say it,

20  the 6th in the afternoon.  But, you know, that would push the

21  objection deadline and brief deadlines and all those things to

22  the --

23          MR. FIEDLER:  I believe the 11th or the 12th will

24  work for us, Your Honor.

25          THE COURT:  All right.  So, I don't know if I need to

23

1   check that with anyone else. I, you know -- so, what would the

2   corresponding changes be then if you did the deadline to file

3   certificate of balloting. We might need to change. Objections

4   deadline, September 1st, is that, you know, it might give a few

5   more days if people are -- if we're moving back the hearing a

6   couple days.

7            MR. FIEDLER: I would defer to Your Honor. I don't

8   think the timeline necessarily needs to change if just what's

9   being moved is the hearing date. But, we'll follow Your

10   Honor's guidance on that.

11            THE COURT: Yeah, I mean, I just -- well, September

12   1st is kind of far away, and it's the Friday before Labor Day.

13   So, you're right. Let's keep that. And then maybe what we'll

14   do is just move up the -- or keep -- yeah, keep the -- is it --

15   could we say instead the 7th or the 8th for the confirmation?

16   Well, how is the confirmation brief deadline and the combined

17   reply deadline, those are the same dates --

18            MR. FIEDLER: Those are one and the same.

19            THE COURT: -- because it goes by the debtor.

20            MR. FIEDLER: Yeah, those are one and the same, Your

21   Honor.

22            THE COURT: Yeah. That's what I kind of thought.

23   So, yeah, you could -- we could move those a day or two, or you

24   could keep those, or what, you know.

25            MR. FIEDLER: If you're going to give us more time to

24

1  file our reply, we would certainly take that.

2            THE COURT:  I'll give you one more day.  Why not?

3            MR. FIEDLER:  Okay.

4            THE COURT:  So --

5            MR. FIEDLER:  Thank you, Your Honor.

6            THE COURT:  -- September 7th.  And the combined

7  hearing date, if we think it's going to be consensual -- you

8  know what, I'm going to -- the 11th we have, and my courtroom

9  deputy, I believe, is on the phone.  I think the 11th right

10 now, we were keeping it for a trial in that other case that I

11 told you about, but this would usurp that, and I would have

12 that whole day.  So, I could do that.  I'll keep it -- how

13 about the 11th at 10 a.m.?  We have the whole day.

14           MR. FIEDLER:  That works for us, Your Honor.  Thank

15 you.

16           THE COURT:  And you know, if there's going to be

17 witnesses beyond the, you know, proffer of declarations, we

18 need to know that, and we need to -- and we need to make

19 arrangements for that.  And I think it's fair for the parties

20 to know who the witnesses are.  So --

21           MR. FIEDLER:  Yeah.  We'll coordinate with the Court

22 on that, Your Honor.  Don't envision that to be the case, but

23 we will certainly keep you apprised.

24           THE COURT:  Yeah, that -- that's what I'm saying.  I

25 need to -- we need to know for all kinds of reasons, and I

1  think the other parties need to know.  And if another party's

2  considering they need a witness, I guess you'll know that from

3  the objection, and we'll deal with it then.  Okay?

4          MR. FIEDLER:  Certainly.

5          THE COURT:  And I think I said to you before, and if

6  I did, I'm sure I said it before, but I'll repeat it.  If

7  there's some discovery issues that come up, or issues that you

8  can't resolve consensually that are of that nature, then you

9  can certainly submit a short letter, or the other party can

10  submit a short letter, two, three pages at the most, outlining

11  the issues and asking for me to get involved.  And the other

12  party, of course, has an opportunity to reply.

13          MR. FIEDLER:  Okay.  Thank you, Your Honor.

14          THE COURT:  All right?  I didn't say that before?

15  No?

16          MR. FIEDLER:  You may have said it before.

17          THE COURT:  All right.  But, if I didn't, I meant to,

18  and I'm saying it now.  So, there you go.

19          MR. FIEDLER:  Thank you.

20          THE COURT:  All right?  All right.  So, I don't see

21  anyone else wishing to be heard.  I think we covered

22  everything.

23          MR. FIEDLER:  I think so, Your Honor.

24          THE COURT:  All right.  That's great.

25          MR. FIEDLER:  We'll submit --

26

1          THE COURT:  I appreciate it, to all parties, and

2  again, for the organized and very effective presentations all

3  the way around.  Thanks very much.

4          MR. FIEDLER:  Thank you, Your Honor.

5          THE COURT:  Thank you.

6          MR. SANDLER:  Thank you, Your Honor.

7          THE COURT:  Bye-bye.

8          MS. GEIER:  Thank you, Your Honor.

9                         * * * * *

10              **C E R T I F I C A T I O N**

11          I, KIM WEBER, court approved transcriber, certify

12  that the foregoing is a correct transcript from the official

13  electronic sound recording of the proceedings in the above-

14  entitled matter, and to the best of my ability.

15

16  /s/ Kim Weber

17  KIM WEBER

18  J&J COURT TRANSCRIBERS, INC.     DATE: August 30, 2023

19

20

21

22

23

24

25