UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

IN RE:                        .     Case No. 23-13359-VFP
                              .
BED BATH & BEYOND, INC., .         M.L.K. Federal Building
et al.,                       .     50 Walnut Street, 3rd Floor
                              .     Newark, NJ 07102
           Debtors.      .
                              .     August 30, 2023
. . . . . . . . . . . . .          10:09 a.m.

TRANSCRIPT OF SALE HEARING WITH RESPECT TO PHASE I LEASES
BEFORE HONORABLE VINCENT F. PAPALIA
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:          Kirkland & Ellis LLP
                          By:  ROSS J. FIEDLER, ESQ.
                               EMILY E. GEIER, P.C.
                          601 Lexington Avenue
                          New York, NY 10022

                          Kirkland & Ellis LLP
                          By:  CASEY McGUSHIN, ESQ.
                          300 North LaSalle
                          Chicago, IL  60654

                          Kirkland & Ellis LLP
                          By:  CHRISTINE SHANG, ESQ.
                          609 Main Street
                          Houston, TX  77002

                          Cole Schotz, P.C.
                          By:  WARREN A. USATINE, ESQ.
                          Court Plaza North, 25 Main Street
                          Hackensack, New Jersey 07601

Audio Operator:           Juan Filgueiras

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311     Fax No. (609) 587-3599**

```
APPEARANCES (Cont'd):

For Pinnacle Hills, LLC:  Kelley Drye & Warren LLP
                          By:  ROBERT L. LeHANE, ESQ.
                               CHRISTINE ISAACS, ESQ.
                          3 World Trade Center
                          175 Greenwich Street
                          New York, NY 10007

                          Kelley Drye & Warren LLP
                          By:  WILLIAM S. GYVES, ESQ.
                               PHILIP A. WEINTRAUB, ESQ.
                          3 World Trade Center
                          175 Greenwich Street
                          New York, NY 10007

For Michaels Stores,      Lowenstein Sandler, LLP
Inc.:                     By:  PHILIP J. GROSS, ESQ.
                          One Lowenstein Drive
                          Roseland, New Jersey 07068

                          Lowenstein Sandler, LLP
                          By:  KENNETH A. ROSEN, ESQ.
                          1251 Avenue of the Americas
                          New York, NY 10020

For DPEG Fountains, LP:   Porzio, Bromberg & Newman, P.C.
                          By:  JOHN S. MAIRO, ESQ.
                          100 Southgate Parkway
                          P.O. Box 1997
                          Morristown, NJ 07962

                          Porzio, Bromberg & Newman, P.C.
                          BY:  DEAN M. OSWALD, ESQ.
                          1675 Broadway, Suite 1810
                          New York, NY 10019

For Michaels Stores,      White & Case, LLP
Inc.:                     By:  SAMUEL P. HERSHEY, ESQ.
                          1221 Avenue of the Americas
                          New York, New York 10020

                          White & Case, LLP
                          By:  LAURA E. BACCASH, ESQ.
                          111 South Wacker Drive, Suite 5100
                          Chicago, IL  60606-4302
```

3

APPEARANCES (Cont'd):

For Michaels Stores,      White & Case, LLP
Inc.                      By:  DEVIN RIVERO, ESQ.
                          Southeast Financial Center
                          200 South Biscayne Blvd., Suite 4900
                          Miami, FL  33131-2352


For Burlington Coat       Womble Bond Dickinson (US) LLP
Factory Warehouse         By:  WOJCIECH F. JUNG, ESQ.
Corporation:              950 Third Avenue, Suite 2400
                          New York, NY  10022


- - -

1                (Proceedings commenced at 10:29 a.m.)

2            THE COURT:  Okay.  Good morning.

3            MR. FIEDLER:  Good morning, Your Honor.

4            THE COURT:  It is Wednesday, August 30th --

5            ELECTRONIC INTERRUPTION:  Recording in progress.

6            THE COURT:  Good morning, everyone.  It is Wednesday,

7    August 30, 2023.  This is the United States Bankruptcy Court

8    for the District of New Jersey, and we are here in the case of

9    Bed Bath & Beyond, Inc., et al., 23-13359, and it's an

10   evidentiary hearing with regard to the debtors' motion to

11   assume and assign three leases, one at the Pinnacle Hill

12   Shopping Center, Serramonte, and Fountains.

13           I know you filed an amended agenda last night, so why

14   don't we get started and I have a couple of preliminary

15   comments and then we can proceed.

16           MR. FIEDLER:  Okay.  Great, Your Honor.  Good

17   morning.  Ross Fiedler of Kirkland and Ellis on behalf of the

18   debtors.  I'm joined by my partners, Emily Geier and Casey

19   McGushin, along with my colleague, Christine Shang, and co-

20   counsel, Warren Usatine, from Cole Schotz.

21           THE COURT:  Okay.  Good morning.

22           MR. FIEDLER:  Your Honor, as you noted, we filed an

23   amended agenda yesterday at Docket Number 2085.  As you'll

24   note, there was a rejection motion at Docket 1613, which we've

25   resolved one of the objections, and we'll file an order for

1  Your Honor's consideration.  We have adjourned that rejection

2  motion solely as it relates to the remaining lease in Addison,

3  Texas, to September 12th.

4          But with that, as Your Honor mentioned, we're here

5  today on one key matter, that's the assignment of these three

6  leases.  I'm happy to proceed or if Your Honor wanted to make

7  those preliminary comments.  However Your Honor would like to

8  proceed.

9          THE COURT:  Well, I do have some preliminary comments

10 and questions and they mostly relate to how we're going to

11 proceed today.  The first one is opening statements.  I've read

12 the papers.  I have a good feel for what the facts and

13 arguments are up to this point, certainly.  And I'm fine with a

14 very brief opening statement, and I'm also fine with dispensing

15 with opening statements and also proceeding directly with, and

16 this is going to fall into my second and third questions, the

17 evidentiary presentation.

18         So do the parties wish to make opening statements?

19 And that goes to the --

20         MR. FIEDLER:  Yeah.

21         THE COURT:  -- debtors and the landlords and whomever

22 else is here to be heard.

23         MR. FIEDLER:  Your Honor, I'd like to just make a few

24 comments at the outset to set the stage for the key issues and

25 facts.  I think we can dispense with opening statements.

6

1          On the evidentiary point, which I was planning to

2     make, why don't I just turn to that now.  We do have basically

3     a fully stipulated evidentiary record that consists of the

4     leases, which, as Your Honor noted, is the Pinnacle Hills

5     lease, the Serramonte lease, and the Fountains lease.  Those

6     are the debtors leases.

7          THE COURT:  Right.

8          MR. FIEDLER:  The other leases are the landlord

9     leases with other third-party shopping center tenants.  That's

10    the Hobby Lobby lease, the Dollar Tree lease, and the two Ross

11    Store leases.  We also have testimony, which consists of the

12    declarations and the deposition transcripts.  As to the

13    depositions of Mr. Amendola and Mr. Aronoff, the parties have

14    agreed to certain excerpts to the deposition transcripts which

15    were submitted to chambers last night via email by Mr. Usatine

16    and Ms. Isaacs of Kelley Drye.

17         As to the declarations, those include the Amendola

18    declaration from the debtors at Docket Number 2062; the Aronoff

19    declaration and the Elliott declaration from Pinnacle Hills,

20    filed at Docket Number 1927 and 28, respectively; the Bell

21    declaration from Serramonte filed at Docket Number 1930; and

22    finally, the Dhanani declaration from Fountains at Docket

23    Number 1573.

24         With respect to Serramonte, we have filed the

25    stipulation of facts at Docket Number 2087.

1             THE COURT:  Oh, I didn't --

2             MR. FIEDLER:  I don't know if Your Honor saw that.

3             THE COURT:  That's what I was going to ask, because I

4   thought there was going to be a stipulation of facts, and I

5   didn't see it, so --

6             MR. FIEDLER:  I have a copy if you'd like me to --

7             THE COURT:  Yeah.  I mean, obviously, since I didn't

8   see it, I didn't read it, so I would need a moment to read

9   that.  Are you saying this applies only to the Serramonte

10  lease, or?

11            MR. FIEDLER:  That's right, only Serramonte.

12  Although we do have another stipulation of facts, which I

13  understand was just filed, and that's for the Fountains lease.

14  So, apologies for getting that to Your Honor after the hearing

15  started, but it took a little while to tie the bow on that.

16            THE COURT:  And not as to the Pinnacle --

17            MR. FIEDLER:  Pinnacle Hills, we've agreed to rely on

18  the leases and the testimony, which includes the deposition

19  transcript excerpts that were submitted to Your Honor, as well

20  as the declarations.  Well, certain of the declarations.

21            THE COURT:  All right.  So then, I guess that does --

22            MR. FIEDLER:  So, unless Your Honor has any questions

23  on the evidence, I would, given the agreement on the parties,

24  ask that we submit those documents into evidence.

25            THE COURT:  Yeah.  Well, I'll ask if there are any

1  objections.  But I do have that question first, is that it was

2  my understanding that there was going to be some type of

3  evidentiary hearing today with testimony.  But as I understand

4  what you're saying and Mr. Gyves' letter, although I wanted to

5  just confirm it, is that it seems like you're saying there's no

6  more testimony that's going to be needed and we're going to

7  proceed on the record as you just outlined it.

8           MR. FIEDLER:  That's correct, Your Honor.

9           THE COURT:  So are we headed right to the closing

10 argument?  Is that where this is?

11          MR. FIEDLER:  I can give Your Honor just a brief

12 overview to set the stage.  We do have three objections, but

13 they're all very similar and they share a lot of commonalities,

14 and I think we can address each lease objection individually,

15 starting with Pinnacle Hills.  Or if Your Honor would just like

16 to go straight forward with all of them, we can proceed that

17 way as well.

18          THE COURT:  I'm not going to tell you how you present

19 your case.  You can present it in whichever way you believe is

20 most appropriate.  And also, same goes for the landlords.  And

21 to the extent there's any -- I don't think anyone else filed

22 papers as far as I can tell, so I think that's really the scope

23 of it.

24          And then, I just wanted to clarify one other thing.

25 I did have one final question.  The way this was presented to

1 me, at least initially, and I think almost all throughout

2 except maybe towards the very end of the submissions, was that

3 I was being asked to rule on whether the adequate assurance

4 requirements of 365(b)(3)(C) and (D) were satisfied.  And

5 that's what this is all about.

6         There was some discussion of adequate assurance as to

7 financial condition, but that seemed to have been addressed in

8 the sense that the debtor said they'll provide whatever they

9 need, whatever is requested reasonably.  And I thought

10 percentage rent might have slipped in there at the end, too,

11 but it wasn't a focus of anything and I'm not sure there's

12 really much evidence or kind of any evidence on that at at this

13 point.  So that was what I think is my last question.

14         MR. FIEDLER:  Okay.  Yeah.  That's right, Your Honor.

15 It's just 365(b)(3)(C) and (D), and I'll get to that in a

16 moment.  I think before we proceed, if it's all right with Your

17 Honor, if we could just proceed with getting the evidence

18 submitted and then we can go to a statement and argument after

19 that.

20         THE COURT:  Okay.  So the landlord's heard

21 Mr. Fiedler's presentation as to what the evidence is.  And if

22 there's any clarification or addition or whatever that needs to

23 be made, then why don't we do that?

24         MR. FIEDLER:  Your Honor, we also submitted three

25 additional documents relating to the Pinnacle Hills Shopping

1 Center directory and stores that were emailed to your chambers.

2 I have them here and we would like to add that to the

3 evidentiary record as well.  The landlord and Michaels are both

4 aware of that as well.

5          THE COURT:  This is different than the PowerPoint

6 that was provided?

7          MR. FIEDLER:  That's right.  This is just an overview

8 of the directory and map of the shopping center at Pinnacle

9 Hills --

10          THE COURT:  Okay.

11          MR. FIEDLER:  -- and the stores therein.

12          THE COURT:  And then, I thought -- I wasn't correct.

13 I said it was my last question, but it wasn't really my last

14 question because there also seems to have been, I want to use

15 the right word, but I thought we were initially talking about

16 the Pinnacle Hills Shopping Center, and then subsequently, the

17 focus was with the whatever hundred-plus stores and

18 subsequently, there was a lot of discussion of the power

19 center, which is, as I understood it, is kind of a subset of

20 the Pinnacle Hills Shopping Center.  But the shopping center we

21 were talking about and I thought that was agreed to was the

22 Pinnacle Hills Shopping Center.

23          MR. FIEDLER:  That is our understanding, Your Honor,

24 and that is part of our argument, that we should be looking at

25 the shopping center broadly and not the power center, which is

1  a subset of collection of stores within the broader shopping

2  center.  But, yes, we will certainly touch on that.

3            THE COURT:  All right.

4            MR. FIEDLER:  Okay, so --

5            THE COURT:  Mr. LeHane.  Yeah.

6            He wanted to comment.  I invited other comments on

7  your presentation.  It sounded like you were done.

8            MR. LEHANE:  Good morning, Your Honor.  Robert

9  Lehane, Kelley Drye and Warren, on behalf of Pinnacle Hills,

10 the landlord at Rogers, Arkansas, and Daly City Serramonte

11 Center, LLC, the landlord at the Serramonte Center in Daly

12 City, California.

13           With me today are my partner, Bill Gyves, associate

14 Philip Weintraub, and from Brookfield Properties, the owner of

15 Pinnacle Hills, Jeffrey Aronoff is here in Court today, Your

16 Honor.

17           THE COURT:  Okay.  Well, good morning and welcome.

18           MR. LEHANE:  Thank you very much, Your Honor.

19           We know we've got a lot to get through this morning.

20 We appreciate and I agree with Mr. Fiedler's recitation of what

21 the agreements that we've reached with respect to the evidence

22 that should be in the record.  We do have an amendment or a

23 supplement as well with respect to some of the deposition

24 transcripts.  We just want to add and supplement, there are

25 some additional pages of Mr. Amendola's deposition excerpts,

12

1  which Mr. Gyves will point out.  But other than that, we agree,

2  but we would also, for the record, disagree about any agreement

3  on what the relevant shopping center is.  There's no agreement

4  on that and that's subject of today's discussion, Your Honor.

5          Thank you.

6          THE COURT:  All right.

7          So, you were going to tell me those read-ins from

8  Amendola's deposition?

9          MR. GYVES:  Good morning, Your Honor.  Am I okay here

10 or shall I get up there?

11         THE COURT:  Well, I understand that it's better at

12 the podium for recording purposes.

13         MR. GYVES:  Easy enough.

14         Good morning, Your Honor.

15         THE COURT:  Good morning.

16         MR. GYVES:  Bill Gyves, Kelley Drye.

17         The only addition that we would propose and we've

18 conferred with counsel for debtors and Michaels is, in our rush

19 to get you deposition excerpts yesterday, I dropped one page

20 and 14 lines from the Amendola deposition.  So we would like to

21 supplement our Exhibit 6 with Page 42 of the Amendola

22 deposition, Lines 2 through 16.

23         THE COURT:  Page 42, let me get there.

24         MR. GYVES:  4-2, Lines 2 through 16.

25         THE COURT:  Did you say 42?

13

1          MR. GYVES:  Page 42.

2          THE COURT:  I don't have it.

3          MR. GYVES:  That's what I have.

4          THE COURT:  Okay.  I was looking for it and I didn't

5   see it.

6          MR. GYVES:  That's what I should have gotten to you

7   yesterday.

8          THE COURT:  All right.  Thank you.

9          MR. GYVES:  And that's all we have on that, Your

10  Honor.  Thank you.

11          THE COURT:  9 through?

12          MR. GYVES:  2 through 1-6.

13          THE COURT:  Okay.

14          MR. GYVES:  All right.  Thank you.

15          THE COURT:  Got it.  Thank you.

16          MR. HERSHEY:  Good morning, Your Honor.  Sam Hershey

17  from White and Case for Michaels Stores.  I'm joined by my

18  colleagues Laura Baccash and Devin Rivero.

19          I just want to note for the avoidance of doubt that

20  Michaels also was part of the conversations between the debtors

21  and the landlord regarding how we will proceed today, and

22  Michaels agrees with the agreement that was reached.

23          THE COURT:  Of course.

24          MR. HERSHEY:  Thank you.

25          MR. FIEDLER:  Okay.  Your Honor, with that, why don't

14

1  I proceed.

2           As I mentioned, we have three separate objections

3  filed by three distinct landlords.  These are leases that the

4  debtors are seeking to assign.  They're valuable leases.  It's

5  not disputed that they're under market, which is to say that

6  Bed Bath currently rents these properties for less than the

7  landlord could otherwise rent the property if the debtors were

8  to reject the leases and return the property to the landlords.

9           And so, that's part of the reason why we have

10  substantial bids from Michaels and Burlington to take these

11  leases on.  And I think it's easy to see why the objecting

12  landlords do not want to see their properties assigned to the

13  new tenants on the current lease terms.

14           Despite having had the opportunity to participate in

15  the auction for these leases by putting forth competitive bids

16  just like everyone else, the landlords opted not to.  They're

17  now looking to claw back their leases by other means.

18  Specifically, as Your Honor noted, there are two really

19  distinct, I'll say, novel legal arguments at play.

20           First is that the landlord --

21           THE COURT:  Can I stop you, though, for one second?

22  I don't want to interrupt your flow, but you said they did not

23  bid at the auction of landlords.  What significance do you want

24  me to attach to that?

25           MR. FIEDLER:  The significance, Your Honor, is they

1 had the opportunity to bid for an under market lease and get

2 their lease back by the auction process that was established by

3 the debtors.  But in their decision, they opted not to, and now

4 are trying to stand in the way of the lease assignments by

5 mischaracterizing the law and not participating in the debtors'

6 auction process.  Also at --

7        THE COURT:  But are you saying that they had some

8 obligation to do that or --

9        MR. FIEDLER:  Not necessarily, Your Honor, that they

10 had an obligation, but we have Michaels and Burlington paying

11 significant amounts for these leases, nearly $1.5 million, and

12 we don't have a backup bidder.  And so there's a lot of money

13 at stake for the debtors' estate and its stakeholders in a case

14 where, as you've seen, every dollar really matters.

15        But as I was mentioning, two distinct legal

16 arguments.  First, the landlords are arguing that the Bed Bath

17 lease would violate, the lease assignment would violate

18 365(b)(3)(C) because it would breach an exclusive provision set

19 forth in the landlord's lease, not with the debtors but with

20 some other unaffiliated third party in the shopping center.

21        The second main argument the landlords make is that

22 the proposed assignments to Michaels and to Burlington would

23 disrupt the tenant mix and balance in the underlying shopping

24 centers, purportedly in violation of 365(b)(3)(D) of the

25 Bankruptcy Code.  Your Honor, as you'll hear today from the

16

1  debtors, from Burlington, from Michaels, none of these

2  objections can survive legal scrutiny, much less the evidence

3  in the record before you.

4          So, overall, Your Honor, throughout these cases, the

5  debtors have been really successful in monetizing the value of

6  their leases and if the proposed assignments are approved, as I

7  mentioned, there's nearly $1.5 million set to inure to the

8  estate for the benefit of key stakeholders.

9          Let me just also say this, Your Honor, there have

10 been hundreds of leased properties up for auction in these

11 cases and issues have been raised by landlords with a number of

12 the proposed lease sales.  And that's evidenced by the jam-

13 packed docket that Your Honor has seen.  But valid objections

14 have been filed and the debtors have exercised their discretion

15 appropriately to address those objections.  And so there's been

16 a number of valid use restrictions in the debtors' leases where

17 the debtors chose not to proceed with valuable lease sales.

18         But here is a little different, Your Honor.  The

19 debtors can't sit back and abide by any land grabs by the

20 landlords to recapture their under market leases, not only as a

21 result of not participating in the auction, but in

22 characterizing the law it fundamentally at odds with the

23 existing authority.  So, that's just a flavor of the issues,

24 Your Honor.  I'm happy to just turn to argument now on the

25 Pinnacle Hills lease, if that's acceptable to you.

17

1          THE COURT:  So I guess that's where we are.  So we're

2    really going straight to oral argument.

3          MR. FIEDLER:  That's right, Your Honor.

4          THE COURT:  Okay.  That wasn't exactly the way I

5    thought it was going to proceed but that's fine, so why don't

6    we get started?

7          MR. FIEDLER:  Okay.  Great.  Thank you, Your Honor.

8          THE COURT:  Does anyone have any issue with that?

9                    (No audible response)

10         THE COURT:  Okay.

11         MR. FIEDLER:  So, Your Honor, Pinnacle Hills first,

12   where I'd like to start is the plain terms of the Pinnacle

13   Hills lease, which clearly permit the debtors to assign the

14   lease to Michaels, and the landlord hasn't proposed anything

15   that would suggest otherwise.

16         So, first, under the Pinnacle Hills lease, the

17   debtors are authorized to use the premises for any permitted

18   use, and that term is broadly defined as any lawful use not

19   specifically prohibited by Section 13.11 of the lease.  And

20   when we turn to that section of the lease, the language

21   provides that the tenant cannot use the premises, one, for any

22   prohibited use, or two, in violation of any of the existing

23   exclusives.

24         Now, on the first point, prohibited uses, those are

25   identified in Exhibit L of the lease, and they include things

1  like laundromats, medical centers, tattoo parlors, and other

2  non-retail uses.  They do not, however, include things like the

3  operation of a Michaels store.  And the debtors believe the

4  landlord is largely in agreement with that.

5       I'd just point Your Honor to Page 69 of Mr. Aronoff's

6  deposition transcript.

