**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Emily E. Geier, P.C. (admitted *pro hac vice*)
Derek I. Hunter (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
joshua.sussberg@kirkland.com
emily.geier@kirkland.com
derek.hunter@kirkland.com

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com

*Co-Counsel for Debtors and*
*Debtors in Possession*

### UNITED STATES BANKRUPTCY COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | Chapter 11 |
| BED BATH & BEYOND INC., *et al.*, | Case No. 23-13359 (VFP) |
| Debtors.[1] | (Jointly Administered) |

## DEBTORS' MEMORANDUM OF LAW IN SUPPORT OF
## (I) APPROVAL OF THE DISCLOSURE STATEMENT ON A FINAL
## BASIS AND (II) CONFIRMATION OF THE JOINT CHAPTER 11 PLAN
## OF BED BATH & BEYOND INC. AND ITS DEBTOR AFFILIATES

---

[1]  The last four digits of Debtor Bed Bath & Beyond Inc.'s tax identification number are 0488. A complete list of the Debtors in these Chapter 11 Cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/bbby.  The location of Debtor Bed Bath & Beyond Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 650 Liberty Avenue, Union, New Jersey 07083.

# TABLE OF CONTENTS

**Page**

Introduction ............................................................................................................................. 1

Background ............................................................................................................................. 3

I.      Chapter 11 Plan and Procedural History. ....................................................................... 3

II.     Plan Modifications. ...................................................................................................... 7

III.    Remaining Confirmation Objections. ............................................................................ 8

Argument ............................................................................................................................... 9

I.      The Disclosure Statement Contains "Adequate Information" as Required by
       Section 1125 of the Bankruptcy Code, and the Debtors Complied with Applicable
       Notice Requirements. .................................................................................................. 9

       A.     The Disclosure Statement Contains Adequate Information. .................................. 9

       B.     The Debtors Complied with the Applicable Notice Requirements. ...................... 12

       C.     Solicitation of the Plan Complied with the Bankruptcy Code and Was in
            Good Faith. ............................................................................................... 12

II.     The Plan Satisfies Each Requirement for Confirmation. ................................................ 13

       C.     The Plan Complies with the Applicable Provisions of the Bankruptcy
            Code (Section 1129(a)(1)). .......................................................................... 13

            1.     The Plan Satisfies the Classification Requirements of Section 1122
                 of the Bankruptcy Code. ..................................................................... 14

            2.     The Plan Satisfies the Mandatory Plan Requirements of  Section
                 1123(a) of the Bankruptcy Code. ......................................................... 16

       D.     The Debtors Have Complied with the Applicable Provisions of the
            Bankruptcy Code (Section 1129(a)(2)). ........................................................ 19

            1.     The Debtors Have Complied with the Disclosure and Solicitation
                 Requirements of Section 1125. ............................................................ 19

            2.     The Debtors Have Satisfied the Plan Acceptance Requirements of
                 Section 1126. .................................................................................... 19

       E.     The Debtors Proposed the Plan in Good Faith and Not by Any Means
            Forbidden by Law (Section 1129(a)(3)). ....................................................... 21

**TABLE OF CONTENTS (CONT'D)**

**Page**

F.  The Plan Provides that the Debtors' Payment of Professional Fees and Expenses Are Subject to Court Approval (Section 1129(a)(4)). .......................... 22

G.  The Plan Satisfies the Bankruptcy Code's Governance Disclosure Requirements (Section 1129(a)(5)). ....................................................... 22

H.  The Plan Does Not Require Government Regulatory Approval of Rate Changes (Section 1129(a)(6)). ...................................................... 23

I.  The Plan Satisfies the Best Interests Test (Section 1129(a)(7)). .......................... 23

J.  The Plan Satisfies the Bankruptcy Code's Voting Requirements (Section 1129(a)(8)). ....................................................... 25

K.  The Plan Provides For The Statutorily Mandated Treatment of Administrative and Other Priority Claims (Section 1129(a)(9)). .......................... 26

L.  At Least One Impaired Class of Claims Has Accepted the Plan (Section 1129(a)(10)). ...................................................... 27

M.  The Plan Is Feasible and Is Not Likely to Be Followed by the Need for Further Financial Reorganization (Section 1129(a)(11)). ..................................... 27

N.  The Plan Provides for the Payment of All Fees Under 28 U.S.C. § 1930 (Section 1129(a)(12)). ...................................................... 29

O.  Sections 1129(a)(13) Through 1129(a)(16) of the Bankruptcy Code Do Not Apply to the Plan. ....................................................... 30

P.  The Plan Satisfies the Cramdown Requirements (Section 1129(b)). ................... 30

    1.  The Plan is Fair and Equitable with Respect to All Classes. .................... 31

    2.  The Plan Does Not Unfairly Discriminate Against Any Class. ................ 32

Q.  The Plan Complies with the Other Provisions of Section 1129 of the Bankruptcy Code (Sections 1129(c)–(e)). ............................................... 33

III.  The Discretionary Contents of the Plan Are Appropriate. ................................................. 34

A.  The Debtor Release Provision in the Plan is Appropriate. .................................... 34

B.  The Third-Party Releases in the Plan Are Appropriately Tailored and Should Be Approved. ...................................................... 38

C.  The Plan's Exculpation Provision Is Permitted Under the Bankruptcy Code. ...................................................... 41

**TABLE OF CONTENTS (CONT'D)**

Page

D.    The Injunction Provision is Appropriate. ..............................................43

IV.    The Objections Should Be Overruled..................................................44

    A.    The Plan's Third-Party Release is Consensual and Permissible. .........................44

    B.    The Third-Party Release is Appropriate. ..............................................44

        1.    The Third-Party Release is Consensual....................................................45

        2.    Even if the Third-Party Release is Non-Consensual, It is
Permissible................................................................................49

        3.    The Court Has Jurisdiction and Authority to Approve the
Third-Party Release. ..................................................................51

    C.    The "Gatekeeping Provision" Should be Approved.............................................51

    D.    The Distributions Under the Plan Do Note Require Substantive
Consolidation. ..........................................................................56

Waiver of Bankruptcy Rule 3020(e)..............................................................59

Conclusion ..................................................................................60

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re 203 N. LaSalle St. Ltd. P'ship*,
   190 B.R. 567 (Bankr. N.D. Ill. 1995), *rev'd on other grounds* ...............................................31

*In re 203 N. LaSalle St. Ltd. P'ship*,
   190 B.R. 567 (Bankr. N.D. Ill. 1995) ...................................................................................31

*In re 500 Fifth Ave. Assocs.*,
   148 B.R. 1010 (Bankr. S.D.N.Y. 1993) ...............................................................................14

*In re A. H. Robins Co., Inc.*,
   880 F.2d 694 (4th Cir. 1989) .................................................................................................9

*In re A.H. Robins Co.*,
   88 B.R. 742 (Bankr. E.D. Va. 1988) .......................................................................................7

*In re Abbotts Dairies of Pa., Inc.*,
   788 F.2d 143 (3d Cir. 1986) ..................................................................................................21

*In re Aceto Corporation*,
   Case No.-15-24999 (VFP) (Bankr D. N.J. Jan. 12, 2017) ......................................................46

*In re Aceto Corporation*,
   Case No. 19-13448 (VFP) (Bankr D. N.J. Sept. 18, 2019) ......................................................46

*In re Aleris Int'l, Inc.*,
   No. 09-10478 (BLS), 2010 WL 3492664 (Bankr. D. Del. May 13, 2010) .................28, 31, 32

*In re Armstrong World Indus., Inc.*,
   348 B.R. 136 (Bankr. D. Del. 2006) ....................................................................13, 14, 31, 32

*In re Avaya Inc.*,
   Case No. 23-90088 (DRJ) (Bankr S.D. Tex. Mar. 21, 2023) ..................................................50

*In re Aztec Co.*,
   107 B.R. 585 (Bankr. M.D. Tenn. 1989) ...............................................................................31

*Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
   526 U.S. 434 (1999) ........................................................................................................23, 31

*Baron v. Sherman (In re Ondova Ltd. Co.,)*,
   2017 Bankr. LEXIS 325 (Bankr. N.D. Tex. Feb. 1, 2017) ......................................................50

**TABLE OF AUTHORITIES (CONT'D)**

**Page(s)**

*Barton v. Barbour*,
   104 U.S. 126 (1881)...............................................................................................50

*Boston Regional Med. Ctr., Inc. v. Reynolds (In re Boston Regional Med. Ctr.
   Inc.)*,
   410 F.3d 100 (1st Cir. 2005)...................................................................................52

*Brite v. Sun Country Dev., Inc. (In re Sun Country Dev., Inc.)*,
   764 F.2d 406 (5th Cir. 1985) ..................................................................................21

*In re Bryson Properties, XVIII*,
   961 F.2d 469 (4th Cir. 1992) ..................................................................................30

*In re Capmark Fin. Grp. Inc.*,
   2011 WL 6013718 (Bankr. D. Del. Oct. 5, 2011) ..................................................27

*Carter v. Rodgers*,
   220 F.3d 1249 (11th Cir. 2000) ..............................................................................50

*Celotex Corp. v. Edwards*,
   514 U.S. 300 (1995)................................................................................................54

*In re Century Glove, Inc.*,
   1993 WL 239489 (D. Del. Feb. 10, 1993) ..............................................................21

*Century Glove, Inc. v. First Am. Bank of N.Y.*,
   860 F.2d 94 (3d Cir. 1988)...........................................................................9, 26, 35

*In re Chapel Gate Apartments, Ltd.*,
   64 B.R. 569 (Bankr. N.D. Tex. 1986)......................................................................21

*In re Charter Commc'ns*,
   419 B.R. 221 (Bankr. S.D.N.Y. 2009).....................................................................55

*In re Chassix Holdings, Inc.*,
   533 B.R. 64 (Bankr. S.D.N.Y. 2015)..................................................................39, 45

*In re Cineworld Group plc*,
   Case No. 22-90168 (MI) (Bankr. S.D. Tex. Jun. 26, 2023)....................................50

*In re Cobalt Int'l Energy, Inc.*,
   No. 17-36709 (MI)...................................................................................................49

*In re Congoleum Corporation*,
   Case No. 20-18488 (MBK) (Bankr. D. N.J. Jan. 25, 2021)....................................46

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*In re Conseco, Inc.*,
301 B.R. 525 (Bankr. N.D. Ill. 2003) ......................................................................45

*In re Coram Healthcare Corp.*,
315 B.R. 321 (Bankr. D. Del. 2004) ..............................................31, 34, 39, 45

*Cosoff v. Rodman (In re W.T. Grant Co.)*,
699 F.2d 599 (2d Cir. 1983) ....................................................................................34

*In re Cuyahoga Equip. Corp.*,
980 F.2d 110, 114 (2d Cir. 1992) ........................................................................54

*In re Cypresswood Land Partners, I*,
409 B.R. 396 (Bankr. S.D. Tex. 2009) ................................................................23

*In re DBSD N. Am., Inc.*,
419 B.R. 179 (Bankr. S.D.N.Y. 2009) ................................................................45

*In re Dow Corning Corp.*,
237 B.R. 374 (Bankr. E.D. Mich. 1999) ..............................................................7

*In re Drexel Burnham Lambert Grp. Inc.*,
138 B.R. 723 (Bankr. S.D.N.Y. 1992) ................................................................14

*In re Drexel Burnham Lambert Grp., Inc.*,
960 F.2d 285 (2d Cir. 1992) ....................................................................................42

*In re Enron Corp.*,
326 B.R. 497 (S.D.N.Y. 2005) ..............................................................................42

*In re Exaeris, Inc.*,
380 B.R. 741 (Bankr. D. Del. 2008) ....................................................................34

*In re Exide Techs.*,
303 B.R. 48 (Bankr. D. Del. 2003) ......................................................................35

*Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship)*,
116 F.3d 790 (5th Cir. 1997) ..................................................................................21

*First Am. Bank of N.Y. v. Century Glove, Inc.*,
81 B.R. 274 (D. Del. 1988) ......................................................................................9

*In re Flintkote Co.*,
486 B.R. 99 (Bankr. D. Del. 2012) ..............................................................*passim*

**TABLE OF AUTHORITIES (CONT'D)**

**Page(s)**

*In re Freymiller Trucking, Inc.*,
    190 B.R. 913 (Bankr. W.D. Okla. 1996) ...............................................................31

*Frito Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.)*,
    10 F.3d 944 (2d Cir. 1993).....................................................................................14

*In re Future Energy Corp.*,
    83 B.R. 470 (Bankr. S.D. Ohio 1988)....................................................................21

*In re Genco Shipping & Trading Ltd.*,
    513 B.R. 233 (Bankr. S.D.N.Y. July 2, 2014) .......................................................38

*In re Genesis Health Ventures, Inc.*,
    266 B.R. 591 (Bankr. D. Del. 2001) ...........................................................48, 55, 56

*Genesis Health Ventures, Inc. v. Stapleton (In re Genesis Health Ventures, Inc.)*,
    402 F.3d 416 (3d Cir. 2005)............................................................................55, 56

*Gillman v. Continental Airlines (In re Continental Airlines)*,
    203 F.3d 203 (3d Cir. 2000).................................................................................48

*In re Granite Broad. Corp.*,
    369 B.R. 120 (Bankr.S.D.N.Y.2007).....................................................................31

*Hallock v. Key Fed. Sav. Bank (In re Silver Oak Homes)*,
    167 B.R. 389 (Bankr. D. Md. 1994) ......................................................................51

*Hargreaves v. Nuverra Env't Sols., Inc. (In re Nuverra)*,
    590 B.R. 75 (D. Del. 2018), *aff'd*, 834 F. App'x 729 (3d Cir. 2021), *as*
    *amended*
    (Feb. 2, 2021).......................................................................................................31

*In re Harstad*,
    155 B.R. 500 (Bankr. D. Minn. 1993) ...................................................................39

*In re Health Diagnostics Lab, Inc.*,
    551 B.R. 218 (Bankr. E.D. Va. 2016)....................................................................30

*Helmer v. Pogue*,
    212 U.S. Dist. LEXIS 151262 (N.D. Ala. Oct. 22, 2012) ......................................50

*In re Heritage Org., L.L.C.*,
    375 B.R. 230 (Bankr. N.D. Tex. 2007)..................................................................14

*In re Highland Capital Management, L.P.*,
    Case No.19-34054-SGJ (Bankr. N.D. Tex. Nov. 24, 2020) ............................50, 53

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*In re Indianapolis Downs*,
　486 B.R. 286 (Bankr. D. Del. 2013) .........................................................................37, 38, 46

*Matter of Jersey City Med. Ctr.*,
　817 F.2d 1055 (3d Cir. 1987) .........................................................................................14

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs (In re Route 37 Bus. Park Assocs.)*,
　987 F.2d 154 (3d Cir. 1993) ...........................................................................................14

*In re Johns-Manville Corp.*,
　68 B.R. 618 (Bankr. S.D.N.Y. 1986) ..............................................................................32

*Kane v. Johns-Manville Corp.*,
　843 F.2d 636 (2d Cir. 1988) ...........................................................................................27

*Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*,
　337 F.3d 314 (3d Cir. 2003) ............................................................................................9

*In re Lannett Company, Inc.*,
　Case No. 23-10559 (JKS) (Bankr. D. Del. Jun. 8, 2023) .................................................52

*In re Lapworth*,
　1998 WL 767456 (Bankr. E.D. Pa. Nov. 2, 1998) ...........................................................18

*In re Lernout & Hauspie Speech Prods., N.V.*,
　301 B.R. 651 (Bankr. D. Del. 2003), *aff'd sub nom. In re Lernout & Hauspie*
　*Speech Prod. N.V.*, 308 B.R. 672 (D. Del. 2004) ...........................................................31

*In re Lisanti Foods, Inc.*,
　329 B.R. 491 (Bankr. D.N.J. 2005) ..............................................................................9, 21

*Lowenbraun v. Canary (In re Lowenbraun)*,
　453 F.3d 314 (6th Cir. 2006) ..........................................................................................51

*In re Maharaj*,
　681 F.3d 558 (4th Cir. 2012) ..........................................................................................30

*In re Master Mortg. Inv. Fund, Inc.*,
　168 B.R. 930 (Bankr. W.D. Mo. 1994) ...........................................................................34

*In re Metrocraft Publ'g Servs., Inc.*,
　39 B.R. 567 (Bankr. N.D. Ga. 1984) ..............................................................................10

*In re Millennium Lab Holdings II, LLC*,
　575 B.R. 252 (Bankr. D. Del. 2017) ...............................................................................54

**TABLE OF AUTHORITIES (CONT'D)**

**Page(s)**

*In re Modell's Sporting Goods, Inc.*,
  Case No. 20-14179 (VFP) (Bankr. D. N.J. Nov. 12, 2020)....................................................46

*In re Modell's Sporting Goods, Inc.*,
  No. 20-14179 (VFP) (Bankr. D. N.J. Nov. 12, 2020)..............................................................52

*In re Monnier Bros.*,
  755 F.2d 1336 (8th Cir. 1985) ...................................................................................................9

*In re Motors Liquidation Co.*,
  541 B.R. 104 (Bankr. S.D.N.Y. 2015)......................................................................................51

*In re National Realty Investment Advisors, LLC*,
  Case No. 22-14539 (JKS) (Bankr. D. N.J. Aug. 10, 2023)......................................................50

*In re Nautical Solutions, L.L.C.*,
  No. 23-90002 (CML) (Bankr. S.D. Tex. Feb. 14, 2023) ..........................................................50

*NextPoint Advisors, L.P. v. Highland Capital Mgmt., L.P. (In re Highland Capital
  Mgmt., L.P.)*,
  48 F.4th 419 (5th Cir. 2022) .....................................................................................................53

*In re NII Holdings, Inc.*,
  288 B.R. 356 (Bankr. D. Del. 2002) ........................................................................................21

*Oneida Motor Freight, Inc. v. United Jersey Bank*,
  848 F.2d 414 (3d Cir. 1988).......................................................................................................9

*In re Phoenix Petrol., Co.*,
  278 B.R. 385 (Bankr. E.D. Pa. 2001) ...................................................................................9, 10

*Pizza of Haw., Inc. v. Shakey's, Inc. (In re Pizza of Haw., Inc.)*,
  761 F.2d 1374 (9th Cir. 1985) ..................................................................................................27

*In re Premier Int'l Holdings, Inc.*,
  2010 WL 2745964 (Bankr. D. Del. Apr. 29, 2010)...........................................................12, 40

*In re Princeton Alternative Income Fund, LP*,
  Case No. 18-14603 (MBK) (Bankr. D. N.J. Feb. 19, 2020)....................................................50

*In re Prussia Assocs.*,
  322 B.R. 572 (Bankr. E.D. Pa. 2005) .......................................................................................27

*In re PWS Holding Corp.*,
  228 F.3d 224 (3d Cir. 2000).........................................................................................21, 40, 42

**TABLE OF AUTHORITIES (CONT'D)**

**Page(s)**

*In re Quigley Co., Inc.*,
676 F.3d 45 (2d Cir. 2012)................................................................................54

*In re RCS Cap. Corp.*,
No. 16-10223 (MFW) ...........................................................................40, 45

*In re River Vill. Assoc.*,
181 B.R. 795 (E.D. Pa. 1995) ................................................................9

*In re Sabine Oil & Gas Corp.*,
555 B.R. 180 (Bankr. S.D.N.Y. 2016)...................................................56

*In re Saint Michael's Medical Center, Inc.*,
Case No. 15-24999 (VFP) (Bankr D. N.J. Jan. 12, 2017) ......................46

*In re Scioto Valley Mortg. Co.*,
88 B.R. 168 (Bankr. S.D. Ohio 1988).....................................................10

*In re Sea Garden Motel & Apartments*,
195 B.R. 294 (D. N.J. 1996) ................................................................27

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
546 B.R. 284 (Bankr. S.D.N.Y. 2016)...................................................51

*In re Sentinel Mgmt. Grp., Inc.*,
398 B.R. 281 (Bankr. N.D. Ill. 2008) ...................................................7

*In re SLT Holdco, Inc.*,
Case No 20-18368 (MBK) (Bankr. D. N.J. Oct. 21, 2020) .............46, 47

*In re Spansion, Inc.*,
426 B.R. 114 (Bankr. D. Del. 2010) ............................34, 37, 38, 46

*In re Spansion*,
No. 09-10690 (KJC), 2010 WL 2905001 (Bankr. D. Del. 2010) ...........41

