```
                    UNITED STATES BANKRUPTCY COURT
                       DISTRICT OF NEW JERSEY

IN RE:                      .    Case No. 23-13359-VFP
                            .
BED BATH & BEYOND, INC.,    .    M.L.K. Federal Building
et al.,                     .    50 Walnut Street, 3rd Floor
                            .    Newark, NJ 07102
            Debtors.        .
                            .    September 12, 2023
. . . . . . . . . . . . .   .    2:30 p.m.


     TRANSCRIPT OF CONFIRMATION HEARING AND MOTIONS HEARING
         BEFORE THE HONORABLE MICHAEL B. KAPLAN
         UNITED STATES BANKRUPTCY COURT CHIEF JUDGE


APPEARANCES:

For the Debtors:            Kirkland & Ellis LLP
                            By:  ROSS J. FIEDLER, ESQ.
                                 EMILY GEIER, ESQ.
                                 NOAH Z. SOSNICK, ESQ.
                            601 Lexington Avenue
                            New York, NY 10022

                            Cole Schotz, P.C.
                            By:  FELICE YUDKIN, ESQ.
                            Court Plaza North, 25 Main Street
                            Hackensack, New Jersey 07601

For the Official            Pachulski Stang Ziehl & Jones LLP
Committed of Unsecured      By:  BRADFORD J. SANDLER, ESQ.
Creditors:                       PAUL J. LABOV, ESQ.
                            780 Third Avenue
                            34th Floor
                            New York, NY 10017

Audio Operator:             Mariela Primo

Proceedings recorded by electronic sound recording, transcript
               produced by transcription service.
```

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:   jjcourt@jjcourt.com**

**(609) 586-2311      Fax No. (609) 587-3599**

APPEARANCES (Cont'd):

| | |
|---|---|
| For Sixth Street Specialty Lending: | Proskauer Rose LLP<br>By:  CHARLES A. DALE, ESQ.<br>One International Place<br>Boston, MA 02110 |
| For the Securities and Exchange Commission: | United States Securities and Exchange<br>  Commission<br>By: ALAN MAZA, ESQ.<br>200 Vesey Street<br>New York, NY 10080 |
| For the United States Trustee: | Office of the United States Trustee<br>By: FRAN STEELE, ESQ.<br>One Newark Center<br>1085 Raymond Boulevard<br>Suite 2100<br>Newark, NJ 07102 |
| For 200-220 West 26th LLC: | Becker, Glynn, Muffly, Chassin &<br>  Hosinski LLP<br>By:  ALEC P. OSTROW, ESQ.<br>299 Park Avenue<br>New York, NY 10171 |
| For Google LLC: | White & Williams LLP<br>By:  AMY E. VULPIO, ESQ.<br>1650 Market Street<br>One Liberty Place, Suite 1800<br>Philadelphia, PA 19103 |

- - -

3

# I N D E X

**EXHIBITS:**

| | EVD. |
|---|---|
| Declaration of Holly Etlin (Docket 2139) | 14 |
| Declaration of Alex Orchowski (Docket 2140) | 14 |

**WWW.JJCOURT.COM**

4

1             (Proceedings commenced at 2:30 p.m.)

2             THE COURT:  Good afternoon, everyone.  Please be

3 seated.  Let me get myself all oriented.

4             For those who are surprised or somewhat disappointed

5 in my being up here, I am filling in for Judge Papalia who had

6 a medical emergency, but is doing well, but may be out of

7 commission for the near term.  So, lucky me.

8             Rest assured I've ruined my weekend by reading

9 everything.  So, I am hopefully up to speed.  I know we have

10 several individuals looking on remotely.  Since I don't, and

11 let me start, obviously, this is -- I am Chief Judge Michael

12 Kaplan.  This is the Bed Bath & Beyond proceedings.  Today is

13 confirmation hearing, also I believe a couple of other pending

14 motions that are listed on the agenda.

15             Since I haven't had the benefit of seeing you all,

16 I'm going to take appearances.  And we'll start with on behalf

17 of the debtors.

18             MR. FIEDLER:  Your Honor, Ross Fiedler of Kirkland &

19 Ellis on behalf of the debtors.  I'm joined by my partner,

20 Emily Geier, my colleague Noah Sosnick, and our co-counsel

21 Felice Yudkin of Cole Schotz.

22             OPERATOR:  Recording in progress.

23             THE COURT:  Well, good.  That's working.

24             Thank you.  Good afternoon.

25             MR. FIEDLER:  Good afternoon.

1        THE COURT:  For the Committee?

2        MR. SANDLER:  Good afternoon, Your Honor.

3        Brad Sandler, Pachulski Stang Ziehl & Jones.  I'm

4  here with my partner Paul Labov.

5        THE COURT:  Good afternoon.

6        MR. DALE:  Good afternoon, Your Honor.

7        My name is Charles Dale.  I'm with Proskauer Rose,

8  and I'm here on behalf of Sixth Street Specialty Lending, the

9  pre-petition FILO agent and DIP agent.

10        THE COURT:  Great, thank you.

11        MR. MAZA:  Good afternoon, Your Honor.

12        Alan Maza on behalf of the SEC.

13        MS. STEELE:  Good afternoon, Your Honor.

14        Fran Steele on behalf of the U.S. Trustee.

15        THE COURT:  It's been a long time we've had this.

16        Yes?

17        MR. OSTROW:  Good afternoon, Your Honor.

18        Alec Ostrow from Becker, Glynn, Muffly, Chassin &

19  Hosinski on behalf of 200-220 West 26th LLC, one of the parties

20  that is objecting to confirmation.

21        THE COURT:  All right.  Thank you.

22        So, with respect to those who are --

23        MS. VULPIO:  One more appearance, Your Honor.

24        THE COURT:  Oh, sorry.  Go ahead.

25        MS. VULPIO:  Amy Vulpio on behalf of Google, LLC.  I

1  believe we have resolved our objection, but I'm just looking at

2  the revised proposed confirmation order now.

3          THE COURT:  Great, thank you.

4          I was going to say for those who are appearing

5  remotely, rather than taking the time to enter appearances and

6  talking over each other, which is inevitable, when you wish to

7  be heard, please use the "raise hand" function and then you can

8  enter an appearance at that time.

9          All right, counsel?

10          MR. FIEDLER:  Great.  Good afternoon, Your Honor.

11          Again, Ross Fiedler of Kirkland & Ellis.  It's a

12  pleasure to be before you.  I would like to note we have some

13  members of the Bed Bath management team here in the courtroom

14  That's Holly Etlin, our chief financial officer and chief

15  restructuring officer, as well as David Kastin, our chief legal

16  officer.

17          As Mr. Sussberg had noted at the first day and as has

18  been the case throughout these cases, Mr. Kastin and Ms. Etlin

19  have been hugely important in advancing these cases to where

20  they are today which is a confirmable Chapter 11 plan that has

21  widespread support which we'll get to in a moment.

22          Before we turn to the agenda, Your Honor, I just

23  wanted to take a moment to thank the Court and the staff for

24  all their efforts throughout these cases.  I think I speak for

25  everyone in the courtroom and on the line in saying how much we

1  appreciate the Court's attention to these complex matters.

2       Turning to the agenda, we filed an agenda yesterday

3  at Docket Number 2159.  As you've noted the big item today is

4  the confirmation of the debtors' plan and final approval of the

5  disclosure statement.  I'd note there's also a lift stay motion

6  on the agenda which was filed by a personal injury claimant.

7  We've made a modest request for a brief adjournment of that to

8  be heard outside of confirmation.  We have not yet heard back.

9  But we can address that at the end of the hearing.

10       THE COURT:  That's fine.

11       MR. FIEDLER:  There's also a rejection motion that's

12  been adjourned to a later date, as well.  So it's really just

13  confirmation today and the one lift stay.

14       As we've noted in our papers, Your Honor, there

15  really are only three live objections to the plan which remain,

16  and they're pretty limited in nature.  And we'll get to them

17  shortly, but before I do, I'd like to provide the Court with a

18  brief overview of where we started these cases and where we are

19  today and what we'll be seeking approval of before Your Honor

20  today.

21       THE COURT:  Absolutely.

22       MR. FIEDLER:  So, Your Honor, we filed these cases on

23  April 23rd of this year following extensive pre-petition

24  efforts to stave off a bankruptcy filing.  And while it may

25  seem like a long time ago, it's just been under five months and

1   a lot has transpired and been accomplished since that date.

2          As Your Honor is well-aware, retail cases like these

3   are never easy.  Bed Bath & Beyond, like many retailers before

4   it and after it, have faced a number of challenges.  And we

5   initially outlined those challenges in Ms. Etlin's first-day

6   declaration who's also our declarant today, and they were

7   multi-faceted.

8          We had experienced great declines in in-store foot

9   traffic.  There had been failed efforts of the prior management

10  team to reorient the business around private brand labels,

11  increase competition from online as the case has been with a

12  number of retailers, and declining operating margins due to

13  record level inflation as well as an overlevered capital

14  structure that was just unsustainable.

15         But the debtors' management team, the board, and the

16  advisor team worked tirelessly to start these cases and enter

17  these cases on our toes with support from our secured lenders.

18  And that support ultimately came in the form of the DIP

19  facility which was provided by our pre-petition FILO lenders.

20  And while there was no commitment there to a reorganization, we

21  were set forth on a path to determine the best way to maximize

22  value for this estate.  And that path really was a dual track

23  process.

24         First and foremost, we were going to continue our

25  pre-petition efforts to find a going concern buyer or buyers

1  for the debtors' assets to preserve the thousands of Bed Bath &

2  Beyond jobs.  And that was to find a buyer either for the Bed

3  Bath & Beyond banner or the buybuy Baby banner.

4      At the same time, on the first day of the case, we

5  implemented an orderly process to start to wind down parts of

6  the estate through the liquidation of our store inventory and

7  closure of our brick-and-mortar stores.  And despite our best

8  efforts in the first two months of these cases, we were

9  ultimately unable to find a going concern buyer for the Bed

10 Bath brand or the buybuy Baby banner.

11      And so, Your Honor, we continued on a comprehensive

12 plan and effort to monetize every asset of the estate.  In

13 June, we reached an agreement with the retailer Overstock.com

14 to sell the Bed Bath & Beyond name to Overstock for about

15 21-1/2 million which has critically ensured that the storied

16 name will continue even after the conclusion of these cases.

17      We did the same, Your Honor, for buybuy Baby and in

18 addition we've sold hundreds of leases throughout these cases

19 to generate substantial value for our stakeholders and really

20 continued the process of our going-out-of-business sales which

21 as of July have closed all of our retail locations.

