**LOWENSTEIN SANDLER LLP**
Kenneth A. Rosen, Esq.
Mary E. Seymour, Esq.
Philip Gross, Esq.
One Lowenstein Drive
Roseland, NJ 07068
Telephone: (973) 597-2500
Email: krosen@lowenstein.com
Email: mseymour@lowenstein.com
Email: pgross@lowenstein.com

*Co-Counsel to Michaels Stores, Inc.*

**WHITE & CASE LLP**
Gregory F. Pesce, Esq. (admitted *pro hac vice*)
Laura E. Baccash, Esq. (admitted *pro hac vice*)
111 South Wacker Drive, Suite 5100
Chicago, IL 60606-4302
Telephone: (312) 881-5400
Email: gregory.pesce@whitecase.com
Email: laura.baccash@whitecase.com

-and-

Samuel P. Hershey, Esq. (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Email: sam.hershey@whitecase.com

-and-

Devin J. Rivero, Esq. (admitted *pro hac vice*)
Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, FL 33131-2352
Telephone: (305) 371-2700
Email: devin.rivero@whitecase.com

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>BED BATH & BEYOND INC., *et al.,*<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 23-13359 (VFP)<br><br>(Jointly Administered) |

## MICHAELS STORES, INC.'S OBJECTION TO APPROVAL OF THE
## SALE AND ASSIGNMENT OF THE BBBY LEASE TO HOBBY LOBBY

---

[1] The last four digits of Debtor Bed Bath & Beyond Inc.'s tax identification number are 0488. A complete list of the Debtors in these Chapter 11 Cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/bbby. The location of Debtor Bed Bath & Beyond Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 650 Liberty Avenue, Union, New Jersey 07083.

Michaels Stores, Inc. ("**Michaels**")—the only qualified bidder that submitted a timely bid in connection with the Auction (defined below) for the sale and assignment of the above-captioned debtors and debtors in possession's (collectively, the "**Debtors**") lease located in the Pinnacle Hills Promenade in Rogers, Arkansas (Store #1142, as amended and extended, the "**BBBY Lease**")—objects to approval of the sale and assignment of the BBBY Lease to Hobby Lobby Stores, Inc. ("**Hobby Lobby**") because, among other reasons: (i) the Court improperly permitted[2] the Debtors to reopen the June 26, 2023 auction (the "**Auction**") to allow Hobby Lobby to bid on the BBBY Lease three months after the Auction concluded and after Hobby Lobby failed to attend the Auction, otherwise object to the assignment to Michaels or even submit a late (untimely) bid prior to the Assumption and Assignment Hearing (defined below); and (ii) the September 27, 2023 reopened auction conducted by the Debtors (the "**Reopened Auction**") violated the Procedures Order, and the results therefore must be set aside. In the alternative, to the extent that the Court is inclined to enter any order approving the sale and assignment of the BBBY Lease to Hobby Lobby, Hobby Lobby is not entitled to a finding that its bid was the highest and best bid nor a finding that it is a good faith purchaser finding because of collusive conduct that occurred throughout the sale process with respect to the BBBY Lease. In support of this objection, Michaels states as follows:

## PRELIMINARY STATEMENT

1.      Michaels is the quintessential "white knight" investor that a debtor should welcome to ensure a value-maximizing sale process. Following entry of the *Order (I) Establishing Procedures to Sell Certain Leases, (II) Approving the Sale of Certain Leases, and (III) Granting Related Relief* [Docket No. 422] (the "**Procedures Order**"), Michaels and its advisors played by

---

[2] "[W]hen an auction is conducted in a manner that, in all facets, was beyond reproach, it may not be reopened to allow a higher bid. To do so would be an abuse of discretion." *In re Cloverleaf Enterprises, Inc.*, No. 09-2005, 2011 WL 873145, at *1 (Bankr. D. Md. Mar. 11, 2011) (citation omitted).

the rules, rolling up their sleeves to evaluate multiple potential unexpired leases in the Debtors'

portfolio.  In doing so, Michaels (i) relied on the Procedures Order and its belief that the Debtors

and other potential bidders would comply with the terms of the Procedures Order, and (ii)

submitted bids at the Auction for the BBBY Lease as well as ten other unexpired leases.  Michaels

was declared the high bidder for eight of the unexpired leases that it bid on at the Auction, and it

has closed on seven of those unexpired leases.  Regrettably, that has not been the case with the

BBBY Lease.  Indeed, the ink on the Auction transcript had barely dried before the Michaels' bid

for the BBBY Lease was treated as a "free option" against which post-Auction bids were

welcomed and, frankly, encouraged.

2.      More specifically, immediately following the Auction, Pinnacle Hills, LLC,[3] the

landlord for the BBBY Lease (the "**Landlord**")—which  had the opportunity to bid for the BBBY

Lease under the Procedures Order and could have participated in the Auction but, for unknown

reasons, failed to submit a bid or otherwise challenge the Michaels bid for the BBBY Lease—

commenced time-consuming, costly litigation in an effort to prevent the sale and assignment of

the BBBY Lease to Michaels.  In addition to objecting to the proposed sale and assignment of the

BBBY Lease to Michaels, the Landlord also sought to reopen the results of the Auction by

submitting a new, untimely bid for the BBBY Lease, which led the Debtors to demand (without

notice to the Court or the other parties in interest) additional consideration from Michaels.

Michaels was disappointed by the Debtors' effort to reopen the Auction but nevertheless agreed

to increase its original $100,000 bid by roughly $900,000, to a total of $1,000,000.  That increased

bid amount included $150,000, which the Debtors asserted was necessary to cover the costs of

---

[3] Brookfield Properties Retail, Inc. serves as managing agent for the Landlord with respect to the BBBY Lease.  *See*
Docket No. 1927, ¶ 2.

litigation with the Landlord.  Michaels ultimately prevailed in that litigation and immediately

engaged with the Debtors and the Landlord to negotiate a form of order reflecting the Court's

judgment.

