## **Exhibit 8**

**Michaels' Letter Submitted to the Court on September 22, 2023**

**LS** LOWENSTEIN SANDLER

| **Kenneth A. Rosen** | One Lowenstein Drive |
| Of Counsel | Roseland, New Jersey 07068 |

**T**: (973) 597-2548
**F**: (973) 597-2549
**E**: krosen@lowenstein.com

September 22, 2023

<u>VIA E-MAIL</u>
Honorable Michael B. Kaplan, Chief U.S.B.J.
Honorable Vincent F. Papalia, U.S.B.J.
United States Bankruptcy Court for the District of New Jersey

**Re:    In re Bed Bath & Beyond, Inc.,** *et al.*
**Case No. 23-13359 (VFP)**
**Proposed Sale and Assignment Order – Rogers, Arkansas Store #1142 – to Michaels Stores**

Dear Chief Judge Kaplan and Judge Papalia:

As Your Honors are aware, we, together with White & Case LLP, are co-counsel to Michaels Stores, Inc. ("<u>Michaels</u>"). Michaels is the Court-approved purchaser/assignee in connection with the above-referenced debtors and debtors-in-possession's (the "<u>Debtors</u>") lease located in Rogers, Arkansas (Store #1142, hereinafter the "<u>Lease</u>").

The Debtors' September 20, 2023 correspondence with this Court is the culmination of a troubling pattern by the Landlord, Debtors, and now Hobby Lobby of seeking to evade the Court-approved auction process that threatens the integrity of this case. It is indisputable that the Landlord and Hobby Lobby had the ability to participate and bid on the Lease if they had wanted to do so. They did not. It is also indisputable that Hobby Lobby and the Landlord have been secretly working together to get around the Court-approved auction process in favor of their own backroom deal—even after Michaels followed the rules, won at auction, and then was declared the highest and best bid in Court after extensive litigation. Condoning the Landlord and Hobby Lobby's opaque tactics instead of the transparent and lawful Court-approved auction process—would undermine this and every other bankruptcy auction in this district, and open the door to future collusive bidding efforts that ignore a judicially approved bidding process as appears to have occurred here by Hobby Lobby and the Landlord. Courts have repeatedly rejected this type of improper conduct. This Court should do the same.

**BACKGROUND**

<u>**Michaels Is Declared the Winning (and Sole) Bidder at Auction. The Debtors Ignore the Procedures Order Forcing Michaels to Increase Its Bid. Following Substantial Briefing and Discovery, the Court Overrules the Landlord's Objection and Declares Michaels' Bid the Highest and Best.**</u>

As the Court is aware, in accordance with the lease sale procedures order entered by this Court (Docket No. 422) (the "<u>Procedures Order</u>"), Michaels was the sole bidder for the Lease at the auction held on June 26, 2023. *See* Docket No. 1397 (June 26, 2023 Auction Transcript). Landlord Pinnacle Hills, LLC (the "<u>Landlord</u>")[1] and Hobby Lobby, Inc. ("<u>Hobby Lobby</u>") did not bid on the Lease. After the auction

---

[1] Brookfield Properties Retail, Inc. serves as managing agent for landlord Pinnacle Hills, LLC with respect to the Lease. *See* Declaration of Jeffrey Aronoff [Docket No. 1927], at paragraph 2.

concluded, on June 27, 2023, the Debtors filed a notice of successful bidders (the "Winning Bid Notice"), which identified Michaels as the successful bidder with respect to the Lease, with no back-up bidder.  *See* Docket No. 1114.

As the Court is further aware, the Landlord objected to the assignment to Michaels, leading to multiple rounds of briefing, a discovery dispute, document productions and depositions.  Notably, Hobby Lobby made no objection to the assignment.  A lengthy contested hearing regarding the assignment to Michaels was held on August 30, 2023, more than two months after Michaels had submitted the winning bid at auction.  That same day, the Court issued a bench ruling (the "Bench Ruling," as reflected in Docket No. 2115, the "Aug. 30 Transcript") approving the sale and assignment of the Lease to Michaels and overruling the Landlord's objection. The Court found, among other things, that Michaels' bid maximized value for the estates.  *See* Aug. 30 Transcript at 128:3-7.

The Landlord did not attack the proposed assignment to Michaels merely by objecting.  On August 21, 2023, without prior discussions with or notice to Michaels, the Debtors informed Michaels in writing that—notwithstanding the Landlord's failure to bid on the Lease at the Court-approved auction and the Debtors' identification of Michaels' $100,000 auction bid as the winning bid for the Lease—the Debtors had reached a tentative deal with the Landlord for (i) the Landlord to pay the Debtors an undisclosed amount greater than Michaels' bid at the auction and (ii) the Debtors to terminate the Lease rather than follow through with the proposed sale and assignment of such Lease to Michaels.

In the interest of avoiding litigation, and despite serious concerns regarding the Debtors' actions nearly two months after the auction concluded, on August 22, 2023, Michaels engaged in good faith negotiations with the Debtors and ultimately agreed to increase its bid on the Lease by $750,000 (from $100,000 to $850,000).  Michaels also agreed to reimburse fees and expenses incurred by Debtors' counsel in connection with defending the sale and assignment of the Lease to Michaels up to an aggregate amount of $150,000.[2] Michaels increased its bid despite its belief that, as a good-faith purchaser who abided by this Court's Procedures Order, no such re-bidding was required, and the Debtors' conduct was wholly inconsistent with the Procedures Order.  *See* Procedures Order § I.iii ("For a Qualified Bid to be considered and in order for a Qualified Bidder to further bid at a Lease Auction, ***Qualified Bidders must appear in person at the Lease Auction***, or through a duly authorized representative, unless alternative arrangements are agreed upon in advance by the Debtors.") (emphasis added).  Thereafter, the Debtors supported Michaels' increased bid and sought the Court's approval of the sale and assignment to Michaels. These endeavors culminated in the Court's favorable Bench Ruling for both the Debtors and Michaels.

At the conclusion of the Bench Ruling on August 30, 2023, per the Court's instruction (*see* Aug. 30 Transcript at 136:15-25), the Debtors and Court-approved assignee, Michaels, on the one hand, and the Landlord on the other hand, sought to negotiate a consensual form of sale and assignment order regarding the Lease. While the Debtors had agreed with Michaels and signed-off on the proposed form of order, on September 13, 2023, the Debtors refused to submit the agreed-upon proposed order approving the sale and assignment of the Lease to Michaels.  As a result, Michaels submitted its proposed order to the Court and highlighted the issues remaining in dispute with the Landlord.

---

[2] The Debtors and Michaels memorialized this agreement in a letter agreement dated as of August 23, 2023 (the "Letter Agreement").  Such Letter Agreement provided that the Debtors agreed to "take all reasonable actions to cooperate with Michaels in all efforts and matters related to the full and final prosecution of the [Lease] Assignment Issues."  A copy of the Letter Agreement was attached as Exhibit 3 to the Proposed Order submitted to the Court by Michaels for entry on September 15, 2023.

## ARGUMENT

**Hobby Lobby, Apparently in Collusion with the Landlord, Has Lain in Wait to Top Michaels' Bid after Michaels Was Already Approved as the Winning Bidder.  The Debtors Seek to Validate this Troubling Conduct.  The Court Should Follow Relevant Precedent and Reject It.**

Now, after Michaels has spent nearly three months and substantial resources defending (and even increasing) its winning bid, Michaels finds that the Debtors are once again considering ignoring the process established by the Court (and the Court's Bench Decision declaring Michaels the highest and best bid) in favor of yet another untimely bid, this time from Hobby Lobby.  Troublingly, it appears that Hobby Lobby (after colluding with the Landlord) is now attempting an end-run around the auction process and the Court's ruling to obtain the Lease in a secret, backroom deal with the Debtors after the Court approved the Lease assignment to Michaels at a hearing at which Hobby Lobby did not even appear, much less submit a timely objection, even though discovery reveals that Hobby Lobby was discussing the Lease with the Landlord months before the hearing.

Indeed, in the course of discovery (conducted by Michaels in connection with the Landlord's objection to assignment of the Lease), the Landlord (despite being aware of the fact that Michaels planned to bid on the Lease at the auction well before the auction date)[3] produced emails that reflect discussions between the Landlord and Hobby Lobby regarding Michaels' winning bid at the auction as far back as June 30, 2023,[4] and reveal collusive behavior between those two parties.  Specifically, on or about August 21, 2023 (*i.e.*, more than a week before the hearing), the Landlord was conducting secret discussions with Hobby Lobby to assign the Lease to Hobby Lobby, with Hobby Lobby then planning to sublease the premises to Mardel, a Christian bookstore retailer.[5]  Hobby Lobby engaged in these backroom efforts to subvert the Court-sanctioned auction process, rather than showing up in Court and objecting, presumably because Hobby Lobby worried that its exclusive use provision—granted more than a decade after the Lease was executed—would not "appl[y] to the Bed Bath lease given the age of it."  *See* Ex. B.

Accepting the extremely untimely Hobby Lobby bid and failing to approve the proposed order (the form of which was already agreed by the Debtors) assigning the Lease to Michaels would be a clear violation and affront to the Court-approved auction process, which provided that successful bidders were required to attend and submit bids at the auction or forever be foreclosed from bidding.  *See* Procedures Order § I.iii. Michaels bid on the Lease (and expended substantial sums in litigating the assignment of the lease) based upon the understanding that the Procedures Order would be followed and a successful bidder designated at the close of the auction would no longer be subject to further overbid.  Hobby Lobby and

---

[3] *See* **Exhibit A** attached hereto, containing a June 13, 2023 email exchange with Mr. Brian Tader at Brookfield demonstrating that weeks prior to the auction, Landlord was aware of Michaels' intent to bid on the Lease.  Mr. Tader is listed on the Brookfield Properties website as the retail leasing contact for the shopping center at which the Lease is located.  *See* https://www.brookfieldproperties.com/en/our-properties/pinnacle-hills-promenade-441.html.

[4] *See* **Exhibit B** attached hereto, which contains a June 30, 2023 message from Les Miller at Hobby Lobby Stores to Landlord's agent (Mr. Tader) stating that Hobby Lobby noticed that "Michaels apparently was a successful bidder on the . . . Bed Bath Beyond [Lease] Space and [*sic* at] Rogers AR"; Mr. Miller from Hobby Lobby also states that "Boy, I really thought you guys [*i.e.*, Landlord] would bid on that and recapture the space, but. Regardless . . . we certainly haven't [*sic* – have an] exclusive in our lease but I [*sic*] that it applies to the Bed Bath lease given the age of it but.  Just checking in as well touching base . . .").

[5] *See* **Exhibit C** attached hereto, containing August 21 & 24, 2023 email messages between Mr. Miller at Hobby Lobby and Mr. Tader and Mr. Aronoff at Brookfield (Aronoff served as Landlord's declarant's in connection with the contested Lease assignment hearing; *see* Declaration of Jeffrey Aronoff [Docket No. 1927]).  These messages demonstrate that just days prior to the August 30 contested Lease assignment hearing, Hobby Lobby told the Landlord of Hobby Lobby's "plan" to take assignment of the Rogers, AR Lease and sublease the space to Mardel.

the Debtors now seek to side-step the transparent Court-approved process in violation of the Procedures Order and section 363(n) of the Bankruptcy Code.

Michaels requests this Court's intervention to compel the Debtors to abide by the results of the auction, their contractual commitments, and the Procedures Order. Allowing the Debtors to violate the Procedures Order (and breach their obligations under the Letter Agreement) would set a dangerous precedent by providing third parties an effective veto over proposed assignments of unexpired leases after the close of an auction and after the Court adjudicates objections and declares a winning bidder. This Court should not permit this kind of gamesmanship to taint the process.[6] Even worse, here, not only has the auction been closed, but this Court has already approved the sale and assignment of the Lease to Michaels. If the untimely bid by Hobby Lobby—a party that sat on the sidelines for *months* despite clearly knowing about the auction process and related litigation—is allowed to supplant the Court-approved assignment to Michaels, hundreds of sale and assignments of leases authorized in this and other cases would be called into question, and as the Third Circuit presciently noted in a pre-Code case, "nothing will more certainly tend to discourage and prevent bidding than a judicial determination that the highest bidder may be deprived of the advantage of his accepted bid by an offer of another person, subsequently made, to bid higher on resale." *In re Stanley Engineering Corp.*, 164 F.2d 316, 319 (3d Cir. 1947). Indeed, Michaels is not aware of any case where a bankruptcy court has authorized the reopening of bids for a new bid submitted after court approval of the successful bid following a sale/assignment hearing. *Cf. In re Reading Broadcasting, Inc.*, 386 B.R. 562, 575-76 (Bankr. E.D. Pa. 2008) ("Courts have long concluded that the ability to achieve the highest price would be undermined if bankruptcy sales were not considered final at the conclusion of an auction, unless clear evidence of impropriety in the sale process has been demonstrated. To easily reopen the bidding process would chill future interest in purchasing property from a bankruptcy estate, since bidders could not feel secure at the conclusion of an auction . . . thereby driving down the market value of the bankruptcy estate property in general. . . . If parties are to be encouraged to bid at trustee-conducted bankruptcy sales 'there must be stability in such sales and a time must come when a fair bid is accepted and the proceedings are ended.'") (citing, *inter alia*, *Stanley Engineering Corp.*, 164 F.2d at 319 ("Public policy requires stability in such sales.... To induce bidding at such sales and reliance upon them, the purpose of the law is that they shall be final ... they are not to be disturbed except for substantial reasons.")); *see also In re Bryan*, Case No. 12-31486 (WRS), 2013 WL 4716194, at *3 (Bankr. M.D. Ala. Sept. 3, 2013) ("The Court agrees with the proposition that 'a time must come when a fair bid is accepted and the proceedings are ended.' . . . . That time arrived in this case when Hamm ended the bidding process, accepted Lawley's bid, and filed a Notice of Sale with the Court. It was the expectation of the bidders that the best offer would win. . . This sale has reached a stage at which the need for finality and deference to the auction process should win out."); *In re Bigler, LP*, 443 B.R. 101, 107 (Bankr. S.D. Tex. 2010) (auction would not be reopened to allow a losing bidder to make a topping bid that was $500,000 higher than winning bidder's $20.5 million bid).

