**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Emily E. Geier, P.C. (admitted *pro hac vice*)
Derek I. Hunter (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
joshua.sussberg@kirkland.com
emily.geier@kirkland.com
derek.hunter@kirkland.com

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com

*Co-Counsel for Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| BED BATH & BEYOND INC., *et al.*, | Case No. 23-13359 (VFP) |
| Debtors.[1] | (Jointly Administered) |

**DEBTORS' REPLY IN SUPPORT OF ENTRY OF AN ORDER
(I) APPROVING THE SALE AND ASSIGNMENT OF THE PINNACLE HILLS
LEASE TO HOBBY LOBBY STORES, INC. AND (II) GRANTING RELATED RELIEF**

---

[1] The last four digits of Debtor Bed Bath & Beyond Inc.'s tax identification number are 0488. A complete list of the Debtors in these Chapter 11 Cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/bbby. The location of Debtor Bed Bath & Beyond Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 650 Liberty Avenue, Union, New Jersey 07083.

TO: THE HONORABLE JUDGES MICHAEL B. KAPLAN AND VINCENT F. PAPALIA

UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEW JERSEY:

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file this reply (this "Reply")[2] in further support of the *Debtors' Motion for Entry of an Order (I) Establishing Procedures to Sell Certain Leases, (II) Approving the Sale of Certain Leases, and (III) Granting Related Relief* [Docket No. 193] (the "Motion"), and in response to *Michaels Stores, Inc.'s Objection to Approval of the Sale and Assignment of the BBBY Lease to Hobby Lobby* [Docket No. 2395] (the "Objection").  In support of this Reply, in further support of the Motion, and in opposition to the Objection, the Debtors respectfully state as follows.

## Preliminary Statement

1.      No duty is more sacred to a chapter 11 debtor than that of its duty as a fiduciary to maximize the value of its estate for the benefit of all of its stakeholders.  In the context of a sale of assets, a debtor maximizes value for the estate as a whole, and not any individual creditor, by selecting, in its own judgment, the "highest and best" offer.  Indeed, it would be contrary to a debtor's fiduciary duties to impose a limitation on a debtor's ability to pivot to any value-maximizing offer to the extent one presented itself.  Moreover, substituting a debtor's business judgment as to what constitutes "highest and best" for that of a third party with no economic stake in the debtor's estate effectively strips a debtor of its duty to maximize value.  And more importantly, it deprives the debtors' creditors of reaping the benefits of higher offers.

2.      Consistent with this fiduciary duty, which is further memorialized in the Debtors' Lease Sale Procedures, the Debtors seek to assign the Pinnacle Hills Lease to Hobby Lobby for

---

[2]     Capitalized terms used but not otherwise defined in this Motion shall have the meanings ascribed to them in the Lease Sale Procedures, the Objection, or the Debtors' Omnibus Reply.

approximately $2.1 million.  While the Hobby Lobby deal provides the Debtors with **_nearly triple_**

the cash consideration offered by Michaels at the time of this Court's Bench Opinion, it just as

importantly eliminates the possibility of protracted litigation with the Landlord and the attendant

risk of losing the entirety of the sale proceeds upon appeal or through the estate's continued

metering of legal fees and expenses.  And even though the Debtors recognize and appreciate

Michaels's efforts as a bona fide bidder during the bidding process, the Debtors can ill afford to

underwrite the risk of an uncertain outcome as presented by the Michaels bid.  At bottom, it would

be contrary to the Debtors' fiduciary duties to trade the significant locked-in value of the Hobby

Lobby bid for the inevitable litigation and uncertainty endemic to the Michaels bid.  And nothing

in the Lease Sale Procedures or otherwise prevents the Debtors from pivoting to the Hobby Lobby

bid.

   3.  Contrary to the assertions made in Michaels' Objection, the Debtors landed on the

Hobby Lobby bid after a robust and successful auction process that, at all times, complied with the

Lease Sale Procedures, including step by step consultation with the Creditors' Committee and DIP

Lenders (as Consultation Parties)—both of which support the relief requested.  Following entry of

the Lease Sale Procedures Order [Docket No. 422], the Debtors and their advisors advanced a

comprehensive lease optimization process consisting of dual phase lease auctions, which resulted

in the approval of nearly 200 lease dispositions, generating nearly $65 million in cash proceeds for

the estate. At the June 26, 2023 auction, the Debtors declared Michaels the successful bidder with

respect to eight unexpired leases, one of which was the Pinnacle Hills Lease valued at the price of

$100,000.  Despite attending but failing to participate in the auction as a qualified bidder,

the Landlord objected to the assignment of the lease to Michaels.  The Landlord contended that

the assignment violated various adequate assurance requirements of certain shopping center

provisions in the Bankruptcy Code and insisted on discovery and a briefing schedule. Acknowledging the legal costs and expenses attendant to litigating an asset sale of only $100,000, the Debtors reached a fee coverage arrangement with Michaels to enable the estate to continue to prosecute the lease sale. The Debtors engaged in depositions, briefing, and more with respect to the issues raised in the Landlord's objection, ultimately prevailing on the litigation as reflected by the Court's Bench Opinion.

4. Notwithstanding the Court's ruling, the Landlord indicated to both Michaels and the Debtors of its intent to appeal the Court's ruling and potentially seek reconsideration of the assignment based on, among other things, the disclosure of the fee arrangement. These actions threatened to delay, and potentially prevent, the closing of the Michaels' assignment. As the Debtors, Michaels, and the Landlord worked to negotiate an agreed form of order reflecting the Court's ruling, the Debtors received an unsolicited, alternative bid from Hobby Lobby to buy the Pinnacle Hills Lease for approximately $1.7 million, or nearly $1 million more than the consideration offered by Michaels. Rather than take any unilateral action, and in recognition of the Court's prior ruling and all parties' efforts throughout the bidding process, the Debtors coordinated a status conference with the Court to give all parties an opportunity to be heard with respect to the latest developments and related issues. At the Court's suggestion, and consistent with the Lease Sale Procedures,[3] the Debtors held an auction on September 27, 2023 for Michaels and Hobby Lobby to present dueling bids to buy the lease.[4]

---

[3]    Lease Sale Procedures § O (Reservation of Rights).

[4]    Consistent with the Phase 1 Lease Auction, the Landlord informed the Debtors (and the Court) that it would not bid on the Pinnacle Hills Lease at the auction. It ultimately did not.

5.      Following the auction, the Debtors, in consultation with the Consultation Parties, selected Hobby Lobby as the Successful Bid and Michaels as the Backup Bid.  In so doing, the Debtors properly availed themselves of the broad "fiduciary out" provided in, and sacred to, the Lease Sale Procedures.[5]  Disappointed with the outcome of the auction, Michaels now seeks to cast aspersions on the integrity of the process to prevent the Debtors from closing on the higher and better offer.  But as both Michaels and Hobby Lobby confirmed on the record at the auction, neither party engaged in collusion and both parties participated in good faith.[6]  While complaints of collusion often follow parties' efforts to control the price of an auctioned asset, here, the Debtors' auction process yielded a purchase price nearly triple the purchase price of the lease prior to the auction.  This is not a matter of colluding parties' efforts to control and depress the value of an asset at the expense of the estate.  Not only did the Debtors' process of a final auction (as mandated by this Court) work, but it critically provides the finality that Michaels so desires.  (In any event, as the losing bidder, Michaels has no standing to pursue a section 363(n) claim).[7]

6.      Failing to find evidence in collusion or bad faith, Michaels argues that the Hobby Lobby bid is not the highest and best because the Debtors incorrectly value Michaels' waiver of

---

[5]   *Id.* § R (Fiduciary Out).

[6]   *See* Tr. H'rg. at 25:21-25; 26:2-10

[7]   And even if Michaels has standing—it does not—Michaels' objection is misguided as the Debtors were not harmed by communications (if any) between Hobby Lobby and Pinnacle Hills.

its putative substantial contribution claim at $0.  But Michaels already waived any such claim in its bid documents with the Debtors.[8]  So, indeed, the Debtors assign it no weight here.[9]

7.    Overall, the Debtors' bidding procedures, which all bidding parties assented to through their participation in the Debtors' process, contain a broad "fiduciary out" permitting the Debtors to take any action consistent with their fiduciary obligations.  Having received an unsolicited, alternative bid that was over $1 million higher than the Michaels' bid, the Debtors availed themselves of that fiduciary out and, at the Court's direction, permitted both parties to put forth competitive bids to top the other through a final auction.  The Hobby Lobby bid was the Successful Bid, not simply because it provides access to the most money on the quickest timeline, but also because it resolves what could be a lengthy and uncertain litigation path forward that would jeopardize the sale of the lease itself.  In this respect, the Debtors arguably could have considered a headline price for the lease that was less than the price presented by Michaels.[10]  But the Debtors, in their business judgment, proceeded in a transparent manner that generated even more money for the estate.  Now, despite being the Backup Bidder, Michaels, through its Objection, seeks to find another way to become the Successful Bidder.  But the only way to do so was to put forth a topping bid.  Accordingly, the Court should overrule the Objection and approve the assignment of the lease to Hobby Lobby.

---

[8]    *See* Exhibit C (the "Offer and Qualified Bidder Form") to that certain Acquisition of Designation Rights Agreement dated June 22, 2023, (Michaels warrants and represents, *inter alia*, that it "shall be deemed to waive the right to pursue a substantial contribution under section 503 of title 11 of the United States Code (the "Bankruptcy Code") related in any way to the submission of its bid, the Lease Sale Procedures, or any earnest money Deposit.").

[9]    In any event, Michaels' ability to prevail on any such claim becomes that much more challenging as it continues to stand in the way of the Debtors' efforts to capitalize on the additional value achieved through the auction process.

[10]    *See* Lease Sale Procedures § I(v) ("The Debtors, in consultation with the Consultation Parties, reserve the right to select the Successful Bid, even if it is not the highest bid.").

**Background**

8.     On May 3, 2023, the Debtors filed the Motion seeking Court authorization to establish procedures to facilitate an expeditious and orderly process for the sale or other disposition of the Debtors' unexpired leases of non-residential real property (the "Lease Sale Procedures"). This Court approved the Lease Sale Procedures on May 22, 2023 [Docket No. 422] (the "Lease Sale Procedures Order").   On May 25, 2023, pursuant to the Lease Sale Procedures Order, the Debtors filed a notice informing parties in interest of the "phase 1" lease sale auction (the "Phase 1 Lease Auction"), (then) set to take place on June 26, 2023 [Docket No. 456]. The Debtors filed supplemental notices on June 23 and June 24 further detailing the lease assets to be auctioned at the Phase 1 Lease Auction, identifying, among other leases, the Pinnacle Hills Lease (as defined below).

9.     The Debtors held the Phase 1 Lease Auction on June 26, 2023, where over 150 leases were placed up for bidding.  Following the Phase 1 Lease Auction, the Debtors filed the *Notice of Successful and Backup Bidder with Respect to the Phase 1 Auction of Certain of the Debtors' Lease Assets and Assumption and Assignment of Certain Unexpired Leases* [Docket No. 1114] (the "Successful Bidder Notice") and the *Notice of Assumption of Certain Unexpired Leases* [Docket No. 1157] (the "Assumption and Assignment Notice" and together with the Successful Bidder Notice, the "Notices").   The Notices identified Michaels as the successful bidder, with designation rights relating to the Rogers, Arkansas Store Number 1142 lease (the "Pinnacle Hills Lease") with a successful bid in the amount of $100,000.

10.     On July 12, 2023, Pinnacle Hills, LLC ("Pinnacle Hills") filed its *Objection of Pinnacle Hills, LLC to Debtors' Motion for Order Authorizing Debtors to Assume and Assign Lease for Store No. 1142* [Docket No. 1323] (the "Pinnacle Hills Objection") objecting to the Debtors' proposed assumption and assignment of the Pinnacle Hills Lease to Michaels.

11.     After it became apparent that the Debtors would incur substantial legal expense in pursuing the assignment of the Pinnacle Hills Lease (that appeared likely to exceed any consideration the Debtors would receive for the Pinnacle Hills Lease if Michaels exercised its designation rights and determined to assume the Pinnacle Hills Lease), the Debtors reached an arrangement with Michaels whereby Michaels would cover fees associated with litigating the Pinnacle Hills Objection to a full and final adjudication.  On August 7, 2023, Michaels sent the Debtors a letter agreeing to cover such fees in an amount not to exceed $150,000 (the "Fee Sharing Agreement").  And on August 24, 2023, the Debtors confirmed, by email, that they were in agreement on the Fee Sharing Agreement.

12.     Following the Auction, Pinnacle Hills approached the Debtors about resolving the Pinnacle Hills Objection through a consensual lease termination.  On August 21, 2023, Pinnacle Hills sent the Debtors an offer to enter into an agreement to consensually terminate the Pinnacle Hills Lease in exchange for a payment in the amount of $300,000 (the "Pinnacle Hills Offer").

13.     After the Debtors advised Michaels of the Pinnacle Hills Offer, Michaels sent the Debtors a revised offer for the Pinnacle Hills Lease, increasing its offer to $850,000 and converting its bid from a designation rights agreement (where Michaels maintained optionality to accept an assignment of the Pinnacle Hills Lease and pay any consideration therefor) to an assumption and assignment agreement.  On August 23, 2023, the Debtors' informed Pinnacle Hills of Michaels' $850,000 offer for the Pinnacle Hills Lease.  On August 25, 2023, Pinnacle Hills matched the consideration set out in the revised Michaels offer, but declined to increase its offer beyond $850,000.  The Debtors proceeded to seek approval of the assignment to Michaels, filing a reply in support of the lease sale [Docket No. 2062] (the "Omnibus Reply").

14.     On August 30, 2023, the Court held a hearing (the "Approval Hearing") on the Motion.  At the conclusion of the Approval Hearing, the Court issued its opinion from the bench, granting the Motion and overruling the Pinnacle Hills Objection (the "Bench Opinion").  The Court also directed Pinnacle Hills, the Debtors, and Michaels to meet and confer to enter a consensual order (a "Consensual Order").

15.     On August 31, 2023, the Debtors sent Pinnacle Hills a proposed form of order (the "Original Proposed Order").  Several days later, on September 6, 2023, Pinnacle Hills sent a revised draft of the Original Proposed Order (the "Pinnacle Markup") and informed the Debtors that "[i]n all likelihood, Landlord will be appealing the order upon entry."  *See Declaration of Robert L. Lehane, Esq. In Support of Pinnacle Hills, LLC's Objection to the Michaels Proposed Form of Order Approving Sale and Assignment of Lease to Michaels* at PDF p. 188 of 290 [Sent by Email to the Court on September 23, 2023] (the "LeHane Declaration").