7       THE COURT:  All right.  Let me just grab that.

8  This is Amendola.

9       MR. FIEDLER:  I know, there's a lot.

10      THE COURT:  Okay.  Page 69?

11      MR. FIEDLER:  Page 69.

12      Essentially, Mr. Aronoff was asked whether after his

13  review of Exhibit L whether any of the prohibited uses on that

14  exhibit raised an issue as to Michaels store and the operation

15  of a Michaels store and whether that would violate any of the

16  enumerated uses in that exhibit.  And Mr. Aronoff clearly

17  confirmed that they didn't.  And I think that's not only

18  evidence that this operation of a Michaels store is permitted

19  as it doesn't violate any of the enumerated uses in that

20  exhibit, but the landlord hasn't proposed anything to suggest

21  otherwise.

22      The second point I'd make is on the existing

23  exclusives.  Section 13.3.1 of the lease obligates the debtors

24  to honor the existing exclusives that are identified in

25  Exhibit K1 of the lease.  The existing exclusives include eight

1  tenants, none of them are Hobby Lobby or Dollar Tree.  And I

2  think Mr. Aronoff acknowledges that fact in Page 72 of his

3  deposition transcript.

4          But more importantly, Your Honor, the Pinnacle Hills

5  lease and the discussion of existing exclusives expressly

6  disclaims any obligation by the debtors to honor any exclusives

7  besides the existing exclusives.  And what that's getting at is

8  really any future exclusives.  And on this point, I think

9  there's a few points to note from Mr. Aronoff's testimony,

10 which is first, on Pages 76 and 77, Mr. Aronoff acknowledges

11 that the Bed Bath lease makes clear that if an exclusive is not

12 expressly mentioned in that Exhibit K1 of the Bed Bath lease,

13 then it is not binding on Bed Bath which is, I think, an

14 important point, Your Honor, that there are no exclusives

15 within the lease that would prohibit the assignment to

16 Michaels.

17         Second, Your Honor, on Pages 74 and 75 of his

18 deposition transcript, Mr. Aronoff acknowledges that there was

19 never an amendment to the Bed Bath lease with the landlord that

20 would have bound Bed Bath to the Hobby Lobby or the Dollar Tree

21 exclusives.  And in fact, the landlord never asked for such an

22 amendment, even though it had the option to.

23         And what's interesting here, Your Honor, is that the

24 landlord has had an opportunity previously to offer that to Bed

25 Bath.  Years ago, when the landlord was agreeing to bring Hobby

1   Lobby into the shopping center, it had to look to Bed Bath to

2   get express approval for entering into the Hobby Lobby lease.

3   And as Mr. Aronoff makes clear in his testimony, that prior

4   amendment to the Bed Bath lease, which included allowing Hobby

5   Lobby to come into the shopping center, did not include any

6   exclusive for Hobby Lobby or any other tenants in the shopping

7   center.

8          And so while the landlord had the option to ask for

9   that, for some reason it chose not to.

10         THE COURT:  What did you refer to pages of the --

11         MR. FIEDLER:  Yeah.  That was Page 74 and 75 and 76

12  and 77 of the deposition transcript.

13         THE COURT:  Okay.

14         MR. FIEDLER:  And, Your Honor, as the debtor's

15  witness, Mr.  Amendola, makes clear in his declaration, leases

16  often include these sorts of future exclusives and landlords

17  expressly require tenants to comply with the future exclusive,

18  and that was noticeably missing from the Pinnacle Hills lease.

19  And so, I think it's clear, Your Honor, that just based on the

20  plain language of the lease, an assignment to Michaels does not

21  violate the prohibited use or the exclusive use provision or

22  any other provision in the lease.

23         And, Your Honor, since the landlord is unable to show

24  that the plain terms of the Pinnacle Hills lease prohibit the

25  assignment to Michaels, the landlord instead turns to a gross

1  mischaracterization of the language of Section 365(b)(3)(c) to

2  stand in the way of the assignment.

3       As Your Honor is aware, there's two key elements to

4  365(b)(3).  When a debtor looks to assume and assign a lease,

5  first, assumption and assignment of such lease is subject to

6  all provisions thereof.  And second, it will not breach any

7  such provision contained in any lease, financing arrangement,

8  or master agreement relating to such shopping center.

9       And I think what's important to note here, Your

10 Honor --

11       THE COURT:  What is the gross mischaracterization

12 there?  I mean, I understand the various arguments as to why

13 your side is saying that really refers to leases to which the

14 debtor was subject, but doesn't it say any other lease in the

15 shopping center?

16       MR. FIEDLER:  Your Honor, I think the case law on

17 this is very clear, both in the Toys case, the Trak Auto case,

18 the cases from SDNY and Martin Paint Stores and Ames Department

19 Stores, which is that that language is referring to any lease

20 that the debtors have entered into or master agreement relating

21 to the shopping center that the debtor has entered into.  And

22 it cannot be the case, and Congress did not intend it to be the

23 case, that the debtor would be bound by potentially several

24 hundred provisions in hundreds of leases to which it could not

25 possibly know about because it never negotiated those leases,

22

1  it never signed off on the provisions in those leases,

2  primarily because here, the lease that the debtor entered into

3  came well over 10 years before the other leases that the

4  landlords are referring to.

5         THE COURT:  Am I allowed to, I think you just kind of

6  implicitly said that that is what it says, but they can't have

7  meant that.  So, it says it, but you're asking me to say that's

8  what it says, but it can't be what they meant.

9         MR. FIEDLER:  Well, I think --

10        THE COURT:  Isn't that what the argument is?

11        MR. FIEDLER:  I think there's two points on that,

12 Your Honor.

13        The language says it will not breach any such

14 provision contained in any other lease, right?  And it is a

15 tenant of contract law that a party can't breach a contract to

16 which it was never a party.  And so that language is referring

17 to leases that the debtor had actually entered into or master

18 agreements that document the terms of the shopping center,

19 which we noticeably don't have here in the Pinnacle Hills

20 lease.

21        THE COURT:  But isn't the landlord saying, and I

22 don't want to steal anyone's thunder, but isn't the landlord

23 saying that in response to that argument that the lease between

24 Hobby Lobby and the landlord is being breached?  And that's a

25 lease in the shopping center.

23

1          MR. FIEDLER:  That's right, Your Honor, but the lease

2    is being breached by the landlord not the debtor, and I think

3    what's important to note here is the legislative history which

4    really supports the reading that the debtors and Michaels have

5    proposed, which is that Congress intended this language to

6    preserve the landlord's rights in respect of its lease with the

7    debtor and any other applicable agreements, and that includes

8    master agreements to which the debtors had entered into.

9          Specifically, when enacting 365(b)(3), the House

10   Judiciary Committee discussed the import of looking at the

11   debtor lease.  And I'm quoting from a report which says, "A

12   shopping center is often carefully planned and apprised, and

13   though it consists of numerous individual tenants, the center

14   is planned as a single unit, often subject to a master lease or

15   financing agreement.  Under those agreements, the tenant mix in

16   a shopping center may be as important to the lessor as the

17   promised rental payments."

18          And I know we're delving a bit into tenant mix, but I

19   think it's abundant and clear that the House Judiciary Report

20   and the other legislative history bits that are cited in our

21   papers make clear that the master lease or the financing

22   agreement that Congress speaks of is one in which the debtor,

23   as the shopping center tenant, had entered into and made itself

24   bound by.

25          And I think, Your Honor, the Toys case rightly

24

1  recognized this, and you'll hear a lot about the Toys case

2  because the facts there are nearly identical to the facts here.

3  And there, the Court said that the assignment could go through

4  because the assignment did not violate the terms in the

5  debtor's lease, which the debtor had bargained for with the

6  landlord.

7         And I think what that court was getting at is what

8  is, not only did Congress not intend for a debtor to be bound

9  by several hundred leases, but recognized the practical

10  importance of not making a party bound by a contract to which

11  it has no clue about what's in it.  And so I think any other

12  reading, including the reading that the landlords propose,

13  would lead to the absurd result that the debtors must be

14  knowledgeable about the terms, provisions of potentially

15  hundreds of other contracts to which they never entered into.

16         THE COURT:  So the argument really is that the plain

17  language says what it says, and the general rule is that if the

18  language is plain, the analysis really ends there unless it

19  leads to an absurd result and that's what's being argued here.

20         MR. FIEDLER:  Well, that's right, Your Honor.  I

21  think the plain language was intended to refer to leases and

22  other agreements to which the debtors were actually party to.

23  And the legislative history supports that and the fact that it

24  would lead to these absurd results and unjust results that a

25  debtor would be bound by a contract it has no clue about

25

1  clearly weighs in favor of not only the debtors' reading of the

2  statute, but the several other courts that have read the

3  statute the same way, both in <u>Toys</u>, in <u>Trak Auto</u>, and a number

4  of the SDNY cases.

5          THE COURT:  So then it's even a little further than

6  that.  It's kind of the flip of the landlord plain language

7  argument.  You're saying the plain language of (b)(3) and (C)

8  refers to only the lease with the debtor.

9          MR. FIEDLER:  That's right, Your Honor.  Or any

10 master agreement that the debtor had entered into as part of

11 the shopping center arrangement.

12         THE COURT:  But don't I have to go to legislative

13 history or other sources to get to that?

14         MR. FIEDLER:  Well, I think, Your Honor, yes, the

15 case law is pretty clear.  I did not see one case cited in the

16 landlord's, not only Pinnacle Hills' landlord, but the

17 Serramonte and Fountains landlord briefs, which said a court

18 was looking to something other than a debtor's lease in

19 analyzing the assignability of a contract under 365(b)(3).  So

20 I think that's important to note that accepting the landlord's

21 reading would really be breaking ground here and at odds with

22 all of the existing case law as well as the legislative

23 history.

24         THE COURT:  Okay.

25         MR. FIEDLER:  With that, Your Honor, I'd like to turn

26

1  to the landlord's reading of 365(b)(3) as it relates to

2  365(f)(1), which really turns a blind eye to the fundamental

3  protection that the bankruptcy accords debtors, which is, as

4  Your Honor's aware, the Code greatly favors the debtors' free

5  assignability of its contracts.  And in that spirit, courts,

6  both in this circuit and others, acknowledge that

7  Section 365(b)(3) of the Bankruptcy Code is not meant to be

8  read in isolation, but rather is meant to be read in

9  conjunction with 365(f), which it explicitly cross references.

10         And this is exactly what the Court held in the

11  Delaware case in Rickel Home Centers.  And so when interpreting

12  365(f), courts have construed the terms of leases to not only

13  render unenforceable lease provisions would prohibit assignment

14  outright, but also those lease provisions that are so

15  restrictive that they constitute *de facto* anti-assignment

16  provisions.

17         And here, Your Honor, I can't think of a more clear

18  *de facto* anti-assignment provision than the imposition of the

19  exclusivity provisions in the Hobby Lobby lease and the Dollar

20  Tree lease, which --

21         THE COURT:  But doesn't it say (f)(1) says except as

22  provided in (B) and (C) of 365?  And wasn't it amended to make

23  that clear.

24         MR. FIEDLER:  That's right, Your Honor.  But as the

25  Toys court pointed out, and as the Fourth Circuit held in Trak

1  <u>Auto</u>, that did not mean that 365(f)(1) can never be used to

2  invalidate a clause prohibiting or restricting assignment in a

3  shopping center lease.  And I think that is largely exactly in

4  line with Congress's intent, which is that what Congress meant

5  in focusing on restrictive provisions was to focus on those

6  provisions that are in a debtor tenant lease that it had agreed

7  to.

8       And to the extent the bankruptcy court at the time

9  was seeking to disregard those covenants in a proving

10  assignment, that is what Congress intended to avoid.  And so, I

11  think the provisions that are in the Hobby Lobby lease and the

12  Dollar Tree lease are not binding on the debtors simply because

13  they constitute *de facto* anti-assignment clauses under

14  365(f)(1).

15       THE COURT:  But all they're saying is that -- in

16  other words, let's just say, for example, that the Hobby Lobby

17  lease was entered into before the Bed Bath & Beyond lease, and

18  there was restriction on that.  That would prohibit the

19  assignment, right?

20       MR. FIEDLER:  Well, I think, Your Honor, to engage in

21  your hypothetical, there have been a number of objections in

22  these cases filed because there were prior in time exclusives,

23  and the debtors didn't go forward with those assignments in

24  part because they were prior in time.  Here, we're talking

25  about leases that came at least 10, in some cases, 15 years

1 after the debtors entered into their lease.  And so --

2          THE COURT:  Right.  So it's not -- so but I guess

3 that -- my point was that it's not that C is an anti-assignment

4 clause or prohibits the assignment.  It just says a valid

5 restrictive use has to be honored in a shopping center lease,

6 right?

7          MR. FIEDLER:  Well, I think, Your Honor, Congress was

8 clear that those restrictive provisions are those to which the

9 debtor tenant had agreed.  As explained by Senator Hatch in the

10 Congressional House Report, he's made clear that it is my

11 understanding sorry, I'll start over.

12          Congress decided that use or similar restrictions in

13 a retail lease, which the retailer can't evade under non-

14 bankruptcy law, should not be evaded in bankruptcy.  It's my

15 understanding from Mr. Hatch that some bankruptcy judges have

16 not followed this mandate.  Under another provision of the

17 Code, Section 365(f), a number of bankruptcy judges have

18 misconstrued the Code and allowed the assignment of a lease

19 even though the terms of the lease are not being followed.

20          And clearly in that language, Mr. Hatch is referring

21 to the lease that the debtors had entered into.  And so I think

22 that's important to note that 365(f)(1) can be used or should

23 be viewed in conjunction with 365(b)(3)(C) to prevent the

24 assignment, or to allow the assignment of a lease despite a

25 restrictive covenant in a lease in which the debtors were not

1  party to.

2       So, unless Your Honor has any other questions on

3  that, I'd like to turn now to tenant mix, which as Your Honor

4  is aware, the landlords assert that the proposed assignment to

5  Michaels will disrupt tenant mix and balance in violation of

6  (b)(3)(D) of the Bankruptcy Code.  All of the evidence in the

7  record and the controlling legal precedent on this tells a very

8  different story, Your Honor.

9       As Your Honor may know, as with 365(b)(3)(C),

10 365(b)(3)(D) must be interpreted to refer to the contractual

11 protections in the debtors' lease or a master lease in which

12 the debtor had been party to.  That is directly from the Ames

13 Department Stores case the Toys R Us opinion as well.  And,

14 Your Honor, as I've mentioned, there's no master lease or

15 similar arrangement in the Pinnacle Hill Shopping Center, which

16 you would ordinarily suspect at a shopping center.  And the

17 landlord really hasn't pointed to any provision within the

18 debtors' lease that would speak to the intent to maintain some

19 sort of tenant mix and balance in the shopping center that

20 would otherwise prohibit the assignment to Michaels.  But --

21       THE COURT:  Well, what about the one that allows them

22 to terminate?  I understand that's not enforceable in

23 bankruptcy, but what about the one that allows them to

24 terminate if they don't agree with the proposed use?

25       MR. FIEDLER:  That's right, Your Honor.  The landlord

30

1    does assert that Section 15 of the lease it has a right to

2    terminate the lease outside of bankruptcy.  But they do

3    acknowledge that that provision would be an anti-assignment

4    clause unenforceable in Chapter 11.  But what the landlord

5    conveniently omits is that the landlord would be required to

6    pay the tenant substantial damages in the case it were to

7    terminate the lease based on a proposed unacceptable

8    assignment.

9           So by blocking the assignment in Chapter 11 and not

10   paying the tenant substantial damages that it otherwise would

11   outside of Chapter 11, the landlord is asking the Court to

12   enlarge the bargain for protections that it had agreed to back

13   when it signed the lease.  And, Your Honor, the debtors don't

14   think that is appropriate, nor does the case law support that.

15          THE COURT:  But my question to you was, I thought

16   your argument was that they didn't deal with the use in the

17   lease.  And I think the argument that's being made is that they

18   dealt with it by saying it's a termination if they don't like

19   it and they have to pay substantial damages or whatever the

20   damages are.  I don't really know what they are.  But they have

21   to pay damages if they don't agree with the use.  That feels

22   like they were concerned about the use to me.

23          MR. FIEDLER:  Well, I think, Your Honor, this goes

24   back to the point I made a little while ago, which is, if the

25   landlord really thought that the coexistence of Michaels and

1  Hobby Lobby and Dollar Tree and Michaels would be detrimental

2  to the tenant mix, they would have negotiated that in the

3  debtors' lease.  And they had the opportunity to do so when

4  they asked Bed Bath & Beyond to waive the otherwise prohibition

5  on Hobby Lobby coming into the center.

6           And so Mr. Aronoff made clear in his deposition

7  testimony that they had the opportunity to do so and they opted

8  not to.  And I think that speaks to the fact that the landlord

9  is not seeking to -- there hasn't been an intent within the

10 lease to maintain tenant mix and balance.

11          But I do want to hit on one rather interesting and I

12 think flawed point, which Your Honor mentioned at the outset of

13 the hearing, which is that despite the clear language in the

14 statute referring to shopping center, when looking at tenant

15 mix, the landlord is saying we must look at a few stores within

16 the shopping center and not the whole shopping center itself.

17 And I think that's a very dangerous argument to make, Your

18 Honor, because the shopping center is clearly defined in the

19 lease as encompassing the entire Pinnacle Hills property, not

20 just the power center, which is only consisting of 12 stores

21 and a fraction of the square footage of the over million square

22 feet shopping center.

23          And I think --

24          THE COURT:  I was going to ask Mr. Lehane that

25 because that's what I thought it said as well.

32

1              MR. FIEDLER:  Yeah.

2              THE COURT:  I guess we'll save that for when he's up

3   here.

4              MR. FIEDLER:  I think, Your Honor, I'd like to point

5   the Court to page 65 of Mr. Aronoff's declaration.  And more --

6   sorry, not his declaration, his deposition transcript.

7              When Mr. Aronoff was asked whether referring to in

8   analyzing tenant mix of the large complex, which is called the

9   Pinnacle Hills Shopping Center, as defined in the lease,

10  whether he was looking at that in analyzing tenant mix, or

11  whether he was looking at analyzing tenant mix just in respect

12  to the power center, he confirmed, and I quote, "that the

13  Pinnacle Hills Shopping Center was not in our discussion.  It

14  was only the power center."

15             And like I mentioned, the definition of shopping

16  center in the lease clearly refers to Pinnacle Hills Shopping

17  Center as a whole, and it's not in any way limited to any

18  subdivision within the shopping center like the power center.

19  And I believe Mr. Aronoff acknowledged that in Pages 40 and 41

20  of his deposition transcript.

21             So, it's therefore really unclear, Your Honor, what

22  evidence the landlord has put forward as to the lease agreement

23  itself and the shopping center to support the notion that

24  tenant mix is somehow disrupted at the shopping center as a

25  whole.  And so, I don't think it's appropriate, Your Honor, to

33

1  look to a few stores within a shopping center that has over a

2  hundred stores and over about a million square feet and limit

3  the tenant mix analysis to just about 250,000 square feet.

4  But, again, if we were to analyze tenant mix outside

5  of the intention of the contractual terms that the debtors

6  agreed to, like I said, there's over 100 stores in the Pinnacle

7  Hills Shopping Center.  There's at least 28 women's clothing

8  stores, five children's stores, five department stores, six

9  electronic stores, seven jewelry stores, and more and more.

10  And of those a hundred, many of them sell the exact same items.

11  But what is more telling is that over a hundred of those

12  stores, there's only two stores that the landlord has

13  identified that sell craft items.  And not even both of those,

14  the landlord admits, are not craft focused retailers.

15  And I'd like to point the Court to Page 46 and

16  Page 48 of Mr. Aronoff's deposition transcript.  Here, after

17  scrolling through the entire tenant roster of the Pinnacle

18  Hills Shopping Center with Mr. Aronoff, Mr. Aronoff admitted

19  that Hobby Lobby was the only craft focused retailer in the

20  shopping center and that he didn't know whether Dollar Tree was

21  even a craft focused retailer, though he acknowledged they do

22  engage in the selling of certain craft items.

23  And so, adding another retailer like Michaels that is

24  engaged in the selling of craft products certainly does not

25  disrupt the tenant mix of a shopping center with over a hundred

34

1   stores and perhaps two that are engaged in the sale of craft

2   products.  But, I think more telling, Your Honor, is as

3   explained in Mr. Amendola's declaration, Michaels and Hobby

4   Lobby coexist in at least 30 shopping centers across the

5   country.  And the landlord generally agrees with that.  Indeed,

6   Ms. Elliott's declaration acknowledges that at at least 19 of

7   those locations, those two tenants coexist and likely more.

8          And the same is true of Dollar Tree and Michaels.

9   And I think for that reason, Your Honor, there is a reason for

10  that, Your Honor, and Mr. Amendola makes that clear in his

11  declaration, which is that companies, particularly retailers,

12  actually like to be located in close proximity to their

13  competition because of the additional foot traffic it would

14  bring, not only their store, but to the shopping center as a

15  whole.

16         And assuming Michaels was a direct competitor of

17  Hobby Lobby and Dollar Tree, which I'm not sure they are, those

18  tenants may gain the additional foot traffic from bringing

19  Michaels in there.

20         THE COURT:  You're not sure if Hobby Lobby and

21  Michaels are direct competitors?  Or Hobby Lobby and Dollar

22  Tree?  Or both?

23         MR. FIEDLER:  Michaels and Hobby Lobby and Michaels

24  and Dollar Tree.

25         THE COURT:  You're saying Michaels and Hobby Lobby

1 are not competitors?

2         MR. FIEDLER:  I think, Your Honor, Mr. Aronoff's

3 testimony focuses on Hobby Lobby being a craft focused

4 retailer, and so it's possible that they are competitors.  They

5 likely are.  But certainly not with respect to Dollar Tree.