*In re Specialty Equip. Companies, Inc.*,
3 F. 3d 1043 (7th Cir. 1993) ............................................................39, 45

*In re TCI 2 Holdings, LLC*,
428 B.R. 117 (Bankr. D.N.J. 2010) ......................................................12

*In re Trans Max Techs., Inc.*,
349 B.R. 80 (Bankr.D.Nev.2006) .........................................................31

*In re Transwest Resort Properties Inc.*,
881 F. 3d 724 (9th Cir. 2018) ..............................................................55

**TABLE OF AUTHORITIES (CONT'D)**

**Page(s)**

*In re Tribune Co.*,
464 B.R. 126 (Bankr. D. Del. 2011), *on reconsideration*, 464 B.R. 208
(Bankr. D. Del. 2011) ...............................................................................................27

*In re U.S. Brass Corp.*,
194 B.R 420 (Bankr. E.D. Tex. 1996). .....................................................................10

*In re U.S. Truck Co.*,
47 B.R. 932 (E.D. Mich. 1985), *aff'd,* 800 F.2d 581 (6th Cir. 1986) .....................27

*In re Unichem Corp.*,
72 B.R. 95 (Bankr. N.D. Ill. 1987) ............................................................................9

*In re W.R. Grace & Co.*,
475 B.R. 34 (D. Del. 2012) ................................................................................21, 27

*In re Wash. Mut., Inc.*,
442 B.R. 314 (Bankr. D. Del. 2011) ..................................................34, 35, 37, 40

*Westland Oil Dev. Corp. v. MCorp Mgmt. Sols., Inc.*,
157 B.R. 100 (S.D. Tex. 1993) ................................................................................10

*In re Wiersma*,
227 F. App'x 603 (9th Cir. 2007) .............................................................................13

*In re World Health Alts., Inc.*,
344 B.R. 291 (Bankr. D. Del. 2006) .........................................................................34

*In re Worldcom, Inc.*,
No. 02-13533 (AJG), 2003 WL 23861928 (Bankr. S.D.N.Y. Oct. 31, 2003) .........18

*In re Zenith Elecs. Corp.*,
241 B.R. 92 (Bankr. D. Del. 1999) ...................................................................*passim*

**Statutes**

11 U.S.C. ...................................................................................................................30

11 U.S.C. § 101(31) ..................................................................................................22

11 U.S.C. § 101(51D)(B) ..........................................................................................33

11 U.S.C. §§ 101-1532 ..........................................................................................1, 52

11 U.S.C. § 105 .........................................................................................................49

11 U.S.C. § 328 .........................................................................................................22

**TABLE OF AUTHORITIES (CONT'D)**

**Page(s)**

11 U.S.C. § 330 ............................................................................................................... 22

11 U.S.C. § 365(f) ........................................................................................................... 57

11 U.S.C. § 503(b) .......................................................................................................... 25

11 U.S.C. § 507(a)(2) ...................................................................................................... 25

11 U.S.C. § 507(a)(8) ...................................................................................................... 26

11 U.S.C. § 1114 ............................................................................................................. 29

11 U.S.C. § 1114(a) ........................................................................................................ 29

11 U.S.C. § 1122 .......................................................................................... 7, 13, 14, 15

11 U.S.C. § 1122(a) ........................................................................................................ 13

11 U.S.C. § 1123 ...................................................................................................... 7, 13

11 U.S.C. § 1123(a) ........................................................................................ 15, 16, 17

11 U.S.C. § 1123(a)(1)–(3) ............................................................................................. 16

11 U.S.C. § 1123(a)(4) .................................................................................................... 16

11 U.S.C. § 1123(a)(5) .............................................................................................. 16, 17

11 U.S.C. § 1123(a)(6) .................................................................................................... 17

11 U.S.C. § 1123(a)(7) .............................................................................................. 17, 18

11 U.S.C. § 1123(b) ........................................................................................................ 33

11 U.S.C. § 1123(b) (1)–(6) ........................................................................................... 33

11 U.S.C. § 1123(b)(3)(A) .............................................................................................. 34

11 U.S.C. § 1123(b)(6) ................................................................................................... 49

11 U.S.C. § 1125 ........................................................................................ 1, 18, 19, 52

11 U.S.C. § 1125 .................................................................................................... *passim*

11 U.S.C. § 1125(a) ........................................................................................................ 11

11 U.S.C. § 1125(a)(1) ...................................................................................................... 9

**TABLE OF AUTHORITIES (CONT'D)**

**Page(s)**

11 U.S.C. § 1125(e) ................................................................................................................12

11 U.S.C. § 1126 ...............................................................................................1, 18, 19, 52

11 U.S.C. § 1126 .......................................................................................................19, 20

11 U.S.C. § 1126(a) ...............................................................................................................19

11 U.S.C. § 1126(a) ...............................................................................................................20

11 U.S.C. § 1126(c) .......................................................................................................20, 24

11 U.S.C. § 1126(f) ...............................................................................................................19

11 U.S.C. § 1126(f) .......................................................................................................20, 24

11 U.S.C. § 1126(g) ...............................................................................................................19

11 U.S.C. § 1126(g) .......................................................................................................20, 24

11 U.S.C. § 1127(a) .........................................................................................................7, 13

11 U.S.C. § 1129 .............................................................................................................1, 52

11 U.S.C. § 1129 .......................................................................................................12, 32

11 U.S.C. § 1129(a) ...............................................................................................................12

11 U.S.C. § 1129(a) ...............................................................................................................30

11 U.S.C. § 1129(a)(1) ...........................................................................................................13

11 U.S.C. § 1129(a)(2) .................................................................................................18, 20, 41

11 U.S.C. § 1129(a)(3) .................................................................................................20, 21, 41

11 U.S.C. § 1129(a)(4) .....................................................................................................21, 22

11 U.S.C. § 1129(a)(5) ...........................................................................................................22

11 U.S.C. § 1129(a)(5)(A)(i) ...................................................................................................22

11 U.S.C. § 1129(a)(5)(A)(ii) ..................................................................................................22

11 U.S.C. § 1129(a)(5)(B) .......................................................................................................22

11 U.S.C. § 1129(a)(6) ...........................................................................................................23

### TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

11 U.S.C. § 1129(a)(7) ................................................................................................. 23, 24

11 U.S.C. § 1129(a)(8) ............................................................................................ 24, 25, 30

11 U.S.C. § 1129(a)(8)(A) ............................................................................................... 30

11 U.S.C. § 1129(a)(9) ................................................................................................. 25, 26

11 U.S.C. § 1129(a)(9)(A) ........................................................................................... 25, 26

11 U.S.C. § 1129(a)(9)(B) ........................................................................................... 25, 26

11 U.S.C. § 1129(a)(9)(C) ............................................................................................... 26

11 U.S.C. § 1129(a)(10) ........................................................................................... 25, 26, 27

11 U.S.C. § 1129(a)(11) .............................................................................................. 27, 28

11 U.S.C. § 1129(a)(12) ................................................................................................. 29

11 U.S.C. § 1129(a)(13) ................................................................................................. 29

11 U.S.C. § 1129(a)(14) ................................................................................................. 29

11 U.S.C. § 1129(a)(15) ................................................................................................. 29

11 U.S.C. § 1129(a)(15) ................................................................................................. 29

11 U.S.C. § 1129(a)(15) ................................................................................................. 29

11 U.S.C. § 1129(a)(16) .............................................................................................. 29, 30

11 U.S.C. § 1129(b) ................................................................................................. *passim*

11 U.S.C. § 1129(b)(1) ........................................................................................... 30, 31, 32

11 U.S.C. § 1129(b)(2)(B)(ii) ........................................................................................... 30

11 U.S.C. § 1129(b)(2)(C)(ii) ........................................................................................... 30

11 U.S.C. § 1129(c) ..................................................................................................... 32

11 U.S.C. § 1129(d) ..................................................................................................... 32

11 U.S.C. § 1129(e) .................................................................................................. 32, 33

11 U.S.C. § 1141(a) ..................................................................................................... 49

### TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

11 U.S.C. § 1141(b) ........................................................................................49

11 U.S.C. § 1141(c) ........................................................................................49

28 U.S.C. § 1930 ............................................................................................29

Bankruptcy Code chapter 7.......................................................................*passim*

Bankruptcy Code chapter 11.....................................................................*passim*

Securities Act of 1933 section 5 ...................................................................32

**Rules**

Bankruptcy Rule 3019 .....................................................................................7

Bankruptcy Rule 3020(e)................................................................................57

Bankruptcy Rule 6004(h)................................................................................57

Bankruptcy Rule 6006(d)................................................................................57

Fed. R. Bankr. P. 3020(e) ..............................................................................57

**Other Authorities**

H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 412 (1977), *reprinted in* 1978
    U.S.C.C.A.N. 5936 ..................................................................................13

S. Rep. No. 95-989, 95th Cong., 2d Sess. 126 (1978), *reprinted in* 1978
    U.S.C.C.A.N. 5787 ..................................................................................13

S. Rep. No. 95-989 (1978), reprinted in 1978 U.S.C.C.A.N. 5787 ................9

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file this memorandum of law (this "Memorandum") in support of final approval of the *Amended Disclosure Statement Relating to the Amended Joint Chapter 11 Plan of Bed Bath & Beyond Inc. and Its Debtor Affiliates* [Docket No. 1713] (as modified, amended, or supplemented from time to time, the "Disclosure Statement") and confirmation of the *Amended Joint Chapter 11 Plan of Bed Bath & Beyond Inc. and Its Debtor Affiliates* [Docket No. 1712] (as modified, amended, or supplemented from time to time, the "Plan" or the "Amended Plan") pursuant to sections 1125, 1126, and 1129 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code").[2]   In further support of confirmation of the Plan, substantially contemporaneously herewith, the Debtors have filed:   (a) the *Declaration of Holly Etlin in Support of (I) Final Approval of the Disclosure Statement and (II) Confirmation of the Amended Joint Chapter 11 Plan of Bed Bath & Beyond Inc. and Its Debtor Affiliates* (the "Etlin Declaration"); and (b) the *Declaration of Alex Orchowski of Kroll Restructuring Administration LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Amended Joint Chapter 11 Plan of Bed Bath & Beyond Inc. and Its Debtor Affiliates* (the "Voting Report").   In support of confirmation of the Plan and final approval of the Disclosure Statement, and in response to the Objections thereto, the Debtors respectfully state as follows.

## Introduction

1.       After months of arm's-length, good faith negotiations with their funded debtholders, the Debtors entered bankruptcy with committed postpetition financing in the form of the DIP Facility to facilitate an expeditious and cost-efficient process to maximize the value of

---

[2]    Capitalized terms used but not defined herein have the meanings ascribed to them in the Plan, Plan Supplement (as amended), or Disclosure Statement.

their estates for the benefit of all stakeholders.   While immediately commencing an orderly winddown of their operations through the liquidation of their inventory and closure of certain of their brick-and-mortar stores, the Debtors simultaneously pursued a sale or other disposition of their businesses as a going-concern.   Though the Debtors were unfortunately unable to find a going-concern buyer, the Debtors advanced a comprehensive asset-monetization process during these cases, which still continues today.  In parallel, the Debtors engaged in months of hard-fought negotiations with their prepetition secured lenders and the official committee of unsecured creditors regarding, among other issues, claims related to the wind down, intercreditor disputes, millions of dollars in asset sales, and treatment of prepetition and postpetition claims.  And now, the Debtors are prepared to confirm a chapter 11 plan with the support of nearly all of their key stakeholders and bring these chapter 11 cases to a conclusion.  While this is far from the path that anyone envisioned when these cases were commenced, the consensus that has been reached is a tribute to the stakeholders involved in a vastly complicated set of circumstances and issues.  For those reasons and the others specified herein, the Plan represents the best available path to maximize recoveries for all creditors.

2.      The Plan itself exemplifies and embodies a value-maximizing settlement with every major constituency in the case—receiving near-unanimous support from the largest creditor constituencies in these cases, including the FILO Lenders and the Creditors' Committee.  The Plan is consistent with the Bankruptcy Code, maximizes the value of the Debtors' assets, and provides a meaningful recovery to as many creditors as possible in these circumstances.  Significantly, the Plan provides for an orderly liquidation of the Debtors' remaining assets and brings finality to these chapter 11 cases.

3.      The Plan satisfies all of the requirements for confirmation under the Bankruptcy Code.  With the support of the Holders of DIP Claims, FILO Claims, and the Creditors' Committee, the Plan faces limited opposition.  Of the eleven formal objections filed to Confirmation of the Plan and/or final approval of the Disclosure Statement, only a handful remain standing in the way of confirmation (collectively, the "Objections"), including objections from certain of the Debtors' insurers, the United States Securities and Exchange Commission (the "SEC"), and the United States Trustee (the "U.S. Trustee").[3] None of the objectors seriously contests confirmation of the Plan; instead, their Objections are limited to challenging the merits of certain of the Plan's release and injunction provisions and seeking clarification from the Debtors on aspects of the Plan that already remain abundantly clear.  The Debtors continue to engage with the objectors to reach a consensual resolution on each outstanding Objection.  As explained in detail below, to the extent not resolved prior to the Combined Hearing, the Court should overrule these Objections, approve the Disclosure Statement on a final basis, confirm the Plan, and set in motion the final steps needed to bring the Debtors' chapter 11 cases to conclusion.

## **Background**

### I.      **Chapter 11 Plan and Procedural History.**

4.      On April 23, 2023, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code [Docket No. 1].  Following the U.S. Trustee's appointment of the Creditors' Committee on May 5, 2023 [Docket No. 218], the Debtors promptly engaged in a robust diligence sharing process with the Creditors' Committee and its advisors to educate them on the Debtors' businesses and bring them up to speed on the developments in the cases.  Soon thereafter,

---

[3]     A summary of the Objections to the Plan and the Debtors' responses thereto are attached as **Exhibit A**.

and following intense, hard-fought negotiations, the Debtors, the Creditors' Committee, and the DIP Lenders reached a comprehensive, negotiated settlement on various issues relating to, among other things, the distribution of proceeds of the Debtors' assets, which was memorialized in the Final DIP Order [Docket No. 729] (the "UCC Settlement"). The UCC Settlement, which enjoyed the support of each of the UCC's members, including the indenture trustee on the Senior Unsecured Notes, critically coalesced stakeholder consensus around the Debtors' expected path to confirmation and provided an avenue for potential recovery for the Debtors' general unsecured creditors.

5.     On top of the UCC Settlement, the Debtors' sustained efforts to monetize their assets and recover estate property has proceeded rapidly and effectively. Following a robust marketing process that began prepetition and continued postpetition, as well as an auction, the Debtors obtained approval of a sale of certain intellectual property assets of the Bed Bath & Beyond banner to Overstock.com, Inc. for a purchase price of $21.5 million in cash consideration [Docket No. 1117]. Additionally, the Debtors obtained approval of a sale of the intellectual property assets of the buybuy BABY banner to Dream On Me, Inc. for approximately $15.5 million [Docket No. 1314]. Monetization of the valuable intellectual property assets of the Debtors' key business banners provides hope for the continued use and revitalization of the Debtors' storied brands. In addition to these sales, the Debtors successfully monetized all inventory pursuant to the relief granted in the Store Closing Order [Docket No. 641] and sold all of their under-market leasehold interests through the court-approved procedure to sell or dispose of their lease assets and designation rights related thereto [Docket No. 422]. In conjunction with the foregoing efforts, the Debtors and their advisors advanced the drafting and negotiation of the Plan and the Disclosure Statement.

6.      The Debtors filed their initial Plan on July 20, 2023 [Docket No. 1429] and their initial Disclosure Statement on July 21, 2023 [Docket No. 1437] respectively.  The Debtors filed amended, solicitation versions of the Plan and Disclosure Statement on August 1, 2023 [Docket Nos. 1712 and 1713].  The Debtors intend to file a second amended Plan, setting forth additional technical and clarifying modifications and resolving certain formal and informal objections to the Plan prior to the Combined Hearing.

7.      Only Holders of Claims and Interests in impaired Classes receiving or retaining property on account of such Claims or Interests were entitled to vote on the Plan.  Holders of the following Classes of Claims were the only Holders entitled to vote:

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 3 | DIP Claims | Impaired | Entitled to Vote |
| 4 | FILO Claims | Impaired | Entitled to Vote |
| 5 | Junior Secured Claims | Impaired | Entitled to Vote |
| 6 | General Unsecured Claims | Impaired | Entitled to Vote |

8.    The following Classes of Claims and Interests were not entitled to vote on the Plan:

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 2 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 7 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote |
| 8 | Intercompany Interests | Unimpaired | Deemed to Accept |
| 9 | Interests in BBB | Impaired | Deemed to Reject |
| 10 | Section 510(b) Claims | Impaired | Deemed to Reject |

9.    Pursuant to the Conditional Disclosure Statement Order, the deadline for all Holders of Claims and Interests entitled to vote on the Plan to cast their ballots was September 1, 2023, at 4:00 p.m., prevailing Eastern Time (the "Voting Deadline").  On September 7, 2023, the Debtors filed the Voting Report, which shows the results of voting on the Plan.  The Voting Report, summarized below, reflects that **at least one Voting Class voted in favor of accepting the Plan at each Debtor.**

| CLASSES | TOTAL BALLOTS RECEIVED | | | |
|---------|------------------------|--|--|--|
| | Accept | | Reject | |
| | AMOUNT (% of Amount Voted) | NUMBER (% of Number Voted) | AMOUNT (% of Amount Voted) | NUMBER (% of Number Voted) |
| Class 3 – DIP Claims | 100% | 100% | 0% | 0% |
| Class 4 – FILO Claims | 100% | 100% | 0% | 0% |
| Class 5 – Junior Secured Claims | The Debtors did not identify any Holders of Claims in Class 5 of the Plan. In accordance with Art. III(D) of the Plan, Class 5 shall be deemed eliminated from the Plan for voting purposes. | | | |

| CLASSES | TOTAL BALLOTS RECEIVED | | | |
|---|---|---|---|---|
| | Accept | | Reject | |
| | AMOUNT (% of Amount Voted) | NUMBER (% of Number Voted) | AMOUNT (% of Amount Voted) | NUMBER (% of Number Voted) |
| Class 6 – General Unsecured Claims | 56.63% | 86.48% | 43.47% | 13.52% |

10.    As set forth below, the Plan is confirmable, notwithstanding the deemed rejection by certain Classes, because there is at least one impaired, accepting Class of Claims at each Debtor, and the Debtors can satisfy the applicable cramdown requirements in section 1129(b) of the Bankruptcy Code.

11.    The deadline for parties in interest to file objections to the Plan was September 1, 2023, at 4:00 p.m., prevailing Eastern Time (the "Objection Deadline").  The hearing to consider Confirmation of the Plan and final approval of the Disclosure Statement (the "Combined Hearing") is scheduled for September 12, 2023, at 2:30 PM, prevailing Eastern Time.  Concurrently with the filing of this Memorandum, the Debtors have submitted a proposed version of the order confirming the Plan (the "Confirmation Order").

**II.    Plan Modifications.**

12.    A plan proponent may modify its plan at any time before confirmation if the modified plan meets the requirements of sections 1122 and 1123 of the Bankruptcy Code.[4]  Once filed, "the plan as modified becomes the plan."[5]  Pursuant to Bankruptcy Rule 3019, courts consistently have held that a proposed modification to a previously accepted plan will be deemed

---

[4]    11 U.S.C. § 1127(a).

[5]    *Id.*

accepted where the proposed modification is not material or does not adversely affect the way

creditors and stakeholders are treated.[6]

13.    Accordingly, only those modifications that are "material" require resolicitation.

A plan modification is not material unless it so affects a creditor or interest holder who accepted

the plan that such entity, if it knew of the modification, would be likely to reconsider its

acceptance.[7] Here, to clarify and address certain claimant concerns, the Debtors filed an amended

Plan.  The modifications to the Plan are not material changes.  Rather, they are either modifications

to resolve objections to the Plan or permissible, technical modifications to the Plan, each of which

either improve or do not reflect material differences to recoveries of each affected class—*i.e.*, no

holder is "likely" to reconsider its acceptance.