22      In short, Your Honor, this case, the debtors have

23 been ensuring that we're doing all we can to get every dollar

24 back to creditors that we can.  And in conjunction with those

25 efforts, since the beginning of these cases, we have engaged

1  with both the DIP lenders and the Committee around a consensual

2  path forward.  And, specifically, in connection with the final

3  DIP order back in June, the debtors reached an agreement with

4  the Committee and the DIP lenders which would provide general

5  unsecured creditors a recovery, a sharing on certain of the DIP

6  lenders' and pre-petition lenders' collateral.

7          And that agreement which was, initially, memorialized

8  in the final DIP order is reflected as the sharing mechanism in

9  the plan and really allows the estate's general unsecured

10  creditors the potential for a recovery that they otherwise

11  would not get absent the plan.  And so I think that's why, Your

12  Honor, the plan critically enjoys the support of our secured

13  lenders, the Committee, and will really bring these cases to a

14  conclusion.

15          At a high level, I won't go into the details of the

16  plan, but at a high level, the plan vests all the assets in the

17  winddown debtor which is to be administered by the plan

18  administrator who's been selected as shown in the plan

19  supplement and overseen by the Oversight Committee.  The plan

20  administrator will liquidate and distribute the remaining

21  assets to the holders of DIP claims, FILO claims, and general

22  unsecured claims in accordance with the sharing mechanism set

23  forth in the plan.

24          And, Your Honor, while a liquidating Chapter 11 plan

25  was certainly not the result that we or our stakeholders had

1 hoped for, it is the best available option today.  And it

2 really represents the hard work on the part not just of the

3 debtors' management team and the debtors' advisors but all the

4 other stakeholders including the DIP lenders, their advisors,

5 the Committee, their advisors, and the various other parties

6 that have been a part in getting us to where we are today.  So,

7 I'd just like to thank all of them for their efforts and

8 coordination.

9        With that, Your Honor, unless Your Honor has any

10 questions, I think we can turn to the case in chief and the

11 outstanding objections unless you have any questions.

12        THE COURT:  No, I don't.  Thank you for the overview.

13        MR. FIEDLER:  Okay, great.

14        So, there's been a lot of paper docketed, as I

15 suspect you recognized this weekend.  So, why don't I just run

16 through each of the documents so you can keep track of them.

17 We filed a second amended plan last night at Docket Number

18 2160.  That attaches a redline which shows the changes from the

19 prior version.  We also filed a revised proposed confirmation

20 order earlier today at Docket Number 2162.

21        And both of the redlines for those documents show

22 additional language that we've agreed to with objecting parties

23 but also parties that reached out informally to reach a

24 resolution on their issues to avoid the need to have any

25 further discussion on those today.

12

1          THE COURT:  Let me just stop you for a second.

2    Initially you had filed the proposed findings of fact and

3    conclusions of law.  Are there any amended versions of those or

4    do you intend to amend those subject to obviously rulings

5    today?

6          MR. FIEDLER:  Yeah.  So, we filed an amended version

7    before the hearing at Docket 2162 I believe is the docket

8    number.  And we expect there will be minor changes with other

9    parties that we've already agreed to that we'll submit to Your

10   Honor after the hearing and, of course, the result of any

11   ruling Your Honor makes on the issues.

12         THE COURT:  Okay, thank you.

13         MR. FIEDLER:  We also filed an amended plan

14   supplement at Docket Number 2161 that discloses the plan

15   administrator agreement, the roles and responsibilities of the

16   plan administrator as well as his compensation structure.  It

17   also discloses the members of the Oversight Committee, provides

18   some background on those individuals and also the list of

19   contracts that are going to be assumed through the plan.

20         Additionally, we filed our brief in support of

21   confirmation at Docket 2134, as well as a declaration from

22   Holly Etlin, our chief restructuring and financial officer at

23   Docket 2139 which supports confirmation of the plan as well as

24   final approval of the disclosure statement.

25         The voting declarations from Alex Orchowski who's a

1  director at Kroll, the debtors' claims noticing and

2  solicitation agent, that's at 2140.  That declaration evidences

3  that Class 3 DIP claims and Class 4 FILO claims both voted

4  unanimously to accept the plan.  And that's it for the

5  declarations, Your Honor.

6        So, we don't intend to offer any live testimony

7  today, nor are we aware of any objections to the declarations

8  or an attempt by any party to cross examine the debtors'

9  declarants.  So, unless Your Honor has any questions generally

10 or for the declarants who are here in the courtroom, I would

11 request that we move those declarations into evidence.

12        THE COURT:  All right.  Those declarations are going

13 to be deemed direct testimony.  Let me ask are there any

14 parties or counsel who wish the opportunity to cross-examine

15 either of the declarants, Ms. Etlin or Mr. Orchowski?  How do

16 you pronounce?

17        MR. FIEDLER:  Orchovski.

18        THE COURT:  Orchovski.

19        MR. FIEDLER:  Orchowski, sorry.

20        THE COURT:  Orchowski.

21        MR. FIEDLER:  I messed that up.

22        THE COURT:  Close enough.

23        MR. FIEDLER:  Yeah.

24             (No audible response)

25        THE COURT:  Hearing no one, the Court will accept the

1 declarations as direct testimony into evidence.

2           (Declarations of Holly Etlin and Alex Orchowski

3                        admitted into evidence)

4           MR. FIEDLER:  Okay, great.  Thank you, Your Honor.

5           With respect to the objections, Your Honor, I'm happy

6 to report that while the debtors received 11 formal objections

7 to the plan with the exception of three limited objections

8 raised by the Trustee, the SEC, and one landlord, all others

9 have been withdrawn or substantially resolved.  We're still

10 working out some language with Chub (phonetic) and the revised

11 confirmation order, but there really are just three live

12 objections that remain.  And we've identified those both in our

13 brief as well as in the materials that we sent to the Court

14 earlier today.

15           My colleague, Mr. Sosnick, will be happy later to

16 address any questions Your Honor may have about not only the

17 revised form of order but also the plan.  But I think why don't

18 we first turn if it's okay with Your Honor to what remains of

19 the U.S. Trustee and SEC objections as we've been in

20 discussions with both of them and they're largely the same

21 issue.

22           THE COURT:  That's fine.  Could you identify just for

23 the record the three remaining objectors?

24           MR. FIEDLER:  That's right.  So it's the United

25 States Trustee.

1          THE COURT:  Right.

2          MR. FIEDLER:  The SEC, and the one landlord

3   represented by Mr. Ostrow.  We're still finalizing language for

4   Chub and I believe the Texas tax authorities but we are largely

5   resolved with them, as well.

6          THE COURT:  So let me ask just for clarity, I see

7   Neelay Das appearing remotely and there was initially a motion

8   brought on shortened time to vacate the order scheduling the

9   confirmation and initial disclosure statement.  My

10  understanding is Judge Papalia was going to treat that as an

11  objection to the plan.  I didn't see any reference to that.

12         Is the debtor taking a position on the concerns

13  raised?

14         MR. FIEDLER:  Yeah, Your Honor, we're happy to

15  address that later in the presentation as an objection to

16  confirmation and we'll proceed however Your Honor would like to

17  on that.

18         THE COURT:  That's fine.  I just wanted to at least

19  account for it.

20         MR. FIEDLER:  Understood.

21         So with that, I'll turn to the SEC and the U.S.

22  Trustee jointly.  I'll start first with the good news which is

23  we've largely resolved the issues raised in the SEC's objection

24  and the U.S. Trustee's objection except for two main issues.

25  The first -- well, why don't first walk the Court through what

16

1  we have agreed to with the Trustee and the SEC.

2          There's been changes in the amended plan to deal with

3  the definition of exculpated parties, the provisions around

4  exculpation and injunction, as well as modifications to the

5  language of the releasing parties' definition in the plan.  And

6  on that last point, we've agreed to remove holders who are

7  deemed to reject but do not opt out, so that's generally the

8  Class 9 equity holders.  They're no longer required to

9  participate in the opt-out process because we've removed them

10  from the release.

11          THE COURT:  So they're deemed to have rejected and

12  they're also not required to physically take any steps to opt

13  out of any releases?

14          MR. FIEDLER:  Correct.

15          THE COURT:  All right.

16          MR. FIEDLER:  The two limited items that remain, the

17  first is a clause in the definition of releasing parties which

18  contains releases from parties who vote to reject the plan but

19  choose not to opt out of the releases.  And the second issue is

20  the gatekeeper provision which is in Article 10, Section D of

21  the plan which we'll get to in a moment, as well.

22          But on both of these points, Your Honor, we've fully

23  briefed the issues at our brief in Docket Number 2134.  And

24  we'll rely mostly on our papers, but I just wanted to highlight

25  a couple of points on both of the issues for the record here.

1          So, on the first issue, Your Honor, we believe the

2  opt-out and the third party release is reasonable and

3  appropriate and wholly consistent with the decisions not only

4  of this Court but the Circuit more broadly.  First, the

5  third-party release language is clearly and conspicuously

6  included not only in the combined hearing notice but in the

7  ballots and the opt-out forms that were sent to parties in

8  connection with solicitation.

9          And so parties who vote to reject the plan were given

10  ample opportunity to evaluate the opt-out form, and all they

11  were required to do is check a box to opt out or otherwise

12  object to the release.  So, this process was made clear to

13  claim holders.  In fact, we have a number of parties in

14  interest who have already availed themselves of that opt-out

15  process.  Specifically, we've had over a thousand parties just

16  in Class 6 alone who have decided to opt out from the release,

17  which further demonstrates that the process is not only worked

18  as intended but was clear and understood by all the parties who

19  chose to protect their rights and participate.

20          But more importantly, Your Honor, the weight of

21  authority in this Circuit and this Court has held on numerous

22  occasions that the opt-out mechanism such as the one in our

23  plan constitutes a consensual release.  Specifically, in the

24  St. Michael's Medical Center case, this Court recognized that

25  the releases provided through an opt-out were largely

1  consensual and even cited the various parties that had availed

2  themselves of the opt-out.

3        I would point out it also confirmed the plan that

4  included releases for parties who vote to reject but otherwise

5  do not opt out of the procedures that were put in place in that

6  plan.  I think the same was followed in the Aceto Corporation

7  case.  And then most notably, Your Honor, precisely in the Sur

8  La Table cases, I believe Your Honor overruled the same

9  arguments that the SEC is making here as they did there.

10        And we reference that in our papers, specifically

11  that if a creditor receives a ballot and votes on the plan but

12  is careless or inattentive in opting out of the release by

13  participating in the process that was set forth, then it's

14  really on them, as long as they were afforded due process which

15  I think here is the case given the proper noticing that took

16  effect and that's spelled out in Ms. Etlin and Mr. Orchowski's

17  declarations.

18        I would note that the same opt-out structure was also

19  included and improved in Delaware most recently in the Lannett

20  cases earlier this summer as well as the Extraction Oil & Gas

21  cases, both of which were over the objections of the U.S.

22  Trustee and the SEC.  So, I think, Your Honor, we believe the

23  releases from parties who vote to reject but do not opt out is

24  appropriate under the circumstance of this case but also under

25  the weight of authority of this jurisdiction and the Circuit

1  more broadly.