3.      Given this record, and the extensive efforts taken by the Landlord to prevent the

Debtors from assuming and assigning the BBBY Lease to Michaels, Michaels was disappointed

but not entirely surprised to learn after the August 30 hearing that Hobby Lobby—the Landlord's

preferred candidate to take assignment of the BBBY Lease and the tenant whose lease was the

subject of the August 30 hearing—was seeking to bid on the BBBY Lease.  Regrettably, rather

than rejecting this unprecedented gambit launched by Hobby Lobby *after the Sale and

Assignment Hearing had been concluded*, the Debtors welcomed the opportunity to reopen the

Auction, which occurred on the afternoon of September 27.

4.      The Court should not sanction this unprecedented collateral attack on its Procedures

Order and the judgment rendered at the August 30 hearing.  Doing so would undermine the terms

of the Procedures Order.  And the Court's decision to order the auction reopened should be

reconsidered on a full record and with knowledge of all of the facts to avoid creating a dangerous

precedent that would incentivize parties to forego participating at an auction in the hopes of

bidding in connection with (or, as is the case here, *after*) a sale hearing.

5.      There is no reason to vary these rules in this case for the benefit of Hobby Lobby.

Hobby Lobby—whose counsel (Gibbon P.C.) is a retained professional in these cases,[4] and had

actual knowledge of Michaels' bid for the BBBY Lease months prior to the Assumption and

Assignment Hearing, where its lease was at issue—did not participate at the Auction.  Moreover,

its untimely bid came three months *after* the Auction and *weeks after the Court had rendered its*

_____
[4] *See Order Granting Application to Employ Gibbons P.C. as Special Counsel for the Official Committee of Unsecured Creditors* [Docket No. 1333].

*judgment on the Landlord's objection to the proposed sale and assignment of the BBBY Lease to Michaels*.

6.      While the evidentiary record leading up to last week's Reopened Auction leaves much to be desired, the limited information available makes it clear that Hobby Lobby was secretly working hand-in-glove with the Landlord.  Indeed, communications show that Hobby Lobby and the Landlord were discussing the BBBY Lease and assignment of the BBBY Lease to Hobby Lobby (and a further sub-assignee of Hobby Lobby) as opposed to Michaels before the Sale and Assignment Hearing.  And, once Hobby Lobby submitted its bid, Hobby Lobby promptly forwarded a copy of that bid to the Landlord's counsel.

7.      Rather than standing by their sale process—which was conducted by independent professionals and resulted in the sale and assignment of hundreds of leases—the Debtors instead acquiesced to the Landlord's and Hobby Lobby's maneuvers and sought to reopen the Auction. As set forth in greater detail herein, it was inappropriate to reopen the Auction under such circumstances where the Landlord was effectively acting as "creditor in possession" to ensure that its preferred bidder took assignment of the BBBY Lease.  Michaels expected the Debtors **and** the other qualified bidders (*i.e.*, the Landlord and Hobby Lobby) to play by the rules.  While Michaels has not been afforded the opportunity to conduct any discovery following the August 30 Assumption and Assignment Hearing, the thin record presented to the Court is riddled with errors that throws the integrity of the Reopened Auction into further dispute.  Moreover, the major flaws in the Reopened Auction—namely, that the Landlord and Hobby Lobby would collectively seek to deny assignment of the BBBY Lease to Michaels—were plainly known **before** the Auction was reopened.  Rather than taking steps to ensure that collusion had not and would not occur, the

Debtors *made it easier* for bidders to collude by, for example, initially agreeing to modify the Procedures Order to *permit* conversations between any qualified bidder.

8.      With this record in mind, there is no question that the Court should refuse to approve the sale and assignment of the BBBY Lease to Hobby Lobby for at least four reasons.

9.      *First*, as noted above and further detailed herein, the Debtors should not have requested—and the Court should not have permitted the Debtors—to reopen the Auction. Michaels was the sole bidder at the Auction for the BBBY Lease. Michaels followed the Court's Procedures Order and participated in the Auction in reliance on the belief the requirements set forth in the Procedures Order would be enforced. The Landlord knew about the Auction and its counsel attended the Auction, and when presented the opportunity to bid, *sat on its hands and did not bid for the BBBY Lease*. Instead of participating in a transparent and Court-sanctioned process, the Landlord instead engaged in a lengthy, time-consuming litigation and, when that litigation appeared poised to fail, engaged with the Debtors in secret to submit its own bid *after the Auction closed*. The Procedures Order does not allow this conduct, and the Auction should not have been reopened thereby rewarding such behavior. Rather, the Court should have enforced its decision approving the assignment to Michaels—the only party who bid at the Auction and acted in compliance with the Court's Procedures Order.

10.      *Second*, even if the Reopened Auction was permissible, which it was not, the Court should not approve Hobby Lobby's bid. As Michaels stated at the status conference on September 26, 2023, Michaels was prepared to participate in the Reopened Auction solely to the extent that the Reopened Auction was conducted in accordance with the Procedures Order. In particular, Michaels explained that it was concerned that the Landlord would seek to tip the scales in favor of its preferred bidder, Hobby Lobby, to the detriment of Michaels. Rather than seeking to prevent

that type of behavior, the Debtors made it easier for collusion between Hobby Lobby and the Landlord to occur by proposing to modify the Procedures Order mere hours before the opening of the Reopened Auction by providing (in modified bidding procedures) that "each Bidding Party shall be permitted to discuss the terms of any bid with any other Bidding Party." In other words, in the face of criticism by Michaels that the Landlord may be seeking to subsidize the Hobby Lobby bid, the Debtors sought to permit conversations between potential qualified bidders. This is especially troubling given that counsel to Hobby Lobby has all but conceded in correspondence with the Court that Hobby Lobby and the Landlord coordinated in connection with the Reopened Auction. Tellingly, counsel for Hobby Lobby has failed to respond to counsel to Michaels' multiple emails asking, point blank, for Hobby Lobby to share any communications with the Landlord regarding its bid and the Reopened Auction. Moreover, when asked if they had received all disclosures related to communications between the qualified bidders, counsel to the Debtors said they had not requested that information even though it was required by the Procedures Order. *See* Procedures Order § L ("Qualified Bidders shall disclose to the Debtors all communications with other Qualified Bidders following the submission of a Qualified Bid until the sale of the Lease Assets is consummated."). Likewise, Hobby Lobby refused to provide such disclosures even though counsel to Michaels requested such disclosures from Hobby Lobby at least two separate times.