Moreover, even if the Court were willing to entertain the untimely bid from Hobby Lobby, which it should not, that bid does not offer greater consideration than Michaels' bid. Although the Debtors asserted that "the consideration in the alternative [Hobby Lobby] bid is obviously significantly higher than the consideration in the Michaels Stores agreement" and that Hobby Lobby's bid "would resolve the appellate and other related risks associated with the Michaels Stores' assignment," the Debtors failed to

---

[6] *See* Aug. 8, 2023 Hr'g Tr., *In re Surgalign Holdings, Inc.*, No. 23-90731 (CML) (Bankr. S.D. Tex. August 8, 2023) [Docket No. 349] (Judge Lopez declining to accept a late topping bid after the close of the auction because it violated the court-sanctioned sale and auction process, explaining "someone's not going to show up at the eleventh hour for whatever reason and bypass an entire order that I entered"). The *Surgalign* hearing transcript is **Exhibit D** attached hereto.

mention that acceptance of Hobby Lobby's bid would expose the Debtors and their estates to significant damages and substantial contribution claims from Michaels.[7]

Specifically, in reliance on the Procedures Order and the Debtors' commitment—and in addition to the time and resources it dedicated to the auction and post-auction assignment agreement—Michaels has devoted hours of professional time and expenses in litigating the Lease assignment dispute with the Landlord.  Moreover, there is no real concern that appellate litigation related to the Court's Bench Opinion will deplete the Debtors' estates.  Indeed, at the Debtors' unusual request, Michaels agreed to reimburse certain estate costs in connection with continued litigation (subject to the Debtors' proceeding in good faith with seeking the approval of Michaels' bid) in order for the estates to realize the full benefit of the consideration offered by Michaels.  All of this was done in reliance on the Debtors' repeated promises that they intended to move forward with the assignment of the Lease to Michaels in accordance with the Procedures Order and the Letter Agreement and to vigorously defend against the Landlord's objection.

Now, Michaels is in the position of having played by the rules and submitted (and prosecuted) a successful bid at the auction and sale and assignment hearing, only to have the Debtors seek approval for a last-minute backroom deal with Hobby Lobby.

\* \* \* \* \*

In light of these events and the upcoming conference call on this matter scheduled for next week, Michaels requests that the Court consider these serious issues and the far-reaching implications that any decision to upend the finality of the auction and the Court's Bench Ruling would have on (a) future bankruptcy sale processes and (b) previous lease assignments in these chapter 11 cases.

Finally, to the extent the Debtors do not proceed with the proposed assignment of the Lease to Michaels, Michaels reserves all rights, claims and remedies in connection with the actions of the Debtors, Hobby Lobby, and/or the Landlord, including the right to seek additional discovery and to assert claims for, *inter alia*, reliance, consequential and punitive damages, substantial contribution and/or administrative expense claims, and other claims arising under the Procedures Order, the Letter Agreement, or otherwise available under applicable court orders, the Bankruptcy Code (including pursuant to section 365(n) of the Bankruptcy Code) or at law or in equity.

Sincerely,

*/s/ Kenneth A. Rosen*
Kenneth A. Rosen, Esq.


cc:   Kelley Drye Warren (via email)
      White & Case (via email)
      Kirkland & Ellis (via email)
      Cole Schotz (via email)

---

[7] These substantial potential claims, and the cost to the Debtors' estates in defending against such claims, alone make it highly questionable whether the Hobby Lobby late post-sale hearing bid, and which is only approximately $700,000 higher than the Michaels bid ($1,000,000), even provides any material incremental value to an estate where unsecured claims may exist in the hundreds of millions of dollars.

# EXHIBIT A

**From:** Tader, Brian <Brian.Tader@bpretail.com>
**Sent:** Tuesday, June 13, 2023 2:00 PM
**To:** Ashley Fehlman <ashley.f@atlasbtw.com>
**Subject:** RE: Landlord Sign Regulations: Michaels - 2203 S. Promenade Blvd, Rogers, AR

> This message was sent from outside the company. Please do not click links or open attachments unless you recognize the source of this email and know the content is safe.

Ok.  That makes sense now.

**Brian Tader**
Senior Director Leasing - Big Box | Development Retail
Retail

Brookfield Properties
350 N Orleans St. Suite 300, Chicago, IL 60654
T 312.960.5007 | M 847.962.5584
brian.tader@bpretail.com
www.brookfieldproperties.com/retail

**Brookfield**
Properties



---

**From:** Ashley Fehlman <ashley.f@atlasbtw.com>
**Sent:** Tuesday, June 13, 2023 12:57 PM
**To:** Tader, Brian <Brian.Tader@bpretail.com>
**Subject:** RE: Landlord Sign Regulations: Michaels - 2203 S. Promenade Blvd, Rogers, AR

[EXTERNAL]

This is the feedback I got from Michaels, "This is a potential acquisition of a few Bed Bath and Beyond. We will be bidding in an auction for the space along with others I'm sure."

Does this make more sense?

Thank You,



**Ashley Fehlman | Senior Project Manager**
**Atlas | One Source...Many Solutions**
t: 561 863 6659 x4454 |  m: 561 635 4998
**Toll Free 800 772 7932**
e: ashley.f@atlasbtw.com |  w: www.atlasbtw.com



**From:** Tader, Brian <Brian.Tader@bpretail.com>
**Sent:** Tuesday, June 13, 2023 1:38 PM
**To:** Ashley Fehlman <ashley.f@atlasbtw.com>
**Subject:** RE: Landlord Sign Regulations: Michaels - 2203 S. Promenade Blvd, Rogers, AR

---

> This message was sent from outside the company. Please do not click links or open attachments unless you recognize the source of this email and know the content is safe.

---

I am the box leasing person for the center.  I just have not talked to Michaels yet.

**Brian Tader**
Senior Director Leasing - Big Box | Development Retail
Retail

Brookfield Properties
350 N Orleans St. Suite 300, Chicago, IL 60654
T 312.960.5007 | M 847.962.5584
brian.tader@bpretail.com
www.brookfieldproperties.com/retail

**Brookfield**
Properties



---

**From:** Ashley Fehlman <ashley.f@atlasbtw.com>
**Sent:** Tuesday, June 13, 2023 12:09 PM
**To:** Tader, Brian <Brian.Tader@bpretail.com>
**Subject:** RE: Landlord Sign Regulations: Michaels - 2203 S. Promenade Blvd, Rogers, AR

[EXTERNAL]

I will find out, they gave me your name as the "landlord" contact.

Thank You,



**Ashley Fehlman** | **Senior Project Manager**
**Atlas | One Source...Many Solutions**
t: 561 863 6659 x4454 | m: 561 635 4998
**Toll Free 800 772 7932**
e: ashley.f@atlasbtw.com | w: www.atlasbtw.com



**From:** Tader, Brian <Brian.Tader@bpretail.com>
**Sent:** Tuesday, June 13, 2023 1:04 PM
**To:** Ashley Fehlman <ashley.f@atlasbtw.com>
**Subject:** RE: Landlord Sign Regulations: Michaels - 2203 S. Promenade Blvd, Rogers, AR

> This message was sent from outside the company. Please do not click links or open attachments unless you recognize the source of this email and know the content is safe.

---

We have a Hobby Lobby at the center.  Who is Michaels talking to?

**Brian Tader**
Senior Director Leasing - Big Box | Development Retail
Retail

Brookfield Properties
350 N Orleans St. Suite 300, Chicago, IL 60654
T 312.960.5007 | M 847.962.5584
brian.tader@bpretail.com
www.brookfieldproperties.com/retail

**Brookfield**
Properties



---

**From:** Ashley Fehlman <ashley.f@atlasbtw.com>
**Sent:** Tuesday, June 13, 2023 11:59 AM
**To:** Tader, Brian <Brian.Tader@bpretail.com>
**Subject:** RE: Landlord Sign Regulations: Michaels - 2203 S. Promenade Blvd, Rogers, AR

[EXTERNAL]

HI There,

I work for Michaels, I have been told they are looking to potentially occupy the former Bed Bath & Beyond.

Thank You,

Highly Confidential



**Ashley Fehlman │ Senior Project Manager**
**Atlas | One Source...Many Solutions**
t: 561 863 6659 x4454 | m: 561 635 4998
**Toll Free 800 772 7932**
e: ashley.f@atlasbtw.com | w: www.atlasbtw.com



**From:** Tader, Brian <Brian.Tader@bpretail.com>
**Sent:** Tuesday, June 13, 2023 12:27 PM
**To:** Ashley Fehlman <ashley.f@atlasbtw.com>
**Subject:** RE: Landlord Sign Regulations: Michaels - 2203 S. Promenade Blvd, Rogers, AR

This message was sent from outside the company. Please do not click links or open attachments unless you recognize the source of this email and know the content is safe.

Ashley,

Who are you working with at the mall?  Are you sure you have the right address?

**Brian Tader**
Senior Director Leasing - Big Box | Development Retail
Retail

Brookfield Properties
350 N Orleans St. Suite 300, Chicago, IL 60654
T 312.960.5007 | M 847.962.5584
brian.tader@bpretail.com
www.brookfieldproperties.com/retail

**Brookfield**
Properties



**From:** Ashley Fehlman <ashley.f@atlasbtw.com>
**Sent:** Tuesday, June 13, 2023 10:03 AM
**To:** Tader, Brian <Brian.Tader@bpretail.com>
**Subject:** Landlord Sign Regulations: Michaels - 2203 S. Promenade Blvd, Rogers, AR

[EXTERNAL]

Good Morning,

I am working on putting together the sign package for the Michaels to be located at Michaels - 2203 S. Promenade Blvd, Rogers, AR

I wanted to reach out to see if you have a landlord sign regulations you could provide to me for this shopping center.

Highly Confidential

Thank You,



**Ashley Fehlman** | **Senior Project Manager**
**Atlas | One Source...Many Solutions**
t: 561 863 6659 x4454 | m: 561 635 4998
**Toll Free 800 772 7932**
e: ashley.f@atlasbtw.com | w: www.atlasbtw.com

 

PINNACLEHILLS_0000038

# EXHIBIT B

**From:** HOBBY LOBBY STO[+14056419377]
**Sent:** Fri 6/30/2023 11:38:17 AM Eastern Daylight Time
**To:** Tader, Brian[Brian.Tader@bpretail.com]
**Subject:** Voice Mail (1 minute and 3 seconds)
**Attachment:** audio.mp3

[EXTERNAL]
Hey, Brian Les Miller with Hobby Lobby Stores. Just wanted to catch up with you. We notice that Michaels apparently was a successful bidder on the. Bed Bath Beyond Space and Rogers AR. Boy, I really thought you guys would probably bid on that and recapture the space, but. Regardless Monday visit with you about that we certainly haven't exclusive in our lease but I that it applies to the Bed Bath lease given the age of it but. Just checking in as well touching base, we can talk middle and next week after the holiday. I'm traveling right now, but if you want to check with me now, my cell phone number is 405-641-9377. Thank you. Bye.

You received a voice mail from HOBBY LOBBY STO.

---

**Thank you for using Transcription! If you don't see a transcript above, it's because the audio quality was not clear enough to transcribe.**

Set Up Voice Mail

Highly Confidential

# EXHIBIT C

**From:** Les S Miller[les.miller@hobbylobby.com]
**Sent:** Thur 8/24/2023 12:12:20 PM Eastern Daylight Time
**To:** Tader, Brian[Brian.Tader@bpretail.com]; Aronoff, Jeffrey[Jeffrey.Aronoff@bpretail.com]
**Subject:** RE: Rogers AR

[EXTERNAL]

Apologies for the email...

**From:** Les S Miller
**Sent:** Thursday, August 24, 2023 10:53 AM
**To:** 'Tader, Brian' <Brian.Tader@bpretail.com>; 'Aronoff, Jeffrey' <Jeffrey.Aronoff@bpretail.com>
**Subject:** RE: Rogers AR

Brain...will LL send us the BBB lease now so that we can do a quick review of it? Thanks.