16.     On September 7, 2023, the Debtors, Pinnacle Hills, and Michaels discussed the Original Proposed Order and Pinnacle Markup (the "Meet and Confer").  During the Meet and Confer, the Debtors and Michaels confirmed they had a Fee Sharing Agreement.  Pinnacle Hills requested disclosure of the terms of the Fee Sharing Agreement and that its existence be included in any Consensual Order—which the Debtors and Michaels initially declined to do, believing its inclusion was unnecessary.  The Pinnacle Hills Markup further requested Michaels and the Debtors strike a finding that the proposed assignment to Michaels represented the highest and best value for the Pinnacle Hills Lease—which request the Debtors and Michaels rejected.

17.     Subsequent to the Meet and Confer, Pinnacle Hills informed the Debtors that it would object to any proposed Consenual Order that did not include its requested revisions and

would further object to any finding that Michaels is a good faith purchaser under section 363(m) of the Bankruptcy Code due to the Fee Sharing Agreement.

18.    On September 11, 2023, the Debtors sent the Fee Sharing Agreement to Pinnacle Hills.

19.    On September 12, 2023, Hobby Lobby sent an unsolicited offer of $1.35 million for the Pinnacle Hills Lease.

20.    On September 15, 2023, Hobby Lobby increased its offer to $1.7 million.  On that same date, Michaels submitted the proposed form of order to the Court.  On September 20, 2023, the Debtors notified the Court of Hobby Lobby's offer and requested a status conference.

21.    On September 26, 2023, the Court held a status conference, during which the Court suggested that the Debtors conduct another auction during which the parties could bid against each other for the Pinnacle Hills Lease.  The parties, including Michaels, agreed with the Court's suggestion.

22.    The following day the Debtors conducted that auction (the "Second Auction").  The Second Auction was conducted in accordance with the Lease Sale Procedures Order.  Both Michaels and Hobby Lobby participated in the Second Auction.  After several rounds of bidding, the Debtors, in consultation with the Consultation Parties, determined that Hobby Lobby made the highest and best bid, with a purchase price of $2.1 million (the "Hobby Lobby Bid").  Michaels' bid, of $2.05 million, was determined to be the back-up bid.[11]  At the conclusion of the Second Auction, and despite having willingly participated in it, Michaels informed the auction participants that it expected to object, on a limited basis, to the sale and assignment of the Pinnacle

---

[11]    Michaels' final bid included a waiver of its putative substantial contribution claim.

Hills Lease to Hobby Lobby based on its belief that the Lease Sale Procedures Order had not been followed.

<u>Argument</u>

I.    **The Fiduciary Out Provision in the Lease Sale Procedures Mandates that the Debtors Consider Alternative Value-Maximizing Bids, Like the Hobby Lobby Bid.**

23.    The fiduciary out provision in the Lease Sale Procedures permits the Debtors to consider all alternative offers, like the Hobby Lobby bid, provided that they maximize value of the estate.

24.    It well established that, "[w]hen a debtor desires to sell an asset, its main responsibility, and the primary concern of the bankruptcy court, is the *maximization of the value of the asset sold*," and that the "debtor will need to demonstrate to the bankruptcy court that the proffered purchase price is the highest and best offer." *In re Integrated Res.*, 135 B.R. 746, 750 (Bankr. S.D.N.Y. 1992) (citation omitted). Indeed, a debtor has a "fiduciary duty to get the highest value for" its assets. *In re Flour City Bagels, LLC*, 557 B.R. 53, 78 (Bankr. W.D.N.Y. 2016) ("In conducting an auction sale, debtors have a fiduciary duty to maximize the value of their assets.").[12]

25.    "In a bankruptcy case, it is 'Bankruptcy 101' that a debtor and its board of directors owe fiduciary duties to the debtor's creditors to maximize the value of the estate, and each of the estates in a multi-debtor case." *In re Innkeepers USA Tr.*, 442 B.R. 227, 235 (Bankr. S.D.N.Y. 2010). For that reason, it standard to include provisions in sale procedures like a "fiduciary out" to ensure that the debtor can satisfy its fiduciary duties to maximize recovery to the estate. *Id.* (denying approval of an agreement because the "fiduciary out" clause was flawed). The Lease

---

[12]    *See also In re Family Christian, LLC*, 533 B.R. 600, 621-22 (Bankr. W.D. Mich. 2015) ("The Debtors, in conducting the sale process, have a fiduciary duty to maximize the value of their estates.") (citing *In re Embrace Sys. Corp.*, 178 B.R. 112, 123-24 (Bankr. W.D. Mich. 1995)). A duty is imposed upon the trustee to maximize the value obtained from a sale, particularly in liquidation cases." *In re Bakalis*, 220 B.R. 525, 532 (Bankr. E.D.N.Y. 1998) (citations omitted).

Sale Procedures Order here expressly preserved the Debtors' fiduciary duties.  Section R of the

Lease Sale Procedures provides:

> Nothing in these Lease Sale Procedures shall require the Debtors'
> management or board of directors to take any action, or to refrain
> from taking any action, with respect to these Lease Sale Procedures,
> to the extent the Debtors' management or board of directors
> determines, or based on the advice of counsel, that taking such
> action, or refraining from taking such action, as applicable, is
> required to comply with applicable law or its fiduciary obligations
> under applicable law.[13]

26.    Moreover, the Lease Sale Procedures make clear that nothing therein "shall

abrogate the fiduciary duties of the Debtors."[14]  This is precisely the type of provision that Courts

have endorsed when debtors consider alternative asset bids.  *See, e.g.*, *In re Global Crossing Ltd.*,

295 B.R. at 733,746 (Bankr. S.D.N.Y. 2003) (concluding that fiduciary out provision permitting

termination of the purchase agreement "in order to discharge its fiduciary duties under applicable

Law, based upon consultation with external counsel" allowed "the Debtors to make an appropriate

response if a superior offer is made that the Debtors should consider by reason of their fiduciary

duties").[15]

---

[13]    *See* Lease Sale Procedures § R (Fiduciary Out).

[14]    *Id.* § O (Reservation of Rights).

[15]    *See also id.* at 745–46 ("If this Court were to believe, for half a second, that the Debtors had spurned a better offer
to the detriment of their fiduciary duties, this Court would not hesitate to invoke its powers. But there is no basis,
on this extensive record, for any such finding.  Rather, the record reflects that with the 'fiduciary out' provisions
in Sections 4.3 and 7.1(1) of the Purchase Agreement, execution of Amendment # 2 still permits the Debtors to
make an appropriate response if a superior offer is made that the Debtors should consider by reason of their
fiduciary duties.'"); *In re Innkeepers USA Tr.*, 442 B.R. 227, 235 (Bankr. S.D.N.Y. 2010) ("Finally, and of
paramount importance, I believe that the so-called Fiduciary Out, as written, is flawed. It prohibits the Debtors
from taking action consistent with their fiduciary obligations. Fiduciaries owe duties of care and loyalty, and
courts have held that these duties apply with equal or greater force in the context of a sale of assets." In a
bankruptcy case, it is 'Bankruptcy 101' that a debtor and its board of directors owe fiduciary duties to the debtor's
creditors to maximize the value of the estate, and each of the estates in a multi-debtor case."); *In re Diocese of
Camden, New Jersey*, 653 B.R. 309, 346–47 (Bankr. D.N.J. 2023) (applying the reasoning from the *Innkeepers*
case to reject the argument that limitations on a debtor's fiduciary out could be effective as a matter of contract).

27.    Notably, there is no temporal element to the exercise of the Debtors' fiduciary duty under the Lease Sale Procedures.  The Debtors are charged with exercising their fiduciary duty ***at all times***.  While the Debtors' submit applicable law imposes that responsibility on the Debtors, it is undeniable that the Lease Sale Procedures reinforce that obligation.  Michaels' bid was, and continues to be, subject to the provisions of the Lease Sale Procedures.  *See*, *e.g.*, Lease Sale Procedures Order at ¶ 23 ("The Lease Sale Procedures … shall govern the *submission*, receipt, and analysis of all bids related to any Lease Sales.  Any party desiring to submit a bid shall comply with the Lease Sale Procedures and this Order.") (emphasis added).  Because Michaels submitted its bid with the express understanding that the Debtors could—and would—continually exercise their fiduciary duties (and continually "analyze" the bids with reference thereto), Michaels cannot complain with the Debtors doing so (regardless of Michaels' good faith throughout this process).  Michaels certainly cannot claim "reliance" that their bid would be sacrosanct or that it would suffer damages, when the very Lease Sale Procedures under which it submitted its bid permit the Debtors to pivot at *any* time if their fiduciary obligations so required.

28.    Despite Michaels' suggestions otherwise, the Debtors' ability to consider meaningful alternatives to the proposed Michaels bid is unfettered, thereby protecting the interests of all constituents of the estates.[16]  Absent enforcement of the fiduciary out, the Debtors would be stripped of their ability to satisfy their fiduciary duties and the estate deprived of the substantial additional value to be generated from alterative asset bids.  *See Omnicare, Inc. v. NCS Healthcare, Inc.*, 818 A.2d 914, 937 (Del. 2003) (concluding that absence of a fiduciary out provision prevented

---

[16]    *In re GSC, Inc.*, 453 B.R. 132, 169–70 (Bankr. S.D.N.Y. 2011) ("The Trustee's decision of what is best for the estate should be undertaken with the goal of maximizing the value of the estate. A trustee maximizes value for creditors by selecting the 'highest and best bid, and thereby protecting the interests of [the debtor], its creditors, and its equity holders.' This duty is an obligation to the estate as a whole, not to individual creditors." (internal citations, quotation marks omitted)).

the board of directors from considering alternative transactions and therefore from "discharging its fiduciary responsibilities to the minority stockholders").

## II.    The Assignment of the Pinnacle Hills Lease to Hobby Lobby Reflects a Sound Exercise of the Debtors' Business Judgment.

29.    The assignment of the Pinnacle Hills Lease to Hobby Lobby reflects a sound exercise of the Debtors' business judgment as the Hobby Lobby bid represents the highest and best offer for the Pinnacle Hills Lease.

30.    The business judgment standard mandates that a court approve a debtor's business decision unless the decision is the product of bad faith, whim or caprice. *See In re Trans World Airlines, Inc.*, 261 B.R. 103, 121 (Bankr. D. Del. 2001); *see also Summit Land Co. v. Allen* (*In re Summit Land Co.*), 13 B.R. 310, 315 (Bankr. D. Utah 1981) (absent extraordinary circumstances, court approval of a debtor's decision to assume or reject an executory contract "should be granted as a matter of course"). Thus, if the debtor's business judgment has been exercised reasonably, a court should approve the assumption and assignment of an unexpired lease. *See, e.g.*, *Group of Inst'l Investors v. Chicago, Milwaukee, St. Paul & Pac. R.R. Co.*, 318 U.S. 523, 550-51 (1943).

31.    Here, the Hobby Lobby Bid provides the Debtors with ***immediate*** access to $2.1 million in cash proceeds.  Moreover, the Landlord already expressed its willingness to consent to the Debtors' assignment of the Pinnacle Hills Lease to Hobby Lobby, thereby eliminating any go-forward litigation risk with the Landlord.  Conversely, accepting the Michaels Bid would (a) provide the Debtors with $50,000 less in cash consideration, (b) fail to eliminate protracted litigation (including appellate) risks with the Landlord (as the Court acknowledged at the status conference in discussion of certain good-faith findings), and (c) extend an effectively worthless

commitment to waive substantial contribution claims.[17]  It is clearly in the best interests of the

Debtors and their estates to accept the Hobby Lobby bid.

**III.  The Debtors Conducted the Lease Sale Process in Accordance With the Lease Sale Procedures, Free from Any Collusion or Bad Faith Otherwise Harmful to the Debtors' Estates.**

32.    Contrary to the allegations set forth in Michaels' Objection, the Debtors' auction

process was free from any collusive bidding by qualified bidders and conducted in good-faith.

Indeed, Michaels and Hobby Lobby—the only two bidding parties—confirmed so much on the

record at the auction.  *See* Tr. H'rg. at 25:21-25; 26:2-10 ("MR. PESCE:  On behalf of Michaels,

I confirm the bid I made at $2.05 million with the substantial contribution waiver is a binding bid

made in good faith, and we have the ability to consummate that bid.  I also affirm that Michaels

has not engaged in any collusion, and for the avoidance of any doubt, we have never had any

conversations with Hobby Lobby, and our only conversations with the landlord were in connection

with the preparation of litigation on August 30th."), 26:11-15 ("MR. MALONE:  On behalf of

Hobby Lobby, the offer is made at $2,100,000 is a bone fide offer made in good faith.  There has

been no collusive bidding.").

33.    Further, Michaels' allegation that, under the facts and circumstances here, Hobby

Lobby and Pinnacle Hills could "collude" is a misconception of the term "collusion" as used in

section 363(n) and its effects in the context of an auction.  *In re New Energy Corp.*, 739 F.3d 1077,

1079 (7th Cir. 2014) (explaining "why collusion among bidders is forbidden.").   "Collusion is a

form of monopsony that ***depresses*** the price realized at auctions."  *Id.* (emphasis added).  Indeed,

---

[17]    As mentioned above, the Debtors assign no weight to Michaels' purported waiver of substantial contribution claims.  Michaels already waived those claims so this second waiver is effectively worthless.  *See* Exhibit C (the "Offer and Qualified Bidder Form") to that certain Acquisition of Designation Rights Agreement dated June 22, 2023, (Michaels warrants and represents, *inter alia*, that it "shall be deemed to waive the right to pursue a substantial contribution under section 503 of title 11 of the United States Code (the "Bankruptcy Code") related in any way to the submission of its bid, the Lease Sale Procedures, or any earnest money Deposit.").