6         But I think, Your Honor, the more important point is

7 Congress's intent when enacting 365(b)(3), which I've hit on a

8 bunch, which was to preserve the bargain for exchange between

9 the parties and that's the debtor tenant and the landlord.  And

10 so, as I've mentioned, if there was any issue that the landlord

11 foresaw with tenant mix and balance in bringing a store like

12 Michaels into the shopping center, they would have negotiated

13 that in the Bed Bath lease.  And I really don't think it's

14 appropriate for the bankruptcy court to entertain the

15 landlord's request to enlarge the rights in its lease in

16 Chapter 11 that it otherwise wouldn't have outside.

17         Lastly, Your Honor, I'd like to just turn to the rent

18 abatement and damages point that was raised by the landlord

19 where the landlord argues that the proposed assignment should

20 be denied because if the lease is assigned, the landlord may be

21 subject to certain rent abatements by Hobby Lobby under the

22 terms of the Hobby Lobby lease.  I think this argument fails on

23 many grounds, Your Honor, and is frankly irrelevant to the

24 discussion of the assignability of the contract under

25 365(b)(3).

1          First, Your Honor, there's nothing in the case law,

2   and the landlord hasn't pointed to a case, that suggests a

3   bankruptcy court must consider a landlord's supposed expected

4   losses from its other contractual arrangements with other

5   parties that the debtors don't know about as a result of the

6   assignment of the lease.  As the bankruptcy court in the <u>Ames</u>

7   <u>Department Stores</u> case explained, Congress has determined that

8   subject to certain statutory safeguards, the value of the

9   debtors' leases should go to the debtors' creditors and that

10  leases may be sold to achieve that end with or without the

11  landlord's consent.

12         There is one point I'd like to make about the Hobby

13  Lobby lease, which is there is an express provision in that

14  lease related to rent abatement, which says in the event the

15  tenant violates the Hobby Lobby exclusive without the

16  landlord's consent, then rent abatement would be triggered.

17  And I think, Your Honor, by overruling the objection and

18  maintaining the status quo with respect to the language of

19  365(b)(3), the landlord would have met that requirement and

20  would not be subject to the damages that it claims it might be.

21         That's the same view that the <u>Martin Paint Stores</u>

22  case took in the Southern District of New York, as well as the

23  view that the <u>Toys</u> court took in the Eastern District of

24  Virginia that essentially a court order is a judicial action

25  that may render the landlord incapable of complying with a

37

1    restriction on another lease, and therefore would excuse the

2    landlord's performance under that provision.

3           THE COURT:  What Martin Paint Store case are you

4    referring to because there's a few of them, and I thought, or

5    at least two, and one of them wasn't even really a shopping

6    center case as I understood it.

7           MR. FIEDLER:  I was referring, Your Honor, to cite

8    199 B.R. 258 (1996).

9           THE COURT:  I don't have at my fingertips whether

10   that's the one I'm referring to.  I know what Toys R Us says,

11   but I don't know Martin Paints.  At least one of them did not

12   have to address the issue because of well, didn't have to

13   address the issue because it wasn't a shopping center and then

14   there was another one where there was no standing found.  So

15   I'm not sure what Martin Paints adds to the discussion at this

16   moment.

17          MR. FIEDLER:  Your Honor, I think it's really the

18   point that the law excuses performance if there's a legal

19   impossibility of actually performing.  And that's the quote

20   from the Martin Paint case, I believe, which gets to the point

21   here that if the landlord can't possibly consent, it doesn't

22   need to be bound by the abatement provision in the Hobby Lobby

23   lease.

24          So, with that, Your Honor, I think that really

25   concludes my argument.  I will say there is a lot of money at

1  stake here.  We do not have any backup bidders.  The landlord's

2  reading of this statute would call into question any debtor's

3  ability to maximize value of its estate for the benefit of all

4  of its stakeholders, not just the landlord.

5         And I think accepting the landlord's reading of this

6  statute would really jeopardize not only retail debtors but any

7  debtor's ability to restructure in Chapter 11.

8         THE COURT:  Okay.  Thank you.

9         MR. FIEDLER:  Thank you, Your Honor.

10        THE COURT:  I mean, in terms of order, I think we're

11  dealing with the Pinnacle Hills Shopping Center, at least, and

12  Michaels certainly was supportive of that.  It seems to me it

13  makes sense to hear from Michaels and then hear from the

14  landlord.  Otherwise, there might be --

15        MR. FIEDLER:  I think that makes sense, Your Honor.

16        THE COURT:  All right.

17        MR. FIEDLER:  Thank you.

18        THE COURT:  Mr. Hershey.

19        MR. HERSHEY:  Good morning, Your Honor.  Sam Hershey

20  from White and Case on behalf of Michaels Stores.

21        Just a few preliminary notes.  I know that Mr. LeHane

22  transmitted some slides last night and I have some thoughts on

23  those but I think those thoughts are best saved for rebuttal

24  after Mr. LeHane goes through them.  So, I just wanted to up

25  front reserve some time for rebuttal with the Court's

1 permission.

2          I do not have a slide deck for Your Honor.

3 Everything that Michaels wanted Your Honor to consider was in

4 our briefs, and on that note, I do just want to say, at the

5 start of the hearing, Your Honor referenced the debtors' briefs

6 and the landlord's briefs.  Michaels did, of course, also file

7 briefs, specifically a reply at Docket Number 1383, and a sur-

8 surreply on Docket Number 2059.  I just wanted that on the

9 record.

10          THE COURT:  Of course, Michaels has been here

11 throughout.  I apologize for that omission.

12          MR. HERSHEY:  I just wanted to avoid --

13          THE COURT:  I did not forget.  I just omitted that.

14          MR. HERSHEY:  That's all I wanted to confirm.  Thank

15 you, Your Honor.  I appreciate that.

16          Anyway, despite not having slides, I do want to give

17 Your Honor a brief roadmap of where I'm going to go today.

18 There are really, as everyone's observed, two sections of the

19 Code at issue, 365(b)(3)(C) and 365(b)(3)(D).  I'm going to

20 discuss each of them in turn.  I think I will be able to avoid

21 overlapping too much with Mr. Fiedler's argument.  But what I

22 want to do is talk about each, and in respect of each, what the

23 law is and what the law should be.  Because I think what Your

24 Honor will find is that the law overwhelmingly, in some cases

25 totally, supports the debtors' and Michaels' position, but also

1  that's the way it should be, because under the landlord's

2  proposed view of the world, restructurings by retail debtors

3  would be completely impossible.

4          And I'll get there, but before I do, let's start with

5  the actual plain language of Subsection C.  And I will just

6  read it to make things simple.  This is 365(b)(3)(C) starting

7  with (3).

8          "For the purposes of Paragraph (1) of this subsection

9          and Paragraph (2)(b) of Subsection (f), adequate

10         assurance of future performance of a lease of real

11         property in a shopping center includes adequate

12         assurance,"

13 and cutting down to (C):

14         "[T]hat assumption or assignment of such lease is

15         subject to all the provisions thereof, including, but

16         not limited to, provisions such as radius, location,

17         use, or exclusivity provisions, and will not breach

18         any such provision contained in any other lease,

19         financing agreement, or master agreement relating to

20         such shopping center."

21         So, the first thing that becomes really clear,

22 looking at this, is Congress is focused on the lease at issue

23 to be assigned.  We see that in "such lease" and "thereof," the

24 reference is clearly to the lease.  But then of course there is

25 a second part of that talks about other leases, financing

41

1  agreements, master agreements.  And look, like items are

2  grouped together.  I forget the Latin expression for that, but

3  we're talking about a master agreement that is by definition an

4  agreement that the debtor will be a party to because it applies

5  to all tenants, a financing agreement, again, an agreement that

6  would apply to all tenants that a debtor would be party to, and

7  then I guess where the rubber meets the road is with other

8  leases.

9        And it's perfectly possible to imagine a situation

10  where a debtor has multiple leases in a shopping center.

11  Particularly, say, a franchise, where a franchisor might have

12  multiple franchise locations in the same shopping center.  And

13  what the Code is guaranteeing to a landlord is that a debtor

14  will not be able to use the terms of one of its leases to

15  breach the terms of other leases to which it is a party with

16  the landlord.

17        In other words, the Code is guaranteeing the benefit

18  of the bargain that the landlord has with the debtor, right,

19  not giving the debtor greater rights than what are in the

20  leases that the debtor has actually agreed to.  And on that

21  note, I think we have confirmation of that point in the use of

22  the term "breach."

23        As Mr. Fiedler observed, and as the landlord has

24  agreed in its briefing, a party can only breach an agreement if

25  it is a party to that agreement.  What that means is that the

42

1  debtors' assignment to Michaels of their lease cannot be a

2  breach by the debtors of the Hobby Lobby lease.  The debtors

3  are not party to that lease.  It cannot be a breach by Michaels

4  of the Hobby Lobby lease.  Michaels is not party to that lease.

5  And I'll take it one step further, I actually disagree with

6  Mr. Fiedler on this point.  It's not a breach by the landlord

7  of that lease with Hobby Lobby.  The landlord standing

8  helplessly by and watching by operation of the Bankruptcy Code

9  its lease be assigned over its objection is not taking any

10  steps to breach that lease.

11          There's no breach of contract claim that Hobby Lobby

12  can now bring against the landlord saying, "You did this, and

13  by doing this, you breached our agreement."  To the contrary,

14  the landlord has been working very hard, as we know full well,

15  to prevent the assignment to Michaels, and therefore, is not in

16  any kind of breach.

17          There is, however, a breach happening here, and I

18  think it needs to be noted.  The breach that's happening here

19  is a breach by the landlord of the debtors' lease.  The

20  landlord is seeking to import into that lease terms that the

21  debtors never agreed to.  And it's worth noting that it's a

22  black letter rule under the Bankruptcy Code that a bankruptcy

23  does not modify a contract.  But that is exactly what the

24  landlord is trying to do by taking terms that were agreed to

25  after the debtors entered into their lease with the landlord

43

1  and seeking to apply them.

2         THE COURT:  But doesn't the Bankruptcy Code modify

3  contracts all the time, including particularly 365?

4         MR. HERSHEY:  Well, fair enough, Your Honor.  I think

5  there are examples where the Bankruptcy Code carves out

6  exceptions to that rule.  For example, anti-assignment

7  provisions and rules those out.  But it is generally a tenant

8  that, except for those exceptions, there is not a modification

9  to a contract simply by the fact of a bankruptcy which is what

10 the landlord is trying to do.

11        And I'll just note, Your Honor, there was an easy

12 solution to this.  There are multiple easy solutions to this

13 that the landlord could have pursued before bankruptcy, right.

14 The landlord could have written different restrictions into the

15 debtors' lease.  It could have said, this lease is only to be

16 used for bedding, or whatever other purposes Bed Bath & Beyond

17 would use it for.  Or it could have said, this lease is subject

18 to all future exclusives that this landlord may enter into.

19 There are leases that say that.  This is not one of them.

20        The landlord could have had a master agreement

21 between all the tenants in the shopping center that says the

22 leases in the shopping center should be used only for the

23 purposes agreed to in that lease.  That happens as well.  It

24 didn't happen here.  And the Code actually specifically

25 references master agreements for that reason.  And the landlord

44

1  could have bid.  Came to the auction, knew about it, chose not

2  to bid, right.  That would be a way to avoid the damages that

3  it claims it's facing.  I agree with Your Honor, there is no

4  obligation for the landlord to do that, but it was an option.

5  And it could have avoided being here today if it had bid.  It

6  chose not to.  Michaels was the sole bidder at auction with no

7  backup bidder, and that's why we're here today.

8          So moving on from the plain language of the statute,

9  I do want to focus a bit on the cases, and Mr. Fiedler said it

10  perfectly.  Every case that we are aware of that was cited by

11  any party favors the debtors' and Michaels' position.  That's

12  from the Ames case in 1991 from the Southern District of New

13  York to the Trak Auto case, which is by the way the only

14  Circuit level case on this issue from 2004, the Fourth Circuit,

15  all the way up to the Toys R Us case in 2018.

16          And I want to pause there and just note, there's no

17  disagreement among the parties that the Toys R Us case is

18  directly on point.  The facts are squarely on four with what

19  Your Honor is confronting today.  So not only is the landlord

20  asking Your Honor to be the first court to rule differently and

21  break from precedent on these issues, but also to rule against

22  a case that considered these issues directly and decided in

23  favor of the debtors and Michaels.  And we think that's

24  important.

25          THE COURT:  Well, if they're saying that Toys R Us

45

1  got it wrong.  That's basically it, right.

2        MR. HERSHEY:  Yeah.  Look, Your Honor, I agree.  I

3  will note that <u>Toys R Us</u> is in line with a substantial body of

4  precedent.  There is not a single case that's been cited that

5  rules differently.  So I understand the landlord disagrees with

6  the case.  But all the body of the law that's been cited is in

7  line with <u>Toys R Us</u>.

8        I'll note, and Mr. Fiedler touched on this, it's not

9  just the case law that supports the debtors' and Michaels'

10 position, the Congressional record is crystal clear that what

11 Congress was seeking to protect was the landlord's bargain for

12 protections in its lease with the debtors.  That's why so many

13 of the cases that come out our way quote the Congressional

14 record, and I'm going to do the same.  Here's a quote.

15        "When an owner enters into a use clause with a retail

16        tenant forbidding assignments of the lease for a use

17        different than that specified in the lease, that

18        clause should be honored."

19        All right.  That was Senator Orrin Hatch in 2005

20 talking about the Bankruptcy Abuse Prevention and Consumer

21 Protection Act.  Here's another one.

22        "Congress decided that use or similar restrictions in

23        a retail lease, which the retailer cannot evade under

24        non-bankruptcy law, should not be evaded in

25        bankruptcy."

46

 1  Again, Senator Hatch focusing on the terms of the lease.

 2          And last, this is from the House report on the Act

 3  that I just mentioned.

 4          "Section 404(b) amends Section 365(f)(1) to assure

 5          that Section 365(f) does not override any part of

 6          Section 365(b).  Therefore, for example, assumption

 7          or assignment of a lease of real property in a

 8          shopping center must be subject to the provisions of

 9          the lease, such as use clauses."

10  Again, Congressional focus on the lease itself.  There is not a

11  single example I'm aware of of Congress focusing on anything

12  other than the provisions of the lease and the landlord's

13  bargain for benefits under that lease.

14          Now, there is one case that the landlord tries to

15  rely on in support of its argument under Subsection C, excuse

16  me.  That's the _Sears_ case.  And I'll just pause here and say

17  it must have been a very difficult decision by the landlord to

18  cite that case because _Sears_ completely supports the debtors'

19  and Michaels' position on Subsection D.  And for that reason,

20  I'll be coming back to _Sears_ momentarily when I get to

21  Subsection D.

22          But in the meantime, I want to note two things.

23  First, the landlord's reliance on _Sears_ isn't really based on

24  _Sears_' discussion of Subsection C.  It's based on _Sears_'

25  discussion of Subsection A and the sort of application of that

47

1  Subsection C, or that discussion, rather, to C.  There's no

2  basis for that in the Sears decision.  The Sears decision never

3  says and this analysis should be applied to Subsection C.  In

4  fact, the Sears analysis completely disclaims such an

5  application.  And I'll just read from that case where the Sears

6  court, and this is I can give Your Honor the pincite.  It's

7  613 B.R. 51, 78.

8         The Sears court refers to 365(b)(3)(A) as having more

9  stringent requirements and saying that it differs substantially

10 from how a use clause or restriction on assignment addresses

11 the landlord's ability to control the look and feel of its

12 property.  The Sears court also says, "The Bankruptcy Code,"

13 this is, sorry pincite 70, same case, "The Bankruptcy Code

14 cannot be read to place the landlord in a better position than

15 it would have occupied absent the bankruptcy."

16        And that's actually a good segue to the point I want

17 to make about what the law should be, right.  The landlord's

18 position in bankruptcy and outside of bankruptcy.

19        Let's look at how things would work if the landlord

20 had its way, okay.  There's no dispute that outside of

21 bankruptcy, this lease could be assigned to Michaels.  There's

22 no provision limiting the assignment right of Bed Bath & Beyond

23 to assign to Michaels.

24        THE COURT:  Other than the termination.

25        MR. HERSHEY:  Other than the termination provision,

48

1  which is --

2          THE COURT:  But that's a pretty big other, isn't it?

3          MR. HERSHEY:  Well, fair enough, Your Honor, except

4  to note that focusing specifically on the use provisions, which

5  I think are what's relevant here because the termination right

6  doesn't apply in bankruptcy, I think that's what we have to

7  look at, is what Congress intended for the exclusive

8  provisions.  That's what C focuses on, so let's look at that.

9          There's no use provision, no exclusive use provision

10  that would limit the assignment to Michaels.  Now, under the

11  landlord's perspective, if the landlord had its way, the

12  debtors would be limited in their ability to assign their lease

13  not just by the terms that they negotiated and agreed to, but

14  by the terms of every other lease in the shopping center that

15  they had no part in negotiating and never agreed to.  And in

16  fact, in this case, were negotiated and agreed over a decade

17  after the debtors negotiated their lease.

18          Not only that, these are terms that the debtors do

19  not know and cannot know.  They are confidential, commercially

20  sensitive terms in lease agreements that are not public and are

21  not made public.  And we know this firsthand because when this

22  dispute started, we asked the landlord for a copy of the Hobby

23  Lobby lease, and they refused.  And when we pressed, they gave

24  us this, which is on the docket.  This is the redacted copy of

25  the Hobby Lobby lease.  Pages and pages of redactions of terms

1 that we still don't know and we can't know, right, but that the

2 landlord might come forward and say, actually, there's this

3 term that you had no way of knowing about, that's secret and

4 confidential, but that bars you from making this assignment.

5      THE COURT:  But I mean, if there was something in

6 there that supported their position.  If there was, for

7 example, if there was a use restriction in there or some other

8 term that indicated that, for example, Bed Bath & Beyond had

9 agreed to it, or they had to go get their consent or something

10 like that, I would --

11      MR. HERSHEY:  Well, presumably, Your Honor, if we

12 agreed to the term, we would know about it or we'd be subject

13 to it.  We would say, if we, for example, had in our lease a

14 clause that said, "This lease is subject to all future

15 exclusives," right, we would be saying, we may not know what

16 those exclusives are, but we're subject to them.  There's

17 nothing like that here.  We have no ability -- we've never

18 agreed to those terms.  We have no ability to know them.

19      And I get it.  I mean, the last thing a landlord

20 wants is for one tenant to know what's in another tenant's

21 lease.  It makes perfect sense why these would be secret and

22 confidential.  But what the landlord is arguing is that debtors

23 effectively go into bankruptcy blind giving up their rights

24 under their lease and making themselves subject to all other

25 leases not knowing what those leases say.  That cannot be what

1  the law is.

2         And to be clear, we're not talking about a small

3  number of terms that the debtor makes itself subject to.  I

4  want to turn back, actually, to the language of the statute,

5  which I read, which says that the assignment must comply with

6  certain terms and, here I'm going to quote, "including but not

7  limited to, provisions such as radius, location, use, or

8  exclusivity."

9         So that's four specific terms, "radius, location,

10 use, and exclusivity," that the landlord claims it can rely on

11 to block an assignment, but it's not limited, right.  It's

12 "including, but not limited to."  There's a potential infinite

13 number of terms that the landlord can come into court and say,

14 because this term is in another lease that the debtor never

15 agreed to, never negotiated, didn't know about, we are able to

16 block the assignment.

17        And here's where things get a little interesting.

18 The landlord argues in its surreply, and Mr. Fiedler touched on

19 this, that only the leases in the power center, which is a 12-

20 store subset of the 100-store promenade, can be used to block

21 the assignment.  And we all know why the landlord made this

22 argument.  Because the landlord doesn't want to make the

23 extreme argument.  There are hundreds of leases with hundreds

24 and hundreds of terms that it could rely on.  It wants to try

25 to limit its position to focus just on 12 because the Court may

51

1  be more likely to agree if the position is less extreme.  I

2  have three responses to that.

3        And the first is that even if we were just talking

4  about 12 other leases, based on the four non-exclusive terms in

5  the statute that I just read, that's about 50 terms still that

6  the landlord could come into Court and argue, any one of which

7  blocks the assignment.  But second, the landlord is simply

8  wrong.  As Mr. Aronoff acknowledged in his deposition, and as

9  clear in the terms of the lease, and I'll read the lease,

10  Section 1134 says the following, creates the defined term

11  shopping center.

12        And it says, "The shopping center, known as Pinnacle

13  Hills Promenade, located in Rogers, Arkansas, consists of two

14  retail shopping centers, which shall be operated as a single

15  integrated shopping center.  One, the so called big box center,

16  in which the premises shall be located, containing

17  approximately, whatever, square feet.  That's called the power

18  center.  And, two, the regional outdoor mall anchored by

19  certain stores designated the promenade."  Okay.

20        The lease makes crystal clear that as far as the

21  plain terms of the debtors' and the landlord's agreement are

22  concerned, there is just one shopping center, and all of these

23  terms apply to that shopping center with 100 plus stores.  And

24  the last thing I'll say on this point is that, regardless of

25  the legal distinction under the lease between the 12-store

52

1  power center, the 100-store promenade, it's really irrelevant,

2  because whatever this Court rules doesn't just apply to this

3  case.  It applies to every case.  As we note in our brief, the

4  result of the Court ruling in the landlord's favor is that

5  debtors will have fewer rights in bankruptcy than they would

6  have out of bankruptcy.

7          Out of bankruptcy, as I said, and subject to I

8  understand the termination provision, but just focusing on the

9  use provisions, there's no dispute that a tenant's ability to

10  assign its lease is based solely on the terms of its lease, and

11  the terms of other leases to which it is not party are

12  irrelevant.  But in bankruptcy, according to the landlord, all

13  that changes.  In bankruptcy, even if the debtors' lease had no

14  provision that would preclude a proposed assignment, as is the

15  case here, the landlord can step forward and say, "Sorry.

16  Lease Number 67 has this term that prevents the assignment."

17  Or, "Sorry.  Lease Number 114 has this term, and you can't make

18  the assignment."  That's not what the law is.  It's not what

19  the law should be.