## III.    Remaining Confirmation Objections.

14.    Since the Objection Deadline, the Debtors have worked with parties in interest to

resolve the Objections prior to the Combined Hearing.  The Debtors believe that they have

resolved, or will be able to resolve, all Objections with the exception of the objections filed by

(a) the SEC; (b) the U.S. Trustee; (c) 200-220 West 26 LLC; and (d) the Bed Bath and Beyond

Common Stock Equity Interest Holders purportedly represented by Neelay Das (the "<u>Das</u>

---

[6]    *See In re Sentinel Mgmt. Grp., Inc.*, 398 B.R. 281, 301 (Bankr. N.D. Ill. 2008) ("The Bankruptcy Code is designed to encourage consensual resolution of claims and disputes through the plan negotiation process, which includes pre-confirmation modifications"; one percent reduction of one class' distribution was not sufficiently material to require re-solicitation); *In re Dow Corning Corp.*, 237 B.R. 374, 378 (Bankr. E.D. Mich. 1999) (holding that where proposed modification does not adversely impact previously accepting claimants, such claimants are deemed to accept the modified plan); *In re A.H. Robins Co.*, 88 B.R. 742, 750 (Bankr. E.D. Va. 1988) ("There have been no modifications which adversely affect the treatment of claims or interests under the Plan.  The Court concludes that the modifications do not require resolicitation of acceptances or rejections, nor do they require that holders of claims or interests be afforded an opportunity to change previously cast acceptances or rejections of the Plan.").

[7]    *See In re A.H. Robins Co., Inc.*, 88 B.R. 742, 750 (Bankr. E.D. Va. 1988) ("There have been no modifications which adversely affect the treatment of claims or interests under the Plan.  The Court concludes that the modifications do not require resolicitation of acceptances or rejections….").

Objection"), which the Debtors respond to below and as set forth in **Exhibit A** (the "Objection

Chart").  The Debtors either have resolved, or are working to resolve, the remaining Objections,

as reflected on the Objection Chart.

**Argument**

15.    For the reasons set forth herein, the Debtors respectfully request that the Court

overrule the remaining Objections, approve the Disclosure Statement on a final basis, and confirm

the Plan.

I.    **The Disclosure Statement Contains "Adequate Information" as Required by Section 1125 of the Bankruptcy Code, and the Debtors Complied with Applicable Notice Requirements.**

A.    **The Disclosure Statement Contains Adequate Information.**

16.    The primary purpose of a disclosure statement is to provide "adequate information"

that allows parties entitled to vote on a proposed plan to make an informed decision about whether

to vote to accept or reject the plan.[8]  "Adequate information" is a flexible standard, based on the

facts and circumstances of each case.[9]

---

[8]    *See, e.g., Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*, 337 F.3d 314, 321–22 (3d Cir. 2003) (providing that a disclosure statement must contain "adequate information to enable a creditor to make an informed judgment about the Plan" (internal quotations omitted)); *Century Glove, Inc. v. First Am. Bank of N.Y.*, 860 F.2d 94, 100 (3d Cir. 1988) ("[Section] 1125 seeks to guarantee a minimum amount of information to the creditor asked for its vote."); *In re A. H. Robins Co., Inc.*, 880 F.2d 694, 696 (4th Cir. 1989) (stating that the disclosure statement must provide "information of a kind, and in sufficient detail . . . that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan."); *In re Monnier Bros.*, 755 F.2d 1336, 1342 (8th Cir. 1985) ("The primary purpose of a disclosure statement is to give the creditors the information they need to decide whether to accept the plan."); *In re Phoenix Petrol., Co.*, 278 B.R. 385, 392 (Bankr. E.D. Pa. 2001) ("[T]he general purpose of the disclosure statement is to provide 'adequate information' to enable 'impaired' classes of creditors and interest holders to make an informed judgment about the proposed plan and determine whether to vote in favor of or against that plan."); *In re Unichem Corp.*, 72 B.R. 95, 97 (Bankr. N.D. Ill. 1987) ("The primary purpose of a disclosure statement is to provide all material information which creditors and equity security holders affected by the plan need in order to make an intelligent decision whether to vote for or against the plan."). Congress intended that such informed judgments are necessary to both negotiate the terms of, and vote on, a chapter 11 plan. *See Century Glove, 860 F.2d at 100.*

[9]    11 U.S.C. § 1125(a)(1) ("'[A]dequate information' means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records. . . ."); *see Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988) ("From the legislative history of § 1125 we discern that adequate information will be determined by the facts and

9

17.    In making a determination as to whether a disclosure statement contains adequate information as required by section 1125 of the Bankruptcy Code, courts look for disclosures in a related to topics such as:

(i)    the events which led to the filing of a bankruptcy petition;

(ii)    the relationship of a debtor with the affiliates;

(iii)    a description of the available assets and their value;

(iv)    the anticipated future of the company;

(v)    the source of information stated in the disclosure statement;

(vi)    the present condition of a debtor while in chapter 11;

(vii)    the claims asserted against a debtor;

(viii)    the estimated return to creditors under a chapter 7 liquidation;

(ix)    the future management of a debtor;

(x)    the chapter 11 plan or a summary thereof;

(xi)    the financial information, valuations, and projections relevant to the claimants' decision to accept or reject the chapter 11 claim;

(xii)    the information relevant to the risks posed to claimants under the plan;

(xiii)    the actual or projected realizable value from recovery of preferential or otherwise voidable transfers;

(xiv)    the litigation likely to arise in a nonbankruptcy context; and

---

circumstances of each case."); *In re Lisanti Foods, Inc.*, 329 B.R. 491, 507 (Bankr. D.N.J. 2005) ("The information required will necessarily be governed by the circumstances of the case."); *In re Phx. Petrol. Co.*, 278 B.R. 385, 393 (Bankr. E.D. Pa. 2001) ("The determination of what is adequate information is subjective[,] made on a case-by-case basis[,] . . . [and] is largely within the discretion of the bankruptcy court."); *In re River Vill. Assoc.*, 181 B.R. 795, 804 (E.D. Pa. 1995) ("[T]he Bankruptcy Court is thus given substantial discretion in considering the adequacy of a disclosure statement."); *First Am. Bank of N.Y. v. Century Glove, Inc.*, 81 B.R. 274, 279 (D. Del. 1988) (noting that adequacy of disclosure for a particular debtor will be determined based on how much information is available from outside sources); S. Rep. No. 95-989, at 121 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5907 ("The information required will necessarily be governed by the circumstances of the case.")

(xv)    the tax attributes of a debtor.[10]

18.    Here, the Disclosure Statement contains adequate information and was previously approved on a conditional basis on August 2, 2023.[11]    The Disclosure Statement contains descriptions and summaries of, among other things:

1.    ***The Debtors' Business Operations and Capital Structure.***    An overview of the Debtors' corporate history, business operations, organizational structure, and prepetition capital structure, which are described in detail in Article V of the Disclosure Statement;

2.    ***Events Leading to these Chapter 11 Cases.***    An overview of the events leading to the commencement of the Debtors' Chapter 11 Cases, which are described in detail in Article VI of the Disclosure Statement;

3.    ***Events of the Chapter 11 Cases.***    An overview of key events in the Debtors' Chapter 11 Cases, which are described in detail in Article VII of the Disclosure Statement;

4.    ***Notice of the Injunction, Exculpation, and Release Provisions of the Plan.***    A description of the entities subject to an injunction under the Plan and the acts that they are enjoined from pursuing, including bolded language related to the Debtor Release, Third-Party Release, Exculpation, and Injunction, which are described in Article IV of the Disclosure Statement;

5.    ***Risk Factors.***    Certain risks associated with the Debtors' businesses, as well as certain risks associated with forward-looking statements and an overall disclaimer as to the information provided by and set forth in the Disclosure Statement, which are described in Article VIII of the Disclosure Statement;

6.    ***Solicitation and Voting Procedures.***    A description of the procedures for soliciting votes to accept or reject the Plan and voting on the Plan, which are described in Article IX of the Disclosure Statement;

7.    ***Liquidation Analysis***.    An analysis of the liquidation value of the Debtors, which is described in Article X of the Disclosure Statement;

---

[10]    *In re U.S. Brass Corp.*, 194 B.R. 420 at 424–25 (Bankr. E.D. Tex. 1996) (listing factors courts have considered in determining the adequacy of information provided in a disclosure statement); *Westland Oil Dev. Corp. v. MCorp Mgmt. Sols., Inc.*, 157 B.R. 100, 102 (S.D. Tex. 1993) (same); *In re Scioto Valley Mortg. Co.*, 88 B.R. 168, 170–71 (Bankr. S.D. Ohio 1988) (same); *In re Metrocraft Publ'g Servs., Inc.*, 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984) (same).  Disclosure regarding all topics "is not necessary in every case." *In re U.S. Brass Corp.*, 194 B.R. at 425; *see also In re Phx. Petroleum*, 278 B.R. 385, 393 (Bankr. E.D. Pa. 2001) ("[C]ertain categories of information which may be necessary in one case may be omitted in another . . . .").

[11]    *See* Docket No. 1716.

8.    ***Confirmation of the Plan.***  Confirmation procedures and statutory requirements for Confirmation and Consummation of the Plan, which are described in Article X of the Disclosure Statement;

9.    ***Certain United States Federal Income Tax Consequences of the Plan.***  A description of certain U.S. federal income tax law consequences of the Plan, which are described in Article XI of the Disclosure Statement; and

10.    ***Recommendation of the Debtors.***  A recommendation by the Debtors that Holders of Claims in the Voting Classes should vote to accept the Plan, stated in Article XII of the Disclosure Statement.

19.    As discussed above, section 1125(a) of the Bankruptcy Code requires only "adequate information" sufficient for parties entitled to vote on a proposed plan to make an informed decision about whether to vote to accept or reject the plan.  Accordingly, the Disclosure Statement contains adequate information within the meaning of section 1125(a) of the Bankruptcy Code and should be approved.

**B.    The Debtors Complied with the Applicable Notice Requirements.**

20.    In addition to conditionally approving the adequacy of the Disclosure Statement, the Conditional Disclosure Statement Order granted final approval of, among other things: (a) the Solicitation and Voting Procedures; (b) the Combined Hearing Notice, the Non-Voting Status Notices, and the Publication Notice; (c) the Solicitation Packages; and (d) certain dates and deadlines with respect to the Plan and Disclosure Statement.  The Debtors complied with the procedures and timeline approved by the Conditional Disclosure Statement Order.

**C.    Solicitation of the Plan Complied with the Bankruptcy Code and Was in Good Faith.**

21.    Section 1125(e) of the Bankruptcy Code provides that "a person that solicits acceptance or rejection of a plan, in good faith and in compliance with the applicable provisions of this title . . . is not liable" on account of such solicitation for violation of any applicable law,

rule, or regulation governing solicitation of acceptance or rejection of a plan.[12]  As demonstrated

by the Debtors' compliance with the Conditional Disclosure Statement Order, the Debtors at all

times conducted the solicitation process in good faith and in compliance with section 1125 of the

Bankruptcy Code and the Court-approved Solicitation and Voting Procedures.   Therefore, the

Debtors request that the Court grant the protections provided under section 1125(e) of

the Bankruptcy Code.

## II.      The Plan Satisfies Each Requirement for Confirmation.

22.      To confirm the Plan, the Court must find that the Debtors have satisfied the

requirements of section 1129 of the Bankruptcy Code.[13]  As described in detail below, the Plan

complies with all relevant provisions of the Bankruptcy Code and all other applicable law.

In addition to this Memorandum, the Debtors will produce evidence of this compliance at the

Confirmation Hearing.

### C.      The Plan Complies with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(1)).

23.      Section 1129(a)(1) of the Bankruptcy Code requires that a chapter 11 plan comply

with the applicable provisions of the Bankruptcy Code.[14]  The principal aim of this provision is to

ensure compliance with the sections of the Bankruptcy Code governing classification of claims

---

[12]   11 U.S.C. § 1125(e).

[13]   *See In re Premier Int'l Holdings, Inc.*, 2010 WL 2745964, at *4 (Bankr. D. Del. Apr. 29, 2010) (holding that the plan proponent must prove each element of section 1129(a) and 1129(b) of the Bankruptcy Code by a preponderance of the evidence); *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 148 (Bankr. D.N.J. 2010) ("The plan proponent bears the burden to show by a preponderance of the evidence that the proposed Chapter 11 plan has a reasonable probability of success, and is more than a visionary scheme") (citing *In re Wiersma*, 227 F. App'x 603, 606 (9th Cir. 2007)) (internal quotation marks omitted).

[14]   11 U.S.C. § 1129(a)(1).

and interests and the contents of a plan of reorganization.[15]  Accordingly, the determination of whether the Plan complies with section 1129(a)(1) of the Bankruptcy Code requires an analysis of sections 1122 and 1123 of the Bankruptcy Code.

> ### 1. The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code.

24.     The classification requirement of section 1122(a) of the Bankruptcy Code provides, in pertinent part, that "[e]xcept as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."[16]  For a classification structure to satisfy section 1122 of the Bankruptcy Code, substantially similar claims or interests need not be grouped in the same class.[17]  Instead, claims or interests placed in a particular class must be substantially similar to each other.[18]  Courts in this jurisdiction and others have recognized that plan proponents have significant flexibility in placing similar claims into different classes, provided there is a rational basis to do so.[19]

---

[15]   *See* S. Rep. No. 95-989, 95th Cong., 2d Sess. 126 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5912; H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 412 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5936, 6368.

[16]   11 U.S.C. § 1122(a).

[17]   *See, e.g.*, *In re Armstrong World Indus., Inc.*, 348 B.R. 136, 159 (Bankr. D. Del. 2006).

[18]   *Id.*

[19]   Courts have identified grounds justifying separate classification, including where members of a class possess different legal rights or there are good business reasons for separate classification.  *See John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs (In re Route 37 Bus. Park Assocs.)*, 987 F.2d 154, 158–59 (3d Cir. 1993) (as long as each class represents a voting interest that is "sufficiently distinct and weighty to merit a separate voice in the decision whether the proposed reorganization should proceed," the classification is proper); *Matter of Jersey City Med. Ctr.*, 817 F.2d 1055, 1060–1061 (3d Cir. 1987) (recognizing that separate classes of claims must be reasonable and allowing a plan proponent to group similar claims in different classes); *see also Frito Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.)*, 10 F.3d 944, 956–57 (2d Cir. 1993) (finding separate classification appropriate because the classification scheme had a rational basis on account of the bankruptcy court-approved settlement); *In re Heritage Org., L.L.C.*, 375 B.R. 230, 303 (Bankr. N.D. Tex. 2007) ("[T]he only express prohibition on separate classification is that it may not be done to gerrymander an affirmative vote on a reorganization plan."); *In re 500 Fifth Ave. Assocs.*, 148 B.R. 1010, 1018 (Bankr. S.D.N.Y. 1993) (although discretion is not unlimited, "the proponent of a plan of reorganization has considerable discretion to classify

25.     The Plan's classification of Claims and Interests satisfies the requirements of section 1122 of the Bankruptcy Code because the Plan places Claims and Interests into separate Classes based on legal or factual distinction or otherwise based on other relevant criteria.[20] Specifically, the Plan provides for the separate classification of Claims and Interests into the following Classes:

| | |
|---|---|
| Class 1 | Other Priority Claims |
| Class 2 | Other Secured Claims |
| Class 3 | DIP Claims |
| Class 4 | FILO Claims |
| Class 5 | Junior Secured Claims |
| Class 6 | General Unsecured Claims |
| Class 7 | Intercompany Claims |
| Class 8 | Intercompany Interests |
| Class 9 | Interests in BBB |
| Class 10 | Section 510(b) Claims |

26.     Here, each of the Claims and Interests in each particular Class is substantially similar to the other Claims and Interests in such Class.  The Plan's classification scheme generally corresponds to the Debtors' corporate and capital structure, thereby taking into account the relative priority among Claims and Interests, including the relative priority between secured and unsecured claims.  Other aspects of the classification scheme are related to the different legal or factual

---

claims and interests according to the facts and circumstances of the case") (internal citation omitted); *In re Drexel Burnham Lambert Grp. Inc.*, 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992) ("Courts have found that the Bankruptcy Code only prohibits the identical classification of dissimilar claims.  It does not require that similar classes be grouped together . . . .") (internal citations omitted).

[20]    *See* Plan, Art. III.

circumstances of the Claims or Interests within each Class.  Accordingly, the Debtors submit that

the Plan fully complies with and satisfies section 1122 of the Bankruptcy Code, and no party has

asserted otherwise.

> **2.    The Plan Satisfies the Mandatory Plan Requirements of Section 1123(a) of the Bankruptcy Code.**

27.    The seven applicable requirements of section 1123(a) of the Bankruptcy Code

generally relate to the specification of classification and treatment of claims and interests, the equal

treatment of claims and interests within classes, and the mechanics of implementing a plan.

The Plan satisfies each of these requirements.

28.    ***Specification of Classes, Impairment, and Treatment.***    The first three

requirements of section 1123(a) are that the plan specify (a) the classification of claims and

interests, (b) whether such claims and interests are impaired or unimpaired, and (c) the precise

nature of their treatment under the Plan.[21]   Article III of the Plan satisfies these three requirements

by setting forth these specifications in detail, and no party has asserted otherwise.[22]

29.    ***Equal Treatment.***  The fourth requirement of section 1123(a) is that the plan must

"provide the same treatment for each claim or interest of a particular class," except where the

holder of such claim or interest has agreed to less favorable treatment.[23]   The Plan meets this

requirement because each Holder of an Allowed Claim and Interest will receive the same treatment

as all other Holders of Allowed Claims and Interests within the same class, except to the extent

---

[21]    11 U.S.C. § 1123(a)(1)–(3).

[22]    *See* Plan Art. III.A–F.

[23]    11 U.S.C. § 1123(a)(4).

any Holders of Allowed Claims and Interests have agreed to different treatment.[24]  No party has

asserted otherwise.

30.    ***Adequate Means for Implementation.***  The fifth requirement of section 1123(a) is

that a plan must provide for adequate means for its implementation.[25]  Article IV and various other

provisions of the Plan provide adequate means for the Plan's implementation.  Among other things,

the Plan provides for:

- the sources of consideration for Plan distributions;[26]

- the cancellation of notes, instruments, certificates, and other existing securities;[27]

- the vesting of assets in the Wind-Down Debtors,[28] and the authorization for the Debtors, or Wind-Down Debtors, as applicable, to take corporate actions necessary to effectuate the Plan[29]; and

- the preservation of certain Causes of Action.[30]

31.    The terms governing the execution of these transactions are set forth in greater

detail in the Plan and the Plan Supplement.[31]  Thus, the Plan satisfies section 1123(a)(5), and no

party has asserted otherwise.

---

[24]    *See* Plan Art. III A–C.

[25]    11 U.S.C. § 1123(a)(5).  Section 1123(a)(5) specifies that adequate means for implementation of a plan may include: retention by the debtor of all or part of its property; the transfer of property of the estate to one or more entities; cancelation or modification of any indenture; curing or waiving of any default; amendment of the debtor's charter; or issuance of securities for cash, for property, for existing securities, in exchange for claims or interests or for any other appropriate purpose.

[26]    *See* Plan Art. IV.B

[27]    *See* Plan Art. IV.D.

[28]    *See* Plan Art. IV.F.

[29]    *Id.*

[30]    *Id.*

[31]    *Notice of Filing of Plan Supplement* (as amended, the "Plan Supplement"), filed contemporaneously herewith.

32.     ***Non-Voting Stock.***  The sixth requirement of section 1123(a) is that the plan must contemplate a provision in the reorganized debtor's corporate charter that prohibits the issuance of non-voting equity securities or, with respect to preferred stock, adequate provisions for the election of directors upon an event of default.[32]  As the Debtors are winding down, there will not be any issuance of non-voting equity securities or preferred stock.  Accordingly, the Plan satisfies section 1123(a)(6) of the Bankruptcy Code, and no party has asserted otherwise.

33.     ***Selection of Officers and Directors.***  Finally, section 1123(a)(7) requires that the Plan "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the [P]lan."[33]  The Plan provides that, on the Effective Date, the terms of the existing boards of directors of the Debtors will expire.[34]  The Plan satisfies this requirement by providing for the discharge of all of the Debtors' managers and officers from their duties and the appointment of the Plan Administrator, subject to the authority of the Oversight Committee, as the sole officer of the Wind-Down Debtors and successor to the powers, duties, and privileges of the Debtors' officers, subject to the provisions of the Plan.[35]  The Plan Supplement identifies the Plan Administrator and Oversight Committee, and sets forth the roles and responsibilities of each. Accordingly, the Plan satisfies section 1123(a)(7) of the Bankruptcy Code.  No party has asserted otherwise.

---

[32]   *See* 11 U.S.C. § 1123(a)(6).

[33]   11 U.S.C. § 1123(a)(7).

[34]   Plan Art. IV.F.