2         Unless Your Honor has any questions on that, I'd like

3  to turn to the gatekeeper provision --

4         THE COURT:  Yes, please.

5         MR. FIEDLER:  -- to address that.  That's the second

6  issue that's been raised by the Trustee and I guess the SEC,

7  too.

8         The provision is set forth in Section D of Article 10

9  of the plan, and the language really provides that to the

10 extent any entity that has opted out or otherwise not

11 participated in the releases but seeks to assert a claim or

12 cause of action against a released party under the plan, it

13 must first obtain an order from this Court determining that it

14 is authorized to bring such a claim.

15        And while the debtors do recognize that this sort of

16 provision is not found in every plan and the objecting parties

17 may not see it that often, it has been approved in numerous

18 other jurisdictions as well as this jurisdiction giving courts

19 recognition of the need and the importance of having a

20 gatekeeper role in the bankruptcy court.

21        And I think that is very important here because

22 really the purpose of this provision is to benefit not only the

23 debtor and the winddown debtor but also the potential claimant.

24 The provision really is meant to give the debtor and winddown

25 debtor the peace of mind that the estate won't be utilizing

 1 limited resources which are better spent on the winddown

 2 process in connection with having to defend any frivolous

 3 actions that are brought improperly by certain litigants.

 4 　　　　　And, likewise, I think that structure benefits the

 5 claimants in that they'll have the peace of mind that they're

 6 not violating an order from this Court which they otherwise

 7 would not get.  And so I think this provision which was

 8 negotiated with the Creditors' Committee and the DIP lenders

 9 and is supported by them is even more so relevant here in these

10 cases where the debtors are a widely-held public company, we

11 have thousands of highly active shareholders.

12 　　　　　Those parties, as I mentioned, are not participating

13 in the release.  And they may require guidance from this Court

14 on whether or not they're able to bring certain claims and

15 causes of action.  And I think absent the gatekeeping

16 provision, it's possible and maybe even likely that certain of

17 these parties will seek to assert a number of claims that are

18 otherwise enjoined by the plan's injunction provisions.

19 　　　　　And I think even here the fact of the liquidation is

20 important, right.  There's not going to be a reorganized debtor

21 that is going to be funding and dealing with these frivolous

22 actions forever.  And so it's really critical that the debtors

23 and the winddown debtors be able to rely on the gatekeeping

24 provision in connection with implementing the terms of the

25 plan.

21

1          I do also want to make one point.  I think it was

2   briefly raised maybe in the SEC objection that this is somehow

3   an attempt to circumvent the limitations on the bankruptcy

4   court's jurisdiction.  And I just don't think that's the case,

5   right.  The provision is really ensuring that the bankruptcy

6   court, which is the court that's most familiar with the facts

7   and circumstances of these cases, can provide a threshold level

8   of review following confirmation as to whether a claim may be

9   brought.

10          And I think courts in this jurisdiction and others

11  have approved of plans that provide for this broad exclusive

12  retention of jurisdiction over matters that really arise out of

13  the Chapter 11 cases.  And that's the case even in liquidating

14  Chapter 11 plan cases, as well, which was made clear by the

15  First Circuit in the Boston Regional Medical Center cases.

16          I also think, Your Honor, this is really grounded in

17  the Barton doctrine which is the precedent that the Supreme

18  Court set years ago which has been recognized and approved by

19  bankruptcy courts in various jurisdictions including this one.

20          But, for example, in the Madoff cases which we refer

21  to in our brief, there the bankruptcy court served as the

22  gatekeeper for determining whether certain claims of creditors

23  that were going to be brought against certain Madoff feeder

24  funds were direct claims that could be brought by a creditor to

25  the extent colorable, and then -- or if they were derivative

22

1   claims that should be brought by the liquidating trust post-

2   confirmation.

3          And I think the <u>General Motors</u> case followed a

4   similar gatekeeper function where you had ignition defects in

5   cars post-confirmation and the court served the gatekeeping

6   function in determining whether claims on account of those

7   defects were against the old GM or the new GM.  And so I think

8   that's exactly what our provision is seeking to do.  And I

9   think it's been approved not only in the Southern District of

10  New York but also in the Fifth Circuit in the <u>Highland Capital</u>

11  cases, as Your Honor is aware.

12         I'd also like to point out, Your Honor, that if we

13  look at the plain language of the provision, there really is

14  nothing in it that's determinative of this Court's

15  jurisdiction.  All it's really saying is the Court may hear or

16  adjudicate a claim to the extent legally permissible and

17  otherwise retained by the Court pursuant to the retention of

18  jurisdiction provision in Article 13 of the plan.

19         And so this is not a means of circumventing the

20  Court's jurisdiction but rather only dealing with what is

21  legally permissible and expressly retained by the plan in those

22  provisions.

23         The last point I'll make is that this is not a

24  release.  It's not an injunction.  It's just a provision which

25  is seeking to enforce the injunction provisions in the plan.

1  And I don't think it's proper to categorize it as anything

2  else.

3        Unless Your Honor has any further questions on that,

4  I think we can move on at least to hear from the U.S. Trustee

5  or the SEC or the other objections that have been filed.

6        THE COURT:   Let me just ask a -- I want to make an

7  inquiry for purposes of clarity.  With respect to the

8  gatekeeping language, the intent that as far as I understand is

9  for the gatekeeping court, this Court, or Judge Papalia -- I

10 approve of placing the burden on him, but it's what he gets for

11 not watching where he walks.

12                        (Laughter)

13       THE COURT:  So -- but the intent is to ensure that

14 the action being sought to be brought, pardon the language,

15 that there's a basis that it's consistent with the plan, the

16 terms of the confirmation order.  It's not contemplated

17 necessarily that the gatekeeping court is ruling on the

18 underlying merits of the action.  It's whether or not apart

19 from whether there is standing to bring the action or whether

20 it has been addressed as part of the plan or the confirmation

21 order.

22       And I ask this for clarification because there are

23 words such as colorable and frivolous.  You could have an

24 invalid claim, a not frivolous claim, but still one that has

25 been addressed by the plan, possibly released by the plan.  And

1  we get to is it derivative or not.

2          So, it's one -- it's an initial threshold inquiry.

3  Is that what's contemplated?

4          MR. FIEDLER:  That's right, Your Honor.  It would be

5  exactly what you said, initial threshold level of review by the

6  Court.  And as I mentioned, to the extent legally permissible

7  and otherwise provided by that retention of jurisdiction, the

8  Court would have authority to adjudicate that claim as it sees

9  fit.

10         THE COURT:  In essence, it requires the gatekeeping

11 court to engage in the construction of the terms of the plan,

12 interpretation of the terms of the plan in the confirmation

13 order, among other elements.

14         MR. FIEDLER:  Yeah.  I think, Your Honor, the debtor

15 is not seeking to impose on the Court a standard of what

16 constitutes colorable or what may -- the merits of that

17 underlying claim.  All we are saying is that that claim must be

18 brought to this Court to make that initial determination.  And

19 whatever the Court's interpretation of what might be colorable,

20 that's up to the Court and we're not seeking to impose our

21 views on that.

22         THE COURT:  All right.  Let me hear in response.  I'd

23 like to keep it narrow to that issue or those issues, the

24 release, the opt-out release and the gatekeeping functions.

25 Let me hear from the objecting creditors.  Do we want to start

1  with the U.S. Trustee?

2            MS. STEELE:  Sure.

3            Thank you, Your Honor.

4            Fran Steele on behalf of the U.S. Trustee.

5            Your Honor, as Counsel mentioned, the second amended

6  plan was filed last night.  And the U.S. Trustee is happy to

7  note for the Court that as Mr. Fiedler mentioned, there were

8  many modifications that were agreed upon between the debtor and

9  the U.S. Trustee.  And I'd just like to put those on the record

10 before --

11           THE COURT:  Yes.

12           MS. STEELE:  -- I go forward with the releases.

13           Those modifications included the definition of

14 exculpated parties to only include estate fiduciaries, a

15 modification of the exculpation clause deleting the word

16 "released," a modification to the indemnification and liability

17 limitations section of the plan for the administrator, the word

18 "exculpation" was deleted.  A modification to the debtors'

19 releases, language was added to state that nothing in the

20 debtor release is intended to release direct claims by any

21 holder of a claim or interest in the debtors.

22           There was also a modification in the injunction

23 provision which in fact limited the injunction after the words

24 "from and after the effective date," words were included that

25 said "through and until the date upon which all remaining

1  property of the debtors' estates vested in the winddown debtors

2  has been liquidated and distributed in accordance with the

3  terms of the plan."

4         As Mr. Fiedler said, the third-party releasing

5  parties was amended to delete holders of claims or interest who

6  are deemed to reject the plan and who do not affirmatively opt

7  out.  And the U.S. Trustee and the debtors also entered into an

8  agreement that the third-party release will not be deemed to

9  have been granted to those holders whose ballots are returned

10 undeliverable.

11        All of those modifications were completed.  And based

12 on those modifications, the U.S. Trustee filed a limited

13 objection on the basis that the non-debtor third-party release

14 is overbroad and impermissible in that it contains as a

15 releasing party those holders of claims or interest who vote to

16 reject the plan and who do not affirmatively opt out of the

17 releases provided by in the plan.

18        The non-debtor releases are referred, Your Honor, as

19 consensual but the definition of releasing party includes

20 anyone that does not affirmatively opt out of the releases.

21 And specifically, our objection points out that that in fact

22 includes those that reject and don't affirmatively opt out.

23 And we submit, Your Honor, that those parties who vote to

24 reject the plan and who do not affirmatively opt out of the

25 third-party release are not agreeing and are not consensual.

27

1  And it's contrary to applicable case law as set forth in our

2  brief.

3         The U.S. Trustee submits, Your Honor, that those

4  creditors who have rejected the plan but did not opt out in all

5  likelihood believed, Your Honor, that they were in fact

6  rejecting the leases.  They've rejected the plan.  In their

7  mind, they've rejected the leases.  And marking the rejection

8  box should not establish that they have not opted out.

9         Accordingly, the U.S. Trustee submits that those

10 claims, claimants that rejected the plan should not have to

11 mark the box that they're opting out of the releases.

12         THE COURT:  All right.  Thank you.

13         MS. STEELE:  Okay.

14         THE COURT:  Do you want to move on to the

15 gatekeeping?

16         MS. STEELE:  I'm happy to move on to the gatekeeping.

17         THE COURT:  Thank you.

18         MS. STEELE:  Okay.  So, the plan provides for a

19 gatekeeping provision that provides that any entity that opted

20 out may not assert any claim or cause of action against any

21 released party without first obtaining a final order from the

22 bankruptcy court.