11.     ***Third***, as a result of Hobby Lobby's conduct and its refusal to demonstrate compliance with the Procedures Order, Hobby Lobby is not entitled to a good faith finding. Nor is Hobby Lobby entitled to a finding that its bid was highest and best because the Debtors have (i) apparently, and incorrectly, valued Michaels' waiver of its substantial contribution at $0 and

(ii) indicated that Hobby Lobby's bid includes undisclosed remuneration that was not mentioned at the auction.

12.    *Finally*, a hearing on the assignment to Hobby Lobby is inappropriate at this time, given that Michaels has not been afforded any opportunity to develop the record by taking discovery and investigating relevant facts regarding the proposed assignment and winning bidder. As shown above, there is ample evidence of improper conduct and non-compliance with the Procedures Order, and this Court should not rule on an incomplete record and without Michaels being given an adequate opportunity to explore all of the facts surrounding the Reopened Auction. As this Court is aware, the Landlord was afforded over a month to litigate its objection to the assignment to Michaels, as well as ample discovery and the right to file a sur-reply.  As a matter of due process, there is no basis for Michaels being deprived of any ability to take targeted discovery and develop its case.  Given the importance of the issues at stake—including the integrity of this Court's orders and the bankruptcy auction process in general—the Court should not proceed on an inadequate record at this time, and if it must so proceed, given the substantial questions raised, it should deny approval of the assignment of the BBBY Lease to Hobby Lobby for the reasons set forth below.

## **BACKGROUND**

A.    **The Lease Agreements**

13.    On or about June 1, 2007, the debtor Bed Bath & Beyond, Inc. entered into the BBBY Lease with the Landlord.[5]  The terms of the BBBY Lease permitted the assignment to

---

[5]  Brookfield Properties Retail, Inc. serves as managing agent for the Landlord with respect to the BBBY Lease.  *See* Docket No. 1927, ¶ 2.

Michaels.  *See* BBBY Lease § 1.1.27; Docket No. 2115, Aug. 30, 2023 Hr'g Tr. (the "**Aug. 30**

**Hr'g Tr.**") at 119:14-16.

14.    Almost 15 years after the effective date of the BBBY Lease, the Landlord leased a

different retail space located in the same shopping center to Hobby Lobby.  Under this lease

agreement with Hobby Lobby (the "**Hobby Lobby Lease**"), the Landlord granted Hobby Lobby

an exclusive use right, which prohibited the Landlord from leasing any space in the Promenade to

any party that would "sell art supplies, craft supplies, fabrics, photo frames, frames, framed art,

wall art, and wall decor."  *See* Hobby Lobby Lease § 7.3.

15.    However, the exclusive use right granted to Hobby Lobby was never enforceable

against the Debtors under the BBBY Lease, which long pre-dated the Hobby Lobby Lease.

**B.    The Procedures Order and Michaels' Sole Bid at Auction**

16.    On May 22, 2023, this Court entered the Procedures Order to facilitate a fair and

orderly process for the sale or other disposition of the Debtors' unexpired leases of non-residential

real property.  Pursuant to the Procedures Order, on June 26, 2023, the Debtors held the Auction

for over 150 leases of the Debtors, including the BBBY Lease.  *See* Docket No. 456 (notifying

parties in interest of the lease sale auction).  Michaels was the sole bidder for the BBBY Lease at

the Auction.  The Landlord and Hobby Lobby did not bid on the BBBY Lease.[6]  After the Auction

concluded, the Debtors filed notices identifying Michaels as the successful bidder for the BBBY

Lease, with no back-up bidder.  *See* Docket No. 1114 (successful bidder notice) and Docket No.

1157 (assumption and assignment notice).

---

[6]  The Landlord had actual notice of Michaels' bid as of June 13, 2023. *See* **Exhibit 1** attached hereto, containing a
June 13, 2023 email exchange with Mr. Brian Tader at Brookfield demonstrating that weeks prior to the auction,
Landlord was aware of Michaels' intent to bid on the Lease. Mr. Tader is listed on the Brookfield Properties website
as the retail leasing contact for the shopping center at which the Lease is located. *See*
https://www.brookfieldproperties.com/en/our-properties/pinnacle-hills-promenade-441.html. Moreover, Landlord's
counsel was present at the Auction. *See* Docket No. 1397 (June 26, 2023 Auction Transcript), at 3:9.

17.    The Landlord objected to the assignment to Michaels, leading to multiple rounds of briefing, a discovery dispute, document productions and depositions. *See* Docket No. 1323, 1353, 1926, 1927, 1928, 2059, 2062. ***Hobby Lobby, despite direct knowledge of the successful and winning bid by Michaels at the initial Auction, never objected to the sale and assignment of the BBBY Lease to Michaels and failed to even appear at the Assumption and Assignment Hearing*** (defined below). *See* **Exhibits 1–2**.

18.    Additionally, subsequent to Michaels submitting its successful (and timely) bid, on August 21, 2023 (approximately two months after the Auction), the Debtors informed Michaels that the Landlord had made an untimely bid for $300,000.  *See* Declaration of Robert LeHane (hereinafter, the "**LeHane Decl.**"; a copy of which is attached hereto as **Exhibit 3**), at ¶ 8.  The Debtors requested that Michaels increase the amount of its bid, and Michaels agreed to raise its bid to $850,000.  *See* LeHane Decl. at ¶ 9.  At the insistence of Debtors, Michaels also executed a Letter Agreement (as defined in the LeHane Decl.) to defray up to $150,000 in costs and expenses for the estate in litigating the Landlord's objection to the assignment.  *See* **Exhibit 4**; *see also* LeHane Decl. at ¶ 19.  The Landlord apparently continued to raise its bid, but the Debtors apparently rejected these offers in favor of Michaels.  *See* LeHane Decl. at ¶ 11.