**From:** Les S Miller
**Sent:** Thursday, August 24, 2023 10:45 AM
**To:** 'Tader, Brian' <Brian.Tader@bpretail.com>; Aronoff, Jeffrey <Jeffrey.Aronoff@bpretail.com>
**Subject:** Rogers AR

Brain...has LL done any additional work in regard to option periods for Mardel?

**From:** Les S Miller
**Sent:** Monday, August 21, 2023 4:05 PM
**To:** 'Tader, Brian' <Brian.Tader@bpretail.com>
**Subject:** RE: [EXTERNAL]RE: Call

Brian,

Our plan would be for Hobby Lobby Stores, Inc. to take assignment of the lease, assuming it gives us the right to sublease the space to Mardel (at the same rent). We would also like to secure three additional, 5-year options. Let me know how you want to manage this. Thanks,

Les

**From:** Tader, Brian <Brian.Tader@bpretail.com>
**Sent:** Monday, August 21, 2023 3:29 PM
**To:** Les S Miller <les.miller@hobbylobby.com>
**Subject:** [EXTERNAL]RE: Call

Do you have time for a quick call?

**Brian Tader**
Senior Director Leasing - Big Box | Development Retail
Retail

Brookfield Properties
350 N Orleans St. Suite 300, Chicago, IL 60654
T 312.960.5007 | M 847.962.5584
brian.tader@bpretail.com
www.brookfieldproperties.com/retail

**Brookfield**
Properties



**From:** Les S Miller <les.miller@hobbylobby.com>
**Sent:** Monday, August 21, 2023 3:16 PM
**To:** Tader, Brian <Brian.Tader@bpretail.com>

PINNACLEHILLS_0000162

**Subject:** Call

[EXTERNAL]
Sorry I missed your call Brian. I'm in the office this afternoon. Thanks.

*Les Miller, MAI*
Real Estate Representative
**P:** 405.745.1658
**F:** 405.745.1635
**E:** les.miller@hobbylobby.com
7707 SW 44th Street, Oklahoma City, OK 73179

**HOBBY LOBBY**

---

This email message, including any attachment(s) is for the sole use of the intended recipient(s) and may contain confidential information. Any unauthorized review, use, disclosure or distribution is strictly prohibited. If you are not the intended recipient, please immediately contact the sender by email.

⚠ This email is from an external address. Exercise caution when following links or opening attachments. ⚠

# EXHIBIT D

```
                    UNITED STATES BANKRUPTCY COURT
                   SOUTHERN DISTRICT OF TEXAS (HOUSTON)

                                        .  Case No. 23-90731
IN RE:                                  .  Chapter 11
                                        .  (Jointly Administered)
SURGALIGN HOLDINGS, INC.,               .
et al.,                                 .  515 Rusk Street
                                        .  Houston, TX 77002
                Debtors.                .
                                        .  Tuesday, August 8, 2023
. . . . . . . . . . . . . . . .         .  1:03 p.m.
```

TRANSCRIPT OF EMERGENCY MOTION FOR ENTRY OF AN ORDER
AUTHORIZING CONTINUATION OF THE INTERNATIONAL HARDWARE BUSINESS
WIND-DOWN FILED BY DEBTOR SURGALIGN HOLDINGS, INC [24];
EMERGENCY MOTION FOR ENTRY OF (I) AN ORDER (A) ESTABLISHING
BIDDING PROCEDURES FOR THE SALE OF SUBSTANTIALLY ALL OF THE
DEBTORS' ASSETS, (B) AUTHORIZING THE DEBTORS' ENTRY INTO A
STALKING HORSE AGREEMENT, (C) ESTABLISHING PROCEDURES FOR THE
ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND
UNEXPIRED LEASES, (D) APPROVING THE FORM AND MANNER OF RELATED
NOTICES, (E) SCHEDULING A HEARING TO CONSIDER THE BID
PROTECTIONS AND PROPOSED SALE, AND (F) GRANTING RELATED RELIEF;
(II) AND ORDER (A) AUTHORIZING AND APPROVING THE BID
PROTECTIONS AND (B) GRANTING RELATED RELIEF; AND (III) AN ORDER
(A) AUTHORIZING AND APPROVING THE SALE OF ALL OR SUBSTANTIALLY
ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS,
ENCUMBRANCES, AND INTERESTS, (B) AUTHORIZING THE ASSUMPTION AND
ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES,
AND (C) GRANTING RELATED RELIEF FILED BY
DEBTOR SURGALIGN HOLDINGS, INC [26]
BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
UNITED STATES BANKRUPTCY COURT JUDGE


TELEPHONIC APPEARANCES CONTINUED.

Audio Operator:           Courtroom ECRO Personnel

Transcription Company:    Access Transcripts, LLC
                          10110 Youngwood Lane
                          Fishers, IN 46048
                          (855) 873-2223
                          www.accesstranscripts.com

    Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

TELEPHONIC APPEARANCES (Continued):

For the Debtors:

White & Case LLP
By:  GREGORY F. PESCE, ESQ.
     LAURA BACCASH, ESQ.
111 South Wacker Drive, Suite 5100
Chicago, IL 60606-4302
(312) 881-5400

White & Case LLP
By:  BARRETT LINGLE, ESQ.
     SAMUEL P. HERSHEY, ESQ.
1221 Avenue of the Americas
New York, NY  10020-1095
(212) 819-8200

Jackson Walker LLP
By:  VERONICA POLNICK, ESQ.
1401 McKinney Street, Suite 1900
Houston, TX 77010
(713) 752-4200

For the Official
Committed of Unsecured
Creditors:

Pachulski Stang Ziehl & Jones LLP
By:  BENJAMIN L. WALLEN, ESQ.
440 Louisiana Street, Suite 900
Houston, TX 77002
(713) 691-9385

Pachulski Stang Ziehl & Jones LLP
By:  ROBERT J. FEINSTEIN, ESQ.
     BRADFORD J. SANDLER, ESQ.
70 Third Avenue, 34th Floor
New York, NY  10017-2024
(212) 561-7700

Pachulski Stang Ziehl & Jones LLP
By:  COLIN R. ROBINSON, ESQ.
919 North Market Street, 17th Floor
Wilmington, DE 19801
(302) 652-4100

For Dearborn Capital
Management:

Hughes Watters & Askanase
By:  WAYNE KITCHENS, ESQ.
TotalEnergies Tower
1201 Louisiana, 28th Floor
Houston, TX  77002
(712) 759-0818

```
FOR SNH MEDICAL OFFICE      Goulston & Storrs PC
PROPERTIES TRUST:           By:  PETER BILOWZ, ESQ.
                            400 Atlantic Avenue
                            Boston, MA  02110
                            (617) 482-1776

For Augmedics, Inc.:        Munsch Hardt Kopf & Harr, PC
                            By:  DEBORAH PERRY, ESQ.
                            500 N. Akard Street, Suite 3800
                            Dallas, TX  75201
                            (214) 855-7565

                            Law Office Of Nathan A. Schultz
                            By:  NATHAN SCHULTZ, ESQ.
                            10621 Craig Road
                            Traverse City, MI  49686
                            (310) 429-7128

For RTI Surgical, Ins.      Weil, Gotshal & Manges LLP
and Resolve Surgical        By:  ARDEN HAM, ESQ.
Technologies:               767 Fifth Avenue
                            New York, NY  10153-0119
                            (212) 310-8000

For SAP America, Inc.       Brown & Connery, LLP
and Concur                  By:  DONALD K. LUDMAN, ESQ.
Technologies, Inc.:         6 N. Broad Street, Suite 100
                            Woodbury, NJ  08096
                            (856) 812-8900

For Surgical Theater,       Chamberlain Hrdlicka
Inc.:                       By:  JARROD MARTIN, ESQ.
                                 TARA LEDAY, ESQ.
                                 MICHALE O'NEIL, ESQ.
                            1200 Smith Street, Suite 1400
                            Houston, TX  77002
                            (713) 356-1280

For Cigna Health and        Connolly Gallagher LLP
Life Insurance              By:  JEFFREY WISLER, ESQ.
Company:                    1201 North Market Street, 20th Floor
                            Wilmington, DE  19801
                            (302) 757-7300

For Xtant Medical           Fox Rothschild LLP
Holdings, Inc.:             By:  STEVEN W. MEYER, ESQ.
                            33 South 6th Street, Suite 3600
                            Minneapolis, MN  55402
                            (612) 607-7411
```

INDEX
8/8/23

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| FOR THE DEBTOR: | | | | |
| George Varughese | 16 | | | |

| EXHIBITS | ADMITTED |
|---|---|
| ECF Numbers 317-1 through 317-8 | 15 |

 1        (Proceedings commence at 1:03 p.m.)

 2             THE CLERK:  All rise.

 3             THE COURT:  Please be seated.

 4             ELECTRONIC VOICE:  Conference muted.

 5             THE COURT:  Okay.  Let me turn on my camera here.

 6   Good afternoon, this is Judge Lopez.  Today is August the 8th.

 7   I'm going to call the 1 p.m. case, 23-90731, Surgalign

 8   Holdings, Inc., et al, here I believe on two motions, I think

 9   the wind-down and also the sale hearing.  Let me go ahead and

10   take appearances.  I would ask if you're online, it's about --

11   over -- about 60 folks on the line so I've muted the line.  If

12   you know you're going to be speaking today, why don't you go

13   ahead and hit "five star", and I'll unmute your line in a

14   moment.  I'd also ask that you please make an electronic

15   appearance.  Hop on the Southern District of Texas website,

16   find my page, you will find a place to make electronic

17   appearances, and you'll find this case.  I'd ask that you make

18   an electronic appearance again.

19             So, good afternoon, Mr. Pesce.

20             MR. PESCE:  Good afternoon, Your Honor.  For the

21   debtors today, Gregory Pesce of White & Case.  I'm joined in

22   the courtroom by my colleagues Laura Baccash and Barrett

23   Lingle, and Veronica Polnick from our proposed local counsel,

24   the Jackson Walker firm.  We also have in the courtroom today

25   Mr. George Varughese from Alvarez & Marsal, our investment

1   banker who is the debtor's witness for today.

2            THE COURT:  Okay.

3            MR. PESCE:  I'll step aside if others want to make

4   appearances.

5            THE COURT:  Afternoon.  Are you all still proposed?

6   Have we not gotten you?

7            MR. PESCE:  I think that's tomorrow.

8            THE COURT:  Ah, alrighty.

9            MR. WALLEN:  Good afternoon, Judge Lopez.  Ben

10   Wallen, Pachulski Stang Ziehl & Jones, proposed counsel to the

11   Committee.  I'm joined today by my colleagues that are

12   appearing remotely, Robert Feinstein, Bradford Sandler, and

13   Colin Robinson.

14            THE COURT:  Okay.

15            MR. WALLEN:  Judge, I do want to flag one small issue

16   for you, a scheduling issue.  I may have to step away for

17   emergency mediation at two o'clock before Judge Isgur.  If not

18   my colleagues --

19            THE COURT:  You're stiffing me for Isgur?  Not the --

20   it's completely fine, I'm just kidding.

21            MR. WALLEN:  Thank you, Judge.

22            THE COURT:  Completely understand, good to see you.

23            MS. LEDAY:  Good afternoon, Your Honor.  Tara LeDay

24   on behalf of Surgical Theater.  I'm joined by my co-counsel

25   Jarrod Martin, and Michael O'Neil on Zoom.

1        THE COURT:  Alrighty.  Good afternoon, Ms. LeDay.

2        MR. MEYER:  Hello, Your Honor.  Steve Meyer here for

3  Xtant Medical Holdings.  In the courtroom with me today is Sean

4  Browne, the CEO of Xtant -- Xtant, the purchaser of the

5  hardware Biologics business.

6        THE COURT:  Ah, got it.  Good afternoon.

7        Anyone else in the courtroom?  Alrighty.  I'm just

8  going in no particular order, just as I see them.  Here's a 310

9  number.  Line is unmuted, the 310 number.  Mr. Schultz, I see

10 your lips moving, you may have muted yourself as well, I do it

11 all the time.  Let me go with an 856 number.

12       MR. LUDMAN:  Good afternoon, Your Honor.  Donald

13 Ludman from Brown & Connery on behalf of SAP America and Concur

14 Technologies.

15       THE COURT:  Good afternoon, sir.

16       Here is an 832 number.

17       MR. MARTIN:  Good morning, Your Honor.  Jarrod

18 Martin, Chamberlain Hrdlicka.  Also joined with me on GoTo

19 Meeting is the representative of Surgical Theater, Jeff

20 Witherite.

21       THE COURT:  Okay.  Good afternoon.

22       There's a 617 number.  A 617 number.  All right.

23 Here's a --

24       UNIDENTIFIED:  Good afternoon.

25       THE COURT:  Go ahead.

1          UNIDENTIFIED:  -- a medical office properties trust.

2          THE COURT:  Good afternoon, sir.

3          The 310 number?  310 number was just unmuted.

4          MR. SCHULTZ:  Yes, Your Honor.  Can you hear me?

5          THE COURT:  Just fine.

6          MR. SCHULTZ:  Oh, great.  Thank you.  Apologies for

7    the difficulties, Your Honor.  Nathan Schultz on behalf of

8    Augmedics, Inc.  Also with us on the line are Garrett, who is

9    the outside general counsel and the declarant for Augmedics.