"[c]ollusion by two bidders would have made it *easier* for [the losing bidder] to secure the [auction

asset]" by reducing the high bid—which "would have harmed [the debtors'] creditors, not [the

losing bidder]." *Id.* Here, the results of the Debtors' auction process generated nearly triple the

value of the sale of the Pinnacle Hills Lease. Indeed, the collusion that Michaels alleges, which

remains unsupported by the record, are not the actions that the the caselaw and the Bankruptcy

Code seek to protect. In addition, Michaels' assertion that Section L of the Lease Sale Procedures

illustrates a tainted auction process carries no water. There were two participants at the reopened

auction: Hobby Lobby and Michaels.[18] The relevance of the Landlord, as Michaels agrees, is that

it did not consent to the Michaels' assignment, but did consent to a Hobby Lobby assignment.

The Landlord's predisposition to one tenant over the other does not constitute an unfair advantage

in the auction process and certainly does not rise to the level of vacating an assignment that the

Debtors determine to be value-maximizing.

34. In any event, Michaels does not have standing to pursue a section 363(n) claim. *Id.*

("[U]nder § 363(n), the trustee rather than a bidder is the right party to protest collusive sales.");

*see also In re Waypoint Leasing Holdings Ltd.*, 607 B.R. 143, 156–57 (Bankr. S.D.N.Y. 2019)

(clarifying that a "[losing bidder] lacks standing to assert a claim under section 363(n) as

[proposed] assignee of the Debtors" where "[t]he Debtors did not assign any rights granted under

the Bankruptcy Code, specifically rights under section 363(n)"); *In re Butan Valley, N.V.*, No.

ADV 09-3291, 2009 WL 5205343, at *2 (S.D. Tex. Dec. 23, 2009). Section 363(n) is not available

to Michaels due solely to being outbid. *Macquarie Rotorcraft Leasing Holdings Ltd. v. LCI*

---

[18]    Though Pinnacle Hills was deemed a Qualified Bidder by virtue of the Lease Sale Procedures Order, Pinnacle
Hills never bid. (Indeed, it never bid at the Auction in June either). The only parties that bid at the Second
Auction were Hobby Lobby and Michaels.

*Helicopters (Ir.) Ltd. (In re Waypoint Leasing Holdings Ltd.)*, 607 B.R. 143, 156–58 (Bankr.

S.D.N.Y. 2019) ("Put simply, Lombard outbid Macquarie, the only other bidder.").

**IV.    The Court Appropriately Reopened the Auction of the Pinnacle Hills Lease, Providing All Parties With Finality of the Bidding Process.**

35.    Michaels asserts that finality and the integrity of the Court-approved sale process

are important policy considerations in evaluating whether to approve the sale of a lease.

The Debtors agree.  In imposing another auction on the bidding parties, the Court appropriately

walked the tightrope between providing for an orderly bidding process and retaining the flexibility

to obtain the greatest return for the estate.  *See Consumer News & Bus. Channel P'ship v. Fin.*

*News Network Inc. (In re Financial News Network Inc.)*, 980 F.2d 165, 166 (2d Cir. 1992)).

36.    "Where a sale of an asset has not progressed to a comparable plateau,

the bankruptcy court enjoys more discretion to decide whether to entertain a late bid, and its

judgment in that regard commands commensurate deference from the reviewing court." *Corp.*

*Assets, Inc. v. Paloian*, 368 F.3d 761, 768 (7th Cir. 2004).  Moreover, "financial gain for the estate

and its creditors might suffice as a basis for reopening the bidding without an additional showing

that the initial bids were grossly inadequate or that the original bidding was tainted by fraud or

some other irregularity."  *See Id.* at 768; *In re Payless Cashways, Inc.*, 281 B.R. 648, 651 n.3

(B.A.P. 8th Cir. 2002) (reopening auction for later bid offering a 2.5% increase in the sale price);

*Corp. Assets, Inc. v. Paloian*, 368 F.3d at 771-72 (reopening auction for later bid offering a 9%

increase in the sale price); *In re Muscongus Bay Co.*, 597 F.2d 11, 12 (1st Cir. 1979) (reopening

auction for later bid offering a 12.3% increase in the sale price).

37.    Here, the reality—unfortunate as it may be for Michaels—is that the initial Hobby

Lobby bid of $1.7 million represented 100% of Michaels' bid for the Pinnacle Hills Lease.

The Court was not only justified in reopening the auction before considering an order to approve

the assignment to Michaels, but it was compelled to due so by the other facts and circumstances surrounding the Debtors' auction process.  Through the reopened auction, which all bidding parties agreed to, the Court provided a platform for both Michaels and Hobby Lobby to submit their best and final bids for the Pinnacle Hills Lease.  Accordingly, the reopened auction provides all parties with the finality that the parties' desired.

## V.    Conclusion.

38.    Overall, the Debtors' auction process worked as intended—Hobby Lobby and Michaels engaged in robust, competitive bidding for an asset they both desired.  *In re Pursuit Cap. Mgmt., LLC*, 874 F.3d 124, 136 (3d Cir. 2017)  ("As to value, we have said that, '[g]enerally speaking, an auction may be sufficient to establish that one has paid 'value' for the assets of a bankrupt' . . . a competitive auction strongly indicates that a purchaser has paid appropriate value for estate assets." (internal citations omitted)).  And ultimately, Michaels "failed to win at the auction not because of" the Debtors', Pinnacle Hills', or Hobby Lobby's "conduct, but because of" Michaels' "own decisions during the bidding process."  *In re Pursuit Cap. Mgmt., LLC*, 874 F.3d 124, 136 (3d Cir. 2017).

39.    For the reasons set forth herein, the Debtors' respectfully request the Court deny the Objection and authorize the Debtors' entry into an assumption and assignment agreement with Hobby Lobby.

*[Remainder of page intentionally left blank.]*

Dated: October 3, 2023

/s/ Michael D. Sirota

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone:  (201) 489-3000
Email:       msirota@coleschotz.com
             wusatine@coleschotz.com
             fyudkin@coleschotz.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Emily E. Geier, P.C. (admitted *pro hac vice*)
Derek I. Hunter (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900
Email:       joshua.sussberg@kirkland.com
             emily.geier@kirkland.com
             derek.hunter@kirkland.com

*Co-Counsel for Debtors and*
*Debtors in Possession*

## **Exhibit A**

**September 27, 2023 Auction Transcript**

Page 1

1

2  UNITED STATES BANKRUPTCY COURT
   DISTRICT OF NEW JERSEY

3   - - - - - - - - - - - - - - - -x
   In Re:

4  5 Bed Bath & Beyond, Inc., et al.

5                    Case No.
   23-13359(VFP)

6

    - - - - - - - - - - - - - - - -x

7

                    VIA ZOOM

8

                    September 27, 2023

9                    3:15 p.m.

10

11     AUCTION OF BED BATH & BEYOND, held at

12  the above time and place and taken before

13  Elizabeth C. Swanson, a Notary Public of

14  the State of New York.

15

16              *      *      *

17

18

19

20

21

22

23

24

25

Page 2

```
 1
 2     A P P E A R A N C E S
 3
 4     KIRKLAND & ELLIS
       Attorney for the Debtors
 5     601 Lexington Avenue, 50th Floor
       New York, New York 10022
 6
       BY: ROSS FIEDLER, ESQ.
 7
 8
       GIBBONS P.C.
 9     Attorneys for Hobby Lobby
       One Pennsylvania Plaza, Suite 4515
10     New York, New York 10119
11     BY: ROBERT MALONE, ESQ.
12
13     KELLEY DRYE & WARREN LLP
       Attorneys for Pinnacle Hills
14     175 Greenwich Street
       New York, New York 10007
15
       BY: ROBERT LEHANE, ESQ.
16
17
       WHITE & CASE LLP
18     Attorneys for Michaels Stores
       1221 Avenue of the Americas
19     New York, New York 10020
20     BY: GREGORY PESCE, ESQ.
21
22
23
24
25
```

**Page 3**

1
2

ALSO PRESENT:

3

EMILY GEIER              KIRKLAND & ELLIS
4    BRADFORD SANDLER         PACHULSKI STANG
ROBERT FEINSTEIN
5    KENNETH ROSEN            LOWENSTEIN SANDLER
SAMUEL HERSHEY
6    ADAM SALTER
ASIFA SHEIKH
7    CAROL SORENSEN
DAVID BASS
8    DAVID KASTIN
DEVIN RIVERO             WHITE & CASE
9    JONATHAN KRAMER
JANE ANN NEISWENDER
10   KRISTIN ELLIOTT
PHILIP GROSS
11   SETH RASMUSSEN
TODD POWERS
12   LAURA BACCASH
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1      AUCTION of BED BATH & BEYOND

2           MR. FIEDLER:  Good afternoon.

3      My name is Ross Fiedler.  I am an

4      attorney with Kirkland & Ellis,

5      counsel to the debtors in the Bed Bath

6      & Beyond Chapter 11 bankruptcy

7      proceeding currently pending in front

8      of the United States Bankruptcy Court

9      of the District of New Jersey.  Those

10     cases are being be jointly

11     administered under the caption In Re:

12     Bed Bath & Beyond, Inc. and under the

13     case number .3-13359.

14          I'm here today on the line with

15     other folks from Kirkland & Ellis, as

16     well as Cole Schotz, co-counsel to the

17     debtors, and certain members of the

18     debtor's management team are on the

19     line as well.

20          We also have representatives of

21     the consultation parties joining from

22     the UCC.  That's counsel to the

23     creditor's committee Chelsea, as well

24     as Proskauer Rose, counsel to the bid

25     lenders.

Page 5

```
 1      AUCTION of BED BATH & BEYOND

 2           We scheduled this auction today,

 3      September 27, 2023 pursuant to the

 4      lease sale procedures that were

 5      approved by the bankruptcy court

 6      through the lease sale procedures

 7      order entered on May 22, 2023, docket

 8      number 422, and as was discussed at

 9      the status conference with the

10      bankruptcy court on Tuesday,

11      September 26, 2023.

12           We'll hold today's auction for

13      the Pinnacle Hills lease assignment.

14      An email has been circulated in

15      advance of today's auction laying out

16      the terms and conditions for the

17      auction.

18           The auction will be conducted in

19      accordance with and subject to the

20      order approving the lease sale

21      procedures subject to the following

22      terms which were made clear to parties

23      prior to beginning the auction:

24           One, Hobby Lobby, Pinnacle Hills

25      as the landlord on the Pinnacle Hills
```

Page 6

1           AUCTION of BED BATH & BEYOND

2           lease, as well as Michael's will each

3           be deemed to be qualified bidders as

4           that term is defined in the lease sale

5           procedures order.  Each bidding party

6           shall be committed to discuss the

7           terms of any bid with any other

8           bidding party.

9                The starting bid for the

10          Pinnacle Hills lease will be $1.7

11          million from Hobby Lobby.  The minimum

12          overbid will be $50,000.  Absent

13          consent of the debtors, a qualified

14          bid may not deviate substantially from

15          the assumption of assignment agreement

16          between the debtor and Hobby Lobby,

17          which has been circulated to all

18          parties prior to the auction.

19                Pinnacle Hills as the landlord

20          on the Pinnacle Hills lease will be

21          precluded from raising any objection

22          to the proposed lease assignment that

23          was already ruled upon by the

24          Bankruptcy Court prior to this

25          auction, and there will be a hearing

Page 7

1       AUCTION of BED BATH & BEYOND

2       scheduled for approval of the lease

3       assignment on October 3, 2023 with

4       objections due to any lease assignment

5       proposed in this assignment by Monday,

6       October 2, 2023 at 4:00 p.m. eastern

7       time.

8            Prior to the auction, counsel to

9       Michaels voiced an objection to one of

10      the specific items in the email that

11      had been circulated prior to the

12      auction, which is the ability of each

13      bidding party to discuss the terms of

14      any bid with another bidding party.

15      The debtors have agreed to remove that

16      from the requirements for the auction

17      today, and so unless there is any

18      objection by any other party, the

19      bidding procedures as modified will

20      not included the ability of any

21      bidding party to discuss the terms of

22      any of bid with any other bidding

23      party.  Otherwise, the auction will be

24      conducted in accordance with the terms

25      of the lease sale procedures order.

Page 8

1    AUCTION of BED BATH & BEYOND

2         So why don't I stop there and

3    see if any party would like to be

4    heard or has any objection to any

5    statements made on the record thus

6    far.

7         MR. MALONE:  Two things.  Robert

8    Malone, Gibbons, counsel for Hobby

9    Lobby.  First, thank you.  Hobby Lobby

10   through Carol Sorensen will be the one

11   who will be expressing the bids on our

12   behalf today.

13        Couple things I want to clear

14   up:

15        Number one, we sent you the

16   assumption assignment agreement which

17   I assume has been now shared with

18   Michaels counsel.  I asked for a copy

19   of theirs to be sent to us as well.

20        Second, as a point of

21   clarification, there is no -- are you

22   saying that speaking with anybody else

23   is considered collusion now during the

24   auction or after the auction or during

25   any kind of break?  I'm trying to get

Page 9

1          AUCTION of BED BATH & BEYOND

2          clarification as to what has changed.

3               MR. FIEDLER:  All that has

4          changed is in the email that was

5          circulated prior to the auction --

6               MR. MALONE:  Right.

7               MR. FIEDLER:  -- bullet point

8          number two is no longer -- is no

9          longer part of the bidding procedure.

10         So the bidding procedures will stand

11         on their own, but they will not

12         include the requirement that each of

13         the parties consent to the ability of

14         each bidding party to discuss the

15         terms of any bid with any other

16         bidding party.

17              MR. MALONE:  Okay.  So there is

18         no consent.  That's all I needed

19         clarification on.  Thank you.

20              MR. LEHANE:  This is Robert

21         LeHane, Kelley Drye & Warren.  Thank

22         you for that clarification, Mr.

23         Fiedler.  Pinnacle Hills just reserves

24         the right during the auction to ask

25         for such consent if it becomes

1        AUCTION of BED BATH & BEYOND

2        necessary, and we would ask the debtor

3        for that consent separately.

4              MR. FIEDLER:  Understood.

5              MR. PESCE:  Thank you, Mr.

6        Fiedler and the Kirkland team for

7        organizing the auction today.  My name

8        is Gregory Pesce.  I'm with White &

9        Case.  I'm counsel to Michaels.  On

10       the line with me today is the business

11       representative Todd Powers of

12       Michaels.  Todd and myself will be the

13       speakers for Michaels during today's

14       auction.