20          I'm going to turn quickly to Subsection D.  I think I

21  can be brief here.  I'm going to touch on the evidence,

22  although I think Mr. Fiedler did an excellent job with it, and

23  I'm going to largely rest on his discussion of the evidence.  I

24  also think the parties have sort of moved on from the evidence.

25  As Your Honor observed, we were supposed to have a big

53

1   evidentiary hearing.  That's not what happened today.  And I

2   think the reason for that is really this is about the law, and

3   that's always been Michaels' position, and I think the cases

4   bear that out.

5          And in terms of the law, the best place to start is

6   the Sears case because the landlord relies on that case, and I

7   don't think the landlord can credibly argue that the Sears

8   court got it exactly right on one subsection of 365(b)(3), but

9   exactly wrong on another section of 365(b)(3).  And on

10  Section 365(b)(3)(D), Sears completely supports the debtors'

11  and Michaels' position.  And I'll just read from that case.

12  This is at pincite 74.

13          "Put more generally, where there are few or no use

14          restrictions on a demised premises,"

15  I want to pause and just focus on use restrictions, because

16  that's what the Court considered, not other terms, not related

17  to use restrictions, but use restrictions.

18          "[A]nd the assignee agrees to be bound by whatever

19          restrictions do exist,"

20  as the (indiscernible) has here,

21          "[A] court may deem the adequate assurances under

22          365(b)(3)(D) to have been given."

23  That's it.  Right.  The focus is on the lease, the use

24  restrictions in the lease, and whether those are satisfied.

25          And there is no dispute that with respect to the use

54

1  provisions here, those are satisfied, and therefore so is

2  365(b)(3)(D).

3       Now, <u>Sears</u> also does a very good job, and I want to

4  note this, distinguishing the one case the landlord identifies

5  in support of its position on Subsection D, and that's the

6  <u>Federated Stores</u> case, which is out of Ohio from 1991.  And

7  what <u>Sears</u> observes is that the landlord's ability in that case

8  to block the assignment under Subsection D was based not on

9  protections the landlord received or bargained for under the

10 debtors' lease, but rather under the debtors' plan that of

11 course was entered into subsequent to the lease, and obviously

12 that's not the case here.

13      Now, with regard to the evidence, I want to make just

14 one point.  I think I have to address the Powers declaration.

15 We're not putting it into evidence today and I just didn't want

16 to not say anything about it.  But what I do want to note is

17 that I don't think we even need it in evidence because the

18 Elliott declaration submitted by the landlord basically puts

19 everything in the Powers declaration into evidence for us.  And

20 in particular, what the Elliott declaration shows is that

21 Michaels and Hobby Lobby coexist in dozens of shopping centers,

22 in some cases, right next door to each other.

23      The last thing I want to touch on is I want to

24 address the landlord's alleged damages that it claims it will

25 incur from the assignment to Michaels, which, by the way, are

1 damages that it bargained for and it agreed to under the Hobby

2 Lobby lease.  But look, in the first instance, I would note

3 that those damages are illusory.

4        Under the Hobby Lobby lease, as long as the landlord

5 makes good faith efforts to object to the assignment, damages

6 cannot be enforced.  Moreover, Mr. Fiedler, and I know Your

7 Honor discussed this, the <u>Toys</u> case expressly addressed this

8 issue and held that if the Court enters an order approving the

9 assignment, then the landlord is not in breach.

10        Second, the landlord's alleged damages, even if real,

11 are simply irrelevant.  There is no provision of the Code that

12 instructs the Court to consider those damages.  And I don't

13 mean to be glib here, but as Judge Glenn of the Southern

14 District once said to me, sometimes in restructurings, people

15 get restructured.

16        There are hundreds, thousands of unsecured creditors

17 in this case who are recovering pennies on the dollar.  There

18 are lots and lots of people who could stand up before Your

19 Honor and complain about what's happening to them in this

20 bankruptcy case.  And it happens every day of every week of

21 every month of every year in this building.  That's bankruptcy

22 court.  It's just how it is.

23        Now, the Bankruptcy Code does provide certain special

24 protections to landlords, and those provisions should be

25 enforced.  But what the Court should not do is create new

56

1  protections that have no basis under the law and that impede

2  the ability of debtors to restructure, as the landlord seeks to

3  do here.

4          Thank you.

5          THE COURT:  But isn't the argument that, the whole

6  argument is it's not a new protection, it's what it says.

7  That's the whole argument.

8          MR. HERSHEY:  Well, that no court has ever found to

9  exist.  I mean, that's why it's new.  Yeah.  Yes, Your Honor.

10 No court has ever found this.  The Congressional record doesn't

11 indicate it.  That is the basis for my saying it would be a new

12 protection for this Court to break new ground and break from

13 precedent, frankly.

14         THE COURT:  Okay.  Thank you.

15         MR. HERSHEY:  Thank you, Your Honor.

16         THE COURT:  Mr. LeHane.

17         MR. LEHANE:  Good afternoon, Your Honor.  Robert

18 LeHane, Kelley Drye and Warren, on behalf of Pinnacle

19 Hills LLC, the landlord at Rogers, Arkansas, and also Daly City

20 Serramonte Center, the landlord at the Serramonte Center.

21         Your Honor, it's been briefed extensively.  Just

22 heard a lot from Mr. Fiedler and Mr. Hershey.  The essential

23 summary of our argument, I think they've stated it well, and

24 you, I think, understand it as well.  Our view is the proposed

25 assignment to Michaels will breach use restrictions in two

1  other tenant leases in the shopping center, Hobby Lobby and

2  Dollar Tree.

3         And, Your Honor, those are protected leases.  The

4  fundamental disagreement here is, A, that the statute, we

5  believe, is absolutely clear.  We don't think you need to go

6  beyond the plain meaning of the statute.  We think the Third

7  Circuit is very clear on that in the case law.  We also think

8  it's important to note, the Third Circuit in <u>Joshua Slocum</u>

9  pointed out, this is a very heightened burden.  But since the

10 debtors and Michaels have spent a tremendous amount of time on

11 legislative history, we think it's important then for us to

12 visit the legislative history.  So I want to talk about the

13 plain meaning, the legislative history, and common sense, Your

14 Honor.

15        So, with respect to tenant mix and balance, common

16 sense just tells you when you put the number one competitor one

17 door down from its competitor in a specific arts and crafts

18 retail chain, that you're going to disrupt the tenant mix and

19 balance in that power center.  I'm happy to talk about the

20 shopping center and whether we're defining one larger shopping

21 center that the lease clearly says is two shopping centers

22 later.

23        THE COURT:  But when you say that, it's clear that --

24 but there is evidence that not only that sometimes it's better

25 to have competitors next to each other, but also that, in fact,

58

1  there's at least two that I recall from Ms. Elliott's

2  declaration that say they're adjacent to each other, Hobby

3  Lobby and --

4           MR. LEHANE:  Right.

5           THE COURT:  -- Michaels.

6           MR. LEHANE:  Right.  Well, I'd like to discuss that

7  when we discuss tenant mix, but I would also submit that tenant

8  mix is about this shopping center, not any other shopping

9  centers.  For that reason, Powers declaration was irrelevant.

10 We went through it because it would have been put in evidence,

11 but it's not relevant to the analysis of this shopping center

12 and tenant mix in this shopping center.

13          But, Your Honor, I think it's helpful to actually

14 look at what we're talking about here and take a look at it.

15 So, what we have here is the Pinnacle Plaza is a 12-store power

16 center that's circled in blue, and it's in the upper right hand

17 corner.  And the promenade is below that, you have the

18 promenade, and it's a much larger number of stores.  If it

19 would help Your Honor, I have this also in paper, so you could

20 look at it on paper.

21          But, the power center is made up of those stores.

22 Bed Bath & Beyond is highlighted in yellow.  There's T.J. Maxx

23 in the middle, and there is the Hobby Lobby store right next to

24 it.  And there are nine other stores in that separate power

25 center, a shopping center, and as the only evidence we have on

59

1 that is from Jeffrey Aronoff, from Senior Vice President, who

2 was involved in this whole project.  He's been there.  He has

3 personal knowledge.  And he specializes in optimizing the

4 tenant mix and balance in shopping centers.

5        This is treated as a shopping center.  Promenade is a

6 shopping center, and, yes, Mr. Hershey read into the record

7 exactly what the lease says.  There's two shopping centers that

8 they operate as one integrated shopping center.

9        THE COURT:  So I'm supposed to effect the plain

10 language on 365(b)(3)(C), but not in the lease?

11        MR. LEHANE:  And the lease as well because the lease

12 says there's two shopping centers that we're going to treat as

13 one integrated shopping center.

14        THE COURT:  As one integrated.

15        MR. LEHANE:  Yeah.

16        THE COURT:  And the parties agreed to it.  That's not

17 even a -- that one I have a hard time with because there's an

18 agreement that it's one integrated center.  So why would they

19 agree that is one integrated center when that's an issue in

20 every shopping center case?  It's used to be an issue, but then

21 landlords dealt with it by saying, this is a shopping center

22 and you got to agree to that, right.  So I'm having a hard time

23 with that.

24        MR. LEHANE:  Okay.  Do you want me to address tenant

25 mix right now?  Or can I go through --

1          THE COURT:  I mean, I think you are addressing it

2    because you're telling me that I've got to consider just the

3    power center, even though that's not what the lease defines as

4    an integrated shopping center.

5          MR. LEHANE:  Well, let me try to encapsulate the

6    argument on that and then I want to walk through this as well.

7          It's the debtors' burden to show that there will not

8    be any disruption in tenant mix and balance in the center and

9    the evidence doesn't show that.  In fact, the evidence shows

10   the opposite.  Both Mr. Aronoff and even Mr. Amendola admitted

11   there will be an impact and there will be a disruption in

12   tenant mix and balance.  It's in both declarations.  So not

13   only do the debtors not have any evidence showing that there

14   will not be any disruption, but the evidence to the contrary

15   shows that there will be a disruption in the tenant mix and

16   balance in the shopping center.

17         So I think the debtors have not met their burden with

18   regard to tenant mix and balance.  It is the debtor's burden

19   and they simply haven't met it.  And common sense says that if

20   you put the number one retailer in arts and crafts one door

21   down from its number one competitor, there's going to be a

22   disruption.  The other evidence, I believe, that this will

23   disrupt the tenant mix and balance is the fact that the two

24   other tenants in that portion of the shopping center have

25   specific provisions in their leases saying that this is a

1 protected use or a prohibited use would be to allow either an

2 arts and crafts retailer specialized in that within this part

3 of the shopping center, the power center, or expressly,

4 Michaels is expressly a prohibited use under the Dollar Tree

5 lease.

6　　　　　THE COURT:  What did Bed Bath & Beyond know about

7 that?

8　　　　　MR. LEHANE:  Bed Bath & Beyond didn't know anything

9 about it, Your Honor.  That's a great question.  It was

10 executed 15 years before these two other leases were entered.

11 And that gets to the question of the balance between what the

12 shopping center protections did when the Code was enacted in

13 1978, and how the 1978 Bankruptcy Code drastically changed the

14 rights of landlords after the bankruptcy had been filed.

15　　　　　So I think it's important, since we're talking about

16 legislative history, to keep in mind, prior to 1978, Your

17 Honor, the lease provisions that said if the debtor files for

18 bankruptcy, I can terminate my lease, that was enforceable.

19 And all the anti-assignment provisions in the leases were

20 enforceable.  So, the Bankruptcy Code does a wonderful thing

21 for debtors and the debtors have done a good job of that here.

22　　　　　They have managed to dispose of over 200 leases.

23 They've brought in $65 million.  They've closed on 135 lease

24 assignments.  I think that utterly contradicts their worries

25 that if you read the statute as it's written, as we believe

62

1    it's interpreted, you'll have absurd results.  It's belied by

2    the results that have already been achieved in this case.

3          But let's also talk about what Congress did when it

4    passed the Bankruptcy Code in 1978 and it put 365 in place and

5    it took out the *ipso facto* provisions in leases and it took out

6    the anti-assignment provisions in leases.  It also very

7    specifically and very intentionally protected shopping centers.

8    Not just the landlords, Your Honor, but all of the participants

9    in the shopping center system.

10          It expressly protected the other tenants, the solvent

11    tenants.  And it also protected the lenders.  Other parties

12    than the debtor and the landlord are protected.  Let's look at

13    a couple snippets from the actual Congressional record from the

14    Shopping Center's Protections Improvements Act of 1982.  The

15    title of the Act was designed to protect all of the

16    participants in the shopping center.  Why?  Because shopping

17    centers were an incredibly important part of the American

18    economy and they remain so.

19          In 1978, there was approximately tens of thousands of

20    shopping centers.  Now, there are more than 100,000 shopping

21    centers in the country.  Congress said, shopping centers are an

22    important sector of U.S. retail trade.  The linchpin of the

23    entire operation is the freely accepted and openly negotiated

24    contractual agreements among the parties.  While the operation

25    of the bankruptcy law necessarily alters contractual

63

1  relationships, these alterations have direct and potentially

2  crippling impacts on other shopping center businesses and

3  consequently must be strictly limited and minimized.

4        They also said that Congress recognized and sought to

5  deal with the potential harm to shopping centers and their

6  solvent tenants, which arise when one tenant becomes bankrupt.

7  They weren't talking about what happened when the lease was

8  initially entered into, they were talking about protecting the

9  tenants in the shopping center when one tenant files for

10 bankruptcy and goes to assign the leases.

11       THE COURT:  But which way does this cut, Mr. -- this

12 is the first time I'm seeing this, I think.  I don't know if

13 this was in the papers.  Was this in the papers?

14       MR. LEHANE:  We cited to the Congressional record and

15 we cited to the legislative history in the paper, Your Honor --

16 in our papers, and we'll go back to that.  But --

17       THE COURT:  But which way does this cut?  It says,

18 "The linchpin of this entire operation is freely accepted and

19 openly negotiated contractual agreements among the parties."  I

20 mean --

21       MR. LEHANE:  And then, what it goes on to say,

22 though, is that to the extent the Bankruptcy Code is going to

23 alter the contractual relationships, which it does to the

24 landlord by removing, as you've noted, its right to terminate

25 these leases, right, it must do so in a way that minimizes the

64

1   harm and is strictly limited.  And there's another quote that

2   says, when the trustee is unable to find a lease that can be

3   assumed and assigned without violating use provisions, then the

4   lease should revert to the landlord.

5        So I think we'd like to also walk through adequate

6   assurance of future performance.  And this is part of the

7   Bankruptcy Code since inception.  And 365(b)(1) starts with

8   that it's the debtor's burden to provide adequate assurance of

9   future performance at the time of the assumption of the lease,

10  right.  So this adequate assurance is now.

11       And then 365(b)(3), we've talked about them a lot, A

12  through D, those are the specific, that's the heart of the

13  shopping center protections.  And A and B, Your Honor, really

14  go to the relationship between the landlord and its debtor,

15  right.  A is that the source of rent must be assured and there

16  will be similar financial condition and operating performance

17  between the assignee and the debtor at the time the lease was

18  entered into.  And B says there'll be no reduction in

19  percentage rent.  C and D, Your Honor, go to protection of the

20  other tenants and they have since the inception of the Code.

21       Let's look at what 365(b)(3)(C) looked like when the

22  Code was first passed in 1978.  It was only one clause.  And

23  what it said was that "Assumption or assignment of the lease

24  will not breach substantially any provision, such as radius,

25  location, exclusivity, in any other financing agreement or

1   master agreement or lease relating to such shopping center."

2          It was only one clause, and it only protected the

3   other tenants in the shopping center.  That was the 1978

4   version of the Code.  There was a problem.  Some debtors were

5   arguing that this assignment, even though it will reach the

6   terms of my lease with the debtor, a use, a radius or

7   exclusivity provision, since it won't breach any other leases

8   in the shopping center, then I can go forward and have this

9   assignment and the Court can ignore the provisions in the

10  debtors' lease with the tenant as anti-assignment provisions.

11         So in 1984, the Code was amended to deal specifically

12  with that problem.  And when it did so, it specifically said in

13  the legislative history, the debtors are ignoring the terms of

14  their own leases and arguing that they're only required to

15  comply with the other non-debtor leases.  So the solution was

16  to break this provision into two clauses and make sure that in

17  connection with an assignment that the assignment can't breach

18  the terms of the lease between the landlord and the debtor and

19  similarly, will not breach any such provision with any other

20  lease financing arrangement or agreement relating to such

21  shopping center.

22         THE COURT:  I didn't see any case that -- and maybe

23  you can tell me otherwise.  I didn't see any case pre-'84 or

24  after '84 that cited to a provision in a lease to which the

25  debtor was not party, or a master agreement to which the debtor

1  was not party, or a financing agreement to which the debtor was

2  not subject, that said, this is how it works.

3        MR. LEHANE:  Well, we would submit, Your Honor, that

4  the plain language of this statute is so clear that it's never

5  before been litigated to final decision until <u>Toys R Us</u> in

6  2018.  That's really the only decision.  And as we've pointed

7  out at length in our briefs, the <u>Toys R Us</u> decision is deeply

8  flawed.

9        First, it relies on <u>Trak Auto</u>.  Your Honor, <u>Trak Auto</u>

10 didn't deal with other leases.  It dealt with the lease that

11 the debtor had with the tenant and it went in favor of the

12 landlord because the debtor tried to assign a lease to someone

13 that was not an auto supplier.  <u>Trak Auto</u> was an auto supplier

14 and that lease said you have to be an auto supplier in order to

15 use this.  And so <u>Trak Auto</u>, in favor of the landlord.  It does

16 not support the logic of the <u>Toys R Us</u> decision.

17       *In dicta* in that, <u>Trak Auto</u> talks about <u>Ames</u>.  And

18 unfortunately, the <u>Ames</u> decision that they refer to was also

19 not about 365(b)(3)(C).  So, <u>Toys R Us</u> also ignores the whole

20 second clause.  We really believe it's a deeply flawed decision

21 and it's not binding on this Court.

22       THE COURT:  Okay.  So you're saying it's just because

23 it's so clear, it's not litigated.

24       MR. LEHANE:  It hasn't been litigated.

25       THE COURT:  Okay.

67

1          MR. LEHANE:  So there's also the common sense portion

2     of it and what Congress was clearly trying to do in the

3     legislative history was protect all of the participants in a

4     shopping center, not just the landlord.  And we've heard

5     argument that it's only protecting agreements with the

6     landlord.  Financing agreements, Your Honor, are oftentimes the

7     agreements between the landlord and its lender.  And they

8     may --

9          THE COURT:  Right, and they're recorded.

10         MR. LEHANE:  Right.

11         The debtor wouldn't be -- no tenant would be a party

12    to a financing agreement between the landlord and its lenders.

13    But those are also protected agreements.  There also may be

14    reciprocal easement agreements.  The Three A's Holdings case is

15    a good example, and there's others, where the agreement that's

16    being referred to that can't be breached is some zoning

17    agreement, agreement with adjacent property owners, or a

18    municipality stating -- the debtors have nothing to do with

19    those.  The tenants don't enter into those agreements, the

20    landlord does.

21         THE COURT:  But in Three A's, it was a restriction to

22    which the debtor was subject.  And the financing agreement

23    either would be recorded or would be disclosed in the lease as

24    saying this is a restriction in the use, so therefore, you

25    can't do it.  So, that's different than any other lease

1  being -- any lease that is entered into 14 years later, or a

2  lease that the debtor doesn't know anything about, and it's

3  troubling to me.

4          I'll be completely forthright.  The plain language

5  argument, I get it.  It's a good argument.  And this argument

6  is a good argument, too.  The debtors' argument and Michaels'

7  argument is a good argument also.  I think they're good

8  arguments both ways.  I guess I'm having a little bit of

9  trouble with a fundamental fairness kind of issues to how you

10 make somebody subject to the terms of a contract with somebody

11 else that you have no knowledge of.  It's hard to -- there was

12 discussion of common sense on the mix.  This gets into common

13 sense as well.

14         MR. LEHANE:  Yeah.  And I think, Your Honor, the

15 answer to that is, though, that outside of bankruptcy, the

16 landlord still had the right to terminate these.  And maybe

17 there would have been some economic consequences or damages,

18 and outside of bankruptcy, they can weigh that.  They could

19 have said, hey, Michaels wants to move into the vacant Bed

20 Bath & Beyond space.  We're not in bankruptcy.  We will suffer

21 damages, our other tenants, Dollar Tree, and Hobby Lobby.  The

22 provisions in their leases allow them to assert damages us, and

23 they could weigh that.  But the Bankruptcy Code removes that

24 right, right.

25         THE COURT:  Let me ask you this, Mr. LeHane.  You're

1    a well regarded, experienced, knowledgeable landlord lawyer,

2    right.  And doesn't this look like, and I like looking at words

3    of documents and things like that.  When you look at the lease,

4    Pinnacle Hill Lease with Bed Bath & Beyond, it looks like the

5    landlord, with its really capable lawyers, negotiating and

6    using its bargaining power with respect to Bed Bath & Beyond,

7    which I think at the time was a very, very powerful and

8    desirable tenant, going back and forth on lease terms, and they

9    came up with a recognition that, you know what, we might put

10   these use restrictions in here and have these issues in here,

11   or these limitations in here, but if there's a problem and, for

12   example, in this case, some crazy bankruptcy court says you can

13   assign this anyway, as long as you fight it, I'm not faulting

14   anyone for using violation in the objection.

15          But to say violation in the lease, right, as opposed

16   to breach, it shall be a breach of the lease to assign to

17   someone outside the use restriction.  If it's to say a

18   violation is different than a breach and doesn't give right, it

19   wouldn't even give rise to any enforcement right because they

20   dealt with it and that was a function of the bargaining power

21   between the parties that Bed Bath & Beyond negotiated for a

22   freely assignable lease.

23          And the landlord said, yeah, I want to get you in

24   here and I got you in here and I had to give up the veto right,

25   I guess, over the use restriction.  But, A, I'm dealing with it

70

1  in this challenge provision and, B, then I can just go ahead

2  and enter into a contract or lease with Hobby Lobby and say,

3  you can't have one of the stores that was expressly permitted

4  by the assignment in the BBB Pinnacle Hills lease.