[35]   *Id.*

**D.    The Debtors Have Complied with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(2)).**

34.    The Debtors have satisfied section 1129(a)(2) of the Bankruptcy Code, which requires the plan proponent to comply with the applicable provisions of the Bankruptcy Code.[36] The legislative history to section 1129(a)(2) of the Bankruptcy Code reflects that this provision is intended to encompass the disclosure and solicitation requirements set forth in sections 1125 and 1126 of the Bankruptcy Code.[37]    As discussed below, the Debtors have complied with sections 1125 and 1126 of the Bankruptcy Code regarding disclosure and solicitation of the Plan.

**1.    The Debtors Have Complied with the Disclosure and Solicitation Requirements of Section 1125.**

35.    As discussed in Sections I.A-C herein, the Debtors complied with the notice and solicitation requirements of section 1125 of the Bankruptcy Code.

**2.    The Debtors Have Satisfied the Plan Acceptance Requirements of Section 1126.**

36.    Section 1126 of the Bankruptcy Code specifies the requirements for acceptance of a plan of reorganization.  Specifically, under section 1126 of the Bankruptcy Code, only holders of allowed claims and allowed interests in impaired classes of claims or interests that will receive or retain property under a plan on account of such claims or interests may vote to accept or reject such plan.  Section 1126 of the Bankruptcy Code provides, in pertinent part, that:

(a)    The holder of a claim or interest allowed under section 502 of [the Bankruptcy Code] may accept or reject a plan. . . .

---

[36]    *See* 11 U.S.C. § 1129(a)(2).

[37]    *See, e.g.*, *In re Lapworth*, 1998 WL 767456, at *3 (Bankr. E.D. Pa. Nov. 2, 1998) ("The legislative history of § 1129(a)(2) specifically identifies compliance with the disclosure requirements of § 1125 as a requirement of § 1129(a)(2).") (internal citations omitted); *In re Worldcom, Inc.*, No. 02-13533 (AJG), 2003 WL 23861928, at *49 (Bankr. S.D.N.Y. Oct. 31, 2003) (stating that section 1129(a)(2) requires plan proponents to comply with applicable provisions of the Bankruptcy Code, including "disclosure and solicitation requirements under sections 1125 and 1126 of the Bankruptcy Code").

(f)    Notwithstanding any other provision of this section, a class that is not impaired under a plan, and each holder of a claim or interest of such class, are conclusively presumed to have accepted the plan, and solicitation of acceptances with respect to such class from the holders of claims or interests of such class is not required.

(g)    Notwithstanding any other provision of this section, a class is deemed not to have accepted a plan if such plan provides that the claims or interests of such class do not entitle the holders of such claims or interests to receive any property under the plan on account of such claims or interests.[38]

37.    As set forth in Part I of this Memorandum, in accordance with section 1125 of the Bankruptcy Code, the Debtors solicited votes from the Holders of Allowed Claims in Classes 3, 4, 5, and 6—the only Classes entitled to vote on the Plan.  The Debtors did not solicit votes from Holders of Claims and Interests in Classes 1, 2, 7, 8, 9, or 10 because Holders of such Claims and Interests are either Unimpaired and conclusively presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code or Impaired and conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Thus, pursuant to section 1126(a) of the Bankruptcy Code, only Holders of Claims in Classes 3, 4, 5 and 6 were entitled to vote to accept or reject the Plan.[39]

38.    With respect to the Voting Classes, section 1126(c) of the Bankruptcy Code provides that a class accepts a plan where holders of claims holding at least two-thirds in amount and more than one-half in number of allowed claims in such class of those voting vote to accept such plan.  The Voting Report reflects the results of the voting process in accordance with section

---

[38]    11 U.S.C. §§ 1126(a), (f), (g).

[39]    *See* Plan, Art. III.

1126 of the Bankruptcy Code.[40]  Based upon the foregoing, the Debtors submit that they satisfy

the requirements of section 1129(a)(2) of the Bankruptcy Code.

### E. The Debtors Proposed the Plan in Good Faith and Not by Any Means Forbidden by Law (Section 1129(a)(3)).

39.     Section 1129(a)(3) of the Bankruptcy Code requires that a chapter 11 plan be

"proposed in good faith and not by any means forbidden by law."[41]  Bankruptcy Courts in the

Third Circuit have found that where a plan aims to maximize the value of the debtor's estate and

the recoveries of creditors, in light of the totality of the circumstances, the good faith standard is

satisfied.[42]  Whether a plan satisfies this test is a question of fact assessed on a case-by-case basis

in light of the totality of the circumstances surrounding the development of the Plan.[43]

40.     Here, the Debtors have proposed the Plan with the goal of maximizing value,

providing recoveries to creditors, and maximizing the value of the Debtors' estates.  The Plan

represents the culmination of collaborative efforts between the Debtors, their stakeholders, and

their respective advisors.  Accordingly, the Plan has been proposed in good faith and not by any

means forbidden by law as required by section 1129(a)(3) of the Bankruptcy Code.

---

[40]   *See generally* Voting Report.

[41]   11 U.S.C. § 1129(a)(3).

[42]   *See, e.g.*, *In re PWS Holding Corp.*, 228 F.3d at 242 (quoting *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 150 n.5 (3d Cir. 1986)); *Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship)*, 116 F.3d 790, 802 (5th Cir. 1997) (quoting *Brite v. Sun Country Dev., Inc. (In re Sun Country Dev., Inc.)*, 764 F.2d 406, 408 (5th Cir. 1985)); *In re Century Glove, Inc.*, 1993 WL 239489, at *4 (D. Del. Feb. 10, 1993); *In re NII Holdings, Inc.*, 288 B.R. 356, 362 (Bankr. D. Del. 2002).

[43]   *See, e.g.*, *In re W.R. Grace & Co.*, 475 B.R. 34, 87 (D. Del. 2012) ("[A] determination of good faith associated with a Chapter 11 reorganization plan requires a factual inquiry into a totality of the circumstances surrounding the plan's proposal.") (citing *In re Sun Country Dev., Inc.*, 764 F. 2d at 408); *Century Glove*, 1993 WL 239489, at *4 ("The requirement of good faith must be viewed in light of the totality of the circumstances surrounding establishment of a Chapter 11 plan, keeping in mind the purpose of the Bankruptcy Code is to give debtors a reasonable opportunity to make a fresh start.") (citing *In re Sun Country Dev., Inc.*, 764 F.2d at 408); *T-H New Orleans*, 116 F.3d at 802 (same).

**F.** **The Plan Provides that the Debtors' Payment of Professional Fees and Expenses Are Subject to Court Approval (Section 1129(a)(4)).**

41.    Section 1129(a)(4) of the Bankruptcy Code requires that certain fees and expenses paid by the plan proponent, by the debtor, or by a person receiving distributions of property under the plan, be approved by the bankruptcy court as reasonable or remain subject to approval by the bankruptcy court as reasonable.  Courts have construed this section to require that all payments of professional fees paid out of estate assets be subject to review and approval by the court as to their reasonableness.[44]

11.    In general, the Plan provides that Professional Fee Claims and corresponding payments are subject to prior Court approval and the reasonableness requirements under sections 328 and 330 of the Bankruptcy Code.  Moreover, Article II.B.1 of the Plan provides that all final requests for payment of Professional Fee Claims must be filed no later than forty-five (45) days after the Effective Date.  Accordingly, the Plan complies with section 1129(a)(4) of the Bankruptcy Code, and no party has asserted otherwise.

**G.** **The Plan Satisfies the Bankruptcy Code's Governance Disclosure Requirements (Section 1129(a)(5)).**

42.    Section 1129(a)(5)(A)(i) of the Bankruptcy Code requires that the proponent of a plan disclose the identity and affiliations of the proposed officers and directors of the reorganized debtors.  Section 1129(a)(5)(B) of the Bankruptcy Code requires a plan proponent to disclose the identity of an "insider" (as defined by section 101(31) of the Bankruptcy Code) to be employed or retained by the reorganized debtor and the nature of any compensation for such insider.

---

[44]    *See In re Lisanti Foods, Inc.*, 329 B.R. at 503 ("Pursuant to § 1129(a)(4), a [p]lan should not be confirmed unless fees and expenses related to the [p]lan have been approved, or are subject to the approval, of the Bankruptcy Court."); *In re Future Energy Corp.*, 83 B.R. 470, 488 (Bankr. S.D. Ohio 1988) (holding that fees and expenses related to the plan are subject to the approval by the Bankruptcy Court); *In re Chapel Gate Apartments, Ltd.*, 64 B.R. 569, 573 (Bankr. N.D. Tex. 1986) (noting that before a plan may be confirmed, "there must be a provision for review by the Court of any professional compensation").

In addition, the Bankruptcy Code provides that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy.[45]

43.    The Plan satisfies section 1129(a)(5)(A)(i) of the Bankruptcy Code because the Debtors have disclosed the identities of the Plan Administrator and the members of the Oversight Committee, and the responsibilities, identity, and compensation thereof.    Therefore, the requirements under section 1129(a)(5) of the Bankruptcy Code are satisfied, and no party has asserted otherwise.

### H.    The Plan Does Not Require Government Regulatory Approval of Rate Changes (Section 1129(a)(6)).

44.    Section 1129(a)(6) of the Bankruptcy Code permits confirmation only if any regulatory commission that has or will have jurisdiction over a debtor after confirmation has approved any rate change provided for in the plan.  Section 1129(a)(6) of the Bankruptcy Code is inapplicable to these chapter 11 cases because the Plan does not contemplate a rate change that is subject to regulatory review, and no party has asserted otherwise.

### I.    The Plan Satisfies the Best Interests Test (Section 1129(a)(7)).

45.    The "best interests test" of section 1129(a)(7) of the Bankruptcy Code requires that, with respect to each impaired class of claims or interests, each individual holder of a claim or interest has either accepted the plan or will receive or retain property having a present value, as of the effective date of the plan, of not less than what such holder would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code at that time.  The best interests test is satisfied where the estimated recoveries for a debtor's stakeholders in a hypothetical chapter 7 liquidation

---

[45]    11 U.S.C. § 1129(a)(5)(A)(ii).

are less than or equal to the estimated recoveries for a holder of an impaired claim or interest under the debtor's chapter 11 plan that rejects the plan.[46]

46.    The Debtors are winding down operations and liquidating all of their remaining assets and distributing such assets to their creditors, subject to the Plan.  Recoveries in a chapter 7 case liquidation would be lower in light of the additional expenses that would be incurred in a chapter 7 proceeding.  Although a chapter 7 liquidation would achieve substantially the same goal, recoveries in a chapter 7 case liquidation would be lower in light of the additional expenses that would be incurred in a chapter 7 proceeding, and other additional costs associated with a chapter 7 liquidation.

47.    Moreover, as described in the Disclosure Statement, the Plan provides that certain estate Causes of Action will be preserved by the Wind-Down Debtors.  Pursuant to the terms of the Waterfall Recovery and Sharing Mechanism, the proceeds of any such Causes of Action may be distributed to the applicable Successor Entity for the benefit of Holders of General Unsecured Claims.  By contrast, in the event of a liquidation under chapter 7, Holders of General Unsecured Claims would not have received any such recovery.  The Sharing Mechanism reflected in the Plan results from the UCC Settlement agreed in connection with the Final DIP Order, which definitively provides Holders of General Unsecured Claims a recovery in these cases that they otherwise would not be entitled to in a chapter 7.  Notably, no party (even those that are impaired) sought to convert these cases to cases under chapter 7, indicating that they agree with the Debtors' assessment.

---

[46]    *See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 n.13 (1999) ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan."); *In re Cypresswood Land Partners, I*, 409 B.R. 396, 428 (Bankr. S.D. Tex. 2009) ("This provision is known as the 'best-interest-of-creditors-test' because it ensures that reorganization is in the best interest of individual claimholders who have not voted in favor of the plan.").

48.    In sum, no Holder of Claims or Interests would receive more in a hypothetical chapter 7 liquidation than it would receive under the Plan.  Accordingly, the Debtors submit that the Plan complies with and satisfies all of the requirements of section 1129(a)(7) of the Bankruptcy Code, and no party has asserted otherwise.

**J.    The Plan Satisfies the Bankruptcy Code's Voting Requirements (Section 1129(a)(8)).**

49.    Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests must either accept the plan or be unimpaired under the plan.[47]  If any class of claims or interests rejects the plan, the plan must satisfy the "cramdown" requirements with respect to the claims or interests in that class.[48]

50.    Of the Impaired Classes and Interests under the Plan, Holders of Claims in Classes 3 and 4 voted to accept the Plan, and Holders of Claims in Class 6 voted to reject the Plan.   The Debtors did not identify any Holders of Claims in Class 5 of the Plan, and accordingly, the Debtors did not solicit or receive any votes on the Plan for Class 5.  Holders of Claims and Interests in Classes, 9, 10, and 7 (if the Debtors elect to impair Intercompany Claims) are deemed to have rejected the Plan and thus were not entitled to vote.   While the Plan does not satisfy section 1129(a)(8) of the Bankruptcy Code with respect to the Impaired Classes that were deemed to reject the Plan, the Plan is confirmable nonetheless because it satisfies sections 1129(a)(10) and 1129(b) of the Bankruptcy Code, as discussed below.

---

[47]  11 U.S.C. § 1129(a)(8).  A class of impaired claims accepts a plan if holders of at least two-thirds in dollar amount and more than half in number of the claims in that class vote to accept the plan. *Id.* § 1126(c). A class that is not impaired under a plan, and the creditors in that class, are conclusively presumed to have accepted the plan. *Id.* § 1126(f).  A class is deemed to have rejected a plan if the plan provides that the holders of claims or interests in that class do not receive or retain any property under the plan on account of such claims or interests. *Id.* § 1126(g).

[48]  *Id.* § 1129(b).

K.  **The Plan Provides For The Statutorily Mandated Treatment of Administrative and Other Priority Claims (Section 1129(a)(9)).**

51.   Section 1129(a)(9) of the Bankruptcy Code requires that certain priority claims be paid in full on the effective date of a plan or receive certain other specified treatment as agreed by the claim holder in satisfaction of the claim and that the holders of certain other priority claims receive deferred cash payments.[49]   In particular, pursuant to section 1129(a)(9)(A) of the Bankruptcy Code, holders of claims of a kind specified in section 507(a)(2) of the Bankruptcy Code—administrative claims allowed under section 503(b) of the Bankruptcy Code—must receive on the effective date cash equal to the allowed amount of such claims.[50] Section 1129(a)(9)(B) of the Bankruptcy Code requires that each holder of a claim of a kind specified in section 507(a)(1) or (4) through (7) of the Bankruptcy Code—generally wage, employee benefit, and deposit claims entitled to priority—must receive deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim (if such class has accepted the plan), or cash of a value equal to the allowed amount of such claim on the effective date of the plan (if such class has not accepted the plan).[51]  Finally, section 1129(a)(9)(C) provides that the holder of a claim of a kind specified in section 507(a)(8) of the Bankruptcy Code—*i.e.*, priority tax claims—must receive cash payments over a period not to exceed five years from the Petition Date, the present value of which equals the allowed amount of the claim.[52]

52.   The Plan satisfies section 1129(a)(9) of the Bankruptcy Code.  *First*, Article II.A of the Plan satisfies section 1129(a)(9)(A) of the Bankruptcy Code because it provides that each

---

[49]   *See* 11 U.S.C. § 1129(a)(9).

[50]   11 U.S.C. § 1129(a)(9)(A).

[51]   11 U.S.C. § 1129(a)(9)(B).

[52]   11 U.S.C. § 1129(a)(9)(C).

Holder of an Allowed Administrative Claim will receive cash equal to the amount of such Allowed Claim. *Second*, the Plan satisfies section 1129(a)(9)(B) of the Bankruptcy Code because no Holders of the types of claims specified by 1129(a)(9)(B) are Impaired under the Plan. *Third*, Article II.C of the Plan satisfies section 1129(a)(9)(C) of the Bankruptcy Code because it provides that Holders of Allowed Priority Tax Claims shall be treated in accordance with the terms of section 1129(a)(9)(C) of the Bankruptcy Code. The Plan thus satisfies each of the requirements of section 1129(a)(9) of the Bankruptcy Code. No party has asserted otherwise.

**L.     At Least One Impaired Class of Claims Has Accepted the Plan (Section 1129(a)(10)).**

53.     The Bankruptcy Code requires that, "[i]f a class of claims is impaired under the plan, then at least one class of impaired claims must accept the plan, determined without including any acceptance of the plan by any insider."[53]  As set forth above, Classes 3 and 4 which are impaired Classes of Claims under the Plan, voted to accept the Plan independent of any insiders' votes.[54]  The Plan thus satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code, and no party has asserted otherwise.

**M.     The Plan Is Feasible and Is Not Likely to Be Followed by the Need for Further Financial Reorganization (Section 1129(a)(11)).**

54.     Section 1129(a)(11) of the Bankruptcy Code requires that the Court find that a plan is feasible as a condition precedent to confirmation. Specifically, the Court must determine that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such

---

[53]    11 U.S.C. § 1129(a)(10).

[54]    *See* Voting Report.

liquidation or reorganization is proposed in the plan."[55]  To demonstrate that a plan is feasible, it is not necessary for a debtor to guarantee success.[56]  Rather, a debtor must provide only a reasonable assurance of success.[57] There is a relatively low threshold of proof necessary to satisfy the feasibility requirement.[58]  As demonstrated below, the Plan is feasible within the meaning of section 1129(a)(11) of the Bankruptcy Code.

55.    In determining standards of feasibility, courts have identified the following probative factors:

1.    the adequacy of the capital structure;

2.    the earning power of the business;

3.    the economic conditions;

4.    the ability of management;

5.    the probability of the continuation of the same management; and

---

[55]   11 U.S.C. § 1129(a)(11).

[56]   *See Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988) ("[T]he feasibility standard is whether the plan offers a reasonable assurance of success. Success need not be guaranteed."); *In re Flintkote Co.*, 486 B.R. 99, 139 (Bankr. D. Del. 2012) (stating that the bankruptcy court "need not require a guarantee of success") (internal citations and quotation marks omitted); *In re W.R. Grace & Co.*, 475 B.R. at 115; *In re U.S. Truck Co.*, 47 B.R. 932, 944 (E.D. Mich. 1985) ("'Feasibility' does not, nor can it, require the certainty that a reorganized company will succeed."), *aff'd,* 800 F.2d 581 (6th Cir. 1986).

[57]   *Kane*, 843 F.2d at 649; *In re Flintkote Co.*, 486 B.R. at 139; *In re W.R. Grace & Co.*, 475 B.R. at 115; *see also Pizza of Haw., Inc. v. Shakey's, Inc. (In re Pizza of Haw., Inc.)*, 761 F.2d 1374, 1382 (9th Cir. 1985) (holding that "[t]he purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation") (internal quotation marks omitted) (quoting 5 Collier on Bankruptcy ¶ 1129.02[11] (15th ed. 1984)); *In re Capmark Fin. Grp. Inc.*, 2011 WL 6013718, at *61 (Bankr. D. Del. Oct. 5, 2011) (same).

[58]   *See, e.g.*, *In re Prussia Assocs.*, 322 B.R. 572, 584 (Bankr. E.D. Pa. 2005) (quoting approvingly that "[t]he Code does not require the debtor to prove that success is inevitable, and a relatively low threshold of proof will satisfy § 1129(a)(11) so long as adequate evidence supports a finding of feasibility") (internal quotation marks and citations omitted); *In re Sea Garden Motel & Apartments*, 195 B.R. 294, 305 (D. N.J. 1996); *In re Tribune Co.*, 464 B.R. 126, 185 (Bankr. D. Del. 2011), *on reconsideration,* 464 B.R. 208 (Bankr. D. Del. 2011).

6.      any other related matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.[59]

56.      The Plan is feasible as required by section 1129(a)(11) of the Bankruptcy Code and should be confirmed.  The Plan provides for the orderly liquidation and wind down of the Debtors' operations and timely distributions to Holders of Allowed Claims in accordance with the Bankruptcy Code and applicable law.  The Debtors have worked with their advisors to ensure that the Wind-Down Debtors maintain adequate liquidity in order to effectively wind down the Debtors' estates.  Rather than unnecessarily elongate these cases through a conversion to chapter 7, the Plan provides closure and assurance that the assets of the Debtors' Estates are being distributed in an efficient and value maximizing manner subject to the Debtors' obligations under the Plan without the need for any further financial restructuring.  Thus, the Plan satisfies the feasibility requirement under section 1129(a)(11) of the Bankruptcy Code.