23         As Mr. Fiedler mentioned, it would -- the bankruptcy

24 court would determining after notice and a hearing that such

25 claim or cause of action is not subject to the releases and

1   specifically authorizing such entity or person to bring such

2   claim or cause of action against any released party.

3           The U.S. Trustee has submitted in our brief, Your

4   Honor, submits that this provision is an inappropriate burden

5   on the claim holder and should be deleted from the second

6   amended plan.  The effect of the language is to create a

7   gatekeeper role for this Court.

8           It forces a non-debtor who wishes to pursue a claim

9   to come to this Court for a determination of whether the claim

10  is colorable.  Thereafter, the Court would have jurisdiction to

11  adjudicate the underlying cause of action.  These rules would

12  apply even after the bankruptcy cases have been closed, thereby

13  requiring a party seeking to pursue a claim to even perhaps to

14  have to reopen the bankruptcy case.

15          It's not akin to the Barton doctrine, Your Honor, as

16  that was for a trustee.  And it should not be held in this

17  case.  The debtors brings to the Court's attention the Fifth

18  Circuit opinion in <u>Highland Capital</u>.  However, Your Honor, the

19  U.S. Trustee submits that the Court should not look towards the

20  Northern District of Texas, but should look in our own Circuit

21  and a similar provision which was rejected by Judge Owens in

22  the Bankruptcy Court for the District of Delaware.  And that

23  was in <u>Gulf Coast Health Care, LLC</u>.

24          And all that, Your Honor, I have is a transcript

25  which I can provide to the Court, but in the transcript on Page

29

1  30, Line 18, Judge Owens in declining to uphold the gatekeeping

2  provision stated, "The plan says what it says, and other courts

3  should be entitled to exercise their authority to interpret it.

4  Further, imposing such a requirement could also impose an

5  unnecessary administrative hurdle and cost to the parties when

6  these cases are closed."

7          And I apologize, Your Honor, for not having included

8  that in our brief.  It was just discovered yesterday prior to

9  the objection in BlockFi being filed.

10          And in addition, the U.S. Trustee just learned that

11  in July, a similar gatekeeping provision was deleted from the

12  plan in SiO2 Medical, a Delaware case, prior to the

13  confirmation hearing.

14          Accordingly, Your Honor, the U.S. Trustee submits the

15  gatekeeping provision requiring non-consenting parties to

16  request authorization to bring a claim or cause of action

17  against a released party should be stricken from the amended

18  joint plan.

19          THE COURT:  Thank you.

20          MS. STEELE:  You're welcome.

21          THE COURT:  Thank you, counsel.

22          Mr. Maza?

23          MR. MAZA:  Your Honor, may I speak?

24          THE COURT:  Absolutely.

25          MR. MAZA:  Your Honor, Alan Maza on behalf of the

30

1  U.S. Securities and Exchange Commission.

2          First, in terms of the release, the SEC also takes

3  that position in terms of opt-outs.  It is pretty much our

4  position that that cannot be a suitable form of consent.

5  Often, we suggest that the Court should adopt the opt-in in

6  this particular case.  Also, just mere rejection should not be

7  understood to mean that the stakeholders are also saying we

8  would like to be bound by a release just because they did not

9  opt out.

10         Going to the gatekeeper provision, we would also

11  suggest the following.  First of all, this provision is not

12  found in plans.  I mean now we're seeing a couple of them pop

13  up.  Clearly, bankruptcy courts were comfortable for years

14  continuing with the basic third-party release language which

15  again is supposed to be in general very limited, very

16  extraordinary to extend this kind of relief.  And now what

17  they're doing is not only adding the opt-out, okay, which is

18  one burden in a situation where consideration is not identified

19  for the specific release but, okay, assuming it's consensual.

20         But now they're saying, okay, you not only could be

21  bound by the release, you have to opt out, but here's an extra

22  step that you have to do.  So, if you have what you believe is

23  a direct claim against any of these numerous parties listed in

24  the laundry list of released parties, you now have to have your

25  attorney now go to the bankruptcy court to make sure what

1  you've done already, opted out, is now a permissible path

2  forward.

3         So, as the SEC stated in our papers, first of all, it

4  seems contrary to Federal Rule of Civil Procedure, which

5  specifically lists release as an affirmative defense.

6  Accordingly, if somebody's being sued in a state court, it

7  shouldn't be the burden on the person bringing the lawsuit who

8  opted out to start determining whether he was consistent with

9  what the bankruptcy court allowed through his opt-out process.

10        It shouldn't be at that point that that's the problem

11 of the plaintiff.  Let the defendant say, hey, wait a second, I

12 got a release in Bed Bath & Beyond, I'll go back to the

13 bankruptcy court and we could stop this lawsuit right here and

14 there.  This is not acceptable that all of a sudden this now

15 becomes another headache for this party that got minimal

16 consideration under the plan, even the noteholders are getting

17 2-1/2 percent on their claims, and now they got additional

18 expense involves in this situation, which again is contrary to

19 our Federal Rule of Civil Procedure 8(c)(1).

20        You know, the debtors compare this Madoff.  I think

21 that's really a big stretch to start bringing this particular

22 case into that kind of unique situation.  So, it's just not a

23 common practice, and it seems that confirmed plans have been

24 able to continue.  It's not clear that there's these thousands

25 of creditors coming out against the -- suing the debtor that

32

1  they got to be concerned about this, that they'd have to put

2  this provision in.

3        So, as I said, it's not fair to burden the

4  stakeholders with this burdensome and bizarre procedure that is

5  not provided for under the law to bring such claims.  We also

6  say that it is not fair to burden the bankruptcy courts with

7  these -- to making qualitative determination.  I realize these

8  are threshold issues, but now they're asking the estate

9  essentially or somebody to bear the bankruptcy courts to now

10  make threshold determinations and to parse through.  Even the

11  threshold determination requires some analysis of the merits of

12  the claim.

13        And I cited cases in our submission which is clear

14  that the state courts have these determinations to look at the

15  claim and now start regarding the merits.  It shouldn't be

16  years after a bankruptcy case is closed, all of a sudden it has

17  to go back to the bankruptcy court.  So, we say that it's not

18  fair to burden the Court with making this determinations of

19  validity of state and federal claims outside the bankruptcy

20  arena.  And the relevant courts are the ones to decide the

21  issue by dispositive motions.

22        One other issue, we think this language is confusing

23  at best.  The debtors put in this provision, they state -- they

24  give a simplistic oral argument as to what it is, but they will

25  not make the provision as simple as they present it.  One

1  particularly confusing aspect of it is they have in parenthesis

2  that, they say, "From and after the effective date, any entity

3  that" -- and then they say other than DIP agent, et cetera --

4  "that opted out of or," and then they have in parenthesis, "or

5  otherwise did not participate in the releases."

6        Well, we negotiated that the "deemed to reject public

7  shareholders" are outside the scope of the releases.  According

8  to this, they would -- they didn't participate in the releases,

9  but yet now they seem to be swept back in and they got to worry

10  about going back to the bankruptcy court.  So what was the

11  point of taking them out of the third-party release provision?

12  I asked counsel to remove this provision, this part of it, and

13  apparently, the debtors are resistant to that and I'm not sure

14  what that's about.

15        Essentially, what I'm saying is the gatekeeper

16  provision seems to just be an extra level of complexity to what

17  is otherwise a very simple analysis of confirmation of the

18  plan.  The plan gets confirmed, even if we don't agree to the

19  opt-out, if Your Honor says the opt-out is okay, fine.  You

20  know, that's one aspect.  But then to say, okay, you already

21  opted out, now you have to come back years later and you got to

22  worry about this issue, else, you don't have a claim to go

23  forward in the state court is -- it's illogical.

24        It doesn't make sense in terms of being consistent

25  with the confirmation.  And it's just another burden that's

1  being placed on stakeholders, which we, the SEC at least and

2  U.S. Trustee agrees it just should not be now that is the new

3  norm of Chapter 11 plans that you have confirmation of a plan

4  and it's never over for these parties that are caught up in

5  this release mess of constantly not only getting very little

6  consideration but then being stripped of rights to bring direct

7  claims.

8          So, accordingly, we would request that Your Honor

9  strike that provision from the plan.  Thank you.

10          THE COURT:  Thank you, Mr. Maza.

11          Does the Committee wish to be heard on this issue?

12          MR. SANDLER:  Your Honor, Brad Sandler, Pachulski

13  Stang Ziehl & Jones, for the Committee.

14          Your Honor, the Committee supports the plan.  We

15  support the releases that are in the plan.  It was a highly

16  negotiated document among the debtors, the Committee, and the

17  FILO lenders, so we support the position of the debtors on

18  this.  Thank you.

19          THE COURT:  All right.  Thank you, Counsel.

20          Does the debtor wish to respond?

21          MR. FIEDLER:  Yes, Your Honor.

22          For the record, Ross Fiedler of Kirkland & Ellis on

23  behalf of the debtors.

24          Just real quick on the opt-out, that structure has

25  been approved on numerous occasions.  As I mentioned, I think

1  if parties are given a document that clearly and specifically

2  lays out options for them to participate in a judicial process,

3  they should be bound to do so.  And I don't think there's

4  anything in the evidence today that would suggest that parties

5  were not afforded due process through proper notice.

6         On the gatekeeper point, we do acknowledge it is an

7  additional administrative step to enforce the provisions of the

8  plan, but it is a mutually beneficial one, right.  We have

9  thousands of shareholders who may bring claims who are not

10 aware of the provisions around the injunction and the plan.

11 And what this provision is doing is giving them the guidance as

12 to whether a claim they may seek to bring in an alternative

13 jurisdiction can actually be brought in the first place.

14        And so the gatekeeper provision, it's not a release.

15 Nothing in that language that Mr. Maza pointed to releases any

16 claims.  It's not prejudicing their rights to bring a claim.

17 It's just saying that the proper forum for determining whether

18 that claim is, for example, a direct claim or a derivative

19 claim should be the bankruptcy court.

20        And I think, you know, Ms. Steele made reference to a

21 number of cases, a few cases, actually, where that provision

22 may not have been included or may have been removed.  And,

23 obviously, every case is different.  But it has been included

24 in a number of plans in the Fifth Circuit and also in this

25 Circuit.

1          In the <u>Princeton Alternative Income</u> cases, as well as

2     the <u>National Realty</u> cases, there were specific references to

3     the Barton doctrine.  And the Barton doctrine, we acknowledge,

4     is originally intended as protection for federal receivers, but

5     courts like the court in <u>Princeton</u> and in <u>National Realty</u> have

6     expanded application of that doctrine to debtors and to

7     court-appointed fiduciaries of a debtor's estate.

8          And so it is important that we have that provision in

9     there.  And the references to the <u>Madoff</u> cases, to the <u>General</u>

10    <u>Motors</u> cases, to the <u>Pilgrim's Pride</u> case in our brief, and the

11    <u>Highland Capital</u> case, they're all to show that in prior

12    circumstances, bankruptcy courts have acknowledged, as well as

13    circuit courts have acknowledged the key role that the

14    bankruptcy court must play in being a gatekeeper with respect

15    to certain claims that may be brought.