**C.    The Assumption and Assignment Hearing**

19.    On August 30, 2023, following extensive litigation by the Landlord and over two months after Michaels had submitted its successful bid at the Auction, this Court held a contested hearing on the proposed assignment of the BBBY Lease to Michaels (the "**Assumption and Assignment Hearing**").  *See generally* Aug. 30 Hr'g Tr.  At that hearing, the Debtors sought approval from the Court to assign the BBBY Lease to Michaels.  The Landlord failed to make any objection to the Michaels bid being highest or best.  Rather, the Landlord contested the assignment to Michaels solely only on adequate assurance grounds pursuant to section 365(b)(3)(C)-(D) of the

Bankruptcy Code.  *See* Aug. 30 Hr'g Tr.  The Landlord did not inform the Court that it had submitted an untimely bid for the BBBY Lease, or otherwise object to the assignment to Michaels based on the fact that Michaels had improved its bid in response to pressure from the Debtors to overcome the Landlord's improper bid.

**D.        The Bench Ruling Approving the Assignment to Michaels**

20.        At the conclusion of the Assumption and Assignment Hearing, after considering the arguments of counsel and the evidence consensually admitted, the Court issued a bench ruling, approving the sale and assignment of the BBBY Lease to Michaels and overruling the Landlord's objection (the "**Bench Ruling**").  *See* Aug. 30 Hr'g Tr. at 107:24-135:17. The Court found, among other things, that Michaels' bid maximized value for the estates. *See* Aug. 30 Hr'g Tr. at 128:3-7. Neither the Landlord nor Hobby Lobby objected to or challenged these findings at or prior to the Bench Ruling.

**E.        Hobby Lobby's Improper Bid and the Reopening of the Auction**

21.        On September 20, 2023, the Debtors informed the Court that Hobby Lobby—which had not bid at the auction or objected to the assignment to Michaels—had submitted an untimely bid for the BBBY Lease pursuant to letters dated September 12 and 15, 2023 to Debtors' counsel. *See* **Exhibits 5–7**.  In addition to Hobby Lobby's bid being late, documents produced in discovery demonstrated that Hobby Lobby had been in contact with the Landlord regarding the BBBY Lease—actions which were expressly prohibited by the Procedures Order.[7]    Despite these

---

[7] After the Bench Ruling but prior to the Conference, Michaels submitted letters to the Court dated September 22 and September 25, 2023 (the "**Letters**"), attached hereto as **Exhibit 8** and **Exhibit 9**, which raised objections and issues in connection with the Debtors', the Landlord's, and Hobby Lobby's actions, including but not limited to communications between Hobby Lobby and the Landlord regarding Michaels' original June 2023 bid for the BBBY Lease and an apparent August 21, 2023 agreement between the Landlord and Hobby Lobby for the Landlord to assign the BBBY Lease to Hobby Lobby (who would then assign the BBBY Lease to a Christian book seller). The Letters, including the facts and exhibits contained therein, are incorporated herein in their entirety.

improprieties, the Debtors requested a status conference with the Court to re-open the auction to allow Hobby Lobby to potentially outbid Michaels.  *See* **Exhibit 7**.  Michaels objected.

22.     On September 26, 2023, counsel to the Debtors, the Landlord, Hobby Lobby, and Michaels attended a status conference with the Court (the "**Conference**").  At the Conference, the Court authorized the Debtors to reopen the Auction for the BBBY Lease, subject to the requirements of the Procedures Order.

23.     After the Conference and in advance of the Reopened Auction, the Debtors sent an email to Michaels, attached hereto as **Exhibit 10**, pursuant to which the Debtors proposed to jettison certain of the bidding procedures approved under the Procedures Order.  Specifically, the Debtors' email provided that "Hobby Lobby, Pinnacle Hills, and Michaels (the '**Bidding Parties**') shall each be deemed to be Qualified Bidders" and "each Bidding Party shall be permitted to discuss the terms of any bid with any other party."  *See* **Exhibit 10** ¶¶ 1–2.  Michaels objected to this request on the grounds that the Procedures Order requires the opposite: "Debtors, in consultation with the Consultation Parties, **shall ascertain whether the Successful Bidder(s)** and the Backup Bidder(s) are insiders of one or more of the Debtors, **whether each applicable Sale represents an arm's-length transaction between the parties, made without fraud or collusion, and whether there has been any attempt by either party to take any unfair advantage of the other** . . ." Bid Procedures § J (emphasis added).  The Debtors did not move the Court to modify the Procedures Order, nor did the Court modify the Procedures Order or state that any different set of rules would or could apply to the Reopened Auction.

24.     At the beginning of the Reopened Auction, counsel to Michaels objected because the Debtors' "new" bidding procedures for the Reopened Auction violated the Procedures Order.  Further, Michaels asked whether the Debtors had received disclosure of any communications

among the Qualified Bidders, including Hobby Lobby and the Landlord, as the Procedures Order required. *See* Procedures Order § L ("Qualified Bidders shall disclose to the Debtors all communications with other Qualified Bidders following the submission of a Qualified Bid until the sale of the Lease Assets is consummated."). Counsel to the Debtors (a) agreed to retract the modification that permitted Bidding Parties to discuss the terms of a bid with any other party, recognizing that the new rule did not comport with the Procedures Order but (b) admitted that no such disclosures, as required under the Procedures Order, had been provided to the Debtors. Nonetheless, the Debtors plowed ahead with the Reopened Auction and solicited bids on the BBBY Lease. After multiple rounds of bidding, Michaels submitted a final bid of $2.05 million in cash consideration plus a waiver of its substantial contribution claims. Hobby Lobby countered with a final bid of $2.1 million in cash consideration.

25.     After the final bids, counsel to the Debtors informed Michaels that the Debtors, in consultation with their consultation parties, had selected Hobby Lobby as the successful bidder and Michaels as the backup bidder. The Debtors informed Michaels that the successful bid from Hobby Lobby included, "***among other things***, $2.1 million in cash consideration" and the backup bid from Michaels included $2.05 million in cash consideration. *See* Sept. 27, 2023 email from Debtors' counsel attached hereto as **Exhibit 11** (emphasis added). The Debtors did not provide any detail as to what Hobby Lobby's bid included other than the $2.1 million in cash consideration, nor did they acknowledge Michaels' offer to waive its potential substantial contribution claims.