10   And we also have Mr. Kevin Hykes, who is the CEO and president

11   of Augmedics, who is listening in from Israel today.

12          THE COURT:  Okay.  Good afternoon.

13          There's a 317 number.

14          MR. O'NEIL:  Me?  Good afternoon, Judge.  Michael

15   O'Neil, one of the counsel for Surgical Theater, Inc.  Thank

16   you.

17          THE COURT:  Okay.  214 number.  Looks like I got one

18   more after that.

19          MS. PERRY:  Good afternoon, Your Honor.  Deborah

20   Perry with Munsch Hart Kopf & Harr, local counsel for

21   Augmedics, Inc.

22          THE COURT:  Okay.  And a 917 number, and I believe

23   that's it.

24          MR. FEINSTEIN:  Yes, Your Honor.  Robert Feinstein

25   appearing as proposed counsel for the Committee.

1              THE COURT:  All right.  Good afternoon,

2    Mr. Feinstein.  I lied, there was one more, a 212 number.

3              MR. HAM:  Yes, good afternoon, Your Honor.  This is

4    Argen Ham from Weil, Gotshal & Manges on behalf of RTI

5    Surgical, Inc., and Resolve Surgical Technologies.

6              THE COURT:  Okay.  And again, folks, those who even

7    if you made an appearance, I still ask that you make an

8    electronic appearance, just so we have the clean record.  Okay.

9              Mr. Pesce, I'll turn it over to you.

10             MR. PESCE:  Thank you.  For the record, Gregory

11   Pesce, White & Case on behalf of the debtors.  And when I made

12   my appearance earlier, and we'll reflect this electronically, I

13   neglected to mention Samel Hershey.  Our litigation partners

14   here today will be handling the direct examination and any

15   cross-examination of our witness and any other witnesses.

16             THE COURT:  Okay.

17             MR. PESCE:  So on today's agenda we have two motions,

18   one of which is uncontested.  That is our international

19   wind-down motion we filed it at Docket Number 24.  We haven't

20   received any objections to it today.  So unless there's any

21   questions from the Court, we would ask that that get entered

22   today.  We filed it originally at Docket Number 24, and we list

23   it as Number 2 on our agenda.

24             THE COURT:  All right.  Let me find that.  Is there

25   any objection to approval of the international hardware

1   business wind-down motion at Docket Number 24?  Okay.  Let me

2   just -- you want to just take this up real quick.  I'm just

3   going to just note that for the record, there was a motion, it

4   was actually filed on the petition date because the proposed

5   order still shows joint administration requested.  I would note

6   there's been plenty of notice on this.  The Court originally

7   asked the debtor, the debtor was, you know, agreed to allow a

8   committee to get formed to share some thoughts, if any, on it.

9   So there's been more than enough notice about this motion.

10         I'm going to find that there's been notice of today's

11   hearing and service of the motion have both been proper.  The

12   Court has had an opportunity to consider this motion for quite

13   some time, and the relief requested.  And I'm going to find

14   that there's been -- the relief is granted.  The debtors are

15   exercising their business judgment in connection with this

16   motion, and they are -- I'm going to grant the relief

17   requested.  I'm going to sign the proposed order at 24, and

18   I'll get that signed and on the docket today.

19         MR. PESCE:  Thank you, Your Honor.  And if it's

20   helpful, we can work with Ms. Polnick and your chambers to

21   submit an updated one that has the --

22         THE COURT:  No, no, I think I've got the skillset --

23         MR. PESCE:  Okay.

24         THE COURT:  -- to knock this one out.  If it got too

25   much, I sure would take you up on the offer.

1          MR. PESCE:  Okay.  The second matter that was listed

2   actually first on the agenda is our sale motion.  It was

3   originally filed at Docket Number 26, our sale motion, and as

4   we've described before in hearings, the debtors effectively

5   have two different assets.  We have an international -- we have

6   a hardware business, including U.S. and international

7   components, and then we have a digital and AI business.  The

8   hardware business sale to our stalking horse bidder, Xtant, is

9   uncontested.  The proposed sale of the digital business, there

10  are objections in light of a subsequently surfaced bid.

11         In the interest of efficiency here, and because our

12  stalking horse bidder's team has some scheduling issues with

13  their travel this afternoon, we were -- we would like to

14  bifurcate this.  And we can quickly do an introduction to the

15  hardware piece.  We'll put up Mr. Varughese for a very short

16  direct exam on the hardware sale.  And then we'd ask that the

17  Court approve that.  We can then effectively do the same again

18  with digital, which will take a little bit more of a discussion

19  in light of the objections and filings on the court side.

20         THE COURT:  Yeah, and for Xtant, there's a proposed

21  order at 315.  Is that the one that you all want me to

22  consider?

23         MR. PESCE:  That is correct.

24         THE COURT:  Okay.  Yeah.  I've got no issues with

25  that; that makes a lot of sense to me.  Why don't we do that?

1        MR. PESCE:  So let me just say a couple words here,

2   and then Mr. Hershey will put Mr. Varughese up for a direct

3   exam for the evidentiary portion.

4        So the debtors are pleased to present the order

5   seeking approval of a sale of the spinal hardware business and

6   biomaterials product line, as well as the equity interest in

7   some of their international subsidiaries to Xtant Medical

8   Holdings on an uncontested basis.  As Your Honor will recall,

9   earlier this year we filed a motion for approval of bidding

10  procedures for the sale of the asset -- for the debtor's assets

11  free and clear, assumption of certain executory contracts and

12  leases.  On June 30th the Court entered an order approving the

13  bidding procedures for the proposed auction, including bid

14  protections for our stalking horse bidder, Xtant.  Xtant was

15  willing to serve as a stalking horse bidder subject to higher

16  or better offers.

17       As we've discussed before, the Xtant proposal was

18  particularly attractive because they are going to be taking

19  numerous international subsidiaries that didn't file for

20  Chapter 11 and allowing us to avoid the cost of winding down

21  the bulk of our hardware international presence.  Apropos to

22  the order you are entering today on the wind-down, there's a

23  few ministerial steps that have to be taken for some non-

24  acquired subsidiaries at this point which will be taken.

25       On July 5th, we notified parties of the of the

1  stalking horse offer and the auction, put that out for

2  publication notice in The New York Times on July the 7th, and

3  we put it on the Kroll website that is maintained for our case

4  for noticing purposes.  Ultimately, except for Xtant's stalking

5  horse purchase agreement, we did not receive any qualified

6  offers for the spinal hardware business, and we didn't hold an

7  auction for those assets.

8          After a consultation with the UCC, we announced the

9  successful bidder for the hardware business is Xtant, filed

10  that at Docket Number 290.  The purchase price is $5 million,

11  plus the assumption of liabilities for the international

12  business.  It also contemplates the assignment -- assumption

13  and assignment for certain executory contracts.

14          The asset purchase agreement between the debtors and

15  Xtant was originally filed with the bid procedures at Docket

16  Number 26-2.  That was amended a few times as reflected on

17  Dockets 181, 267, and 281.  The purchase agreement is also

18  attached as Exhibit A to the proposed sale order.

19          As indicated in the hearing agenda, the debtors

20  received five objections to the sale, all from contract

21  counterparties.  The no-contract counterparty objections are

22  going forward today.  The objections of Aziyo, RTI, Spartronics

23  Watertown, Vaco LLC, they are being adjourned with the

24  expectation that those will become moot because Xtant is not

25  expecting to assume those or take assignment of those

1   contracts.

2          As to the fifth one filed at Docket 297 by SAP

3   America, Concur technologies, the debtors have been in contact

4   with SAP's counsel.  We expect to resolve that and file an

5   amendment and stipulation consenting to the assumption of that

6   agreement by the debtors on an amended term in the near future

7   as a result.  It's my understanding, and SAP's counsel I see is

8   on the line, that is not contested for today.

9          So with that preliminary piece put in, I would yield

10  the podium to my colleague, Mr. Hershey, who can do the direct

11  exam of Mr. Varughese for the evidentiary portion.  And then we

12  can wrap up, hopefully, unless Your Honor has any questions,

13  the Xtant hardware sale part of the hearing.

14          THE COURT:  Okay.  Not a problem.

15          Mr. Hershey, good afternoon.

16          MR. HERSHEY:  Good afternoon, Your Honor.  Sam

17  Hershey from White & Case for the debtors.  And, Your Honor,

18  before I call Mr. Varughese, we did submit an exhibit list at

19  Docket Number 317 that contains eight exhibits.  And we haven't

20  had a chance to confer with the parties yet, but I think it

21  makes sense at this point to move those into evidence.  And

22  perhaps other parties at the this time would like to address

23  any evidentiary issues now if that works for the Court.

24          THE COURT:  Are we just talking about Xtant?

25          MR. HERSHEY:  So actually --

1          THE COURT:  Or are we talking about both?

2          MR. HERSHEY:  -- these exhibits are relevant to both,

3   Your Honor.

4          THE COURT:  Is there a 317, 1 through 8.  So any

5   objection to the admission, any documents 317-1 through -8?

6   And -- all right.  They're admitted.

7      (ECF Numbers 317-1 through 317-8 admitted into evidence)

8          MR. HERSHEY:  Thank you, Your Honor.  I'm happy to

9   call Mr. Varughese now, unless Your Honor would like other

10  parties to enter their exhibits, however Your Honor would like

11  to proceed.

12         THE COURT:  Well, why don't we -- well, I guess it

13  does make sense to just kind of deal with everything.  Even

14  though we're just going to take up Xtant now, but for purposes

15  -- there's going to be another discussion.  Let's see.

16         Ms. Perry, let me talk to the Augmedics and STI.  Are

17  there any exhibits that you all wish to move in at this time?

18         MR. SCHULTZ:  Yes.  Your Honor, this is Nathan

19  Schultz on behalf of Augmedics.  Can you hear me again?

20         THE COURT:  Just fine.

21         MR. SCHULTZ:  Thank you, Your Honor.  We did file a

22  witness and exhibit list.  And the only exhibit that we would

23  move into evidence at this time is the declaration of James

24  Garrett, listed on the exhibit list.

25         THE COURT:  I'm sorry, I didn't -- I couldn't hear

1    what you said, which one you're seeking to move in.

2             MR. SCHULTZ:  Just the declaration of James Garrett,

3    which was filed at Docket 318-1.

4             THE COURT:  Okay.  Any objection to the admission of

5    318-1?

6             MR. MARTIN:  Yes, Your Honor.  STI objects as

7    hearsay.

8             THE COURT:  You're objecting, Mr. Martin?

9             MR. MARTIN:  I am, Your Honor.

10            THE COURT:  Okay.  All right.  Well, we'll have to

11   put him in -- put him on.  Mr. Martin, do you have any

12   documents you wish to move in?

13            MR. MARTIN:  No, Your Honor.

14            THE COURT:  Okay.  All right.  Let's just proceed

15   with Xtant now.

16            MR. HERSHEY:  Thank you very much, Your Honor.  The

17   debtors would like to call Mr. George Varughese to the stand.

18            THE COURT:  Okay.  Mr. Varughese, come on up.  Good

19   afternoon.  Can you raise your right hand, sir?

20            GEORGE VARUGHESE, DEBTOR'S WITNESS, SWORN

21                      DIRECT EXAMINATION

22            THE COURT:  Alrighty.  Please be seated.  I'll let

23   the record reflect the witness has been duly sworn in.

24            Counsel, you may proceed.

25            MR. HERSHEY:  Thank you.

1   BY MR. HERSHEY:

2   Q    Good afternoon, Mr. Varughese.

3   A    Good afternoon.

4   Q    Mr. Varughese, where are you currently employed?

5   A    Alvarez & Marsal.

6   Q    And what is your position at Alvarez & Marsal?

7   A    I'm a managing director, and head of the investment

8   banking practice.

9   Q    And how long have you held that position?

10  A    21 years.

11  Q    And, Mr. Varughese, what is your role in this case?

12  A    I and my team are representing the debtors in marketing

13  its assets and acting as an investment banker.

14  Q    So I want to talk about that process of marketing the

15  assets.  And in particular, my partner, Mr. Pesce, mentioned

16  there are two separate categories of assets, the hardware

17  assets and the digital assets.  If it's okay with you, I'll

18  focus for now on the hardware assets.

19  A    Okay.

20  Q    Can you describe for the Court the process for marketing

21  those assets?

22  A    Yes.  The company has been trying to sell those assets for

23  a long period of time.  The first process, which we were not

24  involved in, company hired a separate investment banker in late

25  '21, and early '22, and tried to market those assets.  We

1  understand there was no sale from that process.  Second time in

2  late '22, going on to early this year, company hired a separate

3  investment banker, and again tried to market those assets.  As

4  part of that process, company was able to sell the Coflex

5  product line, which is one product line of the hardware assets

6  to Xtant.  They tried to sell the rest of the assets, and there

7  was no bidder that they were able to conclude a transaction

8  with.