15            I thank the debtors for agreeing

16       to remove that modification that was

17       proposed in Mr. Fiedler's email.  In

18       the interest of having the auction go

19       forward today, Michaels just wants to

20       put on the record that we reserve our

21       rights as to any issues of good faith

22       or lack of collusion.  In particular,

23       for the record, yesterday, Michaels

24       asked the debtors to confirm in

25       writing that there is no side

Page 11

1    AUCTION of BED BATH & BEYOND

2    agreements between Pinnacle and Hobby

3    Lobby or their respective affiliates

4    regarding consideration, amendments to

5    the lease, or similar changes that

6    might be in effect subsidizing the

7    Hobby Lobby lease.

8         The debtors told us they were

9    not going to require that

10   confirmation, and we are not going to

11   ask Hobby Lobby for that confirmation

12   unless requested, and they would not

13   assure an answer.  Michaels is

14   concerned about the possibility that

15   there might be some type of side deal.

16   We reserve our right on that matter,

17   and to the extent necessary, we will

18   deal with that at the hearing next

19   week.

20        Similarly, we reserve our rights

21   regarding any issues for that hearing

22   or any subsequent appeal that Michaels

23   might lodge here, and those are the

24   only major reservations of rights that

25   I wanted to put on the record today,

Page 12

1       AUCTION of BED BATH & BEYOND

2       and obviously, we have reserve our

3       rights regarding any requests to have

4       a bidding party speak to another

5       bidding party today.  Thank you.

6            MS. GEIER:  Hi everyone.  It's

7       Emily Geier from Kirkland, also on the

8       team for the auction.  I want to

9       clarify one point on the communication

10      we did receive from White Case just so

11      that everyone is clear about the rules

12      that we have here today.

13           The bidding procedures do

14      require representation as to no

15      collusion.  That representation will

16      be requested.  What we did not seek or

17      request today was any documentation or

18      evidence as to that.  We'll accept the

19      representation today, but Mr. Pesce,

20      understand the reservation of rights

21      and that's completely understood on

22      the issue.

23           I think with that -- well, Mr.

24      Fiedler, I will hand it back over to

25      you.

Page 13

1       AUCTION of BED BATH & BEYOND

2            MR. PESCE:  Sorry.  In the

3       interest of time, I just want to be

4       clear.  The existing bidding

5       procedures did require each bidding

6       party to disclose to the debtors under

7       Section L, qualified bidders shall

8       disclose to the debtors all

9       communications with other qualified

10      bidders following the submission of

11      qualified bid until the sale of the

12      lease asset is consummated.

13           We understand that that

14      requirement of the bidding procedures

15      is not being modified today and we

16      would just like confirmation the

17      debtors have -- whether they received

18      information or not from Pinnacle or

19      Hobby Lobby regarding any

20      communications between them that

21      happened between the time of a

22      qualified bid and ongoing that that

23      will be enforced.

24           So I guess the question is has

25      Pinnacle or Hobby Lobby disclosed any

Page 14

```
 1      AUCTION of BED BATH & BEYOND
 2      communications they have had regarding
 3      a bid by either of those bidding
 4      parties, and is it recognized between
 5      today and the consummation of the sale
 6      as contemplated by Section L that any
 7      such disclosures are made.
 8           MS. GEIER:  I will just state
 9      for the record that no communications
10      have been disclosed.  I think there
11      are some -- nor have they again been
12      requested by the debtor so we can
13      determine whether or not that's been
14      satisfied or not or at what point
15      something became a qualified bid or if
16      there is a relevant issue here, we can
17      explore that at the hearing.  The
18      bidding procedures including that
19      provision remain in effect.  This was
20      not an intention to modify the bidding
21      procedures.  So all those remain in
22      effect, and we can determine whether
23      there was any issue with execution of
24      those.
25           MR. PESCE:  Thank you.  I think
```

Page 15

1      AUCTION of BED BATH & BEYOND

2      that's sufficient for today, and we'll

3      reserve rights and reserve the right

4      to seek information or discovery if

5      appropriate at the sale hearing to see

6      if that is in fact the case among not

7      the debtors but other parties that may

8      or may not be involved today.

9           Thank you.

10          MR. FIEDLER:  Okay.  Unless any

11     other party wishes to be heard or

12     would like to make a statement, I

13     think we can move forward with the

14     bidding.

15          The starting bid is a qualified

16     bid from Hobby Lobby at $1.7 million.

17     The minimum overbid is $50,000 so

18     we'll open it up to bidding now.

19          MR. PESCE:  I will pass the

20     electronic podium for Michaels to Todd

21     Powers.  He will make any further

22     comments on the record or bids on the

23     record.

24          Todd, I will hand it to you.

25          MR. POWERS:  Todd Powers on

Page 16

1        AUCTION of BED BATH & BEYOND

2        behalf of Michaels Stores.  We will

3        bid $1.75 million.

4             MR. FIEDLER:  Just so we have

5        this at the outset, when a party makes

6        a bid, can you please confirm on the

7        record that you have the financial

8        wherewithal to proceed with the bid,

9        that the bid is the same terms or

10       substantially the same terms as the

11       latest qualified bid and whether there

12       are any modifications to that

13       qualified bid, and then we can proceed

14       after that.

15            MR. POWERS:  Ross, I'm not clear

16       what you are asking.

17            MR. FIEDLER:  We just want

18       confirmation from the debtor that you

19       have the financial wherewithal to

20       consummate the bid --

21            MR. POWERS:  Yes.

22            MR. FIEDLER:  -- the terms you

23       proposed, and whether there were any

24       modification in your bid from the

25       latest qualified bid.

Page 17

1     AUCTION of BED BATH & BEYOND

2         MR. MALONE:  For the record, the

3     opening bid by Hobby Lobby was

4     $1,700,000.  That was cash, no

5     financing contingencies.

6         MR. PESCE:  Todd, you can

7     correct me if I am wrong.

8         Our bid is $1.75 million,

9     substantially the same terms as the

10    assumption and assignment agreement

11    submitted by Hobby Lobby which was

12    derivative of the one we did, and

13    Michaels has cash on hand and does not

14    require external financing to

15    consummate the bid that is being made.

16        Todd, can you confirm that that

17    is correct?

18        MR. POWERS:  That is correct.

19        MR. FIEDLER:  Okay.  Thank you.

20    So the bid from Michaels for $1.75

21    million is a qualified bid.  Opening

22    up the auction to any overbids.

23        MS. SORENSEN:  Hobby Lobby bids

24    $1.8 million, same terms with the

25    financial wherewithal to make such

Page 18

1        AUCTION of BED BATH & BEYOND

2        payment in cash.

3              MR. FIEDLER:  Okay.  The bid

4        from Hobby Lobby of $1.8 million is a

5        qualified bid and now the highest bid.

6        Opening up the auction to any overbids

7        over the $1.8 million bid.

8              MR. POWERS:  Todd Powers,

9        Michaels Stores.  We'll bid

10       $1.85 million with the financial

11       wherewithal as set forth in the

12       assignment assumption to fulfill the

13       terms of the bidding process.

14             MR. FIEDLER:  Okay.  The bid

15       from Michaels of $1.8 million is a

16       qualified bid, now the highest bid.

17       Opening the auction back up to Hobby

18       Lobby if there is an overbid to that

19       bid.

20             MS. SORENSEN:  Hobby Lobby bids

21       $1.9 million, same terms with the

22       financial wherewithal to make such

23       payment.

24             MR. FIEDLER:  The bid from Hobby

25       Lobby for $1.9 million is a qualified

Page 19

```
 1        AUCTION of BED BATH & BEYOND
 2        bid.  Turning it back over to Michaels
 3        to see if there is any overbid.
 4              MR. POWERS:  Todd Powers,
 5        Michaels Stores.  $1.95 million under
 6        the terms and conditions as set forth
 7        in the assignment assumption agreement
 8        with the financial wherewithal to
 9        fulfill the terms of the bidding
10        process.
11              MR. FIEDLER:  Michaels' bid for
12        $1.95 is a qualified bid.
13              Turning it to Hobby Lobby for
14        any overbid.
15              MS. SORENSEN:  Hobby Lobby will
16        be $2 million, same terms with the
17        financial wherewithal to make such
18        payment.
19              MR. FIEDLER:  Hobby Lobby's bid
20        of $2 million is a qualified bid.
21        Turning it back over to Michaels for
22        any overbid.
23              MR. PESCE:  Todd, before
24        responding, if you would like to take
25        a short recess, you can ask for that
```

Page 20

1      AUCTION of BED BATH & BEYOND

2      or for a recess or between any bids.

3              MR. POWERS:  Yeah.  I need a few

4      minutes if you don't mind.

5              MR. FIEDLER:  Why don't we take

6      ten minutes and reconvene at 3:40.

7              MR. POWERS:  Thank you.

8              (Whereupon, a recess was taken.)

9              MS. GEIER:  I think we were

10     determining whether Michaels was going

11     to make an overbid.

12             MR. PESCE:  For the record,

13     Gregory Pesce, White & Case on behalf

14     of Michaels.  To be clear, the prior

15     bid was $2 million in cash?

16             MS. GEIER:  That's correct.

17             MR. PESCE:  Michaels next bid

18     would be $2,050,000 in cash.  We have

19     the financial wherewithal to make the

20     bid, and we would be bidding on

21     substantially the same terms as our

22     prior agreement with the one

23     modification that if we are the

24     winner, we would waive our entitlement

25     to seek a substantial contribution

**Page 21**

1          AUCTION of BED BATH & BEYOND

2          claim if we are the winner in that

3          case.

4               MR. MALONE:  I'm going to have

5          to object for the record -- Robert

6          Malone, Gibbons P.C. --  object to

7          that as a term and condition that

8          could even be considered because first

9          off they are not -- they were not the

10         stalking horse bidder.  There was no

11         approval of a stalking horse breakup

12         fee or anything of that nature.  To

13         insert it now later on as some kind of

14         term and condition that would somehow

15         make their bid higher by the mere fact

16         that they claimed they had a million

17         dollars worth of time put into this --

18         it should not be considered as to any

19         of the terms with respect to this new

20         bid.

21               We object for the record.

22               MR. LEHANE:  Rob LeHane, Kelley

23         Drye & Warren on behalf of Pinnacle

24         Hills.  We also object.  There is no

25         basis for any allegation of a stalking

Page 22

1    AUCTION of BED BATH & BEYOND

2    horse right here or that there is any

3    basis for a substantial contribution

4    bid and so we also object.

5         MS. GEIER:  Okay.  Thank you.

6    Both objections are noted, and thank

7    you, Mr. Pesce, for the bid.

8         MS. SORENSEN:  Hobby Lobby makes

9    a bid at $2,100,000 and the same terms

10   -- cash, no conditions, with the

11   financial wherewithal to make such

12   payment.

13        MR. FIEDLER:  The Hobby Lobby

14   bid $2.1 million is a qualified bid.

15   Turn it back to Michaels for any

16   overbid.

17        MR. PESCE:  Michaels will not

18   overbid $2.1 million in cash.  We

19   reserve our rights for the sale

20   hearing whether it is -- whether the

21   Hobby Lobby bid is higher or better

22   when taking into account our

23   entitlement to seek a substantial

24   contribution claim for our efforts to

25   date and all reference regarding other

Page 23

1         AUCTION of BED BATH & BEYOND

2         aspects of the auction as well.

3             MR. MALONE:  For the record --

4         Robert Malone, Gibbons on behalf the

5         Hobby Lobby -- we will restate what we

6         stated yesterday during the conference

7         call that if we are going to look at

8         better, we reserve the rights with

9         respect to the shopping lease

10        violations with respect to 365(b) of

11        the bankruptcy code and the fact that

12        there would be exorbitant costs to

13        take that up on appeal to both the

14        District Court or to the Third Circuit

15        to this estate.

16            MR. PESCE:  We won't agree or

17        disagree --

18            MR. MALONE:  We are not agreeing

19        with what you say.  I expect you not

20        to agree with what I say, but if we

21        are going to go reserve rights for the

22        record, Mr. Pesce, we are both going

23        to reserve our rights and I am

24        reserving them for my client as the

25        winning bidder.

Page 24

1     AUCTION of BED BATH & BEYOND

2         MR. PESCE:  I don't know how you

3     are characterized right now, but I

4     understand you think you are the high

5     bid, and we reserve our rights as to

6     whether that is in fact the case.

7         MR. MALONE:  I guess we will

8     leave that to the parties, both the

9     debtors and the committee who have

10    consultation rights to decide after

11    the closing of bidding today who is

12    the highest bid to be presented.

13    Thank you.

14        MR. PESCE:  In the interest of

15    clarity, I would ask for the debtors

16    to let me know what type of process

17    you need to respond to their bid or if

18    you need time or what we should expect

19    in that regard.

20        MR. FIEDLER:  Well, it's Ross

21    Fiedler for the debtors.  Thank you

22    both for your objections.  They are

23    noted.

24        The debtors are going to consult

25    with the consultation parties

Page 25

1      AUCTION of BED BATH & BEYOND

2      regarding the latest qualified bid of

3      Hobby Lobby, and we will be back to

4      the bidding parties to inform the

5      bidders as to which bid is the

6      successful bid and which bid is the

7      backup bid.

8             Before we go forward though,

9      consistent with the bidding procedures

10     order, we would just like each

11     qualified bidder participating at the

12     lease auction to confirm on the record

13     that it has not engaged in any

14     collusion with respect to the bidding,

15     and that its qualified bid is a good

16     faith bona fide offer, and it intends

17     to consummate its qualified bid on the

18     terms it has posed, both for the

19     latest bid and the prior bids that

20     have been made at the auction.

21            MR. PESCE:  On behalf of

22     Michaels, I confirm the bid I made at

23     $2.05 million with the substantial

24     contribution waiver is a binding bid

25     made in good faith, and we have the

Page 26

1       AUCTION of BED BATH & BEYOND

2       ability to consummate that bid.

3              I also affirm that Michaels has

4       not engaged in any collusion, and for

5       the avoidance of any doubt, we have

6       never had any conversations with Hobby

7       Lobby, and our only conversations with

8       the landlord were in connection with

9       the preparation of litigation on

10      August 30th.

11             MR. MALONE:  On behalf of Hobby

12      Lobby, the offer is made at $2,100,000

13      is a bone fide offer made in good

14      faith.  There has been no collusive

15      bidding.

16             MR. FEINSTEIN:  Robert

17      Feinstein.  I have a question for the

18      committee whether Michaels bid is

19      being designated as a backup bid.

20             MR. FIEDLER:  I think we will --

21      the debtors will consult with both the

22      committee and the lenders ass the

23      consultation parties, and we'll come

24      back and inform the parties of the

25      successful bid and the backup bid.