5          That's a lot.  Okay.  That's like --

6          MR. LEHANE:  I want to answer your question if I

7  can --

8          THE COURT:  Usually, to be subject to something,

9  you've got to agree to it.

10         MR. LEHANE:  Well, excuse me?

11         THE COURT:  To be subject to something, you have to

12 agree to it usually, right?  I mean --

13         MR. LEHANE:  True.  But I think it's important to

14 keep the background context.  The landlord had rights and only

15 the bankruptcy filing of Bed Bath & Beyond took those rights

16 away.  The Bankruptcy Code takes a bunch of rights away, but at

17 the same time it then protects the participants in that

18 complicated economic unit.

19         THE COURT:  And isn't the landlord protected?  So if

20 the Hobby Lobby lease was entered into before the Bed Bath &

21 Beyond lease and there was a use restriction that said you

22 can't have a Michaels in here in the Hobby Lobby lease, we

23 wouldn't be talking about this.  It would be over.  Right?

24         MR. LEHANE:  That's correct.

25         THE COURT:  We would be done.  The landlord

1  couldn't --

2          MR. LEHANE:  Wait, excuse me, in the Hobby Lobby

3  lease?

4          THE COURT:  I'm sorry?

5          MR. LEHANE:  In the Hobby Lobby lease, there is.  It

6  says you can't allow Michaels.

7          THE COURT:  I'm sorry.  In the Hobby Lobby lease

8  before the Bed Bath & Beyond.  If the timing was reversed,

9  right.  The timing was reversed.  Hobby Lobby is before --

10          MR. LEHANE:  Bed, Bath --

11          THE COURT:  -- Bed Bath & Beyond --

12          MR. LEHANE:  Certainly --

13          THE COURT:  And then, the Bed Bath & Beyond lease

14  says you can't, you can assign, but you can't assign to another

15  arts and crafts store.

16          MR. LEHANE:  Right.

17          THE COURT:  Then the landlord is fully protected with

18  respect to the benefit of its bargain, right?

19          MR. LEHANE:  Right.  But the landlord can only

20  protect the benefits of bargain to the extent it knows what its

21  shopping center looks like now.  And shopping centers are

22  dynamic places, right.  The leases don't all terminate at the

23  same time.  Things change over time, as evidenced by the Dollar

24  Tree lease and the Hobby Lobby lease, which have come in within

25  the last five years.  The situation now is drastically

72

1  different than it was 15 years ago when the Bed Bath & Beyond

2  lease was put in place.  And Congress specifically protected

3  the shopping centers now, at the time of the assumption, by

4  giving protections to those other tenants for the situation

5  now.  And I think that's the plain meaning of the argument.

6        You can drive down really deeply on breach versus

7  violation, but the plain reading and the way the statute was

8  originally written was this is going to protect the other

9  tenants against the failure of one tenant now, and the harms

10 aren't that tremendous and terrific.  I will say the original

11 bid that Michaels put in for this was $100,000, Your Honor, and

12 there has been exponentially greater amount of time spent on

13 that because the absurd results that have been suggested by

14 counsel for Michaels and the debtor, we would say are

15 contradicted by the tremendous results achieved to date.

16        Whereas, the Toys R Us decision we believe is wrong

17 and we believe following it would do extreme harm and undermine

18 the specific protections that Congress intended the other

19 participants in the shopping center industry to have.  And it's

20 a very careful balance.

21        And also, I'll say this.  There's a lot of, or not a

22 lot, but some mention by both Mr. Fiedler and Mr. Hershey that

23 there's nothing in the Bankruptcy Code that could otherwise

24 protect these landlords against these harms.  And that's just

25 absolutely incorrect as well.  There's a very broad provision

73

1 that says -- it's 363(e) -- anytime the debtor sells, uses, or

2 leases anything that another party has an interest in, the

3 bankruptcy court shall provide adequate protection to the other

4 parties with an interest in that property being used, sold, or

5 leased.

6       That's a very broad provision.  It's used in a lot of

7 other contexts, right, and the Bankruptcy Code weighs and

8 balances the harm when it's considering lifting the automatic

9 stay or considering the appointment of examiners.  It

10 oftentimes demands that the courts look to the potential harms

11 by what's going to happen.

12       Here we have a very specific provision of the

13 Bankruptcy Code.  Congress said you must protect the shopping

14 centers not just the landlords, but the other parties as well.

15 The financing agreements, the master agreements, and the other

16 leases in the shopping center.  And we think a very plain

17 language, common sense read is why there's very little

18 litigation on this.

19       I think if you read the decisions underlying Toys R

20 Us, they're deeply flawed.  And with respect to Sears, the

21 important point of Sears, that the district court said this is

22 a heightened standard, and the bankruptcy courts can't just

23 rewrite the standards that Congress put in place because they

24 don't like them.  And why it's relevant here is because, in

25 that case, it went to, A, it was the financial condition and

1   the judge found that transform is perfectly fine.  It's got a

2   net worth of $50 million, but he also found it is not of

3   similar financial condition to the debtor when the tenant

4   entered into this lease because when Sears entered into the

5   initial lease, it was one of the most powerful financial

6   companies in the world.  They just were not similar.

7            And the district court judge said you may be correct

8   that it is significant financial wherewithal, but that's not

9   what the Bankruptcy Code says.  And what the Bankruptcy Code

10  says is very specific and clear and you can't just rewrite that

11  to suit your purposes.  So we think that here it would be

12  suiting the purposes to let one narrow set of transactions go

13  through that really is a very small subset, even of the total

14  leases the debtors has tried to assign.  They've assigned 135

15  leases successfully.  We're hung up on three of them because

16  they fall within protections that Congress provided to the

17  Bankruptcy Code.

18           That's less than 5 percent of their total lease

19  assignments.  It's far less than the total amount of leases

20  that they had, Your Honor.  So, look, we understand that it's

21  very important for the debtor to maximize its value.  Both of

22  these clients are also creditors of the estate, right.  But it

23  is a liquidating company, right, and they are difficult

24  decisions.  We don't think that the need to maximize value

25  trumps the protections that Congress granted to the shopping

1  centers.

2          And in short, you --

3          THE COURT:  How about in the <u>Sears</u> case that I

4  thought -- I think that was Judge McMahon.

5          MR. LEHANE:  It was.  Colleen McMahon.  Correct.

6          THE COURT:  She went into a very, very detailed and

7  thoughtful discussion about D, and how -- which D runs --

8          MR. LEHANE:  The D argument --

9          THE COURT:  -- in all candor, completely contrary to

10 your C argument in a lot of ways, and your D arguments, because

11 you said you just got to look at it in the context of the

12 bargain between the debtor and the landlord.

13         MR. LEHANE:  But you need to have evidence that there

14 will be no disruption and she found there was no evidence of a

15 disruption.

16         Here, to the contrary, the only evidence that we have

17 is that there will be a disruption.  Not only from the

18 declaration of Jeff Aronoff, who specializes in tenant mix and

19 balance, right.  He worked on these properties specifically.

20 He's been there.  This is what Jeff Aronoff does, right.  And

21 he said there will absolutely be an impact, and a negative

22 impact, on the tenant mix and balance in the shopping center.

23         THE COURT:  But if you look at it in the context of

24 the Hobby Lobby Pinnacle, I mean, I'm sorry, Bed Bath & Beyond

25 Pinnacle lease, is it fair for Pinnacle Hills to get Hobby

1  Lobby as a tenant in part on the basis of the free

2  assignability clause, and then, 14 years later, enter into a

3  lease with a third party that they know nothing about, that Bed

4  Bath & Beyond knows nothing about, and then restrict that very

5  broad assignment provision?  Isn't that kind of having it both

6  ways?

7          MR. LEHANE:  They had the right to terminate outside

8  of bankruptcy, Your Honor, and --

9          THE COURT:  Yeah, but you know that that's one that's

10 not the 365(f) --

11         MR. LEHANE:  Right.

12         THE COURT:  -- and all that.  That's different.  But

13 you know, that the other, as far as the B and C and all that.

14 But I'm just having a bit of a more difficult time with that.

15 It just seems like an unintended benefit to parties that

16 were -- to the landlord who got the benefit of the tenant in

17 the first place, and then just eviscerates it by entering into

18 another agreement 14 years later that restricts the use in a

19 manner that wasn't contemplated by that lease.

20         MR. LEHANE:  Well, look, we think it's, in my mind,

21 it's commercially reasonable for them to say Bed Bath & Beyond

22 can use that for whatever they want to now, right.  But, and if

23 Bed Bath & Beyond changed its use, there was nothing that

24 Pinnacle Hills could have done or the Pinnacle power center.

25         THE COURT:  Arts and crafts.

77

1          MR. LEHANE:  Right.  Bed Bath & Beyond had an

2    unlimited lawful use, right.  But the point is, once you file

3    for bankruptcy, you stop paying rent, you can reject the lease,

4    completely breach it, right.  And our claims under that are

5    capped and we'll get paid whatever it is.  In this case, there

6    will probably be no return.  And we no longer have that right

7    to terminate.  That was really the protection they had, was to

8    say, if we're in a situation where the assignment is going to

9    breach these other two leases, we have the ability to say, hey,

10   Bed Bath & Beyond, you can't do that assignment.

11          And obviously, at that point, Bed Bath & Beyond has

12   decided they want out if they're going to assign it outside of

13   bankruptcy.  And the landlord and Bed Bath & Beyond, by that

14   15.1.2, are able to have that negotiation, essentially.

15          THE COURT:  So, if Bed Bath & Beyond just was doing a

16   reorganization and part of the reorganization was that they

17   were going to shift their focus from bed and bath to arts and

18   crafts, and Hobby Lobby was already there, right, Hobby Lobby

19   was already in there as an arts and crafts store.

20          MR. LEHANE:  We would have a very different

21   conversation going on, Your Honor, because if there's no

22   assumption in an assignment of the lease, right, and then I

23   believe that --

24          THE COURT:  No, I said assumption.  I said there is

25   assumption.

78

1          MR. LEHANE:  Right, but there's no assignment.

2          THE COURT:  Right.

3          MR. LEHANE:  Right, there's just assumption for

4   purposes of changing their use.  I think it's a very different

5   conversation.

6          Bed Bath & Beyond had almost unfettered use of the

7   premises, and that is different.

8          THE COURT:  Why?

9          MR. LEHANE:  Because there's no assignment and the

10  Bankruptcy Code is very clear about this.

11          THE COURT:  So what?

12          MR. LEHANE:  So you don't get your shopping center --

13          THE COURT:  If I do the plain language, right --

14          MR. LEHANE:  Yeah.

15          THE COURT:  If I do the plain language, wouldn't them

16  changing to the -- it says the assumption or assignment, it

17  doesn't say the assumption and assignment.  It says assumption

18  or assignment is subject to the provision of any other lease.

19  And the Hobby Lobby lease says you can't have another arts and

20  crafts store.  Why is that different?

21          MR. LEHANE:  Perhaps we would be -- I haven't

22  considered this one before, Your Honor.  I guess it is.

23  It's --

24          THE COURT:  It's not a bad argument.

25          MR. LeHANE:  It's not a bad one.  It's a good one.

1                            (Laughter)

2              THE COURT:  All right.

3              MR. LeHANE:  And, look, going to 365(d)(3) to tenant

4    mix to (d), it used to say substantial disruption.  It doesn't

5    anymore.  They amended it, right.  It's now any disruption, and

6    it's their burden to show that there will not be any

7    disruption.  And I think the evidence that we have shows that

8    there will be a disruption.  So as a result, I think the

9    assignment also fails on the tenant mix arguments.

10             THE COURT:  Okay.  All right.

11             MR. LeHANE:  You know, Your --

12             THE COURT:  I appreciate that.  I thank you.  Well, I

13   guess parties wanted some rebuttal, and we'll get to 12:20.  So

14   I don't know what the plan is with regard to the other leases.

15   Can you help me on that?  Is that --

16             MR. LeHANE:  So I think I probably can from my

17   perspective, Serramonte Center.  We also represent Daly City

18   Serramonte Center.  And many of the arguments are almost

19   exactly the same.  There may be some nuance to them, and

20   counsel for Burlington or the debtors may want to make some.

21             But those are -- you have competitors, Burlington,

22   Ross.  And the Ross leases, it's undisputed that they have

23   provisions in them which say you can't operate a certain

24   percentage of the square footage in this center as a discount

25   retailer, and that's what Burlington would be operated as.  So

80

1  the argument is you'll be breaching these.

2          Now there's some nuance to those, but I think the

3  larger arguments are the same, that Congress was protecting the

4  landlord and the shopping center and the other tenants.

5          THE COURT:  Even if they didn't have an agreement?

6          MR. LeHANE:  Right.  Yeah.

7          THE COURT:  Debtor.

8          MR. LeHANE:  Yeah, I think --

9          THE COURT:  Or warrants subject to something that's

10 --

11         MR. LeHANE:  That's right.

12         THE COURT:  -- runs with the land --

13         MR. LeHANE:  Right.

14         THE COURT:  -- like a master -- like the reciprocal

15 --

16         MR. LeHANE:  Yeah.

17         THE COURT:  -- easement agreement and/or restrictive

18 covenants or a master agreement or -- well, that might not run

19 with the land.

20         MR. LeHANE:  Yeah.

21         THE COURT:  But a financing agreement, that kind of

22 thing.

23         MR. LeHANE:  Can you put the one other slide up,

24 Phil?

25         There is one quote from the congressional legislation

81

1    that we think is, it's actually exactly the same hypothetical

2    that we have here where the legislative history says if you had

3    a women's wear store assigned to a men's wear store, that could

4    have a negative impact on the other men's wear stores in the

5    shopping center and we're protecting against that, that with

6    both (c) and (d).

7             So certainly appreciate it, but the similarities

8    between the arguments, Serramonte lease also has the right to

9    terminate.  The 15.2.1, it's almost exactly identical, right.

10   And it would clearly breach the Ross exclusive protective use

11   provision.  Happy to answer any other questions on that.

12            THE COURT:  I asked you enough questions.

13            MR. LeHANE:  All right.  Thank you, Your Honor.

14            THE COURT:  Thank you.

15            MR. MAIRO:  Your Honor, for the record, John Mairo of

16   Porzio Bromberg & Newman on behalf of the Landlord DPEG

17   Fountains, LP.  Are we going to conclude with the Pinnacle

18   arguments and then turn to Serramonte and DPEG?  That's how I

19   understood it.  Or are we trying to do it all in one enchilada?

20            THE COURT:  Well, I think that's exactly the question

21   I had.  And I think what Mr. LeHane said is that it's really

22   the same arguments with Serramonte, just perhaps some nuances.

23   So I think the rebuttal, unless you're going to just tell me

24   that you agree with what Mr. LeHane said and then that would be

25   for rebuttal for them, I guess.  Unless you want to make new

82

1 and different arguments.

2        MR. MAIRO:  I certainly want to argue for DPEG

3 Fountains some different arguments.  I don't know if it makes

4 sense to do it now or let them rebut to the Pinnacle and

5 Serramonte.

6        THE COURT:  I think we might as well just finish

7 Pinnacle right now, so yeah.

8        MR. FIEDLER:  Okay, Your Honor.  I'll be fairly quick

9 here.  Just --

10       THE COURT:  Everybody says that.

11       MR. FIEDLER:  Yeah.  Just a few points on rebuttal.

12       Mr. LeHane talked about common sense at the outset.

13 Not common sense to put the number one competitor next to each

14 other.  I don't know if they're the number one competitor, but

15 the landlord acknowledges in Ms. Elliott's declaration that it

16 happens all the time.  At least 19 times and perhaps 30 times

17 are they next to each other.

18       And so I think the common-sense argument in that

19 respect is a little far-fetched.  I will also say there was

20 nothing prohibiting Hobby Lobby from entering into an amendment

21 with the landlord right when Bed Bath filed to add every

22 exclusive under the sun under its lease just knowing that Bed

23 Bath might assign its lease out to another party.

24       And so it would be unfathomable to think that the

25 debtors would be bound by an amendment to that lease that adds

1    say 100 exclusives including every other store that Bed Bath or

2    Bed Bath was seeking to assign to a new tenant.  And so common

3    sensically, I don't think we should be binding the debtor to a

4    lease that is subsequent in time and which the debtor had no

5    clue was entered into.  That's the first point on common sense.

6         The second point is on tenant mix.  The landlord

7    asked the Court to look to the Power Center and not the

8    shopping center.  And I think the inquiry ends right there.

9    The shopping center is clearly defined in the lease as one

10   integrated shopping center that includes the Power Center and

11   the Promenade.  And it would be one thing if the landlord said

12   the tenant mix and the Power Center will certainly be upset but

13   the tenant mix and the whole shopping center will be upset, as

14   well.  They didn't do that.

15        As Mr. Aronoff made clear in his testimony in his

16   declaration, it wasn't even part of the discussion to address

17   the shopping center.  They only addressed the Power Center, and

18   there's a reason for that, because there was no intent behind

19   tenant mix and use for the entire shopping center.  And even if

20   there was, the landlord can't prove that it's disrupted by

21   adding Michaels.

22        I will also say, Your Honor --

23        THE COURT:  What about I think he said that you don't

24   have any evidence that the tenant mix won't be disrupted?

25        MR. FIEDLER:  Well, I think there's a wealth of

84

1   evidence, Your Honor.  First, the idea that there are over a

2   hundred stores in the shopping center and the landlord admits

3   that there's only one that is engaged in a craft item-oriented

4   business and that's Hobby Lobby.  The other potentially being

5   Dollar Tree, the landlord couldn't even confirm if that was a

6   craft-oriented business.  And granted, they do sell craft

7   items, but there are several other stores in the shopping

8   center that sell the same exact items.

9         Further, there's nothing in the lease or in a master

10  agreement relating to the shopping center that specifies some

11  intent to get to tenant mix and balance.

12        THE COURT:  There is a master agreement?

13        MR. FIEDLER:  There is not.

14        THE COURT:  No.

15        MR. FIEDLER:  And that's my point, Your Honor.

16        THE COURT:  I thought you said there's nothing in the

17  lease or the master agreement.

18        MR. FIEDLER:  Or a master agreement.  There --

19        THE COURT:  There's no --

20        MR. FIEDLER:  There is no --

21        THE COURT:  There's nothing in the lease and there is

22  no master agreement.

23        MR. FIEDLER:  That's right.

24        So tenant mix requires an intended tenant mix.  And

25  there's a great example for why context matters and why that

85

interpretation should be applied to 365(b)(3)(C).  Tenant mix

does not exist in a vacuum, and a court can't decide what

selection of stores is an ideal tenant mix.  And I think the

evidence shows that the landlord can't prove there's an ideal

tenant mix, it can't prove there's a tenant mix that was

intended.  And I think the evidence shows that there is no

tenant mix that is being upset here.

        THE COURT:  But that's not their burden.  The burden

is on the debtor to show that there's no disruption to the

tenant mix.

        MR. FIEDLER:  That's right, Your Honor.  I think the

Amendola declaration proves that.  I think the directory that

we submitted to Your Honor shows that.  And there's nothing in

the landlord's deposition or testimony that would show any

disruption to the tenant mix in the shopping center.  They're

only talking about a subcollection of stores in the Power

Center.  And that's just tenant mix.

        I will say and want to address the point which is

what we were discussion not too long ago about it being black

letter law that you can't modify a lease subject to certain

exceptions.  What the landlord is asking you to do, Your Honor,

is place additional restrictions in the Bed Bath lease that it

didn't negotiate or ask to negotiate in the lease it executed

or any subsequent amendment.  So rewriting the lease to put an

additional restriction on the debtors' ability to assign it is

1 not appropriate.

2          While the Bankruptcy Code does allow the modification

3 of certain contracts, it doesn't do so in favor of non-debtor

4 parties, as the Court ruled in <u>Bon Ton Restaurant & Pastry Shop</u>

5 in the Northern District of Illinois, "It is not intended that

6 a non-debtor party should acquire greater rights in a case

7 under the Code than he has outside of the Code.  A lessor

8 cannot insist that bankruptcy law give him what the lease

9 itself does not."

10          And I think that --

11          THE COURT:  I don't remember that case.  Was that

12 case cited to me?

13          MR. FIEDLER:  It's 53 B.R. 789, Your Honor, 1985 out

14 of Northern District of Illinois.

15          THE COURT:  What was the name of it?

16          MR. FIEDLER:  <u>Bon Ton Restaurant & Pastry Shop</u>.

17          THE COURT:  Okay.

18          MR. FIEDLER:  And so that's what's really key, Your

19 Honor, that the landlord is asking the Court to rewrite the

20 lease.

21          And the last point I'll make about the rent abatement

22 is it's really irrelevant -- or I'll stay on tenant mix for a

23 second.  It's really irrelevant what might happen to one tenant

24 in the shopping mall, shopping center.  The landlord makes the

25 argument that Hobby Lobby would be significantly disadvantaged

87

1   by putting Michaels a store away from it even though that

2   exists in numerous shopping centers throughout the country.

3        But what tenant mix really gets at is the proposed

4   assignment creating an upset of the balance of the entire

5   shopping center, not just what happens to Hobby Lobby.

6        And so I think, Your Honor, I can conclude there

7   unless you have any questions.  I do want to make actually one

8   more point, and I'm going a little longer than I said I would.

9   But I think you're right, Your Honor.  If there is a covenant

10  or zoning or master agreement that's recorded on the property

11  that makes it enforceable against the debtor, there is notice

12  in the record that the circumstance is that the debtor be bound

13  by whatever is in that agreement.  And if there was a

14  restriction on the property, we would be bound by that and we

15  would be put on notice of that.

16       But it begs the question why there's not a master

17  agreement here or some sort of covenant prescribing certain use

18  restrictions, particularly if this was supposed to be a

19  shopping center that we're talking about.  And so I think the

20  fact that there's no master agreement is important in kind of

21  relaying the fact that the landlord did not intend a tenant mix

22  that the tenants be bound by.