**N.      The Plan Provides for the Payment of All Fees Under 28 U.S.C. § 1930 (Section 1129(a)(12)).**

57.      Section 1129(a)(12) of the Bankruptcy Code requires the payment of all fees payable under 28 U.S.C. § 1930.[60]  The Plan includes an express provision requiring payment of all fees under 28 U.S.C. § 1930.[61]  The Plan, therefore, complies with section 1129(a)(12) of the Bankruptcy Code, and no party has asserted otherwise.

---

[59]   *See, e.g.*, *In re Aleris Int'l, Inc.*, No. 09-10478 (BLS), 2010 WL 3492664, at *28 (Bankr. D. Del. May 13, 2010) (internal citations omitted).

[60]   11 U.S.C. § 1129(a)(12).

[61]   Plan Art. II.D.

**O.**     **Sections 1129(a)(13) Through 1129(a)(16) of the Bankruptcy Code Do Not Apply to the Plan.**

58.     A number of the Bankruptcy Code's confirmation requirements are inapplicable to the Plan.  Section 1129(a)(13) of the Bankruptcy Code requires chapter 11 plans to continue all "retiree benefits" (as defined in section 1114 of the Bankruptcy Code).[62]  The Debtors have no obligations to pay retiree benefits after the Effective Date and, as such, section 1129(a)(13) of the Bankruptcy Code is inapplicable to the Plan.  Section 1129(a)(14) of the Bankruptcy Code is inapplicable to the Plan because the Debtors are not subject to any domestic support obligations.[63]  Section 1129(a)(15) is inapplicable to the Plan because none of the Debtors are "individuals" as that term is defined in the Bankruptcy Code.[64]  Section 1129(a)(16) of the Bankruptcy Code is also inapplicable because the Plan does not provide for any property transfers by a corporation or trust that is not a moneyed, business, or commercial corporation or trust.[65]

**P.**     **The Plan Satisfies the Cramdown Requirements (Section 1129(b)).**

59.     A plan must meet the requirements of section 1129(a) to be confirmable.  But, section 1129(a)(8)(A) states that each impaired class must vote in favor of the plan.  Pursuant to section 1129(b), a plan may still be confirmed even if it does not meet the requirements of section 1129(a)(8) through a cramdown "if the plan does not discriminate unfairly, and is fair and

---

[62]   11 U.S.C. § 1129(a)(13). Section 1114(a) of the Bankruptcy Code defines "retiree benefits" as: "[P]ayments to any entity or person for the purpose of providing or reimbursing payments for retired employees and their spouses and dependents, for medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, or death under any plan, fund, or program (through the purchase of insurance or otherwise) maintained or established in whole or in part by the debtor prior to filing a petition commencing a case under this title."

[63]   *See id.* § 1129(a)(14).

[64]   *See id.* § 1129(a)(15).

[65]   *See id.* § 1129(a)(16).

equitable to the dissenting creditors."[66]    As described below, the Plan satisfies both of these cramdown requirements with respect to all classes deemed to reject the Plan.[67]

### 1.    The Plan is Fair and Equitable with Respect to All Classes.

60.    A plan is "fair and equitable" with respect to an impaired class of claims or interests that rejects the plan (or is deemed to reject the plan) if it follows the "absolute priority rule."[68] With respect to classes that are receiving no recovery under a plan, the absolute priority rule requires only that no class junior to such claim or interest receive any distribution under a plan.[69]

61.    There are no Claims or Interests in the Debtors that are junior to the Class 6 General Unsecured Claims (which voted to reject) or the Deemed Rejecting Classes that are receiving any recovery under the Plan and the creditors with senior claims secured by substantially all of the Debtors' assets are not being paid in full under the Plan.  Accordingly, the Plan satisfies the absolute priority rule with respect to all Classes.[70]

---

[66]    *See In re Maharaj*, 681 F.3d 558, 562 (4th Cir. 2012) (citing 11 U.S.C. § 1129(b)(1)).

[67]    Class 9 (Interests in BBB) and Class 10 (Section 510(b) Claims) (collectively, the "Deemed Rejecting Classes").

[68]    *See In re Bryson Properties, XVIII*, 961 F.2d 469, 503 (4th Cir. 1992) ("The absolute priority rule was "codified in 11 U.S.C. § 1129(b)(2)(B)(ii) of the Bankruptcy Code and stems from the requirement that a plan must be fair and equitable before it can be confirmed over the objecting dissenting creditors.").

[69]    11 U.S.C. § 1129(b)(2)(C)(ii); *see also In re Health Diagnostics Lab, Inc.*, 551 B.R. 218, 230 (Bankr. E.D. Va. 2016) ("A plan unfairly discriminates in violation of § 1129(b) of the Bankruptcy Code only if similar claims are treated differently without a reasonable basis for the disparate treatment, or a class of claims receives consideration of a value greater than the amount of its allowed claims.").

[70]    The Plan also satisfies the corollary to the absolute priority rule in that no Holder of any Class of Claims or Interests is receiving more than a 100 percent recovery under the Plan.  *See In re Granite Broad. Corp.,* 369 B.R. 120, 140 (Bankr.S.D.N.Y.2007) ("There is no dispute that a class of creditors cannot receive more than full consideration for its claim, and that excess value must be allocated to junior classes of debt or equity, as the case may be."); *In re Trans Max Techs., Inc.,* 349 B.R. 80, 89 (Bankr.D.Nev.2006) ("One component of the fair and equitable treatment is that a plan may not pay a premium to a senior class.").

## 2.    The Plan Does Not Unfairly Discriminate Against Any Class.

62.    Although the Bankruptcy Code does not provide a standard for determining when "unfair discrimination" exists, courts typically examine the facts and circumstances of the particular case to make the determination.[71]    In general, courts have held that a plan unfairly discriminates in violation of section 1129(b) of the Bankruptcy Code only if (a) it provides less favorable treatment to a dissenting class of creditors than to another class of creditors with similar legal rights, taking into account whether the different treatment is material and the relative risks associated with each class's treatment, and (b) there is not sufficient justification for doing so.[72] A threshold inquiry to assessing whether a proposed chapter 11 plan unfairly discriminates against

---

[71]    *See Hargreaves v. Nuverra Env't Sols., Inc. (In re Nuverra)*, 590 B.R. 75, 93 (D. Del. 2018), *aff'd*, 834 F. App'x 729 (3d Cir. 2021), *as amended* (Feb. 2, 2021) ("As unfair discrimination is not defined in the Bankruptcy Code, courts must examine the facts and circumstances of the particular case to determine whether unfair discrimination exists."); *In re 203 N. LaSalle St. Ltd. P'ship*, 190 B.R. 567, 585 (Bankr. N.D. Ill. 1995) (noting "the lack of any clear standard for determining the fairness of a discrimination in the treatment of classes under a Chapter 11 plan" and that "the limits of fairness in this context have not been established."), *rev'd on other grounds*, *203 N. LaSalle St. P'ship*, 526 U.S. 434; *In re Freymiller Trucking, Inc.*, 190 B.R. 913, 916 (Bankr. W.D. Okla. 1996) (holding that a determination of unfair discrimination requires a court to "consider all aspects of the case and the totality of all the circumstances"); *In re Aztec Co.*, 107 B.R. 585, 589–91 (Bankr. M.D. Tenn. 1989) ("Courts interpreting language elsewhere in the Code, similar in words and function to § 1129(b)(1), have recognized the need to consider the facts and circumstances of each case to give meaning to the proscription against unfair discrimination.").

[72]    *See In re Nuverra*, 590 B.R. at 93 (holding that a plan's unequal treatment of substantially similar claims did not constitute unfair discrimination where such unequal treatment was justified); *In re Aleris Int'l*, 2010 WL 3492664, at *31 ("section 1129(b) of the Bankruptcy Code ensures that a plan does not unfairly discriminate against a dissenting class with respect to the value the dissenting class will receive under a plan when compared to the value given to all other similarly situated classes") (citing *In re Armstrong World Indus.*, 348 B.R. at 121); *In re Coram Healthcare Corp.*, 315 B.R. at 349 (citing cases and noting that separate classification and treatment of claims is acceptable if the separate classification is justified because such claims are essential to a reorganized debtor's ongoing business); *In re Lernout & Hauspie Speech Prods., N.V.*, 301 B.R. 651, 661 (Bankr. D. Del. 2003) (permitting different treatment of two classes of similarly situated creditors upon a determination that the debtors showed a legitimate basis for such discrimination), *aff'd sub nom. In re Lernout & Hauspie Speech Prod. N.V.*, 308 B.R. 672 (D. Del. 2004); *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986) (stating that interests of objecting class were not similar or comparable to those of any other class and thus there was no unfair discrimination).

a dissenting class is whether the dissenting class is equally situated to a class allegedly receiving more favorable treatment.[73]

63.     Here, the Plan's classification of Claims and Interests is proper because all similarly situated Holders of Claims and Interests will receive substantially similar treatment and the Plan's classification scheme rests on a legally acceptable rationale, and no party has asserted otherwise. Accordingly, the Plan does not discriminate unfairly in contravention of section 1129(b)(1) of the Bankruptcy Code, and may be confirmed irrespective of any rejection by Impaired classes.

**Q.     The Plan Complies with the Other Provisions of Section 1129 of the Bankruptcy Code (Sections 1129(c)–(e)).**

64.     The Plan satisfies the remaining provisions of section 1129 of the Bankruptcy Code. Section 1129(c), which prohibits confirmation of multiple plans, is not implicated because there is only one proposed chapter 11 plan for the Debtors.[74]

65.     The purpose of the Plan is not to avoid taxes or the application of section 5 of the Securities Act of 1933.  Moreover, no governmental unit or any other party has requested that the Court decline to confirm the Plan on such grounds.  Accordingly, the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.

66.     Lastly, section 1129(e) of the Bankruptcy Code is inapplicable because none of the Debtors' chapter 11 cases is a "small business case."[75]  Thus, the Plan satisfies the Bankruptcy Code's mandatory confirmation requirements.

---

[73]     *See In re Aleris Int'l, Inc.*, 2010 WL 3492664, at *31 (citing *In re Armstrong World Indus.*, 348 B.R. at 121).

[74]     11 U.S.C. § 1129(c).

[75]     11 U.S.C. § 1129(e). A "small business debtor" cannot be a member "of a group of affiliated debtors that has aggregate noncontingent liquidated secured and unsecured debts in an amount greater than $2,566,050 (excluding debt owed to 1 or more affiliates or insiders)." 11 U.S.C. § 101(51D)(B).

## III.    The Discretionary Contents of the Plan Are Appropriate.

67.    The Bankruptcy Code identifies various additional provisions that may be incorporated into a chapter 11 plan, including "any other appropriate provision not inconsistent with the applicable provisions of this title."[76]    Among other things, section 1123(b) of the Bankruptcy Code provides that a plan may:  (a) impair or leave unimpaired any class of claims or interests; (b) provide for the assumption or rejection of executory contracts and unexpired leases;[77] (c) provide for the settlement or adjustment of any claim or interest belonging to the debtor or the estates; and (d) include any other appropriate provision not inconsistent with the applicable provisions of chapter 11.[78]    As set forth below, the Plan includes certain of these discretionary provisions, including releases by the Debtors and third parties of Claims and potential Causes of Action, exculpation, and injunction provisions.  The Debtors have determined, as fiduciaries of their Estates and in the exercise of their reasonable business judgment, that each of the discretionary provisions of the Plan is appropriate given the circumstances of these Chapter 11 Cases.

### A.    The Debtor Release Provision in the Plan is Appropriate.

68.    The Bankruptcy Code supports the inclusion of debtor releases in a chapter 11 plan. Section 1123(b)(3)(A) of the Bankruptcy Code states that a chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."[79]

---

[76]    11 U.S.C. § 1123(b) (1)–(6).

[77]    *See* Plan Art. V.A.

[78]    11 U.S.C. § 1123(b)(1)–(3), (6).

[79]    *See In re Coram Healthcare Corp.*, 315 B.R. at 334–35.  Generally, courts in the Third Circuit approve a settlement by the debtors if the settlement "is above the lowest point in the range of reasonableness." *Id.* at 330 (internal citation omitted); *see also In re Exaeris, Inc.*, 380 B.R. 741, 746–47 (Bankr. D. Del. 2008) (internal citation omitted); *see Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983) (examining whether settlement "fall[s] below the lowest point in the range of reasonableness") (alteration in original) (internal

Further, a debtor may release claims under section 1123(b)(3)(A) of the Bankruptcy Code "if the release is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate."[80]   In determining whether a debtor release is proper, courts in the Third Circuit and elsewhere generally may consider the following five factors:

1.  whether the non-debtor has made a substantial contribution to the debtor's reorganization;

2.  whether the release is essential to the debtor's reorganization;

3.  agreement by a substantial majority of creditors to support the release;

4.  identity of interest between the debtor and the third party; and

5.  whether a plan provides for payment of all or substantially all of the claims in the class or classes affected by the release.[81]

Not all of the above factors need to be satisfied for a court to approve a debtor release.[82]

69.    Article X.C of the Plan provides for releases by the Debtors, as of the Effective Date, of, among other things, certain claims, rights, and causes of action that the Debtors and the Wind-Down Debtors may have against the Released Parties (the "Debtor Release").[83]

---

citation omitted); *In re World Health Alts., Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006) (stating that settlement must be within reasonable range of litigation possibilities) (internal citation omitted).

[80]   *In re Spansion, Inc.*, 426 B.R. 114, 143 (Bankr. D. Del. 2010) (internal citation omitted); *see also In re Wash. Mut., Inc.*, 442 B.R. 314, 327 (Bankr. D. Del. 2011) ("In making its evaluation [whether to approve a settlement], the court must determine whether the compromise is fair, reasonable, and in the best interest of the estate.") (internal citation omitted).

[81]   *See, e.g.*, *In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999) (citing *In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930, 935 (Bankr. W.D. Mo. 1994)); *In re Spansion, Inc.*, 426 B.R. at 143 n.47 (citing the *Zenith* factors).

[82]   *See, e.g.*, *In re Wash. Mut.*, 442 B.R. at 346 ("These factors are neither exclusive nor conjunctive requirements, but simply provide guidance in the [c]ourt's determination of fairness.") (internal citation omitted); *In re Exide Techs.*, 303 B.R. 48, 72 (Bankr. D. Del. 2003) (finding that *Zenith* factors are not exclusive or conjunctive requirements).

[83]   Article I.A.129 of the Plan defines "Released Party" to mean each of the following, solely in its capacity as such: (a) the ABL Lenders; (b) the Predecessor ABL Agent; (c) the Creditors' Committee; (d) the Retained Professionals; and (e) with respect to each of the foregoing entities in clauses (a) through (d), each such Entity's current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, control persons, equity holders (regardless of whether such interests are held directly

The Debtor Release meets the applicable standard because it is a valid exercise of the Debtors' business judgement, is fair, reasonable, and in the best interests of the Debtors' Estates, the product of extensive arm's-length negotiations, and was critical to obtaining support for the Plan. Indeed, the Debtor Release is an indispensable component to achieve final resolution of potential disputes that would otherwise negatively affect these Chapter 11 Cases and the available recoveries under the Plan.

70.    *First*, each Released Party has made a substantial contribution to the Debtors' Estates.  The Released Parties played an integral role in the formulation of the Plan and contributed to the Plan not only by expending significant time and resources analyzing and negotiating the terms thereof.  Moreover, the Debtor Release is narrowly tailored, excluding all Non-Released Claims (which comprise a significant portion of all Claims and Causes of Action held by the Estates).

71.    *Second*, the Debtor Release is essential to the success of the Debtors' Plan because it constitutes an integral term of the Plan.  Indeed, absent the Debtor Release, it is highly unlikely the Debtors would have been able to build the extraordinary level of consensus with respect to the Plan and the transactions contemplated thereby.  Moreover, the Debtor Release is limited in scope; only a limited subset of the Debtors' funded debt creditors are encapsulated in the Debtor Release, and the Directors and Officers of the Debtors are not Released Parties.  Such releases do not release any entity other than a Released Party from any Claims or Causes of Action expressly set forth

---

or indirectly), affiliated investment funds or investment vehicles, participants, managed accounts or funds, fund advisors, predecessors, successors, assigns, subsidiaries, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, investment managers, and other professionals, each in their capacity as such; and (f) the D&O Parties; provided that no party, including a D&O Party, shall be a Released Party with respect to any Non-Released Claims. Notwithstanding anything to the contrary herein, (i) the Debtors do not release the D&O Parties, and (ii) the term "Released Party" does not include: (a) the Debtors or the Wind-Down Debtors; (b) the DIP Agent; (c) the DIP Lenders; (d) the ABL Agent; (e) the FILO Lenders; or (f) the FILO Agent.

and preserved by the Plan.   Importantly, the Debtor Release is the product of arm's-length negotiations between the Debtors and their key stakeholders.   In consideration for the Debtor Release, the Debtors and their Estates will receive mutual releases from potential Claims and Causes of Action of each of the Releasing Parties.   The Debtors do not believe that they have material causes of action against any of the Released Parties that would justify the risk, expense, and delay of pursuing any such causes of action as compared to the results and benefits achieved under the Plan.   The Debtor Release provides finality, underpins the settlement and compromise of issues achieved by the Plan, and avoids significant delay in consummating the Plan; therefore the inclusion of the Debtor Release is worthwhile and inures to the benefit of all the Debtors' stakeholders.

72.     ***Third***, no stakeholder has objected to the Debtor Release contained in the Plan.

73.     ***Fourth***, an identity of interest exists between the Debtors and the parties to be released.   Each Released Party, as a stakeholder and critical participant in the Plan process, shares a common goal with the Debtors in seeing the Plan succeed.   Like the Debtors, these parties seek to confirm the Plan and implement the transactions contemplated thereunder.

74.     For these reasons, the Debtor Release is justified, is a sound exercise of the Debtors' business judgement, is in the best interests of creditors and all stakeholders, is an integral part of the Plan, and satisfies key factors considered by courts in determining whether a debtor release is proper.

**B.** **The Third-Party Releases in the Plan Are Appropriately Tailored and Should Be Approved.**

75. The Plan also provides for the Releasing Parties'[84] release of the Released Parties to the extent set forth in the Plan (the "Third-Party Release").[85] Courts in this jurisdiction routinely approve such release provisions if, as here, they are consensual and appropriately tailored.[86] The determination as to whether a third party release is consensual ultimately depends on the particular circumstances at issue in a particular case.[87] Courts in this circuit have recognized that a third party release is consensual against non-debtor parties where the releasing parties have the opportunity to opt out of the release but fail to do so.[88] As such, affirmative consent to a third party release is not required for such release to be "consensual."[89] Additionally, courts have

---

[84] Article I.A.130 of the Plan defines "*Releasing Party*" means each of, means each of the following, solely in its capacity as such: (a) the ABL Lenders; (b) the Predecessor ABL Agent; (c) the Creditors' Committee; (d) with respect to each of the foregoing entities in clauses (a) through (c), each such Entity's current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, control persons, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, participants, managed accounts or funds, fund advisors, predecessors, successors, assigns, subsidiaries, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, investment managers, and other professionals, each in their capacity as such; (e) all Holders of Claims or Interests that are deemed to accept the Plan and who do not affirmatively opt out of the releases provided by the Plan; (f) all Holders of Claims or Interests who are deemed to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan; (g) all Holders of Claims or Interests who vote to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan; and (h) all Holders of Claims or Interest who vote to accept the Plan; *provided* that no party, including a D&O Party, shall be a "Releasing Party" with respect to any Non-Released Claims. For the avoidance of doubt, the term "Releasing Party" does not include: (a) the Debtors or the Wind-Down Debtors; (b) the DIP Agent; (c) the DIP Lenders; (d) the ABL Agent; (e) the FILO Lenders; or (f) the FILO Agent.

[85] *See* Plan Art. X.D.

[86] *See, e.g.*, *In re Indianapolis Downs,* 486 B.R. 286, 304–05 (Bankr. D. Del. 2013) (approving third-party release that applied to unimpaired holders of claims deemed to accept the plan as consensual); *In re Spansion*, 426 B.R. at 144 (same); *In re Wash. Mut.*, 442 B.R. at 352 (observing that consensual third-party releases are permissible); *In re Zenith Elecs.*, 241 B.R. at 111 (approving non-debtor releases for creditors that voted in favor of the plan).

[87] *See In re Indianapolis Downs*, 486 B.R. at 305.