16         And for those reasons, we believe that the gatekeeper

17    provision is appropriate, especially under the circumstances of

18    this case, as I've outlined, and should be approved not only

19    under Section 105 of the Bankruptcy Code but the other sections

20    that we referenced in our brief, 1141 and I believe 1123.

21              THE COURT:  Thank you, Counsel.

22              MR. FIEDLER:  Thank you, Your Honor.

23              MR. MAZA:  Your Honor, if I could just address one --

24              THE COURT:  Sure.

25              MR. MAZA:  -- quick point?

1             THE COURT:  You can stay there.

2             MR. MAZA:  Okay.

3             THE COURT:  We can pick it up.

4             MR. MAZA:  So, just to be clear, I'm not saying this

5    is a release, this language.  I'm saying it's an unnecessary

6    burden placed on the stakeholders.  And why if there's a direct

7    claim that, you know, first of all, if somebody in three years

8    going to remember that this was in their plan buried in the

9    third-party release provision, they're going to file a suit in,

10   I don't know, any supreme court in New Jersey, superior court,

11   and then find out they're in contempt of a confirmation order.

12   It just doesn't make any sense.

13            And that's why we again ask the Court to please

14   strike this from the plan.

15            THE COURT:  Thank you.  Thank you, Counsel.

16            Well argued, and I thank counsel for the argument.

17   And there are difficult issues.  Obviously, courts are

18   addressing these issues within the Circuit, outside and in

19   other Circuits.  And courts have come to different conclusions.

20   It is a shock in bankruptcy that we have courts that have

21   different outlooks on essential issues.

22            I'm prepared to give a ruling on these two issues

23   today.  Whether it's the luck or the lack of luck of a draw to

24   have a substitute judge who has already ruled in some respects

25   on these issues.  I guess we'll never know how other judges

1   would rule.  But I had the sense how my colleagues in this

2   district would rule, and I think my ruling is consistent with

3   both Judge Papalia's outlook and other colleagues.

4          With respect to the opt-out release, what we're

5   speaking to is the limited situation where there's been a

6   rejection and the party has not affirmatively opted out to

7   protect their interests and, therefore, would be deemed to have

8   consented to the releases.

9          The issue came before this Court before me in <u>Sur La</u>

10  <u>Table</u>, I like to give the French pronunciation.

11                     (Laughter)

12         THE COURT:  And I noted that there was a concern that

13  we expect too little of parties today, both within the law and

14  outside of the law as far as steps to be taken to protect their

15  rights.  I continue to hold that view.  The requirement to

16  check a box electronically or on paper is minimal.  It's a

17  minimal task to preserve one's rights when faced with the need

18  to protect one's interests.

19         Within the law, we expect that of parties all the

20  time.  You get served with a summons complaint.  You can't just

21  bury your head.  You need to respond.  You get a jury summons,

22  well be it if you just toss it in the garbage, you're going to

23  have to respond.  You have to take action.  Most of our terms

24  of service with respect to consumer agreements include a

25  provision that you have to affirmatively opt out of arbitration

1  clauses.

2          You have automobile insurance.  You usually, in fact,

3  almost every policy that I know, at least in this State, have

4  to take certain action to opt out unless you're stuck with

5  certain limited relief in the tort system.

6          Outside of the law, we all know all too well you have

7  to unsubscribe.  If you want to avoid, you have to take actions

8  to avoid a plethora of e-mails.  You have to reject cookies.

9  Whatever that means.

10          Indeed, even in open season if you want to change

11  your insurance, medical insurance, you have to take affirmative

12  action.  Society, both in and out of the law, requires steps to

13  be taken to protect your interests.  What is essential, though,

14  is that the parties be given notice of that obligation.  That

15  is critical.  And here there can be no question that there was

16  adequate clear and conspicuous notice.

17          The obligation to affirmatively opt out appears in

18  the plan, in the disclosure statement, in the ballots.  It

19  should come as no surprise.  And I'll note, anecdotally, again,

20  we seem to accept a very low threshold for notice these days.

21  You can scroll through on your phone an agreement and just

22  scrolling through is deemed it gives you sufficient notice.

23          Anybody who watches TV sees the tiniest of print,

24  disclaimers, boilerplate, that last on a screen for

25  milliseconds and that's deemed sufficient notice.  Let alone,

those who listen on a radio and hear voice overs do disclaimers

that are virtually incomprehensible they're so quick.

This is not the situation here with these notices.

Again, they've been conspicuous.  They've been clear.  There's

transparency and I don't view it as burdensome in order to

protect their interests.  The ability to opt out and pursue

claims exists.  It takes the simple task of reading a document,

either digitally or in paper, and exercising opt out.

So, I'm overruling the objections consistent with

prior ruling within this circuit, prior rulings within this

court and, specifically prior cases that I've had.

The gatekeeping language is a difficult issue.  We

see it now.  It seems to have a significant acceptance in the

Fifth Circuit, which is not as amenable to releases in general

whether they be consensual or non-consensual, as our Third

Circuit.

So, this gatekeeping function was a step taken within

the courts of that circuit and other courts to ensure that the

benefit of negotiated and bargained for contributions to a plan

are preserved for those making contributions and getting

releases as juxtaposed against those who have claims.  It was

viewed within the Fifth Circuit as a form of protection that is

less prejudicial than the actual third-party releases.  But

aimed at preserving the rights of those who have made

meaningful contributions to reorganizations.

1          This Court holds similar views, that there is a

2     purpose served by this gatekeeping function.  It is not unusual

3     for a bankruptcy court to, years after a confirmation, to be

4     asked to interpret the language of the confirmation order or a

5     plan.  I've done in recently in Congoleum.  I've done it in

6     other cases and it's not limited to the circuit, the Second

7     Circuit.  We certainly thing they're still interpreting Johns

8     Manville language.

9          So, it happens.  And it happens because, in this

10    Court's view, and it's not shared by, necessarily, all courts,

11    the bankruptcy court is well-equipped, if not best equipped to

12    interpret and construe the language of the plans and the

13    confirmation orders in order to protect the interest of all

14    parties -- the claimants, the plaintiffs, as well as those who

15    are benefitting under plans through releases and who have made

16    substantial contributions towards reorganizations.

17          One of the benefits of Chapter 11 that I think we all

18    recognize is that it creates essential forum to resolve

19    disputes relative to the bankruptcy.  Absent a gatekeeping

20    function, there is a risk that you're going to have courts

21    across this country construe and interpret the language of a

22    plan and a confirmation order in inconsistent fashion.  That's

23    a disservice to those plaintiffs.  It's a disservice to those

24    who were under the impression they were benefitting by making a

25    contribution to the reorganization and getting certain

1 protections.

2        The ability of a single court to take on a limited

3 burden, and let's be clear -- it's minimal.  Let's be clear, in

4 all likelihood in all of these situations it's coming back

5 before the bankruptcy court anyway.  It's either the defendant

6 is going to come back before the court to ask for clarity and

7 enforcement of a confirmation order, enforcement of a discharge

8 or one of the other parties to the litigation.  And that's the

9 way it should be because the courts will have a familiarity.

10        In making my inquiry and making my questions of

11 counsel, I wanted to clarify that it's not the Court's intent

12 to exceed its jurisdictional authority by rendering final

13 judgments beyond the limits of authority permitted under 28

14 U.S.C. 1334 and 28 U.S.C. 157.  We are of limited authority,

15 but certainly within those parameters, within those Code and

16 Judicial Code sections, is the authority to construe our own

17 orders and construe the terms of the plan when, in doing so,

18 doing so with the limited purpose of ensuring that the benefits

19 under the confirmed plan truly exist -- are truly available to

20 those who have maybe made financial or other contributions.

21        For those reasons and also incorporating by reference

22 the rationale set forth in the decisions out of the Southern

23 District of Texas, I believe, that were cited in the briefs,

24 the Court will approve the gatekeeping language.  And I think

25 it's a valid concern that U.S. Trustee has raised as to the

43

1  burden or reopening a case.  I know if I'm presented with this

2  issue down the road, certainly, I would be inclined to waive

3  any reopening fee.  I've done that in countless other

4  situations and I'm confident my colleagues on the bench would

5  take the same approach.

6          So, we've addressed those two issues.  And again, I

7  thank counsel.  These are difficult issues and these are

8  contentious issues and I recognize that.

9          What's next up on the menu?

10         MR. FIEDLER:  The next objection is brought by 200 --

11         THE COURT:  Let me, just, before we proceed, I do see

12 a hand raised.  Counsel from White & Case?

13         MS. RIVERO:  Hi, Your Honor, yes.  Can you hear me

14 okay?

15         THE COURT:  Yes, we can.  Thank you.

16         MS. RIVERO:  Thanks.  This is Devin Rivero of White &

17 Case, counsel to Michaels stores.  Your Honor, Michaels serves

18 as the proposed assignee with respect to the debtors' unexpired

19 lease for Store 1142 in this assignment was opposed by the

20 landlord at a contested hearing.  Also before Judge Papalia on

21 August 30th.  At the conclusion of that hearing, Judge Papalia

22 issued a bench decision on the record --

23         THE COURT:  That is the correct pronunciation.  I

24 just wanted to say she's right.  That is the correct

25 pronunciation.

1              MS. RIVERO:  Thank you.

2              THE COURT:  I'm always wrong with it.  But go ahead.

3              MS. RIVERO:  And the parties are still negotiating

4    the form of the order and Michael just wanted to note for the

5    record and make clear that this particular lease will not be

6    deemed rejected under the plan and confirmation order by virtue

7    of the debtors' pending assignment which, as noted, remains

8    subject to entry of an order by the Court.  The debtors' noted

9    this proposed assignment at Docket 1114, 1157, after being teed

10   up by the debtors' resale and assignment motion filed at Docket

11   193.

12             Accordingly, in accordance with Section V.A of the

13   plan, due to the pending assignment, the relevant lease will

14   not be deemed rejected but Michael is just stating this for the

15   record out of an abundance of caution given that the lease

16   assumption and assignment order has not yet been entered.

17             And that's all I wanted to say.  Thank you, Your

18   Honor.

19             THE COURT:  You're welcome.  Thank you.

20             Counsel, any issue with that?

21             MR. FIEDLER:  No, we fully agree with that.

22             THE COURT:  All right  Thank you.  Proceed.

23             MR. FIEDLER:  Okay.  Leaving aside that I've been

24   calling Judge Papalia by his wrong name this entire time --

25             THE COURT:  We all have for a decade.

45

1              MR. FIEDLER:  Then next objection, Your Honor is

2    brought by 200-220 West 26th, LLC.  This argument that they

3    make is that the plan operates as a substantive consolidation

4    of each of the debtors.  And I think that objection be

5    overruled for many reasons.  First, Article 1(g) of the plan

6    explicitly states that it does not provide for substantive

7    consolidation, said the plan applies separately for each of the

8    debtors.