## ARGUMENT

### I.     The Bench Ruling with Respect to the Sale and Assignment to Michaels Should Not Have Been Disturbed and the Auction Should Not Have Been Reopened

26.     Bankruptcy courts have recognized that accepting a late bid that fails to comply with court-approved bidding procedures "undermines confidence in judicial sales and discourages

prospective purchasers from making their best offers in a timely and efficient manner." *In re Sebert*, No. 07-15509, 2008 WL 686264, at *2 (E.D. Mich. Mar. 11, 2008); *In re Bigler, LP*, 443 B.R. 101, 117 (Bankr. S.D. Tex. 2010) ("[W]hen the bid procedures are clear; the bid procedures are not complex; the parties are sophisticated; there is no collusion or fraud; and the auction price is not grossly inadequate—the highest priority should be on maintaining the integrity of the system."); *In re Reading Broadcasting, Inc.*, 386 B.R. 562, 575-76 (Bankr. E.D. Pa. 2008) ("Courts have long concluded that the ability to achieve the highest price would be undermined if bankruptcy sales were not considered final at the conclusion of an auction, unless clear evidence of impropriety in the sale process has been demonstrated.").

27.    Here, the Court should not have permitted the Debtors to reopen the Auction, providing Hobby Lobby—a party that had not bid at the Auction or raised any objection to the assignment to Michaels either before or during the Assumption and Assignment Hearing—with the opportunity to bid on the BBBY Lease after the Bench Ruling.  Michaels submitted the highest and best—indeed, only—bid for the BBBY Lease at the Court-approved Auction (and later increased its bid at the Debtors' request from total consideration of $100,000 to $850,000, plus an agreement to reimburse the estate up to $150,000 in fees and expenses).  The sale and assignment of the BBBY Lease to Michaels was approved after a contested hearing at which neither the Landlord nor Hobby Lobby objected to Michaels' bid as not being highest or best or raised any issues with Michaels' agreement to increase its bid.

28.    The Court erred by reopening the auction because the record demonstrated that both the Landlord and Hobby Lobby, which sought to submit late, untimely bids, had unclean hands. Although the Landlord feigned dismay that Michaels had agreed to pay a portion of the Debtors' litigation fees, the Landlord (i) had not bid at the Auction, and therefore waived the ability to

challenge the good faith of Michaels' bid, in particular, because it did not make such an objection before or during the Assumption and Assignment Hearing, (ii) caused Michaels to enter into the agreement to pay the Debtors' litigation fees by making an untimely and improper bid after the Auction, forcing Michaels to improve its bid at the Debtors' request, and (iii) colluded with Hobby Lobby regarding its untimely bid for the BBBY Lease.

29.    Indeed, the Court should not have disturbed the Bench Ruling in order to reopen the Auction on account of Hobby Lobby's purportedly greater but untimely, non-compliant bid. *First*, the Landlord's and Hobby Lobby's untimely bids were not "Qualified Bids" under the Procedures Order. *See* Procedures Order § D.[8]  The bid deadline for the BBBY Lease was June 22, 2023 at 5:00pm (prevailing Eastern Time). *See* Procedures Order ¶ 8.  In addition to the Landlord receiving actual notice (*see* Docket No. 467), the Debtors published the Notice of the Procedures Order in a national edition of *The New York Times* on May 30, 2023, over three weeks before the Bid Deadline.  And news of the Debtors' bankruptcy and proposed asset sale was reported in numerous online publications. S*ee,    e.g.,* https://www.marketscreener.com/quote/stock/BED-BATH-BEYOND-INC-4852/news/Bidding-Procedure-Approved-for-Bed-Bath-Beyond-Inc-44493298/.  More than two months after the bid deadline, Hobby Lobby offered to purchase the BBBY Lease for $1.35 million.  Hobby Lobby has never offered, and cannot offer, any excuse for its failure to bid on the BBBY Lease at the Auction. The Court erred by condoning Hobby Lobby's tactic of lying in wait until after the Court held an

---

[8] Even assuming that the Debtors could have entertained the Landlord's improper bid prior to the Bench Ruling pursuant to the Debtors' fiduciary out, the fiduciary out is not a remedy for a bidder who failed to (i) attend the auction, (ii) make a bid prior to the Bench Ruling, and/or (iii) appear at the Bench Ruling where the Court approved the highest and best bidder. Nor is it a remedy to overturn a court's ruling in order to cure a bidder's failures. Finality and the integrity of the Court-approved sale process are important policy considerations that must be weighed against use of a fiduciary out to upset a bid after the close of an auction, much less approval of a lease sale and assignment at a sale hearing.

evidentiary hearing and approved the sale and assignment to Michaels before submitting a competing bid.  Accepting the untimely Hobby Lobby bid and failing to approve the sale and assignment of the BBBY Lease to Michaels was a clear violation and affront to the Court-approved auction process, which provided that successful bidders were required to attend and submit bids at the auction or forever be foreclosed from bidding.  *See* Procedures Order § I.iii.

30.    ***Second***, the Landlord and Hobby Lobby were colluding about wresting the BBBY Lease from Michaels almost immediately after the Auction concluded.  A condition of the Procedures Order is that each qualified bidder participating at an auction is required to confirm on the record at the auction that (i) it has not engaged in any collusion with respect to the bidding and (ii) its qualified bid is a good-faith *bona fide* offer. *See* Procedures Order § I.iv.  Indeed, in accordance with the Procedures Order, at the Auction and in connection with its bid, among other things, each bidder attested that it had not engaged in collusive bidding.  *See* Docket No. 1397 (June 26, 2023 Auction Tr.), at 10:9 –11:5; Procedures Order § I.iv (terms of lease auction); *see also* Proc. Order Ex. C, Bidder Registration Form § i.  Even if they were eligible to bid (and they were not), neither the Landlord nor Hobby Lobby satisfied these requirements in submitting their late bids.