9       Company retained us, Alvarez & Marsal, sometime in May,

10  and we immediately started working on getting that process

11  started.  As background, I think it's been earlier described,

12  company is losing money and eroding its cash, so there was a

13  sense of urgency in trying to find a stalking horse and filing

14  the bankruptcy as quickly as possible.  So we -- we tried -- I

15  and my team started working on the documents.  We got a

16  confidential information memorandum done.  We got the data room

17  ready; we got a buyers list ready with the -- working with the

18  management.

19       And we primarily focused on the people who had expressed

20  some interest in the second process that I mentioned, which

21  took place in late '22 and early '23.  After -- and we had two

22  objectives.  We wanted to sell the domestic assets, but just as

23  importantly, we wanted to sell the equity in the international

24  entities.  I believe, as Mr. Pesce said earlier, the reason we

25  were so keen on that second piece was because if you did not

1   sell those, the company would have to wind down those assets

2   after the sale.  That would -- that was going to take a long

3   time, and it was going to be very expensive.

4       So we tried to interest somebody in becoming a stalking

5   horse for those assets.  Xtant was the only one that was

6   willing to do both.  That is, acquire the domestic assets, and

7   acquire the stock of the international entities.  So after some

8   negotiation, company and Xtant were able to execute a stalking

9   horse contract, and that was filed with the Court.

10  Q   You mentioned in your testimony a buyers list.  How many

11  buyers did Alvarez & Marsal reach out to in connection with the

12  sale of the hardware assets?

13  A   So there were several people that were common to both

14  assets.  If I may, let me answer it this way.  In total, we

15  contacted over 500 parties in relation to both pieces of

16  business.

17  Q   And after Xtant was identified as the stalking horse

18  bidder and entered into that agreement, did Alvarez & Marsal

19  continue to try to market the assets to find a topping bid?

20  A   Yes.

21  Q   And what was the result of that effort?

22  A   So after the filing, we continued the marketing.  So here

23  our objective became trying to find somebody who can top the

24  stalking horse bid.  Again, we focused on the usual interested

25  parties, many of whom we had been talking to prior to the

1  filing.  And there were a few parties that spent significant

2  time in the data room and wanted a lot of questions answered.

3  We went through that process.  But at the end when the bidding

4  -- the bid deadline had come and gone, nobody else had put in a

5  bid.

6  Q    And as a result of that is Xtant today the highest and

7  best offer for the hardware assets?

8  A    It is.

9         MR. HERSHEY:  Thank you very much.

10        Your Honor, I have no further questions regarding the

11 hardware assets for this witness.  I would ask that he be

12 excused if possible, and I'll recall him for digital, just

13 because I do think there will be a significant amount of time,

14 potentially, between when he finishes testifying now and when

15 he comes back to the stand for digital, if that's okay with

16 Your Honor.

17        THE COURT:  What's the request again?

18        MR. HERSHEY:  Oh, sorry.  I guess I should see if

19 anyone wants to cross him.  But I would like him to be excused

20 after finishing this portion of his testimony.

21        THE COURT:  Yeah, yeah, yeah.  Let's -- does anyone

22 have any questions for this witness, solely as it relates to

23 the hardware assets?  I have no questions.  Thank you very much

24 for your time, sir.

25        THE WITNESS:  Thank you, yeah.

1       (Witness excused)

2            MR. HERSHEY:  Thank you, Your Honor.

3            MR. PESCE:  For the record, Gregory Pesce, White &

4    Case again for the debtors.  That concludes our presentation

5    with respect to the hardware assets.  Unless the Court has any

6    questions, we'd ask that you enter the order at Docket 315 as

7    the sale order and then permit the Xtant team to excuse

8    themselves for the day.

9            THE COURT:  Okay.  Let me just ask, does anyone wish

10   to be heard in connection with the Xtant sale?  Well, I'll call

11   the sale of the hardware assets to Xtant.  Anyone wish to be

12   heard?  Going once, going twice -- okay.  I just note for the

13   record that at Docket Number 26 there was a request for

14   approval of a sale filed in connection with what has been

15   referred to as the debtor's global hardware business.  There's

16   been proper notice, and the Court has signed bidding procedures

17   that facilitated the right to a stalking horse bid and also a

18   potential auction.  There's been proper notice of today's

19   hearing, service of the motion.

20           The Court has already entered the bidding procedures

21   which facilitated this process.  The Court has considered the

22   testimony of the witness and takes judicial notice of the

23   docket.  There are no objections filed to this request.  The

24   Court finds that the sale of the digital hardware business --

25   excuse me, of the hard -- the global hardware business, let me

1    get the word "digital" out of my mouth for now -- the global

2    hardware business is in the best interest of the debtor's

3    estates.  Debtors have satisfied the business judgment standard

4    required on the 363 to sell the assets.  I'm going to find that

5    selling the assets free and clear under 363(f), and that Xtant,

6    based upon the record before me, satisfies the standard to be

7    considered a good faith purchaser, that there is no collusion

8    between the debtor and is entitled to the protections of 363.

9    And as well, the Court finds that the purchase price is fair

10   and satisfies any applicable standard as to -- that the debtors

11   have exercised their business judgment, and I'm going to

12   approve this sale.

13          I've reviewed the proposed order filed at Docket

14   Number 315, and I've got no issues with it.  I'm going to sign

15   that and get that on the docket now.  So anyone just here for

16   Xtant, let me just thank all the parties for all their hard

17   work in connection with this.  Everything -- everybody who was

18   involved in the process with respect to Xtant, congratulations,

19   and I will sign -- I've signed that order.  It will probably

20   hit the docket a little bit later today, but you can certainly

21   proceed that I have signed the order at 315, and it is off to

22   docketing.

23          MR. PESCE:  Thank you very much, Your Honor.  We

24   really appreciate it.

25          THE COURT:  Okay.

```
 1            MR. HAM:  Your Honor, can you hear me?

 2            THE COURT:  Yes.

 3            MR. HAM:  Oh, sorry, I was (indiscernible) just I

 4  think we were having some technical difficulties.  But my name

 5  is Arden Ham from Weil Gotshal again, we represent RTI Surgical

 6  and Resolve Surgical Technologies.  We reviewed the proposed

 7  sale contract earlier today and noticed that there are five

 8  contracts with one of RTI's subsidiaries, Tutogen Medical GmbH,

 9  that we weren't aware were being assigned.  They were not on

10  any of the sale notices to -- from -- as we understand, and we

11  were just generally unaware that they were being assigned.  So

12  we would actually like to reserve our rights with respect to

13  the non-inclusion of the Tutogen contracts in the notice.

14            THE COURT:  I've signed the order.  But your rights

15  are -- whatever rights you have, you have.  But I've reviewed

16  them.  We'll see where it goes.  Thank you.

17            MR. PESCE:  Thank you, Your Honor.  So the second

18  part of our hearing where there --

19            THE COURT:  Yeah.  For the folks, I've signed the

20  order.

21            UNIDENTIFIED:  Right.  Thank you very much.

22            THE COURT:  Okay.  Thank you.

23            MR. PESCE:  For the second part of the hearing, where

24  there might be some more fireworks, so to speak, we're going to

25  deal with the digital business.  As we've talked about a few
```

1  times, this part of the business was envisioned to be the

2  go-forward strategy for Surgalign.  They were trying to

3  separate the hardware business so they could focus on this

4  digital business.  At the time of the bankruptcy filing, and as

5  is the case today, this business is effectively pre-revenue.

6  Meaning it is not generating revenue, but is -- requires

7  significant capital to continue.

8           As a result, since Surgalign did not have capital to

9  fund it, and no investors were willing to invest in Surgalign

10 to fund it, to put this business up for sale as well.  At the

11 time of the bankruptcy filing there was no stalking horse bid.

12 As Mr. Varughese will talk about, we did, post-petition, seek

13 out stalking horse bids, and that did not result in a stalking

14 horse.  As a result, in accordance with the bid procedures, we

15 had an auction on July the 27th.  At the auction, Augmedics

16 ultimately bid $900,000 for the digital assets.  There was a

17 backup bidder called Brainlab that was selected at the backup

18 bidder for $850,000.

19          Following the auction, a medical technology company

20 called Surgical Theater reached out to me indicating that it

21 was prepared to submit a significantly higher bid than

22 Augmedics.  As Mr. Varughese will describe more, Surgical

23 Theater was not part of our process, it was a smaller, newer

24 player in the space and was not part of that process, and it

25 didn't have the opportunity to participate in the auction.  I

1    also understand that Surgical Theater became unaware of -- or

2    was unaware of the debtor's proposed sale until after it saw a

3    press release after Augmedics was selected.

4           We're going to put Mr. Varughese up, but just sort of

5    to set the stage here a little bit about our timeline here.  As

6    I mentioned, you know, when we filed for bankruptcy on June

7    19th, we started marketing the hardware and digital, including

8    seeking stalking horse bids for digital.  We didn't have a

9    stalking horse by the bid procedures hearing on June the 30th.

10   We didn't have one by the bid deadline of June 26th -- or July

11   26th, and we started the auction on July the 27th at White &

12   Case's offices in New York with those two bids, but neither of

13   which, the Brainlab's and Augmedic's bids, neither of which was

14   a stalking horse.

15          Bidding started at $250,000, based on the Augmedic's

16   bid, with successive bids between Brainlabs and Augmedics of

17   $50,000 increments.  As I mentioned, ultimately the bidding

18   stopped when Augmedics hit 900-, and Brainlab hit 850-.

19          Roughly -- or less than a week later, on the morning

20   of Tuesday, August the 1st, I received an email from an

21   attorney that I knew who represented Surgical Theater.

22   Surgical Theater asking for an extension of the objection

23   deadline to object to the sale.  During that conversation, I

24   informed her that I thought that was inappropriate and

25   unnecessary in any event, because if there was a bid that was

1  sufficiently higher, under our fiduciary out under the bidding

2  procedures, we believe we had sufficient ability to consider

3  it.

4         You know, the debtors believe that there were a lot

5  of questions regarding the Surgical Theater outreach.  It was

6  obviously very late.  We tried pounding the pavement very hard

7  to find bids, and we -- the two bids that we had we thought

8  were the best we could get.  Nevertheless, the data room was

9  already set up, and it was easy enough to sign an NDA and give

10 them access, which we did on Tuesday, August the 1st.

11         On Wednesday the 2nd, Surgical Theater and the

12 debtor's management team had a conversation about the assets,

13 and then on Friday the 4th, we received a signed bid and a

14 deposit reflecting a $1.1 million bid from Surgical Theater.

15 The debtor's advisors informed Surgical Theater (indiscernible)

16 with the company that that was -- while that was $200,000 more

17 than the existing highlight -- the existing bid, and 22 percent

18 more of the purchase, given the value at stake, it was simply

19 not sufficient for us to pivot from Augmedics.  Later in the

20 day they committed to bidding at least 1.3 million, and the

21 debtors likewise told them that that was not sufficient.  We

22 gave them some further guidance about what might be appropriate

23 or sufficient, and there was further talks over the weekend.

24         On Monday, August the 7th, Surgical Theater committed

25 to us in the morning that it would send in a bid and deposit

1   for $1.5 million bid, which is $600,000 more.  Promptly

2   thereafter we notified Augmedics of the bid, and our desire to

3   let them bid if they would like to.  There was some further

4   conversations, which Mr. Varughese will describe throughout the

5   day.  But suffice to say, Augmedics did not take us up on the

6   offer to re-open the bidding and submit a new bid and has now

7   objected.

8          For the rest of our presentation, how I would suggest

9   we proceed is Mr. Varughese will testify under oath regarding

10  these and other facts.  And then I'd like to argue the merits

11  of the motion.  The -- Augmedics, the prior high bid at

12  $900,000, their counsel has objected and has, you know, has an

13  objection to make.  My understanding is Mr. O'Neil or

14  Mr. Martin, on behalf of Surgical Theater, the new high bid,

15  will be able to -- might also have commentary to make.

16         THE COURT:  I just want to know who is going to take

17  the stand for Surgical Theater?

18         MR. PESCE:  For Surgical Theater, for Mr. Martin, and

19  Mr. O'Neil, but my understanding is they had a business -- that

20  their CFO I think was going to do so.

21         THE COURT:  So I want to know, Mr. Martin, who is

22  going to take the stand for Surgical Theater.  Because they're

23  -- what you're saying is you didn't find out -- your client

24  didn't find out about the auction until afterwards, and I've --

25  so I have questions about that, and I want to make sure that I

1   understand when they contacted you and when everybody found

2   out.  I want to make sure I understand the process, and when it

3   all happened, and how they found out.

4           MR. MARTIN:  Certainly, Your Honor.  Taking the stand

5   for Surgical Theater will be Jeff Witherite.  He's on the GoTo

6   Meeting, and he is the senior vice president.

7           THE COURT:  He understands the level or questioning

8   that's going to come, right?

9           MR. MARTIN:  He does, and we've discussed it with him

10  thoroughly (audio interference).

11          THE COURT:  I just want -- but I want to make sure --

12  I can't hear you really well, you sound like you're in a phone

13  booth.  I can't -- am I allowed to use phone booth anymore?