Page 27

1      AUCTION of BED BATH & BEYOND

2           MR. MALONE:  How do we make that

3      happen to get the consultation parties

4      in a separate room?

5           MR. SANDLER:  I will send a Zoom

6      link around.

7           MR. MALONE:  Off the record.

8           (Whereupon, a discussion was

9      held off the record.)

10          (Whereupon, the proceeding

11     concluded at 3:55  p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 28

1

2                          C E R T I F I C A T E

3    STATE OF NEW YORK   )

                              :

4    COUNTY OF RICHMOND )

5

6           I, ELIZABETH C. SWANSON, a Notary

7    Public within and for  the State of New

8    York, do hereby certify:

9           THAT THE AUCTION OF BED BATH &

10   BEYOND hereinbefore set forth was duly

11   sworn by me and that such is a true record

12   of auction.

13          I further certify that I am not

14   related to any of the parties to this

15   action by blood or marriage; and that I am

16   in no way interested in the outcome of

17   this matter.

18          IN WITNESS WHEREOF, I have

19   hereunto set my hand this 29th day of

20   September, 2023.

21                    *Elizabeth C. Swanson*

22

                 ELIZABETH C. SWANSON

23

24

25

| & |
| --- |
| **&**   1:4,11 2:4,13 |
| 2:17 3:3,8 4:1 |
| 4:4,6,12,15 5:1 |
| 6:1 7:1 8:1 9:1 |
| 9:21 10:1,8 |
| 11:1 12:1 13:1 |
| 14:1 15:1 16:1 |
| 17:1 18:1 19:1 |
| 20:1,13 21:1 |
| 21:23 22:1 |
| 23:1 24:1 25:1 |
| 26:1 27:1 28:9 |

| 1 |
| --- |
| **1,700,000**   17:4 |
| **1.7**   6:10 15:16 |
| **1.75**   16:3 17:8 |
| 17:20 |
| **1.8**   17:24 18:4 |
| 18:7,15 |
| **1.85**   18:10 |
| **1.9**   18:21,25 |
| **1.95**   19:5,12 |
| **10007**   2:14 |
| **10020**   2:19 |
| **10022**   2:5 |
| **10119**   2:10 |
| **11**   4:6 |
| **1221**   2:18 |
| **13990**   28:21 |
| **175**   2:14 |

| 2 |
| --- |
| **2**   7:6 19:16,20 |
| 20:15 |

| 2 (cont.) |
| --- |
| **2,050,000**   20:18 |
| **2,100,000**   22:9 |
| 26:12 |
| **2.05**   25:23 |
| **2.1**   22:14,18 |
| **2023**   1:8 5:3,7 |
| 5:11 7:3,6 |
| 28:20 |
| **22**   5:7 |
| **23-13359**   1:5 |
| **26**   5:11 |
| **27**   1:8 5:3 |
| **29th**   28:19 |

| 3 |
| --- |
| **3**   7:3 |
| **3-13359**   4:13 |
| **30th**   26:10 |
| **365**   23:10 |
| **3:15**   1:9 |
| **3:40**   20:6 |
| **3:55**   27:11 |

| 4 |
| --- |
| **422**   5:8 |
| **4515**   2:9 |
| **4:00**   7:6 |

| 5 |
| --- |
| **5**   1:4 |
| **50,000**   6:12 |
| 15:17 |
| **50th**   2:5 |

| 6 |
| --- |
| **601**   2:5 |

| a |
| --- |
| **ability**   7:12,20 |
| 9:13 26:2 |
| **above**   1:12 |
| **absent**   6:12 |
| **accept**   12:18 |
| **accordance** |
| 5:19 7:24 |
| **account**   22:22 |
| **action**   28:15 |
| **adam**   3:6 |
| **administered** |
| 4:11 |
| **advance**   5:15 |
| **affiliates**   11:3 |
| **affirm**   26:3 |
| **afternoon**   4:2 |
| **agree**   23:16,20 |
| **agreed**   7:15 |
| **agreeing**   10:15 |
| 23:18 |
| **agreement**   6:15 |
| 8:16 17:10 |
| 19:7 20:22 |
| **agreements** |
| 11:2 |
| **al**   1:4 |
| **allegation** |
| 21:25 |
| **amendments** |
| 11:4 |
| **americas**   2:18 |
| **ann**   3:9 |
| **answer**   11:13 |

| a (cont.) |
| --- |
| **anybody**   8:22 |
| **appeal**   11:22 |
| 23:13 |
| **appropriate** |
| 15:5 |
| **approval**   7:2 |
| 21:11 |
| **approved**   5:5 |
| **approving**   5:20 |
| **asifa**   3:6 |
| **asked**   8:18 |
| 10:24 |
| **asking**   16:16 |
| **aspects**   23:2 |
| **ass**   26:22 |
| **asset**   13:12 |
| **assignment** |
| 5:13 6:15,22 |
| 7:3,4,5 8:16 |
| 17:10 18:12 |
| 19:7 |
| **assume**   8:17 |
| **assumption** |
| 6:15 8:16 |
| 17:10 18:12 |
| 19:7 |
| **assure**   11:13 |
| **attorney**   2:4 |
| 4:4 |
| **attorneys**   2:9 |
| 2:13,18 |
| **auction**   1:11 |
| 4:1 5:1,2,12,15 |
| 5:17,18,23 6:1 |
| 6:18,25 7:1,8 |

[auction - circulated]                                                    Page 2

7:12,16,23 8:1
8:24,24 9:1,5
9:24 10:1,7,14
10:18 11:1
12:1,8 13:1
14:1 15:1 16:1
17:1,22 18:1,6
18:17 19:1
20:1 21:1 22:1
23:1,2 24:1
25:1,12,20
26:1 27:1 28:9
28:12
**august**   26:10
**avenue**   2:5,18
**avoidance**   26:5

**b**

**b**   23:10
**baccash**   3:12
**back**   12:24
18:17 19:2,21
22:15 25:3
26:24
**backup**   25:7
26:19,25
**bankruptcy**   1:2
4:6,8 5:5,10
6:24 23:11
**basis**   21:25
22:3
**bass**   3:7
**bath**   1:4,11 4:1
4:5,12 5:1 6:1
7:1 8:1 9:1
10:1 11:1 12:1

13:1 14:1 15:1
16:1 17:1 18:1
19:1 20:1 21:1
22:1 23:1 24:1
25:1 26:1 27:1
28:9
**bed**   1:4,11 4:1
4:5,12 5:1 6:1
7:1 8:1 9:1
10:1 11:1 12:1
13:1 14:1 15:1
16:1 17:1 18:1
19:1 20:1 21:1
22:1 23:1 24:1
25:1 26:1 27:1
28:9
**beginning**   5:23
**behalf**   8:12
16:2 20:13
21:23 23:4
25:21 26:11
**better**   22:21
23:8
**beyond**   1:4,11
4:1,6,12 5:1
6:1 7:1 8:1 9:1
10:1 11:1 12:1
13:1 14:1 15:1
16:1 17:1 18:1
19:1 20:1 21:1
22:1 23:1 24:1
25:1 26:1 27:1
28:10
**bid**   4:24 6:7,9
6:14 7:14,22

9:15 13:11,22
14:3,15 15:15
15:16 16:3,6,8
16:9,11,13,20
16:24,25 17:3
17:8,15,20,21
18:3,5,5,7,9,14
18:16,16,19,24
19:2,11,12,19
19:20 20:15,17
20:20 21:15,20
22:4,7,9,14,14
22:21 24:5,12
24:17 25:2,5,6
25:6,7,15,17,19
25:22,24 26:2
26:18,19,25,25
**bidder**   21:10
23:25 25:11
**bidders**   6:3
13:7,10 25:5
**bidding**   6:5,8
7:13,14,19,21
7:22 9:9,10,14
9:16 12:4,5,13
13:4,5,14 14:3
14:18,20 15:14
15:18 18:13
19:9 20:20
24:11 25:4,9
25:14 26:15
**bids**   8:11 15:22
17:23 18:20
20:2 25:19

**binding**   25:24
**blood**   28:15
**bona**   25:16
**bone**   26:13
**bradford**   3:4
**break**   8:25
**breakup**   21:11
**bullet**   9:7
**business**   10:10

**c**

**c**   1:13 2:2 28:2
28:2,6,22
**call**   23:7
**caption**   4:11
**carol**   3:7 8:10
**case**   1:5 2:17
3:8 4:13 10:9
12:10 15:6
20:13 21:3
24:6
**cases**   4:10
**cash**   17:4,13
18:2 20:15,18
22:10,18
**certain**   4:17
**certify**   28:8,13
**changed**   9:2,4
**changes**   11:5
**chapter**   4:6
**characterized**
24:3
**chelsea**   4:23
**circuit**   23:14
**circulated**   5:14
6:17 7:11 9:5

**claim** 21:2
22:24
**claimed** 21:16
**clarification**
8:21 9:2,19,22
**clarify** 12:9
**clarity** 24:15
**clear** 5:22 8:13
12:11 13:4
16:15 20:14
**client** 23:24
**closing** 24:11
**code** 23:11
**cole** 4:16
**collusion** 8:23
10:22 12:15
25:14 26:4
**collusive** 26:14
**come** 26:23
**comments**
15:22
**committed** 6:6
**committee** 4:23
24:9 26:18,22
**communication**
12:9
**communicati...**
13:9,20 14:2,9
**completely**
12:21
**concerned**
11:14
**concluded**
27:11

**condition** 21:7
21:14
**conditions** 5:16
19:6 22:10
**conducted** 5:18
7:24
**conference** 5:9
23:6
**confirm** 10:24
16:6 17:16
25:12,22
**confirmation**
11:10,11 13:16
16:18
**connection**
26:8
**consent** 6:13
9:13,18,25
10:3
**consideration**
11:4
**considered**
8:23 21:8,18
**consistent** 25:9
**consult** 24:24
26:21
**consultation**
4:21 24:10,25
26:23 27:3
**consummate**
16:20 17:15
25:17 26:2
**consummated**
13:12

**consummation**
14:5
**contemplated**
14:6
**contingencies**
17:5
**contribution**
20:25 22:3,24
25:24
**conversations**
26:6,7
**copy** 8:18
**correct** 17:7,17
17:18 20:16
**costs** 23:12
**counsel** 4:5,16
4:22,24 7:8 8:8
8:18 10:9
**county** 28:4
**couple** 8:13
**court** 1:2 4:8
5:5,10 6:24
23:14
**creditor's** 4:23
**currently** 4:7

**d**

**date** 22:25
**david** 3:7,8
**day** 28:19
**deal** 11:15,18
**debtor** 6:16
10:2 14:12
16:18
**debtor's** 4:18

**debtors** 2:4 4:5
4:17 6:13 7:15
10:15,24 11:8
13:6,8,17 15:7
24:9,15,21,24
26:21
**decide** 24:10
**deemed** 6:3
**defined** 6:4
**derivative**
17:12
**designated**
26:19
**determine**
14:13,22
**determining**
20:10
**deviate** 6:14
**devin** 3:8
**disagree** 23:17
**disclose** 13:6,8
**disclosed** 13:25
14:10
**disclosures**
14:7
**discovery** 15:4
**discuss** 6:6
7:13,21 9:14
**discussed** 5:8
**discussion** 27:8
**district** 1:2 4:9
23:14
**docket** 5:7
**documentation**
12:17

**dollars** 21:17
**doubt** 26:5
**drye** 2:13 9:21
21:23
**due** 7:4
**duly** 28:10

**e**

**e** 2:2,2 28:2,2
**eastern** 7:6
**effect** 11:6
14:19,22
**efforts** 22:24
**either** 14:3
**electronic**
15:20
**elizabeth** 1:13
28:6,22
**elliott** 3:10
**ellis** 2:4 3:3 4:4
4:15
**email** 5:14 7:10
9:4 10:17
**emily** 3:3 12:7
**enforced** 13:23
**engaged** 25:13
26:4
**entered** 5:7
**entitlement**
20:24 22:23
**esq** 2:6,11,15
2:20
**estate** 23:15
**et** 1:4
**evidence** 12:18

**execution**
14:23
**existing** 13:4
**exorbitant**
23:12
**expect** 23:19
24:18
**explore** 14:17
**expressing** 8:11
**extent** 11:17
**external** 17:14

**f**

**f** 28:2
**fact** 15:6 21:15
23:11 24:6
**faith** 10:21
25:16,25 26:14
**far** 8:6
**fee** 21:12
**feinstein** 3:4
26:16,17
**fide** 25:16
26:13
**fiedler** 2:6 4:2
4:3 9:3,7,23
10:4,6 12:24
15:10 16:4,17
16:22 17:19
18:3,14,24
19:11,19 20:5
22:13 24:20,21
26:20
**fiedler's** 10:17
**financial** 16:7
16:19 17:25

18:10,22 19:8
19:17 20:19
22:11
**financing** 17:5
17:14
**first** 8:9 21:8
**floor** 2:5
**folks** 4:15
**following** 5:21
13:10
**forth** 18:11
19:6 28:10
**forward** 10:19
15:13 25:8
**front** 4:7
**fulfill** 18:12
19:9
**further** 15:21
28:13

**g**

**geier** 3:3 12:6,7
14:8 20:9,16
22:5
**gibbons** 2:8 8:8
21:6 23:4
**go** 10:18 23:21
25:8
**going** 11:9,10
20:10 21:4
23:7,21,22
24:24
**good** 4:2 10:21
25:15,25 26:13
**greenwich** 2:14

**gregory** 2:20
10:8 20:13
**gross** 3:10
**guess** 13:24
24:7

**h**

**hand** 12:24
15:24 17:13
28:19
**happen** 27:3
**happened**
13:21
**heard** 8:4 15:11
**hearing** 6:25
11:18,21 14:17
15:5 22:20
**held** 1:11 27:9
**hereinbefore**
28:10
**hereunto** 28:19
**hershey** 3:5
**hi** 12:6
**high** 24:4
**higher** 21:15
22:21
**highest** 18:5,16
24:12
**hills** 2:13 5:13
5:24,25 6:10
6:19,20 9:23
21:24
**hobby** 2:9 5:24
6:11,16 8:8,9
11:2,7,11
13:19,25 15:16

**[hobby - minimum]**

17:3,11,23
18:4,17,20,24
19:13,15,19
22:8,13,21
23:5 25:3 26:6
26:11
**hold**  5:12
**horse**  21:10,11
22:2