23       So with that, Your Honor, I'll conclude unless you

24  have any questions.

25       THE COURT:  No, I don't have any more questions.

88

1  Thank you.

2         MR. FIEDLER:  Thank you, Your Honor.

3         MR. HERSHEY:  Good afternoon.  I guess now it's

4  afternoon, Your Honor.  Sam Hershey from White & Case for

5  Michaels.  I will be extremely brief.

6         Two points, the first is Mr. LeHane makes the

7  argument that Section 365(b)(3)(C) so obviously applies to the

8  leases of other tenants in the shopping center that it's never

9  been litigated.  If it's so obvious, why has court after court

10 said the opposite?  I mean even if it is dicta, as he observes,

11 court after court that we have cited to you have said that you

12 look solely to the debtors' lease.  Those courts have not found

13 it so obvious that that provision means you look to other

14 leases.

15        THE COURT:  Well, other than Toys 'R Us, there's not

16 that many courts that --

17        MR. HERSHEY:  Well, no, that's not true, Your Honor.

18 The Trak Auto case, the Ames case, I mean those cases -- I mean

19 his response is that it's dicta, but those cases do say you

20 look to the debtors' lease to determine the application of use

21 provisions under 365(b)(3)(C).

22        The same could be said for the congressional record.

23 Mr. LeHane went through a presentation with a lot of slides.  I

24 did not see a single slide showing a quote from the

25 congressional record saying we have to look to other leases

1  beyond the leases that the debtor has agreed to, whether that's

2  a master lease or the lease that the debtor has in the shopping

3  center.

4       The last point I'll make, Your Honor, is on tenant

5  mix and balance.  We have an unambiguous lease agreement here.

6  I'm not sure we need to look to the extrinsic evidence.  I

7  think we look to that lease agreement.  But even if we were to

8  do so, tenant mix is about the nature of the shopping center.

9  I think Mr. LeHane actually made this point when talking about

10 the men's wear versus women's wear.  It attracts a different

11 clientele.  That's what it's about, about letting in a tattoo

12 parlor or a burlesque club, something like that, not letting in

13 a competitor to one of the existing tenants.

14      When Your Honor reads Mr. Aronoff's declaration or,

15 sorry, his deposition transcript, rather, you'll see again and

16 again examples that he just walked through of competitors

17 existing within the Promenade shopping center.  It's very

18 common for competitors to exist in the same shopping center.

19 That's not what tenant mix is about.  It's about the nature of

20 the center, the nature of the clientele.

21      Thank you very much.

22      THE COURT:  Thank you.

23      Mr. LeHane.

24

25      MR. LeHANE:  Thank you very much, Your Honor.  I'll

1  try to be very brief.

2        First of all, co-existence does not mean successful

3  co-existence.  I think whatever may be happening elsewhere with

4  Michaels and Hobby Lobby is irrelevant, right.  And even the

5  debtors' witness, Mr. Amendola, who by the way and I'd suggest

6  that you look at it, he has no expertise in tenant mix and

7  balance, limited familiarity with the concepts.  But he admits

8  that Michaels will have a negative impact on the Hobby Lobby

9  lease sales and will have a negative impact on tenant mix and

10 balance in the shopping center, right, so --

11        THE COURT:  Well, didn't you say it might be

12 initially negative and then it will be positive?

13        MR. LeHANE:  Exactly.  There will be a negative

14 impact.  And the statute doesn't say substantial.  It says any

15 impact.  And even their witness admits that, and Jeff Aronoff

16 who specializes in this absolutely states in his declaration

17 that putting Hobby Lobby -- Michaels right next to Hobby Lobby

18 in that portion of the shopping center will disrupt the tenant

19 mix and balance in the shopping center.  It's the debtors'

20 burden to show there will be no disruption.

21        Mr. Fiedler and Mr. Hershey, with all due respect,

22 are not experts in tenant mix and balance.  The only witness we

23 have heard that has any experience in tenant witness -- tenant

24 mix and balance is Jeff Aronoff, Senior Vice-President of

25 Brookfield Properties.  And his declaration makes it absolutely

1 | clear that there will be a disruption of tenant mix and balance

2 | in the shopping center.  Thank you very much, Your Honor.

3 | THE COURT:  Thank you.  I appreciate it.

4 | All right.  I think we're concluded with the

5 | Pinnacle's and Serramonte, and now we move on to Fountains.  Is

6 | there a -- I mean I think probably it makes sense for Mr. Mairo

7 | to give his presentation and then we would go to your response.

8 | Does that make sense or do you want to go first?  It's your

9 | motion.

10 | MR. FIEDLER:  It's fine if Mr. Mairo goes first.

11 | THE COURT:  Okay.

12 | MR. MAIRO:  Thank you, Your Honor.

13 | For the record, John Mairo of Porzio Bromberg &

14 | Newman on behalf of the Landlord DPEG Fountains LP.

15 | Your Honor, DPEG is pursuing its objection based on

16 | 365(b)(3)(C) grounds, the use exclusivity provisions of another

17 | lease in the Fountains shopping center would be breached.

18 | We're no longer pursuing a tenant mix/balance argument under

19 | 365(b)(3)(D).  We have stipulated to certain facts and that

20 | will be getting sent to Your Honor within the next I think half

21 | hour.

22 | And the Fountains lease is attached to the stipulated

23 | facts.  And part of the stipulated facts is that the parties

24 | have agreed that the Fountains Center is a shopping center for

25 | purposes of 365.  And we have stipulated, as well, that a true

and correct copy of the DPEG and Ross lease are attached to the

objection that we filed that was at ECF 1344.

There has been a reference to Mr. Amendola's

declaration being admitted into evidence.  I do want to point

out that his declaration does not state that he reviewed the

DPEG-Ross lease, nor did Mr. Amendola speak to whether the use

exclusivity provisions of the DPEG-Ross lease would be violated

or breached.

DPEG contends that the debtors have not met their

burden of showing adequate assurance.  Your Honor, I view this

as fairly straightforward.  365(b)(3)(C) is clear on its face.

And the proposed assignment to Burlington must be shown to not

breach any use or exclusivity provision in the DPEG-Ross lease

which is another lease in the shopping center.

And the DPEG-Ross lease says, and this is at Section

15.3(a) that, "No tenant or occupant of the shopping center

other than tenant may use" -- and then I'm skipping over some

unnecessary language -- "use its premises for the off-price

sale as hereinafter defined of merchandise or, B, use more than

10,000 square feet of leaseable floor area of its premises for

the sale of apparel except for discount department store in

excess of 85,000 square feet of leaseable floor area."

Then further on in that Section 15.3(a), Burlington

is identified as an off-price retailer.  And the Bed Bath lease

that we're in question here to be assigned is for over 25,000

93

1  square feet.  Obviously, much more than 10,000.

2        So on its face, the use exclusivity provision is

3  getting breached violated.  Then you go to subpart (b) in the

4  Ross lease, Section 15(b), the exceptions.  And, first of all,

5  it says that the section is limited to tenants and occupants

6  operating as of the effective date under the existing leases.

7  But importantly, this section, 15.3(b), is different than the

8  Serramonte-Ross lease which appears to extend exceptions to

9  "any assignments or subleases of tenants on the effective

10  date."

11        However, under the DPEG lease, the Ross-DPEG lease,

12  even though Bed Bath was excepted as a current tenant, there is

13  no language relating to assignments.  So if Burlington violates

14  or breaches the use exclusivity provisions, 15.3(b) does not

15  except out Burlington.  Accordingly, under Section

16  365(b)(3)(C), the assignment Burlington would breach the DPEG-

17  Ross lease's use exclusivity provisions so the proposed

18  assumption to Burlington must be denied.

19        Now a couple of other points, Your Honor, there was

20  reference made at the outset about the Dhanani declaration,

21  which is DPEG's declaration in support of its objection, being

22  admitted into evidence, and that's at Document 1573 on the

23  docket.  Paragraphs 11 and 12 of that declaration, in Paragraph

24  11, it certified that it's his understanding, the declarant's,

25  that the proposed assignment of the Bed Bath lease to

94

1 Burlington if approved would result in a violation of Section

2 15.3 of the Ross lease, which would expose DPEG to potential

3 damages in the form of, A, termination of the Ross lease which

4 has approximately 66 months remaining and approximate rent owed

5 for that time period of over one and a half million dollars or,

6 B, Ross would have the option of paying substituted rent of

7 either its minimum rent or two percent of gross sales during

8 the preceding month.

9        The point there, Your Honor, as has been talked about

10 with respect to the Pinnacle lease, the landlord here could be

11 exposed to significant claims from Ross.  And the language of

12 365(b)(3)(C) talks about a breach.  It doesn't talk about

13 debtors' breach, landlord's breach, tenant's breach.  It's just

14 a breach of another lease.  And I know there was a little

15 disagreement on this side as to whether use exclusivity

16 provision that is violated, would it be considered a breach.

17        Mr. Fiedler said the landlord would be breaching, not

18 the debtor.  Mr. Hershey said I'm not sure the landlord would.

19 But neither of these folks are going to be the Court and be

20 determining whether or not my client is going to be facing

21 claims from Ross.  And that ties in with something Mr. LeHane

22 mentioned in terms of 363(e), adequate protection.

23        If this is going to be sold in some way, the

24 leasehold interest, we need to be adequately protected.  And

25 that would be setting aside significant sums for the benefit of

1  my client to be able to protect itself against any type of

2  claims that may be brought.

3        And the other paragraph I wanted to raise in the

4  certification is Paragraph 12.  Just that Ross has objected to

5  the assignment of this lease to my client, has directed them to

6  consider and to pursue an objection because of Section 15.3 of

7  the lease.

8        I also want to just hit upon something that has been

9  raised and Mr. LeHane covered this, as well.  But there's been

10 a fair amount of discussion in the papers as well as in oral

11 argument about how on a certain level, like the sky is falling

12 if Your Honor were to uphold these objections.  Retail cases

13 would end.  It would turn the Bankruptcy Code on its head.

14 It's just not true.

15       And as Mr. LeHane detailed, the Bed Bath case proves

16 it.  The enforcement of 365(b)(3) as argued by the landlords

17 before you today will only impact three proposed assumptions,

18 and the debtors have successfully assigned over I think I heard

19 125 shopping center leases.  So applying 365(b)(3)(C) according

20 to its terms which are clear, plain meaning, would not lead to

21 absurd results.

22       Another point that was made is, oh, you're taking

23 value potentially away from the estate if the objections are

24 upheld.  Well, look, maybe a little bit less would be paid by

25 Burlington but, Your Honor, as Mr. LeHane said, that's all part

96

1  of the balance of the Bankruptcy Code.  There are provisions

2  that protect nondebtors.

3           And Burlington acknowledges in its pleading that

4  price adjustments have already occurred to its bid.  In

5  Paragraph 2 of Burlington's reply which is at ECF 2058,

6  Burlington admitted, "The debtors withdrew one lease from their

7  bid package resulting in an adjustment to the purchase price."

8  Presumably, a similar price adjustment would occur if the

9  Fountain's lease was removed.  Thus, the debtors' estate would

10 still get the benefit of Burlington's bid for all the other

11 leases.

12          And I guess I'll just close, Your Honor, with a point

13 that I think I heard towards the end from Mr. Fiedler saying to

14 the Court that it's not appropriate to rewrite leases.  I would

15 say my argument in sum is that it's not appropriate for this

16 Court to rewrite the Bankruptcy Code, specifically Section

17 365(b)(3)(C).

18          THE COURT:  Well, I guess I'm being asked to

19 interpret what that other lease provision means, and that's

20 where I'm having the issue.  But also, on the adequate

21 protection argument, if the lease is assigned subject to all

22 its terms, the Bed Bath-Fountain's lease, then what else --

23 what other adequate protection would debtor be required to

24 provide if the lease is being assigned subject to all its

25 terms?

97

1            MR. MAIRO:  I think the request would be to set aside

2   money from that for some type of reserve to protect the

3   landlords in the event they're faced with lawsuits from Ross.

4            THE COURT:  To protect the landlord from the breach

5   of its agreement with the third party that came after the

6   debtors' Bed Bath and the landlord's lease was Bed Bath &

7   Beyond.

8            MR. MAIRO:  That would be right, Your Honor.  But on

9   a certain level, I also don't want to lose sight of the primary

10  argument that in my view we don't even go there because a

11  strict application of the Bankruptcy Code requires denial of

12  the assignment.

13           THE COURT:  Right.  That argument I get.  I totally

14  get that.

15           MR. MAIRO:  Thank you, Your Honor.

16           THE COURT:  Thank you.

17           MR. FIEDLER:  All right.  Back again, Your Honor.

18           THE COURT:  All right.

19           MR. FIEDLER:  Just real quick, Your Honor, I did not

20  hear anything in Mr. Mairo's recitation that would be different

21  than the Pinnacle Hills' assignment or the Serramonte

22  assignment.  And so all the arguments previously made in

23  support of the Michaels assignment I think apply equally to

24  this assignment.  I just want to correct --

25           THE COURT:  Well, to be fair, I think what he's

98

1  saying is it doesn't have like the Pinnacle Hills-Bed Bath &

2  Beyond lease, it doesn't have that out if you're contesting the

3  assignment in good faith.  Is that right or am I wrong on that,

4  Mr. Mairo or no?

5      MR. MAIRO:  I'm not aware of that provision, Your

6  Honor.

7      THE COURT:  Okay.

8      MR. FIEDLER:  Okay.  So just a few points, Your

9  Honor.  Mr. Mairo said I think that if the objection was

10 sustained, Burlington would just pull it out and we'd still get

11 the other leases.  The estate's still going to lose money if

12 that happens.  There is almost $1.5 million at stake here.  And

13 so my question to Mr. Mairo and his client is at what point is

14 the money to be gained by the estate not enough, right?

15     And so, yes, Burlington had 44 leases.  One of those

16 was pulled out because the lease was actually terminated, and

17 Your Honor was made aware of that.  But there is significant

18 money at stake.

19     The second point refers to the first thing Mr. Mairo

20 said I think was that Mr. Amendola didn't review the Fountains

21 lease in his declaration, but in Paragraph 17 of his

22 declaration, it makes clear that he did.  And that says, "In

23 reviewing the Fountain lease, I understand" and it continues

24 on.  But I'll turn just to the provisions of the Fountain lease

25 itself.

1          Under 25(b) of the Fountains lease, the debtors are

2   authorized to assign the lease for certain permitted uses.  The

3   Fountain leases further provides tenants, assignees, and

4   sublessees shall be permitted to use the premises or applicable

5   portion thereof for the uses permitted by Section 25.  The

6   prohibited uses in turn fail to prohibit the operation of the

7   Fountains lease premises by Burlington.  There's nothing in the

8   Fountain lease that would prohibit Burlington from using that

9   premises for its apparel operations.

10          And similar to the Pinnacle Hills violation, the

11  landlord here is violating the warranties and representations

12  that it made in the use of the premises by objecting to the

13  assignment here.

14          Notwithstanding the fact that the Fountains lease

15  expressly permits the assignment of the lease to Burlington,

16  Fountains also alleges that the lease will violate exclusives

17  and a non-debtor tenant lease in the non-debtor lease of Ross

18  Stores.  I think we made ourselves clear in the prior

19  discussion with Pinnacle Hills that Bed Bath should not be

20  bound by an exclusive in a lease to which it did not enter into

21  and could not have possibly known about.

22          And so I think the lease expressly permits the use by

23  Burlington.  There's no exclusive within the lease that would

24  prohibit the assignment to Burlington.  And there is a

25  provision in Section 23(d)(3) that talks about the future

1 exclusives and says that the lease provides that any future

2 exclusive should not relate to the sale, rental or distribution

3 of apparel or apparel accessories.  And I think Burlington fits

4 squarely within that definition of 23(d)(3) of the lease.

5        And so I think the lease expressly provides or

6 permits for the assignment to Burlington.  There's nothing in

7 the lease that the landlord has pointed to that would say

8 otherwise.  And unless Your Honor has any questions, I think

9 we'd rest on the argument we made in connection with the

10 Pinnacle Hills assignment.

11        THE COURT:  I think they're basically the same

12 arguments except for these nuances, those details.

13        Mr. Mairo?  Oh, I'm sorry, Burlington is -- I think

14 Burlington didn't --

15        MR. JUNG:  Good afternoon, Your Honor.

16        Wojciech Jung, Womble Bond Dickinson, on behalf of

17 Burlington.  Your Honor, the way we view the issues before Your

18 Honor is that they are squarely legal issues and not so much

19 factual issues.  As Mr. Mairo said, we did enter into a

20 stipulation that's probably being filed as I speak.  But the

21 issue, Your Honor, as I said is legal.  Plenty of argument has

22 been made by the debtors, by Michaels that are fully applicable

23 to the leases that Burlington seeks to take over.

24        Your Honor, I would specifically address briefly

25 issues raised by Mr. Mairo that Your Honor's ruling in the

1  landlord's favor would not disrupt the assignment and

2  assumptions of leases in retail cases.  And he specifically

3  points to the fact that the debtor was successful in assuming

4  and assigning many leases to prospective buyers, potential

5  buyers, including Burlington.

6       But as Your Honor noted in other context, the meaning

7  of that, if any, could be turned around.  One could say that

8  the other landlords subject to those leases did not take the

9  absurd position that the two landlords are taking here, right.

10 One could say they were rational.  They did not fight the

11 debtors' proposed assumptions because the law and the statute

12 is quite clear.

13      The statute refers to the lease in question which is

14 a debtor cannot be bound by a lease that it is not a party to.

15 Any by analogy, Your Honor, there is plenty of case law in the

16 context of claim objections related to rejection damages, for

17 example, when a debtor rejects a lease.  And when someone else

18 files a rejection damage claim saying, hey, I was somehow

19 impacted by the debtors' rejection of a third-party claim,

20 courts clearly say that that party has no right to complain

21 because it did not -- it is not, excuse me, a party to that

22 lease.

23      And, Your Honor, that analogy I would suggest is

24 squarely applicable here.  So, Your Honor, for those reasons

25 and incorporating arguments raised by Michaels and the debtors,

1 we would rest on the papers and request tat Your Honor --

2      THE COURT:  I'm not sure I understood the last

3 argument.  Could you say --

4      MR. JUNG:  I apologize?

5      THE COURT:  The last argument, what was that?  The

6 one that you just made about --

7      MR. JUNG:  With respect to --

8      THE COURT:  The rejection.

9      MR. JUNG:  Correct, Your Honor.  There are instances

10 where a debtor rejects a contract and a third party, another

11 party to the contract files a claim before a bankruptcy court

12 that's saying I was somehow impacted by the rejection of that

13 contract and seeks whatever damages they would seek from the

14 debtor.

15      And there are cases, there are plenty of cases that

16 say that, sure, maybe you're somehow impacted by the debtors'

17 rejection of a contract, but you have no reason to complain

18 because you are not a party to that contract.  The debtor has

19 never contracted to protect you.

20      Your Honor, similarly, here I would say that the

21 landlord assumes the risk when it enters into a contract that

22 that contract may be assigned to someone else.  And the only

23 meaningful way to protect itself in that situation is to

24 expressly contract or enter into provisions and agreements in a

25 contract that prevents or prohibits the tenant from assuming a

103

1  contract to a party the landlord may not find acceptable.

2          Thank you, Your Honor.

3          THE COURT:  Thank you.

4          Mr. Mairo, do you have any rebuttal?

5          MR. MAIRO:  Thank you, Your Honor.

6          John Mairo for the record.

7          If I heard Mr. Jung correctly, I think he's on some

8  level characterized our arguments as absurd and irrational.  I

9  completely disagree.  I don't understand --

10         THE COURT:  No, I'm not finding any arguments are

11  absurd or irrational.  For example, I don't know out of the

12  other landlords' leases that were assumed and assigned whether

13  parties had potential objections or didn't have them.  So I

14  don't know how I can as to the use.  So I don't know how I can

15  give that any weight one way or the other.  It just doesn't

16  seem to -- it's just not something that is a fact in this case.

17  It's just not here.  So I'm not going to --

18         MR. MAIRO:  Fair enough, Your Honor.

19         THE COURT:  I'm not going to consider that either

20  way.

21         MR. MAIRO:  Thank you, Your Honor.  Again, and

22  certainly we view it as just a strict application of the

23  Bankruptcy Code.

24         And I wanted to just hit upon something that Mr.

25  Fiedler mentioned in terms of Mr. Amendola's declaration.  He

1  does not reference the DPEG-Ross lease.  In Paragraph 5, he

2  describes reviewing the leases of Bed Bath & Beyond's leases

3  with the leases that are considered to be assumed and assigned.

4  And then Paragraph 17 that Mr. Fiedler referenced is not the

5  DPEG-Ross lease.  That's again the Bed Bath-Fountains lease.

6       So I just wanted to be clear that Mr. Amendola's

7  declaration he does not say he reviewed the Ross-DPEG lease, he

8  does not reference it in Paragraph 17.  And it is the debtors'

9  burden to establish adequate assurance.  And I don't believe

10  they have, Your Honor.

11       THE COURT:  Well, there's no dispute that the

12  Fountains lease with Ross prohibits the Burlington use, right?

13       MR. MAIRO:  I agree.

14       THE COURT:  So, in contrast, that is something that's

15  in the record.

16       MR. MAIRO:  Thank you, Your Honor.

17       THE COURT:  Thank you.

18       All right.  That's it for the presentations I guess.

19  And it's 1:00, so that's a good time to break.  I need to

20  digest all this, and I know there's time pressures involved in

21  the sense that there's -- well, this is -- I think the

22  landlords were gracious in saying no rent during this period

23  from July 31st to August 31st while this gets decided.  I don't

24  know if it goes beyond that, but I would like to decide this

25  today but I may need some time.