[88] *See In re Indianapolis Downs*, 486 B.R. at 305, 306; *In re Spansion*, 426 B.R. at 144; *In re Genco Shipping & Trading Ltd.*, 513 B.R. 233, 271 (Bankr. S.D.N.Y. July 2, 2014).

[89] *See id.*; *In re Spansion*, 426 B.R. at 144.

recognized that unimpaired creditors—who are being paid in full—can be bound by third-party releases when they have not objected to the Plan, as their silence constitutes consent.[90]

76.    Here, all parties in interest had ample opportunity to evaluate and opt out of the Third-Party Release through their Ballots or Opt-Out Forms, as applicable. Importantly, the Ballots and Opt-Out Forms each quoted the entirety of the Third-Party Release in bold, conspicuous font, clearly informing such Holders of the steps they should take if they disagreed with the scope of the release. Thus, affected parties were on notice of Third-Party Release, including the option to opt out of the Third-Party Release. All Holders of Claims and Interests also had the opportunity to object to the Third-Party Release by timely filing an objection on the docket of these Chapter 11 Cases. Holders of Claims that have not objected to the releases in the Plan or are paid in full and thus deemed to have accepted the Plan, may generally, and consensually, be bound by third-party release provisions.[91] Since the Third-Party Release applies only to Holders of Claims and/or Interests that do not opt-out, it is consensual under the weight of authority of what constitutes consent in the context of a third-party release. As such, the Third-Party Release is consensual as to all creditors and interest holders who did not object.

---

[90]    *See Spansion*, 426 B.R. at 144 (overruling an objection to a release that bound unimpaired creditors, noting that "no creditor or interest holder whose rights are affected by the 'deemed' acceptance language has objected to the Plan" and the "silence of the unimpaired classes on this issue is persuasive").

[91]    *See, e.g.*, *Indianapolis Downs*, 486 B.R. at 306 ("In this case, the third-party releases in question bind certain unimpaired creditors who are deemed to accept the Plan: these creditors are being paid in full and have therefore received consideration for the releases."); *In re Spansion, Inc.*, 426 B.R. 114, 144 (Bankr. D. Del. 2010) ("I note that no creditor or interest holder whose rights are affected by the 'deemed' acceptance language has objected to the Plan. While I recognize—and fully appreciate—the importance of the UST's supervision of the administration of bankruptcy cases . . . the silence of the unimpaired classes on this issue is persuasive. This aspect of the Third-Party Release is not over-reaching. The unimpaired classes are being paid in full and have received adequate consideration for the release.").

77.    Moreover, the Plan is a contract between a Debtor and its stakeholders, implemented with approval from the Bankruptcy Court.[92]   As with any party considering a contract, parties entitled to vote on a chapter 11 plan consider the options in front of them wholistically prior to voting to accept or reject such a plan.   The Plan is unambiguous that Holders entitled to vote on the Plan may opt out of the Third-Party Release only if they vote to reject the Plan.[93]   Courts in the Third Circuit and others have recognized that voting in favor of a plan is sufficient to demonstrate consent to any third-party release contained therein.[94]Significantly, this structure does not take away any party's right to opt-out of the Third-Party Release.   A voting party may opt out of a third-party release by voting to reject the Plan.[95]

78.    The Third-Party Release is an integral and essential provision of the Plan and provides finality for the Released Parties regarding the Party's respective obligations under the Plan, is in exchange for good and valuable consideration provided by the Released Parties, is in the best interests of the Debtors, the Estates, and all Holders of Claims and Interests, is fair and

---

[92]    *See, e.g.*, *In re Coram Healthcare Corp., Inc.*, 315 B.R. 321, 336 (Bankr. D. Del. 2004) ("[A] Plan is a contract that may bind those who vote in favor of it."); *see also In re Harstad*, 155 B.R. 500, 510 (Bankr. D. Minn. 1993) (holding that "a chapter 11 plan is a contract between the debtor and its creditors" and applying contracts law principle to plan interpretation issues).

[93]    *See* Plan Art. I.A. 129-130.

[94]    *See, e.g.*, *In re Coram Healthcare Corp., Inc.*, 315 B.R. 321, 336 (Bankr. D. Del. 2004) ("To the extent creditors or shareholders voted in favor of the Trustee's Plan, which provides for the release of claims they may have against the [creditors], they are bound by that."); *In re Zenith Elecs. Corp.*, 241 B.R. 92 111 (Bankr. D. Del. 1999) (finding that a third-party release binds those voting in favor of the plan); *see also In re Specialty Equip. Companies, Inc.*, 3 F. 3d 1043, 1047 (7th Cir. 1993) ("Unlike the injunction created by the discharge of a debt, a consensual release does not inevitably bind individual creditors.   It binds only those creditors voting in favor of the plan of reorganization."); *In re Chassix Holdings, Inc.*, 533 B.R. 64, 80 (Bankr. S.D.N.Y. 2015) (holding that releasing parties "should include creditors who voted in favor of the Plan" and that "case law in this District and elsewhere supports the conclusion that the creditors' vote for the Plan constitutes a consent to the releases.").

[95]    *See In re RCS Cap. Corp.*, No. 16-10223 (MFW), Hr'g Tr. 59:21-60:2 (Bankr. D. Del. Mar. 21, 2016) ("[i]f a creditor doesn't want to grant a release, they can vote no and opt out . . . .").

equitable, and reasonable, and is given and made after due notice and opportunity to be heard. For the foregoing reasons, the Third-Party Release is permissible.

### C. The Plan's Exculpation Provision Is Permitted Under the Bankruptcy Code.

79. Exculpation provisions that apply only to estate fiduciaries and are limited to claims not involving actual fraud, willful misconduct, or gross negligence, are customary and generally approved in the Third Circuit under appropriate circumstances.[96] Unlike third-party releases, exculpation provisions do not affect the liability of third parties *per se*, but rather set a standard of care of gross negligence or willful misconduct in future litigation by a non-releasing party against an "Exculpated Party" for acts arising out of the Debtors' restructuring.[97]

80. The Plan provides for the exculpation of the Exculpated Parties.[98] The Exculpation is fair and appropriate under both applicable law and the facts and circumstances of these Chapter 11 Cases. The Exculpated Parties have participated in good faith in formulating and negotiating the Plan as it relates to the Debtors, and they should be entitled to protection from exposure to any lawsuits filed by disgruntled creditors or other unsatisfied parties.

---

[96] *See In re Wash. Mut.*, 442 B.R. at 350–51 (holding that an exculpation clause that encompassed "the fiduciaries who have served during the chapter 11 proceeding: estate professionals, the [c]ommittees and their members, and the [d]ebtors' directors and officers" was appropriate).

[97] *See In re PWS Holding Corp.*, 228 F.3d 224, 245 (3d Cir. 2000) (finding that an exculpation provision "is apparently a commonplace provision in Chapter 11 plans, [and] does not affect the liability of these parties, but rather states the standard of liability under the Code"); *see also In re Premier Int'l Holdings, Inc.*, 2010 WL 2745964, at *10 (approving a similar exculpation provision as that provided for under the Plan); *In re Spansion*, No. 09-10690 (KJC), 2010 WL 2905001, at *16 (Bankr. D. Del. 2010) (same).

[98] Article I.A.60 of the Plan defines "Exculpated Parties" to mean collectively, and in each case in its capacity as such: (a) the Debtors and Wind-Down Debtors; (b) the Creditors' Committee; and (c) with respect to the foregoing clauses (a) and (b), each such Entity's current and former Affiliates, and such Entities' and their current and former Affiliates' current and former control persons, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, subsidiaries, principals, members, employees, agents, managed accounts or funds, management companies, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such; provided that no party that otherwise qualifies as an Exculpated Party, including a D&O Party, shall be an Exculpated Party with respect to a Non-Released Claim.

81.     Moreover, the Exculpation provision and the liability standard it sets represents a conclusion of law that flows logically from certain findings of fact that the Court must reach in confirming the Plan as it relates to the Debtors.  As discussed above, this Court must find, under section 1129(a)(2), that the Debtors have complied with the applicable provisions of the Bankruptcy Code.  Additionally, this Court must find, under section 1129(a)(3), that the Plan has been proposed in good faith and not by any means forbidden by law.  These findings apply to the Debtors and, by extension, to the Debtors' officers, directors, employees, and professionals. Further, these findings imply that the Plan was negotiated at arm's-length and in good faith.  Where such findings are made, parties who have been actively involved in such negotiations should be protected from collateral attack.  Ultimately, the Exculpation provides protection to those parties that worked hand-in-hand with the Debtors and were instrumental in assuring the success of the Debtors' restructuring.

82.     Here, the Debtors and their officers, directors, and professionals actively negotiated with Holders of Claims and Interests across the Debtors' capital structure and the Creditors' Committee in connection with the Plan and these Chapter 11 Cases.  The Exculpated Parties played a critical role in negotiating, formulating, and implementing the Disclosure Statement, the Plan, and related documents.  Accordingly, the Court's findings of good faith vis-à-vis the Debtors' Chapter 11 Cases should also extend to the Exculpated Parties.  In short, the Exculpation represents an integral piece of the overall settlement embodied in the Plan and is the product of good-faith, arm's-length negotiations, and significant sacrifice by the Exculpated Parties.

83. Exculpation for parties participating in the plan process is appropriate where plan negotiations could not have occurred without protection from liability.[99]  As set forth in the Plan, the scope of the Exculpation is narrowly tailored to exclude certain acts, relates only to acts or omissions in connection with or arising out of the Debtors' restructuring, is limited to the duration of time between the Petition Date and Effective Date, and ultimately inures to the benefit of only those parties traditionally considered estate fiduciaries and their agents.

84. Accordingly, under the circumstances, it is appropriate for the Court to approve the exculpation provision and to find that the Exculpated Parties have acted in good faith and in compliance with the law.[100]

### D. The Injunction Provision is Appropriate.

85. The injunction provision set forth in Article VIII.F of the Plan (the "Injunction Provision") implements the Plan's discharge, release, and exculpation provisions by permanently enjoining all Entities from commencing or maintaining any action against the Debtors, the Wind-Down Debtors, the Plan Administrator, the Released Parties, or the Exculpated Parties on account of, or in connection with, or with respect to, any such Claims or Interests discharged, released, exculpated, or settled under the Plan.  Thus, the Injunction Provision is a necessary part of the Plan precisely because it enforces the discharge, release, and exculpation provisions that are centrally important to the Plan.  Further, the injunction provided for in the Plan is narrowly tailored to achieve its purpose.  To the extent the Court finds that the Plan's exculpation and release provisions are appropriate, the Court should approve the Injunction Provision.

---

[99]  *See In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 293 (2d Cir. 1992); *In re Enron Corp.*, 326 B.R. 497, 503 (S.D.N.Y. 2005) (excising similar exculpation provisions would "tend to unravel the entire fabric of the Plan, and would be inequitable to all those who participated in good faith to bring it into fruition.").

[100]  *See In re PWS Holding Corp.*, 228 F.3d at 246–47 (approving plan exculpation provision exception for willful misconduct and gross negligence); *In re Indianapolis Downs*, 486 B.R. at 306 (same).

**IV.     The Objections Should Be Overruled.**

86.     The Debtors received eleven formal objections to Confirmation of the Plan. To date, the Debtors have successfully resolved many of these objections, a number of which have already been withdrawn or deemed to be withdrawn, and they hope and expect to resolve additional objections before the commencement of the Confirmation Hearing.   The Objections, and the reasons why they should be overruled, are discussed in the chart attached hereto as **Exhibit A**.[101]

**A.     The Plan's Third-Party Release is Consensual and Permissible.**

87.     The SEC objected to the permissibility of the Plan's Third-Party Release.   As discussed in Section III.B of this Memorandum and below, the Third-Party Release is reasonable, appropriate, consistent with provisions regularly approved in this jurisdiction, and should be approved.

**B.     The Third-Party Release is Appropriate.**

88.     The Third-Party Release is a consensual, narrowly tailored release that benefits, and is in exchange for, the Released Parties' substantial contributions to the Plan.   All parties in interest—including Holders of FILO Claims and General Unsecured Claims—had ample opportunity to evaluate and opt out of the Third-Party Release by (a) returning an opt-out form to the Debtors and checking the opt-out box or (b) objecting (formally or informally) to the Third-Party Release.   As such, the Third-Party Release is a consensual release of all creditors and interest holders who did not object to the Third-Party Release.

---

[101]   The Debtors continue to engage with certain parties, including the Texas Taxing Authorities and certain insurers, regarding language to be included in the Confirmation Order to resolve such parties' objections.   To the extent not resolved prior to the Combined Hearing, the Debtors are prepared to present oral argument in response to the Objections.

89.     The SEC and U.S. Trustee, however, have objected on the grounds that the Third-Party Release is not consensual.  The SEC also suggests that the Court may lack the authority to approve the Third-Party Release.   Notwithstanding the SEC's and U.S. Trustee's concerns, the Third-Party Release complies with Third Circuit law and is supported by the facts and circumstances of these Chapter 11 Cases.  The Court unambiguously has the authority to approve the Third-Party Release, and courts in this district routinely exercise that authority by confirming plans containing third-party releases.  Accordingly, the Court should overrule the objections by the SEC and the U.S. Trustee and approve the Third-Party Release.

### 1.      The Third-Party Release is Consensual.

90.     The Third-Party Release is consensual.  The SEC's and U.S. Trustee's contention that the Third-Party Release is not consensual is belied by the plain language of the Plan, robust service of Court-approved notices to Holders of Claims and Interests, and the fact that a number of parties in interest have availed themselves of the opt-out mechanism to opt-out of the Third-Party Release.   The law is clear that a release is consensual where parties have received sufficient notice of a plan's release provisions and have had an opportunity to object to or opt out of the release and failed to do so (including where such holder abstains from voting altogether).[102] The Debtors clearly and conspicuously included the Third-Party Release language in the Combined Hearing Notice, the Ballots, and the Opt-Out Forms, which were sent to all creditors

---

[102]  *See, e.g.*, *In re Indianapolis Downs, LLC*, 486 B.R. at 306 ("As for those impaired creditors who abstained from voting on the Plan, or who voted to reject the Plan and did not otherwise opt out of the releases, the record reflects these parties were provided detailed instructions on how to opt out, and had the opportunity to do so by marking their ballots. Under these circumstances, the Third-Party Releases may be properly characterized as consensual and will be approved."); *In re DBSD N. Am., Inc.*, 419 B.R. 179, 218-19 (Bankr. S.D.N.Y. 2009) ("Except for those who voted against the Plan, or who abstained and then opted out, I find the Third-Party Release provision consensual and within the scope of releases permitted in the Second Circuit."); *In re Conseco, Inc.*, 301 B.R. 525, 528 (Bankr. N.D. Ill. 2003) ("The Article X release now binds only those creditors who agreed to be bound, either by voting for the Plan or by choosing not to opt out of the release.  Therefore, the Article X release is purely consensual and within the scope of releases that Specialty Equipment permits.").

and equity holders, as applicable, and explicitly alerted such parties (i) of the deadlines to vote on and object to the Plan and (ii) that unless a party expressly opts-out, it shall be deemed a Releasing Party under the Plan.  Accordingly, all stakeholders had proper notice of their rights and could have chosen to object to the release, opt-out of the release, or object to confirmation of the Plan.

91.    Further, because the Third-Party Release applies only to Holders of Claims that vote affirmatively for the Plan or do not opt out, it is consensual under the weight of authority of what constitutes consent in the context of a third-party release.[103]  Generally, voting in favor of a plan is sufficient to demonstrate consent to any third-party release contained therein.[104]  Similarly, those Holders of Claims that have not objected to the releases in the Plan, opted out of the releases in the Plan, or are paid in full and thus deemed to have accepted the Plan, may generally, and consensually, be bound by Third-Party Release provisions.[105]

---

[103]  *In re RCS Cap. Corp.,* No. 16-10223 (MFW), Hr'g Tr. 59:21-60:2 (Bankr. D. Del. Mar. 21, 2016) ("[T]here's enough affirmative action required to allow the mechanism the debtor is suggesting because it's clear in the ballot that, if they vote yes on the plan, they are granting a release.  If a creditor doesn't want to grant a release, they can vote no and opt out, or just not vote.  So I think affirmatively voting on the plan is enough action to be an acceptance of third-party releases"); *In re Indianapolis Downs, LLC,* 486 B.R. at 306 ("As for those impaired creditors who abstained from voting on the Plan, or who voted to reject the Plan and did not otherwise opt out of the releases, the record reflects these parties were provided detailed instructions on how to opt out, and had the opportunity to do so by marking their ballots.  Under these circumstances, the Third-Party Releases may be properly characterized as consensual and will be approved.").

[104]  *See, e.g.*, *In re Coram Healthcare Corp., Inc.,* 315 B.R. 321, 336 (Bankr. D. Del. 2004) ("To the extent creditors or shareholders voted in favor of the Trustee's Plan, which provides for the release of claims they may have against the [creditors], they are bound by that."); *In re Zenith Elecs. Corp.*, 241 B.R. 92 111 (Bankr. D. Del. 1999) (finding that a third-party release binds those voting in favor of the plan); *see also In re Specialty Equip. Companies, Inc.*, 3 F. 3d 1043, 1047 (7th Cir. 1993) ("Unlike the injunction created by the discharge of a debt, a consensual release does not inevitably bind individual creditors.  It binds only those creditors voting in favor of the plan of reorganization."); *In re Chassix Holdings, Inc.*, 533 B.R. 64, 80 (Bankr. S.D.N.Y. 2015) (holding that releasing parties "should include creditors who voted in favor of the Plan" and that "case law in this District and elsewhere supports the conclusion that the creditors' vote for the Plan constitutes a consent to the releases.").

[105]  *See, e.g., Indianapolis Downs*, 486 B.R. at 306 ("In this case, the third-party releases in question bind certain unimpaired creditors who are deemed to accept the Plan: these creditors are being paid in full and have therefore received consideration for the releases."); *In re Spansion, Inc.*, 426 B.R. 114, 144 (Bankr. D. Del. 2010) ("I note that no creditor or interest holder whose rights are affected by the 'deemed' acceptance language has objected to the Plan. While I recognize—and fully appreciate—the importance of the UST's supervision of the administration of bankruptcy cases . . . the silence of the unimpaired classes on this issue is persuasive.  This aspect of the Third-

92.    Nevertheless, the SEC asserts that the Third-Party Release is non-consensual because consent to a third-party may only be given through an "opt-in" mechanism.  However, this argument is belied by the weight of authority in this district, which has held on numerous occasions that opt-out mechanisms such as the one included in the Plan constitute consensual releases.[106]  Specifically, in *In re Saint Michael's Medical Center*, this Court recognized that the releases provided through an opt-out mechanism were "largely consensual," pointing to the numerous creditor who availed themselves of the right to opt out.[107]  Moreover, in *In re Aceto Corporation*, this Court approved thirty party releases from all parties who: (a) voted to accept the plan; (b) abstained from voting on the plan, but failed to return an opt-out form; and (c) voted to reject the plan but did not elect on their ballot to opt out of the third-party release.[108]

93.    Indeed, Chief Judge Kaplan overruled precisely the same arguments raised by the SEC in *In re SLT HoldCo*:

> As far as the third party releases I do not view them as non-consensual.  I view it as consensual.  I am –I find support in the fact that all creditors are who involved in this bankruptcy, all classes of claims received not only the opt-out provisions as part of a ballot, but if they were not given an opportunity to participate because they were not impaired or otherwise in a position to cast a ballot they were given and presented with the opt-out form.
>
> I disagree with Emerge Energy Services.  That language in which – and was cited by the U.S. Trustee both in argument and in their papers where the court held that the failure to return a notice can be

Party Release is not over-reaching. The unimpaired classes are being paid in full and have received adequate consideration for the release.").

[106]    *See, e.g., In re Congoleum Corporation*, Case No. 20-18488 (MBK) (Bankr. D. N.J. Jan. 25, 2021); *In re Modell's Sporting Goods, Inc.,* Case No. 20-14179 (VFP) (Bankr. D. N.J. Nov. 12, 2020); *In re SLT Holdco, Inc.*, Case No 20-18368 (MBK) (Bankr. D. N.J. Oct. 21, 2020); *In re Aceto Corporation*, Case No. 19-13448 (VFP) (Bankr D. N.J. Sept. 18, 2019); *In re Saint Michael's Medical Center, Inc.*, Case No. 15-24999 (VFP) (Bankr D. N.J. Jan. 12, 2017).

[107]    *In re Saint Michael's Medical Center*, Hr'g Tr. 3:13-15 (Jan. 12, 2017).