9              Second, the classification of claims in interest

10   under the plan apply separately to those debtors.  And as was

11   made clear in Mr. Orchowski's voting declaration, the

12   tabulation of votes for recording acceptances and rejections on

13   the plan was done on a debtor by debtor basis.

14             And, lastly, Your Honor, it's our understanding that

15   the movant has a claim against buybuy Baby entity and

16   substantive consolidation in this case would not ensure more

17   equitable treatment to the movant or any creditors.  The

18   debtors' secured creditors have liens on, substantially, all of

19   the debtors' assets including those at the buybuy Baby entity.

20             And, you know, there has been an agreement in the

21   plan for the sharing mechanism that I mentioned that unsecured

22   claimants, which the movant is, will have the opportunity to

23   recover, you know, in this case than they otherwise would be

24   able to in a Chapter 7 or even in another plan that didn't have

25   that agreement in it.

1          So, I think the objection should be overruled for

2    those reasons and I'll defer to Your Honor if you have any

3    questions on that.

4          THE COURT:  Thank you.

5          Let me hear -- counsel for the objector wish to make

6    argument?

7          Good afternoon.

8          MR. OSTROW:  Thank you, Your Honor.  Alec Ostrow from

9    Becker, Glynn, Muffly, Chassin & Hosinski, on behalf of 200-220

10   West 26th LLC.  Your Honor, I appreciate the statements that

11   counsel has made but I don't think the statements that counsel

12   has made can be found in the plan.  The plan is a plan for 74

13   debtors.  It has definitions that define the classes.  It puts

14   into Class 6 any claim that is described as a general unsecured

15   claim and a general unsecured claim is not differentiated

16   between any of the 74 debtors.  So, all of the general

17   unsecured claims against all of the 74 debtors are put into one

18   class -- Class 6.

19         The plan does say, it does say, that it's not

20   substantively consolidated but then despite that statement, it

21   puts claims against 74 debtors into one class and the treatment

22   is the same.  So, Your Honor, what is substantive

23   consolidation?  It is a pooling of liabilities and assets and

24   what we have here is a pooling of liabilities and assets.

25         Now, I heard counsel say that the plan says that the

1  votes are tabulated on a debtor by debtor basis.  And he wrote

2  that in the memorandum of law in support.  But the plan doesn't

3  say that.  I looked -- it doesn't say that.  The disclosure

4  statement doesn't say that.  The tabulation was done that way -

5  - that's the declaration that was put into evidence today and

6  that's fine.  But somebody reading the plan, the hypothetical

7  unsecured creditor for whose benefit the disclosure statement

8  is made, didn't see that.

9       The hypothetical unsecured creditor that's voting on

10  the plan reads the plan and sees one class of unsecured claims

11  for 74 debtors and identical treatment.  That looks like

12  substantive consolidation, Your Honor.  And it looks like it,

13  it walks like it, it swims like it.  I mean, that's what it

14  really is.  Even though the plan does say it, that's not being

15  done.

16       THE COURT:  The impact is on Class 6, correct?  The

17  unsecured creditors?

18       MR. OSTROW:  Absolutely.

19       THE COURT:  Am I correct -- I think my understanding

20  Class 6 did not accept the plan, general unsecured creditors?

21       MR. OSTROW:  That's right.

22       THE COURT:  So, where's the prejudice?  They didn't

23  accept it.  We can't say that they would have accepted it had

24  they known.  They didn't accept it.

25       MR. OSTROW:  Yeah, I understand that, Your Honor.

1  The real question is we don't know what people would have done

2  had they been given the proper disclosure.  People who rejected

3  the plan may have decided to accept it.  People who accepted

4  the plan may have decided to reject it.  We don't know because

5  the proper disclosure wasn't given.

6       And, Your Honor, look, there's something that is said

7  in the memorandum of law that makes a great deal of sense to

8  me.  It says the debtors' secured creditors have claims against

9  each of the debtors and have liens on substantially all of the

10  assets of each debtor.

11       Accordingly, outside of a Chapter 11 plan, including

12  in a hypothetical Chapter 7 liquidation, unsecured creditors

13  would not be entitled to any distribution.  If that's right,

14  then the classification of putting claims, unsecured claims,

15  against 74 different debtors into one class, if the liquidation

16  recovery -- of a recovery against each debtor on an individual

17  debtor by debtor basis is identically zero, then sure -- you're

18  putting substantially similar claims in the same class because

19  they would get nothing.

20       On the other end of the spectrum, if everybody gets

21  everything, putting the claims in the same class also makes

22  sense.  It's basically a convenience.  But in the absence of

23  proof, and what we have here in the debtors' memorandum of law

24  at Paragraph 114 is legal argument.  It's not evidence.  And

25  more important, it's nowhere to be found in the disclosure

1  statement.  The disclosure statement doesn't say this.  And

2  even this language, there's no proof -- this is legal argument,

3  this is not evidence.

4      The disclosure statement contains very, very little

5  in terms of financial information.  There is no list of the

6  assets and their values.  There's no balance sheet.  There's

7  nothing that would suggest to anybody reading it that if you

8  were to liquidate each individual of these 74 debtors, because

9  each of them has guaranteed some or all of the secured debt and

10  the value of the assets of each of them is such that it's

11  insufficient to satisfy the secured debt, then there would be

12  nothing for unsecured creditors and, therefore, unsecured

13  creditors should like the plan that gives them at least a

14  chance of something.

15      But the disclosure statement doesn't say any of this.

16  It's nowhere to be found, Your Honor.  And similarly, read the

17  definition in the plan of general unsecured claim.  Read the

18  definition of Class 6.  So, they're all lumped in the same

19  class without this disclosure, without this explanation.

20      So, I really believe, Your Honor, and more important

21  than what I believe, my client believes, that this looked like

22  an attempt to achieve the results of substantive consolidation

23  without following the rules.  Without making the evidentiary

24  showing that Owens Corning requires.

25      And what it looked like to my client is something

1   that was done in another case, that is <u>SunEdison</u> where a host

2   of avoidance actions were brought by people who received

3   payments of debt that was due, but not from the debtor that

4   owed the payment, but from one of the other jointly

5   administered debtors.  And the fraudulent transfer action was,

6   well, you got paid from a debtor that didn't owe you the money.

7           So, that debtor that didn't owe you the money was

8   insolvent, or under capitalized or knew it would incur debts

9   beyond ability to pay and didn't receive reasonably equivalent

10  value.  So, you got paid from debtor A when debtor B really

11  owed you the debt even though debtor A and debtor B are jointly

12  administered in the same plan.  You have to give the money

13  back.

14          And, Your Honor, to me, having represented defendants

15  in that situation, it seems entirely unfair, especially when

16  there's joint borrowings, pre-petition, post petition, as is

17  the case here.

18          Your Honor, I am not saying that this plan is

19  impossible, what I'm saying is that there should have been

20  appropriate disclosure of what is going on.  If it is true that

21  the debtors' secured creditors have claims against each of the

22  debtors and have liens on substantially all of the assets of

23  each debtor, accordingly, outside of a Chapter 11 plan,

24  including in a hypothetical Chapter 7 liquidation, unsecured

25  creditors would not be entitled to any distribution.  And the

51

1  disclosure statement should have said that.  And, moreover, the

2  disclosure statement should have provided financial information

3  to back it up, including a valuation of assets and a chart

4  showing how the assets would be distributed.  There's none of

5  that in the disclosure statement.

6        I mean, the liquidation analysis in the disclosure

7  statement is language which we see in lots of disclosure

8  statements about the plans liquidating any way, it would be

9  quicker an cheaper to liquidate in Chapter 11 but under a

10 Chapter 7 when you have a new set of professionals and new

11 expenses and new learning curves and all that, and all of that

12 is true.  But what it doesn't say is, why this is not an

13 attempt to achieve substantive consolidation without following

14 the rules.

15       And I think that the -- whatever convenience is

16 served by having combined the hearing on final approval of the

17 disclosure statement with confirmation, puts this kind of

18 objection into a place that says wait a minute, we may have to

19 go back and do this again.

20       If the normal procedure had been followed, if there

21 had been a notice to approve the disclosure statement and an

22 opportunity to assert objections such as the one that I have

23 made, then this could have been fleshed out in advance, could

24 have been corrected, the disclosure could have been added

25 because what do we do at disclosure hearings when they're not

1  combined with confirmation hearings?  Some missing disclosure

2  added in. It's not hard, it's done all the time.

3          Either this really is an end around at substantive

4  consolidation or as the legal argument is in the memorandum of

5  law, there are facts that support this position.  We don't have

6  those facts.  We don't have the disclosure of those facts.

7          So, Your Honor, my view, as expressed in the

8  objection is, the disclosure statement is inadequate, it

9  doesn't contain the material that we would hope to find in the

10 disclosure statement, including a description of the available

11 assets and their value and information that would enable the

12 relevant parties financial information that would enable the

13 relevant parties to make an informed judgment whether to accept

14 or reject the plan.

15         So, Your Honor, there's nothing fatal about this plan

16 but there's something that's wrong about the procedure that was

17 used because the disclosure that should have been there wasn't

18 there.  And, therefore, I respectfully submit that

19 notwithstanding the wonderful efforts of a lot of talented

20 people in this room, we don't have a confirmable plan today

21 because without the proper evidence there's improper

22 classification by putting unsecured claims against 74 debtors

23 into the same class and without the appropriate evidence, we

24 have improper de facto substantive consolidation.  So, we don't

25 have satisfaction of the first requirement of confirmation in

53

1 Section 1129(a)(1).

2        And, without a proper disclosure statement we don't

3 have satisfaction of the second requirement in 1129(8).  And if

4 what was done was an attempt to use the, what I call in the

5 objection the wrong debtor paid avoidance actions, then I

6 submit that that is a proposing of a plan that's not in good

7 faith and we don't have the third requirement of confirmation

8 satisfied.

9        And, finally, without the proper evidence about what

10 a liquidation on a debtor-by-debtor basis would do, we don't

11 have the seventh requirement of confirmation satisfied, that is

12 the best interest test.

13        So, for all those reasons, Your Honor, I respectfully

14 submit that the plan today cannot be confirmed.  All these

15 things can be corrected if the parties are willing, but today

16 the plan cannot be confirmed.  And unless Your Honor has any

17 questions, that's all I have to say.

18        THE COURT:  Thank you.  Okay, I appreciate it, thank

19 you, all of you.  Counsel, do you want to respond or before

20 that, is there anyone else who wishes to be heard?  Counsel?