31.    ***Third***, since the Landlord did not object to the assignment to Michaels on the grounds that Michaels was not the highest and best bid and therefore, the Court should not have allowed the Landlord to raise that objection after the Bench Ruling. *See* Aug. 30 Transcript at 111:7–10 (finding, after confirming with the objecting parties, that "the objections that are the focus of today's hearing relate exclusively to the tenant mix and exclusive use provisions in the leases and only those grounds, 365(b)(3)(C) and (D), as acknowledged by the parties").

32.     **Fourth**, allowing the Debtors and third-parties to violate the Procedures Order sets a dangerous precedent by providing third parties an effective veto over proposed assignments of unexpired leases after the close of an auction and after the Court adjudicates objections and declares a winning bidder. This Court should not have permitted this kind of gamesmanship to taint the process. *See* Aug. 8, 2023 Hr'g Tr., *In re Surgalign Holdings, Inc.*, No. 23-90731 (CML) (Bankr. S.D. Tex. Aug. 8, 2023) [Docket No. 349] (declining to accept a late topping bid after the close of the auction because it violated the court-sanctioned sale and auction process, explaining "someone's not going to show up at the eleventh hour for whatever reason and bypass an entire order that I entered").

33.     Even worse, here, not only was the Auction closed, but this Court had already approved the sale and assignment of the BBBY Lease to Michaels.  Allowing the untimely bid by Hobby Lobby—a party that sat on the sidelines for months despite clearly knowing about the auction process and related litigation—to supplant the Court-approved assignment to Michaels "certainly tend[s] to discourage and prevent bidding than a judicial determination that [the highest bidder may be deprived of] the advantage of his accepted bid by an offer of another person, subsequently made, to bid higher on resale." *In re Stanley Engineering Corp.*, 164 F.2d 316, 319 (3d Cir. 1947).[9]

---

[9] Indeed, Michaels is not aware of any case where a bankruptcy court has authorized the reopening of bids for a new bid submitted after court approval of the successful bid following a sale/assignment hearing. *Cf. In re Reading Broadcasting, Inc.*, 386 B.R. 562, 575-76 (Bankr. E.D. Pa. 2008) ("Courts have long concluded that the ability to achieve the highest price would be undermined if bankruptcy sales were not considered final at the conclusion of an auction, unless clear evidence of impropriety in the sale process has been demonstrated. To easily reopen the bidding process would chill future interest in purchasing property from a bankruptcy estate, since bidders could not feel secure at the conclusion of an auction . . . thereby driving down the market value of the bankruptcy estate property in general . . . If parties are to be encouraged to bid at trustee-conducted bankruptcy sales 'there must be stability in such sales and a time must come when a fair bid is accepted and the proceedings are ended.'") (citing, *inter alia*, *Stanley Engineering Corp.*, 164 F.2d at 319 ("Public policy requires stability in such sales . . . To induce bidding at such sales and reliance upon them, the purpose of the law is that they shall be final . . . they are not to be disturbed except for substantial reasons.")); *see also In re Bryan*, No. 12-31486 (WRS), 2013 WL 4716194, at *3 (Bankr. M.D. Ala. Sept. 3, 2013) ("The Court agrees with the proposition that 'a time must come when a fair bid is accepted and the proceedings are ended . . . That time arrived in this case when Hamm ended the bidding process, accepted Lawley's

34.     When courts have reopened bidding and approved late bids, they generally have

done so based upon circumstances not present here.  *See, e.g. Brink v. Payless Cashways, Inc. (In*

*re Payless Cashways, Inc.)*, 281 B.R. 648, 650 (B.A.P. 8th Cir. 2002) (no prior Court approval of

bidding procedures); *Four B. Corp. v. Food Barn Stores (In re Food Barn Stores)*, 107 F.3d 558,

566 (8th Cir. 1997) ("very informal and flexible bidding process" with "auction marked by a lack

of applicable rules and guidelines" and "no definite time by which the court required parties to

submit offers"); *In re Fin. News Network, Inc.*, 980 F.2d 165, 170 (2d Cir. 1992) (reopening

bidding to allow previous auction participants to increase bids where "[n]o clear winner emerged

from [initial auction]").

35.     None of these considerations applied to Hobby Lobby, which simply waited far too

long and used an increased purchase price to distract the Court from its unjustified failure to

comply with the Procedures Order.  Hobby Lobby's bid at the Reopened Auction does not justify

completely undermining the fairness of the Court-approved lease sale procedures, which were

carefully developed by the Debtors, judiciously approved by the Court, and assiduously followed

and relied upon by Michaels.  By reopening the Auction, the Court provided Hobby Lobby with

an unwarranted, material advantage (*i.e.*, hold back to see who bid at the Auction and at what price

prior to submitting its own initial bid). The Court should not have undermined confidence in the

bankruptcy sale process by contravening its own Procedures Order.

---

bid, and filed a Notice of Sale with the Court. It was the expectation of the bidders that the best offer would win . . .
This sale has reached a stage at which the need for finality and deference to the auction process should win out."
(internal quotations omitted)); *Bigler*, 443 B.R. at 107 (declining to reopen auction to would not be reopened to allow
backup bidder to submit a topping bid that was $500,000 higher than winning bidder's $20.5 million bid).