14  They don't -- there's no more phone booths, so I can't use the

15  phone booth.

16          MR. MARTIN:  Is this better, Your Honor.

17          THE COURT:  Yeah, this is much better.  I apologize,

18  I can't use the word "phone booth" anymore, nobody knows what

19  they are.  I dated myself.  I want to make sure we can all hear

20  each other, but I want to make sure.  Maybe we can all talk.  I

21  need to understand more, Mr. Pesce.  I just need to -- I need

22  more background, and I need to understand from the debtor --

23  and I don't want anybody to think I'm pre-judging it.  I just

24  need to understand what the ask is today.  Is it you want to go

25  forward with Surgical Theater?  And if I say no, then the

1  motion dies, or what happens today?

2         MR. PESCE:  Yeah.

3         THE COURT:  That's what I need to understand.  Or is

4  it, you know, do I go forward with Surgical Theater, run it in

5  front of Lopez, see if he's going to bite, and if not, then we

6  reserve the right to go back to Augmedics.  I just need to know

7  what the ask is today.

8         MR. PESCE:  Sure, yeah, let me -- that's great, and I

9  apologize for not making that clear up front.  You know, we --

10  yesterday we sent the bid for Surgical Theater to Augmedics,

11  and we proposed a minimum increase of $250,000 to restart the

12  auction, and we asked for a response by 6 p.m. Central Time.

13  We also suggested $100,000 increments thereafter.  Those were

14  higher than the $50,000 increments previously.  As

15  Mr. Varughese will explain, we wanted to sort of cut this

16  short, given we already had an auction, and we had this hearing

17  today, and it's very expensive to kind of continue this

18  process.

19         THE COURT:  Yep.

20         MR. PESCE:  So we wanted to really avoid endless back

21  and forth.  And Augmedics also told us they didn't want to have

22  -- they weren't committing, but they didn't want a process that

23  was back -- endless back and forth, they wanted to bring it to

24  a close quickly.  So we made that proposal.  We were told that

25  there was no -- there was a inability to sort of process it by

1  six o'clock.  I offered, if they wanted to, you know, to talk

2  about it, we were open to a different process.  But what we had

3  proposed, and which Surgical Theater was amenable to, was

4  effectively reopening the auction in that manner.

5         I have not been told -- I haven't been told by

6  Augmedics that it is willing to submit a higher bid.  If

7  Augmedics is -- were to be willing to submit a materially

8  higher bid -- and we're open to the bid increments.  They don't

9  necessarily need to be the 250- and 100-.  But they're

10  amendable to that in very short order like you know, this week.

11  We would be amenable to reopening the auction by zoom for

12  telephonic means and trying to bring this to closure that way.

13         In the absence of that, which I haven't been told

14  yet, you know, we would like to get the Surgical Theater bid

15  approved today.  But again, we are ready, willing, and I

16  understand the Committee is supportive of this.  If Augmedics

17  is willing to do that, if it's willing to submit a higher bid

18  than the 1.5-, we would reopen the auction and, you know, put

19  out -- get that going right away.  And we also are cognizant

20  that there are people in Israel and other time zones.

21         THE COURT:  Yeah.

22         MR. PESCE:  You know, we -- we're willing to do this

23  telephonically so people don't have to fly.  We're going to do

24  it, you know, tomorrow or you know, the day after if that

25  works.  But we're willing to do it if people want to do that.

1  But in the absence of a commitment to bid, we would ask that

2  Surgical Theater be approved today.

3           THE COURT:  Okay.  And what if I say no to that?

4  Then what -- where are we?

5           MR. PESCE:  If you say no to --

6           THE COURT:  Or what if I say I'll approve it, but

7  without, you know -- I guess is it up or down on Surgical

8  Theater today?  That's what I'm trying to figure out.  In other

9  words, I just need to know --

10          MR. PESCE:  Yeah, if they -- if they're not willing

11 -- look, if they're not willing to participate in a short,

12 abbreviated, re-bid, over-bid session --

13          THE COURT:  I haven't been asked to open up the

14 bidding, right?  So no one is asking me to re-open up the

15 auction.

16          MR. PESCE:  I --

17          THE COURT:  What I'm being asked to do is either

18 approve a sale to a person I just found out a few hours ago?

19          MR. PESCE:  Yeah, it's a fair point.  Taking a step

20 back here, the debtors believe that they have the ability to

21 consider this bid and to reopen the auction based on the

22 existing bidding procedures.

23          THE COURT:  Okay.

24          MR. PESCE:  If the Court were to disagree but the

25 parties were willing to bid again, we would be happy to make a

1  formal motion to reopen --

2          THE COURT:  I got it.

3          MR. PESCE:  -- the bidding in that way.

4          THE COURT:  Okay.

5          MR. PESCE:  But we need a willing counterparty in

6  Augmedics to do that.  And in the absence of that, we think

7  that the bid that we received is sufficiently higher that it's

8  appropriate using our fiduciary provisions of the bidding

9  procedures to consider it and seek approval of that today.

10          THE COURT:  Okay.

11          MR. PESCE:  I appreciate that's a little convoluted

12 and --

13          THE COURT:  No, no, no, no, it's actually very

14 helpful.  I just want to make sure that I --

15          MR. PESCE:  Yeah.

16          THE COURT:  So, Mr. Martin, who would testify on

17 behalf of your client today?

18          MR. MARTIN:  Yeah, again, that's Jeff Witherite.  He

19 is the senior vice president of finance for Surgical Theater.

20          THE COURT:  Is he --

21          MR. MARTIN:  And, in fact, the first -- go ahead,

22 Your Honor.

23          THE COURT:  Is he available to us -- is he on video.

24          MR. MARTIN:  He is, Your Honor.  He is on the GoTo

25 Metting right now.

1          Mr. Witherite, do you want to turn on your camera?

2          And in the meantime, Judge, while he's turning on his

3  camera, I would advise the Court that I believe the evidence is

4  going to show that Surgical Theater operated in good faith

5  throughout this process.  I was personally contacted on August

6  1st, and advised by Surgical Theater that they did not learn of

7  the auction or the bidding procedures until July 31st.  And we

8  worked expeditiously to actively reach out to the debtor, the

9  debtor did not reach out to us, to seek access to the data room

10 and gauge the possibility of submitting a late bid.  As

11 Mr. Pesce describes, there was a significant --

12          THE COURT:  I don't want you testifying to what he's

13 going to say.  I just want to hear it from him.  I want to hear

14 him.

15          MR. PESCE:  Yeah, it looks like I see that -- I see

16 Mr. Witherite's box there --

17          THE COURT:  Yeah, I see it there.

18          MR. PESCE:  -- but I don't see his camera on --

19          THE COURT:  Yeah, I see it there.  No, I'm just

20 saying as part of the process, and I'm going to let the debtor

21 put on their presentation however they want.  I'm going to let

22 the objecting parties object, right?

23          MR. PESCE:  Well, if he's here and needs a moment to

24 turn his camera on, we can provide --

25          THE COURT:  Yeah, no, no --

1          MR. PESCE:  We can put our witness up first.

2          THE COURT:  I don't want to jam him, and I don't want

3    -- I just want to make sure, if someone is going to testify

4    today, that we can all see them today, especially if we're

5    going to go on a expedited basis.  I just want to make sure.

6          Mr. Feinstein, and I know that I haven't heard from

7    the Committee yet and their views.  But obviously I'm

8    interested in hearing that as well.  I'm kind of going a little

9    bit out of order.  I just want to make sure that everybody who

10   I'm at least asking to speak today is available to be heard

11   today.

12         And then I want the parties to ask just a fundamental

13   question.  It's on my mind, and you might as well start

14   thinking about it, and I don't know that -- well, I'm thinking

15   about it now out loud.  You know, I got it the debtor has to

16   consider it, but do I?  That's the real question you got to

17   answer today, right?  In other words, can someone just next

18   time just -- you know, what's the difference between not

19   knowing about it, and  -- but there's a due process notice in

20   the procedure, and the debtor goes through an auction, and not

21   knowing about it but then showing up a day later.  Is 50

22   percent more, is 10 percent more?

23         What -- you know -- I don't think the issue today is

24   about the debtor exercising their fiduciary duty, let me just

25   put that out there now, right, professionals, from everything

1  I've heard about the process, and I'm sure I will hear more.  I

2  think debtors' counsel did everything they were supposed to do.

3  And maybe I'll find out -- maybe that will be found out wrong,

4  but -- in other words, considering another offer and someone is

5  putting more money, you can't not listen.  The question is, you

6  know, does the process itself allow consideration of additional

7  bids afterwards, and  I think regardless of how this turns out,

8  I think the debtors and their professionals did what they were

9  supposed to do, which was to listen and at least bring it to

10  the Court's attention that there's someone else who is willing

11  to do more.  Whether they're able -- whether I'm -- I'll

12  entertain it is another question.  And I think that's the

13  question that you all are going to -- I'm saying that for

14  purposes of presentation.

15          I think, you know, Ms. Perry, I read your pleading,

16  and I thought it was a little strong on the integrity of the

17  process part, but I got it, you were putting something together

18  really fast.  But you know what's the real question, right?

19  What's the purpose of an auction and bidding procedures if

20  someone can, you know -- does someone even need to talk?  Can

21  someone just not participate and then show up later?  Is this

22  different?  I don't know.  Those are the questions that we got

23  to kind of uncover today, you know?  But I don't -- you know, I

24  think everyone should focus less on, you know, what people did

25  or didn't do, but more kind of where are we, and what does one

1  do in light of where we are.  So --

2        MR. PESCE:  And I think Mr. Varughese will be

3  testifying to that, and we had some legal argument that to

4  follow his testimony and any other witness that appear today,

5  and I'd be happy to address those point once the evidentiary

6  record is before the Court if that's helpful, or I could do it

7  now?  Whatever Your Honor prefers.

8        THE COURT:  No, no, no.  Just, you know, I just --

9  the reason I'm saying that is one could read Mr. Martin's

10 argument that they just found out as a lack of diligence on

11 behalf of Alvarez, and that's what they're going to have to

12 deal with, right?  These folks didn't find out about it.  Well,

13 why didn't they find out about it?  Well, what didn't they do

14 to find out about it?  And I'm -- I don't think -- it sounds

15 like that's not the case based upon the testimony I heard

16 earlier, but I want to make sure that we dispel of any of that

17 notion, if it's the case, one way or the other.  But Alvarez

18 will have to tell me about their process itself.  I'm just kind

19 of -- you know, you can read someone showing up a lot of

20 different ways, and I want to make sure that we hyperfocus on

21 the exact precise issue that's before me.  I think close a

22 bunch of other doors that aren't.

23        So what I would ask is why don't we just take like a

24 five-minute break?  Why don't you all figure out in terms of

25 whether we're going forward, not going forward.  It sounds like

 1 | we are, but I don't know if there's agreement on opening up the

 2 | process up or not.  And I'm not saying what I'll do one way or

 3 | the other.  I am saying I just want to make sure that, you

 4 | know, whoever is going to go first is ready to go, and that all

 5 | the tech issues that we've got are ready to go.  But you all

 6 | tell me how you want to proceed.

 7 | MR. PESCE:  Why don't -- I'm looking at the clock.  I

 8 | see it's almost 10 to 2 Central Time.  I would -- I -- if

 9 | Augmedics is willing to consider submitting a different bid,

10 | setting aside the bid increments.

11 | THE COURT:  And I don't know if they are or not,

12 | but --

13 | MR. PESCE:  I don't know, but I -- yeah,  I don't

14 | know.  I -- I'll call them during, like, say, the next ten

15 | minutes and discuss that.  And if we can reach some type of --

16 | we don't need to be on the record.

17 | THE COURT:  Okay.  And again, I'm not asking anyone

18 | to say or no.  I am asking just for purposes of what's before

19 | me that I -- that we cross the lines -- the issues, and kind of

20 | where Augmedics is.  And I'm sure they can say it on the

21 | record.  I sure would appreciate it.  I think it would help

22 | streamline the procedures that we've got in terms of this

23 | afternoon.

24 | MR. PESCE:  I'll speak to Ms. Perry and Mr. Schults

25 | now.  Depending on what they say, that might negate the need

 1  for the rest of the hearing, or it might necessitate it.

 2  And --

 3          THE COURT:  Got it.

 4          MR. PESCE:  And we would then -- we could then put

 5  Mr. Varughese on and address the legal arguments.  And, in

 6  fact, we could then put Mr. Varughese on and address the legal

 7  argument.  So, Your Honor, would we all just maybe two o'clock

 8  central time?

 9          THE COURT:  Yeah, I'll do that.

10          Mr. Feinstein, before I turn to that, I'm going to

11  just take like a ten-minute break.  But Mr. -- I just -- I

12  don't --

13          MR. FEINSTEIN:  Thank you, Your Honor.  I did want to

14  be heard, Your Honor, because Mr. Pesce made a statement before

15  about what the Committee's position is, which isn't entirely

16  informed, I guess, because the Committee has been caucusing

17  today.  And we were advised of this yesterday.  And I say

18  "advised" because we're a consultation party, but we weren't

19  asked should we accept this new bid, but we were told what was

20  going on in real time.  And we're very mindful of the sanctity

21  of the process, and of bidder's right to rely on bid

22  procedures, a letter and a process.  We also represent a

23  constituency that would fare better financially if this comes

24  in.