**i**

**include**  9:12
**included**  7:20
**including**  14:18
**inform**  25:4
26:24
**information**
13:18 15:4
**insert**  21:13
**intends**  25:16
**intention**  14:20
**interest**  10:18
13:3 24:14
**interested**
28:16
**involved**  15:8
**issue**  12:22
14:16,23
**issues**  10:21
11:21
**items**  7:10

**j**

**jane**  3:9
**jersey**  1:2 4:9

**joining**  4:21
**jointly**  4:10
**jonathan**  3:9

**k**

**kastin**  3:8
**kelley**  2:13 9:21
21:22
**kenneth**  3:5
**kind**  8:25 21:13
**kirkland**  2:4
3:3 4:4,15 10:6
12:7
**know**  24:2,16
**kramer**  3:9
**kristin**  3:10

**l**

**l**  13:7 14:6
**lack**  10:22
**landlord**  5:25
6:19 26:8
**latest**  16:11,25
25:2,19
**laura**  3:12
**laying**  5:15
**lease**  5:4,6,13
5:20 6:2,4,10
6:20,22 7:2,4
7:25 11:5,7
13:12 23:9
25:12
**leave**  24:8
**lehane**  2:15
9:20,21 21:22
21:22

**lenders**  4:25
26:22
**lexington**  2:5
**line**  4:14,19
10:10
**link**  27:6
**litigation**  26:9
**llp**  2:13,17
**lobby**  2:9 5:24
6:11,16 8:9,9
11:3,7,11
13:19,25 15:16
17:3,11,23
18:4,18,20,25
19:13,15 22:8
22:13,21 23:5
25:3 26:7,12
**lobby's**  19:19
**lodge**  11:23
**longer**  9:8,9
**look**  23:7
**lowenstein**  3:5

**m**

**made**  5:22 8:5
14:7 17:15
25:20,22,25
26:12,13
**major**  11:24
**make**  15:12,21
17:25 18:22
19:17 20:11,19
21:15 22:11
27:2
**makes**  16:5
22:8

**malone**  2:11
8:7,8 9:6,17
17:2 21:4,6
23:3,4,18 24:7
26:11 27:2,7
**management**
4:18
**marriage**  28:15
**matter**  11:16
28:17
**members**  4:17
**mere**  21:15
**michael's**  6:2
**michaels**  2:18
7:9 8:18 10:9
10:12,13,19,23
11:13,22 15:20
16:2 17:13,20
18:9,15 19:2,5
19:11,21 20:10
20:14,17 22:15
22:17 25:22
26:3,18
**million**  6:11
15:16 16:3
17:8,21,24
18:4,7,10,15,21
18:25 19:5,16
19:20 20:15
21:16 22:14,18
25:23
**mind**  20:4
**minimum**  6:11
15:17

[minutes - procedures] Page 6

| | | | |
|---|---|---|---|
| **minutes** 20:4,6 | **o** | **p.m.** 1:9 7:6 | **philip** 3:10 |
| **modification** | | 27:11 | **pinnacle** 2:13 |
| 10:16 16:24 | **object** 21:5,6 | **pachulski** 3:4 | 5:13,24,25 |
| 20:23 | 21:21,24 22:4 | **part** 9:9 | 6:10,19,20 |
| **modifications** | **objection** 6:21 | **participating** | 9:23 11:2 |
| 16:12 | 7:9,18 8:4 | 25:11 | 13:18,25 21:23 |
| **modified** 7:19 | **objections** 7:4 | **particular** | **place** 1:12 |
| 13:15 | 22:6 24:22 | 10:22 | **plaza** 2:9 |
| **modify** 14:20 | **obviously** 12:2 | **parties** 4:21 | **please** 16:6 |
| **monday** 7:5 | **october** 7:3,6 | 5:22 6:18 9:13 | **podium** 15:20 |
| **move** 15:13 | **offer** 25:16 | 14:4 15:7 24:8 | **point** 8:20 9:7 |
| | 26:12,13 | 24:25 25:4 | 12:9 14:14 |
| **n** | **okay** 9:17 | 26:23,24 27:3 | **posed** 25:18 |
| | 15:10 17:19 | 28:14 | **possibility** |
| **n** 2:2 | 18:3,14 22:5 | **party** 6:5,8 | 11:14 |
| **name** 4:3 10:7 | **ongoing** 13:22 | 7:13,14,18,21 | **powers** 3:11 |
| **nature** 21:12 | **open** 15:18 | 7:23 8:3 9:14 | 10:11 15:21,25 |
| **necessary** 10:2 | **opening** 17:3 | 9:16 12:4,5 | 15:25 16:15,21 |
| 11:17 | 17:21 18:6,17 | 13:6 15:11 | 17:18 18:8,8 |
| **need** 20:3 24:17 | **order** 5:7,20 | 16:5 | 19:4,4 20:3,7 |
| 24:18 | 6:5 7:25 25:10 | **pass** 15:19 | **precluded** 6:21 |
| **needed** 9:18 | **organizing** | **payment** 18:2 | **preparation** |
| **neiswender** 3:9 | 10:7 | 18:23 19:18 | 26:9 |
| **never** 26:6 | **outcome** 28:16 | 22:12 | **present** 3:2 |
| **new** 1:2,14 2:5 | **outset** 16:5 | **pending** 4:7 | **presented** |
| 2:5,10,10,14,14 | **overbid** 6:12 | **pennsylvania** | 24:12 |
| 2:19,19 4:9 | 15:17 18:18 | 2:9 | **prior** 5:23 6:18 |
| 21:19 28:3,7 | 19:3,14,22 | **pesce** 2:20 10:5 | 6:24 7:8,11 9:5 |
| **notary** 1:13 | 20:11 22:16,18 | 10:8 12:19 | 20:14,22 25:19 |
| 28:6 | **overbids** 17:22 | 13:2 14:25 | **procedure** 9:9 |
| **noted** 22:6 | 18:6 | 15:19 17:6 | **procedures** 5:4 |
| 24:23 | **own** 9:11 | 19:23 20:12,13 | 5:6,21 6:5 7:19 |
| **number** 4:13 | | 20:17 22:7,17 | 7:25 9:10 |
| 5:8 8:15 9:8 | **p** | 23:16,22 24:2 | 12:13 13:5,14 |
| | | 24:14 25:21 | 14:18,21 25:9 |
| | **p** 2:2,2 | | |
| | **p.c.** 2:8 21:6 | | |

**proceed** 16:8
16:13
**proceeding** 4:7
27:10
**process** 18:13
19:10 24:16
**proposed** 6:22
7:5 10:17
16:23
**proskauer** 4:24
**provision** 14:19
**public** 1:13
28:7
**pursuant** 5:3
**put** 10:20 11:25
21:17

**q**

**qualified** 6:3
6:13 13:7,9,11
13:22 14:15
15:15 16:11,13
16:25 17:21
18:5,16,25
19:12,20 22:14
25:2,11,15,17
**question** 13:24
26:17

**r**

**r** 2:2 28:2
**raising** 6:21
**rasmussen** 3:11
**receive** 12:10
**received** 13:17

**recess** 19:25
20:2,8
**recognized**
14:4
**reconvene** 20:6
**record** 8:5
10:20,23 11:25
14:9 15:22,23
16:7 17:2
20:12 21:5,21
23:3,22 25:12
27:7,9 28:11
**reference** 22:25
**regard** 24:19
**regarding** 11:4
11:21 12:3
13:19 14:2
22:25 25:2
**related** 28:14
**relevant** 14:16
**remain** 14:19
14:21
**remove** 7:15
10:16
**representation**
12:14,15,19
**representative**
10:11
**representatives**
4:20
**request** 12:17
**requested**
11:12 12:16
14:12

**requests** 12:3
**require** 11:9
12:14 13:5
17:14
**requirement**
9:12 13:14
**requirements**
7:16
**reservation**
12:20
**reservations**
11:24
**reserve** 10:20
11:16,20 12:2
15:3,3 22:19
23:8,21,23
24:5
**reserves** 9:23
**reserving** 23:24
**respect** 21:19
23:9,10 25:14
**respective** 11:3
**respond** 24:17
**responding**
19:24
**restate** 23:5
**richmond** 28:4
**right** 9:6,24
11:16 15:3
22:2 24:3
**rights** 10:21
11:20,24 12:3
12:20 15:3
22:19 23:8,21
23:23 24:5,10

**rivero** 3:8
**rob** 21:22
**robert** 2:11,15
3:4 8:7 9:20
21:5 23:4
26:16
**room** 27:4
**rose** 4:24
**rosen** 3:5
**ross** 2:6 4:3
16:15 24:20
**ruled** 6:23
**rules** 12:11

**s**

**s** 2:2
**sale** 5:4,6,20
6:4 7:25 13:11
14:5 15:5
22:19
**salter** 3:6
**samuel** 3:5
**sandler** 3:4,5
27:5
**satisfied** 14:14
**saying** 8:22
**scheduled** 5:2
7:2
**schotz** 4:16
**second** 8:20
**section** 13:7
14:6
**see** 8:3 15:5
19:3
**seek** 12:16 15:4
20:25 22:23

| | | | |
|---|---|---|---|
| send 27:5 | stated 23:6 | **t** | today 4:14 5:2 |
| sent 8:15,19 | statement | t 28:2,2 | 7:17 8:12 10:7 |
| separate 27:4 | 15:12 | take 19:24 20:5 | 10:10,19 11:25 |
| separately 10:3 | statements 8:5 | 23:13 | 12:5,12,17,19 |
| september 1:8 | states 1:2 4:8 | taken 1:12 20:8 | 13:15 14:5 |
| 5:3,11 28:20 | status 5:9 | team 4:18 10:6 | 15:2,8 24:11 |
| set 18:11 19:6 | stop 8:2 | 12:8 | today's 5:12,15 |
| 28:10,19 | stores 2:18 16:2 | ten 20:6 | 10:13 |
| seth 3:11 | 18:9 19:5 | term 6:4 21:7 | todd 3:11 10:11 |
| shared 8:17 | street 2:14 | 21:14 | 10:12 15:20,24 |
| sheikh 3:6 | subject 5:19,21 | terms 5:16,22 | 15:25 17:6,16 |
| shopping 23:9 | submission | 6:7 7:13,21,24 | 18:8 19:4,23 |
| short 19:25 | 13:10 | 9:15 16:9,10 | told 11:8 |
| side 10:25 | submitted | 16:22 17:9,24 | true 28:11 |
| 11:15 | 17:11 | 18:13,21 19:6 | trying 8:25 |
| signature 28:21 | subsequent | 19:9,16 20:21 | tuesday 5:10 |
| similar 11:5 | 11:22 | 21:19 22:9 | turn 22:15 |
| similarly 11:20 | subsidizing | 25:18 | turning 19:2,13 |
| sorensen 3:7 | 11:6 | thank 8:9 9:19 | 19:21 |
| 8:10 17:23 | substantial | 9:21 10:5,15 | two 8:7 9:8 |
| 18:20 19:15 | 20:25 22:3,23 | 12:5 14:25 | type 11:15 |
| 22:8 | 25:23 | 15:9 17:19 | 24:16 |
| sorry 13:2 | substantially | 20:7 22:5,6 | **u** |
| speak 12:4 | 6:14 16:10 | 24:13,21 | ucc 4:22 |
| speakers 10:13 | 17:9 20:21 | theirs 8:19 | under 4:11,12 |
| speaking 8:22 | successful 25:6 | things 8:7,13 | 13:6 19:5 |
| specific 7:10 | 26:25 | think 12:23 | understand |
| stalking 21:10 | sufficient 15:2 | 14:10,25 15:13 | 12:20 13:13 |
| 21:11,25 | suite 2:9 | 20:9 24:4 | 24:4 |
| stand 9:10 | swanson 1:13 | 26:20 | understood |
| stang 3:4 | 28:6,22 | third 23:14 | 10:4 12:21 |
| starting 6:9 | sworn 28:11 | time 1:12 7:7 | united 1:2 4:8 |
| 15:15 | | 13:3,21 21:17 | |
| state 1:14 14:8 | | 24:18 | |
| 28:3,7 | | | |

**[vfp - zoom]**                                                    Page 9

| v | x |
|---|---|
| **vfp**   1:5 | **x**   1:3,6 |
| **violations** | **y** |
|    23:10 | **yeah**   20:3 |
| **voiced**   7:9 | **yesterday** |
| **w** |    10:23 23:6 |
| **waive**   20:24 | **york**   1:14 2:5,5 |
| **waiver**   25:24 |    2:10,10,14,14 |
| **want**   8:13 12:8 |    2:19,19 28:3,8 |
|    13:3 16:17 | **z** |
| **wanted**   11:25 | **zoom**   1:7 27:5 |
| **wants**   10:19 | |
| **warren**   2:13 | |
|    9:21 21:23 | |
| **way**   28:16 | |
| **week**   11:19 | |
| **whereof**   28:18 | |
| **wherewithal** | |
|    16:8,19 17:25 | |
|    18:11,22 19:8 | |
|    19:17 20:19 | |
|    22:11 | |
| **white**   2:17 3:8 | |
|    10:8 12:10 | |
|    20:13 | |
| **winner**   20:24 | |
|    21:2 | |
| **winning**   23:25 | |
| **wishes**   15:11 | |
| **witness**   28:18 | |
| **worth**   21:17 | |
| **writing**   10:25 | |
| **wrong**   17:7 | |

## **Exhibit B**

### **Michaels Bid Documents**

## ACQUISITION OF DESIGNATION RIGHTS AGREEMENT

     This ACQUISITION OF DESIGNATION RIGHTS AGREEMENT (the "Agreement"), dated as of June 22, 2023, is by and between Bed Bath & Beyond, Inc. ("Seller") and Michaels Stores, Inc. ("Purchaser").  For the avoidance of doubt, in the event that the Purchaser exercises the right to designate a Lease(s) (as defined below) for assumption and assignment to the Purchaser itself or an affiliate and the Purchaser delivers a Lease Assumption Notice (as defined below) to the Seller, except as set forth herein, all provisions of the applicable assigned contract, including any provision limiting future assignment, shall be binding on the applicable Purchaser after consummation of the assignment of such contract by the Debtors to the Purchaser.