1            And I was wondering whether -- I mean there's a lot

2   of parties here that are very -- that are charging the estate

3   or charging their clients.  And it's going to be a couple of

4   hours at least or sometime later this afternoon.  So if the

5   parties want to go back to their offices and work on other

6   things or limit the time for now and I'll go bank on the record

7   and I anticipate being able to read my decision into the record

8   later on, although with today's technology, maybe you can work

9   from here and it doesn't really matter.  But I give you that

10  option.

11          MR. FIEDLER:  I just want to make one note, Your

12  Honor.  While Mr. LeHane's clients have agreed to waive

13  obligations for September, the same is not true for the

14  Fountains landlord.  And I think it's our position that any

15  obligation for rent in September would not be required from the

16  debtors.  And to the extent Your Honor were to rule in their

17  favor, there will just be a lease termination or rejection as

18  of the end of this month.

19          THE COURT:  In other words, another reason for me to

20  decide today.

21          MR. FIEDLER:  I don't want to put pressure on you.

22          THE COURT:  No.  That's all right.  I can handle it.

23          MR. FIELDER:  All right.  Thank you, Your Honor.

24          MR. HERSHEY:  Sam Hershey from White & Case, Your

25  Honor, for Michaels.  If Your Honor wants counsel to stay,

1  we're certainly happy to.  Otherwise, I think at least the

2  White & Case team are based in New York and we would return to

3  the office and join virtually when Your Honor reads your

4  ruling.  Whatever Your Honor prefers, of course.

5          THE COURT:  I have no preference.  I'm just going to

6  --

7          MR. HERSHEY:  I think that's what we'll do, Your

8  Honor.

9          THE COURT:  I was just offering it to you as a way to

10 hopefully limit the expense to -- because, like I say, it could

11 be --a few hours, you know.

12         MR. HERSHEY:  And that's our goal too is to limit the

13 expense.  That's what we'll do.  We'll join virtually later

14 whenever Your Honor is ready to read the ruling.

15         THE COURT:  All right.

16         MR. HERSHEY:  Thank you very much.

17         THE COURT:  And otherwise, we'll make -- you know

18 what, and then I was just thinking of another alternative,

19 Juan, is that we could also make conference rooms available to

20 the parties.  They can go there.

21         MR. FIEDLER:  Your Honor, does it make sense to maybe

22 set a time later for today to put forth a conference call

23 available for folks that aren't going to be joining in the

24 courtroom or does it make sense for everyone to join via Zoom

25 at that time?

1          THE COURT:  I think since everybody's been doing it

2    by Zoom all along, I think we should continue the Zoom.

3          MR. FIEDLER:  Okay.

4          THE COURT:  Those kinds of issues are not my forte.

5          MR. FIEDLER:  Yeah, yeah, yeah.  I understand.

6    That's on us.

7          THE COURT:  I'm fine with people appearing by Zoom,

8    appearing in person.  What I do know is that Court Solutions

9    and Zoom doesn't usually work, so it's going to be Zoom or in

10   person.

11         MR. FIEDLER:  Okay.  Yeah, I've experienced that

12   before, by the way.

13         THE COURT:  All right.

14         MR. FIEDLER:  All right.  Thank you, Your Honor.

15         THE COURT:  Thank you.

16         All right.  Thank you for all the professionalism,

17   and really exceptional presentations.  You make my decision a

18   difficult one, but that's what I have to do and I'm going to --

19   I have every intent of deciding today, okay.

20         Thank you very much.

21         MULTIPLE COUNSEL:  Thank you, Your Honor.

22         THE COURT:  Thank you.  Bye bye.

23         (Recess at 1:02 p.m./Reconvened at 5:25 p.m.)

24         THE COURT:  Okay.  We're back on the record in the

25   Bed Bath & Beyond case, 23-13359.  We had a hearing this

1  morning at which certain evidence was admitted into the record.

2  I'll describe it in more detail in a few moments.  But

3  basically, there were stipulations, there were deposition

4  transcripts that were admitted in excerpts.  And there were

5  also declarations that were admitted.  However, there was no

6  testimony.  And there was extensive argument.

7          So before the Court today are the objections filed by

8  three landlords to the motion of the debtors here, Bed Bath &

9  Beyond, Inc., and its affiliated entities, we'll collectively

10  call them the debtors, to the assignment of certain leases by

11  the debtors.  Two of the leases are intended to be assigned to

12  Burlington Stores, and those assignments are opposed by the

13  Daly City Serramonte Center, which I'll call Serramonte, and

14  Landlord DPEG Fountains, LP.  We'll call them Fountains.

15          The third is intended to be assigned to Michaels

16  Stores, and that assignment is opposed by the Landlord Pinnacle

17  Hills, LLC, Pinnacle we'll call them, and collectively the

18  objecting landlords.  The objections are based primarily on or

19  really exclusively on 11 U.S.C. 365(b)(3)(C) and (D) which

20  apply to shopping centers and are referred to as the use,

21  restrictive use and tenant mix and balance provisions.

22          There has been extensive briefing on the issues

23  before the Court including the following papers.  As to the

24  Pinnacle proposed assignment with Michaels as the proposed

25  assignee, is Document 1323, an objection to the assignment

1  filed by Pinnacle on 7/12; Document 1383, a response by

2  Michaels filed on 7/17; Document 1926, a surreply by Pinnacle

3  filed on August 18th and supported by the declarations of

4  Jeffrey Aronoff at 1927 and Kristin S. Elliott at 1928.

5          Document 2059 was a further reply by Michaels filed

6  on August 25th.  Document 2062 was an omnibus response by the

7  debtor filed on 8/25 and supported by the declaration of Emilio

8  Amendola, Document 2062-1.

9          As to the Serramonte lease, which is the proposed

10  assignee as Burlington, there was Document 1388, a limited

11  objection filed by the Landlord Serramonte on 7/12.  And on

12  August 18th, a supplemental objection was filed by Daly City

13  Serramonte at 1929 and supported by the declaration of Ernst

14  Bell.  And then there was a Burlington omnibus reply filed on

15  8/25, Document 2058, and the omnibus response by the debtor on

16  8/25, as I noted at 2062 and 2062-1.  There also was a

17  stipulation of undisputed facts at Docket 2087.

18          And then, finally, as to the Fountains lease, and the

19  assignee again proposed is Burlington, Document 1933; a

20  supplemental objection by Fountains and a joinder in Pinnacle's

21  opposition to the Michaels arguments; Document 1573, a

22  certification of Nikhil Dhanani, filed by Fountains.  The

23  Burlington omnibus reply at 2058, and the debtors' omnibus

24  reply at 2062 and 2062-1.

25          As I noted briefly earlier, the Court scheduled an

1  evidentiary hearing on these motions for today, but the need

2  for live testimony was obviated by the parties' agreement to

3  admit into evidence the direct testimony contained in each of

4  the declarations described above.  In addition, the parties

5  agreed to admit into evidence in lieu of cross-examination

6  certain excerpted portions of the depositions of Mr. Aronoff

7  and Mr. Amendola.  And then, finally, as noted, the debtor and

8  the Serramonte landlord and the debtor and the Fountain

9  landlord submitted stipulations today.

10         The Court admits each of these documents into

11  evidence.  As a result, today's hearing consisted entirely of

12  the arguments of counsel as well as the admission of those

13  documents.

14         By way of background, the debtors filed these cases

15  under Chapter 11 for reorganization on April 23rd, 2023.  The

16  debtors have indicated a primary focus in this case has been to

17  maximize the value of its assets for all stakeholders including

18  through the sale of its below-market leases which is also

19  referred to as lease optimization efforts.  These efforts

20  included conducting Phase I and Phase II Lease auctions.

21    Numerous objections were filed to those proposed

22  assumptions and assignments.  The objections were based on cure

23  costs and adequate assurance, also, the debtors' financial

24  ability to perform.  And those objections were largely or

25  completely resolved.  There were also other objections based on

1  those issues, as well as tenant mix and exclusivity provisions.

2       Most of those as far as this Court knows have also

3  been resolved, although I'm not 100 percent sure which way

4  they've all been resolved.  I assume some resulted in

5  withdrawal of the leases from the motion and some were in

6  connection with withdrawal of the objections.  That said, the

7  objections that are the focus of today's hearing relate

8  exclusively to the tenant mix and exclusive use provisions in

9  the leases and only those grounds, 365(b)(3)(C) and (D), as

10  acknowledged by the parties.

11       This Court has jurisdiction over this matter under 28

12  U.S.C. 1334(b), and the standing orders of reference entered by

13  the District Court for New Jersey on July 10th, 1984, as

14  amended on September 18th, 2012.  This is a core proceeding

15  under 28 U.S.C. 157(b)(2)(A) and (O).  Venue is proper in this

16  Court under 28 U.S.C. 1408.

17       The Court issues the following findings of fact and

18  conclusions of law pursuant to Federal Rule of Bankruptcy

19  Procedure 7052.  To the extent any of the findings of fact

20  might constitute conclusions of law, they're adopted as such,

21  and the reverse is also true.

22       The applicable law under 365(f)(2)(B), a trustee or

23  debtor in possession that seeks to assign an unexpired lease to

24  provide adequate assurance of future performance by the

25  assignee.  Section 365(b)(3) then defines what adequate

assurance of future performance means in the context of a lease
in a shopping center.

Section 365(b)(3) of the Bankruptcy Code has four
subsections applicable to shopping centers including (C) and
(D) which as noted are at issue today.  Subsection (C) requires
adequate assurance that "assumption or assignment of such a
lease is subject to all the provisions thereof, including but
not limited to provisions such as a radius, location, use, or
exclusivity provision and will not breach any provision
contained in any other lease, financing agreement, or master
agreement relating to such shopping center."

That's (C), and the focus there is in any other lease
relating to such shopping center.  And subsection (D) requires
adequate assurance that assumption or assignment of such lease
will not disrupt any tenant mix or balance in such shopping
center.  That's 11 U.S.C. 365(3)(D).

Shopping centers are not defined by the Bankruptcy
Code, but here they are defined by the lease between Bed Bath &
Beyond and Pinnacle, the landlord.  And Section 1134 of the
lease provides that the shopping center known as Pinnacle Hills
Promenade located in Rogers, Arkansas, the shopping center
consists of two retail shopping centers which shall be operated
as a single operating -- single integrated shopping center.

So there was some dispute today that frankly caught
the Court a bit by surprise as to whether the shopping center

113

1   consisted of the integrated shopping center known as the

2   Promenade, Pinnacle Hills Promenade, which consists of over 100

3   stores, or what was so-called Power Center which includes just

4   12 stores but may be defined as big box retailers that include

5   the lease with Bed Bath & Beyond that is sought to be assigned

6   to Michaels as well as the leases with Dollar Tree and Hobby

7   Lobby.  They're all in the Power Center.

8          I'm going to go by the lease and find that the

9   shopping center consists of the two shopping centers that are

10  operated as a single integrated shopping center.  So that is

11  the Court's holding on that point, which is based on the

12  agreement of the parties and is pretty clear to me.

13         Based on the pre-hearing briefing and evidence and

14  argument presented today, the Court is convinced that the

15  objections under 365(b)(3)(C) and (D) could be resolved as a

16  matter of law as was suggested by certain of the parties.  But

17  the Court will first address the legal issues which largely

18  overlap and also Fountains and Serramonte both expressly joined

19  in the Pinnacle surreply.  And then the Court will address the

20  certain factual issues under 365(b)(3)(D) in the alternative.

21         The landlord's primary argument under 365(b)(3)(C) is

22  that the assignments to Michaels and Burlington as proposed

23  should be prohibited because the addition of those stores to

24  the shopping malls would violate the exclusive use provisions

25  the objecting landlords have granted in leases entered into

1  subsequent to the leases with the debtors and in some cases, in

2  most cases, more than ten years after the lease with Bed Bath &

3  Beyond.

4       But as to the plain language, the Supreme Court has

5  instructed that when the meaning of the statute is plain, the

6  Court's inquiry and there, that's <u>Bostock v Clayton County,</u>

7  <u>Georgia</u>, 141 S.Ct. 1731, 1749.  The Third Circuit feels the

8  same way.  <u>Burton v. Schamp</u>, for example, 25 F.4th 198, 207 (3d

9  Cir. 2022), quoting, "As always statutory interpretation begins

10  with an examination of the statute's plain language."

11       Accordingly, this Court turns first to the disputed

12  phrase provision in 365(b)(3)(C) that states that the

13  assignment proposed will not breach any radius, location, use,

14  or exclusivity provision in "any other lease, financing

15  agreement, or master agreement in such shopping center relating

16  to such shopping center."

17       There are no temporal or other restrictions on this

18  phrase, thus, the objecting landlords argue that that should be

19  the end of the analysis.  In other words, a proposed assignment

20  must not breach any other lease, with emphasis on the word

21  "any," a landlord may have entered into with respect to the

22  subject shopping center including those such as the ones

23  Pinnacle has with Hobby Lobby and Dollar Tree and the other

24  leases relating to the Serramonte and Fountains shopping

25  center, all of which were entered into years after the Bed Bath

1  & Beyond lease.

2          In the case of the Hobby Lobby and Dollar Tree lease,

3  they were more than a decade after the debtors' lease, 14 years

4  as to Hobby Lobby and 12 as to the debtor -- as to Dollar

5  Store.  The same is generally true as to the lease with the

6  Serramonte which was entered into about three years before and

7  with Ross and the one with Ross and Fountains which was also

8  many years, entered into many years after the BBB lease.

9          And the Court acknowledges that there is appeal to

10 the plain language argument, and it is frankly one that I

11 struggled with.  But I don't believe that the plain language

12 canon or principle is the only one that is at play here for

13 various reasons, which I will describe.  The Court will also

14 consider Supreme Court precedent that holds the plain meaning

15 of legislation should be conclusive except in rare cases in

16 which the literal application of the statute would --

17          UNIDENTIFIED SPEAKER:  (Indiscernible).  I don't

18 think so.

19          THE COURT:  I'm sorry.

20          UNIDENTIFIED SPEAKER:  I'm not --

21          THE COURT:  Hello?

22          I'm just going to continue.  The literal application

23 of the statute will produce a result demonstrably at odds with

24 the intentions of its drafters.  Griffin v. Oceanic

25 Contractors, Inc., 458 U.S. 564, 571.  This Court finds that

1 this is one of those rare cases where a strictly literal

2 application of the phrase "any other lease" in 365(b)(3)(C)

3 would be at odds with the intentions of the drafters of 365.

4      The Court also will consider the related principle of

5 statutory interpretation that the provisions of the statute

6 must be read in the context of the statutory scheme as a whole.

7 <u>Gundy v. United States</u>, 139 S.Ct. 2116, 2126 (2019).  Statutory

8 interpretation is a holistic endeavor which determines meaning

9 by looking not to isolates words but to text and context along

10 with purpose and history.

11      When those canons of statutory construction are

12 applied, it becomes clear to the Court that the phrase "any

13 other lease" could not have been intended and was not intended

14 to mean a subsequent lease between a landlord and a third party

15 as to which the debtor was not a party.

16      As the District Court for the Southern District of

17 New York persuasively explained in the <u>Sears</u> case, the

18 provisions of 365(b) must be read in harmony with 365(f)(2)(B),

19 <u>Sears Holding Corp</u>, 613 B.R. 51,68 (S.D.N.Y. 2020).

20      That court relied extensively on the <u>Ames Department</u>

21 <u>Store</u> cases in the Bankruptcy Court for the Southern District

22 of New York where the <u>Ames</u> court noted that subject only to

23 certain statutory safeguards, the value of the debtors' leases

24 should go to the debtors' creditors and that leases can be sold

25 to that end with or without the landlord's consent.  <u>Ames</u>

Department Stores, 348 B.R. 91,98 (Bankr. S.D.N.Y. 2006).  The

Ames cases were the earlier cases that Judge McMahon relied on.

As the Burlington Stores' objection notes, the

landlords, the proposed interpretation turns 365(b)(3)(C) and

(D) into a sword rather than a shield, a sword that bestows

upon the landlords a commercially competitive advantage that

actually allows them to improve their position to the detriment

of the debtors' estate.

And that is because applying the plain language

argument here would mean that the debtors are bound by

restrictive use and similar provisions in any other leases that

were entered into after the Bed Bath & Beyond leases, in these

cases, often more than a decade later, and make the broad

assignment provisions negotiated for by BBB unenforceable based

on the landlords' agreement with a third party that the debtor

never knew about or much less agreed to.

And it would also violate the provisions in the BBB

lease that say that BBB is not required to honor any exclusive

subsequently given by the landlord.  Thus, the ability of

debtors to maximize the proceeds from their leases would or

could be severely curtailed by landlords' agreement with other

tenants to limit the uses for which the BBB premises were

expressly allowed to be used without BBB, Bed Bath & Beyond

agreeing to those terms.

The landlords would be permitted to eviscerate the

118

1  debtors' negotiated bargain, a broad assignment provision, by

2  subsequently entering into an agreement with any third party in

3  the same shopping center that restricts uses that Bed Bath &

4  Beyond was expressly permitted to have under their lease.  That

5  would seriously limit BBB's assignment's rights without its

6  knowledge or consent.  And this frankly makes no sense to the

7  Court, especially in light of the legislative history that I

8  will also discuss.

9       The House Report from when the Modern Bankruptcy Code

10  was enacted in 1978 in discussing the shopping mall protections

11  in 365 states that, "To assure the landlord of his bargains for

12  exchange, the court would have to consider factors such as the

13  nature of the business to be conducted by the trustee or his

14  assignee whether that business complies with the requirements

15  of any master agreement and whether the business proposed to be

16  conducted would result in a breach of other clauses and master

17  agreements relating, for example, to tenant mix and location as

18  per House Report 95-595 at 348-349, 1978 U.S.C.C.A.N.

19  5963,6305."

20       It just demonstrates that from the very beginning,

21  the focus was on a landlord's bargain for his rights with the

22  debtor, not with the third parties, including things like

23  master agreements to which the debtor would be the party.

24  Then, in 1984 when Congress decided to enhance or reduce any

25  confusion or lack of clarity in 365(b)(3), the legislative

1 history makes plain that Congress's purpose was to ensure that

2 "the lessor and the other tenants maintain the benefit of the

3 original bargain with the debtor."

4       Later when -- that's Senate Report No. 65, 98th

5 Cong., 166 1ST Sess. 67-68 (1983).  And I emphasize original

6 bargain with the debtor.  Later, when changes were made to the

7 365 by BAPCPA, Senator Hatch stated, "The bill helped clarify

8 that an owner should be able to attain control over the mix of

9 retail uses in the shopping center.  When an owner enters into

10 a use clause with a retail tenant forbidding assignments of the

11 lease for a use different than that specified in the lease, the

12 clause should be honored."  151 Cong. Rec. S. 2455-2361 (March

13 10, 2005).

14       In this case, it is acknowledged by all that the

15 leases at issue do not contain a use clause that would forbid

16 the proposed assignments to Michaels or Burlington.

17       In response, the objecting landlords point to a

18 portion of the legislative history that states that Section

19 (b)(3) provides that in lease situations common to shopping

20 centers, protections must be provided for the lessor if the

21 trustee assumes the lease, including protecting against a

22 decline in percentage rents, breach of agreements with other

23 tenants, and preservation of tenant mix.

24       In this Court's view, that statement is not

25 consistent with those already cited.  The phrase "breach of

1  agreements with other tenants" must be understood to mean

2  breach of agreements with other tenants that were in existence

3  at the time the debtor entered into the lease and would either

4  be incorporated into the lease or part of an agreement or part

5  of a master agreement, not subsequently entered into leases

6  that the debtor had no knowledge of or agreed to.

7        Any other interpretation would expand the rights of a

8  shopping center landlord outside of bankruptcy result which has

9  been virtually as far as this Court knows universally rejected

10 in the case law.  See, for example, Great Atlantic & Pacific

11 Tea Company, Inc., 472 B.R. 666-675 (S.D.N.Y. 2012).

12        Section 365 does not give the landlord the right to

13 improve its position on the bankruptcy of the tenant.  In re

14 Sears Holding, 613 B.R. 51,70 (S.D.N.Y. 2020).

15        The Bankruptcy Code cannot be read to place the

16 landlord in a better position than it would have been absent

17 the bankruptcy.  And also, as the Third Circuit noted in the

18 Joshua Slocum case, Congress has suggested that the

19 modification of a contracting party's rights is not to be taken

20 lightly, 922 F.2d. 1081 at 1091 (3d Cir. 1990).  At the same

21 time, the Joshua Slocum court noted that the non-debtor party,

22 here the landlord, that the policy is to require that the

23 non-debtor party receive the full benefit of his bargain.

24        Further, the language that is at issue here as to not

25 breaching any provision contained in any other lease, the

121

1  argument is made by the debtor and Michaels and also Burlington

2  is that a debtor can't breach a contract to which it's a party.

3  Pinnacle's lease with Hobby Lobby, for example, provides that

4  is to be governed by the laws of Arkansas, and Arkansas law

5  provides that before a contractual provision can be enforced,

6  there must be privity of contract between the parties.

7          There was no privity of contract between Bed Bath &

8  Beyond and Hobby Lobby or Dollar Tree.  In each instance, Bed

9  Bath & Beyond's lease precluded those leases in time, and there

10  was no provision in the Bed Bath & Beyond lease that made it

11  subject to future lease restrictions.  In fact, the exact

12  opposite is true.  Section 13.3.2 of the June 1st, 2007 lease

13  between Pinnacle and Bed Bath & Beyond states that, "Except as

14  expressly set forth in this Section 3.3, tenant shall not be

15  obligated to honor any exclusive granted to landlord in any

16  shopping center."

17          The objecting landlord's reading of the statute would

18  also write that "bargain for" provision our of the BBB lease

19  and that, as noted, is not what was intended according to the

20  legislative history, as cited above.  It would also give the

21  landlord extra unbargained for rights by actually breaching the

22  lease with the debtor.  And I just can't find that that's what

23  Congress intended.  It just doesn't make sense to me.

24          And by reading the statute in this way and in

25  harmony, what I'm saying is that you start out with 365(b) and

122

1   its focus is on the lease with the debtor and the landlord.