[108]    *In re Aceto Corporation*, Case No.-15-24999 (VFP) (Bankr D. N.J. Jan. 12, 2017).

due to carelessness and inattentiveness or mistake, and that's acceptable.  That's not acceptable.  I guess I'm frustrated with society today where we allow carelessness and inattentiveness and mistake to go without consequence.  There is consequence when you ignore your rights even if its through carelessness or inattentiveness.  And you forego the ability to pursue certain rights and remedies.  Due process requires proper notice, and I'm convinced that proper notice was granted in – was provided in this case.[109]

94.    Further, courts in this Circuit follow similar reasoning with respect to the notion of implied consent to that of Chief Judge Kaplan in *SLT HoldCo*.  Specifically, in *In re Extraction Oil and Gas*, the Debtors sought approval of a plan that included an opt-out mechanism.[110] "Releasing Parties" under the plan was defined to include "holders of all Claims or Interests who vote, or are deemed, to reject the Plan but do not opt out of granting the releases set forth therein."[111]  The court overruled the U.S. Trustee's and SEC's objections to the third-party releases holding that:

Very importantly, these are consensual releases, these are not nonconsensual releases. I have repeatedly ruled that you can imply consent by failing to opt out or respond to a plan, either through a ballot or on the docket, that calls for a release. I don't believe this is necessarily a contractual point . . . as much as it is a point of notice under the Bankruptcy Code and the Bankruptcy Rules, because it's the plan that serves as the mechanism to have the release take effect and, thus, it's really the rules, the Federal Rules of Bankruptcy Procedure that figure out whether someone has achieved proper notice and has, by not responding, given their implied consent. Importantly, the Supreme Court recently, in the context of whether someone is consenting to the Article III jurisdiction of an Article I court, specifically held that you could imply consent by failure to preserve the right to argue that I don't have Article III powers. This is no different. This is a court who set up a mechanism to confirm a

---

[109]    *In re SLT Holdco, Inc., et al.*, Case No. 20-18368 (MBK) (Oct. 21, 2020), Hr'g Tr. 27:18-28:13.

[110]    *In re Extraction Oil and Gas, Inc.*, No. 20-11548 (CSS) (Bankr. D. Del. 2020).

[111]    *Id.*

> plan that contains releases and has provided a noticing mechanism
> under which, if it's complied with, consent can be implied.[112]

95.     Here, as was the case in the matters cited above, either when voting on the Plan or

as a recipient of an Opt-Out Form, the ability of holders of Claims and Interests to choose whether

to grant the Consensual Third-Party Releases was clear and conspicuous on the Ballots and Opt-

Out Forms in these cases.   In view of similar notice, Chief Judge Kaplan had "no problem

regarding the matter as a consensual release for all those parties who were given proper notice and

opportunity."[113]   Accordingly, the Debtors submit that the Third-Party Release is consensual, and

the SEC's objection should be overruled in its entirety.

### 2.     Even if the Third-Party Release is Non-Consensual, It is Permissible.

96.     Even if the Court were to find that the Third-Party Release is non-consensual—

which it should not—the Court should nevertheless approve the Third-Party Release under the

circumstances of these Chapter 11 Cases.   Courts in the Third Circuit have held that a

non-consensual release may be approved if such release is fair and necessary to the reorganization,

and the court makes specific factual findings to support such conclusions.[114]   In addition, the Third

Circuit has found that, for such releases to be permissible, fair consideration must be given in

exchange for the release.[115]   "[N]ecessity requires a demonstration that the success of the debtors'

---

[112]   *In re Extraction Oil and Gas, Inc.*, No. 20-11548 (CSS), Hearing Tr., 12-23-20 at 80-81 (Bankr. D. Del. Dec. 22, 2020).

[113]   *Id.* at 28:19-20.

[114]   *See Gillman v. Continental Airlines (In re Continental Airlines)*, 203 F.3d 203, 213-14 (3d Cir. 2000) (explaining that the "hallmarks" of permissible nonconsensual third-party releases are "fairness, necessity to the reorganization, and specific factual findings to support these conclusions.")

[115]   *In re Cont'l Airlines*, 203 F. 3d 203, 214 (3d. Cir. 2000); *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 607 (Bankr. D. Del. 2001) (considering whether: (a) the non-consensual release is necessary to the success of the reorganization; (b) the releasees have provided a critical financial contribution to the debtor's plan; (c) the releasees' financial contribution is necessary to make the plan feasible; and (d) the release is fair to the non-

reorganization bears a relationship to the release of the non-consensual parties, and that the releasees have provided a critical financial contribution to the debtors' plan that is necessary to make the plan feasible in exchange for receiving a release of liability."[116]

97.     Here, the support of the Released Parties (and in particular, the Creditors' Committee) was critical in the strategic development of the Plan and in paving the way for emergence from these Chapter 11 Cases.  The Third- Party Releases are integral to the Plan and the settlements incorporated therein, and are fair and appropriate.   Without the efforts and contributions of the Released Parties, the Debtors would not be poised to confirm a plan and would be forced to liquidate under chapter 7 of the Bankruptcy Code, leaving less recoveries for all stakeholders than those provided under the Plan.   The Third-Party Releases were a material inducement for support that the Released Parties have provided in connection with the Plan. Finally, the contributions made by the Released Parties are sufficient consideration to the third parties bound by the Releases to justify the Third-Party Releases, as indicated by the broad support of the Plan among the Releasing Parties.

98.     Finally, holders of claims against the Debtors stand to benefit from the Third-Party Release given the mutuality of such releases. The mutuality of the Third-Party Release—a "proverbial peppercorn-for-peppercorn"[117]—provides adequate consideration to parties that are otherwise not receiving any recovery under the Plan.   Accordingly, the Third-Party Release is

---

consenting creditors, i.e., whether the non-consenting creditors received reasonable compensation in exchange for the release).

[116]   *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 607 (Bankr. D. Del. 2001).

[117]   *In re Cobalt Int'l Energy, Inc.*, No. 17-36709 (MI) Hr'g Tr. 244:16-18 (Bankr. S.D. Tex. Apr. 4, 2018) [Docket No. 790] ("I simply find that this is, in effect, the proverbial peppercorn-for-peppercorn and that that is adequate consideration for the release, given its mutuality.").

necessary and reasonable under the circumstances, and the SEC's and the U.S. Trustee's objections should be overruled.

### 3. The Court Has Jurisdiction and Authority to Approve the Third-Party Release.

99. The Court has clear authority to approve the Third-Party Release. Confirmation of a plan, including one with third-party releases, requires the application of federal standards, not state, thus granting bankruptcy judges with the constitutional authority to enter final judgments on confirmation.[118] Furthermore, the Court has subject matter jurisdiction over matters that "might have any conceivable effect on the bankrupt[cy] estate."[119] Given the importance of the Third-Party Release here and the critical role the Released Parties play in ensuring that the Plan is successfully consummated, the Debtors submit that this Court has the requisite subject matter jurisdiction to consider and approve such releases. In light of the foregoing, the Debtors respectfully request that the Court overrule the SEC's objections to the Court's jurisdiction to approve the Third-Party Release.

### C. The "Gatekeeping Provision" Should be Approved.

100. The SEC and U.S. Trustee have objected to the so-called "gatekeeping" provision (the "Gatekeeping Provision") in the Third-Party Release, which provides that:

> From and after the Effective Date, any Entity (other than the DIP Agent, the DIP Lenders, the ABL Agent, the FILO Lenders, or the FILO Agent) that opted out of (or otherwise did not participate in) the releases contained in Article X.D may not assert any claim or

---

[118] *In re Millennium Lab Holdings II, LLC*, 575 B.R. 252, 271 (Bankr. D. Del. 2017) (noting the court's constitutional authority to confirm a plan, including one with releases, despite *Stern v. Marshall*); *see also In re Quigley Co., Inc.*, 676 F.3d 45, 52 (2d Cir. 2012) (noting *Stern's* narrow holding in deciding that the court had constitutional authority to grant an injunction against third-party non-debtors).

[119] *In re Quigley Co.*, 676 F.3d at 53; *see also Celotex Corp. v. Edwards*, 514 U.S. 300, 308 n.6 (1995) (collecting cases); In re Cuyahoga Equip. Corp., 980 F.2d 110, 114 (2d Cir. 1992) (noting that if the outcome of litigation "might have any 'conceivable effect' on the bankruptcy estate" then "the litigation falls within the 'related to' jurisdiction of the bankruptcy court") (internal citations omitted).

other Cause of Action against any Released Party for which it is
asserted or implied that such claim or Cause of Action is not subject
to the releases contained in Article X.C of the Plan without first
obtaining a Final Order from the Bankruptcy Court (a) determining,
after notice and a hearing, that such claim or Cause of Action is not
subject to the releases contained in Article X.C of the Plan and
(b) specifically authorizing such Person or Entity to bring such
claim or Cause of Action against any such Released Party. For the
avoidance of doubt, the terms of this paragraph shall not apply to
the Plan Administrator. The Bankruptcy Court will have sole and
exclusive jurisdiction to determine whether a claim or Cause of
Action constitutes a direct or derivative claim, is colorable and, only
to the extent legally permissible and as provided for in Article XIII
of the Plan, the Bankruptcy Court shall have jurisdiction to
adjudicate the underlying claim or Cause of Action.

101.    The Gatekeeping Provision is a legitimate exercise of this Court's power under

sections 105, 1123(b)(6), and 1141(a), (b), and (c) of the Bankruptcy Code.  The purpose of the

Gatekeeping Provision is to ensure that the Debtors and their successors-in-interest—namely,

the Plan Administrator and the Wind-Down Debtors—do not become bogged down in vexatious,

meritless litigation.  Gatekeeping Provisions are not a novel attempt to circumvent limitations on

bankruptcy court jurisdiction; rather, they have been utilized by many courts to provide a threshold

level of review following confirmation of a chapter 11 plan.  Under this construct, which has been

approved in numerous jurisdictions[120] (including the District of New Jersey),[121] the Bankruptcy

Court serves as a "gatekeeper" and determines whether a litigant has a colorable claim that remains

---

[120]    *In re Cineworld Group plc*, Case No. 22-90168 (MI) (Bankr. S.D. Tex. Jun. 26, 2023); *In re Avaya Inc.*, Case
No. 23-90088 (DRJ) (Bankr S.D. Tex. Mar. 21, 2023); *In re Nautical Solutions, L.L.C.*, No. 23-90002 (CML)
(Bankr. S.D. Tex. Feb. 14, 2023); and *In re Highland Capital Management, L.P.*, Case No.19-34054-SGJ (Bankr.
N.D. Tex. Nov. 24, 2020).

[121]    *See, In re National Realty Investment Advisors, LLC*, Case No. 22-14539 (JKS) (Bankr. D. N.J. Aug. 10, 2023)
(providing that the Bankruptcy Court maintained exclusive jurisdiction to adjudicate matters related to the chapter
11 case on a post-effective date basis); *In re Princeton Alternative Income Fund, LP*, Case No. 18-14603 (MBK)
(Bankr. D. N.J. Feb. 19, 2020) (explicitly applying the Barton Doctrine to post-confirmation suits);

assertable following confirmation of the Plan and whether a litigant's claim is a direct claim or a derivative claim.

102.    In fact, the Gatekeeping Provision is an outgrowth of the long-standing "Barton Doctrine" established by the Supreme Court in *Barton v. Barbour*.[122]   The Barton Doctrine provides that, as a general rule, before a suit may be brough against a trustee, leave of the appointing court must be obtained.[123]   While the Barton Doctrine originated as a protection for federal receivers, courts have applied the concept to various participants in chapter 11 cases, including debtors in possession,[124] officers and directors of a debtor,[125] and professionals retained by the debtors.[126]   By requiring claimants to seek leave of the Bankruptcy Court before pursuing actions against the Debtors and its successors in interest, the Gatekeeping Provision is within the spirit of the protections afforded to fiduciaries and their agents under the Barton Doctrine. The gatekeeping role is one played by Bankruptcy Courts in numerous contexts.  In the *Madoff* cases, the U.S. Bankruptcy Court for the Southern District of New York served as a gatekeeper to determine whether claims against certain Madoff funds were direct or derivative claims[127] (which is precisely the role that the Debtors are asking the Court to play here).  In *In re Motors Liquidation Co.*, the U.S. Bankruptcy Court for the Southern District of New York serves as a gatekeeper to

---

[122]   *Barton v. Barbour*, 104 U.S. 126 (1881).

[123]   *Baron v. Sherman (In re Ondova Ltd. Co.*,), 2017 Bankr. LEXIS 325, *29 (Bankr. N.D. Tex. Feb. 1, 2017).

[124] *Helmer v. Pogue*, 212 U.S. Dist. LEXIS 151262 (N.D. Ala. Oct. 22, 2012) (applying Barton Doctrine to debtor in possession).
[125] *See Carter v. Rodgers*, 220 F.3d 1249, 1252 and n.4 (11th Cir. 2000) (debtor must obtain leave of the bankruptcy court before initiating an action in district court when that action is against the trustee or other bankruptcy-court-appointed officer for acts done in the actor's official capacity, and finding no distinction between a "bankruptcy-court-appointed officer" and officers who are "approved" by the court.); *Hallock v. Key Fed. Sav. Bank (In re Silver Oak Homes)*, 167 B.R. 389 (Bankr. D. Md. 1994) (president of debtor).
[126]   *Lowenbraun v. Canary (In re Lowenbraun)*, 453 F.3d 314, 321 (6th Cir. 2006) (trustees' counsel).

[127]   *See, e.g., Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC,* 546 B.R. 284 (Bankr. S.D.N.Y. 2016) (discussing the Bankruptcy Court's gatekeeper role).

determine whether claims may properly be asserted against the pre- or post-reorganization General

Motors entity.[128]  Under this construct, the Bankruptcy Court effectively serves the same role as it

does when it determines whether a statutory committee should be granted standing to file litigation

on behalf of a debtor; that is, the Court is asked to make a determination as to whether the claim

at issue is colorable.

103.    Neither is the Gatekeeping Provision an attempt to impermissibly extend the

Bankruptcy Court's jurisdiction past its limits.  Courts in this circuit have confirmed plans on

numerous occasions that provide permanent Bankruptcy Court jurisdiction over matters arising

out of the chapter 11 cases, recognizing that Bankruptcy Courts may continue to exclusively

adjudicate issues related to the chapter 11 cases on a post-emergence basis.[129]  Furthermore, courts

have acknowledged that Bankruptcy Court jurisdiction over matters arising out of chapter 11 cases

may extend even further where the debtor is liquidating its assets, as is the case here.  In *Boston

Regional Med. Ctr. Inc. v. Reynolds (In re Boston Regional Med. Ctr. Inc.)*, the First Circuit

acknowledged that a "liquidating debtor exists for the singular purpose of executing an order of

the bankruptcy court," and "[a]ny litigation involving such a debtor thus relates much more directly

to a proceeding under title 11."[130]

104.    Furthermore, contrary to the assertions of the U.S. Trustee and the SEC,

the Gatekeeping Provision does not impose any greater burden on claimholders than the Plan

---

[128]   *See, e.g., In re Motors Liquidation Co.*, 541 B.R. 104 (Bankr. S.D.N.Y. 2015) (discussing Bankruptcy Court's gatekeeper role).

[129]   *See, e.g., In re Modell's Sporting Goods, Inc.*, No. 20-14179 (VFP) (Bankr. D. N.J. Nov. 12, 2020) (providing that the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or relating to, the chapter 11 cases and the plan); *In re Lannett Company, Inc.*, Case No. 23-10559 (JKS) (Bankr. D. Del. Jun. 8, 2023) (same).

[130]   *Boston Regional Med. Ctr., Inc. v. Reynolds (In re Boston Regional Med. Ctr. Inc.)*, 410 F.3d 100 (1st Cir. 2005).

would impose without the Gatekeeping Provision. Nearly all chapter 11 plans in complex cases, including the Plan, contain an injunction permanently preventing parties from asserting released claims against released parties. If a claimant seeks to assert a claim following the effective date of the Plan but is unsure whether that claim constitutes a direct or derivative (*i.e,* a released) claim, the claimant will need a judicial determination that the claim was not released under the Plan; otherwise, the claim could not be properly asserted. The Gatekeeping Provision ensures that the Bankruptcy Court—the court most familiar with the facts and circumstances of the Chapter 11 Cases, the court best-positioned to determine as to whether the claim may be asserted—is the court making that determination. This inures to the benefit of all parties, including potential claimants.

105. The propriety of Gatekeeping Provisions was recently litigated in the Fifth Circuit in the *In re Highland Capital* matter. There, the debtors sought approval of a provision nearly identical to the Gatekeeping Provision in the Plan. In upholding confirmation of the plan, the Fifth Circuit recognized that the Gatekeeping Provision was necessary to ensure the effectiveness of the debtors' plan by "screen[ing] and prevent[ing] bad-faith litigation against Highland Capital, its successors, and other bankruptcy participants."[131] And indeed, following confirmation of the plan, the U.S. Bankruptcy Court for the Northern District of Texas exercised the gatekeeper provision by denying a suit by a non-debtor against the debtors' former chief executive officer.[132]

106. The Court should approve the Gatekeeping Provision for the same reasons identified by the Northern District of Texas in *In re Highland Capital*. Rather than seeking to shift

---

[131] *NextPoint Advisors, L.P. v. Highland Capital Mgmt., L.P. (In re Highland Capital Mgmt, L.P.)*, 48 F.4th 419, 435 (5th Cir. 2022).

[132] *In re Highland Capital Management,* Case No.19-34054-SGJ (Bankr. N.D. Tex. Aug. 25, 2023).

the burden of proof to claimants or provide a further release of claims or causes of action under

the Plan, the Gatekeeping Provision simply provides a threshold level of review necessary to

ensure the effectiveness of the Plan.  The Debtors are a widely-held public company with a highly

active group of shareholders.[133]  In the absence of the Gatekeeping Provision, it is entirely possible

that the Debtors' shareholders, or other parties who opt out of the Third-Party Release, will seek

to assert frivolous claims, or claims barred by the Plan's injunction provisions, against the

Wind-Down Debtors or Plan Administrator, hindering the effectiveness of the Debtors' Plan.

107.    The Gatekeeping Provision, which enjoys the support of the Creditors' Committee

(a fiduciary for all of the estate's general unsecured creditors), represents a permissible exercise

of the Bankruptcy Court's jurisdiction, and will inure to the benefit of the Debtors, their

successors-in-interest, and potential claimants.  Accordingly, the Court should overrule the

objections of the U.S. Trustee and SEC and approve the Gatekeeping Provision.

**D.    The Distributions Under the Plan Do Note Require Substantive Consolidation.**

108.    200-220 West 26 LLC argue that the Debtors' Plan distribution mechanism

operates as if the Debtors are substantively consolidated.  The Plan, however, expressly states the

opposite, and substantive consolidation would serve no purpose to the Debtors' creditors.  Thus,

this should be overruled.

109.    The Bankruptcy Code allows for joint administration without violating the

corporate separateness principal.  When a group of debtors files for chapter 11, the Bankruptcy

Code authorizes, under certain circumstances, that the bankruptcy cases will be conducted under

one case, through joint administration.  Such consolidation is not meant to disrupt the corporate

separateness between the debtor entities and the creditors of each debtor "continue to look to that

---

[133]    *See, e.g.,* the Das Objection.

debtor for payment of their claims."[134]  Indeed, when the enterprise is managed by a certain entity

on an integrated basis, it is "reasonable and administratively convenient to propose a joint plan."[135]

110.    As the Third Circuit Court of Appeals explained in *In re Genesis Health Ventures Inc.*:

> Substantive consolidation treats separate legal entities as if they
> were merged into a single survivor left with all the cumulative assets
> and liabilities (save for enter-entity liabilities, which are erased).
> The result is that claims of creditors against [**16] separate debtors
> morph to claims against the consolidated survivor. Because its effect
> radically rearranges legal boundaries, assets and liabilities,
> substantive consolidation is typically a sparingly used remedy for
> debtors' conduct that blurs separateness so significantly that either
> the debtors' assets are so scrambled that unscrambling them is cost,
> time and energy prohibitive or creditors already perceive the debtors
> as simply a single unit and deal with them so.[136]

111.    In *Genesis Health Ventures*, the U.S. Trustee argued that the "deemed

consolidation" provision of the debtors' chapter 11 plan, which deemed the debtor consolidated

for the purposes of voting and distribution constituted "de facto substantive consolidation."[137]  The

Third Circuit Court of Appeals ruled against the U.S. Trustee, finding that "deemed consolidation

left no effect on the Debtors (including their legal and organizational structures) and the rights of

claimholders."[138]  The court noted that the *Genesis* debtors had "made clear…that [the deemed

---

[134]  *In re Transwest Resort Properties Inc.*, 881 F. 3d 724, 731 (9th Cir. 2018) (Friedland, J., concurring).