21        MR. FIEDLER:  Thank you, Your Honor.  For the record,

22 Ross Fiedler of Kirkland Ellis for the debtors.

23        We'll generally rely on what's in our papers.  I'll

24 just note the disclosure statement contains adequate

25 information.  We have Ms. Etlin's declaration which testifies

1  to that.  I'll also note the agreement that was reached with

2  the DIP lenders and the Committee as part of the final DIP

3  order gives unsecured creditors, like Mr. Ostrow's clients, the

4  opportunity to recover on assets that are liened up in favor of

5  both the DIP lenders and the pre-petition secured lenders.

6         And so, that is a potential for recovery that Mr.

7  Ostrow's client would not otherwise get under the plan.

8         You know, I'm also a little lost as to what Mr.

9  Ostrow's client is looking to get from this.  Class 6 did vote

10  to reject the plan and I'm not sure any changes to the plan

11  with respect to the issues that Mr. Ostrow has raised would

12  change that result.  And so, we'll rely on the papers and the

13  evidence here, but unless Your Honor has any questions I don't

14  have anything further than that.

15         THE COURT:  All right, thank you.  It is, I guess,

16  ironic that if there were changes made consistent with what the

17  objector seeks or let me rephrase it, if the votes which would

18  be changed as a result of information that were included, it

19  would only change a non-consenting class into a consensual

20  class and avoid the cram down requirements.

21         I understand the arguments being made and it is the

22  Court's view that there is no prejudice to the Class 6 or any

23  other creditor as a result of the disclosures made in the

24  disclosure statement and that the lack of prejudice, in fact,

25  quite the opposite, the interest of the class in which the

1  objecting creditor is included, benefits from this plan in a

2  fashion that would be unavailable, even the lien position of

3  the secured claims.  I'm overruling the objection.

4       MR. FIEDLER:  Thank you, Your Honor.  That takes us

5  to what I think is the final objection to the plan I guess, if

6  you will call it that, is Mr. Das and Mr. Rostom's objection.

7       I think, you know, part of their objection gets to a

8  scrivener's error on the opt-out form for deemed rejecting

9  parties.  We have already reached out to Mr. Das and notified

10 him that he is not a releasing party under the plan, nor is any

11 Class 9 interest holder.  And, so, the debtor struggled to see

12 what irreparable harm would befall Mr. Das or Mr. Rostom under

13 their terms of the plan.

14      The second point is, I think they make the argument

15 that the plan doesn't satisfy 1129(b)(2) because it's not fair

16 and equitable.  The equity interests are being cancelled under

17 this plan, they're not entitled to any recovery in accordance

18 with the absolute priority rule.

19      And so, I think Mr. Das' objection should be

20 overruled for both that reason, as well as the fact that they

21 are no longer a party to the release provisions.

22      THE COURT:  I think there was also reference in the

23 objection to the fact that there should be -- that certain

24 claims that are being deemed allowed and that were eligible for

25 voting were not eligible because under Section 542, if those

1   claimants had stock in the debtor corporation it was subject to

2   turnover.  I, frankly, couldn't find any authority for the

3   proposition that authorized stock of a debtor corporation is

4   property of the estate and the debtor corporation as opposed to

5   the party holding the stock.  Therefore, I don't understand or

6   I don't accept the 542 argument that underlies the objection.

7   But, for the reasons that you've indicated as well as the

8   Court's concerns, the objection is overruled.

9           MR. FIEDLER:  Thank you, Your Honor.

10          MR. DAS:  Your Honor --

11          THE COURT:  Ms. Das?

12          MR. DAS:  Yeah, hi, Your Honor.  I would like to

13  present an argument about the shares of the estate, the common

14  shares of the debtors, which are borrowed.

15          And so, they were considered as property of the

16  estate as per the approved order, the final NOL order that was

17  approved in Docket 587.

18          THE COURT:  All right.  Well, I'm going to let you

19  make your argument and then I'll rule on it.  I've already

20  ruled but I'm certainly open to considering your argument.

21          MR. DAS:  Okay.  So, the common shares of the debtor

22  of Bed Bath & Beyond, they have been already approved as, or

23  considered as valuable property of the estate per the approved

24  final order that has been approved in Docket 587.

25          And, so, Section 542 of the Bankruptcy Code states

1   that such property of the estate, which is, it is returnable to

2   the trustee or be held at the custodian.  So, that is the

3   stipulation for Section 542 of the Bankruptcy Code.

4           So, I believe -- so as per that statute these common

5   shares that are borrowed by parties and as per Section 4.1.6 of

6   the disclosure statement and 9.f of the plan, they make the

7   creditors holding such borrowed shares are property of the

8   state, ineligible to vote to accept or reject the plan.  They

9   make their claims disallowed.

10          So, there is currently no mechanism specified in the

11  disclosure statement or the plan to determine such creditors

12  with disallowed claims and so, the presence of the working on

13  the plan by such creditors is also questionable.

14          So, as per Section 1129(a)(3) and 1129(b)(1) of the

15  Bankruptcy Code, so basically 1129(b)(1) of the Bankruptcy

16  Code relates to the fair and the tests for fair and

17  equitability of the plan and those tests are not met because

18  the plan allows for disallowed claims being potentially

19  addressed and distribution being made pursuant to disallowed

20  claim while it unfairly affects the shareholders who are not

21  allowed to basically get the greatest possible value of their

22  shares which would have occurred if all the borrowed shares

23  were returned.

24          So, I believe that's why the plan, it is not

25  confirmable as we have outlined in our Docket 2068 in the Das

1  certification in that docket.

2          THE COURT:  All right, thank you.  Mr. Das, the oral

3  argument presented was consistent with the written argument

4  that you had made as part of your objection and the underlying

5  motion to vacate the order setting the matter down for

6  confirmation and conditionally approving the disclosure

7  statement.

8          As I indicated, the Court reviewed your written

9  arguments and, again, have listened to the oral argument.  The

10  Court had the opportunity to review Docket 587, which was the

11  NOL order.  There is no, in this Court's view, determination

12  that the underlying shares of stock are a valuable asset or

13  property of the estate.  The NOLs were valuable to the, or the

14  potential NOLs were valuable to the bankruptcy estate not the

15  underlying shares of the debtor corporation, as far as property

16  of the estate.  I don't believe there's a foundation for the

17  turnover argument.  I don't believe there's a foundation for or

18  legal authority supporting your objection.  It will be

19  overruled.  Thank you for your efforts, though.

20          MR. FIEDLER:  Thank you, Your Honor.  Your Honor, I

21  think that does it for our case-in-chief.  We'll rely on our

22  brief in support of confirmation.

23          THE COURT:  You just want to run through it, this is

24  a cram down under 1129(b) in light of Article, Class 6 which I

25  think you have the majority in number but not the two-thirds in

1 amount?

2          MR. FIEDLER:  That's correct.  Class 6 voted to

3 reject the plan.

4          THE COURT:  So, you're asking for the Court to find

5 that it's a fair and equitable treatment, and not just

6 scrivinatory, correct?

7          MR. FIEDLER:  That's right, Your Honor.  And that the

8 evidence adduced at the hearing, as well as the declaration of

9 Ms. Etlin supports confirmation of the plan under 1129 as well

10 as approve of the final disclosure statement under 1125 and

11 1126.

12          THE COURT:   And under, just confirm for the Court,

13 the Court's understanding that under the plan, no class, no

14 equity holders are retaining any assets or any property.

15          MR. FIEDLER:  That's correct.  The equity interests

16 are being cancelled.

17          THE COURT:  So, those Classes 7, 8 and 9 are not

18 retaining anything of value, correct?

19          MR. FIEDLER:  That's correct, Your Honor.

20          THE COURT:  All right.  I've reviewed the memorandum

21 submitted in support of confirmation.  I've also reviewed the

22 declaration of Ms. Etlin.

23          The Court is comfortable in making findings that

24 under 1129(b) the plan, it's fair and equitable to the

25 objecting class and does not discriminate unfairly within its

 1  treatment.

 2          Before I have you continue, well, why don't I let you

 3  continue then we'll go to Mr. Werkheiser.

 4          MR. FIEDLER:  I'm sorry, Your Honor?

 5          THE COURT:  Did you want to -- well, I don't want to

 6  interrupt you, do you have anything else to add in your

 7  case-in-chief?

 8          MR. FIEDLER:  I'm happy to walk through the

 9  individual confirmation requirements if that would be helpful

10  to the Court.

11          THE COURT:  All right.  Before we discuss that, Mr.

12  Werkheiser, you have your hand raised.

13          MR. WERKHEISER:  Yes, thank you, Your Honor and thank

14  you for the opportunity to appear today.  I'm appearing on

15  behalf of MSC Mediterranean Shipping Company SA, a creditor in

16  the case.

17          Your Honor, we're not objecting to the plan.  We did

18  have a limited objection, that was one of the ten filed that

19  appears at Docket Item 2100, that we believe is resolved.  And

20  the only reason that it's necessary for me to appear and

21  address the Court today is that while the debtors' acknowledge

22  it's resolved, the memorandum of law in support of confirmation

23  doesn't state what the resolution is and I'd simply like to

24  just have that put on the record to confirm the terms under

25  which we resolved our objection.

1          Your Honor, we filed a limited objection to the

2    plan's setoff and recoupment provisions that appear in Article

3    10(f) and (I).  And included also a statement of MSC's asserted

4    and reserved setoff and recoupment rights.  Following that, we

5    had e-mail correspondence with Mr. Fiedler and his colleagues

6    in furtherance of resolving that objection.  And I believe we

7    came to an agreement that the debtors' acknowledged that our

8    objection was sufficient to fully preserve those setoff and

9    recoupment rights including with respect to any, and this is a

10   defined term in the plan, Your Honor, any shipping and price

11   gouging claims that may be brought against our client.  And my

12   understanding is the debtors' are in agreement with that and we

13   don't need to take any further steps at this time to preserve

14   those.

15          So, if that's consistent with the debtors'

16   understanding, Your Honor, and that's acceptable to the Court,

17   as previously that I indicated, I believe our objection would

18   be resolved.

19          THE COURT:  All right.  Thank you, counsel.

20          MR. WERKHEISER:  Thank you, Your Honor.

21          THE COURT:  Does that comport with the debtors'

22   understanding?

23          MR. FIEDLER:  That's right, Your Honor.  The debtors

24   have agreed that the setoff rights of MSC are preserved as laid

25   out by Mr. Werkheiser.

62

1          THE COURT:  All right.  Then, Mr. Werkheiser, if

2     that's all, the Court finds it acceptable and --

3          MR. WERKHEISER:  Thank you, Your Honor.  I appreciate

4     the opportunity to be heard.

5          THE COURT:  You're welcome, thank you.  As far as the

6     remaining 1129(a) requirements, the Court has reviewed the

7     memorandum submitted in support of confirmation as I indicated

8     before, as well as the two declarations.  I don't need for you

9     to go through that effort again on the record.  So, but I thank

10    you for the offer of doing so.