## II.    The Reopened Auction Did Not Comply with the Procedures Order and the Results Must Therefore Be Set Aside

36.    Even if the Auction should have been reopened (which it should not have been), the Court should set aside the results of the Reopened Auction because it was conducted in violation of the Procedures Order.[10]

37.    The Procedures Order unequivocally provides that "Qualified Bidders shall disclose to the Debtors all communications with other Qualified Bidders following the submission of a Qualified Bid until the sale of the Lease Assets is consummated."  Procedures Order § L. Despite the evidence of prior interactions between the Landlord and Hobby Lobby prior to the Reopened Auction, which was produced in discovery in connection with the Sale and Assignment Hearing, *see* **Exhibit 13**, the Debtors failed to require Hobby Lobby and the Landlord to disclose communications between the two of them leading up to the Reopened Auction.  The Debtors also failed to "ascertain whether the Successful Bidder(s) and the Backup Bidder(s)" and the "applicable Sale represents an arm's-length transaction between the parties, made without fraud or collusion, and whether there has been any attempt by either party to take any unfair advantage of the other" **as required** by paragraph J of the Lease Sale Procedures (as defined in and annexed to the Procedures Order).  Instead, the Debtors admitted that they had requested no such disclosures

---

[10] As an initial matter, Michaels has standing to challenge the Reopened Auction because Michaels is the backup bidder and the actions of Hobby Lobby destroyed the "intrinsic fairness" of the sale transaction such that Hobby Lobby could never be considered a good faith purchaser. *In re Waypoint Leasing Holdings Ltd.*, 607 B.R. 143, 156 (Bankr. S.D.N.Y. 2019); *see also In re Colony Hill Assocs.*, 111 F.3d 269, 274 (2d Cir. 1997) (finding that unsuccessful bidder had standing to challenge the intrinsic fairness of sale and good faith status of purchaser); *cf. In re RTI Holding Co., LLC*, No. 20-12456, 2021 WL 4994414, at *7 (Bankr. D. Del. Oct. 27, 2021) ("BNA Associates was a bidder during the sales process before its cancellation . . . Thus, BNA Associates had standing to examine, test, and object to the sufficiency of the sales process, and the decision to cancel the Auction.") (citing *Colony Hill Assocs*).  Indeed, it is apparent that the Reopened Auction and sale and assignment of the BBBY Lease was tainted by bad faith and collusion by and among Hobby Lobby and the Landlord.

and were willing to rely upon Hobby Lobby's and the Landlord's representations that there was no collusion.[11]

38.     Such disclosures are not only routine, but they are particularly important in circumstances such as these cases, where extensive emails and communications between the Landlord and Hobby Lobby seeking to prevent Michaels from taking assignment of the BBBY Lease to permit Hobby Lobby to take assignment of the space or a portion thereof have already been produced.  The Court should therefore set aside the results of the Reopened Auction, and require, at a minimum, disclosure of any such communications.

### III.    Hobby Lobby Is Not Entitled to a Good Faith Finding, Nor Was Hobby Lobby's Bid the Highest and Best

39.     Even if the sale and assignment to Hobby Lobby is approved, there can be no finding that Hobby Lobby acted in good faith or that it submitted the highest and best bid for the BBBY Lease.  No evidence has been presented to support such findings, and, to the contrary, the only evidence before the Court—including the emails between Hobby Lobby and the Landlord attached to the Letters submitted by Michaels—shows the opposite.  *See* **Exhibits 2, 8–9, 13**.

40.     First, Hobby Lobby's conduct fails to meet the requirements of a good faith finding under section 363(m) of the Bankruptcy Code.  Hobby Lobby's conduct in connection with the Reopened Auction constituted bad faith because it "involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147 (3d Cir. 1986) (citing *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978); *see also Taylor v. Lake (In re*

---

[11] In an email from Hobby Lobby's counsel to the Court on September 28, 2023, counsel for Hobby Lobby stated that there were no communications between Michaels and Hobby Lobby in connection with the Reopened Auction.  *See* **Exhibit 12** attached hereto.  However, Hobby Lobby never confirmed on the record at the Reopened Auction or otherwise that there were no communications between Hobby Lobby and the Landlord—both of whom were deemed "Qualified Bidders"—in connection with Hobby Lobby's bid.

*Cada Invs.)*, 664 F.2d 1158, 1162 (9th Cir. 1981) ("Courts have generally appeared willing to set aside confirmed sales that were 'tinged with fraud, error or similar defects which would in equity affect the validity of any private transaction.").

41.     Discovery revealed that Hobby Lobby was discussing the BBBY Lease and alternative tenants other than Michaels with the Landlord months before the Bench Ruling.  *See* **Exhibit 13**.  The Landlord (despite being aware of the fact that Michaels planned to bid on the BBBY Lease at the Auction well before the Auction) produced emails that reflect discussions between the Landlord and Hobby Lobby regarding Michaels' winning bid at the Auction as far back as June 30, 2023, and reveal collusive behavior between those two parties. *See* **Exhibit 2**. Specifically, on or about August 21, 2023 (*i.e.*, more than a week before the Bench Ruling), the Landlord was conducting secret discussions with Hobby Lobby to assign the BBBY Lease to Hobby Lobby, with Hobby Lobby then planning to sublease the premises to Mardel, a Christian bookstore retailer. *See* **Exhibit 13**.  Hobby Lobby engaged in these secret, backroom efforts to subvert the Court-sanctioned auction process, rather than showing up in Court and objecting, presumably because Hobby Lobby believed that its exclusive use provision—granted more than a decade after the BBBY Lease was executed—would not "appl[y] to the Bed Bath lease given the age of it."  *See* **Exhibit 2**.  Indeed, despite case law directly on point holding that exclusivity provisions in other tenant leases do not affect assignment of a debtor lease with no such restrictions, the Landlord continued to needlessly prosecute its exclusivity objections, wasting this Court's and Michaels' time and valuable resources in an effort to delay authorization of and supplant the Debtors' chosen assignee, Michaels, for its choice, Hobby Lobby.  *See* Docket No. 1323, 1353, 1926, 1927, 1928, 2059, 2062.

42.     Moreover, evidence suggests that Hobby Lobby and the Landlord continued to coordinate among themselves in anticipation of the Reopened Auction.  In an email to the Court, counsel to Hobby Lobby stated that "[c]onsistent with section L of the Lease Sale Procedures Orders quoted by Michaels' co-counsel in its email found below, there were absolutely no communications whatsoever between Hobby Lobby and [Michaels]."  *See* **Exhibit 12**.  This statement purposefully avoids the real question: what were the communications regarding the Reopened Auction between Hobby Lobby and the Landlord, a party deemed a Qualified Bidder at both the Auction ***and*** the Reopened Auction?  Michaels' counsel twice emailed counsel to Hobby Lobby to ask this question; counsel to Hobby Lobby simply did not respond.  *See id.*  Given this record, it is impossible for the Court to make a finding that Hobby Lobby acted in good faith.  Indeed, despite repeated inquiries to the Debtors' counsel, there has been no confirmation one way or the other whether the Landlord is subsidizing the Hobby Lobby bid by, for example, discounting Hobby Lobby's rent or offering preferred economics for the BBBY Lease if it is assigned to Hobby Lobby.