25          So we -- you know, we unfortunately -- you know, the

1   decision will ultimately be Your Honor's.  But I did want to

2   point out that we're not simply in favor of opening up the

3   auction and imposing the bid requirements of 250,000 and so

4   forth that the debtor articulated to Augmedics yesterday.  I

5   think you could start over and have a new auction, you know,

6   start fresh, or you could decide either to take the new bidder,

7   the Augmedics bid.  But the idea of sort of forcing a new

8   auction to happen in real time today with a $250,000 over bid

9   with an hour's notice didn't seem to us particularly fair.

10          THE COURT:  So --

11          MR. FEINSTEIN:  I don't envy Your Honor having to

12   decide this, but I will point out, Your Honor, that there -- I

13   had a similar experience in front of Judge Jones early last

14   year in Limetree Bay Petroleum case, refinery case.

15          THE COURT:  I'm familiar with Limetree.

16          MR. FEINSTEIN:  Where the judge very reluctantly

17   opened up the bidding, but a very different set of

18   circumstances where the principal of the competing bidder had a

19   heart attack the day before the bid deadline --

20          THE COURT:  Yeah.

21          MR. FEINSTEIN:  -- and they were not able to follow

22   through.  So very different set of facts.

23          THE COURT:  And I'm happy to hear that they're

24   different sets.  You know, I didn't want a repeat of Limetree

25   on that -- those facts.  So what do we do?  This --

```
 1              MR. FEINSTEIN:  Just a dull case.

 2              THE COURT:  So why don't we do this?  It's 1:54.

 3   Mr. Pesce, I'm going to give you the ten minutes, so why don't

 4   we just do 2:05 Central.  And I'll let you all talk.  And if --

 5   it sounds like you may -- if you -- you know, in the middle of

 6   something, just let Ms. DeSantis know, my clerk, know.

 7              MR. PESCE:  Maybe just kind of looking at it, because

 8   I think I have to speak to Augmedics and then with the

 9   Committee to be sure we're on the same page because I know

10   there's a lot of people --

11              THE COURT:  Yeah, do you want to do 2:10?

12              MR. PESCE:  Why don't we do 2:15?

13              THE COURT:  2:15?  Okay.  Yeah.  2:15.  So everyone,

14   we'll take a break till 2:15.  I would ask everyone, the line

15   is going to remain unmuted, so I would just -- you know, don't

16   just jump off this line.  We will not do anything before 2:15.

17   I want to make sure that you're not -- anything you say is not

18   heard in open court.  So I'll come back at 2:15.  Thank you.

19              MR. PESCE:  Thank you, Your Honor.

20              THE CLERK:  All rise.

21              MR. MARTIN:  Judge, with us really quickly,

22   Mr. Witherite is on the line, by the way.  I was able to get

23   his camera on.

24              THE COURT:  I see him, too.  Okay.  2:15.  All right.

25        (Recess taken at 1:55 p.m.)
```

 1          (Proceedings resumed at 2:39 p.m.)

 2               THE CLERK:  All rise.

 3               THE COURT:  I don't mean to rush anyone.  I'm just

 4   ready whenever.  We'll give everyone a minute.  Give me a

 5   second.

 6               MR. PESCE:  For the record, Gregory Pesce, White &

 7   Case on behalf of the debtors.  I see Mr. Schultz turned on his

 8   camera.  We had an offline discussion.

 9               Mr. Schultz, if you need to speak with me, I can step

10   aside.  Let me know.

11               THE COURT:  If you all need more time, just go ahead.

12   There's just a couple of things I figured I could just do up

13   here as well.

14               Mr. Schultz, hold on a second.  Let me make sure.

15   Have I unmuted your line, Mr. Schultz?  I just want to make

16   sure.

17               MR. SCHULTZ:  Can you hear me, Your Honor?

18               THE COURT:  Yes, I can.  Thank you.

19               MR. SCHULTZ:  Thanks, Your Honor.  I had to

20   disconnect to have some calls during the break.  We did have a

21   chance to speak with the debtors.  I'm happy to advise the

22   Court what my client is prepared to do and not prepared to do.

23   I don't think that there's further discussion necessary, as far

24   as I understand.

25               THE COURT:  Okay.

1            MR. PESCE:  Yeah, I mean, maybe just to set it up.

2    Like I said at the prior session, Your Honor, the process here

3    matters.  These are unusual circumstances.  So the debtors

4    would be, as I understand, in support of -- as to Surgical

5    Theater, would be willing to reopen the auction later this week

6    at a mutually convenient time, using a $50,000 bid increment,

7    versus what we had, you know, sought to do the other day.

8            And I guess I need to hear from Mr. Schultz about his

9    client's position regarding that proposal.  If they're willing

10   to do that, we would be prepared to adjourn this hearing for a

11   couple days.  If they're not prepared to do that, you know, we

12   expect to go forward with Mr. Varughese's testimony.  So I'll

13   stop there.

14           THE COURT:  Okay.  Mr. Schultz, why don't you just

15   state your name and who you represent for the -- just so we

16   have a clean record again?

17           MR. SCHULTZ:  Yes, Your Honor.  Thank you.  Nathan

18   Schultz, on behalf of Augmedics, Inc.  Can Your Honor hear me

19   again?

20           THE COURT:  Just fine.  Thank you.

21           MR. SCHULTZ:  Great.  Thank you, Your Honor.  So,

22   first I'd like to tell the Court what I have authorization for,

23   and then I can explain what I don't have authorization for.

24   I've conferred with the client, we conferred with the debtors'

25   professionals, and I have authority to increase the amount of

1   the Augmedics bid to a million-five today on the condition that

2   it is put up for approval by the debtors today, not subject to

3   further overbid, and approved by the Court today.  Or if we

4   needed to continue the hearing for the Court to consider that

5   matter, although it's just a dollar increase, we could do that

6   on a narrow basis.

7          What I don't have authority to do is to commit to

8   participating in a further overbid process after the client

9   already prevailed as a successful bidder in compliance with the

10  bidding procedures order.  You can -- Your Honor can probably

11  understand the client has, you know, a strong emotional

12  reaction to that.  They are business people.  They want to do,

13  you know, what makes practical business sense.  And so,

14  against, you know, that displeasure about what happened, you

15  know, again, they are willing to make an economic accommodation

16  to get finality today.

17         They've participated in this process as a stand-up

18  bidder the entire time, you know, and again engaged in

19  discussions even before the case was filed; but they feel very

20  extremely unsettled about, you know, what happened thus far.

21  And I don't have, Your Honor, honestly, a way to convince them

22  that I know of, you know, so far, how they could feel

23  comfortable when they already participated in a court-approved

24  process and then they would be subjected to another, you know,

25  presumably court-approved process that could, you know, fall

1   apart.  And that's not any, you know, disrespect to the Court

2   or to the debtors' professionals.  I understand --

3          THE COURT:  None taken.  I haven't said anything.

4   None taken on my part.  I haven't done anything.

5          MR. SCHULTZ:  No, no.  Didn't mean to suggest there

6   is any need for that --

7          THE COURT:  No, no.  No, I'm just kidding.  I -- tell

8   me what y'all want to do.  I can -- let me clear the deck a

9   little bit.  There will be no more auctions.  I'm either -- I'm

10  going to -- the debtor is going to pick one and is going to go

11  forward today.  I'm not opening up the process.

12         There was a process.  There was due process,

13  constitutional due process, provided to all parties in the

14  notice.  Unless somebody tells me -- it sounds like the bidding

15  procedure went out to all parties.  There's always going to be

16  someone who doesn't know about an auction, right?  So the "I

17  just found out," that doesn't move me one way or the other,

18  because in every case there's going to be someone who can come

19  in saying "I didn't know about it," right?

20         The question is, was the process fair?  Was, you

21  know -- and A&M is going to have to tell me one way or the

22  other what their process was and whether the process was fair.

23  And if the process was fair, there's always going to be someone

24  who can come in and say I -- you know, but I approved the

25  process to maximize value for the estate.  So the debtor is

1  going to have to tell me who they're going to go forward with,

2  and then, you know, they can put on a witness.  But, you know,

3  I'm not opening this auction back up.

4      It does say -- I do want to note, and I want to give

5  the debtors some cover on this -- "unless otherwise ordered by

6  the Court" -- the bidding procedures say, "unless otherwise

7  ordered by the Court, all bids" -- you know, there are no kind

8  of qualified bids, right, after the auction.

9      So I'm not further authorizing -- just on a basis.

10 Now, if somebody wants to attack process, they're more than

11 welcome to.  But that's sale hearing stuff.  But I just showed

12 up.  We're not doing that anymore, in light of everything that

13 I've heard.

14     So, Mr. Schultz, you will have the comfort.  I

15 haven't heard anything to open up an auction process anymore.

16 That's not voluntary.  And it sounds like your client isn't

17 volunteering to one, so -- and it sounds like there's an

18 increased offer.

19     So I'll give the debtors some time to, you know,

20 figure out what you all want to do, but -- and everybody's

21 rights are preserved on that.  I'm just -- what I'm saying is

22 the debtor's going to -- the debtor's either going to go

23 forward and tell me who they want to -- who they're going

24 forward with.  Everybody's here and on notice, but if the --

25 I'm not opening up the auction again.

 1          There was a -- unless I hear something that gives me

 2    pause about process, right?  But that's -- and that's not to --

 3    I'm saying this for the record.  That's not to imply that there

 4    was anything about the process.  I'm just saying that's

 5    auction sale hearing stuff, right?  You hear the process, and

 6    then someone says -- someone can come in and object and say,

 7    Your Honor, we didn't get our fair shake, and we get to hear

 8    about the process and what the bidding procedures say.

 9          I don't know how this turns out, but I just know the

10    answer is the debtor is going to pick someone and we're just

11    going to go forward.

12          MR. PESCE:  Sure.  At the risk of delaying this

13    further, what I would suggest is we just spend maybe ten --

14    2:55, and then come back on, so I can confer with the debtors

15    about our approach, and the Committee --

16          THE COURT:  Yeah, and you can talk to -- you know,

17    and if you want to talk to the Committee, I got it.  I will

18    tell you I have a short 3:30 hearing that I would need to just

19    take a break for, but that would take no longer than 30

20    minutes.  So 3:30 to 4, if we have to.

21          So maybe -- if we need to start, we'd need to stop

22    then and just take a 30-minute break and go forward.  But I

23    wanted to make sure -- I'm not prejudging anything, but what I

24    am telling the debtor is I don't want you considering Options A

25    or B.  Let me close a door or two, in terms of what I'm willing

1   to do today.

2         MR. PESCE:  Understood.  I think --

3         THE COURT:  And maybe that -- I don't know if that

4   helps or hurts, but I want to make sure that at least you knew

5   where I was going.

6         MR. PESCE:  If you'd just give us maybe eight minutes

7   to --

8         THE COURT:  Yeah.  No, no, no.  Take as much time as

9   you need.  I'll be here just doing other stuff.  Don't let me

10  -- go from there.  Okay?

11        MR. PESCE:  We'll come back then.  Thank you,

12  Your Honor.

13        THE COURT:  Alrighty.  Thank you.  Again for the

14  folks here, just make sure you keep your phone on mute.  I

15  really am in the courtroom now, and I'll hear everything.

16      (Recess taken at 2:48 p.m.)

17      (Proceedings resumed at 3:00 p.m.)

18        THE COURT:  -- record in Surgalign.  Counsel, is

19  there an update?

20        MS. POLNICK:  Yes, Your Honor.  This is Veronica

21  Polnick on behalf of the debtors.  We are in discussions with

22  the various parties about how best to proceed today.  If we

23  could possibly come back after your 3:30 setting, I think that

24  would give us some time to circle the wagons.

25        THE COURT:  Okay.  And just so we have -- completely

1   fine with me.  Let me just take a quick look at what's in line

2   here.  Just give me ten seconds.  Just for the record, maybe we

3   can just start lining back in around 3:45?

4           MS. POLNICK:  Yes, Your Honor.

5           THE COURT:  Okay?

6           MS. POLNICK:  Will do.  Thank you.

7           THE COURT:  And that way we can at least tell the

8   phone folks, if you dial back in and -- I will not start before

9   3:45.  I still may be finishing up on another hearing, but at

10  least everyone knows kind of 3:45.  Okay.

11          MS. POLNICK:  Great, Your Honor.  Thank you for the

12  flexibility.

13          THE COURT:  Thank you.

14          MS. POLNICK:  Thanks.

15      (Recess taken at 3:01 p.m.)

16      (Proceedings resumed at 3:59 p.m.)

17          THE COURT:  Let me turn to 23-90731, Surgalign.

18          Mr. Pesce, why don't you give me a sense and tell me

19  where we are?  I guess let me give everyone a moment to kind of

20  come back on.

21          Okay.  Mr. Pesce, why don't you tell me where we are?

22          MR. PESCE:  Thank you, Your Honor.  We appreciate

23  your endless patience with us today as we work through this.