## RECITALS

     WHEREAS, Seller, along with its affiliated debtors and debtors in possession, has filed a voluntary petition for relief pursuant to chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (as amended, the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of New Jersey (the "Court"), jointly administered under case *In re Bed Bath & Beyond, Inc.*, Case No. 23-13359 (VFP) (Bankr. D.N.J. 2023) (the "Chapter 11 Cases"); and

     WHEREAS, Seller has agreed to (i) sell, convey, assign, transfer and deliver to Purchaser, pursuant to sections 105, 363 and 365 of the Bankruptcy Code, the Designation Rights (as defined below herein) with respect to unexpired lease(s) listed on Schedule A attached hereto (the "Lease(s)") with respect to the premises set forth on Schedule A (the "Premises"), (ii) take the actions set forth herein to cause the rejection of the Lease(s) identified in the subject Lease Rejection Notice(s) (as defined below herein) following the date that Purchaser delivers a Lease Rejection Notice to the Seller, and (iii) assign and Purchaser and/or an affiliate has agreed to assume Lease(s) identified in the subject Lease Assumption Notice(s) (as defined below herein) as set forth herein, pursuant to the terms and conditions of the *Lease Sale Procedures for the Sale of Certain Lease Assets* (the "Lease Sale Procedures"), as modified herein, subject to approval by the Court in the Chapter 11 Cases.

     NOW, THEREFORE, in consideration of the Premises and the mutual agreements herein contained, the parties hereto agree as follows:

## AGREEMENT

     1.    **Designation Rights**.  On the terms and conditions set forth in this Agreement, Purchaser shall have the sole, exclusive, and continuing right to select, identify and designate (on one or more occasions) which of the Leases set forth on Schedule A hereto shall be either: (i) rejected or (ii) assumed and assigned in connection with an assumption and assignment, to Purchaser and/or an affiliate (all of which rights are referred to in this Agreement as the "Designation Rights"). The sale of the Designation Rights provided for in this Agreement shall not effect a conveyance of the Leases to Purchaser and/or an affiliate except for those Leases that Purchaser will specifically designate for itself and/or an affiliate in accordance with this Agreement.  Notwithstanding anything to the contrary herein, the Lease Sale Order[1] shall provide that effective upon receipt of a Lease Assumption Notice (defined herein) to the applicable Lease Counterparty under any Lease(s) identified in such Lease Assumption Notice from Seller, (a) Seller shall be authorized to transfer, convey, assign and set over to Purchaser and/or an affiliate, its successors and assigns, all of Seller's right, title, and interest in and to the Lease(s), and (b) Purchaser and/or an affiliate shall be authorized to assume and undertake to pay, perform, and discharge all of Seller's obligations and

---

[1]    To the extent that words and phrases are capitalized but undefined in this Agreement and have been defined in the *Lease Sale Procedures*, those definitions are incorporated herein by reference.

duties with respect to the Lease(s) as set forth herein.  For the avoidance of doubt, the Lease Sale Order shall approve (x) the Designation Rights and (y) any potential assumption and assignment of Lease(s) set forth on Schedule A to the Purchaser.

2.      **Designation Period**.  Purchaser's Designation Rights shall commence immediately after Court approval of the terms of this Agreement (the "Sale Closing Deadline") and expire thirty days (30) after the Court's entry of the Lease Sale Order (the "Designation Period"); *provided, however*, that the Designation Period may be extended upon mutual written agreement of Purchaser, the Seller, and a landlord or counterparty to the applicable Lease (each, a "Lease Counterparty").

(a)      ***Rejection of Leases***.  At any time during the Designation Period, Purchaser shall have the right, which right may be exercised at any time and from time to time, to provide written notice to the Seller (each such notice, a "Lease Rejection Notice") of Purchaser's election to require the Seller to reject the Lease(s) identified in the Lease Rejection Notice.  Following the date that Purchaser delivers a Lease Rejection Notice to the Seller, the Purchaser shall cause the rejection of the Lease(s) identified in the Lease Rejection Notice, pursuant to the *Procedures to Reject, Assume, or Assume and Assign* or the plan of reorganization in the Seller's Chapter 11 Cases.[2]  Purchaser shall not be responsible for any obligations and duties for a particular Lease that come due under the Lease after such Lease has been rejected pursuant to the terms of this Agreement.  For the avoidance of doubt, after the Purchaser provides a Lease Rejection Notice to the Seller, all of the Purchaser's obligations and duties with respect to the Lease(s) identified in the applicable Rejection Notice are discharged.

(b)      ***Assumption and Assignment of Leases***.  At any time during the Designation Period, Purchaser shall have the right, which right may be exercised at any time and from time to time, to provide written notice to the Seller (each such notice, a "Lease Assumption Notice") of Purchaser's election to assume the Lease(s) identified in the subject Lease Assumption Notice(s) and assign same to Purchaser and/or an affiliate, as set forth below or pursuant to the *Procedures to Reject, Assume, or Assume and Assign*, as applicable.

(i)      Assumption and Assignment to Purchaser or Affiliate.      At any time during the Designation Period, in the event that the Purchaser exercises the right to designate a Lease(s) for assumption and assignment to the Purchaser itself or an affiliate and the Purchaser delivers a Lease Assumption Notice to the Seller, without further Court order, on the effective date of assignment as set forth in the Lease Assumption Notice, (a) Seller shall be authorized to transfer, convey, assign and set over to Purchaser or an affiliate, as applicable, its successors and assigns, all of Seller's right, title, and interest in and to the Lease(s), and (b) Purchaser or an affiliate, as applicable, shall be authorized to assume and undertake to pay, perform, and discharge all of Seller's obligations and duties with respect to the Lease(s) as set forth herein.

3.      **Payment of Purchase Price**.  Purchaser shall, on or before the effective date of the assumption and assignment of the Lease(s) (the "Sale Closing"), deliver the purchase price for the Lease(s) in the amount of $406,042.79 (the "Purchase Price") minus the amount of the deposit (*i.e.*, $40,604.28) in immediately available funds wired to the account specified by Seller; *provided, however*, if the Court does not approve this Agreement, the Designation Rights, and/or the assumption and assignment of such Lease(s) set forth on Schedule 1 hereto to Purchaser in accordance with the terms of this Agreement, including with respect to Purchaser's rights to exercise any renewal options or extensions under the Lease(s), this Agreement shall terminate, Seller shall return the deposit to Purchaser, and Purchaser shall not be liable for

---

[2]      On May 17, 2023, the Court entered the *Order (i) Authorizing and Approving Procedures to Reject Executory Contracts and Unexpired Leases, and (ii) Granting Related Relief* (the "Procedures to Reject, Assume, or Assume and Assign")  [Docket No. 382].

any other amounts, obligations, liabilities or duties under this Agreement or any of the Leases.  The Parties acknowledge that if the assignment and assumption of the Lease(s) identified in the subject Lease Assumption Notice(s) (the "Closing") does not occur before thirty days (30) after the Court's entry of the Lease Sale Order, or such other date as set forth in the subject Lease Assumption Notice(s), the Lease(s) may thereafter be rejected in the Chapter 11 Cases.

(a)    Removal of Leases From the Lease Sale Process.  To the extent that any of the Leases listed on **Schedule A** attached hereto are not included in the Auction or are no longer subject to the sale process under the Lease Sale Procedures, the Seller shall return the applicable portion of Purchaser's Deposit to Purchaser the later of (i) three business days after removing any such Lease from the sale process under the Lease Sale Procedures and (ii) three business days after the Auction.

(b)    Toggle to Second Choice Lease.  For the (i) Summerlin and (ii) Dayton locations, there are two Leases available for assumption and assignment to a potential assignee.  With respect to the Summerlin location, in the event that Purchaser is not the Successful Bidder at the Auction for Lease Store ID 3112 (first choice lease), Purchaser will bid on Lease Store ID 503 (second choice lease).  With respect to the Dayton location, in the event that Purchaser is not the Successful Bidder at the Auction for Lease Store ID 3116 (first choice lease), Purchaser will bid on Lease Store ID 462 (second choice lease).  In each case, if Purchaser is the Successful Bidder on its first choice lease, Purchaser will not participate in the Auction with respect to its second choice Lease.  Purchaser will submit a single deposit with respect to each location and if such deposit is greater than was necessary for the Lease that is purchased, the overage or excess shall be applied to reduce the remaining Purchase Price due at Closing for the other applicable Leases where the Purchaser is the Successful Bidder.

4.    **Obligations under the Leases During the Designation Period**.  During the Designation Period, with respect to each individual Lease, Purchaser shall assume all obligations under the Lease, including rent, real estate taxes, insurance, common area charges, maintenance and any other obligations owed by Seller to each Lease Counterparty under a particular Lease for the period commencing on and after the Sale Closing Deadline; *provided, however,* that Purchaser shall not be responsible for (i) any obligations already satisfied by the Seller, (ii) any obligations that accrued prior to the Sale Closing Deadline but had not yet come due, (iii) any obligations for a particular Lease that come due under the Lease after such Lease has been rejected pursuant to the terms of this Agreement, and (iv) any obligations covered by insurance actually carried by the Seller.

5.    **Assumption of Assigned Liabilities**.  In addition to assuming all obligations that become due and are required to be paid during the Designation Period with respect to the Lease(s), as limited by paragraph 4 above, to the extent that Purchaser delivers a Lease Assumption Notice(s) to the Seller, upon the effective date of the assumption and assignment of any Lease(s) identified in such Lease Assumption Notice(s) by Purchaser and/or an affiliate, Purchaser shall assume (i) all obligations under such Lease(s) that both become due and accrue after the Sale Closing with respect to the Lease(s) and (ii) cure all outstanding liabilities that were (x) due and/or (y) accrued but not yet due prior to the Sale Closing under the applicable Lease(s) with respect to the Lease(s), which cure amounts, if any, are solely limited to the amounts listed for each applicable Lease set forth on <u>Schedule A</u> hereto (the "Cure Costs"). Notwithstanding anything herein or in any other agreement to the contrary, any applicable Cure Costs for the Lease(s), including any amounts that had accrued but had not yet come due, if any, are solely set forth on <u>Schedule A</u> hereto, provided that any objection or dispute with respect to the Cure Costs shall be resolved in accordance with the Lease Sale Procedures.  The Lease Sale Order shall provide that upon satisfaction of the Cure Costs, each Lease Counterparty shall be barred from asserting any additional amount other than the Cure Costs set forth on <u>Schedule A</u> hereto, including any other amounts, liabilities or claims with respect to its Lease(s) that arose, accrued, or came due on or before entry of the Lease Sale Order.  In the event the final Cure Costs include obligations and duties not identified on <u>Schedule A</u> hereto or in excess of the

amounts listed on Schedule A hereto, absent written consent from Purchaser to assume and pay such additional and/or increased Cure Costs, the Purchaser may terminate this Agreement if Purchaser is otherwise the successful bidder and the Seller shall return the Purchaser's deposit to the Purchaser within a reasonable amount of time.

6.      **No Further Liability of Seller**.  From and after the Sale Closing, except as provided herein, Seller shall have no further obligations and duties with respect to the Lease(s).

7.      **Further Assurances**.  At any time and from time to time after the date hereof, at the request of Purchaser, and without further consideration, Seller shall execute and deliver such other instruments of sale, transfer, conveyance, assignment, and confirmation or consents and take such other action as Purchaser may reasonably request as necessary or desirable in order to more effectively transfer, convey, and assign to Purchaser the Seller's rights to the Lease(s).

8.      **"As Is Where Is" Transaction**.  Purchaser hereby acknowledges and agrees that Seller makes no representations or warranties whatsoever, express or implied, with respect to any matter relating to the Lease(s).  Without limiting the foregoing, Seller hereby disclaims any warranty (express or implied) of merchantability or fitness for any particular purpose as to any portion of the Lease(s).  Purchaser further acknowledges that the Purchaser has conducted an independent inspection and investigation of the physical condition of the Lease(s) and all such other matters relating to or affecting the Lease(s) as Purchaser deemed necessary or appropriate and that in proceeding with its acquisition of the Lease(s), Purchaser is doing so based upon such independent inspections and investigations.  Accordingly, Purchaser will accept the Lease(s) "AS IS" and "WHERE IS."

9.      **No Holdover**. Seller shall fully vacate the Lease(s) identified in Schedule A hereto no later than five (5) days prior to the Sale Closing.  In the event Seller fails to fully vacate such Lease(s) as provided herein, Purchaser shall have no obligation to the Seller during the Designation Period, including the obligation to pay any rent, additional rent, or percentage rent, unless and until Seller complies with this Agreement. If the Seller has not vacated the Premises related to any Designated Lease during the required time, the Seller shall be solely responsible for any and all obligations related to the applicable Lease(s), including payment of any amounts due thereunder until the Lease(s) are assumed and assigned to Purchaser or rejected in accordance with this Agreement.

10.      **Lease Sale Order**.  A condition precedent to any obligations of the Parties under this Agreement shall be entry by the Court of the Lease Sale Order approving this Agreement in form and substance acceptable to the Purchaser and Seller in all respects.  To the extent that (i) a Lease Counterparty informally objects or files an objection to this Agreement or the proposed Lease Sale Order and such objection can not be resolved prior to the Lease Sale Hearing and the Purchaser determines it does not want to proceed or (ii) such Lease Sale Order is not approved by the Court, the Purchaser shall not have any obligations under this Agreement or under the Leases set forth on Schedule A and the entire Purchase Price shall be returned to Purchaser, including any deposit, within five (5) business days of either event set forth in (i) and (ii) or any other event that makes the entry of such Lease Sale Order impossible.

11.      **Customary Modifications to Lease(s).**  Notwithstanding anything to the contrary herein, if certain customary modifications to the Lease(s) (which may include one or a combination of the Lease(s) set forth on Schedule A hereto) in connection with the occupancy and operation of Purchaser at the applicable Premises are not approved by the applicable Lease Counterparty and/or set forth in the Lease Sale Order authorizing any assignment of such Lease(s) to Purchaser, including modifications with respect to, among other provisions, requirements in connection with use, continuous operations, increased deposit, rent or other obligations related to assignment, signage for, improvements to, and buildout of the Premises, unless waived in writing by Purchaser in its sole discretion, this Agreement shall terminate, Seller shall

return the deposit to Purchaser, and Purchaser shall not be liable for any amounts, obligations, liabilities or duties under this Agreement or any of the Lease(s).

12.     **Compliance With Law**.  Purchaser hereby agrees to comply with all applicable laws. Purchaser agrees to indemnify and hold Seller harmless for any violation or alleged violation of this section.