2   And that's where it all derives from.  And then that's the

3   context.  And then if you read it the way I think it is

4   intended is that it wouldn't read the words out of the statute.

5          It would just say that, for example, it would be

6   enforced where the lease was subject to a master lease

7   agreement that said the lease -- the proposed use was

8   prohibited or a reciprocal easement agreement as in the <u>Three</u>

9   <u>A's</u> case that was in place before the tenant agreed to lease

10  the premises, or a financing agreement that was recorded and

11  which the tenant knew about and agreed to or acknowledged or

12  consented to in advance.

13         None of those things are here, but it would allow for

14  the enforcement of the restrictive use provisions in many many

15  cases, and this Court dares to say in cases where that's what

16  was intended and that was what was bargained for by the party.

17  And so, by this reading and I believe I am harmonizing the

18  legitimate commercial expectations of the debtor, the landlord,

19  and other tenants and Congress in enacting 365(b)(3)(C).

20     Outside of bankruptcy, the tenant such as Hobby Lobby

21  could not have expected that the provisions of his lease would

22  supersede provisions in existing tenant lease that was entered

23  into 14 years before.  And then that gets into the other issue

24  where the landlord candidly acknowledges that you can't enforce

25  -- that there's a provision in the leases that allows the

1    landlord to terminate the lease in the event of an assignment

2    that it does not approve of.

3          But as the landlords also candidly and forthrightly

4    acknowledged, that kind of provision would not be enforceable

5    in the bankruptcy court.  So that kind of provision would not

6    be enforceable, and we're left with the provisions that allow

7    for the assignment to virtually any -- for any use that's not

8    prohibited by law, essentially.

9          All that said, and as the landlords point out,

10   there's no binding precedent in this jurisdiction, as neither

11   the Third Circuit nor the Supreme Court has ruled on this

12   precise issue.  In a case from another jurisdiction that has

13   been heavily discussed here and factually nearly identical,

14   it's very rare that there's a virtually identical case, but the

15   Toys "R" Us case is one, 587 B.R. 304.

16         It even involved a Ross lease that was a lease with

17   Toys "R" Us that was proposed to be assigned to a Burlington

18   and that they would have been adjacent to each other.  And the

19   court allowed that assignment that was alleged to violate the

20   exclusive use provisions of another lease that was entered into

21   many years after the subject lease with the debtor and that was

22   sought to be assigned.

23         The Court specifically found that the cases cited by

24   landlord did not support its plain language argument argument,

25   although I'll admit there wasn't a long discussion on that.

124

1  That's at 310.  Nonetheless, Pinnacle urges the Court not to

2  follow <u>Toys</u>, arguing that it was wrongly decided because it did

3  not examine the plain meaning of the statute and relied on

4  dicta from the Fourth Circuit's <u>Trak Auto</u> opinion.

5       The Court is not persuaded by that argument because

6  this Court's own examination of the plain meaning of the

7  statute led it to the same conclusion.  And I will note that

8  that conclusion that it doesn't violate the plain language of

9  the statute was at least tacitly and preliminarily adopted by

10 the district court in the <u>Toys "R" Us</u> case when it refused to

11 grant the landlord a stay pending appeal of the <u>Toys "R" Us</u>

12 decision because the landlord could not show a likelihood of

13 success on the merits based on, among other things, the plain

14 language argument.  That's <u>Brea Union Plaza I, LLC v. Toys "R"</u>

15 <u>Us</u>, 2018 Lexis 123049*3 (E.D.Va. 2018).

16      Pinnacle would suggest that this Court should follow

17 the guidance in the <u>Sears Holding Corp</u> case, 613 B.R. 5172, a

18 case that was referred to earlier.  That case, though,

19 addressed 365(b)(3)(A) and (D) rather than (C), but the

20 rationale behind that ruling and particularly that 365(b)

21 should be read in harmony with 365(f) actually cuts in favor of

22 this Court's ruling today because it's a holistic analysis and

23 that 365(f) refers to the lease with the debtor and so does the

24 beginning of 365.

25      There's also the argument that there will be harm to

1 the landlords because there will be rent abatements with Hobby

2 Lobby and Dollar Tree and also with the other stores in the

3 Fountains and Serramonte malls.  The Court also disagrees with

4 that argument because at least certainly in the case of the

5 Pinnacle lease, Section 7.4 provides that any use which would

6 otherwise violate a tenant's exclusive shall not be allowed to

7 continue for any assignment unless landlord does not have a

8 right to approve such assignment.  Here, it is the bankruptcy

9 court and not the landlord that has a right to approve the

10 assignment.

11        Similarly, Section 7.5 of the Hobby Lobby lease

12 provides that a tenant shall not be entitled to abatement and

13 rent if the landlord promptly initiates and diligently pursues

14 all commercially reasonable remedies including without

15 limitation legal action for final approval.  Here, Pinnacle

16 promptly initiated and is diligently pursuing its objection to

17 the proposed assignment.  It's acting in accordance with the

18 lease by bringing the issue before the Court and allowing the

19 Court to decide if the assignment violates the Bankruptcy Code.

20        And as the Toys "R" Us and Martin Store courts

21 observed, the assumption and assignment of the lease is a

22 judicial action that may render the landlord unable to comply

23 with the restriction contained in another lease and the law

24 would excuse performance that has been rendered legally

25 impossible or -- that's 199 B.R. 265.  Or similarly, that

1  provision 7.5 says that the rent isn't going to be abated as

2  long as the landlord proceeds with the objection.

3        And so, similarly, the <u>Toys "R" Us</u> court

4  alternatively found that the assignment would not breach the

5  exclusivity provision because the Court's order would render

6  the landlord without the capacity to prevent Burlington's

7  intended use which was based on the lease with Ross Stores that

8  only applied if the landlord had the capacity to prevent a

9  tenant from selling off-price apparel.

10       And then I also have to note the use of the word

11 "violation" rather than breach, and I think this lease is a

12 very heavily negotiated document and by extremely sophisticated

13 attorneys that, whether it's 2007 or 2019 or 2021, had the

14 Bankruptcy Code and the related assignment provisions in mind

15 when it was drafted.  And a violation is not necessarily a

16 breach as is particularly true in this case with 7.5 because as

17 I understand the lease and as I read the lease, it couldn't be

18 terminated and there wouldn't be any rent abatement as long as

19 the landlord is diligently prosecuting the objection.

20       So then I also note that the Fountains landlord makes

21 a similar argument that it could be exposed to substantial

22 damages pursuant to its lease with Ross, but that 15.3(a) of

23 the Ross-Fountains lease provides that landlord, if it had the

24 capacity to do so, shall not permit any other tenant or

25 occupant of the shopping center to use its premises for the

 1  off-price sale of merchandise.

 2        So the damages arguments appear to be possibly

 3  illusory or, alternatively, I would say the one thing that's

 4  clear is that the landlord had knowledge of the Hobby Lobby

 5  broad assignment provisions when it entered into these leases.

 6  And whether it was to entice the new tenants to enter into the

 7  lease or it was just part of the whole negotiating process,

 8  what ended up happening was that the landlord gave the

 9  exclusive use provisions to the other tenants without getting

10  BBB's consent, without modifying BBB's lease, without BBB even

11  having knowledge of the use restrictions.

12        And I also adopt the argument of the debtors and the

13  tenants that -- the proposed tenants that the damages, if any,

14  and this is what I was getting at, are the result of the

15  landlord's actions that it undertook knowingly in violation of

16  not only the assignment provisions of the Bed Bath & Beyond

17  lease but also the provision that says that they're not going

18  to be bound by any exclusive, yet the landlords are seeking to

19  enforce exclusives of the other tenants.

20        I'm going to find then that I'm not required to

21  reject the proposed assignments based on the plain language of

22  365(b)(3) for all those reasons.  But even in the alternative,

23  even if I were to give effect, full effect to the landlord's

24  plain language argument, the proposed assignments to Michaels

25  and Burlington that I noted here would not result in a breach

128

1  at all as the lease will continue and the landlord did what it

2  was supposed to do to make it continue.

3         And I'm also reading 365(b)(3)(C) in a manner that

4  places in context with the rest of 365 and allows the landlord

5  to the full benefit of what it bargained for and allows the

6  tenant, debtor tenant to maximize its recovery when it's

7  legally permissive to do so and doesn't effectively not only

8  provide greater rights to the landlord than are available

9  outside of bankruptcy, but also would allow the landlord to

10 breach the lease and specifically the provision that allows --

11 that says that it's not bound by future exclusives and then

12 benefit from that breach.

13        So it respects the rights, this interpretation

14 respects the rights of both parties but doesn't eviscerate any

15 clause at all.  What it does is I believe interpret it in a way

16 that was intended by the legislature and the cases that

17 construe it including the very thorough and persuasive opinion

18 of Judge McMahon in the <u>Sears</u> case.

19        So on all those grounds, whether it's because it

20 would lead to a result that was never intended as in the case

21 before the Court here or whether on the basis that you read the

22 statute in context or also on the basis that even if you read

23 it the way the landlords are asking, there is no breach of the

24 lease because the debtor was not party to it and the debtor was

25 not party to it.  And if there was a breach -- well, not party

1  to it and also the lease itself provides that there's no rent

2  abatement or other damages recoverable in that instance.

3         So I am going to reject the 365(b)(3)(C) arguments as

4  for the reasons described.

5         Subsection (D), turning to that now, requires

6  adequate assurance that assumption or assignment of such lease

7  will not disrupt any tenant mix or balance in the shopping

8  center.  That's (3)(D).  On this issue, the objecting

9  landlord's arguments is that allowing Michaels and Burlington

10 into the shopping centers is unacceptable because they are

11 direct competitors of other tenants such as Hobby Lobby, Dollar

12 Tree, and Ross/Dress For Less.  In fact, some of the leases

13 specifically name these proposed assignees.

14        Oh, I should note here also that Fountains at this

15 point indicated that it was not pursuing the 365(b)(3)(D)

16 argument, so it just applies to the Pinnacle and Serramonte

17 stores.

18        And while it is undeniably debtors' burden to

19 demonstrate adequate assurance under 365(f), in the case of the

20 tenant mix, that burden arises -- before that burden arises,

21 "The burden is on the landlord to establish the existence of an

22 intended tenant mix, and that requires more than simply

23 demonstrating that it has provided each of its tenants with

24 exclusivity provisions."  In re Toys "R" Us, 598 B.R. 233, 242.

25        As the district court found in the Lasalle-Trak Auto

1  case, "As a predicate to a finding that a shopping center is

2  entitled to protection under 365(b)(3)(D), the lessor must

3  demonstrate that there was an intended tenant mix in the first

4  instance.  Intent to create a diverse tenant mix must be

5  established in light of the lease terms.  In order to establish

6  that the proposed assignment" -- omitting a word or two there

7  -- "would disturb the tenant mix of the shopping center -- In

8  order to establish that the proposed assignment would have

9  disturbed a tenant mix of the shopping center, the landlord

10 must establish that the tenant mix was part of its bargained-

11 for exchanged in its lease and leases with the other tenants."

12 Lasalle v. Trak Auto, 288 B.R. 114,125 (E.D.Va. 2003)  Also

13 Toys "R" Us Property Co I, 2019 WL *6 (E.D.Va. February 11,

14 2019).

15        Here, as noted, the debtors had a virtually

16 unrestricted right to use the premises for any lawful purpose

17 which would include arts and crafts stores or discount apparel

18 stores.  Then, the Court further notes that tenant mix or

19 balance is not defined in the Bankruptcy Code, but the Court

20 agrees with the reasoning in Sears where the Court in a very

21 detailed and well-reasoned opinion found that given the lack of

22 any statutory definition for the words "tenant mix" and the

23 several possibilities for what it might mean, it makes perfect

24 sense to interpret the phrase "tenant mix" for the purposes of

25 365(b)(3)(D) in light of the lease whose performance is being

1  assured because the tenancy governed by that lease is part of

2  the tenant mix at the shopping center.  <u>Sears</u> 613 B.R. 68.

3          And here, I'm going to adopt the -- and really, in

4  total, the district court's reasoning at Pages 65 to 71 where

5  the court discussed in great detail the legal basis for that

6  interpretation in light of the case law, in light of

7  legislative history, in light of principles of statutory

8  construction.  And although the case is relied upon by the

9  landlords for the (A) portion and the (A) discussion, I find

10  the (D) discussion to be of particular relevance not only here

11  but also in the case of -- I'm sorry, I need to get the case

12  here -- in the case of the analysis for (3)(C), by analogy,

13  because it does require a focus on the lease at issue.

14          And that court, I'll just note in its conclusion

15  after that lengthy and detailed analysis, concluded as follows:

16  "The bankruptcy court cannot be read to place the landlord in a

17  better position than it would have occupied absent the

18  bankruptcy."  That's the <u>Great Atlantic & Pacific Tea Company</u>

19  case, 472 B.R. 675.

20          And then quoting from that case, "Section 365 does

21  not give a landlord the right to improve its position upon the

22  bankruptcy of the tenant.  The statute affords no relief to a

23  landlord simply because it might seek to escape a bargain it

24  made, quoting <u>Rock 49th Restaurant</u> case.

25          So then the court then concludes in support of the

1  argument and the words that the tenant mix will not be

2  disrupted, that must be read to guarantee the preservation of

3  the very businesses or at least the same type and number of

4  businesses that were resident in the mall just before Sears

5  declared bankruptcy.  And then it went on to distinguish the

6  Federated case which I agree with that is a distinguishing

7  factor, also.

8           So I think as a matter of law, I need to look at the

9  lease again between Bed Bath & Beyond and the respective

10 landlords.  And in none of those leases was any of these uses

11 prohibited.  So the landlords didn't care to negotiate that in

12 or weren't able to negotiate that into the leases when they

13 entered into the lease with Bed Bath & Beyond.  And maybe that

14 was because Bed Bath & Beyond wouldn't agree to it without it.

15 And so then to allow the landlord to just get out of that

16 provision because the debtor filed bankruptcy just does not

17 make sense to this Court.

18          So I think in that context, I don't really need to

19 look at other -- and especially in the context of the entire

20 shopping center.  When you look at the lease, the lease, these

21 uses are permitted, so why would that result in a disruption in

22 the tenant mix and balance as was contemplated by Congress and

23 the case law in light of the agreement between the parties, the

24 landlord and the tenant?

25          At the hearing on August 30th, the parties stipulated

133

1  to asserted facts and also the leases were all stipulated into

2  evidence.  No one pointed out in those leases where the tenant

3  mix was subject to a master lease or some particular tenant mix

4  that the debtor agreed to.  In fact, the opposite is true is

5  that the landlord granted Bed Bath & Beyond very broad rights

6  to assign the lease and, in fact, did not require it to honor

7  any exclusives.

8          So the tenant mix could have been affected by that

9  because it wasn't required to honor any exclusives, but that

10 was the deal.  And to give the landlord more rights than it

11 would have outside of the bankruptcy again is inconsistent for

12 the reasons stated.

13         So, again, I think I can decide that as a matter of

14 law.  But to the extent that we need to get into facts, the

15 Court finds that the evidence falls short of establishing that

16 the existing tenant mix is going to be disrupted in the

17 shopping center as opposed to the Power Center.  The only

18 evidence that was submitted in Mr. Aronoff's certification

19 says, "The contractual use, exclusive use, and assignment

20 provisions of the leases of the various tenants of the Power

21 Center including the Hobby Lobby lease, the BBY lease, and the

22 Dollar Tree lease allow landlord to control the tenant mix and

23 balance at the Power Center and the Promenade."

24         He had to limit it to the Power Center to even make

25 that statement.  But as the Court previously found, the

134

1  shopping center includes the 100-plus stores and the two stores

2  that -- the two arts and crafts stores that will be there are

3  two out of a hundred.  And they are very close to each other,

4  but to the extent again I have to consider facts and this goes

5  to the Elliott certification and the -- I'm not sure where it

6  stands on the Power certification.

7       But the Elliott certification makes clear that there

8  are plenty of places in the country where Michaels and Hobby

9  Lobby co-exist and where also the other proof about it that

10  Ross and Burlington co-exist in various places.  But I think

11  that gives further support to you have to look at the agreement

12  between the two key parties' argument because it is a function

13  of the individual leases.

14       In some places, the Michaels and the Hobby Lobby at

15  least two are right next to each other.  So in those cases,

16  that did not obviously by definition disrupt the tenant mix and

17  balance because they're there together.  And there's plenty of

18  other instances where even taking away the ones as to which

19  there's some question, there are a few stores away in the same

20  center.

21       So that's why you have to look at the agreement

22  between the parties, and whether it was for whatever reasons

23  the parties agreed that Bed Bath & Beyond could assign to

24  essentially whomever it wanted, that to me means that the

25  tenant mix was not that important because you could assign to

1   anyone who wasn't operating something illegal or a tattoo

2   parlor or something like that.

3          And, further, there is an indication that there would

4   be some possible diminishment in traffic at the Hobby Lobby

5   store, for example, when the Michaels first opens.  But then

6   that there might be beneficial synergies to that.  I don't

7   know.  I'm not an expert in that, but that also seems to make

8   sense to me.

9          And in any event, I don't find that the landlords met

10  their initial burden as to the mix.  But even considering the

11  facts that were provided in the context of the lease, I can't

12  find that there was a disruption of the tenant mix and balance

13  as contemplated by 365(b)(3)(D).

14         So that's the Court's ruling.  I'm going to allow the

15  assignment subject to all the terms of the leases including

16  whatever restrictions there might be and whatever the terms

17  are, they are.  There's no change in any of the terms.  It's

18  just being assigned exactly as it was or as is.  So that's the

19  Court's ruling.

20         MR. LeHANE:  Your Honor, Robert LeHane for the

21  record, Kelley Drye & Warren, on behalf of the Pinnacle

22  landlord and the Serramonte landlord.  Just a few questions,

23  Your Honor?

24         THE COURT:  Sure.

25         MR. LeHANE:  Is all of the evidence offered by all of

1  the parties now admitted into evidence?  I just want to --

2          THE COURT:  Yeah.  I didn't say that?  I'm sorry.

3  It's all admitted into evidence.

4          MR. LeHANE:  Okay.  That includes the leases, the

5  declarations, the Aronoff, the Elliott, the deposition

6  transcript excerpts, and the declaration exhibits?

7          THE COURT:  I meant to say that when I listed all of

8  them.

9          MR. LeHANE:  Yeah.

10          THE COURT:  But apparently I forgot.

11          MR. LeHANE:  Right.

12          THE COURT:  But they're all admitted into evidence.

13          MR. LeHANE:  The additional slides, the -- okay.

14          THE COURT:  They're all in.

15          MR. LeHANE:  Okay.  Now with respect to an order, we

16  would ask that we have time to work through an order, and we

17  would ask for that there would be the typical time to allow the

18  parties to as for file a notice of appeal and not that the

19  order be enforceable immediately.  We would ask to have some

20  time to work through that with counsel for the debtor.

21          THE COURT:  Okay.  That's no problem.  But I'm going

22  to tell you right now I'm not going to say that you can't have

23  those 14 days at least to try to come to the form of order or

24  do whatever it is that you want to do in connection with any

25  appeal.

1          I kind of said this, but maybe I didn't directly say

2    it.  This was a difficult decision for me.  There was a lot of

3    good arguments on both sides, and it required a lot of thought

4    and a lot of consideration and a lot of reading of cases and

5    hundred-page leases in small print.  And that's the way I came

6    out, but it's a difficult issue.  And I appreciate the

7    arguments on both sides.

8          And as much as I appreciate the arguments on both

9    sides, I more appreciate the absolutely impeccable and really

10   in many ways unprecedented professionalism, courtesy, and

11   respect that the parties have shown for each other throughout

12   these proceedings.  I have to call them one way or another, and

13   that means somebody wins and somebody loses.

14         But I appreciate that all the effort that goes into

15   this and even more the professionalism and good faith that has

16   been shown.  For example, that the landlord said let the lease

17   payment go for 30 days or actually 60 days.  That's good faith,

18   to me.  Okay?

19         MR. LeHANE:  Thank you very much, Your Honor.

20         THE COURT:  Thank you.

21         So we'll just mark this order to be submitted.  And

22   you know our Rules, this is not going to happen, but our Rules

23   provide that if the parties can agree, one party can submit on

24   seven days' notice and the other party has the right to object

25   and submit their own form of order.  I think the form of order

138

1  should be pretty simple, but I haven't seen that mean simple

2  ones in this case.  I'll be waiting on it and I'll be ready to

3  enter it when it's the appropriate time.  Okay?

4          Thank you very much.

5          MULTIPLE COUNSEL:  Thank you, Your Honor.

6          THE COURT:  Much appreciated again.  Have a good

7  afternoon.

8          UNIDENTIFIED COUNSEL:  Same to you.

9          UNIDENTIFIED COUNSEL:  Thank you, Your Honor.

10          THE COURT:  I'm sorry for keeping everybody late, but

11  I'm glad we got it done today.  I think it's helpful to all

12  involved.

13          (Proceedings concluded at 6:29 p.m.)

14                      * * * * *

15

16

17

18

19

20

21

22

23

24

25

139

**C E R T I F I C A T I O N**

1

2          We, KAREN K. WATSON AND DIPTI PATEL, court approved

3   transcribers, certify that the foregoing is a correct

4   transcript from the official electronic sound recording of the

5   proceedings in the above-entitled matter, and to the best of

6   our ability.

7

8   /s/ Karen K. Watson

9   KAREN WATSON, CET-1039

10

11   /s/ Dipti Patel

12   DIPTI PATEL, CET-997

13   J&J COURT TRANSCRIBERS, INC.      DATE:  September 1, 2023

14

15

16

17

18

19

20

21

22

23

24

25