[135]  *In re Charter Commc'ns*, 419 B.R. 221, 266 (Bankr. S.D.N.Y. 2009).

[136]  *Genesis Health Ventures, Inc. v. Stapleton (In re Genesis Health Ventures, Inc.*), 402 F.3d 416, 423 (3d Cir. 2005).

[137]  *Id.*

[138]  *Id.*

consolidation provision] does not result in substantive consolidation," and that the effect of the provision was to ensure that "voting and distribution were streamlined."[139]

112.    In *In re Sabine Oil & Gas Corp.*, the U.S. Bankruptcy Court for the Southern District of New York faced a similar argument, namely that the plan effected a de facto substantive consolidation.[140]    There, the Court denied the argument that the plan effectuated a de facto substantive consolidation, noting that the plan treated each claim separately against each debtor, which was demonstrated by (i) the ballots and voting tabulation, which were on a debtor-by-debtor-basis, and (ii) the distribution scheme.[141]

113.    Here, the Plan explicitly states that it does not provide for substantive consolidation.[142]    Instead, the Plan applies separately for each of the Debtors, and the classification of Claims and Interests under the Plan apply separately to each of the Debtors.    In addition, voting tabulations for recording acceptances and rejections of the Plan are done on a Debtor-by-Debtor basis.[143]

114.    Further, substantive consolidation in this case would not ensure more equitable treatment to the creditors.    The Debtors' secured creditors have claims against each of the Debtors and have liens on substantially all of the assets of each Debtor.    Accordingly, outside of a chapter 11 plan, including in a hypothetical chapter 7 liquidation, unsecured creditors would not be entitled to any distribution.    But under the Plan, certain of the Debtors' secured creditors have agreed to

---

[139]    *Id.*

[140]    *In re Sabine Oil & Gas Corp.*, 555 B.R. 180 (Bankr. S.D.N.Y. 2016).

[141]    *Id.* at 318.

[142]    *See* Plan at Art. I.G.

[143]    *See generally,* Voting Report.

allow holders of General Unsecured Claims to benefit from the prosecution of certain estate causes of action, notwithstanding that these secured creditors may not be paid in full, as memorialized in the UCC Settlement incorporated in the Plan.  In this context, the Debtors determined that such pro rata sharing among all holders of Unsecured Claims across all Debtors was a fair and appropriate means to effectuate this distribution in light of their capital structure, not because the Plan is effectuating a de facto substantive consolidation.  Thus, there is no basis for holding that the Plan's terms result or should result in a de facto substantive consolidation.[144]

### Waiver of Bankruptcy Rule 3020(e)

115.    Bankruptcy Rule 3020(e) provides that "[a]n order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the Court orders otherwise."[145] Bankruptcy Rules 6004(h) and 6006(d) provide similar stays to orders authorizing the use, sale, or lease of property (other than cash collateral) and orders authorizing a debtor to assign an executory contract or unexpired lease under section 365(f) of the Bankruptcy Code.  Each rule also permits modification of the imposed stay upon court order.

116.    To implement the Plan, the Debtors seek a waiver of the 14-day stay of an order confirming a chapter 11 plan under Bankruptcy Rule 3020(e).  Given the complexity of the Plan and the various transactions implicated by the Plan, the Debtors may take certain steps to effectuate the Plan in anticipation of and to facilitate the occurrence of the Effective Date so that the Effective Date can occur promptly.  Therefore, good cause exists to waive any stay imposed by the

---

[144]  200-220 West 26 LLC makes several arguments flowing from the contention that the Debtors' Plan constitutes a *de facto* substantive consolidation, including that the Plan improperly preserves the identity of separate debtors for the purposes of pursuing so-called "Wrong Debtor Paid Avoidance Actions.."  As set forth in the foregoing paragraphs, the Debtors do not seek to substantively consolidate their estates, nor do they seek to preserve the identities of individual debtor entities for purposes other than effectuating the Plan.  Accordingly, the entirety of 200-220 West 26 LLC's objection should be denied.

[145]  *See* Fed. R. Bankr. P. 3020(e).

Bankruptcy Rules so that the proposed Confirmation Order may be effective immediately upon its

entry.

## **Conclusion**

117.    For the reasons set forth herein, the Debtors respectfully request that the Court

overrule the outstanding Objections and enter the Confirmation Order.


[*Remainder of Page Intentionally Left Blank*]

Dated: September 7, 2023

/s/ Michael D. Sirota

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone:  (201) 489-3000
Email:        msirota@coleschotz.com
                wusatine@coleschotz.com
                fyudkin@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Emily E. Geier, P.C. (admitted *pro hac vice*)
Derek I. Hunter (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900
Email:        joshua.sussberg@kirkland.com
                emily.geier@kirkland.com
                derek.hunter@kirkland.com

*Co-Counsel for Debtors and*
*Debtors in Possession*

# Exhibit A

## Objection Chart

*In re Bed Bath & Beyond, Inc.*, No. 23-13359 (VFP)
**Confirmation Objection Summary Chart[1]**

| Docket No. | Objecting Party | Objection Summary | Debtors' Response | Status |
|---|---|---|---|---|
| | | **Unresolved Objections** | | |
| 2129 | Ace American Insurance Company, ACE Property & Casualty Insurance Company, Westchester Fire Insurance Company, Westchester Surplus Lines Insurance Company, Indemnity Insurance Company of North America, Federal Insurance Company, Chubb Custom Insurance Company, Executive Risk Specialty Insurance Company, Executive Risk Indemnity Inc., Great Northern Insurance Company, Chubb Insurance Company of New Jersey, Vigilant Insurance Company, Chubb Indemnity Insurance Company, ESIS, Inc., (collectively, " Chubb") | Chubb argues that (a) the Plan attempts to impermissibly assume Chubb's insurance policies and alter the terms thereof in violation of the Bankruptcy Code by (1) impermissibly releasing obligations under the insurance programs; (2) expanding coverage of the D&O Liability Insurance Policies; (3) creating restrictions on handling and administration of insured claims; and (b) the Plan does not provide for the handling of workers' compensation claims or direct action claims against the Debtors' insurers. | The Debtors are engaged in ongoing discussions with Chubb around revisions to the Plan. While the Debtors hope to reach agreement with Chubb, the Debtors will be prepared to address Chubb's objection during the Combined Hearing to the extent not resolved. | Outstanding |

---

[1]    Capitalized terms used herein but not defined have the same meaning given to such terms in the Plan, the Disclosure Statement, the relevant Objection, or the Confirmation Brief (each as defined in the Confirmation Brief), as applicable.

| Docket No. | Objecting Party | Objection Summary | Debtors' Response | Status |
|---|---|---|---|---|
| 2123 | United States Trustee | The U.S. Trustee argues that the Third-Party Release is overbroad and impermissible in that it contains as a Releasing Party all Holders of Claims or Interest who vote to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan. The U.S. Trustee further argues that the Gatekeeping Provision should be removed from the Plan.<br><br>The U.S. Trustee requested other revisions to the Releases, Injunction, and Exculpation Provisions through an informal objection. | The Debtors have agreed to make various changes to the Plan to resolve the U.S. Trustee's informal objection, including: (a) the removal of Holders of Claims that are deemed to reject the Plan from the definition of "Releasing Party" and (b) agreed-upon revisions to the Injunction and Exculpation Provisions, each of which will be reflected in a further amended Plan filed in advance of the Combined Hearing.<br><br>As of the filing of this Confirmation Brief, the only outstanding issues with the U.S. Trustee relate to (a) the Third-Party Releases as it relates to parties who vote to reject the Plan (addressed in the Confirmation Brief at Art IV.B 1 and IV.B2) and (b) the Gatekeeping Provision (addressed at Art IV.B.3 of the Confirmation Brief).<br><br>The Debtors remain engaged in ongoing with discussions with the U.S. Trustee around further revisions to the Plan and hope to reach a resolution in advance of the Combined Hearing. | Outstanding |
| 2113 | Google LLC | Google LLC argues that the Plan's definition of "Released Party" does not expressly include Holders of General Unsecured Claims that vote to accept the Plan, notwithstanding the Disclosure Statement's language providing that "Holders of General Unsecured Claims that vote to accept the Plan shall be deemed a Released Party for all purposes under the Plan.<br><br>Google LLC requests that the Court (a) clarify in the Confirmation Order that "Holders of General Unsecured Claims that vote to accept the Plan shall be deemed a Released Party for all purposes under the Plan"; and (b) deny assumption of any Contracts in the absence of | The Debtors expect to reach a resolution with Google LLC ahead of the Combined Hearing.<br><br>As set forth in the Plan and Confirmation Order, all Holders of Claims who vote to accept the Plan but do not opt out of the Releases are Releasing Parties. | Outstanding |

| Docket No. | Objecting Party | Objection Summary | Debtors' Response | Status |
|---|---|---|---|---|
| | | Debtors' confirmation that they will cure the outstanding amounts due and owing to Google in connection therewith. | | |
| 2112 | Texas Taxing Authorities ("TTAs") | The TTAs argue that the Plan should not be confirmed for the following reasons:<br><br>The Plan fails to expressly provide for the retention of their pre- and post-petition tax liens in the proper priority under the Bankruptcy Code and Texas law, in and to the assessed collateral or the proceeds from the sale of such collateral, including any funds earmarked for taxes in the DIP Budget, the Combined Reserve and the WARN Reserve, until their claims, and any accrued post-petition interest, have been paid in full;<br><br>The Plan fails to expressly provide for the payment of interest at the applicable non-bankruptcy rate.<br><br>The Plan provides for the surrender of collateral to lienholders whose claims are junior to the Tax Liens, without payment of the Tax Claims.<br><br>The Plan contradicts the Final DIP Order by providing that (a) the TTAs are paid fourth in priority from the Waterfall Recovery if the Debtors pay the Tax Claims first from the DIP Budget and then from the Combined Reserve | The Debtors are engaged in ongoing discussions with the Texas Taxing Authorities around revisions to the Confirmation Order. While the Debtors hope to reach agreement with the Texas Taxing Authorities, the Debtors will be prepared to address the Texas Taxing Authorities' objection during the Combined Hearing to the extent not resolved. | Outstanding |

| Docket No. | Objecting Party | Objection Summary | Debtors' Response | Status |
|---|---|---|---|---|
| | | or WARN Reserve, or vice versa, with any shortfall coming from the Distributable Proceeds; and (b) Article IV, Paragraph C of the Plan allows the Plan Administrator to use both the Priority Claims Reserve and the Wind-Down Reserve to fund any wind-down expenses of the Debtors; and (c) Allowed Other Secured Claims are left out of the Plan Provision that provides that the WARN Reserve shall be used to pay WARN Costs, and, to the extent such Claims are not paid in full from the Combined Reserve, allowed Priority Tax Claims. | | |
| 2099 | Safety National Casualty Corporation ("SNCC") | SNCC argues that the Debtors impermissibly seek to assume the Debtors' insurance policies with SNCC without their consent, and that the Debtors seek to assume their policies without providing adequate assurance under section 365(b)(1)(C) of the Bankruptcy Code. | The Debtors are engaged in ongoing discussions with SNCC around revisions to the Confirmation Order. While the Debtors hope to reach agreement with the SNCC, the Debtors will be prepared to address SNCC's objection during the Combined Hearing to the extent not resolved. | Outstanding |
| 2096 | U.S. Securities and Exchange Commission | The SEC argues that the releases are not consensual, and do not meet the standard to be approved as non-consensual because they are not: (i) fair to the releasing parties; (ii) necessary to the reorganization; and (iii) supported by the facts of this case. The SEC further argues that the Court lacks authority to approve the releases, and that the Gatekeeping Provision should be removed from the Plan.<br><br>The SEC requests that the Court deny approval of the Plan unless the Plan is amended to provide that: (i) either (a) public | The Debtors have agreed to make various changes to the Plan to resolve the SEC's objection, including: (a) the removal of Holders of Claims that are deemed to reject the Plan from the definition of "Releasing Party" and (b) agreed-upon revisions to the Injunction Provision, each of which will be reflected in a further amended Plan filed in advance of the Combined Hearing.<br><br>As of the filing of this Confirmation Brief, the only outstanding issues with the SEC relate to (a) the Third-Party Releases as it relates to parties who vote to reject the Plan (addressed in the Confirmation Brief at Art IV.B | Outstanding |

| Docket No. | Objecting Party | Objection Summary | Debtors' Response | Status |
|---|---|---|---|---|
| | | shareholders, holders of unsecured notes, and holders of subordinated claims are not bound by the releases; (b) the releases are deleted from the Plan; or (c) public shareholders, holders of unsecured notes, and holders of subordinated claims be required to opt in to the Releases in order to be bound; (ii) the provision requiring any entity to seek bankruptcy court authorization before pursuing a claim does not apply to equity holders, holders of unsecured notes, and holders of subordinated claims; and (iii) the Plan is amended to comply with Bankruptcy Code section 1141(d)(3). | 1 and IV.B2) and (b) the Gatekeeping Provision (addressed at Art IV.B.3 of the Confirmation Brief).<br><br>All other issues raised by the SEC in the SEC's objection have been resolved.<br><br>The Debtors remain engaged in ongoing with discussions with the SEC around further revisions to the Plan and hope to reach a resolution in advance of the Combined Hearing. | |
| 2090 | 200-220 West 26 LLC ("West 26") | 200-220 West 26 LLC argues that the Court should deny final approval of the Disclosure Statement and Confirmation on the following grounds:<br><br>The Plan improperly provides for de facto substantive consolidation without satisfying the requirements of Owens Corning, it does not comply with the applicable provisions of the Bankruptcy Code and does not satisfy the requirement of confirmation in section 1129(a)(1) of the Bankruptcy Code.<br><br>The Plan disavows substantive consolidation but pools assets and liabilities for the purposes of voting and distribution, and therefore, it improperly allows the Debtors to pursue Wrong Debtor Paid Avoidance Actions (and thus does not satisfy 1129(a)(3) of the Code).<br><br>Because claims against different Debtors with potentially different liquidation values are classified in the same class, the Plan has | The Debtors have engaged in discussions with 200-220 West 26 LLC in an effort to resolve their objection. 200-220 West 26 LLC's arguments are addressed in the Confirmation Brief.<br><br>For the reasons set forth in Art. IV.C of the Confirmation Brief, the Plan does not provide for the substantive consolidation of the Debtors. Each of 200-220 West 26 LLC's arguments flowing from that premise is therefore without merit.<br><br>For the reasons set forth in Art. II.I of the Confirmation Brief, the Plan satisfies the best interests test pursuant to section 1129(a)(7) of the Bankruptcy Code. | Outstanding |

| Docket No. | Objecting Party | Objection Summary | Debtors' Response | Status |
|---|---|---|---|---|
| | | placed substantially dissimilar claims in the same class in violation of section 1122(a) of the Bankruptcy Code (and thus does not satisfy 1129(a)(1) of the Code). Because the Disclosure Statement does not contain adequate information (for the reasons set forth above), the Plan does not satisfy the requirement of confirmation in section 1129(a)(2) of the Code. The Plan does not satisfy section 1129(a)(7) of the Bankruptcy Code because there is no demonstration of what each creditor in class 6 would receive if the cases were liquidated under chapter 7. | | |
| **Resolved Objections** | | | | |
| 2120 | Basser Kaufman, Benderson Development Company LLC, Blumenfeld Development Group Ltd., Brookfield Properties Retail Inc., Hines Global REIT, Kite Realty Group, L.P., NNN REIT, Inc., Nuveen Real Estate, Oak Street Real Estate, Regency Centers L.P., ShopCore Properties, and SITE Centers Corporation ("Landlords") | Landlords argue that the Debtors' ability to unilaterally disallow claims without certain notice procedures and without allowing creditors an opportunity to object, pursuant to Article V.C. of the Plan, may undermine section 502 of the Bankruptcy Code and Bankruptcy Rule 3007. | The Debtors have resolved the objection by agreeing to include revised language in an amended Plan to be filed ahead of the Combined Hearing. | Resolved |
| 2111 | City of Philadelphia | The City of Philadelphia requested assurance that the Court condition entry the Confirmation Order on a timeframe being set for the Debtors to file certain missing tax returns. | The Debtors have resolved the City of Philadelphia's objection through language included in the Confirmation Order at ¶ 143. | Resolved |

| Docket No. | Objecting Party | Objection Summary | Debtors' Response | Status |
|---|---|---|---|---|
| 2109 | Oracle America, Inc. ("Oracle") | Through their objection, Oracle reserved its rights to the extent the Debtors intend to assume any of its contracts with Oracle. | The Debtors have confirmed that Oracle's objection is resolved. | Resolved |
| 2100 | Mediterranean Shipping Company SA ("MSC") | MSC asserted and reserved all rights to setoff and recoupment. Further, MSC objects to Confirmation arguing that the Court should (a) deny entry of the Anti-Setoff Injunction contained in the Plan unless MSC's preservation in full of its setoff rights by its Proofs of Claim and Setoff Assertion Notice is recognized in the Plan and any confirmation order, and (b) deny confirmation of the Plan unless the Anti-Recoupment Provision is stricken from the Plan in its entirety. | The Debtors have confirmed that MSC's objection is resolved. | Resolved |
| Informal | Aetna Life Insurance Company ( "Aetna") | Aetna Life Insurance Company requested language be added to the Confirmation Order regarding Aetna and the Debtors' ongoing obligations under Aetna's insurance policies. | The Debtors have resolved Aetna's objection through language included in the Confirmation Order at ¶ 142. | Resolved |

8

| Docket No. | Objecting Party | Objection Summary | Debtors' Response | Status |
|---|---|---|---|---|
| Informal | Bratya SPRL and all other persons similarly situated in connection with *Pencheng v. Bed Bath & Beyond Corporation, et. al.*, Case No- 22-cv-02541-TNM ("Bratya") | Bratya requested language be added to the Confirmation Order clarifying that Ryan Cohen and RC Ventures, LLC are not Released Parties under the Plan. | The Debtors have resolved the objection through language included in the Confirmation Order at ¶ 109. | Resolved |
| Informal | Certain landlords represented by Ballard Spahr LLP (the "Ballard Spahr Landlords") | The Ballard Spahr Landlords requested language regarding certain claims administration provisions. | The Debtors have confirmed that the Ballard Spahr Landlords' objection is resolved. | Resolved |
| Informal | Certain landlords represented by Barclay Damon (the "Barclay Damon Landlords") | The Barclay Damon Landlords requested language be added to the Confirmation Order preserving the landlords' rights to setoff and recoupment. | The Debtors have resolved the Barclay Damon Landlords' objection by agreeing to include revised language in an amended Plan to be filed ahead of the Combined Hearing. | Resolved |
| Informal | Collin County, Collin College, City of Plano, McKinney ISD, City of McKinney, and City of Sherman (the "Authorities") | The Authorities requested that Collin County, Collin College, the City of Plano, McKinney ISD, the City of McKinney, and they City of Sherman be added to the definition of "Texas Taxing Authorities" in the Plan. | The Debtors have resolved the Authorities' objection by agreeing to include revised language in an amended Plan to be filed ahead of the Combined Hearing. | Resolved |

| Docket No. | Objecting Party | Objection Summary | Debtors' Response | Status |
|---|---|---|---|---|
| Informal | Mississippi Department of Revenue ("<u>MSDOR</u>") | The MSDOR requested language be added to the Confirmation Order to preserve the Mississippi Department of Revenue's rights to setoff and recoupment and governing the MSDOR's tax claims. | The Debtors have resolved the MSDOR's objection through language included in the Confirmation Order at ¶ 141. | Resolved |
| Informal | ShopperTrak RCT LLC ("<u>ShopperTrak</u>") | ShopperTrak provided informal comments to various Plan and Disclosure Statement provisions. | The Debtors have confirmed that ShopperTrak's objection is resolved. | Resolved |
| Informal | Texas Comptroller of Public Accounts ("<u>Texas Comptroller</u>") | The Texas Comptroller requested language be added to the Confirmation Order to reserve certain rights related to the treatment of the Texas Comptroller's claims. | The Debtors have resolved the Texas Comptroller's objection through language included in the Confirmation Order at ¶ 140. | Resolved |