11         MR. FIEDLER:  Thank you, Your Honor.

12         THE COURT:  Anything else you wish to bring to the

13    Court's attention?

14         MR. FIEDLER:  You know, with respect to the

15    confirmation order and disclosure statement, I think we would

16    rest there.  We do have to address the lift stay.  I don't know

17    if you want to handle that now or however you would like to

18    proceed, Your Honor.

19         THE COURT:  We can address the lift stay in a couple

20    of moments.  Let me, let's focus on the plan and the

21    confirmation hearing.

22         Then let me ask, is there anyone present in court who

23    wishes to be heard further on the matter?

24         MR. DAS:  Yes, Your Honor.  This is Neelay Das.

25         THE COURT:  Yes, Mr. Das.

1          MR. DAS:  Yeah, I would like to respond to the

2    argument about Docket 587, not referring to the common shares

3    as property of the estate.

4          So, Docket 587 specifically states, subject to

5    certain exceptions, Section 362 of the Bankruptcy Code operates

6    as a way -- sorry, as a stay of any act to obtain position of

7    property or from the debtors' estate or to exercise control

8    over property off or from the debtors' estate.  So, this,

9    essentially implies that the debtors are considering the common

10   stock shares as property of the estate.

11         Pursuant to Section 362 of the Bankruptcy Code, which

12   is related to 542, I mean, it specifically states that entities

13   who have control over the property of the estate, so that was

14   essentially considered common shares of Bed Bath & Beyond as

15   property of the estate.  And this has been approved in this

16   final NOL order.

17         THE COURT:  All right.  Thank you.  Again, I have

18   overruled your objection.  The Court disagrees with your

19   reading of the NOL order and the impact of Section 362 and your

20   understanding of Section 541.  I've considered your arguments

21   and are overruling the objection.  Thank you.  Where did we

22   leave off?

23         MR. FIEDLER:  I think you were asking if anyone else

24   wanted to be heard.

25         THE COURT:  Oh.  Anyone else besides Mr. Das wish to

1 be heard?  Hearing -- oh, Mr. Ostrow.

2          MR. OSTROW:  Just -- Your Honor, just a question

3 about the submission of the final version of the proposed

4 findings of fact and conclusions of law.  I just want to have

5 an opportunity to look at them before they're signed.  I know

6 there was one that was submitted just before the start of the

7 hearing and there may be another version of it.

8          THE COURT:  Rest assured I'm not entering it today.

9 And I was going to comment on that.  It would -- so, hearing

10 and seeing that there's no further arguments to be made, either

11 for or against confirmation, the Court will be granting

12 confirmation and making the requisite findings of fact and

13 conclusions of law to memorialize that the debtor has satisfied

14 both the 1129(a) and 29(b) requirements.

15          With respect to the specific findings of fact and

16 conclusions of law, I, too, would like an opportunity to review

17 the proposed language and more detail.  My intent would be, and

18 I'm cognizant of time frames, to take tomorrow to review it and

19 either -- and I would say tomorrow -- Thursday morning enter

20 the proposed findings of fact and conclusions of law.  My math,

21 then 14 days from there, let's see.  Today is the 12th, 13th,

22 14th, will put that to the 28th.  So, if that's a concern for

23 the debtor, let me know.

24          Mr. Ostrow, if you have issues or concerns with the

25 language, you can reach out, contact my chambers directly, copy

1  debtor and the Committee, obviously, see if you can work out

2  language, needless to say.  I won't enter it before 9 a.m.

3  Thursday morning, put it that way.

4          MR. OSTROW:  Thank you, Your Honor.

5          THE COURT:  All right.  Does that schedule work for

6  the debtor and for the Committee?

7          MR. SANDLER:  That's fine with us.

8          MR. FIEDLER:  That works for us, Your Honor.  You got

9  to the 28th much quicker than I could.

10          THE COURT:  Without counting.  All right.  Let's turn

11  to the stay relief motion.  I believe Mr. Ballak is on the

12  line.

13          MR. BALLAK:  I am, Your Honor.  How are you doing?

14  Nice to see you today.

15          THE COURT:  In a non-Chapter 13 setting, Mr Ballak,

16  it's nice to see you.

17          MR. BALLAK:  I've taken other cases.

18          MR. FIEDLER:  So, Your Honor, we have made a, what I

19  think is a reasonable request to have a modest adjournment of

20  this matter to be heard in the following week.  My

21  understanding is, it's a state court claim that hasn't preceded

22  far in the state court.  There hasn't been any discovery, there

23  hasn't been any depositions and I don't think any of the

24  parties would be prejudiced by a week adjournment here.

25          My understanding was the movant had an issue with

1  that because they haven't seen the insurance policy that's

2  underlying or that's covering the alleged act.  We have offered

3  to provide that on a professional eyes only basis.  We haven't

4  gotten a response yet.  So, we would request just a brief

5  adjournment of this matter to, you know, next week.

6          THE COURT:  Mr. Ballak, you can correct me if I'm

7  wrong, I believe your concern was that the debtor would use

8  confirmation of its plan as part of an argument.  And if that's

9  not going to be the case, let's clarify that.  Is that your

10  concern on the adjournment?

11          MR. BALLAK:  That was part of the concern but I think

12  as far as being able to respond to the objection that was

13  filed, I believe I should have the policy in hand based upon

14  the representations that were made in the objection and part of

15  what was placed upon us as far as the eyes only, was basically,

16  would have hamstrung me from being able to respond or do

17  anything with regards to what I may see that may be legitimate

18  responses and objections.

19          I mean, I don't understand what is the basis in any

20  manner as to why this policy is not being provided.  I've not

21  heard one, other than they don't want to provide it.  I mean,

22  but then under the plan and the disclosure statement, it talks

23  about how the insurance policies are going to be assumed, how,

24  you know, there's these lines of credit out there.  I don't

25  know any of that information.

1          THE COURT:  Is there a basis not to simply provide

2     the policy?

3          MR. FIEDLER:  Your Honor, we e-mailed Mr. Ballak last

4     week letting him know we would provide the policy.  There were

5     some confidentiality issues that were raised by counsel to the

6     insurer, so we were proposing to provide that on a professional

7     eyes only basis.  I see counsel for the insurer is on the line.

8     If he has any issue with that we would defer to him, but we've

9     offered to provide the policy and that shouldn't be an issue.

10          THE COURT:  Mr. Holzaepfel, if I'm pronouncing it

11     correctly.

12          MR. HOLZAEPFEL:  Good morning, Your Honor.

13          THE COURT:  Good morning.

14          MR. HOLZAEPFEL:  Caleb Holzaepfel for Safety National

15     Insurance Company.  Yes, Your Honor, I don't think we have an

16     issue with professional eyes only for Mr. Ballak to view the

17     policy.  Safety National has an internal policy not to produce

18     the insurance policy for confidentiality reasons, outside of a

19     court order that would otherwise authorize it.  We don't think

20     there's insurance in this case.  We think that's pretty clear

21     but I understand Mr. Ballak's wish to see the policy to confirm

22     the same.

23          THE COURT:  Let me suggest this.  Put together a

24     quick stipulation, a confidentiality stipulation, provide the

25     policy.  Mr. Ballak, if there are concerns with what you can do

1  with the policy, we can have a conference call on it and come

2  up with a mechanism, whether it's partially sealed or any

3  responses would be sealed, we can accommodate the

4  confidentiality concerns.  But, let's get the policy over to

5  Mr. Ballak, under a professional eyes only basis.  I think

6  we're going to need more than a week.  So, Christie, do we have

7  a sense of what -- it's a little hard to schedule what I'm

8  scheduling for.  I'm not sure I'm scheduling for me or for

9  Judge Papalia (pronouncing).

10         UNIDENTIFIED ATTORNEY:  I think you pronounced his

11  name wrong, Your Honor.

12         UNIDENTIFIED SPEAKER:  I'm not exactly sure yet, but

13  we can --

14         THE COURT:  How about, we'll advise counsel of a new

15  date, we'll carry this without date for now.  Let us work out

16  the calendar on our end but, if within the next 48 hours you

17  can provide the policy and I'm sure there could be a pretty

18  simple stipulation with respect to access to the information.

19         MR. FIEDLER:  Thank you, Your Honor, that works.

20         MR. HOLZAEPFEL:  Very well, Your Honor, thank you.

21         THE COURT:  Okay.  Thank you, counsel.  So, we'll

22  carry that without date for now.

23         MR. FIEDLER:  Okay, great.  I just wanted to note, we

24  will be submitting a revised proposed order that has agreed

25  upon language with certain stakeholders that raised certain

1   issues.  Part of that is an agreement with the Texas taxing

2   authorities who filed an objection.

3           THE COURT:  Right.

4           MR. FIEDLER:  We have agreed in resolution of that

5   objection and I just wanted to note for the record that the

6   debtors are going to make payment of the 2022 tax claims

7   referenced in their objection within 24 hours of entry of the

8   order.  So, I just wanted to put that on record and give

9   counsel to the Texas taxing authorities that comfort.

10          THE COURT:  All right, thank you.  What I'm going to

11  ask is that the final version of the confirmation order, as

12  well as any final version, even if you've already uploaded it

13  to the docket, of the proposed findings of fact and conclusions

14  of law, be e-mailed to my chambers.  E-mail it to my law clerk,

15  Becca Earl directly.  That way it gets to me and I can spend

16  more time on this case.  And I think that will be the most

17  efficient way of moving this forward.

18          I do want to take the opportunity to express the

19  Court's appreciation for the work of debtors' counsel and

20  Committee counsel throughout this case.  I've been keeping a

21  eye on it from afar. I think the work has been stellar, I

22  appreciate the work of the U.S. Trustee and the SEC in

23  protecting everyone's interests and working with counsel in

24  making the case -- in producing the best result that we can.

25          And that's my end, unless there's anything, any other

70

1   concerns or issues by anyone.  I'll also thank Bed Bath &

2   Beyond's representatives for their efforts throughout the case.

3          MR. FIEDLER:  Thank you, Your Honor, we appreciate

4   it.

5          THE COURT:  All right.  We are adjourned.  Thank you.

6          MR. FIEDLER:  Thank you.

7          UNIDENTIFIED ATTORNEYS:  Thank you, Your Honor.

8          THE COURT:  Thank you.

9                        * * * * *

10               **C E R T I F I C A T I O N**

11          WE, DIPTI PATEL, ALYCE H. STINE and ELAINE HOWELL,

12   court approved transcribers, certify that the foregoing is a

13   correct transcript from the official electronic sound recording

14   of the proceedings in the above-entitled matter and to the best

15   of our ability.

16

17

18   /s/ Dipti Patel

19   DIPTI PATEL

20   /s/ Alyce H. Stine

21   ALYCE H. STINE

22   /s/ Elaine Howell

23   ELAINE HOWELL

24   J&J COURT TRANSCRIBERS, INC.   DATE:  September 14, 2023

25