43.     In evaluating whether there was collusion between different bidders, courts find that bidders' nondisclosure of an agreement indicates collusion.  *See, e.g.*, *In re GSC, Inc.*, 453 B.R. 132, 182 (Bankr. S.D.N.Y. 2011); *Colony Hill Assocs.*, 111 F.3d at 277.  Hobby Lobby's repeated refusals to produce its communications with the Landlord leading up to the Reopened Auction implies that the Landlord and Hobby Lobby (again, ***both*** of which were Qualified Bidders for the Reopened Auction) may have engaged in conduct that prevented the estates from realizing the full value attributable to the BBBY Lease.  The Procedures Order specifically requires such disclosures to prevent this situation and until those disclosures are made and examined, there can be no finding of good faith.

44.     Hobby Lobby is not a financial buyer; rather, it is, as counsel to Hobby Lobby has admitted in a September 28, 2023 email to the Court, an established "competitor[] [of Michaels] in the arts & crafts retail space."  *See* **Exhibit 12**.  The Landlord also has a vested interest in keeping Michaels out of the shopping center as evidenced by its vigorous objections raised to the assignment of the BBBY Lease to Michaels.  Together, the Landlord and Hobby Lobby have improperly conspired to prevent Michaels from consummating the assignment of the BBBY Lease. Simply put, their actions constitute bad faith and are collusive within the meaning of section 365(n) of the Bankruptcy Code.

45.     Second, Hobby Lobby's bid is not the highest and best.  The Debtors mischaracterized Michaels' bid in the email announcing the results from the Reopened Auction by failing to include Michaels' waiver of its substantial contribution claim (in connection with the substantial and material fees Michaels spent in reliance upon its bid being the only qualified bid and in defeating the Landlord's objection to the proposed assignment to Michaels which enabled the estate to then receive the late bid from Hobby Lobby).[12]  Additionally, the announcement indicated that Hobby Lobby's final bid included renumeration other than the cash bid, which was all that was disclosed on the record at the Reopened Auction.  There is no evidence that Hobby Lobby's bid is, in fact, greater than Michaels' bid and the Court should not enter a finding that Hobby Lobby submitted the highest and best bid.

## IV.     This Court Should Briefly Postpone the Hearing on Hobby Lobby's Bid So That It Can Rule on a Full Record.

46.     As the Court is aware, in light of the Landlord's and Hobby Lobby's history of collusion and the Debtors' failure to uphold the terms of the Procedures Order in connection with

---

[12] Michaels plans to file a motion requesting allowance of a substantial contribution claim for the amounts expended in litigating the sale and assignment of the BBBY Lease, including at the Assumption and Assignment Hearing in reliance on the fact that its bid was the highest and best (and indeed, only bid).

the Reopened Auction, Michaels requested that the Court postpone the hearing by approximately 10 days[13] so that Michaels could conduct limited discovery regarding collusion. Such a brief delay will not materially prejudice Debtors, the Landlord or Hobby Lobby, but will provide the Court the opportunity to make an informed decision. Michaels hereby renews that request. The Court should have a full record on which to rule, particularly where, as here, there is every indication that the Procedures Order was not followed.

47.     To the extent that the Court does not postpone the hearing to consider the sale and assignment of the BBBY Lease to Hobby Lobby, Michaels reserves all rights to contest, among other things, any findings in a proposed sale and assignment order, the reopening of the Auction and any other issues in connection with Hobby Lobby's bid at the hearing.

## **CONCLUSION**

WHEREFORE, for the reasons set forth herein, Michaels requests that the Court deny approval of the sale and assignment of the BBBY Lease to Hobby Lobby or, in the alternative, adjourn the hearing and order discovery as set forth herein.

---

[13] These 10 days are far less than the extension of the Court requested by the Landlord when it was advancing its objection pursuant to section 365(b)(3)(C)-(D) of the Bankruptcy Code related to the assignment of the BBBY Lease to Michaels. There is no basis for Michaels to be denied much less time to conduct targeted discovery in connection with the currently-scheduled assumption and assignment hearing.

Dated: October 2, 2023                    Respectfully submitted,


                                          **LOWENSTEIN SANDLER LLP**

                                          By: /s/ *Kenneth A. Rosen*
                                          Kenneth A. Rosen, Esq.
                                          Mary E. Seymour, Esq.
                                          Philip J. Gross, Esq.
                                          One Lowenstein Drive
                                          Roseland, NJ 07068
                                          Telephone (973) 597-2500
                                          E-mail: krosen@lowenstein.com
                                          Email: mseymour@lowenstein.com
                                          E-mail: pgross@lowenstein.com

                                          -and-

                                          **WHITE & CASE LLP**
                                          Gregory F. Pesce, Esq. (admitted *pro hac vice*)
                                          Laura E. Baccash, Esq. (admitted *pro hac vice*)
                                          111 South Wacker Drive, Suite 5100
                                          Chicago, IL 60606-4302
                                          Telephone: (312) 881-5400
                                          Email: gregory.pesce@whitecase.com
                                          Email:  laura.baccash@whitecase.com
                                          -and-

                                          Samuel P. Hershey, Esq. (admitted *pro hac vice*)
                                          1221 Avenue of the Americas
                                          New York, New York 10020
                                          Telephone: (212) 819-8200
                                          Email: sam.hershey@whitecase.com


                                          -and-

                                          Devin J. Rivero, Esq. (admitted *pro hac vice*)
                                          Southeast Financial Center
                                          200 South Biscayne Blvd., Suite 4900
                                          Miami, FL 33131-2352
                                          Telephone: (305) 371-2700
                                          Email:  devin.rivero@whitecase.com


                                          *Co-Counsel to Michaels Stores, Inc.*