24  Taking a step back here.  Our goal is to maximize the value

25  available and minimize cost to achieve that value, and that's

1   what's been guiding us through the last couple of days.

2          Heading into the break there, we took to heart your

3   comments regarding not reopening the auction and the manner in

4   which we should proceed today.  During the course of the break,

5   I think there were two relevant updates that sort of came into

6   focus with us as we were talking to the bidders and developing

7   our path forward.

8          First off, we had been under the impression that the

9   purchase agreement with Augmedics was, in fact, completely

10  done.  In fact, there's -- as brought to our attention,

11  schedules that are attached to it were not yet complete,

12  including the schedule of required assets, which we sent over

13  previously.

14         At the same time, Surgical Theater came to us with

15  an agreement to purchase the assets with a fully set --

16  fully-executed set of documents for $1.65 million and a

17  commitment to employ at least three of the digital employees so

18  that the business can be kept as a going concern within their

19  organization once they acquire it.

20         In the absence of having the agreement fully executed

21  with Augmedics, we don't have any choice but to proceed with

22  seeking approval of the Surgical Theater bid.  And to that end,

23  we have conferred with the Committee.  You know, they -- we

24  consulted with the Committee.  I do not -- I'll let them speak

25  to it.  I don't know if they support that decision, but we

1   would like to proceed with our case in chief and show the --

2   have the testimony -- or have the testimony from Mr. Varughese

3   today so we can then move on to the legal argument.

4           THE COURT:  Okay.  Let me hear from Mr. Feinstein.

5           Mr. Feinstein, hold on a second.  I may have muted

6   you by chance.  Hold on a second.  There were a number --

7           MR. FEINSTEIN:  There we go.

8           THE COURT:  There we go.

9           MR. FEINSTEIN:  Thank you, Your Honor.  I

10  literally found out by way of a text that came 30 seconds ago,

11  Your Honor, that -- this issue about the Augmedics APA not

12  being completed because of the schedules.  So I'm kind of taken

13  aback.  I'm processing all this in real time.

14          All I can say, Your Honor, is, you know, in the first

15  instance, the debtor will make its decisions here and consult

16  with us, but this is just brand new.  I'm having difficulty

17  processing, I guess, given all that's been going on.  We

18  thought that we -- this was a finalized APA.

19          THE COURT:  Okay.  Let me hear from Mr. Schultz.

20          MR. SCHULTZ:  Thank you, Your Honor.  This is Nathan

21  Schultz on behalf of Augmedics.  Can you hear me?

22          THE COURT:  Yes.  Thank you.

23          MR. SCHULTZ:  Thank you, Your Honor.  So I can't

24  agree with the debtors' (audio interference) one issue that

25  came up on the disclosure schedules.  It was the fact that

1   there were three patents included in the STI bid that were not

2   originally included in the Augmedics bid.  That's the only

3   issue on the disclosure schedule.  We'd like to add those.

4   That's an apples-to-apples deal in terms of the scope of

5   patents included.  There are other issues on the disclosure

6   schedules.

7           There is one issue that we've been discussing, that

8   is one word on an IP assignment, ancillary document, related to

9   the ability to pursue future damages for violation of the

10  patents, which, if you're buying patents, I'm not sure how you

11  couldn't be buying future damages for those patents.

12          Those are the only two issues.  I confirmed that in

13  writing to debtors' counsel immediately before we got on this

14  (audio interference) issues that we just hadn't worked through

15  because of what came up yesterday.  I don't view those as

16  substantive.  We believe there's an easy path to resolving

17  those.

18          The debtors didn't file an Augmedics APA, yet they

19  chose to file the STI APA, and so that's not, you know, before

20  the Court.  But there are not, in my view, substantive

21  differences between the APA that was filed with STI and the

22  Augmedics APA.  Those are the same form.  There are very minor

23  differences.

24          So I (audio interference) that counsel made to the

25  court.  People are, you know, subject to reasonable

1   disagreement, of course, but that's where Augmedics is at.

2   It's prepared to go forward with its million-five increase with

3   those two issues, the only things to be resolved that I know

4   of, and I think there's an easy resolution there.  So I'm happy

5   to answer further questions if the Court has them, but that's

6   where we're at.

7           THE COURT:  Okay.  Anyone else wish to be heard?  And

8   please hit "five star."  I want to make sure that I give you

9   the opportunity.

10          All right.  I'm going to cancel today's hearing.

11  We're not going forward with Surgical Theater as the proposed

12  purchaser.  They weren't part of the auction process.  The

13  process has to be run.  Either the auction gets opened up --

14  but I'm not opening the auction back.  I haven't heard a reason

15  why we should.  I'm not saying the debtor has to go forward

16  with Augmedics, but we're not going to -- someone's not going

17  to show up at the eleventh hour for whatever reason and bypass

18  an entire order that I entered.  You're not going to be able --

19  there's no way.

20          And, Mr. Martin, I'm doing this for you -- quite

21  frankly, for the benefit -- there's no way in the world I'm

22  going to get comfortable with a good-faith purchaser

23  requirement today.  And you don't want -- you're not going to

24  want a hearing where there's a good-faith purchaser today.

25          And I have the utmost respect for the professionals

1    today.  I think they got put in a really tough situation.  I

2    don't need -- I think -- I'm going to hear testimony -- I don't

3    want to put -- to me, process matters a lot.  And there are

4    reasons to go forward today, but there's -- no one's going to

5    get me comfortable with process today and get me comfortable

6    that the new buyer is a good-faith purchaser.

7            So you all can figure out what you want to do, and

8    the debtor can come back and go forward at another date.  And I

9    can give you a hearing really fast, but I'm not comfortable

10   proceeding today in light of kind of where things stand and

11   where things go.

12           And I'm not telling the debtor -- the debtor can go

13   forward with Augmedics or not.  Debtor can go forward with

14   Surgical Theater today or not.  I don't have a dog in it.  You

15   know, I don't have anything in there but process.  There was a

16   bidding procedure, there was notice provided, there was a

17   winning bidder provided, and I'm not opening up the auction

18   based upon anything that I heard today.

19           So I think you all are going to have to figure out

20   what you're asking me to do, but -- maybe you get me

21   comfortable another day.  But today won't be that day.  And I

22   think the Committee is entitled to take information and go back

23   to their group and hear where things are and see where the

24   documents are and -- as a consulting party.

25           But I -- this is not the case today, based on

1    anything that I've heard.  But I've got to be really careful of

2    opening up the door where somebody can just show up with

3    another ten bucks after a hearing and say that they want a

4    hearing.  I'm not saying that's what happened today, but I'm

5    not comfortable proceeding today, and I think I need the

6    Committee comfortable as a consulting party that there's been

7    process, I need A&M comfortable getting on the stand saying

8    that they ran a comfortable process.  And I'm unsure how

9    anybody's going to be able to do that today to get me

10   comfortable.

11          Let's pick a date in a couple days and see where this

12   goes.  I'm not saying this needs to be forever, but let's

13   figure out where it is.  And I think, at a minimum, Augmedics

14   is entitled to put on their best case.  And I'm not sure, you

15   know, holding them up with documents and someone showing up and

16   promising to do a lot of stuff, I am just not comfortable

17   today.

18          I think the debtor is going to have to decide what it

19   wants to do, and it sounds like they have, but today is just

20   not the day to do that and I'm not comfortable proceeding today

21   with -- in light of everything.  And I just found out who these

22   folks are.  I think this is different, and I want to be really

23   clear.

24          There was a case, Limelight, where the bidding

25   procedures were opened back up.  But Mr. Feinstein is right,

 1  right?  Somebody had a heart attack right before the bid

 2  deadline.  It's a little different than what we have today.

 3  And that person was in the Mayo Clinic, if I remember

 4  correctly.

 5          Things are a little bit different from where we are.

 6  But if it turns out -- and I'm not telling -- maybe the debtor

 7  can get me comfortable.  I'm not saying they can't.  And I want

 8  to make sure that we respect the process, and part of the

 9  process is making sure that Mr. Schultz's client has every

10  opportunity to come in and prepare and have their day in light

11  of where things go.

12          So, Mr. Pesce, this is not on the debtor.  This is

13  entirely on the Court and my comfort level and this has nothing

14  to do with A&M, Jackson Walker.  This has everything to do with

15  me making sure that I feel like the process has gone in, and I

16  don't want to rush into -- anyone.  I want everyone to have a

17  full opportunity and I want everybody to think about where this

18  is going.

19          So this is entirely on me and I want to make sure

20  that everyone has a fair opportunity to show up.  And I'm

21  hearing the Committee just found out about stuff, and it makes

22  sense because things are moving at a rapid pace.  But I do -- I

23  want to make sure that Mr. Feinstein can go back and talk to

24  the Committee and figure out what's going on and let everybody

25  come in when they're ready.

```
 1              Why don't y'all get with Ms. Saldana --

 2         MR. PESCE:  We'll find a date.

 3         THE COURT:  -- and pick a date.  But it can be this

 4  week.  I will let you know, I'm out next Tuesday -- no, next

 5  Wednesday.  Next Tuesday I've got long hearings in a particular

 6  matter that's going to take some time.  She'll figure out what

 7  day, and it doesn't have to be long.  It can be 48 hours for

 8  all --

 9         MR. PESCE:  We're eager to bring it to closure, too.

10  So we'll talk to Mr. Feinstein and your chambers and come back

11  to you soon.

12         THE COURT:  Let me just pull out some -- let me just

13  take a look.  If we do something on Thursday, it will be like

14  4 p.m., and we'll just go to we're done.  If we do something on

15  Friday -- oh, that's Envision.  Let me figure out what's going

16  on there.  That one's tricky.  Or maybe Friday can't do it --

17  I'm just throwing out dates and just giving you --

18         MR. PESCE:  Let me confer with our witness and our --

19         THE COURT:  Yeah, I'm just telling you.  Thursday

20  afternoon.  Friday, it would be Friday early afternoon.

21  Parties can appear by video or on phone.  I don't -- well,

22  let's see if we can get something done on Thursday, if we're

23  going to do it.  If not, then I'll let Ms. Saldana fit in a

24  date for y'all.

25         MR. PESCE:  If I --
```

 1          THE COURT:  You don't have to agree now.  I'm just

 2   kind of throwing out schedule dates.  I want you to sit back

 3   and think about everything.  I'm not going to jam anyone.

 4          MR. PESCE:  Thursday is -- we'll speak to the

 5   parties, and Thursday afternoon is fine for the debtors if we

 6   can do it by video --

 7          THE COURT:  Yeah.  And maybe like four o'clock would

 8   be the earliest that I could probably get it in.

 9          MR. PESCE:  We will -- if that works for the bid --

10   the UCC and the others, we'll make that work as well.

11          MR. FEINSTEIN:  It does.

12          THE COURT:  All right.  But at that point we're just

13   picking up and we're going.

14          MR. PESCE:  Yeah.  Right.

15          THE COURT:  You know?

16          MR. PESCE:  Understood.

17          THE COURT:  And you know, everybody will do a short

18   opening if you want one, and we're going.  We're just putting

19   on evidence and is it up or down on a sale.  At the same time,

20   I want to make sure that I don't -- the reason we have to go

21   fast is I know you want closure and we're not -- there's

22   someone that's going to buy this thing, and we're going to

23   figure out who it is, and that's what it is.  But we're not

24   going to let -- we're not going to chill bidding and we're not

25   going to --

1          MR. PESCE:  Uh-huh.

2          THE COURT:  I'm not having two folks walk way.

3     Somebody's going to show up and put the money up and buy this

4     asset and get all the protections and findings from me, but I

5     need to be comfortable that I can make them, so -- all right?

6          MR. PESCE:  We'll see you on Thursday unless -- we'll

7     speak to the other parties, but I expect we'll be here

8     Thursday.

9          THE COURT:  I'll just -- I'll call it Thursday at 4.

10         MR. PESCE:  Okay.

11         THE COURT:  All right?

12         MR. PESCE:  Put out a notice.

13         THE COURT:  Yeah.

14         MR. PESCE:  Thank you, Your Honor.

15         THE COURT:  Alrighty, folks.  Thank you.

16         COUNSEL:  Thank you.

17         THE CLERK:  All rise.

18       (Proceedings concluded at 4:12 p.m.)

19                        * * * * *

20

21

22

23

24

25

1      **C E R T I F I C A T I O N**

2

3         I, Lisa Luciano, court-approved transcriber, hereby

4  certify that the foregoing is a correct transcript from the

5  official electronic sound recording of the proceedings in the

6  above-entitled matter, to the best of my ability.

7

8

9  _____

10  LISA LUCIANO, AAERT NO.  327      DATE:  August 11, 2023

11  ACCESS TRANSCRIPTS, LLC

12

13

14      **C E R T I F I C A T I O N**

15

16         I, Alicia Jarrett, court-approved transcriber, hereby

17  certify that the foregoing is a correct transcript from the

18  official electronic sound recording of the proceedings in the

19  above-entitled matter, to the best of my ability.

20

21

22

23  _____

24  ALICIA JARRETT, AAERT NO. 428    DATE: August 11, 2023

25  ACCESS TRANSCRIPTS, LLC