13.     **Governing Law**.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to principles of conflicts of law.

14.     **Jurisdiction.**  The Parties consent to the exclusive jurisdiction of the United States Bankruptcy Court for the District of New Jersey with respect to all matters arising under or relating to this Agreement.  The Parties hereby irrevocably waive any objection on the grounds of venue, forum non conveniens, or any similar grounds and irrevocably consent to service of process by mail or in any other manner permitted by applicable law.  The Parties further hereby waive any right to a trial by jury with respect to any lawsuit or judicial proceeding arising or relating to this Agreement.

15.     **No Reliance**.  Each Party represents and warrants that in entering into this Agreement it is relying on its own judgment, belief and knowledge and, as applicable, on that of any attorney it has retained to represent it in this matter.  In entering into this Agreement, no Party is relying on any representation or statement made by any other Party or any person representing such other Party.

16.     **Construction.**  This Agreement has been drafted through a cooperative effort of both Parties, and neither Party shall be considered the drafter of this Agreement so as to give rise to any presumption of convention regarding construction of this document.  All terms of this Agreement were negotiated in good faith and at arm's-length, and this Agreement was prepared and executed without fraud, duress, undue influence, or coercion of any kind exerted by any of the Parties upon the other.  The execution and delivery of this Agreement is the free and voluntary act of the Parties.

17.     **Execution in Counterparts**.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  All signatures of the Parties to this Agreement may be transmitted by facsimile or by electronic mail, and such transmission will, for all purposes, be deemed to be the original signature of such Party whose signature it reproduces, and will be binding upon such Party.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.


**SELLER:**
**BED BATH & BEYOND, INC.**

By_____
Name_____
Its_____


**PURCHASER:**
**MICHAELS STORES, INC.**

By__*Michael F Diamond*_____
Name___Michael Diamond_____
Its_____Executive Vice President – Chief
Financial Officer_____

**Schedule A**

**Description of Lease Asset(s)**

| LEASES | |
|---|---|
| 1. **Lease #:** | Store #988; Store ID: 540 |
| Name, State, and Zip: | Capitola, CA 95062 |
| Banner Name: | Bed Bath & Beyond |
| Cure Amount: | $0.00 |
| 2. **Lease #:** | Store #568; Store ID: 1338 |
| Name, State, and Zip: | Winter Garden, FL 34787 |
| Banner Name: | Bed Bath & Beyond |
| Cure Amount: | $3,390.45 |
| 3(a). **Lease #:** | Store #82; Store ID: 3112 |
| Name, State, and Zip: | Summerlin, NV 89135 |
| Banner Name: | BuyBuy Baby |
| Cure Amount: | $45,000.00 |
| 3(b).  **Lease #:** | Store ID: 503 |
| Name, State, and Zip: | Summerlin, NV 89135 |
| Banner Name: | Bed Bath & Beyond |
| Cure Amount: | $45,000.00 |
| *Purchaser will bid on 3(b) at the Auction solely in the event that it is not the Successful Bidder on 3(a) above.* | |
| 4. **Lease #:** | Store #23; Store ID: 385 |
| Name, State, and Zip: | East Boca, FL 33486 |
| Banner Name: | Bed Bath & Beyond |
| Cure Amount: | $0.00 |
| 5. **Lease #:** | Store #684; Store ID: 1014 |
| Name, State, and Zip: | Moreland Avenue, GA 30307 |
| Banner Name: | Bed Bath & Beyond |
| Cure Amount: | $0.00 |
| 7. **Lease #:** | Store #220; Store ID: 544 |
| Name, State, and Zip: | Edmond, OK 73034 |
| Banner Name: | Bed Bath & Beyond |
| Cure Amount: | $29,968.38 |
| 8(a). **Lease #:** | Store #1083; Store ID: 3116 |

| Name, State, and Zip: | Dayton - Washington, OH 45459 |
|---|---|
| Banner Name: | BuyBuy Baby |
| Cure Amount: | $51,174.29 |
| 8(b). **Lease #:** | Store ID: 462 |
| Name, State, and Zip: | Dayton - Washington, OH 45459 |
| Banner Name: | Bed Bath & Beyond |
| Cure Amount: | $0.00 |
| *Purchaser will bid on 8(b) at the Auction solely in the event that it is not the Successful Bidder on 8(a) above.* | |
| 9. **Lease #:** | Store #624; Store ID: 1161 |
| Name, State, and Zip: | Mueller, TX 78723 |
| Banner Name: | Bed Bath & Beyond |
| Cure Amount: | $0.00 |
| 10. **Lease #:** | Store #1067; Store ID: 3118 |
| Name, State, and Zip: | Chula Vista, CA 91915 |
| Banner Name: | BuyBuy Baby |
| Cure Amount: | $0.00 |
| 11. **Lease #:** | Store #595; Store ID: 1142 |
| Name, State, and Zip: | Rogers, AR 72758 |
| Banner Name: | Bed Bath & Beyond |
| Cure Amount: | $0.00 |
| 12. **Lease #:** | Store #850; Store ID: 1403 |
| Name, State, and Zip: | Flower Mound, TX 75028 |
| Banner Name: | Bed Bath & Beyond |
| Cure Amount: | $1,509.67 |

**EXHIBIT C TO LEASE SALE PROCEDURES**

**OFFER AND QUALIFIED BIDDER FORM**

Bidder, Michaels Stores, Inc., hereby:

- Offers to purchase the Designation Rights (as defined in the accompanying Acquisition of Designation Rights Agreement) for the following Lease Asset(s) for the bid set forth below, pursuant to this Offer and Qualified Bidder Form and the terms and conditions of the accompanying Acquisition of Designation Rights Agreement, and

- Seeks to become a Qualified Bidder pursuant to the terms and conditions of the *Lease Sale Procedures for the Sale of Certain Lease Assets* subject to approval by the United States Bankruptcy Court for the District of New Jersey in the Chapter 11 Cases jointly administered under *In re Bed Bath & Beyond Inc.*, Case No. 23-13359 (VFP) (Bankr. D.N.J. 2023) (the "Lease Sale Procedures") as modified in the Acquisition of Designation Rights Agreement.

- Is willing to purchase the Designation Rights for the following Lease Asset(s) as a group or individually if not sold as a group. The Bid/Purchase Price set forth below indicates the purchase price with respect to each such lease.

Bidder's offer is for the Designation Rights for the following Lease Assets at the following bids:

| LEASE ASSET | | BID/PURCHASE PRICE |
|---|---|---|
| 1. **Lease #:** | Store #988; Store ID: 540 | $25,000.00 |
| Name, State, and Zip: | Capitola, CA 95062 | |
| Banner Name: | Bed Bath & Beyond | |
| Cure Amount: | $0.00 | |
| 2. **Lease #:** | Store #568; Store ID: 1338 | $28,390.45 |
| Name, State, and Zip: | Winter Garden, FL 34787 | |
| Banner Name: | Bed Bath & Beyond | |
| Cure Amount: | $3,390.45 | |
| 3(a). **Lease #:** | Store #82; Store ID: 3112 | $70,000.00* |
| Name, State, and Zip: | Summerlin, NV 89135 | |
| Banner Name: | BuyBuy Baby | |
| Cure Amount: | $45,000.00 | |
| *In the event that Purchaser is not the Successful Bidder, the Bid / Purchase Price shall apply to Store ID 503 (Bed Bath & Beyond) as set forth in the Acquisition of Designation Rights Agreement.* | | |
| 3(b). **Lease #:** | Store ID: 503 | N/A |
| Name, State, and Zip: | Summerlin, NV 89135 | |
| Banner Name: | Bed Bath & Beyond | |

| **LEASE ASSET** | | **BID/PURCHASE PRICE** |
|---|---|---|
| Cure Amount: | $45,000.00 | |
| *Purchaser will bid on 3(b) at the Auction solely in the event that it is not the Successful Bidder on 3(a) above.* | | |
| 4. **Lease #:** | Store #23; Store ID: 385 | $25,000.00 |
| Name, State, and Zip: | East Boca, FL 33486 | |
| Banner Name: | Bed Bath & Beyond | |
| Cure Amount: | $0.00 | |
| 5. **Lease #:** | Store #684; Store ID: 1014 | $25,000.00 |
| Name, State, and Zip: | Moreland Avenue, GA 30307 | |
| Banner Name: | Bed Bath & Beyond | |
| Cure Amount: | $0.00 | |
| 7. **Lease #:** | Store #220; Store ID: 544 | $54,968.38 |
| Name, State, and Zip: | Edmond, OK 73034 | |
| Banner Name: | Bed Bath & Beyond | |
| Cure Amount: | $29,968.38 | |
| 8(a). **Lease #:** | Store #1083; Store ID: 3116 | $76,174.29* |
| Name, State, and Zip: | Dayton - Washington, OH 45459 | |
| Banner Name: | BuyBuy Baby | |
| Cure Amount: | $51,174.29 | |
| *\* In the event that Purchaser is not the Successful Bidder, the Bid / Purchase Price shall apply to Store ID 462 (Bed Bath & Beyond) as set forth in the Acquisition of Designation Rights Agreement.* | | |
| 8(b). **Lease #:** | Store ID: 462 | N/A |
| Name, State, and Zip: | Dayton - Washington, OH 45459 | |
| Banner Name: | Bed Bath & Beyond | |
| Cure Amount: | $0.00 | |
| *Purchaser will bid on 8(b) at the Auction solely in the event that it is not the Successful Bidder on 8(a) above.* | | |
| 9. **Lease #:** | Store #624; Store ID: 1161 | $25,000.00 |
| Name, State, and Zip: | Mueller, TX 78723 | |

| **LEASE ASSET** | | **BID/PURCHASE PRICE** |
|---|---|---|
| Banner Name: | Bed Bath & Beyond | |
| Cure Amount: | $0.00 | |
| 10. **Lease #:** | Store #1067; Store ID: 3118 | $25,000.00 |
| Name, State, and Zip: | Chula Vista, CA 91915 | |
| Banner Name: | BuyBuy Baby | |
| Cure Amount: | $0.00 | |
| 11. **Lease #:** | Store #595; Store ID: 1142 | $25,000.00 |
| Name, State, and Zip: | Rogers, AR 72758 | |
| Banner Name: | Bed Bath & Beyond | |
| Cure Amount: | $0.00 | |
| 12. **Lease #:** | Store #850; Store ID: 1403 | $26,509.67 |
| Name, State, and Zip: | Flower Mound, TX 75028 | |
| Banner Name: | Bed Bath & Beyond | |
| Cure Amount: | $1,509.67 | |
| **Aggregate Purchase Price:** | | $406,042.79 |
| | | • Deposit:  $40,604.28 |

**Bidder hereby warrants and represents as follows**:

    (a)    Bidder has received, reviewed, understands, and agrees to abide by the terms and conditions of the Lease Sale Procedures, the terms and conditions of which are incorporated herein by reference.

    (b)    Bidder has received, reviewed, and understands the terms and conditions of the Acquisition of Designation Rights Agreement as modified and submitted by Bidder, the terms and conditions of which are incorporated herein by reference.

    (c)    To the extent that the words and phrases which are capitalized in this Offer and Qualified Bidder Form have been defined in the Lease Sale Procedures or in the Acquisition of Designation Rights Agreement, those definitions are incorporated herein by reference.

    (d)    Each Bid made at a Lease Auction shall constitute a binding, irrevocable "Bid" pursuant to the Lease Sale Procedures and as set forth in and limited by the Acquisition of Designation Rights Agreement.

    (e)    Each Bid is and shall be a good faith, bona fide, irrevocable offer to purchase the Lease Asset(s) on an as-is, where-is basis, with no contingencies as set forth in the Acquisition of Designation Rights Agreement.

    (f)    Bidder (a) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Lease Asset(s) in making its offer; (b) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Lease Asset(s) or the completeness of any information provided in connection therewith or the Lease Auction other than as provided in

the Acquisition of Designation Rights Agreement; (c) is not entitled to any break-up fee, termination fee, expense reimbursement, or similar type of payment; and (d) by submitting an Acquisition of Designation Rights Agreement, waives, and shall be deemed to waive, the right to pursue a substantial contribution claim under section 503 of title 11 of the United States Code (the "Bankruptcy Code") related in any way to the submission of its bid, the Lease Sale Procedures, or any earnest money Deposit.

(g)    Bidder is either not represented by a broker seeking a commission, or if Bidder is represented by a broker, Bidder exclusively authorizes broker to submit such offer on behalf of Bidder and that any commission or fee of any type due and payable to such broker as a result of a Lease Sale shall be paid solely by Bidder and Bidder shall indemnify the Debtors and their agents in this regard, and (ii) Bidder acknowledges that it will comply with the Lease Sale Procedures.

(h)    Bidder acknowledges that, pursuant to, *inter alia*, 18 U.S.C. § 371, it is a federal crime to engage in collusive bidding or to chill the bidding.

(i)    Bidder confirms that it has not engaged, and will not engage, in any collusion with respect to the bidding or any Lease Sale.

(j)    Bidder will pay any remaining amounts due related to the Purchase Price on or before the Sale Closing by wire transfer to the bank account identified by Bed Bath & Beyond, Inc.

(k)    Bidder confirms that it is prepared to enter into and consummate the transactions contemplated in the Acquisition of Designation Rights Agreement as set forth in the Acquisition of Designation Rights Agreement.

*[Signatures appear on following page]*

AGREED & ACCEPTED this 22nd day of June, 2023

Company: Michaels Stores, Inc.

By: *Michael F Diamond*

Name: Michael Diamond

Title: Executive Vice President – Chief Financial Officer

*BIDDER I.D.*

Bidder's Company: Michaels Stores, Inc.

Bidder's Address: 3939 West John Carpenter Freeway, Irving TX 75062

Bidder's Contact: Seth Rasmussen

Bidder's Phone & Facsimile Numbers: 469-704-2827

Bidder's Email Address: seth105@michaels.com

Bidder's Tax ID Number: 37-1737959

*ATTORNEY OR AUTHORIZED AGENT I.D.*

Attorney or Agent Name: Gregory A. Pesce and Laura E. Baccash

Law Firm or Company: White & Case LLP

Address: 111 South Wacker Drive, Suite 5100, Chicago, IL 60606-4302

Phone & Facsimile Numbers: 312-881-5360 (Gregory) and 847-736-0179 (Laura)

Email Address: gregory.pesce@whitecase.com and laura.baccash@whitecase.com